# Transcript of the Testimony of
# Videotaped Deposition of Lyndon Wright

### Date taken: July 10, 2009

### In Re: FEMA Trailer Formaldehyde Products Liability Litigation

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:  504-529-5255
Fax:  504-529-5257
Email:  reporters@psrdocs.com
Internet:  www.psrdocs.com

EXHIBIT 4

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER         MDL NO. 1873
FORMALDEHYDE PRODUCTS       SECTION "N"(4)
LIABILITY LITIGATION        JUDGE ENGELHARDT

* * *

VIDEOTAPED DEPOSITION OF LYNDON WRIGHT, 3417 SOUTH CLAIBORNE AVENUE, APARTMENT 5, NEW ORLEANS, LOUISIANA 70113, TAKEN AT THE OFFICES OF FRANK D'AMICO, 622 BARONNE STREET, NEW ORLEANS, LOUISIANA 70130, ON THE 10TH DAY OF JULY, 2009.

REPORTED BY:
    CATHY RENEE' POWELL, CCR
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255

VIDEOGRAPHER:
    BRIAN SOILEAU
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255

## Page 2

1  APPEARANCES:
2
    THE LAW OFFICES OF FRANK
3   J. D'AMICO, JR.
    (BY: FRANK J. D'AMICO, JR., ESQUIRE
4       AARON AHLQUIST, ESQUIRE)
    622 BARONNE STREET
5   NEW ORLEANS, LOUISIANA 70113
6       ATTORNEYS FOR THE PLAINTIFF
7
    DAVID McCLENDON, ESQUIRE
8   4731 CANAL STREET
    NEW ORLEANS, LOUISIANA 70119
9
        ATTORNEYS FOR THE PSC
10
11  U.S. DEPARTMENT OF JUSTICE
    (BY: MICHELLE GREIF, ESQUIRE)
12  CIVIL DIVISION
    1331 PENNSYLVANIA AVENUE, N.W.
13  ROOM 8210-N
    WASHINGTON, D.C. 20004
14
        ATTORNEYS FOR DEFENDANT, UNITED
15        STATES OF AMERICA
16
    BAKER DONELSON
17  (BY: DAVID KURTZ, ESQUIRE
        KAREN WHITFIELD, ESQUIRE)
18  201 ST. CHARLES AVENUE
    SUITE 3600
19  NEW ORLEANS, LOUISIANA 70170
20      ATTORNEYS FOR DEFENDANTS,
        CH2M HILL CONSTRUCTORS, INC. AND
21      SHAW ENVIRONMENTAL, INC.

## Page 3

1  APPEARANCES CONTINUED:
2
    GIEGER, LABORDE & LAPEROUSE, LLC
3   (BY: JASON BONE, ESQUIRE
        CARSON STRICKLAND, ESQUIRE)
4   701 POYDRAS STREET
    SUITE 4800
5   NEW ORLEANS, LOUISIANA 70139
6       ATTORNEYS FOR DEFENDANT, FOREST
        RIVER, INC.
7
    GARRISON, YOUNT, FORTE &
8   MULCAHY, L.L.C.
    (BY: KELLY MORTON, ESQUIRE)
9   909 POYDRAS STREET
    SUITE 1800
10  NEW ORLEANS, LOUISIANA 70112
    (VIA TELEPHONE)
11
        ATTORNEYS FOR DEFENDANTS,
12      RECREATION BY DESIGN, LLC, TL
        INDUSTRIES, INC., FRONTIER
13      RV, INC. AND PLAY'MOR TRAILERS,
        INC.

## Page 4

EXAMINATION INDEX

EXAMINATION BY MR. BONE: ................9
EXAMINATION BY MR. KURTZ: ............248
EXAMINATION BY MS. GREIF: ............298
EXAMINATION BY MR. BONE: ..............326
EXAMINATION BY MR. KURTZ: ............337
EXAMINATION BY MR. AHLQUIST: ..........342

* * *

INDEX OF EXHIBITS

Exhibit No. 1 ........................99
    Ready for Occupancy Check List,
    SHAW-WRI 00011.

Exhibit No. 2 ......................204
    Bankruptcy petition filed on behalf
    of Lyndon Wright, May 24, 2001.

Exhibit No. 3 ........................212
    FEMA Document, Important
    Information for Travel Trailer
    Occupants, FEMA08-000013, 14.

Exhibit No. 4 ........................213
    Formaldehyde Levels in
    FEMA-Supplied Trailers.

Exhibit No. 5 ........................214
    FEMA Document, Important

1 (Pages 1 to 4)

| | |
|---|---|
| 1   Formaldehyde Information for FEMA<br>2   Housing Occupants.<br>3   Exhibit No. 6 ..........................249<br>4   FEMA Landowner's Authorization,<br>5   Ingress-Egress Agreement, SHAW-WRI<br>6   00004.<br>7   Exhibit No. 7 ..........................254<br>8   Handwritten document dated 1-18-06<br>9   by Bobbie R. Wright, FEMA<br>10   124-000041 and FGC 009-000052.<br>11   Exhibit No. 8 ..........................257<br>12   Inspection report SHAW-WRI-00007.<br>13   Exhibit No. 9 ..........................272<br>14   Call Center Maintenance Request<br>15   Form, SHAW-WRI-0015, 16.<br>16   Exhibit No. 10 ........................284<br>17   Two photographs.<br>18   Exhibit No. 11 ........................285<br>19   Black and white photograph.<br>20   Exhibit No. 12 ........................291<br>21   Supplemental Plaintiff Fact Sheet.<br>22   Exhibit No. 13 ........................301<br>23   SF Form 95 filled out by Mr.<br>24   Wright.<br>25<br>Page 5 | 1   THE VIDEOGRAPHER:<br>2   This is the 10th day of July,<br>3   2009, the time is approximately 9:16.<br>4   This is the videotaped deposition<br>5   of Lyndon T. Wright, taken at the offices of<br>6   Frank D'Amico, Jr., located at 622 Baronne<br>7   Street, New Orleans, Louisiana, for the case<br>8   entitled "FEMA Trailer Formaldehyde Products<br>9   Liability Litigation," in the United States<br>10   District Court, Eastern District of<br>11   Louisiana, MDL No. 1873.<br>12   Would counsel please identify<br>13   themselves and which parties they represent.<br>14   MR. BONE:<br>15   Before I identify myself, there's<br>16   a correction, it's 8:16 this morning.<br>17   It's Jason Bone and Carson<br>18   Strickland for Forest River.<br>19   MS. GREIF:<br>20   Michelle Greif for the United<br>21   States.<br>22   MR. KURTZ:<br>23   David Kurtz and Karen Whitfield<br>24   for Shaw Environmental, Inc.<br>25   MR. AHLQUIST:<br>Page 7 |
| 1   STIPULATION<br>2<br>3   It is stipulated and agreed by and<br>4   between counsel for the parties hereto that<br>5   the deposition of the aforementioned witness<br>6   is hereby being taken for all purposes<br>7   allowed under the Federal Rules of Civil<br>8   Procedure, in accordance with law, pursuant<br>9   to notice;<br>10   That the formalities of reading and<br>11   signing are specifically not waived;<br>12   That the formalities of filing,<br>13   sealing, and certification are specifically<br>14   waived;<br>15   That all objections, save those as to<br>16   the form of the question and the<br>17   responsiveness of the answer, are hereby<br>18   reserved until such time as this deposition,<br>19   or any part thereof, may be used or sought<br>20   to be used in evidence.<br>21   * * *<br>22   CATHY RENEE' POWELL, CCR, Certified<br>23   Court Reporter, in and for the State of<br>24   Louisiana, officiated in administering the<br>25   oath to the witness.<br>Page 6 | 1   Aaron Ahlquist and Frank D'Amico<br>2   for the plaintiff.<br>3   MR. D'AMICO:<br>4   Frank D'Amico for the PSC.<br>5   MR. McCLENDON:<br>6   David McClendon on behalf of the<br>7   PSC.<br>8   LYNDON T. WRIGHT,<br>9   having been first duly sworn as a witness,<br>10   was examined and testified as follows:<br>11   MR. BONE:<br>12   Before we get started this<br>13   morning, since, Aaron, you are appearing for<br>14   Mr. Wright, it's my understanding that<br>15   Mr. Wright has withdrawn his wage claims<br>16   pursuant to the most recent discovery we've<br>17   received.<br>18   And as it may speed along the<br>19   deposition, I just want to confirm on the<br>20   record that that includes both past lost<br>21   earnings and future wage loss.<br>22   MR. AHLQUIST:<br>23   We have withdrawn the past lost<br>24   wage claim. I believe the impact on his<br>25   future earning capacity is not waived and<br>Page 8 |

## Page 133

1  A. Yes.
2  Q. The same smell from the time you
3  smelled it in the winter of '06 until the
4  summer of 2008, correct?
5  A. (Witness nods head affirmatively.)
6  Q. And the severity of the smell, the
7  amount of the smell that you could perceive,
8  didn't change except for when you deodorized
9  the unit, correct?
10  A. That's right.
11  Q. So if you were asked, it was your
12  perception that it wasn't -- the smell
13  wasn't worse at any given point in time from
14  the time you first perceived it until the
15  time you left the trailer, correct?
16  A. Other than when the stove was on
17  in that particular area. No, I couldn't say
18  it got worse. Like I said, I was on top of
19  it. I mean, it could have been worse, but
20  by me always deodorizing it, I just probably
21  didn't pay attention to it.
22  Q. But if called upon to testify,
23  your testimony would be that the smell was
24  the same --
25  A. The same.

## Page 134

1  Q. The same across the top?
2  A. Yes.
3  MR. D'AMICO:
4  I object to the form of that
5  question. I don't know that that is what he
6  just said. But --
7  EXAMINATION BY MR. BONE::
8  Q. Do you ever recall being asked by
9  FEMA if you had any health problems that you
10  associated with this particular unit?
11  A. Repeat the question.
12  Q. Do you ever recall being asked by
13  FEMA if you had any health problems that you
14  associated with this particular unit?
15  A. By FEMA? No.
16  Q. Do you recall being asked by
17  anyone if you had any health problems
18  associated with this particular unit?
19  A. My mom.
20  Q. When did that conversation take
21  place?
22  A. Basically, when I was on the phone
23  talking to her at one time and I was doing a
24  lot of coughing. I made the mention that I
25  woke up choking, you know, looking for

## Page 135

1  water. I believe I made the comment that I
2  think this trailer has made me sick because
3  I wasn't like this when I was on the cruise
4  ship.
5  She said, "Well, I'm going to call
6  FEMA and have somebody come out. You think
7  there's a leak going on up in there?"
8  I said, "Not that I know of, I
9  don't smell propane or nothing, I'm just not
10  feeling like I was feeling on the cruise
11  ship."
12  Q. Explain to me the difference in
13  the way you were feeling from the time -- as
14  compared to the cruise ship, which is why
15  you thought there was some problem with the
16  unit.
17  A. I mean, I slept comfortably. I
18  was actually -- what word can I use? I felt
19  a lot better on the cruise ship than I did
20  in the trailer. When I got in the trailer,
21  my eyes started getting irritated and I just
22  associated it with my allergies, and I think
23  it was this trailer, but it was just
24  constant. And the coughing, just a plain
25  old dry cough. And I started seeing blood

## Page 136

1  in my mucus when I expelled, you know.
2  Q. Uh-huh.
3  A. And I would wake up with this
4  choking feeling out of my sleep. And I
5  started keeping water by the bed -- by the
6  sofa, really, I slept on the sofa.
7  It just didn't feel right, I mean,
8  between telling the people about the
9  rainwater and -- I don't know. It was just
10  aggravating.
11  Q. Okay. During that period of time
12  that you were living in this unit, you had
13  health insurance with the City of New
14  Orleans, correct?
15  A. Yes.
16  Q. And you also had health insurance
17  with Hyatt still, correct?
18  A. Yes, for a short period, yes.
19  Q. So if you needed to go to the
20  doctor, you had insurance to cover your
21  access to care, correct?
22  A. Yes.
23  Q. And did you ever seek out medical
24  care for the problems that you're telling us
25  about today?

**Page 169**

1  Q. What kind of information or
2  articles have you gotten from the City of
3  New Orleans' Web site?
4  A. Pretty much the recovery
5  information they had on the Web site.
6  That's all.
7  Q. Did you ever read anything on the
8  City of New Orleans' Web site about issues
9  relating to formaldehyde or otherwise
10 pertaining to these travel trailers?
11 A. No.
12 MR. AHLQUIST:
13     The point of confusion was
14 probably that he works at the CDC.
15 MR. BONE:
16     I understand. That's why I was
17 clarifying.
18 EXAMINATION BY MR. BONE:
19 Q. Did you at any point review any
20 information online about formaldehyde or
21 about any issues other folks were having
22 relating to these trailers?
23 A. No.
24 Q. When you first believed or came to
25 the belief that your occupancy of this

**Page 170**

1  particular unit was impacting your health,
2  did you tell your mother immediately?
3  A. Yes. I made the comment, because
4  I was coughing so much, I made the comment,
5  "Ma, I think this trailer is making me
6  sick."
7  Q. Did you ask her to take any action
8  on your behalf in that regard?
9  A. Initially, she wanted me to call
10 the maintenance people, but they gave me the
11 runaround. They wanted all kinds of
12 personal information from my mom, so I told
13 my mom she had to call.
14     So she said she called to tell
15 them that I was smelling a foul odor. They
16 gave her the runaround. She said they gave
17 her another number to call. She called that
18 number and somebody said they would get back
19 in touch with her.
20     She never did get a phone call,
21 and it just pretty much fell from there on.
22 That's when I started telling the
23 maintenance people when I saw them.
24 Q. Do you recall when the phone call
25 was with your mother that you expressed to

**Page 171**

1  her that you believed your occupancy of this
2  unit was causing you a health problem?
3  A. I would say probably April.
4  Q. Of what year?
5  A. '06. Right after I got in the
6  trailer.
7  Q. So in April of '06, you were of
8  the opinion that your occupancy of this unit
9  was causing you a health problem?
10 A. I would say I thought it was
11 making me sick, yes.
12 Q. And you expressed that to your
13 mother by May of 2006, correct?
14 A. By April.
15 Q. By April of 2006, correct?
16 A. Yes.
17 Q. Do you have any information as to
18 why your mother would have represented to
19 FEMA by February of 2008, that there were no
20 health concerns that she had about you
21 regarding your occupancy of this unit?
22 A. No, I don't know.
23 Q. Were you ever offered the
24 opportunity to purchase this unit?
25 A. You would have to ask my mom. I

**Page 172**

1  wasn't.
2  Q. If that contact was made, it was
3  typically made through your mother, correct?
4  A. Huh?
5  Q. If contact with FEMA was made, it
6  was typically made through your mother?
7  A. Yes.
8  Q. Is your mother a smoker?
9  A. Huh?
10 Q. Is your mother a smoker?
11 A. Used to be.
12 Q. When was she a smoker?
13 A. '86 back. Backward.
14 Q. When you were growing up in the
15 house, she was a smoker?
16 A. Yes.
17 Q. And you lived with her all the way
18 up until Katrina, correct?
19 A. Yes.
20 Q. Do you know what types of
21 cigarettes your mom liked to smoke?
22 A. Salems.
23 Q. When she was smoking, how many
24 packs a day did she typically smoke?
25 A. I have no idea.

43 (Pages 169 to 172)

```
 1      Q.  Oh, it's a her?  It's pretty
 2  blurry.  Don't tell her I said that.
 3      A.  Her name is Temika.
 4      Q.  Temika.  And her last name?
 5      A.  Zachary.
 6      Q.  Zachary?
 7          Okay.  When were those pictures
 8  taken?
 9      A.  I don't have any idea.
10      Q.  Did you take those two pictures?
11      A.  Yes, it would have had to be me.
12      Q.  Okay.  I'm going to hand you
13  another black and white copy of a photograph
14  that your counsel has represented to me was
15  taken by Bill Scott.
16          Have you ever seen this picture
17  before today?  And I am marking that as
18  Exhibit 11.  I don't remember if I put on
19  the record the other two photographs we were
20  just talking about were Exhibit 10.
21      MR. AHLQUIST:
22          Taken by the Scott Group.  I don't
23  know who in that group.
24      MR. KURTZ:
25          Thank you, Aaron.
                                      Page 285
```

```
 1  EXAMINATION BY MR. KURTZ:
 2      Q.  Have you ever seen Exhibit 11
 3  before today?
 4      A.  Yes.
 5      Q.  When have you seen it before?
 6      A.  If I'm not mistaken, I think I
 7  took it.
 8      Q.  Okay.
 9      A.  I didn't?  I mean, I'm seeing my
10  car, that's why I'm assuming.
11      Q.  Well, your counsel has told me
12  that one of the plaintiffs' experts or his
13  firm took this picture.
14      A.  Oh, right.  He did.
15      Q.  It's not inconsistent with what
16  you recall, right?  Do you recall ever
17  taking a picture of the outside of your
18  trailer?
19      A.  Of the trailer?  No.  I took
20  pictures outside the trailer, but not of the
21  trailer itself.
22      Q.  Okay.  Were you present when this
23  photograph, Exhibit 11, was taken?  You said
24  your car is there, that's why I'm --
25      A.  Yeah, my car is there.  I assume I
                                      Page 286
```

```
 1  was there.
 2      Q.  Okay.  Did you know that Mr. Scott
 3  or someone from his group was going to come
 4  by and take pictures of your trailer?
 5      A.  Who?
 6      Q.  Mr. Scott, Bill Scott.  Have you
 7  ever met Mr. Scott?
 8      A.  I don't recall.
 9      Q.  Okay.  It looks to me like the
10  door is slightly ajar.  Do you see that?  It
11  looks like it's slightly open?
12      A.  That's the way it's leaning.
13      Q.  That's the way it's leaning?
14  That's what led the -- caused the leak that
15  we've been talking about, right?
16      A.  Yes.
17      Q.  Did you ever notice whether air
18  was moving in or out of the trailer through
19  that gap in the door?
20      A.  No, I didn't notice.
21      Q.  You moved out of the trailer in
22  July 2008, right?
23      A.  Yes.
24      Q.  Why did you move out?
25      A.  It was the deadline for trailers
                                      Page 287
```

```
 1  to be picked up, and my mom had already had
 2  an extension, so it was just time for me to
 3  try and get my own place instead of retrying
 4  for another extension.
 5      Q.  Okay.  And where did you go?
 6      A.  To my present residence, 3417
 7  South Claiborne Avenue.
 8      Q.  Okay.  Other than the door-leaning
 9  issue, was the trailer in good shape when
10  you left it?
11      A.  When I left it?  Yeah, for the
12  most part, yeah.
13          The mold around the window and
14  down on the carpet should have still been
15  there, in the bedroom, in the front part of
16  the unit.
17      Q.  Okay.
18      A.  In the bedroom, the mold and
19  stuff.  But, I mean, as far as, I guess,
20  maintenance-wise, yes, it was in good
21  condition.
22      Q.  Okay.  Let's talk about the mold.
23  Was the window leaking?
24      A.  It kept a lot of condensate around
25  it, around the frame.
                                      Page 288
```

72 (Pages 285 to 288)

**Page 293**

1  A. I thought you was talking about
2  the certification page itself.
3  Q. Oh, I'm sorry. No.
4  I meant the data and information
5  in the packet, all that's accurate?
6  A. Yes.
7  Q. Okay. I apologize. We're talking
8  over one another, and I'm letting you do
9  that and I shouldn't.
10  Let me ask you specifically to
11  look at page 4 of that document.
12  Mr. Wright, you see above that, there are
13  some check boxes, in fact, they go back to
14  page 3, where a bunch of symptoms are
15  indicated. You see that?
16  A. Yes.
17  Q. And then you see on page 4,
18  question No. 5 says, "When do you claim this
19  injury or disease first occurred," right?
20  A. Yes.
21  Q. And your answer was what?
22  A. March of '06.
23  Q. Okay. Is that accurate?
24  A. Injury or disease? Yes.
25  Q. Mr. Bone asked you some questions

**Page 294**

1  about some work that you did in One Shell
2  Square. Do you recall that, about Sheetrock
3  removal?
4  A. Yes.
5  Q. Were you also removing and
6  disposing of ceiling tiles?
7  A. I don't recall that, no.
8  Q. What did you do at CDC right after
9  the hurricane when you first got back?
10  A. Make sure it was maintained
11  properly.
12  Q. Did you do any cleanup or help
13  repair any parts of the courthouse building?
14  A. No.
15  Q. Did you do anything to help it get
16  back up and running other than the HVAC
17  maintenance?
18  A. No.
19  Q. You said you did not see the
20  trailer itself being installed, right?
21  A. No, I didn't.
22  Q. Okay. Have you ever spoken to
23  anyone who says that they saw the trailer
24  being installed?
25  A. No.

**Page 295**

1  Q. You said you had a conversation
2  with your mother in which you told her that
3  you thought the trailer was making you sick,
4  right?
5  A. Yes.
6  Q. And you said that conversation
7  occurred in April of 2006, right?
8  A. Yes.
9  Q. Had you already seen a doctor
10  about the trailer making you sick prior to
11  talking to your mom or did you go see one
12  after talking to your mom?
13  A. After. After talking to my mom.
14  Q. About how long after?
15  A. I can't say. It was basically a
16  regular doctor's appointment.
17  No, it wasn't a regular doctor's
18  appointment. That's when I had stuff in my
19  eyes, and I saw Dr. Fox about that and he
20  gave me eyedrops.
21  Q. Is he -- you mean -- sorry. Go
22  ahead.
23  A. That was the first time I started
24  going about my problems with my eyes and
25  stuff.

**Page 296**

1  Q. Was he the physician that you had
2  said earlier said it was possible that the
3  trailer was making you sick?
4  A. Yes. That was an appointment call
5  there. I had told him I was -- at that
6  particular time, I was congested, and I just
7  asked him, I said, "Is it possible, you
8  know, that the trailer is making me sick?"
9  And he said, "It's possible."
10  Q. And when did that appointment
11  occur?
12  A. '07? I just can't pinpoint.
13  Q. Okay. Other than that doctor and
14  your mother, did you ever talk to anybody
15  specifically about the idea that the trailer
16  might be making you sick?
17  A. When Cretia and them was staying
18  with me, I didn't particularly say that the
19  trailer was making me sick, but by me always
20  deodorizing, I told them it had a smell that
21  was getting on my nerves and that's why they
22  called me a clean freak.
23  So I, like, let them know about
24  the smell, but as far as me thinking I was
25  really, really sick, I didn't mention that

1  to anyone else, I don't think.
2      Q.  You mentioned the trailer, the
3  move-in inspection, that you thought the
4  gentleman who walked around the trailer with
5  you had a Shaw helmet on, right?
6      A.  He pretty much did all the walking
7  himself. I mean, pretty much everything
8  was, like, done when I met him. But he
9  just, like, showed me down the side of the
10 trailer. Just looked at.
11     When we went inside, he showed me
12 everything was working.
13     Q.  Have you ever spoken to anybody
14 else that you thought was employed by Shaw?
15     A.  About the trailer itself, other
16 than the maintenance people? I mean --
17     Q.  Were there any maintenance people
18 who you thought were employed by Shaw that
19 you were speaking with?
20     A.  Is FEMA and Shaw the same thing or
21 is that different companies or what? I
22 mean, I don't know --
23     Q.  That's part of why I'm asking.
24 You don't know whether any individual was
25 working for FEMA or Shaw or somebody else,

Page 297

1  right?
2      A.  No, I don't. I don't.
3      Q.  Okay. When did you first notice
4  blood in your mucus?
5      A.  In '06. '06.
6      Q.  About when in '06? Still
7  summertime or was it starting to get cold?
8      A.  Probably during the summertime
9  because it was hot. It was hot at the time.
10 So the summer of '06.
11     Q.  Have you ever been arrested or
12 convicted of anything, Mr. Wright?
13     A.  No.
14     MR. KURTZ:
15     I think that's all I have. Thank
16 you.
17 EXAMINATION BY MS. GREIF:
18     Q.  Mr. Wright, my name is Michelle
19 Grief. I represent the United States in
20 this action. I just have some questions for
21 you. It shouldn't take long at this point.
22     A.  Okay.
23     Q.  I think you have been asked most
24 questions.
25     Just so I'm clear here, you

Page 298

1  started living in the unit in March of '06
2  and you moved out in July of '08; is that
3  correct?
4      A.  Yes.
5      Q.  You lived in the trailer the
6  entire time?
7      A.  Yes, I did.
8      Q.  And you moved directly from the
9  cruise ship to the travel trailer; is that
10 correct?
11     A.  Yes.
12     Q.  Did you evacuate before Hurricane
13 Katrina?
14     A.  Evacuate before? No.
15     Q.  Evacuate New Orleans before the
16 hurricane?
17     A.  No.
18     Q.  You stayed in New Orleans during
19 Hurricane Katrina?
20     A.  Yes.
21     Q.  But your mother evacuated? Did
22 your mother evacuate?
23     A.  Before?
24     Q.  Before.
25     A.  No.

Page 299

1      Q.  She stayed also?
2      A.  She stayed also.
3      Q.  At what point did she leave?
4      A.  After the storm had hit. Like two
5  days after the storm had hit.
6      Q.  Okay. At some point you went to
7  Houston, too, I think. I think you had
8  testified earlier between Hurricane Katrina
9  and then October, the beginning of October,
10 you were in Houston and then you came back
11 to New Orleans?
12     A.  In October I came back to New
13 Orleans, yes. Roughly October, late
14 September. Right after Rita.
15     Q.  And why did you come back to New
16 Orleans?
17     A.  I mean, it's my home. I wanted to
18 be part of the rebuilding process. I mean,
19 I was more stable here. I had a job here
20 and my job wanted me back and I wanted to
21 come back and I came back.
22     Q.  Let's mark this as an exhibit.
23 It's a form called an SF 95 that you filled
24 out. Will you just take a look at it and
25 review it? It's three pages. Can you just

Page 300

75 (Pages 297 to 300)

1 take a look at it?
2 Have you reviewed it?
3 A. Yes, I have.
4 Q. And is that your signature on the
5 third page?
6 A. Yes, it is.
7 Q. Do you remember filling out this
8 form?
9 A. Excuse me?
10 Q. Do you remember filling out this
11 form?
12 A. Yes.
13 Q. Did you read the last page, the
14 rider? Did you review that just now?
15 A. At the time of signing, you mean?
16 Or now, you mean?
17 Q. At the time of signing it, did you
18 read it?
19 A. No, I didn't.
20 Q. Did you review it just now?
21 A. I just --
22 Q. Can you just go ahead and read
23 this rider?
24 A. Yes, I have read it.
25 Q. Does this form accurately reflect
Page 301

1 your claim against the United States?
2 A. Yes.
3 Q. What made you decide to fill out
4 the SF 95 form?
5 Let me ask you this first. Where
6 did you first see this form?
7 A. If I'm not mistaken, this is one
8 of the forms that I signed that the person
9 from the attorney's office came by with.
10 Q. And gave you --
11 A. Yeah, I filled out the paper when
12 they came by.
13 Q. When they came by the first time
14 with Lucretia or the second time when
15 someone came back?
16 A. When I made the call to Doug
17 Schmidt's office, they asked me if I could
18 come down there, and I told them I didn't
19 know the area, so they came to me.
20 Q. At that meeting, that's when you
21 filled out this form?
22 A. Yes.
23 Q. So this is dated April 2, 2008, so
24 that would be the date that this gentleman
25 came to your home that second time or that
Page 302

1 someone from the law firm, the Schmidt law
2 firm, came to your home?
3 A. Yes.
4 Q. That second time after you
5 called --
6 A. That was the first time.
7 Q. I want a clean record here.
8 Okay. It's my understanding from
9 what you testified to earlier that one day
10 Lucretia was hanging out smoking in front of
11 your trailer, and someone from the Schmidt
12 law firm, a representative --
13 A. I don't know if he was a
14 representative, he had the card.
15 MR. AHLQUIST:
16 I object to the form of the
17 question. It has not been established.
18 EXAMINATION BY MS. GREIF:
19 Q. Okay. Someone handed you a card
20 from the Schmidt law firm on that day?
21 A. I don't know if he worked for
22 Schmidt or not. There was a card --
23 Q. Right. I just said someone from
24 the Schmidt -- someone handed you a card
25 that had Schmidt's law firm name and number
Page 303

1 on that card, that day that Lucretia was
2 hanging out in front of your trailer,
3 correct?
4 A. Yes.
5 Q. Was that when Lucretia was living
6 with you?
7 A. Yeah, at the time.
8 Q. So that would be sometime between
9 February and May of '07. It would have to
10 be sometime after February of '07?
11 A. Yes. She stayed there, like,
12 three months or so, yes.
13 Q. So this form was signed on --
14 MR. AHLQUIST:
15 Wait, wait. You just said
16 February and May of '07? Is that what you
17 just said?
18 EXAMINATION BY MS. GREIF:
19 Q. When was Lucretia staying there?
20 A. It was February of '08. That was
21 corrected in the fact sheet.
22 Q. Okay. Okay. So my next question
23 is regarding this SF 95 form.
24 A. Excuse me?
25 Q. My next question is regarding this
Page 304

**Page 305**

1  SF 95 form. You signed it on April 2, 2008?
2     A. Yes.
3     Q. That was the date that someone
4  from Schmidt's firm came to your trailer?
5     A. Yes.
6     Q. On this Form 12A, it says,
7  "Property Damage"--
8     A. Yes.
9     Q. And it says, is that $100,000?
10    A. Yes.
11    Q. What's the basis of that $100,000?
12 That means you are seeking $100,000 in
13 property damage, is that correct?
14    A. Yes.
15    (Off the record discussion.)
16 EXAMINATION BY MS. GREIF:
17    Q. My question, what does that
18 $100,000 that you're seeking in property
19 damage represent?
20    MR. AHLQUIST:
21        I'm going to object in that it
22 asks for a legal foundation.
23 EXAMINATION BY MS. GREIF:
24    Q. Well, in this form, you wrote
25 down -- it says in here that you are seeking

**Page 306**

1  $100,000 in property damage; is that
2  correct?
3     A. I didn't write the $100,000.
4     Q. You didn't write that?
5     A. No. I didn't write that.
6     Q. My question is, are you seeking
7  $100,000 in property damage from the United
8  States in this litigation?
9     A. I'm seeking as much as I can
10 possibly get.
11    Q. What property damage have you
12 sustained as a result of the allegations
13 that you're making in this claim?
14    MR. AHLQUIST:
15        I'm going to reassert my objection
16 as far as vested property interest. As we
17 have voiced in several pleadings, this is a
18 vested property right that has yet to be
19 decided by the Court. You can continue to
20 ask and I will continue to object.
21 EXAMINATION BY MS. GREIF:
22    Q. Okay. You can answer.
23    A. I can't answer that question.
24    Q. And then in 12B, it says "Personal
25 Injury, $200,000."

**Page 307**

1     A. When the guy wrote that, he was,
2  like, that was because of the formaldehyde
3  exposure from staying in the trailer.
4  That's what that number would be for.
5     Q. Okay. And what personal injuries
6  have you sustained in this litigation? What
7  personal injuries have you sustained in this
8  litigation that you are seeking compensation
9  for?
10    A. My main thing is the blood that
11 comes out of my sinuses, you know, when I
12 expel mucus. That's my main one because I
13 don't know what is keeping that going on.
14    I mean, it's just progressively
15 getting -- I wasn't going to say getting
16 worse, but it got noticeably bad in the
17 trailer.
18    I mean, I wasn't sick before I got
19 into that trailer. I mean, my eyes wasn't
20 always irritated, waking up with mucus in
21 them and all that, going to the doctor,
22 trying to get treatment because I'm thinking
23 something is seriously wrong, but it's just
24 an irritation. And the coughing that gave
25 me headaches and things like that.

**Page 308**

1     Q. Okay. So you're seeking
2  compensation for the blood in your mucus?
3     A. Uh-huh.
4     Q. For irritated eyes, for coughing
5  and what else?
6     MR. AHLQUIST:
7        I'm going to object also in that
8  we spent an hour and a half plus talking
9  about his physical impairments from
10 formaldehyde. I think it's safe to assume
11 that all of those are factors that he will
12 be seeking compensation for.
13 EXAMINATION BY MS. GREIF:
14    Q. Okay. Do you have any other
15 symptoms that you can --
16    A. I mean, from having skin rashes
17 and stuff like that. Because of this, I
18 found out that I have asthma, some form,
19 which I never was diagnosed with before.
20    Q. Are you done?
21    A. The long-term effects of
22 formaldehyde, period. I mean, I'm not a
23 chemist, but, I mean, how much formaldehyde
24 is too much and how much did I inhale over
25 two years staying there.

**Page 325**

about the odor? Like called FEMA?
A. No, my mom. My mom did.
Q. Your mom has?
A. Yes.
Q. I think you testified earlier that she called, and then what happened?
A. They did a runaround, gave her another number and said they would get back in touch with her. And we just never followed up on it.
I mean, that's when I started telling the maintenance people during their little checkoff, you know, that I was having these problems.
MS. GREIF:
I have no other questions. I have a statement to make. I'm asking that Mr. Wright read and sign the transcript.
THE WITNESS:
Read it and sign it?
MS. GREIF:
Yes. You will receive the transcript from today's deposition, so I ask that you read it and sign it.
THE WITNESS:

**Page 326**

Okay.
EXAMINATION BY MR. BONE:
Q. Mr. Wright, I have just a few follow-up questions to close out.
One of the things you mentioned during examination by counsel for the government was that as late as 2008, when your mother was asking for renewals of the travel trailer lease, that if you didn't live in that travel trailer, you would live in your car, right?
A. Yes.
Q. Did you ever attempt to locate another apartment or another place to live?
A. No.
Q. Okay. So there is no documentation of you looking or requesting alternate housing between you and FEMA saying, "I can't live in this travel trailer, I would request that you put me somewhere else"?
A. No.
Q. And there is no document between you and FEMA or your mother and FEMA saying, "There's an odor in this unit and we need

**Page 327**

corrective action to be taken," correct?
A. She made the phone call and nobody called her back. I told the maintenance people. They never wrote nothing down, but they always told me they would have somebody come out about the situation.
Q. I understand.
But my question is, did you ever write a document, did you ever write a letter or did you ever have anyone on your behalf write a letter to FEMA or anyone to say, "There's an odor in my unit, it's irritating to me and I want corrective action to be taken"?
A. No.
Q. In 2005 -- let's say 2006, you were a single man with no dependents making approximately $30,000 a year, correct?
A. That's correct.
Q. You were financially able to get an apartment if you wanted to?
A. Basically, yeah.
Q. All right. In 2007, you were a single gentleman with no dependents making $47,000 -- over $47,000 a year. You were

**Page 328**

financially able to get an apartment if you wanted one, correct?
A. Yes.
Q. In 2008, we have already established that you made roughly $72,000 a year as a single individual with no dependents. You were financially able to get an apartment if you had wanted one, correct?
A. Yes.
Q. And yet, despite the fact that you made these complaints and you testified about the complaints you had and you testified that as early as 2006, you believed the trailer you were living in made you sick, you never attempted to locate alternate housing on your own or through FEMA; isn't that true?
A. That's true. But I also didn't know the trailer was formaldehyde riddled.
Q. Let me ask you about something. If you had been provided the owner's manual to this particular trailer, would you have read it?
A. If I had -- I mean, as far as the

```
 1    A.   No, they didn't.
 2    Q.   Did they tell you you had to worry
 3  about any long-term effects of exposure?
 4    A.   No.
 5    Q.   You were also asked about
 6  complaints made at the Hyatt. I believe you
 7  said there were periodic complaints made of
 8  mold or mildew or leaks made at the Hyatt
 9  that you would encounter periodically. I
10  think it was in the bathroom on tiles, or I
11  can't remember exactly in what context.
12         When there were complaints made at
13  the Hyatt, did the Hyatt take action to
14  remedy those complaints?
15    A.   Yes, they did.
16  MR. BONE:
17         And let me object to the colloquy
18  before the question.
19  MR. AHLQUIST:
20         Okay. I'm not, I'm --
21  MR. BONE:
22         I understand. I have to preserve
23  the record, since you made that statement
24  before you asked the question.
25  MR. AHLQUIST:
                                      Page 345
```

```
 1         Okay. I appreciate that.
 2  EXAMINATION BY MR. AHLQUIST:
 3    Q.   All right. We have also discussed
 4  you taking sick leave at the Hyatt.
 5         When you called in sick, did you
 6  give reasons for why you were calling in
 7  sick?
 8    A.   No.
 9    Q.   You also indicated that you had
10  used all of your sick leave. Why was that?
11    A.   Because every year you get, like,
12  six days of sick leave or annual leave. If
13  you don't use them by the time your
14  anniversary comes around, you lose them. So
15  I just tried to use them up.
16    Q.   Did other people do this too?
17    A.   Oh, yeah.
18    Q.   Do you know what date the trailer
19  was delivered to your property on Seminole?
20    A.   What date it was delivered? No, I
21  don't.
22    Q.   You had also indicated that you
23  left the cruise ship because it was leaving?
24    A.   Yes, it was time to get off the
25  ship.
                                      Page 346
```

```
 1    Q.   If your trailer had been ready
 2  before the date the cruise ship was leaving,
 3  would you have moved into your trailer?
 4    A.   Yes, I would have.
 5    Q.   We have seen -- you also testified
 6  that the cruise ship left in March and that
 7  you moved into your trailer after Mardi Gras
 8  of '06.
 9    A.   Yes.
10    Q.   I'm going to represent, because I
11  looked up the date that Mardi Gras happened,
12  February 28 of '06. February 28, I believe
13  was the last day of Mardi Gras in 2006.
14         You have been shown exhibits
15  today. I would ask you to find Exhibit 1
16  and Exhibit 8. They have little stickers on
17  them, if you can find them in the pile.
18    A.   Exhibits 1 and 8?
19    Q.   All right. You've got them right
20  there.
21         If you look at the bottom of
22  Exhibit 8, the signature date is 2-13-06.
23         Do you still stand by your
24  statement that you moved into your trailer
25  after Mardi Gras in '06?
                                      Page 347
```

```
 1    A.   Yes, I know it was after Mardi
 2  Gras because it was after Mardi Gras -- I
 3  mean, because March 1 was the deadline for
 4  everybody to get off the boat.
 5    Q.   Okay.
 6    A.   And my lights were on or had to
 7  come on right around Mardi Gras time. It
 8  was March when I moved in.
 9    Q.   Did you leave the last day you
10  could be on the cruise ship?
11    A.   The last day I could be there?
12  No. I left, I had like -- it was after
13  Mardi Gras. It was March. I know it was
14  March.
15    Q.   Were you able to move in before
16  you had electrical hookup?
17    A.   No. They wouldn't give me the
18  keys.
19    Q.   You also said at the time you
20  moved in there was a checklist that either
21  you saw or you went through.
22         Do you recognize either of these
23  as the checklist, Exhibit 1 and Exhibit 8?
24  MR. KURTZ:
25         Objection.
                                      Page 348
```

87 (Pages 345 to 348)

**Page 353**

1  Q. How long would you leave the stove
2  on for?
3  A. To really warm it up real quick,
4  probably about 15, 20 minutes.
5  Q. Why didn't you tell the women who
6  came to stay with you that you were
7  concerned that the trailer was making you
8  sick?
9  A. Like I say, when I told my mom
10 that I thought the trailer was making me
11 sick, I mean, it was like a freelance-type
12 statement, but like I said, my mom tried to
13 get somebody --
14 Q. I'm going to restate the question.
15 Why didn't you tell the women who
16 came to stay with you, Nicole Dyson and then
17 Lucretia and Vanessa and their children, why
18 didn't you tell them that the trailer was
19 making you sick?
20 A. Because I didn't actually know
21 that the trailer was making me sick. I
22 mean, I didn't want to alarm them, but I
23 didn't really actually know, even though I
24 was going to the doctor with these symptoms.
25 Q. Just a couple more.

**Page 354**

1  We talked about Bio-Treat and
2  Coolite, which are HVAC chemicals.
3  Did you ever notice any container
4  of Bio-Treat or Coolite leaking at CDC?
5  A. No.
6  Q. What would you do if you saw a
7  container leaking?
8  A. We would have to call the
9  contractor company to come out.
10 Q. Would you handle it in any way?
11 A. Depending on how bad the leak is,
12 we would probably have to call the fire
13 department.
14 Q. Would you handle it in any way?
15 MR. BONE:
16     Objection.
17 THE WITNESS:
18     Oh, me? Me specifically? No.
19 MR. AHLQUIST:
20     All right. I think that that's
21 it. Lyndon, I really appreciate your time.
22 Does anybody have anything else?
23 THE VIDEOGRAPHER:
24     That concludes our deposition; it
25 is 4:46.

**Page 355**

1  (Which concluded the deposition.)

**Page 356**

WITNESS' CERTIFICATE

I have read or have had the foregoing
testimony read to me and hereby certify that
it is a true and correct transcription of my
testimony with the exception of any attached
corrections or changes.

_____
LYNDON WRIGHT

PLEASE INDICATE
( ) NO CORRECTIONS
( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED