UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE:   **FEMA TRAILER**              *   **MDL NO. 1873**
         **FORMALDEHYDE PRODUCTS**     *
         **LIABILITY LITIGATION**      *   **SECTION "N" (5)**
                                       *
                                       *   **JUDGE ENGELHARDT**
                                       *   **MAGISTRATE CHASEZ**
                                       *
**THIS DOCUMENT IS RELATED TO**        *
                                       *
*Aldridge, et al v. Gulf Stream Coach* *
*Inc., et al*, Docket No. 07-9228;     *
Elisha Dubuclet, individually and on behalf *
of Timia Dubuclet                      *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PLAINTIFF'S RESPONSE TO DEFENDANT FLEETWOOD ENTERPRISES, INC.'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PATRICIA M. WILLIAMS, PH.D., DABT

Plaintiff Elisha Dubuclet, individually and on behalf of Timia Dubuclet, ("Ms. Dubuclet" or "Plaintiff") respectfully submits the following Response to Defendant Fleetwood Enterprises, Inc.'s Motion *in Limine* to Exclude the Testimony of Patricia M. Williams, Ph.D., DABT and hereto states:

## INTRODUCTION

Plaintiff has designated Patricia M. Williams, Ph.D., DABT as an expert in the field of toxicology. Based on her cumulative research, Dr. Williams has rendered two opinions pertinent to this case: (1) that "[a] cause—effect relationship exists between formaldehyde and eczema" and (2) that "[a] cause—effect relationship exists between formaldehyde and upper respiratory tract damage and cancer." Exhibit A, Affidavit of Patricia M. Williams, Ph.D., DABT, July 9, 2009, p. 40. Fleetwood Enterprises, Inc. ("Defendant") seeks to exclude the testimony of Dr. Williams arguing that she is not

qualified to render opinions in this matter and her opinions are not based on any reliable methodology. As will be discussed *infra*, Dr. Williams is more than qualified to render the opinions she has offered, the science supporting her opinions is sound and her opinions are reliable.

## I.     STANDARD OF ADMISSIBILITY.

The admission of expert testimony in federal court is government by Federal Rule of Evidence 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under a Rule 702 inquiry, the first step is to determine whether the expert is qualified to testify. *Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994). The United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), emphasized that a Rule 702 inquiry is "a flexible one" where the individual factors are neither exclusive nor dispositive. *Id*. at 594-95. As such, this Court essentially considers whether the expert retains a range of knowledge, skills and training. *Id*.

The second step of the Rule 702 inquiry requires the expert testimony to be reliably based upon scientific methods. *Paoli*, 35 F.3d at 742. "*Daubert* explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good

grounds' for his or her belief." *Id*. (citing *Daubert*, 509 U.S. at 590).

Dr. Williams's testimony is not only qualified to provide her opinions, but her opinions are indeed reliable and provide information that will undoubtedly assist the trier of fact in developing a reasoned decision. In a flawed attempt to exclude Dr. Williams's testimony, Defendant fails to consider the entirety of Dr. Williams's Affidavit and testimony, and instead seemingly cherry-picks segments of her testimony that are not reflective of her true expertise.[1]

## II.     DR. WILIAMS IS QUALIFIED TO TESTIFY.

The first step in a Rule 702 inquiry is to determine whether the expert is qualified. Plaintiff offers Dr. Williams as an expert in toxicology. As discussed below, Dr. Williams is clearly qualified by knowledge, skill, experience, training and education to offer such testimony, and any attempt by Defendant to refute Dr. Williams's qualifications lacks foundation as they do not apply to the opinion Dr. Williams seeks to proffer.

### A.     Dr. Williams Retains the Requisite Qualifications.

Dr. Williams holds a Masters Degree in microbiology from Louisiana State University, and a Ph.D. in anatomy with a doctoral minor in biochemistry from Tulane Medical Center. *See* Exhibit C, Patricia M. Williams, Ph.D., DABT Curriculum Vita, p.1; *see also* Exhibit A, p.1-2. She is board certified by the American Board of Toxicology and licensed by the State of Louisiana as a Clinical Laboratory Scientist and Laboratory Director. *See* Exhibit C, p.1; Exhibit A, p. 1-2. She currently serves as a tenured

---

[1]     For example, in its memorandum regarding Dr. Williams, Defendant begins with a so-called 'factual background' where Defendant proceeds to refute the "three principal studies that Dr. Williams relies on to show a causal link between gaseous formaldehyde and Ms. Dubuclet's pre-existing skin conditions." Rec. Doc. 6664-2, p. 2-7. Respectfully, Plaintiff does not agree with Defendant's rendition of its 'factual background.' Moreover, on at least five occasions, Dr. Williams states that she is relying on additional studies beyond the three cited by Defendant. Exhibit B, Deposition Transcript of Patricia M. Williams, Ph.D., DABT, September 28, 2009, p. 11, l. 21-24; p. 12, l. 16-24; p. 26, l. 14-15; p. 44, l. 15-21; p.137, l. 4-10.

Associate Professor and Coordinator for Toxicology Research Laboratories of the Pontchartrain Institute for Environmental Sciences at the University of New Orleans., where she also teaches graduate and undergraduate classes in toxicology, cell biology, histology and immunology. *See* Exhibit C, p.1; Exhibit A, p.1-2.  She has lectured to second-year medical students on the "Environmental Etiology of Disease," and has served as Principal Investigator for medical surveillance research projects funded by the State of Louisiana. *See* Exhibit A, p. 3.   Her experience also includes performing health profiles and epidemiologic studies to identify the evolution of disease in association with chemical exposure. *See* Exhibit A, p. 3.  This Court did recognize Dr. Williams qualification subsequent a Rule 104 hearing on September 14, 2009, and in as recent as July 30, 2009, other courts have found her to be qualified.  *See* Exhibit D, Opinion from the Twenty Fourth Judicial District Court, Parish of Jefferson, July 30, 2009, p. 3, 8; Exhibit E, Opinion from the Northern District of Mississippi, July 23, 2007, p. 10 (finding Dr. Williams "clearly and indisputably well-qualified").   Notably, Dr. Williams has testified regarding formaldehyde in a previous litigation involving textiles.  *Williams v. Superior Uniform Group, Inc.*, Cause No. 35,331 (5th Dist., Richland Parish Sept. 2009).

Dr. Williams is also particularly qualified as to the testimony she provides.  Her opinions derive in part from the existence and concentration range of formaldehyde in the FEMA trailers available from the direct analysis of air concentrations performed by the Center for Disease Control and Prevention (CDC), which published its Final Report on July 2, 2008. *See* Exhibit A, p. 25.  Dr. Williams conducted an extensive review of the scientific literature, which she summarizes in her affidavit.  *See* Exhibit A, p. 8-38.  Her references include such venerated sources as the World Health Organization (WHO), International Agency for Research on Cancer (IARC), Cassarett & Doull's, the Agency

for Toxic Substances and Disease Registry (ATSDR), and Patty's Toxicology.  *See* Exhibit A, p. 8-38.

### B.    Defendant's Challenges To Dr. Williams's Qualifications Are Erroneous and Do Not Relate To the Purpose of Her Opinions.

Defendant attempts to argue that a toxicologist "is not qualified to offer an expert opinion regard a chemical's ability to cause alleged damages where the toxicologist is not a licensed medical doctor and lacks experience in the study of exposures to the subject chemical."  Rec. Doc. 6664-2, p. 7 (citing *Wintz v. Northrop Corp.*, 110 F.3d 508, 514 (7th Cir. 1997)).    Respectfully, no such requirement exists.   Defendant's case support does not require the medical licensing of toxicologist, but instead recognizes the importance of following the guideless established in the Federal Judiciary Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 407-08   (2d ed. Federal Judicial Center) (2000).[2] *Wintz*, 110 F.3d at 513. Notably, Dr. Williams's methodology for her opinions originates from techniques published in this very manual.  Exhibit A, p. 7.

Defendant similarly argues that Dr. Williams is not qualified because her expertise stems from her experience as an anatomist, and that she does not have experience with skin disease.   However, as noted many times, Dr. Williams is a toxicologist, and "[t]oxicology is the study of the adverse effects of chemicals on living organisms."   *In Re Silicone Gel Breast Implants Products Liability Litigation*, 318 F.Supp.2d 879, 906 (C.D. Cal. 2004) (internal quotations and citations removed).   Further, the Federal Judicial Center's Reference Manual on Scientific Evidence, discusses the expert qualifications of a toxicologist and notes that "no single academic degree, research speciality, or career path qualifies an individual as an expert in toxicology" because

---

[2]       It should also be noted that *Wintz* involved a toxicologist rendering an opinion on the specific causation of chemically induced damages.  *Wintz*, 110 F.3d at  514.  Dr. Williams's opinions extend only to general causation.    Exhibit A, p. 7.

toxicology is a "heterogenous field." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 415

(2d ed. Federal Judicial Center) (2000). Nevertheless, "[a] proposed expert should be

able to demonstrate an understanding of the discipline of toxicology, including

statistics, toxicological research methods, and disease processes." *Id.* at 416. Here, while

Dr. Williams has not authored any skin disease articles, Dr. Williams, as evidenced in

her deposition testimony, clearly understands the processes regarding diseases of the

dermatitis.  Exhibit B, p. 109, l. 2-p. 111, l. 14.[3]

---

[3]

Q        I do not disagree with you one whit on that, but that is not to say
that every molecule of formaldehyde that your skin sees is absorbed by
your skin, correct?

A        You're talking two different things. Absorption is totally
different from direct contact. On contact, a reactive electrophile will react
with a negatively charged membrane or particle or whatever it is that it's
coming into contact with. Absorption is a totally different phenomenon.

Q        Well, let's talk about absorption. What's the difference?

A        Well, absorption is if it can penetrate the keratinized layer of the
stratum corneum and penetrate through the desmosomal junctions of the
individual keratinocytes that are present in the stratum corneum.
Absorption for the skin would be penetration through those intracellular
barriers, and that is a totally different thing than just making contact.

Q        Where would sensitization occur?

A        Well, sensitization is going to occur after it penetrates into the
dermis.

Q        Correct.

A        The epidermis is your barrier, and the outermost layer of the
epidermis is your main barrier, and that's the keratinized -- the
keratinocytes that have keratohyalin -- Well, actually, it's filaggrin
filaments in addition to the proteins that allow it to be very
impenetrable.

Q        And assuming you've got no filaggrin deficit and all of the
things being equal, not everything that strikes the outer barrier of your
skin is then going to be absorbed and be reacted below the surface,
correct?

A        If it does not penetrate, you will see the irritant reaction of the
contact between the reactive electrophile with the surface of the cell
membranes of the skin. That's what makes the irritant reaction.

Q        You may see an irritant reaction, correct?

In addition, the Reference Manual on Scientific Evidence offers suggested "indicia of expertise" which are relevant to both the admissibility and weight of a proffered expert opinion, including: (1) whether the proposed expert has an advanced degree in toxicology, pharmacology or a related field, and if the expert is a physician, is he board certified in a field such as occupational medicine; (2) whether the proposed expert has been certified by the American Board of Toxicology, or does he belong to a professional organization such as the Academy of Toxicological Sciences or the Society of Toxicology; and (3) what other criteria does the proposed expert meet, such as quality and number of peer-reviewed publications, service on scientific advisory panels, and university appointments. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 415-18  (2d ed. Federal Judicial Center) (2000).   As noted above, Dr. Williams meets all of these indicators of expertise.   As such, her testimony obviates that her education, research, and work experience qualify her to identify and interpret patterns of disease development in association with toxic exposures to determine the etiology of environmental diseases using the tools, data, and resources she used as the basis of her expert testimony for her opinions regarding general causation. *See* Exhibit A, p. 5.

## III.    DR. WILLIAMS'S OPINIONS ARE RELIABLE.

---

A        If there is sufficient amount of the reactive electrophile combining with the negative components of the cell membranes, you will see an irritant reaction.

Q        So the dose becomes important?

A        Well, the penetration becomes important. If you have intact skin, the penetration will occur at a very small amount. I mean, eczematous skin has really no -- very little protective barrier. That's why people with eczema get Staphylococcus aureus or infections in the eczematous skin, because they just have lost that barrier.

In addition to lacking qualifications, Defendant argues that Dr. Williams's opinion regarding eczema and cancer are unreliable.  The reliability of an expert's opinion is based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; essentially, the expert must have 'good grounds' for his or her belief." *Id.* (citing *Daubert*, 509 U.S. at 590).

Under *Daubert* and its progeny, Dr. Williams's methodology is reliable and bears numerous hallmarks of such reliability. *See Ancar v. Murphy Oil, U.S.A., Inc.*, 2007 WL 3270763, *2 (E.D. La. Nov. 2, 2007); *In re Katrina Canal Breaches Consol. Litigation*, 2007 WL 3245438, *12 (E.D. La. Nov. 2, 2007). Her opinions relating to the general causation of eczema and cancer are consistent with the research on which she relies.  *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Further, there exists no "analytical gaps" between the data and her opinion.  As such, Dr. Williams's opinions are reliable.

A.      **Dr. Williams's Eczema Opinion Is Reliable**

Gaseous formaldehyde is a well recognized source causing and/or exacerbating atopic dermatitis.  For example, the National Institute for Safety and Occupation Health ("NIOSH") notes that "[a]llergic dermatitis has been produced by direct skin contact with formaldehyde solutions the handling of formaldehyde-containing textiles, skin contact with formaldehyde from formaldehyde-containing resins, and exposure to gaseous formaldehyde."   NIOSH Criteria for Recommended Standard: Occupational Exposure to Formaldehyde, DHHS (NIOSH) Publication No. 77-126, US Department of Health, Education and Welfare (1976); *see also* Exhibit M, Supplemental Affidavit of Patricia M. Williams, Ph.D., DABT, November 16, 2009, p. 13-15. Similarly, the Occupational Safety and Health Administration ("OSHA") states that "[e]xposure to liquid formalin or formaldehyde vapor can provoke skin reactions in sensitized individuals even when air-borne concentrations of formaldehyde are well below 1

ppm." 29 CFR 1910.1000 (1990); *see also* Exhibit M, p. 17-18.  Finally, Patty's Toxicology, a long venerated source for the effects of chemical exposure, finds that "[p]rolonged exposure to low concentrations of the vapor can result in irritation of the eyes and inflammation of the eyelids, and sensitive persons might develop an allergic skin rash." Exhibit M, p. 20-21.

Defendant argues that Dr. Williams's opinion regarding eczema is unreliable because it is not based on sound methodology.  Rec. Doc. 6664-2, p. 11-19.  Specifically, Defendant asserts that the 'three primary studies' relied upon by Dr. Williams do not prove causation.  Defendant's argument fails because (1) Defendant applies the wrong methodology to determining causation; (2) the 'three primary studies' cited by Defendant establish a strong association (3) Defendant fails to consider the multitude of reports and studies involving free formaldehyde that has been off-gassed from materials such as sealed wood products; and (4) there exists biological support that free formaldehyde exacerbates of eczema.

### 1. *Defendant Applies the Wrong Methodology to Determining Causation.*

Defendant's only basis for negating Dr. Williams's eczema opinion is that she only relies on 'three primary studies' that do not prove causation in and of themselves. As noted *supra*, Dr. Williams relies on many studies noted in her Affidavit, and furthermore, Dr. Williams's causation opinion is not dictated solely by the studies, but instead she applies the methodology approved by Bradford Hill and the Federal Judiciary Center's Reference Manual on Scientific Evidence.  This methodology does not look solely to studies to prove absolute causation, but instead, looks at studies to determine the "strength of the association of disease and exposure." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 407 (2d ed. Federal Judicial Center) (2000).      As

clearly stated by Dr. Williams, scientific studies do not seek to prove causation, but seek

to show association.

> A        This study is showing an association.  That is what epidemiologic studies do and –
>
> Q        It is certainly not drawing by its very own terms a cause and effect relationship, is it?
>
> A        No, the causal consideration comes with examining strength of the association of "epi" studies in addition to consistency of association in multiple studies, in addition to the mechanisms behind those particular associations, in addition to the temporality of the particular eczema and exposure, in addition to the biological plausibility, the dose-response, biological gradient, coherence and animal models.
>
> A cause and effect is a causal opinion, where all of the information has been looked at, not just a cause and effect from one study.
>
> Q        . . . [T]he fact of the matter is, the  authors of this paper expressly state, "We   draw no cause and effect relationship in  this study between formaldehyde exposure on   the one hand and eczema on the other"; isn't   that correct?
>
> A        That's correct.  One study should not draw a cause and effect.  The authors will examine it and will put out their results.   <u>A causal opinion is exactly that, an opinion, and requires looking at all of  the parameters from the Bradford Hill  parameters, which are also code-required in  Federal Court, so that one would not take  any one study without looking at all of the  other evidence.</u>
>
> Q        Right.

Exhibit B, p. 21, l. 6-25; p. 22, l. 3-21 (emphasis added). In fact, other Bradford Hill and

Reference Manual on Scientific Evidence considerations are the consistency of

observations, dose-response relationships, temporal relationship of the disease and

exposure, biological plausibility and whether the association conflicts with the natural

history and biology of the disease.  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 407-08

(2d ed. Federal Judicial Center) (2000).   As will be established *infra*, Dr. Williams not

only provides scientific studies showing strength of association, Dr. Williams follows the additional criterion in formulating her opinion.

**2.     The Three Primary Studies Cited by Defendant Show an Association Between Gaseous Formaldehyde and Eczema**

Although Dr. Williams relied on more than the 'three primary studies' cited by Defendant, these 'three primary studies' are useful in proving an association between gaseous formaldehyde and eczema.

**a.     Matsunaga Study (2008)**

The Matsunaga Study examined the relationship between formaldehyde exposure and the prevalence of allergic disorders in Japan.  Exhibit F, Matsunaga, et al., *Ambient Formaldehyde Levels and Allergic Disorders Among Japanese Pregnant Women: Baseline Data Form the Osaka Maternal and Child Health Study*, 18(1) ANNALS OF EPIDEMIOLOGY 78 (2008).   The study found a positive association for atopic eczema where exposure exceeded 47 ppb or more.  *Id.*  This finding is supported by an adjusted odds ratio of 2.25 at a 95% confidence interval.  *Id.*  Defendant states that this is not a significant finding, but in fact the authors of the study disagree: "[i]n the present cross-sectional study of Japanese pregnant women, we found that FA [formaldehyde] exposure was positively related to the prevalence of atopic eczema."  *Id.* at 81. Furthermore, many courts disagree and find that studies with a relative risk of 2.0 or greater are sufficient to support a causation opinion. *See, e.g., In re Bextra and Celebrex Marketing Sales Practices*, 524 F.Supp.2d 1166 (N.D.Cal.2007); *In re Breast Implant Litigation,* 11 F.Supp.2d 12 (D.Colo.1998); *see also,* Russellyn S. Carruth & Bernard D. Goldstein, *Relative Risk Greater Than Two in Proof of Causation in Toxic Tort Litigation,* 41 JURIMETRICS J. 195 (2001).

The authors of the Matsunaga Study also provide an explanation for their association: "[t]here are potential reasons why such an association may exist.  In a climate chamber study, FA exposure induced significant increase of transepidermal water loss in patients with atopic eczema but not in control subject.  The irritation properties of FA may impair the epidermal barrier function."   *Id*. at 82.

Defendant attempts to reanalyze the study and essentially dissolve any of its findings.  However, as noted by Reference Manual on Scientific Evidence, a court should not question the findings of a published study unless there is presence of clear error. See REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 375   (2d ed. Federal Judicial Center) (2000); *see also King v. Burlington Northern Santa Fe RR*, 762 N.W.2d 24(Neb. Sup. Crt. 2009); Berry *v. CSX Transp., Inc.*, 709 So.2d 552 (Fla.App. 1998).  Defendant has not alleged the presence of clear error.[4]   Thus, the Matsunaga study establishes the relationship between gaseous formaldehyde and eczema.

### b.  Takahashi Study (2007)

The Takahashi Study examined both the irritation and sensitization of atopic dermatitis to formaldehyde fumes from a laboratory.   Exhibit H, Takahashi, et al., *Prospective Study of Clinical Symptoms and Skin Test Reactions in Medical Students Exposed to Formaldehyde Gas*, 34 J. OF DERMATOLOGY 283 (2007).  The study noted that "students with a history of atopic dermatitis complained of skin irritation ($P < 0.001$), skin redness ($P = 0.008$), general fatigue ($P = 0.009$) and mood swings ($P = 0.025$), more often than students without a history of atopic dermatitis.  *Id*. at 285.  Defendant takes issue with the level of association present in this study.  Rec. Doc. 6664-2, p. 15.  However, the

---

[4]     Defendant questions the study's decision to select participants based on a self-reporting as turning "Bradford Hill on its head."  Respectfully, many studies are based on self-reported questionnaires in which the participants are then selected and such do not violate Bradford Hill criteria when seeking to prove exacerbation.

significance of epidemiological studies with weak positive associations is a question of weight, not admissibility. *In re Joint Eastern & Southern Dist. Asbestos Lit.*, 52 F.3d 1124, 1134 (2d Cir.1995).  Regardless, the authors state that "the present results suggest that de novo sensitization to formaldehyde occurs in a minority of students due to airborne or direct contact with formaldehyde during the anatomy course."

### c.        Eberlein-Konig (1998)

The purpose of the Eberlein-Konig Study was "[t]o investigate the influence of nitrogen dioxide and formaldehyde on the epidermal barrier function and skin surface" of those with atopic dermatitis.  Exhibit I, Eberlein-Konig, et al., *Influence of Airborne Nitrogen Dioxide or Formaldhyde on Paramters of Skin Function And Cellular Activation In Patients With Atopic Eczema and Control Subjects*, 101(1) J. ALLERGY CLIN. IMMUNOL. 142 (1998). As noted by Defendant's own expert, the epidermal barrier is compromised in those with atopic eczema and is further fatigued by exposure to formaldehyde.

> Q.      And what happens when the barrier function is compromised?
>
> A.      Well, like I said previously, the skin barrier is to hold water in, so water escapes the skin when the barrier is compromised; and it is also to keep potential allergens and microorganisms out, so those may more easily penetrate the skin.
>
> Q.      And does it not trigger an immune response then that causes skin inflammation and eczema?
>
> A.      The allergens can cause skin inflammation and eczema.  Correct.

Exhibit G, Deposition Testimony of Patricia M. Farris, M.D., F.A.A.D., October 14, 2009, p. 55, l. 10-p. 57, l. 4.  The study ultimately concluded that "[f]ormaldehyde exposure induced a significant increase of TEWL [transepidermal water loss] in patients with atopic eczema but not in control   subject.   The known irritant properties of

formaldehyde may be the cause of this worsened epidermal barrier function."  Eberlein-Konig, et al., 101(1) J. ALLERGY CLIN. IMMUNOL. at 143. Further "the results of this study indicate that exposure to even low concentration of pollutants for a short period of time can influence skin surface parameters, especially the skin barrier functions."  *Id*. Finally, Defendant implies that Dr. Williams perhaps "intentionally" forgot to mention the third measure of the study, which looked at disease markers.  Respectfully, the study itself chose not to draw any conclusions regarding the disease markers.  In the conclusion of the study, there is not one mention of the effect of these disease markers nor their implication.  *Id*. at 142-43.  As such, this study proves a positive correlation to gaseous formaldehyde exposure and exacerbation of atopic eczema.

Therefore, the 'three primary studies' cited by Defendant support the positive relationship between gaseous formaldehyde and eczema exacerbation and are relevant in establishing the dose-response and temporal relationship pursuant to the causation criteria of Bradford Hill and the Reference Manual on Scientific Evidence.

### 3.     *Defendant Fails to Consider the Multitude of Studies Regarding Free Form Formaldehyde.*

Defendant would have this Court believe that only studies including the specific words "gaseous formaldehyde" are relevant to this case.   Respectfully, the type of formaldehyde critical to this matter is free formaldehyde — formaldehyde that is off-gassed from other materials such as wood products and is, in effect, gaseous formaldehyde. Thus, studies regarding textiles and contact dermatitis are relevant as "the free formaldehyde release is so great from textiles, so you cannot ignore the fact that you have clothing on that may be releasing the gaseous formaldehyde so great that it can contaminate other clothing in the same drawer" Exhibit B, p. 80, l. 23-p. 81, l. 3; *see also* Hovding G., *Contact Eczema Due to Formaldehyde in Resin Finished Textiles,* 41 ACTA

DERMATO-VENEROLOGICA 194 (1961). Also, as previously mentioned, venerated sources such as NIOSH, OSHA and Patty's Toxicology have recognized that gaseous formaldehyde can cause/exacerbate eczema.

Further, many studies evaluating the histopathological effects of formaldehyde on the nasal and respiratory passages involve free (i.e. – gaseous) formaldehyde.[5] Such studies are relevant in establishing the consistency of the atopic allergic potential of formaldehyde under Bradford Hill and the Reference Manual on Scientific Evidence. Also, as will be discussed next, the mechanism of formaldehyde absorption in the nose is similar to the absorption process for skin affected by atopic dermatitis.  For example, a 2006 study examining the effect of low concentrations of free formaldehyde on respiratory health indicated that mild exposure to free formaldehyde in the home was sufficient to aggravate symptoms in patients with allergic asthma.  Casset, et al., *The Bronchial Response to Inhaled Formaldehyde,* 23 REV. MAL RESPIR. 3S25 (2006).  Similarly in 2001, a study indicated that among children with a history of atopy, the inhalation of formaldehyde at higher concentrations resulted in greater number of asthma diagnoses. Smedje, et al., *Asthma Among Secondary Schoolchildren in Relation to the School Evironment,* 27 Clin. & Envir. Allergy 1270 (1970).

Thus, the studies involving free-form formaldehyde are also relevant to Dr. Williams's opinion regarding formaldehyde effects on atopy, and further support the relationship between formaldehyde and eczema.

### 4. There Exists Biological Support for Dr. Williams's Opinion Regarding Formaldehyde.

---

[5]     Although many studies do not clearly state that the formaldehyde is indeed "gaseous formaldehyde," it would be ludicrous to assume that the participants' noses came into direct contact with formaldehyde.  It is in fact gaseous formaldehyde that is inhaled and absorbed by the mucus membrane, just as formaldehyde is absorbed by the weakened transepidermal barrier.  *See generally* Exhibit G, p. 55, l. 10-p. 57, l. 4.

Although this Court has held that "[n]o requirement exists that epidemiological evidence be presented before hypothesis can be considered scientifically valid for purposes of *Daubert* standard and admissible in a court of law," *Pick v. American Medical Systems, Inc.*, 958 F.Supp. 1151, 1157 (E.D. La. 1997), there exists clear biological support for Dr. Williams's opinion.  In fact, Defendant's experts provide the majority of such biological support.

As noted in the Eberlein-Konig study, epidermal barrier function plays a key role in atopic dermatitis.  This point is reiterated by Defendant's dermatological expert, Dr. Patricia Farris.

> Q.     And what exactly is barrier function in layman's terms?
>
> A.     Barrier function is keeping the good stuff in the skin and keeping the bad stuff out.
>
> Q.     And isn't the structure of the stratum corneum commonly described as bricks and mortar?
>
> A.     Yes, it is.
> . . .
> Q.     And why is it described as bricks and mortar?
>
> A.     Well, it is described as bricks and mortar because the bricks are the epidermal cells, and the mortar that holds them are a series of lipids called natural moisturizing factor or ceramides. So it is this structure of skin cells and lipids that make the epidermal barrier impenetrable to external substances and also holds water in the skin.
>
> Q.     And how do children with atopic dermatitis differ from those who don't have atopic dermatitis?
>
> A.     Children with atopic dermatitis have lower levels of ceramides, or lipids, so they have less mortar. They also have dysfunctional bricks. They lack a protein called filaggrin that causes the bricks to mature in a normal way. So, in other words, their epidermal barrier is compromised.
>
> Q.     And that, in turn, allows for increased water loss resulting in a skin that becomes dry and cracked. Correct?

A.      Correct.

Q.      And do you not agree then that, additionally, when barrier function is compromised, such as someone with atopic dermatitis, that this allows for easier penetration of microorganisms, irritants and potential allergens into the skin?

A.      Correct.

Q.      Now, is formaldehyde a microorganism, irritant or a potential allergen?

A.      Formaldehyde, topically, would be both a potential allergen and an irritant.

Q.      And would you not agree that a child whose epidermal barrier is compromised is at greater risk of easier penetration of microorganisms, irritants and potential allergens into the skin, correct?   A.      Correct.

Q.      I'm sorry?

A.      Correct.

Q.      And what happens when the barrier function is compromised?

A.      Well, like I said previously, the skin barrier is to hold water in, so water escapes the skin when the barrier is compromised; and it is also to keep potential allergens and microorganisms out, so those may more easily penetrate the skin.

Q.      And does it not trigger an immune response then that causes skin inflammation and eczema?

A.      The allergens can cause skin inflammation and eczema. Correct.

Exhibit G, p.54, l. 7 - p. 57, l. 4.   Ultimately, Dr. Farris spells out the dangers of formaldehyde to eczema.   Because atopic dermatitis results in a weakened barrier function that is releasing more water than normal, formaldehyde — a volatile electrophile seeking to bind — attaches to the water released from the dermis.  Notably,

17

this type of action is recognized by Defendant's Expert, Dr. Howard I. Maibach.  In his deposition, Dr. Maibach notes that  "when the skin is damaged with eczema . . . water loss increases," Exhibit J, Deposition Transcript of Howard I. Maibach, M.D., October 20, 2009, p. 120, l. 6-7.[6]  Further, Dr. Maibach has published that "[f]ormaldehyde penetrates human and animal skin.  If some amount of the molecule or its metabolites did not penetrate, allergic contact dermatitis could not occur." Maibach, H., EFFECTS OF FORMALDEHYDE ON SKIN, ch. 15, p. 166 (1980).   Ultimately, Dr. Williams's conclusion restates Defendant experts' opinions and logically applies the toxicological science to the equation.

> Q      And assuming you've got no filaggrin deficit and all of the things being equal, not everything that strikes the outer barrier of your skin is then going to be absorbed and be reacted below the surface, correct?
>
> A      If it does not penetrate, you will see the irritant reaction of the contact between the reactive electrophile with the surface of the cell membranes of the skin. That's what makes the irritant reaction.
>
> Q    You may see an irritant reaction, correct?
>
> A      If there is sufficient amount of the reactive electrophile combining with the negative components of the cell membranes, you will see an irritant reaction.
>
> Q    So the dose becomes important?
>
> A     Well, the penetration becomes important.  If you have intact skin, the penetration will occur at a very small amount.  I mean, eczematous skin has really no -- very little protective barrier. That's why people with eczema get Staphylococcus aureus or infections in the eczematous skin, because they just have lost that barrier.

---

[6]      Defendant relies heavily on the opinion of Dr. Maibach because of his development of the T.R.U.E. Test.  It should be noted that the T.R.U.E. Test has undergone heavy criticism for its high percentage of false-negatives.  In fact, one study reported a potential rate of possibly 40% potential for error in the type of test used on Timia Dubuclet.

Exhibit B, p. 110, l. 13-p. 111, l. 4.  Thus, her opinion is not a leap of faith, but follows sound biological theory concerning the chemical effect of formaldehyde on the epidermis.

Dr. Williams's opinion follows the criteria set forth in the Reference Manual on Scientific Evidence and under Bradford Hill.  Not only have venerated sources such as NIOSH, OSHA and Patty's Toxicology recognized the effects of gaseous formaldehyde, but separate studies have proven the association.  These studies provide the dose response and temporal bases to establish the parameters of the effects to gaseous formaldehyde exposure.  Further, additional studies involving gaseous formaldehyde and its effects on the respiratory system are important in showing consistency.  Finally, there exists biological support for Dr. Williams's opinion.  Thus, Dr. Williams's opinion that there is a cause—effect relationship between gaseous formaldehyde and exacerbation of eczema is reliable.

**B.**     **Dr. Williams's Cancer Opinion Is Reliable.**

Dr. Williams opines that "[a] cause—effect relationship exists between formaldehyde and upper respiratory tract damage and cancer."  Exhibit A, p. 40.  This opinion applies only to general causation and is irrelevant to any determination of specific causation.  Defendant alleges that this opinion is unreliable because it (1) is based on a "no threshold" model, (2) lacks evidentiary and scientific support, (3) fails to consider negative studies and (4) misuses epidemiological data.[7]  Gulf Stream's reasons, analyzed singularly or as a whole, fail to show that Dr. Williams's opinion is unreliable.

**1.**     *The "No Threshold" Model Is Reliable and Recognized As Such.*

---

[7]     It should be noted that Defendant's reasons are the exact same as those alleged in the *Alexander* trial, and which this Court overruled.  Rec. Doc. 3094.

Defendant attacks Dr. Williams's statements concerning the inevitability of damage caused by formaldehyde by alleging that the "no threshold" damage model is unreliable. *See* Rec. Doc. 6664-2, p. 17.  This model, however, has been recognized as a valid theory by the Reference Manual on Scientific Evidence.  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 407-08  (2d ed. Federal Judicial Center) (2000); *see also Pub. Citizen Health Research Group v. Tyson*, 796 F.2d 1479, 1498 (D.C. Cir. 1986) (noting that OSHA applies a no-threshold model).   As explained by Dr. Williams during her Rule 104 hearing, Dr. Williams does not opine that one molecule of formaldehyde can cause cancer.

> In theory, one molecule can attack a cell of DNA. However, I also said in the deposition that you're not showing, it's theoretically not plausible that one molecule would cause a cancer, because it would depend on when in the cell cycle that that event to damage the DNA occurred. We have numerous repair mechanisms that depending on when in the cell cycle the insult occurs that it could be repaired. So, basically, a no-threshold level is recognized for mechanistic purposes. The risk -- the Reference Manual on Scientific Evidence recognizes that and says, it's not probable -- it's not probable -- that a cancer results, but, quote, 'The risk is not zero.'

Exhibit L, Transcript of Rule 104 Hearing, September 14, 2009, p.43, l. 17-p. 44, l. 4.

Again, Defendant's cited case law fails to support its argument.  Each case cited by Gulf Stream deals with causation of a specific disease in a specific individual.  The testimonial problems of Defendant's cited cases range from a total lack of exposure quantification to a lack of a differential diagnosis.  Dr. Williams, however, has made it clear that she is not giving an opinion as to specific causation.  Defendants arguments, therefore, fail to cast doubt on the reliability of Dr. Williams's opinions.

> **2.    *Dr. Williams's Opinions Have Evidentiary and Scientific Support.***

Next, Defendant states Dr. Williams's opinion is unrelabile because she fails to consider relevant formaldehyde exposure levels.  Specifically, Defendant cite to the study entitled *Mortality from Solid Cancers Among Workers in Formaldehyde Industries*, 159 AM. J. EPID. 1117 (2004), stating that the study found no association between formaldehyde and nasopharyngeal cancer below a peak exposure of 4ppm.

Respectfully, the study noted three different levels of exposure for cancer.  *Id.* Further, all of the levels associated in this study involved workers where protective equipment and industrial hygiene ventilation controls were required and implemented.  *Id.* As such, the exposure levels would not represent the actual exposure of the workers if the plants were not in compliance with the law.

### 3. *Negative Findings Are Irrelevant to Dr. Williams Opinion.*

A negative finding, or the null hypothesis, occurs when a study does not provide a positive statistical determination of a certain variable.  Gulf Stream argues that Dr. Williams is required to consider the null hypothesis of a study in order to render a reliable opinion. This argument contradicts scientifically founded principles.  A null hypothesis is not typically considered because they are often a statistical starting point as explained in the treatise of *Modern Epidemiology*, 2d Edition:

> Biologic knowledge about epidemiologic hypotheses is often scant, making the hypotheses themselves at times little more than vague statements of causal association between exposure and disease, such as "smoking causes cardiovascular disease."  To cope with this vagueness, epidemiologists usually focus on testing the negation of the causal hypothesis, that is, the null hypothesis that the exposure does not have a causal relation to disease.  Then, any observed association can potentially refute the hypothesis, subject to the assumption (auxiliary hypothesis) that biases are absent.

Rothman & Greenland, *Modern Epidemiology*, 2d Ed. p. 2 (1998).

It is important to understand that a "null hypothesis" does not mean there is no causal relationship . . . it simply means that it has not been proven otherwise. *Why We Don't "Accept" the Null Hypothesis*, AM. SOC. FOR QUALITY 1 (July 2003).  In attempting to discredit Dr. Williams, Gulf Stream misconstrues her testimony to promote the conclusion that by not considering the null hypothesis, Dr. Williams's opinion is incomplete and result-oriented.  Rec. Doc. 6664-2, p. 21-22.  However, as noted by epidemiologists, "the null hypothesis is never proved or established, but is possibly disproved, in the course of experimentation.  Every experiment may be said to exist only in order to give the facts a chance of disproving the null hypothesis." *Why We Don't "Accept" the Null Hypothesis*, AM. SOC. FOR QUALITY 1 (July 2003) (quoting Ronald A. Fisher).  A perhaps useful analogy in explaining the null hypothesis and understanding why it need not be proved involves the criminal justice system. *Id*. at 2. A person is always innocent until proven guilty, and the prosecution bears the burden of building a case to prove guilty beyond a reasonable doubt. *Id*.  Likewise, a jury will never find a defendant "innocent"; instead, that person will be either "guilty" or "not guilty". *Id*. As applied to the null hypothesis, a finding of "not guilty" means the jury failed to reject the null hypothesis. *Id.*

Ultimately, a null hypothesis does not prove the existence of a relationship for <u>or</u> against a particular variable. *Id.* at 1 (emphasis added).  While the IARC does state "when several epidemiological studies show little or no indication of an association between an exposure and cancer, the judgment may be made that, in the aggregate, they show evidence of lack of carcinogenicity," Defendant, however, once again fails to look at the entire statement.  IARC makes clear that:

> Such a judgment requires firstly that the studies meet, to a sufficient degree, the standards of design and analysis described above. Specifically, the possibility that bias,

> confounding or misclassification of exposure or outcome could explain the observed results should be considered and excluded with reasonable certainty . . . It is important to note that evidence of lack of carcinogenicity obtained from several epidemiological studies can apply only to the type(s) of cancer studied, to the dose levels reported, and to the intervals between first exposure and disease onset observed in these studies.

World Health Organization, International Agency for Research on Cancer, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 88, Preamble. Thus, had Defendant read the entire statement, Defendant would have recognized that the null hypothesis reported cannot serve as "lack of evidence of carcinogenicity" because the studies provide a unique analysis of the data.

Furthermore, Defendant's reliance on *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584 (D. N.J. 2002), is also unpersuasive as factually and legally dissimilar to the case at bar.  In *Magistrini*, the court acknowledged the expert's failure to look at other studies with negative findings **only** because "Dr. Ozonoff relied most heavily on his own study, which itself looked at only seven (7) cases of leukemia and had a huge confidence interval, indicating that the results of the study are unstable and imprecise. He neither explained why the confidence interval in that study was not of concern to him."  *Id*. at 607 (emphasis added).  Here, Dr. Williams is not using a study conducted by herself, and she has consistently explained the scientific reasoning for not examining the null hypothesis.

### 4.     *Dr. Williams Properly Evaluates Epidemiological Data.*

Defendant self-selects portions of Dr. Wiliams's testimony to supports its faulty conclusion that Dr. Williams misuses epidemiological data.  Defendant's statements regarding Dr. Williams's recalculation of a relative risk and confidence intervals in the Hauptmann study are misleading.   Dr. Williams clearly explains that "the confidence

interval is what you are going to use when you are looking at and judging.  You will get various levels, confidence levels, 95 percent, 90 percent, if it's—depending on how it's done, it's going to be 95 percent sure that the signal versus noise is not due to chance.  Then you want to look at the confidence interval to see that it does not include unity, which is just one more little step that tells you whether this validates it just one more time."   Exhibit K, Deposition Testimony of Patricia M. Williams, Ph.D., DABT, July 7, 2009, p. 26, l. 14-25.

Furthermore, Defendant's reliance on a footnote to "change" the reported relative risk is essentially the same act they argue is improper.  Rec. Doc. 6664-2, p. 23-24.  Regardless, Dr. Williams has provided ample support of her conclusion beyond the Hauptmann study.  As noted in pages 26-33 of Dr. Williams's Affidavit, Dr. Williams provides a complete listing of those studies, including their respective relative risks and confidence intervals, to support her conclusion.   Exhibit A, p. 26-33.  Thus, Defendant's assertion that Dr. Williams improperly evaluates epidemiological data is unfounded and unpersuasive.

## CONCLUSION

Dr. Williams is a highly qualified toxicologist and has rendered her opinion in accordance with the Reference Manual on Scientific Evidence and Bradford Hill.  Furthermore, NIOSH, OSHA, Patty's Toxicology and various scientific study establish the strong association between gaseous formaldehyde — or free formaldehyde — and exacerbation of atopic dermatitis.  This is consistent with the studies recognizing a strong association between free formaldehyde and other atopic disorders.  Finally, as recognized by Defendant's experts, there exists a biological foundation for Dr. Williams's opinion.

In addition, Dr. Williams's cancer opinion, as this Court has previously

recognized, is reliable.  A no-threshold model is recognized as reliable by OSHA and is recognized by the Reference Manual on Scientific Evidence.  Dr. Williams's cancer opinion is also supported by IARC, who just recently reevaluated formaldehyde and upheld its cancer classification.   As such, Dr. Williams's opinins are reliable, and this Court should deny Defendant's Motion to Exclude the Testimony of Patricia M. Williams, Ph.D., DABT.

Respectfully submits:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:    s/Gerald E. Meunier
        GERALD E. MEUNIER, #9471
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:   504/522-2304
        Facsimile:     504/528-9973
        gmeunier@gainsben.com

        s/Justin I. Woods
        JUSTIN I. WOODS, #24713
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:   504/522-2304
        Facsimile:     504/528-9973
        jwoods@gainsben.com

        **COURT-APPOINTED PLAINTIFFS'
        STEERING COMMITTEE**
        ANTHONY BUZBEE, Texas # 24001820
        RAUL BENCOMO, #2932
        FRANK D'AMICO, #17519
        MATT MORELAND, #24567
        LINDA NELSON, #9938
        MIKAL WATTS, Texas # 20981820
        DENNIS REICH, Texas #16739600
        ROBERT M. BECNEL, #14072

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing on November 17, 2009.

 s/Gerald E. Meunier
GERALD E. MEUNIER, #9471