UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER ) | MDL NO. 1873 |
| FORMALDEHYDE ) | |
| PRODUCT LIABILITY LITIGATION ) | |
| ) | SECTION: N(4) |
| ) | |
| ) | JUDGE: ENGELHARDT |
| ) | MAG: ROBY |

**AFFIDAVIT OF PATRICIA M. WILLIAMS, PH.D. DABT IN THE TRIAL OF TIMIA DUBUCLET**

STATE OF LOUISIANA
PARISH OF ORLEANS

Before me, the undersigned notary on this day personally appeared Patricia M. Williams, Ph.D. DABT, a person whose identity is known to me. After I administered the oath to her, upon her oath she stated as follows:

All statements contained herein are true and correct and based upon my personal knowledge, education, and experience and I am a person of full age of majority, competent to execute this affidavit.

**Section 1.0 – Expert Witness Qualifications**

1.1  My qualifications as expert witness include the following:

**Board certification: Diplomate of the American Board of Toxicology**
**Tulane University, School of Medicine, Department of Anatomy, Ph.D., 1983.**
    **Major: Anatomy; Minor: Biochemistry**
**Louisiana State University in Baton Rouge; M.S. in Microbiology, 1975**
**Louisiana State University in Baton Rouge; B.S. in Medical Technology, 1966**
**Clinical Laboratory Scientist-Generalist, Louisiana License Number: G00023**
**Laboratory Director – CLIA Certification 19D0898394 (1993-2005)**

I am board-certified in Toxicology and a Diplomate of the American Board of Toxicology. I am a tenured Associate Professor and currently serve as Coordinator for Toxicology Research

1

Laboratories of the Pontchartrain Institute for Environmental Sciences, University of New Orleans. In that capacity, I am also responsible for teaching courses in Toxicology to Graduate and Undergraduate students.

I served for ten years as the Director of the Occupational Toxicology Outreach Program of the Department of Medicine of the LSU Medical Center in Shreveport. In that capacity, I surveyed or evaluated over 17,000 workers or community members with occupational or environmental toxic exposures for adverse health effects of such exposures. I was a tenured Associate Professor of Medicine of the Department of Medicine of LSU Medical School in Shreveport. Additionally, I served as the Laboratory Director of an in-house research laboratory for Medical Surveillance for adverse health effects of chemical exposure. In this capacity, I was responsible for identifying the laboratory parameters that are clinical indicators of environmental and occupational toxic exposure and for the interpretation of the laboratory parameters to the attending physicians. I am licensed by the State of Louisiana and certified by the American Society for Clinical Pathologists and meet the requirements of federal law, specifically, the Clinical Laboratory Improvement Act, to serve as the Laboratory Director. I have been certified and have had work experience in the performance and interpretation of clinical laboratory procedures for over thirty-nine years. My work experience includes serving as Department Head of Medical Technology at LSU Medical Center for seven years. In that capacity, I was responsible for the development, organization, administration, review, revision, and direction of the educational program to train students at the baccalaureate and masters levels in the performance and the interpretation of clinical laboratory procedures in the areas of hematology, immunology, immunohematology, microbiology, parasitology, urinalysis, clinical chemistry, toxicology, phlebotomy, and management. In that capacity, I also designed and taught courses in the various areas of clinical pathology to cytotechnology students, pathology residents, and maxillo-facial surgery dental residents, as well as medical students. I also developed an in-house departmental clinical practicum, which was nationally accredited, in the performance and interpretation of laboratory procedures. This clinical practicum substituted for six months of the required hospital training program in the various areas of clinical pathology for the baccalaureate students.

By virtue of my doctoral degree in Anatomy, I have extensive training and teaching in the areas of gross anatomy, medical histology, embryology, neuroscience, and cell biology. I have a minor in biochemistry at the doctoral level with doctoral research in the areas of hematology, specifically megakaryocytopoiesis, thrombopoiesis, and erythropoiesis, and the stem cell compartment. Also, I have graduate credit in epidemiology from Tufts University New England Epidemiology Institute. I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. I have taught in numerous HASMET (hazardous materials) conferences, workshops, and seminars for union workers and industrial corporations. I have assisted numerous physicians in the understanding of the etiology of occupational and environmental diseases and provided Continuing Medical Education for physicians and Continuing Education programs for Industrial Hygienists. I conducted disease prevention programs for workplace, communities, homes, and schools including prevention of prostate cancer, inhalant abuse, fetal alcohol syndrome, alcohol toxicity, and abuse of drugs and alcohol.

2

I lectured to second year medical students on the "Environmental Etiology of Disease", which includes: recognizing the adverse health patterns commonly observed in chemically associated diseases, the multifactorial nature of disease, effects of chemical interactions in a mixture, dose-response, and the cellular effects of DNA reactive carcinogens.

I was commissioned to conduct a health assessment and medical surveillance using laboratory procedures of the people of Grand Bois who reside next to a Non-hazardous oilfield waste site that received shipments of Benzene-contaminated wastes that were ordered removed from an out-of- state facility because of the toxic nature of the wastes. The preliminary results of this study resulted in announcement of funding provided from the Department of Health and Hospitals budget by the then Governor of Louisiana, Mike Foster, for an additional medical surveillance research project of which I was designated the Principal Investigator. Internal Review Board approval from the LSU Medical Center in Shreveport was granted for the conduct of both research studies. Soon thereafter, the Louisiana Legislature granted an additional funding amount of $100,000 in the 1998 Legislative Session for additional medical surveillance of the adults and children of Grand Bois for the 1998-1999 fiscal year. This study was not related to litigation and was an independent research project. The results of this study are located in all of the State Libraries throughout Louisiana. It consists of two volumes: Volume 1 consists of a "Retrospective Study of Health Effects of the Grand Bois Community" utilizing a health survey for data collection. Volume 2 consists of a one year medical surveillance project with the performance of clinical laboratory procedures that would serve as indicators of developing disease or indicators of abnormalities of concern with the potential for future disease development. As laboratory director under Federal Law, specifically the Clinical Laboratory Improvement Amendments Subpart A Section 493, I was responsible for ensuring that my consultation was available to the laboratory clients for the interpretation of the test results reported concerning specific patient conditions. (pg. 7176, Federal Register, vol 57, No. 40, Friday, February 28, 1992)

I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. In the Combustion litigation of Livingston Parish in Louisiana, I served as the expert witness for a population of 10,000 who had exposures to benzene and other toxic chemicals. Leukemias and Neuroblastomas were prominent among the adverse consequences of chemical exposure. Another case of 4,000 individuals, in the Thompson Hayward Case in Orleans Parish of Louisiana, involved pesticide exposure. I examined the reproductive health outcomes from chemical exposure, which included spontaneous abortions, stillbirths, live births with short survival time, and children with birth defects and mothers with multiple children with birth defects. In the Lincoln Creosote case in Bossier Parish of Louisiana, I examined a population exposed to Benzene, creosote, Pentachlorophenol, Toluene, Styrene, and other toxic compounds. Leukemias, reproductive cancers, and birth defects were prominent among the adverse consequences of the toxic exposure in the Lincoln Creosote case. Two Worker Compensation cases and one toxic tort suit, each with single person complainants/plaintiffs, in which I served as Expert Witness or Consultant involved benzene-related hematologic malignancies.

3

I have conducted doctoral research on stem cell precursors for erythrocytic and megakaryocytic cell lineages. My doctoral research included characterization of megakaryocytopoiesis under the hormonal influence of thrombopoietin and the development of an in vitro assay for thrombopoietin. This was a study of stem cell precursors of the megakaryocytic cell line that differentiates into the mature cells that produce blood platelets. Further doctoral research included the immunocytochemical localization of erythropoietin receptors on the cell surface of early erythrocytic precursors at the ultrastructural level. For this research, I received the Arceneaux Memorial ward in Recognition of Outstanding Student Research in Electron Microscopy in May of 1981. I have conducted funded research by the American Heart Association on the development of an assay for thrombopoietin and an additional grant for the characterization of megakaryocytopoiesis. I conducted funded research from the American Cancer Society on an immunocytochemical characterization of skin biopsies in the diagnosis of human acute Graft-versus-Host Disease in Leukemia. The American Heart Association further funded my research for the Isolation and Characterization of 4N and 8N Megakaryocytes. I served as a consultant to Karel A. Dicke, M.D., chief oncologist and Director of the Bone Marrow Transplantation Unit at M.D. Anderson Hospital for electron microscopic evaluation of in vitro chemotherapeutic treatment for autologous bone marrow transplantation therapeutic techniques. I have written, developed, and taught numerous courses and lectures in Hematology and Immunology to students at the associate, baccalaureate, and masters levels, as well as, medical students, pathology residents, and maxillo-facial surgery residents. I am qualified by both State and Federal Law to perform and interpret clinical laboratory procedures in the areas of hematology and immunology. I am further qualified by Federal Law (CLIA-Clinical Laboratory Improvement Act) to serve as a Laboratory Director for all levels of complexity in the interpretation of laboratory procedures, which include hematology and immunology. I served as the Laboratory Director of an in-house medical surveillance laboratory for ten years and have interpreted hematological parameters in a population of residents exposed to benzene and other toxic substances. I have also served as principal investigator in a project to screen for Lupus Erythematosus, an autoimmune disease of the hematologic/immunologic systems of the body.

In the area of Forensic Drug Testing, I have served as an expert witness and consultant on collection of specimens, chain of custody, and drug-testing in the workplace to numerous clients, including the Department of Education, School Boards, Unions, Medical Care Corporations, municipalities, the State of Louisiana, and private entities, and served as consultant to a collection company for collection of forensic urine and blood specimens and, in that capacity, designed and oversaw the administration of chain of custody and collection procedures. Furthermore, I have served as expert witness in drug-testing litigation in State Court, Workman's Compensation and Unemployment compensation hearings, and arbitration hearings. I have served as expert witness in numerous legislative committees on the subject of drug-testing and minimal guidelines for collection and testing of forensic specimens. I drafted the bill for Louisiana Act 1036 of the 1990 Legislative Session establishing minimal guidelines for collection of forensic specimens and drug-testing in the State of Louisiana. Additionally, I drafted Act 396 of the 1993 Legislative Session for Mandatory Licensure of Clinical Laboratory Personnel and Certification of Phlebotomists in the State of Louisiana. I was the expert witness testifying for both bills at the request of Senators and Representatives, the Commissioner of

Administration, the AFL-CIO, and the Louisiana State Society for Medical Technology during the course of passage into Law by the Louisiana Legislature.

By virtue of my educational, research, and work experience, I am qualified to identify and interpret patterns of development of disease in association with toxic exposure and to determine the etiology/causation of environmental and occupational diseases. I am qualified to conduct community health assessments and interpret the etiology/causation of environmental diseases and birth defects. I am qualified to identify and interpret patterns of adverse reproductive outcomes, including fetal birth defects and embryonal tumors, in association with toxic exposure. I am qualified to review the scientific and medical literature, and medical and laboratory data associated with occupational and environmental exposures and to interpret said data as to the etiology/causation. I am qualified to perform and interpret medical surveillance utilizing laboratory procedures as to the development and causation of environmental and occupational diseases. I am qualified to interpret the causation of hematological diseases as related to environmental and occupational exposures.

Additionally, I am qualified to interpret the role of contributing factors in the development of cancer and birth defects. I have qualified as an expert in anatomy, hematology, toxicology, medical surveillance utilizing laboratory procedures, neuroanatomy, and performance and interpretation of health assessments of environmentally exposed communities. Additionally, in the areas of forensic drug testing, I am qualified to review and interpret medical and laboratory data, including the phlebotomy, chain of custody, and accessioning techniques utilized in the collection of medical and forensic drug specimens.

1.2    Delayed Type Hypersensitivity includes contact hypersensitivity that occurs at the point of contact with an allergen. It is a T cell-mediated inflammatory response in which the stimulation of antigen-specific effector T cells leads to macrophage activation and localized inflammation and edema within tissues.    The mechanism underlying the skin disease in this case (eczema) is a Delayed Hypersensitivity Type IV. (Male, Brostoff, Roth, and Roitt, 2007, See Appendix A) Rendering a causal opinion necessitates that toxicologists have knowledge and experience with mechanisms of action of the chemical and its ability to alter normal cellular, immunological, histological, toxicological function, structure, and physiology. I am a Board-certified toxicologist with extensive formal training and experience in those areas specific to the mechanisms of action for Type IV Delayed Hypersensitivity. Specifically I have taught formal courses in cell biology, histology, immunology, and toxicology as well as used formaldehyde in research techniques throughout my doctoral and master's research training . I have used formaldehyde in numerous published articles on my CV and used its mechanisms of action in development, implementation, and interpretation of research technology. Additionally, I have worked with formaldehyde in Gross Anatomy, Neuroanatomy, and Histology and have personal knowledge of its irritant and sensitizing effects. I have worked with formaldehyde in other litigation concerning textiles with formaldehyde and formaldehyde exposure in a chemical plant. Additionally, I have extensive experience in clinical laboratory procedures . I have served as the Laboratory Director of an in-house Federally approved (CLIA) research laboratory for Medical Surveillance for adverse health effects of chemical exposure. In this capacity, I was responsible for identifying the laboratory paramenters that are clinical indicators of the environmental and occupational toxic exposure and for the interpretation of the laboratory

5

parameters to the attending physicians. Part of my role as a laboratory director was to ascertain the error rate of laboratory procedures in assuring quality results for patient care. (See CV pages 6-8)

## Section 2   Statement of Facts.

Three major scientific references in addition to the journal articles cited specifically in my affidavit of July 9, 2009 provide documentation that it has long been known and well established that gaseous formaldehyde can cause eczema or allergic contact dermatitis.

1. Reliance material NIOSH 77-126a-f DUB-WILL-002552—DUB-WILL-002728 NIIOSH Criteria for a Recommended Standard: Occupational Exposure to Formaldehyde, **December 1976, DHHS (NIOSH)) Publication No. 77-126:**

"Two skin hazards are associated with exposure to formaldehyde: primary irritation [65,66] and allergic dermatitis [43,45,49,67-83]. Primary irritation has resulted from direct skin contact with formaldehyde solutions [65,66], and exposure to gaseous formaldehyde [65]. Allergic dermatitis has been produced by direct skin contact with formaldehyde solutions [65,68,71,73,74,78,79], the handling of formaldehyde-containing textiles [67,69,76,77,80,81,83], skin contact with formaldehyde from formaldehyde-containing resins [44,65,72,75,82], and exposure to gaseous formaldehyde [43,45,49,65,79,84]." (see attached  Appendix B[pg 43-44])

2. Reliance material 29 CFR 1910.1000-END  DUB-WILL-002465 –DUB-WILL-002484 Occupational Safety and Health Administration (OSHA) 1910.1048, **July 1, 1990:**

"Exposure to liquid formalin or formaldehyde vapor can provoke skin reactions in sensitized individuals even when air-borne concentrations of formaldehyde are well below 1 ppm." (see attached Appendix C [pg 340])

3.  Patty's Toxicology, **2001**  Fifth Edition Volume 5, Bingham, Cohrssen, and Powell, John Wiley & Sons, Inc.  (pg 11 of Expert Affidavit of July 9, 2009):

"Prolonged exposure to low concentrations of the vapor can result in irritation of the eyes and inflammation of the eyelids, and sensitive persons might develop an allergic skin rash." (See appendix D  [pg 987])

6

I reserve the right to submit additional affidavits if deemed necessary.

Affiant further sayeth not.

_____
**Date**  11/6/09

_____
Patricia M. Williams, Ph.D.
**President, Environmental Toxicology Experts, LLC**

Sworn to and subscribed before me this 16th day of November, 2009.

_____
**Aaron Ahlquist**
Notary Public
Commission expires at death.
**Bar Roll No. 29063**

7

APPENDIX A

# Hypersensitivity (Type IV)

## 26

### SUMMARY

- DTH reflects the presence of antigen-specific CD4 T cells.

- There are three variants of type IV hypersensitivity reaction - contact, tuberculin, and granulomatous.

- Contact hypersensitivity occurs at the point of contact with an allergen. Langerhans' cells internalize and process epicutaneously applied hapten and migrate to the draining lymph nodes where they present it to antigen-specific T cells. Cytokines produced by immune-competent skin cells (e.g. keratinocytes, Langerhans' cells, T cells) recruit antigen-non-specific T cells and macrophages.

- Tuberculin-type hypersensitivity is induced by soluble antigens from a variety of organisms. It is useful as a diagnostic test for exposure to a number of infectious agents.

- Granulomatous hypersensitivity is clinically the most important form of type IV hypersensitivity. Persistence of antigen leads to differentiation of macrophages to epithelioid cells, and fusion to form giant cells. This pathological response is termed a granulomatous reaction and it results in tissue damage. Granuloma formation is driven by T cell activation of macrophages, and is dependent on TNF. Inhibition of TNF leads to breakdown in granulomas.

- Many chronic diseases manifest type IV granulomatous hypersensitivity. These include tuberculosis, leprosy, schistosomiasis, sarcoidosis, and Crohn's disease.

## DTH REFLECTS THE PRESENCE OF ANTIGEN-SPECIFIC CD4 T CELLS

Delayed-type hypersensitivity (DTH) is a T cell-mediated inflammatory response in which the stimulation of antigen-specific effector T cells leads to macrophage activation and localized inflammation and edema within tissues. This effector T cell response is:

- a normal component of adaptive immunity; and
- essential for the control of intracellular and other pathogens.

However, if the response is excessive it can damage host tissues.

The T cell response may be made to exogenous agents, such as microbial antigens or sensitizing chemicals, or to self-antigens. Typically T cells are sensitized to the foreign antigen during infection with the pathogen or by absorption of a contact sensitizing agent across the skin.

### Q. Where in the body are T cells sensitized and how?

A. Typically, T cells are sensitized in the T cell areas of secondary lymphoid tissues, by dendritic cells.

Subsequent exposure of the sensitized individual to the exogenous antigen, either injected intradermally or applied to the epidermis, results in the recruitment of antigen-specific T cells to the site and the development of a local inflammatory response over 24-72 hours.

If the foreign antigen persists in the tissues, chronic activation of T cells and macrophages may lead to granuloma formation and tissue damage.

If the antigen is an organ-specific self antigen, autoreactive T cells may produce localized cellular inflammation resulting in autoimmune disease, such as type I diabetes mellitus.

According to the Coombs and Gell classification, type IV or DTH reactions take more than 12 hours to develop and involve cell-mediated immune reactions rather than antibody responses to antigens. Some other hypersensitivity reactions may straddle this definition with:

- a rapid antibody-mediated phase; and
- a later cell-mediated phase.

For example, the late-phase IgE-mediated reaction may peak 12-24 hours after contact with an allergen, and cells, such as helper T (TH2) cells and eosinophils, contribute to the inflammation as well as IgE (see Chapter 22).

In contrast to other forms of hypersensitivity, type IV hypersensitivity is transferred from one animal to another by T cells, particularly CD4 TH1 cells in mice, rather than by serum. Therefore it can occur in antibody-deficient humans, but is lost with the decline in CD4 T cells in HIV infection and AIDS.

Type IV hypersensitivity reflects the presence of antigen-specific CD4 T cells and is associated with protective immunity against intracellular and other pathogens.

# Immunology

## Seventh Edition

**David Male** MA PhD
Professor of Biology
Department of Biological Sciences
The Open University
Milton Keynes, UK

**Jonathan Brostoff** MA DM(Oxon) DSc(Med) FRCP (Lond) FRCPath FIBiol
Professor Emeritus of Allergy and Environmental Health
School of Biomedical and Health Sciences
King's College London
London, UK

**David B Roth** MD PhD
Irene Diamond Professor of Pathology
Investigator, Skirball Institute
Program in Molecular Pathogenesis
Chairman, Department of Pathology
New York University School of Medicine
New York, NY, USA

**Ivan Roitt** MA DSc (Oxon) Hon FRCP (Lon) FRCPath FRS
Emeritus Professor of Immunology
Royal Free and University College Medical School
University College
London, UK



MOSBY
ELSEVIER

# MOSBY
ELSEVIER

An imprint of Elsevier Limited

© 2006, Elsevier Limited. All rights reserved.

The right of Dale Male, Jonathan Brostoff, David B Roth and Ivan Roitt to be identified as authors of this work has been asserted by them in accordance with the Copyright, Designs and Patents Act 1988

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior permission of the Publishers. Permissions may be sought directly from Elsevier's Health Sciences Rights Department, 1600 John F. Kennedy Boulevard, Suite 1800, Philadelphia, PA 19103-2899, USA: phone: (+1) 215 239 3804, fax: (+1) 215 239 3805, or, e-mail: healthpermissions@elsevier.com. You may also complete your request on-line via the Elsevier homepage (http://www.elsevier.com), by selecting 'Support and contact' and then 'Copyright and permission'.

First edition published by Gower Medical Publishing Ltd., 1985
Second edition published by Gower Medical Publishing Ltd., 1989
Third edition published by Mosby-Year Book Europe Ltd., 1993
Fourth edition published by Mosby, an imprint of Times Mirror International Publishers, 1996
Fifth edition published by Mosby, an imprint of Times Mirror International Publishers, 1998
Sixth edition published by Elsevier Ltd, 2001
Seventh edition published by Elsevier Ltd, 2006
Reprinted 2007

Main edition
ISBN 13: 978 0 323 03399 2
ISBN 10: 0 323 03399 7

International edition
ISBN 13: 978 0 8089 2332 9
ISBN 10: 0 8089 2332 3

British Library Cataloguing in Publication Data
A catalogue record for this book is available from the British Library

Library of Congress Cataloging in Publication Data
A catalog record for this book is available from the Library of Congress

**Notice**

Knowledge and best practice in this field are constantly changing. As new research and experience broaden our knowledge, changes in practice, treatment and drug therapy may become necessary or appropriate. Readers are advised to check the most current information provided (i) on procedures featured or (ii) by the manufacturer of each product to be administered, to verify the recommended dose or formula, the method and duration of administration, and contraindications. It is the responsibility of the practitioner, relying on their own experience and knowledge of the patient, to make diagnoses, to determine dosages and the best treatment for each individual patient, and to take all appropriate safety precautions. To the fullest extent of the law, neither the Publisher nor the Authors assume any liability for any injury and/or damage to persons or property arising out of or related to any use of the material contained in this book.

The Publisher

Working together to grow
libraries in developing countries

www.elsevier.com | www.bookaid.org | www.sabre.org

ELSEVIER    BOOK AID    Sabre Foundation
            International

your source for books,
journals and multimedia
in the health sciences

www.elsevierhealth.com

Printed in Canada

Last digit is the print number 9 8 7 6 5 4 3 2

The
Publisher's
policy is to use
paper manufactured
from sustainable forests

APPENDIX

B

# NIOSH Criteria Documents

# Criteria for a Recommended Standard: Occupational Exposure to Formaldehyde

December 1976
DHHS (NIOSH) Publication No. 77-126

This Criteria Document is contained in six PDF files, for ease of handling. The following table of contents allows you to open or download the files containing the sections of the document you want to see.

## TABLE OF CONTENTS

| Preface | |
| --- | --- |
| NIOSH Review Committee | |
| Review Consultants | |
| Contents | |
| I. Recommendations for a Formaldehyde Standard | 77-126A.PDF (11 pages, 176K) |
| II. Introduction | |
| III. Biologic Effects of Exposure | 77-126B.PDF (20 pages, 676K) |
| IV. Environmental Data | 77-126C.PDF (61 pages, 2,356K) |
| V. Development of Standard | |
| VI. Work Practices | |
| VII. Occupational Research Priorities for Formaldehyde | 77-126D.PDF (29 pages, 1,028K) |
| VIII. References | |
| IX. Appendix I - Sampling of Formaldehyde in Air | 77-126E.PDF (29 pages, 1,066K) |
| X. Appendix II - Analytical Method for Formaldehyde in Air | |
| XI. Appendix III - Material Safety Data Sheet | 77-126F.PDF (27 pages, 598K) |
| XII. Tables and Figures | |

These PDF files contain "bookmarks" that appear in a window to the left of the document image. Most of the files contain indented bookmarks. With the indented bookmarks, you can go to sections or subsections of the document contained in the open file. These bookmarks work whenever the file is open.

Other "file-to-file" bookmarks allow you to go to the other files that contain parts of the document.

http://www.cdc.gov/niosh/77-126.html

9/17/2009

within the chamber. Formaldehyde concentrations were determined by a modified chromotropic acid procedure, specific for formaldehyde, with a sensitivity of 0.01 ppm. The subjects reported their feelings of eye irritation in terms of 4 standard descriptions during 5-minute exposures. Exposure to the photooxidation products of ethylene caused somewhat more eye irritation at a given concentration of formaldehyde in the air of the chamber than to those of propylene. The concentration-response relation for subjective irritation of the eyes was linear for propylene oxidation products but became linear for ethylene oxidation products only after concentrations of formaldehyde exceeded 0.3 ppm. The subjects were said to experience equivalent irritations at formaldehyde concentrations of 0.05 and 0.5 ppm. The differences between concentration-response curves for formaldehyde in the presence of the photooxidation products of ethylene and propylene emphasize the importance of other components in the gas mixtures studies. The blinking rate of the eyes, which was used as an objective measure of irritation, was variable for any given subject and passed through several cycles of waxing and waning during a 5-minute exposure period. The authors further reported that the eyes of human subjects could readily detect, by the sensation of irritation, some gas mixtures containing as little as 0.01 ppm formaldehyde.

(d)   Skin Effects

Two skin hazards are associated with exposure to formaldehyde: primary irritation [65,66] and allergic dermatitis [43,45,49,67-83]. Primary irritation has resulted from direct skin contact with formaldehyde solutions [65,66], and exposure to gaseous formaldehyde [65]. Allergic dermatitis has been produced by direct skin contact with formaldehyde solutions [65,68,71,73,74,78,79], the handling of formaldehyde-containing

43

textiles [67,69,76,77,80, 81,83], skin contact with formaldehyde from formaldehyde-containing resins [44,65,72,75,82], and exposure to gaseous formaldehyde [43,45,49,65,79,84].

Cases involving primary skin irritation by contact with formaldehyde or its formulations include a case of hyperkeratotic palmar and plantar eczemas in a 63-year-old seamstress who ironed permanent-press cloth with a steam iron [66], dermatitis in a hairdresser who used a hair-waving solution containing 3% formalin (about 1% formaldehyde) [65], red and blistered hands in a pathologist [65], and an irritant dermatitis in fourteen workers using a vegetable glue containing 0.25 - 1% formalin (.09 - .4% formaldehyde). One glue worker after 0.5 - 1 year of exposure became so sensitized that inhaling formaldehyde caused a recurrence of her dermatitis [19]. Patch testing of these people with 4% formalin (1.5% formaldehyde) produced positive reactions. In addition, the seamstress reacted positively to permanent press cotton cloth and reacted slightly to permanent press wool cloth [66]. Pirila and Kilpio [65] also reported observing an irritant dermatitis in two lithographers who handled egg-albumin solutions containing formalin as a preservative. In these incidents of primary skin irritation, repeated exposures to formaldehyde led to development of hypersensitivity in some individuals.

In 1934, Horsfall [79] presented the results of a detailed study of the effects of formaldehyde on a single hypersensitive individual. He in-vestigated cutaneous hypersensitivity, specificity of sensitivity to form-aldehyde, cutaneous hypersensitivity reactions after the inhalation of formaldehyde, humoral manifestations, and cutaneous hypersensitivity to formalinized proteins. Following intradermal injections of 0.02 cc, the back of the hand in the subject was found to respond to solutions as dilute

APPENDIX C

# code of federal regulations

Labor

29

PART 1910 (§ 1910.1000 to END)

CONTAINING
A CODIFICATION OF DOCUMENTS
OF GENERAL APPLICABILITY
AND FUTURE EFFECT

AS OF JULY 1, 1990

Revised as of July 1, 1990

With Ancillaries



Published by
the Office of the Federal Register
National Archives and Records
Administration

as a Special Edition of
the Federal Register

## §1910.1048

### 29 CFR Ch. XVII (7-1-90 Edition)

in a wide range of ocular injuries including corneal injuries. These injuries have been directly dependent on the concentration of formaldehyde in solution and the amount of time lapsed before emergency and medical intervention.

3. *Skin contact.* Exposure to formaldehyde solutions can cause irritation of the skin and allergic contact dermatitis. These skin diseases and disorders can occur at levels well below those necessary to produce the other effects. Symptoms include erythema, edema, and vesiculation or hives. Exposure to liquid formalin or formaldehyde vapor can provoke skin reactions in sensitized individuals even when airborne concentrations of formaldehyde are well below 1 ppm.

#### B. Chronic Effects of Exposure

Long term exposure to formaldehyde has been shown to be associated with an increased risk of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer in humans. Animal experiments provide conclusive evidence of a causal relationship between nasal cancer in rats and formaldehyde exposure. Concordant evidence of carcinogenicity includes DNA binding, genotoxicity in short-term tests, and cytotoxic changes in the cells of the target organ suggesting both preneoplastic and a dose-rate effect. Formaldehyde is a complete carcinogen and appears to exert an effect on at least two stages of the carcinogenic process.

### III. Surveillance considerations

#### A. History

1. *Medical and occupational history.* Along with its acute irritative effects, formaldehyde can cause allergic sensitization and cancer. One of the goals of the work history should be to elicit information on any prior or additional exposure to formaldehyde in either the occupational or the non-occupational setting.

2. *Respiratory history.* As noted above, formaldehyde has irritant and sensitizing properties as an airway irritant and has been reported by some authors in cases of occupational asthma. In addition, formaldehyde has been associated with respiratory symptoms in exposed workers. For these reasons, it is appropriate to include a comprehensive review of the respiratory system in the medical history. Complaints of shortness of breath, chronic airway complaints, hyperreactive airway disease, rhinitis, bronchitis, bronchiolitis, asthma, emphysema, and other preexisting pulmonary disease.

In addition, generalized airway hyperreactivity can result from exposure to a single sensitizing agent. The examiner should, therefore, elicit any prior history of exposure to pulmonary irritants, and any short- or long-term effects of that exposure.

Smoking is known to decrease mucociliary clearance of materials deposited during respiration in the nose and upper airways. This may increase a worker's exposure to inhaled materials such as formaldehyde vapor. In addition, smoking is a potential confounding factor in the investigation of any chronic respiratory disease, including cancer. For these reasons, a complete smoking history should be obtained.

3. *Skin Disorders.* Because of the dermal irritant and sensitizing effects of formaldehyde, a history of skin disorders should be obtained. Such a history might include the existence of dermatitis, previously documented physical findings in the skin, previously documented allergic skin reaction, and other dermatological disorders. Previous exposure to

### §1910.1048

### Occupational Safety and Health Admin., Labor

formaldehyde and other dermal sensitizers should be recorded.

4. *History of atopic or allergic diseases.* Since formaldehyde can cause allergic sensitization of the skin and airways, it might be useful to identify individuals with prior allergen sensitization. A history of atopic disease and/or prior allergic sensitization to formaldehyde may be obtained. It is not definitely known at this time whether atopic diseases and allergies to formaldehyde are more likely to develop the results of future exposure to formaldehyde. However, identification of these individuals may be useful for ongoing surveillance.

5. *Use of disease questionnaires.* As compared with interviews, the comparison of forms for the medical and occupational history provides a more standardized and complete method for collection of data and should be used wherever deemed appropriate by the physician.

#### B. Physical Examination

1. *Mucous of eyes and airways.* Because formaldehyde is an irritant of the mucous membranes of the eyes and airways, a speculum examination of the nasal mucosa may be helpful in assessing possible irritation and cytotoxic changes, as may be indirect inspection of the posterior pharynx by mirror.

2. *Pulmonary system.* A conventional respiratory examination, including inspection of the thorax and auscultation and percussion of the lung fields should be performed as part of the routine medical examination. Pulmonary function testing is only required by the standard once every year for persons who have exposed over the TWA concentration limit, these tests have an additional value in investigating possible respiratory dysfunction and should be used

#### C. Additional Examinations or Tests

The physician may deem it necessary to perform other medical examinations or tests as indicated. The standard provides a mechanism whereby these additional investigations are covered under the standard for occupational exposure to formaldehyde.

#### D. Emergencies

The examination of workers exposed in an emergency should be directed at the organ systems most likely to be affected. Much of the content of the examination will be similar to the periodic examination unless the patient has received a severe acute exposure requiring immediate attention to prevent serious consequences. If a severe overexposure requiring medical intervention or hospitalization has occurred, the physician must be alert to the possibility of delayed symptoms.

340

341

APPENDIX D

# PATTY'S TOXICOLOGY

## Fifth Edition
Volume 5

**EULA BINGHAM**
**BARBARA COHRSSEN**
**CHARLES H. POWELL**

Editors

**CONTRIBUTORS**

James S. Bus
Steven T. Cragg
A. Philip Leber
R. A. Lemen

Silvia Maberti
Myron A. Mehlman
Maria Morandi
Debdas Mukerjee

Jon B. Reid
George M. Rusch

LSUMC-SHREVEPORT
Department of Medicine
Occupational Toxicology
Outreach Office



A Wiley-Interscience Publication
**JOHN WILEY & SONS, INC.**
New York / Chichester / Weinheim / Brisbane / Singapore / Toronto

### 3.4.2 Human Experience

3.4.2.1 *Clinical Cases.* Exposure to formaldehyde has been considered one possible cause of the sick building syndrome (151). Formaldehyde exposure provokes pharyngeal irritation in occupational (152, 153) and environmental (108) settings. Laryngitis has also been reported as a reaction of exposure to formaldehyde (154). Chronic exposure to formaldehyde was related to episodes of aphonia and pharyngeal irritation (laryngeal mucosa and vocal cords were swollen) that disappeared when occupants were away from work (154).

3.4.2.2.1 *Acute Toxicity.* Human subjects experienced eye irritation at 0.5 ppm in an experimental chamber (155). Irritating effects in the upper respiratory tract begin at 0.1 ppm and become more common at 0.2 ppm (156). Symptoms in the lower airways such as cough, chest tightness, and wheeze are observed at higher levels (> 0.5 ppm) but may occur in the presence of fine particles at lower concentrations (0.07 ppm) (157). Exposures to 2–3 ppm cause acute nose, throat, and eye irritation (158–160).

In mild asthmatics, short-term exposure to 2.0 ppm of formaldehyde under controlled environmental conditions does not induce acute airway obstruction (161). Similar to ozone and sulfur dioxide, formaldehyde decreases the forced expiratory volume (FEV₁) but does not trigger acute respiratory function changes in asthmatics (159). Similar results were obtained with healthy volunteers exposed to 2.0 ppm (160). In contrast, healthy subjects exposed to 3.0 ppm showed significant decreases in FEV₁, forced vital capacity (FVC), and FEV₃, whereas asthmatics exposed in the same manner showed no significant changes (158).

Headache, nausea, vomiting, and diarrhea have been reported by people exposed to concentrations that range from 0.02 to 4.15 ppm in residential environments (162). Neurobehavioral effects, such as headache, dizziness, nausea, memory loss, and sleeping problems were also observed among histology technicians exposed to concentrations from 0.2 to 1.9 ppm (163).

3.4.2.2.2 *Chronic and Subchronic Toxicity.* Prolonged exposure to low concentrations of the vapor can result in irritation of the eyes and inflammation of the eyelids, and sensitive persons might develop an allergic skin rash. At levels of 25–50 ppm, tissue damage may occur, but recovery tends to be rapid and complete after removal from exposure. Aqueous solutions of formaldehyde are strongly irritating to the eye and may cause severe eye burns. Levels of 2–3 ppm of formaldehyde in air cause mild irritation in eyes, nose, and throat, and few people can work comfortably under these conditions for an entire 8-h work shift. Levels of 10 ppm cause lacrimation and can be tolerated for only a few minutes (18) (164). Cases of bronchial asthma have been reported as a result of occupational exposure to formaldehyde (165).

One hundred nine workers and 254 control subjects were studied to evaluate the effects of formaldehyde on the mucous membranes and lungs (166). A modified, respiratory symptom questionnaire and spirometric test were administered to all study participants before and after their work shift, and formaldehyde levels were determined for each test subject. Over the course of the monitored work shift, test subjects demonstrated a dose-dependent excess of irritant symptoms and a statistically significant decline in certain lung