UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION "N" (5)<br><br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |

*************************************************************************

### DECLARATION OF DAVID GARRATT

I, David Garratt, state and declare as follows:

1. I am the Acting Deputy Administrator of FEMA. During the time period following Hurricanes Katrina and Rita, I served, for varying periods, as either the Deputy Assistant Administrator (Deputy Director) or Acting Assistant Administrator (Acting Director) of the Disaster Assistance Directorate (Recovery Division). Titles in parentheses indicate names of positions/organization before a reorganization in 2007. The Disaster Assistance Directorate is responsible for certain FEMA programs and policies that provide support to individuals, households, and communities following Presidentially declared major disasters and emergencies. The major disaster-related responsibilities of the Disaster Assistance Directorate include: *Individual Assistance,* which includes the provision of financial assistance, emergency housing, crisis counseling, and unemployment assistance to eligible individuals and families; *Public Assistance,* which includes the provision of financial, technical, and material assistance to states, local communities and nonprofit groups to remove debris, support emergency protective measures, and restore and rebuild public systems and facilities; program responsibility for the National Response


EXHIBIT 8

Framework Emergency Support Functions 6 (Mass Care, Emergency Assistance, Housing, and Human Services) and 14 (Long-Term Community Recovery); adjudication of all requests for Fire Management Assistance Grants; and the processing of all gubernatorial requests for Presidential emergency and major disaster declarations.

2. Prior to being appointed Deputy Assistant Administrator of FEMA's Disaster Assistance Directorate, I worked for FEMA in a number of other capacities. My past assignments include: Acting Director of Preparedness, Chief of Capability Assurance, Director of Assessments and Exercises in the Office of National Preparedness, and Executive Operations Officer to the Assistant Director for Readiness, Response and Recovery. In addition, during my time with FEMA, I have served in key positions supporting numerous Presidentially-declared disasters; established and directed the initial Homeland Security Coordination Center; and led the development of the Catastrophic Incident Supplement to the National Response Plan.

3. Following Hurricanes Katrina and Rita, and under the authority of the Stafford Act, FEMA provided (at the direct request of the States) temporary emergency housing assistance to disaster victims. FEMA's housing assistance ended on May 1, 2009. From September 2005 to May 1, 2009, FEMA has provided a significant number of Hurricane Katrina and Rita disaster victims with - at no cost - travel trailers, park model trailers, and manufactured housing, also commonly referred to as mobile homes (hereinafter collectively referred to as "Emergency Housing Units" or "EHUs"). Disaster victims have not been charged for their use of the EHUs, nor have they been required to pay any costs associated with the installation, maintenance, or removal of the units.

4. I became aware of a possible systemic formaldehyde problem involving EHUs in May/June 2006, following the release of a Sierra Club report purporting high formaldehyde readings in

occupied EHUs. In June 2006, the Disaster Assistance Directorate assumed FEMA responsibility for coordinating the agency response to formaldehyde-related concerns in EHUs. Prior to the Disaster Assistance Directorate assuming response coordination responsibility of the formaldehyde issue in June 2006, FEMA's Gulf Coast Recovery Office had - through its assigned Transitional Recovery Offices in each State - been responding to occupant's air quality complaints on a case-by-case basis. This latter practice continued, as the Transitional Recovery Offices were charged with managing/supporting the EHUs located in their respective States.

5. Mr. Kevin Souza (a senior member of the Disaster Assistance Directorate) took the lead for working this issue. Sometime in late June, he briefed me regarding his recommendation for dealing with the assertions regarding elevated levels of formaldehyde in EHUs. Specifically, he recommended that FEMA prepare and issue a safety notice to all occupants and test EHUs to validate the Sierra Club assertions. He also recommended that the testing should be conducted by an independent federal agency with experience in such matters, and further recommended the Environmental Protection Agency (EPA). I agreed with Mr. Souza's recommendation and advised him to issue a safety notice to occupants and engage with the EPA to commence testing. I was the FEMA decision-maker ultimately responsible for this decision. My decision to proceed with testing primarily stemmed from my determination that we (FEMA) lacked the ability to either validate or invalidate the Sierra Club assertions, and that testing by a qualified independent third party was necessary to establish whether elevated formaldehyde levels were present in EHUs.

6. The decision regarding whether or not to test EHUs was not made by FEMA's Office of Chief Counsel ("OCC," also known as the Office of General Counsel prior to the 2007 FEMA reorganization), nor were any OCC attorneys present when the decision was made. OCC's function

is to provide FEMA's program and support offices with legal services, legal advice, and to represent the agency in litigation. As with any other organization or company, OCC provides FEMA with legal advice and outlines the legal ramifications regarding any number of agency actions, including those unrelated to ongoing litigation. OCC was involved with and issued advice regarding formaldehyde response actions, however, OCC did not dictate response actions to me or the Disaster Assistance Directorate. My office, the Directorate, weighed competing concerns, including those voiced by OCC and others, regarding the different ways in which we could handle this matter, and I agreed with Mr. Souza that FEMA should prepare and issue a safety notice and test for formaldehyde.

7. I initially envisioned that the testing of EHUs would include both occupied and unoccupied units. I was later advised by Mr. Souza that the EPA subsequently recommended that only unoccupied units be tested, since the purpose of the test was to determine whether the units themselves (as opposed to materials introduced by occupants) were generating elevated formaldehyde levels. I concurred with this rationale. The testing was further modified to evaluate (under the aegis of the Centers for Disease Control/Agency for Toxic Substance Disease Registry, or ATSDR) the efficacy of increased/steady ventilation of EHUs, to determine if adequate ventilation was effective in reducing formaldehyde levels.

8. ATSDR also reported that ventilation was an effective method of mitigating formaldehyde levels in EHUs to below levels of concern. Based upon this recommendation, FEMA believed that properly ventilated EHUs remained a viable temporary emergency housing option. Accordingly, FEMA continued to advise occupants to air out and ventilate their units, and if venting failed to resolve the complaint, FEMA would swap the unit out for an older, previously occupied, unit.

9. In early-to-mid 2007, I was advised by FEMA's External Affairs Office that a doctor in Mississippi had reported an increased rate of illness in children living in EHUs, and he attributed their illness to formaldehyde in EHUs. I immediately advised senior FEMA leadership, and immediately reached out to both the Department of Homeland Security Office of Health Affairs (DHS/OHA) and to the Department of Health and Human Services, requesting their support to investigate the claims. The DHS/OHA immediately agreed, and assumed responsibility fjor the medical/health investigation, to include coordination with CDC.

10. In response to concerns surrounding this report, FEMA as a further precaution modified its response to occupant complaints and implemented programs to aggressively promote relocation from EHUs. In July 2007, FEMA established a formaldehyde call center (in coordination with a CDC hotline) to answer occupant questions about formaldehyde and assist concerned EHU occupants find alternate housing. FEMA adopted a policy of offering to immediately move any occupant who contacted the call center to a hotel/motel, until alternate housing could be found. FEMA also issued a second formaldehyde safety sheet to occupants and, as recommended by DHS/OHA and CDC, engaged CDC/ATSDR to test occupied EHUs and conduct a public health assessment.

11. In December 2007, CDC/ATSDR commenced testing occupied units, and issued its initial findings in February 2008. As a result of CDC/ATSDR's initial findings, FEMA further modified its response strategy. While FEMA continued its efforts to relocate EHU occupants to alternate housing, priority was now given to occupants who expressed health concerns and, as recommended by health authorities, to those who could potentially be more susceptible to formaldehyde, such as the elderly, households with young children, and persons with respiratory problems. A flyer

detailing CDC/ATSDR's initial findings was also distributed to all occupants.

12. In Spring 2008, FEMA hired a contractor to test any occupied units, upon occupant request. Since implementing this program, over 3,000 occupants have had their EHU tested for formaldehyde. The results of such testing are shared with the requesting occupant.

13. Hurricanes Katrina and Rita caused catastrophic damage to the Gulf Coast region, requiring a massive and unprecedented federal response. The magnitude of the disaster and its unprecedented catastrophic effects and the damage to housing stock required FEMA to provide, at the request of the States, over 140,000 EHUs; numbers that dwarf the response to any previous disaster. Because such a massive amount of housing stock was damaged and uninhabitable, there existed few, if any, alternatives to using EHUs to provide temporary accommodations for disaster victims and their families. Given FEMA's longstanding and successful use of EHUs in response to previous disasters, FEMA did not anticipate that formaldehyde in these EHUs (all of which were required to meet or exceed existing industry standards) would become a significant issue of concern. Given the lack of any residential indoor air formaldehyde standard, and the absence of any regulatory and/or scientific consensus regarding appropriate action levels, it is my belief that FEMA has responded to formaldehyde concerns in a manner appropriate to its evolving understanding of the situation.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is, to the best of my memory, true and correct. Executed on this 12th day of May, 2009.

DAVID GARRATT
DHS/FEMA