Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * | MDL NO. 1873 |
| | | * | SECTION: N(5) |
| This Document Relates to: *Dubuclet v. Fleetwood Enterprises, Inc.* Case No. 07-9228 | | * * * * | JUDGE: ENGELHARDT |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF WILLIAM L. DYSON, Ph.D

STATE OF NORTH CAROLINA

COUNTY OF ORANGE

Before me, an officer duly authorized to administer oaths, came WILLIAM L. DYSON, Ph.D., who, having been duly sworn deposes and makes this affidavit in support of the response of Fleetwood Enterprises, Inc. to Plaintiffs' *Daubert* motion to limit the testimony of William L. Dyson, Ph.D. and says:

1. I am over the age of 18 and am not a party to the above-entitled action. I have personal knowledge of the facts stated herein and could competently testify thereto if called upon to do so.

2. I am an industrial hygienist employed with Workplace Environments, LLC. I have practiced industrial hygiene for over 38 years. My educational background includes Master of Science and Doctor of Philosophy degrees in environmental health engineering from Northwestern University in 1971 and 1975, respectively. I have been certified as an industrial hygienist by the American Board of Industrial Hygiene since 1978. A true and correct copy of my current curriculum vitae is attached hereto as **Exhibit A**.

3.  I was asked to review and respond to the Memorandum in Support of Plaintiff's Motion to Limit the Testimony of William L. Dyson, Ph.D., CIH. This affidavit will serve as my response.

4.  Plaintiff asserts that my opinion regarding the effects of gaseous formaldehyde on the Dubuclets is outside my expertise. The specific opinion cited comes from my report in this case and is as follows:

> 3. In light of available scientific data on sensory irritation from formaldehyde, it is unlikely that the Dubuclet family would have experienced ocular, olfactory, or upper respiratory irritation at formaldehyde levels below 0.3 ppm and certainly would not have at levels below 0.1 ppm.

Plaintiff interprets this opinion as one of medical causation, and, since I am not a medical doctor, asserts that I am unqualified to offer such an opinion. Further, Plaintiff states that I have done no independent research and, thus, rely upon scientific articles to support this conclusion.

5.  In risk management terms there are four stages in the assessment and control of adverse effects from a chemical substance such as formaldehyde : 1) Hazard determination - Determination of the intrinsic ability of a substance to cause the effect; 2) Exposure evaluation – Evaluation of the type and extent of exposure in relation to the intrinsic hazard; 3) Risk assessment – Assessment of whether the exposure presents a risk of an adverse effect; and 4) Risk management – Control measures to reduce or eliminate the risk. Industrial hygienists have a role in all four of these stages with core expertise in the latter three. As an industrial hygienist I have been allowed to testify in numerous courts about general causation, which I equate to risk, but not about specific medical causation, which is reserved for medical practitioners. Perhaps the opinion addressed by the Plaintiff should have been stated in more general terms (i.e., …it is unlikely that anyone would have experienced…) rather than specifically applied to the Dubuclets, but such an opinion is not outside the expertise of an industrial hygienist.

2

6. The basis for my opinion regarding sensory irritation was addressed in great detail in the body of my report as follows:

> Eye, nose, and upper respiratory tract irritation has been observed in individuals exposed to formaldehyde in air, with eyes generally being most sensitive. Irritant effects are concentration-dependent rather than dose-dependent. The formaldehyde levels at which sensory irritation occurs has been explored through chamber, community observation, and workplace studies. Chamber studies provide the best opportunity for determining the presence of eye, nose, and throat irritation at known levels of formaldehyde.[1] Conclusions from a recent, well designed chamber study[2] with both subjective and objective observations were as follows:
>
>> "The results of the present study indicated eye irritation as the most sensitive parameter. Minimal objective eye irritation was observed at a level of 0.5 ppm with peaks of 1 ppm. The subjective complaints of ocular and nasal irritation noted at lower levels were not paralleled by objective measurements of eye and nasal irritation and were strongly influenced by personality factors and smell. It was concluded that the no-observed effect level for subjective and objective eye irritation due to formaldehyde exposure was 0.5 ppm in case of a constant exposure level and 0.3 ppm with peaks of 0.6 ppm in case of short-term peak exposure."
>
> Irritant effects – burning and itching of the eyes, rhinitis, and sore throat – are temporary and cease once exposure ceases. Acclimatization has been observed in continuing exposure situations.
>
> After reviewing scientific studies through 1995 a panel of experts[3] recommended an occupational exposure limit for formaldehyde of 0.3 ppm as an eight-hour, time weighted average with a ceiling limit of 1.0 ppm based on sensory irritation potential and protection of nearly all workers. In large part, the panel based this recommendation on controlled studies on humans in chambers where formaldehyde was the only contaminant. Even though the panel recognized that sensory irritation from formaldehyde is concentration rather than dose dependant, they applied a safety factor and concluded that "if concentrations of formaldehyde are kept below 0.1 ppm in the indoor environment (where exposure might occur 24h/d) this should prevent irritation in virtually all persons."
>
> More recent reviews have reached similar conclusions. Based on a "Benchmark dose analysis" one set of reviewers estimated that at a level of 1 ppm formaldehyde only 9.5

---

[1] Bender, J.: The Use of Noncancer Endpoints as a Basis for Establishing a Reference Concentration for Formaldehyde. *Regul Toxicol Pharmacol* 35: 23-31 (2002).
[2] Lang, I., T. Bruckner and G. Triebig: Formaldehyde and Chemosensory Irritation in Humans: A Controlled Human Exposure Study. *Regul Toxicol Pharmacol 50*: 23-36 (2008).
[3] Paustenbach, D., Y. Alarie, T. Kulle, N. Schachter, R. Smith, et al.: A Recommended Occupational Exposure Limit for Formaldehyde Based on Irritation. *J Toxicol Environ Health 50*: 217-262 (1997).

3

percent of healthy volunteers experience moderate (i.e., annoying) eye irritation.[4] These same reviewers noted that slight sensory irritation could be observed at formaldehyde concentrations of 0.2 to 0.3 ppm and concluded that 0.1 ppm can be considered a "safe and appropriate level" for indoor air.[5]

It is true that I relied upon scientific literature in forming my opinion. This is normal practice in industrial hygiene as well as other scientific disciplines. To do otherwise would be malpractice. Rather than being unsubstantiated and unreliable, the opinion I expressed is supported by available scientific literature which was cited in the body of the report, not in the condensed conclusion cited in Plaintiff's memorandum. Perhaps an alternative would have been to rely upon symptoms reported by occupants of the travel trailer. According to published reports in the scientific literature, this approach would have been unreliable due to the "placebo effect" (i.e., effects reported at zero formaldehyde exposure level).

7.  Plaintiff asserts that my opinions concerning the levels of formaldehyde exposure experienced by the Dubuclet family are unsubstantiated speculation. The specific opinions cited are as follows:

> 4. Even though the measurement was made long after they moved out, the best estimate of the formaldehyde exposure potentially experienced by the Dubuclet family is the 0.16 to 0.22 ppm measured in the Fleetwood travel trailer in August 2009.
>
> 5. Although the concentration of formaldehyde in the Fleetwood travel trailer may have been somewhat higher (under closed, unventilated conditions) than 0.16 to 0.22 ppm when the Dubuclet family began occupancy in June 2006, it is not possible to determine quantitatively what the level might have been at that time.

According to Plaintiff these opinions taken together are contradictory and little more than sheer speculation.

8.  Both Plaintiff and Defendant have the same problem. To judge whether gaseous formaldehyde was the etiologic agent for the health effects claimed by the Dubuclet family, it is

---

[4] Arts, J. H., M. A. Rennen, and C. de Herr: Inhaled Formaldehyde: Evaluation of Sensory Irritation in Relation to Carcinogenicity. *Regul Toxicol Pharmacol 44(2)*: 144-160 (2006).
[5] Arts, J. H., H. Muijser, C. F. Kuper, and R. A. Woutersen: Setting an Indoor Air Exposure Limit for Formaldehyde: Factors of Concern. *Regul Toxicol Pharmacol 52(2)*: 189-194 (2008).

4

desirable to know the concentration of airborne formaldehyde to which family members were exposed while living in the travel trailer. Unfortunately, no measurements were made at the time. Both Plaintiff and Defendant must now *estimate* the levels of formaldehyde to which the Dubuclet family was exposed while living in the travel trailer in the absence of contemporaneous measurements.

9. Plaintiff's approach to this *estimate* has been to measure the present level of formaldehyde in the Dubuclet travel trailer in 2009 and extrapolate back to the time the family lived in travel trailer using various mathematical models (e.g., exponential decay with an estimated half-life). This approach is fraught with difficulties and give different results. The first difficulty is the starting point for extrapolation. Plaintiff experts chose to measure the current level of airborne formaldehyde in the travel trailer under ventilation and temperature conditions that do not represent actual living conditions. The second difficulty is that the mathematical model has numerous variables, inputs for many of which are not known. In particular, ventilation conditions created by opening windows and doors (as Ms. Dubuclet testified she did) and temperature conditions created by operating the air conditioner (as Ms. Dubuclet testified she did) cannot be adequately represented by the mathematical model. I discussed the use of mathematical models in my report as follows:

> Ms. DeVany[6] used mathematical modeling to address the question of what formaldehyde levels may have been present in the Dubuclet travel trailer in June 2006. She described four different models. Two of these models apply to wood products, not to homes built from such products. One model was based on statistical analysis of monitoring data collected in FEA THUs with attendant problems as noted above. The last "model" Ms. DeVany considered simply states that it takes 7.5 years for the formaldehyde concentration to reach 0.01 ppm, a conclusion that assuredly depends upon the beginning level and other factors.
>
> Using various assumptions as input for these models, Ms. DeVany estimates that the formaldehyde level in the travel trailer when occupied by the Dubuclet family ranged from 0.14 to 0.48 ppm. This wide range reflects the vagaries and imprecision of such

---

[6] Affidavit of Mary C. DeVany, MS, CSP, CHMM in the Dubuclet case dated July 17, 2009.

5

modeling. Little confidence can be placed in such estimates. As Ms. DeVany points out, and as were listed above, a large number of factors affect the formaldehyde concentration found in a home at any given time and the interplay between these factors is complex.

Any *estimate* of formaldehyde level reached in the manner chosen by Plaintiff cannot be accurate or precise to a reasonable degree of scientific certainty even though it is certainly more than unsubstantiated speculation.

10. The approach to the desired *estimate* that I suggest is based on measurements, analysis of data, and testimony to the maximum extent possible. First, use the measurements made in the Dubuclet travel trailer in August 2009 after standardization of environmental conditions and while operating the air conditioner as a starting point. The results were 0.16 to 0.22 ppm formaldehyde. Second, recognize that, due to the passage of time, formaldehyde levels in the Dubuclet travel trailer during the time of occupancy – June 2006 to September 2007 – may have been somewhat higher *under similar environmental conditions*. How much higher, if any, cannot be determined with accuracy to a reasonable degree of scientific certainty. Third, acknowledge Ms. Dubuclet's testimony that she operated the air conditioner as necessary and often opened the windows and door of the travel trailer. With four people occupying the Dubuclet travel trailer it is reasonable to believe that the door was also opened frequently. Fourth, incorporate the findings of the ATSDR regarding the effect of air conditioning and opening windows and doors described in my report as follows:

> One of the questions addressed by ATSDR in their February 2007 Health Consultation[7] regarding the FEMA THUs was whether simple measures, such as operating the air conditioner or opening windows, would lower the levels of formaldehyde in the units. Based on a large number of observations the answer is clearly yes. For example, mean formaldehyde levels dropped from 1.04 ppm (n=96) in closed, unventilated units to 0.39 ppm (n=852) when the air conditioner was operated and to 0.09 ppm (n=863) when windows were opened.

---

[7] ATSDR: *An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers, Baton Rouge, Louisiana, September-October, 2006.* Agency for Toxic Substances and Disease Registry, Atlanta, GA (October 2007).

6

The effect of opening windows and doors was to reduce the formaldehyde level in an air conditioned travel trailer by a factor of four. Applied to the August 2009 measurement this would result in an exposure *estimate* of 0.04 ppm to 0.05 ppm while windows in the travel trailer were opened. Finally, utilize the data on occupied and unoccupied Fleetwood travel trailers reported by Dr. Hewett to evaluate the effect that occupancy in general. Dr. Hewett reported mean formaldehyde concentrations of 0.06 ppm and 0.30 ppm for occupied and unoccupied Fleetwood travel trailers respectively[8], indicating that mere occupancy of the travel trailer reduced the average formaldehyde concentration by a factor of five. Application of this finding to the August 2009 measurement suggests an exposure *estimate* of 0.03 ppm to 0.04 ppm for the occupied Dubuclet travel trailer. Obtaining the desired *estimate* using the approach described in this paragraph is neither speculative nor unsubstantiated. If an *estimate* is deemed not acceptable, then this determination applies to both Plaintiff and Defendant and the only factual data upon which judgments can be based are the measurements made in the Dubuclet travel trailer in August 2009.

11.     Plaintiff asserts that my opinion concerning exposures by direct contact to formaldehyde from products has no factual support. The specific opinion referenced was as follows:

> 8. More likely than not, Dubuclet family members had direct contact with formaldehyde from products they used such as cleansers, cosmetics, and clothing.

Limited testimony has been elicited regarding specific products that the Dubuclet family, particularly Timia Dubuclet, used. The fact remains that the overwhelming majority of formaldehyde-related dermal sensitization in humans comes from inadvertent contact with

---

[8] See Tables 2 and 5 accompanying the letter from Paul Hewett, Ph.D., CIH to Chris Pinedo dated November 4, 2009.

7

everyday products such as cleaners, cosmetics, and clothing. The likelihood that the Dubuclet household did not utilize such products, particularly permanent-press clothing is low. This issue will be addressed in more detail by other experts.

12. Plaintiff asserts that my opinion that the Dubuclet family exposure to formaldehyde was unlikely to be higher than that experienced by residents of conventional homes in southern Louisiana is irrelevant and unsubstantiated. The specific opinion addressed was as follows:

> 9. It is unlikely that the Dubuclet family was exposed to average formaldehyde levels higher than those experienced by residents of conventional homes in Southern Louisiana.

This opinion relates specifically to the formaldehyde exposure level the Dubuclet family experienced while living in the Fleetwood travel trailer which was discussed in detail above. More detail regarding formaldehyde levels measured in Southern Louisiana homes was given in my report as follows:

> Formaldehyde levels have been measured in 53 conventional homes in Southern Louisiana.[9] The levels found ranged from non-detectable to 5.4 ppm. Approximately 60 percent of the samples exceeded 0.1 ppm with average levels of 0.53 ppm, 0.46 ppm, 0.56 ppm, and 1.04 ppm in Spring, Summer, Fall, and Winter respectively. These results suggest that formaldehyde levels in Ms. Dubuclet's travel trailer more likely than not were low in comparison to other residences in Southern Louisiana.

The concentrations of airborne formaldehyde measured by both Plaintiff and Defendant in the Dubuclet travel trailer in August 2009 were all lower than the average formaldehyde level of 0.46 ppm found in the Summer in conventional Southern Louisiana homes. A simple comparison of the numbers substantiates the opinion as expressed in more likely than not terms. The counter argument depends upon extrapolation of the formaldehyde levels found in August 2009 to levels during the period of occupancy that are higher than the average levels found in

---

[9] Lemus, R., A. A. Abdelghani, T. G. Akers, and W. E. Horner: Potential Health Risks from Exposure to Indoor Formaldehyde. *Rev Environ Health* 13: 91-98 (1998).

8

conventional Southern Louisiana homes. As noted previously, such an extrapolation is fraught with difficulties and not supported by available information. Comparison of exposure levels found in conventional homes with those found in the Fleetwood travel trailer is relevant if for no other reason than that it demonstrates that formaldehyde levels in the Fleetwood travel trailer are not exceptionally high relative to other residential environments.

William L. Dyson, Ph.D.

Sworn to and subscribed before
me this 19th day of November, 2009.

Notary Public

My Commission Expires:

# CURRICULUM VITAE

## WILLIAM L. DYSON, PhD, CIH

**ADDRESS:**  Workplace Environments, LLC  Telephone: 919-732-2043
P.O. Box 160  Facsimile: 919-732-7534
2100 Dimmocks Mill Road  e-mail:
Hillsborough, NC 27278    wmdyson@bellsouth.net

**EDUCATION:**  B.S., Chemical Engineering, North Carolina State University, Raleigh, North Carolina, 1966.

M.S., Environmental Health Engineering, Northwestern University, Evanston, Illinois, 1971. Thesis title: *Reduction of Toluene Diisocyanate in Air by Water Vapor*

Ph.D., Environmental Health Engineering, Northwestern University, Evanston, Illinois, 1975. Dissertation title: *The Reaction of Sulfur Dioxide with Zinc Oxide Fume in Air*

Miscellaneous: Graduate work in chemical engineering, North Carolina State University, 1966; Ten week industrial hygiene training course, U.S. Public Health Service, 1967; Business courses, University of Cincinnati, 1967. Numerous short courses and seminars - toxicology, ventilation, asbestos, formaldehyde, indoor air quality, management, and other topics - 1973 to present.

**PROFESSIONAL EXPERIENCE:**

2001
to
Present

Workplace Environments, LLC, Hillsborough, North Carolina
*Consultant in Industrial Hygiene*

1998
to
2001

Workplace Hygiene, LLC, Greensboro, North Carolina
*Consultant in Industrial Hygiene*

1991
to
1998

Health & Hygiene, Inc. Greensboro, North Carolina
*President*

| | | |
|---|---|---|
| *Curriculum Vitae* | *William L. Dyson, PhD, CIH* | *Page 2 of 4* |

| | |
|---|---|
| 1982 to 1991 | Health & Hygiene, Inc. Greensboro, North Carolina<br>*Vice President/Industrial Hygiene* |
| 1976 to 1982 | Burlington Industries, Greensboro, North Carolina<br>*Corporate Industrial Hygienist* |
| 1973 to 1976 | IBM, Lexington, Kentucky<br>*Manager, Industrial Hygiene* |
| 1967 to 1969 | U.S. Public Health Service, Cincinnati, Ohio<br>*Industrial Hygiene Engineer* |
| 1967 | Monsanto Company, Luling, Louisiana<br>*Technical Assistance Engineer* |
| Summer 1966 | E.I. DuPont de Nemours, Belle, West Virginia<br>*Engineer Intern* |
| Summers 1964 & 1965 | Union Carbide, Institute, West Virginia<br>*Operator and Engineer Intern* |

**ACADEMIC EXPERIENCE:**

| | |
|---|---|
| 1979 | North Carolina A & T State University, Greensboro, North Carolina<br>*Adjunct Assistant Professor* |
| 1971 to 1976 | Northwestern University, Evanston, Illinois<br>*Teaching assistant* |
| 1970 | Northwestern University, Evanston, Illinois<br>*Laboratory teaching assistant* |
| 1966 | North Carolina State University, Raleigh, North Carolina<br>*Laboratory teaching assistant* |

*Curriculum Vitae*          *William L. Dyson, PhD, CIH*          Page 3 of 4

**CERTIFICATION:** Certified by the American Board of Industrial Hygiene in the Comprehensive Practice of Industrial Hygiene (1978). Certification No. 1457

**AFFILIATIONS:** American Industrial Hygiene Association – Fellow Member
American Academy of Industrial Hygiene – Member
American Board of Industrial Hygiene – Diplomate
Carolinas Section AIHA – Member
American Society of Safety Engineers – Professional Member
Sigma Xi

**PROFESSIONAL ACTIVITIES:** American Industrial Hygiene Association
- Air Pollution Technical Committee 1975-1979
- Conference Program Committee 1979, 1982-1986
- Treasurer-Elect 1995 - 1996
- Treasurer 1996 – 1998
- Finance Committee 1995 - 2002

American Academy of Industrial Hygiene
- Secretary-Treasurer 1980-1983
- Vice-President 1983-1984
- President-Elect 1984-1985
- President 1985-1986
- Past-President 1986-1987

American Board of Industrial Hygiene
- Director 1989-1995
- Treasurer 1991-1995

American Industrial Hygiene Foundation
- Trustee 2002-2005

American Textile Manufacturers Institute
- Chemical Substances Subcommittee 1976-1982
- Dye Task Group 1981

N.C. Triad Association of Occupational Health Nurses
- Advisory Board 1978-1983

Numerous talks and lectures;
- American Industrial Hygiene Conference and Exposition
- North Carolina Statewide Safety Conference
- Professional Conference on Industrial Hygiene
- American Furniture Manufacturers Association
- American Association of Textile Colorists and Chemists
- Carolinas Section AIHA

*Curriculum Vitae*                *William L. Dyson, PhD, CIH*                *Page 4 of 4*

**PAPERS AND PUBLICATIONS:**

Heath, George A. and William Dyson: Handling Powder Dyes: Workplace Exposure, *Textile Chemist and Colorist*, Vol. 22, No. 4, pgs. 25-31, April 1990.

Dyson, William L.: *Guidelines for Safe Handling of Dyes*, ETAD, pgs. 1-15, November 1989.

Powell, Charles H, Duncan A. Holady, Mildred A. Kendrick, and William L. Dyson, The Preliminary Survey: A Technique for the Assessment of the Nation's Occupational Health Requirements, Transactions of the 30th Annual Meeting of the ACGIH, pgs. 60-72, 1968.

McCarl, G.W., R. E. Reifschneider and W. L. Dyson: *Study of an Episode of Illness at Lasko Metal Products Company*, Franklin, Tennessee, Bureau of Occupational Safety and Health, Division of Occupational Injury and Disease Control, May 1969.

Dyson, William, and G. Warren McCarl: *Vehicle Exhaust Exposure at El Paso and Laredo, Texas, Border Crossing Stations*, U.S. Department of Health, Education, and Welfare, Public Health Service, Consumer Protection and Environmental Health Service, Environmental Control Administration, TR-58, November 1968.

Dyson, William and Edward R. Hermann: Reduction of Atmospheric Toluene Diisocyanate by Water Vapor, *American Industrial Hygiene Association Journal*, Vol. 32, Number 11, November 1971.

Imbus, Harold R., Ralph Buncher, William L. Dyson, John A. Thomas, and G.Z. Nothstein: Health Professionals as Experts, *Toxic Torts, Litigation of Hazardous Substance Cases, Trial Practice Series*, pgs. 542-584 (1984).

Dyson, William L. and James E. Quon: Reactivity of Zinc Oxide Fume with Sulfur Dioxide in Air, *Environmental Science & Toxicology*, Vol. 10, No. 5, pgs. 476-481, May 1976.

Imbus, Harold R., and William L. Dyson: A Review of Nasal Cancer in Furniture Manufacturing and Woodworking in North Carolina, the United States, and Other Countries, *Journal of Occupational Medicine*, Vol. 29, No. 9, pgs. 734-740, September 1987.

Rose, Vernon E, and William L. Dyson: Occupational Health Survey of the Chicago Metropolitan Area, U.S. Department of Health, Education and Welfare, Bureau of Occupational Safety and Health, October 1969.