Exhibit A

Atkins, Mark                 Atkins, Mark                 11/3/2009

UNITE STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION


IN RE:  FEMA TRAILER
FORMALDEHYDE PRODUCT LIABILITY
LITIGATION
                              MDL NO. 1873

Relating to:  07-9288         SECTION "N-5"
Aldridge, et al. vs. Gulf     JUDGE ENGELHARDT
Stream Coach, Inc., et al.    MAG. JUDGE CHASEZ
(Elisha Dubuclet obo Timia
Dubuclet)




VIDEO DEPOSITION OF

MARK ATKINS

November 3, 2009

11:03 a.m.

Nelson, Mullins, Riley & Scarborough

201 17th Street

Suite 1700

Atlanta, Georgia

Robyn Bosworth, RPR, CRR, CCR-B-2138

Atkins, Mark                 Atkins, Mark                 11/3/2009

Page 2

 1                 DESCRIPTION OF EXHIBITS

 2    EXHIBIT    DESCRIPTION

 3    For the Plaintiffs:

 4    #1         Amended Notice of Oral and Videotaped

 5               Federal Rule 30(b)(6) Deposition of

 6               Georgia-Pacific Corporation

 7    #2         Response of Georgia-Pacific Wood Products

 8               LLC (Improperly Named as Georgia-Pacific

 9               Corporation) to Subpoena for Production of

10               Documents Issued by Plaintiffs

11    #3         Georgia-Pacific Shipments to Fleetwood and

12               Continental Lumber Years 2005 and 2006

13    #4         Invoices

14    #5         Unit tag or product stamp examples

15    #6         Composite exhibit, Bates Nos.

16               FLEETWOOD_EX-000136-138

17

18

19                 INDEX TO EXAMINATION            PAGE

20    By Mr. Dominick                            7, 108

21    By Mr. Waldron                                 77

22    By Mr. Hines                                  106

23

24

25

Tiffany Alley & Associates
770-343-9696

Page 3

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs:

3            PAUL A. DOMINICK

4            Attorney at Law

5            Nexsen Pruet, LLC

6            205 King Street, Suite 400

7            Charleston, South Carolina  29402

8

9    On behalf of the Defendants Dutchmen Manufacturing,

10   Keystone RV Company, KZRV, LP, Thor California, DS

11   Corporation d/b/a Cross Roads RV:

12           RYAN JOHNSON (via telephone)

13           Attorney at Law

14           Jones Walker

15           8555 United Plaza Boulevard

16           Baton Rouge, Louisiana  708098

17

18   On behalf of the Defendant Fluor Enterprises, Inc.:

19           LEZLY L. PETROVICH (via telephone)

20           Attorney at Law

21           Middleberg, Riddle & Gianna

22           Suite 1101

23           450 Laurel Street

24           Baton Rouge, Louisiana  70801

25

Atkins, Mark            Atkins, Mark                    11/3/2009

1      APPEARANCES OF COUNSEL (Continued):

2      On behalf of the Defendant Fleetwood Enterprises:

3              RICHARD K. HINES, IV

4              Attorney at Law

5              Nelson, Mullins, Riley & Scarborough, LLP

6              Atlantic Station

7              201 17th Street, Suite 1700

8              Atlanta, Georgia   30363

9

10     On behalf of the Defendants Jayco, Inc., and

11     Starcraft RV:

12             DIANE SWEEZER (via telephone)

13             Attorney at Law

14             Willingham, Fultz & Cougill, LLP

15             Niels Esperson Building

16             808 Travis, Suite 1608

17             Houston, Texas   77002

18

19     On behalf of the Defendant United States of America:

20             JONATHAN R. WALDRON

21             Attorney at Law

22             U. S. Department of Justice,

23             Civil Division, Environmental Torts

24             1331 Pennsylvania Avenue, N.W.

25             Washington, D.C. 20004

Atkins, Mark              Atkins, Mark                11/3/2009

Page 5

1    APPEARANCES OF COUNSEL (Continued):

2    On behalf of the Defendants Heartland Recreational

3    Vehicles, LLC:

4              LORI A. DAIGLE (via telephone)

5              Attorney at Law

6              Allen Gooch

7              3900 North Causeway Boulevard

8              Suite 1450

9              Metairie, Louisiana  70002

10   On behalf of the Defendants CMH Manufacturing, Inc.;

11   Southern Energy Homes, Inc.; Giles Family Holdings,

12   Inc.; Giles Industries, Inc.; SunRay RV, LLC: SunRay

13   Investments, LLC:

14             KATI C. WEAVER (via telephone)

15             Attorney at Law

16             Fowler Rodriguez Valdes-Fauli

17             400 Poydras Street, Suite 3000

18             New Orleans, Louisiana  70130

19   On behalf of the Defendants TL Industries, Inc.;

20   Frontier RV, Inc.; Play'Mor Trailers, Inc.:

21             RANDALL C. MULCAHY (via telephone)

22             Attorney at Law

23             Garrison, Yount, Forte & Mulcahy, LLC

24             909 Poydras Street, Suite 1800

25             New Orleans, Louisiana  70112

Atkins, Mark          Atkins, Mark               11/3/2009

                                                      Page 6

1     APPEARANCES OF COUNSEL (Continued):

2     On behalf of the Defendant Forest River,

3     Incorporated:

4              CARSON W. STRICKLAND (via telephone)

5              Attorney at Law

6              Gieger, Laborde & Laperouse, LLC

7              Forty-Eighth Floor

8              One Shell Square

9              701 Poydras Street

10             New Orleans, Louisiana   70139

11

12    On behalf of the Deponent:

13             MARY K. MCLEMORE

14             Attorney at Law

15             Georgia-Pacific

16             133 Peachtree Street, NE

17             Atlanta, Georgia   30348

18

19    Also Present:  Peter Ausburn, Videographer

20

21

22

23

24

25

Atkins, Mark          Atkins, Mark                    11/3/2009

Page 7

1          THE VIDEOGRAPHER:  This will be the

2    30(b)(6) videotaped deposition of Georgia-Pacific in

3    regards to FEMA trailer.  Today's date is

4    November 3rd, 2009.  The time is 11:03 a.m.  Will

5    all counsel present please identify yourselves for

6    the record.

7          MR. DOMINICK:  Paul Dominick for

8    plaintiffs.

9          MR. WALDRON:  Jonathan Waldron for the

10   United States.

11         MR. HINES:  Richard Hines for Fleetwood

12   Enterprises and its various subsidiary corporation.

13         MS. MCLEMORE:  I'm Mary McLemore, and I'm

14   with Georgia-Pacific.

15         THE VIDEOGRAPHER:  You may now swear the

16   witness.

17                MARK ATKINS,

18   having been first duly sworn, was examined and

19   testified as follows:

20                EXAMINATION

21   BY MR. DOMINICK:

22      Q    Okay.  To get started, would you state your

23   name, please?

24      A    Mark Atkins.

25      Q    Mark Atkins.

Atkins, Mark             Atkins, Mark                11/3/2009

Page 8

1        A     Yes.

2        Q     And, Mark -- Mark, we met earlier, but I --

3    I'm here representing the plaintiffs in this

4    litigation involving Fleetwood, and it involves issues

5    involving formaldehyde emissions and levels of

6    formaldehyde within the travel trailer that was

7    provided to the Dubuclet family as a part of the FEMA

8    relief efforts after Hurricane Katrina.

9              And you're here I believe pursuant to a

10   30(b) -- 30(b)(6) deposition notice that we served on

11   Georgia-Pacific.  And I'd like to show you -- hand you

12   Plaintiff's Exhibit 1 which is a copy of the notice.

13             (Document marked for identification as

14   Plaintiff's Exhibit-1.)

15             MS. MCLEMORE:  Just for clarification

16   we're actually here pursuant to a subpoena that was

17   issued.

18             MR. DOMINICK:  Okay.

19             MS. MCLEMORE:  Your -- your notice is

20   issued from the Eastern District of Louisiana.

21             MR. DOMINICK:  Right.

22             MS. MCLEMORE:  For our purposes we're here

23   pursuant to a subpoena that was issued by the court

24   of the Northern District of Georgia, so just with

25   that clarification.

Atkins, Mark               Atkins, Mark                    11/3/2009

Page 9

1          MR. DOMINICK:  Okay.  I stand clarified.

2     And as -- as part of that exhibit the subpoena is

3     within that exhibit, I believe.

4          MS. MCLEMORE:  That's correct, yes.

5     BY MR. DOMINICK:

6      Q    Okay.  Have -- within that exhibit,

7     Mr. Atkins, is -- actually, it's part of Exhibit A of

8     the 30(b)(6) notice.  If you'll turn in there, it's

9     the seventh page back, it says Exhibit A.  And these

10    were a list of items that were put in a 30(b)(6)

11    deposition notice.

12          Have you -- have you had a chance to review

13    this particular notice and this exhibit?

14     A    I'd have to go back and look at the one I

15    have and see if it compares to it, but I've seen

16    Exhibit A and Exhibit B, I believe.

17     Q    Okay.  And -- and Exhibit B I think if you

18    turn -- the -- the next page is -- it's some warning

19    notices.  Page after that is also a -- a photograph,

20    not a very good one, of the warning notices in the

21    Dubuclet trailer, and then Exhibit B is a document

22    request.  Is that the Exhibit B you were discussing?

23     A    That's correct.

24     Q    And you've seen that?

25     A    Yes, sir.

Atkins, Mark            Atkins, Mark                11/3/2009

Page 10

1      Q    And then behind that is the subpoena.

2   Have -- have you reviewed that also?

3      A    So, yes -- yes, I have.

4      Q    And then -- and attached to the subpoena

5   is -- is an exhibit for document requests called

6   Exhibit B.

7      A    Exhibit B.

8      Q    Correct.

9      A    Yes.

10     Q    Were -- were you involved in gathering --

11  assisting and gathering those documents to produce?

12     A    Yes, sir, I was.

13     Q    You were?

14     A    Yes, sir.

15     Q    All right.  We'll talk about that.

16          First, let -- why don't we go over your

17  background a little bit.  How long have you been

18  employed by Georgia-Pacific?

19     A    25 years.

20     Q    And what is your current position with

21  Georgia-Pacific?

22     A    I'm the vice-president and general manager

23  of engineered wood products.

24     Q    How long have you had that particular

25  position?

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                Atkins, Mark                11/3/2009

Page 11

1      A      Roughly two and a half years.

2      Q      And what -- what would your job

3   responsibilities be in -- in general?

4      A      Managing sales and operations for that

5   particular division, for that group of assets.

6      Q      And -- and prior to getting that position

7   what did you do before that?

8      A      Vice-president of sales for industrial wood

9   products.

10      Q      And what's the difference in that position

11   versus the position you have now other than your

12   title?

13      A      The -- the engineered wood products includes

14   engineered lumber.  The industrial wood products group

15   was a different group of assets that we have since

16   sold.

17      Q      Excuse me?

18      A      We have since sold to another company.

19      Q      Okay.

20      A      So it's just a different group of assets

21   primarily, and then sales versus -- I handle

22   operations as well.

23      Q      And when you say operations, what -- what

24   would be included in operations?

25      A      Basically managing the P&L.  The P&L,

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 12

1  responsible for the bottom line of the division.

2      Q    You're not directly involved in the

3  manufacturing process?

4      A    (Shaking head.)

5      Q    No?

6      A    No, sir.  Excuse me.

7      Q    And I ask you to speak up when you -- I'm

8  asking questions.

9      A    That's fine.

10      Q    I know you've got a -- a bronchitis issue,

11  but I ask you to do your best to speak up --

12      A    Okay.

13      Q    -- so everyone can hear you.

14          Prior to coming to work for Georgia-Pacific

15  had you worked at any other employers?

16      A    No, sir.

17      Q    So you're a lifer with Georgia-Pacific?

18      A    Yes, sir.

19      Q    If you would kind of quickly take me through

20  your employment history with Georgia-Pacific up to the

21  last one we talked about starting from the beginning.

22      A    Hired out of college in 1984 in a sales

23  role, inside customer service role, for about three

24  years.  And then moved outside to a territory in

25  Columbus, Ohio, so outside sales experience.  And then

Atkins, Mark            Atkins, Mark                 11/3/2009

Page 13

1   came back to Atlanta in the mid '90s as a -- I can't
2   remember what my title was then, sales manager
3   basically, and then moved up to the two positions
4   we've previously referenced.
5        Q    And what -- what was your educational
6   background?
7        A    I have a -- a bachelor's degree in
8   education.
9        Q    From where?
10       A    Georgia College and State University.
11       Q    When did you receive that degree?
12       A    1984, I believe.
13       Q    Have you -- have you testified before?
14       A    No.
15       Q    So this is your first deposition?
16       A    Yes, sir.
17            MR. HINES:  That's a good thing.
18            MS. MCLEMORE:  We think it's a good thing.
19   BY MR. DOMINICK:
20       Q    I'm sure you'd like to make it your last.
21            Have -- during the course of your employment
22   with Georgia-Pacific, have you had direct dealings
23   with individuals at Fleetwood or its subsidiaries?  I
24   don't know the names of all the subsidiaries.
25            MS. MCLEMORE:  I was going to say I'm

Atkins, Mark                 Atkins, Mark                 11/3/2009

Page 14

1   going to object to the question to the extent you're

2   asking the witness to assume who the subsidiaries of

3   Fleetwood are --

4   BY MR. DOMINICK:

5        Q      Okay.  Well, do you know --

6               MS. MCLEMORE:  -- but if you know.

7   BY MR. DOMINICK:

8        Q      Do you know the subsidiaries of Fleetwood by

9   their names?

10       A      Probably not.

11       Q      Probably not.

12              You ever dealt with an entity called -- that

13   had Fleetwood in its name?

14       A      Yes.

15       Q      And when would that first involvement be

16   with that entity?

17       A      Involvement -- define involvement.

18       Q      Well, let me -- let me ask you first, what

19   was the -- do you recall the name of the Fleetwood

20   entity that -- entities or entity that you've had any

21   dealings with?

22       A      I believe it would have been the one on the

23   face of that invoice, I think it's Fleetwood

24   Enterprises I believe.  It's whatever's on that

25   invoice would have been the one that I had --

Tiffany Alley & Associates
770-343-9696

Atkins, Mark            Atkins, Mark            11/3/2009

Page 15

1       Q       Okay.
2       A       -- any dealings with.  Fleetwood Homes I
3   believe it's actually called.
4       Q       Fleetwood Homes.  All right.
5       A       Yes, sir.
6       Q       And has -- has all of your involvement with
7   Fleetwood been involved from a sales capacity?
8       A       Yes, sir.
9       Q       And were you dealing with Fleetwood Homes in
10   a sales capacity in year 2005?
11       A       No, sir.
12       Q       No?
13       A       No.
14       Q       Do you know who would have been dealing with
15   Fleetwood at that point in time for sales of
16   Georgia-Pacific products?
17       A       Primarily that was handled by -- by GP
18   distribution which became BlueLinx at that time, and
19   there were probably a multitude of people that would
20   have had responsibility for that account.
21       Q       And -- and that's the -- I think that that
22   was mentioned in the --
23       A       Correct.
24       Q       -- responses --
25       A       Correct.

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 16

1       Q     -- to the discovery requests.
2    BlueLinx Corporation is the sales arm --
3       A     That's correct.
4       Q     -- of --
5       A     For Georgia-Pacific.
6       Q     -- of Georgia-Pacific.
7            MS. MCLEMORE:  Let him finish his question
8    before you answer, please.  Thank you.
9            (Document marked for identification as
10   Plaintiff's Exhibit-2.)
11   BY MR. DOMINICK:
12      Q     I'll show you, Mr. Atkins, what's been
13   marked as Plaintiff's Exhibit 2 and ask you if you
14   have seen that document?
15      A     I've seen it, yes, sir.
16      Q     And -- okay.  Plaintiff's Exhibit 2 for the
17   record is entitled Response of Georgia-Pacific Wood
18   Products, LLC, Improperly Named as Georgia-Pacific
19   Corporation, to Subpoena for Production of Documents
20   Issued by Plaintiffs.
21           Did you assist in putting this document
22   together?
23           MS. MCLEMORE:  Object to the form.  You
24   can answer.
25      A     Excuse me?

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                Atkins, Mark                    11/3/2009

1    BY MR. DOMINICK:

2        Q    You can answer.

3             MS. MCLEMORE:  You can answer.  I just put

4    an objection on the record.

5        A    I may have provided some of the answers that

6    are in here.

7    BY MR. DOMINICK:

8        Q    All right.  Provided information that may

9    be --

10       A    I could have provided information, but I did

11   not write this, so I provided information.

12       Q    And the reason I skipped this exhibit is

13   it's -- on the second page, first full paragraph, it

14   talks about the -- Georgia-Pacific's distribution

15   division was sold to BlueLinx in May of 2004.  Is that

16   information that -- is that correct to your knowledge?

17       A    Yes, sir.

18       Q    And it's also indicated in here that most of

19   the business records related to the construction

20   products distribution from May of 2004 -- prior to May

21   of 2004 were transferred to BlueLinx at the time of

22   the sale.  Is -- is that your understanding?

23       A    Yes, sir, that's correct.

24       Q    Well, were you involved in the transfer of

25   any of those records?

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 18

1        A    No, sir.

2        Q    No.  And no copies to your knowledge were

3   kept by Georgia-Pacific?

4        A    No, sir.

5        Q    Now, in your involvement with Fleetwood

6   Homes, did you -- were you at any time involved in the

7   sale to your knowledge of construction materials that

8   were going to be used in their travel trailers?

9        A    Could you repeat that?

10        Q    Okay.  Well, I'll probably have to rephrase

11   it because I know I can't remember exactly how I asked

12   it to you, but to your knowledge in your involvement

13   with Fleetwood Homes, your business dealings with

14   Fleetwood Homes, were you involved in selling them

15   Georgia-Pacific products specifically for their use in

16   their travel trailers?

17        A    No, sir.

18        Q    No?

19        A    Huh-uh.

20        Q    Did you know products that you were involved

21   in selling to Fleetwood, which I -- or your division

22   was involved in selling to Fleetwood, did you know how

23   those products were going to be used by Fleetwood?

24        A    No, sir.

25        Q    Did you know that Fleetwood made travel

Atkins, Mark                Atkins, Mark                11/3/2009

Page 19

1   trailers?

2        A      I was not aware of that, no, sir.

3        Q      What -- what did you -- what was your

4   understanding of what Fleetwood was using

5   Georgia-Pacific products for?

6        A      What I would call a manufactured house or a

7   mobile home.

8        Q      And the fact that Fleetwood was using

9   Georgia-Pacific products in travel trailers, would

10  that have made a difference to you one way or the

11  other as far as sales to Fleetwood?

12       A      Not -- no, I don't think so.

13       Q      Well, would there have been any additional

14  information that would have -- that would have made a

15  difference as far as being a travel trailer versus a

16  manufactured home?

17       A      Information from --

18       Q      From Georgia-Pacific to Fleetwood?

19       A      No, sir.

20       Q      Okay.  When -- when Georgia-Pacific sells

21  a -- a wood product that contains formaldehyde,

22  urea-formaldehyde, is there any definite set of

23  information that's provided to the purchaser regarding

24  those products as part of the sales transaction?

25              MS. MCLEMORE:  Objection to the form of

Atkins, Mark              Atkins, Mark                    11/3/2009

1   the question because there's no time frame provided,

2   but you can answer.

3        A    Can you ask me again, was there any

4   information provided to the purchaser?

5   BY MR. DOMINICK:

6        Q    Correct.

7        A    The purchaser would have been BlueLinx.

8   BlueLinx.

9        Q    Well, at the time -- I guess in 2006 or '5

10  and '6 the purchaser would have been BlueLinx,

11  correct?

12       A    That's correct.

13       Q    Okay.  Well, prior -- prior to that time,

14  what about when you were involved in -- in sales that

15  would have been directly to Fleetwood Homes, would

16  there have been information -- what information would

17  have been provided to Fleetwood Homes about your

18  products as part of the sales transaction?

19       A    What information would have been provided to

20  them?  Any information?

21       Q    Yep.  As part of the --

22       A    Product specifications, you know, linear

23  expansion, things like that, you know, product --

24  product attributes.

25       Q    Is that -- is that something that -- that

Atkins, Mark                 Atkins, Mark                 11/3/2009

Page 21

1  would have been -- wouldn't have been part of the

2  Material Safety Data Sheet, that would have been

3  something that would have been provided?

4        A    It could have been.  I -- I'm not aware if

5  it was provided or not, if it was requested or not.

6        Q    But a product attributes -- so was there

7  some promotional literature or something that would go

8  with each shipment or -- when you were --

9        A    There was a unit tag which I think you have

10 a copy of that would have been on every shipment.

11       Q    Okay.

12       A    And the product itself had a stamp on it

13 which I think you have a copy of that would have gone

14 on every -- every panel that went to them.

15       Q    All right.  Is that in this stack of

16 documents you think?

17       A    I'd have to look at the stack.

18       Q    Okay.  Well, this is -- all right.  Well,

19 this is -- let's see.  Why don't we go ahead and I --

20 I'm going to ask you to identify Plaintiff's

21 Exhibits 3, 4, and 5 which were provided to us this

22 morning before the deposition began.

23            (Document marked for identification as

24 Plaintiff's Exhibit-3.)

25       A    Okay.  Exhibit 3 is a record of our volume

Atkins, Mark                Atkins, Mark                    11/3/2009

1   of shipments to Fleetwood and Continental Lumber for
2   the years 2005 and 2006 for plywood, OSB, and particle
3   board.  This would have been sold to BlueLinx
4   Corporation who in turn shipped to Fleetwood or --
5   Homes or Continental Lumber Products.  So it has --
6   you know, the -- the volume of product and then the
7   gross sales dollar.
8   BY MR. DOMINICK:
9        Q    Okay.  We're just going to identify them
10  right now --
11       A    Okay.
12       Q    -- then I'm going to come back and ask you
13  about them later.
14       A    Okay.  Okay.  Thank you.  A record of an
15  example of an invoice from those years.
16            (Document marked for identification as
17  Plaintiff's Exhibit-4.)
18  BY MR. DOMINICK:
19       Q    Plaintiff's Exhibit 4?
20       A    Exhibit 4.
21       Q    Okay.  Now -- all right.  Let me ask you a
22  little bit more about that.  So -- so Exhibit 4 is --
23  and I had a discussion with your -- with counsel prior
24  to this, it is my understanding those are examples of
25  invoices not all of the invoices because of the

Atkins, Mark            Atkins, Mark            11/3/2009

Page 23

1    expense and the --
2            MS. MCLEMORE:   Because of the volume,
3    right.
4    BY MR. DOMINICK:
5        Q    -- volume involved?
6            MS. MCLEMORE:   What we've -- what we've
7    done, and Mr. Atkins can explain it more fully if
8    you want him to, we've provided an example of an
9    invoice for particle board, one for plywood, and one
10   for OSB for the year 2005 and then the same three
11   products for the year 2006, so that that exhibit is
12   six separate invoices representing the three
13   products for both years.
14   BY MR. DOMINICK:
15       Q    Is -- is that correct, Mr. Atkins?
16       A    That's correct.  Yes, sir, that's correct.
17       Q    All right.
18            (Document marked for identification as
19   Plaintiff's Exhibit-5.)
20   BY MR. DOMINICK:
21       Q    And what about Plaintiff's Exhibit 5?
22       A    Exhibit 5 is an example of a unit tag and/or
23   product stamp that would be applied to every
24   individual either unit or piece of product.  So those
25   are examples of unit tags.

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 24

1      Q    Okay.  And -- and that's the information
2  that we were just discussing that would have gone with
3  each shipment to the purchaser; is that correct?
4      A    That's correct.
5      Q    Let's see -- let me see Exhibit 5.
6           Mr. Atkins, do you have information as to
7  which Georgia-Pacific products would have been
8  included in the travel trailer at issue in this
9  litigation?
10     A    I do not.
11     Q    Exhibit -- Exhibit 5, these -- these
12  particular tags, would -- would -- to your knowledge
13  would -- is it possible that any or -- or -- of these
14  products would have been included in a --
15     A    Any of that equipment?
16  BY MR. DOMINICK:
17     Q    -- a travel trailer?
18          I mean, I -- the -- let me just reask that.
19  The -- what I'm asking, I don't know -- you've given
20  me these tags, but are -- are these tags all products
21  that may have been included in a travel trailer, or
22  are these just tags for all the products you
23  manufacture, or what -- what is it exactly, the
24  universe of these -- of Exhibit 5?
25     A    These are --

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 25

1      Q    And maybe just go through each one and tell
2   me what the product -- might be the easiest way to do
3   it, Plaintiff's Exhibit 5.
4      A    I cannot tell you which products were in the
5   travel trailers.  I -- I don't have the knowledge of
6   that.  This is an example of a -- a tag on our MDF
7   product we manufacture.
8      Q    Okay.  So we're looking -- the -- that's
9   page 1 --
10     A    Page 1.
11     Q    -- of Exhibit 5 is called?
12     A    Synergite --
13     Q    Synergite.
14     A    Yes, sir.
15     Q    And the MDF is a medium density fiberboard?
16     A    That's correct.
17     Q    And would that be a product that -- that you
18  would expect to find in a travel trailer?
19     A    Possibly could.
20     Q    Possible, okay.
21          All right.  What about the second page?
22     A    Second page is an example of our particle
23  board floor underlayment and our manufactured home
24  decking.  And this is actually a picture of the stamp,
25  I believe, stamp that would have been stamped on each

Atkins, Mark                 Atkins, Mark                    11/3/2009

Page 26

1    individual product.

2          This is -- this is representative of what

3    Fleetwood Homes would have gotten on their decking

4    products we sold to them.

5          Q    Okay.

6          A    So that would have been on every individual

7    piece of -- of board.

8          Q    Okay.  And -- and the decking being the --

9    the flooring --

10         A    That's correct.

11         Q    -- underlayment, I guess.

12         A    The particle board.  That's correct.

13         Q    Particle board?

14         A    That's correct.

15         Q    Okay.  And -- and that could possibly be a

16   product that you would find in a Fleetwood travel

17   trailer?

18         MR. HINES:  Object to the form,

19   foundation.

20         A    I don't -- I don't know.

21   BY MR. DOMINICK:

22         Q    Well, would it possibly be?

23         A    I really don't know.

24         Q    Don't know?

25         A    But if they specified it, it could be.

Tiffany Alley & Associates
770-343-9696

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 27

1        Q     Okay.  All right.  The third page of

2    Exhibit 5?

3        A     Third page is an example of our industrial

4    particle board.

5        Q     Okay.  To your knowledge is that a product

6    that would have possibly been included in a Fleetwood

7    travel trailer?

8        A     Again I don't know.

9             MR. HINES:  Object to form.

10       A     I -- I wouldn't -- I wouldn't know that.

11   BY MR. DOMINICK:

12       Q     Okay.  That's what I'm trying to find out.

13   All right.  Next page?

14       A     Just another example of industrial particle

15   board from a different facility --

16       Q     And what's that page say at the top?

17       A     Here?

18       Q     Yes.

19       A     Novoply.

20       Q     And -- and that's a trade name for your

21   product?

22       A     That's correct.  Just a different facility.

23             Next page is another example of our

24   industrial particle board out of another facility.

25   And then --

Atkins, Mark              Atkins, Mark              11/3/2009

1      Q    What's the -- what's -- what's the name of
2  that product?
3      A    Micro -- MicroFine.
4      Q    MicroFine, okay.
5      A    And then the last one's another example of
6  MDF from another facility.
7      Q    Okay.  That's the final page?
8      A    Yes, sir.
9      Q    Thank you.
10          Okay.  On Exhibit 3 which you've identified,
11 which I don't know where my copies went, I think it
12 was stolen by co -- opposing counsel, the -- which is
13 the sales, Georgia-Pacific shipments to Fleetwood and
14 Continental Lumber.  And it's indicated, there's a
15 column there that says product, and then there are
16 initials.  Is there a way to tell from this record
17 which of the products that we just went through on
18 Plaintiff's Exhibit 5 were sold to BlueLinx and
19 shipped to Fleetwood?
20      A    Is there a way to correspond this with that;
21 is that what you're asking me?
22      Q    Exactly.  I want you to correspond Exhibit 3
23 sales to the -- the information that was sent --
24      A    The one that references that is that product
25 right there.

Atkins, Mark                Atkins, Mark                11/3/2009

Page 29

1      Q    Okay.   That -- all right.

2      A    Yes, sir.

3      Q    Let's get this straight for the record.

4      A    That is the particle board we sold them that

5   I'm aware of.   I didn't go through every shipment

6   record, but that's --

7      Q    So PB -- all right.   The first one is -- is

8   product, PB.   And that's particle board --

9      A    That's correct.

10      Q    -- correct?

11      A    Yes, sir.

12      Q    And then you showed me -- said the --

13   what corresponds to that on Exhibit -- Plaintiff's

14   Exhibit 3 is page 2 of Plaintiff's Exhibit 5 which is

15   the particle board tags?

16      A    Manufactured home decking.   The one on the

17   right.

18      Q    The one --

19      A    Not the one on the left, the one on the

20   right.

21      Q    -- on the right.   And that shows the gross

22   sales.   And is that in -- the gross sales figure at

23   the far right, is that in dollars?

24      A    Yes, sir.

25      Q    Okay.   What is the column -- is that linear

Tiffany Alley & Associates
770-343-9696

Atkins, Mark              Atkins, Mark              11/3/2009

Page 30

1   feet basis, FTG, that column on -- second to the last
2   column on Exhibit 3?
3       A    It's square footage.
4       Q    Square footage?
5       A    And that's in million square feet, so
6   5.78 million square feet.
7       Q    Okay.  Of that product was sold in 2005 to
8   Fleetwood?
9       A    Yes, sir.
10      Q    I can't -- continuing to look at
11  Exhibit 3 -- and actually, I'll give you the exhibit,
12  and I'll look at the copy.  The -- the next product
13  down, PLY, is that -- can you correspond that to the
14  tag --
15      A    There's -- there's not one --
16      Q    -- in Exhibit 3?
17      A    There is not one in there.
18      Q    Okay.  Well, what is that product?
19      A    Plywood.
20      Q    Okay.  Would -- would the plywood that was
21  sold on this list contain urea-formaldehyde?
22      A    No, sir.
23      Q    No formaldehyde?
24      A    No, sir.
25           MS. MCLEMORE:  Object to the form of that

Tiffany Alley & Associates
770-343-9696

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 31

1  question.  Your first question is urea --

2  urea-formaldehyde, your second question was no

3  formaldehyde.

4  BY MR. DOMINICK:

5       Q    Well, it was two different -- two questions.

6       A    I -- I didn't understand the second

7  question.  I'm sorry.  It had phenolic-formaldehyde in

8  it.

9       Q    It had formaldehyde but not

10 urea-formaldehyde?

11      A    That's correct.

12      Q    Okay.  Okay.  And the next product, OSB,

13 it's oriented strand board --

14      A    Correct.

15      Q    -- correct?

16           And that Fleetwood product, would that

17 contain urea-formaldehyde?

18      A    No, sir.

19      Q    No?  Would it contain formaldehyde?

20      A    Yes, phenol-formaldehyde.

21      Q    Okay.  But not urea-formaldehyde?

22      A    No, sir.

23      Q    Okay.  Okay.  And as far as the -- still

24 looking at Exhibit 3, the 2006 sales, those are just

25 the same three products in a different year, correct?

Atkins, Mark                Atkins, Mark                11/3/2009

Page 32

    1        A       Correct.

    2        Q       Let me ask, in the -- in the time period --

    3    do you recall Hurricane Katrina when that occurred

    4    just in general?

    5        A       Roughly.

    6        Q       Roughly 2005.  Did the hurricane affect the

    7    supplies of any of these materials, the availability

    8    of these materials?

    9        A       I don't recall, but I don't -- I don't think

   10    so.

   11        Q       Do you recall whether the sales to Fleetwood

   12    Homes in 2005 were -- how did they compare volume wise

   13    to -- to prior years?

   14            MS. MCLEMORE:  I'm going to object to the

   15    question, Counsel, just because I don't think that

   16    any information about the prior years is encompassed

   17    within your 30(b)(6) notice.  I -- the witness

   18    hasn't been prepared on sales in the prior year.  I

   19    mean, we looked at your notice and prepared him with

   20    respect to the years 2005 and 2006.

   21            MR. DOMINICK:  Well, if -- if he knows.  I

   22    mean, what I --

   23            MS. MCLEMORE:  If he knows I'll let him

   24    answer this --

   25            MR. DOMINICK:  Right.

Atkins, Mark            Atkins, Mark            11/3/2009

1        MS. MCLEMORE:  -- but if we can stick to
2    the parameters of the notice I'd prefer that.
3        MR. DOMINICK:  Okay.
4        MS. MCLEMORE:  But --
5    A    I don't recall.
6    BY MR. DOMINICK:
7    Q    Don't recall.
8    A    I didn't look at it, no, sir.
9    Q    All right.  Would it be fair that -- to say
10   that the sales to Fleetwood of -- of your products in
11   2005 were substantially more than the sales in 2006?
12   A    They were less in 2006.
13   Q    Right.  By about half?
14   A    On a dollar basis, that's correct.
15   Q    All right.  I -- I was just wondering if you
16   know the reason for the -- for the differences in the
17   sales volumes between '06 and 2005?
18   A    Not right offhand, no, sir.
19   Q    Is BlueLinx Corporation the -- the sole
20   distribution arm for Georgia-Pacific?
21   A    Currently?
22   Q    At this -- at this time, 2005/2006.
23        MS. MCLEMORE:  Object to the form.  You
24   can answer.
25   A    The sole distribution arm for which product?

Tiffany Alley & Associates
770-343-9696

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 34

1    BY MR. DOMINICK:

2        Q     Okay.  Well, we can go -- let's go one by

3    one.

4        A     Okay.

5        Q     I'm looking at Exhibit 3.  For particle

6    board in 2005, was BlueLinx the sole distribution arm

7    for Georgia-Pacific's particle board?

8        A     No, sir.

9        Q     Okay.  Were they the sole distribution arm

10   for sales to Fleetwood Homes?

11       A     Yes, sir.

12       Q     Okay.  And I -- what I want to do is just go

13   down for each product.  2005 plywood, were they the

14   sole distribution arm for sales to Fleetwood?

15       A     I believe so, yes, sir.

16       Q     2005 OSB, was BlueLinx the sole distribution

17   arm for sales to Fleetwood?

18       A     Yes, sir.

19       Q     And when I say Fleetwood, I'm including

20   Continental in that also.

21       A     Okay.

22       Q     Is that all right?  Will that -- the answers

23   be the same?

24       A     Yes.

25       Q     2006 would BlueLinx be the sole distribution

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 35

1    arm for particle board to Fleetwood for

2    Georgia-Pacific?

3         A    Correct.

4         Q    And in 2006 would BlueLinx be the sole

5    distribution arm for -- to Fleetwood for

6    Georgia-Pacific plywood?

7         A    To Fleetwood and Continental?

8         Q    Yes.

9         A    Yes, correct.

10        Q    Okay.  And then for 2006 would BlueLinx be

11   the sole distribution arm for Georgia-Pacific OSB to

12   Fleetwood and Continental?

13        A    Yes.

14        Q    So as far as Exhibit 3, would it be fair to

15   say if it was -- if -- if these products were sold to

16   Fleetwood they would appear on this sheet?

17        A    If these products were sold to Fleetwood?

18        Q    This is -- this is the summation of -- of

19   all the products -- Georgia-Pacific products sold to

20   Fleetwood for 2005/2006.

21        A    That should be correct.

22        Q    Okay.

23             MS. MCLEMORE:  Can you give us a minute?

24        A    Can I go back to your last question --

25   BY MR. DOMINICK:

Atkins, Mark                Atkins, Mark                11/3/2009

Page 36

1        Q     Sure.

2        A     -- make sure I understood the question

3    properly.

4        Q     Okay.

5        A     You asked me if this -- you asked -- I

6    believe I interpreted the question was if

7    Georgia-Pacific sold these three products to Fleetwood

8    it would be on this sheet.

9        Q     Correct.

10       A     Georgia-Pacific, correct.  I'm sorry?

11       Q     Yeah.  If Georgia-Pacific sold these

12   products through BlueLinx to Fleetwood or directly to

13   Fleetwood, which I understand didn't happen in --

14       A     They didn't.

15       Q     -- 2005/2006, it would be on Exhibit 3, that

16   information would be on Exhibit 3?

17       A     If Georgia-Pacific sold these three products

18   to Fleetwood or Continental it should be on this sheet

19   for those two years, correct.

20       Q     Why -- why did you think you were confused

21   about my question?

22       A     I just wanted to clarify --

23       Q     Okay.

24       A     -- just make sure I heard you properly.

25       Q     Were -- are there other products to your

Tiffany Alley & Associates
770-343-9696

Page 37

1    knowledge that were sold to Fleetwood that -- in

2    2005/2006 by Georgia-Pacific or through BlueLinx that

3    would not appear on this --

4         A    Huh-uh.

5         Q    -- Exhibit 3?

6         A    No, sir.  No.

7         Q    No?

8         A    No, sir.  No, sir.

9         Q    Okay.  Let's -- let's go back and look at

10   Exhibit 1 real -- I believe you have it in front of

11   you.  What I'd like to do is take a look at the page

12   that's part of that -- the 30(b)(6) notice, it's this

13   page that says important notices at the top,

14   Exhibit -- okay?  Is that --

15            And it -- it's my understanding that these

16   were warning notices that appeared in the Fleetwood

17   owner's manual for the -- that was the owner's manual

18   at the time that the Dubuclets -- for -- well, for the

19   year of the model of travel trailer that the Dubuclets

20   would have purchased.  Is that your understanding, or

21   do you have an understanding one way or the other?

22        A    I -- I don't.  I'm not sure of the source of

23   this.

24        Q    Okay.  And -- and if you look at the next

25   page, and I know it's hard to read, you've --

Atkins, Mark                Atkins, Mark                11/3/2009

Page 38

1  hopefully you've seen a better picture of this,

2  because I have, it appears that the middle warning of

3  that photograph, which I understand is a photograph

4  from the medicine cabinet of the Dubuclet travel

5  trailer, there's a -- it says warning, and

6  Georgia-Pacific Corporation's name is under it.  Do

7  you see that, the middle --

8       A    I do, yes.

9       Q    Yes.  Is -- is that the same language as the

10  third and bottom warning on the prior page that was in

11  the Fleetwood owner's manual?

12       A    It appears to have the same wording, yes.

13       Q    Do you know whether or not that is a -- a

14  warning that Georgia-Pacific provides to purchasers of

15  its wood products?

16       A    I've never seen that before.

17       Q    When you say you've never seen that, have --

18  you've never seen this particular language; is that --

19       A    Correct.

20       Q    Okay.

21       A    Correct.

22       Q    Are you aware of any warnings that

23  Georgia-Pacific would provide to purchasers concerning

24  its products that contain urea-formaldehyde?

25       A    Am I aware of any warnings we would provide

Atkins, Mark            Atkins, Mark              11/3/2009

Page 39

1    to the purchasers of our products?

2        Q    Correct.

3        A    You have examples on the bundle tag and the

4    stamp on the product, which are the two I'm aware of.

5        Q    So what you've -- what you've provided today

6    as Plaintiff's Exhibit 5, this is the information that

7    Georgia-Pacific would provide concerning information

8    about urea-formaldehyde to purchasers of its products?

9            MS. MCLEMORE:  Object to the form.  You

10   can answer.

11   BY MR. DOMINICK:

12       Q    You understand my question?

13       A    No.  Clarify it for me.  It sounds wide

14   ranging.

15       Q    Well, it was.  Let me try to tighten it up a

16   little bit.  The -- what I'm trying to find out,

17   Mr. Atkins, is other than Plaintiff's Exhibit 5, are

18   you aware of any information that would be provided by

19   Georgia-Pacific to purchasers of these products in

20   Exhibit 5 containing and relating to the use of

21   urea-formaldehyde in those products?

22           MR. HINES:  Paul, yeah --

23           MS. MCLEMORE:  Same objection.

24           MR. HINES:  Yeah.  And, Paul, let me just

25   ask a clarifying question if I can.  Is your

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                    Atkins, Mark                    11/3/2009

1    question limited to the time frame of 2005/2006, or

2    is it more open ended than --

3          MR. DOMINICK:  Well, it was more open

4    ended, but we can --

5    BY MR. DOMINICK:

6          Q    We'll -- let's say for 2005/2006 first and

7    then -- because I want to make sure we're on the same

8    page as far as, you know, what I'm asking you.  And --

9    and maybe not in the form of a question, but what I'm

10   trying to get at here, there's no hidden agenda, I

11   just want to know what does Georgia-Pacific provide

12   its purchasers concerning warnings related to its

13   products that contain urea-formaldehyde resin.

14   Other -- other than Plaintiff's Exhibit 5, is there

15   other information in the 2005/2006 time frame that

16   would have been provided by Georgia-Pacific to

17   purchasers concerning warnings about the use of

18   urea-formaldehyde in its products?

19         A    The only other thing I'd be aware of is the

20   MSDS sheet.

21         Q    All right.  But as far as the particular

22   language that we were looking at in Exhibit 1, the

23   warning language from the Fleetwood owner's manual,

24   you have no knowledge of where that language was

25   derived, where it came from?

Atkins, Mark          Atkins, Mark          11/3/2009

Page 41

1     A     I do not have knowledge, no, sir.

2     Q     And to your knowledge that language was not

3  provided to Fleetwood by Georgia-Pacific?

4          MR. HINES:  Object to the -- object to the

5  form, foundation.

6     A     I'm sorry?

7          MS. MCLEMORE:  You can answer.  I'm

8  objecting to the form as well.

9  BY MR. DOMINICK:

10    Q     To your knowledge did Georgia-Pacific

11 provide this warning language for the Fleetwood

12 owner's manual in Exhibit 1?

13         MR. HINES:  Same objection.

14         MS. MCLEMORE:  Same objection.

15         MR. WALDRON:  Join.

16 BY MR. DOMINICK:

17    Q     That's a great question.  Can you answer it?

18    A     Ask the question again, please.

19    Q     To your knowledge, okay?

20    A     Okay.

21    Q     Did Georgia-Pacific provide Fleetwood with

22 this warning language that was included in its owner's

23 manual that's a page in Plaintiff's Exhibit 1 to this

24 deposition?

25         MR. HINES:  Same objection.

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                  Atkins, Mark                  11/3/2009

Page 42

1            MS. MCLEMORE:  Same objection.  You can --

2    you can answer the question.

3        A    I have no --

4    BY MR. DOMINICK:

5        Q    You can answer.

6        A    -- I have no knowledge.

7        Q    You have no knowledge one way or the other?

8        A    No.

9        Q    Are you aware of any document in the

10   2005/2006 time frame that would have been created by

11   Georgia-Pacific that would have had this specific

12   warning language in it?

13       A    I'm not aware of any, no.

14       Q    To your knowledge has Fleetwood ever

15   requested in the 2005/2006 time frame warning language

16   from Georgia-Pacific concerning the products it was

17   purchasing from Georgia-Pacific either directly or

18   through BlueLinx?

19       A    These particular products we're talking

20   about?  You said products.

21       Q    Well, the products -- the products that were

22   on Exhibit 3.

23       A    Okay.

24       Q    To your knowledge did Fleetwood request any

25   warnings language from Georgia-Pacific regarding those

Atkins, Mark            Atkins, Mark                 11/3/2009

Page 43

1    products 2005/2006 time frame?

2         A     No, sir.

3         Q     Okay.  To your knowledge had Fleetwood ever

4    requested from Georgia-Pacific warnings language prior

5    to that time relating to the use of urea-formaldehyde

6    products?

7              MS. MCLEMORE:  I'm going to object to the

8    question to the extent it goes beyond the 30(b)(6)

9    notice.  The witness hasn't been prepared for time

10   frames prior to 2005 and 2006.

11   BY MR. DOMINICK:

12        Q     Okay.  Do you know the answer to that

13   question?

14        A     Not that I'm aware.

15        Q     Yeah.  Okay.  Let's -- Mr. Atkins, if you'd

16   take a look at Plaintiff's Exhibit 2.  And I'm looking

17   at the first page, and there's a preliminary statement

18   here about Georgia-Pacific's records retention program

19   at the bottom of page 1 of Exhibit 2.  You see that?

20        A     Yes, sir.

21        Q     And there's a discussion of that many of the

22   requested documents such as e-mails and correspondence

23   no longer exist at Georgia-Pacific because of the

24   record retention schedule.  Is that -- to your

25   knowledge is that true?

Atkins, Mark               Atkins, Mark                    11/3/2009

Page 44

1      A     Yes, sir.

2      Q     Okay.  What is the retention schedule for

3   those types of documents at Georgia-Pacific?

4           MS. MCLEMORE:  Which type of documents?

5           MR. DOMINICK:  This says e-mails,

6   correspondence, et cetera.  The one -- the ones that

7   are mentioned in the preliminary statement.

8      A     I'd have to go back and get our record

9   retention policy.  I don't have it -- I didn't bring

10  that with me and don't -- don't recall right off the

11  top of my head.

12  BY MR. DOMINICK:

13     Q     Okay.  Are you familiar with how the

14  documents are discarded?

15          MS. MCLEMORE:  Object to the form.

16  BY MR. DOMINICK:

17     Q     Okay.  Are you familiar with how the

18  documents are discarded?  You can answer the question.

19          MS. MCLEMORE:  You can answer.

20     A     Well, I'm sure in various -- I mean, e-mails

21  I assume you delete them.  Documents I assume you'd

22  shred them or discard them.

23  BY MR. DOMINICK:

24     Q     But you're not -- you're not involved in

25  that process, I take it?

Atkins, Mark                Atkins, Mark                11/3/2009

Page 45

1        A    I do my own, yes, sir.

2        Q    You do your own.  What's your retention

3   schedule?

4        A    I don't have any -- whatever the company

5   policy is.

6        Q    Okay.  Is that a -- is there a written

7   policy retention -- document retention policy that

8   you're aware of?

9        A    There is, but I can't recall it because we

10  have a lot of things we --

11       Q    Yeah.  I'm just asking --

12       A    -- have to keep up with.

13       Q    -- if there's one in --

14       A    Yes.  There is.

15       Q    -- if there is a written policy?

16       A    Oh, yes.  Yes, sir.

17       Q    Okay.  And then we've -- we've talked

18  about -- this is on page 2 of this same exhibit, we --

19  we've talked about the BlueLinx sale.  As a continuing

20  part of the preliminary statement, there's a mention

21  of the sale of assets of the particle board business

22  to Roseburg Forest Products Company on September 15th

23  of 2006, and it -- it's indicated that at that time

24  most of the business records would have been

25  transferred to Roseburg.  Is that your understanding?

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 46

1       A     Yes, sir.

2       Q     And that would include documents I think

3    prior to September 2006.  I think it says that in the

4    statement.

5       A     Correct.

6       Q     Okay.  On the next page, objections and

7    responses, at response number 1 -- to -- to number 1

8    it's indicated that assuming the reference to, quote,

9    wood, unquote, is intended to refer to plywood of the

10   type purchased by Fleetwood Enterprises and limiting

11   this response to documents related to either Fleetwood

12   Enterprises, Inc. or Continental Lumber,

13   Georgia-Pacific has located no documents responsive to

14   this request.

15          When we talk about plywood of the type

16   purchased by Fleetwood Enterprises, is that -- that's

17   what appears on Exhibit 3; is that what is meant by

18   that or something else?

19      A     Which -- which part of number 1 were you

20   referencing?  I didn't see that.  Where were you

21   reading from?

22      Q     Yeah.  I'm reading the bottom -- let me show

23   you -- subject to -- this part right here.  It talks

24   about that.

25      A     And your question is -- would you state the

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 47

1    question again?

2        Q    Well, it -- it -- it's a request for

3    documents pertaining to wood, particle board, OSB

4    purchased by Fleetwood Enterprises.  That's the

5    request for documents.  And then at the bottom it

6    talks about assuming the reference to wood is intended

7    to refer to plywood of the type purchased by Fleetwood

8    Enterprises, and then there's a limitation to the

9    response.

10            Is that -- is that -- that limiting

11   definition, I guess, is that what's indicated on 3

12   as -- as far as what wood is, the plywood of the type

13   purchased by Fleetwood Enterprises?

14            MS. MCLEMORE:  I'm going to object to the

15   form and the foundation.  Counsel, I prepared that

16   response.  Number one, it should be amended at this

17   point because we have come today.

18            MR. DOMINICK:  Right.

19            MS. MCLEMORE:  When we read that request

20   originally it was talking about sales from GP to

21   Fleetwood.  There were no sales from GP to Fleetwood

22   during that time frame, they were from BlueLinx to

23   Fleetwood, but we did bring those -- we brought the

24   summary of those products that were shipped by GP

25   directly to Fleetwood pursuant to a sale that had

Tiffany Alley & Associates
770-343-9696

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 48

1   been made by BlueLinx, so that response should be

2   amended to reflect that information.

3           MR. DOMINICK:  Okay.

4           MS. MCLEMORE:  But the objection to the

5   term "wood" is one that I interposed and the witness

6   did not so, I mean, he's not going to know why

7   that -- why that was interposed.

8           MR. DOMINICK:  Okay.  Well, he had said he

9   helped provide some of the information.  I just

10  didn't know --

11          MS. MCLEMORE:  That -- he did not --

12          MR. DOMINICK:  Right.

13          MS. MCLEMORE:  -- help prepare the

14  objections.

15          MR. DOMINICK:  I think I could have

16  guessed that.  Okay.

17      A    Is that -- is that a compliment?

18          MS. MCLEMORE:  Probably not, but you don't

19  have to worry about it.

20  BY MR. DOMINICK:

21      Q    All right.  Moving on.  Number 2, there's

22  the request and then there's the response.  And what I

23  want to talk about is the response, the objection.

24  And under that response on the next page, B, it says,

25  as a failure to define what is meant by the phrase

Atkins, Mark          Atkins, Mark                    11/3/2009

Page 49

1    "low formaldehyde emitting," (LFE).  And it says,

2    "Georgia-Pacific knows of no such designation in the

3    industry that would permit it to interpret what is

4    intended by this phrase."

5              Have you ever heard that phrase "low

6    formaldehyde emitting"?

7        A    No, sir.

8        Q    No?  LFE, y'all -- you don't use that

9    terminology at Georgia-Pacific?

10       A    Not -- not aware of it, no, sir.

11       Q    Are there wood products to your knowledge

12   that are specifically designed to emit lower

13   formaldehyde levels?

14       A    Define your question if you could.

15       Q    Well, it's my understanding from what I read

16   in this case that there's something called low

17   formaldehyde emitting wood products, and -- and I'm

18   trying to figure out if that's a term of art or to

19   your knowledge is there such a thing as a piece of

20   wood that's lower formaldehyde emitting than another

21   piece of wood by design?

22             MS. MCLEMORE:  Object to the form and

23   foundation.  You can answer.

24       A    I'm not aware of any low formaldehyde

25   emitting products, no.

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 50

1    BY MR. DOMINICK:

2         Q    And let me go to number 4 request in this

3    same exhibit which is a request, asked for any and all

4    formaldehyde warnings, and then it goes on to describe

5    that.

6              And we've -- we've discussed warnings, but

7    within the objection there's an objection that the

8    phrase "formaldehyde warnings" is vague and ambiguous.

9    What would you call a warning about exposure to

10   formaldehyde?

11             MS. MCLEMORE:   Object to the form.   You

12   can answer.

13   BY MR. DOMINICK:

14        Q    You ever heard of a formaldehyde warning?

15   Let me ask you that that way.

16        A    Formaldehyde warning?

17        Q    Right.

18        A    Not -- not -- that's not what we call it on

19   our products.

20        Q    And that's -- yeah.   And that's what I'm

21   trying to get at.   I -- I just want to make sure we're

22   talking about the same thing and I'm not -- that I'm

23   not missing anything.

24             What do you call it on your products?   Is it

25   a notification or what?

Atkins, Mark          Atkins, Mark                    11/3/2009

Page 51

1           A       I'd have to read what it says.
2           Q       Okay.   And you're looking at Plaintiff's
3     Exhibit 5?
4           A       Correct.   It's a statement that says it
5     conforms to the formaldehyde emission requirements.
6           Q     Okay.  So you -- to your knowledge as far as
7     the relevant time frame 2005/2006 you've -- you've
8     produced all the examples of Georgia-Pacific
9     statements relating to formaldehyde emission
10    requirements?
11               MS. MCLEMORE:  I'm going to object to the
12    form.  The witness doesn't know that answer.  I
13    mean, I can tell you what we did, but he's not going
14    to know that answer.
15               MR. DOMINICK:  Well, go ahead.
16               MS. MCLEMORE:  I mean --
17               MR. DOMINICK:  That's fine.  I'm just
18    trying to --
19               MS. MCLEMORE:  We -- we got what --
20               MR. DOMINICK:  I'm making sure I got
21    everything.
22               MS. MCLEMORE:  We got what we could find.
23    I mean --
24               MR. DOMINICK:  Okay.
25               MS. MCLEMORE:  -- we don't have sort of a

Atkins, Mark                 Atkins, Mark                 11/3/2009

```
                                                        Page 52
 1   historical set of all of the bundle tags and
 2   information that would have gone on the wood
 3   products at various points in time.  Some of this
 4   information we actually got from our third party
 5   certifier rather than from our own records because
 6   we no longer -- we -- we just don't keep the
 7   historical information that goes back into this time
 8   frame.
 9              MR. DOMINICK:  Okay.  Okay.  Well, let me
10   just ask you this, can either one of you tell me who
11   the third party certifier is?  I mean, is there --
12              MS. MCLEMORE:  CPA.
13              MR. DOMINICK:  That's in here?
14              MS. MCLEMORE:  Bottom left-hand corner --
15              MR. HINES:  Bottom left.
16              MS. MCLEMORE:  -- where it says CPA
17   certified.
18              MR. DOMINICK:  Ah, CPA.
19   BY MR. DOMINICK:
20        Q    Where is that located, CPA, do you know?
21        A    Virginia.
22        Q    And do you know what CP -- CPA stands for,
23   those initials?
24        A    Composite Panel Association.
25        Q    Composite.  Okay.
```

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 53

1          Okay.  Let me -- well, if you would staying

2  in that exhibit, Exhibit 2, at the end of the response

3  drafted by counsel there's a document that says

4  Manufactured Home Decking.  See that document in that?

5      A    Okay.

6      Q    And is -- is that part of the label that's

7  contained on page 2 of Exhibit 5 on the right-hand

8  side; is that what that is?

9          Actually, it looks a little -- or is that a

10 different document?

11     A    I'd have to look at what -- it may have just

12 been a different facility.  This may have stretched

13 out longer and just didn't catch this part here, so I

14 can't tell.

15     Q    Okay.  Do you know whether that would be a

16 tag -- what do you call it, a tag?

17     A    A bundle tag.

18     Q    A bundle tag for your product Novoflor?  Is

19 there any other -- do you have any other trade names

20 for your manufactured home decking?

21     A    Yes, there was a Novodeck and a Novoflor.

22 It was two different -- two products out of what we

23 were selling.

24     Q    And if you would turn over a couple more

25 pages, and I'd like to look at the -- in Exhibit 2 the

Tiffany Alley & Associates
770-343-9696

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 54

1    Georgia-Pacific Material Safety Data Sheet.  And the

2    first one is -- in this exhibit on the right-hand side

3    is entitled Georgia-Pacific UF Bonded Wood Products

4    Material Safety Data Sheet Number 30.  You see that?

5         A     (Nodding head.)  Uh-huh.

6         Q     Okay.  And does that mean urea-formaldehyde

7    bonded wood products, UF?

8         A     That's correct.

9         Q     Okay.  And -- and the effective date on this

10   MSDS is June 1 of 2001; is that correct?

11        A     That's what it says, yes.

12        Q     And -- and this would have been the Material

13   Safety Data Sheet that was in effect in 2005 and 2006?

14        A     I believe that is correct, yes.

15        Q     To your knowledge has -- has there been any

16   updates to this Material Safety Data Sheet since

17   2005/2006?

18        A     I'm not aware of any, no, sir.  Not that I

19   recall.

20        Q     Okay.

21        A     But I -- I didn't go looking to see.

22        Q     At the -- and if -- and if -- and if you

23   look down that page under section 1, it's got the --

24   first it lists the product name, and then it has trade

25   names, see list of products at end of MSDS.

Atkins, Mark                Atkins, Mark                11/3/2009

Page 55

1           And look at page 6 of this document --
2    Material Safety Data Sheet, you have the trade names
3    of products manufactured by Georgia-Pacific for MSDS
4    Number 30.
5           So it's my understanding, and correct me if
6    I'm wrong, that this Material Safety Data Sheet would
7    relate to all the products with those trade names; is
8    that correct?
9       A    That looks to be correct, yes.
10      Q    By -- and in looking back at your Exhibit 3
11   which is the -- our Exhibit 3 which is the
12   Georgia-Pacific shipments to Fleetwood and Continental
13   Lumber, can you -- are you able to tell me by trade
14   name what those products were that are summarized on
15   Exhibit 3?
16      A    I believe I can, yes, sir.
17      Q    Okay.
18      A    Under the particle board section --
19      Q    All right.
20      A    -- particle board would have been Novodeck
21   and/or Novoflor.  The distinction between those two
22   products is just driven by size, the size
23   differentiates what the product name is.  So depending
24   on the size both of those products could have been
25   part of the particle board category.

Atkins, Mark                Atkins, Mark                11/3/2009

Page 56

1      Q    Okay.

2      A    And that's the only two I see.  Plywood's --

3   no plywood, no OSB in here.

4      Q    Now, all of the products covered by this

5   Material Safety Data Sheet, are -- are these -- these

6   all products that are manufactured by Georgia-Pacific

7   or are some of them just sold by Georgia-Pacific?

8           MS. MCLEMORE:  Object to the form based on

9   time frame.

10  BY MR. DOMINICK:

11     Q    Okay.  All right.  Far as 2005/2006, let's

12  just limit it -- the question to manufacturer.  All of

13  the products covered by this Material Safety Data

14  Sheet are actually manufactured by Georgia-Pacific; is

15  that correct?

16     A    Are you referencing these trade names?

17     Q    Correct.

18     A    Or -- or the -- does it matter?

19     Q    Yeah.

20     A    I just want to make sure I understand your

21  question.

22     Q    Well, the most inclusive.  Every -- every --

23  every -- I would think the trade names is what I'm

24  looking at, is -- is that each one of those products'

25  trade names -- it says trade names of products

Atkins, Mark          Atkins, Mark                11/3/2009

Page 57

1    manufactured by Georgia-Pacific.  All -- so all of

2    these products -- all of these products were

3    manufactured by Georgia-Pacific.

4            MS. MCLEMORE:  Counsel, I'm going to

5    object to the form just on this basis.  The answer

6    might be different depending upon the -- the point

7    in time in the year 2006 you're talking about

8    because of the sale to Roseburg.

9            MR. DOMINICK:  Okay.

10       A    That's correct.  That's where I was going.

11           MR. DOMINICK:  All right.  And the sale to

12   Roseburg occurred on September 15, 2006 --

13           MS. MCLEMORE:  That's correct.

14           MR. DOMINICK:  -- correct?  Okay.

15           Well, I -- I would be interested in prior to

16   that time.  It's my understanding the Dubuclets'

17   trailer was manufactured in March of 2006.

18           MR. HINES:  Correct.

19           MR. DOMINICK:  So --

20           MS. MCLEMORE:  Okay.  So --

21   BY MR. DOMINICK:

22       Q    So at -- so at that time prior to September

23   of 2006 all of the products on this Material Safety

24   Data Sheet listed by trade name would have been

25   manufactured by Georgia-Pacific?

Atkins, Mark          Atkins, Mark                    11/3/2009

Page 58

1       A     In what time frame?

2       Q     Prior to September 2006 which is prior to

3    the sale to Roseburg.

4       A     Yes, I believe that'd be correct.  I'm just

5    trying to make sure I caught all the products, but

6    that looks correct, yes, sir.

7       Q     And I believe you indicated earlier, and

8    correct -- correct me if I'm wrong, that the Material

9    Safety Data Sheet may have been an item that would

10   have been provided to Fleetwood by Georgia-Pacific or

11   BlueLinx; is that correct?

12      A     Could have been.

13      Q     But you don't -- you don't know?

14      A     I -- I wouldn't be able to recall that.

15      Q     Okay.  Where would --

16            MS. MCLEMORE:  Can I talk to the witness

17   for a minute?

18            MR. DOMINICK:  Sure.  Sure.

19      A     Yes.  Can you excuse us for a minute?

20            MR. DOMINICK:  Sure.

21            THE VIDEOGRAPHER:  12:13 p.m.  Off video

22   record.

23            (Recess 12:13-12:20 p.m.)

24            THE VIDEOGRAPHER:  12:20 p.m.  Back on

25   video record.

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 59

1    BY MR. DOMINICK:

2        Q     Okay.  Mr. Atkins, it's my understanding you

3    want to clarify an answer you gave me or --

4        A     Correct.

5        Q     Okay.  Please go ahead.

6        A     In regards -- I think you had a question

7    around the material safety MSDS sheets and whether

8    they were supplied to Continental.  And in my

9    preparation for this testimony on behalf -- on behalf

10   of our company I was made aware that we provided both

11   of these MSDS sheets to Continental and/or Fleetwood.

12       Q     Okay.  And -- and when would that have been?

13   When would they have been provided?

14       A     Gosh, I don't recall.

15       Q     Would it have been prior to March of 2006?

16       A     I don't know.  I'd have to -- I don't recall

17   the dates.

18       Q     Okay.

19       A     I'd have to go back and see if I could find

20   those.

21       Q     Okay.

22             MR. DOMINICK:  Is that something, Mary, we

23   could -- we could follow up on?  Or if you've got --

24   well --

25             MS. MCLEMORE:  I know the answer.

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 60

1              MR. DOMINICK:  Well, I don't care where I

2       get the answer from.

3              MS. MCLEMORE:  The answer is yes, they

4       were provided prior to March of 2006 according to

5       our records.

6       BY MR. DOMINICK:

7          Q    Does that refresh your recollection?

8          A    That'll be fine.  I got -- I got too much.

9       It's too much to recall.  Yes.

10         Q    That does.

11         A    If my counsel says so, I believe her.

12         Q    And -- all right.  Well, let me -- and let

13      me ask you, I know we're on a tight time schedule

14      here, so we're going to run -- I would like to run

15      through a few things with this Material Safety Data

16      Sheet that we're looking at that's part of Exhibit 2.

17              And in the -- under the section that says

18      Hazards Identification, section 3 on the first page --

19         A    Uh-huh.

20         Q    -- you see a box that says emergency

21      overview, see that --

22         A    Yes.

23         Q    Okay.  And would you read just what's in

24      that box for me, please, into the record?

25         A    "Sawing, sanding or machining wood products

Atkins, Mark               Atkins, Mark               11/3/2009

Page 61

1   can produce wood dust which can cause an explosion
2   hazard.  This product may release small quantities of
3   formaldehyde in gaseous form.  Emissions decrease
4   through time as the board ages.  Formaldehyde and/or
5   wood dust may cause eye, nose, throat, and skin
6   irritation."
7       Q    Okay.  And what I'd like to focus on, at
8   least for now, is this sentence, "Emissions decrease
9   through time as the board ages."  Is -- is that your
10  understanding to -- as something that's true?
11      A    Yes, that's correct.
12      Q    Who -- kind of flipping back a second
13  mentally, who prepares these Material Safety Data
14  Sheets for Georgia-Pacific?  And I -- let -- let me
15  just ask you this specific sheet is part of Exhibit 2.
16  Do you know who prepared this document?
17          MS. MCLEMORE:  Are you asking him the
18  specific individuals --
19      A    Yeah.
20          MS. MCLEMORE:  -- that prepared this MSDS?
21  BY MR. DOMINICK:
22      Q    Right.  Do you know specifically who --
23      A    I would not know the specific individual.
24  I'd -- I'd have to go back and look at -- in that --
25  in that time frame since it was '01.  I -- I don't

Atkins, Mark                Atkins, Mark                11/3/2009

Page 62

1   recall a specific person.

2       Q    Well, is there a department at

3   Georgia-Pacific that would be responsible for this --

4   preparing Material Safety Data Sheets?

5       A    I would think the technical group and the

6   legal group combined would -- and business group unit

7   would all three do that.

8       Q    Okay.  To your knowledge as far as being

9   involved in -- in sales during the 2005/2006 time

10  frame, was there any policy within Georgia-Pacific to

11  allow urea-formaldehyde bonded wood products to -- to

12  age prior to sell -- sale to a purchaser?

13      A    No, sir.

14      Q    Okay.  Was there any -- and I guess we've

15  been through the information that's provided to the

16  purchaser, so, I mean, it'd be fair to say in

17  2005/2006 you're not aware of any information that

18  would have gone to a purchaser which would have had

19  recommendations concerning allowing the material to

20  age prior to using it in the final product?

21      A    I'm not aware of any, no, sir.

22      Q    Would -- since emissions, formaldehyde

23  emissions, decrease through time as the board ages,

24  would it be fair to say that the formaldehyde

25  emissions generally would be -- well, the formaldehyde

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 63

1    emissions would be higher three to four months after
2    the sale of -- of your product than, say, two to three
3    years after the sale of your product?
4            MS. MCLEMORE:  Objection to form and
5    foundation.
6    BY MR. DOMINICK:
7        Q    Foundation is the Material Safety Data
8    Sheet, but can you answer that question?
9            MS. MCLEMORE:  That doesn't mean that this
10   witness knows everything that's in the Material
11   Safety Data Sheet.  I mean --
12           MR. DOMINICK:  I got you.  Well, he's
13   pretty smart.
14   BY MR. DOMINICK:
15       Q    Do you know?
16       A    No, I don't.  That'd be an assumption.
17       Q    Okay.  Well -- okay.  Let me ask you to look
18   at the next page of the Material Safety Data Sheet,
19   section 7, Handling and Storage.  There's a statement
20   in here that says, "UF bonded wood products should not
21   be stored where exposure to water would occur" --
22   "could occur."  Do you know why that statement is in a
23   Material Safety Data Sheet?
24       A    Yes.
25       Q    Why?

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 64

1        A     Because the product will swell --

2        Q     Okay.

3        A     -- or retain the water.

4        Q     Okay.  Do you -- do you know whether that

5    would have any impact on the increased -- any impact

6    on the amount of formaldehyde emissions from the

7    product as the wood swells?

8        A     No, sir.

9        Q     Do you -- do you know or are you --

10       A     I'm not aware of any correlation.

11       Q     Okay.

12       A     Has nothing to do with it, no.

13       Q     All right.  All right.  If you would turn to

14   Section 11 called -- it's called Toxicological

15   Information.

16       A     Okay.

17       Q     It's on page 4 of the Material Safety Data

18   Sheet.  Do you know who may have written this

19   particular part of the Material Safety Data Sheet?

20       A     The individual person?

21       Q     Well, yeah, first the individual person.

22       A     No.  (Shaking head.)

23       Q     No?  How about what group of individuals

24   would have been responsible for this section of the

25   Material Safety Data Sheet?

Tiffany Alley & Associates
770-343-9696

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 65

1      A    I would assume again the technical group in
2  conjunction with the legal group.
3      Q    Okay.  And when you -- the technical group,
4  is that -- is that how it's referred to within
5  Georgia-Pacific, is there a group of -- of people that
6  y'all call the technical group, or is there scientists
7  or -- I'm trying to figure out if I wanted to know --
8  talk to someone who had written this, how would I go
9  about finding that person?
10     A    Yeah.  Technical group's a pretty wide
11 ranging group, but we have R&D group, some scientists,
12 correct.
13     Q    In here there's -- if you look at the --
14 under formaldehyde of Section 11 there's references to
15 various studies.  Are you familiar with any of those
16 scientific studies?
17     A    No, sir.  Not -- not -- not in any great
18 detail, no.
19     Q    On page 5 of 6 of the MSDS there's a
20 discussion of the ANSI standards for particle board as
21 well as medium density fiberboard.  Do you see
22 those --
23     A    Uh-huh.
24     Q    -- sections?
25     A    Yes, sir.

Atkins, Mark                Atkins, Mark                11/3/2009

Page 66

1      Q    And it's -- talks about industry consensus
2   standards.  What is an industry consensus standard?
3      A    I would identify that as an industry
4   standard.
5      Q    Do you -- I mean, do you know is there a
6   group or body that provides -- that comes up with
7   what's called an industry consensus standard?  I guess
8   in this it's the ANSI standards.
9      A    I'm not real sure who would do that.  I
10  just -- I just always referred to it as industry --
11  industry standard we had to meet.
12     Q    Do you know of any -- are there individuals
13  at Georgia-Pacific who would have been involved in
14  developing those national industry standards?
15     A    Could have been, yes.
16     Q    Okay.  But you -- specifically would you
17  know who that would be?
18     A    It's -- it's changed through time.  You
19  know, we're going back to 2001, so it could be a
20  variety of people that have served on some of those.
21     Q    Okay.  Have you ever heard of a group called
22  the Formaldehyde Council?
23     A    I know the name.
24     Q    Do you know what it is?
25     A    Not really.

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                Atkins, Mark                11/3/2009

Page 67

1      Q      Not really?

2      A      No.  (Shaking head.)

3      Q      Okay.  You know don't whether

4  Georgia-Pacific would have any representation on the

5  Formaldehyde Council?

6      A      I couldn't say for sure.

7      Q      Do you know whether Georgia-Pacific's a

8  member of the Formaldehyde Council --

9      A      I'd have to ask.

10     Q      -- as an entity?

11            MS. MCLEMORE:  Counsel --

12     A      You're challenging my memory.

13            MS. MCLEMORE:  -- you're going well beyond

14  the notice at this point.

15            MR. DOMINICK:  And that's why you came, to

16  keep me honest.

17  BY MR. DOMINICK:

18     Q      Okay.  Well --

19     A      I couldn't factually say so.

20     Q      Right.

21     A      That's what I'm trying to give you --

22     Q      Right.

23     A      -- the facts as I know them.

24     Q      I -- I know that's not -- that's not an area

25  where -- I just wondered if you knew --

Atkins, Mark          Atkins, Mark                11/3/2009

Page 68

1      A     I -- I'm not aware.

2      Q     -- since you've been working there awhile.

3      A     Yeah.  I'm not aware.

4      Q     All right.  And on page 6 of the Material

5    Safety Data Sheet, the very last paragraph that says

6    Important, do you know why that paragraph is in this

7    document?

8      A     Clarify your question.

9      Q     Yeah.  I mean, just -- and -- and I guess

10   there -- it is long enough to ask several questions,

11   so let me -- let me take one at a time.

12         The first two sentences, "The

13   information" -- and I'm quoting here -- "The

14   information and data herein are believed to be

15   accurate and have been compiled from sources believed

16   to be reliable.  It is offered for your consideration,

17   investigation, and verification."  Do you know why

18   those two sentences would be in a Material Safety Data

19   Sheet?

20     A     Not right -- not right offhand, no.

21     Q     Okay.  The -- the final sentence of that

22   paragraph, "Georgia-Pacific" -- I'm quoting again, I'm

23   sorry -- "Georgia-Pacific and its subsidiaries will

24   not be liable for claims relating to any party's use

25   of or reliance on information and data contained

Atkins, Mark                Atkins, Mark                11/3/2009

Page 69

1    herein regardless of whether it is claimed that the
2    information and data are inaccurate, incomplete, or
3    otherwise misleading."  Do you have any personal
4    knowledge of why that's in this document?
5          A    No, sir.
6          Q    And as a -- a follow-up to an earlier
7    question, and I know -- I guess this was an answer
8    that your counsel gave me about when the material data
9    safety sheet was provided -- generally when it was
10   provided to Fleetwood, do you have any information or
11   knowledge who at Fleetwood would have been provided
12   this information?
13         A    I don't have that information, no, of
14   specifically who it would have gone to or who required
15   it, no.
16         Q    Okay.  I'm okay if you want to consult with
17   your counsel.
18              MS. MCLEMORE:  It's not on my cheat sheet.
19              MR. DOMINICK:  That's not on your sheet?
20              MS. MCLEMORE:  No.
21              MR. DOMINICK:  Okay.
22   BY MR. DOMINICK:
23         Q    Mr. Atkins, let me just ask you if -- if we
24   could take a look at Exhibit 4 which is the -- which
25   are the invoices that you've given me, the -- I guess

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 70

1    we'd call them sample invoices.

2              Would -- I noticed on these invoices that in

3    each instance it's -- it shows that it's sold to

4    BlueLinx, but it says the shipment is directly to

5    Fleetwood Homes; is that correct?

6         A    That's correct.

7         Q    Okay.  And for quality control purposes is

8    there a way to -- I mean, is there a way to track kind

9    of this -- these shipments for -- in case there's a

10   complaint down the line about the product by, say,

11   Fleetwood?

12        A    Yes.

13        Q    Is -- is this like a bundling number or --

14        A    Yes.

15        Q    -- how -- how do you do it?

16        A    Yes.

17        Q    Does that information appear on this

18   invoice?

19        A    No, you would go by the invoice number.

20        Q    Okay.  So what -- what do you mean you would

21   go by the invoice number?

22        A    The invoice number correspond to a unit tag

23   or a production date.

24        Q    Okay.  So you would be -- if there's -- say

25   we're -- we're looking at this first invoice, okay --

Atkins, Mark             Atkins, Mark                 11/3/2009

Page 71

1        A      Uh-huh.

2        Q      -- for particle board to be shipped to

3  Rocky Mount, Virginia --

4        A      Uh-huh.

5        Q      -- Fleetwood Homes.  And assuming we could

6  dig up the information you would be able to -- by the

7  invoice number would you be able to tell me when this

8  particular Novoflor shipment, when it was

9  manufactured?

10       A      Correct.

11       Q      The date of manufacture?

12       A      Correct.

13       Q      Okay.  And is there -- as far as the date of

14  in the 2005 time frame, was there a -- from an

15  inventory control standpoint I guess was there a

16  general lag time of how much time would you say

17  between the date of manufacture and the date of

18  shipment?  You understand what I'm asking?

19       A      A general lag time between date of --

20       Q      Yeah.

21       A      -- manufacture and date of shipment?

22       Q      Is there a goal that, you know, hey, once

23  we -- we manufacture a product, you know, we want

24  to -- we're going to ship it out within 30 days of the

25  date it's manufactured, is there some policy or goal

Atkins, Mark                Atkins, Mark                11/3/2009

1    within Georgia-Pacific as far as that's concerned?

2        A    No -- no policy --

3        Q    Okay.

4        A    -- that says it must be out by this time,

5    no.

6        Q    Is -- when -- when you -- when

7    Georgia-Pacific receives an order from -- through

8    BlueLinx at the time it receives the order, does the

9    product have -- generally have to be manufactured, or

10   is it already in inventory to be shipped?

11       A    It could be either --

12       Q    Could be either?

13       A    -- but typically manufactured.

14       Q    Typically it's manufactured to order?

15       A    That's correct.

16       Q    Okay.  So once you receive the order, how

17   long would that take from -- generally from the time

18   you receive the order in time -- until you're able to

19   ship the product?

20       A    Generally probably a two to four-week time

21   frame.

22       Q    Could -- could you say as far as in

23   something being shipped out of -- out of inventory

24   what would be the longest period you would expect

25   something to be sitting in inventory without it being

Atkins, Mark          Atkins, Mark          11/3/2009

Page 73

1   shipped during 2005/2006 time frame?

2        A    Probably 30 to 60 days.

3        Q    And then these -- looks like each of these

4   invoices -- let me see -- it's all shipped by truck;

5   does that appear to be the case?

6        A    Correct.

7        Q    Is that -- that the -- kind of the normal

8   mechanism for shipping for Georgia-Pacific products?

9        A    These products in particular?

10       Q    These products.  Yeah, these products in

11  particular, the particle board.

12       A    I'd say it's the majority of the shipments

13  would go by truck.

14            MR. DOMINICK:  Okay.  Let me check a

15  couple things.  We can go off.  Go off the record

16  for a couple seconds.

17            THE VIDEOGRAPHER:  12:43 p.m.  Off video

18  record.

19            (Recess 12:43-12:46 p.m.)

20            THE VIDEOGRAPHER:  12:46 p.m.  Back on

21  video record.

22  BY MR. DOMINICK:

23       Q    Mr. Atkins, let me ask you, we were just

24  talking about this Material Safety Data Sheet.  Was

25  there any policy that you were aware of in 2005 or

Atkins, Mark                Atkins, Mark                11/3/2009

Page 74

1    2006 that -- and I -- I may have asked you this
2    question.  If I did, I apologize -- that -- where
3    Georgia-Pacific would provide this type information to
4    the purchaser and basically leave it up to the
5    purchaser to decide what warnings should be provided
6    based on the Material Safety Data Sheet information?
7            MS. MCLEMORE:  Objection to form and
8    foundation.
9    BY MR. DOMINICK:
10       Q    Do you know?
11       A    Ask the question again.
12       Q    Okay.  Here is -- here is what I'm getting
13   at.  There -- there's information -- a lot of
14   information that we've been over in this Material
15   Safety Data Sheet and -- and other -- other
16   information we didn't, which is technical information
17   concerning urea-formaldehyde bonded wood products,
18   correct?
19       A    Correct.
20       Q    And then there's information in Exhibit 5
21   which are the bundle tags that go with the product
22   that also contain information concerning
23   urea-formaldehyde emissions, correct?
24       A    Correct.
25       Q    That's correct?  Yeah.  And my question is,

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 75

1   other than providing this information to -- to

2   purchasers of Georgia-Pacific products, was there a

3   policy within Georgia-Pacific that it was essentially

4   up to the purchaser at that point in time to decide

5   what warnings should go on the products?

6           MS. MCLEMORE:  Objection to form and

7   foundation.  You can answer if you know.

8       A    I'm not aware of a policy.

9   BY MR. DOMINICK:

10      Q    Excuse me?

11      A    I'm not aware of a policy.

12      Q    Not aware of a policy.

13      A    No.

14      Q    Okay.  But you're not aware of a policy of

15  Georgia-Pacific to provide sample warnings to

16  purchasers, are you?

17          MS. MCLEMORE:  Same objection.

18  BY MR. DOMINICK:

19      Q    2005/2006 time frame did Georgia-Pacific

20  provide sample warnings to purchasers of its

21  urea-formaldehyde bonded wood products?

22      A    I'm not aware of anything outside of what --

23  what I've showed you here.

24      Q    Okay.  During that time frame, did you

25  personally have any discussions with anyone at

Atkins, Mark            Atkins, Mark                    11/3/2009

Page 76

1    Fleetwood, 2005/2006, about what would be an
2    appropriate warning for its products relating to
3    Georgia-Pacific urea-formaldehyde bonded wood
4    products?
5         A    No, sir.
6         Q    Do you know of anyone within Georgia-Pacific
7    that would have had that conversation within that time
8    frame?
9         A    No, sir, I do not.
10        Q    Is there anyone at Georgia-Pacific who has a
11   job responsibility of interfacing with customers or
12   purchasers relating to urea-formaldehyde bonded wood
13   products warnings?
14             MS. MCLEMORE:   Objection to form and
15   foundation.
16   BY MR. DOMINICK:
17        Q    Can you answer that?
18        A    Can you clarify?   You may need to narrow the
19   question down because you're talking about -- you're
20   talking about all customers or you're talking about
21   Fleetwood?
22        Q    No.  Well, I'm -- I'm talking about in
23   2005/2006 was there anyone within the -- to your
24   knowledge within the Georgia-Pacific organization
25   whose job responsibility was to -- to assist or

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 77

1    interface in any way with purchasers concerning

2    warnings they should put on their finished products

3    that contained Georgia-Pacific urea-formaldehyde

4    bonded wood products?

5         A    No, sir.

6         Q    No?

7         A    No.

8              MR. DOMINICK:  Okay.  I think that's all

9    the questions I have.  Any --

10             MR. HINES:  Let's go off the record one

11   second.  Let me look at Exhibit 1 --

12             THE VIDEOGRAPHER:  12:51 p.m.

13             MR. HINES:  -- one moment.

14             THE VIDEOGRAPHER:  Off video record.

15             (Recess 12:51-12:52 p.m.)

16             THE VIDEOGRAPHER:  12:52 p.m.  Back on

17   video record.

18                    EXAMINATION

19   BY MR. WALDRON:

20        Q    Hi.  My name is Jonathan Waldron, and I

21   represent the United States in this matter.  Can you

22   please state your full name for the record and spell

23   the last name?

24        A    Mark Atkins.  And that's spelled

25   A-T-K-I-N-S.

Atkins, Mark                Atkins, Mark                11/3/2009

1      Q      And where do you reside?

2      A      Alpharetta, Georgia.

3      Q      And do you understand that you're under oath

4   and sworn to tell the truth and give complete answers

5   to my questions?

6      A      That's right.

7      Q      And that's the same as if you were in a

8   courtroom in front of a jury, correct?

9      A      Yes, sir.

10     Q      By giving your testimony today, do you

11  understand that you are speaking on behalf of

12  Georgia-Pacific as a corporation?

13     A      Yes, sir.

14     Q      So unless I ask you specifically about your

15  personal knowledge on a given topic you're speaking on

16  behalf of the corporation; is that correct?

17     A      Yes, sir.

18     Q      Mr. Atkins, how long has Georgia-Pacific

19  supplied wood products directly to manufacturers of

20  travel trailers?

21         MS. MCLEMORE:  Object to the form of the

22  question.

23  BY MR. WALDRON:

24     Q      You can answer.

25         MS. MCLEMORE:  You -- I was going to say

Atkins, Mark              Atkins, Mark              11/3/2009

1   you can answer.

2       A    Oh, I'm allowed to answer?  How long -- ask

3   the question again.  Restate it.

4   BY MR. WALDRON:

5       Q    I'll restate it.  Let's talk about

6   Fleetwood, for instance.  Has Georgia-Pacific ever

7   provided wood products containing formaldehyde or

8   urea-formaldehyde to Fleetwood directly?

9       A    Has Georgia-Pacific ever provided wood

10  products with urea-formaldehyde to Fleetwood, yes.

11      Q    And what about the time frame of 2005 and

12  2006?

13      A    Yes.

14      Q    And tell me about what -- tell me about

15  BlueLinx.  What is that?

16      A    It's a publicly held distribution company.

17      Q    And what is its relation with

18  Georgia-Pacific?

19      A    It was formerly the Georgia-Pacific

20  distribution division that was sold in whatever the

21  time frame was, May of '04.

22      Q    So prior to May of '04 what

23  Georgia-Pacific -- strike that.

24           Prior to May of 2004 any materials that

25  would have been given to Fleetwood or another

Atkins, Mark            Atkins, Mark            11/3/2009

1    manufacturer containing -- containing formaldehyde

2    would have been sent directly from Georgia-Pacific to

3    the manufacturer?

4           MS. MCLEMORE:  Object to the form.  You

5    can answer.

6       A    That's a pretty broad question.  Can I have

7    you narrow it down?

8    BY MR. WALDRON:

9       Q    Sure.  Why don't we -- my understanding is

10   that BlueLinx is the sales arm for Georgia-Pacific

11   prior -- or after May of 2004; is that right?

12          MS. MCLEMORE:  Object to the form of the

13   question.  You can answer.

14      A    They were for these particular products in

15   '05 and '06.

16   BY MR. WALDRON:

17      Q    All right.  Can you describe what

18   formaldehyde is or what your understanding of

19   formaldehyde is, just a general understanding?

20      A    Gee.  It's a -- a gaseous chemical, I -- I

21   assume.

22      Q    How is it used in --

23      A    I don't know the --

24      Q    -- in wood products that Georgia-Pacific

25   creates?

Atkins, Mark                 Atkins, Mark                    11/3/2009

Page 81

1      A     It's part of the resin or adhesive.

2            THE REPORTER:  Resin --

3      A     Or adhesive.

4            THE REPORTER:  Thank you.

5      A     Adhesive.  I'm sorry.

6  BY MR. WALDRON:

7      Q     And what is your understanding of

8  off-gassing --

9      A     I would --

10     Q     -- as it relates to formaldehyde?

11           MS. MCLEMORE:  I was going to say I'm

12  going to object to form and foundation.  We're

13  getting pretty far afield of what the notice asked

14  Georgia-Pacific to -- to produce a witness to

15  testify about.  I mean, the -- the technical aspects

16  of formaldehyde this witness is not familiar with.

17           MR. WALDRON:  I'm not asking for his

18  technical understanding.

19  BY MR. WALDRON:

20     Q     I'm just asking for your general

21  understanding of -- of what forms formaldehyde can be

22  present in.

23     A     What forms it can be present in?

24     Q     Can it be formed in a gaseous state?

25     A     I -- I would assume.  I'm not an -- I'm not

Atkins, Mark                Atkins, Mark                11/3/2009

Page 82

1    an expert.

2         Q     And you're not familiar with what low

3    emitting formaldehyde materials might be?

4         A     Not -- not the way you're characterizing it,

5    no, as opposed to high.

6         Q     Have you heard of LFE in -- used in the

7    industry?

8         A     I have not, no.

9         Q     What about reg, or R-E-G?

10        A     Reg?  I'm not sure what that definition

11   means.

12        Q     Well, let's turn to the Exhibit 2, the MSDS

13   sheet that's entitled US Bonded Wood Products Material

14   Safety Data Sheet Number 30.  What's the effective

15   date on that document?

16        A     I'm -- I'm sorry.  Slow -- I just got

17   Exhibit 2.  What -- what page are you on?

18        Q     Well, it's not labeled on the pages here,

19   but it's --

20        A     The MSDS sheet, first page of it?

21        Q     Right, Number 30.  You see the effective

22   date there?

23        A     6/1/01.

24        Q     All right.  Was this in effect during the

25   2005/2006 years?

Atkins, Mark                Atkins, Mark                11/3/2009

Page 83

1      A      I believe so, yes.

2      Q      Has it been updated since that time?

3      A      I -- I don't -- I'm not aware because I -- I

4   didn't go research that prior to this.

5      Q      Do you see the section where it says

6   potential health effects?

7      A      At the bottom of the first page?  Yes.

8      Q      And possible health effects would include

9   irritation of nose and throat as listed here?

10     A      What was your question?

11     Q      Does this MSDS sheet -- well, first of all,

12  was this produced by Georgia-Pacific?

13     A      Yes.

14     Q      And this was given to Fleetwood or other

15  purchasers of wood products containing UF bonded

16  urea-formaldehyde?

17            MS. MCLEMORE:  Object to the form.  You

18  can answer.

19            MR. DOMINICK:  You've got to answer

20  verbally.

21     A      Correct.  I'm sorry.  I've got --

22  BY MR. WALDRON:

23     Q      That's okay.

24     A      My throat's scratchy today.  I apologize.

25     Q      And if you need any water at any time,

Atkins, Mark                Atkins, Mark                11/3/2009

Page 84

```
1    just --
2         A    No, I just -- okay.
3         Q    And it says here, "Gaseous formaldehyde may
4    cause temporary irritation of the nose and throat"; is
5    that right?
6         A    That's correct.
7         Q    And it says it may also cause temporary
8    irritation to the eyes?
9         A    Correct.
10        Q    And under skin -- skin contact it says, "May
11   evoke allergic contact dermatitis"?
12        A    Where are you?
13        Q    On the next page under skin contact.
14             MS. MCLEMORE:  Object to the form.  You
15   can answer.
16        A    What was your question again?  I was trying
17   to read.
18   BY MR. WALDRON:
19        Q    Under skin contact --
20        A    Yes.
21        Q    -- it says that formaldehyde may evoke
22   allergic contact dermatitis?
23             MS. MCLEMORE:  Again, objection to form.
24   You can answer.
25        A    Yes.
```

Atkins, Mark            Atkins, Mark                11/3/2009

Page 85

1    BY MR. WALDRON:

2        Q    And then section 4 talks about first aid

3    measures.

4        A    Uh-huh.

5        Q    And what does it say under inhalation?

6        A    It says, "Remove to fresh air.  If

7    persistent irritation, severe coughing, or breathing

8    difficulty occurs get medical attention."

9        Q    Do you have any understanding why it says

10   remove to fresh air?

11       A    Not from a technical standpoint, no.

12       Q    And what -- what about a nontechnical

13   standpoint?

14       A    I would assume if it's gaseous you might

15   want to remove or get away from it.

16       Q    If you're talking about a confined space,

17   ventilation would be something that is recommended?

18            MS. MCLEMORE:  Object to the form of the

19   question.  You're well beyond the scope of this

20   witness' preparation for today's deposition, and

21   that's not what he's here to answer, and he's not

22   going to answer it.

23   BY MR. WALDRON:

24       Q    I'm just asking does this MSDS sheet

25   recommend to reduce formaldehyde levels, gaseous

Atkins, Mark            Atkins, Mark                11/3/2009

Page 86

1    levels, inhalation -- to ventilate or increase

2    ventilation of the air quality?

3            MS. MCLEMORE:  Object to the form of the

4    question.  If you can point the witness to a certain

5    part of the MSDS you're asking.

6            You're asking him technical questions for

7    which he doesn't have any foundation to answer unless

8    you're talking about a specific part of the Material

9    Safety Data Sheet.

10   BY MR. WALDRON:

11       Q    Can you take a look at section 7, Handling

12   and Storage.  Can you read the first sentence for me?

13       A    "Provide adequate ventilation to reduce the

14   possible buildup of formaldehyde gas particularly when

15   high temperatures occur."

16       Q    And do you know why it states that here?

17       A    Again, no, not technically.

18       Q    Could you turn to section 8.  I'm sorry,

19   Section 11.

20       A    Okay.

21       Q    And that says Toxicological Information.

22       A    Okay.

23       Q    You see where it says Formaldehyde as a

24   subheading?

25       A    Yes.

Atkins, Mark                 Atkins, Mark                    11/3/2009

Page 87

1          Q     Do you have any understanding of what this
2    says here?
3          A     Which part?
4          Q     Let's take the first sentence under the
5    first paragraph.  "Exposure to gaseous formaldehyde
6    may cause temporary irritation of the nose and throat
7    as well as lead to respiratory disorders."  That's
8    your understanding, right?
9                MS. MCLEMORE:  Object to the form of the
10   question.
11   BY MR. WALDRON:
12         Q     That's what it says here, right?
13               MS. MCLEMORE:  You can answer that
14   question.
15         A     That's what it says.
16   BY MR. WALDRON:
17         Q     These MSDA sheets --
18         A     Right.
19         Q     -- MSDS sheets were -- were provided to
20   purchasers of the materials that contained the
21   chemicals contained in this MSDS sheet?
22               MS. MCLEMORE:  Object to the form of the
23   question.  You can answer if you know.
24         A     I'm not sure what was your question again.
25               MS. MCLEMORE:  And, Counsel --

Tiffany Alley & Associates
770-343-9696

Atkins, Mark            Atkins, Mark                11/3/2009

Page 88

1      A    I'm not trying --

2          MS. MCLEMORE:  -- he's been prepared to

3  talk about the GP relationship with Fleetwood.  When

4  you ask him a question that says was this MSDS

5  provided to customers, he hasn't been prepared on

6  that topic.  I don't believe he knows the answer to

7  that topic.  If you want to confine your questions

8  to Fleetwood --

9          MR. WALDRON:  He's already testified that

10 he did -- that this was provided to purchasers, and

11 so I'm asking about --

12         MS. MCLEMORE:  He testified --

13         MR. WALDRON:  -- representations made in

14 there.

15         MS. MCLEMORE:  He testified it was

16 provided to Fleetwood.

17     A    Fleetwood.

18         MS. MCLEMORE:  I mean, your question asked

19 are these Material Safety Data Sheets as a matter of

20 course provided to all customers.  Okay.  I mean,

21 he's not been prepared on that topic.  He doesn't

22 know the answer to that.

23         MR. WALDRON:  Well, I'd like him to tell

24 me if he knows the answer.

25         MS. MCLEMORE:  That's fine.

Atkins, Mark          Atkins, Mark                    11/3/2009

Page 89

1           MR. WALDRON:  I'd prefer not to have --

2           MS. MCLEMORE:  Tell him.

3           MR. WALDRON:  -- a speaking objection.

4      A    What was your question?

5  BY MR. WALDRON:

6      Q    Are you aware whether or not MSD -- this

7  MSDS sheet was provided to purchasers of materials

8  from Georgia-Pacific that contained formaldehyde?

9      A    I'm not aware of any other than what we've

10 talked about.

11     Q    And which ones would those have been?

12     A    The ones we said we provided to Fleetwood,

13 which were these.

14          THE REPORTER:  The ones we said we

15 provided to --

16     A    To Fleetwood.

17          THE REPORTER:  Thank you.

18 BY MR. WALDRON:

19     Q    So they were provided to Fleetwood, but you

20 don't know about anybody else?

21     A    I didn't research that, no.

22     Q    Would that be something you would be able to

23 research if requested to?

24     A    I don't know how far back our records went.

25 I'd have to go look.  I -- you know, we're talking

Atkins, Mark              Atkins, Mark              11/3/2009

Page 90

1   about something eight years ago.

2        Q    Okay.  Would -- would it include the

3   2005/2006 time period?

4        A    I -- I don't know until I go back and look

5   at what our records would show.

6        Q    Have you read this entire MSDS sheet?

7        A    I glanced through it.

8        Q    Have you read the section on formaldehyde?

9        A    I've read through it.

10       Q    Prior to today?

11       A    Yes, prior to today I've read through it.

12       Q    And as a corporate representative of

13   Georgia-Pacific can you -- can you tell me if anything

14   in here -- can you -- well, can you tell me if this is

15   a representation that Georgia-Pacific has made to at

16   least Fleetwood as a purchaser of

17   formaldehyde-containing wood products?

18            MS. MCLEMORE:  Object to the form.  You

19   can answer.

20       A    If it's on here and we sent it to Fleetwood

21   then yes, it would be representative of what we said.

22   BY MR. WALDRON:

23       Q    All right.  Then you're aware in -- in

24   looking at this paragraph that a representation was

25   made that studies on formaldehyde from the standpoint

Tiffany Alley & Associates
770-343-9696

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 91

1   of occupational exposure have shown that in
2   concentrations of .3 parts per million failed to
3   produce irritation; is that right?
4        A    That's what it says here.
5        Q    And the wood products that Georgia-Pacific
6   has supplied to Fleetwood as is shown in Exhibit 3,
7   are you aware of any of those products having
8   formaldehyde level above .3?
9        A    They do not.   They did not.
10       Q    Do any of the products that Georgia-Pacific
11  creates or manufactures contain formaldehyde levels
12  above .3?
13       A    I haven't done all the homework on every
14  product, but we would have met the federal regulations
15  that were in place.
16       Q    If you'll look at section 14 of that same
17  M -- MSDS.   There's different state standards here,
18  correct?
19       A    Yes.
20       Q    And look at California, for instance.   It
21  states what the standard is for California, and then
22  it says, "The products covered by this MSDS contain
23  formaldehyde and may, depending on the conditions such
24  as of temperature and relative humidity, emit
25  formaldehyde gas," right?

Atkins, Mark               Atkins, Mark                 11/3/2009

Page 92

1      A    Correct.

2      Q    And in the state of California it says,

3  "Formaldehyde gas is listed under Proposition 65 as a

4  chemical known to the state to cause cancer."  And it

5  says, "Georgia-Pacific has, evaluated according to the

6  state regulations, the emissions of formaldehyde gas

7  from the products it manufactures and sells into

8  California," right?

9      A    Correct.

10     Q    And it says, "It has been determined that

11 the emissions are below the no significant risk level

12 and do not require warnings."  Do you see that?

13     A    I see that.

14     Q    Do you have any knowledge about why this

15 statement was included in there?

16     A    Not particular knowledge, no.

17     Q    What about the evaluation according to

18 California state standards?

19     A    I'd have to go back and look at what the

20 California standards were.  There's no numbers here

21 that show what that standard was.

22     Q    All right.  Well, look down to the Minnesota

23 standards.

24     A    Uh-huh.

25     Q    The last sentence there says, "Raw MDF

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                Atkins, Mark                    11/3/2009

Page 93

1  manufactured by Georgia-Pacific meets this standard."
2  Do you see that?
3       A    Yes, sir.
4       Q    And if we were to go back farther down and
5  look at the ANSI standards that are listed the two
6  below that, does it not also say that Georgia-Pacific
7  meets or exceeds those standards?
8       A    Correct.
9       Q    Is there a policy within Georgia-Pacific to
10  provide and meet all of these standards when providing
11  wood products that contain formaldehyde?
12       A    Is it a policy to meet the required
13  standards?
14       Q    To meet these required standards.
15            MS. MCLEMORE:  Object to the form.  You
16  can answer.
17       A    Yeah, I would think so.  Yes.
18  BY MR. WALDRON:
19       Q    And that's without regard to the use --
20            THE REPORTER:  Without regard to the
21  use --
22  BY MR. WALDRON:
23       Q    Of the products that were created by
24  Georgia-Pacific were being put?
25       A    I'm not sure I understand your question.

Atkins, Mark                Atkins, Mark                    11/3/2009

Page 94

1    Q    Well, let -- let's go about it this way.
2  Georgia-Pacific -- is it your testimony that
3  Georgia-Pacific would seek to meet these standards or
4  exceed these standards regardless of how the
5  individual purchaser planned to use the products that
6  you manufactured that contain formaldehyde?
7    A    I wouldn't say irregardless.  I'm not sure
8  what you're asking.
9    Q    Do you need to -- as Georgia-Pacific -- does
10  Georgia-Pacific need to know the use that its products
11  containing formaldehyde that it manufactures are going
12  to be put to in order to decide whether it's -- it's
13  going to meet these standards as listed on this MSDS?
14    A    I met the -- I met the standards as they
15  were listed.
16    Q    Regardless of whatever use then the
17  formaldehyde-containing materials that your company
18  manufactured --
19    A    I met -- I met the standard as it was
20  written.  I met the federal regulations as it was
21  written.
22    Q    You understand that the federal regulations
23  apply -- for instance HUD standards apply to mobile
24  homes but not to travel trailers?
25    A    I met the HUD standard as it was requested.

Atkins, Mark                Atkins, Mark                11/3/2009

Page 95

1        Q    So you're saying Georgia-Pacific met the HUD

2    standard for formaldehyde regardless of whether that

3    was used in a mobile home or travel trailer?

4        A    I was -- I wasn't aware it was used in a

5    travel trailer at the time of the order.

6        Q    Thank you.

7             Are you aware of any conversations or

8    correspondence or communications between

9    Georgia-Pacific and FEMA?

10       A    I'm not aware of any, no.

11       Q    Are you aware of any warnings or other

12   documents regarding formaldehyde that were directed to

13   FEMA in any way?

14       A    I'm not aware of any, no.

15       Q    And the stamps that were located in

16   Exhibit 5, these are the bundle tags and stamps,

17   correct?

18       A    Uh-huh.

19       Q    And so this -- this would be on each product

20   that your company manufactured?

21       A    Which product?  Which -- be specific about

22   which product you're talking about.

23       Q    Sure.  In Exhibit 5 each of these tags here

24   state the product that they're to be placed on; is

25   that right?

Atkins, Mark              Atkins, Mark                    11/3/2009

Page 96

1      A     That is correct, either a tag or a stamp
2   would have been on the product.
3      Q     Would there be a stamp or a tag on every
4   product that your company produced?
5            MS. MCLEMORE:  Object to the form.  You
6   can answer.
7   BY MR. WALDRON:
8      Q     During 2005 and --
9      A     Every --
10     Q     -- 2006?
11     A     You say every company my -- every product my
12  company produces is -- are you talking about these
13  products?
14     Q     Right.
15     A     I can't speak on behalf of every -- every
16  product.  Are you talking about these products here?
17     Q     I'm asking is there a general policy and
18  practice to stamp or tag each product that your
19  company produces?
20           MS. MCLEMORE:  Object to the form.  You
21  can answer.
22     A     On these products that I'm aware of, yes.
23  BY MR. WALDRON:
24     Q     Are there any products that you're aware
25  that do not receive a stamp --

Atkins, Mark                    Atkins, Mark                    11/3/2009

Page 97

1        A      I'm not aware.

2        Q      -- or a tag?

3               MS. MCLEMORE:   Counsel, we produce Dixie

4    cups, we produce --

5        A      That's what I'm getting at.  I don't -- I

6    don't know the --

7    BY MR. WALDRON:

8        Q      Sure.

9        A      The ones you're asking about, yes.

10       Q      Sure.  Okay.  Fair enough.

11              On these tags are they generally located on

12   the front or back of a particular -- say, flooring --

13       A      Uh-huh.

14       Q      -- would you expect that these would be

15   exposed to somebody who was walking on or looking at

16   the finished product?

17       A      The flooring products had to be -- had to be

18   stamped on every product, so yes, it was on the

19   surface of the product as it was used.

20       Q      Are you aware of how these -- your products

21   are used in mobile homes?

22       A      Our products meaning these three again?

23       Q      Yes.

24       A      Primarily for flooring, yes.

25       Q      And is one of these products a top cover of

Atkins, Mark            Atkins, Mark            11/3/2009

Page 98

1    the flooring?

2        A     Top cover?

3        Q     Is it generally -- are these products, in

4    general use do you -- are you able to see the product

5    or is it covered up by carpet or other -- some other

6    type of flooring?

7        A     The flooring is typically covered by

8    something, a surface treatment, like carpet or vinyl

9    or something, yes.

10       Q     So you wouldn't expect that a person looking

11   at the finished product would be able to read these

12   tags?

13       A     The finished product?

14       Q     Right.

15       A     No, I don't think so.

16       Q     Does Georgia-Pacific require any warnings be

17   placed on its manufactured products for the ultimate

18   consumer to read?

19             MS. MCLEMORE:  Object to the form.

20             MR. HINES:  Just object to foundation.

21             MS. MCLEMORE:  You can answer.

22       A     What's the -- what's the question again?

23   You're -- again the define the -- you're talking about

24   Georgia-Pacific and multiple products.  I'm trying

25   to --

Atkins, Mark            Atkins, Mark                11/3/2009

Page 99

1   BY MR. WALDRON:

2       Q    Sure.  All these questions I'm -- I'm asking

3   about formaldehyde-containing wood products.

4       A    Okay.

5       Q    Are you aware --

6            MS. MCLEMORE:  Urea-formaldehyde or -- or

7   both urea and phenolic-based formaldehyde resins.

8   BY MR. WALDRON:

9       Q    Urea-formaldehyde.

10      A    Okay.

11      Q    Are you aware of any warnings that

12  Georgia-Pacific requires to be placed on its products

13  that would be visible to the ultimate consumer?

14      A    I'm not aware of any, no.

15           THE VIDEOGRAPHER:  We need to change.

16           MR. WALDRON:  Need a change of tape.

17  Okay.

18           THE VIDEOGRAPHER:  End of tape 1.

19  1:15 p.m.  Off video record.

20           (Recess 1:15-1:17 p.m.)

21           THE VIDEOGRAPHER:  Tape 2, 1:17 p.m.  Back

22  on video record.

23  BY MR. WALDRON:

24      Q    Besides the tags that were in Exhibit 5

25  regarding the wood products containing formaldehyde

Atkins, Mark                Atkins, Mark                11/3/2009

1    that Georgia-Pacific manufactured and the MSDS sheet

2    that we talked about, Number 30, was there anything

3    else that was provided to Fleetwood with delivery of

4    their products that they ordered from your company?

5        A    Not aware of any, no.

6        Q    What about when products were sold to

7    BlueLinx for distribution to other companies, was

8    there anything beyond those two categories of

9    documents provided to BlueLinx?

10       A    Two or three, tag and/or stamp and MSDS

11   sheet?

12       Q    Correct.

13       A    No, same thing.

14       Q    But the MSDS sheet Number 30 and the -- the

15   tags in Exhibit 5 --

16       A    Right.

17       Q    -- were produced to BlueLinx any time that

18   they ordered a wood bonded product containing

19   formaldehyde?

20            MS. MCLEMORE:   Object to the form and

21   foundation.

22       A    Correct.

23   BY MR. WALDRON:

24       Q    During 2005/2006?

25       A    Correct.

Atkins, Mark          Atkins, Mark               11/3/2009

Page 101

1      Q    Okay.  Looking back to the MSDS real quick,
2   Number 30.  Under the trade names of products
3   manufactured by Georgia-Pacific on page 6, do you see
4   that?
5      A    Yes, sir.
6      Q    Prior to September 2006 were all of these
7   trade names listed here manufactured by
8   Georgia-Pacific?
9      A    I believe so, yes.
10     Q    And if you look to Exhibit 3, this is the
11  Georgia-Pacific shipments to Fleetwood and Continental
12  Lumber years 2005 and 2006.  Is there any products
13  represented on Exhibit 3 that are not listed here
14  under the trade names?
15          MS. MCLEMORE:  Object to the form.
16  BY MR. WALDRON:
17     Q    I'll -- I'll -- I'll clarify.  Each of these
18  trade names represent a specific type of product,
19  correct?
20     A    Uh-huh.
21          MS. MCLEMORE:  You have to say yes.
22     A    Yes, I'm sorry.  Yes.
23  BY MR. WALDRON:
24     Q    And on Exhibit 3 particle board represented
25  by PB, correct?

Atkins, Mark            Atkins, Mark                11/3/2009

Page 102

1     A     Correct.

2     Q     That would be encompassed within these trade

3  names in Exhibit 2?

4     A     Correct.

5     Q     What about plywood?

6     A     Plywood was not in here because it was -- I

7  think it was on a different -- it was on the other.

8  It was not under that same -- let me go back and look

9  here.

10    Q     That would be -- would that be MSDS Number

11 31, which is right after --

12    A     Find the right one.

13    Q     -- Exhibit Number -- MSDS 30 in Exhibit --

14    A     And there are no trade names listed under

15 that.

16    Q     Is it your understanding, though, that the

17 plywood listed in Exhibit 3 would be covered by the

18 MSDS Number 31?

19    A     Yes.

20    Q     And would that be the same for the OSB?

21    A     Correct.

22    Q     And if we could turn to that MSDS 31.  Under

23 section 14, do you know what TSCA stands for?

24    A     I'm sorry, I do not.

25    Q     What about SARA 313?

Atkins, Mark                Atkins, Mark                11/3/2009

```
                                                    Page 103
1        A    No, not right offhand I don't.
2        Q    What I'm trying to figure out is for plywood
3   and OSB --
4        A    Uh-huh.
5        Q    -- that contains the -- that contain
6   formaldehyde, would those have also been -- met any
7   HUD standards that were applicable?
8             MS. MCLEMORE:  Object to the form.  You
9   can answer.
10        A    I believe they were exempt because -- I
11   can't answer why, because, but they were exempt from
12   the HUD standard.
13   BY MR. WALDRON:
14        Q    Do you know if Georgia-Pacific has any
15   testing that they did on those specific products or
16   had any policy about the levels of formaldehyde that
17   were permissible in those products?
18             MS. MCLEMORE:  Object to the form.  You
19   can answer.
20        A    Your question was around a policy?
21   BY MR. WALDRON:
22        Q    Right, is there a policy about how much
23   formaldehyde can be contained in plywood or OSB?
24        A    I'm not aware of a policy necessarily.  It
25   would have met whatever the regulations were again.
```

Atkins, Mark            Atkins, Mark            11/3/2009

```
                                              Page 104

1        Q    And if you look at Exhibit 1, the important

2    notice, which is four pages from the back of the

3    document --

4             MS. MCLEMORE:  He's -- he's actually --

5    BY MR. WALDRON:

6        Q    I know it's a little difficult to see here.

7        A    Yes.

8             MS. MCLEMORE:  He's looking at the next

9    page.

10       A    I'm sorry.  This one.

11            MS. MCLEMORE:  That one right there.

12       A    Okay.  All right.

13   BY MR. WALDRON:

14       Q    Actually, I'll -- I'll go ahead and hand you

15   another document which we'll mark as Exhibit --

16   whatever we're up to -- 6.

17            (Document marked for identification as

18   Exhibit-4.)

19   BY MR. WALDRON:

20       Q    I believe that's just a better copy of the

21   same --

22       A    Okay.

23       Q    -- label there.

24       A    Okay.

25       Q    Do you see the Warning -- Warning:
```

Atkins, Mark          Atkins, Mark                    11/3/2009

Page 105

1    Irritant, the middle warning there?

2         A     Correct.  Yes.

3         Q     And it says -- underneath that warning it

4    says Georgia-Pacific Corporation?

5         A     I see where it says that, yes.

6         Q     Have you ever seen this particular warning

7    before -- before today I should say?

8         A     Not -- not prior to this, no.

9         Q     And as part of that warning it says, "Use

10   with adequate ventilation," do you see that?

11        A     I do see it, yes.

12        Q     But you don't know one way or the other

13   whether this specific one was provided by

14   Georgia-Pacific Corporation?

15        A     I have not seen this before, no, sir.

16        Q     Is there someone in your company that would

17   know that?

18        A     Depends on when it supposedly was developed

19   or whatever.  There may be.  I don't know.

20        Q     But you're not aware of any specific person?

21        A     I'm not aware of any, no.

22        Q     Is it fair to say that Georgia-Pacific

23   sought to comply with any standards that might be

24   applicable to its formaldehyde-containing wood

25   products?

Tiffany Alley & Associates
770-343-9696

Atkins, Mark                Atkins, Mark                11/3/2009

Page 106

1       A       Oh, yeah, I would think so.   Yes.

2       Q       And if those standards required that

3   formaldehyde emitting products be limited to .3 or

4   less, would that be the level of concern that

5   Georgia-Pacific would have adopted?

6           MS. MCLEMORE:   Object to the form.   You

7   can answer.

8       A       We would have met the federal regulation,

9   yes.

10          MR. WALDRON:   That's all I have.

11          MR. DOMINICK:   I've just got a real quick

12  follow-up if you don't have a question.

13          MR. HINES:   Let me clarify one thing.

14                      EXAMINATION

15  BY MR. HINES:

16      Q       Mr. Atkins, continue to look, if you would,

17  at what counsel for the government gave you.   And if

18  you look at the introductory paragraph to the three

19  warnings on the Fleetwood notice that is posted in

20  travel trailers it says, "Certain of our forest

21  product suppliers have advised that urea-formaldehyde

22  is used in the production of particle board, hardwood

23  plywood, or paneling which they supply us and which we

24  utilize in our finished product.   These suppliers have

25  requested that we communicate this to our customers,"

Atkins, Mark               Atkins, Mark                    11/3/2009

Page 107

1    and then proceeds with providing information.
2              My question simply is this, it is my
3    understanding, and please correct me if I'm wrong,
4    that in your preparation for this deposition today in
5    order to act on behalf of the Georgia-Pacific
6    Corporation that the records that you were able to
7    obtain in your search of records which you personally
8    undertook --
9         A    Right.
10        Q    -- revealed no such records, so you were
11   simply unable to respond to questions with respect to
12   this notice or the notice that was otherwise attached
13   to Exhibit 1; is that fair?
14             MR. DOMINICK:  Object to the form.
15        A    Correct.
16   BY MR. HINES:
17        Q    And you don't know of your own knowledge or
18   on -- in preparation for this deposition the
19   communications that may have taken place between
20   Georgia-Pacific on the one hand and Fleetwood
21   Enterprises or any of its subsidiaries back in the
22   1982, 1983 or 1984 time period; is that fair to say?
23             MR. WALDRON:  Object to form.
24        A    I couldn't -- that's correct.
25   BY MR. HINES:

Atkins, Mark                Atkins, Mark                11/3/2009

Page 108

1       Q      And it follows like the night the day then
2    that you don't know whether this information was, in
3    fact, supplied by Georgia-Pacific to Fleetwood or any
4    of its other customers back in the early 1980s; is
5    that fair?
6              MR. DOMINICK:  Object to the form.
7              MR. WALDRON:  Object to form, leading.
8       A      I can -- I can say I haven't seen it, and my
9    search hasn't shown it.
10             MR. HINES:  Thank you very much.  That's
11   all I've got.
12                    FURTHER EXAMINATION
13   BY MR. DOMINICK:
14      Q      I have just a couple quick questions.
15             Mr. Atkins, you had testified and we went
16   back into that Material Safety Data Sheet Number 30.
17   Page 6 of 6 on that, it's in Exhibit 2.
18      A      Okay.
19      Q      I'm looking at the last --
20             MS. MCLEMORE:  We're on --
21   BY MR. DOMINICK:
22      Q      -- page.
23             MS. MCLEMORE:  -- number -- Material
24   Safety Data Sheet 30 again?
25             MR. DOMINICK:  Number 30 --

Atkins, Mark                   Atkins, Mark                   11/3/2009

```
                                                    Page 109
 1              MS. MCLEMORE:  Okay.
 2              MR. DOMINICK:  -- right.
 3        A     Okay.  Page 6 of 6?
 4   BY MR. DOMINICK:
 5        Q     6 of 6 --
 6        A     Okay.
 7        Q     -- that last section --
 8        A     Yes, sir.
 9        Q     -- where it says in all caps and bold
10   "Important."  Have you -- have you ever seen a --
11   well, let me ask -- in 2005 or 2006 do you know of any
12   Material Safety Data Sheets that would have gone to
13   Fleetwood that did not contain this final section of
14   the document?
15        A     Am I aware of any that would have gone to
16   Fleetwood that did not have that?
17        Q     Right.
18        A     No, sir, I'm not.
19        Q     And I won't make you read, but what I see in
20   the middle of that paragraph is a statement that says,
21   "Georgia-Pacific and its subsidiaries make no warranty
22   of any kind, express or implied, concerning the
23   accuracy or completeness of the information and data
24   herein."  Do you see that?
25        A     Yes, sir, I do.
```

Atkins, Mark            Atkins, Mark                11/3/2009

Page 110

1      Q    And -- and do you understand from that that
2   Fleetwood could not rely on any of the information
3   that was in this Material Safety Data Sheet?
4             MR. WALDRON:  Objection.
5             MS. MCLEMORE:  Object to form and
6   foundation.
7             MR. WALDRON:  Join.
8   BY MR. DOMINICK:
9      Q    That's what it says.  It's a disclaimer.
10  Could -- do you think Fleetwood could rely on any of
11  the information in this Material Safety Data Sheet?
12            MS. MCLEMORE:  Object.
13            MR. WALDRON:  Object to form, speculation.
14            MS. MCLEMORE:  Yeah, I was going to say.
15  BY MR. DOMINICK:
16     Q    Can you answer that question?
17     A    I can't respond on what Fleetwood thought.
18     Q    Did -- how about what Georgia-Pacific
19  thought, did Georgia-Pacific intend for Fleetwood to
20  rely on the information in this Material Safety Data
21  Sheet Number 30?
22            MS. MCLEMORE:  Object to --
23            MR. WALDRON:  Objection.
24            MS. MCLEMORE:  -- form -- I'm sorry,
25  object to foundation.

Atkins, Mark                Atkins, Mark                11/3/2009

```
                                              Page 111
 1            MR. WALDRON:  Calls for a legal

 2    conclusion.

 3    BY MR. DOMINICK:

 4        Q    I assume you can't answer that based on all

 5    the objections around the table.

 6            What about the -- and the formaldehyde

 7    emission levels that are in this document that -- and

 8    it's claimed that Georgia-Pacific achieved with its

 9    products, based on this paragraph did Fleetwood, in

10    Georgia-Pacific's view, have the right to rely upon

11    those emissions levels?

12            MS. MCLEMORE:  Object to the form of that

13    question.  Let me -- are -- are you suggesting by

14    your question that we didn't meet the HUD

15    regulations; is that what you're suggesting?

16    BY MR. DOMINICK:

17        Q    I'm not suggesting that.  I'm just

18    suggesting that this document says you can't rely on

19    anything in it, to the -- and the buyer has to be --

20    the buyer has to be aware and verify all the

21    information themselves.  Doesn't it say that in there?

22            MS. MCLEMORE:  Object to the form.

23    BY MR. DOMINICK:

24        Q    Well --

25        A    What's your question?
```

Atkins, Mark                 Atkins, Mark                 11/3/2009

```
                                                    Page 112
 1        Q    My question is, did Fleetwood have a right
 2   to rely on these emissions levels that were stated in
 3   here as far as what the emission levels of their
 4   particle board -- of Georgia-Pacific's particle board
 5   is or UF bonded wood products when the final paragraph
 6   says that they can't rely on any of that information?
 7             MS. MCLEMORE:  Object to the form.
 8             MR. WALDRON:  Objection, calls -- calls
 9   for a legal conclusion, mischaracterizes.
10        A    We met the federal regulations.  I'll answer
11   your question that way.
12   BY MR. DOMINICK:
13        Q    That's your -- that's the company's
14   position, they met the federal regulations?
15        A    That's correct.
16             MR. DOMINICK:  All right.  That's all I
17   have.
18             MR. HINES:  I've got nothing further.
19             MR. DOMINICK:  Thank you.
20             THE VIDEOGRAPHER:  This concludes the
21   30(b)(6) videotaped deposition of Georgia-Pacific.
22   The time is 1:31 p.m.  We are now off video record.
23             (Deposition concluded at 1:31 p.m.)
24             (Signature reserved.)
25
```

Atkins, Mark            Atkins, Mark                11/3/2009

Page 113

1                       CERTIFICATE

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6            I hereby certify that the foregoing

7    transcript was taken down, as stated in the caption,

8    and the colloquies, questions, and answers were

9    reduced to typewriting under my direction; that the

10   transcript is a true and correct record of the

11   evidence given upon said proceeding.

12           I further certify that I am not a relative

13   or employee or attorney of any party, nor am I

14   financially interested in the outcome of this action.

15           This the 16th day of November, 2009.

16

17   _____

18           ROBYN BOSWORTH, RPR, CRR, CCR-B-2138

19

20

21

22

23

24

25