Exhibit A

# Deposition of

# WILLIAM FARISH

*Taken On*
*November 4, 2009*

**Transcript provided by:**

# HUTCHINGS℠
COURT  REPORTERS, LLC
CSR 649

**GLOBAL LEGAL SERVICES**

**800.697.3210**

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.    November 4, 2009                    WILLIAM FARISH

11

1         Q.  Did any of the jobs prior to your beginning

2    your employment with Fleetwood involve travel trailers?

3         A.  I can't remember any, no.

4         Q.  So 1987 you go to work for Fleetwood; is that

5  09:25    correct?

6         A.  Well, '88 actually.

7         Q.  And what was your job title at that time and

8    where were you located?

9         A.  I started out as a senior engineer, and I was

10  09:25   in Riverside, California.

11        Q.  Which is corporate headquarters; correct?

12        A.  Correct.

13        Q.  And were you working in the manufactured

14   housing end of the Fleetwood business?

15  09:25    A.  Yes.  That's correct.

16        Q.  Not the travel trailer?

17        A.  That's correct.  Only in manufactured housing.

18        Q.  How long did you work in the manufactured

19   housing end as opposed to maybe obtaining a job that

20  09:25   covered both manufactured housing and travel trailers?

21        A.  For my 21 years at Fleetwood, I was always in

22   manufactured housing side of things.

23        Q.  Now, who would your counterpart have been in

24   the travel trailer end of the business for Fleetwood?

25  09:26    A.  Well, after I got my last promotion, which was

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

13

1           1984?  You weren't there.

2                   A.  I wasn't there yet.

3                   Q.  So you were with Bendix at the time?

4                   A.  Well, in '84 I would have been at Lancer

5    09:27  Brinkcraft in Wichita Falls, Texas.

6                   Q.  When you came to Fleetwood, did you become

7    aware of any issues pertaining to formaldehyde in any of

8    the Fleetwood products, be they manufactured housing or

9    travel trailers?

10   09:28       A.  By the time I got to Fleetwood, formaldehyde

11   just wasn't an issue in manufactured housing.  It wasn't

12   a service issue or -- the only issues I can remember

13   were if -- making sure we had the labels on the

14   products.  And HUD made a change from -- on their label,

15   09:28  the label that goes inside the home.  But, no, other

16   than -- that was the only involvement we had.

17                  Q.  How about manufactured housing?

18                  A.  That was all manufactured housing.

19                  Q.  Did you ever become aware of any testing that

20   09:29  Fleetwood had undertaken pertaining to formaldehyde

21   either prior to or subsequent to your employment with

22   Fleetwood?

23                  A.  The only testing I know of was very recent

24   testing done in Waco.

25   09:29       Q.  And tell me when you say "very recent testing

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

16

1       A.  Yes.  You could test ambient air in a travel

2   trailer.

3       Q.  Prior to this testing that took place in

4   2007-2008, let's say between 1984 and 2007, are you

5  09:33   aware of any testing of ambient air that was performed

6   by Fleetwood or on behalf of Fleetwood?

7       A.  No.

8       Q.  That would apply both to manufactured housing

9   and to travel trailers; correct?

10  09:33   A.  I'm not aware of any, that's correct, on either

11   side.

12       Q.  From an engineering point of view, is there

13   anything that prevented Fleetwood from performing

14   ambient air testing in either its manufactured homes or

15  09:33   its travel trailers between 1984 and 2005?

16       A.  The most obvious thing would be a protocol,

17   testing protocol:  What equipment to use, how to

18   precondition the units, what your -- is there a delay

19   time?  That would be the most obvious engineering

20  09:34   problem that I would be aware of.

21       Q.  But certainly, from an engineering point of

22   view, you have dealt with protocols your whole life;

23   correct?

24       A.  Oh, yes.

25  09:34   Q.  And at some point you come up with a protocol

17

1     and you conduct the test; correct?

2         A.  Yes.

3         But you don't know if it's meaningful if there is

4     not an established protocol.  That's one of the things

5  09:34  that we often most worry about, especially if we want to

6     get third-party approval of our results, whatever they

7     are.

8         Q.  Was a protocol for ambient air, as it pertains

9     to formaldehyde levels, ever undertaken by Fleetwood on

10  09:34  behalf of Fleetwood between 1984 and 2005?

11        A.  I know of none.

12        Q.  Have you ever been deposed before?

13        A.  Yes.

14        Q.  Have you ever been deposed in connection with

15  09:35  any formaldehyde issues?

16        A.  I think only for this case.  I mean a previous

17     one for this case.

18        Q.  And that would have been a class cert?

19        MS. DALY:  Yes.

20  09:35  THE WITNESS:  I guess so.

21        MR. BENCOMO:

22        Q.  When you came here today, who was -- actually,

23     we had asked to take your deposition a while back a few

24     months ago and were told you were unavailable or

25  09:35  something like that.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

18

1           Was there something that kept you from appearing at

2      a deposition?

3           MS. DALY:  Actually, that's not correct what

4      happened at all.

5  09:35    MR. BENCOMO:  Again, no speaking.  That's not even

6      an objection.  I'm just asking the witness.

7           MS. DALY:  That's not what our conversation was.

8           THE WITNESS:  I have no idea.

9           MR. BENCOMO:

10 09:35    Q.  When is the first time that you met with

11     Counsel to discuss any issues pertaining to this case?

12         A.  To this, well, several years ago or at least a

13     year and a half ago.

14         Q.  And how many times have you met with Counsel

15 09:36 since that first meeting over a year and a half ago as

16     it pertains to this case?

17         A.  I think maybe three.

18         Q.  Do you keep tabs on when those meetings would

19     have taken place?

20 09:36    A.  I try to keep a daily log.  And so I might have

21     them in there, yes.

22         Q.  And who would you have met with on those three

23     occasions?

24         A.  Well, Taylor specifically on those occasions.

25 09:36    Q.  So on all three occasions, it was just Ms. Daly

20

1          said "the main thing."  So what other things did you

2          review in preparation for this deposition?

3                    A.  I tried to prepare very little, actually.

4                    Q.  Now, I note that you have in front of you three

5   09:38  booklets.  What are those booklets?  [EXH-2]

6                    A.  These are the HUD regulations, standards; 3280,

7          3282, and 3285 they are called.

8                    Q.  And is there any reason why you brought them

9          here today?

10  09:38           A.  I usually bring them to any deposition.  And so

11         if we get into any code-related things, I don't look

12         like I don't know what I'm talking about.

13                   Q.  Well, I'm not going to make you look at them

14         because I'm not going to ask you any questions about

15  09:38  them today.

16                   A.  That's excellent.  No problem.

17                   Q.  That's not my style.

18                   A.  Okay.

19                   Q.  But I would ask that they be attached to the

20  09:38  deposition and that they be labeled Farish 2 in globo.

21                   Farish 1 is going to be the Amended Notice of

22         Deposition for Mr. Farish.  [EXH-1]

23                   Sir, are you familiar with a company by the name of

24         Radco?

25  09:39           A.  Yes.

Case 2:07-md-01873-KDE-MBN   Document 8143-1   Filed 11/29/09   Page 9 of 30
IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.   November 4, 2009                                    WILLIAM FARISH

21

1    Q.  And what do you understand Radco's business to

2    be?

3    A.  They're primarily a third-party listing and

4    testing agency.

5    09:39    Q.  And are you aware of the fact that in the late

6    '70s, early '80s they performed tests specific to

7    formaldehyde for Fleetwood?

8    A.  No.  I did not know that.

9    Q.  So you, as the director of engineering, was

10   09:39  never made aware of the testing that Radco may have

11   performed for Fleetwood; correct?

12   A.  No.  I did not know that.

13   Q.  You were never made aware of any results that

14   Radco would have obtained in connection with those

15   09:40  tests; correct?

16   A.  No.  I didn't know that.

17   Q.  Are you familiar with an individual by the name

18   of Forrest Theobald?

19   A.  Yes.

20   09:40    Q.  And would you please share with us who

21   Mr. Theobald is?

22   A.  I knew him when he was counsel, when he was

23   internal counsel at Fleetwood.

24   Q.  He was the head lawyer for Fleetwood?

25   09:40    A.  For a while he was.

22

1        Q.   Now, did Mr. Theobald ever tell you that Radco

2     had been retained by Fleetwood to conduct any type of

3     formaldehyde testing?

4        A.   No.

5  09:40   Q.   Did Mr. Theobald ever tell you that tests had

6     in fact been performed as it pertains to the levels of

7     formaldehyde in Fleetwood products?

8        A.   No.

9        Q.   As the director of engineering, would you have

10 09:41  liked to have had that information available to you?

11       A.   Well, as director of engineering it's

12    interesting information.  But, I mean, we -- the time

13    period you're talking about, Fleetwood did all kinds of

14    testing in the early days of the HUD program that

15 09:41  wouldn't be beneficial to me now.

16       And that would be interesting to see that.  But

17    since we weren't having formaldehyde problems, any old

18    testing that was done would be superficial to any -- to

19    my daily activities and pressures.

20 09:41   Q.   Well, would formaldehyde testing become

21    important as soon as any issues arose pertaining to

22    formaldehyde?

23       A.   Yes.

24       I think if we had some significant concerns about

25 09:42  formaldehyde, we'd definitely want to know about our

1      history, yes, any data we had.

2            Q.  And as an engineer, particularly a director of

3      engineering, that's something you would consider to be

4      important; correct?

5  09:42      A.  What would be important?

6            Q.  Looking at the data that you already had on

7      that issue.

8            A.  If the issue was important, yes.

9            Q.  When did you first hear or learn about the fact

10 09:43 that people were complaining about formaldehyde in

11     travel trailers?

12           A.  I think it was in the news, actually, just TV

13     or internet or something like that I think first I heard

14     it.

15 09:43      Q.  And you obviously know Mr. Eldon Smith;

16     correct?

17           A.  Yes.

18           Q.  Mr. Smith has previously testified that that's

19     how he learned -- he first learned about the issue of

20 09:43 formaldehyde.  So you have a similar recollection; is

21     that correct?

22           A.  I guess so, yes.

23           Q.  Now, when you first heard in the news about the

24     fact that people were complaining or having issues with

25 09:43 formaldehyde in travel trailers, did you participate in

24



1    any meeting that was called by Fleetwood to attempt to

2    address that issue?

3         A.   Initially, no.   Because it looked like it was

4    just -- well, it sounded like it was just very spotty,

5  09:44   very irregular, and nothing about Fleetwood at all.

6         Q.   Did you attend any meetings at any time

7    pertaining to formaldehyde sometime after that?

8         A.   Oh, yes.

9         I mean, afterwards it became, you know, as with the

10  09:44   more publicity, the manufactured housing industry and

11    the Manufactured Housing Institute, MHI, started

12    worrying about public relations because people were

13    saying "trailers" and lumping them together, FEMA

14    trailers.   So that was having an effect on the

15  09:44   perception of manufactured housing.

16         Q.   Manufactured housing being separate in your

17    mind from the travel trailers?

18         A.   Yes, very much.

19         Q.   So you felt as if -- well, the manufactured

20  09:45   housing industry, which you are a part of, felt that

21    from a PR point of view you all were being lumped

22    together; correct?

23         A.   We often are lumped together, yes.

24         Q.   Now, when that issue then came about, do you

25  09:45   have any recollection of Eldon Smith or anyone working

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

25

1           for Fleetwood calling a meeting to address formaldehyde

2           and any engineering issues pertaining to formaldehyde in

3           travel trailers?

4                   A.   I don't remember who all we -- I know

5   09:45   internally we tried to help MHI draft a resolution, if I

6           remember correctly, stating a public position.

7                   So Fleetwood may have come together on that

8           internally to figure out how we could contribute best to

9           their efforts.

10  09:46           Q.   From the PR end?

11                  A.   Right.

12                  Q.   Now, what in your opinion is the difference

13          between a manufactured home and a travel trailer?

14                  A.   Well, there's quite a few.

15  09:46   The HUD code regulations spell out some of the more

16          obvious ones about the size of the units and

17          transportation method.

18                  The biggest one usually is that the HUD code units,

19          manufactured housing, have to have a HUD label, have to

20  09:47   be produced and inspected and certified conforming to

21          that code, and the travel trailers do not.

22                  But, you know, their uses are so much different,

23          obviously.   The markets are different.   It's probably a

24          pretty long list of differences if you want to get into

25  09:47   it.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.    November 4, 2009                    WILLIAM FARISH

35

1                    I'm going to attach this document and label it as

2          Farish 4.

3                    I'm going to show you a document that has been

4          previously Bates Stamped Fleetwood 00000998 and -999 and

5    10:02  ask you some questions about that after I show it to

6          your counsel.

7                    MS. DALY:  You should read that whole thing.

8                    THE WITNESS:  Okay.

9                    MR. BENCOMO:

10   10:04    Q.  Did you have a chance to read the entire

11         document?

12                   A.  Scanning it, yes.

13                   Q.  Feel free to read it and absorb it if you want.

14         I'm going to ask you some questions about it.

15   10:04    MS. DALY:  Ask him questions.

16                   THE WITNESS:  I may have to stop and re-read

17         sections.

18                   MR. BENCOMO:  Well, just from the way that he made

19         that facial expression, I figured I didn't want him

20   10:04  later on to say, well, you know, you didn't give me the

21         opportunity to read and digest.

22                   MS. DALY:  See if you have an easy question.

23                   MR. BENCOMO:  They are all easy.

24                   (Intercom rings.)

25   10:05    MS. DALY:  This happened yesterday.  It will stop

1        in just a moment.  Somebody called in on the line, but

2        they are not really calling in on the line.  So it will

3        ring about 10 times and then it will stop.

4              MR. BENCOMO:  I'm glad you told me.

5    10:05    MS. DALY:  Phone people, you're still there; right?

6              INTERCOM:  "Yes."

7              MS. DALY:  Okay.  Good.

8              MR. BENCOMO:

9        Q.  Mr. Farish, that document is labeled "CDC

10   10:05  Conference Call - Dec. 11, 2007."  [EXH-5]

11         Is that not correct?

12         A.  That's correct.

13         Q.  And the subject is "Formaldehyde in FEMA

14        Housing & Trailers"; correct?

15   10:05    A.  Yes.

16         Q.  Now, there are some names that appear at the

17        top of that document just below the subject, and that

18        would be Mike Tressle, and then there is a question

19        mark, then the name Larry Reed, and then the name Chad

20   10:06  with a question market; is that correct?

21         A.  Yes.

22         Q.  And then right after that there's an equal

23        sign.  It says, "CDC-Cincinnati office"; correct?

24         A.  Yes.

25   10:06    Q.  Now, do you know or did you know Mike Tressle?

1           A.   No, I did not.

2           Q.   And Larry Reed or Chad, the same thing?

3           A.   Correct.

4           Q.   Now, do you know the name that appears below

5   10:06  that, which is a gentleman by the name of Jeff Inks?

6           A.   Yes.  I know him.

7           Q.   And what was Jeff Inks' position on December 11

8       of 2007?

9           A.   He was vice president of technical affairs for

10  10:06  MHI.

11          Q.   And MHI is the acronym for Manufactured Housing

12      Institute?

13          A.   That's correct.

14          Q.   And just below that name appears the name

15  10:06  Bill Farish-Fleetwood; is that correct?

16          A.   Yes.

17          Q.   Now, you participated in a phone conference

18      with the CDC, Mr. Jeff -- or individuals from the CDC,

19      Mr. Jeff Inks and yourself; is that correct?

20  10:07  A.   Correct.

21          Q.   And you do recall having had a phone conference

22      at that time?

23          A.   Somewhat, yes.

24          Q.   At that time there was a discussion pertaining

25  10:07  to the study that the CDC was performing in connection

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.    November 4, 2009                      WILLIAM FARISH

38

1       with the issue of formaldehyde in travel trailers;

2       correct?

3               A.  Yes.

4               Q.  And you knew that that would be the subject of

5   10:07   that conference call, so you and Mr. Inks, on behalf of

6       the Manufactured Housing Institute, could obtain as much

7       information as possible pertaining to what was going on;

8       correct?

9               A.  I think we were mainly just monitoring the

10  10:08   call, listening in more than anything.  There were other

11      people on this call, but I didn't record who they were.

12              Q.  Now, were you -- when you say you didn't

13      record, this is a Fleetwood document.  I can assume this

14      is a document that was generated by you?

15  10:08           A.  Correct.

16              Q.  And how do you generate documents?

17              A.  This particular document I'm just typing along

18      as best I can during -- trying to keep some notes.

19              Q.  Are you on a computer or on a typewriter or --

20  10:08   A.  I'm on a computer.

21              Q.  Now, where would a document like this wind up?

22      What file of yours or what file of the company's

23      would this document wind up in?

24              A.  It was just in my personal computer.  I don't

25  10:09   remember who I even shared this with after I typed it.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

39

1        A lot of this was for my own -- I didn't know much about

2        formaldehyde testing.  I wanted to learn what I could

3        from this conference call.

4            Q.  Do you have any recollection of sharing this

5   10:09   information with anyone else at Fleetwood?

6            A.  I really don't.  You would think if I spent

7        this much time I would, but I'm not really sure what

8        happened to it after this.

9            Q.  And it shows if you look at the back page of

10  10:09   Document 999, it shows that the conference was one hour

11       and 15 minutes; is that correct?

12           A.  That's what it says.

13           Q.  Now, after the conference call, it appears --

14       and I'm referring to the conference call with CDC --

15  10:09   that there was a follow-up call immediately thereafter

16       that was just between Jeff Inks and yourself; is that

17       correct?

18           A.  That's what it says, yes.

19           Q.  Would you please read that part of the document

20  10:10   that deals with the conference call that took place

21       between yourself and Jeff?

22           A.  Okay.

23           "Jeff is worried that CDC will still get the three

24       types of product confused; but industry review should

25  10:10   catch this."

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

40

1        Q.  Let me stop you there.

2            What is or are the three types of product that

3        we're referring to?  Is that the manufactured housing as

4        opposed to the travel trailers?

5   10:10    A.  And the park models.

6            Q.  And this is what you referred to earlier as

7        "they tend to lump us together"?

8            A.  Correct.

9            Q.  Would you please continue.

10  10:11    A.  "Jeff thinks FEMA will need to buy some

11       accessible units soon, and they will also add ambient

12       levels of formaldehyde to the specs, and they will err

13       on the conservative side in case there is even a very

14       sensitive person as an occupant."

15  10:11    Q.  Please continue.

16            A.  "The industry will have to try to defeat

17       ambient levels and have FEMA focus on materials as in

18       the HUD code, even if they derive more stringent

19       requirements for certain materials."

20  10:11    Q.  Let me ask you this question.  When -- strike

21       that.  Let me back up.

22            Who made the observation that, I quote, "The

23       industrial will have to try to defeat ambient levels and

24       have FEMA focus on materials as in the HUD code"?

25  10:12    Was that Jeff talking to you or you talking to

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.   November 4, 2009                    WILLIAM FARISH

41

1              Jeff?

2                   A.  I think it's both of us agreeing that that was

3        the right thing to do.

4                   Q.  To try to defeat ambient levels; is that

5    10:12    correct?

6                   A.  Yes.

7                   Q.  Then look at the last sentence which ends with

8        a question.  Please read that into the record.

9                   A.  "How is Fleetwood (and other builders) going to

10   10:12    conform (or resist) the new California requirements for

11       formaldehyde?"

12                  Q.  And that, again, would have been just a

13       discussion or colloquy that would have occurred between

14       the two of you?

15   10:12         A.  I think -- this is separated.  So I have a

16       feeling this is a note to myself.

17                  Q.  Because there's some space?

18                  A.  There's a break.  And it's strictly Fleetwood

19       related.  So I think that's more of what it was about.

20   10:12         Q.  So that was you, your view as the Fleetwood

21       director of engineering.  And I quote, "How is Fleetwood

22       (and other buildings) going to conform (or resist) the

23       new California requirements for formaldehyde"; correct?

24                  A.  Yes.

25   10:13         Q.  Now, what is your expertise when it comes to

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

42

1    the issue of ambient levels, be it of formaldehyde or

2    any other type of material that might be emitted into a

3    structure such as a travel trailer or manufactured home?

4           A.   I have very little expertise in that.   I had a

5  10:13   mechanical engineer on my staff that I would rely on for

6    those type of issues.

7           Q.   And who was that mechanical engineer?

8           A.   Robert Garcia.

9           Q.   Robert Garcia?

10 10:14   A.   Yes.

11          Q.   G-A-R-C-I-A?

12          A.   Yes.

13          Q.   And where is Mr. Garcia these days, if you

14   know?

15 10:14   A.   He is now with Cavco that bought what was part

16   of Fleetwood, Fleetwood housing.   So he is actually

17   still in Riverside.

18          Q.   And what is your understanding of what

19   Mr. Garcia's knowledge was when it came to dealing with

20 10:14   issues pertaining to ambient levels of formaldehyde?

21          A.   Well, he was -- after this subject came up, the

22   CDC testing, he was trying to find out more about test

23   protocols, acceptable levels, and all of those issues.

24          Q.   But do you know what expertise he had when it

25 10:15   came to formaldehyde and its properties, meaning whether

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

43

1       it was an irritant, whether it was a carcinogenic, or

2       anything like that?

3              A.  No.  That was beyond us, the medical side of

4       it.  We were just trying to, as engineers, find out how

5  10:15  to test for it, find out what levels we had if we had

6       anything to concern.

7              Q.  Let me ask you this:  Why, if you did not have

8       the background and Mr. Garcia did not have the

9       background, specifically the chemical, epidemiological,

10  10:15  or other background necessary to address issues of

11       formaldehyde, were you of the opinion that the industry

12       will have to try to defeat ambient levels?  What was

13       your basis for that?

14              A.  Very good question.

15  10:16     It was strictly on the difficulty of this protocol.

16       And it was strictly on that we knew there were so many

17       variables that you could not get a really truly

18       controlled test.

19              As engineers we were frustrated by that.  We knew

20  10:16  you were trying to test inside of a box that comes in

21       different sizes, all different types of materials.

22       There were too many variables.  You could not get

23       consistent readings.

24              You could probably test two houses side by side and

25  10:16  get wildly varying reasons, we thought.  But we knew the

44



1       chamber test, where you test the materials that HUD

2       required, we knew that was a very good test, very

3       stable.  You got consistent results.  And we knew that

4       was a much better way.

5   10:16       That's what we were meaning.  We wanted to make

6       sure that if FEMA came out with any kind of standard for

7       the homes, they had product standards, not ambient air

8       standards.

9            Q.  Do you know whether or not the off-gassing of

10  10:17  formaldehyde varies -- and I'm talking about the

11       products that go into a travel trailer -- also vary from

12       let's say depending on the amount of time the product

13       had been in a plant or what the product is exposed to or

14       not exposed to?  Are you aware of that?

15  10:17       A.  I don't have expertise in that area, but I

16       have -- the general knowledge is that that should vary

17       some, yes.

18            Q.  Now, when this discussion took place, did you

19       attempt to contact anyone to determine whether or not --

20  10:17  instead of trying to defeat ambient levels whether or

21       not they could come up with a protocol that would give

22       you an appropriate reading, for instance, in a travel

23       trailer?

24            A.  No.  We did not pursue that aspect.

25  10:18       Q.  Did you ever hear anyone within the travel

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.   November 4, 2009                    WILLIAM FARISH

45



1    trailer division say that they were attempting to pursue

2    that aspect?

3         A.  No.  I never heard that.

4         Q.  I'm going to label this document and offer it

5    10:18   to be filed into evidence as Farish Number 5, and that

6    is the two-page document 00000998 and -999, both sides.

7         Sir, as an engineer with expertise in manufactured

8    housing, what do you know about the ventilation and the

9    importance of ventilation?

10   10:19   A.  Well, first and foremost I know we have code

11   requirements for ventilation that we have to comply with

12   in our designs.

13        And I know air quality is obviously -- it is a

14   desired effect in the living unit.  You want to have

15   10:19   good air quality.

16        Q.  And why does one have to want good air quality

17   in a living unit?

18        A.  The most obvious reason I think is because the

19   way people live generates undesirable air quality:

20   10:20   Cooking, smoking, other aspects add things to the air

21   and you want to disperse those.

22        Q.  You want to disperse the bad elements, if you

23   will, that are within a particular structure; correct?

24   And that's for health reasons?

25   10:20   A.  Generally.

46

1       Q.   Do windows help ventilation?

2       A.   Yes.

3       Q.   And why and how do windows help and affect

4   ventilation?

5   10:20   A.   They give you a chance to exchange outdoor

6   supposedly fresh air with the indoor air.

7       Q.   And that is a concept that you do not quarrel

8   with?

9       A.   Well, again, part of my expertise would be the

10  10:21   fact that that's mandated in the codes.  Every window

11  has a ventilation value when it's opened, and we have to

12  make sure each room has a certain amount of ventilation.

13  That's a code item.

14      Q.   Let's assume that's not a code item.

15  10:21   A.   Okay.

16      Q.   Is it not important, though, just from an

17  engineering point of view, if you want to have good

18  ventilation to have things such as windows, if you will?

19      I know that sounds simplistic, but is that a fair

20  10:21   statement?

21      A.   I wouldn't want to be selling homes without

22  windows.  Yes, I think that would be a tough market.

23      Q.   Besides the aesthetic reason, the obvious one

24  you mentioned earlier which is the health reason;

25  10:21   correct?

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.   November 4, 2009                    WILLIAM FARISH

47

1        A.  Well, there's -- light ventilation is one of

2   their primary uses, yes.

3        Q.  What do you understand by the term "proper

4   ventilation"?  Is that an engineering term?

5   10:22        A.  I would think -- if I use it as engineer, I'd

6   mean complying to some code or standard when I say

7   "proper."

8        Q.  Now, how does that differ from "adequate

9   ventilation"?

10  10:22        A.  It depends on how it was used, who was saying

11  it, how they were using it.  I wouldn't want to split

12  hairs on that.

13        Q.  Assume for a moment that a document reads, and

14  I'll quote, "This product is manufactured with

15  10:23  urea-formaldehyde resin.  Formaldehyde vapor may in some

16  people cause headaches, eye, nose, and throat

17  irritation, and aggravation of allergies and respiratory

18  problems, such as asthma.  Proper ventilation should

19  reduce the risk of such problems."  [EXH-6]

20  10:23        As an engineer, what does that tell you, proper

21  ventilation?

22        A.  It doesn't quantify.  So as an engineer I would

23  be frustrated with that.  But it does say you should

24  have ventilation.  It does say you should have some

25  10:23  ventilation definitely.

48

1          Q.  I'm going to read to you yet another statement.

2          "This product contains a urea-formaldehyde resin

3     and may release formaldehyde vapors in low

4     concentrations.  Formaldehyde can be irritating to the

5  10:23  eyes and upper respiratory system of especially

6     susceptible persons such as those with allergies or

7     respiratory ailments.  Use with adequate ventilation."

8          Now, as an engineer, what does that tell you or

9     does that also frustrate you?

10  10:24   A.  Well, not necessarily.  I mean, I wouldn't want

11    to -- that's a general statement, a warning statement

12    that sounds like it would be for the occupant.  I

13    wouldn't want to be giving them air changes per hour

14    that they wouldn't know what that meant.

15  10:24   So obviously I think either way you're saying, to

16    the consumer I assume, that you need ventilation that

17    gets rid of whatever is aggravating; if you show these

18    symptoms, you should have more ventilation obviously.

19          Q.  But do you know -- how do you quantify that?

20  10:24   A.  No.  You can't quantify from that, of course

21    not.

22          Q.  Now, going back to the beginning sentence of

23    the first statement that I read to you, "This product is

24    manufactured with urea-formaldehyde resin," does that

25  10:25  tell you as an engineer what the quantity of that

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

49

1          urea-formaldehyde resin is?

2              A.  Obviously not.

3              Q.  The next paragraph that I read to you, and I

4      will read to you the first sentence of that one, "This

5  10:25  product contains a urea-formaldehyde resin.  It may

6      release formaldehyde vapors in low concentrations," what

7      does that tell you as an engineer?

8              A.  That there's urea-formaldehyde products that

9      may emit formaldehyde.

10 10:25      Q.  Can you tell me what level?

11             A.  No, not from that.

12             Q.  In connection with the witness' testimony, I'm

13     going to offer and produce and file into evidence as

14     Farish Number 6, Fleetwood 00012455.

15 10:26      MS. DALY:  Which is --

16             MR. BENCOMO:  Which is --

17             MS. DALY:  -- the travel trailer thing?

18             MR. BENCOMO:  Yes.

19             MS. DALY:  You're not having him identify that.

20 10:26  That's just what you were reading to him from, correct,

21     a moment ago?

22             MR. BENCOMO:  Okay.

23             I'll be happy to see if -- I think I got what I

24     need.  But let's see if he's seen this document before.

25 10:26      MS. DALY:  But just for the record, what you were

50

1       reading from a moment ago is Exhibit 6.

2            MR. BENCOMO:  That's correct.

3            Q.  Mr. Farish, have you ever seen this document

4       before?

5   10:26     A.  I believe.  I believe this is -- I believe I

6       have, yes.

7            Q.  And when is the first time you saw that

8       document?

9            A.  Preparing for the previous deposition for this.

10  10:26     Q.  Prior to the previous deposition, had you ever

11      seen that document before?

12           A.  Not this exact doc, no.

13           Q.  When you say not this exact document, have you

14      seen other documents similar to that one?

15  10:27     A.  Well, in manufactured housing we have a

16      formaldehyde warning dictated by the regulations, and it

17      has some similar wording.  It's not as lengthy as that,

18      but also it has to have larger letters.  The print has

19      to be larger.

20  10:27     Q.  Yeah.  Let me ask you about that.  Maybe I will

21      ask you a couple little questions about the HUD code.

22           Is there anything in that code that talks about the

23      print, the letters you were just referring to, that have

24      to be larger?

25  10:28     A.  I think so.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS V.    November 4, 2009                    WILLIAM FARISH

51

1      Q.   Do you mind looking for that, please?

2          A.   You promised me, on the record.   I want to

3      know.

4          Q.   You know what, it was almost a promise.   But

5  10:28  you did what is known as opening the door.

6          A.   Could we read back?   Let's see the exact

7      wording.   Never mind.

8          Yes.   It's 3280.309(a).

9          Q.   Now, you are familiar with that?

10  10:28  A.   Yes.

11          Q.   And where does that come from?   What is the

12      actual book?   Give us the title.

13          A.   I'm sorry.   Well, it's officially The

14      Manufactured Home Construction and Safety Standards, 24

15  10:28  CFR, Part 3280.

16          Q.   And then the applicable part that deals with

17      the warning and the letters that you were referring to.

18          A.   3280.309(b) says, "The Notice shall be legible

19      and typed using letters at least one-quarter inch in

20  10:29  size.   The title shall be typed using letters at least

21      three-quarter inch in size."   [EXH-7]

22          Q.   In connection with the witness' testimony,

23      we're going to offer to produce and file into evidence

24      specifically as Fleetwood Number 7, the front page of

25  10:29  24 CFR 3280 and -- where did you just read from?

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210