Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION

IN RE:   FEMA TRAILER

FORMALDEHYDE PRODUCT

LIABILITY LITIGATION

                      MDL NO. 1873

   vs.

                      SECTION "N-5"

                      JUDGE ENGELHARDT

                      MAG. JUDGE CHASEZ

ORAL AND VIDEOTAPED DEPOSITION OF

JOSEPH D. LITTLE

June 23, 2009

9:25 a.m.

201 17th Street

Suite 1700

Atlanta, Georgia

Maureen S. Kreimer, RPR, CCR-B-1379

```
 1         Q.    And what were you particularly tasked to
 2   do in this conference call?
 3         A.    Nothing, just to listen.  It was a
 4   heads-up call.
 5         Q.    When you say heads-up call, what does that
 6   mean?  Is it just informational?
 7         A.    It was informational, that there may be
 8   more activities later.
 9         Q.    Particularly, what information was Sam
10   Coleman and Rick Preston conveying to you?
11               MR. MILLER:  Objection, vague.  Compound.
12         A.    I remember they mentioned that Sierra Club
13   had made the accusation that an elderly gentleman had
14   died in a trailer from formaldehyde, that -- I
15   remember them mentioning there was some sampling that
16   was done by Sierra Club that they didn't have any of
17   the data for, and they mentioned a lawsuit.
18   BY MR. WOODS:
19         Q.    During this conference call, is this the
20   first that you ever heard of the issue of
21   formaldehyde in travel trailers?
22         A.    Yes.
23         Q.    At that time, or during that conference
24   call, did you raise any concerns about the health
25   concerns, or effects of formaldehyde on individual
```

1    A.   I think Mark Keim was out of the country,
2 Mike Allred was in charge of that office.
3    Q.   Okay.  And you received a copy, I see
4 you're cc'd on this; you received a copy of this
5 letter?
6    A.   Yes, absolutely.
7         (Exhibit 7 marked.)
8 BY MR. WOODS:
9    Q.   Commander, what I have just handed you
10 we're marking as Joe Little Exhibit No. 7 is a
11 memorandum from the U. S. House of Representatives
12 Committee on Science and Technology.
13         Have you ever seen this document before?
14    A.   I have heard of it.
15    Q.   Weren't you, in fact, interviewed as a
16 part of the Committee on Science and Technology's
17 investigation?
18    A.   Yes, I was interviewed.
19    Q.   And that majority staff report is entitled
20 Toxic Trailers - Toxic Lethargy:  How the Centers for
21 Disease Control and Prevention has Failed to Protect
22 the Public Health.  And it's dated September 22,
23 2008.
24         MR. MILLER:  Counsel, was that a question,
25 or do you want him to read it?

```
 1              MR. WOODS:  No, just identifying it.
 2      BY MR. WOODS:
 3          Q.   And without going to great detail at this
 4      point, but it's your understanding that the committee
 5      was pretty critical of the ATSDR and the Health
 6      Consultation study that resulted; correct?
 7              MR. MILLER:  Object, foundation.  The
 8      witness indicated he hasn't seen this, he had only
 9      heard of it.
10              MR. WOODS:  He had heard of it.
11      BY MR. WOODS:
12          Q.   But what you had heard of it, what is your
13      understanding of this?
14          A.   My understanding is it was -- "toxic
15      trailers, toxic lethargy" implies negative, so...
16          Q.   Well, what have you heard about this
17      investigation, or report?
18              MR. MILLER:  Objection, compound.  Vague,
19      narrative.
20          A.   That it was not complimentary.
21      BY MR. WOODS:
22          Q.   Well, I'll read -- if you'll turn to
23      page 2 of the report, and the first section, the last
24      sentence, it reads:  The consultation -- they are
25      talking about the Health Study consultation, if
```

1    issue?

2        A.    Well, we were involved because of a

3    mission assignment under the Federal Response Plan as

4    part of the Hurricane Katrina emergency.  This whole

5    thing was a mission assignment from FEMA.

6        Q.    I guess my question is then how would it

7    come about what authority is given, or where could we

8    look to find the authority that was given for

9    governmental agencies and ATSDR to be requested to

10   perform the work that you did?

11       A.    It's part of the Federal Response Plan,

12   the plan was activated.

13       Q.    Okay.  And I would assume that's some sort

14   of Congressionally mandated, or approved plan?

15       A.    Yes.

16       Q.    Would you turn quickly to page 19 of the

17   report.  It begins at Section B.  It says "Dr. DeRosa

18   raises red flags."  Are you there?

19             Second paragraph begins:  Dr. DeRosa

20   called Scott Wright and Joe Little into his office to

21   discuss the health consultation, his concerns, and

22   questioned why he was not aware that it was being

23   prepared.  He followed up that same day with an

24   e-mail to Dr. Sinks and Dr. Frumkin in which he

25   included a draft letter he had written to Rick

1   Preston pointing out the significant flaws and
2   omissions in the February 1 health consultation on
3   formaldehyde.
4           Is the reason Dr. DeRosa was not aware of
5   the health consultation was because he was not a part
6   of the emergency situation Federal Response Plan
7   organization?
8           MR. MILLER:  Objection.  Assumes facts not
9   in evidence.
10      A.  Dr. DeRosa was provided copies of the
11  weekly reports so he had access to knowledge about
12  this project, what was going on.
13          Dr. DeRosa did not normally participate in
14  any emergency type of activity, so he was not
15  involved in any aspect of the hurricane response, or
16  really any of the emergency response activities.
17  BY MR. WOODS:
18      Q.  But you're testifying that he was aware
19  that the project was ongoing?
20      A.  He was -- the weekly reports were provided
21  to him; whether he read them or not, I can't say.
22      Q.  And the weekly reports were in what
23  format, were they e-mails, or memos?
24      A.  They were e-mail, and they were the weekly
25  activities of the section put forward by the duty

```
 1    officer of that week.
 2        Q.   Were you aware that Dr. DeRosa had serious
 3    concerns about the Health Consultation Report?
 4        A.   I saw a letter he had written, a copy of a
 5    letter he had written, yes.
 6        Q.   Are you talking about the letter that was
 7    directed to Rick Preston, FEMA's General Counsel in
 8    FEMA's Office of General Counsel?
 9        A.   I believe so.
10        Q.   Let me ask you this question about the
11    Health Consultation Report.  When it was drafted in
12    '07, do you know whom else at FEMA received a copy of
13    the report?
14        A.   No, I don't know.
15        Q.   All you know is that Rick Preston
16    definitely received a copy?
17        A.   Yes, it was sent to Rick Preston.
18        Q.   You don't know who he forwarded it to --
19        A.   No.
20        Q.   -- after that?  If you turn to page 21.
21    The last paragraph that begins "Dr. Sinks", do you
22    see that paragraph?
23        A.   Yes.
24        Q.   And if you'd go down to the fifth line in
25    the sentence that begins, "in fact".  Do you see
```

```
 1    video record.
 2                        EXAMINATION
 3    BY MR. WEINSTOCK:
 4         Q.    Commander, my name is Andy Weinstock.  I
 5    represent Gulf Stream Coach.  We're going to cover a
 6    little ground you've already covered today, and it's
 7    going to be a little unusual, but because your
 8    deposition may be used at a later time without you
 9    being there, I'm going to ask you to reintroduce
10    yourself for the record.  What is your full name?
11         A.    Commander Joseph D. Little.
12         Q.    And where are you employed, sir?
13         A.    National Institute for Occupational Safety
14    and Health.
15         Q.    And how long have you been there?
16         A.    A year-and-a-half, since January of 2008.
17         Q.    Where were you before that time?
18         A.    With ATSDR.
19         Q.    ATSDR.  We hear those initials all the
20    time.  What does that stand for?
21         A.    Agency for Toxic Substances and Disease
22    Registry.
23         Q.    What did you do at ATSDR?
24         A.    I was an emergency response coordinator.
25         Q.    What does an emergency response
```

1       A.   Yes, this was -- I believe this was from
2   the tox profile.
3       Q.   Now, if we can go to the next paragraph.
4   Bronchial narrowing may begin -- I'm sorry.  Some
5   sensitive individuals may experience asthma-like
6   symptoms and dermatitis even at low -- very low
7   doses; correct?
8       A.   Yes.
9       Q.   Previously sensitized individuals can
10  develop severe narrowing of the bronchi at very low
11  concentrations such as .3 ppm?
12      A.   Yes.
13      Q.   And that was your definition, I mean,
14  that's what you saw as a very low level, .3 ppm?
15      A.   Yes.
16      Q.   Or 300 parts-per-million?
17      A.   300 parts-per-billion.
18      Q.   Per-billion.  I'm sorry.
19  50 parts-per-billion would be ridiculously low?
20      A.   It's much lower.
21      Q.   You then go on to state that the threshold
22  limit value short-term exposure limit recommended by
23  the American Conference of Government Industrial
24  Hygienists is also .3 ppm?
25      A.   Yes.  I believe they looked at -- may have