Exhibit A

```
                                                                    Page 1
  1               UNITED STATES DISTRICT COURT

  2                  DISTRICT OF LOUISIANA

  3                   NEW ORLEANS DIVISION

  4   In Re:  FEMA Trailer    )

  5   Formaldehyde Products  ) MDL No. 1873

  6   Liability Litigation   )

  7

  8                              Washington, D.C.

  9                              Tuesday, July 14, 2009

 10   Videotape Deposition of MARTIN EDWARD McNEESE, called

 11   for examination by counsel for Plaintiffs in the

 12   above-entitled matter, the witness being duly sworn

 13   by CHERYL A. LORD, a Notary Public in and for the

 14   District of Columbia, taken at the offices of NELSON

 15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

 16   Avenue N.W., Suite 900, Washington, D.C., at

 17   9:03 a.m., and the proceedings being taken down by

 18   Stenotype by CHERYL A. LORD, RPR, CRR.

 19

 20

 21

 22
```

Martin Edward McNeese                                July 14, 2009
                    Washington, DC

Page 54

1   to generate a new series of issues?

2           MR. MILLER:  Objection, argumentative.

3           Go ahead.

4       A.  We wanted to provide the information that

5   the travel trailers had formaldehyde in them, that's

6   correct.

7           MS. GILBREATH:  We're going to change the

8   tape.

9           THE VIDEOGRAPHER:  This ends tape number 1

10  in the video deposition of Martin McNeese.  The time

11  on the video is 10:08 AM.  We are off the record.

12          (Recess.)

13          THE VIDEOGRAPHER:  This begins tape number

14  2 in the video deposition of Martin McNeese.  The

15  time on the video is 10:22 AM.  We are on the record.

16          BY MS. GILBREATH:

17      Q.  Mr. McNeese, I'm going to hand you what

18  has been previously marked exhibit McNeese 4.

19                  (McNeese Exhibit No. 4

20                  was marked for

21                  identification.)

22          BY MS. GILBREATH:

Page 55

```
 1      Q.    First I want to direct your attention to
 2   the bottom-most email. It's from a Gail Haubrich to
 3   a Tracy Haynes dated July 11th, 2006.
 4            Who is Gail Haubrich?
 5      A.    Gail Haubrich is an employee of FEMA. At
 6   this time frame when she wrote this, she was based --
 7   assigned temporarily to the Louisiana New Orleans
 8   transition recovery office.
 9      Q.    And Tracy Haynes at this time, was he
10   still in a temporary field office?
11            Do I have that right?
12      A.    At this time frame, he would have still
13   been the acting individual branch director in New
14   Orleans and the Louisiana transition recovery office.
15      Q.    Now, Mr. McNeese, you are not cc'ed on
16   this email; is that correct?
17      A.    That's correct.
18      Q.    And in the first paragraph, it states:
19   Also present are Sam Coleman, Dana Tulis, and Ron
20   Crossland of EPA, Rick Preston of FEMA OGC, David
21   Chawaga of FEMA safety, and someone from CDC.
22            You're also not listed as participating in
```

```
                                                              Page 56
 1   this phone call; is that correct?
 2        A.    That's correct.
 3        Q.    As this email is entitled, summary of EPA
 4   conference call, would this have been considered one
 5   of the biweekly conference calls relating to the EPA
 6   testing of the travel trailers?
 7        A.    I wouldn't know that.  I wasn't involved
 8   until some period after this.
 9        Q.    You were not involved with the EPA testing
10   of units until after July 11th, 2006?
11        A.    I would assume so.  That's somewhere about
12   the time I arrived down in New Orleans.
13        Q.    So it's safe to say, then, that
14   discussions were being had concerning the EPA testing
15   prior to your arrival in -- in Louisiana?
16        A.    That's correct.
17        Q.    Above, however, it shows that you were
18   forwarded this summary of a conference call on July
19   21st, 2006.
20              Do you see that?
21        A.    I do see that.
22        Q.    Do you remember reading this email?
```

Martin Edward McNeese                                              July 14, 2009
                        Washington, DC

Page 57

1     A.    I don't remember it, but I'm sure I did.
2     Q.    In the first paragraph, prior to where
3  quoted earlier it states:  Doug Nagle and I listened
4  in on the EPA conference call today.  Although it was
5  supposed to be a technical recall, the discussion was
6  more strategic in nature.
7           In reading this email, what did you -- or
8  do you believe that "strategic in nature" meant?
9     A.    I don't know.  I only took it for what it
10 said in the email.
11    Q.    What do you mean when you say you took it
12 for what it said in the email?
13    A.    I didn't interpret -- I don't remember
14 trying to interpret this email.
15    Q.    Okay.  The second paragraph states:  Sam
16 and Dana preferenced the call -- prefaced the call by
17 saying that they had done some preliminary research
18 to establish a health base level for formaldehyde,
19 and it appears that it will be much lower than we
20 suspected.  The 14-day exposure maximum may be .03
21 PPM, and the 1-year level may top out at .008 PPM.
22 The levels we find after testing may well be more

Martin Edward McNeese                                         July 14, 2009
                        Washington, DC

Page 58

1    than a hundred times higher than the health base
2    level.
3              This initial email -- this email sent in
4    July of 2006 quoting a .03 PPM and a 1-year level at
5    .008 PPM, that's dramatically different than the
6    level of concern used by ATSDR.
7              Don't you agree?
8              MS. PETROVICH:  Object to the form.
9         A.   It -- I -- it is, yes.
10             BY MS. GILBREATH:
11        Q.   The next sentence states:  Sam and Dana
12   again expressed concern with regard to the
13   advisability of testing at all and said they will do
14   the same on Thursday's call.
15             And I know you said previously that you
16   were not involved -- or you don't believe you were
17   involved prior -- when this email was sent.
18             Did you ever understand EPA, though, to
19   have expressed concerns with regard of testing at
20   all?
21        A.   Did I ever have EPA express a concern,
22   yes.

```
                                                      Page 62
 1    though it would feed to them.
 2              So I don't remember specifically remember
 3    what their agendas were at that point.
 4       Q.     Who is Bronson Brown?
 5       A.     Bronson Brown was with FEMA safety.
 6       Q.     And he was concerned about the OSHA
 7    testing levels or the OSHA --
 8       A.     I don't remember.  That's his primary
 9    responsibility, is implementing the OSHA guidelines.
10                   (McNeese Exhibit No. 6
11                    was marked for
12                    identification.)
13              BY MS. GILBREATH:
14       Q.     I'm now handing you what's been premarked
15    McNeese exhibit 6, which appears to be an email
16    string that begins with an email from David Phillips
17    to Gail Haubrich concerning a formaldehyde unit.
18              Who is David Phillips?
19       A.     David Phillips was the head -- I don't
20    remember a specific title -- of the Lake Charles area
21    office in Louisiana.
22       Q.     In this email, he states towards the
```

Page 63

1    bottom: Once deactivated, we will mark the unit as
2    nonhabitable and ship to BR staging area.
3               Do you see --
4        A.     I see that.
5        Q.     Further up, it shows that you were
6    forwarded this email from David -- or no -- from Gail
7    Haubrich on August 30th, 2006.
8               Do you see that right above it?
9        A.     Yes.
10       Q.     On August 30th -- later on August 30th,
11   2006, you responded in an email to David Phillips
12   that stated -- the third line down -- I am very
13   concerned that you are recommending a level of
14   habitability for the units when no other federal
15   agency has set a threshold for residential
16   formaldehyde levels.
17              Do you see where I am?
18       A.     I see that.
19       Q.     How did you interpret that he was
20   recommending a level of habitability from his
21   previous email?
22       A.     Well, because he actually said that -- in

Martin Edward McNeese                                      July 14, 2009
                        Washington, DC

Page 64

```
 1   this part you read before, once deactivated, we mark
 2   the unit as nonhabitable.  And that's not his job, to
 3   determine habitability or not habitability.
 4        Q.    The unit in reference that he says he will
 5   mark as nonhabitable, it was one that had been found
 6   with his, quote, excessively high levels of
 7   formaldehyde; is that correct?
 8        A.    That's what he's quoting.
 9        Q.    So are you taking the position, then, that
10   a travel trailer with as he states an excessively
11   high level of formaldehyde, he could not determine
12   that that was nonhabitable?
13        A.    I'm not taking that position.
14              I'm just saying, that's not his job, to
15   determine nonhabitable.  It's his job to report
16   the -- that there are high levels of formaldehyde,
17   report the findings, let it -- take it back to Baton
18   Rouge, because his report doesn't actually list what
19   the OSHA level of determination was.
20              This was just an attempt to get him to
21   stay in his lane.
22        Q.    Was there ever a travel trailer that was
```

Page 65

1   tested with high levels of formaldehyde that was ever
2   deemed habitable?
3        A.   I'm not aware of any.
4        Q.   So it was merely his determination that
5   the unit was nonhabitable that you were correcting?
6        A.   Merely -- not "merely," but in addition
7   to -- I mean, it's not his role to determine
8   habitability of the unit.
9             He had direct housing operations people.
10  We have unit specialists.  We have logistics.  It's
11  to identify the unit and send it back.  The,
12  quote-unquote, nonhabitable is -- is just an arena
13  that he should not be playing in.
14            Taking people out of trailers that are not
15  safe, that he can do.  Determining the condition of
16  the unit is really something that needs to be done by
17  experts.
18       Q.   Mr. McNeese, if we could go back to
19  exhibit McNeese 5.
20       A.   Okay.
21       Q.   The email from you to Kevin Souza.
22            At the bottom, it says:  I hope you are