Exhibit A

```
             UNITED STATES DISTRICT COURT

              EASTERN DISTRICT OF LOUISIANA

                  NEW ORLEANS DIVISION

IN RE:  FEMA TRAILER

FORMALDEHYDE PRODUCT

LIABILITY LITIGATION

                               MDL NO. 1873

                               SECTION "N-5"

                               JUDGE ENGELHARDT

                               MAG. JUDGE CHASEZ

         ORAL AND VIDEOTAPED DEPOSITION OF

         CHRISTOPHER T. DE ROSA M.S., Ph.D.

                   July 6, 2009

                     9:25 a.m.

                  201 17th Street

                    Suite 1700

                  Atlanta, Georgia

         Maureen S. Kreimer, RPR, CCR-B-1379
```

```
 1     dealing with exposure levels and reported adverse
 2     effects?
 3              MR. WEINSTOCK:  Objection, leading.
 4        A.    The --
 5              MR. MILLER:  Hold on, Doctor --
 6        A.    -- comment I would --
 7              MR. MILLER: -- I'll object.  Objection.
 8     Beyond the scope of what this witness's duties and
 9     responsibilities and what actions he took during his
10     employment at the CDC ATSDR.  Go ahead.  I'm sorry.
11        A.    During the deliberations and discussions
12     regarding the health issues associated with
13     formaldehyde, I made it clear that there was a
14     growing body of information that there could be
15     reproductive developmental outcomes associated with
16     exposure to formaldehyde.
17              Again, this is based on more recent
18     understandings, insights, regarding the mechanism of
19     action about stem cells circulating through the
20     nasopharyngeal passages, that although formaldehyde
21     only has a half-life of about a minute to a
22     minute-and-a-half in the body, that it is so highly
23     reactive that it can cause cross-links within the DNA
24     strands, methylation of the DNA strands, that then
25     become permanent within that stem cell, which can
```

```
 1     then be transported to the fetus.  And that is the
 2     basis on which most theories of not only the
 3     reproductive developmental effects of formaldehyde is
 4     based, but also the leukemia sometimes reported as a
 5     result of exposure to formaldehyde.
 6     BY MR. MEUNIER:
 7         Q.    And that statement that you've just given,
 8     Doctor, is based upon your years of experience, as
 9     well as your education and training in the field of
10     environmental health science; correct?
11         A.    Yes.  And also the fact that as the issue
12     became increasingly evident, I attempted to review
13     the literature that was available.  I provided to my
14     counsel the article by Thrasher and Kilburn, which
15     was an authoritative review of the extant literature
16     at the time, and a statement regarding the mechanism
17     of action that I just relayed to you.
18         Q.    When, then, you reviewed this Tab A,
19     although you indicated you may not have reviewed it
20     in advance of it being sent with this letter to
21     Congress, you did review it at some point in time;
22     correct?
23         A.    Yes, I did.
24         Q.    Did you have any issues, or disagreement,
25     with anything set forth in the content of this
```

```
 1        Q.    Let me turn now to another part of this
 2   Majority Staff Report, which is at De Rosa 34.
 3              And there is reference in the last full
 4   paragraph to a ATSDR industrial hygienist by the name
 5   of Lynn Wilder.  Do you know Ms. Wilder?
 6        A.    I do.
 7        Q.    Were you aware in early August of '07, she
 8   also outlined her concerns about the Health
 9   Consultation in an e-mail after seeing it for the
10   first time?
11        A.    I was not.
12        Q.    Do you see where this report references
13   her criticism of the .3 ppm reference used in that
14   analysis?
15              MR. WEINSTOCK:  Object to the form.
16              MR. MILLER:  Objection, foundation.
17        A.    I don't see --
18   BY MR. MEUNIER:
19        Q.    Well, let me reference exactly what I'm
20   speaking of.  About the middle of the paragraph the
21   quote from Ms. Wilder is "even with the doors and
22   windows open, formaldehyde levels exceed all three
23   ATSDR MRLs", minimum risk levels, "NIOSH, OSHA, and
24   other standards.  I'm extremely concerned that we
25   have compared the air sampling results with an
```

```
 1    occupational exposure level of 300 parts per billion
 2    .3 ppm.  Residents are exposed up to 24 hours a day
 3    and may reside in these homes for years.  This
 4    exposure should not be compared to a 15-minute
 5    occupational value."  I mean --
 6              MR. WEINSTOCK:  Object to the form.
 7    BY MR. MEUNIER:
 8         Q.   -- referring you to that, my question is
 9    do you share Ms. Wilder's concerns about the analysis
10    being referenced to a .3 ppm for the reason she
11    mentioned?
12              MR. WEINSTOCK:  Object to the form.
13    Sorry.  I object to the form of the question.
14         A.   I feel as --
15              MR. MEUNIER:  Let the objection be made
16    first, Dr. De Rosa.
17              THE WITNESS:  Okay.
18              MR. WEINSTOCK:  I object to the form of
19    the question.  There is no foundation.  Ms. Wilder's
20    statement, at best, is a hearsay statement, and most
21    importantly of all, it has absolutely no relevance to
22    the Alexander case.  With that, you can proceed,
23    Doctor.
24              MR. MILLER:  My objection is that you're
25    asking the witness to testify regarding matters that
```

1  he didn't do in his official capacity while he was
2  working at the ATSDR, asking expert testimony, not
3  fact testimony.
4  BY MR. MEUNIER:
5       Q.   So --
6       A.   Yeah.  I totally agree with the statements
7  that are made here that .3 was an inappropriate value
8  to use.  I don't think there is any question about
9  that.  And that I also recall even some reports from
10 FEMA correspondence indicating that people at FEMA
11 felt that the value would be challenged because it
12 was so high.
13           I believe some expert testimony given
14 before Congress in the Waxman Committee also said
15 that this was a breach of professional -- the code of
16 professional conduct to use such a value.
17           So I think that there is general agreement
18 that this is a indefensible level to have been used.
19 BY MR. MEUNIER:
20      Q.   Do you know who Vincent Garry is?
21      A.   No, I don't believe so.  I may have heard
22 the name, but I don't attach any...
23      Q.   Environmental Medicine Director at the
24 University of Minnesota.
25      A.   Oh, yeah.  He was one of the peer

```
 1             (Exhibit-10 was marked.)
 2     BY MR. MEUNIER
 3        Q.    I want to refer you now, Dr. De Rosa, to
 4     Bates number 92.  And, in particular, to your e-mail
 5     of July 25th, '07, to Mike McGeehin, and others,
 6     including Frumkin and Sinks.
 7        A.    Yes.
 8        Q.    Was this e-mail, and you refer in it to
 9     sampling data provided by FEMA, is that again the
10     data dealing with the 96 unoccupied units?
11        A.    That's correct.
12        Q.    And you state that you were asking what is
13     being done to properly inform the inhabitants about
14     the health effects of formaldehyde; correct?
15        A.    That's correct.
16        Q.    And you say:  I have seen no mention of
17     reproductive, developmental hazards in materials
18     distributed to the residents?
19        A.    Correct.
20        Q.    Now, what materials being distributed to
21     residents were you referring to?
22        A.    I just saw the -- some of the materials
23     that I don't recall exactly what they were, I think
24     they were FEMA flyers that I had seen on e-mail or
25     perhaps in other media.  I just don't recall where I
```

1      saw that.

2          Q.    But the material that you had looked at

3      purporting to communicate to residents in the units

4      you felt failed to mention all of the things that

5      needed mentioning with respect to formaldehyde risks?

6          A.    That's correct.

7          Q.    If you'd turn to the next Bates numbered

8      page, 93.

9          A.    Yes.

10         Q.    On July 24 you had done an e-mail blast to

11     a number of people in which you state that you were

12     concerned that the reported clinical signs are the

13     harbinger of an impending public health disaster.

14         A.    Correct.

15         Q.    Why did you say that?

16         A.    Because kids were presenting with clinical

17     signs of formaldehyde toxicity.  They were being

18     taken to hospitals.

19              MR. WEINSTOCK:  I'm sorry?

20         A.    They were being taken to hospitals with

21     asthmatic attacks, and then being returned to the

22     environment which caused them.

23     BY MR. MEUNIER:

24         Q.    And you felt more needed to be done to

25     communicate to those families, Dr. De Rosa?

```
 1    their occupancy?
 2         A.    How long were they in there, do you know?
 3         Q.    We know that they were in there for some
 4    period of time.
 5         A.    Some period of time?
 6         Q.    Yes, sir.
 7         A.    Well, weeks would not be chronic, so if
 8    you can't specify the period of time, that's an
 9    issue.
10         Q.    Let's just -- we'll break it down further.
11    Are you aware of any reported exposure in any of
12    those homes, regardless of how short, or regardless
13    of how long, that exceeded four parts per million?
14         A.    I don't believe so.
15         Q.    You were asked earlier this morning a
16    question about an e-mail that you had written that
17    there were clinical signs, and that there was --
18    these clinical signs are a harbinger of a public
19    health disaster.
20               And as I recall your testimony, and I
21    could be wrong, you had reference to the amount of
22    asthma being reported in the children who were
23    occupants of those homes.  Is that what your
24    reference was to?
25         A.    My reference was to children presenting
```

1    with clinical signs of formaldehyde toxicity
2    including bloody noses, coughing of blood; and that's
3    not asthmatic response, bronchial constriction is an
4    asthmatic response.  So it was among a suite of
5    symptoms that were presented --
6        Q.    All right.
7        A.    -- clinically.
8        Q.    Let's talk about asthma specifically.  Are
9    you aware of whether or not the children that
10   presented -- who are occupants of the FEMA trailer,
11   presented at a higher incidence rate than the average
12   inner-city-dwelling child?
13           MR. REICH:  Objection, incomplete
14   hypothetical.
15        A.    And the inclusion criteria for whether or
16   not the residents had a higher rate of asthmatic
17   response before or after Katrina was that they had
18   asthmatic conditions prior to Katrina.
19           So they did not look at children who did
20   not present clinically with asthmatic signs prior to
21   Katrina, which is how you would assess it to whether
22   or not there were asthmatic symptoms induced based on
23   exposures following Katrina.  A fundamentally flawed
24   study.
25        Q.    What study did you have reference to?

1              THE WITNESS:  Thank you, likewise, for

2     your patience and time.

3              MR. WEINSTOCK:  Dennis, if there is any

4     time left for the defense, I have a couple of quick

5     questions.

6              MR. REICH:  What do you want, a couple of

7     minutes?

8              MR. WEINSTOCK:  Yes.  I just have a couple

9     of quick questions.  I'll be very quick.

10             MR. MILLER:  Guys, I'm leaving.  Mark is

11    here.  He can object, we are allowed two people, and

12    he can ask questions if he needs any rebuttal.  Thank

13    you.

14                     FURTHER EXAMINATION

15    BY MR. WEINSTOCK:

16        Q.   Andy Weinstock again.  Doctor, previously

17    you had talked about reports of kids in Mississippi

18    who were being treated at the emergency room;

19    correct?

20        A.   I referenced kids presenting clinical

21    signs in a number of different settings.

22        Q.   Did you review medical records from any of

23    those cases?

24        A.   No, I didn't.

25        Q.   Going back to site-built homes for an

1    and that's the strength of the scientific method is
2    it's self-correcting by virtue of repeated testing.
3         Q.    Can you identify the most recent study
4    that you are referencing with respect to cancer risk
5    from formaldehyde?
6         A.    Yes.  It was the NCI study.  It had a
7    group of high exposed workers versus low exposed
8    workers, and as I mentioned earlier, there was a
9    threefold increase in cancers of the blood,
10   blood-forming tissues, in the high exposed versus the
11   low exposed workers, which address the issue of the
12   healthy worker effect that was associated with the
13   CIIT-sponsored study by industry in which the
14   Formaldehyde Council was instrumental in funding.
15        Q.    During your service as Director of
16   Toxicology and Environmental Medicine at the ATSDR,
17   did you have occasion to provide guidance, or input,
18   or vote, with respect to the cancer classification of
19   formaldehyde either through the NTP program or IARC?
20             MR. HINES:  Object to the form.
21        A.    I did serve on the NTP Review Committee.
22   It was already classified as reasonably anticipated.
23   I did participate in the discussions around
24   formaldehyde with IARC when it was upgrading from --
25   we refer to it as upgraded -- when it was

1    ==reclassified as a known human carcinogen.==

2        Q.   So was it in approximately 2004, or before

3    the announcement was made by IARC that formaldehyde

4    is a human carcinogen, that you had provided some

5    input?

6        A.   Yeah.  In fact, I just saw our group

7    picture from 2005.

8        Q.   Do you want to take a short break?

9             MR. REICH:  Let's go off the record.

10            THE VIDEOGRAPHER:  6:00 p.m., off video

11   record.

12            (Recess from 6:00-6:06 p.m.)

13            THE VIDEOGRAPHER:  6:06 p.m., back on

14   video record.

15   BY MR. REICH:

16       Q.   Dr. De Rosa, before we took a quick break,

17   I believe I was asking you some questions about your

18   input with respect to both the NTP and IARC regarding

19   classification of formaldehyde as either a reasonably

20   anticipated carcinogen, or in the case of IARC what

21   became in 2004 a classification as a known human

22   carcinogen.

23            Can you describe a little bit about your

24   work with respect to those two institutions, or

25   agencies?

```
 1    developmental effects.
 2         Q.   I'm going to try to wrap this up fairly
 3    quickly, because I know the hour is late and people
 4    do want to leave to catch planes.
 5              Did you have any involvement with respect
 6    to the convening of an expert panel in September of
 7    2007 to evaluate health effect issues concerning the
 8    trailer residents?
 9              MR. HINES:  Same objection as being
10    improper.  And let me just put a continuing objection
11    here to improper line of redirect.  Go ahead.
12         A.   No, I had no involvement --
13    BY MR. REICH:
14         Q.   Okay.
15         A.   -- after September 19th, basically.  I did
16    review some aspects of the consultation as it went
17    forward and provided some comment, but my involvement
18    following the September time frame was virtually nil.
19         Q.   Did you develop an understanding as to why
20    a panel of experts was convening in Boulder,
21    Colorado, to discuss health effect issues pertaining
22    to the trailer residents?
23         A.   Did I understand why that was being done?
24         Q.   Yes.
25         A.   I think that there was a desire on the
```

1  Agency to demonstrate that they were moving forward
2  and trying to deal with the science on formaldehyde
3  and the impacts of trailer residents.
4       Q.    By 2007, was it your view that the science
5  on formaldehyde, at least with respect to short term
6  effects, was fairly well established?
7       A.    Yes.
8       Q.    Okay.  And with respect to chronic effects
9  by 2007, was it well-recognized that formaldehyde
10  does present a carcinogenic risk?
11       A.    Yes.
12       Q.    You mentioned in response to Mr. Hines'
13  question that concentration is more important than
14  dose, and you gave a reason for that; correct?
15       A.    I said that depending on the
16  circumstances, concentration can be -- dose can be
17  expressed as a concentration, or a level of exposure
18  expressed as per unit body weight.  And typically in
19  inhalation studies, such as this, concentrations are
20  used parts per million, for example.
21            And that is considered to be the delivered
22  dose, or the administered dose.  There is, you know,
23  several different definitions of dose; one is the
24  administered dose, one is the absorbed dose, and then
25  there is the delivered dose at target tissue.