Exhibit A

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF LOUISIANA

 3                   NEW ORLEANS DIVISION

 4    In Re:  FEMA Trailer    )

 5    Formaldehyde Products  ) MDL No. 1873

 6    Liability Litigation   )

 7

 8                            Washington, D.C.

 9                            Tuesday, July 7, 2009

10    Videotape Deposition of DAVID EDWARD GARRATT, called

11    for examination by counsel for Plaintiffs in the

12    above-entitled matter, the witness being duly sworn

13    by CHERYL A. LORD, a Notary Public in and for the

14    District of Columbia, taken at the offices of NELSON

15    MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16    Avenue N.W., Suite 900, Washington, D.C., at 9:07

17    a.m., and the proceedings being taken down by

18    Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

**7/7/2009  Garratt, David E.**

1        A.      Acting deputy administrator of the Federal

2    Emergency Management Agency.

3        Q.      Could you give us a brief description of

4    what your duties are as acting deputy.

5        A.      Basically to manage the Federal Emergency

6    Management Agency and support the administrator in

7    the management of the agency.

8        Q.      When you say, support that admin -- the

9    administrator, who is currently the administrator?

10       A.      W. Craig Fugate.

11       Q.      And how long have you held your position

12   as acting deputy director?

13       A.      Since January 21st.

14       Q.      Of?

15       A.      2009.

16       Q.      And prior to January 21st, 2009, what was

17   your job title?

18       A.      Deputy assistant administrator of disaster

19   assistance.

20       Q.      And how long did you hold that position?

21       A.      On and off since May of 2005.

22       Q.      And what were your duties involved in that

1    into these units or to include for example smoking,

2    and that was generating those levels.

3         And the only way to make that

4    determination was to test unoccupied units that had

5    never been lived in.  Agreed with him.

6         So again, he -- Mr. Souza was the one who

7    was most engaged with the EPA, and again my awareness

8    of their concerns was through him.

9                   (Garratt Exhibit No. 3

10                   was marked for

11                   identification.)

12         BY MR. WOODS:

13    Q.    Mr. Garratt, what I'm handing you is a

14    document at the top -- it's produced by FEMA counsel.

15    It's Bates-labeled FEMA 17, dash, 002489.  It's also

16    produced as part of the Congressional Record.  It's

17    at the bottom labeled FEMA, dash, Waxman, dash, 2489.

18         And it's not the best copy.  It's sort of

19    grayed-out, but hopefully you can follow along with

20    me on it.

21         If you'd look down, please, sir -- it's a

22    series of emails, email chain.  If you go back to the

**7/7/2009  Garratt, David E.**

```
 1    last page, it appears as if it's beginning from a

 2    Russ Knocke to Edward Buckley, Lauren Isenhour, and

 3    cc'ing Price Roe.

 4              But I want to bring you back forward to

 5    page 2 of 5 of the document.  And if you'll see,

 6    there is an original message from Price Roe to John

 7    Philbin, David Garratt, cc'ing Harvey Johnson and

 8    William R. Knocke.  And it's sent on July 25th.  And

 9    the time is 2003, 2006.

10              Can you see that?

11              Can you read that?

12    A.    I can.

13    Q.    Okay.  And it says, Pat and Dave, see

14    below and please advise if I am capturing this

15    correctly.

16              First of all, who is Price Roe?

17    A.    He was the counselor to the secretary.

18    Q.    And you say, counselor to the secretary.

19              Was he legal counsel --

20    A.    No.

21    Q.    -- to the secretary?

22    A.    He may be -- he may have been a lawyer,
```

**7/7/2009  Garratt, David E.**

```
 1      but that was not the role of that counselor position.
 2           Q.     Okay.  It says:  We should lead the memo
 3      with the media angle in a way that addresses the
 4      media context and FEMA's monitoring of the situation.
 5      Note well my language on why the secretary didn't
 6      hear about this earlier.  Attached doc has edits,
 7      opening 2 paragraphs as follows.  I won't share this
 8      with S 1 until I get your green light.
 9                  Who is S 1?
10           A.     The secretary.
11           Q.     Okay.  If you go down to -- it says, media
12      exposure.
13                  Can you see that?
14           A.     Yep.
15           Q.     Okay.  If you go down to, I think it's the
16      third sentence, it begins, following the MSNBC, dot,
17      com story.
18                  Do you see that?
19           A.     I do.
20           Q.     Okay.
21                  Following the MSNBC, dot, com story that
22      ran the weekend of July 22, media attention in this
```

7/7/2009  Garratt, David E.

1      story has increased though not dramatically.  While

2      FEMA has not directly briefed the secretary on this

3      issue, believing it was being appropriately handled

4      by FEMA legal counsel and FEMA's complaint resolution

5      process.

6              Did I read that statement correctly?

7          A.    Yes.

8          Q.    If you go further up the page on this

9      document, and it's an email from you, David Garratt,

10     to Price Roe, John Philbin, cc'ing Harvey Johnson,

11     William Knocke, Robert Paulison, John Daraujo, and

12     Kevin Souza.

13             You say:  Price, okay with everything

14     except the statement that FEMA believes this problem

15     is not widespread.  In fact we do not know.  It is

16     entirely possible this will be widespread problem.

17     Dave.

18             Did I read that correctly?

19         A.    Yes.

20         Q.    Okay.  So I can take that, Mr. Garratt, as

21     you're saying that the statement which I read

22     previously under media exposure, you took no issue

1    with that particular statement.

2              You only took issue with the statement

3    that FEMA believes this problem is not widespread; is

4    that correct?

5         A.   That certainly appears to be the case.

6         Q.   Okay.

7              THE VIDEOGRAPHER:  Sir, we need to change

8    the tape.

9              MR. WOODS:  Okay.  We're going to go off

10   the record for a second.

11             THE VIDEOGRAPHER:  We're going off the

12   record.  The time on the video is 10:03 AM.

13             (Discussion off the record.)

14             THE VIDEOGRAPHER:  This begins tape number

15   2 in the video deposition of David Garratt.  The time

16   on the video is 10:09 AM.  We are on the record.

17             BY MR. WOODS:

18        Q.   Mr. Garratt, back to the document we were

19   discussing.  I want to bring you forward again to an

20   email from Price Roe.

21             It's on the first page, beginning on the

22   first page.  And it's to David Garratt, John Philbin,

**7/7/2009  Garratt, David E.**

```
1    kind a  -- (indiscernible) -- board for that.
2           Q.    What, if any, changes in FEMA's strategy
3    specifically with respect to housing assistance to
4    displaced disaster victims will be different going
5    forward because of what happened after Katrina?
6                 MR. WOODS:  I object, vague, narrative.
7           A.    Nevertheless, it's a good question.
8                 BY MR. MEUNIER:
9           Q.    Thank you.
10                I thought so.
11          A.    There are -- made a number of changes,
12   modifications to how we're going to do business in
13   the future, both strategic and tactical.
14                From a strategic perspective, since
15   Hurricane Katrina, we developed the national disaster
16   housing strategy.
17                We've also developed and published on a
18   yearly basis a companion document to that which is a
19   disaster housing plan for each year.  The national
20   disaster housing strategy is more of a high-level
21   document that kind of aggregates in one place for the
22   very first time all of the capabilities that the
```

**7/7/2009  Garratt, David E.**

1    leads into housing because we need to get people

2    sheltered first, and then we need to progress them

3    from a sheltering environment into a longer term or

4    more stable temporary housing environment.

5              So we typically will shelter folks --

6    folks will be typically sheltered in a congregate

7    environment in the very beginning.  If they're likely

8    to be in a congregate environment for a long period

9    of time, we can implement our transitional housing

10   program.

11             This is another program that we

12   implemented after Hurricane Katrina.  This allows us

13   to move them into on a subsidized basis hotels and

14   motels.

15             We manage that through corporate lodging

16   consultants, a contractor who basically deals in

17   that.  They've got coordinated arrangements with

18   hotel and motel operators around the country, and

19   they will be our agent for subsidizing the stay of

20   individuals making sure that they're eligible to be

21   in these hotels and motels.

22             And we can keep them there as long as we

**7/7/2009  Garratt, David E.**

1    need to or until we can find or provide temporary

2    housing to individuals in that environment or until

3    they can return to their predisaster dwellings or

4    find their own accommodations.

5              Obviously we have 2 ways of providing

6    assistance to individuals, either rental assistance

7    or financial assistance, or we can provide direct

8    housing assistance to them.  And that's where we'll

9    roll out a manufactured housing unit or alternative

10   housing unit, either on somebody's property or we can

11   build a community site from scratch, essentially

12   build a manufactured housing community to support

13   these individuals.

14             We have also employed after Hurricane

15   Katrina for the very first time cruise ships to

16   support disaster victims, not something we had done

17   prior to that.  It had been contemplated once but not

18   used.  But it is now an official part of our toolbox,

19   although it's not a first resort for us, but it is a

20   last resort, and should we face another situation

21   near a coastal area where we've got a large

22   population that needs assistance, we can use that,

**7/7/2009  Garratt, David E.**

1    most valuable to support disaster victims who are

2    also critical members of the emergency response

3    community in the affected areas so that they can live

4    and work, for example police officers, members of the

5    fire service, et cetera, in that area as opposed to

6    relocating those individuals far away from their

7    communities.

8              But the biggest progress that we've made

9    is in terms of identifying new forms of alternative

10   housing that in fact are -- will be better in more

11   suitable environments for populations that are likely

12   to need these units for an extended period of time.

13        Q.    So that through this change in strategy,

14   again informed by the experience of Katrina, FEMA

15   does not plan to rely on travel trailers for example

16   as a primary means of providing emergency assistance

17   for housing?

18        A.    That's accurate.  We do not plan to rely

19   on travel trailers as the primary means.  We will

20   still use travel trailers under a unique set of

21   circumstances.

22        Q.    Right.

**7/7/2009  Garratt, David E.**

1    period of time.

2                    We -- we have solved the -- at least from

3    our perspective, the formaldehyde issue, because we

4    are only producing now units that meet our own

5    specifications.

6             Q.    All right.   Since the Katrina --

7             A.    Correct.

8             Q.    -- disaster, there are now federal

9    regulations of formaldehyde air levels in travel

10   trailers?

11            A.    No.

12                  There are -- FEMA has specifications, our

13   own specifications for all forms of manufactured

14   housing that we produce and require that these units

15   meet those specifications and be tested before it

16   will accept them.

17            Q.    And are these similar to the HUD standards

18   that existed?

19            A.    Much lower.

20            Q.    Lower than that.

21                  What are they?

22            A.    .016 PPM.

**7/7/2009  Garratt, David E.**

```
 1          Q.     Now, is that -- is that an air level
 2   requirement, or does that refer to the particle board
 3   and plywood --
 4          A.     Air level.
 5          Q.     Air level.
 6                 Point- --
 7          A.     -- -016.
 8          Q.     -016.
 9                 What is it if you know that went into
10   selecting .016 as an appropriate level?
11          A.     At the time we made that decision to lower
12   it to that level, we were advised by our office of
13   health affairs that that was the lowest level at
14   which NIOSH had detected formaldehyde affecting
15   cells, so we wanted something that was below the
16   level at which cellular activity was noted when it
17   was exposed to formaldehyde.
18          Q.     All right.  Let me go back on a couple of
19   documents that Mr. Woods has reviewed with you just
20   for some followup questioning.
21                 First, if you have your declaration that
22   was referred to and signed by you March -- I'm sorry
```

**7/7/2009  Garratt, David E.**

1        A.    Well, actually FEMA-funded testing, but

2    following CDC-approved protocols.

3        Q.    All right.  So was it your understanding

4    that the result of CDC's outreach to this particular

5    physician was to in some ways validate his concern

6    about an ailment trend related to formaldehyde?

7              MR. MILLER:  Objection, mischaracterizes

8    the witness's testimony.

9        A.    I'm sorry.  Ask that one more time.

10             BY MR. MEUNIER:

11       Q.    All right.  Since CDC reached out to the

12   physician and --

13       A.    Somebody -- somebody did.  And it may or

14   may not have not CDC, but it would have been under

15   their again aegis --

16       Q.    Yeah.

17       A.    -- that that --

18       Q.    Yeah.

19       A.    -- outreach was done.

20       Q.    And then after that, you say:  The result

21   was to go forward with some further testing of units.

22       A.    Well, not just necessarily that outreach

1    on that particular occasion to that particular

2    doctor.

3            The end result of the engagement of the

4    medical community in this -- this problem identified

5    by this doctor resulted in a decision to do occupied

6    testing and to provide the results of that testing to

7    the -- to the occupants.

8        Q.    Did you assume therefore that there had

9    been some validation of the doctor's report of

10   concern about formaldehyde-related ailment trends?

11       A.    Well, certainly validation of the concern,

12   in terms of, were any of these individuals suffering

13   from formaldehyde exposure, no -- no validation or

14   invalidation of that, but validation that there was

15   sufficient concern to warrant us going forward with

16   occupied testing.

17       Q.    Okay.  Look right above that email from

18   you to Dr. Runge, and there's an email from Gil

19   Jamieson to you, same date, May 17.

20            Do you see that?

21       A.    Yes.

22       Q.    And Mr. Jam- -- who is Mr. Jamieson?

7/7/2009  Garratt, David E.

1          A.     At the time, he was the principal federal

2     official and/or associate administrator for Gulf

3     Coast recovery.

4          Q.     And in this email, he recommends a change,

5     parens, or validate -- he recommends that you change

6     or validate the MH, slash, TT spec and contract

7     provisions for new production runs.

8                 Let me just stop there.

9                 Does MH, slash, TT refer to manufactured

10    housing, travel trailers?

11         A.     It does.

12         Q.     And the spec and contract provisions for

13    new production runs would refer to the further

14    production of units to be used by FEMA for the

15    hurricane victims from that point forward?

16         A.     Correct.

17         Q.     And then continuing with Jamieson's

18    recommendation in the email and that:  You should

19    state that the acceptance of the units will require a

20    testing of formaldehyde levels to conform with EPA

21    acceptable levels.

22                Would the testing that's referred to there

7/7/2009  Garratt, David E.

1    be testing conducted by the manufacturers prior to

2    the units being furnished or testing done by FEMA

3    after receipt of the units?

4        A.    Really a combination of both.   It would be

5    testing that was done by an independent third party

6    tester, but it would be done at the manufacturing

7    facility as part of the contract, and it would be a

8    condition of acceptance that they pass that.

9        Q.    And --

10       A.    Now, this --

11       Q.    Okay.

12       A.    -- was not necessarily known at the time

13   that he wrote that.   That is what ended up being the

14   protocol for the contracts that we have in place

15   using our new specifications.

16       Q.    So from May -- from -- well, this

17   recommendation by Jamieson was implemented?

18       A.    It was.

19       Q.    And when was it implemented?

20       A.    I don't recall when we let our first new

21   contract for park models and/or mobile homes, but

22   whatever date that was.

**7/7/2009  Garratt, David E.**

1        Q.    All right.   Can you give me some idea?

2              Was it within a month of May 17, '07, the

3    date of this email?

4        A.    I can't give you a date, but as you --

5    indicates in the subsequent email, we are already had

6    new specifications in place when he wrote this, and

7    we already had a hundred percent inspection protocol

8    established before acceptance of any unit, so he was

9    recommending something that we already had in the

10   works and as part of our strategy going forward.

11       Q.    Let me make sure I understand you on that.

12             Even before Jamieson makes this

13   recommendation --

14       A.    We were already doing this.

15       Q.    -- FEMA is already requiring testing for

16   formaldehyde levels?

17       A.    No.

18             We were already developing a -- or already

19   had a -- come up with a new contract with new

20   specifications, and it had a testing protocol as part

21   of that that we were pursuing.

22             What I can't say is that we had

7/7/2009  Garratt, David E.

1    were no federal standards that applied -- there were

2    no HUD standards that applied to their construction

3    at the time that those units were purchased for

4    Hurricane Katrina.

5         Q.    Well, how did the new specifications for

6    travel trailer manufacturing change what you refer to

7    as the industry standards?

8         A.    Well, our new specifications for park

9    models and mobile homes require that the units test

10   at point- -- what they ended up requiring is that

11   below .016 PPM.

12            Now, how the manufacturers and what the

13   manufacturers did to achieve that level in terms of

14   reducing components, materials, glues, et cetera,

15   that emit formaldehyde was up to them.  We were

16   interested in the outcome, which was a unit that

17   emitted no more than this amount of formaldehyde.

18            For travel trailers, we faced a different

19   or additional concern, and that was, they don't have

20   the ventilation systems that a park model or a mobile

21   home has.

22            So even if they use reduced formaldehyde,

7/7/2009  Garratt, David E.

1       the concern was that in a closed space without

2       ventilation that there could still be buildups of

3       formaldehyde, so we also have a requirement that the

4       travel trailers that are built for us have a much

5       more robust ventilation system that is much

6       comparable -- that is comparable to a larger type of

7       a unit so that the air is circulated out of that unit

8       at a much greater rate than your average trailer

9       travel.

10          Q.    All with a view toward -- towards still

11      hitting that target of .0- --

12          A.    Correct.

13          Q.    -- -16?

14                But in the case of travel trailers, you do

15      it not just with the wood product, but you do it with

16      a ventilation product?

17          A.    An increased ventilation system that is

18      more powerful.

19                MR. MEUNIER:  Let me mark what I've just

20      referred to, the series of May '07 emails, as Garratt

21      number 7.

22                          (Garratt Exhibit No. 7

**7/7/2009  Garratt, David E.**

1    the trailers?

2         A.    Oh, expedient from the sense that it would

3    immediately solve the problem, but not necessarily

4    expedient in the sense that it was something that

5    could be quickly done or accomplished.

6         Q.    All right.  Let me show you an exchange of

7    mails that --

8         A.    Or, by the way, that a number of the

9    occupants were even interested in.

10        Q.    I'm showing you an exchange of emails

11   between you and Dr. Lang on May 25, 2007.

12              And in his email to you of that date,

13   Dr. Lang, bottom of that first page, says this in

14   reference to CDC:  We're going to -- we're having to

15   push very hard to get them to give us preliminary

16   recommendations on what we should do right now to

17   reduce risk.  Their initial response was to just move

18   everyone out of trailers.  We told them that was

19   probably not a valid approach and we really needed

20   some immediate guidance on a reasonable short-term

21   engineering target that can be accomplished in days,

22   not weeks.  They seem to understand.  And they really

7/7/2009  Garratt, David E.

1      do need to have something along those lines.

2                      Correct?

3                      That's what Dr. Lang wrote to you?

4        A.    Correct.

5        Q.    And then your response on that same date,

6      the second paragraph of your email, you said:  I

7      agree that an en masse evacuation of trailers is not

8      a preferred solution by any means.  However we want

9      to confirm that does not represent a formal medical

10     recommendation from CDC but merely their opinion of

11     an expedient solution.

12                     That was how you characterized CDC's

13     recommendation, as an expedient solution?

14       A.    No, I didn't characterize it that.  I was

15     asking him to characterize it.

16       Q.    Oh, you wanted Dr. Lang to confirm --

17       A.    That's correct.

18       Q.    Did he?

19       A.    Yes.

20       Q.    In an email?

21       A.    I don't recall.

22       Q.    What do you recall him saying to you?

7/7/2009  Garratt, David E.

1          A.     That they were not going to make a formal

2      recommendation.

3                 In other words, they could not formally

4      say that -- it was their opinion, is the bottom line

5      here.   We did not get a -- or did not, to my

6      knowledge, ever receive a formal recommendation from

7      CDC that said, our formal recommendation is that you

8      for safety reasons, for health reasons, get everyone

9      out of these trailers right now, because again if

10     that had been their recommendation, we would have

11     done that.

12         Q.     Where would you have put the people?

13         A.     Don't know.

14             MR. MEUNIER:   All right. Let me mark as

15     Garratt 10 the emails we've referred to.  It's

16     Bates-numbered at the top, FEMA 17, dash, 006442 and

17     443.

18                          (Garratt Exhibit No. 10

19                          was marked for

20                          identification.)

21             BY MR. MEUNIER:

22         Q.     Showing you an email exchange of June 4,

**7/7/2009  Garratt, David E.**

```
 1    believed that this -- establishing federal standards
 2    is a federal responsibility, and it belongs within
 3    the bailiwick of whatever agency was most
 4    appropriate.
 5              I would have voted for EPA and/or CDC to
 6    be establishing what are appropriate standards for --
 7    for what is safe in terms of formaldehyde exposure
 8    levels.  I do not think that it's the industry's
 9    responsibility to develop federal standards.  I think
10    that's a federal responsibility.
11        Q.    Oh, so you were here referring to federal
12    regulatory standards?
13        A.    Yes.
14        Q.    You were not referring to a general
15    determination of what's safe or not.
16        A.    Well, actually I probably need to read
17    this whole exchange before I --
18              (Pause.)
19        A.    So the purpose of this message was
20    challenging the fact that we had a moratorium on the
21    use of and provision of travel trailers.  We had
22    stopped the provision of travel trailers in new -- in
```

7/7/2009  Garratt, David E.

```
 1    any new -- for disaster support purposes.
 2              BY MR. MEUNIER:
 3         Q.   This is as of August 18 --
 4         A.   Right.
 5         Q.   -- 2007.
 6         A.   Part -- part of an interim direction that
 7    was published under Chief Paulison's signature.
 8              And Gil was challenging that, and this
 9    exchange was trying to explain the reason that we had
10    done that moratorium, which was on the second page,
11    is:  We cannot assure occupants the units are safe,
12    nor can we assume HUD certification provides such
13    assurance, as it applies to formaldehyde levels, for
14    structures that are smaller than mobile homes -- as
15    it applies to formaldehyde levels, for structures
16    that are smaller than mobile homes and do not possess
17    the inside, outside air circulation exchange at least
18    equal to a HUD-required mobile home.
19              And so the issue was, back to the
20    paragraph or email that you cited, the allowance for
21    mobile homes is not based on an -- our allowance to
22    allow mobile homes to be used is not based on
```

7/7/2009  Garratt, David E.

1    independent determination by FEMA that the units are

2    safe.  It is based on the fact that these are

3    HUD-approved and that mobile homes are being sold

4    throughout the United States for long-term use as a

5    matter of practice and continuing practice.

6              And so -- but travel trailers were not

7    being sold throughout the United States for the

8    purposes of long-term housing.  They were being sold

9    for the purposes of recreational use.

10       Q.    M-hm.

11       A.    So we're just explaining in this

12   back-and-forth the rationale behind the reason to

13   suspend use of travel trailers for housing at that

14   time.

15       Q.    And as you say in your email to

16   Jamieson of August 18, '07, on the second page:

17   the prohibition -- meaning the prohibition against

18   further use of travel trailers -- is in place

19   because we cannot assure occupants the units are

20   safe.

21             Correct?

22       A.    Correct.

**7/7/2009  Garratt, David E.**

1    of that fact in FEMA?

2                   MR. SCANDURRO:  Object to form.

3                   MR. PENOT:  Objection, foundation.

4        A.    No.

5              I do.

6              BY MR. MEUNIER:

7        Q.    Let me show you --

8        A.    Let -- let me rephrase that.

9              I don't deny it, but neither do I confirm

10   it.

11       Q.    Here is a formaldehyde question sheet,

12   frequently asked questions as of July 15, '07.

13             Are you familiar with that document?

14             MR. MILLER:  Do you have a copy,

15   counsel?

16       A.    I do not recall this document.

17             BY MR. MEUNIER:

18       Q.    All right.  Then let me ask you if you

19   recall seeing an email from John Philbin on July 30,

20   2007.

21             (Pause.)

22       A.    Yes, I vaguely recall this.

**7/7/2009  Garratt, David E.**

```
 1            BY MR. MEUNIER:
 2        Q.    So Philbin was sending you a draft of
 3   something to go out over Administrator Paulison's
 4   name.
 5            You did say his draft needed a lot of
 6   work, and yet in the first paragraph, he states,
 7   Philbin -- this is for Paulison's statement:  FEMA's
 8   response to occupant complaints from prolonged
 9   exposure to elevated levels of formaldehyde could
10   have been better had earlier complaints triggered our
11   organizational awareness of a systemic problem that
12   has been well known in the manufacturing industry for
13   more than 30 years.
14            Do you recall seeing that?
15        A.    I vaguely recall seeing that.
16        Q.    And finally, in -- and I'll mark that as
17   Garratt --
18            MR. MEUNIER:  What's the next one?
19            THE COURT REPORTER:  18.
20            BY MR. MEUNIER:
21        Q.    -- 18.
22                    (Garratt Exhibit No. 18
```