1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  FEMA TRAILER          MDL NO. 1873

5    FORMALDEHYDE PRODUCTS         SECTION N(4)

6    LIABILITY LITIGATION          JUDGE ENGELHARDT

7

8                       *   *   *

9                    (RE:  DUBUCLET)

10

11           VIDEOTAPED DEPOSITION OF MORGAN

12    BUILDINGS & SPAS THROUGH ITS CORPORATE

13    REPRESENTATIVE JAMES SCHILLIGO, 2800 MCCREE

14    ROAD, GARLAND, TEXAS 75041, TAKEN AT THE

15    OFFICES OF MCGLINCHEY, STAFFORD, PLLC, 601

16    POYDRAS STREET, 12TH FLOOR, NEW ORLEANS,

17    LOUISIANA, ON THE 22ND DAY OF OCTOBER, 2009.

18
     REPORTED BY:
19
         PAT KENNEDY QUINTINI, CCR
20       PROFESSIONAL SHORTHAND REPORTERS
         (504)529-5255
21
22    VIDEOGRAPHER:
23       MICHAEL BERGERON
         PROFESSIONAL SHORTHAND REPORTERS
24       (504)529-5255
25

1          A.   The manufacturing --

2          MR. MILLER:

3                Objection.   Hold on.   Objection;

4     narrative.   Go ahead.

5          THE WITNESS:

6                The manufacturing plant would give

7     it to a shipping company, who would

8     transport it to the staging area.   The

9     staging area -- when the unit got to the

10    staging area, the FEMA personnel would check

11    it in, bar code it, sign off on it, and then

12    put it into their staging area.

13                At that point we would go in and

14    check to make sure all the equipment was in

15    there that was specified on the contract and

16    that everything worked.

17    EXAMINATION BY MR. PINEDO:

18         Q.   The staging area that it went to,

19    after point of manufacture and then

20    transported to that first staging area, is

21    that a FEMA-controlled staging area?

22         A.   Yes, sir.

23         Q.   It is not a Morgan staging area,

24    is it?

25         A.   No, sir.

1        Q.    And once it arrives at that

2    staging area, FEMA is the first one to check

3    it in to make sure it meets whatever

4    requirements they have?

5        MR. MILLER:

6            Objection; form.

7        THE WITNESS:

8            I don't know that they check to

9    make sure about any specifications.  They

10    check it in to make sure that the unit was

11    there.  They bar coded it and turned it over

12    back to us, once they parked the unit, to

13    make sure that everything was in the unit.

14    If they saw a deficiency, they would let us

15    know about it.

16    EXAMINATION BY MR. PINEDO:

17        Q.    And then all that Morgan did after

18    that point was check to make sure the water

19    worked, the lights worked and things of that

20    nature, turn on the air conditioner and make

21    sure it works?

22        MR. MILLER:

23            Objection; form.

24        THE WITNESS:

25            All of the appliances and the

1    equipment inside worked.

2    EXAMINATION BY MR. PINEDO:

3         Q.   I'm familiar with the appliances

4    from the standpoint of a refrigerator or a

5    stove.  What are you including with regard

6    to equipment?

7         A.   It could be the sink, mixing

8    valves, the mini blinds, that they were in

9    place, that they hadn't come out during

10   transportation, that the doors swung

11   properly.  There was no locks missing, the

12   interior locks, the exterior locks, if there

13   was any exterior damage on the coach.

14        Q.   So once Morgan got it, they made

15   sure the appliances were working, they made

16   sure the doors would swing open and close

17   and things of that nature, but they would

18   not change or alter or modify the unit other

19   than to fix a condition that might be in a

20   state of disrepair; is that fair to state?

21        MR. MILLER:

22             Objection; foundation.  Actually I

23   apologize.  My objection is to form.

24        THE WITNESS:

25             Morgan never modified or altered

1    any of the coaches.  We would repair any

2    deficiencies.

3    EXAMINATION BY MR. PINEDO:

4        Q.   And those would be deficiencies

5    brought to the attention of Morgan either by

6    their own inspection of the vehicle or by

7    the review that the United States had of the

8    vehicle when it first arrived?

9        A.   Yes, sir.

10       Q.   Did anyone at Morgan have contact

11   with Fleetwood with regard to fulfilling

12   these orders for travel trailers?

13       A.   Yes, sir.

14       Q.   Did anyone at Fleetwood ever say

15   to Morgan:  Our travel trailers have a low

16   level of formaldehyde emissions?

17       A.   Not that I remember.

18       Q.   Did anyone at Fleetwood make any

19   representations to Morgan about formaldehyde

20   offgassing or the amount of formaldehyde in

21   the Fleetwood travel trailers?

22       A.   There was a period of time that we

23   had an email go back and forth about

24   formaldehyde.

25       Q.   And when was that?

1        A.   I believe it was in February of

2   2006.

3        Q.   So that was after the initial

4   order was placed that we have marked here as

5   Exhibit 4?

6        A.   Yes.

7        Q.   And generally speaking, do you

8   remember what the nature of that email

9   correspondence was with regard to

10  formaldehyde?

11       A.   One of the contractors, CH2M Hill,

12  had asked us about -- it was a list of

13  questions really.  It was about offgassing,

14  about monometer readings on gas units and

15  more or less safety issues.

16       Q.   Was that the first time Morgan was

17  aware of any issue with regard to

18  formaldehyde in these travel trailers?

19       MS. LIPSEY:

20            Object to the form.

21       THE WITNESS:

22            It was the first time that we had

23  been notified of anybody even talking about

24  formaldehyde.

25  EXAMINATION BY MR. PINEDO:

1    trip without having the opportunity to ask a

2    few items.

3    EXAMINATION BY MS. DALY:

4        Q.   Good afternoon, Mr. Schilligo.

5    I'm Taylor Daly for Fleetwood.

6        A.   Good afternoon.

7        Q.   When was the first time that

8    Morgan entered into any contract with the

9    U.S. Government to procure emergency housing

10   units for a national disaster?  What year?

11       A.   I believe it was in 1993.

12       Q.   When was the first time that it

13   procured emergency housing units in the form

14   of travel trailers from Fleetwood to respond

15   to a government request for such emergency

16   housing in response to a national disaster?

17       A.   I believe it was --

18   MR. PINEDO:

19           Objection to the form.  Are you

20   talking about the Government with Fleetwood

21   or Morgan with Fleetwood fulfilled a

22   government order?

23   EXAMINATION BY MS. DALY:

24       Q.   Let me restate it.  When was the

25   first time that Morgan contracted with

1    Fleetwood to provide travel trailers for

2    emergency housing units in response to a

3    request from FEMA for emergency units to use

4    in a national disaster?

5        A.   I believe it was Charlie in

6    Florida, 2004.

7        Q.   Approximately how many units did

8    you get at that time?

9        A.   I don't remember.

10       Q.   Was there any time other than

11   Charlie in 2004 and before Katrina when

12   Morgan obtained or contracted with Fleetwood

13   for travel trailers to respond to an

14   emergency that FEMA was looking for housing?

15       A.   Not that I remember.

16       Q.   Did you have any complaints from

17   occupants who received the housing for

18   Charlie from Fleetwood?

19       A.   No, ma'am.

20       MR. PINEDO:

21           Objection; foundation.

22       THE WITNESS:

23           No, ma'am.

24   EXAMINATION BY MS. DALY:

25       Q.   Now, Morgan also entered into a

1    me restate that.  Were Morgan personnel ever

2    instructed to remove owner's manuals from

3    units that Fleetwood provided?

4        A.   No, ma'am.

5        Q.   Now, in your questioning a moment

6    ago, you were asked whether Morgan's

7    responsibility for the, in this case,

8    Fleetwood units that were provided to FEMA

9    ended basically when you dropped them at a

10   FEMA staging yard and they were accepted by

11   FEMA.  Do you remember saying that?

12       A.   Yes, ma'am.

13       MR. MILLER:

14            Objection; form.

15   EXAMINATION BY MS. DALY:

16       Q.   Did you have -- did Morgan have

17   any further contact with FEMA or with

18   Fleetwood or with occupants about any of

19   those units thereafter?

20       A.   No, ma'am.

21       Q.   From that do I take it that you

22   did not get calls from occupants, that is

23   Morgan did not get calls from occupants?

24       A.   We did get calls.

25       Q.   Excuse me?

1          A.    We did get calls.

2          Q.    And what types of calls did Morgan

3     get from occupants of Fleetwood units?

4          A.    We lost our keys, how do we get

5     another set; door is locked, how do I get it

6     open, those kind of things.

7          Q.    And did you -- in response to any

8     of those occupant calls, did Morgan ever

9     have a reason to call Fleetwood with respect

10    to those types of calls?

11         A.    No, ma'am.

12         Q.    Those were things that you took --

13    that Morgan took care of itself?

14         A.    Either that, or for example, if

15    you ask keys were lost, we would tell them

16    to take the back off of the lock itself.  It

17    gave a number and an 800 number and that

18    company that manufactured the lock would

19    send a set of keys out to them.

20         Q.    Did Morgan ever receive any

21    complaints from occupants of the Fleetwood

22    units provided to FEMA for Katrina about

23    formaldehyde?

24         A.    No, ma'am.

25         Q.    Did any occupant call Morgan with

1    a complaint on the Fleetwood units about

2    smell?

3          A.   No, ma'am.

4          Q.   How about eye irritation or throat

5    irritation?

6          A.   No, ma'am.

7          Q.   How about any other health problem

8    that they thought was related to their

9    occupancy of the unit?

10          A.   No, ma'am.

11          Q.   Let's talk for a minute about --

12    you were talking about an email stream that

13    I believe you said emanated from C -- I can

14    never say their name right, CM2 Hill?

15          A.   CH2M Hill.

16          Q.   CH2M Hill.  Do you remember

17    discussing that a moment ago with

18    Mr. Pinedo?

19          A.   Yes, ma'am.

20          Q.   I'm going to hand you a document

21    and ask you to look at it sort of in reverse

22    order, because as emails do, the latest ones

23    are on the top and the oldest ones are on

24    the bottom.  And ask you first about this

25    document, if you recognize it, and then I

1   will ask you about the people in this

2   document.

3        A.   Yes, ma'am.

4        Q.   First of all, who is Kerri Cull

5   who is listed on this page as having sent an

6   email to Al Snyder, which most of the people

7   in this room know is a Fleetwood employee,

8   on February 10, 2006 at 10:20?  Who is Kerri

9   Cull?

10       A.   Kerri Cull is my administrative

11  assistant.

12       Q.   And her comment on this email is:

13  Any news on the formaldehyde levels,

14  correct?

15       A.   Yes, ma'am.

16       Q.   Do you know what caused Ms. Cull

17  to send Mr. Snyder at Fleetwood that

18  question?

19       A.   There was an email from Dave Wells

20  at CH2M Hill, and the reference line was

21  formaldehyde, I believe.

22       Q.   And do you know what triggered

23  Mr. Wells to send Morgan an email with the

24  Re line that said formaldehyde?

25       A.   I do not.

1      Q.    Did Mr. Wells indicate to anybody

2   at Morgan that they had had occupant

3   complaints at that time?

4      A.    No, ma'am.

5      Q.    Did Morgan indicate in this email,

6   this initial email to Fleetwood on

7   February 10, that there were occupant

8   complaints of formaldehyde?

9      A.    No, ma'am.

10      Q.    You then see on the next email

11   response up that there is a response to

12   Ms. Cull at Morgan.  Do you see that?

13      A.    Yes, ma'am.

14      Q.    And it's from a man named Craig

15   Biazo.  It's showing him at

16   Craig.Biazo@fleetwood.com.  Do you know

17   Craig Biazo?

18      A.    Yes, I do.

19      Q.    Was Craig Biazo involved at all

20   with the Morgan contract between Morgan and

21   Fleetwood for the Katrina units?

22      A.    He had some minor involvement.

23      Q.    And let me just read what it says,

24   Craig Biazo's response is.  It says, quote:

25   Hi, Kerri, I have an engineering document

1     that lists the standards that we test to for

2     our travel trailers.  Before I can release

3     it, I need from your company documenting why

4     the information is needed and its intended

5     purposes and who the recipients of the

6     information are -- will be.  This will be

7     used for document purposes and support the

8     release of this information.  Do you see

9     that he says that?

10         A.   Yes.

11         Q.   And then above that is a response

12    that says -- and it may be out of order.

13    I'm just looking at this.  That one looks

14    like -- oh, I know.  It's because it's

15    coming from California.  Never mind.

16    Mr. Biazo was in California.  Anyway, there

17    is one above it from Kerri Cull on the same

18    day that says, quote:  FEMA has requested

19    the information for their records.  Please

20    send information ASAP.  Thanks, Kerri.  Do

21    you see that?

22         A.   Yes, ma'am.

23         Q.   And then above that we have a

24    Craig Biazo response, again the same day,

25    February 13, saying:  Attached to this email

1    is a confidential Fleetwood engineering

2    standards bulletin that describes the

3    formaldehyde regulations that Fleetwood

4    utilizes in the selection of materials used

5    to construct our travel trailers.  This is a

6    confidential document and its sole purpose

7    can only be used for the intention that you

8    described.  Please let us know if you have

9    any questions or require additional

10   information.  Do you see that?

11        A.   Yes, ma'am.

12        Q.   Do you know what engineering

13   standard was sent to Morgan?

14        A.   There was an attached document.

15        Q.   Did you find a copy of that in

16   your files when you were looking through it

17   in advance of this deposition?

18        A.   Yes, we did.

19        Q.   Let me go ahead and mark this

20   before I move off as Exhibit 16, the email

21   stream.

22   (Exhibit No. 16 marked for identification.)

23        Then let me show you the next

24   item, which is a document entitled Fleetwood

25   Towable Group Engineering Standards Bulletin

1    No. 10, December 1, 1997, subject:  Matters

2    of construction, concealed materials wood.

3    Do you see that?

4         MR. PINEDO:

5              Excuse me.  Materials of

6    construction.

7         MS. DALY:

8              I'm having trouble speaking today.

9    EXAMINATION BY MS. DALY:

10        Q.   Materials of construction,

11   concealed materials wood.  Do you see where

12   it says that?

13        A.   Yes, ma'am.

14        Q.   Do you know if this is the

15   document that Morgan received as the

16   attachment to Craig Biazo's email we just

17   read?

18        A.   Yes, ma'am.

19        Q.   And would you look at Page 3 of

20   that engineering standards bulletin?

21        A.   Okay.

22        Q.   And at Paragraph 4, and it says:

23   Wood panel products, correct?

24        A.   Yes, ma'am.

25        Q.   And at 4.1 it says:  Formaldehyde

1    regulations, correct?

2        A.   Yes, ma'am.

3        Q.   And below that it references the

4    HUD standard 24CFR part 3280.308, correct?

5        A.   Yes, ma'am.

6        Q.   And then on the next page, that

7    would be Page 4, under Section 4.2, there

8    are descriptions of different types of wood

9    products and formaldehyde parts per million

10   for each product.  Do you see that?

11       A.   Yes, ma'am.

12       Q.   So you believe that's what you

13   received?

14       A.   Yes, ma'am.

15       Q.   And what did Morgan do with that

16   document?

17       A.   We forwarded it on to Dave Wells

18   at CH2M Hill.

19       Q.   Did you ever hear anything further

20   about that?

21       A.   No, ma'am.

22       Q.   Let me put Exhibit 17 on that

23   document, please.

24   (Exhibit No. 17 marked for identification.)

25            So when this engineering standards

1    document was sent back to Mr. Wells, there

2    was no further follow up from Mr. Wells

3    about what we had sent?

4         A.   No, ma'am.

5         MR. PINEDO:

6              Objection to form.

7         THE WITNESS:

8              No, ma'am.

9         MR. PINEDO:

10             By we, you mean Fleetwood?

11   EXAMINATION BY MS. DALY:

12        Q.   Let me ask it two different ways.

13   Was there any follow up to Morgan from

14   Mr. Wells or anybody else, for that matter,

15   after Morgan sent Fleetwood's engineering

16   standard that we have just discussed?

17        A.   No, ma'am.

18        MR. PINEDO:

19             Objection; foundation.

20        THE WITNESS:

21             No, ma'am.

22   EXAMINATION BY MS. DALY:

23        Q.   Was there any other communication

24   between Morgan and Fleetwood about that

25   engineering standard after February 13,

```
 1    2006?

 2         A.   No, ma'am.

 3         MR. PINEDO:

 4              Objection; form.

 5    EXAMINATION BY MS. DALY:

 6         Q.   When was the first time that

 7    Morgan ever heard about alleged complaints

 8    of formaldehyde in FEMA travel trailers?

 9         MR. PINEDO:

10              Objection; form.

11         THE WITNESS:

12              The first time that I'm aware of

13    is when an article came out in the Wall

14    Street Journal about it.

15    EXAMINATION BY MS. DALY:

16         Q.   Now, you were talking about when

17    the Fleetwood units were transported into

18    the staging areas when Mr. Pinedo was

19    questioning you, and I think you answered

20    his question were those FEMA staging areas

21    as opposed to Morgan-controlled areas and

22    you said:  Yes, they were FEMA; is that

23    correct?

24         A.   Yes, ma'am.

25         Q.   Morgan personnel were allowed on
```

1    the staging sites as the Fleetwood units

2    came in?

3         A.   Yes, we were issued FEMA passes.

4         Q.   And clarify this for me.  Who was

5    looking at the Fleetwood units first when

6    they hit the ground?  Was it Morgan, was it

7    FEMA or was it somebody else?

8         A.   FEMA.

9         Q.   In your -- to your knowledge, were

10   FEMA personnel looking at every Fleetwood

11   unit?

12        A.   They looked at every unit that was

13   received at the staging area no matter who

14   the manufacturer was.

15        Q.   Based on your understanding of

16   Morgan's contract with the U.S. Government,

17   did the U.S. Government/FEMA have the right

18   to reject any unit it felt was rejectable?

19        A.   Yes, ma'am.

20        Q.   Did you ever get one rejected, a

21   Fleetwood unit?

22        A.   No, ma'am.

23        MS. DALY:

24             That's all I have.  I will pass

25   the witness for now.

```
1          THE VIDEOGRAPHER:

2              We are off the record.  It's 3:47.

3          (Whereupon, an off-the-record

4              discussion was held.)

5          THE VIDEOGRAPHER:

6              We are back on the record.  It's

7     4:06.

8     EXAMINATION BY MR. MILLER:

9          Q.   Sir, my name is Henry Miller.  I

10    represent the United States, which is a

11    defendant in the In Re: FEMA Formaldehyde

12    Litigation.  The United States is not a

13    defendant at this point in the Dubuclet

14    matter, but because this is a rule 30(b)(6)

15    deposition that will be used for purposes of

16    all cases in this litigation.

17             I have some questions to ask you

18    relating to Morgan's involvement with the

19    trailers that are at issue in this case.  Do

20    you understand that?

21         A.   Yes, sir.

22         Q.   Sir, there were some questions

23    that were raised by counsel for plaintiff as

24    well as counsel for Fleetwood relating to

25    formaldehyde and formaldehyde warnings that
```

1    had been issued by Fleetwood or you had not

2    received one way or the other.  Are you

3    aware that -- well, when you received the

4    travel trailers from Fleetwood that have

5    been the subject of this deposition and were

6    provided by Morgan to FEMA for Hurricane

7    Rita -- well, let me step back.  I want to

8    talk right now about the trailers that

9    Morgan provided to FEMA for purposes of

10   Hurricane Rita and Hurricane Katrina

11   response.  Did Morgan have -- what did

12   Morgan do -- did these trailers come with

13   owner's manuals?

14        A.   Yes, sir.

15        Q.   What did -- were these owner's

16   manuals included in each of the trailers

17   that were provided to FEMA?

18        A.   Yes, sir.

19        Q.   What did Morgan do, if anything,

20   to make sure that the owner's manuals were

21   included with the trailers?

22        A.   We just made sure they were there.

23        Q.   And how did you do that?

24        A.   By checking them.  They are always

25   in the top cabinet over the sink.

```
1            Q.   And who would do that checking?

2            A.   It would either be myself or one

3    of my people.

4            Q.   When you say your people, who

5    would that be?

6            A.   Employees we had on site with us.

7            Q.   And on site where at?

8            A.   Baton Rouge, Purvis, Mississippi,

9    Selma, Jasper, Texas.  That's all for travel

10   trailers.

11           Q.   These would be basically at the

12   FEMA staging areas?

13           A.   Yes, sir.

14           Q.   And these were employees that

15   Morgan had on site at these areas?

16           A.   Yes, sir.

17           Q.   And when would the Morgan

18   employees check to make sure that the

19   owner's manuals were in each of the

20   trailers?

21           A.   After FEMA had received them into

22   the staging area.

23           Q.   And would Morgan personnel have

24   checked each and every one of the trailers

25   it received from a manufacturer to make sure
```

1      it had an owner's manual in it?

2          A.   That was my instruction.

3          Q.   Who did you receive that

4      instruction from?

5          A.   No, that was my instruction to my

6      people.

7          Q.   Okay.  Sir, I'm going to hand you

8      a document which is marked Exhibit 18.

9      (Exhibit No. 18 marked for identification.)

10             This document is assigned

11     identification numbers FLE-00001942 through

12     1955.  It's copied on front and back and

13     it's titled on the first page FEMA

14     Procedures Storage Site Manual, Fall 2005.

15     And it has on the front of it the FEMA logo,

16     a Morgan logo and a Fleetwood logo.  Have

17     you seen this document before?

18         A.   Yes, sir.

19         Q.   Are you familiar with this

20     document?

21         A.   Yes, sir.

22         Q.   Do you know who put this document

23     together?

24         A.   Yes, sir.

25         Q.   Who?

1        A.    The manufacturer.

2        Q.    You indicated that Morgan received

3    calls from some of the occupants relating to

4    concerns or issues they had with the

5    trailers, such as keys or other things?

6        A.    Yes, sir.

7        Q.    Do you know how those occupants

8    got Morgan's telephone number?

9        A.    Yes, sir.

10       Q.    How?

11       A.    It's on a dealer sticker we put on

12   every unit.

13       Q.    And I gather from your testimony

14   that you never received any complaints

15   relating to formaldehyde?

16   MR. PINEDO:

17            Objection; form.

18   THE WITNESS:

19            Not one.

20   EXAMINATION BY MR. MILLER:

21       Q.    Let me step back.  The dealer

22   sticker with the Morgan telephone number, is

23   that on every one of the units that Morgan

24   provided to FEMA?

25       A.    We try.  But with the volume we

1    were dealing with sometimes I ran out of

2    stickers.   Sometimes we used other placards.

3         Q.   Was some stickers some -- your

4    telephone on each of the units?

5         A.   Not the ones that didn't get

6    stickers.

7         Q.   Approximately how many units may

8    have not gotten stickers?

9         A.   I have no idea.

10        Q.   What is your best estimate?

11        A.   I wouldn't have a guess.

12        Q.   What was the total number, best

13   estimate of the total number of calls that

14   Morgan received relating to the units

15   provided to FEMA?

16        A.   Best guess, a dozen.

17        Q.   And does Morgan keep a log or is

18   there some document which would reflect

19   these calls?

20        A.   No, sir.

21        Q.   Who was the person responsible for

22   receiving those calls?

23        A.   Myself and my administrative

24   assistant, Kerri Cull.

25        Q.   If someone calls in, there is no

1    record of those calls?

2         A.    No, sir.

3         Q.    So the only record we have is what

4    yourself or your administrative assistant

5    would recall?

6         A.    Correct.  Most were referral

7    calls:  Contact your FEMA representative and

8    they will help you out.

9         Q.    Let me retrace this.  To the best

10   of your recollection, none of the calls

11   related to complaints about formaldehyde?

12        A.    None that I know of.

13        MR. PINEDO:

14             Objection to form.

15        THE WITNESS:

16             None that I know of.

17   EXAMINATION BY MR. MILLER:

18        Q.    Did any of the complaints relate

19   to formaldehyde?

20        MR. PINEDO:

21             Objection; form.

22        THE WITNESS:

23             None that I know of.

24   EXAMINATION BY MR. MILLER:

25        Q.    Did any of the complaints

1    concern -- relate to odors?

2         A.   None that I'm aware of.

3         Q.   Did any of the complaints you

4    received involve concerns about burning eyes

5    or scratchy, irritated throats?

6         A.   None that I'm aware of.

7         Q.   During the entire -- let me step

8    back.  When was the first time Morgan

9    started providing temporary emergency

10   housing units to FEMA?

11        A.   I believe it was 1993.

12        Q.   When was the first time Morgan

13   started providing travel trailers?

14        A.   I'm sorry.  That was travel

15   trailers.

16        Q.   And between 1993 and August of

17   2005, approximately how many travel trailers

18   did Morgan provide FEMA?

19        A.   Tens of thousands.

20        Q.   And would it have been Morgan's

21   policy to include a dealer sticker with your

22   telephone number on each of those units?

23        A.   Yes, sir.

24        Q.   And over the course between 1993

25   and August 2005, who would have been

1        THE WITNESS:

2            Correct.

3    EXAMINATION BY MR. MULCAHY:

4        Q.   Earlier you were talking about the

5    manufacturer would ship units to a FEMA

6    staging ground.  At that time FEMA would

7    inspect the units; is that right?

8        A.   Correct.

9        Q.   And Morgan would also have

10   somebody inspect the unit, correct?

11       A.   Correct.

12       Q.   And part of the inspection I heard

13   you talk about, you all would check out

14   certain appliances and features of the unit.

15       A.   All appliances.

16       Q.   That's part of Morgan's

17   inspection, correct?

18       A.   Correct.

19       Q.   Did you check to see if the units

20   were meeting all the FEMA specifications or

21   was that inspection that FEMA did?

22       A.   No.  We both did, FEMA and us.

23       Q.   It's my understanding you didn't

24   have any units rejected by FEMA; is that

25   right?

1       A.   Correct.

2       MR. MULCAHY:

3            That's all the questions I have.

4       MR. PINEDO:

5            I have some more questions.

6   Anybody else want to --

7       MS. DALY:

8            I have one single clarification

9   question.

10      MR. PINEDO:

11           Go ahead.

12  EXAMINATION BY MS. DALY:

13      Q.   Mr. Schilligo, let me ask you one

14  question about this Exhibit 18.  You

15  remember talking about this?

16      A.   Yes, ma'am.

17      Q.   I wanted to be sure I got your

18  answer down right.  You indicated that this

19  was something Doug Henriquez had drafted,

20  correct?

21      A.   Yes, ma'am.

22      Q.   And you rejected it?

23      A.   Yes, ma'am.

24      Q.   And I think you said before

25  Katrina you rejected it?

1    Towable Group Engineering Standards

2    Bulletin.

3         A.   Yes, sir.

4         Q.   What is your testimony of when you

5    first saw this?

6         A.   Two days ago, I believe.

7         Q.   So prior to that, you personally

8    were not aware of this particular document,

9    were you?

10        A.   No, sir.

11   MR. PINEDO:

12             Unless somebody else has some

13   questions, I would like to go off the record

14   and go through my notes rather than have

15   everybody shuffle papers.

16       THE VIDEOGRAPHER:

17             We are off the record.  It's 5:26.

18       (Whereupon, an off-the-record

19             discussion was held.)

20       THE VIDEOGRAPHER:

21             Back on record.  It's 5:37.

22   EXAMINATION BY MR. PINEDO:

23        Q.   Sir, there is testimony earlier

24   about the owner's manuals that were in these

25   Fleetwood travel trailers.  Do you recollect

```
 1    that?

 2         A.   Yes, sir.

 3         Q.   You cannot personally verify that

 4    the unit that Alicia Dubuclet ultimately

 5    lived in, in fact, came with an owner's

 6    manual when Morgan and the United States

 7    received it from Fleetwood, can you?

 8         A.   No, sir.

 9         Q.   You are not planning to do any

10    further work in this case, are you, sir?

11         A.   I don't understand the question.

12         Q.   You are not planning to review any

13    other documents to render testimony in this

14    case, are you?

15         A.   Not that I know of, no.

16         Q.   Now, there was a purchase order

17    for 10,600 Fleetwood travel trailer units;

18    is that right?

19         A.   Yes, sir.

20         Q.   Now, you also testified you viewed

21    a couple.  Are there some of the travel

22    trailer units that FEMA requested that

23    didn't ultimately get sent out to a staging

24    yard and deployed?

25         A.   Yes, sir.
```