UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE          MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

SECTION N(5)

JUDGE ENGELHARDT
MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:
Anthony Bartel v. Gulf Stream Coach, Inc, et al, No.: 09-03943
and
Leslie Kujawa, et al v. Keystone RV Company and Bechtel National, Inc., No.: 09-03944

**REPLY TO PLAINTIFFS' OPPOSITION TO MEMORANDUM IN SUPPORT OF BECHTEL NATIONAL, INC'S MOTION TO CERTIFY FOR INTERLOCUTORY REVIEW PURSUANT TO 28 U.S.C. § 1292(B) THE COURT'S  OCT. 1, 2009 ORDER**

The Plaintiffs, in their Opposition to Bechtel National, Inc.'s ("Bechtel") Motion to Certify for Interlocutory Review (Rec. Doc. 8072), concede that the Court's October 1, 2009 Order and Reasons ("Order") (Rec. Doc. 4366) involves controlling legal issues.  Plaintiffs pretend, however, that no substantial ground for a difference of opinion on these issues exists and that immediate appellate review would not materially advance the ultimate termination of the litigation.  Plaintiffs invite the Court to take up numerous tangential questions which have no real bearing on the issues raised by the present motion.  The Court should not accept Plaintiffs' invitation.

Bechtel's Memorandum in Support of its Motion to Certify for Interlocutory Review (Rec. Doc. 6082-3) presented two purely legal questions.  *First*, whether Plaintiffs presented a *plausible* claim for relief under *Ashcroft v. Iqbal*.  *Second*, whether the actual specifications developed and issued by the Government to its contractor should be regarded as *reasonably precise*.  For the reasons set forth in Bechtel's motion, Rec. Doc. 6082-3, at 3-4, 14-16, Bechtel contends that, at a minimum, substantial ground for a difference of opinion exists as to both of these two controlling legal issues.  Immediate appellate review of these two issues would

materially advance the ultimate termination of this litigation.  None of the multitude of reasons Plaintiffs offer for why that might not be so holds up under scrutiny.

## I. PLAINTIFFS MISSTATE THE TEST FOR INTERLOCUTORY REVIEW.

Plaintiffs claim no substantial ground for a difference of opinion may exist unless Bechtel shows the "Court's Order is contrary to the ruling of all Courts of Appeals."  Rec. Doc. 8072, at 19.  Plaintiffs' statement misstates the law.  In a prior filing, to show substantial ground for a difference of opinion about this Court's order on preemption, Plaintiffs relied heavily on a district court opinion.  Rec. Doc. 1813-2, at 3.  Thus, the Court should regard Plaintiffs' single sentence, half-hearted rebuttal of the *Gauthreaux* opinion, *see id.* at 7, as non-persuasive.[1]

Moreover, Plaintiffs misconstrue *Ryan v. Flowserve Corp.*, their authority for 28 U.S.C. § 1292(b)'s three-part test.  *Id.* at 19.  Rather than require unanimous appellate decisions, the *Ryan* Court listed circumstances where courts have found substantial ground for a difference of opinion, only one of which involved uniformly contrary appellate rulings.  *See Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006).  Ultimately, the *Ryan* Court found no substantial ground for a difference of opinion; however, it did so only after finding no authority supported the movant's position.  *Id.* at 729.  Here, in contrast, Bechtel supported its motion with multiple authorities that established substantial ground for a difference of opinion.

## II. PLAINTIFFS MISCHARACTERIZE BECHTEL'S ARGUMENT.

Plaintiffs erroneously characterize the arguments in Bechtel's motion as relying on whether "the Fifth Circuit is split on the application of the first and second elements of the Boyle test."  Rec. Doc. 8072, at 7.  However, Plaintiffs neither cite to nor quote any part of Bechtel's motion.  Plaintiffs cannot because Bechtel made no such argument.  Bechtel contended instead

---

[1] As Bechtel explained, the *Gauthreaux* decision provides ample basis for finding that substantial ground for a difference of opinion exists about the controlling legal issues involved in the Order.  *See* Rec. Doc. 6082-3, at 8-9.  Plaintiffs' inability to refute *Gauthreaux* in any meaningful way implicitly acknowledges that point.

that the Fifth Circuit's interpretation of the *Boyle* Court's federal common law defense has matured beyond the *Trevino* decision, a decision which represented one of the Fifth Circuit's earliest post-*Boyle* applications of the defense to claims against a design-build-contract contractor.  *See* Rec. Doc. at 6082-3, at 6-11.

Indeed, as Judge Jolly foresaw when dissenting from the denial of the *en banc* petition, the "significant potential for conflict" inherent in *Trevino* has been addressed and resolved by the Fifth Circuit's post-*Trevino* decisions.  *See Trevino v. Gen. Dynamics Corp.*, 876 F.2d 1154, 1156-57 (5th Cir. 1989) (Jolly, J., dissenting).  Now, the Fifth Circuit cites *Trevino* for its admonition against rubber stamp approval of specifications developed in a design-build-contract. *See Stout v. Borg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991) (Jolly, J.) ("In *Trevino* . . . we were called upon to determine *the meaning of 'approval.'*") (emphasis added); *see also Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435, 438 (5th Cir. 2000) (holding specifications may be *reasonably precise* even if the specifications are silent as to "the specific defect").

### III.  <u>PLAINTIFFS ADOPT BECHTEL'S ARGUMENT AS THEIR OWN.</u>

Plaintiffs represent to the Court that "what Bechtel fails to mention is that the Fifth Circuit also noted that if the court were applying the government contractor defense to an allegedly defective feature on which the government specifications were silent, the first *Boyle* condition – reasonably precise specifications – would probably be in issue with respect to that feature." Rec. Doc. 8072, at 10.  In fact, Bechtel made that precise point.

Bechtel argued that:  "when the specifications issued by the Government are silent with respect to the challenged feature, the controlling legal issue becomes whether Government-issued specifications should be regarded as '*reasonably precise*.'"  *See* Rec. Doc. 6082-3, at 7 (citing *Bailey*, 989 F.2d at 801 n.15); *see also id.* at 9 (citing Bailey, 989 F.2d at 799).  Bechtel submitted that substantial ground for a difference of opinion existed as to whether the

3

Government-issued specifications should be regarded as *reasonably precise*. Rec. Doc. 6082-3, at 6-11.[2] Rather than refute Bechtel's position, Plaintiffs adopted it and then made a series of wholly tangential unrelated arguments. For example, Plaintiffs attack *Baldassaro's* significance. *Id*. at 12. Plaintiffs claim that in that decision, "[n]either the government contractor defense nor the *Boyle* requirements for its applicability were mentioned or discussed." *Id*.

The Court should not be led astray. In *Baldassaro v. United States*, the Fifth Circuit took up both *Boyle* and the fundamental policy for immunizing the Government's contractors:

> [Plaintiff] distinguishes *Boyle v. United Technologies Corp.*, arguing that, in contrast to the nonexistent policy factors that underlie decisions regarding the design of bunks on RRF vessels, the design and decision making process for military equipment, i.e., a co-pilot emergency escape hatch system for a military helicopter, is clearly based on social, economic and political policy factors. Again, for the reasons expressed, we are convinced that the government's design decisions in this instance are capable of being influenced by policy considerations. . . .
> 
> The decision to use detachable sea rails was but one of myriad details that added up to the total ship design eventually approved by MARAD as an exercise of its discretion in selecting vessels that it determined were of value for national defense. We venture that almost any exercise of governmental discretion could be overly parsed so as to focus on minute details of sub-decisions to the point that any relationship to policy would appear too attenuated. But doing that obscures the very purpose of the discretionary function exception. Clearly, that purpose is to prevent judicial "second-guessing" of decisions arising from and grounded in policy. We are neither in a position-nor do we desire to be-to dissect and second-guess each discreet aspect of a total design package that is grounded in policy considerations pertaining to national defense. Indeed, such tunnel-visioned analyses would render the discretionary function exception nugatory and open virtually every decision that implements a governmental policy to liability under some waiver of sovereign immunity.

64 F.3d 206, 211-212 (5th Cir. 1995). Thus, *Baldassaro* establishes that to protect the Government's discretion, courts must let contractors assert the defense even if the Government

---

[2] This question involved three parts. *First*, to what feature of Bechtel's work should the Court apply the defense's three conditions. Put another way, may Plaintiffs plead around the defense by artfully challenging some extra feature of work the Government never included in its task orders. *Second*, should the Court regard the Government approved specifications as reasonably precise even if the specifications were, as Plaintiffs contend, totally silent as to the specific defect – the lack of an engineered jacking process – that Plaintiffs complain of. *Third*, apart from any written specifications, has the Government approved reasonably precise specifications through post-performance inspections, Government acceptance, and use of Bechtel's work upon completion. Rec. Doc. 6082-3, at 3-4.

has not specified (i.e., overly parsed) every step of a federal project. Rec. Doc. 6082-3, at 8.

## IV. <u>PLAINTIFFS OVERSTATE THE *IN RE AGENT ORANGE* SPECIFICATIONS.</u>

Plaintiffs overstate the level of precision in the specifications at issue in the Second Circuit's *In re Agent Orange* decision. Plaintiffs say that, "[u]nlike dioxin in Agent Orange, Bechtel was not limited by government specifications," Rec. Doc. 8072, at 8, and that, "the contractor in *In re Agent Orange* [ ] was limited by specifications regarding the percentages of the chemicals and the purity of the final product," Rec. Doc. 8072, p. 9. Plaintiffs exaggerate the facts and wholly mischaracterize the holding of *In re Agent Orange*. The *Agent Orange* contractors "admit[ed] that they were under no federal contractual duty to produce Agent Orange using any particular manufacturing process or with any particular reference to the resulting toxicity levels." *In re Agent Orange*, 517 F.3d 76, 93 (2d Cir. 2008). The *Agent Orange* contractors argued "that the manufacture of dioxin-free Agent Orange was impossible and that, in any event, they could not have complied with their procurement contracts with the government had they used the slower, less efficient, [ ] method" advocated by the plaintiffs. *Id*.

Plaintiffs mischaracterize the Second Circuit's holding because they cannot confront it directly. Plaintiffs know that, if the Order had applied the defense to the Government-issued installation specifications – as the Second Circuit applied the defense to the Agent Orange component specifications rather than the nonexistent but artfully pled dioxin specifications – the defense would have barred Plaintiffs' claims entirely. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) ("Where the government has directed a contractor to do *the very thing that is the subject of the claim*, we have recognized this as a special circumstance where the contractor may assert a defense.") (emphasis added). In any case, at a minimum, *In re Agent Orange* provides ample basis for finding that substantial ground for a difference of opinion exists about the controlling legal issues involved in the Order. *See* Rec. Doc. 6082-3, at 4-11.

5

## V.     <u>PLAINTIFFS' PHANTOM ISSUES HAVE NO BEARING ON THIS MOTION.</u>

Plaintiffs ignore the substantive legal issues raised by the motion and pretend instead that fact questions surrounding the non-existent specifications for a specific jacking process thwart Bechtel's present motion. For example, Plaintiffs ask whether the Government inspected Bechtel's "jacking," Rec. Doc. 8072, at 9; whether Bechtel generated jacking drawings, instructions, or testing, Rec. Doc. 8072, at 11; whether the Government substantively reviewed Bechtel's jacking specifications, Rec. Doc. 8072, at 12; or whether the Government's inspected, approved, and used a specific jacking process, Rec. Doc. 8072, at 11. Plaintiffs' fact questions raise purely phantom issues related to the nonexistent specific jacking process about which they complain. These issues have as much relevance to Bechtel's present motion as the *Agent Orange* plaintiffs' questions about the nonexistent but artfully pled dioxin specifications had to the *Agent Orange* contractor's ability to assert the defense, meaning none.

## VI.     <u>SILENCE IN THE SPECIFICATIONS SAYS NOTHING DISPOSITIVE.</u>

Plaintiffs now concede that their argument against the application of the government contractor defense boils down to a single, albeit erroneous proposition. Plaintiffs assert that: "[s]ilence in the government specifications regarding the defective feature or process is the equivalent of granting the contractor full discretion as to how to perform that portion of the contract." Rec. Doc. 8072, at 7-8. Apart from its mistaken premise[3] and unjustified discounting of the Government's involvement,[4] Plaintiffs' contention ignores black letter contract law.

---

[3] Bechtel maintains that the Government issued reasonably precise specifications for installing emergency housing "as expeditiously as possible" by "raising the Plaintiffs' travel trailer several feet into the air and off of its wheel base, and setting it on concrete blocks." Rec. Doc. 6082-3, at 5-6. Exhibit Seven instructed that "[t]ravel trailers shall be set-up on concrete piers"; "the weigh [sic] of the travel trailer is transferred to the piers"; "[a]fter the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned." *Id*. at 6.

[4] Plaintiffs admit the Government inspected, approved, and used Bechtel's work but complain that cannot satisfy the defense since the Government never detected the alleged failure to engineer a specific jacking process. *See* Rec. Doc. 2894, at 4; Rec. Doc. 8072, at 15. Plaintiffs logic is circular, contrary to the case law, and ignores the Government's strict control of its contractor. *See* Rec. Doc. 2796-3, at 11-13, 14-22.

6

Assume, *arguendo*, that the Government hired a contractor to perform only those specific features of work contained in a task order, e.g., install emergency housing as expeditiously as possible. Also assume that the task order makes no mention of an additional, design engineering feature of work, e.g., designing a specific jacking process, which, at any time, the Government could have included in the task order but did not.[5] If both assumptions hold, then it follows that the Government has not hired its contractor to perform that additional feature of work. Even more so when the contract expressly warns that "the Contractor is not authorized to make expenditures or incur obligations exceeding the amount obligated under individual task orders." Rec. Doc. 2796-7, at 22. Any other construction imposes an extra-contractual duty, i.e., a tort duty, to perform work that the Government never tasked its contractor with performing.

Plaintiffs may argue about what extra-contractual work or methods Bechtel "should have" or "could have" performed. These tort arguments, however, have no bearing on whether the Government, in its discretion, approved *reasonably precise* specifications. Only the terms of the Government's agreement with its contractor matter for that inquiry. Importing extra-contractual tort duties into the Government's specifications imposes the very same obligation to ferret out latent defects that both the *Boyle* Court and the Fifth Circuit have rejected. *Boyle*, 487 U.S. at 512-13; *Kerstetter*, 210 F.2d at 436-37. The defense precludes that. Indeed, contractors may establish the defense in spite of "defects that neither the contractor nor the government considered." Rec. Doc. 6082-2, at 7; Rec. Doc. 2796-3, at 14. The fact that the Government never "fully appreciate[d] the risks latent in" the specifications *does not mean* that the Government did not approve *reasonably precise* specifications. *Kerstetter v. Pac. Sci. Co.*, 1999 U.S. Dist. LEXIS 22536, *50 (S.D. Tex. May 26, 1999).

---

[5] The Government's failure to task Bechtel with designing a specific jacking process proves much since the Government had strict control over Bechtel and could modify the task order *unilaterally*, *at any time*, and *entirely at its discretion*. *See* Rec. Doc. 6082-3, at 12-13; *see also* 48 C.F.R. § 52.246-5(c), (d); 48 C.F.R. § 52.243-2.

7

Plaintiffs may not subject Bechtel to lengthy litigation merely because the Government, in its effort to house the hundreds of thousands of displaced residents pursuant to the Stafford Act's mandate, exercises its discretion in directing its contractor to install Government-provided temporary emergency housing in accordance with Exhibit Seven *as expeditiously as possible*. *See T.L. James & Co. v. Traylor Bros.*, 2000 U.S. Dist. LEXIS 4378 (E.D. La. Mar. 23, 2000) ("the [Government] is responsible for things caused by defects in the plans and specifications"). Plaintiffs may not employ the federal forum as a vehicle for second-guessing the Government's exercise or failure to exercise its discretion through the vehicle of a tort suit against the Government's contractors. *See Ackerson v. Bean Dredging LLC,* No. 07-30272, slip op. at 16-17 (5th Cir. Nov. 25, 2009) (holding contractor immune from suit when "the actions causing the alleged harm were taken pursuant to contracts with the federal government"); *see also Boyle*, 487 U.S. at 512 ("It makes little sense to insulate the Government against financial liability for the judgment that a particular [temporary emergency travel trailer] is necessary when the Government [furnishes] the equipment itself, but not when it contracts for the [installation].").

## VII. <u>PLAINTIFFS FAIL TO STATE A *PLAUSIBLE* CLAIM FOR RELIEF.</u>

Parties may plead themselves out of court, and Plaintiffs have done so here. "Factual assertions in pleadings are judicial admissions conclusively binding on the party that made them. [Plaintiffs] may not now argue contrary to the factual allegations of [Plaintiffs] complaint." *See Morales v. Dept. of the Army*, 947 F.2d 766, 769 (5th Cir. 1991). To avoid dismissal, Plaintiffs had to plead facts which stated a *plausible* claim for relief, meaning Plaintiffs had to make factual allegations that elevated their right to relief above the speculative level. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Ackerson v. Bean Dredging LLC*, No. 07-30272, slip op. at 19. Plaintiffs' facts must advance their claims "across the line from conceivable to *plausible*." *Iqbal*, 129 S. Ct. at 1951 (emphasis added). Plaintiffs fail that test.

Indeed, Plaintiffs own facts provide more likely explanations for the alleged harm. The Government-provided temporary emergency housing contained formaldehyde *well before* Bechtel performed any work. Rec. Doc. 6082-3, at 14-15 ("*new, unused trailers . . . unoccupied units, had high levels of formaldehyde*"). Moreover, even if Bechtel had performed no work whatsoever, the emergency housing would have emitted formaldehyde for four to five years. *Id*. at 15 (even without blocking, "trailer building materials continue to emit formaldehyde for four to five years"). Plaintiffs cannot escape the allegations in their own complaint.

To their credit, however, Plaintiffs make no attempt to defend their allegations as plausible. Plaintiffs claim instead that Bechtel's arguments for why *Iqbal* offers a substantial ground for a difference of opinion lacks merit for no reason other than that Bechtel has not shown "that this Court's Order is contrary to the ruling of all Courts of Appeals." Rec. Doc. 8072, at 19-20. As explained in Part I, *supra*, Plaintiffs misconstrue the authority they cite to the Court. For the reasons set forth in Bechtel's motion, Bechtel submits that, at a minimum, whether Plaintiffs' allegations show any entitlement to relief is a purely legal question for which substantial ground for a difference of opinion exists. Rec. Doc. 6082-3, at 14-16.

### VIII. APPELLATE REVIEW OF THE ORDER WOULD MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION.

Plaintiffs state that since the Order turned on the application of the defense's first condition, "the second and third elements would still have to be discussed and proven by Bechtel." Rec. Doc. 8072, at 19. As such, Plaintiffs claim, immediate appellate review would not materially advance the ultimate termination of this litigation.

Conveniently, however, Plaintiffs fail to disclose that the entirety of their opposition to Bechtel's arguments for the second and third conditions relied on the same legal issues raised by the Order, namely on the nonexistent specific jacking process specifications. Rec. Doc. 2894, at

9

19-21. Thus, immediate appellate review of the Order will materially advance this litigation because it has the potential for substantially accelerating, if not also terminating, the final disposition of the litigation. *Philibert v. Ethicon, Inc.*, No. Civ. A. 04-220, 2004 WL 1922032, at *5 (E.D. La. Aug. 25, 2004).

## IX. CONCLUSION

The Court should certify its Order for interlocutory review under 28 U.S.C. § 1292(b). Determining whether Plaintiffs presented a *plausible* claim for relief under *Ashcroft v. Iqbal* and whether the actual specifications that the Government approved for its contractor should be regarded as *reasonably precise* involve purely legal questions. There exists substantial ground for a difference of opinion as to how to resolve these two controlling legal issues. Immediate review of these two issues would materially advance the ultimate termination of the litigation.

Respectfully submitted,
**FRILOT L.L.C.**

/s/     John J. Hainkel, III
JOHN J. HAINKEL, III – La. Bar No. 18246
A. J. KROUSE - La. Bar No. 14426
DAVID P. CURTIS – La. Bar No. 30880 (Ms. Bar - 102092)
CAROLYN B. HENNESY - La. Bar No. 25089
PETER R. TAFARO – La. Bar No. 28776
3700 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:     (504) 599-8000
Facsimile:     (504) 599-8100
Attorneys for Bechtel National, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was filed electronically using the CM/ECF system. Notice of this filing will be forwarded to all known counsel by operation of the court's electronic filing system. I also certify that I have emailed a copy of this filing to any non-CM/ECF participants on this the 30th day of November, 2009.

/s/
JOHN J. HAINKEL, III