**7/7/2009  Garratt, David E.**

```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF LOUISIANA

 3                   NEW ORLEANS DIVISION

 4    In Re:  FEMA Trailer   )

 5    Formaldehyde Products  ) MDL No. 1873

 6    Liability Litigation   )

 7

 8                              Washington, D.C.

 9                              Tuesday, July 7, 2009

10    Videotape Deposition of DAVID EDWARD GARRATT, called

11    for examination by counsel for Plaintiffs in the

12    above-entitled matter, the witness being duly sworn

13    by CHERYL A. LORD, a Notary Public in and for the

14    District of Columbia, taken at the offices of NELSON

15    MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16    Avenue N.W., Suite 900, Washington, D.C., at 9:07

17    a.m., and the proceedings being taken down by

18    Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

**7/7/2009  Garratt, David E.**

```
1     APPEARANCES:

2

3     Plaintiffs' Co-Liaison Counsel:

4          JUSTIN I. WOODS, ESQ.

5          GERALD E. MEUNIER, ESQ.

6          TARA GILBREATH, ESQ.

7          GAINSBURGH, BENJAMIN, DAVID, MEUNIER &

8          WARSHAUER, LLC

9          1100 Poydras, Suite 2800

10         New Orleans, LA  70163-2800

11         (504) 522-2304

12

13    On behalf of the United States of America and David

14    E. Garratt:

15         HENRY T. MILLER, ESQ.

16         Senior Trial Counsel

17         UNITED STATES DEPARTMENT OF JUSTICE

18         1331 Pennsylvania Avenue, N.W.

19         Washington, D.C.  20004

20         (202) 616-4223

21

22
```

**7/7/2009  Garratt, David E.**

```
1     APPEARANCES CONTINUED:

2

3     On behalf of the United States Federal Emergency

4     Management Agency:

5          JANICE WILLIAMS-JONES, ESQ.

6          Trail Attorney

7          JORDAN FRIED, ESQ.

8          Deputy Chief

9          UNITED STATES FEDERAL EMERGENCY MANAGEMENT

10         AGENCY

11         OFFICE OF THE CHIEF COUNSEL

12         409 3rd Street S.W., Suite 206

13         Washington, D.C.  20472

14         (202) 646-4168

15

16    On behalf of Forest River Inc.:

17         JASON D. BONE, ESQ.

18         GIEGER, LABORDE & LAPEROUSE LLC

19         701 Poydras Street, 48th Floor

20         New Orleans, LA  70139-4800

21         (504) 561-0400

22
```

**7/7/2009  Garratt, David E.**

```
1      APPEARANCES CONTINUED:

2

3      On behalf of Keystone RV Company, Dutchmen

4      Manufacturing Inc., DS Corp., Thor California Inc.,

5      and KZ RV, LP:

6           RYAN E. JOHNSON, ESQ.

7           JONES, WALKER, WAECHTER, POITEVENT, CARRERE &

8           DENEGRE LLP

9           8555 United Plaza Boulevard

10          Baton Rouge, LA  70809-7000

11          (225) 248-2080

12

13     On behalf of Fluor Enterprises Inc.:

14          CHARLES R. PENOT JR., ESQ.

15          MIDDLEBERG RIDDLE & GIANNA

16          717 N. Harwood, Suite 2400

17          Dallas, TX  75102

18          (214) 220-6334

19

20

21

22
```

**7/7/2009  Garratt, David E.**

```
1     APPEARANCES CONTINUED:

2

3     On behalf of Fleetwood Enterprises Inc.:

4          TAYLOR TAPLEY DALY, ESQ.

5          NELSON MULLINS RILEY & SCARBOROUGH LLP

6          201 17th Street N.W., Suite 1700

7          Atlanta, GA  30363

8          (404) 322-6156

9

10    On behalf of Gulf Stream Coach Inc.:

11         TIMOTHY D. SCANDURRO, ESQ.

12         SCANDURRO & LAYRISSON LLC

13         607 St. Charles Avenue

14         New Orleans, LA  70130

15         (504) 522-7100

16

17    On behalf of Bechtel National Inc.:

18         JOHN J. HAINKEL III, ESQ.

19         FRILOT LLC

20         1100 Poydras Street, Suite 3700

21         New Orleans, LA  70163-3600

22         (504) 599-8021
```

```
1     APPEARANCES CONTINUED:

2

3     On behalf of Heartland Recreational Vehicles:

4          BRENT M. MAGGIO, ESQ.

5          ALLEN & GOOCH, A LAW CORPORATION

6          3900 N. Causeway Boulevard, Suite 1450

7          Metairie, LA  70002

8          (504) 836-5200

9

10    On behalf of Recreation by Design LLC, TL Industries

11    Inc., Frontier RV Inc., and Play'mor Trailers Inc.

12         RANDALL C. MULCAHY, ESQ.

13         GARRISON, YOUNT, FORTE & MULCAHY LLC

14         909 Poydras Street, Suite 1800

15         New Orleans, LA  70112

16         (504) 527-0680

17         Appearing by telephone

18

19

20

21

22
```

**7/7/2009  Garratt, David E.**

1    APPEARANCES CONTINUED:

2

3    On behalf of Starcraft RV Inc. and Jayco Inc.:

4         HAL L. ROACH JR., ESQ.

5         WILLINGHAM, FULTZ & COUGILL LLP

6         808 Travis, Suite 1608

7         Houston, TX  77002

8         (713) 333-7600

9         Appearing by telephone

10

11   On behalf of CMH Manufacturing Inc., Southern Energy

12   Homes, SunRay Investments LLC, and Giles Family

13   Holdings LLC:

14        JAMES K. CARROLL, ESQ.

15        FOWLER RODRIGUEZ VALDES-FAULI

16        400 Poydras Street, 30th Floor

17        New Orleans, LA  70130

18        (504) 523-2600

19        Appearing by telephone

20

21

22

**7/7/2009  Garratt, David E.**

```
 1     APPEARANCES CONTINUED:

 2

 3     On behalf of Shaw Environmental Inc. and CH2M Hill

 4     Constructors Inc.:

 5          CATHERINE THIGPEN, ESQ.

 6          BAKER, DONELSON, BEARMAN, CALDWELL &

 7          BERKOWITZ PC

 8          201 St. Charles Avenue, Suite 3600

 9          New Orleans, LA  70170

10          (504) 566-5241

11          Appearing by telephone

12

13     On behalf of Morgan Building and Spas:

14          DAN E. WEST, ESQ.

15          McGLINCHEY STAFFORD PLLC

16          301 Main Street, 14th Floor

17          Baton Rouge, LA  70825

18          (225) 383-9000

19          Appearing by telephone

20     ALSO PRESENT:

21          Qais Ghafary, Charles "Al" Whitaker in PM

22          session only, and Dan Reidy, videographer
```

7/7/2009  Garratt, David E.

```
 1                 C O N T E N T S

 2      WITNESS                        EXAMINATION

 3                                     PAGE NO.

 4      DAVID EDWARD GARRATT

 5           By Mr. Woods                    13

 6           By Mr. Meunier                  71

 7           By Mr. Scandurro               203

 8           By Mr. Hainkel                 218

 9           By Mr. Miller                  228

10           By Mr. Meunier                 234

11           By Mr. Miller                  242

12

13                 E X H I B I T S

14                 (Exhibits attached.)

15      GARRATT EXHIBIT NO.              PAGE NO.

16      1   Notice of Oral and Videotaped

17          Deposition of David Garratt       14

18      2   Defendant United States of

19          America's Motion to Dismiss

20          Plaintiffs' Remaining FTCA Claims

21          for Lack of Subject Matter Jurisdiction   27

22      3   Email, 8-17-06, FEMA-Waxman-2489-93       50
```

**7/7/2009  Garratt, David E.**

```
1              E X H I B I T S   C O N T I N U E D

2        GARRATT EXHIBIT NO.                        PAGE NO.

3

4        4    Letter, FEMA17-010962-63                   58

5        5    Email, 5-18-07, DHS_S&T_6040-44            64

6        6    Email, 6-27-06, FEMA-Waxman - 791-92      143

7        7    Email, 5-17-07, FEMA17-0009030-33         160

8        8    Email, 5-18-07, DHS_S&T_4856-57           166

9        9    Email, 5-23-07, DHS_S&T_3702-03           174

10       10   Email, 5-25-07, FEMA17-006442-58          177

11       11   Email, 6-4-07, FEMA17-009258              185

12       12   Email, 6-5-07, FEMA17-009327              188

13       13   Email, 6-8-07, FEMA17-009411-12           194

14       14   Email, 11-2-07, FEMA17-013853-54          196

15       15   Email, 7-30-07, FEMA17-015474-76          198

16       16   Email, 8-18-07, DHS_S&T_4060-62           203

17       17   Memorandum, 7-26-06, FEMA-Waxman

18            - 23-25                                   213

19       18   Email, 7-30-07, FEMA17-015472-73          240

20

21

22
```

**7/7/2009  Garratt, David E.**

```
1                    P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:  This begins tape number

4     1 in the video deposition of David Garratt, taken by

5     the plaintiff in regards to the FEMA trailer

6     formaldehyde products liability litigation filed in

7     the U.S. District Court, Eastern District of

8     Louisiana, number MDL 1873.

9              Today's deposition is being held at the

10    law offices of the Nelson Mullins, 101 Constitution

11    Avenue N.W., suite 900, Washington, D.C., 20001.

12             For identification purposes, I'm Dan

13    Reidy, the video operator, with Alderson Court

14    Reporting.  The stenographer is Cheryl Lord, also

15    with Alderson Court Reporting.

16             Today's date is July it 7th, 2009.  The

17    time on the video is 9:07 AM.  We are on the record.

18             At this time, will all counsel please

19    introduce yourself and whom you represent, starting

20    with the plaintiffs' counsel, please.

21             MR. WOODS:  Justin Woods, for plaintiffs.

22             MR. MEUNIER:  Gerry Meunier, for
```

1    plaintiffs.

2              MR. BONE:  Jason Bone, Forest River

3    Incorporated.

4              MR. JOHNSON:  Ryan Johnson, for Keystone

5    RV, Thor California, Dutchmen Manufacturing, DS

6    Corp., KZ RV.

7              MS. DALY:  Taylor Daly for the Fleetwood

8    defendants.

9              MR. PENOT:  Charles Penot, for Fluor

10   Enterprises Inc.

11             MR. MAGGIO:  Brent Maggio, for Heartland

12   Recreational.

13             MR. HAINKEL:  John Hainkel, for Bechtel

14   National Inc.

15             MR. SCANDURRO:  Tim Scandurro, for Gulf

16   Stream Coach.

17             MS. GILBREATH:  Tara Gilbreath, for the

18   plaintiffs.

19             MR. MILLER:  Henry Miller, for the United

20   States.

21             MR. GHAFARY:  Qais Ghafary, for the United

22   States.

**7/7/2009  Garratt, David E.**

```
1              THE VIDEOGRAPHER:  Will the court reporter
2    please swear in the witness.
3
4    Whereupon,
5                  DAVID EDWARD GARRATT
6    was called as a witness by counsel for Plaintiffs,
7    and, having been duly sworn by the Notary Public, was
8    examined and testified as follows:
9
10            EXAMINATION BY COUNSEL FOR PLAINTIFFS
11              BY MR. WOODS:
12    Q.    Good morning, Mr. Garratt.
13              Again, my name is Justin Woods.  I'm
14    counsel for the plaintiffs in this MDL litigation,
15    along with Gerry Meunier and Tara Gilbreath from --
16    from our office of Gainsburgh, Benjamin in New
17    Orleans.
18              First I want to start just some
19    administrative task, and that is to -- I want to ask
20    you if you've seen this notice of oral and videotape
21    deposition of David Garratt.
22    A.    No, I don't recall seeing this.
```

**7/7/2009  Garratt, David E.**

1       Q.    Okay.   What it is is basically a notice to

2    all counsel that we're taking your deposition.   The

3    plaintiffs are taking your deposition today, July 7,

4    2009.

5            Now, I had an understanding before we went

6    officially on the record that Garratt is spelled

7    G-A-R-R-A-T-T.

8       A.    Correct.

9       Q.    The notice has -E-T, so I'll just make

10   that correction to the notice if there's no

11   objection.

12           And we'll mark as Garratt 1 the notice of

13   deposition.

14                         (Garratt Exhibit No. 1

15                          was marked for

16                          identification.)

17           MR. MILLER:  Everybody, please mute your

18   telephones if you're listening on-line.

19           Thank you.

20           BY MR. WOODS:

21      Q.    Mr. Garratt, could you tell us what

22   position you hold currently?

**7/7/2009  Garratt, David E.**

1          A.      Acting deputy administrator of the Federal

2    Emergency Management Agency.

3          Q.      Could you give us a brief description of

4    what your duties are as acting deputy.

5          A.      Basically to manage the Federal Emergency

6    Management Agency and support the administrator in

7    the management of the agency.

8          Q.      When you say, support that admin -- the

9    administrator, who is currently the administrator?

10         A.      W. Craig Fugate.

11         Q.      And how long have you held your position

12   as acting deputy director?

13         A.      Since January 21st.

14         Q.      Of?

15         A.      2009.

16         Q.      And prior to January 21st, 2009, what was

17   your job title?

18         A.      Deputy assistant administrator of disaster

19   assistance.

20         Q.      And how long did you hold that position?

21         A.      On and off since May of 2005.

22         Q.      And what were your duties involved in that

**7/7/2009  Garratt, David E.**

```
1    position?

2         A.    Managing the programs and responsibilities

3    of that directorate, supporting the -- either

4    recovery director or assistant administrator in that

5    capacity.

6         Q.    I just want to go back for a second.

7               You said W. Craig Fugate is the --

8         A.    -- administrator.

9         Q.    -- administrator.

10              Who does Mr. Fugate report to?

11        A.    Secretary Napolitano, the Department of

12   Homeland Security.

13        Q.    And how long has Mr. Fugate been

14   administrator?

15        A.    Approximately a month and a half.  I don't

16   remember the exact date that he was confirmed and

17   came on board.

18        Q.    So all of these -- your position as acting

19   deputy director and Mr. Fugate's position as

20   administrator, is that current because of the change

21   in administration to the Obama administration?

22        A.    I'm in this position because the outgoing
```

**7/7/2009  Garratt, David E.**

1    administration -- the politicals (phonetic) in the

2    administration now left the agency.  Mr. Fugate came

3    on board as the new political administrator for the

4    agency.

5         Q.    Okay.  You said you've held the position

6    as deputy administrator on and off for a period since

7    May of 2005.

8         A.    Deputy assistant administrator, and during

9    a part of that time as the deputy director.  There's

10   been a title change within that organization since

11   2005.  Responsibilities are the same.  Title's

12   changed.

13        Q.    Okay.  Prior to May of 2005, what was your

14   job position?

15        A.    I was the acting director of preparedness.

16        Q.    And how long did -- when were you

17   appointed to that position?

18        A.    It was either December or January of two

19   thousand and -- either December of 2004 or January of

20   2005.

21        Q.    So you held that position from January of

22   2005 to May of 2005?

**7/7/2009  Garratt, David E.**

1           A.      Right.

2           Q.      And what were your duties?

3           A.      Manage the preparedness division.

4           Q.      And when you say, manage the preparedness

5    division, I'm assuming that for disasters natural or

6    otherwise that --

7           A.      You can assume that that certainly

8    encompasses a substantial amount of what we prepare

9    for, but we also prepare for things other than that.

10              Preparedness encompasses a wide range of

11   responsibilities that belong to FEMA, for example,

12   continuity of operations, continuity of government,

13   et cetera.  And so preparedness kind of runs the

14   gamut across all of those functional areas.

15              The principal focus is on preparing for

16   disasters, yes.

17          Q.      Okay.  Now, continuing on and going back,

18   prior to January of 2005, what was your position?

19          A.      Prior to January of 2005, I was the acting

20   deputy director of preparedness.

21          Q.      And how long did you hold that position?

22          A.      I don't remember.  I think it was

**7/7/2009  Garratt, David E.**

1      approximately 6 months to a year.

2           Q.      I'd say (phonetic) we go back to 2004.

3                   Well, what position did you hold before --

4           A.      Chief --

5           Q.      -- that?

6           A.      -- of the capability assurance branch,

7      also known prior to again a name tit- -- name change,

8      the director of the assessment and exercise division.

9           Q.      I'm sorry.

10                  Assessor of --

11          A.      It was 2 titles during that period of

12     time, same function, chief capability assurance

13     branch.

14          Q.      M-hm.

15          A.      It was renamed from the assessment and

16     exercise division.

17          Q.      And what were your job duties in that

18     position?

19          A.      Other than manage the functions of the --

20     the division and/or branch, it was to manage the

21     assessment programs that the agency had to look at,

22     both federal and state and local capability as well

**7/7/2009  Garratt, David E.**

1     as schedule, develop, execute various forms of -- or

2     various exercises to support largely disaster

3     operations.

4          Q.     And how long did you hold that position?

5          A.     I don't remember.  A couple of years I

6     think.

7          Q.     Okay.  And prior to this position, what

8     was your job title?

9          A.     I was the executive operations officer in

10    the response and recovery directorate, possibly

11    division.

12         Q.     I'm sorry.

13                At?

14         A.     The executive operations officer for --

15    went through a number of name changes.  At one time,

16    it was the response and recovery directorate.  Then

17    it became the response recovery readiness division,

18    and then I think it reverted back to response and

19    recovery, but in any case, it was one of those 3.

20         Q.     And how long did you hold that position?

21         A.     Maybe a year.

22         Q.     And job duties for this particular

7/7/2009  Garratt, David E.

1    position?

2         A.    Typical exec officer responsibilities

3    supporting the administrator and/or director of that

4    division and/or directorate, sort of a

5    troubleshooter, following up, making sure folks

6    got -- got business taken care of.

7         Q.    Okay.  Prior to that position, what was

8    your job title?

9         A.    What was my job title prior to that?

10              I'm not sure I remember what my job title

11   was prior to that.

12        Q.    But was it still with -- you were still

13   with FEMA?

14        A.    I was.  I was in a suborganization within

15   the response and recovery directorate.  I don't

16   remember what the name of the organization was.  It

17   went through many -- so many changes.

18        Q.    Well, let me ask this question.

19              How long have you been with FEMA?

20        A.    14 years.

21        Q.    Let's tackle it from the other end.

22              How did you begin?

**7/7/2009  Garratt, David E.**

1           What was your -- do you recall what your

2    first job title was?

3        A.    Just a program specialist.  I'm not sure I

4    had a title per se, other than the position that I

5    applied for.  It was in the federal planning branch,

6    I believe.

7        Q.    So once you began your tenure with FEMA,

8    you began as a program specialist, but eventually,

9    throughout the past 14 years worked in various

10   positions and through the reorganization of FEMA, and

11   that was in 2007?

12       A.    Couple of reorganizations.

13       Q.    To where you're now the acting deputy

14   director?

15       A.    Deputy administrator.  And again, this is

16   a temp gig.

17       Q.    What does that mean?

18       A.    It means that this is a Senate-confirmed

19   position, so there will be a Senate-confirmed

20   appointee coming in to replace me, and I'll be

21   reverting back to the deputy assistant administrator

22   of disaster assistance, career position that I

**7/7/2009  Garratt, David E.**

1    permanently hold.

2         Q.    Prior to your 14 years with FEMA, what was

3    your professional employment?

4         A.    20 years with the United States Air Force.

5         Q.    And what was your rank?

6         A.    Master sergeant, E 7.

7         Q.    And your career with the Air Force, did

8    that begin immediately after high school or college?

9         A.    It began approximately a year after high

10   school.

11        Q.    Do you hold any degrees from any colleges

12   or universities?

13        A.    Upper Ohio University, bachelor's in

14   public administration.

15        Q.    And when did you obtain that degree?

16        A.    About 6 months after joining FEMA, so that

17   would have been in late 1995.

18        Q.    Any other degrees?

19        A.    No.

20        Q.    No.

21              Any special certifications?

22        A.    Nothing noteworthy.

**7/7/2009  Garratt, David E.**

```
1           Q.    I'm sure anything -- anything that you
2     receive a special certification in is noteworthy, but
3     maybe not for this litigation.
4                 I just want to ask you one question on
5     your positions, in your current position, Admiral
6     Harvey Johnson served as -- in what position with
7     FEMA?
8           A.    Acting deputy administrator and deputy
9     administrator.
10          Q.    And when did he serve in that position, if
11    you know?
12          A.    I think he officially came on board in May
13    of 2006, maybe 2007.  I think it was 2006.
14          Q.    And when did -- and he left that position
15    when you assumed it January 21, 2009?
16          A.    Affirmative.
17          Q.    Prior to Admiral Johnson, who held that
18    position?
19          A.    Prior to Admiral Johnson, who held that
20    position.
21                I'm not sure anybody held that position
22    prior to Admiral Johnson.
```

**7/7/2009  Garratt, David E.**

```
1              (Pause.)
2         A.    Let's see, I'm not sure anybody officially
3    held that position prior to Admiral Johnson.  I think
4    Ken Buras may have been -- sort of quasi-functioned
5    in that role, but -- but I don't believe Chief
6    Paulison had a deputy until Admiral Johnson came on
7    board.
8              BY MR. WOODS:
9         Q.    Tell me this:  What was the operational
10   hierarchy in August of 2005?
11             MR. MILLER:  Objection, vague.
12        A.    Beginning where?
13             BY MR. WOODS:
14        Q.    With the secretary.
15        A.    Secretary Chertoff, deputy secretary,
16   Michael Jackson, August 2005, the FEMA director, Mike
17   Brown.
18             How far down?
19        Q.    Let's go to your position of deputy
20   assistant administrator.
21        A.    Okay.  Then it would have been the --
22   August of 2005, the director of recovery, Dan Craig,
```

**7/7/2009  Garratt, David E.**

```
1    and then myself, the deputy director of recovery.
2         Q.    And once there was the reorganization of
3    2007, after this 2005 hierarchy, what if any of these
4    positions that you've just named in the hierarchy
5    were either eliminated or redirected?
6         A.    None of them were eliminated.  Some of
7    them were renamed.  And a number of them have been
8    filled with new faces.
9         Q.    So you were -- you've been with FEMA when
10   FEMA was its own department and did not come under
11   Homeland Security.
12             Correct?
13        A.    Correct.
14        Q.    Mr. Garratt, what I want to show you next
15   is -- it was U.S. exhibit number 27 to defendant
16   United States of America's motion to dismiss
17   plaintiffs' remaining FTCA claims for lack of subject
18   matter jurisdiction, and it's a document entitled,
19   declaration of David Garratt.
20             Could you please turn to page 6 of that
21   document.  And you will see there's a signature
22   there.
```

**7/7/2009  Garratt, David E.**

1               Is that indeed your signature?

2      A.    It is.

3                       (Garratt Exhibit No. 2

4                       was marked for

5                       identification.)

6           BY MR. WOODS:

7      Q.    I just want to ask you a few questions

8  about this declaration that you completed.

9           First, I want to ask:  For what reason

10  were you told that you needed to complete a

11  declaration?

12           MR. MILLER:  Well, I'm going to -- I'm

13  going to object to the extent it calls for

14  attorney-client communications.

15           Instruct the witness not to answer.

16           BY MR. WOODS:

17      Q.    Let me ask it this way:  What is your

18  understanding of what you were trying to communicate

19  as part of this declaration?

20      A.    I'm not sure I understand the question.

21      Q.    Okay.  At some point in -- I don't want to

22  get into an area of getting into

1    attorney-client-privileged meeting, what the FEMA

2    lawyers have discussed regarding this case and the

3    need for this declaration, but this is a pretty

4    lengthy declaration.  It's 6 pages.

5          What is your understanding of the purpose

6    of this declaration?

7        A.   As I recall, I was advised that I was

8    going to be involved in litigation.  I don't recall

9    if I was specifically told this was for a deposition

10   or not, but I was advised that I needed to make and

11   file a declaration, and so I did.

12      Q.   But it wasn't a declaration about the

13   inner workings of FEMA.  It wasn't a declaration

14   about response to let's say the wild fires in

15   California.

16         It was a specific declaration that you

17   were asked to complete as it related to Hurricane

18   Katrina and Rita and assistance efforts given by

19   FEMA.

20         Correct?

21      A.   Well, and more specifically, to the

22   formaldehyde-related litigation that -- that has

**7/7/2009  Garratt, David E.**

1    arisen from that.

2         Q.    Okay.  Well, the declaration starts off by

3    explaining what individual assistance is, and it

4    talks about the rebuilding of public systems and

5    facilities.  That has nothing to do with the

6    formaldehyde issue.

7              Correct?

8         A.    Well, it does in the sense that our

9    programs are delivered under the aegis of individual

10   assistance and public assistance, and mobile homes,

11   travel trailers were provided under both of those

12   programs.  That's the authority under which we

13   provide this kind of assistance.

14        Q.    Under the Stafford Act?

15        A.    Yes.

16        Q.    Which brings up a good question:  What is

17   the -- your understanding of the Stafford Act and

18   FEMA's responsibilities?

19              MR. MILLER:  Objection, calls for a legal

20   conclusion.

21              THE WITNESS:  I can still answer?

22              MR. MILLER:  Answer.

**7/7/2009  Garratt, David E.**

1                 Also, objection, narrative.

2         A.     That's a pretty broad question.

3                 Can you narrow that down?

4                 Because the range of our responsibilities

5     under the Stafford Act are pretty enormous, so what

6     exactly again are you asking me?

7                 BY MR. WOODS:

8         Q.     And I want a pretty general answer, not

9     specific, but --

10        A.     Well, then let me -- let me try, and then

11    you tell me if this fills the bill.

12                Stafford Act provides the president

13    enormous authority once he declares -- excuse me -- a

14    major disaster or an emergency to utilize the

15    resources, the authorities of federal agencies with

16    or without reimbursement and supply that assistance

17    to state and local governments and the response to

18    that declared emergency or disaster.

19                Most of his authorities under the Stafford

20    Act are delegated down to the FEMA administrator, so

21    the FEMA administrator literally has the authority to

22    exercise those responsibilities.  And of course the

**7/7/2009  Garratt, David E.**

1    range of those responsibilities are as wide as the

2    authorities and resources and assets of the federal

3    government.

4         Q.    And that's basically after an assessment

5    is done, I assume, based upon whatever that

6    particular emergency is, and a determination is made

7    as to what would be an appropriate response.

8              Correct?

9         A.    Not necessarily.

10             We often will preposition and push assets

11   to venues in advance of for example an approaching

12   hurricane.  So we'll deploy assets and direct federal

13   agencies to begin prepositioning in advance of a

14   major disaster, a declaration, using our surge

15   authority.

16             But -- but generally, post-disaster, we

17   complete preliminary damage assessments.  Once the

18   governor has requested a declaration, and those

19   preliminary damage assessments provide the

20   information that yield an ultimate decision by the

21   president whether an emergency or major disaster

22   declaration is merited.

**7/7/2009  Garratt, David E.**

1          Q.    With that being said, I want to direct you

2     to page 2 of 6, and particularly section 3 of your

3     declaration.  And this is where you're talking about

4     temporary emergency housing assistance to disaster

5     victims.  And I want to direct you to the sentence

6     that begins -- the second sentence of 3.

7               It begins:  From September 2005 to May 1,

8     2009, FEMA has provided a significant number of

9     Hurricane Katrina and Rita disaster victims with at

10    no cost travel trailers, park model trailers, and

11    manufactured housing, also commonly referred to as

12    mobile homes, hereinafter collectively referred to as

13    emergency housing, or EHUs.

14              Did I read that statement correctly, that

15    sentence?

16         A.    Yes.

17         Q.    Mr. Garratt, I want to ask a question:

18    What is the purpose of this sentence in this

19    statement in your declaration?

20         A.    Other than to convey the information that

21    it conveys?

22              (Mr. Fried and Ms. Williams-Jones entered

**7/7/2009  Garratt, David E.**

1            the room.)

2            BY MR. WOODS:

3        Q.    What -- exactly what went into your

4    thinking, and I'm particularly struck by the

5    statement, at no cost.

6        A.    I'm -- I don't think I can tell you why I

7    wrote what I wrote when I wrote this with any level

8    of certainty.

9        Q.    Let me ask you this question.

10           Did you prepare this declaration yourself?

11       A.    I edited a prepared declaration.

12       Q.    Do you know who prepared it?

13       A.    I don't.

14       Q.    Who presented it to you for your

15   signature?

16       A.    One of the FEMA attorneys.

17       Q.    Anyone in this room?

18       A.    (Gesturing) -- I think it was Janice.

19       Q.    And you said that basically you edited

20   this document before signing it?

21       A.    Rather heavily.

22       Q.    Rather heavily.

1          A.     (Nodding head.)

2          Q.     Was this statement a part of the document

3     when you originally --

4          A.     I don't remember.

5          Q.     -- received --

6                 You go on to state after that:  Disaster

7     victims have not been charged for their use of the

8     EHUs, nor have they been required to pay any cost

9     associated with the installation, maintenance, or

10    removal of the units.

11                What is the significance of that statement

12    in this declaration?

13         A.     Other than, again, painting the picture of

14    how we provide these units and the conditions under

15    which they're provided to disaster victims.

16         Q.     So in your mind, it's important to note

17    that the victims have received something at cost --

18    at no cost to them, and they've not been required to

19    pay any costs associated with the installation,

20    maintenance, or removal of the units.

21                Does that mean that they should have no

22    right to complain about what they've received?

**7/7/2009  Garratt, David E.**

```
1        A.     No.
2               What it means is, these units are our
3    responsibility.
4        Q.     So this statement basically means -- what
5    you're trying to convey is that this is FEMA's
6    responsibility.
7               It has no other -- no other meaning
8    besides that?
9        A.     That's correct.
10       Q.     And this is just again to reiterate that
11   the Stafford Act enables FEMA to provide at direct
12   request of the state whatever emergency assistance is
13   necessary for victims?
14       A.     I'm sorry.
15              Say that again.
16       Q.     I'm trying to get to -- this -- this
17   particular statement, and you've just testified, is
18   this to say that FEMA has the authority due to
19   Stafford Act to provide and to -- to respond to
20   disasters, in this particular instance to provide
21   temporary emergency housing assistance to victims?
22              MR. MILLER:  Objection, mischaracterizes
```

**7/7/2009  Garratt, David E.**

```
1    the witness's testimony.

2          A.    I'm still not sure I understand exactly

3    what you're asking.  Let me try this.

4                As part of this declaration, it seems like

5    it's important to try to essentially lay the -- the

6    background for the operation that took place in the

7    Gulf Coast.  And so this paragraph just briefly

8    summarizes what the disaster housing mission is in

9    terms of -- or -- or how it's provided, that

10   assistance is provided under the authority of the

11   Stafford Act, and it essentially says that these --

12   these units are provided at absolutely no cost to the

13   disaster victims and that we, the federal government,

14   are responsible for those units.  That's our

15   responsibility.

16               BY MR. WOODS:

17         Q.    You say, absolutely no cost, so -- but the

18   unit is actually paid for by -- by taxpayer money,

19   isn't it -- aren't they?

20         A.    Right, as disaster victims.

21         Q.    So the disaster victims as taxpayers,

22   they -- they ultimately do pay for the units.
```

**7/7/2009  Garratt, David E.**

1          Correct?

2      A.    I would say that's probably correct, that

3  they -- their taxes go to pay for those units, that's

4  correct, as does the rest of the United States

5  population.

6      Q.    Absolutely, but you're not excluding the

7  disaster victims from -- they didn't get anything per

8  se absolutely free or at no cost to them?

9          MR. WOODS:  Objection, calls for --

10 assumes facts not in evidence.

11     A.    Nothing came out of their pockets in terms

12 of the requirements for this.  They paid no

13 out-of-pocket costs for this.

14         BY MR. WOODS:

15     Q.    At the time that the units were provided,

16 but again, it being funded by taxpayer money,

17 assuming that an individual is a taxpayer that

18 received an EHU, that there is some portion --

19     A.    I'll concede the point.

20     Q.    Okay.  Let's get into talking specifically

21 about the reason we're here, and that's the

22 formaldehyde concerns in the EHUs.

**7/7/2009  Garratt, David E.**

```
1                  In paragraph -- or -- I'm sorry -- section

2      4, which is, again, the next section of your

3      declaration, you say:  I became aware of a possible

4      systemic formaldehyde problem involving EHUs in May,

5      June 2006, following the release of a Sierra Club

6      report recording high formaldehyde readings in

7      occupied EHUs.

8                  Who brought to your attention that Sierra

9      Club report?

10          A.     A member of my staff named Kevin Souza.

11          Q.     And what is Mr. Souza's title?

12          A.     At the time, he was the chief of our IA

13      policy branch.

14          Q.     And IA stands for?

15          A.     I'm sorry.

16                 Individual assistance.

17          Q.     You go on to state that:  In June 2006,

18      the disaster assistance director assumed FEMA

19      responsibility for coordinating the agency response

20      to formaldehyde-related concerns in EHUs.

21                 How did the directorate assume FEMA

22      responsibility for coordination?
```

**7/7/2009  Garratt, David E.**

1          A.      Well, because the emergency housing units

2    are provided under the aegis of the individual

3    assistance program and the public assistance program,

4    those programs are managed at least at the

5    headquarters level by our directorate, so I don't

6    think there was any doubt that this was our

7    directorate's responsibility at the time.

8          Q.      Well, go on to say that prior to the

9    disaster assistance directorate assuming response

10   coordination responsibility of the formaldehyde issue

11   in June 2006, FEMA's Gulf Coast recovery office had

12   through its assigned transitional recovery offices in

13   each state been responding to occupants' air quality

14   complaints on a case-by-case basis.

15          What was your understanding in June of

16   2006 of how the Gulf Coast recovery office was

17   responding to air quality complaints?

18          A.      I'm not sure what you mean when you say my

19   understanding of how they were responding to

20   complaints.

21          You mean the -- the mechanism by which

22   they respond to complaints, how they're set up to

1    respond to complaints?

2         Q.    How they're set up to respond to

3    complaints and how did they actually respond to

4    complaints, if you know?

5              MR. MILLER:  Objection, compound.

6         A.    In terms of the former, the transitional

7    recovery offices, which are really extended versions

8    of our joint field offices that we set up in every

9    disaster operation, but these are there long term,

10   and we typically staff them with longer-term

11   employees, have maintenance and deactivation

12   contracts, and those maintenance and deactivation

13   contractors -- and they had numerous maintenance and

14   deactivation contractors -- supporting each of the

15   transitional recovery offices, depending on which

16   state that you're in are assigned a certain sector

17   area, and occupants of emergency housing units in

18   those areas would call this particular maintenance

19   and deactivation contractor if they have an issue or

20   a problem with a unit, and it was that contractor's

21   responsibility to respond and address and deal with

22   the issue.

**7/7/2009  Garratt, David E.**

```
1            BY MR. WOODS:

2       Q.    Do you know of any directives that were

3    given to these contractors on how to respond to these

4    issues?

5       A.    I do not, at least not at this time.

6       Q.    Not at this time?

7       A.    Right.

8       Q.    And what is your understanding today of

9    how they were responding?

10           MR. MILLER:  Objection, vague, time.

11      A.    My understanding today of how they were

12   responding in June of 2006?

13           BY MR. WOODS:

14      Q.    Yes.

15      A.    My under- -- my understanding is that the

16   maintenance and deactivation contractors were in

17   general doing a pretty good job of responding to the

18   slew of complaints or concerns that occupants were

19   calling in, this being one among many.

20           And I have at least to this date no reason

21   to believe that they were not executing the

22   provisions of the contract in meeting their
```

7/7/2009  Garratt, David E.

1    performance requirements.

2         Q.    Okay.  Specifically, what were the

3    provisions of the contract in how they were to

4    respond to complaints?

5         A.    I think they had to respond within a

6    specific period of time to every complaint that was

7    received.  Beyond that, I'm not sure what the

8    performance provisions are of the contracts.

9         Q.    You go on to state in section 5 that:

10   Mr. Kevin Souza -- who you've already mentioned --

11   took the lead for working this issue, and sometime in

12   late June, he briefed me regarding his recommendation

13   for dealing with the assertions regarding elevated

14   levels of formaldehyde in EHUs.

15              You further state that:  He also

16   recommended that the testing should be conducted by

17   an independent federal agency with experience in such

18   matters, and further recommended the environmental

19   protection agency.

20              Specifically, what testing was Mr. Souza

21   talking about?

22              What was your understanding of what

1    testing needed to take place?

2         A.    Essentially validation testing.  Sierra

3    Club had just released a report that asserted that

4    the levels of formaldehyde, emitted formaldehyde in

5    some number of units that they had testing were very

6    high.  What we wanted was corroborative evidence to

7    that effect.

8              Didn't know what -- for example at the

9    time and none of us were or are formaldehyde or

10   industrial hygiene experts, know what scientific

11   basis Sierra Club used to -- to come up with -- with

12   their assertions.

13             And what we wanted was validation, so we

14   wanted an independent credible third party to go in

15   and essentially tell us that either Sierra Club was

16   on the mark or that they weren't.

17        Q.    And so you further state that you agree

18   with Mr. Souza's recommendation and advised him to

19   issue a safety notice to occupants and engage with

20   the EPA to commence testing.

21             What was the safety notice that was issued

22   to occupants?

**7/7/2009  Garratt, David E.**

1        A.    We issued a number of safety notices or

2   have issued a number safety notices.  I -- I'm not

3   sure I remember exactly what that first safety notice

4   was, but I believe it was a notice that advised them

5   of the concerns and recommended that they take

6   certain precautions to reduce the potential for

7   formaldehyde buildup, such as increased ventilation.

8        Q.    And when was this notice issued?

9              Do you recall?

10       A.    I think it was around the July time frame.

11       Q.    So at this point, you really had no

12  scientific evidence to go on, but notice was issued

13  anyway regardless?

14       A.    That's correct.

15       Q.    And you don't recall the specific document

16  that was the subject of the first issued notice?

17       A.    If -- if it's the one I am thinking of, it

18  had a picture of a travel trailer or a drawing of a

19  travel trailer on it, and again, it basically

20  addressed the things that I just discussed, but I'm

21  not entirely positive that that was the first notice.

22  That may have been the second notice.

**7/7/2009  Garratt, David E.**

```
1           Q.     If that may have been the second notice --
2      you're not saying -- you're just not certain whether
3      or not that particular notice you're referring to
4      with the drawing of the trailer on it was this one
5      issued in July.  You're not saying that there was one
6      issued prior to that.
7                  You're just not certain which document --
8           A.     Correct.
9           Q.     -- is --
10                 If you turn, sir, to page 4 of 6.  This is
11     included in section 6.  I want to direct you to the
12     last sentence of section 6.
13                 And it says that:  My office, the
14     directorate, weighed competing concerns, including
15     those voiced by OCC and others regarding the
16     different ways in which we could handle this matter.
17     And I agree with Mr. Souza that FEMA should prepare
18     and issue a safety notice and test for formaldehyde.
19                 And again, are you talking about that same
20     notice in July of '06?
21          A.     I believe that's the same notice, yes.
22          Q.     Okay.  In that statement, what were the
```

**7/7/2009  Garratt, David E.**

```
1    competing concerns that were discussed or considered

2    when issuing the notice that you refer to in section

3    6?

4         A.    I'm not sure I know what those issues

5    were.  I'm just aware that there were issues and that

6    there were -- there was concern with us moving out

7    with the safety notice at that time.

8         Q.    What were the concerns?

9         A.    They were voiced or at least in terms of

10   the email exchange that I had with Mr. Souza at the

11   time concern from general counsel that -- that I

12   think they wanted additional time to -- I think they

13   were not ready to have us issue that notice at that

14   point.

15        Q.    And what is your understanding as to why

16   they needed this additional time or they weren't

17   ready for you to issue that notice?

18        A.    I'd be speculating.

19        Q.    But you left that concern -- you

20   considered that concern.

21              Correct?

22        A.    I was aware of that concern at the time
```

**7/7/2009  Garratt, David E.**

1    that I told Mr. Souza to move ahead with testing and

2    distribution of that safety notice anyway.

3         Q.    But your statement says you weighed

4    competing concerns, so you weighed that.

5               You weighed the concerns of the Office of

6    General Counsel.

7               Correct?

8         A.    Well, I was aware of it, so obviously, I

9    weighed it.

10        Q.    So this is just a general statement.

11              You made this -- this declaration on May

12   12, 2009, at this point, approximately 2 months ago.

13              Correct?

14        A.    Seems a lot longer.

15        Q.    And at that time 2 months ago, you say

16   that you weighed competing concerns including those

17   voiced by OCC and others, but today as you sit here,

18   you can't tell me what those concerns were?

19        A.    Well, I'm aware this that this exchange

20   that led to that decision to place in a number of

21   email exchanges, and those email exchanges involved

22   or reflected a concern by the Office of Chief

**7/7/2009  Garratt, David E.**

```
1    Counsel, so I was aware that the Office of Chief
2    Counsel had concerns with moving out this quickly
3    with this.  We rejected those concerns in favor of
4    moving out.
5         Q.   You were aware that those concerns had to
6    do with litigation, I assume?
7              MR. MILLER:  Objection, assumes facts not
8    in evidence.
9         A.   I would say that -- I can't say I was
10   aware of that, but given that that's the role of our
11   attorneys, is to deal with litigation, then I'm not
12   sure it mattered to me one way or the other what the
13   basis for that concern was.  It was outweighed by --
14   regardless of what the concern was.
15             BY MR. WOODS:
16        Q.   Let's go on to section 7.
17             In the second sentence, you say:  I was
18   later advised by Mr. Souza that the EPA subsequently
19   recommended that only unoccupied units be tested
20   since the purpose of the test was to determine
21   whether the units themselves as opposed to materials
22   introduced by occupants were generating elevated
```

**7/7/2009  Garratt, David E.**

1    formaldehyde levels.

2            What information or knowledge do you have

3    regarding EPA's recommendations?

4        A.    Only what was conveyed to me by Mr. Souza.

5        Q.    And what -- what did Mr. Souza convey to

6    you?

7        A.    That he had returned -- let me back up a

8    little bit.

9            Our initial engagement was that Mr. Souza

10   recommended and I completely agreed with him that EPA

11   needed to go in and essentially replicate what the

12   Sierra Club had done.  We need to find out if the

13   Sierra Club's findings were accurate or not.

14           So we were envisioning that they would be

15   going in and evaluating occupied units as the Sierra

16   Club had done.  After Mr. Souza engaged with the EPA,

17   he came back at some point and said that based on our

18   discussions, EPA was recommending that we reengineer

19   our approach, since what we were attempting to

20   determine was whether our units were producing the

21   formaldehyde versus whether the formaldehyde was

22   largely the result of occupants introducing products

**7/7/2009  Garratt, David E.**

```
1    into these units or to include for example smoking,

2    and that was generating those levels.

3              And the only way to make that

4    determination was to test unoccupied units that had

5    never been lived in.  Agreed with him.

6              So again, he -- Mr. Souza was the one who

7    was most engaged with the EPA, and again my awareness

8    of their concerns was through him.

9                        (Garratt Exhibit No. 3

10                        was marked for

11                        identification.)

12             BY MR. WOODS:

13        Q.   Mr. Garratt, what I'm handing you is a

14   document at the top -- it's produced by FEMA counsel.

15   It's Bates-labeled FEMA 17, dash, 002489.  It's also

16   produced as part of the Congressional Record.  It's

17   at the bottom labeled FEMA, dash, Waxman, dash, 2489.

18             And it's not the best copy.  It's sort of

19   grayed-out, but hopefully you can follow along with

20   me on it.

21             If you'd look down, please, sir -- it's a

22   series of emails, email chain.  If you go back to the
```

**7/7/2009  Garratt, David E.**

1    last page, it appears as if it's beginning from a

2    Russ Knocke to Edward Buckley, Lauren Isenhour, and

3    cc'ing Price Roe.

4           But I want to bring you back forward to

5    page 2 of 5 of the document.  And if you'll see,

6    there is an original message from Price Roe to John

7    Philbin, David Garratt, cc'ing Harvey Johnson and

8    William R. Knocke.  And it's sent on July 25th.  And

9    the time is 2003, 2006.

10          Can you see that?

11          Can you read that?

12   A.     I can.

13   Q.     Okay.  And it says, Pat and Dave, see

14   below and please advise if I am capturing this

15   correctly.

16          First of all, who is Price Roe?

17   A.     He was the counselor to the secretary.

18   Q.     And you say, counselor to the secretary.

19          Was he legal counsel --

20   A.     No.

21   Q.     -- to the secretary?

22   A.     He may be -- he may have been a lawyer,

**7/7/2009  Garratt, David E.**

```
1    but that was not the role of that counselor position.

2         Q.    Okay.  It says:  We should lead the memo

3    with the media angle in a way that addresses the

4    media context and FEMA's monitoring of the situation.

5    Note well my language on why the secretary didn't

6    hear about this earlier.  Attached doc has edits,

7    opening 2 paragraphs as follows.  I won't share this

8    with S 1 until I get your green light.

9              Who is S 1?

10        A.    The secretary.

11        Q.    Okay.  If you go down to -- it says, media

12   exposure.

13             Can you see that?

14        A.    Yep.

15        Q.    Okay.  If you go down to, I think it's the

16   third sentence, it begins, following the MSNBC, dot,

17   com story.

18             Do you see that?

19        A.    I do.

20        Q.    Okay.

21             Following the MSNBC, dot, com story that

22   ran the weekend of July 22, media attention in this
```

**7/7/2009  Garratt, David E.**

1    story has increased though not dramatically.  While

2    FEMA has not directly briefed the secretary on this

3    issue, believing it was being appropriately handled

4    by FEMA legal counsel and FEMA's complaint resolution

5    process.

6              Did I read that statement correctly?

7         A.    Yes.

8         Q.    If you go further up the page on this

9    document, and it's an email from you, David Garratt,

10   to Price Roe, John Philbin, cc'ing Harvey Johnson,

11   William Knocke, Robert Paulison, John Daraujo, and

12   Kevin Souza.

13             You say:  Price, okay with everything

14   except the statement that FEMA believes this problem

15   is not widespread.  In fact we do not know.  It is

16   entirely possible this will be widespread problem.

17   Dave.

18             Did I read that correctly?

19        A.    Yes.

20        Q.    Okay.  So I can take that, Mr. Garratt, as

21   you're saying that the statement which I read

22   previously under media exposure, you took no issue

**7/7/2009  Garratt, David E.**

1    with that particular statement.

2              You only took issue with the statement

3    that FEMA believes this problem is not widespread; is

4    that correct?

5         A.    That certainly appears to be the case.

6         Q.    Okay.

7              THE VIDEOGRAPHER:  Sir, we need to change

8    the tape.

9              MR. WOODS:  Okay.  We're going to go off

10   the record for a second.

11             THE VIDEOGRAPHER:  We're going off the

12   record.  The time on the video is 10:03 AM.

13             (Discussion off the record.)

14             THE VIDEOGRAPHER:  This begins tape number

15   2 in the video deposition of David Garratt.  The time

16   on the video is 10:09 AM.  We are on the record.

17             BY MR. WOODS:

18        Q.    Mr. Garratt, back to the document we were

19   discussing.  I want to bring you forward again to an

20   email from Price Roe.

21             It's on the first page, beginning on the

22   first page.  And it's to David Garratt, John Philbin,

**7/7/2009  Garratt, David E.**

```
1      Harvey Johnson, William Knocke, Robert Paulison, and

2      it's sent on Tuesday, July 25th, 2028, 2006, and it's

3      the revised info memo, dash, FEMA toxic trailers.

4              And this is in response to your email,

5      Price Roe writes back, and he begins by saying, would

6      it be more accurate to say?

7              Do you see that?

8      A.      Yep.

9      Q.      Okay.  You go back down to his section on

10     media exposure.  And again, if you look at the

11     sentence -- I believe it's the fourth sentence that

12     begins, following.

13              Do you see that?

14     A.      Yes.

15     Q.      Okay.  It says:  Following the MSNBC, dot,

16     com story that ran the weekend of July 22, media

17     attention in this story has increased though not

18     dramatically.  While FEMA has not directly briefed

19     the secretary on this issue, believing it was being

20     appropriately handled by FEMA legal counsel and

21     FEMA's complaint resolution process.

22              Did I read that accurately?
```

7/7/2009  Garratt, David E.

```
1          A.     You did.

2          Q.     Okay.

3                 MR. MILLER:  I'm going to object to that

4    document, incomplete.  It goes on.

5                 BY MR. WOODS:

6          Q.     If you go up, Mr. Garratt, to your email

7    in response to Price Roe's email you sent to him on

8    July 25th, 2006, at 9:10 PM.  It's to Price Roe,

9    David Garratt, John Philbin, cc'ing Harvey Johnson,

10   William Knocke, Robert Paulison, John Daraujo, and

11   Kevin Souza, and it's regarding revised info memo,

12   dash, FEMA toxic trailers.

13                You say, yes, much better price; is that

14   correct?

15         A.     I did.

16         Q.     Okay.  Again, you made no change or

17   comment to Mr. Roe's suggested language under, media

18   exposure.

19                Correct?

20         A.     I don't think I was reacting to that.  I

21   was -- in fact, I can't even say I read that.

22                I was reading the paragraph that was
```

**7/7/2009  Garratt, David E.**

```
1        immediately under, would it be more accurate to say.
2                    BY MR. WOODS:
3           Q.    Okay.  But you did see that sentence
4        under -- or that's media exposure?
5           A.    I can't say that I did.
6           Q.    But you did receive this email?
7           A.    Yes.
8           Q.    And you were asked to advise whether or
9        not he was capturing this correctly.
10                   Correct?
11          A.    Right.
12          Q.    Okay.
13          A.    What I was responding to, however, was, I
14       don't believe I ever re-read that media exposure
15       bullet, because I think I thought that was just a
16       repeat from a previous message, and I was responding
17       when I said, yes, much better price, only to the
18       paragraph that begins, while the number of complaints
19       recorded by FEMA.
20          Q.    That's fine.
21                   But you -- you didn't make any changes the
22       first time around to this media exposure bullet --
```

**7/7/2009  Garratt, David E.**

1        A.    No.

2        Q.    -- and made no changes to the -- when he

3    re-edited the second time around.

4              Correct?

5        A.    That's correct.

6        Q.    Okay.  And by the way, that is going to be

7    marked as exhibit Garratt 3, if I didn't state so for

8    the record.

9                         (Garratt Exhibit No. 4

10                         was marked for

11                         identification.)

12             BY MR. WOODS:

13        Q.    Mr. Garratt, what I'm handing you now is a

14    document entitled, FEMA -- well, I'm sorry -- labeled

15    FEMA 17, dash, 010962.  It's produced in this

16    litigation as well, but it was also a part of the

17    Waxman Congressional Record report at FEMA Waxman,

18    2/14/08 3802.

19             And it appears to be an unsigned letter

20    from you, David Garratt, to -- it's actually 2

21    letters, one to the Honorable Henry Waxman, and the

22    other to the Honorable Bennie Thompson.

**7/7/2009  Garratt, David E.**

1               First of all, do you know if there's a

2      final version of this document, a signed version of

3      this document?

4           A.    I do not recall.

5           Q.    Do you know if this document was ever

6      actually sent and received by Congressman Waxman,

7      and/or Congressman Thompson?

8           A.    I do not.

9                 MR. MILLER:  Objection, foundation.

10                BY MR. WOODS:

11          Q.    Do you recall drafting this document?

12          A.    I did not draft this document.

13          Q.    Do you know who drafted this document?

14          A.    I do not.

15          Q.    Have you seen this document before?

16          A.    I do recall seeing this document.

17          Q.    Who showed you this document?

18          A.    I don't recall.

19          Q.    Do you recall when you were shown this

20     document?

21          A.    I do not.

22          Q.    So you claim no authorship of this

1    document?

2         A.    That's correct.

3               Just to -- in terms of understanding, we

4    have a very large correspondence unit within the

5    disaster assistance directorate.  We receive

6    literally hundreds of congressional requests that

7    require responses, and that correspondence unit is

8    responsible for reaching out to and pulling together

9    and preparing responses to all of the many

10   congressionals that we receive, so it is not usual,

11   in fact, it is routine that correspondence is

12   prepared for my signature that is not of my

13   drafting.

14        Q.    So you routinely signed letters to

15   congressmen that have been drafted by others?

16        A.    Yes.

17        Q.    Well, without taking time to read the

18   entire document, I just want to draw your attention

19   to the second paragraph particularly.

20              And it says that:  FEMA at all times

21   remains concerned with the health, safety, and

22   security of those temporarily living in manufactured

**7/7/2009  Garratt, David E.**

```
1      housing units, as well as those consumers who will be

2      purchasing surplus units for various uses.

3              It goes on to say:  As a result, FEMA has

4      been committed to providing applicants and consumers

5      with information on health and safety issues

6      regarding manufactured housing units, including

7      formaldehyde levels in these units.

8              Did I read that statement correctly?

9      A.    Yes.

10     Q.    Do you have any reason to disagree or

11     determine whether or not that is not an accurate

12     statement?

13             MR. MILLER:  Objection, vague, time.

14     A.    No reason to disagree with that statement.

15             BY MR. WOODS:

16     Q.    And bear with me on -- on the next

17     question that I have.  And I want to ask you an

18     individualized question and I need to ask 5 different

19     times.

20             Okay?

21     A.    I'm sorry.

22             That you have to ask 5 different times?
```

**7/7/2009  Garratt, David E.**

1          Q.    Yes.

2                This statement says that:  As a result,

3     FEMA has been committed to providing applicants and

4     consumers with information on health and safety

5     issues regarding manufactured housing units,

6     including formaldehyde levels in these units.

7                Do you know specifically what were the

8     communications given to Alana Alexander and the unit

9     that she occupied?

10         A.    I don't -- I don't know who Alana

11    Alexander is.

12         Q.    That's fine.

13               Do you know specifically what

14    communications were given to Diana Bell regarding the

15    unit that she occupied?

16         A.    If Diana Bell is the -- is or was an

17    occupant of one of the units, the answer is no.

18         Q.    Do you know what information was given to

19    Alicia Dubuclet of the unit -- regarding the unit --

20    EHU that she occupied?

21         A.    Let me -- let me ask you a question as

22    part of this.

**7/7/2009  Garratt, David E.**

1              I'm aware that correspondence was

2      distributed to temporary housing occupants gulfwide,

3      and correspondence was distributed on a regular basis

4      to everyone living in units gulfwide.

5              Do I know that any of these people are

6      disaster victims or that they specifically received

7      this, no, I do not.  But if they were living in

8      temporary housing units at the time that we were

9      conducting the distribution of these materials, then

10     they certainly should have received them.

11         Q.    But you have no personal knowledge that

12     they actually did receive them?

13         A.    I do not.

14         Q.    Okay.  And continue 2 -- 2 others.

15              What were the communications that were

16     sent to Lyndon Wright regarding the unit, the EHU

17     that he occupied, if you know?

18         A.    It would depend on when he occupied that

19     unit since communications were distributed to

20     occupants over the course of a couple of years,

21     but -- so he could have received any number of

22     materials as part of our flier distribution program,

**7/7/2009  Garratt, David E.**

```
1     but I do not have any personal knowledge that he

2     personally received any communications.

3          Q.    Thank you.

4                One additional.  Kerrie Smith.

5                Do you have any personal knowledge of the

6     communications that Kerrie Smith received regarding

7     the EHU that she occupied?

8          A.    Same answer.

9          Q.    Thank you.

10                          (Garratt Exhibit No. 5

11                           was marked for

12                           identification.)

13               BY MR. WOODS:

14          Q.    Mr. Garratt, I just handed you a document,

15     and for identification purposes, it's going to be

16     labeled as Garratt number 5, and there's some

17     descriptive at the bottom that says, DHS, underscore,

18     S&T, underscore, 6040.

19                And it appears to be an email chain from

20     Jeff Runge?

21          A.    Runge.

22          Q.    Runge.
```

**7/7/2009  Garratt, David E.**

```
1                -- dated Friday, May 18, 2007, at 3:47 PM,

2       to Adam Isles --

3            A.    Isles.

4            Q.    Isles.

5                -- Paul Schneider, Tina Burnette, and Paul

6       Schneider again, cc'ing Gil Jamieson, David Garratt,

7       Bennett Waters, Elaine Duke, and Price Roe.  And its

8       subject matter is, re FEMA formaldehyde in trailers.

9       It's, forward, reporter that accosted the chief after

10      the hearing Tuesday.

11               Who is Jeff Runge?

12           A.    He was the assistant secretary for health

13      affairs for the Department of Homeland Security.

14           Q.    He was there in May of 2007.

15               Do you know when he left that position?

16           A.    He left before the new administration came

17      on.  I do not remember when.

18           Q.    Do you recall receiving this email?

19               (Pause.)

20           A.    No, I can't say that I do recall receiving

21      this.

22               BY MR. WOODS:
```

**7/7/2009  Garratt, David E.**

1        Q.    Was Jeff Runge -- how did he become

2    involved in -- if you know in the FEMA formaldehyde

3    in trailers issue?

4        A.    He was specifically asked to get involved

5    in this issue, or more specifically, the office of

6    health affairs that he headed for the secretary.  I'm

7    aware that he was specifically asked to get involved

8    following a report by a Bayou La Batre physician that

9    some number of children in units in Mississippi were

10   suffering what he characterized as an illness

11   symptomatic of -- of exposure to formaldehyde, and so

12   both I think the deputy secretary and ourselves

13   reached out to the office of health affairs and

14   requested their direct engagement.

15       Q.    And I guess I want to point you to --

16   in -- in Mr. Runge's email -- or is it Dr. Runge?

17             It would be Dr. Runge.

18             Correct?

19       A.    Dr. Runge.

20       Q.    Okay.  It's an email concerning --

21   regarding levels; is that correct?

22       A.    The last email in this chain appears to be

**7/7/2009  Garratt, David E.**

```
1       the only one dealing with levels.

2            Q.    You mean the top -- the last one --

3            A.    Correct.

4            Q.    -- being the one on the first page.

5                  Okay.  And that's very true.

6                  I just want to talk about this particular

7       email, Dr. Runge's response to being looped in to

8       this particular issue.  And I want to particularly

9       direct you to Dr. Runge's bullet point 6.

10                 And it says:  No residential indoor air

11      quality.

12                 Do you see that?

13           A.    I do.

14           Q.    No residential indoor air quality

15      standards have been established in the U.S.  There

16      are HUD standards for building materials, but it's

17      always been considered too difficult to measure and

18      regulate actual residential indoor air quality.

19                 Did I read that statement correctly?

20           A.    You did.

21           Q.    I want to go further up to his bullet

22      point number 4 where he says:  None of these are
```

**7/7/2009  Garratt, David E.**

1     germane to 24-hour times 7 days, slash, week exposure

2     in a mobile home or trailer that a child or stay-home

3     parent may experience.

4              Did I read that correctly?

5         A.    Yes.

6         Q.    If you go back one more to:  Levels should

7     have a unit attached to them to be meaningful.

8              And it gives examples.  And he talks about

9     the OSHA legally enforceable standard that workers

10    can't be exposed to being .75 PPM TWA, the 8-hour

11    average.

12             Reading this email today currently, you

13    said you can't really recall it, do you know what

14    Jeff Runge was speaking of?

15             Do you know -- and this is compound -- do

16    you know what he was tasked to do?

17             MR. MILLER:  I'm going to object,

18    compound.

19        A.    It doesn't from this sequence of emails

20    appear that he was tasked to do anything.  What it

21    appears is that Adam Isles looped him in following a

22    succession of emails and that he contributed his

**7/7/2009  Garratt, David E.**

1    opinion to what had transpired emailwise prior to his

2    engagement.

3                BY MR. WOODS:

4        Q.    But apparently, he was asked to give some

5    opinion or information regarding levels of

6    formaldehyde in exposure.

7                Correct?

8        A.    It's not apparent at all.

9                MR. MILLER:  Objection, assumes facts not

10   in evidence, foundation.

11               BY MR. WOODS:

12       Q.    Well, what would you assume to be the

13   importance of this discussion by Dr. Runge regarding

14   levels?

15               MR. MILLER:  Objection, foundation, also

16   speculation.

17       A.    Well, I think Dr. Runge was doing what the

18   good doctor is paid to do, which is what anyone in a

19   position of responsibility is paid to do, is, he was

20   made aware of a series of emails, he read them, he

21   had concerns about them, and he contributed his

22   professional opinion to them.

**7/7/2009  Garratt, David E.**

```
1              BY MR. WOODS:

2         Q.    But this -- this professional opinion,

3     would you agree, has to do with levels of

4     formaldehyde in EHUs?

5              MR. MILLER:  Objection, foundation,

6     speculation.

7              Go ahead.

8         A.    Yes.

9              BY MR. WOODS:

10        Q.    Okay.

11             MR. MILLER:  Justin, we've been going

12    about an hour and a half.

13             Do you want to take a short break?

14             MR. WOODS:  Sure.

15             MR. MILLER:  About 5 minutes?

16             MR. WOODS:  Yeah.

17             THE VIDEOGRAPHER:  We're going off the

18    record.  The time on the video is 10:32 AM.

19             (Recess.)

20             THE VIDEOGRAPHER:  We're back on the

21    record.

22             The time on the video is 10:46 PM -- or
```

**7/7/2009  Garratt, David E.**

```
 1    AM.

 2

 3              EXAMINATION BY COUNSEL FOR PLAINTIFFS

 4              BY MR. MEUNIER:

 5    Q.    Good morning, Mr. Garratt.

 6          How are you, sir?

 7          I'm Gerry Meunier, also representing

 8    plaintiffs.  Tomorrow, there's going to be a hearing

 9    in Congress about FEMA's strategy going forward with

10    disaster relief to victims displaced such as occurred

11    in the Katrina disaster.

12          True?

13    A.    There is a disaster housing hearing

14    tomorrow, correct.

15    Q.    One of the witnesses will be Craig Fugate,

16    in fact, one of the people we've talked about today?

17    A.    Correct.

18    Q.    I assume you've had meetings with your

19    staff about the content of what will be covered in

20    tomorrow's hearing?

21    A.    They're meeting today as a matter of fact.

22    I think 11 o'clock, they're briefing Mr. Fugate on
```

**7/7/2009  Garratt, David E.**

```
1    kind a  -- (indiscernible) -- board for that.

2         Q.    What, if any, changes in FEMA's strategy

3    specifically with respect to housing assistance to

4    displaced disaster victims will be different going

5    forward because of what happened after Katrina?

6              MR. WOODS:  I object, vague, narrative.

7         A.    Nevertheless, it's a good question.

8              BY MR. MEUNIER:

9         Q.    Thank you.

10             I thought so.

11        A.    There are -- made a number of changes,

12   modifications to how we're going to do business in

13   the future, both strategic and tactical.

14             From a strategic perspective, since

15   Hurricane Katrina, we developed the national disaster

16   housing strategy.

17             We've also developed and published on a

18   yearly basis a companion document to that which is a

19   disaster housing plan for each year.  The national

20   disaster housing strategy is more of a high-level

21   document that kind of aggregates in one place for the

22   very first time all of the capabilities that the
```

1    federal government can bring to bear both using our

2    own resources and the resources of private sector

3    voluntary agencies, as well as fully exploiting the

4    capabilities of state and local governments when

5    responding in their areas.

6         It also weaves throughout the housing

7    strategy some new concepts and ideas for how we can

8    deal with specific situations and time lines under --

9    when specific decisions should be made.  Further, it

10   establishes a national disaster housing task force,

11   which is a new body that's been established at FEMA,

12   led by FEMA but involving other federal agencies and

13   certain voluntary agencies to help oversee and manage

14   moving forward, looking for new ideas.

15        Prior to that, we -- in post-Katrina, we

16   established a body known as the joint housing

17   solutions group.  Joint housing solutions group is

18   essentially headquartered in our region 3 under the

19   leadership of an individual named Jack Schubach, who

20   is one of our premium individual assistance and

21   housing experts.

22        Joint housing solutions group's

**7/7/2009  Garratt, David E.**

```
1    responsibility is to go out and look at the universe
2    of alternative types of temporary housing, assess
3    those against a very strict set of criteria, and then
4    evaluate their potential utility in future disasters.
5    And they've come up with something they call a
6    housing assessment tool, and they bring in experts
7    from HUD, from private sector housing expert
8    organizations.
9            And they will go to a vendor and evaluate
10   a unit or a prototype or a design if that's all they
11   have at this particular point, against this set of
12   criteria.   And then they'll rack and stack all of
13   these and come up with recommendations in terms of
14   which ones they think would be usable in a disaster
15   environment, which ones need more work, which ones
16   are want are not usable.
17           We've also done competitions -- we've done
18   one so far.  We've got another one coming up -- to
19   the alternative housing industry to actually purchase
20   units that they have and have them ready to roll in
21   the event of a disaster.
22           We did one last year.  We ordered
```

**7/7/2009  Garratt, David E.**

1     contracts to 7 vendors.  We've put -- or installed

2     one each of their units up at our national emergency

3     training center in Emmitsburg, Maryland, where they

4     are being used to house students.

5          So we're actually having students live in

6     these things 24 hours a day, and we'll be able to

7     evaluate problems that those units have if any over

8     that period of time to further help us make a

9     practical determination if these things can weather

10    the rigors of long-term housing in an actual disaster

11    environment.  But we can use those now.

12         So from an alternative housing standpoint,

13    between the national disaster housing strategy, the

14    task force, and the joint housing solutions group, I

15    think we've made a lot of progress in terms of

16    examining and starting to move forward in

17    incorporating alternative forms of housing into our

18    housing toolbox.

19         From a sheltering perspective, which

20    really isn't a housing activity per se, at least

21    within our own vernacular, but nevertheless is often

22    thought of as a housing activity, and it obviously

**7/7/2009  Garratt, David E.**

```
1    leads into housing because we need to get people

2    sheltered first, and then we need to progress them

3    from a sheltering environment into a longer term or

4    more stable temporary housing environment.

5              So we typically will shelter folks --

6    folks will be typically sheltered in a congregate

7    environment in the very beginning.  If they're likely

8    to be in a congregate environment for a long period

9    of time, we can implement our transitional housing

10   program.

11             This is another program that we

12   implemented after Hurricane Katrina.  This allows us

13   to move them into on a subsidized basis hotels and

14   motels.

15             We manage that through corporate lodging

16   consultants, a contractor who basically deals in

17   that.  They've got coordinated arrangements with

18   hotel and motel operators around the country, and

19   they will be our agent for subsidizing the stay of

20   individuals making sure that they're eligible to be

21   in these hotels and motels.

22             And we can keep them there as long as we
```

**7/7/2009  Garratt, David E.**

```
1     need to or until we can find or provide temporary

2     housing to individuals in that environment or until

3     they can return to their predisaster dwellings or

4     find their own accommodations.

5              Obviously we have 2 ways of providing

6     assistance to individuals, either rental assistance

7     or financial assistance, or we can provide direct

8     housing assistance to them.  And that's where we'll

9     roll out a manufactured housing unit or alternative

10    housing unit, either on somebody's property or we can

11    build a community site from scratch, essentially

12    build a manufactured housing community to support

13    these individuals.

14             We have also employed after Hurricane

15    Katrina for the very first time cruise ships to

16    support disaster victims, not something we had done

17    prior to that.  It had been contemplated once but not

18    used.  But it is now an official part of our toolbox,

19    although it's not a first resort for us, but it is a

20    last resort, and should we face another situation

21    near a coastal area where we've got a large

22    population that needs assistance, we can use that,
```

**7/7/2009  Garratt, David E.**

1    most valuable to support disaster victims who are

2    also critical members of the emergency response

3    community in the affected areas so that they can live

4    and work, for example police officers, members of the

5    fire service, et cetera, in that area as opposed to

6    relocating those individuals far away from their

7    communities.

8         But the biggest progress that we've made

9    is in terms of identifying new forms of alternative

10   housing that in fact are -- will be better in more

11   suitable environments for populations that are likely

12   to need these units for an extended period of time.

13        Q.    So that through this change in strategy,

14   again informed by the experience of Katrina, FEMA

15   does not plan to rely on travel trailers for example

16   as a primary means of providing emergency assistance

17   for housing?

18        A.    That's accurate.  We do not plan to rely

19   on travel trailers as the primary means.  We will

20   still use travel trailers under a unique set of

21   circumstances.

22        Q.    Right.

1          Much more limited than those which --

2    under which the travel trailers were used after

3    Katrina, obviously?

4          A.    That is correct.

5          Prior to Katrina, we used all manufactured

6    housing under essentially the same conditions.  Since

7    Katrina, we will only allow travel trailers to be

8    used, number 1, if they meet our formaldehyde

9    requirement and are built to our unique

10   specifications, 2, if they are placed on somebody's

11   private property and that individual or that

12   household can rebuild their home within 6 months.

13   Those are the only conditions under which we'll allow

14   travel trailers to be used.

15        Q.    So it sounds like even to the extent

16   travel trailers are used again after hurricanes in

17   FEMA's provision of emergency housing, there will be

18   a programmatic limit to a 6-month residency or

19   occupancy in travel trailers.

20        A.    Provisional, correct.

21        Q.    And is it fair to say that's because of

22   the concerns about formaldehyde in travel trailers?

**7/7/2009  Garratt, David E.**

1          A.     No.

2                 It's because a travel trailer is in our

3    estimation not an adequate -- because of the size of

4    the unit, not adequate to be a long-term temporary

5    housing solution.  They're very small, and we would

6    not for example put travel trailers in a group site

7    environment that houses what were principally

8    predisaster renters who are going to have to wait for

9    postdisaster rental resources to be made available

10   and might need that -- those sorts of accommodations

11   for many, many months if not many years.

12                But what they need is a unit that is in

13   fact built for, designed for long-term habitation,

14   like a mobile home.  Obviously millions of people

15   live in those in this country as a permanent home.

16   So that's an adequate longer-term living

17   environmental.

18                A travel trailer is designed for

19   recreational use on weekends.  It's not designed for

20   that sort of long term.  So we will only provide

21   those in the very short term for someone who we think

22   can get back on their feet in a relatively short

**7/7/2009  Garratt, David E.**

```
 1      period of time.

 2                  We -- we have solved the -- at least from

 3      our perspective, the formaldehyde issue, because we

 4      are only producing now units that meet our own

 5      specifications.

 6          Q.    All right.  Since the Katrina --

 7          A.    Correct.

 8          Q.    -- disaster, there are now federal

 9      regulations of formaldehyde air levels in travel

10      trailers?

11          A.    No.

12                There are -- FEMA has specifications, our

13      own specifications for all forms of manufactured

14      housing that we produce and require that these units

15      meet those specifications and be tested before it

16      will accept them.

17          Q.    And are these similar to the HUD standards

18      that existed?

19          A.    Much lower.

20          Q.    Lower than that.

21                What are they?

22          A.     .016 PPM.
```

**7/7/2009  Garratt, David E.**

1          Q.    Now, is that -- is that an air level

2    requirement, or does that refer to the particle board

3    and plywood --

4          A.    Air level.

5          Q.    Air level.

6                Point- --

7          A.    -- -016.

8          Q.    -016.

9                What is it if you know that went into

10   selecting .016 as an appropriate level?

11         A.    At the time we made that decision to lower

12   it to that level, we were advised by our office of

13   health affairs that that was the lowest level at

14   which NIOSH had detected formaldehyde affecting

15   cells, so we wanted something that was below the

16   level at which cellular activity was noted when it

17   was exposed to formaldehyde.

18         Q.    All right.  Let me go back on a couple of

19   documents that Mr. Woods has reviewed with you just

20   for some followup questioning.

21                First, if you have your declaration that

22   was referred to and signed by you March -- I'm sorry

**7/7/2009  Garratt, David E.**

```
1      -- May 12 of this year, 2009.

2                  You told us that the reason you thought it

3      appropriate to state in this record, in this

4      document, that disaster victims were not being

5      charged for their use of the emergency housing units,

6      was in order to make it clear that FEMA has a

7      responsibility for the installation, maintenance, et

8      cetera, of those units.

9                  Is that true?

10     A.     I think that's -- not exactly.

11                 I think what I was doing was explaining

12     why I do not have an issue with and explaining why I

13     thought this was valuable information in this

14     declaration.

15                 As I indicated, I was presented a

16     declaration, which I heavily edited, but this may

17     very well have been in the original document, but it

18     certainly didn't seem -- or at least as I look at it

19     now, I think it adds value to providing some context

20     to the environment in which we were operating in.

21                 So not knowing at the time exactly what

22     the purpose of this was for, I took my cues from the
```

**7/7/2009  Garratt, David E.**

1    document that I was provided and edited that document

2    to be accurate.

3         Q.    Yes.

4              But I thought I understood your earlier

5    testimony when you were asked why you understood this

6    sentence to be in here was, you said you wanted to

7    make it clear in this document that the occupants

8    themselves don't have the cost responsibility for

9    installation and maintenance, rather FEMA does.

10             Is that true?

11        A.    Well, I think what I was doing was

12   responding to a statement from Justin, who was

13   suggesting a different reason for having that in this

14   document.  And I was saying that, no, the reason that

15   this is in that document is to demonstrate that we

16   are responsible for -- (indiscernible) -- these

17   units.

18        Q.    Now, in this case, though, FEMA contracted

19   to have certain private companies handle the

20   installation and maintenance of the units.

21             Correct?

22        A.    We did.

**7/7/2009  Garratt, David E.**

1      Q.     Which companies were contracted with to do

2   that?

3      A.     For Katrina?

4      Q.     Yes.

5      A.     Shaw, Fluor, CH2M Hill.  I think there was

6   one other one, but --

7      Q.     Bechtel?

8      A.     Bechtel, yes, sir.

9      Q.     Did FEMA -- did you have a participation

10   in -- in the selection of those contractors?

11      A.     I did not.

12      Q.     Who at FEMA did?

13      A.     I believe it was Mr. Craig, but I'm not a

14   hundred percent sure if -- no, I am a hundred percent

15   sure.  That was before he recused himself, so

16   Mr. Craig was responsible for that.

17      Q.     Before he recused himself?

18      A.     Yes.

19      Q.     Why -- why did Mr. Craig recuse himself?

20      A.     He left the agency.

21      Q.     Oh.

22      A.     He made a decision to leave the agency,

**7/7/2009  Garratt, David E.**

```
 1    and at the point he made a decision to leave the

 2    agency, he recused himself.

 3         Q.    Well, so before leaving the agency,

 4    Mr. Craig is the one who -- who selected those 4

 5    contractors?

 6         A.    Well, I believe he was -- he was the head

 7    of the disaster -- excuse me -- the recovery division

 8    at the time.

 9               Now, I don't know if it was technically

10    him or if it was technically the chief acquisitions

11    officer, senior procurement official who was the one

12    who technically did that.  But from a program

13    perspective, it would have been under his aeg- -- or

14    his responsibility.

15         Q.    I know this is not your direct activity,

16    but is it your understanding that under the protocol

17    for selecting contractors to do that, FEMA would

18    undertake to assure that these are -- these are

19    companies which can perform that activity in a

20    proper, workmanlike manner?

21         A.    Well, yes.

22               They have to compete against a -- their
```

**7/7/2009  Garratt, David E.**

```
1     bids on these contracts with evaluated, so certainly

2     the prevailing belief is among those who selected

3     them that they are capable of performing what they

4     say they can perform in -- in their bids.

5          Q.    And certainly FEMA in exercising whatever

6     due diligence it exercised to select these particular

7     companies would assume, wouldn't it, that in their

8     installation of travel trailers, they would do

9     nothing to increase the levels of formaldehyde in the

10    units.

11             True?

12         A.    True.

13         Q.    And you would count on them not to do that

14    as FEMA, wouldn't you?

15         A.    Well, I think we would certainly count on

16    them not to knowingly do that.

17         Q.    Well, would you expect them not to do it

18    even negligently?

19         A.    Well, not knowing what they could do or

20    what sorts of things might inadvertently contribute

21    to increased formaldehyde in a unit beyond what is

22    organically present in that unit, I really don't have
```

**7/7/2009  Garratt, David E.**

1    any way to answer that.

2         Q.    What if any mechanism was in place for

3    FEMA to follow up on the installation work by these

4    contractors in order to determine whether or not in

5    fact formaldehyde levels might have been affected by

6    what they did?

7              MR. MILLER:  Objection, foundation.

8         A.    I'm not aware that any retroactive

9    activity took place to see if any of the installation

10   actions of any of the contractors may have contribute

11   to do an increase in formaldehyde.

12             BY MR. MEUNIER:

13        Q.    Now, in your declaration at page 3, you

14   also talked today about the fact that prior to June

15   of 2006, FEMA was responding to occupant complaints

16   about air quality in the units on a case-by-case

17   basis.

18             Correct?

19        A.    Correct.

20        Q.    And do you know as you sit here today when

21   the first complaints reached FEMA concerning air

22   quality in these units?

**7/7/2009  Garratt, David E.**

```
1          A.     I do not.

2          Q.     Would you be in a position to deny the

3    fact that the first complaints reached FEMA as early

4    as October of 2005?

5          A.     I've got no basis to deny that.

6          Q.     And so assuming that to be true, between

7    October 2005 and June 2006, for roughly an 8-month

8    period of time, FEMA was handling complaints about

9    these units -- complaints by occupants on a

10   case-by-case rather than programmatic basis.

11               MR. MILLER:  Objection, assumes --

12               BY MR. MEUNIER:

13         Q.     True?

14               MR. MILLER:  Objection, assumes facts not

15   in evidence, hypothetical.

16         A.     Certainly true as far as air quality

17   issues.

18               BY MR. MEUNIER:

19         Q.     So there was no programmatic coordination

20   of FEMA's responses to the complaints that it was

21   receiving about formaldehyde concerns for the 8-month

22   period of time we're talking about?
```

**7/7/2009  Garratt, David E.**

1         A.    What do you mean when you say,

2    programmatic?

3         Q.    Well, I mean, a coordinated, strategized

4    programmatic response plan --

5         A.    Correct.

6         Q.    -- as opposed to an ad hoc case-by-case

7    approach.

8         A.    I wouldn't describe it as ad hoc.

9    However, it was case by case.

10        Q.    All right.  Now, and let me make sure I

11   understand.

12             When we say, case by case, there was no

13   document, there was no memo, there was no game plan

14   laid out for someone who received a call from an

15   occupant to keep all the responses to complaints more

16   or less on the same page.

17             True?

18        A.    I can't say that is true.

19        Q.    Well, tell me what documents existed,

20   then, to inform those who were responding to these

21   complaints between October '05 or whenever the

22   complaints started and June of 2006.

**7/7/2009  Garratt, David E.**

```
1              MR. MILLER:  Objection, assumes facts not

2    in evidence and mischaracterizes the witness's

3    testimony.

4         A.   I can't.  And I'm not the person who would

5    be able to tell you that.

6              That would be the individuals who are in

7    charge of leading the federal response in that

8    particular state and to manage that transitional

9    recovery office.

10             BY MR. MEUNIER:

11        Q.   So there would be individuals in different

12   offices who would come up with their own documents on

13   this?

14             MR. MILLER:  Objection, assumes facts not

15   in evidence.

16        A.   What I'm saying is that when we have a

17   major disaster declared for a state, the president

18   appoints an official, a federal official to lead and

19   manage that operation.  And that individual is

20   responsible for standing up, establishing, managing,

21   and coordinating the federal response within his or

22   her area of responsibility.
```

**7/7/2009  Garratt, David E.**

1           So they are the ones who would be

2    responsible for generating at their level direction

3    and guidance to the entities operating under their

4    authority.

5           BY MR. MEUNIER:

6       Q.    They were not receiving any direction from

7    above, that is, from FEMA.

8           True?

9           MR. MILLER:  Objection.

10      A.    I would say that's false.

11          They were receiving a lot of general

12   policy-related direction from FEMA.  I am not aware

13   that they were receiving any specific direction

14   regarding air quality from FEMA headquarters at that

15   time.

16          BY MR. MEUNIER:

17      Q.    Now, you've testified today that there

18   were a, quote, slew, in your words, or, quote, many

19   complaints that were being received and handled on a

20   case-by-case basis prior to June 2006.

21          Correct?

22      A.    Correct.

**7/7/2009  Garratt, David E.**

1          Q.      Any idea, how many?

2                  Can you quantify?

3          A.      When I said, slew, I was referring to the

4     full range of occupant-related issues, whether it be

5     a refrigerator that's not working or a crack in the

6     door, or, my unit is -- is wobbly.

7                  I'm talking about the range of concerns.

8     And, no, I --

9          Q.      Okay.

10         A.      -- don't have an idea.

11         Q.      Does -- do you know of any records that

12    exist today which would tell us the number of

13    complaints that were received by these various

14    offices in the field specifically regarding air

15    quality or formaldehyde?

16         A.      They're all required to -- those

17    maintenance and deactivation contractors maintain

18    records and keep those records, so, yes, those

19    records should be available.

20         Q.      Have you reviewed those records?

21         A.      I recall seeing a -- one set of records

22    probably about year and a half to 2 years ago.  I

**7/7/2009  Garratt, David E.**

1    don't remember from which MDC, or maintenance and

2    deactivation contractor, that was, but I do recall

3    seeing some records.

4         Q.    And what did those records indicate to you

5    in terms of the volume or number of air quality or

6    formaldehyde-related calls?

7         A.    At the time, there were not that many.  I

8    don't remember how many there were, and I'm not even

9    sure I remember exactly what the circumstances were

10   under which we requested that information.

11            It may have been for a snapshot in time as

12   opposed to everything to that point.  I recall us

13   asking to be pro- -- asking the field to provide us

14   records dealing with some period in time, but I don't

15   recall what that time was or even the -- necessarily

16   the impetus -- the impetus for that request.

17        Q.    And what do the records reflect was being

18   said to people who complained about air quality or

19   formaldehyde?

20            What -- what kind of response was being

21   given to those types of complaints?

22        A.    I would -- as I recall, different types of

**7/7/2009  Garratt, David E.**

1    responses were being provided to individuals, but

2    those responses were generally related to what it was

3    that was being reported.

4            For example, air quality issues:  my unit

5    has an odor to it, or, my eyes are watering.  And I'm

6    not saying that these are specific things that they

7    reported at the time.

8            I don't recall for most of the complaints

9    that I saw prior to -- and my memory is vague here --

10   that formaldehyde was mentioned.  It was typically

11   air -- general air quality issues that were

12   mentioned.  It was characterized that way.

13           It wasn't really formaldehyde being

14   reported as the problem until after this became a

15   public issue.

16       Q.    Yes, sir.

17           But my question was, if you can tell me

18   what types of responses were being given to those who

19   called about things like air quality, smell, watery

20   eyes, et cetera?

21           MR. MILLER:  Objection, foundation.

22           BY MR. MEUNIER:

**7/7/2009  Garratt, David E.**

1          Q.     According to the records that you

2     reviewed.

3          A.     I recall imperfectly different responses.

4                 In some cases, individuals were told to

5     try and ventilate their units or air it out and then

6     (phonetic) call back.  In some cases, people went out

7     to the units to check on them themselves.  In some

8     cases, a determination was made they needed to swap

9     out a unit.

10                It depends, but different responses.

11         Q.     Now, again, in your declaration, and this

12    is at page 3, you talk about Mr. Souza making a

13    recommendation in late June, which you authorized

14    and -- and supported that FEMA both prepare and issue

15    a safety notice and proceed with testing.

16                Correct?

17         A.     Correct.

18         Q.     You then in late June of '06 as the acting

19    deputy administrator of FEMA had the authority

20    whether or not to approve safety notices, whether or

21    not to approve testing of these trailers.

22                Correct?

**7/7/2009  Garratt, David E.**

1          A.     I'm sorry.

2                 Repeat that.

3          Q.     You had the authority, then, in June of

4     '06 to authorize both the issuance of safety notices

5     and the commencement of testing.

6          A.     Well, I certainly assumed I had the

7     authority.

8          Q.     And without you authorizing it, it

9     wouldn't happen?

10         A.     I can't say that.

11         Q.     You think Mr. Souza could have gone

12    forward without you?

13         A.     I don't know, but I can't say that it

14    would not have gone forward whether I authorized it

15    at that point in time or not.

16         Q.     But in any event, you were asked to

17    authorize it and did so?

18         A.     Correct.

19         Q.     And on your authorization, it happened.

20         A.     Correct.

21         Q.     Is it -- is it safe to say that for the

22    period May '06 to June -- January '09, Mr. Johnson,

**7/7/2009  Garratt, David E.**

```
1      in the same position of acting deputy administrator

2      of FEMA, would have that kind of authority to

3      authorize notices to occupants or the commencement of

4      testing of the units?

5           A.    Admiral Johnson?

6           Q.    Admiral Johnson.

7           A.    Okay.  I'm sorry.

8                 Could you ask that question one more time.

9           Q.    Would Admiral Johnson's authority in the

10     position of acting deputy administrator of FEMA from

11     May '06 to January '09, preceding you, likewise vest

12     him with the authority to authorize notices to

13     occupants such as you did or the commencement of

14     testing of units such as you did?

15          A.    Had he been there at that time, that is

16     correct.

17                I'm not entirely sure that -- again I'm

18     trying to remember when Admiral Johnson came on

19     board.  It was about this time, I believe, but it --

20     the bottom line is, if I have that authority, then

21     anybody above me also has that authority.

22          Q.    Right.
```

**7/7/2009  Garratt, David E.**

1           So from May -- I think you told us earlier

2     that Johnson assumed the position of acting deputy

3     administrator for FEMA in May of '06 and held it till

4     January of '09.

5           A.    I think that's correct.

6           Q.    And so for that period of time, he had and

7     exercised the same decision-making authority which

8     you have had and exercised since January 21, '09.

9                 True?

10          A.    Well, he was the deputy administrator of

11    the agency.  I was the either -- I'm not sure at this

12    point in time -- I was either the acting assistant

13    administrator of this directorate or the deputy

14    assistant administrator of this directorate, so in

15    either of those positions, I would be below him in

16    the food chain.

17          Q.    But certainly any decision-making

18    authority you had, he would have?

19          A.    Agreed.

20          Q.    Now, let me ask you about the safety

21    notice that you authorized in late June of '06.

22                You told Mr. Woods that there were a,

**7/7/2009  Garratt, David E.**

1     quote, number of these safety notices to occupants.

2            A.     Correct.

3            Q.     How many?

4            A.     Don't recall.

5            Q.     Less than a dozen, more than a dozen, 5,

6     6?

7                   Can you give me some idea?

8            A.     Well, less than a dozen.

9            Q.     Less than 10, less than 5?

10           A.     I honestly don't know, because not all

11    safety notices were necessarily generated or directed

12    by FEMA headquarters.  The TROs, regions, had the

13    authority to do this on their own.

14           Q.     Who would know the total number of safety

15    notices that were directed to occupants regard- --

16    specifically regarding the formaldehyde concerns in

17    these units?

18           A.     You'd have to talk to whoever was heading

19    up the individual transitional recovery offices at

20    the time.

21           Q.     Well, there's no one person, then, you're

22    saying, at FEMA who had the kind of oversight who

**7/7/2009  Garratt, David E.**

1    could tell us officially how many safety notices

2    issued to occupants?

3         A.    I think it depends on what it is that you

4    want to talk -- consider a safety notice.

5               For example, we --

6         Q.    Using your term.

7         A.    Right.

8               We approved a safety notice during this

9    period of time, and we directed that this notice be

10   provided to all occupants of all units at that

11   particular time.

12              Now, that does not mean that a TRO on

13   their own could not have gone in and reprovided

14   followup versions of these if they changed a phone

15   number, for example, and wanted to provide new

16   notices to all of the occupants with the new phone

17   numbers on them.  They changed maintenance and

18   deactivation contractors, so they're going out and

19   they're reproviding.  I don't know that they -- that

20   could have happened.

21              The bottom line is, what I know is what

22   headquarters directed, but that does not mean that --

**7/7/2009  Garratt, David E.**

1    that our field guys didn't on their own also do some

2    distribution of notices.

3         Q.    All right.  Let's just talk about what

4    headquarters directed.

5              Who had input into the language of the

6    safety notice?

7         A.    Our directorate, Office of Chief Counsel.

8    I think our safety office was involved.  The office

9    of health affairs was involved.  We consulted CDC and

10   the Department of Health and Human Services.

11             And I think either Admiral Johnson and/or

12   Chief Paulison were likely involved in that, and it's

13   possible that higher headquarters at the department

14   level was involved as well, but I don't have any

15   specific memory of that.

16        Q.    Did you mention legal counsel?

17        A.    I did.

18        Q.    Who -- which legal counsel had input into

19   the language of the safety notices?

20        A.    I don't recall.

21        Q.    What did the safety notices tell occupants

22   regarding the effects of long-term exposure to

**7/7/2009  Garratt, David E.**

1    formaldehyde?

2              MR. MILLER:  Objection, vague, time.

3         A.    I don't recall.

4              BY MR. MEUNIER:

5         Q.    Do you believe that subject was addressed

6    in the safety notice?

7         A.    I don't know.

8         Q.    Do you believe it should have been

9    addressed in the safety notice?

10        A.    That's another good question.

11        Q.    Thank you.

12        A.    At the time, we didn't know what the

13   long-term effects of formaldehyde exposure --

14   exposure were.

15        Q.    Wait a minute.

16              At the time.

17              We're talking about late June of '06 --

18        A.    Right.

19        Q.    -- that you authorized the safety notice.

20              You're saying you didn't know at that time

21   what the long-term exposure effects of formaldehyde

22   were?

**7/7/2009  Garratt, David E.**

```
1          A.     I did not.

2          Q.     Okay.  Are you suggesting that science in

3    late June of '06 provided no information regarding

4    the long-term exposure effects of formaldehyde?

5          A.     I don't believe I did say that.  I believe

6    what I said was, I did not know.

7          Q.     Well, did any of the individuals having

8    input into the language of the safety notice as far

9    as you know have information to share about the

10   long-term effects of formaldehyde?

11         A.     There was certainly discussion, a lot of

12   discussion about formaldehyde throughout that period

13   of time.  And we were reaching out to and consulting

14   any number of people who try to get a handle on

15   exactly what we were dealing with at this particular

16   time.

17                Central to those discussions were

18   obviously the department's office of health affairs

19   and CDC, at least in 2007 when we actively engaged

20   them.  In 2006, when this issue first arose, I think

21   at the time that we were starting this process, we

22   did not yet know what the extent of this potential
```

7/7/2009  Garratt, David E.

1    problem was.

2              What we recognized was that the Sierra

3    Club was asserting that in fact there was a systemic

4    issue, which prior to that, we did not recognize.  So

5    they had asserted there was a systemic issue, and

6    what we wanted was validation.

7              And that's really the point that we were

8    at at that point in time, and what we were interested

9    in doing was reducing the formaldehyde levels in

10   these units, and so the safety notices were designed

11   to help those occupants who really didn't have any

12   other place to go to actions to reduce formaldehyde

13   in their units.

14        Q.    Meaning ventilate the units?

15        A.    Ventilate the units was the principal

16   mechanism for reducing formaldehyde.

17              MR. MEUNIER:  We have to change the tape.

18              THE VIDEOGRAPHER:  This concludes tape

19   number 2 in the videotape deposition of David

20   Garratt.  The time on the video is 11:24 AM.  We are

21   off the record.

22              (Discussion off the record.)

**7/7/2009  Garratt, David E.**

```
1              THE VIDEOGRAPHER:  This begins tape number

2     3 in the video deposition of David Garratt.  The time

3     on the video is 11:27 AM.  We are on the record.

4              BY MR. MEUNIER:

5         Q.    Just to finish up on the subject of safety

6     notices to occupants, Mr. Garratt.

7              You've indicated you really don't recall

8     today exactly how many safety notices were put out.

9     And I think you've also indicated that, you know, if

10    we named any one occupant, no matter what the name of

11    that occupant, you could not as you sit here tell us

12    one way or the other if that occupant received a

13    notice.

14             True?

15        A.    I did not see occupants receiving notices.

16        Q.    Right.

17             Now, you -- you could, though, I hope,

18    tell us exactly how the notices, the safety notices

19    that you know about were meant to be delivered to or

20    received by occupants.

21        A.    Hand-delivered, at least some number of

22    notices were hand-delivered.  It's entirely possible
```

**7/7/2009  Garratt, David E.**

```
1     that some notices were also mailed to occupants.  I

2     honestly don't recall, but that is possible.

3               But at least this initial notice was to be

4     hand-delivered, and we had asked the TROs to report

5     back to us when they had completed those

6     hand-deliveries.

7          Q.   And the TROs, just so the jury

8     understands --

9          A.   Transitional recovery --

10         Q.   -- transitional recovery office.

11              All right.  So this initial notice of late

12    June '06, which is the one mentioned in your

13    declaration, that was not mailed but hand-delivered

14    to some occupants.

15              Correct?

16         A.   I believe it was hand-delivered to all

17    occupants.

18         Q.   All right.  So --

19         A.   Or at least to all units.

20         Q.   To all units.  All right.

21              Now, how many units were out in place in

22    the field as of late June of '06?
```

**7/7/2009  Garratt, David E.**

```
1          A.     I do not recall.

2          Q.     And the intent -- the mission, if you

3     will, of this safety notice effort was to get a

4     written safety notice hand-delivered to each and

5     every unit.

6                 Correct?

7          A.     Correct.

8          Q.     And this was done through the transitional

9     recovery offices?

10         A.     Correct.

11         Q.     And how many of those were there?

12         A.     At that time, certainly Alabama,

13    Mississippi, Louisiana.  I'm not sure if Texas had a

14    transitional recovery office or was operating out of

15    a joint field office at the time, but it doesn't

16    matter, performing essentially the same function.

17         Q.     And do I assume, then, that the staff of

18    each of those offices was sufficient to go out into

19    the field and bring a notice to each unit no matter

20    where the unit was located?

21         A.     I think the transitional recovery offices

22    didn't necessarily all use the same methodology to
```

**7/7/2009  Garratt, David E.**

1    execute this particular mission.  In some instances,

2    they may have used their maintenance and deactivation

3    contractors to go out and provide these notices.

4              In others, they may have supplemented that

5    or replaced that with disaster assistance reserve

6    staff, but bottom line, it was up to the TROs to come

7    up with the fastest, most efficient way of getting

8    these notices out to these units.

9         Q.    Is there any document that exists today

10   that would confirm the delivery of a safety notice to

11   a specific location?

12        A.    Not that I'm aware of.

13        Q.    So individuals would leave the

14   transitional recovery office for example with a stack

15   of notices and come back, and the assumption was that

16   they had physically delivered each one to a specific

17   unit?

18        A.    I don't think so.

19        Q.    You don't think so.

20              Why not?

21        A.    Well, let me rephrase my answer.

22              I would be surprised if that was how the

1    transitional recovery offices were operating, that

2    they would hand someone a stack of notices and assume

3    that they had provided those.

4            If I was managing this out in the field,

5    we would be sitting everyone down who is responsible

6    for doing this, we'd be articulating exactly what

7    their area of responsibility is and how many units

8    are in that particular area, and they would report

9    back when they came back that they had completed all

10   of their assigned deliveries.

11       Q.    And if you were managing it, you'd have

12   some document or checkoff sheet that would show that

13   a specific unit got a notice?

14           MR. MILLER:  Objection, assumes facts not

15   in evidence, calls for speculation.

16           BY MR. MEUNIER:

17       Q.    If you -- if you were managing the

18   operation.

19       A.    And in fact, that may have happened,

20   because we did ask the TROs to report back at least

21   during this first go-around the status of their

22   deliveries and were tracking when they completed

**7/7/2009  Garratt, David E.**

1    those deliveries.

2        Q.    So you do have some status reports in that

3    regard?

4        A.    I think we have -- I recall seeing I think

5    emails, or we may have had this report on

6    teleconferences -- I'm not sure -- but the bottom

7    line was, we were getting reports back from the field

8    on their progress and were tracking those -- progress

9    through completion.

10       Q.    And so there would be some emails today

11   that would evidence discussions on that tracking

12   effort?

13       A.    Wouldn't be surprised.

14       Q.    All right.  And you would have been part

15   of the email string?

16       A.    I would think so.

17       Q.    Okay.  Would there have been someone at

18   FEMA who was directly in charge with oversight of

19   the -- of the notice delivery system other than in

20   these individual transitional recovery offices?

21       A.    Well, as either the acting -- if I was

22   acting at the time, then I would have been

**7/7/2009  Garratt, David E.**

1    responsible for anything that happens in any program

2    area in our directorate.  In terms of this particular

3    tasking, Kevin Souza was my assigned lead for working

4    this particular project, but the responsibility was

5    mine.

6         Q.    Given the importance of the safety notice

7    and what was at stake, I assume that the intent, if

8    they have a hundred percent delivery of a notice,

9    that is, every occupant in every -- every unit was to

10   physically receive the notice.

11             That was the intent?

12        A.    Correct.

13        Q.    Did you achieve that?

14        A.    To the best of my recollection, yes.

15        Q.    So that it didn't matter where a unit was,

16   in other words, if it was in a trailer park or if it

17   was on someone's private property, a single address,

18   if you will, didn't matter.

19             Every one of those units by intent was to

20   get a physical delivery of the -- of the notice?

21        A.    A notice, yes, a notice delivered to each

22   unit, not necessarily to a hot body in that unit.

**7/7/2009  Garratt, David E.**

```
1          Q.    All right.  Explain what you mean by that.

2          A.    I mean, if they stopped by a unit and no

3     one answered the door, then they would tape that unit

4     (sic) to the door, or they would put it on the door

5     or slip it under the door.

6          Q.    Those were the instructions?

7          A.    No.

8                I'm just -- I don't know what the specific

9     instructions were, but the answer -- the tasking was

10    to make sure that these fliers were provided to all

11    units.

12         Q.    Now, you wanted -- let's talk about

13    testing for a minute.

14               You authorized testing as recommended by

15    Souza?

16         A.    As recommended by the EPA.

17         Q.    By the EPA.

18               And you felt that they were a qualified,

19    independent entity for the purpose of that testing?

20         A.    Absolutely.

21         Q.    When you talk in your statement about

22    wanting testing by a qualified independent third
```

1    party, you don't necessarily mean someone outside of

2    the federal government, but a third party in that

3    they're not FEMA?

4        A.    Correct.

5        Q.    So another government agency such as EPA

6    was what you had in mind?

7        A.    With experience in this sort of stuff.

8        Q.    And the purpose of the testing that you

9    authorized was to either validate or not the Sierra

10   Club test results that had been reported about unsafe

11   levels of formaldehyde?

12       A.    Initially what we wanted to do was -- when

13   we initially started this process -- initial

14   discussion with Mr. Souza about this, it was to

15   validate what the Sierra Club was asserting, and that

16   was that these high levels of formaldehyde existed in

17   the units, that they were attributing to the units

18   that we were providing.

19            Now, subsequent to that, however --

20       Q.    Yeah.

21       A.    -- it he involved into wanting to

22   determine what was -- what levels of formaldehyde

**7/7/2009  Garratt, David E.**

1    were the units themselves producing.

2                So we were not necessarily at that point

3    validating what the Sierra Club had come up with,

4    because they were measuring occupied units.  And we

5    in fact were just verifying whether our units were

6    producing sufficient formaldehyde to generate a level

7    of concern among us as well.

8         Q.    Right.

9                That's -- that's the point I wanted to

10   clarify.

11               In fact, the testing you did because it

12   was unoccupied units didn't directly address the test

13   results from the Sierra Club --

14        A.    Correct.

15        Q.    -- for occupied units.

16               Correct?

17        A.    Indirectly, but not directly.

18               Or excuse me.

19               Let me rephrase that.

20               It wasn't a one-for-one sets of tests.

21        Q.    Certainly since you're not a scientist on

22   this issue, you're not in a position to tell us the

**7/7/2009  Garratt, David E.**

1    extent to which you could take the test result from

2    an unoccupied unit and make decisions or conclusions

3    about the validity of the test results from an

4    occupied unit.

5              You can't do that, can you?

6         A.    Wouldn't try.

7         Q.    Now, at page 4 of your declaration, you do

8    talk about the involvement of OCC, the Office of

9    Chief Counsel.  And you say that they were involved

10   or that office was involved with and did issue advice

11   regarding formaldehyde response actions.

12             Over what period of time did the OCC have

13   that involvement?

14        A.    I would imagine from the very beginning.

15        Q.    And if we assume for the purpose of my

16   question that the first complaints to reach FEMA

17   about formaldehyde concerns in the travel trailers

18   was in October of '05, you would say that's the

19   period which started the involvement of OCC?

20        A.    No, I did not.

21        Q.    All right.  When you said, from the very

22   finishing, what did you mean?

**7/7/2009  Garratt, David E.**

```
1          A.    The beginning of our engagement following

2     the publication of the Sierra Club report.  When met

3     with Kevin and sent Kevin out to tackle this, that

4     OCC would have been -- excuse me -- Office of Chief

5     Counsel would have been involved in that effort.  He

6     would have been reaching out to and engaging whoever

7     he needed to within the agency to participate in that

8     process.

9          Q.    And would you -- would you say that they

10    were frequent participants in the telephone and other

11    meetings concerning what response action should be

12    taken?

13         A.    Spec- -- I'd be speculating since I did

14    not participate in very many of those meetings.

15    Kevin managed most of those with the team that he had

16    assembled.

17         Q.    Was it the intent, though, to involve them

18    in all important discussions regarding formaldehyde

19    response actions?

20         A.    I'm certain that was his intent.

21         Q.    But was it your intent?

22         A.    I'm not sure I had an intent at that point
```

**7/7/2009  Garratt, David E.**

```
1    other than the direction that I had given to Kevin,

2    which was to reach out and get this going.

3             How he managed that and how he worked that

4    left up to him, but I certainly would assume again

5    that OCC -- excuse me -- the Office of Chief Counsel

6    would have been integral to that engagement.

7       Q.    Now, the Office of Chief Counsel expressed

8    concerns about proceeding with testing.

9             True?

10      A.    Yes.

11            MR. MILLER:  Objection.

12            BY MR. MEUNIER:

13      Q.    They wanted to delay testing.

14            True?

15      A.    According to the email records, yes.

16      Q.    And we wanted to delay testing because of

17   concerns about pending litigation.

18            True?

19      A.    I do not know that that's true.

20      Q.    Do you deny that's true?

21      A.    I do not deny that that's true.

22      Q.    You're not in a position to deny that.
```

**7/7/2009  Garratt, David E.**

1          A.     I'm not.

2          Q.     In fact, have you seen email from

3     attorneys with FEMA talking about once you get the

4     results, you have a duty to respond, and let's be

5     careful, because this implies FEMA's ownership in the

6     issue?

7          A.     I have.

8          Q.     That would suggest that there was a real

9     concern about litigation on the part of those

10    individuals.

11         A.     Well, it might suggest that, but it also

12    might suggest just an operational concern as well.

13              In other words, before we roll out this

14    testing, let's get our ducks in order here.  I don't

15    see any reference in that citation you just did to

16    litigation.  There are other emails that reference

17    that, but I don't think that one does.

18         Q.     So when an attorney -- a trial attorney

19    for FEMA writes in an email, do not initiate testing

20    until we give the okay, once you get results and

21    should they indicate some problem, the clock is

22    running on our duty to respond to them, do you see

**7/7/2009  Garratt, David E.**

1      that as operational, not legal in intent?

2          A.     I see it both.

3                 Legal is intent, but it certainly has an

4      operational -- or it's geared to or directed at our

5      operational response.

6          Q.     Now, you mention in your declaration at

7      page 4 that the ATSDR reported that ventilation was

8      an effective method to reduce the levels in the units

9      to below levels of concern.

10                Correct?

11         A.     Correct.

12         Q.     What was the level of concern?

13         A.     I don't recall.

14         Q.     And so you don't know how that level of

15     concern, for example, compares to various government

16     agency standards regarding formaldehyde?

17         A.     Well, I know that there are different

18     standards within the government for levels of

19     formaldehyde.

20                I do not know how that level of concern --

21     bottom line is, no, I don't.

22         Q.     Well, was it your understanding at that

**7/7/2009  Garratt, David E.**

1    time that if people ventilated their units, they

2    could get the level of formaldehyde below that which

3    would be a health risk for them?

4                MR. MILLER:  Objection, time, vague.

5        A.    I don't know that it would be accurate to

6    say that they could get them below a level that would

7    be a health risk to them.  I'm not in -- was never in

8    a position to -- to state that.

9                What I was in a position to do was take

10   the results of the qualified agency that we had asked

11   to make recommendations to us, who said, if you

12   ventilate them to these levels, then they are safe

13   for these folks to live in, and they can get them to

14   acceptable levels.

15               Now, the health risk --

16               BY MR. MEUNIER:

17       Q.    Well, but -- so your -- your conclusion

18   going forward was, if you ventilate the units,

19   they're safe to occupy.

20               True?

21       A.    Or can be made safe to occupy if they're

22   ventilated, yes.

**7/7/2009  Garratt, David E.**

1      Q.    And that's in fact what you communicated

2   going forward from that point in time to people, that

3   if they ventilated the units, they would be safe to

4   occupy?

5      A.    Safe in comparison to the average living

6   environment that the average -- that we live in,

7   correct, as opposed to absolutely safe.

8      Q.    At page 5 of your declaration, you make

9   reference to a second formaldehyde safety sheet to

10   occupants.

11          That's in paragraph 10.  And that -- and

12   the reference in date time here seems to be July of

13   2007 .

14          Do you see that?

15      A.    I do.

16      Q.    All right.  So we've talked about a safety

17   notice that went -- that appears to have been

18   generated back in the summer of '06.

19          When you say, a second formaldehyde safety

20   sheet, do we assume now that the second safety notice

21   to occupants came roughly a year later in the summer

22   of '07?

**7/7/2009  Garratt, David E.**

1           A.    Where -- I'm looking for it says, second

2     to safety notice.

3           Q.    It's the third line up, paragraph 10, page

4     5 of your declaration.

5           A.    Page 5, third line up, 10.

6           Q.    Paragraph 10.

7           A.    Okay.  Okay.

8                 I'm sorry.

9                 Could you repeat the question again?

10          Q.    All right.  We talked about the safety

11    notice that went out in the summer of '06 that was

12    meant to be hand-delivered to every unit.

13                Do I assume that when you say there was a

14    second formaldehyde safety sheet to occupants,

15    quote-unquote, and this is occurring in July of '07,

16    that a year passed roughly between the first safety

17    sheet notice to occupants and the second?

18          A.    Between the first headquarters-directed

19    safety notice to occupants and the second.

20          Q.    And do I assume that for the second safety

21    sheet notice in July of '07, you had the same

22    distribution plan, which was hand-delivery to every

**7/7/2009  Garratt, David E.**

1   single unit?

2       A.     I think that's correct, but I'm not a

3   hundred percent sure.  We may have also mailed those

4   safety notices as well, but I don't recall.

5       Q.     You wouldn't have mailed them by certified

6   mail.

7              You would have -- if you mailed them, by

8   regular mail.

9              Correct?

10      A.     I think so.  We have used certified mail

11  in the past, but I can't say that we used it for

12  this.

13      Q.     If they came back undelivered because of a

14  bad address, what was the plan?

15      A.     We typically do initial outreach at that

16  point, and that's typical of any of the forms of

17  assistance that we provide when we communicate with

18  disaster victims -- excuse me -- survivors.

19      Q.     And in your declaration at page 6,

20  paragraph 12, you say:  In the spring of 2008, FEMA

21  hired a contractor to test occupied units, and over

22  3,000 occupants have now had their units tested for

**7/7/2009  Garratt, David E.**

```
1      formaldehyde.

2              Correct?

3      A.      Yes.

4      Q.      And who is the contractor?

5      A.      It was Bureau Veritas.

6      Q.      We talked earlier about the fact that if

7      you test occupied units, you -- you bring in the

8      variable or the confounder of something other than

9      what might be generating or emitting formaldehyde in

10     the unit.

11             To your knowledge, had the -- had the

12     testing of occupied units by Bureau Veritas accounted

13     for those variables?

14     A.      By, accounted for those variables, what

15     exactly do you mean?

16     Q.      What I mean is, are the -- is the aim of

17     this testing program to find out what formaldehyde is

18     being emitted by components within the unit itself?

19     A.      No.

20     Q.      So the testing here is only aimed at --

21     A.      -- informing the occupant.

22     Q.      -- at discerning -- at discerning how much
```

**7/7/2009  Garratt, David E.**

1    formaldehyde is in the unit from any source?

2         A.    So that the occupant can make an informed

3    decision about whether they do or do not want to

4    vacate that unit.

5         Q.    I want to turn to the email string that

6    Mr. Woods referred you to involving Roe -- Price Roe.

7              And let me first ask you to look at the --

8    well, let's -- let's first -- you had a concern here

9    that you expressed about communicating to the media

10   something to the effect that FEMA did not consider

11   this problem widespread, and you said, wait a minute,

12   we may not know enough, let's -- let's not

13   communicate that thought.

14             Right?

15             You said, we just don't know whether it's

16   widespread or not.

17             True?

18        A.    Correct.

19        Q.    Is that still your position today?

20        A.    No.

21             I think we recognize that it's a

22   widespread issue now.

**7/7/2009  Garratt, David E.**

```
 1          Q.    And in the email about media exposure, I
 2    think you indicated you may or may not have read this
 3    entire email, but there's a -- there's a sentence in
 4    here talking about the fact that FEMA has not
 5    directly briefed the secretary on this issue
 6    believing it was appropriately handled by FEMA's
 7    legal counsel and FEMA's complaint resolution
 8    process.
 9          Do you see that?
10          A.    Yes.
11          Q.    What is that referring to exactly?
12          A.    It's referring to the maintenance and
13    deactivation -- at least I believe it's referring to
14    the maintenance and deactivation contractors who were
15    the ones who were responsible for taking calls from
16    occupants if they had issues or complaints about
17    their units.
18          Q.    So what was the role of FEMA's legal
19    counsel in handling that?
20          A.    I'm not aware that they had any role in
21    the complaint resolution process.
22          Q.    It's indicated here that they -- they
```

**7/7/2009  Garratt, David E.**

```
1      handled.

2           A.     I didn't write that.

3           Q.     So you don't know what that refers to?

4           A.     I'd be speculating.

5           Q.     And then if you turn to the email from

6      Price Roe to Harvey Johnson, copied to others, this

7      is July 25th --

8           A.     What page are you on?

9           Q.     This is page 4.

10                 And here Roe is communicating to Admiral

11     Johnson the need for a draft information memo.

12                 Do you see that?

13          A.     I do.

14          Q.     And it says, from FEMA by COB.

15                 What is COB?

16          A.     Close of business.

17          Q.     Close of business.

18                 That addresses these points at a high

19     level, one of which is, FEMA's legal exposure

20     liability, parens, is burden on manufacturer, or does

21     FEMA have some risk, close parens.

22                 Do you see that?
```

**7/7/2009  Garratt, David E.**

1         A.    I do.

2         Q.    Do you understand why at a high level

3   there needed to be a draft memo from FEMA addressing

4   that issue in particular at that time?

5         A.    Not specifically.  I think it's a

6   reasonable request.

7         Q.    Did you ultimately see the draft

8   information memo that addressed that?

9         A.    I don't recall, although I could very well

10  have been the one to put it together, but I just

11  don't recall.

12        Q.    And to your knowledge, what -- that draft

13  memo would have been something to be used by Admiral

14  Johnson or relied on by him?

15        A.    In what way?

16        Q.    In any way.

17        A.    Well, this was something that the

18  secretary was -- apparently being requested for the

19  secretary, not for Admiral Johnson.

20        Q.    The "secretary" meaning of --

21        A.    Secretary of Homeland Security.

22        Q.    -- Homeland Security was requesting this

**7/7/2009  Garratt, David E.**

1    memo?

2         A.    Well, or it was being requested for the

3    secretary, but it says:  Admiral, the secretary is

4    concerned about this story and wants to make sure

5    we're out in front of it.  We need a draft -- "we"

6    being the Department of Homeland Security -- need a

7    draft information memo from FEMA.

8              So the department was requesting that FEMA

9    provide them a draft memo addressing these points.

10        Q.    Do you know why the department needed such

11   a memo?

12        A.    Well, at the bottom here, it says:  I'd

13   like to see a draft by close of business today so I

14   can give the secretary an update on progress

15   Wednesday morning.  I will use the memo to brief S 1

16   informally.  And he will decide if he wants a full

17   briefing from FEMA.

18        Q.    "S 1" being?

19        A.    The secretary.

20        Q.    The secretary.  All right.

21              So do you know how this memo ultimately

22   was used by the secretary?

**7/7/2009  Garratt, David E.**

1          A.    That was one of probably a gazillion

2    memos.  I honestly don't remember.

3          Q.    You were referred to this letter to

4    Congressman Waxman over your signature.  And I just

5    want to clarify one part of it.

6          A.    Over the --

7          Q.    Over the --

8          A.    -- space where --

9          Q.    Over the space where  -- (indiscernible).

10         A.    -- my signature would be if it were

11   actually there.  Okay.

12         Q.    It's stated, second-to-last paragraph, to

13   the congressman:  We have distributed health and

14   safety information to occupants of these units

15   outlining what formaldehyde is and how it may affect

16   occupants and how occupants can reduce their

17   exposure.

18              I don't know if we know the date of this

19   letter per se, but it's in response apparently to an

20   April '07 letter from Waxman.

21              Now, would the health and safety

22   information that is referred to here be the safety

**7/7/2009  Garratt, David E.**

```
 1    notice that was meant to be hand-distributed to each

 2    unit that you know about plus any others that you may

 3    not know about that were given out by the field

 4    offices?

 5         A.    Well --

 6         Q.    Is that what this refers to?

 7         A.    It would certainly -- it would at least

 8    refer to that, yes.

 9         Q.    What else would it refer to?

10         A.    I don't know.

11         Q.    Again, you didn't write the letter, and

12    you may not have even signed it.

13               Is that true?

14         A.    I don't recall signing it, but I very well

15    could have.

16         Q.    Okay.  Pretty important to respond to a

17    congressman when he wants to know answers, isn't it?

18         A.    This could have been a first draft that

19    just didn't make it through.  I honestly don't know.

20    There are just so many of these that --

21         Q.    All right.  So who drafted it?

22               A lawyer with FEMA drafted this for you?
```

**7/7/2009  Garratt, David E.**

```
1          A.    I suspect that our correspondence unit

2     reached out to -- I don't know who drafted it.

3          Q.    Okay.

4          A.    But it looks like it had the

5     involvement -- at least the office of health affairs

6     was involved in this.

7          Q.    Well, the only question I just want to ask

8     is, other than the safety notice to be distributed by

9     hand to units, can you tell me what other

10    distribution of health and safety information to

11    occupants concerning formaldehyde had occurred as of

12    the spring of 2007?

13         A.    Not without going back and doing some

14    research.

15         Q.    What kind of research would you have to

16    do?

17         A.    I don't know.

18               See if CDC did any outreach, for example,

19    at that time.  I thought that they may have been

20    preparing some of their own handouts.  I don't know

21    if they were ever distributed or not.  I'd have to

22    see if any of the TROs did any distribution on their
```

**7/7/2009  Garratt, David E.**

1    own.

2              I'd have to see if the headquarters, if

3    for example they decided to do a redistribution of

4    these memos again at some point.  They made that

5    decision on their own, which would be fine for our

6    program offices to exhibit that kind of initiative.

7              The bottom line is, I just can't

8    authoritatively say that anything more was done than

9    that one distribution effort prior to this date.

10   Q.    But you can't authoritatively state today

11   under oath that anything further -- anything beyond

12   that one hand-delivered notice was done?

13   A.    I cannot authoritatively say that anything

14   up until the second notice that we had directed and

15   that I alluded to in my deposition statement.

16   Q.    Now, let me ask you about Dr. Runge.  This

17   is his email which was copied to you and others May

18   18 of 2007.

19              Dr. Runge was the chief medical officer of

20   the Department of Homeland Security.

21              Correct?

22   A.    Correct.

**7/7/2009  Garratt, David E.**

```
1          Q.    You would certainly defer to him on issues

2    dealing with the medical and health affects of

3    exposure to formaldehyde, wouldn't you?

4          A.    We would.

5          Q.    And he was specifically asked to get

6    involved in response to reports of children becoming

7    ill in these units from formaldehyde.

8                Correct?

9          A.    Correct.

10         Q.    And his advice to FEMA in this email of

11   May 18, '07, was to put a hold on citing to

12   formaldehyde standards or levels at that time.

13               Right?

14         A.    His advice to FEMA was much more than this

15   email.

16               His advice to FEMA when we initially

17   reached out to Dr. Runge was that we get CDC and HHS

18   engaged right away and volunteered to lead that

19   effort and to devote his own resources to helping

20   coordinate and manage that effort.

21               So his advice was much more comprehensive

22   than just this email.
```

**7/7/2009  Garratt, David E.**

1          Q.    And I'm not suggesting otherwise.

2                My -- my focus is this:  There's been talk

3     here about all these different standards and .0 this

4     and .0 that, and I think a witness yesterday called

5     it a tyranny of numbers.  We've got all of these

6     various levels and standards of formaldehyde issues.

7                Did you understand this chief medical

8     officer, Dr. Runge, to be saying in May of '07, among

9     other things, hold off on citing to specific

10    standards and levels, because, among other things, as

11    he puts in the email, none of these are germane to

12    24-hour, 7-day-a-week exposure in mobile home or

13    trailers that a child or stay-home parent may

14    experience?

15         A.    First off, as I indicated before, I do not

16    recall seeing this email or series of emails.

17         Q.    You're copied, though.

18         A.    I was copied.

19         Q.    Yeah.

20         A.    I don't recall seeing this, however.

21         Q.    All right.

22         A.    However, this was common -- in terms of

**7/7/2009  Garratt, David E.**

1      our dealing with the office of health affairs,

2      Dr. Lake, Dr. Lang, and the others, who were leading

3      this effort for Dr. Runge, that was understood by us

4      as that this community was -- this reflects their

5      concern that there are a number of different

6      standards that exist out there published by different

7      agencies, different organizations, and that their

8      concern was, there is no single standard to operate

9      by.

10         Q.    Right.

11         A.    One of the reasons why we decided in terms

12     of our new specifications to drive to a level so low

13     that we didn't have to worry about a standard at that

14     point.  It was -- it was below at that point.

15               But this is reflective -- if what it's

16     reflecting is his concern that there are -- there are

17     no standards and that we need to be careful about

18     that, that was a common, prevailing concern among the

19     medical community, the health community that we were

20     dealing with at that time.

21               We were anxious to have standards.  We

22     wanted standards.  And they simply were either not

**7/7/2009  Garratt, David E.**

1    available or there were a number of different

2    standards, and no one was able to point at one and

3    say, that is the standard that you need to use.

4         Q.    Right.

5               And again, you know, because Runge was

6    called in at a time when there was concern about kids

7    in these units, you would agree, one of the most

8    compelling points he makes here is that, you know,

9    none of these standards are really going to address

10   directly 24-hour-a-day, 7-day-a-week exposure for a

11   child or stay-home parent.

12              That's a pretty compelling point, isn't

13   it?

14        A.    Agreed.

15        Q.    Now, in the prior months, FEMA had turned

16   to ATSDR and EPA, and they had established a level of

17   concern, just .3 PPM, by the way, and then a health

18   report goes out saying to people:  You know, if you

19   ventilate the unit, it will be safe.  We'll get you

20   below the level of concern.

21              Correct?

22        A.    I don't know the exact terminologies, but

**7/7/2009  Garratt, David E.**

1    the bottom line on the report that came out of ATSDR

2    was that ventilation would reduce the levels to

3    levels that occupants should feel safe living in

4    them.

5         Q.    Isn't it true that after Runge speaks in

6    May of '07 particularly about kids and stay-home moms

7    that that's not valid advice to give someone, that

8    you can ventilate and automatically get any given

9    unit to a safe level?

10        A.    I'm sorry.

11              Say that one more time.

12        Q.    After Runge's input saying, don't drill

13   down on standards, you've got kids exposed

14   around-the-clock, 7 days a week, no one standard can

15   address those concerns, isn't it true after that that

16   it's not a good idea to be telling people that by

17   ventilation, they can automatically get the level to

18   a safe level no matter what?

19              MR. SCANDURRO:  Object to the form of the

20   question.

21              MR. MILLER:  Objection, calls for expert

22   testimony, beyond the scope of the witness's

**7/7/2009  Garratt, David E.**

1    expertise.  It's speculation.

2             Go ahead.

3       A.    I need you to ask that question one more

4    time, please.

5             MR. MILLER:  Just read it back.

6             (The reporter read the last

7             question.)

8             MR. MILLER:  Same objection, vague.

9       A.    Again, not remembering this particular

10   email, I can't respond to that question in the

11   context of this.

12            I can respond and say that was a common

13   prevailing concern even well before this in dealing

14   with members of his staff.  At that particular time,

15   though, it was the CDC who had the lead for providing

16   us direction on what to do and what not to do with

17   regard to those units.  We were specifically seeking

18   that direction from CDC.

19            So this -- this is a concern that was a

20   prevailing concern at the time and not just for

21   children and not just for the elderly.  It was for

22   anybody in units that -- that were potentially

**7/7/2009  Garratt, David E.**

```
1    producing levels of formaldehyde that could be a

2    health problem.

3              MR. MEUNIER:  This might be a good time

4    for a brief lunch recess.

5              MR. MILLER:  How much more do you have?

6              MR. MEUNIER:  I have to huddle with my

7    teammates to answer that question.

8              MR. SCANDURRO:  That means he's at the

9    bottom of his sheet.  He's done.

10             MR. MILLER:  That's fine.  Okay.

11             Why don't we take a lunch break, then.

12             THE VIDEOGRAPHER:  We're going off the

13   record.  The time on the video is 12:06 PM.

14             (Whereupon, at 12:06 p.m., the deposition

15   in the above-entitled matter was recessed, to

16   reconvene at 1:23 p.m., this same day.)

17

18

19

20

21

22
```

```
1                 AFTERNOON SESSION

2                      (1:23 p.m.)

3

4      Whereupon,

5                 DAVID EDWARD GARRATT,

6      the witness testifying at the time of recess, having

7      been previously duly sworn, was further examined and

8      testified further as follows:

9

10               THE VIDEOGRAPHER:  This begins tape number

11     4 in the video deposition of David Garratt.  The time

12     on the video is 1:23 PM.  We are on the record.

13

14        EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

15              BY MR. MEUNIER:

16        Q.    Mr. Garratt, I want to refer to an email

17     string from June of '06.  And forgive me, I should

18     have pulled the -- let me just give you the marked

19     and highlighted copy, and I will -- I will find my

20     own.

21               This is an exchange of emails both dated

22     June 27, '06, in which you were shown to have been
```

**7/7/2009  Garratt, David E.**

```
1      one of the recipients of both emails by copy.   And

2      I'll mark this as Garratt number 6.

3           A.    Appears to be missing a couple of pages.

4                           (Garratt Exhibit No. 6

5                            was marked for

6                            identification.)

7           BY MR. MEUNIER:

8           Q.    Well, unfortunately, this is all that I

9      have with us, and it also bears a FEMA Waxman Bates

10     number 791 and 792.

11               And the bottom email, which is from

12     someone named Tracy Haynes, refers to a report of a

13     death of an applicant in a mobile home park in

14     St. Tammany Parish.

15               Do you see that?

16          A.    I do.

17          Q.    And then the top email is from someone

18     named Mark --

19          A.    -- Misczak.

20          Q.    -- Misczak, M-I-S-C-Z-A-K, to Haynes and

21     others.

22               And in this email, Mr. Misczak states
```

**7/7/2009  Garratt, David E.**

```
1    that:  We are requesting a PIO to prepare a response

2    to the inevitable question about trailer safety.

3              Do you know what is meant by a "PIO"?

4        A.    Public information officer.

5        Q.    And who is Mr. Misczak?

6        A.    Now, he is the deputy director of the

7    individual assistance division.

8              At the time, I think he was assigned to

9    the transitional recovery office.

10       Q.    Which transitional recovery office?

11       A.    I believe Louisiana.

12       Q.    And so he would have been in this instance

13   requesting some guidance on responding to the --

14       A.    Yeah.

15             First let me clarify.

16             He was I believe at the time -- he's now a

17   headquarters employee, but I believe at the time he

18   was essentially detailed for disaster purposes to

19   support the Louisiana transitional recovery office.

20   He was a permanent employee of our FEMA region 6 out

21   of Denton, Texas.

22             So I'm sorry -- back to your question.
```

**7/7/2009  Garratt, David E.**

1          Q.    He would have been asking for some

2     public -- some guidance for a public response to the

3     reported death of the individual in the mobile home

4     in St. Tammany Parish?

5          A.    He is asking Michelle for that,

6     apparently.

7          Q.    Okay.  And he states in the email that

8     you're shown as receiving a copy of -- he says:  We

9     need to move past OGC objections to possible testing.

10               Let me just stop there, middle of that

11     sentence and just ask you, were those -- is OGC

12     referring to the Office of General Counsel at FEMA?

13          A.    Yes.

14          Q.    And what do you know their objections to

15     possible testing to have been as of the date of this

16     email, July -- June 27 of '06?

17          A.    No.

18          Q.    You don't know what those objections were?

19          A.    No.

20          Q.    And then, Mr. Misczak goes on to say:  We

21     need to move forward with our safety notice, parens,

22     similar to the one HUD uses for mobile homes, close

**7/7/2009  Garratt, David E.**

```
1    parens.  I believe this is issue is well past the

2    point of, quote, wait and see.

3                  And we've already talked about the fact

4    that in the summer of '06, there was a safety notice

5    recommended by Souza, which you approved, so we can

6    assume that this is --

7         A.     This is the approval --

8         Q.     -- this is going forward with that safety

9    notice that we've already discussed.

10                 The parenthetical to -- that says, similar

11   to the one HUD uses for mobile homes, can you tell me

12   what specifically is being referred to there?

13        A.     HUD posts a -- or there's a notice posted

14   in all mobile homes that essentially certifies that

15   it's been built in compliance with HUD standards and

16   also has some additional information regarding

17   occupant safety in the unit, and it may or may not

18   involve formaldehyde.

19                 I don't know.  And I don't know if -- if

20   they're referring to the format of the notice or if

21   they are referring to a notice that specifically

22   deals with formaldehyde.
```

**7/7/2009  Garratt, David E.**

1          Q.    Because the notice that you approved that

2     Souza had recommended was going to be delivered to

3     travel trailers as well as other units.

4               True?

5          A.    All units.

6          Q.    Yeah.

7               Let me next refer you to some emails dated

8     from May of '07 --

9          A.    Do you need to put little stickies on

10    these?

11         Q.    Yeah.

12              I have on this one.

13         A.    Okay.

14              MR. MILLER:  I would just note for the

15    record, the United States objects to exhibit number 6

16    from Garratt, which was just marked, is incomplete.

17    It's missing what appears to be the first 2 pages.

18              BY MR. MEUNIER:

19         Q.    I meant to ask you about that because when

20    you looked at it, you said it appears to incomplete.

21         A.    I'm familiar with that email exchange.

22         Q.    You're familiar.

**7/7/2009  Garratt, David E.**

```
1              So what -- what can you just describe
2    what's not attached that goes with that email string?
3         A.    Well, this is a truncated message from me,
4    and I'm responding to Mark's request that we move
5    past OGC's objections to possible testing and move
6    forward with their safety notice.
7              And the full message, which is relatively
8    short, says, concur with your recommendations and
9    agree that you should not wait to post notices.
10        Q.    That was your response?
11        A.    Correct.
12        Q.    Okay.  Is there anything else in the -- in
13   the attached?
14        A.    No.
15             I think it goes on.  There are additional
16   emails back and forth --
17        Q.    Okay.
18        A.    -- but as far as this particular issue, I
19   think that's the only material 2 emails.
20        Q.    I want to next hand you a series of emails
21   that is dated from May of '07 --
22             MR. MILLER:  Do I have a copy?
```

**7/7/2009  Garratt, David E.**

1                  MR. MEUNIER:   (Handing document to

2       counsel.)

3                  BY MR. MEUNIER:

4          Q.    And let me just refer you to the third

5       page of that series of emails, Mr. Garratt, which

6       is -- reflects an email from you to Dr. Runge, May

7       17, 2007.

8                  Do you see that?

9          A.    Yes.

10         Q.    And in that email, you reference a news

11      report about a physician in Bayou La Batre, who's

12      identified what believes is an ailment trend among

13      travel trailer residents attributable to

14      formaldehyde.

15                 And you say:  I am nevertheless interested

16      in arranging to have a formal federal medical

17      assessment of this individual's evidence and claims.

18                 Now, what -- what exactly did you mean by,

19      a formal federal medical assessment?

20         A.    Have experts -- medical experts go in and

21      validate or invalidate the -- that doctor's

22      assertions that formaldehyde was contributing to this

**7/7/2009  Garratt, David E.**

1    particular ailment trend.

2         Q.    So this would have been separate and apart

3    from the EPA --

4         A.    Yes.

5         Q.    -- evaluation of unoccupied units.

6               You wanted somebody to actually go look at

7    medical records involving what this doctor was

8    referring to, for example?

9         A.    You're drilling down a little bit more in

10   terms of what I was looking for.

11        Q.    Okay.

12        A.    What was looking for was some expert,

13   independent --

14        Q.    M-hm.

15        A.    -- validation of what this doctor was

16   saying or asserting, and -- and how they did that was

17   entirely up to them at this stage of the game.  I

18   wanted someone to tell me, we were going to take

19   this, we're going to run with this --

20        Q.    Right.

21        A.    -- and let us know how they're going to do

22   that.

**7/7/2009  Garratt, David E.**

1        Q.    Did you get a reply from Dr. Runge?

2        A.    Yes.

3        Q.    And what was the reply?

4        A.    They got it.  They're all over it.

5              I'm paraphrasing.

6        Q.    Okay.  So he said that was a -- that was a

7    go?

8        A.    Yes.

9        Q.    Okay.  And so what was the outcome of that

10   assessment?

11       A.    They reached out to -- well, they reached

12   out to the CDC, and they engaged with the CDC, and

13   over a period of time came up with a strategy for --

14   for validating this.  Part of their engagement

15   involved going and talking with this physician.

16             And I'm aware that either they or somebody

17   from CD- -- CDC staff did go down and talk with them.

18             It may have been state health officials

19   who talked with this doctor as well.  That

20   subsequently led to the decision to do additional

21   testing.

22       Q.    CDC testing?

**7/7/2009  Garratt, David E.**

1          A.     Well, actually FEMA-funded testing, but

2      following CDC-approved protocols.

3          Q.     All right.  So was it your understanding

4      that the result of CDC's outreach to this particular

5      physician was to in some ways validate his concern

6      about an ailment trend related to formaldehyde?

7              MR. MILLER:  Objection, mischaracterizes

8      the witness's testimony.

9          A.     I'm sorry.  Ask that one more time.

10             BY MR. MEUNIER:

11         Q.     All right.  Since CDC reached out to the

12     physician and --

13         A.     Somebody -- somebody did.  And it may or

14     may not have not CDC, but it would have been under

15     their again aegis --

16         Q.     Yeah.

17         A.     -- that that --

18         Q.     Yeah.

19         A.     -- outreach was done.

20         Q.     And then after that, you say:  The result

21     was to go forward with some further testing of units.

22         A.     Well, not just necessarily that outreach

**7/7/2009  Garratt, David E.**

1     on that particular occasion to that particular

2     doctor.

3                    The end result of the engagement of the

4     medical community in this -- this problem identified

5     by this doctor resulted in a decision to do occupied

6     testing and to provide the results of that testing to

7     the -- to the occupants.

8          Q.    Did you assume therefore that there had

9     been some validation of the doctor's report of

10    concern about formaldehyde-related ailment trends?

11         A.    Well, certainly validation of the concern,

12    in terms of, were any of these individuals suffering

13    from formaldehyde exposure, no -- no validation or

14    invalidation of that, but validation that there was

15    sufficient concern to warrant us going forward with

16    occupied testing.

17         Q.    Okay.  Look right above that email from

18    you to Dr. Runge, and there's an email from Gil

19    Jamieson to you, same date, May 17.

20                    Do you see that?

21         A.    Yes.

22         Q.    And Mr. Jam- -- who is Mr. Jamieson?

**7/7/2009  Garratt, David E.**

1          A.     At the time, he was the principal federal

2     official and/or associate administrator for Gulf

3     Coast recovery.

4          Q.     And in this email, he recommends a change,

5     parens, or validate -- he recommends that you change

6     or validate the MH, slash, TT spec and contract

7     provisions for new production runs.

8               Let me just stop there.

9               Does MH, slash, TT refer to manufactured

10    housing, travel trailers?

11         A.     It does.

12         Q.     And the spec and contract provisions for

13    new production runs would refer to the further

14    production of units to be used by FEMA for the

15    hurricane victims from that point forward?

16         A.     Correct.

17         Q.     And then continuing with Jamieson's

18    recommendation in the email and that:  You should

19    state that the acceptance of the units will require a

20    testing of formaldehyde levels to conform with EPA

21    acceptable levels.

22              Would the testing that's referred to there

**7/7/2009  Garratt, David E.**

```
1     be testing conducted by the manufacturers prior to

2     the units being furnished or testing done by FEMA

3     after receipt of the units?

4          A.     Really a combination of both.  It would be

5     testing that was done by an independent third party

6     tester, but it would be done at the manufacturing

7     facility as part of the contract, and it would be a

8     condition of acceptance that they pass that.

9          Q.     And --

10         A.     Now, this --

11         Q.     Okay.

12         A.     -- was not necessarily known at the time

13    that he wrote that.  That is what ended up being the

14    protocol for the contracts that we have in place

15    using our new specifications.

16         Q.     So from May -- from -- well, this

17    recommendation by Jamieson was implemented?

18         A.     It was.

19         Q.     And when was it implemented?

20         A.     I don't recall when we let our first new

21    contract for park models and/or mobile homes, but

22    whatever date that was.
```

**7/7/2009  Garratt, David E.**

```
1        Q.    All right.  Can you give me some idea?

2              Was it within a month of May 17, '07, the

3    date of this email?

4        A.    I can't give you a date, but as you --

5    indicates in the subsequent email, we are already had

6    new specifications in place when he wrote this, and

7    we already had a hundred percent inspection protocol

8    established before acceptance of any unit, so he was

9    recommending something that we already had in the

10   works and as part of our strategy going forward.

11       Q.    Let me make sure I understand you on that.

12             Even before Jamieson makes this

13   recommendation --

14       A.    We were already doing this.

15       Q.    -- FEMA is already requiring testing for

16   formaldehyde levels?

17       A.    No.

18             We were already developing a -- or already

19   had a -- come up with a new contract with new

20   specifications, and it had a testing protocol as part

21   of that that we were pursuing.

22             What I can't say is that we had
```

**7/7/2009  Garratt, David E.**

1    necessarily made any awards on that contract at this

2    stage of the game, just that we had a protocol for

3    going forward to execute the new contracts using

4    these specs and this testing protocol.

5         Q.    Did the new contract protocol extend to

6    each and every manufacturer that was a source of

7    emergency housing units?

8         A.    Yes.

9         Q.    Prior to that change, did -- was it the

10   prevailing view, at least your view, that the con- --

11   that the manufacturers were in fact providing units

12   that complied with the required safety standards for

13   formaldehyde?

14        A.    It was our understanding that the

15   manufacturers were -- if they were producing mobile

16   homes or manufactured housing, producing units that

17   complied with HUD standards.

18        Q.    M-hm.

19        A.    For those who were not producing

20   manufactured housing, they were producing park models

21   or travel trailers, which were recreational vehicles

22   that met or exceeded industry standards since there

**7/7/2009  Garratt, David E.**

1      were no federal standards that applied -- there were

2      no HUD standards that applied to their construction

3      at the time that those units were purchased for

4      Hurricane Katrina.

5          Q.    Well, how did the new specifications for

6      travel trailer manufacturing change what you refer to

7      as the industry standards?

8          A.    Well, our new specifications for park

9      models and mobile homes require that the units test

10     at point- -- what they ended up requiring is that

11     below .016 PPM.

12            Now, how the manufacturers and what the

13     manufacturers did to achieve that level in terms of

14     reducing components, materials, glues, et cetera,

15     that emit formaldehyde was up to them.  We were

16     interested in the outcome, which was a unit that

17     emitted no more than this amount of formaldehyde.

18            For travel trailers, we faced a different

19     or additional concern, and that was, they don't have

20     the ventilation systems that a park model or a mobile

21     home has.

22            So even if they use reduced formaldehyde,

**7/7/2009  Garratt, David E.**

1    the concern was that in a closed space without

2    ventilation that there could still be buildups of

3    formaldehyde, so we also have a requirement that the

4    travel trailers that are built for us have a much

5    more robust ventilation system that is much

6    comparable -- that is comparable to a larger type of

7    a unit so that the air is circulated out of that unit

8    at a much greater rate than your average trailer

9    travel.

10       Q.    All with a view toward -- towards still

11   hitting that target of .0- --

12       A.    Correct.

13       Q.    -- -16?

14            But in the case of travel trailers, you do

15   it not just with the wood product, but you do it with

16   a ventilation product?

17       A.    An increased ventilation system that is

18   more powerful.

19            MR. MEUNIER:  Let me mark what I've just

20   referred to, the series of May '07 emails, as Garratt

21   number 7.

22                          (Garratt Exhibit No. 7

**7/7/2009  Garratt, David E.**

1                               was marked for

2                               identification.)

3                MR. PENOT:  Jerry, do you have the Bates

4    numbers?

5                MR. MEUNIER:  FEMA Waxman 2, slash, 14,

6    slash, 08, 1870 -- oh, there's a different one at the

7    top.

8                FEMA 17, dash, 009030 through 33.

9                BY MR. MEUNIER:

10        Q.    While we search for copies of this next

11   document, let me refer to it verbally and then let

12   you look at it even though my copy is marked.

13                This is an exchange of emails between you

14   and Dr. William Lang from May of 2007.

15                First, who was Dr. Lang?

16        A.    He was a member of the Department of

17   Homeland Security office of health affairs staff.  I

18   think he was a detailee from the public health

19   service, but I'm not sure.  But he was a physician in

20   the federal service assigned to that organization.

21        Q.    And he would have been working with

22   Dr. Runge?

**7/7/2009  Garratt, David E.**

```
1          A.     For Dr. Runge.

2          Q.     Oh, for Dr. Runge.

3                 Let me show you the email and then I'm

4     going to ask you some questions.  Hopefully we'll be

5     able to put our hands on a copy.  We may have to work

6     off one copy for now.

7                 I'll be brief on this one.

8          A.     Okay.

9          Q.     In his email to you --

10                MR. MILLER:  What is the date on that

11    email?

12                MR. MEUNIER:  Oh, here it is.

13                THE WITNESS:  May of 2007.

14                BY MR. MEUNIER:

15         Q.     In his email of May 18, '07, to you,

16    Dr. Lang expresses an interest in putting together a

17    set of questions for internal use moving forward.

18    And he references to an attachment which we -- we

19    don't have here.

20                But then at the end of that first

21    paragraph to you in his email, Dr. Lang says:  As you

22    imagine, they -- he's referring here to CD- -- CDC's
```

**7/7/2009  Garratt, David E.**

```
 1     involvement -- they are somewhat concerned about the
 2     difficulty of addressing this as the whole issue of
 3     residential indoor air quality, especially in mobile
 4     homes, but even in single-family houses, always opens
 5     more issues than it closes.
 6              And then in the next paragraph talks about
 7     the fact that formaldehyde is ubiquitous, and it's
 8     difficult to assign a given level.
 9              And then he says:  We need -- we need a
10     meeting on Monday.
11              And your response to him that same date is
12     that you think a Monday meeting is a good idea.
13              Right?
14              Do you see that?
15     A.    M-hm.
16     Q.    And then you say:  Since our chief
17     counsel's office is engaged in litigation on this
18     issue, they are interested in being involved in any
19     action planning for this issue, so I will be inviting
20     them to our meeting as well.
21              Correct?
22     A.    Correct.
```

**7/7/2009  Garratt, David E.**

```
1          Q.    Who with the chief counsel's office had

2     expressed to you interest in being involved in any

3     action planning on this issue which deals with

4     formaldehyde safety in the -- in the units?

5          A.    In response it his question --

6          Q.    Yes?

7          A.    -- to me --

8          Q.    Yes.

9          A.    -- to discuss this meeting?

10          Q.    Yes.

11          A.    I don't believe any member of counsel did.

12               I believe it was a member of my staff, who

13     when I said -- I reached out to my staff when

14     Dr. Lang sent this message to say, who do we need at

15     the table for this, and one of them had indicated to

16     me that among the recommendations was, we need to

17     have general -- or chief -- the Office of Chief

18     Counsel at the table.

19               So when I responded, I addressed those

20     folks who we decided needed to be at this meeting as

21     cc addressees on my response to him.

22          Q.    And just to put this in some context,
```

**7/7/2009  Garratt, David E.**

```
 1    we -- we are now past the point when the EPA did its

 2    testing, past the point when there was a health

 3    consultation in February of '07 that followed that

 4    analysis of that data by ATSDR.

 5              We're in the -- in May of '07, and CDC is

 6    getting involved now, correct, on the question of --

 7    of what levels are applicable to respond to health

 8    issues about these units?

 9         A.    Well, just to put this in context, I

10    believe that this occurred at whatever point that we

11    reached out to Jeff Runge following the news report

12    on the Bayou La Batre issue.

13              So I think this was Dr. Lang charged by

14    Mr. Runge with reaching out to us to say, you're my

15    point guy on this, reach out to FEMA and let's get

16    this thing going.  So he was reaching out to say,

17    let's schedule a meeting to talk about this.

18              We agreed.

19         Q.    Right.

20              And your staff when you talked to them

21    about who ought to be in the meeting suggested to you

22    that --
```

**7/7/2009  Garratt, David E.**

1         A.     These people who are on that cc line.

2         Q.     Are the staff people?

3         A.     Well, they're the ones who I was info'ing

4    about the meeting that we --

5         Q.     Right.

6         A.     Right.

7         Q.     Okay.  But I thought you told me that when

8    you told Dr. Lang that chief counsel needed to be

9    involved, you were relying on what your staff told

10   you when you said, who should be at this meeting.

11        A.     Correct.

12        Q.     Okay.  So who on your staff told you that

13   they thought chief counsel needed to be involved?

14        A.     I don't remember who specifically told me

15   that.  I could speculate, but I don't have a memory

16   of --

17        Q.     Would it be one of the people who's copied

18   with the email?

19        A.     I would assume that that is the case.  I

20   think that's -- that's a good assumption.  I just

21   don't remember.

22        Q.     Okay.  And was in fact someone from chief

**7/7/2009  Garratt, David E.**

1     counsel's office a participant in the followup

2     discussion with Dr. Lang and others about this

3     medical issue?

4          A.     Don't remember.

5                 In fact, I don't even remember having this

6     meeting, but a member -- or 2 members of the chief

7     counsel's office are addressed on the cc line of that

8     email.

9          Q.     And who are they?

10         A.     David Trissell and Adrian Sevier.

11         Q.     Trissell, T-R-I-S-S-E-L-L, and Sevier,

12    S-E-V-I-E-R.

13                Are they still with --

14         A.     They are.

15         Q.     -- the chief counsel's office?

16         A.     Chief counsel and deputy chief counsel.

17         Q.     All right.  And I will now mark as Garratt

18    8 the May '07 exchange of emails.

19                              (Garratt Exhibit No. 8

20                               was marked for

21                               identification.)

22                MR. MEUNIER:  The Bates number, bottom

**7/7/2009  Garratt, David E.**

```
1      right-hand corner, is DHS, S and T 4856 and 4857.

2                BY MR. MEUNIER:

3           Q.    I'm next showing you an exchange of mails

4      again from May of '07 and involves at the bottom an

5      email from you to Michelle McQueeney.

6                Do you see that?

7           A.    I do.

8           Q.    And your response was to her May 23, '07,

9      email on the next page, addressed to, quote, all.

10               Do you see that?

11          A.    I do.

12          Q.    Who is Ms. McQueeney?

13          A.    At the time, she was the chief of staff

14     for the office of Gulf Coast recovery.  She was Gil

15     Jamieson's chief of staff.

16          Q.    And among other things, in this paragraph,

17     first paragraph of her email addressed to, all, she

18     references 28 complaints received in Mississippi and

19     Louisiana in the last couple of days regarding

20     formaldehyde in the units.

21               And she says further:  Occupants are now

22     starting to request that we test their unit for
```

**7/7/2009  Garratt, David E.**

```
1     formaldehyde levels.

2              Correct?

3       A.    Correct.

4       Q.    And she's asking for guidance about what

5    our position should be, should we test or should we

6    just tell people ventilate and all is well, and that

7    kind of thing.

8              True?

9       A.    Ventilate.

10      Q.    Ventilate.

11      A.    Not necessarily, all is well.

12      Q.    All right.  She refers to ventilation here

13   as a mitigation measure.

14              Correct?

15      A.    I think that would be an accurate

16   characterization.

17      Q.    Now, your response of May 23rd, '07, to

18   her and others states that you don't have a strong

19   opinion on this.  You will support whatever response,

20   slash, interdiction strategy OGCR and OHA jointly

21   determine.

22              Now, OC- -- OGCR is the Office of General
```

**7/7/2009  Garratt, David E.**

```
 1      Counsel?
 2           A.     No.
 3                  Office of Gulf Coast recovery.
 4           Q.     Who is OHA?
 5           A.     Office of health affairs.
 6           Q.     And you say:  The principal concern is
 7      that we are able to explain and defend maintaining
 8      the status quo if that is a strategy.
 9                  What did you mean by, the status quo?
10           A.     Not testing is what I meant by, the status
11      quo.
12                  Let me explain.
13           Q.     Yeah.
14           A.     Michelle forwarded an email suggesting
15      that we need -- need to make a decision about
16      conducting tests or not conducting tests on occupied
17      units.  At the time, I was still very much
18      vacillating on my opinion on whether we should or
19      should not do that.
20                  And the reason I was vacillating is, on
21      the one hand, I was being told by the medical
22      community that if we test, which we can do, what are
```

**7/7/2009  Garratt, David E.**

1    we going to tell the folks, what do we tell them if

2    they ask, what does this mean, what is the standard

3    that we're applying this against.

4              We did not have a standard, so our concern

5    was being able to if we do test being able to

6    rationalize those findings in a way that were

7    meaningful to the occupants, and they can make an

8    informed decision good what this meant.

9              We wrestled with that for a long period of

10   time trying to come to -- get someone to tell us what

11   in fact that meant.  So at this stage of the game in

12   terms of test, not testing, I was still concerned

13   about, yes, we can go test, we can find out what the

14   results are, but what are we going to tell the

15   occupants about the results of these tests when they

16   ask us -- many of them of very low income -- what

17   does this information mean and can we explain this to

18   them in a way that is -- is meaningful.

19             My concern here in terms of the prin- --

20   principal concern about not testing was that if in

21   fact we're going to decide not to test, then we need

22   to be able to explain and defend our rationale for

**7/7/2009  Garratt, David E.**

1    not testing if in fact that was the decision.

2              So my principal concern regarding this

3    was, if in fact we're going to decide that we aren't

4    going to test for the reasons that I talked about --

5         Q.    M-hm.

6         A.    -- we need to be able to again

7    authoritatively defend that rationale.

8              I was predisposed to testing at that

9    point, but I was still waiting for the folks that we

10   had commissioned to engage on this, OHA --

11        Q.    Right.

12        A.    -- principally, and CDC to give their

13   recommendation to us on what to do.  I think at this

14   stage of the game, we hadn't reached that point yet.

15   This was just days after the Bayou La Batre news

16   story appeared.

17        Q.    M-hm.  Ultimately, we know that you did

18   move forward as an agency, test 3,000 units, I

19   think --

20        A.    Yeah.

21        Q.    -- you said earlier.

22              So you ultimately got the medical

**7/7/2009  Garratt, David E.**

1    certainty that you needed to -- to conduct tests and

2    interpret the results for occupants who wanted to

3    know what it meant?

4         A.    I wouldn't say that we got the medical

5    certainty that we needed.

6              I would say that we got to a point where

7    we decided that we needed to test, and we came up

8    with working with CDC.  In fact, CDC is the one who

9    went out and explained the results, their

10   representatives, to individuals who wanted their --

11   their units tested.

12             We still didn't necessarily, even at that

13   point weren't able to tell -- they weren't able to

14   tell them if they asked them, do I have to leave my

15   units, does this mean that I'm unsafe here and I must

16   leave.

17             They couldn't answer that question,

18   wouldn't answer that question simply because there

19   were no specific standards that -- that applied to --

20   to this population.  All they could do was explain --

21   talk about formaldehyde exposure and, et cetera, but

22   ultimately, this was a decision that the occupants

**7/7/2009  Garratt, David E.**

```
1     had to make.

2          Q.     M-hm.

3          A.     Many of them chose to stay.

4          Q.     So with respect to the 3,000 units that --

5     that FEMA has tested through Bureau Veritas, what is

6     the standard or programmatic response to people who

7     had their unit -- those 3,000 people who have their

8     units tested and want to know what does that mean?

9          A.     The protocol that CDC came up with is the

10    one that we've employed since they came up with that

11    protocol where Bureau -- how do you pronounce it?

12         Q.     Bureau Veritas.

13         A.     -- Veritas.

14                They're employing the protocol that

15    essentially CDC designed and approved and have been

16    employing that in the Gulf Coast since we implemented

17    that.  So when someone requests their unit to be

18    tested or at least during this period of time that

19    they were doing that, CDC would go in and -- and

20    brief the folks on the outcome.  They could ask

21    questions, and the CDC reps would answer those within

22    whatever parameters that they could.
```

**7/7/2009  Garratt, David E.**

1        Q.      Okay.

2                BY MR. MEUNIER: Let me label the emails

3        that we've just been looking at as Garratt 9.

4                            (Garratt Exhibit No. 9

5                             was marked for

6                             identification.)

7                BY MR. MEUNIER:

8        Q.      In fact, in the same period of time, May

9        '07, CDC was at least initially taking the position

10       that everybody ought to get moved out of these

11       trailers.

12               True?

13       A.      I would not say that was the CDC position.

14       I would say that I recall that sentiment being

15       shared, but I don't recall exactly the context in

16       which that was shared.  I don't believe we've got for

17       example an official report from CDC telling us that

18       we needed to get everyone out of those trailers,

19       because quite frankly, had they told us that, we

20       would have done it.

21       Q.      Well, wasn't that CDC's opinion about what

22       an expedient solution would be, to move people out of

**7/7/2009  Garratt, David E.**

1    the trailers?

2        A.    Oh, expedient from the sense that it would

3    immediately solve the problem, but not necessarily

4    expedient in the sense that it was something that

5    could be quickly done or accomplished.

6        Q.    All right.  Let me show you an exchange of

7    mails that --

8        A.    Or, by the way, that a number of the

9    occupants were even interested in.

10       Q.    I'm showing you an exchange of emails

11   between you and Dr. Lang on May 25, 2007.

12            And in his email to you of that date,

13   Dr. Lang, bottom of that first page, says this in

14   reference to CDC:  We're going to -- we're having to

15   push very hard to get them to give us preliminary

16   recommendations on what we should do right now to

17   reduce risk.  Their initial response was to just move

18   everyone out of trailers.  We told them that was

19   probably not a valid approach and we really needed

20   some immediate guidance on a reasonable short-term

21   engineering target that can be accomplished in days,

22   not weeks.  They seem to understand.  And they really

**7/7/2009  Garratt, David E.**

1    do need to have something along those lines.

2                 Correct?

3                 That's what Dr. Lang wrote to you?

4         A.     Correct.

5         Q.     And then your response on that same date,

6    the second paragraph of your email, you said:   I

7    agree that an en masse evacuation of trailers is not

8    a preferred solution by any means.   However we want

9    to confirm that does not represent a formal medical

10   recommendation from CDC but merely their opinion of

11   an expedient solution.

12                That was how you characterized CDC's

13   recommendation, as an expedient solution?

14        A.     No, I didn't characterize it that.  I was

15   asking him to characterize it.

16        Q.     Oh, you wanted Dr. Lang to confirm --

17        A.     That's correct.

18        Q.     Did he?

19        A.     Yes.

20        Q.     In an email?

21        A.     I don't recall.

22        Q.     What do you recall him saying to you?

1          A.     That they were not going to make a formal

2     recommendation.

3                 In other words, they could not formally

4     say that -- it was their opinion, is the bottom line

5     here.  We did not get a -- or did not, to my

6     knowledge, ever receive a formal recommendation from

7     CDC that said, our formal recommendation is that you

8     for safety reasons, for health reasons, get everyone

9     out of these trailers right now, because again if

10    that had been their recommendation, we would have

11    done that.

12         Q.     Where would you have put the people?

13         A.     Don't know.

14                MR. MEUNIER:   All right. Let me mark as

15    Garratt 10 the emails we've referred to.  It's

16    Bates-numbered at the top, FEMA 17, dash, 006442 and

17    443.

18                          (Garratt Exhibit No. 10

19                           was marked for

20                           identification.)

21                BY MR. MEUNIER:

22         Q.     Showing you an email exchange of June 4,

**7/7/2009  Garratt, David E.**

```
1     2007, firstly an email from you to Mary Margaret

2     Walker.

3               Who is that?

4         A.    She's a member of our external affairs

5     staff.

6         Q.    I'm sorry.

7               At the bottom, Mary Margaret Walker had

8     sent a timeline that she wanted you to look at.

9               Correct?

10        A.    Correct.

11        Q.    And then at the top, Gil Jamieson emails

12    you June 4, and Mary Margaret Walker, expressing some

13    concerns about the timeline.

14              True?

15        A.    Correct.

16        Q.    And the concern that Gil Jamieson

17    expresses about the timeline -- and I'm sorry.  I

18    don't have the actual timeline here, but he refers to

19    the first paragraph referring to, quote, initial

20    applicant complaint, close quote.

21              He wants that deleted he says, because it

22    sounds like the first time we ever heard of the
```

**7/7/2009  Garratt, David E.**

1    problem was on March 16, 2006.  This issue has been

2    around a long time, and as I recall, surfaced in

3    previous disasters.  Has anyone researched this.

4            Now, did you know what Gil Jamieson was

5    referring to there?

6        A.    No.

7        Q.    Did you research it or have anyone else

8    research it?

9        A.    Yes.

10       Q.    And what was the result of the research?

11       A.    Inconclusive, anecdotal, no one was able

12   to provide any written documentation that there were

13   prior formaldehyde issues.

14       Q.    From prior disaster responses --

15       A.    Correct.

16       Q.    -- in particular.

17       A.    Gil was one individual who raised this

18   issue in this email.  I'm also aware and I don't

19   remember who the individual was, but somebody from

20   our logistics organization, had also suggested that

21   they had recalled dealing with formaldehyde problems

22   or a formaldehyde issue in a previous disaster, and I

**7/7/2009  Garratt, David E.**

 1    asked staff to look into that and find out what the

 2    background was on that, but came back and no one

 3    could find anything, and all they were able to

 4    identify were these anecdotal beliefs of some people

 5    that this existed.

 6              Don't have anything more on that.

 7         Q.    So there was nothing in the re- -- in the

 8    research of that issue to indicate that prior to

 9    choosing travel trailers to use for example in

10    connection with this disaster that FEMA, the federal

11    government had any experience from prior disasters

12    suggesting that that would be a formaldehyde problem?

13         A.    Well, I can only speak for myself, and

14    that is that -- and let's keep in my mind, I'd been

15    in this particular job for about 5 months, so it's

16    not like I had a lot of corporate experience with

17    direct housing missions prior to that point.  There's

18    certainly other people in the agency who do.

19              I have no prior knowledge of that.  As I

20    indicated, asked folks to look into it.  I cannot

21    tell you what kind of a job was done in terms of

22    looking into that, how thorough, how comprehensive,

1    who was talked to.

2              All I know at the end result of that was

3    that weren't -- was unable to validate that there was

4    any systemic issue that existed prior to this.

5         Q.    In the final paragraph of this email to

6    you of June 4, '07, Jamieson says he remains

7    concerned that we seem to be putting ourselves at the

8    tip of the spear on this issue.  We are, quote,

9    consumer of these products, close quote.  The

10   messaging in my view should emphasize our

11   understanding, compassion, and extensive efforts to

12   find ways to mitigate but shift the issue to

13   standards-making groups and the industry.

14             I'm not sure that's a complete sentence.

15             But did you agree with Jamieson's apparent

16   suggestion that FEMA indeed ought to be viewed as the

17   consumer of these products?

18        A.    Well, I think he's technically correct.

19   We are a consumer of those products in that we

20   purchase those from the commercial sector to deliver

21   to end-users, but that doesn't mean that we don't

22   have a responsibility, certainly an inherent

**7/7/2009  Garratt, David E.**

1    responsibility for units that we provide to disaster

2    victims.

3              So I agree that we're a consumer of those

4    products.  And I also agreed with him that we were

5    putting ourselves at the tip of the spear of this

6    issue.

7              But I thought that was our -- disagree

8    with him.  I think that was our responsibility to do

9    that.

10   Q.    But do you agree with the suggestion that

11   the industry sources for these products should also

12   be looked to as sharing in the responsibility for the

13   formaldehyde issues?

14   A.    Well, I would say anyone involved in -- in

15   this should share responsibility.  But let's keep in

16   mind, if what they were producing were units that

17   were built to meet or exceed industry standards, and

18   if that's what our contracts required, and they did,

19   then they were meeting their contract obligations.

20             So in terms of responsibility, yes, we all

21   share some responsibility.  With regard to these

22   particular units, manufacturers share the

```
1    responsibility for the construction of the units and

2    whatever guidance they provide regarding its use, but

3    it's our responsibility as the purchasers and

4    subsequent providers of those units to the disaster

5    population to be -- to own up to and be responsible

6    for those units from that point on, at least in terms

7    of dealing with the needs and concerns of the

8    occupants of units that we own and have provided to

9    them, so I'd say it's a shared responsibility.

10       Q.    And you certainly wanted to -- you

11   would -- you would rely on the manufacturer of a

12   travel trailer for example to furnish a product that

13   would be safe for long-term residents knowing that

14   these trailer travels, which as you say are

15   recreational vehicles, were going to be used for

16   long-term residents?

17            MS. DALY:  Object to the form to the

18   extent it's calling upon him to give a legal

19   conclusion.

20            MR. SCANDURRO:  I also object to the form

21   of the question.

22       A.    I would suggest that the responsibility of
```

**7/7/2009  Garratt, David E.**

```
1      the manufacturers would be to meet the terms of

2      whatever performance specifications that we ask them

3      to meet with contracts that we awarded to them.

4                 BY MR. MEUNIER:

5         Q.    Did you specify anything in those

6      contracts that was directed to long-term residents or

7      occupancy of a unit containing formaldehyde-emitting

8      products?

9                 MR. MILLER:  Objection, assumes facts not

10     in evidence.

11        A.    Don't know.

12                BY MR. MEUNIER:

13        Q.    Would it be in the contract if it was

14     there?

15        A.    Well, yes.

16        Q.    Okay.  I mean, it wouldn't have been done

17     verbally.

18                If you specified it, it would be written

19     in the contract?

20        A.    I can't imagine a verbal --

21        Q.    Right.

22        A.    -- of that nature that would -- would not
```

**7/7/2009  Garratt, David E.**

```
1      have to be in a contract --

2          Q.    Right.

3          A.    -- written form, as an amendment or

4      otherwise.

5          Q.    Right.

6              MR. MEUNIER:  I will label as Garratt 11

7      the June 4, '07, exchange of emails we've been

8      talking about as FEMA 17 009258.

9                          (Garratt Exhibit No. 11

10                          was marked for

11                          identification.)

12             BY MR. MEUNIER:

13         Q.    I next show you an exchange of emails from

14     June 5, '07, and the lower email on this sheet is

15     from Ryan --

16         A.    -- Buras.

17         Q.    -- Buras to Kevin Souza.

18             And then at the top, we have your email to

19     Souza, both dealing with the same subject, which is,

20     RFI for travel trailer.

21             What does RFI stand for?

22         A.    I'm having a senior moment here.
```

**7/7/2009  Garratt, David E.**

```
1              I think it's a request for information,

2      but I'm not a hundred percent sure.  In any case,

3      it's a solicitation to industry.

4          Q.    A solicitation for what?

5          A.    Interest in --

6          Q.    For information, you mean?

7          A.    Or interest in competing, for example, on

8      a contract.  I think it's, request for information.

9              THE WITNESS:  Anybody help me out here?

10             BY MR. MEUNIER:

11         Q.    They're not under oath.

12         A.    Clarify, request for information?

13         Q.    Is this -- let -- let me -- you earlier

14     were talking about a change in the specs --

15         A.    Right.

16         Q.    -- going forward with the contracts.

17             Could it be that this -- this was a

18     posting of the new specs for the units that would be

19     furnished by manufacturers?

20         A.    I'm not a hundred percent sure without

21     the -- without the context here, but what I believe

22     this was was yanking back an RFI that was about to go
```

**7/7/2009  Garratt, David E.**

1    out because we had determined that we were going to

2    further require that the specs be even lower than

3    were in this.

4              And we went through several evolutions

5    here where we initially came up with specs that were

6    I think .03 or .02, but we end up driving that down

7    even further.

8         Q.    And that's why when Ryan Buras at your

9    request sends Souza an RFI to be posted on the

10   Website, Souza writes to you and says, I assume the

11   answer is to cease and desist, and you say,

12   affirmative.

13        A.    Right.

14        Q.    So you and Souza were aware at that point

15   that there was going to be a change in the specs that

16   would be posted for new contracts?

17        A.    Well, this was either, again, one of 2

18   things.

19              Either this was the -- they were going out

20   to do a solicitation for a new contract for units,

21   and either it was the old one or it was one of the

22   newer ones but we were pulling it back because we

**7/7/2009  Garratt, David E.**

```
1    wanted to adjust those specs and make them even more
2    strict.  Either way, this was pulled back to make --
3    to reengineer the specs to make them more strict.
4              MR. MEUNIER:  All right.  Let me mark as
5    Garratt 12 the June 5, '07, emails we've been
6    referring to.  It's Bates-numbered FEMA 17 009327.
7                        (Garratt Exhibit No. 12
8                         was marked for
9                         identification.)
10             BY MR. MEUNIER:
11        Q.   Let me show you now an exchange of emails
12   from June of '07, and I want to refer to the second
13   page of this string, which is an email of June 8,
14   '07, from you to Kevin Souza and William Lang.  It's
15   Dr. Lang, I suppose.
16             And in your email, you say that you've
17   talked with Bruce Davis, DHS, slash, S and T, today.
18   And Bruce called because he was recently privy to a
19   briefing from a company that apparently offers a
20   potential capability to mitigate formaldehyde fumes.
21             Now, does that -- using technology with
22   which I'm not familiar nor technically capable of
```

**7/7/2009  Garratt, David E.**

1    characterizing here.

2              Tell us about this communication about

3    this new technology.

4         A.    One of a number of similar proposals from

5    members of the commercial community who thought that

6    they had or might have or were proposing technologies

7    or systems that they thought could remediate

8    formaldehyde levels in existing manufactured housing.

9    And they were -- in this case Bruce was -- was

10   passing along information that he had been made privy

11   to based on a briefing that he had received.

12        Q.    And who is Bruce Davis?

13        A.    I don't know.

14        Q.    Okay.  What do you remember specifically

15   about the company that was offering this capability

16   to mitigate formaldehyde?

17        A.    Nothing.

18        Q.    Do you remember what the capability --

19        A.    I don't.

20        Q.    -- equipment was?

21        A.    No.

22        Q.    Well, do you remember whether it was

**7/7/2009  Garratt, David E.**

1    something that you would take into an existing unit?

2        A.    I remember nothing about this.

3        Q.    Okay.

4        A.    Our -- the protocol that we had in place

5    was, CDC was going to lead -- as part of the

6    interagency agreement that we had with them, they

7    were going to lead and manage the mitigation

8    assessment effort.

9            So we were referring anybody who had a

10   proposal to Mike Lapinski, who was then referring

11   that -- or to Merritt Lake, who was providing the

12   that information to the CDC-led team that was doing

13   the mitigation evaluation effort.

14       Q.    And if you refer to the first page as an

15   email of June 8, '07, later that day from Dr. Lang to

16   you and others in which he says he talked to CDC

17   about their discussions with NIOSH and NIOSH knew of

18   some new technologies that are promising.

19           Again, do you remember anything about the

20   new technologies that resulted from CDC's contact

21   with NIOSH?

22       A.    I do not.

**7/7/2009  Garratt, David E.**

1    Q.    In followup to these June '07 references

2    to new technologies that could be used to mitigate

3    formaldehyde fumes in units, was anything put in

4    either your contracts or in any of your protocol to

5    allow for the use of such technologies?

6    A.    Are you talking about new production

7    contracts?

8    Q.    Or -- or anything that would apply to

9    existing units, either -- either or both.

10    A.    No, I'm not aware of anything that was

11    done pending recommendations from the CDC-led team

12    that was looking at evaluating these units on their

13    recommendations for the efficacy of any or some of

14    those units.

15         At this stage of the game, we had a lot of

16    proposals, a lot of skepticism within the medical

17    community on again the efficacy of any number of

18    these things, and so they wanted to run some

19    scientifically rigorous testing on these things, and

20    we agreed that they needed to do that before we would

21    recommend or -- any of these units for application.

22         So -- so, no, I'm not aware that we --

**7/7/2009  Garratt, David E.**

1          Q.     Okay.

2          A.     -- ever did.

3          Q.     Well, but it -- correct me if I'm wrong,

4    but it seems like in addition to looking at new

5    technologies that might be out there to reduce the

6    formaldehyde fumes in the units, and that was

7    explored in some way, ultimately, the decision by

8    FEMA was, let's just put new specs out, have a low

9    target level of .016 for formaldehyde and just make

10   that a requirement going forward.

11          Was that ultimately the -- the way to get

12   to the lower levels?

13          MR. MILLER:  Objection, mischaracterizes

14   the witness's testimony.

15          A.     There are 2 different issues with

16   mitigating existing units and new unit production.

17          What we wanted to do was produce brand-new

18   units that were at levels that are fair below any

19   living environment anyplace.  We wanted them to be

20   that low.

21          There's no reason to have any formaldehyde

22   mitigation in a unit that we are building that emits

1     such low --

2          Q.     Right.

3          A.     -- amounts of it that -- that we test and

4     validate.  So that's one issue.

5                 The other issue is existing units and

6     mitigating the existing units.  Is there a way to

7     remove the formaldehyde, is there a way to dampen the

8     formaldehyde, temper the formaldehyde that's being

9     emitted.

10                We were interested in exploring that, and

11    that's one of the reasons that we asked CDC as part

12    of the IAA that we were negotiating with them.  One

13    of the 4 things that we wanted them to tackle was an

14    assessment of these potential mitigation techniques

15    to see if any of them had any practical value and if

16    they would recommend any of -- that we employ any of

17    those to deal with the existing problem that we had.

18                MR. MEUNIER:  I will mark as Garratt 13

19    the emails of June 8, '07, that we have referred to.

20                And I believe we need to change the tape.

21    By the way, that's FEMA 17 009411.

22                            (Garratt Exhibit No. 13

**7/7/2009  Garratt, David E.**

1                          was marked for

2                          identification.)

3              THE VIDEOGRAPHER:   This concludes tape

4    number 4 of the video deposition of David Garratt.

5    The time on the video is 2:22 PM.  We are off the

6    record.

7              (Recess.)

8              THE VIDEOGRAPHER:   This begins tape

9    number 5 in the video deposition of David Garratt.

10   The time on the video is 2:29 PM.  We are on the

11   record.

12             BY MR. MEUNIER:

13       Q.   Mr. Garratt, I'm referring you to an

14   exchange of emails of November 2nd, '07, between you

15   and Dr. William Lang.

16             And in his email to you, Dr. Lang

17   references the re-release of the ATSDR consultation.

18   This was the proposed revisions to the initial

19   February '07 health consultation report.

20             Do you recall that?

21       A.   Yes.

22       Q.   And attached to this email, there are from

```
1     Lang an extract from the ATSDR regulations and

2     advisories -- you see that?  -- for acute,

3     intermediate, and chronic inhalation MRL?

4          A.     Correct.

5          Q.     And among other things in this email to

6     you, Dr. Lang says:  This blows out of the water any

7     logic behind an interim action level.

8               And he asks, so now what.

9               And he says:  One good thing to come of

10    this release is that in and of itself, it gives

11    us a reason to delay sampling until we can digest

12    this.

13              Do you recall that?

14         A.     I recall this -- this email, yes, sir.

15         Q.     Okay.  And your one-word response was,

16    hot, exclamation point.

17         A.     That was my -- certainly my initial

18    response when I was forwarding this email from

19    Dr. Lang on to other concerned parties within the

20    agency.

21         Q.     So when you say, hot, you were meaning to

22    alert others to the fact that this was an important
```

**7/7/2009  Garratt, David E.**

```
 1    thing --

 2          A.     Read it now.

 3          Q.     -- needed your attention.

 4                 I got you.

 5                 BY MR. MEUNIER:  Let me label that as

 6    Garratt number 14, and it's Bates-numbered FEMA 17,

 7    dash, 013853.

 8                              (Garratt Exhibit No. 14

 9                               was marked for

10                               identification.)

11                 BY MR. MEUNIER:

12          Q.     I'll show you now an email exchange of

13    July 30, '07, and call your attention in particular

14    to an email from Harvey Johnson to you and others of

15    July 30, '07, in which Mr. -- Admiral Johnson sets

16    forth different bullet points to be included in a

17    summary for a deputy's meeting.

18                 Correct?

19          A.     Correct.

20          Q.     Now, at that point, was Admiral Johnson --

21    what was his position at -- at that point, in July of

22    '07?
```

**7/7/2009  Garratt, David E.**

```
1          A.     Either acting deputy administrator

2     or deputy administrator.  I'm not sure if he'd

3     been confirmed at that point or not.  I don't

4     think he had been, so acting deputy

5     administrator.

6          Q.     And it would have been his role at that

7     point to set forth the content of a -- of a summary

8     like this for a deputy's meeting?

9          A.     Yes.

10               He was -- yes.

11         Q.     Why -- why -- why is that?

12               Why -- why would he be the one to be

13     setting forth the content of a memo like that?

14         A.     Well, I'm not saying that he would have to

15     be the one.  It's appropriate for the deputy or even

16     the administrator to be engaged in an issue that's

17     going to be floated before cabinet deputy secretaries

18     at a deputy's council meeting.

19               So this was an issue that at this point

20     had White House interest, and they were convening

21     deputies councils to address this particular issue,

22     and I think it's reasonable to think that the deputy
```

**7/7/2009  Garratt, David E.**

1    administrator would -- would have an interest in

2    what's going to be presented before a body like

3    that.

4            MR. MEUNIER:  Let me mark as Garratt 17

5    those emails of July 30, '07.  It's FEMA 17 015474,

6    75, and 76.

7            (Discussion off the record.)

8            MR. MEUNIER:  Let me relabel that as

9    Garratt 15.

10            I'm sorry.

11            We are relabeling at Garratt 15 the July

12    '07 emails involving Admiral Johnson that we've

13    talked about.

14                        (Garratt Exhibit No. 15

15                         was marked for

16                         identification.)

17            BY MR. MEUNIER:

18    Q.    Let me next refer you to an exchange of

19    emails in August of '07 between you and Gil Jamieson,

20    and I want to direct your attention in particular to

21    yours to Jamieson of August 18, '07, in which the

22    subject is, TT replacement housing.

**7/7/2009  Garratt, David E.**

```
1                    "TT" being travel trailers.

2                    True?

3          A.        Correct.

4          Q.        And you say:  The allowance for MHs --

5    that's mobile housing or manu- --

6          A.        Mobile homes or manufactured housing.

7          Q.        The allowance for MHs is not based on an

8    independent determination by FEMA that the units are,

9    quote, safe, close quote, in terms of formaldehyde

10   exposure levels.  FEMA does not have the expertise,

11   slash, capability to render such an authoritative

12   determination.

13                   Correct?

14         A.        Correct.

15         Q.        Are you suggesting there that the entities

16   which have the expertise and capability to render

17   authoritative determinations of the safety of those

18   units would be the manufacturers?

19         A.        No.

20         Q.        Who -- who would it be if not them and if

21   not FEMA?

22         A.        Well, I would -- we believed or I
```

**7/7/2009  Garratt, David E.**

```
1     believed that this -- establishing federal standards

2     is a federal responsibility, and it belongs within

3     the bailiwick of whatever agency was most

4     appropriate.

5              I would have voted for EPA and/or CDC to

6     be establishing what are appropriate standards for --

7     for what is safe in terms of formaldehyde exposure

8     levels.  I do not think that it's the industry's

9     responsibility to develop federal standards.  I think

10    that's a federal responsibility.

11         Q.    Oh, so you were here referring to federal

12    regulatory standards?

13         A.    Yes.

14         Q.    You were not referring to a general

15    determination of what's safe or not.

16         A.    Well, actually I probably need to read

17    this whole exchange before I --

18              (Pause.)

19         A.    So the purpose of this message was

20    challenging the fact that we had a moratorium on the

21    use of and provision of travel trailers.  We had

22    stopped the provision of travel trailers in new -- in
```

7/7/2009  Garratt, David E.

1     any new -- for disaster support purposes.

2               BY MR. MEUNIER:

3        Q.    This is as of August 18 --

4        A.    Right.

5        Q.    -- 2007.

6        A.    Part -- part of an interim direction that

7     was published under Chief Paulison's signature.

8               And Gil was challenging that, and this

9     exchange was trying to explain the reason that we had

10    done that moratorium, which was on the second page,

11    is:  We cannot assure occupants the units are safe,

12    nor can we assume HUD certification provides such

13    assurance, as it applies to formaldehyde levels, for

14    structures that are smaller than mobile homes -- as

15    it applies to formaldehyde levels, for structures

16    that are smaller than mobile homes and do not possess

17    the inside, outside air circulation exchange at least

18    equal to a HUD-required mobile home.

19              And so the issue was, back to the

20    paragraph or email that you cited, the allowance for

21    mobile homes is not based on an -- our allowance to

22    allow mobile homes to be used is not based on

**7/7/2009  Garratt, David E.**

```
1      independent determination by FEMA that the units are

2      safe.  It is based on the fact that these are

3      HUD-approved and that mobile homes are being sold

4      throughout the United States for long-term use as a

5      matter of practice and continuing practice.

6              And so -- but travel trailers were not

7      being sold throughout the United States for the

8      purposes of long-term housing.  They were being sold

9      for the purposes of recreational use.

10     Q.    M-hm.

11     A.    So we're just explaining in this

12     back-and-forth the rationale behind the reason to

13     suspend use of travel trailers for housing at that

14     time.

15     Q.    And as you say in your email to

16     Jamieson of August 18, '07, on the second page:

17     the prohibition -- meaning the prohibition against

18     further use of travel trailers -- is in place

19     because we cannot assure occupants the units are

20     safe.

21             Correct?

22     A.    Correct.
```

1             MR. MEUNIER:  Let me mark that as Garratt

2      16.

3             I will tender the witness and reserve the

4      remaining 8 minutes for redirect.

5                        (Garratt Exhibit No. 16

6                        was marked for

7                        identification.)

8             MR. MEUNIER:  Let me -- Garratt 16, by the

9      way, has Bates number at the bottom right-hand corner

10     DHS and T, 4060 through 62.

11

12       EXAMINATION BY COUNSEL FOR GULF STREAM COACH INC.

13             BY MR. SCANDURRO:

14       Q.    Mr. Garratt, my name is Tim Scandurro, and

15     I represent Gulf Stream Coach, one of the commercial

16     manufacturers of these travel trailers.

17             (Discussion off the record.)

18             BY MR. SCANDURRO:

19       Q.    Mr. Garratt, can you confirm that FEMA

20     supplied thousands of travel trailers for natural

21     disasters prior to Hurricane Katrina?

22       A.    Yes.

**7/7/2009  Garratt, David E.**

1        Q.    Okay.  And certainly some of those natural

2    disasters were hurricanes.

3              Correct?

4        A.    Correct.

5        Q.    And some of those hurricanes hit -- maybe

6    a lot of them hit on the Gulf Coast in the hot and

7    humid area where a lot of us live.

8              Fair?

9        A.    Fair.

10       Q.    Okay.  I believe you -- you testified

11   earlier that you undertook an investigation to try to

12   determine whether or not there had been any systemic

13   formaldehyde problem prior to Hurricane Katrina with

14   FEMA travel trailers.

15             Right?

16       A.    I think "investigation" is probably too

17   strong a word.

18             I became aware that there was anec- --

19   anecdotally suggestions that this was a problem that

20   existed prior or that people were aware that we'd had

21   formaldehyde issues prior to this.  I was aware of

22   that from at least 2 sources, one being Gil Jamieson

**7/7/2009  Garratt, David E.**

1    and one somebody from our logistic staff who I just

2    don't remember who it was.

3              I had asked our staff to go and see if

4    there was -- what was behind this, look into this,

5    come back and tell me, were there in fact instances

6    or formaldehyde problems prior to this.  And the

7    staff was unable to validate that, so --

8         Q.    You turned up nothing concrete in the way

9    of an actual person who had made a formaldehyde claim

10   to FEMA prior to Hurricane Katrina?

11        A.    To be -- again, to characterize this

12   absolutely correctly, asked staff at some point, what

13   was the status of your looking into these prior

14   reports of formaldehyde problems.  And the answer

15   was, we've gone all over the place, we have not been

16   able to find that there have been any -- we have not

17   been able to validate these anecdotal reports of

18   formaldehyde issues.  Had people talk about it that

19   they've heard about it, but we've been unable to find

20   that there are actual formaldehyde-related issues

21   prior to this.

22             So I'm not saying that there were not.

**7/7/2009  Garratt, David E.**

1      I'm saying that whatever research was done by my

2      staff into this, they were unable to uncover anything

3      that would prove that that was the case.

4          Q.    Okay.  You're not personally aware today

5      of any claims against FEMA based on pre-Hurricane --

6          A.    I'm not.

7          Q.    -- Katrina formaldehyde claims.

8                (Discussion off the record.)

9                BY MR. SCANDURRO:

10         Q.    As we sit here today, based on whatever

11     investigation that you're aware of that FEMA has

12     done, you're not aware of any single formaldehyde

13     claim presented to FEMA based on travel trailers put

14     out into the public prior to Hurricane Katrina?

15         A.    I have no direct knowledge of that.

16               Again, there is anecdotal reports of that.

17     Nothing that has been confirmed that I'm aware of.

18         Q.    As of September the 1st, 2005, when you

19     walked into the Katrina situation, did you have any

20     reason to believe that travel trailers were going to

21     be a problem?

22         A.    From a formaldehyde --

**7/7/2009  Garratt, David E.**

1          Q.     From a formaldehyde standpoint.

2          A.     None whatsoever.

3          Q.     Can you talk a little bit about why FEMA

4     used travel trailers by the thousands both prior to

5     Hurricane Katrina and during the Hurricane Katrina

6     response?

7          A.     They were the preferred direct temporary

8     housing product because of their -- because of their

9     size, because we could move them in and set them up

10    quickly.  I think 80 percent of the units that we

11    provided in response to hurricanes Katrina and Rita

12    were on individuals' private property.  And typically

13    we put travel trailers on private property or often

14    because we can't fit anything else on their private

15    property.  They simply can't accommodate a mobile

16    home on their driveway.

17               So they were used because, number 1, they

18    filled a need that could not be met any other way.

19    2, they were inexpensive compared to a mobile home.

20    3, they allowed people to stay at their property and

21    rebuild their home as opposed to relocating them to a

22    community site that might be miles away and might be

**7/7/2009  Garratt, David E.**

```
1      far more expensive to build.

2                So a number of reasons I think contributed

3      to the use of travel trailers and their popularity at

4      least within a certain segment of the disaster

5      population on those small properties and wanted to

6      stay on their property and rebuild their home.

7           Q.    Am I also correct that during the prior

8      natural disaster events that we talked about prior to

9      Hurricane Katrina, can we assume that there were

10     young children and elderly people and stay-at-home

11     moms living in those travel trailers as well?

12          A.    I think that's safe to assume.

13          Q.    And again you're not aware of any

14     formaldehyde claims by any of those people in those

15     prior disasters?

16          A.    I'm not personally aware of any.

17          Q.    When you were working with the CDC after

18     Hurricane Katrina, did you become aware of the

19     results of a study that they did in Hancock County,

20     Mississippi, of children's pre-Katrina and

21     post-Katrina doctor visits?

22          A.    Not by -- not by that reference.
```

1          Was this subsequent to the Bayou La Batre

2     that they went and did this?

3          Is this a study that was produced as a

4     result of their engagement with the doctor who -- I

5     can't ask you that question, can I?

6          You can't answer.

7          The answer is no.

8     Q.    Okay.  We'll ask somebody who knows about

9     that.  It's neither one of us obviously.

10          I think you mentioned in your testimony in

11    response to Mr. Meunier's questions that you became

12    aware of the formaldehyde issue in about May of 2006;

13    is that correct?

14    A.    As a systemic issue, I became aware of

15    that when the Sierra Club report came out.  There

16    was -- going back and looking through my emails when

17    I had to go through them for this and for the

18    congressional call for emails, there was an email

19    that was sent to me in either February or March from

20    Greg Cooper, our chief of security, who was

21    essentially telling me that he had received a report

22    of a formaldehyde issue and was essentially letting

**7/7/2009  Garratt, David E.**

```
 1   me know that he was passing this issue on to the TRO,

 2   I think at the time.

 3              So when I went back and looked, that was

 4   the earliest that I could find a reference to being

 5   notified about a formaldehyde issue.  But in terms of

 6   this being more than just an issue related to a

 7   trailer in terms of it being a potential systemic

 8   issue, it was when that Sierra Club report came out.

 9      Q.    You were asked about the volume or

10   frequency of formaldehyde complaints.

11              Do you recall that when Mr. Meunier was

12   questioning you?

13      A.    I'm sorry.

14              The volume or frequency of formaldehyde

15   complaints --

16      Q.    Formaldehyde complaints.

17              Do you recall that?

18      A.    Yes, I recall that.

19      Q.    We talked about the slew and then -- I had

20   a document I wanted to show you to see if this might

21   refresh your memory.  This is a document

22   Bates-stamped FEMA 17, dash, 00023, and also marked
```

**7/7/2009  Garratt, David E.**

```
1     FEMA, dash, Waxman 23.

2                 Looks to be a memorandum from Secretary

3     Chertoff -- to Secretary Chertoff from David

4     Paulison.

5                 Let me -- let me show you that document

6     and ask you first if you've seen it before.

7          A.    I think I have seen this before, and I

8     think I probably participated in the review and

9     editing of this document, I think.

10         Q.    What does that document say about the

11    number of complaints FEMA had recorded in Louisiana

12    on formaldehyde as of July 2006, compared to the

13    total number of trailers on the ground in Louisiana?

14         A.    You want to give me a clue as to where

15    in --

16         Q.    Yes.

17                On the first page in about the middle.

18         A.    Okay.  Well, the number of complaints

19    recorded by FEMA thus far has been minimal, 20 plus

20    complaints out of 79,000 trailers deployed in

21    Louisiana.

22                Is that the reference?
```

**7/7/2009  Garratt, David E.**

```
1           Q.      Yes, sir.

2           A.      Okay.

3           Q.      So 20-plus complaints out of 79,000

4     trailers that were in use?

5           A.      In Louisiana.

6           Q.      And that's about, what, 10 months after

7     Hurricane Katrina, 11 months?

8           A.      Let's see, while the number of complaints

9     recorded by FEMA thus far has been minimal, and this

10    is as of July, so a little less than a year since

11    Katrina.

12          Q.      Is one complaint in every 4,000 trailers

13    an indication of a systemic problem to you?

14          A.      I don't know.

15          Q.      It's a fairly small number, isn't it?

16          A.      I agree it's a small number.  I think --

17    it obviously depends on your definition of systemic,

18    but I don't know that I have an arbitrary figure on

19    what above or below that line would qualify something

20    as systemic.

21          Q.      Sure.

22                  For your -- for you, every complaint is
```

1    important.

2              Correct?

3       A.    Correct.

4       Q.    Did you --

5              MR. MILLER:  The date of the document --

6    the document is Bates-stamped FEMA 17 00023 through

7    25 and is dated apparently July 26, 2006.

8              MR. SCANDURRO:  Let's go ahead and mark

9    that as Garratt number 17.

10                        (Garratt Exhibit No. 17

11                         was marked for

12                         identification.)

13             BY MR. SCANDURRO:

14      Q.    Mr. Garratt, were you aware in the middle

15   of 2006 of FEMA's policy of swapping out trailers to

16   people who express health concerns due to their

17   travel trailer?

18      A.    At what point again?

19      Q.    In the middle of '06.

20      A.    I can't tell you when I became aware of

21   that as a policy.

22             It certainly was after the Sierra Club

**7/7/2009  Garratt, David E.**

```
1    event -- or the Sierra Club report, but I don't know

2    when exactly I became aware of that as a policy.  I

3    would assume it would have been within a relatively

4    short period after that, be it a month or 2.

5         Q.    Do you know when the policy was first put

6    in force?

7         A.    I do not.

8         Q.    Was it in 2005?

9         A.    I don't know.

10        Q.    But could you explain what the policy

11   was?

12        A.    Well, there's a general policy that --

13   that they operate under whereby if they cannot

14   resolve the concerns of an occupant, whatever those

15   concerns are with the unit that they're in, then

16   they'll swap them out.

17              They've done that I believe, for issues

18   other than this, but --

19        Q.    And was the swapout procedure intended to

20   give the occupant an older trailer than the one the

21   occupant was then in?

22        A.    No.
```

1            That was only a policy as far as I know

2      that was utilized for this particular issue, because

3      the belief at the time was that older trailers were

4      less likely to have the same potentially elevated

5      levels of formaldehyde, because they would have

6      off-gassed more over some period of time.

7          Q.    So anybody who complained, any occupant

8      who complained about formaldehyde, and you couldn't

9      resolve the concern, that person would be given the

10     opportunity to move into a different housing unit?

11         A.    I can't say that everybody was given that

12     opportunity.  I can say that that was an opportunity

13     that was presented to some number of -- of occupants.

14         Q.    Are you aware of anyone who was denied

15     that opportunity?

16            MR. MILLER:  I'm going to object, vague,

17     time.

18         A.    No, I'm not aware that anyone was denied

19     that opportunity, at least until we made the

20     determination that we were going to stop swapping

21     units and instead move people out of them and into

22     hotels and motels instead.  It doesn't mean that it

**7/7/2009  Garratt, David E.**

1    did not happen, but I'm not aware of it.

2              BY MR. SCANDURRO:

3        Q.    Okay.  And did FEMA at some point

4    establish a call center where an occupant who had any

5    concern at all about formaldehyde could make a phone

6    call to FEMA and talk about it?

7        A.    Yes.

8              We actually did several call centers.  The

9    main one was at one of our national processing

10   service centers, and they were linked in to CDC,

11   which also maintained a hotline, and so they were

12   collaborating on that in terms of referring phone

13   calls back and forth.

14             But also our TROs established their own

15   separate call centers in Mississippi and Louisiana to

16   handle calls regarding the same thing.  They were

17   also linked into this principal call center.

18             The short answer is yes.

19       Q.    So am I correct that early on, occupants

20   who expressed a formaldehyde concern could be moved

21   into a different housing unit, and then later on in

22   the process occupants who expressed a concern about

**7/7/2009  Garratt, David E.**

1    formaldehyde would have the opportunity to be moved

2    to a motel or a hotel?

3         A.    I don't believe we stood up that call

4    center -- I'm not sure exactly when we stood up the

5    call center.

6              I know we stood up a call center following

7    the Bayou La Batre issue.  I don't know when we stood

8    up a call center prior to that.

9              So prior to standing up that call center,

10   I would -- I believe that the prevailing approach was

11   again on a case-by-case basis and dealing with the

12   needs of that individual occupant.  And if what -- at

13   the end of the day what they required was a new unit

14   or we couldn't resolve their issue in the unit that

15   they were in, then they would get a new unit, was

16   the -- the policy that the folks we were operating

17   under at that time.

18             Again it wasn't until we instituted a halt

19   on that practice that -- that I think that

20   effectively ended for everybody, but I -- I don't

21   know exactly how that lines up with or aligns with

22   the date that we stood up the call center.

**7/7/2009  Garratt, David E.**

1      Q.    But the point is, from the beginning of

2    the Hurricane Katrina response to the end, FEMA was

3    willing to give people the opportunity to move out of

4    a unit if they expressed any formaldehyde concern

5    that you couldn't resolve?

6            MR. MILLER:  Objection, vague, time.

7      A.    I believe that was the general practice in

8    play, and it was my understanding that that was how

9    these issues were being resolved in the field by the

10   transitional recovery offices through their MDCs,

11   yes.

12           MR. SCANDURRO:  I tender the witness.

13

14     EXAMINATION BY COUNSEL FOR BECHTEL NATIONAL INC.

15           BY MR. HAINKEL:

16     Q.    Good afternoon, Mr. Garratt.

17           My name is John Hainkel, and I represent

18   Bechtel National Inc. in the formaldehyde litigation.

19           I read your declaration a couple of times,

20   and I've tried to listen closely today, so hopefully

21   I won't plow any new ground.

22           Am I correct that FEMA's authority to

**7/7/2009  Garratt, David E.**

```
1    provide and install housing, in this case the travel

2    trailers and under these circumstances, ultimately

3    derived from the Stafford Act?

4         A.    Correct.

5         Q.    And the post-Katrina housing effort, would

6    it be fair to say that this was probably the largest

7    housing effort in the history of FEMA?

8         A.    Is the largest housing effort in the

9    history of FEMA.

10        Q.    Even to this day.

11             And would it be fair to say that FEMA,

12   that federal agency, didn't have the manpower or even

13   the capacity in any sense to actually deliver and

14   install the travel trailers that we've been

15   discussing today?

16        A.    The agency certainly did not.  Prior to

17   the use of the IA/TACS, we relied on the Corps of

18   Engineers for this particular mission.  The Corps

19   would not have had the capacity to do -- to handle

20   the scale of this mission, so, yes, we lack the

21   organic capacity to do this mission.

22        Q.    So in order to fulfill FEMA's federal
```

**7/7/2009  Garratt, David E.**

```
 1      mandate to provide this housing in the wake of this

 2      natural disaster, is it fair to say that FEMA

 3      contracted with Fluor, Shaw, CH2M Hill, and Bechtel

 4      National to help it haul and install the travel

 5      trailers we've been discussing?

 6          A.    Yes.

 7          Q.    And the contractors -- and I'll call them

 8      contractors rather than saying all 4 names every

 9      time -- the contractors had to deliver the trailers

10      that FEMA had designated and purchased.

11              Isn't that true?

12              They couldn't pick up any trailer

13      willy-nilly and go buy their own trailers.  They

14      were -- they were delivering the trailers you guys

15      told them to deliver.

16              Is that fair?

17          A.    Correct.

18          Q.    To do otherwise or to choose some other

19      form of housing would have been a breach of their

20      contract.

21              Is that fair?

22          A.    That's correct.
```

1          Q.    And tell me if I'm getting too specific

2     here, but did you know that FEMA also directed the

3     contractors to put these travel trailers on blocks?

4          A.    Yes.

5          Q.    And you understand that that was a FEMA

6     directive?

7          A.    Yes.

8          Q.    And would it be fair to say that if the

9     contractors did not do that, they would have been

10    violating their contract?

11         A.    Yes.

12         Q.    And I would assume that you're also aware

13    that FEMA required that these travel trailers have

14    electricity, plumbing, hot and cold running water,

15    sewerage?

16         A.    Correct.

17         Q.    And again, if the contractors didn't set

18    them on blocks, hook up the electricity, hook up the

19    hot and cold running water, hook up the sewerage,

20    they would have been violating their contract with

21    the federal government through FEMA.

22              Correct?

**7/7/2009  Garratt, David E.**

```
1          A.     Correct.

2          Q.     Over the course of the deposition, I heard

3    some questions about maintenance, and I just want to

4    make sure I have all of this down right.

5                 At different times, some of these

6    contractors or maybe even all of the contractors

7    contracted with FEMA to undertake certain maintenance

8    responsibilities.

9                 True?

10         A.     True.

11         Q.     And you discussed with Mr. Meunier if some

12   way FEMA's procedure for air quality issues, when it

13   was that those sorts of complaints were made early on

14   in the project.

15                Right?

16                Do you recall that?

17         A.     I think I know -- know to which you refer,

18   yes.

19         Q.     Okay.  And I'm going to say earlier on in

20   the project, the policy -- or FEMA's policy was to

21   handle those sorts of complaints on a case-by-case

22   basis.
```

**7/7/2009  Garratt, David E.**

1              Is that fair to say?

2        A.    I would say yes.  More practice, I think

3    than policy, but, yes.

4        Q.    Okay.  And if for instance a complaint of

5    formaldehyde -- let's call it a formaldehyde

6    complaint came through, and it either made its way

7    through the temporary recovery office which then sent

8    it on to a contractor or if the temporary recovery

9    office handled it directly, the policy was at least

10   in the early days to recommend venting, opening

11   doors, opening windows to get rid of the odor.

12             Is that true?

13       A.    I think that's generally true, if you're

14   referring to the guidance provided by the maintenance

15   and deactivation contract personnel who visited and

16   talked to the occupants who had made the complaint?

17       Q.    Correct?

18       A.    Right.

19             I think they did explore options short of

20   swapping out the trailer before they would agree to

21   swap out a travel trailer.  And among them was

22   ventilating the unit.

**7/7/2009  Garratt, David E.**

1      Q.    Was that a FEMA directive?

2      A.    Not that I'm aware of.

3      Q.    Okay.  Where did that policy come from?

4      A.    If -- I don't know.

5      Q.    Was that ever a FEMA policy?

6      A.    Was what ever a FEMA policy?

7      Q.    If an air quality complaint, in this case,

8   a complaint about formaldehyde, was brought to FEMA's

9   attention or a maintenance contractor's attention,

10  and they were to deal with it on a case-by-case

11  basis, was it the policy to recommend airing out the

12  trailer before swapping out the trailer.

13     A.    I don't know if it was a FEMA policy or

14  not.

15            By, policy, we need to be careful here.  A

16  written policy is different than again a practice or

17  an unwritten policy.  In this case I'm not aware that

18  of any policies dictating or governing exactly what

19  contractors or anybody who is receiving complaints

20  from occupants says and how they respond to -- to

21  those particular complaints.

22            I'm not saying they didn't exist.  They

```
 1    may exist within the contract acquisitions framework,

 2    but I'm not familiar with the existence of any such

 3    policy.

 4         Q.    Was it a FEMA practice to make that

 5    recommendation?

 6         A.    Yes.

 7         Q.    Okay.  And you explained that at some

 8    point, FEMA came to the realization that it might

 9    have a possible systemic formaldehyde problem.  I

10    think that's the way you described it.

11              Is that a fair way to describe it?

12         A.    Yes.

13         Q.    Okay.  And I'm not trying to dictate a

14    date on that, whatever it turns out to be, but at

15    some point in time around the time of the Sierra Club

16    results, I understand that the problem seemed to be

17    one that needed greater attention than perhaps it was

18    getting.

19              Is that true?

20         A.    Yes.

21         Q.    And as I understand your testimony, FEMA

22    assumed the responsibility for coordinating the
```

**7/7/2009  Garratt, David E.**

1    response to this issue at that time, whenever it was.

2              Isn't that fair?

3         A.    That is fair.

4         Q.    And FEMA debated what an appropriate

5    response might be, whether it be testing, warnings,

6    or taking people out of the trailers.

7              Is that true?

8         A.    True.

9         Q.    Okay.  And you would agree with me that

10   the responsibility for determining an appropriate

11   programmatic response to this issue lay within the

12   FEMA organization?

13        A.    Let me caveat my response to that and

14   that -- or let me characterize this carefully.

15             FEMA is delegated responsibility for the

16   disaster environment and coordinating the engagement

17   and application of all federal resources and assets

18   to support that state.  So at the top of that

19   multiorganizational activity is FEMA, who is solely

20   or responsible for what goes on by all of those

21   agencies.

22             So, yes, we are ultimately responsible,

**7/7/2009  Garratt, David E.**

```
1     but in terms of expertise and agency responsible --

2     agency responsibility, this was something we believed

3     that we shared.

4          Q.    Okay.  With other agencies?

5          A.    Yes.

6          Q.    Okay.

7                MR. HAINKEL:  That's all the questions I

8     have.

9                Thank you.

10               MR. MILLER:  I've got a couple followup,

11    not many.

12               MR. MEUNIER:  We will have some brief

13    redirect after all the cross-examination is

14    completed.

15               MR. MILLER:  Let's go off the record.

16               THE VIDEOGRAPHER:  We're going off the

17    record.  The time on the video is 3:08 PM.

18               (Discussion off the record.)

19               THE VIDEOGRAPHER:  This begins tape number

20    6 in the video deposition of David Garratt.  The time

21    on the video is 3:38 PM.  We are on the record.

22                         EXAMINATION BY COUNSEL FOR
```

```
1        THE UNITED STATES OF AMERICA AND DAVID E. GARRATT

2              BY MR. MILLER:

3        Q.    Sir, my name is Henry Miller.  I'm an

4   attorney with the Department of Justice and represent

5   the United States, which is a defendant in this case.

6              I have a couple followup questions.

7              And the first is, I'd ask you to refer to

8   what has been marked as Garratt exhibit number 7,

9   which is assigned identification numbers FEMA 17,

10  dash, 009030 through 33.

11             And I wanted to direct you to the third

12  page of that document, FEMA 17 009032, and there's an

13  email from yourself, I believe, to Gil Jamieson and

14  Jeff Runge dated Thursday, May 17th, 2007.  That's

15  the first full email -- or second full email on that

16  page.

17             Do you see that, sir?

18       A.    I do.

19       Q.    And it's talking about new specifications

20  do require formaldehyde testing and 100 percent

21  inspection before government acceptance of any unit.

22             The formaldehyde specifications that are
```

**7/7/2009  Garratt, David E.**

```
1    referencing -- referenced here, were these in place

2    prior to Hurricane Katrina and Rita?

3          A.    Not for travel trailers and park models.

4          Q.    And these specifications, what is your

5    recollection of when FEMA initially started

6    contemplating inserting such specifications in for

7    travel trailers and park model trailers?

8                MR. MEUNIER:  Objection, asked and

9    answered.

10               MR. MILLER:  I can reask, counsel.

11               MR. MEUNIER:  I can make the objection,

12   too.

13         A.    I don't remember exactly when we began

14   contemplating new specifications.  We began it when

15   we recognized that we needed to go out and procure

16   new units under a new contract in order to

17   reestablish our inventories, particularly of park

18   models at that time.

19               Again, I don't know at what -- what

20   chronological point those contemplations began, but

21   it would have begun at that point.

22               BY MR. MILLER:
```

**7/7/2009  Garratt, David E.**

1          Q.     As of May 17th, 2007, your email here

2     indicates that the new specifications will follow HUD

3     emission levels.

4               Do you see that?

5          A.     I do.

6          Q.     Was that the specifications that were

7     eventually adopted by FEMA?

8          A.     No.

9          Q.     What were the specifications that were

10    finally adopted by FEMA for the new purchase -- new

11    units that were being purchased?

12         A.     Below .016 parts per million.

13         Q.     And as you sit here today, what is your

14    best recollection of when that determination was made

15    to use the 0- -- 0.016 part per million standard?

16         A.     To the best of my recollection, it

17    occurred after we published the -- the interim

18    direction, and that interim direction is what

19    suspended the use of travel trailers and provided

20    conditions for the use of manufactured housing.

21               That interim direction required that

22    states must establish an acceptable level of

**7/7/2009  Garratt, David E.**

1    formaldehyde for any units that we brought into their

2    states to be used by their -- by disaster survivors

3    in their states.

4             And what we found were that states were

5    very reluctant to establish these levels or that they

6    were defaulting to a very low level that was actually

7    below the HUD level.  As a result, because that

8    forced to us then test every unit that we have before

9    we delivered it to find out what -- at what level it

10   was at and to see if it would meet their standards,

11   we needed a level that was so low that no state would

12   have a problem with us unilaterally bringing those

13   units into their states to serve their disaster

14   victims.

15       Q.    Were there any internal concerns or policy

16   concerns relating to use of those 0.016 PPM standard?

17       A.    There were some concerns.

18             I know that initially HUD did not think

19   that achieving such a standard in manufactured

20   housing was achievable.  So there was a technical

21   concern from their perspective.

22             There were some concerns that what we were

**7/7/2009  Garratt, David E.**

1    essentially doing was something that we had been

2    saying to that point that we shouldn't -- we

3    shouldn't be doing, which is establishing a standard,

4    in this case, a de facto standard.

5              But because we had a need and had a

6    requirement to provide these units in a disaster, we

7    had to come up with something in the absence of a

8    standard established by an entity that more

9    appropriately should establish such a standard, in

10   our minds, someone like an EPA or a CDC.

11             So we discussed this with our office of

12   health affairs personnel at length and determined

13   that we what we wanted to do was establish a standard

14   that was lower than the lowest standard that they

15   could provide to us, which was a NIOSH standard that

16   was purported to be the -- the level at which

17   cellular activity -- or cells were reacting to

18   formaldehyde.  And we wanted a level below that.

19             And so that's how we came up with that

20   standard.

21        Q.    Does FEMA have the responsibility to

22   supervise the day-to-day activities of other federal

**7/7/2009  Garratt, David E.**

1    agencies' actions during a disaster relief?

2         A.     I think supervision of their day-to-day

3    activities is probably overstating what our

4    responsibility is.

5              What our responsibility is to organize

6    the -- and coordinate and integrate the response of

7    all of the federal agencies who are brought to the

8    table to help in a disaster environment as well as

9    voluntary agencies as well as the private sector

10   designated by the president to perform that role in

11   that function.

12             Now, does that mean that we're responsible

13   for supervising all of the actions of everybody who's

14   involved in that response, no.

15             But what it does mean is that we are

16   responsible for the overall disaster and for, again,

17   organizing and coordinating the engagement of federal

18   agencies and the engagement of the resources, assets,

19   and authorities that they have.

20             For example, we can task a federal agency

21   to exercise their authorities in a disaster.  Well,

22   it's still their authority.  It's not ours.

**7/7/2009  Garratt, David E.**

```
 1              We can be responsible for requiring

 2      them to do that, but it's their responsibility

 3      to exercise their authorities and to do so

 4      responsibly.

 5          Q.    And in providing the disaster response, do

 6      you rely upon other federal agencies?

 7          A.    Absolutely.

 8              MR. MILLER:  I have no further

 9      questions.

10              Pass the witness.

11              MR. MEUNIER:  Any other cross-examination

12      by defense counsel?

13

14      FURTHER EXAMINATION BY PLAINTIFFS' CO-LIAISON COUNSEL

15              BY MR. MEUNIER:

16          Q.    I just have a couple of followup to what

17      was covered on cross, Mr. Garratt.

18              Counsel for the manu- -- for one of the

19      manufacturers asked if in earlier disasters there had

20      been complaints received by FEMA about formaldehyde

21      problems.

22              In any earlier disasters that you're aware
```

**7/7/2009  Garratt, David E.**

1    of, was there the same extent of the use of travel

2    trailers and specifically in the state of Louisiana?

3                 MR. SCANDURRO:  Objection, vague, the word

4    extent.

5         A.    No disaster compared to Katrina in

6    terms of the total number of forms of manufactured

7    housing that were deployed in response to that

8    disaster.

9                 BY MR. MEUNIER:

10        Q.    And in any of the prior disasters that

11   you're aware of where FEMA provided emergency

12   housing, what do you think was the maximum length of

13   time that any displaced citizen was required to live

14   in a temporary housing unit?

15        A.    First off, no one is required to live in a

16   temporary housing unit.  Individuals choose to live

17   in a temporary housing unit.

18        Q.    Normally because they don't have any other

19   place to go.

20        A.    Or because they don't want to go to any

21   other place.

22        Q.    Okay.  But we --

**7/7/2009  Garratt, David E.**

1          A.     There's always someplace else to go.   It

2     just may not be as close as they would like, and so

3     they prefer living in a smaller travel trailer here

4     than in an apartment over there.

5          Q.     So what's the longest period of time prior

6     to the Katrina disaster that you knew displaced

7     citizens to be actually occupying a FEMA-provided

8     emergency housing unit?

9          A.     Probably in the neighborhood of 36

10    months.

11         Q.     And in which disaster was that?

12         A.     Several different disasters.

13              For example, in West Virginia, we've had

14    individuals who were living in manufactured housing.

15    These are very small disasters, but -- very small

16    communities, but in which purportedly, there was no

17    rental housing available, and so they were extended

18    in those -- those units for an extensive period of

19    time.

20              In Florida, following the 2004 hurricanes,

21    we had individuals living in units down there for at

22    least 24 months, perhaps longer.

**7/7/2009  Garratt, David E.**

1        Q.      Travel trailers?

2        A.      Some travel trailers, yes.

3        Q.      How many?

4        A.      I don't know.

5        Q.      Would you agree that after Katrina, there

6    were more people living for longer periods of time in

7    travel trailers than in any prior disaster ever in

8    the history of this country?

9        A.      To my knowledge --

10       Q.      The answer is yes?

11       A.      -- yes.  (Nodding head.)

12       Q.      And in regard to this question about prior

13   awareness of formaldehyde issues, you're not

14   suggesting that there was not an organizational,

15   institutional awareness in FEMA that the issue of

16   formaldehyde in the -- in the housing industry dated

17   back 30 years.

18              You don't deny that, do you?

19       A.      I don't -- say that again.

20       Q.      You don't deny that the issue of

21   formaldehyde in the housing industry dates back 30

22   years and that there was an organizational awareness

**7/7/2009  Garratt, David E.**

```
1    of that fact in FEMA?

2              MR. SCANDURRO:  Object to form.

3              MR. PENOT:  Objection, foundation.

4    A.    No.

5          I do.

6          BY MR. MEUNIER:

7    Q.    Let me show you --

8    A.    Let -- let me rephrase that.

9          I don't deny it, but neither do I confirm

10   it.

11   Q.    Here is a formaldehyde question sheet,

12   frequently asked questions as of July 15, '07.

13         Are you familiar with that document?

14             MR. MILLER:  Do you have a copy,

15   counsel?

16   A.    I do not recall this document.

17             BY MR. MEUNIER:

18   Q.    All right.  Then let me ask you if you

19   recall seeing an email from John Philbin on July 30,

20   2007.

21         (Pause.)

22   A.    Yes, I vaguely recall this.
```

**7/7/2009  Garratt, David E.**

```
1              BY MR. MEUNIER:

2         Q.    So Philbin was sending you a draft of

3    something to go out over Administrator Paulison's

4    name.

5              You did say his draft needed a lot of

6    work, and yet in the first paragraph, he states,

7    Philbin -- this is for Paulison's statement:  FEMA's

8    response to occupant complaints from prolonged

9    exposure to elevated levels of formaldehyde could

10   have been better had earlier complaints triggered our

11   organizational awareness of a systemic problem that

12   has been well known in the manufacturing industry for

13   more than 30 years.

14             Do you recall seeing that?

15        A.    I vaguely recall seeing that.

16        Q.    And finally, in -- and I'll mark that as

17   Garratt --

18             MR. MEUNIER:  What's the next one?

19             THE COURT REPORTER:  18.

20             BY MR. MEUNIER:

21        Q.    -- 18.

22                       (Garratt Exhibit No. 18
```

**7/7/2009  Garratt, David E.**

1                          was marked for

2                          identification.)

3              BY MR. MEUNIER:

4         Q.    Finally, you were asked by counsel for the

5    contractors whether in directing the contractors to

6    put travel trailers on blocks -- whether FEMA

7    directed contractors to put travel trailers on

8    blocks, and your answer was yes.

9              Right?

10        A.    Correct.

11        Q.    In giving that direction to contractors to

12   put travel trailers on blocks, FEMA certainly did not

13   expect or understand that this action might increase

14   levels of formaldehyde off-gassing in the units, did

15   it?

16        A.    I'm not aware that it would, so the answer

17   is no.

18        Q.    Did the contractors ever communicate their

19   concerns about the risk of increasing formaldehyde

20   off-gassing through the jacking up of travel trailers

21   onto blocks?

22              MR. HAINKEL:  Object to the form of the

**7/7/2009  Garratt, David E.**

1    question that it implies that they even had a

2    concern.

3              BY MR. MEUNIER:

4         Q.    Did they ever communicate a concern --

5         A.    Not to me.

6         Q.    -- of that nature?

7              Did they ever communicate that as a risk

8    or possible risk?

9         A.    Not to me.

10        Q.    Do you know whether any of the

11   manufacturers' specifications for travel trailers,

12   including provisions in owners manuals, guard or warn

13   against jacking up travel trailers off of their

14   wheels?

15        A.    I do not.

16        Q.    You've never been made aware of that?

17        A.    I have not.

18        Q.    The contractors never communicated that to

19   you?

20        A.    Not -- I would not have expected them to.

21   If they were communicating that, they would have

22   communicated that to the folks that we were dealing

**7/7/2009  Garratt, David E.**

1    with.

2         Q.    Would you have expected the manufacturers

3    to communicate that to you?

4         A.    I would expect them to communicate that to

5    our acquisitions personnel.

6              MR. MEUNIER:  Thank you.

7              No further questions.

8              MR. MILLER:  I have one followup on

9    exhibit number 18 that you used.

10             MR. MEUNIER:  I'll make my objection to

11   recross, a standing objection.

12             MR. MILLER:  I understand.  I think you've

13   made this a new issue.

14

15   FURTHER EXAMINATION BY COUNSEL FOR THE UNITED STATES

16             OF AMERICA AND DAVID E. GARRATT

17             BY MR. MILLER:

18        Q.    The document there, exhibit number 18,

19   Mr. Meunier asked you some questions about the email

20   from Mr. Philbin, John Philbin, dated July 30th,

21   2007.

22             And the first sentence of that email -- or

**7/7/2009  Garratt, David E.**

```
1    the first sentence in the draft editorial reply he
2    read to you, and we're talking about a systemic
3    problem that has been well known in the manufacturing
4    industry for more than 30 years, prior to seeing this
5    email were you aware of that, that there was such a
6    thing?
7         A.    I'm only vaguely aware of this email --
8         Q.    Let me -- let me rephrase it.
9              Do you know where Mr. Philbin came up with
10   that information?
11        A.    I do not.
12        Q.    Do you have any -- any personal knowledge
13   or information that would lead you to believe that
14   that statement is accurate or inaccurate?
15        A.    I -- I do not.
16             MR. MILLER:  I don't have any further
17   questions.
18             The witness reads and signs.
19             THE VIDEOGRAPHER:  This concludes the
20   video deposition of David Garratt.  The time on the
21   video is 3:55 PM.  We are off the record.
22             (Whereupon, at 3:55 p.m., the taking of
```

**7/7/2009  Garratt, David E.**

1     the instant deposition ceased.)

2

3

4                         _____

5                         Signature of the Witness

6     SUBSCRIBED AND SWORN to before me this _____ day of

7     _____, 20_____.

8

9                         _____

10                        Notary Public

11    My Commission Expires:_____

12

13

14

15

16

17

18

19

20

21

22

7/7/2009  Garratt, David E.

```
1                    CERTIFICATE OF COURT REPORTER

2        UNITED STATES OF AMERICA      )

3        DISTRICT OF COLUMBIA          )

4                I, CHERYL A. LORD, the reporter before

5        whom the foregoing deposition was taken, do hereby

6        certify that the witness whose testimony appears in

7        the foregoing deposition was sworn by me; that the

8        testimony of said witness was taken by me in machine

9        shorthand and thereafter transcribed by

10       computer-aided transcription; that said deposition is

11       a true record of the testimony given by said witness;

12       that I am neither counsel for, related to, nor

13       employed by any of the parties to the action in which

14       this deposition was taken; and, further, that I am

15       not a relative or employee of any attorney or counsel

16       employed by the parties hereto, or financially or

17       otherwise interested in the outcome of this action.

18

19                    CHERYL A. LORD

20                    Notary Public in and for

21                    the District of Columbia

22       My Commission expires April 30, 2011
```