# Transcript of the Testimony of
# Earline Castanel

### Date taken: December 2, 2009

### In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

EXHIBIT 2

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
                   NEW ORLEANS DIVISION
                    *   *   *   *   *
     IN RE: FEMA TRAILER           MDL NO. 07-1873
     FORMALDEHYDE PRODUCTS         SECTION "N"(5)
     LIABILITY LITIGATION          JUDGE ENGELHARDT
     This document relates to:
          Earline Castanel v. Recreation by Design,
                L.L.C., et al
                Docket No. 09-3251

                    *   *   *   *   *

                 Deposition of EARLINE CASTANEL,
     2925 St. Peters Street, New Orleans, Louisiana
     70163, taken at the Law Offices of Gainsburgh,
     Benjamin, David, Meunier & Warshauer, L.L.C.,
     2800 Energy Centre, 1100 Poydras Street, New
     Orleans, Louisiana 70163-2800, on Wednesday,
     December 2, 2009.
     REPORTED BY:
          PAMELA C. BLACK, CCR, RPR
          PROFESSIONAL SHORTHAND REPORTERS
          (504) 529-5255
```
Page 1

```
 1   APPEARANCES:
 2       GAINSBURGH, BENJAMIN, DAVID,
         MEUNIER & WARSHAUER, L.L.C.
 3       (BY: GERALD MEUNIER AND
             TARA GILBREATH, ESQUIRE)
 4       2800 Energy Centre, 1100 Poydras Street
         New Orleans, Louisiana 70163
 5
             ATTORNEYS FOR THE PLAINTIFFS
 6           STEERING COMMITTEE
 7       LAW OFFICES OF DAVID V. MCLENDON, L.L.C.
         (BY: DAVID V. MCLENDON, ESQUIRE)
 8       721 Henry Clay Avenue
         New Orleans, Louisiana 70118
 9
             ATTORNEYS FOR PLAINTIFF STEERING
10           COMMITTEE
11
         U.S. DEPARTMENT OF JUSTICE
12       (BY: HENRY MILLER, ESQUIRE)
         CIVIL DIVISION
13       1331 Pennsylvania Avenue, N.W.
         Washington, D.C. 20004
14
             ATTORNEYS FOR DEFENDANT, UNITED
15           STATES OF AMERICA
16       GARRISON, YOUNT, FORTE &
         MULCAHY, L.L.C.
17       (BY: RANDALL C. MULCAHY, ESQUIRE)
         909 Poydras Street, Suite 1800
18       New Orleans, Louisiana 70112
19           ATTORNEYS FOR DEFENDANTS,
             RECREATION BY DESIGN, L.L.C., TL
20           INDUSTRIES, INC., FRONTIER EV, INC.
             AND PLAY'MOR TRAILERS, INC.
21
         ALLEN & GOOCH
22       (BY: BRENT MAGGIO, ESQUIRE)
         3900 N. Causeway Blvd., Suite 1450
23       Metairie, Louisiana 70002
24           ATTORNEYS FOR DEFENDANTS,
             HEARTLAND REC. VEHICLES, L.L.C.
25
```
Page 2

```
 1   APPEARANCES CONTINUED:
 2       BAKER, DONELSON
         (BY: KAREN WHITFIELD, ESQUIRE)
 3       201 St. Charles Avenue
         Suite 3600
 4       New Orleans, Louisiana 70163
 5           ATTORNEYS FOR DEFENDANTS,
             CH2M HILL CONSTRUCTORS, INC. AND
 6           SHAW ENVIRONMENTAL, INC.
 7
         JONES, WALKER, WAECHTER, POITEVENT,
 8       CARRERE & DENEGRE, L.L.P.
         (BY: RYAN JOHNSON, ESQUIRE, VIA
 9           TELEPHONE)
         Four United Plaza, 5th Floor
10       8555 United Plaza Boulevard
         Baton Rouge, Louisiana 70809
11
             ATTORNEYS FOR KEYSTONE RV COMPANY,
12           THOR CALIFORNIA, THOR INDUSTRIES,
             DUTCHMEN MANUFACTURING, DS CORP
13           (d/b/a CrossRoads RV), KZ RV, LP
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 3

```
 1                EXAMINATION INDEX
 2                                      PAGE
 3   EXAMINATION BY HENRY MILLER         6, 111
 4   EXAMINATION BY RANDALL MULCAHY      73, 113
 5   EXAMINATION BY KAREN WHITFIELD      102
 6
                  INDEX OF EXHIBITS
 7                                      PAGE
 8   Exhibit No. 1 (Notice of Deposition)    12
 9   Exhibit No. 2 (Plaintiff Fact Sheet)    21
10   Exhibit No. 3 (Collection of Photographs)  26
11   Exhibit No. 4                           57
     (Letter Dated 8/6/08 to FEMA from
12    Gainsburgh, Benjamin)
13   Exhibit No. 5                           57
     (Form 95 Claim Form/Rider, Contingency
14    Fee Retainer, FEMA 000983 through 986)
15   Exhibit No. 6                           64
     (FEMA, Emergency Shelter Agreement to Rules
16    of Occupancy, FEMA 159-000009 - 012)
17   Exhibit No. 7                          106
     (FEMA Temporary Housing Unit Inspection
18    Report)
19   Exhibit No. 8                          108
     (Shaw Trailer Lease Check In List)
20
     Exhibit No. 9                          110
21   (Shaw Document Dated 3/11/06)
22
23
24
25
```
Page 4

## Page 5

S T I P U L A T I O N

It is stipulated and agreed by and among counsel that the deposition of Earline Castanel, is hereby being taken pursuant to Rules 26, 28 and 30 of the Federal Rules of Civil Procedure in accordance with the Code.

The witness reserves the right to read and sign the deposition transcript. The formalities of sealing and certification are hereby waived. The party responsible for service of the discovery material shall retain the original.

All objections, except those as to the form of the questions and/or responsiveness of the answers, are reserved until the time of the trial of this cause.

* * * * *

PAMELA C. BLACK, Registered Professional Reporter, Certified Court Reporter in and for the State of Louisiana officiated in administering the oath to the witness.

## Page 6

1  MR. MULCAHY:
2      On the record, though, I'd like to
3  put on that this deposition is being held for
4  the limited purposes of prescription and
5  statute of limitation; and that we reserve the
6  full right to come back and depose her on the
7  merits in the case should we get to that point
8  with the prescription motion and the deadlines
9  that were set.
10              EARLINE CASTANEL,
11  2925 St. Peter Street, New Orleans, Louisiana
12  after having first been duly sworn, was
13  examined and testified on her oath as follows:
14  EXAMINATION BY MR. MILLER:
15      Q. Ma'am, can you please state your full
16  name and spell your name?
17      A. Earline Castanel, E-A-R-L-I-N-E,
18  C-A-S-T-A-N-E-L.
19      Q. Ms. Castanel, my name is Henry
20  Miller. I'm a lawyer with the United States
21  Department of Justice, and I've be assigned to
22  represent the United States in this case which
23  is captioned "Earline Castanel, et al versus
24  Recreation by Design," and it's Case No.
25  09-3251. This case has been filed in the

## Page 7

1  Eastern District of Louisiana, and it's been
2  consolidated in what is called a multidistrict
3  litigation before Judge Engelhardt here in the
4  Eastern District of Louisiana.
5      The purpose of this deposition is to
6  allow the United States to discover information
7  relating to or that may lead to the discovery
8  of information regarding whether your claims
9  against the United States are time barred. The
10  United States reserves the right to conduct and
11  to participate in a merits deposition should
12  the court deny the United States's motion or
13  should be the court not rule in a sufficient
14  time and we need to proceed with your
15  deposition on the merits. Do you understand
16  that?
17      A. (Witness indicates an affirmative
18  response.)
19      Q. I'm sorry, you have to say "yes" or
20  "no."
21      A. Yes.
22      Q. Have you ever been deposed before,
23  Ms. Castanel, asked questions like this under
24  oath?
25      A. No.

## Page 8

1      Q. You've never done this before?
2      A. No.
3      Q. Have you had a chance to speak to
4  your lawyers, Ms. Gilbreath, Mr. Meunier or
5  Mr. Woods about what was going to take place
6  here today?
7      A. Yes.
8      Q. Did they explain to you generally the
9  rules that govern this type of proceeding?
10     MS. GILBREATH:
11        Objection, calls for privilege.
12  BY MR. MILLER:
13     Q. Do you generally understand the rules
14  that govern this proceeding?
15     A. I think I do. I'm not sure.
16     Q. Okay. I'm going to go over those
17  rules with you again to make sure that you
18  understand them. Okay? The court reporter
19  just swore you in and administered an oath and
20  that oath requires you to answer my questions
21  today truthfully. Do you understand that?
22     A. Yes.
23     Q. Further, because you're under oath if
24  you were to lie or provide an intentionally
25  misleading answer, you may be subject to

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Earline Castanel

**Page 9**

1  criminal and/or civil penalties. Do you
2  understand that?
3      A. Yes.
4      Q. Although this is an informal
5  proceeding, we're not in a courtroom, there's
6  no judge, there's no jury, this proceeding
7  itself has the same effect as if you were
8  testifying in a courtroom before a judge or a
9  jury. Do you understand that?
10     A. Yes.
11     Q. Now, the court reporter is recording
12 my questions and your answer, that's what she's
13 doing right now. To make sure it's recorded
14 accurately, only one of us can talk at a time.
15 Do you understand that?
16     A. Yes.
17     Q. In addition, because the testimony is
18 being recorded and will be transcribed, she's
19 going to type it out and we'll get a document,
20 you have to give a verbal answer. A shrug, a
21 nod of the head, a shake of the head, uh-huh is
22 not sufficient, you need to say yes, no, I
23 don't know. Do you understand that?
24     A. Yes.
25     Q. If for any reason you do not

**Page 10**

1  understand a question, you require
2  clarification, explanation of any words or want
3  to refer to a document you must tell me and
4  we'll get that matter resolved before you
5  answer the question. Do you understand that?
6      A. Yes.
7      Q. The converse of this rule, the flip
8  side, is if you answer a question, it is
9  assumed that you understood the question and
10 are providing a complete and truthful response
11 to that question. Do you understand that?
12     A. Yes.
13     Q. After the deposition is completed you
14 will be provided an opportunity to review the
15 transcript. The rules allow you 30 days to
16 review and make any changes or corrections.
17 The United States encourages you to review that
18 transcript for any errors and make any
19 corrections within that 30-day period. Do you
20 understand you have that right and an
21 opportunity to do that?
22     A. Yes, sir.
23     Q. However, to the extent when you
24 review that transcript, if you make any
25 substantive changes, the Unites States reserves

**Page 11**

1  the right to reopen this deposition or to
2  question you at a later deposition regarding
3  any such changes. Do you understand that?
4      A. I guess so, yes.
5      Q. Are you currently suffering from any
6  medical disease or illness that in any way
7  interferes with your ability to answer
8  truthfully and completely my questions to you
9  today?
10     A. Yes.
11     Q. What is the problem that you're
12 suffering from that would prevent you from
13 answering my questions truthfully today?
14     A. Well, I'm answering whatever you ask
15 me I can answer you yes or no.
16     Q. Okay. No, that was my question, are
17 you suffering from any medical illness or
18 disease that prevents you from answering my
19 questions?
20     A. No.
21     Q. Are you currently taking any
22 medication or drugs that in any way interfere
23 with your ability to listen to or understand or
24 answer my questions?
25     A. No.

**Page 12**

1      Q. Finally, I try to take a break every
2  hour or so. If at any time before I take a
3  break, if you want to take a break earlier,
4  please let me know, and once I come to an end
5  of a line of questioning we'll take a break.
6  Is that fair?
7      A. Yes.
8      Q. Ms. Castanel, I'm going to hand you a
9  document which is marked Exhibit No. 1, and
10 it's a notice of deposition for today's
11 deposition. Have you seen this document before
12 (tenders)?
13     A. (Views document.) I can't see this
14 too well. I think I've seen this.
15     Q. Okay. This was the document that we
16 issued in agreement with your counsel for the
17 deposition today. You understood that this
18 deposition was going to take place and that you
19 had to come forth here at 2:30 to testify;
20 right?
21     A. Uh-huh (affirmative response).
22     Q. You have to say "yes" or "no."
23     A. Yes.
24     Q. It's okay. It's an unusual procedure
25 and it's going to happen and I'll remind you.

3 (Pages 9 to 12)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)  Earline Castanel

```
 1   Other than this lawsuit which you've filed
 2   against the United States and several other
 3   parties, have you ever filed any other lawsuit
 4   against any other persons?
 5        MS. GILBREATH:
 6            Objection, what does this have to do
 7   with prescription?  Isn't that why we're here
 8   today?
 9        MR. MILLER:
10            I get to do background questions,
11   Counsel.  Unless you're instructing the witness
12   not to answer the question, you can state an
13   objection, but if you're going to instruct the
14   witness not to answer, then that's fine and
15   I'll go on, but you're going to need to
16   instruct the witness not to answer.  Okay?
17        MR. MEUNIER:
18            No.  She can make objections or
19   instruct the witness.
20        MR. MILLER:
21            No.  The objections in deposition are
22   form objections, Mr. Meunier.
23        MR. MEUNIER:
24            Yeah.  But the objection is to the
25   form because it doesn't adhere to the rules of
                                          Page 13
```

```
 1   the court for what this deposition is to cover.
 2   So we'll reserve the objection for the record
 3   and reserve the right to strike the answer to
 4   this question and any others that go beyond the
 5   question of prescription.
 6        MR. MILLER:
 7            So, Counsel, what is your objection?
 8        MS. GILBREATH:
 9            I'm objecting that it goes beyond the
10   scope of the deposition for the record.
11        MR. MILLER:
12            That's fine.
13   BY MR. MILLER:
14        Q.  Ms. Castanel, have you ever filed any
15   other lawsuits?
16        A.  No.
17        Q.  Have you ever filed any other claims
18   against the United States?
19        A.  No.
20        Q.  Ms. Castanel, what is your date of
21   birth?
22        A.  8/10/30.
23        Q.  What is that last?
24        A.  8/10/30.
25        Q.  And how old are you?
                                          Page 14
```

```
 1        A.  79.
 2        Q.  And what are your current telephone
 3   numbers?
 4        A.  931-9560, my home -- I mean, my cell.
 5   My home is 404-1408.
 6        Q.  And are both of those in area code
 7   504?
 8        A.  Right.
 9        Q.  Do you have an e-mail address?
10        A.  No.
11        Q.  Do you have a computer?
12        A.  No.
13        Q.  What was the highest level of
14   education that you ever obtained?
15        A.  I think it was sixth or seventh
16   grade.
17        Q.  Were you born here in New Orleans?
18        A.  Yeah.
19        Q.  And you went to school here in New
20   Orleans?
21        A.  Yeah.
22        Q.  Have you lived your entire life in
23   New Orleans?
24        A.  Yes.
25        Q.  When were you last employed?
                                          Page 15
```

```
 1        A.  I went for about a couple of weeks
 2   after Katrina at St. Peter Claver.
 3        Q.  And St. Peter Claver, is that a
 4   school?
 5        A.  Well, it's a school and a church, I
 6   was working in the rectory.
 7        Q.  How long did you work at St. Peter
 8   Claver?
 9        A.  You mean before the --
10        Q.  Before or after?
11        A.  I'd say about 30 years.
12        Q.  And what was your position?
13        A.  I used to keep the house for the
14   priests, did the housecleaning.
15        Q.  How many hours did you work a week?
16        A.  About 15 hours.  I used to go three
17   times a week.
18        Q.  And when did you stop working there?
19        A.  I don't remember exactly.
20        Q.  What's your best estimate?
21        A.  I think year before last I think it
22   was.  I'm not sure.
23        Q.  2007, 2008?
24        A.  I'd say the beginning of 2008, I'd
25   say.
                                          Page 16
```

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255                           (504) 529-5255
New Orleans * Baton Rouge * Shreveport

```
 1      Q.  I want to go back to August of 2005
 2  prior to Katrina.  Where did you live?
 3      A.  St. Peter Street, 2925 St. Peter.
 4      Q.  2925 St. Peter Street?
 5      A.  Yes.
 6      Q.  And that's here in New Orleans?
 7      A.  Yes.
 8      Q.  Did you own or rent?
 9      A.  It was my mother's place.
10      Q.  Is your mother still alive?
11      A.  No.
12      Q.  Did anyone else from your family live
13  there besides yourself?
14      A.  It was sister but she's dead.
15      Q.  Are you considered the owner of that
16  house?
17      A.  Yeah.
18      Q.  And what type of house is it, is it a
19  stand-alone unit, is it a condo, is it a row
20  house?
21      A.  It's a standard house, a double.
22      Q.  And when you say "double," what do
23  you mean?
24      A.  It was two sides, my sister live on
25  one side and I lived on one side, but now it's
                                          Page 17
```

```
 1  -- it's one house, you know.
 2      Q.  Got it.  It's one house but two
 3  units.
 4      A.  Yeah.
 5      Q.  And how long had you lived there
 6  prior to Katrina?
 7      A.  All my life.  I was raised there.
 8      Q.  Was your home damaged by Katrina?
 9      A.  Yes.
10      Q.  Did you have homeowner's insurance
11  that covered the damage?
12      A.  Some of it.
13      Q.  And did you use that money to repair
14  the house?
15      A.  Yes.
16      Q.  And besides homeowner's insurance,
17  did any other entities provide you with money
18  to assist you in the repair of your house?
19      A.  Yes.
20      Q.  And who else provided you with monies
21  to repair your house?
22      A.  Oh, boy, FEMA.
23      Q.  And by "FEMA," are you referring to
24  the Federal Emergency Management Agency?
25      A.  Well, I don't know, I guess that's
                                          Page 18
```

```
 1  what it is.  They came in and helped me that's
 2  all I know.
 3      Q.  Was the total amount that you got
 4  from your insurance and FEMA sufficient to pay
 5  for the repairs of your house?
 6      A.  Well, I'm still doing a little
 7  repairing, I still have some to do.
 8      Q.  Was it sufficient to repair it so you
 9  could move back in?
10      A.  Well, it was, you know, enough for me
11  to get back in the house, you know, I still
12  have some things to do.
13      Q.  When Katrina struck, did you evacuate
14  -- let me step back and start over.  Did you
15  evacuate New Orleans prior to Katrina striking?
16      A.  I left New Orleans the Saturday
17  before.  I went to Texas.
18      Q.  And where did you go in Texas?
19      A.  It was a -- they had a -- it was a
20  church or something that took us in, we was
21  sleeping on the floor.
22      Q.  And how long did you stay at that
23  church?
24      A.  We stayed a while and then we went
25  to, I don't know what you call it, I have to
                                          Page 19
```

```
 1  think of the name of that place.
 2      Q.  Was it an apartment?
 3      A.  It was like a hotel -- I can't think
 4  of the name of it right now.
 5      Q.  How long did you stay in Texas?
 6      A.  I stayed in Texas until -- well, it
 7  was while I was fixing my house.  I stayed in
 8  Texas and then I came back down and I asked for
 9  a trailer.  And then they told me they would
10  get me a trailer.  And when I got the trailer,
11  the lady told me that I could come and live in
12  her yard, you know, bring the trailer in her
13  yard.  So I had them to put the trailer there.
14  They gave me a handicap trailer.  And I don't
15  know, the man's name was Harry, that's all I
16  know, and he came and gave me the key and I
17  went in the trailer.  And that's where I was
18  staying while they was fixing my house.
19      Q.  Let me step back.  When did you leave
20  Texas and come back to Louisiana?
21      A.  I don't remember exactly when.  That
22  was about in about the beginning of 2006, I
23  think it was.  I'm not sure, I don't know
24  exactly.
25      Q.  I'm going to show you a document
                                          Page 20
```

## Page 21

1  which we're going to mark as Exhibit No. 2
2  (tenders). This is a plaintiff fact sheet for
3  Earline M. Castanel. It's Bates stamped
4  PL_Castanel 02-000001 through 19. And this is
5  a fact sheet that was provided to the United
6  States by your counsel. And I believe that if
7  you turn to the last page of this document, do
8  you have that in front of you?
9       A. This page (indicating)?
10      Q. Yes. Is that your signature?
11      A. Yes.
12      Q. And it's dated November 18th, 2009?
13      A. Yes.
14      Q. Do you recall going over this
15  document on or about November 18th, 2009?
16      A. Yes.
17      Q. And did you check this document to
18  make sure that everything was true and
19  accurate?
20      A. Yes.
21      Q. And to the best of your knowledge,
22  everything recorded in this document, is it
23  truthful and correct?
24      A. Yes, as far as I know. Because I'm
25  the one that answered the questions.

## Page 22

1       Q. And the reason why I ask you this is
2  that if you turn to the ninth page of Exhibit
3  No. 2, which is also Bates stamped 09 at the
4  end, do you have that in front of you?
5       A. Yeah.
6       Q. And it shows is there questions at
7  the top, 5, 6 and 7 and 6 it says -- 5 it says,
8  was the temporary housing unit provided to you
9  by FEMA a travel trailer or a mobile home and
10 travel trailer is marked, did FEMA provide you
11 with a travel trailer?
12      A. It was just a trailer that sits on
13 blocks, that's all I know. It sit on blocks,
14 that's all I could tell you.
15      Q. And No. 6 it has move in date and it
16 has 2/2006 which, I think, means February 2006.
17 Is that your best recollection about when you
18 moved into the travel trailer?
19      A. It's about around that time, I guess.
20 Like I said, around the first part of 2006.
21      Q. Correct, and February is the early
22 part of 2006.
23      A. I guess so.
24      Q. Do you have any reason to believe
25 that this is incorrect or inaccurate?

## Page 23

1       A. Well, that's about right there.
2       Q. And then it says, the next question
3  there 7, move out date and it has 3/2007, which
4  would be March 2007. Is that the approximate
5  date you moved out of the trailer?
6       A. I can't say exactly because I don't
7  exactly remember. But I do know I moved out
8  around that time, but I don't know exactly.
9       Q. Understood. That was your best
10 estimate of when you moved out.
11      A. That's right.
12      Q. Now, between the time you evacuated
13 the city and came back to Louisiana and moved
14 into the trailer, were you in Texas the entire
15 time?
16      A. Yeah, I wasn't nowhere else. I ain't
17 had nowhere else to stay down here.
18      Q. I understand that. And that's all I
19 wanted to make sure. So between the first week
20 or the week before Katrina hit until you moved
21 into the trailer on or about February 2006, you
22 were in Texas.
23      A. Yes.
24      Q. When you came back to Louisiana in
25 February of 2006, what was the condition of

## Page 24

1  your house?
2       A. Everything was messed up, water,
3  toilet, I mean, everything, the walls was all
4  wet and they had water all on the floor where
5  it went down, but where it was settled at was
6  higher than I -- taller than me. You could see
7  all against the wall like where the mantlepiece
8  was, all that was messed, my furniture was all,
9  some parts was coming apart, mattresses was
10 soaked with water, I had lost all of my clothes
11 in the closet. It was just a mess.
12      Q. It was a disaster?
13      A. Yes.
14      Q. The house was not liveable, it wasn't
15 habitable.
16      A. No, you couldn't live in it. The
17 stove, all that was -- like the pots in the
18 cabinet where the dishes and pans and pots was,
19 you know, had water in it. Water was soaking
20 in the pots, I had to throw all that out.
21      Q. Was there mold and everything growing
22 in places?
23      A. Yes. It was a mess.
24      Q. Other than this trailer, was there
25 anywhere else you could have lived when you

**Page 29**

1    Q. Got it. Besides the table, does this
2  look similar to the interior of the unit that
3  you had, ma'am?
4    A. This part right here and this the
5  refrigerator, and that was the bathroom right
6  here, and way back up in here was the bedroom.
7    Q. Right. So does it look similar?
8    A. It looks similar right here. But I
9  know one thing, this thing here, this part here
10 where the air condition was, every time you
11 turned around I had to be calling them for
12 that, that thing wouldn't work and water would
13 be leaking down.
14   Q. Okay. And let me ask you about this,
15 this trailer, from the pictures that I've seen,
16 looks very clean. When you left the trailer,
17 did you clean it up before you left?
18   A. Yeah, I didn't leave no mess.
19   Q. No. I agree with you. I mean --
20   A. I swept it, you know.
21   Q. A lot of people didn't do that.
22   A. Well, I swept the trailer and put the
23 sheet on the bed and left it straight. I
24 didn't leave it in no mess.
25   Q. You left it the way they gave it to

**Page 30**

1  you.
2    A. Clean.
3    Q. Now, this trailer during the time
4  period it was provided to you, did FEMA ever
5  charge you any money for rent?
6    A. No.
7    Q. At any point, did the government also
8  provide a contractor who provided maintenance?
9    A. Well, when I call in, I know the man
10 came and fixed the air condition a couple of
11 times.
12   Q. Did they ever charge you for
13 repairing the air conditioner, doing any repair
14 work?
15   A. No.
16   Q. They never charged you for that?
17   A. No.
18   Q. And you understood that when you took
19 this trailer that it was a temporary shelter
20 until you got your home repaired?
21   A. Yes.
22   Q. And as soon as you had your home
23 repaired you moved out of your trailer and back
24 into your house.
25   A. Right.

**Page 31**

1    Q. And your house would be much more
2  comfortable rather than this small confined
3  space?
4    A. Yes.
5    Q. During the entire time you lived in
6  that trailer, was there any other housing
7  option you had available to you, apartment or
8  anything like that?
9    A. No.
10   Q. If you didn't have that trailer,
11 would you have been able to move back here in
12 New Orleans?
13   A. Could I --
14   Q. Without that trailer, could you have
15 come back to New Orleans?
16   A. Well, there was nowhere for me to
17 come unless I go find a little apartment or
18 something.
19   Q. Were there apartments available?
20   A. I don't know. I just went on and see
21 if I could get a trailer.
22   Q. Okay. Now, I want to go through this
23 fact sheet, which is Exhibit No. 2. Okay?
24 Your counsel will direct you to the third page
25 of that document, of Exhibit No. 2. Now, it

**Page 32**

1  indicates here that you had some problems,
2  symptoms or complaints when you were in the
3  trailer. Do you see that? There's a whole
4  bunch of -- on C3, there's a whole bunch of
5  boxes and many of them are checked such as
6  irritation to the eyes, irritation to nasal
7  membrane inside the nose, do you see those?
8    A. You're talking about down here?
9    Q. Yes. Do you see that?
10   A. Yeah.
11   Q. When you were in the trailer, did you
12 suffer irritation to your eyes?
13   A. Well, when I was in the trailer,
14 after I was in there for a while, not too long,
15 then I started having my nose stopped up. It
16 would get so stopped up like I had to go to the
17 door to see if I can catch some air, I couldn't
18 like hardly breathe.
19   Q. So you had breathing problems?
20   A. Yes. My sinus. When I get like that
21 I couldn't, I don't know, I keep going like
22 that (demonstrating), trying to catch my breath
23 because I couldn't breathe through my nose.
24   Q. And this happened soon after you
25 moved into the trailer?

**Page 33**

1  A. It was like five weeks or so after I
2  got in there, four or five weeks it started
3  getting like that.
4  Q. And when you went outside of the
5  trailer, did that relieve the symptoms?
6  A. Well, I would stand up by the door
7  until I keep doing that (demonstrating), and
8  then I would get some of that stuff, it's A-Y-R
9  I think it is, and spray in my nose to try to
10 open it up some. And when it opened up a
11 little bit, well, I'd go back in there.
12 Q. So you'd experience this symptom,
13 this difficulty breathing when you were inside
14 the trailer.
15 A. Yeah.
16 Q. And this started happening about five
17 weeks after you moved into the trailer?
18 A. Yeah.
19 Q. And to relieve those symptoms, you
20 would go outside the trailer.
21 A. Yes.
22 Q. And when you went outside the trailer
23 it would get better?
24 A. Not that much.
25 Q. A little bit?

**Page 34**

1  A. Not that much.
2  Q. Okay. Besides this problem with your
3  sinus and breathing problems, did you have any
4  other problems that you attributed to the
5  trailer?
6  A. No, I'd just feel bad sometimes, you
7  know, start feeling bad. I know it wasn't very
8  comfortable, that's for sure.
9  Q. Understood. And what I want to know
10 is, what specific type symptoms were present,
11 how you presented, what was the problem, was it
12 a stomachache, was it headache, was it just
13 general malaise?
14 A. I just would feel bad, I know that.
15 And I'd get that little funny feeling and I
16 would go lay down.
17 Q. Let me ask you, you're 79 years old;
18 is that right?
19 A. Yes.
20 Q. Was the illness that you were
21 experiencing when you were in the trailer
22 different than other illnesses that you were
23 suffering?
24 A. Before I didn't have all that problem
25 with that, you know, getting like -- sometimes

**Page 35**

1  I'd get like nauseated and I just thought it
2  was just one of them things.
3  Q. And that's what I'm trying to get at,
4  was this something different, something unique
5  that you thought was being caused by the
6  trailer?
7  A. I don't know what it was being caused
8  by, I just know I felt it.
9  Q. So let's go through the symptoms you
10 had, sinus problems, breathing problems; is
11 that right?
12 A. Yeah.
13 Q. And those started about five weeks
14 after you moved in?
15 A. Yes.
16 Q. You had some generally just not
17 feeling well.
18 A. Yes.
19 Q. Anything else?
20 A. That's about it I can think about
21 right now.
22 Q. Did you ever suffer any irritation or
23 itching of the skin?
24 A. Yeah. My arm. I have some marks
25 now, you see where it's like dry skin. And you

**Page 36**

1  can see the marks right here (indicating).
2  Q. Did that happen when you were in the
3  trailer?
4  A. When I was in the trailer that
5  happened, you know, I would be like dry, itchy.
6  Q. And when did that first present?
7  A. I don't know. I know it happened
8  while I was in there.
9  Q. Did it happen shortly after you were
10 in there, were you in there a couple of months,
11 how long before you started presenting with dry
12 itchy skin?
13 A. I'd say about three months or
14 something, something like that, I don't know.
15 I can't remember exactly.
16 Q. And I understand, just the best of
17 what your recollection is. Did you have any
18 irritation or swelling of your eyelids or your
19 lips?
20 A. It would get a little puffy, my eye.
21 Q. And that happened when you were in
22 the trailer?
23 A. Yes. And I don't know, I'd get like
24 a dry feeling, you know. Like I said, I would
25 get like a dry feeling. And then I would get

**Page 37**

1  like itchy. And then I'd look at my arm and it
2  would be kind of a little scaly. And when I'd
3  do like this, you know, dry. You could see all
4  the little spots where it was.
5      Q. And the irritation, swelling of your
6  eyelids or the puffiness that you just
7  described, how long were you in the trailer
8  before you presented with that?
9      A. I would say around the same time I
10 was getting my sinus trouble.
11     Q. So about five weeks?
12     A. About the same time around up in that
13 time.
14     Q. Is that about five weeks? And it's
15 not an exact science, just your best
16 recollection.
17     A. I'll say about five or six weeks,
18 something like that.
19     Q. And I'm sorry, because I have to --
20 we have to be clear on it, so is your best
21 estimate that you started suffering the
22 irritation or swelling of your eyelids --
23     A. Around the same time I started with
24 the sinus thing stopping up and that's when my
25 eyes started puffing and then I started feeling

**Page 38**

1  all this itchy stuff.
2      Q. Okay. And you indicated earlier that
3  your eyes or your sinus was about five weeks
4  after you moved in?
5      A. Yeah.
6      Q. So that would be about five weeks
7  after you started suffering the puffiness and
8  irritation of the eyelids?
9      A. Yeah. About five or six weeks,
10 something like that.
11     Q. Did you ever suffer any headaches
12 that you associated with the trailer?
13     A. Well, I'd get a little headache, my
14 head would hurt like right up in here
15 (indicating).
16     Q. Were those different from headaches
17 that you had prior to moving in the trailer?
18     A. I know they'd hurt me more than when
19 I would have a regular headache.
20     Q. And when did you start having those
21 headaches?
22     A. Around the same time. Everything
23 started around the same time, around 5, 6,
24 6 1/2 weeks, around that time.
25     Q. You also indicate that you suffered

**Page 39**

1  nausea, abdominal pain, diarrhea, did those
2  symptoms start occurring about five or six
3  weeks after you moved into the trailer?
4      A. It was about I would say three
5  months.
6      Q. About three months after you moved
7  in?
8      A. Yeah. That's when I started getting
9  all kind of problems.
10     Q. If we turn to the next page of
11 Exhibit No. 2, Ms. Castanel, there are some
12 other complaints here that are marked at the
13 top of that page. And you see it says
14 tightness of chest, throat irritation,
15 hoarseness, are those symptoms that you also
16 suffered within five or six weeks after you
17 moved into the trailer?
18     A. I wasn't looking at the time, I just
19 know I got them, you know, I had those problems
20 after, but I didn't know exactly what, if it
21 was like two weeks, three weeks, I didn't
22 notice all of that, I just know I had them.
23     Q. And I guess what I'm just trying to
24 do is put the best estimate date that you think
25 it was, was it one month, two months, three

**Page 40**

1  months, four months after moving in? I
2  understand it happened a while ago.
3      A. I don't know exactly when.
4      Q. And I understand that. What's your
5  best estimate of when you started suffering
6  tightness of the chest, throat irritation and
7  hoarseness?
8      A. It was I'd say around the fourth
9  month or something like that, third month,
10 fourth month.
11     Q. Three or four months?
12     A. Yeah.
13     Q. And you also checked that you had an
14 upper respiratory tract infection. Did you
15 have an upper respiratory tract infection that
16 you thought was caused by the trailer?
17     A. I don't know. I had a throat thing
18 and I went to my doctor and he gave me -- put
19 me in front of the heat lamp and looked at my
20 throat, put some medicine in my throat, he
21 packed my nose, he put me in front of the heat
22 lamp, he gave me a shot.
23     Q. So when you marked upper respiratory
24 tract infection, you were talking about that
25 treatment that the doctor provided?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                              Earline Castanel

```
 1        A. Yeah, up in my throat.
 2        Q. Now, did you have allergies before
 3   you moved into the trailer?
 4        A. Well, I ain't never had nothing like
 5   I had when I got in the trailer, you know, I
 6   mean, I get a little headache.
 7        Q. And I understand that. And the
 8   reason I ask you is because it says the
 9   worsening of allergies that you had previously.
10   Did you have allergies beforehand?
11        A. Before, I might have a little stopped
12   up nose, but nothing compared to after I got in
13   that trailer what I was having.
14        Q. Once you got in that trailer --
15        A. It was like everything got worse.
16        Q. And that started happening about five
17   or six weeks after you moved into the trailer?
18        A. Yes.
19        Q. And this is separate and apart from
20   that, were you ever treated or diagnosed with
21   allergies before you moved into the trailer?
22        A. I had a little, I guess a little
23   light sinus trouble but nothing like I had when
24   I got in there. After I was in there, that's
25   when I started really having it bad, I couldn't
                                          Page 41
```

```
 1   breathe.
 2        Q. When you moved into the trailer, was
 3   there any odor or anything like that? Was
 4   there any smell or anything that you noticed?
 5        A. I'm not gonna lie, I didn't really
 6   pay attention, you know. It had something
 7   going on in there to cause me to be having this
 8   but, I mean, you know, I never gave it a
 9   thought.
10        Q. And I understand that. And it's a
11   while ago, I understand that.
12        A. Yeah.
13        Q. The question is, did you notice any
14   odors or was there any special smell that was
15   different from things that you'd smelled
16   before?
17        A. I can't say.
18        Q. Let me approach it a different way.
19   If you burn something in your house most people
20   open up their windows; is that right, is that
21   reasonable?
22        A. Yeah.
23        Q. And you do that to get rid of that
24   burnt smell; right?
25        A. Yeah.
                                          Page 42
```

```
 1        Q. At any point when you were living in
 2   the trailer, was there any odor or anything in
 3   there that caused you to want to open up the
 4   windows, open up the doors --
 5        A. Well, I would open the window and I
 6   opened the door in there when it would get warm
 7   and then, you know, it would get -- I don't
 8   know, I just would open them up. I don't know.
 9        Q. Whenever it got warm inside, would
10   you generally open up the windows?
11        A. Well, when the air condition was
12   working, I wouldn't bother with opening it up.
13   But when the air condition started acting up,
14   sometimes it would be a couple of days before
15   they'd come and check it and I'd have to open
16   the windows too.
17        Q. Got you. Did you have a fan or
18   anything that you would use inside the trailer?
19        A. No.
20        Q. Did the trailer also have ceiling
21   vents that you could open up?
22        A. They only had that one little vent in
23   the center, it was an air conditioner.
24        Q. Okay.
25        A. That's all they had up in there.
                                          Page 43
```

```
 1        Q. Was there a ceiling vent in the
 2   bathroom that would open up?
 3        A. No. They ain't had no vent in the
 4   bathroom, only that one thing where they had
 5   that air conditioner.
 6        Q. The door that you had, was there a
 7   screen door so you could open the door and
 8   leave the door open?
 9        A. Yeah, they had a screen door. And
10   one time something got loose with that, I had
11   to call them up to come and fix that. I can't
12   tell you exactly what date it was or when it
13   was, you know, but I had to call them to come
14   and check that.
15        Q. Now, if we turn to the form, Exhibit
16   No. 2, page No. 4 if you go down to point No. 5
17   there, do you see that, it says: When do you
18   claim this injury or disease first occurred?
19   And it's written in there 3/2006 or what I
20   believe would be March 2006; is that correct?
21        A. I'd imagine.
22        Q. Is that when you first believe you
23   started experiencing problems in the trailer?
24        A. Around the third and fourth month,
25   something like up in there, that's when I
                                          Page 44
```

                                11 (Pages 41 to 44)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Earline Castanel

**Page 53**

BY MR. MILLER:
Q. When we broke, we were talking about discussions that you had with persons about the complaints or concerns that you experienced when you were in the trailer, and you told me that you talked to a Ms. Robert, to one of your daughters; is that right?
A. To tell them how I feel.
Q. And besides your daughter and Ms. Robert, anyone else who you talked to about the complaints or concerns that you experienced in the trailer?
A. No.
Q. Now, did you tell them that you thought that these things were happening to you after you moved into the trailer?
A. Yeah.
Q. And did you tell them that these were things that you didn't experience before moving into the trailer?
A. Yeah.
Q. What advice did they give you, if any?
A. They didn't really tell me, they just, you know, take your medicine whatever the

**Page 54**

doctor give you and that's what I did, you know.
Q. Anything else other than take your medicine?
A. That's all they said.
Q. I mean, I'm sitting here and I understand that you're complaining to your daughter and to your neighbor that in this trailer, you've moved in, you're having these sinus problems, you're having this itchy skin, you're having these problems that you didn't have before moving in the trailer and all they told you was to take your medicine?
A. Well, when I was feeling like that, like my daughter would be out of town, well, I just went to the doctor and I took the medicine. When she came in town, I told her I had the medicine and I told her what they told me and I took the medicine. And she would tell me: Well, Mama, all you can do is take your medicine. Nothing else she could tell me.
Q. Now, these are symptoms these problems that you're talking about, these were things that you weren't experiencing or presenting with before you moved in the

**Page 55**

trailer?
A. What do you mean?
Q. You didn't have these problems before the trailer?
A. Oh, no, I ain't had all this.
Q. And I just want to make sure it's clear, when you were in Texas, did you have these problems with your sinuses, did you have these problems with the itching, with this bad feeling?
A. No.
Q. Is that no?
A. No, I didn't have that in Texas.
Q. After you moved into the trailer within five or six weeks you started experiencing these problems.
A. Yes.
Q. And when you were talking to Ms. Robert and your daughter you told them that when you moved into the trailer that these things started happening.
A. It was, like I said, three or four weeks, five weeks like that I started feeling that.
Q. And did you tell your daughter and

**Page 56**

your neighbor --
A. Well, I didn't tell them just then.
Q. Did you tell them shortly after that?
A. Yeah, a while after.
Q. Besides Ms. Robert and your daughter, anyone else that you talked about regarding these complaints or concerns with the trailer?
A. I didn't know anyone around there.
Q. How did you learn about this lawsuit, that people were filing suit against the government, manufacturers, government contractors because of the formaldehyde in the trailers?
A. Well, I didn't know about it till I just -- I just hear people talking about it, then I said well, I'm going check it.
Q. Who did you hear talking about this?
A. I don't know those people, I just see them talking. And I'm not the type of person to ask questions.
Q. I'm sorry, what was that?
A. I say, I'm not the type that if I see somebody -- hear somebody talking to go ask them what you talking about and all that. I sit and listen.

14 (Pages 53 to 56)

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255   (504) 529-5255
New Orleans * Baton Rouge * Shreveport

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel) — Earline Castanel

**Page 65**

1  A. Yes.
2  Q. And is that also your handwriting?
3  A. Yes.
4  Q. And so is it fair to say that you
5  would have signed this document on or about
6  March 11th, 2006?
7  A. Yes.
8  Q. It has a name Edwin Ganier a little
9  bit below your name. Do you see that?
10 A. Uh-huh (affirmative response).
11 Q. Who is Mr. Ganier?
12 A. Just a friend of mine.
13 Q. And was the trailer that you occupied
14 installed on his property?
15 A. His mother's property.
16 Q. And what was the address where your
17 trailer was installed?
18 A. It's 2261 but that was a lot, so I
19 don't know if it go with the address or the
20 house.
21 Q. What was the address that you thought
22 that the trailer was installed on?
23 A. 2250 something, I don't know.
24 Q. If you look on this document there at
25 the top of the page there, it says location,

**Page 66**

1  very top it says location 22 --
2  A. 2261.
3  Q. Right. And what was the street?
4  A. Urquhart.
5  Q. How do you spell that?
6  A. I don't know how you spell that.
7  It's all screwed up here. I didn't write that,
8  that's not my handwriting.
9  Q. Is it U-R-Q-U-H-A-R-T?
10 A. Yeah, Urquhart.
11 Q. Urquhart Street?
12 A. It's right there on this page here,
13 it's printed.
14 Q. And you're talking about the third
15 page of Exhibit No. 6 which is Bates stamped
16 FEMA 159-000011; is that correct? At the
17 bottom of the page, I'm referring to that.
18 MS. GILBREATH:
19     For the record, I think she was
20 actually referring to the second page.
21 MR. MILLER:
22     Okay, that's fine.
23 THE WITNESS:
24     I was telling him about the name of
25 the street.

**Page 67**

1  MS. GILBREATH:
2      Right. On the second page of the
3  document.
4  THE WITNESS:
5      Yeah, it's written right here.
6  BY MR. MILLER:
7  Q. So the address where the trailer was
8  installed was 2261 Urquhart, and it's spelled
9  U-R-Q-U-H-A-R-T; is that right?
10 A. Right.
11 Q. And the trailer was on that location
12 the entire time you occupied it.
13 A. Right.
14 Q. And the land that the trailer was on
15 was owned by Mr. Ganier or his family?
16 A. I know his mother. I don't know who
17 it's owned by.
18 Q. Okay. But he's the one who gave you
19 permission to put the trailer there.
20 A. The mother.
21 Q. His mother gave you permission.
22 A. Yeah.
23 Q. Now, this document is signed March
24 11th, 2006. You indicated on your fact sheet,
25 Exhibit No. 2, that your best estimate of the

**Page 68**

1  date that you moved in was February 2006 that
2  you moved into the trailer. Do you think that
3  it may, in fact, be the date you moved into the
4  trailer may have been March 11th, 2006, when
5  you signed this agreement?
6  A. I don't know if it was March 6th or
7  March the 11th.
8  Q. And that's what I'm getting to. When
9  you moved into the trailer, did you have to
10 sign some papers?
11 A. I think, but I don't know if it was
12 before I went in the trailer or after. I can't
13 remember.
14 Q. Okay.
15 A. All I remember is --
16 Q. What do you remember?
17 A. That Mr. Harry, the one that gave me
18 the key, that's all I remember. And I don't
19 know what day that was.
20 Q. So your best recollection as you sit
21 here stays the same, you moved in, best
22 estimate was February of 2006?
23 A. Yeah.
24 Q. Just to make it very clear, within
25 five to six weeks of moving in you started

17 (Pages 65 to 68)

**Page 69**

1  suffering these symptoms, sinus problems,
2  itching, dry itching skin, generally not
3  feeling good; is that right?
4     A. Yes.
5     Q. Prior to moving into the trailer you
6  weren't experiencing those symptoms or those
7  problems?
8     A. No.
9     Q. You didn't have those problems
10 before?
11    A. No. I had a -- I used to have my
12 nose stop up a little bit but nothing like I
13 had it in there.
14    Q. It was different and it was much
15 worse.
16    A. Yes, it was much worse.
17    Q. It was different than what you'd
18 experienced before and it was worse than you
19 experienced before?
20    A. Yes.
21    Q. And that happened within five or six
22 weeks of moving in the trailer.
23    A. Yes.
24    Q. And you had discussions with your
25 neighbor and your daughter about these

**Page 70**

1  problems?
2     A. Yes.
3     Q. And I think you also indicated that
4  you mentioned it to your doctor; is that right?
5     A. Yes.
6     Q. And did these problems go away after
7  you moved back into your house?
8     A. I might have a -- well, I'll say yes,
9  because I don't have that anymore.
10    Q. So these were problems that you had
11 because you attributed because of the trailer?
12    A. Yeah.
13    Q. And at no time did you complain to
14 FEMA or the maintenance contractor about these
15 problems?
16    A. No. I mean, when the guy came and
17 fixed that I told him I wasn't feeling good,
18 but I don't know who he was or nothing. You
19 know, when they come in and say, good evening,
20 how you doing, I'd just say, well, I'm not
21 doing too well, that's all.
22    Q. But you never called up FEMA and said
23 hey, I need for you to replace this trailer or
24 put me someplace else?
25    A. No.

**Page 71**

1     Q. And the complaints that you called up
2  about were the air conditioning several times,
3  the screen door that needed to be repaired, and
4  some wire thing that was running around that
5  had to be repaired; and in each of those
6  occasions within 2, 3, 4, 5, 6 or 7 days
7  someone came out and fixed it; is that correct?
8     A. Yeah.
9     Q. And when you were in this trailer, if
10 the air conditioning wasn't working and it was
11 warm you would open the windows.
12    A. Yeah.
13    Q. And if it was warm out and the air
14 conditioner was working you'd run the air
15 conditioning?
16    A. Yes.
17    Q. And during the time in there, as you
18 sit here today, you don't recall any strange
19 odors or anything like that?
20    A. No. Just when I'd -- like I say,
21 when I took my clothes out that's what -- I
22 smelled my clothes, they had a funny odor,
23 that's all I know.
24    Q. Those were just from the clothes that
25 were in the closet; right?

**Page 72**

1     A. That were in the closet.
2     Q. Okay. When you were in the trailer
3  yourself, you don't recall any strange odors or
4  any bad odors or anything like that?
5     A. I don't know. I can't say right now.
6     Q. You don't recall one way or the
7  other?
8     A. No.
9     Q. And so as we sit here today, you
10 don't remember whether or not there was any bad
11 odor in the unit?
12    A. No.
13    Q. Any odor that would be a chemical
14 type smell?
15    A. I don't know.
16    Q. Did you ever, when you were in the
17 trailer, have an odor that you thought smelled
18 like chemicals or a bad chemical type smell?
19    A. Well, like a car pass or something
20 I'd say -- you know, sometime and they -- I
21 don't know what you would call it, a muffler or
22 whatever, well, once in a while I smell that
23 and I don't know if it was coming from a car or
24 not, I can't say. Because I'd have the door
25 open and the screen closed, you know, when it's

18 (Pages 69 to 72)

## Page 109

1  remember all that.
2  BY MS. WHITFIELD:
3      Q. I know it's been a long time. But
4  these are your initials on this document;
5  right?
6      A. Yeah, that's my initials. But I
7  don't remember.
8      Q. And this is, for the record, it's a
9  document called Trailer Lease Check-in List and
10 in each one of these 17 items you have initials
11 at each number; is that correct, that's your
12 handwriting?
13     A. That's my handwriting.
14     Q. Okay. You don't recall anybody
15 walking you through your trailer at any time?
16     A. No, I don't.
17     Q. Like just for example the very first
18 item says "Walk through entire trailer room to
19 room, show where closets are, where to pull
20 blinds, light switches, let them look at
21 whatever they want to check out in each room."
22     A. I don't remember that. I just know
23 when he gave me that key I went in there and I
24 looked around. Now this, I don't remember.
25     Q. Okay. But it is your initials?

## Page 110

1      A. It is my initials, but I don't
2  remember.
3      Q. Okay. I'm going to hand you one more
4  document, this is the last one, and ask you if
5  you've ever seen this one before, please
6  (tenders).
7      MS. WHITFIELD:
8          And I'll mark that as Exhibit 9.
9      THE WITNESS:
10         That's my handwriting here.
11 BY MS. WHITFIELD:
12     Q. I'm sorry, I didn't hear you.
13     A. That's my handwriting. But like I
14 said, I don't remember.
15     Q. Okay. This is your handwriting on
16 this document, that's your signature that's
17 dated March 11th, '06, that at the top of the
18 page it talks about running an advisory notice
19 regarding propane use and then under that it
20 says for maintenance please call FEMA at and it
21 gives the telephone number?
22     A. I don't remember any of that.
23     Q. I hear you.
24     A. I don't remember.
25     Q. I don't understand. I really just

## Page 111

1  wanted to make sure that that was your
2  signature.
3      A. Yeah, but that's my signature.
4      Q. And you don't remember ever signing
5  these documents at any time?
6      A. No. I don't remember.
7      Q. Okay.
8      MS. WHITFIELD:
9          I believe that's all the questions I
10 have. Thank you very much.
11     THE WITNESS:
12         All right. I did the best I could.
13 RE-EXAMINATION BY MR. MILLER:
14     Q. Ms. Castanel, I just have a couple of
15 follow-ups. And it really goes to a question
16 that was asked to you by Ms. Whitfield and it
17 said that what you recalled Harry telling you
18 when he gave you the keys was he said to enjoy
19 your travel trailer.
20     A. No. Enjoy my trailer.
21     Q. Enjoy your trailer.
22     A. Yeah.
23     Q. Did you enjoy your trailer?
24     A. It was all right. But I was sick and
25 I know that. After I was in there a while it

## Page 112

1  wasn't like I thought it would have been.
2      Q. And after you were in there a while
3  you thought that the trailer was making you
4  sick?
5      A. There was nothing else I see could be
6  making me sick, there was nothing else. Like I
7  said, I don't drink, I don't smoke, and I don't
8  run the streets, so I don't see nothing else
9  could make me sick.
10     Q. And you got sick within four or five
11 or six weeks of moving in that trailer.
12     A. Yeah. Because I started feeling bad,
13 you know, so that's it.
14     Q. Now, in all of these documents that
15 Ms. Whitfield has showed you which are marked
16 Exhibit 7, 8 and 9, that's your signatures on
17 those documents.
18     A. That's my signatures.
19     Q. Although you don't remember them now,
20 you wouldn't have signed those documents at the
21 time without having gone through them, would
22 you?
23     A. I had to meet the people who gave me
24 the paper to sign.
25     Q. Okay. And you would have read the

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel) — Earline Castanel

REPORTER'S PAGE

I, PAMELA C. BLACK, Registered Professional Reporter, Certified Court Reporter, in and for the State of Louisiana, the officer before whom this sworn testimony was taken, do hereby state:

That due to the spontaneous discourse of this proceeding, where necessary, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(assumed spelling)."

PAMELA C. BLACK, CCR, RPR

Page 117

CERTIFICATE

I, PAMELA C. BLACK, Registered Professional Reporter, Certified Court Reporter, in and for the State of Louisiana, do hereby certify that the foregoing 114 pages of proceedings were reported by me in shorthand and transcribed under my personal direction and supervision and are a true and correct transcript to the best of my ability and understanding.

I further certify that I am not of counsel or related to any person participating in this cause; and I am in no way interested in the outcome of this event.

PAMELA C. BLACK, CCR, RPR
STATE OF LOUISIANA, CCR 93044
NCRA, RPR 043414
EXPIRATION DATE: 12/31/2009

Page 118

30 (Pages 117 to 118)