```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3   ****************************************************************

4   IN RE:  FEMA TRAILER
    FORMALDEHYDE PRODUCTS
5   LIABILITY LITIGATION

6                             DOCKET MDL NO. 1873 "N"
                              NEW ORLEANS, LOUISIANA
7                             TUESDAY, SEPTEMBER 15, 2009, 8:30 A.M.

8   THIS DOCUMENT IS RELATED TO

9   CHARLIE AGE, ET AL V
    GULF STREAM COACH, INC.,
10  ET AL, DOCKET NO. 09-2892;
    ALANA ALEXANDER,
11  INDIVIDUALLY AND ON BEHALF
    OF CHRISTOPHER COOPER
12
    ****************************************************************
13
                             DAY 2
14                       MORNING SESSION
                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15         HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                   UNITED STATES DISTRICT JUDGE
16

17  APPEARANCES:

18

    FOR THE PLAINTIFFS:
19
                         GAINSBURGH BENJAMIN DAVID MEUNIER AND
20                       WARSHAUER
                         BY:  GERALD E. MEUNIER, ESQUIRE
21                       2800 ENERGY CENTRE
                         1100 POYDRAS STREET, SUITE 2800
22                       NEW ORLEANS LA  70163

23
                         THE BUZBEE LAW FIRM
24                       BY:  ANTHONY G. BUZBEE, ESQUIRE
                         600 TRAVIS, SUITE 7300
25                       HOUSTON TX  77002
```

```
 1  APPEARANCES CONTINUED:

 2
                            WATTS GUERRA CRAFT
 3                          BY:  MIKAL C. WATTS, ESQUIRE
                            FOUR DOMINION DRIVE
 4                          BUILDING THREE, SUITE 100
                            SAN ANTONIO TX 78257
 5

 6                          HILLIARD MUNOZ GUERRA
                            BY:  ROBERT C. HILLIARD, ESQUIRE
 7                          719 S. SHORELINE BOULEVARD #500
                            CORPUS CHRISTI TX 78401
 8

 9                          CHRIS PINEDO
                            ATTORNEY AT LAW
10                          802 N. CARANCAHUA, SUITE 2250
                            CORPUS CHRISTI TX  78470
11

12  FOR GULF STREAM COACH, INC.:

13                          DUPLASS ZWAIN BOURGEOIS MORTON
                            PFISTER & WEINSTOCK
14                          BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                 JOSEPH G. GLASS, ESQUIRE
15                          THREE LAKEWAY CENTER
                            3838 N. CAUSEWAY BOULEVARD
16                          SUITE 2900
                            METAIRIE LA  70002
17

18                          SCANDURRO & LAYRISSON
                            BY:  TIMOTHY D. SCANDURRO, ESQUIRE
19                          607 ST. CHARLES AVENUE
                            NEW ORLEANS LA  70130
20

21
    FOR FLUOR ENTERPRISES, INC.:
22
                            MIDDLEBERG RIDDLE & GIANNA
23                          BY:  CHARLES R. PENOT, JR., ESQUIRE
                                 RICHARD A. SHERBURNE, ESQUIRE
24                               SONIA MALLETT, ESQUIRE
                            717 N. HARDWOOD
25                          DALLAS TX  75201
```

```
1   OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RMR, CRR
                                  500 POYDRAS STREET, ROOM B406
2                                 NEW ORLEANS LA  70130
                                  (504) 589-7779
3
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
4   PRODUCED BY COMPUTER.
```

                                   **I N D E X**

EXAMINATIONS                                               PAGE

VIDEOTAPED DEPOSITION OF **DR. DEROSA**....................  13

**DONN FREIBERGER**.......................................  35

DIRECT EXAMINATION BY MR. WATTS.........................  35

CROSS-EXAMINATION BY MR. WEINSTOCK......................  43

REDIRECT EXAMINATION BY MR. WATTS......................  46

**PATRICIA WILLIAMS**.....................................  50

DIRECT EXAMINATION BY MR. MEUNIER......................  51

CROSS-EXAMINATION BY MR. WEINSTOCK......................  70

REDIRECT EXAMINATION BY MR. MEUNIER....................  91

**KAREN FREIBERGER**......................................  97

DIRECT EXAMINATION BY MR. WATTS.........................  97

CROSS-EXAMINATION BY MR. WEINSTOCK......................  99

VIDEOTAPED DEPOSITION OF **JIM SHEA**..................... 111

1                    P-R-O-C-E-E-D-I-N-G-S

2                        MORNING SESSION

3           TUESDAY, SEPTEMBER 15, 2009, 8:30 A.M.

4                    (COURT CALLED TO ORDER)

5

6

7           THE DEPUTY CLERK:  ALL RISE.

8           THE COURT:  COUNSEL, COULD I ASK YOU ALL TO APPROACH AT

9   THIS TIME.

10          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE

11  WAS A CONFERENCE HELD AT THE BENCH.)

12          THE COURT:  LET ME GIVE YOU THE UPDATE AND CONCLUSION OF

13  THIS SAGA.  AND I'M GOING TO RECOUNT THIS IN DETAIL WITH

14  PAM RADOSTA, WHO IS MY COURTROOM DEPUTY PRESENT, AND

15  MARIANNE JUDICE, WHO IS THE JURY ADMINISTRATOR IN THIS MATTER.

16  MARIANNE, COULD YOU COME UP HERE AND JUST KIND OF LISTEN IN HERE?

17          AND THE REASON I'M ASKING THEM TO --

18  MARIANNE JUDICE IS THE JURY ADMINISTRATOR IN THE EASTERN

19  DISTRICT.  THE REASON I'M ASKING THEM TO LISTEN IN TO WHAT I AM

20  GOING TO SAY IS BECAUSE I WOULD LIKE THEM TO CORRECT ANY

21  INACCURACY -- PLEASE BE QUIET.  THANK YOU -- ANY INACCURACY THAT

22  I MAY STATE WITH REGARD TO ANY COMMUNICATION TO MS. MORRIS, AND

23  I'M GOING TO TRY TO GO BACK TO THE BEGINNING.  IF I'VE LEFT

24  ANYTHING OUT, IT'S NOT INTENTIONAL.  PLEASE ADD TO WHATEVER I'M

25  GOING TO SAY HERE, COUNSEL.

1        YESTERDAY, DURING THE JURY SELECTION PROCESS, JUROR

2    NUMBER 9 WAS A YOUNG LADY BY THE LAST NAME OF MORRIS.

3    RACHEL MORRIS IS HER NAME.  SHE WAS THE SUBJECT OF THE DEFENSE'S

4    FIFTH PEREMPTORY CHALLENGE.  BASED UPON THE *BATSON* CHALLENGE THAT

5    WAS MADE AT THE CONCLUSION OF THE SELECTION PROCESS, THE

6    DEFENDANTS OFFERED TO WITHDRAW THEIR CHALLENGE TO THAT PARTICULAR

7    JUROR AND USE IT ON SOMEONE ELSE, AND WITHOUT GETTING INTO THE

8    *BATSON* ISSUE WHICH I COVERED YESTERDAY IN DETAIL, THE RESULT OF

9    THAT WAS THAT RACHEL MORRIS WOUND UP BEING ON THIS JURY, AND THE

10   IMPORTANCE OF THAT WAS THAT SHE WAS ONE OF TWO AFRICAN-AMERICAN

11   JURORS THAT WERE IMPANELED ON THE JURY AS A RESULT OF THE *BATSON*

12   CHALLENGE; THUS, OUT OF A NINE-MEMBER JURY, THERE WERE TWO

13   AFRICAN-AMERICAN JURORS, MS. MORRIS AND MR. BACCHUS.

14        I WAS ADVISED YESTERDAY AFTERNOON THAT MS. MORRIS

15   HAD TRANSPORTATION PROBLEMS AND COULD NOT COME TO COURT EVERY

16   DAY.  I MET WITH HER DURING THE AFTERNOON BREAK.  I STRESSED TO

17   HER THE IMPORTANCE OF BEING ON THE JURY.  I STRONGLY ENCOURAGED

18   HER TO ATTEND COURT.

19        I EXPLORED WITH HER WHATEVER OPTIONS SHE MIGHT HAVE

20   WITH REGARD TO TRANSPORTATION, INCLUDING HER FRIEND WHO DROPPED

21   HER OFF YESTERDAY AND, I ASSUME, PICKED HER UP.  I THINK SHE TOLD

22   ME HER FRIEND WAS PICKING HER UP YESTERDAY AFTERNOON, BUT SHE

23   ADVISED ME THAT SHE DOES NOT HAVE TRANSPORTATION.  SHE'S 21 YEARS

24   OLD.  I ASKED HER IF SHE COULD BORROW A CAR OR GET A RIDE WITH A

25   RELATIVE OR A FRIEND.  SHE TOLD ME SHE WOULD -- SHE DIDN'T TELL

1   ME SHE WOULD LOOK INTO IT.  I ENCOURAGED HER TO LOOK INTO IT.

2   SHE SEEMED RATHER INSISTENT THAT SHE COULD NOT BE HERE TODAY.

3              I TOLD HER THAT THE ATTORNEYS HAD WORKED VERY HARD

4   TO PRESENT THE CASE AND WERE PREPARED TO PRESENT THE CASE AND

5   THAT SHE WAS AN IMPORTANT JUROR, AS WERE THE OTHER EIGHT JURORS,

6   AND THAT IT WAS CRITICAL THAT SHE COME TO COURT.  I GAVE HER THE

7   COURT'S PHONE NUMBERS, THE VARIOUS PHONE NUMBERS THAT WE HAVE

8   HERE SO THAT SHE COULD NOTIFY US OF ANY PROBLEM WITH REGARD TO

9   TRANSPORTATION AND I, AGAIN, STRONGLY ENCOURAGED HER TO ATTEND.

10             IN THAT CONVERSATION, I ALSO TOLD HER, I REMINDED

11  HER THAT DURING THE QUESTIONING PROCESS, I ASKED THE ENTIRE JURY

12  POOL WHETHER THEY HAD ANY PROBLEMS AT ALL SERVING ON THIS JURY.

13  I ASKED IT TWO OR THREE DIFFERENT WAYS WITH REGARD TO BEING HERE

14  EVERY DAY, AND THEN I ASKED TWO QUESTIONS AT THE END OF THE

15  SELECTION PROCESS.  THOSE ARE ON THE TRANSCRIPT, THAT ASKED IF A

16  JUROR HAD ANYTHING ELSE ON HIS OR HER MIND THAT WOULD IMPACT

17  THEIR ABILITY TO SERVE ON THIS JURY.  AT NO TIME DID MS. MORRIS

18  INDICATE THAT SHE WAS UNABLE TO ATTEND JURY SERVICE OR THAT IT

19  WOULD BE A PROBLEM.  AND WHEN I ASKED HER ABOUT THAT IN THE

20  AFTERNOON MEETING, SHE TOLD ME SHE DIDN'T HEAR ME.

21             AFTER THE TRIAL YESTERDAY, I VISITED WITH ALL

22  COUNSEL IN CHAMBERS AND ADVISED HER OF THAT CONVERSATION.  ALL

23  COUNSEL GRACIOUSLY AGREED TO CONTRIBUTE IN EQUAL PORTIONS AND ALL

24  COUNSEL, INCLUDING GULF STREAM AND FLUOR, AGREED TO SPLIT THE

25  COST OF HER TRANSPORTATION FOR A CAB OR OTHER PRIVATE

1  TRANSPORTATION SUCH THAT SHE COULD BE BROUGHT TO COURT IN THE

2  MORNING AND BROUGHT HOME IN THE EVENING.

3         THE OTHER OPTION THAT WE EXPLORED AND MS. JUDICE

4  BROUGHT TO MY ATTENTION YESTERDAY AFTERNOON WAS THAT THE

5  GOVERNMENT MIGHT BE WILLING TO PAY -- THERE IS A PROCEDURE THAT

6  WE COULD EMPLOY TO PAY TO HOUSE HER IN A HOTEL FOR THE PENDENCY

7  OF THE TRIAL.  MY PROBLEM WITH THAT AND THE REASON THE COURT IS

8  UNWILLING TO DO THAT IS BECAUSE WE HAVE TWO OTHER JURORS THAT ARE

9  COMING FROM THE THIBODAUX AREA, ALMOST TWICE AS FAR AWAY AS

10 MS. MORRIS, AND ANOTHER COUPLE OF JURORS THAT ARE COMING FROM

11 DISTANCES THAT ARE SIMILAR TO THAT WHICH MS. MORRIS WAS EXPECTED

12 TO TRAVEL.

13        TO OFFER THAT TO MS. MORRIS AND NOT THE OTHERS I

14 THINK IS AN INJUSTICE TO THEM, AND THE COURT IS NOT WILLING TO

15 MAKE THAT OFFER UNLESS SHE WERE THE ONLY ONE THAT WAS COMING FROM

16 A DISTANCE, AND EVEN THEN, A GREATER DISTANCE THAN SOME 35 MILES.

17 SHE'S FROM GARYVILLE, WHICH IS ABOUT 35 MILES FROM COURT.

18        SO THE COURT WAS UNWILLING TO GO TO THAT LENGTH;

19 HOWEVER, AFTER COURT CONCLUDED AND I REVIEWED THE SITUATION WITH

20 COUNSEL AND THE OFFER WAS MADE TO CONTRIBUTE TO PRIVATE

21 TRANSPORTATION OR A CAB, MS. JUDICE WAS ABLE TO FIND MS. MORRIS

22 OUTSIDE OF THE BUILDING BEFORE SHE LEFT, BEFORE HER RIDE CAME TO

23 PICK HER UP, AND MS. JUDICE ADVISED HER THAT THAT AVENUE OF

24 TRANSPORTATION WAS AVAILABLE.

25        ALSO RAM RADOSTA, MY COURTROOM DEPUTY, CALLED

1  MS. MORRIS -- WAS IT PAM OR MARIANNE?

2          JURY ADMINISTRATOR:  I CALLED HER LATER THAT NIGHT.

3  LATER.

4          THE COURT:  MS. JUDICE CALLED MS. MORRIS AGAIN AFTER

5  TALKING WITH HER PRIOR TO HER DEPARTURE FROM HERE AND ADVISED HER

6  OF THE ABILITY FOR US TO PROVIDE TRANSPORTATION.

7          JURY ADMINISTRATOR:  PARDON ME.  ACTUALLY, I SPOKE TO

8  HER MOTHER AND EXPLAINED THE CIRCUMSTANCES TO HER MOTHER AND HER

9  MOTHER SEEMED TO BE AGREEABLE TO THAT, THAT SHE WOULD HELP HER

10  TRY TO FIND A WAY TO GET HERE TODAY, BECAUSE I KNEW SHE WOULDN'T

11  HAVE THE MONEY TO PAY FOR A CAB ON THE WAY HERE TODAY OR TO HAVE

12  HER SISTER BRING HER HERE TODAY.

13          THE COURT:  AND TO BE ACCURATE, THE OFFER WAS THAT IF

14  SHE COULD GET DOWN HERE TODAY, THAT WE WOULD COMMENCE THE

15  TRANSPORTATION STARTING TODAY FOR HER TO GET HOME TODAY AND THEN

16  BACK TO AND FROM COURT EVERY DAY THEREAFTER DURING THE PENDENCY

17  OF THE TRIAL.

18          MR. WEINSTOCK:  IF I CAN ADD, JUDGE, I THINK YOU

19  INQUIRED IF THERE WAS A CAB COMPANY IN HER HOMETOWN AND THERE WAS

20  NOT.

21          THE COURT:  I WAS ADVISED THAT MS. JUDICE HAD INQUIRED

22  ABOUT A CAB COMPANY AND WAS ADVISED THAT THERE WAS NO CAB COMPANY

23  BASED IN GARYVILLE, WHICH MEANS WE WOULD HAVE TO FIND A CAB FROM

24  SOMEWHERE ELSE TO GO TO GARYVILLE TO PICK HER UP OR HIRE PRIVATE

25  TRANSPORTATION.

1    THIS MORNING, MS. MORRIS CALLED AND SPOKE WITH

2   PAM RADOSTA, MY COURTROOM DEPUTY, AND ADVISED HER THAT SHE COULD

3   NOT FIND TRANSPORTATION TO GET TO COURT AND THAT HER MOTHER DID

4   NOT WANT HER, DID NOT TRUST HER RIDING IN A TAXI CAB.

5    WITH THAT, WE WERE ADVISED THAT SHE WOULD NOT BE

6   HERE TODAY.  SO IT'S VERY UNFORTUNATE THAT AFTER ALL OF THE JURY

7   SELECTION PROCESS AND ALL OF THE *BATSON* DISCUSSION WE HAD

8   YESTERDAY, WE ARE NOW GOING TO LOSE A JUROR WHO WAS ON THIS JURY

9   TO ADDRESS THE *BATSON* ISSUE.

10    I THINK THE COURT HAS GONE ABOVE AND BEYOND WHAT

11   IT'S REQUIRED TO DO TO ENSURE JUROR COMPLIANCE WITH THEIR

12   ATTENDANCE.  THE ONLY OTHER OPTION IS TO HAVE THE MARSHALS GO GET

13   HER AND BRING HER HERE.  I FRANKLY AM VERY, VERY RELUCTANT AND I

14   WOULD ADVISE ALL COUNSEL AGAINST THAT TYPE OF COMPULSION TO GET A

15   JUROR TO SIT IN THE JURY BOX DURING THE TRIAL WHEN IT'S PRETTY

16   CLEAR TO ME THAT, A, SHE DOES NOT WANT TO SERVE ON THE JURY; B,

17   SHE WAS NOT PAYING ATTENTION YESTERDAY DURING THE JURY SELECTION

18   PROCESS; AND C, SHE HAS MADE IT VERY CLEAR THAT SHE DOES NOT WANT

19   TO BE HERE TODAY; AND D, THE OTHER CONCERN OF THE COURT IS THAT

20   WE ARE SO STRAPPED FOR MARSHAL SERVICES RIGHT NOW THAT AS OF LAST

21   WEEK, THE JUDGES IN THE EASTERN DISTRICT CHANGED THE DAYS OF

22   THEIR CRIMINAL DOCKETS IN ORDER TO HAVE SUFFICIENT MARSHALS ON

23   DUTY TO HANDLE THE CRIMINAL DOCKETS.

24    SO HAVING A MARSHAL PICK HER UP AND BRING HER HOME

25   EVERY DAY IS FRANKLY NOT FEASIBLE WITH REGARD TO THE OPERATION OF

1   THE EASTERN DISTRICT.

2            FIRST OF ALL, LET ME ASK MS. RADOSTA OR MS. JUDICE,

3   IS THERE ANYTHING I'M LEAVING OUT OR ANYTHING I'VE SAID THAT'S

4   INACCURATE?

5        THE DEPUTY CLERK:  SHE LEFT A MESSAGE ON MY MACHINE THIS

6   MORNING, I DIDN'T TALK TO HER PERSONALLY.  IT WAS ON MY

7   VOICEMAIL.

8        THE COURT:  DID I ACCURATELY CHARACTERIZE THE MESSAGE?

9        THE DEPUTY CLERK:  CORRECT.

10       JURY ADMINISTRATOR:  YES, SIR.

11       THE COURT:  ANY COUNSEL WANT TO COMMENT?

12       MR. WATTS:  JUDGE, MIKAL WATTS FOR THE PLAINTIFFS.

13            FIRST, THE PLAINTIFFS WOULD STATE THAT WE AGREE

14  WITH YOUR RECITATION OF THE DETAILS WITH RESPECT TO WHAT HAPPENED

15  YESTERDAY AFTERNOON.  I SAW YOU OUT THERE WITH THE JUROR TALKING.

16  AND WE --

17       THE COURT:  FOR THE RECORD, MR. WATTS IS REFERRING TO

18  MS. JUDICE.  HE SAW MS. JUDICE TALKING TO THE JUROR.

19       MR. WATTS:  YES, OUTSIDE THE COURT.  SO WE AGREE WITH

20  EVERYTHING THAT WAS SAID WITH RESPECT TO EVERYTHING THAT HAPPENED

21  YESTERDAY AFTERNOON AND LAST NIGHT.

22            THAT BEING SAID, THE PLAINTIFFS HEREBY OBJECT TO

23  PROCEEDING FORWARD AT THIS TIME FOR THE REASON THAT THE VENIRE

24  PANEL HAD FIVE AFRICAN-AMERICANS THAT WERE STRICKEN BY THE

25  DEFENDANTS.  WE ASK THAT ALL FIVE BE REINSTATED UNDER *BATSON*.

1   THE COURT MADE CERTAIN RULINGS.  WE DON'T BELIEVE THAT THE

2   COURT'S RULING APPROPRIATELY REMEDIED THE SITUATION, AND NOW WE

3   HAVE THE SECONDARY SITUATION THAT ONE PART OF THE REMEDY IS GONE.

4           WE RESPECTFULLY REQUEST A COUPLE OF HOURS OF RECESS

5   SO THAT THE COURT MARSHALS CAN GO GET ONE OF THE TWO

6   AFRICAN-AMERICAN JURORS LEFT ON THIS JURY IN LIGHT OF THE

7   DEFENDANTS' STRIKES THAT WE THINK VIOLATE *BATSON* AND *MILLER-EL V.*

8   *DRETKE*.

9       MR. WEINSTOCK:  THIS IS MR. WEINSTOCK.  WITHOUT

10  REOPENING THE *BATSON* ISSUE, I THINK MR. WATTS IS INCORRECT IN

11  THAT THE FIFTH JUROR WAS NOT STRUCK BECAUSE BEFORE THE JURY WAS

12  IMPANELED WE WITHDREW OUR STRIKE AND CHOSE TO USE IT ON A

13  NONAFRICAN-AMERICAN.

14          AND AS FAR AS MS. MORRIS GOES, WE AGREED TO SPLIT

15  THE COST OF TRANSPORTATION HERE; AND FURTHER, IF THEY COULD -- I

16  MEAN, WE AGREED IF THEY COULD FIND A CAB TO PICK HER UP TODAY, WE

17  WOULD AGREE TO PAY THAT AS WELL.  SO WE HAVE DONE WHAT WE COULD

18  TO MAKE SURE THIS JURY WAS FAIR AND BALANCED.

19      THE COURT:  I THINK THAT'S CORRECT.  I THINK THE

20  CHALLENGE TO HER WAS VOLUNTARILY WITHDRAWN BY GULF STREAM.  SO

21  INSOFAR AS THIS PARTICULAR JURY IS CONCERNED, GULF STREAM AND

22  FLUOR, THE DEFENDANTS, WHO EXERCISED D-5, WHICH IS THE FIFTH AND

23  LAST PEREMPTORY THE DEFENDANTS HAD, THAT WAS WITHDRAWN BEFORE THE

24  COURT EVEN COMMENTED ON THE MOTION THAT HAD BEEN MADE.

25          IS EVERYBODY READY TO PROCEED TODAY?

1           MR. WATTS:  YOUR HONOR, IS MY OBJECTION OVERRULED?

2           THE COURT:  OBJECTION OVERRULED FOR THE REASONS STATED.

3           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

4    CONFERENCE CONCLUDED.)

5           THE COURT SECURITY OFFICER:  ALL RISE.

6           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

7    PANEL ENTERS THE COURTROOM.)

8           THE COURT:  YOU MAY BE SEATED.  A COUPLE OF HOUSEKEEPING

9    THINGS FIRST.

10          MS. MORRIS, WHO WAS JUROR NUMBER 6, HAD SOME ISSUES

11   YESTERDAY THAT SHE BROUGHT TO THE COURT'S ATTENTION, AND THE

12   COURT HAS DILIGENTLY TRIED TO WORK THROUGH THOSE ISSUES IN ORDER

13   FOR HER TO CONTINUE AS A JUROR IN THIS CASE.  AND UNFORTUNATELY

14   WE HAVE BEEN UNSUCCESSFUL WITH REGARD TO THAT.

15          NOW, WE DO HAVE EIGHT JURORS, AND UNDER THE FEDERAL

16   RULES, WE'RE ENTITLED TO PROCEED WITH A JURY OF EIGHT IN THIS

17   CASE.  I HAVE CONFIRMED WITH COUNSEL AND DISCUSSED THE SITUATION

18   WITH COUNSEL, AND WITHOUT GOING INTO IT IN ANY FURTHER DETAIL, WE

19   WILL CONTINUE TO TRY THE CASE BEFORE THE JURY OF EIGHT, AND ALL

20   EIGHT OF YOU WILL DELIBERATE THIS CASE.

21          SO I DO APPRECIATE YOU ALL BEING HERE AND BEING

22   HERE ON TIME.  WE'RE GOING TO COVER A LOT OF GROUND TODAY.  I'VE

23   ASKED THE ATTORNEYS TO PICK UP THE PACE ON THIS THING, AND THAT'S

24   WHAT WE'RE GOING TO DO.

25          IN THE MEANTIME, I SHOULD ALSO POINT OUT THAT

1   CHRISTOPHER COOPER, WHO IS ONE OF THE PLAINTIFFS HERE, IS IN

2   SCHOOL TODAY, SO THE FACT THAT ONE OF THE PLAINTIFFS IS NOT HERE

3   SHOULDN'T BE CONSIDERED BY YOU TO BE ANYTHING OTHER THAN THE FACT

4   THAT HE HAS EDUCATIONAL OBLIGATIONS, SO HE'S NOT GOING TO BE IN

5   THE COURTROOM TODAY, AS I UNDERSTAND IT.

6              WE WERE WATCHING THE VIDEOTAPE YESTERDAY OF

7   DR. DEROSA.  AND I UNDERSTAND WE'RE GOING TO COMPLETE THAT THIS

8   MORNING.  COUNSEL, WE'RE READY TO GO AHEAD AND DO THAT?

9         MR. WATTS:  WE'RE READY.

10        THE COURT:  LET'S GO AHEAD AND TURN OFF THOSE LIGHTS.

11  IT MIGHT MAKE IT A LITTLE EASIER TO SEE.  LET'S GO AHEAD AND

12  START RIGHT WHERE WE LEFT OFF WITH DR. DEROSA AND THEN WE'LL PICK

13  UP WITH A LIVE WITNESS AFTER THAT.

14             (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

15  VIDEOTAPED DEPOSITION OF DR. DEROSA WAS PLAYED.)

16  Q.   THE STATEMENT YOU THEN MAKE IN THE SAME E-MAIL IS YOU SAY,

17  "WE KNOW BASED ON DATA PROVIDED TO US THAT LEVELS ARE UP TO 80

18  TIMES HIGHER THAN PEAK OCCUPATIONAL LIMITS, AND UP TO THREE

19  HUNDRED TIMES HIGHER THAN OUR GUIDANCE VALUES."

20             NOW, WHAT EXACTLY WERE YOU REFERRING TO THERE?

21  A.   OCCUPATIONAL LIMITS SET BY NIOSH AND OUR HEALTH GUIDANCE

22  VALUES, THE MINIMAL RISK LEVELS THAT WE WERE REFERENCING EARLIER.

23  Q.   WHAT IS NIOSH, DOCTOR?

24  A.   IT'S THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND

25  HEALTH.

1   Q.   AND WHAT ARE THE LEVELS ESTABLISHED BY NIOX (SIC) -- OR

2   NIOSH FOR FORMALDEHYDE?

3   A.   MY RECOLLECTION IS .012 IS THE RECOMMENDED -- NIOSH

4   RECOMMENDATION.

5   Q.   IT'S .01?

6   A.   IT'S .012 OR PERHAPS IT IS .016.  IT MAY WELL BE 0.16.

7   Q.   AND THAT'S PPM?

8   A.   THAT'S CORRECT.

9   Q.   SO WHEN YOU SAY THAT "THE DATA PROVIDED TO US REFLECTS

10   LEVELS 80 TIMES HIGHER THAN PEAK OCCUPATIONAL LIMITS AND THREE

11   HUNDRED TIMES HIGHER THAN OUR GUIDANCE VALUES," THE OCCUPATIONAL

12   LIMITS YOU'RE REFERRING TO ARE THE NIOSH LIMITS?

13   A.   I BELIEVE THAT'S WHAT I WAS REFERRING TO.  IT WAS RATHER

14   LATE IN THE EVENING.  I WAS NOT IN MY OFFICE, AND I WAS SIMPLY

15   TRYING TO PRECIPITATE A RESPONSE THAT WAS CONSISTENT WITH PRUDENT

16   PUBLIC HEALTH PRACTICES.

17   Q.   WHEN YOU SAY HERE "THE DATA WAS THREE HUNDRED TIMES HIGHER

18   THAN THE HEALTH GUIDANCE VALUES," THE HEALTH GUIDANCE VALUES ARE

19   THE MRL'S OF THE ATSDR?

20   A.   RIGHT.

21   Q.   WHY DID YOU WRITE THIS LETTER, DR. DEROSA?

22   A.   BECAUSE THERE WAS A CONTINUING PATTERN OF WHAT I THOUGHT

23   WERE HEALTH ISSUES THAT WERE BEING WITHHELD BY THE AGENCY AND

24   THAT MY OWN ABILITY TO FUNCTION IN MY POSITION WAS BEING

25   CIRCUMSCRIBED IN AN UNACCEPTABLE FASHION CONTRARY TO MY STATED

1   DUTIES IN MY POSITION DESCRIPTION, WHICH I AM PROBABLY MORE

2   CONSCIOUS OF THAN MANY WOULD BE, BUT I HAVE ALWAYS PREDICATED MY

3   ACTIONS BASED ON THAT AND THE ACTUAL SUPERFUND LEGISLATION, SO IT

4   WASN'T A MATTER OF PERSONAL DISCRETION ON MY PART, BUT ADHERENCE

5   TO MY STATED RESPONSIBILITIES.

6   Q.   IN THIS LETTER AT PAGE 3, AND IT'S BATES NO. 102, FIRST FULL

7   PARAGRAPH, YOU MAKE REFERENCE TO THE FACT THAT AT THE SPECIFIC

8   DIRECTION OF FEMA'S ATTORNEY, YOUR TWO STAFF MEMBERS DID NOT

9   SHARE THE INFORMATION THROUGH THE USUAL DIVISION REVIEW AND

10  APPROVAL CHANNELS, BUT INSTEAD PROVIDED THE INFORMATION TO YOU,

11  FRUMKIN, DR. SINKS, AND YOUR COORDINATING OFFICE FOR PREPAREDNESS

12  TERRORISM AND EMERGENCY RESPONSE.   THAT AGAIN REFERS TO PRESTON'S

13  REQUEST THAT THE DATA FROM THE 96 TESTED TRAILERS BE KEPT

14  CONFIDENTIAL, CORRECT?

15  A.   YES, THAT'S CORRECT.

16  Q.   AND YOU WERE KEPT OUT OF THE REVIEW OF THAT DATA?

17  A.   THAT'S CORRECT.

18  Q.   AND I JUST WANT TO STEP BACK, AND I WANT TO RESTRICT MY

19  QUESTION TO THE TRAILER RESPONSE.   THE ONLY COMMUNICATION YOU

20  EVER HAD WITH FEMA ABOUT FORMALDEHYDE IN TRAILERS WAS THAT

21  CONVERSATION IN SPRING 2006?

22  A.   RIGHT.   I BELIEVE IT WAS A CONVERSATION THAT THEN WAS

23  FOLLOWED BY AN E-MAIL BECAUSE I WAS WAITING FOR THE E-MAIL, TO

24  REVIEW IT, BASED ON THE PHONE CALL.

25  Q.   AND ALL I'M SAYING IS HERE AS OF DECEMBER 4TH, IT APPEARS

1  THAT YOU WERE AWARE THAT EPA HAD SOME CONCERNS THAT FEMA MIGHT

2  NOT BE PROPERLY INTERPRETING THE DATA THAT WAS GENERATED FROM

3  THIS TESTING?

4  A.   RIGHT.   THEY MAY NOT BE PROPERLY INTERPRETING THE DATA,

5  RIGHT.

6  Q.   NOW, IF WE GO TO WHAT MR. LITTLE WROTE TO MR. FRUMKIN AND

7  CC'D YOU, TURN TO THAT FIRST PARAGRAPH THERE, IT SAID,

8  "SCOTT WRIGHT AND MYSELF ARE CURRENTLY AWAITING TO RECEIVE

9  SAMPLING DATA FROM FEMA CONCERNING FORMALDEHYDE IN TEMPORARY

10  HOUSING UNIT EXAMPLES SIMILAR TO THOSE UTILIZED BY

11  HURRICANE KATRINA DISPLACED PERSONS.   RICK PRESTON FROM FEMA'S

12  OFFICE OF GENERAL COUNSEL, OGC, INDICATED LAST THURSDAY,

13  NOVEMBER 30TH, THAT HE WOULD SEND BY FED-EX A CD WITH THE DATA TO

14  US.   AT THIS MOMENT, THE DATA HAS NOT BEEN RECEIVED BUT IS

15  EXPECTED SOMETIME TODAY, DECEMBER 4TH.   WE INDICATED TO FEMA THAT

16  ONCE THE DATA IS RECEIVED, WE WOULD BE ABLE TO PROVIDE A QUICK

17  TURNAROUND EVALUATION, AS IS STANDARD PROTOCOL FOR EVALUATION OF

18  EPA DATA BY THE EMERGENCY RESPONSE PROGRAM WITHIN THE DIVISION OF

19  TOXICOLOGY AND ENVIRONMENTAL MEDICINE.   A TIME FRAME OF

20  APPROXIMATELY 10 DAYS OR LESS WAS DISCUSSED FOR OUR EVALUATION.

21  FEMA WILL USE THE ATSDR'S EVALUATION TO AFFECT THEIR POLICY

22  DECISION.   THE ATSDR'S EMERGENCY RESPONSE TEAM'S ACTIVITIES

23  INVOLVING THIS ISSUE HAVE BEEN DESCRIBED IN THE PROGRAM'S WEEKLY

24  ACTIVITY REPORTS."

25          DO YOU SEE THAT?

1   A.    YES, I DO.

2   Q.    WELL, THERE ARE TWO E-MAILS HERE AND THEY ARE BOTH JULY OF

3   2006, CORRECT?

4   A.    MINE SAYS -- WELL, OKAY, I WAS INTERPRETING THE 5TH, BUT --

5   I'M SORRY, THE 6TH.  YEAH, JULY OF 2006, JULY 5TH OF 2006.

6   Q.    MR. BENKEN, IN HIS E-MAIL TO MR. COLEMAN, IN THE SECOND FULL

7   PARAGRAPH -- OR ACTUALLY, START WITH THE FIRST ONE, "SAM, HAVE

8   YOU HEARD ANYTHING ELSE FROM FEMA REGARDING THE ISSUE THAT

9   ADDRESSES INTERIOR AIR QUALITY RELATED TO THEIR TRAILERS,

10  FORMALDEHYDE?  FROM THE CALL, IT WAS CLEAR THEY HAVE A SPECIFIC

11  INTEREST IN TESTING A RANDOM SAMPLE OF THE CURRENT TRAILERS IN

12  NEW ORLEANS, OR AT LEAST THOSE TRAILERS THAT WILL COME INTO THE

13  AREA FROM THE MANUFACTURERS.  WILL THEY CONTINUE TO SEEK

14  ASSISTANCE FROM THE CONSUMER PROTECTION AGENCY OR THE

15  MANUFACTURERS?"

16          WERE YOU AWARE BACK IN JUNE OR JULY WHAT FEMA WAS

17  ASKING CDC AND ATSD -- AND EPA TO DO?

18  A.    I WAS JUST, AS IT SAYS, AWARE THAT THEY WERE INTERESTED IN

19  DOING SOME SAMPLING.

20  Q.    NOW, WHEN YOU SAW THAT LETTER AT THIS TIME, WHAT IT SAYS IN

21  THAT FIRST PARAGRAPH, IT SAYS, "ENCLOSED, YOU WILL FIND A DVD

22  DISC CONTAINING THE TEST RESULTS AND RELATED DATA FROM THE FEMA

23  TRAILER FORMALDEHYDE TESTING CONDUCTED BY EPA.  PLEASE REVIEW THE

24  DATA AND PROVIDE" -- I'M NOT SURE WHAT THAT --

25  A.    YOUR ANALYSIS.  PROVIDE ME -- TO ME.

1    Q.    -- "TO ME, A WRITTEN REPORT OF YOUR ANALYSIS OF THE RESULTS

2    OF THOSE TESTS AND ANY CONCLUSIONS OR RECOMMENDATIONS THAT CAN BE

3    DERIVED THEREFROM."

4           NEXT PARAGRAPH:  "PLEASE KEEP THIS INFORMATION AND YOUR

5    ANALYSIS CONFIDENTIAL.  NO INFORMATION SHOULD BE RELEASED TO ANY

6    THIRD-PARTY WITHOUT MY EXPRESSED PERMISSION.  PLEASE CONTACT ME

7    DIRECTLY IF YOU HAVE ANY QUESTIONS."

8           NOW, THE REPORT THAT JOE LITTLE AND SCOTT WRIGHT

9    PREPARED, THEY SHARED THAT REPORT WITH OTHER PEOPLE AT ATSDR,

10   CDC, DIDN'T THEY?

11   A.    I KNOW THAT MIKE ALLRED, WHO WAS THEN IN PLACE OF

12   DON BENKEN, RELAYED THEIR EVALUATIONS PHYSICALLY BACK AND FORTH

13   BETWEEN THE OFFICE OF THE DIRECTOR, ACCORDING TO THEM, ON AT

14   LEAST FOUR OCCASIONS.

15   Q.    IF YOU GO TO THE SECOND PAGE THERE, IT SAYS, "ON 2/1,

16   ERT" -- WHAT DOES ERT STAND FOR?

17   A.    EMERGENCY RESPONSE TEAM.

18   Q.    -- "EMERGENCY RESPONSE TEAM FINALIZED THE FORMALDEHYDE

19   HEALTH CONSULTATION FOR THE FEDERAL EMERGENCY MANAGEMENT AGENCY,

20   FEMA.  THIS CONSULTATION DISCUSSES THE EVALUATION OF EPA DATA

21   GENERATED FROM SAMPLING OF FEMA MANUFACTURED HOMES DURING THE

22   TIME PERIOD OF SEPTEMBER 19TH THROUGH OCTOBER 7, 2006.  A TOTAL

23   OF 96 NEW, NEVER OCCUPIED HOMES WERE TESTED AT A LOCATION IN THE

24   GREATER NEW ORLEANS/BATON ROUGE AREA.  IN SUMMARY, THE OPENING OF

25   WINDOWS AND VENTS WAS EFFECTIVE IN REDUCING FORMALDEHYDE

1   CONCENTRATIONS BELOW LEVELS OF HEALTH CONCERN.  RUNNING THE

2   HEATING, VENTILATION AND AIR-CONDITIONING SYSTEMS DID NOT PROVIDE

3   ADEQUATE AIR EXCHANGES TO ADEQUATELY REDUCE THE FORMALDEHYDE

4   CONCENTRATIONS."

5            AND THIS WAS SENT TO YOU ON FEBRUARY 2ND, 2007,

6   CORRECT?

7   A.   THAT'S CORRECT.

8   Q.   OKAY.  AND IT WOULD BE REASONABLE -- ANYBODY WHO GOT THIS

9   E-MAIL, IT WOULD BE REASONABLE TO ASSUME THAT IF THEY SAW THIS,

10  THEY WOULD THINK THAT IF YOU OPENED THE WINDOWS IN THE TRAILERS,

11  THAT WOULD REDUCE THE FORMALDEHYDE LEVELS BELOW LEVELS OF HEALTH

12  CONCERNS?  ISN'T THAT REASONABLE?

13  A.   UH-HUH (AFFIRMATIVE RESPONSE).

14  Q.   SIR, THIS IS A DOCUMENT, A PAPER THAT I THINK WAS WRITTEN BY

15  JOHN RISHER AND YOURSELF.

16  A.   YES.

17  Q.   AND IT WAS PUBLISHED IN *HUMAN AND ECOLOGICAL RISK ASSESSMENT*

18  IN 1997.  AND THIS ARTICLE IS ENTITLED "THE PRECISION, USES AND

19  LIMITATIONS OF PUBLIC HEALTH GUIDANCE VALUES."

20  A.   UH-HUH (AFFIRMATIVE RESPONSE).

21  Q.   IS THAT RIGHT?

22  A.   YES.

23  Q.   AND HEALTH GUIDANCE VALUES, THAT REFERS TO MRL'S OR MINIMAL

24  RISK LEVELS, RIGHT?

25  A.   IT INCLUDES THOSE, YES.

1   Q.    WHAT ARE RFD'S?

2   A.    THAT'S THE EPA'S ANALOGOUS VALUE TO A MINIMAL RISK LEVEL.

3   IT'S A REFERENCE DOSE.

4   Q.    MRL'S, WHAT IS THAT?

5   A.    THAT'S MINIMAL RISK LEVELS.

6   Q.    AND ADI'S?

7   A.    ADI'S ARE ACCEPTABLE DAILY INTAKES WHO WERE ORIGINALLY

8   COINED BY FDA AND SUBSEQUENTLY USED BY EPA, BUT THEN CHANGED TO

9   REFERENCE DOSES AS OPPOSED TO ADI'S FOR REASONS THAT ARE PROBABLY

10  NOT WORTH TALKING ABOUT.

11           BUT THEY ARE ALL, YOU KNOW, DERIVED IN THE SAME FASHION

12  BY THE IDENTIFICATION WITH TOXICITY THRESHOLD SUCH AS A

13  NO-OBSERVED ADVERSE EFFECT LEVEL OR LOW ADVERSE EFFECT LEVEL,

14  DIVIDED BY AN UNCERTAINTY FACTOR, WHICH IS INVERSELY PROPORTIONAL

15  TO OUR CONFIDENCE IN THE DATABASE.  THE HIGHER THE CONFIDENCE,

16  THE LOWER THE UNCERTAINTY FACTOR.

17  Q.    LET ME READ WHAT YOU WROTE HERE.

18           "TOO OFTEN, HOWEVER, RFD'S, RFC'S, MRL'S, AND ADI'S ARE

19  CONSTRUED AS RIGID THRESHOLD LIMITS ABOVE WHICH TOXICITY IS

20  LIKELY TO OCCUR.  THE TRUTH, HOWEVER, IS THAT THESE VALUES

21  ACTUALLY REPRESENT LEVELS OF A POTENTIAL TOXICANT THAT ARE HIGHLY

22  UNLIKELY TO REPRESENT ANY THREAT TO HUMAN HEALTH OVER A

23  PARTICULAR SPECIFIED DURATION OF DAILY EXPOSURES.  THE MORE

24  FREQUENTLY THESE LEVELS ARE EXCEEDED AND THE GREATER THE

25  EXCEDENCE, THE MORE LIKELY SOME TOXIC MANIFESTATION IS TO OCCUR.

1    THESE GUIDANCE/REFERENCE VALUES ARE MOST DEFINITELY NOT THRESHOLD

2    VALUES FOR THE ONSET OF TOXICITY IN ANY EXPOSED POPULATION.

3    HEALTH GUIDANCE VALUES MUST BE THOUGHT OF IN THE CONTEXT OF THEIR

4    INTENDED ROLE AS MERE SCREENING OR TRIGGER VALUES IN WHICH THEY

5    SERVE AS A TOOL FOR ASSISTING IN THE DETERMINATION OF WHETHER

6    FURTHER EVALUATION OF A GIVEN POTENTIAL EXPOSURE SCENARIO IS

7    WARRANTED."

8              THAT'S WHAT YOU WROTE; IS THAT CORRECT?

9    A.   YES, THAT'S WHAT WE WROTE.  AND I WOULD POINT OUT, TOO, THAT

10   THAT PROBABLY SHOULD BE STATED AT THE TIME, THOSE VALUES WERE

11   DERIVED BASED ON AVAILABLE INFORMATION.

12   Q.   IF YOU GO TO THE NEXT PAGE OF YOUR PAPER, AND IF YOU GO

13   ABOUT THREE-QUARTERS OF THE WAY DOWN, IT STARTS, "THESE MRL'S."

14   AND IT'S THE SECOND -- THIRD FULL PARAGRAPH ABOUT HALFWAY THROUGH

15   IT.

16   A.   YES.

17   Q.   IT SAYS -- YOU WROTE THERE, "THESE MRL'S" -- AND THAT'S

18   REFERRING TO THE MINIMAL RISK LEVELS FROM WHAT YOU ARE TALKING

19   ABOUT, THE HEALTH GUIDANCE VALUES THAT -- THE ATSDR ISSUES; IS

20   THAT RIGHT?

21   A.   RIGHT.

22   Q.   "THESE MRL'S ARE INTENDED TO BE USED BY PUBLIC HEALTH

23   OFFICIALS TRAINED IN HEALTH RISK ASSESSMENT AND ONLY TO IDENTIFY

24   SUBSTANCES OF CONCERN AT HAZARDOUS WASTE OR OTHER SITES OF

25   ENVIRONMENTAL CONTAMINATION.  DESPITE THEIR OCCASIONAL

1  MISUNDERSTANDING AND CONSEQUENT MISUSE BY WELL-MEANING RISK

2  ASSESSORS WHO VIEW THEM AS A PANACEA OF HEALTH RISK

3  DETERMINATION, THESE VALUES PROVIDE A SCIENTIFICALLY SOUND BASIS

4  FOR DECISIONS IN THE ENVIRONMENTAL HEALTH RISK ASSESSMENT

5  PROCESS."

6  A.    THAT'S CORRECT.

7  Q.    THEY ARE NOT A CAUSE-EFFECT, ARE THEY?

8  A.    THERE IS NO IMPLICATION THAT THEY ARE A CAUSE OR AN EFFECT.

9  Q.    IF WE GO TO ONE OF THOSE SECTIONS AT PAGE 5 OF THE REPORT,

10  118 BATES LABELED, PARAGRAPH 2.  IN THE MIDDLE OF THE PARAGRAPH,

11  IT SAYS, "MANY PRODUCTS USED EVERY DAY AROUND THE HOUSE ALSO

12  CONTAIN FORMALDEHYDE"; IS THAT ACCURATE?

13  A.    YES, IT IS.

14  Q.    "SUCH AS FINGERNAIL POLISH"; IS THAT ACCURATE?

15  A.    YES, IT IS.

16  Q.    "FINGERNAIL HARDENERS"?

17  A.    YES.

18  Q.    "ANTISEPTICS"; IS THAT ACCURATE?

19  A.    YES.

20  Q.    "MEDICINES"?

21  A.    THESE ARE ALL CLEARLY STATED POINTS, AND THAT'S QUITE TRUE.

22  Q.    "COSMETICS"?

23  A.    THAT'S ALSO TRUE.

24  Q.    DO CIGARETTES OFF-GAS FORMALDEHYDE?

25  A.    YES, THEY DO.

1   Q.    TOBACCO, OTHER TOBACCO PRODUCTS?

2   A.    WHEN COMBUSTED, YEAH.

3   Q.    FORMALDEHYDE IS A SIMPLE CARBON, A ONE-MOLECULE CARBON?

4   A.    ITS CHEMICAL FORMULA IS HCHO.

5   Q.    ONE CARBON?

6   A.    ONE CARBON.

7   Q.    THERE IS A FAIR AMOUNT OF FORMALDEHYDE IN ME RIGHT NOW?

8   A.    YES.

9   Q.    WOULD YOU AGREE WITH THE STATEMENT THAT IT OCCURS NATURALLY

10  IN THE BLOOD?

11  A.    YES.

12  Q.    OKAY.  WE -- I MEAN, "COMPLETE COMBUSTION OF HYDROCARBON

13  FUELS CAN CONTRIBUTE TO THE LEVEL OF FORMALDEHYDE IN OUTDOOR

14  AIR."

15          DO YOU AGREE WITH THAT STATEMENT?

16  A.    FUELS, THERE IS A DIFFERENCE BETWEEN A HYDROCARBON AND A

17  HYDROCARBON-BASED FUEL.

18  Q.    FAIR ENOUGH.  DO YOU AGREE WITH THE STATEMENT IN THE REPORT?

19  A.    YES.

20  Q.    "FURTHER CONCENTRATIONS DURING HEAVY TRAFFIC OR SEVERE

21  INVERSIONS CAN RANGE UP TO 0.8 PPM"?

22  A.    YES.  AND THAT'S AN ANALOGY I JUST MADE IN TERMS OF A HOT

23  DAY WITH A HIGH OF 75.

24  Q.    EIGHTY PARTS -- I'M SORRY.  EIGHTY PARTS PER BILLION.  .8

25  PPM IS 80 PARTS PER BILLION?

1   A.   THAT WOULD BE 80 PARTS PER BILLION.

2   Q.   NEXT PAGE, TOP OF THE FIRST PARAGRAPH, HALFWAY THROUGH THE

3   PARAGRAPH, IT STARTS WITH, CONVENTIONAL HOMES.  "CONVENTIONAL

4   HOMES OVERALL HAD A CONCENTRATION OF FORMALDEHYDE RANGING FROM

5   LESS THAN .02 TO .4 PPM."

6   A.   THAT'S A VERY DATED REFERENCE.

7   Q.   IT'S THE HAWTHORNE PAPER OF 1985, CORRECT?

8   A.   RIGHT.

9   Q.   WOULD YOU AGREE THAT THAT'S WHAT HAWTHORNE FOUND AND THAT

10  WAS ACCURATE AT LEAST IN 1985 AND 1986?

11  A.   THAT'S WHAT THEY'VE REPORTED.

12  Q.   "SINCE THE MID 1980'S, PLYWOOD AND PARTICLE BOARD

13  MANUFACTURING METHODS HAVE CHANGED TO REDUCE FORMALDEHYDE

14  EMISSIONS."  IS THAT ACCURATE?

15  A.   THAT'S ACCURATE.

16  Q.   NEXT SENTENCE, "HOME CONSTRUCTION EFFORTS HAVE ALSO CHANGED

17  TO REDUCE THE USE OF UFFI."  IS THAT ACCURATE?  IS USE OF

18  FORMALDEHYDE FOAM INSULATION, IS THAT ACCURATE OR DO YOU NOT

19  KNOW?

20  A.   YES, THAT'S ACCURATE.

21  Q.   "A STUDY CONDUCTED ON NEWLY RECONSTRUCTED AND UNOCCUPIED

22  HOUSE," I ASSUME IT SHOULD BE HOUSES, "FOUND AVERAGE INDOOR

23  CONCENTRATION OF FORMALDEHYDE TO BE .035 TO .5 PPM."

24  A.   ACTUALLY, IT IS SINGULAR HOUSE.  IT SAYS ON A NEWLY

25  CONSTRUCTED UNOCCUPIED HOUSE.

1    Q.    "URBAN BACKGROUND FROM .0008 TO .068 PPM."  IS THAT CORRECT?

2    A.    YES.

3    Q.    BUT YOU DISAGREE WITH THE ONE ON URBAN BACKGROUND?

4    A.    NO.

5    Q.    I APPRECIATE IT.  BUILDINGS IN WHICH SMOKING IS NOT

6    PERMITTED, AS YOU SAID, IT'S -- THE RANGE IS FROM NONDETECT TO AS

7    HIGH AS .22 PARTS PER MILLION?

8    A.    YES.

9    Q.    SO 220 PARTS PER BILLION?

10   A.    I THINK WE'VE ESTABLISHED THAT, YES.

11   Q.    BUILDINGS IN WHICH SMOKING IS PERMITTED FROM NONDETECT TO

12   .6 PPM?

13   A.    THAT'S CORRECT.

14   Q.    OR 600 PARTS PER BILLION?

15   A.    THAT ALSO WOULD BE CORRECT.

16   Q.    WOULD YOU HAVE CONCERNS IF IT WAS ABOVE .008 PARTS PER

17   BILLION -- PARTS PER MILLION?

18   A.    IN AN OFFICE SETTING?

19   Q.    IN AN OFFICE SETTING, EIGHT HOURS A DAY, OVER 65, NO BREAKS?

20   A.    OKAY.  THE MRL'S INTENDED FOR A LIFETIME OF EXPOSURE,

21   24 HOURS A DAY, SEVEN DAYS A WEEK.  IT'S DIFFERENT THAN AN

22   OCCUPATIONAL EXPOSURE, AND YOU'RE ASKING ME TO COMPARE APPLES AND

23   ORANGES AND THAT IS INAPPROPRIATE.

24   Q.    I APPRECIATE YOU GIVING THE INFORMATION BECAUSE YOU JUST

25   TOLD ME STUFF I DIDN'T UNDERSTAND.

1    A.    THAT'S OKAY.  I'M HAPPY TO.

2    Q.    YOU'RE TALKING ABOUT A LIFETIME EXPOSURE, NOT JUST 366 DAYS,

3    CORRECT?

4    A.    IT'S FOR 366 DAYS UP TO A LIFETIME OF EXPOSURE.

5    Q.    AND 24/7; IS THAT CORRECT?

6    A.    THAT'S CORRECT.

7    Q.    WHEN WE SAY "24/7," WE'RE TALKING ABOUT 24 HOURS A DAY,

8    SEVEN DAYS A WEEK, 52 WEEKS A YEAR, CORRECT?

9    A.    YES.

10   Q.    WE'RE NOT TALKING ABOUT IN AND OUT OF THE TRAILER TO GO TO

11   SCHOOL, TO GO PLAY BALL, TO RUN AROUND THE NEIGHBORHOOD WITH YOUR

12   CAT AND YOUR DOG, RIGHT?

13   A.    AND AS YOU ADD THOSE OTHER CAVEATS, ARE THEY RUNNING AROUND

14   PLAYING BALL NEXT TO INTERSTATE 75?  OKAY?  SO PLEASE REMEMBER,

15   WHEN YOU ASK THESE QUESTIONS, THE ANSWER HAS TO BE CONTENT

16   SPECIFIC.  AND I'M NOT GOING TO ANSWER QUESTIONS THAT ARE GENERAL

17   IN NATURE REGARDING THE LEVEL OF ANYTHING HERE THAT DOES NOT

18   ADDRESS THE FULL RANGE OF FACTORS THAT NEED TO BE TAKEN INTO

19   ACCOUNT.

20   Q.    BECAUSE IF THEY WERE RUNNING AROUND DOWN THE STREET FROM

21   INTERSTATE 75 OR INTERSTATE 10, THEY WOULD BE EXPOSED TO A FAIR

22   AMOUNT OF FORMALDEHYDE FROM A SOURCE OTHER THAN THE TRAILER,

23   CORRECT?

24   A.    POSSIBLY SO.  DEPENDING ON THE TIME OF YEAR, TIME OF DAY, IT

25   COULD VARY.

1  Q.    IF WE CAN FLIP TO THE NEXT PAGE.  HERE, WE HAVE THE ATSDR

2  MRL'S, CORRECT?

3  A.    YES, THAT'S CORRECT.

4  Q.    AND LET'S START WITH THE FIRST ONE.  CHRONIC IS .008 PPM?

5  A.    UH-HUH (AFFIRMATIVE RESPONSE).

6  Q.    YES?

7  A.    YES.  THAT'S CORRECT.

8  Q.    AND IT SAYS, "THE CHRONIC MRL WAS DERIVED FROM A HUMAN

9  STUDY."

10  A.    YES.

11  Q.    "AFTER 7.3 YEARS EXPOSURE"?

12  A.    YES.

13  Q.    "THE LOWEST OBSERVABLE ADVERSE EFFECT LEVEL" -- OR LOAEL --

14  "WAS .24 PPM," CORRECT?

15  A.    THAT'S WHAT IT SAYS, YES.

16  Q.    "WHICH CAUSED LESIONS IN NASAL MUCOSA," CORRECT?

17  A.    YES.

18  Q.    AND IT SAYS, "DIVIDING BY A SAFETY FACTOR OF 30 YIELD WOULD

19  GIVE THE MRL OF .008," CORRECT?

20  A.    YES.

21  Q.    THE NEXT ONE IS THE INTERMEDIATE LEVEL, .03?

22  A.    UH-HUH (AFFIRMATIVE RESPONSE).

23  Q.    "THE INTERMEDIATE INHALATION MRL WAS DERIVED FROM A MONKEY

24  STUDY.  AFTER EXPOSURE FOR 26 WEEKS, SEVEN DAYS PER WEEK,

25  22 HOURS PER DAY, THE NO-OBSERVABLE ADVERSE EFFECT LEVEL" --

1  NOAEL -- "WAS .98 PPM," CORRECT?

2  A.   YES.

3  Q.   "GUIDED BY A SAFETY FACTOR OF 30 YIELD WOULD BE AN MRL OF

4  .03"?

5  A.   RIGHT.

6  Q.   EXCUSE ME.  "THE ACUTE MRL OF .04, THE ACUTE INHALATION MRL

7  WAS DERIVED FROM A HUMAN STUDY.  AFTER A TWO-HOUR EXPOSURE, THE

8  LOAEL" -- AGAIN, LOWEST OBSERVABLE ADVERSE EFFECT LEVEL -- "WAS

9  .4 PPM, WHICH CAUSED INCREASED WHITE BLOOD CELLS IN NASAL" --

10  A.   LAVAGE?

11  Q.   -- "FLUID ACCOMPANIED BY INCREASED ITCHING, SNEEZING AND

12  CONGESTION DIVIDING BY A SAFETY FACTOR OF NINE YIELDED THE MRL OF

13  .04."

14  A.   YES, SIR.

15  Q.   AS WE LOOK AT THOSE THREE MRL'S, THE LOWEST OBSERVABLE

16  EFFECT WAS FOUND TO BE .24, CORRECT?

17  A.   YES.  LET'S SEE.  LET ME JUST CHECK THAT.  YES, THAT'S

18  CORRECT.

19  Q.   LET'S TALK ABOUT THAT FOR JUST A MOMENT.  SO ARE YOU SURE

20  THAT WE'RE TALKING ABOUT THE SAME TERMINOLOGY HERE?  WHEN YOU'RE

21  TALKING ABOUT RESPONSE AND A SENSITIZED RESPONSE TO EXPOSURE TO

22  GASEOUS FORMALDEHYDE, AND AN IMMUNOGENIC RESPONSE, ARE YOU -- ARE

23  YOU SPEAKING ABOUT EITHER AN IGE, AN IGG OR AN IGM MEDIATED

24  RESPONSE?

25  A.   THOSE ALL MAY BE INVOLVED.

1  Q.   ASSUME, THEN, THAT YOU'RE SPEAKING OF AN IGE, AN IGG OR AN

2  IGM MEDIATED RESPONSE TO EXPOSURE TO GASEOUS FORMALDEHYDE, ARE

3  YOU AWARE OF A SINGLE STUDY THAT HAS EVER FOUND AN ANTIBODY

4  SPECIFIC TO SUCH EXPOSURE?

5  A.   I AM NOT.

6  Q.   BUT INSOFAR AS BEING THE GENERAL CATEGORY OF KNOWN AS

7  OPPOSED TO PROBABLE OR LIKELY OR WHATEVER THE ADVERB MIGHT BE

8  THAT PRECEDES THE WORD "CARCINOGEN," THE ONLY AGENCY THAT HAS

9  COME OUT AND DECLARED FORMALDEHYDE A CARCINOGEN IS IARC; IS THAT

10 CORRECT?

11 A.   THE ONLY AGENCY THAT HAS COME OUT AND CALLED IT A KNOWN

12 HUMAN CARCINOGEN IS IARC.

13 Q.   CORRECT.  AND THAT'S ONLY WITH RESPECT TO ONE FORM OF

14 CANCER, WHICH IS NASOPHARYNGEAL CANCER; IS THAT CORRECT?

15 A.   THAT'S PRIMARILY BASED ON NASOPHARYNGEAL CANCERS, BUT IT

16 ALSO REFERENCES LEUKEMIA AS WELL.

17 Q.   WITH RESPECT TO LEUKEMIA, AND I CAN QUOTE YOU THE LANGUAGE,

18 IT HAS NOT DECLARED LEUKEMIA AS A KNOWN HUMAN CARCINOGEN, DOES

19 IT?

20 A.   LEUKEMIA IS A DISEASE, NOT A CARCINOGEN.

21 Q.   EXCUSE ME.  FORMALDEHYDE IS NOT DECLARED, IN THAT 2004 PRESS

22 RELEASE, AS A KNOWN HUMAN CARCINOGEN CAUSING LEUKEMIA, CORRECT?

23 A.   THE CLASSIFICATION OF KNOWN HUMAN CARCINOGEN IS BASED

24 PRIMARILY ON NASOPHARYNGEAL CANCER; HOWEVER, THE WEIGHT OF

25 EVIDENCE IS ALWAYS CONSIDERED IN THOSE DESIGNATIONS.  AND IN

1  FACT, I WAS, AS I RECALL, AT THE CONSULTATION IN LYONS WHEN THAT

2  WAS DISCUSSED AND IT WAS RECLASSIFIED, IF I'M NOT MISTAKEN.  I

3  WAS AT THAT PARTICULAR CONSULTATION.

4  Q.   WITH RESPECT TO THE CLASSIFICATION OF FORMALDEHYDE, INSOFAR

5  AS NASOPHARYNGEAL CANCER IS CONCERNED, THAT IARC REPORT IS

6  PREDICATED PRIMARILY ON WHAT PAPERS; DO YOU KNOW?

7  A.   THERE WERE A NUMBER OF STUDIES, THE OCCUPATIONAL STUDIES

8  THAT WERE CONDUCTED.

9  Q.   THE NCI OCCUPATIONAL STUDY AUTHORED PRIMARILY IN 2003 BY

10  HAUPTMANN, CORRECT?

11  A.   I BELIEVE THAT'S CORRECT, YES.

12  Q.   HAVE YOU READ THAT PAPER?

13  A.   I BELIEVE I HAVE.

14  Q.   DID YOU KNOW THE THRESHOLD WHERE THERE WAS AN EXCESS OF THE

15  STANDARD -- FOR THE STANDARD MORTALITY RATIO AND EXCESS OF DEATHS

16  ON WHICH THE HAUPTMANN REPORT CONCLUDES THAT IT IS A HUMAN

17  CARCINOGEN?

18  A.   I BELIEVE THERE WAS A HIGH EXPOSURE GROUP VERSUS A LOW

19  EXPOSURE GROUP IN THE COHORTS THAT WERE STUDIED.  I DO NOT RECALL

20  WHAT THE EXPOSURE RANGES WERE IN THAT STUDY.

21  Q.   WOULD IT SURPRISE YOU TO KNOW THAT THAT EXPOSURE RANGE WAS

22  IN EXCESS OF FOUR PARTS PER MILLION?

23  A.   NO, IT'S TYPICALLY THE CASE THAT BECAUSE OF DIFFICULTY IN

24  IDENTIFYING TOXIC EFFECTS IN CHEMICALS THAT HIGH DOSE LEVELS ARE

25  USED.  IT'S A MAXIMUM TOLERATED DOSE.  IT'S A LONGSTANDING

1  PROTOCOL BASED ON THE NATIONAL TOXICOLOGY BIOASSAY PROGRAM AND

2  ALSO ON THE BIOASSAY PROGRAM OF THE RAMAZZINI INSTITUTE IN ITALY

3  THAT YOU SCALE BACK FROM THE MAXIMUM TOLERATED DOSE ON A

4  LOGARITHMIC BASIS SO THAT YOU HAVE A DOSE SPAN THAT IS MORE

5  LIKELY TO ILLUSTRATE THE SHAPE OF THE DOSE RESPONSE FUNCTION.

6  Q.   LET'S JUST -- WE'LL BREAK IT DOWN FURTHER.  ARE YOU AWARE OF

7  ANY REPORTED EXPOSURE IN ANY OF THOSE HOMES REGARDLESS OF HOW

8  SHORT OR REGARDLESS OF HOW LONG THAT EXCEEDED FOUR PARTS PER

9  MILLION?

10  A.   I DON'T BELIEVE SO.

11  Q.   YOU WERE ASKED EARLIER THIS MORNING A QUESTION ABOUT AN

12  E-MAIL THAT YOU HAD WRITTEN THAT THERE WERE CLINICAL SIGNS AND

13  THAT THERE WAS -- THESE CLINICAL SIGNS ARE A HARBINGER OF A

14  PUBLIC HEALTH DISASTER.  AND AS I RECALL YOUR TESTIMONY, AND I

15  COULD BE WRONG, YOU HAD REFERENCE TO THE AMOUNT OF ASTHMA BEING

16  REPORTED IN THE CHILDREN WHO WERE OCCUPANTS OF THOSE HOMES.  IS

17  THAT WHAT YOUR REFERENCE WAS TO?

18  A.   MY REFERENCE WAS TO CHILDREN PRESENTING WITH CLINICAL SIGNS

19  OF FORMALDEHYDE TOXICITY, INCLUDING BLOODY NOSES, COUGHING OF

20  BLOOD.  AND THAT'S NOT AN ASTHMATIC RESPONSE.  BRONCHIAL

21  CONSTRICTION IS AN ASTHMATIC RESPONSE.  SO IT WAS AMONG A SUITE

22  OF SYMPTOMS THAT WERE PRESENTED CLINICALLY.

23  Q.   OKAY.  LET'S TALK ABOUT ASTHMA SPECIFICALLY.  ARE YOU AWARE

24  OF WHETHER OR NOT THE CHILDREN THAT PRESENTED -- WHO ARE

25  OCCUPANTS OF THE FEMA TRAILERS PRESENTED AT A HIGHER INCIDENCE

1   RATE THAN THE AVERAGE INNER CITY DWELLING CHILD?

2   A.   AND THE INCLUSION CRITERIA FOR WHETHER OR NOT THE RESIDENTS

3   HAD A HIGHER RATE OF ASTHMATIC RESPONSE BEFORE OR AFTER KATRINA

4   WAS THAT THEY HAD ASTHMATIC CONDITIONS PRIOR TO KATRINA.  SO THEY

5   DID NOT LOOK AT CHILDREN WHO DID NOT PRESENT CLINICALLY WITH

6   ASTHMATIC SIGNS PRIOR TO KATRINA, WHICH IS HOW YOU WOULD ASSESS

7   IT TO WHETHER OR NOT THERE WERE ASTHMATIC SYMPTOMS INDUCED BASED

8   ON EXPOSURES FOLLOWING KATRINA.  A FUNDAMENTALLY FLAWED STUDY.

9   Q.   WHAT STUDY DID YOU HAVE REFERENCE TO?

10  A.   THESE WERE THE CHILDREN THAT WERE ENROLLED IN THE STUDY

11  DESIGNED BY CDC.

12  Q.   IS THAT THE SO-CALLED MISSISSIPPI STUDY?

13  A.   YES.

14  Q.   DID YOU PARTICIPATE IN THE STRUCTURE OF THAT STUDY?

15  A.   NO, I DID NOT.

16  Q.   DID YOU COMPLAIN TO ANYONE ABOUT THE STRUCTURE OF THAT STUDY

17  AT ANY TIME?

18  A.   YES, I DID.

19  Q.   DR. DEROSA, EARLIER TODAY YOU THREW OUT THE GENERAL

20  PRINCIPLE, AS I UNDERSTOOD IT, THAT IT IS GENERALLY RECOGNIZED IN

21  TOXICOLOGY, IN GENERAL, THAT CHILDREN AND THE ELDERLY ARE MORE

22  LIKELY TO RESPOND TO A TOXIN OR TO AN IRRITANT.  I'M CERTAINLY

23  NOT QUARRELING WITH THAT GENERAL PRINCIPLE OF TOXICOLOGY AT ALL.

24       I JUST WANT TO ASK THIS QUESTION:  ARE YOU AWARE OF ANY

25  STUDY OF FORMALDEHYDE IN EXPOSURE OF THE ELDERLY THAT SHOWS THAT

1  WITH RESPECT TO THE AIRBORNE FORMALDEHYDE, THAT THE ELDERLY ARE

2  MORE SUSCEPTIBLE TO GASEOUS CONCENTRATIONS OF FORMALDEHYDE?

3  A.   I DON'T HAVE A SPECIFIC REFERENCE, IF THAT'S WHAT YOU'RE

4  ASKING FOR, BUT I DON'T HAVE THAT SPECIFIC REFERENCE BUT IT'S --

5  Q.   THE SAME WITH RESPECT TO CHILDREN.

6  A.   NO, I THINK THERE ARE SPECIFIC REFERENCES THAT -- BUT I

7  DON'T HAVE THOSE AVAILABLE TO ME AT THIS JUNCTURE.

8  Q.   ALL RIGHT.  AND MORE SPECIFICALLY, A MINIMUM RISK LEVEL, OR

9  MRL, IS SIMPLY A GUIDANCE VALUE -- TALKING ABOUT AN MRL NOW,

10  SIMPLY A GUIDANCE VALUE NOT INTENDED TO BE CONSIDERED AS

11  REPRESENTING A THRESHOLD FOR TOXICITY, YOU WOULD AGREE WITH THAT?

12  A.   IT'S NOT CONSIDERED AS A THRESHOLD FOR TOXICITY, BUT IT'S

13  NOT TO SAY THAT BELOW THAT LEVEL, THERE MAY BE A POSSIBILITY OF

14  TOXICITY.

15  Q.   WERE YOU AWARE THAT IN JULY 2007, FEMA CHANGED ITS POLICY

16  AND OFFERED TO MOVE ANYONE IN A TRAILER WHO WANTED OUT OF THAT

17  INTO ALTERNATE HOUSING?

18  A.   I DO RECALL THAT, YES.

19  Q.   AND WHEN YOU SAY "MUCH LATER," HOW MUCH LATER AFTER YOU

20  RECEIVED A COPY OF THE HEALTH CONSULT, WHICH I BELIEVE WAS, WHAT,

21  ON FEBRUARY 27TH?

22  A.   RIGHT.  YEAH.  THAT'S WHEN I DID SEE IN THE INTRODUCTION

23  THAT -- AT THE REQUEST OF FEMA, AND I THINK MR. PRESTON WAS

24  REFERENCED IN THE FIRST PARAGRAPH, BUT THERE I WAS NOT REALLY

25  FOCUSING ON THAT ISSUE SO MUCH AS THE OVERALL CONTENT

1   COMPLETENESS OF THE REPORT.  AND HIS SPECIFIC ROLE TO ME WAS NOT

2   CLEAR UNTIL I SAW THE DOCUMENT, THE TWO-PARAGRAPH LETTER THAT WAS

3   PROVIDED EARLIER FROM HIM TO SCOTT WRIGHT, WHEN I APPROACHED MY

4   STAFF REGARDING HOW THIS HAD TRANSPIRED.

5   Q.   HAVE YOU, IN THE PAST, BEEN CONTACTED BY COUNSEL FOR

6   DIFFERENT GOVERNMENTAL AGENCIES WHO WERE INVOLVED IN THE DEFENSE

7   OF A LAWSUIT BROUGHT AGAINST THE AGENCY WHICH THAT COUNSEL WAS

8   DEFENDING?

9   A.   I DON'T BELIEVE SO.  I THINK I WAS CONTACTED BY LEGAL

10  COUNSEL FOR DIFFERENT FIRMS FROM TIME TO TIME.  SOME OF THE

11  MANUFACTURERS OF THE CHEMICALS THAT WE HAVE A FOCUS UPON, WASTE

12  SITES, BUT -- AND, YOU KNOW, CHALLENGING ONE OR MORE ASPECTS OF

13  OUR DOCUMENTATION.  I RECALL DOWELANCO AND MONSANTO AND GE, AND,

14  YOU KNOW, THE RANGE OF FIRMS.

15          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

16  VIDEOTAPED DEPOSITION OF DR. DEROSA WAS STOPPED.)

17          MR. WATTS:  JUDGE, I THINK THAT CONCLUDES THE VIDEO FROM

18  BOTH SIDES.

19          THE COURT:  ALL RIGHT.

20          MR. WATTS:  MAY I CALL THE NEXT WITNESS?

21          THE COURT:  YES.  BEFORE WE DO THAT, LET ME ALSO, I'VE

22  NEGLECTED TO STATE AT THE OUTSET OF OUR PROCEEDINGS THIS MORNING

23  THAT ALL CELL PHONES, BLACKBERRIES, ANY OTHER COMMUNICATION

24  DEVICES ARE NOT ALLOWED IN THE COURTROOM, EVEN TURNED OFF.  IF

25  ANYONE HAS ANY OF THOSE, THEY NEED TO TURN IT IN TO CHAMBERS.

1   YOU CAN PICK IT UP DURING THE LUNCH BREAK.  AND I WOULD ALSO ASK

2   THE CSO IF HE WOULD NOTICE ANY SUCH DEVICES IN THE COURTROOM, TO

3   PLEASE BRING THAT TO THE COURT'S ATTENTION.

4            LET'S GO AHEAD AND CALL THE NEXT WITNESS.

5        MR. WATTS:  DONN FREIBERGER.

6        THE COURT:  DONN FREIBERGER.

7            MR. FREIBERGER, COULD YOU COME UP HERE AND PLEASE

8   REMAIN STANDING UNTIL YOU TAKE THE OATH.  TAKE THE CHAIR NEXT TO

9   ME.

10       THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

11  HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

12  ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

13  THE TRUTH, SO HELP YOU GOD?

14       THE WITNESS:  I DO.

15       THE DEPUTY CLERK:  YOU MAY BE SEATED.  PLEASE STATE AND

16  SPELL YOUR FULL NAME FOR THE RECORD.

17       THE WITNESS:  DONN FREIBERGER, D-O-N-N,

18  F-R-E-I-B-E-R-G-E-R.

19                    **DONN FREIBERGER**

20  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

21  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

22       MR. WATTS:  MAY I PROCEED, YOUR HONOR?

23       THE COURT:  YES.

24                 DIRECT EXAMINATION

25  BY MR. WATTS:

1   Q.   THANK YOU.  MR. FREIBERGER, I'M MIKAL WATTS.  YOU AND I MET

2   FOR THE FIRST TIME THIS MORNING; IS THAT RIGHT?

3   A.   YES, SIR.

4   Q.   YOU ARE APPEARING BY VIRTUE OF A SUBPOENA THAT WE DELIVERED

5   TO YOU TO BE HERE?

6   A.   YES, SIR.

7   Q.   WHERE DO YOU LIVE?

8   A.   SOUTH BEND, INDIANA.

9   Q.   AND SOUTH BEND, INDIANA, IS THAT NEAR THE MANUFACTURING

10  FACILITIES FOR GULF STREAM?

11  A.   YES, IT IS.

12  Q.   DID YOU USED TO WORK FOR GULF STREAM?

13  A.   I DID.

14  Q.   BEFORE YOU WORKED FOR GULF STREAM, COULD YOU SHARE WITH THE

15  JURORS SOME OF THE OTHER EMPLOYERS THAT YOU HAD?

16  A.   STARCRAFT AUTOMOTIVE, FOUR SEASONS MODULAR HOMES, ADVANTAGE

17  VANS.

18  Q.   OKAY.  WHAT YEARS DID YOU WORK AT GULF STREAM?

19  A.   2003 TO THE END OF 2005.

20  Q.   WERE YOU WORKING AT GULF STREAM DURING DECEMBER OF 2004?

21  A.   I WAS.

22          MR. WATTS:  MAY I APPROACH, YOUR HONOR?

23          THE COURT:  YES.

24                              EXAMINATION

25  BY MR. WATTS:

1  Q.   MR. FREIBERGER, I'M ONLY GOING TO HAVE YOU ON THE STAND FOR

2  A FEW MINUTES, BUT I WANT TO COVER THREE SUBJECTS WITH YOU.   THE

3  FIRST IS THE SUBJECT OF THE WOOD USED, THE SECOND IS THE SUBJECT

4  OF COMPLETED TRAILERS THAT WERE MADE, AND THE THIRD IS THE

5  SUBJECT OF THE EMPLOYEES THAT WERE MAKING THEM.   OKAY, SIR?

6  A.   YES, SIR.

7  Q.   THE FIRST SUBJECT, THE WOOD THAT WAS USED, BETWEEN 2003 AND

8  2005, WHAT DID YOU DO AT GULF STREAM?

9  A.   I BUILT PARTITION WALLS AND SLIDE-OUTS?

10  Q.   DID YOU BUILD PARTITION WALLS AND SLIDE-OUTS THAT WENT INTO

11  THE TRAILERS THAT WERE SOLD TO BE USED BY FEMA?

12  A.   YES.

13  Q.   TO BUILD PARTITION WALLS AND SLIDE-OUTS, DO YOU NEED WOOD?

14  A.   YES, YOU DO.

15  Q.   WAS THERE A COMMON LOCATION WITHIN THE GULF STREAM PLANTS TO

16  OBTAIN THE WOOD THAT YOU NEEDED TO CONSTRUCT WHAT YOU

17  CONSTRUCTED?

18  A.   YES, THERE WAS.

19  Q.   WHERE WAS THAT LOCATION OF WOOD?

20  A.   IN THE WAREHOUSE.

21  Q.   WAS THE WOOD STORED IN A COMMON AREA?

22  A.   YES.

23  Q.   AND WAS THE WOOD FROM THIS COMMON AREA OBTAINED BY THE

24  DIFFERENT FABRICATORS TO BUILD DIFFERENT COMPONENTS OF THESE FEMA

25  TRAILERS?

1   A.   YES, SIR.

2   Q.   NOW, THE JURY HAS HEARD SOME TESTIMONY; YOU HAVEN'T BEEN

3   HERE.  DID ANY OF THE WOOD THAT YOU SEE, WHEN YOU PICKED IT UP,

4   DID IT HAVE AN LFE STAMPED ON IT?

5        MR. WEINSTOCK:  I OBJECT TO THE FORM, YOUR HONOR.  IT'S

6   LEADING.  IT'S BEEN LEADING.  I SUSPECT IF I DON'T OBJECT, IT'S

7   GOING TO CONTINUE TO BE LEADING.

8        MR. WATTS:  DID IT OR DID IT NOT?  I DIDN'T SUGGEST THE

9   ANSWER.

10       THE COURT:  I DON'T THINK IT'S A LEADING QUESTION.  I'LL

11  OVERRULE.

12                          EXAMINATION

13  BY MR. WATTS:

14  Q.   DID ANY OF THE WOOD THAT YOU OBTAINED FROM THE COMMON AREA

15  AT THE GULF STREAM FACTORIES BETWEEN 2003 AND 2005 HAVE A STAMP

16  THAT SAID "FLE" ON IT?

17  A.   NO, SIR.

18  Q.   DID I SAY FLE?  I MEANT -- SURE SOUNDED LIKE LFE.  I'M

19  SORRY.  LET ME REASK THE QUESTION.

20       BETWEEN 2003 AND 2005, WHEN YOU WENT TO THE COMMON AREA

21  TO GET THE WOOD, DID ANY OF IT HAVE A STAMP THAT SAID "LFE" ON

22  IT?

23  A.   NO, SIR.

24  Q.   WERE YOU AWARE OF ANY POLICY AT GULF STREAM THAT REQUIRED

25  FABRICATORS OF DIFFERENT PARTS OF THESE GULF STREAM TRAILERS TO

1   USE ONLY LOW FORMALDEHYDE EMITTING WOODS?

2   A.   NO, SIR.

3   Q.   WAS ANY POLICY WITH RESPECT TO ONLY USING LFE EVER

4   COMMUNICATED TO YOU WHILE YOU WERE THERE?

5   A.   NO, SIR.

6   Q.   DID YOU USE THE WOOD THAT GULF STREAM PROVIDED YOU?

7   A.   YES, I DID.

8   Q.   ALL RIGHT.  I WANT TO TAKE YOU TO THE SECOND SUBJECT UP

9   THERE, AND THAT IS THE TRAILERS THAT WERE MADE.  DID YOU HAVE

10  OCCASION WHILE YOU WORKED AT GULF STREAM TO GO INTO THE TRAILERS

11  WHEN THEY WERE COMPLETED BEFORE THEY LEFT THE MANUFACTURING

12  FACILITY?

13  A.   YES.

14  Q.   AND COULD YOU DESCRIBE TO THE JURY WHAT IT IS THAT YOU

15  EXPERIENCED WHEN YOU OPENED THE DOOR TO GO INTO A COMPLETED

16  GULF STREAM TRAILER THAT WAS GOING TO BE PROVIDED TO FEMA?

17  A.   THERE WOULD BE LIKE A HIGH HEAT, AN ODOR THAT WOULD JUST

18  BURN YOUR EYES, YOUR NASAL PASSAGES AND TAKE YOUR BREATH AWAY.

19  Q.   NOW, I ASKED YOU ABOUT YOUR PREVIOUS EMPLOYERS, ADVANTAGE

20  VANS, STARWOOD INDUSTRIES, FOUR SEASONS.  HAD YOU HAD OCCASION TO

21  WORK AROUND FORMALDEHYDE IN PREVIOUS EMPLOYMENTS?

22  A.   I DID.

23  Q.   HOW DID YOU KNOW THAT YOU WERE WORKING AROUND FORMALDEHYDE

24  INSTEAD OF SOME OTHER CHEMICAL?

25  A.   BECAUSE IN THE CERTAIN PLACES THAT I WORKED, WE WOULD PUT

1  WARNING LABELS UP WARNING THAT THE WOOD CONTAINED FORMALDEHYDE,

2  WARNING OF IRRITATION.  THERE USED TO BE WARNINGS YEARS AGO OF

3  THAT.

4  Q.   DID THE FORMALDEHYDE THAT YOU WORKED AROUND IN PREVIOUS

5  EMPLOYMENT HAVE A DISTINCTIVE SMELL THAT YOU COULD RECOGNIZE?

6  A.   YES.

7  Q.   WHEN YOU WERE AT GULF STREAM USING THIS WOOD THAT DID NOT

8  HAVE AN LFE STAMP ON IT, DID THE WOOD CONTAIN THAT SAME

9  DISTINCTIVE SMELL?

10  A.   IT DID.

11  Q.   WHEN YOU ENTERED THE TRAILERS AND TOLD US THAT YOU HAD THIS

12  HEAT THAT CAME OUT AND A DISTINCTIVE SMELL THAT BURNED YOUR EYES,

13  WAS THAT THE SAME DISTINCTIVE SMELL?

14  A.   IT WAS.

15  Q.   DO YOU KNOW THAT THAT DISTINCTIVE SMELL THAT BURNED YOUR

16  EYES WHEN YOU ENTERED THE TRAILERS WAS FORMALDEHYDE?

17  A.   YES.

18  Q.   WHEN YOU ENTERED THE TRAILERS, YOU SAID IT BURNED YOUR EYES?

19  A.   YES.

20  Q.   DID YOUR EYES START RUNNING?

21  A.   YES.

22  Q.   DID THIS HAPPEN TO OTHER EMPLOYEES AT THE PLANT?

23  A.   YES, SIR.

24       MR. WEINSTOCK:  I OBJECT TO THE FORM, YOUR HONOR.

25       THE COURT:  IF HE'S OBSERVING IT, I THINK YOU HAVE TO

1  REPHRASE THE QUESTION.

2                          EXAMINATION

3  BY MR. WATTS:

4  Q.   DID YOU OBSERVE THIS HAPPENING TO OTHER EMPLOYEES AT THE

5  PLANT?

6  A.   YES, I DID.

7  Q.   DID YOU COMPLAIN ABOUT IT?

8  A.   NO, SIR.

9  Q.   WERE YOU TOLD WHAT WOULD HAPPEN IF YOU COMPLAINED?

10        MR. WEINSTOCK:  I OBJECT TO THE FORM, YOUR HONOR.  NOW

11  HE'S ASKING FOR HEARSAY.

12        MR. WATTS:  ACTUALLY, IT'S NOT.  IT'S NONHEARSAY UNDER

13  RULE 801.  THE FACT THAT HE'S TOLD IT, IT'S NOT BEING OFFERED FOR

14  THE TRUTH OF THE MATTER ASSERTED.

15        THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.  I DO

16  THINK IT SHOULD BE REWORDED, THOUGH.

17                          EXAMINATION

18  BY MR. WATTS:

19  Q.   WHAT WERE YOU TOLD ABOUT IF YOU COMPLAINED?

20  A.   NOT REALLY THAT YOU COMPLAINED, YOU WOULD DO YOUR JOB OR YOU

21  WOULD BE REPLACED BY SOMEBODY ELSE.  THAT IF YOU DIDN'T LIKE YOUR

22  JOB, YOU COULD FIND ANOTHER ONE.

23  Q.   NOW, SPEAKING OF EMPLOYEES MAKING THEM, I WANT TO TALK TO

24  YOU ABOUT THE CIRCUMSTANCES OF HOW YOU GET HERE TODAY.  DID THE

25  PLAINTIFFS' LAWYERS IN THIS LITIGATION PUT AN ADVERTISEMENT IN

1  THE PAPER UP WHERE YOU LIVE?

2  A.   YES, THEY DID.

3  Q.   DID WE ASK FOR PEOPLE THAT HAD EXPERIENCE WORKING IN

4  GULF STREAM TO COME TELL US WHAT THEY EXPERIENCED?

5  A.   YES, SIR.

6  Q.   DID YOU RESPOND TO THAT AD?

7  A.   YES.

8  Q.   ARE YOU HERE TO TELL THE TRUTH?

9  A.   YES.

10  Q.   WITH RESPECT TO THE THIRD TOPIC OF EMPLOYEES MAKING THEM, IT

11  IS A FACT THAT YOU WERE HERE WHILE UNDER PAROLE; IS THAT RIGHT?

12  A.   YES.

13  Q.   CAN YOU TELL THE MEMBERS OF THIS JURY HOW MANY DWI'S YOU

14  HAVE HAD?

15  A.   I HAVE FIVE.

16  Q.   HOW MANY HAD YOU HAD WHEN GULF STREAM HIRED YOU?

17  A.   FOUR.

18  Q.   THEY KNEW ABOUT THIS?

19  A.   YES.

20  Q.   AFTER YOU HAD YOUR FIFTH DWI, DID YOU SERVE TWO YEARS IN THE

21  INDIANA STATE PENITENTIARY?

22  A.   I DID.

23  Q.   AFTER YOU GOT OUT OF THE TWO YEARS OF THE INDIANA STATE

24  PENITENTIARY, DID GULF STREAM TALK TO YOU ABOUT COMING BACK TO

25  WORK FOR THEM?

1    A.    YES, SIR, THEY DID.

2              MR. WATTS:   THOSE ARE ALL OF MY QUESTIONS.

3              THE COURT:  CROSS.

4                        CROSS-EXAMINATION

5    BY MR. WEINSTOCK:

6    Q.    MR. FREIBERGER, WE MET BRIEFLY OUT IN THE HALLWAY.   HOW DID

7    YOU GET HERE TODAY?

8    A.    I FLEW.

9    Q.    ON YOUR OWN NICKEL?

10   A.    NO.

11   Q.    WHO PAID FOR YOUR FLIGHT?

12   A.    THE FIRM DID.

13   Q.    WHAT FIRM?

14   A.    BUZBEE.

15   Q.    DID YOUR WIFE COME WITH YOU?

16   A.    YES, SHE DID.

17   Q.    WHO PAID FOR HER FLIGHT?

18   A.    MR. BUZBEE.

19   Q.    DID YOU SAY YOU RECEIVED A SUBPOENA IN INDIANA TO APPEAR IN

20   COURT IN LOUISIANA?

21   A.    I RECEIVED A SUBPOENA FROM LOUISIANA TO APPEAR HERE.

22   Q.    DID SOMEBODY HAND YOU A SUBPOENA AND TELL YOU YOU WERE

23   REQUIRED TO COME TO THE STATE OF LOUISIANA?

24   A.    IT WAS MAILED TO ME.

25   Q.    AND THAT'S WHAT THEY TOLD YOU?

```
1   A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

2   Q.    WHO SIGNED IT?

3              THE COURT:  ANSWER VERBALLY.  SHE CAN'T WRITE IT DOWN.

4              THE WITNESS:  YES.

5                               EXAMINATION

6   BY MR. WEINSTOCK:

7   Q.    WHO SIGNED THE SUBPOENA?

8   A.    I BELIEVE MR. BUZBEE.

9   Q.    DID I UNDERSTAND YOU CORRECTLY THAT YOU BUILT SLIDE-OUTS FOR

10  FEMA UNITS?

11  A.    NO.  I SAID I BUILT SLIDE-OUTS AT GULF STREAM AND I DID

12  PARTITION WALLS IN THE FEMAS.

13  Q.    AND ALL THE WOOD SMELLED THE SAME, CORRECT?

14  A.    YES, IT DID.

15  Q.    WHETHER IT WAS GOING ON A FEMA UNIT OR ANOTHER UNIT,

16  MANUFACTURED WOOD, COMPRESSED WOOD CONTAINS FORMALDEHYDE?

17  A.    YES.

18  Q.    AND IT SMELLS OF FORMALDEHYDE, CORRECT?

19  A.    YES.

20  Q.    I MEAN, WE'VE STIPULATED TO THAT FACT IN THE CASE.

21  EVERYBODY KNOWS THAT, RIGHT?

22  A.    RIGHT.

23  Q.    EVERYBODY YOU'VE EVER WORKED WITH KNOWS THIS WOOD CONTAINS

24  FORMALDEHYDE?

25  A.    NOT EVERYBODY.
```

1  Q.   MOST OF THE PEOPLE?

2  A.   MOST PEOPLE.

3  Q.   YOU SAW THE WARNING SIGNS.

4         THE UNITS YOU WERE TALKING ABOUT WHERE IT IRRITATED

5  YOUR EYES WHEN YOU WENT IN, HOW MANY OF THOSE WERE 500 DAYS OLD?

6  A.   I CAN'T ANSWER THAT QUESTION.

7  Q.   THEY WERE BRAND-NEW UNITS, RIGHT?

8  A.   CORRECT.  ALL OF THEM WERE BRAND-NEW UNITS.

9  Q.   THEY WERE ALL BRAND-NEW UNITS WAITING TO BE SHIPPED OUT,

10  RIGHT?

11  A.   CORRECT.

12  Q.   TO DEALERSHIPS, IF THEY WERE BEING SOLD IN REGULAR RETAIL

13  AND TO FEMA, IF -- FOR THE GOVERNMENT IF IT WAS GOING TO FEMA,

14  RIGHT?

15  A.   CORRECT.

16  Q.   YOU'RE AWARE THAT AS TIME GOES ON, THAT GLUE ODOR GOES DOWN

17  AND DOWN, RIGHT?

18  A.   TO A CERTAIN POINT, YES.

19  Q.   SO REGARDLESS OF WHETHER IT WAS PARTITION WALLS FOR RETAIL

20  UNITS OR WORK YOU DID FOR FEMA UNITS, THE SAME PRODUCT?

21  A.   SAME MATERIAL.

22  Q.   HOW MANY TIMES DID YOU GET A CHANCE TO MEET WITH MR. BUZBEE

23  OR ONE OF HIS REPRESENTATIVES?

24  A.   ONCE THIS MORNING.

25  Q.   AND HIS REPRESENTATIVE IN INDIANA?

1  A.   AN INVESTIGATOR WAS AT MY HOUSE --

2  Q.   HOW MANY TIMES?

3  A.   ONCE.

4  Q.   ONCE.  AFTER YOU CALLED, RIGHT?

5  A.   YES.

6  Q.   AND I ACTUALLY SENT AN INVESTIGATOR TO TALK TO YOU, TOO,

7  DIDN'T I?

8  A.   YES.

9  Q.   NICE LITTLE AVON LADY, RIGHT?

10  A.   YEAH.

11  Q.   PINK CAR, RIGHT?

12  A.   NO.

13  Q.   DEBINPINK, HER E-MAIL ADDRESS.  DID SHE EVER E-MAIL YOU?

14  A.   NO.

15  Q.   AND YOU TOLD HER EVERY PLANT YOU EVER WORKED AT IS ALL THE

16  SAME, RIGHT?

17  A.   IT'S ALL THE SAME.

18        MR. WEINSTOCK:  IF I COULD HAVE ONE SECOND, YOUR HONOR.

19        THE COURT:  SURE.

20        MR. WEINSTOCK:  IN THAT CASE, I DON'T NEED THE SECOND.

21  THANK YOU, SIR.

22        MR. PENOT:  FLUOR HAS NO QUESTIONS.

23        THE COURT:  GO AHEAD, MR WATTS.

24                    REDIRECT EXAMINATION

25  BY MR. WATTS:

1  Q.   DID WE EXPLAIN TO YOU THAT WHEN WE SUBPOENAED YOU TO BE HERE

2  THAT THE RULES PROVIDE THAT WE CAN PAY FOR YOUR FLIGHT; IS THAT

3  RIGHT?

4  A.   YES.

5  Q.   YOU CAME IN LAST NIGHT?

6  A.   YES, I DID.

7  Q.   WE PAID FOR A HOTEL ROOM; IS THAT RIGHT?

8  A.   YES.

9  Q.   AND WE'RE PAYING FOR YOU TO FLY HOME?

10  A.   YES, SIR.

11  Q.   HAVE YOU BEEN OFFERED ANY OTHER FINANCIAL COMPENSATION

12  WHATSOEVER TO BE HERE?

13  A.   I HAVE NOT.

14  Q.   MR. WEINSTOCK ASKED YOU ABOUT SOMETHING THAT EVERYBODY

15  KNOWS, AND HE WENT THROUGH EVERYBODY KNOWS THAT FORMALDEHYDE IS

16  IN WOOD; DO YOU REMEMBER THAT?

17  A.   YES.

18  Q.   IN THE GULF STREAM PLANTS THAT MADE THE FEMA TRAILERS IN

19  DECEMBER OF 2004, IN TERMS OF THE CONDITIONS THAT YOU SAW, DID

20  EVERYBODY KNOW THAT WHEN YOU WENT INTO A FEMA TRAILER IT WOULD

21  BURN YOUR EYES?

22  A.   YES.

23  Q.   DID EVERYBODY IN THAT PLANT KNOW THAT WHEN YOU WENT INTO A

24  FEMA TRAILER IT WOULD CAUSE A RUNNY NOSE?

25  A.   YES.

1           MR. WEINSTOCK:  OBJECTION, YOUR HONOR, AS TO WHAT

2  EVERYBODY KNEW.

3           THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  HE

4  CAN'T TESTIFY AS TO WHAT OTHER PEOPLE KNEW.

5                            EXAMINATION

6  BY MR. WATTS:

7  Q.   WELL, I'LL TELL YOU WHAT, RUNNY EYES, RUNNY NOSES, BURNED

8  EYES, BLOODY NOSES --

9           THE COURT:  HE CAN TESTIFY TO WHAT HE OBSERVED, WHICH I

10  THINK IS WHAT YOU ASKED ON DIRECT.

11          MR. WATTS:  SURE.

12                            EXAMINATION

13  BY MR. WATTS:

14  Q.   WHEN COUNSEL ASKED YOU WHAT EVERYBODY KNOWS, IN TERMS OF

15  WHAT YOU OBSERVED, YOU OBSERVED RUNNY EYES, BURNED EYES, RUNNY

16  NOSES, BLOODY NOSES?

17  A.   YES.

18  Q.   LAST ISSUE.  COUNSEL ASKED YOU ABOUT WHETHER EVERY PLANT

19  THAT YOU WORKED IN IS ALL THE SAME; DO YOU REMEMBER THAT

20  QUESTION?

21  A.   YES.

22  Q.   THE OTHER PLANTS THAT YOU WORKED IN, THEIR PRODUCT WENT OUT

23  WITH A FORMALDEHYDE WARNING ON IT; IS THAT RIGHT?

24          MR. WEINSTOCK:  I OBJECT TO THE FORM, YOUR HONOR.

25          THE COURT:  COME ON UP.  WHEN THERE IS AN OBJECTION,

1  JUST WAIT FOR THE RULING, AND THEN YOU CAN EITHER ANSWER OR NOT.

2  COME ON UP.

3          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

4  A CONFERENCE HELD AT THE BENCH.)

5          MR. WEINSTOCK:  THAT WAS THE SUBJECT OF MOTION PRACTICE,

6  YOUR HONOR.

7          MR. WATTS:  IT'S RESPONDING DIRECTLY TO HIM SAYING ALL

8  THE PRODUCTS WERE THE SAME, ALL THE OTHER PRODUCTS WERE THE SAME.

9          MR. WEINSTOCK:  I DIDN'T ASK ABOUT THE -- WARNING.  I

10  DIDN'T OPEN ANY DOORS.  WE HAVE A MOTION IN LIMINE ON THIS THAT'S

11  PENDING.

12          THE COURT:  I DON'T RECALL THAT BEING PART OF THE CROSS.

13          MR. WATTS:  HE ASKED SPECIFICALLY WAS EVERY OTHER PLANT

14  THAT YOU WORKED AT THE SAME.

15          THE COURT:  AS TO PLANT, THE SAME, NOT THE PRODUCT.

16  YOU'RE ASKING ABOUT THE PRODUCT.

17          MR. WEINSTOCK:  RIGHT.

18          MR. WATTS:  AND IF THE PRODUCT WENT OUT WITH A WARNING

19  OR NOT.

20          THE COURT:  NO, I DON'T THINK THAT IT'S A PROPER

21  QUESTION BASED ON THE FACT THAT IT WASN'T COVERED AT ALL IN

22  CROSS.

23          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

24  CONFERENCE CONCLUDED.)

25                          EXAMINATION

1  BY MR. WATTS:

2  Q.   MR. FREIBERGER, YOU WERE ONE OF SEVERAL WITNESSES THAT

3  WORKED IN THE PLANT.  HAVE YOU TOLD US THE TRUTH ABOUT WHAT YOU

4  SAW HERE TODAY?

5  A.   YES.

6          MR. WATTS:  THANK YOU.

7          THE COURT:  THANK YOU, SIR.  YOU CAN STEP DOWN.  PLEASE

8  DON'T DISCUSS YOUR TESTIMONY WITH ANYONE WHO MIGHT BE A WITNESS

9  IN THIS TRIAL UNTIL THE TRIAL IS OVER.  THANK YOU FOR YOUR TIME.

10          WHO IS NEXT?

11          MR. BUZBEE:  PATRICIA WILLIAMS, YOUR HONOR.

12          THE COURT:  PATRICIA WILLIAMS.  DR. WILLIAMS, IF YOU'D

13  COME UP HERE.  PLEASE REMAIN STANDING UNTIL YOU TAKE THE OATH.

14          THE DEPUTY CLERK:  DO YOU SOLEMNLY SWEAR THE TESTIMONY

15  YOU ARE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND

16  NOTHING BUT THE TRUTH, SO HELP YOU GOD?

17          THE WITNESS:  I DO.

18                    **PATRICIA WILLIAMS**

19  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

20  CLERK, WAS EXAMINED AND TESTIFIED ON HER OATH AS FOLLOWS:

21          THE DEPUTY CLERK:  THANK YOU.  YOU MAY BE SEATED.  AND

22  PLEASE STATE YOUR NAME AND YOUR CORRECT SPELLING FOR THE RECORD.

23          THE WITNESS:  PATRICIA M. WILLIAMS.  P-A-T-R-I-C-I-A, M,

24  W-I-L-L-I-A-M-S.

25          THE COURT:  ALL RIGHT, MR. MEUNIER.  GO AHEAD.

```
 1                        DIRECT EXAMINATION

 2    BY MR. MEUNIER:

 3    Q.    GOOD MORNING, DR. WILLIAMS.

 4    A.    GOOD MORNING.

 5    Q.    PLEASE GIVE THE JURY YOUR OCCUPATION.

 6    A.    I AM A TOXICOLOGIST, AND I TEACH TOXICOLOGY AT THE

 7    UNIVERSITY OF NEW ORLEANS.  I'M A PROFESSOR, ASSOCIATE PROFESSOR

 8    FOR THE PONTCHARTRAIN INSTITUTE FOR ENVIRONMENTAL SCIENCES OF THE

 9    UNIVERSITY OF NEW ORLEANS.  AND I'M COORDINATOR OF THE TOXICOLOGY

10    RESEARCH LABORATORIES.

11            THE COURT:  COUNSEL, SHE'S BEING OFFERED AS AN EXPERT

12    WITNESS.  DO WE HAVE A STIPULATION AS TO EXPERTISE?

13            MR. WEINSTOCK:  YOUR HONOR, WE WOULD STIPULATE SHE'S AN

14    EXPERT IN TOXICOLOGY, BUT NOT EPIDEMIOLOGY.

15            MR. MEUNIER:  SHE WILL BE TENDERED AS AN EXPERT IN

16    TOXICOLOGY, YOUR HONOR.

17            THE COURT:  THE COURT WILL GO AHEAD AND, IN LIGHT OF THE

18    STIPULATION, ADMIT THIS WITNESS AND ACCEPT HER AS AN EXPERT IN

19    THE FIELD OF TOXICOLOGY.

20            ALL RIGHT, MR. MEUNIER, GO AHEAD AND PROCEED.

21                           EXAMINATION

22    BY MR. MEUNIER:

23    Q.    I MAY JUST COVER A COUPLE OF POINTS IN YOUR BACKGROUND

24    BEFORE YOU STATE YOUR OPINION, DOCTOR.  ACCORDING TO YOUR RESUMÉ

25    WHICH IS ON THE SCREEN, AFTER RECEIVING YOUR UNDERGRADUATE AND
```

1    MASTER'S DEGREE, YOU RECEIVED A PH.D. IN ANATOMY AT THE TULANE

2    MEDICAL SCHOOL; IS THAT TRUE?

3    A.    YES, THAT IS CORRECT.

4    Q.    AND YOU HAVE TWO BOARD CERTIFICATIONS NOTED HERE, ONE IN

5    TOXICOLOGY, THE OTHER IN -- IS IT CLINICAL PATHOLOGY AND MEDICAL

6    TECHNOLOGY?

7    A.    CLINICAL LABORATORY MEDICINE.  IT'S PERFORMANCE OF

8    LABORATORY PROCEDURES AND INTERPRETATION OF THEM, CLINICALLY,

9    LICENSED BY THE STATE OF LOUISIANA TO INTERPRET LABORATORY

10   PROCEDURES.

11   Q.    WHAT DOES IT MEAN TO BE BOARD CERTIFIED?

12   A.    IT MEANS YOU HAVE PROOF OF COMPETENCY.

13   Q.    AND IS THAT DONE ON A NATIONAL LEVEL?

14   A.    THE AMERICAN BOARD OF TOXICOLOGY IS ACTUALLY INTERNATIONAL

15   BOARD CERTIFICATION WITH ONLY 2,000 OF US INTERNATIONALLY.

16   Q.    HOW LONG HAVE YOU BEEN A BOARD-CERTIFIED TOXICOLOGIST?

17   A.    I SAT FOR THE BOARD THE YEAR AFTER KATRINA, 2006.

18   Q.    I ALSO, IN REGARD TO THE CERTIFICATION -- I'M SORRY, IN

19   REGARD TO THE CV, NOTICE THAT YOU HAVE A CERTIFICATION AS A

20   LABORATORY DIRECTOR?

21   A.    RIGHT.  THE FEDERAL GOVERNMENT, THAT'S A FEDERAL

22   GOVERNMENT -- HAS REQUIREMENTS, IF YOU ARE GOING TO HAVE --

23   OPERATE AND BE IN CHARGE OF A LABORATORY TO DO MEDICAL

24   SURVEILLANCE, WHICH I HAVE DONE FOR RESEARCH PURPOSES, AND

25   PERFORM LABORATORY PROCEDURES ON INDIVIDUALS TO LOOK FOR

1    PARAMETERS OR BLOOD TEST RESULTS OR URINE TEST RESULTS THAT SAY

2    THEY HAVE BEEN EXPOSED, AND THAT GIVES ME THE AUTHORITY TO

3    OPERATE A LABORATORY AND BE IN CHARGE OF INTERPRETING THOSE

4    PROCEDURES.

5    Q.   IN YOUR LABORATORY WORK, HAVE YOU BECOME FAMILIAR

6    SPECIFICALLY WITH FORMALDEHYDE?

7    A.   YES.  I'VE USED FORMALDEHYDE IN RESEARCH DURING BOTH MY

8    MASTER'S WORK, AS WELL AS IN MY DOCTORAL WORK IN ANATOMY.

9    Q.   HAVE YOU BECOME FAMILIAR WITH THE NATURE AND CHEMICAL

10   BEHAVIOR OF FORMALDEHYDE SPECIFICALLY AS IT INTERACTS WITH THE

11   HUMAN ANATOMY?

12   A.   YES.  IN MY RESEARCH, I USED IT TO TAKE TISSUES, SUCH AS

13   LITTLE SLIMY LIVER, AND PUT FORMALDEHYDE ON IT SO IT WOULD BECOME

14   VERY RIGID, SO THAT I CAN THEN TREAT IT WITH OTHER CHEMICALS AND

15   SLICE IT AND LOOK AT IT UNDER A VERY BIG MICROSCOPE THAT'S AS BIG

16   AS WHERE WE'RE SITTING RIGHT NOW.

17   Q.   AND FINALLY, WITH RESPECT TO YOUR RESUMÉ, DOCTOR, I SEE THAT

18   YOU HAVE DONE A STUDY AT BOTH TUFTS UNIVERSITY AND MICHIGAN IN

19   REGARD TO EPIDEMIOLOGY?

20   A.   YES.

21   Q.   WOULD YOU EXPLAIN WHY AS A TOXICOLOGIST YOU DO WORK AND

22   STUDY IN THE FIELD OF EPIDEMIOLOGY?

23   A.   BECAUSE TOXICOLOGISTS ARE RESPONSIBLE FOR ANALYZING THE

24   STRENGTHS OF ASSOCIATION, THAT IS, THE INCREASED CANCERS OR THE

25   INCREASED DISEASES IN LOOKING AT THAT NUMBER, WHICH IS JUST A

1    NUMBER UNTIL WE CAN TELL YOU WHAT THAT NUMBER REALLY MEANS BY THE

2    MECHANISMS OF ACTION OR OTHER DATA THAT WE HAVE THAT GIVE US THE

3    BIOLOGIC PLAUSIBILITY, DO WE KNOW WHAT IT REALLY MEANS.

4    Q.   SO ARE EPIDEMIOLOGICAL RESEARCH AND STUDIES AND DATA TOOLS

5    THAT YOU ROUTINELY USE IN YOUR WORK AND IN YOUR CAREER AS A

6    TOXICOLOGIST?

7    A.   YES.

8    Q.   DOCTOR, HAVE YOU AUTHORED OR COAUTHORED PEER-REVIEWED

9    PUBLICATIONS IN TOXICOLOGY?

10   A.   YES.

11   Q.   HAVE YOU BEEN ACCEPTED BY COURTS TO TESTIFY AT TRIAL AS AN

12   EXPERT IN TOXICOLOGY?

13   A.   YES.

14   Q.   WOULD YOU TELL THE JURY IN SUMMARY WHAT THE FIELD OF

15   TOXICOLOGY ADDRESSES.

16   A.   IT ADDRESSES THE HEALTH EFFECTS, THE ADVERSE EFFECTS OF

17   CHEMICALS ON LIVING ORGANISMS, HUMANS AND ANIMALS.

18   Q.   IS ONE OF THE QUESTIONS THAT ARE TRADITIONALLY ADDRESSED BY

19   TOXICOLOGISTS THE QUESTION OF WHETHER SCIENCE SUPPORTS AN

20   ASSOCIATION OR RELATIONSHIP BETWEEN A GIVEN CHEMICAL AND HUMAN

21   DISEASE OR INJURY?

22   A.   YES.

23   Q.   AND IS THIS REFERRED TO TYPICALLY AS A QUESTION OF GENERAL

24   CAUSATION?

25   A.   YES.

1    Q.    WERE YOU ASKED BY US ON THE PLAINTIFF'S BEHALF IN THIS CASE

2    TO ADDRESS A GENERAL CAUSATION QUESTION DEALING WITH EXPOSURE TO

3    FORMALDEHYDE?

4    A.    YES.

5    Q.    IN ANALYZING SUCH A QUESTION AS GENERAL CAUSATION, DO

6    SCIENTISTS SUCH AS YOURSELF FOLLOW A RECOGNIZED METHOD OR

7    METHODOLOGY IN ORDER TO ARRIVE AT THE ANSWER TO THE QUESTION?

8    A.    YES.

9    Q.    IS IT THE SAME METHODOLOGY THAT IS PUBLISHED IN THIS BOOK?

10   A.    YES.

11   Q.    *THE REFERENCE MANUAL ON SCIENTIFIC EVIDENCE*, SECOND EDITION?

12   A.    YES.

13   Q.    AND IT'S A BOOK PUBLISHED BY THE FEDERAL JUDICIAL CENTER,

14   CORRECT?

15   A.    YES.

16   Q.    AS SOMEONE SUCH AS YOURSELF WHO HAS WORKED IN CASES AS A

17   TOXICOLOGIST, YOU'RE AWARE THAT THIS MANUAL PUBLISHED BY THE

18   FEDERAL JUDICIAL CENTER IS USED BY COURTS, ATTORNEYS AND EXPERT

19   WITNESSES TO VALIDATE THE SCIENCE OF THEIR APPROACH, TRUE?

20   A.    YES.

21   Q.    AND SO YOU HAVE USED THE METHODOLOGY IN THAT BOOK.  AND WHAT

22   IS THE GENERAL NATURE OF THAT METHODOLOGY?  WHAT IS IT REFERRED

23   TO AS?

24   A.    IT'S REFERRED TO AS THE SIR BRADFORD HILL CONSIDERATIONS

25   BECAUSE SIR BRADFORD HILL WAS THE FIRST ONE TO PULL ALL OF THE

1    METHODOLOGY TOGETHER IN A NICE FORM, AND IT WAS USED BY THE

2    SURGEON GENERAL, AT LEAST THIS METHODOLOGY, IN MAKING THE CAUSAL

3    CONNECTION ON LUNG CANCER FROM SMOKING.

4    Q.    LET ME REFER YOU TO THAT PORTION OF YOUR WRITTEN REPORT,

5    DOCTOR, WHERE YOU SPECIFY THE DIFFERENT COMPONENT PARTS OF THIS

6    METHODOLOGY, THE SAME ONE THAT'S IN THE REFERENCE MANUAL, THE

7    SIR BRADFORD HILL METHODOLOGY.  ARE THESE THE SPECIFIC COMPONENTS

8    OF THE METHODOLOGY THAT YOU REFERRED TO?

9    A.    YES.

10   Q.    AND YOU FOLLOWED IN THIS CASE?

11   A.    YES.

12   Q.    STRENGTH OF ASSOCIATION OF THE DISEASE AND EXPOSURE IS THE

13   FIRST?

14   A.    YES.

15   Q.    CONSISTENCY IS THE SECOND?

16   A.    YES.

17   Q.    DOSE RESPONSE OR BIOLOGICAL GRADIENTS IS THE THIRD?

18   A.    YES.

19   Q.    THE FOURTH IS TEMPORAL.  IS THERE A TEMPORAL RELATIONSHIP

20   BETWEEN DISEASE AND EXPOSURE?  CORRECT?

21   A.    YES.

22   Q.    THE FIFTH IS BIOLOGIC PLAUSIBILITY?

23   A.    YES.

24   Q.    THAT'S AN IMPORTANT ONE, ISN'T IT?

25   A.    VERY.

1  Q.   WE'LL TALK ABOUT THAT.  THE NEXT IS COHERENCE?

2  A.   YES.

3  Q.   AND THE FINAL IS EXPERIMENTAL EVIDENCE, TRUE?

4  A.   TRUE.

5  Q.   NOW, BASED UPON THIS ESTABLISHED METHODOLOGY, DID YOU ARRIVE

6  AT AN OPINION AS TO THE CAUSAL RELATIONSHIP BETWEEN EXPOSURE TO

7  FORMALDEHYDE AND CANCER?

8  A.   YES.  MY OPINION WAS THAT FORMALDEHYDE CAN CAUSE CANCER.  I

9  ADDRESSED THE UPPER RESPIRATORY TRACT CANCERS IN THIS PARTICULAR

10 REPORT.

11 Q.   NOW, HOW DID THE FIRST FACTOR OF STRENGTH OF ASSOCIATION

12 SUPPORT THAT CONCLUSION?

13 A.   WELL, YOU HAVE EPIDEMIOLOGICAL STUDIES THAT GENERATE

14 NUMBERS.  BASICALLY THE NUMBERS MEAN, IF THEY ARE OVER -- IF THEY

15 INCREASE OVER ONE, THAT MEANS IT IS ABOVE BACKGROUND.  IF THEY

16 ARE TWO TIMES GREATER, THEN IT'S TWO TIMES BACKGROUND THAT YOU

17 SEE THAT KIND OF AN INCREASE IN THE CANCERS.  AND IN THIS CASE,

18 WE HAVE WORKER EPIDEMIOLOGY STUDIES, SO THAT THE STUDIES ARE

19 SAYING THE INCREASES IN THE CANCERS IN THESE WORKERS IS TWO TIMES

20 GREATER, OR WHATEVER THE STUDY IS GIVING YOU FOR THAT PARTICULAR

21 STUDY, FOR THOSE PARTICULAR WORKERS.

22 Q.   WHEN YOU SAY BACKGROUND, TWO TIMES GREATER THAN BACKGROUND,

23 WHAT DO YOU MEAN?

24 A.   THAT WOULD BE THE GENERAL POPULATION OR A CONTROL GROUP THAT

25 WAS NOT EXPOSED TO FORMALDEHYDE.

1   Q.   SO YOU TAKE A GENERAL POPULATION OUT WALKING IN THE

2   ENVIRONMENT, AND THE DEFENDANTS ARE INSISTING FORMALDEHYDE IS

3   EVERYWHERE IN THE ENVIRONMENT, AND THAT'S BACKGROUND DATA; AND,

4   THEN YOU TAKE WORKERS EXPOSED TO FORMALDEHYDE, AND THAT'S WHERE

5   THE STUDY COMPARISON IS DRAWN?

6   A.   CORRECT.  SOME OF THEM USE THE GENERAL POPULATION.  SOME USE

7   OTHER WORKERS THAT DO NOT HAVE FORMALDEHYDE EXPOSURE.

8   Q.   WHAT IS THE SIGNIFICANCE OF THE FACT THAT A LOT OF THE

9   STUDIES DEAL WITH WORKER EXPOSURE, THAT IS, EXPOSURE IN THE

10  WORKPLACE?

11  A.   A VERY IMPORTANT DIFFERENCE IN A WORKER WHO IS IN A

12  WORKPLACE WHERE OSHA REQUIRES THAT AT ONE-HALF OF A PART PER

13  MILLION, THEY BE MONITORED IF THE EXPOSURE GOES OVER THAT, THAT

14  THEIR WORKPLACE BE MONITORED FOR CONCENTRATIONS.

15       AT THREE-FOURTHS OF A PART PER MILLION, THAT'S THE MAX

16  THAT THEY CAN EVER HAVE ON AN EIGHT-HOUR DAY; AND, IF IT GOES

17  OVER THAT, THEY ARE GOING TO HAVE PERSONAL PROTECTIVE RESPIRATORY

18  EQUIPMENT.  OSHA PROTECTS THE WORKERS.

19       AND IT'S FOR AN EIGHT-HOUR DAY.  THAT IS VERY

20  DIFFERENT.  AND IT'S ALSO, BESIDES THEIR PERSONAL PROTECTION,

21  IT'S FOR INDUSTRIAL HYGIENE CONTROLS, VENTILATION.  WHEN I WORKED

22  WITH IT, I HAD HOODS THAT WOULD SUCK OUT ANY FUMES IMMEDIATELY.

23       SO THE WORKERS HAVE A LOT OF THINGS.  THEY MAY BE

24  WORKING IN IT AT THREE-QUARTERS OF A PARTS PER MILLION, BUT THEY

25  ARE WORKING IN A SPECIFICALLY DESIGNED ENVIRONMENT WHERE FUMES

1  AND CONCENTRATION IS GOING TO BE RAPIDLY TURNED OVER; WHEREAS,

2  SOMEONE IN A RESIDENTIAL STUDY, IN A MOBILE HOME, DOESN'T HAVE

3  THAT VENTILATION MECHANISM TO OFFER THEM PROTECTION.  AND THEY

4  ARE 24 HOURS A DAY, 7 DAYS A WEEK, AND THEY ARE NOT WEARING

5  PERSONAL PROTECTIVE EQUIPMENT.

6  Q.   SO THE STUDIES THAT YOU LOOKED AT, INCLUDING WORKER STUDIES,

7  AND YOU'VE EXPLAINED THE DIFFERENCE BETWEEN EXPOSURE OF A WORKER

8  AND SOMEONE IN A RESIDENCE, BUT THOSE STUDIES SUPPORTED IN YOUR

9  VIEW A STRENGTH OF ASSOCIATION BETWEEN THE EXPOSURE TO

10  FORMALDEHYDE AND CANCER?

11  A.   YES, THEY DID.

12  Q.   THE SECOND FACTOR IS CONSISTENCY.  TELL THE JURY HOW THAT

13  FACTOR SUPPORTED YOUR CONCLUSION.

14  A.   WELL, YOU WANT TO SEE AN INCREASE IN CANCERS IN MORE THAN

15  ONE STUDY.  SO YOU WANT TO SEE CONSISTENCY MORE IN SEVERAL

16  STUDIES WITH THIS INCREASE IN CANCER FROM FORMALDEHYDE EXPOSURE.

17  AND SO THAT IS WHAT CONSISTENCY MEANS.

18  Q.   NOW, YOU FOUND EXPOSURE RELATIONSHIP TO CANCER IN MORE THAN

19  ONE STUDY?

20  A.   MANY STUDIES, YES.

21  Q.   AND MORE THAN THE RELATIVE RISK OR ODDS RATIO OF TWO?

22  A.   CORRECT.

23  Q.   WHICH MEANS IT WAS MORE THAN TWICE THE BACKGROUND, AS YOU

24  SAY?

25  A.   CORRECT.

1   Q.   WHAT ABOUT NEGATIVE STUDIES?   I MEAN, AREN'T THERE A BUNCH

2   OF STUDIES OUT THERE, AND THE DEFENDANTS TALK ABOUT THEM, THAT

3   SHOW NO RELATIONSHIP BETWEEN FORMALDEHYDE AND CANCER?

4   A.   WELL, THERE ARE.   THERE ARE SOME STUDIES THAT DON'T SHOW

5   MUCH OVER BACKGROUND.   BUT, EVEN IN SOME OF THOSE -- AND THERE

6   ARE STUDIES THAT SHOW INCREASES BETWEEN THE BACKGROUND OF 1.0 AND

7   THE DOUBLE RAISED 2.0 STANDARD.   AND WE LEARNED TO LOOK AT IS

8   THERE AN INCREASE IN THOSE CONCENTRATIONS?   AS WE INCREASE THE

9   DOSE OR THE CONCENTRATION IN THE ENVIRONMENT, DO WE SEE AN

10  INCREASE IN CANCERS?

11          IT'S SIMILAR TO WHAT WE CALL IN TOXICOLOGY WORDS, DOSE

12  RESPONSE.   IN EPIDEMIOLOGY, WE CALL IT A BIOLOGICAL GRADIENT.   SO

13  YOU'RE NOT GOING TO JUMP FROM A ONE TO A TWO.   YOU'RE GOING TO

14  SEE THIS GRADED RESPONSE.   AS YOU INCREASE THE AMOUNT OF

15  CONCENTRATION OF THE EXPOSURE OF FORMALDEHYDE, YOU'RE GOING TO

16  SEE SOME OF THE INCREASES IN THE CANCERS.

17  Q.   SO THE THIRD CONSIDERATION WE'RE NOW TALKING ABOUT, WHICH IS

18  DOSE RESPONSE OR BIOLOGICAL GRADIENT, THAT FACTOR IS LOOKED AT IN

19  NOT JUST STUDIES THAT SHOW A RELATIONSHIP, BUT EVEN STUDIES THAT

20  DON'T DEMONSTRATE IT BECAUSE OF WHAT THE STUDIES THEMSELVES TALK

21  ABOUT; IS THAT TRUE?

22  A.   RIGHT.   YOU'RE LOOKING AT THOSE TO SEE IF YOU'RE FINDING

23  THAT GRADIENT TO GET TO THAT LEVEL WHERE YOU CAN SAY THIS IS

24  TWICE GREATER THAN THE BACKGROUND.

25  Q.   SO EVEN A SO-CALLED NEGATIVE STUDY, ONE THAT THE OUTCOME OF

1  WHICH IS, LOOK, WE DIDN'T DEMONSTRATE A RELATIONSHIP IN THIS

2  STUDY, IN THOSE STUDIES YOU WILL SEE THAT AN INCREASE IN DOSE OR

3  EXPOSURE WILL INCREASE THE RISK OF CANCER?

4  A.   CORRECT.  YOU SHOULD SEE THAT.  THAT IS EVIDENCE OF

5  CARCINOGENICITY.

6  Q.   THE NEXT CONSIDERATION IS THE TEMPORAL CONSIDERATION.  HOW

7  DID THAT COME TO PLAY IN YOUR ANALYSIS?

8  A.   WELL, YOU MUST HAVE THE CAUSE BEFORE THE EFFECT.  IF YOU

9  HAVE THE CANCER BEFORE YOU EVEN GO INTO AN EXPOSURE OF

10  FORMALDEHYDE, THEN IT CERTAINLY CAN'T BE RELATED.  YOU MUST HAVE

11  THE EXPOSURE FIRST AND THEN MONITOR THE PROGRESSION TO A CANCER.

12  Q.   AND THE SCIENCE OF FORMALDEHYDE EXPOSURE AND CARCINOGENICITY

13  SHOWS THAT TEMPORAL RELATIONSHIP?

14  A.   YES.  THESE WERE ALL STUDIES WHERE WORKERS WERE EXPOSED, AND

15  THEN TIME LATER, SOMETIMES 20 YEARS LATER, IT WOULD TAKE MAYBE

16  EVEN 30 TO SEE THE CANCERS.

17  Q.   NOW, LET'S TALK ABOUT THE NEXT CONSIDERATION, WHICH IS

18  BIOLOGICAL PLAUSIBILITY.  PUT THAT IN LAY TERMS FOR US.  WHAT

19  DOES THAT FACTOR MEAN?

20  A.   IS THIS REASONABLE?  IS THIS CONSISTENT WITH WHAT WE KNOW IN

21  SCIENCE?  IS THERE AN EXPLANATION FOR HOW FORMALDEHYDE CAUSES THE

22  DAMAGE IN A CELL THAT CAN TURN INTO A CANCER CELL?

23  Q.   WHAT DOES SCIENCE TELL US ABOUT THAT, DR. WILLIAMS?

24  A.   YES, WE KNOW A GREAT DEAL ABOUT THE BIOLOGIC PLAUSIBILITY

25  AND THE MECHANISM OF ACTION OF FORMALDEHYDE.  IT IS VERY REACTIVE

1  AS A MOLECULE, AND IT IS VERY REACTIVE AND CAN CAUSE DAMAGE TO

2  CELLS.

3  Q.   WHAT DOES IT MEAN TO SAY THAT FORMALDEHYDE IS VERY REACTIVE?

4  A.   WELL, YOU HAVE TO LOOK AT THE MOLECULAR LEVEL FOR THAT.  AND

5  IT'S A VERY -- IT'S A CELL THAT IS UNBALANCED IN ITS OUTER SHELL.

6  IT'S LOOKING -- IT'S MORE POSITIVE.  LIKE A MAGNET IS NEGATIVE,

7  WELL, IT'S MORE POSITIVE, AND SO IT'S LOOKING FOR NEGATIVE

8  MOLECULES, AND IT'S GOING TO STICK.

9        THAT'S WHY I USED IT IN THE LAB.  I MADE CROSS LINKS IN

10  THOSE TISSUES, LIKE A CHICKEN WIRE FENCE.  WHEN I PUT THE

11  FORMALDEHYDE, IT WOULD TAKE THE TISSUES AND MAKE IT BIND IN

12  SEQUENTIAL, SO THAT YOU HAVE SORT OF MOLECULARLY, THINK OF A

13  CHICKEN WIRE FENCE, AND SO NOW IT WAS SOLID.  AND THAT'S HOW IT

14  BINDS TO CELLS.  AND IN DOING THAT, IT CERTAINLY DAMAGES THEM;

15  AND, IF IT BINDS INSIDE THE CELL, WHICH IT DOES, IT CAN ATTACH TO

16  THE DNA AND TOTALLY DAMAGE THAT DNA.  AND THAT'S WHEN YOU HAVE A

17  HIT.  WE WOULD CALL IT A HIT.

18        AND FROM THEN ON, IF THE HIT ISN'T REPAIRED, THE DAMAGE

19  ISN'T REPAIRED, THEN IT WILL GO ON AND DIVIDE AND FORM TWO NEW

20  CELLS THAT NOW CAN GO ON, IF THE HIT IS AT THE CANCER GENES, TO

21  BECOME A CANCER CELL AND CONTINUE TO FORM CANCER.

22  Q.   BUT THE DEFENDANTS SAY, WAIT, BUT FORMALDEHYDE HAS A VERY

23  SHORT HALF-LIFE.  IT DOESN'T LAST LONG ENOUGH IN THE BODY TO HURT

24  ANYBODY.  WHAT DO YOU SAY TO THAT?

25  A.   THAT'S IN THE BLOOD.  IT'S THE HALF-LIFE THAT IS -- THAT

1  THEY ARE REFERRING TO IS 1 MINUTE IN THE BLOOD, AND THAT'S

2  BECAUSE IT IS RAPIDLY HANDLED BY OUR BODY BECAUSE OUR BODY IS

3  MADE TO TRY TO USE IT, GET RID OF IT; BUT, IT ALSO REMAINS, ABOUT

4  40 PERCENT OF IT REMAINS IN OUR BODY ATTACHED, AS THE CHICKEN

5  WIRE THOUGHT IT HAD ATTACHED, IT HAS REACTED WITH DIFFERENT

6  COMPONENTS.

7  Q.   DR. DEROSA TESTIFIED IN A DEPOSITION FOR TRIAL PURPOSES

8  YESTERDAY ABOUT THE CROSS LINKS IN THE DNA PROTEIN.  IS THAT THE

9  SAME MECHANISM THAT YOU AND OTHER SCIENTISTS RECOGNIZE WHEN WE

10 TALK ABOUT THE CARCINOGENICITY OF FORMALDEHYDE?

11 A.   RIGHT.  THE MECHANISM OF CARCINOGENESIS WOULD BE THE CROSS

12 LINKS IN THE DNA.  THAT'S ONE MECHANISM.  AND THAT'S THE MAIN ONE

13 THAT WE ARE CONCERNED ABOUT BECAUSE IT CAN DISTORT THE NORMAL DNA

14 BY ATTACHING.  AND THEN MISTAKES ARE MADE WHEN THE DNA IS COPIED

15 AND TO BE SPLIT INTO TWO DAUGHTER CELLS.  AND SO IF WE HAVE AN

16 ERROR THAT ISN'T CORRECTED, NOW WE HAVE TWO DAUGHTER CELLS THAT

17 CAN GO ON TO DIVIDE INTO A TUMOR OR TO A CANCER.

18 Q.   SO IN SCIENCE, WE SEE A BIOLOGICAL PLAUSIBILITY, AN

19 EXPLANATION, AT A VERY CELLULAR LEVEL, ON HOW FORMALDEHYDE LEADS

20 TO CANCER?

21 A.   THAT IS CORRECT.

22 Q.   UNLESS THERE IS SOME REPAIR DONE OF THE DNA DAMAGE THAT

23 FORMALDEHYDE DOES BECAUSE IT'S SO HIGHLY REACTIVE?

24 A.   THAT'S CORRECT.

25 Q.   YOU LOOKED AT CERTAIN STUDIES, DIDN'T YOU, THAT SPECIFIED IN

1  TALKING ABOUT THIS LINK BETWEEN FORMALDEHYDE EXPOSURE AND CANCER;

2  THESE WERE STUDIES THAT ACTUALLY SPECIFIED THE DOSE LEVELS OF

3  FORMALDEHYDE THAT WERE THE SUBJECT OF THE STUDY?

4  A.   RIGHT.

5  Q.   AND I WANT TO JUST BRIEFLY TALK ABOUT THESE BECAUSE WE HEAR

6  A LOT FROM THE DEFENDANTS ABOUT HOW SMALL .05 PPM IS IN THIS

7  TRAILER WHEN IT WAS TESTED IN JANUARY OF '08.

8          THE FIRST STUDY YOU HAVE HERE IS THE SHAHAM STUDY,

9  CORRECT?

10  A.   CORRECT.

11  Q.   AND IN LAY TERMS, WHAT DID SHAHAM TELL US, AND SPECIFICALLY

12  ABOUT DOSE AND CONCENTRATION?

13  A.   WELL, HE LOOKED AT WORKERS, AND HE TOOK CELLS.  AND THESE

14  WERE WORKERS WHO WERE EXPOSED AT CONCENTRATIONS STARTING AT THE

15  40 PARTS PER BILLION LEVEL.

16          AND HE LOOKED AT THEIR BLOOD CELLS, AND HE LOOKED FOR

17  DNA PROTEIN CROSS LINKS, THE CHICKEN WIRE, THE FORMALDEHYDE ABLE

18  TO ATTACH TO THE DNA.  AND THAT'S WHAT -- AND IT IS STATISTICALLY

19  SIGNIFICANT.  THIS SAYS THAT THE ERROR RATE, IF YOU SAW THE

20  RESULTS THAT HE OBTAINED, YOU COULD BE SURE THAT YOU WOULD ONLY

21  SEE THIS -- IF YOU SAW IT AGAIN, IT WOULD BE A ONE IN A HUNDRED

22  CHANCE THAT YOU WOULD SEE A 1 PERCENT CHANCE THAT THIS WOULD

23  BE -- EVER OCCUR BY CHANCE.

24  Q.   AND JUST SO WE'RE COMPARING APPLES AND APPLES, WHEN WE SAY

25  .05 PPM IN THE ALEXANDER TRAILER TESTED IN JANUARY OF '08, THAT'S

1   50 PPB, 50 PARTS PER BILLION?

2   A.   THAT IS CORRECT.

3   Q.   SO THAT 50 PARTS PER BILLION IS WHAT WOULD BE COMPARED TO

4   THESE DOSE LEVELS IN THESE CANCER STUDIES?

5   A.   THAT'S CORRECT.

6   Q.   AND THE FIRST ONE, SHAHAM, TALKED ABOUT A 40 PARTS PER

7   BILLION EXPOSURE?

8   A.   THAT'S THE LOWEST RANGE OF THE EXPOSURE FROM THE WORKERS

9   THAT HE TOOK THE SAMPLES FROM.

10  Q.   WHAT ABOUT THE BALLARIN STUDY?

11  A.   HE LOOKED AT A LITTLE DIFFERENT PARAMETER.  WHEN YOU -- HE

12  LOOKED AT -- IT'S CALLED FREQUENCY OF MICRONUCLEATED CELLS, BIG,

13  BIG WORDS.  BUT WHAT IT IS, IS WHEN YOUR CELL IS DIVIDING, IT'S

14  GOING TO COPY THE DNA, AND THEN IT'S GOING TO PUT THE COPIES, ONE

15  IN EACH DAUGHTER CELL.

16       IF THERE IS AN ERROR OR A DAMAGE TO THE DNA, IT'S GOING

17  TO LEAVE ONE OF THOSE CHROMOSOMES OR MORE OUT OF THE CELL, OUT OF

18  WHAT'S GOING TO DIVIDE.  AND SO YOU SEE AN ABNORMAL, ISOLATED

19  CHROMOSOME SITTING OUTSIDE OF THE NUCLEUS, WHICH TELLS YOU IT GOT

20  LEFT BEHIND, IT WAS DAMAGED, AND IT DIDN'T GO INTO THE TWO

21  DAUGHTER CELLS.  SO YOU HAVE AN ABNORMAL CELL NOW.

22  Q.   AND THEN, FINALLY, IN THE COSTA STUDY, YOU MENTIONED SEVERAL

23  DIFFERENT FINDINGS THERE.  AND, AGAIN, IN TERMS OF DOSE AND

24  EXPOSURE CONCENTRATION, WHAT DO WE LEARN IN THAT STUDY?

25  A.   40 PARTS PER BILLION -- THIS WAS HIS WORKER -- RANGE OF HIS

1   WORKERS, WHERE HE DID THIS.  AND THEY LOOKED AT THE SAME THING.

2   THEY LOOKED AT CELLS IN WORKERS.  AND AT 40 -- THESE WERE THE

3   WORKER RANGES OF THEIR EXPOSURES -- 40 PARTS PER BILLION TO 1.58

4   PARTS PER MILLION.  AND HE FOUND, AGAIN, DAMAGE TO THE DNA.

5        HE USED DIFFERENT PARAMETERS.  IN ONE, CHROMOSOMES WERE

6   BROKEN OFF AND CYSTOCHROME WAS THEN EXCHANGED, JUST MEANS THEY

7   SWAPPED DNA.  SORT OF LIKE THE TRISOMY THAT YOU SEE IN DOWNS

8   SYNDROME, IT GOES WITH THE WRONG CHROMOSOME AND CAUSES A LOT OF

9   ADVERSE EFFECTS.

10  Q.   AND WE'VE TALKED ABOUT THE .05 PPM, OR 50 PARTS PER BILLION,

11  THAT WAS TESTED HERE IN JANUARY OF '08.  IF THERE'S EVIDENCE FROM

12  EXPERTS THAT THE LEVEL WAS ACTUALLY .23 PPM AT THE TIME OF

13  OCCUPANCY HERE, THAT WOULD BE 230 PARTS PER BILLION?

14  A.   CORRECT.

15  Q.   NOW, THE NEXT FACTOR AFTER BIOLOGICAL PLAUSIBILITY -- WELL,

16  I THINK WE TALKED ABOUT COHERENCE?

17  A.   WELL, COHERENCE IS WHEN YOU ARE LOOKING AT THESE STUDIES,

18  THESE WORKER STUDIES, WE KNOW THAT IT TAKES TIME FOR THE CANCER

19  TO SHOW.  YOU CAN SEE WHAT WE JUST SHOWED YOU ON THIS CHART OF

20  EVIDENCE OF DNA DAMAGE, BUT IT COULD TAKE 20 YEARS TO 30 YEARS TO

21  SEE THE ACTUAL CANCER.

22       AND SO THE COHERENCE, THE STUDIES DID BEAR OUT THAT IT

23  TOOK TIME TO SEE THE CANCER.  AND YOU WANT TO MAKE SURE THAT YOU

24  ARE SEEING SOMETHING THAT FITS THE CANCER TYPE OF WHAT YOU KNOW

25  IS CALLED A LATENCY AND THE TIME TO DEVELOP THE CANCER IN THESE

1   STUDIES.  AND WE DID.  I DID.

2   Q.    THE FINAL FACTOR IS EXPERIMENTAL EVIDENCE.  HAVE WE COVERED

3   THAT, OR IS THERE SOMETHING ELSE?

4   A.    NO, THERE IS SOMETHING ELSE.  WE LOOK TO SEE DO WE HAVE AN

5   ANIMAL MODEL WHERE WE CAN MAKE A NASAL CANCER FROM FORMALDEHYDE?

6   BECAUSE THAT IS EVIDENCE OF CARCINOGENICITY.  AND, YES, WE DO.

7           WE HAVE AN ANIMAL MODEL THAT IF WE WANT TO STUDY THE

8   NASAL CANCERS FROM FORMALDEHYDE NOW, WE CAN JUST FOLLOW THE

9   PROTOCOL AND MAKE THE CANCER.  AND THAT TELLS YOU, YOU REALLY DO

10  HAVE A CARCINOGEN HERE.

11  Q.    NOW, THERE'S BEEN REFERENCE TO IARC, THE INTERNATIONAL

12  AGENCY FOR RESEARCH ON CANCER.  YOU'RE FAMILIAR WITH IARC?

13  A.    YES.

14  Q.    THAT'S A DIVISION OF THE WORLD HEALTH ORGANIZATION?

15  A.    YES.

16  Q.    IS THE WORLD HEALTH ORGANIZATION, DR. WILLIAMS, VIEWED IN

17  THE SCIENTIFIC COMMUNITY AS A CREDIBLE, INDEPENDENT SCIENTIFIC

18  ORGANIZATION?

19  A.    YES.

20  Q.    IT'S NOT FUNDED BY SPECIAL INTERESTS; FOR EXAMPLE, CORPORATE

21  FUNDING, ET CETERA, IS NOT INVOLVED?

22  A.    NO, IT'S NOT.  IN FACT, THEY WILL NOT PUT YOU ON THE PANEL

23  IF YOU HAVE ANY TYPE OF SPECIAL.  THEY TRY VERY HARD NOT TO.

24  Q.    DR. DEROSA HAS TALKED ABOUT THE FACT THAT IARC NOW

25  CLASSIFIES FORMALDEHYDE NOT JUST AS A PROBABLE BUT AS A KNOWN

1  CARCINOGEN; YOU'RE AWARE OF THAT?

2  A.    WELL, YES.

3  Q.    THE DEFENDANTS CLAIM THAT'S BASED ONLY ON ONE STUDY, AND

4  THEY ARE GOING TO CHALLENGE THAT ONE STUDY.  IS THAT TRUE?

5  A.    NO.  YOU'VE HEARD ME TALK ABOUT HOW MANY DIFFERENT KINDS OF

6  STUDIES ARE NEEDED, AND HOW MANY DIFFERENT STUDIES.  AND

7  CERTAINLY THE WORKER STUDIES WOULD BE PROBLEMATIC IN JUST USING

8  WORKER STUDIES.  YOU NEED TO LOOK AT EVERYTHING.

9  Q.    AND IARC IN PARTICULAR, AND THAT WOULD BE THE WORLD HEALTH

10  ORGANIZATION IN PARTICULAR, USE A METHODOLOGY THAT LOOKS AT

11  PLAUSIBILITY, MECHANISM, JUST AS YOU HAVE?

12  A.    THIS IS THE SAME METHODOLOGY THAT IARC USES.  THIS IS YOUR

13  STANDARD SCIENTIFIC METHODOLOGY.  YOU LOOK AT ALL OF THESE

14  DIFFERENT PARAMETERS IN EVERYTHING THAT WE KNOW IN ALL OF THOSE

15  DIFFERENT AREAS.

16  Q.    ARE YOU SAYING THAT ONE MOLECULE OF FORMALDEHYDE WILL ALWAYS

17  CAUSE CANCER?

18  A.    NO.

19  Q.    ARE YOU SAYING THAT SCIENTIFIC STUDIES, HOWEVER, SHOW THAT

20  FORMALDEHYDE IS A HIGHLY REACTIVE SUBSTANCE WHICH IS KNOWN TO

21  CHANGE OUR ANATOMY ON THE CELLULAR LEVEL, CORRECT?

22  A.    YES.

23  Q.    AND IN DOING THIS IS KNOWN TO PROMOTE THE GROWTH OF CANCER

24  CELLS?

25  A.    YES.

Q.    AND IT'S YOUR UNDERSTANDING THAT THIS IS WHY, AS DR. DEROSA

TESTIFIED, THE FEDERAL GOVERNMENT'S OFFICIAL SCIENCE POLICY IS

THERE IS NO SUCH THING AS A SAFE LEVEL OF EXPOSURE TO

FORMALDEHYDE?

A.    THAT'S RIGHT.

Q.    BUT THESE DEFENDANTS SAY, WELL, BUT FORMALDEHYDE IS

EVERYWHERE, SO HOW CAN IT BE; IF IT CAN INDUCE THIS CANCER

GROWTH, HOW CAN IT BE THAT WE'RE NOT ALL AT RISK EVERY DAY IN

THIS ROOM RIGHT NOW BECAUSE OF FORMALDEHYDE?  WHAT DO YOU SAY TO

THAT?

A.    I SAY THAT WHEN WE ARE IN OUR EVERYDAY LIFE IN

WELL-VENTILATED HOMES OR ROOMS OR OUTSIDE, WE HAVE A VERY

DIFFERENT CIRCUMSTANCE THAN WHEN WE ARE IN A CONTAINED, SMALL,

CLOSED, POORLY VENTILATED ENVIRONMENT.

        I ALSO SAY THAT THE STUDIES THEMSELVES ARE INCLUDING

THE GENERAL POPULATION, WHO HAS THAT EVERYDAY EXPOSURE, AND WE'RE

LOOKING AT THE INCREASED CANCERS ABOVE THAT.

        MR. WATTS:  THANK YOU VERY MUCH, DR. WILLIAMS.

        THE COURT:  WHY DON'T WE GO AHEAD AND TAKE A 10-MINUTE

BREAK.  WE'LL TAKE A 10-MINUTE BREAK, AND WE'LL COME BACK WITH

THE CROSS-EXAMINATION OF THE DEFENDANTS AND REDIRECT.  THANK YOU.

        THE COURT SECURITY OFFICER:  ALL RISE.

        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

PANEL LEAVES THE COURTROOM.)

        THE COURT:  THANK YOU ALL.  BACK IN TEN MINUTES.

1            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF

2     RECESS WAS TAKEN.)

3            THE DEPUTY CLERK:  ALL RISE.

4            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

5     PANEL ENTERS THE COURTROOM.)

6            THE COURT:  YOU MAY BE SEATED.

7            DR. WILLIAMS, YOU ARE STILL UNDER OATH, AND

8     MR. WEINSTOCK WILL BEGIN HIS CROSS-EXAMINATION.

9                         CROSS-EXAMINATION

10    BY MR. WEINSTOCK:

11    Q.   GOOD MORNING, DR. WILLIAMS.  ANDY WEINSTOCK.  WE'VE MET

12    BEFORE.  I DID NOT REALIZE THIS, IS THAT CORRECT, YOU'VE ONLY

13    BEEN A BOARD-CERTIFIED TOXICOLOGIST SINCE 2006?

14    A.   RIGHT.  YOU HAVE TO PRACTICE THE FIELD OF TOXICOLOGY AND

15    DEMONSTRATE THAT YOU HAVE PRACTICED IT BEFORE YOU CAN TAKE IT.

16            MR. WEINSTOCK:  YOUR HONOR, THAT WAS A REALLY SIMPLE

17    YES/NO QUESTION.  WE'RE GOING TO GET OUT OF HAND IF WE CAN'T --

18            THE COURT:  DR. WILLIAMS, HERE IS HOW WE'RE GOING TO DO

19    THIS:  HE'S GOING TO ASK A QUESTION, AND YOU'RE GOING TO LISTEN

20    TO THE QUESTION CAREFULLY, AND YOU'RE GOING TO ANSWER THE

21    QUESTION AS DIRECTLY AS YOU CAN, ANSWER ONLY THAT QUESTION, AND

22    THEN WE'RE GOING TO GET ANOTHER QUESTION.

23            NOW, IF WE CAN'T DO THAT, THEN IF THIS IS REPEATED,

24    THEN YOU'RE GOING TO HAVE TO STEP DOWN, AND WE'RE GOING TO BRING

25    ANOTHER WITNESS IN, AND I'M GOING TO TELL THE JURY TO DISREGARD

1  YOUR TESTIMONY IN ITS ENTIRETY.

2          THE WITNESS:  YES, SIR.

3          THE COURT:  SO LET'S BE CAREFUL.

4             GO AHEAD.

5                         EXAMINATION

6  BY MR. WEINSTOCK:

7  Q.   DOCTOR, LOOKING OVER YOUR CV, IS IT CORRECT YOU HAVE NEVER

8  PUBLISHED A STUDY ON FORMALDEHYDE?

9  A.   CORRECT.

10  Q.   SO WHEN YOU WERE TALKING ABOUT THE WORK YOU'VE DONE ON

11  FORMALDEHYDE, THAT'S JUST LAB WORK WHERE YOU ACTUALLY USED

12  FORMALDEHYDE?

13  A.   CORRECT.

14  Q.   YOU WERE NICE ENOUGH TO SHARE WITH US THE -- SOME OF THE

15  BRADFORD HILL POINTS OF CONSIDERATION, I THINK YOU CALLED THEM?

16  A.   YES.

17  Q.   AND ONE OF THOSE IS CONSISTENCY?

18  A.   YES.

19  Q.   AND BY CONSISTENCY WE MEAN THAT WE NEED TO SEE SIMILAR

20  OBSERVATIONS IN DIFFERENT POPULATIONS?

21  A.   YES.

22  Q.   AND I THINK YOU ANSWERED MR. MEUNIER'S QUESTION CORRECTLY

23  THAT WE NEED TO SEE MORE THAN ONE STUDY TO DECIDE SOMETHING.  WE

24  NEED TO SEE A SERIES OF STUDIES WITH SOME CONSISTENCY.

25  A.   YES.

1   Q.   NOW, IS IT CORRECT THAT AS PART OF YOUR METHODOLOGY, ALL YOU

2   LOOK FOR ARE EPIDEMIOLOGICAL STUDIES THAT PROVE AN ASSOCIATION?

3   A.   WAIT.  I'M SORRY.  WOULD YOU REPEAT THAT?

4   Q.   IS IT CORRECT THAT ALL YOU LOOK FOR ARE EPIDEMIOLOGICAL

5   STUDIES THAT WOULD PROVE AN ASSOCIATION?

6   A.   NO.

7   Q.   HAVE YOU EVER TESTIFIED OTHERWISE?

8   A.   I HAVE NOT TESTIFIED THAT I ONLY LOOKED AT NEGATIVE STUDIES

9   TO PROVE THE CAUSATION.

10          MR. WEINSTOCK:  MAY I APPROACH, YOUR HONOR?

11          THE COURT:  YES.

12                              EXAMINATION

13   BY MR. WEINSTOCK:

14   Q.   IN YOUR DEPOSITION IN THE ACRES CASE.  DON'T SPEAK, JUST

15   READ.

16   A.   ALL RIGHT. (WITNESS REVIEWS THE DOCUMENT.)

17   Q.   ARE YOU DONE?

18          MR. MEUNIER:  MAY I HAVE THE REFERENCE, COUNSEL?

19          MR. WEINSTOCK:  DUDLEY JOE ACRES, PAGE 132.  DIFFERENT

20   CASE, DIFFERENT DEPOSITION.

21          THE COURT:  WHAT LINES?  TELL HIM PAGE AND LINE.

22          MR. WEINSTOCK:  FIVE THROUGH 14.

23          THE COURT:  ALL RIGHT.

24          MR. MEUNIER:  I'M SORRY, DID YOU SAY A DIFFERENT CASE?

25          MR. WEINSTOCK:  YES.

```
 1            MR. MEUNIER:  NOT THIS TIME.
 2                              EXAMINATION
 3  BY MR. WEINSTOCK:
 4  Q.   DOCTOR, DOES THAT REFRESH YOUR RECOLLECTION?
 5  A.   I WONDER IF YOU COULD PUT IT UP HERE SO I COULD SEE IT, ON
 6  THE ELMO.
 7  Q.   YOU WANT IT ON THE SCREEN?
 8  A.   YEAH.  IF THAT'S ALL RIGHT.  IF THAT'S NOT TOO MUCH TROUBLE.
 9            THE COURT:  WELL, FIRST OF ALL, ANSWER THE QUESTION
10  ABOUT WHETHER -- HE ASKED YOU IF YOU HAD YOUR RECOLLECTION
11  REFRESHED?
12            THE WITNESS:  YES.
13            THE COURT:  NOW, YOU MAY USE IT OR ASK ANOTHER QUESTION.
14            MR. WEINSTOCK:  YOUR HONOR, I APOLOGIZE.  I SAID LINE
15  FIVE TO EIGHT, BUT IT'S ACTUALLY LINES ONE THROUGH FOUR.
16            THE COURT:  OKAY.
17                              EXAMINATION
18  BY MR. WEINSTOCK:
19  Q.   "THEY DO NOT PROVE THE NULL.  THIS IS THE CARDINAL RULE OF
20  EPIDEMIOLOGY.  ALL I LOOKED FOR WERE EPIDEMIOLOGICAL STUDIES, AND
21  I LOOK FOR THOSE THAT WOULD PROVE AN ASSOCIATION."  WAS THAT YOUR
22  TESTIMONY, DOCTOR?
23  A.   THAT IS.
24  Q.   DOCTOR, IS IT TRUE YOU CONSIDER NEGATIVE STUDIES
25  MEANINGLESS?
```

1   A.    INSOFAR AS PROVING THE NULL, YES.

2   Q.    AND YOU DON'T RELY ON THEM?

3   A.    I RELY -- I DO -- YES, I RELY ON THEM.

4   Q.    DOCTOR, IS IT TRUE IF WE HAD TWO STUDIES, ONE SHOWING THE

5   POSITIVE, ONE SHOWING THE NEGATIVE, YOU WOULD DISREGARD THE

6   NEGATIVE AND JUST GO WITH THE POSITIVE?

7   A.    NO.

8   Q.    HAVE YOU EVER TESTIFIED OTHERWISE?

9   A.    I HAVE TESTIFIED -- NO -- YES, I HAVE TESTIFIED THAT I USE

10  THE POSITIVE STUDIES FOR THE NO.  NO, I HAVE NOT TESTIFIED THAT I

11  DON'T -- THAT I DISREGARD THE NEGATIVE STUDIES.

12  Q.    BUT DID YOU TESTIFY THAT IF YOU HAD TWO STUDIES, YOU WOULD

13  LOOK AT THE POSITIVE AND DISREGARD THE NEGATIVE?

14  A.    FOR A PROOF OF CAUSATION, THE POSITIVE STUDY WOULD BE THE

15  ONLY ONE THAT WOULD OFFER THE PROOF.

16  Q.    CLASS CERTIFICATION, PAGE 79.  YOU'RE GOING TO HAVE TO READ

17  THE WHOLE PAGE.

18  A.    (WITNESS REVIEWS THE DOCUMENT.)

19  Q.    DOCTOR, DOES THAT REFRESH YOUR RECOLLECTION?

20  A.    YES.

21  Q.    DO YOU WANT IT UP?  I THOUGHT YOU SAID YOU WANT IT UP?

22  A.    NO.

23  Q.    I THINK IT'S LINES 19 THROUGH 24.  SO IF WE HAD THREE

24  STUDIES, TWO SHOWED AN ASSOCIATION AND ONE SHOWED NO ASSOCIATION,

25  THE ONE, AS YOU SAID, NO ASSOCIATION IS MEANINGLESS, CORRECT?

1    A.    THAT IS CORRECT.

2    Q.    AND IARC SAYS IF YOU SEE AN ABUNDANCE OF NEGATIVE EPI

3    STUDIES, BUT ONE WITH A POSITIVE ASSOCIATION, THEN YOU HAVE TO

4    LOOK AT ONLY THE POSITIVE ASSOCIATION, CORRECT?

5    A.    THAT'S CORRECT.

6    Q.    IF WE HAVE TEN STUDIES, ONE SHOWS A POSITIVE ASSOCIATION,

7    NINE SHOW NO ASSOCIATION, YOU WOULD DISREGARD THE NINE AND GO

8    WITH THE ONE, CORRECT?

9    A.    FOR PROOF OF CAUSATION AT THE 2.0, CORRECT.

10   Q.    IF WE HAD A MILLION STUDIES, ONE SHOWS A POSITIVE

11   ASSOCIATION, 999,999 SHOW NO ASSOCIATION, YOU WOULD DISREGARD THE

12   999,999 AND JUST GO WITH THE ONE, CORRECT?

13   A.    FOR PROOF OF CAUSATION, CORRECT.

14   Q.    AND I DON'T WANT TO BEAT A DEAD HORSE, BUT YOU AGREE,

15   READING THAT PAGE, THAT YOU ALSO TOLD ME ON THAT OCCASION THAT

16   NEGATIVE STUDIES WERE MEANINGLESS, RIGHT?

17   A.    FOR PROOF OF CAUSATION, CORRECT.

18   Q.    IN FACT, ON ANOTHER OCCASION YOU TOLD ME WHEN YOU'RE DONE

19   WITH NEGATIVE STUDIES, YOU JUST PITCH THEM, RIGHT?

20   A.    IF THERE IS NO DATA REPORTED AND IT'S A TRUE NEGATIVE STUDY,

21   A ZERO REPORTED, YOU HAVE NOTHING THAT YOU CAN ANALYZE FOR PROOF

22   OF CAUSATION.

23   Q.    AND THAT'S WHAT YOU DID IN THIS CASE; YOU PITCHED THE

24   NEGATIVE STUDIES, RIGHT?

25   A.    THERE WERE -- THE ONES THAT HAD ZERO RESULTS WERE ONES I

1  COULD NOT CONSIDER IN THE CAUSAL ANALYSIS.

2  Q.    EXACTLY.  THE ONES THAT COULD NOT SHOW THE CAUSAL ANALYSIS

3  YOU WERE LOOKING FOR, THOSE WOUND UP IN THE TRASH, CORRECT?

4  A.    NO.  THE ONES THAT DID NOT REPORT DATA PERTAINING TO THE

5  NASOPHARYNGEAL OR NASAL CANCER.  IF YOU DON'T HAVE THE DATA, YOU

6  CANNOT CONSIDER IT.

7  Q.    FAIR ENOUGH.  IN YOUR 35-PAGE REPORT, NOT IN THE APPENDIX OF

8  THE DOCUMENTS YOU REVIEWED BUT IN THE 35-PAGE REPORT THAT

9  CONSTITUTES ALL YOUR REVIEW MATERIAL, THE STUFF YOU ACTUALLY

10 COMMENTED ON, HOW MANY NEGATIVE STUDIES ARE DISCUSSED?

11 A.    THERE ARE SEVERAL THAT ARE DISCUSSED IN THERE.

12 Q.    NAME ONE.

13 A.    WELL, I HAVE -- MOST -- I THINK, EVERY -- JUST ABOUT EVERY,

14 MAYBE ONE EXCEPTION, EVERY STUDY HAD SOME NEGATIVE RESULTS AND

15 SOME POSITIVE RESULTS.

16 Q.    CERTAINLY EVERY STUDY HAS NEGATIVE INFORMATION AND POSITIVE

17 INFORMATION, BUT MY QUESTION TO YOU IS -- AND I'LL BE CLEAR, SO

18 WE'RE ALL CLEAR -- A STUDY WAS CONCLUDED, WE CAN FIND NO

19 ASSOCIATION BETWEEN FORMALDEHYDE EXPOSURE AND NASOPHARYNGEAL

20 CANCER, HOW MANY OF THOSE ARE ACTUALLY CITED AND DISCUSSED IN

21 YOUR REPORT?

22 A.    THEY ARE CITED.  I HAVE ABOUT -- I HAVE 23 OR 24 THAT ARE

23 DISCUSSED IN MY REPORT OR CITED IN MY REPORT.

24 Q.    NEGATIVE STUDIES?

25 A.    BOTH.

1  Q.    NO, NO, NO.  NOT WITH NEGATIVE DATA.  WHERE THE CONCLUSION

2  WAS NEGATIVE.

3  A.    WHERE THE CONCLUSION WAS NEGATIVE?

4  Q.    YES.  WHERE THE EXCLUSION WAS NEGATIVE.

5  A.    YOU HAVE FOUR STUDIES OF EPIDEMIOLOGICAL STUDIES WITH DOSE

6  WITH A POSITIVE CAUSAL ASSOCIATION.

7  Q.    WHERE THE AUTHORS CONCLUDED THAT THERE WAS NOT -- THAT

8  FORMALDEHYDE WAS NOT ASSOCIATED WITH NASOPHARYNGEAL CANCER, HOW

9  MANY OF THOSE HAVE YOU CITED, HAVE YOU DISCUSSED?  NOT JUST A

10 DATA STREAM WHERE THEY SAID, AT THIS LEVEL WE DON'T IT.  HOW MANY

11 OF THOSE 35 PAGES?  HOW MANY OF THOSE PAPERS CAME TO THE

12 CONCLUSION THAT NASOPHARYNGEAL CANCER, WE COULD NOT FIND AN

13 ASSOCIATION WITH FORMALDEHYDE EXPOSURE?

14 A.    THE PREDOMINANCE OF THE STUDIES WERE NOT ABLE TO SHOW --

15          THE COURT:  WAIT.  WAIT.  HE'S ASKING HOW MANY?

16          THE WITNESS:  OH, HOW MANY?  OF THE 24, 25 THAT I LOOKED

17 AT, PROBABLY 20 WERE EITHER -- DID NOT MAKE THAT STATEMENT.

18                              EXAMINATION

19 BY MR. WEINSTOCK:

20 Q.    AND THOSE ARE THE ONES YOU ATTACHED TO YOUR APPENDIX?

21 A.    YES, THEY ARE ALL IN MY --

22 Q.    AND IT WAS THE OTHERS YOU DISCUSSED -- WE DISCUSSED AT YOUR

23 DEPOSITION AND WERE DISCUSSED IN YOUR REPORT?

24 A.    THERE WERE -- YES, THE REST WERE NOT -- HAD NO DATA TO

25 EVALUATE.

1   Q.   WHAT IS IARC?

2   A.   THE INTERNATIONAL AGENCY FOR RESEARCH ON CANCER.

3   Q.   AND, IN FACT, YOU TOLD ME THAT YOUR METHODOLOGY REGARDING

4   NEGATIVE STUDIES WAS IDENTICAL TO IARC'S CORRECT?

5   A.   CORRECT.

6   Q.   YOU DID TELL ME THAT, SO I WENT AND BOUGHT A COPY.

7        FIRST, LET ME ASK YOU THIS QUESTION, DO YOU AGREE WITH

8   THE FOLLOWING:  WHEN SEVERAL EPIDEMIOLOGICAL STUDIES SHOW LITTLE

9   OR NO INDICATION OF AN ASSOCIATION BETWEEN AN EXPOSURE AND

10  CANCER, THE JUDGMENT MAY BE MADE THAT IN THE AGGREGATE THEY SHOW

11  LACK OF EVIDENCE OF CARCINOGENICITY?

12  A.   THAT ON ITSELF IS CORRECT.

13  Q.   DID YOU EVER TELL ME THAT STATEMENT WAS ACTUALLY TRAGICALLY

14  WRONG?

15  A.   I DIDN'T TELL YOU THAT STATEMENT WAS TRAGICALLY WRONG.

16       MR. WEINSTOCK:  MAY I APPROACH, YOUR HONOR?

17       THE COURT:  YES.

18       THE WITNESS:  (WITNESS REVIEWS THE DOCUMENT.)

19                          EXAMINATION

20  BY MR. WEINSTOCK:

21  Q.   DOCTOR, DOES THAT REFRESH YOUR RECOLLECTION THAT WHEN I

22  ASKED YOU, "WHEN SEVERAL EPIDEMIOLOGICAL STUDIES SHOW LITTLE OR

23  NO INDICATION OF AN ASSOCIATION BETWEEN EXPOSURE AND CANCER, THE

24  JUDGMENT MAY BE MADE THAT IN THE AGGREGATE THEY SHOW A LACK OF

25  EVIDENCE OF CARCINOGENICITY?"  AND YOUR RESPONSE WAS, "I THINK

1   THAT'S A VERY DANGEROUS STATEMENT."

2   A.   I THINK THAT -- I WOULD BE BETTER IF I COULD SEE IT.

3   Q.   WELL, I'M SURE YOU COULD BECAUSE YOU THEN WENT OFF ON SOME

4   TANGENT ABOUT SOME OTHER DRUG THAT YOU'RE GOING TO WANT TO

5   DISCUSS NOW, AND I WANT TO TALK ABOUT FORMALDEHYDE.

6          MR. MEUNIER:  JUDGE, I OBJECT TO THAT.  SHE HAS A

7   RIGHT --

8          THE COURT:  MASK THE PART THAT IS NOT PERTINENT.  BETTER

9   YET, WHY DON'T YOU BRING IT UP HERE.  COUNSEL, MR. MEUNIER, COME

10  ON UP HERE.

11         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

12  A CONFERENCE HELD AT THE BENCH.)

13         MR. WEINSTOCK:  HERE IS WHERE SHE ANSWERS, AND THEN SHE

14  GOES ON WITH THALIDOMIDE, WHICH I CAN'T STOP HER IN A DEPOSITION.

15         MR. MEUNIER:  YES, BUT IT'S AN ILLUSTRATION OF WHAT

16  SHE'S SAYING.  IF SHE WANTS TO EXPLAIN HER ANSWER, SHE HAS TO BE

17  ABLE TO DO THAT, PARTICULARLY IF YOU'RE GOING TO --

18         MR. WEINSTOCK:  SHE WANTS TO TALK ABOUT THALIDOMIDE.

19         THE COURT:  SHE CAN EXPLAIN HER ANSWER, BUT NOT IF SHE'S

20  GOING TO GO ON.  AND I GIVE HER INSTRUCTION TODAY, BASED ON WHAT

21  HAPPENED LAST NIGHT.  AND IF SHE'S GOING TO GO OFF ON SOME

22  TANGENT, LIKE IT APPEARS SHE DID HERE, I'VE GOT A PROBLEM WITH

23  THAT.

24         I WANT TO MAKE SURE THAT IF SHE'S GIVING ANSWERS,

25  PARTICULARLY IN A DEPOSITION, THAT THEY ARE IN CONTEXT.  SO I

1   AGREE WITH THE IDEA THAT WE SHOULDN'T PREVENT HER FROM LOOKING AT

2   THE ENTIRETY OF THE TESTIMONY, BUT I DON'T WANT THAT TO BE AN

3   INVITATION FOR HER TO GO OFF AND START ANSWERING A QUESTION

4   THAT'S NOT ASKED.

5           MR. MEUNIER:  BUT SHE SHOULD BE ABLE TO EXPLAIN HER

6   ANSWER.

7           MR. WEINSTOCK:  SHE CAN WITHOUT TALKING ABOUT THAT

8   THALIDOMIDE.

9           MR. MEUNIER:  AND HE'S GOING TO STOP AFTER THE FIRST

10  SENTENCE.

11          MR. WEINSTOCK:  READ THE REST OF IT BECAUSE YOU'LL SEE

12  HER ANSWER.

13          MR. MEUNIER:  BUT THEN HE'S GOING TO MOVE ON --

14          MR. WEINSTOCK:  NO.

15          MR. MEUNIER:  -- WITHOUT GIVING HER A CHANCE TO EXPLAIN

16  THAT ANSWER IN THE DEPOSITION.

17          MR. WEINSTOCK:  I PROMISE YOU, SHE'S GOING TO GET A

18  CHANCE TO EXPLAIN THIS WHOLE STATEMENT.

19          MR. MEUNIER:  THEN --

20          THE COURT:  PUT IT ON THERE, BUT I DON'T WANT ANY

21  TESTIMONY ABOUT THALIDOMIDE OR ANYTHING ELSE THAT WE'RE NOT

22  DEALING WITH HERE.

23          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

24  CONFERENCE CONCLUDED.)

25                          EXAMINATION

1  BY MR. WEINSTOCK:

2  Q.   AND THAT WAS YOUR TESTIMONY, CORRECT?   AND THEN WE HAVE

3  DISCUSSION ABOUT THALIDOMIDE WHEN I'M ASKING YOU ABOUT

4  FORMALDEHYDE, CORRECT?

5  A.   THIS IS A TRANSCRIPT FROM A DEPOSITION AND --

6  Q.   FROM YOUR DEPOSITION?

7  A.   YES, IT'S CORRECT.

8  Q.   SO WHEN I ASKED YOU ABOUT, "WHEN SEVERAL EPIDEMIOLOGICAL

9  STUDIES SHOW LITTLE OR NO INDICATION OF AN ASSOCIATION BETWEEN

10  EXPOSURE AND CANCER, THE JUDGMENT MAY BE MADE THAT IN THE

11  AGGREGATE THEY SHOW EVIDENCE OF A LACK OF CARCINOGENICITY," YOU

12  TOLD ME IT WAS A VERY DANGEROUS STATEMENT, CORRECT?

13  A.   THAT IS WHAT I SAID.

14       MR. WEINSTOCK:  AND IF I CAN CONTINUE ON, YOUR HONOR,

15  FOR PURPOSES OF SAVING TIME.

16       THE COURT:  GO AHEAD.

17                              EXAMINATION

18  BY MR. WEINSTOCK:

19  Q.   FOLLOWING THE SAME QUESTIONING, "THE STATEMENT I READ IS

20  COMPLETELY WRONG?"  AND YOUR RESPONSE WAS, "THE STATEMENT YOU

21  HAVE READ I HAVE SEEN MANY TIMES OVER, BUT IT IS SCIENTIFICALLY

22  NOT CORRECT."  THAT'S WHAT YOU SAID, RIGHT?

23  A.   THAT IS MY TRANSCRIPT, AND THAT IS WHAT I SAID.

24  Q.   AND I ASKED YOU, "WAS THAT BAD SCIENCE," AND YOU SAID, "IT

25  CAN BE TRAGIC SCIENCE."  AND THEN I ASKED, "IS TRAGIC WORSE THAN

1    BAD," AND THE ANSWER IS, "YES," CORRECT?

2    A.    THAT IS CORRECT.

3    Q.    NOW, LET'S GET TO WHAT IARC ACTUALLY SAID.  AS I SAID, I

4    BOUGHT A COPY OF THE BOOK.  AND LO AND BEHOLD, IARC SAYS THE SAME

5    THING.  "WHEN SEVERAL EPIDEMIOLOGICAL STUDIES SHOW LITTLE OR NO

6    INDICATION OF AN ASSOCIATION BETWEEN AN EXPOSURE AND CANCER, THE

7    JUDGMENT MAY BE MADE THAT IN THE AGGREGATE, THEY SHOW LACK OF

8    EVIDENCE OF CARCINOGENICITY."

9             IARC IS PRACTICING TRAGIC SCIENCE, ACCORDING TO YOU,

10   CORRECT?

11   A.    IF IT STOPPED AT THE -- THE FIRST SENTENCE IS CORRECT, BUT

12   THERE IS MORE.

13   Q.    WELL, THEY DISCUSS THE STANDARDS OF THE STUDIES, CORRECT?

14   A.    CORRECT.

15   Q.    THEY DISCUSS THE METHODOLOGY OF THE STUDIES THEY WOULD LIKE

16   THEM TO FOLLOW, CORRECT?

17   A.    THAT'S CORRECT.

18   Q.    AND THEN AT THE END THEY DISCUSS THE LATENCY PERIOD THEY

19   WOULD LIKE THESE STUDIES TO USE, CORRECT?

20   A.    AND BEFORE THAT, THEY TALK ABOUT IF YOU SEE AN INCREASE IN

21   THE CANCERS WITH INCREASED DOSE, EVEN THOUGH IT'S STILL CALLED A

22   NEGATIVE STUDY BECAUSE IT DOESN'T REACH THE 2.0, THAT IS EVIDENCE

23   OF CARCINOGENICITY AND CANNOT BE CALLED A LACK OF CARCINOGENICITY

24   EVIDENCE.

25   Q.    ABSOLUTELY.  THEY DON'T WANT YOU TO THROW OUT ANY DATA?

1  THAT'S THE BOTTOM LINE?

2  A.    WELL --

3  Q.    EVEN IF IT'S NOT STATISTICALLY SIGNIFICANT DATA, THEY WANT

4  YOU TO CONSIDER IT.  THAT'S WHAT IARC IS SAYING?

5  A.    AND THAT'S CORRECT.

6  Q.    AND THEY ARE NOT TELLING YOU THAT A STUDY THAT SHOWS NO --

7         THE COURT:  WAIT.  WAIT.  LET'S ASK A QUESTION.  PUT

8  THAT IN THE FORM OF A QUESTION RATHER THAN MAKE STATEMENTS.  I

9  MEAN, IF YOU WANT HER TO RESPOND ONE WAY OR THE OTHER, THAT'S

10 FINE.

11        MR. WEINSTOCK:  FAIR ENOUGH, JUDGE.

12                       EXAMINATION

13 BY MR. WEINSTOCK:

14 Q.    AND IARC IS NOT TELLING YOU THAT NEGATIVE STUDIES ARE

15 MEANINGLESS?

16 A.    I WOULD SAY NO, THEY ARE SAYING THEY HAVE A LACK OF

17 CARCINOGENICITY.

18 Q.    I THINK YOU SHARED WITH US ANOTHER ONE OF THE BRADFORD HILL

19 CRITERIA -- I'M SORRY, POINTS OF CONSIDERATION.  AND THAT ONE IS

20 BIOLOGICAL GRADIENT, OR WHAT WE CALL DOSE RESPONSE, CORRECT?

21 A.    THAT IS.

22 Q.    AND I THINK, AS YOU'VE PUT IT BEFORE, THE DOSE MAKES THE

23 POISON?

24 A.    I DON'T RECALL SAYING THAT RIGHT HERE AND NOW; BUT, THAT IS

25 A CARDINAL TENET OF TOXICOLOGY THAT THE DOSE CHANGES WHETHER A

1  CHEMICAL IS A POISON OR NOT A POISON.

2  Q.   AND, IN FACT, EVEN WATER CAN CAUSE DEATH BY HYPOHYDRATION IF

3  YOU DRINK TOO MUCH OF IT?

4  A.   BY HYPERHYDRATION, YES.

5  Q.   I'M SORRY.  THAT WOULD MAKE SENSE, HYPER NOT HYPO.  BUT

6  WATER CAN CAUSE DEATH IF YOU HAVE TOO MUCH OF IT?

7  A.   YES.

8  Q.   YOU WOULD AGREE THAT FORMALDEHYDE IS EVERYWHERE, CORRECT?

9  A.   YES.

10  Q.   IT'S COMING OUT OF ALL OF OUR BREATH?

11  A.   YES.

12  Q.   IS IT CORRECT THAT THE BACKGROUND LEVELS FOR FORMALDEHYDE IN

13  INDUSTRIALIZED CITIES CAN BE AS HIGH AS 16 PARTS PER BILLION?

14  A.   YES.

15  Q.   SO THAT WOULD BE TWICE THE TONY BUZBEE GOLD STANDARD, IS THE

16  BACKGROUND LEVELS IN INDUSTRIALIZED CITIES, THE TONY BUZBEE

17  8 PARTS PER BILLION GOLD STANDARD?  JUST THE NORMAL ENVIRONMENT

18  OUTSIDE IN INDUSTRIALIZED CITIES IS TWICE THAT LEVEL?

19  A.   YES, BUT I DON'T KNOW TONY BUZBEE'S LEVEL.  I KNOW THAT --

20  Q.   THIS IS MR. BUZBEE.

21       MR. BUZBEE:  I HAVE NEVER MET HER BEFORE, YOUR HONOR, SO

22  I'M NOT SURE.

23                         EXAMINATION

24  BY MR. WEINSTOCK:

25  Q.   AJAX BACTERIAL SOAP CONTAINS FORMALDEHYDE?

1   A.   YES.

2   Q.   LATEX PAINT CONTAINS FORMALDEHYDE?

3   A.   YES.

4   Q.   SHAMPOOS CONTAIN FORMALDEHYDE?

5   A.   YES.

6   Q.   HAIR PRODUCTS CONTAIN FORMALDEHYDE?

7   A.   YES.

8   Q.   PAPER PRODUCTS LIKE TOWELS CONTAIN FORMALDEHYDE?

9   A.   YES.

10  Q.   IT'S CERTAINLY IN OUR BLOOD RIGHT NOW?

11  A.   YES.

12  Q.   THE HUMAN BODY PRODUCES FORMALDEHYDE?

13  A.   YES.

14  Q.   IT'S THE SAME MOLECULE AS THE MOLECULE IN AMBIENT AIR?

15  A.   YES.

16  Q.   SO NOW IF WE CAN GET BACK TO DOSE RESPONSE, DOCTOR.  YOU

17  HAVE SAID BEFORE THAT ONE MOLECULE OF FORMALDEHYDE CAN START THE

18  PROCESS THAT RESULTS IN CANCER, CORRECT?

19  A.   YES.

20  Q.   IN THAT CASE -- WELL, I'M NOT GOING TO ASK YOU TO HOLD YOUR

21  BREATH, BUT KEEP THAT FORMALDEHYDE BACK, OKAY.

22          TOBACCO SMOKE INCREASES FORMALDEHYDE?

23  A.   YES.

24  Q.   IN FACT, SMOKING -- I'M SORRY, THE SURGEON GENERAL'S '79

25  REPORT SAYS TOBACCO SMOKE, THE PART THAT COMES OFF THE CIGARETTE,

1  HAS UP TO 214 PARTS PER MILLION?

2  A.   I'M NOT FAMILIAR WITH THE EXACT AMOUNT ON THAT PARTICULAR

3  STUDY, BUT THERE IS FORMALDEHYDE IN SMOKE.

4  Q.   I'M IN THE RIGHT BALLPARK, RIGHT?

5  A.   YES.

6  Q.   IN YOUR REVIEW MATERIALS, YOU REVIEWED THE ATSDR TOX

7  PROFILE?

8  A.   YES.

9  Q.   AND YOU'RE AWARE THAT IN OFFICE BUILDINGS THAT ALLOW SMOKE,

10 THE LEVELS OF FORMALDEHYDE ARE AS HIGH AS 600 PARTS PER BILLION?

11 A.   YES.

12 Q.   IN PARTS PER MILLION, THAT'S .6 --

13 A.   PARTS PER MILLION, YES.

14 Q.   -- PARTS PER MILLION, WHICH WOULD BE 12 TIMES HIGHER THAN

15 .050?

16 A.   YES.

17 Q.   DESPITE THE DISCUSSION ABOUT HOW MUCH FORMALDEHYDE MIGHT BE

18 IN CIGARETTE SMOKE, WOULD SMOKING TEN CIGARETTES A DAY INCREASE

19 THE RISK OF CANCER FROM FORMALDEHYDE?

20 A.   NO.   THERE IS NO ASSOCIATION WITH SMOKING AND LUNG CANCER

21 BELOW TEN OR BELOW.   ABOVE THAT, THE ASSOCIATIONS BEGIN.

22 Q.   AND THAT'S WHAT WE MEAN BY A DOSE RESPONSE.   YOU NEED A

23 CERTAIN LEVEL OF EXPOSURE TO GET THAT WHERE WE SEE THE INCREASES

24 IN THOSE DISEASES, CORRECT?

25 A.   THAT'S CORRECT, FOR AN EPIDEMIOLOGICAL STUDY.

1  Q.   FOR AN EPIDEMIOLOGICAL STUDY.  AND IN THIS CASE, YOU HAVE

2  NOT OPINED AND YOU'RE NOT OPINING ON WHAT THAT LEVEL IS, CORRECT?

3  A.   IN THE LITERATURE?

4  Q.   NO, YOU.  YOU, AS THE REVIEWER OF THE LITERATURE, ARE NOT

5  SAYING, HERE IS MY TEN CIGARETTES FOR CIGARETTE SMOKE?

6  A.   NO.

7  Q.   HERE IS MY LEVEL OF FORMALDEHYDE THAT WE DON'T SEE AN EXCESS

8  BELOW, AND WE DO SEE AN EXCESS ABOVE, CORRECT?  YOU'RE NOT MAKING

9  THAT OPINION?

10  A.   NO.

11  Q.   MY STATEMENT IS CORRECT, RIGHT?

12  A.   YES.

13  Q.   SO IF I UNDERSTOOD YOUR TESTIMONY EARLIER, IF DR. MCGWIN AND

14  DR. DEROSA HAVE BOTH TESTIFIED THAT THE PRIMARY BASIS FOR IARC

15  MAKING OR CLASSIFYING FORMALDEHYDE AS A KNOWN CARCINOGEN WAS THE

16  HOUTMAN 2003 PAPER, YOU'D DISAGREE WITH THAT; IS THAT CORRECT?

17       MR. MEUNIER:  OBJECTION, JUDGE.  THAT'S NOT WHAT

18  DR. DEROSA SAID, AND I THINK THE TESTIMONY BEARS THAT.  HE SAID

19  THAT WAS AMONG THE THINGS HE REFERRED TO.  IT'S A

20  MISCHARACTERIZATION OF DR. DEROSA.

21       THE COURT:  WHY DON'T YOU REPHRASE THE QUESTION.  I

22  THINK THE JURY CAN MAKE A RECOLLECTION OF WHAT THAT PARTICULAR

23  TESTIMONY WAS.  SO WHY DON'T YOU REPHRASE THE QUESTION, AND THEY

24  CAN FACTOR ALL OF THAT IN, AND YOU CAN MAKE THAT ARGUMENT LATER.

25                      EXAMINATION

```
 1  BY MR. WEINSTOCK:
 2  Q.   I'LL LEAVE OUT DR. DEROSA.  IF THE TESTIMONY OF DR. MCGWIN
 3  WAS THAT THE PRIMARY REASON IARC CLASSIFIED FORMALDEHYDE AS A
 4  KNOWN CARCINOGEN WAS BASED ON THE HOUTMAN 2003 PAPER, YOU WOULD
 5  DISAGREE WITH THAT, CORRECT?
 6            MR. MEUNIER:  THAT, TOO, IS A MISCHARACTERIZATION OF
 7  WHAT THE DOCTOR SAID.  THE JURY WILL RECALL IT.  I THINK COUNSEL
 8  IS MISREPRESENTING THE EVIDENCE.
 9            MR. WEINSTOCK:  YOUR HONOR, THAT IS EXACTLY WHAT HE
10  SAID.  IF I CAN GET THE DAILY TRANSCRIPT, I WILL.
11            THE COURT:  THAT'S WHAT I RECALL HIS TESTIMONY AS WELL.
12  MAYBE I MISUNDERSTOOD HIS TESTIMONY.  THAT'S WHAT I RECALL
13  DR. MCGWIN'S TESTIMONY TO BE.  I THINK IT'S A FAIR QUESTION.
14                                  EXAMINATION
15  BY MR. WEINSTOCK:
16  Q.   YOU WOULD DISAGREE, CORRECT?
17  A.   YES.
18  Q.   BUT YOU'RE NOT AN EPIDEMIOLOGIST, CORRECT?
19  A.   I'M A TOXICOLOGIST.
20  Q.   AND, THEREFORE, YOU CAN BE BOTH, BUT YOU JUST HAPPEN TO BE A
21  TOXICOLOGIST, RIGHT?
22  A.   I'M A TOXICOLOGIST WHO USES THE TOOLS OF EPIDEMIOLOGY.
23  Q.   AND YOU'RE NOT AN EPIDEMIOLOGIST, CORRECT?
24  A.   I DON'T REFER TO MYSELF AS AN EPIDEMIOLOGIST.
25  Q.   DOCTOR, WHO IS LYNN ERIC WILLIAMS, JR.?
```

1  A.    MY SON.

2  Q.    GOOD-LOOKING GUY IN THE BACK?

3  A.    I THINK HE'S THERE, STILL HERE.  YES.

4  Q.    AND LYNN ERIC WILLIAMS, JR. REPRESENTS SOME PLAINTIFFS WHO

5  HAVE MADE CLAIMS AGAINST MY CLIENT; ISN'T THAT RIGHT?

6  A.    I DON'T KNOW.

7  Q.    YOU'VE CONSULTED WITH HIM ON CLAIMS ON FEMA FORMALDEHYDE

8  CLAIMS?

9  A.    NO.

10  Q.    YOU'VE TALKED TO HIM ABOUT FEMA FORMALDEHYDE CLAIMS?

11  A.    NO.

12  Q.    I STAND CORRECTED.  YOU DID NOT SPECIFICALLY CONSULT WITH

13  HIM ON THIS CASE?

14  A.    NO, I DID NOT.

15  Q.    YOU SAID SOMETHING IN RESPONSE TO MR. MEUNIER'S QUESTIONS

16  ABOUT A POORLY-VENTILATED TRAILER.  DO YOU KNOW ANY OF THE FACTS

17  OF HOW THE ALEXANDERS USE THEIR TRAILER?

18  A.    I'M SORRY, WOULD YOU REPEAT WHAT YOU SAID?

19  Q.    DO YOU KNOW ANYTHING ABOUT HOW THE PLAINTIFFS HERE ACTUALLY

20  USED THEIR TRAILER IN TERMS OF VENTILATION?

21  A.    I DON'T.  I'M NOT INVOLVED IN THE SPECIFICS OF THE

22  PARTICULAR PLAINTIFF.  I'M DOING GENERAL CAUSATION.

23  Q.    AND AN 8-BY-32 TRAVEL TRAILER WITH FOUR WINDOWS, A SCREEN

24  DOOR AND A BATH VENT THAT REMAINED OPENED, YOU WOULD NOT CONSIDER

25  THAT POORLY-VENTILATED, CORRECT?

1   A.   REPEAT ALL THOSE PARAMETERS.

2   Q.   8 FEET BY 32 FEET, FOUR WINDOWS OPEN, ONE DOOR OPEN WITH A

3   SCREEN DOOR, AND A BATH VENT OPENED, YOU WOULD NOT CONSIDER THAT

4   POORLY VENTILATED, CORRECT?

5   A.   I WOULD IN COMPARISON TO THIS ROOM, IN COMPARISON TO THE

6   OUTDOOR AIR, YES, I WOULD.

7   Q.   HOW MANY WINDOWS DO YOU SEE?

8   A.   IT'S A VERY LARGE ROOM.  IT HAS ONE, TWO, THREE, FOUR, FIVE

9   VENTS COMING IN FROM THE SIDE.  IT HAS REALLY GOOD VENTILATION.

10  I CAN FEEL IT BLOWING ON ME RIGHT NOW.

11  Q.   SURE.  AND YOU'RE SAYING, I'M JUST CURIOUS, YOU'RE SAYING

12  THAT FOUR WINDOWS IN AN 8-BY-32 ROOM AND AN OPEN DOOR WOULD NOT

13  PROVIDE VENTILATION?

14  A.   I'M SAYING THAT THOSE WINDOWS THAT I HAVE -- I'M NOT

15  FAMILIAR WITH THAT PARTICULAR TRAILER, BUT THE ONES THAT I HAVE

16  SEEN IN MOBILE HOMES, THESE ARE VERY SMALL WINDOWS.  AND YOU ARE

17  HAVING RECIRCULATION OF THE AIR, IF IT'S AIR CONDITIONED, SO YOU

18  REALLY DON'T HAVE THE RETURN OR THE CIRCULATION PATTERNS THAT YOU

19  WOULD HAVE IN A VERY LARGE ROOM LIKE THIS.

20  Q.   APPLES AND ORANGES.  THE WINDOWS ARE OPEN.  YOU WOULD HAVE

21  TREMENDOUS VENTILATION, WOULDN'T YOU?

22  A.   I REALLY DON'T KNOW.  I HAVE NOT VISITED THE TRAILER.

23         MR. WEINSTOCK:  THANK YOU VERY MUCH.

24         THE COURT:  ALL RIGHT.

25         MR. SHERBURNE:  FLUOR HAS NO QUESTIONS.

1          THE COURT:  FLUOR HAS NO QUESTIONS.  ALL RIGHT.

2   MR. MEUNIER, REDIRECT.

3                    REDIRECT EXAMINATION

4   BY MR. MEUNIER:

5   Q.   WHEN MR. WEINSTOCK BROUGHT TO YOUR ATTENTION YOUR USE OF THE

6   WORD MEANINGLESS IN DEALING WITH NEGATIVE STUDIES, YOU SAID THEY

7   WERE MEANINGLESS TO PROVE OR DISPROVE CAUSATION; IS THAT CORRECT?

8   A.   CORRECT.

9   Q.   NOW, THAT'S WHAT'S KNOWN AS THE NULL HYPOTHESIS, TRUE?

10  A.   TRUE.

11  Q.   THIS IS A BASIC PRINCIPLE OF SCIENCE, ISN'T IT?

12  A.   CORRECT.

13  Q.   HYPOTHESIS, THERE IS A RELATIONSHIP SHOWN IN A STUDY.  NULL

14  HYPOTHESIS, THAT STUDY SHOWS NO RELATIONSHIP.  THAT'S WHAT THE

15  NULL HYPOTHESIS MEANS, DOESN'T IT?

16  A.   YES.

17  Q.   CAN THE NULL HYPOTHESIS EVER BE USED IN SCIENCE TO DISPROVE

18  A RELATIONSHIP?

19  A.   NO.

20  Q.   AND THAT'S WHAT YOU MEAN WHEN YOU SAY THE NEGATIVE STUDIES

21  CANNOT BE SET UP TO DISPROVE RELATIONSHIP, TRUE?

22  A.   THAT IS CORRECT.

23  Q.   IN SCIENCE, THAT NULL HYPOTHESIS IS SPECIFICALLY DESIGNED TO

24  TEST WHETHER IT CAN BE REFUTED BY THE HYPOTHESIS SUPPORT, WHICH

25  ARE THE POSITIVE STUDIES?

1   A.   CORRECT.

2   Q.   SO THIS IS NOT TO SAY THAT YOU'RE GOING TO THROW OUT 999

3   MILLION NEGATIVES, BUT THAT IF THERE IS SUFFICIENT POSITIVE STUDY

4   SUPPORT, SCIENCE TELLS US THE RELATIONSHIP EXISTS.

5   A.   THAT IS ABSOLUTELY CORRECT.

6        THE COURT:  MR. MEUNIER, YOUR QUESTIONS ARE BORDERING ON

7   TESTIFYING.  IT'S REDIRECT.

8        MR. MEUNIER:  I'M SORRY, JUDGE.

9        THE COURT:  IT'S REDIRECT SO...

10       MR. MEUNIER:  I'M SORRY.

11                         EXAMINATION

12  BY MR. MEUNIER:

13  Q.   NOW, MR. WEINSTOCK WAS GOOD ENOUGH TO GO OUT AND BUY A BOOK,

14  AND I'M SO GLAD HE DID, BECAUSE I'M GOING TO ASK HIM IF I CAN

15  BORROW IT.  THANK YOU.  THIS IS THE IARC MONOGRAPH, TRUE?

16  A.   YES.

17  Q.   AND TELL THE JURY WHAT THAT IS BASICALLY.

18  A.   THE INTERNATIONAL AGENCY FOR RESEARCH ON CANCER.  IT IS

19  THEIR WORK PRODUCT AFTER REVIEWING 803 REFERENCES TO COME UP WITH

20  A DECISION ON WHETHER, THAT FORMALDEHYDE IS A CARCINOGEN.

21  Q.   AND AGAIN, IARC IS THE PREEMINENT AUTHORITY ON THE

22  CLASSIFICATIONS OF SUBSTANCES FOR CARCINOGENICITY PURPOSES,

23  RIGHT?

24  A.   YES.

25  Q.   I MEAN, IT IS THE INSTITUTE FOR THE STUDY OF CANCER, TRUE?

1   A.   WELL, YES, IT IS THE, I WOULDN'T SAY IT'S THE INSTITUTE.   I

2   WOULD SAY IT'S THE BODY THAT IS GOING TO REVIEW ALL OF THE

3   PUBLICATIONS OR A VAST NUMBER OF THEM TO COME UP WITH A DECISION

4   ON CARCINOGENICITY.

5   Q.   AND YOU'VE ALREADY EXPLAINED THAT IARC, LIKE YOU, LOOKS AT

6   THE MECHANISM OF HOW FORMALDEHYDE REACTS, INCLUDING WHAT'S SHOWN

7   IN THE NEGATIVE STUDIES IN ORDER TO COME UP WITH A

8   CLASSIFICATION?

9   A.   YES.

10  Q.   NOW, MR. WEINSTOCK LIMITED HIS QUESTION TO THE FIRST

11  SENTENCE HERE, WHICH IS:  "WHEN SEVERAL EPIDEMIOLOGICAL STUDIES

12  SHOW LITTLE OR NO INDICATION OF AN ASSOCIATION BETWEEN EXPOSURE

13  AND CANCER, THE JUDGMENT MAY BE MADE, MAY BE MADE, THAT IN THE

14  AGGREGATE, THEY SHOW EVIDENCE OF LACK OF CARCINOGENICITY."

15       IN THIS CASE, DID THE AGGREGATE STUDIES SHOWS A

16  RELATIONSHIP?

17  A.   YES.  THEY SHOWED A POSITIVE RELATIONSHIP.

18  Q.   AND THEN DOESN'T THE SAME IARC MONOGRAPH GO ON TO TELL US:

19  MOREOVER, STARTING WITH THIS SENTENCE:  "NO INDIVIDUAL STUDY NOR

20  THE POOLED RESULTS OF ALL THE STUDIES SHOULD SHOW ANY CONSISTENT

21  TENDENCY FOR THE RELATIVE RISK OF CANCER TO INCREASE."

22       IN FACT, WHEN YOU LOOK AT THE DATA AND THE STUDIES, THE

23  RISK OF CANCER INCREASES WITH THE LEVEL OF EXPOSURE, DOESN'T IT?

24  A.   YES, THAT IS CORRECT.

25  Q.   AND THEN THE NEXT SENTENCE SAYS:  "IT IS IMPORTANT TO NOTE

1   THAT THE EVIDENCE OF THE LACK OF CARCINOGENICITY OBTAINED IN THE

2   WAY OF STUDIES CAN ONLY APPLY TO THE TYPES OF CANCERS AND DOSE

3   LEVELS AND INTERVALS IN THOSE STUDIES."

4   A.   THAT IS CORRECT.

5   Q.   AGAIN, YOU DON'T USE NEGATIVE STUDIES TO DISPROVE CAUSAL

6   RELATIONSHIP?

7          THE COURT:  MR. MEUNIER, YOU'RE TESTIFYING AGAIN.

8                              EXAMINATION

9   BY MR. MEUNIER:

10  Q.   IS IT TRUE THAT YOU DON'T USE NEGATIVE STUDIES IN GENERAL

11  CAUSATION SCIENCE TO DISPROVE A RELATIONSHIP?

12  A.   THAT IS ABSOLUTELY CORRECT.

13  Q.   AND THAT'S BECAUSE THE ABSENCE OF EVIDENCE --

14         THE COURT:  MR. MEUNIER, ASK HER A QUESTION, THAT IS, A

15  NONLEADING, NONTESTIFYING QUESTION, PLEASE.

16         MR. MEUNIER:  THANK YOU, JUDGE.

17         THE COURT:  I APPRECIATE YOUR WILLINGNESS TO TRY TO SAVE

18  TIME.

19         MR. MEUNIER:  I AM TRYING TO SAVE TIME.

20         THE COURT:  BUT WE HAVE TO GO ABOUT THIS THE RIGHT WAY.

21         MR. MEUNIER:  IF I COULD JUST TAKE THE STAND, I COULD

22  REALLY SAVE SOME TIME, BUT I CAN'T DO THAT.

23                              EXAMINATION

24  BY MR. MEUNIER:

25  Q.   FINALLY, I DO WANT TO REFER TO THAT STATEMENT IN YOUR

1  DEPOSITION, BECAUSE, AGAIN, YOU WERE REFERRING JUST TO THE FIRST

2  SENTENCE OF THAT PARAGRAPH AND YOU SAID THAT WOULD BE, AND

3  MR. WEINSTOCK POINTED OUT, YOU SAID, "I THINK THAT'S A VERY

4  DANGEROUS STATEMENT.  ALONE IN ISOLATION IT'S DANGEROUS."

5          AND THEN YOU WENT ON TO TALK ABOUT THALIDOMIDE, WHICH

6  IS NOT --

7          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

8          MR. MEUNIER:  -- THE ISSUE HERE.

9          THE COURT:  WAIT, WAIT.  LET'S FINISH THE QUESTION --

10         MR. MEUNIER:  MAY I ASK THE QUESTION?

11         THE COURT:  -- AND THEN WE'LL HEAR THE OBJECTION BEFORE

12  THE WITNESS ANSWERS.

13         MR. WEINSTOCK:  HE'S GOING TO READ THE WHOLE QUESTION.

14         MR. MEUNIER:  I'M NOT GOING TO, NO, I'M NOT GOING TO

15  READ, I'M NOT GOING TO ASK HER TO READ THE ANSWER.

16          I WANT YOU TO SIMPLY EXPLAIN TO THE JURY WHY YOU

17  WENT ON IN THAT ANSWER TO REFER TO THAT PARTICULAR SCIENCE AND

18  WHY IT'S RELEVANT HERE TO EXPLAIN YOUR ANSWER.

19         THE WITNESS:  BECAUSE THERE WERE MANY, MANY STUDIES ON

20  THALIDOMIDE IN THE 1960'S, EARLY 1960'S, AND THEY WERE ALL

21  NEGATIVE.  AND THE DRUG WAS PUT ON THE MARKET EXCEPT HERE IN THE

22  UNITED STATES OF AMERICA BECAUSE ONE WOMAN SAID, I WANT TO SEE

23  MORE STUDIES.  BY THE TIME SHE DELAYED THE AUTHORITY OR SHE

24  DELAYED PUTTING IT OUT ON THE MARKET IN THE UNITED STATES, SHE

25  WAS ABLE TO DO THAT FOR FIVE YEARS, AND BY THAT TIME, THERE WERE

1  HUNDREDS OF BABIES BORN WITH BIRTH DEFECTS.

2          MR. WEINSTOCK:  NOTE MY OBJECTION.

3          THE COURT:  WE'RE TALKING ABOUT FORMALDEHYDE HERE.  I

4  THINK SHE'S ANSWERED THE QUESTION.

5                              EXAMINATION

6  BY MR. MEUNIER:

7  Q.   LET'S BRING IT BACK TO THIS CASE.  WHY IS THAT RELEVANT TO

8  YOUR ANSWER THAT WE CAN'T JUST STOP WITH THAT FIRST SENTENCE AND

9  HAVE TO LOOK AT THE REST OF THAT PARAGRAPH?

10  A.   BECAUSE THE FIRST SENTENCE PERTAINS TO STUDIES OF A

11  PARTICULAR CHEMICAL WHERE THERE ARE NO POSITIVE STUDIES.

12  Q.   AND HERE THERE ARE POSITIVE STUDIES?

13  A.   THAT'S CORRECT.

14          MR. MEUNIER:  THANK YOU VERY MUCH.  NO FURTHER

15  QUESTIONS.

16          THE COURT:  THANK YOU, DR. WILLIAMS.  YOU CAN STEP DOWN.

17  THANK YOU FOR YOUR TIME.

18              WHO IS NEXT?

19          MR. WATTS:  KAREN FREIBERGER.

20          THE COURT:  KAREN FREIBERGER.

21          THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

22  HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

23  ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

24  THE TRUTH, SO HELP YOU GOD?

25          THE WITNESS:  I DO.

1               **KAREN FREIBERGER**

2  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

3  CLERK, WAS EXAMINED AND TESTIFIED ON HER OATH AS FOLLOWS:

4          THE WITNESS:  YES, I DO.

5          THE DEPUTY CLERK:  PLEASE BE SEATED AND STATE AND SPELL

6  YOUR FULL NAME FOR THE RECORD.

7          THE WITNESS:  MY NAME IS KAREN FREIBERGER, K-A-R-E-N,

8  F-R-E-I-B-E-R-G-E-R.

9          MR. WATTS:  MAY I PROCEED, YOUR HONOR?

10         THE COURT:  YES.

11                 DIRECT EXAMINATION

12 BY MR. WATTS:

13 Q.    THANK YOU, YOUR HONOR.

14         MS. FREIBERGER, MY NAME IS MIKAL WATTS.  YOU AND I MET

15 FOR THE FIRST TIME THIS MORNING; IS THAT CORRECT?

16 A.    THAT'S CORRECT.

17 Q.    YOU LIVE IN INDIANA WITH YOUR HUSBAND DON?

18 A.    YES.

19 Q.    DID YOU WORK AT GULF STREAM BETWEEN MARCH OF 1998 AND APRIL

20 OF 2009?

21 A.    YES, I DID.

22 Q.    FOR THE FIRST SIX YEARS OR SO THAT YOU WORKED AT GULF STREAM

23 UP UNTIL ABOUT EARLY 2005, CAN YOU TELL THE MEMBERS OF THE JURY

24 WHAT YOU DID?

25 A.    I CLEANED AND REPAIRED THE INSIDE OF THE COACHES, AND ALSO

1   BUILT DOORS THAT WERE INSTALLED IN THE COACHES.

2   Q.    NOW, YOUR HUSBAND HAS ALREADY BEEN ON AND I DON'T WANT TO GO

3   THROUGH EVERYTHING THAT WE'VE ALREADY TALKED TO HIM ABOUT.   I

4   JUST WANT TO TALK TO YOU ABOUT YOUR EXPERIENCE.   BEFORE YOU WENT

5   TO GO WORK AT GULF STREAM, WERE YOU A COSMETOLOGIST?

6   A.    YES.

7   Q.    WHAT IS THAT SINCE I CAN'T PRONOUNCE IT?

8   A.    PARDON ME?

9   Q.    WHAT IS A COSMETOLOGIST?

10  A.    IT'S WHERE YOU DO HAIR AND STUFF.

11  Q.    DID YOU WORK AROUND FORMALDEHYDE IN KEEPING BRUSHES AND

12  COMBS CLEAN?

13  A.    YES, THAT'S THE SOLUTION THAT WE USE TO KEEP THEM SANITIZED,

14  BRUSHES, COMBS AND PERM RODS AND THINGS.

15  Q.    DO YOU KNOW WHAT FORMALDEHYDE SMELLS LIKE AS A RESULT OF

16  THAT?

17  A.    YES.

18  Q.    WHEN YOU WORKED FOR SIX YEARS AS A CLEANER OF COMPLETED

19  TRAILERS AT GULF STREAM, CAN YOU TELL THE LADIES AND GENTLEMEN OF

20  THE JURY WHEN YOU OPENED UP THE TRAILER WHAT YOU EXPERIENCED?

21  A.    WHEN YOU WOULD OPEN IT UP AFTER THEY HAD BEEN CLOSED UP,

22  THAT SMELL, THE FORMALDEHYDE SMELL, WOULD JUST TOTALLY TAKE YOUR

23  BREATH AWAY, CHOKE AND GAG YOU.   YOUR EYES WOULD AUTOMATICALLY

24  WATER.   AND, I MEAN, IT WAS JUST, IT WAS HORRIBLE.

25  Q.    DID YOU COMPLAIN ABOUT THAT TO GULF STREAM'S MANAGEMENT?

1    A.    YES.

2    Q.    WHAT DID THEY TELL YOU TO DO?

3    A.    OPEN THE WINDOWS UP AND AIR THE TRAILERS OUT.

4            MR. WATTS:  THOSE ARE ALL OF MY QUESTIONS, THANK YOU.

5            MR. WEINSTOCK:  I HOPE TO BE EQUALLY BRIEF, YOUR HONOR.

6                        CROSS-EXAMINATION

7    BY MR. WEINSTOCK:

8    Q.    WHAT YOU WOULD DO IS YOU WOULD OPEN THE WINDOWS UP, YOU'D GO

9    DOWN THE LINE OPENING THE WINDOWS UP AND THEN GO BACK AND CLEAN

10   THEM, CORRECT?

11   A.    YES.

12   Q.    AND BY THE TIME YOU GOT BACK IN IT, NOW ALL OF A SUDDEN IT

13   WASN'T TAKING YOUR BREATH AWAY AND YOU WERE ABLE TO ACTUALLY GO

14   IN THERE AND DO YOUR JOB, RIGHT?

15   A.    THAT'S NOT NECESSARILY TRUE.  BECAUSE IT LINGERED.

16   Q.    SURE, AND YOU COULD STILL SMELL IT?

17   A.    YES.

18   Q.    AND YOU COULD DO YOUR JOB, RIGHT?

19   A.    YES.

20   Q.    JUST IN THAT 15 OR 20 MINUTES, YOU HAD AIRED IT OUT, RIGHT?

21   A.    SOMETIMES IT DEPENDED ON HOW LONG THEY SET IN THE YARD

22   BECAUSE THE LONGER THEY SET, THE WORSE IT SMELLED.

23   Q.    AND THEN, BUT WHEN YOU CAN AIR IT OUT IN 15 OR 20 MINUTES,

24   YOU WOULD THINK 500 DAYS MIGHT DO THE TRICK, RIGHT?

25   A.    IT JUST DEPENDS.

1    Q.    DID YOU EVER WORK IN ANY OF THEM THAT WERE 500 DAYS OLD?

2    A.    I REALLY WOULDN'T KNOW.

3    Q.    YOU DON'T BELIEVE YOU DID.  YOU BELIEVE YOU WORKED IN ALL

4    NEW ONES, DIDN'T YOU?

5    A.    IN ALL NEW ONES?

6    Q.    THE ONES THAT WERE COMING OFF THE LINE?

7    A.    NO.  WE HAD TRAILERS THAT WOULD SIT OUT IN THE YARD FOR

8    MONTHS ON END, AND THEY WOULD COME BACK THROUGH THE LINE TO BE

9    REDONE.

10   Q.    AND YOUR EXPERIENCE IN EVERY SINGLE TRAILER WAS EXACTLY THE

11   SAME?

12   A.    YES, THAT SMELL WAS ALWAYS THERE.

13   Q.    AT THAT LEVEL?

14   A.    YES.

15   Q.    YOUR HUSBAND HAD FOUR DWI'S, I UNDERSTAND, WHEN GULF STREAM

16   HIRED HIM BACK?

17   A.    I GUESS.

18   Q.    DID THEY HOLD THAT AGAINST HIM?

19   A.    NO.  HE WAS WORKING THERE WHEN HE HAD GOT ONE, AND HE WASN'T

20   EMPLOYED THERE ANY LONGER WHEN HE RECEIVED HIS LAST ONE.

21   Q.    WHERE DO YOU WORK NOW?

22   A.    WHERE DO I WORK NOW?

23   Q.    YES.

24   A.    I AM LAID OFF FROM GULF STREAM.

25   Q.    FROM GULF STREAM, AFTER 11 YEARS?

1   A.    UH-HUH (AFFIRMATIVE RESPONSE).

2   Q.    YES?

3   A.    YES.

4   Q.    SO IF I UNDERSTAND CORRECTLY, IT SOUNDS LIKE IT'S A VERY,

5   VERY BAD PLACE TO WORK, CORRECT?

6   A.    I WOULDN'T SAY THEY ARE A BAD COMPANY TO WORK.  I MEAN, YOU

7   KNOW, I WENT IN AND DID MY JOB, BUT AFTER TEN, 11 YEARS OF

8   SERVICE, I WAS LET GO BECAUSE REDUCTION IN WORKFORCE.

9   Q.    REDUCTION OF WORKFORCE BECAUSE OF WHAT'S GOING ON IN THE RV

10  INDUSTRY THESE DAYS, RIGHT?

11  A.    THAT'S CORRECT.

12  Q.    BUT HAD YOU NOT BEEN IN RIF, YOU HAD NO INTENTION OF

13  QUITTING THIS JOB THAT TOOK YOUR BREATH AWAY EVERY TIME YOU WENT

14  IN A TRAILER, RIGHT?

15  A.    WHEN YOU'RE MAKING A LIVING AND THE MONEY IS GOOD, YOU DO

16  WHAT YOU HAVE TO DO TO KEEP A JOB.

17          MR. WEINSTOCK:  THANK YOU VERY MUCH.

18          THE COURT:  FLUOR?

19          MR. PENOT:  FLUOR HAS NO QUESTIONS, YOUR HONOR.

20          THE COURT:  ANY REDIRECT?

21          MR. WATTS:  NO, SIR.  WE'RE DONE, YOUR HONOR.  THANK

22  YOU.

23          THE COURT:  THANK YOU, MA'AM.  YOU MAY STEP DOWN.

24  PLEASE DON'T DISCUSS YOUR TESTIMONY WITH ANYONE IN THIS CASE.

25          MR. BUZBEE:  YOUR HONOR, MAY WE APPROACH BEFORE WE CALL

1   MARY DEVANY?

2            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE

3   WAS A CONFERENCE HELD AT THE BENCH.)

4            MR. BUZBEE:  TONY BUZBEE.  WERE YOU PROVIDED A COPY OF

5   THE TRANSCRIPT FROM THE WASHINGTON HEARING THAT YOU HAD ASKED

6   FOR?

7            THE COURT:  I HAVE RIGHT HERE.

8            MR. BUZBEE:  WERE YOU ABLE TO LOOK AT THE FIRST PART,

9   THE PART THAT THEY DIDN'T MENTION TO YOU, BUT THE FIRST PART

10  WHERE SHE MENTIONS THAT SHE WAS HIRED BY PLAINTIFFS' LAWYERS, WHO

11  WERE APPOINTED BY THE COURT BECAUSE THE REASON I ASK THAT IS

12  BECAUSE THIS IS, I CAN TELL THAT YOU'RE UNHAPPY WITH HER.

13           THE COURT:  I'LL SEE WHAT SHE HAS TO SAY, BUT I HAVE TO

14  TELL YOU, I'VE GOT BIG PROBLEMS WITH HER --

15           MR. BUZBEE:  BUT YOU DID SEE THE FIRST PART --

16           THE COURT:  -- AND I'M GOING TO ADMONISH HER IN FRONT OF

17  THE JURY.  SHE'S GOING TO HAVE TO CORRECT THIS TESTIMONY.

18           MR. BUZBEE:  WHICH PART?

19           THE COURT:  SHE'S GOING TO HAVE TO -- I'M TALKING ABOUT

20  THIS TESTIMONY.  THE PART THAT IS INCORRECT.  SHE'S GOING TO HAVE

21  TO DO IT WITHIN 15 DAYS IN WRITING, AND I'M GOING TO TELL HER

22  THIS WHEN SHE'S ON THE STAND OR SHE'S GOING TO BE FINED $5,000,

23  BUT FOR HER TO INVOKE MY NAME AND THE AUTHORITY OF THIS COURT TO

24  ENHANCE HER CREDENTIALS I THINK IS REPREHENSIBLE.

25           MR. BUZBEE:  ARE YOU LOOKING AT THE --

1    THE COURT:  YES, THIS IS THE TRANSCRIPT.  AND I HAVE

2  READ THROUGH IT, YES.  YOU CAN GET INTO THE WHEREFORES AND

3  HOWFORES AND WHATEVER, BUT I DON'T APPRECIATE WHAT SHE DID.  I

4  DON'T APPRECIATE IT.

5    MR. BUZBEE:  I MUST NOT BE SEEING WHAT YOU'RE TALKING

6  ABOUT.

7    THE COURT:  I'M TALKING ABOUT THE PAGES -- I'M GOING TO

8  SEE WHAT SHE HAS TO SAY FIRST.  I'M TALKING ABOUT PAGES 52 TO 54.

9  52 TO 54.

10    MR. BUZBEE:  CAN WE DO THAT OUTSIDE THE PRESENCE OF THE

11  JURY?

12    THE COURT:  WHEN SHE -- SHE ATTRIBUTES TO ME THAT I

13  COMPLAINED -- I COMPLAINED ABOUT THE CLOGGING UP HIS FEDERAL

14  COURT SYSTEM.  SHE'S A SOPHISTICATED WITNESS.  SHE KNOWS BETTER

15  THAN THAT.  SHE KNOWS BETTER THAN TO SAY THAT.  SHE'S NOT A LAY,

16  BLUE-COLLAR WITNESS THAT CAME IN OFF THE OIL RIG.  SHE KNOWS

17  BETTER THAN THAT.

18    MR. BUZBEE:  YOUR HONOR, MY REQUEST TO HAVE THAT DONE

19  OUTSIDE THE PRESENCE OF THE JURY IS DENIED?

20    THE COURT:  IT'S DENIED BECAUSE IT GOES TO WHATEVER

21  WEIGHT, IF ANY, THEY WISH TO ATTRIBUTE HER TESTIMONY.  SHE'S AN

22  EXPERT WITNESS.  THIS ISN'T AN INNOCENT LAY WITNESS SAYING

23  SOMETHING THAT WAS IRRESPONSIBLE OR ILL-ADVISED, SHE'S AN EXPERT

24  WITNESS.  SHE'S PAID TO SERVE AS AN EXPERT IN THIS CASE.

25         I'VE NEVER SEEN ANYTHING LIKE IT BEFORE IN MY LIFE.

1   FOR HER TO TAKE THE AUTHORITY OF THIS COURT AND MY NAME AND TELL

2   PEOPLE IN THE STATE OF WASHINGTON THAT I HAVE SOMEHOW ENTRUSTED

3   HER, THAT'S ENTIRELY FALSE.

4          MR. BUZBEE:  WELL, THERE IS NO DOUBT THAT'S FALSE, BUT I

5   DON'T THINK THAT'S WHAT THIS TRANSCRIPT SAYS IS ALL I'M SAYING.

6          THE COURT:  I'LL LET YOU COVER IT WITH HER, BUT SHE WAS

7   HERE FOR THE CLASS CERT. HEARING.  I THINK I KNOW WHAT SHE KNOWS

8   AND DOESN'T KNOW.  SHE'S A SOPHISTICATED WITNESS.

9          I TOLD YOU ALL THIS IN THE ORDER I ENTERED, THAT

10  SHE WAS GOING TO BE ADMONISHED AND THAT THEY WERE GOING TO BRING

11  IT OUT WHEN YOU TRIED TO QUALIFY HER AS AN EXPERT, AND I

12  DISCOURAGED YOU FROM PUTTING HER -- DO YOU NEED HER AS AN EXPERT?

13  CAN SHE COME IN AND TESTIFY AS TO JUST -- THAT SHE TOOK TESTS AND

14  GOT RESULTS?

15         MR. BUZBEE:  I THINK WE NEED HER, YOUR HONOR.  IT'S AN

16  IMPORTANT WITNESS AND I FRANKLY THINK THAT --

17         THE COURT:  YOU BROUGHT HER TO THE DANCE, SO...

18         MR. BUZBEE:  WE'RE GOING TO PLAY JIM SHEA'S THEN, I

19  GUESS, YOUR HONOR, BUT I REALLY WOULD LIKE TO HAVE A HEARING

20  OUTSIDE OF THE PRESENCE SO WE CAN TALK ABOUT THIS, BECAUSE I

21  REALLY THINK -- BUT I'M JUST SAYING THIS:  KNOWING HER, I CAN

22  ASSURE YOU THAT IF YOU READ THIS IN TOTO, THERE AIN'T NO, I MEAN,

23  MAYBE I'M JUST LOOKING AT IT FROM MY LITTLE PRISM HERE, AND I CAN

24  UNDERSTAND YOUR CONCERN ABOUT HER.

25         THE COURT:  WELL, LET'S ASSUME THAT SHE WAS MISTAKEN,

1   WHICH I DON'T BELIEVE, SHE WAS MISTAKEN INNOCENTLY ENOUGH, SHE'S

2   GOING TO WRITE TO THESE PEOPLE AND, IN WRITING, TELL THEM THAT

3   HER TESTIMONY WAS WRONG ON THOSE PAGES, THAT SHE WAS INCORRECT.

4   SHE IS GOING TO DO IT WITHIN 15 DAYS AND SHE'S GOING TO CERTIFY

5   TO ME THAT SHE HAS DONE SO.  I WANT HER TO WRITE TO THIS JUDGE,

6   TO THIS PERSON AND TO THIS OTHER LAWYER HERE TOO, BOTH OF THESE

7   TWO LAWYERS, AND IF I DON'T GET A WRITTEN CERTIFICATION FROM HER

8   WITH A COPY OF HER NOTIFICATION, IT'S GOING TO BE 5,000 BUCKS.

9            LOOK, I TAKE MY SIGNATURE AND MY AUTHORITY VERY,

10  VERY SERIOUSLY, AND I'VE HAD THIS COME UP IN OTHER CASES WHERE

11  PEOPLE SAY, OH, THE JUDGE SAID THIS AND THE JUDGE SAID THAT, AND

12  SHE NEEDS TO BE REALLY CAREFUL WITH HOW SHE REPRESENTS HER

13  AUTHORITY BECAUSE I AM WITH MINE.

14       MR. BUZBEE:  YOUR HONOR, FIRST OFF, THE FIRST ISSUE, IT

15  SOUNDS LIKE, IS THAT SHE SAID THAT YOU TOLD THE PARTIES THAT

16  THESE CASES WERE CLOGGING UP THE SYSTEM.

17       THE COURT:  FIRST OF ALL, SHE REPRESENTED -- OH, WHERE

18  DO I BEGIN ON THIS?  I MEAN, MY GOODNESS.

19       MR. HILLIARD:  LET'S SHOW THE VIDEO, YOUR HONOR.

20       THE COURT:  SHE'S GOING ON A TEAR HERE FOR ABOUT A HALF

21  A DOZEN THINGS IN THREE PAGES THAT I COULDN'T BELIEVE MY EYES

22  WHEN I READ THEM.

23       MR. HILLIARD:  JUDGE ENGELHARDT, CAN WE PUSH THE PAUSE

24  BUTTON HERE AND PLAY THIS VIDEO RIGHT NOW AND DISCUSS THIS LATER?

25            THE COURT:  LET'S DO THAT.  LET'S DO THAT.  BUT I FEEL

1  VERY STRONGLY ABOUT IT.  YOU'RE NOT GOING TO DISSUADE ME FROM

2  THIS.  LET'S GO AHEAD AND DO THAT.

3          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

4  BENCH CONFERENCE CONCLUDED.)

5          THE COURT:  WHO'S NEXT?

6          MR. BUZBEE:  WE'RE GOING TO CALL JIM SHEA, YOUR HONOR,

7  THE CHAIRMAN OF THE BOARD OF GULF STREAM COACH BY VIDEO

8  DEPOSITION.

9          THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND BEGIN THIS

10  DEPOSITION OF TESTIMONY OF JIM SHEA.

11          MR. WATTS:  JUDGE, FOR YOUR TIMING PURPOSES, THE

12  VIDEOTAPE OF HIS 2008 DEPOSITION IS 34 MINUTES LONG.

13          THE COURT:  THIRTY-FOUR, OKAY, GOOD.  LET'S GO AHEAD AND

14  COVER THAT.

15          MR. WEINSTOCK:  YOUR HONOR, IT'S MY UNDERSTANDING THEY

16  ARE GOING TO PLAY BOTH TAPES, 2008, 2009.

17          MR. WATTS:  WE DON'T WANT TO, BUT IF THEY WANT US TO,

18  THE 2009 PART IS AN HOUR AND 26 MINUTES LONG IN ADDITION TO 34.

19  WE'RE READY TO PLAY THE 34, BUT IF WE'RE REQUIRED TO PLAY BOTH,

20  WE'LL DO THAT.

21          THE COURT:  IT'S ALMOST 11:00.  WHY DON'T WE GO AHEAD

22  AND PLAY THE SHORTER ONE AND SEE IF WE CAN GO AHEAD AND BEGIN

23  WITH THE LONGER ONE, AND THEN WE'LL TAKE A BREAK AND WE'LL JUST

24  FINISH IT UP AFTER LUNCH AND THEN WE'LL TAKE ANOTHER WITNESS.

25          MR. WATTS:  OKAY, YOUR HONOR.  WE CALL JIM SHEA BY AND

1    THROUGH HIS 2008 DEPOSITION, WHICH IS 34 MINUTES LONG.

2         MR. WEINSTOCK:  YOUR HONOR, CAN WE APPROACH THE BENCH?

3    WE'VE GOT A PROBLEM.

4              (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE

5    WAS A CONFERENCE HELD AT THE BENCH.)

6         MR. WEINSTOCK:  YOUR HONOR, I'VE GOT A REAL PROBLEM WITH

7    THIS.  THIS HAPPENED YESTERDAY WITH DR. DEROSA, AND SOME STUFF

8    THAT WAS SUPPOSED TO BE CUT WASN'T CUT BECAUSE WE DON'T GET THESE

9    CUTS UNTIL TOO LATE IN THE GAME.  WE GOT THIS 2009 VERSION

10   15 MINUTES AGO.  THESE CUTS WERE IN THE CAN LAST -- OVER THE

11   WEEKEND.  AND NOW WE CAN'T VERIFY THE 2009 CUTS.

12             AND THIS IS EXACTLY WHAT HAPPENED WITH DR. DEROSA

13   YESTERDAY, AND I LET IT GO BECAUSE I'M TRYING TO COOPERATE AND WE

14   WANT TO MOVE THIS THING ALONG, BUT THIS IS GETTING RIDICULOUS.

15   WHY ARE WE GETTING THESE CUTS 15 MINUTES BEFORE --

16        THE COURT:  DID YOU LOOK AT THE FIRST ONE?  DID YOU LOOK

17   AT THE HALF HOUR?

18        MR. WEINSTOCK:  YEAH, WE DID, AND THIS IS THE GAME THEY

19   ARE TRYING TO PLAY.  THEY ONLY WANT TO PLAY THE 2008 TAPE.

20        THE COURT:  NO, WE'RE GOING TO PLAY THEM ALL AT THE SAME

21   TIME.  I THINK THE PROBLEM IS THAT, IF YOU WANT TO REVIEW THE

22   OTHER TAPE TO VERIFY THAT EVERYTHING IS IN ORDER, YOU'RE GOING TO

23   HAVE THE OPPORTUNITY TO DO THAT.  WE DON'T HAVE ANYBODY THAT CAN

24   COME IN REAL QUICK AND TESTIFY FOR THE NEXT FEW MINUTES LIVE AND

25   THEN START THE HALF HOUR TAPE AND THEN TAKE A BREAK FOR LUNCH?

 1   IN OTHER WORDS, CAN WE FILL A HALF HOUR, PLAY THE TAPE, COME

 2   BACK, BECAUSE --

 3            MR. BUZBEE:  IS SCOTT PULLEN HERE?

 4            THE COURT:  HOW LONG IS SCOTT PULLEN GOING TO TAKE?

 5            MR. WEINSTOCK:  HE'S GOING TO TAKE A LITTLE WHILE.  TONY

 6   IS GOING TO BE A LITTLE MORE.

 7            MR. BUZBEE:  FIRST OFF, LET ME SAY, WE, YOU KNOW WHAT

 8   KIND OF HERCULEAN TASK IT IS FOR US TO DO ALL OF THESE.

 9            THE COURT:  I KNOW.

10            MR. BUZBEE:  AND TO BE HONEST, WITH ALL DUE RESPECT TO

11   YOU, SIR, YOU GUYS ARE TARDY EVERY TIME TO GET US THIS STUFF, AND

12   I'VE GOT PEOPLE WORKING LITERALLY 24 HOURS TO MAKE THIS HAPPEN.

13            THE COURT:  I APPRECIATE THAT.

14            MR. WEINSTOCK:  I'VE GOT PEOPLE STAYING UP ALL NIGHT

15   WATCHING CUTS, WHICH THEY ARE NOT GETTING.

16            THE COURT:  ALL RIGHT, ALL RIGHT, WHAT ARE WE GOING TO

17   DO NOW?

18            MR. BUZBEE:  I THINK WE PLAY THE FIRST ONE AND THEY CAN

19   TAKE THE LUNCH HOUR AND THEN THEY CAN WATCH IT, AND WE CAN PLAY

20   THE SECOND PART OF IT.

21            MR. WEINSTOCK:  JUDGE, YOU KNOW, I WANT TO MOVE THIS

22   CASE ALONG SO I'M GOING TO LET IT HAPPEN, BUT PLEASE LET THIS BE

23   THE LAST TIME THEY PLAY THIS GAME.  JUDGE, THEY HAVE BEEN TRYING

24   TO SET THIS UP FOUR TIMES NOW, THEY WANTED TO PLAY JIM SHEA AND

25   STOPPED LAST NIGHT HALFWAY.  IT'S A TACTIC.

1          THE COURT:  DO YOU WANT TO WAIT AND PLAY THE -- THEY

2   WANT TO WAIT AND PLAY THE SECOND HALF.

3          MR. WATTS:  HE CAN PLAY IT IN HIS CASE IN CHIEF.

4          THE COURT:  YOU WANT TO WAIT AND PLAY THE SECOND HALF

5   LATER?  I'M THE ONE THAT SAYS I WOULD RATHER HAVE SOMEBODY COME

6   IN.

7          MR. WATTS:  YOU'VE GOT THE DISCRETION TO LET US PLAY OUR

8   PART, AND HE CAN DO HIS PART IN HIS CASE IN CHIEF.

9          MR. WEINSTOCK:  IF YOU WANT TO PLAY JUST THE 2008 IN

10  YOUR CASE IN CHIEF AND CUT LOOSE THE 2009, AND WE'LL MAKE THE

11  DECISION WHETHER TO PLAY THAT, IS THAT WHAT YOU'RE SAYING?

12         MR. BUZBEE:  NO.  BECAUSE WE'RE REQUIRED TO PUT IT ALL

13  IN ONE TAPE.  WE WANTED TO DO IT HALF AND HALF.  WE WERE TOLD WE

14  HAVE TO PUT IT IN ONE TAPE.

15         THE COURT:  I WANT TO PLAY IT ALL AT ONE TIME.  IF

16  THEY'RE CALLING THEM ON THEIR CASE IN CHIEF, I WANT IT ALL THE

17  WAY THROUGH.

18         MR. HILLIARD:  COULD WE DO THIS?  COULD WE PLAY THE

19  34 MINUTES, TAKE AN EARLY LUNCH AND NOT LOSE ANY TIME, JUST COME

20  BACK EARLY?

21         THE COURT:  WELL, WE'RE WASTING TIME RIGHT NOW.

22         MR. WEINSTOCK:  WHERE IS BURL KEELS DEPO?  YOU GOT OTHER

23  DEPO CUTS.

24         MR. BUZBEE:  WE CAN PLAY THE FIRST PART OF JIM'S AND

25  PLAY BURL'S WHILE YOU GUYS ARE WATCHING THE OTHER ONE?

1          THE COURT:  CAN YOU PLAY BURL'S NOW?

2          MR. BUZBEE:  WE'VE GOT KEEL.  IT'S VERY SHORT, THOUGH,

3    30 MINUTES, LET'S SEE.

4          THE COURT:  YOU DON'T HAVE KEEL?

5          MR. BUZBEE:  THEY ARE ALL ON THE SAME TAPE.

6          MR. GLASS:  THEY WERE ALL ON THE SAME TAPE THAT WE WERE

7    ASKING FOR LAST NIGHT.

8          MR. WEINSTOCK:  WE GOT THEM 15 MINUTES AGO.  THAT'S THE

9    ONLY ONE WE HAVE IS 2008.

10         THE COURT:  LET'S GO AHEAD AND PLAY THE FIRST HALF.

11   WE'LL TAKE AN EARLY LUNCH.  YOU WATCH IT OVER THE LUNCH HOUR OR

12   HAVE SOMEBODY START WATCHING IT NOW.  GO SOMEWHERE ACROSS THE

13   HALL.

14         MR. WATTS:  FOR WHAT IT'S WORTH, I THINK WE'RE DONE WITH

15   THE VIDEOS AFTER WE'RE DONE WITH THIS ONE.

16         MR. MEUNIER:  ANDY, ON THE SUBJECT OF LATE, GETTING CUTS

17   LATE TO YOU, WHAT I'M TOLD BY OUR GROUP IS THAT THE DEFENDANTS'

18   CUTS CONTAINED REFERENCE TO CONGRESS, WHICH YOU HAVE TOLD US IS

19   OUT OF BOUNDS, SO ONE OF THE PROBLEMS IS, WE HAD TO GO BACK IN

20   AND SPLICE OUT CONGRESS LIKE WE DID WITH DR. DEROSA.

21         MR. WEINSTOCK:  NO, THAT'S NOT WHAT HAPPENED.  WHAT

22   HAPPENED IS, INITIALLY, THERE'S SOME CRAZY RULE IN TEXAS WHERE

23   THEY WERE ONLY CUTTING YOUR STUFF AND THEY WERE LEAVING OUT ALL

24   OF OUR STUFF, AND WE SAID, NO, YOU HAVE TO PUT OUR QUESTIONS IN

25   ORDER SO IT'S NOT OUT OF SEQUENCE.  THAT'S WHAT CAUSED THE WHOLE

1    DELAY.

2          MR. MEUNIER:  WHAT I'M SAYING IS, WHEN YOU GAVE US YOUR

3    STUFF, YOU HAD CONGRESS IN IT.

4          THE COURT:  OKAY.  I UNDERSTAND.  GO ON, RIGHT NOW.

5              (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

6    BENCH CONFERENCE CONCLUDED.)

7          THE COURT:  ALL RIGHT, COUNSEL.

8          MR. WATTS:  THIS IS JIM SHEA VIA, THROUGH HIS 2008

9    DEPOSITION, AND I BELIEVE THIS CLIP IS 34 MINUTES LONG.

10         THE COURT:  MY UNDERSTANDING IS THAT WE'RE GOING TO HEAR

11   THE FIRST PART OF MR. SHEA'S TESTIMONY BY WAY OF VIDEOTAPE.  THEN

12   WE'LL PROBABLY TAKE AN EARLY LUNCH AND THEN COME BACK AND HEAR

13   THE BALANCE OF MR. SHEA'S TESTIMONY.  ALL RIGHT.  LET'S GO AHEAD.

14             (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

15   VIDEOTAPED DEPOSITION OF JIM SHEA WAS PLAYED.)

16   Q.   YOUR NAME IS JIM SHEA, RIGHT?

17   A.   CORRECT.

18   Q.   AND YOU'RE THE CHAIRMAN OF GULF STREAM COACH?

19   A.   THAT'S CORRECT.

20   Q.   AND TELL ME THE DIFFERENCE BETWEEN A SCREENING AND A TEST.

21   A.   A TEST WOULD BE -- WOULD FOLLOW A PRESCRIBED PROTOCOL,

22   PROPER PRESCRIBED PROTOCOL.  IT WOULD USE CERTIFIED PERSONNEL,

23   CERTIFIED EQUIPMENT.  IT WOULD BE SOMETHING THAT OSTENSIBLY COULD

24   BE USED BY OSHA OR WOULD BE SOMETHING THAT COULD BE USED

25   EVIDENTIARILY FOR OTHER PURPOSES.

1            SCREENING IS AN INDICATOR, AND IT COULD BE USED AS AN

2    INDICATOR OF INDOOR AIR QUALITY, COULD BE USED AS TO WHETHER --

3    AN INDICATOR OF WHETHER IT MAY POTENTIALLY -- TO TESTING MIGHT BE

4    EMPLOYED IN A GIVEN SITUATION.

5    Q.   YOUR TESTIMONY IS, IS THAT WHAT YOU GUYS DID IN MARCH, APRIL

6    OF '06 WAS SCREENING, NOT TESTING, RIGHT?

7    A.   CORRECT.  YEAH.

8    Q.   WHAT WAS THE PURPOSE OF THE SCREENING?

9    A.   THE PURPOSE WAS TO UNDERSTAND HOW THE UNITS VENTILATED AND

10   TO ADVISE THEM AND GIVE BEST RESPONSE TO THEM IN TERMS OF HOW THE

11   UNIT PERFORMED IN A VENTILATION STANDPOINT.  AND -- AND WE HAD --

12   WE HAD SOME OTHER DEVICES THAT WE HAD -- WERE LOOKING AT AS FAR

13   AS AUGMENTED VENTILATION.

14   Q.   THE PURPOSE OF THE SCREENING WAS TO CHECK THE AIR QUALITY

15   WITHIN THE UNITS?

16   A.   TO CHECK HOW THE AIR CHANGED WITH RESPECT TO THE USE OF

17   NATURAL VENTILATION ELEMENTS THAT WE PROVIDED WITH THE TRAILERS

18   AND SOME OPTIONAL DEVICES.

19   Q.   SO YOU DIDN'T DO THIS, WHAT YOU CALL SCREENING, BECAUSE YOU

20   ANTICIPATED LITIGATION?

21   A.   NO.

22   Q.   YOU DID NOT DO THE SCREENING BECAUSE YOU THOUGHT YOU MIGHT

23   BE SUED?

24   A.   NO.

25   Q.   DO YOU REMEMBER THE WRITTEN STATEMENT YOU GAVE?

1    A.    YES.

2    Q.    LET'S TAKE A LOOK AT IT.  EXHIBIT 9.  NO BATES NUMBER.

3    A.    WHERE ARE WE GOING HERE?

4    Q.    EXHIBIT 9 IS THE STATEMENT OF JIM SHEA THAT WE OFFERED TO

5    SHARE WITH FEMA THE RESULTS OF SOME INFORMAL FORMALDEHYDE

6    SCREENINGS OF OCCUPIED TRAVEL TRAILERS THAT ONE OF OUR EMPLOYEES

7    HAD PERFORMED IN MARCH AND APRIL OF 2006 IN ANTICIPATION OF

8    LITIGATION, DIDN'T YOU?

9    A.    THAT'S THE STATEMENT HERE, YES.

10   Q.    AND THE TRUTH IS, THE REASON THAT THE SCREENING -- THE

11   SCREENING WAS DONE IS BECAUSE YOU ANTICIPATED LITIGATION, ISN'T

12   IT?

13   A.    WHAT OUR PURPOSE WAS, WAS TO GO INTO THE FIELD, UNDERSTAND

14   WHAT -- PART OF OUR RESPONSE WAS TO UNDERSTAND WHAT ISSUES PEOPLE

15   WERE FACING IN THE FIELD, AND WE DID CANVASS CERTAIN PERSONS

16   AND -- IN ST. BERNARD PARISH.  AND AS PART OF THAT DISCUSSION IN

17   TALKING WITH THE PERSONS, THE INDIVIDUAL DID DEPLOY THIS DEVICE.

18   Q.    FORMALDEMETER?

19   A.    CORRECT.

20   Q.    NOW, AGAIN, I'M GOING TO ASK YOU AGAIN, BECAUSE I'VE ASKED

21   YOU THREE TIMES NOW, DID YOU OR DID YOU NOT ANTICIPATE LITIGATION

22   IN MARCH AND APRIL OF 2006?

23   A.    WE ANTICIPATED THE POTENTIAL LITIGATION OF, WHEN THIS ISSUE

24   BECAME -- CAME TO THE FORE IN MARCH.

25   Q.    YOU ANTICIPATED LITIGATION EVEN BEFORE YOU DELIVERED THE

1  LAST TRAILER, DIDN'T YOU?

2  A.    WE ANTICIPATED THE POTENTIAL FOR LITIGATION, YES.

3  Q.    AND YOU DO KNOW THE CONTRACT SAYS THAT YOU'RE SUPPOSED TO BE

4  PAID 30 DAYS AFTER YOU DELIVER THE TRAILER.  ISN'T THAT RIGHT?

5  A.    CORRECT.

6  Q.    NOW, WHO DID YOU SEND DOWN TO DO THIS SCREENING IN

7  ANTICIPATION OF LITIGATION?

8  A.    THE PERSON THAT WE SENT DOWN TO CANVASS SEVERAL OCCUPANTS

9  WAS SCOTT PULLEN.

10  Q.    WHO IS THAT GUY?

11  A.    SCOTT PULLEN WAS A LONG-TERM TECHNICAL SPECIALIST AND

12  VICE-PRESIDENT OF GULF STREAM.

13  Q.    WHAT'S A TECHNICAL SPECIALIST?

14  A.    HE'S FAMILIAR WITH THE CONSTRUCTION OF UNITS, OF THE VARIOUS

15  SYSTEMS, THE ELEMENTS THAT WOULD RELATE TO THE RVIA STANDARD.

16  JUST A PERSON THAT IS WELL ROUNDED IN UNDERSTANDING THE TECHNICAL

17  ASPECTS OF A RECREATIONAL VEHICLE.

18  Q.    WHY DID YOU CHOOSE HIM TO GO DO THIS SCREENING?

19  A.    HE HAD -- HAS EXPERIENCE IN THE FIELD AND HAD SPENT TIME IN

20  THE HURRICANE ZONE RELATED TO, YOU KNOW, THE DEPLOYMENT OF UNITS

21  AND SO FORTH.

22  Q.    DID YOU FEEL THAT HE WAS A COMPETENT INDIVIDUAL?

23  A.    HE'S A COMPETENT INDIVIDUAL RELATIVE TO UNDERSTANDING RV

24  CONSTRUCTION AND STANDARDS.

25  Q.    HE WASN'T A SCIENTIST AND HAD NO TRAINING OR PRIOR

1  EXPERIENCE ON THE USE OF THE SCREENING DEVICE?

2  A.    CORRECT.

3  Q.    DID YOU KNOW THAT BEFORE YOU SENT HIM DOWN THERE?

4  A.    YES.

5  Q.    COULD YOU HAVE SENT SOMEONE DOWN THAT HAD TRAINING?

6  A.    NO.

7  Q.    YOU COULDN'T DO THAT?

8  A.    NO.

9  Q.    WHY NOT?

10  A.    WE DIDN'T HAVE ANYBODY IN THE EMPLOYMENT OF THE COMPANY THAT

11  DID THAT.

12  Q.    YOU SAID HE DETERMINED THAT HE HAD FAILED TO FOLLOW THE

13  OPERATING INSTRUCTIONS, WHAT DO YOU MEAN BY THAT?

14  A.    THERE IS SOME ASPECTS OF THAT PIECE OF EQUIPMENT THAT --

15  THAT HE DIDN'T FOLLOW.

16  Q.    LIKE WHAT?

17  A.    HE DIDN'T, AS I UNDERSTAND, HE DIDN'T NECESSARILY

18  RECALIBRATE THE UNIT WITH THE FREQUENCY THAT WOULD HAVE BEEN

19  REQUIRED.  HE DIDN'T OBSERVE, AS I UNDERSTAND IT, NECESSARILY THE

20  AMOUNT OF TIME BETWEEN USES IN CERTAIN CASES.  AND THERE'S SOME

21  OTHER THINGS THAT YOU CAN DO THAT HE DIDN'T DO.

22  Q.    SO YOU FELT THAT HIS SCREENING WAS USELESS?

23  A.    WE FELT THAT THE SCREENING FROM -- GIVEN AN INDICATION OF

24  THE CHANGES IN INDOOR AIR WAS -- HAD SOME VALUE IN TERMS OF US

25  BEING ABLE TO COMMUNICATE WITH FEMA RELATIVE TO VENTILATION

1   ASPECTS OF THE UNIT, SO WE THOUGHT THAT IT HAD SOME VALUE THERE.

2   AND SO FOR THAT PURPOSE, YOU KNOW, IT WAS BETTER THAN, QUOTE, A

3   SNIFF ANALYSIS, AS SOMEBODY MIGHT DO IN A UNIT TO TRY TO

4   DETERMINE INDOOR AIR QUALITY.

5   Q.   WHEN YOU GOT THE RESULTS OF THE SCREENING, DID YOU BELIEVE

6   THAT THERE MAY BE A PROBLEM WITH FORMALDEHYDE IN THE TRAILERS

7   THAT YOU WERE SELLING THE GOVERNMENT?

8   A.   WELL, THERE WAS TWO TYPES OF SCREENING THAT WE DID:  ONE WAS

9   OCCUPIED UNITS AND ONE TYPE WAS UNOCCUPIED UNITS.

10  Q.   OKAY.

11  A.   AND RELATIVE TO THE OCCUPIED UNITS, THE SCREENINGS FELL

12  BELOW OR PROXIMATE TO THE ONLY TWO -- THE ONLY TWO FEDERAL

13  REGULATORY RULES THAT I WAS -- THAT WE WERE FAMILIAR WITH THAT

14  MIGHT GIVE GUIDANCE, EVEN THOUGH, AS YOU PROBABLY KNOW, THERE'S

15  NO SUCH U.S. GOVERNMENT REGULATORY RULES ON FORMALDEHYDE FOR

16  TRAVEL TRAILERS.

17  Q.   SO DID YOU OR DID YOU NOT BELIEVE, ONCE THIS EMPLOYEE HAD

18  DONE THIS SCREENING, THAT YOU HAD A POTENTIAL PROBLEM WITH

19  FORMALDEHYDE IN THE TRAILERS YOU HAD SOLD THE GOVERNMENT?

20  A.   WELL, THE INDICATION TO US WAS NO.  BECAUSE THE PEOPLE THAT

21  HE HAD SPOKEN TO, YOU KNOW, THE APPROXIMATE DOZEN PEOPLE, DIDN'T

22  HAVE HEALTH ISSUES OR COMPLAINTS.

23  Q.   NONE OF THE PEOPLE HE TALKED TO HAD A COMPLAINT?

24  A.   RIGHT, CORRECT.

25  Q.   YOU'RE SURE OF THAT?  BECAUSE THAT'S WHAT YOU TOLD ME.

1  A.   BECAUSE THAT'S WHAT THE REPORTINGS WERE TO US FROM

2  MR. PULLEN, AND THEY WEREN'T PEOPLE THAT HAD REGISTERED

3  COMPLAINTS TO OUR COMPANY IN ANY WAY THAT WE COULD FIND, AND SO

4  THOSE WERE, THAT EXPERIENCE THAT HE HAD AND THAT HE RELAYED TO

5  US.

6         AND I ALSO BELIEVE, TO MY KNOWLEDGE IN SPEAKING TO HIM,

7  HE DID SOME FOLLOW-UPS WITH THOSE PEOPLE, JUST TO SEE WHAT THEIR

8  COURSE OF -- OVER A SEVERAL-WEEK PERIOD OF TIME WAS.  AND THAT

9  WAS -- THEIR INITIAL RESPONSE TO HIM WAS THAT -- YOU KNOW,

10 REMAINED THE SAME.

11 Q.   SO AS FAR AS YOU KNOW, NO RESIDENT OF ANY OF THE OCCUPIED

12 TRAILERS THAT YOU SCREENED WERE COMPLAINING OR HAD ANY

13 COMPLAINTS?

14 A.   CORRECT.

15 Q.   HOWEVER, YOU JUST TOLD US THAT THE READINGS, ONLY TWO

16 WERE -- YOU KNOW, THERE'S NO STANDARD, BUT FROM WHAT YOU COULD

17 TELL WITH THE READINGS, YOU WEREN'T CONCERNED ABOUT THEM, RIGHT?

18 A.   WELL, I THINK, YOU KNOW, YOU'RE ASKING ME TO MAKE MY

19 JUDGMENT.  YOUR EARLIER QUESTION ASKED ME TO MAKE A JUDGMENT, AND

20 I GAVE YOU SOME BASIS FOR THAT JUDGMENT.  THE MOST IMPORTANT

21 BASIS WAS, THE PEOPLE WEREN'T COMPLAINING.

22 Q.   NOW, IS IT YOUR TESTIMONY THAT TO PERFORM UNDER THIS

23 CONTRACT WITH FEMA, THAT YOU GUYS USED THE SAME VENDORS FOR WOOD

24 PRODUCTS AS YOU HAD ALWAYS USED IN THE PAST?

25 A.   IT WOULD BE MY TESTIMONY THAT WE'VE USED VENDORS THAT WE

1   HAVE USED IN THE PAST, VENDORS THAT WERE LONG-TIME OR USUAL

2   VENDORS TO THE MANUFACTURED HOUSING INDUSTRY AND/OR THE

3   RECREATIONAL VEHICLE INDUSTRY.

4   Q.   FOR INSTANCE, IF I GAVE YOU A VIN NUMBER OR A NUMBER THAT

5   IDENTIFIED A PARTICULAR TRAILER, WOULD YOU BE ABLE TO, BASED ON

6   RECORDS THAT YOU HAVE, GO BACK AND TELL ME WHERE THE WOOD

7   PRODUCTS FOR THAT PARTICULAR TRAILER CAME FROM?

8   A.   BE VERY DIFFICULT BECAUSE, YOU KNOW, WE HAD MULTIPLE VENDORS

9   FOR ALMOST EVERY KIND OF WOOD PRODUCT.  AND WE ALTERED THE

10  SOURCING, IN TERMS OF BY AVAILABILITY FROM THOSE VENDORS, AND WE

11  WOULD ALTER, DEPENDING ON -- FOR VARIOUS REASONS, DEPENDING ON

12  THE CIRCUMSTANCES AT THE TIME OF THE CONTRACT, WHERE THOSE

13  MATERIALS WERE GOING, TO WHAT PLANT THOSE MATERIALS WERE GOING,

14  SO IT WAS -- THERE WAS A LOT OF CHANGE IN TERMS OF WHAT PRODUCTS

15  WENT WHERE.  SO IT WOULD BE DIFFICULT TO DO THAT.

16  Q.   COULD YOU DO IT?

17  A.   IT WOULD -- THE BEST YOU COULD DO WOULD BE, YOU KNOW, WOULD

18  HAVE -- WOULD TAKE A CERTAIN AMOUNT OF GUESSWORK.

19  Q.   SO --

20  A.   SO NO, YOU COULDN'T PRECISELY DO IT, IN MY OPINION.

21  Q.   BECAUSE THERE WERE SO MANY DIFFERENT SOURCES AND BECAUSE OF

22  THE PROCESS YOU JUST DESCRIBED, IT WOULD BE VERY DIFFICULT FOR

23  YOU TO SAY THE PARTICLE BOARD OR THE PRESSED WOOD IN THIS

24  PARTICULAR TRAILER CAME FROM THIS PARTICULAR VENDOR.  TRUE

25  STATEMENT?

1    A.   CORRECT.  DEPENDING -- AND IT DEPENDS ON THE WOOD PRODUCT,

2    TOO, BECAUSE SOME WOOD PRODUCTS HAD MORE SOURCES THAN OTHER WOOD

3    PRODUCTS, SO SOME WOULD BE POTENTIALLY EASIER THAN OTHERS

4    LONGITUDINALLY.

5    Q.   DO YOU KNOW WHAT, MR. SHEA, I DID A BAD JOB ON THE QUESTION.

6    LET ME TRY AGAIN.  THE END PRODUCT THAT YOU CREATED, WHETHER YOU

7    DID IT WITH 20 STATIONS OR TWO, EACH OF THOSE TRAILERS, AT THE

8    END OF THE DAY, WHEN THEY WERE DELIVERED, WERE SUBSTANTIALLY THE

9    SAME?

10   A.   NO.

11   Q.   TELL ME WHY NOT.

12   A.   WELL, FIRST OF ALL, THERE WAS TWO DIFFERENT FLOOR PLANS THAT

13   WE USED.

14   Q.   OKAY.  TWO DIFFERENT MODELS -- ESSENTIALLY FLOOR PLANS OF

15   THE PARTICULAR TRAILERS DELIVERED, RIGHT.

16   A.   RIGHT.  TWO, YEAH, TWO FLOOR PLAN CONFIGURATIONS, SO THEY

17   VARIED IN THAT CERTAINLY.

18            AND THERE WAS, YOU KNOW, LIKE I KIND OF INFERRED TO

19   YOU, I THINK, ALREADY, TREMENDOUS VARIATION IN THE MATERIALS THAT

20   WERE EMPLOYED FOR THE VARIOUS PURPOSES NECESSARY, EVEN THOUGH

21   EACH UNIT WOULD HAVE MET THE STANDARD OR THE SPEC, STANDARD OR

22   SPECS THAT APPLIED, WHETHER THEY WERE THE RVIA STANDARD OR THE

23   ADDITIONAL FEMA SPEC.

24   Q.   DID YOU ALWAYS USE -- TELL ME WHAT THIS TERM LFE MEANS.

25   A.   LFE REFERS TO PRODUCT THAT WOULD EMIT FORMALDEHYDE EMISSIONS

1  OR WOULD HAVE FORMALDEHYDE EMISSIONS EQUIVALENT TO THE HUD

2  MANUFACTURED HOUSING PRODUCT STANDARD FOR A GIVEN PRODUCT.

3  Q.   SO DID YOU ALWAYS USE LFE WOOD PRODUCTS?

4  A.   SINCE THE MID '90S, WE'VE SPECIFIED TO OUR VENDORS THAT THEY

5  PROVIDE US WITH LFE PRODUCTS.

6  Q.   WHEN YOU PERFORMED UNDER THIS CONTRACT WITH FEMA, DID YOU

7  USE LFE PRODUCTS IN EACH OF THE TRAILERS PRODUCED?

8  A.   WE RELY ON OUR VENDORS, SO I CAN'T MAKE, YOU KNOW, SPECIFIC

9  AFFIRMATIVE REPRESENTATIONS OTHER THAN THIS IS OUR POLICY, THIS

10  IS WHAT WE SPECIFIED, AND THAT'S WHAT WE CAN SAY AFFIRMATIVELY.

11  Q.   SO YOU DON'T KNOW.

12  A.   WE DON'T ABSOLUTELY KNOW.

13  Q.   ROOF UNDERLAYMENT.  HOW MUCH OF THAT, PERCENTAGE-WISE, DID

14  YOU PUT IN THE TRAILERS PROVIDED TO THE GOVERNMENT THAT WAS NOT

15  LFE?

16  A.   WELL, I WOULD SAY THAT -- I DON'T KNOW THE EXACT PERCENTAGE,

17  TO BE HONEST WITH YOU, BUT THOSE VENDORS COMPRISE MOST OF WHAT WE

18  USED IN THAT PURPOSE.

19  Q.   OKAY.

20  A.   THE MAJORITY OF THEM.

21  Q.   SO PROBABLY A HUNDRED PERCENT?

22  A.   I DON'T THINK IT WAS A HUNDRED PERCENT BUT A CONSIDERABLE

23  PERCENTAGE --

24  Q.   AND NORMALLY --

25  A.   -- PREDOMINANTLY.

1  Q.   DID YOU HAVE ANYONE WITHIN EACH FACTORY MAKING SURE THAT

2  WHAT WAS ACTUALLY DELIVERED AND WHAT WAS ACTUALLY USED WAS LFE

3  VERSUS, QUOTE, REG?

4  A.   WE DIDN'T HAVE AN LFE INSPECTOR, NO.

5  Q.   FROM WHAT I GATHER, AND I DON'T KNOW ANYTHING ABOUT THIS,

6  BUT YOUR BROTHER WAS ABLE TO FIGURE THIS OUT JUST SIMPLY BY

7  WALKING BY, RIGHT?

8  A.   HE LOOKED AT THE LABELING ON THE BUNK.  AND, OF COURSE,

9  ANYBODY COULD HAVE.

10 Q.   BUT THEY DIDN'T, JUST YOUR BROTHER, RIGHT?

11 A.   IN THIS PARTICULAR CASE.

12 Q.   SO WHAT I'M GETTING AT IS THAT IT COULD BE THE CASE THAT ALL

13 OF YOUR DECORATIVE WOOD -- WHAT DID YOU CALL IT?  -- DECORATIVE

14 WOOD PRODUCTS COULD HAVE BEEN NON-LFE, BECAUSE YOU DON'T KNOW, DO

15 YOU?

16 A.   WE RELY ON OUR VENDORS.

17 Q.   I HEAR YOU.  YOU SAID THAT MANY TIMES.  MY QUESTION IS, YOU

18 JUST DON'T KNOW, DO YOU?

19 A.   THE ONLY WAY YOU CAN KNOW ABSOLUTELY IS TO TEST EVERY PIECE.

20 NO ONE WITHIN EACH OF THESE FACTORIES WAS TASKED WITH LOOKING AT

21 EACH BUNDLE TO MAKE SURE THAT IT WAS MARKED LFE VERSUS SOMETHING

22 ELSE.

23          WE HAVE A PURCHASING MANAGER WITH EACH PLANT.  WE HAVE

24 MANAGEMENT WITH EACH PLANT THAT ARE FAMILIAR WITH THE LABELING,

25 BUT WE DON'T HAVE AN LFE INSPECTOR IN EACH PLANT.

1    Q.    WELL, IF THAT'S THE CASE, THEN WHY IS IT, THEN, THAT YOU

2    TOLD UNDER OATH THAT YOU USED LFE PRODUCTS IN YOUR TRAILERS THAT

3    WERE PROVIDED TO THE GOVERNMENT?

4    A.    I SAID WE SPECIFIED, WHICH IT ISN'T REQUIRED, OF COURSE, BY

5    OUR CONTRACT OR BY THE RVIA CODE OR BY ANY OTHER U.S. FEDERAL

6    GOVERNMENT STANDARDS.  IT'S JUST SOMETHING THAT WE DID AS A

7    POLICY AND THAT'S WHAT WE DID.  THAT'S WHAT WE SPECIFIED.

8    Q.    IS IT FAIR TO SAY THAT THE PRODUCTS PROVIDED TO THE

9    GOVERNMENT WERE ONE OF TWO DIFFERENT, DO YOU CALL THEM MODELS?

10   TWO DIFFERENT FLOOR PLANS, IS THAT HOW YOU WOULD SAY IT?

11   A.    CORRECT.

12   Q.    OTHER THAN MAYBE THEY HAD DIFFERENT SOURCING FOR THE

13   COMPONENT PARTS, THEY WERE ESSENTIALLY THE SAME, TRAILER BY

14   TRAILER, DEPENDING ON THE FLOOR PLAN.

15   A.    I DON'T WANT TO MAKE ABSOLUTES, BUT SUBSTANTIALLY THE SAME.

16   Q.    AND THEY WERE ALL MADE PURSUANT TO THIS 2004 GOVERNMENT

17   SPECIFICATION THAT WE DISCUSSED PREVIOUSLY?

18   A.    YES.  THE UNITS THAT WE SOLD TO FEMA UNDER OUR CONTRACTS.

19   Q.    OKAY.  THERE WAS NOTHING IN THE SPECS THAT DEALT WITH THE

20   AMBIENT AIR QUALITY WITHIN THE TRAILER?

21   A.    NO.

22   Q.    THE GOVERNMENT RELIED UPON YOU ON THAT ISSUE?

23   A.    THE GOVERNMENT RELIED ON US TO FULFILL THE STANDARDS AND

24   SPECS IN THEIR CONTRACT.

25   Q.    AS THE CHAIRMAN OF THIS COMPANY, WOULD YOU AGREE THAT THE

1   GOVERNMENT -- AT LEAST YOUR UNDERSTANDING WAS THE GOVERNMENT

2   EXPECTED YOU TO PROVIDE A SAFE PRODUCT?

3   A.   YES.  WE WERE CONCERNED WITH SAFETY AND TOOK MEASURES TO

4   PROVIDE A SAFE PRODUCT, AND THOSE INCLUDED ADDITIONAL TESTING AND

5   SO FORTH.

6   Q.   SO EVEN THOUGH IT DOESN'T SAY IN THE CONTRACT, PROVIDE A

7   PRODUCT THAT DOESN'T MAKE PEOPLE SICK, YOU, AS THE CHAIRMAN,

8   UNDERSTAND THAT THAT'S IMPLICIT IN THE CONTRACT?

9   A.   WE UNDERSTAND THAT OUR PRODUCT HAS TO BE SAFE.

10  Q.   OKAY.  SO OSB OR PARTICLEBOARD?

11  A.   CORRECT.

12  Q.   WAS THAT ALL LFE, OR COULD IT HAVE BEEN ALSO JUST REG,

13  REGULATION?

14  A.   OSB IS A NONREGULATED PRODUCT, AND PEOPLE DON'T TYPICALLY

15  REFER TO IT AS LFE OR NOT LFE OR --

16  Q.   OKAY.

17  A.   THE TWO REGULATED PRODUCTS IN QUESTION ARE PARTICLEBOARD AND

18  HARDWOOD PLYWOOD.

19  Q.   OKAY.

20  A.   AND THOSE PARTICLEBOARDS WOULD HAVE, THE PARTICLEBOARDS THAT

21  WE USED, AGAIN, RELYING ON OUR VENDORS, EVERY INDICATION IS THAT

22  THAT WAS PRODUCT THAT WOULD HAVE MET THE HUD STANDARD OR EXCEEDED

23  IT.

24  Q.   WHY DO YOU SPECIFY THAT THIS -- THESE WOOD PRODUCTS MEET THE

25  HUD STANDARD?  WHY IS THAT IMPORTANT?

1   A.    YOU MEAN GOING BACK TO OUR POLICY IN THE '90S?

2   Q.    WHATEVER IS YOUR POLICY NOW, '90S, WHATEVER THE CASE MAY BE.

3   A.    THERE'S A SISTER INDUSTRY TO RECREATIONAL VEHICLES,

4   MANUFACTURED HOUSING, AND THERE WAS A SERIES OF -- A PERIOD OF

5   TIME IN THE '80S WHERE THERE WAS A LOT OF LEGAL -- OR COMPLAINTS

6   AND LEGAL-RELATED PROCEEDINGS, AND SO THERE WAS A STANDARD -- THE

7   STANDARD WAS CREATED.

8   Q.    OKAY.  DID YOU HAVE ANY PROCEDURE WHEREBY YOU WOULD AIR OUT

9   THE PRODUCTS BEFORE DELIVERING THEM TO THE GOVERNMENT?

10  A.    NO.

11  Q.    DID YOU INSTRUCT THE GOVERNMENT TO AIR OUT THE PRODUCTS?

12  A.    NO.

13  Q.    I SEE.  THIS QUOTE, "AIRING OUT OF YOUR TRAILERS," IS THAT

14  SOMETHING THAT'S DONE NORMALLY IN THE PRODUCTION OF THE TRAILERS?

15  A.    NO.

16  Q.    IT'S NOT A PART OF THE MANUFACTURING PROCESS?

17  A.    NO, IT ISN'T.

18  Q.    IN THAT OWNER'S MANUAL THAT ACCOMPANIED THE TRAILERS

19  PROVIDED TO THE GOVERNMENT, WAS THERE ANYTHING, ANY LANGUAGE OR

20  WARNINGS REGARDING FORMALDEHYDE EXPOSURE?

21  A.    THERE WAS NO LANGUAGE RELATING TO FORMALDEHYDE.

22  Q.    DID YOU PROVIDE ANY WARNINGS OR INFORMATION ABOUT

23  FORMALDEHYDE EXPOSURE TO THE GOVERNMENT?

24  A.    NO.

25  Q.    HOW LONG DID YOU THINK THESE TRAILERS WOULD BE USED THAT YOU

1   WERE PROVIDING TO THEM?

2   A.   I WOULD HAVE THOUGHT THAT THEY WOULD HAVE BEEN PROVIDED --

3   WOULD HAVE BEEN USED FOR A MATTER OF MONTHS.

4   Q.   AND DID YOU TELL THE GOVERNMENT OR DID YOU PLACE ANY

5   RESTRICTIONS AS TO HOW LONG YOU WOULD RECOMMEND THE RESIDENTS

6   STAY IN THESE TRAILERS?

7   A.   WE HAD A HISTORY OF SUPPLYING UNITS TO FEMA AND THAT'S NEVER

8   BEEN A SUBJECT.

9   Q.   OKAY.  DO YOU KNOW THIS TERM JACKING UP OF A TRAILER?  HAVE

10   YOU HEARD THAT TERM?  JACK THE TRAILERS OFF THE GROUND?

11   A.   YEAH, YOU HAVE TO -- YEAH.  WHEN THE UNITS ARE TAKEN OUT OF

12   TRANSPORTATION MODE, YOU HAVE TO PROVIDE ADDITIONAL

13   STABILIZATION.

14   Q.   AND THAT'S PROPER USE OF THE TRAILER AND PROPER SETUP AS FAR

15   AS YOU KNOW?

16   A.   YEAH.

17   Q.   JACKING THEM UP?

18   A.   YOU SHOULD HAVE PLACED THEM ON A STABILIZING JACK OR OTHER

19   MEANS TO STABILIZE THE UNIT.

20   Q.   SHOULD THEY BE -- HAVE YOU HEARD THE TERM BLOCKING THEM?

21   A.   UH-HUH (AFFIRMATIVE RESPONSE).

22   Q.   PUTTING THEM ON BLOCKS?  DO YOU KNOW THAT TERM?

23   A.   HEARD THE TERM PUTTING THEM ON BLOCKS, YEAH.

24   Q.   IS THAT PROPER USE?

25   A.   THAT'S USUALLY -- IT'S MORE COMMONLY USED WITH MANUFACTURED

1    HOUSING, THAT TERM.  IN RECREATIONAL VEHICLES, THEY, MANY TIMES,

2    INCORPORATE A JACK OR -- IN THE UNIT.  THAT'S WHAT'S MORE

3    COMMONLY USED IN PARLANCE.

4    Q.   RIGHT.  BUT THE QUESTION REALLY IS, IS WOULD IT BE IMPROPER

5    USE TO BLOCK THE TRAILER OR TAKE ALL THE WEIGHT OFF ITS WHEELS?

6    A.   I DON'T THINK, YOU KNOW, TO MY KNOWLEDGE, IT WOULDN'T BE

7    IMPROPER USE TO BLOCK THE FRAME OF THE UNIT TO STABILIZE IT.

8    Q.   AND EVEN REMOVE THE WEIGHT FROM THE WHEELS WOULD BE OKAY?

9    A.   I DON'T KNOW ABOUT -- IT WOULD DEPEND ON HOW YOU BLOCK THE

10   UNIT.  YOU KNOW, YOU NEED SUPPORT IN THE AREA WHERE THE WHEELS

11   ARE, AS WELL AS OTHER AREAS, TO STABILIZE THE UNIT.

12   Q.   BUT DID YOU EVER INSTRUCT THE GOVERNMENT WITH REGARD TO

13   BLOCKING OR JACKING OF THE TRAILERS, CERTAIN THINGS NOT TO DO?

14   A.   I DON'T THINK THAT THAT'S EVER COME UP AS A SUBJECT.  I'M

15   JUST NOT AWARE OF THAT EVER COMING UP.

16   Q.   WOULD IT BE CONSISTENT WITH THE WAY YOU DESIGN THE TRAILER

17   TO HAVE PERMANENT PLUMBING RUNNING TO THE TRAILER?

18   A.   THE GOVERNMENT SPEC ACTUALLY REQUIRES THAT WE PROVIDE -- OR

19   BUILD A UNIT WITHOUT A HOLDING TANK, SO THERE'S AN INFERENCE

20   THERE THAT THERE IS GOING TO BE A PLUMBING HOOKUP --

21   Q.   RIGHT.  IN OTHER WORDS --

22   A.   -- THAT DOESN'T UTILIZE A HOLDING TANK LIKE TYPICAL RV

23   CONSTRUCTION.

24   Q.   THAT IS A FEMA SPEC THAT AT LEAST GIVES YOU THE

25   UNDERSTANDING THAT THE TRAILER IS GOING TO BE PLACED SOMEWHERE

1   WHERE THERE'S PERMANENT PLUMBING AVAILABLE?

2   A.   YEAH, AND THAT'S BEEN TRUE FOR QUITE A WHILE, ALTHOUGH YOU

3   KNOW THAT FEMA BUYS UNITS JUST OFF OF DEALER LOCATIONS AND THEY

4   COULD HAVE HOLDING TANKS OR PROBABLY DO.

5   Q.   DID YOU REALIZE THAT THE TEMPERATURE RANGES TO BE

6   EXPERIENCED IN THE GULF COAST WOULD AFFECT THE AMBIENT AIR

7   QUALITY WITHIN THE TRAILERS YOU PROVIDED THE GOVERNMENT?

8   A.   WE REALIZED THAT THE UNITS WE PROVIDED, LIKE WE PROVIDED FOR

9   FLORIDA AND SO FORTH, HAVE -- ARE EXPOSED TO HUMIDITY AND HEAT,

10  AS THEY HAVE BEEN FOR ALL THE YEARS WE'VE PROVIDED THEM.

11  Q.   THAT WOULD AFFECT THE AMOUNT OF NEW SMELL IN THE TRAILER?

12  A.   HEAT AND HUMIDITY?

13  Q.   UH-HUH (AFFIRMATIVE RESPONSE).

14  A.   HEAT AND HUMIDITY CAN AFFECT THE LEVELS OF FORMALDEHYDE IN

15  THE AIR.

16  Q.   OKAY.  SOMETIMES --

17  A.   AS I UNDERSTAND IT.

18  Q.   YOU REALIZE THAT WHEN YOU PROVIDED THESE PARTICULAR TRAILERS

19  TO THE U.S. GOVERNMENT?

20  A.   WE REALIZED THAT THEY WOULD BE IN HEAT AND HUMIDITY.

21  Q.   DO YOU SEE WHAT YOUR BROTHER TELLS MR. MILLER ON MARCH 17,

22  '06?

23  A.   YES, I DO.

24  Q.   WAS HE BEING TRUTHFUL?

25  A.   YES.  TO THE BEST OF HIS KNOWLEDGE, I BELIEVE HE WAS BEING

1  TRUTHFUL, YES.

2  Q.    WASN'T THIS AFTER HE HAD ALREADY DISCOVERED THAT THEY WERE

3  USING REG?

4  A.    NO.

5  Q.    SO HE FOUND THAT OUT LATER?

6  A.    YES.

7  Q.    AND IS THERE ANOTHER E-MAIL SOMEWHERE THAT YOU'VE SEEN WHERE

8  HE E-MAILS THE GOVERNMENT AND CORRECTS HIS PRIOR MISSTATEMENT?

9  A.    NO, THERE'S NOT AN E-MAIL RELATIVE TO THAT.

10  Q.    SO WE KNOW THAT AS OF MARCH 17TH OF 2006, YOUR BROTHER TELLS

11  THE GOVERNMENT, "WHERE POSSIBLE, OUR COMPANY USES MATERIAL THAT

12  MEETS THE HUD SPECS OF LOW FORMALDEHYDE EMISSIONS," RIGHT?

13  A.    CORRECT.  THAT'S WHAT HE -- THAT'S THE STATEMENT.

14  Q.    BUT IT WAS THAT SAME MONTH THAT HE JUST SO HAPPENED TO BE

15  WALKING THROUGH THE PLANT AND FOUND OUT THAT WASN'T TRUE, ISN'T

16  IT?

17  A.    AT THE END OF THE MONTH, AS I RECALL.

18  Q.    AND HE NEVER TOOK THE INITIATIVE TO INFORM THE GOVERNMENT

19  THAT HIS PREVIOUS STATEMENT WAS WRONG, DID HE?

20  A.    I THINK HE -- HE HAD A CONVERSATION WITH STEVE MILLER, BUT I

21  DON'T KNOW WHEN THAT WAS.

22  Q.    SO YOU BELIEVE HE TOLD STEVE MILLER THAT, HEY, MY PREVIOUS

23  STATEMENT WAS NOT COMPLETELY ACCURATE?

24  A.    YES.

25  Q.    AND HOW DO YOU KNOW THAT?

1   A.   HE ADVISED ME OF THAT, THAT HE HAD THAT CONVERSATION.

2   Q.   IN YOUR CONVERSATIONS WITH THE GOVERNMENT, DID YOU EVER GET

3   THE IMPRESSION THAT FEMA OR ANYONE WITHIN THE GOVERNMENT BELIEVED

4   THAT YOU WERE AIRING OUT THESE TRAILERS PRIOR TO PROVIDING THEM?

5   A.   NO.  I SAW, YOU KNOW, STATEMENTS THAT -- OR COMMUNICATIONS

6   THAT FEMA HAD A PROCESS TO AIR THEM OUT PRIOR TO THEM BEING PUT

7   INTO SITE -- ON-SITE.

8   Q.   WE'RE JUST LOOKING AT THE FIRST PAGE, WHERE STEPHEN MILLER

9   PROVIDES TO YOUR BROTHER A LOT OF INTERNAL E-MAIL TRAFFIC WITHIN

10  FEMA.  HAVE YOU SEEN THIS DOCUMENT BEFORE?

11  A.   UH-HUH (AFFIRMATIVE RESPONSE).

12  Q.   YES?

13  A.   YES, I HAVE.

14  Q.   NOW, DO YOU NOTICE ON THE SECOND PAGE THAT, AT LEAST SOMEONE

15  WITHIN FEMA FELT LIKE THE MANUFACTURERS INCLUDE A NOTICE THAT THE

16  UNITS HAVE FORMALDEHYDE.  THAT'S NOT TRUE WITH REGARD TO YOU, IS

17  IT?

18  A.   CORRECT.

19  Q.   OR IT WASN'T AT THE TIME, WAS IT?

20  A.   THAT'S CORRECT.

21  Q.   AND IT ALSO SAYS THAT PRIOR TO BEING CONSIDERED READY, I

22  GUESS FOR OCCUPANCY, THE CONTRACTOR HAS ALREADY AIRED THE UNIT

23  OUT.  TELL ME ABOUT THAT PROCESS, IF AND WHEN IT WOULD TAKE

24  PLACE.

25  A.   I'M NOT EXACTLY SURE WHAT HE'S REFERRING TO.  I TOOK IT, THE

1  CONTRACTOR WHO SET UP THE UNIT AIRED IT OUT.  THAT'S HOW I TOOK

2  IT WHEN I REVIEWED THIS.

3  Q.   DO YOU KNOW WHETHER THAT ACTUALLY OCCURS?

4  A.   I'VE SEEN IT REFERENCED IN OTHER PLACES AND DISCUSSED AT

5  FEMA, BUT I HAVEN'T BEEN DOWN AND WITNESSED.

6  Q.   YOU'VE ALREADY TOLD US THAT'S NOT AN INSTRUCTION THAT

7  GULF STREAM PROVIDES TO FEMA OR THE GOVERNMENT, IS IT?

8  A.   NO.

9  Q.   WHY WOULD YOU NEED TO AIR OUT THE TRAILER, I MEAN, OR WOULD

10  YOU, BEFORE YOU LIVED IN IT?

11  A.   POTENTIALLY, THERE CAN BE AN ACCUMULATION OF INDOOR AIR,

12  CHEMICAL CONSTITUENTS, INCLUDING FORMALDEHYDE AND OTHER THINGS,

13  THAT YOU WOULD AIR OUT THE UNIT PRIOR TO TAKING RESIDENCY.

14  OBVIOUSLY, WHEN YOU, YOU KNOW, FIRST PUT IT IN SERVICE.

15  Q.   YOUR BROTHER TOLD STEPHEN MILLER THAT HE WOULD SEND A PERSON

16  DOWN TO BATON ROUGE ON FRIDAY TO TEST UNITS IN YOUR STAGING AREA.

17  THAT'S WHAT YOUR BROTHER TOLD THE GOVERNMENT.

18  A.   CORRECT.

19  Q.   HE DIDN'T SAY SCREEN UNITS, DID HE?

20  A.   NO, HE DIDN'T.

21  Q.   HE SAID TEST UNITS, RIGHT?

22  A.   YES, HE DID.

23  Q.   HAVE YOU SEEN ANY DOCUMENT WHERE YOU GO BACK AND TELL

24  MR. MILLER, HEY, WE SAID WE WERE GOING TO TEST AND TRY TO, QUOTE,

25  PUT THIS ISSUE TO BED, BUT INSTEAD, ALL WE'RE GOING TO DO IS DO

1    SOME SCREENING THAT'S REALLY USELESS?

2    A.    THERE WAS NO MORE CONTACT FROM MR. MILLER THAT I'VE SEEN IN

3    A DOCUMENT OR OTHERWISE RELATIVE TO US DOING TESTING.

4    Q.    RIGHT.

5    A.    WHERE HE'S ASKING US TO DO TESTING OR FURTHERING TESTING OR

6    WHATEVER.  YOU KNOW, THERE IS COMMUNICATIONS FROM US TO FEMA

7    TELLING THEM THAT WE WOULD PARTICIPATE WITH THEM IN CONDUCTING

8    TESTING SUBSEQUENT TO THIS.

9    Q.    HOW MANY CLAIMS, WHETHER THEY BE COMP CLAIMS, ET CETERA,

10   HAVE YOU HAD BY YOUR EMPLOYEES REGARDING FORMALDEHYDE EXPOSURE?

11   A.    I'M NOT FAMILIAR WITH ANY.

12   Q.    SO AS FAR AS YOU KNOW, THERE'S NEVER BEEN A CLAIM BY AN

13   EMPLOYEE ABOUT FORMALDEHYDE EXPOSURE?

14   A.    I HAVE NO MEMORY OF SUCH A CLAIM.

15   Q.    HAVE YOU WENT BACK TO SEE IF THERE WAS SUCH A CLAIM?

16   A.    WHEN THIS CAME UP IN THE PRESS, THIS ISSUE OF EMPLOYEES.

17   Q.    UH-HUH (AFFIRMATIVE RESPONSE).

18   A.    I THINK IT WAS IN THE SPRING OF 2007, WE LOOKED AT OUR OSHA

19   RECORDS; WE LOOKED AT -- WE TALKED TO THE VARIOUS MANAGEMENT,

20   MANAGERS, WE CANVASSED THEM THAT WERE INVOLVED IN THIS PROJECT;

21   WE ASKED LOCAL PHYSICIANS WHETHER THERE WAS ANY SUCH PHENOMENA OR

22   REPORT OR SOMETHING THEY COULD LINK TO THIS, AND ALL OUR

23   INQUIRIES WERE TO THE NEGATIVE.

24   Q.    OKAY.  SO YOU LOOKED INTO IT AND FOUND THAT NO ONE AT YOUR

25   COMPANY HAD EVER MADE A CLAIM ABOUT FORMALDEHYDE.

1   A.   WE WENT BACK AND LOOKED, AND CERTAINLY THE TIME FRAME THAT

2   WAS, THAT WAS INVOLVED HERE WITH THIS CONTRACT, PEOPLE THAT WERE

3   MAKING THE CLAIMS.   THERE'S AN OSHA LOG THAT'S KEPT, AND WE

4   REVIEWED ALL THOSE.

5            AND WE WENT THE EXTRA STEP OF TALKING TO A LOCAL

6   PHYSICIAN WHO TREATS WORKPLACE SPRAINS AND STRAINS AND SO FORTH,

7   AND -- AS WELL AS GENERAL HEALTH ASPECTS IN THE COMMUNITY.   SO

8   THAT'S WHAT WE DID AND THAT'S WHAT WE FOUND.

9   Q.   WHY DIDN'T YOU TELL THE GOVERNMENT ABOUT YOUR INFORMAL

10  SCREENING RESULTS?

11  A.   THE INFORMAL SCREENING RESULTS THAT WE REFERENCED IN OUR

12  LETTER?

13  Q.   YES, SIR.

14  A.   WE OFFERED THOSE TO THE GOVERNMENT.

15  Q.   WHY DIDN'T YOU JUST PROVIDE THEM, JUST ATTACH THEM AND

16  PROVIDE THEM?   IT'S NO MORE THAN 15 OR 20 PAGES.

17  A.   WELL, I THINK THE IMPORTANT THING THAT WE WANTED TO

18  COMMUNICATE WITH THE GOVERNMENT WAS WHAT WE FOUND WHEN WE

19  CANVASSED THE PEOPLE.   AND, YOU KNOW, WE'VE HAD A MEETING WITH

20  FEMA REPRESENTATIVES ON APRIL 24TH, I BELIEVE IT WAS, AND WE

21  UNDERSTOOD WE WOULD BE WORKING COLLECTIVELY WITH PEOPLE THAT HAD

22  SENSITIVITIES, WE WANTED TO COMMUNICATE WHAT WE FOUND RELATIVE TO

23  THE CANVASSING THAT WE DID, AND WE THOUGHT THAT WAS THE MOST

24  IMPORTANT ASPECT.

25  Q.   COULDN'T YOU HAVE JUST SENT THEM A FAX OF ALL OF YOUR

1   SCREENING RESULTS?

2   A.   I SUPPOSE WE COULD HAVE SENT THEM A FAX OF, YEAH, ANYTHING.

3   Q.   LET ME BE PRECISE.   IN MARCH OF '06, YOU PREVIOUSLY TOLD US

4   THAT YOU DID SOME SCREENING PARTLY IN ANTICIPATION OF LITIGATION.

5   REMEMBER THAT?

6   A.   UH-HUH (AFFIRMATIVE RESPONSE).

7   Q.   YES?

8   A.   YES.

9   Q.   WHO DID YOU ANTICIPATE LITIGATION WITH?

10  A.   I JUST SAID, OUR EXPERIENCE OR MY EXPERIENCE, BEING IN THE

11  MANUFACTURED HOUSING INDUSTRY AT THE TIME THAT IT WAS AN ISSUE, A

12  GENERAL INDUSTRY ISSUE, WAS WITH INDIVIDUAL PERSONS.

13  Q.   SO --

14  A.   THAT HAD MADE A CLAIM FOR THEIR PARTICULAR SITUATION.

15  Q.   OKAY.   SO THE RESIDENT OF THE TRAILER, THE RESIDENT WHO WAS

16  COMPLAINING ABOUT HIS OR HER TRAILER, THAT'S WHO YOU

17  ANTICIPATED --

18  A.   YES.

19  Q.   -- LITIGATION WITH?

20  A.   POTENTIALLY.

21          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

22  VIDEOTAPE CONCLUDED.)

23          MR. BUZBEE:  DO YOU WANT US TO START THE SECOND TAPE,

24  YOUR HONOR, OR DO YOU WANT TO TAKE LUNCH?

25          THE COURT:  IT'S ABOUT 20 MINUTES TO 12.  WHY DON'T WE

1   GO AHEAD AND TAKE AN EARLY LUNCH BREAK AND PLAN TO RESUME, WHY

2   DON'T WE JUST TAKE AN HOUR, WE'LL PLAN TO RESUME AT 20 MINUTES TO

3   ONE.  IF YOU CAN BE IN THE JURY ROOM PREPARED, WE WILL START

4   PRECISELY THEN AND WE'LL HEAR THE BALANCE OF THE TESTIMONY ON

5   VIDEO.  PLEASE DON'T DISCUSS THE CASE AMONGST YOURSELVES AT ALL

6   DURING THE LUNCH BREAK.

7          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

8   PANEL LEAVES THE COURTROOM, AND AT THIS POINT IN THE PROCEEDINGS,

9   THERE WAS A CONFERENCE HELD AT THE BENCH OUTSIDE THE PRESENCE OF

10  THE COURT REPORTER, AFTER WHICH THE COURT WAS IN LUNCHEON

11  RECESS.)

12                        *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3       I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

4   MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

5   REPORTER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT

6   COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE

7   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY

8   ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

9   THE ABOVE-ENTITLED AND NUMBERED MATTER.

10

11

12                         *S/CATHY PEPPER*_____

13                         CATHY PEPPER, CRR, RMR, CCR

14                         OFFICIAL COURT REPORTER

15                         UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25