1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2

3      ************************************************************

4  IN RE:  FEMA TRAILER
   FORMALDEHYDE PRODUCTS
5  LIABILITY LITIGATION

6                           DOCKET MDL NO. 1873 "N"
                           NEW ORLEANS, LOUISIANA
7                           WEDNESDAY, SEPTEMBER 16, 2009, 8:30 A.M.

8  THIS DOCUMENT IS RELATED TO

9  CHARLIE AGE, ET AL V
   GULF STREAM COACH, INC.,
10 ET AL, DOCKET NO. 09-2892;
   ALANA ALEXANDER,
11 INDIVIDUALLY AND ON BEHALF
   OF CHRISTOPHER COOPER
12

13     ************************************************************

                        **DAY 3**
14                 **MORNING SESSION**
             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15       HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                 UNITED STATES DISTRICT JUDGE
16

17 APPEARANCES:

18

19 FOR THE PLAINTIFFS:

                           GAINSBURGH BENJAMIN DAVID MEUNIER AND
20                         WARSHAUER
                           BY:  GERALD E. MEUNIER, ESQUIRE
21                         2800 ENERGY CENTRE
                           1100 POYDRAS STREET, SUITE 2800
22                         NEW ORLEANS LA  70163

23
                           THE BUZBEE LAW FIRM
24                         BY:  ANTHONY G. BUZBEE, ESQUIRE
                           600 TRAVIS, SUITE 7300
25                         HOUSTON TX  77002

```
 1   APPEARANCES CONTINUED:

 2
                              WATTS GUERRA CRAFT
 3                            BY:  MIKAL C. WATTS, ESQUIRE
                              FOUR DOMINION DRIVE
 4                            BUILDING THREE, SUITE 100
                              SAN ANTONIO TX 78257
 5

 6                            HILLIARD MUNOZ GUERRA
                              BY:  ROBERT C. HILLIARD, ESQUIRE
 7                            719 S. SHORELINE BOULEVARD #500
                              CORPUS CHRISTI TX 78401
 8

 9                            CHRIS PINEDO
                              ATTORNEY AT LAW
10                            802 N. CARANCAHUA, SUITE 2250
                              CORPUS CHRISTI TX  78470
11

12   FOR GULF STREAM COACH, INC.:

13                            DUPLASS ZWAIN BOURGEOIS MORTON
                              PFISTER & WEINSTOCK
14                            BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                   JOSEPH G. GLASS, ESQUIRE
15                            THREE LAKEWAY CENTER
                              3838 N. CAUSEWAY BOULEVARD
16                            SUITE 2900
                              METAIRIE LA  70002
17

18                            SCANDURRO & LAYRISSON
                              BY:  TIMOTHY D. SCANDURRO, ESQUIRE
19                            607 ST. CHARLES AVENUE
                              NEW ORLEANS LA  70130
20

21
     FOR FLUOR ENTERPRISES, INC.:
22
                              MIDDLEBERG RIDDLE & GIANNA
23                            BY:  CHARLES R. PENOT, JR., ESQUIRE
                                   RICHARD A. SHERBURNE, ESQUIRE
24                                 SONIA MALLETT, ESQUIRE
                              717 N. HARDWOOD
25                            DALLAS TX  75201
```

1    OFFICIAL COURT REPORTER:        CATHY PEPPER, CCR, RMR, CRR
                                     500 POYDRAS STREET, ROOM B406
2                                    NEW ORLEANS LA   70130
                                     (504) 589-7779
3
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
4    PRODUCED BY COMPUTER.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2

3     EXAMINATIONS                                      PAGE

4

5     VIDEOTAPED DEPOSITION OF **EDDIE ABBOTT**.................    6

6     VIDEOTAPED DEPOSITION OF **BURL KEEL**....................   35

7     **JEFFREY ZUMBRUN**.......................................   66

8     DIRECT EXAMINATION BY MR. BUZBEE......................   66

9     CROSS EXAMINATION BY MR. WEINSTOCK....................   95

10    REDIRECT EXAMINATION BY MR. BUZBEE....................  102

11    RECROSS EXAMINATION BY MR. WEINSTOCK..................  106

12    VIDEOTAPED DEPOSITION OF **JAMES BROWN**..................  107

13    VIDEOTAPED DEPOSITION OF **KYLE TIMMINS**.................  124

14    **CHARLES ALBERT WHITAKER**...............................  133

15    DIRECT EXAMINATION BY MR. HILLIARD....................  133

16    PLAINTIFFS' PROFFER NUMBER 1..........................  174

17

18                          **E X H I B I T S**

19    DESCRIPTION                                       PAGE

20

21    EXHIBIT 123...........................................   69

22    EXHIBIT 140...........................................   74

23    EXHIBIT 174...........................................   93

24

25

1                      **P-R-O-C-E-E-D-I-N-G-S**

2                        MORNING SESSION

3            WEDNESDAY, SEPTEMBER 16, 2009, 8:30 A.M.

4                     (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  ALL RISE.

8          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

9   PANEL ENTERS THE COURTROOM.)

10          THE COURT:  GOOD MORNING.  YOU MAY BE SEATED.  PURPLE IS

11   ONE OF MY TWO FAVORITE COLORS.  WOULD YOU LIKE TO GUESS WHAT THE

12   OTHER ONE IS?

13          THE JUROR:  THREE OF US.

14          THE COURT:  RIGHT.  BUT PURPLE IS ONE OF MY TWO FAVORITE

15   COLORS.

16          MR. WATTS:  WE'VE GOT A BLOCK ON THE JURY, JUDGE.

17          THE COURT:  THANK YOU ALL FOR BEING ON TIME.  WE WILL GO

18   AHEAD AND COVER A LOT OF GROUND TODAY AGAIN.  I'VE MET WITH THE

19   ATTORNEYS IN THE MEANTIME, AND WE'VE COMMUNICATED REGARDING THE

20   SCHEDULE AND I THINK THAT WE'RE ON A PRETTY GOOD PACE INSOFAR AS

21   WHERE WE EXPECTED TO BE AT THIS JUNCTURE IN THE LITIGATION.

22              SO WE ARE GOING TO CONTINUE TODAY WITH THE

23   PLAINTIFFS' CASE IN CHIEF.  THEY HAVE A NUMBER OF WITNESSES TO

24   CALL.  WE'LL COVER A LOT OF GROUND TODAY AND TOMORROW, SO LET'S

25   GO AHEAD AND PROCEED.

1              MR. WATTS, THE NEXT WITNESS.

2              MR. WATTS:  WE'RE GOING TO START WITH EDDIE ABBOTT BY

3    AND THROUGH HIS VIDEOTAPED DEPOSITION.  IT'S 33 MINUTES LONG.

4              THE COURT:  MR. ABBOTT HAS BEEN SWORN IN AND WOULD BE

5    HERE IN PERSON, BUT IS GOING TO BE PRESENTED BY WAY OF A

6    VIDEOTAPE.

7                   (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

8    PORTIONS OF THE VIDEOTAPED DEPOSITION OF EDDIE ABBOTT WAS

9    PLAYED.)

10   Q.    WHAT'S YOUR NAME?

11   A.    EDDIE ABBOTT.

12   Q.    WHAT DO YOU DO FOR GULF STREAM?

13   A.    I'M ENGINEERING MANAGER OF THE TOWABLE DIVISION.

14   Q.    HOW LONG HAVE YOU WORKED FOR THAT COMPANY?

15   A.    IT WILL BE 10 YEARS IN FEBRUARY.

16   Q.    YOU'RE IN THE TOWABLE DIVISION, WHICH MEANS THOSE TRAILERS

17   THAT ARE PULLED BY TRUCKS OR WHATEVER?

18   A.    YES.

19   Q.    WHAT'S YOUR EDUCATION?

20   A.    MECHANICAL ENGINEERING.  I HAVE A TWO-YEAR CERTIFICATE FROM

21   IVY TECH AND I HAVE TAKEN THREE OR FOUR OTHER ENGINEERING AND

22   DESIGN CLASSES THROUGH SOUTH BEND IVY TECH.

23   Q.    YOU SAID YOUR EDUCATION WAS HIGH SCHOOL AND THEN ITT TECH,

24   IS THAT WHAT YOU SAID?  TWO-YEAR DEGREE?

25   A.    UH-HUH (AFFIRMATIVE RESPONSE).

1    Q.    YES?

2    A.    YES.

3    Q.    ANY OTHER EDUCATION?

4    A.    LIKE I SAID, I'VE HAD THREE AUTOCAD ADVANCED ENGINEERING

5    CLASSES.

6    Q.    ARE YOU IN THE RESEARCH AND DEVELOPMENT DEPARTMENT AT

7    GULF STREAM?

8    A.    TOWABLE DIVISION, YES.  THAT'S PART OF THE ENGINEERING

9    FUNCTION.

10   Q.    OKAY.  SO -- AND NO OFFENSE TO YOU, YOU HAVE NO COLLEGE

11   DEGREE?

12   A.    WELL, IVY TECH IS A CERTIFIED COLLEGE.

13   Q.    IS IT?

14   A.    YES.

15   Q.    I WANT TO TALK TO YOU ABOUT THE DESIGN OF THE FEMA TRAILER.

16   ARE YOU FAMILIAR WITH THE FEMA TRAILER?

17   A.    UH-HUH (AFFIRMATIVE RESPONSE), YES.

18   Q.    ARE YOU FAMILIAR WITH THE DESIGN?

19   A.    YES.

20   Q.    LET'S TALK ABOUT THE DESIGN.  YOU'VE BEEN WITH THE COMPANY

21   10 YEARS.  WHO WAS IT THAT CAME UP WITH THAT PARTICULAR DESIGN?

22   WAS IT YOU?

23   A.    THAT TRAILER, AS FAR AS I KNOW, HAS BEEN AROUND SINCE

24   PROBABLY THE '50'S.

25   Q.    THE DESIGN OF THAT TRAILER?

1    A.   YES.  I WOULDN'T KNOW WHO ORIGINALLY DESIGNED THAT, THAT 30

2    FBHS BUNKHOUSE, I'VE SEEN --

3    Q.   LET ME -- I HATE TO INTERRUPT YOU, BUT WHAT ARE YOU TALKING

4    ABOUT 30 FB --

5    A.   THAT'S THE STYLE THAT -- PRETTY MUCH, I'VE SEEN THAT FOR

6    25 YEARS.

7    Q.   IT WAS THERE WHEN YOU GOT THERE?

8    A.   EVERY COMPANY THAT I'VE EVER SEEN HAS THAT FLOOR PLAN, SO

9    I'M SURE YOU CAN FIND THAT FLOOR PLAN.

10   Q.   SO IT'S A REALLY OLD DESIGN?

11   A.   YES.

12   Q.   ARE THERE ANY -- GOSH, HOW DO I SAY THIS WITHOUT MAKING YOU

13   MAD AT ME, BUT ARE THERE ANY ENGINEERS AT THE COMPANY, LIKE

14   PROFESSIONAL ENGINEERS?  NO OFFENSE TO YOU, NOW.  I JUST WANT TO

15   ASK THAT.

16   A.   YOU KNOW, I BELIEVE THAT THERE MIGHT BE A COUPLE IN

17   MOTORIZED DIVISION THAT ARE PE'S, YOU MEAN?

18   Q.   YEAH.

19   A.   YES.

20   Q.   THAT'S WHAT I MEANT TO SAY.  BUT NOT IN YOUR DIVISION?

21   A.   NOT IN OUR DIVISION.

22   Q.   SO AS FAR AS ENGINEERING GOES IN THE TOWABLE DIVISION,

23   YOU'RE IT?

24   A.   YES.

25   Q.   WHAT CONSIDERATION, IF ANY, IS GIVEN TO THIS TERM THAT

1  YOU'VE JUST -- AT LEAST IT'S THE WAY YOU DESCRIBED IT, WHAT

2  CONSIDERATION IS GIVEN TO AIR EXCHANGE IN THE DESIGN OF THE FEMA

3  TRAILER?

4  A.   I THINK ALL THE UNITS THAT WE BUILD, INCLUDING THE FEMA

5  TRAILERS, WE TRY AND MAKE THEM TO A STANDARD WHERE YOU HAVE

6  WINDOWS, VISIBILITY, YOU'RE NOT FEELING CLAUSTROPHOBIC, VENTS IN

7  THE BATHROOM TO EXCHANGE AIR.

8  Q.   SO YOU BELIEVE THAT THIS VENT THAT'S IN THE BATHROOM, WHICH

9  I'M ASSUMING IS TO TAKE AWAY FOUL ODORS IN THE BATHROOM --

10  A.   YES.

11  Q.   -- HAS SOMETHING TO DO WITH THE AIR EXCHANGE IN THE ENTIRE

12  TRAILER?

13  A.   WELL, IT'S ALSO A PASSIVE VENT THEY CAN LEAVE OPEN WHERE AIR

14  BLOWING ACROSS THE TOP OF THE COACH RE-CIRCULATES AND PULLS AIR

15  OUT OF THE COACH.

16  Q.   IS THERE A LITTLE FAN IN THERE TOO?

17  A.   THERE IS A FAN IN THAT -- POWER FAN, YEAH, YES.

18  Q.   ALL THESE QUESTIONS, WE'RE TALKING ABOUT FEMA TRAILERS, THE

19  FEMA DESIGN.  OKAY?

20  A.   YES.

21  Q.   SO CONTINUE TO TELL ME ABOUT AIR EXCHANGE IN THE FEMA

22  TRAILERS.  YOU'VE THE TOLD ME ABOUT THE VENT IN THE BATHROOMS.

23  WHAT ELSE?

24  A.   WELL, THE WINDOWS ARE ALL VENTED WINDOWS.

25  Q.   WHAT'S THAT MEAN?

1  A.    THEY'RE ALL -- THEY ALL OPEN AND THEY ALL HAVE SCREENS TO

2  ALLOW AIR -- FRESH AIR MOVEMENT.

3  Q.    IS THAT SOME SORT OF -- SOMEBODY DID A CALCULATION OR IS

4  THAT JUST WHERE THEY ENDED UP, JUST KIND OF FORTUITOUSLY?

5  A.    WELL, ACTUALLY, WE WERE TOLD BY FEMA, THEY REQUIRE SO MANY

6  WINDOWS PER COACH.  MY UNDERSTANDING IS THAT WE HAD FOUR WINDOWS

7  IN THAT COACH, AND WE WERE ONLY REQUIRED TWO.  IT'S JUST A --

8  Q.    YOU GUYS REALLY WENT ABOVE AND BEYOND THE CALL OF DUTY,

9  DIDN'T YOU?

10 A.    I'M GLAD YOU SAID THAT.  WE DID.  WE FELT WE DID.

11 Q.    SO YOU DON'T KNOW WHETHER AIR EXCHANGE IS IMPORTANT TO

12 AMBIENT AIR QUALITY?

13 A.    WOULD IT MAKE A DIFFERENCE?  YEAH.  DO I KNOW IF IT'S

14 IMPORTANT?  NO.  I HAVEN'T STUDIED THAT.

15 Q.    WHAT CONSIDERATION, IF ANY, IS GIVEN IN THE DESIGN OF THE

16 FEMA TRAILER TO HOW LONG IT'S GOING TO BE USED BY THE RESIDENT?

17 A.    I'M SORRY.  CAN YOU REPEAT THE QUESTION?

18 Q.    YEAH.  I'M TRYING TO FIGURE OUT IN THE DESIGN OF THIS FEMA

19 TRAILER, WHAT CONSIDERATION, IF ANY, IS GIVEN TO HOW IT'S GOING

20 TO BE USED; THAT IS, THE DURATION OF ITS USE?

21 A.    IN THE FEMA SITUATION --

22 Q.    UH-HUH (AFFIRMATIVE RESPONSE).

23 A.    -- WE DID NOT KNOW WHAT USE THE FEMA UNITS WERE GOING TO BE,

24 WHERE THEY WERE GOING TO BE PLACED, HOW THEY WERE GOING TO BE

25 USED, OR THE EXTENT OF THAT USE.  WE HAD SPECIFICATIONS SUPPLIED

1   BY FEMA TO US FOR THAT TRAILER.

2   Q.   SO YOU DIDN'T KNOW HOW LONG THEY WERE GOING TO BE USED?

3   A.   NO, WE DID NOT.

4   Q.   HOW MUCH TIME THESE PEOPLE WERE GOING TO SPEND IN THIS

5   TRAILER?

6   A.   NO, WE DID NOT.

7   Q.   DID YOU ASK?

8   A.   I DID NOT, I SHOULD SAY.

9   Q.   SO WITH REGARD TO THE DESIGN OF THAT TRAILER, NOTHING -- NO

10  CONSIDERATION WAS GIVEN TO THAT ISSUE?

11  A.   NO CONSIDERATION WAS GIVEN BEYOND NORMAL RVIA PRACTICES IN

12  OUR NORMAL BUILDING PROCEDURES.

13  Q.   BUT YOU KNEW THEY WERE GOING TO BE USED IN THE GULF SOUTH,

14  OF COURSE?

15  A.   I DID NOT KNOW THAT THESE COACHES WOULD BE THERE.  WE HAVE

16  BUILT FEMA UNITS BEFORE THAT HAVE WENT TO VARIOUS PLACES AND SAT

17  OR NOT BEEN USED AND TRANSFERRED TO OTHER LOCATIONS.  SO WHEN YOU

18  SAY "KNOW," I TEND TO BE SPECIFIC ABOUT THAT.  I DID NOT KNOW

19  THAT ALL THESE TRAILERS OR ANY OF THESE TRAILERS WOULD END UP

20  SPECIFICALLY AT THE GULF COAST.

21  Q.   BUT YOU DID KNOW THAT'S WHERE THE HURRICANES --

22  A.   YES.

23  Q.   FOR INSTANCE, IN FLORIDA AND LOUISIANA, THAT'S WHERE THE

24  HURRICANES --

25  A.   YES.

1    Q.    -- WERE HITTING, RIGHT?

2    A.    YES.

3    Q.    LIKE, FOR INSTANCE, THE HURRICANE IN 2004 -- THE HURRICANES

4    IN 2004 AND THE TWO HURRICANES IN LOUISIANA, TEXAS; MISSISSIPPI

5    IN 2005?

6    A.    YES.  BUT THERE WAS ALSO FLOODING IN TEXAS --

7    Q.    RIGHT.  TEXAS IS PRETTY HOT.  HAVE YOU BEEN THERE?

8    A.    -- AND MISSISSIPPI.  YES.

9    Q.    MISSISSIPPI IS PRETTY HOT.  HAVE YOU BEEN THERE?

10   A.    YES.

11   Q.    VERY HUMID, RIGHT?

12   A.    AND I BELIEVE WE SENT UNITS TO A LANDING PLACE IN

13   CONNECTICUT.  JUST SAYING, I DID NOT KNOW SPECIFICALLY WHERE

14   THESE UNITS WOULD END UP.

15   Q.    SO WHO CAN I TALK TO WHO WOULD BE THE INDIVIDUAL WHO

16   ACTUALLY WAS SELECTING THE COMPONENT PARTS THAT WENT INTO THE

17   TRAILER, THE FEMA TRAILER?  WHO IS THAT PERSON?

18   A.    I'M SORRY.  CAN YOU REPEAT THE QUESTION?  THERE'S LIKE --

19   Q.    ARE YOU OKAY?

20   A.    -- NOT ONE SPECIFIC PERSON THAT --

21   Q.    THERE'S NOT?

22   A.    NO.  NO DIFFERENCE WERE DONE BETWEEN A NORMAL UNIT AND THE

23   FEMA THAT I KNOW OF.

24   Q.    WELL, NOW --

25   A.    IT'S A STANDARD PROCESS.

1   Q.   WERE YOU IN ANY OF THE FACTORIES THAT WERE PRODUCING THE

2   FEMA TRAILERS EITHER IN 2004 OR 2005?

3   A.   YES.

4   Q.   WHICH FACTORIES WERE YOU IN?

5   A.   I'M SURE I WAS IN ALL OF THE FACTORIES.

6   Q.   AND SO YOU SAW HOW THE TRAILERS WERE BEING PUT TOGETHER?

7   A.   YES.

8   Q.   DID YOU HAVE ANY PROBLEMS WITH FORMALDEHYDE EXPOSURE

9   YOURSELF?

10  A.   NO.

11  Q.   YOU DID NOT?

12  A.   NO.

13  Q.   HOW LONG DID YOU SPEND IN THE FACTORIES?

14  A.   LIKE I SAID, MY OFFICE IS LOCATED DIRECTLY IN THE CENTER OF

15  THE FACTORY.

16  Q.   OKAY.  AND YOU'VE NEVER -- IN YOUR EXPERIENCE, IN 10 YEARS

17  AT GULF STREAM, YOU NEVER HAD A PROBLEM WITH ANY SORT OF

18  FORMALDEHYDE EXPOSURE?

19  A.   NO.  I'VE NEVER HAD A PROBLEM WITH IT.

20  Q.   HAVE YOU BEEN INSIDE A NEW TRAILER AFTER IT'S BEEN BUILT AT

21  ONE OF THE FACTORIES?

22  A.   YES.

23  Q.   DOES YOUR NOSE WORK?

24  A.   MY NOSE WORKS AS FAR AS I KNOW, YES.

25  Q.   OKAY.  BUT YOU'RE NOT ACTUALLY OUT THERE PUTTING STAPLES IN

1   THE WALL?

2   A.   YES.  I HAVE DONE THAT QUITE A BIT, YEAH.

3   Q.   HAVE YOU HAD ANY PROBLEMS WITH FORMALDEHYDE OR ANY SORT OF

4   BREATHING OR EYE ISSUES WHEN YOU WERE DOING THAT?

5   A.   NO.

6   Q.   HAVE YOU TALKED TO ANYONE AT THE FACTORIES THAT HAVE HAD

7   THAT PROBLEM?

8   A.   NO.

9   Q.   NO ONE'S EVER COMPLAINED TO YOU OR JUST IN CHITCHATTING

10  THAT, "MAN, YOU KNOW WHAT, IT REALLY IS A TRUE STATEMENT THAT THE

11  WOOD BOTHERS US OR GIVES US PROBLEMS"?  NO ONE'S EVER SAID

12  SOMETHING TO THAT EFFECT TO YOU IN THE BREAK ROOM OR OTHERWISE?

13  A.   I WAS GOING TO SAY I DON'T RECALL.  BUT, NO, I'VE NEVER HAD

14  THAT CONVERSATION WITH ANYBODY.

15  Q.   NO ONE?

16  A.   NO.

17  Q.   WHO IS IT THAT DECIDES WHAT PARTICULAR WOOD TO USE IN THE

18  FEMA TRAILERS?

19  A.   GULF STREAM HAS HAD A LONGSTANDING POLICY TO USE

20  LOW-EMISSION STUFF.

21  Q.   REALLY?  WHERE IS THAT WRITTEN?

22  A.   I DON'T KNOW THAT IT'S WRITTEN.  I JUST KNOW THAT WHEN WE

23  PURCHASE STUFF, IT'S KIND OF BEEN FROM THE DAY I'VE BEEN THERE

24  THAT WHEN ANYBODY PURCHASES ANYTHING, IF IT'S NOT LOWER EMISSION

25  OR THE SAME WAY WITH CHEMICALS IN THE PLANT AND THAT KIND OF

1    STUFF.  WE'RE ALWAYS TRYING TO LOWER OUR FLOOR PLAN -- OR OUR

2    FOOTPRINT WITH THAT KIND OF ITEMS, TOO.  BUT WHO WOULD MAKE THAT

3    DECISION, I MEAN, THE PURCHASING AGENTS, THEY WOULD BE THE BUYERS

4    OF THAT.

5    Q.   SO THERE ARE SPECS THAT EXIST THAT THE PURCHASING AGENT MUST

6    FOLLOW?

7    A.   YOU CAN'T ALTER THE CURRENT SPECS WITHOUT A WRITTEN -- AN

8    ECN, AN ENGINEERING CHANGE NOTICE.

9    Q.   OKAY.  WHERE ARE THE SPECS?

10   A.   FOR WOOD?

11   Q.   YEAH.

12   A.   I WOULD SAY THAT FALLS UNDER WHAT I WAS SAYING A MINUTE AGO

13   ABOUT FOLLOWING THE CURRENT STANDARD OF WHAT WE'RE USING.

14   Q.   IT'S AN UNWRITTEN SPEC?

15   A.   YES.

16   Q.   ANYTHING WRITTEN DOWN ABOUT THE TYPE OF WOOD THAT SHOULD OR

17   MUST BE USED IN THE TRAILERS THAT ARE MANUFACTURED IN THE TOWABLE

18   DIVISION AT GULF STREAM?

19   A.   NOW OR DURING THE FEMA --

20   Q.   DURING 2004 AND 2005.

21   A.   DURING 2005, RVIA HAD NO SPECIFICATIONS ON THAT.  SINCE

22   THEN, THEY HAVE SUBMITTED SPECIFICATIONS FOR LOW FORMALDEHYDE

23   EMISSIONS.

24   Q.   TELL ME WHERE FEMA GAVE YOU GUIDANCE AS TO WHAT SORT OF

25   WOOD.  SHOW ME IN THE SPECS WHERE FEMA HAD ENOUGH INFORMATION OR

1  EXPERTISE TO TELL GULF STREAM WHAT SORT OF WOOD TO USE.

2  A.   WELL, THE FIRST LINE I SEE IS THAT THE SUPPLIER MAY PROVIDE

3  EQUAL OR BETTER UNITS.

4  Q.   BETTER THAN WHAT?

5  A.   EQUAL OR BETTER.  I MEAN, I TAKE THAT TO MEAN, YOU KNOW,

6  YOUR STANDARD UNIT MUST BE EQUAL TO A STANDARD UNIT OR BETTER.

7  AND AGAIN, IN THE THIRD PARAGRAPH IT SAYS, "THE UNITS SHALL MEET

8  INDUSTRY STANDARD EXCEPT WHERE IDENTIFIED."

9  Q.   WHAT I'M ASKING YOU AGAIN IS, WAS IT THE INDUSTRY STANDARD

10  IN 2004 TO USE THE LOW-FORMALDEHYDE-EMITTING MATERIALS?

11  A.   INDUSTRY.  I'VE TOLD YOU THAT WE FOLLOWED THE RV INDUSTRY

12  STANDARDS.  AND YOU'RE ASKING ME IF THE ENTIRE INDUSTRY LOW --

13  USED LOW.  I CAN'T SPECULATE ON WHAT THE OTHER COMPANIES DID.  I

14  CAN SAY THAT THE COMPANIES I'M FAMILIAR WITH DID.

15  Q.   SO NOW I'M ASKING YOU WHAT WAS THE INDUSTRY STANDARD IN

16  2004?  WAS THE INDUSTRY STANDARD TO USE LOW-FORMALDEHYDE-EMITTING

17  MATERIALS OR WAS IT NOT IN 2004?

18  A.   I DON'T KNOW HOW TO ANSWER THAT.  THE INDUSTRY STANDARDS FOR

19  GULF STREAM WAS, THE OTHER COMPANIES THAT I HAVE BEEN FAMILIAR

20  WITH, THEIR STANDARDS WERE THE SAME, TO USE

21  LOW-FORMALDEHYDE-EMITTING ITEMS.

22  Q.   OKAY.  SO IT'S YOUR BELIEF, AS THE HEAD ENGINEERING GUY IN

23  TOWABLES, THAT IN 2004, THE INDUSTRY STANDARD WAS TO USE

24  LOW-FORMALDEHYDE-EMITTING MATERIALS IN THE FEMA TRAILERS; IS THAT

25  TRUE?

A.   I CANNOT GIVE YOU A YES OR NO ON THAT, ONLY WHAT I AM

FAMILIAR WITH.  I DO NOT KNOW NATIONWIDE WHAT THE OTHER PARTS OF

THE INDUSTRY -- YOU KNOW, IF 51 PERCENT DIDN'T AND 51 PERCENT

DID, I DON'T KNOW THOSE STATISTICS.

Q.   BUT I THOUGHT YOU TOLD ME YOU GUYS WERE BUILDING THE

TRAILERS TO INDUSTRY STANDARD.

A.   OR ABOVE.

Q.   OR ABOVE.  AND HOW CAN YOU BUILD IT TO A STANDARD IF YOU

DON'T KNOW WHAT IT IS OR YOU CLAIM YOU DON'T KNOW WHAT IT IS?

A.   IF I PUT A TOILET IN A UNIT, I DON'T NEED ANYBODY TO TELL ME

THAT I NEED A TOILET IN A UNIT.  IF I DIDN'T PUT A TOILET IN A

UNIT, I'D KNOW THAT WAS BELOW STANDARD.

Q.   I'M TALKING ABOUT LOW-FORMALDEHYDE-EMITTING MATERIALS.  I'M

NOT TALKING ABOUT TOILETS.

          LET ME ASK YOU FOR THE LAST TIME.  IF YOU DON'T KNOW

WHAT THE INDUSTRY STANDARD WAS IN 2004, EDDIE, IT'S OKAY TO SAY

IT.  BUT YOU'RE THE ONE THAT SAID YOU BUILT THEM TO INDUSTRY

STANDARD OR ABOVE.  THAT'S YOU.  YOU SAID THAT.  REMEMBER?

A.   THAT'S A CORRECT STATEMENT.  WE BUILD THEM TO INDUSTRY

STANDARDS OR ABOVE.

Q.   BUT YOU DON'T KNOW WHAT THE INDUSTRY STANDARD WAS IN 2004,

DO YOU?

A.   IN THE SPECIFIC ITEM YOU'RE TALKING ABOUT, THE LOW

FORMALDEHYDE EMISSIONS, ARE YOU SAYING WE SHOULD HAVE BUILT IT

WITH A LESS --

1    Q.    I'M NOT SAYING ANYTHING.  I'M ASKING YOU A QUESTION.

2    A.    OKAY.

3    Q.    YOU DON'T KNOW WHAT THE INDUSTRY STANDARD WAS IN 2004 WITH

4    REGARD TO THE USE OR NONUSE OF LOW-FORMALDEHYDE-EMITTING

5    MATERIALS, DO YOU?

6    A.    I DON'T KNOW WHAT WOULD BE ABOVE WHAT WE DID IS WHAT'S

7    THROWING ME OFF.

8    Q.    OKAY.  YOU'RE TELLING ME THAT YOUR STANDARD AT GULF STREAM

9    WAS TO USE LOW-FORMALDEHYDE-EMITTING MATERIALS?

10   A.    YES.

11   Q.    SO IF A TRAILER WAS BUILT IN 2004 FOR FEMA AND IT WAS BUILT

12   WITHOUT LOW-FORMALDEHYDE-EMITTING MATERIALS, IT WOULD BE YOUR

13   TESTIMONY, AS THE ENGINEERING MANAGER FOR TOWABLES, THAT THAT

14   TRAILER WAS NOT BUILT TO SPEC?

15   A.    NOW, YOU SAID "BUILT TO SPEC."  IS THERE A WRITTEN SPEC,

16   BECAUSE IT WAS BUILT TO THIS OR ABOVE.

17   Q.    WE ALREADY TALKED ABOUT THAT WAS A SPEC.  IT'S UNWRITTEN,

18   BUT THAT WAS A SPEC.  REMEMBER?  THE USE OF LFE,

19   LOW-FORMALDEHYDE-EMITTING MATERIALS, IS A SPEC, BUT IT'S

20   UNWRITTEN; ISN'T THAT RIGHT?

21   A.    YES.  COMPANY.  A COMPANY SPEC, YES.

22   Q.    RIGHT.  LET'S TALK ABOUT THE COMPANY SPEC.

23   A.    RIGHT.

24   Q.    AND IF A TRAILER WAS BUILT AND IT DID NOT HAVE LFE MATERIALS

25   BUT INSTEAD HAD REG, JUST REGULAR WOOD, NON-LFE WOOD, YOU WOULD

1   AGREE WITH ME THAT THAT WOULD MEAN THAT IS A TRAILER NOT BUILT TO

2   SPEC, COMPANY SPEC?

3   A.   THAT WOULD NOT BE BUILT TO COMPANY SPEC.

4   Q.   THAT WOULD BE CONTRARY TO THE COMPANY SPECS; TRUE?

5   A.   CONTRARY TO COMPANY SPEC -- CONTRARY TO COMPANY SPEC, BUT,

6   AGAIN, THE WRITTEN SPECS THAT YOU WERE TALKING ABOUT, IT WOULD

7   BE -- I DO NOT KNOW.  AGAIN, THAT'S SPECULATION.  I HAVE NO IDEA

8   WHAT YOU'RE TALKING ABOUT.

9   Q.   WHAT IS SPECULATION?  WHAT PART OF THAT IS SPECULATION?

10  A.   YOU'RE SAYING IF THIS AND IF THAT.

11  Q.   MY QUESTION IS, IF THAT HAPPENED, THOSE TRAILERS WOULD NOT

12  BE BUILT TO SPEC, AT LEAST COMPANY SPEC; TRUE STATEMENT?

13  A.   YES.

14  Q.   LET ME ASK YOU AGAIN, THERE WAS A REASON FOR THAT, WASN'T

15  THERE?

16  A.   YEAH.

17  Q.   AND WHAT WAS THE REASON?

18  A.   GULF STREAM'S ALWAYS TRYING TO BE ON THE LEADING EDGE OF,

19  YOU KNOW, PUTTING A SMALLER FOOTPRINT ON EARTH, BEING GREENER,

20  BEING A RESPONSIBLE COMPANY.  I THINK THAT FALLS UNDER THAT

21  CATEGORY FOR THAT -- THOSE TYPE ITEMS.  WE USE A QUALITY TIRE.  I

22  MEAN, THERE'S JUST THINGS WE DO THAT WE FEEL RESPONSIBLE FOR.

23  Q.   CAN YOU TELL ME WHAT THE DIFFERENCES ARE BETWEEN THE FEMA

24  TRAILER VERSUS ANY OTHER KIND OF TRAILER THAT IS PRODUCED BY

25  GULF STREAM?

1  A.   MOST STANDARD UNITS BUILT BY GULF STREAM FOR THE RETAIL SALE

2  OR SOMETHING WOULD HAVE AN RV-TYPE REFRIGERATOR AND STOVE AND AN

3  RV-TYPE BATHROOM, A TOILET, PLASTIC TOILET BASICALLY THAT DOESN'T

4  REQUIRE WATER TO FLUSH BECAUSE OF THE WATER CONSTRAINTS AT

5  CAMPGROUNDS OR OUT DRY CAMPING.

6        THE FEMA UNITS DIFFERENCES WOULD BE THEY'RE MOSTLY

7  INTENDED TO BE HOOKED UP TO A SEWER AND SEPTIC, SO -- AND POWER

8  ALL THE TIME, SO THEY HAVE A HOME-STYLE REFRIGERATOR IN IT AND A

9  STANDARD CERAMIC-TYPE TOILET LIKE YOU WOULD SEE IN A NORMAL HOUSE

10 OR SOMETHING.  SPECIFICATIONS OTHER THAN WHAT THEY HAVE

11 MENTIONED, AND THAT'S CALLED OUT IN THE FEMA REQUIREMENTS HERE,

12 THAT IT HAS A HOME-STYLE TOILET AND WHATEVER CUBIC INCH

13 REFRIGERATOR AND THAT KIND OF STUFF IS CALLED OUT IN THERE.

14        OTHER THAN THOSE, YOUR STANDARD FEMA UNIT HAS NO, LIKE,

15 DIFFERENCE IN THE WAY THE SIDE WALL WOULD BE BUILT OR ANY OF

16 THAT, OTHER THAN THE RAIL UNITS HAD EXTRA STRAPS OR MAYBE AN

17 EXTRA STRAP ON THE FRONT END OR SOMETHING, BUT --

18 Q.   WHAT I MEANT TO SAY WAS THAT THE FEMA UNITS, THE WOOD USED

19 IN THE FEMA UNITS SHOULD BE THE SAME TYPE OF WOOD USED IN ANY

20 OTHER TYPE OF UNIT SOLD TO THE PUBLIC?

21 A.   NORMALLY, YES.

22 Q.   OKAY.  YOU SHOULD NOT USE LOWER-QUALITY WOOD IN THE FEMA

23 UNIT OR THE FEMA-DESIGNED TRAILER; RIGHT?

24 A.   YES.

25 Q.   SHOULD NOT DO THAT?

1  A.    SHOULD NOT.

2  Q.    HAS ANYONE AT GULF STREAM THAT YOU KNOW ABOUT IN THE

3  ENGINEERING DEPARTMENT ANALYZED WHAT IMPACT JACKING OR BLOCKING

4  WILL HAVE ON THE GULF STREAM FEMA TRAILER FRAME?

5  A.    NO.

6  Q.    DO YOU KNOW OF ANY SPECS THAT PERTAIN TO JACKING OR BLOCKING

7  OF THE FEMA TRAILER?

8  A.    NO.

9  Q.    DO YOU AGREE THAT IMPROPER JACKING OF THE FEMA TRAILER CAN

10  DAMAGE THE FRAME?

11  A.    YOU KNOW, I DON'T KNOW WHAT YOU'RE CALLING "IMPROPER."

12  Q.    WELL, CAN YOU THINK OF A WAY THAT YOU COULD IMPROPERLY JACK

13  A FEMA TRAILER?  DO YOU KNOW WHAT I MEAN WHEN I SAY "JACK?"  DO

14  YOU UNDERSTAND WHAT I'M SAYING?

15  A.    LIFT THE COACH?

16  Q.    YES.  WITH SOME SORT OF JACK, WHETHER IT BE A HYDRAULIC OR

17  THE THING THAT YOU INCLUDE WITH THEM WHEN YOU SELL THEM TO THE

18  PUBLIC.

19  A.    I MEAN, I COULD THINK OF A THOUSAND WAYS YOU CAN DO IT

20  WRONG.  I MEAN --

21  Q.    TELL ME.  TELL ME SOME OF THEM.

22  A.    DROP IT OFF OF A TRAILER, I MEAN --

23  Q.    NO, I'M TALKING ABOUT JUST THE JACKING PART, NOT DROPPING

24  IT.  THERE'S A THOUSAND WAYS IT COULD BE DONE WRONG, YOU SAID.

25  TELL ME ONE OF THOSE WAYS.

1   A.   I DON'T KNOW.  YOU COULD LIFT IT STRAIGHT UP AND DOWN THE

2   FRONT.  I MEAN, I DON'T KNOW WHAT EXTREME YOU'RE TALKING ABOUT.

3   THAT'S MY POINT IS I DON'T KNOW WHAT EXTREME YOU'RE TALKING

4   ABOUT.  WHEN YOU SAY "JACK THE COACH," IF YOU LIFTED ONE SIDE UP

5   EVENLY AND LIFTED THE OTHER SIDE UP EVENLY, I CAN'T SEE ANY

6   PROBLEM WITH THAT.  IF YOU ROLLED IT OVER ON ITS SIDE, DO YOU

7   KNOW WHAT I MEAN, WHERE IS THE DIFFERENCE IN THAT, WHETHER IT'S

8   HALFWAY UP OR DOWN?  I DON'T KNOW.

9   Q.   IF YOU JACKED ONE CORNER ALL THE WAY UP?

10  A.   HOW HIGH?

11  Q.   AS HIGH AS THE JACK WILL GO.

12  A.   HOW HIGH IS THAT?

13  Q.   WELL, YOU KNOW ABOUT THE JACKS; RIGHT?

14  A.   I DON'T KNOW WHAT IT'S SITTING ON; THE GROUND.  I MEAN,

15  EVERY JACK LIFTS A DIFFERENT HEIGHT, YOU KNOW, DEPENDING ON WHAT

16  THE GROUND HEIGHT IS, WHAT KIND OF FEET IT HAS ON IT, I DON'T

17  HAVE THAT.  I'D BE GUESSING IF I SAID ANYTHING LIKE THAT.

18  Q.   SO EVEN THOUGH YOU SAID THERE'S A THOUSAND WAYS THAT YOU

19  COULD DO IT WRONG, YOU CAN'T TELL ME ONE WAY YOU CAN DO IT WRONG

20  OTHER THAN TURNING IT OVER?

21  A.   YOU MEAN OTHER THAN LIFTING IT UP 45 DEGREES JUST TO SEE IF

22  YOU CAN DO IT OR, I MEAN --

23  Q.   YOU'RE THE HEAD ENGINEERING GUY FOR THE TOWABLES; RIGHT?

24  A.   YES.

25  Q.   OKAY.  I'M TRYING TO FIGURE OUT THE PROPER WAY TO JACK AND

1   BLOCK THE TRAILER.  TELL ME THE PROPER WAY.

2   A.   I DON'T HAVE A WRITTEN SPEC ON THAT.  NOBODY'S EVER HIRED ME

3   TO WRITE THAT SPEC.

4   Q.   THERE IS NO SPEC AT GULF STREAM ON THAT, IS THERE?

5   A.   OTHER THAN LEVELING THE JACK, NO, WE DON'T SPECIFY HOW

6   YOU'RE GOING TO SET UP YOUR COACH.  IF I DID, IT WOULD BE AN

7   ASSUMPTION.  IT'S NOT LIKE I SAW THEM JACKED AND BLOCKED.

8   Q.   OKAY.  GULF STREAM PROVIDES NO GUIDANCE WITH REGARD TO

9   PROPER JACKING AND BLOCKING?

10  A.   FOR FEMA USE, NO.

11  Q.   WOULD IT BE PROPER TO JACK ONE CORNER OF THE TRAILER UP AND

12  BLOCK IT AND THEN JACK THE OTHER CORNER AND BLOCK IT AND THEN DO

13  ALL FOUR CORNERS THAT WAY?

14  A.   WELL, NO.  I'VE ALREADY SAID THE EXACT SAME THING.  YOU

15  KNOW, I'D BE SPECULATING.  I DON'T KNOW HOW HIGH YOU'RE TALKING,

16  LIFTING ONE CORNER.  WHAT DO YOU WANT ME TO SAY; IF YOU LIFTED IT

17  AN INCH, EACH CORNER AT A TIME YOU'D BE OKAY, BUT IF YOU LIFT IT

18  TWO FEET, YOU WOULDN'T BE?

19  Q.   I'M ASKING YOU.

20  A.   I DON'T KNOW.

21  Q.   YOU HAVE NO CLUE?

22  A.   I DON'T KNOW WHAT THAT -- YOU KNOW, IT DEPENDS ON THE

23  LOCATION, YOU KNOW, THE TYPE OF JACKS YOU'RE USING.  YOU KNOW,

24  THE GROUND COULD BE UNEVEN.  THERE'S ALL KINDS OF VARIABLES TO

25  THAT.

1   Q.   IT COULD DISTORT -- THERE'S WAYS IT COULD BE DONE WRONG THAT

2   WOULD DISTORT THE FRAME?

3   A.   YEAH, YES.

4   Q.   DISTORTION OR BENDING OF THE FRAME IS NOT A GOOD THING, IS

5   IT?

6   A.   DISTORTION OR BENDING OF THE FRAME -- THE FRAMES FLEX GOING

7   DOWN THE ROAD.   THERE'S -- YOU KNOW, AGAIN, I DON'T KNOW

8   SPECIFICALLY HOW MUCH YOU'RE TALKING ABOUT BECAUSE FRAMES

9   SPECIFICALLY -- THEY ARE DESIGNED TO FLEX GOING DOWN THE ROAD.

10  OTHERWISE, YOU KNOW, YOU'D GET AN AWFUL BRITTLE UNIT IF IT WAS

11  RIGID AS A ROCK.

12          SO MY ANSWER IS, I DON'T KNOW EXACTLY HOW MUCH YOU'RE

13  TALKING ABOUT.   IF YOU TWISTED IT IN A KNOT, THAT WOULD BE BAD.

14  IF YOU TWISTED IT A HALF INCH, NOT SO BAD.

15  Q.   BUT IN GENERAL, DISTORTION OF THE FRAME IS NOT GOOD FOR THE

16  TRAILER.   WOULD YOU AGREE WITH THAT?

17  A.   CAN YOU SPECIFY "DISTORTION?"   I DON'T KNOW.   THAT'S WHAT

18  I'M TRYING TO SAY.

19  Q.   IF YOU BEND THE FRAME, YOU'RE GOING TO AFFECT THE TRAILER.

20  A.   WHAT I'M SAYING IS THEY ARE MADE TO FLEX GOING DOWN THE

21  ROAD.

22  Q.   I UNDERSTAND.   HAVE YOU SEEN TRAILERS WHERE THE WALL PANELS

23  HAVE DISLODGED OR COME UNDONE FROM THE TWO-BY-TWO'S?

24  A.   I HAVE SEEN THAT ON A COUPLE UNITS THAT WERE RAIL -- THAT

25  WERE ON THE RAIL DURING THAT PERIOD.

1  Q.   TELL ME ABOUT THAT.

2  A.   THE HUMPING PROCESS FOR LOADING TRAINS IS THEY TAKE THE

3  TRAIN CAR UP TO THE TOP OF A HILL AND LET IT ROLL DOWN A HILL AND

4  COUPLE WITH THE OTHER UNITS.  AND I'VE SEEN PANELS COME LOOSE IN

5  THAT PROCESS.

6  Q.   WHY?

7  A.   WHAT'S THAT?

8  Q.   WHY DID THAT HAPPEN?

9  A.   JUST THE TWO TRAILERS COMING TOGETHER OR THE UNIT WAS NOT

10 SECURED TIGHTLY TO THE TRAILER OR SOMETHING.

11 Q.   SO THIS SHAKING OF THE TRAILER CAUSED THE WALL PANELS TO

12 COME OFF?

13 A.   I DID SEE THAT, YES, ON TWO UNITS, I BELIEVE.

14 Q.   OKAY.  AND WHAT DID YOU ATTRIBUTE THAT -- AS AN ENGINEER, OR

15 AS AN ENGINEERING MANAGER, WHAT DID YOU ATTRIBUTE THAT HAPPENING

16 TO?

17 A.   THE HANDLING OF THE UNIT.

18 Q.   ROUGH HANDLING OF IT?

19 A.   ROUGH HANDLING OF THE UNIT.  I'M NOT SURE IF THERE'S MORE,

20 BUT TWO IS ALL I SAW OUT OF 55,000 OR WHATEVER WE SHIPPED.

21 Q.   DID YOU HAVE ANY CONTACT OR ANY INVOLVEMENT WITH ANY OF THE

22 COMPANIES THAT WERE INSTALLING THESE FEMA TRAILERS IN NEW ORLEANS

23 OR LOUISIANA?

24 A.   NO, NOT THE INSTALLATION COMPANIES.

25 Q.   WELL, DID YOU HAVE INVOLVEMENT WITH OTHER COMPANIES,

1   MAINTENANCE COMPANIES?

2   A.   NO.   JUST FEMA DURING THE DELIVERY OF THE FIRST TRAIN UNITS.

3   Q.   DID YOU PROVIDE FLUOR OR ANY OF THE INSTALLATION COMPANIES

4   ANY SORT OF GUIDANCE OR INFORMATION OR JUST SPECIFICATIONS OF THE

5   TRAILER, ITSELF, SO THEY COULD DO THEIR OWN ANALYSIS ON THE

6   INSTALLATION?

7   A.   NO.

8   Q.   THERE ARE WARNINGS ON THE SCISSORS JACKS?   HAVE YOU SEEN THE

9   WARNING?

10  A.   THE STICKER, YES.

11  Q.   EXHIBIT 2 IS A COPY OF A STICKER ON ONE OF THE JACKS THAT

12  ACCOMPANY THE FEMA TRAILERS.   HAVE YOU SEEN THAT WARNING BEFORE?

13  A.   LOOKS FAMILIAR, YES.

14  Q.   OKAY.   CAN I SEE IT?   THIS IS IMPORTANT INFORMATION THAT

15  ACCOMPANIES THE TRAILER; IS THAT RIGHT?

16  A.   IT'S IMPORTANT INFORMATION THAT ACCOMPANIES THE JACK, YES.

17  Q.   YOU'RE THE ENGINEERING MANAGER, AND YOU AGREE THAT THAT'S AN

18  IMPORTANT WARNING THAT SHOULD BE FOLLOWED?

19  A.   YES.

20  Q.   OKAY.   AND WHY SHOULD THIS WARNING BE FOLLOWED BY ANYONE

21  USING THE JACK OR JACKING A TRAILER?

22  A.   I SEE WHERE IT STATES THAT THE JACK CAN BE DAMAGED AT THE

23  BOTTOM THERE.   I THINK THAT'S THE PART.   I CAN'T HARDLY READ THE

24  END OF THAT.

25  Q.   WELL, READ THE SECOND SENTENCE UNDER 1.

1    A.    THE "VEHICLE FRAME OR DOOR JAMB DAMAGE MAY RESULT"?

2    Q.    UH-HUH (AFFIRMATIVE RESPONSE).  IF YOU IMPROPERLY JACK THE

3    VEHICLE, THE TRAILER, YOU COULD DAMAGE THE FRAME, CAN'T YOU?

4    A.    IF YOU IMPROPERLY JACK THE UNIT, YOU COULD DAMAGE THE FRAME.

5    Q.    AND THAT'S WHAT'S BEING WARNED ABOUT ON THE JACK, ISN'T IT?

6    A.    YES.

7    Q.    AND THAT SHOULD BE FOLLOWED, SHOULDN'T IT?

8    A.    YES.

9    Q.    AND AS FAR AS THE ACTUAL DESIGN OF THE FEMA TRAILER, YOU'VE

10   ALREADY TOLD ME THAT DESIGN HAS BEEN AROUND FOR A LONG, LONG

11   TIME?

12   A.    THAT FLOOR PLAN, YES.

13   Q.    SO YOU WEREN'T INVOLVED IN THE DESIGN OF THE FEMA TRAILER,

14   WERE YOU?

15   A.    THAT SPECIFIC FEMA TRAILER WAS DRAWN BY ME.  IT WAS AN

16   EXISTING FLOOR PLAN.

17   Q.    SO YOU JUST COPIED IT FROM SOMEWHERE ELSE?

18   A.    FROM ONE OF OUR OLDER -- IT'S AN EXISTING FLOOR PLAN THAT

19   MOST PEOPLE HAVE.

20   Q.    BUT YOU GAVE NO CONSIDERATION TO AIR EXCHANGE IN THAT PLAN,

21   DID YOU?

22   A.    OTHER THAN WHAT WE TALKED ABOUT BEFORE AS PUTTING THE -- YOU

23   KNOW, A GOOD AMOUNT OF WINDOWS OR VENTS IN THE ROOF.

24   Q.    BUT YOU DIDN'T DO ANY CALCULATIONS ABOUT HOW LONG IT WOULD

25   TAKE FOR THE COMPLETE AIR EXCHANGE OR ANYTHING LIKE THAT, DID

1  YOU?

2  A.   NO.

3  Q.   OKAY.  WERE YOU AT ANY OF THE PLANTS WHEN THE FEMA TRAILERS

4  WERE BEING MADE, WHETHER IT BE 2004 OR 2005?

5  A.   YES.

6  Q.   OKAY.  DID YOU SEE ANYONE SUFFERING FROM ANY SORT OF

7  SICKNESS OR ILLNESS OR RESPIRATORY, EYE, NOSE, WHATNOT, ANY

8  PROBLEMS?

9  A.   NO.

10 Q.   DO YOU -- WHAT WAS THE INTENDED USE OF THE FEMA TRAILERS, AT

11 LEAST FROM YOUR PERSPECTIVE AS ENGINEERING MANAGER?

12 A.   TEMPORARILY HOUSE DISPLACED PEOPLE.

13 Q.   WHAT DO YOU CONSIDER TEMPORARY?

14 A.   I DON'T KNOW.  I MEAN, I KNOW THAT IN THE PAST, WE DID FEMA

15 UNITS THAT, YOU KNOW, WERE MAYBE SOMEWHERE FOR A DAY.  I DON'T

16 KNOW.  JUST TEMPORARILY.

17 Q.   I THINK THIS WOULD BE EXHIBIT 3.  I'M MARKING A DOCUMENT AS

18 EXHIBIT 3.  FOR THE FOLKS ON THE PHONE, IT'S BATES STAMPED

19 FL-FCA000113 THROUGH 122.  IT'S EXHIBIT 7 TO THE IA-TAC CONTRACT

20 OF FLUOR.

21       YOU PROBABLY HAVE NEVER SEEN THAT DOCUMENT BEFORE

22 TODAY, HAVE YOU, MR. ABBOTT?

23 A.   I HAVE NOT.

24 Q.   OKAY.  I JUST -- I JUST NEED YOU TO READ ONE SECTION.  YOU

25 SEE THE SECTION THERE THAT'S TITLED BLOCKING AND LEVELING 2.1.2?

1    A.    YES.

2    Q.    WHY DON'T YOU READ THAT TO YOURSELF.   RELATIVELY SHORT.

3    HAVE YOU SEEN THAT?

4    A.    YES, SIR.

5    Q.    I'M GOING TO REPRESENT TO YOU THAT THAT WAS PART OF THE

6    CONTRACT BETWEEN FEMA AND FLUOR, AND IT CALLED FOR THE TRAVEL

7    TRAILERS THAT FEMA WAS USING TO HOUSE FOLKS FOLLOWING -- I MEAN,

8    THAT -- YES, THAT FEMA WAS USING TO HOUSE FOLKS FOLLOWING KATRINA

9    BE PLACED UP ON SIX BLOCKS OR PIERS THAT WERE TO BE BUILT A

10   CERTAIN WAY; ISN'T THAT RIGHT?

11   A.    YES.

12   Q.    OKAY.  AS THE ENGINEERING MANAGER FOR THE TOWABLES DIVISION

13   OF GULF STREAM, DO YOU SEE ANY PROBLEMS WITH PLACING ONE OF YOUR

14   TRAVEL TRAILERS ON SIX PIERS LIKE THAT?  IF YOU KNOW.  IF YOU

15   DON'T KNOW, IT'S OKAY FOR YOU TO TELL ME THAT TOO.

16   A.    I DON'T SEE ANYTHING THAT STANDS OUT WRONG ABOUT THIS

17   PROCEDURE.

18   Q.    OKAY.  THAT'S FINE.  I WANT YOU TO TAKE A LOOK AT EXHIBIT 2

19   THAT MR. BUZBEE SHOWED YOU, AND IN PARTICULAR THE TOP PARAGRAPH.

20   THIS IS THE WARNING ON THE SCISSORS JACK THAT APPEARS ON THE FEMA

21   TRAILER OR TRAVEL TRAILERS THAT GULF STREAM MANUFACTURED.  IT'S

22   YOUR UNDERSTANDING THAT WARNING COMES FROM THE MANUFACTURER OF

23   THE JACK, NOT FROM GULF STREAM, CORRECT?

24   A.    YES.

25   Q.    OKAY.  AND IT SAYS -- LET ME HAVE IT IN FRONT OF ME FOR

1   ONE MINUTE -- "DO NOT USE THIS SCISSORS JACK TO LIFT EXCESSIVE

2   WEIGHT OR LIFT TIRES OFF OF THE GROUND.  VEHICLE FRAME AND DOOR

3   JAMB DAMAGE MAY RESULT."  IS THERE ANYTHING IN THAT WARNING THAT

4   SAYS YOU SHOULDN'T USE HYDRAULIC JACKS PLACED AT VARIOUS POINTS

5   AROUND THE TRAILER TO LIFT THE TRAILER?

6   A.   NO.

7   Q.   AND THE STANDARD THAT GULF STREAM COACH USED WAS TO USE

8   LOW-FORMALDEHYDE-EMISSION MATERIALS?

9   A.   YES.

10  Q.   WHETHER THAT'S THE INDUSTRY STANDARD OR NOT, THIS IS WHAT

11  GULF STREAM COACH DETERMINED WAS THE APPROPRIATE MATERIALS TO BE

12  USED?

13  A.   THAT WAS OUR POLICY, YES, AND STILL IS.

14          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

15  PORTIONS OF THE VIDEOTAPED DEPOSITION OF EDDIE ABBOTT WAS

16  CONCLUDED.)

17          MR. WATTS:  YOUR HONOR, I THINK THAT COMPLETES

18  EVERYBODY'S TENDER OF THIS WITNESS.

19          THE COURT:  AND WHO IS NEXT?  WE HAVE ANOTHER VIDEOTAPE

20  NEXT?

21          MR. WEINSTOCK:  YOUR HONOR, WE NEED TO APPROACH WITH

22  FLUOR.

23          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A

24  CONFERENCE WAS HELD AT THE BENCH.)

25          MR. WEINSTOCK:  WE HAVE A DISPUTE AS TO ESSENTIALLY A

1    QUESTION AND ANSWER THAT'S ON THE COMPLIANT WOOD.  THE PLAINTIFFS

2    REFUSE TO TAKE IT OUT.  THEY SAY THAT WE MISSED OUR CHANCE TO

3    OBJECT TO IT.

4            THE COURT:  LET ME SEE.  WHAT QUESTION IS THIS?  THIS IS

5    ON KEEL?

6            MR. WEINSTOCK:  THIS IS ON KEEL.

7            THE COURT:  HOW ARE WE GOING TO FIX IT NOW, ASSUMING

8    THAT I AGREE WITH YOU?  ARE WE GOING TO BE ABLE TO SKIP THROUGH

9    THAT?  IS SOMEBODY OPERATING IT?

10           MR. WATTS:  WE WERE E-MAILING FOR SEVERAL HOURS HAVING

11   FUN THIS MORNING.  NOBODY TOLD ME A THING ABOUT THIS DISPUTE.

12           MR. WEINSTOCK:  WE WERE GOING BACK WITH PETER.

13           MR. GLASS:  I'LL TELL YOU, YOU ACTUALLY TOOK OUT SOME

14   PARTS THAT WE CAUGHT THAT YOU ACCIDENTLY INCLUDED.

15           THE COURT:  PAGE 84, ALL OF THESE?

16           MR. GLASS:  YES.

17           MR. BUZBEE:  NEVER OBJECTED TO THEM.

18           THE COURT:  HE CAN OBJECT TO THEM NOW.

19           MR. GLASS:  JUDGE, MAY I JUST POINT OUT TO BE FAIR,

20   THERE WAS STUFF THAT THEY WANTED IN THAT WE HAD INCLUDED ABOUT

21   PAST HEALTH COMPLAINTS, THAT THERE WERE NO COMPLAINTS THAT WERE

22   MISSED BY PLAINTIFFS THAT WE VOLUNTARILY TOOK OUT THIS MORNING

23   AND THEY WERE ABLE TO TAKE IT OUT.

24           THE COURT:  I HAVE NO PROBLEM WITH THAT ONE.  WE HAVE

25   BEEN TALKING A LOT ABOUT LFE.  THAT'S PAGE 84.

1              PAGE 86, ONE THROUGH EIGHT.  I WOULD HAVE EXCLUDED

2    SIX THROUGH EIGHT BECAUSE THEIR NEW POLICY IS NOT RELEVANT, BUT

3    HE DOES SAY IN THE PREVIOUS QUESTION, UNTIL LAST YEAR, SO IT'S

4    KIND OF IMPLICIT IN THE QUESTION BEFORE, BUT I WOULD ELIMINATE

5    SIX THROUGH EIGHT.  I DON'T KNOW IF THAT'S EASY ENOUGH TO TAKE

6    OUT NOW.  WE'RE HERE NOW.

7              95, 25.  I WOULD HAVE PROBABLY HAVE TAKEN THAT OUT

8    AS WELL.

9              SO WHAT ARE WE GOING TO DO?  I WOULD SUSTAIN THE

10   OBJECTION TO THIS TESTIMONY, BUT IT'S GOING TO -- WE'RE READY TO

11   PLAY THE TAPE.

12        MR. GLASS:  CAN THEY PUT ON THE NEXT WITNESS NOW UNTIL

13   THEY ARE ABLE TO TAKE THE STUFF OUT?

14        THE COURT:  HOW LONG IS IT GOING TO TAKE TO CUT THESE

15   TWO LITTLE SNIPPETS OUT?

16        MR. WATTS:  A COUPLE OF MINUTES.

17        THE COURT:  IF YOU CAN DO IT NOW.

18        MR. WATTS:  86, SIX TO EIGHT AND 95, 25 TO 96, FIVE?

19        MR. BUZBEE:  I DON'T KNOW WHAT THE OBJECTION IS OR

20   ANYTHING.  THAT'S COMPLETELY --

21        THE COURT:  I DON'T KNOW IF IT'S OF GREAT CONSEQUENCE

22   BECAUSE IT'S PRETTY CLEAR IN HIS TESTIMONY THAT UNTIL RECENTLY,

23   HE HADN'T LOOKED AT IT, BUT RECENTLY HE DID.  SO IT'S NEITHER

24   HERE NOR THERE TO ME, BUT I WOULD SUSTAIN THE OBJECTION, IF THE

25   WITNESS WERE ON THE STAND.

1        WHILE YOU ALL ARE UP HERE AND WHILE HE'S CHECKING

2   INTO THAT, WE HAVE GOT TO -- AND THIS ISN'T A CRITICISM OF YOU

3   ALL, BUT WE HAVE GOT TO FIGURE OUT A WAY ON WHETHER TO HANDLE

4   OBJECTIONS ON DEPOSITION TESTIMONY BECAUSE I'M SORT OF IN A

5   POSITION OF WRITING A BOOK REPORT, HAVING READ ONLY EVERY THIRD

6   PAGE OF THE BOOK.  I HAVE A TRANSCRIPT THAT IS, ALTHOUGH I CAN

7   READ CONTEXT IN THAT TRANSCRIPT, I THINK IT'S SAFE TO SAY THAT IF

8   THE WITNESS WERE TESTIFYING IN REALTIME FOLLOWING OTHER

9   WITNESSES, MY APPRECIATION FOR THE CONTEXT WITHIN THE TRIAL WOULD

10  BE GREATER.  I RULE ON THE OBJECTIONS BASED ON WHAT I HAVE IN

11  FRONT OF ME, AND I READ THE ENTIRETY OF THE TESTIMONY WHEN I GET

12  TO THE OBJECTION.  BUT OFTENTIMES WERE THAT WITNESS HERE LIVE AND

13  THAT TESTIMONY ENCOUNTERED AT THAT JUNCTURE IN THE TRIAL, THERE

14  MAY BE RELEVANCE THAT IS LOST ON ME WHEN I READ A COLD

15  TRANSCRIPT, YOU KNOW, IN THE EVENINGS A WEEK BEFORE TRIAL.

16        SO THAT'S ONE THING.  THE OTHER THING IS THAT WHILE

17  I APPRECIATE YOU ALL BEING CRYPTIC, IT SAVES TIME FOR ME NOT TO

18  HAVE TO LOOK AT MEMOS WHEN I READ YOUR LITTLE BOXES ON THE

19  TRANSCRIPT, BUT SOME OF THOSE ARE SO CRYPTIC THAT I'M NOT SURE

20  WHEN YOU SAY AN OBJECTION IS CONDITIONAL ON A PRIOR RULING, I

21  MAKE THE PRIOR RULING.  AS FAR AS WHETHER SOMETHING CONDITIONAL

22  GOES ONE WAY OR THE OTHER, I DON'T KNOW WHICH ONE IS CONDITIONED

23  ON WHAT SUCH THAT IT IS OR IS NOT INCLUDED THEREAFTER.

24        SO WE'RE GOING TO HAVE TO DEVISE A BETTER SYSTEM.

25  I MEAN, I'VE DONE THE BEST I COULD WITH WHAT YOU ALL HAVE GIVEN

1   ME AND I'M NOT CRITICIZING YOU ALL BECAUSE YOU HAVE GIVEN ME WHAT

2   I'VE ASKED FOR IN TERMS OF TRANSCRIPTS, BUT WE'LL FIGURE OUT A

3   SYSTEM TO ENCOUNTER OBJECTIONS.

4         MR. GLASS:  I THINK THE MOST HELPFUL THING WOULD HAVE

5   BEEN IF WE HAD IT FURTHER AWAY FROM THE TRIAL BECAUSE IT WAS TENS

6   OF THOUSANDS OF PAGES GOING BACK AND FORTH.  I THINK EVERYBODY

7   WAS PRETTY MUCH PUNCH DRUNK BY THE TIME WE FINISHED.

8         THE COURT:  WELL, WE'LL HAVE TO DO THAT, BUT THEN WE CAN

9   MAKE IT FOR EARLIER -- WE CAN TALK ABOUT THIS LATER.  BUT IF I

10  MAKE IT EARLIER, THEN I'M GOING TO GET WHAT I PRETTY MUCH GOT IN

11  THIS CASE, EVEN WITH THE LIMITED TIME, BUT DON'T READ THAT ONE,

12  READ THIS ONE.  NOW WE'VE MADE SOME OTHER DESIGNATIONS, PUT THAT

13  ONE AWAY, JUDGE, WE'VE GOT A NEW TRANSCRIPT THAT'S MARKED UP

14  DIFFERENTLY.  AND THAT MAKES IT EVEN HARDER BECAUSE I'VE GOT

15  MULTIPLE COMPETING VERSIONS OF TESTIMONY.

16        SO WE'LL TALK ABOUT IT AFTER TRIAL.

17        MIKAL, IS HE READY TO DO THAT?

18        MR. WATTS:  YES, SIR, IT'S DONE.

19        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

20  BENCH CONFERENCE CONCLUDED.)

21        THE COURT:  THE NEXT WITNESS, AS I UNDERSTAND IT, IS

22  MR. BURL KEEL AND HE'S BEEN SWORN IN AND WILL TESTIFY BY WAY OF A

23  VIDEO DEPOSITION AS WELL.  IT'S A LITTLE SHORTER THAN THE LAST

24  ONE WE WATCHED.

25        MR. WATTS:  YES, SIR.

1        THE COURT:  GO AHEAD.

2            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

3   PORTIONS OF THE VIDEOTAPED DEPOSITION OF BURL KEEL WAS PLAYED.)

4   Q.   WHAT'S YOUR NAME, SIR?

5   A.   BURL KEEL.

6   Q.   WHERE DO YOU LIVE, MR. KEEL?

7   A.   3061 EAST, ROCHESTER, INDIANA.

8   Q.   WHAT DO YOU DO FOR A LIVING?

9   A.   I WORK AT GULF STREAM COACH IN THE SERVICE DEPARTMENT.

10  Q.   THE HURRICANE HIT IN AUGUST OF '05.  TRAILERS BEGAN TO BE

11  DELIVERED SOMETIME, I BELIEVE, IN NOVEMBER -- OCTOBER,

12  NOVEMBER '05.

13  A.   SO IT WAS IN THE BEGINNING OF DECEMBER, I WAS DOWN IN

14  LOUISIANA.

15  Q.   AND WHERE IN LOUISIANA WERE YOU?

16  A.   BATON ROUGE.

17  Q.   AND WHAT WERE YOU ASKED TO DO?

18  A.   TO GO TO A CUSTOMER'S HOUSE AND EXCHANGE SOME BOARDS OUT ON

19  THE BED -- ON THE BEDS.

20  Q.   WHAT DOES THAT MEAN, EXCHANGE SOME BOARDS OUT?

21  A.   WE TOOK SOME LAUAN OFF THE BEDS AND PUT OSB ON THERE.

22  Q.   WHY DID YOU DO THAT?

23  A.   SCOTT PULLEN TOLD ME TO DO IT.

24  Q.   DID YOU ASK WHY YOU WERE TAKING OFF THE WOOD FROM THE BED?

25  A.   AS I UNDERSTAND IT, THE CUSTOMER SAID THERE WAS A SMELL IN

1  THE UNIT.

2  Q.   WHY DID YOU HAVE OSB WHEN YOU WERE DOWN IN LOUISIANA?

3  A.   IT WAS SENT DOWN THERE.   WE WERE PUTTING OSB ON SOME OF THE

4  BEDS.   SOME OF THE BEDS CAME DOWN WITH OSB; SOME OF THEM CAME

5  DOWN WITH LAUAN.

6  Q.   AND OSB IS JUST A KIND OF WOOD, SOME KIND OF MANUFACTURED

7  WOOD; RIGHT?

8  A.   CORRECT.

9  Q.   OSB STANDS FOR WHAT?

10  A.   I HAVE NO IDEA, SIR.

11  Q.   OKAY.   BUT ANYWAY, OSB IS DIFFERENT THAN LAUAN?

12  A.   YES, SIR.

13  Q.   OSB, AT LEAST YOU DON'T BELIEVE THAT IT GIVES OFF ANY

14  FORMALDEHYDE FUMES; RIGHT?

15  A.   I DON'T KNOW ABOUT THAT, SIR.

16  Q.   CAN YOU SMELL FORMALDEHYDE?

17  A.   I CAN SMELL, YES, SIR.

18  Q.   AND YOU CAN SMELL LAUAN AND YOU CAN SMELL FORMALDEHYDE ON

19  IT, CAN'T YOU?

20  A.   I CAN -- I NOTICE THE SMELL ONCE IN A WHILE, YES.

21  Q.   AND OSB IS NOT AS BAD; TRUE STATEMENT?

22  A.   YES, SIR.

23  Q.   I'M JUST WORDING IT WHERE, YOU KNOW, I'VE GOT TWO PIECES OF

24  WOOD HERE AND I CAN SMELL EACH ONE, AND I CAN SMELL FORMALDEHYDE

25  ON THE LAUAN, BUT I CAN'T SMELL IT ON THE OSB; TRUE?

1  A.   TRUE.  AS FAR AS SHEETS.

2  Q.   SO TELL ME HOW IT CAME TO BE THAT YOU WENT TO GET ONE OF

3  THESE SHEETS TO PUT IT ON THIS PERSON'S BED.

4  A.   SCOTT PULLEN CALLED ME AND ASKED ME TO HAVE SOME BED BOARDS

5  CUT AND TAKE THEM TO THIS CUSTOMER'S HOUSE AND LOOK AT THE UNIT

6  AND PUT THEM ON, EXCHANGE THEM OUT.

7  Q.   SO WHEN YOU SAY "THE CUSTOMER'S HOUSE," YOU MEAN THEIR

8  HOUSE, MEANING THE GULF STREAM TRAILER THEY WERE LIVING IN?

9  A.   YES, SIR.

10  Q.   TELL ME HOW THAT OCCURRED.

11  A.   WELL, I WENT TO THE UNIT THAT WAS IN THE YARD, AND I TOOK

12  OUT THE BEDS BECAUSE I DIDN'T HAVE TIME TO CUT THEM, SO I TOOK

13  THE OSB OUT OF THAT UNIT, WENT TO THE CUSTOMER'S HOUSE AND SPOKE

14  WITH THE CUSTOMER, AND THEN I STARTED EXCHANGING THE BOARDS.

15  Q.   TELL ME WHAT THE CUSTOMER TOLD YOU.

16  A.   THAT THERE WAS A SMELL AND HIS EYES WERE BURNING.

17  Q.   HE WAS HAVING PROBLEMS WITH WHAT HE THOUGHT TO BE

18  FORMALDEHYDE?

19  A.   YES, SIR.

20  Q.   DID YOU GO INSIDE HIS TRAILER?

21  A.   YES, I DID, SIR.

22  Q.   DID YOU NOTICE THE FORMALDEHYDE SMELL AS WELL?

23  A.   I NOTICED THE SMELL, YES, SIR.

24  Q.   WAS IT BURNING YOUR EYES?

25  A.   IT DID NOT BURN MY EYES INITIALLY, SIR, NO.

1   Q.   BUT ONCE YOU WERE IN THERE, IT STARTED BURNING YOUR EYES?

2   A.   YES, SIR.

3   Q.   WAS THE AIR-CONDITIONING RUNNING?

4   A.   NO, SIR.

5   Q.   WHY DIDN'T YOU JUST TELL HIM, "HEY, TURN YOUR AIR ON"?

6   A.   AFTER A PERIOD OF TIME, WE STARTED TALKING ABOUT VENTILATION

7   OF THE UNIT, AND AT THAT TIME IT WAS MENTIONED, YES, SIR.

8   Q.   BUT THAT'S AFTER YOU CHANGED OUT HIS BOARDS?

9   A.   THAT WAS DURING THAT TIME BECAUSE HE STARTED ASKING

10  QUESTIONS WHILE I WAS CHANGING THE BOARDS OUT.

11  Q.   WHEN YOU WERE SPEAKING WITH HIM, WAS HE RUNNING ANY OF THE

12  VENTS?

13  A.   NO, SIR.

14  Q.   OR THE FANS?

15  A.   NO, SIR.

16  Q.   HOW MANY FANS WERE THERE IN THAT PARTICULAR UNIT?

17  A.   YOU HAVE A RANGE HOOD FAN, YOU HAVE A BATHROOM FAN, YOU HAVE

18  A FAN ON THE FURNACE AND YOU HAVE THE AC.

19  Q.   SO THERE'S THREE FANS AND THEN THE AIR-CONDITIONING UNIT?

20  A.   YES, SIR.

21  Q.   AND ONE OF THE FANS IS INSIDE THE LITTLE BATHROOM?

22  A.   YES, SIR.

23  Q.   DO YOU KNOW WHETHER HE WAS RUNNING THE FANS?

24  A.   I DIDN'T HEAR THEM RUNNING, SIR.

25  Q.   ALL RIGHT.  SO HE WAS SAYING HIS EYES WERE BURNING AND THAT

1  THERE WAS THIS SMELL, RIGHT?

2  A.   YES, SIR.

3  Q.   AND THEN ONCE YOU WERE IN THE TRAILER, YOU NOTICED YOUR EYES

4  WERE BURNING TOO AFTER A WHILE?

5  A.   AFTER A WHILE IN THERE, YES, SIR.

6  Q.   AND WHEN YOU WERE INSIDE THERE CHANGING OUT THE BOARDS, DID

7  YOU NOT TURN ON THE AIR-CONDITIONING?

8  A.   IT'S NOT MY HOME, SO I DON'T FEEL LIKE IT WAS MY

9  RESPONSIBILITY JUST TO STEP IN AND DO THAT.

10  Q.   WAS IT HOT?

11  A.   NOT EXTREMELY HOT, NO, SIR.

12  Q.   DID YOU CHANGE OUT THE LAUAN IN ALL THREE BEDS?

13  A.   YES, SIR.

14  Q.   WHAT ELSE DID YOU CHANGE OUT?

15  A.   THE DINETTE BOARDS.

16  Q.   WHAT WAS THE BRAND OF THE LAUAN THAT WAS BEING USED FOR

17  THOSE PIECES OF THAT TRAILER?

18  A.   I HAVE NO IDEA, SIR.

19  Q.   BUT YOU COULD SMELL THE FORMALDEHYDE COMING OUT OF THOSE

20  PIECES OF WOOD YOU CHANGED OUT?

21  A.   YES, SIR, I COULD.

22  Q.   AND WHAT DID YOU DO WITH THAT WOOD?

23  A.   I THREW IT AWAY.

24  Q.   IS THAT THE ONLY TRAILER THAT YOU CHANGED WOOD OUT IN?

25  A.   TO MY KNOWLEDGE, YES, SIR.

1  Q.   NOW, DID YOU JUST TELL ME THAT YOU DIDN'T HAVE TIME TO CUT

2  IT, SO YOU TOOK THE OSB OUT OF ANOTHER TRAILER?

3  A.   YES, SIR.

4  Q.   TELL ME ABOUT THAT.  I MEAN, IS THAT WHAT YOU DID FOR ALL

5  THOSE MONTHS THAT YOU WERE DOWN THERE?

6  A.   NO.  THAT IS NOT WHAT I DID.  BUT WHEN I WAS CALLED AND

7  ASKED TO HELP OUT OUR CONTRACTOR -- OR FEMA'S CONTRACTOR IN

8  ASSISTING IN REPAIRS OR TEACHING THEM HOW TO FIX AC'S AND THAT

9  KIND OF STUFF, THEN, YES, I DID GO TO THE CUSTOMERS' HOUSES TO

10  SHOW THEM HOW TO DO IT.

11  Q.   HOW MANY TIMES DID YOU SMELL FORMALDEHYDE WHEN YOU WERE IN

12  THOSE HOUSES?

13  A.   ALMOST NONE.  MAINLY, IF I RECALL CORRECTLY, I WAS DOWN

14  THERE TO TRAIN THE CONTRACTOR DOWN THERE BECAUSE THEY WERE HAVING

15  ISSUES WITH VARIOUS ITEMS IN THE UNIT.

16  Q.   WHICH CONTRACTOR?

17  A.   I DON'T RECALL, SIR.

18  Q.   CAN YOU HELP ME UNDERSTAND WHAT SORTS OF THINGS YOU WERE

19  TELLING THEM ABOUT OR WERE PROVIDING EXPERTISE ON?

20  A.   THEY WOULD PLUG THE UNIT IN AND THE AC WOULDN'T WORK AND

21  THEY COULDN'T FIGURE OUT WHY, IS ONE.  THE FURNACE MAY NOT WORK.

22  IN ONE CASE, I REMEMBER THERE WAS A WATER HEATER ISSUE.  AND ALL

23  I DID WAS TEACH THEM HOW TO FIX THEM.

24  Q.   OKAY.  CAN YOU THINK OF ANY OTHER EXAMPLES?

25  A.   AN ESCAPE WINDOW THAT DIDN'T OPEN, JUST THE WALL PANELS,

1  JUST GENERAL STUFF LIKE THAT.

2  Q.   WALL PANELS RELEASING FROM THE WALL?

3  A.   YEAH.  CORRECT, SIR.

4  Q.   OKAY.  HOW OFTEN DID YOU SEE WALL PANELS COMING LOOSE FROM

5  THE WALL?

6  A.   I DON'T RECALL EXACTLY HOW MANY TIMES.  I SAW IT MORE THAN

7  FIVE TIMES, BUT --

8  Q.   IN YOUR EXPERIENCE WORKING FOR FIVE YEARS FOR GULF STREAM,

9  IS THAT A COMMON OCCURRENCE, WHEN SOMEBODY IS USING THEIR

10  TRAILER, FOR THE WALLS TO JUST SEPARATE LIKE THAT?

11  A.   I WOULDN'T SAY IT'S COMMON, BUT IT DOES HAPPEN, YES, SIR.

12  Q.   DO YOU KNOW WHAT WAS CAUSING -- AT LEAST THE FIVE TIMES THAT

13  YOU SAW THAT HAPPEN, DO YOU KNOW WHAT HAD CAUSED IT?

14  A.   NO, SIR.

15  Q.   YOU HELPED THEM FIX IT?

16  A.   YES, SIR.

17  Q.   DO Y'ALL USE STAPLES OR NAILS FOR THAT?

18  A.   WE USED -- WELL, I USED NAILS IN THAT CASE BECAUSE I DIDN'T

19  HAVE AN AIR COMPRESSOR.

20  Q.   OKAY.  USUALLY YOU WOULD USE ONE OF THOSE AIR GUNS?

21  A.   YES, SIR.

22  Q.   OKAY.  BUT SINCE YOU WERE IN THE FIELD, YOU JUST USED NAILS

23  AND A HAMMER?

24  A.   YES, SIR.

25  Q.   OKAY.  AND WERE YOU ABLE TO DETERMINE WHY THE WALL -- BOARD

1   WAS SEPARATING FROM THE WALL?

2   A.   NO, SIR.

3   Q.   DID YOU EVER, WHILE YOU WERE DOWN IN LOUISIANA, PROVIDE

4   EXPERTISE TO THE CONTRACTOR WITH REGARD TO JACKING UP THE TRAILER

5   OR BLOCKING THE TRAILER?

6   A.   NO, SIR.

7   Q.   DO YOU HAVE EXPERTISE ON THAT?

8   A.   NO, SIR.

9   Q.   ALL RIGHT.  I'M GOING TO COME BACK TO ALL THAT, BUT MY

10  QUESTION WAS, IN YOUR LONG EXPERIENCE WITH GULF STREAM, 17 YEARS,

11  YOU'RE NOT SURPRISED TO SMELL FORMALDEHYDE, ARE YOU?

12  A.   NO, SIR.

13  Q.   I MEAN, THAT'S WELL-KNOWN TO YOU THAT YOU SMELL FORMALDEHYDE

14  IN TRAILERS; ISN'T THAT RIGHT?

15  A.   YES, SIR.

16  Q.   WELL, YOU KNOW IT'S IN THE WOOD?

17  A.   I KNOW IT'S IN THE WOOD, YES.

18  Q.   YEAH.  YOU'VE SEEN FRAMES BENT BEFORE, THOUGH, HAVEN'T YOU?

19  A.   I'VE SEEN BENT FRAMES, YES, SIR.

20  Q.   YOU'VE SEEN CONTORTED OR DISTORTED FRAMES?

21  A.   YES, SIR.

22  Q.   HOW OFTEN DO YOU SEE THAT?

23  A.   NOT VERY OFTEN AT ALL, SIR.  MAYBE ONCE A YEAR.  THAT'S JUST

24  A FLAT GUESS.

25  Q.   WHEN THE FOUNDATION OF YOUR HOUSE CRACKS OR SHIFTS, IT

1   CAUSES YOUR DOORS NOT TO CLOSE RIGHT, DOESN'T IT?

2   A.   IT'S SIMILAR, BUT YOUR FRAME STILL HAS TO BE BASED ON AN

3   ADDITIONAL FOUNDATION OF HOW IT'S SET UP.

4   Q.   IT'S GOT TO BE SET UP CORRECTLY.

5   A.   A TWISTED FRAME DOESN'T NECESSARILY MEAN THAT THE DOOR AIN'T

6   GOING TO CLOSE.

7   Q.   THAT'S TRUE.  BUT IT CAN MEAN THAT, CAN'T IT?

8   A.   YES.

9   Q.   IT CAN MEAN THAT THE WINDOWS DON'T CLOSE; RIGHT?

10  A.   YES.

11  Q.   IT CAN MEAN THE WALL COVERINGS OR THE LAUAN POPS OFF THE

12  WALLS?

13  A.   BECAUSE OF A TWISTED FRAME?

14  Q.   YEAH.

15  A.   I DON'T THINK SO, SIR.  THERE IS MORE TO IT.

16  Q.   I REALIZE THAT.  THERE IS MORE TO IT THAN THAT.  IT CAN

17  ALLOW WATER TO GET INTO THE TRAILER, CAN'T IT?

18  A.   NO, SIR.

19  Q.   IT CAN AFFECT THE CAULKINGS, CAN'T IT?

20  A.   NO, SIR.  I DON'T BELIEVE SO, SIR.

21  Q.   YOU DON'T THINK SO?

22  A.   NO, SIR.

23  Q.   WOULD YOU AGREE WITH ME THAT YOU WANT TO AVOID BENDING OR

24  DISTORTING THE FRAME AT ALL COST?

25  A.   I WOULD AGREE WITH THAT, YES, SIR.

1   Q.   THERE ARE THINGS THAT YOU CAN DO WITH REGARD TO JACKING OF

2   THE TRAILER THAT CAN CAUSE THE FRAME TO BEND, DISTORT OR CAUSE

3   THE WOODEN FRAME OF THE TRAILER TO BE DAMAGED; ISN'T THAT RIGHT?

4   A.   YES, SIR.

5   Q.   TELL ME WHAT INFORMATION YOU HAVE OR WHAT GUIDANCE YOU WOULD

6   HAVE GIVEN THESE CONTRACTORS, HAD THEY ASKED, ABOUT PROPER

7   INSTALLATION TO ENSURE THAT YOU'RE NOT BENDING THE FRAME OR

8   AFFECTING THE WOODEN FRAME OF THE TRAILER?

9   A.   I WOULDN'T HAVE GIVEN --

10  Q.   WHY NOT?

11  A.   WHY WOULDN'T I HAVE GIVEN THEM ANY INFORMATION?

12  Q.   YEAH.

13  A.   EVEN IF THEY WOULD HAVE ASKED?

14  Q.   UH-HUH (AFFIRMATIVE RESPONSE).

15  A.   BECAUSE THAT'S NOT WHAT I DO FOR A LIVING.  I DON'T INSTALL

16  TRAILERS FOR A LIVING.

17  Q.   OKAY.  YOU WOULD EXPECT THEM TO HAVE THAT EXPERTISE?

18  A.   YES, SIR.

19  Q.   BUT YOU REALIZE THAT JACKING AND BLOCKING THE TRAILERS,

20  SOMEBODY HAS TO LOOK AT THAT ISSUE SO AS NOT TO DAMAGE THE

21  TRAILER?

22  A.   I WOULD CERTAINLY THINK SO, YES, SIR.

23  Q.   MY JOB IS ONLY TO PROVIDE TECHNICAL EXPERTISE WITH REGARD TO

24  THE SYSTEMS IN THE TRAILER?

25  A.   YES, SIR.

1   Q.   DO YOU REMEMBER SMELLING FORMALDEHYDE OR ANY ISSUES WITH

2   FORMALDEHYDE AT THE STAGING AREA?

3   A.   NO, SIR, I DON'T REMEMBER IT.

4   Q.   OKAY.  IS IT FAIR TO SAY THAT EITHER YOU OR THE TWO GUYS

5   WORKING WITH YOU WENT THROUGH EVERY SINGLE ONE AT THE BATON ROUGE

6   STAGING AREA?

7   A.   IT'S FAIR TO SAY THAT EVERYBODY I HAD WORKING THERE, WE WENT

8   THROUGH EVERY UNIT THAT CAME THROUGH BATON ROUGE WHILE WE WERE

9   THERE, YES.

10  Q.   WAS THERE EVER A TIME WHEN YOU WOULD GO INTO A UNIT THAT THE

11  SMELL WAS JUST SO BAD THAT YOU HAD TO LEAVE IT?

12  A.   NO, SIR.

13  Q.   OKAY.  DID YOU EVER HAVE TO WEAR A MASK OR ANYTHING TO COVER

14  YOUR FACE WHEN YOU WENT IN THE UNITS?

15  A.   NO, SIR.

16  Q.   OKAY.  WERE YOU DOING MOST OF YOUR INSPECTIONS IN THE EARLY

17  MORNING HOURS OF THE DAY?

18  A.   TWENTY-FOUR HOURS A DAY, SIR.

19  Q.   OKAY.  DID YOU EVER DO THESE INSPECTIONS WHEN IT WAS REALLY,

20  REALLY HOT?

21  A.   YES, SIR.

22  Q.   WHEN WAS THAT?  IT SOUNDS LIKE YOU WERE DOING IT, YOU TOLD

23  ME -- IN WHAT TIME FRAME?

24  A.   WELL, I WAS IN BATON ROUGE OFF AND ON FOR SIX MONTHS.

25  APPROXIMATELY SIX MONTHS.

1   Q.    OKAY.  WERE YOU IN BATON ROUGE DURING THE SUMMERTIME?

2   A.    IN JUNE.  I WAS THERE IN JUNE.

3   Q.    OKAY.  WERE YOU INSPECTING TRAILERS LIKE YOU JUST TOLD ME

4   ABOUT?

5   A.    YES, SIR.

6   Q.    SO THEY WERE STILL BEING STAGED AND DISTRIBUTED IN JUNE?

7   A.    THE BEST I REMEMBER, YES, SIR.

8   Q.    AND YOU WERE GOING INSIDE OF THEM?

9   A.    YES, SIR.

10  Q.    AND YOU'RE TELLING ME THAT ALTHOUGH YOU SMELLED

11  FORMALDEHYDE, IT WAS NEVER SO BAD THAT YOU HAD TO LEAVE THE

12  TRAILER?

13  A.    NO, SIR.

14  Q.    OKAY.  BEFORE YOU WOULD GO IN, WOULD YOU OPEN THE WINDOWS OR

15  OPEN THE DOOR?

16  A.    NO, SIR.

17  Q.    OR TRY TO AIR IT OUT IN SOME WAY?

18  A.    NO, SIR.

19  Q.    OKAY.  WAS THERE EVER -- WERE THERE EVER ANY COMPLAINTS THAT

20  ANYONE ADDRESSED TO YOU AT THE BATON ROUGE STAGING AREA ABOUT

21  FORMALDEHYDE?

22  A.    NO, SIR.

23  Q.    -- WENT INTO THE TRAILERS?

24  A.    NO, THEY WERE NOT GOING INTO THE TRAILER.  THEY WERE GOING

25  THERE TO HOOK UP TO THE UNIT AND TAKE IT AWAY, OR DROP IT OFF.

1   Q.   DO YOU REMEMBER THERE BEING ANY FORMALDEHYDE TESTING AT THE

2   BATON ROUGE AREA?

3   A.   YES, SIR.

4   Q.   TELL ME ABOUT THAT.

5   A.   WE BROUGHT THIS MACHINE DOWN, AND -- AND WE WENT THROUGH

6   SOME OF THE UNITS TO SEE WHATEVER THE READINGS WERE.   AND I WAS

7   TOLD HOW TO READ THEM, AND I NEVER UNDERSTOOD IT COMPLETELY.

8   BUT --

9   Q.   WHEN WAS THIS?

10  A.   I DON'T REMEMBER THE MONTH OF THAT, SIR.

11  Q.   WAS THAT WHEN SCOTT WAS WITH YOU?

12  A.   YES, SIR.   HE COME OUT THERE AND HE ASKED ME, HE SAID, "COME

13  WITH ME AND GO THROUGH THESE UNITS."   AND WE WENT.

14  Q.   DID YOU AIR THE TRAILER OUT BEFORE THE TEST?

15  A.   SOME OF THE TESTS, YES.

16  Q.   TELL ME ABOUT THAT.

17  A.   WE OPENED IT UP AND WAITED -- I DON'T REMEMBER THE TIME

18  PERIOD WE WERE WAITING.   I DON'T REMEMBER IF IT WAS AN HOUR OR

19  30 MINUTES, I DON'T REMEMBER WHAT THE WAIT PERIOD WAS.   AND THEN

20  WE WENT IN AND TOOK A READING.

21  Q.   OKAY.   DID YOU TAKE A READING BEFORE YOU AIRED IT OUT?

22  A.   AT TIMES, YES.

23  Q.   OKAY.   BUT WHEN YOU WOULD AIR IT OUT, WOULD YOU TURN ON THE

24  FANS AND THE AIR-CONDITIONING?

25  A.   AT TIMES, YES.   NOT EVERY TEST WAS DONE THE SAME WAY.

1    Q.    OKAY.  HE WAS TRYING TO FIGURE OUT WHAT WOULD AFFECT THE

2    LEVELS?

3    A.    I DON'T KNOW WHAT HE WAS FIGURING OUT.  I WAS JUST FOLLOWING

4    DIRECTIONS.

5    Q.    OKAY.  WAS HE THERE WITH YOU WHEN THIS WAS HAPPENING?

6    A.    SOME OF THE TIME, YES, SIR.

7    Q.    AND HOW LONG DID THIS TESTING OF THESE UNOCCUPIED UNITS

8    LAST?  IN OTHER WORDS, HOW MANY DAYS DID IT GO ON?

9    A.    I DON'T KNOW FOR SURE.  I BELIEVE THREE DAYS, BUT I DON'T

10   KNOW FOR SURE.

11   Q.    OKAY.  AND DO YOU REMEMBER WHAT TIME OF DAY YOU WERE DOING

12   THIS?

13   A.    FROM SUNUP TO SUNDOWN BECAUSE WE DID TESTING ON THE UNITS

14   ALL DAY LONG.

15   Q.    BUT YOU DID THIS TEST PURSUANT TO THE PROTOCOL GIVEN TO YOU

16   BY SCOTT?

17   A.    YES, SIR.

18   Q.    AND YOU RECORDED EACH OF YOUR READINGS?

19   A.    YES, SIR.

20   Q.    OKAY.  AND YOU SPOKE TO SCOTT AFTER YOU FINISHED THIS

21   PROJECT, DIDN'T YOU?

22   A.    YES, SIR.  I JUST -- PERSONALLY, I THOUGHT IT WAS A WASTE OF

23   MY TIME.

24   Q.    WHY IS THAT?

25   A.    BECAUSE THE NUMBERS, TO ME, DIDN'T MAKE SENSE.

1   Q.    OKAY.  HELP ME UNDERSTAND WHAT THAT MEANS, MR. KEEL.

2   A.    YOU'RE ASKING WHAT I REMEMBER FROM BACK THEN.  I DON'T KNOW

3   FOR SURE WHAT ALL THE NUMBERS MEANT, WHAT EACH CATEGORY WAS.  I

4   MEAN, I CAN READ IT AND FIGURE IT OUT, BUT TO ME, I REMEMBER

5   THINKING THAT WHY ARE WE DOING THIS?  BUT THAT'S WHAT I REMEMBER.

6   Q.    YOU WERE THINKING THAT THIS WAS A COMPLETE WASTE OF TIME,

7   YOU SAID?

8   A.    IN MY OPINION, IT WAS A COMPLETE WASTE OF MY TIME WHEN I

9   COULD BE FIXING UNITS INSTEAD OF DOING THIS.

10  Q.    OKAY.  SO YOU DIDN'T AGREE WITH DOING THIS TESTING?

11  A.    NO, SIR, I DIDN'T.

12  Q.    I MEAN, BOTTOM LINE IS, YOU'RE SAYING, "LOOK, WE'RE TESTING

13  FOR SOMETHING WE ALREADY KNOW TO BE THE CASE"; RIGHT?

14  A.    NO, THAT HAD NOTHING TO DO WITH WHAT I WAS THINKING.

15  Q.    HELP ME UNDERSTAND WHY YOU THOUGHT IT WAS A WASTE OF TIME.

16  A.    I WOULD -- I'D BE IN THE KITCHEN AT 85 DEGREES, 54 PERCENT

17  HUMIDITY, AND HAVE SOME KIND OF READING LIKE -- IF I CAN REMEMBER

18  WHAT THE READINGS WERE -- .04.  AND THEN AN HOUR LATER, I GOT

19  EXACTLY THE SAME HUMIDITY AND TEMPERATURE AND I'D HAVE A .000.  I

20  NEVER UNDERSTOOD WHAT THE PURPOSE OF ALL THIS WAS BECAUSE THIS

21  MACHINE, I FELT LIKE I WAS USING, JUST --

22  Q.    YOU DIDN'T THINK IT WAS ACCURATE?

23  A.    I DIDN'T KNOW WHAT TO THINK ABOUT IT.  I JUST DIDN'T

24  THINK -- TO ME, TWO AND TWO WASN'T MAKING FOUR WITH THE NUMBERS.

25  Q.    AND YOU DIDN'T REALIZE THAT OFF-GASSING OF FORMALDEHYDE CAN

1  CHANGE AND IT HAS TO DO WITH VENTILATION AND THAT SORT OF THING?

2  A.   NO, I DIDN'T UNDERSTAND FORMALDEHYDE, AND I STILL DON'T

3  UNDERSTAND IT COMPLETELY, BUT --

4  Q.   YOU NEVER DID ANY WORK IN MISSISSIPPI ON THIS GULF STREAM

5  ORDER?

6  A.   PURVIS.  PURVIS, MISSISSIPPI?

7  Q.   YOU WENT TO --

8  A.   WAS THAT MISSISSIPPI?

9  Q.   YEAH, THAT WAS A BIG STAGING AREA.

10  A.   YEAH, I WAS --

11  Q.   DID YOU GO OVER THERE?

12  A.   -- I WAS THERE FOR A SHORT PERIOD OF TIME.

13  Q.   DO YOU REMEMBER THERE BEING ANY COMPLAINTS OF PEOPLE OF EYES

14  BURNING, THAT SORT OF THING?

15  A.   NO, SIR.

16  Q.   YOU'VE BEEN IN A LOT OF DIFFERENT POSITIONS AT GULF STREAM.

17  A.   YES, SIR.

18  Q.   ARE YOU FAMILIAR WITH THE COMPONENT WOOD PRODUCTS THAT GO

19  INTO THE TRAILER?

20  A.   YES, SIR.

21  Q.   OKAY.  DO YOU KNOW WHAT LFE MEANS, THE DESIGNATION LFE?

22  A.   I BELIEVE IT HAS SOMETHING TO DO WITH WHAT WE'RE CALLING F4

23  RATING, THAT ALL MATERIALS NOW MUST HAVE AN F4 RATING FOR US TO

24  USE IT.

25  Q.   F4 MEANS WHAT?

1   A.   I DON'T KNOW.   I WAS JUST TOLD IT HAD TO HAVE F4 ON THERE TO

2   USE IT.

3   Q.   IS THAT RECENTLY?

4   A.   ABOUT A YEAR AGO, YEAR AND A HALF AGO.

5   Q.   HOW ABOUT BEFORE THAT, WOULD YOU HAVE ANY -- WAS THERE ANY

6   POLICY THAT YOU KNEW ABOUT AS FAR AS FORMALDEHYDE?

7   A.   NO, SIR.

8   Q.   YOU NEVER KNEW THAT THERE WAS ANY POLICY THAT THE COMPANY

9   WOULD USE ONLY LOW-FORMALDEHYDE-EMITTING PRODUCTS?

10  A.   I WAS NOT AWARE OF IT, SIR.

11  Q.   OKAY.   YOU'VE NEVER EVEN HEARD THAT BEFORE, HAVE YOU?

12  A.   NO, SIR.

13  Q.   OKAY.   YOU CERTAINLY NEVER SAW IT IN WRITING?

14  A.   NO, SIR.

15  Q.   OKAY.   AND YOU'VE BEEN SERVICE MANAGER, PLANT

16  SUPERINTENDENT, FOREMAN, YOU'VE BEEN IN RESEARCH AND DEVELOPMENT?

17  A.   YES, SIR.

18  Q.   YOU FILLED PRETTY MUCH EVERY LEADERSHIP ROLE WITHIN A

19  FACTORY?

20  A.   YES, SIR.

21  Q.   AND YOU NEVER, IN YOUR 17 YEARS OF WORKING AT GULF STREAM,

22  UNTIL LAST YEAR, EVER KNEW ABOUT ANY POLICY THAT REQUIRED THE USE

23  OF LOW-FORMALDEHYDE-EMITTING MATERIALS; ISN'T THAT TRUE?

24  A.   YES, SIR.

25  Q.   AND PLANT 57 BUILT FEMA SPEC TRAILERS; DID IT NOT?

1  A.   YES, SIR.

2  Q.   OKAY.  WHAT COMPLAINTS DID YOU GET AS PLANT SUPERINTENDENT

3  ABOUT PEOPLE HAVING PROBLEMS WITH EYES BURNING?

4  A.   NONE.

5  Q.   YOU NEVER GOT A COMPLAINT?

6  A.   NEVER GOT A COMPLAINT, SIR, THAT I RECALL.

7  Q.   OKAY.  IF YOU HAD GOTTEN A COMPLAINT, WOULD YOU WRITE IT

8  DOWN SOMEWHERE?

9  A.   I'VE RECEIVED NO COMPLAINTS FROM ANYBODY ABOUT FORMALDEHYDE.

10  NOBODY HAS EVER SAID A WORD TO ME ABOUT IT.

11  Q.   NOBODY IN THE FACTORY?

12  A.   AS A PLANT MANAGER, NO, SIR.

13  Q.   OKAY.  HOW ABOUT NOT AS A PLANT MANAGER, JUST --

14  A.   THE ONLY ISSUES I'VE EVER HEARD ABOUT FORMALDEHYDE HAPPENED

15  TO BE AFTER THE NEWS RELEASE OF IT.

16  Q.   OKAY.

17  A.   BUT PRIOR TO THAT, I DON'T RECALL ANYBODY EVER SAYING A WORD

18  TO ME ABOUT IT.

19  Q.   YOUR FOLKS WERE PUTTING WHATEVER WOOD WAS AVAILABLE INTO THE

20  TRAILERS?

21  A.   WHATEVER MATERIALS WERE PURCHASED AND DELIVERED TO PLANT 57

22  FOR THE PRODUCTION OF TRAILERS WAS USED.

23  Q.   AND NOBODY CHECKED TO SEE WHAT -- IF THAT WAS LOW

24  FORMALDEHYDE WOOD OR NOT, DID THEY?

25  A.   ON THE PLANT LEVEL, NO, SIR.  I DON'T KNOW --

1   Q.   OKAY.  YEAH.  I UNDERSTAND.  I'M JUST TALKING ABOUT FROM

2   YOUR LEVEL ON DOWN.

3   A.   NO, WE DID NOT.

4   Q.   OKAY.  NO ONE EVER TOLD YOU TO DO THAT EITHER, DID THEY?

5   A.   THAT'S CORRECT, SIR.

6   Q.   HAVE YOU EVER IN YOUR HISTORY AT GULF STREAM WORKED WITH

7   WOOD, WHETHER AS A SUPERINTENDENT OR A FOREMAN OR A GROUP LEADER,

8   WHERE YOU THOUGHT, MAN, THIS STUFF JUST HAS SO MUCH FORMALDEHYDE

9   IN IT, WE SHOULDN'T USE IT?

10  A.   NO, SIR.

11  Q.   IS IT FAIR TO SAY THAT IT'S YOUR BELIEF THAT REGARDLESS OF

12  HOW IT SMELLS AT THE TIME YOU'RE USING IT THAT IT WILL

13  PROBABLY -- THAT STUFF WILL GO AWAY OVER TIME?

14  A.   TO BE TOTALLY HONEST WITH YOU, SIR, DURING THE PRODUCTION

15  PHASE OF THESE UNITS, I NEVER HAVE SMELLED FORMALDEHYDE.

16  Q.   NEVER SMELLED IT?

17  A.   NEVER SMELLED IT.  DURING THE PRODUCTION PHASES, IN THE

18  PLANT WHILE YOU'RE PRODUCING THE WALLS, WHILE YOU ASSEMBLE IT, I

19  HAVE NEVER NOTICED IT.

20  Q.   NEVER NOTICED IT.  YOU'VE NOTICED IT OTHER TIMES BUT NOT IN

21  THE PRODUCTION PHASE?

22  A.   ONLY IN THE UNITS THAT ARE OUTSIDE, BUILT, PUT OUTSIDE.

23  Q.   OKAY.  SO THE TIMES YOU'VE NOTICED IT IS ONCE THE UNIT IS

24  FULLY BUILT?

25  A.   YES, SIR.

1   Q.   AND WHEN YOU'RE GOING IN IT TO INSPECT IT AND THAT SORT OF

2   THING?

3   A.   YES, SIR.

4   Q.   BUT YOU SAID, YOU KNOW, TONY, OR SIR, OR WHATEVER YOU'VE

5   BEEN CALLING ME, YOU SAID, HONESTLY, YOU NEVER REALLY SMELLED

6   FORMALDEHYDE DURING THE PRODUCTION PHASE OF THE TRAILER, RIGHT?

7   A.   YES, SIR.

8   Q.   INSTEAD, YOU SMELL IT AT THE END DURING THE INSPECTION

9   PHASE, RIGHT?

10   A.   YES, SIR.

11   Q.   OKAY.  AND YOU'VE KNOWN THAT FOR MANY, MANY YEARS, HAVEN'T

12   YOU?

13   A.   YES, SIR.

14   Q.   JUST FOR BACKGROUND INFORMATION, WHAT TYPE OF EDUCATION DO

15   YOU HAVE?  WHAT'S YOUR HIGHEST LEVEL OF EDUCATION?

16   A.   I'VE GOT SOME COLLEGE.

17   Q.   WHERE DID YOU GET YOUR SOME COLLEGE?

18   A.   TEXAS SOMETHING OR OTHER IN GERMANY AND NATCHITOCHES IN

19   LOUISIANA, NATCHITOCHES -- WHAT WAS THE NAME OF THAT COLLEGE?

20   NORTHWESTERN --

21   Q.   OKAY.

22   A.   -- IN NATCHITOCHES.

23   Q.   WHAT -- SOME PEOPLE HAVE DESCRIBED IT AS SIMILAR TO LIKE A

24   NEW CAR SMELL.  ARE YOU FAMILIAR WITH THAT, WHAT A NEW CAR SMELLS

25   LIKE?

1   A.   YES, SIR.

2   Q.   WAS IT SIMILAR TO THAT?

3   A.   I WOULD SAY IT'S VERY SIMILAR TO IT, YES.

4   Q.   LET'S TALK ABOUT ANY CONTACTS YOU HAD WITH THE CONTRACTORS

5   DURING YOUR TIME PERIOD DOWN IN SOUTH LOUISIANA AND MISSISSIPPI

6   RUNNING FROM, WHAT, ABOUT NOVEMBER, DECEMBER OF '05 THROUGH THE

7   SUMMER OF '06?  IS THAT THE TIME FRAME?

8   A.   YES, SIR.

9   Q.   OKAY.  WHEN YOU WENT DOWN TO WORK ON THOSE 31 TRAILERS DOWN

10  SOUTH NEAR THE GULF, WERE YOU HAVING ANY CONTACT WITH FOLKS THAT

11  YOU THOUGHT WERE FLUOR PEOPLE?

12  A.   MY MEMORY OF THAT, I DON'T KNOW WHAT CONTRACTOR THEY WERE

13  FROM.  I KNOW I DEALT WITH PEOPLE FROM FLUOR, BUT I DON'T

14  REMEMBER DISTINCTLY BEING THAT SITE.  IT COULD HAVE BEEN ONE OF

15  THE OTHER SITES I WAS AT.

16          I DON'T -- THERE WAS -- THERE WAS THREE OR FOUR

17  DIFFERENT CONTRACTORS THAT -- OR SUBCONTRACTORS OR WHATEVER THEIR

18  TITLE WAS THAT I DID DEAL WITH.  FLUOR WAS A BIG NAME DOWN THERE,

19  BUT TO SAY THAT IT WAS FLUOR PEOPLE THAT WAS AT THAT SITE, I

20  CAN'T DO IT.

21  Q.   OKAY.

22  A.   SO --

23  Q.   AND I DON'T WANT TO SPEND A WHOLE LOT OF TIME ON IT, BUT

24  JUST CAN YOU GIVE US WHAT YOU REMEMBER OF WHATEVER CONTRACTOR

25  THAT WAS, WHAT WERE THEY -- WHAT WERE YOUR INTERACTIONS WITH

1  THEM?  WHAT KIND OF HELP WERE THEY ASKING FOR?

2  A.   I THINK I GAVE AN EXAMPLE OF UNIT NUMBER 12 -- I DON'T

3  REMEMBER FOR SURE -- WHICH IS NOTHING MORE THAN LOT 12, THE AC

4  DIDN'T WORK IN IT, OKAY.  AND -- I MEAN, AND THERE WAS A WATER

5  HEATER ISSUE.  BUT, ONCE AGAIN, I THINK IT WAS THE 2-AMP FUSE

6  ON --

7  Q.   BUT IT DIDN'T HAVE ANYTHING TO DO WITH JACKING THE TRAILERS

8  OR HOW TO INSTALL THEM OR ANYTHING LIKE THAT?

9  A.   THE ISSUES THAT I WAS THERE FOR, NO, SIR.

10  Q.   YEAH.  OKAY.  DO YOU RECALL WHETHER THE TRAILERS THERE AT

11  THAT SITE WITH THE 31 TRAILERS DOWN SOUTH WERE SITTING ON PIERS

12  OR BLOCKS?  I DON'T KNOW WHAT YOU WANT TO CALL THEM.

13  A.   THEY WERE SITTING ON BLOCKS, BUT I DON'T RECALL HOW MANY.

14  Q.   SURE.  THAT WASN'T CLEAR.  THIS TIME YOU WENT DOWN SOUTH

15  NEAR THE GULF TO LOOK AT THOSE 31 TRAILERS, AND YOU WERE -- I'M

16  GOING TO CALL IT TROUBLESHOOTING.  IS THAT A FAIR --

17  A.   THAT'S A FAIR.

18  Q.   OKAY.  WHEN YOU WERE TROUBLESHOOTING WITH THIS -- WHATEVER

19  CONTRACTOR THAT WAS DOWN THERE, THEY NEVER ASKED YOU ABOUT THESE

20  TRAILERS, THEY NEVER HAD ONE OF THESE PROBLEMS:  THE DOOR WON'T

21  CLOSE RIGHT?

22  A.   NO, I DON'T RECALL THAT ONE.

23  Q.   THE WINDOWS WON'T CLOSE?

24  A.   I DO HAVE THAT -- DID HAVE THAT ONE THERE.

25  Q.   OKAY.  WELL, TELL ME ABOUT THAT.  WHAT DO YOU REMEMBER?

1   A.   IT WAS JUST THE EGRESS WINDOW.  IT WAS THE HEAT.

2   Q.   WHICH ONE IS THE EGRESS WINDOW?

3   A.   THE ONE THAT OPENS ALL THE WAY UP THAT YOU CAN CRAWL OUT IN

4   CASE OF AN EMERGENCY.  IT'S BEHIND THE SOFA.

5   Q.   OKAY.  ALL RIGHT.

6   A.   OKAY.  THAT ONE WOULDN'T OPEN, AND THEY WERE HAVING PROBLEMS

7   WITH IT.  AND WHAT IT WAS WAS THE HEAT HAD MELTED THE GLUE ON

8   THIS GASKET AND KIND OF STUCK THE WINDOW.  YOU GIVE IT A FIRM POP

9   ON THE SIDE, IT OPENS RIGHT UP.  YOU PULL IT IN, YOU MOVE IT IN

10  AND OUT TWO OR THREE TIMES, CHECK YOUR SEAL, AND YOU LOCK IT BACK

11  IN PLACE.

12  Q.   BUT IT WASN'T THAT THE WINDOW WOULDN'T CLOSE AND IT WAS

13  LETTING WATER IN?

14  A.   NO.

15  Q.   THAT WASN'T THE PROBLEM?

16  A.   NO, THAT -- TO MY RECOLLECTION, THERE WAS NO LEAK THERE.

17  Q.   ALL RIGHT.  AND DUCTS COMING UNSEALED?  I GUESS --

18  A.   I HAD NEVER HEARD THAT UNTIL IN HERE.

19  Q.   OKAY.  PANELS POPPING OFF THE WALL, YOU NEVER HEARD THAT ON

20  THAT TRIP DOWN TO THOSE 31 TRAILERS, DID YOU?

21  A.   I DON'T RECALL THE PANEL POPPING DOWN THERE AT THAT -- AT

22  THAT JOB.

23  Q.   OKAY.  AND I THINK THIS IS -- I THINK YOU MADE YOURSELF

24  CLEAR ON THIS, BUT I JUST WANT TO UNDERSTAND.  YOU KNOW THERE

25  WERE VARIOUS CONTRACTORS DOWN THERE WORKING FOR FEMA.  FLUOR WAS

1  ONE OF THEM.  THERE WERE OTHERS, RIGHT?

2  A.   YES, SIR.

3  Q.   AND TO BUILD THE BOX, YOU'RE BASICALLY BUILDING WALLS --

4  FLOOR, CONNECT THE WALLS, CONNECT THE CEILING, AND THEN YOU START

5  FILLING IN WITH THE SIDE WALL PANELINGS AND THE CEILING AND THE

6  FLOOR MATERIAL; IS THAT BASICALLY RIGHT?

7  A.   BASICALLY, SIR, YES.

8  Q.   GENERALLY.  BUT THERE IS A WOODEN FRAME STRUCTURE, IS THERE

9  NOT?

10 A.   YES, SIR.

11 Q.   OKAY.  AND YOU SAID THAT'S MADE OUT OF PINE?

12 A.   YES, SIR.

13 Q.   WELL, THE STRONGEST PART?  I'M ASSUMING THE CORNERS AND

14 THE --

15 A.   YOUR SIDE WALLS AND YOUR FRONT AND REAR WALLS ARE BUILT OUT

16 OF TWO BY TWO PINE, YES.

17 Q.   TWO BY TWO?

18 A.   YES, SIR.

19 Q.   YEAH.  WALLS CONNECTED TO THE FLOOR WHICH ARE THEN CONNECTED

20 TO THE CEILING?

21 A.   OKAY, SIR.

22 Q.   RIGHT?  IT'S MADE IT INTO A -- YOU CALLED IT THE BOX OF THE

23 TRAILER?

24 A.   YES, SIR.

25 Q.   CAN WE CALL IT THAT?  CAN YOU DISTORT THE BOX OF A TRAILER?

1   A.    YES, SIR.

2   Q.    THERE ARE THINGS THAT YOU CAN DO IMPROPERLY IN INSTALLATION

3   TO DISTORT THE BOX OF THE TRAILER?

4   A.    YES, SIR.

5   Q.    THE MAINTENANCE OF THE TRAILER IS VERY IMPORTANT?

6   A.    YES.

7   Q.    MAINTENANCE OF THE TRAILER PREVENTS WATER INTRUSION?

8   A.    YES.

9   Q.    PREVENTS LEAKS?

10  A.    YES, SIR.

11  Q.    I JUST SHOWED YOU SOME PICTURES OF MS. ALEXANDER'S TRAILER.

12  I'M GOING TO TELL YOU THAT TRAILER WAS MANUFACTURED AT PLANT 57

13  IN DECEMBER OF 2004 TO FEMA SPECS.  COULD YOU TELL ME IN YOUR

14  LONG EXPERIENCE AS A SERVICE MANAGER AND WORKING ON

15  TROUBLESHOOTING THESE TRAILERS, WHAT KINDS OF ISSUES WOULD CAUSE

16  WALL PANELING TO BREAK OFF LIKE THAT?  THAT'S WHAT I WAS TRYING

17  TO ASK YOU, OR MAYBE THE DISTRIBUTION POINT.  BUT WHAT YOU'RE

18  TELLING ME IS, LOOK, MAN, MAINTENANCE IS REAL IMPORTANT?

19  A.    YES.

20  Q.    THIS LOOKS LIKE A POTENTIAL WATER LEAK, AND I WOULD NEED TO

21  KNOW THE HISTORY OF THIS TRAILER?

22  A.    CORRECT, SIR.

23  Q.    BUT WHAT YOU CERTAINLY CAN TELL ME IS THE PROPER FIX IS NOT

24  TO PUT DUCT TAPE ON THE WALL?

25  A.    WELL, I WOULD HAVE NAILED THE PANEL BACK WITH -- BUT --

1  Q.   YOU CERTAINLY WOULDN'T HAVE TOLD -- IF YOU WERE CALLED OUT

2  TO ADVISE AS A TECHNICIAN ON THIS TRAILER, YOU WOULDN'T HAVE TOLD

3  THIS LADY, LOOK, JUST GET SOME DUCT TAPE AND TAPE IT BACK UP,

4  WOULD YOU?

5  A.   NO, SIR.

6  Q.   BECAUSE THAT'S JUST FLAT OUT STUPID, ISN'T IT?

7  A.   IN MY OPINION, YES, SIR.

8  Q.   WHAT I'M TRYING TO FIGURE OUT IS, IN YOUR INTERACTIONS, AND

9  I KNOW THERE WERE LIMITED INTERACTIONS WITH THESE FOLKS, WOULD

10 YOU AGREE WITH ME THAT IT APPEARED TO YOU THAT THEY HAD NOT HAD

11 SOME OF THE BASIC TRAINING WITH REGARD TO MAINTAINING A TRAILER?

12 A.   I WOULD AGREE WITH THAT, YES, SIR.

13 Q.   OKAY.  THAT YOU WOULD HAVE TO INSTRUCT THEM ON SOME VERY

14 BASIC STUFF THAT YOU KNOW BECAUSE OF YOUR MANY YEARS IN THE

15 INDUSTRY?

16 A.   YES, SIR.

17 Q.   AND IT APPEARED TO YOU, JUST IN YOUR INTERACTIONS WITH THEM,

18 FROM YOUR PERSPECTIVE, THAT THEY HAD NOT BEEN TRAINED?

19 A.   YES, SIR.

20 Q.   DID ANY OF THOSE CREW MEMBERS ON THE CREWS EVER COMPLAIN OF

21 EYES BURNING OR ANY ISSUES LIKE THAT?

22 A.   NO, SIR.

23 Q.   OKAY.  DID YOU AND THE CREWS EVER TALK ABOUT THIS

24 FORMALDEHYDE ISSUE?

25 A.   NOT UNTIL IT CAME UP.

1   Q.   AND THAT WAS IN MARCH?

2   A.   I BELIEVE SO.

3   Q.   NOW, YOU TOLD ME EARLIER THAT IT WAS JANUARY '06 WHEN YOU

4   CHANGED OUT THAT WOOD?

5   A.   I ALSO TOLD YOU I WASN'T SURE.

6   Q.   OKAY.

7   A.   I REMEMBER DOING IT.  I DON'T REMEMBER FOR SURE WHEN IT WAS.

8   Q.   OKAY.  COULD IT HAVE BEEN MARCH?

9   A.   IT COULD HAVE BEEN.

10  Q.   BECAUSE, SEE, I HAVE -- I HAVE THE COMPLAINT FROM

11  MR. BREAUX.  YOU KNOW, I'M TRYING TO GIVE YOU AN OPPORTUNITY TO

12  TELL ME WHEN YOU THINK IT WAS.  PREVIOUSLY YOU SAID JANUARY,

13  FEBRUARY, BUT I KNOW THAT THE COMPLAINT FROM MR. BREAUX CAME IN

14  IN MARCH.

15  A.   OKAY.

16  Q.   SO I'M ASKING YOU NOW, BECAUSE I KNOW YOU'RE NOT A LIAR,

17  COULD IT HAVE BEEN MARCH?

18  A.   IT COULD HAVE BEEN.  I DON'T RECALL IT BEING IN MARCH OR

19  APRIL.  I SEEM TO RECALL JANUARY, FEBRUARY TIME FRAME.  I --

20  Q.   AND YOU ALSO SAID ONCE YOU DID THAT, REPLACED ALL THAT WOOD,

21  THAT MR. BREAUX SEEMED HAPPY?

22  A.   YES, SIR.

23  Q.   DO YOU REMEMBER THE COMPANY CALLED ADORN?

24  A.   ADORN, IF I'M NOT MISTAKEN, IS A PANELING COMPANY.

25  Q.   YEAH, THAT'S WHAT I'M TALKING ABOUT.

1    A.    OKAY.

2    Q.    DID THEY PROVIDE PANELING PRODUCTS?

3    A.    I CAN'T SIT HERE AND TELL YOU THAT AT THAT TIME THAT'S WHERE

4    WE GOT THEM.

5    Q.    OKAY.

6    A.    I DON'T REMEMBER.

7    Q.    YOU DON'T REMEMBER.  BUT YOU DO KNOW THAT NONE OF THE WOOD

8    THAT YOU WERE USING, WHETHER IT BE -- ANY OF THE WOOD PRODUCTS

9    HAD ANY KIND OF STAMPS ON IT, OR DID IT, DURING THAT TIME FRAME?

10   A.    DURING THAT TIME FRAME, I DON'T KNOW, SIR.

11   Q.    YOU DON'T REMEMBER SEEING ANY LE OR LFE ON ANY OF THE WOOD

12   OR HUD CERTIFIED?

13   A.    OH, I SAW A LOT OF HUD CERTIFIED STUFF, BUT I DON'T KNOW IT

14   WAS DURING THAT TIME.

15   Q.    JUST A COUPLE QUICK QUESTIONS.  I BELIEVE YOU SAID IN THE

16   FIRST BOUT OF QUESTIONING FROM PLAINTIFF'S COUNSEL HERE, YOU SAID

17   YOU HAD NEVER SMELLED FORMALDEHYDE DURING THE PRODUCTION PROCESS

18   IN THE PLANT; IS THAT RIGHT?

19   A.    YES, SIR.

20   Q.    IT'S HAULED OFF-ROAD INTO SOME RENTED FIELD IN LOTTIE,

21   LOUISIANA, WHERE FEMA IS KEEPING THESE THINGS AND, TO MY

22   KNOWLEDGE, NOT MAINTAINED FROM THE SPRING OF '08 UNTIL THE

23   SPRING, SUMMER OF '09.  AND THAT PRETTY PICTURE MR. BUZBEE SHOWED

24   YOU RIGHT THERE, SHEA 8, THAT WAS TAKEN IN APRIL OF '09 OR MAY OF

25   '09, JUST A FEW WEEKS AGO.

1          NOW, WITH ALL YOUR EXPERIENCE, AS MR. BUZBEE PUTS IT,

2   IN MAINTAINING TRAILERS AND THE IMPORTANCE OF MAINTENANCE OF

3   TRAILERS, YOU LOOKING AT THAT PICTURE THERE, CAN YOU TELL ME WHEN

4   AND HOW THAT PANEL POPPED UP?

5   A.   NO, SIR, I CANNOT.

6   Q.   DO YOU THINK ANYBODY COULD?

7   A.   NO, SIR, I DO NOT.

8   Q.   BURL, REGARDLESS OF WHERE THE TRAILER WAS OR WHAT HAD BEEN

9   DONE TO THE TRAILER FOR HOWEVER MANY YEARS SINCE IT WAS

10  MANUFACTURED, AT THE TIME THAT IT WAS INSTALLED, BEFORE SOMEONE

11  TOOK RESIDENCE, IT SHOULD HAVE BEEN PUT INTO SUCH A WAY THAT IT

12  DIDN'T HAVE LEAKS, DIDN'T HAVE WALLS COMING OFF, DIDN'T HAVE

13  DOORS NOT CLOSING PROPERLY; ISN'T THAT RIGHT?

14  A.   YES, SIR.

15          MR. BUZBEE:  THAT CONCLUDES THE SUBMISSION, YOUR HONOR.

16          THE COURT:  IT'S ABOUT QUARTER TO TEN.  DO WE HAVE A

17  VERY, VERY BRIEF WITNESS WE CAN PUT ON RIGHT NOW?

18          MR. BUZBEE:  OUR NEXT WITNESS IS JEFF ZUMBRUN,

19  YOUR HONOR.  I WOULD RESPECTFULLY SUBMIT WE TAKE OUR BREAK NOW.

20          THE COURT:  ALL RIGHT.  WHY DON'T WE GO AHEAD AND TAKE A

21  SHORT 10-MINUTE BREAK.  LET'S PLAN ON RESUMING AT FIVE MINUTES TO

22  TEN.

23          THE COURT SECURITY OFFICER:  ALL RISE.

24          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

25  PANEL LEAVES THE COURTROOM.)

1          MR. PENOT:  MY NAME IS CHARLES PENOT FOR FLUOR.

2              AS YOU KNOW, THE COURT HAS WORKED HARD AND THE

3  PARTIES HAVE WORKED HARD ON THESE CUTS.  AND CUTS WERE BEING MADE

4  AND RULINGS WERE BEING MADE.  AND CLEARLY WHAT HAPPENED THERE

5  WERE SOME CUTS CAME IN ON MAINTENANCE.  YOUR HONOR HAS DISMISSED

6  THE NEGLIGENT MAINTENANCE CLAIM AGAINST FLUOR.  COULD I RECEIVE A

7  LIMITING INSTRUCTION THAT THERE IS NO CLAIM OF NEGLIGENT

8  MAINTENANCE AGAINST FLUOR?

9          THE COURT:  IT HAS TO BE PART OF THE JURY INSTRUCTIONS.

10 THEY'RE NOT GOING TO BE INSTRUCTED AS TO ANYTHING INVOLVING

11 MAINTENANCE.  THE CLAIM HAS BEEN DISMISSED.  WHY THAT APPEARED ON

12 THE VIDEOTAPE IS UNKNOWN TO ME.  I RULED ON THE OBJECTIONS THAT

13 WERE MADE AT THE TIME THE DEPOSITION TRANSCRIPT WAS SUBMITTED TO

14 ME.

15              I NOTICED IT, TOO, BUT, YOU KNOW WHAT, YOU ALL

16 SUBMITTED THESE.  IT WOULD BE BETTER IF HE HAD BEEN HERE AT THE

17 TIME, IN WHICH CASE YOU COULD HAVE OBJECTED AND I COULD HAVE

18 SUSTAINED THE OBJECTION, BUT WE GOT HIM ON VIDEOTAPE.  I RULED ON

19 THE OBJECTIONS, AND THE TAPE IS WHAT IT IS.

20          MR. WATTS:  WE TOOK OUT THE SUSTAINED OBJECTIONS.

21          THE COURT:  I UNDERSTAND THAT.  I'M NOT SUGGESTING THAT

22 IT WAS IMPROPERLY IN THERE THROUGH THE FAULT OF COUNSEL.  BUT

23 THAT CLAIM WAS DISMISSED; AND, IF WE PUT IN THE JURY INSTRUCTIONS

24 AT THE CONCLUSION OF THE TRIAL THAT THE CLAIM IS BASED UPON THE

25 INSTALLATION, THE JACKING ONLY, MAYBE WE CAN WORK OUT SOME

1    LANGUAGE IN THAT REGARD, AND THAT THEY ARE NOT TO BE CONSIDERING

2    CLAIMS RELATIVE TO MAINTENANCE.

3            MR. WATTS:  DO YOU KNOW WHAT WE MIGHT DO, JUDGE.  WE'VE

4    GOT OUR JACKING EXPERT LATER TODAY.  I'LL GET BOB TO THROW IN

5    SOMETHING IN HIS DIRECT EXAMINATION.

6            THE COURT:  THAT WOULD BE HELPFUL BECAUSE, IN FACT,

7    MR. PENOT IS CORRECT ON THE LAW, THE FACT THAT HIS TESTIMONY IS

8    WHAT IT WAS.  I RULE ON THE OBJECTIONS YOU GIVE ME ON THE

9    TRANSCRIPTS.

10           MR. PENOT:  YOUR HONOR, I THINK IT'S JUST THE TIME

11   CONSTRAINTS.  WE'RE TRYING TO MOVE FAST, AND IT JUST SLIPPED BY.

12           THE COURT:  I UNDERSTAND.

13           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF

14   RECESS WAS TAKEN.)

15           THE COURT:  ALL RISE.

16           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

17   PANEL ENTERS THE COURTROOM.)

18           THE COURT:  AS YOU WERE.  SIR, IF YOU'D REMAIN STANDING

19   UNTIL YOU TAKE THE OATH.  WHO IS THIS GENTLEMAN, MR. BUZBEE?

20   THIS IS YOUR NEXT WITNESS?

21           MR. BUZBEE:  JEFF ZUMBRUN, YOUR HONOR.

22           THE COURT:  JEFF ZUMBRUN.

23           THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

24   HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY YOU ARE ABOUT TO

25   GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE

1   TRUTH, SO HELP YOU GOD?

2          THE WITNESS:  YES, MA'AM.

3                         **JEFFREY ZUMBRUN**

4   WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

5   CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

6          THE DEPUTY CLERK:  THANK YOU.  YOU MAY BE SEATED.  STATE

7   AND SPELL YOUR FULL NAME FOR THE RECORD.

8          THE WITNESS:  IT'S JEFFREY LEE ZUMBRUN, J-E-F-F-R-E-Y,

9   L-E-E, Z-U-M-B-R-U-N.

10          THE COURT:  GO AHEAD AND PROCEED, COUNSEL.

11                       DIRECT EXAMINATION

12   BY MR. BUZBEE:

13   Q.   YOU'VE INTRODUCED YOURSELF.  YOU'RE JEFF ZUMBRUN, AND YOU

14   WORK FOR GULF STREAM COACH, CORRECT?

15   A.   YES, SIR.

16   Q.   YOU'VE WORKED THERE FOR 18 YEARS?

17   A.   YES, SIR.

18   Q.   AND YOU'RE THE DIRECTOR OF PURCHASING FOR GULF STREAM COACH?

19   A.   FOR GULF STREAM COACH TOWABLES.

20   Q.   AND THAT MEANS THAT YOU BUY ALL OF THE PRODUCTS THAT GO INTO

21   THE TRAILERS?

22   A.   I DIRECT THE BUYING OF THE PRODUCT THAT GOES INTO THE

23   TRAILERS.

24   Q.   YOU HAVE PURCHASERS THAT WORK FOR YOU?

25   A.   YES, SIR.

1   Q.   YOU REPORT EITHER TO DAN SHEA, THE PRESIDENT, OR

2   PHIL SAVARI, ONE OF THE VICE-PRESIDENTS; IS THAT RIGHT?

3   A.   YES, SIR.

4   Q.   WHO IS THIS LADY SITTING HERE, THE CORPORATE REPRESENTATIVE

5   FOR GULF STREAM?

6   A.   THAT IS LIZ GANEER (SPELLED PHONETICALLY).

7   Q.   WHAT IS HER JOB?

8   A.   HER JOB IS COUNSEL.

9   Q.   LAWYER?

10  A.   LAWYER, ATTORNEY.

11  Q.   ARE YOU FAMILIAR WITH THE OWNERS MANUAL THAT WOULD HAVE

12  ACCOMPANIED THE TRAILER THAT THE ALEXANDER FAMILY LIVED IN?

13  A.   NO, SIR.

14  Q.   ARE YOU FAMILIAR WITH A FANTASTIC FAN?

15  A.   YES, SIR.

16  Q.   IS THAT A PIECE OF EQUIPMENT THAT IS SOMETIMES PLACED IN A

17  TRAILER?

18  A.   YES, SIR.

19  Q.   HOW MUCH DOES THAT COST?

20  A.   IT VARIES IN PRICE BECAUSE THERE IS DIFFERENT OPTIONS, BUT I

21  WOULD SAY ANYWHERE FROM $60 TO $200.

22  Q.   I WAS LOOKING ON THE INTERNET LAST NIGHT, AND TELL ME IF

23  THIS IS A CORRECT DESCRIPTION OF IT.  IT'S A LIGHTWEIGHT,

24  COMPACT, BUG RESISTANT, DURABLE FAN, TRUE?

25  A.   SOUNDS ACCURATE.

1  Q.   AND ITS -- FRESH, CLEAN, NATURAL AIR IS PULLED IN.  HOT,

2  STALE, STUFFY AIR IS PUSHED OUT.  THAT'S ITS PURPOSE?

3  A.   IT PUSHES AIR OUT.  IT ONLY PULLS AIR IN IF THERE IS WINDOWS

4  AND OTHER VENTS THAT ALLOW IT TO DO THAT.

5  Q.   NOW, HAVE YOU HAD THE OPPORTUNITY TO ACTUALLY LOOK AT THE

6  WOOD THAT WOULD COME INTO THE PLANT, WOOD THAT EITHER YOU OR ONE

7  OF YOUR AGENTS PURCHASES?

8  A.   I'VE LOOKED AT IT BEFORE, YES, SIR.

9  Q.   HAVE YOU EVER SEEN A WARNING ON ANY OF THE PLYWOOD THAT

10 COMES INTO ANY OF THE FACTORIES?

11 A.   YES, SIR.

12      MR. BUZBEE:  MAY I APPROACH, YOUR HONOR?

13      THE COURT:  YES.

14                      EXAMINATION

15 BY MR. BUZBEE:

16 Q.   I'M SHOWING YOU WHAT'S BEEN MARKED AS EXHIBIT 123.  HAVE YOU

17 SEEN THAT TYPE OF WARNING BEFORE?

18 A.   I'VE SEEN THINGS SIMILAR TO THIS.  I DON'T KNOW ABOUT THE

19 EXACT WARNING.

20 Q.   BUT EXHIBIT 123 IS A FAIR REPRESENTATION OF THE TYPE OF

21 WARNING THAT WOULD ACCOMPANY THE WOOD THE COMES INTO THE FACTORY;

22 TRUE STATEMENT?

23 A.   YES, SIR.

24      MR. BUZBEE:  YOUR HONOR, WE OFFER 123.

25      THE COURT:  ANY OBJECTION?

1        MR. WEINSTOCK:  NO OBJECTION, YOUR HONOR.

2        THE COURT:  SO ORDERED.

3        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

4   EXHIBIT 123 WAS ADMITTED.)

5        MR. BUZBEE:  KARL, WOULD YOU MIND.

6                        EXAMINATION

7   BY MR. BUZBEE:

8   Q.   WHEN THE WOOD THAT COMES INTO YOUR FACTORY ARRIVES, IT HAS A

9   WARNING ON IT ABOUT FORMALDEHYDE, DOESN'T IT?

10  A.   YES, SIR.

11       MR. BUZBEE:  MOVE IT ON UP, KARL, IF YOU DON'T MIND.

12                       EXAMINATION

13  BY MR. BUZBEE:

14  Q.   IT EVEN HAS A STAMP ON IT THAT SAYS THAT THIS PRODUCT, I

15  THINK IT SAYS, IS A KNOWN CHEMICAL TO THE STATE OF CALIFORNIA

16  THAT CAUSES CANCER; ISN'T THAT RIGHT?

17  A.   I HAVE NOT SEEN THAT BEFORE.

18  Q.   YOU'VE SEEN THE WARNINGS ABOUT FORMALDEHYDE BUT NOT THE

19  WARNING ABOUT CANCER?

20  A.   THAT'S CORRECT.

21  Q.   NOW, WOULD YOU AGREE THAT, AT LEAST BACK IN 2004 AND 2005,

22  THIS TYPE OF INFORMATION, WHETHER IT BE CANCER OR FORMALDEHYDE

23  ISSUES, IS NOT PASSED ALONG TO THE PEOPLE WHO ARE GOING TO LIVE

24  IN THE TRAILERS?

25  A.   I WOULD NOT KNOW THAT INFORMATION.

1  Q.   IF IT WERE GOING TO BE PASSED ALONG, IT WOULD BE IN THE

2  OWNERS MANUAL, WOULDN'T IT?

3         MR. WEINSTOCK:  I OBJECT TO THE FORM, YOUR HONOR.  HE'S

4  ALREADY ESTABLISHED HE DOESN'T KNOW WHAT'S IN THE OWNERS MANUAL.

5         THE COURT:  I'LL SUSTAIN IT.

6                        EXAMINATION

7  BY MR. BUZBEE:

8  Q.   DO YOU KNOW IF IN ANY WAY, WHETHER IT BE OWNERS MANUAL OR

9  WHATNOT, THAT THIS TYPE OF INFORMATION THAT YOU GUYS RECEIVE AT

10 GULF STREAM IS ACTUALLY PASSED ALONG TO THE FOLKS THAT ARE GOING

11 TO LIVE IN THE TRAILERS?

12        MR. WEINSTOCK:  OBJECTION, ASKED AND ANSWERED.  THIS IS

13 THE QUESTION HE ASKED BEFORE THE MANUAL.

14        THE COURT:  YES.  I THINK WE NEED TO MOVE ON.  I THINK

15 WE'VE COVERED THIS.  LET'S NOT REPEAT STUFF.  WE'VE GOT LIMITED

16 TIME.  LET'S GO.

17        MR. BUZBEE:  I UNDERSTAND, YOUR HONOR.

18                        EXAMINATION

19 BY MR. BUZBEE:

20 Q.   YOU GUYS, BACK IN 2000 -- NOW, I WANT TO TALK TO YOU ABOUT

21 2004, 2005.  ALL RIGHT.  LET'S FOCUS ON THAT BECAUSE THAT'S THE

22 TIME FRAME WHEN THE ALEXANDER TRAILER WAS BUILT, ALL RIGHT?

23 A.   NO, SIR.  MY UNDERSTANDING, THE ALEXANDER TRAILER WAS BUILT

24 IN DECEMBER 2004.

25 Q.   WELL, LET'S FOCUS ON 2004.  I'M SORRY.  AT THAT TIME,

1   GULF STREAM HAD A POLICY TO USE LOW-FORMALDEHYDE-EMITTING WOODS?

2   A.   YES, SIR.

3   Q.   THAT WAS AN IMPORTANT POLICY?

4   A.   YES, IT WAS.

5   Q.   AS AN IMPORTANT POLICY THERE SHOULD BE MECHANISMS IN PLACE

6   TO INSURE THAT IT'S FOLLOWED?

7   A.   YES, SIR.

8   Q.   DO YOU AGREE WITH MR. PULLEN THAT IT'S A SAFETY POLICY?

9   A.   I DON'T KNOW ABOUT THAT.

10  Q.   NOW, YOU LEARNED -- WELL, LET'S STOP THERE.

11        HOW IS, AT LEAST FROM YOUR PERSPECTIVE AS PURCHASING

12  MANAGER FOR GULF STREAM TOWABLES, HOW IS THAT POLICY ENFORCED?

13  A.   WELL, WHAT I WOULD DO AND WHAT I HAD DONE IS I CALLED ALL MY

14  SUPPLIERS THAT I HAD DONE BUSINESS WITH AND INFORMED THEM THAT

15  EVERYTHING THAT I BUY, THAT I PURCHASE, MUST BE

16  LOW-FORMALDEHYDE-EMITTING MATERIAL.  THEN I WENT TO MY PA'S, AND

17  I EXPLAINED TO MY PA'S THAT EVERYTHING THAT YOU PURCHASE MUST BE

18  LOW FORMALDEHYDE MATERIAL.

19  Q.   DID YOU EVER SEND ANY WRITTEN CORRESPONDENCE?  AND, AGAIN,

20  LET'S FOCUS ON THAT TIME FRAME, 2004.  ANY WRITTEN CORRESPONDENCE

21  TO YOUR VENDORS ABOUT THIS POLICY THAT YOU SAY YOU HAD?

22  A.   NOT SPECIFICALLY THE POLICY; BUT, ON MOST OF OUR PO'S, WE

23  WOULD PUT LOW FORMALDEHYDE EMISSIONS ON THEM.  ON SOME OF THEM WE

24  DIDN'T.

25  Q.   YOU NEVER SENT ANY SPECIFIC LETTER OR ANY SPECIFIC GUIDANCE,

1    BUT WHAT YOU'RE TELLING ME IS THAT IT APPEARED ON THE PURCHASE

2    ORDER?

3    A.    YES, SIR.

4    Q.    WHEN YOU SAY PO, YOU MEAN PURCHASE ORDER?

5    A.    PURCHASE ORDER.

6    Q.    AND THAT WAS REALLY THE ONLY WRITTEN DOCUMENTATION THAT EVER

7    EXISTED ABOUT THIS POLICY, TRUE?

8    A.    WE WOULD GET SOME QUOTES FROM THE SUPPLIERS THAT WOULD SAY

9    LOW FORMALDEHYDE EMISSIONS ON IT.

10   Q.    THE QUOTES COMING FROM THE SUPPLIERS?

11   A.    YES, SIR.

12   Q.    BUT I'M TALKING ABOUT THE INFORMATION COMING FROM --

13   A.    FROM US?

14   Q.    YES.

15   A.    NO, THAT WOULD BE THE ONLY THING.

16   Q.    SO THE ONLY TIME IT WAS WRITTEN ANYWHERE WOULD BE ON THE

17   PURCHASE ORDER?

18   A.    YES, SIR.

19          MR. BUZBEE:  MAY I APPROACH AGAIN, YOUR HONOR?

20          THE COURT:  YES.

21                        EXAMINATION

22   BY MR. BUZBEE:

23   Q.    I'M SHOWING YOU EXHIBIT 140.  CAN YOU TELL ME WHETHER THAT

24   IS A STACK OF INVOICES AND PURCHASE ORDERS FROM GENESIS PRODUCTS,

25   INC.?

1   A.   YOU WANT ME TO GO THROUGH THEM?

2   Q.   I WOULD LIKE YOU TO DO IT QUICKLY, IF YOU COULD,

3   MR. ZUMBRUN.  I'M TRYING NOT TO WASTE TIME.

4   A.   SO FAR, EVERYTHING THAT I SEE HERE HAS NOTHING TO DO WITH

5   LAUAN.  IT'S JUST ALL VINYL.

6   Q.   WE'LL GET TO THAT.  MY QUESTION, THOUGH, IS -- SEE, THESE

7   ARE DOCUMENTS PROVIDED TO ME BY GULF STREAM.

8   A.   YES, SIR.

9   Q.   AND YOU'RE THE PURCHASING MANAGER.

10  A.   YES, SIR.

11  Q.   MY QUESTION TO YOU IS, IS THIS A STACK OF DOCUMENTS, WHETHER

12  IT BE INVOICES OR PACKING SLIPS, THAT REPRESENT ITEMS PURCHASED

13  FROM GENESIS?

14  A.   YES.  THAT WOULD BE CORRECT.

15  Q.   AND THE YEAR IS 2004 ON THESE; IS THAT TRUE?

16  A.   IT APPEARS THAT WAY.  SOME OF THE DATES ARE NOT ON THERE,

17  SO -- BUT I WOULD SAY YEAH.

18  Q.   LET ME PUT THAT BACK TOGETHER.

19          MR. BUZBEE:  YOUR HONOR, WE OFFER EXHIBIT 140.

20          MR. WEINSTOCK:  MY GUESS IS I HAVE NO OBJECTION, IF I

21  COULD SEE IT VERY BRIEFLY.

22          THE COURT:  SURE.

23          MR. WEINSTOCK:  NO OBJECTION.

24          THE COURT:  ANY OBJECTION, FLUOR?

25          MR. PENOT:  NO, YOUR HONOR.

1          THE COURT:  SO ORDERED.  140 IS IN.

2          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

3     EXHIBIT 140 WAS ADMITTED.)

4                              EXAMINATION

5     BY MR. BUZBEE:

6     Q.   YOU MENTIONED VINYL.

7     A.   YES, SIR.

8     Q.   WHAT IS VINYL?

9     A.   VINYL IS WHAT YOU WOULD SEE ON THE LAUAN.  IT'S USUALLY

10    ABOUT FOUR MIL, AND IT'S DECORATIVE.  IT COULD BE WHITE.  IT

11    COULD BE WOOD GRAIN.  BUT IT'S WHAT COVERS UP THE LAUAN ON THE

12    INSIDE OF THE COACH.

13    Q.   I THINK WE'VE HEARD SOME OF THIS.  LAUAN OR LAUAN, AS I SAY

14    IT IN MY EAST TEXAS ACCENT, OR HOWEVER YOU SAY IT, THAT IS JUST

15    SOME COMPRESSED WOOD; IS IT NOT?

16    A.   COMPRESSED COMPOSITE WOOD, YES.

17    Q.   AND THEN YOU PUT THIS VINYL ON TOP OF IT TO GIVE IT A NICE

18    COAT?

19    A.   WE DON'T.  OUR LAMINATORS DO, SIR.

20    Q.   VINYL IS NOT THE SAME THING AS LAUAN PANELING?

21    A.   SOMETIMES PEOPLE WILL CALL LAUAN PANELING LAUAN PANELING

22    WITH VINYL ON IT AND NOT REFER TO THE VINYL THAT'S ON IT.

23    Q.   RIGHT.  SOMETIMES YOU'LL BUY LAUAN PANELING, AND IT WILL

24    ALREADY HAVE VINYL ON IT, AND THAT'S WHY IT TELLS WHAT YOU COLOR

25    IT IS?

1    A.   YES.  YES, SIR.

2    Q.   I JUST WANTED TO MAKE SURE WE'RE TALKING -- WE'RE ON THE

3    SAME PAGE.

4    A.   I APPRECIATE THAT.

5    Q.   LET'S LOOK AT ONE OF THE DOCUMENTS FROM EXHIBIT 40, IN FACT,

6    THE SECOND PAGE, IF I KNOW HOW TO -- CAN FIGURE OUT HOW TO DO

7    THIS.

8         YOU SEE THERE NUMBER 2?

9    A.   YES, SIR.

10   Q.   IT SAYS, 52. -- OR 5.2, 48 INCHES TIMES 96 INCHES,

11   INDUSTRIAL LAUAN, LOW EMISSIONS?

12   A.   YES, SIR.

13   Q.   WHAT IS THAT?

14   A.   LOW EMISSIONS WOULD BE LOW FORMALDEHYDE EMISSIONS?

15   Q.   I'M TALKING ABOUT THE LAUAN.  IS THAT THIS WOOD, THIS

16   PRESSED WOOD YOU'RE TALKING ABOUT?

17   A.   YES.  5.2 LAUAN, UH-HUH.

18   Q.   WHAT ABOUT THE ONE ABOVE THAT?  5.2 MILLIMETERS TIMES FORTY

19   TIMES ONE-FOURTH TIMES 77 LAUAN, WHAT IS THAT?

20   A.   THAT WOULD BE THE SAME TYPE OF MATERIAL.

21   Q.   THAT'S WOOD PANELING, TOO?

22   A.   YES, SIR.

23   Q.   IT DOESN'T SAY LOW EMISSIONS?

24   A.   NO, SIR, IT DOESN'T.

25   Q.   ONE OF THEM SAYS LOW EMISSIONS AND ONE OF THEM DOESN'T?

1   A.   THAT'S CORRECT.

2   Q.   THAT'S AT PLANT 59?

3   A.   YES, SIR.

4   Q.   BECAUSE WE CAN SEE OVER TO THE RIGHT IT'S 59.  THAT MEANS

5   THAT PRODUCT WENT TO PLANT 59?

6   A.   YES, SIR, THAT'S CORRECT.

7   Q.   LET'S LOOK AT ANOTHER ONE.  LET'S LOOK AT THE THIRD PAGE OF

8   THAT SAME EXHIBIT:  NUMBER 2, 2.7 TIMES FOUR FOOT TIMES EIGHT

9   FOOT GRANITE ARCTIC PANELING LFE.

10  A.   YES, SIR.

11  Q.   THAT'S LOW-FORMALDEHYDE-EMITTING PRODUCT?

12  A.   THAT'S CORRECT, SIR.

13  Q.   IT WENT TO PLANT 57?

14  A.   YES.

15  Q.   THE TIME FRAME ON THIS -- LET'S SEE IF THERE IS A DATE.

16  A.   NOVEMBER 2 OF '04.

17  Q.   NOVEMBER 2004, SO THAT'S A MONTH BEFORE THE ALEXANDER

18  TRAILER WAS MADE AT THE SAME PLANT, RIGHT?

19  A.   YES, SIR.

20  Q.   NOW, LET'S LOOK AT ONE NUMBER ONE.  THAT'S MORE LAUAN, ISN'T

21  IT?

22  A.   YES, SIR, IT IS.

23  Q.   BUT IT'S NOT LOW FORMALDEHYDE EMITTING, IS IT?

24  A.   YES, IT IS.

25  Q.   WHERE DOES IT SAY THAT?

1  A.   IT DOESN'T SAY IT.

2  Q.   RIGHT.  ONE OF THEM SAYS IT AND THE OTHER ONE DOESN'T,

3  RIGHT?

4  A.   YES, SIR.

5  Q.   NOW, IF SOMEONE WERE TO SAY -- YOU TELL ME WHAT YOUR

6  UNDERSTANDING IN THE INDUSTRY IS.  IF SOMEONE WERE TO SAY THIS:

7  LOOK, IF IT'S LOW FORMALDEHYDE EMITTING, IT WILL BE DESIGNATED AS

8  SUCH, IS THAT A TRUE OR FALSE STATEMENT?

9  A.   NOT ALWAYS.

10  Q.   NOT ALWAYS.

11  A.   NO.

12  Q.   BUT WE CAN SEE HERE THAT ON THIS PRODUCT THAT WENT TO

13  PLANT 57 IN NOVEMBER OF '04, ONE MONTH BEFORE THIS LADY'S TRAILER

14  THAT SHE WAS LIVING IN WAS BUILT, THAT THERE IS NO DESIGNATION

15  WHATSOEVER AS TO WHETHER THAT WOOD IS LFE OR NOT, IS THERE?

16  A.   THAT'S CORRECT.

17  Q.   NOW, YOU WOULD EXPECT THAT THE PURCHASE ORDERS WOULD HAVE

18  THIS LANGUAGE YOU TALK ABOUT, WE ONLY WANT HUD CERTIFIED

19  PRODUCTS, CORRECT?

20  A.   WE DIDN'T REFERENCE HUD, SIR.

21  Q.   YOU WOULD REFERENCE LFE THEN, RIGHT?

22  A.   YES, SIR, OR LE, OR LOW EMISSIONS.

23  Q.   IT SHOULD BE ON YOUR PURCHASE ORDER, CORRECT?

24  A.   IT SHOULD BE.

25  Q.   WAS IT?

1   A.   NO, IT WASN'T.

2   Q.   RIGHT.  WE KNOW THAT THE PURCHASE ORDERS FROM 2004, AT LEAST

3   FROM GENESIS, THIS COMPANY THAT WAS SELLING YOU THIS WOOD, DIDN'T

4   SAY ANYTHING ABOUT YOU WANTED LFE ON IT, DID THEY?

5   A.   NOT ON THE PURCHASE ORDER.

6   Q.   SO THE ONLY MECHANISM THAT YOU GUYS HAVE, AT LEAST IN

7   WRITING, TO MAKE SURE THAT YOU'RE GETTING LFE PRODUCT, YOU TOLD

8   ME BEFORE WAS WRITING IT ON THE PURCHASE ORDER, CORRECT?

9   A.   I DON'T UNDERSTAND THE WORD MECHANISM.  I MEAN, WE TOLD THEM

10  VERBALLY THAT'S WHAT WE NEED TO USE.  THAT, TO ME, IS A

11  MECHANISM.

12  Q.   BUT YOU DIDN'T WRITE IT ON THE PURCHASE ORDER?

13  A.   NO, SIR.

14  Q.   LET'S JUST LOOK AT AN EXAMPLE.

15          LET ME ASK YOU SOMETHING, MR. ZUMBRUN.  IS IT POSSIBLE

16  THAT YOU GUYS PURCHASED DIFFERENT KIND OF WOOD FOR THE FEMA

17  UNITS?

18  A.   I DON'T KNOW WHAT YOU MEAN BY DIFFERENT KINDS OF WOODS.

19  Q.   LOWER GRADE WOOD?

20  A.   NOT FOR FEMA UNITS, SIR.

21  Q.   CHEAPER WOOD?

22  A.   NO, SIR, NOT FOR FEMA UNITS.

23  Q.   WE KNOW THAT THE -- WE KNOW THAT LOW FORMALDEHYDE IS MORE

24  EXPENSIVE THAN NON-LOW FORMALDEHYDE?

25  A.   THAT'S CORRECT.

1  Q.   AND WE KNOW IT'S ABOUT 10 PERCENT OR MORE IN PRICE, CORRECT?

2  A.   IT'S 10 TO $15 A THOUSAND.

3  Q.   LET'S TAKE A LOOK AT ONE OF THE PURCHASE ORDERS FROM THAT

4  SAME EXHIBIT.

5         BEFORE WE DO THAT, WHY WOULD THERE BE SOME DESIGNATION

6  ON SOME OF THESE PURCHASE ORDERS THAT THIS WAS FEMA WOOD?

7  A.   PROBABLY FOR AN ACCOUNTING PURPOSE.  OUR AP DEPARTMENT

8  WANTED TO KNOW WHAT CLASSIFICATIONS TO PUT IT TO, AND SO WE WOULD

9  TELL THEM THAT IT WAS FOR A FEMA RUN.

10  Q.   BECAUSE YOU'VE SEEN ON THESE PURCHASE ORDERS THAT SOMEBODY

11  WENT THROUGH AND WROTE FEMA AND CIRCLED IT, RIGHT?  DO YOU WANT

12  TO TAKE A LOOK AT ONE OF THOSE?  HERE IS AN EXAMPLE FROM THE SAME

13  EXHIBIT.  THAT'S A PURCHASE ORDER; IS IT NOT?

14  A.   YES, SIR.

15  Q.   THERE AIN'T NOTHING ON THAT PURCHASE ORDER, TOP, SIDE OR

16  BOTTOM, THAT SAYS, WE WANT LFE, IS THERE?

17  A.   YES, SIR, THERE IS.

18  Q.   SHOW ME WHERE IT IS.

19  A.   DO YOU SEE WHERE IT SAYS, GRANITE ARCTIC PANELING?

20  Q.   YEP.

21  A.   AND WHERE IT'S BLACKED OUT?

22  Q.   YEAH.

23  A.   AFTER THAT, IT DOES SAY LFE.

24  Q.   IT DOES?

25  A.   YES, SIR.

1    Q.    UNDER THE BLACKOUT PART?

2    A.    YES, SIR.

3    Q.    YOU SEE AT THE TOP LEFT-HAND SIDE, IT SAYS, FEMA?  SOMEBODY

4    HAS WRITTEN FEMA.  LET ME MAKE SURE I GET THAT.  RIGHT THERE.

5    A.    OKAY.

6    Q.    WHO WROTE THAT?

7    A.    I HAVE NO IDEA.

8    Q.    WHY WOULD THEY WRITE THAT?

9    A.    I HAVE NO IDEA.

10   Q.    I'VE BEEN TOLD BY REPEATED WITNESSES THAT WE DON'T MAKE ANY

11   DISTINCTION IN OUR WOODS BETWEEN FEMA AND NON-FEMA.  WE BUY THE

12   SAME STUFF FROM THE SAME VENDORS.  WHY WOULD ANYBODY, AT LEAST

13   FROM YOUR PERSPECTIVE AS SOMEBODY WHO IS IN CHARGE OF THE

14   PURCHASING DEPARTMENT, WHY WOULD THEY NEED TO WRITE FEMA AND

15   DESIGNATE IT AS SUCH?

16   A.    WELL, NO ONE FROM THE PURCHASING DEPARTMENT WOULD HAVE

17   WRITTEN THAT.

18   Q.    WELL, WHO WOULD HAVE WRITTEN IT, IF YOU KNOW?

19   A.    I DON'T KNOW WHO WOULD HAVE WRITTEN IT.

20   Q.    HERE IS ANOTHER EXAMPLE FROM PLANT 59 THEY SENT.  ON

21   NUMBER 2, THERE IS NO DESIGNATION OF THE LFE; IS THERE?

22   A.    NO, SIR.

23   Q.    HOW DO YOU KNOW THAT WHAT YOU ORDERED IS WHAT YOU GOT?

24   A.    I HAVE TO TRUST MY SUPPLIERS THAT WHEN I TELL THEM I WANT

25   SOMETHING THAT'S WHAT I'M GOING TO GET.

1   Q.   SIR, DON'T YOU REALIZE YOU HAVE AN OBLIGATION, TOO?

2   A.   I UNDERSTAND.

3   Q.   DON'T YOU REALIZE THAT THERE IS A PURPOSE OF A RECEIVING

4   DEPARTMENT, CORRECT?

5   A.   THE PURPOSE IS TO COUNT THE MATERIAL AS IT COMES IN AND MAKE

6   SURE THAT IT'S THE RIGHT MATERIAL.

7   Q.   TO MAKE SURE THAT YOU RECEIVE WHAT YOU PURCHASED, CORRECT?

8   A.   NOT ENTIRELY.

9   Q.   THAT'S NOT THE PURPOSE OF THE RECEIVING DEPARTMENT?

10  A.   NO, SIR.  THE MAIN PURPOSE IS TO MAKE SURE THAT WE'VE GOT

11  THE RIGHT AMOUNT AND THAT IT'S THE RIGHT MATERIAL.  NOW, I DON'T

12  KNOW WHAT DETAILS THEY CAN GO INTO TO FIND OUT IF THE MATERIAL IS

13  EXACTLY WHAT WE ORDERED.

14  Q.   HERE IS ANOTHER -- HERE IS ANOTHER ONE THE MONTH BEFORE THIS

15  PARTICULAR TRAILER WAS MADE.  MORE LAUAN, CORRECT, PANELING

16  THAT'S NOT DESIGNATED LFE, TRUE?

17  A.   RIGHT.  BUT IF YOU SEE, THE TOP LINE, SIR, WHERE IT SAYS LFE

18  PANELING, THIS IS THE SAME TYPE OF PANELING OF THE DOCUMENT YOU

19  SHOWED ME BEFORE WHERE YOU COULDN'T SEE THE LFE -- IT WAS BLACKED

20  OUT.  THIS IS THE PART NOW THAT YOU CAN SEE THAT WAS BLACKED OUT

21  IN THIS FORM OF THE PO.

22  Q.   NOTICE THE COST DIFFERENCE.  THE LFE ON THIS DOCUMENT IS 283

23  BUCKS, THE ONE THAT'S NOT DESIGNATED LFE IS 270 BUCKS; IS THAT

24  RIGHT?

25  A.   THAT'S CORRECT.

1  Q.   YOU GUYS ARE TRYING TO SAVE A LITTLE MONEY HERE, AREN'T YOU?

2  A.   NO, SIR.  IF YOU LOOK AT THE FIRST ONE IT'S EIGHT FOOT LONG.

3  IF YOU LOOK AT THE SECOND ONE IT'S ONLY 78 INCHES LONG.  THERE

4  WAS A DIFFERENCE IN THE SIZE, HENCE THE DIFFERENCE IN THE PRICE.

5  Q.   HERE IS ANOTHER ONE THAT WENT TO PLANT 57.  LFE.  NOW, JUST

6  SO WE ALL -- SO I UNDERSTAND, IT SAYS GRANITE ARCTIC; THAT'S JUST

7  A COLOR?

8  A.   THAT'S THE VINYL.  THAT'S HOW YOU DESCRIBE THE VINYL.

9  Q.   YEAH.  BUT IT'S GOT WOOD UNDERNEATH IT?

10 A.   YES, SIR.

11 Q.   AND THE OTHER ONE SAID BECK SAND; THAT'S A COLOR?

12 A.   YES, SIR.

13 Q.   CAN YOU JUST GENERALLY DESCRIBE WHAT THAT COLOR LOOKS LIKE?

14 A.   GRANITE ARCTIC IS JUST A WHITE.  IT WAS USED FOR THE CEILING

15 PANEL.  I DON'T REMEMBER EXACTLY WHAT BECK SAND LOOKS LIKE.  I

16 THINK IT WAS KIND OF A TAUPE COLOR --

17 Q.   TAUPE.  WHAT --

18 A.   -- OR OFF-TAN.  I DON'T KNOW.  TAN.

19 Q.   OFF-TAN?

20 A.   YEAH.

21 Q.   DO YOU KNOW WHAT COLOR THE WALLS AND THE CEILING WERE IN THE

22 TRAILER THAT THIS LADY LIVED IN?

23 A.   NO, SIR, I DON'T.

24 Q.   DO YOU KNOW WHETHER IT WAS BECK SAND?

25 A.   NO, SIR, I WOULD NOT.

1  Q.   HERE IS ANOTHER ONE, NO LFE DESIGNATION.  IT WENT TO

2  PLANT 57, CORRECT?

3  A.   THAT'S CORRECT.

4  Q.   I'VE GOT A WHOLE STACK OF THEM.  I'M NOT GOING TO BORE YOU

5  WITH THEM, OKAY, MR. ZUMBRUN.  WE'VE GOT A LOT OF TIME WE'VE GOT

6  TO TRY TO MAKE UP HERE.

7            YOU LEARNED IN 2006 THAT THIS POLICY TO USE LFE WOODS

8  WAS NOT BEING FOLLOWED, DIDN'T YOU?

9  A.   WE FOUND ONE COMPANY THAT SENT US SOME MATERIAL THAT WAS NOT

10  LFE.  THAT'S CORRECT.

11  Q.   YOU LEARNED THAT YOU HAD ACTUALLY PURCHASED NON-LFE WOODS

12  FROM A SUPPLIER WHO HAD BEEN SUPPLYING FOR MORE THAN 10 YEARS;

13  ISN'T THAT RIGHT?

14  A.   WE RECEIVED MATERIAL FROM THEM.  THAT'S CORRECT.

15  Q.   YOU LEARNED THAT BEFORE THE LAST TRAILER WAS EVER DELIVERED

16  TO LOUISIANA, DIDN'T YOU?

17  A.   YES, SIR.

18  Q.   SO YOU ASKED THIS SALESMAN -- THE COMPANY WAS ADORN?

19  A.   YES, SIR.

20  Q.   AND YOU ASKED THE SALESMAN FROM ADORN TO COME MEET YOU IN

21  YOUR OFFICE?

22  A.   THAT'S CORRECT.

23            MR. WEINSTOCK:  YOUR HONOR, IF WE MAY APPROACH?

24            THE COURT:  YES.

25            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

1   A CONFERENCE HELD AT THE BENCH.)

2          MR. WEINSTOCK:  MR. BAILEY TESTIFIED YESTERDAY

3   MR. ZUMBRUN TOOK A RECORDED STATEMENT FROM HIM.  THIS IS STRICTLY

4   RELATED TO THE 2005 PRODUCT.  IT HAS NOTHING TO DO WITH 2004

5   PRODUCT.  I MEAN, WHEN YOU -- HE HAS TO LAY A FOUNDATION THAT THE

6   DISCUSSION REVOLVED AROUND THE 2004 PRODUCT --

7          THE COURT:  WELL, HE'S GOING TO HAVE TO ASK THE WITNESS

8   A QUESTION ABOUT WHAT THE CONVERSATION RELATED TO.  IF, IN FACT,

9   IT'S ABOUT 2005 PRODUCT THAT'S NOT AT ISSUE HERE, THEN I DON'T

10  SEE HOW IT'S RELEVANT.

11         MR. BUZBEE:  IT'S RELEVANT AS TO WHETHER THIS POLICY

12  THEY CLAIM THEY HAVE WORKS.

13         THE COURT:  BUT YOU'RE TALKING ABOUT A POLICY A YEAR

14  AFTER, THOUGH.

15         MR. BUZBEE:  YOUR HONOR, IT'S THE SAME POLICY THEY HAD

16  IN 2004.  IT'S THE SAME POLICY.  IT NEVER CHANGED EXCEPT AFTER

17  THIS LAWSUIT.  THAT'S THE SAME POLICY.  IF IT DIDN'T WORK IN

18  2005, THE INFERENCE IS IT DIDN'T WORK IN 2004.  THAT'S THE POINT.

19         MR. WEINSTOCK:  AND BAILEY CERTAINLY TESTIFIED WHAT HIS

20  UNDERSTANDING WAS.  YOU'VE GOTTEN THAT.

21         MR. BUZBEE:  YOU SEE WHAT THEY'RE DOING HERE.  THAT'S

22  NOT PROPER --

23         MR. WEINSTOCK:  YOU SEE, BUT THEY WANT TO GET AFTER HIM

24  FOR RECORDING THE CONVERSATION.  THAT'S WHAT HE'S AFTER.

25         MR. BUZBEE:  I'M NOT GOING TO ASK HIM ABOUT THE RECORDED

1    CONVERSATION.  THAT'S HEARSAY.  I'M JUST ASKING ABOUT WHAT HE

2    LEARNED.

3            THE COURT:  IF WE'RE NOT PLAYING THE RECORDED

4    CONVERSATION, THEN THERE IS NO REASON TO ASK HIM WHETHER HE DID

5    OR HE DIDN'T.  IF YOU'RE GOING TO ASK HIM ABOUT THE CONVERSATION,

6    YOU'RE GOING TO HAVE TO LAY A FOUNDATION FOR IT SUCH THAT IT'S

7    RELEVANT, AND THEN YOU CAN ASK HIM ABOUT THE CONVERSATION.  BUT I

8    DON'T SEE ANY REASON TO ASK HIM ABOUT WHETHER HE RECORDED IT OR

9    NOT.

10            MR. BUZBEE:  HERE IS WHY.  THEY KNEW THAT THEY HAD HAD

11   THIS PROBLEM AND THEY DID NOT WARN.

12            THE COURT:  ARE YOU GOING TO PLAY THE TAPE?

13            MR. BUZBEE:  YOU CAN'T HEAR THE TAPE.

14            THE COURT:  ALL RIGHT THEN.  I THINK IT'S PREJUDICIAL.

15   IT'S UNDULY PREJUDICIAL TO SUGGEST THAT HE DID SOMETHING IMPROPER

16   WHEN, FIRST OF ALL, THERE IS NO SHOWING THAT HE DID; AND, SECOND

17   OF ALL, THE TAPE IS NOT GOING TO BE PLAYED FOR THE JURY ANYWAY.

18   IT'S NOT IN EVIDENCE.  IF IT'S INAUDIBLE, THEN OF WHAT RELEVANCE

19   IS IT?

20            YOU HAVE TO LAY A FOUNDATION WITH REGARD TO THIS

21   CONVERSATION.  YOU'RE TELLING ME IT HAS TO DO WITH POLICIES AND

22   PROCEDURES THAT WERE IN PLACE IN 2004.  YOU MIGHT BE ABLE TO GO

23   AHEAD AND ASK HIM ABOUT THE CONVERSATION AS IT RELATES TO 2005,

24   BUT I DON'T SEE ANY REASON TO ASK HIM WHETHER HE TAPED IT OR NOT.

25   THERE IS NO TAPE OF IT.

1        THE COURT:  WHY WOULD YOU WANT TO ASK HIM ABOUT THAT?

2        MR. BUZBEE:  BECAUSE IF THEY KNEW THEY HAD SUCH A

3   PROBLEM THAT HIS BOSS WOULD INSTRUCT HIM TO SECRETLY RECORD

4   SOMEONE, IF THAT DOESN'T RAISE THE ISSUE THAT THEY NEED TO WARN,

5   THEN WHAT DOES?  THEY KNEW THEY HAD A BIG PROBLEM.  THAT'S WHY HE

6   SECRETLY RECORDED --

7        THE COURT:  WELL, WAIT.  NOW YOU'RE TELLING ME THAT HIS

8   BOSS INSTRUCTED HIM?

9        MR. BUZBEE:  DAN SHEA INSTRUCTED HIM TO DO THAT.

10       MR. WEINSTOCK:  IN 2005, ABOUT THE DISPUTE IN -- WELL,

11  THE RECORDING WAS IN 2007, BUT ABOUT THE DISPUTE IN 2005.  THIS

12  HAS NOTHING TO DO WITH 2004.

13       THE COURT:  BUT NOW WE'RE IN 2007.

14       MR. WEINSTOCK:  THE CONVERSATION TOOK PLACE IN 2007.

15       THE COURT:  ABOUT THE 2005 PRODUCT?

16       MR. WEINSTOCK:  ABOUT 2005.  THERE IS NOT A SINGLE

17  REFERENCE TO 2004.

18       MR. MEUNIER:  IT'S THE SAME POLICY, JUDGE.

19       MR. BUZBEE:  NO, YOUR HONOR.  IT HAPPENED IN 2006, AND

20  HE WAS INSTRUCTED BY HIS BOSS BEFORE THE LAST TRAILER WAS EVER

21  DELIVERED.

22       MR. WEINSTOCK:  NO.  THAT'S JUST NOT TRUE.

23       MR. BUZBEE:  ASK THE WITNESS WHEN IT WAS.

24       THE COURT:  LOOK, AS OF RIGHT NOW, YOU LAY A FOUNDATION.

25  YOU CAN ASK HIM ABOUT THE CONVERSATION ABOUT 2005 POLICIES IF

1    IT'S ESTABLISHED THAT -- AND YOU'VE ALREADY ASKED HIM ABOUT THE

2    POLICIES THAT WERE IN PLACE.  YOU CAN ASK HIM ABOUT IT.  I DON'T

3    SEE ANY REASON -- WE CAN REVISIT THE ISSUE ABOUT THE TAPING OF

4    THE CONVERSATION.  I DON'T SEE ANY REASON TO ASK HIM WHETHER THE

5    CONVERSATION WAS TAPED OR NOT OR WHETHER HE WAS TOLD TO TAPE A

6    CONVERSATION.  WE'RE TALKING ABOUT SOMETHING THAT HAPPENED IN

7    2007 NOW.  THESE PEOPLE ARE ALREADY IN THIS TRAILER BY, WHAT, MAY

8    OF 2006.

9            MR. BUZBEE:  YOUR HONOR, THAT'S THE FIRST TIME THEY'VE

10   EVER SAID -- I ASKED HIM IN HIS DEPOSITION.  HE DIDN'T KNOW WHEN

11   IT WAS RECORDED.

12           MR. WEINSTOCK:  YOU NEVER ASKED ME.

13           MR. BUZBEE:  YOU SEE THIS KIND OF THING RIGHT HERE.

14   THAT'S SO IMPROPER.  YOUR HONOR, THIS IS THE KIND OF THING THAT'S

15   GOING ON WITH THESE FOLKS.

16           MR. WEINSTOCK:  THE QUESTION WAS NEVER ASKED OF ME.

17           THE COURT:  LOOK, I'M NOT GOING TO SIT HERE AND DISPUTE

18   BETWEEN A DISCOVERY DISPUTE THAT HAPPENED BETWEEN YOU ALL.  I'M

19   HERE TALKING ABOUT WHAT THIS WITNESS IS GOING TO TESTIFY TO AND

20   WHAT HE CAN'T TESTIFY TO.  AND I AM INSTRUCTING YOU, ABSENT

21   FURTHER ORDER OF THIS COURT, NOT TO QUESTION HIM ABOUT RECORDING

22   THE CONVERSATION OR BEING ASKED TO RECORD THE CONVERSATION.  YOU

23   MAY ASK HIM ABOUT THE CONVERSATION.

24           MR. BUZBEE:  OKAY.  I'LL DO THAT.  YES, SIR.

25           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

88

1  CONFERENCE HELD AT THE BENCH WAS CONCLUDED.)

2                          EXAMINATION

3  BY MR. BUZBEE:

4  Q.   NOW, YOU CALLED THIS ADORN SALESMAN TO COME TO YOUR OFFICE,

5  DIDN'T YOU?

6  A.   YES, SIR.

7  Q.   YOU WANTED TO SET THE RECORD STRAIGHT WITH HIM?

8  A.   YES, SIR.

9  Q.   BECAUSE YOU HAD LEARNED THAT THERE WAS NON-LFE PRODUCTS IN

10  ONE OF THE FACTORIES, RIGHT?

11  A.   THAT'S CORRECT.

12  Q.   AND YOU, AS THE PURCHASING MAN, THE PURCHASING MANAGER, YOU

13  DON'T KNOW WHETHER THAT WOOD GOT INTO THE TRAILERS OR NOT?

14  A.   I WOULD HAVE NO IDEA, SIR.

15  Q.   YOU DIDN'T ASK HIM ABOUT IT?

16  A.   NO, SIR, I DID NOT.

17  Q.   AND THERE IS OTHER PEOPLE AT GULF STREAM THAT KNOW MORE

18  ABOUT THAT THAN YOU?

19  A.   YES, SIR, THERE WOULD BE.

20  Q.   YOU DON'T KNOW WHETHER THE VENDOR MADE THE MISTAKE AND GAVE

21  YOU THE WRONG STUFF OR WHETHER GULF STREAM MADE THE MISTAKE AND

22  ORDERED THE WRONG STUFF, DO YOU?

23          MR. WEINSTOCK:  YOUR HONOR, IF I CAN JUST ASK FOR

24  CLARIFICATION.  WE'RE TALKING 2005, CORRECT?

25          THE COURT:  COUNSEL --

1              MR. BUZBEE:  THAT'S CORRECT.

2              THE COURT:  -- WOULD YOU CLARIFY THE TIME FRAME THAT THE

3    QUESTION APPLIES TO.

4              MR. BUZBEE:  YES, SIR.

5                                   EXAMINATION

6    BY MR. BUZBEE:

7    Q.    LET ME TRY AGAIN.  THE POLICY THAT EXISTS IN 2004 IS EXACTLY

8    THE SAME POLICY THAT EXISTS IN 2005?

9    A.    THAT'S CORRECT, SIR.

10   Q.    THERE'S NO DIFFERENCE WHATSOEVER?

11   A.    NO, SIR.

12   Q.    WHATEVER YOU HAD IN PLACE TO MAKE SURE THE POLICY WAS

13   FOLLOWED WAS THE SAME IN 2004 AS IT WAS IN 2005, RIGHT?

14   A.    YES, SIR.

15   Q.    AND THE ONLY THING YOU HAD WAS THE VENDORS HAVE KNOWN FOR A

16   LONG TIME AND WE TRY TO PUT IT ON OUR PURCHASE ORDERS, RIGHT?

17   A.    YES, SIR.

18   Q.    THAT'S IT TO ENFORCE THAT POLICY.  AND RELYING ON SOMEONE

19   ELSE, RIGHT?

20   A.    NOT ENTIRELY.

21   Q.    WHAT ELSE?

22   A.    WELL, IN '05 AND '06, WE HAD MEETINGS EVERY WEEK AND -- WITH

23   THE PURCHASING AGENTS.  AND THEN I REMINDED THEM TO MAKE SURE

24   THAT EVERYTHING COMING IN WAS LOW FORMALDEHYDE EMISSIONS.

25   Q.    BUT IN 2004 YOU DIDN'T HAVE ANY OF THOSE KIND OF MEETINGS?

1   A.   NO, IT WASN'T REQUIRED.

2   Q.   IN 2004 AND 2005, YOU HAD AN UNWRITTEN POLICY TO USE LFE

3   WOODS?

4   A.   YES, SIR.

5   Q.   IN 2006, YOU LEARNED THAT THE POLICY WASN'T BEING FOLLOWED,

6   AT LEAST WITH ONE VENDOR?

7   A.   IN ONE PARTICULAR INCIDENT, YES, SIR.

8   Q.   AND THE VENDOR, WHEN YOU BROUGHT HIM INTO YOUR OFFICE HE

9   SAID TO YOU, AFTER YOU RAISED IT WITH HIM -- REMEMBER RAISING THE

10  ISSUE WITH HIM?

11  A.   YES, SIR.

12  Q.   HE SAID, I THINK IT WAS JUST A MISCOMMUNICATION ERROR.  WE

13  DIDN'T REALIZE THAT YOU WANTED LFE FOR ONE REASON OR ANOTHER, AND

14  THEN WE FOUND OUT YOU DID.  THAT'S EXACTLY WHAT HE SAID TO YOU,

15  ISN'T IT?

16  A.   IT SOUNDS FAMILIAR.

17  Q.   AND THEN YOU ASKED HIM, WHAT ASSURANCES ARE THERE THAT I'LL

18  BE PROVIDED LFE, RIGHT?

19       MR. WEINSTOCK:  YOUR HONOR, I'M GOING TO OBJECT TO THE

20  LINE OF QUESTIONING, UNTIL HE CAN ESTABLISH THAT THEY PURCHASED

21  ANY WOOD FROM ADORN IN 2004.  THIS IS A 2005 DISPUTE.

22       THE COURT:  YOU'LL HAVE TO LAY A FOUNDATION.  HOW DOES

23  THIS RELATE TO THE 2004?  GET THIS WITNESS TO ANSWER THE QUESTION

24  SUCH THAT IT'S CLEAR THAT WHAT YOU'RE ASKING HIM ABOUT HAS SOME

25  RELEVANCE TO 2004 AT THE TIME THAT THIS PARTICULAR UNIT IN

1  QUESTION WAS CONSTRUCTED.

2                          EXAMINATION

3  BY MR. BUZBEE:

4  Q.   DID YOU PURCHASE WOODS FROM ADORN IN 2004?

5  A.   NOT FOR FEMA, SIR.

6  Q.   HOW DO YOU KNOW?

7  A.   BECAUSE I'VE LOOKED AT ALL THE INVOICES, THE DOCUMENTS, THE

8  PO'S AND THE SHIPPERS, AND THERE IS NOTHING IN THERE TO INDICATE

9  THAT WE ORDERED WOOD PRODUCTS FOR FEMA.

10 Q.   BUT TELL ME HOW YOU KNOW THAT.  IT'S NOT ON THE INVOICES

11 UNLESS IT'S WRITTEN ON THERE.

12 A.   SIR, WE DIDN'T ORDER ANY TYPE OF LAUAN, ANY TYPE OF WOOD

13 FROM ADORN DURING THAT TIME.

14 Q.   WHAT TIME IS THAT?

15 A.   THE LATTER PART OF THE YEAR, FROM AUGUST UNTIL THE END OF

16 THE YEAR.

17 Q.   DID YOU ORDER ANY WOODS DURING THE YEAR 2004 FROM ADORN?

18 A.   I DON'T REMEMBER THAT.  I DIDN'T LOOK TO SEE IF WE DID

19 EARLIER.

20         MR. BUZBEE:  MAY I APPROACH THE WITNESS, YOUR HONOR?

21         THE COURT:  YES.

22                          EXAMINATION

23 BY MR. BUZBEE:

24 Q.   I'M SHOWING YOU A DOCUMENT, SIR.  IT'S AN ADORN -- WHAT KIND

25 OF DOCUMENT IS THIS I'M SHOWING YOU?

1       MR. WEINSTOCK:  COUNSEL --

2       THE WITNESS:  WHEN I REFER TO A SHIPPER, THIS WOULD

3   BE -- I'M SORRY.

4       THE COURT:  WHICH ONE?

5       MR. WEINSTOCK:  174 OR 175?

6       MR. BUZBEE:  I DON'T KNOW.  IT'S NOT MARKED BECAUSE IT

7   WAS NEVER PRODUCED TO US, AND I DON'T KNOW.  I'M TRYING TO

8   IDENTIFY IT RIGHT NOW.

9       MR. WEINSTOCK:  YOU PRODUCED IT TO ME, AND IT'S GOT A

10  NUMBER.

11      THE COURT:  HOW IS IT IDENTIFIED?  IS IT IDENTIFIED AS A

12  POTENTIAL EXHIBIT IN THIS CASE?  BECAUSE THEY NEED TO LOOK AT

13  IT --

14      MR. WEINSTOCK:  MAY I SEE IT?  IT'S EITHER 174 OR 175.

15  THEY ARE BOTH IDENTICAL, OR I COULDN'T TELL THE DIFFERENCE IN

16  THEM.

17                          EXAMINATION

18  BY MR. BUZBEE:

19  Q.   I'M SHOWING YOU WHAT WILL BE MARKED AS 174.

20  A.   YES, SIR.

21  Q.   I'M SHOWING YOU -- WHAT IS THAT DOCUMENT?  TELL EVERYONE

22  WHAT IT IS.

23  A.   THAT WOULD BE A SHIPPER FROM ADORN.

24  Q.   WHAT DATE IS IT?

25  A.   APRIL OF 2004.

1   Q.   AND WHAT KIND OF WOODS WERE BEING PURCHASED?

2   A.   IT IS GYPSUM BOARD FOR A FAIRMONT HOMES PLANT, WHICH IS

3   LIKE, DRYWALL OR ROCK WALL.

4   Q.   AND WHAT ELSE?

5   A.   AND THERE IS LAUAN, 2.7 REGULAR SECONDS.

6   Q.   REGULAR?

7   A.   YES, SIR.

8   Q.   WHAT DOES REGULAR MEAN?

9   A.   REGULAR MEANS IT'S NON-LFE.

10          MR. BUZBEE:  WE OFFER -- WHAT DID YOU SAY IT WAS?

11          THE COURT:  174.

12          MR. WEINSTOCK:  NO OBJECTION, YOUR HONOR.

13          THE WITNESS:  BUT THAT'S FOR A FAIRMONT PLANT, NOT A

14   GULF STREAM PLANT.

15          THE COURT:  SO ORDERED.  THAT WAS 174, I THINK?

16          MR. BUZBEE:  YES, SIR.

17          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

18   EXHIBIT 174 WAS ADMITTED.)

19                            EXAMINATION

20   BY MR. BUZBEE:

21   Q.   DO YOU DISAGREE WITH MR. PULLEN WHEN HE SAYS THAT WOODS ARE

22   SHARED ACROSS THESE COMPANIES?

23   A.   NO, I DON'T -- WE DO.  WE DO SHARE WOODS, SIR.

24   Q.   YOU DO SHARE WOODS FROM FAIRMONT TO GULF STREAM?

25   A.   YES, ON OCCASION WE DO.

1   Q.   IF REG WOODS WERE USED IN A FEMA TRAILER THAT WOULD BE A

2   MISTAKE?

3   A.   YES, IT WOULD BE.

4   Q.   WHEN YOU LEARNED THAT THESE REG WOODS WERE IN THE FACTORY

5   WHEN THE FEMA TRAILERS WERE BEING BUILT, DID YOU WARN OR TELL,

6   INSTRUCT YOUR BOSS THAT WE NEED TO WARN THESE RESIDENTS?

7   A.   I DIDN'T HAVE --

8         MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  CAN WE CLARIFY

9   2004, 2005?

10        THE COURT:  I THINK WE NEED TO BE SPECIFIC AS TO THE

11  TIME FRAME HERE.  I THINK IT'S IMPORTANT THAT WE ESTABLISH THAT

12  RELATIVE TO THESE QUESTIONS.

13                          EXAMINATION

14  BY MR. BUZBEE:

15  Q.   YOU LEARNED THAT THIS POLICY THAT YOU HAD IN PLACE WASN'T

16  WORKING IN 2006; ISN'T THAT RIGHT?

17  A.   YES, SIR.

18  Q.   WHEN YOU LEARNED YOUR POLICY WASN'T WORKING, DID YOU TAKE

19  ANY ACTION TO WARN A POTENTIAL RESIDENT OF A TRAILER THAT YOUR

20  COMPANY HAD MADE OR WAS MAKING?

21  A.   SIR, I DIDN'T.  I DIDN'T FEEL IT WAS MY POSITION.  AND I

22  DIDN'T KNOW WHETHER OR NOT IT EVEN WENT INTO THE UNITS.

23        MR. BUZBEE:  I PASS THE WITNESS, YOUR HONOR.

24        THE COURT:  ALL RIGHT.  MR. WEINSTOCK.

25        MR. WEINSTOCK:  YOUR HONOR, I HOPE IT'S ALL RIGHT IF I

1    BRING MY COMPUTER UP.

2            THE COURT:  SURE.

3            MR. WEINSTOCK:  I'M GOING BLIND, AND I NEED BIGGER TYPE.

4                        CROSS EXAMINATION

5    BY MR. WEINSTOCK:

6    Q.   IF WE CAN ADDRESS SOME OF THE DOCUMENTS MR. BUZBEE JUST

7    SHARED WITH THE COURT.  I'D ASK YOU TO TAKE A LOOK AT 174.  CAN

8    YOU TELL THE COURT AND THE JURY WHAT LAUAN SECONDS ARE USED FOR?

9    A.   LAUAN SECONDS IS USED FOR PACKING CRATES FOR OUR SHIPPING

10   DEPARTMENT FOR PARTS AND SERVICE.

11   Q.   DO THOSE GO INTO FEMA TRAILERS?

12   A.   ABSOLUTELY NOT.

13   Q.   DID YOU TELL MR. BUZBEE THAT AT YOUR DEPOSITION?

14   A.   YES, I DID.

15   Q.   LET'S TAKE A LOOK A SOME OF THE GENESIS INVOICES MR. BUZBEE

16   SHARED WITH THE COURT.  WHAT IS THE DESIGNATION BECK?

17   A.   I'M SORRY, WHAT WAS THE DESIGNATION?

18   Q.   WHAT DOES BECK MEAN?

19   A.   BECK?

20   Q.   B-E-C-K?

21   A.   WELL, IT WAS TWO THINGS.  I HAD A PURCHASING AGENT NAMED

22   BECK, ROB BECK.  AND BECK WOULD ALSO BE -- THERE WAS A BECK, I

23   THINK IT WAS BECK SAND WAS A VINYL THAT WAS ON THE LAUAN.

24   Q.   WAS BECK SAND SPECIAL MADE FOR GULF STREAM?

25   A.   ARE YOU TALKING ABOUT THE VINYL?

1    Q.    THE LAUAN?

2    A.    THE LAUAN?  NO, SIR.

3    Q.    THE VINYL?

4    A.    I DON'T BELIEVE SO.  WE USUALLY DON'T ASK FOR SPECIAL VINYLS

5    TO BE MADE.

6    Q.    WAS THERE A VINYL NAMED AFTER ROB BECK?

7    A.    IN THIS CASE IT MAY HAVE BEEN.

8    Q.    MR. BUZBEE ASKED YOU ABOUT ONE SPECIFIC INVOICE.  I THINK IT

9    WAS THIS ONE.  AND YOU SAID YOU KNEW IT WAS LFE, AND THEN HE

10   MOVED ON TO SOMETHING ELSE.  HOW DO YOU KNOW IT WAS LFE?

11   A.    WELL, IT SAYS LOW EMISSIONS ON IT.  AND CAN I ADD,

12   COUNSELOR, THAT NONE OF THIS IS FEMA STUFF?

13   Q.    THAT IS AN EXCELLENT POINT.  FEMA IS NOT 5.2?

14   A.    NO.

15   Q.    I'M NOT TERRIBLY INTERESTED IN ALL OF THIS WHAT SIZE WOOD

16   YOU USED, BUT 5.2 DOES NOT GO INTO FEMA UNITS?

17   A.    AND NEITHER DOES THE 3.6.

18   Q.    SO THIS IS DEFINITELY WOOD GULF STREAM BOUGHT OR FAIRMONT,

19   SOMEBODY BOUGHT FROM GENESIS, RIGHT?

20   A.    YES, IT IS, TO GO IN REGULAR UNITS.

21   Q.    JUST NOT THAT WENT INTO THE FEMA UNITS?

22   A.    THAT'S CORRECT.

23   Q.    AND YOU HAVE REVIEWED, DID YOU NOT, ALL OF THE 2004 PURCHASE

24   ORDERS, INVOICES AND PACKING SLIPS, HAVE YOU NOT, SIR?

25   A.    YES, I HAVE.

1    Q.    DID ADORN SELL ANY LAUAN TO GULF STREAM IN THE FALL, IN THE

2    SECOND, THIRD -- IN THE THIRD OR FOURTH QUARTER OF 2004 THAT WENT

3    INTO THE FEMA UNITS?

4    A.    NO, SIR, THEY DID NOT.

5    Q.    HOW LONG HAVE YOU AS THE PURCHASING MANAGER BEEN AWARE OF

6    GULF STREAM'S LFE POLICY?

7    A.    JUST SHORTLY AFTER I WAS HIRED.

8    Q.    HOW DID YOU COME TO KNOW ABOUT THAT POLICY?

9    A.    MR. JIM SHEA, WHO IS THE FOUNDER OF THE COMPANY, CALLED ME

10   IN, WANTED TO MAKE SURE THAT EVERYTHING I HAD IN STOCK WAS LFE.

11   I THEN -- I'M SORRY.

12   Q.    GO AHEAD.

13   A.    I THEN CHECKED, AND IT WAS.  AND HE SAID, YOU MAKE SURE THAT

14   EVERYTHING THAT COMES IN IS LOW FORMALDEHYDE EMISSIONS.

15   Q.    MR. JIM SHEA, THE GOOD-LOOKING GUY WE SAW YESTERDAY ON

16   VIDEOTAPE FOR ABOUT THREE HOURS?

17   A.    NO, SIR.  MR. JIM SHEA, SR., PASSED AWAY A FEW YEARS AGO.

18   Q.    SO YOU GOT THIS FROM THE FOUNDER OF THE COMPANY?

19   A.    THAT'S CORRECT.

20   Q.    WE'VE HEARD A LOT ABOUT LAUAN.  WE ALL LIVE THIS CASE.  CAN

21   YOU EXPLAIN TO THE JURY WHAT LAUAN IS?

22   A.    LAUAN IS LIKE A PLYWOOD.  IT'S A COMPOSITE WOOD THAT'S

23   PRESSED TOGETHER WITH CERTAIN RESINS AND GLUES TO KEEP IT

24   TOGETHER.  THEN THE LAMINATORS BUY IT, PUT A VINYL ON IT AND GLUE

25   THAT DOWN, AND THEN SEND IT TO US SO WE CAN USE IT INSIDE THE

1  COACH.

2  Q.   IS IT VINYL ON BOTH SIDES OR JUST ONE?

3  A.   NO, SIR, IT'S ONLY VINYL ON ONE SIDE.

4  Q.   DOES THE VINYL FACE THE INTERIOR OR THE EXTERIOR OF THE

5  WALL?

6  A.   THE INTERIOR OF THE COACH.

7  Q.   WE'VE ALSO HEARD ABOUT ANOTHER PRODUCT, ORIENTAL STRAND

8  BOARD.  WHAT IS -- OH, I'M SORRY.  LET ME BACK UP.  DID YOU SAY

9  WHERE LAUAN GOES IN THIS COACH?

10  A.   IT GOES ON THE CEILINGS.  IT ALSO GOES ON THE WALLS.  AND

11  COME TO THINK OF IT, THIS WOULD BE ANOTHER REASON THAT THAT

12  PRODUCT THAT MR. BUZBEE SHOWED ME WOULD BE MORE EXPENSIVE BECAUSE

13  IT WAS A CEILING PRODUCT.  IN THE CEILING PRODUCTS, THEY USE A

14  SPECIAL CROSS LINK GLUE SO THAT THE VINYL STAYS TO IT, AND THAT

15  DOES ADD MORE MONEY TO IT. IT'S USED IN CABINETRIES AND INTERIOR

16  WALLS, PARTITION WALLS.

17  Q.   AND WHAT IS ORIENTAL STRAND BOARD?

18  A.   ORIENTAL STRAND BOARD, OR OSB AS SOMETIMES IT'S REFERRED TO,

19  IS -- IT'S LIKE A PARTICLEBOARD BUT IT'S DIFFERENT.  THE STRANDS

20  OF WOOD ARE JUST CHIPS OF WOOD THAT ARE MADE FROM FOUR OR FIVE

21  DIFFERENT SPECIES OF WOOD AND THEN PRESSED TOGETHER AND GLUED.

22  Q.   AND WHAT KIND OF FORMALDEHYDE CONTENT DOES THAT PIECE OF

23  MATERIAL HAVE?

24  A.   IT'S USUALLY LOW EMITTING.

25  Q.   WHY DON'T YOU USE THAT ON YOUR SIDE WALLS OR YOUR CEILINGS?

1  A.   WELL, FIRST OF ALL, NONE OF THE LAMINATORS DO.  BUT THE

2  REASON THAT WE DON'T IS BECAUSE YOU COULDN'T LAMINATE TO IT.

3          DURING THE LAMINATING PROCESSES, YOU WOULD PUT THE GLUE

4  AND PRESS ON IT.  BECAUSE THE WAFERS ARE SO THIN AND CLOSE TO THE

5  SURFACE, IT WOULD DELAMINATE THOSE.  IT WOULD REACT WITH THE GLUE

6  BELOW IT.  AND ON TOP OF THAT, IT'S GOT A ROUGH FINISH.  THE

7  WALLS WOULD LOOK ROUGH AND --

8  Q.   I KNOW MR. BUZBEE IS GOING TO ASK SOME WITNESSES COMING

9  AFTER YOU ABOUT SOME WOOD BRIDGE INVOICES.

10         MR. WEINSTOCK:  CAN WE GET THAT EXHIBIT PUT UP ON THE

11  SCREEN.

12                         EXAMINATION

13  BY MR. WEINSTOCK:

14  Q.   AND HE'S GOING TO WANT TO KNOW -- HE'S TALKED WITH SOMEBODY

15  ON VIDEOTAPE -- HOW COME IT DOESN'T SAY ANYTHING IN THIS LFE

16  COLUMN?

17  A.   I WOULD HAVE NO IDEA, SIR.

18  Q.   SO HOW DO YOU KNOW THAT THIS THING YOU CAN'T VERIFY DIDN'T

19  GO INTO A FEMA TRAILER?

20  A.   WELL, I KNOW FOR A COUPLE REASONS -- WELL, THREE REASONS,

21  ACTUALLY.  IT WAS SOLD ON FAIRMONT HOMES AND NOT TO US.  ALSO,

22  THE THICKNESS IS 5.2.  I DON'T USE 5.2.  AND THEN THE FAVERIA

23  PLYWOOD, I'VE NEVER EVEN SEEN IT OR HEARD OF THAT BEFORE.

24  Q.   THERE ARE OTHER THINGS THAT GO INTO A TRAVEL TRAILER AS

25  WELL.  THE BACK SIDE OF THE WALL YOU JUST SAID WAS THE UNVINYL

1  PORTION OF THE LAUAN?

2  A.   YES, THAT'S CORRECT.

3  Q.   AND THEN THERE'S A STEEL SHELL OR A METAL SHELL ON THE

4  OUTSIDE?

5  A.   ALUMINUM SHELL ON THE OUTSIDE.

6  Q.   IS THERE INSULATION IN BETWEEN?

7  A.   YES, THERE IS.

8  Q.   HOW IS THE INSULATION PUT IN PLACE?

9  A.   WITH A GLUE, A SPRAY ADHESIVE.

10  Q.   DOES THAT GLUE CONTAIN FORMALDEHYDE?

11  A.   NO, SIR.

12  Q.   DOES THAT INSULATION CONTAIN FORMALDEHYDE?

13  A.   NO, SIR, IT DOESN'T.

14  Q.   CAN YOU BUY INSULATION THAT DOES HAVE FORMALDEHYDE?

15  A.   BACK THEN, YOU COULD.  I DON'T KNOW WHETHER YOU CAN NOW, BUT

16  BACK THEN YOU COULD, YES.

17  Q.   WHICH COSTS MORE?

18  A.   OH, THE STUFF THAT'S FORMALDEHYDE FREE.

19  Q.   BUT THAT'S THE STUFF YOU USE?

20  A.   YES, SIR.

21  Q.   IF WE COULD TALK ABOUT SOME OTHER PRODUCTS THAT PEOPLE MIGHT

22  SUGGEST WE SHOULD HAVE USED INSTEAD.  WHY DIDN'T Y'ALL USE

23  MASONITE?

24  A.   WELL, MASONITE, WHEN YOU GLUE TO IT AND YOU PUT IT ON A

25  WALL -- AND I KNOW THIS FROM PERSONAL EXPERIENCE BECAUSE WE'VE

1    TRIED ALL THE DIFFERENT SUBSTRATES THROUGHOUT MY CAREER AT

2    GULF STREAM -- WHEN YOU GLUE TO IT AND YOU PUT IT ON THE WALL,

3    AND WHICH WE DID, WE PUT ON IT A MOCK WALL, AND I SET IT IN A

4    BUILDING NEXT TO US.  AND WHILE IT WENT ON GREAT AND LOOKED

5    GREAT, A FEW DAYS LATER I WENT TO CHECK ON IT.  AND THE HUMIDITY

6    WAS HIGH THAT DAY.  AND THAT WALL HAD COME LOOSE FROM THE WOOD,

7    AND IT WAS JUST CREATING THIS HUGE WAVE.  SO OBVIOUSLY IT WASN'T

8    GOOD FOR THAT TYPE OF PRODUCT WITH THAT MUCH HUMIDITY.

9    Q.   COULD YOU BUY MEDIUM DENSITY FIBERBOARD THAT USED A

10   DIFFERENT TYPE OF GLUE BACK IN --

11   A.   NO, NOT AT THAT TIME, YOU COULDN'T.

12   Q.   TODAY, CAN YOU?

13   A.   YES, YOU CAN.  AND WE DO.

14   Q.   CAN YOU GO BACK IN YOUR TIME BUBBLE AND INVENT IT?

15   A.   NO, SIR, I CAN'T.

16   Q.   I JUST WANT TO BE CLEAR OR UNCLEAR ON SOMETHING.  ALL THESE

17   GENESIS RECORDS MR. BUZBEE -- I DON'T WANT TO GO OVER THEM ONE BY

18   ONE -- YOU'VE SEEN ALL THESE BEFORE TODAY?

19   A.   YES, SIR.

20   Q.   ANYTHING IN HERE THAT TELLS YOU YOU BOUGHT NON-LFE THAT WENT

21   INTO A FEMA TRAILER?

22   A.   THERE IS NOT ONE THING IN THERE.

23        MR. WEINSTOCK:  I PASS THE WITNESS, YOUR HONOR.

24        MR. PENOT:  NO QUESTIONS, YOUR HONOR.

25        THE COURT:  MR. WEINSTOCK, IS THIS A WITNESS THAT YOU

1    WERE GOING TO CALL IN YOUR CASE IN CHIEF?

2            MR. WEINSTOCK:  YES, YOUR HONOR.

3            THE COURT:  SO WE'RE GOING TO END UP WITH YOU ON A

4    REDIRECT, WHICH WOULD BE LIMITED.  ALL RIGHT.

5            OKAY, MR. BUZBEE.

6                    REDIRECT EXAMINATION

7    BY MR. BUZBEE:

8    Q.   IF YOU DID BUY NON-LFE, THAT WOULD BE A REFLECTION UPON YOU,

9    WOULDN'T IT?

10   A.   MORE OF A REFLECTION UPON MY SUPPLIERS THAN ME PERSONALLY.

11   Q.   I MEAN, IT'S THEIR FAULT, NOT YOURS, RIGHT?  THE SUPPLIERS'

12   FAULT, NOT YOUR FAULT?

13   A.   IF THEY SENT ME NON-CONFORMING MATERIAL, IT WOULD BE THEIR

14   FAULT.

15   Q.   WHEN I WAS IN THE MARINE CORPS, WE SAY DON'T EXPECT,

16   INSPECT.

17   A.   YES, SIR, I UNDERSTAND WHAT YOU'RE SAYING.

18   Q.   DO YOU AGREE WITH THAT?

19   A.   YES, SIR.

20   Q.   I WANT TO LOOK AT A FEW OF THESE PURCHASE ORDERS.  HERE IS A

21   PURCHASE ORDER, BECAUSE I'VE TALKED A LITTLE BIT ABOUT THIS

22   LITTLE STAMP THAT YOU PUT ON PURCHASE ORDERS, AND THE JURY HAS

23   HEARD ABOUT IT.  BUT SPECIFICALLY RIGHT HERE, IT SAYS, ALL

24   PRODUCTS MUST BE APPROVED TO THE HUD REQUIREMENTS OF HOUSING,

25   RIGHT?

1   A.    THAT'S CORRECT.

2   Q.    AND THAT BASICALLY MEANS, LOOK, WE'RE ORDERING AND WE WANT

3   YOU TO DELIVER TO US LFE PRODUCTS.  THAT'S WHAT YOU MEAN,

4   BASICALLY?

5   A.    I DON'T KNOW THAT.

6   Q.    WELL, THAT'S THE INSTRUCTION TO THE VENDOR, THAT YOU EXPECT

7   LFE PRODUCTS, ISN'T IT?

8   A.    NOT FOR GULF STREAM COACH.  I DIDN'T USE THAT STAMP FOR

9   GULF STREAM COACH.  THIS IS A FAIRMONT PO.

10  Q.    LET'S LOOK AT ANOTHER -- WHAT KIND OF STAMP WOULD YOU USE

11  FOR GULF STREAM COACH?  NO STAMP AT ALL?

12  A.    SIR, AT THAT TIME WE DID NOT USE A STAMP.

13  Q.    IS THAT WHY WHEN I LOOK AT AN ACTUAL INVOICE OR PURCHASE

14  ORDER THAT HAS FEMA ON IT -- YOU SEE THAT, IT SAYS FEMA?

15  A.    YES, SIR.

16  Q.    THERE IS NO STAMP ON THERE, IS THERE?

17  A.    NOT THAT I CAN SEE, SIR.

18  Q.    LET'S LOOK AT ANOTHER ONE.  LET'S LOOK AT ONE -- THERE IS

19  THAT STAMP, AGAIN.  WHAT IS THIS?  IT'S ANOTHER PURCHASE ORDER.

20  IT'S GOT THAT STAMP THAT SAYS, LOOK, WE WANT THE STUFF YOU'RE

21  SELLING US TO BE CERTIFIED BY HUD.  DO YOU SEE THAT AT THE

22  BOTTOM?

23  A.    YES, I DO.

24  Q.    WHAT KIND OF MATERIAL IS THAT?

25  A.    IT'S JUST VINYL.

1    Q.    WHAT IS IT GOING TO BE USED FOR?

2    A.    I DON'T KNOW.  IT'S FOR JEJ, FAIRMONT.

3    Q.    IT COULD BE GOING INTO A TRAILER?

4    A.    MORE THAN LIKELY IT WENT INTO A TRAILER, YES.

5    Q.    BUT YOU DON'T KNOW WHAT KIND OF TRAILER?

6    A.    NO, I DON'T.  WHERE IS THE DATE AT, MR. BUZBEE?  OH, I SEE.

7    12/04.  I DON'T KNOW WHAT BECK SAND WOULD HAVE BEEN USED FOR,

8    THAT KIND OF VINYL, IN A FEMA TRAILER.

9    Q.    PROBABLY WOULDN'T HAVE BEEN USED, WOULD IT?

10   A.    I DON'T -- I DON'T KNOW, UNLESS IT WAS MADE TO USE BATTENS.

11   Q.    RIGHT.  LET'S LOOK AT ANOTHER ONE.  THIS ONE IS A PURCHASE

12   ORDER FOR FEMA.  WE KNOW FOR A FACT BECAUSE, AGAIN, SOMEBODY

13   WROTE IT UP HERE ON THE TOP LEFT, RIGHT?

14   A.    YES.

15   Q.    IS THAT STAMP ON THERE?

16   A.    NO, BUT IT DOES REFER TO LFE.

17   Q.    YOU MEAN BEHIND THE BLACK PART?

18   A.    YES, SIR.

19   Q.    RIGHT.

20   A.    CAN I MAKE SOMETHING CLEAR ABOUT THAT, THOUGH?  THAT'S NOT

21   WHAT GOES TO THE SUPPLIER.  A SUPPLIER DOESN'T SEE THAT.  THAT'S

22   JUST FOR RECEIVING.  THE SUPPLIER WOULD SEE A COPY THAT DOES HAVE

23   THE LFE ON IT.

24   Q.    RIGHT.

25            HERE IS ANOTHER ONE.  IT'S GOT THAT STAMP ON IT.  BUT

1    IT DOESN'T HAVE ANYTHING ABOUT FEMA ON IT, RIGHT?

2    A.    NO, SIR.

3    Q.    BUT, YET, HERE WE HAVE ANOTHER ONE THAT DOES SAY FEMA AT THE

4    TOP LEFT, BUT IT DOESN'T HAVE THE STAMP, RIGHT?

5    A.    BUT IT DOES SAY LFE, SIR.

6    Q.    UNDER THE BLACK?

7    A.    YES, SIR.

8    Q.    YOUR LAWYER THERE SHOWED YOU A DOCUMENT WHICH IS ACTUALLY

9    EXHIBIT 137.  WE HAVE BEEN TOLD BY ONE OF THE SALESMEN FOR ONE OF

10   THE VENDORS THAT IF IT'S LFE, IT WILL BE DESIGNATED BECAUSE IT'S

11   MORE EXPENSIVE.  YOU DON'T KNOW WHETHER THAT'S TRUE OR NOT, DO

12   YOU?

13   A.    WHETHER OR NOT THEY'LL DESIGNATE IT LFE?

14   Q.    YES.

15   A.    THERE ARE SEVERAL SUPPLIERS THAT WOULD NOT DESIGNATE IT LFE,

16   AND IT WAS LFE.

17   Q.    DO YOU SEE THIS COLUMNAR HERE?

18   A.    LFE?

19   Q.    THIS COLUMN?

20   A.    YES, I DO.

21   Q.    THERE IS NO CHECK IN THAT COLUMN, IS THERE?

22   A.    THAT'S CORRECT.

23        MR. BUZBEE:  I PASS THE WITNESS, YOUR HONOR.

24        MR. WEINSTOCK:  TO SAVE TIME, CAN I HAVE THOSE SAME

25   DOCUMENTS?

```
 1                    RECROSS EXAMINATION
 2  BY MR. WEINSTOCK:
 3  Q.   JUST TO BE CLEAR, I THOUGHT I HEARD THIS, BUT DID THIS WIND
 4  UP IN A FEMA TRAILER?
 5  A.   NO, IT'S NOT.  IT DIDN'T EVEN WIND UP IN A GULF STREAM
 6  TRAILER.  IT'S A FAIRMONT PRODUCT ONLY.  IT'S 5.2.  IT'S FAVERIA
 7  PLYWOOD.  I DON'T USE IT.  I DON'T EVEN KNOW WHAT THAT IS.
 8  Q.   WE CAN GO BACK TO THE OTHER ONES.  WHAT DOES FAIRMONT HOMES
 9  MAKE?
10  A.   THEY MAKE MANUFACTURED HOUSING.
11  Q.   ARE THEY REQUIRED TO COMPLY WITH THE HUD CODE?
12  A.   YES, THEY ARE.
13  Q.   IS THAT WHY THEIR PO'S SAY HUD?
14  A.   YES, SIR.
15  Q.   IS GULF STREAM COACH REQUIRED TO COMPLY WITH THE HUD CODE?
16  A.   WE ARE NOW, SIR.
17  Q.   WERE YOU IN 2004?
18  A.   NO, SIR.
19  Q.   IN 2004, INSTEAD OF SAYING HUD, WHICH IS NOT SOMETHING IN
20  THE TRAVEL TRAILER UNIVERSE AT THE TIME, DID YOU ASK FOR LFE?
21  A.   FOR THE MOST TIME ON THE PO'S, IT WAS LFE.
22  Q.   AND THAT'S WHAT YOU GOT?
23  A.   YES, SIR.
24  Q.   AND, LIKE I SAID, I CAN SHOW YOU ALL THESE, ALL THE ONES
25  THAT HAVE THE HUD REQUIREMENT OR -- LET ME JUST GET THEM -- OR
```

1  THE JEJ MOLDINGS.   TELL US WHAT JEJ MOLDINGS IS.

2  A.   JEJ IS AN AFFILIATION OF FAIRMONT HOMES.   THEY ARE ON THE

3  OTHER SIDE OF TOWN, AND THEY MAKE PRODUCTS FOR FAIRMONT AND SOME

4  FOR GULF STREAM COACH IN THE WAY OF STYLES, MAINLY STYLES.

5  Q.   BUT WHAT YOU'RE TELLING THIS JURY IS THAT THE ONES THAT WENT

6  INTO THE FEMA UNITS, UNFORTUNATELY, BECAUSE OF THE CARBON, IT

7  SAYS LFE, BUT THAT'S WHAT THESE PURCHASE ORDERS WOULD HAVE ON

8  THEM?

9  A.   THAT'S CORRECT.

10 Q.   AND THAT'S WHY WHEN I ASKED YOU IF YOU HAD REVIEWED ALL

11 THESE DOCUMENTS, DID YOU SEE ANY INDICATION THERE WAS SOMETHING

12 OTHER THAN LFE IN THE FEMA RUN IN 2004, YOUR ANSWER WAS?

13 A.   THERE IS NOTHING IN THERE TO INDICATE THAT IT'S NOT LFE.

14       MR. WEINSTOCK:   THANK YOU, YOUR HONOR.

15       THE COURT:   THANK YOU.   YOU CAN STEP DOWN, SIR.   PLEASE

16 DON'T DISCUSS YOUR TESTIMONY WITH ANYONE WHO MIGHT BE A WITNESS

17 IN THIS CASE.

18       MR. WATTS:   WE CALL JAMES BROWN BY AND THROUGH HIS

19 VIDEOTAPE DEPOSITION.   IT'S 16 MINUTES LONG.

20       THE COURT:   THE DEPOSITION OF JAMES BROWN.

21       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

22 VIDEOTAPED DEPOSITION OF JAMES BROWN WAS PLAYED.)

23 Q.   WHAT IS YOUR NAME?

24 A.   JAMES R. BROWN.

25 Q.   WHAT DO YOU DO FOR A LIVING, MR. BROWN?

```
 1   A.    RECEIVING CLERK.

 2   Q.    HOW LONG HAVE YOU WORKED FOR EITHER FAIRMONT OR GULF STREAM?

 3   A.    34 YEARS.

 4   Q.    HAVE YOU BEEN A RECEIVER THAT ENTIRE TIME?

 5   A.    YES, I HAVE.

 6           WHEN THE FREIGHT COMES IN, THE DRIVER WALKS IN WITH THE

 7   FREIGHT BILLS, PACKING LIST, STUFF LIKE THAT RIGHT THERE.  AND I

 8   MAKE SURE ON THE COMPUTER THAT IT BELONGS TO US.  IF IT DOESN'T

 9   BELONG TO US, I GET HIM TO THE RIGHT DEPARTMENT, OR NOT EVEN US,

10   SEND HIM TO ANOTHER COMPANY THAT, YOU KNOW, THAT IS NOT OURS.

11           AND THEN I PROCESS THE PAPERWORK.  PERIODICALLY I WOULD

12   GO OUT AND VOUCH THE LOAD MYSELF.  OTHERWISE, WE'VE GOT A BLANK

13   COPY OF PAPER THAT GOES BACK WITH THE DRIVER, AND THE RECEIVER

14   PUTS DOWN THE COUNTS AND ANY CONCEALED DAMAGE THAT MIGHT BE ON IT

15   AND STUFF OF THAT SORT THERE.

16           THEN AFTERWARDS, IF EVERYBODY IS SATISFIED WITH THE

17   COUNTS, THE SHAPE OF THE LOAD AND EVERYTHING, I WILL SIGN THE

18   BILLS, AND THE DRIVER WILL MOVE ON.  AND THEN IT WILL BE THE TIME

19   FOR THE NEXT ONE.

20           SOMETIMES I WILL GO OUT AND MEASURE THE STUFF.

21   SOMETIMES I WILL GO OUT AND COUNT THE STUFF MYSELF.  AND

22   SOMETIMES I WILL GO OUT AND SPOT CHECK THE LABELS TO MAKE SURE IT

23   SAYS WHAT'S IN THERE.  AND THEN THAT'S ABOUT IT.

24   Q.    ARE YOU THE HEAD RECEIVER?

25   A.    NO, I'M THE RECEIVING CLERK.
```

```
 1   Q.   BUT YOU'RE NOT THE HEAD RECEIVER?

 2   A.   NO.

 3   Q.   NOW, YOU'RE NOT THE RECEIVING CLERK FOR THE COMPANY WIDE?

 4   A.   I'M CORPORATE.

 5   Q.   YOU'RE CORPORATE RECEIVING CLERK; YES?

 6   A.   YES.

 7   Q.   SO YOU KNOW, AT TIMES, GULF STREAM HAS HAD MULTIPLE PLANTS

 8   OPERATING.  YOU KNOW THAT, RIGHT?

 9   A.   YES.

10   Q.   AND SO YOU WOULD BE THE RECEIVING CLERK FOR ALL THE PLANTS,

11   WHICHEVER ONES WERE IN OPERATION?

12   A.   YES.

13   Q.   SO ARE YOU TELLING ME THAT -- AND ARE ALL OF THESE PLANTS

14   LOCATED IN THE SAME GENERAL AREA?

15   A.   PRETTY MUCHLY.

16   Q.   OKAY.  BUT YOU WOULD KIND OF BE THE FUNNEL THROUGH WHICH THE

17   DRIVER HAS TO GO TO GET TO THE RIGHT PLANT?

18   A.   RIGHT, RIGHT.

19   Q.   OKAY.  I THINK I UNDERSTAND.  SO THE DRIVER COMES IN.  AND

20   WHAT KIND OF PAPERWORK DOES HE BRING TO YOU, MR. BROWN?

21   A.   HE BRINGS ME THE FREIGHT BILLS, IF THERE'S FREIGHT BILLS.

22   NOT EVERYBODY'S GOT FREIGHT BILLS.  SOME WILL BE PACKING LISTS.

23   AND THEN, LIKE I SAID EARLIER, I'LL JUST GO BACK THROUGH, GO

24   THROUGH EVERY ONE OF THOSE THINGS MAKING SURE WHAT THE VENDOR

25   SAYS IS ON THE BILLS IS ON THE LOAD AND CONTINUE ON WITH THAT.
```

1    Q.    OKAY.  SO HE'S GOING TO BRING YOU, THE DRIVER, SOME SORT OF

2    PAPERWORK?

3    A.    YES.

4    Q.    AND SOMETIMES IT'S A PACKING SLIP?

5    A.    YES.

6    Q.    SOMETIMES IT'S A DELIVERY TICKET?

7    A.    YES.

8    Q.    AND SOMETIMES YOU CALLED IT A FREIGHT BILL?

9    A.    YES.

10   Q.    AND WHAT WOULD BE YOUR JOB AS THE RECEIVING CLERK,

11   MR. BROWN, WHEN THE DRIVER, HE OR SHE WOULD BRING YOU THAT

12   DOCUMENT?

13   A.    THE FIRST THING I WOULD DO WOULD BE HE HANDS THIS TO ME WHEN

14   HE WALKS IN THE DOOR.  AND I GET ON MY COMPUTER.  WE GOT PURCHASE

15   ORDERS ON HERE THAT WE CONFIRM WITH.  AND EVERYTHING ON THE

16   COMPUTER IS GOING TO TELL ME ALL OF THIS STUFF RIGHT HERE.

17            AND THEN, SAY, FOR INSTANCE, THERE'S SOMETHING ADDED TO

18   IT.  WHY, WE MIGHT SAY, NO, NO, NO, WE DID NOT ORDER THAT, THAT'S

19   NOT FOR US, IN THAT TYPE OF CATEGORY.  BASICALLY, I WOULD JUST

20   SIT DOWN AND SEE THEY'RE GIVING US 900 SHEETS RIGHT HERE, LOOKS

21   LIKE.  I'M GOING TO LOOK AT THE COMPUTER AND SEE WHAT THE

22   COMPUTER SAYS.  DID WE ORDER 900, DID WE ORDER A THOUSAND,

23   YOUR KNOW, STUFF LIKE THAT RIGHT THERE.  AND THEN EVERYTHING

24   ELSE, I WILL MAKE SURE THAT EVERYTHING MEETS ALL OF OUR CRITERIA.

25            AND THEN ONCE HE'S DONE, ONCE I'M DONE WITH HIM THEN,

1    IF HE DOESN'T KNOW WHERE TO GO AT, I WILL DIRECT HIM TO WHERE HE
2    GOES AT TO GET PROPERLY UNLOADED.  AND THEN WHEN HE COMES BACK,
3    THE RECEIVER WILL HAVE PUT DOWN HERE THE COUNTS.  AND IF
4    EVERYTHING JIVES, HE'S HAPPY, I'M HAPPY, THE RECEIVER IS HAPPY, I
5    SIGN HIS BILL AND, *C'EST LA VIE*, HE'S GONE FOR ANOTHER DAY, AND
6    THEN I START ON THE NEXT PERSON.
7    Q.   YOU SIGN HIS PACKING SLIP --
8    A.   YES.
9    Q.   -- BASICALLY?  AND THE PURPOSE OF THAT, AT LEAST AS YOU
10   UNDERSTAND IT, IS SO HE CAN TAKE IT TO WHOMEVER HE'S WORKING FOR
11   TO PROVE THAT HE DID WHAT HE'S SUPPOSED TO DO?
12   A.   YES.
13   Q.   AND WHAT YOU'RE DOING IS MAKING SURE THAT WHATEVER WAS
14   ORDERED IS RECEIVED?
15   A.   YES.
16   Q.   ARE YOU FAMILIAR WITH THAT TERM REG?  DO YOU SEE IT RIGHT
17   THERE?
18   A.   WHERE ARE WE AT?
19   Q.   WE'RE RIGHT THERE.  LOOK HERE.  WE'RE LOOKING AT TIMMINS
20   SIX, LAUAN.  YOU KNOW WHAT THAT IS.
21   A.   YES.
22   Q.   IT SAYS REG?
23   A.   WHERE IS THAT AT?
24   Q.   RIGHT AFTER LAUAN.
25   A.   I'M NOT QUITE SURE WHAT THAT WOULD BE.

1   Q.   HAVE YOU SEEN THAT WORD BEFORE?

2   A.   NOT THAT I'M AWARE OF.

3   Q.   BACK TO THIS PARTICULAR DOCUMENT, TIMMINS SIX, HAVE YOU SEEN

4   THAT DESIGNATION USED ON LAUAN WOOD BEFORE?

5   A.   NOT THAT I CAN REMEMBER.

6   Q.   WHEN YOU READ THAT, AS THE RECEIVER, AND HAVING BEEN A

7   RECEIVER FOR, GOSH, MORE THAN 30 YEARS, WHAT DOES THAT TELL YOU?

8   A.   ACTUALLY, WHAT THAT'S TELLING ME RIGHT THERE WOULD BE

9   SOMETHING THAT THE VENDOR IS PUTTING ON IN THEIR CODE.  THAT

10  WOULD BE ABOUT THE BEST I COULD SAY.

11  Q.   SO EVERY OTHER WORD ON THERE EXCEPT REG HAS SIGNIFICANCE TO

12  YOU AS A RECEIVER?

13  A.   RIGHT.

14  Q.   AND OTHER THAN A GUESS, YOU DON'T KNOW WHAT THAT MEANS?

15  A.   RIGHT.

16  Q.   NO ONE FROM THE COMPANY HAS EVER TOLD YOU WHAT THAT MEANS OR

17  TRAINED YOU ON THAT?

18  A.   NO.

19  Q.   NO ONE FROM PURCHASING HAS COME TO YOU AND SAID, THIS REG

20  WORD HAS SIGNIFICANCE?

21  A.   NO.

22  Q.   SOMETIMES WHEN YOU'RE RECEIVING, THOUGH, YOU DO SEE THE WORD

23  OR THE DESIGNATION LFE?

24  A.   YEAH.

25  Q.   AND YOU KNOW WHAT THAT MEANS?

1   A.    YEAH.

2   Q.    WHAT DOES THAT MEAN?

3   A.    LOW FORMALDEHYDE.

4   Q.    THE PURCHASE ORDER SAYS LFE.  WHAT DO YOU IF THE LOAD

5   DOESN'T SAY LFE?

6   A.    CALL PURCHASING.

7   Q.    HAVE YOU DONE THAT BEFORE?

8   A.    YES, I HAVE.

9   Q.    SO THERE HAS BEEN TIMES IN THE PAST WHEN THE PURCHASE ORDER

10  USED THE DESIGNATION LFE?

11  A.    YES.

12  Q.    THERE HAS?  YES?

13  A.    YES.

14  Q.    AND YOU'VE HAD LOADS PRESENTED TO YOU THAT DIDN'T HAVE THE

15  DESIGNATION ON IT?

16  A.    YES.

17  Q.    AND YOU CALLED PURCHASING.

18  A.    YES.

19  Q.    WHO DID YOU CALL?

20  A.    IT WOULD BE BASICALLY JEFFREY ZUMBRUN.

21  Q.    YOU DEAL WITH HIM?

22  A.    YEAH.

23  Q.    HAVE YOU EVER BEEN TRAINED ON WHAT LFE MEANS OR WHAT THE

24  SIGNIFICANCE OF IT IS?

25  A.    YES, WE HAD A LITTLE PROGRAM ON IT.

1  Q.    WHEN?

2  A.    NOW THAT I DON'T REMEMBER.

3  Q.    RECENTLY, RIGHT?

4  A.    NO.

5  Q.    TELL ME WHEN IT WAS.

6  A.    IT WOULD HAVE BEEN PROBABLY FOUR YEARS, FIVE YEARS AGO

7  MAYBE.

8  Q.    FIVE YEARS AGO.  WHAT PROGRAM DID YOU HAVE ON LFE?

9  A.    JUST A, I WOULD CALL IT A SUMMARY.  EVERYBODY WAS INVOLVED

10 WITH IT, AND THEY WAS EXPLAINING TO US WHAT IT WAS, TO LOOK FOR

11 IT.

12 Q.    TO LOOK FOR IT?

13 A.    TO LOOK FOR IT.  I MEAN, YOU KNOW, THE ONLY THING WE COULD

14 DO IS LOOK AT THE TAG.

15 Q.    I REALIZE, BUT AGAIN --

16 A.    THAT'S THE ONLY THING WE'RE GOING TO LOOK FOR WOULD BE WHAT

17 THE TAG SAYS.

18 Q.    SO THE PROGRAM THAT YOU MENTIONED IS NOTHING MORE THAN

19 SOMEONE SAYS, YOU MIGHT SEE THE DESIGNATION LFE ON THE PURCHASE

20 ORDER, AND IF YOU SEE THAT, MAKE SURE THE DESIGNATION IS ON THE

21 LOAD?

22 A.    YES, YES.

23 Q.    DO YOU KNOW WHO YOU HAD THE MEETING WITH?

24 A.    WELL, JEFF ZUMBRUN WAS THE LEADER OF IT.

25 Q.    HE LED THE MEETING?

1   A.   YEAH.  THERE WAS PROBABLY ABOUT 30.

2   Q.   THIRTY WHO?

3   A.   PEOPLE IN THE MEETING.

4   Q.   FROM WHERE?

5   A.   ALL THE PLANTS.

6   Q.   SO THERE WERE PEOPLE IN ALL THE PLANTS, AND YOU BELIEVE IT

7   WAS FOUR YEARS AGO?

8   A.   FOUR OR FIVE.  I DON'T REMEMBER FOR SURE.

9   Q.   COULD IT BE A LOT LESS THAN THAT?

10  A.   I'M STICKING WITH THE FOUR OR FIVE.

11  Q.   AND IF WHOEVER IS ORDERING DOES NOT PUT IT ON THE PURCHASE

12  ORDER, THEN THEY DON'T EXPECT ME AND I DON'T EXPECT MY RECEIVERS

13  TO LOOK FOR THAT DESIGNATION, TRUE?

14  A.   NO.

15  Q.   ALL RIGHT.  TELL ME WHERE I'M FALSE.

16  A.   BECAUSE ON THE GENERAL STUFF, YOU'RE RIGHT, I WOULD NOT

17  BECAUSE IT WOULD NOT PERTAIN TO IT.  BUT KNOWING PANELING AND THE

18  STUFF LIKE THAT RIGHT THERE, IF IT'S NOT ON THERE, I WILL BE ON

19  THE TELEPHONE, SAYING, HEY, I GOT A LOAD OUT HERE AND YOU'RE NOT

20  SAYING THAT IT'S, THAT IT'S FORMALDEHYDE ON THE PURCHASE ORDER.

21  AND THE FREIGHT BILL IS NOT SAYING IT.  BUT I GOT A LOAD -- WE'LL

22  USE ADORN RIGHT HERE, I GOT THIS LOAD OF ADORN OUT HERE, AND

23  THERE'S NOTHING ON THIS LOAD TELLING ME THAT IT'S A FORMALDEHYDE

24  POSSIBILITY, BUT I KNOW THAT IT IS.  SO I'LL BE ON THE TELEPHONE.

25  Q.    AND SO YOU'RE TELLING ME, LOOK, TONY, IF THERE WAS A LOAD

1   THAT DIDN'T HAVE THE LFE DESIGNATION ON IT AND IT WAS RECEIVED

2   AND GOT PAST ME AND PAST THE GATE AND PAST THE RECEIVER WHO

3   UNLOADED IT, THAT WAS A MISTAKE?

4   A.   THAT WOULD BE, YES.

5   Q.   ALL RIGHT.  SO IF THERE ARE PACKING SLIPS THAT CAME INTO THE

6   HEAD -- OR THE RECEIVING CLERK, I.E., YOU, THAT DID NOT SAY LFE

7   ON THEM, YOU'RE TELLING ME THAT SOMEONE MADE A MISTAKE.

8   A.   YES.

9   Q.   WELL, IF IT WASN'T, AND AGAIN, YOU KNOW, PART OF A LAWSUIT

10  IS TO POINT FINGERS, I GUESS, SO I'M GOING TO HAVE TO START

11  POINTING SOME FINGERS.  IF IT WASN'T YOU, MR. BROWN, WHO ELSE

12  WOULD IT HAVE BEEN THAT WOULD HAVE MADE SUCH A MISTAKE?

13  A.   NUMBER ONE, IT WOULD HAVE BEEN THE VENDOR.

14  Q.   THAT'S THE WHOLE PURPOSE OF THE RECEIVING DEPARTMENT, ISN'T

15  IT?

16  A.   YES.

17  Q.   OTHERWISE, THERE IS NO NEED OF HAVING ONE, IS THERE?

18  A.   BUT AT THE SAME TOKEN, IF MY COMPUTER SAID THAT IT WAS AND

19  IF THE VENDOR DID NOT PUT IT ON THEIR FREIGHT BILL, BUT IF IT WAS

20  ON THE STICKER, I'D HAVE BEEN SATISFIED.

21  Q.   BUT YOU DON'T KNOW IF THAT'S TRUE OR NOT.

22  A.   NO, I CAN'T -- I CAN'T VOUCH FOR THAT RIGHT THIS MOMENT.

23  Q.   MY QUESTION AGAIN IS:  IF IT WASN'T YOU -- FIRST OF ALL,

24  LET'S TALK ABOUT THE PURPOSE OF THE RECEIVING DEPARTMENT.  YOU'VE

25  BEEN IN IT 30-SOMETHING YEARS.  THE PURPOSE IS TO MAKE SURE THE

1  VENDORS ARE DOING WHAT THEY ARE SUPPOSED TO DO.

2  A.   RIGHT.

3  Q.   IF YOU'RE JUST GOING TO RELY COMPLETELY ON THE VENDORS,

4  THERE'S NO NEED IN HAVING A RECEIVING DEPARTMENT, RIGHT?

5  A.   RIGHT.

6  Q.   I MEAN, IF WE COULD ALL TRUST PEOPLE TO DO WHAT THEY ARE

7  SUPPOSED TO DO, THEN GULF STREAM COULD SAVE THEMSELVES YOUR

8  SALARY AND A LOT OF OTHER PEOPLE'S BY JUST LETTING THE VENDOR

9  SHOW UP AND DELIVER WHAT WAS ORDERED.

10  A.   SURE.  JUST DUMP IT OFF.

11  Q.   DUMP IT OFF.  IF YOU'RE GOING TO RELY ON THEM, JUST DUMP IT

12  OFF.

13  A.   YEAH.

14  Q.   BUT YOU CAN'T RELY ON THEM, RIGHT?

15  A.   RIGHT.

16  Q.   THERE'S BEEN TOO MANY TIMES IN 30 YEARS THAT YOU'VE CAUGHT

17  ISSUES WITH SHIPMENTS, HAVEN'T THERE?

18  A.   YES.

19  Q.   I MEAN, THAT'S THE REASON YOU'RE DOING YOUR JOB AS RECEIVER.

20  A.   YES.

21  Q.   TO MAKE SURE THAT WHAT WAS ORDERED IS WHAT WAS DELIVERED.

22  A.   YES.

23  Q.   I WANT TO KNOW MORE ABOUT THIS MEETING, THIS SEMINAR, YOU

24  CALLED IT.  MR. BROWN, CAN YOU REMEMBER ANYTHING ELSE ABOUT IT

25  OTHER THAN THERE WERE 30 PEOPLE IN THE ROOM, IN A CONFERENCE

1    ROOM, UP THE ROAD AT JEFF'S OFFICE?  CAN YOU REMEMBER WHY YOU

2    WERE HAVING THIS MEETING OR WHAT THE CATALYST WAS TO HAVE THE

3    MEETING?

4    A.    WELL, ME, IT WAS FOR THE FORMALDEHYDE STUFF.

5    Q.    IT WAS A BIG ISSUE?

6    A.    I TOOK IT AS A BIG ISSUE BECAUSE THEY CALLED IN ALL OF US

7    RECEIVERS.

8    Q.    DID THEY TELL YOU, HEY, LOOK, WE HAVE BEEN RECEIVING THE

9    WRONG KIND OF STUFF OR THERE'S A PROBLEM?

10   A.    NOBODY SAID THAT.

11   Q.    THIS WAS JUST, THEY WANTED TO MAKE YOU AWARE THAT THIS NEEDS

12   TO BE CHECKED?

13   A.    YES.

14   Q.    THIS FORMALDEHYDE ISSUE?

15   A.    YES.

16   Q.    AND WAS IT BEFORE OR AFTER THE BIG LAWSUIT?

17   A.    OH, THIS WAS BEFORE.

18   Q.    BEFORE THE LAWSUIT?

19   A.    YEAH.

20   Q.    WAS IT -- DID THEY SAY IT WAS BECAUSE PEOPLE WERE HAVING

21   COMPLAINTS OR PROBLEMS?

22   A.    NO.  THAT WASN'T BROUGHT UP.

23   Q.    OKAY.  BUT THEY MADE IT, WHOEVER, OR JEFFREY RAN THE

24   MEETING?

25   A.    YES.

1    Q.    JEFFREY ZUMBRUN?

2    A.    YEAH.

3    Q.    THE HEAD PURCHASING GUY?

4    A.    YES, HE DID.

5    Q.    HE MADE IT CLEAR AND STRESSED TO ALL OF YOU RECEIVERS HOW

6    IMPORTANT IT WAS THAT THE STUFF COMING INTO THE PLANTS WAS LOW

7    FORMALDEHYDE?

8    A.    YES.

9    Q.    A LOT OF IT.  BUT THIS IS AN INVOICE, AND I WANT YOU TO LOOK

10   AT THE TOP RIGHT-HAND SIDE OF THE PAGE, WHERE IT SAYS, "DELIVERED

11   TO PLANT 67."  DO YOU SEE THAT?

12   A.    UH-HUH (AFFIRMATIVE RESPONSE).

13   Q.    YES?

14   A.    YES.

15   Q.    YOU WOULD ASSUME, OF COURSE, THAT THERE WOULD BE SOME

16   CORRESPONDING PACKING SLIP THAT YOU WOULD HAVE HAD TO SIGN OFF ON

17   BEFORE THIS INVOICE WAS SENT?

18   A.    YES.

19   Q.    DO YOU SEE WHAT KIND OF PRODUCT WAS -- THAT'S BEING BILLED

20   FOR?

21   A.    YES, I DO.

22   Q.    DO YOU SEE THAT PESKY WORD THERE AGAIN?

23   A.    YEAH.  THAT R-E-G.

24   Q.    YEAH.  SO SOMEBODY'S BILLING GULF STREAM FOR REG PRODUCT?

25   A.    YES.

1   Q.   WHICH MEANS THAT GULF STREAM'S PAYING FOR REG PRODUCT,

2   ASSUMING THEY PAID THE INVOICE; RIGHT?

3   A.   RIGHT.

4   Q.   WHICH MEANS THAT SOMEBODY WITHIN RECEIVING ACCEPTED REG

5   PRODUCT, DOESN'T IT?

6   A.   YES.

7   Q.   AND THAT WOULD PROBABLY BE YOU, WOULDN'T IT?

8   A.   PROBABLY.  YES, I WOULD.

9   Q.   SO YOU CAN SEE IF JEFF ZUMBRUN MADE THE MISTAKE, RIGHT?

10  A.   SURE.

11  Q.   BECAUSE IF JEFF ORDERED REG PRODUCT, THEN NO ONE CAN SLIGHT

12  YOU FOR RECEIVING REG PRODUCT, CAN THEY?

13  A.   NO.

14  Q.   AND NO ONE CAN SLIGHT THE VENDOR FOR PROVIDING WHAT WAS

15  ORDERED, CAN THEY?

16  A.   NO.

17  Q.   BUT CERTAINLY, AT LEAST AS FAR AS YOU CAN SEE THERE -- AND

18  THAT'S CALLED -- THAT DOCUMENT, IS THAT WHAT YOU WOULD CALL AN

19  INVOICE?  OR YOU DON'T REALLY EVEN KNOW WHAT IT IS BECAUSE YOU

20  DON'T EVER SEE THAT KIND OF DOCUMENT.

21  A.   NO, I WOULD SAY THIS IS AN INVOICE BECAUSE OF THIS RIGHT

22  HERE.

23  Q.   LET ME SHOW YOU --

24  A.   AND THE PRICE IS ON IT, TOO.

25  Q.   RIGHT.  EXHIBIT 4, TIMMINS 4, THAT'S -- IT'S CALLED A

1    PACKING SLIP, ISN'T IT?

2    A.    YEAH.

3    Q.    THAT'S THE TYPE OF PACKING SLIP WE HAVE BEEN TALKING ABOUT?

4    A.    WELL, THAT WOULD BE THE SAME AS THIS RIGHT HERE.

5    Q.    THE SAME AS IN ONE?

6    A.    YEAH, A LOT CLEARER.

7    Q.    YEAH.  YOU'RE SAYING THAT, THAT TIMMINS 4 WOULD BE THE SAME

8    AS THESE THREE DOCUMENTS WE'VE MARKED AS BROWN 1?

9    A.    YES.

10   Q.    SAME TYPE OF DOCUMENT.

11   A.    YES.  THIS PACKING LIST.

12   Q.    YEAH.  PACKING SLIP.  AND YOU SEE THAT SAME PESKY WORD THERE

13   AGAIN, DON'T YOU?

14   A.    YEAH, R-E-G.

15   Q.    R-E-G.  WHICH MEANS THAT WHOEVER RECEIVED THAT PARTICULAR

16   SHIPMENT RECEIVED A REG, REG PRODUCT; ISN'T THAT RIGHT?

17   A.    YES.

18   Q.    BECAUSE YOU ABSOLUTELY LOOK AT EVERY PACKING SLIP, DON'T

19   YOU?

20   A.    I HAVE TO.

21   Q.    YEAH.  THAT'S YOUR JOB.

22   A.    YES.

23   Q.    CAN YOU TELL ME, AND I'M GOING TO ASK JEFFREY ZUMBRUN TODAY,

24   BUT FROM ADORN, WAS THERE ANY PARTICULAR TYPE OF PRODUCT THAT YOU

25   WERE MOSTLY RECEIVING FROM THEM?

1    A.   IT WOULD HAVE BEEN THE PANELING, WHERE IS THAT AT, RIGHT

2    HERE.

3    Q.   LAUAN?

4    A.   LAUAN, YEAH, WE CALL PANELING, YEAH.

5    Q.   PANELING.  AND THAT'S THE STUFF THAT GOES ON THE WALLS

6    INSIDE?

7    A.   YES.

8    Q.   HAVE YOU EVER SEEN ANYONE COMPLAINING OF ANY KIND OF ILLNESS

9    AT THE PLANTS OR ANYBODY YOU TALKED TO?

10   A.   FOR?

11   Q.   FOR JUST EITHER EYES BURNING, NOSE BURNING, COUGHING, THAT

12   SORT OF THING.

13   A.   NO.  NO.  JUST THE STANDARD FLU THAT THEY WOULD HAVE,

14   SICKNESS, YEAH.

15   Q.   BUT NOTHING --

16   A.   NOTHING LIKE THAT.

17   Q.   NOTHING THAT YOU WOULD RELATE TO BEING EXPOSED TO ANYTHING.

18   A.   NO.

19        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

20   VIDEOTAPED DEPOSITION OF JAMES BROWN WAS CONCLUDED.)

21        MR. WATTS:  JUDGE, THAT CONCLUDES THE OFFER OF THAT

22   WITNESS.

23        MR. WEINSTOCK:  YOUR HONOR, WE WOULD OFFER THE EXHIBITS

24   FROM MR. BROWN'S DEPOSITION THAT HE WAS REVIEWING AND DISCUSSING

25   WITH THE DATES IN QUESTION AS --

1           MR. WATTS:  NO OBJECTION.

2           MR. WEINSTOCK:  -- WHATEVER THE NEXT --

3           THE COURT:  WHAT NUMBERS WERE THEY SO WE CAN KEEP IT

4    STRAIGHT?

5           MR. WEINSTOCK:  THEY WERE BROWN.

6           THE COURT:  NO, WHAT NUMBERS ARE THEY GOING TO BE HERE?

7           MR. WEINSTOCK:  510.

8           THE COURT:  510?

9           MR. WATTS:  NO OBJECTION.

10          THE COURT:  ANY OBJECTION?

11          MR. WATTS:  NO, SIR.  AND, JUDGE, IN THAT DEPOSITION,

12   THERE WAS A REFERENCE TO A MEETING WITH 30 PEOPLE CALLED IN ABOUT

13   FOUR YEARS AGO.  WE WOULD JUST LIKE TO HAVE THE COURT TAKE

14   JUDICIAL NOTICE, THE DEPOSITION WAS TAKEN ON JULY 16TH OF 2009.

15          MR. WEINSTOCK:  AND I BELIEVE HE SAID FOUR OR FIVE YEARS

16   AGO.

17          MR. WATTS:  WHATEVER.

18          THE COURT:  WELL, THE RELEVANT TIME FRAME, THEN, WOULD

19   BE THAT LONG AGO FROM THE DATE OF THE DEPOSITION, WHICH IS JULY

20   OF '09.

21          MR. WATTS:  JULY OF '09.

22          MR. WEINSTOCK:  YOU'RE ABSOLUTELY CORRECT.

23          THE COURT:  NOW THAT WE'VE GOT OUR TIMELINE.  LET'S GO

24   AHEAD AND MARK THOSE 510.  MAKE SURE WE PROVIDE THOSE TO THE

25   COURTROOM DEPUTY, AND WHO DO WE HAVE NEXT, MR. WATTS?

1          MR. WATTS:  WE HAVE KYLE TIMMINS BY AND THROUGH HIS

2    VIDEOTAPED DEPOSITION.  IT'S NINE MINUTES, SIR.

3          THE COURT:  ALL RIGHT, KYLE TIMMINS.

4               (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

5    VIDEOTAPED DEPOSITION OF KYLE TIMMINS WAS PLAYED.)

6    Q.   WHAT IS YOUR NAME?

7    A.   KYLE R. TIMMINS.

8    Q.   WHAT DO YOU DO FOR A LIVING?

9    A.   I'M A RECEIVER RIGHT NOW.

10   Q.   FOR WHOM?

11   A.   FAIRMONT HOMES.

12   Q.   WHAT IS FAIRMONT HOMES?

13   A.   MODULAR HOUSING.  THEY MAKE MODULAR HOUSING.

14   Q.   HAVE YOU EVER BEEN A RECEIVER FOR GULF STREAM COACH?

15   A.   YES, SIR.

16   Q.   WHEN?

17   A.   2004 TO 2005.

18   Q.   WHAT DOES A RECEIVER FOR GULF STREAM COACH DO?  WHAT ARE

19   YOUR JOB REQUIREMENTS?

20   A.   YOU RECEIVE PRODUCT OFF A TRUCK.  YOU CHECK YOUR INVOICE TO

21   MAKE SURE IT'S THE CORRECT INVOICE.  YOU COUNT THE PRODUCT TO

22   MAKE SURE THERE'S THE RIGHT QUANTITIES, MAKE SURE THE SUPPLIER IS

23   NOT SHORTING YOU, MAKE SURE THE PRODUCT IS THE CORRECT PRODUCT,

24   AND THEN YOU WOULD DELIVER IT TO WHERE IT IS USED ON THE FLOOR.

25   Q.   DO YOU, AS A RECEIVER FOR GULF STREAM COACH, DID YOU RECEIVE

1  WOOD PRODUCTS?

2  A.   YES.

3  Q.   FROM WHICH VENDORS DID YOU RECEIVE WOOD PRODUCTS?

4  A.   ADORN AND -- I BELIEVE MOST OF IT WAS FROM ADORN.

5  Q.   SO, AND THAT'S IN 2004?

6  A.   YES.

7  Q.   SO YOU WERE A RECEIVER IN THE YEAR 2004 FOR GULF STREAM

8  COACH?

9  A.   YES.

10  Q.   WHERE WAS YOUR JOB LOCATION?

11  A.   I WAS LOCATED AT GULF STREAM MAIN, THE MAIN PLANT IN

12  NAPPANEE.

13  Q.   DID YOU WORK OR DID YOU DO ANY RECEIVING AT PLANT 57?

14  A.   NO, SIR.

15  Q.   AND DID THEY BUILD TRAILERS AT THE MAIN FACILITY?

16  A.   YES.

17  Q.   DID THEY BUILD FEMA TRAILERS AT THE MAIN FACILITY?

18  A.   YES.

19  Q.   AND THEN THERE WAS A PLANT 57 THAT ALSO WAS BUILDING FEMA

20  TRAILERS?

21  A.   YES, SIR.

22  Q.   AND THERE WOULD BE A RECEIVER THERE AS WELL?

23  A.   YES, SIR.

24  Q.   AND YOU GO THROUGH AND MAKE SURE EXACTLY WHAT WAS ORDERED IS

25  WHAT WAS RECEIVED?

1    A.    EXACTLY.

2    Q.    WHAT IS THE FORMALDEHYDE POLICY AT GULF STREAM?

3    A.    I DO NOT KNOW THAT QUESTION.

4    Q.    HAVE YOU EVER BEEN ADVISED THAT THERE WAS ANY SORT OF LOW

5    FORMALDEHYDE-EMITTING POLICY AT GULF STREAM COACH?

6    A.    NO.

7    Q.    SOMETHING YOU'VE NEVER HEARD OF, IS IT?

8    A.    NO.

9    Q.    IT'S NOT PART OF YOUR JOB, IS IT?

10   A.    NO.

11   Q.    YOU'RE NOT SUPPOSED TO LOOK AT THE PRODUCT TO MAKE SURE IT'S

12   LFE?

13   A.    NO.

14   Q.    HAVE YOU EVER SMELLED THE WOOD THAT ADORN DELIVERED?

15   A.    SMELLED LIKE WOOD, YEAH, YEAH.

16   Q.    DID IT SMELL LIKE FORMALDEHYDE?

17   A.    AS FAR AS, NO, IT DID NOT.

18   Q.    IT DID NOT.  DO YOU KNOW WHAT FORMALDEHYDE SMELLS LIKE?

19   A.    YEAH, A STRONG SMELL, IT'S LIKE GLUE ALMOST.

20   Q.    DID YOU EVER NOTICE ANY LABELS THAT HAD TO DO WITH

21   FORMALDEHYDE ON ANY OF THE PRODUCTS YOU WERE RECEIVING?

22   A.    NO.

23   Q.    DID YOU EVER INVOLVE YOURSELF OR TAKE PART IN REMOVING ANY

24   LABELS?

25   A.    NO.  WE WERE NOT ALLOWED TO REMOVE THE LABELS.

1  Q.    IF SOMEONE WAS REMOVING LABELS FROM WOOD PRODUCT BEING

2  DELIVERED, FOR INSTANCE, AT THE MAIN PLANT IN 2004, THAT WOULD

3  NOT BE PURSUANT TO ANY SORT OF POLICY OR PROCEDURE?

4  A.    NO.

5  Q.    THAT WOULD BE AGAINST POLICY OR PROCEDURE?

6  A.    EXACTLY.

7  Q.    SO YOU DON'T KNOW OF ANY WRITTEN, ANYTHING WRITTEN THAT

8  EXPLAINS TO YOU EXACTLY HOW TO BE A RECEIVER?

9  A.    NO.

10  Q.    DO YOU HAVE A WRITTEN JOB DESCRIPTION THAT YOU'VE EVER SEEN?

11  A.    NOT THAT I'M AWARE OF, NO.

12  Q.    YOU WERE JUST TRAINED ON THE JOB TO BE A RECEIVER?

13  A.    YES.

14  Q.    AND NO ONE'S EVER, DURING THIS THREE AND A HALF YEARS YOU'VE

15  WORKED AT GULF STREAM, YOU'VE NEVER BEEN TRAINED ON HOW TO

16  IDENTIFY WHETHER A PRODUCT IS LOW FORMALDEHYDE-EMITTING OR

17  WHETHER IT'S JUST NONLOW-FORMALDEHYDE EMITTING?

18  A.    NO.

19  Q.    THAT'S JUST NOT PART OF YOUR JOB, IS IT?

20  A.    NO.

21  Q.    YOUR JOB AS RECEIVER IS JUST TO MAKE SURE THAT WHAT YOU

22  RECEIVE IS WHAT WAS WHAT ORDERED.

23  A.    YES.

24  Q.    AND YOU DO THAT BY USING YOUR OWN THAN INTERNAL, WHEN I SAY

25  YOUR, I MEAN GULF STREAM'S OWN INTERNAL PURCHASE ORDER.

1  A.   YES.

2  Q.   AND WHEN YOU WERE A RECEIVER IN 2004, THE WOOD MANUFACTURER

3  OR VENDOR THAT YOU DEALT WITH, THE ONLY ONE YOU CAN THINK ABOUT

4  IS ADORN.

5  A.   THAT'S THE ONLY ONE I CAN THINK OF, YES.

6  Q.   DID YOU DEAL WITH PATRICK INDUSTRIES AS WELL?  WHEN I SAY

7  DEAL WITH, I MEAN RECEIVE PRODUCT FROM PATRICK INDUSTRIES?

8  A.   I CAN'T REMEMBER EXACTLY HOW MANY COMPANIES -- I JUST, I

9  REMEMBER DISTINCTLY ADORN.

10  Q.   ADORN WAS CERTAINLY THE GREAT MAJORITY OF THE PRODUCT YOU

11  RECEIVED.

12  A.   (WITNESS NODS IN THE AFFIRMATIVE).

13  Q.   YES?

14  A.   YES.

15  Q.   DO YOU KNOW WHAT THE WORD -- YOU CAN SEE ON EXHIBIT 2

16  THERE'S SOME WORDS USED HERE.  LAUAN, YOU KNOW WHAT THAT IS?

17  A.   YES.

18  Q.   WHAT IS LAUAN?

19  A.   LAUAN IS THIN, IT'S HARD TO DESCRIBE.  IT'S THIN -- IT'S

20  USUALLY THIN WITH LAYERS OF WOOD PRESSED TOGETHER.

21  Q.   SO IN THE TIME YOU WERE RECEIVING AT THE MAIN PLANT, YOU

22  CALLED IT, IT WAS ALL FEMA TRAILERS?

23  A.   YES.

24  Q.   ARE YOU FAMILIAR WITH THIS WORD REG?

25  A.   NO.

1  Q.   IS THAT A WORD THAT WAS EVER ONE OF THE DISTINCTIONS OF THE

2  PRODUCT THAT YOU WERE LOOKING AT TO MAKE SURE YOU WERE RECEIVING

3  THE RIGHT THING?

4  A.   NO.

5  Q.   IS THAT A WORD THAT YOU EVER SAW ON ANY OF THE DOCUMENTATION

6  WHEN YOU WERE PERFORMING YOUR JOB AS A RECEIVER?

7  A.   NOT THAT I CAN RECALL, NO.

8  Q.   SITTING HERE IN THIS -- IN THE BASEMENT, I GUESS WE'RE IN

9  THE BASEMENT HERE, KYLE, TELL ME, DO YOU KNOW WHAT REG EVEN

10 MEANS?

11 A.   REGULAR.

12 Q.   AS A RECEIVER, THAT'S WHAT YOU WOULD ASSUME IT MEANS?

13 A.   THAT'S WHAT I WOULD ASSUME.

14 Q.   SO YOU KNOW WHAT REGULAR WOULD SIGNIFY?

15 A.   NO.

16 Q.   BUT REG WASN'T SOMETHING THAT WAS IN YOUR VOCABULARY OR PART

17 OF YOUR JOB IN ANY WAY?

18 A.   NO.

19 Q.   DID YOU SOMETIMES SEE THE DESIGNATION OF LFE ON ANY OF THE

20 PRODUCTS?

21 A.   I'M NOT SURE WHAT THAT IS.

22 Q.   OKAY.  SO WHETHER IT BE THE DESIGNATION REG OR WHETHER IT BE

23 THE DESIGNATION LFE, THAT WAS NOT ONE OF THE DISTINGUISHING

24 FACTORS THAT WAS USED TO MAKE SURE YOU WERE PROPERLY RECEIVING.

25 A.   NO.

1  Q.   YOU WERE MORE CONCERNED WITH, IT'S THE RIGHT SIZE?

2  A.   YES.

3  Q.   RIGHT?  IT'S THE RIGHT COLOR.

4  A.   YES.

5  Q.   AND IT'S THE RIGHT QUANTITY.

6  A.   YES.

7  Q.   ANYTHING ELSE?

8  A.   NO.

9  Q.   IN 2004 AT THE MAIN PLANT, YOU WERE ALSO ONLY MAKING FEMA

10 TRAILERS?

11 A.   YES, IT WAS STRICTLY FEMA.  THERE WAS NO OTHER TRAILERS

12 GOING DOWN THE LINE.

13 Q.   AND I'M JUST TRYING TO CLEAR UP THE RECORD BECAUSE YOU MAY

14 NOT BE AT THE TRIAL AND I WANT TO MAKE SURE THAT THIS IS ON THE

15 RECORD HERE.

16       KYLE TIMMINS AS RECEIVER FOR THE MAIN PLANT IN 2004 AND

17 2005, AS BEST YOU CAN RECALL, ONLY FEMA TRAILERS WERE MADE AT

18 THAT PLANT; AND THE ONLY WOOD VENDOR THAT YOU CAN RECALL THAT

19 DELIVERED TO THAT PLANT WAS ADORN.

20 A.   THAT'S CORRECT.

21 Q.   AND IT'S GOT A PACKING SLIP IN THERE, RIGHT?

22 A.   RIGHT.

23 Q.   DO YOU KNOW WHERE THE PACKING SLIP WOULD BE ON THE LOADS OF

24 WOOD THAT YOU WOULD RECEIVE?

25 A.   IF THE DRIVER, THE DRIVER WOULD HAVE THE PACKING SLIP.  AND

1    THAT'S WHAT HE WOULD GIVE TO THE GUARD.  THEY WERE NEVER ON THE

2    MATERIAL ITSELF WHEN IT CAME AROUND TO US.

3    Q.   SO THE PACKING SLIP WAS ALREADY OFF THE SHIPMENT.

4          HAVE YOU EVER HAD ANY ILLNESS OR SICKNESS WHILE YOU

5    WERE WORKING AT GULF STREAM?

6    A.   NO.

7    Q.   YOU NEVER HAD TO GO SEE THE DOCTOR FOR ANY SORT OF

8    RESPIRATORY ISSUES?

9    A.   NO, SIR.

10   Q.   WHEN YOU WERE RECEIVING THE WOOD PRODUCTS FROM ADORN, DID

11   YOU EVER EXPERIENCE ANY SORT OF BURNING EYES OR NOSE BURNING,

12   ANYTHING LIKE THAT?

13   A.   NO.

14   Q.   BACK IN 2004/05 YOU WORKED AT PLANT 67.

15   A.   YES.

16   Q.   AND YOU NEVER NOTICED ANY UNUSUAL SMELLS COMING FROM SOME OF

17   THE SHIPMENTS OF THE WOOD?

18   A.   NO.

19   Q.   YOU NEVER NOTICED THAT THE WOOD WAS STICKY OR WET OR

20   ANYTHING LIKE THAT?

21   A.   NO, NO.  WE WERE SUPPOSED TO CHECK TO MAKE SURE THAT IT

22   DIDN'T LOOK LIKE IT WAS RAINED ON OR IT WAS DAMAGED.  THAT WAS

23   ONE OF THE THINGS.  WE HAD TO MAKE SURE THAT IT WASN'T DAMAGED.

24   BECAUSE IF IT WAS DAMAGED, YOU KNOW, YOU WEREN'T SUPPOSED TO

25   RECEIVE THAT PRODUCT.

1   Q.   AND WHEN YOU RECEIVED IT, WAS IT STORED INSIDE OR OUTSIDE?

2   A.   WE WOULD TAKE IT OFF THE TRUCK AND WE WOULD STORE IT IN A

3   WAREHOUSE UNTIL THEY WOULD NEED IT ON THE PRODUCTION LINE.   THEN

4   WE WOULD MOVE IT FROM THE WAREHOUSE TO THE PRODUCTION LINE.

5   Q.   SO YOU WOULD MOVE THAT PRODUCT TWICE.

6   A.   YES.

7   Q.   AS A RECEIVER, PART OF YOUR JOB WAS TO RUN THE FORKLIFT?

8   A.   RIGHT.

9   Q.   NOW, DID ANYONE EVER COME TO YOU AND SAY, YOU KNOW, A LOT OF

10  THAT WOOD THAT WE WERE RECEIVING HAD A LOT OF FORMALDEHYDE IN IT?

11  A.   NO.

12         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

13  VIDEOTAPED DEPOSITION OF KYLE TIMMINS CONCLUDED.)

14         MR. WATTS:   JUDGE, THAT CONCLUDES THAT WITNESS.

15         THE COURT:   OKAY.

16         MR. WEINSTOCK:   YOUR HONOR, AT THIS TIME WE WOULD OFFER

17  THE 2005 INVOICES THAT WERE, THE DOCUMENTATION THAT WAS ATTACHED

18  TO MR. TIMMINS' DEPOSITION AS EXHIBIT 511, ALSO WITH THE

19  UNDERSTANDING THAT HIS DEPOSITION WAS TAKEN JULY 16, 2009.

20         MR. WATTS:   NO OBJECTION.

21         THE COURT:   NO OBJECTION.   ALL RIGHT, 511 IS ADMITTED.

22  AND THE DATE IS SO NOTED.

23         ALL RIGHT, NEXT WITNESS.

24         MR. HILLIARD:   YOUR HONOR, WE CALL AL WHITAKER TO THE

25  STAND, THE CORPORATE REP FOR FLUOR.

1      THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

2   HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

3   ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

4   THE TRUTH, SO HELP YOU GOD?

5      THE WITNESS:  I DO.

6                      **CHARLES ALBERT WHITAKER**

7   WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

8   CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

9      THE DEPUTY CLERK:  PLEASE BE SEATED AND STATE AND SPELL

10  YOUR NAME FOR THE RECORD.

11     THE WITNESS:  YES, MA'AM.  MY NAME IS CHARLES ALBERT

12  WHITAKER.  CHARLES, C-H-A-R-L-E-S, ALBERT, A-L-B-E-R-T, WHITAKER,

13  W-H-I-T-A-K-E-R.

14     THE COURT:  YOU MAY PROCEED.

15     MR. HILLIARD:  THANK YOU, JUDGE.

16                      DIRECT EXAMINATION

17  BY MR. HILLIARD:

18  Q.   MR. WHITAKER, I'M BOB HILLIARD.  BEFORE THIS TRIAL, WE'VE

19  NEVER MET, HAVE WE?

20  A.   BEFORE THIS TRIAL, NO, SIR.  YOU INTRODUCED YOURSELF

21  YESTERDAY MORNING.

22  Q.   I CAME UP HERE AND INTRODUCED MYSELF AND WE HAD A LITTLE

23  VISIT, BUT I WASN'T AT YOUR DEPOSITION; IS THAT CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   I WANT TO START BY CLARIFYING A FEW THINGS.  YOU'VE BEEN IN

1    THE COURTROOM SINCE WE PICKED THESE FOLKS TO BE ON THE JURY, AND

2    YOU HEARD YOUR LAWYER TALK TO THEM IN OPENING STATEMENTS; RIGHT?

3    A.    YES, SIR, THAT IS CORRECT.

4    Q.    ONE THING I WANT TO BE SURE OF IS WHEN HE SAID, WHEN

5    HURRICANE KATRINA HIT AND PEOPLE WERE HEADING OUT, FLUOR WAS

6    HEADING IN; REMEMBER THAT?

7    A.    YES, SIR.

8    Q.    YOU GUYS WERE NOT UNPAID VOLUNTEERS, WERE YOU?

9    A.    NO, SIR.

10   Q.    YOU HAD A PREEXISTING CONTRACT WITH THE UNITED STATES

11   GOVERNMENT TO HANDLE DISASTERS THAT MAY COME UP, CORRECT?

12   A.    YES, SIR.

13   Q.    IN FACT, IN THAT CONTRACT, YOU ARE THE PROGRAM MANAGER TO

14   HANDLE THOSE DISASTERS.

15   A.    YES, SIR, THAT IS CORRECT.

16   Q.    WOULD IT BE FAIR TO SAY THAT YOU HAD NO IDEA KATRINA WAS

17   COMING, BUT YOU HAD A WRITTEN CONTRACT WITH THE GOVERNMENT THAT

18   SAYS, IF KATRINA OR SOMETHING LIKE THAT COMES, WE'LL BE READY.

19   A.    I GUESS YOU NEED TO PUT THAT IN CONTEXT OF TIME FRAME, WHEN

20   YOU SAY I DIDN'T KNOW IT WAS COMING.  I MEAN, I MONITORED THE

21   WEATHER AND WATCHED.  I KNEW IT WAS DEVELOPING.

22   Q.    WHEN YOU ENTERED THE CONTRACT -- I GOT THAT.  WHEN YOU

23   ENTERED THE CONTRACT WITH THE UNITED STATES GOVERNMENT, YOU

24   DIDN'T KNOW KATRINA WAS GOING TO HIT NEW ORLEANS.

25   A.    THAT IS CORRECT, THERE WAS NO WEATHER INDICATIONS THERE WAS

1   A KATRINA.

2   Q.   KARL, COULD WE PULL UP 501.

3          MR. HILLIARD:  YOUR HONOR, 501, BY AGREEMENT, IS THE

4   AWARD CONTRACT THAT WE ARE MOVING TO ADMIT INTO EVIDENCE WITH

5   SOME REDACTIONS.  IT HAS NOT YET BEEN ADMITTED, BUT I DISCUSSED

6   IT WITH CHARLIE AND, BY AGREEMENT, WE'RE GOING TO MOVE TO ADMIT

7   501, THE AWARD CONTRACT.

8          THE COURT:  IS THERE ANY OBJECTION?

9          MR. WEINSTOCK:  NO OBJECTION, YOUR HONOR.

10          THE COURT:  I ASSUME NO OBJECTION FROM GULF STREAM?

11   MR. WEINSTOCK?

12          MR. WEINSTOCK:  NO OBJECTION.

13          THE COURT:  SO ORDERED.  WHAT WAS THE NUMBER ON THAT?

14          MR. HILLIARD:  501, JUDGE.

15          THE COURT:  501.  501 IS ADMITTED.

16                          EXAMINATION

17   BY MR. HILLIARD:

18   Q.   IF YOU COULD GO TO -- THIS IS THE AWARD CONTRACT.  KARL, IF

19   YOU COULD GO TO 0010, PLEASE.  THE PRINCIPAL PLACE OF

20   PERFORMANCE, CAN YOU BRING THAT UP?

21          SO YOU CONTRACTED WITH THE GOVERNMENT VARIOUS DISASTER

22   SITES TO BE DETERMINED UNDER INDIVIDUAL TASK ORDERS; IS THAT

23   RIGHT?

24   A.   YES, SIR, THAT'S CORRECT.

25   Q.   0058, PLEASE, KARL.  KEY PERSONNEL.

1        AL WHITAKER, DO YOU SEE THAT?  IN THIS CONTRACT WITH

2   THE GOVERNMENT, YOU ARE IDENTIFIED AS A KEY PERSONNEL UNDER THE

3   CONTRACT, THE PROGRAM MANAGER?

4   A.    YES, SIR, THAT'S CORRECT.

5   Q.    0062, PLEASE, KARL.

6        THIS IS A THICK CONTRACT, BUT I PROMISE YOU WHAT I'M

7   ABOUT TO TURN TO IS THE LAST TIME WE'RE GOING TO BE TALKING ABOUT

8   THIS.  WE'RE NOT GOING PAGE BY PAGE.

9        2.1.4.  NOW, I CALL THIS SECTION, IF FLUOR BREAKS IT,

10  FLUOR PAYS FOR IT.  WOULD YOU AGREE WITH MY CHARACTERIZATION OF

11  2.1.4: "THE CONTRACTOR HAS THE OVERALL RESPONSIBILITY OF

12  ENSURING ALL TASKS ARE PERFORMED SATISFACTORY AS DICTATED BY

13  INDIVIDUAL TASKS ORDERS.  FOR TASKS NOT PERFORMED IN A

14  SATISFACTORY MANNER, THE CONTRACTOR WILL BE REQUIRED TO CORRECT

15  DEFICIENCIES AT NO ADDITIONAL COSTS TO THE GOVERNMENT."

16       IF FLUOR BREAKS IT, FLUOR PAYS FOR IT.

17  A.    BREAKS SOUNDS LIKE WE'RE BREAKING SOMETHING.  I THINK YOU'RE

18  TRYING TO USE A COLLOQUIAL-TYPE TERM, BUT...

19  Q.    DO YOU HAVE A PROBLEM WITH THAT?

20  A.    NO.  BUT I DON'T UNDERSTAND YOUR REFERENCE TO IF WE BREAK

21  IT.  I MEAN, WHAT IS IT WE'RE BREAKING?  IF WE DON'T COMPLY WITH

22  THE CONTRACT, WE NEED TO FIX IT.  THAT'S CORRECT.

23  Q.    WELL, LET ME ASK YOU THE QUESTION, WHAT IS IT WE'RE

24  BREAKING, AND THAT SEGUES INTO THIS TRAILER RIGHT HERE.

25       ARE YOU AN ENGINEER?

1    A.    YES, SIR, I'M A PROFESSIONAL ENGINEER.

2    Q.    SO --

3             MR. HILLIARD:  MAY I APPROACH, JUDGE?

4             THE COURT:  YES.

5             MR. HILLIARD:  CAN I SIT THIS RIGHT HERE?

6             THE WITNESS:  THAT'S OKAY WITH ME.

7                         EXAMINATION

8    BY MR. HILLIARD:

9    Q.    THE FIRST THING I NOTICED ABOUT THIS WHEN CHARLIE BROUGHT IT

10   UP WAS, THIS LOOKS A LOT DIFFERENT THAN THE TRAILER THAT ALANA

11   AND CHRIS AND ERICA LIVED IN IN REGARDS TO HOW STURDY IT LOOKS,

12   HOW FIRM IT LOOKS IN THAT IT'S ONE SINGLE PIECE.  WOULD YOU AGREE

13   WITH THAT?  DIFFERENT FROM THE TRAILER THEY LIVED IN IN THAT THAT

14   REGARD.

15   A.    I DON'T NECESSARILY UNDERSTAND THE QUESTION.  IT'S MORE THAN

16   ONE PIECE.

17   Q.    THIS WHITE BLOCK RIGHT HERE IS MORE THAN ONE PIECE?

18   A.    NO, YOU SAID THE TRAILER.

19   Q.    SO YOU'RE INCLUDING THE ATTACHMENT?

20   A.    YOU'RE ASKING ME ABOUT THE MODEL.  I DON'T KNOW.  I'VE NOT

21   EXAMINED THE MODEL OR TAKEN IT APART.

22   Q.    THE PURPOSE OF THE MODEL, AS I UNDERSTOOD FROM CHARLIE WHEN

23   HE USED IT, WAS ONLY TO DEMONSTRATE HOW TO JACK UP AND DOWN,

24   RIGHT?  IT IS NOT MEANT TO, AND YOU AGREE WITH ME, THAT IT WOULD

25   NOT BE INDICATIVE OF HOW THE TRAILER WAS DESIGNED, HOW THE ROOF

1  WAS GLUED TO THE SIDES.

2  A.   OH, NO, IT WASN'T MANUFACTURED THE SAME WAY A TRAILER WAS

3  MANUFACTURED.  THAT WOULD BE CORRECT.

4  Q.   AND AS FAR AS YOU KNOW, DOES FLUOR MANUFACTURE TRAILERS?

5  A.   NO, SIR.

6  Q.   ONE RESPONSIBILITY FLUOR HAD IS TO HIRE SUBS WHO WERE GOING

7  TO, WHAT'S CALLED HAUL AND INSTALL, RIGHT?

8  A.   YES, SIR.  THAT'S CORRECT.

9  Q.   AGAIN, IN LISTENING TO FLUOR'S LAWYER DURING OPENING

10  STATEMENT, THE HAUL AND INSTALL, WHICH IS WHAT HE SAID IS ALL

11  Y'ALL DID, I WANT TO FILL IN A FEW OF THOSE BLANKS, AND THAT IS,

12  BEFORE YOU HAUL, YOU HAVE TO PICK UP AT A SITE, CORRECT?  YOU GO

13  TO A STAGING SITE.  YOU PICK UP THE TRAILER?

14  A.   YES.  YOU WOULD HOOK IT TO THE -- THE TRAILER TO IT SO YOU

15  COULD HAUL, YES, SIR.

16  Q.   AND BEFORE YOU HOOKED THE TRAILER TO IT, YOU WOULD HAVE TO

17  INSPECT IT.

18  A.   OH, YES.  I DON'T THINK -- WELL, I DON'T KNOW IF -- YOUR

19  QUESTION, BUT YOU CHARACTERIZED WHAT CHARLIE SAYS AT THE

20  BEGINNING OF THE THING.  HE DIDN'T SAY THAT WAS THE ONLY THING WE

21  DID.  WE DID OTHER THINGS UNDER THE CONTRACT AS WELL.

22  Q.   BUT WHAT I WANT TO REFER TO IS, AND I APPRECIATE THAT

23  BECAUSE IF IT WAS THE IMPRESSION, IT WAS MY IMPRESSION THAT

24  FLUOR'S RESPONSIBILITY IN THIS REGARD IS TO ONLY HAUL AND

25  INSTALL, THEN THAT'S A WRONG IMPRESSION.  BECAUSE YOU ALSO HAVE

1   TO INSPECT THE TRAILER WHEN YOU PICK IT UP AT THE STAGING GROUND,

2   CORRECT?

3   A.   YES, SIR.

4   Q.   YOU HAVE TO MAKE SURE THAT THE TRAILER IS IN WORKING ORDER.

5   A.   NO, SIR.

6   Q.   NO?

7   A.   WHEN IT'S GIVEN TO US, IT'S SUPPOSED TO BE MISSION CAPABLE.

8   Q.   IS SUPPOSED TO BE WHAT?

9   A.   MISSION CAPABLE.  MISSION READY.  FEMA SUPPLIES IT TO US.

10  THEY TELL US THAT THIS TRAILER IS READY FOR DEPLOYMENT.  IT'S

11  READY FOR SOMEONE TO USE.  IT'S THEN FOR US TO TAKE IT TO ITS

12  LOCATION TO HAUL AND INSTALL IT.

13          NOW, WE DID FIND THAT THERE WERE SOME PROBLEMS WITH

14  SOME OF THE UNITS, SO WE ASKED FEMA IF WE COULD START CHECKING

15  THEM OUT BEFORE WE TOOK THEM ALL THE WAY TO THE SITE, SET THEM UP

16  AND THEN FOUND OUT THAT THERE WAS PROBLEMS WITH THE ITEM, BECAUSE

17  WE COULDN'T CHECK THEM UNTIL THEY WERE HOOKED UP TO ELECTRICITY

18  OR WATER, SO WE ASKED IF WE COULD START DOING THAT IN THE STAGING

19  YARD AHEAD OF TIME BECAUSE IT WAS QUICKER, EASIER AND CHEAPER,

20  SAVED THE GOVERNMENT MONEY, SAVED THE TAX PAYER MONEY TO DO THAT

21  AND WE WERE ABLE TO BE -- ABLE TO GET MORE UNITS INSTALLED IN A

22  DAY THAT WAY.  INSTEAD OF --

23          THE COURT REPORTER:  YOU ARE TALKING SO FAST I CAN'T

24  UNDERSTAND WHAT YOU ARE SAYING.  QUICKER, EASIER --

25          THE WITNESS:  OH, I'M SORRY.

1   Q.   AND LET ME TELL YOU THIS:  YOU'VE BEEN IN THIS COURTROOM --

2           THE COURT:  (ADDRESSING THE COURT REPORTER) DID YOU GET

3   ALL OF HIS ANSWER?  YOU SAID YOU GOT IT QUICKER, EASIER AND WHAT

4   WAS THE REST OF IT?

5           THE WITNESS:  WELL, IT'S EVEN SAFER AND YOU DON'T HAVE

6   TO TAKE IT, INSTALL IT, AND THEN UNINSTALL IT AND BRING IT BACK

7   SOMEWHERE, OR EVEN -- THE OTHER THING WAS THE ASPECT OF GETTING

8   THE ANTICIPATIONS OF THE POTENTIAL OCCUPANTS EXCITED, TO SAY, YOU

9   KNOW, WE'RE INSTALLING IN THEIR YARD AND THEM SAYING, I GET TO

10  MOVE IN, AND THEN IT'S NOT READY BECAUSE A HIDDEN DEFECT IS FOUND

11  WHILE WE'RE TRYING TO INSTALL IT ONCE WE HOOK UP THE UTILITIES.

12                         EXAMINATION

13  BY MR. HILLIARD:

14  Q.   HOW LONG HAVE YOU BEEN IN THIS COURTROOM, SIR?

15  A.   SINCE MONDAY MORNING.

16  Q.   HAVE YOU HAD A CHANCE TO GET A SENSE OF HOW THE COURT FEELS

17  ABOUT ANSWERS THAT ARE NOT RESPONSIVE TO QUESTIONS?

18  A.   I THOUGHT I WAS RESPONDING TO YOUR QUESTION, SIR.

19  Q.   NO, YOU WEREN'T.  WE'RE GOING TO BE HERE ALL AFTERNOON

20  UNLESS YOU AND I WORK TOGETHER, YOU LISTEN TO MY QUESTION, GIVE

21  ME A PRETTY DIRECT AND COMPLETE ANSWER.  IS THAT FAIR?

22  A.   YES, SIR, I THOUGHT THAT'S WHAT I WAS DOING.

23  Q.   KARL, CAN YOU PULL UP 412.  IS THAT IT, THE THREE SHEETS?

24  IS THAT THE OLD NUMBER?  THERE WE GO.

25           THE COURT:  FOR THE RECORD, IN RELATION TO YOUR COMMENT,

1   I ASKED HIM TO GO BACK BECAUSE I DON'T BELIEVE THE COURT REPORTER

2   CAUGHT ALL OF THE ANSWER THAT HE HAD GIVEN.  HE HAD ADDED ON A

3   FEW SENTENCES TO THAT, BUT THE CONCERN WAS THAT THE COURT

4   REPORTER INDICATED SHE WAS NOT GETTING ALL OF WHAT HE SAID

5   BECAUSE HE SPOKE IT TOO QUICKLY.

6              MR. HILLIARD:  RIGHT.

7              THE COURT:  SO I GAVE HIM THE OPPORTUNITY TO GO BACK AND

8   SAY THAT.  SO LET'S GO AHEAD ON.

9              MR. HILLIARD:  GOT IT, JUDGE.

10                       EXAMINATION

11  BY MR. HILLIARD:

12  Q.   CAN YOU SEE THAT OKAY?  I HAVE A HARD COPY, TOO, IF YOU

13  WOULD LIKE TO SEE IT.

14              AS I UNDERSTAND IT, IN REGARDS TO THIS UNIT, THERE WAS

15  A -- THREE SHEETS OF PAPER, ONE WHEN THEY PICKED IT UP, ONE WHEN

16  THEY SET IT UP, AND THEN ONE WHEN THEY CONFIRMED THAT EVERYTHING

17  WAS READY FOR THE ALEXANDERS TO MOVE IN.  HAVE YOU SEEN THIS

18  DOCUMENT BEFORE, SIR?

19  A.   YES, SIR.  THIS WAS WHAT'S REFERRED TO AS A 9013.  IT'S AN

20  INSPECTION OF THE UNIT, WHEN IT CHANGED CUSTODY FROM FEMA TO US,

21  FOR EXAMPLE.

22  Q.   WHO FILLS IT OUT?

23  A.   IN THIS CASE, IT WAS FEMA TRANSFERRING THE CUSTODY TO US, SO

24  ONE OF OUR INSPECTORS WOULD.

25  Q.   AND DOWN HERE AT THE BOTTOM, IF YOU CAN --

1   A.   OH, NO, EXCUSE ME.  THIS IS US TRANSFERRING IT TO ONE OF THE

2   SUBCONTRACTORS, I'M SORRY.

3   Q.   ONE OF Y'ALL'S SUBCONTRACTORS?

4   A.   YES, SIR.

5   Q.   SO YOU HAVE AN INSPECTOR RIGHT HERE, THE SIGNATURE IS FAIRLY

6   LEGIBLE, THE A SOMETHING, RIGHT?

7   A.   A. BAKSH, YES, SIR.

8   Q.   AND IS SHE THE ONE RESPONSIBLE FOR FILLING OUT ALL OF THESE

9   CHECKLISTS, WHERE MOST OF THE TIME UP THERE, IT SAYS, NO, NO, NO,

10  NO?

11  A.   YES, SIR.

12  Q.   NOW, IS --

13        MR. PENOT:  I THINK THAT'S A MISCHARACTERIZATION OF THE

14  DOCUMENT.  IT DOESN'T SAY NO, NO, NO, NO.

15        THE COURT:  WAS THAT AN OBJECTION OR NOT?  I MEAN.

16        MR. PENOT:  WELL, I WAS A LITTLE LATE, YOUR HONOR, SO IF

17  YOU'LL GIVE IT TO ME, I'LL TAKE IT.  IT'S A MISCHARACTERIZATION

18  OF THE EVIDENCE.

19        THE COURT:  I'LL OVERRULE IT TO THE EXTENT THAT YOU CAN

20  COVER IT, WHAT WOULD TECHNICALLY BE YOUR DIRECT EXAMINATION, BUT

21  IF YOU'RE GOING TO OBJECT, OBJECT BEFORE HE ANSWERS OR WE'RE

22  MOVING ON.

23        MR. HILLIARD:  THANK YOU, JUDGE.

24        MR. PENOT:  THANK YOU.

25                          EXAMINATION

1   BY MR. HILLIARD:

2   Q.   YOUR FLUOR INSPECTOR'S RESPONSIBILITY IS TO MAKE SURE -- CAN

3   WE GO BACK TO THAT DOCUMENT -- IS TO MAKE SURE THAT THE TRAILER

4   THAT YOU WERE TURNING OVER TO YOUR SUBS, IN DETAIL, SHE HAS TO

5   DECIDE WHAT CONDITION EVERY ONE OF THESE SPECIFIC ITEMS ARE IN.

6   THEY HAVE SOMETHING FOR KITCHEN AND DINING, LIVING ROOM, HALL,

7   FIRST BEDROOM, SECOND BEDROOM; RIGHT?

8   A.   YES.   YOU SAID YOU HAD A HARD COPY.   THAT MIGHT BE EASIER

9   BECAUSE THIS THING KEEPS CHANGING SIZE ON US.

10           MR. HILLIARD:   MAY I APPROACH, JUDGE?

11           THE COURT:   YES.

12           THE WITNESS:   THANK YOU.

13                       EXAMINATION

14   BY MR. HILLIARD:

15   Q.   NOW, DO YOU ALLOW INSPECTORS TO SIGN OTHER INSPECTORS'S

16   NAMES?

17   A.   DO I ALLOW?   NO, THAT WOULDN'T BE SOMETHING I WOULD CONSIDER

18   APPROPRIATE.

19   Q.   AND YOU UNDERSTAND, WHEN I SAY YOU, I'M TALKING ABOUT FLUOR

20   AND YOU IN THE CAPACITY THAT YOU HOLD FOR FLUOR, RIGHT?

21   A.   OH, OKAY.   NO, IT WOULDN'T BE PROPER FOR SOMEONE TO SIGN

22   SOMEONE ELSE'S NAME.

23   Q.   AND DO YOU KNOW IF THAT HAPPENED ON THIS SHEET, FOR THIS

24   TRAILER, THAT WAS INSPECTED BY FLUOR BEFORE IT WENT OUT TO

25   DALE STREET?

1   A.   DO I KNOW THAT?

2   Q.   YES.

3   A.   NO, SIR.

4   Q.   I SEE ON NUMBER 7 THAT THE INSPECTOR CIRCLED THIS TRAILER

5   WAS BRAND-NEW.  YOU SEE THAT?

6   A.   NO, SIR, IT DOESN'T SAY BRAND-NEW.  IT SAYS NEW.

7   Q.   IT DOESN'T SAY BRAND-NEW, BUT IT SAYS NEW.  AND IT ALSO

8   DOESN'T SAY GOOD, RIGHT?

9   A.   THAT IS CORRECT.

10   Q.   IT DOESN'T SAY POOR.

11   A.   THAT IS CORRECT.

12   Q.   IT DOESN'T SAY DAMAGED.

13   A.   THAT IS CORRECT.

14   Q.   AND IT DOESN'T SAY MISSING.

15   A.   THAT IS CORRECT.

16   Q.   AND THIS TRAILER HAD A HISTORY BEFORE IT GOT TO THE STAGING

17   AREA WHERE IT WAS PICKED UP TO GO TO DALE STREET, RIGHT?  IT HAD

18   TRAVELED AROUND PARTS OF THE COUNTRY.

19   A.   YES, SIR.

20   Q.   YOUR INSPECTORS ARE ALLOWED TO, IF THEY SEE ANY DAMAGE IN

21   THE TRAILER, CIRCLE WHATEVER CONDITION THEY DETERMINED IS

22   APPROPRIATE:  NEW, GOOD, POOR OR DAMAGED, RIGHT?  THEY HAVE THAT,

23   THEY HAVE THE RIGHT TO CIRCLE WHATEVER THEY FEEL IS APPROPRIATE

24   IN REGARDS TO THEIR INSPECTION.

25   A.   YES, IT SHOULD REFLECT THEIR INSPECTION, WHAT THEY SAW.

1    Q.    AND WHAT DOES NEW MEAN TO YOU?

2    A.    NEW WOULD BE, OTHER THAN WHAT YOU SAID LIKE A BRAND-NEW, IT

3    WOULD BE NEW OR LIKE-NEW CONDITION.  THAT IT'S NOT WORN, OR THE

4    OTHER DESIGNATION BEING GOOD, IT'S LIKE IT'S NOT REAL NEW BUT

5    IT'S IN GOOD SHAPE OR POOR OR ACTUALLY DAMAGED WOULD BE THE D OR,

6    IN THIS CASE, MISSING, YOU KNOW, THERE IS SOMETHING THAT WAS

7    ACTUALLY MISSING.

8    Q.    GOT IT.  THANK YOU, KARL.  LET'S GO --

9          MR. HILLIARD:  IF I COULD APPROACH AGAIN, JUDGE.

10          THE COURT:  SURE.

11                            EXAMINATION

12   BY MR. HILLIARD:

13   Q.    LET'S MOVE TO JACKING FOR A MINUTE.

14   A.    DO YOU WANT THIS ONE BACK, SIR?

15   Q.    YESTERDAY WHEN MR. PENOT WAS TALKING TO THE GULF STREAM

16   FELLOW, THEY WERE VISITING AND THE TRAILER WAS RIGHT HERE, AND HE

17   ASKED THE GULF STREAM WITNESS IF, WHEN BLOCKING THIS TRAILER, YOU

18   CAN LIFT IT UP BY ITS SIDE LIKE THIS, BLOCK IT AND THEN GO OVER

19   HERE, AND LIFT IT UP BY THIS SIDE.  DO YOU RECALL THAT LINE OF

20   QUESTIONING?

21   A.    YES, SIR.

22   Q.    THE WITNESS SAID THAT WAS FINE.  THAT WAS OKAY.  THAT WAS

23   ALLOWED.

24   A.    YES.

25   Q.    DO YOU AGREE WITH THAT?

1  A.   YES.  YOU WOULD HAVE TO, AS I THINK EVEN THAT WITNESS SAID,

2  LOOK AT HOW MUCH YOU'RE LIFTING AT ONE TIME.  I MEAN, YOU DON'T

3  WANT TO LIFT IT TO WHERE IT'S GOING TO TIP OVER.

4  Q.   WHAT'S ACCEPTABLE IN THAT REGARD?  THAT'S A GOOD POINT, WHEN

5  YOU'RE LIFTING IT UP?  6 TO 12 INCHES PER SIDE, 12 TO 18?

6  A.   OH, I WOULDN'T GO THAT HIGH.

7  Q.   TELL ME HOW HIGH.

8  A.   I THINK WE ACTUALLY DID SOME SAFETY TRAINING BECAUSE WE

9  DIDN'T WANT ANYBODY TO GET HURT DOING IT, AND WE TOLD THEM THEY

10 SHOULDN'T LIFT IT MORE THAN AN INCH OFF OF THE CATCH PIERS.  PUT

11 CATCH PIERS UNDER IT IF YOU'RE GOING TO BE LIFTING IT UP TO WHERE

12 THE WHEELS ARE GOING TO COME OFF THE GROUND, SO THAT IF IT DOES

13 SLIP, IT'LL CATCH ON THAT AND NOT COME ALL THE WAY DOWN TO THE

14 GROUND AND HURT YOURSELF OR THE PROPERTY.  SO OUR SAFETY

15 TRAINING, I THINK WE TOLD THEM AN INCH OVER THE CATCH PIERS.

16 Q.   IS THAT IN WRITING ANYWHERE, BY THE WAY?

17 A.   YES, SIR.

18 Q.   THAT INCH OVER?

19 A.   YES, SIR.

20 Q.   AND THAT WAS PART OF YOUR RESPONSIBILITY WAS TO TRAIN YOUR

21 SUBS HOW TO PROPERLY JACK THESE TRAILERS?  BEFORE YOU -- WELL, GO

22 AHEAD.

23 A.   WELL, YOU SAY OUR RESPONSIBILITY.  IT'S NOT LIKE WRITTEN IN

24 THE CONTRACT TO SAY TRAIN SUBS HOW TO PROPERLY JACK THE TRAILERS,

25 BUT WE WANT EVERYONE TO BE SAFE, SO WE HAVE A RESPONSIBILITY FOR

1   SAFETY.

2   Q.   WELL, AND LET ME CLARIFY THIS.  ARE YOU SAYING THAT YOU DID

3   NOT HAVE A RESPONSIBILITY TO TELL YOUR SUBS, TO TRAIN YOUR SUBS,

4   TO SHOW YOUR SUBS HOW TO PROPERLY JACK THE TRAILERS UP WHEN THEY

5   ARE BLOCKING THEM ON PEOPLE'S PROPERTY?  YOU LEFT IT COMPLETELY

6   UP TO THE SUBS?

7   A.   WELL, I DON'T KNOW IF I WOULD CHARACTERIZE IT THAT WAY.  WE

8   WOULDN'T HAVE TO TRAIN THEM BECAUSE WE'RE HIRING PEOPLE THAT HAVE

9   EXPERIENCE AND KNOW HOW TO DO THIS.  I MEAN, THE PEOPLE THAT WE

10  HIRED WERE LICENSED MOBILE HOME INSTALLERS, AND WE ALSO LOOK FOR

11  PEOPLE THAT HAD PREVIOUS EXPERIENCE INSTALLING UNITS FOR FEMA.

12  Q.   DID YOU TRAIN YOUR SUBS OR NOT ON HOW TO JACK UP THESE

13  TRAILERS?

14  A.   DID WE?  YES.

15  Q.   IS IT ACCEPTABLE TO JACK UP A TRAVEL TRAILER SIDE TO SIDE?

16  GULF STREAM TESTIFIED IT WAS YESTERDAY, RIGHT?

17  A.   YES, I BELIEVE MR. PULLEN.

18  Q.   RIGHT.

19  A.   AND THE ENGINEER TODAY, I THINK.

20  Q.   AND FLUOR AGREES?

21  A.   YES.

22  Q.   CONCEPTUALLY, YOU AND I CAN AGREE THAT ONE ISSUE -- LET ME

23  GO BACK AND I'LL TAKE THE DOCUMENT.

24        ONE ISSUE THAT YOU HAVE WITH A TRAVEL TRAILER IN THE

25  WAY THAT IT'S DESIGNED IS, YOU HAVE TO EXERCISE SOME CARE TO MAKE

1   SURE THAT YOU DON'T DAMAGE IT STRUCTURALLY WHEN YOU'RE MOVING IT

2   AND WHEN YOU'RE BLOCKING IT AND WHEN YOU'RE JACKING IT.  IS THAT

3   FAIR?

4   A.   IT WOULD BE FAIR.

5   Q.   BECAUSE ONCE YOU -- THE SHELL OF A TRAILER IS LIKE THE SHELL

6   OF AN EGG, IN A WAY, AND THAT IS, YOU'RE PROTECTING WHAT'S

7   INSIDE, YOU'RE TRYING TO KEEP OUT THE ELEMENTS, AND IT CAN BREAK?

8   A.   FROM USING THE ANALOGY OF AN EGG FROM THE ASPECT OF SAYING

9   THAT IT'S AN OUTER COVERING TO PRODUCT THE INSIDES, I WOULD AGREE

10  WITH THAT.  TO USE THE ANALOGY OF IT'S FRAGILE LIKE AN EGG, I

11  WOULD NOT.

12  Q.   WELL, YOU CAN'T UNCRACK AN EGG, RIGHT?

13  A.   NO.  HUMPTY DUMPTY FALLS OFF THE WALL, YEAH.

14  Q.   EVEN IF HE GOES TO TEXAS A & M LIKE YOU, YOU STILL CAN'T

15  UNCRACK AN EGG.

16         AND IF YOU CRACK A TRAILER, IN ALL SERIOUSNESS, IF YOU

17  CRACK A TRAILER, IT'S VERY DIFFICULT TO EVER UNCRACK THAT

18  TRAILER.

19  A.   CAN A TRAILER BE REPAIRED?

20  Q.   SURE IT CAN BE REPAIRED, BUT ONCE IT'S CRACKED, ONCE THE

21  FRAME IS CRACKED OR THE STRUCTURE OF THE TRAILER ITSELF IS

22  COMPROMISED, WHAT YOU HAVE IS A POTENTIAL --

23         THE COURT:  WAIT, ARE YOU ANSWERING HIS QUESTION OR ARE

24  YOU ASKING HIM A QUESTION?

25         MR. HILLIARD:  WELL, IT SWITCHED ON US.

1                              EXAMINATION

2    BY MR. HILLIARD:

3    Q.    I KNOW IT CAN'T BE REPAIRED, BUT -- IT CAN BE REPAIRED, BUT

4    MY QUESTION TO YOU IS, ONCE IT'S CRACKED, IT'S NOT GOING TO BE

5    THE SAME AS IF IT HAD NEVER BEEN CRACKED, RIGHT?

6    A.    NO, I WOULD SAY THAT WOULD RELY UPON THE NATURE OF THE

7    REPAIR.

8    Q.    WHAT DOES NEVER MEAN TO YOU?

9    A.    NEVER?

10   Q.    UH-HUH (AFFIRMATIVE RESPONSE).

11   A.    THROUGH ETERNITY.

12   Q.    KARL, CAN YOU PULL UP 411, PLEASE.

13          411 IS FLUOR'S TOOLBOX TRAINING PROPER JACKING

14   TECHNIQUES.  THIS IS WHAT YOU PROVIDE YOUR SUBS, RIGHT?

15   A.    YES, IT'S PART OF A TOOLBOX TRAINING SESSION THAT WAS

16   PROVIDED TO SUBCONTRACTORS.

17   Q.    THE OVERVIEW SAYS:  "THE PURPOSE OF THIS TOPIC IS TO

18   REINFORCE PROPER TECHNIQUES AND PROCEDURES."

19   A.    CAN WE HAVE A PAPER COPY AGAIN?  I'VE GOT SOMETHING ELSE

20   NOW.

21   Q.    KARL MUST THINK I'M TONY.

22          AT THE TOP THERE, KARL.  "THE PURPOSE OF THIS TOPIC IS

23   TO REINFORCE PROPER TECHNIQUES AND PROCEDURES YOU ARE REQUIRED TO

24   USE WHEN PARTICIPATING IN THIS OPERATION."  DO YOU SEE THAT,

25   KARL?  ON THE OVERVIEW?

1   A.   I'M SORRY, DID YOU ASK ME A QUESTION?  I THOUGHT YOU WERE

2   TALKING TO KARL.

3   Q.   THIS DOESN'T SEEM OPTIONAL TO ME.  IS IT OPTIONAL?  PROPER

4   TECHNIQUES AND PROCEDURES YOU ARE REQUIRED TO USE.

5   A.   I'M SORRY?  IS THERE A QUESTION --

6   Q.   THE QUESTION IS, IS IT OPTIONAL?

7   A.   IS IT OPTIONAL?  (WITNESS REVIEWS THE DOCUMENT.)  THE

8   PURPOSE OF THIS TOPIC IS TO REINFORCE PROPER TECHNIQUES AND

9   PROCEDURES YOU ARE REQUIRED TO USE WHEN PARTICIPATING IN THIS

10  OPERATION.  I WOULD SAY IT'S REQUIRED, YES.

11  Q.   GO DOWN TO NUMBER 7, PLEASE, KARL.

12       CAN YOU READ NUMBER 7 TO US.

13  A.   YES, SIR.  "WORK FROM END TO END, NEVER SIDE TO SIDE."

14  Q.   SO WHAT THAT MEANS IS WHEN YOU ARE JACKING THE TRAILER,

15  ACCORDING TO Y'ALL'S DOCUMENT, IS YOU WORK FROM END -- YOU JACK

16  IT FROM THIS END AND THEN FROM THIS END?

17  A.   YES, SIR, THAT'S THE WAY I WOULD DO IT.

18  Q.   NOT FROM SIDE TO SIDE?

19  A.   THAT'S CORRECT.

20  Q.   WELL, IF IT'S REQUIRED UNDER YOUR DOCUMENTS, IF YOU SAY

21  THAT'S CORRECT, AND YET YOU TESTIFIED IT'S ACCEPTABLE TO JACK IT

22  FROM SIDE TO SIDE, HOW CAN THOSE TWO LIVE TOGETHER?

23  A.   WELL, THE FIRST QUESTION YOU ASKED ABOUT SIDE TO SIDE, I

24  THOUGHT YOU WERE TALKING IN THE SAME CONTEXT IN WHICH YOU WERE

25  TALKING ABOUT THE PREVIOUS WITNESS BECAUSE THAT'S HOW YOU BROUGHT

1   IT ABOUT, SAYING WOULD IT BE OKAY, WOULD IT BE ACCEPTABLE, FROM

2   THE ASPECT OF WOULD IT DAMAGE THE UNIT.

3          THIS IS TALKING ABOUT FROM AN ASPECT OF A SAFETY

4   STANDPOINT.  WE WOULD RATHER HAVE OUR PEOPLE DO IT FROM END TO

5   END SO THERE'S LESS LIKELIHODD OF IT SLIPPING OFF OF THE JACK OR

6   OF THE BLOCKS, SO THAT THEY DON'T HURT THEMSELVES OR THE UNIT BY

7   DOING IT THAT WAY.

8   Q.   SO WHAT YOU'RE SAYING IS, ALL YOU WERE REFERRING TO ON

9   PROPER JACKING TECHNIQUES HERE WAS SAFETY, NOT DAMAGING THE UNIT.

10  SAFETY OF THE INDIVIDUALS WHO WERE JACKING THE UNIT.

11  A.   WELL, IF YOU GO BACK UP, THIS IS A TOOLBOX TRAINING SESSION.

12  THIS IS A SAFETY TOOLBOX TRAINING DISCUSSION.  SO THE MAIN

13  PURPOSE OF THIS DOCUMENT IS THE SAFETY ITEM.  BUT SAFETY ALSO IS

14  NOT ONLY HUMAN SAFETY BUT SAFETY OF PROPERTY, YES, SO IT WOULD BE

15  FOR BOTH.  YOU DON'T WANT TO DAMAGE PEOPLE OR YOU DON'T WANT TO

16  DAMAGE PROPERTIES.

17  Q.   WELL, I APPRECIATE THAT, AND WE'RE NOT GOING TO BELABOR IT,

18  BUT FIRST IT WAS -- WHEN I ASKED THE QUESTION, MY ASSUMPTION WAS

19  WE WERE TALKING ABOUT STRUCTURAL SAFETY.  THEN YOUR ANSWER WAS

20  NO, I'M TALKING ABOUT SAFETY OF THE EMPLOYEES.  BUT NOW YOU'RE

21  SAYING IT'S BOTH, EMPLOYEES AND STRUCTURAL SAFETY.

22  A.   NO, SIR.  THE FIRST TIME, MY UNDERSTANDING THE WAY YOU PUT

23  IT IN THE CONTEXT WHEN YOU WERE TALKING TO MR. PULLEN, I BELIEVE

24  HIS NAME WAS, ABOUT DOING IT SIDE TO SIDE, WAS THAT ACCEPTABLE,

25  YOU WERE TALKING ABOUT FROM THE ASPECT OF STRUCTURAL INTEGRITY.

1   OKAY.

2   Q.   RIGHT.

3   A.   AND WOULD IT BE ACCEPTABLE TO DO THAT AND NOT HARM THE UNIT.

4   I WOULD AGREE BY GOING SIDE TO SIDE AS YOU DO IT -- AS WAS

5   DISCUSSED WITH MR. PULLEN, THAT YOU DO IT EVENLY ON THE SIDES,

6   THAT THAT WOULD NOT HARM THE UNIT.

7           FROM A SAFETY STANDPOINT, WE WOULD PREFER FOR OUR

8   EMPLOYEES AND OUR SUBCONTRACTORS TO DO IT FROM END TO END SO

9   THERE IS LESS LIKELIHOOD OF THE UNIT SLIPPING OFF OF THE JACKS OR

10  THE PIERS WHILE THEY ARE DOING IT.

11  Q.   SO DO YOU TRAIN YOURS SUBS TO JACK FROM SIDE TO SIDE OR END

12  TO END?

13  A.   END TO END, SIR.

14  Q.   AND THAT IS ONLY BECAUSE OF THEIR SAFETY, NOT THE SAFETY OF

15  THE STRUCTURE OF THE UNIT?

16  A.   WELL, NO, IT WOULD BE BOTH.  BECAUSE THERE IS LESS LIKELY --

17  NO.

18  Q.   NO, I GOT IT.  I UNDERSTAND.

19  A.   THE FIRST ONE WAS TALKING ABOUT THE STRUCTURAL INTEGRITY OF

20  THE UNIT.  THE SECOND HALF, GOING END TO END, IS FROM THE ASPECT

21  OF YOU DON'T WANT IT SLIPPING OFF.  IT'S LESS LIKELY TO SLIP OFF

22  GOING FROM END TO END THAN IT IS FROM SIDE TO SIDE.

23  Q.   BUT IT'S YOUR BELIEF AS AN ENGINEER AND AS FLUOR'S

24  REPRESENTATIVE THAT IF YOU JACK IT FROM SIDE TO SIDE OR END TO

25  END, BOTH OF THOSE ARE ACCEPTABLE IN REGARDS TO THE STRUCTURE OF

1   THE UNIT.

2   A.    AS FAR AS THE STRUCTURAL INTEGRITY OF THE UNIT, YES, SIR.

3   Q.    FLUOR'S RESPONSIBILITY WAS ALSO TO ONLY HIRE, YOU HAD TO

4   HIRE LICENSED MOBILE HOME INSTALLERS LICENSED IN LOUISIANA?

5   A.    I DON'T WANT TO PICK WORDS WITH YOU.  YOU SAID RESPONSIBLE

6   TO, THAT, IN MY WAY OF TALKING AND THINKING, MEANS THAT IS A

7   CONTRACTUAL REQUIREMENT.  IT'S NOT.  BUT THERE IS A REQUIREMENT

8   IN THE CONTRACT THAT YOU HAVE TO OBEY LOCAL LAWS AND STATE LAWS.

9   MOST STATES DO REQUIRE, IF YOU'RE GOING TO INSTALL A MOBILE HOME,

10  YOU HAVE TO HAVE A LICENSE IN THAT STATE TO INSTALL THE MOBILE

11  HOME IN THAT STATE.  AND LOUISIANA IS SUCH A STATE, SO YES, WE

12  ARE REQUIRED TO HIRE LICENSED MOBILE HOME INSTALLERS TO INSTALL

13  MOBILE HOMES IN LOUISIANA.

14  Q.    I WANT TO BREAK THAT DOWN AND ASK YOU A QUESTION AND TRY TO

15  CLEAN IT UP.  ARE YOU REQUIRED, FIRST, BEFORE WE TALK ABOUT THE

16  CONTRACT, ARE YOU REQUIRED TO HIRE LOUISIANA MOBILE HOME LICENSED

17  INSTALLERS?

18  A.    TO INSTALL MOBILE HOMES, YES, SIR.

19  Q.    SO IF FOLKS, BECAUSE YOU HAD SUBS POURING INTO NEW ORLEANS

20  FASTER THAN WATER FROM LAKE PONTCHARTRAIN, RIGHT?  I MEAN,

21  EVERYONE WAS COMING IN TO TRY TO GET WORK AFTER KATRINA.  YOU

22  WERE HIRING SUBS LEFT AND RIGHT?

23  A.    WE WERE HIRING PEOPLE?  YES.  WE HIRED 14, 15, 16 SUBS, I

24  THINK.

25  Q.    AND EVERY SUB THAT YOU HIRED, THAT THEY WERE GOING TO SET UP

1   TRAVEL TRAILERS, HAD TO BE -- HAD TO HAVE A LICENSE FROM THE

2   STATE OF LOUISIANA TO SET UP MOBILE HOMES.  THAT WAS Y'ALL'S

3   DECISION, RIGHT?  LICENSED MOBILE HOME INSTALLERS.

4   A.   WE ELECTED TO HIRE LICENSED MOBILE HOME INSTALLERS BECAUSE

5   WHEN WE WERE HIRING THEM, WE WERE HIRING THEM TO INSTALL MOBILE

6   HOMES, TRAVEL TRAILERS AND PARK MODELS.  THEY WERE NOT REQUIRED

7   TO HAVE A LICENSE TO INSTALL A TRAVEL TRAILER, BUT SINCE WE WERE

8   HIRING THEM DO ALL THREE, WE PUT A REQUIREMENT THAT THEY BE

9   LICENSED MOBILE HOME INSTALLERS.

10  Q.   LICENSED IN THE STATE OF LOUISIANA?

11  A.   YES, SIR.

12  Q.   AND WHO INSTALLED ALANA'S TRAVEL TRAILER?

13  A.   THAT WAS ASSIGNED TO MLU SERVICES.

14  Q.   WELL, WHO DID THEY SUB IT OUT TO?

15  A.   I BELIEVE IT WAS LEMIEUX.

16  Q.   WHAT WAS THE NAME OF IT?

17  A.   I DON'T KNOW HOW TO SPELL IT.  BUT IT'S LEMIEUX,

18  L-E-M-I-E-U-X, SOMETHING LIKE THAT, I BELIEVE.

19  Q.   LEMIEUX TRAVEL TRAILERS?  DO YOU KNOW THE NAME OF THE

20  COMPANY?

21  A.   NO, SIR.

22  Q.   I THINK CHARLIE REFERRED TO THEM AS LEMIEUX MOBILE HOMES OR

23  DAN'S MOBILE HOMES MAYBE?

24       MR. PENOT:  YOUR HONOR, I CANNOT HEAR MR. HILLIARD,

25  BECAUSE I CAN'T OBJECT IF I CAN'T HEAR HIM.

```
 1            THE COURT:  I WOULD LIKE YOU TO USE THE PODIUM EXCEPT

 2   FOR WHEN YOU'RE WORKING UP HERE FOR A PARTICULAR REASON.

 3            MR. HILLIARD:  I WILL, JUDGE, THANK YOU.

 4                         EXAMINATION

 5   BY MR. HILLIARD:

 6   Q.   SO DAN'S MOBILE HOMES OR LEMIEUX MOBILE HOMES, WHATEVER IT

 7   IS, HAD TO HAVE A LOUISIANA LICENSE WITH THE STATE OF LOUISIANA?

 8   A.   IF THEY ARE INSTALLING A MOBILE HOME IN LOUISIANA.

 9   Q.   WELL, IF THEY ARE INSTALLING ALANA'S TRAVEL TRAILER,

10   ACCORDING TO YOUR CONTRACT WITH MLU, RIGHT?

11   A.   NO, SIR.  MLU HAD TO HAVE A LICENSED MOBILE HOME INSTALLER.

12   Q.   I'M SORRY?

13   A.   OUR CONTRACT WAS WITH MLU.  WE HIRED MLU.  MLU ELECTED TO

14   SUBCONTRACT SOME OF THE WORK TO OTHER PEOPLE WHICH INCLUDED THE

15   LEMIEUX.

16   Q.   AND DID THE CONTRACT YOU HAVE WITH MLU REQUIRE THEM TO ONLY

17   HIRE LOUISIANA-LICENSED MOBILE HOME INSTALLERS?

18   A.   NO, SIR.  ONLY IF THEY WERE GOING TO INSTALL MOBILE HOMES.

19   Q.   503, PLEASE, KARL.  PAGE 2872.  DOWN AT THE BOTTOM.  AND I

20   HAVE A HARD COPY IF THAT WILL HELP YOU AS WELL, SIR.

21            WHEN IT SAYS CONTRACTORS SHALL BE LICENSED LOUISIANA

22   MANUFACTURED INSTALLERS, CONTRACTOR'S LICENSE SHALL BE DISPLAYED

23   AT ALL TIMES AND MUST BE PROVIDED AT THE TIME OF PICKUP, WHAT

24   YOU'RE TELLING US IS, THAT'S ONLY IF THEY ARE INSTALLING MOBILE

25   HOMES?
```

1  A.   WELL, IF YOU READ THE REST OF THAT SENTENCE, IT SAYS FOR

2  MOBILE HOMES AND PARK MODELS.  SO IT'S FOR WHEN YOU'RE DOING

3  MOBILE HOMES AND PARK MODELS.  I'M SORRY, WHEN I SAID IT EARLIER,

4  I LEFT OUT PARK MODELS.  WE DIDN'T DO A WHOLE LOT OF, I KIND OF

5  JUST SAY MOBILE HOMES AND TRAVEL TRAILERS.

6  Q.   HAS FLUOR EVER REPRESENTED ANYWHERE THAT THEY WERE ONLY

7  GOING TO SET UP TRAVEL TRAILERS WITH INSTALLERS THAT HAD MOBILE

8  HOME LICENSES?  HAVE YOU EVER, AS FAR AS YOU KNOW, HAVE YOU EVER

9  TAKEN THAT POSITION, THAT IS, EVEN IF IT'S A TRAVEL TRAILER, WE

10 ARE ONLY GOING TO USE MOBILE HOME INSTALLERS THAT ARE LICENSED IN

11 THE STATE OF LOUISIANA?

12 A.   WE WERE ONLY GOING TO SUBCONTRACT WITH PEOPLE THAT HAD THAT

13 BECAUSE WE WOULD SUBCONTRACT WITH THEM TO BE ABLE TO DO MOBILE

14 HOMES, PARK MODELS AND TRAVEL TRAILERS.

15 Q.   BECAUSE ON A WEDNESDAY IT MIGHT BE A MOBILE HOME AND ON A

16 THURSDAY IT MIGHT BE A TRAVEL TRAILER?

17 A.   THAT'S CORRECT.  THAT'S WHY WE, IN OUR PROCUREMENT STRATEGY,

18 WANTED TO ONLY HIRE SUBCONTRACTORS THAT HAD THAT CAPABILITY.

19 Q.   AND SO IF THE FELLOW THAT COMES IN AFTER YOU IS GOING TO

20 TESTIFY THAT HE'S THE ONE THAT INSTALLED ALANA ALEXANDER'S TRAVEL

21 TRAILER AND HE DOES NOT HAVE A LOUISIANA MOBILE HOME INSTALLER'S

22 LICENSE, IS THAT FLUOR'S RESPONSIBILITY?

23 A.   WHO IS THE PERSON THAT'S COMING IN AFTER ME?

24 Q.   DARRYL LEMIEUX, THE GUY WITH --

25 A.   DARRYL LEMIEUX WAS NOT UNDER CONTRACT TO FLUOR.  HE WAS A

1    SUBCONTRACTOR TO ONE OF OUR SUBCONTRACTORS, SO HE DID NOT VIOLATE

2    OUR PROCUREMENT STRATEGY, AND IF HE'S INSTALLING A TRAVEL

3    TRAILER, NOR IS HE VIOLATING THE LAW IN LOUISIANA.

4    Q.   TO BE CLEAR ON THIS, ONCE FLUOR, WHO GETS THE CONTRACT WITH

5    THE GOVERNMENT AND TURNS IT OVER TO MLU, THEN THE SINS OF MLU ARE

6    NOT THE SINS OF FLUOR, IS THAT WHAT YOU'RE SAYING?

7    A.   NO, SIR, I'M NOT SAYING THAT AT ALL.

8    Q.   WELL, THEN, ANSWER THIS:  IF DARRYL LEMIEUX IS NOT A

9    LICENSED LOUISIANA MOBILE HOME INSTALLER AND HE INSTALLED THIS

10   TRAVEL TRAILER ON DALE STREET, IS THAT FLUOR'S RESPONSIBILITY?

11           MR. PENOT:  OBJECTION, YOUR HONOR.  IS HE ASKING FOR A

12   LEGAL CONCLUSION?

13           THE COURT:  WELL, I'M A LITTLE CONCERNED ABOUT THAT AS

14   WELL.  WHY DON'T YOU REPHRASE THE QUESTION.  I THINK I UNDERSTAND

15   WHAT HE'S ASKING, AND I UNDERSTAND THE OBJECTION AND I'LL SUSTAIN

16   IT.  GO AHEAD AND REPHRASE IT.

17                        EXAMINATION

18   BY MR. HILLIARD:

19   Q.   WE'RE IN AGREEMENT THAT THE LOUISIANA MANUFACTURING HOME

20   LICENSE IS REQUIRED BY FLUOR FOR EVERYONE SETTING UP MOBILE

21   HOMES, TRAVEL TRAILERS AND, WHAT'S THE THIRD ONE?  PARK HOMES?

22   A.   EVERYONE THAT WE HAVE A DIRECT CONTRACT WITH, YES, SIR.

23   THAT'S OUR PROCUREMENT STRATEGY.

24   Q.   SO IF DARRYL LEMIEUX DOES NOT HAVE A LOUISIANA MOBILE HOME

25   LICENSE, WHAT I'M TRYING TO INARTFULLY GET TO IS -- AND HE SET UP

1  THIS TRAVEL TRAILER, HE JACKED IT UP, AND HE WAS TRAINED BY, HE

2  WAS A SUB THAT WAS TRAINED BY FLUOR, IS MR. LEMIEUX'S CONDUCT IN

3  SETTING UP THE TRAVEL TRAILER FLUOR'S RESPONSIBILITY?

4          MR. PENOT:  SAME OBJECTION, YOUR HONOR.

5          MR. HILLIARD:  MAYBE IT'S THE RESPONSIBILITY THAT'S

6  GIVING HIM TROUBLE, JUDGE.

7          THE COURT:  WELL, LET ME GO BACK TO THAT.  I THINK

8  MR. WHITAKER HAS TESTIFIED ALSO AS TO WHAT HIS UNDERSTANDING OF

9  THE LEGAL REQUIREMENTS WERE RELATIVE TO SETTING UP TRAVEL

10 TRAILERS, MOBILE HOMES AND PARK MODELS, SO I THINK THE PROBLEM

11 WITH THE OBJECTION IS THE USE OF THE WORD RESPONSIBILITY.

12          DID YOU UNDERSTAND THE QUESTION?

13          THE WITNESS:  I UNDERSTAND THE QUESTION, BUT HE ADDED

14 SEVERAL THINGS IN THAT QUESTION.  WE NEED TO BREAK IT APART.  HE

15 SAID --

16          THE COURT:  IT'S A COMPOUND QUESTION.  LET'S TRY

17 REWORDING IT AGAIN.  MAYBE THAT WILL CURE THE OBJECTION PROCESS.

18          MR. HILLIARD:  I HAVE AN EASIER WAY TO GET WHERE WE ALL

19 KNOW WE'RE GOING.

20          MR. PENOT:  SO YOU'RE WITHDRAWING THE QUESTION?

21          MR. HILLIARD:  I AM.

22                      EXAMINATION

23 BY MR. HILLIARD:

24 Q.   YOU HAVE AN INSPECTOR ON-SITE THAT AFTER HE SETS, THAT AFTER

25 THE TRAVEL TRAILER IS SET UP, THE INSPECTOR SIGNS OFF THAT IT'S

1  DONE PROPERLY, RIGHT?

2  A.   YES, WE HAVE AN INSPECTOR INSPECT EACH ONE OF THE

3  INSTALLATIONS.

4  Q.   AND IS ONE OF THE REQUIREMENTS OF THAT INSPECTOR TO MAKE

5  SURE THAT THE TRAVEL TRAILER INSTALLER IS PROPERLY LICENSED?

6  A.   YOU DO NOT NEED A LICENSE TO INSTALL A TRAVEL TRAILER.

7  THAT'S WHAT I'M GETTING AT.

8  Q.   RIGHT, BUT YOU'VE ALREADY SAID THAT'S THE ONLY FOLKS YOU

9  USE, THOUGH.  YOU ONLY USE LICENSED.

10  A.   NO, SIR.  THAT WAS THE ONLY PEOPLE THAT WE HIRED DIRECTLY.

11  THOSE CONTRACTORS THEN HAD THE ABILITY TO SUBCONTRACT OTHER

12  PEOPLE.  WHAT THEIR PROCUREMENT STRATEGY IS WAS UP TO THEM.  IF

13  THEY WANTED TO HIRE A FIRM TO COME IN AND CLEAN THE UNITS AFTER

14  THEY INSTALLED THEM, THAT PERSON WOULDN'T HAVE TO BE A LICENSED

15  MOBILE HOME INSTALLER TO CLEAN THE UNITS.

16  Q.   SO IF I FOLLOW THAT TO ITS NECESSARY CONCLUSION, THAT MEANS

17  IF THEY DECIDE TO HIRE SOMEONE WHO KNOWS NOTHING ABOUT INSTALLING

18  TRAVEL TRAILERS, PUTS IT UP WRONG, BRAKES IT AND DOESN'T TIE IT

19  DOWN RIGHT, YOU'RE HANDS ARE CLEAN?

20  A.   NO, SIR.  I WOULDN'T SAY THAT.  I WOULD HAVE A PROBLEM WITH

21  THEM HIRING SOMEONE LIKE THAT.

22  Q.   WHY?

23  A.   WHY?  BECAUSE THAT'S NOT THE MISSION.  THAT'S NOT THE JOB.

24  Q.   SO BACK TO THE MISSION AND BACK TO THE JOB.  IF THE GUY THAT

25  DID IT IS NOT LICENSED?

1   A.   THERE IS NO PROBLEM WITH HIM NOT BEING LICENSED TO INSTALL A

2   TRAVEL TRAILER.  IF YOU WOULD TURN THE PAGE OF THIS EXHIBIT TO

3   THE NEXT PAGE AND LOOK AT TRAVEL TRAILER INSTALLATIONS, IT DOES

4   NOT REQUIRE YOU TO HAVE A LICENSE.

5        MR. PENOT:  IT'S ACTUALLY ON THE SAME PAGE, IF YOU WOULD

6   SCROLL UP.

7        THE WITNESS:  OH, I'M SORRY, I DON'T HAVE THE PAPER IN

8   FRONT OF ME.

9                        EXAMINATION

10  BY MR. HILLIARD:

11  Q.   GO AHEAD.

12  A.   THE SECTION YOU'RE HIGHLIGHTING HERE IS TALKING ABOUT PARK

13  MODEL INSTALLATIONS.  THERE IS ANOTHER ONE THAT TALKS ABOUT

14  MOBILE HOME INSTALLATIONS, AND THEN THERE'S ANOTHER ONE THAT

15  TALKS ABOUT TRAVEL TRAILER INSTALLATIONS.  IF YOU TO GO THE

16  SECTION ABOUT MOBILE HOMES INSTALLATIONS, IT TELLS YOU YOU HAVE

17  TO HAVE A LICENSE.  PARK MODELS YOU HAVE TO HAVE A LICENSE.

18  TRAVEL TRAILERS YOU DO NOT HAVE TO HAVE LICENSE.

19  Q.   I UNDERSTAND THAT.  BUT WHAT I'M NOT CLEAR ON IS THAT IF

20  FLUOR HAS DECIDED FOR WHATEVER REASON THAT THEY'RE ONLY GOING TO

21  USE LICENSED MOBILE HOME INSTALLERS, AND THE GUY THAT INSTALLS

22  THE TRAVEL TRAILER ISN'T LICENSED, DOESN'T THAT VIOLATE THE RULE

23  THAT YOU'VE DECIDED TO USE IN SETTING UP THESE TRAVEL TRAILERS?

24  A.   NO, SIR.

25  Q.   DO YOU INFLATE -- DEFLATE THE TIRES AFTER YOU JACK UP THE

1    TRAILER?

2    A.   NO, SIR.

3    Q.   DO YOU UNDERSTAND WHAT I'M SAYING?

4    A.   LET THE AIR OUT OF THE TIRES?

5    Q.   AFTER IT'S BLOCKED?

6    A.   RIGHT.

7    Q.   AND AFTER YOU TIE IT DOWN, DO YOU DEFLATE, LET THE AIR OUT

8    OF THE TIRES?

9    A.   NO, SIR.

10   Q.   DO YOU TRAIN ANY OF YOUR SUBS TO DEFLATE THE TIRES?

11   A.   NO, SIR.

12   Q.   AS AN ENGINEER, WHAT'S THE DANGER OF DEFLATING THE TIRES

13   AFTER YOU JACK UP THE TRAILER?

14   A.   DANGER?

15   Q.   STRUCTURAL DANGER, I'M SORRY.

16   A.   IF THE TIRES ARE NOT TOUCHING THE GROUND FROM A STRUCTURAL

17   STANDPOINT, THERE IS NOT ANY DANGER, THERE IS SOME LOSS OF

18   INTEGRITY IN THE TIRE FROM THE ASPECT OF DRY ROT AND THE ABILITY

19   FOR CONTAMINANTS TO ENTER INTO THE TIRE THAT WAY.

20        IF IT'S SITTING, IF IT'S RAISED WHERE THE TIRE HAS LEFT

21   THE GROUND, THEN OUR REQUIREMENTS ARE THAT THE TIRES WOULD BE

22   BLOCKED SO YOU WOULD WANT THEM TO BE INFLATED.

23   Q.   AND THE TIRES ARE SUPPOSED TO ALWAYS TOUCH THE GROUND AFTER

24   BLOCKING, RIGHT?

25   A.   NO, SIR.  THEY CAN TOUCH THE GROUND OR IF YOU RAISE THE

1   WHEELS WHERE THEY ARE OFF THE GROUND DURING THE BLOCKING PROCESS,

2   YOU BLOCK UNDERNEATH THE TIRES.  SO THEY WOULDN'T ALWAYS BE IN

3   TOUCH WITH THE GROUND BUT THEY WOULD BE SUPPORTED.

4   Q.   SAY THAT ONE MORE TIME.  THEY MUST ALWAYS -- THEY DON'T

5   ALWAYS HAVE TO TOUCH THE GROUND BUT THEY WILL BE SUPPORTED, IS

6   THAT WHAT YOU SAID?

7   A.   YES, SIR.  SOMETHING VERY SIMILAR TO THAT.

8   Q.   504, PLEASE, KARL.  5611.

9        THIS IS FLUOR'S INSTRUCTION AND DETAILS ON HOW TO BLOCK

10  A TRAVEL TRAILER, ISN'T IT?

11  A.   THIS IS AN INSERT OUT OF THE INSTALLATION MANUAL, IF THAT'S

12  WHAT YOU'RE ASKING.

13  Q.   AN INSERT OUT OF THE INSTALLATION MANUAL.

14       CAN YOU HIGHLIGHT THE CLOUD, PLEASE, KARL?

15  A.   IT SAYS, TRAVEL TRAILER TIRES MUST REMAIN IN --

16       THE COURT:  MR. HILLIARD, IS THIS ADMITTED, 504, YOU

17  SAID?  BECAUSE I DON'T HAVE, I DON'T BELIEVE --

18       MR. PENOT:  IT WAS OBJECTED TO, YOUR HONOR, BUT WE HAVE

19  AGREED.

20       THE COURT:  YOU HAVE AGREED TO IT, OKAY, BECAUSE I DON'T

21  HAVE IT IN.  504 IS IN, THEN.

22       MR. HILLIARD:  I APOLOGIZE.

23       THE COURT:  GO AHEAD AND PROCEED.  WHILE WE'RE AT THIS

24  POINT, HOW MUCH LONGER DO YOU HAVE WITH YOUR EXAMINATION OF THIS

25  WITNESS?

1          MR. HILLIARD:  LONG ENOUGH TO TAKE A BREAK.

2          THE COURT:  WELL, I WOULD RATHER FINISH YOUR EXAMINATION

3     OF HIM.  HOW LONG?

4          MR. HILLIARD:  TEN MINUTES.

5          THE COURT:  ANOTHER TEN MINUTES.  LET'S GO AHEAD AND

6     WORK ANOTHER TEN MINUTES.  WE'LL STOP AT YOUR EXAMINATION AND

7     THEN WE'LL PICK UP AFTER LUNCH AND THEN GET BACK TO YOUR -- LET'S

8     GO AHEAD AND FINISH UP THIS TEN MINUTES.

9          MR. HILLIARD:  I WILL.

10                              EXAMINATION

11    BY MR. HILLIARD:

12    Q.   "TRAVEL TRAILER TIRES MUST REMAIN INFLATED AND IN CONTACT

13    WITH THE GROUND.  BLOCKS MAY BE PLACED UNDER THE TIRES TO

14    MAINTAIN GROUND CONTACT."  SO EITHER WAY YOU DO IT, THE TIRES,

15    WHETHER THEY ARE TOUCHING THE GROUND OR WHETHER YOU BLOCK THEM,

16    THEY HAVE TO STAY INFLATED.

17    A.   YES, SIR.

18    Q.   THERE IS NOT ANY ATTEMPT BY FLUOR TO TRAIN ITS SUBS TO

19    DEFLATE THE TIRES?

20    A.   NO, SIR.

21    Q.   LET'S MOVE FOR JUST A FEW MINUTES, AND I'M GOING TO TRY TO

22    GIVE THE COURT SOME OF THE TEN MINUTES BACK, TO FORMALDEHYDE.

23    WHEN DID FLUOR BECOME AWARE, THE GENERAL TIME FRAME, OF THE ISSUE

24    WITH FORMALDEHYDE OUTGASSING IN THE TRAILERS AFTER KATRINA?

25    A.   WHEN YOU USE THE TERM ISSUE, I ASSUME YOU'RE TALKING ABOUT

1    THE IDEA OF THE ELEVATED LEVELS, SO THAT WOULD BE IN THE MARCH

2    TIME OF 2006 TIME FRAME WHEN THE NEWSPAPERS WERE REPORTING IT.

3    Q.    AND YOU LEARNED ABOUT IT THROUGH THE PAPERS?

4    A.    YES, SIR.  AND THERE WAS ONE E-MAIL FROM A FEMA

5    REPRESENTATIVE OUT OF THE NEW ORLEANS AREA FIELD OFFICE AT THAT

6    SAME TIME ALSO.

7    Q.    WHAT DID THAT SAY?

8    A.    BASICALLY SAID, LET'S SEE, LET ME REFRESH MY MEMORY.  IT'S

9    FROM BRIAN BOYLE.  HE WAS IN THE DIRECT HOUSING OPERATIONS FOR

10   THEIR FIELD OFFICE.  HE SAID HE HAD A REQUEST, I THINK, FROM

11   HEADQUARTERS SAFETY TO FIND OUT WHAT THE CONTRACTORS WERE DOING

12   AS TO AIRING OUT THE TRAILERS TO ADDRESS THE FORMALDEHYDE ISSUE.

13   Q.    NOW, DID FLUOR PLAY ANY PART IN DECIDING THAT TRAVEL

14   TRAILERS WERE GOING TO BE THE APPROPRIATE TYPE OF PLACE TO PUT

15   DISPLACED RESIDENTS?

16   A.    NO, SIR.  FEMA MADE THOSE DETERMINATIONS.

17   Q.    CAN YOU PULL UP, WHAT I WANT TO TALK TO YOU ABOUT NOW IS

18   447, KARL.

19          YOU'RE FAMILIAR WITH A MICHAEL HOPKINS EVENT

20   NOTIFICATION LOG?

21   A.    YES, I'M AWARE OF THIS.

22   Q.    AND WHAT AN EVENT NOTIFICATION LOG IS IS --

23          THE COURT:  I'M SORRY, HAVE YOU ALL AGREED ON THIS ONE

24   AS WELL?

25          MR. HILLIARD:  WE DID, YOUR HONOR.  WE WOULD MOVE --

1          THE COURT:  YOU NEED TO TELL ME THAT BECAUSE YOU'RE

2     PUTTING THEM UP HERE.  447.  I DON'T HAVE THAT ONE DOWN.

3          MR. PENOT:  NO OBJECTION, YOUR HONOR, WE'VE REMOVED THE

4     OBJECTION.  EXCUSE ME, YOUR HONOR, WITH THIS ONE, IT WAS A MATTER

5     THAT WAS ADDRESSED IN LIMINE.

6          THE COURT:  OKAY.

7                         EXAMINATION

8     BY MR. HILLIARD:

9     Q.   CAN YOU SEE YOURS OKAY ON THE SCREEN?

10    A.   I CAN SEE WHAT IT IS.  I CAN'T READ ALL OF THE WORDS, NO,

11    SIR.

12    Q.   ON MAY 22, 2006, AT 1:45 P.M., MICHAEL HOPKINS FILLED OUT AN

13    EVENT NOTIFICATION LOG, AND HIS DESCRIPTION OF THE EVENT, HE

14    SAYS, "I AM REPORTING THAT FOR THE LAST 48 HOURS I HAVE HAD A

15    SEVERE HEADACHE AND FLU-LIKE SYMPTOMS.  THESE SYMPTOMS STARTED

16    AROUND 2 A.M. SATURDAY, MAY 20, 2006.  THE DAY BEFORE, MAY 19TH,

17    2006, AROUND 12:30 P.M., AFTER LUNCH, I WAS CHECKING TWO ROWS OF

18    TRAVEL TRAILERS THAT I HAD INSPECTED THE DAY BEFORE, MAY 18,

19    2006.

20         "I HAD LEFT THE AIR CONDITIONERS ON IN THE UNITS SO I

21    COULD RETURN AND CHECK UP ON THE AIR CONDITIONERS TO VERIFY THEY

22    WERE WORKING PROPERLY.  SOMEONE HAD TURNED THE AC OFF IN THE

23    UNITS, SO I WENT BACK INTO THE UNITS TO TURN THEM BACK ON.  I

24    NOTICED A STRONG IRRITATION, FUMES INSIDE THE UNIT.  I WAS

25    PROBABLY INSIDE EACH UNIT ABOUT ONE MINUTE.  LONG ENOUGH TO OPEN

1    THE THREE WINDOWS, TURN ON THE VENT HOOD, AC AND BATHROOM VENT.

2    AS I LEFT THE UNIT, I PROPPED THE DOOR OPEN AND LEFT THE UNIT TO

3    AIR OUT.

4           "I MENTIONED THE HEADACHES I WAS HAVING TO SITE SAFETY

5    PERSONNEL TODAY, TWO DAYS AFTER NOTICING THE SYMPTOMS, SYMPTOMS

6    SIMILAR TO GALVANIZED POISONING."

7           DID YOU PERSONALLY GET NOTICE OF THIS?

8    A.   OF THIS PARTICULAR ITEM AT THE TIME?

9    Q.   AT THE TIME OR NEAR THE TIME?

10   A.   NO, SIR.

11   Q.   AN INVESTIGATION WAS CONDUCTED?

12   A.   YES, SIR.

13   Q.   DID THE TRAILER THAT MR. HOPKINS WAS IN GET TESTED?

14   A.   YES, SIR.

15   Q.   WHAT WAS THE TEST RESULTS?

16   A.   I DON'T HAVE THOSE IN FRONT OF ME.

17   Q.   YOU DON'T.

18          WAS A DETERMINATION MADE BY FLUOR THAT AS A RESULT OF

19   THOSE TEST RESULTS, NO FURTHER ACTION WAS GOING TO BE TAKEN AS TO

20   FORMALDEHYDE AND MR. HOPKINS' COMPLAINT?

21   A.   THE -- THERE WERE SEVERAL STATEMENTS IN THERE.  THE RESULTS

22   CAME BACK, I DON'T HAVE THE EXACT NUMBER, BUT THE RESULTS CAME

23   BACK TO WHERE THEY WERE BELOW OCCUPATIONAL SAFETY AND HEALTH

24   LEVELS.  SO THERE WAS NOT A TRIGGER LEVEL FOR US TO TAKE AN

25   ACTION TO DO ANYTHING OVER AND ABOVE WHAT WE WERE ALREADY DOING.

1  WE'VE ALREADY DONE A RISK ASSESSMENT ON THE POTENTIAL FOR

2  FORMALDEHYDE EXPOSURE TO WORKERS.  THE RESULTS DID NOT CHANGE

3  THAT RISK ANALYSIS, SO THERE WAS NO NEED TO CHANGE ANYTHING ELSE.

4       AS FAR AS MR. HOPKINS'S CONCERN OR ILLNESS, THIS, HE

5  TALKED ABOUT GALVANIZED POISONING IN HIS REPORT.  HE HAD

6  PREVIOUSLY HAD GALVANIZED POISONING THROUGH SOME WELDING

7  ACTIVITIES THAT HE DID, SO IT WAS BASICALLY DETERMINED THAT IT

8  MAY BE RELATED TO THAT ASPECT, BUT THERE WAS NOT ANY INDICATION

9  THAT HE HAD RECEIVED ANY LEVEL OF FORMALDEHYDE EXPOSURE THAT

10  WOULD CAUSE AN ACTION LEVEL.

11  Q.   WAS HE WELDING IN THE TRAILER?

12  A.   NO, SIR.  I'M TALKING ABOUT, THIS WAS A PREVIOUS INCIDENT

13  THAT HE HAD.  A PAST EXPOSURE TO GALVANIZED POISONING.

14  Q.   AND HE'S COMPARING THE, THE SYMPTOMS WERE SIMILAR TO

15  GALVANIZED POISONING, HE DIDN'T SAY IT WAS GALVANIZED POISONING.

16  YOU DETERMINED THAT IT WAS GALVANIZED POISONING?

17  A.   NO, I'M NOT A DOCTOR.  I DIDN'T DETERMINE ANYTHING.

18  Q.   WELL, DID ANY DOCTOR AT FLUOR DETERMINE THAT?

19  A.   FLUOR DOESN'T HAVE DOCTORS, I DON'T KNOW.  I'M JUST SAYING

20  THAT WHAT WE DETERMINED WERE THE LEVELS IN THE TRAILERS WERE NOT

21  ABOVE AN ACTUAL LEVEL REQUIRED BY OSHA FOR US TO DO ANY OTHER

22  ACTION.

23  Q.   BUT NOT JUST THE FOLKS THAT WORKED FOR YOU OR WORKED FOR

24  YOUR SUBS, YOU CERTAINLY DID AN INVESTIGATION IN REGARDS TO THE

25  FAMILIES WHO WERE GOING TO MOVE INTO THE TRAILERS, RIGHT?

1            MR. PENOT:  YOUR HONOR --

2            THE COURT:  GO AHEAD.  WAIT.

3            MR. HILLIARD:  I'M SORRY, JUDGE.

4            MR. PENOT:  I WOULD JUST LIKE TO NOTE AN OBJECTION ON

5    THE RECORD.  THIS IS A MATTER THAT'S BEEN ADDRESSED IN LIMINE

6    THAT I FEEL LIKE, PROCEDURALLY, IT'S SOMETHING I NEED TO NOTE ON

7    THE RECORD AT THIS POINT.

8            THE COURT:  IF I'VE ALREADY RULED ON IT, SO NOTED.

9                              EXAMINATION

10   BY MR. HILLIARD:

11   Q.   WHAT OSHA DOES IS IT DETERMINES A SAFE WORKPLACE FOR WORKERS

12   DURING AN EIGHT-HOUR TIME-WEIGHTED PERIOD, CORRECT?

13   A.   YES, SIR.

14   Q.   WHAT I'M TALKING ABOUT IS FAMILIES THAT LIVE IN THE TRAILERS

15   TEN TO 15 HOURS A DAY, MAYBE LONGER ON A WEEKEND OR A BAD-WEATHER

16   DAY.  DID FLUOR DO ANYTHING ONCE IT GOT PUT ON NOTICE OF THIS

17   FORMALDEHYDE ISSUE TO MAKE SURE THAT YOUR CUSTOMERS,

18   ALANA ALEXANDER, YOUR CUSTOMERS WERE GOING TO BE SAFE WHEN THEY

19   MOVED IN THE TRAILER OR WERE GOING TO BE WARNED IF THEY NEEDED TO

20   BE WARNED?

21   A.   WELL, ONE THING, YOU'RE MISCHARACTERIZING.  OUR CUSTOMER,

22   OUR CLIENT, WAS FEMA.  NOW, GRANT IT, WE WERE PUTTING HOUSING IN

23   FOR OCCUPANTS TO GO INTO AND WE WERE CONCERNED ABOUT THE

24   OCCUPANTS, WITHOUT A DOUBT.  WE DON'T WANT ANYBODY HARMED.  BUT

25   THIS INCIDENT IN MAY OF, 22ND OF '06, WE DID THE SAMPLING.  THE

1  SAMPLING INDICATED THAT THE LEVELS WERE NO ACTION LEVELS THAT

2  WOULD REQUIRE US TO DO ANYTHING, IT WAS NOT ANY HIGHER THAN WHAT

3  WE'VE ALREADY DONE.

4       AS FAR AS ASKING WHEN THIS ISSUE CAME BACK, THAT

5  HAPPENED IN MARCH, AND AT THAT TIME WE ASKED FEMA, DO WE NEED TO

6  DO ANYTHING AS FAR AS THE RESIDENTS, DO YOU NEED OUR ASSISTANCE

7  IN THAT, DO YOU WANT US TO DO ANYTHING, AND THEY TOLD US NO

8  FURTHER ACTION NEEDED TO BE DONE.

9       THE RESIDENTS AND THE UNITS ARE FEMA'S.  ONCE THE

10  OCCUPANT MOVES INTO IT, WE NO LONGER HAVE RESPONSIBILITY, IF YOU

11  WILL, OF THAT UNIT.  IT WOULD BE LIKE ME WALKING INTO YOUR HOUSE

12  AND TELLING YOU SOMETHING ABOUT YOUR HOUSE.  I HAVE NO LEGAL

13  RIGHT TO ENTER THAT BUILDING.

14  Q.   WELL, TO USE YOUR ANALOGY, IF I'M YOUR CUSTOMER AND I'M

15  GETTING THAT HOUSE FROM YOU AND YOU HAVE INFORMATION THAT'S GOING

16  TO AFFECT MY FAMILY AND YOU DON'T TELL ME, THEN YOU AND I ARE

17  GOING TO HAVE A PROBLEM.

18  A.   I WOULD -- OH, I'M SORRY, IS THERE A QUESTION THERE OR A

19  STATEMENT?

20  Q.   WELL, NO, I WAS RESPONDING TO YOUR --

21       THE COURT:  PUT IT IN THE FORM OF A QUESTION.

22       MR. HILLIARD:  THERE IS A QUESTION, JUDGE, AND THAT IS,

23  ARE YOU TELLING THIS JURY THAT SHE WAS NOT YOUR CUSTOMER?

24       THE WITNESS:  MY OFFICIAL CLIENT WAS FEMA.  FEMA'S

25  CLIENT, IF YOU WILL, WOULD BE THE CITIZENS OF THE UNITED STATES,

1  WHICH WOULD INCLUDE MS. ALEXANDER.  OUR JOB AS FAR AS SUPPORTING

2  OUR CLIENT IS TO HELP SUPPORT THEIR CLIENTS, THEIR CUSTOMERS.

3  AND WE DID THAT.

4                          EXAMINATION

5  BY MR. HILLIARD:

6  Q.    432.  WHAT THIS IS IS A TRAVEL TRAILER TRAINING SYLLABUS FOR

7  YOUR INSPECTORS.  ARE YOU FAMILIAR WITH THAT?

8  A.    CAN I HAVE A HARD COPY.  I CAN'T SEE.  OH, NOW WE CHANGED TO

9  ANOTHER THING, BECAUSE THE OTHER THING DIDN'T LOOK LIKE WHAT YOU

10 WERE DESCRIBING.

11 Q.    BEAR WITH THE TECHNOLOGY.  I APOLOGIZE.

12 A.    THAT'S QUITE ALL RIGHT.

13 Q.    437.  THIS IS A TRAVEL TRAILER TRAINING SYLLABUS?

14 A.    YES, SIR.  THAT'S WHAT IT SAYS.

15 Q.    WHAT THIS IS A SYLLABUS TO TRAIN YOUR INSPECTORS, TRAIN THE

16 INSPECTORS FOR FLUOR, CORRECT?

17 A.    BY JUST READING THE FIRST PARAGRAPH, THAT'S WHAT IT SAYS,

18 YES, SIR.

19 Q.    CAN YOU GO TO 19988, PLEASE?

20 A.    YES, SIR.

21 Q.    DO YOU SEE DOWN ON NUMBER 4, CUSTOMERS?

22 A.    YES, SIR.

23 Q.    SO THE CUSTOMERS, AT LEAST WHAT YOU TELL YOUR INSPECTORS,

24 ARE BOTH FEMA AND THEY USE MRS. JONES, BUT WHEN YOU READ THROUGH

25 THE DOCUMENT, YOU REALIZE MRS. JONES IS A GENERIC NAME FOR ANYONE

1   THAT IS GOING TO LIVE IN A FEMA TRAILER?

2   A.   I WOULD AGREE WITH THAT, YES.  I THINK THAT'S CONSISTENT

3   WITH WHAT I JUST SAID, TOO --

4   Q.   NO.

5   A.   -- THAT FEMA IS MY CLIENT AND THAT PART OF OUR

6   RESPONSIBILITY IN SATISFYING OUR CLIENT IS TO HELP THEM SATISFY

7   THEIR CUSTOMERS, WHICH WERE THE CITIZENS OF THE UNITED STATES.

8   Q.   IT SEEMS TO ME THAT IF MRS. JONES IS FEMA'S CUSTOMER AND NOT

9   YOURS, IT WOULD BE A AND THEN LITTLE I.  YOU HAVE TWO CUSTOMERS

10  ACCORDING TO YOUR OWN DOCUMENT.  YOU HAVE FEMA AND YOU HAVE

11  MRS. JONES, YOU DISAGREE WITH THAT, DON'T YOU?  LOOK --

12  A.   I'M NOT SAYING THAT WE'RE NOT CONCERNED ABOUT MRS. JONES OR

13  MS. ALEXANDER OR MR. SMITH.  I'M SAYING THAT BY CONTRACT MY

14  CLIENT IS FEMA.  MY CLIENT HAS CUSTOMERS, BEING THE CITIZENS OF

15  THE UNITED STATES.  WE SUPPORT OUR CLIENT BY HELPING THEM SUPPORT

16  THEIR CLIENTS, THEIR CUSTOMERS.  WE PROVIDE THEM A PLACE TO LIVE.

17  Q.   RIGHT.  BUT IF THE PLACE THAT YOU PROVIDE THEM TO LIVE HAS

18  LEVELS OF FORMALDEHYDE THAT'S GOING TO AFFECT THEIR FAMILY, THEIR

19  CHILDREN, THEN I SUGGEST TO YOU THAT YOU DO NOT CARE FOR THOSE

20  PEOPLE WHO ARE MOVING IN THE TRAILERS IF YOU DO NOT ADVISE THEM,

21  IF THEY ARE YOUR CUSTOMERS OF THE ISSUE.

22  A.   MY CUSTOMER --

23          MR. PENOT:  OBJECTION, YOUR HONOR.

24          THE COURT:  WE HAVE TO GET TO A QUESTION.

25          MR. HILLIARD:  IS THAT RIGHT?

1       THE COURT:  THIS ISN'T CLOSING ARGUMENT.  YOU HAVE TO

2  PHRASE IT IN A QUESTION.  ASK HIM YES OR NO OR WHATEVER SO HE CAN

3  RESPOND.  YOU'RE MAKING THESE STATEMENTS, AND I GUESS YOU WANT

4  HIM TO RESPOND TO THEM SOMEHOW, BUT LET'S ASK A QUESTION.

5       MR. HILLIARD:  WELL, WITH ALL DUE RESPECT, THEN MY

6  OBJECTION JUDGE WOULD BE THAT THE QUESTION COMES BACK TO ME,

7  WHICH I RESPOND TO IN A QUESTION FORM, BUT I HEAR WHAT THE COURT

8  SAYS.

9       THE COURT:  YOU'RE NOT RESPONDING IN QUESTION FORM.

10 ANSWER HIS QUESTION.  ASK A QUESTION, NOT A STATEMENT FOR HIM TO

11 RESPOND TO.

12                          EXAMINATION

13 BY MR. HILLIARD:

14 Q.   ALL RIGHT.  THE LAST QUESTION, THEN I'M GOING TO SIT DOWN,

15 AND THAT IS, IS ALANA ALEXANDER A CUSTOMER OF FLUOR IN THAT IF

16 FLUOR HAD INFORMATION ABOUT LEVELS OF FORMALDEHYDE THAT COULD

17 AFFECT HER, CHRISTOPHER AND ERICA, DO YOU HAVE A RESPONSIBILITY

18 TO GIVE HER THAT INFORMATION; YES OR NO?

19      MR. PENOT:  OBJECTION TO THE EXTENT HE'S ASKING FOR A

20 LEGAL CONCLUSION.  THERE IS THAT RESPONSIBILITY WORD AGAIN.

21      MR. HILLIARD:  IT'S NOT A LEGAL --

22      THE COURT:  HE CAN TESTIFY TO HIS UNDERSTANDING OF,

23 PURSUANT TO THE CONTRACT AND PURSUANT TO THE RELATIONSHIP THAT HE

24 DESCRIBED THAT'S REPRESENTED UP THERE, AND HE'S ALREADY SAID THAT

25 ABOUT TWO OR THREE TIMES ABOUT HOW HE VIEWED HIS RELATIONSHIP, HE

1   CAN ANSWER.  IT'S NOT A LEGAL CONCLUSION BECAUSE HE'S NOT BEEN

2   QUALIFIED AS A LAWYER AND HIS ANSWER WILL NOT BE ACCEPTED AS A

3   LEGAL CONCLUSION.

4                MR. WHITTAKER, YOU CAN GO AHEAD AND RESPOND.

5           THE WITNESS:  I'M GLAD YOU SAID I'M NOT A LAWYER.

6                I GUESS, I HAVE TO MAKE A LONGER ANSWER THAN YOU

7   PROBABLY WANT TO ANSWER THIS TO YOU.

8                             EXAMINATION

9   BY MR. HILLIARD:

10  Q.   CAN UP ANSWER IT YES OR NO?

11          THE COURT:  WHY DON'T YOU START WITH AN AFFIRMATIVE OR A

12  NEGATIVE, AND THEN WE'LL GIVE YOU AN EXPLANATION.

13          THE WITNESS:  OKAY.  THEN, YES.  AND WE DID.  WE

14  REPORTED THE INFORMATION TO OUR CLIENT, FEMA.  BACK WHEN THE

15  INCIDENT BROKE, BACK IN THE MARCH TIME FRAME, WE ASKED OUR

16  CLIENT, DO YOU NEED US TO DO ANYTHING TO HELP YOU WITH THIS ISSUE

17  OR HELP WITH COMMUNICATIONS PLANNED, WE WERE TOLD NO FURTHER

18  ACTION WAS REQUIRED.

19               SUBSEQUENT TO THAT, FEMA STARTED THEIR OWN

20  COMMUNICATION PLAN AND PLANNING FOR A COMMUNICATIONS PLAN.  WHEN

21  THIS INCIDENT CAME UP ABOUT MR. HOPKINS, WE REPORTED ALL THE

22  INFORMATION ABOUT OUR FINDINGS OF ANY SAMPLINGS AND THE INCIDENT

23  AND A COPY OF THE INCIDENT REPORT TO OUR CLIENT, FEMA.  SO FEMA

24  HAD THE ABILITY TO SUPPLY ALL OF THAT INFORMATION TO ANYBODY THEY

25  NEEDED TO.

1          MR. HILLIARD:  THAT WAS A PAUSE.  I APOLOGIZE.  I

2    THOUGHT HE WAS DONE.  I PASS THE WITNESS, JUDGE.

3          THE COURT:  MR. WEINSTOCK, WE'RE GOING TO BREAK FOR

4    LUNCH HERE, BUT ARE YOU GOING TO HAVE QUESTIONS FOR THIS WITNESS?

5          MR. WEINSTOCK:  IF WE DO, IT WILL BE VERY FEW.

6          THE COURT:  WE'LL TAKE YOURS AFTER THE LUNCH BREAK AND

7    THEN, OF COURSE, MR. PENOT WOULD CALL MR. WHITAKER ON HIS CASE

8    AND CHIEF.  SO WE'LL ALLOW HIM TO DO THAT.  THEN WE'LL GET BACK

9    TO MR. HILLIARD AND THEN MR. PENOT WILL WRAP UP WITH THIS

10   WITNESS.

11          MR. WHITAKER, IF YOU CAN BE BACK HERE AT 1:15.  AND

12   IF OUR JURORS CAN BE BACK AT 1:15 READY TO COME INTO THE

13   COURTROOM, THAT'S WHEN WE'LL BEGIN AGAIN.  PLEASE DON'T DISCUSS

14   ANY OF THE EVIDENCE DURING THE LUNCH HOUR.

15          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

16   PANEL LEAVES THE COURTROOM.)

17          THE COURT:  COUNSEL, ANYTHING WE NEED TO COVER ON THE

18   RECORD?

19          MR. WATTS:  JUST SOMEBODY NEEDS TO GET ME THE DAN SHEA

20   STUFF SO THAT I CAN CUT IT.

21          THE COURT:  I JUST SIGNED OFF ON THE DAN SHEA ORDER

22   RELATIVE TO YOUR PRIOR DESIGNATIONS, WHICH I UNDERSTAND IT NOW

23   HAVE BEEN CHANGED.

24          OFF OF THE RECORD.

25          THIS IS PLAINTIFFS' PROFFER NUMBER 1.

1      MR. BUZBEE:  DURING THE TESTIMONY OF JEFF ZUMBRUN, WE

2  SOUGHT TO OFFER TESTIMONY REGARDING THE SECRET RECORDING OF A

3  CONVERSATION BETWEEN JEFF ZUMBRUN AND ADORN REPRESENTATIVE

4  SCOTT BAILEY, SPECIFICALLY REGARDING, AND I'M GOING TO SET IT

5  FORTH ON THE RECORDING STARTING ON PAGE 12 OF MR. ZUMBRUM'S

6  DEPOSITION, WHICH I'M GOING TO ATTACH AS AN EXHIBIT, WHERE

7  MR. ZUMBRUN REPORTED THIS INDIVIDUAL ABOUT THE SO-CALLED LOW EMIT

8  FORM, WHICH ATTACHMENT WAS WHERE MR. ZUMBRUN SECRETLY RECORDED

9  SCOTT BAILEY, AND THEIR CONVERSATION HAD TO DO WITH A SO-CALLED

10  POLICY THAT REQUIRED GULF STREAM TO USE ONLY LOW FORMALDEHYDE-

11  EMITTING WOOD PRODUCTS.

12      AND THEY ALSO DISCUSSED IN THEIR CONVERSATION

13  ADORN'S LACK OF KNOWLEDGE OF THAT POLICY AND ADORN'S FAILURE TO

14  FOLLOW THIS POLICY THAT THEY KNEW NOTHING ABOUT.  AND DURING

15  JEFFREY ZUMBRUN'S TESTIMONY, PLAINTIFFS' COUNSEL ATTEMPTED TO

16  QUESTION THE WITNESS ON THAT SECRET RECORDATION AND THE FACT THAT

17  DAN SHEA, THE PRESIDENT OF THE COMPANY, INSTRUCTED HIM TO PERFORM

18  THAT SECRET RECORDING, AND THOSE TWO, THAT IS, ZUMBRUN AND THE

19  PRESIDENT, DISCUSSED THE SECRET RECORDING AFTER THE FACT.

20      THE PLAINTIFFS SOUGHT TO OFFER THAT TESTIMONY TO

21  SHOW, NUMBER 1, THE FAILURE TO FOLLOW THIS POLICY, NUMBER 2, THAT

22  ADORN, THE WOOD VENDOR, HAD NO KNOWLEDGE OF THE POLICY, AND

23  NUMBER 3, TO SHOW THAT THE PRESIDENT WAS WELL AWARE THAT THE

24  POLICY WASN'T BEING FOLLOWED BEFORE THE ALEXANDER FAMILY MOVED

25  INTO THE TRAILER AT ISSUE IN THIS CASE.  AND SO AS AN EXHIBIT, I

1  WOULD OFFER, I WILL HIGHLIGHT ALL THE PORTIONS OF THE TESTIMONY

2  THAT WOULD, THAT I WOULD HAVE ASKED JEFFREY ZUMBRUN ABOUT HAD I

3  BEEN ALLOWED TO BY THE JUDGE, BUT THE JUDGE EXCLUDED THAT

4  TESTIMONY.

5        MR. MEUNIER:  ON BEHALF OF PLAINTIFFS, LET ME ADD THAT

6  THE FACT OF THE RECORDING OF THE SECRET -- THE FACT OF THE SECRET

7  RECORDING OF THE CONVERSATION SHOULD HAVE BEEN DISCLOSED TO THE

8  JURY BECAUSE IT GOES DIRECTLY TO THE CREDIBILITY OF MR. ZUMBRUN

9  AS A WITNESS.

10        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE COURT

11  WAS IN LUNCHEON RECESS.)

12        (WHEREUPON, AT 12:23 P.M., THE PROCEEDINGS WERE

13  CONCLUDED.)

14                    *    *    *

15

16

17

18

19

20

21

22

23

24

25

1                       REPORTER'S CERTIFICATE

2

3       I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

4  MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

5  REPORTER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT

6  COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE

7  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY

8  ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

9  THE ABOVE-ENTITLED AND NUMBERED MATTER.

10

11

12                       *S/CATHY PEPPER*_____

13                       CATHY PEPPER, CRR, RMR, CCR

14                       OFFICIAL COURT REPORTER

15                       UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25