1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3    ************************************************************

4    IN RE:  FEMA TRAILER
     FORMALDEHYDE PRODUCTS
5    LIABILITY LITIGATION

6                           DOCKET MDL NO. 1873 "N"
                            NEW ORLEANS, LOUISIANA
7                           THURSDAY, SEPTEMBER 17, 2009, 8:30 A.M.

8    THIS DOCUMENT IS RELATED TO

9    CHARLIE AGE, ET AL V
     GULF STREAM COACH, INC.,
10   ET AL, DOCKET NO. 09-2892;
     ALANA ALEXANDER,
11   INDIVIDUALLY AND ON BEHALF
     OF CHRISTOPHER COOPER
12

13   ************************************************************

                              **DAY 4**
14                      **MORNING SESSION**
                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                     UNITED STATES DISTRICT JUDGE
16

17   APPEARANCES:

18

     FOR THE PLAINTIFFS:
19
                            GAINSBURGH BENJAMIN DAVID MEUNIER AND
20                          WARSHAUER
                            BY:  GERALD E. MEUNIER, ESQUIRE
21                          2800 ENERGY CENTRE
                            1100 POYDRAS STREET, SUITE 2800
22                          NEW ORLEANS LA   70163

23
                            THE BUZBEE LAW FIRM
24                          BY:  ANTHONY G. BUZBEE, ESQUIRE
                            600 TRAVIS, SUITE 7300
25                          HOUSTON TX   77002

```
 1   APPEARANCES CONTINUED:

 2
                              WATTS GUERRA CRAFT
 3                            BY:  MIKAL C. WATTS, ESQUIRE
                              FOUR DOMINION DRIVE
 4                            BUILDING THREE, SUITE 100
                              SAN ANTONIO TX 78257
 5

 6                            HILLIARD MUNOZ GUERRA
                              BY:  ROBERT C. HILLIARD, ESQUIRE
 7                            719 S. SHORELINE BOULEVARD #500
                              CORPUS CHRISTI TX 78401
 8

 9                            CHRIS PINEDO
                              ATTORNEY AT LAW
10                            802 N. CARANCAHUA, SUITE 2250
                              CORPUS CHRISTI TX  78470
11

12   FOR GULF STREAM COACH, INC.:

13                            DUPLASS ZWAIN BOURGEOIS MORTON
                              PFISTER & WEINSTOCK
14                            BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                   JOSEPH G. GLASS, ESQUIRE
15                            THREE LAKEWAY CENTER
                              3838 N. CAUSEWAY BOULEVARD
16                            SUITE 2900
                              METAIRIE LA  70002
17

18                            SCANDURRO & LAYRISSON
                              BY:  TIMOTHY D. SCANDURRO, ESQUIRE
19                            607 ST. CHARLES AVENUE
                              NEW ORLEANS LA  70130
20

21
     FOR FLUOR ENTERPRISES, INC.:
22
                              MIDDLEBERG RIDDLE & GIANNA
23                            BY:  CHARLES R. PENOT, JR., ESQUIRE
                                   RICHARD A. SHERBURNE, ESQUIRE
24                                 SONIA MALLETT, ESQUIRE
                              717 N. HARDWOOD
25                            DALLAS TX  75201
```

```
 1   OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RMR, CRR
                                   500 POYDRAS STREET, ROOM B406
 2                                 NEW ORLEANS LA  70130
                                   (504) 589-7779
 3
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
 4   PRODUCED BY COMPUTER.

 5

 6

 7                          I N D E X

 8

 9   EXAMINATIONS                                          PAGE

10

11   VIDEOTAPED DEPOSITION OF RICHARD SOBER.................   5

12   DR. EDWARD SHWERY......................................  23

13   VOIR DIRE EXAMINATION BY MR. MEUNIER...................  23

14   DIRECT EXAMINATION BY MR. MEUNIER......................  25

15   CROSS-EXAMINATION BY MR. GLASS.........................  49

16   CROSS-EXAMINATION BY MR. SHERBURNE.....................  63

17   REDIRECT EXAMINATION BY MR. MEUNIER....................  67

18   CHARLES DAVID MOORE....................................  69

19   DIRECT EXAMINATION BY MR. HILLIARD.....................  70

20   CROSS-EXAMINATION BY MR. PENOT......................... 100

21   REDIRECT EXAMINATION BY MR. HILLIARD................... 122

22

23

24

25
```

1                    P-R-O-C-E-E-D-I-N-G-S

2                       MORNING SESSION

3          THURSDAY, SEPTEMBER 17, 2009, 8:30 A.M.

4                   (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  ALL RISE.

8          THE COURT:  GOOD MORNING.

9          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

10  PANEL ENTERS THE COURTROOM.)

11         THE COURT:  YOU MAY BE SEATED.

12             FIRST OF ALL, THANK YOU, LADIES AND GENTLEMEN OF

13  THE JURY, FOR BEING HERE ON TIME AND READY TO PROCEED, AND WE'LL

14  MAKE EFFICIENT USE OF YOUR TIME TODAY.  I'VE CONFERRED WITH THE

15  ATTORNEYS AND WE HAVE A PRETTY GOOD LINEUP FOR YOU TODAY.  WE

16  ARE, AGAIN, GOING TO COVER A LOT OF GROUND.

17             SO WHY DON'T WE GO AHEAD AND BEGIN WHERE WE LEFT

18  OFF YESTERDAY, WHICH I THINK WAS IN THE MIDDLE OF THE VIDEO

19  TESTIMONY HERE OF MR. RICHARD SOBER?

20         MR. WATTS:  YES, SIR.

21         THE COURT:  IS THAT CORRECT?

22         MR. WATTS:  YES, SIR.

23         THE COURT:  WE'RE GOING TO GO AHEAD AND WATCH THAT, AND

24  THEN I BELIEVE WE'RE GOING TO HAVE SOME LIVE TESTIMONY AS SOON AS

25  THIS VIDEO IS OVER.

1          LET'S GO AHEAD AND PROCEED.

2          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

3    PORTIONS OF THE VIDEOTAPED DEPOSITION OF RICHARD SOBER WAS

4    PLAYED.)

5    Q.    AND THEN WHAT WAS THE NEXT STAGE AFTER THE REQUEST FOR

6    PROPOSALS WERE SENT OUT AFTER STAGE 3, WHAT HAPPENED IN STAGE 4?

7    A.    UNDER NORMAL PROCESS WITH FLUOR, YOU USUALLY HAVE A QUESTION

8    AND ANSWER -- THERE'S USUALLY SOME TECHNICAL QUESTIONS THAT THEY

9    COME THROUGH WITH.  YOU WRITE AN ADDENDUM TO THE REQUEST FOR

10   PROPOSAL.  YOU GIVE EVERYBODY A LIST OF QUESTIONS AND THE ANSWERS

11   TO THEM.  AND THEN YOU -- WHEN YOU RECEIVE THE PROPOSALS, YOU

12   REVIEW THEM, EITHER ADMINISTRATIVELY OR YOU GET SOMEONE TO DO A

13   TECHNICAL EVALUATION.

14   Q.    STAGE 4 IS WHEN YOU GET BACK THE REQUEST FOR PROPOSAL AND

15   THEY ARE REVIEWED BY FLUOR?

16   A.    YES.

17   Q.    IS THERE -- WHAT'S NEXT AFTER THAT, WHAT YOU WOULD CALL

18   STAGE 5?

19   A.    THE EVALUATION TO SEE WHO IS THE LOWEST BID, OR LOWEST BID

20   TECHNICALLY QUALIFIED.

21   Q.    EXPLAIN TO ME WHAT YOU MEAN BY THAT, "LOWEST BID TECHNICALLY

22   QUALIFIED."

23   A.    THEY MEET THE REQUIREMENTS WITH -- WITH EXPERIENCE AND THE

24   WORK THAT THEY'RE GOING TO PERFORM.  IN OTHER WORDS, IF THEY

25   DIDN'T DO A PREQUALIFICATION FORM, THEN YOU LOOK AT WHAT THEY

1  SUBMITTED WITH THEIR PROPOSAL, AND THEN LOWEST PRICE.

2  Q.   WAS THERE ANY MINIMUM REQUIREMENT THAT SUBCONTRACTORS WHO

3  RECEIVED AWARDS UNDER THIS PROCESS HAD, INDEED, HAULED AND

4  INSTALLED TRAVEL TRAILERS IN THE PAST?

5  A.   WAS THERE A REQUIREMENT FOR THAT?

6  Q.   YES.

7  A.   YES.  TO MY KNOWLEDGE, YES.

8  Q.   IS THAT SOMEWHERE IN WRITING?

9  A.   I WOULD BELIEVE THAT IT'S IN THE REQUEST FOR PROPOSAL

10  DOCUMENTS, BUT I DON'T REMEMBER IT WORD FOR WORD.

11  Q.   AND IF THEY ANSWERED -- SAY, FOR EXAMPLE, IF IT IS IN THE

12  REQUEST FOR PROPOSAL DOCUMENTS AND THEY ANSWERED THEY NEVER HAD

13  HAULED OR INSTALLED A TRAVEL TRAILER BEFORE, WOULD THEY BE

14  DISQUALIFIED IN SOME WAY, OR COULD THEY STILL RECEIVE A CONTRACT

15  FOR FLUOR TO DO WORK?

16  A.   THEY WOULD BE DETERMINED AS NONRESPONSIVE AND THEY WOULD BE

17  DISQUALIFIED.

18  Q.   DID FLUOR DO ANYTHING TO VERIFY THAT THOSE WHO SAID THEY

19  HAULED AND INSTALLED TRAVEL TRAILERS HAD, INDEED, DONE SO IN THE

20  PAST?

21  A.   ONLY BY THEIR PREQUALIFICATION FORM, TO SHOW THAT THEY'D

22  DONE THAT.  RECOMMENDATIONS BY FEMA THAT HAVE USED THEM IN THE

23  PAST.  AND THEY ALSO HAVE TO HAVE A LICENSE TO DO THAT TYPE OF

24  WORK IN THE STATE AND COUNTY WHERE THEY ARE WORKING.

25  Q.   AND FROM WHAT YOU ARE AWARE OF, THE CONTRACTORS, WERE THEY

1   ABLE TO SUBLET SOME OF THE BUSINESS TO FURTHER SUBCONTRACTORS TO

2   ASSIST THEM IN DOING THAT WORK?

3   A.   WHAT I RECALL THE FLUOR BOILERPLATE LANGUAGE IS THAT ANYONE

4   CAN SUBLET WORK, PROVIDING IT'S -- IT'S APPROVED BY FLUOR, AND I

5   BELIEVE THERE'S A PERCENTAGE IN OUR GENERAL TERMS AND CONDITIONS

6   THAT DISALLOWS YOU TO SUBCONTRACT MORE THAN A CERTAIN PERCENTAGE

7   OF THE WORK.

8   Q.   WAS THERE ANY TYPE OF PROHIBITION TO HAVING A FURTHER LEVEL

9   OF SUBLETTING BENEATH THAT SUBCONTRACTOR?  FOR EXAMPLE, FLUOR

10   LOOKED FOR SUBCONTRACTORS TO ASSIST THEM.  AND FROM WHAT I'M

11   UNDERSTANDING YOU'RE SAYING, IN THE BOILERPLATE LANGUAGE, THOSE

12   SUBCONTRACTORS COULD SUBLET SOME OF THE WORK.  BUT MY QUESTION TO

13   YOU IS, IF THEY, INDEED, SUBLET THAT WORK, WAS THERE SOME

14   PROHIBITION FOR THEM, THAT SUBCONTRACTOR, FROM SUBLETTING THE

15   WORK FURTHER ON DOWN TWO OR THREE LEVELS?

16   A.   THAT WAS NEVER THE INTENT WHEN WE SENT OUT THE BOA'S.

17   Q.   BUT WAS THERE ANY PROHIBITION AGAINST IT, SIR?

18   A.   ONLY THAT FLUOR WOULD HAVE TO APPROVE ANY LOWER-TIER

19   SUBCONTRACTOR.

20   Q.   WOULD IT HAVE TO BE APPROVED IN WRITING?

21   A.   YES.

22   Q.   AND WHAT WAS THE PROCESS THAT FLUOR WOULD GO THROUGH BEFORE

23   THEY WOULD APPROVE SOME TYPE OF A SUBCONTRACTOR FOR THE

24   SUBCONTRACTOR THAT HAD A BOA?

25   A.   THEY WOULD PRESENT WHO THAT SUBCONTRACTOR WAS AND WHAT THEY

1   WERE GOING TO DO TO SUPPORT THE WORK.  AND UNDER NORMAL

2   CIRCUMSTANCES, ON JUST FLUOR IN GENERAL WITH CONTRACTING, WE DO

3   HAVE LANGUAGE IN THE CONTRACT THAT ALLOWS THEM TO DO THAT ON ANY

4   CONTRACT.

5   Q.   THEY'RE ALLOWED TO DO THAT, BUT ONLY WITH THE PERMISSION OF

6   FLUOR; IS THAT RIGHT?

7   A.   THAT'S CORRECT.  UNLESS THEY -- WITH THEIR INITIAL PROPOSAL,

8   THEY ACTUALLY PROPOSE THEIR LOWER-TIER SUBS AT THAT TIME.  THEN

9   IF WE AWARD THEM THE CONTRACT, WE HAVE APPROVED THEM AND THEIR

10  LOWER-TIER SUBS.

11  Q.   AND WITHOUT THAT APPROVAL -- WITHOUT THAT APPROVAL, EITHER

12  IN THE INITIAL REQUEST FOR PROPOSAL OR A SUBSEQUENT, AFTER THEY

13  GOT A BOA, THE SUBCONTRACTOR SHOULD NOT BE USING ANY FURTHER

14  SUBCONTRACTORS BENEATH THEM TO EXECUTE ANY OF THE WORK; ISN'T

15  THAT RIGHT?

16  A.   NOT WITHOUT PERMISSION, WRITTEN PERMISSION FROM FLUOR.

17  APPROVAL, NOT PERMISSION.

18  Q.   ARE YOU FAMILIAR WITH AN ENTITY CALLED MLU?

19  A.   ONLY BY NAME.

20  Q.   WHAT IS MLU?

21  A.   AS I RECALL THE BIDDER'S LIST FOR THE BOA'S, MLU, I BELIEVE,

22  WAS A HAUL-AND-INSTALL CONTRACTOR.

23  Q.   WHAT IS THIS COLLECTION OF DOCUMENTS YOU HAVE BEFORE YOU,

24  GENERALLY SPEAKING, EXHIBIT NO. 1?

25  A.   A FILE SUMMARY MEMO IS A SUMMARY OF ALL OF THE EVENTS THAT

1   TOOK PLACE, FROM GENERATING A BIDDER'S LIST, TO ISSUING AN RFP,

2   ANY ADDENDUMS, ANY NEGOTIATIONS, UP TO AWARD AND DETERMINING A

3   FAIR AND REASONABLE PRICE TO THE U.S. GOVERNMENT.

4   Q.   ALL THESE DOCUMENTS BEFORE YOU IN EXHIBIT 1, ARE THEY

5   RELATED TO MLU SERVICES?

6   A.   YES.   THE FILE SUMMARY MEMO IS.

7   Q.   I'M GOING TO SHOW YOU WHAT HAS NOW BEEN MARKED AS EXHIBIT 5,

8   WHICH FOLLOWS SEQUENTIALLY AFTER THE LAST DOCUMENT WE HAVE

9   SUBDIVIDED OUT OF EXHIBIT 1.

10          COULD YOU PLEASE IDENTIFY THIS FOR ME, EXHIBIT 5.

11  A.   EXHIBIT 5 IS THE BOILERPLATE, PART III, GENERAL TERMS, SHORT

12  FORM, FOR FLUOR CONTRACTS.

13  Q.   IS THERE ANYWHERE IN HERE WHERE IT DISCUSSES SUBCONTRACTING

14  OUT A PORTION OF THE WORK THAT THE CONTRACTOR HAS BEEN AWARDED?

15  A.   IN LOOKING AT THE INDEX ON PAGE 1, I WOULD SAY NO.

16  Q.   HOW ABOUT SECTION 15?

17  A.   ASSIGNMENTS AND SUBCONTRACTS.

18  Q.   DOES THAT COVER SUBCONTRACTING?

19  A.   IT MAY.   "ASSIGNMENT" MEANS THEY CAN -- THEY CAN ASSIGN IT

20  OVER TO ANOTHER CONTRACTOR.   I WOULD HAVE TO LOOK TO SEE WHAT --

21  WHAT IT ALSO SAYS ABOUT SUBCONTRACTS.

22  Q.   IT'S SAYS, "ANY ATTEMPT" -- IN SECTION 15, "ANY ATTEMPT BY

23  CONTRACTOR TO ASSIGN OR SUBCONTRACT THIS CONTRACT, IN WHOLE OR IN

24  PART, WITHOUT FIRST OBTAINING COMPANY'S CONSENT SHALL BE VOIDABLE

25  AT THE OPTION OF COMPANY.   CONTRACTOR HEREBY AGREES THAT COMPANY

1   MAY ASSIGN THIS CONTRACT TO OWNER, OWNER'S DESIGNATED

2   REPRESENTATIVE, OR TO COMPANY AFFILIATES."

3          IS THAT WHAT IT STATES?

4   A.   YES.

5   Q.   WHAT IS "OWNER"?  WHO IS "OWNER"?

6   A.   "OWNER" IS FLUOR.

7   Q.   AND --

8   A.   I'M SORRY.  "OWNER" WOULD USUALLY BE THE CLIENT, GOVERNMENT.

9   Q.   AND "CONTRACTOR," WOULD IT BE FLUOR OR THE PERSON THAT -- OR

10  ENTITY THAT IS FILLING OUT THE REQUEST FOR PROPOSAL?

11  A.   IT WOULD BE THE PERSON FILLING OUT THE REQUEST FOR PROPOSAL.

12  Q.   AND THEN "COMPANY" WOULD BE FLUOR?

13  A.   YES, SIR.

14  Q.   AND I'M TRYING TO UNDERSTAND THE IMPORT OF THIS.  DOES THIS

15  MEAN THAT THE SUBCONTRACTOR WHO IS FILLING OUT THE REQUEST FOR

16  PROPOSAL, IF THEY DO NOT GET WRITTEN CONSENT FROM FLUOR, THAT THE

17  SUBCONTRACT IS VOID, OR THE ENTIRE CONTRACT THAT THE

18  SUBCONTRACTOR HAS WITH FLUOR IS VOIDABLE?

19  A.   THE WAY I READ THAT, IT COULD BE VOIDABLE AT THE OPTION OF

20  FLUOR.

21  Q.   DO YOU SEE ANYTHING ELSE IN THIS EXHIBIT 5 THAT COVERS

22  SUBCONTRACTING?

23  A.   WELL, IT'S ALL RELATIVE TO A SUBCONTRACT.

24  Q.   I'M TALKING ABOUT THE SUBCONTRACTOR WHO IS AWARDED A

25  CONTRACT BY FLUOR RELETTING OR SUBBING OUT SOME OF THE WORK THAT

1  THEY HAVE BEEN AWARDED.

2  A.   NO, I DON'T RECALL ANYTHING ELSE IN HERE TO COVER THAT.

3  Q.   THERE'S NOTHING THAT SETS FORTH A MINIMUM COMPETENCY LEVEL

4  FOR SUBCONTRACTORS OF THE SUBCONTRACTORS, IS THERE?

5  A.   NOT TO MY KNOWLEDGE.

6  Q.   I'M GOING TO SHOW YOU THE NEXT SECTION OF PAGES FROM

7  EXHIBIT 1, WHICH WE HAVE NOW SUBDIVIDED OUT.  IT HAS BEEN MARKED

8  AS EXHIBIT 6.

9       COULD YOU PLEASE IDENTIFY WHAT THAT DOCUMENT IS.

10 A.   THIS IS CONTRACT PART IV, SPECIAL TERMS.

11 Q.   AND THESE ARE CLAUSES THAT ARE INCORPORATED BY REFERENCE

12 INTO THE CONTRACT THAT THE SUBCONTRACTOR WOULD ENTER INTO WITH

13 FLUOR; IS THAT RIGHT?

14 A.   THAT'S CORRECT.

15 Q.   I'M GOING TO SHOW YOU THE NEXT TWO PAGES FROM EXHIBIT 1 THAT

16 WE HAVE SUBDIVIDED OUT -- THAT I HAVE NOW MARKED AS EXHIBIT 7.

17      COULD YOU PLEASE IDENTIFY THOSE DOCUMENTS FOR ME.

18 A.   EXHIBIT 7 IS THE STANDARD ATTACHMENT THAT WE SEND OUT WITH

19 ALL RFP'S, FOR "REPS AND CERTS" AS WE REFER TO THEM,

20 REPRESENTATIONS AND CERTIFICATIONS.  THIS IS A SUPPLEMENTAL FORM

21 TO THE FULL FORM "REPS AND CERTS."

22 Q.   MR. SOBER, BEFORE WE TOOK A BREAK, WE WERE TALKING ABOUT

23 EXHIBIT 7.  DO YOU HAVE THAT IN FRONT OF YOU, REPRESENTATIONS AND

24 CERTIFICATIONS?

25 A.   YES.  REPRESENTATIONS AND CERTIFICATIONS, SUPPLEMENTAL.

1   Q.    AND IS THAT SOMETHING THAT THE SUBCONTRACTOR WHO IS SEEKING

2   TO DO WORK WITH FLUOR WOULD NEED TO SIGN AND TURN BACK IN WITH A

3   REQUEST FOR PROPOSAL?

4   A.    THEY'RE REQUESTED TO TURN IT IN WITH THE REQUEST FOR

5   PROPOSAL.  SOMETIMES YOU HAVE TO GO BACK AND GET THEM TO DO IT

6   AFTERWARDS.

7   Q.    I'M NOW SHOWING YOU WHAT HAS BEEN MARKED AS SOBER EXHIBIT 8,

8   WHICH IS THE NEXT SET OF PAGES THAT WE HAVE SUBDIVIDED OUT OF

9   EXHIBIT NO. 1.

10          COULD YOU PLEASE IDENTIFY THAT FOR ME.

11  A.    THAT'S THE NONSUPPLEMENTAL REPRESENTATIONS AND

12  CERTIFICATIONS FORM THAT --

13  Q.    THE SUBCONTRACTOR IS SUPPOSED TO FILL OUT EXHIBIT 8 AND SEND

14  IT BACK WITH THEIR REQUEST FOR PROPOSAL WHEN IT'S COMPLETED; IS

15  THAT RIGHT?

16  A.    THAT'S CORRECT.

17  Q.    YOUR TESTIMONY IS FOR A SUBCONTRACTOR TO HAVE A

18  SUBCONTRACTOR ASSIST THEM IN WORK, UNDER THIS CONTRACT, THAT IT

19  HAD TO BE APPROVED IN WRITING BY FLUOR, OR IT HAD TO BE CONTAINED

20  IN THE ORIGINAL REQUEST FOR PROPOSAL, AND FLUOR NEEDED TO APPROVE

21  IT THERE; IS THAT RIGHT?

22  A.    THAT'S FLUOR'S INTENT.

23  Q.    AND YOU DON'T KNOW IF THAT PRACTICE WAS FOLLOWED ALL THE

24  TIME, DO YOU?

25  A.    ALL I KNOW IS WHAT IT SAYS IN THE GENERAL TERMS IS THAT IT'S

1   FLUOR'S OPTION TO VOID THAT SUBCONTRACT OR NOT.

2   Q.   SO FLUOR ISN'T REQUIRING IT IN WRITING, AHEAD OF TIME, THAT

3   A LOWER-TIER SUBCONTRACTOR BE APPROVED IN WRITING, ARE THEY?

4   A.   YES.

5   Q.   WHERE IS THAT CONTAINED IN ANY OF THE DOCUMENTS WE'VE SEEN

6   TODAY?

7   A.   IN THE PART III, GENERAL TERMS, SUBCONTRACTING, PART 15 THAT

8   I READ TO YOU.

9   Q.   ALL OF PART 15 SAYS THAT, "ANY ATTEMPT BY THE CONTRACTOR TO

10  ASSIGN OR TO SUBCONTRACT THIS CONTRACT, IN WHOLE OR IN PART,

11  WITHOUT FIRST OBTAINING THE COMPANY'S CONSENT, SHALL BE VOIDABLE

12  AT THE OPTION OF THE COMPANY."

13  A.   THAT'S CORRECT.

14  Q.   BUT IT DOESN'T SAY THAT THE SUBCONTRACTOR MUST GET WRITTEN

15  APPROVAL FROM FLUOR AHEAD OF TIME, DOES IT?

16  A.   NO.

17  Q.   ARE YOU AWARE OF ANY DOCUMENT FROM FEMA ANYWHERE THAT

18  DISCUSSES ANY OF THOSE PARTICULARITIES THAT I JUST ASKED YOU

19  ABOUT?

20  A.   FLUOR ISSUES SAFETY DOCUMENTATION IN THEIR RFP THAT REQUIRES

21  JOB SAFETY ANALYSIS SHEETS TO BE FILLED OUT, WHICH IS YOUR

22  PREREVIEW OF THE TASK THAT YOU ARE GOING TO DO.  IT IDENTIFIES

23  ANY -- ANY DANGERS AND HOW TO AVOID THOSE OR MITIGATE THE

24  DANGERS.

25          AND I CAN'T RECALL THAT -- I HAVEN'T ACTUALLY SEEN ONE

1   THAT WAS COMPLETED FOR INSTALLING A TRAVEL TRAILER, BUT THAT

2   DOCUMENT COULD ACTUALLY HAVE SOMETHING IN IT THAT WOULD TALK

3   ABOUT A METHOD OF PUTTING A TRAILER ON BLOCKS, ONLY FOR SAFETY

4   REASONS FOR WHOEVER.  AND IT COULD EVEN INCLUDE HOW MANY PEOPLE

5   HAVE TO BE THERE TO DO IT.  BUT I DON'T KNOW.  THAT'S THE PURPOSE

6   OF A JSA FORM.

7   Q.   BUT THAT'S A DOCUMENT -- THE JSA FORM THAT YOU'RE REFERRING

8   TO WOULD BE A DOCUMENT THAT'S CREATED BY FLUOR AND NOT BY FEMA;

9   ISN'T THAT RIGHT?

10  A.   IT'S ACTUALLY A BLANK DOCUMENT THAT'S PART OF THE REQUEST

11  FOR PROPOSAL THAT NEEDS TO BE FILLED OUT BY THE CONTRACTOR,

12  BECAUSE THEY'RE THE ONES THAT'S GOING TO DO THE WORK, SO THEY

13  HAVE TO IDENTIFY ANY HAZARDS.  AND IT WOULD BE REVIEWED BY A

14  SAFETY ENGINEER OF FLUOR TO MAKE SURE THAT THEY COVERED ANY

15  UNSAFE CONDITIONS TO KEEP PEOPLE FROM GETTING HURT ON THE JOB.

16  Q.   BUT MY QUESTION TO YOU WAS, YOU'RE NOT AWARE OF ANY DOCUMENT

17  FROM FEMA THAT SETS FORTH DIRECTIONS ON WHERE TO PLACE THE JACKS,

18  HOW MANY JACKS TO USE, THE CAPACITY OF THE JACKS, OR HOW MANY

19  PEOPLE NEED TO BE ON A CREW TO JACK UP ONE OF THESE TRAVEL

20  TRAILERS, ARE YOU?

21  A.   I'M NOT AWARE OF ANY DOCUMENTATION FROM FEMA THAT STATES

22  THAT.

23  Q.   AND THE SECTION THAT YOU REFERRED TO ON BLOCKING IN

24  EXHIBIT 9 DOESN'T COVER ANY OF THOSE PARTICULARITIES THAT WE JUST

25  DISCUSSED, DOES IT?

1    A.   I CAN'T SAY, NO, BECAUSE I DON'T -- I'M NOT A PERSON THAT

2    SETS THESE UP ON BLOCKS.

3    Q.   WELL, YOU DON'T SEE THE WORD "JACKING" ANYWHERE HERE IN THAT

4    SECTION THAT YOU JUST REFERRED TO IN EXHIBIT 9, DO YOU?

5    A.   NO.

6    Q.   IF YOU HAD READ THIS SECTION -- AND YOU ARE REFERRING TO

7    SECTION 2, BLOCKING AND LEVELING, IN EXHIBIT 9 -- IT DOESN'T GIVE

8    YOU ANY DIRECTION ON HOW TO JACK UP A TRAVEL TRAILER, DOES IT?

9    A.   IT DOESN'T TELL ME THAT IN ORDER TO DO WHAT THEY TELL YOU

10   YOU HAVE TO ACCOMPLISH, THAT YOU DO NOT HAVE TO JACK IT UP IN A

11   CERTAIN WAY.  THAT'S WHY I CAN'T ANSWER THE QUESTION.  YOU HAVE

12   TO HAVE SIX EQUALLY-PLACED BLOCKS.  I'M NOT AN EXPERT, BUT I

13   WOULD THINK THAT IT WOULD BE VERY DIFFICULT TO JACK UP ONE CORNER

14   OF A TRAILER AND STILL BE ABLE TO PLACE SIX EVENLY-SPACED BLOCKS

15   AROUND THE TRAILER.  AND THAT'S WHY I CAN'T ANSWER THE QUESTION.

16   Q.   WELL, LET ME ASK IT A DIFFERENT WAY.  THIS SECTION THAT

17   YOU'RE REFERRING TO HERE IN EXHIBIT 9, IT DOESN'T TELL YOU HOW TO

18   JACK IT, DOES IT?

19   A.   NO.

20   Q.   I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS EXHIBIT 11 TO

21   THE SOBER DEPOSITION, WHICH WAS PRODUCED BY FLUOR IN THIS MATTER

22   AS DETAIL ON THE ALEXANDER/COOPER TRAVEL TRAILER.

23        MY QUESTION TO YOU, SIR, IS, HAVE YOU EVER SEEN A

24   DOCUMENT LIKE THAT BEFORE THAT PROVIDES DETAIL ON A SPECIFIC

25   TRAVEL TRAILER?

1  A.   NOT THAT I RECALL.

2  Q.   TO YOUR LEFT HAND THERE, THERE'S A NAME THAT APPEARS.  WHAT

3  IS THAT NAME?

4  A.   UNDER "FLUOR DRIVER NAME"?

5  Q.   YES.

6  A.   DARREN LEMIEUX.

7  Q.   AND IF WE TURN TO PAGE 2 OF EXHIBIT 11, IT IDENTIFIES A

8  FLUOR HAUL CONTRACTOR; IS THAT RIGHT?

9  A.   A FLUOR HAUL CONTRACTOR, YES.

10  Q.   AND WHO IS THE FLUOR HAUL CONTRACTOR IDENTIFIED IN THAT

11  PARTICULAR EXHIBIT?

12  A.   MLU SERVICES.

13  Q.   AND THAT LOWER-TIER SUBCONTRACTOR COULD GO DOWN TWO, THREE,

14  OR EVEN FOUR LEVELS; ISN'T THAT RIGHT?

15  A.   NOT LIKELY.  I HAVE NEVER SEEN A CONTRACT THAT DID THAT.

16  Q.   HOW FAR DOWN HAVE YOU SEEN THEM GO, TIER LEVELS?

17  A.   MAYBE TWO.

18  Q.   OKAY.  SO YOU DON'T KNOW WHAT TIER LEVEL OF EMPLOYEE DARREN

19  LEMIEUX IS, WHO IS INVOLVED IN HAULING AND INSTALLING THIS

20  PARTICULAR TRAVEL TRAILER THAT'S IDENTIFIED IN EXHIBIT 11, DO

21  YOU?

22  A.   I DON'T KNOW ANYTHING ABOUT DARREN LEMIEUX, WHO HE WORKS

23  FOR.  I DON'T KNOW ANYTHING ABOUT HIM.

24  Q.   TO YOUR KNOWLEDGE, WERE THERE ANY TRAINING MATERIALS THAT

25  WERE GIVEN TO MLU SERVICES WITH REGARD TO INSTALLING TRAVEL

1  TRAILERS?

2  A.    I DON'T RECALL.

3  Q.    DID FLUOR HAVE A REQUIREMENT THAT ALL CONTRACTORS WHO

4  RECEIVED BOA'S TO HAUL AND INSTALL TRAVEL TRAILERS RECEIVED

5  TRAINING MATERIALS ON HOW TO DO THAT WORK?

6  A.    NO.   THE LANGUAGE IN THE CONTRACT IS THAT YOU NEED TO BE

7  QUALIFIED, YOU HAVE TO HAVE EMPLOYEES THAT ARE QUALIFIED, AND YOU

8  HAVE TO HAVE A LICENSE IN THE STATE, COUNTY, OR REGION TO PERFORM

9  THE WORK.

10  Q.    AND WHEN YOU USE THE TERM "QUALIFIED," WHAT DO YOU MEAN BY

11  "QUALIFIED"?

12  A.    QUALIFIED TO PERFORM THAT TYPE OF WORK.

13  Q.    AND THERE'S NO PARTICULAR QUALIFICATIONS THAT EXIST FOR

14  INSTALLING TRAVEL TRAILERS, IS THERE?

15  A.    NOT TO MY KNOWLEDGE.

16  Q.    HAVE YOU EVER READ THE OWNER'S MANUALS FOR ANY OF THE TRAVEL

17  TRAILERS THAT FLUOR INSTALLED UNDER THIS CONTRACT WITH THE

18  GOVERNMENT?

19  A.    NOT THAT I CAN RECALL.

20  Q.    YOU DON'T KNOW ANYTHING THEY SAY ABOUT THE MANUFACTURER'S

21  SPECIFICATIONS FOR THESE TRAVEL TRAILERS OR HOW TO INSTALL THEM,

22  DO YOU?

23        AND WHEN FLUOR ENTERED THOSE SUBCONTRACTS WITH ENTITIES

24  SUCH AS MLU, MLU COULD HIRE LOWER-TIER SUBCONTRACTORS TO ASSIST

25  THEM IN DOING THAT WORK; IS THAT RIGHT?

1   A.   THAT WAS NEVER THE INTENT WHEN THEY WENT OUT FOR THE BOA'S,

2   BUT ANY SUBCONTRACTOR THAT HAS A SUBCONTRACT WITH -- WITH FLUOR

3   HAS THE RIGHT TO HAVE SUBCONTRACTORS, BUT THEY HAVE TO BE

4   APPROVED BY FLUOR.

5   Q.   BUT REGARDLESS, ALL THE TRAVEL TRAILERS THAT ARE INSTALLED

6   IN THE IA-TAC CONTRACT BETWEEN FEMA AND FLUOR, FLUOR IS

7   ULTIMATELY RESPONSIBLE FOR THE PROPER INSTALLATION OF THOSE

8   TRAVEL TRAILERS; ISN'T THAT RIGHT?

9   A.   I WOULD SAY YES, THEY ARE THE ULTIMATE RESPONSIBLE

10  INDIVIDUAL, YES.

11  Q.   ULTIMATELY, FLUOR WAS RESPONSIBLE FOR SEEING THAT THEIR

12  SUBCONTRACTORS WHO INSTALLED THESE TRAVEL TRAILERS, AND IF THOSE

13  SUBCONTRACTORS, IN TURN, HAD ANY LOWER-TIER SUBCONTRACTORS, FLUOR

14  WAS RESPONSIBLE FOR ENSURING THAT ALL THOSE SUBCONTRACTORS DID

15  THE WORK IN INSTALLING THE TRAVEL TRAILERS IN CONFORMANCE WITH

16  THE CONTRACT BETWEEN FLUOR AND FEMA; ISN'T THAT RIGHT?

17  A.   THEY WERE -- YES, BECAUSE THEY HAD TO FLOW DOWN ALL OF THE

18  REQUIREMENTS FROM THE PRIME CONTRACTOR.

19  Q.   NOW, THE INSTALLATION REQUIREMENTS THAT ARE COVERED IN SOME

20  OF THESE CONTRACT DOCUMENTS SAYS THAT THE TRAVEL TRAILERS SHALL

21  BE INSTALLED IN CONFORMANCE WITH THE MANUFACTURER'S

22  SPECIFICATIONS.

23       HAVE YOU EVER SEEN OR HEARD ANY LANGUAGE LIKE THAT?

24  A.   NO.

25  Q.   DO YOU KNOW WHAT THE -- GULF STREAM'S SPECIFICATIONS ARE FOR

1   THEIR TRAVEL TRAILERS?

2   A.   NO.

3   Q.   DO YOU KNOW IF ANY ATTEMPT WAS MADE TO COMMUNICATE THE

4   SPECIFICATIONS FOR THE GULF STREAM TRAVEL TRAILERS DOWN TO THE

5   SUBCONTRACTORS THAT FLUOR HAD HIRED TO DO THE WORK SUCH THAT THEY

6   COULD BE ENSURED THAT THE TRAVEL TRAILERS WERE INSTALLED IN

7   CONFORMANCE WITH THE MANUFACTURER'S SPECIFICATIONS?

8   A.   NO, I'M NOT AWARE OF THAT.

9   Q.   WHEN FLUOR WOULD AWARD A CONTRACT TO A SUBCONTRACTOR, DID

10  FLUOR HAVE TO GET APPROVAL FROM FEMA OR THE UNITED STATES TO

11  AWARD THAT SUBCONTRACT?

12  A.   NOT TO MY RECOLLECTION, NO.

13  Q.   FLUOR WOULD JUST MAKE ITS SELECTION AND AWARD THE CONTRACT;

14  CORRECT?

15  A.   CORRECT.

16  Q.   AND THE CONTRACT THAT FLUOR WOULD PUT TOGETHER TO CONTRACT

17  WITH ITS SUBCONTRACTORS, THAT DOCUMENT WOULD BE PREPARED BY

18  FLUOR, NOT FEMA OR THE U.S. GOVERNMENT; CORRECT?

19  A.   THE ACTUAL CONTRACT DOCUMENT?

20  Q.   RIGHT.

21  A.   YES.  THE ATTACHMENTS MAY HAVE BEEN PREPARED BY FEMA.  THE

22  ACTUAL CONTRACT DOCUMENT WOULD HAVE BEEN PREPARED BY FLUOR.

23  Q.   THERE IS NOTHING IN THE CONTRACT DOCUMENTS, THE REQUEST FOR

24  PROPOSAL, OR THE EXHIBITS ATTACHED TO THEM THAT SETS FORTH THE

25  MINIMUM COMPETENCY REQUIREMENTS FOR LOWER-TIER SUBCONTRACTORS, IS

1  THERE?

2  A.   NO.  BUT THE FLOW-DOWNS HAVE TO GO TO ANY LEVEL OF

3  SUBCONTRACTOR.

4  Q.   AND THE FLOW-DOWNS, WHAT ARE YOU TALKING ABOUT?

5  A.   THE PART IV CLAUSES.

6  Q.   WHAT DO YOU MEAN, "PART IV CLAUSES"?

7  A.   THAT'S ONE OF THE EXHIBITS HERE.  IT WOULD BE THE FAR

8  CLAUSES OR ANY OTHER CLAUSES THAT WE HAVE THAT COME FROM THE

9  PRIME CONTRACT.  THEY'RE INCORPORATED BY REFERENCE.

10  Q.   AND WHAT'S THE BATES PAGE THAT YOU'RE REFERRING TO THERE?

11  A.   THIS IS YOUR EXHIBIT 6, AND --

12  Q.   WHAT'S THE BATES NUMBER ON THAT, SIR?

13  A.   BASE?  I'M SORRY, FL-FCA 028811.

14  Q.   SO THOSE FAR CLAUSES ARE INCORPORATED BY REFERENCE; THEY

15  FLOW DOWN; IS THAT RIGHT?

16  A.   THEY FLOW DOWN TO ANYONE WHO WOULD DO WORK UNDER THIS

17  CONTRACT, EVEN A LOWER-TIER SUB.

18  Q.   AND NONE OF THESE CLAUSES THAT FLOW DOWN THAT YOU HAVE

19  REFERENCED COVER THE COMPETENCY OF LOWER-TIER SUBS, DO THEY?

20  A.   I QUESTIONED HIS WORD "COMPETENCY"?

21  Q.   YES, COMPETENCY TO DO THE WORK.

22  A.   WELL, LET ME GO THROUGH THESE AND -- BEFORE I ANSWER THAT

23  QUESTION.

24       DRUG-FREE WORKPLACE.  IF YOU WANT TO INCLUDE THAT IN

25  BEING COMPETENT, BEING DRUG FREE.  OTHER THAN THAT, I DON'T SEE

1   ANYTHING THAT WOULD BE SPECIFIC, IN THIS PART IV, THAT WOULD

2   REQUIRE THE COMPETENCY OF A LOWER-TIER SUBCONTRACTOR.

3   Q.   AND YOU'RE REFERRING TO EXHIBIT 6, WHICH IS ALSO DESIGNATED

4   AS PART IV; IS THAT RIGHT?

5   A.   YES.

6   Q.   ANYTHING ELSE THAT YOU CAN THINK OF THAT'S A FLOW-DOWN

7   PROVISION THAT SPECIFICALLY RELATES TO THE COMPETENCY OF THE

8   LOWER-TIER SUBCONTRACTORS BESIDES "DRUG FREE WORKPLACE"?

9   A.   OTHER THAN FLUOR WOULD WANT TO APPROVE THEM TO MAKE SURE

10  THEY'RE COMPETENT.

11  Q.   AND DID FLUOR HAVE ANY PROCEDURE TO JUDGE THE COMPETENCY OF

12  LOWER-TIER SUBCONTRACTORS, THAT YOU'RE AWARE OF?

13  A.   A PROCEDURE?  NO, OTHER THAN WHAT WE USED TO AWARD THE

14  INITIAL CONTRACT TO THE FIRST-TIER SUBCONTRACTOR.

15  Q.   BUT THE SUB-TIER CONTRACTORS DIDN'T HAVE TO GO THROUGH THAT

16  SAME REQUEST FOR PROPOSAL AND GIVING REFERENCES AND THAT TYPE OF

17  PROCEDURE, DID THEY?

18  A.   WELL, THEY WOULDN'T GO THROUGH A REQUEST FOR PROPOSAL,

19  BECAUSE THE PRICES THAT WERE PAID TO THE CONTRACTOR WERE IN THE

20  BOA.

21  Q.   I UNDERSTAND THAT, BUT PART OF WHAT YOU HAD MENTIONED, THAT

22  THINGS WERE NEEDED SUCH AS A REQUEST TO PROVIDE FORMER CLIENTS,

23  PROVIDE FINANCIAL CAPABILITIES, THOSE KINDS OF THINGS WERE NOT

24  REQUESTED OF LOWER-TIER SUBCONTRACTORS, WERE THEY?

25  A.   I DON'T KNOW.

1  Q.   AT LEAST WHEN YOU WERE THERE, THAT WAS NOT A REQUIREMENT,

2  THAT LOWER-TIER SUBCONTRACTORS PROVIDE FORMER CLIENTS, FINANCIAL

3  CAPABILITIES, OR ANYTHING RELATED TO PROVE THEIR COMPETENCY, WAS

4  THERE?

5  A.   THAT'S NOT TRUE.  IF THEY WOULD HAVE, IN THEIR PROPOSAL,

6  LISTED LOWER-TIER SUBCONTRACTORS, THOSE LOWER-TIER SUBCONTRACTORS

7  MAY HAVE BEEN EVALUATED JUST LIKE THE FIRST TIER WAS.

8  Q.   AND AS YOU SIT HERE RIGHT NOW, YOU DON'T KNOW OF ANYTHING

9  THAT WAS DONE TO EVALUATE THE COMPETENCY OF THE LOWER-TIER

10 CONTRACTORS FOR MLU SERVICES, DO YOU?

11 A.   NO, I WASN'T INVOLVED WHEN THEY IDENTIFIED SUBCONTRACTORS.

12 Q.   AND, IN FACT, YOU DON'T KNOW WHO THE LOWER-TIER

13 SUBCONTRACTORS WOULD BE FOR MLU SERVICES, DO YOU?

14 A.   NO, NO.

15 Q.   AND, SIR, I NEED TO ASK A COUPLE OF BACKGROUND QUESTIONS.

16 IF I ALREADY HAVE, I APOLOGIZE.

17        ARE YOU A GRADUATE OF A UNIVERSITY?

18 A.   GRADUATE OF CITY UNIVERSITY IN BELLEVUE, WASHINGTON.

19 Q.   AND WHAT WAS YOUR DEGREE IN?

20 A.   BUSINESS ADMINISTRATION.

21 Q.   WHAT YEAR WAS THAT?

22 A.   1996.

23 Q.   AND WHAT'S YOUR DATE OF BIRTH, SIR?

24 A.   12/3/1952.

25        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

1  PORTIONS OF THE VIDEOTAPED DEPOSITION OF RICHARD SOBER WAS

2  CONCLUDED.)

3          THE COURT:  THAT'S IT?

4          MR. WATTS:  YES, SIR.

5          THE COURT:  OKAY.  LET'S GO AHEAD AND TURN UP THE LIGHTS

6  AND MOVE ON TO THE NEXT WITNESS.

7          MR. MEUNIER:  WE CALL DR. ED SHWERY.

8          THE COURT:  DR. ED SHWERY.

9          THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

10 HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

11 ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

12 THE TRUTH, SO HELP YOU GOD?

13         THE WITNESS:  I DO.

14         THE DEPUTY CLERK:  PLEASE STATE AND SPELL YOUR FULL NAME

15 FOR THE RECORD.

16         THE WITNESS:  EDWARD HALIE SHWERY.

17         THE DEPUTY CLERK:  CAN YOU SPELL IT?

18         THE WITNESS:  S-H-W-E-R-Y.

19                    **DR. EDWARD SHWERY**

20 WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

21 CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

22                 VOIR DIRE EXAMINATION

23 BY MR. MEUNIER:

24 Q.   MORNING, DR. SHWERY.

25 A.   GOOD MORNING.

1    Q.    WOULD YOU TELL THE JURY YOUR OCCUPATION AND CURRENT

2    EMPLOYMENT, PLEASE.

3    A.    CURRENT EMPLOYMENT?

4    Q.    YES, SIR.

5    A.    YES, I'M A CLINICAL PSYCHOLOGIST.  I PRACTICE IN METAIRIE,

6    LOUISIANA.  I'M IN PRIVATE PRACTICE.

7    Q.    YOU HAVE A PH.D. IN CLINICAL PSYCHOLOGY?

8    A.    YES.

9    Q.    TELL THE JURY WHAT THE FIELD OF CLINICAL PSYCHOLOGY ENTAILS.

10   A.    CLINICAL PSYCHOLOGY IS THE BRANCH OF THAT SCIENCE OF

11   PSYCHOLOGY THAT DEALS WITH DIAGNOSIS AND TREATMENT OF NERVOUS AND

12   MENTAL DISORDERS.

13   Q.    HOW MANY YEARS OF EXPERIENCE IN PRACTICE AS A CLINICAL

14   PSYCHOLOGIST DO YOU HAVE?

15   A.    THIRTY-FIVE.

16   Q.    AND ARE YOU A MEMBER OF ANY PROFESSIONAL ASSOCIATIONS OR

17   ORGANIZATIONS?

18   A.    YES.

19          MR. GLASS:  YOUR HONOR, I'LL STIPULATE TO HIS EXPERTISE

20   IN CLINICAL PSYCHOLOGY.

21          THE COURT:  IS HE BEING TENDERED AS AN EXPERT IN THE

22   FIELD OF CLINICAL PSYCHOLOGY?

23          MR. MEUNIER:  CLINICAL PSYCHOLOGY, YES, JUDGE.

24          THE COURT:  AND WE HAVE A STIPULATION FROM COUNSEL?

25          MR. GLASS:  YES, YOUR HONOR.  WE'LL STIPULATE.

1          THE COURT:  THE COURT WILL ALSO THEN ACCEPT DR. SHWERY

2     AS AN EXPERT IN THE FIELD OF CLINICAL PSYCHOLOGY.

3                      DIRECT EXAMINATION

4     BY MR. MEUNIER:

5     Q.   DOCTOR, BEFORE WE PROCEED, I JUST WANT TO REFERENCE ONE PART

6     OF YOUR CV THAT YOU HAVE BEEN ACCEPTED AS AN EXPERT.

7          YOU REFERENCED, STARTING AT PAGE 13 OF YOUR CV, A

8     LISTING OF THESE COURTS AND JUDGES.  COULD YOU JUST EXPLAIN TO

9     THE JURY WHAT THAT REFERS TO.

10    A.   OH.  OKAY.  OVER THE YEARS, I'VE HAD OCCASION TO BE

11    APPOINTED BY A JUDGE AS THE COURT'S EXPERT WHEN THEY HAVE AN

12    ISSUE BEFORE THE COURT WHERE THE JUDGE WANTS HIS OWN PERSON, HIS

13    OR HER OWN EXPERT.  SO THERE IS A NUMBER, ABOUT THREE DOZEN

14    JUDGES, THAT HAVE APPOINTED ME AS THE COURT'S EXPERT.

15    Q.   SO THESE ARE INSTANCES WHERE THE JUDGE HAS APPOINTED YOU AS

16    AN EXPERT?

17    A.   THAT'S RIGHT.

18    Q.   AND WE INCLUDE NOT ONLY THE APPELLATE COURT AND FEDERAL

19    COURT, BUT ON THE NEXT PAGE, ALL THE LOUISIANA COURTS THAT HAVE

20    DONE THAT?

21    A.   YES.

22    Q.   IN THIS CASE, DR. SHWERY, DID WE ASK YOU, AS COUNSEL FOR

23    ALANA ALEXANDER AND CHRIS COOPER, TO EVALUATE THE PSYCHOLOGICAL

24    HARM, IF ANY, ASSOCIATED WITH THE CLAIMS OF FORMALDEHYDE EXPOSURE

25    WHILE THEY WERE LIVING IN A FEMA TRAILER?

1  A.   WELL, NOT THE FORMALDEHYDE EXPOSURE BECAUSE I'M NOT A

2  MEDICAL DOCTOR.  I WAS ASKED TO EXAMINE A MOTHER AND TWO CHILDREN

3  TO SEE WHETHER OR NOT THEY HAD ANY PSYCHOLOGICAL PROBLEMS OR

4  CONCERNS OR ISSUES.

5  Q.   AND AS TO CHRIS COOPER IN PARTICULAR, YOU'RE AWARE THAT HE

6  HAD ASTHMA FROM THE AGE OF THREE?

7  A.   YEAH.  PROBABLY AS AN INFANT.  IT WAS DIAGNOSED BY HIS

8  DOCTOR AT AGE THREE, BUT HE PROBABLY HAD IT EARLIER THAN THAT.

9  Q.   AND JUST SO WE'RE CLEAR, AND I THINK YOU JUST ALLUDED TO

10 THIS, YOU ARE NOT A MEDICAL DOCTOR?

11 A.   THAT'S CORRECT.

12 Q.   YOU'RE NOT A PULMONOLOGIST OR LUNG SPECIALIST?

13 A.   NO.

14 Q.   YOU'RE NOT A TOXICOLOGIST?

15 A.   I AM NOT.

16 Q.   SO YOU'RE NOT HERE TO EXPRESS AN OPINION WHETHER

17 FORMALDEHYDE EXPOSURE MADE CHRIS'S ASTHMA WORSE, FOR EXAMPLE?

18 A.   I'M NOT QUALIFIED TO TALK ABOUT THAT.

19 Q.   BUT YOU ARE HERE TO ANSWER WHETHER OR NOT THERE WERE

20 PSYCHOLOGICAL CONSEQUENCES ASSOCIATED WITH CHRIS'S EXPERIENCE

21 LIVING IN A TRAVEL TRAILER?

22 A.   WELL, THE FIRST ISSUE WAS WHETHER OR NOT THERE ARE ANY

23 PSYCHOLOGICAL ISSUES PRESENT WITH THESE PEOPLE, AND SECONDLY WHAT

24 THE HISTORY IS, WHETHER THERE WERE ANY PRIOR DIFFICULTIES, AND

25 THAT WOULD HAVE LED ME INTO EVALUATING WHETHER OR NOT THERE WERE

1   ANY PROBLEMS WHILE THEY WERE LIVING IN THE TRAILER.

2   Q.   DID YOU CONDUCT A PSYCHOLOGICAL EXAMINATION OF CHRIS?

3   A.   I DID.

4   Q.   WHEN DID YOU DO THAT?

5          THE WITNESS:  MAY I USE MY NOTES, YOUR HONOR?

6          THE COURT:  SURE.

7          THE WITNESS:  I SAW THIS CHILD ON MAY -- EXCUSE ME,

8   APRIL 29, 2009, AND MAY -- I THINK IT WAS MAY 1ST, 2009.

9                              EXAMINATION

10  BY MR. MEUNIER:

11  Q.   DID YOU ALSO INTERVIEW CHRIS'S MOTHER, ALANA ALEXANDER?

12  A.   YES.

13  Q.   ON WHAT DATE?

14  A.   I SAW HER ON APRIL 23, 2009 AND AGAIN ON MAY 17, 2009.

15  Q.   HOW OLD WAS CHRISTOPHER AT THE TIME YOU EXAMINED HIM?

16  A.   TWELVE YEARS OLD.

17  Q.   AS PART OF YOUR PROTOCOL, WHEN YOU ARE ASKED TO EVALUATE

18  SOMEONE THAT AGE, DO YOU INTERVIEW PARENTS?

19  A.   YES.  YES, OF COURSE.

20  Q.   WHY IS THAT PART OF YOUR PROTOCOL?

21  A.   WELL, WHENEVER YOU'RE EXAMINING A CHILD, YOU NEED TO

22  UNDERSTAND WHAT THE DEVELOPMENTAL HISTORY IS, WHAT THE

23  RELATIONSHIP IS WITH THE MOTHER, WHETHER THERE HAD BEEN ANY

24  PROBLEMS IN HIS LIFE.  AND SO IT'S STANDARD TO FIRST TALK TO A

25  PARENT TO FIND OUT HOW WAS THIS CHILD BORN?  WERE THERE ANY

1  COMPLICATIONS AT THE BIRTH OR PRENATAL?  WHAT WAS HIS DEVELOPMENT

2  LIKE; WAS IT NORMAL?  WHAT'S HE BEEN LIKE?  HAS HE HAD ANY

3  PROBLEMS?  WHAT ARE HIS STRENGTHS?  YOU NEED THAT BACKGROUND IN

4  ORDER TO EVALUATE A CHILD.

5  Q.   AND WHEN YOU INTERVIEWED MS. ALEXANDER, DID YOU ALSO CONDUCT

6  A PSYCHOLOGICAL EVALUATION OF HER?

7  A.   OF WHOM?

8  Q.   OF ALANA ALEXANDER.

9  A.   YES.

10  Q.   LET'S TALK ABOUT THAT FIRST, BEFORE WE GET TO CHRISTOPHER.

11        BASED ON YOUR CLINICAL EXAMINATION AND EVALUATION OF

12  ALANA ALEXANDER, DID YOU FIND HER TO BE PSYCHOLOGICALLY HEALTHY?

13  A.   I DID.

14  Q.   DID YOU FIND HER TO BE WELL-ADJUSTED?

15  A.   I DID.

16  Q.   IN YOUR CLINICAL WORK, DO YOU HAVE EXPERIENCE IN EVALUATING

17  HOW WELL A PERSON FUNCTIONS AS A PARENT?

18  A.   YES.

19  Q.   WHAT CONCLUSION DID YOU REACH AS TO MS. ALEXANDER?

20  A.   WELL, BASICALLY, SHE WAS FUNCTIONING VERY WELL.  SHE'S A

21  WELL-DEVELOPED, NORMAL INDIVIDUAL.  I FOUND NO MENTAL DISORDER

22  WITH HER.  SHE WAS HAVING SOME DEGREE OF WORRIES AND CONCERNS

23  ABOUT HER CHILDREN'S WELFARE, BUT SHE DOESN'T HAVE ANY

24  SIGNIFICANT PSYCHOLOGICAL PROBLEMS.  AND HER ABILITY AND

25  COMPETENCY TO PARENT WAS VERY GOOD.

1  Q.    TELL US ABOUT THE THINGS SHE DID REPORT TO YOU THAT YOU SAY

2  WERE CONCERNS DEALING WITH HER CHILDREN.

3  A.    WELL, SHE HAS BEEN CONCERNED WITH HER CHILDREN'S HEALTH EVER

4  SINCE THEY HAVE BEEN LITTLE.  HER SON, CHRISTOPHER, DEVELOPED

5  ASTHMA EARLY IN LIFE AND HAS BEEN TREATED BY THE PEDIATRICIAN HIS

6  ENTIRE LIFE.  AND SO SHE'S BEEN ATTUNED TO WHAT KIND OF THINGS

7  THEY NEED TO DO TO MANAGE THE PROBLEM, BECAUSE ASTHMA, AS I'M

8  TOLD BY THE DOCTORS, IS NOT SOMETHING YOU CURE.  IT'S SOMETHING

9  YOU DEAL WITH AND MANAGE.  AND SO SHE'S BEEN ON TOP OF THAT.  SHE

10 TAKES HIM TO THE DOCTOR.  SHE'S BEEN CONCERNED ABOUT THE

11 LONG-TERM OUTCOME FOR THE CHILDREN.

12 Q.    DID SHE REPORT ANY CONCERNS THAT SPECIFICALLY RELATED TO THE

13 TIME OF BEING IN THE TRAILER?

14 A.    WELL, YES.  THEY WERE IN THE TRAILER FROM, I BELIEVE, MAY OF

15 '06 TO DECEMBER OF '07.  AND THE REASON THEY LEFT THE TRAILER WAS

16 THAT SHE BECAME AWARE THAT THERE MAY HAVE BEEN SOME HEALTH RISKS

17 OR HEALTH CONCERNS WITH LIVING IN THE TRAILER.  AND AT THAT

18 POINT, SHE ELECTED TO LEAVE.

19        SUBSEQUENTLY, SHE'S TALKED TO HER DOCTORS AND HAS

20 BECOME AWARE THAT THERE MIGHT BE LONG-TERM EFFECTS FROM LIVING IN

21 THAT TRAILER.  SO SHE'S CONCERNED ABOUT THE LONG-TERM EFFECT AND

22 THINKS ABOUT THAT AND WORRIES ABOUT IT.

23 Q.    AND DID YOU FIND THAT TO BE A NORMAL PSYCHOLOGICAL RESPONSE

24 TO THAT EXPERIENCE?

25 A.    OH, YES.

1  Q.   DO YOU RECOMMEND ANY FOLLOW-UP FOR MS. ALEXANDER BECAUSE OF

2  THAT CONCERN?

3  A.   YES.  I DID NOT THINK SHE NEEDED ANY EXTENSIVE TREATMENT,

4  BUT I THOUGHT SHE WOULD BENEFIT FROM SOME SHORT-TERM COUNSELING

5  AND CONSULTATION WITH SOMEONE ON CHILD DEVELOPMENT, TO BE ABLE TO

6  DEAL WITH HER CHILDREN MORE EFFECTIVELY AND TO REDUCE HER STRESS

7  AND WORRY ABOUT THAT.

8  Q.   WOULD THE OBJECT BE TO ADDRESS THOSE CONCERNS SHE HAS ABOUT

9  THE EXPOSURE IN THE TRAILER?

10 A.   WELL, THAT HAS AN IMPACT ON HER CONCERNS ABOUT HER CHILDREN,

11 THEIR FUTURE, GRANDCHILDREN, AND SO ON.  SO YEAH, IT INCLUDES

12 THAT.

13 Q.   HOW MANY SESSIONS WOULD YOU RECOMMEND IN FOLLOW-UP FOR HER?

14       MR. GLASS:  I OBJECT, YOUR HONOR.  THIS IS OUTSIDE THE

15 SCOPE OF HIS REPORT.

16       MR. MEUNIER:  I DON'T THINK SO, JUDGE.

17       THE COURT:  WHY DON'T Y'ALL APPROACH AND BRING THAT

18 REPORT WITH YOU.  I SHOULD HAVE ONE UP HERE, I WOULD IMAGINE.

19           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A

20 CONFERENCE WAS HELD AT THE BENCH.)

21       MR. MEUNIER:  HE TALKS ABOUT BEFORE GETTING HERE THAT HE

22 WOULD RECOMMEND FOLLOW-UP, WHAT HE CALLS BRIEF COUNSELING.  NOW,

23 I'M HEARING THE OBJECTION THAT HE WAS NOT ASKED TO SAY IN THE

24 REPORT NOR WAS HE ASKED IN HIS DEPOSITION HOW MANY SESSIONS, WHAT

25 COST.  BUT MY FEELING IS THAT WHEN HE SAYS "BRIEF COUNSELING,"

1  HE'S ALLOWED TO EXPLAIN WHAT HE MEANS BY THAT.

2          MR. GLASS:  YOUR HONOR, THEY'RE TRYING TO USE THIS TO GO

3  INTO THEIR -- ECONOMIST.  HE'S TRYING TO DEVELOP FUTURE DAMAGES

4  AND ALL OF THAT STUFF WHICH HAS NOW BEEN PROVIDED TO US AND NOT

5  PUT IN HIS REPORT.  I DON'T THINK IT'S APPROPRIATE FOR IT TO BE

6  ESTABLISHED HERE SO THAT THEY SHOULD BE ALLOWED TO USE DR. SHWERY

7  TO PUT INTO EVIDENCE THAT THEY CAN USE WITH A LATER EXPERT TO

8  DEVELOP DAMAGES THAT HAVEN'T BEEN ESTABLISHED IN HIS REPORT

9  PRETRIAL.

10          THE COURT:  YOU'RE ASKING HIM ABOUT BRIEF COUNSELING?

11  AND THE QUESTION WAS HOW MANY COUNSELING SESSIONS?

12          MR. MEUNIER:  YES.

13          MR. GLASS:  AND THE NEXT QUESTION IS GOING TO BE HOW

14  MUCH.

15          MR. MEUNIER:  IF THE JURY IS GOING TO BE ASKED TO

16  EVALUATE THE FUTURE MEDICAL AND --

17          MR. GLASS:  IT SHOULD HAVE BEEN IN HIS REPORT.

18          MR. MEUNIER:  AND IF THIS EXPERT SAID SHE NEEDS BRIEF

19  COUNSELING, I THINK THE JURY IS ENTITLED -- WE'RE NOT TALKING

20  ABOUT A LOT HERE, BUT I THINK THE JURY IS ALLOWED TO HAVE SOME

21  SORT OF SPECIFICITY ON THAT UNLESS THEY ARE LEFT TO DO IT ON

22  THEIR OWN.  AND I DON'T KNOW WHY IT'S PREJUDICIAL FOR HIM TO BE

23  ABLE TO SAY, YOU KNOW, A FEW SESSIONS AT SO MANY DOLLARS A

24  SESSION.

25          THE COURT:  SO WHAT ARE WE TALKING ABOUT IN TERMS OF

1    WHAT HIS TESTIMONY IS GOING TO BE?

2         MR. MEUNIER:  I THINK HE'S GOING TO SAY SEVERAL

3    SESSIONS.  I DON'T THINK IT'S ANYTHING SIGNIFICANT.

4         MR. GLASS:  WHAT DOES SEVERAL MEAN?  ARE YOU GOING TO

5    ASK HIM HOW MUCH?

6         MR. MEUNIER:  I'LL ASK HIM THREE OR FOUR, WHATEVER.

7         THE COURT:  IF THIS IS SOMETHING THAT'S GOING TO BE ON

8    THE ORDER AND MAGNITUDE OF -- IN OTHER WORDS, IF THIS IS A

9    RELATIVELY MINOR POINT, THAT WOULD NOT HAVE BEEN IN THE REPORT

10   BUT, RATHER, FOLLOWING WITH BRIEF COUNSELING, THAT'S ONE THING.

11   IF BRIEF COUNSELING IS A DOORWAY INTO SOMETHING THAT IS OF THE

12   ENORMITY THAT OBVIOUSLY SHOULD HAVE BEEN DISCLOSED, THEN IT

13   SHOULD HAVE BEEN DISCLOSED.

14        MR. GLASS:  CAN WE DO THIS:  CAN WE HAVE YOU ASK HOW

15   MANY SESSIONS AND LEAVE OUT THE COST?

16        THE COURT:  BUT THEN THE JURY WILL NOT HAVE A BASIS.  WE

17   KNEW THAT THERE WOULD BE FUTURE MEDICALS.

18        MR. GLASS:  HOW MUCH IS A CHARGE PER SESSION?

19        MR. MEUNIER:  HIS RATE IS $300 A SESSION.

20        THE COURT:  IS HE GOING TO SAY HOW MANY SESSIONS?

21        MR. MEUNIER:  I THINK HE'S GOING TO SAY THREE OR FOUR.

22        THE COURT:  I DON'T THINK THAT IS SIGNIFICANT ENOUGH.

23   THAT COULD HAVE BEEN LAID OUT HERE.

24        MR. MEUNIER:  WHILE WE'RE UP HERE, LET'S TALK ABOUT

25   CHRIS.  CHRIS, I THINK HE SAYS SIX MONTHS TO A YEAR.

```
 1              THE COURT:  ONCE A WEEK?

 2              MR. MEUNIER:  ONCE A WEEK.  AND IT WOULD BE THE SAME.

 3              MR. GLASS:  FIFTY-TWO WEEKS TIMES $300, YOU'RE THROWING

 4    IN ALL KINDS OF DAMAGES THAT ARE NOT IN HIS REPORT.

 5              THE COURT:  WHERE IS THE PART ABOUT CHRIS IN HERE?

 6              MR. GLASS:  IT'S IN HIS REPORT, YOUR HONOR.

 7              THE COURT:  A DIFFERENT REPORT.

 8              MR. MEUNIER:  IN CHRIS'S CASE, JOE ASKED IN THE

 9    DEPOSITION ABOUT HOW LONG AND HE SAID --

10              MR. GLASS:  I'M SORRY.

11              MR. MEUNIER:  -- AND HIS OPINION IN RESPONSE TO

12    QUESTIONING WAS SIX MONTHS TO A YEAR IN HIS DEPOSITION.

13              MR. GLASS:  THAT WAS IN DISCOVERY.  THAT'S NOT IN HIS

14    REPORT.  IT WASN'T IN HIS REPORT.

15              THE COURT:  WHY DON'T YOU ASK HIM -- HE'S ALREADY MET

16    WITH HIM.  HASN'T HE ALREADY CHARGED THEM?  ISN'T THERE ALREADY A

17    CHARGE ASSOCIATED AT THIS TIME?  DOESN'T HE SAY THAT ON HERE?

18              WHY DON'T WE JUST ASK HIM WHAT HIS CHARGE IS AND

19    THEN ASK HIM HOW MANY SESSIONS.  DON'T GET HIM TO QUANTIFY --

20              MR. MEUNIER:  NO, I WASN'T GOING TO DO THAT.

21              THE COURT:  YOU CAN ARGUE THE MATH LATER.

22              MR. GLASS:  ALL RIGHT.  SO YOU'RE GOING TO LET HIM --

23              THE COURT:  HE DOES TALK ABOUT FUTURE COUNSELING.  I'LL

24    LET HIM QUANTIFY THE AMOUNT OVER A PERIOD OF TIME, NUMBER OF

25    SESSIONS.  WHY DON'T YOU ASK HIM, AND THEN YOU CAN ASK HIM HOW
```

1   MUCH HE HAS CHARGED.

2         MR. GLASS:  ACTUALLY, I PREFER THE TIME RATHER THAN THE

3   NUMBER OF SESSIONS BECAUSE IF HE'S GOING TO SAY ONCE A WEEK FOR A

4   YEAR, THAT'S 52 SESSIONS.  I MEAN, THAT COULD BE YEARS.  I THINK

5   I WOULD RATHER HAVE IT SAY SIX MONTHS.

6         THE COURT:  WELL, LOOK, SIX OF ONE, HALF A DOZEN OF THE

7   OTHER.

8         MR. MEUNIER:  I'LL ASK HIM HOW MANY SESSIONS FOR CHRIS.

9   HE'LL SAY SIX MONTHS TO A YEAR FOR THE OTHER, ONCE A WEEK, AND

10  I'LL ASK HIM WHAT HIS CHARGE PER SESSION IS.

11        THE COURT:  ALL RIGHT.

12        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

13  BENCH CONFERENCE WAS CONCLUDED.)

14                        EXAMINATION

15  BY MR. MEUNIER:

16  Q.   I THINK WE WERE ABOUT TO FINISH WITH MS. ALEXANDER, AND I

17  WAS GOING TO ASK YOU ABOUT THE FUTURE BRIEF COUNSELING YOU

18  RECOMMEND FOR HER.

19  A.   YES.

20  Q.   AND HOW MANY FUTURE BRIEF COUNSELING SESSIONS WOULD YOU

21  RECOMMEND?

22  A.   WITH THIS KIND OF SITUATION, I WOULD RECOMMEND PROBABLY ONCE

23  A WEEK FOR ABOUT THREE MONTHS, AND THEN FOLLOW-UP CONSULTATION ON

24  HERSELF AND CHILD MANAGEMENT, MAYBE ABOUT NINE MORE SESSIONS,

25  LIKE ONCE A MONTH OR ONCE EVERY TWO MONTHS OVER A PERIOD OF A

1    YEAR OR TWO.

2              MR. GLASS:  YOUR HONOR --

3                   (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A

4    CONFERENCE WAS HELD AT THE BENCH.)

5              THE COURT:  YOU SEE, THIS IS THE PROBLEM IN THE REPORT

6    NOT BEING SPECIFIC.

7              MR. MEUNIER:  I'M GOING TO LEAVE THIS ALONE.  I'M NOT

8    GOING TO ASK HIM.

9              MR. GLASS:  BUT HE'S ALREADY RANG THE BELL.

10             THE COURT:  BUT I THINK WITH REGARD TO

11   CHRISTOPHER COOPER, YOU JUST ASK HIM IF HE NEEDS FUTURE

12   COUNSELING AND LEAVE IT AT THAT.

13             MR. MEUNIER:  BUT I DO THINK JOE CAN COME BACK BECAUSE

14   HIS REPORT SAID "BRIEF."  I MEAN, YOU CAN CROSS-EXAMINE HIM.

15             MR. GLASS:  I'M NOT TOUCHING THAT.

16             THE COURT:  IF HE WANTS TO.  IF IT BLOWS UP ON HIM,

17   THAT'S HIS PROBLEM.

18             MR. GLASS:  DO YOU THINK THE CURE IS GOING TO BE THAT HE

19   CANNOT ASK A SPECIFIC NUMBER OF CHRIS?

20             THE COURT:  JUST ASK WHAT IT SAYS IN THE REPORT.  DON'T

21   ASK HIM TO QUANTIFY IT BECAUSE NONE OF US KNOW WHAT HE'S GOING TO

22   SAY.  I RULED BASED ON THE REPRESENTATION AS TO THE ORDER AND

23   MAGNITUDE OF WHAT HE WAS GOING TO SAY.  IF IT WAS SOMETHING THAT

24   WAS NOT UNEXPECTED, IF IT WAS NOT A CURVE BALL THAT WAS FROM LEFT

25   FIELD, THEN I COULD UNDERSTAND WHY IT WAS NOT PARTICULARIZED IN

1   THE REPORT, BUT IF IT'S GOING TO BE SOMETHING ON A GRANDER SCALE

2   THAN EVEN YOU EXPECT, THEN IT'S GOT TO BE ON THE REPORT.

3           MR. MEUNIER:  I AGREE WITH YOU, JUDGE, BUT LET'S

4   REMEMBER ON CHRIS, HE DID SAY IN HIS DEPOSITION SIX MONTHS TO A

5   YEAR.

6           MR. GLASS:  THIS IS A CURING INSTRUCTION FOR HOW WE JUST

7   GOT THE CURVE BALL FROM LEFT FIELD.

8           MR. MEUNIER:  BUT HIS TESTIMONY IN THE RECORD WAS

9   SIX MONTHS TO A YEAR ON CHRISTOPHER.

10          MR. GLASS:  IT'S IN HIS DEPOSITION, NOT IN THE REPORT.

11          THE COURT:  I'M GOING TO LET YOU LEAD HIM.  IF HE SAID

12  THAT IN THE DEPOSITION, I'M GOING TO LET YOU LEAD HIM THAT YOU'VE

13  TESTIFIED THAT IT'S SIX MONTHS TO YEAR.

14          MR. MEUNIER:  AND I WON'T QUANTIFY THAT.

15          MR. GLASS:  CAN I GET THE SIX MONTHS TO A YEAR WITHOUT

16  THE WEEK HERE?  I HAVE TO GET SOMETHING BACK.

17          THE COURT:  SIX MONTHS TO A YEAR.  THAT'S WHAT HE SAID

18  IN THE DEPOSITION, THAT'S IT.  AND YOU CAN LEAD HIM ON THAT TO

19  MAKE SURE HE SAYS THAT.

20          MR. MEUNIER:  OKAY.

21           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

22  BENCH CONFERENCE WAS CONCLUDED.)

23                            EXAMINATION

24  BY MR. MEUNIER:

25  Q.   LET'S TALK ABOUT CHRIS.

1  A.   I HAD A COUPLE OTHER RECOMMENDATIONS FOR HER THAT ARE NOT

2  TREATMENT, BUT ARE COMMUNITY BASED.  DO YOU WANT ME TO ADD TO

3  THAT?

4  Q.   NO.  I THINK WE'LL MOVE ON TO CHRIS.

5  A.   THAT'S FINE.

6  Q.   WHAT, IF ANY, CLINICAL EXPERIENCE DO YOU HAVE, DR. SHWERY,

7  IN REGARD TO THE PSYCHOLOGICAL EVALUATION OF CHILDREN WITH

8  ASTHMA?

9  A.   WITH ASTHMA SPECIFICALLY?

10 Q.   YES.

11 A.   I HAVE SEEN QUITE A FEW CHILDREN OVER THE LAST 35 YEARS.

12 INITIALLY, MY WORK WAS AS A PEDIATRIC PSYCHOLOGIST AND I WORKED

13 IN HOSPITALS, CHILDREN'S HOSPITALS AND CLINICS AND COMMUNITY

14 PROGRAMS, SO I'VE SEEN CHILDREN WITH ASTHMA AND OTHER MEDICAL

15 PROBLEMS FOR MANY, MANY YEARS.

16 Q.   IS IT WELL-ESTABLISHED IN YOUR FIELD THAT EMOTIONAL DISTRESS

17 AND ANXIETY ARE ASSOCIATED WITH ASTHMA AND ASTHMA ATTACKS,

18 PARTICULARLY IN THE CASE OF CHILDREN?

19 A.   YES.

20 Q.   WHY WOULD AN ASTHMA ATTACK, FOR EXAMPLE, BE CONSIDERED AMONG

21 PSYCHOLOGISTS TO BE THE TYPE OF STRESSOR THAT WOULD CAUSE

22 EMOTIONAL DISTRESS AND ANXIETY IN A CHILD?

23 A.   IT'S IN THE CONTEXT OF A LOT OF MEDICAL CONDITIONS THAT

24 CAUSE DISTRESS IN CHILDREN, LIKE SEIZURES, OR WEAKNESS, OR

25 FATIGUE, BUT ASTHMA, IN PARTICULAR, IS A STRESSOR PSYCHOLOGICALLY

1  BECAUSE THE CHILD CAN'T BREATHE AND THEY HAVE TROUBLE BREATHING.

2  USUALLY, THEY GET VERY DISTRESSED WHEN THEY HAVE AN ASTHMA

3  ATTACK, AND THEY CAN'T GET AIR, AND THEY SHAKE AND THEY GET

4  SCARED.  OFTEN, THEY WORRY THAT THEY ARE GOING TO DIE.  THAT'S A

5  COMMON PSYCHOLOGICAL REACTION WITH CHILDREN OF ASTHMA.

6  Q.   NOW, YOU INDICATED YOU CONDUCTED A PSYCHOLOGICAL EXAMINATION

7  OF CHRIS?

8  A.   I DID.

9  Q.   IN SUMMARY, WHAT DID YOUR PSYCHOLOGICAL EVALUATION CONSIST

10 OF?

11 A.   WELL, FIRST OF ALL, HIS BASIC PERSONALITY WAS PRETTY

12 HEALTHY.  HE HAD GOOD PRIOR DEVELOPMENT, PRIOR PARENTING.  HIS

13 BASIC -- THE STRUCTURE OF HIS BASIC PERSONALITY WAS PRETTY GOOD.

14 HE DOES HAVE RECURRENT ANXIETY ISSUES RELATED TO ASTHMA AND

15 ALLERGIES.

16        AND WHEN YOU PROBE UNDER THE SURFACE WITH THIS

17 YOUNGSTER, HIS ASTHMA ATTACKS ARE A CONTINUING WORRY AND CONCERN

18 THAT HE HAS IN HIS MIND.  AND HE HAS DREAMS ABOUT IT.  HE HAS

19 THOUGHTS ABOUT IT.  HE WORRIES ABOUT IT PRIVATELY.  BUT IT'S A

20 RECURRENT ISSUE.  IT'S NOT SOMETHING THAT'S PERVASIVE AND IS

21 THERE ALL THE TIME, BUT WHEN IT COMES UP, IT COMES UP WITH SOME

22 SIGNIFICANT IMPACT PSYCHOLOGICALLY.

23 Q.   NOW, DID YOU REVIEW MEDICAL RECORDS IN CHRIS'S CASE?

24 A.   YES.

25 Q.   WHY DID YOU DO THAT?

1  A.   WELL, I NEEDED TO, FIRST OF ALL, UNDERSTAND THE BACKGROUND

2  OF THE CHILD, WHAT KIND OF HEALTH HE'S HAD, WHAT KIND OF PROBLEMS

3  HE'S HAD.  ALSO, WHEN YOU'RE PRESENTED WITH INFORMATION, YOU NEED

4  TO SEE IF IT FITS WITH ALL OF THE HISTORY AND THE RECORDED

5  INFORMATION LIKE MEDICAL RECORDS.  DOING AN EXAMINATION, YOU WANT

6  TO MAKE SURE THAT EVERYTHING FITS TOGETHER.

7         SO KNOWING A CHILD HAS A MEDICAL PROBLEM, YOU WOULD

8  WANT TO READ WHAT HAS BEEN GOING ON MEDICALLY.  WHAT KIND OF

9  TREATMENT HAS HE HAD?  WHAT HAS BEEN GOING WELL?  WHAT KIND OF

10  THINGS FOSTER HEALTH?  WHERE DOES HE HAVE PROBLEMS, AND SO ON.

11  SO YOU WOULD ALWAYS REVIEW HISTORY.

12  Q.   YOU ALSO CONDUCTED PSYCHOLOGICAL TESTING?

13  A.   I DID.

14  Q.   IN BRIEF SUMMARY, WHAT WERE THE TESTS YOU CONDUCTED AND THE

15  RESULTS OF THOSE TESTS?

16  A.   I CONDUCTED -- I MEAN, I ADMINISTERED SEVERAL TESTS TO THIS

17  CHILD.  ONE TEST THAT I ADMINISTERED IS CALLED THE THEMATIC

18  APPERCEPTION TEST, WHICH IS A TASK WHERE THE CHILD LOOKS AT

19  PICTURES THAT ARE PREPARED BY THE TEST PUBLISHER AND MAKES UP A

20  STORY.  AND IT GIVES YOU A LOT OF INFORMATION ABOUT THAT CHILD'S

21  ABILITY TO USE THOUGHT AND INCORPORATE FEELINGS AND COGNITIONS.

22  AND BASICALLY, THAT REFLECTED THE STRUCTURE OF HIS PERSONALITY

23  BEING PRETTY HEALTHY.  THAT WAS POSITIVE.  THOSE RESULTS WERE

24  POSITIVE.

25         I ALSO ADMINISTERED PROJECTIVE DRAWINGS WHERE YOU GIVE

1  THE CHILD A BLANK SHEET OF PAPER.  THIS IS A TASK THAT'S BEEN

2  DONE BY PSYCHOLOGISTS, PEDIATRICIANS, PSYCHIATRISTS FOR PROBABLY

3  A HUNDRED YEARS.

4       AND YOU ASK THE CHILD TO PERFORM CERTAIN TASKS.  THE

5  FIRST ONE IS TO DRAW A PERSON.  AS SIMPLE AS THAT SOUNDS, THE

6  INTACT NEUROLOGICALLY AND PSYCHOLOGICALLY CHILD THAT DOESN'T HAVE

7  A LOT OF PROBLEMS CAN RENDER A DRAWING THAT IS WITHIN NORMAL

8  LIMITS, AND ARTISTIC ABILITY IS NOT AN ISSUE.

9       AND THEN YOU ASK THEM TO DRAW A PICTURE OF A HOUSE AND

10 A TREE.  THOSE ARE THEMES THAT REFLECT FAMILY AND RELATIONSHIP

11 ISSUES.  AND THAT WAS PRETTY GOOD.

12       AND THEN I ASKED HIM TO DRAW HIS WORRIES.  WHAT KIND OF

13 THINGS DO YOU WORRY ABOUT?  AND HE DREW A DRAWING WITH THREE

14 ISSUES:  ONE WAS HAVING ANXIETY DREAMS THAT CAUSE HIM TO WAKE UP,

15 OR NIGHTMARES; AND THE SECOND WAS NOT DOING WELL ON HIS TESTS AT

16 SCHOOL, ANXIETY ABOUT THAT; AND THE THIRD WAS HAVING AN ANXIETY

17 ATTACK -- EXCUSE ME, AN ASTHMA ATTACK WHERE HE CAN'T BREATHE AND

18 CAN'T GET AIR.  AND SO HE RENDERED THOSE ISSUES.

19       AND THEN I ALSO ASKED HIM TO DRAW WHAT THINGS ARE GOING

20 WELL IN HIS LIFE, AND HE DID.  HE DREW FIGURES OF HIS FRIENDS AND

21 THINGS HE LIKES TO DO AND VIDEO GAMES AND COMPUTER GAMES AND SO

22 ON.

23       I ALSO ADMINISTERED A SCALE OR A FORMAT THAT'S CALLED

24 THE BECK YOUTH SCALES.  IT'S A SERIES OF 25 SECTIONS OF 20

25 QUESTIONS.  THE CHILD ANSWERS AND CIRCLES WHETHER OR NOT THEY

1  HAVE THAT PROBLEM SOMETIMES OR NEVER OR FREQUENT OR ALL THE TIME.

2  AND FROM THAT, YOU GET A SUMMARY SCORE.  AND THAT WAS BASICALLY

3  WITHIN NORMAL LIMITS.  IT COVERS ANXIETY AND DEPRESSION,

4  SELF-CONCEPT AND SOME OTHER THINGS.

5         BUT THE OVERALL FUNCTIONING OF THE CHILD IS PRETTY

6  GOOD, BUT UNDER THE SURFACE THERE ARE THOSE WORRIES AND CONCERNS

7  ABOUT ASTHMA ATTACKS LEADING TO THOUGHTS OF DEATH AND WORRIES

8  THAT HE'LL DIE.

9  Q.  DID YOU MAKE A DIAGNOSIS IN THE CASE OF CHRIS COOPER?

10  A.  YES.

11  Q.  AND WHAT WAS YOUR PRIMARY DIAGNOSIS?

12  A.  WELL, THE PRIMARY DIAGNOSIS IS ANXIETY DISORDER DUE TO

13  ASTHMA AND ALLERGIES.

14  Q.  NOW, IS AN ANXIETY DISORDER A RECOGNIZED PSYCHOLOGICAL

15  DIAGNOSIS, ACCORDING TO THE *DIAGNOSTIC AND STATISTICAL MANUAL*?

16  A.  YES.

17  Q.  TELL THE JURY WHAT THAT IS, BRIEFLY.

18  A.  IN ANY FIELD OF SCIENCE OR ANY BRANCH OF MEDICINE, THERE IS

19  AN ATTEMPT TO HAVE A NOSOLOGICAL SYSTEM OR A SYSTEM CATEGORIZING

20  MEDICAL PROBLEMS, PSYCHOLOGICAL PROBLEMS.  IT'S USED IN SCIENCE

21  LIKE IN BOTANY CLASSIFICATION, TREES AND PLANTS.  THE SCIENCE

22  ATTEMPTS TO ORGANIZE FINDINGS ACCORDING TO CATEGORIES.

23         AND WITH MENTAL HEALTH OR PSYCHOLOGY OR PSYCHIATRY,

24  WHAT WE'RE DOING OR WHAT HAS BEEN DONE IS TO DIVIDE INTO VARIOUS

25  GROUPS THE KIND OF PROBLEMS THAT PEOPLE HAVE.  SO THERE IS A

1   GENERAL CATEGORY OF THINGS LIKE ANXIETY.  THERE IS A GENERAL

2   CATEGORY FOR DEPRESSION, PSYCHOSIS OR PSYCHOTIC FUNCTIONING,

3   MENTAL RETARDATION, BRAIN INJURY, AND ALCOHOL, AND DRUG ABUSE AND

4   SO ON.  YOU HAVE THESE LARGE UMBRELLAS LIKE ANXIETY.  AND THEN

5   UNDER THAT, THERE ARE ATTEMPTS TO DIFFERENTIATE THEM INTO

6   DIFFERENT TYPES.

7          AND SO WITH THIS CHILD, THE PROBLEMS -- THERE WERE

8   ACTUALLY THREE DIAGNOSES THAT WOULD FIT HIM TO SOME DEGREE.  THIS

9   ONE FIT HIM A LITTLE BETTER THAN THE OTHER TWO, BUT IT'S

10  BASICALLY ANXIETY.

11  Q.   AND WHEN YOU ASKED HIM TO DO THE DRAWINGS, DID YOU ASK ABOUT

12  ASTHMA IN YOUR QUESTION?

13  A.   WELL, NO.  ASTHMA CAME UP IN THE CLINICAL INTERVIEW.

14  Q.   BUT WHEN YOU ASKED HIM TO MAKE THAT DRAWING, DID YOU USE THE

15  WORD "ASTHMA"?

16  A.   OH, NO, NO.  I JUST SAID, "DRAW WHAT YOU WORRY ABOUT."

17  Q.   DO YOU HAVE A COPY OF THE DRAWING?

18  A.   SURE.

19          MR. MEUNIER:  MAY I APPROACH THE WITNESS, YOUR HONOR?

20          THE COURT:  YES.

21          THE WITNESS:  HERE IT IS.

22                        EXAMINATION

23  BY MR. MEUNIER:

24  Q.   THIS IS THE DRAWING THAT CHRIS MADE WHEN YOU ASKED HIM TO

25  DRAW WHAT HE WAS WORRIED ABOUT?

1   A.   YES.

2   Q.   AND YOU WROTE THE WORDS HERE, DOCTOR, "DREAMING, TEST, AND

3   ASTHMA ATTACK"?

4   A.   I DID.   THOSE ARE MY WORDS.   I MEAN, THAT'S MY WRITING.

5   Q.   AND YOU WROTE THOSE WHEN CHRIS DESCRIBED TO YOU WHAT HE WAS

6   DRAWING?

7   A.   YEAH, I LOOKED AT THE DRAWING AND I SAID, "WHAT IS THIS ON

8   THE LEFT UPPER?"   AND HE SAID, "WELL, THAT'S ME DREAMING AND

9   WAKING UP, HAVING A BAD DREAM."   AND HE SAID THIS WAS HIM TAKING

10  A TEST AND HE'S WORRIED ABOUT HIS PERFORMANCE.   AND I SAID, "WHAT

11  IS THIS?"   AND HE SAID, "WELL, THAT'S ME HAVING AN ASTHMA

12  ATTACK."   AND YOU CAN SEE THE CONSTRICTION IN THE THROAT AND THE

13  WORD "AIR" WITH AN EXCLAMATION POINT, LARGE, OPEN MOUTH.

14        HE WAS RENDERING ON THIS PAGE THE THINGS THAT HE

15  WORRIES ABOUT.   AND THAT'S THE PURPOSE OF THE DRAWING.

16  Q.   WHEN YOU QUESTION CHRIS AND HE GIVES YOU RESPONSES, DO YOU

17  TAKE NOTES OF HIS RESPONSES?

18  A.   YES.

19  Q.   CAN YOU GIVE THE JURY JUST A COUPLE OF EXAMPLES OF THINGS HE

20  SAID TO YOU WHICH SUPPORTED YOUR DIAGNOSIS OF AN ANXIETY DISORDER

21  ASSOCIATED WITH AN ASTHMA ATTACK?

22  A.   WELL, I ASKED HIM AT ONE POINT IN THE EXAMINATION IF HE

23  COULD HAVE THREE WISHES, WHAT WOULD YOU WISH FOR?   AND IN

24  CONDUCTING AN EXAMINATION OF A CHILD, YOU TRY TO GET UNDER THE

25  SURFACE TO FIND OUT WHAT'S GOING ON IN THEIR PRIVATE THINKING AND

1  FEELINGS.

2          AND HIS SECOND WISH WAS THAT EVERYBODY IN THE WORLD

3  WOULD BE HEALTHY.  AND I THOUGHT THAT WAS A LITTLE UNUSUAL.

4  USUALLY CHILDREN ARE WISHING FOR GAMES AND MONEY OR CANDY OR

5  WHATEVER.  AND I SAID, "WELL, WHAT'S THAT?"  AND HE SAID, "WELL,

6  ASTHMA, FLU AND HIV ARE PROBLEMS PEOPLE HAVE IN THE WORLD."  AND

7  HE WOULD LIKE TO SEE THOSE GONE.

8          I SAID, "WELL, WHAT DOES ASTHMA DO?"  AND HE SAID, "IT

9  MAKES THEM UNABLE TO PLAY SPORTS.  WHEN THEY RUN, THEY WHEEZE,

10  THEY HURT, THEY CAN'T BREATHE VERY WELL."  I SAID, "TELL ME

11  MORE."  AND HE SAID, "SOMETIMES I GET TO WHEEZING REAL FAST AND I

12  WORRY THAT I MIGHT PASS AWAY."  AND THEN I ASKED HIM MORE

13  INFORMATION ABOUT WHEN HE HAD HIS LAST ASTHMA ATTACK AND WHAT

14  DOES IT DO TO YOU ON THE INSIDE.

15          AND BASICALLY, AS WE WENT THROUGH THAT, HE TALKED ABOUT

16  WHEN HE HAS AN ATTACK, HE FEELS DISTRESSED, WORRIED, ANXIOUS, AND

17  HE THINKS HE MIGHT DIE.  AND IT'S NOT SOMETHING THAT COMES UP ALL

18  THE TIME, BUT HE STILL WORRIES ABOUT IT.

19          THE LAST ONE WAS IN '07 OR '08, BUT HE STILL THINKS

20  ABOUT IT.  SO IT'S NOT LIKE HE HAS AN ATTACK EVERY WEEK, BUT IT'S

21  STILL IN HIS MIND.

22  Q.   DID HE BRING UP HIS EXPERIENCE IN THE FEMA TRAILER WHILE

23  LIVING IN THE TRAILER?

24  A.   YEAH, HE WENT INTO THAT.  HE STARTED TO TALK ABOUT WHERE HE

25  HAD MORE PROBLEMS WITH HIS ASTHMA AND ALLERGIES.

1  Q.    AND WHAT DID HE SAY ABOUT THAT?

2  A.    WELL, LET'S SEE.  I ASKED HIM WHEN HE HAD HIS LAST ATTACK.

3  HE SAID IT WAS IN 2007.  I SAID, "WHERE WERE YOU?"  HE SAID, "I

4  WAS IN A TRAILER."  HE SAID, "SOMETIMES I WOULD GO OUTSIDE, AND

5  IF THE POLLEN WAS HIGH, I WOULD GO BACK IN THE TRAILER, BUT I

6  STARTED GETTING MORE ATTACKS IN THE TRAILER."

7        I SAID, "WELL, WHAT DID THAT DO TO YOU?"  HE SAID, "I

8  GOT FRUSTRATED BECAUSE I COULDN'T GO OUTSIDE."  AND I SAID, "WHEN

9  DID YOU HAVE THE MOST PROBLEMS BREATHING?"  AND HE SAID, "IN THE

10  TRAILER."  I SAID, "DID YOU HAVE PROBLEMS WHEN YOU LIVED IN

11  FLORIDA?"  HE SAID, "NOT REALLY.  I HAD A COUPLE OF MINUTES.  I

12  WOULD TAKE THE PUFFERS AND GO RIGHT BACK OUTSIDE AND PLAY WITH MY

13  COUSINS."  I SAID, "WELL, WHY DO YOU THINK YOU HAD PROBLEMS IN

14  THE TRAILER?"  HE SAYS, "I DON'T KNOW.  IT GOT WORSE THAN IN

15  FLORIDA OR NOW, WHAT IT'S LIKE NOW."

16        AND WE TALKED SOME MORE, AND HE EVENTUALLY TALKED ABOUT

17  THAT HE REMEMBERED HIS BREATHING AND HIS ALLERGIES GETTING BAD,

18  REAL BAD.  HE USED WORDS LIKE THAT.  TALKING ABOUT HIS EXPERIENCE

19  OVER THE PAST SEVERAL YEARS OF WHEN IT WENT UP IN INTENSITY AND

20  FREQUENCY AND WHEN IT WAS DISTRESSING, AND HE ATTRIBUTED THAT TO

21  THE MONTHS HE WAS IN THE TRAILER.

22  Q.    LET ME ASK YOU THIS, MR. SHWERY:  WE SPOKE BEFORE ABOUT YOUR

23  ABILITY TO TELL WHEN A PATIENT IS EITHER EXAGGERATING OR MAKING

24  SOMETHING UP.

25  A.    UH-HUH (AFFIRMATIVE RESPONSE).

1  Q.   YOU DIDN'T THINK THAT WAS TRUE IN THE CASE OF

2  ALANA ALEXANDER?

3  A.   NO.  I FOUND NOTHING TO SUGGEST THAT SHE WAS FAKING,

4  EXAGGERATING, OR ANYTHING LIKE THAT.

5  Q.   WHAT ABOUT IN THE CASE OF CHRIS?  CAN YOU TELL THE JURY

6  WHETHER YOU WERE ABLE TO JUDGE WHETHER THIS WAS A YOUNG MAN WHO

7  WAS TELLING YOU THINGS THAT HE THOUGHT YOU WANTED TO HEAR OR THAT

8  HE WAS SUPPOSED TO SAY OR WAS IT AUTHENTIC AND RELIABLE IN HIS

9  EXPERIENCE?

10  A.   WELL, THAT ISSUE COMES UP A LOT IN EXAMINING CHILDREN,

11  PARTICULARLY WHEN THERE IS SOME QUESTIONS ABOUT THAT.

12          AND FIRST OF ALL, THE NATURE OF HOW YOU CONDUCT THE

13  EXAMINATION HAS TO BE WITHOUT ASKING QUESTIONS THAT ARE

14  SUGGESTIVE OR SUGGESTING TO THE CHILD THAT I WANT TO KNOW ABOUT

15  THIS.  SO YOU ASK VERY OPEN-ENDED QUESTIONS.  YOU DON'T SAY, FOR

16  EXAMPLE, "TELL ME ABOUT YOUR ASTHMA IN THE TRAILER.  WAS IT BAD

17  IN THE TRAILER?  WHAT KIND OF PROBLEMS DID YOU HAVE?"  THAT WOULD

18  BE THE SORT OF QUESTION THAT WOULD BE SUGGESTING THAT'S WHAT YOU

19  WANT TO HEAR.  BUT YOU KEY OFF OF WHAT THE CHILD HAS TOLD YOU,

20  THAT THEY BRING UP SPONTANEOUSLY, AND THEN YOU INQUIRE FOR MORE

21  INFORMATION.

22          SO A LOT OF THE QUESTIONS ARE THINGS LIKE, "TELL ME

23  MORE," OR "WHAT'S THAT LIKE FOR YOU, WHAT DOES THAT DO TO YOU ON

24  THE INSIDE," AND SO ON.

25          WHEN CHILDREN ARE GIVING RESPONSES, PARTICULARLY WHEN

1    THERE IS AN ISSUE OF INCOMPLETE INFORMATION OR YOU ASK FOR MORE

2    OR YOU ASK FOR EXAMPLES, WHEN THEY CAN'T GIVE YOU ANY ADDITIONAL

3    DETAIL, THEN YOU START TO QUESTION THE VERACITY AND VALIDITY OF

4    THOSE RESPONSES.

5        IT COMES UP ALL THE TIME IN QUESTIONS OF SEXUAL ABUSE

6    OF CHILDREN, WHETHER IT'S A FALSE ALLEGATION OR WHETHER THEY HAVE

7    BEEN TOLD TO SAY SOMETHING.  IT COMES UP ALL THE TIME IN CUSTODY

8    EVALUATIONS OF CHILDREN IN FAMILIES.  BUT YOU DEVELOP SKILLS OVER

9    THE YEARS OF HOW TO CONDUCT THE EXAM SO YOU'RE NOT LEADING THEM

10   OR SUGGESTING THINGS TO THEM.  AND THEN WHEN THEY DO BRING UP

11   SOMETHING THAT IS AN AREA OF CONCERN, YOU INQUIRE FOR MORE

12   INFORMATION.  IT ALL HAS TO FIT TOGETHER.  YOU CAN'T HAVE --

13       I'LL GIVE YOU AN EXAMPLE.  A CHILD COMES IN ON A

14   CUSTODY EVALUATION AND SAYS, "MY DAD IS MEAN TO ME."  AND YOU

15   SAY, "WELL, WHAT KIND OF THINGS DOES HE DO?"  "WELL, HE'S JUST

16   MEAN."  AND YOU ASK THEM, "WHAT IS THAT LIKE FOR YOU?"  "WELL, I

17   DON'T KNOW."  AND THEN YOU EVENTUALLY ASK THE CHILD QUESTIONS

18   LIKE, "WELL, WHAT WAS IT YOUR MOTHER SAID TO BE SURE AND" --

19       THE COURT:  DOCTOR, JUST TRY TO CONCENTRATE ON THE

20   QUESTION.  I KNOW YOU WANT TO EXPLAIN.  WE'LL GIVE YOU A CHANCE

21   TO EXPLAIN, BUT DON'T DIGRESS TOO MUCH.

22                          EXAMINATION

23   BY MR. MEUNIER:

24   Q.   LET ME JUST TRY TO SUM UP THIS PART AND JUST ASK YOU THIS:

25   IN YOUR EXPERIENCE, WHEN A CHILD IS SAYING SOMETHING LIKE, "MY

1    DAD IS MEAN TO ME" OR SOMETHING THAT IS NOT AUTHENTIC, DOES THE

2    CHILD HAVE THE AMOUNT OF DETAIL ASSOCIATED WITH THAT STATEMENT

3    THAT A CHILD HAS WHO IS SPEAKING ABOUT AN AUTHENTIC EXPERIENCE?

4    A.   WELL, THAT'S CORRECT.   THAT'S ONE CLUE.   THEY DON'T HAVE ANY

5    REAL DETAIL OR ADDITIONAL INFORMATION.

6    Q.   SO IN CHRIS'S CASE WHEN HE TOLD YOU ABOUT FEELING WORSE WHEN

7    HE WAS IN THE TRAILER WITH HIS ASTHMA, ET CETERA, BASED ON YOUR

8    PROFESSIONAL EXPERIENCE AND JUDGMENT, WAS HE RELATING WHAT FOR

9    HIM WAS AN AUTHENTIC EXPERIENCE AS OPPOSED TO SAYING SOMETHING

10   THAT HE FELT HE WAS EXPECTED TO SAY?

11   A.   NO, THIS WAS IN HIS MIND.   THESE DETAILS AND THIS

12   INFORMATION IS WHAT'S OCCURRING IN HIS MIND, NOT A SCRIPT OR

13   BEING PROGRAMMED OR LED.

14   Q.   AND YOU'RE SURE OF THAT IN YOUR PROFESSIONAL JUDGEMENT?

15   A.   YEAH.   I FOUND NOTHING CONSISTENT WITH HIM EXAGGERATING OR

16   MAKING UP INFORMATION.

17   Q.   NOW, GOING FORWARD FOR CHRISTOPHER, DO YOU RECOMMEND

18   FOLLOW-UP COUNSELING IN HIS CASE?

19   A.   YES.   THESE PROBLEMS WITH ANXIETY CONTINUE, AND HE NEEDS

20   SOME HELP TO GET RID OF THAT.

21   Q.   AND DID YOU TELL US IN YOUR DEPOSITION THAT YOU RECOMMENDED

22   IN HIS CASE FUTURE COUNSELING OF SIX MONTHS TO A YEAR IN

23   DURATION?

24   A.   YEAH, THAT WOULD BE ABOUT RIGHT.

25   Q.   DO YOU RECALL SAYING THAT IN YOUR DEPOSITION, DOCTOR?

1  A.   YES.

2          MR. MEUNIER:  NO FURTHER QUESTIONS.

3          THE COURT:  CROSS.  MR. GLASS?

4          MR. GLASS:  THANK YOU, YOUR HONOR.

5                      CROSS-EXAMINATION

6  BY MR. GLASS:

7  Q.   DOCTOR, MY NAME IS JOE GLASS.  I REPRESENT GULF STREAM

8  COACH.  WE HAD AN OPPORTUNITY TO TALK --

9  A.   YES.

10  Q.   -- A COUPLE OF MONTHS BACK; ISN'T THAT RIGHT?

11  A.   WE DID.  THAT'S RIGHT.

12  Q.   I JUST WANT TO CONFIRM A COUPLE THINGS THAT MR. MEUNIER JUST

13  ASKED OF YOU.  AND THAT IS THAT YOU'RE NOT A DOCTOR WHO CAN

14  DIAGNOSE AN UNDERLYING CONDITION; YOU'RE JUST HERE TO TALK ABOUT

15  MENTAL CONDITIONS, CORRECT?

16  A.   THAT'S CORRECT.

17  Q.   SO WHILE YOU CAN DIAGNOSE ANXIETY DUE TO THE ASTHMA ATTACKS,

18  YOU'RE UNABLE TO ACTUALLY DIAGNOSE WHAT CAUSES THOSE ASTHMA

19  ATTACKS; IS THAT ACCURATE?

20  A.   THAT'S CORRECT.

21  Q.   WHO FIRST CONTACTED YOU ABOUT INTERVIEWING OR EXAMINING THE

22  PLAINTIFFS?

23  A.   AN ATTORNEY NAMED CHRIS PINEDO.

24  Q.   WAS IT YOUR UNDERSTANDING HE WAS WITH THE PLAINTIFFS; THAT

25  WAS THEIR ATTORNEY?

1   A.   HE TOLD ME HE WAS REPRESENTING SOME PEOPLE, YES.

2   Q.   SO IT WASN'T ANOTHER DOCTOR WHO REFERRED MS. ALEXANDER AND

3   HER SON TO YOU TO BE EXAMINED MENTALLY; IS THAT ACCURATE?

4   A.   THAT'S CORRECT.   IT WAS NOT ANOTHER DOCTOR.

5   Q.   AND THEY DIDN'T COME TO YOU TO SEEK SOME HELP; IT WAS THEIR

6   ATTORNEY THAT ASKED YOU TO LOOK AT THEM?

7   A.   THAT'S CORRECT.

8   Q.   PRIOR TO DRAFTING YOUR REPORTS ON THESE TWO INDIVIDUALS, YOU

9   LOOKED AT A FEW MEDICAL RECORDS; IS THAT CORRECT?

10   A.   I DID.

11   Q.   BUT YOU DIDN'T HAVE ALL THE MEDICAL RECORDS AT THE TIME YOU

12   DRAFTED THE REPORT; THAT'S ALSO ACCURATE?

13   A.   NO, I SAW MORE LATER.   THAT'S CORRECT.

14   Q.   BUT AT THE TIME YOU DRAFTED YOUR REPORT, YOU HAD SOME

15   CHILDREN'S HOSPITAL RECORDS AND THEN DR. JANET BARNES' RECORDS;

16   IS THAT CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   AND DR. BARNES' RECORDS HAD BEEN DESTROYED IN THE STORM, SO

19   YOU JUST HAD POST-STORM RECORDS; IS THAT ACCURATE?

20   A.   YES.   IT WAS A LETTER THAT SHE PREPARED.

21   Q.   AND A LOT OF THE HISTORY IN DR. BARNES' REPORT WAS A

22   HISTORICAL ACCOUNT OF WHAT MS. ALEXANDER HAD TOLD DR. BARNES MANY

23   MONTHS, MAYBE EVEN YEARS, AFTER THE STORM; IS THAT ACCURATE?

24   A.   WELL, IT HAD SOME OF THAT.   IT ALSO HAD DR. BARNES'

25   TREATMENT -- MEMORIES OF TREATMENT OF THE CHILD.

1   Q.   DID THE PLAINTIFFS ACTUALLY TREAT WITH DR. BARNES FOR A

2   PERIOD OF TIME WHILE THEY WERE IN THE TRAILER?

3   A.   I CAN'T REMEMBER IF THEY -- I THINK IT STARTED IN THE SUMMER

4   OR FALL OF '07 THAT THEY SAW HER AGAIN.  SO, I GUESS, THE LAST

5   FEW MONTHS, I'M CERTAIN OF; I'M NOT SURE ABOUT EARLIER MONTHS.

6   Q.   THE LAST FEW MONTHS THAT THEY WERE IN THE TRAILER?

7   A.   THAT'S CORRECT.

8   Q.   DID YOU SEE ANYTHING IN THE RECORDS FROM DR. BARNES THAT

9   INDICATED A REFERRAL, A REFERENCE OF CHRIS COOPER FOR

10  PSYCHOLOGICAL TREATMENT?

11  A.   NO, I DID NOT.

12  Q.   SO THE ONLY OTHER INFORMATION THAT YOU HAD PRIOR TO DRAFTING

13  YOUR REPORT, OTHER THAN THESE LIMITED RECORDS, WAS YOUR ACTUAL

14  INTERVIEW WITH THE PLAINTIFFS; IS THAT ALSO TRUE?

15  A.   SAY THAT AGAIN.

16  Q.   SURE.

17  A.   OR ASK ME THAT AGAIN.

18  Q.   YOU TOLD ME ABOUT THE TWO DIFFERENT MEDICAL RECORDS YOU HAD.

19  A.   YES.

20  Q.   THE ONLY OTHER INFORMATION THAT YOU HAD TO BASE YOUR REPORT

21  ON WAS THE ACTUAL INFORMATION THAT WAS SUBJECTIVELY PROVIDED TO

22  YOU BY MS. ALEXANDER AND HER SON, CHRISTOPHER?

23  A.   THAT'S CORRECT.

24  Q.   NOW, YOU TOLD MR. MEUNIER THAT IT APPEARED THAT

25  CHRISTOPHER'S ANXIETY WAS TIED TO A TIME WHILE HE WAS IN THE

1  ACTUAL TRAILER.  THAT'S AN ACCURATE RECITATION OF WHAT YOU

2  JUST --

3  A.   YES, THAT'S HIS EXPERIENCE AND HIS MEMORY.

4  Q.   YOU TOLD ME IN THE DEPOSITION THAT IT'S YOUR OPINION THAT

5  THE ANXIETY IS CLEARLY TIED TO BREATHING PROBLEMS AND, IN CHRIS'

6  CASE, THE ANXIETIES THAT HE WORRIES ABOUT DEATH.  IS THAT STILL

7  TRUE TODAY?

8  A.   WELL, I HAVEN'T SEEN HIM SINCE I DID THIS, BUT --

9  Q.   I UNDERSTAND.  BUT YOUR OPINION IS, BASED ON YOUR

10  EXAMINATION, THAT HIS ANXIETY IS TIED TO THE BREATHING PROBLEMS?

11  A.   THAT'S CORRECT.

12  Q.   SO, IN A NUTSHELL, CHRIS' ANXIETY IS FOCUSED AROUND THE

13  ASTHMA ATTACK; AND, IF THE ASTHMA IS CONTROLLED, HIS ANXIETY IS

14  CONTROLLED, AS WELL?

15  A.   WELL, EXCEPT IT'S BEEN A COUPLE OF YEARS SINCE HE HAD AN

16  ACTUAL ASTHMA ATTACK, BUT YET HE STILL WORRIES ABOUT IT.  SO IT'S

17  NOT ONLY AROUND A SPECIFIC ATTACK, BUT IT HAS BECOME AN ISSUE IN

18  HIS MIND THAT LEADS TO WORRY AND DISTRESS THAT HE MIGHT HAVE

19  ANOTHER ONE.

20  Q.   IT'S YOUR UNDERSTANDING THAT HE HASN'T HAD AN ASTHMA ATTACK

21  IN A COUPLE OF YEARS?

22  A.   WELL, HE HAD -- HIS LAST ONE WAS IN '07, AND I THINK THERE

23  WAS ONE IN '08.  I DON'T KNOW THAT THERE WERE ANY SINCE THEN.

24  BUT THEY HAVEN'T BEEN AS FREQUENT AND ARE GETTING BETTER, BUT

25  THAT DOESN'T MEAN THE ANXIETY AROUND WORRIES OF HAVING AN ATTACK

1  HAVE GONE AWAY.

2  Q.   I UNDERSTAND.  BUT IF WE CONTROLLED THE ASTHMA, IT'S YOUR

3  UNDERSTANDING THAT WE'LL CONTROL THE ANXIETY?

4  A.   YEAH, EXCEPT -- HE NEEDS SOME TREATMENT TO GET RID OF THAT

5  BECAUSE IT'S A POCKET OF ANXIETY IN HIS MIND THAT HE WORRIES

6  ABOUT.

7  Q.   WELL, THIS ANXIETY, YOU'VE ALREADY TOLD MR. MEUNIER,

8  PREDATED HIS TIME IN THE TRAILER AND PREDATED HURRICANE KATRINA,

9  CORRECT?

10 A.   THAT'S CORRECT.  IT STARTED WHEN HE WAS A LITTLE BOY.

11 Q.   BASED ON THE RECORDS THAT YOU REVIEWED PRIOR TO DRAFTING

12 YOUR REPORT, YOU BELIEVED THAT CHRISTOPHER COOPER WAS ACTUALLY

13 COMPLYING WITH HIS MEDICAL REGIMEN REGARDING ASTHMA; IS THAT

14 ACCURATE?

15 A.   FOR THE MOST PART, I THINK HE WAS.  THERE WERE A COUPLE

16 TIMES THEY RAN OUT OF MEDICATIONS, I THINK, BUT --

17 Q.   YOU BELIEVE THAT WHILE HE WAS IN FLORIDA, HE WAS USING HIS

18 BREATHING MACHINE, CORRECT?

19 A.   YES.  THE NEBULIZER AND THE PUFFERS.

20 Q.   WHAT IS A BREATHING MACHINE?

21 A.   WELL, IT'S CALLED A NEBULIZER OR, GENERICALLY, A BREATHING

22 MACHINE.  IT'S A DEVICE THAT FILTERS AIR AND ALSO HAS A PLACE

23 WHERE YOU CAN PUT MEDICINE IN IT.  YOU CAN ASK THE PEDIATRICIAN

24 WHEN THEY ARE HERE FOR MORE ACCURATE.

25        BUT MY SON USED ONE WHEN HE WAS A CHILD.  AND IT ALLOWS

1    THE CHILD TO HAVE AIR THAT IS FILTERED AND MEDICATED TO TRY AND

2    HELP THEM BREATHE BETTER.

3    Q.   SO YOUR UNDERSTANDING IS THAT MEDICATION LIKE STEROIDS WOULD

4    BE USED WITH THE BREATHING MACHINE?

5    A.   IT CAN BE, YES.

6    Q.   WHAT ABOUT PUFFERS; WHAT IS A PUFFER?

7         MR. MEUNIER:  YOUR HONOR, HE'S NOT A PULMONOLOGIST.

8    WE'LL HEAR FROM OTHERS ON THIS.  SO I'M NOT SURE WHY IT'S

9    RELEVANT TO ASK A PSYCHOLOGIST ABOUT THE TREATMENT --

10        THE COURT:  WELL, I'M GOING TO GIVE HIM A LITTLE LEEWAY

11   TO EXTENT THAT HE HAS ANXIETY, AND THERE ARE METHODS TO RELIEVE

12   ANXIETY, PERHAPS.  I UNDERSTAND THE LINE OF QUESTIONING IS BEING

13   ASKED FOR THAT PURPOSE; BUT, YOUR POINT IS CORRECT THAT THIS

14   WITNESS HAS QUITE CLEARLY, FROM THE OUTSET, SAID HE'S NOT A

15   MEDICAL DOCTOR.  SO I DON'T KNOW HOW MUCH FURTHER WE CAN GO.

16        MR. GLASS:  I'M NOT GOING REAL FAR.

17        THE COURT:  IF YOU KNOW THE ANSWER TO THAT QUESTION,

18   I'LL OVERRULE THE OBJECTION AND ALLOW HIM TO ANSWER.

19        MR. GLASS:  THANK YOU, YOUR HONOR.

20        THE WITNESS:  PUFFERS ARE DEVICES THAT HAVE A MOUTHPIECE

21   AND MEDICATION.  THE CHILD SQUEEZES IT AND BREATHES IT IN.  THEY

22   USE IT FOR TARGETING PROBLEMS IN BREATHING AT THE MOMENT.

23                         EXAMINATION

24   BY MR. GLASS:

25   Q.   AT THE MOMENT.

1    A.    YES.

2            MR. GLASS:   THE LAST QUESTION ON THIS POINT, YOUR HONOR.

3                        EXAMINATION

4    BY MR. GLASS:

5    Q.    IS IT YOUR UNDERSTANDING THAT THE MEDICINES THAT WOULD GO

6    INTO A BREATHING MACHINE WOULD BE DIFFERENT FROM THE TYPE OF

7    RELIEF THAT A PUFFER IS GIVING?

8    A.    WELL, THE MEDICATION MAY BE THE SAME, BUT IT COMES IN

9    DIFFERENT FORM.   SOMETIMES IT'S LIQUID THAT IS PUT IN THE

10   BREATHING MACHINE.

11   Q.    FROM YOUR REPORT, YOU GIVE SOME RECOMMENDATIONS AS TO WHAT

12   CHRISTOPHER COOPER -- WHAT TREATMENT SHOULD BE PROVIDED TO

13   CHRISTOPHER COOPER, CORRECT?

14   A.    YES.

15   Q.    AND THAT FIRST RECOMMENDATION IS EXACTLY THAT CHRISTOPHER

16   SHOULD CONTINUE TO TAKE ALL PRESCRIBED MEDICATIONS AND TREATMENTS

17   FROM HIS PHYSICIAN; IS THAT ACCURATE?

18   A.    YES.

19   Q.    WHAT IS THE REASON FOR THIS RECOMMENDATION?

20   A.    WELL, YOU ASKED ME THAT IN MY DEPOSITION.   SOME YEARS AGO, I

21   DIDN'T PUT THAT IN, AND A LAWYER SAID, WHY DIDN'T YOU SAY THEY

22   SHOULD TAKE MEDICATION?   SO I ALWAYS PUT IT IN WHEN THE PATIENT

23   HAS BEEN TAKING MEDICATION.

24           I'M NOT RECOMMENDING ANY DRUGS AS A DOCTOR WOULD, OR A

25   MEDICAL DOCTOR, BUT IT'S JUST INTEREST OF THOROUGHNESS THAT IT

1  NEEDS TO BE SAID.

2  Q.   DID YOU ALSO TELL ME IN YOUR DEPOSITION THAT YOU WANT TO

3  MAKE SURE THAT THE PROPER MEDICAL AND HEALTHCARE ISSUES ARE

4  ATTENDED TO BECAUSE THAT REDUCES THE FREQUENCY AND INTENSITY OF

5  THE ANXIETY?

6  A.   WELL, SURE.

7  Q.   ALL RIGHT.  IT TOOK A FEW MINUTES FOR THE TUMBLERS ALL TO

8  FALL INTO PLACE, BUT IF I'M JUST UNDERSTANDING YOUR TESTIMONY

9  CORRECTLY, ARE YOU TELLING ME -- OR, BETTER YET, ARE YOU TELLING

10  THE JURY THAT IF ASTHMA IS SUBOPTIMALLY TREATED, THAT CAN

11  INCREASE THE AMOUNT OF ATTACKS?

12  A.   I WOULDN'T BE ABLE TO ANSWER THAT.

13       MR. MEUNIER:  YOUR HONOR, AGAIN, THIS IS A QUESTION FOR

14  A PULMONOLOGIST.

15       MR. GLASS:  WELL, YOUR HONOR, THIS GOES TO THE NUMBER --

16  AMOUNT OF ANXIETY HE HAS.  HE SAYS IT'S TIED TO THE ASTHMA

17  ATTACKS, AND HE SAYS YOU HAVE TO TAKE CARE OF THE TREATMENT.

18  THIS IS ALL TIED TO HIS ANXIETY.

19       MR. MEUNIER:  BUT THAT LAST QUESTION, JUDGE, WAS WHETHER

20  ATTACKS WERE RELATED TO THE EXTENT OF TAKING DRUGS.  THAT IS

21  BEYOND THE EXPERTISE OF THIS WITNESS.  HE CAN TALK ABOUT THE

22  ANXIETY, BUT NOT THE RELATIONSHIP BETWEEN ASTHMA ATTACKS AND

23  MEDICATION.

24       THE COURT:  WELL, I DO THINK WE'RE ON THE WRONG WITNESS

25  HERE FOR THAT PARTICULAR QUESTION.  I DON'T KNOW HOW FAR YOU WANT

1   TO GO WITH THIS, BUT -- ALTHOUGH THE WITNESS HAS TESTIFIED THAT

2   HE HAS SOME FAMILIARITY WITH ASTHMA, SO...

3          MR. GLASS:  IF I CAN GET AN ANSWER TO THIS QUESTION, I

4   THINK I CAN MOVE TO A HYPOTHETICAL.

5          THE COURT:  WE'RE SPENDING A LOT OF TIME ASKING HIM

6   MEDICAL QUESTIONS WHEN HE'S NOT BEEN QUALIFIED AS A MEDICAL

7   DOCTOR.  SO, AGAIN, FOR THE SECOND TIME, LET'S MOVE ON TO

8   SOMETHING THAT HE DOES HAVE EXPERTISE IN.

9          I WILL ALLOW HIM TO ANSWER THIS BECAUSE HE DID

10  INDICATE THAT HE WAS FAMILIAR BOTH ON A PROFESSIONAL LEVEL AND ON

11  A PERSONAL LEVEL WITH ASTHMA.  SO GO AHEAD AND ANSWER.

12         THE WITNESS:  ASK ME AGAIN.  I'VE FORGOTTEN WHAT YOU

13  ASKED ME.

14                          EXAMINATION

15  BY MR. GLASS:

16  Q.   SURE.  IF AN ASTHMA PATIENT IS SUBOPTIMALLY TREATED, THAT

17  CAN CREATE OR CAUSE ADDITIONAL ASTHMA ATTACKS WHICH IN TURN

18  CREATES ADDITIONAL ANXIETY IN THAT PATIENT?

19  A.   WELL, I NEED TO ANSWER IT IN TWO WAYS.  IT CAN, BUT WHEN

20  YOU'RE DEALING WITH PSYCHOLOGICAL ISSUES LIKE ANXIETY THAT HAS

21  BECOME DEVELOPED IN THE MIND OF THE PERSON, IT'S NOT TIED ONE TO

22  ONE THAT IF THEY HAVE AN ANXIETY ATTACK -- EXCUSE ME, AN ASTHMA

23  ATTACK, THEN THEIR ANXIETY IS GOING TO GO UP.  IT PROBABLY WILL

24  TEMPORARILY, BUT THE ISSUE PSYCHOLOGICALLY IS, THIS HAS BECOME A

25  RECURRENT THEME IN HIS WORRIES AND DISTRESS.

1      I CAN TALK A LOT ABOUT THAT WITH CHRONIC PAIN, FOR

2  EXAMPLE, AND OTHER MEDICAL PROBLEMS THAT BRING PEOPLE TO ME, BUT

3  IT'S NOT ONLY AROUND THE TIME THAT AN ASTHMA ATTACK OCCURS.  IT'S

4  IN HIS MIND AS AN ISSUE OF ANXIETY THAT HE MIGHT HAVE ONE IN THE

5  FUTURE.

6  Q.   WELL, LET'S TALK ABOUT THE INCREASE IN THE AMOUNT OF ATTACKS

7  WHILE IN THE TRAILER.  I THINK THE EASIEST WAY FOR ME TO DO THIS

8  HYPOTHETICAL MIGHT BE IF I PULL UP AN ACTUAL EXHIBIT THAT WAS

9  USED EARLIER -- NOT EXHIBIT, DEMONSTRATIVE THAT WAS USED EARLIER

10  IN THE TRIAL.

11  A.   OKAY.

12  Q.   SIR, I'M GOING TO GIVE YOU A HYPOTHETICAL BASED ON WHAT IS

13  UP ON THE SCREEN HERE, AND I'M GOING TO ASK YOU HYPOTHETICALLY --

14  DO YOU SEE THE LITTLE HURRICANE RIGHT HERE?  WE ALL KNOW WHAT

15  THAT IS.  THAT'S AUGUST 2005 --

16  A.   YES.

17  Q.   -- CORRECT?

18      I'M GOING TO REPRESENT TO YOU HYPOTHETICALLY THAT IF

19  CHRISTOPHER COOPER WAS IN FLORIDA AT SABAL PALM ELEMENTARY SCHOOL

20  AND FILLED OUT A HEALTH FORM AT THAT TIME, OR HIS MOM DID ON HIS

21  BEHALF --

22  A.   OKAY.

23  Q.   -- AND SHE WROTE DOWN ASTHMA TRIGGERED BY CHANGES IN THE

24  WEATHER.

25  A.   UH-HUH.

1   Q.   AND I'LL ALSO REPRESENT TO YOU IN THAT FORM, HYPOTHETICALLY,

2   SHE SAID THAT THE LAST TIME HE TREATED IN THE EMERGENCY ROOM FOR

3   ASTHMA WAS IN FEBRUARY OF 2005 --

4   A.   OKAY.

5   Q.   -- A FEW MONTHS BEFORE THE STORM.   THEN HE COMES BACK TO

6   NEW ORLEANS, 2006, AROUND MAY 2006.

7   A.   OKAY.

8   Q.   MOM FILLS OUT ANOTHER FORM WHEN HE'S COMING TO SCHOOL HERE.

9   IT SAYS, SEASONAL ASTHMA --

10  A.   ALL RIGHT.

11  Q.   -- NO MENTION OF FORMALDEHYDE, NOTHING ABOUT ATTACKS.   THE

12  RECORDS HERE, THERE IS NOTHING ABOUT ANY HOSPITAL VISITS, NOTHING

13  ABOUT ATTACKS.

14  A.   OKAY.

15  Q.   GOES TO SEE DR. BARNES, HYPOTHETICALLY, OCTOBER 4, 2007, FOR

16  SINUSES AND REFILLED AN INHALER FOR THE FIRST TIME.

17  A.   OKAY.

18  Q.   THEN GOES TO THE EMERGENCY ROOM, DECEMBER 4, 2007.   I THINK

19  THIS IS ONE OF THE RECORDS YOU HAD.   LAST EPISODE OF WHEEZING WAS

20  ONE YEAR AGO.

21        THIS WHOLE BLUE SECTION IS THE TIME HE'S IN THE

22  TRAILER.

23  A.   OKAY.

24  Q.   THEN HE COMES -- BECOMES A PLAINTIFF ON FEBRUARY 15, 2008.

25  FTCA FORM WAS FILLED OUT.   SEES DR. BARNES SEPTEMBER 17, 2008,

1   FOR ALLERGIC CONJUNCTIVITIS, NO MENTION OF ASTHMA, NO MENTION OF

2   FORMALDEHYDE.

3           THE COURT:  SEPTEMBER OR APRIL?

4           MR. GLASS:  I'M SORRY, APRIL.  I APOLOGIZE.

5                           EXAMINATION

6   BY MR. GLASS:

7   Q.   THEN WE'RE BACK TO MARCH 30, 2009.  HE'S BACK IN SCHOOL,

8   FILLS OUT ANOTHER FORM, SAYS WEATHER FOR ASTHMA TRIGGERS.

9   APRIL 6, 2009, CHRIS COOPER IS CHOSEN TO BE A TRIAL PLAINTIFF

10  HERE TODAY.

11          NOW, WITHIN A FEW WEEKS AFTER THAT, APRIL 24, 2009,

12  EARLIER THIS YEAR, DR. BARNES IS SEEN FOR ALLERGIC ASTHMA FOR THE

13  FIRST TIME, AND FOR THE FIRST TIME FORMALDEHYDE IS EVER MENTIONED

14  IN MEDICAL RECORDS FOR CHRIS COOPER.

15          NOW, I WANT YOU TO TAKE THAT HYPOTHETICAL.

16  A.   ALL RIGHT.

17  Q.   AND I WANT TO ASK YOU, FIRST OFF, IS THAT CONSISTENT WITH AN

18  INCREASE IN THE ASTHMA ATTACKS DURING THE TIME HE LIVED IN THE

19  TRAILER, THIS LITTLE BLUE TIME?

20  A.   NO, THAT DOESN'T LIST ALL OF THE THINGS THAT THE CHILD

21  DESCRIBED.

22  Q.   SO IF THE EVIDENCE SHOWS THIS, ALL YOU HAVE TO GO ON IS THE

23  SUBJECTIVE INFORMATION PROVIDED BY CHRIS; YOU HAVE NO MEDICAL

24  RECORDS TO SUPPORT THAT THERE WAS AN INCREASE IN ASTHMA WHILE IN

25  THE TRAILER?

1    A.    THAT'S CORRECT.  BUT I WASN'T FOCUSING ON ASTHMA AS MUCH AS

2    I WAS ON ANXIETY AND WORRY AND DISTRESS.

3    Q.    I UNDERSTAND, BUT YOU'VE ALREADY TOLD ME --

4    A.    OH, OKAY.

5    Q.    -- THAT THAT'S TIED TO THE ASTHMA.

6    A.    WELL, YEAH, BUT WHAT I WAS TRYING TO SAY IS IT'S NOT TIED TO

7    A SPECIFIC ATTACK.  IT'S A WORRY AND DISTRESS THAT IT'S GOING TO

8    HAPPEN AGAIN THAT IS IN THE MIND OF THE CHILD.

9    Q.    WHICH PREDATED HURRICANE KATRINA?

10   A.    WELL, IT HAS BEEN GOING ON FOR YEARS WITH HIM.  THAT'S

11   RIGHT.

12   Q.    THE SECOND POINT I'D LIKE TO MAKE BASED ON THIS HYPOTHETICAL

13   IS, EVEN IF THERE WERE AN INCREASE IN ASTHMA ATTACKS, CAN YOU

14   EXCLUDE THE POSSIBILITY THAT IT'S RELATED TO LITIGATION -- I

15   THINK I JUST LOST MY -- THERE IT IS -- RELATED TO LITIGATION

16   BASED ON THE FACT THAT THE FIRST TIME IT'S MENTIONED FROM ALL

17   THIS HISTORY IS JUST WEEKS AFTER THEY'RE SELECTED AS TRIAL

18   PLAINTIFFS?

19   A.    WELL, THE CHILD IS NOT -- WAS NOT -- I WASN'T FOCUSING ON

20   LITIGATION WITH HIM.  HE DOESN'T HAVE -- HE DIDN'T COME IN AND

21   TALK ABOUT THE LITIGATION.  HE'S TALKING ABOUT HIS EXPERIENCES

22   WITH BREATHING AND WHAT HE WORRIES ABOUT AND WHAT CREATES

23   ANXIETY.

24   Q.    YOU TOLD MR. MEUNIER YOU HAD TO AT LEAST BE AWARE OF THE

25   FACT THAT PATIENTS CAN BE IN LITIGATION BECAUSE THAT CAN

1  INFLUENCE THE INFORMATION YOU'RE GETTING, CORRECT?

2  A.    YEAH, YOU ARE WITH ADULTS, BUT -- AND WHEN THAT OCCURS, IN

3  YOUR EXAMINATION, YOU NEED TO FIND OUT WHAT'S UNDERNEATH IT.  ARE

4  THERE ISSUES OF EXAGGERATION OR FAKING AND THINGS LIKE THAT

5        I WOULD EXPECT, IF IT WAS RELATED TO LITIGATION, THE

6  TWO OF THEM, THE MOTHER AND THE SON, WOULD HAVE GIVEN ME A LOT

7  MORE COMPLAINTS ABOUT SYMPTOMS.  I MEAN, I FOUND HER TO BE

8  WITHOUT PROBLEMS.  AND IF SOMEBODY IS GOING TO COME IN LITIGATION

9  DRIVEN, YOU EXPECT THEM TO COMPLAIN ABOUT A TON OF PROBLEMS.

10 Q.    I'LL GET BACK TO ALANA IN A SECOND.  I APPRECIATE YOU

11 POINTING OUT THAT SHE HAD NO PROBLEMS.

12        FOR THE SECOND POSSIBILITY, I WANT TO GIVE YOU A LITTLE

13 BIT OF A DIFFERENT PIECE OF INFORMATION.  ASSUME FOR ME THAT

14 CHRIS WAS SUPPOSED TO BE ON STEROID MEDICATION DURING THE TIME

15 THAT HE WAS IN THE TRAILER, THIS PERIOD RIGHT HERE; THAT HE'S

16 SUBOPTIMALLY TREATED BECAUSE HE'S NOT ON STEROID MEDICATION; CAN

17 YOU RULE OUT THE POSSIBILITY THAT HIS INCREASE IN ASTHMA WAS FROM

18 THAT SUBOPTIMAL TREATMENT, RATHER THAN SOMETHING TIED TO THE

19 TRAILER?

20 A.    YOU'RE ASKING THE WRONG DOCTOR.

21        MR. GLASS:  I'LL WITHDRAW THE QUESTION.

22        MR. MEUNIER:  YOUR HONOR, AGAIN, HE'S ASKING THE WRONG

23 WITNESS.

24        MR. GLASS:  I'LL WITHDRAW THAT QUESTION.

25        THE COURT:  I AGREE.  I THINK THE DOCTOR'S EXPERTISE IS

1  CLEARLY DELINEATED.  I THINK WE'VE ASKED HIM ABOUT AS MUCH AS WE

2  CAN RELATIVE TO THE MEDICINE.

3                              EXAMINATION

4  BY MR. GLASS:

5  Q.   YOU JUST TOLD ME ABOUT MS. ALEXANDER, THAT YOU EXAMINED HER

6  AND YOU DIDN'T THINK SHE HAD ANY PROBLEM, CORRECT?

7  A.   WELL, SHE HAS SOME WORRY AND DISTRESS, BUT BASICALLY SHE'S

8  PSYCHOLOGICALLY HEALTHY.

9  Q.   BASED UPON THE EXAMINATION OF CHRISTOPHER AND HIS MOM, DID

10 YOU BASICALLY CONCLUDE THAT THESE GUYS ARE -- I'M SORRY, I DON'T

11 WANT YOU TO TELL ME WHETHER THEIR MENTAL CONDITION IS OKAY.  DID

12 YOU DETERMINE THAT MS. ALEXANDER AND CHRISTOPHER COOPER WERE

13 ESSENTIALLY NORMAL, HEALTHY INDIVIDUALS, MENTALLY?

14 A.   WELL, MS. ALEXANDER DIDN'T HAVE ANY DIAGNOSABLE CONDITION,

15 AND HER TESTING WAS WITHIN NORMAL LIMITS.  THERE WAS NO

16 INDICATION OF EXAGGERATION OR FAKING.

17          AND THE CHILD HAS BASICALLY A HEALTHY PERSONALITY, BUT

18 DOES HAVE THIS POCKET OF ANXIETY THAT REOCCURS AROUND ISSUES OF

19 BREATHING.

20          MR. GLASS:  NO FURTHER QUESTIONS, YOUR HONOR.  I THANK

21 YOU VERY MUCH, DR. SHWERY.

22          THE COURT:  THANK YOU, MR. GLASS.  MR. SHERBURNE.

23          MR. SHERBURNE:  JUST A FEW, YOUR HONOR.

24                          CROSS-EXAMINATION

25 BY MR. SHERBURNE:

1    Q.    MORNING, DR. SHWERY.  GOOD TO SEE YOU AGAIN.

2    A.    GOOD MORNING.

3    Q.    IT HAS BEEN SAID BY SOME PEOPLE THAT WE ARE A PRODUCT OF OUR

4    EXPERIENCES AND OUR GENES; IS THAT GENERALLY CORRECT?

5    A.    YEAH, I THINK SO.

6    Q.    AND I KNOW THAT SOME PROFESSIONALS SUGGEST THAT WE'RE MORE A

7    PRODUCT OF OUR GENES AND SOME MORE OF PRODUCT OF YOUR

8    EXPERIENCES.  ARE YOU ON THE EXPERIENCE OR GENETIC SIDE OF THAT?

9    A.    I'M NOT A BIOLOGIST, SO I WOULD LEAN TOWARD EXPERIENCE; BUT,

10   WHO KNOWS.  NATURE/NURTURE.

11   Q.    AND YOU HAVE SOME PERSONAL EXPERIENCES YOURSELF DEALING WITH

12   THE STRESS OF CHILDREN AND ASTHMA; DO YOU NOT?

13   A.    BOTH PROFESSIONAL AND PERSONAL, YES.

14   Q.    AND I DON'T WANT TO DELVE INTO YOUR PERSONAL EXPERIENCES TOO

15   FAR, BUT YOU HAVE A SON WHO HAD ASTHMA; IS THAT NOT CORRECT?

16   A.    YES.

17   Q.    AND YOU HAVE EXPERIENCE OF DEALING WITH YOUR CHILD WHEN HE

18   GETS DISTRESSED WITH ASTHMA AND HAS TO GO TO THE EMERGENCY ROOM

19   IN THE MIDDLE OF THE NIGHT FOR INJECTIONS AND TREATMENT, CORRECT?

20   A.    WELL, IT'S PAST TENSE.  HE'S 28 YEARS OLD, AND HE STILL HAS

21   ASTHMA AND USES PUFFERS.  BUT WHEN HE WAS A CHILD, WHEN THINGS

22   BUILT UP AND THE PUFFERS DIDN'T WORK, THEN YOU'D END UP IN THE

23   EMERGENCY ROOM.

24   Q.    AND DEALING WITH THAT WITH YOUR CHILD, WOULD YOU -- WOULD IT

25   BE FAIR TO SAY THAT IT CAUSED ASTHMA AND ITS CAUSES TO BECOME AN

1   INTEREST OF YOURS?

2   A.   OH, YES.   I READ EXTENSIVELY ABOUT THE PROBLEMS.

3   Q.   READ LEARNED JOURNALS OR *TIME* AND *NEWSWEEK*?

4   A.   LEARNED JOURNALS AND BOOKS.   THERE WASN'T A LOT IN *NEWSWEEK*

5   ABOUT ASTHMA.

6   Q.   JUST WANTED TO GET CLEAR WHERE YOU WERE GETTING THAT

7   INFORMATION FROM.

8   A.   OKAY.

9   Q.   DR. SHWERY, WOULD IT BE FAIR TO SAY THAT YOUR EXPERIENCES

10   AND INTERESTS DEALING WITH YOUR SON'S PROBLEMS, DID THEY INFORM

11   OR COLOR YOUR VIEW OF CHRIS COOPER AND HIS TREATMENT AND

12   PROBLEMS?

13   A.   ONLY IN THE SENSE THAT I HAVE MORE EXPERIENCE WITH IT THAN

14   IF I WERE TO SEE SOMEBODY WITH A CONDITION THAT I HAD NEVER DEALT

15   WITH BEFORE.

16   Q.   AND THAT EXPERIENCE AND STUDY YOU'VE ENGAGED IN HAS GIVEN

17   YOU SOME THOUGHTS ABOUT ASTHMA AND ITS TREATMENT?

18   A.   I DIDN'T UNDERSTAND THE QUESTION.

19   Q.   THAT EXPERIENCE WITH YOUR SON HAS GIVEN YOU SOME THOUGHTS

20   ABOUT CONTROLLING ASTHMA; HAS IT NOT?

21   A.   OH, YES.   AND I HAVE SUGGESTIONS FOR PARENTS ON HOW TO

22   BETTER DEAL WITH THE PROBLEM.

23   Q.   LIKE KEEPING THE DUST DOWN IN THE HOUSE, DIET, LACK OF

24   CARPETING, PUTTING PLASTIC SHEETS AROUND THE BED --

25   A.   THAT'S RIGHT.

1   Q.   -- CONTROLLING FATIGUE OF THE CHILD, THOSE KINDS OF THINGS?

2   A.   THAT'S RIGHT.  AND BEING ATTUNED TO THE DISTRESS OR THE

3   BREATHING.  A LOT OF ENVIRONMENTAL THINGS THAT PEOPLE CAN PROFIT

4   FROM KNOWING ABOUT.

5   Q.   I APPRECIATE IT, DOCTOR.  AND, IN FACT, YOU FREQUENTLY

6   DISCUSS THOSE THINGS WITH YOUR PATIENTS THAT YOU ARE TREATING FOR

7   ANXIETY OR OTHER PROBLEMS THAT HAVE ASTHMA?

8   A.   WELL, IF THEY HAVE A BREATHING CONDITION, I WOULD CERTAINLY

9   DO THAT, REFER THEM BACK TO THEIR MEDICAL DOCTOR FOR MORE

10  INFORMATION ABOUT IT, ENCOURAGE THEM TO GET INVOLVED IN COMMUNITY

11  SUPPORT GROUPS AND THINGS LIKE THAT, TO LEARN MORE ABOUT THE

12  DISEASE.

13  Q.   DID YOU MAKE THOSE RECOMMENDATIONS TO MS. ALEXANDER?

14  A.   YES.

15  Q.   DOCTOR, DID YOU REVIEW THE MEDICAL RECORDS FROM DR. PACHECO

16  AT NATIONAL JEWISH HOSPITAL IN DENVER?

17  A.   YES.

18  Q.   DID YOU PARTICULARLY SEE HER REPORT WHERE SHE DISCUSSES

19  WHETHER MR. COOPER'S TREATMENT WAS SUBOPTIMAL?

20  A.   I SAW THAT, YES.

21  Q.   AND YET YOU DID NOT FACTOR THAT REPORT IN TO YOUR VIEW OF

22  HIS ANXIETY AND THE CAUSES OF IT?

23  A.   WELL, LIKE I SAID, YOU'RE GETTING INTO MEDICAL ISSUES OF

24  WHETHER IT WAS TREATED APPROPRIATELY BY THE MEDICAL DOCTOR.  I

25  DON'T REALLY HAVE ANY OPINION ON THAT.  WHAT I'M DEALING WITH IS

1  TRYING TO UNDERSTAND WHAT'S IN HIS MIND, AND THAT'S THE FOCUS

2  THAT I TOOK.

3         MR. SHERBURNE:  THANK YOU, DOCTOR.  THAT'S ALL THE

4  QUESTIONS I HAVE.

5         THE COURT:  THANK YOU, MR. SHERBURNE.  REDIRECT.

6         MR. MEUNIER:  JUST TWO, TWO QUICK FOLLOW-UP QUESTIONS.

7                    REDIRECT EXAMINATION

8  BY MR. MEUNIER:

9  Q.   DR. SHWERY, DO YOU BELIEVE THAT YOUR EXPERIENCE AS A PARENT

10  WITH A SON WHO HAD ASTHMA GIVES YOU GREATER INSIGHT AND ABILITY

11  TO DIAGNOSE ANXIETY IN CASES ASSOCIATED WITH CHILDHOOD ASTHMA?

12  A.   WELL, IT HELPS ME UNDERSTAND IT BETTER, BUT THE CAPACITY OR

13  COMPETENCE TO DIAGNOSE IT WOULD NOT BE BASED ON MY EXPERIENCES

14  WITH MY CHILD.  IT WOULD BE BASED ON MY TRAINING AS A

15  PSYCHOLOGIST.

16  Q.   JUST TO CORRECT THE RECORD, THIS IS NOT AN EXHIBIT.  THIS

17  WAS A DEMONSTRATIVE AID USED IN OPENING STATEMENT BY THE

18  DEFENDANT LAWYERS, JUST SO YOU KNOW THAT.

19  A.   I'M SORRY, I DIDN'T --

20  Q.   THIS IS NOT AN EXHIBIT.  THIS IS A DEMONSTRATIVE AID THAT

21  THE LAWYERS CREATED THAT THEY USED IN OPENING STATEMENT, I THINK.

22  A.   OH.

23  Q.   COUNSEL MAY HAVE REFERRED TO IT AS BEING AN EXHIBIT.

24         IN THE SHADED AREA --

25  A.   THE BLUE AREA, OKAY.

1  Q.   -- THAT'S WHEN CHRIS LIVED IN THE TRAILER?

2  A.   YES.

3  Q.   WHEN CHRIS REPORTED TO YOU THAT HIS EXPERIENCE WAS THAT HIS

4  ASTHMA WORSENED WHEN HE WAS LIVING IN THAT BLUE SHADED AREA --

5  A.   OKAY.

6  Q.   -- DID YOU CONSIDER HIM TO BE RELIABLE AND AUTHENTIC?

7  A.   WELL, YES.  HE HAD LOTS OF DETAIL AND LOTS OF INFORMATION.

8  Q.   DID HE GIVE YOU THAT INFORMATION ANSWERING ANY LEADING

9  QUESTIONS BY YOU?

10  A.   NO.

11  Q.   DOES ANYTHING ABOUT THIS TIMELINE CREATED BY THE DEFENDANTS

12  AND THE FACTS THEY PUT UP THERE ABOUT HIRING LAWYERS CHANGE YOUR

13  PROFESSIONAL CONCLUSION THAT CHRIS COOPER ACTUALLY EXPERIENCED A

14  WORSENING OF HIS ASTHMA DURING THE TIME HE LIVED IN THAT TRAILER?

15  A.   WELL, YEAH, THAT'S WHAT I FOUND IN MY EXAMINATION.  THAT WAS

16  HIS EXPERIENCE AND HIS RECOLLECTION AND THE THINGS THAT ARE GOING

17  ON IN HIS MIND.  IT DOESN'T HAVE ANYTHING TO DO WITH THE CHART.

18  Q.   AND HE HAS SUFFERED ANXIETY BECAUSE OF IT --

19  A.   YES.

20  Q.   -- AND NEEDS TREATMENT?

21  A.   YES.

22        MR. MEUNIER:  THANK YOU, SIR.

23        THE COURT:  THANK YOU, DOCTOR.  YOU CAN STEP DOWN.

24  THANK YOU FOR YOUR TIME.

25            ALL RIGHT.  IT'S ALMOST TEN AFTER 10:00.  WE'LL GO

1  AHEAD AND TAKE A VERY SHORT MIDMORNING BREAK, AND THEN WE'LL COME

2  BACK AND RESUME.  WHO DO WE HAVE NEXT?

3          MR. HILLIARD:  WE HAVE DAVID MOORE, YOUR HONOR.

4          THE COURT:  AN EXPERT?

5          MR. HILLIARD:  YES, SIR.

6          THE COURT:  LET'S GO AHEAD AND TAKE TEN-MINUTE BREAK,

7  AND WE'LL START AT 10:20.

8          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

9  PANEL LEAVES THE COURTROOM, AND THEN A BRIEF RECESS WAS TAKEN.)

10          THE DEPUTY CLERK:  ALL RISE.

11          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

12  PANEL ENTERS THE COURTROOM.)

13          THE COURT:  YOU MAY BE SEATED.

14          MR. HILLIARD:  YOUR HONOR, WE'D CALL CHARLES DAVID MOORE

15  TO THE STAND.

16          THE DEPUTY CLERK:  PLEASE RAISE YOUR RIGHT HAND.  DO YOU

17  SOLEMNLY SWEAR THE TESTIMONY YOU ARE ABOUT TO GIVE WILL BE THE

18  TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU

19  GOD?

20          THE WITNESS:  I DO.

21                          **CHARLES DAVID MOORE**

22  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

23  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

24          THE DEPUTY CLERK:  THANK YOU.  YOU MAY BE SEATED.

25  PLEASE STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

1          THE WITNESS:  CHARLES DAVID MOORE.  C-H-A-R-L-E-S,

2   SECOND NAME DAVID, D-A-V-I-D, LAST NAME MOORE, M-O-O-R-E.

3          MR. HILLIARD:  YOUR HONOR, WE WOULD TENDER

4   CHARLES DAVID MOORE AS A LICENSED PROFESSIONAL ENGINEER FOR THE

5   STATE OF LOUISIANA.

6          THE COURT:  DO WE HAVE A STIPULATION OR WOULD YOU LIKE

7   TO QUESTION THIS WITNESS ABOUT HIS EXPERTISE?

8          MR. PENOT:  NO OBJECTION.  WE'LL ACCEPT HIM AS AN

9   ENGINEER.

10         THE COURT:  WHAT ABOUT GULF STREAM?

11         MR. WEINSTOCK:  NO OBJECTION.

12         THE COURT:  LET'S BE CLEAR NOW, HE'S BEING TENDERED AS

13   AN EXPERT IN WHAT FIELD HERE?

14         MR. HILLIARD:  HE'S A CIVIL ENGINEER.

15              MAY I PROCEED?

16         THE COURT:  YES, PLEASE.

17                      DIRECT EXAMINATION

18   BY MR. HILLIARD:

19   Q.   WOULD YOU INTRODUCE YOURSELF TO THE JURY, PLEASE, SIR.

20   A.   I'M CHARLES DAVID MOORE, OWNER OF AN ENGINEERING COMPANY IN

21   NEW IBERIA, LOUISIANA.

22   Q.   YOU ARE A LICENSED PROFESSIONAL ENGINEER WITH THE STATE OF

23   LOUISIANA?

24   A.   YES, SIR.

25   Q.   IS THAT YOUR SEAL?

1   A.   YES, SIR, IT IS.

2   Q.   LICENSE NUMBER 24627?

3   A.   THAT'S CORRECT.

4   Q.   YOU ARE ALSO AN OWNER OF -- PRONOUNCE THAT FOR ME.

5   A.   FREYOU.   FREYOU, MOORE AND ASSOCIATES.

6   Q.   NOW, AS I UNDERSTAND IT, YOU WENT THERE INITIALLY AS AN

7   EMPLOYEE?

8   A.   THAT'S CORRECT.

9   Q.   CAN YOU EXPLAIN TO THE JURY HOW YOU MOVED UP THE FOOD CHAIN

10  TO WHERE YOU ARE NOW THE OWNER OF THE COMPANY?

11  A.   I BEGAN WORK THERE IN 1990 AS A PROJECT ENGINEER.  I WORKED

12  FOR MR. FREYOU.  SIMON FREYOU WAS THE OWNER OF THE COMPANY AT

13  THAT TIME.  I WORKED FOR HIM AS A PROJECT ENGINEER FOR SEVERAL

14  YEARS AND BECAME A PARTNER WITH HIM IN THE EARLY 2000S.

15           HE THEN WENT TO RETIRE IN 2004.  WE BEGAN THE PROCESS A

16  COUPLE YEARS BEFORE THAT; BUT, IN 2004, HE ACTUALLY RETIRED, AND

17  I BOUGHT THE COMPANY FROM HIM.

18  Q.   AND HOW LONG HAVE YOU OWNED THE COMPANY?

19  A.   SINCE 2004, JANUARY 2004.

20  Q.   YOU OBTAINED YOUR DEGREE WHEN AND WHERE?

21  A.   I OBTAINED MY DEGREE FROM THE UNIVERSITY OF KENTUCKY IN

22  1982.

23  Q.   IN WHAT?

24  A.   BACHELOR OF SCIENCE IN CIVIL ENGINEERING.

25  Q.   FROM WILDCATS TO TIGERS.

1  A.   THAT'S CORRECT.

2  Q.   LET ME ASK YOU A QUESTION.  YOU HAVE, AS I UNDERSTAND IT, AN

3  OPINION BASED ON REASONABLE ENGINEERING PROBABILITY AS TO WHETHER

4  THE STRUCTURE OF THE ALEXANDER TRAILER WAS DAMAGED DURING THE

5  JACKING OF THAT TRAILER WHEN IT WAS PUT ON DALE STREET ON

6  FEBRUARY 17, 2006, CORRECT?

7  A.   THAT'S CORRECT.

8  Q.   BEFORE I ASK YOU WHAT THAT OPINION IS, I WANT TO GO THROUGH

9  WITH YOU THE FOUNDATION FOR YOUR OPINION, WHAT YOU LOOKED AT,

10 WHAT YOU DID, WHAT YOU CONSIDERED, AND HOW YOU FINALLY CAME TO

11 THAT OPINION.  OKAY?

12 A.   OKAY.

13 Q.   LET'S TAKE A LOOK -- CAN YOU BACK UP -- OH, IT'S ME, RIGHT?

14 I CONTROL THIS ONE.

15      ALL RIGHT.  SO A SUMMARY OF WHAT YOU DID, AND WE'RE

16 GOING TO GO THROUGH IT IN DETAIL, BUT A SUMMARY TO START THIS

17 TESTIMONY IS YOU TOOK A DESCRIPTION OF THE STRUCTURE --

18 A.   YES.

19 Q.   -- CORRECT?

20 A.   THAT'S CORRECT.

21 Q.   YOU TOOK A HISTORY OF THE TRAILER --

22 A.   YES.

23 Q.   -- FROM THE TIME IT WAS MANUFACTURED TO THE TIME IT ENDED UP

24 ON DALE STREET?

25 A.   YES.

1   Q.   YOU CONSIDERED THE FOLLOWING DATA IN FORMULATING YOUR

2   OPINIONS:   DRAWINGS, PHOTOGRAPHS, TECHNICAL DOCUMENTS AND SOME

3   GENERAL ENGINEERING MANUALS; IS THAT CORRECT?

4   A.   THAT'S CORRECT.

5   Q.   YOU ALSO DID A SITE VISIT OUT TO LOTTIE, WHERE THAT TRAILER

6   WAS ULTIMATELY STORED BY FEMA, CORRECT?

7   A.   THAT'S CORRECT.

8   Q.   YOU DID AN ANALYSIS CALLED A LOAD COMPUTATION ANALYSIS?

9   A.   YES, SIR.

10  Q.   AND YOU WERE IN THE COURTROOM YESTERDAY, AND YOU HEARD THE

11  TESTIMONY OF DARRYL LEMIEUX IN REGARDS TO HOW HE ACTUALLY JACKED

12  THIS TRAILER UP?

13  A.   YES, SIR.

14  Q.   YOU ALSO HEARD THE TESTIMONY OF SHIRLEY ALEXANDER IN REGARDS

15  TO WHAT SHE OBSERVED IN REGARDS TO HOW THIS TRAILER WAS JACKED

16  UP, RIGHT?

17  A.   YES, SIR.

18  Q.   THE DESCRIPTION OF THE STRUCTURE, HOW BIG IS THIS TRAILER?

19  A.   IT'S EIGHT-FOOT WIDE AND APPROXIMATELY 28-FOOT LONG.   IT'S A

20  LITTLE LONGER THAN THAT.   28-FOOT, FOUR INCHES.

21  Q.   SO TO GIVE IT SOME PERSPECTIVE, IF THIS JURY BOX IS THE

22  TRAILER, WOULD THE TRAILER FIT INSIDE THIS JURY BOX?

23  A.   THE TRAILER IS PROBABLY JUST A TOUCH LONGER THAN THAT AND

24  MAYBE JUST A TOUCH NARROWER THAN THAT.

25  Q.   SO MAYBE TO HERE?

1   A.   THAT'S CORRECT.

2   Q.   BUT A LITTLE NARROWER, PERHAPS?

3   A.   PERHAPS, YES.

4   Q.   AND SO INSIDE THIS JURY BOX, IF IT WAS THE TRAILER, YOU

5   WOULD HAVE A LAYOUT, A FLOOR PLAN, CORRECT?

6   A.   THAT'S CORRECT.

7   Q.   AND THIS FLOOR PLAN --

8        MR. HILLIARD:  THIS IS 101, GUYS.

9                       EXAMINATION

10  BY MR. HILLIARD:

11  Q.   THIS FLOOR PLAN IS ON THE FAR END OF THE TRAILER, YOU HAVE

12  THE KIDS' BUNK BEDS; YOU SEE THAT?

13  A.   OKAY.

14  Q.   AND THEN RIGHT NEXT TO THE BUNK BEDS, YOU HAVE THE TUB AND

15  THE BATHROOM?

16  A.   CORRECT.

17  Q.   AND THEN ON THE OTHER END OF THE TRAILER, YOU HAVE ALANA'S

18  BEDROOM DOWN HERE, RIGHT?

19  A.   CORRECT.

20  Q.   SO INSIDE THIS BOX IS WHERE A FAMILY OF THREE LIVED FOR

21  17 MONTHS?

22  A.   YES.

23  Q.   CHARLIE HAS BEEN KIND ENOUGH TO LET ME USE AN EXHIBIT THAT

24  HE PREPARED SO THAT WE CAN TALK ABOUT WHERE THAT TRAILER WAS BORN

25  AND WHERE IT TRAVELED TO PRIOR TO COMING TO DALE STREET.

1    A.    OKAY.

2        THE COURT:  CAN EVERYBODY SEE THAT IN THE JURY BOX?  CAN

3    YOU SEE THAT ALL RIGHT, TOO?

4        THE WITNESS:  YES.

5                            EXAMINATION

6    BY MR. HILLIARD:

7    Q.    NOW, IN COMING TO AN OPINION IN REGARDS TO THE STRUCTURAL

8    DAMAGE THAT OCCURRED TO THE TRAILER DURING THE JACKING BY

9    MR. LEMIEUX OF THE TRAILER ON FEBRUARY 17, 2006, ON DALE STREET,

10   YOU TOOK INTO ACCOUNT EVERYWHERE THE TRAILER HAD BEEN?

11   A.    YES.  I WASN'T REALLY AWARE OF THE PENSACOLA LOCATION THERE;

12   BUT, OTHER THAN THAT, I THINK EVERYTHING ELSE IS COVERED IN THE

13   DOCUMENTS THAT I'VE SEEN.

14   Q.    SO THE TRAILER WAS BUILT DECEMBER 13, '04, RIGHT?

15   A.    CORRECT.

16   Q.    NOW, LET ME ASK YOU THIS:  CAN YOU EXPLAIN TO THE JURY IF,

17   WHEN THIS TRAILER WAS BORN, IT WAS BORN TO BE A FEMA TRAILER, IF

18   YOU KNOW?

19   A.    FROM THE DOCUMENTS I SAW, IT WAS CREATED UNDER THE FEMA

20   SPECIFICATIONS AND CREATED SPECIFICALLY FOR FEMA TO USE AS

21   HOUSING UNITS.

22   Q.    HOUSING UNITS FROM PLACE TO PLACE FROM TIME TO TIME?

23   A.    CORRECT.

24   Q.    DID YOU REVIEW ANY DOCUMENTS THAT INDICATED TO YOU THAT THIS

25   TRAILER WAS EVER USED, EVER LIVED IN, EVER JACKED AND BLOCKED

1   BEFORE IT CAME TO DALE STREET?

2   A.   I DID NOT SEE ANYTHING LIKE THAT, NO.

3   Q.   THE ONLY DOCUMENTS THAT INDICATE THIS TRAILER WAS EVER

4   JACKED AND BLOCKED ARE THE DOCUMENTS THAT SHOW IT WAS JACKED AND

5   BLOCKED ON DALE STREET FOR ALANA ALEXANDER ON FEBRUARY 17, 2000

6   AND WHAT?

7   A.   2005, I BELIEVE.  NO, 2006 IS WHEN IT WAS -- WHEN IT WAS

8   JACKED UP AND BLOCKED ORIGINALLY BACK HERE.

9   Q.   JANUARY 17, 2006.  SO BRIEFLY, AND WE'LL MOVE ON.  WENT TO

10  FLORIDA.  CAN YOU SEE THIS?  WENT TO FLORIDA, STAYED IN FLORIDA,

11  WENT TO GEORGIA, WENT TO LOUISIANA, BATON ROUGE, UP TO TAFT, BACK

12  TO BATON ROUGE; AND, FROM BATON ROUGE DOWN TO SIX FLAGS STAGING

13  AREA IN NEW ORLEANS IS WHEN FLUOR HOOKED IT UP AND HAULED IT FOR

14  THE FIRST TIME?

15  A.   THAT'S MY UNDERSTANDING.

16  Q.   ARE THERE ANY DOCUMENTS THAT YOU HAVE REVIEWED THAT SHOWS

17  THERE IS ANY DAMAGE TO THIS TRAILER PRIOR TO THE TIME THAT THE

18  FLUOR TRUCK HOOKED IT UP IN BATON ROUGE AND HAULED IT TO THE

19  NEW ORLEANS SIX FLAGS STAGING AREA?

20  A.   NONE OF THE DOCUMENTS INDICATE ANY DAMAGE LIKE THAT.

21  Q.   ONCE FLUOR GOT AHOLD OF THIS TRAILER AND TOOK IT DOWN TO THE

22  NEW ORLEANS SIX FLAGS STAGING AREA, ARE THERE DOCUMENTS THAT

23  INDICATE WHETHER OR NOT THERE WAS DAMAGE TO THE TRAILER?

24  A.   THERE WAS AN INSPECTION REPORT DATED JANUARY 14TH, WHICH

25  WOULD HAVE BEEN A COUPLE OF DAYS AFTER IT GOT TO SIX FLAGS, THAT

1   HAS SOME COMMENTS ON THERE.

2   Q.   AND DO THOSE COMMENTS INDICATE THAT THERE IS DAMAGE TO THE

3   TRAILER?

4   A.   IT HAS A COMMENT THAT SAYS, "WALL IN BEDROOM."

5   Q.   SORRY?

6   A.   IT JUST SAYS, "WALL IN BEDROOM."

7   Q.   AND HAVE YOU LOOKED AT ANY DEPOSITIONS OR LOOKED AT ANY

8   OTHER DOCUMENTS THAT WOULD ALLOW YOU TO UNDERSTAND WHAT THE

9   COMMENT "WALL IN BEDROOM" REFERRED TO?

10   A.   THE DOCUMENTS I'VE SEEN DON'T REALLY HAVE ANY OTHER

11   CLARIFICATION OF WHAT THAT WAS.

12   Q.   WHEN YOU WENT OUT TO LOTTIE TO LOOK AT THE TRAILER AS IT SAT

13   IN LOTTIE, WAS THERE ANYTHING DAMAGED TO THE WALL IN THE BEDROOM?

14   A.   THERE WAS DAMAGE TO ONE OF THE WALLS IN THE BEDROOM, YES.

15   Q.   WHICH WALL?

16   A.   IT WAS THE REAR WALL OF THE BEDROOM, IF I COULD -- THE

17   OPPOSITE SIDE FROM THE FRONT DOOR.

18   Q.   OPPOSITE OF THE FRONT DOOR?

19   A.   YES, SIR.

20   Q.   RIGHT THERE?

21   A.   YES.   THAT'S ACTUALLY ON THE BED, BUT ON THAT SIDE OF THE --

22   Q.   I CAN FIX THAT.

23   A.   RIGHT.

24   Q.   THERE WE GO.   SO THAT'S THE WALL THAT WAS DAMAGED.   OKAY.

25        WE THEN KNOW THAT WHILE ON DALE STREET IT WAS MOVED

1   ONCE AND THEN MOVED BACK.  YOU KNOW THAT, RIGHT?

2   A.   CORRECT.

3   Q.   AND THEN ONCE ALANA AND HER FAMILY MOVED OUT, IT WAS TAKEN

4   TO LOTTIE, WHERE IT IS STILL TODAY?

5   A.   PRESUMABLY, YES.

6   Q.   AND THERE ARE NO TOMBSTONES IN LOTTIE; THAT'S CHARLIE'S

7   INDICATION THAT THIS IS A GRAVEYARD FOR THESE FEMA TRAVEL

8   TRAILERS?

9   A.   CORRECT.

10   Q.   IT'S A HUGE YARD?

11   A.   HUGE.

12   Q.   NOW, THE DRAWINGS THAT YOU LOOKED AT, BRIEFLY SUMMARIZE WHAT

13   DRAWINGS YOU LOOKED AT.

14   A.   THERE WAS, DURING OUR INSPECTION, SOME PEOPLE THAT WENT

15   THROUGH TAKING DIMENSIONS AND NOTATING WHERE THINGS WERE, SO THAT

16   WE PRODUCED -- I SAY, "WE," I GUESS THE WHOLE TEAM OF INSPECTORS

17   THERE, THERE WAS A SET OF DRAWINGS THAT WAS PRODUCED THAT SHOWED

18   WHERE EVERYTHING WAS LOCATED, SIMILAR TO WHAT YOU HAVE SHOWN UP

19   HERE.

20        I DID SEE A FEW DRAWINGS FROM GULF STREAM, ALSO, THAT

21   WOULD BE INCLUDED WITH THAT.

22   Q.   YOU ALSO LOOKED AT PHOTOGRAPHS, PHOTOGRAPHS TAKEN DURING

23   YOUR ON-SITE INVESTIGATION AND PHOTOGRAPHS TAKEN OF THE TRAILER

24   AS IT WAS ON DALE STREET BEFORE IT WAS MOVED AND THEN AS IT WAS,

25   AGAIN, ON DALE STREET AFTER IT WAS MOVED BACK?

1   A.   ACTUALLY, THE -- WHEN I MADE MY REPORT, I ONLY HAD SEEN THE

2   PHOTOGRAPH AFTER IT WAS MOVED.

3   Q.   I'LL SHOW YOU TWO OF THEM.

4   A.   OKAY.

5   Q.   THIS IS THE PHOTOGRAPH OF THE TRAILER AS IT WAS SET UP BY

6   DARRYL LEMIEUX; IS THAT YOUR UNDERSTANDING?

7   A.   THAT'S MY UNDERSTANDING, YES.

8   Q.   THEN TO TEAR THE HOUSE DOWN, THEY MOVED THE TRAILER OUT, AND

9   THEN THEY BROUGHT THE TRAILER BACK IN AND SET IT UP?

10  A.   CORRECT.

11  Q.   YOU LOOKED AT TECHNICAL DOCUMENTS, GULF STREAM COACH'S

12  OWNERS MANUAL FOR TRAVEL TRAILERS AND FIFTH WHEELS FOR THIS

13  TRAILER?

14  A.   FOR THIS TRAILER, YES.

15  Q.   YOU LOOKED AT A DOCUMENT ENTITLED, EXHIBIT 7, TRAVEL TRAILER

16  INSTALLATION, THAT WAS PART OF THE FLUOR CONTRACT?

17  A.   THAT'S CORRECT.  YES.

18  Q.   YOU ALSO UTILIZED GENERAL ENGINEERING MANUALS ENTITLED, THE

19  MANUAL OF STEEL CONSTRUCTION --

20  A.   YES, SIR.

21  Q.   -- FROM THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION?

22       YOU LOOKED AT THE TIMBER CONSTRUCTION MANUAL FROM THE

23  AMERICAN INSTITUTE OF TIMBER CONSTRUCTION; IS THAT CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   AND ASCE 7-05, MINIMUM DESIGN LOADS FOR BUILDINGS AND OTHER

1  STRUCTURES?

2  A.   THAT'S CORRECT.

3  Q.   EXCERPTS FROM A HUD DOCUMENT CONCERNING SPECIFICATIONS FOR

4  MANUFACTURING HOUSING, PART 3280; YOU ALSO CONSULTED THAT?

5  A.   YES, SIR.

6  Q.   AND YOU DID THE SITE VISIT?

7  A.   YES, SIR.

8  Q.   IN LISTENING TO THE TESTIMONY OF DARRYL LEMIEUX YESTERDAY,

9  YOU SPECIFICALLY AND FIRSTHAND LEARNED HOW THIS TRAILER WAS

10  JACKED ON DALE STREET, CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   WOULD IT BE HELPFUL TO YOU IN EXPLAINING TO THE JURY THE

13  STRUCTURAL ISSUES THAT OCCURRED IN JACKING IT THE WAY

14  DARRYL LEMIEUX JACKED IT TO STEP DOWN AND DEMONSTRATE TO THEM

15  USING THIS MODEL WHAT OCCURS?

16          MR. HILLIARD:  AND WITH THE COURT'S PERMISSION, MAY HE?

17          THE COURT:  YES.

18          MR. HILLIARD:  MAY I COME AROUND THE FRONT, YOUR HONOR?

19          THE COURT:  SURE.

20                              EXAMINATION

21  BY MR. HILLIARD:

22  Q.   LET ME START WITH A QUESTION.  USING THESE CUPS JUST AS

23  EXAMPLES OF HOW THE TRAILER WAS LIFTED, CAN YOU SHOW THE JURY

24  WHAT YOU REMEMBER MR. LEMIEUX'S TESTIMONY TO BE IN REGARDS TO HOW

25  HE WAS JACKING THIS SIDE TO SIDE; AND, IN SHOWING THAT TO THE

1   JURY, EXPLAIN TO THEM WHAT HAPPENS TO THE STRUCTURE OF THIS

2   TRAILER, AS YOU UNDERSTAND THAT STRUCTURE TO BE, WHEN IT'S JACKED

3   THAT WAY.

4   A.   OKAY.

5         MR. PENOT:  OBJECTION, YOUR HONOR.  THAT'S NOT IN THE

6   REPORT.

7         THE COURT:  COUNSEL, WE'RE GOING TO STICK WITH THE

8   EXPERT REPORT THAT'S BEEN GIVEN.  HE'S GOING TO HAVE TO -- HIS

9   TESTIMONY IS GOING TO HAVE TO BE THAT WHICH IS REFLECTED IN HIS

10  EXPERT REPORT.

11        MR. HILLIARD:  THAT'S CORRECT.

12        THE COURT:  SO WE'RE NOT GOING TO GO BEYOND THAT, ARE

13  WE?

14        MR. HILLIARD:  HIS EXPERT REPORT SPEAKS SPECIFICALLY TO

15  THE JACKING THAT CAUSED THE DAMAGE TO THE TRAILER.

16        THE COURT:  WELL, I DON'T THINK THAT'S THE PART THAT

17  MR. PENOT IS COMPLAINING ABOUT.

18        MR. HILLIARD:  HIS EXPERT REPORT DOES NOT SPEAK TO

19  DARRYL LEMIEUX'S TESTIMONY BECAUSE DARRYL LEMIEUX'S TESTIMONY WAS

20  FOR THE FIRST TIME GIVEN IN FRONT OF THIS JURY.  NEVER DEPOSED.

21        THE COURT:  NO, BUT I DON'T THINK THAT'S WHAT -- WHY

22  DON'T Y'ALL APPROACH.

23        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

24  A CONFERENCE HELD AT THE BENCH.)

25        MR. PENOT:  YOUR HONOR, HERE IS WHAT THE REPORT SAYS.

1  AND I'VE GOT IT, AND I'LL GIVE IT TO YOU, BUT I KNOW YOU DON'T

2  HAVE TIME TO LOOK AT IT.

3           YOU KNOW, HE DEALS WITH DIFFERENTIAL MOVEMENT,

4  TALKS ABOUT TORSIONAL MOVEMENT, BUT HE DOES NOT DO WHAT BOB IS

5  ABOUT TO HAVE HIM DO, WHICH IS AS THIS MOVES HERE, NOW THIS IS

6  WHAT HAPPENS.  OKAY.  THERE IS NO LEVEL OF DETAIL LIKE THAT.

7           WHAT HE SAID IS, "WHAT I SEE IS CONSISTENT WITH

8  DIFFERENTIAL MOVEMENT OR TORSIONAL MOVEMENT OF THE TRAILER."  I'M

9  FINE TO HAVE HIM SAY THAT, BUT I DON'T KNOW WHAT HE'S GOING TO

10 SAY ABOUT, YOU KNOW, WELL, IF YOU LIFT HERE, IT DOES THIS TO THIS

11 BEAM AND THAT PART.  I DIDN'T HAVE MY EXPERT DEAL WITH THAT.

12          THE COURT:  LET ME SEE YOUR REPORT.  DO YOU HAVE HIS

13 REPORT?

14          MR. PENOT:  OH, THE REPORT.  OKAY.  I CAN GET YOU THE

15 REPORT.

16          THE COURT:  WAIT.  I HAVE MIGHT HAVE IT HERE.

17          MR. HILLIARD:  I HAVE IT REAL HANDY, JUDGE, IF YOU WANT

18 ME TO --

19          THE COURT:  YES.  WHY DON'T Y'ALL DO THAT.

20          MR. PENOT:  I COULD POINT OUT A FEW THINGS.

21          THE COURT:  LET ME START THEN WITH MR. HILLIARD.  WHERE

22 IN THE REPORT IS WHAT YOU WANT HIM TO TESTIFY TO HERE?

23          MR. HILLIARD:  THANK YOU, JUDGE.  JUDGE, IN 5.2, PAGE 6

24 OF THE REPORT, UNDER JACKING, THIS EXPERT STATES, "JACKING OF THE

25 TRAILER WOULD PROBABLY OCCUR WITHOUT THE UNIT FULLY LOADED;

1    HOWEVER, THE JACKS WOULD CAUSE A LARGE DIFFERENTIAL IN THE LOADS

2    APPLIED TO THE BEAMS IF THE PROCESS WERE DONE IMPROPERLY.  THIS

3    DANGER IS PROMINENTLY NOTED ON THE WARNING STICKERS ON EACH JACK,

4    AS DISCUSSED ABOVE.  IN ADDITION TO FRAME DAMAGE AND DOOR JAMB

5    DAMAGE, OTHER DAMAGE COULD ALSO OCCUR, INCLUDING DAMAGE TO THE

6    INTERIOR FINISHES.

7              "THE SEPARATION OF THE PANELING NOTED IN THE

8    BATHROOM AND BEDROOM AREAS ARE CONSISTENT WITH THE EFFECTS OF

9    UNEVEN MOVEMENT OF THE TRAILER THAT WOULD OCCUR WITH IMPROPER

10   JACKING TECHNIQUES."

11             I THINK THAT'S CONSISTENT WHAT I SAID.  IT'S VERY

12   GENERAL, HIGH LEVEL STUFF.

13             THE COURT:  WHY DON'T WE DO THIS.  I'LL LET HIM ANSWER

14   THE QUESTION, BUT DIRECT HIM TO THAT PARAGRAPH IN THE REPORT, AND

15   LET'S STICK TO THE REPORT.  LINK IT TO THE REPORT.

16             MR. HILLIARD:  I WILL, JUDGE.  AND I WANT TO BE SURE

17   THAT I'M CONSISTENT WITH HOW YOU SEE THIS GOING, SO I'M GOING TO

18   TELL YOU WHAT I'M PLANNING TO DO IN THE COURSE OF THIS.

19             DARRYL LEMIEUX'S TESTIMONY CONFIRMS THAT THERE WAS

20   UNEVEN JACKING THAT CAUSED STRUCTURAL DAMAGE, PARDON ME, WHICH HE

21   REPORTED IN HIS REPORT.  I'LL ADMIT EVERY DAY OF THE WEEK THAT HE

22   DID NOT HAVE DARRYL LEMIEUX'S TESTIMONY; BUT, THE TESTIMONY HE

23   HEARD IS CONSISTENT WITH THE OPINION HE ALREADY HAD AND SUPPORTS

24   THE OPINION.

25             THERE ARE TWO CASES ON POINT THAT ALLOWS HIM TO USE

1   TESTIMONY AT THE TIME OF TRIAL.

2            THE COURT:  HE CAN'T OFFER A NEW OPINION.

3            MR. HILLIARD:  IT'S NOT A NEW OPINION.

4            THE COURT:  THAT'S RIGHT.

5            MR. MEUNIER:  WELL, JUST LINK IT TO WHAT HE SAYS IN

6   THERE.

7            THE COURT:  THE RULE IS THAT WE CANNOT HAVE SURPRISE

8   OPINIONS.  IF HE SAT IN TRIAL AND HE HEARD A WITNESS TESTIFY

9   YESTERDAY, AND IT DOESN'T CHANGE HIS OPINION, THEN HE CAN SO

10  TESTIFY.

11           MR. HILLIARD:  GOT IT.

12           MR. PENOT:  I'M NOT ARGUING WITH THAT.

13           THE COURT:  LET ME LOOK AT THE REPORT, AND TELL HIM THE

14  QUESTION IS PERTAINING TO THE PARAGRAPH IN THE REPORT, AND THAT

15  HE SHOULD TRY TO ANSWER THE QUESTION --

16           MR. HILLIARD:  I'LL DO IT.

17           THE COURT:  -- IN THAT FASHION.

18           MR. PENOT:  I JUST DON'T WANT THE RECORD TO GO BY

19  WITHOUT ME SAYING THAT I DON'T BELIEVE THAT THE TESTIMONY

20  SUPPORTS DIFFERENTIAL MOVEMENT, BUT WE'LL DO THAT ON

21  CROSS-EXAMINATION.

22           THE COURT:  RIGHT.  BELIEVE ME, YOU'LL GET A WIDE BERTH.

23           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

24  CONFERENCE CONCLUDED.)

25           MR. HILLIARD:  MAY I PROCEED, YOUR HONOR?

1     THE COURT:  YES.

2                          EXAMINATION

3   BY MR. HILLIARD:

4   Q.   BEFORE WE HAVE YOU DEMONSTRATE THIS TO THE JURY, MR. MOORE,

5   I WANT TO ASK YOU SOME PRELIMINARY QUESTIONS, SOME PREDICATE

6   QUESTIONS.

7   A.   OKAY.

8   Q.   IN REFERRING TO YOUR REPORT ON PAGE 6, 5.2, JACKING, YOU

9   STATE IN THAT REPORT THAT, "JACKING OF THE TRAILER WOULD PROBABLY

10  OCCUR WITHOUT THE UNIT FULLY LOADED; HOWEVER, THE JACKS WOULD

11  CAUSE A LARGE DIFFERENTIAL IN THE LOADS APPLIED TO THE BEAMS IF

12  THE PROCESS WERE DONE IMPROPERLY.  THIS DANGER IS PROMINENTLY

13  NOTED ON THE WARNING STICKERS ON EACH JACK, AS DISCUSSED ABOVE.

14  IN ADDITION TO FRAME DAMAGE AND DOOR JAMB DAMAGE, OTHER DAMAGE

15  COULD ALSO OCCUR, INCLUDING DAMAGE TO THE INTERIOR FINISHES, WALL

16  PANELING, CABINET DOORS, ET CETERA.

17          "THE SEPARATION OF THE PANELING NOTED IN THE BATHROOM

18  AND BEDROOM AREAS ARE CONSISTENT WITH THE EFFECTS OF UNEVEN

19  MOVEMENT OF THE TRAILER THAT WOULD OCCUR WITH IMPROPER JACKING

20  TECHNIQUES."

21          MY QUESTION TO YOU IS, BASED ON YOUR REPORT AND

22  SPECIFIC TO YOUR OPINIONS THAT YOU HAD WHEN YOU CAME IN HERE

23  TODAY AND WHEN YOU WROTE THAT REPORT, HOW DID THE TESTIMONY OF

24  DARRYL LEMIEUX CONFIRM THAT THERE WAS IMPROPER JACKING AND UNEVEN

25  JACKING THAT AFFECTED THE STRUCTURAL INTEGRITY OF THAT TRAILER?

1    PLEASE DEMONSTRATE.

2    A.    OKAY.   FIRST OFF, LIKE I SAY, MY REPORT INDICATES THAT I DO

3    THINK THAT IMPROPER JACKING WOULD CAUSE -- PROBABLY CAUSE DAMAGE

4    TO THIS UNIT.   THE TESTIMONY OF MR. LEMIEUX YESTERDAY REALLY JUST

5    FURTHER CONFIRMED THAT.

6    Q.    HANG ON.   I LOST MY CUPS.

7    A.    THE FIRST THING THAT WOULD HAVE TO HAPPEN, WHETHER IT'S

8    MR. LEMIEUX OR WHOEVER, YOU WOULD HAVE TO TAKE IT OFF OF THE

9    TRUCK WHERE IT'S BEING TOWED HERE AT THE TONGUE.   AND THERE IS A

10   JACK INSTALLED ON THE TRAILER AT THIS POINT SIMILAR TO THIS SCREW

11   RIGHT HERE.   SO THAT WOULD BE USED TO TAKE THE LOAD OFF OF THE

12   TRUCK.   THEY CAN MOVE THE TRUCK OUT OF THE WAY, GET IT OUT OF THE

13   WAY AND OUT OF THE PICTURE.   SO THAT WOULD BE THE FIRST THING

14   THAT WOULD HAPPEN.

15        AND MR. LEMIEUX DESCRIBED DOING THAT AND USING THAT

16   JACK TO EITHER RAISE OR LOWER THIS FRONT END SO THAT IT WOULD BE

17   LEVEL FROM FRONT TO BACK.   I DON'T HAVE ANY REAL PROBLEM WITH

18   THAT.   YOU WOULD HAVE TO DO THAT, WHOEVER IS DOING THAT, WHETHER

19   IT'S MR. LEMIEUX, WHETHER IT'S THIS TRAILER OR NOT.

20        THEN THE NEXT THING MR. LEMIEUX SAID WAS THAT HE CAME

21   OVER ON THIS SIDE -- OR I DON'T KNOW IF HE SAID WHICH PARTICULAR

22   SIDE, BUT, THAT, COMBINED WITH MS. SHIRLEY'S TESTIMONY THAT THEY

23   WORKED ON THIS SIDE WITH THE FRONT DOOR FIRST, HE CAME OVER HERE

24   AND RELIEVED PRESSURE OFF THESE WHEELS.

25        HE ALSO SAID HE USED ONE JACK.   SO, IN ORDER TO DO

1   THAT, IT WOULD HAVE TO BE BASICALLY HERE IN THE CENTER OF THE

2   TRAILER.  IF YOU DO IT ON THE BACK OR THE FRONT, THEN YOU'RE

3   GOING TO BE PUTTING PRESSURE, REALLY, EITHER ON THE TONGUE JACK

4   OR KEEPING PRESSURE ON THE TIRES.  SO IT WOULD HAVE TO BE

5   SOMEWHERE HERE IN THE CENTER.  THEY WOULD HAVE TO GET IT UNDER

6   HERE.

7         AND, ACTUALLY, THIS CUP IS REALLY TOO LARGE TO DO THAT,

8   SO HE WOULD -- BECAUSE HE TALKED ABOUT JUST RELIEVING THE

9   PRESSURE OFF OF THESE TIRES, HE'D PICK IT UP A LITTLE BIT WITH

10  THIS, AND HE'D THEN PLACE BLOCKS ON THE FORWARD AND BACK SIDE OF

11  THIS SIDE OF THE TRAILER.  THAT WAY, NOTHING IS REALLY RESTING ON

12  THESE TIRES.

13        ONE THING THAT I WOULD LIKE TO JUST POINT OUT AND

14  MENTION ABOUT THIS PARTICULAR MODEL, AS COMPARED TO THE ACTUAL

15  TRAILER, THIS MODEL, WHILE IT'S CUT DOWN IN SCALE TO SIZE, IS

16  REALLY NOT CUT DOWN IN SCALE TO THE PHYSICAL CHARACTERISTICS OF

17  THE UNIT.

18  Q.   WHAT DO YOU MEAN BY THAT?

19  A.   WELL, THIS IS A VERY SOLID BLOCK.  THERE IS NO SPRINGS

20  ATTACHED TO THE TIRES.  THE BEAMS THAT'S ON THE BACK SIDE -- LET

21  ME JUST PICK IT UP HERE, IF I WOULD -- THE BEAMS, EVERYTHING HERE

22  IS MADE OUT OF PLASTIC.

23        MR. PENOT:  COULD I ASK THAT --

24        THE WITNESS:  THE BEAMS THAT'S SHOWN HERE ARE MADE OUT

25  OF PLASTIC, WHICH, FOR THIS SCALE, IS VERY, VERY RIGID COMPARED

1  TO THE STEEL THAT'S ON THE TRAILER ITSELF THAT'S USED TO MAKE THE

2  FRAME.

3                              EXAMINATION

4  BY MR. HILLIARD:

5  Q.   WHY IS THAT DISTINCTION IMPORTANT WHEN YOU'RE TALKING ABOUT

6  THE FRAME GETTING DAMAGED DUE TO THE JACKING?

7  A.   WELL, THAT WOULD BE THE NEXT STEP, AS MR. LEMIEUX DESCRIBED

8  IT, IS THAT ONCE HE GOT THE BLOCKS OVER HERE ON THIS SIDE TO

9  STABILIZE THIS OFF OF THE TIRES, THEN HE MOVED AROUND TO THIS

10 SIDE OF THE UNIT, AND AGAIN, HE SAID HE USED ONE JACK, AND HE

11 PICKED THIS UP SO THAT HE COULD PUT THE BLOCKS UNDER HERE.

12 AGAIN, TO USE ONE JACK YOU WOULD HAVE TO PUT IT IN THE CENTER.

13              THE COURT:  WAIT, NOW HE'S ON THE OPPOSITE SIDE WHERE

14 THE JURY CAN'T SEE.  TURN IT AROUND.

15              THE WITNESS:  OKAY.  SO YOU WOULD HAVE TO PUT THE JACK

16 BASICALLY HERE IN THE CENTER.  THE BEAM STRETCHES FROM THE END TO

17 THE END OF THE TRAILER, YOU WOULD HAVE TO PUT THAT JACK IN THE

18 CENTER IN ORDER TO GET THE WHOLE THING UP.

19              OKAY.  NOW, FOR A STEEL BEAM THAT'S LIKE THAT, IT'S

20 A VERY SMALL STEEL BEAM, IT'S A SIX-INCH I-BEAM, I-SHAPED BEAM,

21 AND WHAT'S GOING TO HAPPEN, WHEN YOU PICK THAT UP LIKE THAT,

22 YOU'VE GOT LOAD ON BOTH SIDES, AND IT'S VERY SIMILAR, IF YOU

23 WILL, TO AN AIRPLANE WING.  WHEN AN AIRPLANE IS SITTING ON THE

24 GROUND, THAT WING, IF YOU'VE EVER BEEN IN AN AIRPLANE, AS IT'S

25 GOING DOWN THE RUNWAY, THAT WING IS KIND OF DROOPING BECAUSE ALL

1  OF THE LOADS ARE HOLDING IT DOWN HERE AND IT'S DROOPING.  SO IT

2  WOULD BE THE SAME THING, WHEN YOU PICK THIS, JACK THIS UP HERE,

3  THAT STEEL BEAM IS GOING TO DROOP ON BOTH SIDES.

4                OKAY.  SO YOU PICK THIS UP HIGH ENOUGH THEN.

5                        EXAMINATION

6  BY MR. HILLIARD:

7  Q.   I NEED TO STOP YOU FOR A MINUTE AND ASK YOU, DURING THE

8  DROOPING PHENOMENON, WE'LL CALL IT, WHILE IT'S JACKED UP,

9  STRUCTURALLY, WAS, IN YOUR OPINION, BASED ON A REASONABLE

10 ENGINEERING PROBABILITY, WAS THERE DAMAGE DONE TO THIS TRAILER?

11 A.   YES.  I DO BELIEVE IT IS.  BECAUSE WHEN THIS STEEL THEN

12 DROOPS, IT CAUSES EVERYTHING THAT'S ATTACHED TO IT TO DROOP.

13 WELL, EVERYTHING THAT'S ATTACHED TO IT IS ALSO VERY LIGHTWEIGHT

14 STRUCTURE.  IT'S VERY SMALL WOOD MEMBERS.  THE CONNECTIONS ARE

15 VERY SMALL.  MUCH SMALLER THAN A TYPICAL HOUSE OR EVEN A MOBILE

16 HOME.  MOBILE HOMES ARE TYPICALLY MADE OUT OF TWO-BY-FOURS, YOU

17 KNOW, THE SAME TYPE OF TWO-BY-FOURS THAT YOU WOULD GO DOWN TO THE

18 LOCAL HARDWARE STORE AND PICK UP.  THESE ARE MADE OUT OF NOMINAL

19 TWO-BY-TWOS, WHICH IF YOU LOOK AT THE CROSS-SECTION, IT'S ABOUT A

20 THIRD OF THE SIZE OF A TWO-BY-FOUR.

21              SO THE STRUCTURE OF THIS UPPER FRAME IS MUCH LIGHTER

22 THAN YOU WOULD EXPECT SO THAT AS THIS DROOPS, IT'S ALSO GOING TO

23 DROOP.  NOW, THIS SIDE IS SUPPORTED BY BLOCKS ALREADY SO THAT

24 WHEN THIS SIDE DROOPS, THIS SIDE IS NOT, AND SO THE WHOLE THING

25 IS DISTORTING AND WARPING.

1 Q.   SO IF YOU HAVE ONE SIDE THAT'S BEEN JACKED UP AND ALREADY

2 BLOCKED AND THEN YOU WERE JACKING UP THE OTHER SIDE, THAT CREATES

3 THE DROOPING?

4 A.   THAT'S CORRECT.

5 Q.   AND ONCE THE DROOPING OCCURS ON ONE SIDE, STRUCTURALLY,

6 AGAIN, WHAT'S YOUR OPINION BASED ON REASONABLE ENGINEERING

7 PROBABILITY IN REGARDS TO WHAT IS OCCURRING TO THIS TRAVEL

8 TRAILER SKELETON, THE SKELETON OF IT?

9 A.   THE SKELETON IS WARPING.  IT'S DEFORMING.

10        WHAT HAPPENS HERE IS THAT, AND THE PROBLEMS THAT YOU

11 GET INTO ARE THE WINDOWS, THE DOORS, THE, ALL THE SEAMS THAT'S IN

12 THIS, THE WINDOWS ARE GOING TO DISTORT AND WARP, WHICH WOULD

13 CAUSE LEAKING.  THE SAME THING WITH THE DOOR ON THE OTHER SIDE.

14 ALL ALONG THE SEAMS HERE, THESE SEAMS ARE MADE TO WHERE THE OUTER

15 SHELL JUST BUTTS UP TO EACH OTHER, THEN THEY PUT A CLOSURE STRIP

16 AND A LITTLE BEAD OF CAULK ON THERE TO PREVENT WATER FROM GETTING

17 IN.

18        SO AS IT DISTORTS AND WARPS, NOW IT'S TRYING TO STRETCH

19 AND PULL ON THIS CAULK AND THE RUBBER SEALS AND ALL THE

20 CONNECTIONS AROUND THE OPENINGS.

21 Q.   REMIND ME TO ASK YOU ABOUT CAULK IF I FORGET, BUT I WANT YOU

22 TO ASSUME THAT THE TESTIMONY OF ALANA ALEXANDER IS GOING TO BE

23 THAT THERE WAS LEAKING AROUND THE DOOR, THERE WAS LEAKING AROUND

24 THE CLOSET IN THE BEDROOM, AND THERE WAS A POPPED-OUT PANEL IN

25 THE BATHROOM.  THERE MAY BE OTHER LEAKING, BUT PLEASE ASSUME THE

1   TESTIMONY LATER IN THE WEEK THAT THESE FOLKS WILL HEAR WILL SHOW

2   THAT THERE WAS WATER INTRUSION IN VARIOUS PARTS OF THE HOUSE.  IS

3   THAT WATER INTRUSION, IN YOUR OPINION, CONSISTENT WITH YOUR VIEW

4   THAT IMPROPER JACKING ON FEBRUARY 17, 2006, BY THE FLUOR SUB

5   CAUSED STRUCTURAL DAMAGE THAT ALLOWED THE WATER TO INTRUDE?

6   A.   YES, SIR, IT IS.

7            AND THE REASON WE TALK ABOUT THE DOOR, TOO, EVEN THOUGH

8   THAT WAS THE FIRST PART THAT WAS BLOCKED AND THEN THEY RAISED UP

9   THIS OTHER SIDE HERE, HE HAD TO COME BACK HERE THEN AND CONTINUE

10  RAISING THIS SIDE BECAUSE, LIKE I SAY, HE SAID THAT HE ONLY

11  RELIEVED THE PRESSURE OFF OF THE TIRES, AND FROM WHAT I'VE SEEN,

12  THE WHOLE UNIT WAS PICKED UP ALL THE WAY OFF THE TIRES, SO HE HAD

13  TO COME BACK HERE AND FINISH THE JOB, AGAIN, HE USED ONE JACK, SO

14  IT WOULD HAVE HAD TO BE IN HERE IN THE MIDDLE, WHICH IS RIGHT

15  HERE BY THIS DOOR, AND THAT'S, YOU KNOW, WHERE WE SAW SOME DAMAGE

16  JUST INSIDE THE DOOR HERE WAS WHERE IT WAS WET AND WE SAW DAMAGE

17  TO THE FLOOR THERE.

18  Q.   OKAY.  NOW, I WANT TO GET BACK TO YOUR UNDERSTANDING OF THE

19  DESIGN OF THIS TRAILER BECAUSE I THINK IT'S IMPORTANT IN

20  ATTACHING IT TO YOUR OPINION REGARDING THE LOSS OF STRUCTURAL

21  INTEGRITY.  THIS PANEL ATTACHES TO THIS PANEL THROUGH A SEAM

22  RIGHT HERE, RIGHT?

23  A.   THEY ARE ACTUALLY NOT CONNECTED.  THEY JUST BUTT UP TO EACH

24  OTHER, AND THAT GAP, THEN, IS CLOSED WITH A, WITH A RUBBER

25  CLOSURE.

1   Q.   SO THEY BUTT UP TO EACH OTHER LIKE THIS?

2   A.   THAT'S CORRECT.

3   Q.   AND ARE THEY NAILED TOGETHER LIKE THE WALL OF YOUR HOUSE AND

4   THE ROOF OF YOUR HOUSE ARE NAILED TOGETHER?

5   A.   WELL, THE WALL PANEL HERE WOULD BE NAILED THROUGH HERE OR

6   STAPLED IN THIS CASE.

7   Q.   WAIT A MINUTE.  IT IS NOT NAILED.  LET'S BE CLEAR.  THEY USE

8   STAPLE GUNS, STAPLERS, RIGHT?

9   A.   THAT'S CORRECT.  YES.  THEY STAPLE THE PANELS HERE AND THEN

10  THEY STAPLE THE PANELS HERE.  NOW, THERE WAS A RUBBER COATING, A

11  RUBBER ROOF THAT CAME OVER AND INCLUDED THIS ROOF ALSO.  SO THAT

12  CAME AROUND, AND THEN THERE THERE'S A GUTTER THAT'S PLACED IN

13  HERE AND THAT GUTTER HOLDS THAT ROOF IN PLACE.

14  Q.   SO WHAT IS THE ADHESION THAT HOLDS THESE TWO PIECES

15  TOGETHER?

16  A.   THE WOOD INSIDE, INSIDE THERE.

17  Q.   AND IF WATER GETS, WATER INTRUSION GETS INTO THAT WOOD, WHAT

18  HAPPENS TO ITS INTEGRITY IN REGARDS TO ITS ABILITY TO ADHERE TO

19  WHAT IT IS STUCK TO?

20  A.   IT DECAYS AND DETERIORATES FROM THERE.

21  Q.   AND DO YOU HAVE AN OPINION BASED ON REASONABLE ENGINEERING

22  PROBABILITY IN REGARDS TO WHETHER OR NOT THE STRUCTURAL DAMAGE

23  THAT YOU BELIEVE OCCURRED DURING THE JACKING OF THE TRAILER ON

24  FEBRUARY 17, 2006, ALLOWED ULTIMATELY WATER INTRUSION INTO THE

25  TRAILER, SPECIFICALLY INTO DIFFERENT PARTS OF PARTICLEBOARD IN

1    THE TRAILER?

2    A.    MOST DEFINITELY, THERE WAS -- THE JACK CAN CAUSE PROBLEMS

3    WITH THIS AND LED TO AREAS WHERE WATER WOULD GET INTO THE

4    TRAILER.

5            MR. HILLIARD:  THANK YOU, YOUR HONOR.  I'M NOT PASSING.

6    THANK YOU FOR LETTING HIM COME DOWN.

7                              EXAMINATION

8    BY MR. HILLIARD:

9    Q.    ONCE AGAIN, COMPLIMENTS OF CHARLIE, TAKE A LOOK AT THIS

10   DEMONSTRATIVE AID WHICH FLUOR HAS PREPARED, AND LET ME ASK YOU:

11   DO YOU UNDERSTAND WHAT THAT IS?

12   A.    IT LOOKS LIKE THE UNDERCARRIAGE OF A TRAILER.

13   Q.    ONCE AGAIN, WITH THE COURT'S PERMISSION, WHAT I WOULD LIKE

14   YOU TO DO IN REGARDS TO THE UNDERCARRIAGE OF THE TRAILER IS COME

15   DOWN AND USE THIS BOARD TO ASSIST YOU TO DESCRIBE TO THIS JURY

16   THE BOWING EFFECT OR SAGGING EFFECT THAT YOU BRIEFLY MENTIONED IN

17   REGARDS TO WHAT HAPPENS WHEN THE JACKING IS DONE IMPROPERLY.

18           MR. HILLIARD:  JUDGE, MAY HE STEP DOWN AND DO THAT?

19           THE COURT:  YES.

20                              EXAMINATION

21   BY MR. HILLIARD:

22   Q.    OKAY.  LIKE I SAID, THIS REPRESENTS THE UNDERCARRIAGE OF THE

23   TRAILER.

24           THE COURT REPORTER HAS ASKED THAT YOU USE THE

25   MICROPHONE.

1  A.   THIS DRAWING ACTUALLY REPRESENTS MOST OF THE UNDERCARRIAGE

2  OF THE TRAILER.  ACTUALLY, JUST THE FORWARD PART OF THE CARRIAGE.

3  THE MAIN BEAMS WE'RE TALKING ABOUT, THIS WOULD BE THIS LONG

4  MEMBER HERE, THIS LONG PIECE IN GRAY, AND THEN THERE'S ANOTHER

5  CORRESPONDING ONE ON THIS SIDE.  THOSE ARE THE TWO MAIN

6  STRUCTURAL COMPONENTS OF THE TRAILER.  THAT'S MEANT TO SUPPORT

7  AND CARRY THE TRAILER.

8          THE LOCATION AND SIZE OF THIS IS VERY IMPORTANT AS TO

9  THE STRENGTH IN THAT THE STRUCTURAL STRENGTH OF THIS BEAM IS

10  STRONGER IN THIS LONG DIRECTION.  IT'S NOT VERY STRONG INTO THE

11  PAGE OR IN THIS DIRECTION, AND THAT'S WHY THEY DO IT LIKE THIS,

12  BECAUSE THE TRAILER IS SUPPORTED ON THE WHEELS AND THEN IT'S

13  SUPPORTED BY THE TRUCK UP HERE AT THE TOP.  SO IT'S GOT TO BE

14  STRONG IN THE LONG DIRECTION IN ORDER TO CARRY THIS TRAILER.

15          WHAT'S NOT ON HERE IS THE REAR PART OF THE TRAILER,

16  WHICH IS REALLY JUST MORE OF THE SAME TYPE OF CROSS MEMBERS.

17  THESE CROSS MEMBERS ARE PUT IN THERE FOR A LITTLE BIT OF ADDED

18  STABILITY.  LIKE I SAID, IT'S NOT AS STRONG IN THIS DIRECTION, SO

19  THEY ARE ADDED TO GIVE IT A LITTLE BIT OF EXTRA STRENGTH HERE.

20  THEY'RE ALSO ADDED TO -- ACTUALLY, THE FLOOR, THE WOOD MEMBERS OF

21  THE FLOOR SIT ON THESE MIDDLE BEAMS THAT CUT ACROSS HERE.

22          THESE PIECES UP HERE ARE REALLY JUST THERE TO DIRECT

23  ALL OF THE STRENGTH OF THESE LONG PIECES OUT TO THE TOP.

24          I'M NOT SURE WHAT THESE MEMBERS ARE.  THEY LOOK LIKE

25  SOME TYPE OF SLING.  I DON'T THINK THAT'S EVEN PART OF THE

1  TRAILER.  THERE IS SOME THINGS HERE THAT ARE NOT PART OF THE

2  TRAILER, EITHER.

3  Q.   ALL RIGHT.  MR. MOORE, WHAT I WOULD LIKE YOU TO DO IS, NOW

4  THAT YOU HAVE SHARED WITH US THE BASIC UNDERCARRIAGE OF THE

5  TRAILER, IN USING THE BOARD THERE, CAN YOU DESCRIBE THE BOWING,

6  YOU DIDN'T CALL IT A BOWING EFFECT.  YOU CALLED IT SAGGING.  S

7  THAT RIGHT?

8  A.   SAGGING, YES, SIR.

9       YEAH, WHAT'S GOING TO HAPPEN IS -- AND I'M NOT A REAL

10  GOOD SKETCHER.  I'M NOT AN ARTIST.  THAT'S WHY I USE COMPUTERS TO

11  DO ALL OF MY DRAWINGS.  THE TRAILER -- I'M GOING TO TRY TO DRAW A

12  THREE-DIMENSIONAL BOX HERE -- IS SOMETHING SIMILAR TO THIS.  WE

13  HAVE WHEELS THAT SIT BACK HERE.  YOU HAVE THE TONGUE THAT COMES

14  OUT HERE.  OKAY.  WHEN, AND I'M GOING TO ASSUME NOW THAT THIS FAR

15  SIDE THAT YOU BASICALLY CAN'T SEE IS THE SIDE WHERE THE DOOR,

16  LIKE YOU'RE LOOKING AT ON THE TABLE HERE, HE WOULD HAVE PUT

17  BLOCKS UNDERNEATH THIS SIDE, AND IF YOU WOULD KIND OF CARRY THIS

18  OUT HERE ON THIS BACK SIDE, HE WOULD HAVE PUT BLOCKS HERE.  THAT

19  SUPPORTED THE SIDE WITH THE DOORS.

20       THEN HE CAME IN HERE AND HE PUT A JACK IN HERE, AND AS

21  I UNDERSTAND IT, IT WAS A HYDRAULIC JACK, YOU KNOW, IT'S THE TYPE

22  THAT YOU JUST STICK A HANDLE IN AND YOU PUMP IT UP AND THE PISTON

23  COMES UP AND PUSHES ON THE TRAILER HERE AT THIS END, AND HE'S

24  PICKING IT UP ENOUGH TO GET THE BLOCKS TO WHERE HE CAN PUT BLOCKS

25  UP UNDERNEATH THIS END.  SO WHAT'S GOING TO END UP HAPPENING NOW

1   IS THAT THIS WHOLE SIDE, AND I'M EXAGGERATING HERE, THAT THIS

2   WHOLE SIDE IS GOING TO BOW AT THIS POINT RIGHT HERE.

3          THEN AS THAT BOWS, THEN THIS WHOLE WALL HAS TO GO UP

4   WITH IT, SO THE TOP OF IT IS GOING UP LIKE THAT.  THIS SIDE IS

5   TRYING TO STAY EVEN BECAUSE IT'S RESTING AND SUPPORTED BY THE

6   BLOCKS.  BUT WHAT'S HAPPENING IS, AS THE WHOLE THING IS GOING

7   OVER, IT'S STARTING TO TILT OVER THIS WAY, SO THAT THE WHOLE

8   TRAILER IS STARTING TO TILT OVER, AND AS THAT'S BOWING OUT, THEN

9   NOW EVERYTHING IS BEING WARPED AS IT'S TRYING TO GO AND FOLLOW

10  THAT, FOLLOW THAT SHAPE AND FOLLOW THAT PATTERN.

11  Q.   THIS TRAILER IS KNOWN AS A, WHAT IS KNOWN AS AN ENTRY-LEVEL

12  TRAILER, ONE OF THEIR LOWER-END MODELS.  DOES THE BOWING EFFECT

13  AND THE DAMAGE CAUSED TO THIS TRAILER AS A RESULT OF THE BOWING

14  EFFECT INCREASE BECAUSE OF THE QUALITY OF THE ATTACHMENT DEVICES,

15  THE STAPLES, THE GLUE AND HOW STRONGLY SIDES ADHERE TO OTHER

16  SIDES?

17  A.   YES.

18  Q.   CAN YOU EXPLAIN THAT.

19  A.   OKAY.  ONE OF THE THINGS THAT, ONE OF THE DOCUMENTS THAT I

20  ACTUALLY LOOKED AT TO KIND OF FURTHER CLARIFY THAT IS, THERE WAS

21  A DOCUMENT FROM GULF STREAM THAT TALKED ABOUT THEIR

22  RAILROAD-READY TRAILERS.  THE RAILROAD-READY TRAILERS, INSTEAD OF

23  USING A SIX-INCH I-BEAM DOWN HERE OR AT THESE POINTS, THEY USED

24  AN EIGHT-INCH TUBE MEMBER.  THE TUBE IS A MUCH --

25  Q.   PARDON ME.  JUST BY WAY OF FOUNDATION AGAIN, AS I UNDERSTAND

1  IT, THE RAILROAD-READY TRAILERS ARE THE FEMA TRAILERS THAT FLUOR

2  KNOWS WILL BE SHIPPED BY RAIL INSTEAD OF BY ROADWAY ON TRUCKS?

3  A.   THAT'S CORRECT.

4  Q.   SO THEY DESIGNED THE FOUNDATION OF THOSE TRAILERS

5  DIFFERENTLY THAN THEY DESIGNED THIS ONE?

6  A.   RIGHT, BECAUSE THOSE, THOSE KINDS OF TRAILERS ARE INTENDED

7  TO BE STRAPPED DOWN TO A RAILCAR AND VERY RIGIDLY ATTACHED TO

8  THAT RAILCAR, AS OPPOSED TO GOING DOWN THE HIGHWAY ON THESE

9  WHEELS.  THESE WHEELS ARE ON SPRINGS, WHICH LETS THE TRAILER

10 FLOAT AND NOT DO THAT.  ON A RAILCAR, THEY ARE ACTUALLY STRAPPED

11 DOWN VERY RIGIDLY, SO THEY HAVE TO BE STRONGER TO SUPPORT THAT

12 KIND OF MOVEMENT.

13 Q.   AND I HAD INTERRUPTED YOU WHEN YOU WERE EXPLAINING HOW THE

14 DESIGN OF THIS ENTRY-LEVEL TRAILER AND THE CHOICE OF THE DESIGN

15 COMPONENT PARTS CONTRIBUTED TO THE DAMAGE CAUSED BY THE IMPROPER

16 JACKING.

17 A.   OKAY.  THE DIFFERENCES BETWEEN THE EIGHT-INCH TUBE AND THE

18 SIX-INCH I-BEAM IS SUCH THAT THE EIGHT-INCH TUBE WOULD NOT DEFORM

19 NEARLY AS MUCH AS THE SIX-INCH.  IN OTHER WORDS, THE SAG THAT YOU

20 GET ON A SIX-INCH I-BEAM IS GOING TO BE GREATER THAN AN

21 EIGHT-INCH TUBE.  DEPENDING ON EXACTLY WHAT THOSE LOADS ARE WILL

22 DETERMINE EXACTLY HOW MUCH DIFFERENT THEY ARE IN SAG.

23      ALL STRUCTURES WILL DEFORM AND MOVE LIKE THAT, AND WHAT

24 YOU TRY TO DO IS LIMIT THAT BY THE STRENGTH OF THE MEMBER TO MAKE

25 IT MORE RIGID, TO BE ABLE TO TAKE THOSE TYPES OF MOVEMENTS TO

1 WHERE, INSTEAD OF SAGGING, NOW IT SUPPORTS ITSELF AND STAYS

2 STRAIGHT.

3 Q.   OKAY.  SO FLUOR COULD CHOOSE TO BUILD THIS -- I MEAN,

4 GULF STREAM COULD CHOOSE TO BUILD THIS ANY WAY THEY WANTED,

5 RIGHT?

6 A.   YES.

7 Q.   SO IF THIS TRAILER ENDS UP GOING TO DALE STREET AND IT IS

8 WHAT IT IS, IT'S DESIGNED AS ITS DESIGNED, IT'S PUT TOGETHER AS

9 IT'S PUT TOGETHER, IT'S GOT A LIFE BEFORE DALE STREET, CORRECT?

10 A.   CORRECT.

11 Q.   ALL THOSE ARE GIVENS.  IN ORDER TO ASSURE THAT THIS TRAILER

12 IS NOT DAMAGED WHEN IT IS GETTING SET UP AND BLOCKED SO THIS

13 FAMILY CAN SAFELY LIVE IN IT WITHOUT WATER COMING IN AND

14 FORMALDEHYDE INCREASING, WHAT IS THE PROPER WAY TO JACK THIS

15 TRAILER?  HOW SHOULD THIS TRAILER BE LIFTED UP AND BLOCKED SO

16 THERE IS NO DAMAGE DONE DURING THE PROCESS OF SECURING THIS AND

17 TURNING IT INTO A HOUSE INSTEAD OF A TRAVEL TRAILER?

18 A.   FOR THIS UNIT WHAT I WOULD REALLY RECOMMEND WOULD BE THAT

19 YOU WOULD JACK, AND LET ME JUST SHOW AGAIN ON HERE, IS THAT

20 INSTEAD OF USING A SINGLE JACK AT THE CENTER, WHAT I WOULD REALLY

21 RECOMMEND WOULD BE USING A SERIES OF JACKS ALONG THE ENTIRE

22 LENGTH OF THE BEAM ON BOTH SIDES TO WHERE YOU WOULD JACK UP THE

23 ENTIRE STRUCTURE AT ONCE, AS OPPOSED TO LIFTING UP ONE SIDE OR

24 THE OTHER OR ONE END VERSUS THE OTHER OR ONE POINT VERSUS ANOTHER

25 POINT.  THAT YOU'RE LIFTING THE ENTIRE TRAILER UP AS A UNIT.

1    Q.    AT THE SAME TIME?

2    A.    AT THE SAME TIME.

3    Q.    NOW, WHAT'S YOUR RECOLLECTION AS TO WHETHER DARRYL LEMIEUX

4    HAD MORE JACKS IN HIS TRUCK?  WHAT DO YOU SAY YES TO?

5    A.    I BELIEVE HE SAID THAT HE HAD FIVE OR SIX JACKS IN HIS

6    TRUCK.

7    Q.    AND BASED ON YOUR EXPERIENCE, IS IT QUICKER TO DO IT THE WAY

8    HE DID IT, SO THAT HE CAN GET ON DOWN THE ROAD AND MOVE ANOTHER

9    TRAILER, OR IS IT QUICKER TO DO IT THE WAY YOU DID IT?

10   A.    IT WOULD DEFINITELY BE QUICKER TO USE A SINGLE JACK AND TRY

11   TO GET IT DONE QUICKER, AS TRYING TO PUT SEVERAL JACKS ALL

12   TOGETHER AND DOING IT ALL AT THE SAME TIME, BECAUSE YOU WOULD

13   HAVE TO COORDINATE LIFTING EACH JACK.  WHETHER HE COULD DO THAT

14   MANUALLY WITH THE NUMBER OF JACKS THAT WE WOULD NEED, I DON'T

15   KNOW, OR WHETHER IT WOULD HAVE TO BE HOOKED UP TO SOME TYPE OF

16   HYDRAULIC CONTROLLER.

17   Q.    DO YOU RECALL DARRYL LEMIEUX SAYING THAT FLUOR PAID HIM PER

18   TRAILER INSTALLED?

19   A.    YES, SIR.

20   Q.    WHICH MEANS THE MORE HE INSTALLED, THE MORE HE MADE.

21   A.    YES, SIR.

22   Q.    IF YOU DO IT THE WAY YOU SUGGEST YOU DO IT, JUST BECAUSE OF

23   THE AMOUNT OF HOURS IN A DAY, YOU'RE NOT GOING TO GET AS MANY

24   TRAILERS INSTALLED AS OPPOSED TO DOING IT WITH A SINGLE JACK?

25   A.    I WOULD NOT THINK SO, NO.

1          MR. HILLIARD:  I PASS THE WITNESS, YOUR HONOR.

2          THE COURT:  COULD YOU BE SEATED, SIR, PLEASE.

3               ANYONE FROM THE GULF STREAM SIDE?

4          MR. WEINSTOCK:  CHARLIE WILL GO FIRST.  I DON'T THINK

5  HE'S GOING TO OPEN ANYTHING FOR US.

6          THE COURT:  ALL RIGHT.  MR. PENOT.

7                    CROSS-EXAMINATION

8  BY MR. PENOT:

9  Q.   GOOD MORNING, MR. MOORE.

10 A.   GOOD MORNING.

11 Q.   WE MET AT TWO OF YOUR DEPOSITIONS, RIGHT?

12 A.   YES, SIR.

13 Q.   ANOTHER ONE THAT THESE FELLOWS HAVE YOU WORKING ON.

14 A.   THAT'S CORRECT.

15 Q.   I WANT TO BE CLEAR ABOUT SOMETHING.

16         MR. PENOT:  BOB, COULD I BORROW THOSE PICTURES OF THE

17 TRAILER THAT YOU HAD?

18         MR. HILLIARD:  YES, SIR.  HOW COULD I SAY NO.

19         MR. PENOT:  I WOULD WONDER HOW YOU COULD.  NO, NO, NO,

20 LET'S SEE.  THE ONES OF IT INSTALLED AS A HOUSE, THE TWO THAT YOU

21 WERE USING.

22                      EXAMINATION

23 BY MR. PENOT:

24 Q.   AND I WANT TO BE CLEAR ABOUT SOMETHING.  I WANT TO MAKE SURE

25 IT'S CLEAR TO THE JURY BASED ON WHAT YOU'VE SAID.  FIRST TIME YOU

1 SAW THIS TRAILER, FIRST TIME YOU EVER SAW MS. ALEXANDER'S TRAILER

2 WAS MAY OF 2009, RIGHT?

3 A.   THAT'S CORRECT.

4        MR. PENOT:  YOUR HONOR, MAY I APPROACH AND USE THE

5 DEMONSTRATIVE?

6        THE COURT:  YES.

7                      EXAMINATION

8 BY MR. PENOT:

9 Q.   YOUR UNDERSTANDING WAS THAT BEFORE YOU EVER SAW THAT

10 TRAILER, IT HAD TRAVELED ALMOST 1300 MILES FROM ELKHART, INDIANA,

11 TO PUNTA GORDA, FLORIDA, RIGHT?

12 A.   CORRECT.

13 Q.   AND NEVER TOUCHED BY FLUOR OR ANY OF THE OTHER

14 SUBCONTRACTORS AT THAT POINT, RIGHT?

15 A.   I DON'T THINK SO.

16 Q.   DO YOU HAVE ANY DOUBT?

17 A.   NO.

18 Q.   AND FROM PUNTA GORDA, FLORIDA, 563 MILES TO SAUFLEY FIELD IN

19 PENSACOLA, YOU DIDN'T KNOW ABOUT THAT?

20 A.   I DIDN'T KNOW ABOUT THAT.

21 Q.   SO YOU SAID YOU NEVER SAW ANY DOCUMENTATION ABOUT DAMAGE FOR

22 THE WALL AND BEDROOM ON THE DOCUMENT, BUT YOU DIDN'T LOOK AT

23 THESE DOCUMENTS, DID YOU?

24 A.   I DID NOT SEE THAT, NO.

25 Q.    SUPPOSE THE COMMENT SAID "NO DRIVER DAMAGE," DOES THAT

1   IMPLY TO YOU THAT THERE WAS A FULL INSPECTION OF THE TRAILER

2   INSIDE AND OUT?

3   A.   IT WOULD SAY NO DRIVER DAMAGE SO --

4            MR. HILLIARD:  PARDON ME, JUDGE.  PARDON ME.  EXCUSE ME.

5   I'M GOING TO OBJECT.  THAT'S SPECULATION.  NO DRIVER DAMAGE

6   WASN'T IMPLIED TO HIM.  THERE IS NO FOUNDATION AS TO WHETHER HE

7   KNOWS WHETHER THERE'S NO DRIVER DAMAGES OR NOT.  MY OBJECTION IS

8   SPECULATION.

9            THE COURT:  I'M GOING TO OVERRULE.  I THINK HE CAN

10  ANSWER.  HE'S AN EXPERT.  I'M GOING TO GIVE HIM LATITUDE ON THIS.

11                            EXAMINATION

12  BY MR. PENOT:

13  Q.   THE FORM SAYS NO DRIVER DAMAGE.  THAT IMPLIES TO YOU

14  SOMEBODY WENT THROUGH THAT WHOLE TRAILER AND CHECKED IT OUT?

15  A.   IT IMPLIES THAT THEY WENT THROUGH SOME, I DON'T KNOW IF THAT

16  WOULD BE A COMPLETE INSPECTION OR NOT BUT AT LEAST WENT THROUGH

17  AN INSPECTION OF THAT, YEAH.

18  Q.   BUT IN FORMING YOUR OPINION, YOU DIDN'T EVEN KNOW THIS FACT,

19  DID YOU?

20  A.   ABOUT PENSACOLA, NO.

21  Q.   THEN IT WENT 321 MILES, STILL NOT TOUCHED BY FLUOR AT THIS

22  POINT OR ANY OF ITS SUBCONTRACTORS, RIGHT?

23  A.   AS FAR AS I KNOW, RIGHT.

24  Q.   321 MILES TO FORT GILLEM IN GEORGIA, IN MARCH OF '05.  YOU

25  KNEW ABOUT THAT.  THAT'S WHERE YOU SAW, THAT'S WHERE YOU PICKED

1  IT UP BASICALLY?

2  A.   YES, SIR.

3  Q.   AGAIN, NOT TOUCHED BY FLUOR, RIGHT?

4  A.   AS FAR AS I KNOW, THAT'S CORRECT.

5  Q.   DID YOU SEE ANY PAPERWORK THERE ABOUT WHETHER IT WAS

6  INSPECTED?

7  A.   YES.

8  Q.   524 MILES, AGAIN, NOT BY FLUOR, TO A FEMA STAGING YARD IN

9  BATON ROUGE.  DID YOU KNOW THAT?

10  A.   YES, SIR.

11  Q.   THEN IT WENT 75 MILES DOWN THE RIVER TO THE UNION CARBIDE

12  PLANT, RIGHT?

13  A.   THAT'S CORRECT.

14  Q.   YOU DON'T KNOW WHO HANDLED IT THERE, DO YOU?

15  A.   THE PAPER, I SAID, DID SHOW CONTRACTOR FLUOR, SO I...

16  Q.   NOW, I BELIEVE YOU SAID --

17  A.   I BELIEVE -- THE PAPER THAT I SAW DID NOT SHOW TAFT.  I

18  BELIEVE IT ACTUALLY SHOWED HAHNVILLE.

19  Q.   THE -- I UNDERSTOOD YOU TO SAY THAT THE FIRST TIME THE

20  TRAILER WAS INSTALLED HERE AT DALE STREET, YOU SAID THAT WAS THE

21  FIRST TIME IT WAS EVER INSTALLED.

22  A.   I THINK THAT IT WAS DETERMINED THAT THAT WAS THE FIRST TIME

23  THAT IT WAS JACKED AND BLOCKED AS A FULL INSTALLATION, YES.

24  Q.   AND HOW DO YOU KNOW THAT?

25  A.   THE DOCUMENTS THAT SHOW IT GOING TO UNION CARBIDE/DOW IN

1    HAHNVILLE, AND THEN THERE WAS ACTUALLY SOME MORE DOCUMENTS WHERE

2    IT WAS IN ST. ROSE, WHICH WAS JUST RIGHT UP THE STREET FROM

3    HAHNVILLE, SHOWS THE ONLY THINGS THAT EVER WAS MARKED ON ANY OF

4    THOSE WAS BASIC SETUP.

5            THE PLACES FOR STEPS, FOR UTILITIES, SEWAGE, WATER, NO

6    RAMPS, NONE OF THOSE WERE EVER CHECKED OFF AS BEING INSTALLED.

7    IT JUST SAID BASIC SETUP, SO I WOULD ASSUME THAT IT WAS JUST

8    DROPPED OFF THERE.

9    Q.   SO THAT WAS AN ASSUMPTION ON YOUR PART?

10   A.   FROM THE DOCUMENTS.

11   Q.   BASED ON THAT DOCUMENT?

12   A.   BASED ON THAT DOCUMENT.

13   Q.   BUT YOU DIDN'T KNOW ANYTHING ABOUT A PROGRAM THAT FLUOR

14   PARTICIPATED IN CALLED THE INDUSTRIAL RESTART PROGRAM; DO YOU

15   SIR?

16   A.   I DID NOT KNOW THAT, NO.

17   Q.   YOU DON'T KNOW ANYTHING ABOUT THE FACT THAT THE INDUSTRIAL

18   RESTART PROGRAM -- YOU DON'T KNOW ANYTHING ABOUT THE RELATIONSHIP

19   BETWEEN THE CONTRACTOR AND THE INDUSTRY THAT USES THE TRAILER.

20   A.   I DO NOT KNOW THAT, NO.

21   Q.   SO THAT'S AN ASSUMPTION, THAT IT'S NEVER BEEN INSTALLED ON

22   BLOCKS BEFORE, RIGHT?

23   A.   AT THIS POINT, YES.

24   Q.   OKAY.  NOW, AFTER THAT IT COMES BACK FROM UNION CARBIDE TO

25   THE FEMA STAGING YARD IN BATON ROUGE, DO YOU KNOW THAT?

1   A.   I DID NOT SEE THAT UNTIL EARLIER THIS WEEK.

2   Q.   SO YOU DIDN'T KNOW THAT WHEN IT WAS -- WHEN YOU WERE

3   RENDERING YOUR OPINION?

4   A.   NO, THAT'S CORRECT.

5   Q.   AND DO YOU KNOW WHO HAULED IT, THOSE 75 MILES?

6   A.   THE WORK ORDER THAT I SAW FROM THE ST. ROSE THAT SAID TO

7   DEACTIVATE IN ST. ROSE ALSO LISTED FLUOR AS A CONTRACTOR.

8   Q.   SO IT'S YOUR BELIEF THAT FLUOR HAULED IT FROM HERE TO HERE,

9   RIGHT?

10  A.   THAT'S WHAT THE DOCUMENT SAID, FLUOR WAS THE CONTRACTOR.

11  Q.   ARE YOU SURE IT DIDN'T SAY ANY OTHER CONTRACTOR ON THAT

12  FORM?

13  A.   THERE WAS ANOTHER CONTRACTOR AT THE BOTTOM OF THE FORM, YES.

14  Q.   AND, IN FACT, IN YOUR DEPOSITION, YOU TOLD ME WHEN I HAD IT,

15  SHOWN THIS UP HERE AT UNION CARBIDE/DOW, YOU SAID, YOU TOLD ME, I

16  DON'T EVEN THINK IT WAS USED THERE, I THINK IT WAS REALLY A

17  STAGING YARD; IS THAT CORRECT?

18  A.   THAT'S CORRECT.

19  Q.   BUT YOU NOW KNOW THAT'S INCORRECT, OR YOU DON'T KNOW?

20  A.   I DON'T KNOW THAT.

21  Q.   SO, THEN, ONE OF FLUOR SUBS, INDEED, HAULS IT TO THE

22  SIX FLAGS STAGING AREA, AND WE'VE GOT THE FORM THAT SAYS WALL IN

23  BEDROOM, CORRECT?

24  A.   YES.  ACTUALLY, THERE IS A DOCUMENT THAT SHOWS IT COMING ON

25  THE 12TH AND THEN THE INSPECTION WAS ON THE 14TH, SO A COUPLE

1   DAYS AFTER THAT, YES.

2   Q.    AND THEN IT COMES, JUST SHORT A LITTLE DISTANCE OUT THERE IN

3   NEW ORLEANS EAST TO MS. ALEXANDER'S HOME.  IT'S INSTALLED THERE

4   ON FEBRUARY 17, 2006.  CORRECT?

5   A.    CORRECT.

6   Q.    YOU ARE AWARE OF THE FACT, ARE YOU NOT, SIR, THAT IN JULY OF

7   2007, THIS TRAILER WAS MOVED OFF OF THE BLOCKS THAT IT WAS SET

8   ON, PULLED OUT TO THE CURB, SET DOWN ON THE TONGUE JACK AND THE

9   TIRES FOR TWO DAYS, AND THEN PULLED BACK IN, PICKED UP AND SET

10  BACK ON THE BLOCKS?

11  A.    YES, SIR.

12  Q.    YOU'RE AWARE OF THAT?

13  A.    I'M AWARE OF THAT.  YES.

14  Q.    AND YOU'RE AWARE THAT NONE OF THAT WAS DONE BY FLUOR?

15  A.    I DID NOT KNOW THAT AT THE TIME.  I'VE HEARD THAT THAT'S

16  CORRECT, YES.

17  Q.    NOW, MR. HILLIARD SHOWED YOU A PICTURE OF WHEN IT WAS

18  INSTALLED BEFORE THE HOUSE WAS TORN DOWN.  YOU NEVER SAW IT IN

19  THIS CONDITION; YOU NEVER WERE AT DALE STREET AND SAW THIS

20  TRAILER, CORRECT?

21  A.    THAT'S CORRECT.

22  Q.    NOW, AND WHEN YOU WERE DOING YOUR DEMONSTRATION, YOU SAID

23  SOMETHING ABOUT MR. LEMIEUX SAYING THE WHEELS WERE OFF THE

24  GROUND.  YOU SAID THE WHEELS WERE OFF THE GROUND.  IS THAT WHAT

25  MR. LEMIEUX SAID?

1  A.   I DON'T THINK I SAID MR. LEMIEUX SAID THAT, NO.

2  Q.   BUT YOU BELIEVE, WHEN IT WAS INSTALLED BY FLUOR, THE WHEELS

3  WERE OFF THE GROUND?

4  A.   YES, SIR.

5  Q.   AND WHAT DO YOU BASE THAT ON?

6  A.   I BASE THAT ON THE HEIGHT OF THE PIERS THAT ARE ON THERE,

7  AND ALSO I TALKED TO MS. ALANA ALEXANDER ABOUT THAT, AND I DO

8  BELIEVE THAT THE WHEELS WERE PICKED UP OFF THE GROUND.  I THINK

9  MS. ALANA SAID THAT THEY PUT SOME, WHAT SHE TERMED SOME WEDGES

10 UNDER THE FRONT AND THE BACK OF THE TIRE SO THAT THERE WOULD BE,

11 I GUESS THERE WOULD BE CONTACT BETWEEN THE TIRE AND THE GROUND.

12 Q.   WHO IS "THEY"?

13 A.   WHOEVER INSTALLED IT.

14 Q.   SO WHOEVER INSTALLED IT -- FIRST OF ALL, YOU'RE BASING YOUR

15 OPINION ON THE WHEELS BEING OFF THE GROUND ON SOMETHING

16 MS. ALEXANDER SAID TO YOU, RIGHT?

17 A.   NO, SIR.  I'M BASING MY OPINION ON THE HEIGHT OF THE PIERS

18 AS THEY ARE THERE.

19 Q.   WHAT PIERS?

20 A.   THE CONCRETE BLOCKS.  I'M SORRY.

21 Q.   YOU CAN TELL THE HEIGHT OF THE BLOCKS IN THIS PICTURE?

22 A.   IN THIS PICTURE DIRECTLY, IT'S VERY HARD TO SEE IT BECAUSE

23 IT'S A VERY DARK PICTURE.  ON THE SCREEN HERE, YOU CAN SEE IT A

24 LITTLE BIT BETTER, BUT THERE ARE, THERE IS ANOTHER PICTURE THAT

25 WE SHOWED THAT WAS AFTER THE, THAT SHOWS IT VERY CLEARLY.

1  Q.   VERY CLEARLY.  RIGHT.  THAT'S AFTER IT'S BEEN MOVED AND PUT

2  BACK BY ANOTHER CONTRACTOR.

3  A.   THAT'S CORRECT.  THAT'S CORRECT.

4  Q.   SO YOU DON'T KNOW IF THAT'S THE HEIGHT OF THE PIERS THAT

5  FLUOR'S CONTRACTOR USED.

6  A.   I'M PRETTY SURE, I'M PRETTY SURE IT IS.  IF YOU LOOK, THERE

7  IS SOME EVIDENCE ON THE TWO PICTURES THERE, WHERE YOU CAN KIND OF

8  COMPARE THE TWO PICTURES AND SEE THAT.  ONE, THE TRASH CAN IS

9  SITTING RIGHT BY THE FRONT DOOR THERE.  IT'S THE SAME TRASH CAN

10  IN BOTH PICTURES OR IT APPEARS TO BE THE SAME TRASH CAN.  IT

11  CERTAINLY APPEARS TO BE THE EXACT SAME TYPE OF TRASH CAN THAT'S

12  ON BOTH SIDES.  AND YOU CAN SEE THAT IT'S -- THE HEIGHT OF THAT

13  TRASH CAN COMPARED TO THE TRAILER IS VERY MUCH THE SAME.

14           IN ADDITION TO THAT, AGAIN, TALKING TO MS. ALANA AND

15  ACTUALLY TALKING TO HER MOTHER ALSO, THE STEPS THAT ARE INSTALLED

16  THERE, THEY USED THE SAME STEPS TO GO BACK IN PLACE.  SO THAT

17  WOULD INDICATE THAT IT WAS THE SAME HEIGHT BEFORE AND AFTER.  SO

18  THE TWO INSTALLATIONS WERE PROBABLY AT THE SAME HEIGHT.

19  Q.   NOW, AND SO AFTER IT WAS MOVED ON AND OFF THE BLOCKS BY

20  SOMEONE OTHER THAN FLUOR, IT GETS HAULED 116 MILES TO LOTTIE,

21  LOUISIANA; IS THAT CORRECT?

22  A.   THAT'S CORRECT.

23  Q.   AND IT GETS PULLED -- NOW, THAT'S, EXCUSE ME.  IT GETS

24  PULLED THERE IN FEBRUARY OF 2008; IS THAT RIGHT?

25  A.   I THINK THAT'S CORRECT, YES.

1  Q.   AND IT SITS THERE UNMAINTAINED, FROM FEBRUARY OF 2008 UNTIL

2  THE FIRST WEEK OF MAY, 2009, A COUPLE OF MONTHS AGO, WHEN YOU SEE

3  IT FOR THE VERY FIRST TIME, CORRECT?

4  A.   THAT'S CORRECT.

5  Q.   AND THAT WAS AN OLD AGRICULTURAL FIELD; WAS IT NOT?

6  A.   PROBABLY.

7  Q.   AND YOU HAD TO DRIVE BACK TO GET TO THAT LOCATION OF THE

8  TRAILER WHEN YOU DID YOUR INSPECTION, OR HAD THEY PULLED IT UP

9  FRONT?

10  A.   NO, I HAD TO DRIVE BACK THERE.

11  Q.   HOW LONG DID IT TAKE?

12  A.   ACTUALLY, THEY DROVE ME BACK THERE IN THEIR CAR, BUT YEAH.

13  Q.   DID IT TAKE ABOUT FIVE MINUTES TO DRIVE BACK THERE?

14  A.   I DON'T REMEMBER.  IT WASN'T JUST RIGHT THERE.

15  Q.   NICE PAVED, EVEN ROAD, I GUESS?

16  A.   NO.

17  Q.   NO.  PRETTY ROUGH.  AGRICULTURAL FIELD LAND, RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   BUT YOU'RE HERE TO TELL THE JURY TODAY THAT YOU, TO A

20  REASONABLE DEGREE OF ENGINEERING PROBABILITY, KNOW THAT THIS

21  TRAILER, IN THE CONDITION YOU SAW IT OUT HERE ON MAY 2009, WAS

22  DAMAGED BY IMPROPER JACKING ON FEBRUARY 17, '06, THAT'S YOUR

23  OPINION?

24  A.   YES, SIR.

25  Q.   ALL RIGHT.  NOW, WHEN YOU RENDERED YOUR REPORT, MR. MOORE,

1  YOU DID A PHYSICAL INSPECTION OF THE TRAILER, AND YOU NOTED THAT

2  THERE WERE NO PHYSICAL, PERMANENT DEFORMATIONS, IS THE WORD YOU

3  USED.  I GUESS THAT MEANS DEFORMED, RIGHT?

4  A.   THAT'S CORRECT.

5  Q.   DEFORMATIONS OF THE FRAME; IS THAT CORRECT?

6  A.   THAT'S CORRECT.

7  Q.   AND YOU DIDN'T NOTE ANY DEFORMATIONS OF THOSE CROSS MEMBERS,

8  THOSE METAL PIECES THAT CONNECT THE TWO I-BEAMS, RIGHT?

9  A.   THAT'S CORRECT.

10  Q.   AND THOSE ARE SIX-INCH SOLID STEEL I-BEAMS THAT RUN THE

11  WHOLE LENGTH OF THAT TRAILER, CORRECT?

12  A.   THE TWO END FRAME BEAMS, THAT'S CORRECT.

13  Q.   NOW, IN YOUR REPORT, YOU ALSO DID A CALCULATION FOR US, DID

14  YOU NOT, OF WHAT THOSE BEAMS COULD SUPPORT?

15  A.   YES, SIR.

16  Q.   AND IF I UNDERSTOOD YOU CORRECTLY, AND I'M SURE YOU'LL TELL

17  ME IF I DIDN'T, YOU LOOKED AT A HUD STANDARD FIRST TO FIGURE OUT

18  WHAT SQUARE -- WHAT AMOUNT OF WEIGHT PER SQUARE FOOT MOBILE HOMES

19  SHOULD BE ABLE TO MAINTAIN, A CONSTRUCTION STANDARD FROM HUD FOR

20  MOBILE HOMES, MANUFACTURED HOUSING.  CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   AND -- BUT THAT STANDARD HAS NO DIRECT APPLICATION TO TRAVEL

23  TRAILERS, CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   AND LET'S SEE.  THAT STANDARD WAS THREE POUNDS PER SQUARE

1  FOOT.

2  A.   YES, SIR.

3  Q.   DO YOU HAVE ANY DOUBT?  DO YOU NEED TO SEE IT?

4  A.   I THINK THERE WERE SOME OTHER QUALIFICATIONS ABOUT THAT.  I

5  HAVE --

6  Q.   THERE YOU GO.  I HAVE IT ON THE SCREEN FOR YOU.

7  A.   OKAY, GO AHEAD.

8  Q.   IS THAT RIGHT?  DOWN AT THE BOTTOM?  LET'S SEE.  "THE HUD

9  DOCUMENT CONSULTED INDICATED THAT THE DESIGN FLOOR LOAD FOR A

10  TRAILER IS A MINIMUM OF THREE POUNDS PER SQUARE FOOT."  RIGHT?

11  A.   YES, SIR.

12  Q.   BUT YOU WENT FURTHER AND YOU LOOKED AT SOMETHING CALLED

13  ASCE-7.  THAT'S MINIMUM -- PROVIDES MINIMUM FOR LIVE LOADS IN

14  RESIDENTIAL UNITS OF 30 TO 40, 30 POUNDS PER SQUARE FOOT IN

15  SLEEPING AREAS AND 40 POUNDS PER SQUARE FOOT IN OTHER AREAS,

16  CORRECT?

17  A.   THAT'S CORRECT.

18  Q.   TELL THE JURY WHAT ASCE-7?

19  A.   ASCE-7 IS THE GOVERNMENT STANDARD THAT IS USED IN MOST

20  BUILDING CODES FOR BUILDINGS AND OTHER STRUCTURES.  THAT'S THE

21  TITLE OF THE DOCUMENT.  IT'S THE MINIMUM DESIGN LOADS FOR

22  BUILDING AND OTHER STRUCTURES.

23  Q.   SO THAT WOULD BE A STANDARD THAT APPLIED TO THIS BUILDING?

24  A.   YES, SIR.

25  Q.   THERE IS NOTHING IN IT THAT SAYS IT APPLIES TO TRAVEL

1  TRAILERS, IS THERE?

2  A.   NO, IT HAS RESIDENTIAL UNITS, WHICH ARE THE LOADS THAT I

3  REFERRED TO THERE, YES.

4  Q.   BUT YOU DID A CALCULATION, DID YOU NOT, USING THAT STANDARD?

5  A.   YES, SIR.

6  Q.   AND IF I REMEMBER IT RIGHT, WE WENT THROUGH THAT WHOLE

7  CALCULATION IN YOUR DEPOSITION, DIDN'T WE?

8  A.   YES, SIR.

9  Q.   IT CAME UP TO, IF WE USE 30 POUNDS PER SQUARE FOOT IN THE

10  SQUARE FOOTAGE OF THIS TRAVEL TRAILER AND WE SUBTRACTED THE DEAD

11  LOAD, I THINK WE CALLED IT, WE CAME UP WITH A FIGURE OF

12  6,799 POUNDS.  DOES THAT SOUND RIGHT?  DO YOU NEED YOUR

13  RECOLLECTION REFRESHED ON THAT?

14  A.   THAT SOUNDS CLOSE, YES.

15  Q.   AND IF WE USE 40 POUNDS PER SQUARE FOOT, WE CAME UP WITH

16  9,065 POUNDS, RIGHT?

17  A.   THAT'S CORRECT.  WELL, I'M ASSUMING IT IS.

18  Q.   I'LL BE HAPPY TO SHOW YOU THE DEPO IF YOU HAVE ANY DOUBT

19  ABOUT IT?

20  A.   I'LL TAKE YOUR WORD FOR IT THAT'S WHAT WE CALCULATED AT THAT

21  TIME.

22  Q.   NOW, IF I CAN DO A LITTLE SIMPLE ARITHMETIC, BUT I'M NEVER

23  SURE OF THAT, A TON IS 2,000 POUNDS, CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   SO IF WE WERE TALKING ABOUT 6800 POUNDS, THAT'S AT THE LOWER

1   LEVEL OF 30 POUNDS PER SQUARE FOOT, THAT WOULD BE OVER THREE TONS

2   THAT COULD BE BROUGHT INTO THAT TRAILER TO WITHSTAND THAT LOAD,

3   RIGHT?

4   A.   THAT'S CORRECT, YES, THEORETICALLY.

5   Q.   MS. ALEXANDER, HER 12-YEAR-OLD -- I FORGET HOW OLD

6   ERICA ALEXANDER, MS. ERICA ALEXANDER WAS WHEN THEY MOVED IN, AND

7   HER SON COULD BRING UP TO OVER THREE TON'S WORTH OF STUFF IN

8   THERE TO COME UP WITH THIS CALCULATION, RIGHT?

9   A.   THAT'S EXACTLY WHAT YOU'RE GETTING AT, BUT THAT'S NOT WHAT

10  THE CALCULATIONS ARE FOR.

11         THE REASON WHY THEY DO IT THAT WAY IS BECAUSE THEY

12  DON'T KNOW HOW THAT ANY PARTICULAR STRUCTURE IS GOING TO BE

13  LOADED, WHETHER THERE'S GOING TO BE ANYTHING DIRECTLY ON THE

14  CENTER OF THE STRUCTURE OR ANYTHING OUT ON THE VERY EDGE OF THE

15  STRUCTURE, WHERE THOSE LOADS ARE GOING TO BE LOCATED.

16         FOR INSTANCE, IF MS. ALANA AND HER CHILDREN BROUGHT IN

17  ALL OF THEIR PHYSICAL BELONGINGS THAT THEY HAD AND STACKED THEM

18  ALL IN ONE CORNER, THAT WOULD OBVIOUSLY BE A MUCH GREATER LOAD ON

19  A STRUCTURAL MEMBER THAT'S IN THAT CORNER THAN IT WOULD BE IN THE

20  REST OF THE HOUSE.

21         AND SO THEY PUT THESE MINIMUM LOADS OUT THERE FOR THE

22  STANDARD OF DESIGN, THAT YOU DESIGN THE ENTIRE STRUCTURE SO THAT

23  IT DOESN'T REALLY MATTER WHERE LOADS MAY OR MAY NOT BE PLACED, IF

24  YOU'VE DESIGNED IT TO THIS LEVEL, THEN IT CAN -- IT CAN WITHSTAND

25  ANY LOCAL OVERLOADING SITUATION, IF YOU WOULD, THAT IT WOULD BE

1  A -- IT WOULD BE THE SAME KIND OF EFFECT AS IF YOU HAD A

2  UNIFORMLY-DISTRIBUTED LOAD THROUGHOUT THERE.  SO WE'RE NOT

3  TALKING APPLES AND APPLES HERE.  WE'RE TALKING APPLES AND

4  ORANGES.

5  Q.   SIR, MY QUESTION IS, YOU DID A CALCULATION USING THOSE 30-

6  TO 40-SQUARE FOOT STANDARDS, AND THAT WOULD -- CORRECT?

7  A.   THAT'S CORRECT.

8  Q.   AND THOSE -- AND DOING THAT CALCULATION REVEALS THAT THESE

9  I-BEAMS THAT YOU SAID MR. LEMIEUX, BECAUSE HE TOOK THE WEIGHT OFF

10 OF THE SPRING SUSPENSION, WAS HIS TESTIMONY, THE ONES THAT YOU

11 SAID GOT DEFORMED BECAUSE HE PUT HIS ONE LITTLE JACK THERE AND

12 BENT IT, THEY COULD WITHSTAND THREE TO FOUR TON'S WORTH OF

13 MATERIAL BROUGHT INTO THAT TRAILER.

14 A.   THAT'S CORRECT.

15 Q.   ISN'T THAT CORRECT?

16 A.   THAT'S CORRECT.

17 Q.   OKAY.

18 A.   UNDER A DIFFERENT LOCATION.

19 Q.   NOW, LET'S BE CLEAR ABOUT WHAT YOU'RE CONCERNED ABOUT.

20 YOU'RE NOT CONCERNED ABOUT THE USE OF PIERS TO SUPPORT THIS

21 STRUCTURE, RIGHT?  THE FACT THAT FEMA TOLD FLUOR AND ITS

22 CONTRACTORS, PUT THIS ON SIX CONCRETE PIERS BUILT A CERTAIN WAY,

23 YOU LOOKED AT ALL THAT.  THAT'S NOT WHAT CONCERNS YOU.  YOUR

24 OPINIONS DIRECTED ONLY TO THE JACKING, THE PROCESS OF HOISTING OR

25 JACKING THE TRAILER FROM THE BACK OF THE TRUCK THAT IT GETS

1  PULLED ON INTO THE FINAL PLACEMENT, CORRECT?

2  A.   THAT'S CORRECT.  WE WERE CONCERNED ABOUT THE BLOCKING

3  ISSUES, WHICH IS WHY WE RAN SOME OF THOSE CALCULATIONS AND LOOKED

4  AT THAT.  BUT AFTER RUNNING THOSE CALCULATIONS AND ANALYSIS,

5  THAT'S NOT AS BIG OF A CONCERN AS THE JACKING PROCESS.

6  Q.   NOW, SIR, WHEN YOU FIRST WROTE YOUR REPORT, YOU DIDN'T

7  SAY -- WHAT'S THAT PHRASE, MR. HILLIARD USES?  TO --

8         MR. HILLIARD:  ARE YOU GOING TO SWEAR ME IN?

9                        EXAMINATION

10  BY MR. PENOT:

11  Q.   TO A DEGREE OF ENGINEERING PROBABILITY.  YOU DIDN'T SAY THAT

12  WHEN YOU FIRST WROTE YOUR REPORT, DID YOU, SIR, THAT TO SOME

13  DEGREE OF ENGINEERING PROBABILITY, YOU KNEW THAT IMPROPER JACKING

14  ON MARCH 17, 2006, CAUSED THE DAMAGE TO THE TRAILER?

15  A.   THAT'S NOT THE WORDS IN THE REPORT, THAT'S CORRECT.

16  Q.   OH, IT'S NOT EVEN CLOSE, IS IT, MR. MOORE?  IS IT,

17  MR. MOORE?

18  A.   IT SAYS THAT IT'S CONSISTENT WITH THE JACKING EFFECTS.

19  Q.   RIGHT.  YOUR REPORT SAID IT'S "CONSISTENT WITH."  IT'S

20  CONSISTENT WITH A NUMBER OF OTHER THINGS, TOO, ISN'T IT?

21  A.   IT COULD BE.

22  Q.   LET'S TALK ABOUT WHAT SOME OF THOSE COULD BE.  ONE OF THEM

23  COULD BE TRANSPORTATION LOADS, RIGHT, SIR?

24  A.   THAT'S CORRECT.

25  Q.   THAT IS TO SAY, I'M LAPSING INTO TRYING TO USE ENGINEERING

1 LANGUAGE.  TRANSPORTATION LOAD, WHAT DO WE MEAN BY THAT?  A GUY'S

2 GOING DOWN THE STREET, GOING DOWN THE HIGHWAY 60 MILES AN HOUR

3 AND HE HITS A POTHOLE, AND THAT CAUSES -- THAT'S GOING TO CAUSE

4 SOME OF THIS BOWING OR DEFLECTION OF THE BEAMS THAT WE HAVE BEEN

5 TALKING ABOUT, ISN'T IT?

6 A.   IT COULD, YES.

7 Q.   AND THAT COULD CAUSE DAMAGE LIKE WE'VE SEEN IN THIS TRAILER,

8 COULDN'T IT?

9 A.   IT COULD, YES.

10 Q.   YOU ALSO NOTED, SIR, IT'S NOT ALL THAT CLEAR ON THIS

11 PICTURE, BUT YOU NOTED YOUR BELIEF, IF YOU LOOK AT JUST THAT

12 PICTURE, THAT THE LEFT FRONT PIER THERE, THE ONE INSTALLED BY

13 SOMEBODY OTHER THAN FLUOR, IS LEANING A LITTLE BIT TO THE LEFT.

14 THAT'S YOUR BELIEF AS YOU EXAMINE THIS PICTURE, RIGHT, SIR?

15 A.   IT CERTAINLY APPEARS THAT WAY, YES.

16 Q.   AND THAT COULD CAUSE SOME OF THE TYPES OF DAMAGE WE'RE

17 TALKING ABOUT ON THIS TRAILER, RIGHT?

18 A.   THE LEANING PIER BY ITSELF, REALLY, NO.  IT DEPENDS ON WHAT

19 HAPPENED, IF THE LEANING PIER WAS INSTALLED THAT WAY, IF IT WAS

20 INSTALLED WITH A LEAN TO IT, THEN, NO, IT WOULD NOT CAUSE THAT.

21 IF THERE WAS SOME SETTLEMENT ISSUES, WHERE THE PIER STARTED

22 LEANING AFTERWARDS, THEN, YES.

23 Q.   SO SOME DIFFERENTIAL SETTLEMENT OF LAND COULD CAUSE THIS.

24 A.   YES, SIR.

25 Q.   CORRECT?

1    A.    THAT'S CORRECT.

2    Q.    THAT'S SOMETHING WE HAVE A LOT OF AROUND SOUTH LOUISIANA,

3    ISN'T IT?

4    A.    SURE.

5    Q.    SOME DIFFERENTIAL SETTLEMENT OF LAND.

6    A.    THAT'S CORRECT.

7    Q.    THAT'S WHY OUR STREETS LOOK THE WAY THEY DO SOMETIMES.

8    A.    NOT SO MUCH STREETS.  MORE STRUCTURES THAT IT AFFECTS.

9    Q.    NOW, IT'S ALSO -- IT'S ALSO CONSISTENT WITH SOME OTHER VERY

10   SIMPLE THINGS.  THE WALL PANEL POPPED OUT, CORRECT?  LIKE A GUY

11   MISSES THE STUD WITH A STAPLE GUN.  THAT CAN HAPPEN, CAN'T IT,

12   MR. MOORE?

13   A.    IT SURE CAN, YES.

14   Q.    NOW, THE LEAKS YOU WERE TALKING ABOUT, YOU WEREN'T HERE FOR

15   MS. ERICA ALEXANDER'S TESTIMONY ON MONDAY, WERE YOU, OR WERE YOU

16   NOT?

17   A.    NO, I WAS NOT HERE ON MONDAY.

18   Q.    NOW, THE LEAKS, SHE SAID, STARTED OCCURRING MIDWAY THROUGH

19   THE TIME THEY MOVED INTO THE TRAILER, THAT IS, NOT ON

20   FEBRUARY 17, '06, BUT MIDWAY BETWEEN FEBRUARY 17, '06 AND

21   DECEMBER OF '07.  OKAY?

22   A.    OKAY.

23   Q.    ASSUMING THAT THAT'S TRUE, ASSUMING THAT THAT'S TRUE, WHAT

24   DOES THAT DO TO YOUR OPINION THAT THE DEFORMATIONS OR BOWING OF

25   THE BEAMS THAT CAUSED SOME SORT OF DIFFERENTIAL MOVEMENT AND

1   OTHER STRUCTURAL ELEMENTS THAT CAUSED THE ROOF TO BREAK, HOW DOES

2   THAT IMPACT THAT DECISION -- THAT OPINION?

3   A.   I DON'T THINK WE EVER TALKED ABOUT THE ROOF TO BREAK.

4        IT DOESN'T REALLY --

5   Q.   LEAK.  THE ROOF LEAKED.  I THOUGHT YOU SPOKE ABOUT ROOF

6   LEAKING WITH MR. HILLIARD.

7   A.   I DON'T THINK WE SPECIFICALLY TALKED ABOUT THE ROOF LEAK,

8   BUT BE THAT AS IT MAY, IT REALLY DOES NOT AFFECT MY OPINION A

9   WHOLE LOT ON THAT.  BECAUSE FROM HER PERSPECTIVE, THAT WOULD BE

10  PROBABLY THE FIRST TIME THAT THEY SAW THE WATER COMING THROUGH.

11  THERE COULD HAVE BEEN AND PROBABLY WERE LEAKS IN THIS UNIT MUCH

12  SOONER THAN THAT, THAT THEY JUST DIDN'T SEE, THAT WAS BEHIND

13  WALLS AND THINGS LIKE THAT.

14  Q.   YEAH.  SO, YEAH, IT COULD HAVE TAKEN A UNIT THIS SMALL SOME

15  WATER, IT COULD TAKE, LET'S SEE, THEY WERE THERE FOR, IS THAT 18

16  MONTHS, 17 MONTHS?

17  A.   SOMETHING LIKE THAT.

18  Q.   YEAH.  SO IT'S REASONABLE TO THINK THAT THE WATER DOESN'T

19  SHOW UP FOR EIGHT AND A HALF, NINE MONTHS?

20  A.   COULD BE.

21  Q.   TALKING ABOUT JUST OTHER SIMPLE EXPLANATIONS, LIKE GUYS

22  MISSING -- MISSING STUDS WITH A STAPLE GUN.  WERE YOU HERE FOR

23  MS. BAKSH'S TESTIMONY, THE LADY WHO DID THE INSPECTION OF THIS

24  PARTICULAR TRAILER ON JANUARY 14, '06?

25  A.   YES, I WAS HERE, YES.

1  Q.   AND YOU HEARD HER SAY THAT -- THOUGH SHE DOESN'T BELIEVE SHE

2  WROTE IT, "WALL IN BEDROOM," SHE WOULD AGREE MEANS, AND YOU WOULD

3  AGREE, WOULDN'T YOU, SIR, IT'S JUST A REASONABLE ASSUMPTION THAT

4  IF ON AN INSPECTION FORM SOMEBODY WROTE "WALL IN BEDROOM," THE

5  WALL IN THE BEDROOM WASN'T PERFECT?

6  A.   I WOULD AGREE WITH THAT, YES.

7  Q.   AND DID YOU SEE HER WHEN WE TALKED ABOUT ANOTHER INSPECTION

8  FORM, "WALL OVER SINK AND BEDROOM."  YOU SAW THAT ONE?

9  A.   I REMEMBER DOING THAT, YES.

10  Q.   AND MAYBE THIS ONE, "WALL LOOSE IN BEDROOM"?

11  A.   YES.

12  Q.   AND THIS ONE, "BEDROOM WALL LOOSE"?

13  A.   I THINK WE LOOKED AT MOST OF THOSE THE OTHER DAY, AND, YES,

14  IN HER TESTIMONY.

15  Q.   SO IT SEEMS LIKE BEDROOM WALLS BEING LOOSE, PANELS BEING

16  LOOSE, IS SOMETHING THAT'S NOT TERRIBLY UNCOMMON, IS IT, SIR, IN

17  A TRAVEL TRAILER THAT'S BEEN TRANSPORTED 1500 MILES?

18  A.   WE DON'T KNOW ANYTHING ABOUT THOSE OTHER UNITS.  I REALLY

19  COULDN'T SPEAK TO THAT.

20  Q.   BUT WE DO KNOW THAT FEMA, WHO ESTABLISHES AN INSPECTION

21  FORM, SPECIFICALLY, SPECIFICALLY WANTS ITS INSPECTORS OR WHOEVER

22  IS INSPECTING TO LOOK AT WALL PANELS, THAT'S ONE THING THAT

23  SHOULD BE CHECKED FOR, RIGHT?

24  A.   CORRECT.

25  Q.   NOW, IN BETWEEN THE TIME -- LET'S GO BACK TO YOUR OPINION.

1   IN BETWEEN THE TIME THAT YOU WROTE YOUR REPORT AND I GOT A CHANCE

2   TO CONDUCT YOUR DEPOSITION, YOU HAD A TELEPHONE CONVERSATION WITH

3   SOME OF THESE LAWYERS HERE ON, REPRESENTING THE PLAINTIFF AND

4   MS. SHIRLEY ALEXANDER, RIGHT?

5   A.   THAT'S CORRECT.

6   Q.   AND AT YOUR DEPOSITION, BY THE TIME OF YOUR DEPOSITION, YOUR

7   OPINION HAD BECOME MUCH AS IT IS TODAY, THAT YOU KNEW TO A

8   REASONABLE DEGREE OF ENGINEERING CERTAINTY OR PROBABILITY THAT

9   DAMAGE OCCURRED ON FEBRUARY 17, '06, WHEN IT WAS IMPROPERLY

10  JACKED; IS THAT CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   AND YOU DID THAT, IN PART, BASED ON MS. SHIRLEY ALEXANDER'S

13  TESTIMONY ABOUT HOW IT WAS JACKED, CORRECT?

14  A.   IN PART.

15  Q.   AND I'M SURE WHEN YOU SPOKE TO MS. ALEXANDER THAT NIGHT

16  BEFORE YOUR DEPOSITION WITH THE LAWYERS, IT WAS EXTRAORDINARILY

17  CLEAR JUST EXACTLY HOW THAT TRAILER HAD BEEN JACKED.

18  A.   SHE WAS FAIRLY CLEAR THAT IT WAS JACKED FROM ONE SIDE TO THE

19  OTHER.

20  Q.   BUT YESTERDAY SHE TESTIFIED IT WAS IN AN X, FROM ONE CORNER

21  TO THE OTHER, DIDN'T SHE, SIR?

22  A.   YES, SIR.

23  Q.   THAT'S NOT WHAT YOU TESTIFIED, THAT'S NOT WHAT YOU TESTIFIED

24  YOU HAD, YOU TOOK AWAY FROM THAT PHONE CONVERSATION THE NIGHT

25  BEFORE YOUR DEPOSITION; IS IT, SIR?

1    A.    THAT'S CORRECT.  MY DEPOSITION SAID JUST LIKE I SAID NOW

2    THAT SHE BASICALLY SAID IT WAS FROM ONE SIDE TO THE OTHER.

3    Q.    NOW, SIR, IN YOUR FIELD, THERE'S A CALCULATION YOU COULD DO

4    THAT WOULD TELL US, IF SOMEBODY TOOK A JACK ON THAT TRAILER WITH

5    THOSE DIMENSIONS, THAT WEIGHT -- WEIGHT DISTRIBUTION AND WHATNOT,

6    THERE'S A CALCULATION YOU COULD DO THAT WOULD TELL US JUST HOW

7    HIGH A GUY WOULD HAVE TO JACK ON ONE OF THOSE I-BEAMS WITH A

8    HYDRAULIC JACK BEFORE DAMAGE WOULD START OCCURRING, CORRECT?

9    A.    FOR DIFFERENT MATERIALS IT WOULD BE DIFFERENT, BUT YES,

10   THERE ARE CALCULATIONS THAT COULD BE DONE LIKE THAT, YES.

11   Q.    SOMETHING CALLED FINITE ELEMENT ANALYSIS, IS THAT -- DO I

12   HAVE THE RIGHT TERM?

13   A.    THAT WOULD BE A GOOD TERM, YES.

14   Q.    BUT YOU DIDN'T DO THAT CALCULATION.

15   A.    NO, SIR, I DID NOT.

16   Q.    YOU WEREN'T ASKED TO DO THE CALCULATION.

17   A.    NO, SIR.

18            MR. PENOT:  YOUR HONOR, MAY I HAVE A MOMENT?

19            THE COURT:  SURE.

20            MR. PENOT:  PASS THE WITNESS, YOUR HONOR.

21               THANK YOU, MR. MOORE.

22            THE WITNESS:  THANK YOU.

23            THE COURT:  ANYTHING FROM GULF STREAM?

24            MR. WEINSTOCK:  NO, YOUR HONOR.

25            THE COURT:  GOOD.  LET'S GO AHEAD AND DO REDIRECT.

1    MR. HILLIARD?

2              MR. HILLIARD:  THANK YOU, JUDGE.

3                        REDIRECT EXAMINATION

4    BY MR. HILLIARD:

5    Q.   DO YOU RECALL THIS LINE OF QUESTIONING -- MISSING THE

6    POINTER.  WHEN YOU JACK A TRAILER FROM SIDE TO SIDE, THE FRAME OF

7    THE TRAILER, THE STEEL STRUCTURE THAT MR. PENOT SAYS IS SO

8    STRONG, IS NOT WHAT'S BEING AFFECTED AS COMPARED TO THE COMPONENT

9    PARTS THAT ARE STAPLED, GLUED AND CAULKED; IS THAT RIGHT?

10   A.   IT'S A COMBINATION OF THOSE TWO ACTUALLY, YES.

11   Q.   SO IF YOU HAVE A PIECE OF STEEL THAT'S JACKED UP, AND IT

12   POPS BACK IN AS THE JACKING OCCURRED, WHAT IS YOUR OPINION AND

13   BELIEF AS TO THE DAMAGE CAUSED TO THE INSIDE AND STRUCTURE OF THE

14   TRAILER THAT IS CAULKED, GLUED AND STAPLED?

15   A.   WELL, AGAIN, WHAT I THINK YOU'RE KIND OF REFERRING TO IS THE

16   STEEL IS AN ELASTIC MATERIAL MUCH LIKE A RUBBER BAND, AND THAT IT

17   DOES MOVE AND IT WILL COME BACK TO ITS PROPER SHAPE, WHICH IS WHY

18   THERE IS NO DEFORMATIONS THAT ARE SEEN ON IT AS IT IS NOW.  THERE

19   WASN'T A PERMANENT DEFORMATION, BUT THERE WAS SOME LOCAL

20   DEFORMATION THAT WAS IN THE ELASTIC RANGE.

21   Q.   AND AS IT'S BEING DEFORMED, REGARDLESS OF HOW IT SHAPES BACK

22   AFTERWARDS, THE FACT OF THE DEFORMATION WHILE OCCURRING, WHILE

23   BEING JACKED BY MR. LEMIEUX ON FEBRUARY 16TH, DID IT CAUSE DAMAGE

24   TO OTHER PARTS OF THE STRUCTURE, THE CAULKING, THE GLUE, THE

25   STAPLING THAT KEPT THIS TRAILER TOGETHER?

1   A.    I BELIEVE IT DID, YES.

2   Q.    AND YOU CONSIDERED THE OTHER SCENARIOS IN FORMING YOUR

3   OPINION THAT MR. PENOT PRESENTED TO YOU?

4   A.    YES.  ACTUALLY, WHAT I WROTE IN MY REPORT WAS A VERY SHORT

5   TIMELINE THAT WE WENT AND LOOKED AT IT AND WE HAD TO --

6   Q.    MY QUESTION IS:  DID YOU CONSIDER IT?

7   A.    YES, SIR.  I WAS JUST GOING TO SAY, WE CONSIDERED MANY

8   THINGS AFTER I WROTE THE REPORT.  THERE WERE SEVERAL DOCUMENTS

9   THAT WERE GIVEN TO ME AFTER THAT.

10  Q.    OKAY.  ONE THING I WANTED TO -- MR. PENOT SEEMED TO FOCUS ON

11  IS THE AMOUNT OF DISTANCE THIS TRAILER HAS TRAVELED.  WHEN WE

12  ADDED IT UP OVER THERE, IT'S ABOUT 2900 MILES.  DO THEY CALL IT A

13  TRAVEL TRAILER?

14  A.    YES, SIR.

15  Q.    SO IF WE TOOK IT FROM NEW ORLEANS TO YELLOWSTONE IN WYOMING

16  AND BROUGHT IT BACK, IT WOULD BE ABOUT THE SAME DISTANCE, RIGHT?

17  A.    PROBABLY, YES.

18  Q.    IT'S MEANT TO BE PULLED BEHIND A VEHICLE SO THAT WE CAN GO

19  TO THE NATIONAL PARKS AND THE NATIONAL SEASHORES, SO THAT WE CAN

20  TRAVEL IN A TRAILER, RIGHT?

21  A.    YES, SIR.

22  Q.    IT'S NOT MEANT TO BE JACKED UP FROM SIDE TO SIDE, WHICH

23  AFFECTS IT DIFFERENTLY THAN BEING PULLED BEHIND A TRUCK, RIGHT?

24  A.    YES, SIR.

25  Q.    AND THE WALL-IN-THE-BEDROOM DOCUMENTS THAT MR. PENOT SHOWED

1   YOU, EVERY SINGLE ONE OF THOSE WERE DOCUMENTS SIGNED BY THE FLUOR

2   INSPECTOR.  DID YOU HEAR HIM TELL YOU THAT PART?

3   A.   I BELIEVE THAT WE TALKED ABOUT THAT, YES.

4           THE COURT:  MR. HILLIARD, DON'T LEAD THE WITNESS.

5           MR. HILLIARD:  I WON'T, JUDGE.

6                          EXAMINATION

7   BY MR. HILLIARD:

8   Q.   FINALLY, THE LACK OF PAPERWORK OR DOCUMENTATION IN THIS AREA

9   HERE THAT MR. PENOT TALKED TO YOU ABOUT, YOU SAW NO DOCUMENTS

10  THAT THIS TRAILER WAS DAMAGED AS IT WAS BEING USED AS A TRAVEL

11  TRAILER, DID YOU?

12  A.   NO, SIR.

13  Q.   MR. PENOT DIDN'T PULL OUT ANY DOCUMENTS EITHER AND SHOW YOU

14  ANY THAT WOULD SUPPORT HIS UNSUPPORTABLE VIEW THAT THERE WAS ANY

15  DAMAGE WHILE IT WAS BEING USED AS A TRAVEL TRAILER, CORRECT?

16  A.   NO, SIR.

17          MR. HILLIARD:  THANK YOU FOR YOUR TIME.  YOUR HONOR, I

18  PASS THE WITNESS.

19          THE COURT:  THANK YOU, SIR.  YOU CAN STEP DOWN.  I

20  APPRECIATE YOUR TIME.

21              I'VE GOT ABOUT A QUARTER TO 12.  WHY DON'T WE GO

22  AHEAD AND, RATHER THAN START A NEW WITNESS AT THIS POINT, WHY

23  DON'T WE GO AHEAD AND TAKE AN EARLY LUNCH BREAK.  LET'S PLAN ON

24  STARTING UP AT, WHY DON'T WE JUST SAY 1 O'CLOCK SHARP.  PLEASE

25  DON'T DISCUSS THE CASE AMONGST YOURSELVES DURING THE LUNCH BREAK.

1            THE COURT SECURITY OFFICER:  ALL RISE.

2            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

3    PANEL LEAVES THE COURTROOM, AND THE COURT WAS IN LUNCHEON

4    RECESS.)

5                              *    *    *

6

7

8                        REPORTER'S CERTIFICATE

9

10      I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

11   MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

12   REPORTER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT

13   COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE

14   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY

15   ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

16   THE ABOVE-ENTITLED AND NUMBERED MATTER.

17

18

19                         *S/CATHY PEPPER*_____

20                         CATHY PEPPER, CRR, RMR, CCR

21                         OFFICIAL COURT REPORTER

22                         UNITED STATES DISTRICT COURT

23

24

25