```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************

 4   IN RE:  FEMA TRAILER
     FORMALDEHYDE PRODUCTS
 5   LIABILITY LITIGATION

 6                             DOCKET MDL NO. 1873 "N"
                              NEW ORLEANS, LOUISIANA
 7                            MONDAY, SEPTEMBER 21, 2009, 7:45 A.M.

 8   THIS DOCUMENT IS RELATED TO

 9   CHARLIE AGE, ET AL V
     GULF STREAM COACH, INC.,
10   ET AL, DOCKET NO. 09-2892;
     ALANA ALEXANDER,
11   INDIVIDUALLY AND ON BEHALF
     OF CHRISTOPHER COOPER
12
     ****************************************************************
13
                                DAY 6
14                         MORNING SESSION
                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15          HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                     UNITED STATES DISTRICT JUDGE
16

17   APPEARANCES:

18

     FOR THE PLAINTIFFS:
19
                              GAINSBURGH BENJAMIN DAVID MEUNIER AND
20                            WARSHAUER
                              BY:  GERALD E. MEUNIER, ESQUIRE
21                            2800 ENERGY CENTRE
                              1100 POYDRAS STREET, SUITE 2800
22                            NEW ORLEANS LA  70163

23
                              THE BUZBEE LAW FIRM
24                            BY:  ANTHONY G. BUZBEE, ESQUIRE
                              600 TRAVIS, SUITE 7300
25                            HOUSTON TX  77002
```

```
1   APPEARANCES CONTINUED:

2
                              WATTS GUERRA CRAFT
3                             BY:  MIKAL C. WATTS, ESQUIRE
                              FOUR DOMINION DRIVE
4                             BUILDING THREE, SUITE 100
                              SAN ANTONIO TX 78257
5

6                             HILLIARD MUNOZ GUERRA
                              BY:  ROBERT C. HILLIARD, ESQUIRE
7                             719 S. SHORELINE BOULEVARD #500
                              CORPUS CHRISTI TX 78401
8

9                             CHRIS PINEDO
                              ATTORNEY AT LAW
10                            802 N. CARANCAHUA, SUITE 2250
                              CORPUS CHRISTI TX  78470
11

12  FOR GULF STREAM COACH, INC.:

13                            DUPLASS ZWAIN BOURGEOIS MORTON
                              PFISTER & WEINSTOCK
14                            BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                   JOSEPH G. GLASS, ESQUIRE
15                            THREE LAKEWAY CENTER
                              3838 N. CAUSEWAY BOULEVARD
16                            SUITE 2900
                              METAIRIE LA  70002
17

18                            SCANDURRO & LAYRISSON
                              BY:  TIMOTHY D. SCANDURRO, ESQUIRE
19                            607 ST. CHARLES AVENUE
                              NEW ORLEANS LA  70130
20

21
    FOR FLUOR ENTERPRISES, INC.:
22
                              MIDDLEBERG RIDDLE & GIANNA
23                            BY:  CHARLES R. PENOT, JR., ESQUIRE
                                   RICHARD A. SHERBURNE, ESQUIRE
24                                 SONIA MALLETT, ESQUIRE
                              717 N. HARDWOOD
25                            DALLAS TX  75201
```

1  OFFICIAL COURT REPORTER:        CATHY PEPPER, CCR, RMR, CRR
                                   500 POYDRAS STREET, ROOM B406
2                                  NEW ORLEANS LA  70130
                                   (504) 589-7779
3
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
4  PRODUCED BY COMPUTER.

5
                         **I N D E X**
6

7  EXAMINATIONS                                          PAGE

8

9  **DR. JAMES P. KORNBERG** (DAUBERT TESTIMONY)..............   6

10 CROSS-EXAMINATION BY MR. WEINSTOCK.....................   6

11 REDIRECT EXAMINATION BY MR. WATTS:.....................  24

12 **DR. JAMES P. KORNBERG**................................  37

13 VOIR DIRE EXAMINATION BY MR. WATTS:....................  37

14 TRAVERSE EXAMINATION BY MR. WEINSTOCK:  ...............  44

15 DIRECT EXAMINATION BY MR. WATTS:.......................  47

16 CROSS-EXAMINATION BY MR. WEINSTOCK..................... 100

17 REDIRECT EXAMINATION BY MR. WATTS..................... 144

18 **JANET DUNCAN BARNES, M.D.**............................ 151

19 DIRECT EXAMINATION BY MR. BUZBEE...................... 152

20

21                     E X H I B I T S

22 DESCRIPTION                                           PAGE

23

24 EXHIBITS 300 AND 325 WERE ADMITTED....................   5

25

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                         MORNING SESSION

3            MONDAY, SEPTEMBER 21, 2009, 7:45 A.M.

4                     (COURT CALLED TO ORDER)

5

6

7            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

8    A *DAUBERT* HEARING OUTSIDE THE PRESENCE OF THE JURY AS FOLLOWS:)

9            THE DEPUTY CLERK:  ALL RISE.

10           THE COURT:  GOOD MORNING.

11           MR. WATTS:  JUDGE, COULD I DO 30 SECONDS OF CLEAN-UP

12   BEFORE I FORGET?

13           THE COURT:  YES, GO AHEAD.

14           MR. WATTS:  BY AGREEMENT OF COUNSEL, WE HAD AGREED TO

15   TAKE OUT SOME PHOTOGRAPHS FROM MR. RITTER THAT DEPICTED THE AIR

16   BLOWER, AND SO WE TOOK THAT OUT.  WE'RE OFFERING AS EXHIBIT 325

17   RITTER'S PHOTOS 1 THROUGH 114, AND THERE IS NO OBJECTION.

18           THE COURT:  DO YOU WANT TO DO THIS IN FRONT OF THE JURY,

19   THOSE THAT YOU ARE ADMITTING?

20           MR. WATTS:  THEY'VE ALREADY BEEN OFFERED AND WE'VE JUST

21   AGREED TO TAKE IT OUT.  THEY WON'T EVEN KNOW THE DIFFERENCE.

22           THE COURT:  DO YOU HAVE THE EXHIBIT NUMBER?

23           MR. WATTS:  YES, SIR.  IT'S EXHIBIT 325 IS RITTER'S

24   PHOTOGRAPHS 001 THROUGH 114.  AND WE TOOK OUT 115 THROUGH THE

25   END.

1            AND THEN EXHIBIT 300, WHICH IS ALREADY OFFERED IN

2  FRONT OF THE JURY, WAS THE CV AND HEWETT SLIDES 1 THROUGH 17.  WE

3  TOOK OUT 18 THROUGH 20 PURSUANT TO DIRECTION OF THE COURT.  AND

4  WE FORMALLY OFFER THOSE AT THIS TIME WITHOUT OBJECTION.

5            THE COURT:  WHAT ARE THOSE NUMBERS?

6            MR. WATTS:  THREE HUNDRED IS THE CV AND SLIDES 1 THROUGH

7  17, SIR.

8            THE COURT:  AND THERE IS NO OBJECTION?

9            MR. WEINSTOCK:  NO OBJECTION.

10           THE COURT:  ONE THROUGH 17; RIGHT?

11           MR. SHERBURNE:  YES, YOUR HONOR.

12           THE COURT:  SO ORDERED.

13           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

14  EXHIBITS 300 AND 325 WERE ADMITTED INTO EVIDENCE.)

15           MR. WATTS:  AND THEN WE WOULD ASK THE COURT FOR A RULING

16  ON OUR OFFER OF PROOF WE DID FRIDAY AFTERNOON WITH RESPECT TO

17  HEWETT, AND I ASSUME THAT'S OVERRULED?

18           THE COURT:  THAT'S CORRECT.

19           MR. WATTS:  OKAY.  I'M DONE.  THANK YOU.

20           THE COURT:  LET'S GO AHEAD AND TAKE UP THE ISSUE OF THE

21  EXPERT TESTIMONY OF DR. KORNBERG, WHO IS WITH US THIS MORNING.

22           I HAVE RECEIVED THE PLAINTIFF'S BRIEF IN SUPPORT OF

23  JAMES P. KORNBERG'S *DAUBERT* HEARING.  I HAVE ALSO HAD, PRIOR TO

24  THIS, OF COURSE, THE BENEFIT OF THE MOTION FILED BY THE

25  DEFENDANTS TO EXCLUDE THE TESTIMONY WHICH THE COURT HAD ISSUED A

1  RULING ON, WHICH IS WHY WE'RE HERE EARLY TODAY, TO HEAR WHAT HE

2  HAS TO SAY WITH REGARD TO THE OPINION.

3              SO WHY DON'T WE GO AHEAD AND PROCEED BY PRIOR

4  AGREEMENT AND WITH THE BENEFIT OF THIS SUBMISSION FROM THE

5  PLAINTIFFS, MR. WEINSTOCK IS GOING TO PROCEED TO COMMENCE HIS

6  CROSS-EXAMINATION ON THOSE PARTICULAR ISSUES, AND THEN WE HAVE

7  REDIRECT AND THEN WE'LL GO AHEAD AND RULE ON IT BEFORE WE BRING

8  THE JURY IN.

9        THE DEPUTY CLERK:  DO YOU SOLEMNLY SWEAR THE TESTIMONY

10  YOU'RE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND

11  NOTHING BUT THE TRUTH SO HELP YOU GOD?

12        THE WITNESS:  I DO.

13        THE DEPUTY CLERK:  PLEASE STATE AND SPELL YOUR FULL NAME

14  FOR THE RECORD.

15        THE WITNESS:  MY NAME IS JAMES, PHILIP, P-H-I-L-I-P,

16  KORNBERG, K-O-R-N-B-E-R-G.

17                    **DR. JAMES P. KORNBERG**

18  (DAUBERT TESTIMONY) WAS CALLED AS A WITNESS AND, AFTER BEING

19  FIRST DULY SWORN BY THE CLERK, WAS EXAMINED AND TESTIFIED ON HIS

20  OATH AS FOLLOWS:

21        THE COURT:  AND WE WILL ADMINISTER THE OATH TO HIM AGAIN

22  BEFORE THE JURY WHEN HE ACTUALLY TESTIFIES.

23           GO AHEAD.

24                    CROSS-EXAMINATION

25  BY MR. WEINSTOCK:

1  Q.    DR. KORNBERG, I'VE NEVER SEEN AN ISSUE BRIEFED QUITE SO

2  MUCH.  YOU HAVE REVIEWED ALL OF THE BRIEFING, CORRECT?

3  A.    YES.

4  Q.    AND PREPARED YOUR AFFIDAVIT IN ACCORDANCE WITH IT, RIGHT?

5  A.    THAT'S CORRECT.

6  Q.    I WANT TO KIND OF GET TO THE HEART OF THE MATTER AND NOT

7  BELABOR THIS POINT.  YOU PRESENTED ME AT YOUR DEPOSITION THE EPA

8  TABLES AS TO THE RISK-BASED CONCENTRATION FOR RESIDENTIAL

9  EXPOSURE FOR FORMALDEHYDE; CORRECT?

10 A.    YES.

11 Q.    AND THAT WAS A ONE IN A MILLION CONCENTRATION OFF THAT

12 TABLE; CORRECT?

13 A.    THAT'S CORRECT.

14 Q.    AND WE AGREED, I THINK, THAT THE EPA MODEL WAS BASED ON A

15 NO-THRESHOLD LINEAR MODEL; CORRECT?

16 A.    THAT'S CORRECT.  BUT I MIGHT ADD THAT THE LEVELS THAT ARE

17 CITED FOR FORMALDEHYDE ARE ABOVE THE ZERO THRESHOLD LIMIT.

18 Q.    AND BASED ON USING THAT EPA MODEL, YOU CALCULATED THAT

19 CHRIS COOPER, FOR THE TIME HE WAS IN THE TRAILER, HAD A -- I

20 BELIEVE IT WAS A 79 PARTS PER BILLION YEAR EXPOSURE FOR THE

21 1.58 YEARS HE WAS IN THE TRAILER; CORRECT?

22 A.    THAT'S CORRECT.

23 Q.    IT'S REALLY A VERY, VERY SIMPLE CALCULATION.  YOU JUST --

24 AFTER YOU DID YOUR WORK, YOU JUST TOOK THE EXPOSURE LEVEL OF 50

25 PARTS PER BILLION?  YES?

```
 1   A.   YES.

 2   Q.   AND MULTIPLIED IT BY 1.58?

 3   A.   THAT'S CORRECT.

 4   Q.   AND YOU CAME UP WITH 79 PARTS PER BILLION YEARS?

 5   A.   THAT'S CORRECT.

 6   Q.   IF WE FOLLOW THAT TO ITS LOGICAL EXTREME AND WE TOOK AN

 7   8 PARTS PER BILLION EXPOSURE, THE ATSDR MRL, OVER A SEVEN-YEAR

 8   EXPOSURE HISTORY, WE WOULD WIND UP WITH A 560 PARTS PER BILLION

 9   YEAR; CORRECT?

10   A.   THAT WOULD BE AN INCORRECT APPLICATION OF THE MRL BECAUSE

11   MRL'S ARE ONLY USED FOR NONCANCER OUTCOME.

12   Q.   I DON'T WANT TO DELAY THE POINT BY POINTING OUT THAT THE MRL

13   WAS NOT BASED ON THAT.  LET'S JUST MAKE IT SIMPLE.  LEAVE OUT

14   ATSDR.  IF I TOOK AN 8 PARTS PER BILLION EXPOSURE OVER A 70-YEAR

15   LIFETIME, I WOULD HAVE A 560 PARTS PER BILLION YEAR; CORRECT?

16   A.   MATHEMATICALLY, THAT'S RIGHT.

17   Q.   AND SINCE THE EPA RISK TABLE IS BASED ON THE 4.65 PARTS PER

18   BILLION YEARS, I WOULD BE LOOKING AT A FACTOR OF OVER 100 TIMES

19   HIGHER; CORRECT?

20   A.   BUT YOU WOULDN'T USE THAT APPLICATION.  IT WOULD BE AN

21   INCORRECT METHODOLOGY, 100 PERCENT INCORRECT.

22   Q.   BUT THAT'S THE CALCULATION AND METHODOLOGY YOU USED.

23   A.   NO, IT ISN'T.

24   Q.   DID YOU TAKE THE EXPOSURE AND MULTIPLY IT BY THE YEAR?

25   A.   I APPLIED THE CORRECT METHODOLOGY.  WHAT YOU'RE DOING IS
```

1   ESSENTIALLY PULLING UP NUMBERS THAT HAVE NO MEANING.  YOU DON'T

2   MULTIPLY IT BY 70 YEARS UNLESS YOU FEEL LIKE MULTIPLYING IT BY

3   70 YEARS.  IT HAS NOTHING TO DO WITH THIS CASE.  WE TALKED ABOUT

4   A 30-YEAR RESIDENTIAL EXPOSURE, WHICH IS THE NUMBER THAT IS USED

5   IN THE EPA GUIDELINES.

6   Q.   I'M JUST TAKING THE ORDINARY PERSON WHO LIVES TO 70 YEARS AT

7   8 PARTS PER BILLION, WHICH PEOPLE SEEM TO AGREE WON'T HURT YOU,

8   YOU'RE TELLING ME THAT THAT SCENARIO WOULD HAVE TEN TIMES THE

9   RISK?

10  A.   IT WOULD BE TEN TIMES THE SMALL RISK ASSOCIATED WITH THE

11  30-YEAR RISK-BASED CONCENTRATION.

12  Q.   I APOLOGIZE.  A HUNDRED TIMES THE RISK, NOT TEN TIMES THE

13  RISK.  A HUNDRED AND TWENTY TO BE SPECIFIC.

14  A.   MATHEMATICALLY, THAT'S CORRECT.

15  Q.   I'M ALSO CORRECT THAT ONE OF THE THINGS YOU SUGGESTED FOR

16  CHRIS COOPER WAS THAT HE WOULD UNDERGO PERIODIC X-RAYS AND CAT

17  SCANS?

18  A.   NO.

19  Q.   YOU DID NOT PUT THAT IN YOUR REPORT?

20  A.   I DID, BUT THE ADMINISTRATION OF THOSE TESTS WOULD BE

21  DETERMINED BY A PHYSICIAN WHO IS INVOLVED IN THE CASE.

22          IF I MAY EXPLAIN QUICKLY, IN MEDICAL MONITORING, THE

23  APPLICATION OF THE TEST IS THERE TO ALLOW THE ADMINISTRATING

24  DOCTOR TO DEAL WITH THAT PARTICULAR QUESTION.  IT'S A GO, NO-GO

25  DECISION MADE BY THE CLINICAL DOCTOR AT THE TIME OF THE EXAM.

1    Q.    SO IF I'M UNDERSTANDING YOU CORRECTLY, YOU FEEL HE NEEDS

2    MEDICAL MONITORING, BUT YOU WOULD NOT COMMENT ON WHAT THAT

3    MEDICAL MONITORING ENTAILS?  YOU WOULD LEAVE THAT TO THE

4    PHYSICIAN DOWN THE ROAD?

5    A.    NO.  I WOULD LEAVE THE DECISION, WHETHER TO ADMINISTER AN

6    INVASIVE TEST LIKE X-RAY, TO THE PHYSICIAN AT THE TIME OF THE

7    EXAM.  THERE WOULD HAVE TO BE A CLINICAL INDICATION FOR THAT

8    TEST.

9    Q.    IT'S GOT TO BE ONE OR THE OTHER, DOCTOR.

10            ARE YOU RECOMMENDING X-RAYS AND CAT SCANS OR ARE YOU

11   LEAVING THAT TO SOMEBODY ELSE?

12   A.    AGAIN, IT'S A MISSTATEMENT OF THE MEDICAL MONITORING PLAN.

13   IF THE DECISION IS ON THE MATRIX, IT STILL MUST BE DETERMINED

14   WHETHER IT'S CLINICALLY INDICATED.  THAT'S MENTIONED IN MY

15   REPORT.

16   Q.    FAIR ENOUGH.  DOES YOUR MATRIX INCLUDE CAT SCANS AND X-RAYS?

17   A.    ONLY AS AN OPTION.

18   Q.    YOU'RE ON THE STAND.  NOW IS YOUR DAY.  DOES CHRIS COOPER

19   NEED CAT SCANS AND X-RAYS FOR THE REST OF HIS LIFE TO MEDICALLY

20   MONITOR HIM FOR NASOPHARYNGEAL CANCER?

21   A.    IT'S DEPENDS ON THE PHYSICIAN AT THE TIME OF THE CLINICAL

22   EXAM.

23   Q.    SO YOU'RE NOT OFFERING THAT OPINION AS WE SIT HERE TODAY?

24   A.    I'M OFFERING AN OPINION I JUST GAVE, WITH ALL DUE RESPECT.

25   IN MEDICINE, WHEN YOU BASICALLY CONSIDER MEDICAL MONITORING, YOU

1  LIST THE TEST AND THEN THE DOCTOR AT THE TIME OF THE EXAM,

2  ESPECIALLY RELATED TO X-RAYS, WOULD MAKE A DETERMINATION OF

3  WHETHER THAT TEST IS CLINICALLY INDICATED.

4  Q.   LET'S PUT THIS UP.

5       THIS IS ATTACHMENT B?

6  A.   YES.

7  Q.   THESE ARE THE ESTIMATED MEDICAL MONITORING COSTS FOR

8  CHRISTOPHER JAMES COOPER FOR FORMALDEHYDE-INDUCED ASTHMA, CHRONIC

9  RHINOSINUSITIS, MUCOSAL INFLAMMATION, AND HERE IS THE BIG ONE,

10 CANCER PREVENTION; CORRECT?

11 A.   THAT'S RIGHT.

12 Q.   ARE YOU SAYING THAT HE DOES OR DOES NOT NEED A CAT SCAN

13 EVERY THREE YEARS?

14 A.   HE DOES NOT NEED A CAT SCAN EVERY THREE YEARS UNLESS THE --

15 IF YOU LOOK AT MY REPORT, WHICH YOU ARE NOT PUTTING ON THE

16 OVERHEAD HERE, IT STATES THAT IT'S TO BE DETERMINED BY THE

17 PHYSICIAN AT THE TIME OF THE EXAMINATION.  IT IS NOT AN AUTOMATIC

18 TYPE OF TEST, WHATSOEVER.

19 Q.   DO YOU KNOW WHAT THAT PHYSICIAN IS GOING TO DO IN THE

20 FUTURE, GOING TO RECOMMEND?

21 A.   IT'S DEPENDS.  IF HE FINDS A LESION IN THE YOUNG MAN'S NOSE

22 OR IF HE'S AT AGE 35 OR 40 AND THE LESION WARRANTS AN EVALUATION,

23 THAT WOULD BE CONSIDERED.  EVEN OUTSIDE OF THIS FRAMEWORK, THE

24 DOCTOR WOULD INTERVENE IF SOMETHING IMPORTANT APPEARS ON THE

25 PHYSICAL EXAM.

1    Q.   SO IT'S SPECULATIVE.  YOU CAN'T TELL US, AS YOU SIT HERE

2    TODAY, THAT THAT WILL HAPPEN?

3    A.   IT NEVER IS.  THE LIFETIME DURATION MEANS THAT OVER A PERIOD

4    OF THE LIFETIME, FOR A CT SCAN, EVERY THREE YEARS THE

5    CONSIDERATION FOR X-RAY WILL BE BROUGHT TO THE ATTENTION OF THE

6    PHYSICIAN.  THAT PHYSICIAN AT THAT TIME WOULD MAKE A

7    DETERMINATION.  WE DON'T AUTOMATICALLY TAKE X-RAYS ON PEOPLE

8    EVERY THREE YEARS.  IT JUST ISN'T DONE.

9    Q.   SO IF YOU WERE REDRAWING THIS CHART, YOU WOULD TAKE THAT

10   OUT?

11   A.   I WOULDN'T TAKE IT OUT BECAUSE IT'S QUALIFIED IN MY REPORT.

12   YOU'RE NOT SHOWING THE DOCUMENTATION IN MY REPORT, WHICH IS ONE

13   OR TWO PAGES BACK, WHICH INDICATES THAT ALL OF THIS, ESPECIALLY

14   THE CT SCAN, MRI, AND X-RAY, WOULD BE DETERMINED BY THE

15   RESPONSIBLE PHYSICIAN.  IT'S IN THE REPORT.  THE METHODOLOGY IS

16   CORRECT.  I'VE DONE MANY OF THESE OVER THE YEARS.

17   Q.   IF THE PHYSICIAN USES THIS PLAN HYPOTHETICALLY, YOU HAVE NOT

18   EVALUATED WHETHER THIS PLAN, THIS IONIZING RADIATION IS, IN FACT,

19   MORE DANGEROUS TO CHRIS COOPER THAN THE FORMALDEHYDE EXPOSURE; IS

20   THAT CORRECT?

21   A.   IF A PHYSICIAN MAKES A DECISION TO DO A CT SCAN ON THAT

22   YOUNG MAN AND TO INCUR THAT RADIATION, IT WOULD ONLY BE AS

23   CLINICALLY INDICATED, LIKE FOR ANY OTHER PERSON.  THIS SIMPLY

24   DOCUMENTS THE REQUIREMENT EVERY THREE YEARS THAT CONSIDERATION BE

25   MADE.

1  Q.   WHERE IN YOUR REPORT DID YOU SAY YOU WOULD REFER TO THE

2  FUTURE CLINICIAN?

3  A.   PAGE 27, IT STATES VERY CLEARLY, "THE ELEMENTS OF THE

4  INTERVENTION BEYOND A CLINICAL EVALUATION WOULD INCLUDE OBTAINING

5  MRI, CT SCAN, X-RAY, ENDOSCOPY, BIOPSY AND APPROPRIATE LABORATORY

6  TESTS, AS DETERMINED BY THE EVALUATING SPECIALIST."  PAGE 27,

7  THIRD PARAGRAPH.

8  Q.   AND GOING BACK TO MY PRIOR QUESTION, HAVE YOU EVALUATED THE

9  RISK TO CHRIS COOPER OF THE MEDICAL MONITORING PLAN YOU'RE

10 SUGGESTING BE MORE OR LESS HARMFUL THAN THE FORMALDEHYDE HE WAS

11 EXPOSED TO?

12 A.   IF A CT SCAN OR MRI WERE ORDERED, LITERALLY BY DEFINITION,

13 AND IT'S NOT GOING TO OCCUR EVERY THREE YEARS, EVEN THOUGH IT'S

14 TO BE CONSIDERED EVERY THREE YEARS, LIKE ANY OTHER PERSON WHO

15 GOES TO HIS DOCTOR OR HER DOCTOR, THE RISK OF X-RAY'S ALWAYS

16 CONSIDERED AS A RISK/BENEFIT ANALYSIS BY THE TREATING PHYSICIAN.

17         SO IF A SUSPICIOUS LESION WERE FOUND IN HIS NOSE AND A

18 CT SCAN WERE ORDERED, THAT DOCTOR, WHO WOULD BE RUNNING THAT

19 PROGRAM, WOULD BE MAKING THAT DECISION CLINICALLY AT THAT TIME.

20 Q.   SO THE ANSWER TO THE QUESTION IS, YOU HAVE NOT DONE THE

21 RISK-BASED ANALYSIS?

22 A.   NO.  YES, I HAVE, BECAUSE I'VE ASKED THE SUPERVISING

23 PHYSICIAN TO LOOK AT THIS EVERY THREE YEARS, AND, OF COURSE,

24 UNLESS I'M RUNNING THE PROGRAM PHYSICALLY THERE, THE TESTS WILL

25 NOT BE ORDERED BY A RESPONSIBLE PHYSICIAN UNLESS THAT RISK IS

1  WORTH THE BENEFIT THAT IT WILL INCUR.

2          THE PHYSICIAN WHO DOES THIS TEST WILL CLINICALLY

3  EVALUATE THIS CHILD AS HE GROWS UP ON A PERIODIC BASIS AND MAKE

4  THAT DETERMINATION.

5  Q.   AND THAT'S BECAUSE HE WAS EXPOSED TO 79 PARTS PER BILLION

6  YEARS OF FORMALDEHYDE WHILE IN A TRAILER; IS THAT CORRECT?

7  A.   THAT'S CORRECT.

8  Q.   SO THEREFORE, ANYBODY EXPOSED TO MORE THAN 79 PARTS PER

9  BILLION YEARS WOULD NEED THE SAME POTENTIAL MONITORING; CORRECT?

10  A.   POTENTIALLY, THAT'S CORRECT.   THIS IS ALSO CUSTOMIZED.   THIS

11  IS BACKED UP BY A VERY WELL-DOCUMENTED CLINICAL RESPONSE THAT IS

12  RELEVANT TO THIS PARTICULAR CHILD.

13  Q.   WE'LL GET TO THE CLINICAL RESPONSE WHEN WE GET TO YOUR

14  OVERALL CROSS-EXAMINATION.

15          BUT AS WE SIT HERE TODAY, ANYBODY EXPOSED TO MORE THAN

16  79 PARTS PER BILLION YEARS WOULD NEED MEDICAL MONITORING JUST

17  LIKE CHRIS COOPER?

18  A.   THIS EVALUATION IS CUSTOMIZED TO THIS PARTICULAR CASE.   I

19  CAN'T GENERALIZE THAT AT THIS POINT IN TIME.   AS A CLINICAL

20  DOCTOR, THIS WAS AN IMPORTANT FINDING THAT PROMPTED ME TO

21  CONSIDER MEDICAL MONITORING IN ADDITION TO THE OTHER FINDINGS

22  THAT WERE RELEVANT TO HIM.

23  Q.   YOUR CALCULATION WAS BASED ON A 24-HOUR-A-DAY EXPOSURE?

24  A.   ABSOLUTELY.   IT'S A CONSERVATIVE ESTIMATE, AND WHEN THE EPA

25  DERIVED THESE PARTICULAR ESTIMATES, THEY TOOK INTO CONSIDERATION

1  THE VERY YOUNG GROUP, LIKE A CHILD OR BABY WHO MIGHT BE IN A

2  PLACE FOR 24 HOURS, OR AN INVALID WHO IS OLDER, THAT MIGHT BE IN

3  A PLACE FOR 24 HOURS, OR A CHILD THAT SLEEPS IN A BED WHO IS AT

4  HOME AND SLEEPS IN A BED FOR 16 HOURS PER DAY, OR OVER THE

5  WEEKEND, POSSIBLY 24 HOURS.

6  Q.   BUT YOU SAID YOU DID INDIVIDUALIZED ANALYSIS.  CHRIS COOPER

7  DID NOT LIVE IN A TRAILER 24 HOURS A DAY, DID HE?

8  A.   THE FINDING IS ROBUST ENOUGH, FROM A METHODOLOGIC

9  STANDPOINT, TO ALLOW FOR THAT PARTICULAR EPA ESTIMATE.  IT'S

10 INTRINSIC INTO THE ANALYSIS.  THIS IS THE WAY EPA DOES IT.

11 Q.   I STILL DON'T THINK I'VE GOTTEN AN ANSWER TO MY QUESTION.

12 HAVE YOU DONE THE CALCULATION OF THE CANCER RISK FROM THE

13 EXPOSURE TO THE CAT SCANS AND THE X-RAYS POTENTIALLY LAID OUT IN

14 YOUR MEDICAL MONITORING PLAN?

15 A.   YES, I HAVE.  AS A CLINICIAN, THE NUMERICAL ESTIMATE OF

16 THAT, AT ANY GIVEN POINT IN TIME, IF A DOCTOR CONSIDERS THIS

17 PARTICULAR INTERVENTION, LIKE ANY OTHER INDIVIDUAL, THE INCURRING

18 OF MEDICAL X-RAYS IS SOMETHING THAT IS A VERY IMPORTANT DECISION,

19 AND THE PARTICULAR INTERVENTIONS, MRI, FOR EXAMPLE, IS NOT A

20 CONCERN.  A CT SCAN WOULD BE.

21 Q.   IF A CLINICIAN AGREES WITH YOU AND FOLLOWS THE PLAN YOU'VE

22 LAID OUT, WHAT IS THE RISK OF CANCER FROM IONIZING RADIATION?

23 A.   DO YOU WANT ME TO LOOK AT WHAT YOU OFFERED IN YOUR MOTION TO

24 STRIKE MY TESTIMONY OR DO YOU WANT TO TALK ABOUT --

25 Q.   IF YOU WANT ME TO DO THE CALCULATION FOR YOU, CERTAINLY YOU

1  CAN LOOK AT THAT.

2  A.   THE POSSIBILITY OF HIS GETTING X-RAYS EVERY THREE YEARS IS

3  NEGLIGIBLE.

4  Q.   THAT'S ONE.  WHAT ELSE YOU GOT?

5  A.   THAT'S BASICALLY IT.  WHAT I EXPECT OF A PHYSICIAN -- EXCUSE

6  ME.  WHAT I EXPECT OF A PHYSICIAN WHO IS RUNNING THIS PROGRAM TO

7  THE EXTENT THAT I'VE SUPERVISED MANY, MANY OF THESE, A HUNDRED OR

8  MORE, IS TO MAKE A CLINICAL DECISION AT THE TIME OF THE EXAM THAT

9  WOULD WARRANT THAT INTERVENTION.  I THINK IN OUR SOCIETY, IN

10  GENERAL, THAT IS CONSIDERED TO BE A GOOD THING, IF THE DOCTOR IS

11  RESPONSIBLE AND MAKES THE DECISION TO TAKE AN X-RAY.  THE

12  TOTALITY OF THESE X-RAYS EVERY THREE YEARS WOULD BE AN

13  INAPPROPRIATE CALCULATION BECAUSE THE PROBABILITY OF THAT

14  OCCURRING IS ALMOST NIL.

15  Q.   SO YOU HAVEN'T DONE THE ANALYSIS; CORRECT?

16  A.   I HAVE DONE THE ANALYSIS.

17  Q.   WHAT'S THE NUMBER?

18  A.   IT'S NEAR ZERO.  THE NUMBER OF MILLIREM, IF YOU WERE TO

19  CONSIDER EVERY THREE YEARS FROM THIS SORT OF INTERVENTION WOULD

20  NOT OCCUR.  IT'S SIMPLY THERE TO PUT THE DOCTOR ON NOTICE THAT

21  THIS WOULD BE AN APPROPRIATE THING TO LOOK AT IF THAT DOCTOR CAN

22  CORROBORATE THAT WITH A CLINICAL ASSESSMENT.

23  Q.   WHAT'S THE NUMBER OF MILLIREM FROM AN X-RAY?

24  A.   IT DEPENDS ON THE FILM.

25  Q.   FROM THE X-RAY YOU'RE PROPOSING?

1  A.   THE NUMBER OF MILLIREM -- YOU MEAN, FROM A CT SCAN?

2  Q.   LET'S START WITH THE X-RAYS.  YOU SAY X-RAYS, CT SCANS, AND

3  MRI'S.  LET'S START WITH X-RAY.

4  A.   IT DEPENDS ON THE -- WHAT WE CALL THE PLATES OF THE PHOSPHOR

5  THAT'S USED IN THE X-RAY.  IT CAN BE ANYWHERE FROM TEN TO A

6  HUNDRED MILLIREM.

7  Q.   TEN TO A HUNDRED MILLIREM?

8  A.   YEAH.  I MEAN, IT USUALLY WOULD BE A MUCH LOWER NUMBER THAN

9  THAT.

10 Q.   AND HOW ABOUT THE CAT SCANS?  HOW MANY MILLIREM IONIZING

11 RADIATION FROM THE CAT SCAN?

12 A.   IT WOULD BE HIGHER THAN THAT.  I WOULD HAVE TO LOOK AT THAT.

13 BUT IT'S NOT A RELEVANT CALCULATION TO THIS YOUNG MAN BECAUSE

14 IT'S ACTUALLY A MAX, AND I NEED TO EMPHASIZE THIS FROM A

15 METHODOLOGIC STANDPOINT, THAT IF IT'S NECESSARY CLINICALLY AT THE

16 TIME, IF THERE IS A LESION IN THIS YOUNG MAN'S NOSE, THE X-RAY IS

17 TAKEN, IF IT'S ORDERED BY THE DOCTOR.  THIS IS NEVER INTENDED TO

18 HAVE HIM RECURRENTLY X-RAYED EVERY THREE OR FOUR YEARS.

19 Q.   IS IT MORE PROBABLE THAN NOT THAT HE WOULD HAVE A LESION IN

20 HIS NOSE?

21 A.   IT'S UNKNOWN.  YOU CAN'T -- WE'RE DEALING WITH AN INCREASED

22 RISK ISSUE HERE.

23 Q.   SO INCREASED RISK, BUT NOT INCREASED PROBABILITY, CORRECT?

24 A.   OF COURSE IT'S INCREASED PROBABILITY.  IT'S 17 TIMES THE

25 LIFETIME TARGET RISK THAT EPA HAS IDENTIFIED.  SEVENTEEN TIMES.

1  Q.   MORE PROBABLE THAN NOT?

2  A.   IT'S NOT RELEVANT EITHER.  IN A MEDICAL MONITORING PROGRAM,

3  YOU CAN'T PREDICT THAT HE'S GOING TO GET CANCER.  THAT'S NOT WHAT

4  THE MEDICAL MONITORING PROGRAM IS ABOUT.

5  Q.   I'M IN A COURT OF LAW.  IS IT MORE PROBABLE THAN NOT THAT

6  HE'LL GET A NASAL LESION IN HIS LIFETIME?  CAN YOU ANSWER THAT

7  QUESTION OR NOT?

8  A.   THE ANSWER IS IT'S UNKNOWN WHETHER IT'S MORE PROBABLE THAN

9  NOT.  THAT'S NOT THE PURPOSE OF THE MEDICAL MONITORING.  THE

10 PURPOSE OF THE MEDICAL MONITORING IS EARLY INTERVENTION.  IT'S AN

11 IRRELEVANT QUESTION, WITH ALL DUE RESPECT, SIR.

12 Q.   FOR YOU.

13 A.   NO, IT'S NOT JUST FOR ME, SIR.

14 Q.   SO THE CAT SCANS AND THE MRI'S, YOU HAVE NOT ADDED UP THE

15 MILLIREM HE WOULD BE EXPOSED TO AND CALCULATED THE RISK FOR HIM

16 TO BE EXPOSED TO THAT MILLIREM; AM I CORRECT?

17 A.   THAT CALCULATION IS NEAR ZERO, AS I SAID.

18 Q.   HAVE YOU DONE IT?

19 A.   YOU CAN'T PREDICT THE FUTURE IN A MEDICAL MONITORING

20 PROGRAM.  THAT'S NOT THE PURPOSE OF IT.

21 Q.   LET'S BREAK IT DOWN.  HAVE YOU ADDED UP THE LEVEL OF

22 EXPOSURE TO IONIZING RADIATION THAT YOU'RE SUGGESTING WOULD

23 EXPOSE CHRIS COOPER TO?

24 A.   CLINICALLY, I HAVE TAKEN THAT INTO CONSIDERATION BECAUSE

25 WHEN THE X-RAY IS ORDERED AT THAT TIME, WHATEVER THAT MIGHT BE,

1   IF IT'S A HUNDRED MILLIREM OR 150, WHATEVER IT MIGHT BE,

2   DEPENDING ON THE PROCEDURE AND WHAT'S DONE, THAT IS A CLINICAL

3   INDICATION IN WHICH THE RISK IS WORTH THE BENEFIT.

4          MR. WEINSTOCK:  YOUR HONOR, I THINK THAT ONE IS A

5   YES/NO.  CAN I GET A YES/NO?  DID HE ADD IT UP OR NOT?

6          THE COURT:  DR. KORNBERG, I'M TRYING TO LISTEN, FOR

7   PURPOSES OF THIS HEARING, TO EVERYTHING THAT YOU HAVE TO SAY, BUT

8   I CAN TELL YOU WHEN THAT JURY COMES OUT OF THAT DOOR OVER THERE

9   AT 8:30, YOU'RE GOING TO HAVE TO ANSWER THESE QUESTIONS DIRECTLY.

10  IF IT'S A YES OR NO QUESTION, YOU'RE GOING TO HAVE TO GIVE A YES

11  OR NO ANSWER AND THEN A VERY BRIEF EXPLANATION.  BUT WHAT YOU'VE

12  BEEN DOING IN RESPONDING TO MR. WEINSTOCK'S QUESTIONS ISN'T GOING

13  TO CUT IT.  AND I'M GOING TO ADMONISH YOU IF THAT HAPPENS IN

14  FRONT OF THE JURY.  I'LL TELL YOU NOW SO MAYBE WE CAN AVOID IT,

15  I'M GOING TO TELL YOU THAT'S NOT GOING TO WORK IN FRONT OF THE

16  JURY.  I'M TRYING TO UNDERSTAND YOUR TESTIMONY TO RULE ON THIS

17  MOTION, BUT YOU'RE GOING TO HAVE TO ANSWER A LOT MORE DIRECTLY TO

18  MR. WEINSTOCK'S QUESTIONS.  IF IT'S A YES OR NO, YES OR NO.

19  ALL RIGHT?

20                         EXAMINATION

21  BY MR. WEINSTOCK:

22  Q.   HAVE YOU ADDED UP THE MILLIREM FROM THE X-RAYS AND CAT SCANS

23  IN YOUR PROPOSAL THAT YOU WOULD EXPOSE CHRIS COOPER TO?

24  A.   AM I ALLOWED TO ANSWER -- IT'S NOT A YES OR NO ANSWER.  I'M

25  NOT TRYING TO BE EVASIVE, SERIOUSLY.  THE ANSWER IS, AS A

1  CLINICIAN, WE CAN DO THAT CALCULATION, BUT IT'S NOT RELEVANT TO

2  THIS.  IT WOULD BE ESSENTIALLY, IF SOMEONE --

3         THE COURT:  SIR, WITH ALL DUE RESPECT, I'LL BE THE JUDGE

4  OF RELEVANCY.  OKAY?  SO THAT'S THE SECOND TIME YOU'VE SAID THAT

5  AND IF YOU SAY THAT IN FRONT OF THE JURY, I WILL REMIND YOU AGAIN

6  THAT RELEVANCY IN THE COURTROOM MAY BE DIFFERENT THAN RELEVANCY

7  IN YOUR AREA OF EXPERTISE.  AND I UNDERSTAND THAT YOU'RE NOT

8  TRYING TO MAKE A RULING AS A MATTER OF LAW IN SAYING THAT, IT'S

9  RATHER PART OF YOUR ANALYSIS.  BUT RELEVANCY IS SOMETHING THAT IF

10 THE LAWYER ASKS A QUESTION AND IT'S A FAIR QUESTION, IT'S GOING

11 HAVE TO BE ANSWERED WHETHER YOU THINK IT'S RELEVANT OR NOT, BASED

12 ON YOUR UNDERSTANDING OF YOUR REPORT.

13         GO AHEAD, MR. WEINSTOCK.

14         THE WITNESS:  IN MY REPORT, I DID NOT DO A SPECIFIC

15 CALCULATION FOR THE TOTAL NUMBER OF MILLIREM THAT HE WOULD INCUR

16 IF HE WERE IMPROBABLY X-RAYED EVERY THREE YEARS.

17                        EXAMINATION

18 BY MR. WEINSTOCK:

19 Q.  AND, IN FACT, ISN'T IT CORRECT THAT THE EPA RISK TABLES

20 STARTED WITH LOOKING AT IONIZING RADIATION AS A ZERO TOLERANCE

21 POLICY?  ISN'T THAT EXACTLY WHAT DR. DEROSA TESTIFIED TO IN THIS

22 CASE?

23 A.  THAT IS ABSOLUTELY CORRECT.

24 Q.  SO IT'S A ZERO TOLERANCE POLICY FOR FORMALDEHYDE, BUT YOU

25 HAVEN'T CONSIDERED IT FOR IONIZING RADIATION?

1  A.   I HAVE, SIR, CONSIDERED IT BECAUSE OF THE METHODOLOGY THAT'S

2  VESTED IN THE TABLES, SO I'LL ANSWER THAT QUESTION.

3  Q.   YOU CONSIDERED IT, BUT YOU DIDN'T CALCULATE THE RISK?

4  A.   I DID NOT CALCULATE THE RISK.

5  Q.   THERE IS NO RECOGNIZED SCREENING PROCESS FOR NASOPHARYNGEAL

6  CANCER; IS THAT CORRECT?

7  A.   I'M SORRY.  REPEAT THE QUESTION.

8  Q.   THERE IS NO RECOGNIZED SCREENING PROCESS FOR NASOPHARYNGEAL

9  CANCER; IS THAT CORRECT?

10 A.   I DON'T UNDERSTAND THE QUESTION.  ARE YOU SAYING THAT

11 CLINICALLY, THERE IS A PROCEDURE FOR SCREENING FOR NASOPHARYNGEAL

12 CANCER FOR PEOPLE UNDER THE AMERICAN CANCER SOCIETY OUTLINES THAT

13 ARE AT INCREASED RISK?

14 Q.   HOW ABOUT THIS:  IS THERE A INSTITUTIONALIZED PROCESS FOR

15 SCREENING FOR NASOPHARYNGEAL CANCER?

16 A.   FOR PEOPLE WITH INCREASED RISK, YES, THERE IS A

17 RECOMMENDATION THAT IS IMPLICIT IN THE AMERICAN CANCER SOCIETY

18 GUIDELINES TO NOT PROHIBIT THE SCREENING FOR NASOPHARYNGEAL

19 CANCER UNLESS THE PERSON IS AT INCREASED RISK.

20 Q.   DOCTOR, DO YOU REMEMBER YOUR DEPOSITION?  JUDGE, RIGHT

21 THERE.  I GUESS IT'S 214.

22        "IS THERE A RECOGNIZED SCREENING PROCESS FOR

23 NASOPHARYNGEAL CANCER?"  YOUR RESPONSE, "IS THERE AN

24 INSTITUTIONALIZED PROCESS?  NO."  AND THEN YOU GO ON TO EXPLAIN

25 THE SAME THINGS YOU'VE EXPLAINED TO ME.

1          IS YOUR TESTIMONY DIFFERENT TODAY?  IS THERE AN

2    INSTITUTIONALIZED, RECOGNIZED PROCESS FOR SCREENING FOR

3    NASOPHARYNGEAL CANCER?

4    A.   NO.

5    Q.   AND, IN FACT, THE LAWYERS WHO REPRESENT MR. COOPER ADMITTED

6    AS SUCH IN ONE OF THE BRIEFS.  YOU SAW THAT, DIDN'T YOU?

7    A.   YES, I DID.

8    Q.   AND YOU AGREE WITH THAT?  YES?

9    A.   IT IS UP TO THE EXAMINING PHYSICIAN TO MAKE THAT

10   DETERMINATION OF HOW TO DO THAT.

11   Q.   YOU HAVE ABSOLUTELY NO DOUBT TO SUGGEST THAT EARLY DETECTION

12   FROM NPC, NASOPHARYNGEAL CANCER, WILL ACTUALLY IMPROVE THE

13   SURVIVAL RATE; CORRECT?

14   A.   NO, I DO HAVE DATA WHICH I PRESENTED IN MY AFFIDAVIT.

15   Q.   LET ME REPHRASE.  AT THE TIME YOU FORMULATED YOUR OPINIONS

16   AND ISSUED YOUR REPORT, YOU HAD NO DATA THAT EARLY DETECTION OF

17   NASOPHARYNGEAL CANCER WILL ACTUALLY IMPROVE SURVIVAL RATE; IS

18   THAT CORRECT?

19   A.   AS I SIT HERE, MY RECOLLECTION IS THAT EARLY DETECTION, AS A

20   GENERAL RULE, WILL IMPROVE THAT PARTICULAR OUTCOME.

21   Q.   UP HERE AT THE TOP, 213, DO YOU HAVE ANY DATA THAT SUPPORTS

22   THAT CONCLUSION?

23   A.   I SAID, READING DIRECTLY INTO THE RECORD, I SAID NO, AND

24   THEN I SAID I THINK THAT THE CONCLUSION THAT I JUST DREW IS

25   SELF-EVIDENT THAT IF YOU'RE ABLE TO CATCH A PREMALIGNANT LESION

1  AND REMOVE IT, THAT THE PROCEDURES WOULD BE EFFECTIVE.

2  Q.   SURE.  I ASKED YOU FOR DATA AND YOU TOLD ME IT'S

3  SELF-EVIDENT.  BUT THE QUESTION IS, DO YOU HAVE DATA?

4  A.   YES, I DO.

5  Q.   DID YOU HAVE DATA ON MAY 19, 2009, WHEN YOU ISSUED YOUR

6  REPORT?

7  A.   SIR, I GO BY WHAT I SAID THERE.  IN 30 YEARS OF EXPERIENCE,

8  I HAVE DATA THAT EARLY DETECTION IS VALUABLE IN MITIGATING THE

9  OUTCOME OF THIS TYPE OF A LESION.  AS I INDICATED, I'VE READ

10  SHOTTENFELD.  I DID NOT BRING THAT TO YOUR ATTENTION AT THAT

11  PARTICULAR TIME, BUT THAT'S A VERY SIGNIFICANT REFERENCE WHICH I

12  DID REFERENCE IN MY AFFIDAVIT.

13  Q.   YOUR AFFIDAVIT, BUT NOT YOUR REPORT, CORRECT?

14  A.   I FELT IT WAS IMPORTANT TO GIVE YOU DATA AT THAT TIME IN MY

15  AFFIDAVIT.

16         MR. WEINSTOCK:  THANK YOU, DOCTOR.

17         THE COURT:  MR. WATTS?

18         MR. WATTS:  THANK YOU, YOUR HONOR.

19         THE COURT:  MR. WATTS, BEFORE YOU ASK A FEW QUESTIONS

20  HERE, SINCE WE'RE RUNNING SHORT ON TIME, MY UNDERSTANDING, AM I

21  NOT CORRECT THAT DR. KORNBERG IS A GENERAL CAUSATION EXPERT, BUT

22  WE ALSO HAVE SOME ASPECTS IN HIS REPORT RELATIVE TO THE CHILD

23  PLAINTIFF IN THE CASE?

24         MR. WATTS:  YES, HE'S DOING -- HE TOUCHES ON GENERAL

25  CAUSATION, DOES SPECIFIC CAUSATION WITH RESPECT TO AGGRAVATION OF

1   ASTHMA, EPITHELIAL INJURY, VOCAL CORD DYSFUNCTION AND INCREASED

2   RISK OF CANCER.

3           THE COURT:  SPECIFIC CAUSATION AS TO CHRIS COOPER?

4           MR. WATTS:  YES.  MAY I PROCEED, YOUR HONOR?

5           THE COURT:  YES.

6                   REDIRECT EXAMINATION

7   BY MR. WATTS:

8   Q.   AND I'M GOING TO NOT FOLLOW UP ON QUESTIONS ON SPECIFIC

9   CAUSATION SINCE IT WASN'T ADDRESSED.

10          FIRST OF ALL, DR. KORNBERG, WITH RESPECT TO THE EPA

11  RISK ASSESSMENT FORMULA GUIDELINES WHICH YOU FOLLOWED, HAVE THOSE

12  GUIDELINES BEEN PUBLISHED IN THE PEER-REVIEWED LITERATURE?

13  A.   YES.

14  Q.   HAVE THOSE GUIDELINES BEEN PUBLISHED IN THE PEER-REVIEWED

15  LITERATURE SUCH THAT SOMEBODY COULD TAKE THE EPA RISK ASSESSMENT

16  FORMULA GUIDELINE NUMBERS AND SUBJECT THEM TO OBJECTIVE TESTING

17  TO FIGURE OUT WHAT THE RATE OF ERROR IS?

18  A.   YES, INDEED.

19  Q.   AND HAS THE USE OF THE EPA RISK ASSESSMENT FORMULA

20  GUIDELINES BEEN GENERALLY ACCEPTED IN THE ENVIRONMENTAL SAFETY

21  COMMUNITY?

22  A.   YES, SIR.

23  Q.   NOW, YOU'VE SAID THAT YOU'VE DONE MEDICAL MONITORING ON A

24  HUNDRED OCCASIONS, 50, A HUNDRED, I FORGET WHAT IT WAS, BUT WITH

25  RESPECT TO THE EPA RISK ASSESSMENT FORMULA GUIDELINES, ARE THOSE

1   GUIDELINES USED OUTSIDE OF THE LITIGATION CONTEXT?

2   A.   EVERY DAY.

3   Q.   AND JUST SO WE HAVE IT IN THE RECORD, EXPLAIN SOME OF THE

4   CONTEXT IN WHICH THE EPA RISK ASSESSMENT FORMULA GUIDELINES ARE

5   USED OUTSIDE OF LITIGATION.

6   A.   WHEN THERE IS A COMMUNITY EXPOSURE TO VARIOUS HAZARDOUS

7   COMPOUNDS, PHYSICIANS WHO ARE RESPONSIBLE FOR DETERMINING WHETHER

8   POPULATIONS ARE, IN FACT, PUT UNDER MEDICAL MONITORING LOOK

9   ALMOST FIRST TO THE ATSDR AND THE RISK-BASED CONCENTRATIONS FOR

10  EPA.  THAT'S WHY THEY ARE PUBLISHED.  THEY ARE CALLED RISK-BASED

11  CONCENTRATIONS.

12  Q.   AND WHO PUBLISHES IT?

13  A.   THIS IS PUBLISHED BY THE ENVIRONMENTAL PROTECTION AGENCY OF

14  THE UNITED STATES GOVERNMENT.

15  Q.   NOW, I WANT TO SWITCH JUST FOR A SECOND.  HAVE YOU UTILIZED

16  EPA RISK ASSESSMENT FORMULA GUIDELINES IN DOING THIS KIND OF WORK

17  IN OTHER CASES?

18  A.   YES, I HAVE.

19  Q.   IN STATE AND FEDERAL COURT?

20  A.   YES.

21  Q.   HAVE YOUR OPINIONS EVER BEEN EXCLUDED BY ANY JUDGE IN THE

22  UNITED STATES IN THE HISTORY OF YOUR CAREER TESTIFYING?

23  A.   ABSOLUTELY NOT.

24  Q.   ALL RIGHT.  SECOND ISSUE, MEDICAL MONITORING.  COUNSEL ASKED

25  YOU, ARE YOU PRESCRIBING THIS OR DOES IT DEPEND ON THE PHYSICIAN

1  AT THE TIME OF THE EXAM?  SAME QUESTIONS WITH RESPECT TO MEDICAL

2  MONITORING.  ARE THE CORRECT PROCEDURES FOR ESTABLISHING A

3  MEDICAL MONITORING PROGRAM, HAVE THOSE BEEN PUBLISHED AND

4  SUBJECTED TO PEER REVIEW?

5  A.   YES.

6  Q.   AND HAVE THEY BEEN DEBATED SO PEOPLE COULD DEBATE WHAT THE

7  RATE OF ERROR IS AND WHETHER SOMETHING IS WRONG OR RIGHT?

8  A.   YES.

9  Q.   IN TERMS OF THE PROCEDURE OF SETTING FORTH THE MEDICAL

10  MONITORING PROGRAM BUT LEAVING IT TO THE PHYSICIAN AT THE TIME OF

11  THE EXAM TO DECIDE WHICH COMPONENTS TO IMPLEMENT, IS THAT

12  SPECIFICALLY INCLUDED IN THE PUBLISHED LITERATURE AS SOMETHING

13  THAT OUGHT TO BE DONE?

14  A.   YES.  THE DBRP -- ACRONYM IS DETERMINED BY RESPONSIBLE

15  PHYSICIAN -- IS NIOSH NOMENCLATURE.  IT'S ACTUALLY FEDERAL

16  GOVERNMENT NOMENCLATURE, WHICH IS A PREREQUISITE TO THE

17  PRESCRIPTION OF ANY GIVEN TEST, IF THE DOCTOR BELIEVES OR THE

18  CREATOR OF THE PROGRAM BELIEVES THAT THAT'S NECESSARY.

19  Q.   AND WITH RESPECT TO THE LITERATURE ON MEDICAL MONITORING

20  THAT EXISTS, THERE ARE BOOKS THAT ARE WRITTEN ABOUT HOW TO

21  PROPERLY DO MEDICAL MONITORING; IS THAT RIGHT?

22  A.   YES.  THE ATSDR PUBLISHES ITS GUIDELINES, WHICH I WENT OVER

23  IN MY AFFIDAVIT.

24  Q.   AND THE CONCEPT THAT YOU FOLLOWED OF SETTING FORTH MEDICAL

25  MONITORING CRITERIA OF THE PHYSICIAN 10, 20, 30 YEARS DOWN THE

1   LINE OUGHT TO HAVE THE DISCRETION TO DECIDE WHAT TO IMPLEMENT,

2   THAT IS SPECIFICALLY REFERENCED AS THE ACCEPTABLE METHODOLOGY IN

3   PRODUCING A MEDICAL MONITORING PROGRAM?

4   A.   THAT'S CORRECT.  IT'S GOOD CLINICAL MEDICINE.

5   Q.   IN FACT, IT WOULD BE CONSIDERED TO BE BAD CLINICAL MEDICINE

6   TO DO IT THE OTHER WAY AROUND AS MR. WEINSTOCK WAS SUGGESTING?

7   A.   THAT'S CORRECT.

8   Q.   COUNSEL ASKED YOU ABOUT THE ISSUE OF IONIZING RADIATION,

9   WHETHER IT'S MORE DANGEROUS OR NOT.  DOES THE ISSUE OF IONIZING

10  RADIATION HAVE ANYTHING TO DO WITH WHAT THE PUBLISHED LITERATURE

11  SAYS IS THE CORRECT METHODOLOGY FOR SETTING UP A MEDICAL

12  MONITORING PROGRAM?

13  A.   IT HAS NOTHING TO DO WITH THE METHODOLOGY.

14  Q.   NOW, YOU WILL CONCEDE TO MR. WEINSTOCK THAT IT'S A FACT

15  ISSUE THAT HE OUGHT TO GET TO DEBATE WITH YOU IN FRONT OF THE

16  JURY ABOUT IT'S A GOOD IDEA.  BUT DOES IT HAVE ANYTHING -- IS IT

17  EVER PUBLISHED THAT THAT'S PART OF THE METHODOLOGY THAT NEEDS TO

18  BE CONSIDERED?

19  A.   NO, THE METHODOLOGY IS THE INCLUSION OF THE DBRP.  THAT'S

20  THE CORRECT METHODOLOGY.  ANYONE WHO WOULD PRESCRIBE -- IT WOULD

21  NEVER BE DONE TO PRESCRIBE X-RAYS EVERY THREE YEARS FOR A CHILD

22  WITHOUT ANY CLINICAL INTERVENTION.

23  Q.   SECOND TO LAST ISSUE.  WITH RESPECT TO MEDICAL MONITORING,

24  MR. WEINSTOCK ASKED YOU SOME QUESTIONS ABOUT MORE PROBABLE THAN

25  NOT.  CAN YOU TELL THE JUDGE WHAT THE *MANUAL ON SCIENTIFIC*

1  *EVIDENCE* IS?

2  A.    I'M SOMEWHAT FAMILIAR WITH IT, YES.

3  Q.    AND DOES IT INSTRUCT THAT MEDICAL MONITORING REQUIRES

4  TESTIMONY ON THE PATIENT'S RISK OF FUTURE DISEASE RATHER THAN ON

5  THE ACTUAL BUT FOR CAUSE?

6  A.    ABSOLUTELY.  YES.

7  Q.    IN TERMS OF THE REFERENCE ON THE *MANUAL ON SCIENTIFIC*

8  *EVIDENCE* PUBLISHED BY -- THE SECOND EDITION, FEDERAL JUDICIARY

9  CENTER, IN 2000, IS IT SPECIFICALLY STATED THAT MEDICAL

10  MONITORING DOES NOT REQUIRE A MORE PROBABLE THAN NOT DIAGNOSIS

11  FOR SOMETHING THAT MIGHT HAPPEN IN THE FUTURE?

12  A.    IT'S NEVER DONE.  YOU DON'T PREDICT WHETHER A PERSON IS

13  GOING TO HAVE A PARTICULAR OUTCOME OF THE DISEASE, WHETHER IT'S

14  ILEUM DISEASE OR LUNG CANCER.  YOU'RE NOT PREDICTING THAT THAT

15  PATIENT SPECIFICALLY IS GOING TO GET THE DISEASE.  YOU'RE THERE

16  TO MONITOR THAT PERSON FOR EARLY INTERVENTION.

17  Q.    I WANT TO JUST PUT UP PART OF THE BRIEF.  YOU'VE SEEN THIS.

18  THIS IS *SCOTT V. AMERICAN TOBACCO CO.* CASE, 949 SO. 2D 1266,

19  (LA. 4TH CIR 2007).  DOES THAT SET FORTH SEVEN THINGS THAT MUST

20  BE PROVEN IN ORDER FOR A PLAINTIFF TO RECOVER MEDICAL MONITORING

21  COSTS?

22  A.    IT DOES.

23  Q.    WITH RESPECT TO FACTOR NO. 1, SIGNIFICANT EXPOSURE TO A

24  PROVEN HAZARDOUS SUBSTANCE, DO YOU HAVE AN OPINION AS TO WHETHER

25  HE WAS SUBJECTED TO A SIGNIFICANT EXPOSURE TO A PROVEN HAZARDOUS

1   SUBSTANCE?

2   A.   YES.

3   Q.   WITH RESPECT TO WHETHER IT WAS A PROVEN HAZARDOUS SUBSTANCE,

4   WHAT DOES THE EPA SAY ABOUT FORMALDEHYDE?

5   A.   THE EPA CLASSIFIES FORMALDEHYDE AS A PROBABLE HUMAN

6   CARCINOGEN.

7   Q.   THE WORLD HEALTH ORGANIZATION IARC, WHAT DOES IT SAY ABOUT

8   FORMALDEHYDE?

9   A.   IT SAYS, IN IARC NO. 1, WHICH SAYS THAT FORMALDEHYDE IS A

10  CARCINOGENIC TO HUMANS.

11  Q.   DOES NIOSH SAY IT'S A POTENTIAL APPLICATION CARCINOGEN?

12  A.   YES.

13  Q.   DOES NTPR, THE UNITED STATES TOXICOLOGY PROGRAM, SAY THAT

14  IT'S GOT A PROBABILITY OF BEING A CARCINOGEN?

15  A.   THAT'S CORRECT.   IT'S REASONABLY ANTICIPATED TO BE A

16  CARCINOGEN UNDER NTP.

17  Q.   DOES OSHA DEFINE IT AS A CARCINOGEN?

18  A.   YES.

19  Q.   DOES ACGIH, THE AMERICAN CONFERENCE OF GOVERNMENTAL

20  INDUSTRIAL HYGIENISTS, SAY IT'S A SUSPECTED HUMAN CARCINOGEN?

21  A.   YES, IT DOES.

22  Q.   ATSDR I BELIEVE WE'VE AGREED THAT IT'S A KNOWN HUMAN

23  CARCINOGEN?

24  A.   YES.

25  Q.   NOW, SECOND PART OF THIS FACTOR 1, SIGNIFICANT EXPOSURE.

1            HAVE YOU LOOKED AT THE ATSDR GUIDELINE?

2    A.    YES, I HAVE.

3    Q.    THE NIOSH GUIDELINE?

4    A.    YES.

5    Q.    AND WITH RESPECT TO CANCER, HAVE YOU CONSIDERED AND UTILIZED

6    THE EPA LIFETIME RISK ASSESSMENT GUIDELINE?

7    A.    I HAVE.

8    Q.    AND DO YOU HAVE AN OPINION BASED UPON THOSE THREE GUIDELINES

9    AS TO WHETHER CHRIS COOPER SUSTAINED A SIGNIFICANT EXPOSURE TO A

10   PROVEN HAZARDOUS SUBSTANCE?

11   A.    YES, IN 1.58 YEARS OR 19 MONTHS, AT THE CONCENTRATION OF

12   50 PARTS PER BILLION, WHICH IS A CONSERVATIVE ESTIMATE, HE

13   INCURRED 17 TIMES THE LIFETIME TARGET RISK FOR DEVELOPING CANCER

14   UNDER EPA GUIDELINES.

15   Q.    SECOND FACTOR, WAS THAT INCREASED EXPOSURE THE RESULT OR

16   APPROXIMATE RESULT OF HIS EXPOSURE FROM LIVING IN A FEMA

17   FORMALDEHYDE TRAILER FOR 17 MONTHS?

18   A.    IT IS MORE PROBABLE THAN NOT THAT THAT'S THE CASE, AND IT

19   WAS 19 MONTHS.

20   Q.    DID THE PLAINTIFF SUFFER SIGNIFICANT INCREASED RISK OF

21   CONTACTING A SERIOUS DISEASE?

22   A.    YES, HE DID.

23   Q.    IS THAT RISK GREATER THAN THE RISK OF CONTRACTING THE SAME

24   DISEASE HAD HE OR SHE NOT BEEN EXPOSED?

25   A.    ABSOLUTELY.

1  Q.   AND MR. WEINSTOCK ASKED YOU A QUESTION ABOUT WHETHER THE EPA

2  GUIDELINE WAS THE ZERO BASE.  WITH RESPECT TO FORMALDEHYDE,

3  THAT'S NOT TRUE, IS IT?  WE KNOW WHAT THE BASELINE RISK IS;

4  RIGHT?

5  A.   THAT'S CORRECT.

6  Q.   AND IS CHRIS COOPER'S RISK HIGHER THAN THE BASELINE RISK AS

7  A RESULT OF HIS EXPOSURE IN THE TRAILER?

8  A.   YES.  I'VE DONE THAT CALCULATION.

9  Q.   OKAY.  AND IS IT HIGHER THAN THE CHANCES OF MEMBERS OF THE

10 PUBLIC AT LARGE DEVELOPING THE DISEASE?

11 A.   YES.

12 Q.   NUMBER 4, A MEDICAL MONITORING PROCEDURE EXISTS THAT MAKE

13 THE EARLY DETECTION OF THE DISEASE POSSIBLE.  HAS THE MEDICAL

14 MONITORING PROGRAM THAT YOU ARRIVED AT SET FORTH THE TIME

15 FRAGMENTS IN WHICH EARLY DETECTION CAN BE ACHIEVED?

16 A.   YES, I HAVE.

17 Q.   AND DOES THAT MEDICAL MONITORING PROGRAM MAKE THE EARLY

18 DETECTION OF THE DISEASE POSSIBLE?

19 A.   YES, IT DOES.

20 Q.   NUMBER 5, THE MEDICAL MONITORING PROCEDURE HAS BEEN

21 PRESCRIBED BY A QUALIFIED PHYSICIAN AND IS REASONABLY NECESSARY

22 ACCORDING TO CONTEMPORARY SCIENTIFIC PRESCRIPTIONS.

23           FIRST QUESTION, WITH RESPECT TO FACTOR NO. 5, ARE YOU A

24 QUALIFIED PHYSICIAN?  ARE YOU LICENSED IN THE STATE OF COLORADO

25 AS A MEDICAL DOCTOR?

1  A.   YES.

2  Q.   CAN WE SEND CHRIS COOPER UP TO BE EXAMINED BY YOU IN

3  COLORADO?

4  A.   YES.

5  Q.   DID YOU REFER HIM TO THE NATIONAL JEWISH FOR A CLINICAL

6  EVALUATION IN COLORADO?

7  A.   I DID.

8  Q.   AS A RESULT OF THE INVESTIGATION THAT YOU PERFORMED AND THE

9  EVALUATION OF THE CLINICAL TESTING THAT WAS DONE ON HIM AT

10  NATIONAL JEWISH, DID YOU PRESCRIBE THE MEDICAL MONITORING

11  PROCEDURE IN COLORADO WHERE YOU WERE LICENSED AS A QUALIFIED

12  PHYSICIAN?

13  A.   YES.

14  Q.   THE SECOND PART OF THAT IS, IT'S REASONABLY NECESSARY,

15  ACCORDING TO CONTEMPORARY SCIENTIFIC PRINCIPLES, NUMBER 1, HAVE

16  YOU CONSIDERED THE ATSDR IN PHASE I EXPOSURE CRITERIA FOR

17  CONSIDERING MEDICAL MONITORING?

18  A.   I HAVE.

19  Q.   AND IS THAT SET FORTH IN THE AFFIDAVIT THAT YOU PROVIDED THE

20  COURT?

21  A.   I DID.

22  Q.   FOR PURPOSE OF THIS *DAUBERT* HEARING?

23  A.   I DID.

24  Q.   AND JUST TO PUT IT UP ON THE SCREEN REAL QUICK, THE ATSDR

25  SAYS, UNDER ITS PHASE I, EXPOSURE CRITERIA FOR CONSIDERING

1   MEDICAL MONITORING, A, THERE SHOULD BE EVIDENCE OF CONTAMINANT

2   LEVELS OF ENVIRONMENTAL MEDIA THAT WOULD SUGGEST THE HIGH

3   LIKELIHOOD OF ENVIRONMENTAL EXPOSURE TO A HAZARDOUS SUBSTANCE.

4           DO WE HAVE A HIGH LIKELIHOOD OF EXPOSURE TO A HAZARDOUS

5   SUBSTANCE?

6   A.   WE DO.  AND AS I MENTIONED IN THE AFFIDAVIT, WE HAVE A HIGH

7   PROBABILITY, NOT JUST A HIGH LIKELIHOOD.

8   Q.   NOW, IN ADDITION TO THE WORK THAT WE'VE DISCUSSED HERE, DID

9   YOU CONTRACT WITH DR. STEPHEN KING TO PERFORM AN ENORMOUS AND

10  EXPENSIVE LITERATURE SURVEY WITH RESPECT TO GENERAL CAUSATION OF

11  FORMALDEHYDE, BOTH WITH RESPECT TO EXACERBATION AND THE INCREASED

12  RISK OF CANCER?

13  A.   YES.

14  Q.   AND WITH RESPECT TO SUBPART B, THERE SHOULD BE A

15  WELL-IDENTIFIABLE TARGET POPULATION OF CONCERN IN WHICH EXPOSURE

16  TO A HAZARDOUS SUBSTANCE AT A SUFFICIENT LEVEL HAS OCCURRED?

17  A.   YES.

18  Q.   WITH RESPECT TO THIS IDENTIFIABLE TARGET POPULATION, DO WE

19  KNOW WHO THAT TARGET POPULATION IS?

20  A.   YES.  THIS IS AN INDIVIDUAL CAUSATION ANALYSIS PERFORMED BY

21  MYSELF.  I'M A BOARD-CERTIFIED EXPERT IN OCCUPATIONAL AND

22  ENVIRONMENTAL MEDICINE.  AND THIS YOUNG MAN IS THE TARGET OF THIS

23  INVESTIGATION.  IT'S A VERY SPECIFIC CAUSATION ANALYSIS FOR HIM.

24  Q.   SO WE KNOW WHO IT IS BECAUSE IT'S CHRIS COOPER?

25  A.   EXACTLY.

1  Q.   AGAIN, UNDER THE ATSDR, HAS THE DOCUMENTED HUMAN HEALTH

2  RESEARCH DEMONSTRATED A SCIENTIFIC BASIS FOR REASONABLE

3  ASSOCIATION BETWEEN EXPOSURE TO FORMALDEHYDE, A HAZARDOUS

4  SUBSTANCE, AS A SIGNIFICANT ADVERSE HEALTH RISK EFFECT OF

5  NASOPHARYNGEAL CANCER?

6  A.   YES, IT HAS.

7  Q.   NOW, WHEN WE TALK ABOUT THAT LITERATURE, WOULD IT BE BEST

8  CRYSTALLIZED IN THE IARC MONOGRAPHS?

9  A.   THERE IS A LOT OF INFORMATION IN THE IARC MONOGRAPHS.  THE

10 BOTTOM-LINE DECISION WAS TO LIST THE IARC NO. 1, WHICH IS A

11 SUBSTANCE WHICH IS CARCINOGENIC TO HUMANS.

12 Q.   THAT'S THE HIGHEST LEVEL OF CARCINOGENICITY THAT THE

13 COLLECTIVE WORLD LITERATURE CAN BESTOW UPON A TOXIC SUBSTANCE?

14 A.   SURE.

15 Q.   AND WITH RESPECT TO IARC, AND WE'RE GOING TO UTILIZE IT IN

16 FRONT OF THE JURY, IT'S TWO OR THREE HUNDRED PAGES LONG WHERE

17 THEY LOOK AT EVERYTHING THAT'S EVER BEEN WRITTEN WITH RESPECT TO

18 FORMALDEHYDE AND CARCINOGENICITY, RIGHT?

19 A.   RIGHT.

20 Q.   AND IARC, THE WORLD HEALTH ORGANIZATION, INTERNATIONAL

21 AGENCY ON RESEARCH OF CANCER, CONCLUDED THAT IT WAS A KNOWN

22 CARCINOGEN WITH RESPECT TO NASOPHARYNGEAL CANCER?

23 A.   ABSOLUTELY.  THEY DID THIS ON THE BASIS OF THE FULL WEIGHT

24 OF EVIDENCE WITH THE PROPERLY-PERFORMED STUDIES THAT EXIST IN THE

25 LITERATURE.

1  Q.   ALL RIGHT.  AND IS THE PRESCRIBED MONITORING REGIME

2  DIFFERENT THAN THAT NORMALLY RECOMMENDED IN THE ABSENCE OF

3  EXPOSURE?

4  A.   YES, IT IS.

5  Q.   IS THAT WHAT YOU WERE TRYING TO EXPLAIN TO MR. WEINSTOCK?

6  A.   YES.

7  Q.   OKAY.  FINALLY, IS THERE DEMONSTRATED CLINICAL VALUE IN THE

8  EARLY DETECTION AND DIAGNOSIS OF THE DISEASE?

9  A.   YES.  AND WE DISCUSSED THAT WITH RESPECT TO SHOTTENFELD,

10  THAT IT'S VERY CLEAR THAT A SIGN OF NASAL CANCER PARTICULARLY,

11  WHICH IS IMPLICATED IN THE CASE, THAT EARLY DETECTION -- THAT

12  ONE, FIVE AND 10-YEAR SURVIVAL RATES ARE IMPROVED IF YOU COMPARE

13  LOCALIZED TO REGIONAL CANCER, WHICH IS A VERY DEFINITE

14  ENDORSEMENT OF EARLY DETECTION.

15  Q.   AND JUST TO BE CLEAR, IN YOUR REPORT AND IN YOUR DEPOSITION,

16  DID YOU TELL ANDY THAT EARLY DETECTION WOULD IMPROVE THE OUTCOME

17  FROM THE DISEASE?

18  A.   YES.

19          THE COURT:  MR. WATTS, I'M BRINGING THE JURY IN IN ABOUT

20  45 SECONDS.

21          MR. WATTS:  THAT'S GOOD, BECAUSE I'M DONE.

22          THE COURT:  THE COURT IS NOT ENTIRELY SATISFIED WITH THE

23  EXPLANATIONS THAT IT'S RECEIVED, PARTICULARLY WITH REGARD TO

24  SPECIFIC CAUSATION; HOWEVER, IN LIGHT OF THE BRIEFING THAT'S BEEN

25  DONE IN THIS CASE AND THE WIDE BERTH THAT THE COURT IS GOING TO

1    ALLOW MR. WEINSTOCK WITH REGARD TO CROSS-EXAMINATION AND THE

2    EXPECTATION THAT THOSE QUESTIONS ARE GOING TO BE ANSWERED

3    FORTHRIGHTLY, CONCISELY AND DIRECTLY, ALONG WITH THE ABILITY TO

4    OFFER COUNTERVAILING EXPERT TESTIMONY ON THIS PARTICULAR ISSUE,

5    THE COURT IS GOING TO OVERRULE THE OBJECTION TO THIS WITNESS'S

6    TESTIMONY AND ALLOW THE WITNESS TO TESTIFY.

7              LET'S GO AHEAD AND BRING THE JURY IN.  IS HE YOUR

8    FIRST WITNESS?

9         MR. WATTS:  YES, SIR.

10        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

11   PANEL ENTERS THE COURTROOM.)

12        THE COURT:  YOU ALL MAY BE SEATED.

13        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

14   A CONFERENCE HELD AT THE BENCH OUTSIDE THE PRESENCE OF THE COURT

15   REPORTER.)

16        THE COURT:  WHO IS THE NEXT WITNESS ON THE PLAINTIFF

17   SIDE?

18        MR. WATTS:  DR. JAMES KORNBERG, YOUR HONOR.

19        THE COURT:  DR. KORNBERG IS ON THE STAND.  DR. KORNBERG,

20   WOULD YOU STAND UP PLEASE AND TAKE THE OATH.

21        THE DEPUTY CLERK:  DO YOU SOLEMNLY SWEAR THE TESTIMONY

22   WHICH YOU ARE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH

23   AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

24        THE WITNESS:  I DO.

25        THE DEPUTY CLERK:  PLEASE STATE AND SPELL YOUR FULL NAME

1  FOR THE RECORD.

2         THE WITNESS:  MY NAME IS JAMES PHILIP, P-H-I-L-I-P,

3  KORNBERG, K-O-R-N-B-E-R-G.

4                   **DR. JAMES P. KORNBERG**

5  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

6  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

7         MR. WATTS:  MAY I PROCEED, YOUR HONOR?

8         THE COURT:  YES, PLEASE.

9                   VOIR DIRE EXAMINATION

10 BY MR. WATTS:

11 Q.   DR. KORNBERG, ARE YOU A MEDICAL DOCTOR?

12 A.   I AM.

13 Q.   I'M GOING TO PUT UP AS EXHIBIT 307 YOUR CURRICULUM VITAE.

14 CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHERE YOU WENT

15 TO COLLEGE?

16 A.   I WENT TO MIT, THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY.

17         MR. WEINSTOCK:  YOUR HONOR, WE WOULD STIPULATE TO THE

18 DOCTOR'S EXPERTISE IN OCCUPATIONAL MEDICINE.

19         MR. WATTS:  WE'RE OFFERING HIM AS A BOARD-CERTIFIED

20 MEDICAL DOCTOR IN OCCUPATIONAL AND ENVIRONMENTAL MEDICINE AND

21 ENVIRONMENTAL HEALTH SCIENCE AND ENGINEERING AS TO GENERAL

22 CAUSATION ON AGGRAVATION OF ASTHMA, EPITHELIAL INJURY WITH

23 HYPERACTIVITY, VOCAL CORD DYSFUNCTION, RISK OF CANCER AND WITH

24 RESPECT TO THE DESIGN AND IMPLEMENTATION OF MEDICAL MONITORING

25 FOR THE POPULATION GENERALLY AND THE NECESSITY AND COST THEREOF

1   FOR CHRIS COOPER SPECIFICALLY.

2          MR. WEINSTOCK:  PROCEED WITH THE VOIR DIRE.

3          THE COURT:  IN OTHER WORDS, WE DON'T HAVE A STIPULATION

4   AS TO HIS EXPERTISE ON ALL OF THOSE FIELDS; IS THAT CORRECT?

5          MR. WEINSTOCK:  THAT IS CORRECT, YOUR HONOR.

6          THE COURT:  WE'RE KIND OF GILDING THE LILY A LITTLE BIT

7   HERE, AREN'T WE?

8          MR. WATTS:  THESE ARE THE SUBJECTS I'M GOING TO COVER

9   WITH HIM, YOUR HONOR.

10         THE COURT:  BUT WHAT FIELD IS HE BEING QUALIFIED IN?

11         MR. WATTS:  I'M SORRY.  IN OCCUPATIONAL AND

12  ENVIRONMENTAL MEDICINE AND WITH RESPECT TO MEDICAL MONITORING AND

13  SPECIFIC AND GENERAL CAUSATION.

14         THE COURT:  IS THERE A STIPULATION AS TO HIS EXPERTISE

15  IN THAT?

16         MR. WEINSTOCK:  ONLY ON THE FIRST TWO.  NOT ON MEDICAL

17  MONITORING.

18         THE COURT:  LET'S FOCUS ON MEDICAL MONITORING.  LET'S

19  TRY TO QUALIFY HIM ON THAT AND THE COURT WILL GO AHEAD AND RULE

20  ON THAT.

21                         EXAMINATION

22  BY MR. WATTS:

23  Q.   WITH RESPECT TO YOUR EDUCATION, YOU WENT TO MASSACHUSETTS

24  INSTITUTE OF TECHNOLOGY WHERE YOU STUDIED AERONAUTICAL AND

25  ASTRONAUTICAL ENGINEERING?

1  A.   THAT'S CORRECT.

2  Q.   DOESN'T HAVE ANYTHING TO DO WITH THIS CASE, BUT YOU ATTENDED

3  THE APOLLO 10 AND 11 LAUNCHES?

4  A.   THAT'S CORRECT.

5  Q.   AFTER GETTING OUT OF MIT IN 1969, DID YOU BEGIN A MASTER'S

6  PROGRAM AT MIT?

7  A.   I DID.

8  Q.   DID YOU GET A MASTER'S DEGREE IN FLUID MECHANICS, JET

9  PROPULSION SYSTEMS AND SUPERSONIC NOZZLE DESIGN AND THE EFFECTS

10 OF JET ENGINE NOISE?

11 A.   THAT'S RIGHT, WHICH GAVE ME A GOOD BACKGROUND INCLUDING

12 MECHANICS.

13 Q.   AFTER GETTING YOUR MASTER'S AT MIT, WHAT DID YOU DO?

14 A.   I THEN WAS GIVEN A GENERAL ELECTRIC FELLOWSHIP AT HARVARD

15 UNIVERSITY WHERE I EVENTUALLY RECEIVED A DOCTOR OF SCIENCE IN

16 ENVIRONMENTAL HEALTH SCIENCES AND ENGINEERING.

17 Q.   AND DID YOU SPECIALIZE IN AEROSOL PHYSICS, AIR POLLUTION,

18 METEOROLOGY, AND HEALTH PHYSICS AT HARVARD?

19 A.   YES, I DID.

20 Q.   AFTER GETTING YOUR -- WHAT IS AN SCD AS THE JURY SEES IT UP

21 ON THE SCREEN?

22 A.   AN SC.D IS A DOCTOR OF SCIENCE.

23 Q.   AFTER GETTING YOUR DOCTOR OF SCIENCE OR WHILE GETTING YOUR

24 DOCTOR OF SCIENCE, DID YOU TEACH HARVARD AND -- MASTER'S STUDENTS

25 AND OSHA TRAINEES AND PHYSICIANS IN THE AREA OF COMMUNITY AIR

1  POLLUTION AND AIR POLLUTION TOXICOLOGY?

2  A.   YES.  I WAS A TEACHING FELLOW AT HARVARD AND MY STUDENTS

3  INCLUDED PHYSICIANS.

4  Q.   YOU'VE GOT A BACHELOR'S, YOU'VE GOT A MASTER'S, BOTH FROM

5  MIT, AND A DOCTORATE FROM HARVARD.  DID YOU THEN GO TO DARTMOUTH

6  MEDICAL SCHOOL AND GET AN M.D. DEGREE?

7  A.   I WAS ADMITTED TO THE ACCELERATED PROGRAM AT DARTMOUTH

8  MEDICAL SCHOOL AT THAT TIME.

9  Q.   AND DID YOU ACHIEVE A DEGREE, AN M.D. DEGREE FROM DARTMOUTH

10 IN 1976?

11 A.   I DID.

12 Q.   DID YOU DO AN INTERNSHIP AT COLUMBIA UNIVERSITY COLLEGE OF

13 PHYSICIANS AND SURGEONS HOSPITAL?

14 A.   YES, IN COOPERSTOWN, NEW YORK.

15 Q.   DID YOU DO YOUR RESIDENCY AT HARVARD IN OCCUPATIONAL AND

16 ENVIRONMENTAL MEDICINE IN 1979?

17 A.   YES.

18 Q.   IN 1980, WERE YOU BOARD CERTIFIED IN THE FIELD OF

19 OCCUPATIONAL AND ENVIRONMENTAL MEDICINE?

20 A.   YES, SIR, AND ON THE FIRST TRY.

21 Q.   TAKE A LOOK AT THE JURY AND JUST DESCRIBE FOR THEM IN

22 30 SECONDS OR LESS WHAT IS OCCUPATIONAL AND ENVIRONMENTAL

23 MEDICINE AS A FIELD.

24 A.   OCCUPATIONAL AND ENVIRONMENTAL MEDICINE IS A FIELD UNDER THE

25 AMERICAN BOARD OF PREVENTIVE MEDICINE.  AND IT'S A CLINICAL FIELD

1    IN WHICH ONE OBTAINS THE EARLY DETECTION OF DISEASE AND THE

2    TREATMENT OF THAT DISEASE, BUT MORE IMPORTANTLY, ONCE YOU DETECT

3    THE INJURY, YOU THEN TRY TO PREVENT IT.

4            SO THE QUESTION IS, WHEN A MAN FALLS OFF A LADDER, IN

5    MY FIELD, WE NOT ONLY TREAT HIS INJURY WHEN HE HITS THE GROUND,

6    BUT WE WANT TO KNOW WHY HE FELL OFF.

7    Q.   NOW, SINCE 1980 WHEN YOU WERE BOARD CERTIFIED IN THE FIELD

8    OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE, WHAT HAVE YOU DONE BY

9    WAY OF YOUR PRACTICE OVER THE LAST 29 YEARS OR SO?

10   A.   I'VE BEEN IN THE FULL-TIME PRACTICE OF OCCUPATIONAL AND

11   ENVIRONMENTAL MEDICINE WITH SOME TEACHING RESPONSIBILITIES FROM

12   TIME TO TIME.

13   Q.   AND IN DOING THE FULL-TIME PRACTICE OF OCCUPATIONAL AND

14   ENVIRONMENTAL MEDICINE, GIVE THE JURY SOME EXAMPLES OF WHAT IT IS

15   THAT YOU DO BY WAY OF MEDICAL MONITORING PROGRAMS.

16   A.   I'VE DESIGNED AND IMPLEMENTED PROBABLY OVER 150 MEDICAL

17   MONITORING PROGRAMS.  ONE GOOD EXAMPLE WOULD BE THE MANUFACTURING

18   OF A DRUG CALLED TAXOL, WHICH IS USED FOR TREATMENT OF CANCER.

19   MY JOB IS TO GO INTO THE WORKPLACE, LOOK AT ALL OF THE HAZARDS

20   THAT ARE THERE, AND COME UP WITH A STRATEGY TO PREVENT ANY TYPE

21   OF ADVERSE OUTCOME IN THE PEOPLE THAT MANUFACTURE THIS DRUG.

22   THAT WOULD INCLUDE PERIODIC MEDICAL EXAMINATIONS, IF NECESSARY.

23   IT WOULD ALSO INCLUDE GOING INTO THE WORKPLACE AND MAKING SURE

24   THAT THERE IS NO ADVERSE EXPOSURES TO THE WORKERS.

25   Q.   AND WITH RESPECT TO DESIGNING A MEDICAL MONITORING PROGRAM,

1   DO YOU NEED TO REACH A DETERMINATION AS TO WHETHER THERE HAS BEEN

2   A SIGNIFICANT EXPOSURE TO THE PROVEN HAZARDOUS SUBSTANCE?

3   A.   YOU DO.   THESE MEDICAL MONITORING PROGRAMS ARE GIVEN BY

4   EXPOSURE, AND SO CONSEQUENTLY, THE FIRST THING YOU DO, OBVIOUSLY

5   AS AN ENGINEER, I'M FAMILIAR WITH THIS, YOU WILL GO INTO THE

6   WORKPLACE AND OBTAIN INDUSTRIAL HYGIENE MONITORING DATA.

7   Q.   AND THEN YOU COMPARE THAT DATA WITH LEVELS LIKE THE ATSDR

8   AND THE NIOSH LEVELS?

9   A.   THAT'S CORRECT.   AND THE SAME WOULD BE A SIMILAR SITUATION

10  IN THE COMMUNITY THAT HAS HAD AN EXPOSURE.

11  Q.   NOW, WITH RESPECT TO THE ISSUE OF A PROVEN HAZARDOUS

12  SUBSTANCE, LET ME USE FORMALDEHYDE SPECIFICALLY, WHERE YOU LOOK

13  AT BOTH THE LITERATURE AND TESTING THAT'S BEEN DONE WITH SUCH A

14  SUBSTANCE TO MAKE A DETERMINATION BEFORE YOU SET UP A MEDICAL

15  MONITORING PROGRAM AS TO WHETHER THERE HAS BEEN A SIGNIFICANT

16  EXPOSURE TO A PROVEN HAZARDOUS SUBSTANCE?

17  A.   YES.   IN THE CASE OF MR. COOPER, THERE WAS NEVER AN

18  AUTOMATIC DECISION TO DO MEDICAL MONITORING UNTIL WE LOOKED AT

19  THE EXPOSURE DATA.

20       MR. WEINSTOCK:   OBJECTION, YOUR HONOR.   I THINK WE'RE

21  GETTING A LITTLE AFIELD OF QUALIFICATIONS.

22       THE COURT:   STICK WITH QUALIFICATIONS.   WE'RE TRYING TO

23  QUALIFY HIM AS AN EXPERT.   THEN WE'LL HEAR WHAT HE DOES IN THE

24  CASE, IF HE SO QUALIFIES.

25       MR. WATTS:   I'M GOING THROUGH HIS METHODOLOGY.   IS THAT

1    ACCEPTABLE AS LONG AS WE KEEP IT GENERALLY?

2           THE COURT:  FIRST OF ALL, WE WANT TO FIND OUT IF HIS

3    TESTIFYING AS AN EXPERT IS PERTINENT TO THE ISSUE OF MEDICAL

4    MONITORING.

5           MR. WATTS:  I UNDERSTAND THAT.  I'M GOING THROUGH THE

6    METHODOLOGY OF MEDICAL MONITORING.  BUT IT'S JUST QUALIFICATION.

7           MR. WEINSTOCK:  JUST QUALIFICATIONS.

8                               EXAMINATION

9    BY MR. WATTS:

10   Q.    LET'S GO BACK TO THE 29 YEARS OF PRACTICE.  IN THE 29 YEARS

11   OF PRACTICE, HAVE YOU MADE AVAILABLE TO YOURSELF PUBLICATIONS

12   WITH RESPECT TO HOW TO DO A MEDICAL MONITORING PROGRAM?

13   A.    YES, I WROTE A BOOK ON IT THAT WAS PEER REVIEWED BY THE

14   MEDICAL DIRECTOR OF IBM.

15   Q.    WHAT WAS THE NAME OF THE BOOK THAT YOU PUBLISHED THAT

16   RELATED WITH HOW TO DO A MEDICAL MONITORING PROGRAM?

17   A.    IT'S CALLED *THE WORKPLACE WALK-THROUGH*.

18   Q.    HAVE YOU BROUGHT THAT BOOK WITH YOU?

19   A.    I HAVE IT HERE.

20   Q.    IN ADDITION TO WRITING THAT BOOK, HAVE YOU PROVIDED WRITTEN

21   MEDICAL MONITORING PROGRAMS IN A VARIETY OF DIFFERENT SCENARIOS

22   AROUND THE UNITED STATES?

23   A.    YES.  I MEAN, ONE GOOD EXAMPLE IS THE LARGEST BERYLLIUM

24   SURVEILLANCE PROGRAM IN THE COUNTRY WITH COARSE CERAMICS.  WE

25   HAVE 900 PEOPLE WHO HAVE BEEN UNDER SURVEILLANCE, SOME OF THEM

1  FOR THE PAST 25 YEARS, WHICH I DESIGNED AND IMPLEMENTED.

2  Q.   ARE THESE MEDICAL MONITORING PROGRAMS THAT YOU COME UP WITH

3  JUST ONES THAT YOU'VE SUGGESTED FOR RADIATION OR ARE MEDICAL

4  MONITORING PROGRAMS BEING CONDUCTED AS WE SPEAK UNDER YOUR

5  AUSPICES?

6  A.   THEY HAVE NOTHING TO DO WITH LITIGATION.   THEY HAVE TO DO

7  WITH PREVENTIVE MEDICINE.

8  Q.   WITH RESPECT TO THE MEDICAL MONITORING PROGRAMS THAT YOU

9  HAVE BROUGHT TO COURT, HAS ANY COURT IN THE UNITED STATES EVER

10  EXCLUDED YOUR TESTIMONY WITH RESPECT TO MEDICAL MONITORING

11  PROGRAMS?

12  A.   NO.   IT'S ONE OF THE CORE EXPERTISE THAT I'VE TRIED TO

13  DEVELOP OVER 29 YEARS OF PRACTICE.

14  Q.   AND IN DEVELOPING THAT CORE EXPERTISE, HAVE YOU FOLLOWED THE

15  PUBLISHED PROTOCOLS WITH RESPECT TO HOW TO DO A MEDICAL

16  MONITORING PROGRAM?

17  A.   YES.

18          MR. WATTS:   WE WOULD TENDER THE WITNESS ON MEDICAL

19  MONITORING.

20          THE COURT:   MR. WEINSTOCK, DO YOU WANT TO QUESTION THIS

21  WITNESS WITH REGARD TO EXPERTISE IN THE OBJECTED-TO AREA?

22          MR. WEINSTOCK:   CORRECT, YOUR HONOR, VERY BRIEFLY.

23                    TRAVERSE EXAMINATION

24  BY MR. WEINSTOCK:

25  Q.   ARE YOU BOARD CERTIFIED IN MEDICAL MONITORING?

A.   THERE IS NO BOARD IN MEDICAL MONITORING.  THERE IS SOME

QUESTION -- NO, OF COURSE NOT.

Q.   IT'S SOMETHING YOU PRACTICE AND YOU BELIEVE YOU HAVE

EXPERTISE IN; CORRECT?

A.   I DO HAVE EXPERTISE IN THAT FIELD, YES.

Q.   DID I UNDERSTAND CORRECTLY THAT AS PART -- WELL, STRIKE

THAT.  WE'LL GET TO THAT METHODOLOGY ISSUE IN THE REST OF YOUR

CROSS-EXAMINATION.

          WHAT IS YOUR HOURLY RATE, DOCTOR?

A.   $780 AN HOUR.

Q.   AM I CORRECT THAT IN THE PAST FIVE YEARS, ALL THE WORK

YOU'VE DONE FOR WHICH YOU'VE BEEN PAID HAS BEEN INVOLVED IN

LITIGATION?

A.   I WOULD HAVE TO GO BACK AND LOOK, BUT A LOT OF IT HAS

INVOLVED LITIGATION, THAT'S CORRECT, OR CONSULTING WORK IN

RESPONSE TO A LEGAL MATTER.

Q.   SO WHEN YOU WERE TALKING ABOUT THE PROGRAMS YOU PUT IN

PLACE, THAT'S SOMETHING YOU DID IN THE PAST, BUT THESE DAYS

YOU'RE REALLY FOCUSED ON LITIGATION; RIGHT?

A.   I'M DOING CONSULTING WORK AT THE PRESENT TIME.  BUT I AM A

LICENSED PHYSICIAN IN THE STATE OF COLORADO.

Q.   SURE.  YOU ARE BOARD CERTIFIED IN OCCUPATIONAL AND

ENVIRONMENTAL MEDICINE?

A.   YES, I AM.

Q.   OCCUPATIONAL MEDICINE, THAT DEALS WITH WORKERS?

1  A.   YES.

2  Q.   CHILDREN?  CHILD LABOR LAWS?  WHAT'S THE APPLICATION?

3  A.   WELL, I MEAN, CHILDREN UP TO A POINT.  THE ENVIRONMENTAL

4  MEDICINE COMPONENT IS THE ONE THAT INVOLVES CHILDREN.  THERE ARE

5  LABOR LAWS THAT DON'T ALLOW CHILDREN TO WORK IN THE STATE OF

6  COLORADO.

7       MR. WEINSTOCK:  THANK YOU VERY MUCH.  I GET A CHANCE A

8  LITTLE LATER, TOO.

9       THE COURT:  MR. SHERBURNE, ANY QUESTIONS?

10       MR. SHERBURNE:  NO, YOUR HONOR.

11       THE COURT:  IS THE OBJECTION MAINTAINED WITH REGARD TO

12  THE OFFERED EXPERTISE?

13       MR. WEINSTOCK:  IT IS, YOUR HONOR, BECAUSE THERE IS NO

14  BOARD CERTIFICATION, SO IT'S NOT A TRUE RECOGNIZED DISCIPLINE.

15  IT'S JUST SOMETHING THAT HE SAYS HE HAS SOME FAMILIARITY WITH AND

16  PRACTICES, BUT IT'S NOT A MEDICALLY-RECOGNIZED DISCIPLINE TO BE

17  AN EXPERT IN.

18       THE COURT:  WELL, IN QUALIFYING AN EXPERT, TYPICALLY IN

19  THE MEDICAL FIELD, THERE WOULD BE SOME TYPE OF CERTIFICATION;

20  HOWEVER, THE WITNESS HAS TESTIFIED THAT THERE IS NO SUCH

21  CERTIFICATION, AND, OF COURSE, SOMEONE CAN BE QUALIFIED AS AN

22  EXPERT IN ANY NUMBER OF FIELDS WHERE THERE IS NO CERTIFICATION OR

23  LICENSING IN OTHER TYPES OF CASES.  THAT BEING THE CASE, I THINK

24  THAT I'LL GO AHEAD AND OVERRULE THE OBJECTION.  I'LL ALLOW HIM TO

25  BE QUALIFIED AS AN EXPERT IN THE FIELDS OFFERED.  IN LIGHT OF THE

1   VOIR DIRE THAT'S BEEN CONDUCTED BY MR. WEINSTOCK, I THINK IT

2   STANDS FOR ITSELF, AND HE'S MADE HIS ARGUMENTS, BUT I THINK I'M

3   GOING TO GO AHEAD AND QUALIFY THE WITNESS IN THE FIELDS OFFERED.

4              SO LET'S GO AHEAD AND TALK ABOUT THIS CASE.

5          MR. WATTS:  THANK YOU, YOUR HONOR.

6              MAY I APPROACH, YOUR HONOR?

7          THE COURT:  YES.

8                       DIRECT EXAMINATION

9   BY MR. WATTS:

10  Q.   DR. KORNBERG, YOU AND I HAVE NEVER MET BEFORE THIS CASE; IS

11  THAT RIGHT?

12  A.   THAT'S RIGHT.

13  Q.   WITH ALL DUE RESPECT, I DIDN'T KNOW YOU CHARGE $780 AN HOUR,

14  SO LET'S BE QUICK ABOUT THIS.  OKAY?

15              IN TERMS OF YOUR OPINIONS IN THE CASE, HAVE YOU DONE A

16  RISK ASSESSMENT WITH RESPECT TO THE EXPOSURE TO FORMALDEHYDE THAT

17  CHRIS COOPER SUSTAINED WHILE HE WAS IN THE FEMA TRAILER?

18  A.   I HAVE.

19  Q.   AND HAVE YOU CONSULTED THE EPA RISK ASSESSMENT GUIDELINES IN

20  DOING THAT ASSESSMENT?

21  A.   YES, AND THE ATSDR AS WELL.

22  Q.   OKAY.  IN ADDITION TO OPINIONS WITH RESPECT TO RISK

23  ASSESSMENT, HAVE YOU CONSULTED THE LITERATURE WITH RESPECT TO

24  WHAT'S KNOWN AS GENERAL CAUSATION?

25  A.   I HAVE.

1   Q.   HAVE YOU CONSULTED THAT LITERATURE BOTH WITH RESPECT TO THE

2   ISSUE OF ASTHMA, ALSO WITH THE ISSUE OF EPITHELIAL DAMAGE?

3   A.   YES.

4   Q.   WHAT ABOUT WITH RESPECT TO VOCAL CORD DYSFUNCTION?

5   A.   YES.

6   Q.   IS VOCAL CORD WITH A C-H OR A C-O?

7   A.   C-O.

8   Q.   AND HAVE YOU CONSULTED THE LITERATURE WITH RESPECT TO

9   FORMALDEHYDE INCREASING THE RISK OF CANCER?

10   A.   YES, I HAVE.

11   Q.   AND AS A RESULT OF THAT, HAVE YOU REACHED CONCLUSIONS WITH

12   RESPECT TO GENERAL CAUSATION ON EACH OF THESE ISSUES, ASTHMA,

13   EPITHELIAL DAMAGE, VOCAL CORD DYSFUNCTION AND INCREASED RISK OF

14   CANCER?

15   A.   YES, AND THAT CONCLUSION IS THAT AT THE LEVEL THAT

16   MR. COOPER PROBABLY SUSTAINED, THESE EFFECTS ARE PROBABLE IN HIS

17   PARTICULAR CASE.

18   Q.   ALL RIGHT.  AND WITH RESPECT TO WHAT YOU JUST SAID, IN

19   ADDITION TO CONSULTING THE LITERATURE ON THE ISSUE OF GENERAL

20   CAUSATION, HAVE YOU DONE AN ANALYSIS WITH RESPECT TO THE SPECIFIC

21   CAUSATION AS IT SPECIFICALLY APPLIES TO CHRIS COOPER?

22   A.   I HAVE.

23   Q.   AND FINALLY, THE JURY HAS HEARD YOU BEING QUALIFIED ON

24   ISSUES OF MEDICAL MONITORING.  DO YOU HAVE OPINIONS WITH RESPECT

25   TO THAT ISSUE AS WELL?

1  A.   YES.

2  Q.   I WANT TO GO THROUGH EACH OF THOSE OPINIONS WITH YOU AS

3  QUICKLY AS WE CAN WITHOUT DOING AN INJUSTICE.

4        FIRST OF ALL, WITH RESPECT TO RISK ASSESSMENT, CAN YOU

5  TELL THE LADIES AND GENTLEMEN OF THE JURY HOW THE ENVIRONMENTAL

6  PROTECTION AGENCY CONDUCTS RISK ASSESSMENTS?

7  A.   THE GENERAL METHODOLOGY IS TO DO A BASELINE CALCULATION AT

8  AN ABOVE-ZERO DOSE OF THE PROBABILITY OF INCREASING THE RISK OF

9  CANCER OVER A 70-YEAR LIFETIME.   IT'S CALLED A TARGET RISK.   AND

10 FOR CARCINOGENS, IN PARTICULAR FORMALDEHYDE, THIS NUMBER HAS BEEN

11 WORKED OUT IN ORDER TO UTILIZE IT IN A RISK ASSESSMENT

12 METHODOLOGY.

13 Q.   I WANT TO PUT UP WHAT WAS EXHIBIT 13 TO YOUR DEPOSITION JUST

14 REAL BRIEFLY.   AS WE LOOK AT THAT, AND I MARKED IT AS

15 EXHIBIT 307.2, WITHOUT ATTEMPTING TO EXPLAIN IT TO US, IS THE

16 FORMULA WITH RESPECT TO THE INHALATION OF VOLATILES CONTAINED IN

17 4.6.2?

18 A.   YES, IT IS.

19 Q.   IF YOU COULD, IN 30 SECONDS OR LESS, TRY TO DESCRIBE WHAT

20 THAT FORMULA SAYS TO DO.

21 A.   IT'S REALLY QUITE STRAIGHTFORWARD, WITHOUT GETTING BOGGED

22 DOWN IN ALL OF THE UNITS AND SO FORTH, IF YOU LOOK AT THE LEFT

23 SIDE OF THE EQUATION, THAT'S CALLED THE RISK-BASE CONCENTRATION,

24 AND FOR THE FORMALDEHYDE, WE'RE TALKING ABOUT THE AIRBORNE

25 EXPOSURE TO FORMALDEHYDE.

1          AND WHAT WE'RE CONSIDERING AS A BASELINE, THIS IS ABOVE

2    ZERO EXPOSURE, IF AN INDIVIDUAL INHALES THAT AMOUNT OF MATERIAL

3    ON THE LEFT SIDE OF THE EQUATION, OVER A 30-YEAR PERIOD OF

4    RESIDENCY, THAT PERSON WILL INCUR AN INCREASED RISK OVER THEIR

5    LIFETIME OF DEVELOPING CANCER OF ONE IN A MILLION.  BUT THAT'S A

6    BASELINE RISK.  HE WAS 17 TIMES OVER THAT.

7    Q.   NOW, AFTER LOOKING AT THE FORMULA OF HOW THE EPA SAYS TO DO

8    IT, DID THE EPA PUBLISH RISK ASSESSMENT GUIDELINES?

9    A.   YES.  AND THEY ARE ALSO, MAINLY UNDER THE ATSDR WHICH IS

10   BASED ACCORDING TO METHODOLOGY.  ATSDR IS A BRANCH OF PUBLIC

11   HEALTH AND HUMAN SERVICES, A BRANCH LIKE THE CDC.

12   Q.   WE'RE LOOKING AT EXHIBIT 12 TO YOUR DEPOSITION, WHICH WE'VE

13   MARKED AS TRIAL EXHIBIT 307.1.

14          GENERALLY TELL US WHAT THIS IS.

15   A.   THIS IS THAT RISK-BASED CONCENTRATION.  AND IF YOU FOLLOW

16   FORMALDEHYDE, AND YOU GO OVER TO THE RIGHT-HAND SIDE -- YOU NEED

17   TO MOVE THAT OVER A LITTLE BIT, IF YOU WOULD, SIR.

18   Q.   SO FORMALDEHYDE --

19   A.   FORMALDEHYDE IS LISTED.  AND THE 50.00 IS WHAT'S CALLED THE

20   CHEMICAL ABSTRACT NUMBER, SO YOU CAN IDENTIFY THE CHEMICAL

21   SPECIFICALLY.

22          THEN IF YOU TAKE IT OVER TO WHERE IT'S HIGHLIGHTED, IF

23   YOU WOULD, GO TO THE TOP FOR A SECOND, YOU'LL SEE THE UNITS.  THE

24   UNITS FOR AIR -- THE AIR WAS IN THE WAY -- ARE MICROGRAMS, THAT'S

25   A MILLIONTH OF A GRAM PER CUBIC METER.  SO THOSE ARE THE

1   SCREENING LEVELS.  AND THIS 1.9 E-01 IS JUST A MATHEMATICAL WAY

2   OF SAYING 0.19 MICROGRAMS PER CUBIC METER.  AND THAT HAD TO BE

3   CONVERTED IN ORDER TO UNDERSTAND THE LITERATURE INTO WHAT'S

4   CALLED PARTS PER BILLION.  IT WAS THE STANDARD FORMULA FOR DOING

5   THAT.  THE RESULT WAS 0.155 PARTS PER BILLION.  IT'S A SIMPLE

6   CALCULATION BASED UPON HOW HEAVY THE MOLECULE IS AND SO ON.

7             THAT'S YOUR STARTING POINT FOR SETTING UP THE BAROMETER

8   AGAINST WHICH YOU CAN MEASURE THIS CHILD'S SITUATION.

9   Q.   OKAY.  SO ON EXHIBIT 307.1, YOU SEE THE 1.9 E-01; IS THAT

10  RIGHT?

11  A.   YEAH, THAT'S 0.19, YOU JUST MOVE THE DECIMAL POINT OVER TO

12  THE LEFT MARGIN.

13  Q.   AND THAT EQUALS 0.19 MICROGRAMS PER CUBIC METER?

14  A.   0.155 PARTS PER BILLION IS THE CONVERSION FROM THE

15  0.19 MICROGRAMS PER CUBIC METER.

16  Q.   SO WHAT I'M GOING TO BE TALKING ABOUT IS 0.155 PARTS PER

17  BILLION, BUT THE MATH ADDS UP TO -- THAT'S, WHAT, 0.19 MICROGRAMS

18  PER METER?

19  A.   YOU HAVE TO KNOW BOTH OF THEM BECAUSE THE LITERATURE

20  SOMETIMES REPORTS EXPOSURES IN MICROGRAMS PER CUBIC METER AND

21  SOMETIMES IN PARTS PER BILLION.  SO YOU NEED TO KNOW BOTH

22  NUMBERS.

23  Q.   NOW, IF YOU GET 0.155 PARTS PER BILLION AND YOU MULTIPLY

24  THAT FOR YEAR, DOES THAT GIVE YOU PARTS PER BILLION YEARS?

25  A.   THAT'S HOW IT'S DONE.  THAT'S HOW YOU DO IT, YOUR DOSE

1   CALCULATION, WHICH IS THE EXPOSURE TIMES THE DURATION OF TIME.

2   Q.   AND SO IF WE DRAW A LINE HERE, AND WE HAVE .050 PARTS PER

3   MILLION, HOW MANY PARTS PER BILLION IS THAT?

4   A.   THAT'S 50 PARTS PER BILLION.

5   Q.   FIFTY PARTS PER BILLION.  AND UNDER THE EPA GUIDELINES, THIS

6   .155 PARTS PER BILLION, HOW LONG IS THAT SUPPOSED TO BE EXPOSED

7   OVER?

8   A.   WELL, THE RISK CALCULATION IS BASED UPON A 30-YEAR RESIDENCE

9   TIME, WHICH WILL RESULT IN AN INCREASED LIFETIME RISK.

10  Q.   SO THIS 0.155 PARTS PER BILLION IS OVER 30 YEARS?

11  A.   THAT'S CORRECT.

12  Q.   OKAY.  I'VE GOT YOU.

13        NOW, HOW LONG WAS CHRIS COOPER EXPOSED TO WHATEVER

14  LEVEL OF FORMALDEHYDE THAT HE WAS EXPOSED TO IN THE TRAILER?

15  A.   FOR 19 MONTHS, WHICH IS 1.58 YEARS.

16  Q.   1.58 YEARS.  NOW, JUST SO THAT WE'RE CLEAR AND HOPEFULLY

17  THIS WILL SAVE SOME TIME, THIS 50 PARTS PER BILLION WAS THE LEVEL

18  OF FORMALDEHYDE THAT WAS TESTED IN THE TRAILER A MONTH OR SO

19  AFTER HE LEFT; CORRECT?

20  A.   THAT'S A VERY LOW ESTIMATE OF HIS AVERAGE EXPOSURE.

21  Q.   BUT TO BE FAIR, YOU'RE NOT HERE TO TELL US, YOU KNOW, "I'M

22  GOING TO DO A REGRESSION ANALYSIS AND IT AVERAGES 300 PARTS PER

23  BILLION OVER 19 MONTHS"?

24  A.   I TOOK THE LOWEST NUMBER.

25  Q.   SO TAKING THE LOWEST NUMBER OF 50 PARTS PER BILLION, IF YOU

1   MULTIPLY THAT OVER 1.58 YEARS, WHAT DOES THAT GIVE US IN TERMS OF

2   PARTS PER BILLION YEARS?

3   A.   IT GIVES US 79 PARTS PER BILLION YEARS.  YOU NEED THE YEARS

4   THERE ALSO.

5   Q.   OOPS.

6   A.   THAT'S A DOSE CALCULATION.  THAT TELLS YOU HOW MUCH.  IT'S

7   LIKE IF YOU'VE GOT SO MANY PACKS FOR SO MANY YEARS, YOU END UP

8   WITH PACK YEARS IN SMOKING, FOR EXAMPLE.

9   Q.   NOW, THE BASELINE PARTS PER BILLION YEARS EXPOSURE TO

10  FORMALDEHYDE THAT'S IN THE EPA GUIDELINES IS WHAT?

11  A.   THE BASELINE WHAT?  I'M SORRY.

12  Q.   THE EPA NUMBER IF YOU'RE EXPOSED TO .155 PARTS PER BILLION

13  OVER 30 YEARS, WHAT DOES THAT GIVE YOU IN TERMS OF TOTAL

14  EXPOSURE?

15  A.   4.65.

16  Q.   4.65?

17  A.   4.65, WHICH IS JUST THE DOSE AT THE ONE IN A MILLION

18  LIFETIME RISK FOR 30 YEARS OF EXPOSURE.

19  Q.   AND IN TERMS OF THE DIFFERENCE OF WHAT CHRIS WAS EXPOSED TO

20  IN 1.58 YEARS VERSUS THE BASELINE DOSE IN THE EPA GUIDELINES OF

21  4.65 PARTS PER BILLION YEARS, WHAT'S THE DIFFERENCE?

22  A.   WELL, YOU TAKE THE RATIO AND THAT RATIO IS VERY CLOSE TO 17.

23  SO 79 DIVIDED BY 4.65 GIVES YOU 17 TIMES.

24  Q.   SO WAS CHRIS'S EXPOSURE TO FORMALDEHYDE OVER THE 1.58 YEARS

25  THAT HE WAS EXPOSED APPROXIMATELY 17 TIMES GREATER THAN THE EPA

1   BASELINE DOSE?

2   A.   YES, THEIR TARGET.   THAT'S CORRECT.

3   Q.   NOW, I'VE TOLD YOU THAT BOTH WITH RESPECT TO OUR COURT AND

4   OUR JURY AND IT SEEMS LIKE EVERYBODY IN HERE, EVERYBODY IS LSU

5   FANS; RIGHT?   I WANT TO TRY TO PUT THIS IN A WAY THAT MAKES SOME

6   SENSE.

7        NEXT SATURDAY, THE 3 AND 0 LSU FOOTBALL TEAM IS GOING

8   TO EITHER GET ON A BUS OR A PLANE AND THEY ARE GOING TO GO TO

9   MISSISSIPPI TO PLAY MISSISSIPPI STATE.   AND WHEN THEY TRAVEL FROM

10  DEATH VALLEY IN BATON ROUGE TO STARKVILLE, MISSISSIPPI, THAT'S

11  ABOUT 240 MILES.   WE LOOKED THAT UP YESTERDAY; RIGHT?

12  A.   YES.

13  Q.   AND USING THAT EXAMPLE, IF SOMEBODY IS GOING 240 MILES, HOW

14  COULD YOU TAKE WHAT WE JUST TALKED ABOUT EXPOSURE AND SHOW THE

15  DIFFERENCE OF WHAT WE'VE GOT HERE?

16  A.   WELL, IT REALLY IS A VALID COMPARISON IF YOU'RE REALLY

17  TRYING TO UNDERSTAND THIS.   THE DISTANCE, THIS 240 MILES IS

18  EQUIVALENT TO HIS DOSE OVER, IN THIS CASE, LET'S SAY A 30-HOUR

19  PERIOD TRAVELING AT EIGHT MILES PER HOUR.   SO YOU TRAVELED

20  EIGHT MILES PER HOUR FOR 30 HOURS, THEN YOU GO 240 MILES.   AND

21  THAT'S EQUIVALENT TO THE BASELINE TARGET RISK DOSE, THAT'S HIS

22  JOURNEY.

23  Q.   BUT WITH RESPECT TO CHRIS COOPER'S EXPOSURE, HOW LONG WOULD

24  IT TAKE HIM TO GET THERE?   I MEAN, HE'S FLYING, ISN'T HE?

25  A.   WELL, IT'S A VERY VALID METAPHORICAL CONSIDERATION BECAUSE

1  IF YOU LOOK AT THE SAME EVENT, MR. COOPER WAS NOT ONLY TRAVELING

2  FOR A SHORTER PERIOD OF TIME, BUT HE WAS TRAVELING AT A MUCH

3  HIGHER RATE OF SPEED, IF YOU COMPARE SPEED TO EXPOSURE.

4          AND THE NUMBER IS THAT HE WOULD HAVE -- IN 1.58 HOURS,

5  HE WOULD HAVE TRAVELED NOT 240 MILES, BUT 4,080 MILES, AND HE

6  WOULD HAVE DONE IT AT A MUCH HIGHER RATE OF SPEED, 2,582 MILES

7  PER HOUR.

8          SO HE'S GOING FASTER AND HE'S TRAVELING A SHORTER TIME

9  AND HE'S GOING A MUCH LONGER DISTANCE.

10 Q.   SO HE'S GOING TO LONDON IN A FRACTION OF THE TIME?

11 A.   THAT'S CORRECT.

12 Q.   THESE EPA RISK ASSESSMENT GUIDELINES, WERE THEY PUBLISHED BY

13 THE ENVIRONMENTAL PROTECTION AGENCY?

14 A.   YES, THEY ARE.

15 Q.   HAVE THEY BEEN UTILIZED BY OTHER GOVERNMENT AGENCIES FOR THE

16 UNITED STATES?

17 A.   YES.  THE ATSDR, IN PARTICULAR.

18 Q.   AND DOES THE EPA USE THEM AS WELL?

19 A.   YES, IT DOES.

20 Q.   AND SO THIS 17-TIMES FACTOR, WHAT DOES THAT TELL US ABOUT

21 HIS RISK ASSESSMENT?

22 A.   AS A CLINICIAN, FOCUSING ON THIS YOUNG CHILD, IT TELLS ME

23 THAT HE'S AT 17 TIMES THE LIFETIME TARGET RISK OF INCURRING

24 CANCER AS A RESULT OF THIS EXPOSURE WHICH OCCURRED IN A MUCH

25 SHORTER PERIOD OF TIME IN A MUCH HIGHER DOSE -- EXCUSE ME, A MUCH

1   HIGHER EXPOSURE LEVEL.

2   Q.   LET'S GO TO NUMBER 2, WHICH IS THE PRINCIPLES OF CAUSATION,

3   GENERAL AND SPECIFIC.

4        FIRST OF ALL, DID YOU RESEARCH THE LITERATURE WITH

5   RESPECT TO THE RELATIONSHIP BETWEEN ASTHMA AND EXPOSURE TO

6   FORMALDEHYDE?

7   A.   YES.

8   Q.   AND I DON'T WANT TO HAVE A WHOLE LOT OF OVERLAP, BUT YOU

9   READ ALL THE STUDIES THAT MCGWIN ANALYZED IN DOING HIS

10  EPIDEMIOLOGY?

11  A.   YES.

12  Q.   YOU'VE READ THE STUDIES THAT TALK ABOUT THE PREVALENCE

13  BETWEEN EXPOSURE TO FORMALDEHYDE AND THE PREVALENCE OF THAT?

14  A.   AND THE ONSET OF ASTHMA AND THE AGGRAVATION, YES.

15  Q.   IN ADDITION TO THE PREVALENCE STUDIES, ARE THERE STUDIES

16  THAT TALK ABOUT THE EXACERBATION OF THAT?

17  A.   YES.

18  Q.   AND BY THE WAY, JUST SO THAT WE'RE CLEAR, YOU WORK WITH A

19  GENTLEMAN BY THE NAME OF DR. STEPHEN KING, WHO'S A TOXICOLOGIST

20  FROM THE HOUSTON AREA?

21  A.   THAT'S CORRECT.

22  Q.   YOU'VE WORKED WITH HIM BEFORE?

23  A.   I HAVE.

24  Q.   AND DID YOU HAVE HIM PULL TOGETHER A WHOLE BUNCH OF

25  LITERATURE THAT YOU REVIEWED AND CONSIDERED?

1  A.   YES.

2  Q.   AND WAS THAT LITERATURE PROVIDED TO MR. WEINSTOCK AT YOUR

3  DEPOSITION?

4  A.   YES, IT WAS DONE UNDER MY DIRECTION.  HE IS A PH.D.

5  TOXICOLOGIST.

6  Q.   BUT THE BOTTOM LINE IS EVEN THOUGH HE COLLECTED MOST OF THE

7  LITERATURE, YOU REVIEWED IT, AND IT WAS THERE?

8  A.   HE HAD BETTER ACCESS TO IT THROUGH THE LIBRARIES.

9  Q.   AND ARE THERE STUDIES THAT REFERENCE THE ISSUE OF NOT ONLY

10 THE PREVALENCE OR THE INCREASED PREVALENCE OF ASTHMA, BUT ALSO

11 THE EXACERBATION OF ASTHMA?

12 A.   YES.

13 Q.   MICHAEL KRZYZANOWSKI, *THE CHRONIC RESPIRATORY EFFECTS OF*

14 *INDOOR FORMALDEHYDE EXPOSURE*, IS THAT ONE OF THE STUDIES THAT YOU

15 CONSIDERED?

16 A.   YES.  THAT WAS A TUCSON STUDY DONE IN 1990.

17 Q.   DID YOU CONSIDER THAT STUDY TO BE A LEARNED TREATISE?

18 A.   IT IS.  IT'S A PEER-REVIEWED ARTICLE.

19      MR. WATTS:  YOUR HONOR, WE WOULD PROPOSE TO USE

20 EXHIBIT 228, NOT TO OFFER IT BUT TO UTILIZE IT UNDER

21 RULE 803(18).

22      MR. WEINSTOCK:  NO OBJECTION WHATSOEVER.

23      THE COURT:  MR. SHERBURNE, THAT'S FINE WITH YOU?

24      MR. SHERBURNE:  YES, YOUR HONOR.  IT'S ALL RIGHT.

25      MR. WATTS:  I DON'T MEAN TO EXCLUDE MR. SHERBURNE, YOUR

1    HONOR.

2            THE COURT:  I DON'T WANT TO EXCLUDE HIM.  THAT'S WHY I

3    CHECK WITH HIM EVERY TIME.

4            MR. WATTS:  THANK YOU.

5                            EXAMINATION

6    BY MR. WATTS:

7    Q.   ALL RIGHT.  WITH RESPECT TO THE KRZYZANOWSKI STUDY, ON THE

8    ABSTRACT IT SAYS, "IN CHILDREN, LEVELS OF PEFR DECREASED LINEARLY

9    WITH HCHO EXPOSURE."  LET'S TRANSLATE THAT.  PEFR, DOES THAT MEAN

10   PEAK EXPIRATORY FLOW RATES?

11   A.   THAT'S CORRECT.

12   Q.   IN ENGLISH WHAT DOES THAT MEAN?

13   A.   IT MEANS THAT WHEN THE PATIENT BREATHES OUT AS HARD AND AS

14   FAST AS THEY CAN, IT SIMPLY IS THE HIGHEST VELOCITY OF THE GAS AS

15   IT COMES OUT.

16   Q.   AND WHEN MR. KRZYZANOWSKI SAYS, "IN CHILDREN, LEVELS OF PEFR

17   DECREASED LINEARLY WITH HCHO EXPOSURE.  THE EFFECTS IN ASTHMATIC

18   CHILDREN EXPOSED TO HCHO BELOW 50 PPB WERE GREATER THAN IN

19   HEALTHY ONES."

20   A.   YES.  AND THIS IS QUITE SIGNIFICANT.  THE LINE YOU DIDN'T

21   HIGHLIGHT, WHICH INDICATES THAT IT DECREASES 78 PERCENT COMPARED

22   TO UNEXPOSED KIDS WHO WERE EXPOSED TO LEVELS AROUND 60-PARTS PER

23   BILLION, WHICH IS RIGHT IN THE RANGE THAT MR. COOPER WAS EXPOSED

24   TO.

25   Q.   JUST SO THAT WE GET SOME MORE OF THIS INTO THE RECORD, AT

1  PAGE 122, IT SAYS, "IN CHILDREN, LEVELS OF PEFR, BOTH BEDTIME AND

2  MORNING VALUES, DECREASED AS HCHO" -- HCHO IS FORMALDEHYDE,

3  RIGHT?

4  A.   YES.

5  Q.   -- "CONCENTRATION INCREASED.  MORNING PEFR WAS FURTHER

6  DECREASED BY HCHO IN CHILDREN WITH ASTHMA.  SIMILAR PATTERN OF

7  ASSOCIATION BETWEEN MORNING PEFR VALUES AND HCHO IN ASTHMATIC

8  CHILDREN WAS FOUND."

9        GENERALLY, FACE THE JURY AND TELL THEM WHAT THEY WERE

10  TESTING AND WHAT CONCLUSIONS WERE THEY REACHED AND WHY THIS STUDY

11  IS IMPORTANT.

12  A.   WELL, FOR PATIENTS THAT HAVE EXPOSURE TO AN IRRITANT WHO ARE

13  BEING TESTED, WE USE THE PEAK EXPIRATORY FLOW RATE AS ONE

14  PARAMETER.  AND THEN SOMETIMES A DOCTOR WILL GIVE YOU A DEVICE

15  THAT YOU TAKE HOME, AND YOU CAN ACTUALLY MEASURE YOUR OWN PEAK

16  EXPIRATORY FLOW RATE.

17        SO THE DOCTOR WILL SAY, YOU KNOW, WHY DON'T YOU CHECK

18  IT IN THE MORNING, WHY DON'T YOU CHECK IT IN THE AFTERNOON.  YOU

19  BLOW INTO THIS METER, AND IT ACTUALLY WILL TELL YOU HOW FAST YOUR

20  PEAK LEVEL IS.  THERE IS OTHER MEASURES THAT YOU CAN DO IN THE

21  SAME WAY.  BUT THEN YOU TAKE THAT INFORMATION TO THE PHYSICIAN,

22  AND THE PHYSICIAN WILL INTERPRET THAT.

23        IT'S ALSO DONE IN AN OCCUPATIONAL SETTING WHERE A

24  PERSON HAS A SUSPECTED EXPOSURE TO AN IRRITANT CHEMICAL.  YOU

25  MIGHT CATCH THEM BEFORE THEY GO INTO THE WORKPLACE, YOU KNOW,

1  WHEN THEY SHOW UP AT WORK, AND YOU MIGHT GET THEM AT THE END OF

2  THE SHIFT.  AND THEN WE LOOK AT THOSE NUMBERS AND TRY TO MAKE A

3  DETERMINATION IF WE DO HAVE SOME EFFECT FROM THIS EXPOSURE.

4  Q.  HAVE OTHER AUTHORS EXAMINED THE ISSUE OF THE EXACERBATION OF

5  ASTHMA BY FORMALDEHYDE?

6  A.  YES.

7  Q.  AND, FOR EXAMPLE, SAKAMOTO AND BURR, ARE THOSE TWO STUDIES

8  THAT YOU FOUND TO BE LEARNED TREATISES?

9  A.  YES.

10  Q.  AND BOTH OF THOSE DISCUSS THE DATA IN KRZYZANOWSKI?

11  A.  THAT'S RIGHT.

12  Q.  UNDER RULE 803(18), I'LL PUT SAKAMOTO UP.  IN THE ABSTRACT,

13  SHE WRITES, "FORMALDEHYDE HAS BEEN SHOWN TO CAUSE AND EXACERBATE

14  ASTHMATIC SYMPTOMS."  AND ON PAGE 154, DISCUSSING KRZYZANOWSKI

15  DOES SHE WRITE, "IN ADDITION, PEF VALUES DECREASE LINEARLY WITH

16  INCREASING CONCENTRATION OF FORMALDEHYDE, AN EFFECT DISCERNIBLY

17  GREATER IN ASTHMATIC CHILDREN THAN HEALTHY ONES WHEN THE AMBIENT

18  FORMALDEHYDE CONCENTRATIONS WERE BELOW 0.05-PARTS PER BILLION."

19  A.  WHICH IS -- THAT IS THE 50-PART PER BILLION FOUND THE

20  TRAILER.

21  Q.  AND WITH RESPECT TO BURR, DID BURR WRITE, "IN AN AMERICAN

22  STUDY" -- FOOTNOTE 14, WHICH IS KRZYZANOWSKI, "IN AN AMERICAN

23  STUDY DOMESTIC FORMALDEHYDE LEVELS WERE RELEASED INVERSELY TO

24  PEAK EXPIRATORY FLOW RATES IN CHILDREN, THE EFFECT BEING

25  PARTICULARLY MARKED IN THOSE WHO HAD ASTHMA.  THIS SUGGESTS THE

1    POSSIBILITY OF AN EFFECT OF FORMALDEHYDE ON ATOPIC DISEASE."

2          DID I READ THAT CORRECTLY?

3    A.   YES.  AND WHEN THEY SAY INVERSELY, IT SIMPLY MEANS THAT AS

4    THE LEVELS GO UP, THE PEAK EXPIRATORY FLOW RATE GOES DOWN.

5    Q.   WHAT DOES ATOPIC DISEASE MEAN?

6    A.   ATOPIC DISEASE IS A DISEASE WHICH IS MEDIATED BY IGE LEVELS

7    WHICH ARE IMMUNOGLOBULIN LEVELS IN SOME PEOPLE WHO ARE ALLERGIC

8    TO FORMALDEHYDE.

9    Q.   NOW, DID YOU REACH A CONCLUSION WITH RESPECT TO WHETHER

10   EXPOSURE TO FORMALDEHYDE WOULD HAVE AN EFFECT OF SUBSTANTIALLY

11   AGGRAVATING ASTHMA IN CHILDREN?

12   A.   YES, IT CAN.

13   Q.   NOW, IN ADDITION TO IT CAN, DID YOU THEN DO RESEARCH WITH

14   RESPECT TO CHRIS COOPER SPECIFICALLY?

15   A.   YES.

16   Q.   AND JUST BY WAY OF YOUR WORK, CAN YOU TELL THE LADIES AND

17   GENTLEMEN OF THE JURY, DID YOU JUST LOOK AT STUDIES, OR DID YOU

18   ACTUALLY LOOK AT CHRIS COOPER?

19   A.   YES.  I'M A LICENSED PHYSICIAN IN THE STATE OF COLORADO, AND

20   I DON'T HAVE THE WHEREWITHAL AND THE EQUIPMENT THAT IS AT THE

21   NATIONAL JEWISH HOSPITAL.  THE NATIONAL JEWISH IN DENVER IS THE

22   NUMBER ONE RESPIRATORY HOSPITAL IN THE COUNTRY ACCORDING TO SOME

23   SOURCES.  SO I SENT HIM TO A BOARD CERTIFIED DOCTOR WHO IS BOARD

24   CERTIFIED NOT ONLY IN OCCUPATIONAL ENVIRONMENTAL MEDICINE, BUT

25   ALSO BOARD CERTIFIED IN ALLERGY AND IMMUNOLOGY.  AND THIS IS

1  DR. PACHECO.

2           AND SHE PERFORMED TESTING, INDEPENDENT OF WHAT I HAD

3  EVEN RECOMMENDED.  SHE MADE UP HER OWN TESTING PROTOCOL, AND SHE

4  DREW SOME VERY DISTINCT CLINICAL CONCLUSIONS ABOUT HIM AFTER HE

5  WAS TESTED.

6  Q.  AND IN ADDITION TO SENDING CHRIS TO NATIONAL JEWISH, DID YOU

7  EXAMINE CHRIS YOURSELF, AS WELL?

8  A.  I DIDN'T DO A PHYSICAL EXAM, BUT I INTERVIEWED CHRIS AND HIS

9  MOM FOR OVER THREE HOURS, FACE TO FACE, WITH ASKING DIRECT

10 QUESTIONS ABOUT EVERY FACET OF HIS MEDICAL SITUATION.

11 Q.  AND DID YOU EXAMINE THE MEDICAL RECORDS, THE ONES THAT STILL

12 EXIST THAT WEREN'T DESTROYED BY THE FLOOD?

13 A.  YES.  I HAD THE REALLY WONDERFUL OPPORTUNITY TO TALK WITH

14 DR. BARNES, WHO IS HIS PEDIATRICIAN, ABOUT THIS SITUATION.

15 Q.  ALL RIGHT.  NOW, WITH RESPECT TO GENERAL CAUSATION, OUR

16 SECOND CATEGORY IS EPITHELIAL DAMAGE.  CAN YOU TELL THE LADIES

17 AND GENTLEMEN OF THE JURY WHAT THE EPITHELIUM IS.

18 A.  WELL, THE EPITHELIUM IS THE OUTER LAYER OF TISSUE.  AND WE

19 CALL IT SOMETIMES THE RESPIRATORY EPITHELIUM.  IT'S RIGHT ON THE

20 SURFACE.

21          AND IN THIS PARTICULAR CASE, THE DAMAGE WE'RE TALKING

22 ABOUT IS ESSENTIALLY TWOFOLD -- THREEFOLD, ACTUALLY.  ONE IS YOU

23 CAN HAVE WHAT'S CALLED A PROLIFERATION OF CELLS.  YOU CAN HAVE

24 NORMAL CELLS, MANY OF WHICH CONTINUE TO GROW.  SOME OF THOSE

25 CELLS SECRETE MUCUS, SO YOU MIGHT HAVE A LOT OF WHAT'S CALLED

1    HYPERPLASIA OF CELLS THAT PRODUCE MUCUS, SO YOU END UP WITH A

2    RUNNY NOSE.

3              THEN YOU CAN HAVE THE ABNORMALITY AND MATURATION OF

4    CELLS.  SOME CELLS WILL MATURE IN AN ABNORMAL WAY, AND IT

5    PROGRESSES ON AT SOME POINT TO CELLS THAT BECOME CANCEROUS.

6    Q.   NOW, SPEAKING OF DR. BARNES ON THE ISSUE OF THE EPITHELIAL

7    DAMAGE, DID YOU EXAMINE NOT JUST HER EXPERT REPORT, BUT I WANT TO

8    TALK ABOUT HER MEDICAL RECORDS THEMSELVES.

9    A.   YES, AND THEY'RE REFERENCED IN MY REPORT.

10   Q.   AND DID SHE SEE CHRIS COOPER ON OCTOBER 4TH OF 2007, AND

11   PERFORM A PHYSICAL EXAMINATION?

12   A.   YES.

13   Q.   AND DID THAT PHYSICAL EXAMINATION REVEAL BOGGY NASAL

14   TURBINATES?

15   A.   YES.

16   Q.   WHAT ARE BOGGY NASAL TURBINATES, AND WHY ARE THEY IMPORTANT?

17   A.   WELL, BOGGY NASAL TURBINATES ARE A MEASURE OF INFLAMMATORY

18   EFFECTS IN THE NOSE.  AND TURBINATES ARE -- YOU MIGHT -- THEY

19   ARE, IN A SENSE, KIND OF FILTERS YOUR CHAMBERS WHICH EXISTS IN

20   THE NOSE.

21             AND IN THIS PARTICULAR CASE, DR. BARNES WAS REFERRING

22   SPECIFICALLY TO THE FACT THAT THESE WERE SWOLLEN, AND THEY WERE

23   ALSO SECRETING MUCUS, AND THEY LOOKED INFLAMED.

24   Q.   AGAIN, WHEN SHE SAW HIM ON APRIL 24TH OF 2009, DID SHE

25   CONDUCT A PHYSICAL EXAMINATION?

1   A.   YES.

2   Q.   DID SHE FIND NASAL CONGESTION?

3   A.   YES.

4   Q.   DID SHE FIND BOGGY NASAL TURBINATES?

5   A.   YES.

6   Q.   DID SHE FIND GLASSY EYES WITH AN IRRITATED SCLERA?

7   A.   RIGHT.  YES.

8   Q.   SCLERAE IS S-C-L-E-R-A-E.  WHAT IS THAT?

9   A.   THE BRITISH SPELLING IS A-E.

10  Q.   AND WHAT IS THE SCLERA?

11  A.   THE SCLERA IS THE -- ACTUALLY THE TISSUE THAT'S IN THE WHITE

12  PART OF THE EYE, EFFECTIVELY.

13  Q.   DID SHE FIND A PRODUCTIVE COUGH WITH SMALL AMOUNTS OF

14  POSTNASAL DRIP?

15  A.   YES.

16  Q.   AND DID SHE FIND A RED PHARYNX?

17  A.   YES.

18  Q.   NOW, ARE THOSE CLINICAL FINDINGS FOUND BY DR. BARNES

19  SIGNIFICANT TO YOU WITH RESPECT TO WHETHER THERE WAS EPITHELIAL

20  DAMAGE?

21  A.   YES.  THE DAMAGE THAT SHE SAW IN OCTOBER OF '07, WHICH WAS

22  17 MONTHS AFTER HE WENT INTO THE TRAILER, PERSISTED AND WAS FOUND

23  TO EXIST IN APRIL OF '09.

24  Q.   NOW, DR. BARNES IS A LOCAL MEDICAL DOCTOR.  YOU MENTIONED

25  THAT YOU REFERRED CHRIS TO THE NATIONAL JEWISH HOSPITAL.  THAT'S

1  THE FINEST HOSPITAL IN THAT AREA IN THE COUNTRY, CORRECT?

2  A.   THAT'S CORRECT.

3  Q.   DR. KARIN PACHECO, THE JURY HAS ALREADY HEARD HER TESTIMONY

4  ABOUT WHAT SHE FOUND AND WHAT SHE CONCLUDED; BUT, WITH RESPECT TO

5  HER PHYSICAL EXAMINATION, DID SHE ALSO FIND THE MUCOSA WAS PALE?

6  A.   YES.

7  Q.   DID SHE FIND THAT IT WAS BOGGY?

8  A.   YES.

9  Q.   AND WITH SOME CLEAR DRAINAGE?

10  A.   YES.

11  Q.   AND DID SHE ASSESS THAT HE HAD MILD CHRONIC ALLERGIC

12  RHINOSINUSITIS?

13  A.   YES.   THE RHINOSINUSITIS IS THE -- THE WORD "ITIS" IN

14  MEDICINE MEANS INFLAMMATION.   LIKE IF YOU HAD HEPATITIS, THAT'S

15  AN INFLAMED LIVER; OR, PANCREATITIS, IT'S AN INFLAMED PANCREAS.

16  Q.   NOW, ARE THESE CLINICAL FINDINGS CONSISTENT WITH THE MEDICAL

17  LITERATURE IN TERMS OF WHAT FORMALDEHYDE CAUSES IN TERMS OF

18  CLINICAL INDICIA?

19  A.   YES.

20  Q.   PAPER BY HOLSTROM IN 1989, *HISTOLOGICAL CHANGES IN THE NASAL*

21  *MUCOSA IN PERSONS OCCUPATIONALLY EXPOSED TO FORMALDEHYDE ALONE*

22  *AND IN COMBINATION WITH WOOD DUST*.   IS THIS A STUDY THAT YOU FIND

23  TO BE A LEARNED TREATISE?

24  A.   YES.

25           MR. WATTS:   WITH THAT UNDERSTANDING, IT'S BEEN MARKED AS

1    EXHIBIT 220, YOUR HONOR.  WE'LL REFER TO IT BUT NOT ADMIT IT.

2                              EXAMINATION

3    BY MR. WATTS:

4    Q.   LET ME PUT THIS ON THE SCREEN JUST REAL BRIEFLY.  NOW, IN

5    FAIRNESS, THIS IS YOUR HANDWRITING UP HERE; IS THAT RIGHT?

6    A.   ACTUALLY, SOME OF THAT HANDWRITING, I THINK, IS --

7    Q.   DR. KING?

8    A.   -- DR. WILLIAMS.

9    Q.   DR. WILLIAMS.  OKAY.

10              LET ME JUST TAKE YOU TO PAGE 128.

11   A.   THOSE ARE CALCULATIONS THAT I DID DO, ANYWAY, SO...

12   Q.   THEORETICALLY, THE LOSS OF CILIATED -- WHAT DOES CILIATED

13   MEAN?

14   A.   CILIA IS LIKE LITTLE WAVING HAIRS, AND THEY EXIST IN THE

15   RESPIRATORY EPITHELIUM.  IN THE LUNG, FOR EXAMPLE, THE CILIA

16   ACTUALLY MAKE THE MUCUS CARPET OF THE LUNG MOVE.  AND SO,

17   CONSEQUENTLY, YOU CAN REMOVE, YOU KNOW, FOREIGN BODIES AND SO

18   FORTH FROM THE LUNG THAT WAY.

19   Q.   NOW, THERE IS THIS WORD I'VE BEEN TEASING MR. SHEA ABOUT FOR

20   HALF THE TRIAL, COLUMNAR.  IT TURNS OUT IT'S A REAL WORD.  DID

21   YOU KNOW THAT MR. SHEA WAS A DOCTOR AND KNEW THE COLUMNAR?

22              WHAT DOES COLUMNAR MEAN?

23   A.   COLUMNAR JUST MEANS -- AGAIN, THESE ANATOMISTS WERE VERY

24   DESCRIPTIVE, AND COLUMNAR MEANS IT'S LIKE A COLUMN.  THESE CELLS,

25   WHEN YOU LOOK AT THEM, THEY ARE LIKE RECTANGLES INSTEAD OF

1  SQUARES.  CUBOIDAL EPITHELIUM IS MORE SQUARE.

2  Q.   SO THE LOSS OF CILIATED COLUMNAR EPITHELIUM, TRANSLATE THAT

3  INTO ENGLISH FOR US.

4  A.   IT HAPPENS, AND THIS IS ABSOLUTELY CORRECT, WITH TOBACCO

5  SMOKING, FOR EXAMPLE, AS WELL, THAT WHEN WE LOOK AT THE STATUS OF

6  THE EPITHELIUM, THAT OUTER LAYER, THESE CELLS DISAPPEAR.  THEY

7  DISAPPEAR.  THEY ARE REPLACED WITH OTHER CELLS.  THERE ARE CELLS,

8  FOR EXAMPLE, THAT SECRETE MORE MUCUS REPLACE THEM, OR OTHER

9  CELLS.

10  Q.   IS CILIATED COLUMNAR EPITHELIAL DAMAGE PERMANENT?

11  A.   IT USUALLY IS.  IT CAN RECOVER, BUT, IN THIS PARTICULAR

12  CASE, I DON'T THINK THAT THAT'S GOING TO BE THE CASE.

13  Q.   "SO THE LOSS OF CILIATED COLUMNAR EPITHELIUM SHOULD PERHAPS

14  EXPLAIN DIFFERENT DISCOMFORT SYMPTOMS REPORTED BY A

15  FORMALDEHYDE-EXPOSED WORKER, SUCH AS INCREASED SECRETION,

16  FORMATION OF CRUSTS AND NASAL BLOCKAGE."

17       WHAT DOES THIS SENTENCE HAVE IN TERMS OF IMPORTANCE TO

18  YOU IN TERMS OF WHAT WE SAW FROM DR. BARNES AND DR. PACHECO'S

19  CLINICAL EVALUATIONS OF CHRIS COOPER?

20  A.   IT'S NOT ONLY CONSISTENT WITH WHAT WE'RE SEEING, BUT THE

21  MORE IMPORTANT WORD IS IT'S PERSISTENT.  SO IT'S A COMBINATION OF

22  CONGRUENCY ALONG WITH EXTENDED DURATION, WHICH IS IMPORTANT.

23  Q.   NOW, IN ADDITION TO HOLSTROM, DID YOU REVIEW THE STUDY BY

24  EDLING IN 1988 ENTITLED, *OCCUPATIONAL EXPOSURE TO FORMALDEHYDE*

25  *AND HISTOPATHIC CHANGES IN THE NASAL MUCOSA*?

1  A.    I DID.

2  Q.    AND DO YOU FIND IT TO BE A LEARNED TREATISE?

3  A.    YES.

4        MR. WATTS:  WE'VE MARKED IT IS 218, FOR USE AS SUCH,

5  SIR.

6                         EXAMINATION

7  BY MR. WATTS:

8  Q.    NOW, EDLING, JUST GENERALLY DESCRIBE FOR THE JURY WHAT HE

9  WAS LOOKING AT HERE.

10 A.    THIS GENTLEMAN AND HIS RESEARCHERS WERE LOOKING AT THE

11 CHANGES IN THE NASAL MUCOSA OF INDIVIDUALS WHO WERE EXPOSED TO

12 FORMALDEHYDE.  AND WHAT THEY DID IS THEY DID BIOPSIES, IN THIS

13 PARTICULAR CASE IN ADULTS, AND THEY SUBMITTED THEM TO A

14 PATHOLOGIST WHO LOOKED AT THE CELLS UNDER THE MICROSCOPE AND MADE

15 THE DETERMINATION OF WHETHER THERE WERE CHANGES.

16 Q.    WERE SOME OF THESE MEN EXPOSED TO FORMALDEHYDE FOR AS LITTLE

17 AS A YEAR?

18 A.    YES.

19 Q.    DID 72 OF 75 OF THESE MEN EXPOSED TO FORMALDEHYDE HAVE

20 ABNORMAL EPITHELIAL DAMAGE?

21 A.    LITERALLY 72 OUT OF, THAT'S ACTUALLY CORRECT, OUT OF THE 75

22 HAD ABNORMAL EFFECTS AT THESE LEVELS.

23 Q.    THIS STUDY ON PAGE 763 SAYS, "THE HISTOLOGICAL EXAMINATION

24 SHOWED THAT ONLY THREE OF THE CASES HAD A NORMAL CILIATED

25 PSEUDOSTRATIFIED EPITHELIUM," REFERRING TO FIGURE ONE.  "IN EIGHT

1    THERE WAS A LOSS OF CILIATED CELLS AND GOBLET CELL HYPERPLASIA,

2    IN 59 SQUAMOUS METAPLASIA, AND IN SIX A MILD DYSPLASIA."

3          WHAT IS SQUAMOUS METAPLASIA?

4    A.   SQUAMOUS METAPLASIA IS, AS I SAID, THE MULTIPLICATION OF THE

5    NORMAL CELLS WITH A SQUAMOUS CONFIGURATION, A SQUAMOUS CELL

6    CONFIGURATION, WHICH IS THE CELL TYPE OF CANCER, ALTHOUGH THESE

7    ARE NOT CANCER CELLS AT THIS POINT.

8    Q.   SO IF 59 OUT OF 75 PEOPLE HAD SQUAMOUS METAPLASIA AFTER

9    BEING EXPOSED TO FORMALDEHYDE, WHAT IS THAT, ABOUT 78, 80 PERCENT

10   OF THEM?

11   A.   IT WOULD BE, YEAH.  YES.

12   Q.   NOW, AS WE LOOK AT --

13   A.   THE IMPORTANT THING, IF I MAY --

14   Q.   PLEASE.

15   A.   -- THE SIX THAT HAD MILD DYSPLASIA, WHICH IS ANOTHER

16   RATCHETING UP, IF YOU WILL, OF ABNORMALITY WHICH IS RELATED TO

17   IMMATURE CELL FORMATION, THAT'S ALSO VERY SIGNIFICANT FINDING.

18   Q.   AND THEN ON PAGE 764 IT SAYS, "THE RESULTS OF THIS STUDY

19   INDICATE THAT OCCUPATIONAL EXPOSURE TO FORMALDEHYDE IN THE RANGE

20   OF 0.1 TO 1.1 MICROGRAMS PER CUBIC METER -- TLV OF 1.0 MICROGRAMS

21   PER CUBIC METER -- MAY RESULT IN PATHOLOGICAL CHANGES IN THE

22   NASAL MUCOSA WHEN COMPARED WITH NONEXPOSED."

23          WHAT'S THE SIGNIFICANCE OF THIS STUDY TO YOU?

24   A.   THE STUDY DOCUMENTS THE FACT THAT AT LEVELS THAT WERE AS LOW

25   AS 81-PARTS PER BILLION FOR TIME FRAMES AS SHORT AS ONE YEAR, HE

1   FOUND THAT A VERY HIGH PERCENTAGE, ACTUALLY 78 PERCENT OF THESE

2   INDIVIDUALS, SHOWED EFFECTS OF CELL PROLIFERATION, WHICH MEANS

3   INCREASE OF CELLS.  AND SOME OF THEM HAD CHANGES WHICH, IF THEY

4   WERE TO PROCEED, COULD RESULT IN CANCER CELLS.

5   Q.   DR. KORNBERG, REVIEWING THE LITERATURE THAT YOU HAVE, DO YOU

6   HAVE AN OPINION AS A MATTER OF GENERAL CAUSATION AS TO WHETHER

7   EXPOSURE TO FORMALDEHYDE WILL CAUSE EPITHELIAL INJURY WITH

8   HYPERREACTIVITY?

9   A.   YES.

10  Q.   AND WHAT IS THAT OPINION, SIR?

11  A.   MY OPINION IS THAT THE LEVELS OF FORMALDEHYDE THAT WE WERE

12  ABLE TO SEE IN THE TRAILER THAT WERE PROBABLE AT 50-PARTS PER

13  BILLION OR GREATER, THE EFFECTS OF HYPERREACTIVITY, AND I WOULD

14  HAVE TO SAY THAT THE EPITHELIAL CHANGES CAN ALSO OCCUR AS

15  DOCUMENTED HERE.  AND THERE ARE OTHER ARTICLES WHICH SUPPORT

16  THIS, AS WELL.

17  Q.   SO ON THE ISSUE OF CAUSATION, WE'VE TALKED ABOUT GENERAL

18  CAUSATION OF EXACERBATION OF ASTHMA.  DO YOU HAVE A CONCLUSION

19  AFTER REVIEWING THE LITERATURE, TALKING TO CHRIS AND HIS MOTHER,

20  LOOKING AT THE TESTS THAT WERE DONE, LOOKING AT THE CLINICAL

21  DIAGNOSES THAT WERE MADE BY THE TREATING DOCTORS, AS TO WHETHER

22  OR NOT CHRIS' EXPOSURE TO ASTHMA DURING THOSE 19 MONTHS CAUSED AN

23  EXACERBATION OF HIS ASTHMA?

24  A.   YES.

25  Q.   AND WHAT IS THAT OPINION, SIR?

1  A.   WELL, THE OPINION IS THAT BASED UPON ONE TEST THAT WE

2  HAVEN'T DISCUSSED YET, THE METHACHOLINE CHALLENGE, WHICH WAS DONE

3  AT NATIONAL JEWISH, THIS IS A TEST WHERE AN AGENT IS ADMINISTERED

4  BY INHALATION.  AND, AGAIN, IT'S NOT THE PEAK EXPIRATORY FLOW

5  RATE, BUT IT'S ANOTHER MEASURE OF HOW MUCH AIR HE CAN GET OUT OF

6  HIS LUNGS WHICH IS ACTUALLY DOCUMENTED.

7       THEY LOOK FOR 20 PERCENT DROP, AND THEN THEY STOP THE

8  TEST.  AND THIS WAS VERY CLEAR EVIDENCE, IN ADDITION TO WHICH, I

9  SHOULD ADD, LATER HE WAS -- UNDERWENT INDIRECT LARYNGOSCOPY,

10 WHERE DR. PACHECO LOOKED IN HIS THROAT AND FOUND THAT HE HAD A

11 VOCAL CORD DYSFUNCTION IN ADDITION TO THIS.

12       SO, COLLECTIVELY, TAKING ALL THAT INFORMATION, IT'S MY

13 MEDICAL OPINION TO A REASONABLE DEGREE OF MEDICAL PROBABILITY

14 THAT HIS ASTHMA HAS BEEN WORSENED.  THIS WAS A DISPROPORTIONATE

15 EFFECT IN A YOUNG BOY EXPOSED TO THESE LEVELS.

16 Q.   AND IS IT YOUR OPINION TO A REASONABLE DEGREE OF MEDICAL

17 PROBABILITY THAT HIS ASTHMA HAS BEEN WORSENED AS A RESULT OF HIS

18 EXPOSURE TO FORMALDEHYDE IN THE TRAILER?

19 A.   YES.

20 Q.   WITH RESPECT TO THE EPITHELIAL INJURY WITH HYPERREACTIVITY,

21 FROM A STANDPOINT OF GENERAL CAUSATION, CAN FORMALDEHYDE CAUSE

22 EPITHELIAL INJURY WITH HYPERREACTIVITY?

23 A.   YES.

24 Q.   FROM A STANDPOINT OF YOUR SPECIFIC ANALYSIS OF

25 CHRISTOPHER COOPER'S CASE, DO YOU HAVE AN OPINION WITH RESPECT TO

1   SPECIFIC CAUSATION TO A REASONABLE DEGREE OF MEDICAL PROBABILITY

2   AS TO WHETHER THE EPITHELIAL INJURY AND HYPERREACTIVITY IS A

3   RESULT OF HIS EXPOSURE TO FORMALDEHYDE IN THE TRAILER?

4   A.   I DO.

5   Q.   AND WHAT IS THAT OPINION, SIR?

6   A.   THE OPINION IS TO A REASONABLE DEGREE OF MEDICAL

7   PROBABILITY, AND THAT'S OCCUPATIONAL AND ENVIRONMENTAL MEDICAL

8   PROBABILITY, HE HAS SHOWN CONSISTENT CLINICAL RESULTS WHICH ALLOW

9   US TO CONCLUDE THAT HIS ASTHMA IS WORSE AND THAT HIS EPITHELIAL

10  INJURY IS PERSISTENT.  AND, CONSEQUENTLY, HE'S AT RISK IN THE

11  FUTURE OF OVERREACTING TO SUBSTANCES THAT AN ORDINARY PERSON

12  WOULDN'T REACT TO.

13  Q.   SO TO PUT IT SUCCINCTLY, DID THE FORMALDEHYDE EXPOSURE FROM

14  THE TRAILER SPECIFICALLY CAUSE HIS EPITHELIAL INJURY AND HIS

15  HYPERREACTIVITY?

16  A.   YES, IT DID.

17  Q.   WITH RESPECT TO VOCAL CORD DYSFUNCTION, YOU REFERENCED THAT

18  DR. PACHECO FOUND THAT HE HAD VOCAL CORD DYSFUNCTION; IS THAT

19  RIGHT?

20  A.   THAT'S CORRECT.

21  Q.   DID YOU GO BACK AND REVIEW THE LITERATURE WITH RESPECT TO

22  WHETHER OR NOT, FROM A GENERAL CAUSATION STANDPOINT, EXPOSURE TO

23  FORMALDEHYDE CAN CAUSE VOCAL CORD DYSFUNCTION?

24  A.   YES.

25  Q.   AND WITH RESPECT TO --

1          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  MAY WE APPROACH?

2          THE COURT:  YES.

3          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

4   A CONFERENCE HELD AT THE BENCH.)

5          MR. WEINSTOCK:  I'LL GET THE PAGE AND LINE, BUT I

6   SPECIFICALLY ASKED HIM IF HE HAD A STUDY WHICH SHOWED

7   FORMALDEHYDE EXPOSURE CAUSED VOCAL CORD DYSFUNCTION.  HE TOLD ME

8   HE DID NOT, AND HE'S ABOUT TO TELL ME THERE IS ONE, WHICH HAS TO

9   BE AN OPINION --

10               I'LL GET YOU THE PAGE AND LINE.

11         MR. WATTS:  I'M NOT GOING TO SAY THAT HE HAS A STUDY

12  THAT SAYS IT CAUSES IT.  HE'S GOING TO SHOW STUDIES THAT WERE IN

13  THE MATERIALS THAT YOU WERE PROVIDED WITH WITH RESPECT TO PEOPLE

14  THAT WERE DIAGNOSED WITH VOCAL CORD DYSFUNCTION AFTER BEING

15  EXPOSED.

16         THE COURT:  WAIT, BUT THAT'S DIFFERENT, THOUGH.  WHAT

17  HE'S SAYING IS THAT AN OPINION FOR THIS CASE HAS NOT BEEN OFFERED

18  BY THIS WITNESS.

19         MR. WEINSTOCK:  I ASKED HIM POINT BLANK.

20         MR. WATTS:  WHAT HE'S SAYING IS -- AND I AGREE WITH ANDY

21  WITH RESPECT TO IS THERE A SPECIFIC STUDY THAT SAYS IT WAS CAUSED

22  BY IT, AND THERE'S NOT.  THEY DON'T ATTRIBUTE CAUSATION.

23              WHAT HE'S DOING IS HE'S LOOKING AT THE LITERATURE

24  WHERE THEY'RE DIAGNOSED AFTER EXPOSURE, AND HE'S GOING TO EXPLAIN

25  THE METHODOLOGICAL REASON THAT HAPPENS, OR THE MECHANISTIC

1  REASON.

2          MR. WEINSTOCK:  I ASKED THE QUESTION.  I WOULD HAVE GONE

3  INTO ALL THAT.

4          THE COURT:  WELL, NOW HE'S GOING TO ANSWER -- YOU'RE

5  GOING TO HAVE TO MAKE CLEAR THAT HE DOES NOT HAVE AN OPINION AS

6  TO THIS CASE.

7          MR. WATTS:  OH, NO, HE DOES HAVE AN OPINION AS TO THIS

8  CASE.

9          MR. WEINSTOCK:  IT'S JUST NOT BASED ON THE LITERATURE.

10         MR. WATTS:  YEAH.  WHAT ANDY IS SAYING IS THAT THERE

11  WASN'T A PIECE OF LITERATURE THAT SAYS THAT IT CAUSED THAT.  AND

12  WE'RE NOT TRYING TO SAY THAT.  WHAT WE'RE TRYING TO SAY IS

13  THERE'S LITERATURE THAT SAYS PEOPLE WHO WERE EXPOSED TO

14  FORMALDEHYDE WERE DIAGNOSED WITH VOCAL CORD DYSFUNCTION.

15         MR. WEINSTOCK:  I ASKED HIM THAT, AND HE TOLD ME NO.  I

16  WOULD HAVE GONE INTO IT.  I MEAN, HE CAN'T SAY NO AND THEN COME

17  BACK AND SAY, YEAH, I GOT --

18         MR. WATTS:  LET ME KEEP IT GENERAL.

19         THE COURT:  DO YOU WANT ME TO STRIKE IT, TELL THE JURY

20  TO GO AHEAD AND STRIKE THE LAST QUESTION AND ANSWER?

21         MR. WATTS:  HERE IS MY PROBLEM WITH THAT:  THESE STUDIES

22  WERE IN THE MATERIALS THAT HE WAS HANDED.

23         THE COURT:  BUT WE'RE TALKING ABOUT HIS OPINION.  HE

24  JUST TESTIFIED AS TO AN OPINION, THOUGH, HIS OWN OPINION, NOT

25  ABOUT THE STUDY.

1        MR. WATTS:  LET ME JUMP STRAIGHT TO CAUSATION.

2        THE COURT:  I NEED TO INSTRUCT THE JURY.

3        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

4   CONFERENCE WAS CONCLUDED.)

5        THE COURT:  LADIES AND GENTLEMEN OF THE JURY, THE LAST

6   QUESTION AND ANSWER TO WHICH THERE WAS AN OBJECTION IS STRICKEN.

7   THE COURT WILL STRIKE THE LAST QUESTION AND ANSWER.

8        AND WHEN I SAY STRIKE IT, YOU JUST DISREGARD THE

9   QUESTION AND ANSWER BECAUSE IT WAS NOT -- FOR A VARIETY OF

10  REASONS, WAS NOT PART OF THE PRETRIAL PROCEDURE THAT THE COURT

11  EMPLOYED IN THE CASE WITH REGARD TO PERMISSIBLE OPINIONS AND

12  OPINIONS THAT HAVE BEEN DISCLOSED AMONGST COUNSEL AS PART OF THE

13  DISCOVERY PROCESS AND IN PREPARATION OF THE EXPERT REPORT.

14        SO PLEASE STRIKE THE LAST QUESTION AND ANSWER FROM

15  YOUR MEMORY, AND WE'LL GO AHEAD AND PROCEED.

16                             EXAMINATION

17  BY MR. WATTS:

18  Q.   LET ME JUST FAST FORWARD YOU TO DR. PACHECO.  YOU SAW IN HER

19  DEPOSITION WHERE SHE ATTRIBUTES THE VOCAL CORD DYSFUNCTION TO THE

20  EXPOSURE TO FORMALDEHYDE.

21  A.   YES.

22        MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  IT'S COMPLETELY

23  INCORRECT.

24        MR. WATTS:  LET ME KEEP GOING.

25        THE COURT:  WE HEARD DR. PACHECO'S TESTIMONY.  WE DON'T

1    NEED TO RECITE IT AS PART OF A QUESTION AND ASK HIM A QUESTION

2    ABOUT IT.  SO LET'S GET ON THE NEXT SET OF QUESTIONS.

3                              EXAMINATION

4    BY MR. WATTS:

5    Q.    DO YOU HAVE AN OPINION THAT'S SPECIFIC TO CHRIS COOPER AS TO

6    WHETHER HIS EXPOSURE TO FORMALDEHYDE CAUSED THE VOCAL CORD

7    DYSFUNCTION THAT DR. PACHECO LOCATED OR FOUND?

8    A.    YES, I DO.

9    Q.    AND WHAT IS THAT OPINION, SIR?

10   A.    THE OPINION IS THAT THIS REACTION IS CONSISTENT WITH THE

11   EXPOSURE TO FORMALDEHYDE THAT HE ENDURED OVER THIS PERIOD OF

12   TIME.  AND I THINK THAT THERE IS A CAUSAL RELATIONSHIP BETWEEN

13   THE VOCAL CORD DYSFUNCTION AND THE FORMALDEHYDE EXPOSURE.

14   Q.    NOW, MECHANISTICALLY, CAN YOU DESCRIBE HOW THINGS LIKE

15   HOARSENESS, REDDENING OF THE LARYNGEAL MUCOSA, REDDENING OR

16   SWELLING OF THE VOCAL CORDS CAN BE CAUSED BY FORMALDEHYDE?

17   A.    FORMALDEHYDE IS A PRIMARY IRRITANT TO MUCUS MEMBRANES.  AND

18   WHEN IT CONTACTS THE WET ENVIRONMENT, IF YOU WILL, OF THE

19   RESPIRATORY TRACT, IT CAUSES SUBSTANTIAL IRRITATION TO CELLS

20   BECAUSE IT DISSOLVES IN THE MUCUS VERY WELL.

21   Q.    OKAY.  LET'S KEEP RUNNING ALONG HERE.  THE INCREASED RISK OF

22   CANCER, I WANT TO JUST LIMIT OUR DISCUSSION SPECIFICALLY TO

23   NASOPHARYNGEAL CANCER TODAY.  TELL THE JURY WHAT THE WORLD HEALTH

24   ORGANIZATION INTERNATIONAL AGENCY FOR RESEARCH ON CANCER IS.

25   A.    THE IARC IS AN INTERNATIONAL ORGANIZATION.  IT'S -- THE IARC

1   IS SPELLED I-A-R-C, THE INTERNATIONAL AGENCY FOR RESEARCH ON

2   CANCER, IT'S HOUSED IN LYON, FRANCE.  AND IT'S A CENTRAL

3   GATHERING POINT FOR THE WORLD'S LITERATURE ON A VARIETY OF

4   DIFFERENT SUBJECTS.  AND THEY PUBLISH ENORMOUS -- THEY CALL THEM

5   TOMES.  THEY ARE HUGE PEER-REVIEWED TREATISES ON VARIOUS

6   COMPOUNDS.

7   Q.   IS THE IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC

8   RISKS TO HUMANS, VOLUME 48 DEALING WITH FORMALDEHYDE AND OTHERS

9   THAT WAS PUBLISHED IN LYON, FRANCE, IN 2006, DO YOU CONSIDER THAT

10  TO BE A LEARNED TREATISE?

11  A.   ABSOLUTELY.

12  Q.   DO YOU CONSIDER THAT TO BE THE TREATISE WITH RESPECT TO

13  COMPILING THE WORLD'S LITERATURE WITH RESPECT TO THE

14  CARCINOGENICITY OF FORMALDEHYDE?

15  A.   YES.

16  Q.   NOW, TO BE FAIR, THERE ARE OTHER STUDIES WE'LL TALK ABOUT,

17  AS WELL.

18  A.   RIGHT.  THE NEGATIVE STUDIES ARE ALSO IN THERE, ALONG WITH

19  THE POSITIVE STUDIES; SO, IT'S NOT JUST POSITIVE STUDIES IN THAT

20  RESEARCH.

21       MR. WATTS:  UNDER RULE 803(18), WE'LL UTILIZE THE IARC

22  MONOGRAPH.

23                        EXAMINATION

24  BY MR. WATTS:

25  Q.   IS THIS THE IARC MONOGRAPH TO WHICH YOU WERE REFERRING?

1  A.    YES, IT IS.

2  Q.    AND JUST SO THAT WE CAN LOOK, IT GOES ON, IT'S AN INCH THICK

3  AND SEVERAL HUNDRED PAGES; IS THAT RIGHT?

4  A.    YES.

5  Q.    NOW, JUST TO GET TO THE CRUX OF THE MATTER, AT THE END, ON

6  PAGE 280, SECTION 5.5, AFTER THE HUNDREDS OF PAGES OF LOOKING AT

7  ALL THE STUDIES -- IT'S ACTUALLY SECTION 5.5, EVALUATION, DOES

8  IARC WRITE, "THERE IS SUFFICIENT EVIDENCE IN HUMANS FOR THE

9  CARCINOGENICITY OF FORMALDEHYDE"?

10  A.    YES.

11  Q.    "THERE IS SUFFICIENT EVIDENCE IN EXPERIMENTAL ANIMALS FOR

12  THE CARCINOGENICITY OF FORMALDEHYDE"?

13  A.    YES, SIR.

14  Q.    I WANT TO GO BACK A FEW PAGES TO PAGE 274.

15  A.    I WOULD LIKE TO ADD ONE THING, IF I COULD.  WITH THAT

16  ENDORSEMENT, ANY LICENSED PHYSICIAN IS OBLIGATED TO TAKE NOTICE

17  OF THIS CONCLUSION IN TREATING A PATIENT OR MAKING

18  RECOMMENDATIONS FOR A PATIENT.

19  Q.    AND SPECIFICALLY WITH RESPECT TO SECTION 5.2, HUMAN DATA

20  WITH RESPECT TO NASOPHARYNGEAL CANCER, DOES THE IARC WORKING

21  GROUP CONCLUDE, "BOTH THE RESULTS OF A STUDY OF INDUSTRIAL

22  WORKERS IN THE UNITED STATES, SUPPORTED BY LARGELY POSITIVE

23  FINDINGS FROM OTHER STUDIES, PROVIDED SUFFICIENT EPIDEMIOLOGICAL

24  EVIDENCE THAT FORMALDEHYDE CAUSES NASOPHARYNGEAL CANCER IN

25  HUMANS"?

1  A.   YES.

2  Q.   BASED ON THE IARC MONOGRAPH AND THE OTHER STUDIES THAT ARE

3  REFERENCED IN THERE, DO YOU HAVE AN OPINION FROM THE STANDPOINT

4  OF A REASONABLE DEGREE OF MEDICAL PROBABILITY AS TO GENERALLY

5  WHETHER OR NOT EXPOSURE TO FORMALDEHYDE CAUSES NASOPHARYNGEAL

6  CANCER IN HUMANS?

7  A.   I DO.

8  Q.   WHAT IS THAT OPINION, SIR?

9  A.   THE OPINION IS TO A REASONABLE DEGREE OF MEDICAL

10 PROBABILITY, FORMALDEHYDE IS A HUMAN CARCINOGEN THAT CAN CAUSE

11 NASOPHARYNGEAL CANCER AND SINONASAL CANCER.

12 Q.   WITH RESPECT TO BOTH THE IARC MONOGRAPH AND THE EPA RISK

13 ASSESSMENT GUIDELINES AND THE EXPOSURE THAT WE KNOW THAT CHRIS

14 HAD, DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF MEDICAL

15 PROBABILITY AS TO WHETHER CHRIS COOPER HAS SUSTAINED AN INCREASED

16 RISK OF NASOPHARYNGEAL CANCER AS A RESULT OF HIS EXPOSURE TO

17 FORMALDEHYDE IN THE TRAVEL TRAILER?

18 A.   YES.

19 Q.   AND WHAT IS THAT OPINION, SIR?

20 A.   THE OPINION IS, BASED UPON THE ESTIMATES, THE CONSERVATIVE

21 ESTIMATES TO EXPOSURE, AND THE DURATION OF TIME THAT HE WAS

22 EXPOSED, AND THE CLINICAL FINDINGS THAT WERE DOCUMENTED CLEARLY

23 IN HIS MEDICAL RECORD THAT WERE NOT ONLY FOUND CONTEMPORANEOUSLY

24 WITH HIS EXPOSURE BUT WERE ALSO FOUND TO BE PERSISTENT, THESE

25 EFFECTS ARE MORE LIKELY THAN NOT, TO A REASONABLE DEGREE OF

1  MEDICAL PROBABILITY, CAUSED BY HIS EXPOSURE TO FORMALDEHYDE.

2  Q.    I WANT TO SWITCH TO MEDICAL MONITORING, YOUR LAST ISSUE.

3        FIRST OF ALL, I WANT TO ASK YOU ABOUT SEVEN DIFFERENT

4  BASES REAL QUICK.  DID CHRIS COOPER SUSTAIN A SIGNIFICANT

5  EXPOSURE TO A PROVEN HAZARDOUS SUBSTANCE?

6  A.    YES.  AND I DOCUMENTED THAT.

7  Q.    ALL RIGHT.  IN TERMS OF THE SIGNIFICANCE OF HIS EXPOSURE, IS

8  .050, THE CONSERVATIVE LEVELS UTILIZED, SEVEN AND A HALF TIMES

9  THE ATSDR LIMIT?

10 A.    THE ATSDR LIMIT IS -- YOU'RE REFERRING TO THE ONE THAT IS

11 FOR CHRONIC EXPOSURE OVER 365 DAYS, WHICH IS 8-PARTS PER BILLION,

12 WHICH IS ONE WE REFERRED TO EARLIER.  AND THAT, IN FACT, WOULD BE

13 A CORRECT CONCLUSION.

14 Q.    AND AS TO WHETHER IT'S A PROVEN HAZARDOUS SUBSTANCE, IS THIS

15 JUST JIM KORNBERG TALKING ABOUT WHETHER FORMALDEHYDE IS

16 CANCEROUS, OR HAVE YOU CONSULTED OTHER EXPERT ORGANIZATIONS IN

17 THE FIELD WITH RESPECT TO CARCINOGENS?

18 A.    I HAVE INDEED, YES.  AND I'VE ALSO HAD ENORMOUS CLINICAL

19 EXPERIENCE WITH PEOPLE EXPOSED TO FORMALDEHYDE.

20 Q.    WITH RESPECT TO THE UNITED STATES GOVERNMENT'S ENVIRONMENTAL

21 PROTECTION AGENCY, IS FORMALDEHYDE CATEGORIZED AS A PROBABLE

22 HUMAN CARCINOGEN?

23 A.    YES, IT'S A 2A UNDER EPA.

24 Q.    UNDER THE WORLD HEALTH ORGANIZATION'S INTERNATIONAL AGENCY

25 FOR RESEARCH ON CANCER, IS IT CATEGORIZED AS A KNOWN HUMAN

1   CARCINOGEN; YES OR NO?

2   A.   YES, JUST AS WE DESCRIBED.  IT'S A LEVEL ONE.  THAT'S THE

3   HIGHEST LEVEL THAT CAN BE BESTOWED UPON A TOXIC SUBSTANCE BY

4   IARC.

5   Q.   NIOSH, DO THEY REFER TO IT AS A POTENTIAL OCCUPATIONAL

6   CARCINOGEN?

7   A.   YES.  AND WHEN YOU SEE THAT FROM NIOSH, YOU HAVE TO TAKE

8   NOTICE OF IT AS A PRACTICING OCCUPATIONAL MEDICINE DOCTOR.  IT

9   OBLIGATES YOU TO DRAW CONCLUSIONS ABOUT MEDICAL MONITORING AND

10  ABOUT CLINICAL ASSESSMENT OF A GIVEN PATIENT.

11  Q.   DOES THE U.S. NATIONAL TOXICOLOGY PROGRAM REFER TO

12  FORMALDEHYDE AS A PROBABLE CARCINOGEN?

13  A.   WELL, IT'S A REASONABLY ANTICIPATED CARCINOGEN UNDER THE

14  NATIONAL TOXICOLOGY PLATFORM.

15  Q.   OSHA, IS IT DEFINED AS A CARCINOGEN?

16  A.   YES.

17  Q.   THE ACGIH, THAT'S THE AMERICAN CONFERENCE ON GOVERNMENTAL

18  INDUSTRIAL HYGIENISTS?

19  A.   THAT'S CORRECT.

20  Q.   DO THEY REFER TO IT AS A SUSPECTED HUMAN CARCINOGEN?

21  A.   THAT'S RIGHT.

22  Q.   THE ATSDR, DO THEY AGREE THAT IT'S A KNOWN HUMAN CARCINOGEN?

23  A.   YES.  WELL, THEY WOULD GO BY THE EPA'S DESIGNATION THAT IT'S

24  A PROBABLE HUMAN CARCINOGEN, AS A GENERAL RULE.

25  Q.   DID CHRIS COOPER'S EXPOSURE TO FORMALDEHYDE IN THE TRAVEL

1    TRAILER SIGNIFICANTLY INCREASE THE RISK OF CONTRACTING A SERIOUS

2    LATENT DISEASE?

3    A.   YES.

4    Q.   AND THE 17 TIMES RISK THAT WE'VE ALREADY TALKED ABOUT,

5    THAT'S FROM THE EPA RISK ASSESSMENT GUIDELINES; IS THAT RIGHT?

6    A.   WELL, THAT WOULD BE MY CALCULATION BASED UPON THE RISK BASED

7    CONCENTRATION.

8    Q.   DID CHRIS COOPER'S RISK OF CONTRACTING A SERIOUS LATENT

9    DISEASE, IS IT GREATER THAN THE RISK OF CONTRACTING THE SAME

10   DISEASE HAD HE NOT BEEN EXPOSED?

11   A.   YES.

12   Q.   AND IS CHRIS COOPER'S RISK OF CONTRACTING A SERIOUS LATENT

13   DISEASE GREATER THAN THE CHANCES THAT MEMBERS OF THE GENERAL

14   PUBLIC HAVE IN DEVELOPING THAT DISEASE?

15   A.   YES, UNLESS THAT PERSON IS EXPOSED TO FORMALDEHYDE IN

16   COMPARABLE LEVELS.

17   Q.   HAVE YOU DESIGNED A MEDICAL MONITORING PROCEDURE THAT IN

18   YOUR OPINION TO A REASONABLE DEGREE OF MEDICAL PROBABILITY MAKES

19   EARLY DETECTION OF POTENTIAL DISEASE POSSIBLE?

20            MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  MAY WE APPROACH?

21            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

22   A CONFERENCE HELD AT THE BENCH.)

23            MR. WATTS:  SHOULD I LIMIT IT TO --

24            MR. WEINSTOCK:  I'M PRETTY SURE I ASKED HIM ABOUT 40

25   TIMES WHAT HE PROPOSES, AND 40 TIMES HE TOLD ME THIS MORNING HE

1  WOULD LEAVE IT TO THE PHYSICIAN DOWN THE ROAD.

2         MR. WATTS:  I'M GOING TO DO THAT.

3         THE COURT:  WELL, THAT WAS HIS TESTIMONY.

4         MR. WATTS:  YEAH, I'M GOING TO DO THAT.

5         THE COURT:  HE COULD NOT BE SPECIFIC.  THAT'S WHAT

6  TROUBLED ME WHEN I RULED ON THE *DAUBERT* MOTION BECAUSE,

7  NUMBER ONE, HE COULD NOT BE SPECIFIC, AND, NUMBER TWO, HE

8  FACTORED IN -- AND THIS ISN'T PERTINENT TO YOUR OBJECTION, IT'S

9  PERTINENT TO MY RULING OF EARLIER THIS MORNING -- WAS THAT HIS

10  FACTOR WAS CONSTANT EXPOSURE, WHICH I ASSUMED WAS GOING TO BE

11  BROUGHT OUT ON CROSS-EXAMINATION FOR SURE.  BUT HE TESTIFIED THIS

12  MORNING THAT HE COULD NOT MAKE THAT ASSESSMENT.

13         MR. WATTS:  LET ME PUT UP THE EXHIBIT, AND I'LL TALK

14  ABOUT --

15         MR. WEINSTOCK:  NO.

16         THE COURT:  WELL, HE TRIED NOT TO TESTIFY TO IT THIS

17  MORNING WITH THE SAME INSTRUCTION FROM THE COURT.

18         MR. WEINSTOCK:  I OBJECT TO THE EXHIBIT.

19         THE COURT:  HE ANSWERED THE QUESTION THAT HE WOULD LEAVE

20  IT TO UP TO THE DISCRETION OF THE PHYSICIAN DOWN THE ROAD.

21         MR. WATTS:  SURE.  I KNOW HOW TO FIX IT.

22         THE COURT:  GO AHEAD AND OBJECT, AGAIN.

23         MR. WEINSTOCK:  I OBJECT.  I DO NOT WANT THAT EXHIBIT

24  UP.

25         THE COURT:  I SUSTAIN THE OBJECTION.

1    (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

2  CONFERENCE CONCLUDED.)

3                              EXAMINATION

4  BY MR. WATTS:

5  Q.   EXPLAIN GENERALLY WHAT A MEDICAL MONITORING PROGRAM DOES.

6  A.   A MEDICAL MONITORING PROGRAM IS A PROTOCOL THAT BASICALLY

7  DECIDES WHAT TESTS TO DO ON WHOM AND BASICALLY WHEN TO DO THEM.

8  AND IN ANY PROTOCOL THAT'S THERE, YOU HAVE VESTED WITHIN THAT WHY

9  YOU DO THEM AND HOW MUCH IT COSTS TO DO THEM.

10  Q.   AND WITH RESPECT TO THE DECISION OF WHETHER TO DO THEM,

11  UNDER MEDICAL MONITORING PROTOCOLS THAT HAVE BEEN ESTABLISHED IN

12  THE UNITED STATES, IS THAT A DECISION THAT YOU SHOULD MAKE OR

13  PRESCRIBING PHYSICIANS SHOULD MAKE AT A FUTURE TIME?

14  A.   IT WOULD BE MADE BY A PRESCRIBING PHYSICIAN.  AND RECALL

15  THAT THIS PROTOCOL FOR HIM APPLIES TO OTHER PROBLEMS THAT HE HAS,

16  AS WELL, THE AGGRAVATED ASTHMA AND SO ON.

17  Q.   OKAY.  HAD YOU OUTLINED A PROTOCOL WITH RESPECT TO A MEDICAL

18  MONITORING PROGRAM FOR HIS FORMALDEHYDE-INDUCED AGGRAVATION OF

19  ASTHMA, CHRONIC RHINOSINUSITIS, MUCOSAL INFLAMMATION, AND CANCER

20  PREVENTION?

21  A.   YES.

22  Q.   AND WITH RESPECT TO THAT PROTOCOL, JUST TO BE VERY CLEAR, DO

23  EACH AND EVERY ELEMENT OF THE PROTOCOL WITH RESPECT TO TESTS THAT

24  MAY BE CONDUCTED IN THE FUTURE, IS THAT LEFT TO THE DISCRETION OF

25  THE TREATING PHYSICIAN AT THE TIME?

1    A.    YES.

2    Q.    AND WHY IS THAT?

3    A.    WELL, THE HISTORY AND THE CLINICAL EXAM ARE SCHEDULED, BUT

4    ANY TESTS THAT INVOLVES INTERVENTION OR EVEN USE OF LABORATORY

5    TESTS OF SPECIFIC TYPES ARE AT THE DISCRETION OF THE PHYSICIAN

6    WHO IS RUNNING THE EXAM AT THE TIME.

7    Q.    SO LET'S SPLIT THE PROGRAM INTO TWO PARTS.  WITH RESPECT TO

8    THE HISTORY AND THE CLINICAL EXAMS THAT ARE SCHEDULED, HAVE YOU

9    PRESCRIBED THE FREQUENCY WITH WHICH THOSE HISTORIES AND CLINICAL

10   EXAMS SHOULD BE CONDUCTED?

11   A.    I HAVE.  YES.

12   Q.    AND ARE THOSE HISTORY AND CLINICAL EXAMS THAT SHOULD BE

13   SCHEDULED MADE NECESSARY AS A RESULT OF HIS EXPOSURE TO

14   FORMALDEHYDE IN THE TRAILERS?

15   A.    YES.

16          MR. WATTS:  MAY I APPROACH THE WITNESS, YOUR HONOR?

17          THE COURT:  YES.

18                          EXAMINATION

19   BY MR. WATTS:

20   Q.    DR. KORNBERG, I WANT TO SHOW YOU ATTACHMENT B TO YOUR

21   REPORT.  AND IF YOU WOULD, TAKE THIS HIGHLIGHTER AND HIGHLIGHT

22   THE AREAS THAT DESCRIBE THE HISTORY AND PHYSICAL EXAM PORTIONS

23   ONLY, SO THAT WE CAN SEGREGATE THE TWO.

24   A.    OKAY, I'LL MOVE THEM OVER HERE AND DO IT.

25          THE COURT:  DO YOU WANT TO COME UP AND SEE WHAT HE'S

1   DOING?

2          MR. WEINSTOCK:  YES.

3          THE COURT:  WHY DON'T YOU COME UP AND TAKE A LOOK.

4                         EXAMINATION

5   BY MR. WATTS:

6   Q.   ALL RIGHT.  DR. KORNBERG, WITH RESPECT TO THE MEDICAL

7   MONITORING PROTOCOL THAT YOU HAVE OUTLINED, PRIMARY CARE M.D.,

8   WHAT IS THE FREQUENCY WITH WHICH CHRIS NEEDS TO SEE A PRIMARY

9   CARE M.D. AS A RESULT OF HIS EXPOSURE TO FORMALDEHYDE?

10  A.   JUST ANNUALLY.

11  Q.   AND WITH RESPECT TO A SPECIALIST M.D., WHAT IS THE FREQUENCY

12  WITH WHICH HE NEEDS TO BE SEEN?

13  A.   ANNUALLY.

14  Q.   AND IS THAT A RESULT OF HIS EXPOSURE TO FORMALDEHYDE?

15  A.   YES.

16  Q.   AND WITH RESPECT TO THE SPECIALIST, WHAT KIND OF SPECIALISTS

17  ARE WE TALKING ABOUT?

18  A.   WE'RE TALKING ABOUT EAR, NOSE AND THROAT DOCS, WHICH ARE

19  OTOLARYNGOLOGISTS.

20  Q.   AND IN TERMS OF THE ESTIMATED ANNUAL COSTS OF A PRIMARY CARE

21  M.D., HOW MUCH WOULD THAT BE?

22  A.   THE ESTIMATE WAS ABOUT $100.

23  Q.   AND WITH RESPECT TO THE ENT, THE ESTIMATED ANNUAL COST OF

24  THE ENT, HOW MUCH WOULD THAT BE?

25  A.   ABOUT $300.

1  Q.   NOW, WITH RESPECT TO THE ISSUES OF TESTS THAT ARE AVAILABLE,

2  ARE THERE DIFFERENT TESTS AVAILABLE TO DETECT POTENTIAL PROGRESS

3  OF NASOPHARYNGEAL CANCER?

4  A.   YES.  A CLINICAL EXAMINATION WOULD BE OBTAINED, A VERY

5  CAREFUL LOOKING AT THE NASAL MUCOSA, THE ENTIRE NASOPHARYNX; AND,

6  IF NECESSARY, IF THERE IS A SUSPICIOUS LESION, THEY WOULD BIOPSY

7  THAT LESION.

8  Q.   NOW, WE'VE ALREADY TALKED ABOUT EPITHELIAL DAMAGE WITH

9  HYPERREACTIVITY.  WHEN THE ENT IS LOOKING EACH YEAR AT HIS NASAL

10  REGION, IF YOU WILL, WHAT SPECIFICALLY DOES THIS MEDICAL

11  MONITORING PROGRAM HAVE THEM LOOKING FOR FROM THE STANDPOINT OF

12  EARLY DETECTION OF NASOPHARYNGEAL CANCER?

13  A.   BASICALLY CHANGES IN BASELINE.  THE OTOLARYNGOLOGIST IS

14  GOING TO GET A MUCH BETTER LOOK BECAUSE OF THE EQUIPMENT THAT

15  THEY CAN USE THAN A PRIMARY CARE DOCTOR.  AND THAT DOCTOR -- IT'S

16  ALMOST THE SAME AS WHEN AN OPHTHALMOLOGIST TAKES A PICTURE OF

17  YOUR RETINA.  IF YOU'VE GOT DIABETES, THAT -- THEY ARE GOING TO

18  LOOK AT THE VASCULAR EFFECTS ON THE RETINA; AND, THE NEXT TIME

19  THEY SEE YOU, THEY ARE GOING TO HAVE PHOTOGRAPHS, FOR EXAMPLE, OF

20  WHAT YOUR RETINA LOOKED LIKE BEFORE, AND THEN THEY COMPARE IT TO

21  WHAT IT LOOKS LIKE NOW.  IT'S THE SAME PRINCIPLE.

22  Q.   NOW, BASED UPON WHAT THE ENT SEES DURING THESE ANNUAL

23  VISITS, ARE THERE LABORATORY AND DIAGNOSTIC TESTS THAT ARE

24  AVAILABLE FOR THEM TO TEST WHETHER OR NOT THERE IS A POTENTIAL

25  EARLY ONSET OF NASOPHARYNGEAL CANCER?

1    A.   THERE IS NO SPECIFIC LABORATORY TESTS THAT I WOULD RECOMMEND

2    FOR THAT FINDING, EXCEPT TO THE EXTENT THAT IF THIS WERE, GOD

3    FORBID, AN ADVANCED SITUATION, THERE ARE TESTS THAT YOU COULD --

4    STANDARD TESTS OF LIVER FUNCTION, RENAL FUNCTION, OTHER THINGS

5    THAT YOU COULD LOOK FOR.  AND SOMETIMES THESE ARE ACCOMPANIED BY

6    INFECTION, SO, CONSEQUENTLY, YOU COULD --

7              MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

8              THE WITNESS:  -- YOU COULD --

9              THE COURT:  WAIT, ONE SECOND.  I'M SORRY.

10             MR. WEINSTOCK:  YOUR HONOR, THIS IS WAY BEYOND WHAT'S IN

11   HIS REPORT.

12             MR. WATTS:  IT'S ATTACHED AS EXHIBIT B TO HIS REPORT,

13   YOUR HONOR.

14             THE COURT:  COME ON UP.

15             (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

16   A CONFERENCE HELD AT THE BENCH.)

17             THE COURT:  DID YOU LOOK AT ATTACHMENT B?

18             MR. WEINSTOCK:  WHERE ARE THE LIVER TESTS?

19             MR. WATTS:  THE LABORATORY TESTS.

20             MR. WEINSTOCK:  THAT'S NOT A LIVER TEST.

21             MR. WATTS:  I'M ASKING HIM WHAT KIND OF LABORATORIES

22   ARE -- YEAH, THEY ARE.  THAT'S WHAT HE'S TALKING ABOUT.

23             MR. WEINSTOCK:  EVERY YEAR.  HE SAID IF IT'S AN ADVANCED

24   STAGE.  YOU'RE TURNING THIS INTO SOMETHING IT'S NOT.

25             MR. WATTS:  JUDGE, I JUST ASKED THE QUESTION, WHAT KIND

1  OF LABORATORY TESTS WOULD YOU LOOK AT.

2          MR. WEINSTOCK:  YOU SAID, GOD FORBID, IF HE'S IN THE

3  ADVANCED STAGE, IT WOULD BE LIVER TESTING --

4          MR. WATTS:  I HAVEN'T ASKED HIM ABOUT THE FREQUENCY.

5          MR. WEINSTOCK:  BUT HE'S RESPONDED.  HE'S OFF THE

6  RESERVATION.

7          THE COURT:  HE'S RESPONDING MUCH BROADER THAN THE

8  QUESTION.  THAT'S THE PROBLEM.  SO YOU'RE GOING TO HAVE TO NARROW

9  THE QUESTION.  AND I'M GOING TO INSTRUCT HIM TO ANSWER THE

10 QUESTION ASKED, AND DO NOT ANSWER OTHER QUESTIONS THAT HE WOULD

11 LIKE TO ANSWER THAT ARE NOT ASKED.

12          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

13 CONFERENCE CONCLUDED.)

14          THE COURT:  DR. KORNBERG, BE VERY CAREFUL.  ANSWER THE

15 QUESTION THAT WAS ASKED, AND ONLY THE QUESTION THAT WAS ASKED, AS

16 PRECISELY AND CORRECTLY AS YOU CAN WITHOUT GOING ON TO EXPLAIN

17 OTHER THINGS THAT ARE NOT PART OF THE QUESTION THAT'S ASKED.  I

18 THINK THAT'S WHY WE'RE RUNNING INTO SOME DIFFICULTY HERE.  YOU

19 HAVE TO LISTEN CAREFULLY TO THE QUESTION, AND ANSWER ONLY THE

20 QUESTION THAT'S ASKED, AND THEN MOVE ON TO THE NEXT QUESTION.

21          THE WITNESS:  THANK YOU, YOUR HONOR.  THANK YOU.

22                          EXAMINATION

23 BY MR. WATTS:

24 Q.  I THINK THE JUDGE'S INSTRUCTION REMINDS YOU OF SOMEBODY

25 FLYING WITH EAGLES WHILE HANGING OUT WITH TURKEYS.  I THINK MY

1  QUESTION WAS A LITTLE POOR, SO LET ME TRY IT AGAIN.

2          WITH RESPECT TO LABORATORY TESTS, WHAT LABORATORY TESTS

3  ARE AVAILABLE THAT WOULD ASSIST A CLINICIAN IN THE EARLY

4  DETECTION OF NASOPHARYNGEAL CANCER?

5  A.   THERE ARE NO SPECIFIC LABORATORY TESTS IN THAT CASE EXCEPT

6  FOR INFECTION.

7  Q.   WITH RESPECT TO PULMONARY FUNCTION TESTS, ARE THOSE TESTS

8  THAT ARE AVAILABLE NOT WITH RESPECT TO CANCER BUT WITH RESPECT TO

9  AGGRAVATED ASTHMA?

10  A.   YES.

11  Q.   RESPIRATORY THERAPY, IS THAT SPECIFIC TO AGGRAVATED ASTHMA?

12  A.   YES.

13  Q.   ARE THERE MEDICATIONS IN THE FUTURE THAT WILL ASSIST IN THE

14  TREATMENT OF AGGRAVATED ASTHMA?

15  A.   YES.

16  Q.   AND WHAT KIND OF MEDICATIONS ARE THEY?

17  A.   WELL, THERE ARE BASICALLY IN TWO CLASSES.  ONE IS A

18  BRONCHODILATOR, WHICH ALLOWS YOU TO OPEN THE AIRWAYS, AND THERE

19  IS ALSO ANTI-INFLAMMATORY MEDICATIONS TO PREVENT INFLAMMATION.

20  Q.   NOW, WITH RESPECT TO PULMONARY FUNCTION TESTS MADE NECESSARY

21  BY AGGRAVATED ASTHMA, WHAT IS THE COST OF THOSE TESTS?

22  A.   WELL, THE ESTIMATED COST IS ABOUT $250 PER YEAR.

23  Q.   AND IN YOUR MEDICAL MONITORING PROGRAM, WHAT IS THE

24  FREQUENCY WITH WHICH PULMONARY FUNCTION TESTS SHOULD BE CONDUCTED

25  TO MONITOR AGGRAVATION OF ASTHMA AND TREAT IT?

1    A.    ANNUAL.

2    Q.    RESPIRATORY THERAPY, WHAT'S THE FREQUENCY?

3    A.    THIS WOULD BE --

4         MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  I THINK THIS

5    CALLS FOR SPECULATION AS TO WHETHER HE WILL EVER NEED RESPIRATORY

6    THERAPY.

7         THE COURT:  WELL, THE STANDARD THAT WE HAVE BEEN

8    QUESTIONING HIM ABOUT IS TO A REASONABLE MEDICAL CERTAINTY.

9         MR. WATTS:  LET ME REPHRASE THE QUESTION.

10         THE COURT:  WHY DON'T YOU GO AHEAD AND REPHRASE THE

11    QUESTION.

12         MR. WATTS:  SURE.

13         THE COURT:  IF HE CAN ANSWER IT, HE CAN.

14          I'LL TELL THE WITNESS NOT TO SPECULATE.  AND, OF

15    COURSE, YOUR QUESTION IS NOT GOING TO CALL FOR HIM TO SPECULATE.

16    I DON'T KNOW HOW YOU'RE GOING TO REWORD IT, BUT IT CANNOT BE

17    WORDED IN A WAY THAT CALLS FOR HIM TO SPECULATE.

18                              EXAMINATION

19    BY MR. WATTS:

20    Q.    DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF MEDICAL

21    PROBABILITY AS TO THE FREQUENCY IN WHICH RESPIRATORY THERAPY IS

22    NECESSARY AS PART OF A MEDICAL MONITORING PROGRAM AS A RESULT OF

23    HIS EXPOSURE TO FORMALDEHYDE?

24    A.    YES.

25    Q.    AND WHAT IS THAT?

1    A.    THAT IS ANNUALLY.

2    Q.    AND WHAT'S THE COST OF THAT RESPIRATORY THERAPY ON AN ANNUAL

3    BASIS?

4    A.    $200.

5    Q.    AND WE WERE TALKING ABOUT MEDICATIONS.  DO YOU HAVE A

6    REASONABLE -- DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF

7    MEDICAL PROBABILITY AS TO THE COST OF MEDICATIONS ON AN

8    ANNUALIZED BASIS THAT ARE MADE NECESSARY AS A RESULT OF HIS

9    EXPOSURE TO THIS ASTHMA?

10   A.    YES.

11   Q.    I MEAN, TO THIS FORMALDEHYDE?  WHAT IS THAT OPINION?

12   A.    WELL, THE ESTIMATED COST WOULD BE ABOUT $300 PER MONTH.

13   Q.    OR 3,600 A YEAR?

14   A.    YES.

15   Q.    NOW, BACK TO THE ISSUE OF SINONASAL CANCER, HOW IS IT

16   DIAGNOSED?  NOT -- STRIKE THAT.

17           BACK TO THE ISSUE WITH RESPECT TO THE ISSUE OF

18   NASOPHARYNGEAL CANCER, HOW IS IT DIAGNOSED?

19   A.    WELL, IT WOULD BE DIAGNOSED BY A CLINICAL OBSERVATION

20   FOLLOWED BY BIOPSY AND THEN PATHOLOGICAL EXAMINATION OF WHATEVER

21   LESION IS REMOVED FROM THE MUCOSA.

22           MR. WEINSTOCK:  JUST DON'T ASK MR. WATTS TO SPELL IT.

23           MR. WATTS:  SO STIPULATED.

24                              EXAMINATION

25   BY MR. WATTS:

1  Q.   WHAT IS THE USEFULNESS OF CT SCANS, MRI'S AND X-RAYS WITH

2  RESPECT TO THE EARLY DETECTION OF NASOPHARYNGEAL CANCER, IF ANY?

3  A.   WELL, THIS -- THESE X-RAYS WHICH I INDICATED ARE DETERMINED

4  BY THE RESPONSIBLE PHYSICIAN CAN BE USED BOTH FOR --

5       MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

6       THE COURT:  WAIT A MINUTE.  THERE IS AN OBJECTION HERE.

7  BUT YOU HAVE TO OBJECT BEFORE HE STARTS TALKING.

8       MR. WEINSTOCK:  I APOLOGIZE, YOUR HONOR.

9       THE COURT:  HE'S ANSWERING THE QUESTION, AND YOU STAND

10  UP, AND HE SAYS THREE SENTENCES, AND THEN YOU TELL ME YOU OBJECT.

11       MR. WEINSTOCK:  YOU'RE RIGHT.

12       THE COURT:  ALL RIGHT.  WHAT IS THE OBJECTION?

13       MR. WEINSTOCK:  SAME ISSUE AS WE COVERED THIS MORNING.

14       MR. WATTS:  SAME RESPONSE.

15       THE COURT:  WE COVERED SEVERAL ISSUES.  WHY DON'T YOU

16  ALL COME ON UP HERE.

17       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

18  A CONFERENCE HELD AT THE BENCH.)

19       MR. WEINSTOCK:  I ASKED HIM REPEATEDLY TO TELL ME WHAT

20  CAT SCANS, X-RAYS, MRI'S HE RECOMMENDED, AND HE REFUSED TO TELL

21  ME.

22       MR. WATTS:  I DIDN'T ASKED HIM THAT QUESTION.

23       MR. WEINSTOCK:  WELL, HE ANSWERED THAT QUESTION.

24       THE COURT:  HE'S NOT FOLLOWING THE INSTRUCTIONS THAT

25  I'VE GIVEN.

1        MR. WEINSTOCK:  THAT'S THE PROBLEM.  I'M NOT OBJECTING

2   TO THE QUESTION --

3        THE COURT:  I'M GOING TO ADMONISH HIM AGAIN THAT IF HE

4   CANNOT ANSWER THE QUESTION SPECIFICALLY, HE WILL STEP DOWN.  WE

5   WILL DISREGARD THE TESTIMONY IN ITS ENTIRETY, AND WE WILL MOVE ON

6   TO ANOTHER WITNESS.

7        MR. WATTS:  JUDGE, IF I MAY.

8        THE COURT:  THIS IS ABOUT THE FOURTH TIME THAT THIS HAS

9   HAPPENED.

10        MR. WATTS:  JUDGE, IF I MAY, I ASKED THE QUESTION WHAT

11   IS THE USEFULNESS OF CT SCANS, MRI'S AND X-RAYS, AND HE WAS

12   DIRECTLY ANSWERING THAT QUESTION.  ANDY WAITED TO STAND UP AND

13   THEN OBJECTED.  THIS IS NOT THE TIME TO GIVE THAT INSTRUCTION

14   BECAUSE HE WAS DIRECTLY ANSWERING.

15        THE COURT:  ASK IT AGAIN, AND TELL HIM TO BE SPECIFIC

16   BECAUSE I'M VERY CLOSE TO GIVING THAT INSTRUCTION, VERY CLOSE.

17        MR. WEINSTOCK:  I CAN TELL YOU RIGHT NOW, I'M GOING TO

18   LISTEN VERY CAREFULLY, BUT WHEN HE SAYS TO THIS GUY, WHAT'S THE

19   COST AND WHAT'S THE FREQUENCY, I'M NOT GOING TO STAND UP OUT OF

20   MY CHAIR.  I'M GOING TO JUMP OUT OF MY CHAIR.  SO STRIKE THAT

21   QUESTION FROM YOUR LIST, BECAUSE THAT'S WHERE YOU'RE GOING.

22        MR. WATTS:  THANK YOU, JUDGE WEINSTOCK.

23        THE COURT:  WELL, WHAT IT'S GOING TO BE --

24        MR. WATTS:  I'M NOT GOING THERE.

25        MR. WEINSTOCK:  HE SAID WHAT'S THE PURPOSE OF IT.

1        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

2   CONFERENCE CONCLUDED.)

3                         EXAMINATION

4   BY MR. WATTS:

5   Q.    NOW, MY QUESTION SPECIFICALLY, AND IF YOU WOULD SPECIFICALLY

6   ANSWER THIS, WHAT IS THE USEFULNESS OF CT SCANS, MRI'S OR X-RAYS

7   IN THE EARLY DETECTION OF NASOPHARYNGEAL CANCER?

8   A.    YOU CAN IDENTIFY LESIONS AND CHANGES FROM BASELINE.

9   Q.    ALL RIGHT.  NOW, WITH RESPECT TO HIS ECZEMA, DR. PACHECO

10  TALKED ABOUT SOME ECZEMA.  LET ME JUST ASK YOU, WHAT IS ECZEMA?

11  A.    IT'S AN INFLAMMATION OF THE SKIN.

12  Q.    AND WAS HE DIAGNOSED WITH ECZEMA WHILE HE WAS IN THE

13  TRAILER --

14  A.    YES.

15  Q.    -- OR AFTER HE GOT OUT OF THE TRAILER?

16  A.    NO, ACTUALLY -- YES, THAT'S CORRECT.  DR. BARNES HAD NOTICED

17  THIS, I THINK, IN OCTOBER OF '07.

18  Q.    ALL RIGHT.  NOW, WHEN I ASKED YOU ABOUT SOME OF THE

19  PROCEDURES THAT ARE AVAILABLE WITH RESPECT TO THE DIAGNOSIS OF

20  NASOPHARYNGEAL CANCER, YOU MENTIONED THAT IF THEY SEE SOMETHING

21  THEY CAN TAKE A SAMPLE AND PUT IT TO BIOPSY; IS THAT RIGHT?

22  A.    THAT'S RIGHT.

23  Q.    AND WHAT IS THE USEFULNESS OF BIOPSY IN DIAGNOSING

24  NASOPHARYNGEAL CANCER?

25  A.    A PATHOLOGIST OR AN OTOLARYNGOLOGIST CAN DETERMINE IF IT'S

1  CANCER OR IT'S NOT CANCER BASED UPON THE EXAMINATION OF THE

2  CELLS.

3  Q.   AND WITH RESPECT TO BIOPSY, IF IT IS NECESSARY AT SOME POINT

4  IN THE FUTURE TIME, HOW MUCH DOES A BIOPSY COST?

5  A.   WELL, THE ESTIMATED COST OF BIOPSY WITH ENDOSCOPY, AND THEN,

6  OF COURSE, YOU WOULD FOLLOW UP BY LOOKING AT THE CELLS, WOULD BE

7  ABOUT $2,400.

8  Q.   NOW, DOCTOR, WITH RESPECT TO THE MEDICAL MONITORING PROGRAM

9  THAT YOU HAVE SET FORTH, DID YOU CONSIDER LITERATURE WITH RESPECT

10 TO THE EFFECTS OF NASAL MUCOSA FROM FORMALDEHYDE?

11 A.   YES.

12 Q.   AND I WANT TO JUST REFER YOU TO MR. BOYSEN OR DR. BOYSEN'S

13 ARTICLE, EXHIBIT 217.  DO YOU FIND THIS STUDY FROM THE *BRITISH*

14 *JOURNAL OF INDUSTRIAL MEDICINE* TO BE A LEARNED TREATISE?

15 A.   YES.

16 Q.   AND UNDER RULE 803(18), LET ME PUT THAT ON THE SCREEN AND

17 JUST REAL BRIEFLY ASK YOU A COUPLE OF QUESTIONS ABOUT IT.

18         IT'S ENTITLED, "NASAL MUCOSA IN WORKERS EXPOSED TO

19 FORMALDEHYDE, A PILOT STUDY."  AND DOES DR. BOYSEN WRITE,

20 "CONSIDERABLE EVIDENCE EXISTS THAT THESE LESIONS SHOULD BE

21 CONSIDERED PRENEOPLASTIC"?  DO YOU SEE THAT, SIR?

22 A.   YES.

23 Q.   WHAT DOES PRENEOPLASTIC MEAN?

24 A.   IT MEANS THE STEPS BEFORE CANCER, SUCH AS DYSPLASIA OR

25 ANAPLASIA.

1   Q.   AND DOES DR. BOYSEN WRITE, "SCREENING FOR DYSPLASIA OF THE

2   NASAL MUCOSA THEREFORE SEEMS TO BE A SENSITIVE METHOD FOR

3   ASSESSING ANY POSSIBLE RISKS FROM FORMALDEHYDE"?

4   A.   THAT'S ABSOLUTELY RIGHT.

5   Q.   DO YOU AGREE WITH THAT STATEMENT?

6   A.   I DO.

7   Q.   DR. KORNBERG, WITH RESPECT TO YOUR EXAMINATION OR YOUR

8   DISCUSSION WITH CHRIS COOPER AND HIS MOTHER, AT THE TIME THAT YOU

9   DID THAT, WERE YOU A QUALIFIED PHYSICIAN IN THE STATE OF

10  COLORADO?

11  A.   YES.

12  Q.   WERE YOU A LICENSED PHYSICIAN IN THE STATE OF COLORADO?

13  A.   YES.

14  Q.   DID YOU SEE CHRIS COOPER IN THE STATE OF COLORADO?

15  A.   YES.

16  Q.   DID YOU REFER HIM TO NATIONAL JEWISH FOR A CLINICAL

17  EVALUATION IN THE STATE OF COLORADO?

18  A.   YES.

19  Q.   AND WHEN YOU PRESCRIBED THE MEDICAL MONITORING PROCEDURE

20  THAT YOU'VE TALKED ABOUT HERE TODAY IN COLORADO, IS THAT WHEN YOU

21  WERE LICENSED?

22  A.   YES.

23  Q.   DO YOU BELIEVE THAT THE MEDICAL MONITORING PROCEDURE IS

24  REASONABLY NECESSARY ACCORDING TO CONTEMPORARY SCIENTIFIC

25  PRINCIPLES?

1  A.   YES.

2  Q.   IN COMING UP WITH THE MEDICAL MONITORING PROGRAM THAT YOU

3  DESCRIBED TO THE JURY, DID YOU CONSULT THE ATSDR PHASE I EXPOSURE

4  CRITERIA FOR CONSIDERING MEDICAL MONITORING?

5       MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  THIS IS FROM THE

6  AFFIDAVIT.

7       THE COURT:  WELL, IF IT'S NOT AN OPINION THAT'S BEEN

8  GIVEN TIMELY, THEN IT'S AN IMPROPER QUESTION.

9       MR. WATTS:  LET ME MOVE ON.

10                              EXAMINATION

11 BY MR. WATTS:

12 Q.   IS THE PRESCRIBED MONITORING REGIME THAT YOU HAVE PRESCRIBED

13 DIFFERENT FROM THAT NORMALLY RECOMMENDED IN THE ABSENCE OF

14 EXPOSURE?

15 A.   YES, IT IS.

16 Q.   AND AS A PHYSICIAN OVER THE LAST 33 YEARS, DO YOU HAVE AN

17 OPINION TO A REASONABLE DEGREE OF MEDICAL PROBABILITY AS TO

18 WHETHER THERE IS SOME DEMONSTRATED CLINICAL VALUE IN THE EARLY

19 DETECTION AND DIAGNOSIS OF NASOPHARYNGEAL CANCER?

20 A.   YES, I DO.

21 Q.   IF YOU CATCH IT EARLY, CAN YOU STOP IT?

22 A.   IF YOU CATCH IT EARLY, YOU CAN STOP IT, YES.

23 Q.   IF YOU CATCH IT LATE, DOES IT KILL YOU?

24 A.   IT CAN, YES.

25       MR. WATTS:  THOSE ARE ALL OF MY QUESTIONS, YOUR HONOR.

1       THE COURT:  THANK YOU, MR. WATTS.  I'VE GOT ABOUT

2  10 MINUTES TO 10:00.  WOULD IT BE BETTER TO GO AHEAD, MAYBE WE

3  SHOULD GO AHEAD AND TAKE OUR BREAK A FEW MINUTES EARLY AND THEN

4  START UP, BEFORE WE GET INTO CROSS-EXAMINATION.

5       WHY DON'T WE TAKE A BREAK AND PLAN ON STARTING UP

6  RIGHT AT 10 O'CLOCK.  DR. KORNBERG, IF YOU CAN BE UP HERE WHEN WE

7  START, THAT WOULD BE FINE.

8       THE COURT SECURITY OFFICER:  ALL RISE.

9       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

10  PANEL LEAVES THE COURTROOM.)

11       THE COURT:  OFF THE RECORD.

12       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF

13  RECESS WAS TAKEN.)

14       THE COURT SECURITY OFFICER:  ALL RISE.

15       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

16  PANEL ENTERS THE COURTROOM.)

17       THE COURT:  YOU MAY BE SEATED.  BEFORE WE BEGIN WITH THE

18  CROSS-EXAMINATION, I WANTED TO -- AND I NEGLECTED TO BECAUSE WE

19  HAD A BENCH CONFERENCE AS YOU ALL WERE ENTERING THE COURTROOM

20  THIS MORNING, BUT I WANTED TO THANK ALL OF YOU ALL FOR BEING ON

21  TIME THIS MORNING AND FOR BEING READY TO GO TO WORK THIS MORNING

22  ON THIS CASE.  SO, THANK YOU AGAIN FOR BEING ON TIME.

23       MR. WEINSTOCK, YOU CAN GO AHEAD AND BEGIN YOUR

24  CROSS-EXAMINATION.  AND, DR. KORNBERG, OF COURSE, YOU'RE STILL

25  UNDER OATH.

```
 1                          CROSS-EXAMINATION

 2   BY MR. WEINSTOCK:

 3   Q.    STILL GOOD MORNING, DR. KORNBERG.

 4   A.    GOOD MORNING.

 5   Q.    AT THE TIME YOU FORMULATED YOUR OPINIONS, I THINK YOU TOLD

 6   US THAT YOU HAD HAD CHRIS COOPER SENT TO NATIONAL JEWISH FOR AN

 7   EVALUATION OR AN EXAMINATION, CORRECT?

 8   A.    YES.

 9   Q.    YOU RECEIVED A REPORT FROM KARIN PACHECO BUT NOT THE

10   RECORDS, CORRECT?

11   A.    I'M TRYING TO REMEMBER.  I THINK WE RECEIVED THE REPORT BUT

12   NOT THE FULL SET OF RECORDS, THAT'S RIGHT.

13   Q.    FOR EXAMPLE, YOU HAD PULMONARY FUNCTION TESTS DONE, AND YOU

14   HAD KARIN PACHECO'S INTERPRETATION OF THOSE RESULTS, BUT YOU

15   DIDN'T HAVE THE FLOW LIST, FOR EXAMPLE?

16   A.    NO, NO, BUT THE DATA WAS ON HER REPORT, BUT NOT ALL THE

17   DATA.

18   Q.    CORRECT.  AND, FOR EXAMPLE, YOU HAD THE INTERPRETATION OF

19   THE CAT SCANS BUT YOU DIDN'T HAVE THE FILMS?

20   A.    THAT'S CORRECT.

21   Q.    AND YOU PERSONALLY DID NOT EXAMINE CHRIS COOPER?

22   A.    NO, I JUST INTERVIEWED HIM.  THAT'S RIGHT.

23   Q.    JUST INTERVIEWED HIM.

24   A.    THAT'S RIGHT.

25   Q.    YOU SORT OF OUTSOURCED THE EXAMINATION TO NATIONAL JEWISH,
```

1   CORRECT?

2   A.   I REFERRED HIM TO NATIONAL JEWISH.

3   Q.   ACTUALLY, THAT APPOINTMENT WAS SET UP THROUGH THE

4   PLAINTIFFS' LAWYERS, NOT THROUGH CHRIS COOPER, CORRECT?  YOU

5   DIDN'T CALL NATIONAL JEWISH; THEY DID, CORRECT?

6   A.   NO, I DID -- I HAD SPOKEN TO NATIONAL JEWISH BECAUSE I KNOW

7   THE FOLKS OVER THERE.

8   Q.   YOU CERTAINLY DIDN'T TALK TO KARIN PACHECO, CORRECT?

9   A.   I DID TALK TO KARIN PACHECO.

10  Q.   YOU DID TALK TO KARIN PACHECO?

11  A.   YES.

12  Q.   WE'LL GET BACK TO THAT LATER, BUT I THINK THAT --

13           THERE WAS A LARYNGOSCOPY DONE AT NATIONAL JEWISH,

14  CORRECT?

15  A.   THAT'S RIGHT.

16  Q.   AND THERE WAS ACTUALLY A DVD OF THAT LARYNGOSCOPY, CORRECT?

17  A.   I BELIEVE SO.

18  Q.   YOU DIDN'T SEE IT AT THE TIME YOU FORMULATED YOUR OPINIONS,

19  CORRECT?

20  A.   NO.

21  Q.   AM I CORRECT THAT YOU WERE CHARGED WITH MAKING A

22  DETERMINATION OF THE CONDITION FOUND BY DR. PACHECO AND WHAT WAS

23  THE BEST AND MOST PROBABLE RECONSTRUCTION OF HIS EXPOSURE

24  EXPERIENCE BETWEEN MAY 2006 AND DECEMBER 2007?

25  A.   YES, SIR.

1   Q.   NONETHELESS, AFTER REVIEWING DR. PACHECO'S REPORT, WITHOUT

2   EXAMINING THE PATIENT, LOOKING AT THE PULMONARY FUNCTION

3   FLOW TESTS, REVIEWING THE CAT SCANS, YOU DECIDED THAT DR. PACHECO

4   WAS WRONG; ISN'T THAT RIGHT?

5   A.   I CERTAINLY TRULY DON'T UNDERSTAND WHAT YOU MEAN ABOUT HER

6   BEING WRONG.  COULD YOU HELP ME OUT ON THAT, PLEASE?  IN WHAT

7   RESPECT?

8   Q.   WELL, ONE THING YOU FOUND IS THAT MR. COOPER'S ASTHMA IS

9   AGGRAVATED COMPARED TO BEFORE THE STORM, CORRECT?

10  A.   NOT COMPARED TO BEFORE THE STORM.  PERSISTENT ASTHMA WAS

11  EVIDENT BASED UPON DR. BARNES' AND DR. PACHECO'S FINDINGS.

12  Q.   SO HIS ASTHMA IS NOT ANY WORSE THAN IT WAS, IT JUST STILL

13  PERSISTS; IS THAT YOUR OPINION?

14  A.   HIS ASTHMA IS CONSIDERED WORSE BECAUSE OF WHAT WE SAW WAS A

15  DISPROPORTIONATE EFFECT OF THE METHACHOLINE CHALLENGE AND THE

16  PERSISTENT FINDINGS MANY, MANY MONTHS AFTER HE HAD LEFT THE

17  TRAILER.

18  Q.   SO BACK TO MY ORIGINAL QUESTION, THEN.  YOU FOUND THAT HIS

19  ASTHMA IS WORSE NOW THAN IT WAS BEFORE HURRICANE KATRINA?

20  A.   WE DON'T HAVE ANY DATA BEFORE HURRICANE KATRINA, SO I CAN'T

21  ANSWER THE QUESTION.  I DIDN'T -- I NEVER -- I DIDN'T DRAW THAT

22  CONCLUSION.  PLEASE ASK, AGAIN.

23  Q.   IS HIS ASTHMA WORSE NOW THAN IT WAS BEFORE THE STORM; CAN

24  YOU SAY ONE WAY OR NOT?

25  A.   WE DON'T KNOW THAT ANSWER.

1  Q.   FINE.  SO YOU DON'T KNOW IF HIS ASTHMA IS WORSE, BUT YOU'VE

2  GONE THROUGH A BUNCH OF STUDIES HOW FORMALDEHYDE COULD MAKE IT

3  WORSE, BUT YOU DON'T KNOW IF IT IS?

4  A.   BASED UPON THE DATA THAT WE -- THAT I HAVE, I DON'T HAVE

5  DATA BEFORE THE STORM.  SO THERE IS JUST HISTORY BEFORE THE

6  STORM.  AND I THINK -- I'M NOT TRYING TO CHANGE MY OPINION, BUT I

7  THINK THAT THE EVIDENCE IS THAT THE PERSISTENCE OF THE ASTHMA

8  THAT HE HAS NOW IS WORSE THAN IT WAS AND IT'S PERSISTENT COMPARED

9  TO WHAT IT WAS IN THE TIME FRAME THAT HE WAS EXAMINED BY

10  DR. BARNES.

11  Q.   IT MUST BE THE WAY I'M ASKING THE QUESTION.  YES OR NO, IS

12  HIS ASTHMA WORSE NOW THAN IT WAS BEFORE THE STORM?

13  A.   I DON'T KNOW THE ANSWER TO THAT QUESTION BECAUSE THERE IS

14  ONLY HISTORY DATA BEFORE THE STORM.

15  Q.   AND YOU WOULD AGREE WITH DR. PACHECO THAT ONLY A CRANK CAN

16  SAY THAT HIS ASTHMA IS WORSE NOW THAN IT WAS BEFORE THE STORM

17  BASED ON THE DATA YOU HAVE?

18  A.   AS I SAID, SIR, I DON'T KNOW THE ANSWER TO THAT QUESTION

19  BECAUSE WE DON'T HAVE DATA BEFORE THE STORM.  I DON'T KNOW ABOUT

20  BEING A CRANK OR NOT.

21  Q.   I THINK WE WERE ALL HAVING A LITTLE FUN AT DR. PACHECO'S

22  DEPOSITION, BUT THE POINT IS NO ONE, BASED ON THE RECORDS YOU

23  HAVE, CAN SAY CHRIS COOPER'S ASTHMA IS WORSE TODAY THAN IT WAS ON

24  AUGUST 28, 2005, WHEN KATRINA WAS STILL IN THE GULF, CORRECT?

25  A.   THAT'S CORRECT.  DON'T KNOW.

1  Q.   DO YOU AGREE WITH DR. BARNES THAT -- I'M SORRY, DR. PACHECO

2  THAT CHRIS COOPER SUFFERS OR SUFFERED FROM SUBOPTIMALLY TREATED

3  ASTHMA?

4  A.   I DON'T HAVE AN OPINION ON THAT.   THAT WAS DR. PACHECO'S

5  CONCLUSION.

6  Q.   SO THEREFORE YOU WOULD NOT DISPUTE DR. PACHECO'S CONCLUSION?

7  A.   I DON'T HAVE AN OPINION ON THAT.

8  Q.   WELL, IF SHE'S GOT ONE AND YOU DON'T, DO YOU DISPUTE HERS?

9  A.   I HAVE NO BASIS TO DISPUTE HER CONCLUSION.

10  Q.   IN FACT, YOU NEVER EVEN CONSIDERED THAT THE ISSUE HERE MIGHT

11  BE SUBOPTIMALLY TREATED ASTHMA, CORRECT?

12  A.   IT WAS IN THE RECORD, AND IT WAS CONSIDERED, BUT I DIDN'T

13  DEVELOP AN OPINION ON IT.   I'M NOT A PULMONOLOGIST.

14  Q.   YOU DIDN'T -- YOU KIND OF TRICKED ME AT YOUR DEPOSITION.

15  YOU DIDN'T ACTUALLY HAVE THE PRESCRIPTION RECORDS AT THE TIME YOU

16  FORMULATED YOUR REPORT, DID YOU?

17  A.   I DID.   THE WALGREENS --

18  Q.   AT THE TIME YOU FORMULATED YOUR REPORT?

19  A.   YES, SIR, THE WALGREENS RECORDS.

20  Q.   WHEN DID YOU GET THE WALGREENS RECORDS?

21       THE COURT:  WAIT, WAIT, WAIT.

22       MR. WEINSTOCK:  I'M SORRY.

23       THE WITNESS:  I HAD SOME OF THE WALGREENS RECORDS AT THE

24  TIME I FORMULATED MY OPINION.

25                           EXAMINATION

1    BY MR. WEINSTOCK:

2    Q.    LET'S BE VERY CLEAR ON THIS.  NOT AT THE TIME I DEPOSED YOU,

3    BUT AT THE TIME YOU FORMULATED YOUR OPINIONS?

4    A.    NO, I HAD -- I HAD SOME OF THE WALGREENS RECORDS.

5    Q.    WELL, IT'S NOT SOME.  IT'S EITHER ALL OR NONE.  IT'S ONE

6    PACKET OF DOCUMENTS.  WHEN DID YOU GET THEM BEFORE FORMULATING

7    YOUR OPINION?

8    A.    I WOULD HAVE TO LOOK THAT UP.  I DON'T KNOW THAT OFF THE TOP

9    OF MY HEAD.

10   Q.    PLEASE DO.  PLEASE LOOK IT UP.  THIS IS A BIGGEE.

11           MR. WATTS:  JUDGE, COULD WE HAVE QUESTIONS INSTEAD OF

12   SPEECHES ABOUT WHAT'S A BIGGEE AND WHAT'S NOT.

13           MR. WEINSTOCK:  I APOLOGIZE, YOUR HONOR.

14           THE COURT:  HE'S HERE TO ANSWER QUESTIONS.  LET'S FIND

15   OUT WHAT HE KNOWS ABOUT ALL OF THIS, AND THEN WE'LL MOVE ON TO

16   ANOTHER WITNESS.  SO LET'S STICK WITH QUESTIONS.

17                              EXAMINATION

18   BY MR. WEINSTOCK:

19   Q.    FAIR ENOUGH.  WHEN DID YOU RECEIVE THE WALGREENS RECORDS?

20   A.    SIR, I DON'T HAVE THE DATA TO ANSWER YOUR QUESTION.  I WISH

21   I COULD, BUT I DON'T.  BUT I HAD SOME OF THE RECORDS WHEN THE

22   REPORT WAS BEING GENERATED.

23   Q.    YOU FINALIZED YOUR REPORT ON MAY 19TH?

24   A.    YES.

25   Q.    DID YOU GET THE RECORDS THAT DAY, OR YOU HAD THEM BEFORE

1  THAT?

2  A.   I DON'T REMEMBER.  I HAD THE RECORDS BEFORE THAT.

3  Q.   BEFORE THAT?  BECAUSE I GOT THE RECORDS, AND I FORWARDED IT

4  TO THEM ON MAY 19TH.

5  A.   RIGHT.  BUT I HAD -- I HAD RECORDS AT THE TIME THAT I WROTE

6  THE REPORT.  I DON'T REMEMBER EXACTLY WHAT TIME, BUT THOSE

7  RECORDS WERE IN MY POSSESSION.

8  Q.   AND WHAT DID THOSE RECORDS SAY ABOUT SUBOPTIMALLY TREATED

9  ASTHMA?

10  A.   I DIDN'T -- I DIDN'T ANALYZE THEM FROM THAT STANDPOINT.

11  Q.   YOU NEVER CONSIDERED IT, DID YOU?

12  A.   I DIDN'T DO AN ANALYSIS OF THE WALGREENS RECORDS.  I ONLY

13  CONSIDERED THE HISTORY THAT WAS GIVEN TO ME AT THAT TIME.

14  Q.   CORRECT.  YOU BASED IT ON THE HISTORY YOU WERE GIVEN,

15  CORRECT?

16  A.   YES.

17  Q.   YOU NEVER LOOKED AT THE POSSIBILITY, YOU ASSUMED HE WAS NOT

18  SUBOPTIMALLY TREATED BASED ON A CONVERSATION YOU HAD WITH HIS

19  MOTHER THAT HIS ASTHMA WAS UNDER GOOD MEDICAL CONTROL WHILE HE

20  WAS IN THE TRAILER, CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   NOT A CONVERSATION YOU HAD WITH DR. BARNES OR DR. PACHECO;

23  HIS MOTHER TOLD YOU HE WAS UNDER GOOD MEDICAL CONTROL WHILE IN

24  THE TRAILER, CORRECT?

25  A.   WELL, THE RECORD, THE EMERGENCY ROOM RECORD, WHICH WAS IN --

1  I THINK, DECEMBER 7TH, ALSO INDICATED THAT THE ER DOCTOR REPORTED

2  THAT HE HAD NOT HAD AN ASTHMA ATTACK FOR ONE YEAR APPROXIMATELY,

3  A MAJOR ASTHMA ATTACK.  SO THE RECORD WAS -- INCLUDED THAT

4  INFORMATION.

5  Q.   SO FOR THE YEAR -- AND THAT'S RIGHT BEFORE HE MOVED OUT OF

6  THE TRAILER, RIGHT?  CORRECT?  DECEMBER 7, '04?

7  A.   THAT'S RIGHT, YES.

8  Q.   I'M SORRY, DECEMBER 4, '07.  SO FOR THE YEAR BEFORE THAT

9  WHILE HE WAS IN THE TRAILER, HE HADN'T HAD AN ASTHMA ATTACK;

10  THAT'S WHAT YOU JUST SAID, RIGHT?

11  A.   WELL, HE DIDN'T HAVE AN ASTHMA ATTACK THAT WAS SIGNIFICANT

12  ENOUGH TO GO TO THE HOSPITAL FOR EMERGENCY, FOR EXAMPLE.

13  Q.   ACTUALLY, THE RECORD SAYS, NOT AN EPISODE OF WHEEZE IN THE

14  LAST YEAR, NOT, DIDN'T NEED TO GO TO AN EMERGENCY ROOM.

15  A.   I'D NEED TO LOOK AND SEE, BUT THE DOCTOR DEFINITELY DID

16  STATE THAT HE HAD NOT HAD ANY MAJOR ISSUE.

17  Q.   MAJOR IS NOT IN THAT RECORD.

18  A.   COULD WE LOOK?

19  Q.   PLEASE TAKE A LOOK.  WHATEVER YOU NEED TO LOOK AT, PLEASE DO

20  SO.

21  A.   THAT'S FINE.  I CAN SEE TOTALLY THAT THE DOCTOR INDICATED

22  THAT HE HAD NOT HAD SOME SORT OF ASTHMA EVENT BY HISTORY FOR THE

23  PREVIOUS YEAR.

24  Q.   WELL, AND I KNOW YOU'RE NOT A PULMONOLOGIST, AND I KNOW

25  YOU'RE NOT AN IMMUNOLOGIST, BUT IT'S IMPORTANT TO UNDERSTAND THE

1  DIFFERENT TYPES OF MEDICATIONS WE USE TO TREAT ASTHMA; ISN'T IT,

2  DOCTOR?

3  A.   YES, IT IS.

4  Q.   AND USING -- YOU DON'T USE AS-NEEDED MEDICATION WHEN YOU

5  FEEL A LITTLE TIGHTNESS OR ITCHING IN YOUR CHEST TO MAINTAIN

6  ASTHMA; ISN'T THAT CORRECT, DOCTOR?

7  A.   THAT'S CORRECT.

8  Q.   YOU USE STEROID MEDICATION TO MAINTAIN ASTHMA; ISN'T THAT

9  CORRECT, DOCTOR?

10  A.   OR LONG-ACTING BRONCHODILATORS, YES.

11  Q.   IN THE CASE OF CHRIS COOPER, WHAT HE HAD BEEN GIVEN IN THE

12  PAST WAS STEROID MEDICATION, CORRECT?

13  A.   HE HAD BEEN, YES.

14  Q.   NOW, IF HE HADN'T HAD STEROID MEDICATION IN OVER TWO AND A

15  HALF YEARS, YOU WOULD AGREE HE WAS SUBOPTIMALLY MAINTAINING HIS

16  ASTHMA, CORRECT?

17  A.   AGAIN, I REPEAT, I HAVE NO OPINION ON THAT.  THAT'S NOT --

18  NOT WITHIN THE SCOPE OF MY EXPERTISE TO MAKE THAT DECISION AT

19  THAT LEVEL.

20  Q.   IF IT'S NOT WITHIN THE SCOPE OF YOUR EXPERTISE, AND YOU

21  DIDN'T CONSIDER IT, YOU CERTAINLY DID NOT CONSIDER SUBOPTIMALLY

22  TREATED ASTHMA AS AN ALTERNATIVE CAUSE FOR CHRIS COOPER'S

23  CONDITION?

24  A.   I DID, BUT I WAS AWARE OF DR. PACHECO'S CONCLUSION BECAUSE I

25  READ IT IN HER REPORT, SO I DID CONSIDER IT.

1  Q.   YOU CONSIDERED IT TO THE EXTENT SHE CONSIDERED IT, BUT

2  YOU'VE JUST TOLD US YOU DON'T HAVE THE EXPERTISE TO MAKE THAT

3  DETERMINATION; ISN'T THAT RIGHT?

4  A.   IT'S NO DIFFERENT THAN IF I REFER SOMEONE TO AN INVASIVE

5  CARDIOLOGIST WHO DOES AN ANGIOGRAM.  I MEAN, I HAVE TO RELY ON

6  OTHER EXPERTS THAT HAVE MORE EXPERTISE THAN I DO.

7  Q.   SO THEREFORE YOU WOULD HAVE TO ACCEPT DR. PACHECO'S

8  STATEMENT THAT HIS -- LET ME GET IT JUST RIGHT -- THAT, "HIS TEST

9  RESULTS DOCUMENT MODERATELY SEVERE BRONCHIAL HYPERRESPONSIVENESS,

10 AS WELL AS A COMPONENT OF FIXED AIR FLOW OBSTRUCTION.  THIS

11 LIKELY REFLECTS A LONG HISTORY OF ASTHMA THAT HAS BEEN

12 SUBOPTIMALLY TREATED."  BECAUSE YOU DON'T HAVE THE EXPERTISE TO

13 SAY OTHERWISE, YOU ACCEPTED THAT FROM THE EXPERT, CORRECT?

14 A.   YES, AS PART OF THE DIFFERENTIAL DIAGNOSIS.  THAT'S RIGHT.

15 Q.   YOU ALSO UNDERSTOOD WHEN SHE SAID, "ALTHOUGH IT IS COMMON TO

16 WISH TO MINIMIZE MEDICATION USE, ESPECIALLY IN CHILDREN, IN THOSE

17 WITH ASTHMA, THAT IS NOT NECESSARILY A GOOD POLICY.  CHRONIC,

18 UNTREATED ASTHMA CAN LEAD TO AIRWAYS REMODELING AND SCARRING WITH

19 FIXED AIR FLOW OBSTRUCTION THAT NO LONGER REVERSES WITH

20 BRONCHODILATOR," CORRECT?  YOU HAD TO ACCEPT THAT BECAUSE YOU

21 DIDN'T HAVE THE EXPERTISE TO SAY IT WAS WRONG OR THE RECORDS TO

22 SAY IT WAS WRONG?

23 A.   IT'S PART OF THE DIFFERENTIAL DIAGNOSIS, YES.

24 Q.   AND, IN FACT, I'VE LOOKED AT YOUR REPORT.  WHEN YOU

25 DISCUSSED HIS MEDICATIONS, ALL YOU DID WAS LIST HIS CURRENT

1   MEDICATIONS THAT DR. BARNES HAD TOLD YOU ABOUT, CORRECT?

2   A.   I'D HAVE TO GO AND LOOK.  I THINK THE OTHER MEDICATIONS, BY

3   HISTORY, WERE ALSO LISTED.

4   Q.   TAKE A LOOK AT YOUR REPORT, PAGE 16.

5   A.   I'M WITH YOU.  GO AHEAD.

6   Q.   YOU LISTED OUT HIS CURRENT MEDICATIONS?

7   A.   YES, BUT ON THE OTHER HISTORY, I'VE LISTED HIS MEDICATIONS,

8   ALSO, IN THE EARLIER HISTORY.

9   Q.   WHAT PAGE HAVE YOU GOT?

10  A.   PAGE 12.

11  Q.   THAT CAME FROM DR. BARNES?

12  A.   I LISTED HIS MEDICATIONS THAT HE WAS PRESCRIBED ON 10/4/07,

13  AS WELL.

14  Q.   THOSE ARE THE ONES FROM DR. BARNES?

15  A.   YES.  AT EACH ENCOUNTER, I LISTED THE MEDICATION.

16  Q.   YOU SHARED WITH THE JURY SOME EPIDEMIOLOGICAL PAPERS

17  REGARDING FORMALDEHYDE MANAGEMENT?

18  A.   YES.

19  Q.   THOSE ARE CROSS-SECTIONAL OBSERVATION STUDIES?

20  A.   SOME OF THEM ARE, YES.

21  Q.   WELL, THE ONES YOU SHARED?

22  A.   YES.

23  Q.   WHAT IS A CROSS-SECTIONAL STUDY?

24  A.   IT'S BASICALLY A STUDY OF DISEASE OVER -- IN ONE UNIT PART

25  OF TIME.  IT'S NOT A PROSPECTIVE STUDY.

1   Q.   IT'S A DISEASE THAT MEASURES EXPOSURE AND DISEASE -- I'M

2   SORRY.  IT'S A STUDY THAT MEASURES EXPOSURE AND DISEASE AT THE

3   SAME TIME, CORRECT?

4   A.   YES.

5   Q.   SO WE DON'T KNOW WHICH -- YOU DON'T NECESSARILY KNOW

6   TEMPORALLY WHICH CAME FIRST, THE CHICKEN OR THE EGG, THE EXPOSURE

7   OR THE DISEASE, BECAUSE YOU FIND THEM AT THE SAME TIME, CORRECT?

8   A.   THAT'S NOT TRUE.  THE -- IN EVEN CROSS-SECTIONAL STUDIES, TO

9   MAKE THEM EVEN A STUDY, YOU WOULD HAVE TO SEE THAT THE EXPOSURE

10  PRECEDES THE DISEASE.  THAT'S PART OF THE --

11  Q.   BUT IF YOU MEASURE THEM AT THE SAME TIME, HOW IS THAT DONE?

12  A.   IT'S DONE BY HISTORY.

13  Q.   LET'S TAKE A LOOK AT THE KRZYZANOWSKI STUDY YOU SHARED WITH

14  THE JURY, SPECIFICALLY TABLE FOUR.

15  A.   I NEED TO FIND IT.  I DON'T SEE IT HERE.  THIS MIGHT TAKE A

16  SECOND, PLEASE.

17  Q.   I'LL PUT IT ON THE BOARD, IF YOU WOULD LIKE.

18  A.   I HAVE IT HERE.  OKAY.  WHAT TABLE ARE YOU ON?

19  Q.   TABLE FOUR.

20  A.   WHAT PAGE IS THAT ON?

21  Q.   IT'S ON 121.

22  A.   OKAY.

23  Q.   HCHO, THAT'S OUR FORMALDEHYDE EXPOSURE LEVEL?

24  A.   YES.

25  Q.   NOW, IF WE GO DOWN, ONE OF THE CONFOUNDING PROBLEMS THEY HAD

1   IN THAT STUDY WAS ETS, ENVIRONMENTAL TOBACCO SMOKE.  SOME PEOPLE

2   SMOKE IN THE HOUSE, YES?

3   A.   IT'S ENVIRONMENTAL TOBACCO SMOKE.  THAT'S RIGHT.

4   Q.   AND THAT'S A CONFOUNDING FACTOR WHEN MEASURING THE EFFECTS

5   ON ASTHMA, CORRECT?

6   A.   THEY DIDN'T FIND IT TO BE THE CASE HERE.

7   Q.   IN THE HOUSES OR THE PLACES WITH NO ENVIRONMENTAL TOBACCO

8   SMOKE, AS THE LEVELS OF FORMALDEHYDE WENT UP, THE INCIDENCE OF

9   ASTHMA WENT DOWN; ISN'T THAT RIGHT?

10  A.   OKAY, YOU'RE REFERRING TO -- COULD YOU JUST BE MORE

11  SPECIFIC, AND I'LL FOLLOW FROM HERE --

12  Q.   SURE.

13  A.   -- IF YOU DON'T MIND.

14  Q.   AT LEVELS BELOW 40 PARTS PER BILLION --

15  A.   UH-HUH.

16  Q.   -- AND IN THE HOUSES WITHOUT SMOKERS, WE HAD 8.5, YES?  IN

17  THE CASE OF ASTHMA?

18  A.   THAT'S CORRECT.

19  Q.   IN THE LEVELS WITH 41 TO 60 PARTS PER BILLION, WE HAD

20  8.3 PARTS PER BILLION?

21  A.   THAT'S CORRECT.

22  Q.   AND IN THE LEVELS WITH GREATER THAN 60, WE HAD NO CASES OF

23  ASTHMA?

24  A.   WELL, THESE ARE -- THESE ARE -- YOU'RE RIGHT.  THESE ARE

25  PREVALENCE RATES PER HUNDRED SUBJECTS.  SO THE 8.3 RELATES TO THE

1  PREVALENCE RATE.

2  Q.   A SILLY PERSON WOULD LOOK AT THIS DATA AND SAY, FORMALDEHYDE

3  CURES ASTHMA; THE MORE YOU GIVE IT, THE LOWER THE RATE.  NOW, WE

4  DON'T LOOK AT DATA THAT WAY, CORRECT, DOCTOR?

5  A.   NO, THAT'S NOT WHAT THE OVERALL CONCLUSION WAS.

6  Q.   BUT THAT IS WHAT THE DATA SAYS WHEN YOU SEGREGATE SMOKING

7  FROM NONSMOKING?

8  A.   THEIR OVERALL CONCLUSION WAS THAT THE PEAK EXPIRATORY FLOW

9  RATES WERE NOT AFFECTED BY TOBACCO; BUT, THIS -- YOU'RE CORRECT

10 IN WHAT YOU OBSERVED HERE.

11 Q.   AND ACTUALLY WHAT THEY FOUND WAS SOMEWHAT INCONSISTENT

12 BECAUSE THE CASES WHERE THEY FOUND MORE LUNG FUNCTION ISSUES WERE

13 CASES IN WHICH THERE WERE HIGHER RATES OF FORMALDEHYDE IN THE

14 KITCHEN AND LOWER CASES OF FORMALDEHYDE IN THE BEDROOM WHERE THE

15 CHILDREN ACTUALLY SLEEP, CORRECT?

16 A.   YES.  YOU ASKED ME ABOUT THAT IN MY DEPOSITION, AND I

17 REMINDED YOU THAT THE KITCHEN WAS VERY CLOSE TO WHERE HE SLEPT.

18 Q.   WHERE HE SLEPT?

19 A.   RIGHT.

20 Q.   CHRIS COOPER?

21 A.   RIGHT.

22 Q.   NOT THE PEOPLE IN THE STUDY.  YOU DON'T HAVE ANY IDEA WHERE

23 THEY SLEPT?

24 A.   I DON'T KNOW WHERE THEY SLEPT.

25 Q.   AND, DOCTOR, AM I CORRECT, IN ALL THE STUDIES YOU DISCUSSED,

1   YOU WERE NOT ABLE TO CITE ONE WHERE THERE WAS PERMANENT

2   EPITHELIAL DAMAGE FROM FORMALDEHYDE EXPOSURE THAT RESULTED IN

3   EXACERBATION OF ASTHMA; IS THAT CORRECT?

4   A.   I ANSWERED THAT, ALSO.   THERE IS NO ONE STUDY THAT FITS THAT

5   PARTICULAR CONCLUSION.   IT'S A NUMBER OF DIFFERENT STUDIES IN

6   COMPOSITE.

7   Q.   OH, ONE MORE THING ABOUT KRZYZANOWSKI.   YOU SAID THEY WERE

8   MEASURING ATOPIC RESPONSE BASED, IN PART, ON IGE LEVELS?

9   A.   I DON'T REMEMBER SAYING THAT.   IS THAT A QUESTION?

10  Q.   IT'S A QUESTION.

11  A.   I DON'T REMEMBER SAYING THAT.

12  Q.   BUT WE DO KNOW THAT YOU CONCLUDED AND DR. PACHECO CONCLUDED

13  THAT CHRIS COOPER DOES NOT HAVE IGE-MEDIATED ASTHMA, CORRECT?

14  A.   WELL, WE DON'T KNOW, BUT THAT'S BASICALLY THE CURRENT

15  CONCLUSION, YES.

16  Q.   YOU DON'T KNOW.   SHE SAID, NO, HE DOES NOT HAVE IT, CORRECT?

17  A.   THAT'S ABSOLUTELY RIGHT.

18  Q.   AND, AGAIN, THIS IS -- SHE DID THE ALLERGY TESTING, YES?

19  A.   YES.

20  Q.   THAT'S SOMETHING YOU OUTSOURCED TO NATIONAL JEWISH, YES?

21  A.   I REFERRED HIM TO NATIONAL JEWISH, YES.

22  Q.   AND SHE FOUND HE DID NOT HAVE SOME KIND OF ALLERGIC RESPONSE

23  TO FORMALDEHYDE EXPOSURE?

24  A.   SHE DIDN'T TEST HIM FOR THAT.

25  Q.   BUT SHE GAVE THE OPINION THAT HE DID NOT HAVE IGE-MEDIATED

1   ASTHMA, CORRECT?

2   A.   THAT'S RIGHT.

3   Q.   SHE DID FIND THAT HE HAD AN ALLERGY TO PECANS AND HICKORY,

4   YES?

5   A.   YES.

6   Q.   AND HE ALSO HAD AN ALLERGY TO DUST?

7   A.   TO DUST MITES, YES.

8   Q.   AND IF WE CAN BACKTRACK TO ONE OF YOUR OPINIONS, HE

9   SUFFERS -- WELL, IT'S AN OPINION YOU'VE GIVEN.  I'M NOT SURE YOU

10  STILL HOLD IT TODAY.  DOES CHRIS COOPER SUFFER FROM CHRONIC

11  ASTHMA AS A RESULT OF FORMALDEHYDE EXPOSURE WHILE IN THE TRAILER?

12  OR YOU CAN'T SAY NOW?  I CAN'T REMEMBER --

13  A.   NO, YOU ASKED ME PRIOR TO HURRICANE KATRINA.  THE ANSWER IS

14  THE ASTHMA HE HAS COMPARED TO THE BASELINE THAT WE CAN OBTAIN

15  FROM DR. BARNES' RECORDS IS HE HAS DISPROPORTIONATE ADVERSE

16  EFFECTS TO PROVOCATIVE TESTING, WHICH, IN MY OPINION, MEANS THAT

17  HIS ASTHMA IS WORSE THAN IT WAS THEN.  I DON'T KNOW WHAT IT WAS

18  BEFORE THE HURRICANE.

19  Q.   HE'S HAD ASTHMA SINCE AGE TWO OR THREE?

20  A.   THE FIRST DIAGNOSIS -- THAT'S ABOUT RIGHT.  I CAN GIVE YOU A

21  PRECISE DATE, IF YOU WOULD LIKE.

22  Q.   WE DON'T KNOW HOW HE WOULD HAVE -- HOW HE WOULD HAVE

23  PERFORMED ON A METHACHOLINE CHALLENGE TEST BEFORE

24  HURRICANE KATRINA, CORRECT?

25  A.   THAT'S RIGHT.  HIS DIAGNOSIS OF ASTHMA WAS IN 2001, AT LSU

1   UNIVERSITY HOSPITAL.

2   Q.   HE CERTAINLY WAS DIAGNOSED IN 2001 AT AGE FOUR, BUT HE WAS

3   ALSO DIAGNOSED AT AGE THREE BY DR. BARNES; SHE DID TELL YOU THAT,

4   DIDN'T SHE?

5   A.   I'D HAVE TO LOOK AT THE RECORD.   THE MEDICAL RECORDS I HAVE

6   INDICATE THAT THE ORIGINAL DIAGNOSIS IN '99 WAS PNEUMONIA; AND,

7   BY LATE 2001, HE WAS DIAGNOSED WITH ASTHMA.

8   Q.   DOCTOR --

9         MR. WEINSTOCK:   I THINK I NEED TO APPROACH, YOUR HONOR,

10   BEFORE I CROSS A LINE.

11         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

12   A CONFERENCE HELD AT THE BENCH.)

13         MR. WEINSTOCK:   I ASKED HIM POINT-BLANK IN HIS

14   DEPOSITION IF HE WAS AWARE OF ANY POPULATION STUDY THAT

15   ASSOCIATES VOCAL CORD DYSFUNCTION WITH FORMALDEHYDE EXPOSURE, AND

16   HE TOLD ME NO.   AND I WANT TO ASK HIM THAT NOW, BUT I DON'T WANT

17   TO OPEN THE DOOR TO SOMETHING ELSE.

18         MR. WATTS:   IT DOES.

19         THE COURT:   BUT DIDN'T I STRIKE THE TESTIMONY THAT YOU

20   OBJECTED TO?   I THINK THAT WAS THE ALTERNATIVE IS EITHER YOU GET

21   TO CROSS HIM ON THAT OR THAT I GIVE HIM THE INSTRUCTION.

22         MR. WEINSTOCK:   THAT'S WHY I APPROACHED.

23         MR. WATTS:   THANKS FOR APPROACHING.

24         THE COURT:   I UNDERSTAND.

25         MR. WATTS:   WE'RE PRETTY GOOD AT APPROACHING.   I THINK

1  WE ALL KNOW WHERE THE LINE IS.

2         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

3  CONFERENCE CONCLUDED.)

4                        EXAMINATION

5  BY MR. WEINSTOCK:

6  Q.    DOCTOR, ANOTHER PIECE OF THE PUZZLE FOR YOU WAS THAT HE

7  SERVED BOGGY NASAL TURBINATES, OR TURBINATE ENLARGEMENT, WHICH

8  YOU BELIEVE EVIDENCED PERMANENT EPITHELIAL DAMAGE, CORRECT?

9  A.    YEAH.  WELL, IT'S PERSISTENT INJURY THAT WAS OBSERVED BY

10  BOTH DR. BARNES AND DR. PACHECO.

11  Q.    RIGHT.  AND YOU REFERRED TO HIS BOGGY NASAL TURBINATES AND

12  EPITHELIAL DAMAGE, THAT IT'S A SIGNATURE OF HIS FORMALDEHYDE

13  EXPOSURE, YES?

14  A.    ON THE BASIS OF THE PERSISTENCE AND THE INTENSITY, YES.

15  Q.    BUT, ACTUALLY, ASTHMA ITSELF CAN CAUSE BOGGY NASAL

16  TURBINATES, CORRECT?

17  A.    IN -- ESPECIALLY IN PEOPLE THAT ARE ALLERGIC, THAT ARE

18  ATOPIC, YES.

19  Q.    WELL, WE KNOW HE HAD ALLERGIES, CORRECT?  THAT'S WHAT

20  DR. PACHECO FOUND?  YES?

21  A.    YOU'LL RECALL THAT SHE DIDN'T DIAGNOSE HIM AS BEING ATOPIC.

22  Q.    RIGHT.

23  A.    HE DID HAVE ALLERGIES, YOU'RE RIGHT.

24  Q.    YOU WOULD AGREE WITH DR. PACHECO THAT THE ONLY WAY TO

25  DETERMINE IF THERE IS PERMANENT EPITHELIAL DAMAGE IS TO DO A

1    BIOPSY, CORRECT?

2    A.   A BIOPSY COULD BE HELPFUL IF IT WAS INDICATED IN THIS

3    PARTICULAR CASE, YES.

4    Q.   NO BIOPSY WAS EVER PERFORMED, CORRECT?

5    A.   THAT'S CORRECT.  IT WASN'T NECESSARY IN THIS CASE.

6    Q.   ALTHOUGH DR. BARNES TOLD YOU THAT SHE DID NOT DO ONE AND

7    COULD NOT DIAGNOSE PERMANENT EPITHELIAL DAMAGE WITHOUT ONE,

8    CORRECT?

9    A.   I DON'T REMEMBER THAT, SIR.

10   Q.   AND DR. PACHECO SAID THE SAME, DIDN'T SHE?

11   A.   I WOULD HAVE TO -- I'D HAVE TO GO SPECIFICALLY AND LOOK THAT

12   UP.  I DON'T RECALL THAT AS I SIT HERE.

13   Q.   BUT YOUR UNDERSTANDING IS THE TURBINATES LOOK DIFFERENT THAN

14   THEY WOULD HAVE BEFORE THE STORM BECAUSE THAT'S WHAT DR. BARNES

15   TOLD YOU, CORRECT?

16   A.   I ONLY HAVE AN OPINION ON THE CONSISTENCY.  I DON'T HAVE AN

17   OPINION ON WHAT IT WAS BEFORE THE STORM.  I DON'T KNOW.

18            YOU'RE MAKING -- I'D REALLY APPRECIATE IT IF YOU'D JUST

19   MAKE REFERENCES.  I'D BE HAPPY TO LOOK WHAT YOU'RE REFERRING TO.

20   Q.   THIS ONE WE WILL, VERY SPECIFICALLY.  YOUR OPINION THAT

21   THERE WAS A CHANGE IN HIS BOGGY NASAL TURBINATES WAS BASED ON A

22   CONVERSATION YOU HAD WITH DR. JANET BARNES, CORRECT?

23   A.   COMPARED TO WHEN?

24   Q.   COMPARED TO AUGUST 28 OR 29, 2005, THE DAY BEFORE OR DAY OF.

25   A.   I DIDN'T HAVE THAT CONVERSATION WITH DR. BARNES, TO THE BEST

1  OF MY RECOLLECTION, WHERE SHE WOULD HAVE MADE THAT KIND OF -- YOU

2  KNOW, DREW THAT CONCLUSION.  MY OPINION WAS BASED ON WHAT WAS

3  SEEN ON OCTOBER 4TH OF '07 AND WHAT WAS SEEN IN APRIL OF '09 AND

4  AT THE NATIONAL JEWISH EXAM.

5  Q.   LET'S BE VERY CLEAR.  BASED ON HER MEMORY OF WHAT HIS

6  TURBINATES LOOKED LIKE BEFORE THE STORM AND ON OCTOBER 2007, SHE

7  INFORMED YOU THAT IT WAS DIFFERENT, CORRECT?

8  A.   CAN YOU SHOW ME WHAT YOU'RE LOOKING AT?  I DON'T REMEMBER

9  THAT SPECIFICALLY.

10  Q.   SO YOU DON'T REMEMBER GIVING THAT TESTIMONY?  THAT'S FINE.

11  A.   THERE WAS THREE HUNDRED PAGES OF TESTIMONY.  I WOULD BE VERY

12  HAPPY TO LOOK AT IT, IF YOU WOULD JUST LET ME DO THAT.

13  Q.   I'M COMING.  PAGE 98, STARTING LINE 17 THROUGH PAGE 99, LINE

14  21.

15  A.   IS THIS IN MY DEPOSITION?

16           MR. WEINSTOCK:  MAY I APPROACH?

17           THE COURT:  HE'S GOING TO SHOW IT TO YOU.  YES.

18                         EXAMINATION

19  BY MR. WEINSTOCK:

20  Q.   THE UNDERLINED PORTION.

21  A.   I --

22  Q.   KEEP READING.

23  A.   WELL, DO YOU WANT ME TO READ IT OUT LOUD OR --

24  Q.   MAYBE.

25  A.   WHAT I DID HERE WAS DEFER TO HER --

1      THE COURT:  WAIT, WAIT.  LET'S WAIT FOR A QUESTION.

2      THE WITNESS:  OH, I'M SORRY.

3      THE COURT:  THAT'S ALL RIGHT.  GO AHEAD AND REVIEW IT,

4  AND THEN HE'S GOING TO ASK YOU A QUESTION.

5      THE WITNESS:  SORRY, SIR.

6      (WITNESS REVIEWS THE DOCUMENT.)

7                         EXAMINATION

8  BY MR. WEINSTOCK:

9  Q.   I AM CORRECT THAT IT WAS YOUR UNDERSTANDING AFTER SPEAKING

10 TO HER THAT SHE TOLD YOU, BASED ON MEMORY, HIS TURBINATES LOOKED

11 DIFFERENT IN OCTOBER 2007 THAN THEY DID IN 2005?

12 A.   WHAT I DID IN THAT TESTIMONY IS, I DEFER TO HER BECAUSE SHE

13 WAS ON THE SCENE.  I THINK WE NEED TO READ THAT SO THAT I CAN --

14 THERE IS JUST NO CONFUSION.

15 Q.   LET'S PUT IT UP.

16 A.   OKAY.

17 Q.   NOW, WE CAN GO BACK TO WHERE I STARTED.  CAN ASTHMA CAUSE

18 BOGGY NASAL TURBINATES?  ASKED AND ANSWERED.  AND YOU JUMPED IN:

19 "IT'S A MATTER OF DEGREE.  I TOLD YOU THAT ASTHMA CAN CAUSE BOGGY

20 NASAL TURBINATES.  I THINK THE EXTENT OF THEM AND THE PERSISTENCE

21 OF THEM IS WHAT'S INTERESTING AND UNIQUE IN THE CASE.  AND AGAIN,

22 DR. BARNES WAS ON THE SCENE.  SHE LOOKED IN THE MAN'S NOSE, AND,

23 I MEAN, THIS YOUNG BOY'S NOSE, AND DREW CONCLUSIONS ABOUT WHAT

24 SHE FOUND.  YOU WEREN'T THERE.  I WASN'T THERE.  SHE -- IT'S KIND

25 OF RARE TO HAVE THIS KIND OF OBSERVATIONAL, CLINICAL

1    CERTIFICATION OF WHAT THE HECK WAS HAPPENING.  AND THAT'S WHY

2    HER, HER TESTIMONY AND WHAT SHE SAID IS VERY IMPORTANT, EXCEPT

3    DR. BARNES HAD NO PRESTORM RECORDS TO COMPARE IT TO.  BUT SHE SAW

4    THE YOUNG MAN.  SHE SAW AND SHE EXAMINED HIM.  SHE WAS THE FAMILY

5    DOCTOR FOR THIS YOUNG MAN?"

6              "LET ME UNDERSTAND WHAT YOU'RE SAYING.  SHE SAW HIM AT

7    SOME POINT IN TIME BEFORE AUGUST 2005 FOR WHICH SHE HAS NO

8    RECORDS, CORRECT?"

9              "WELL, SHE'S HERE.  I MEAN, THERE'S A RECORD.  SHE HAS

10   NO WRITTEN RECORDS.  SHE HAS NO WRITTEN RECORDS.  THAT'S RIGHT."

11             AND BASED ON HER MEMORY OF WHAT HIS TURBINATES LOOKED

12   LIKE, YOU'RE TELLING ME THAT SHE CAN DETERMINE THEY'RE WORSE NOW?

13   ISN'T THAT WHAT YOUR TESTIMONY WAS, SIR?  BASED ON HER PHENOMENAL

14   MEMORY.

15   A.   I DEFERRED TO HER IN WHAT I THINK IS NOT UNEXPECTED IN A

16   FAMILY DOCTOR THAT YOU REMEMBER, OFTEN REMEMBERS WHAT A PERSON'S

17   EXAM LOOKS LIKES.  IT'S NOT A HUNDRED PERCENT, BUT I HAD TO DEFER

18   TO HER.

19   Q.   IT'S MORE THAN DEFERRING TO HER.  YOU SPOKE TO HER, AND

20   THAT'S WHAT YOU SAID SHE TOLD YOU, CORRECT?

21   A.   I DON'T REMEMBER HER TELLING ME THEY WERE WORSE OR BETTER IN

22   THAT SENSE.  I REALLY DON'T.  I WOULD HAVE TO LOOK AT THE RECORD.

23   BUT I DID DEFER TO HER.  I THINK THE TESTIMONY IS CLEAR.  SHE WAS

24   ON THE SCENE.

25   Q.   AND THEN YOU GAVE ME A WHOLE EXPLANATION OF HOW YOU CAN

1   REMEMBER WHAT 20,000 PEOPLE'S TURBINATES LOOK LIKE, RIGHT?

2   A.   THAT'S AN EXAGGERATION.  I DO REMEMBER PEOPLE, I FORGET

3   NAMES UNFORTUNATELY SOMETIMES, BUT I DO REMEMBER MEDICAL

4   ENCOUNTERS WITH THEM VERY FREQUENTLY.

5   Q.   I MISSPOKE.  TENS OF THOUSANDS OF PEOPLE, IT COULD HAVE BEEN

6   10,000, IT COULD HAVE BEEN 90,000, BUT YOU CAN REMEMBER WHAT

7   THEIR TURBINATES LOOK LIKE, RIGHT?

8   A.   I DON'T THINK I CAN REMEMBER WHAT 10,000 TURBINATES LOOK

9   LIKE.

10  Q.   BUT YOU THOUGHT POSSIBLY SHE COULD REMEMBER WHAT THEY LOOKED

11  LIKE BEFORE THE STORM, WHAT THEY LOOKED LIKE AFTER, AND THAT WAS

12  THE BASIS FOR SAYING HIS BOGGY NASAL TURBINATES WERE DIFFERENT,

13  CORRECT?

14  A.   I DON'T HAVE AN OPINION ON WHETHER THEY WERE DIFFERENT

15  BEFORE THE STORM.

16  Q.   SO THEY MAY BE THE SAME?

17  A.   I DON'T KNOW.  I CAN ONLY -- THE POINTS IN TIME THAT I WAS

18  ABLE TO EVALUATE WERE THE RECORDS IN 2007 AND THE RECORDS IN

19  2009.

20  Q.   YOU READ DR. BARNES'S TESTIMONY, DIDN'T YOU?

21  A.   I DID AT ONE POINT, YES.

22  Q.   LET'S SEE WHAT SHE HAD TO SAY.

23       "AS WE SIT HERE TODAY, CAN YOU TELL ME, SINCE WE DON'T

24  HAVE THE RECORDS, FROM MEMORY, WHETHER HE WAS HAVING BOGGY NASAL

25  TURBINATES BEFORE THE STORM?"

1              "I CAN'T TELL YOU THAT FROM MEMORY."

2              "SO IT'S POSSIBLE HE COULD; IT'S POSSIBLE HE COULDN'T?"

3              "RIGHT."

4              DR. BARNES NEVER CLAIMS SHE CAN REMEMBER WHAT THIS

5    MAN'S -- WHAT THIS YOUNG MAN'S BOGGY NASAL TURBINATES LOOKED LIKE

6    BEFORE THE STORM, COULD SHE?

7    A.   NO, SHE DIDN'T IN THIS CASE, THAT'S RIGHT.

8    Q.   SHE DID NOT, BUT YOU BASED YOUR OPINION IN PART ON THE FACT

9    THAT SHE HAD.

10   A.   NO, I SAID SHE COULD.  I DIDN'T -- I DON'T -- I NEVER HAD

11   THE CONVERSATION WITH HER ABOUT THIS HYPOTHETICAL ENCOUNTER OR

12   TEST HER MEMORY.  I'M JUST SAYING THAT THE CLINICIANS VERY OFTEN

13   REMEMBER.

14   Q.   YOU SPOKE TO HER ON TWO OCCASIONS?

15   A.   THAT'S RIGHT.

16   Q.   AND IT WAS BASED ON THOSE CONVERSATIONS THAT YOU DREW YOUR

17   OPINIONS, IN PART?

18   A.   THAT'S RIGHT.

19   Q.   ONE OF THOSE OPINIONS IS, THAT'S BASED ON TALKING TO HER,

20   HIS TURBINATES ARE DIFFERENT.

21   A.   I DON'T HAVE AN OPINION.

22   Q.   I ASKED YOU A QUESTION A FEW MINUTES AGO, I'M GOING TO REASK

23   IT NOW.  HIS BOGGY NASAL TURBINATES AND EPITHELIAL DAMAGE ARE THE

24   SIGNATURE OF HIS FORMALDEHYDE EXPOSURE.  SINCE HE WASN'T EXPOSED

25   TO FORMALDEHYDE BEFORE AUGUST 2005, HOW IS THE SIGNATURE OF HIS

1   EXPOSURE NOT DIFFERENT THAN BEFORE 2005?

2   A.   IT'S THE PERSISTENCE AND THE DEGREE OF CLINICAL CONSISTENCY

3   BETWEEN '07 AND '09.  I DON'T HAVE AN OPINION ON WHAT HAPPENED

4   BEFORE THE HURRICANE.

5   Q.   AND IN THE PERSISTENCE, YOU HAVE EXCLUDED THE POSSIBILITY

6   THAT THE REASON WHY IT MIGHT BE PERSISTENT IS BECAUSE HE DIDN'T

7   TAKE STEROID MEDICATIONS FOR TWO AND A HALF YEARS.

8   A.   NO.  THAT WAS PART OF THE DIFFERENTIAL DIAGNOSIS AS DEFINED

9   BY DR. PACHECO.  I DIDN'T MAKE THAT DIAGNOSIS, BUT I DID CONSIDER

10  IT.

11  Q.   THAT WAS THE PART YOU IGNORED, THOUGH, BECAUSE YOU DIDN'T

12  FACTOR THAT IN.  YOU JUMPED TO FORMALDEHYDE.

13  A.   I DID FACTOR IT IN THE DIFFERENTIAL AND CONCLUDED WHAT

14  OPINIONS I WROTE.

15  Q.   AND I BELIEVE YOU TOLD ME THAT YOU DID NOT BELIEVE HE HAD

16  USED ANTIHISTAMINES BEFORE THE STORM, CORRECT?

17  A.   I WOULD HAVE TO LOOK AT MY RECORDS ABOUT THE USE OF

18  ANTIHISTAMINES, BUT HE DID USE THEM, OVER-THE-COUNTER

19  PREPARATIONS, FROM TIME TO TIME.

20  Q.   AND PRESCRIPTION, ALTHOUGH YOU DID NOT KNOW THAT AT YOUR

21  DEPOSITION, CORRECT?

22  A.   COULD YOU BE SPECIFIC?  WHAT ARE YOU REFERRING TO?  I HAVE

23  THE RECORDS AND THE MEDICINES HE WAS USING AT EACH POINT IN TIME

24  SO I WOULD KNOW THAT, AND I DEFINED WHAT THE MEDICINES WERE, AS A

25  MATTER OF FACT.

1  Q.   YOU MADE A LIST OF THE MEDICINES HE'S USING AT EACH POINT IN

2  TIME?

3  A.   IF YOU LOOK AT THE RECORD.

4  Q.   I ASKED YOU A QUESTION.

5  A.   I'M LOOKING AT MY RECORD.

6          THE COURT:  WAIT A SECOND, IF HE NEEDS TO ANSWER THE

7  QUESTION BY CHECKING.

8          THE WITNESS:  I LISTED THE MEDICATIONS AT EACH

9  ENCOUNTER, INCLUDING EVEN WHAT WAS RECORDED AT LSU HOSPITAL.  ON

10 10/4/07, I LISTED CLARINEX-D 12.  WITHOUT GOING INTO MUCH DETAIL,

11 IT'S AN H1-ANTIHISTAMINE ANTAGONIST.  SUDAFEDRIN, A DECONGESTANT,

12 ORAL PREPARATION EVERY 12 HOURS.

13                          EXAMINATION

14 BY MR. WEINSTOCK:

15 Q.   I'M SORRY, I ASKED YOU TO READ --

16 A.   I'M READING, I LISTED IT SPECIFICALLY --

17 Q.   WE'LL GET TO IT.

18 A.   -- WHICH MEDICATIONS HE WAS TAKING AT EACH POINT IN TIME.

19 Q.   I PROMISE WE'LL GET TO IT.

20 A.   AND THEN --

21          THE COURT:  WAIT, WAIT, WAIT.

22          THE WITNESS:  AND MEDICINES REPORTED IN THE EMERGENCY

23 ROOM.

24                          EXAMINATION

25 BY MR. WEINSTOCK:

1   Q.   THE QUESTION WAS, DID YOU CREATE A RECORD OF WHAT

2   MEDICATIONS HE WAS TAKING AT WHAT POINT IN TIME?

3   A.   ABSOLUTELY.  IT'S RIGHT HERE IN MY MEDICAL RECORDS, MY

4   REPORT.

5   Q.   AND, THEREFORE, YOU CAN CONFIRM FOR US, HE TOOK SOME

6   STEROIDS FOR TWO AND A HALF YEARS, CORRECT, FROM MARCH '05 UNTIL

7   OCTOBER '07, CORRECT?

8   A.   HE WAS TAKING A BRONCHODILATOR, YOU'RE RIGHT?

9   Q.   NOW, BACK TO THE ANTIHISTAMINES.  WHEN I -- STRIKE THAT.

10  WHEN YOU FORMULATED YOUR OPINIONS ON THESE BOGGY NASAL

11  TURBINATES, IT WAS YOUR BELIEF THAT THE ONLY ANTIHISTAMINES HE

12  WOULD HAVE POSSIBLY TAKEN WERE OVER-THE-COUNTER ANTIHISTAMINES,

13  CORRECT?

14  A.   I DON'T KNOW HOW TO ANSWER THAT BECAUSE I DON'T -- I THINK

15  THAT THEY ARE OVER THE COUNTER, BUT I WOULD HAVE TO CHECK.  I

16  THINK THE CLARINEX-D IS OVER THE COUNTER.  BUT NOW THAT IT HAS

17  PSEUDOEPHEDRINE IN IT, IT MAY HAVE BEEN BY PRESCRIPTION.

18          MR. WEINSTOCK:  MAY I APPROACH, YOUR HONOR, TO REFRESH

19  HIS RECOLLECTION ON THIS POINT?

20          THE COURT:  YES.

21                    EXAMINATION

22  BY MR. WEINSTOCK:

23  Q.   THE UNDERLINED PORTION.

24  A.   MAY I READ IT INTO THE RECORD?

25  Q.   I'LL READ IT INTO THE RECORD IF YOU WOULD LIKE WHEN I GET

1  BACK TO THE PODIUM.

2  A.   LET'S DO THAT.

3  Q.   FIRST THE QUESTION:  "WAS YOUR BELIEF THAT HE DID NOT TAKE

4  ANY MEDICATIONS BEFORE THE STORM OTHER THAN OVER-THE-COUNTER

5  MEDICATIONS, CORRECT?"

6  A.   NO, THAT'S NOT TRUE.  YOU SAID BEFORE THE STORM, THE -- HE

7  DID HAVE A HOME NEBULIZER UNIT, WHICH WAS PRESCRIBED BEFORE THE

8  STORM, THAT WAS LOST.

9  Q.   ANTIHISTAMINES, NOT ASTHMA MEDICATION.  THE NEBULIZER WAS

10  FOR ASTHMA, DOCTOR.  COME ON, HE DID NOT -- WE'RE ON BOGGY NASAL

11  TURBINATES.  HE DID NOT -- IT WAS YOUR BELIEF THAT HIS ALLERGIES,

12  HIS BOGGY NASAL TURBINATES DID NOT REQUIRE PRESCRIPTION

13  MEDICATION BEFORE AUGUST 29, 2005, ISN'T THAT RIGHT, AT THE TIME

14  YOU FORMULATED YOUR OPINION?

15  A.   I DON'T KNOW.  THE ANSWER I GAVE WAS RELEVANT TO THE TIME

16  THAT -- LET ME READ WHAT YOUR QUESTION IS.  (WITNESS REVIEWS THE

17  DOCUMENT.)  WELL, I ANSWERED, I SAID, IT'S NOT IMPOSSIBLE THAT HE

18  COULD HAVE TAKEN ANTIHISTAMINES AT THAT TIME.  I MEAN, THAT'S A

19  VERY COMMON SOURCE OF MEDICATION OVER THE COUNTER THAT MOTHERS

20  RELY ON.

21  Q.   THAT'S RIGHT, OVER-THE-COUNTER MEDICATION, THAT'S MY

22  QUESTION.  OTHER THAN OVER-THE-COUNTER MEDICATION, HIS BOGGY

23  NASAL TURBINATES DID NOT REQUIRE ANTIHISTAMINES BEFORE

24  HURRICANE KATRINA; ISN'T THAT WHAT YOUR OPINION WAS BASED ON?

25  A.   SIR, COULD YOU REPEAT THE QUESTION?  I MEAN, SERIOUSLY, IF

1  YOU WOULD.  I'LL TRY TO ANSWER IT AS BEST I CAN.

2  Q.   HIS BOGGY NASAL TURBINATES DID NOT, BEFORE

3  HURRICANE KATRINA, WERE NOT OF A DEGREE THAT REQUIRED

4  PRESCRIPTION MEDICATION?

5  A.   THAT'S CORRECT.

6  Q.   AND YOU BASED ON -- THAT IS IN PART YOUR ASSUMPTION AND

7  THAT, THEREFORE, THEY WERE WORSE LATER, CORRECT?

8  A.   I HAVE NO OPINION ON WHAT THE CONDITION OF THE BOGGY NASAL

9  TURBINATES WAS BEFORE THE STORM COMPARED TO AFTER THE STORM.

10  Q.   YOU WOULD AGREE WITH ME THAT HE HAD A PRESCRIPTION FOR

11  ANTIHISTAMINES IN JUNE OF 2005, EARLY JUNE, TWO AND A HALF MONTHS

12  BEFORE KATRINA, CORRECT?

13  A.   PRESCRIPTION MEDICATION?

14  Q.   PRESCRIPTION MEDICATION.

15  A.   I DON'T KNOW.  I DON'T HAVE THAT IN MY RECORD.

16  Q.   BUT YOU SAID BEFORE FORMULATING YOUR OPINION, YOU DID REVIEW

17  THE WALGREENS RECORDS, RIGHT?

18  A.   ONLY TO SOME EXTENT.  THEY WERE QUITE VOLUMINOUS AND VERY

19  DIFFICULT TO INTERPRET.

20  Q.   ESSENTIALLY, DOCTOR, YOU WERE NOT CHARGED WITH FINDING OUT

21  WHAT HAD HAPPENED TO CHRIS COOPER.  YOU WERE CHARGED WITH FINDING

22  OUT IF THE FORMALDEHYDE HAD DONE SOMETHING TO CHRIS COOPER; ISN'T

23  THAT RIGHT?

24  A.   BOTH, BOTH ASSIGNMENTS WERE GIVEN TO ME.

25  Q.   AND YOU TOLD US YOU WERE GIVEN AN EXPOSURE, AN EXPOSURE

1   ASSESSMENT, CORRECT?

2   A.   I CALCULATED AN EXPOSURE, YES.

3   Q.   I DON'T WANT TO KNOW ABOUT YOUR CALCULATIONS, WHAT I WANT TO

4   KNOW ABOUT IS THIS:  IS IT INAPPROPRIATE TO ASSUME AN EXPOSURE

5   CAUSED A CONDITION AND THEN EVALUATE AN OVERALL CASE?

6   A.   OF COURSE.

7   Q.   IS IT INAPPROPRIATE TO RELATE A PROBABLE CAUSE TO A PROBABLE

8   EFFECT AND THEN CORRELATING AND PROMOTING THIS NOTION AS FORMING

9   A MEDICALLY PROBABLE CAUSE AND EFFECT RELATIONSHIP?

10  A.   THAT WOULD BE INCORRECT.

11  Q.   THAT STATEMENT WOULD BE INCORRECT?

12  A.   NO.

13  Q.   THAT PRACTICE WOULD BE INCORRECT?

14  A.   I'M AGREEING WITH YOU.

15  Q.   OF COURSE THAT PRACTICE WOULD BE INCORRECT.  THAT'S EXACTLY

16  WHAT YOU DID, THOUGH, ISN'T IT?

17  A.   ABSOLUTELY NOT.

18  Q.   AND, IN FACT, TO TAKE THIS THING SUCH AS FORMALDEHYDE

19  EXPOSURE AND PROMOTE IT WOULD BE INAPPROPRIATE OVER OTHER CAUSES,

20  FOR EXAMPLE, SUBOPTIMALLY-TREATED ASTHMA?

21  A.   NO, IT'S A CONCLUSION THAT A PHYSICIAN REACHES.  IT'S LIKE

22  LOOKING AT AN INFECTIOUS DISEASE.  WHEN YOU HAVE TWO OR THREE

23  DIFFERENT CAUSES, YOU TRY TO MAKE A DETERMINATION OF WHAT THE

24  MOST PROBABLE CAUSE IS.  IT'S NOT AN ABSOLUTE OR CERTAINTY.  IT'S

25  BASED ON A REASONABLE MEDICAL PROBABILITY, AND THEN YOU MAKE A

1   DECISION OF WHICH ANTIBIOTIC TO USE.

2   Q.   THEN YOU ALSO WOULD SAY THAT SOMETIMES A CAUSALITY ANALYSIS

3   IS SO DEFICIENT THAT A PROBABLE CAUSE AND A PROBABLE EFFECT ARE

4   CORRELATED, I'M SORRY, A POSSIBLE -- SORRY, START AGAIN.

5             SOMETIMES A CAUSALITY ANALYSIS IS SO DEFICIENT THAT A

6   POSSIBLE CAUSE LIKE FORMALDEHYDE AND A POSSIBLE EFFECT LIKE

7   INCREASED ASTHMA ARE CORRELATED IN A PROBABLE MANNER.

8   A.   THAT'S RIGHT.   THAT'S FROM MY BOOK.   THAT'S CORRECT.   THAT

9   WAS PART OF THE INSTRUCTIONS THAT I GAVE TO OTHER PHYSICIANS.

10   THAT'S RIGHT.

11   Q.   AND THIS IS EXACTLY WHAT YOU DID, WHEN YOU TOOK THIS

12   THEORETICAL POSSIBILITY OF FORMALDEHYDE EXPOSURE AND A

13   THEORETICAL POSSIBILITY THAT CAN AGGRAVATE ASTHMA, AND YOU TURN

14   THIS INTO YOUR PROBABLE OPINION REJECTING ALL OTHERS, INCLUDING

15   SUBOPTIMALLY-TREATED ASTHMA.

16   A.   THAT IS 100 PERCENT INCORRECT.

17   Q.   AND YOU WOULD AGREE THAT IF YOU DID THAT, IF SOMEBODY FOUND

18   YOU HAD DONE THAT, THAT THIS UNFORTUNATE ERROR IS THE ENEMY OF

19   REASON AND SHOULD NOT BE TOLERATED IN MEDICINE, CORRECT?

20   A.   THAT'S WHAT I SAID, YES.   BUT THAT'S NOT WHAT I DID.

21   Q.   LET'S TURN TO ECZEMA, IF WE CAN.

22             YOU KNOW OF NO STUDIES OR YOU DID -- LET ME START

23   AGAIN.

24             ON MAY 19TH, 2009, WHEN YOU ISSUED YOUR OPINIONS IN

25   THIS CASE, YOU KNEW OF NO STUDIES THAT ASSOCIATED AIRBORNE

1  FORMALDEHYDE TO ECZEMA, CORRECT?

2  A.   I THINK THAT'S WHAT I TESTIFIED TO, YES.

3  Q.   THE STACK IS GETTING SMALL.

4         DOCTOR, IS THERE FOUR TO FIVE PARTS PER BILLION OF

5  FORMALDEHYDE IN HUMAN BREATH?

6  A.   YES.

7  Q.   I WANT TO GO OVER YOUR CALCULATION THAT YOU DID WHEN YOU

8  TOLD THIS JURY CHRIS COOPER HAD A 17 TIMES MORE LIKELY CHANCE OF

9  GETTING CANCER THAN SOMEBODY ELSE.  ESSENTIALLY, WHAT YOU DO OR

10 WHAT YOU DID IS YOU TOOK, YOU CALCULATED, WELL, YOU TOOK THE DOSE

11 YOU WERE GIVEN, 50 PARTS PER BILLION; YES?

12 A.   YES.

13 Q.   AND YOU MULTIPLIED THAT BY 1.55 YEARS THAT HE WAS IN THE

14 TRAILER?

15 A.   1.58 YEARS, YES.

16 Q.   1.58, AND YOU CAME UP WITH 79 PARTS PER BILLION YEARS?

17 A.   THAT'S RIGHT.

18 Q.   IF WE DID THE SAME CALCULATION AT 8 PARTS PER BILLION FOR A

19 LIFETIME, SINCE WE HAVE BEEN HEARING THAT 8 PARTS PER BILLION IS

20 A GOLD STANDARD, ANYTHING AT THAT LEVEL OR BELOW WOULDN'T HURT A

21 FLY, WE WOULD ACTUALLY GET 560 PARTS PER BILLION YEARS?

22 A.   THAT'S CORRECT.

23 Q.   WHICH IS SEVEN TIMES HIGHER THAN THE EXPOSURE CHRIS COOPER

24 GOT, CORRECT?

25 A.   RIGHT.  BUT THAT WASN'T HIS EXPOSURE OVER 70 YEARS.  YOU

1  COULD MULTIPLY BY A HUNDRED YEARS IF YOU WANT.

2  Q.   WELL, LET'S JUST TAKE THE AVERAGE PERSON MAYBE LIVES

3  70 YEARS, AT LEAST LET'S HOPE.

4        SOMEONE EXPOSED AT EIGHT POINT -- YOU SAID CHRIS COOPER

5  WAS 17 TIMES MORE LIKELY TO GET CANCER.  SOMEBODY EXPOSED AT THE

6  8 PARTS PER BILLION LEVEL WOULD BE 120 TIMES MORE LIKELY,

7  CORRECT?  BASED ON YOUR MATH?

8  A.   WHAT RATIO ARE YOU TAKING HERE, IF I MAY ASK?

9  Q.   RATIO?

10 A.   THE 120.

11 Q.   I'M SORRY, THE 120 IS 560 PARTS PER BILLION YEARS DIVIDED BY

12 4.65 FACTOR YOU TOOK OFF THE EPA TABLES.

13 A.   RIGHT.  BUT THAT WASN'T HIS EXPOSURE.  YOU CAN PICK ANY

14 NUMBER YOU WANT.

15 Q.   WE'RE JUST COMPARING HIM TO OTHER PEOPLE.

16        NOW, HUMAN BREATH, I WENT CONSERVATIVE LOW, HUMAN

17 BREATH, 4 PARTS PER BILLION.  WE ALL BREATHE IN AN AREA.  I MEAN,

18 WE REINHALE OUR OWN BREATH, SO WE REINHALE THE FORMALDEHYDE WE

19 EXHALE.  ACCEPT THAT AS A HYPOTHET.  AT A 70-YEAR LIFETIME, THAT

20 WOULD BE 280 PARTS PER BILLION YEARS, CORRECT?

21 A.   THAT'S NOT WHAT HAPPENS, BUT THE MATH IS CORRECT.

22 Q.   THE MATH IS BECAUSE THAT'S ALL I'M ASKING.  THE MATH IS

23 CORRECT, WHICH IS THREE AND A HALF TIMES HIGHER THAN

24 CHRIS COOPER'S YEAR AND A HALF IN THE TRAILER.  IT'S A LIFETIME

25 EXPOSURE OF BREATHING IN AND BREATHING OUT FORMALDEHYDE.

1    A.   YOUR BREATH DOESN'T FILL UP A TRAILER.  IT DOESN'T -- AND IT

2    JUST DOESN'T FILL UP A TRAILER.

3    Q.   AND AT THAT LEVEL, SOMEONE EXPOSED TO THEIR OWN BREATH IS 60

4    TIMES MORE LIKELY THAN CHRIS COOPER TO GET, I'M SORRY, 60 TIMES

5    MORE LIKELY TO GET CANCER THAN YOUR BACKGROUND LEVEL YOU WERE

6    USING, CORRECT?

7    A.   YOUR MATH IS CORRECT.

8    Q.   THANK YOU.  ONE MORE BECAUSE, THE JURY, I THINK THEY WERE

9    PROMISED THERE WOULD BE NO MATH.

10            JUST THE LOWEST LEVEL WE'VE HEARD ABOUT NORMAL

11   BACKGROUND EXPOSURE TO FORMALDEHYDE IN THE INDUSTRIAL AREA IN A

12   MODERN CITY WITH SOME INDUSTRY, LIKE NEW ORLEANS, JUST THE

13   REGULAR AIR OUTSIDE, 10 PARTS PER BILLION, I'M HOPING TO LIVE TO

14   70, THAT'S 700 PARTS PER BILLION YEARS, CORRECT?

15   A.   THAT'S RIGHT.

16   Q.   THAT'S NINE TIMES HIGHER THAN CHRIS COOPER'S EXPOSURE TO

17   FORMALDEHYDE, CORRECT?

18   A.   THAT'S -- THE MATH IS RIGHT.

19   Q.   AND IT'S REAL CLOSE, JUST UNDER, ABOUT, I WAS DOING IT ON

20   THE FLY, ABOUT 15 TIMES MORE, I'M SORRY, IT IS 150, JUST ABOUT

21   150 TIMES MORE LIKELY THAN YOUR BASELINE, YOUR EPA TABLE SAYS,

22   CORRECT?

23   A.   JUST HELP ME OUT HERE.  WHAT ARE YOU REFERRING TO HERE?

24   PLEASE.

25   Q.   4.65 INTO 700?

1   A.   INTO WHAT?

2   Q.   700.  MY MATH IS RIGHT?  IT'S ABOUT 149?

3   A.   THAT'S CLOSE, YEAH.

4   Q.   IF WE COULD TOUCH ON A FEW MORE POINTS THAT MR. WATTS ASKED

5   YOU ABOUT.  YOU REFERRED TO THE ACGIH?  WHAT IS THE ACGIH?

6   A.   AMERICAN CONFERENCE OF GOVERNMENTAL INDUSTRIAL HYGIENISTS.

7   Q.   WHAT IS THE ACGIH RECOMMENDED LEVEL FOR FORMALDEHYDE

8   EXPOSURE?

9   A.   IT'S BASED ON THE TIME-WEIGHTED AVERAGE.  I'D HAVE TO LOOK,

10  BUT I THINK IT'S ON -- I WOULD NEED TO LOOK IT UP.  I'VE GOT IT

11  RIGHT HERE, IF YOU WANT ME TO LOOK AT IT.

12  Q.   DOES .3 RING A BELL?

13  A.   YES, BUT TO ANSWER YOUR QUESTION SPECIFICALLY, I WOULD

14  PREFER TO LOOK AT IT.  IF YOU WOULD GIVE ME ONE SECOND, PLEASE.

15  HERE IT IS.

16       I HAVE THE ACGIH 2009 NUMBERS HERE.  THAT IS A -- IT'S

17  A SHORT-TERM EXPOSURE LIMIT, 0.3 PARTS PER MILLION, WHICH IS 300

18  PPB, BUT THAT'S A TIME-WEIGHTED AVERAGE FOR PEOPLE WORKING IN THE

19  WORKPLACE.  THAT'S USUALLY DONE OVER A 15-MINUTE INTERVAL, AND

20  IT'S NOT TO BE EXCEEDED USUALLY ONCE EVERY THREE OR FOUR TIMES

21  PER DAY.  IT'S ON PAGE 88 OF THE 2009 MANUAL.  THAT'S -- I THINK

22  IT'S BASED ON SENSITIVITY AND NOT ON CANCER.

23  Q.   WHEN YOU LOOKED AT THE -- THOSE OBSERVATIONAL

24  CROSS-SECTIONAL STUDIES ON ASTHMA, YOU DID NOT LOOK AT THE ASTHMA

25  CHALLENGE STUDIES, DID YOU?  THE EXPERIMENTAL STUDIES?

1    A.    I THINK YOU WERE TALKING ABOUT FRIGAS (SPELLED

2    PHONETICALLY), WHICH YOU BROUGHT UP IN MY DEPOSITION.  I DIDN'T

3    SEE THAT UNTIL MY DEPOSITION, BUT THE CHALLENGE, THE EFFECT OF

4    THE CHALLENGE STUDY WAS DONE WHEN THE METHACHOLINE CHALLENGE WAS

5    DONE ON CHRIS COOPER.

6    Q.    DID YOU TAKE A METHACHOLINE CHALLENGE TO BE AN IRRITANT

7    EFFECT CHALLENGE?

8    A.    NO.  METHACHOLINE ITSELF IS NOT AN IRRITANT IN ITS OWN

9    RIGHT, NO.  BUT IT'S MADE TO SIMULATE THE NERVOUS SYSTEM RESPONSE

10   TO AN AGENT WHICH IS CAPABLE OF CAUSING A BRONCHOCONSTRICTION.

11   Q.    LET'S GO ON BACK TO MY PRIOR POINT.  YOU DID NOT CONSIDER OR

12   REVIEW THE ASTHMA CHALLENGE STUDIES, THE EPIDEMIOLOGICAL GOLD

13   STANDARD STUDIES BEFORE FORMULATING YOUR OPINIONS, DID YOU?

14   A.    WELL, THEY WEREN'T EXPERIMENTAL STUDIES, BUT THEY WERE

15   CHALLENGE STUDIES IN THE SENSE THAT THESE PEOPLE WERE CHALLENGED

16   BY THESE CONCENTRATIONS OF GASES -- I MEAN CONCENTRATIONS OF

17   FORMALDEHYDE THAT WERE IN THEIR ENVIRONMENT.

18         ONE IS THE, YOU KNOW, THE ER STUDY OF RUMCHEV OF PEOPLE

19   THAT ACTUALLY SHOWED UP IN THE EMERGENCY ROOM.  I'D HAVE TO LOOK

20   AND SEEN.  THEY WEREN'T --

21   Q.    ARE YOU SUGGESTING RUMCHEV IS AN EXPERIMENTAL CHALLENGE

22   STUDY?

23   A.    NO, YOU'RE CORRECT.  THEY ARE NOT, THEY ARE NOT CHALLENGE

24   STUDIES, WHERE A -- WHERE INDIVIDUALS ARE ACTUALLY SET UP IN A

25   CHAMBER AND CHALLENGED, THAT'S ABSOLUTELY CORRECT.

1    Q.    YOU DIDN'T CONSIDER ANY OF THOSE.  NOT WHEN YOU FORMULATED

2    YOUR OPINIONS, RIGHT?

3    A.    I WASN'T ABLE TO GIVE YOU ANY AT THAT PARTICULAR POINT IN

4    TIME, BUT...

5    Q.    YOU HADN'T CONSIDERED THEM AND YOU HADN'T REVIEWED THEM

6    BEFORE YOU ISSUED YOUR REPORT, RIGHT?  EPIDEMIOLOGICAL GOLD

7    STANDARDS.

8    A.    THAT ISN'T AN EPIDEMIOLOGICAL GOLD STANDARD.

9    Q.    THAT'S WHAT THE EPIDEMIOLOGIST SAID, GERALD MCGWIN.  ARE YOU

10   AN EPIDEMIOLOGIST, SIR?

11   A.    NO, NO, I'M NOT AN EPIDEMIOLOGIST.

12   Q.    DR. WILLIAMS SAID IT WAS A GOLD STANDARD, TOO.  SHE'S A

13   TOXICOLOGIST.  ARE YOU A TOXICOLOGIST, SIR?

14   A.    I AM A TOXICOLOGIST, YES.

15   Q.    ARE YOU BOARD CERTIFIED IN TOXICOLOGY?

16   A.    NO, BUT THAT'S -- THE MAJORITY OF MY TRAINING IS IN

17   ENVIRONMENTAL MEDICINE.

18   Q.    YOU DID, YOU DID AN ANALYSIS IN YOUR MEDICAL MONITORING

19   OPINION, AND ONE OF THE THINGS YOU SAID THAT COULD BE USED AS A

20   SCREENING TOOL IS AN X-RAY?  IS THAT RIGHT?

21   A.    IT'S NOT, IT'S NOT A SCREENING TOOL.  AS I MENTIONED --

22   Q.    WHAT DID YOU WANT TO USE IT FOR?

23   A.    IT WOULD BE USED FOR DIAGNOSTIC PURPOSES.

24   Q.    AN X-RAY IS -- USES IONIZING RADIATION, CORRECT?

25   A.    YES, IT DOES.

1  Q.   YOU WEREN'T HERE, BUT YOU WOULD AGREE WITH DR. DEROSA THAT

2  THERE IS A ZERO TOLERANCE, ZERO SAFE LEVEL FOR IONIZING

3  RADIATION, CORRECT?

4  A.   WELL, ACCORDING TO SOME THEORIES, THAT'S RIGHT.

5  Q.   BUT YOU WOULD AGREE, I'M NOT WORRIED ABOUT OTHER PEOPLE'S

6  THEORIES, YOU PERSONALLY WOULD AGREE THAT THAT'S THE WAY TO DO

7  IT, ZERO TOLERANCE, ZERO SAFE LEVEL, TO IONIZING RADIATION?

8  A.   WELL, THAT'S THE WAY YOU'RE TRAINED, YES.  THAT'S THE

9  PARADIGM THAT'S BROUGHT TO YOUR ATTENTION WHEN YOU'RE TRAINING,

10  YES.

11  Q.   DID YOU CALCULATE WHETHER THAT X-RAY WOULD CAUSE MORE HARM

12  TO CHRIS COOPER THAN FORMALDEHYDE?

13  A.   AT A GIVEN POINT IN TIME, AS I INDICATED EARLIER, THE

14  DECISION TO DO THIS WOULD BE A CLINICAL DECISION, AND AT THAT

15  POINT IN TIME, HE WOULD GET RADIATION, BUT IT WOULD BE CLINICALLY

16  INDICATED.  SO THERE IS NO COMPARISONS PER SE TO THE

17  FORMALDEHYDE.  THAT CALCULATION WAS NOT DONE.

18  Q.   THAT'S THE ANSWER TO MY QUESTION.  YOU DIDN'T DO THE

19  CALCULATION, BUT YOU WOULD AGREE, EVERY TIME I GET AN X-RAY, THEY

20  PUT ON A LEAD APRON AND RUN OUT OF THE ROOM.  IT'S THE SAME FOR

21  YOU, ISN'T IT?

22  A.   WELL, HOPEFULLY THEY ARE DOING IT FOR A REASON.

23  Q.   MAYBE THEY LOOK GOOD IN LEAD.

24  A.   YOU WANT TO MAKE SURE YOUR THYROID IS COVERED, TOO.

25  Q.   WITHOUT REDOING THE CALCULATIONS, WHEN YOU DID YOUR

1   CALCULATION, WHEN YOU DID THAT 17 TIMES MORE LIKELY,

2   CHRIS COOPER, THAT'S BASED ON A CHRONIC EXPOSURE 24 HOURS A DAY,

3   SEVEN DAYS A WEEK, RIGHT?

4   A.   THE EPA MODEL CONSERVATIVELY ESTIMATES 24 HOURS A DAY, SEVEN

5   DAYS A WEEK IN ORDER TO TAKE INTO ACCOUNT INDIVIDUALS WHO MAY BE

6   HOMEBOUND OR CHILDREN WHO MIGHT BE LIVING THERE FULL TIME.

7   Q.   BUT IT WAS YOUR UNDERSTANDING THAT CHRIS COOPER CERTAINLY

8   DID NOT LIVE IN THE TRAILER 24 HOURS A DAY, RIGHT?

9   A.   THAT'S ABSOLUTELY RIGHT, YES.

10  Q.   AND YOUR BODY HAS REPAIR MECHANISMS, CORRECT?

11  A.   IT DOES.

12  Q.   IF THERE IS SOME KIND OF TOXIN, FORMALDEHYDE OR SOMETHING

13  ELSE, YOUR BODY HAS A CHANCE TO REPAIR THAT, CORRECT?

14  A.   IT DEPENDS ON WHAT THE LESION IS, YES.

15  Q.   SPEAKING OF LESIONS, YOU SHARED WITH US YOUR THOUGHTS ABOUT

16  THE HOLMSTROM PAPER.  DID HOLMSTROM NOT FIND THE INJURY OCCURRED,

17  THERE WAS A LOW OR LOWEST OBSERVABLE ADVERSE HEALTH EFFECT AT

18  .24 PARTS PER MILLION?

19  A.   I WOULD BE VERY HAPPY TO LOOK AT THE HOLMSTROM PAPER.  CAN

20  YOU POINT OUT WHERE IN THE PAPER?

21  Q.   I COULD.  DO YOU RECALL THAT OR NOT?

22  A.   I REALLY NEED TO LOOK AT THE STUDY.  THERE ARE SO MANY.

23  Q.   WELL, DID YOU CONSIDER THAT FACT WHEN YOU RELIED ON IT IN

24  REACHING YOUR OPINION, WHAT THE DOSE LEVEL WAS IN HOLMSTROM?

25  A.   I NEED TO LOOK AT THE STUDY.  ARE YOU TALKING ABOUT THE 1989

1   STUDY?

2   Q.   WHICHEVER ONE YOU CITED.

3   A.   SIR, WHAT IS YOUR QUESTION, PLEASE?

4   Q.   WHAT IS THE AVERAGE LEVEL OF EXPOSURE WHERE THERE WAS THE

5   LOWEST OBSERVABLE ADVERSE HEALTH EFFECT AT .24 PARTS PER MILLION?

6   A.   THE HOLMSTROM STUDY I'M LOOKING AT INDICATED THAT THERE WAS

7   LOTS OF CILIATE IN RANGES FROM 40 TO 400 PARTS PER BILLION.

8   Q.   I'LL ASK IT AGAIN.  WAS THE AVERAGE LEVEL OF EXPOSURE WHERE

9   THERE WAS THE LOWEST OBSERVABLE ADVERSE HEALTH EFFECT .24 PARTS

10  PER MILLION?

11  A.   I CAN'T ANSWER YOU UNTIL YOU SHOW ME WHAT YOU'RE TALKING

12  ABOUT.

13  Q.   ARE YOU FAMILIAR WITH THE --

14  A.   I HAVE IT RIGHT IN FRONT OF ME.

15  Q.   ARE YOU FAMILIAR WITH ATSDR MRL'S?  DIDN'T YOU TALK ABOUT

16  THAT BEFORE?

17  A.   YES, THEY ARE BASED ON THE NO OBSERVABLE ADVERSE EFFECT

18  LEVELS IN THE --

19  Q.   IS THE 8 PARTS PER BILLION CHRONIC MRL BASED ON THE

20  HOLMSTROM PAPER?

21  A.   IT MIGHT BE.  I DIDN'T SEE THAT PARTICULAR DOCUMENTATION.

22  Q.   YOU MEAN YOU DON'T KNOW HOW IT WAS CALCULATED?

23  A.   THE ATSDR PAPER IS OVER A HUNDRED PAGES LONG, AND IT SITES

24  MANY, MANY STUDIES AND I WOULDN'T BE SURPRISED IF IT CITED

25  HOLMSTROM.

1       THE COURT:  SO THE QUESTION WAS, YOU DON'T KNOW HOW IT'S

2  CALCULATED, THE QUESTION WAS.

3       THE WITNESS:  I DON'T KNOW.

4       THE COURT:  YOU NEED TO RESPOND TO THAT.

5       THE WITNESS:  YES, SIR.

6       MR. WEINSTOCK:  IT'S ACTUALLY OVER 500 PAGES LONG.  MAY

7  I APPROACH, YOUR HONOR?

8       THE COURT:  YES.

9       MR. WEINSTOCK:  YOUR HONOR, IN THE INTEREST OF SPEEDING

10 THIS UP, I'LL GO BACK TO THE PAPER AND MOVE ON BECAUSE I CAN'T

11 FIND THE WORKSHEET.

12      THE WITNESS:  I HAVE THE HOLMSTROM STUDY HERE IF YOU

13 WANT TO LOOK AT IT.

14                          EXAMINATION

15 BY MR. WEINSTOCK:

16 Q.   WHAT IS THE AVERAGE LEVEL OF EXPOSURE?

17 A.   THE LEVEL THAT'S QUOTED IN THE STUDY IS BETWEEN 40 AND

18 400 PARTS PER BILLION.

19 Q.   BETWEEN 40 AND 400 PARTS PER MILLION, RIGHT?

20 A.   PARTS PER BILLION, YES.

21 Q.   WHAT WAS THE AVERAGE LEVEL OF EXPOSURE?

22 A.   I WOULD HAVE TO CALCULATE IT.  I DON'T KNOW.

23 Q.   WHAT WAS THE AVERAGE TERM OF EXPOSURE?  WAS IT NOT

24 7.3 YEARS?

25 A.   YES, BUT I BELIEVE THE RANGE THERE WAS BETWEEN ONE AND 39,

1  BUT I NEED TO LOOK THAT UP.  I THINK YOU'RE CORRECT.  I'D HAVE TO

2  LOOK.

3  Q.   YOU SAID PREVIOUSLY THAT ONE OF THE THINGS YOU WOULD

4  CONSIDER ON MEDICAL MONITORING IS PULMONARY FUNCTION STUDIES?

5  A.   EXCUSE ME.  THE RANGE WAS ONE TO 36 YEARS.

6  Q.   AND THE AVERAGE --

7  A.   AND THE AVERAGE WAS, IN DIFFERENT GROUPS, IT TENDS TO RANGE

8  TO ABOUT 6.3 YEARS AND 7.3 YEARS, SO THAT'S CORRECT.

9  Q.   I APOLOGIZE, YOU WERE READING AND I WAS ASKING.

10  A.   I'M SORRY.

11  Q.   NO, IT'S MY FAULT.  I SHOULD HAVE LET YOU FINISH.

12       IN MEDICAL MONITORING, YOU DISCUSSED THE POSSIBLE NEED

13  FOR PULMONARY FUNCTION TESTS, CORRECT?

14  A.   YES.

15  Q.   YOU'RE AWARE THAT HE'S HAD ASTHMA SINCE AT LEAST 2001,

16  CORRECT?

17  A.   YES.

18  Q.   AND UNTIL HE BECAME INVOLVED IN THIS LITIGATION, DR. BARNES,

19  HIS TREATING PHYSICIAN, HAD NEVER SEEN FIT TO SEND HIM FOR

20  PULMONARY FUNCTION TESTS, RIGHT?

21  A.   I BELIEVE THAT'S CORRECT.

22  Q.   AND THAT'S -- WHEN YOU SAY, IT WILL BE HANDLED BY THE DOCTOR

23  WHO'S ON SCENE, THAT'S DR. BARNES, RIGHT?

24  A.   I DON'T KNOW WHO IT'S GOING TO BE.

25  Q.   THAT'S WHO IT'S BEEN AT LEAST?

1   A.   THAT'S CORRECT.

2   Q.   AND SHE'S NEVER SENT HIM FOR ANY OF THOSE OTHER SCREENS YOU

3   TALKED ABOUT, HAS SHE?  SHE'S NEVER SEEN THE NEED TO.

4   A.   I'M NOT AWARE OF ANY, YES, THAT'S RIGHT.

5   Q.   ONE OF THE OTHER TOPICS YOU PUT DOWN IS MEDICATION HE WOULD

6   NEED IN THE FUTURE.  HE'S NEEDED THAT IN THE PAST, CORRECT?

7   A.   YES.

8   Q.   AND WE MAY NOT BE ABLE -- IF HYPOTHETICALLY HIS ISSUE IS

9   RELATED TO SUBOPTIMAL TREATMENT OF ASTHMA, WE MAY NOT BE WHERE WE

10  ARE RIGHT NOW HAD HE ACTUALLY TAKEN ALL OF THE MEDICATIONS IN THE

11  PAST, CORRECT?

12  A.   IT'S NOT KNOWN.

13  Q.   IT'S NOT KNOWN.  ALL RIGHT.  I KNOW IT'S ON THAT LIST.

14  EPITHELIAL DAMAGE, YOU NEED TO DO A BIOPSY, RIGHT?  CORRECT?

15  A.   WE DIDN'T NEED TO DO A BIOPSY.

16  Q.   VOCAL CORD DYSFUNCTION.  OH, THAT'S A GOOD ONE.  YOU DIDN'T

17  LOOK AT THE FLOW LOOPS, DID YOU?

18  A.   I DID NOT SEE THEM, THAT'S RIGHT.

19  Q.   YOU UNDERSTAND HIS FLOW LOOPS, ACCORDING TO DR. PACHECO,

20  WERE NORMAL AND DID NOT SHOW INDICATION OF VOCAL CORD

21  DYSFUNCTION, CORRECT?

22  A.   I BELIEVE IT WAS SEEN ON OBSERVATION AFTER, AT THE TIME OF

23  THE LARYNGOSCOPY, THAT'S RIGHT.

24  Q.   THE QUESTION IS, YOU DID NOT LOOK AT THE FLOW LOOPS, WHICH

25  SHOWED THAT IN TERMS OF VOCAL CORD DYSFUNCTION, HE WAS NORMAL,

1    DID YOU?

2    A.   THAT'S TWO QUESTIONS.  THE ANSWER IS, I DID NOT LOOK AT THE

3    FLOW LOOPS, AND I DON'T KNOW WHETHER THEY WOULD HAVE DRAWN THAT

4    CONCLUSION UNTIL I LOOK AT THE RECORD.  I DID NOT LOOK AT THE

5    FLOW LOOPS.

6    Q.   NO, NO, YOU ANSWERED MY QUESTION -- YOU ANSWERED MY QUESTION

7    FAIRLY.  YOU DIDN'T LOOK AT THE FLOW LOOPS.

8    A.   DID NOT.

9    Q.   AND SO, THEREFORE, YOU COULD NOT CONSIDER WHEN DR. PACHECO

10   FOUND THAT THOSE LOOKED NORMAL VIS-À-VIS VOCAL CORD DYSFUNCTION,

11   CORRECT?

12   A.   I HAD TO RELY UPON HER, THAT'S RIGHT.

13   Q.   INCREASED RISK OF CANCER.  WE COVERED THAT.

14   A.   AS A MATTER OF PRACTICE, A FLOW LOOP IS NOT ABSOLUTELY

15   DIAGNOSTIC OF VOCAL CORD DYSFUNCTION.  IT'S MUCH BETTER IF YOU

16   SEE IT, WHICH IS WHAT SHE SAW.

17   Q.   RIGHT.  AND YOU NEVER ASKED TO SEE THE DVD?

18   A.   I DIDN'T ASK TO SEE THE DVD.

19   Q.   IN FACT, THAT'S REALLY NOT SOMETHING YOU WOULD DO ANYWAY.

20   THAT'S NOT YOUR THING, RIGHT?  YOU'RE NOT AN ASTHMA DOCTOR;

21   YOU'RE AN OCCUPATIONAL MEDICINE DOCTOR.

22   A.   I WOULD SIT THERE JUST LIKE I WOULD WITH THE RADIOLOGIST AND

23   I WOULD LOOK AT IT WITH THE SPECIALIST.

24   Q.   RIGHT.  AND RELY ON THAT?

25   A.   YES.

1            MR. WEINSTOCK:  THANK YOU, DOCTOR.

2            THE COURT:  THANK YOU.  MR. WEINSTOCK.

3            MR. SHERBURNE:  FLUOR HAS NO QUESTIONS, YOUR HONOR.

4            THE COURT:  REDIRECT?

5            MR. WATTS:  YES, SIR.

6                         REDIRECT EXAMINATION

7    BY MR. WATTS:

8    Q.    LET'S GO BACKWARDS.  DOCTOR, WOULD YOU AGREE THAT

9    DR. PACHECO COULD CONSIDER THE FLOW LOOPS?

10   A.    I DIDN'T HEAR YOUR QUESTION.

11   Q.    DR. PACHECO COULD CONSIDER THE FLOW LOOPS AND MAKE A

12   DIAGNOSIS BASED ON WHAT SHE SAW?

13   A.    YES.

14   Q.    AND DID SHE DIAGNOSE VOCAL CORD DYSFUNCTION?

15   A.    YES, SIR.

16   Q.    WITH RESPECT TO THE HOLMSTROM PAPER, THE WAY THEY WROTE THE

17   LOSS OF CILIATED COLUMNAR EPITHELIUM SHOULD PERHAPS EXPLAIN

18   DIFFERENT DISCOMFORT SYMPTOMS REPORTED BY FORMALDEHYDE-EXPOSED

19   WORKERS SUCH AS INCREASED SECRETION AND FORMULATION OF CRUSTS AND

20   NASAL BLOCKAGE.  WERE SOME OF THOSE WORKERS EXPOSED FOR A YEAR?

21   A.    THAT'S RIGHT.

22   Q.    WERE SOME OF THOSE WORKERS EXPOSED AT LEVELS AS LOW AS

23   40 PARTS PER BILLION?

24   A.    YES.

25   Q.    ANDY'S MATH PROBLEMS, DO YOU HAVE THOSE?

1  A.    SURE.

2  Q.    DO YOU REMEMBER THE MULTIPLES OF RISK IF YOU BREATHE YOUR

3  OWN AIR IN INDUSTRIAL CITIES AND 20 PARTS PER BILLION PARTS IN

4  OTHER HOMES, THIS KIND OF THING?  YOU SAID YOUR MATH IS CORRECT

5  BUT THAT'S NOT WHAT HAPPENED.  DO YOU REMEMBER THAT?

6  A.    YES.

7  Q.    LET ME JUST ASK YOU A COUPLE OF THESE.  THE HUMAN BREATH,

8  DOES HUMAN BREATH, DO WE BREATHE BACK IN?

9  A.    SOMETIMES.

10  Q.    I'M GLAD I BROUGHT UP APOLLO 10 AND 11.  THE ONLY ONE I

11  THINK ANY OF US REMEMBER OTHER THAN THE LANDING ON THE MOON IS

12  APOLLO 13, THANKS TO TOM HANKS.

13          IF YOU'RE IN A CONFINED SPACE AND YOU CONTINUE TO

14  BREATHE YOUR BREATH, WHAT HAPPENS TO YOU?

15  A.    YOU EXHALE LARGE AMOUNTS OF CARBON DIOXIDE AS A GENERAL RULE

16  AND EVENTUALLY YOU DEVELOP SLEEPINESS AND ULTIMATELY

17  UNCONCIOUSNESS.  SO IF YOU RUN OUT OF OXYGEN, ACTUALLY, IF THE

18  OXYGEN LEVEL DROPS BELOW 18 PERCENT, YOU CAN START TO HAVE

19  PROBLEMS.

20  Q.    SURE.  I MEAN, THAT'S WHAT MAKES THE MOVIE SO GOOD IS THEY

21  HAD TO FIGURE OUT A WAY TO RELEASE THE HUMAN BREATH TO KEEP

22  PEOPLE FROM GETTING KILLED BY IT, RIGHT?

23  A.    RIGHT.  AND ALSO IN THE SPACE MISSIONS, THEY FOUND THAT

24  FORMALDEHYDE WAS SOMETIMES RELEASED FROM ELECTRICAL EQUIPMENT

25  INSIDE THE CABIN.

1  Q.   SO THE HUMAN BREATH, I MEAN, IT'S THREE AND A HALF TIMES

2  HIGHER IF YOU BREATHE YOUR OWN BREATH, THAT'S ONLY A RISK THAT

3  EXISTS IF YOU'RE CONFINED AND IT NEVER GOES ANYWHERE.

4  A.   THE MATH IS RIGHT.  BUT THE EXAMPLE IS NOT SCIENTIFICALLY

5  ACCURATE.

6  Q.   ANDY TOOK SOME READINGS FROM SOME HOUSES OR SOMETHING ABOUT

7  10 PARTS PARTS PER BILLION.  DO HOUSES HAVE MECHANICAL

8  VENTILATION TO FORCE BREATHED AIR OUT?

9  A.   YES.  MOST OF THEM DO.

10  Q.   HE TALKED ABOUT INDUSTRIAL CITIES FROM BACK IN 1985, YOU

11  TALKED ABOUT BEIJING AND MEXICO CITY.  IS THE AIR QUALITY IN

12  NEW ORLEANS LIKE BEIJING AND MEXICO CITY?

13  A.   NO.

14  Q.   ANDY ASKED YOU ABOUT, YOU TOOK --

15  A.   THE HUMIDITY IS HIGHER HERE, THOUGH, I MUST SAY, COMPARED TO

16  COLORADO.

17  Q.   BY THE WAY, WHILE WE'RE DOING THOSE CALCULATIONS, IF THE

18  AVERAGE EXPOSURE WAS .5 PARTS PER MILLION, HYPOTHETICALLY, THAT

19  WOULD BE 500 PARTS PER BILLION?

20  A.   THAT'S RIGHT.

21  Q.   AND IF YOU MULTIPLY THAT BY 1.58 YOU GET 790 PARTS PER

22  BILLION YEARS?

23  A.   THAT'S RIGHT.

24  Q.   AND THAT WOULD BE OVER 5,000 TIMES GREATER THAN THE EPA BASE

25  LEVEL?

1      MR. WEINSTOCK:  OBJECTION, YOUR HONOR, THIS ASSUMES

2  FACTS NOT IN EVIDENCE.  IT'S .5 --

3      MR. WATTS:  NO, I'M ASKING ABOUT .5 AS A HYPOTHETICAL.

4      THE COURT:  I'M GOING TO OVERRULE.

5                           EXAMINATION

6  BY MR. WATTS:

7  Q.   IF THE AVERAGE EXPOSURE WAS .5, TO USE A HYPOTHETICAL, I'M

8  NOT SAYING IT'S TRUE, YOU GO 500 PARTS PER BILLION TIMES 1.58 AND

9  YOU GET 790 PARTS PER BILLION YEARS, RIGHT?

10  A.   I THINK THAT MATH IS CORRECT.

11  Q.   AND USING THAT HYPOTHETICAL SITUATION AND NOT SAYING IT'S

12  TRUE, IF YOU DIVIDE THAT NUMBER BY THE EPA LEVEL OF .155 PARTS

13  PER BILLION, THE DIFFERENCE IN RISK WOULD BE 5,097 TIMES THE EPA

14  BASE LEVEL; IS THAT RIGHT?

15  A.   RIGHT.  YOU HAVE TO MULTIPLY, IT WOULD BE CORRECT, YES.

16  Q.   NOW, ANDY ASKED YOU ABOUT THEORETICAL POSSIBILITIES AS

17  OPPOSED TO THIS OR THAT.  LET ME JUST ASK YOU, KRZYZANOWSKI, HE

18  SHOWED YOU A TABLE WITH RESPECT TO CIGARETTE SMOKE?

19  A.   YES.

20  Q.   JUST SO THAT WE'RE CLEAR, THERE'S NO EVIDENCE OF ANY

21  CIGARETTE SMOKE IN THIS TRAVEL TRAILER, EVEN ONE DAY?

22  A.   THAT'S RIGHT.

23  Q.   NUMBER 2, KRZYZANOWSKI WRITES IN THE ABSTRACT, "IN CHILDREN

24  LEVELS OF PEFR DECREASED LINEARLY WITH HCHO EXPOSURE WITH THE

25  ESTIMATED DECREASE DUE TO 60 PARTS PER BILLION OF HCHO EQUIVALENT

1  TO 22 PERCENT OF PEFR LEVEL IN NONEXPOSED CHILDREN."

2           DID I READ THAT CORRECTLY?

3  A.   YOU DID.

4  Q.   ONE HUNDRED MINUS 22 PERCENT IS WHAT?

5  A.   78.

6  Q.   AND SO 78 PERCENT OF THE CAUSE OF THE CAUSE OF THE DECREASE

7  OF PEFR IS FROM WHAT?

8  A.   WELL, IT'S 60 PARTS PER BILLION CAUSED AN ENORMOUS DROP IN

9  THE PEAK EXPIRATORY FLOW RATE IN THE EXPOSED KIDS.  IT'S A 78

10 PERCENT DROP.

11 Q.   AND WHILE WE'RE ON THE SUBJECT OF KRZYZANOWSKI, DID

12 KRZYZANOWSKI WRITE, "THE DISEASES DIAGNOSED BY A DOCTOR, ASTHMA

13 AND CHRONIC BRONCHITIS, WERE MORE PREVALENT IN HOUSES WITH HIGHER

14 HCHO LEVELS"?

15 A.   YES.

16 Q.   AND DID KRZYZANOWSKI IN HIS ARTICLE, THE EFFECTS OF HCHO IN

17 ADULTS WERE MUCH SMALLER THAN IN CHILDREN.  WOULD YOU AGREE?

18 A.   YES.  YES, INDEED.

19 Q.   THE EFFECTS FOUND IN CHILDREN MAY BE OF GREATER CONCERN?

20 A.   YES.

21 Q.   DID KRZYZANOWSKI CONCLUDE THIS ARTICLE THAT INCLUDED THE

22 TABLE THAT ANDY'S REFERRED YOU TO, "THEREFORE, OUR DATA SUGGESTS

23 NON-NEGLIGIBLE," WHAT DOES NON-NEGLIGIBLE MEAN?

24 A.   IT'S MEANS MEANINGFUL.

25 Q.   "OUR DATA SUGGESTS NON-NEGLIGIBLE RESPIRATORY EFFECTS OF

1   PROLONGED EXPOSURE TO FORMALDEHYDE OF CONCENTRATIONS EVEN BELOW

2   60 PARTS PER BILLION IN CHILDREN."

3           IS THAT WHAT HE WROTE?

4   A.   THAT'S WHAT HE WROTE.

5   Q.   I'M TALKING ABOUT THEORETICAL POSSIBILITIES.  DOES THE

6   COMPILATION OF THE WORLD'S LITERATURE WITH RESPECT TO

7   FORMALDEHYDE AND CANCER LEAD TO THE CONCLUSION THAT THERE IS

8   SUFFICIENT EPIDEMIOLOGICAL EVIDENCE THAT FORMALDEHYDE CAUSES

9   NASAL PHARYNGEAL CANCER IN HUMANS?

10  A.   YES.

11  Q.   THIS THEORETICAL POSSIBILITY HAS BEEN STUDIED EXTENSIVELY.

12  A.   THAT'S TRUE.

13  Q.   COUNSEL ASKED YOU A LOT ABOUT THIS ALLEGED SUBOPTIMAL

14  TREATMENT.  ARE THERE REASONS TO TAKE KIDS OFF OF STEROIDS?

15  A.   YOU BET.

16  Q.   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT A

17  BLACK BOX WARNING IS?

18  A.   THIS S ACTUALLY DID COME UP IN THE HISTORY.  MS. ALEXANDER

19  INDICATED THAT HAVING READ THE WARNINGS ABOUT THE CHRONIC USE OF

20  STEROIDS IN CHILDREN, SHE ELECTED NOT TO USE THE STEROIDS, WHICH

21  WAS HER DECISION AS A MOM, AND THE REASON FOR THAT IS, THE

22  CHRONIC USE OF STEROIDS CAN LEAD TO ALL SORTS OF PROBLEMS,

23  ENDOCRINOLOGICAL ABNORMALITIES.  YOU CAN HAVE BONE NECROSIS,

24  ESPECIALLY ACETABULAR NECROSIS IN THE HIP, BLINDNESS, CATARACT

25  FORMATION.  IT'S -- IT JUST IS NOT A GOOD MEDICATION TO USE

1   CHRONICALLY UNLESS IT'S ABSOLUTELY INDICATED.

2   Q.   AND WHEN YOU USE A MEDICATION LIKE THAT CHRONICALLY, AND THE

3   MANUFACTURER OF THE MEDICATION PUTS SOMETHING IN A BLACK BOX

4   WARNING.

5   A.   YES.

6   Q.   IN THE FDA WARNINGS PROTOCOL, IS THERE ANY WARNING MORE

7   SEVERE THAN A BLACK BOX?

8   A.   NO, NO, THERE'S NOT.

9   Q.   FINALLY, ANDY ASKED YOU A LOT OF QUESTIONS ABOUT WHAT YOU

10  KNEW BEFORE THE STORM.  I KNOW YOU HAVE YOUR BS, BACHELOR OF

11  SCIENCE, FROM MIT, YOUR MASTER'S FROM MIT, YOUR PH.D. OR YOUR

12  DOCTORATE AT -- SC.D FROM HARVARD, AND YOUR MEDICAL DEGREE FROM

13  DARTMOUTH, BUT WITH ALL OF THE EDUCATION IN THE WORLD, CAN YOU

14  READ A MEDICAL RECORD THAT HAS BEEN DESTROYED BY A FLOOD?

15  A.   NO.

16          MR. WATTS:  THOSE ARE ALL OF MY QUESTIONS.

17          THE COURT:  YOU MAY STEP DOWN.

18          THE WITNESS:  THANK YOU.  IT WILL TAKE ME A SECOND.

19          THE COURT:  WHILE DR. KORNBERG IS GATHERING HIS

20  MATERIALS HERE, WHO DO WE HAVE NEXT?

21          MR. WATTS:  DR. THOMAS MAYOR.  IT'S GOING TO BE FIVE

22  MINUTES OR LESS.

23          THE COURT:  DR. THOMAS MAYOR.

24          MR. WEINSTOCK:  MAY WE APPROACH BEFORE HE COMES UP.

25          THE COURT:  YES.

1          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

2    A CONFERENCE HELD AT THE BENCH OUTSIDE THE PRESENCE OF THE COURT

3    REPORTER.)

4          THE COURT:  A LITTLE CHANGE OF PLANS.  WE'LL ASK DR.

5    MAYOR TO STEP DOWN.  BUT DON'T GO ANYWHERE.  WE'LL NEED YOU LATER

6    ON.  IN THE MEANTIME, WE'RE GOING TO CALL DR. BARNES; IS THAT

7    CORRECT?

8          MR. WATTS:  RIGHT.

9          THE COURT:  LET'S GET DR. BARNES ON THE WITNESS STAND.

10         MR. BUZBEE:  WE CALL DR. JANET BARNES.

11         THE COURT:  DR. BARNES, IF YOU WOULD COME UP HERE,

12   MA'AM.  PLEASE REMAIN STANDING WHEN YOU GET TO THIS CHAIR, TAKE

13   THE OATH.  THEN YOU MAY BE SEATED.

14         THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

15   HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

16   ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

17   THE TRUTH, SO HELP YOU GOD?

18         THE WITNESS:  I DO.

19                    **JANET DUNCAN BARNES, M.D.**

20   WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

21   CLERK, WAS EXAMINED AND TESTIFIED ON HER OATH AS FOLLOWS:

22         THE DEPUTY CLERK:  THANK YOU.  YOU MAY BE SEATED.  AND

23   PLEASE STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

24         THE WITNESS:  MY NAME IS JANET DUNCAN BARNES, M.D.

25   J-A-N-E-T, DUNCAN, D-U-N-C-A-N, BARNES, B-A-R-N-E-S.

1           MR. BUZBEE:  MAY I PROCEED, YOUR HONOR?

2           THE COURT:  GO AHEAD.

3           MR. WEINSTOCK:  YOUR HONOR, WE WOULD CERTAINLY STIPULATE

4   TO DR. BARNES'S EXPERTISE IN PEDIATRICS, I BELIEVE.

5           MR. BUZBEE:  PEDIATRICS, YOUR HONOR, AND THE TREATMENT

6   OF CHILDHOOD ASTHMA.

7           THE COURT:  IS THAT CORRECT, COUNSEL?

8           MR. WEINSTOCK:  SURE.

9           THE COURT:  THE COURT WILL GO AHEAD AND ACCEPT

10  DR. BARNES, THEN, AS AN EXPERT IN THE FIELD OF PEDIATRICS AND THE

11  TREATMENT OF CHILDHOOD ASTHMA.

12          GO AHEAD, COUNSEL.

13                        DIRECT EXAMINATION

14  BY MR. BUZBEE:

15  Q.   DR. BARNES, YOU'VE INTRODUCED YOURSELF.  COULD YOU GIVE THE

16  LADIES AND GENTLEMEN OF THE JURY JUST A BRIEF SUMMARY, BECAUSE WE

17  WANT TO GO TO LUNCH, OF YOUR EDUCATIONAL BACKGROUND?

18  A.   STARTING WHEN?

19  Q.   LET'S JUST START AFTER YOU GOT OUT OF HIGH SCHOOL WHAT YOU

20  DID THEN.

21  A.   OKAY.  I FINISHED HIGH SCHOOL --

22          THE COURT:  YES.  TURN THAT MICROPHONE THERE AND TRY TO

23  GET CLOSE ENOUGH TO IT SO WE ALL CAN HEAR YOU.

24                          EXAMINATION

25  BY MR. BUZBEE:

1    Q.    STARTING AFTER HIGH SCHOOL.

2    A.    OKAY.  AFTER HIGH SCHOOL, I FINISHED HIGH SCHOOL.  I

3    ATTENDED GRAMBLING STATE UNIVERSITY MAJORING IN CHEMISTRY.  I

4    FINISHED WITH SUMMA CUM LAUDE WITH AN AVERAGE OF 3.9.  I ATTENDED

5    LSU MEDICAL CENTER HERE IN NEW ORLEANS, FINISHED IN THREE AND A

6    HALF YEARS AND DID A RESIDENCY HERE WITH LSU PEDIATRICS, AND

7    ABOUT TEN YEARS AGO, I WENT BACK AND GOT AN MBA AT THE UNIVERSITY

8    OF NEW ORLEANS.

9    Q.    AND WHAT IS IT THAT YOU DO ON A DAILY BASIS, DR. BARNES?

10   A.    I SEE -- I TREAT CHILDREN.  CHILDHOOD ILLNESSES.

11   Q.    WHAT IS THE NAME OF YOUR PRACTICE?

12   A.    I'M IN PRACTICE WITH MY HUSBAND WHO IS AN INTERNIST.  IT'S

13   PRIMARY HEALTHCARE ASSOCIATES.

14   Q.    AND YOU'VE BEEN A PEDIATRICIAN FOR MORE THAN 26 YEARS; IS

15   THAT RIGHT?

16   A.    YES.

17   Q.    IN 26 YEARS, HOW MANY CHILDREN WITH ASTHMA HAVE YOU TREATED?

18   A.    I SEE ASTHMA EVERY DAY.  I SEE SOMEBODY WHEEZING EVERY DAY.

19   Q.    ARE YOU A MEMBER OF ANY PROFESSIONAL OR HONOR SOCIETIES?

20   A.    I'M A MEMBER OF THE NEW ORLEANS MEDICAL ASSOCIATION WHERE I

21   WAS PRESIDENT FOR THE LAST FIVE YEARS, ONE YEAR PRIOR TO KATRINA,

22   AND THEN I CONTINUED FOR THE NEXT FOUR TRYING TO BRING THE

23   ASSOCIATION BACK.

24   Q.    AFTER THE STORM?

25   A.    AFTER THE STORM, ALONG WITH OTHER NATIONAL ORGANIZATIONS AND

1    STATE ORGANIZATIONS.

2    Q.   I WANT TO -- LET ME SHOW YOU, JUST LOOK ON THE SCREEN THERE,

3    MA'AM, I'M GOING TO HAVE TO MARK THIS, AND I'LL DO THAT IN A

4    MINUTE, BUT IS THIS A TRUE AND CORRECT COPY OF YOUR RÉSUMÉ,

5    JANET DUNCAN BARNES, M.D., AND MBA?

6    A.   YES.  YES.

7          MR. BUZBEE:  YOUR HONOR, I'M GOING TO HAVE TO FIGURE OUT

8    WHAT NUMBER THAT IS.  I THOUGHT I HAD A MARKED COPY, BUT I'M

9    GOING TO OFFER THAT AT THE CONCLUSION, IF THERE IS NO OBJECTION.

10         MR. WEINSTOCK:  NO OBJECTION.

11                        EXAMINATION

12   BY MR. BUZBEE:

13   Q.   LET'S GET RIGHT DOWN TO IT.  WE'VE HEARD A LOT ABOUT ASTHMA

14   WITH CHRIS COOPER.  HE WAS YOUR PATIENT?

15   A.   YES.

16   Q.   STILL IS YOUR PATIENT.

17   A.   YES.

18   Q.   LET'S TALK GENERALLY ABOUT ASTHMA AND THE TREATMENT OF

19   ASTHMA IN A YOUNG CHILD.  COULD YOU TAKE US THROUGH GENERALLY HOW

20   YOU WOULD DIAGNOSE IT AND THEN HOW YOU WOULD RECOMMEND IT BE

21   TREATED?

22   A.   ASTHMA IS A COMMON CHILDHOOD DISORDER THAT THE -- WILL

23   CONTINUE ON INTO ADULT LIFE.  IT HAS ATTACKS, RESPIRATORY, ACUTE

24   RESPIRATORY ATTACKS, THAT CAN BE REVERSIBLE.  HOWEVER, THOSE --

25   THAT MAY REQUIRE MORE INTERVENTION.  THERE ARE ASTHMA NOW, IN THE

1  LATTER YEARS OF MY PRACTICE, BASICALLY HAVE BEEN CLASSIFIED

2  WITHIN A MILD INTERMITTENT TO SEVERE ASTHMA, SEVERE PERSISTENT

3  ASTHMA.

4       MOST OF THE CHILDREN THAT I TREAT ARE EITHER MILD

5  INTERMITTENT, MEANING THAT IT'S OCCASIONAL.  IT'S OCCASIONAL.

6  MAYBE SEASONAL, MAYBE ACCORDING TO EXERCISE OR IT MAY BE A MILD

7  PERSISTENT WHERE YOU WOULD, WHERE THEY WOULD BE ON NEBULIZERS,

8  STEROID INHALERS, OR STEROID INHALATION SOLUTION ALONG WITH

9  EMERGENCY MEDICINES LIKE ALBUTEROL, MEDICINES LIKE SINGULAIR.  SO

10 IT JUST DEPENDS ON THE AGE OF THE CHILD AS TO WHAT YOU RECOMMEND

11 TO THE MOTHER OR THE FATHER.

12 Q.   YOU TALKED ABOUT MILD PERSISTENT AND DID YOU SAY MODERATE,

13 IS THERE A MODERATE ASTHMA AS WELL?

14 A.   YEAH, THERE IS A MODERATE PERSISTENT, THERE IS A SEVERE

15 PERSISTENT.  MOST OF THE CHILDREN IT'S MILD INTERMITTENT.  YOU

16 SEE IT AROUND SEASONS OR YOU SEE IT -- YOU SEE IT IF THEY ARE

17 EXERCISING OR SOMETHING LIKE THAT.

18 Q.   TWO OF MY KIDS HAD -- WERE DIAGNOSED WITH ASTHMA, BUT IT

19 WENT AWAY.  IS THAT COMMON?

20 A.   IT'S COMMON IF THEY, IF THEY HAVE LESS SYMPTOMS, A LOT LESS

21 ATTACKS.  THEY BECOME VERY KNOWLEDGEABLE ALONG WITH PARENTS ON

22 WHAT WORKS FOR THEM AS AN INDIVIDUAL PATIENT.  AND SO, BUT IF YOU

23 PUT THEM IN THE RIGHT ENVIRONMENT, YOU CAN -- IT CAN PRECIPITATE

24 AGAIN.

25 Q.   SO I THINK WE'VE ALL HEARD THIS, WHAT ARE THEY CALLED,

1   CHILDHOOD ASTHMA THAT KIDS CAN -- AND I KNOW THIS IS PROBABLY

2   SIMPLIFYING IT -- BUT CAN GROW OUT OF?

3   A.   YES.

4   Q.   IS THAT A COMMON OCCURRENCE IN YOUR PRACTICE?

5   A.   THEY DON'T REALLY OUTGROW IT.  I BELIEVE THEY GET USED TO

6   THEIR ENVIRONMENT, AND THEY DON'T HAVE AS MANY ATTACKS UNLESS

7   SOMETHING COMES ABOUT AT A CERTAIN AGE THAT WILL PRECIPITATE THEM

8   WHEEZING AGAIN, THEY WILL WHEEZE.

9   Q.   SO YOU'RE SAYING THAT, IS IT -- SAY A CHILD THAT GETS

10  DIAGNOSED AS, LIKE, MY DAUGHTER, FOR INSTANCE, AS MINOR

11  INTERMITTENT ASTHMA WHEN SHE WAS TWO OR THREE.  SHE HASN'T HAD AN

12  ATTACK NOW, SHE'S 12, CAN YOU HELP ME UNDERSTAND WHAT THAT MEANS?

13  SHE STILL HAS IT WHEN SHE GETS TO BE 18 OR IT'S -- OR IF SHE'S

14  GROWN OUT OF IT?

15           MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

16           THE COURT:  WAIT ONE SECOND.  THERE IS AN OBJECTION.

17           MR. WEINSTOCK:  FACTS NOT ON EVIDENCE.  IT'S ALL

18  INTERESTING, BUT IT'S GOT NOTHING TO DO WITH THIS CASE.

19           MR. BUZBEE:  VERY INTERESTING TO ME.

20           THE COURT:  I APPRECIATE YOU USING YOUR OWN EXPERIENCE

21  AS AN ILLUSTRATION, BUT LET'S GO AHEAD AND JUST GET TO QUESTIONS

22  ABOUT THIS CASE.

23           MR. BUZBEE:  WE WILL.  WE WILL, YOUR HONOR.

24                          EXAMINATION

25  BY MR. BUZBEE:

1    Q.    OKAY.  LET'S TALK ABOUT SOME OF THESE BECAUSE WE'VE HEARD

2    SEVERAL TERMS AND MEDICATION.  I DON'T KNOW IF THEY ARE BRAND

3    NAMES OR IF THEY ARE GENERIC NAMES, BUT ALBUTEROL, WHAT IS THAT?

4    A.    ALBUTEROL IS A -- WHAT WE CALL A BETA-AGONIST.  IT'S A

5    STIMULANT.  IT BASICALLY WORKS ON BRONCHOSPASMS, IT WORKS ON

6    STOPPING -- OPENING UP AND STOPPING THE WHEEZING, OPENING UP THE

7    BRONCHIAL TREE, SO THAT THERE IS A BETTER AIR FLOW.

8    Q.    IS THAT THE UPSIDE DOWN PUFFER THAT WE SOMETIMES SEE?

9    A.    YES.

10   Q.    IS THAT A STEROID?

11   A.    WELL, IT CAN COME AS A SOLUTION, THAT YOU PUT IN A NEBULIZER

12   COMMONLY AS AN INHALER.

13   Q.    WHAT'S A NEBULIZER?

14   A.    THE NEBULIZER IS MORE A MACHINE THAT HAS A MASK HOOKED UP TO

15   IT.  IN PREVIOUS YEARS, IN THE EARLIER YEARS, WHEN ALBUTEROL

16   FIRST CAME OUT, YOU COULD ONLY GET IT IN THE HOSPITALS.  SO THE

17   PATIENTS WOULD HAVE TO GO TO THE EMERGENCY ROOM IN ORDER TO GET A

18   TREATMENT ON THE NEBULIZER.  EVENTUALLY THEY REALIZED, TO CUT

19   DOWN COSTS, THAT IT WOULD BE MORE COST EFFECTIVE IF THEY COULD

20   SUPPLY THESE MACHINES TO THE CHILDREN.

21         THE CHILDREN THAT USUALLY USE IT ARE YOUNG CHILDREN.  A

22   LOT OF MY PATIENTS STILL USE IT UNTIL THEY ARE EIGHT.  THEY

23   PREFER THE AEROSOL TREATMENTS --

24   Q.    SO --

25   A.    -- TO THOSE MACHINES.

1  Q.   -- ALBUTEROL CAN BE DELIVERED EITHER THROUGH THE PUFFER OR

2  THROUGH THE MASK --

3  A.   RIGHT.

4  Q.   -- NEBULIZERS?

5  A.   RIGHT.

6  Q.   WHAT IS SINGULAIR?

7  A.   SINGULAIR IS A LEUKOTRIENE RECEPTOR ANTAGONIST.

8  LEUKOTRIENES ARE, FOR A SIMPLE WORD, PROTEINS THAT ARE FOUND IN

9  THE BODY THAT WORK ON SMOOTH MUSCLES.  IN ASTHMA, YOU HAVE THREE

10 PROCESSES, YOU HAVE AN INFLAMMATION INSIDE THE BRONCHIAL TUBE.

11 ON THE OUTSIDE YOU HAVE THE SMOOTH MUSCLE WHICH CONTRACTS AND

12 CAUSES BRONCHORESTRICTION LIKE A CHOKING.  AND THEN BECAUSE OF

13 THE INFLAMMATION, YOU HAVE AN INCREASE OF MUCUS ON THE INSIDE.

14 SO THE LEUKOTRIENES WORK ON THAT MUSCLE.

15        SO IT'S LIKE, IT ALSO WORKS ON THE INFLAMMATION OF THE

16 MUCUS, BUT IT REALLY TARGETS THE SMOOTH MUSCLE THAT'S AROUND THE

17 BRONCHIAL TREE, SO WHEN THEY ARE HAVING AN ATTACK, THIS

18 LEUKOTRIENE SUBSTANCE GRABS AHOLD OF THE SMOOTH MUSCLES AND

19 TIGHTENS THE TUBE.

20        SINGULAIR IS AN ANTAGONIST TO THAT.  AND SO WHAT IT

21 DOES, IT MAKES THE SMOOTH MUSCLE RELAX.  SINCE SINGULAIR HAS COME

22 OUT, YOU HAVE SEEN SUCH A GREAT RESPONSE IN ASTHMA TREATMENT AND

23 IN PARENTS EVEN SAYING THIS CHANGED MY CHILD'S LIFE.  SINGULAIR.

24 IT IS NOT THE FIRST LINE OF CHOICE AS OF THIS DAY IN THE CHRONIC

25 ASTHMATIC OR SOMEONE WITH PERSISTENT ASTHMA.  YOU WOULD CONTINUE

1    THEM ON AN INHALED STEROID.

2            I'LL SAY THIS ABOUT INHALED STEROIDS:  WHEN I FIRST

3    STARTED PRACTICING, WE'RE TALKING ABOUT 26 YEARS AGO, STEROIDS

4    WERE NOT A PART OF THE TREATMENT OF CHILDREN.  WE DIDN'T USE

5    STEROIDS.  WE WERE AFRAID OF STEROIDS.  STEROIDS EVOLVED

6    RECENTLY, IN THE LAST, TEN, MAYBE, MAYBE 15 YEARS.

7            THERE WAS A RETEACHING, NOT ONLY TO THE PATIENTS BUT TO

8    THE PHYSICIANS, TO PEDIATRICIANS WHO WERE ALSO AFRAID TO USE THE

9    STEROIDS.  STEROIDS WERE MORE COMMONLY USED IN ADULTS.

10           THE COURT:  LET'S GO ON TO THE NEXT QUESTION.

11           MR. BUZBEE:  YES, SIR.

12                           EXAMINATION

13   BY MR. BUZBEE:

14   Q.   WHEN YOU SAY STEROIDS, WHAT KIND OF BRAND NAMES MIGHT WE

15   RECOGNIZE?

16   A.   PULMICORT, FLOVENT.

17   Q.   ADVAIR?  IS ADVAIR A STEROID?

18   A.   ADVAIR IS A COMBINATION DRUG.  IT HAS A STEROID AND A

19   LONG-ACTING ALBUTEROL IN IT.

20   Q.   SO THERE IS A STEROID TREATMENT, THERE IS, IT'S SINGULAIR,

21   IS THAT SOMETHING -- THAT'S SOMETHING DIFFERENT AND SEPARATE?

22   A.   YES.

23   Q.   AND THEN THERE IS THE ALBUTEROL THAT'S EITHER PUFFED OR YOU

24   NEBULIZE IT WITH A MASK?

25   A.   YES.  AND YOU CAN ALSO, YOU CAN ALSO NEBULIZE THE STEROID.

1  Q.   LET'S TALK ABOUT CHRISTOPHER COOPER.   HOW LONG OR WHEN DID

2  HE FIRST BECOME YOUR PATIENT?

3  A.   HE WAS ABOUT 3 YEARS OLD.

4  Q.   DO YOU RECALL WHEN HE WOULD HAVE BEEN DIAGNOSED WITH ASTHMA?

5  A.   WHEN HE CAME TO ME, HE HAD ASTHMA.

6  Q.   SO HE HAD ALREADY BEEN DIAGNOSED PRIOR TO SEEING YOU?

7  A.   YES.

8  Q.   DO YOU REMEMBER WHAT YEAR IT WAS WHEN HE FIRST SAW YOU?

9  A.   HE WAS THREE AND, I THINK HIS BIRTHDAY IS DECEMBER OF '96,

10  SOMEWHERE, SO HE HAS FROM DECEMBER '96 UNTIL DECEMBER 2006, SO

11  I'VE SEEN HIM SINCE HE WAS 3 YEARS OLD.

12  Q.   AND YOU CONTINUED TO TREAT HIM FROM AGE OF 3 ALL THE WAY UP

13  UNTIL NOW, AND HE'S 12?

14  A.   EXCEPT FOR THE PERIOD THAT IN BETWEEN -- AFTER KATRINA.

15  Q.   NOW, IN YOUR TREATMENT OF A CHILD, DO YOU -- IS IT PART OF

16  YOUR JOB OR PART OF YOUR ASSESSMENT -- A LITTLE UNCOMFORTABLE?

17  A.   YES.

18  Q.   PART OF YOUR ASSESSMENT IS TO EVALUATE THE MOTHER TO MAKE

19  SURE THAT SHE'S DOING WHAT SHE'S SUPPOSED TO DO?

20  A.   YES.

21  Q.   WHY DO YOU DO THAT?

22  A.   BECAUSE IT GIVES ME A FEEL ON, IT GIVES ME A FEEL ON WHAT I

23  NEED TO DO.   IF I SENSE A PARENT IS NOT COMPLIANT, I MAY NOT GIVE

24  AS MANY REFILLS BECAUSE THAT MEANS THAT THEY WOULD COME BACK IF

25  SOMETHING WOULD HAPPEN AND I WOULD GET A BETTER FEEL.

```
 1        IF I FEEL COMFORTABLE, I'LL GIVE, I'LL GIVE A PARENT
 2   REFILLS.  IF I FEEL COMFORTABLE WITH THAT PARENT AND I SEE THAT
 3   THAT PARENT IS A RELIABLE PARENT, I WILL GIVE MORE REFILLS.  AND
 4   IF I FEEL THAT THAT PARENT IS ALSO COMFORTABLE WITH WHAT THEY ARE
 5   DOING WITH THE CHILD, I'LL GIVE IT, THE PARENT REFILLS.
 6   Q.   WHEN YOU SAY REFILLS, REFILLS OF WHAT?
 7   A.   OF THE MEDICINES.
 8   Q.   WHATEVER YOU'VE PRESCRIBED TO THE CHILD?
 9   A.   AND I'LL ALSO GIVE THEM A NEBULIZER IF I THINK THEY
10   UNDERSTAND HOW TO USE IT.
11   Q.   NOW, DO YOU REMEMBER ALANA ALEXANDER?
12   A.   YES.
13   Q.   THE MOTHER OF CHRIS COOPER?
14   A.   YES.
15   Q.   NOW, YOU MENTIONED THIS WORD COMPLIANT.  I SAW THAT PHRASE
16   OR THAT WORD COMPLIANT IN SOME OF THE MEDICAL RECORDS.
17   A.   YES.
18   Q.   DO YOU RECALL WHETHER SHE WAS COMPLIANT?
19   A.   YES, SIR.
20   Q.   AND BY THAT YOU MEAN WHAT?
21   A.   I MEAN THAT SHE FOLLOWED DIRECTIONS AND SHE BROUGHT THEM
22   BACK WHEN I ASKED HER TO BRING THEM BACK.
23   Q.   DID YOU SEE ANY PROBLEM WITH HER AS A MOTHER NOT DOING WHAT
24   SHE WAS SUPPOSED TO DO?
25   A.   I DIDN'T FIND ANY PROBLEMS.
```

1   Q.   DID SHE SEEM CONCERNED ABOUT HER SON, COOP'S, CARE?

2   A.   YES, SHE DID.

3   Q.   NOW, WE GOT -- AND WE'VE HEARD THIS ALREADY, A MARKED

4   ABSENCE OF RECORDS IN CHRIS COOPER'S CASE, DON'T WE?

5   A.   YES.

6   Q.   WHY IS THAT?

7   A.   BECAUSE MY OFFICE WAS IN NEW ORLEANS EAST, AND MY OFFICE GOT

8   SIX FEET OF WATER, AND MY CHARTS ARE PAPER, AND BY THE TIME THEY

9   LET US BACK INTO NEW ORLEANS, THEY WERE MOLDED.  AND THEY HAD

10  FLOODED AND MOLDED, MILDEWED, DESTROYED.

11  Q.   THERE ARE SOME RECORDS, THOUGH, THAT EXIST?

12  A.   SOME THAT WERE VERY HIGH.

13  Q.   BUT NOT, I MEAN, THERE ARE SOME HOSPITAL RECORDS BUT AS FAR

14  AS YOUR PROGRESS NOTES AND A CERTAIN PERIOD, THEY ARE JUST LONG

15  GONE.

16  A.   THEY ARE GONE.

17  Q.   THERE WAS SOME COMMENT EARLIER ABOUT, YOU KNOW, THERE WAS A

18  DOCTOR HERE BEFORE THAT THEY WERE ASKING COULD HE REMEMBER 10,000

19  PATIENTS AND THAT SORT OF THING.  DO YOU SPECIFICALLY -- THAT'S

20  WHAT HE WAS ASKED.  DO YOU SPECIFICALLY REMEMBER CHRIS COOPER?

21  A.   YES.

22  Q.   YOU REMEMBER HIS CASE?

23  A.   YES.  I REMEMBER HIS MOTHER AND HIS SISTER.  AND CHRIS.

24  Q.   WAS SHE THE KIND OF MOTHER THAT WOULD SPEND TIME WITH YOU

25  AND ASK YOU QUESTIONS?

1   A.   YES.

2   Q.   YOU KNOW, SOME DOCTORS, WHEN YOU GO SEE THEM, THEY ARE ALL

3   BUSINESS, THEY COME IN, THEY HARDLY TALK TO YOU, THEY DON'T -- I

4   MEAN, SOMETIMES WON'T EVEN LOOK AT YOU.  AND THEY DO THEIR DEAL

5   AND LEAVE.  ARE YOU LIKE THAT?

6   A.   NO.

7        MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  THESE ARE ALL

8   LEADING AND CONVERSATIONAL.

9        THE COURT:  DO NOT LEAD HER, AND ASK YOUR QUESTIONS

10  ABOUT WHAT SHE KNOWS ABOUT THIS CASE.

11       MR. BUZBEE:  ALMOST THERE, YOUR HONOR.

12                        EXAMINATION

13  BY MR. BUZBEE:

14  Q.   YOU SPECIFICALLY HAD CONVERSATIONS WITH ALANA ALEXANDER

15  ABOUT HER SON, DIDN'T YOU?

16  A.   YES.

17  Q.   TAKE ME THROUGH AND LET'S JUST GO UP TO THE STORM, TAKE ME

18  THROUGH YOUR CARE AND TREATMENT OF CHRIS COOPER.

19  A.   CAN I USE MY --

20  Q.   ABSOLUTELY.

21  A.   -- PAPERS?

22       THE COURT:  SURE.

23       THE WITNESS:  I JUST REFERRED TO MY NARRATIVE REPORT.

24       MR. WEINSTOCK:  I'M SORRY, COULD I JUST --

25       THE WITNESS:  IT'S THE SAME ONE THAT'S IN ONE OF THE

1    EXHIBITS.

2           MR. WEINSTOCK:  IS THAT THE APRIL 24, 2009, NARRATIVE

3    REPORT?

4           THE COURT:  APRIL 24, 2009?

5           MR. BUZBEE:  YOU'RE GOING TO BE REFERRING FROM

6    EXHIBIT 2, THE APRIL 24TH, 2009, NARRATIVE; IS THAT TRUE NOW?

7           THE WITNESS:  IT'S THE ONE THAT I SUBMITTED THAT I WROTE

8    ON MAY 15, 2009, AND IT'S AN EXHIBIT, WAS EXHIBIT A ON JULY 10,

9    '09.

10          MR. BUZBEE:  MAY I APPROACH THE WITNESS?

11          THE COURT:  YES.

12          MR. BUZBEE:  SHE'S REFERRING TO HER MORE FORMALIZED

13   REPORT.

14          THE COURT:  TO BE CLEAR, WE'RE ASKING ABOUT TREATMENT

15   AND NOT ABOUT OPINIONS IN THAT REPORT; IS THAT CORRECT?

16          MR. BUZBEE:  THAT'S CORRECT.

17                              EXAMINATION

18   BY MR. BUZBEE:

19   Q.   DR. BARNES, IF YOU DON'T MIND, DO YOU HAVE YOUR ACTUAL

20   PROGRESS NOTES, NOT YOUR FORMAL REPORT FOR THE LITIGATION, BUT

21   YOUR PROGRESS NOTES FOR THIS PATIENT, CHRIS COOPER?  THE CHART,

22   IF YOU WILL, I GUESS YOU CALL IT.

23   A.   OKAY.

24   Q.   LET'S TALK ABOUT THE CARE AND TREATMENT OF CHRIS COOPER, SON

25   OF ALANA ALEXANDER.

1  A.    DID YOU WANT ME TO START?

2  Q.    YES, PLEASE.

3  A.    I INITIALLY SAW MASTER COOPER ON 10/4/07 AFTER THE STORM,

4  THAT'S THE FIRST TIME I HAD SEEN HIM AFTER THE STORM AND ACTUALLY

5  WAS HAPPY TO SEE THEM.  THE PATIENT HAD BEEN IN JACKSONVILLE,

6  FLORIDA, AND WAS ON CLARITIN, OVER-THE-COUNTER MED, FOR SINUS.

7  AND HE NEEDED A REFILL ON HIS ALBUTEROL INHALER.

8          ON PHYSICAL EXAM, I FOUND BOGGY NASAL TURBINATES, AND I

9  FOUND ECZEMA ON HIS RIGHT ARM.  SO HE WAS DIAGNOSED WITH

10  SINUSITIS, ATOPIC DERMATITIS, THE ASTHMA, AND HE WAS OVERWEIGHT

11  FOR HIS HEIGHT.

12          I PRESCRIBED SOME CLARINEX-D 12.  I GAVE HIM A REFILL.

13  SINGULAIR, 10 MILLIGRAMS EVERY DAY.  I GAVE HIM FIVE REFILLS.

14  FLOVENT INHALER, WHICH IS A STEROID INHALER, FOR NIGHTTIME.  I

15  GAVE HIM ONE REFILL.  AND I GAVE HIM STEROID OINTMENT TO APPLY

16  EVERY DAY, BUT I DIDN'T GIVE IT A REFILL.

17          I ALSO ORDERED LABS THAT I STARTED ORDERING ON PATIENTS

18  IF IT WAS AN INITIAL PATIENT OR A PATIENT THAT I HAD NOT SEEN

19  SINCE THE STORM, AND THEY WERE JUST ROUTINE LABS, JUST SO THAT WE

20  COULD HAVE THEM IN THEIR RECORDS, NOTHING FANCY.

21          AND I TOLD THE MOM TO RETURN IN TWO WEEKS AND SHE DID.

22  SO THAT WE COULD REVIEW HIS LABS.

23          I FOUND THAT HE HAD AN ELEVATED CHOLESTEROL.  HE ALSO

24  HAD A SUGGESTIVE HEMOGLOBIN C TRAIT, BUT IT'S NOT MUCH YOU DO

25  WITH TRAIT EXCEPT THAT THE FACT THAT I TOLD HER THAT I WAS MORE

1    CONCERNED WITH THE FACT THAT HE WAS OVERWEIGHT FOR HIS AGE, AND

2    AT THE SAME TIME HE WAS -- HE HAD AN ELEVATED CHOLESTEROL.

3              SO WE TALKED ABOUT SOME DIET COUNSELING, WE TALKED

4    ABOUT SOME EXERCISING, PARTICULARLY THAT EXERCISING OR WALKING

5    WOULD DECREASE IT A LOT MORE THAN EVEN THE DIET.

6              AND I TOLD HER THAT TO RETURN IN THREE MONTHS FOR

7    RECHECK OR IF SHE NEED TO.  SHE DIDN'T RETURN TO SEE ME UNTIL

8    APRIL 17, 2008.

9    Q.   LET ME STOP YOU THERE, DOCTOR, IF I CAN.  FLOVENT, YOU TOLD

10   US, WAS A STEROID?

11   A.   YES.

12   Q.   BEFORE THE STORM, HAD YOU PRESCRIBED A STEROID TO

13   CHRIS COOPER?

14   A.   YES, I HAD.

15   Q.   WHAT STEROID?

16   A.   PULMICORT.

17   Q.   WHAT'S IT CALLED?

18   A.   PULMICORT.

19   Q.   AND WHAT DID YOU -- DO YOU HAVE A RECORD OF THAT

20   PRESCRIPTION OR YOU JUST RECALL THAT?

21   A.   THE MOTHER AND I TALKED ABOUT WHAT.

22   Q.   SO YOU THOUGHT YOU DID AND YOU CONFIRMED IT BY TALKING --

23   A.   IT A STANDARD THAT I DO THAT.  IF THEY HAVE A NEBULIZER AT

24   HOME, THEY ARE GOING TO BE ON PULMICORT.  I LIKE THAT BRAND.

25   Q.   SO BEFORE THE STORM, YOU PRESCRIBED THIS PARTICULAR STEROID

1  TO CHRIS COOPER?

2  A.    YES, I DID.

3  Q.    AND WHAT HAD YOU ADVISED ALANA, HOW OFTEN HAD YOU ADVISED

4  HER TO GIVE HIM THAT STEROID?

5  A.    NIGHTLY.

6  Q.    NOW, DID SHE GIVE HIM THAT NIGHTLY?

7  A.    HE DID -- HE DID WELL UNLESS SOMETHING TRIGGERED IT.

8  Q.    SO YOU WOULD EXPECT THAT SHE DID, IN FACT, GIVE HIM THIS,

9  WHAT DID YOU CALL IT, PULMICORT?

10  A.    PULMICORT.

11  Q.    NIGHTLY PRIOR TO THE STORM?

12  A.    NIGHTLY.  YOU HAVE TO REALIZE THAT -- AM I TOO LOUD? --

13  NINE YEARS AGO, LIKE I SAID, STEROIDS WERE STILL EVOLVING AS TO

14  TREAT CHILDREN WITH STEROIDS AND EVEN EARLIER IN MY PRACTICE AND

15  FINALLY INCLUDED THAT AS PART OF THE PROTOCOL AND THE GUIDELINES

16  OR THE RECOMMENDED GUIDELINES.  THEY ARE NOT MANDATORY

17  GUIDELINES.  THEY ARE RECOMMENDED GUIDELINES.

18           AND SO YOU HAVE PARENTS, THESE ARE CHILDREN WHO HAVE

19  HEARD TERRIBLE THINGS ABOUT STEROIDS, SO IT'S NOT UNCOMMON FOR A

20  PARENT TO BE VERY UNCOMFORTABLE GIVING THEIR CHILD STEROIDS.

21  THEY HEAR SO MUCH ON THE NEWS ABOUT THE ATHLETES, AND SO THEY ASK

22  A LOT OF QUESTIONS ABOUT STEROIDS.  SO IT'S NOT UNCOMMON FOR THEM

23  TO GIVE IT FOR A WHILE AND THEN STOP IT BECAUSE THEY ARE AFRAID

24  OF STEROIDS.

25  Q.    OTHER THAN THIS PARTICULAR STEROID, WHAT OTHER THINGS OR

1    PRESCRIPTIONS HAD YOU GIVEN CHRIS COOPER BEFORE THE STORM?

2    A.    WHAT OTHER PRESCRIPTIONS?  I HAD GIVEN HIM ALBUTEROL.

3    Q.    THAT'S THE PUFFER AND THE NEBULIZER?

4    A.    HAND-HELD.  I GIVE THEM -- I GIVE THEM ALBUTEROL INHALATION

5    SOLUTION AND A PULMICORT INHALATION SOLUTION.  PULMICORT

6    INHALATION SOLUTION IS A MAINTENANCE, AND THE ALBUTEROL IS A

7    RESCUE.  SO WHEN YOU HAVE AN ATTACK, THAT'S WHEN YOU ADD THE

8    ALBUTEROL, BUT NOT ON A DAILY BASIS UNLESS THEY'RE HAVING AN

9    ATTACK.

10         I GIVE THE SINGULAIR AS A MAINTENANCE.  AND SO BETWEEN

11   SINGULAIR AND THE STEROIDS, THEY USUALLY DO VERY WELL.  AND

12   THAT'S WHAT I HAD DONE WITH MASTER CHRISTOPHER.

13         AND USUALLY -- AT THAT TIME, IT WAS RECOMMENDED TO

14   GIVE, LIKE, ONCE, ONCE A DAY.  WITHIN THE LAST -- MAYBE LAST

15   COUPLE OF YEARS, IT'S BEEN -- THE SPECIALISTS HERE HAVE

16   RECOMMENDED MAYBE TWICE A DAY, BUT SOMETIMES THEY SEND THEM BACK

17   TO ME ONCE A DAY.

18   Q.    AND I'M TRYING TO -- AND I THINK YOU SEE WHAT I'M TRYING TO

19   DO.  I'M TRYING TO FOCUS ON TWO DIFFERENT POINTS IN TIME, BEFORE

20   THE STORM, WHICH THE RECORDS ARE GONE, AND THEN THE TIME WHEN YOU

21   SAW HIM ON OCTOBER OF 2007, ONCE.

22   A.    YES.

23   Q.    SO BEFORE THE STORM, HE HAD SINGULAIR MAINTENANCE, THIS

24   STEROID FOR MAINTENANCE, AND THEN THE PUFFER TO KIND OF HEAD OFF

25   ATTACKS THAT WE KNOW THAT MAY BE COMING?

1  A.   NO.   HE HAD AN INHALATION SOLUTION AT HOME.   HE ALSO HAD AN

2  INHALER.   THE SCHOOL -- IF YOU HAVE AN ASTHMATIC, THE SCHOOLS

3  REQUIRE AN ALBUTEROL INHALER.   I HAD TO FILL OUT A MEDICATION

4  ORDER FORM FOR THAT CHILD.   THEY TAKE THAT TO SCHOOL.

5          THEN I ALSO GIVE THE PARENT AN EXTRA INHALER, SO THAT

6  IF THEY ARE OUT SHOPPING, SOMEWHERE NOT AT HOME.   THE MACHINE,

7  YOU JUST DON'T TAKE AROUND WITH YOU EVERYWHERE.   IT'S ELECTRIC.

8  IT'S ELECTRIC.   YOU HAVE TO PLUG IT UP.

9          RECENTLY, THEY'VE GOTTEN A PORTABLE ONE, BUT IT'S ABOUT

10 $400, SO THE PARENTS -- IT'S NOT COVERED ON MOST OF THE

11 INSURANCES, SO -- PARTICULARLY MEDICAID.   SO THE INHALER IS

12 SMALL.   THE PARENT CAN PUT IT IN THE POCKET -- IN THEIR PURSE.

13 SO THEY HAVE ONE IN THEIR PURSE, AND THEN THEY HAVE ONE AT

14 SCHOOL.   AND THEN AT HOME, THEY HAVE THE NEBULIZER.

15 Q.   NOW, YOUR INSTRUCTIONS AS TO WHEN TO USE THE PUFFER OR THE

16 NEBULIZER, WHEN ARE THEY -- THEY'RE SUPPOSED TO USE THAT ONCE

17 THEY START TO SEE AN ATTACK COMING ON?

18 A.   YOU USE THE ALBUTEROL INHALER OR THE ALBUTEROL INHALATION

19 SOLUTION IF THERE IS AN ATTACK COMING ON.   FOR MAINTENANCE

20 ROUTINE, YOU HAVE AN INHALED STEROID.

21 Q.   SO IN OCTOBER OF 2007, YOU SAW MRS. ALEXANDER -- OR

22 MS. ALEXANDER AND CHRIS COOPER.   DID SHE MENTION THAT SHE WAS

23 LIVING IN A FEMA TRAILER?

24 A.   NO.

25 Q.   DID THAT SUBJECT COME UP?

1  A.   NO.  EVERYBODY WAS LIVING IN A FEMA TRAILER.

2  Q.   AND THIS WASN'T SOMETHING SHE CAME TO YOU AND SAID, HEY,

3  HELP ME FIGURE OUT WHY CHRIS HAS ASTHMA; SHE JUST CAME TO YOU FOR

4  MORE MEDICATIONS?

5  A.   YES.

6  Q.   DID SHE TALK TO YOU ABOUT HER EXPERIENCE IN FLORIDA, THE

7  KIND OF TREATMENT SHE HAD GOTTEN IN FLORIDA?

8  A.   SHE BASICALLY SAID THAT SHE HAD BEEN IN FLORIDA, IN

9  JACKSONVILLE, FLORIDA, AND THAT SHE HAD AN INHALER.  SHE TOOK HER

10 INHALER THEN, BUT SHE HAD LOST THE REST OF HER MEDICINES.

11 Q.   DO YOU KNOW, WHEN SHE FINALLY CAME TO SEE YOU IN

12 OCTOBER '07 -- THE JURY HAS ALREADY HEARD THAT BY THAT POINT SHE

13 HAD BEEN IN THAT TRAILER FOR MORE THAN 15 MONTHS -- DO YOU KNOW

14 HOW MANY INHALERS SHE HAD DURING THAT TIME FRAME?

15 A.   INITIALLY, I DIDN'T.  I JUST ASSUMED SHE HAD THE ONES, MAYBE

16 ONE OR TWO THAT I HAD PRESCRIBED, AND WHAT THE DOCTOR HAD GIVEN

17 HER.  BUT SINCE THEN, I TALKED TO HER, AND SHE SAID SHE HAD ABOUT

18 FOUR.

19 Q.   NOW, FOUR -- THESE INHALERS HAVE 200 PUFFS EACH; IS THAT

20 RIGHT?

21 A.   YES.

22 Q.   DO YOU KNOW HOW OFTEN THAT INHALER -- OR AN INHALER LIKE

23 THAT WOULD HAVE BEEN USED PRESTORM?  OR HOW LONG ONE OF THOSE

24 INHALERS WOULD HAVE LASTED, I GUESS IS WHAT I'M --

25 A.   IT JUST DEPENDS ON HOW OFTEN THEY USE IT.  IT DEPENDS ON IF

1    YOU HAVE FLARE-UPS, YOU KNOW.  THEY CAN HAVE -- IT DEPENDS ON IF

2    YOU ARE HAVING ONE OR TWO FLARE-UPS A WEEK, IF YOU ARE HAVING

3    A -- IF YOU HAVE -- IF YOU WHEEZE ONCE THAT DAY, OR IF YOU'RE

4    WHEEZING ALL DAY AND YOU CAN'T STOP.  IT DEPENDS ON IF YOU HAD TO

5    GO TO THE EMERGENCY ROOM AND HAD TO GET EMERGENCY MEDICINES AND

6    WERE TOLD BY THE PHYSICIAN THAT YOU NEED TO BE ON IT EVERY DAY.

7            BUT IT'S NOT COMMON FOR -- IT'S NOT COMMON FOR A

8    PHYSICIAN TO TELL YOU TO USE THE ALBUTEROL EVERY DAY.  THERE ARE

9    SIDE EFFECTS WITH ALBUTEROL.  IT CAN CAUSE BRONCHOSPASM.  IT CAN

10   CAUSE YOU TO WHEEZE.

11           SO IT'S AN EMERGENCY MEDICINE.  IT TREATS, IT OPENS UP,

12   RELAXES.  BUT IF YOU USE IT TOO MUCH AND YOU OPEN UP TOO MUCH,

13   THEN YOU WOULD -- THE ADVERSE EFFECT WOULD BE YOU START WHEEZING

14   ALL OVER AGAIN.

15   Q.   SO YOU'VE COME TO LEARN THAT SHE HAD AT LEAST FOUR OF THOSE,

16   I CALL THEM *PUFFERS*, IN THAT 17 TO 19 MONTH PERIOD?

17   A.   YES.

18   Q.   AND SHE WAS COMING TO YOU A COUPLE OF MONTHS BEFORE -- WELL,

19   YOU KNOW NOW, BUT A COUPLE OF MONTHS BEFORE SHE MOVED OUT OF THE

20   TRAILER FOR ANOTHER PRESCRIPTION?

21   A.   YES.

22   Q.   AND YOU -- YOU PRESCRIBED FLOVENT.  HOW IS THAT DIFFERENT

23   FROM THE OTHER STEROID YOU WERE TALKING ABOUT?  OR IS IT THE

24   SAME?

25   A.   IT'S BASICALLY A DIFFERENT GENERIC, BUT IT'S THE SAME.

1  IT'S -- IT STILL SERVES AS AN INHALED STEROID.

2          THE DIFFERENCE IS, IS THAT BECAUSE HE WAS YOUNG, I

3  CHOSE TO USE IT AS A SOLUTION WITH A MASK, BECAUSE THE SMALLER

4  THE CHILD IS, THE BETTER THEY CAN COORDINATE BREATHING OUT OF THE

5  MASK.  AND EVEN IF YOU LOSE SOME OUT OF THE MASK, THEY'RE GOING

6  TO GET SOME MIST AND SUCH THAT THEY -- THEY ARE GOING TO GET A

7  LOT MORE.

8          THE DEXTERITY IN USING AN INHALER, YOU HAVE TO BE A LOT

9  MORE MATURE, OLDER, IN ORDER TO USE AN INHALER.  SO I USUALLY

10  DON'T PRESCRIBE INHALERS UNTIL THEY GET, YOU KNOW, OLDER.

11  Q.  NOW, THE JURY WILL HEAR TESTIMONY THAT WHEN SHE WAS IN

12  FLORIDA, SHE WAS GIVEN ADVAIR.  HOW DOES ADVAIR COMPARE TO THIS

13  FLOVENT THAT YOU GAVE CHRIS COOPER?

14  A.  ADVAIR HAS FLOVENT IN IT, BUT IT ALSO HAS A LONG-ACTING

15  ALBUTEROL IN IT.  AND, LIKE I SAID, ALBUTEROL, AT ITS BEST, HAS

16  SIDE EFFECTS.  IT CAN CAUSE WHEEZING.  IT CAN CAUSE -- IT CAN

17  CAUSE PROBLEMS.

18          SO IT HAS A BLACK BOX WARNING AS A LABEL ON THE SIDE OF

19  ADVAIR THAT ALSO TELLS YOU -- AND WHAT A BLOCK BOX WARNING IS,

20  IT'S A LABEL THAT'S ON THE SIDE OF THE BOX OF THE MEDICINES, OR

21  ANY MEDICINES.  IT'S THE MOST SERIOUS WARNING THAT YOU CAN GET

22  FROM FDA.  IT TELLS YOU ABOUT THE MOST SERIOUS SIDE EFFECTS.  IT

23  ALSO -- IT USUALLY -- IT'S USUALLY THERE BECAUSE IT'S ALSO

24  ASSOCIATED WITH DEATH MORE SO THAN OTHER MEDICINES.

25  Q.  LET ME STOP YOU THERE.  WOULD YOU -- DO YOU, IN YOUR

1   PRACTICE WITH CHILDREN, DO YOU PRESCRIBE ADVAIR?

2   A.   I DON'T.

3   Q.   WHY NOT?

4   A.   THE ONLY TIME I PRESCRIBE ADVAIR, IF THEY HAVE BEEN TO

5   ANOTHER PHYSICIAN WHO HAS BEEN ON THAT MEDICINE FOR QUITE A

6   WHILE, AND THEY ARE COMING TO ME FOR A REFILL.  YOU KNOW, THE

7   FIRST TIME THEY'VE COME TO ME, AND THEY WANT A REFILL, BUT

8   THEY'VE BEEN ON IT A WHILE, I'LL DO IT THEN, BUT I NEVER INITIATE

9   ADVAIR.

10        ADVAIR WAS -- NOT NECESSARILY ADVAIR WAS STUDIED, BUT

11   THE LONG-ACTING ALBUTEROL WAS STUDIED, WHICH WAS SALMETEROL.  IT

12   WAS STUDIED IN A BIG STUDY, AND IT FOUND THE ASSOCIATION WITH

13   SERIOUS SIDE EFFECTS, AND DEATH WAS FOUND IN THAT CLINICAL TRIAL,

14   PARTICULARLY IN AFRICAN-AMERICANS.

15        AND SO WITH MY PRACTICE BASICALLY BEING MAJORITY

16   AFRICAN-AMERICANS, I ELECT NOT TO USE THE ADVAIR BECAUSE IT HAS

17   THE SALMETEROL IN IT THAT WAS IN THAT CLINICAL TRIAL.

18   Q.   WHEN YOU MET WITH ALANA AND CHRIS COOPER IN OCTOBER OF '07,

19   SHE ADVISED YOU THAT SHE HAD BEEN PRESCRIBED ADVAIR?

20   A.   YES.

21   Q.   DID SHE TELL YOU WHETHER SHE HAD USED IT?

22   A.   SHE SAID SHE -- SHE USED IT ON OCCASION; BUT, ONCE SHE

23   REALLY READ THE BLACK BOX WARNING, THAT SHE HAD STOPPED IT.

24   Q.   DID SHE RELATE TO YOU WHETHER THERE HAD BEEN ANY PROBLEMS AS

25   FAR AS FLARE-UPS OR WHATNOT WHILE SHE WAS IN FLORIDA?

1   A.   SHE SAID SHE REALLY HADN'T HAD -- HE HADN'T REALLY HAD MANY

2   PROBLEMS WHILE HE WAS THERE.  HE HAD GONE TO A PHYSICIAN AND

3   GOTTEN AN INHALER.  AND I FOUND OUT LATER ON WHEN I TALKED TO HER

4   THAT SHE HAD GONE BACK BECAUSE THE SCHOOL, JUST LIKE THE SCHOOLS

5   HERE REQUEST, THEY WANT SOMETHING ON HAND IN CASE THE CHILD HAS

6   SOME WHEEZING.

7          SO SHE WENT BACK TO THAT PHYSICIAN, APPARENTLY.  AND AT

8   THAT TIME HE COULD HAVE GIVEN HER A SINGLE STEROID, BECAUSE I'M

9   SURE HE UNDERSTOOD WHY SHE WAS AFRAID OF ADVAIR.  ANY OF THE

10  COMBINATION MEDICINES ARE BASICALLY THE SAME IF THEY HAVE A

11  LONG-ACTING BETA-ADRENERGIC.  SAME RESULTS.

12         HOWEVER, THE STUDIES ALSO SHOW THAT IF YOU HAVE A

13  LONG-ACTING STEROID WITH IT, IT'S OKAY.  IT'S JUST THAT --

14         MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  WE UNDERSTAND.

15         THE COURT:  WE NEED TO FOCUS ON THE QUESTION AND JUST

16  ANSWER THE QUESTION THAT'S ASKED, AND WE'LL MOVE ON TO THE NEXT

17  QUESTION.

18         THE WITNESS:  OKAY.

19         MR. BUZBEE:  YES, SIR.

20                    EXAMINATION

21  BY MR. BUZBEE:

22  Q.   THE BOTTOM LINE, YOU KNEW SHE HAD BEEN -- YOU KNEW SHE HAD

23  BEEN PRESCRIBED, YOU KNEW SHE DIDN'T USE IT; ADVAIR?

24  A.   YES.  THE ADVAIR, YES, UH-HUH.  I KNEW SHE DIDN'T USE IT.

25  Q.   AND WHEN SHE WENT BACK, THE DOCTOR JUST GAVE HER NOT A

1   SINGLE STEROID, SHE JUST GAVE HER THE PUFFER, ALBUTEROL PUFFER?

2   A.   AND THE ALBUTEROL.

3   Q.   AT THE TIME THAT YOU SAW CHRIS COOPER IN OCTOBER OF '07, YOU

4   DIAGNOSED HIM WITH SOMETHING CALLED *BOGGY NASAL TURBINATES*.

5   WE'VE ALREADY HEARD ABOUT THAT, BUT WHAT WERE YOU SEEING WHEN YOU

6   LOOKED AT HIS NOSE?

7   A.   OBSTRUCTION IN HIS NASAL PASSAGES.  WHAT CAN I SAY?  KIND OF

8   LIKE A -- I DON'T KNOW HOW TO EXPLAIN IT IN LAYMEN TERMS EXACTLY,

9   BUT IT'S SOMEWHAT LIKE, I GUESS, LYMPH NODES -- NOT REALLY LYMPH

10  NODES, BUT THEY SWELL UP WHEN THEY'RE -- THEY REACT TO AN

11  ALLERGIC REACTION.  ANYTHING THAT'S AN ALLERGIN OR AN IRRITANT OR

12  VIRAL INFECTION, USUALLY YOU SEE IT.  YOU SEE BOGGY NASAL

13  TURBINATES WHEN THERE IS AN ALLERGIC REACTION GOING ON OR AN

14  IRRITANT.

15  Q.   NOW, YOU KNOW, WE'RE HERE IN THE COURT, AND WE'RE TALKING

16  ABOUT EXPOSURE TO FORMALDEHYDE IN THE TRAILER.  BUT ALANA DIDN'T

17  MENTION FEMA TRAILER TO YOU WHEN SHE CAME TO YOU IN OCTOBER OF

18  '07?

19  A.   NO.

20  Q.   IS THAT RELEVANT TO YOU IN ANY WAY, THAT SHE DIDN'T MENTION

21  THE TRAILER AND THE TRAILER IS CAUSING HER SON PROBLEMS?

22  A.   IT WOULD HAVE.  IF SHE HAD MENTIONED IT, I MIGHT HAVE.

23           MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

24           THE WITNESS:  WELL, AT THAT TIME --

25           MR. WEINSTOCK:  DID SHE MENTION IT OR NOT?  WE'RE GOING

1  TO BE HERE ALL NIGHT.

2          MR. BUZBEE:  YOUR HONOR, WITH ALL DUE RESPECT, I THINK

3  I'M MOVING ALONG PRETTY QUICK COMPARED.

4          THE COURT:  IT'S A FAIR QUESTION.  LET'S NOT GET INTO A

5  DEBATE OVER CROSS AND DEFECT.  BUT IT IS APPROACHING NOON.  HOW

6  MUCH LONGER DO YOU HAVE?  IS IT BETTER TO GO AHEAD AND TAKE A

7  BREAK HERE?

8          MR. BUZBEE:  I THINK I'D LIKE TO FINISH IN THE NEXT

9  10 MINUTES.

10          THE COURT:  IF YOU'D DO THAT IN THE NEXT 10 OR 15

11  MINUTES --

12          MR. BUZBEE:  YES, SIR, OF COURSE.

13          THE COURT:  -- AND THEN WE'LL TAKE A LITTLE BIT LATER

14  LUNCH BREAK AND GIVE YOU A LITTLE BIT EXTRA TIME THAN USUAL.

15          ALL RIGHT.  LET'S GO AHEAD AND FINISH.  I'LL

16  OVERRULE THE OBJECTION.

17          MR. BUZBEE:  THANK YOU.

18                          EXAMINATION

19  BY MR. BUZBEE:

20  Q.   AND, IN FACT, WHAT I'M GETTING AT, DOCTOR, IS THE FACT THAT

21  SHE DIDN'T RELATE HER SON'S CONDITION TO A TRAILER, DOES THAT

22  HAVE ANYTHING TO DO WITH YOU AND HOW YOU'RE TREATING THIS YOUNG

23  MAN?

24  A.   AT THAT TIME -- AT THAT TIME, I DON'T EVEN REALLY REMEMBER

25  MYSELF IF I HAD REALLY HEARD ANYTHING ABOUT FORMALDEHYDE IN THE

1  FEMA TRAILER.  BUT IF I HAD KNOWN, YES, IT WOULD HAVE BEEN

2  PROBABLY A DIFFERENT TREATMENT AT THAT TIME.

3          BUT FROM HIS HISTORY, I KNEW HIM, AND I KNEW WHAT HE

4  HAD; SO, I TREATED HIM -- I JUST CONTINUED THE TREATMENT THAT I

5  HAD HAD -- I HAD DONE PREKATRINA.

6  Q.   AND YOU, AS A MEDICAL DOCTOR IN THE COMMUNITY, HADN'T HAD

7  ENOUGH KNOWLEDGE ABOUT IT FOR YOU TO TRY TO FIGURE OUT WHAT THE

8  PROBLEM WAS?

9  A.   YES.

10  Q.   YOU FOUND OUT ABOUT IT LATER?

11  A.   YES.

12  Q.   NOW, ONCE YOU GAVE ALANA THE MEDICATIONS, THE STEROID, THE

13  INHALER, IN YOUR VIEW WAS SHE COMPLIANT?

14  A.   YES.

15  Q.   NOW, HOW IS IT, THOUGH, THAT IF -- WE KNOW THAT IN OCTOBER

16  OF '07, YOU GAVE HER THESE DRUGS, INCLUDING THE STEROID, THE

17  INHALER, SOME CLARITIN, BUT YET WE KNOW, ALSO, THAT TWO MONTHS

18  LATER THIS YOUNG MAN WAS IN THE ER?

19  A.   YES.

20  Q.   IN YOUR EXPERIENCE, HOW CAN THAT BE?  SHE'S MAINTAINING,

21  SHE'S USING THE PUFFER.  IS THAT COMMON?

22  A.   IT'S COMMON -- IT'S COMMON IF YOU ARE EXPOSED TO SOMETHING,

23  AND THAT WOULD TRIGGER YOU TO WHEEZE.  AND MAYBE AT THAT TIME,

24  CHRONICALLY, YOU CAN'T CONTROL THIS, SO YOU GO AND SEEK EXPERT

25  ADVICE ON EXPERT TREATMENT.  THEY HAVE BETTER MACHINES IN THE

1  HOSPITAL.

2  Q.   NOW, YOU'VE NOW -- SINCE OCTOBER '07, YOU'VE EXAMINED

3  CHRISTOPHER, AGAIN?

4  A.   YES.

5  Q.   WHAT ARE THE DIFFERENCES, IF ANY, FROM OCTOBER '07 AND TODAY

6  IN HIS CONDITION?

7  A.   IN OCTOBER, I SAW HIM IN OCTOBER '07.  I SAW HIM, ALSO,

8  AGAIN IN APRIL '08.  AND WHEN I SAW HIM IN APRIL '08, HIS LUNG

9  FIELDS WERE CLEAR.  HIS NOSE WAS -- HE STILL HAD SOME STUFFINESS.

10  HIS TURBINATES WERE STILL A LITTLE BOGGY.  BUT HIS EYES WERE ALSO

11  INVOLVED AT THIS TIME, AND THEY WERE A LITTLE BIT IRRITATED, AND

12  THEY WERE DARKENED EVEN, WHICH WOULD TELL YOU THAT APPARENTLY HE

13  HAD BEEN EXPOSED TO SOMETHING LONG ENOUGH THAT HE'D HAD --

14          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

15          THE WITNESS:  -- HE WAS HAVING SOME ALLERGIC REACTION.

16          THE COURT:  WAIT, ONE SECOND.

17          MR. WEINSTOCK:  CAN WE APPROACH?

18          THE COURT:  YES.

19          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

20  A CONFERENCE HELD AT THE BENCH.)

21          THE COURT:  IS THIS IN HER REPORT?  I DON'T RECALL IT

22  BEING IN HER REPORT.

23          MR. WEINSTOCK:  NO.

24          MR. BUZBEE:  I HATED TO INTERRUPT HER.  I MEAN, I WAS

25  JUST GOING TO MOVE ON AND JUST GET TO THE CRUX AND WE COULD GO TO

1    LUNCH.

2          MR. WEINSTOCK:  SHE KEEPS THROWING THE EXPOSURE IN

3    THERE.  THAT'S JUST NOT IN HER REPORT.

4          THE COURT:  IT'S NOT IN HER REPORT.  IT'S NOT IN HER

5    REPORT.

6          YOU ASKED HER A GENERAL QUESTION ABOUT THE TIME SHE

7    HAS SEEN -- SHE HAS SEEN HIM SINCE OCTOBER OF '07, AND WERE THERE

8    ANY DIFFERENCES.  SO THAT OPENS THE DOOR FOR HER TO COME UP WITH

9    OPINIONS THAT ARE NOT IN THE REPORT.

10         MR. BUZBEE:  WELL, LET ME GIVE HER MORE CLOSED END

11   QUESTIONS AND JUST MAKE IT CLEAR THAT SHE'S NOT HERE TO TALK

12   ABOUT WHAT CAUSED THIS PROBLEM.  AND I'LL FIX THAT.

13         THE COURT:  TACK CLOSE TO THE REPORT.

14         MR. BUZBEE:  SURE.  NO PROBLEM.

15         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

16   CONFERENCE CONCLUDED.)

17                        EXAMINATION

18   BY MR. BUZBEE:

19   Q.   DOCTOR, THIS IS MY FAULT.  YOU DIDN'T COME HERE TO TELL THE

20   JURY WHAT CAUSED OR -- WHAT CAUSED THIS YOUNG MAN'S ASTHMA OR

21   WHETHER LIVING IN A TRAILER MADE IT WORSE, DID YOU?

22   A.   NO.

23   Q.   LET'S JUST TALK ABOUT HIS CONDITION ONLY, AND THEN WE'LL

24   HEAD OFF TO LUNCH.

25         WHEN YOU SAW HIM IN APRIL OF 2008, DID IT APPEAR TO YOU

1   THAT HIS ASTHMA WAS BEING WELL TREATED AND GETTING BETTER?

2   A.   YES.

3   Q.   OKAY.  BUT HE STILL HAD THE BOGGY NASAL TURBINATES?

4   A.   YES.

5   Q.   AND THEN YOU TALKED ABOUT SOME CONDITION WITH HIS EYES.  IS

6   THAT CALLED AN *ALLERGIC CONJUNCTIVITIS*?

7   A.   YES.

8   Q.   AND THAT MEANS WHAT?

9   A.   THAT MEANS --

10  Q.   DON'T TALK ABOUT WHY YOU THINK HE HAD IT, BUT JUST BASICALLY

11  WHAT IT MEANS WHEN YOU SEE THAT.  WHAT DO YOU SEE WHEN YOU

12  DIAGNOSE THAT?

13  A.   WHEN I SEE THAT, IT'S USUALLY IRRITATED LOOKING.  HE HAD

14  SOME DARKNESS UNDER HIS EYES.  THAT MEANS HE HAD BEEN RUBBING

15  THEM A LOT, AND MORE -- THAT IT WAS MORE CHRONIC THAN ANYTHING.

16  Q.   SO HE HAD ISSUES WITH HIS EYES, THE BOGGY NASAL TURBINATES,

17  BUT YOU BELIEVE THAT HIS ASTHMA WAS BEING WELL MAINTAINED AND

18  GETTING BETTER?

19  A.   YES.

20  Q.   NOW, DESPITE YOU GIVING THIS YOUNG MAN A STEROID, A PUFFER,

21  AND OTHER MEDICATIONS IN OCTOBER, HE STILL WENT TO THE ER IN

22  DECEMBER; ISN'T THAT RIGHT?

23  A.   YES.

24  Q.   WOULD YOU AGREE THAT COOPER DOESN'T FIT THE NORMAL CHILDHOOD

25  PATTERN; THAT IS, YOU WOULD HAVE EXPECTED HIS ASTHMA TO HAVE

1    GOTTEN A LOT BETTER BY NOW?

2    A.    YES.

3    Q.    NOW, WE TOUCHED ON YOUR STORM EXPERIENCE, BUT I EXPECT THAT

4    THIS GULF STREAM LAWYER IS GOING TO BRING IT UP.  YOU HAVE

5    EXPERIENCE WITH FEMA TRAILERS, OR AT LEAST SOME PEOPLE OF YOUR

6    FAMILY DO?

7    A.    YES.

8    Q.    TELL ME ABOUT THAT.  DON'T TELL ME ABOUT THEIR EXPERIENCE.

9    JUST TELL ME WHO WITHIN YOUR FAMILY HAS EXPERIENCE WITH FEMA

10   TRAILERS.

11   A.    MY OLDEST DAUGHTER, HER HUSBAND AND HER NEWBORN BABY AT THAT

12   TIME.

13   Q.    THEY LIVED IN A TRAILER?

14   A.    YES.

15   Q.    IS THAT -- AND MAYBE HE'LL ASK ABOUT IT, I HOPE HE DOES --

16   BUT DOES THAT EXPERIENCE SHADE OR COLOR YOUR OPINION AS TO WHAT

17   YOUR TESTIMONY WOULD BE ABOUT CHRISTOPHER'S CONDITION?

18   A.    ONLY CHRISTOPHER COOPER.

19   Q.    THAT'S ALL YOU'RE TALKING ABOUT?

20   A.    THAT'S ALL I'M TALKING ABOUT.  THAT'S RIGHT.

21   Q.    AND YOU HAVEN'T TRIED TO TELL THE JURY THE TRAILER DID THIS

22   TO THIS YOUNG MAN OR THE TRAILER DID THAT, HAVE YOU?

23   A.    YES.

24   Q.    I MEAN, WE SPECIFICALLY ASKED YOU NOT TO DO THAT, DIDN'T WE?

25   A.    YES, YOU DID.

1  Q.   YOU CAN'T HELP IT THAT YOU LIVED IN THE AREA AND YOUR

2  DAUGHTER AND HER HUSBAND WERE AFFECTED AND HAD TO LIVE IN A

3  TRAILER, CAN YOU?

4  A.   NO.

5  Q.   THE GULF STREAM LAWYER SAYS THAT CHRIS COOPER'S ASTHMA WAS

6  UNDERTREATED, OR HE'S BEEN USING THIS TERM, SUBOPTIMALLY TREATED.

7  BASED ON YOUR REVIEW OF THE RECORDS, BASED ON YOUR TREATMENT OF

8  HIM AND BASED ON YOUR DISCUSSIONS WITH ALANA ALEXANDER, DO YOU

9  AGREE WITH THAT?

10  A.   NO, I DON'T.

11  Q.   DID YOU DO EVERYTHING YOU THOUGHT NEEDED TO BE DONE WITH

12  THAT YOUNG MAN?

13  A.   I DID EVERYTHING THAT I FELT NEEDED TO BE DONE.

14  Q.   AND BASED ON YOUR OBSERVATION OF THIS MOTHER OF THIS CHILD,

15  DID SHE DO EVERYTHING THAT YOU TOLD HER AND DIRECTED HER?

16       MR. WEINSTOCK:  OBJECTION, YOUR HONOR, IT'S LEADING.

17       THE COURT:  NO.  I'LL OVERRULE.  GO AHEAD.

18       MR. BUZBEE:  IN THE INTEREST OF TIME, YOUR HONOR, THAT'S

19  ALL.

20                          EXAMINATION

21  BY MR. BUZBEE:

22  Q.   DID SHE DO EVERYTHING THAT YOU TOLD HER TO DO WITH REGARD TO

23  THIS YOUNG MAN?

24  A.   FROM THE CONVERSATIONS WITH THIS MOTHER, YES.

25  Q.   AND HAVE YOU SEEN MANY, MANY TIMES MOTHERS CONCERNED ABOUT

1  THIS ADVAIR DRUG?

2          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  IT'S NOT

3  RELEVANT.

4          THE COURT:  YES.  I'M GOING TO SUSTAIN THAT ONE.  LET'S

5  FINISH UP.

6                              EXAMINATION

7  BY MR. BUZBEE:

8  Q.   THESE FOUR PUFFERS -- I KNOW I'M MINIMIZING THOSE THINGS,

9  BUT THESE FOUR PUFFERS, IS THAT SUFFICIENT MEDICATION TO CONTROL

10  ASTHMA IN A 17-MONTH PERIOD?

11  A.   YES, IT COULD BE.

12          MR. BUZBEE:  I PASS THE WITNESS, YOUR HONOR.

13          THE COURT:  WE'RE GOING TO GO AHEAD AND TAKE A BREAK FOR

14  LUNCH, AND THEN WE'LL COME BACK WITH CROSS-EXAMINATION.  I HAVE

15  ABOUT TEN AFTER.  WHY DON'T WE PLAN ON 1:15.  IF YOU ALL CAN BE

16  READY AT 1:15, WE'LL RESUME.  DR. BARNES, IF YOU COULD BE ON THE

17  STAND READY TO GO AT 1:15, WE'LL PICK UP WHERE WE LEFT OFF.

18          THE DEPUTY CLERK:  ALL RISE.

19          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

20  PANEL LEAVES THE COURTROOM, AND THE COURT WAS IN LUNCHEON

21  RECESS.)

22                          *    *    *

23

24

25

1                      REPORTER'S CERTIFICATE

2

3       I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

4   MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

5   REPORTER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT

6   COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE

7   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY

8   ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

9   THE ABOVE-ENTITLED AND NUMBERED MATTER.

10

11

12                              *S/CATHY PEPPER*_____

13                              CATHY PEPPER, CRR, RMR, CCR

14                              OFFICIAL COURT REPORTER

15                              UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25