1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2

3  ****************************************************************

4  IN RE:  FEMA TRAILER
   FORMALDEHYDE PRODUCTS
5  LIABILITY LITIGATION

6                         DOCKET MDL NO. 1873 "N"
                         NEW ORLEANS, LOUISIANA
7                         TUESDAY, SEPTEMBER 22, 2009, 8:30 A.M.

8  THIS DOCUMENT IS RELATED TO

9  CHARLIE AGE, ET AL V
   GULF STREAM COACH, INC.,
10 ET AL, DOCKET NO. 09-2892;
   ALANA ALEXANDER,
11 INDIVIDUALLY AND ON BEHALF
   OF CHRISTOPHER COOPER
12
   ****************************************************************
13
                              **DAY 7**
14                       **MORNING SESSION**
                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15        HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                    UNITED STATES DISTRICT JUDGE
16

17 APPEARANCES:

18

   FOR THE PLAINTIFFS:
19
                         GAINSBURGH BENJAMIN DAVID MEUNIER AND
20                       WARSHAUER
                         BY:  GERALD E. MEUNIER, ESQUIRE
21                       2800 ENERGY CENTRE
                         1100 POYDRAS STREET, SUITE 2800
22                       NEW ORLEANS LA   70163

23
                         THE BUZBEE LAW FIRM
24                       BY:  ANTHONY G. BUZBEE, ESQUIRE
                         600 TRAVIS, SUITE 7300
25                       HOUSTON TX   77002

```
 1   APPEARANCES CONTINUED:

 2
                                 WATTS GUERRA CRAFT
 3                               BY:  MIKAL C. WATTS, ESQUIRE
                                 FOUR DOMINION DRIVE
 4                               BUILDING THREE, SUITE 100
                                 SAN ANTONIO TX 78257
 5

 6                               HILLIARD MUNOZ GUERRA
                                 BY:  ROBERT C. HILLIARD, ESQUIRE
 7                               719 S. SHORELINE BOULEVARD #500
                                 CORPUS CHRISTI TX 78401
 8

 9                               CHRIS PINEDO
                                 ATTORNEY AT LAW
10                               802 N. CARANCAHUA, SUITE 2250
                                 CORPUS CHRISTI TX  78470
11

12   FOR GULF STREAM COACH, INC.:

13                               DUPLASS ZWAIN BOURGEOIS MORTON
                                 PFISTER & WEINSTOCK
14                               BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                      JOSEPH G. GLASS, ESQUIRE
15                               THREE LAKEWAY CENTER
                                 3838 N. CAUSEWAY BOULEVARD
16                               SUITE 2900
                                 METAIRIE LA  70002
17

18                               SCANDURRO & LAYRISSON
                                 BY:  TIMOTHY D. SCANDURRO, ESQUIRE
19                               607 ST. CHARLES AVENUE
                                 NEW ORLEANS LA  70130
20

21
     FOR FLUOR ENTERPRISES, INC.:
22
                                 MIDDLEBERG RIDDLE & GIANNA
23                               BY:  CHARLES R. PENOT, JR., ESQUIRE
                                      RICHARD A. SHERBURNE, ESQUIRE
24                                    SONIA MALLETT, ESQUIRE
                                 717 N. HARDWOOD
25                               DALLAS TX  75201
```

```
1   OFFICIAL COURT REPORTER:        CATHY PEPPER, CCR, RMR, CRR
                                    500 POYDRAS STREET, ROOM B406
2                                   NEW ORLEANS LA  70130
                                    (504) 589-7779
3
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
4   PRODUCED BY COMPUTER.

5

6

7                            I N D E X

8
```

EXAMINATIONS                                            PAGE

**DR. ROBERT C. JAMES**................................... 12

VOIR DIRE EXAMINATION BY MR. WEINSTOCK................. 12

VOIR DIRE EXAMINATION BY MR. WEINSTOCK................. 12

DIRECT EXAMINATION BY MR. WEINSTOCK................... 13

CROSS-EXAMINATION BY MR. MEUNIER...................... 30

REDIRECT EXAMINATION BY MR. WEINSTOCK................. 90

VIDEOTAPED DEPOSITION OF **COMMANDER JOSEPH LITTLE**....... 98

**DAMIEN SERAUSKAS**..................................... 120

VOIR DIRE EXAMINATION BY MR. SCANDURRO................ 121

DIRECT EXAMINATION BY MR. SCANDURRO................... 122

CROSS-EXAMINATION BY MR. WATTS........................ 142

REDIRECT EXAMINATION BY MR. SCANDURRO................. 164

```
1                          E X H I B I T S

2    DESCRIPTION                                              PAGE

3

4    374 IS ADMITTED.......................................    6

5    307 IS ADMITTED.......................................    6

6    307.1 IS ADMITTED.....................................    6

7    206 IS ADMITTED.......................................    6

8    314 IS ADMITTED.......................................    6

9    375 IS ADMITTED.......................................    7

10   303 IS ADMITTED.......................................    8

11   352 IS ADMITTED.......................................   13

12   347 IS ADMITTED.......................................  124

13   325.2.................................................  162

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        P-R-O-C-E-E-D-I-N-G-S

2                          MORNING SESSION

3              TUESDAY, SEPTEMBER 22, 2009, 8:30 A.M.

4                     (COURT CALLED TO ORDER)

5

6

7

8          THE DEPUTY CLERK:  ALL RISE.

9          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

10   PANEL ENTERS THE COURTROOM.)

11         THE COURT:  YOU MAY BE SEATED.  LET ME, FIRST OF ALL,

12   THANK THE JURORS FOR BEING HERE ON TIME.  I DECIDED TO START A

13   COUPLE OF MINUTES EARLY IN THE INTEREST OF MAYBE COVERING JUST A

14   LITTLE BIT MORE GROUND TODAY, SO I APPRECIATE YOU BEING ON TIME

15   AND I APPRECIATE COUNSEL BEING HERE AND READY TO PROCEED.

16         WE DO HAVE A COUPLE OF THINGS TO WRAP UP.

17   MR. WATTS AND MR. BUZBEE, WE WERE GOING TO LOOK AT EXHIBITS TO

18   MAKE CERTAIN THAT WE HAD ALL EXHIBITS FROM PRIOR TESTIMONY.

19         MR. WATTS:  WE DID AND WE HAVE FOUR EXHIBITS TO OFFER

20   WITHOUT OBJECTION, HAVING CONFERRED WITH COUNSEL.

21         THE COURT:  LET'S GO AHEAD AND GET THOSE FOUR INTO

22   EVIDENCE.

23         MR. WATTS:  EXHIBIT 374 ARE DOCUMENTS COLLECTED FROM A

24   BUSINESS RECORDS AFFIDAVIT FROM THE WOOD SUPPLIERS, AND SO THAT'S

25   EXHIBIT 374, JUST WOOD SUPPLY DOCUMENTS.

1          THE COURT:  374 IS IN.

2          MR. WATTS:  THERE ARE TWO EXHIBITS FROM DR. KORNBERG

3     YESTERDAY THAT WERE OFFERED WITHOUT OBJECTION, AND 307 IS HIS

4     CURRICULUM VITAE.

5          THE COURT:  307 IS IN.

6          MR. WATTS:  AND 307.1 IS THAT COLOR CHART FROM THE EPA,

7     AND WE OFFER THAT AT THIS TIME, AS WELL.

8          THE COURT:  307, NO OBJECTION; IS THAT CORRECT?

9          MR. SHERBURNE:  THAT'S CORRECT, YOUR HONOR.

10         THE COURT:  307 AND 307.1 ARE IN.

11         MR. WATTS:  AND THEN FINALLY WE HAVE AS EXHIBIT 206 IS

12    THE REPORT FROM THE ERNEST ORLANDO LAWRENCE BERKELEY NATIONAL

13    LABORATORIES ENTITLED ALDEHYDE AND OTHER VOLATILE ORGANIC

14    CHEMICAL EMISSIONS IN FOUR FEMA TEMPORARY HOUSING UNITS.

15         THE COURT:  206 IS ALSO IN, COUNSEL; IS THAT CORRECT,

16    WITH NO OBJECTION?

17         MR. WEINSTOCK:  THAT'S CORRECT.

18         THE COURT:  206 IS IN, SO ORDERED.

19         MR. HILLIARD:  WE ALSO HAVE, JUDGE, BY AGREEMENT 314,

20    THE CV OF CHARLES DAVID MOORE.

21         THE COURT:  314 IS IN; IS THAT CORRECT, COUNSEL, NO

22    OBJECTION?

23         MR. WEINSTOCK:  YES.

24         MR. PENOT:  YES, YOUR HONOR.

25         THE COURT:  314.  ANYTHING ELSE?

1          MR. WATTS:  ANDY'S RIGHT ARM IS TELLING ME THAT

2    EXHIBIT 375, WHICH IS OTHER INVOICES WITH RESPECT TO WOOD, HAS

3    BEEN AGREED TO, AND WE WOULD OFFER AT THIS TIME, AS WELL.

4          THE COURT:  375 IS IN.

5               (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

6    EXHIBIT NOS. 206, 307, 307.1, 314, 374 AND 375 WERE ADMITTED INTO

7    EVIDENCE.)

8          THE COURT:  OKAY.  ANY OTHER EXHIBITS RELATING TO PRIOR

9    TESTIMONY?

10              WHAT I'M GOING TO ASK YOU ALL TO DO, AND THIS, OF

11   COURSE, WILL APPLY TO ALL COUNSEL, IS THAT YOU CONFER WITH

12   PAM RADOSTA, THE COURTROOM DEPUTY, TO MAKE CERTAIN THAT ALL OF

13   THE EXHIBITS THAT ARE SUPPOSED TO BE IN THE COURT RECORD ARE, IN

14   FACT, IN THE COURT RECORD AND WHAT SHE HAS -- SHE'S THE OFFICIAL

15   RECORD KEEPER HERE ON EXHIBITS, THAT WHAT SHE HAS DOES NOT

16   INCLUDE ANYTHING THAT IS NOT PART OF THE COURT RECORD.  AND WE

17   WILL ASK YOU ALL TO VERIFY THAT IN WRITING PRIOR TO THE JURY'S

18   DELIBERATION.

19              AND LADIES AND GENTLEMEN OF THE JURY, YOU WILL BE

20   GIVEN COPIES OF ALL OF THE EXHIBITS IN THIS CASE WHEN YOU

21   COMMENCE YOUR DELIBERATIONS.  SO IF THERE IS SOMETHING ON A

22   DOCUMENT THAT YOU MAY HAVE TAKEN A NOTE ON OR SOMETHING THAT YOU

23   RECALL THAT YOU WOULD LIKE TO SEE A DOCUMENT, YOU WILL HAVE THE

24   BENEFIT OF THESE EXHIBITS, IF YOU NEED TO CONSULT WITH THEM

25   DURING THE COURSE OF YOUR DELIBERATIONS.  SO THAT'S WHY IT'S VERY

1  IMPORTANT THAT WE HAVE ALL OF THE EXHIBITS HERE, THAT WE'RE NOT

2  MISSING ANY AND THAT WE DON'T HAVE ANY EXTRANEOUS MATERIAL AS

3  PART OF A COLLECTION OF EXHIBITS.

4            SO PLEASE CONFER WITH PAM RADOSTA OFTEN HERE ON OUT

5  TO MAKE CERTAIN THAT SHE HAS EVERYTHING THAT WE NEED.

6            OKAY.  SO THAT TAKES CARE OF EXHIBITS.

7        MR. HILLIARD:  YOUR HONOR, I WAS JUST TOLD THAT

8  MARCO KALTOFEN'S CV, 303, HAS NOT BEEN ADMITTED, AND WE WOULD

9  OFFER THAT BY AGREEMENT, AS WELL.

10        THE COURT:  303.

11        MR. WEINSTOCK:  NO OBJECTION.

12        MR. SHERBURNE:  NO OBJECTION, YOUR HONOR.

13        THE COURT:  303 IS ALSO ADMITTED.

14            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

15  EXHIBIT NO. 303 WAS ADMITTED INTO EVIDENCE.)

16        THE COURT:  ANYTHING ELSE FROM THE PLAINTIFFS AT THIS

17  POINT?

18        MR. WATTS:  NOT ON EXHIBITS, BUT WE HAD THE STIPULATION

19  THAT WE ADDRESSED WITH YOU.

20        THE COURT:  I READ TO YOU A SET OF STIPULATIONS AT THE

21  OUTSET OF THE TRIAL, AND, AGAIN, THESE ARE FACTS THAT THE PARTIES

22  HAVE AGREED TO THAT ARE TRUE WITHOUT ANY FURTHER PROOF, AND YOU

23  ARE TO ACCEPT THEM AS TRUE AND PROVEN STATEMENTS.  AN ADDITIONAL

24  STIPULATION, WHICH WE WILL ADD TO THE ONES THAT WE HAVE ALREADY

25  COMPILED THAT I HAVE ALREADY READ TO YOU IS THE FOLLOWING:

1                ERICA ALEXANDER IS A NAMED PLAINTIFF IN THIS

2    LITIGATION.  THE COURT HAS DETERMINED THAT ALANA ALEXANDER'S AND

3    CHRIS COOPER'S CASE SHALL BE TRIED SEPARATELY FROM ERICA'S CASE.

4                OKAY.  THAT'S AN ADDITIONAL STIPULATION.  AND WE

5    WILL ADD THAT TO THE STIPULATIONS FILED INTO THE COURT RECORD.

6                OKAY.  ON THE PLAINTIFFS' SIDE.

7           MR. WATTS:  YOUR HONOR, WITH THAT STIPULATION IN

8    EVIDENCE AND THE DOCUMENTS THAT WE JUST ENTERED IN, THE

9    PLAINTIFFS REST.

10           THE COURT:  THANK YOU, MR. WATTS.

11           MR. WEINSTOCK:  NOW CAN WE APPROACH VERY BRIEFLY,

12   YOUR HONOR?

13           THE COURT:  YES.

14               (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A

15   CONFERENCE WAS HELD AT THE BENCH).

16           THE COURT:  FIRST OF ALL, WE HAVE TO PREPARE ANOTHER

17   PLEADING BECAUSE THEY ARE GOING TO GET THE STIPULATIONS THAT YOU

18   FILED, AND SO YOU WOULD WANT TO EITHER ADD THIS AND MAKE A NEW

19   PLEADING OR JUST MAKE A SUPPLEMENTAL STIPULATION AND PUT THIS ON

20   IT SO THAT IT CAN GO TO THE JURY.

21               AMANDA, WILL YOU PUT THIS ON THE LIST OF

22   STIPULATIONS THAT WILL BE AS PART OF THE JURY INSTRUCTIONS?  AND

23   WE'LL GET THE JURY INSTRUCTIONS LATER TODAY, THE DRAFT

24   INSTRUCTIONS LATER TODAY.

25               GO AHEAD.

1       MR. WEINSTOCK:  IT'S MY UNDERSTANDING THAT THE COURT --

2  THAT WE WOULD MOVE FOR A DIRECTED VERDICT.  THE COURT IS GOING TO

3  LET US RESERVE OUR RIGHT TO MAKE THAT ARGUMENT AT A LATER TIME,

4  BUT MY FIRST-YEAR LAW STUDENT IN THE BACK OF MY MIND SAYS, "IF

5  YOU DON'T MOVE FOR A DIRECTED VERDICT, YOU CAN'T MOVE FOR JNOV,"

6  SO I'M MOVING FOR A DIRECTED VERDICT.

7       MR. PENOT:  AND FLUOR IS ALSO MOVING FOR A JUDGMENT AS A

8  MATTER OF LAW.

9       MR. WATTS:  LET ME STATE ON BEHALF OF THE PLAINTIFFS

10  THAT I PROPOSED, AND THE COURT ACCEPTED, THE IDEA THAT IF WE CAN

11  DELAY THIS UNTIL THE CLOSE OF THE EVIDENCE, AND THE PLAINTIFFS

12  HEREBY STIPULATE THAT A DIRECTED VERDICT BY THE DEFENDANTS AT THE

13  CLOSE OF ALL OF THE EVIDENCE SHALL BE CONSIDERED TIMELY.

14  PLAINTIFFS HEREBY WAIVE ANY ARGUMENT ON APPEAL THAT IT WAS DONE

15  TOO LATE BECAUSE WE'RE CONCEDING THAT IT SHOULD BE DONE AT THE

16  CLOSE OF THE EVIDENCE SO THAT WE CAN MOVE THE EVIDENCE ALONG.

17       THE COURT:  THE COURT NOTES THE OBJECTIONS MADE AND I

18  BELIEVE IT'S BETTER TO GO AHEAD AND COVER THIS AT A LATER TIME,

19  AND I APPRECIATE THE STIPULATION WITH REGARD TO THE TIMING OF THE

20  ARGUMENT OF THE MOTIONS.  I WAS THINKING PERHAPS WE COULD EVEN DO

21  THIS AT THE BEGINNING OF THE LUNCH HOUR JUST TO GO AHEAD AND TAKE

22  CARE OF THEM, BUT IF WE WANT TO GO AHEAD AND DO THEM AT THE

23  CONCLUSION OF THE EVIDENCE, WE COULD DO THAT, AS WELL.

24       MR. WATTS:  I THINK THAT WOULD BE MOST EFFICIENT.

25       MR. WEINSTOCK:  I HAVE TO SAY, I THINK WE'RE GOING TO BE

1    DONE FAIRLY EARLY TOMORROW, BY THE NOON HOUR, SO WE HAVE PLENTY

2    OF TIME FOR A SHORT CONFERENCE AND ARGUE THIS IN THE AFTERNOON.

3              THE COURT:  LET'S DO IT THEN.

4              MR. PENOT:  I HAVE A WRITTEN MOTION.  SHOULD I JUST --

5              THE COURT:  YOU'VE GIVEN THIS TO COUNSEL?

6              MR. PENOT:  I WILL GIVE IT TO COUNSEL.

7              THE COURT:  BEFORE I READ IT.

8                   (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

9    BENCH CONFERENCE WAS CONCLUDED.)

10             THE COURT:  LET'S PROCEED, THEN.  LET'S MOVE ON TO THE

11   GULF STREAM PORTION OF THE CASE.

12                  MR. WEINSTOCK, WILL YOU CALL THE FIRST WITNESS ON

13   BEHALF OF GULF STREAM.

14             MR. WEINSTOCK:  DR. ROBERT JAMES, YOUR HONOR.

15             THE COURT:  ROBERT JAMES.

16                  DR. JAMES, IF YOU'D COME UP, SIR.  PLEASE REMAIN

17   STANDING UP HERE BEHIND THIS CHAIR UNTIL YOU'VE TAKEN THE OATH.

18             THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

19   HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

20   ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

21   THE TRUTH, SO HELP YOU GOD?

22             THE WITNESS:  I DO.

23             THE DEPUTY CLERK:  PLEASE STATE AND SPELL YOUR FULL NAME

24   FOR THE RECORD.

25             THE WITNESS:  I'M DR. ROBERT C. JAMES.

1                         **DR. ROBERT C. JAMES**

2    WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

3    CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

4            MR. WEINSTOCK:  DR. JAMES, I BELIEVE THEY WANT YOU TO

5    SPELL YOUR NAME FOR THE RECORD.

6            THE DEPUTY CLERK:  SPELL YOUR LAST NAME, PLEASE.

7            THE WITNESS:  J-A-M-E-S, JUST LIKE JAMES.

8            THE COURT:  GO AHEAD, MR. WEINSTOCK.

9                       VOIR DIRE EXAMINATION

10   BY MR. WEINSTOCK:

11   Q.   DR. JAMES, WOULD YOU STATE YOUR FULL NAME?

12   A.   I'M ROBERT C. JAMES.

13           MR. WATTS:  WE'VE GOT IT.

14                         EXAMINATION

15   BY MR. WEINSTOCK:

16   Q.   DR. JAMES, WHERE DID YOU GET YOUR EDUCATIONAL BACKGROUND?

17   A.   I GOT MY BACHELOR'S IN CHEMISTRY AT THE UNIVERSITY OF UTAH

18   AND THEN MY DOCTORATE IN PHARMACOLOGY AT THE UNIVERSITY OF UTAH.

19   Q.   WHAT IS PHARMACOLOGY?

20   A.   PHARMACOLOGY IS BASICALLY THE STUDY OF THE BENEFICIAL

21   EFFECTS OF CHEMICALS, THE THERAPEUTIC EFFECTS, THE CHEMICALS WE

22   USE AS MEDICINES AND DRUGS.

23           MR. MEUNIER:  THE PLAINTIFFS WILL OFFER A STIPULATION OF

24   THE EXPERTISE OF DR. JAMES AS A TOXICOLOGIST.

25           MR. WEINSTOCK:  WE'RE GETTING TO THAT.  IT'S IN THE

1  FIELD OF TOXICOLOGY.

2          THE COURT:  IN THE FIELD OF TOXICOLOGY?

3          MR. WEINSTOCK:  CORRECT.

4          THE COURT:  IN LIGHT OF THE STIPULATION, THE COURT WILL

5  ACCEPT DR. ROBERT JAMES AS AN EXPERT IN THE FIELD OF TOXICOLOGY,

6  SO LET'S GO AHEAD AND PROCEED.

7          MR. WEINSTOCK:  YOUR HONOR, I DON'T THINK I'M GOING TO

8  GO THROUGH HIS CV, BUT I AM GOING TO MOVE TO OFFER, FILE AND

9  INTRODUCE INTO EVIDENCE EXHIBIT 352, WHICH IS A COPY OF HIS

10  CURRICULUM VITAE.

11          THE COURT:  ANY OBJECTION?

12          MR. MEUNIER:  NO OBJECTION.

13          THE COURT:  352 IS IN.

14          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

15  EXHIBIT NO. 352 WAS ADMITTED INTO EVIDENCE.)

16                      DIRECT EXAMINATION

17  BY MR. WEINSTOCK:

18  Q.   DR. JAMES, WE'LL COVER SOME OF YOUR QUALIFICATIONS, BUT

19  WE'RE GOING TO TRUNCATE IT QUITE A BIT.

20          HAVE YOU EVER TAUGHT TOXICOLOGY?

21  A.   YES, TO MEDICAL STUDENTS AND GRADUATE STUDENTS IN

22  TOXICOLOGY, TO U.S. EPA PERSONNEL, OSHA PERSONNEL AND STATE DEP

23  PERSONNEL.

24  Q.   HAVE YOU EVER CONSULTED FOR ANY STATE OR GOVERNMENT

25  AGENCIES?

1  A.   YES, SEVERAL STATE DEP OR DEQ AGENCIES, CALIFORNIA, FLORIDA,

2  MASSACHUSETTS, MICHIGAN.  I'VE BEEN A CONSULTANT TO THE

3  DEPARTMENT OF AGRICULTURE, THE U.S. EPA.  I WORKED AT ECOLOGY AND

4  ENVIRONMENT, THE DEPARTMENT OF NAVY, AND THE DEPARTMENT OF

5  JUSTICE, I BELIEVE.

6  Q.   FOR THE PAST 20 YEARS, HAVE YOU BEEN THE PRESIDENT OF TERRA,

7  INC.?

8  A.   I HAVE.

9  Q.   WHAT IS TERRA, INC.?

10 A.   TERRA, INC. IS A TOXICOLOGY CONSULTING FIRM THAT I STARTED

11 WHILE I WAS WORKING AT THE UNIVERSITY OF ARKANSAS FOR MEDICAL

12 SCIENCES.

13 Q.   DOES TERRA, INC. CONSULT FOR LAWYERS OR LITIGATION?

14 A.   IT CONSULTS FOR ANYBODY THAT HAS A TOXICOLOGICAL PROBLEM,

15 YES.

16 Q.   HAVE YOU EVER DONE ANY LITIGATION SUPPORT?

17 A.   YES, I'VE DONE LOTS OF LITIGATION SUPPORT, YES.

18 Q.   WHAT DO YOU MEAN BY "LITIGATION SUPPORT"?

19 A.   LITIGATION SUPPORT MEANS THAT I'M A SCIENTIFIC ADVISOR TO

20 THE ATTORNEYS.  I HELP EXPLAIN THE SCIENTIFIC ISSUES IN THE CASE.

21 I HAVE A SUBSTANTIAL LIBRARY ON TOXICOLOGY AND I HELP IDENTIFY

22 CRITICAL PAPERS THEY NEED TO KNOW.  I LOOK AT REPORTS AND

23 EVALUATE REPORTS AND JUST PROVIDE THEM GENERAL ADVICE ON ISSUES

24 THAT COME UP.

25 Q.   HOW OFTEN DO YOU GET THE PRIVILEGE OF COMING AND TESTIFYING

1  IN COURT?

2  A.    FORTUNATELY, VERY RARELY.

3  Q.    HOW ABOUT GIVING A DEPOSITION JUST IN A CASE THAT'S MOVING

4  ALONG, HOW MANY OF THOSE HAVE YOU GIVEN IN THE 20 YEARS?

5  A.    I THINK SINCE 1985, I THINK I'VE HAD APPROXIMATELY 30

6  DEPOSITIONS.

7  Q.    HAVE YOU AUTHORED ANY PEER-REVIEWED PUBLICATIONS?

8  A.    YES, I HAVE 75 PEER-REVIEWED PUBLICATIONS OR BOOK CHAPTERS

9  AND I'VE AUTHORED A TEXTBOOK IN TOXICOLOGY.

10 Q.    PART OF YOUR HISTORICAL EXPERIENCE IN TOXICOLOGY, DOES THAT

11 INCLUDE WORK WITH FORMALDEHYDE?

12 A.    YES, IT HAS.

13 Q.    CAN YOU DESCRIBE THAT WORK FOR THE JURY?

14 A.    IT BECAME OF CONSIDERABLE INTEREST IN THE '80S, MID '80S AND

15 I HAD A NUMBER OF EVALUATIONS OF THE DIFFERENT ENVIRONMENTS FOR

16 FORMALDEHYDE.  IT WAS ALSO A SCIENTIFIC INTEREST BECAUSE OF THE

17 RODENTS' BIOASSAY, AND I WENT TO SEVERAL SYMPOSIUMS THAT WERE

18 DEBATING THE EXTRAPOLATION METHODS, THE RISK ASSESSMENT METHODS

19 ON THAT CHEMICAL.

20 Q.    ARE YOU A MEMBER OF ANY ORGANIZATIONS IN TOXICOLOGY?

21 A.    I'M A MEMBER OF THE SOCIETY OF TOXICOLOGY, THE SOCIETY OF

22 RISK ANALYSIS, THE SOCIETY OF ENVIRONMENTAL TOXICOLOGY AND

23 CHEMISTRY.

24 Q.    TURNING TO THIS MATTER, WHAT WERE YOU ASKED TO DO IN THIS

25 CASE?

1   A.   I WAS GIVEN TWO TASKS IN THIS CASE:  I WAS ASKED TO LOOK AT

2   THE IRRITANT PROPERTIES OF FORMALDEHYDE AND IDENTIFY A

3   DOSE-RESPONSE CURVE FOR THE IRRITANT PROPERTIES.

4   Q.   IS IT GENERALLY SOMETHING THAT YOU WOULD THINK IN TERMS OF

5   GENERAL CAUSATION AS OPPOSED TO ASKING SPECIFIC QUESTIONS ABOUT

6   THESE PLAINTIFFS?

7   A.   IN THIS CASE, IT WAS MORE AN ASPECT OF GENERAL CAUSATION.

8   IT'S A DEVELOPMENT OF A DOSE-RESPONSE CURVE.

9   Q.   WELL, SINCE WE'RE ON IT, WHAT IS A DOSE-RESPONSE CURVE?

10  A.   I'M SORRY.  FOR THE JURY, A DOSE-RESPONSE CURVE, WHEN YOU DO

11  IT WITH ANIMALS, WE'LL START AT NO DOSE, LOW DOSE, AND KEEP

12  MOVING THE DOSE UNTIL WE BEGIN TO SEE AN EFFECT.  AND THEN AS YOU

13  GET MORE DOSE, THE EFFECT GOES UP TO A HUNDRED PERCENT AND WE'LL

14  TAKE IT A COUPLE DOSES PAST THAT.

15       IF WE'VE GOT THAT KIND OF AN IDEAL DOSE RESPONSE, THEN

16  TOXICOLOGISTS CAN PICK THE THRESHOLD, THE DOSE RIGHT WHERE NO

17  TOXICITY IS SEEN AND IT BEGINS TO BREAK INTO TOXICITY.  AND WE

18  USE THAT POINT IN CONCENTRATIONS BELOW IT TO PICK SAFE LEVELS,

19  AND THEN REGULATORY AGENCIES PICK EVEN LOWER LEVELS TO SET SAFE

20  LEVELS OF EXPOSURE.

21  Q.   WHAT DID YOU DO TO PREPARE FOR THIS ASSIGNMENT?

22  A.   I LOOKED AT THE LITERATURE, IDENTIFIED WHAT I THOUGHT WERE

23  THE BEST STUDIES FOR DOING THIS KIND OF AN EVALUATION, FINDING A

24  TRUE IRRITANT THRESHOLD.

25  Q.   WHAT WAS YOUR CRITERIA FOR CHOOSING WHICH STUDIES TO RELY

1  ON?

2  A.    WELL, THERE IS A LOT OF LITERATURE AND A LOT OF DIFFERENT

3  LITERATURE.   I ULTIMATELY PICKED THE CHAMBER STUDIES BECAUSE THEY

4  ARE DIRECT EXPERIMENTS, AND IN EPIDEMIOLOGY, AN EXPERIMENTAL

5  STUDY IS A STRONGER STUDY AND BETTER EVIDENCE THAN YOUR

6  OBSERVATIONAL STUDIES.   SOME OF YOUR OBSERVATIONAL STUDIES ARE

7  VERY WEAK.

8  Q.    WE'VE HEARD SOME OBSERVATIONAL AND CROSS-SECTIONAL STUDIES.

9  WHAT ARE CROSS-SECTIONAL STUDIES?

10 A.    CROSS-SECTIONAL STUDIES JUST MEANS THEY GO IN, IN A SPECIFIC

11 TIME AND LOOK AT A GROUP AND SEE WHAT THEY SEE IN THE GROUP.   AND

12 SO THE PROBLEM IS, IT PROVIDES NO TEMPORAL RELATIONSHIP OR

13 INFORMATION, IF THERE IS A DISEASE IN THAT GROUP, HOW IT

14 DEVELOPED, WHEN IT DEVELOPED AND IS IT RELATED TO THE EXPOSURE.

15 YOU JUST SEE BOTH THINGS AT THE SAME TIME.   IT'S KIND OF THE

16 CHICKEN OR THE EGG.   YOU DON'T KNOW WHICH CAME FIRST.

17 Q.    DID YOU CONSIDER OCCUPATIONAL STUDIES?

18 A.    SOME OF THE OCCUPATIONAL STUDIES ARE CROSS-SECTIONAL

19 STUDIES.   OTHER PROBLEMS WITH THE OCCUPATIONAL STUDIES IS THERE

20 ARE OFTEN MULTIPLE CHEMICAL EXPOSURES.   IF YOU'RE EXPOSED TO

21 DUST, FORMALDEHYDE HAS BEEN LOOKED AT IN DUST IN WORKSHOPS

22 BECAUSE IT'S USED THERE.   AND THEY'RE USED THESE IN OTHER THINGS,

23 AND IT'S OFF-GASSES FROM SOME WOOD.   SO YOU HAVE A COMBINATION OF

24 THE DUST PARTICULATES AS AN IRRITANT AND THE PROBLEM IN THE

25 FORMALDEHYDE, ITSELF.   IN MANY CHEMICALS INDUSTRIES, THE WORKERS

1   ARE EXPOSED TO A NUMBER OF CHEMICALS THAT FORMALDEHYDE WOULD BE

2   JUST ONE OF MANY.

3           SO MIXTURES ARE DIFFICULT.  I WAS LOOKING FOR STUDIES

4   THAT LOOKED SOLELY AT THE CHEMICAL AND UNDER EXPERIMENTAL

5   CONDITIONS.

6   Q.   SO WE'VE GOT THE EXPERIMENTAL STUDIES THAT YOU RELIED ON AND

7   THE OTHER STUDIES THAT DIDN'T.

8           HOW DID YOU DECIDE WHICH EXPERIMENTAL STUDIES WERE THE

9   ONES TO USE?

10  A.   I DID A QUICK EVALUATION.  I USED AN EVIDENCE-BASED

11  ANALYSIS.  YOU LOOK FOR DESIGN CRITERIA, EXPERIMENTAL DESIGN

12  FEATURES THAT TELL YOU WHICH IS THE BEST STUDY.  WHAT'S THE MOST

13  LIKELY TO GIVE YOU THE MOST ACCURATE ANSWER?  AND IN GOING

14  THROUGH THAT, I CAME UP WITH ABOUT SIX FEATURES.

15          FIRST, I WANTED TO STUDY THAT VARYING DOSE RESPONSE, SO

16  I GET IN THIS NO-EFFECT REGION AND TAKE IT UP TO SOMEWHERE IN THE

17  EFFECT REGION SO I COULD GUESS WHERE THE THRESHOLD WAS.

18          SECOND, MANY OF THE STUDIES USE WHAT I REFER TO AS

19  SUBJECTIVE COMPLAINTS.  DID YOU FEEL A HEADACHE, DID YOU FEEL

20  NAUSEOUS, DID YOU FEEL -- YOU GIVE SOME SYMPTOMS.  AND THE

21  PROBLEMS WITH SYMPTOMS IS THEY ARE INDUCED BY MANY OTHER FACTORS

22  THAT MIGHT BE IN THE ENVIRONMENT.

23          AND SO I LOOKED FOR STUDIES THAT DID A NATURAL

24  PHYSIOLOGICAL MEASUREMENT OF IRRITATION SO YOU COULD SEE THAT THE

25  BODY WAS ACTUALLY RESPONDING IN A WAY THAT IT SHOULD RESPOND IF

1   AN IRRITANT IS PRESENT, AND THEN THAT'S MORE OBJECTIVE AND IT

2   GETS RID OF SOME OF THE CONFOUNDING.

3           I LOOKED FOR STUDIES THAT CONTROLLED FOR MOOD AND

4   BEHAVIOR OF THE PEOPLE.  IF YOU'VE EVER HAD A BAD DAY, YOU KNOW

5   THAT YOUR KIDS MAY ANNOY YOU MORE, THE PEOPLE YOU WORK WITH MAY

6   ANNOY YOU MORE, YOU TEND TO MORE NEGATIVELY ASSESS THINGS.  SO IF

7   YOU CONTROL FOR A MOOD AND AFFECT, THAT'S ANOTHER CONFOUNDER.

8   Q.   DID YOU CONSIDER DOUBLE-BLIND STUDIES?

9   A.   YES.  ANOTHER FEATURE IS, YOU WANT THE STUDIES THAT ARE

10  RANDOMIZED, THEY JUST TOOK A COLLECTION OF VOLUNTEERS AND THEN

11  JUST RANDOMLY ASSIGNED THEM TO GROUPS; THEREFORE, YOU'RE NOT

12  PREDETERMINED WHO GETS EXPOSED TO WHAT AND YOU'RE MORE LIKELY TO

13  BALANCE OUT THE FACTORS THAT MIGHT AFFECT THE RESPONSE.  SO

14  THAT'S RANDOMIZATION.

15          DOUBLE-BLIND IS WHERE THE INVESTIGATOR DOESN'T KNOW

16  WHAT THE EXPOSURE LEVEL IS AND WHAT TO EXPECT AND THE VOLUNTEER

17  DOESN'T SO THAT IF YOU GET MORE OBJECTIVE MEASURES AND RESPONSES

18  AS YOU LOOK AT THINGS BECAUSE YOU HAVE NO IDEA WHAT'S GOING ON.

19  Q.   OKAY.  YOU WENT THROUGH ALL THAT?

20  A.   YES.

21  Q.   ALL THAT CRITERIA, ALL THE WAYS YOU USED TO EVALUATE YOUR

22  STUDIES.  WHICH ONES DID YOU PICK?

23  A.   WELL, THE BEST STUDY WAS LANG, ET AL., 2008.  AND LANG,

24  ET AL. ACTUALLY HAD ALL OF THE FEATURES I WAS LOOKING FOR.  THEY

25  CONTROLLED FOR MOOD AND AFFECT, THEY HAD SEVERAL DOSE-RESPONSE

1  CURVES.  THEY EVEN ADDED -- ONE THING I FORGOT TO TALK ABOUT,

2  SINCE ODORS CAN TRIGGER THE SENSE OF IRRITATION OR THE PERCEPTION

3  OF A BAD ENVIRONMENT IF YOU DON'T LIKE THE ODOR, THEY USED A

4  MASKING CHEMICAL TO TRY TO MASK THE ODOR SO THAT IT WOULDN'T BE

5  THE ODOR TRIGGERING OR HEIGHTENING CONCERN.

6          AS I SAID, THEY LOOKED AT THE MOOD OF PEOPLE AND

7  SUBTRACTED THAT OUT.  THEY EXPOSED THEM TO CLEAN AIR FIRST, AND

8  MOST OF THE STUDIES YOU FIND THAT PEOPLE WILL RESPOND TO CLEAN

9  AIR UP TO 20 TO 30 PERCENT SAYING IT'S AN ODOR THEY ARE MILDLY

10 BOTHERED BY OR THEY MIGHT HAVE MILD IRRITATION.  SO THIS STUDY

11 HAD ALL OF THE FEATURES.

12          A STUDY BY KULLE WAS SIMILAR, BUT IT HAD SUBJECTIVE

13 RESPONSES RATHER THAN MEASURED PHYSIOLOGIC RESPONSES.  THE SAME

14 WITH BENDER AND THE SAME WITH MOLHAVE, AND ANDERSON WAS THE

15 FOURTH STUDY.  AND MOLHAVE AND ANDERSON WAS A LITTLE BIT WEAKER

16 IN THAT IT COMBINED THE SCORES FOR EACH TYPE OF IRRITATION SO YOU

17 COULDN'T SEPARATE EYE IRRITATION, FROM NOSE IRRITATION, FROM

18 THROAT IRRITATION.  AND I WAS LOOKING AT STUDIES WHERE I COULD

19 MEASURE ALL THREE, IN PARTICULAR EYE IRRITATION BECAUSE IT'S THE

20 MOST SENSITIVE ENDPOINT.

21 Q.   JUST SO THE JURY IS CLEAR, IT'S NOT "LANG IT ALL," IT'S

22 LANG, ET AL.; IS THAT RIGHT?

23 A.   YEAH.  I'M SORRY.  IT'S A SCIENTIFIC TERM.  IT MEANS LANG

24 AND COWORKERS.  IF THERE IS THREE OR MORE AUTHORS, THEY

25 ABBREVIATE TO ET AL.  I'M SORRY.

1        SO IT'S THE LANG STUDY.  I'LL SAY THE LANG STUDY.

2   Q.   AS A RESULT OF REVIEWING ALL OF THESE STUDIES, WHAT DID YOU

3   CONCLUDE?

4   A.   I CONCLUDED THAT THE BEST MEASURE OF TRUE IRRITANTS IN

5   PROPERTIES OF FORMALDEHYDE WAS BETWEEN .5 PARTS PER MILLION AND

6   .6 PARTS PER MILLION.  IN THE LANG STUDY, IF A CONTINUOUS

7   EXPOSURE TO .3 WITH PEAKS UP TO .6, THERE WAS NO DIFFERENCE IN

8   THAT EFFECT AND THE RESPONSES SEEN THERE BETWEEN THAT AND THE

9   CONTROLS.

10       AT .5 PARTS PER MILLION, CONTINUOUSLY, AGAIN, IT WAS NO

11  DIFFERENT FROM THE CONTROL GROUP, AND IF YOU HAD .5 BUT HAD PEAK

12  EXCURSIONS TO ONE, THEN YOU'D GET SLIGHT IRRITATION IN SOME

13  PEOPLE AND INCREASED BLINK REFLEX AND REDNESS OF THE EYES.

14       AND SO THAT WAS CLEARLY AN EFFECT LEVEL AND THAT'S NEAR

15  THE BREAKPOINT.

16  Q.   THAT THING YOU JUST SAID, INCREASED BLINK LEVEL AND REDNESS

17  OF THE EYES, HOW IS THAT DIFFERENT FROM PEOPLE SAYING, "MY EYES

18  BURN"?

19  A.   WELL, YOU SAY THE EYES BURN, IT'S A SENSATION OR

20  INTERPRETATION.  AND AS POINTED OUT, SYMPTOMS OF IRRITATION HAVE

21  BEEN REPORTED AT .3 TO .5 IN THESE STUDIES AND AS HIGH UP TO 1,

22  BUT IT WASN'T UNTIL 1 WHERE YOU SAW TRUE PHYSIOLOGIC CHANGES.

23       SO AGAIN, AS I TRY TO EXPLAIN, IF THE ODOR IS -- AND

24  THIS IS A CHEMICAL THAT HAS A PUNGENT ODOR, WILL SOMETIMES

25  NEGLIGENTLY AFFECT THE WAY YOU PERCEIVE IT AND YOU'LL GIVE IT A

1    IRRITATION RANKING WHEN TRUE IRRITATION IS NOT PRESENT.

2    Q.    THE GOAL OF MY QUESTION WAS, WHEN YOU SAY "BLINK RATE," ARE

3    THEY ACTUALLY MEASURING THE AMOUNT OF TIMES YOU BLINK?

4    A.    YES.   THEY ARE WATCHING THE INCREASE IN BLINK TO TRY TO

5    CLEAR, MOISTEN THE EYES, THEY ARE WATCHING THE BLOOD VESSELS

6    DILATE IN THE EYE THAT'S TRYING TO CAPTURE THE CHEMICAL AND TAKE

7    MORE OF IT AWAY, REDUCE IT.

8    Q.    ARE YOU MEASURING THE REDNESS IN THE EYE?

9    A.    YES.

10   Q.    HOW DO YOU MEASURE REDNESS IN THE EYE?

11   A.    I WAS ASKED THAT IN A DEPOSITION, AND I DIDN'T LOOK UP THE

12   PROCEDURES, BUT I'M SURE IT'S WITH CAMERAS AND SCOPES THAT CAN

13   ZERO IN ON AND SEE SMALL CHANGES IN DILATION.

14   Q.    ARE THOSE OBJECTIVE MEASUREMENTS VERSUS SUBJECTIVE

15   COMPLAINTS?

16   A.    YES, IT'S AN OBJECTIVE PHYSIOLOGIC MEASUREMENT.

17   Q.    WHY DID YOU SELECT THE EYE AS THE TARGET SITE?

18   A.    I DID SKIP THROUGH THAT, AND YOU'LL FIND THAT WITH

19   IRRITATING CHEMICALS, THE EYES IS THE MOST SENSITIVE AND IT IS

20   THE MOST SENSITIVE FOR FORMALDEHYDE.   OTHER STUDIES THAT USE

21   SUBJECTIVE COMPLAINTS, EYE IRRITATION WAS GENERALLY SEEN FIRST

22   WHEN THERE WAS A SIGNIFICANT DIFFERENCE ABOVE THE CONTROL VALUES

23   AND THAT YOU WOULD SEE NOSE AND THROAT IRRITATION AT HIGHER

24   LEVELS.   IT'S JUST A COMMON FEATURE OF IRRITATING CHEMICALS.   YOU

25   WILL IRRITATE THE EYES BEFORE THE NOSE AND THROAT, IN GENERAL.

1  Q.   SO IS IT SORT OF LIKE THE EYE IS THE WEAKEST LINK IN THE

2  CHAIN.  IF YOU CAN'T BREAK THE WEAKEST LINK, YOU SURE CAN'T BREAK

3  THE STRONGEST LINKS?

4  A.   YES.  IT'S USING THE MOST SENSITIVE TARGET ORGAN, AND IF

5  YOU'RE AT OR BLOW THAT LEVEL, THEN YOU WON'T SEE THE OTHERS

6  BECAUSE IT TAKES HIGHER CONCENTRATIONS FOR THEM.

7  Q.   DID I UNDERSTAND CORRECTLY THAT YOU WERE LOOKING FOR THE NO

8  OBSERVABLE ADVERSE EFFECT LEVEL?

9  A.   YES.

10 Q.   IS THAT WHAT WE CALL A NOAEL WE'VE HEARD ABOUT ALL WEEK?

11 A.   I PREFER TO CALL IT A NOAEL, BUT YES, THAT'S WHAT --

12 Q.   THAT'S WHAT HAPPENS WHEN A LAWYER PRONOUNCES IT.  YOU TRY TO

13 CHANGE.

14       WHAT ABOUT THE LUNGS?  I MEAN, DID YOU CONSIDER THAT

15 ASTHMATIC LUNGS MIGHT BE MORE SUSCEPTIBLE THAN THE EYE?

16 A.   THERE WERE ABOUT TEN CHAMBER STUDIES THAT LOOKED AT

17 ASTHMATICS THAT COMPARED A WELL -- YOU KNOW, THAT HAD NORMAL

18 VOLUNTEERS, AND EACH OF THE ASTHMATIC STUDIES HAD NORMAL

19 VOLUNTEERS.

20       BUT EARLY ON, PEOPLE WERE CONCERNED WHETHER ASTHMATICS

21 WOULD RESPOND, BE MORE SENSITIVE TO FORMALDEHYDE AND RESPOND AT

22 LOWER LEVELS OR HAVE -- TRIGGER AN ASTHMA ATTACK AND OTHER

23 PROBLEMS.  AND THERE HAVE BEEN MORE THAN, I DON'T KNOW -- I'M

24 SAYING TEN OR A DOZEN STUDIES THAT HAVE LOOKED AT NORMAL

25 VOLUNTEERS AND WERE ASTHMATICS, AND THEY FIND NO DIFFERENCE, THAT

1   UP TO THREE PARTS PER MILLION OF FORMALDEHYDE, AN ASTHMATIC

2   DOESN'T RESPOND ANY DIFFERENTLY FOR EFFECTS IN THE LUNGS, AND

3   TRUE ASTHMA EFFECTS, AND LOWER RESPIRATORY TRACT OR LUNG SYMPTOMS

4   LIKE COUGH, ET CETERA.

5           SO THAT SHOWS THAT FOR THE IRRITANT PROPERTIES, THEY,

6   FOR SOME REASON, ARE NOT UNIQUELY SENSITIVE TO THIS CHEMICAL.

7   Q.   SO DID THAT IMPACT YOUR DECISION TO FOCUS ON THE EYE AS

8   STILL THE MOST SENSITIVE TARGET?

9   A.   YES.  IN PART, YES.

10  Q.   IN WHAT WAY?

11  A.   WELL, THOSE WERE ALL HIGHER DOSES.  IT SAID THAT AT HIGH

12  DOSES, ASTHMATICS ARE NOT ANY DIFFERENT THAN NORMAL VOLUNTEERS.

13  I WAS WORKING AT A SENSITIVE ENDPOINT AT MUCH LOWER

14  CONCENTRATIONS, SO I WOULDN'T ANTICIPATE THAT THERE WOULD BE ANY

15  DIFFERENCE.

16  Q.   AND YOU JUST SAID THEY WERE AT HIGH DOSES.  WHAT KIND OF

17  DOSES ARE WE TALKING ABOUT IN THESE CHAMBER STUDIES?

18  A.   WELL, IN THE CHAMBER STUDIES, THEY WERE TESTING ASTHMATICS,

19  IT WAS TYPICALLY TWO OR THREE PARTS PER MILLION AND AT

20  CONCENTRATIONS I WAS LOOKING AT, IT WAS A LITTLE OVER ONE PART

21  PER MILLION DOWN TO THREE-TENTHS OF A PART PER MILLION.  SO IT'S

22  A DIFFERENT END OF THE DOSE-RESPONSE CURVE.

23  Q.   HOW LONG WERE THESE EXPOSURES GOING ON FOR?

24  A.   IN ASTHMA STUDIES, THEY WERE AN HOUR TO TWO HOURS, MAYBE AS

25  MANY AS THREE.  IN ONE OF THE CHAMBER STUDIES, IT WAS UP TO

1  FIVE HOURS.

2  Q.    WELL, BUT HOW DOES THIS HIGH DOSE, SHORT-TERM EXPOSURE

3  COMPARE TO CHRONIC LOW-DOSE EXPOSURE?

4  A.    WELL, I WAS LOOKING AT IRRITATION, AND FOR IRRITATION, IT IS

5  A CONCENTRATION-DEPENDENT PHENOMENA, NOT A TIME-DEPENDENT

6  PHENOMENA.  THE CHEMICAL'S RAPIDLY METABOLIZED AND RAPIDLY

7  CLEARED.  BUT SEVERAL RESEARCHERS HAVE NOTED THAT CONCENTRATION

8  IS MORE IMPORTANT FOR IRRITANT LEVELS THAN TIME, SO WITH LONGER

9  TIME, YOU WOULD EXPECT TO SEE THE SAME THRESHOLDS AND THE SAME

10  CONCENTRATIONS.

11  Q.    WELL, DOESN'T FORMALDEHYDE BUILD UP IN THE BODY?

12  A.    NO.

13  Q.    YOU MEAN, IT'S NOT A BIOACCUMULATE?

14  A.    NO.  IT HAS A HALF-LIFE, I THINK IT'S BEEN ESTIMATED AT

15  ONE-AND-A-HALF TO TWO MINUTES.  IT'S VERY QUICKLY TAKEN UP BY THE

16  BODY.  IT'S VERY QUICKLY METABOLIZED.  IT'S A USEFUL MOLECULE

17  WITHIN THE BODY, SO THE BODY HANDLES VERY, VERY LARGE AMOUNTS OF

18  IT DAILY.

19  Q.    IS IT PART OF NORMAL METABOLISM THAT IT HANDLES IT?

20  A.    YES.

21  Q.    WE'VE HEARD A PHRASE "THE ONE-CARBON POOL."  WHAT IS THE

22  ONE-CARBON POOL?

23  A.    IT'S A LITTLE BIT OF MY BIOCHEMISTRY, BUT THE ONE-CARBON

24  POOL IS AN ENZYMATIC PATHWAY BASICALLY WHERE WE'RE TAKING CARBON

25  IN THE FORM OF FORMALDEHYDE TYPICALLY FROM OTHER MOLECULES AND

1   USING THEM TO SYNTHESIZE NEW MOLECULES.

2          SO IT'S PART OF A PATHWAY THAT WE CAN BREAK DOWN

3   PROTEINS AND GENERATE CARBONS AND MAKE THINGS LIKE AMINO ACIDS

4   THAT WE NEED TO MAKE NEW PROTEINS, DNA-BASED PAIRS FOR DNA.  SO

5   IT'S KIND OF A BASIC BUILDING BLOCK FOR MANY CHEMICALS -- MANY

6   MOLECULES THAT THE CELL NEEDS THE MAKE DURING THE DAY.

7   Q.   IS FORMALDEHYDE EVERYWHERE, DOCTOR?

8   A.   YES.  IT'S EVERYWHERE.  IT'S IN THE AIR WE BREATHE.  IT'S IN

9   THE FOOD WE EAT.  THERE IS ESSENTIALLY NO FORMALDEHYDE-FREE

10  ENVIRONMENT.

11  Q.   IS IT IN THE BEER WE DRINK?

12  A.   YES.

13  Q.   IS IT IN NORMAL RESIDENTIAL HOUSES?

14  A.   YES.

15  Q.   HAVE YOU READ ANY OR CITED ANY PAPERS ABOUT NORMAL

16  RESIDENTIAL SETTINGS IN LOUISIANA?

17  A.   YES.

18  Q.   WOULD YOU SHARE THAT WITH THE JURY?

19  A.   WELL, YOU NOTICE THAT I DID JUST A CURSORY SUMMARY OF SOME

20  OF THE REPORTED PUBLICATIONS.  I KNOW THERE IS A PAPER BY LEMUS

21  IN '88 THAT STUDIED LOUISIANA HOMES, AND THEY FOUND WHAT WOULD BE

22  CONSIDERED RELATIVELY HIGH FORMALDEHYDE CONCENTRATIONS FOR

23  RESIDENTS.

24  Q.   WHAT CONCENTRATION LEVELS DID THEY FIND?

25  A.   THE PEAK WAS 5.4 PARTS PER MILLION I BELIEVE IS THE

1  CONVERSION FOR 6,600 MICROGRAMS PER CUBIC METER OF AIR.

2  Q.   WHICH ARE A MEAN, OR MEDIAN, OR AN AVERAGE?

3  A.   I'VE GOT IT HERE.  I COULD LOOK IT UP.  I THINK IT WAS

4  AROUND .3 PARTS PER MILLION WAS THE MEAN OR MEDIAN.

5  Q.   GOING BACK TO FORMALDEHYDE AT THE LEVELS WE'RE TALKING ABOUT

6  IN THE CASE, SHOULD SOMEBODY HAVE, BASED ON YOUR RESEARCH,

7  IRRITANT REACTION TO FORMALDEHYDE AT A LEVEL OF .050?

8  A.   NO.

9  Q.   WELL, ARE YOU SAYING THAT MEANS IF THEY WALKED INTO AN AREA

10  AND THEY FELT THEY HAD IRRITANT REACTION, THAT THAT MEANS THE

11  LEVEL WOULD BE -- AT THE LEVELS YOU FOUND WOULD BE REQUIRED?

12  A.   NO.  ACTUALLY, THE PROBLEM WAS SYMPTOMATOLOGY, IN THIS

13  PARTICULAR CASE IS, IT'S NOT PARTICULARLY ACCURATE.  YOU CAN'T

14  USE IT TO PREDICT WHAT THE AIR CONCENTRATION IS.

15        IN AN INDOOR ENVIRONMENT AND EVEN MANY OUTDOOR

16  ENVIRONMENTS, THERE'S LITERALLY HUNDREDS OF DIFFERENT VOCS AND

17  CHEMICALS THAT YOU CAN ENCOUNTER.  THE TOTAL LOAD OF THAT VOC

18  COUNT MAY CAUSE IRRITATION.  AND DUST MAY BE IRRITATING TO THE

19  EYES OR TO THE NOSE.

20        SO THERE IS NO WAY TO TAKE A SINGLE CHEMICAL AND A

21  SINGLE RESPONSE AND SAY YOU THINK THOSE TWO ARE RELATED.  THERE

22  IS TOO MANY WHAT WE CALL CONFOUNDERS.  THERE IS TOO MANY OTHER

23  EXPLANATIONS.  I WOULD NOT ATTEMPT TO DO THAT.

24        THE OTHER PROBLEM IS, IS THAT, AS I MENTIONED, THE

25  CHAMBER STUDIES, IF YOU WERE PUT IN CLEAN AIR -- ONE OF THE

1   STUDIES ACTUALLY CHARCOAL FILTERED THE AIR -- THERE IS STILL A

2   RESPONSE RATE.  WE FIND IN OFFICES THAT PEOPLE RESPOND TO

3   HUMIDITY, LIGHTING, TEMPERATURE, A LOT OF THINGS LEAD TO FEELINGS

4   OF DISCOMFORT AND THEY MAY BE EXPRESSED AS HEADACHES, IRRITATION,

5   OTHER FORMS.

6           SO THE SYMPTOMS ARE JUST NOT SPECIFIC ENOUGH AND IT

7   COULD JUST MEAN MANY THINGS, AND IT MAY BE ACTUALLY VERY LOW

8   LEVELS OF CHEMICALS AND ESSENTIALLY CLEAN AIR BECAUSE WE'VE SEEN

9   THAT IN THE CHAMBER STUDIES.

10  Q.   WHAT WAS THAT ISSUE YOU RAISED BEFORE, THE ODOR CONFOUNDER,

11  WHAT IS THAT?

12  A.   THE ODOR CONFOUNDER, THEY HAVE DONE A BUNCH OF STUDIES ON

13  ODORANTS, AND A PROBLEM WITH A CHEMICAL THAT IS AN IRRITANT AND

14  ALSO HAS AN ODOR IS THAT THE ODOR CAN LEAVE THE PERSON WITH THE

15  PERCEPTION THAT THEY ARE BEING IRRITATED.

16          A CLASSIC EXAMPLE OF THIS IS A STUDY BY DALTON, AND

17  WHEN SHE USED PHENYLETHYL ALCOHOL, WHICH IS THE SMELL OF

18  ROSEWATER, NOW, IT'S BEEN STUDIED AND IT ONLY STIMULATES THE

19  OLFACTORY NERVE IN OUR NOSE, THE NERVES THAT GIVE SENSE OF SMELL.

20  IT DOES NOT IMPACT OR AFFECT THE TRIGEMINAL NERVE, SO IT DOESN'T

21  LEAD TO INTERNAL RESPONSES.  YET IF YOU EXPOSE PEOPLE TO THIS AND

22  ASK THEM IF THEY CAN SMELL IT, THEY WILL RESPOND TO CERTAIN

23  DEGREES, AND IF YOU ASK IF THEY ARE BEING IRRITATED, A CERTAIN

24  PERCENTAGE WILL SAY THEY FEEL IRRITATED.

25  Q.   WHAT IS THE CONCEPT OF ACCLIMATION?

1    A.    ACCLIMATION IS JUST DEVELOPING SORT OF A TOLERANCE TO THE

2    ENVIRONMENT OR TO THE STIMULI YOU'RE BEING EXPOSED TO.

3    Q.    AND WHY DOES THE BODY ACCLIMATE TO AN ODOR, FOR EXAMPLE?

4    A.    WELL, FOR AN ODOR, IT'S PROBABLY JUST A GENERALIZED

5    RESPONSE.  WE FEEL LESS CONCERNED ABOUT AN ODOR AFTER WE HAVE

6    BEEN EXPOSED TO IT FOR A WHILE, AND IF THE BODY IS COMING BACK

7    TO -- AND I'M SPECULATING HERE A LITTLE BIT BECAUSE I'M NOT A

8    PSYCHOLOGIST, I THINK IT'S COMING BACK AND LOOKING MORE IN THE

9    ENVIRONMENT FOR OTHER CUES.  IT'S HELPFUL IF YOU DON'T FOCUS ON

10   ONE CUE OR STIMULI IN AN ENVIRONMENT BUT PAY ATTENTION TO ALL OF.

11   Q.    IS ACCLIMATION A GOOD THING OR A BAD THING, FROM A

12   BIOLOGICAL PERSPECTIVE?

13   A.    IT'S A GOOD THING AND IT'S SOMETHING THAT YOU TYPICALLY SEE,

14   AND YOU CAN SEE MANY FORMS OF ACCLIMATION ON OTHER EFFECTS.

15   Q.    YOU TOLD THIS JURY YOUR NOAEL OR YOUR THRESHOLD IS .5 TO .6.

16   WE HAVE BEEN HEARING ABOUT THE ATSDR MRL OF .008.  WHY DIDN'T YOU

17   JUST RELY ON THE ATSDR MRL?

18   A.    THAT WOULD BE AN APPLES-TO-ORANGES COMPARISON.  THE ATSDR

19   DIDN'T DO THE -- THE KIND OF DOSE-RESPONSE CURVE AND ANALYSIS I

20   DID.  THEY DID NOT REVIEW THE KIND OF LITERATURE AND GO AFTER THE

21   KINDS OF PROCEDURES.

22         THE OTHER ISSUE OF THE MRL'S IS THEY ARE DESIGNED FOR

23   REGULATORY PURPOSES TO BE A SCREENING LEVEL, A PROTECTIVE LEVEL.

24   AND SO THEY'LL TAKE A THRESHOLD OR NO ADVERSE EFFECT LEVEL AND

25   THEN THEY'LL DIVIDE IT BY, SAY, 10 OR A HUNDREDFOLD AND GET A

1   LEVEL WAY DOWN HERE.  AND THEY USE THAT AS A SCREENING LEVEL

2   BECAUSE IF THEY KNOW IF YOU ARE AT THE MRL, THEN THEY ARE

3   COMPLETELY SAFE AND NOTHING WOULD HAPPEN TO THE PERSON.  BECAUSE

4   IT'S SO LOW, THEN, ALTERNATIVELY YOU CANNOT SAY IF YOU'RE ABOVE

5   THE MRL, THAT YOU KNOW THAT YOU'VE HAD A TOXIC EXPOSURE.  IT'S A

6   MISCONCEPTION BY THE LAY PEOPLE AND MANY PEOPLE MAKE IT BECAUSE

7   YOU MAY BE STILL A HUNDREDFOLD LOWER THAN THE VALUE THAT'S STILL

8   SAFE, THE THRESHOLD.

9   Q.   AND THAT IS EXACTLY WHAT ATSDR SAID ABOUT THEIR OWN MRL, IS

10  IT NOT?

11  A.   YES.

12  Q.   THAT AN EXPOSURE TO A LEVEL ABOVE THE MRL DOES NOT MEAN

13  ADVERSE HEALTH EFFECTS WILL OCCUR?

14  A.   YES.  IN THE SECOND PARAGRAPH IN THE SECOND SENTENCE, THEY

15  STATE THAT CLEARLY.

16  Q.   WERE YOU ASKED TO DO A RISK ASSESSMENT IN THE CASE?

17  A.   NO.

18       MR. WEINSTOCK:  I PASS THE WITNESS.  ANSWER THIS

19  GENTLEMAN'S QUESTIONS.  THANK YOU VERY MUCH.

20       THE COURT:  THANK YOU, MR. WEINSTOCK.

21       MR. MEUNIER.

22                     CROSS-EXAMINATION

23  BY MR. MEUNIER:

24  Q.   GOOD AFTERNOON, DR. JAMES.

25  A.   GOOD AFTERNOON.  MORNING, I THINK.

1  Q.   I'M SORRY, MORNING.

2  A.   WE'RE ALL BEHIND.

3  Q.   NOW, THE MAJORITY OF YOUR WORK IS FROM SERVING AS AN EXPERT

4  WITNESS IN LITIGATION?

5  A.   NO.

6  Q.   A FEW YEARS AGO, IT MADE UP 90 PERCENT OF YOUR REVENUE,

7  DIDN'T IT?

8  A.   NINETY PERCENT OF MY REVENUE WAS WORKING ON LEGAL CASES.

9  ALMOST A HUNDRED PERCENT OF THAT WAS AS A LEGAL CONSULTANT ON A

10  VERY LARGE CASE IN CALIFORNIA.  I WASN'T TESTIFYING.

11  Q.   AND IN VIRTUALLY ALL OF THE CASES YOU DO WORK AS AN EXPERT

12  WITNESS, YOU WERE WORKING ON BEHALF OF THE DEFENDANT CORPORATIONS

13  WHERE THERE HAD BEEN SOME ALLEGEDLY TOXIC EXPOSURE, TRUE?

14  A.   I HAVE WORKED LARGELY FOR DEFENDANTS, YES.

15  Q.   AND IN FACT, TERRA, INC., THE COMPANY THAT YOU HEAD UP,

16  PROVIDES HELP TO MANY OF THE MAJOR INDUSTRIES IN THE

17  UNITED STATES, CORRECT?

18  A.   WELL, MANY OF THE MAJOR INDUSTRIES ARE THE ONES THAT ARE

19  LIKELY TO HAVE PROBLEMS, SO YES.

20  Q.   YOU HAVE PROBLEMS WHEN PEOPLE COMPLAIN OF TOXIC EXPOSURE?

21  A.   NO, THEY ARE THE ONES THAT ARE USING THE CHEMICALS AND

22  MAKING THE CHEMICALS, AND IF THERE IS AN ACCIDENTAL RELEASE,

23  ENVIRONMENTAL CONTAMINATION, IT IS MORE LIKELY TO BE A LARGER

24  COMPANY THAN A SMALLER COMPANY IS ALL I'M SAYING.

25  Q.   YOU PROVIDED FOR US A LIST OF THE CASES JUST IN THE LAST

1  FIVE YEARS IN WHICH YOU HAVE SERVED AS AN EXPERT WITNESS, TRUE?

2  A.   YES.

3  Q.   AND IN ALL OF THESE CASES, YOU APPEARED ON BEHALF OF THE

4  DEFENDANT CORPORATION?

5  A.   ON THOSE PARTICULAR CASES, YES.

6  Q.   SO IN THE CASE OF *WYATT*, FOR EXAMPLE, YOU APPEARED ON BEHALF

7  OF A COMPANY, AAC ACTION AIR, WHICH DEALT WITH THE CLAIM OF

8  EXPOSURE TO PAINT SOLVENTS?

9  A.   YES.

10 Q.   AND IN THE CASE OF *WYATT* --

11 A.   NO, I'M SORRY.  YOU SAID WYATT?

12 Q.   I'M SORRY, *DECEDENT* OR *DECEDENT* OR WHATEVER THE PLAINTIFF'S

13 NAME IS IN THAT CASE.

14 A.   I CAN'T TELL WHAT YOU'RE TALKING ABOUT.  THE SECOND ONE IS

15 *SUSAN WYATT V. MATRIXX*.  THAT WAS AN ISSUE OF OLFACTORY OR SMELL.

16 Q.   THAT WAS A PHARMACEUTICAL PRODUCT?

17 A.   THAT WAS A PHARMACEUTICAL PRODUCT, YES.

18 Q.   AND, FOR EXAMPLE, IN THE CASE OF *HONEYWELL*, YOU WERE

19 DEFENDING OR APPEARING ON BEHALF OF HONEYWELL IN A CASE OF PCB

20 SOIL CONTAMINATION, TRUE?

21 A.   I WAS JUST WORKING WITH THEM ON THE CLEANUP LEVELS, YES, AND

22 TESTIFYING ABOUT WHETHER THEY WERE SAFE OR NOT, YES.

23 Q.   IN THE CASE OF *ADAMS*, YOU APPEARED AS AN EXPERT WITNESS FOR

24 COOPER INDUSTRIES.  THAT DEALT WITH EXPOSURE TO SOLVENTS AND

25 DIOXINS; CORRECT?

1    A.    YES.

2    Q.    IN THE CASE OF *HORSESHOE HAMMOND*, THAT WAS A SECONDARY

3    EXPOSURE TO TOBACCO CASE.

4    A.    YES, I WAS HANDLING -- AGAIN, I WAS NOT TAKING ONE SIDE OR

5    THE OTHER.    I WAS REVIEWING THE RISK ASSESSMENT PUT ON BY ONE OF

6    THE EXPERTS, AND ACTUALLY I PUBLISHED A CRITIQUE OF THAT

7    PARTICULAR METHODOLOGY.

8    Q.    ON THE BOTTOM, WE SEE THAT YOU APPEARED ON BEHALF OF

9    JOHNSON & JOHNSON.    THAT WAS A PHARMACEUTICAL CASE?

10   A.    YES.

11   Q.    INVOLVING A CHILDREN'S DRUG?

12   A.    YES.

13   Q.    IN THE CASE OF *GREEN*, YOU APPEARED ON BEHALF OF MAGELLAN

14   PIPELINE.    THAT INVOLVED BENZENE, TRUE?

15   A.    THAT WAS DONE ON BEHALF OF MAGELLAN PRODUCTS.    I THINK

16   THAT'S LISTED IN THE CASE.    IT WAS A -- WHAT'S THE NAME OF THE

17   COMPANY?    SOMEBODY IN THE JURY WILL PROBABLY REMEMBER.    THEY MAKE

18   THE LITTLE RESINS TO CLEAN THE WATER.    I'M BLOCKING ON IT.

19   ANYWAY, IT'S A COMPANY THAT MAKES -- WHY CAN'T I THINK OF THIS?

20   CALGON, YOU KNOW, THE FILTERS THAT CLEAN WATER.

21   Q.    AND THEN IN THE MOST RECENT DEPOSITION YOU'VE GIVEN, YOU

22   WERE APPEARING ON BEHALF OF DUPONT?

23   A.    YES.

24   Q.    IN THE *RHODES* CASE.    YOU'VE NEVER APPEARED ON BEHALF OF A

25   PERSON WHO CLAIMS EXPOSURE TO A TOXIC CHEMICAL?

1   A.   THAT'S NOT TRUE.  THE FIRST CASE I EVER TOOK WAS A PERSON

2   WHOSE LUNGS HAD BEEN BURNED BY AMMONIA.

3   Q.   WELL, IN THE LAST FIVE YEARS, YOU LISTED ALL THE TIMES

4   YOU'VE TESTIFIED AS AN EXPERT.  WE JUST LOOKED AT THAT, DIDN'T

5   WE?

6   A.   YES, AND IN A NUMBER OF THOSE CASES, I'M FILING *DAUBERT*

7   MOTIONS WHICH IS ABOUT JUNK SCIENCE, AND THOSE CASES WERE THROWN

8   OUT OR SETTLED.  SO IT'S NOT ALWAYS AS AN EXPERT WITNESS ON THE

9   TOXICOLOGY.  OFTEN IT'S ON OTHER ASPECTS LIKE IS IT A REASONABLE

10  SCIENCE, WHAT IS THE RISK ASSESSMENT, ET CETERA.

11         FOR EXAMPLE, IN THIS CASE, I'M JUST TALKING ABOUT

12  DOSE-RESPONSE CURVES.

13  Q.   AND YOU'RE APPEARING ON BEHALF OF THE DEFENDANT,

14  GULF STREAM?

15  A.   YES.

16  Q.   NOW, DO YOU WORK WITH EUROPEAN INDUSTRIAL INTERESTS AS WELL

17  AS DOMESTIC?

18  A.   I HAVE.  I HAVE A PROJECT GOING ON WHERE -- ACTUALLY, IT'S A

19  DOMESTIC COMPANY THAT SELLS ITS PRODUCT IN EUROPE, AND THE ISSUES

20  THAT WE'RE HANDLING ARE DATA ANALYSES FOR THE PRODUCT AS IT'S

21  USED IN EUROPE, YES.

22  Q.   WHEN YOU DO RESEARCH OF PUBLISHED STUDIES OF TOXIC EXPOSURE

23  TO A DRUG OR A CHEMICAL PRODUCT, DR. JAMES, DO YOU EVER PRIMARILY

24  RELY ON STUDIES FUNDED BY THOSE WHO HAVE A FINANCIAL OR BUSINESS

25  INTEREST IN THE DRUG OR CHEMICAL PRODUCT?

1    A.   WHEN I REVIEW THE LITERATURE, I REVIEW ALL THE STUDIES TO

2    MAKE A DECISION AS TO WHICH IS THE BEST DESIGN.   SOMETIMES THEY

3    ARE UNPUBLISHED LITERATURE BY SCIENTISTS; SOMETIMES THEY ARE

4    UNPUBLISHED STUDIES BY SCIENTISTS WITHIN THE INDUSTRY, BUT EVEN

5    THE EPA WILL ATTEMPT TO GET ALL OF THE DATA, WHETHER IT'S FROM A

6    COMPANY OR AN INDEPENDENT SCIENTIST, AND TRY TO EVALUATE IT.   YOU

7    CAN ALWAYS USE EXPERIMENTAL CRITERIA TO DECIDE WHETHER THAT STUDY

8    IS A GOOD STUDY OR A BAD STUDY.

9    Q.   YES, SIR, BUT I DON'T THINK YOU ANSWERED MY QUESTION.   LET

10   ME ASK IT AGAIN.

11   A.   I'M SORRY, I THOUGHT I DID.   I SAID I DO USE THEM.

12   Q.   OH, I DIDN'T HEAR YOU.   YOU DO RELY ON STUDIES PRIMARILY

13   FUNDED BY THE INTEREST --

14   A.   I --

15   Q.   LET ME FINISH THE QUESTION.   -- FUNDED AND SUPPORTED BY

16   THAT INTEREST WHICH IS IN THE VERY PRODUCT THAT IS AT ISSUE IN

17   THE STUDY?

18   A.   SEE, WE'RE HAVING PROBLEMS WITH WORDS.   "RELY ON," I DON'T

19   KNOW WHETHER I RELY ON THEM OR NOT.   I EVALUATE THEM.   I EVALUATE

20   ALL THE LITERATURE.   IF I CONSIDERED THAT A GOOD STUDY, I KNOW

21   SOME VERY, VERY GOOD RESEARCH SCIENTISTS IN THE INDUSTRY.   THEY

22   TRY TO ATTRACT GOOD TOXICOLOGISTS COMING OUT OF UNIVERSITIES

23   EVERY YEAR.   SO IT DEPENDS ON THE QUALITY OF THE STUDY WHETHER I

24   RELY ON IT.   BUT I WILL CERTAINLY CONSIDER ALL OF THE LITERATURE

25   TO MAKE SURE I HAVEN'T MISSED SOMETHING.

1    Q.    NOW, IN THIS CASE, YOU'VE OFFERED OPINIONS ABOUT THE EFFECTS

2    OF FORMALDEHYDE EXPOSURE, BUT YOU'VE NOT CONDUCTED ANY ORIGINAL

3    RESEARCH OF YOUR OWN ON FORMALDEHYDE EXPOSURE, TRUE?

4    A.    THAT'S CORRECT.

5    Q.    YOU'VE NEVER CONDUCTED ANY LAB RESEARCH CONCERNING

6    FORMALDEHYDE?

7    A.    NO.

8    Q.    AND IN THE ARTICLES THAT YOU HAVE LISTED IN YOUR CV, AND I

9    THINK YOU LISTED A TOTAL OF 74.

10   A.    YES.  YOU'RE RIGHT.

11   Q.    NONE DEAL WITH FORMALDEHYDE DIRECTLY?

12   A.    NO, I THINK THE CLOSEST THAT COMES, I THINK IT WAS ASKED AT

13   A DEPOSITION, I HAVE A BOOK CHAPTER ON SOLVENTS IS THE CLOSEST

14   I'VE COME.  I DO NOT DO RESEARCH ON FORMALDEHYDE.  I WORKED ON

15   CHLORINATED HYDROCARBONS AND CHLORINATED SOLVENTS.

16   Q.    SO LET'S JUST BE CLEAR ABOUT THIS CASE, DR. JAMES.  ALL THE

17   OPINION TESTIMONY ABOUT FORMALDEHYDE THAT YOU'RE OFFERING IN THE

18   CASE IS BASED ON WHAT YOU AND YOUR ASSISTANTS REVIEWED AS TO

19   CERTAIN PUBLISHED LITERATURE ON FORMALDEHYDE, CORRECT?

20   A.    I WOULD SAY THAT'S ONE WAY TO DESCRIBE IT, YES.

21   Q.    AND ALL OF THE REVIEW OF THESE PUBLICATIONS TOOK PLACE

22   BETWEEN APRIL 27, '09, WHEN YOU WERE FIRST HIRED AS AN EXPERT,

23   AND JUNE 16, '09, WHEN YOUR WRITTEN REPORT WAS GENERATED, TRUE?

24   A.    YES.

25   Q.    SO ALL OF THE WORK YOU'VE DONE TO EXPRESS THE OPINIONS IN

1   THIS WRITTEN REPORT IN THE CASE WAS RESEARCHED WITHIN A PERIOD OF

2   LESS THAN TWO MONTHS, ABOUT 50 DAYS?

3   A.   TO EVALUATE THOSE 20 STUDIES, THAT'S AN APPROPRIATE AMOUNT

4   OF TIME, ACTUALLY.

5   Q.   AND ON BECOMING INVOLVED IN THIS CASE, YOU WERE AWARE THAT

6   IT INVOLVED CLAIMS OF FORMALDEHYDE EXPOSURE IN A FEMA TRAILER,

7   TRUE?

8   A.   I KNEW THAT THAT'S HOW MY DOSE RESPONSE WOULD BE USED.  IT

9   WOULD BE USED IN THAT CONTEXT, YES.

10  Q.   NONETHELESS, YOU'VE NEVER BEEN INSIDE OF A FEMA TRAILER?

11  A.   NO.

12  Q.   IN FACT, YOU'VE NEVER BEEN TO A STAGING AREA TO EVEN SEE

13  WHAT A FEMA TRAILER LOOKS LIKE?

14  A.   NO.

15  Q.   AND YOU HAVE NO INDEPENDENT KNOWLEDGE ABOUT THE SIZE, WOOD

16  PRODUCTS, OR AIR EXCHANGE RATES RELATIVE TO THESE TRAILERS,

17  INCLUDING THE ONE OCCUPIED BY ALANA ALEXANDER?

18  A.   THAT'S CORRECT, BECAUSE NONE OF MY OPINIONS IMPACT OR WOULD

19  REQUIRE THAT KIND OF INFORMATION.

20  Q.   NOW, YOU HAVE DISCUSSED AT LENGTH IN YOUR REPORT AND TO SOME

21  EXTENT IN YOUR TESTIMONY TODAY THAT FORMALDEHYDE IS FOUND IN

22  PLACES OTHER THAN TRAVEL TRAILERS WHERE IT CAUSES NO HARM TO

23  INDIVIDUALS, TRUE?

24  A.   IT'S FOUND IN OTHER PLACES, LOTS OF OTHER PLACES, YES.

25  Q.   BUT YOU'RE NOT TELLING THE JURY, ARE YOU, THAT FORMALDEHYDE

1   EXPOSURE IS ALWAYS HARMLESS?

2   A.   WELL, NO CHEMICAL'S ALWAYS HARMLESS.  WE CAN ALWAYS PUSH THE

3   CONCENTRATION DOSE OF A CHEMICAL TO WHERE IT'S HARMFUL.  THAT'S A

4   FUNDAMENTAL PRINCIPLE OF TOXICOLOGY.

5   Q.   RIGHT.  IN FACT, THERE ARE ANY NUMBER OF CHEMICALS TO WHICH

6   WE ARE EXPOSED IN EVERYDAY LIFE WHICH CAN CAUSE GREAT HARM IF

7   WE'RE EXPOSED IN CERTAIN CIRCUMSTANCES OF EXPOSURE, TRUE?

8   A.   YES.  MANY VOC'S, IF PUSHED TO HIGH ENOUGH CONCENTRATIONS,

9   WILL DO MANY OF THE TOXICITIES THAT YOU WILL SEE IN HIGH DOSES

10  WITH FORMALDEHYDE.  IT'S NOT UNUSUAL, YES.

11  Q.   FOR EXAMPLE, CARBON DIOXIDE IS IN THE EVERYDAY ENVIRONMENT,

12  TRUE?

13  A.   YES.

14  Q.   NITROGEN DIOXIDE?

15  A.   YES.

16  Q.   WE FIND THAT IN CAR EXHAUSTS, BURNERS, SPACE HEATERS, THAT

17  KIND OF THING, TRUE?

18  A.   RIGHT.  WE HAVE ALDEHYDES, CARBOXYLIC ACIDS, ALCOHOLS.  WE

19  HAVE PROBABLY HUNDREDS OF CHEMICALS IN OUR GENERAL INDOOR AND

20  OUTDOOR ENVIRONMENT THAT WE BREATHE EVERY DAY.  I SAID THAT.

21  Q.   RIGHT.  SO THE MERE FACT THAT A CHEMICAL LIKE NITROGEN

22  DIOXIDE OR CARBON DIOXIDE OR FORMALDEHYDE IS FOUND EVERYWHERE IN

23  THE ENVIRONMENT IS NOT TO SAY THOSE CHEMICALS CAN BE VERY HARMFUL

24  IF WE'RE EXPOSED TO THEM IN CERTAIN CIRCUMSTANCES OF EXPOSURE,

25  TRUE?

```
 1  A.   ALL OF THOSE CHEMICALS WOULD BE HARMFUL AT A HIGH ENOUGH
 2  CONCENTRATION, AND ALL OF THEM WILL BE SAFE AT A LOW ENOUGH
 3  CONCENTRATION.
 4  Q.   OF COURSE, IN THIS CASE, YOU HAVE NOT BEEN ASKED TO ANALYZE
 5  THE SPECIFIC EXPOSURE CIRCUMSTANCES THAT THE PLAINTIFF,
 6  ALANA ALEXANDER, OR HER SON DURING THE TIME -- THE 19-MONTH
 7  PERIOD THEY LIVED IN THE FEMA TRAILER?
 8         MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  WE'VE COVERED
 9  THIS.  HE'S ANSWERED QUESTIONS.  HE DOES NOT DO SPECIFIC
10  CAUSATION.  YOU CAN ASK HIM A HUNDRED QUESTIONS ABOUT THIS
11  TRAILER AND THESE PEOPLE, HE STILL DIDN'T DO IT.  I DON'T KNOW
12  HOW MANY TIMES HE'S ASKED THE SAME QUESTION.
13         THE COURT:  I'M GOING TO OVERRULE.  I THINK IT WAS A
14  FAIR QUESTION THAT HE HAS ESTABLISHED THAT, I THINK, SO LET'S GO
15  AHEAD AND MOVE ON.
16         MR. MEUNIER:  IT'S A WRAP-UP TO WHAT I'VE JUST BEEN
17  TALKING ABOUT.
18         THE WITNESS:  I'VE NOW LOST YOUR QUESTION.  SO IF YOU
19  WOULD, PLEASE START OVER.
20                         EXAMINATION
21  BY MR. MEUNIER:
22  Q.   WE WERE TALKING ABOUT THE FACT THAT EVEN THOUGH FORMALDEHYDE
23  IS FOUND EVERYWHERE, IT CAN STILL BE HARMFUL IN THE RIGHT
24  CIRCUMSTANCES OF EXPOSURE.  AND I'M JUST CONFIRMING THAT IN THIS
25  CASE, ALTHOUGH YOU'RE A TOXICOLOGIST, YOU'VE NOT BEEN ASKED BY
```

1   THE DEFENDANT TO CONSIDER THE EXPOSURE CIRCUMSTANCES PERTINENT TO

2   THIS CASE, TRUE?

3   A.   TRUE.   THAT'S BECAUSE OTHER EXPERTS ARE HANDLING THOSE

4   ISSUES.

5   Q.   NOW, WE DON'T ALWAYS DETECT THE ODOR OF FORMALDEHYDE WHEN WE

6   ENCOUNTER IT IN THESE EVERYDAY CIRCUMSTANCES, DO WE?

7   A.   IF IT'S LOW ENOUGH WE CAN DETECT IT.   IF IT'S LOW AND IT'S

8   IN A MIXTURE OF COMPOUNDS, WE PROBABLY WOULDN'T RECOGNIZE IT.   WE

9   WOULD GET A GENERAL ODOR FROM THE MIXTURE, YES.

10  Q.   AND THAT'S BECAUSE FORMALDEHYDE, LIKE ALL CHEMICALS, HAS AN

11  ODOR THRESHOLD, TRUE?

12  A.   YES.

13  Q.   AND THE ODOR THRESHOLD FOR FORMALDEHYDE, ACCORDING TO THE

14  ATSDR'S HEALTH CONSULTATION REPORT OF OCTOBER 2007, WHICH IS IN

15  EVIDENCE, IS WHAT, DR. JAMES?

16  A.   WELL, THEY ARE LISTING IT AT .5 TO 1 PART PER MILLION, BUT I

17  WOULD SAY THAT'S NOT AN ACCURATE LISTING FOR THE ODOR THRESHOLD.

18  I CITED TWO PAPERS IN MY REPORT.   THERE IS A REVIEW BY ARTS 2006,

19  AND ALSO THE MOLHAVE/ANDERSON STUDY, ONE OF THE CLINICAL CHAMBER

20  STUDIES.   THEY ARE FINDING THRESHOLD AT .05 PARTS PER MILLION, UP

21  TO .2 PARTS PER MILLION AND THEN -- .04, I'M SORRY, AND IN THE

22  OTHER PAPER, .04 TO .4 PARTS PER MILLION.   SO AT AROUND 40 OR

23  50 PARTS PER BILLION, PEOPLE CAN BEGIN TO SMELL IT AND AT

24  .2-TENTHS TO FIVE-TENTHS, I WOULD SAY ALMOST EVERYBODY CAN SMELL

25  IT.

1   Q.   YES, SIR.  BUT YOU HAVE NOT RESEARCHED THE SCIENTIFIC BASIS

2   FOR ANY GOVERNMENT LEVELS DEALING WITH FORMALDEHYDE, HAVE YOU?

3   A.   I WAS ASKED THIS AT DEPOSITION.  I WASN'T ASKED TO REVIEW

4   ANY OF THE GOVERNMENT DOCUMENTS TO CRITIQUE THEM OR ANY OF THAT,

5   NO.

6   Q.   AND YOU ACKNOWLEDGE THAT PERTINENT TO THIS CASE, WHEN HEALTH

7   CONSULTATION REPORTS FOR THE FORMALDEHYDE CONTROVERSY WAS ISSUED

8   BY THE GOVERNMENT AGENCY KNOWN AS THE ATSDR, THE ODOR THRESHOLD

9   WAS .5 TO 1 PPM AS PUBLISHED BY THE GOVERNMENT, TRUE?

10  A.   YES, AS I SAID.  THEY ARE NOT INFALLIBLE.  I DO NOT BELIEVE

11  THAT'S AN ACCURATE PORTRAYAL OF THE ODOR THRESHOLD.

12  Q.   ARE YOU INFALLIBLE?

13  A.   WELL, I TRY TO BE, BUT I DON'T THINK ANYBODY IS PERFECT.

14  Q.   AND IT'S NOT JUST THE ATSDR THAT BELIEVES THAT THE ODOR

15  THRESHOLD BEGINS AT .5; ISN'T IT TRUE?

16  A.   I HAVE NO IDEA.  I WAS ASKED AGAIN AT DEPOSITION AND I

17  DIDN'T REVIEW ANY OF THE AGENCY GUIDELINES, ANY OF THE AGENCY

18  DOCUMENTS.  I WASN'T INTERESTED IN WHAT THEY WERE DOING.

19  Q.   YOU'RE NOT INTERESTED?

20  A.   NO.  I WAS ASKED A VERY SPECIFIC QUESTION, WHAT IS THE

21  THRESHOLD, WHAT DO YOU THINK IS THE BEST DATA FOR THE THRESHOLD

22  FOR THE IRRITANT PROPERTIES OF FORMALDEHYDE?  I'M NOT LOOKING AT

23  OTHER TOXICITIES.  I'M NOT LOOKING AT OTHER REGULATORY LEVELS.

24  I'M NOT LOOKING AT ANY OTHER ASPECTS.  I WAS GIVEN A VERY NARROW

25  ISSUE TO ADDRESS.

1   Q.   I KNOW THAT, BUT YOU'VE TALKED ABOUT THE ODOR THRESHOLD.  SO

2   I WANT TO SHOW YOU ANOTHER GOVERNMENT AGENCY PUBLICATION, AGAIN,

3   PERTINENT TO THIS CASE.  THIS IS IN EVIDENCE.  IT'S THE JULY '08

4   CDC REPORT ON THE TESTING OF 519 TRAILERS IN THIS

5   PERTINENT-TO-THE-FORMALDEHYDE CONTROVERSY.

6              AND AT PAGE 4 OF THAT REPORT WE'RE TOLD NOW BY THE

7   CDC -- DO YOU KNOW WHAT THE CDC IS?

8   A.   YES, I KNOW WHAT IS THE CDC IS.

9   Q.   THAT'S THE CENTERS FOR DISEASE CONTROL?

10  A.   YEAH.  ATSDR IS UNDER THE CDC.

11  Q.   TYPICALLY OLFACTORY RECOGNITION OCCURS AROUND 500 PARTS PER

12  BILLION, THAT WOULD BE .5 PPM, TRUE?

13  A.   YES.  I'M NOT SURE WHAT THEY ARE CITING, BUT -- ACTUALLY,

14  THEY ARE CITING PAPERS THAT SHOW A DIFFERENT NUMBER, BUT WE'RE

15  NOT GOING TO ARGUE WITH IT.

16  Q.   NOT GOING TO ARGUE WITH IT?

17  A.   NO.

18  Q.   YOU, FINISHING ON THE ODOR THRESHOLD, SAY IN YOUR REPORT

19  THAT YOU THINK THE ODOR THRESHOLD IS LESS THAN .5 PPM?

20  A.   YES.

21  Q.   WHAT DOES "LESS THAN" MEAN?

22  A.   LOWER THAN.

23  Q.   HOW MUCH LOWER?

24  A.   WELL, I CITED TWO STUDIES THAT CITED OTHER STUDIES, AND

25  AGAIN, THE THRESHOLD RANGED FROM .04 PARTS PER MILLION TO .18

1   PARTS PER MILLION WAS THE RANGE OVER WHICH PEOPLE SMELLED IT IN

2   ONE STUDY.  IN ANOTHER STUDY, IT WAS .04 PARTS PER MILLION UP TO

3   FOUR-TENTHS OF A PART PER MILLION.  SO EVERYBODY IS DIFFERENT.

4   BUT WITHIN THAT RANGE, UNDER A TENFOLD RANGE, THEY FOUND THAT

5   EVERYBODY SMELLED IT.

6   Q.   WE'VE SEEN THAT THE CDC AND THE ATSDR SAYS IT BEGINS AT

7   .5 PPM, TRUE?

8   A.   YES.  I DIDN'T SEE A REFERENCE FOR IT, SO I CAN'T REALLY

9   COMMENT ON ITS VERACITY.

10   Q.   HOW ABOUT THE FORMALDEHYDE COUNTS, ARE YOU FAMILIAR WITH

11   THEM?

12   A.   NO.  AGAIN, I DID NOT LOOK AT ANY OF THESE KINDS OF

13   DOCUMENTS.  IT WASN'T OF ANY INTEREST TO ME.

14   Q.   ARE YOU AWARE THAT THE FORMALDEHYDE COUNCIL BELIEVES THAT

15   THE LOWEST LEVEL AT WHICH PEOPLE CAN BEGIN TO SMELL FORMALDEHYDE

16   IS ABOUT .3 PPM?

17   A.   I READ IT.  YEAH.  I READ WHAT IT SAYS.

18   Q.   SO YOU WOULD DISPUTE NOT ONLY THE GOVERNMENT BUT THE

19   FORMALDEHYDE COUNCIL, AS WELL?

20   A.   WELL, AGAIN, THEY ARE REPORTING A LEVEL WITHOUT REPORTING

21   LITERATURE.  I'M TELLING YOU I CITED LITERATURE THAT REPORTED THE

22   VALUES.  SO I CAN JUST TELL YOU THE TWO THAT I'VE SEEN AND THAT

23   ARE RECENT STUDIES GIVE LOWER VALUES, YES.

24   Q.   NOW, I WAS A LITTLE CONFUSED ABOUT YOUR TESTIMONY ABOUT WHAT

25   PEOPLE REPORT SMELLING.  IF WE'VE HAD TESTIMONY IN THIS CASE FROM

1   FORMER GULF STREAM WORKERS, CERTAIN TRAVEL TRAILER HAULERS AND

2   INSTALLERS, THAT THEY SMELLED A STRONG CHEMICAL SMELL ON FIRST

3   ENTERING A UNIT, A FEMA TRAILER, DOES THAT INDICATE THAT THAT

4   CHEMICAL THEY ARE SMELLING HAS REACHED THE ODOR THRESHOLD?

5   A.   IF THEY ARE SMELLING IT, YES, IT'S REACHED THE ODOR

6   THRESHOLD, YES.

7   Q.   AND IF THE CONCENTRATION FOR THE ODOR THRESHOLD OF

8   FORMALDEHYDE IS, AS THE GOVERNMENT SAYS, .5 PPM, AND IF THEY ARE

9   SMELLING FORMALDEHYDE, THAT WOULD INDICATE THAT AT THAT MOMENT

10  THE CONCENTRATION OF FORMALDEHYDE IN THE TRAILER IS AT LEAST .5

11  PPM, TRUE?

12          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  I DON'T MIND HIM

13  CITING TESTIMONY WE'VE ALL HEARD, BUT TO A MAN, NOBODY COULD TELL

14  YOU EXACTLY THAT THEY WERE SMELLING FORMALDEHYDE.  THEY SMELLED

15  AN ODOR.  NOW HE'S CONVERTING IT TO FORMALDEHYDE LEVELS.

16          MR. MEUNIER:  THIS IS CROSS-EXAMINATION.

17          THE COURT:  WELL, I'M GOING TO OVERRULE THE OBJECTION.

18  I THINK WE NEED TO BE CLEAR, THOUGH.  YOU MENTIONED TWO DIFFERENT

19  GROUPS OF PEOPLE.  YOU MENTIONED FACTORY PEOPLE AND YOU MENTIONED

20  THE INSTALLERS.  SO LET'S BE CLEAR AS TO WHICH ONES IDENTIFIED IT

21  VERSUS WHICH ONES COULD NOT IDENTIFY IT.  I DON'T EXPECT YOU TO

22  GO THROUGH BY NAME, BUT LET'S BE CLEAR THAT CERTAIN WITNESSES

23  TESTIFIED AS TO AN ODOR, AND OTHER WITNESSES TESTIFIED THAT THEY

24  WERE FAMILIAR WITH FORMALDEHYDE AND THEY THOUGHT THAT'S WHAT THE

25  ODOR WAS.

1                    SO LET'S BE CLEAR ON THAT.  GO AHEAD AND REPHRASE

2  THE QUESTION.

3                MR. MEUNIER:  I THINK WE'VE ANSWERED THE QUESTION.

4                              EXAMINATION

5  BY MR. MEUNIER:

6  Q.   BUT IF THE GOVERNMENT IS RIGHT, THAT THE ODOR THRESHOLD FOR

7  FORMALDEHYDE BEGINS AT .5 PPM, AND IF THERE IS TESTIMONY FROM

8  WITNESSES IN THIS CASE THAT THEY ENTERED A NEW TRAILER AND THEY

9  SMELLED THE CHEMICAL, THEN YOU WOULD AGREE THAT THE CHEMICAL

10 WOULD HAVE TO BE AT THE ODOR THRESHOLD, TRUE?

11 A.   I WOULD HAVE TO SAY THE WAY YOU PHRASED THE QUESTION THAT I

12 WOULD HAVE TO SAY YES.  BUT I DON'T AGREE THAT THAT'S THE

13 THRESHOLD.

14 Q.   NO, I KNOW YOU DON'T.  THIS IS A HYPOTHETICAL.

15 A.   HYPOTHETICALLY, IF A THRESHOLD WAS .5 PARTS PER MILLION AND

16 THEY SMELLED AND IT WAS ACTUALLY ONLY FORMALDEHYDE, THEN IT WOULD

17 BE AT THE THRESHOLD LEVEL, YES.

18 Q.   THE JURY HAS HEARD THIS TESTIMONY.  IF IT IS REASONABLE TO

19 BELIEVE THAT THE CHEMICAL AT ISSUE IS FORMALDEHYDE THAT THEY ARE

20 SMELLING, THEN IT WOULD BE AT .5 PPM IF THE GOVERNMENT'S RIGHT

21 ABOUT THE ODOR THRESHOLD, TRUE?

22 A.   GIVEN THOSE SUPPOSITIONS, YES.

23 Q.   THE SAME FOR THE PLAINTIFF OR HER SON, IF THEY SMELL A

24 CHEMICAL IN THEIR TRAILER AND IF WE ASSUME THAT WHAT THEY ARE

25 SMELLING IS FORMALDEHYDE, THEN ACCORDING TO THE GOVERNMENT'S ODOR

1    THRESHOLD, THE CONCENTRATION AT THE TIME THEY DETECTED THE SMELL

2    WOULD BE .5 PPM?

3           MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  I WOULD ASK HIM

4    TO BE VERY CLEAR ABOUT THIS.  TALKING ABOUT MS. ALEXANDER OR HER

5    SON, BECAUSE I THINK THE TESTIMONY WAS DIFFERENT.

6           MR. MEUNIER:  I'LL LIMIT IT TO MS. ALEXANDER.

7           THE COURT:  LET'S GO AHEAD AND REASK THE QUESTION.

8                              EXAMINATION

9    BY MR. MEUNIER:

10   Q.   IF MS. ALEXANDER HAS TESTIFIED THAT SHE DETECTED A CHEMICAL

11   SMELL IN HER TRAILER INCLUDING WHEN SHE FIRST ENTERED IT FOR --

12   WHEN SHE ENTERED IT FOR THE FIRST TIME, AND IF WE ASSUME THAT THE

13   CHEMICAL SHE IS SMELLING IS FORMALDEHYDE AND ACCORDING TO THE

14   GOVERNMENT'S PUBLISHED ODOR THRESHOLD, THE CONCENTRATION OF

15   FORMALDEHYDE AT THAT TIME WOULD BE LEAST .5 PPM, CORRECT?

16   A.   YES, BUT YOUR ANSWER IS DRIVEN BY THE ASSUMPTIONS, SO YOU'VE

17   ASSUMED SOMETHING TO BE TRUE, AND THEN YOU'RE ASKING ME IF GIVEN

18   THOSE ASSUMPTIONS, IT'S TRUE.

19   Q.   HAVE YOU LOOKED AT THE WRITTEN REPORT OF ONE OF THE

20   DEFENDANT EXPERTS, DR. WILLIAM DYSON?

21   A.   NO.

22          MR. MEUNIER:  IS HE GOING TO TESTIFY?

23          MR. WEINSTOCK:  NO.

24                             EXAMINATION

25   BY MR. MEUNIER:

1  Q.   SO YOU'RE NOT AWARE THAT DR. DYSON AGREES WITH THE

2  GOVERNMENT ON THE CONCENTRATION --

3           THE COURT:  WAIT A MOMENT.

4           MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

5           THE COURT:  YOU'RE ASKING HIM ABOUT --

6           MR. WEINSTOCK:  HE SAID HE HADN'T SEEN IT.

7           THE COURT:  I'LL SUSTAIN THE OBJECTION.

8                            EXAMINATION

9  BY MR. MEUNIER:

10  Q.   YOU HAD TALKED ABOUT THE ABILITY OF A PERSON -- WELL, LET ME

11  ASK IT THIS WAY, DOCTOR:  WHAT IS OLFACTORY FATIGUE?

12  A.   OLFACTORY FATIGUE IS WHEN THE STIMULATION OF THE OLFACTORY

13  NERVES, IN A SENSE, IF YOU WILL, TIRES THEM, AND THEY BEGIN TO

14  LOSE THEIR SENSE OF SMELL.

15  Q.   CAN LONG-TERM EXPOSURE TO A CHEMICAL PRODUCE A PERSISTENT

16  DECREASE IN THE ABILITY TO DETECT THE ODOR OF THE CHEMICAL?

17  A.   I DON'T KNOW IF THAT'S A QUESTION OR A STATEMENT AND WHAT

18  IT'S IN REFERENCE TO, I'M SORRY.

19  Q.   I'LL ASK IT AGAIN.

20  A.   OKAY.

21  Q.   CAN LONG-TERM EXPOSURE TO AN ODORANT PRODUCE A PERSISTENT,

22  ALBEIT REVERSIBLE, DECREMENT OR DECREASE IN THE ABILITY TO DETECT

23  THAT ODORANT?

24  A.   I KNOW, IN SOME OF THE ODORANT STUDIES, YOU CAN OVER TIME

25  LOWER THE -- INCREASE THE ODOR THRESHOLD SO YOU DON'T SMELL IT OR

1   YOU RESPOND TO A LOWER RANKING, YES.

2   Q.   SO YOU AGREE --

3   A.   YOU GET -- YES.

4   Q.   -- YOU AGREE WITH THAT STATEMENT?

5   A.   I THINK -- AS I UNDERSTOOD IT CORRECTLY, I THINK SO, YES.

6   Q.   SO IN OTHER WORDS, IF YOU PERSISTENTLY SMELL A CHEMICAL AT A

7   GIVEN CONCENTRATION LEVEL, WE KNOW THAT WHAT CAN HAPPEN IS YOUR

8   ABILITY TO SMELL IT IS DECREASED EVEN THOUGH THE CONCENTRATION

9   LEVEL MAY REMAIN UNCHANGED, CORRECT?

10  A.   WELL, I THINK THAT YOUR ABILITY TO RESPOND TO IT, YES.  I

11  MEAN, YOU GET USED TO CERTAIN SMELLS IS BASICALLY WHAT HAPPENS.

12  Q.   RIGHT.  NOW, YOU ARE ADDRESSING, AS I APPRECIATE IT,

13  DR. JAMES, ONLY THE IRRITANT EFFECTS --

14  A.   YES.

15  Q.   -- OF FORMALDEHYDE?

16          AND YOU HAVE NOT STUDIED AND DON'T PURPORT TO OFFER

17  OPINIONS ABOUT THE CELLULAR OR SUBCELLULAR MECHANISM OF

18  FORMALDEHYDE?

19  A.   I WAS ASKED ALL THIS IN DEPOSITION.  OTHER DOCTORS ARE

20  HANDLING THE OTHER ISSUES.  I'M JUST HANDLING THE IRRITATION.

21  Q.   AND IS THAT WHY, IN YOUR LENGTHY DISCUSSION ABOUT THE NATURE

22  OF FORMALDEHYDE AND YOU TOLD COUNSEL HOW SOLUBLE AND WHAT ITS

23  HALF-LIFE IS, YOU'VE NEVER TALKED ABOUT THE FACT THAT IT'S A

24  REACTIVE ELECTROPHILE?

25  A.   IT IS A RELATIVELY REACTIVE CHEMICAL, BUT, YES, SIR.

1   Q.   TELL THE JURY WHAT IT MEANS TO SAY THAT FORMALDEHYDE IS A

2   REACTIVE ELECTROPHILE.

3   A.   WELL, IT'S CHEMICAL TERMS.  IT MEANS THAT IT'S -- GIVEN THE

4   CHEMICAL BONDS, IT CAN REACT WITH AND BIND OTHER CHEMICALS IS

5   BASICALLY WHAT IT MEANS.  ELECTROPHILE MEANS IT'S LOOKING FOR AN

6   ELECTRON-RICH ENVIRONMENT, WHICH IS CHEMICAL SPEAK FOR CERTAIN

7   PARTS OF CHEMICALS AND CERTAIN FUNCTIONAL GROUPS.

8            SO IT'S ONE REASON, I GUESS, WHY IT'S HELPFUL INTO ONE

9   CARBON POOL.  WE CAN MOVE IN FROM ONE AREA AND ATTACH IT TO

10  ANOTHER, YES.

11  Q.   NOW, WHEN YOU GIVE A GENERAL CAUSATION OPINION ABOUT THE

12  IRRITANT EFFECTS OF FORMALDEHYDE, YOU HAVE TO CONSIDER BIOLOGICAL

13  PLAUSIBILITY, TRUE?

14  A.   YOU SAID IF I WAS GIVING A GENERAL CAUSATION OPINION; IS

15  THAT WHAT YOU SAID?

16  Q.   YES.

17  A.   I'M SORRY, STATE IT AGAIN.

18  Q.   ISN'T BIOLOGICAL PLAUSIBILITY ONE OF THE RECOGNIZED

19  COMPONENTS OF A METHODOLOGY OF A TOXICOLOGIST TO ARRIVE AT A

20  GENERAL CAUSATION OPINION?

21  A.   IT'S ONE OF THE FEATURES OF THE HILL CRITERIA.

22  Q.   DID YOU CONSIDER THE BIOLOGICAL PLAUSIBILITY BY WHICH

23  FORMALDEHYDE CAUSES IRRITATION TO THE EYES, NOSE, AND THROAT?

24  A.   NO.  THAT WASN'T PART OF MY EVALUATION.

25            MY EVALUATION WAS DOSE RESPONSE.  FORMALDEHYDE WAS

1 ALREADY KNOWN TO BE AN IRRITANT.  IT'S ALREADY GENERALLY

2 ESTABLISHED AS AN IRRITANT.  I WAS MERELY LOOKING OVER WHAT DOSE

3 RANGES IT WAS AN IRRITANT.  I DIDN'T HAVE TO DO GENERAL CAUSATION

4 TO KNOW THAT FORMALDEHYDE IS AN IRRITANT.

5 Q.    IT'S WELL KNOWN TO BE AN IRRITANT?

6 A.    YES.

7 Q.    YOU DID ANSWER, I THINK, CERTAIN QUESTIONS ON DIRECT

8 EXAMINATION ABOUT THE TRIGEMINAL NERVE AND THE IRRITATION OF

9 THAT?

10 A.    YES.

11 Q.    WE KNOW WITH FORMALDEHYDE IT WILL IRRITATE THE TRIGEMINAL

12 NERVE AND CAUSE EYE IRRITATION IN THAT WAY?

13 A.    I DON'T KNOW THAT.  ACTUALLY, MOST CHEMICALS BIND RECEPTORS,

14 AND IT'S AN INTERPRETATION OF THE RECEPTOR BINDING BY NERVES,

15 MUCH LIKE OLFACTORY.  I REALLY DON'T KNOW THAT IT BINDS AND

16 IRRITATES OR IT CAUSES ANY INFLAMMATION.  IT'S MORE OF A

17 BINDING -- A MECHANISM BY WHICH THE NERVE IDENTIFIES THE

18 CHEMICAL --

19 Q.    WELL --

20 A.    -- BUT I HAVEN'T RESEARCHED THAT, SO...

21 Q.    WELL, WILL CHEMICAL STIMULATION OF THE TRIGEMINAL NERVE

22 OFTEN COMBINE WITH STIMULATION OF THE OLFACTORY NERVE TO PRODUCE

23 AN ODOR DETECTION?

24 A.    YES.

25 Q.    SO THAT WHEN PEOPLE ARE EXPOSED TO A SUFFICIENT

1  CONCENTRATION OF FORMALDEHYDE, THEY WILL GET BOTH THE ODOR

2  DETECTION AND BURNING EYES OR EYE IRRITATION?

3  A.   THEY CAN.  AT THE HIGH ENOUGH CONCENTRATION, THEY CAN, YES.

4  Q.   WE KNOW FROM THE MECHANISM OF FORMALDEHYDE THAT THOSE THINGS

5  HAPPEN TOGETHER?

6  A.   NO.  NO.  I WOULDN'T AGREE WITH THAT.  I FOUND THE ODOR

7  THRESHOLD TO BE WELL BELOW THE IRRITANT THRESHOLD.  I THINK ALL

8  THE MAJOR REVIEWS THAT I CITED IN MY REPORT POINTED OUT THAT ODOR

9  THRESHOLD WAS BELOW THE THRESHOLD FOR EYE IRRITATION, AND THEY

10 ARE NOT COJOINED, NO.

11 Q.   BUT MY QUESTION IS WHETHER YOU AGREE THAT FORMALDEHYDE, LIKE

12 MOST CHEMICALS, WILL STIMULATE SIMULTANEOUSLY THE TRIGEMINAL

13 NERVE DEALING WITH THE EYES AND THE OLFACTORY NERVE DEALING WITH

14 ODOR?

15 A.   I THINK I SAID THAT EARLIER.  AT HIGH ENOUGH CONCENTRATIONS,

16 YOU CAN ACTIVATE BOTH NERVES, BUT IT'S A DOSE-RESPONSE CURVE FOR

17 BOTH.

18 Q.   I'M SORRY, YOU SAY YOU CAN ACTIVATE BOTH?

19 A.   AT HIGH ENOUGH CONCENTRATIONS, YES.

20 Q.   NOW, IN THIS CASE, DOCTOR, YOU KNOW THAT YOU'RE DEALING WITH

21 THE CLAIMS OF A YOUNG MAN WHO WAS NINE YEARS OLD AT THE TIME HE

22 WAS EXPOSED TO FORMALDEHYDE?

23 A.   YES.

24       MR. WEINSTOCK:  YOUR HONOR, I THINK WE'VE COVERED THIS.

25 HE'S NOT GIVING A SPECIFIC OPINION.

1        MR. MEUNIER:  JUDGE, I WANT TO GET INTO HIS METHODOLOGY

2   WITH THIS QUESTION.

3        THE COURT:  WELL, LET'S STICK WITH METHODOLOGY BECAUSE I

4   THINK YOU'VE ALREADY QUESTIONED HIM AND HE'S VERY CLEAR INSOFAR

5   AS SPECIFIC CAUSATION AND THE LIMITS OF HIS TESTIMONY IN THAT

6   REGARD.  SO LET'S TRY TO STICK WITH WHAT HE IS HERE TO TESTIFY.

7   I THINK WE'VE DRAWN THAT LINE ALREADY.

8                           EXAMINATION

9   BY MR. MEUNIER:

10  Q.   AND YOU ARE AWARE THERE ARE EPIDEMIOLOGICAL STUDIES

11  OBSERVING THE EFFECTS OF FORMALDEHYDE EXPOSURE ON CHILDREN?

12  A.   I DID NOT REVIEW ANY, NO.

13  Q.   BUT YOU'RE AWARE THEY EXIST?

14  A.   YES.

15  Q.   YOU'RE AWARE THAT CHILDREN AND THE ELDERLY ARE MORE

16  SUSCEPTIBLE GENERALLY TO TOXINS WHEN EXPOSED?

17  A.   NO.  ACTUALLY, I'M NOT AWARE OF THAT.  I KNOW THAT'S A

18  REGULATORY ASSUMPTION.  IT'S GENERALLY USED FOR SAFETY.

19       THERE HAVE BEEN STUDIES BY INTERNATIONAL LIFE SCIENCES

20  AND OTHER GROUPS THAT ARE TRYING TO DETERMINE WHICH CHEMICALS AND

21  UNDER WHAT CIRCUMSTANCES CHILDREN MAY BE MORE SENSITIVE THAN

22  ADULTS.  AS A GENERAL REGULATORY PRESUMPTION, IT'S OFTEN USED.

23  AT PRESENT, WE REALLY DON'T KNOW HOW TRUE IT IS AND FOR WHICH

24  CHEMICALS.

25  Q.   SO, AGAIN, I WANT TO REFER YOU TO THE CDC REPORT OF JULY 2,

1   2008, DEALING WITH THE FEMA TRAILERS.  DO I HEAR YOU TO DISAGREE

2   THEN WITH THE CDC STATEMENT THAT RESIDENTIAL POPULATIONS INCLUDE

3   CHILDREN AND ELDERLY PERSONS POSSIBLY MORE SUSCEPTIBLE TO ILLNESS

4   FROM EXPOSURE TO FORMALDEHYDE?

5   A.   NO.  YOU'RE TRYING TO TWIST WHAT I SAID.  IT SAYS POSSIBLY

6   MORE SUSCEPTIBLE.  IT IS A HYPOTHESIS THAT ELDERLY AND CHILDREN

7   MAY BE MORE SUSCEPTIBLE TO CHEMICALS.  WE ALWAYS MAKE THAT A

8   CONSIDERATION.  YOU WILL SEE THAT CONSIDERATION IN EVERY EPA AND

9   ATSDR DOCUMENT, TO RAISE THAT CONSIDERATION, BUT IT POSSIBLY

10  MEANS WE JUST DON'T KNOW.  IT'S A POSSIBILITY, NOT A PROBABILITY.

11  WE DON'T KNOW.

12  Q.   AND WHEN THE CDC IN THIS CASE SAID THAT PRIORITY SHOULD BE

13  GIVEN TO ESPECIALLY VULNERABLE PERSONS, FOR EXAMPLE, CHILDREN,

14  THE ELDERLY, AND THOSE WITH CHRONIC DISEASES, DO YOU DISAGREE

15  WITH THAT?

16  A.   NO.  IN ANY EVALUATION OF THIS TYPE, THOSE WOULD BE THE

17  POPULATIONS YOU'D GENERALLY CONSIDER MIGHT BE VULNERABLE AND THE

18  ONES THAT YOU WOULD WANT TO LOOK AT THE MOST CLOSELY.

19  Q.   YOU'VE LIMITED YOUR REVIEW, THOUGH, TO CHAMBER STUDIES,

20  TRUE?

21  A.   YES.

22  Q.   AND CHAMBER STUDIES DO NOT INVOLVE CHILDREN, DO THEY?

23  A.   THESE DID NOT, NO.

24  Q.   THAT'S BECAUSE TO HAVE A STUDY YOU NEED TO GET REVIEWED BY

25  AN INSTITUTIONAL REVIEW BOARD?

1   A.   YES.

2   Q.   AND THERE'S NO INSTITUTIONAL REVIEW BOARD IN THE WORLD THAT

3   WOULD EVER APPROVE PUTTING A NINE-YEAR-OLD CHILD, PARTICULARLY

4   ONE WITH PREEXISTING ASTHMA, IN A CHAMBER AND PUT FORMALDEHYDE IN

5   THAT CHAMBER, TRUE?

6   A.   TRUE, BUT NOT FOR THE REASONS YOU'RE STATING.  UNDER AN IRB,

7   A PERSON THAT VOLUNTEERS FOR A STUDY HAS TO BE ABLE TO SIGN FOR

8   THEIR OWN RIGHTS AND UNDERSTAND IT.  I THINK PROBABLY THE REASON

9   MOST STUDIES DON'T INCLUDE CHILDREN IS CHILD -- CHILDREN ARE NOT

10  ALLOWED TO SIGN FOR THEIR OWN RIGHTS.  AN ADULT WOULD HAVE TO.

11          SO IT'S MUCH MORE TYPICAL TO STUDY ADULTS, PARTICULARLY

12  WITH CHEMICALS THAT AREN'T DRUGS.

13  Q.   NOW, YOU MENTIONED THE LEMUS, OR LEMUS, STUDY?

14  A.   LEMUS, I THINK IT IS, YES.

15  Q.   AND THAT WAS A STUDY OF HOMES IN SOUTHERN LOUISIANA?

16  A.   YES.  THAT'S THE PAPER, YES.

17  Q.   AND YOU, IN PART, RELIED ON THE LEMUS STUDY?

18  A.   NO, I JUST USED IT TO SAY THAT THESE ARE THE KINDS OF

19  CONCENTRATIONS THAT ARE FOUND.  SO I'M RELYING ON IT FOR

20  CONCENTRATIONS, YES.

21  Q.   DO YOU THINK IT'S A VALID STUDY?

22  A.   I ASSUME SO, YES.

23  Q.   AND IN THE LEMUS STUDY, WE'RE TOLD THAT THE IRRITANT EFFECTS

24  WITH FORMALDEHYDE HAVE BEEN ASSOCIATED WITH CONCENTRATIONS IN THE

25  RANGE OF .1 TO 3.0 PPM, WITH CONCENTRATIONS AS LOW AS .03 PPM

1  REPORTED TO CAUSE EFFECTS IN SENSITIVE INDIVIDUALS, CORRECT?

2  A.   YES.  BUT I HAVE -- THERE IS NO REFERENCE TO THAT.  I DON'T

3  KNOW WHAT IT REFERS TO, WHAT TOXICITY, WHAT STUDY.  IT'S NOT A

4  STUDY ON IRRITATION OR OTHER EFFECTS.

5       ALTHOUGH MANY INTRODUCTIONS IN TOXICOLOGY STUDIES CITE

6  OTHER LITERATURE, YOU USUALLY FOCUS ON THE RESEARCH THEY GET AND

7  WHAT THEY ARE OFFERING, NOT THEIR INTRODUCTION AS TO WHY THEY DID

8  IT, NO.

9  Q.   SO YOU'RE OKAY CITING LEMUS WHEN MR. WEINSTOCK QUESTIONED

10 YOU, BUT YOU NOW SAY YOU DON'T AGREE WITH THIS PART OF THE LEMUS

11 STUDY; IS THAT WHAT YOU'RE SAYING?

12 A.   I DON'T AGREE.  I HAVE DONE MY OWN CHAMBER ANALYSIS, AND,

13 FOR THE EFFECTS THAT I'M TALKING ABOUT, SPECIFICALLY THE EFFECTS

14 THAT I'M TALKING ABOUT, I DON'T AGREE.  SO I DON'T -- THEY COULD

15 HAVE USED CROSS-SECTIONAL STUDIES, ECOLOGICAL STUDIES, OTHER

16 STUDIES THAT I HAVE NOT USED.

17 Q.   ONE OF THE DOCUMENTS IN YOUR RELIANCE FILE WAS THIS ONE.

18 YOU SEE, IT'S GOT A BATES NUMBER FOR JAMES AT THE BOTTOM.

19 A.   UH-HUH.

20 Q.   THIS IS FROM YOUR RELIANCE FILE.  TELL THE JURY WHAT YOUR

21 RELIANCE FILE CONSISTED OF.

22 A.   I GUESS YOU'RE REFERRING TO THE PAPERS THAT I CITED IN MY

23 REVIEW.

24 Q.   AND IN YOUR RELIANCE FILE WAS THIS DISCUSSION PAPER

25 ENTITLED, "CHANGES TO THE OCCUPATIONAL EXPOSURE LIMITS FOR

1  FORMALDEHYDE"; DO YOU SEE THAT?

2  A.   YES.

3  Q.   I WANT TO TALK A LITTLE BIT ABOUT MECHANISM BEFORE WE MOVE

4  ON.

5       IN THIS PAPER, WHICH IS IN YOUR FILE, WE'RE TOLD THAT,

6  "DUE TO ITS HIGHLY HYDROPHILIC WATER-LOVING NATURE, INHALED

7  FORMALDEHYDE IS RAPIDLY AND ALMOST ENTIRELY ABSORBED IN THE

8  RESPIRATORY TRACT"; DO YOU AGREE?

9  A.   YES.

10 Q.   IT SAYS, "IN OBLIGATE NASAL BREATHERS, NOSE BREATHING ONLY,

11 SUCH AS RATS, FORMALDEHYDE IS ALMOST COMPLETELY ABSORBED IN THE

12 NASAL PASSAGES"; DO YOU AGREE?

13 A.   YES.

14 Q.   "IN MONKEYS, ORONASAL BREATHERS," THAT'S BREATHING THROUGH

15 THE NOSE AND MOUTH, "ABSORPTION OCCURS PRIMARILY IN THE NASAL

16 PASSAGES, BUT ALSO, TO A LESSER EXTENT, IN THE TRACHEA AND

17 PROXIMAL REGIONS OF THE MAJOR BRONCHI"; DO YOU AGREE?

18 A.   YES.  TO THE EXTENT THEY MOUTH BREATHE, YES.

19 Q.   THEN IT SAYS, "HUMANS ARE ORONASAL BREATHERS SUCH THAT THERE

20 IS A GREATER POTENTIAL FOR FORMALDEHYDE TO IMPACT THE OROPHARYNX

21 AND PORTIONS OF THE LOWER RESPIRATORY TRACT, SPECIFICALLY THE

22 TRACHEOBRONCHIAL REGION"; DO YOU AGREE?

23 A.   YES, AND IT GOES ON, "DEPENDING ON ACTIVITY PATTERNS."

24 Q.   "THE DEGREE TO WHICH HUMANS USE ORAL VERSUS NASAL BREATHING

25 IS GENERALLY AFFECTED BY ACTIVITY PATTERNS WITH A GREATER

1   VENTILATORY DRIVE REQUIRING INCREASED MOUTH BREATHING," TRUE?

2   A.    YES, ACTIVITIES LIKE RUNNING, ET CETERA.

3   Q.    SO SOMEONE WITH NASAL CONGESTION, FOR EXAMPLE, WHO IS

4   BREATHING MORE THROUGH THE MOUTH, THE TENDENCY WITH FORMALDEHYDE

5   WOULD BE THAT THE CHEMICAL WOULD IMPACT MORE THE LOWER

6   RESPIRATORY TRACT, NOT JUST THE NASAL PASSAGES?

7   A.    COULD, YES.

8   Q.    THE SAME PAPER.  THIS IS FROM YOUR RELIANCE FILE, SAME PAPER

9   WE HAVE BEEN LOOKING AT.  "FORMALDEHYDE'S IRRITANT EFFECTS HAVE

10  BEEN DOCUMENTED OVER A WIDE RANGE OF CONCENTRATIONS"; YOU AGREE?

11  A.    YES.

12  Q.    "IRRITATION OF THE EYES AND UPPER RESPIRATORY TRACT,

13  SPECIFICALLY THE NOSE AND THROAT, AND INCREASED UPPER AIRWAY

14  RESISTANCE HAVE BEEN OBSERVED IN SOME STUDIES AT CONCENTRATIONS

15  BETWEEN 0.05 AND 25 PPM."

16  A.    THAT'S WHAT IT SAYS, YES.

17  Q.    DO YOU AGREE?

18  A.    I AGREE THAT'S WHAT IT SAYS.

19  Q.    OKAY.  YOU KNOW THAT THE CONCENTRATION LEVEL IN THE TRAILER

20  THAT MS. ALEXANDER WAS IN WAS MEASURED AT .05 IN A WINTER MONTH

21  AFTER SHE HAD MOVED OUT OF THE TRAILER?

22  A.    I'M AWARE OF THAT, YES.

23  Q.    WOULD YOU AGREE WITH THIS STATEMENT, DR. JAMES, THAT JUDGING

24  WHETHER OR NOT THERE IS A REPORTED ASSOCIATION BETWEEN A CHEMICAL

25  AND RESPONSE TO THE CHEMICAL EXTENDS WELL BEYOND SIMPLY CITING OR

1  EMPHASIZING THE REPORTED FINDINGS OF A SINGLE STUDY OR SET OF

2  STUDIES?

3  A.    YES, I AGREE WITH THAT.

4  Q.    WOULD YOU AGREE THAT IN THE EVALUATION OF THAT CAUSAL ISSUE,

5  WE HAVE TO LOOK AT HOW WELL YOUR CONCLUSION IS REFLECTED IN THE

6  REMAINING EPIDEMIOLOGICAL LITERATURE, NOT JUST WHAT YOU REVIEWED?

7  A.    FOR EACH STUDY, YOU LOOK FOR INTERNAL CONSISTENCY AND

8  EXTERNAL CONSISTENCY; BUT, YOU WOULD ALSO -- YOU ALSO RANK

9  STUDIES, SO THAT SOME OF YOUR STUDIES MAY BE STRONGER STUDIES

10  THAN OTHER STUDIES.  AND SO WHETHER THEY ARE CONSISTENT OR NOT

11  DEPENDS ON THE OVERALL EVALUATION AND RANKING; BUT, CERTAINLY,

12  WITHIN A RANKING, YOU WOULD COMPARE ONE STUDY TO ALL THE STUDIES

13  OF THAT RANKING, YES.

14  Q.    NOW, YOU MENTIONED, I THINK, IN RESPONSE TO QUESTIONING THAT

15  THE LONGEST EXPOSURE TIME IN ANY OF THE CHAMBER STUDIES YOU

16  LOOKED AT WAS FIVE HOURS?

17  A.    YES.

18  Q.    HOW MANY HOURS WERE ALANA ALEXANDER AND CHRIS COOPER EXPOSED

19  TO DURING THE 19-MONTH PERIOD THEY WERE IN THE TRAILER FROM

20  MAY '06 TO DECEMBER '07?

21        MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  SAME PROBLEM WE

22  HAVE BEEN HAVING.

23        THE COURT:  I THINK WE'VE ESTABLISHED THAT HE'S NOT HERE

24  TO TESTIFY AS TO SPECIFIC CAUSATION.  HE'S ALREADY ANSWERED THE

25  QUESTION ABOUT WHAT HIS ROLE WAS AND WHAT HIS TASK WAS AS AN

1  EXPERT.

2           SO I'M GOING TO SUSTAIN THE OBJECTION.  HE'S

3  TESTIFYING AS TO GENERAL CAUSATION, AND YOU'VE PRETTY MUCH

4  ESTABLISHED ALREADY IN YOUR CROSS-EXAMINATION THAT HE DIDN'T DO

5  THAT ANALYSIS.  SO I DON'T KNOW HOW MANY DIFFERENT WAYS WE CAN

6  ASK IT, BUT I'M GOING TO SUSTAIN THE OBJECTION.

7           MR. MEUNIER:  I WANTED TO STATE THE TOTAL NUMBER OF

8  HOURS.  IT'S A MATTER OF MATHEMATICS.  I GUESS THE JURY CAN DO

9  THAT, YOUR HONOR.

10          THE COURT:  WELL, I MEAN, HE'S ANSWERED THE QUESTION

11 ABOUT WHAT HE DID AND DIDN'T DO IN THIS CASE WITH REGARD TO HIS

12 OPINION.

13                        EXAMINATION

14 BY MR. MEUNIER:

15 Q.  ASSUME THAT -- DO YOU KNOW WHO DR. CHRIS DEROSA IS?

16 A.  HE'S WITH THE CENTER FOR DISEASE CONTROL.  HE'S WRITTEN A

17 NUMBER OF PAPERS ON MRL'S AND THE PROPER USE OR MISUSE OF THEM.

18 Q.  WELL, IN FACT, HE WAS FOR 16 YEARS THE DIRECTOR OF THE

19 DIVISION OF TOXICOLOGICAL AND ENVIRONMENTAL MEDICINE AT THE

20 ATSDR, TRUE?

21 A.  I DIDN'T KNOW HIS EXACT POSITION.  I KNEW HE WAS AT THE

22 ATSDR, YES.

23 Q.  ASSUME THAT IN THIS CASE, DR. DEROSA HAS TESTIFIED BY

24 DEPOSITION AND THAT RELYING ON THE ATSDR'S TOXICOLOGICAL PROFILE

25 HAS SAID THAT INHALATION EXPOSURE TO FORMALDEHYDE OVER A PERIOD

1   OF MONTHS TO A YEAR OR LONGER WOULD BE EXPECTED TO INCREASE THE

2   INCIDENCE OF UPPER RESPIRATORY TRACT AND EYE IRRITATION.  DO YOU

3   AGREE OR DISAGREE?

4   A.   NO.  I DISAGREE.  YOU'RE JUST TALKING ABOUT IRRITATION, OR

5   YOU'RE TALKING ABOUT EFFECTS THAT I'M NOT EVALUATING?  WHICH ARE

6   YOU, AND THEN I'LL TELL YOU WHICH PORTION OF THAT QUESTION I

7   AGREE OR DISAGREE WITH.  BECAUSE YOU SAID, UPPER RESPIRATORY

8   TRACT AND IRRITATION, SO I DON'T KNOW IF YOU'RE TALKING ABOUT

9   EFFECTS ON THE UPPER RESPIRATORY TRACT, WHICH I'M NOT DEALING

10  WITH, OR YOU'RE LEAVING IT SPECIFICALLY TO THE EFFECT OF

11  IRRITATION.

12  Q.   WITH RESPECT TO DR. DEROSA'S TESTIMONY ABOUT EYE IRRITATION,

13  YOU'RE SAYING YOU DISAGREE?

14        MR. WEINSTOCK:  YOUR HONOR, I RECOGNIZE THAT HE'S

15  READING A DIRECT QUESTION TO DR. DEROSA; BUT, SINCE IT WASN'T

16  SPLIT UP FOR DR. DEROSA, IT'S NOT FAIR TO SAY DR. DEROSA -- SPLIT

17  IT UP FOR THIS WITNESS.  DR. DEROSA ANSWERED HIS QUESTION, NO

18  DOUBT, BUT NOW HE'S SPLITTING THE QUESTION AND ASKING, DIDN'T

19  DR. DEROSA SAY THAT?

20        THE COURT:  I'M GOING TO OVERRULE IT.  I THINK IT'S A

21  FAIR QUESTION.  IF THE WITNESS WANTS TO MAKE THAT DISTINCTION,

22  THEN HE CAN, AND YOU CAN, OF COURSE, COVER IT ON REDIRECT, AS

23  WELL.  SO I THINK IT'S A FAIR QUESTION.

24                              EXAMINATION

25  BY MR. MEUNIER:

1   Q.   LET ME ASK THE QUESTION AGAIN.

2   A.   SURE.

3   Q.   ASSUME THAT DR. DEROSA, RELYING ON THE ATSDR TOXICOLOGICAL

4   PROFILE, HAS TESTIFIED IN THIS CASE THAT INHALATION EXPOSURE TO

5   FORMALDEHYDE OVER A PERIOD OF MONTHS TO A YEAR OR LONGER WOULD BE

6   EXPECTED TO INCREASE THE INCIDENCE OF UPPER RESPIRATORY TRACT AND

7   EYE IRRITATION.  AND I KNOW YOU DIDN'T LOOK AT UPPER RESPIRATORY

8   TRACT.  DO YOU DISPUTE DR. DEROSA AS TO EYE IRRITATION?

9   A.   YES, I DO.  THE CHAMBER STUDIES I'VE DONE INDICATE THAT IT'S

10  NOT A TIME-DEPENDENT CHEMICAL; IT'S CONCENTRATION DEPENDENT.  I

11  DON'T KNOW WHICH STUDIES HE LOOKED AT, BUT I LOOKED AT WHAT I

12  CONSIDER THE BEST TYPE OF EPIDEMIOLOGIC STUDY, AND I DID NOT FIND

13  THAT.

14  Q.   YOU PROFESS TO KNOW MORE ABOUT FORMALDEHYDE THAN

15  DR. CHRIS DEROSA?

16  A.   I WAS ASKED TO ANALYZE THIS PART OF A DOSE-RESPONSE CURVE.

17  I THINK IT'S CONCEIVABLE I COULD KNOW MORE ABOUT THIS THAN HE

18  DID.

19  Q.   I'M SORRY?

20  A.   YEAH, I THINK MAYBE I CAN.  YOU'RE TALKING ABOUT A PERSON

21  THAT'S HANDLING LOTS OF ASPECTS OF FORMALDEHYDE.  I DID A UNIQUE

22  EVALUATION.  YOU'RE ASKING ME IF I THINK I KNOW MORE ABOUT MY

23  UNIQUE EVALUATION AND HOW THAT IMPACTS THAT ASPECT THAN HE DID.

24  I SAID I THINK I MIGHT.

25  Q.   LET ME MAKE SURE I UNDERSTAND.  BASED ON 50 DAYS, LESS THAN

1   TWO MONTHS, OF REVIEWING STUDIES, AND ONLY CERTAIN STUDIES, NEVER

2   HAVING PUBLISHED OR DONE RESEARCH ON FORMALDEHYDE, YOU,

3   DR. JAMES, ARE TELLING THIS JURY THAT YOU THINK YOU KNOW MORE

4   ABOUT THE EFFECTS OF FORMALDEHYDE EXPOSURE THAN A MAN WHO WAS THE

5   DIRECTOR FOR 16 YEARS OF THE DEPARTMENT OF TOXICOLOGICAL AND

6   ENVIRONMENTAL MEDICINE FOR THE ATSDR, AND WHO WAS IN CHARGE OF

7   THAT AGENCY'S PROFILE ON FORMALDEHYDE?  IS THAT YOUR TESTIMONY?

8   A.   FOR THE SPECIFIC ISSUE OF EYE IRRITATION, I THINK I DID.  I

9   REVIEWED THOSE LITERATURE.  THOSE DOCUMENTS THAT HE'S IN CHARGE

10  OF ARE LARGE.  PEOPLE THAT WORK FOR THE CENTER FOR DISEASE

11  CONTROL LOOK AT LOTS OF DIFFERENT CHEMICALS LIKE I DO.  YOU DON'T

12  SPEND ALL YOUR TIME ON ONE CHEMICAL.

13       I THINK IT'S SORT OF A MISLEADING QUESTION, TO BE

14  HONEST.  BUT, YES, I THINK I KNOW AS MUCH ABOUT EYE IRRITATION

15  AND THE BEST WAY TO MEASURE IT AS DR. DEROSA.

16  Q.   BASED ON 15 DAYS OF RESEARCH?  50?

17  A.   YEAH.  IT'S A LIMITED NUMBER OF RESEARCH ONCE YOU IDENTIFY

18  THE CHARACTERISTICS OF THE BEST STUDIES AND HONE IN ON THE BEST

19  EXPERIMENTAL DESIGNS.

20  Q.   NOW, JUST SO I UNDERSTAND ONE FINAL THING ABOUT THESE

21  CHAMBER STUDIES, YOU'VE TALKED ABOUT THERE BEING SOME WAY TO

22  OBJECTIVELY MEASURE EYE IRRITATION.

23  A.   YES.

24  Q.   IT'S THAT PLUS THE SUBJECTIVE RESPONSES OF THE SUBJECTS THAT

25  DETERMINE THE OUTCOME OF THOSE STUDIES, TRUE?

1    A.    YES, DEPENDING ON THE STUDIES.  SOME ARE JUST SUBJECTIVE.

2    LANG WAS BOTH SUBJECTIVE AND PHYSIOLOGIC.

3    Q.    SO WE'RE DEPENDING ON PEOPLE TO DESCRIBE, AMONG OTHER

4    THINGS, THE SEVERITY OF A RESPONSE AND REPORT THAT, TRUE?

5    A.    YES.

6    Q.    AND, IN FACT, SOME OF THE SUBJECTS IN THESE STUDIES REPORT

7    IRRITATION EVEN WHEN THERE IS NO FORMALDEHYDE IN THE CHAMBER?

8    A.    CORRECT.

9    Q.    SO THERE IS SOME INHERENT UNRELIABILITY, ISN'T THERE, IN THE

10   STUDIES TO THE EXTENT THEY ARE BASED ON SUBJECTIVE RESPONSE?

11   A.    THANK YOU.  YOU JUST MADE MY POINT, WHICH IS WHY I PICKED

12   LANG, WHICH IS PHYSIOLOGIC MEASUREMENTS, AND DID NOT RELY ON

13   SUBJECTIVE COMPLAINTS WHICH ARE NOT AS RELIABLE.

14   Q.    LET'S TALK ABOUT LANG BECAUSE THAT'S A STUDY THAT YOU REALLY

15   LIKE AND REALLY RELY ON STRONGLY, TRUE?

16   A.    YES.

17   Q.    AND I ASKED YOU EARLIER ABOUT WHETHER THERE WERE TIMES IN

18   YOUR RESEARCH, NOT JUST GENERALLY, NOT JUST IN THIS CASE BUT

19   GENERALLY, WHEN YOU DO RELY ON STUDIES THAT HAVE BEEN SUPPORTED

20   AND FUNDED BY AN ENTITY THAT HAS A BUSINESS INTEREST IN THE DRUG

21   OR PRODUCT THAT'S BEING STUDIED.  AND YOU TOLD ME THERE ARE TIMES

22   WHEN YOU DO THAT, TRUE?

23   A.    SURE.  BUSINESSES OR INDUSTRIES WILL OFTEN HIRE A VERY GOOD

24   TOXICOLOGIST TO RUN STUDIES FOR THEM, SURE.

25   Q.    IN FACT, ONE OF THE STUDIES THAT YOU TOLD US ABOUT THAT YOU

1  RELIED ON IS THE BENDER STUDY?

2  A.   YES.

3  Q.   AND THAT'S ENTITLED, "EYE IRRITATION RESPONSE OF HUMANS TO

4  FORMALDEHYDE"?

5  A.   YES.

6  Q.   AND IN THE ACKNOWLEDGMENT AT THE END OF THE BENDER ARTICLE,

7  "THE AUTHORS WISH TO THANK YOU A. LEVY OF MEMORIAL INSTITUTE,

8  BATTELLE MEMORIAL INSTITUTE FOR ASSISTING IN THE PREPARATION OF

9  THIS MANUSCRIPT" -- AND IT'S A LITTLE BLOCKED OUT -- "AND

10  W. H. MARTIN OF DUPONT, WASHINGTON WORKS, FOR PROJECT

11  COORDINATION"; CORRECT?

12  A.   YES.  THAT WOULD INDICATE THAT DUPONT COORDINATED AN EVENT

13  THAT WAS DONE BY AN INDEPENDENT LAB KNOWN AS BATTELLE INDUSTRIES.

14  Q.   AND HERE IS THE LANG STUDY, WHICH APPEARS TO HAVE BEEN DONE

15  IN HEIDELBURG, GERMANY, IN MARCH OF 2007, RIGHT?

16  A.   YES.

17  Q.   YOU KNOW FROM REVIEWING THE MATERIAL IN THIS CASE, THAT'S

18  AFTER THIS LITIGATION BEGAN, ISN'T IT?

19  A.   YES.  IT'S THE MOST RECENT PAPER ON THIS ISSUE THAT I COULD

20  FIND.

21  Q.   AND IN THE ACKNOWLEDGMENTS FOR THE LANG STUDY, THE AUTHORS

22  THANK THE FORMACARE SECTOR GROUP OF CEFIC, BRUSSELS, BELGIUM, FOR

23  THE FINANCIAL CONTRIBUTION TO PERFORM THIS STUDY, CORRECT?

24  A.   YES.

25  Q.   THAT'S THE EUROPEAN CHEMICAL INDUSTRY COUNCIL, ISN'T IT?

1  A.    YES.

2  Q.    AND THE EUROPEAN CHEMICAL INDUSTRY COUNCIL, ACCORDING TO

3  THEIR WEB SITE, IS THE LARGEST INDUSTRY TRADE ORGANIZATION -- OR

4  ONE OF THE LARGEST INDUSTRY TRADE ORGANIZATIONS IN EUROPE AND IN

5  THE WORLD, CORRECT?

6  A.    YES.  BUT I DON'T KNOW WHY WE'RE DOING THIS LINE OF

7  QUESTIONING.  THE PEOPLE THAT MAKE CHEMICALS ARE HELD RESPONSIBLE

8  FOR GENERATING THE STUDIES, WHICH MEANS THEY WILL HIRE GOOD

9  RESEARCHERS TO DO STUDIES FOR THEM SO THAT THEY MAY DEVELOP

10  PROTECTIVE AND SAFE LEVELS AND UNDERSTAND THE TOXICITY OF THE

11  CHEMICAL.

12        SO YOU SEEM TO BE IMPLYING THAT THERE IS SOMETHING

13  WRONG WITH THE RESEARCH JUST BECAUSE THE PEOPLE THAT ARE SUPPOSED

14  TO BE RESPONSIBLE FOR SEEING THE RESEARCH IS DONE ARE HIRING

15  SCIENTISTS TO DO THAT RESEARCH.

16  Q.    DR. JAMES, AREN'T YOU AWARE OF PUBLISHED LITERATURE TO THE

17  EFFECT THAT CONFLICTS OF INTEREST IN TERMS OF WHAT IS BEING

18  SUBJECT TO A STUDY AND WHO IS FUNDING THE STUDY ARE KNOWN TO

19  EXIST AND TO SHOW UP IN THE OUTCOMES OF STUDIES?  AREN'T YOU

20  AWARE OF THAT?

21  A.    I'M AWARE THAT IN SOME INSTANCES THERE HAVE BEEN SOME BAD

22  STUDIES DONE BY BAD RESEARCHERS.  THERE IS ALWAYS A FULL

23  DISCLOSURE ON WHO FUNDED IT AND WHO DID IT, SO THAT WE CAN WATCH

24  AT THAT; BUT, JUST BECAUSE SOMEBODY HIRES A GOOD SCIENTIST TO DO

25  A GOOD STUDY DOESN'T MEAN IT'S A BAD STUDY IS WHAT I'M SAYING.

Case 2:07-md-01873-KDE-MBN   Document 8879   Filed 12/08/09   Page 66 of 171

66

Q.   BUT THE LANG STUDY, WHICH WAS GENERATED AFTER THIS

LITIGATION BEGAN AND ON WHICH YOU PRIMARILY RELY --

A.   IT'S THE BEST STUDY.

Q.   -- WAS FUNDED BY THE EUROPEAN CHEMICAL INDUSTRY COUNCIL

WHICH REPRESENTS 29,000 COMPANIES PRODUCING 30 PERCENT OF THE

WORLD'S CHEMICALS, TRUE?

A.   I GUESS.  I WASN'T AWARE OF THAT.  I GUESS SO.

Q.   ARE YOU FAMILIAR WITH THE PUBLICATION IN THE *BRITISH MEDICAL

JOURNAL* OF AUGUST 2002 ENTITLED, "ASSOCIATION BETWEEN COMPETING

INTERESTS AND AUTHORS' CONCLUSIONS, EPIDEMIOLOGICAL STUDY OF

RANDOMIZED CLINICAL TRIALS," PUBLISHED IN THE *BRITISH MEDICAL

JOURNAL*?

A.   I'M NOT AWARE OF THAT PAPER, NO.

Q.   ARE YOU AWARE OF THE ARTICLE ENTITLED, "THE SOURCE OF

FUNDING AND THE OUTCOME OF CLINICAL TRIALS," PUBLISHED IN THE

*JOURNAL OF GENERAL INTERNAL MEDICINE* IN 1986?

A.   I'M NOT AWARE OF THAT JOURNAL -- I MEAN, THAT ARTICLE

EITHER.

Q.   AND, AGAIN, I THINK YOU SAID, THOUGH, YOU WERE AWARE,

ALTHOUGH YOU MAY NOT BE SPECIFICALLY AWARE OF THESE STUDIES, THAT

IT HAS BEEN DEMONSTRATED IN PEER-REVIEWED LITERATURE THAT THE

FUNDING OF A STUDY BY AN ENTITY THAT HAS A FINANCIAL INTEREST IN

THE DRUG OR PRODUCT BEING STUDIED SHOWS UP ON A STATISTICALLY

SIGNIFICANT BASIS IN OUTCOME; YOU'RE AWARE OF THOSE STUDIES,

AREN'T YOU?

1   A.   NO, I'M NOT AWARE OF THAT STUDY.  WHAT I SAID WAS I'M AWARE

2   OF INSTANCES WHERE PEOPLE HAVE BEEN HIRED, MISTAKES WERE MADE IN

3   THE LABORATORY, DATA WAS INCORRECTLY REPORTED, IT WAS SORT OF BAD

4   DATA CONTROLLING MANAGEMENT IN ORDER TO KEEP AN INDUSTRIAL CLIENT

5   HAPPY.  I'M AWARE OF THOSE KINDS OF PROBLEMS THAT HAVE OCCURRED

6   IN TOXICITY TESTING LABS.

7            I'M ALSO AWARE THAT THERE IS ALWAYS A CONCERN FOR WHO

8   FUNDED IT AND THAT THERE MAY BE SOME CONCERN OF HOW THAT MIGHT

9   INFLUENCE FUNDING, YES.

10  Q.   LET ME ASK IT THIS WAY:  WOULD YOU DENY THAT THERE IS A

11  PEER-REVIEWED ARTICLE STATING THAT -- SHOWING THAT THERE IS A

12  STATISTICALLY SIGNIFICANT CONNECTION AND ASSOCIATION BETWEEN THE

13  SOURCE OF FUNDING AND THE OUTCOME OF STUDIES?  WOULD YOU DENY

14  THAT?

15  A.   YOU'RE ASKING ME TO DENY OR CONFIRM SOMETHING I'M NOT AWARE

16  OF, SO I DON'T KNOW HOW I CAN DO THAT.  I CAN'T ANSWER THAT

17  QUESTION.

18  Q.   WELL, YOU CAN TELL ME YOU DON'T DENY IT.

19  A.   I DON'T DENY THE EXISTENCE OF SOMETHING I'M NOT SURE EXISTS

20  AND HAVE NEVER SEEN.  I'M SORRY, BUT THE QUESTION IS GETTING SORT

21  OF CIRCUITOUS.

22  Q.   WOULD YOU BE SURPRISED THAT THERE HAS BEEN A STATISTICALLY

23  SIGNIFICANT --

24            MR. WEINSTOCK:  OBJECTION, YOUR HONOR, HE'S NOW

25  TESTIFYING.

1        THE COURT:  WELL, LOOK, THIS IS CROSS-EXAMINATION.

2  DR. JAMES, YOU HAVE TO ANSWER THE QUESTION THAT HE'S ASKED AND

3  THEN MOVE ON TO THE NEXT QUESTION.  SO LET'S STICK WITH THAT

4  FORMAT.

5            MR. MEUNIER, I THINK THAT YOU HAVE NOW GOTTEN TO

6  THE POINT WHERE YOU'VE ESTABLISHED -- YOU'VE ASKED HIM THAT, AND

7  IT'S TIME TO MOVE ON.  SO I'M GOING TO SUSTAIN THE OBJECTION.

8        MR. MEUNIER:  OKAY.

9                        EXAMINATION

10  BY MR. MEUNIER:

11  Q.  I JUST WANT TO ASK YOU ONE MORE THING ABOUT LANG.  WERE YOU

12  AWARE THAT A DRAFT PROTOCOL OF LANG WAS SENT TO THE EPA IN

13  NOVEMBER OF 2006?

14  A.  A DRAFT PROTOCOL, NO.

15  Q.  WERE YOU AWARE THAT THE FORMALDEHYDE COUNCIL SENT A DRAFT

16  PROTOCOL TO THE EPA?

17  A.  NO, I WASN'T, BUT I WOULD THINK THAT WOULD BE A GOOD THING.

18  IF YOU'RE GOING TO DRAFT A STUDY, AND YOU'RE GOING TO SEND IT TO

19  REGULATORY AGENCIES FOR COMMENT, IT'S SORT OF SHOWING AN OPEN

20  COMMUNICATION.

21  Q.  RIGHT.  AND WHY DO YOU THINK THE FORMALDEHYDE COUNCIL WOULD

22  WANT THE EPA TO KNOW ABOUT THE UPCOMING LANG STUDY?

23  A.  I HAVE NO IDEA.  I CAN'T SPEAK FOR THE FORMALDEHYDE COUNCIL

24  AND HOW THEY THINK.

25  Q.  DO YOU KNOW WHO THEY ARE?

1  A.    NO.   I DON'T KNOW THEM.   I MEAN, FOR EACH MANUFACTURING

2  ENTITY, MINING, WHATEVER, THEY WILL HAVE SOME COUNCIL OR SOME

3  REPRESENTATIVE GROUP.   I'M NOT FAMILIAR WITH THE FORMALDEHYDE

4  COUNCIL, NO.

5  Q.    NOW, IN ADDITION TO THERE BEING LOWER IRRITANT LEVELS FOR

6  FORMALDEHYDE IN SOME OF THE STUDIES THAT WERE IN YOUR FILE THAT

7  YOU CHOSE TO DISREGARD LOOKING AT ONLY CHAMBER STUDIES, YOU KNOW

8  THAT FEDERAL SCIENTISTS AND AGENCIES HAVE ESTABLISHED

9  FORMALDEHYDE IRRITANT LEVELS FAR BELOW .5 PPM, DON'T YOU?

10  A.    I DON'T KNOW WHAT DO YOU MEAN BY ESTABLISHED?   AND I DON'T

11  KNOW IF THEY TRIED TO -- IF THEY USED A DIFFERENT BASIS OF

12  RESEARCH.

13  Q.    I WANT TO SHOW YOU A DOCUMENT WHICH IS ENTITLED, "THE

14  DEPARTMENT OF HOMELAND SECURITY OFFICE OF INSPECTOR GENERAL'S

15  FEMA RESPONSE TO FORMALDEHYDE IN TRAILERS."

16       AND DO YOU SEE THAT THIS DOCUMENT SETS FORTH DIFFERENT

17  FEDERAL AGENCIES' STANDARDS OR LEVELS REGARDING THE IRRITANT

18  EFFECTS OF FORMALDEHYDE?

19  A.    BEG YOUR PARDON?   YOU WANT ME JUST TO LOOK AT THE YELLOW

20  HIGHLIGHTING; IS THAT WHAT YOU WERE ASKING?

21  Q.    YES, SIR.

22  A.    OKAY, I SEE IT.

23  Q.    SO IN THE CASE OF THE EPA, .1 PPM AND ABOVE WILL CAUSE

24  WATERY EYES, BURNING SENSATIONS IN THE EYES, NOSE AND THROAT,

25  NAUSEA, COUGHING, CHEST TIGHTNESS, WHEEZING, SKIN RASHES AND

1  ALLERGIC.  THAT'S .1 PPM AND HIGHER.  THAT'S ACCORDING TO THE

2  EPA, TRUE?

3  A.  I GUESS, YES.

4  Q.  DO YOU DISAGREE WITH THAT?

5  A.  WELL, IT SEEMS TO BE COVERING SKIN RASHES, ALLERGIC

6  RESPONSES, ET CETERA.  PART OF IT'S ABOUT IRRITATION.  IT'S SUCH

7  A GENERAL PHENOMENON THAT I CAN'T -- I DON'T DISAGREE WITH IT,

8  BUT I DON'T KNOW THAT IT'S RELEVANT TO WHAT I'VE TALKED ABOUT.

9  IT'S KIND OF AN APPLES AND ORANGES COMPARISON HERE.

10  Q.  WELL, THESE ARE THE IRRITANT EFFECTS OF FORMALDEHYDE

11  EXPOSURE, RIGHT?

12  A.  YES.  AND AS I'VE SAID REPEATEDLY, THAT IF YOU DON'T CONTROL

13  FOR THINGS LIKE RESPONSES TO CLEAN AIR, FLU, MOODS, ET CETERA, IF

14  YOU'RE NOT DOING CAREFUL EXPERIMENTAL STUDIES, YOU CAN GET

15  RESPONSES AT LOWER LEVELS.  THE PROBLEM IS, IS THEY ARE NOT

16  LIKELY TO BE ACCURATE.

17  Q.  WELL, YOU JUST TOLD ME YOU DON'T NECESSARILY DISAGREE WITH

18  THIS.  IS THAT STILL YOUR TESTIMONY?

19  A.  WELL, IT'S COVERING OTHER TOXICITIES, SO I HAVE NO OPINION

20  ON THAT.

21  Q.  NO OPINION ON THAT.

22      HOW ABOUT THE U.S. CONSUMER PRODUCT SAFETY COMMISSION

23  AND ITS STANDARD THAT FORMALDEHYDE EXPOSURE ABOVE .1 PPM WILL

24  CAUSE WATERY EYES, BURNING SENSATIONS IN THE EYES, NOSE AND

25  THROAT, NAUSEA, COUGHING, CHEST TIGHTNESS, WHEEZING, SKIN RASHES

1  AND ALLERGIC REACTIONS?

2  A.   YES.   AND I'VE JUST REVIEWED FIVE CHAMBER STUDIES, NONE OF

3  WHICH FOUND THOSE KINDS OF EFFECTS.

4  Q.   SO YOU DISAGREE WITH THE CONSUMER PRODUCT SAFETY COMMISSION,

5  AS WELL?

6  A.   I DON'T DISAGREE THAT THEY FOUND STUDIES IN THE GENERAL

7  POPULATION THAT WEREN'T WELL CONTROLLED.   I WOULD DISAGREE THAT

8  IF YOU USED A WELL CONTROLLED STUDY OR EXPERIMENTAL STUDY THAT

9  YOU WOULD COME TO THAT CONCLUSION.   SO I THINK WE'RE TALKING

10 ABOUT DIFFERENCES IN APPROACHES TO THE TYPES OF LITERATURE THAT

11 WERE REVIEWED.

12 Q.   AND YOU KNOW THAT NIOSH SETS A STANDARD OF .016 PPM FOR

13 FORMALDEHYDE EXPOSURE?

14 A.   I WAS TOLD THAT.   I HADN'T LOOKED IT UP.

15 Q.   DO YOU HAVE ANY AGREEMENT OR DISAGREEMENT WITH THAT AS A

16 LEVEL OF EXPOSURE STANDARD?

17 A.   I'M SORRY, SIR, BUT THAT'S SUCH A VAGUE QUESTION.   I MEAN,

18 FOR OCCUPATIONAL EXPOSURES, THEY ARE LOOKING AT ALL HEALTH

19 EFFECTS.   I'M BEING SHOWN STANDARDS THAT ARE PROBABLY INTENDED TO

20 CAPTURE ALL HEALTH EFFECTS AND NOT IRRITATION.

21        SO I DIDN'T LOOK AT THESE PARTICULAR STANDARDS, I'VE

22 SAID SO AT DEPOSITION, BECAUSE THEY ARE NOT REALLY RELEVANT TO MY

23 OPINION.   THEY ARE APPLES AND ORANGES COMPARISONS BECAUSE THEY

24 ARE LOOKING AT OTHER TOXICITIES THAT MAY DRIVE THE EVALUATION.

25 SO I HAVE NO ABILITY TO COMMENT.

1       THEY ARE WHAT THEY ARE.  I HAVEN'T LOOKED TO SEE WHAT

2   THEY ARE BASED ON.  I WASN'T REALLY TASKED TO DO THAT.

3   Q.   AND IN THE CDC REPORT WHICH WE'VE LOOKED AT, YOU SEE THE

4   POSITION OF THE WORLD HEALTH ORGANIZATION?

5   A.   YEAH, I CAN READ THE YELLOW HIGHLIGHT FROM HERE, 100 PART

6   PER BILLION FOR 30 MINUTES.  YES.

7       I DON'T KNOW HOW I'M SUPPOSED TO RESPOND.  AM I

8   SUPPOSED TO SAY, YES, I READ THE YELLOW; YES, I SEE THAT?

9   Q.   YES.  YOU KNOW WHAT THE WORLD HEALTH ORGANIZATION IS,

10  DR. JAMES?

11  A.   YES, I KNOW WHO WHO IS.

12  Q.   AND YOU DISAGREE WITH THAT STATEMENT, AS WELL?

13  A.   THE WAY IT'S STATED -- THEY PICKED A GUIDELINE.  LET'S SEE,

14  THIS GUIDELINE WAS DEVELOPED TO PROTECT AGAINST -- I'M SORRY.

15  I'M TRYING TO READ IT SO I CAN JUST SEE IF I DISAGREE WITH IT.

16      NO, BASICALLY IT'S A REGULATORY-TYPE APPROACH.  THEY'RE

17  TRYING TO BE BELOW LEVELS THAT WOULDN'T CAUSE EFFECTS.  THEY'VE

18  PICKED A LEVEL THAT IS VERY LOW AND THEY BELIEVE IS VERY SAFE.

19  THAT'S TYPICALLY WHAT REGULATORY AGENCIES DO.

20      I DON'T HAVE ANY DISAGREEMENT WITH THAT.  I DON'T HAVE

21  ANY DISAGREEMENT WITH THE REGULATORY APPROACH.

22  Q.   AND ASSUMING, FINALLY, THAT DR. CHRIS DEROSA, WHOM WE TALKED

23  ABOUT EARLIER, HAS TESTIFIED THAT HE DISAGREES WITH THE .3 PPM

24  HEALTH EFFECT LEVEL SELECTED BY A MAN NAMED LITTLE WE'RE GOING TO

25  HEAR FROM LATER, AND BELIEVES THAT THE HEALTH EFFECT LEVEL FOR

1  FORMALDEHYDE IS FAR LOWER, MUCH LOWER THAN .3 PPM, YOU WOULD
2  DISAGREE WITH THAT?
3  A.   NO.  AND I THINK YOU'RE TRYING TO TRICK AND TWIST WHAT I'M
4  SAYING, BECAUSE I'M SURE IF YOU'RE PICKING LEVELS FOR HEALTH
5  EFFECTS, YOU'RE LOOKING AT -- IRRITATION IS PROBABLY THE LAST
6  THING ON YOUR MIND.  YOU'RE LOOKING FOR THE FACT THAT IT CAUSES
7  CANCERS IN RATS AND OTHER TOXICITIES.  SO FOR CHRONIC EXPOSURES,
8  YOU'RE LOOKING FOR MORE SERIOUS TOXICITIES THAN IRRITATION.
9         SO WHEN YOU'RE DEVELOPING AN OVERALL STANDARD, I REALLY
10 DOUBT THAT IRRITATION WOULD BE A MAJOR FEATURE OF THAT -- THE
11 DEVELOPMENT OF THAT STANDARD.
12 Q.   RIGHT.  BUT THE STUDIES WE JUST LOOKED AT, THE EPA AND THE
13 CONSUMER PRODUCT SAFETY COMMISSION, DEALT WITH IRRITANT EFFECTS
14 OF FORMALDEHYDE.
15 A.   AND OTHER THINGS, YES.
16 Q.   OKAY.  SO IF I HAVE THIS RIGHT, WE HAVE YOU WITH LESS THAN
17 TWO MONTHS OF RESEARCH LOOKING JUST AT CHAMBER STUDIES, NONE OF
18 WHICH INVOLVED KIDS, SAYING TO THE JURY THAT YOU THINK .5 PPM FOR
19 EYES AND 1 PPM FOR NOSE AND THROAT ARE THE LOWEST EFFECT LEVELS
20 FOR FORMALDEHYDE; IS THAT YOUR POSITION?
21 A.   SEE, NOW YOU'VE SAID SOMETHING TOTALLY DIFFERENT.  YOU'RE
22 SAYING THAT I'M SAYING THAT THE .5 PPM IS THE LOWEST EFFECT
23 LEVEL.  I'M NOT SAYING THAT.
24 Q.   YOU'RE NOT SAYING THAT?
25 A.   NO.  I SAID .5 PPM IS THE LOWEST NO OBSERVABLE EFFECT LEVEL

1   FOR IRRITATION.  EFFECT LEVELS COULD BE LOWER, FOR EXAMPLE, ODOR,

2   ODORS AT 40 PARTS PER BILLION.  THAT WOULD BE AN EFFECT LEVEL,

3   NOT AN ADVERSE EFFECT LEVEL.

4          MOST OF THE GUIDELINES THAT I SEE UP THERE ARE

5   GUIDELINES THAT ARE DERIVED TO PROTECT AGAINST ALL TOXICITIES.  I

6   DON'T -- I CAN'T, AS I SIT HERE, THINK OF ANY ONE OF THEM BEING

7   SPECIFIC FOR IRRITATION.  THEY MIGHT INCLUDE IRRITATION AS A

8   CONSIDERATION, BUT IT'S MORE LIKELY THAN NOT THAT THEY ARE GOING

9   TO BE FOR CHRONIC TOXICITY DETERMINATIONS, AND A CONCERN FOR

10  ANIMAL CANCERS ALWAYS DRIVES A REGULATORY LEVEL TO A LOW LEVEL.

11  Q.   WELL, I WANT TO GET THROUGH WITH THIS AND SAVE TIME, BUT

12  THAT ANSWER TAKES ME BACK TO THE EARLIER THING WE LOOKED AT,

13  WHICH IS THAT THE EPA AND THE CONSUMER PRODUCT SAFETY COMMISSION

14  TALK ABOUT .1 PPM AS THE EFFECT LEVEL SPECIFICALLY FOR WATERY

15  EYES, BURNING SENSATIONS TO THE EYES, NOSE AND THROAT, ET CETERA.

16  THOSE ARE THE THINGS YOU'RE TELLING THE JURY ABOUT, TRUE?

17  A.   YES.  BUT, AS I SAID, AND I CAN GET OUT THE TABLE OF THE

18  KULLE STUDY THAT WOULD SHOW PEOPLE THAT ARE NOT EXPOSED WHICH

19  GIVES SOME OF THESE SAME SENSATIONS, ET CETERA.  SO IF YOU'RE NOT

20  DOING A WELL CONTROLLED STUDY, YOU'RE NOT DOING AN EXPERIMENTAL

21  STUDY, AND YOU'RE NOT LOOKING AT CONFOUNDERS, I'M SURE, IN THE

22  GENERAL LITERATURE, CROSS-SECTIONAL AND ECOLOGICAL LITERATURE,

23  YOU CAN FIND OTHER VALUES AND LOWER VALUES THAT ARE CONFOUNDED BY

24  THESE PROBLEMS.

25  Q.   AND THAT'S IMPORTANT, DOCTOR.  LET ME JUST CONFIRM THAT.

1  YOU RECOGNIZE THAT WITH FORMALDEHYDE THERE MAY WELL BE SERIOUS

2  ADVERSE HEALTH EFFECTS ASIDE FROM IRRITATION OCCURRING AT LESS

3  THAN .5 PPM?

4  A.   NO.  I DID NOT RECOGNIZE THAT AT ALL.  AND, AGAIN, YOU'RE

5  TWISTING WHAT I SAID.

6           REGULATORY AGENCIES PUT A LEVEL WAY BELOW THE SAFE

7  LEVEL.  WHAT I'M SAYING IS THEIR LEVEL WILL BE LOWER THAN MINE IF

8  THEY ARE LOOKING AT OTHER ADVERSE EFFECTS.  IF YOU NOW PICK THAT

9  LEVEL, YOU CANNOT SAY AT THAT LEVEL OR ABOVE THAT LEVEL CAUSES AN

10 ADVERSE EFFECT.  REGULATORY VALUES CAN'T BE USED THAT WAY.

11 THEY'RE PROTECTIVE.  THEY CANNOT BE USED TO ASSIGN CAUSATION.

12 THEY ARE SO LOW THAT WHEN YOU'RE ABOVE THEM, YOU DON'T KNOW HOW

13 FAR YOU CAN GO AND STILL BE SAFE.

14 Q.   SO, IN CONTEXT, WE SEE THAT YOUR IRRITANT EFFECT LEVELS OF

15 .5 PPM AND 1 PPM ARE MUCH GREATER THAN THE EFFECT LEVELS WE'VE

16 TALKED ABOUT, INCLUDING FOR IRRITATION, FOR THE EPA, THE CDC, THE

17 CPSC, ET CETERA; TRUE?

18          MR. WEINSTOCK:  I OBJECT TO THE FORM, YOUR HONOR.  IT'S

19 THE FOURTH TIME.  WHEN ARE WE GOING TO WRAP THIS UP?

20          MR. MEUNIER:  I'M WRAPPING IT UP WITH THIS QUESTION.

21          THE COURT:  I THINK WE'RE GETTING A LITTLE REPETITIVE

22 HERE.  AND I THINK, AS I UNDERSTAND HIS TESTIMONY, I THINK HE'S

23 ANSWERED THAT TESTIMONY.

24          MR. MEUNIER:  ALL RIGHT.  WE'LL MOVE ON.

25                        EXAMINATION

BY MR. MEUNIER:

Q.   LET ME FINALLY TALK ABOUT THE ATSDR'S MINIMUM RISK LEVELS WHICH YOU DISCUSSED IN DIRECT.  THE ATSDR USES THREE DIFFERENT EXPOSURE PERIODS AND EVALUATIONS AND SETS OF SAFETY FACTORS, CORRECT?

A.   YES.

Q.   AND THEY USE BOTH ANIMAL AND HUMAN STUDIES TO MEASURE THOSE EXPOSURES OVER THE CORRESPONDING INTERVAL?

A.   YES.

Q.   AND YOU'VE MADE NO EFFORT TO RESEARCH OR ANALYZE THE SCIENTIFIC BASIS FOR THOSE EXPOSURE VALUES FOR THOSE DIFFERENT INTERVALS?

A.   THAT'S RIGHT.

Q.   AND IT'S CORRECT THAT THE ATSDR MINIMUM RISK LEVELS ARE, AS I'M SHOWING HERE, .04 PPM FOR ACUTE EXPOSURE, .03 PPM FOR INTERMEDIATE EXPOSURE, AND .008 PPM FOR CHRONIC EXPOSURE, CORRECT?

A.   I DON'T KNOW.  LIKE YOU SAID, I DIDN'T RESEARCH THEM, SO I HAVE ASSUMED THAT YOU'VE PRINTED THE NUMBERS CORRECTLY.

Q.   WELL, THIS HAS BEEN, I THINK, ACKNOWLEDGED IN THE CASE, AND IT'S IN EVIDENCE.

A.   OKAY.

Q.   I WANT TO ASK YOU WHAT YOU MEAN OR YOU WOULD SAY IS A CHRONIC EXPOSURE, AS A TOXICOLOGIST.

A.   TYPICALLY, SUBCHRONIC IS UP TO ABOUT 90 DAYS, PROBABLY MORE

1    THAN THREE MONTHS.  THAT'S THE WAY WE TEND TO LOOK AT IT IN

2    ANIMALS, BUT FOR A LONG TIME, YES.  YEARS.

3    Q.   HOW ABOUT FOR HUMANS?

4    A.   I WOULD SAY -- I CONSIDER CHRONIC STUDY TO BE SIX MONTHS OR

5    SEVERAL YEARS, YES.

6    Q.   OVER SIX MONTHS WOULD BE CHRONIC?

7    A.   YES.  THERE'S SORT OF THAT BLUR BETWEEN SUBCHRONIC AND

8    CHRONIC AND HOW LONG THAT'S GOING TO BE.

9    Q.   SO AN EXPOSURE OF 19 MONTHS WOULD BE CHRONIC?

10   A.   YES.

11   Q.   WOULD AN EXPOSURE OF 19 MONTHS STILL BE CHRONIC EVEN IF THE

12   INDIVIDUAL WERE NOT EXPOSED 24 HOURS A DAY, 7 DAYS A WEEK, BUT,

13   LET'S SAY, 10 HOURS A DAY?

14   A.   IT'S A CHRONIC EXPOSURE, JUST AS WORKERS AREN'T EXPOSED TO

15   MORE THAN ABOUT EIGHT OR NINE HOURS A DAY.

16   Q.   SO FOR A 19-MONTH EXPOSURE, YOU WOULD AGREE THAT IN TERMS OF

17   THE INTERVAL THAT CORRESPONDS TO THE ATSDR MINIMUM RISK LEVEL,

18   WE'RE DEALING WITH CHRONIC?

19   A.   THAT WOULD PROBABLY BE MY DEFINITION.  I DON'T KNOW IF ATSDR

20   HAS A DIFFERENT TIME INTERVAL.  I DON'T KNOW IF THEY STATE THAT

21   IN THE DOCUMENTS.

22   Q.   NOW, DO YOU KNOW THESE MINIMUM RISK LEVELS AT THE ATSDR TO

23   ALSO BE REFERRED TO AS HEALTH GUIDANCE VALUES?

24   A.   THAT'S THE WAY THEY REFER TO THEM, YES.

25   Q.   AND THEY ARE PROTECTIVE, ALTHOUGH NOT PREDICTIVE, TRUE?

1  A.    RIGHT.

2  Q.    THAT'S THE IMPORTANT DISTINCTION; THEY'RE PROTECTIVE?

3  A.    YES.

4  Q.    IF DR. DEROSA HAS INDICATED THAT HE CONSIDERS THESE HEALTH

5  GUIDANCE VALUES TO BE APPLICABLE TO AN EVALUATION OF THE

6  FORMALDEHYDE RISKS INVOLVED IN THE FEMA TRAILERS, WOULD YOU

7  DISAGREE?

8  A.    YES, I WOULD.

9          MR. WEINSTOCK:  YOUR HONOR, I OBJECT, AND I WOULD LIKE

10  TO APPROACH BECAUSE I WANT TO SEE THAT TESTIMONY.

11          THE COURT:  COME ON UP.

12          MR. WEINSTOCK:  THAT'S NOT WHAT HE SAID.

13          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

14  A CONFERENCE HELD AT THE BENCH.)

15          MR. WEINSTOCK:  HE SAID IT WAS A STARTING POINT FOR THIS

16  TESTIMONY.  HE DID NOT SAY IT WAS PREDICTIVE.  I MEAN, HE HAS

17  REVIEWED THE DEPOSITION, SO IT'S HIS TESTIMONY.  I UNDERSTAND THE

18  CROSS, BUT --

19          MR. MEUNIER:  WHAT I'M REFERRING TO, JUDGE, IS PAGE 190,

20  LINES 17 THROUGH 22 -- I'M SORRY, 92, LINES 19 TO 23.

21          THE COURT:  92.  WHAT LINES?

22          MR. MEUNIER:  19 TO 23.

23          MR. WEINSTOCK:  IS THIS JUST YOUR TRUNCATED VERSION?

24          MR. MEUNIER:  NO, THIS IS THE ACTUAL TRANSCRIPT OF WHAT

25  WAS PLAYED TO JURY.  THIS IS WHAT WAS PLAYED TO THE JURY.

1        THE COURT:  ALL I HAVE, IT ENDS AT LINE 18.

2        MR. WEINSTOCK:  WHAT PAGE?  I'M SORRY.

3        THE COURT:  PAGE 92.

4        MR. MEUNIER:  PAGE 92.  NO, JUDGE, THIS IS THE

5   TRANSCRIPT OF WHAT THE JURY HEARD.  THAT'S WHY IT'S NOT A

6   CONTINUOUS -- THESE ARE THE ACTUAL WORDS THAT THE JURY HEARD IN

7   HIS TESTIMONY.

8        THE COURT:  AND WHAT --

9        MR. MEUNIER:  PAGE 19, YOU HAVE IT, LINE -- PAGE 92,

10  LINE 19 TO 23.  THIS QUESTION.

11       MR. WEINSTOCK:  THE QUESTION WENT WAY BEYOND THAT.  THAT

12  WAS NOT YOUR QUESTION.

13       THE COURT:  I DON'T RECALL --

14       MR. MEUNIER:  MY QUESTION IS WHETHER HE AGREES WITH

15  DEROSA THAT THE MRL'S ARE APPLICABLE TO THE EVALUATION OF THE

16  RISK IN THIS CASE.

17       THE COURT:  THIS REFERENCES MR. LITTLE.

18       MR. MEUNIER:  RIGHT.  AND WHAT DR. DEROSA SAYS IN HIS

19  TESTIMONY IS HE DISAGREES WITH LITTLE THAT --

20       MR. WEINSTOCK:  BECAUSE THE MRL'S ARE A LAUNCH POINT, A

21  TOPIC OF DISCUSSION.  THAT'S WHAT HE SAID, BUT THAT DOESN'T SAY

22  WHAT YOU ARE SAYING.

23       THE COURT:  WELL, I DON'T SEE WHERE THIS REFERENCES --

24  TELL ME, JERRY.  TELL ME.  SHOW ME WHAT YOU ARE TALKING ABOUT.

25       MR. MEUNIER:  WE ARE TALKING ABOUT ONE ISSUE, WHICH IS

1    THE APPLICABILITY OF THE MRL'S TO EVALUATE THE RISK IN THE CASE.

2    THAT'S WHAT WE'RE DEALING WITH.

3              THE COURT:  RIGHT.  THAT'S RIGHT.  I UNDERSTAND.

4              MR. MEUNIER:  LITTLE SAID IN HIS DEPOSITION AND WILL SAY

5    IN HIS TESTIMONY HE THINKS THE MRL'S WERE INAPPLICABLE TO

6    EVALUATE THE RISK IN THIS CASE.

7                   IN THIS QUESTION, DEROSA IS ASKED --

8              THE COURT:  WAIT, WAIT, WAIT.  WE'VE GOT TWO PEOPLE

9    TALKING.

10             MR. MEUNIER:  IN THIS QUESTION, DEROSA IS ASKED, DO YOU

11   AGREE WITH LITTLE THAT THEY ARE INAPPLICABLE?  HE SAYS, NO.  HE'S

12   THEREFORE SAYING IN THE TESTIMONY HE THINKS THEY ARE APPLICABLE.

13             MR. WEINSTOCK:  THAT'S AN ASSUMPTION.  WHAT HE SAID

14   IS -- I MEAN, LET'S BE FAIR.  WHAT HE SAID WAS, IT IS THE

15   STARTING POINT FOR THE DISCUSSION OF WHAT -- OF WHAT THE RISK

16   LEVELS WOULD BE.  HE'S TURNING A NEGATIVE INTO AN AFFIRMATIVE

17   STATEMENT.

18             THE COURT:  I THINK YOU HAVE TO REWORD YOUR QUESTION.

19             MR. WEINSTOCK:  BECAUSE HE DIDN'T DISAGREE, NOW, ALL OF

20   A SUDDEN, HE AGREES WITH EVERYTHING.

21             MR. MEUNIER:  I CAN'T ASK HIM A DOUBLE NEGATIVE.  I CAN

22   ASK HIM IF HE DISAGREES WITH DEROSA THAT -- YOU SEE WHAT I'M --

23             MR. WEINSTOCK:  BUT THIS IS A COMMENT ON --

24             THE COURT:  WHAT YOU'RE ASKING, THOUGH, IS BY

25   IMPLICATION.  IF WE'RE GOING TO -- IF WE'RE GOING TO REFERENCE

1   SOMEBODY ELSE'S TESTIMONY, WE HAVE TO DO SO ACCURATELY.  SO

2   EITHER ASK HIM WITHOUT REFERENCING SOMEBODY'S TESTIMONY -- THE

3   QUESTION THAT YOU WOULD LIKE HIM TO ANSWER.

4          MR. WEINSTOCK:  WHICH HE HAS ANSWERED ALREADY.

5          THE COURT:  IF YOU'RE GOING TO REFERENCE SOMEBODY'S

6   TESTIMONY, I DON'T THINK WE CAN PRESENT IT BY WAY OF IMPLICATION.

7   AND I AGREE WITH YOU, ASKING HIM A DOUBLE NEGATIVE IS A CONFUSING

8   AND TRICKY WAY, BUT I DON'T SEE WHY WE HAVE TO GO BACK AND

9   REFERENCE WHAT DR. DEROSA SAID WHEN WE'RE SAYING SOMETHING THAT

10  HE DIDN'T NECESSARILY SAY.

11         MR. WEINSTOCK:  AND THIS GENTLEMAN DIDN'T DO THAT

12  ANALYSIS.  HE'S ALREADY ANSWERED THAT QUESTION.

13         THE COURT:  HE DISAGREED WITH ANOTHER WITNESS, AND NOW

14  WE'RE BRINGING A THIRD WITNESS IN HERE TO COMMENT --

15         MR. WEINSTOCK:  WHO DOESN'T KNOW EITHER.

16         THE COURT:  LET ME FINISH.  I'VE GOT TO FINISH MY

17  SENTENCE.

18         MR. WEINSTOCK:  YOU'RE RIGHT.  YOU'RE RIGHT.  I

19  APOLOGIZE.

20         THE COURT:  WE HAVE ASKED ONE WITNESS WHETHER HE AGREES

21  WITH A SECOND WITNESS, AND NOW WE'RE ASKING A THIRD WITNESS

22  WHETHER HE AGREES WITH THE NEGATIVE IMPLICATION OF THAT PRIOR

23  AGREEMENT OR DISAGREEMENT WITH THE SECOND WITNESS' TESTIMONY.

24              LET'S NOT REFERENCE DR. DEROSA.  JUST ASK HIM THE

25  QUESTION.  YOU CAN ARGUE TO THE JURY WHAT DR. DEROSA SAID AND

1  WHAT LITTLE SAID AND WHO AGREED WITH WHOM LATER.  I'M GOING TO

2  SUSTAIN THE OBJECTION.

3          MR. MEUNIER:  I'LL READ IT, AND I'LL TRY TO --

4          MR. WEINSTOCK:  I OBJECT TO THAT.  HE'S GOING TO READ

5  WHAT DR. DEROSA SAID.

6          THE COURT:  WHY ARE YOU DRAGGING TWO MORE WITNESSES INTO

7  THIS WITNESS' TESTIMONY?  I KNOW HE'S AN EXPERT WITNESS, AND I

8  KNOW YOU CAN COMPARE EXPERT TESTIMONY.

9          MR. MEUNIER:  I TRIED TO KEEP IT TO ONE WITNESS, WHICH

10  IS DEROSA, BECAUSE I TAKE THAT TESTIMONY TO THE JURY TO BE THEY

11  THINK IT'S APPLICABLE.

12          THE COURT:  AND THAT MAY BE.  THAT CLEARLY IS THE

13  IMPLICATION.

14          MR. MEUNIER:  I THINK THAT'S A CLEAR INFERENCE OF THAT.

15          THE COURT:  THAT CLEARLY IS THE IMPLICATION.

16          MR. WEINSTOCK:  IT'S AN IMPLICATION -- I'M SORRY, JUDGE.

17          THE COURT:  THE PROBLEM IS THAT WHEN YOU ASKED THE

18  QUESTION TO DR. DEROSA, YOU BROUGHT IN LITTLE AND ASKED HIM IF HE

19  AGREED WITH LITTLE.  WHY DON'T YOU JUST ASK HIM THE SAME QUESTION

20  THAT YOU ASKED LITTLE.

21          MR. WEINSTOCK:  BECAUSE HE WON'T LIKE THE ANSWER.

22          MR. MEUNIER:  NO.  I CAN READ THAT TO HIM.

23          MR. WEINSTOCK:  HE'S ANSWERED THAT QUESTION ALREADY.  WE

24  CAN AGREE.

25          THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  TRY A

1  DIFFERENT WAY OF ASKING IT.

2          HOW MUCH LONGER DO WE HAVE?

3          MR. MEUNIER:  I'M ALMOST DONE.

4          THE COURT:  I GUESS WE'RE GOING TO HAVE A BREAK BEFORE

5  WE DO REDIRECT.  I WAS HOPING TO FINISH WITH HIM.

6          MR. WEINSTOCK:  I'M GOING TO HAVE A GOOD 10 MINUTES OF

7  REDIRECT.  IT'S BEEN OVER AN HOUR.

8          THE COURT:  I KNOW.  WE MIGHT AS WELL TAKE A BREAK AND

9  COME BACK AND FINISH.  WE'RE GETTING BEHIND ALREADY.

10          MR. WEINSTOCK:  I DON'T THINK WE ARE, YOUR HONOR.  AS A

11  RESULT, I THINK I MAY CUT LOOSE ANOTHER WITNESS.

12          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

13  CONFERENCE CONCLUDED.)

14                         EXAMINATION

15  BY MR. MEUNIER:

16  Q.   WE'RE GOING TO WIND UP HERE WITH A DISCUSSION ABOUT THE

17  MRL'S, DOCTOR.  THIS IS IN YOUR RELIANCE FILE, AND IT'S FROM THE

18  ATSDR, AND IT'S A DISCUSSION OF MRL'S.  AND I'M GOING TO ZOOM IN

19  ON A FEW HIGHLIGHTED QUESTIONS, STATEMENTS HERE BY THE ATSDR --

20  A.   YOU MIGHT MAKE IT JUST A LITTLE BIGGER.  I'M HAVING A LITTLE

21  DIFFICULTY READING IT.

22  Q.   IS THAT BETTER?

23          THE COURT:  CAN YOU SEE THAT, OR WOULD YOU LIKE THE HARD

24  COPY?

25          THE WITNESS:  WELL, THE PROBLEM IS I NEED OTHER GLASSES

1   FOR MY SCREEN, AND I BROUGHT READING GLASSES, WHICH I CAN'T USE

2   ON THE SCREEN.

3          THE COURT:  THAT'S WHY I'M ASKING.  DO YOU HAVE AN EXTRA

4   HARD COPY WE CAN GIVE HIM, MAYBE, WITH HIS GLASSES -- BECAUSE

5   SOMETIMES LOOKING AT THE SCREEN DOESN'T WORK FOR ME EITHER.

6          MR. MEUNIER:  HOW ABOUT IF I READ IT, AND ANDY WILL TELL

7   ME IF I'M NOT READING IT ACCURATELY.

8          MR. WEINSTOCK:  YOU'RE RELYING ON MY EYES?

9          THE COURT:  WHY DON'T YOU GO AHEAD AND READ IT, JUST TO

10  MAKE SURE THAT HE UNDERSTANDS IT.

11          WOULD YOU LIKE THE HARD COPY, SINCE HE'S ASKING YOU

12  A QUESTION --

13          THE WITNESS:  IF ONE IS EASILY AVAILABLE, YEAH, I'D

14  RATHER.  THAT WOULD BE A LOT EASIER TO READ AND FOLLOW.

15          THE COURT:  WOULD SOMEBODY PULL THE HARD COPY.  ANYBODY

16  HAVE AN EXTRA HARD COPY?

17          MR. MEUNIER:  IT'S BATES NUMBER 27.

18          THE WITNESS:  HOLD IT.  HOLD IT.  I'VE GOT THESE GLASSES

19  TO WORK ON THE SCREEN.  THEY USUALLY DON'T.

20          THE COURT:  IT'S BETTER?

21          THE WITNESS:  I THINK I CAN SEE IT NOW.  THANKS, SORRY.

22          THE COURT:  THAT'S ALL RIGHT.  LET'S GO.

23                              EXAMINATION

24  BY MR. MEUNIER:

25  Q.   IT STATES HERE THAT, "DURING THE DEVELOPMENT OF

1  TOXICOLOGICAL PROFILES, MRL'S," WHICH IS THOSE MINIMUM RISK

2  LEVELS WE LOOKED AT, "ARE DERIVED WHEN THE ATSDR DETERMINES THAT

3  RELIABLE AND SUFFICIENT DATA EXISTS TO IDENTIFY THE TARGET

4  GROUPS" -- I'M SORRY, "THE TARGET ORGANS OF EFFECT OR THE MOST

5  SENSITIVE HEALTH EFFECTS FOR A SPECIFIC DURATION FOR GIVEN ROUTES

6  OF EXPOSURE TO THE SUBSTANCE."  DO YOU AGREE?

7  A.   YES.

8  Q.   "MRL'S ARE BASED ON NONCANCER HEALTH EFFECTS ONLY AND ARE

9  NOT BASED ON A CONSIDERATION OF CANCER EFFECTS."  DO YOU AGREE?

10 A.   YES.

11 Q.   "INHALATION MRL'S ARE EXPOSURE CONCENTRATIONS EXPRESSED IN

12 UNITS OF PPM FOR GASES."  THAT'S PPM.  AND YOU AGREE WITH THAT?

13 A.   YES.

14 Q.   NEXT HIGHLIGHTED STATEMENT, "MRL'S ARE GENERALLY BASED ON

15 THE MOST SENSITIVE SUBSTANCE INDUCED AND ENDPOINT CONSIDERED TO

16 BE OF RELEVANCE TO HUMANS"?

17 A.   YES.

18 Q.   YOU AGREE WITH THAT?

19 A.   I AGREE WITH -- THAT'S WHAT IT SAYS, YES.

20 Q.   "MRL'S ARE INTENDED TO SERVE AS A SCREENING TOOL TO HELP

21 PUBLIC HEALTH PROFESSIONALS DECIDE WHERE TO LOOK MORE CLOSELY,"

22 AND YOU TALKED ABOUT THAT IN YOUR DIRECT EXAMINATION.  YOU AGREE

23 WITH THAT?

24 A.   YES.

25 Q.   "MOST MRL'S CONTAIN SOME DEGREE OF UNCERTAINTY BECAUSE OF

1  THE LACK OF PRECISE TOXICOLOGICAL INFORMATION ON THE PEOPLE WHO

2  MIGHT BE MOST SENSITIVE, FOR EXAMPLE, INFANTS, ELDERLY, AND

3  NUTRITIONALLY OR IMMUNOLOGICALLY COMPROMISED TO THE EFFECTS OF

4  HAZARDOUS SUBSTANCES," TRUE?

5  A.   YES.  THAT'S WHY THEY ADD UNCERTAINTY FACTORS, YES.

6  Q.   THEY ADD UNCERTAINTY FACTORS BECAUSE THEY'RE TAKING INTO

7  ACCOUNT PEOPLE LIKE CHILDREN WITH ASTHMA, FOR EXAMPLE, WHO ARE

8  PARTICULARLY VULNERABLE TO A GIVEN SUBSTANCE?

9  A.   NO, THAT'S NOT WHAT THEY'RE DOING.  THEY'RE ADDING

10  UNCERTAINTY FACTORS BECAUSE THEY DON'T KNOW IF THERE IS ENOUGH

11  STUDIES.  THEY DON'T KNOW IF THOSE QUESTIONS HAVE BEEN ANSWERED.

12  SO TO BE PROTECTIVE, THEY'RE GOING TO MAKE THE ASSUMPTION THEY'LL

13  GO LOWER BECAUSE THEY ARE NOT SURE.  THEY DON'T HAVE INFORMATION

14  ONE WAY OR THE OTHER.  SO IT'S A PROTECTIVE -- IT'S A PROTECTIVE

15  APPROACH, AND IT'S STANDARD REGULATORY PROCEDURE, AND I HAPPEN TO

16  AGREE WITH IT.

17  Q.   AND, FINALLY, WE SEE, "PROPOSED MRL'S UNDERGO A RIGOROUS

18  REVIEW PROCESS."  YOU DON'T DENY WITH THAT?

19  A.   IN-HOUSE, YES, I'M SURE THEY DO.

20  Q.   SO YOU DON'T REALLY DISPUTE THE .04, .03 AND .008 PPM LEVELS

21  AS MINIMUM RISK LEVELS OR HEALTH GUIDANCE VALUES FOR THE ATSDR

22  FOR FORMALDEHYDE?

23  A.   YOUR QUESTION IS SORT OF SILLY.  I'M NOT DISPUTING THE FACT

24  THAT THEY DERIVED THEM.  I'M NOT DISPUTING THE FACT WHAT THEY

25  ARE.  I DON'T EVEN -- I DIDN'T LOOK AT THEM.  YOU HAD THEM

1  LISTED.  I DON'T KNOW WHAT THEY ARE.  BUT I'M NOT DISPUTING THE

2  FACT THAT ATSDR DOES THEM AND USES THEM FOR SCREENING PURPOSES.

3  Q.    AND, FINALLY, WE SEE HERE, AND THIS IS IN THE TOX PROFILE

4  PART OF YOUR RELIANCE MATERIALS THAT YOU HAD, "ATSDR ACKNOWLEDGES

5  ADDITIONAL UNCERTAINTIES INHERENT IN THE APPLICATION OF THE

6  PROCEDURES TO DERIVE LESS THAN LIFETIME MRL'S.  AS AN EXAMPLE,

7  ACUTE INHALATION MRL'S MAY NOT BE PROTECTIVE FOR HEALTH EFFECTS

8  THAT ARE DELAYED IN DEVELOPMENT."  THAT WOULD BE, FOR EXAMPLE, A

9  LATENT PROBLEM SUCH AS CANCER, TRUE?

10  A.    YES.  HYPERSENSITY (SIC), CHRONIC DISEASES, YES.

11  Q.    "OR ACQUIRED FOLLOWING REPEATED ACUTE INSULT SUCH AS

12  HYPERSENSITIVITY REACTIONS, ASTHMA OR CHRONIC BRONCHITIS,"

13  CORRECT?

14  A.    YES.  IT'S WELL KNOWN THAT ACUTE STUDIES MAY NOT ACCURATELY

15  REFLECT WHAT CHRONIC EXPOSURE WILL DO.  THE TOXICITIES CAN

16  CHANGE.  THE DOSE CAN CHANGE.  SO YOU DON'T EVER USE STUDIES

17  DERIVED FROM ACUTE EXPOSURES TO PREDICT CHRONIC EXPOSURE

18  CONDITIONS.

19  Q.    AND THE ATSDR WITH THE UNCERTAINTY FACTORS BUILT INTO THESE

20  HEALTH GUIDANCE VALUES ARE TAKING INTO ACCOUNT PEOPLE WHO HAVE

21  PREDISPOSITION OR ARE PARTICULARLY SUSCEPTIBLE OR VULNERABLE TO

22  SOME OF THESE CHEMICALS?

23  A.    I'D SAY NOT SO MUCH THEY'RE TAKING INTO ACCOUNT.  THEY ARE

24  ASSUMING THAT THERE MAY BE THAT PROBLEM, AND SO THEY ARE ADDING

25  ADDITIONAL SAFETY FACTORS AS A PROTECTIVE MECHANISM, YES.

1  Q.   BUT IN THIS CASE WE DON'T HAVE TO ASSUME IT BECAUSE WE KNOW

2  THAT NINE-YEAR-OLD CHRIS COOPER HAD ASTHMA WHEN HE WAS EXPOSED TO

3  FORMALDEHYDE, CORRECT?

4          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

5          THE WITNESS:  I DIDN'T LOOK AT HIS MEDICAL RECORDS.

6          THE COURT:  ONE SECOND, DOCTOR.  I THINK THAT WE HAVE,

7  FOR THE FOURTH OR FIFTH TIME, ESTABLISHED WHAT HIS DELINEATED

8  TASK WAS IN THIS CASE, AND I THINK HE'S ANSWERED WHERE HIS

9  INVESTIGATION AND HIS OPINION STARTED AND ENDED, WHICH IS ON

10 GENERAL CAUSATION.

11          SO, AGAIN, I THINK THIS HAS BEEN CERTAINLY COVERED

12 ALREADY AS TO WHAT HE DID AND DID NOT DO IN THIS CASE RELATIVE TO

13 GENERAL CAUSATION AND WHAT HE WAS NOT ASKED TO DO AND DID NOT DO

14 RELATIVE TO SPECIFIC CAUSATION.  SO I'LL SUSTAIN THE OBJECTION.

15                          EXAMINATION

16 BY MR. MEUNIER:

17 Q.   DOCTOR, YOU'VE INDICATED THAT YOU THINK THE MRL'S ARE

18 PROTECTIVE MORE THAN PREDICTIVE?

19 A.   YES, THEY ARE SET LOW.  IF YOU'RE AT THAT LOW, YOU SHOULD BE

20 MORE THAN ADEQUATELY PROTECTED.  THE ATSDR WARNS THAT YOU CANNOT

21 USE THEM FOR ANY OTHER PURPOSE.  YOU CANNOT STATE BECAUSE YOU'RE

22 ABOVE AN MRL THAT THAT EXPOSURE IS UNDESIRABLE OR HAZARDOUS OR

23 WILL CAUSE AN ADVERSE EFFECT.

24          THEY HAVE VERY LIMITED PURPOSES.  THEY SHOULD NOT BE

25 USED FOR ANYTHING OTHER THAN TO SAY WE KNOW AT THIS LEVEL IT'S

1  SAFE, AND WE DON'T HAVE TO EVALUATE IT ANY FURTHER.

2  Q.   AND YOU THINK --

3  A.   THAT'S THEIR ONLY PURPOSE.

4  Q.   I'M SORRY.

5  A.   SORRY, YOU CUT ME OFF, BUT THAT'S ALL RIGHT.

6  Q.   SO SINCE THESE STANDARDS ARE PROTECTIVE, MY FINAL QUESTION

7  IS WHETHER, AS YOU SIT HERE TODAY, YOU CAN THINK OF ANY ONE MORE

8  IN NEED OF PROTECTION THAN A FAMILY INCLUDING AN ASTHMATIC CHILD

9  DISPLACED BY KATRINA LIVING FOR A YEAR AND A HALF IN A TRAILER

10  THE SIZE OF THE JURY BOX MADE OF FORMALDEHYDE-EMITTING WOOD?

11          MR. WEINSTOCK:  YOUR HONOR, OBJECTION.  I DON'T THINK

12  THAT'S A QUESTION.  IT'S A NICE STATEMENT.

13          THE COURT:  WELL, I'M GOING TO SUSTAIN.  I THINK IT'S A

14  RHETORICAL QUESTION.  I'LL SUSTAIN THE OBJECTION.

15          MR. MEUNIER:  THANK YOU.  NO FURTHER QUESTIONS.

16          THE COURT:  IT'S ABOUT 10:25.  WE'RE GOING TO TAKE A

17  SHORT 10-MINUTE BREAK; AND, WHEN WE COME BACK, WE WILL HAVE A

18  BRIEF REDIRECT OF DR. JAMES.  LET'S PLAN ON 10:35 OR SO.

19          THE COURT SECURITY OFFICER:  ALL RISE.

20          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

21  PANEL LEAVES THE COURTROOM AND A BRIEF RECESS WAS TAKEN.)

22          THE COURT SECURITY OFFICER:  ALL RISE.

23          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

24  PANEL ENTERS THE COURTROOM.)

25          THE COURT:  YOU MAY BE SEATED.  DR. JAMES IS STILL UNDER

 1  OATH, AND MR. WEINSTOCK IS GOING TO CONDUCT HIS REDIRECT, AND

 2  THEN WE'LL MOVE ON TO THE NEXT WITNESS.

 3                          REDIRECT EXAMINATION

 4  BY MR. WEINSTOCK:

 5  Q.   STILL GOOD MORNING.  YOU WERE ASKED A LOT OF QUESTIONS ABOUT

 6  WHAT DR. DEROSA MIGHT HAVE HAD TO SAY, CORRECT?

 7  A.   YES.

 8  Q.   AND I THINK YOU'VE ANSWERED THIS, BUT YOU KIND OF GOT CUT

 9  OFF.  DR. DEROSA IS IN CHARGE OF PRESENTING THE TOX PROFILE FOR

10  ABOUT 400 DIFFERENT CHEMICALS, CORRECT?

11  A.   YES.

12  Q.   AND THEY ARE ALL ABOUT THIS THICK, CORRECT?

13  A.   YES.

14  Q.   SO HE DOESN'T KNOW WHAT'S IN EACH AND EVERY STUDY ON EACH

15  AND EVERY CHEMICAL THAT COMES UNDER HIS DOMAIN?

16        MR. MEUNIER:  YOUR HONOR, THAT'S A NICE SPEECH, BUT IT'S

17  NOT A PROPER QUESTION.  HE CAN'T KNOW WHAT DR. DEROSA --

18        THE COURT:  HE CAN'T TESTIFY AS TO WHAT SOMEBODY ELSE

19  KNOWS.

20        MR. WEINSTOCK:  FAIR ENOUGH.

21        THE COURT:  REPHRASE THE QUESTION.

22                          EXAMINATION

23  BY MR. WEINSTOCK:

24  Q.   WOULD YOU AGREE WITH DR. DEROSA'S TESTIMONY THAT HE COULD

25  NOT CITE TO ME A SINGLE STUDY FOR HIS OPINION ON IRRITANT

1  EFFECTS?  DOES THAT MAKE SENSE TO YOU?

2  A.   IT DOES MAKE SENSE TO ME.  I UNDERSTAND HOW THESE PROFILES

3  ARE DONE BY THE EPA, CDC.  THEY ARE OFTEN SENT TO SUBCONTRACTORS.

4  THE PERSON IN CHARGE OVERSEES THE FACT THAT THEY GET DONE, AND

5  THEN THEY GET PEER-REVIEWED, AND THEY GET PUBLISHED.

6         IT DOESN'T ALWAYS MEAN THAT THEY WERE PART OF THE

7  REVIEW PROCESS OR EXTENSIVELY LOOKED AT THE LITERATURE.  SO THERE

8  CAN BE A BIG DISCONNECT BETWEEN YOU'RE THE OFFICER THAT SEES TO

9  THEM GETTING OUT AND HOW MUCH YOU KNOW ABOUT WHAT'S IN THERE,

10 YES.

11 Q.   MR. MEUNIER SHOWED US A LOT OF DIFFERENT -- WELL, NOT

12 STUDIES.  HE DIDN'T SHOW US STUDIES.  HE SHOWED US A LOT OF

13 REFERENCES TO STUDIES AND MANY TIMES UNCITED.  WE WENT THROUGH

14 THE --

15        MR. MEUNIER:  OBJECTION, YOUR HONOR.  THAT'S AN

16 IMPROPER -- THAT'S NOT A QUESTION.  AND WE DID LOOK AT STUDIES,

17 SO I OBJECT TO IT BEING AN IMPROPER CHARACTERIZATION.

18        THE COURT:  LET'S BE CAREFUL OF HOW WE PHRASE THESE

19 QUESTIONS BECAUSE I THINK -- AND THIS HAS HAPPENED IN THE CASE

20 ALREADY; ALTHOUGH, IT SEEMS TO BE BREAKING OUT ALL OVER THIS

21 MORNING -- LET'S NOT CHARACTERIZE WHAT ANOTHER ATTORNEY SAID.

22 THE JURY HAS HEARD THAT, AND THEY'VE HEARD OTHER WITNESSES.

23        SO LET'S NOT TRY TO PLUG INTO SOMETHING THAT'S

24 ALREADY BEEN SAID BECAUSE THEN WE HAVE EXACTLY THIS, WHERE

25 SOMEBODY RECALLS SOMETHING DIFFERENTLY.  SO JUST ASK THE

1  QUESTION, AND HE'LL ANSWER IT.

2                              EXAMINATION

3  BY MR. WEINSTOCK:

4  Q.   THIS MORNING WE WENT THROUGH A FAIRLY BORING LITANY AS TO

5  WHAT TYPES OF EPIDEMIOLOGICAL STUDIES YOU CONSIDERED, CORRECT?

6  A.   TO SOME EXTENT, YES.

7  Q.   WE TALKED ABOUT OBSERVATIONAL STUDIES, CROSS-SECTIONAL

8  STUDIES, OCCUPATIONAL STUDIES?

9  A.   YES.

10 Q.   AND WHY DID YOU REJECT THOSE?

11 A.   THEY ARE WEAKER STUDIES.  THE EXPERIMENTAL STUDIES ARE THE

12 BEST EVIDENCE FOR IDENTIFYING THAT PARTICULAR EFFECT.  THE

13 CROSS-SECTIONAL STUDIES AND ECOLOGICAL STUDIES THAT YOU MIGHT

14 LOOK AT RESIDENTIAL SETTINGS ARE ACTUALLY WHAT WE CALL HYPOTHESIS

15 GENERATING.  THEY TEND TO FIND THINGS THAT IF WE SEE IT, WE WANT

16 TO LOOK AT IT IN A STRONGER STUDY.  LIKE A COHORT STUDY IS A

17 STRONG OBSERVATIONAL STUDY.  AN EVEN BETTER STUDY IS AN

18 EXPERIMENTAL STUDY LIKE A CLINICAL TRIAL, QUASI EXPERIMENT,

19 RANDOMIZED CLINICAL TRIAL, SOMETHING LIKE THAT.

20 Q.   SO IF ONE OF THOSE OBSERVATIONAL OR WEAKER STUDIES GETS

21 PICKED UP BY THE ATSDR OR THE CDC OR SOMEWHERE AND PUT INTO A

22 REPORT WITHOUT CITATION, WE HAVE NO BACKGROUND FOR WHERE THAT

23 NUMBER CAME FROM, CORRECT?

24 A.   THAT'S CORRECT.  AND TYPICALLY THE ATSDR SAYS THAT THEY WILL

25 CITE THE LOWEST LEVEL THEY CAN FIND ON AN EFFECT LEVEL.  SO IT

1    MIGHT -- AND THIS CASE WOULD EASILY BE A STUDY THAT'S PROBABLY

2    NOT AN EXPERIMENTAL STUDY THAT WOULD BE PICKED UP.

3    Q.    A STUDY YOU WOULD HAVE REJECTED?

4    A.    YES.

5    Q.    YOU WERE LOOKING FOR THE EPIDEMIOLOGICAL GOLD STANDARD OF

6    EXPERIMENTAL STUDIES?

7    A.    YES.

8    Q.    WE TALKED ABOUT THE ODOR THRESHOLD AND ABOUT WHAT SOME

9    FELLOWS MIGHT HAVE SMELLED WHEN THEY ENTERED THE TRAILER.

10   MR. MEUNIER ASKED YOU ABOUT THE LEMIEUX BROTHERS.  DO YOU

11   REMEMBER THAT QUESTION?

12   A.    I DO REMEMBER THE QUESTION.

13           THE COURT:  I DON'T THINK HE MENTIONED THAT NAME --

14           MR. MEUNIER:  I DON'T THINK THAT'S A CORRECT

15   CHARACTERIZATION.

16           THE COURT:  -- BUT HE REMEMBERS THE LINE OF QUESTIONS.

17           THE WITNESS:  I REMEMBER THE QUESTION.  I WAS ASKED TO

18   MAKE TWO ASSUMPTIONS, AND I SAID THE ASSUMPTION LEADS TO AN

19   AUTOMATIC ANSWER.  IT'S NOT A QUESTION.

20                          EXAMINATION

21   BY MR. WEINSTOCK:

22   Q.    NOW, IF ONE OF THOSE TWO TESTIFIED THAT THEY HAD THAT EFFECT

23   WHEN THE TRAILER WAS 140 DEGREES AND DID NOT HAVE THAT EFFECT

24   WHEN THE AIR-CONDITIONING HAD BEEN TURNED ON AND THE TEMPERATURE

25   WAS 75 DEGREES, IS THAT THE TYPE OF CONFOUNDER YOU'RE TALKING

1  ABOUT?

2  A.   YES.

3  Q.   YOU WERE ASKED QUESTIONS ABOUT CHILDREN.  FIRST, IF WE COULD

4  TAKE A LOOK AT WHAT THE ATSDR IN THEIR TOX PROFILE SAID ABOUT THE

5  STUDY -- OR THE THEORIES REGARDING WHETHER CHILDREN ARE MORE

6  SUSCEPTIBLE, THE SAME PEOPLE THAT WROTE MANY OF THE PAPERS THAT I

7  BELIEVE YOU WERE JUST SHOWN.

8  A.   YES.

9  Q.   "ADDITIONAL RESEARCH IS NECESSARY TO CONFIRM OR DISCARD THE

10 HYPOTHESIS THAT CHILDREN MAY BE MORE SUSCEPTIBLE THAN ADULTS TO

11 IRRITANT EFFECTS OF FORMALDEHYDE AND TO UNDERSTAND THE

12 MECHANISTIC BASIS OF THIS POSSIBLE DIFFERENCE," RIGHT?

13 A.   CORRECT.  AND THAT'S WHAT I TESTIFIED EARLIER.  THAT IS

14 OFTEN AN ASSUMPTION MADE, BUT WE GENERALLY DON'T HAVE THE

15 INFORMATION.  AND HERE, THEY ARE NOTING THAT IN THIS PARTICULAR

16 CHEMICAL WE DON'T.

17 Q.   SO IT'S A THEORY THAT CHILDREN ARE DIFFERENT, BUT IT IS NOT

18 A PROVEN REALITY?

19 A.   THAT'S TRUE.  AND THIS ISSUE HAS BEEN STUDIED FOR LOTS OF

20 CHEMICALS AND CONTINUES TO BE STUDIED.

21 Q.   IN FACT, WE DO ACTUALLY HAVE A LITTLE BIT OF A STUDY.  CAN

22 WE PULL UP THE EXHIBIT.  IN HANCOCK COUNTY, MISSISSIPPI, IN 2006,

23 THEY TOOK A LOOK AT 144 --

24        THE COURT:  WAIT, WAIT, WAIT.  ARE WE -- LET'S GET HIM

25 TO LOOK AT IT AND IDENTIFY IT, RATHER THAN TESTIFY OURSELVES.

```
 1              MR. WEINSTOCK:  YOU'RE RIGHT.
 2                              EXAMINATION
 3   BY MR. WEINSTOCK:
 4   Q.    CAN YOU GO TO CONCLUSION THREE.  DID YOU REVIEW THE HANCOCK
 5   COUNTY, MISSISSIPPI STUDY?
 6   A.    I DID.
 7   Q.    DID IT REACH THIS CONCLUSION?  IF YOU WOULD READ THAT FOR
 8   THE JURY.
 9   A.    YES.  "THE DECLINE IN THE PROPORTION OF VISITS WITH UPPER
10   RESPIRATORY SYMPTOMS AND THE INCREASE IN PROPORTION OF VISITS
11   WITH LOWER RESPIRATORY SYMPTOMS WERE SIMILAR FOR CHILDREN LIVING
12   IN FEMA-SUPPLIED TRAILERS AND MOBILE HOMES AS FOR THOSE WHO HAD
13   NOT LIVED IN FEMA-SUPPLIED HOMES."  CITES TABLE TWO.
14              "THE INCREASE IN THE PROPORTION OF LOWER RESPIRATORY
15   DIAGNOSES AMONG ALL CHILDREN IN THE STUDY MIGHT BE ATTRIBUTABLE
16   TO, A, INDIVIDUAL PREDISPOSITION OF THE CHILDREN, SAMPLING OR
17   SOME OTHER FACTOR."
18              MR. WEINSTOCK:  THIS IS EXHIBIT NUMBER 282.  IT'S
19   ALREADY INTO EVIDENCE, YOUR HONOR.
20              THE WITNESS:  AND SO AT THE TOP, IT'S SHOWING THAT THE
21   IRRITANTS THAT I WOULD BE LOOKING AT, UPPER RESPIRATORY SYMPTOMS,
22   WEREN'T ANY DIFFERENT IF YOU WERE LIVING IN A TRAILER OR DIDN'T
23   LIVE IN A TRAILER.
24                              EXAMINATION
25   BY MR. WEINSTOCK:
```

1   Q.   AND THAT'S NOT THEORY; THAT'S AN ACTUAL STUDY, CORRECT?

2   A.   YES.  IT'S AN OBSERVATION OF THOSE PEOPLE STUDIED, YES.

3   Q.   I THINK WE COVERED THIS, BUT MR. MEUNIER ASKED YOU A FEW

4   QUESTIONS ABOUT IT.  WHEN WE SAY, FORMALDEHYDE IS EVERYWHERE, WE

5   TALKED ABOUT THE LEMUS STUDY.  WHAT LEVELS -- OR STRIKE THAT.

6            DID LEMUS FIND THAT THERE WAS A DIFFERENCE IN THE

7   LEVELS BASED ON THE SEASON?

8   A.   YES, HE DID.

9   Q.   AND WHAT SEASONS WERE HIGHEST?

10  A.   THE FALL, IF I REMEMBER CORRECTLY, WAS THE HIGHEST, WINTER

11  WAS SECOND HIGHEST, SPRING AND SUMMER TENDED TO BE LOWER.

12  Q.   SO WHEN THEY ACTUALLY STUDIED REGULAR HOUSES, THE WINTER WAS

13  THE SECOND HIGHEST SEASON?

14  A.   YES, AND THEY MADE A NOTE OF THAT.

15  Q.   I THINK MR. MEUNIER ASKED YOU ABOUT THE TEST THAT WAS DONE

16  ON THE TRAILER IN THIS CASE AND SAID IT WAS TESTED IN WINTER.

17  WERE YOU AWARE IT WAS TESTED AT 72 DEGREES?

18  A.   NO.  I JUST KNEW IT HAD BEEN -- MY UNDERSTANDING IS IT HAD

19  BEEN CLOSED UP, AND THAT THEY WENT IN AND SAMPLED IT IMMEDIATELY.

20  Q.   MR. MEUNIER REFERRED TO A WHOLE LITANY OF NUMBERS AS

21  REGULATIONS.  ARE THOSE REGULATIONS?

22  A.   I DON'T REMEMBER ANY OF THEM UP THERE BEING REGULATIONS.

23  THEY ARE EXPOSURE GUIDELINES THAT ARE SET BY REGULATORY AGENCIES.

24  AGAIN, THEY ARE USED, LIKE EPA AND ATSDR, AS SCREENING LEVELS,

25  LEVELS THAT THEY KNOW ARE SAFE, AND SO IT HELPS THEM DO

1  EVALUATIONS QUICKLY IF YOU'RE AT OR BELOW THOSE LEVELS.

2  Q.   AND BACK TO THE TOPIC OF FORMALDEHYDE BEING NOT JUST IN

3  TRAVEL TRAILERS.  FORMALDEHYDE IS IN FOOD, CORRECT?

4  A.   IT'S IN MOST OF THE FOODS, IF NOT ALL THE FOODS WE EAT.  AND

5  WE GENERATE LARGE AMOUNTS IN OUR BODY.

6  Q.   HAVE YOU EVER SEEN STUDIES THAT SUGGEST IT'S AS HIGH AS

7  47 PARTS PER BILLION IN SHRIMP?

8  A.   YES, 10 TO 20 OR 50 PARTS PER BILLION IN FRUITS.  THINGS

9  LIKE SHRIMP.  I THINK IT'S EVEN HIGHER IN MUSHROOMS.

10  Q.   DOCTOR, YOU WERE ASKED SOME QUESTIONS ABOUT THE TYPE OF WORK

11  YOU DO.  HAVE YOU EVER TOLD THE PLAINTIFF OR A PLAINTIFF FIRM OR

12  A PLAINTIFF LAWYER YOU WOULD NOT WORK FOR THEM BECAUSE YOU

13  PHILOSOPHICALLY DISAGREED WITH THEIR POSITION?

14  A.   WELL, I'VE HAD A COUPLE OF EXAMPLES.  I WAS ASKED TO

15  TESTIFY -- I'D HAVE TO NOT USE THE PRINCIPLES I BELIEVE IN AND

16  USE IN EVERY CASE IN ORDER TO RENDER THE OPINION THEY HE WANTED.

17          I HELPED ANOTHER PERSON.  I HAD TO TELL HIM AFTER DOING

18  THE WORK THAT I COULD NOT ATTRIBUTE IT TO THE HOUSE THAT THEY

19  WANTED, AND I -- BUT DURING THE SAME YEAR, I DID THE SAME THING

20  TO A DEFENSE ATTORNEY.  HE WANTED ME TO TESTIFY, AND I SAID, NO,

21  BASED ON WHAT I KNOW AND HOW I DO THINGS, THERE IS NO OPINION I

22  COULD GIVE THAT WOULD HELP YOU, SO...

23          MR. WEINSTOCK:  I'M JUST ABOUT DONE, YOUR HONOR.

24                            EXAMINATION

25  BY MR. WEINSTOCK:

1  Q.   I'M TOLD I MIGHT HAVE MISTAKENLY SAID PARTS PER BILLION ON

2  THE SHRIMP, BUT IT'S ACTUALLY 47 PPM; IS THAT CORRECT?

3  A.   YEAH, FOODS ARE AT PARTS PER MILLION.   IT'S MICROGRAMS PER

4  GRAM.  IT'S PARTS PER MILLION.

5            MR. WEINSTOCK:  THANK YOU, YOUR HONOR.

6            THE COURT:  BY THEIR SILENCE, I ASSUME THAT MY

7  OVERLOOKING FLUOR HAS NOT BEEN OBJECTIONABLE; IS THAT CORRECT?

8            MR. SHERBURNE:  THAT'S CORRECT.

9            THE COURT:  DID YOU HAVE ANY QUESTIONS FOR THIS WITNESS?

10           MR. SHERBURNE:  WE HAVE NO QUESTIONS.

11           THE COURT:  OKAY.  THANK YOU, DR. JAMES.  YOU MAY STEP

12 DOWN.

13           THE WITNESS:  CAN I GIVE A FORMAL APOLOGY TO THE

14 STENOGRAPHER AND SAY I'M VERY SORRY.  IT'S A CHRONIC PROBLEM.

15           THE COURT:  OKAY.  MR. WEINSTOCK.

16           MR. WEINSTOCK:  AT THIS TIME, WE'RE GOING TO PLAY THE

17 VIDEOTAPE OF COMMANDER JOSEPH LITTLE.

18           THE COURT:  COMMANDER LITTLE.  OKAY.  THE NEXT WITNESS

19 IS BY VIDEOTAPE.  THE WITNESS HAS BEEN SWORN IN, AND COUNSEL ARE

20 PRESENT TO QUESTION THIS WITNESS.

21           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

22 VIDEOTAPED DEPOSITION OF COMMANDER JOSEPH LITTLE WAS PLAYED.)

23 Q.   NOW, COMMANDER, I JUST WANT TO GET INTO SOME GENERAL

24 BACKGROUND QUESTIONS ABOUT YOU.  FOR EXAMPLE, WHAT IS YOUR

25 EDUCATIONAL BACKGROUND?  IF YOU'D START WITH COLLEGE GOING

1  FORWARD.

2  A.    I HAVE A BACHELOR'S OF SCIENCE IN BIOLOGY FROM THE

3  UNIVERSITY OF MINNESOTA.  I HAVE A MASTER'S OF SCIENCE IN PUBLIC

4  HEALTH WITH A CONCENTRATION IN ENVIRONMENTAL TOXICOLOGY FROM

5  TULANE UNIVERSITY SCHOOL OF PUBLIC HEALTH AND TROPICAL MEDICINE.

6  Q.    NOW, COMMANDER, DO YOU HOLD ANY SPECIAL CERTIFICATIONS IN

7  REGARDS TO YOUR POSITIONS?

8  A.    I HOLD A REGISTERED ENVIRONMENTAL HEALTH SPECIALIST.

9  Q.    AND WHO GRANTED YOU THAT CERTIFICATION?

10  A.    NEHA, NATIONAL ENVIRONMENTAL HEALTH ASSOCIATION.

11  Q.    AND THIS CERTIFICATION, AGAIN, IT'S -- I'M SORRY, WOULD YOU

12  REPEAT THE TITLE, AGAIN?

13  A.    IT'S A REGISTERED ENVIRONMENTAL HEALTH SPECIALIST.  IT IS

14  REQUIRED FOR MY CATEGORY IN THE PUBLIC HEALTH SERVICE.

15  Q.    AND THAT CATEGORY IS WHAT?

16  A.    ENVIRONMENTAL HEALTH OFFICER.

17  Q.    I WANT TO JUST ASK YOU A COUPLE OF QUESTIONS ABOUT YOUR

18  CURRENT POSITION.  AND THERE IS A DECLARATION THAT YOU SIGNED ON

19  MAY 12, 2009, AND YOU INDICATED IN THAT DECLARATION THAT YOU HAVE

20  A CURRENT POSITION WITH NIOSH.  COULD YOU TELL ME WHAT THAT

21  POSITION IS?

22  A.    I'M AN EMERGENCY COORDINATOR FOR NIOSH, WHICH IS THE

23  NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH.

24  Q.    WHAT ARE YOUR DUTIES AS AN EMERGENCY COORDINATOR FOR NIOSH?

25  A.    TO BE A FOCAL POINT FOR TECHNICAL REQUESTS THAT COME IN

1   DURING AN EMERGENCY, AND SEE TO IT THAT THEY ARE HANDLED BY THE

2   APPROPRIATE PERSON IN NIOSH WITH THE APPROPRIATE EXPERTISE.

3   Q.   PRIOR TO HOLDING THAT POSITION OR GETTING THE POSITION AS

4   EMERGENCY COORDINATOR IN JANUARY OF 2008, WHERE WERE YOU EMPLOYED

5   PRIOR TO THAT?

6   A.   WITHIN THE AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY,

7   WHICH IS PART OF THE NATIONAL CENTER FOR ENVIRONMENTAL HEALTH.

8   Q.   AND THAT'S WHAT'S TYPICALLY KNOWN AS ATSDR --

9   A.   YES.

10  Q.   -- IS THAT CORRECT?

11       WHAT WAS YOUR JOB TITLE WITH ATSDR?

12  A.   EMERGENCY RESPONSE COORDINATOR.

13  Q.   AND HOW LONG DID YOU HOLD THAT POSITION?

14  A.   17 YEARS.

15  Q.   AND YOU BEGAN IN?

16  A.   I WAS HIRED IN THE FALL OF 1990.  I WAS IN THE TECHNICAL

17  SUPPORT SECTION FOR THE FIRST THREE YEARS, AND THEN I WAS

18  OFFICIALLY AN EMERGENCY COORDINATOR.

19  Q.   NOW, YOU SAID THAT YOU BEGAN IN THE TECHNICAL SUPPORT

20  SECTION?

21  A.   YES, OF THE EMERGENCY RESPONSE BRANCH.

22  Q.   WHAT WERE YOUR DUTIES THERE?

23  A.   I WAS A TOXICOLOGIST.

24  Q.   AND GENERALLY WHAT DOES A TOXICOLOGIST DO?

25  A.   I WAS THE ON-CALL TOXICOLOGIST FOR TECHNICAL SUPPORT FOR

1    EMERGENCY SITUATIONS WHERE OTHER FEDERAL AGENCIES, HOSPITALS,

2    FIRE DEPARTMENTS, WOULD CALL WHEN THEY NEEDED HELP WITH A

3    CHEMICAL EMERGENCY THEY WERE DEALING WITH, HAZARDOUS MATERIALS

4    INCIDENTS.

5    Q.    AFTER YOUR ROLE IN THE TECHNICAL SUPPORT SECTION, WHAT DID

6    YOU DO NEXT FOR ATSDR?

7    A.    I WAS -- THEN BECAME AN EMERGENCY COORDINATOR THAT -- I

8    STILL HAD THE SAME DUTIES AS A TOXICOLOGIST, AND ALSO MORE DUTIES

9    AS POTENTIALLY RESPONDING ON SCENE, BUT THE DUTIES WERE VERY

10   SIMILAR.

11   Q.    COMMANDER LITTLE, LET'S -- YOU DIDN'T GO INTO GREAT DETAIL

12   IN YOUR EDUCATION.  IN 1989, YOU RECEIVED FROM TULANE UNIVERSITY

13   SCHOOL OF PUBLIC HEALTH AND TROPICAL MEDICINE A MASTER OF SCIENCE

14   IN PUBLIC HEALTH WITH A CONCENTRATION IN ENVIRONMENTAL

15   TOXICOLOGY; IS THAT CORRECT?

16   A.    YES.

17   Q.    COULD YOU TELL US JUST BASICALLY WHAT WAS YOUR COURSE OF

18   STUDY IN RECEIVING THAT DEGREE?

19   A.    I HAD A VARIETY OF COURSES IN ENVIRONMENTAL SCIENCE,

20   INCLUDING THINGS RELATED TO INDUSTRIAL HYGIENE, EPIDEMIOLOGY, AND

21   SEVERAL COURSES IN TOXICOLOGY, ONE COURSE IN PHARMACOLOGY.

22   Q.    CAN YOU EXPLAIN TO US, WHAT IS THE STUDY OF TOXICOLOGY?

23   A.    IT'S THE STUDY OF THE ADVERSE EFFECT OF CHEMICALS ON

24   BIOLOGICAL -- BIOLOGICAL TISSUES.

25   Q.    SO YOU'D BE FAMILIAR AND YOU'D BE ABLE TO TELL SOMEONE WHAT

1   EFFECT A CHEMICAL WOULD HAVE, OR COULD POSSIBLY HAVE, ON THEIR

2   BODILY FUNCTIONS OR IN ASSOCIATION WITH THEIR HEALTH?

3   A.   HEALTH EFFECTS ASSOCIATED WITH CHEMICALS, YES.

4   Q.   NOW, YOU ALSO SAID THAT IT INVOLVED THE STUDY OF

5   PHARMACOLOGY.  WHAT IS THE STUDY OF PHARMACOLOGY?

6   A.   IT IS HOW A CHEMICAL MOVES THROUGH THE BODY, HOW IT IS

7   METABOLIZED, AND THE EFFECTS ON THE BODY.

8   Q.   WERE YOU PERSONALLY INVOLVED AS AN EMPLOYEE OR IN YOUR ROLE

9   WITH ATSDR IN RESPONDING -- AS PART OF THE FEDERAL RESPONSE PLAN

10  FOR HURRICANE KATRINA?

11  A.   YES.  I WAS ASSIGNED TO THE EMERGENCY OPERATIONS CENTER.

12  Q.   AND WHAT WERE YOUR DUTIES?

13  A.   TECHNICAL SUPPORT FOR HAZARDOUS MATERIALS ISSUES.

14  Q.   OKAY.  IF YOU CAN JUST TAKE US THROUGH HOW THE REQUEST FOR

15  ATSDR TO BECOME INVOLVED IN THE FORMALDEHYDE IN TRAVEL TRAILERS

16  ISSUE CAME ABOUT, AND WHO MADE THE REQUEST?

17  A.   THERE WAS A CONFERENCE CALL THAT CAME IN THROUGH -- OR THERE

18  WAS A REQUEST THAT CAME IN THROUGH THE CDC EMERGENCY OPERATIONS

19  CENTER WHERE THEY REQUESTED A CONFERENCE CALL.  THE EMERGENCY

20  OPERATIONS CENTER CONTACTED SCOTT WRIGHT, AND SCOTT ROUNDED UP A

21  BUNCH OF PEOPLE IN OUR BUILDING, INCLUDING DON BENKEN, TO BE IN

22  ON THIS CONFERENCE CALL.

23  Q.   AND WHAT'S YOUR UNDERSTANDING AS TO WHAT WAS THE PURPOSE OF

24  THE CONFERENCE CALL?

25  A.   WHEN THE CALL WAS ANNOUNCED, I THINK THEY SAID ABOUT

1   FORMALDEHYDE.  I DON'T REMEMBER MUCH MORE THAN THAT.  TRAILERS --

2   FORMALDEHYDE IN TRAILERS.

3   Q.    HOW MANY TIMES WOULD YOU SAY, OVER YOUR HISTORY OR TIME WITH

4   ATSDR, DID YOU EVER PARTICIPATE OR RESPOND TO A CDC EMERGENCY

5   OPERATIONS CENTER'S CALL?

6   A.    MANY, MANY TIMES.

7   Q.    ONCE IT WAS DETERMINED THAT THE PROJECT WOULD MOVE FORWARD,

8   WHAT WAS THE NEXT STEP TAKEN?

9   A.    I THINK THERE WAS A MISSION ASSIGNMENT AS PART OF THE

10  HURRICANE RESPONSE FOR EPA TO CONDUCT THIS SAMPLING ACTIVITY.

11  AND OVER THE NEXT SEVERAL WEEKS, EPA WORKED ON DEVELOPING A

12  SAMPLING PLAN.

13  Q.    DO YOU KNOW WHO AT EPA WAS INVOLVED WITH DEVELOPING THE

14  SAMPLING PLAN?

15  A.    I'M NOT SURE WHO WAS THE AUTHOR.

16  Q.    AND WHAT IS YOUR UNDERSTANDING OF WHAT THE SAMPLING PLAN

17  WAS?

18  A.    THE SAMPLING PLAN WAS TO TAKE 96 UNOCCUPIED TRAILERS,

19  12 FROM EACH OF THE EIGHT DIFFERENT MANUFACTURERS, AND TO TEST

20  THE EFFECTIVENESS OF TWO DIFFERENT VENTILATION STRATEGIES AND,

21  ALSO, TO ESTABLISH THE BASELINE LEVEL OF FORMALDEHYDE IN

22  UNOCCUPIED TRAILERS.

23  Q.    AND THIS SAMPLING WENT ON FROM THE -- DURING THE LAST WEEK

24  OF SEPTEMBER INTO OCTOBER, CORRECT?

25  A.    YES, A 14-DAY SAMPLING PERIOD.

1    Q.    AND YOU SAID THAT THERE WERE TWO DIFFERENT METHODS OF

2    VENTILATION USED.  WHAT WERE THOSE TWO DIFFERENT METHODS?

3    A.    THERE WAS A METHOD WITH THE AIR-CONDITIONING RUNNING AND, I

4    BELIEVE, A BATHROOM VENT OPEN.  AND THEN THERE WAS A SECOND

5    METHOD WITH ALL, ALL WINDOWS AND ALL VENTS OPEN.  AND THEN THEY

6    SAMPLED WITH EVERYTHING CLOSED UP, ALSO.

7    Q.    BUT YOU DID ESTABLISH A LEVEL OF CONCERN?

8    A.    WE PICKED A COMPARISON POINT, REFERRED TO AS A LEVEL OF

9    CONCERN.

10   Q.    AND WHAT WAS THAT?

11   A.    0.3 PARTS PER MILLION.

12   Q.    COMMANDER LITTLE, WHAT I'VE HANDED TO YOU NOW IS A DOCUMENT

13   ENTITLED, "HEALTH CONSULTATION, FORMALDEHYDE SAMPLING OF FEMA

14   TEMPORARY HOUSING UNITS, BATON ROUGE, LOUISIANA, FEBRUARY 1,

15   2007, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY."

16          AND AT THE TOP OF IT IN A HANDWRITTEN NOTE, IT SAYS,

17   "FINAL, 2/1/07, 5:02 P.M."

18          BEFORE I GET STARTED, DO YOU, BY CHANCE, RECOGNIZE THAT

19   HANDWRITING?

20   A.    YES, THAT'S MY HANDWRITING.

21   Q.    AND IT WAS PREPARED IN RESPONSE TO THE DATA THAT YOU

22   RECEIVED FROM EPA IN DECEMBER OF '06, THAT WAS TESTING DATA FROM

23   THE 96 UNITS?

24   A.    YEAH, WE RECEIVED THE DATA FROM FEMA.

25   Q.    THE FINAL SENTENCE UNDER RECOMMENDATIONS SAYS, "INCREASING

1  THE VENTILATION TO PROVIDE FOR THE GREATEST NUMBER OF AIR

2  EXCHANGES WILL BE THE MOST EFFECTIVE ACTION IN LOWERING THE

3  POTENTIAL EXPOSURE TO FORMALDEHYDE."

4  A.   YES.

5  Q.   AND THAT'S A TRUE AND ACCURATE STATEMENT?

6  A.   YES.

7  Q.   HOW DID YOU GET INVOLVED WITH THE SITUATION INVOLVING FEMA

8  TRAILERS AND COMPLAINTS OF FORMALDEHYDE?

9  A.   I GOT PULLED INTO A CONFERENCE CALL ON JUNE 19TH THAT WAS A

10  HEADS-UP CONFERENCE CALL THAT WE SPOKE ABOUT EARLIER.

11  Q.   ULTIMATELY, WHAT WERE YOU CHARGED WITH DOING?

12  A.   AT THE END OF THE CALL, THEY WANTED US TO EVALUATE ANY

13  SAMPLING DATA THAT THEY COLLECTED.

14  Q.   FIRST, WHO WAS US?

15  A.   ME AND SCOTT WRIGHT FROM ATSDR.

16  Q.   AND THEN WHO WAS THEY?  WHO WAS COLLECTING SAMPLING DATA?

17  A.   EPA WAS COLLECTING THE DATA.  FEMA REQUESTED THEM TO COLLECT

18  THE DATA.  THEY -- THE REQUEST WAS AN EMERGENCY MISSION

19  ASSIGNMENT UNDER THE HURRICANE KATRINA RESPONSE.

20  Q.   SO IF I'M UNDERSTANDING YOU CORRECTLY, THE FIRST THING YOU

21  WERE CHARGED WITH DOING WAS FIGURING OUT WHAT THESE TEST RESULTS

22  MEANT TO SOME EXTENT?

23  A.   YEAH, AFTER THEY COLLECTED THE DATA.

24  Q.   YOU'VE TOLD ME BEFORE ABOUT YOUR QUALIFICATIONS, AND THAT

25  SOME OF IT INVOLVED INDUSTRIAL HYGIENE TYPE STUDY.  BUT,

1    ULTIMATELY, YOUR REPORT WENT WELL BEYOND SIMPLE ANALYSIS OF TEST

2    DATA AND GOT INTO, YOU KNOW, WHAT IS FORMALDEHYDE AND WHAT DOES

3    IT DO TO PEOPLE --

4    A.    YES.

5    Q.    -- IS THAT CORRECT?

6    A.    YES.

7    Q.    WHEN DID THAT CHANGE ALONG THE WAY?

8    A.    I'M NOT SURE WHAT YOU MEAN BY --

9    Q.    WHEN DID THAT BECOME ONE OF THE PRINCIPAL THINGS YOU BECAME

10   INVOLVED IN, BEYOND JUST LOOKING AT THE TEST RESULTS, BUT THE

11   EFFECT OF THOSE RESULTS, OR POTENTIAL EFFECT?

12   A.    THAT'S ALWAYS BEEN PART OF MY JOB, LOOKING AT THE HEALTH

13   EFFECTS.

14   Q.    OKAY.

15   A.    THAT'S THE REASON I WOULD LOOK AT DATA.

16   Q.    SO -- I THINK I FOLLOW YOU -- YOU WEREN'T LOOKING AT THE

17   DATA JUST TO ANALYZE RAW TEST NUMBERS; YOU WERE LOOKING AT THE

18   EFFECTS AND, MORE SPECIFICALLY, THE HEALTH EFFECTS, WHICH IS ONE

19   OF THE THINGS THE ATSDR DOES?

20   A.    RIGHT.

21   Q.    YOU'VE INCLUDED A SECTION HERE IN THE SECOND PARAGRAPH,

22   "MANY PRODUCTS USED EVERY DAY AROUND THE HOUSE ALSO CONTAIN

23   FORMALDEHYDE"?

24   A.    YES.

25   Q.    THAT INCLUDES FINGERNAIL POLISH?

```
 1   A.    YES.

 2   Q.    FINGERNAIL HARDENERS?

 3   A.    YES.

 4   Q.    ANTISEPTICS?

 5   A.    YES.

 6   Q.    SOME MEDICINES?

 7   A.    YES.

 8   Q.    COSMETICS?

 9   A.    YES.

10   Q.    DISHWASHING LIQUIDS?

11   A.    YES.

12   Q.    FABRIC SOFTENERS?

13   A.    YES.

14   Q.    SHOE CARE AGENTS?

15   A.    YES.

16   Q.    CARPET CLEANERS?

17   A.    YES.

18   Q.    GLUES AND ADHESIVES?

19   A.    YES.

20   Q.    LACQUERS?

21   A.    YES.

22   Q.    PLASTICS?

23   A.    YES.

24   Q.    SOME PAPER PRODUCTS?

25   A.    YES.
```

1   Q.    THAT INCLUDES GROCERY BAGS?

2   A.    YES.

3   Q.    EVEN PAPER TOWELS CONTAIN FORMALDEHYDE?

4   A.    YES.

5   Q.    ALSO, FOOD PRODUCTS, CERTAIN TYPES OF CHEESES AND DRIED

6   FOODS?

7   A.    YES.

8   Q.    FISH?

9   A.    YES.

10  Q.    IF I UNDERSTOOD YOUR TESTIMONY EARLIER, THE EPA TESTED

11  UNOCCUPIED TRAILERS, CORRECT?

12  A.    YES.

13  Q.    BUT ALL THESE THINGS ARE THINGS THAT YOU WOULD NORMALLY

14  ASSOCIATE WITH AN OCCUPIED TRAILER; IS THAT CORRECT?

15  A.    YES.

16  Q.    SOMEWHERE IN THIS REPORT OR IN THESE DOCUMENTS YOU REFERENCE

17  THE FACT THAT IT'S HARD TO CONTROL FOR ALL THESE DIFFERENT THINGS

18  THAT CAN ADD TO THE FORMALDEHYDE LEVEL IN THE TRAILER; IS THAT

19  RIGHT?

20  A.    YES.

21  Q.    I MEAN, JUST LOOKING AT THAT PARAGRAPH, IT LOOKS LIKE IF ONE

22  PERSON IS A CIGARETTE SMOKER AND ANOTHER PERSON USES FINGERNAIL

23  HARDENERS, IT'S HARD TO MEASURE THAT, THE IMPACTS OF THOSE TWO

24  DIFFERENT THINGS ON THE SAME TYPE OF TRAILER.  WAS THAT THE

25  CONCERN YOU WERE HAVING?

1   A.   YES, IT WOULD BE INTERFERING WITH THE RESULTS.

2   Q.   AND IF THERE WERE VARIABLES YOU COULDN'T CONTROL, LIKE HOW

3   OFTEN SOMEBODY SMOKED A CIGARETTE OR HOW OFTEN THEY USED

4   FINGERNAIL POLISH, YOU WOULD LOSE THE ABILITY TO MAKE AN ADEQUATE

5   SCIENTIFIC COMPARISON; IS THAT RIGHT?

6   A.   YES.

7   Q.   IF WE CAN SKIP FURTHER DOWN TO PARAGRAPH 3, IT STATES, "THE

8   CONCENTRATION OF FORMALDEHYDE DETECTED OUTDOORS IN GENERAL IS

9   USUALLY LESS THAN THAT DETECTED IN INDOOR AIR.  BACKGROUND LEVELS

10   OF FORMALDEHYDE DETECTED IN OUTDOOR AIR FROM URBAN AREAS ARE

11   DEPENDENT ON LOCAL CONDITIONS AND CAN VARY WIDELY."  DID I READ

12   THAT CORRECTLY?

13   A.   YES.

14   Q.   "CONCENTRATIONS GENERALLY RANGE FROM," AND I'LL LEAVE OUT

15   THE VERY COMPLICATED SCIENTIFIC MATH AND GO TO, ".0008 TO

16   .016 PPM"?

17   A.   YES.

18   Q.   ARE YOU SAYING THAT THERE -- BACKGROUND LEVELS OF

19   FORMALDEHYDE CAN BE AS HIGH AS 16 PARTS PER BILLION?

20   A.   YES.

21   Q.   IT FURTHER STATES, "THE INCOMPLETE COMBUSTION OF HYDROCARBON

22   FUELS CAN CONTRIBUTE TO THE LEVEL OF FORMALDEHYDE IN OUTDOOR

23   AIR"; IS THAT CORRECT?

24   A.   YES.

25   Q.   "URBAN AIR CONCENTRATIONS DURING HEAVY TRAFFIC OR SEVERE

1    INVERSIONS CAN RANGE UP TO .08 PARTS PER BILLION" -- "PARTS PER

2    MILLION," I'M SORRY; IS THAT CORRECT?

3    A.   YES.

4    Q.   SO ARE YOU TELLING ME THAT IN CERTAIN SITUATIONS IN HIGH

5    TRAFFIC AREAS, IN URBAN AREAS, YOU CAN GET LEVELS AS HIGH AS

6    80 PARTS PER BILLION?

7    A.   YES.

8    Q.   AM I CORRECT THAT YOUR CONCLUSION IN READING THESE PAPERS

9    THAT YOU WERE CHARGED TO READ, THAT THE RELEASE OF FORMALDEHYDE

10   IS EXPECTED TO DECREASE FROM WOOD-BASED BUILDING MATERIALS AS

11   THEY AGE?

12   A.   YES.

13   Q.   DO YOU HAVE ANY SPECIFIC RECOLLECTION ABOUT THE EPA '96

14   REPORT OR THE ZINN 1990 REPORT IN TERMS OF WHAT AGES OF WOOD THEY

15   WERE EVALUATING?

16   A.   NO.  I GOT THIS FROM THE ATSDR TOX PROFILE.

17   Q.   THE 1999 ATSDR TOX PROFILE?

18   A.   IT'S REFERENCED IN -- I'M NOT SURE OF THE YEAR.

19   Q.   OKAY.

20   A.   1999, YES.

21   Q.   SO IF WE CAN -- NOW, IF WE CAN SKIP TO WHERE I THOUGHT WE

22   WERE HEADED, AND THAT IS TO THE DISCUSSION ABOUT CONVENTIONAL OR

23   SITE-BUILT HOMES, WHICH I BELIEVE IS ON PAGE 6 IN THE FIRST

24   PARAGRAPH -- IN THE FIRST PARAGRAPH.

25   A.   YES.

1  Q.   THE FIRST REPORT YOU REFERENCE IS THE HAWTHORNE REPORT.

2  ABOUT MIDDLE WAY THROUGH THE PARAGRAPH IT SAYS, "CONVENTIONAL

3  HOMES OVERALL HAD A CONCENTRATION OF FORMALDEHYDE RANGING FROM

4  LESS THAN .02 TO .4 PPM"; IS THAT CORRECT?

5  A.   YES, FOR THAT STUDY.

6  Q.   FOR THAT STUDY AND FOR THE HOUSES THEY LOOKED AT THAT IN

7  THAT STUDY, CORRECT?

8  A.   YES.

9  Q.   .02 TO .4 IS 20 TO 400 PARTS PER BILLION, CORRECT?

10  A.   YES.

11  Q.   NOW, THE NEXT SENTENCE IS INTERESTING.  IT SAYS, "SINCE THE

12  MID 1980S, PLYWOOD AND PARTICLEBOARD MANUFACTURING METHODS HAVE

13  CHANGED TO REDUCE FORMALDEHYDE EMISSIONS" --

14  A.   YES.

15  Q.   -- IS THAT RIGHT?

16       SO IF I'M UNDERSTANDING THE POINT YOU'RE MAKING, AS

17  TIME HAS GONE ON, MANUFACTURERS HAVE FIGURED OUT WAYS TO MAYBE

18  LOWER THE FORMALDEHYDE EMISSIONS IN WOOD PRODUCTS?

19  A.   YES.  THIS WAS STATED IN THE TOX PROFILE, I BELIEVE.

20  Q.   IT THEN SAYS, "A STUDY CONDUCTED ON A NEWLY CONSTRUCTED AND

21  UNOCCUPIED HOUSE FOUND AVERAGE INDOOR CONCENTRATIONS OF

22  FORMALDEHYDE TO BE .035 TO .45 PPM"; IS THAT CORRECT?

23  A.   YES.

24  Q.   AND IF WE CONVERT THAT AGAIN, WE'RE TALKING ABOUT 35 TO

25  450 PARTS PER BILLION?

1  A.   YES, THAT'S CORRECT, IN THAT PARTICULAR STUDY.

2  Q.   IN THAT PARTICULAR STUDY OF THOSE PARTICULAR HOUSES?

3  A.   YES.

4  Q.   BUT I'LL GO YOU ONE BETTER.  NOT ONLY THOSE PARTICULAR

5  HOUSES, BUT, IF I'M READING THIS RIGHT, THAT'S 30 DAYS AFTER

6  THOSE PRODUCTS WERE INSTALLED?

7  A.   YES, THAT'S WHAT THIS STUDY SAID.

8  Q.   NOW, EARLIER YOU TALKED ABOUT THE EPA STUDY AND THE

9  REDUCTION IN 14 DAYS THROUGH NORMAL VENTILATION -- OR, I'M SORRY,

10 THROUGH WINDOW VENTILATION VERSUS AIR-CONDITIONING VENTILATION.

11 AND THERE WAS PRETTY SIGNIFICANT REDUCTION AFTER 14 DAYS, WASN'T

12 THERE, IN THE BACK OF THIS PAPER?

13 A.   THIS REPORT, THAT WAS 14 DAYS WITH THE WINDOWS CONTINUOUSLY

14 OPEN.

15 Q.   OR 14 DAYS WITH THE AIR-CONDITIONING CONTINUOUSLY RUNNING?

16 A.   RIGHT.

17 Q.   RIGHT.  AND THERE WAS A SIGNIFICANT REDUCTION IN BOTH CASES,

18 CORRECT?

19 A.   YEAH.  YES.

20 Q.   AND THIS PAPER THAT YOU REFERENCE HERE WITH AN ATSDR TOX

21 PROFILE REFERENCE DEALT WITH HOUSES THAT WERE TESTED AFTER

22 30 DAYS?

23 A.   THAT'S RIGHT.  BUT THESE 30 DAYS, I DON'T -- I DON'T KNOW IF

24 THEY WERE VENTILATING OR ANYTHING.  YOU KNOW, OUR 14-DAY STUDY

25 WAS VENTILATION FOR THAT -- FOR 14 DAYS.

1    Q.    SO IT COULD HAVE BEEN EQUALLY AS WELL VENTILATED OR NOT AS

2    WELL VENTILATED?

3    A.    I DON'T KNOW.

4    Q.    BUT, IN ANY CASE, THEY GOT LEVELS AS HIGH AS 450 PARTS PER

5    BILLION, CORRECT?

6    A.    YES.

7    Q.    AND NOT IN A TRAVEL TRAILER, NOT IN A MANUFACTURED HOUSE,

8    NOT IN A MOBILE HOME, THIS IS IN, YOU KNOW, A STICK-BUILT HOME ON

9    A PIECE OF LAND, CORRECT?

10   A.    YES.

11   Q.    GOING DOWN TO THE NEXT PARAGRAPH, THERE WAS A STUDY, IT

12   LOOKED LIKE THE GOLD STUDY, OF FORMALDEHYDE CONCENTRATION IN

13   CONVENTIONAL HOMES THAT WERE LESS THAN ONE YEAR OLD, AND THE

14   RANGE WAS FROM .05 TO .2 PPM, CORRECT?

15   A.    YES.  IN THAT PARTICULAR STUDY, YES.

16   Q.    AND SO IF WE CONVERT THAT, THAT'S 50 PARTS PER BILLION TO

17   200 PARTS PER BILLION --

18   A.    YES.

19   Q.    -- AFTER A YEAR?

20   A.    YES.

21   Q.    AND WHEN WE TALK ABOUT VENTILATION OF OPENING THE WINDOWS OR

22   CLOSING THE WINDOWS, ANOTHER WAY WE VENTILATE UNITS IS BY COMING

23   IN AND OUT OF THE HOUSE, CORRECT?

24   A.    YES.

25   Q.    NOW, IF WE CAN GET TO THE SECTION ON FORMALDEHYDE TOXICITY.

1  THE TASK YOU WERE CHARGED WITH WAS TO TIE THE RESULTS THAT WERE

2  FOUND BY EPA TO THE KNOWN TOXICOLOGICAL LITERATURE ON

3  FORMALDEHYDE, CORRECT?

4  A.   YES, I NEEDED TO COMPARE IT TO THAT.

5  Q.   IT LOOKS LIKE THE FIRST THING YOU REFERENCE IS THE FACT THAT

6  THE ODOR THRESHOLD FOR FORMALDEHYDE IS FROM .5 PPM TO 1.0 PPM?

7  A.   YES.

8  Q.   AND THEN THAT THE IRRITANT EFFECTS OCCUR FROM .4 TO 3.0 PPM?

9  A.   YES.

10  Q.   .4 IS 400 PARTS PER BILLION?

11  A.   YES.

12  Q.   AND 3.0 IS 3,000 PARTS PER BILLION?

13  A.   YES.

14  Q.   AND THAT'S WHERE THEY FOUND IRRITANT EFFECTS?

15  A.   YES.

16  Q.   WELL, LET'S TALK ABOUT THAT FOR A MINUTE.  OSHA HAS A

17  STANDARD FOR FORMALDEHYDE, CORRECT?

18  A.   YES.

19  Q.   AND THE LEVELS OF FORMALDEHYDE YOU WOULD EXPECT TO SEE IN

20  OCCUPATIONAL WORKERS ARE MUCH HIGHER THAN YOU WOULD EXPECT TO SEE

21  IN A NORMAL -- IN NORMAL ENVIRONMENTS IN A NORMAL SITE-BUILT

22  HOME?

23  A.   YES.

24  Q.   FOR EXAMPLE, LAB WORKERS, PEOPLE JOKE ABOUT THEY ALMOST SWIM

25  IN THE STUFF.  IS THAT -- DID YOU GET TO DO SOME OF THAT AT

1    TULANE?

2    A.    I DID IN MY UNDERGRADS.  I HAD A BIOLOGY LAB THAT --

3    SPECIMENS IN FORMALDEHYDE, YES.

4    Q.    AND YOU WOULD HAVE BEEN EXPOSED AT THAT POINT TO MUCH, MUCH

5    HIGHER LEVELS OF FORMALDEHYDE THAN JUST .1 PARTS OR .3 OR .5

6    PARTS PER MILLION?

7    A.    YES.

8    Q.    MUCH, MUCH HIGHER?

9    A.    YES.

10   Q.    AND THEN YOU STATE, "IN PERSONS WHO ARE NOT SENSITIZED,

11   PROLONGED INHALATION OF FORMALDEHYDE AT LOW LEVELS IS UNLIKELY TO

12   RESULT IN CHRONIC PULMONARY INJURY."  WAS THAT PART OF THE BASIS,

13   OR PART OF THE THINGS YOU WERE LOOKING FOR, HOW THESE -- HOW

14   FORMALDEHYDE MIGHT AFFECT INDIVIDUALS OVER A CHRONIC LOW

15   EXPOSURE?

16   A.    YES, THIS WAS -- I BELIEVE THIS WAS FROM THE TOX PROFILE.

17   Q.    AND THAT WAS YOUR DEFINITION; I MEAN, THAT'S WHAT YOU SAW AS

18   A VERY LOW LEVEL, .3 PPM?

19   A.    YES.

20   Q.    OR 300 PARTS PER MILLION?

21   A.    300 PARTS PER BILLION.

22   Q.    PER BILLION, I'M SORRY.  50 PARTS PER BILLION WOULD BE

23   RIDICULOUSLY LOW?  YES?

24   A.    IT'S MUCH LOWER.

25   Q.    YOU THEN GO ON TO STATE THAT, "THE THRESHOLD LIMIT VALUE

1   SHORT-TERM EXPOSURE LIMIT RECOMMENDED BY THE AMERICAN CONFERENCE

2   OF GOVERNMENT INDUSTRIAL HYGIENISTS IS ALSO .3 PPM."

3   A.    YES.  I BELIEVE THEY LOOKED AT -- MAY HAVE LOOKED AT THE

4   SAME STUDY.

5   Q.    WHAT IS A THRESHOLD LIMIT VALUE?

6   A.    IT'S THE LOWEST LEVEL OF A REAL EFFECT.

7   Q.    SAY THAT ONE OUT LOUD AGAIN.

8   A.    IT'S A -- THRESHOLD IS THE LOWEST LEVEL OF A CHEMICAL THAT'S

9   BEEN SHOWN TO PRODUCE EFFECT.

10  Q.    YOU USED ANOTHER WORD BEFORE, ALSO, I KIND OF LIKED, REAL

11  EFFECT.  IT'S THE LOWEST LEVEL WHERE WE SEE -- WHERE WE COULD

12  POSSIBLY SEE A REAL EFFECT; IS THAT RIGHT?

13  A.    YES.

14  Q.    WHO IS THE ACGIH?

15  A.    IT STANDS FOR THE AMERICAN CONFERENCE OF GOVERNMENT

16  INDUSTRIAL HYGIENISTS.

17  Q.    MOVING ON TO PARAGRAPH 3 IN THE MIDDLE, "STUDIES INVOLVING

18  ASTHMATICS HAVE BEEN SOMEWHAT CONFLICTING, BUT GENERALLY INDICATE

19  THAT FORMALDEHYDE DOES NOT INDUCE AIRWAY HYPERREACTIVITY AT

20  CONCENTRATIONS LESS THAN 3 PARTS PER MILLION"; IS THAT CORRECT?

21  A.    YES, THAT'S -- I BELIEVE THAT WAS FROM THE TOX PROFILE.

22  Q.    3 PARTS PER MILLION, OR 3,000 PARTS PER BILLION, CORRECT?

23  A.    YES.

24  Q.    A LOT MORE THAN 50 PARTS PER BILLION, CORRECT?

25  A.    YES.

1   Q.   AND WHEN WE SAY AIRWAY HYPERREACTIVITY, WE'RE TALKING ABOUT

2   AN ASTHMA ATTACK ESSENTIALLY?

3   A.   YES.  YES.

4   Q.   IF WE CAN GO DOWN TO THE BOTTOM OF THAT PAGE, THE LAST

5   PARAGRAPH, "FORMALDEHYDE IS READILY ABSORBED IN THE BODY.  IT IS

6   ALSO QUICKLY BROKEN DOWN"; CORRECT?

7   A.   YES.

8   Q.   IT IS CONVERTED TO A NONTOXIC CHEMICAL CALLED FORMATE, WHICH

9   IS TYPICALLY EXCRETED IN URINE?

10  A.   YES.

11  Q.   ANOTHER WAY FOR IT TO LEAVE THE BODY IS TO BE CONVERTED TO

12  CARBON DIOXIDE AND EXHALED?

13  A.   YES.

14  Q.   THE NEXT PARAGRAPH ON PAGE 8 IS WHERE YOU STATED, "A LEVEL

15  OF CONCERN FOR FORMALDEHYDE IN TRAILERS USED FOR TEMPORARY

16  HOUSING WOULD BE .3 PARTS PER MILLION," CORRECT?

17  A.   I USED THAT AS MY COMPARISON POINT.

18  Q.   AND THAT WAS YOUR -- YOU BASED IT ON THE EFFECT LEVEL

19  ASSOCIATED WITH NARROWING OF THE BRONCHI IN SENSITIVE

20  INDIVIDUALS?

21  A.   YES, THE ALLERGIC RESPONSE.

22  Q.   AND WE TALKED EARLIER ABOUT IRRITANT RESPONSE IS AT A HIGHER

23  LEVEL?

24  A.   YES.

25  Q.   SO YOU WERE COMFORTABLE SETTING THIS AS THE LEVEL OF

1  CONCERN?

2  A.   YES.  IT WAS THE LOWEST ACTUAL EFFECT LEVEL I FOUND IN THE

3  LITERATURE.

4  Q.   THE LOWEST ACTUAL EFFECT LEVEL YOU FOUND IN THE LITERATURE.

5  WE'RE TALKING ABOUT THE TOXICOLOGICAL LITERATURE?

6  A.   YES.

7  Q.   BUT AS WE SIT HERE TODAY, YOU STILL HAVE THE SAME

8  CONCLUSION, DON'T YOU?

9  A.   YES.

10  Q.   ONE OF THE THINGS THAT CAME UP AFTER THIS REPORT WAS ISSUED

11  WAS QUESTIONS ABOUT WHY IT DIDN'T ADDRESS CARCINOGENICITY.  WHY

12  DIDN'T THIS REPORT ADDRESS CARCINOGENICITY?

13  A.   BECAUSE THIS WAS AN EMERGENCY RESPONSE, AND CARCINOGENICITY

14  IS USUALLY AN ISSUE FOR OVER MANY, MANY, MANY YEARS OF EXPOSURE.

15  Q.   10 OR MORE?

16  A.   10 -- USUALLY 10 OR MORE.

17  Q.   WE'VE COME A LONG WAY SINCE AUGUST 29, 2005.  AS WE SIT HERE

18  TODAY IN THE SUMMER OF 2009, IS IT YOUR BELIEF THAT PEOPLE ARE

19  GOING TO BE STAYING IN THESE TRAILERS FOR 10 YEARS OR MORE; DO

20  YOU HAVE ANY UNDERSTANDING OF THAT?

21  A.   NO, I DON'T BELIEVE THAT'S THE INTENT.

22  Q.   SO WHEN YOU SAY A SAFETY FACTOR, FOR EXAMPLE, IT MIGHT BE

23  MULTIPLIED BY .1 TO GIVE IT A 10 TIMES SAFETY FACTOR?

24  A.   SOMETIMES THEY ARE DIVIDED BY THREE TO ACCOUNT FOR HUMAN

25  VARIABILITY.  THERE IS SOME OTHER NUMBERS, DEPENDING ON THE TYPE

1  OF STUDY THAT WAS USED, IF IT WAS AN ANIMAL STUDY.

2  Q.   IS IT CORRECT THAT THE ATSDR CHRONIC MRL WAS NOT USED

3  BECAUSE IT WAS BASED ON AN AVERAGE EXPOSURE TIME FRAME OF

4  APPROXIMATELY 10 YEARS?  YES?

5  A.   ONE OF THE REASONS.

6  Q.   ONE OF THE REASONS.  AND, ALSO, BECAUSE IT WAS BELOW

7  BACKGROUND LEVELS AT THE TEST SITE?

8  A.   YES.

9  Q.   AND BELOW BACKGROUND LEVELS FOUND IN MOST URBAN AREAS

10 THROUGHOUT THE UNITED STATES?

11 A.   YES.

12 Q.   AND IF I READ MOST OF WHAT WE HAVE GONE OVER HERE TODAY

13 CORRECTLY, THE MRL IS EXCEEDED IN MOST CONVENTIONAL HOMES?

14 A.   YES, THAT'S CORRECT.

15 Q.   AND EXCEEDED IN MOST URBAN AREAS?

16 A.   YES.

17 Q.   AND GROSSLY EXCEEDED IN HIGH TRAFFIC URBAN AREAS?

18 A.   COULD BE, YES.

19 Q.   BUT, LASTLY, AS I SIT HERE TODAY, YOU'VE PUT FORTH .3 PPM,

20 OR 300 PARTS PER BILLION, AS THE NO EFFECT LEVEL, AND YOU STILL

21 BELIEVE IT AS WE SIT HERE TODAY?

22 A.   AS AN EFFECT LEVEL.

23 Q.   CORRECT.  AS AN EFFECT LEVEL.

24 A.   YES, IT WAS AN EFFECT LEVEL.

25 Q.   AND THERE WAS NO EFFECT BELOW THAT LEFT LEVEL?

1  A.   I DID NOT COME ACROSS THAT.

2           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, PLAYING OF

3  THE VIDEOTAPED DEPOSITION OF COMMANDER JOSEPH LITTLE CONCLUDED.)

4           THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND -- WELL,

5  WHERE IS PAM?  WE HAVE TO TURN THE LIGHTS UP HERE.

6           MR. WEINSTOCK, WOULD YOU FILL IN FOR PAM, PLEASE.

7  OPEN THAT DOOR, THERE IS A LIGHT SWITCH RIGHT INSIDE THERE.

8  THERE SHOULD BE TWO.  HIT THE OTHER ONE UP.  IT MAY TAKE A LITTLE

9  WHILE.

10          ALL RIGHT.  WHO IS THE NEXT WITNESS ON THE

11 DEFENDANT'S SIDE?

12          MR. WEINSTOCK:  DAMIEN SERAUSKAS.

13          THE COURT:  DAMIEN SERAUSKAS.  SIR, IF YOU WOULD COME ON

14 UP.

15          THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

16 HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

17 ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

18 THE TRUTH, SO HELP YOU GOD?

19          THE WITNESS:  I DO.

20                          **DAMIEN SERAUSKAS**

21 WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

22 CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

23          THE DEPUTY CLERK:  THANK YOU.  YOU MAY BE SEATED.

24 PLEASE STATE AND SPELL YOUR FULL NAME.

25          THE WITNESS:  DAMIEN WALTER SERAUSKAS.  DAMIEN,

1   D-A-M-I-E-N, WALTER, W-A-L-T-E-R, SERAUSKAS, S-E-R-A-U-S-K-A-S.

2                       VOIR DIRE EXAMINATION

3   BY MR. SCANDURRO:

4   Q.   MR. SERAUSKAS, GOOD MORNING.  YOU SPELLED AND STATED YOUR

5   NAME, BUT COULD YOU TELL THE JURY WHAT YOU DO, WHERE YOU LIVE AND

6   WHO YOU LIVE WITH?

7   A.   MY NAME IS DAMIEN SERAUSKAS, I'M A PROFESSIONAL ENGINEER.  I

8   HAVE MY OWN CONSULTING ENGINEERING FIRM HERE IN THE CITY OF

9   NEW ORLEANS.  I LIVE OVER ON THE WESTBANK WITH MY WIFE AND TWO

10  KIDS, MY SEVEN-YEAR-OLD SON AND MY FIVE-YEAR-OLD DAUGHTER.  AND I

11  WENT TO TULANE UNIVERSITY.  I GRADUATED BACK IN '93.  AND I'VE

12  CONTINUOUSLY OPERATED MY FIRM AS A SOLE PROPRIETORSHIP SINCE

13  APRIL 1ST, 2000.

14  Q.   SO YOU ARE A MECHANICAL ENGINEER?  THAT'S YOUR DEGREE FROM

15  TULANE?

16  A.   THAT'S CORRECT.

17  Q.   JURIES AND JUDGES LOVE HEARING FROM ENGINEERS RIGHT BEFORE

18  LUNCH.

19  A.   I APOLOGIZE IN ADVANCE.

20  Q.   THAT'S OKAY.

21           AND YOU'RE HERE TO TALK ABOUT --

22           MR. SCANDURRO:  YOUR HONOR, BEFORE I GO FORWARD, WE DO

23  HAVE A STIPULATION.  I'VE CONFERRED WITH COUNSEL ON THE WITNESS

24  BEING QUALIFIED IN THIS AREA OF EXPERTISE, WHICH IS MECHANICAL

25  ENGINEERING AND HVAC SYSTEMS.

1          THE COURT:  IS THAT CORRECT?

2          MR. WATTS:  SO STIPULATED.

3          THE COURT:  THE COURT WILL THEREFORE ACCEPT THIS WITNESS

4    AS AN EXPERT IN THE FIELD OF MECHANICAL ENGINEERING AND HVAC

5    SYSTEMS.

6                         DIRECT EXAMINATION

7    BY MR. SCANDURRO:

8    Q.   MR. SERAUSKAS, SINCE YOU'VE BEEN ACCEPTED AS AN EXPERT, I'LL

9    JUST -- I'M GOING TO WHIP THROUGH THIS REAL QUICKLY, SOME OF YOUR

10   BACKGROUND AND QUALIFICATIONS.

11          SOME OF THE PROJECTS YOU'VE WORKED ON, SIR, INCLUDE THE

12   RITZ-CARLTON HOTEL COMPLEX ON CANAL STREET IN NEW ORLEANS; IS

13   THAT CORRECT?

14   A.   THAT'S CORRECT.

15   Q.   THE JEFFERSON PARISH COURTS COMPLEX?

16   A.   CORRECT.

17   Q.   SAINT THERESA HOSPITAL IN KENNER, LOUISIANA?

18   A.   CORRECT.

19   Q.   SOUTHEASTERN LOUISIANA UNIVERSITY, UNO, TULANE UNIVERSITY

20   AND XAVIER UNIVERSITY?

21   A.   THAT'S CORRECT.

22   Q.   FRANKLIN AVENUE BAPTIST CHURCH, SAINT MARTIN'S EPISCOPAL

23   CHURCH, SAINT LUKE THE EVANGELIST CHURCH, HOLY ROSARY HIGH

24   SCHOOL, AMONG OTHERS?

25   A.   AMONG OTHERS, YES.

1    Q.    STENNIS SPACE CENTER.

2    A.    YES.

3    Q.    AND IN ALL OF THOSE THINGS, WERE YOU BRINGING YOUR

4    MECHANICAL ENGINEERING EXPERTISE TO BEAR?

5    A.    YES.

6    Q.    AND THAT INCLUDES HVAC ISSUES?

7    A.    AMONG OTHERS, YES.

8    Q.    TELL THE JURY WHAT HVAC STANDS FOR AND WHAT IT IS.

9    A.    HEATING, VENTILATION AND AIR-CONDITIONING.

10   Q.    YOU'RE A MEMBER OF THE ASHRAE, THE AMERICAN SOCIETY OF

11   HEATING, REFRIGERATION AND AIR-CONDITIONING ENGINEERS?

12   A.    I AM.

13   Q.    HAVE YOU SERVED AS A CHAPTER PRESIDENT OF THE NEW ORLEANS

14   CHAPTER OF ASHRAE?

15   A.    I HAVE.  I'VE SERVED ON EVERY BOARD POSITION AT THE LOCAL

16   CHAPTER LEVEL.

17   Q.    ARE YOU ALSO A VOLUNTEER BOARD MEMBER ON THE CITY OF

18   NEW ORLEANS' BOARD OF BUILDING STANDARDS AND APPEALS?

19   A.    I AM.

20   Q.    AND YOU ARE CURRENTLY A REGISTERED PROFESSIONAL ENGINEER IN

21   THE STATE OF LOUISIANA?

22   A.    YES, SIR.

23         MR. SCANDURRO:  YOUR HONOR, I DON'T HAVE THIS EXHIBIT

24   READY YET, BUT I WOULD LIKE TO GO AHEAD AND OFFER AND INTRODUCE

25   INTO EVIDENCE EXHIBIT 347, WHICH IS MR. SERAUSKAS' CV.

1          MR. WATTS:  NO OBJECTION.

2          THE COURT:  ALL RIGHT.  347 IS ADMITTED.  WHEN

3    MS. RADOSTA COMES BACK UP, SHE HAD TO TEND TO SOMETHING, MAKE

4    SURE SHE'S AWARE OF IT AND I'LL TRY TO REMIND HER AS WELL.  347

5    IS ADMITTED.

6          MR. SCANDURRO:  THANK YOU, YOUR HONOR.

7                         EXAMINATION

8    BY MR. SCANDURRO:

9    Q.   LET'S TALK ABOUT WHAT WE ASKED YOU TO DO IN THIS CASE.  DID

10   WE ASK YOU TO REVIEW AND LOOK AT THE OPINIONS AND REPORTS OF SOME

11   OF THE PLAINTIFF'S EXPERTS ABOUT THIS TRAVEL TRAILER?

12   A.   YES, YOU DID.

13   Q.   AND WOULD THOSE INCLUDE MR. RITTER AND MR. MALLET?

14   A.   PRIMARILY YES.

15   Q.   DID WE ALSO ASK YOU TO GO UP AND LOOK AT THE TRAVEL TRAILER

16   IN LOTTIE, LOUISIANA?

17   A.   YES, I CONDUCTED A PERSONAL INSPECTION OF THE TRAILER.

18   Q.   NOW, WE DIDN'T ASK YOU TO BRING A -- HAUL A GENERATOR UP

19   THERE AND FIRE THE THING UP, DID WE?

20   A.   NO, SIR.

21   Q.   AND MR. RITTER TOLD US -- WERE YOU HERE DURING MR. RITTER'S

22   TESTIMONY?

23   A.   I WAS.

24   Q.   MR. RITTER TOLD US HE HAD NEVER BUILT OR DESIGNED A TRAVEL

25   TRAILER, AN HVAC IN A TRAVEL TRAILER, AND IN FAIRNESS, YOU

1    HAVEN'T EITHER; IS THAT CORRECT?

2    A.   I HAVE NOT.

3    Q.   BUT YOU DID GO LOOK AT THIS ONE?

4    A.   YES, SIR.

5    Q.   AND YOU WERE PRESENT WHEN MR. RITTER TESTIFIED?

6    A.   YES.

7    Q.   DO YOU REMEMBER HIM TALKING ABOUT DUCT LEAKAGE?

8    A.   YES, I DO.

9    Q.   I'M GOING TO SHOW YOU A PHOTOGRAPH THAT THE PLAINTIFFS

10   INTRODUCED INTO EVIDENCE AS 323.2.  YOU SEE THAT, SIR?

11   A.   YES, SIR.

12   Q.   IT WAS SUGGESTED THAT THIS WAS EVIDENCE OF A DUCT LEAK, AS I

13   RECALL THE TESTIMONY, BECAUSE OF THE CONDENSATION THAT YOU SEE

14   THERE.  DO YOU RECALL THAT TESTIMONY?

15   A.   I DO.

16   Q.   WHAT IS YOUR OPINION OF WHAT YOU'RE SEEING THERE?

17   A.   THE ONLY THING THAT THIS IMAGE ACTUALLY PROVES IS THAT THE

18   SURFACE TEMPERATURE OF -- THAT'S THE ACTUAL AIR-CONDITIONING

19   GRILL, AS PART OF THE PANEL OF THE AIR-CONDITIONING UNIT, THAT

20   THAT GRILL TEMPERATURE, THE TEMPERATURE OF THAT SURFACE IS AT OR

21   BELOW THE DEW POINT TEMPERATURE OF THE SPACE.

22   Q.   IS THIS SOMETHING UNCOMMON IN SOUTH LOUISIANA?

23   A.   NO, IT'S NOT.

24   Q.   HOW DOES IT RELATE TO THE HUMIDITY INSIDE OF THE TRAILER?

25   A.   WELL, THE HIGHER THE HUMIDITY, THE RELATIVE HUMIDITY,

1   GENERALLY THE HIGHER THE MOISTURE CONTENT IN THE AIR AND THE

2   HIGHER THE DEW POINT TEMPERATURE.  A MUGGY DAY HAS A HIGHER

3   MOISTURE CONTENT IN THE AIR, AND SO COLD SURFACES WILL HAVE A

4   TENDENCY TO SWEAT.

5   Q.   LIKE PUTTING A COLD COKE OUT ON A PICNIC TABLE IN THE

6   SUMMER?

7   A.   PRECISELY.

8   Q.   LET ME SHOW YOU ANOTHER PHOTOGRAPH AND ASK YOU IF YOU CAN

9   IDENTIFY THAT AS ONE THAT YOU TOOK.

10  A.   YES, SIR, THAT IS A PHOTOGRAPH I TOOK DURING MY INSPECTION.

11  Q.   AND IF -- AGAIN, IF WE LOOK AT THE ONE I JUST MARKED, IS

12  THAT PICTURE THAT THE PLAINTIFFS USED OF THE EDGE OF THIS, DOES

13  IT APPEAR TO BE OF THE EDGE OF THAT PART OF THE AIR CONDITIONER?

14  A.   YES, SIR, IT DOES.

15  Q.   WHAT IS THE BIG THING WE'RE LOOKING UP AT THE TOP HERE?  LET

16  ME SEE IF I CAN SHOW IT TO YOU.  RIGHT THERE.

17  A.   THAT IS THE MAIN RETURN AIR GRILL AND ALSO THE FILTER RACK

18  FOR THAT AC UNIT.

19  Q.   SO THERE IS A FILTER UNDERNEATH HERE?

20  A.   YES, SIR.

21  Q.   AND THIS IS WHERE THE RETURN AIR WOULD COME OUT OF THE

22  TRAILER AND GO INTO THE AIR-CONDITIONING SYSTEM?

23  A.   THAT'S CORRECT.

24  Q.   AND WHAT ABOUT THIS?

25  A.   THAT IS A FUNCTION OF THE DOMETIC AIR-CONDITIONING UNIT

1    INSTALLED IN THE ALEXANDER TRAILER.  THERE IS A SLIDE BAR

2    ADJUSTMENT.  AND -- IS THIS TOUCH SENSITIVE, THIS SCREEN?

3            THE COURT:  YES.

4            THE WITNESS:  RIGHT HERE IS A SLIDE BAR ADJUSTMENT,

5    WHERE YOU CAN DIVERT THE AIR TO THE DUCTWORK SYSTEM OR YOU CAN

6    HAVE ALL OF THE AIR-CONDITIONING AIR DELIVERED STRAIGHT DOWN

7    THROUGH THAT GRILL.

8                             EXAMINATION

9    BY MR. SCANDURRO:

10   Q.   CAN YOU ALSO WITH -- CAN YOU ALSO MANIPULATE THESE GRILLS

11   LIKE YOU CAN ON A -- IN YOUR AUTOMOBILE, FOR EXAMPLE?

12   A.   WITH RESPECT TO DIRECTION?

13   Q.   YES, SIR.

14   A.   NO, THOSE ARE FIXED.  THE ONLY THING THAT'S OPERABLE IS THE

15   SLIDE DAMPER THAT DIVERTS THE AIR TO GO FROM ONE DIRECTION OR THE

16   OTHER.

17   Q.   WE ALSO LOOKED AT MR. RITTER, WE PUT UP ON THE SCREEN, I

18   CALL IT THE PSYCHEDELIC PICTURE.  DO YOU REMEMBER THAT THERMAL

19   IMAGE WE LOOKED AT?

20   A.   YES, SIR.

21   Q.   AND YOU RECALL HIM SAYING THAT THAT INDICATED DUCT LEAKAGE

22   TO HIM?

23   A.   I DO RECALL THAT.

24   Q.   WHAT DID THAT IMAGE SHOW TO YOU?  YOU WERE HERE IN COURT

25   WHEN IT WAS UP THERE, RIGHT?

1  A.   YES, I WAS.  THE THERMAL IMAGE REFERENCE BY MR. RITTER

2  SIMPLY INDICATES, AND I DON'T BELIEVE MR. RITTER ACTUALLY TOOK

3  THAT PHOTOGRAPH, BUT ALL IT INDICATES IS THAT VARIOUS

4  TEMPERATURES, THERE ARE TEMPERATURE DIFFERENTIALS, DIFFERENT

5  THINGS IN THE TRAILER WERE AT DIFFERENT TEMPERATURES, AND THAT'S

6  WHAT AN INFRARED THERMAL IMAGE SHOWS.

7  Q.   YOU RECALL THE DISCUSSION WE HAD ABOUT THE STUD IN THAT

8  AREA?

9  A.   YES.

10  Q.   IS THERE A REASON WHY THE STUD WOULD BE COOLER THAN THE REST

11  OF THE CEILING CAVITY?

12  A.   WELL, REFERENCING SPECIFICALLY THE CEILING JOIST OR STUD, AS

13  YOU REFERENCED, THAT -- THE VERY REAL POSSIBILITY IS BECAUSE

14  THERE IS DIRECT COMMUNICATION BETWEEN THE CEILING PANEL AND THE

15  STUD ITSELF.  THAT IS WHAT THE CEILING PANEL IS AFFIXED TO.  THE

16  CEILING DIFFUSERS, THERE ARE SIX CEILING DIFFUSERS LOCATED IN THE

17  AIR-CONDITIONING SYSTEM, AS PART OF THE AIR-CONDITIONING SYSTEM

18  IN THE ALEXANDER TRAILER.

19  Q.   LET ME STOP YOU RIGHT THERE.

20  A.   YES, SIR.

21  Q.   HOW LONG HAVE WE BEEN SAYING THAT THE TRAVEL TRAILER'S A

22  LITTLE LONGER THAN THE JURY BOX?  IT'S ABOUT 30 FEET LONG OR SO?

23  A.   YES, MY UNDERSTANDING IS IT'S APPROXIMATELY 30 FEET.

24  Q.   AND YOU SAID THERE ARE SIX VENTS?

25  A.   CORRECT.  VENTS.

1  Q.    GO AHEAD, I'M SORRY.

2  A.    AND SO APPROXIMATELY EVERY FIVE FEET OR SO, THEY ARE

3  SCATTERED THROUGHOUT.  THERE IS ONE IN THE BEDROOM.  THERE IS

4  SEVERAL IN THE LIVING AREA.

5         THE WAY THE DIFFUSER IS DESIGNED TO WORK IS TO DELIVER

6  COLD AIR INTO THE SPACE.  THERE IS A PICTURE REFERENCED IN MY

7  REPORT.  I DON'T KNOW IF WE'RE GOING TO LOOK AT THAT OR NOT, BUT

8  IT CASCADES THE COLD AIR FROM THE AIR-CONDITIONING SYSTEM ALONG

9  THE PLANE OF THE CEILING, THE UNDERSIDE OF THE CEILING, WHERE THE

10  HOT AIR IS.  IT DIFFUSES INTO THE ROOM, MIXES WITH THE WARM AIR

11  AND THEN SUBSEQUENTLY COOLS THE SPACE.

12         SO THE BLUE STRIATIONS IN THAT IMAGE THAT WAS REVIEWED

13  WITH MR. RITTER DURING HIS TESTIMONY SIMPLY INDICATES THAT -- OR

14  COULD VERY WELL INDICATE THAT THE COLD AIR BEING DELIVERED BY THE

15  AIR-CONDITIONING SYSTEM IS DOING EXACTLY WHAT IT'S SUPPOSED TO

16  DO:  CASCADE ALONG THE UNDERSIDE OF THE CEILING, SUBSEQUENTLY

17  COOLING THAT CEILING PANEL AND THE STUD BEHIND IT AND THEN MIXING

18  WITH THE ROOM AIR.

19  Q.    THAT PHOTOGRAPH DIDN'T INDICATE TO YOU THAT THERE WAS A DUCT

20  LEAKAGE ISSUE?

21  A.    NO, IT DID NOT.

22  Q.    LET'S ASSUME FOR A SECOND, I WANT YOU TO ASSUME

23  HYPOTHETICALLY THAT MR. RITTER WAS CORRECT AND THAT THERE WAS

24  DUCT LEAKAGE INTO THE CEILING CAVITY, OKAY?

25  A.    OKAY.

1   Q.   WHAT WOULD THE IMPACT OF -- MAYBE THIS IS AN OBVIOUS

2   BEFORE-LUNCH QUESTION, BUT IF IT WAS LEAKING, WHAT WOULD THE

3   IMPACT BE ON THE TEMPERATURE INSIDE THAT CEILING CAVITY?

4   A.   THE INTRODUCTION OF CONDITIONED COLD AIR FROM THE

5   AIR-CONDITIONING UNIT INTO THE CEILING CAVITY WOULD REDUCE THE

6   TEMPERATURE, THE RELATIVE HUMIDITY AND THE DEW POINT TEMPERATURE

7   IN THAT INTERSTITIAL SPACE.

8   Q.   YOU WERE ALSO HERE WHEN WE TALKED ABOUT, WHEN WE TALKED

9   ABOUT NEGATIVE PRESSURE WITH MR. RITTER, DO YOU RECALL THAT?

10  A.   YES, SIR.

11  Q.   DO YOU RECALL ME ASKING HIM, IF THE BATH VENT WAS OPEN,

12  WOULD THAT DEFEAT THE NEGATIVE PRESSURE AND HE SAID THAT IT

13  WOULD?

14  A.   YES, I RECALL THAT.

15  Q.   WHAT IF THE DOOR WAS CLOSED?  I WANT YOU TO ASSUME, THERE

16  HAS BEEN TESTIMONY THAT THE BATHROOM DOOR WAS SOMETIMES CLOSED

17  WHILE THE VENT WAS OPEN.  WOULD THAT CHANGE MR. RITTER'S

18  CONCLUSION?

19  A.   NOT BASED ON MY OBSERVATION OF THE DOOR IN THE ALEXANDER

20  TRAILER.

21  Q.   EXPLAIN THAT.

22  A.   THE ALEXANDER -- THE BATHROOM DOOR IN THE ALEXANDER TRAILER

23  HAD A SIGNIFICANT UNDERCUT, WHERE THEY CUT OFF A BOTTOM PORTION

24  OF THE DOOR.  THIS ALLOWS THE AIR TO COMMUNICATE BETWEEN THE

25  BATHROOM AND THE MAIN LIVING AREA.  IT ALSO ACCOUNTS FOR

1   VARIATIONS IN FLOOR HEIGHTS AND THINGS LIKE THAT, BUT IT'S AN

2   AMPLE AVENUE, IF YOU WILL, FOR AIR TO TRANSLATE BETWEEN THE

3   SMALLER BATHROOM SPACE AND THE LARGER LIVING SPACE.

4   Q.   I WANT YOU TO MAKE ANOTHER ASSUMPTION FOR ME.  I WANT YOU TO

5   ASSUME THAT MR. RITTER WAS CORRECT WHEN HE SAID IN MAY OF 2009

6   WHEN HE WENT INTO THIS TRAVEL TRAILER THAT HE FOUND A NEGATIVE

7   PRESSURE SITUATION, AND I THINK HE SAID MINUS THREE, IF I RECALL

8   CORRECTLY.

9   A.   I BELIEVE HE REFERENCED MINUS THREE PASCALS, CORRECT.

10  Q.   ASSUME THAT IS CORRECT, DOES THAT MEAN TO YOU THAT THIS

11  TRAVEL TRAILER WAS UNDER NEGATIVE PRESSURE WHEN MRS. ALEXANDER

12  AND HER FAMILY LIVED IN IT?

13  A.   NO, ABSOLUTELY NO.

14  Q.   WHY NOT?

15  A.   SPACE IS ENVELOPES, IF YOU WILL, A SET ENVIRONMENT.  THEY

16  SWITCH BETWEEN POSITIVE AND NEGATIVE REGULARLY.  IT CHANGES WHEN

17  A DOOR OPENS.  IT CHANGES WHEN THE WIND CHANGES DIRECTION.  IT

18  CHANGES WHENEVER AN EXTERNAL OR INTERNAL INFLUENCE ACTS UPON IT.

19  THAT'S WHY YOU FEEL A BREEZE WHEN SOMEONE WALKS BY.  THAT'S DUE

20  TO A PRESSURE DIFFERENTIAL.

21       A MINUTE PRESSURE SUCH AS MINUS THREE PASCALS IS ALMOST

22  NEGLIGIBLE AND IT ONLY REPRESENTS A SNAPSHOT IN TIME.

23  Q.   IF A TRAVEL TRAILER IS MINUS THREE NEGATIVE ON THE DAY THEY

24  WERE OUT THERE, DOES THAT MEAN IT WAS NEGATIVE THE DAY BEFORE OR

25  THE DAY AFTER?

1    A.    NO.  IN FACT, IT PROBABLY CHANGED MULTIPLE TIMES THAT DAY

2    SIMPLY BECAUSE OF CHANGING WEATHER CONDITIONS AND PEOPLE ENTERING

3    AND LEAVING THE TRAILER DURING INSPECTIONS.

4    Q.    I WANT TO COME BACK TO THIS BATH VENT.  DOWN IN PLAQUEMINES

5    WHERE I'M FROM AND MY FAMILY IS FROM, WE HAD A LOT OF FEMA

6    TRAILERS, BUT THE MEMBERS OF OUR JURY MAY NEVER HAVE BEEN IN ONE,

7    AND I'M CONCERNED THAT THEY NEED TO KNOW WHAT THIS BATH VENT

8    LOOKS LIKE.  DID YOU PHOTOGRAPH THE BATH VENT?

9    A.    YES, SIR.  YOU CAN ROTATE THAT 180 DEGREES.  NO, I'M SORRY,

10   ONE MORE TIME.  THAT'S THE WAY I TOOK THE PICTURE.  THAT'S

11   CORRECT.

12   Q.    OKAY.  TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT THE

13   SIZE OF THAT SPACE IS AND JUST HOW LARGE THAT IS IN THAT LITTLE

14   BATHROOM.

15   A.    I DIDN'T TAKE A PHYSICAL MEASUREMENT, BUT MY RECOLLECTION IS

16   THAT IT'S APPROXIMATELY 15 BY 15 INCHES.

17   Q.    AND HOW DOES IT OPERATE?

18   A.    THERE IS A MECHANISM THAT YOU CAN SEE RIGHT UP HERE, THAT

19   YOU CAN OPEN UP THE, BASICALLY THE LID, IF YOU WILL.  AND THEN,

20   OF COURSE, YOU HAVE THE ELECTRIC-POWERED FAN RIGHT HERE, THAT

21   THEN DRAWS AIR FROM THE BATHROOM SPACE AND FROM THE REST OF THE

22   TRAILER TO THE EXTERIOR.

23   Q.    AND YOU'VE SEEN BATHROOM VENTS IN CONVENTIONAL HOMES BEFORE

24   AND IN OFFICE BUILDINGS?

25   A.    ABSOLUTELY.

1   Q.   IS THE SIZE OF THIS VENT IN COMPARISON TO THE SIZE OF THAT

2   TRAVEL TRAILER LARGER OR SMALLER THAN YOU WOULD TYPICALLY SEE IN

3   A RESIDENTIAL APPLICATION?

4   A.   I DON'T KNOW THE EXACT CAPACITY OF THIS PARTICULAR FAN, BUT

5   IT DID APPEAR TO BE SOMEWHAT LARGE JUST BASED ON THE SMALL VOLUME

6   AND THE SMALL SURFACE AREA OF THE CEILING IN THE BATHROOM.

7   Q.   LET'S TALK ABOUT CONDENSATION FOR A SECOND.  WE HEARD SOME

8   TESTIMONY FROM THE PLAINTIFFS' EXPERTS ABOUT POSSIBLE

9   CONDENSATION ISSUES IN THIS TRAVEL TRAILER.  NOW, CONDENSATION

10  CAN BE A PROBLEM, CAN IT, IN WALL CAVITIES?

11  A.   IT CAN.

12  Q.   I WANT YOU TO ASSUME, BECAUSE YOU HEARD THE TESTIMONY OF

13  MR. RITTER AND MR. MALLET, THAT THERE HAS BEEN OTHER TESTIMONY IN

14  THE CASE, THAT WHEN THESE TRAVEL TRAILERS ARE SITTING OUT IN THE

15  SUMMERTIME UNOCCUPIED, IT CAN GET AS HOT AS 140 DEGREES INSIDE

16  OKAY?

17  A.   THAT WOULD NOT SURPRISE ME.

18  Q.   I WANT YOU TO ASSUME THAT.  WAS IT HOT THE DAY YOU WERE UP

19  THERE?

20  A.   YES, VERY MUCH SO.

21  Q.   IF THIS THING HAD BEEN SITTING OUT IN A FIELD UNDER THOSE

22  CONDITIONS WHEN IT WAS LOOKED AT BY MR. RITTER AND MR. MALLET AND

23  EVERYBODY ELSE, WOULD YOU EXPECT THEM TO BE ABLE TO SEE

24  CONDENSATION OR DETECT CONDENSATION IN THOSE WALL CAVITIES?

25  A.   UNDER WHICH SPECIFIC CONDITION?

1   Q.   140 DEGREES INSIDE THE TRAILER.

2   A.   I WOULD NOT EXPECT TO SEE ANY CONDENSATION.

3   Q.   WHY NOT?

4   A.   FIRST OF ALL, IF THE TRAILER ITSELF AND THE INTERIOR

5   ESPECIALLY OF A TRAILER IS 140 DEGREES AND IT'S 95 DEGREES

6   OUTSIDE, THERE IS NO POTENTIAL FOR CONDENSATION TO FORM.  THE DEW

7   POINT TEMPERATURES ARE, YOU KNOW, MAYBE 70, 80 DEGREES AT ITS

8   WORST CASE.  YOU DON'T HAVE A SURFACE TEMPERATURE OR ANYTHING

9   THAT CAN CONDENSE BECAUSE NOTHING IS AT THAT TEMPERATURE.

10  Q.   WELL, DO YOU REMEMBER MR. MALLET ON THE STAND WITH THE

11  LITTLE PICTURE OF THE WATER TRICKLING OUT OF THE BOTTOM BOARD OF

12  THE TRAILER?

13  A.   YES, SIR.

14  Q.   AND DO YOU RECALL HIM SAYING HE THOUGHT THAT WAS EVIDENCE OF

15  CONDENSATION?

16  A.   I DO RECALL THAT.

17  Q.   DO YOU AGREE WITH THAT?

18  A.   NO.

19  Q.   WHERE DO YOU THINK THAT WATER CAME FROM?

20  A.   PRIMARILY FROM ROOF LEAKAGE, ENVELOPE LEAKAGE.

21  Q.   I DON'T THINK YOU WERE HERE WHEN MS. ALEXANDER TESTIFIED,

22  BUT THERE WAS TESTIMONY, I WANT YOU TO ASSUME, THAT A ROOF LEAK

23  DEVELOPED SOMETIME IN THE SPRING OF 2007, OKAY?

24  A.   OKAY.

25  Q.   ABOUT TWO AND A HALF YEARS OR SO AFTER THE TRAILER LEFT

1    GULF STREAM, OKAY?

2    A.    YES.

3    Q.    NOW, YOU TOOK PHOTOGRAPHS OF THE ROOF, DIDN'T YOU?

4    A.    YES, AS BEST I COULD.

5    Q.    TELL THE JURY WHAT YOU'RE LOOKING AT THERE.

6    A.    IF WE CAN CLEAR THE -- THANK YOU.

7           THIS HERE REPRESENTS A DELAMINATION OF THE EDGE SEALANT

8    AROUND WHERE THE -- THIS IS THE ACTUAL DOME OVER THE EXHAUST

9    VENT.  AND THIS REPRESENTS A SIGNIFICANT DELAMINATION BETWEEN THE

10   SEALANT AND THE ROOF MEMBRANE, THE GRAY BEING THE SEALANT AND

11   FLASHING EDGE AND THE WHITE BEING THE ACTUAL ROOF MEMBRANE.  IT'S

12   A POTENTIAL LEAK, POTENTIAL DEFINITE LEAK, POTENTIAL LEAK SOURCE.

13   Q.    AND YOU WERE HERE WHEN WE TALKED ABOUT HURRICANE GUSTAV AND

14   ALL OF THAT GOOD STUFF?

15   A.    YES, SIR.

16   Q.    AND THIS IS ON THE TOP OF THE TRAVEL TRAILER, CORRECT?

17   A.    THE UNPROTECTED TOP OF THE TRAVEL TRAILER, YES.

18   Q.    YOU DIDN'T SEE ANY TRAILERS STACKED ON TOP OF EACH OTHER?

19   A.    NO, AND THERE WASN'T ANY COVERING OR ANYTHING ON ANY OF THE

20   TRAILERS OUT THERE THAT I SAW.

21   Q.    DID YOU SEE ANY INDICATION OF ANY PREVENTIVE MAINTENANCE

22   THAT HAD BEEN DONE ON THE ROOF SEALS?

23   A.    NO, I DIDN'T SEE ANY EVIDENCE OF P.M., PREVENTIVE

24   MAINTENANCE, OR REPAIR.

25   Q.    IS THIS ANOTHER PHOTOGRAPH THAT YOU TOOK?

1    A.    YES, SIR, I BELIEVE IT IS.

2    Q.    AND WHAT DOES THAT SHOW?

3    A.    IF YOU COULD CLEAR THE ILLUSTRATOR.

4          THIS SHOWS THE DELAMINATION OF THE EDGE THAT ACTUALLY

5    HOLDS DOWN THE MEMBRANE OF THE ROOF, AND YOU CAN SEE WHERE

6    SEALANT IS DELAMINATED, THE EDGE IS SEPARATING, AND THEN -- IT'S

7    JUST IN TERRIBLE CONDITION.  AND AGAIN, ANOTHER POSSIBLE LEAKAGE

8    SOURCE.

9    Q.    AGAIN, IS IT, IN YOUR OPINION, IS IT APPROPRIATE TO GO OUT

10   AND DRAW CONCLUSIONS ABOUT MOISTURE AND CONDENSATION IN WALL

11   CAVITIES WHEN YOU HAVE THE ROOF IN THIS KIND OF CONDITION?

12   A.    IT WOULD SEEM HIGHLY UNLIKELY THAT ANY POTENTIAL CONCEALED

13   CONDENSATION WOULD, WHEN YOU HAVE OBVIOUS AREAS OF LEAKAGE, THAT

14   YOU WOULD TRY TO BLAME IT ON SOMETHING RELATIVELY INSIGNIFICANT.

15   Q.    IF WE WERE GOING TO TRY TO DETERMINE WHETHER OR NOT THERE

16   WAS A CONDENSATION ISSUE IN THE WALL CAVITIES, WHAT WOULD WE NEED

17   TO KNOW ABOUT THE EXTERIOR SURFACE OF THE TRAVEL TRAILERS?

18   A.    WELL, I'VE ACTUALLY PERFORMED THAT ANALYSIS FOR A NUMBER OF

19   CLIENTS.  AND MR. RITTER STARTED ALONG THAT ANALYSIS IN HIS

20   REPORT AND DURING HIS TESTIMONY.

21   Q.    I WANT TO FOCUS YOU STRICTLY ON THE EXTERIOR COVERING OF THE

22   TRAVEL TRAILER.

23   A.    OKAY.  IN ORDER TO DETERMINE THE POTENTIAL FOR CONCEALED

24   CONDENSATION TO FORM, YOU HAVE TO EVALUATE WHAT THE TEMPERATURE

25   WOULD BE INSIDE OF THE ASSEMBLY, AND WHEN I SAY *ASSEMBLY*, I MEAN

1  FROM THE EXTERIOR SKIN TO THE INTERIOR SKIN AND EVERYTHING IN

2  BETWEEN.

3          I BELIEVE MR. RITTER SHOWED A DRAWING, A HAND-DRAWN

4  SKETCH OF THAT ASSEMBLY, AND YOU WOULD FIRST DETERMINE WHAT THE

5  TEMPERATURE PROFILE IS, AS YOU GO FROM THE EXTERIOR TO THE

6  INTERIOR.

7          THE NEXT STEP WOULD BE TO DETERMINE THE PERMEABILITY OF

8  EACH OF THE COMPONENTS OF THAT ASSEMBLY.

9  Q.   WHAT DOES THAT MEAN, PERMEABILITY?

10 A.   THE PERMEABILITY IS BASICALLY THE RESISTANCE A MATERIAL HAS

11 TO PASS WATER VAPOR, SO A SOLID METALLIC MATERIAL LIKE ALUMINUM

12 OR STEEL HAS, YOU KNOW, ZERO PERMEABILITY.  IF IT'S WATER, VAPOR

13 WILL NOT TRANSLATE THROUGH IT; WHEREAS, PAPER WOULD BE HIGHLY

14 PERMEABLE.

15 Q.   WHAT ABOUT WOOD, LIKE A TYPICAL STICK-BUILT HOUSE WITH WOOD

16 SIDING?

17 A.   WOOD ITSELF HAS A HIGH PERMEABILITY RATE AND WOOD ALSO

18 STORES MOISTURE AS WELL.

19 Q.   WHAT ABOUT BRICK VENEER LIKE I HAVE ON MY HOUSE?

20 A.   BRICK VENEER IS, AGAIN, A POROUS MATERIAL AND VERY POORLY

21 SUITED FOR BLOCKING VAPOR DRIVE OR THE TRANSMISSION OF WATER

22 VAPOR.

23 Q.   AND WOULD YOU HAVE ANY EXPECTATION ABOUT THE PERFORMANCE OF

24 THAT ALUMINUM ON THE OUTSIDE OF THE TRAVEL TRAILER, ASSUMING THAT

25 THE SEALANTS HAD BEEN PROPERLY MAINTAINED?  IN COMPARISON TO WOOD

1   OR BRICK.

2   A.    THE ALUMINUM SHELL WOULD EXCEED, THE REASON IT WAS USED AS

3   THE EXTERIOR SKIN IS BECAUSE IT'S WATER AND WEATHER PROOF AND HAS

4   ZERO PERMEABILITY TO WATER VAPOR.

5   Q.    ASSUMING THAT IT'S BEEN PROPERLY MAINTAINED?

6   A.    EXACTLY.

7   Q.    ALL RIGHT.  THE ONLY THING THAT'S GOTTEN BEATEN UP WORSE

8   THAN OUR LITTLE TRAVEL TRAILER LAST WEEK WAS OUR AIR IN SOUTH

9   LOUISIANA.  WE HEARD A LOT ABOUT HOT, HUMID AIR IN SOUTH

10  LOUISIANA AND WHY IT'S INAPPROPRIATE SOMETIMES TO OPEN THE

11  WINDOWS.

12          I WOULD LIKE YOU TO TELL US A LITTLE BIT ABOUT

13  OPEN-WINDOW VENTILATION, OKAY, AS A MEANS OF PROVIDING

14  VENTILATION TO A SPACE.

15  A.    IN MY LINE OF WORK IN HVAC SYSTEM DESIGN, THERE ARE VARIOUS

16  CODES AND STANDARDS THAT WE ADHERE TO FOR COMMERCIAL BUILDINGS

17  AND RESIDENTIAL BUILDINGS.  AND THE STANDARDS RECOGNIZE THE USE

18  OF NATURAL VENTILATION AS BEING AN ACCEPTABLE MEANS, AND IN SOME

19  CASES, THE PREFERRED MEANS TO PROPERLY VENTILATE A SPACE TO

20  MAINTAIN GOOD INDOOR AIR QUALITY.  THE USE OF OPERABLE WINDOWS IS

21  CODE ALLOWED.  IT'S STANDARD ALLOWED.  AND IT'S RECOMMENDED.  YOU

22  OPEN A WINDOW OR A DOOR TO GET A BREATH OF FRESH AIR, NOT A

23  BREATH OF POISONED, STALE AIR OR WHATEVER.

24  Q.    WE HAD SOME TESTIMONY YESTERDAY FROM ONE OF THE PLAINTIFFS

25  ABOUT HOW WIDE THESE WINDOWS OPEN.  AND AS I RECALL, I DON'T HAVE

1    IT IN FRONT OF ME, BUT AS I RECALL, IT WAS A COUPLE OF INCHES.

2    IS THAT CONSISTENT WITH YOUR OBSERVATION?

3    A.    A COUPLE OF INCHES?

4    Q.    YES, SIR.

5    A.    I WASN'T HERE FOR THAT TESTIMONY SO I'M NOT CERTAIN, BUT,

6    NO, THAT'S NOT MY RECOLLECTION.

7    Q.    LET ME SHOW YOU A PHOTOGRAPH OF ONE OF THE WINDOWS ON THE

8    TRAILER OPEN.

9    A.    COULD YOU ORIENT THAT?  YES, THANK YOU.

10   Q.    WHAT IS THAT BAR ON THE BOTTOM OF THE WINDOW?

11   A.    THAT'S PART OF THE MECHANISM USED TO OPEN THE WINDOW, AND

12   THEN WHEN LOCKED IN PLACE IT HOLDS THE WINDOW OPEN.

13   Q.    AND I KNOW YOU DON'T HAVE A RULER WITH YOU, BUT DOES THAT

14   LOOK LIKE 2 INCHES TO YOU?

15   A.    NO, SIR, IT DOES NOT.

16   Q.    BASED ON YOUR OBSERVATIONS WHEN YOU WERE OUT THERE, ABOUT

17   HOW WIDE DID THAT WINDOW OPEN?

18   A.    I DON'T RECALL ACTUALLY OPERATING A WINDOW, BUT I AM

19   FAMILIAR WITH THE LEVER, BECAUSE I TOOK SPECIFIC PICTURES OF THE

20   WINDOWS, AND IT'S ESTIMATED PROBABLY 7, 8, 9 INCHES.

21   Q.    WE ALSO HEARD FROM MR. RITTER, DO YOU REMEMBER THE

22   DISCUSSION ABOUT THE RECIRCULATING AIR SYSTEM AND HOW THAT WAS A

23   BAD THING IN THIS TRAILER?

24   A.    YES, SIR.

25   Q.    IS A RECIRCULATING AIR SYSTEM A COMMON AC SYSTEM IN

1  LOUISIANA AND ACROSS THE COUNTRY?

2  A.   IT'S PROBABLY THE MOST COMMON IN THE WORLD.

3  Q.   IN EVERYBODY'S HOUSES?

4  A.   IN MOST EVERYBODY'S HOUSES, YES.

5  Q.   DID YOU SEE ANY TRAVEL TRAILERS WHEN YOU WERE OUT THERE IN

6  LOTTIE THAT HAD SOME SORT OF MECHANICAL FORCED-AIR EXTERIOR

7  SYSTEM?

8  A.   NO, I DID NOT.

9  Q.   AND IN YOUR LINE OF WORK, WHAT PERCENTAGE OF HOUSES DO YOU

10  SEE THAT JUST HAS A BIGGER VERSION OF A RECIRCULATING AIR SYSTEM?

11  A.   IT'S QUITE OFTEN.  I MEAN, OFTENTIMES, FOR EXAMPLE, HOTEL

12  ROOMS, THEY HAVE, PTAC'S, PACKAGED TERMINAL AIR CONDITIONERS --

13  WE CALL THEM *WINDOW SHAKERS* -- BUT THEY ARE JUST A STRAIGHT

14  RECIRCULATING-TYPE AIR UNIT.

15         WINDOW UNITS ARE VERY POPULAR, AND WE SEE THOSE ALL

16  OVER LOUISIANA, ALL OVER THE WORLD, REALLY, AND THEN EVEN SPLIT

17  SYSTEMS THAT MOST PEOPLE HAVE IN A STICK-BUILT HOME, IN A

18  RESIDENCE, OR EVEN A LIGHT COMMERCIAL OFFICE, OFFICE SPACE OR

19  SOMETHING LIKE THAT WOULD, THAT'S A RECIRCULATING-TYPE SYSTEM.

20  Q.   WELL, IF YOU ARE RECIRCULATING THE AIR, HOW DOES FRESH AIR

21  GET INTO THE HOUSE?

22  A.   THERE'S ALWAYS -- WELL, THROUGH INFILTRATION.  THERE IS

23  ALWAYS A NATURAL EXCHANGE BETWEEN THE INTERIOR AND THE EXTERIOR

24  OF ANY BUILT ENVIRONMENT, WHETHER IT BE A TRAVEL TRAILER, A

25  RESIDENTIAL STRUCTURE, A COMMERCIAL STRUCTURE.  THERE IS ALWAYS A

1   NATURAL COMMUNICATION BETWEEN THE INTERIOR AND THE EXTERIOR.

2   Q.   SO IF WE TOOK THIS TRAVEL TRAILER OR YOUR HOUSE OR ANYBODY'S

3   HOUSE AND CLOSED IT ALL UP, SHUT THE DOOR, SHUT THE WINDOWS,

4   BUTTON IT UP AS TIGHT AS WE COULD AND WENT TO SLEEP, WHEN WE WOKE

5   UP THE NEXT MORNING, THE AIR WOULD BE DIFFERENT OR NOT?

6   A.   THE AIR WOULD BE DIFFERENT, YES.  BECAUSE OF THAT NATURAL

7   EXCHANGE BETWEEN THE INTERIOR AND THE EXTERIOR.

8   Q.   AND IN YOUR VIEW, IS THAT AIR CONTAMINATED, POLLUTED,

9   ANYTHING ELSE THAT'S INFILTRATING?

10  A.   NO.  UNDER A MAJORITY OF THE CIRCUMSTANCES, ABSOLUTELY NOT.

11  NOT POLLUTED AT ALL.

12  Q.   NOW, THERE HAS BEEN TESTIMONY IN THE CASE THAT THIS TRAVEL

13  TRAILER WAS AN INDUSTRY-STANDARD TRAVEL TRAILER.  ASSUME THAT

14  THAT TESTIMONY HAS BEEN GIVEN.  I DON'T KNOW IF YOU WERE HERE FOR

15  ALL OF IT.  YOU GOT A CHANCE TO LOOK AT THIS AIR-CONDITIONING

16  SYSTEM, RIGHT?

17  A.   CORRECT.

18  Q.   DID YOU TAKE OFF SOME OF THE VENTS AND INSPECT IT?

19  A.   YES, I DID.

20  Q.   WHAT WAS THE DUCT MATERIAL MADE OUT OF?

21  A.   IT APPEARED TO BE A FOIL-FACED FOAM OR FIBERGLASS

22  INSULATION -- OR DUCT MATERIAL.

23  Q.   STANDARD STUFF?

24  A.   I WOULD ASSUME SO FOR THIS TYPE OF INDUSTRY AND FOR THE

25  TYPES OF SPACES THEY HAVE TO WORK WITH.

1    Q.    DIDN'T LOOK UNUSUAL TO YOU?

2    A.    NO, I WASN'T TAKEN BY SURPRISE.

3    Q.    ANYTHING ELSE THAT YOU SAW THAT LED YOU TO BELIEVE THAT THIS

4    WAS NOT AN INDUSTRY-STANDARD TRAVEL TRAILER DESIGN?

5    A.    NO, NOTHING.

6    Q.    AND YOU'RE AWARE THAT FEMA SPEC'D A ROOFTOP AIR-CONDITIONING

7    UNIT?

8    A.    YES, I REVIEWED THOSE SPECIFICATIONS IN CONJUNCTION WITH

9    THIS MATTER.

10   Q.    AND YOU'RE AWARE THAT FEMA SPEC'D A 15,000-BTU AIR

11   CONDITIONER?

12   A.    CORRECT.

13   Q.    AND DID THIS AIR CONDITIONER MEET THOSE SPECIFICATIONS?

14   A.    YES, IT DID.

15         MR. SCANDURRO:  THANK YOU.  ANSWER MR. WATTS'S

16   QUESTIONS, PLEASE.

17         THE COURT:  BEFORE WE GET TO HIM, LET ME CHECK WITH

18   FLUOR.

19         MR. PENOT:  WE HAVE NO QUESTIONS, YOUR HONOR.

20         MR. SHERBURNE:  YES, SIR.

21         MR. WATTS:  MAY I PROCEED, YOUR HONOR?

22         THE COURT:  YES.

23                      CROSS-EXAMINATION

24   BY MR. WATTS:

25   Q.    MR. SERAUSKAS, MY NAME IS MICHAEL WATTS.  WE HAVE NOT MET

1  BEFORE TODAY; IS THAT RIGHT?

2  A.    THAT'S CORRECT.

3  Q.    AS I UNDERSTAND IT, YOU WERE IN THE COURTROOM WHEN I WAS

4  TALKING TO IRVIN RITTER?

5  A.    THAT'S CORRECT.

6  Q.    BY THE WAY, I HATE TO EVEN ASK THESE QUESTIONS, BUT ANDY HAS

7  ASKED SOME OF MY WITNESSES, YOU'RE BEING PAID FOR YOUR TIME?

8  A.    YES, SIR.

9  Q.    AT THE TIME OF YOUR DEPOSITION, YOU HAD SPENT 71.25 HOURS ON

10  THIS CASE AT $250 AN HOUR?

11  A.    YES, SIR.

12  Q.    HOW MUCH TIME DID YOU SPEND ON IT IN LOTTIE?

13  A.    I DON'T RECALL.  I DON'T HAVE MY TIME LOG WITH ME.

14  PROBABLY, WITH TRAVEL, AT LOTTIE?

15  Q.    YEAH, JUST AT LOTTIE.

16  A.    ONLY ABOUT TWO OR THREE HOURS.

17  Q.    TWO OR THREE HOURS.  OKAY.

18          BY THE WAY, YOU CHARGE 250 FOR YOUR WORK UP TO TRIAL,

19  BUT WHEN YOU RAISE YOUR HAND AND ARE SWORN IN, YOU CHARGE 350 TO

20  GIVE SWORN TESTIMONY.

21  A.    THAT'S CORRECT.

22  Q.    SO IT'S $100 MORE WHEN YOU SWEAR TO TELL THE TRUTH?

23  A.    THAT'S CORRECT.

24  Q.    ALL RIGHT.  I GOT YOU.

25          SO 71.25 HOURS AT 250 AN HOUR AT THE TIME OF YOUR

1  DEPOSITION, WILL YOU TAKE MY WORD FOR IT, THAT ADDS UP TO

2  $17,812.50?

3  A.   YES, SIR.

4  Q.   DID YOU SPEND SOME TIME ON DEPO PREP?  I KNOW YOU WERE IN

5  THE COURTROOM APPARENTLY LAST WEEK, IS THAT RIGHT, OR EARLIER

6  THIS WEEK?

7  A.   EARLIER THIS WEEK.

8  Q.   I FORGET WHICH WEEK WE'RE IN.  HOW MUCH TIME DID YOU SPEND

9  FROM THE TIME OF YOUR DEPOSITION UNTIL THIS TESTIMONY?

10  A.   APPROXIMATELY 14 HOURS.

11  Q.   FOURTEEN HOURS AT 250 AN HOUR.  OKAY.  SO $2900 ADDED TO

12  THAT AND THEN WHATEVER TIME HERE IN COURT; IS THAT RIGHT?

13  A.   YES, SIR.

14  Q.   SO BALLPARK, A LITTLE OVER 20 GRAND?

15  A.   BALLPARK.

16  Q.   NOW, YOU KNOW MR. RITTER PERSONALLY, AS I UNDERSTAND IT.

17  A.   YES, I DO.

18  Q.   YOU WERE ASKED WHETHER YOU GOT ANY GENERAL COMPLAINTS WITH

19  HIS WORK, WHICH IS A GLOBAL, I MEAN, YOU HAVEN'T CRITICIZED HIM

20  FOR ANY WORK FOR ANY CLIENT BEFORE; IS THAT RIGHT?

21  A.   THAT'S CORRECT.

22  Q.   AND YOU DON'T HAVE ANY REAL PROBLEMS WITH HIS WORK,

23  ACCORDING TO YOUR DEPOSITION, RIGHT?

24  A.   GENERALLY SPEAKING, NO.

25  Q.   YEAH.  YOU BELIEVE HE IS WELL QUALIFIED?

1  A.    YES.

2  Q.    IN MATTERS OF HVAC ENGINEERING, YOU CONCEDE THAT HE IS A

3  WELL-QUALIFIED HVAC ENGINEER?

4  A.    I AGREE.

5  Q.    NOW, WITH THAT UNDERSTANDING, LET'S GET TO SOME OF THE

6  DISCUSSIONS THAT YOU HAD WITH COUNSEL.

7          YOU TALKED ABOUT THE ASHRAE STANDARDS, AND I THINK IN

8  YOUR REPORT, YOU SAID THE DUCTS DON'T HAVE TO MEET THE ASHRAE

9  STANDARDS; IS THAT RIGHT?

10  A.    THAT'S CORRECT.

11  Q.    JUST SO THAT WE CAN -- KIND OF REMINDS ME WHEN I ASKED MY

12  KID, "DID YOU PASS ALL OF YOUR TESTS?"  HE SAYS, "YES, SIR," AND

13  THEN YOU FIND OUT HE DIDN'T HAVE ANY.

14          THE ASHRAE STANDARDS THAT YOU WERE REFERRING TO THE

15  JURY ABOUT, TRAVEL TRAILERS DON'T HAVE TO MEET THEM, RIGHT?

16  A.    THE STANDARDS THAT I REFERENCED EARLIER TO THE JURY HAD TO

17  DO WITH THE VENTILATION STANDARDS PROVIDED BY ASHRAE AND NOT

18  RELATED TO DUCT CONSTRUCTION.

19  Q.    BUT I'M ASKING ABOUT THE DUCTS RIGHT NOW.  THE DUCTS DON'T

20  HAVE TO MEET ASHRAE STANDARDS, RIGHT?

21  A.    RIGHT.  AND ASHRAE REALLY DOESN'T HAVE MUCH OF A STANDARD

22  RELATED TO DUCT CONSTRUCTION.

23  Q.    KIND OF MY POINT.  SO THIS IS KIND OF A SELF-REGULATED DUCT

24  DESIGN?

25  A.    TO A CERTAIN POINT, YES.

1   Q.   YEAH.  AND YOU HAVE NEVER DESIGNED AN HVAC SYSTEM OR THE

2   DUCTS THEREFOR, FAIR?

3   A.   I DO THAT REGULARLY.  YOU MEAN FOR A TRAVEL TRAILER?

4   Q.   YEAH.

5   A.   OH, OKAY.  NO, NOT FOR A TRAVEL TRAILER.

6   Q.   YEAH, OKAY.  NOW, EVEN THOUGH DUCTS ARE NOT REQUIRED TO MEET

7   THE ASHRAE STANDARDS, IF YOU WERE DESIGNING A TRAVEL TRAILER, YOU

8   WOULD BE INCLINED TO USE THE PROVISIONS OF ASHRAE 62.2 AS A

9   MINIMUM?

10  A.   ASHRAE 62.2, WHICH AGAIN, DOESN'T HAVE TO DO WITH DUCT

11  CONSTRUCTION, IT HAS TO DO WITH VENTILATION, THAT WOULD BE A

12  RESOURCE AVAILABLE TO ME FOR GUIDANCE RELATED TO HOW I WOULD

13  CONDUCT MY DESIGN.

14  Q.   YOU WOULD UTILIZE ASHRAE 62.2 AS A BARE MINIMUM IN DESIGNING

15  AN HVAC SYSTEM IF YOU WERE GOING TO DESIGN ONE, RIGHT?

16  A.   NO.

17  Q.   WELL, DID YOU SAY SO IN YOUR DEPOSITION THAT YOU WOULD BE

18  INCLINED TO USE THAT PROVISION AND YOU SAID PROBABLY AS A BARE

19  MINIMUM, YES?

20  A.   ARE YOU RELATED TO TRAVEL -- YOU DIDN'T SPECIFY TRAVEL

21  TRAILER.  BECAUSE THERE ARE OTHER CODES AND STANDARDS.

22  Q.   YEAH, TRAVEL TRAILERS.

23  A.   OH, OKAY.

24          THE COURT:  TIME OUT.

25          MR. WATTS:  I'M SORRY.  WE GOT TO SLOW DOWN.

1          THE WITNESS:  I'M SORRY.

2                        EXAMINATION

3    BY MR. WATTS:

4    Q.   LET ME ASK THE QUESTION AND YOU ANSWER IT AND THEN WE'LL GO

5    BACK AND FORTH.  AND I'M NOT TRYING TO BE DISRESPECTFUL.

6    A.   NO, I UNDERSTAND.

7    Q.   SHE IS GOING TO SHOOT US.

8          IF YOU ARE DESIGNING A HVAC SYSTEM FOR A TRAVEL

9    TRAILER, EVEN THOUGH ASHRAE DOES NOT APPLY TO TRAVEL TRAILERS,

10   YOU WOULD USE THE PROVISIONS OF 62.2 AS A BARE MINIMUM TO ACHIEVE

11   YOUR DESIGN?

12   A.   YES, IT WOULD BE A RESOURCE.

13   Q.   ALL RIGHT.  NOW, ASHRAE INCLUDES FORMALDEHYDE AS A

14   CONTAMINANT THAT NEEDS TO BE CONSIDERED IN DESIGNING AN HVAC

15   SYSTEM, RIGHT?

16   A.   I BELIEVE IT IS ON THE LIST OF CONTAMINANTS IN THEIR INDOOR

17   AIR QUALITY STANDARD, YES.

18   Q.   AND WITH RESPECT TO DUCTS SPECIFICALLY, IN YOUR DEPOSITION,

19   YOU ADMITTED THAT, FROM THE STANDPOINT OF THE ROUTING, THE

20   INTEGRITY OF THE DUCTS, YOU COULD NOT OBSERVE THOSE DURING YOUR

21   INSPECTION; IS THAT RIGHT?

22   A.   THAT IS CORRECT.

23   Q.   NOW, THE SUBJECT OF MECHANICAL VENTILATION, AGAIN, WITH

24   RESPECT TO TRAVEL TRAILERS, THERE IS NO STANDARD IN ASHRAE THAT

25   APPLIES TO TRAVEL TRAILERS, RIGHT?

1    A.    CORRECT.

2    Q.    BUT WITH RESPECT TO MECHANICAL VENTILATION SYSTEMS, YOU

3    UNDERSTAND THAT TO BE A SYSTEM WHERE IT DRAWS CLEAN AIR IN FROM

4    THE OUTSIDE AND EXPELS CONTAMINATED AIR OUT FROM THE INSIDE,

5    RIGHT?

6    A.    THAT'S THE BASIC PREMISE OF VENTILATION, YES.

7    Q.    AND THE BASIC PREMISE OF VENTILATION, YOU KNOW FROM THE TYPE

8    OF BUILDING THAT WE'RE IN HERE TODAY THAT WE HAVE A MECHANICAL

9    VENTILATION HVAC SYSTEM HERE?

10   A.    CORRECT.

11   Q.    YOU MENTIONED, FOR EXAMPLE, THAT YOU DID WORK ON THE

12   RITZ-CARLTON.  I ASSUME THESE WERE A LOT OF RE-DO'S AFTER THE

13   HURRICANE?

14   A.    SOME OF THE ONES NAMED, YES.

15   Q.    AND I THINK THAT'S GREAT, BUT WITH RESPECT TO THE MECHANICAL

16   VENTILATION SYSTEM AT THE RITZ-CARLTON, IT IS A MECHANICAL

17   VENTILATION SYSTEM.

18   A.    THAT'S CORRECT.

19   Q.    THE JEFFERSON PARISH BUILDING THAT YOU WORKED ON USES A

20   MECHANICAL VENTILATION SYSTEM.

21   A.    THAT WAS ACTUALLY A CENTRAL PLANT RELATED TO THE GENERATION

22   OF CHILLED WATER AND IT'S CIRCULATING THROUGH THE CAMPUS.

23   Q.    SAINT THERESA USES A MECHANICAL VENTILATION SYSTEM.

24   A.    THAT'S CORRECT.

25   Q.    UNIVERSITY OF NEW ORLEANS, THE HVAC SYSTEM THERE IS A

1  MECHANICAL VENTILATION SYSTEM.

2  A.    CORRECT.

3  Q.    TULANE UNIVERSITY UTILIZES A MECHANICAL VENTILATION SYSTEM.

4  A.    CORRECT.

5  Q.    XAVIER UNIVERSITY USES A MECHANICAL VENTILATION SYSTEM.

6  A.    CORRECT.

7  Q.    THE CHURCHES THAT YOU WORKED ON USE MECHANICAL VENTILATION

8  SYSTEMS.

9  A.    YES.

10  Q.    THE HOLY ROSARY HIGH SCHOOL THAT YOU TOLD THE JURY ABOUT

11  UTILIZES A MECHANICAL VENTILATION SYSTEM.

12  A.    YES.

13  Q.    THE STENNIS SPACE CENTER USES A MECHANICAL VENTILATION

14  SYSTEM.

15  A.    YES.

16  Q.    ALL RIGHT.  NOW, THE REASON I BRING THAT UP IS, MECHANICAL

17  VENTILATIONS CAN ACCELERATE THE NUMBER OF AIR CHANGES PER HOUR,

18  RIGHT?

19  A.    YES.

20  Q.    AND THEY CAN DO THAT IN A WAY THAT IS MORE EFFICIENT AND

21  MORE EFFICACIOUS THAN A RECIRCULATING SYSTEM.

22  A.    NOT NECESSARILY.

23  Q.    WELL, LET'S TALK ABOUT IT WITH RESPECT TO TRAVEL TRAILERS.

24  HAVE YOU READ THE ERNEST ORLANDO LAWRENCE BERKELEY NATIONAL LAB

25  REPORT ON THEIR TESTING OF THE FOUR FEMA TEMPORARY HOUSING UNITS?

1   A.   YES.

2   Q.   I JUST WANT TO ASK YOU SOME QUESTIONS ABOUT WHAT THEY FOUND.

3   VERY BRIEFLY.

4        YOU UNDERSTAND THAT THEY TOOK FORMALDEHYDE MEASUREMENTS

5   AND, ON STEADY-STATE IN THE MORNING, AND GOT BETWEEN .31 PARTS

6   PER MILLION AND .52 PARTS PER MILLION, AND IN THE AFTERNOON, GOT

7   BETWEEN .35 PARTS PER MILLION AND .78 PARTS PER MILLION IN THE

8   AFTERNOON.  RIGHT?

9   A.   IT'S REFERENCED AS SUCH, YES.

10  Q.   NOW, IN ADDITION TO THAT, IN THEIR EXECUTIVE SUMMARY, THEY

11  WROTE, "COMPLAINTS ABOUT THE INDOOR ENVIRONMENTAL QUALITY IN THE

12  THU HAVE ARISEN BASED ON OCCUPATIONAL HEALTH COMPLAINTS AND

13  CONCERNS.  THESE HEALTH CONCERNS HAVE BEEN IDENTIFIED BY

14  PHYSICIANS TREATING THU OCCUPANTS AND THROUGH RISK ANALYSES OF

15  INDOOR AIR QUALITY MEASUREMENTS MADE IN BOTH OCCUPIED AND

16  UNOCCUPIED UNITS."

17       DID I READ THAT CORRECTLY?

18  A.   WITH THE EXCEPTION OF *OCCUPANT* VERSUS *OCCUPATIONAL*, YES.

19  Q.   FAIR ENOUGH.  NOW, HERE IS MY QUESTION:  WHEN WE TALK ABOUT

20  INDOOR AIR QUALITY, THAT IS ONE OF THE PURPOSES OF A

21  WELL-DESIGNED HVAC SYSTEM, FAIR?

22  A.   FAIR.

23  Q.   AND THESE FOLKS AT THE BERKELEY NATIONAL LABS ARE

24  INVESTIGATING INDOOR AIR QUALITY PROBLEMS THAT HAVE BEEN BROUGHT

25  TO THEM WITH RESPECT TO THE THU'S, RIGHT?

1    A.   IT APPEARS AS THOUGH THEY ARE INVESTIGATING THE COMPLAINTS

2    AND CONCERNS, YES.

3    Q.   NOW, THEY WRITE ON PAGE IX, ROMAN NUMERAL NINE, "THREE

4    FEATURES OF MATERIAL APPLICATION IN THE THU'S DIFFER FROM MOST

5    OTHER DWELLINGS.  ONE, THE EXTENSIVE USE OF LIGHTWEIGHT COMPOSITE

6    WOOD PRODUCTS."  YOU'RE NOT HERE TO TALK ABOUT THAT, FAIR?

7    A.   FAIR.

8    Q.   "TWO, VERY HIGH-SURFACE LOADING OF COMPOSITE WOOD PRODUCTS,"

9    YOU'RE NOT HERE TO TALK ABOUT THAT.

10   A.   FAIR.

11   Q.   "AND THREE, LOW FRESH AIR PER UNIT SURFACE AREA OF COMPOSITE

12   WOOD PRODUCTS IN THE THU'S."

13            DID I READ THAT CORRECTLY?

14   A.   YES, YOU DID.

15   Q.   NOW, LOW FRESH AIR PER UNIT SURFACE AREA, THAT DEALS WITH

16   HVAC SYSTEMS.

17   A.   IT CAN DEAL WITH THE NATURAL EXCHANGE AND INFILTRATION AND

18   VENTILATION, NOT NECESSARILY JUST THE HVAC SYSTEM.

19   Q.   BUT MY QUESTION WAS SPECIFIC FROM THE STANDPOINT OF WHEN

20   THEY TALK ABOUT LOW FRESH AIR PER UNIT SURFACE AREA, THAT DEALS

21   WITH THE AIR EXCHANGES THAT MAY BE ACHIEVED.  WOULD THAT BE FAIR?

22   A.   AND I BELIEVE IN THIS PARTICULAR REPORT THEY WERE

23   REFERENCING THE NATURAL AIR EXCHANGE, AND IT HAD NOTHING TO DO

24   WITH THE HVAC SYSTEM.

25   Q.   BECAUSE THE HVAC SYSTEM IS NOT A MECHANICAL VENTILATION

1  SYSTEM; THAT'S TRUE, RIGHT?

2  A.   THAT'S CORRECT.

3  Q.   NOW, THEY WRITE, AS WE SEGUE ALONG, "THE THU'S DID NOT

4  INCLUDE MECHANICAL FORCED-AIR VENTILATION SYSTEM," AND YOU AGREE

5  WITH THAT, RIGHT?

6  A.   I AGREE WITH IT TO THE EXTENT OF MY KNOWLEDGE OF THE REPORT,

7  YES.

8  Q.   AND YOU KNOW THAT, FOR EXAMPLE, THIS THU, THE ONE THAT

9  MRS. ALEXANDER WAS IN, DID NOT INCLUDE A MECHANICAL FORCED-AIR

10  VENTILATION SYSTEM, RIGHT?

11  A.   YES AND NO.  AND THE REASON I QUALIFY MY REMARK IS BECAUSE

12  WHEN UTILIZING ASHRAE 62.2, THEY RECOGNIZE THAT EXHAUST FANS ARE

13  ACTUALLY PART OF A MECHANICAL VENTILATION SYSTEM, NOT RELYING

14  SPECIFICALLY ON NATURAL VENTILATION OR INFILTRATION.

15  Q.   BUT IN THE CONTEXT OF WHAT WE HAVE BEEN TALKING ABOUT, YOU

16  KNOW WHAT I WAS ASKING, ALL 6?

17  A.   THE ACTUALS, YES.  THE ACTUAL AIR-CONDITIONING UNIT ITSELF

18  DOES NOT HAVE A FORCED VENTILATION OPTION INSTALLED.  NO.

19  Q.   FAIR ENOUGH.  NOW, ON PAGE 15 IN THE CONCLUSIONS --

20  A.   THIS IS THE SAME REPORT?

21  Q.   YES, SIR.   -- THE BERKELEY NATIONAL LABORATORY WRITES:

22  "FORMALDEHYDE AND SOME OTHER VOC'S MEASURED IN THE UNOCCUPIED THU

23  AND THE ASSOCIATED WHOLE-TRAILER EMISSION FACTORS WERE FOUND TO

24  BE HIGHER, SOMETIMES MUCH HIGHER THAN WHAT IS TYPICALLY FOUND IN

25  RESIDENTIAL ENVIRONMENTS.  THE DIFFERENCE BETWEEN THESE THU'S AND

1    OTHER HOUSING APPEARS TO BE THE VERY HIGH COMPOSITE WOOD SURFACE

2    AREA RELATIVE TO ROOM VOLUME AND THE LOW VENTILATION RATES IN

3    TERMS OF LOW AREA-SPECIFIC FRESH AIR FLOW RATES RELATIVE TO

4    INTERNAL SURFACE AREAS IN THE THU'S."

5            DID I READ THAT CORRECTLY?

6    A.   YES.

7    Q.   NOW, AGAIN, I DON'T WANT TO TALK TO YOU ABOUT ONE, WHICH IS

8    THE VERY HIGH COMPOSITE WOOD SURFACE AREA.  THAT'S FOR THE WOOD

9    GUYS, CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   BUT THE SECOND DIFFERENCE BETWEEN THU'S IN THE OTHER HOUSING

12   UNITS IS THE LOW VENTILATION RATES IN TERMS OF LOW AREA-SPECIFIC

13   FRESH AIR FLOW RATES RELATIVE TO INTERNAL SURFACE AREAS IN THE

14   THU.  THAT DEALS WITH WHAT YOU'RE HERE TO TALK ABOUT, RIGHT?

15   A.   TO A CERTAIN EXTENT, YES.

16   Q.   NOW, AS I UNDERSTAND IT, AS THE RETAINED EXPERT FOR

17   GULF STREAM, DO YOU DISAGREE WITH THE GOVERNMENT'S NATIONAL LAB

18   AT BERKELEY THAT THESE THU'S HAVE LOW VENTILATION RATES RELATIVE

19   TO NORMAL RESIDENTIAL ENVIRONMENTS?

20   A.   I DIDN'T CONDUCT THE ANALYSIS, AND THE DATA THAT'S IN THERE

21   DOESN'T ACTUALLY SUPPORT THE CONCLUSION, IN MY OPINION.

22   Q.   SO THE JURY CAN UNDERSTAND IT, GULF STREAM'S RETAINED

23   EXPERT'S OPINION IS THAT WHEN OUR BERKELEY NATIONAL LAB -- THAT'S

24   RUN BY THE GOVERNMENT, RIGHT?

25   A.   THAT'S CORRECT.

1    Q.   WHEN THEY CONCLUDED THAT THERE WERE LOW VENTILATION RATES IN

2    TERMS OF LOW AREA-SPECIFIC FRESH AIR FLOW RATES, THEY GOT THAT

3    WRONG?

4    A.   IN THE FOUR TRAILERS THAT THEY TESTED AND DRAW IN THE

5    CONCLUSION?

6    Q.   WHAT'S THE ANSWER TO MY QUESTION, SIR?

7    A.   I THINK THEY DID GET IT WRONG BECAUSE THERE IS NO REFERENCED

8    STANDARD TO DETERMINE WHAT LOW IS.

9    Q.   NOW, THIS CONCEPT OF NOT UTILIZING A MECHANICAL VENTILATION

10   SYSTEM WITH YOUR AIR CONDITIONER BUT INSTEAD OPENING WINDOWS,

11   WITH THE AC ON, NOW CERTAINLY, TO BE FAIR, OPENING WINDOWS WHILE

12   YOU'RE RUNNING THE AC IS ONE WAY TO VENTILATE A TRAILER, RIGHT?

13   A.   CORRECT.

14   Q.   BUT YOU WOULD AGREE THAT THAT'S A WEIRD IDEA.  DIDN'T YOU

15   SAY THAT IN YOUR DEPOSITION?

16   A.   IT'S NOT UNCOMMON, BUT IT WOULD BE A WEIRD -- IT WOULD BE.

17   Q.   IT'S WEIRD FOR A LOT OF REASONS, BECAUSE, NUMBER ONE, IF YOU

18   HAVE A LADY WHO'S GOT TWO KIDS, SINGLE MOM, WORKING HARD, IN

19   ORDER TO KEEP FROM GASSING YOUR KIDS WITH FORMALDEHYDE, YOU GOT

20   TO LEAVE THE AC ON ALL DAY, THAT'S EXPENSIVE, RIGHT?

21   A.   IT WOULD -- IT WAS PRESUMED THAT THE AC WOULD HAVE BEEN ON

22   ALL THE TIME ANYWAY.

23   Q.   IF THE AC IS ON ALL DAY, SOMEBODY HAS GOT TO PAY FOR THAT,

24   RIGHT?

25   A.   CORRECT.

Q.   SO IF YOU RUN THE AC ALL DAY FOR THE TEN HOURS WHILE YOU'RE

AT WORK AND YOUR KIDS ARE AT SCHOOL, THAT'S GOING TO COST MONEY,

RIGHT?

A.   IT WOULD.

Q.   NUMBER TWO, AT MY HOUSE WHEN I WAS RAISED, IF YOU RAN THE AC

AND OPENED UP A WINDOW, YOU GOT IN TROUBLE.  WHY WOULD YOU GET IN

TROUBLE FOR OPENING UP DOORS AND WINDOWS WHILE THE AC WAS

RUNNING?

A.   PRESUMABLY BECAUSE IT WASTES ENERGY.

Q.   BECAUSE IT WASTES ENERGY.  LET'S TALK ABOUT THAT FOR A

SECOND.  IF YOU'RE RUNNING AN AC, YOU'RE DOING SO, YOU HAVE TO

PAY THE LOCAL ELECTRIC COMPANY TO RUN IT, RIGHT?

A.   CORRECT.

Q.   AND IF YOU ARE RUNNING THE AC WITH THE WINDOWS OPEN, ALL

THAT EXPENSIVE AIR-CONDITIONING IS GOING RIGHT OUT THE WINDOW,

RIGHT?

A.   YES.

Q.   NOW, IF YOU'RE TRYING TO ACHIEVE, IN ALANA ALEXANDER'S CASE,

AN INDOOR TEMPERATURE OF 75 DEGREES, IN HER DAUGHTER'S CASE OF 70

DEGREES WHEN SHE'S SNEAKING AROUND BEHIND HER, I GUESS, AND IT'S

112 DEGREES OUTSIDE, IS OPENING THE DOORS AND WINDOWS A GOOD WAY

TO LOWER THE INTERIOR TEMPERATURE?

A.   NO.  NOT IN THOSE CONDITIONS.

Q.   NOW, IN THOSE CONDITIONS, WHEN WE TALK ABOUT TEMPERATURE,

LET'S GET TO HUMIDITY FOR A SECOND.  IF YOU HAVE AN OUTDOOR

1   HUMIDITY OF 80, 90 DEGREES, IF YOU WANT TO LOWER THE INDOOR

2   HUMIDITY, IS IT A GOOD IDEA TO RUN THE AIR CONDITIONER WITH YOUR

3   DOORS AND WINDOWS OPEN?

4   A.   NO.

5   Q.   IF YOU RUN THE AIR CONDITIONER WITH YOUR DOORS AND WINDOWS

6   OPEN, THE INDOOR RELATIVE HUMIDITY IS GOING TO RISE.

7   A.   CORRECT.

8   Q.   AND IF YOU RUN YOUR AIR CONDITIONER WITH THE WINDOWS AND

9   DOORS OPEN, THE RELATIVE DIFFERENCE BETWEEN THE OUTDOOR HUMIDITY

10  AND THE INDOOR HUMIDITY IS GOING TO DECREASE SUCH THAT EVENTUALLY

11  THEY ARE THE SAME?

12  A.   THAT'S CORRECT.

13  Q.   AND SO IF YOU HAD 85 PERCENT HUMIDITY AND A HUNDRED DEGREE

14  WEATHER OUTSIDE AND YOU RUN THE AIR CONDITIONER WITH THE WINDOWS

15  AND DOORS OPEN, AT SOME POINT IN TIME, YOU'RE GOING TO HAVE

16  85-DEGREE TEMPERATURE -- I MEAN, 85-DEGREES HUMIDITY ON THE

17  INSIDE, RIGHT?

18  A.   CORRECT.

19  Q.   NEGATIVE PRESSURE.  WHEN MR. RITTER ASSERTS THAT THE

20  POTENTIAL EXISTS FOR CONDENSATION TO FORM ON THE CONCEALED FACE

21  OF THE INTERIOR WALL PANEL, WHEN THE DEW POINT TEMPERATURE IN THE

22  WALL CAVITY ADJACENT TO THE PANEL MEETS OR EXCEEDS THE

23  TEMPERATURE OF THE INTERIOR PANEL ITSELF, HE'S CORRECT?

24  A.   ON THE INTERIOR -- I'M SORRY.  COULD YOU READ IT AGAIN OR DO

25  YOU HAVE -- CAN YOU PUT IT ON THE SCREEN?

1    Q.    SURE.   HOW ABOUT -- I HAVE YOUR REPORT.   PAGE 6.   QUOTE,

2    "MR. RITTER ASSERTS THAT THE POTENTIAL EXISTS FOR CONDENSATION TO

3    FORM ON THE CONCEALED FACE OF THE INTERIOR WALL PANEL, WHEN THE

4    DEW POINT TEMPERATURE IN THE WALL CAVITY ADJACENT TO THE PANEL

5    MEETS OR EXCEEDS THE TEMPERATURE OF THE INTERIOR WALL PANEL

6    ITSELF."

7            YOU WROTE THAT, RIGHT?

8    A.    THAT'S CORRECT.

9    Q.    HIS DESCRIPTION OF THIS PHENOMENON IS, QUOTE, TECHNICALLY

10   CORRECT, CLOSE QUOTE, RIGHT?

11   A.    THAT'S CORRECT.

12   Q.    BUT YOU SAY THAT THERE ARE ADDITIONAL FACTORS TO CONSIDER,

13   RIGHT?

14   A.    THAT'S CORRECT.

15   Q.    AND THE ADDITIONAL FACTOR TO CONSIDER THAT YOU TALKED ABOUT

16   IN YOUR REPORT IS, WHAT ABOUT WHEN YOU RUN THE HEATER?

17   A.    WHEN -- I'M SORRY?

18   Q.    I TELL YOU WHAT, PAGE 6 OF YOUR REPORT, "THE PHENOMENON OF

19   CONCEALED CONDENSATION IS MOST READILY PRESENT DURING PERIODS OF

20   HIGH AMBIENT TEMPERATURE AND HUMIDITY, I.E., THE COOLING SEASON,

21   COINCIDING WITH THE OPERATION OF THE COOLING UNIT."  RIGHT?

22   A.    THAT'S CORRECT.

23   Q.    SO WHERE MR. RITTER IS TECHNICALLY CORRECT, THAT PHENOMENON

24   OF CONCEALED CONDENSATION IS MOST READILY PRESENT DURING PERIODS

25   OF HIGH AMBIENT TEMPERATURE AND HIGH HUMIDITY WHILE YOU'RE

1   RUNNING THE AC, RIGHT?

2   A.   THAT'S CORRECT.

3   Q.   AND HERE IN LOUISIANA, ESPECIALLY IN NEW ORLEANS, WE ARE IN,

4   CONSTANTLY, IN THE SUMMER, SPRING AND FALL MONTHS, PERIODS OF

5   HIGH AMBIENT TEMPERATURES, GENERALLY, RIGHT?

6   A.   YES.

7   Q.   HIGH RELATIVE HUMIDITY, RIGHT?

8   A.   YES.

9   Q.   AND PEOPLE TRY TO BEAT THE HEAT AND BEAT THE HUMIDITY BY

10  RUNNING THE AC, RIGHT?

11  A.   CORRECT.

12  Q.   NEXT ISSUE.  THE CONDENSATION AROUND THE AIR-CONDITIONING

13  VENT.  WHEN MR. RITTER NOTES THAT THERE WAS CONSIDERABLE

14  CONDENSATION ON THE CEILING GRILL OF THE UNIT, AND ON THE AREAS

15  OF THE CEILING AROUND THE AIR-CONDITIONING UNIT, YOU DON'T

16  DISAGREE WITH THAT BECAUSE, QUOTE, I HAVE NO OPINION, I WASN'T

17  THERE, RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   ALL RIGHT.  NOW, NEGATIVE PRESSURE, WHEN IT EXISTS, IS LIKE

20  A VACUUM, RIGHT?

21  A.   THAT'S CORRECT.

22  Q.   AND THAT VACUUM IS GOING TO KEEP AIR FROM LEAVING THE

23  BUILDING, IT'S GOING TO KEEP IT IN, RIGHT?

24  A.   NOT NECESSARILY.  UNDER STRONG NEGATIVE PRESSURE CONDITIONS

25  IT'S POSSIBLE, BUT UNDER SLIGHT, THERE IS ALWAYS A NATURAL

1    TRANSLATION, IF YOU WILL, BETWEEN THE INTERIOR AND THE EXTERIOR.

2    Q.   AND THE NATURAL TRANSLATION BETWEEN THE INTERIOR AND THE

3    EXTERIOR EXISTED WHEN THEY PULLED OUT THE MANOMETER AND MEASURED

4    THE THREE TO FIVE PASCALS OF NEGATIVE PRESSURE, RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   SO EVEN WITH THE NATURAL VENTILATION AND THE NATURAL AIR

7    EXCHANGE THAT YOU TALKED ABOUT SEEPING THROUGH THE WOOD, THAT

8    EXISTED AT THE TIME THAT THEY MEASURED THE NEGATIVE AIR CONDITION

9    THAT THEY GOT WITH THE MANOMETER, RIGHT?

10   A.   YES.

11   Q.   NOW, IF YOU HAVE A SITUATION WITHOUT A MECHANICAL

12   VENTILATION SYSTEM LIKE WE HAVE HERE, AND YOU HAVE A NEGATIVE

13   PRESSURE SITUATION, CONDENSATION CAN FORM, TRUE?

14   A.   IT CAN.

15   Q.   AND IF CONDENSATION FORMS INSIDE THE WALL PANELS, THE

16   INSULATION CAN GET WET.

17   A.   THAT'S TRUE.

18   Q.   AND WHEN THE INSULATION CAN GET WET, YOU'RE GOING TO SEE IT

19   STICK TO THE INTERIOR WALL PANELS, RIGHT?

20   A.   IT'S MY UNDERSTANDING THAT THE FIBERGLASS INSULATION IN THE

21   WALL PANELS IN THE GULF STREAM UNIT ARE ACTUALLY GLUED TO THE

22   BACK OF THAT PANEL, SO THEY ARE GOING TO STICK NO MATTER WHAT.

23   Q.   AND YOU'RE GOING TO SEE MOISTURE WHERE IT WAS, RIGHT?

24   A.   THERE MAY BE EVIDENCE OF MOISTURE.  A STAINING OR SOMETHING

25   LIKE THAT.

1   Q.   SURE.  AND YOU CAN SEE THAT EVIDENCE OF MOISTURE AND

2   STAINING WHEN YOU PULL THAT WALL BACK IN THE BEDROOM, RIGHT?

3   A.   IF WE WERE ABLE TO ACTUALLY GO IN AND DO, YOU KNOW, THE --

4   MANIPULATE THE ENVIRONMENT, BUT, NO, WE CAN'T.

5   Q.   ROOF LEAK.  NOW, LET ME SEE IF I CAN GET YOUR TESTIMONY

6   CORRECT HERE.  FIRST OF ALL, WHETHER IT'S CONDENSATION OR ROOF

7   LEAK, MOISTURE GETTING INTO THE TRAILER INCREASES THE RELATIVE

8   HUMIDITY INSIDE OF THE TRAILER, TRUE?

9   A.   UNDER STEADY-STATE CONDITIONS WITHOUT THE AIR-CONDITIONING

10  RUNNING?

11  Q.   SURE.  ALL OTHER THINGS BEING EQUAL, MORE MOISTURE IN THE

12  TRAILER EQUALS A HIGHER RELATIVE HUMIDITY?

13  A.   WELL, THE ANSWER IS DIFFERENT DEPENDING ON WHETHER THE AC IS

14  RUNNING.

15  Q.   OKAY.  WITHOUT IT FIRST.

16  A.   WITHOUT IT, YES, THE RELATIVE HUMIDITY WOULD INCREASE.

17  Q.   NOW, WITH RESPECT TO RELATIVE HUMIDITY INCREASING, DO YOU

18  KNOW ANYTHING ABOUT THE OFF-GASSING OF FORMALDEHYDE, ALL OTHER

19  THINGS BEING EQUAL, WITH LOW HUMIDITY VERSUS HIGH RELATIVE

20  HUMIDITY?

21  A.   I'M NOT HERE TO TESTIFY ABOUT FORMALDEHYDE RELEASE IN WOOD

22  PRODUCTS.

23  Q.   I DIDN'T ASK THAT.  I ASKED WHETHER YOU KNOW.

24  A.   I'M FAMILIAR WITH OTHER EXPERTS' REPORTS ON THE MATTER.

25  Q.   ARE YOU FAMILIAR WITH THE PROPOSITION AND THE FACT THAT, ALL

1   OTHER THINGS BEING EQUAL, THE HIGHER RELATIVE HUMIDITY YOU HAVE

2   INSIDE THAT TRAILER, THE HIGHER THE OFF-GASSING?

3   A.   I'M FAMILIAR WITH THE PROPOSITION.  I DON'T ACCEPT IT AS

4   FACT BECAUSE I'M NOT AN EXPERT IN THAT FIELD.

5   Q.   YOU'RE NOT DENYING IT, AND I GET YOUR POINT.

6   A.   RIGHT, YEAH, I'M NOT THAT GUY.  I'M NOT THAT EXPERT.

7   Q.   I'M WITH YOU.  OKAY, THAT'S FAIR.

8           NOW, ONE OTHER ISSUE, AND THEN WE'LL LET YOU GO BECAUSE

9   IT'S TIME FOR LUNCH.

10          I THINK COUNSEL ASKED YOU A QUESTION, DID YOU SEE

11  ANYTHING UNUSUAL ABOUT THIS AIR CONDITIONER VERSUS THE OTHER ONES

12  OUT AT LOTTIE.  DO YOU REMEMBER THAT?

13  A.   YES.

14  Q.   YOU TOLD ME AT THE START OF THIS EXAMINATION YOU WERE OUT AT

15  LOTTIE FOR TWO TO THREE HOURS?

16  A.   THAT'S CORRECT.

17  Q.   HOW LONG WERE YOU LOOKING AT THE ALEXANDER TRAILER?

18  A.   APPROXIMATELY -- MOST OF THAT.  PROBABLY ABOUT, YOU KNOW, AN

19  HOUR AND A HALF.

20  Q.   AND IS IT YOUR TESTIMONY, THEN, THAT OTHER 30 MINUTES YOU

21  LOOKED AROUND AT THE OTHER EIGHT OR 10,000 TRAILERS THAT WERE OUT

22  THERE?

23  A.   THERE ARE PROBABLY MORE THAN THAT THERE, YEAH.

24  Q.   AND YOU EXAMINED THEM IN 30 MINUTES?

25  A.   YEAH, AN OVERALL SURVEY OF THE LOT.  THERE'S PROBABLY 30,000

1  TRAILERS OUT THERE.

2          MR. WATTS:  MAY I APPROACH?

3          THE COURT:  YES.

4                          EXAMINATION

5  BY MR. WATTS:

6  Q.   IS EXHIBIT 325.2 AN AERIAL PHOTOGRAPH SHOWING THE TRAILERS

7  OUT AT THE LOTTIE SIGHT?

8  A.   IT APPEARS TO BE THE CASE, YES.

9  Q.   AND THAT CAN GIVE US SOME IDEA OF THE MAGNITUDE OF THE

10 NUMBERS OF THE TRAILERS THAT WERE OUT THERE FOR YOU TO INSPECT IN

11 30 MINUTES.

12 A.   EXACTLY.

13         MR. WATTS:  WE OFFER 325.2.  I THINK I ALREADY SHOWED

14 THIS TO CHARLIE BEFORE.

15         MR. PENOT:  NO OBJECTION.

16         MR. WATTS:  LET ME PUT THIS UP SO THE JURY CAN GET AN

17 IDEA OF WHAT WE'RE TALKING ABOUT.

18         THE WITNESS:  A LOT OF TRAILERS.

19                          EXAMINATION

20 BY MR. WATTS:

21 Q.   A LOT OF TRAILERS.  AND AS I UNDERSTAND IT FROM TALKING WITH

22 THE FOLKS OUT THERE, THERE IS SOME GUY OUT THERE THAT'S GOT A

23 RANCH OR A FARM OR SOMETHING THAT'S LEASED THIS TO FEMA AND

24 THAT'S WHERE THEY ARE STORING THEM ALL.  IS THAT YOUR

25 UNDERSTANDING?

1   A.    THAT'S MY UNDERSTANDING.

2   Q.    AND THEY ARE PARKED A COUPLE OF FEET APART OVER AND OVER AND

3   OVER AGAIN; IS THAT RIGHT?

4   A.    THAT'S MY UNDERSTANDING FROM MY OBSERVATIONS.

5   Q.    NOW, WHEN WE GOT TO LOOK AT THE TRAILER, AND I REMEMBER, WE

6   GOT TO GO BACK AND I DON'T REMEMBER WHERE IT WAS, IT WAS ALONG

7   SOME TREE LINE, WHEN YOU ALL LOOKED AT IT, IT WAS UP NEAR THE

8   ENTRANCE; IS THAT RIGHT?

9   A.    THAT'S CORRECT.

10  Q.    AND THE TRAILER WAS SEGREGATED FROM THE 10,000 OTHER ONES.

11  A.    THAT'S CORRECT.

12  Q.    OKAY.  BUT IT'S YOUR TESTIMONY, YOU SPENT AN HOUR AND A HALF

13  LOOKING AT THE ALEXANDER TRAILER, YOU WERE OUT THERE FOR TWO

14  HOURS OR SO, AND YOU MANAGED TO LOOK AT ALL THESE OTHER TRAILERS

15  TO TELL US WHETHER OR NOT THIS AIR-CONDITIONING SYSTEM WAS

16  TYPICAL.

17  A.    WELL, I DIDN'T PERFORM A VISUAL OBSERVATION -- OR A VISUAL

18  INSPECTION OF ALL 30-SOMETHING THOUSAND TRAILERS OUT THERE.  BUT

19  DRIVING TO, WAITING FOR, AND THEN DRIVING OUT OF, I WAS ABLE TO

20  WITNESS THOUSANDS OF TRAILERS.

21  Q.    SURE.  AND THE FACT OF THE MATTER IS, IS THAT IN 2004,

22  MECHANICAL VENTILATION AIR-CONDITIONING SYSTEMS WERE UTILIZED

23  THROUGHOUT THE UNITED STATES, RIGHT?

24  A.    IN WHAT APPLICATION?

25  Q.    IT DOESN'T MATTER THE APPLICATION.  THE TECHNOLOGY WAS THERE

1   TO BE UTILIZED.

2   A.   YES, FOR COMMERCIAL BUILDINGS, RESIDENTIAL BUILDINGS, YES.

3            MR. WATTS:   THOSE ARE ALL OF MY QUESTIONS.   THANK YOU.

4            THE COURT:   BRIEF REDIRECT BEFORE WE TAKE LUNCH?

5            MR. WEINSTOCK:   JUST A FEW, YOUR HONOR.

6                        REDIRECT EXAMINATION

7   BY MR. SCANDURRO:

8   Q.   MR. SERAUSKAS, I THINK I ASKED, YOU'RE NOT TELLING THIS JURY

9   THAT YOU PHYSICALLY INSPECTED 30,000 TRAILERS IN LOTTIE?

10  A.   OH, NO, NO, NO, NO, NO.

11  Q.   BUT EVERY TRAILER YOU WERE ABLE TO SEE, ALL HAD THE ROOFTOP

12  AIR-CONDITIONING SYSTEM JUST LIKE THE ONE YOU SAW IN THE

13  ALEXANDER TRAILER?

14  A.   THAT'S CORRECT.   AND THAT WAS PART OF THE FEMA

15  SPECIFICATIONS.

16  Q.   AND NONE OF THEM HAD ANY SEPARATE MECHANICAL VENTILATION

17  SYSTEM INSTALLED OUTSIDE THE TRAILER ON THE GROUND NEXT TO THE

18  TRAILER?

19  A.   NONE THAT I WITNESSED EITHER AT THAT SITE OR BEING IN THE

20  CITY SINCE THE STORM.

21  Q.   AND YOU DIDN'T SEE THAT ON THE ROOF, EITHER?

22  A.   NO, I DID NOT.

23  Q.   SO YOU'RE JUST NOT AWARE OF THAT BEING USED IN THIS

24  APPLICATION.

25  A.   THAT'S CORRECT.

1  Q.    YOU WERE ASKED A LOT OF QUESTIONS ABOUT MECHANICAL

2  VENTILATION SYSTEMS, FOR EXAMPLE, IN THIS COURTHOUSE.  WHY WOULD

3  YOU HAVE A MECHANICAL VENTILATION SYSTEM, FOR EXAMPLE, IN THIS

4  COURTHOUSE WHERE WE ARE TODAY AND NOT IN A RESIDENTIAL SETTING

5  WHERE YOU HAD WINDOWS OPENING TO THE OUTSIDE?

6  A.    FIRST OF ALL, AS YOU CAN SEE FROM THIS COURTROOM, WE DON'T

7  HAVE ANY WINDOWS.  SECOND OF ALL, THERE ARE CODE-MANDATED VOLUMES

8  OF VENTILATION AIR THAT WE HAVE TO PROVIDE.  ASHRAE ESTABLISHES

9  THOSE.  THEY ARE ADOPTED BY CERTAIN CODES THAT WE HAVE TO ADHERE

10  TO.  AND IT'S BASED PRIMARILY ON THE SQUARE FOOTAGE OF THE SPACE,

11  BUT PRIMARILY, IT'S BASED ON THE NUMBER OF OCCUPANTS WITHIN A

12  SPACE.

13         SO IF I WAS DESIGNING THIS COURTROOM, FOR EXAMPLE, OR

14  THE SYSTEM FOR THIS COURTROOM, I WOULD HAVE TO PROVIDE SO MANY

15  CUBIC FEET PER MINUTE, OR CFM, OF OUTSIDE AIR VENTILATION AIR FOR

16  EVERY PERSON IN HERE.  THE BEST AND MOST EFFECTIVE AND EFFICIENT

17  MEANS OF DOING THAT IS THROUGH A MECHANICAL SYSTEM.  I WOULDN'T

18  BE ABLE TO RELY SOLELY ON INFILTRATION TO HANDLE THAT

19  CODE-MANDATED VOLUME.

20  Q.    AND I THINK YOU'VE TOUCHED ON THIS EARLIER, BUT YOU RARELY

21  SEE A MECHANICAL SYSTEM EVEN IN A RESIDENTIAL HOUSE.

22  A.    RIGHT.  THE INTRODUCTION OF VENTILATION AIR THROUGH THE

23  CENTRAL AIR CONDITIONER AT THE HOUSE IS VERY UNCOMMON.  THERE ARE

24  APPLICATIONS WHERE IT EXISTS, BUT IT'S VERY UNCOMMON, LIKE LESS

25  THAN A PERCENT PROBABLY.

1   Q.    LESS THAN ONE PERCENT?

2   A.    CORRECT.

3   Q.    SO ALMOST STANDARD IN A COMMERCIAL BUILDING LIKE THE ONE

4   WE'RE IN?

5   A.    CORRECT.

6   Q.    BUT ONE PERCENT IN A RESIDENCE?

7   A.    CORRECT.  MY HOUSE DOESN'T HAVE IT, FOR EXAMPLE.  YOURS

8   PROBABLY DOESN'T, EITHER, I'M SURE.

9   Q.    I WOULDN'T KNOW.  YOU WOULD HAVE TO ASK MY WIFE.  SHE'S THE

10  ENGINEER IN THE FAMILY.

11          OKAY.  AGAIN, I THINK WE TALKED ABOUT NEGATIVE

12  PRESSURE.  I THINK THE JURY IS TIRED OF HEARING IT.  THE POINT

13  IS, THAT ONE SNAPSHOT THAT MR. RITTER TALKED TO US ALL ABOUT

14  DOESN'T TELL YOU ANYTHING ABOUT THE PRESSURE CONDITION THE DAY

15  BEFORE OR THE DAY AFTER?

16          MR. WATTS:  OBJECTION, LEADING.

17          THE COURT:  YES.

18          MR. SCANDURRO:  IT IS, YOUR HONOR, BECAUSE IT'S

19  LUNCHTIME.  I CAN HEAR MY STOMACH GRUMBLING.

20          MR. WATTS:  SAY QUIT.

21          THE COURT:  I UNDERSTAND THAT.  THERE IS NO LUNCHTIME

22  EXCLUSION OF THE RULE.

23          MR. WATTS:  THERE OUGHT TO BE, JUDGE.

24          THE COURT:  AND I AGREE, THERE OUGHT TO BE.  THERE OUGHT

25  TO BE ANOTHER ONE THAT APPLIES AT THE END OF THE DAY, BUT THERE

1    ARE NO LUNCHTIME EXCLUSIONS, SO LET'S NOT LEAD THE WITNESS.

2            MR. SCANDURRO:  YES, SIR.

3                            EXAMINATION

4    BY MR. SCANDURRO:

5    Q.   YOU WERE ASKED ABOUT THE BERKELEY LAB STUDY; DO YOU RECALL

6    THAT?

7    A.   YES, I DO.

8    Q.   AND THE CONCLUSIONS OF THE AUTHORS OF THOSE STUDIES, THAT

9    THERE WAS A LOW VENTILATION RATE, DO YOU RECALL ALL OF THAT?

10   A.   YEAH, I RECALL THE CONCLUSIONS.

11   Q.   WHAT'S YOUR UNDERSTANDING ABOUT, SINCE YOU'VE READ IT, HOW

12   THE BERKELEY LAB PEOPLE TESTED THAT TRAILER IN TERMS OF WHETHER

13   THE HVAC SYSTEM WAS OPERATING?

14   A.   IN THE -- AND I DON'T HAVE THE BERKELEY LAB REPORTS, IT'S A

15   VOLUMINOUS DOCUMENTS SO I DON'T HAVE THE REPORT IN FRONT OF ME,

16   BUT IN TERMS OF THE WAY IT WAS TESTED, I BELIEVE IT WAS WITH A

17   $CO_2$, OR CARBON DIOXIDE TRACER GAS DECAY TEST, WHERE THEY

18   STEADY-STATE THE TRAILER OR THE ENVELOPE, IF YOU WILL.  THEY

19   RELEASE A SPECIFIC QUANTITY OF GAS IN THE TRAILER, IN THIS CASE

20   CARBON DIOXIDE, AND THEY MEASURE IT OVER A PERIOD TIME UNTIL IT

21   REACHES A CERTAIN POINT, AND THEN THEY CAN CALCULATE FROM THAT

22   WHAT THE NATURAL AIR EXCHANGE RATE IS BETWEEN THE INTERIOR AND

23   THE EXTERIOR WITH NOTHING HAPPENING.

24   Q.   AND THAT WAS THE BASIS OF THE CONCLUSIONS IN THAT REPORT?

25   A.   IT WAS.

1    Q.    WERE ANY OF THE WINDOWS OPEN WHEN THAT TEST WAS DONE?

2    A.    NO, I DON'T BELIEVE THEY WERE.

3    Q.    WAS THE AIR CONDITIONER RUNNING?

4    A.    TO MY RECOLLECTION, NO.

5    Q.    SO IT'S JUST A HOT, CLOSED-UP ENVIRONMENT ON THE INSIDE?

6    A.    YES.

7    Q.    IF YOU HAD DONE THIS, IF YOU WERE DOING THE SAME TEST AND

8    YOU OPENED A WINDOW OR RAN THE AIR CONDITIONER, WOULD YOU EXPECT

9    THE SAME RESULT?

10   A.    OH, ABSOLUTELY NOT.

11   Q.    WHY NOT?

12   A.    WELL, FIRST OF ALL, THE -- YOU WOULD LOSE ALL OF YOUR TRACER

13   GAS BECAUSE YOU'RE GOING TO HYPERVENTILATE THE BUILDING.  AND

14   THEN THERE'S OTHER STUDIES THAT HAVE BEEN OFFERED THAT I'VE

15   REVIEWED IN CONJUNCTION WITH MY EFFORT THAT SHOWS THAT THE

16   OPERATION OF THE AC SYSTEM AND THE -- AND OPENING DOORS AND

17   WINDOWS AND RUNNING THE EXHAUST FANS IN THE BATHROOMS AND IN THE

18   KITCHEN, OVER THE KITCHEN STOVE, THE RANGE HOOD, SIGNIFICANTLY

19   REDUCE THE LEVELS OF INDOOR CONTAMINANTS.

20   Q.    SO CHECKING THE VENTILATION RATE OF A TRAVEL TRAILER ALL

21   BUTTONED UP AND SEALED UP AND JUST POKING THIS TRACER GAS THROUGH

22   A HOLE IN THE DOOR, WOULD YOU AGREE THAT THAT'S NOT THE SAME AS

23   SOMEBODY LIVING IN A TRAVEL TRAILER?

24            MR. WATTS:  OBJECTION.  LEADING.

25            THE COURT:  YES.  LEADING.

1           MR. SCANDURRO:  IT'S OBVIOUS, YOUR HONOR.  I'LL WITHDRAW

2    IT.

3                          EXAMINATION

4    BY MR. SCANDURRO:

5    Q.   YOU TALKED ABOUT A STUDY THAT YOU HAD SEEN.  I'M TALKING TO

6    MYSELF.

7           THIS IS EXHIBIT 148, THE ATSDR REPORT.  AND THE JURY

8    HAS SEEN A LOT OF THIS, BUT IS THIS THE STUDY YOU WERE REFERRING

9    TO THAT SHOWED, WHEN YOU TURNED THE AIR-CONDITIONING ON,

10   FORMALDEHYDE LEVELS WERE LOWERED IN THE TRAVEL TRAILER?

11   A.   I BELIEVE IT IS, YES, AND I BELIEVE METHOD A AND METHOD B

12   BOTH REFER TO WHAT THEY CALLED *INTERVENTION MEASURES*.  ONE WAS

13   THE OPERATION OF THE AC AND THE OTHER WAS OPENING DOORS AND

14   WINDOWS.

15   Q.   SO THERE IS A BIG DIFFERENCE IN THE STUDIES THAT HAVE BEEN

16   DONE ON TRAVEL TRAILERS BETWEEN A CLOSED-UP, BUTTONED-UP UNIT AND

17   ONE WHERE YOU'RE EITHER RUNNING THE AIR CONDITIONER OR OPENING

18   THE WINDOWS?

19   A.   WHICH WOULD MORE CLOSELY APPROXIMATE A LIVED-IN CONDITION,

20   IF YOU WILL.

21   Q.   YOU WERE ASKED A LOT OF QUESTIONS ABOUT AIR-CONDITIONING

22   RUNNING WHILE THE WINDOWS WERE OPEN.  ARE YOU AWARE OF

23   GULF STREAM INSTRUCTING THESE PEOPLE TO RUN THEIR AIR CONDITIONER

24   WITH THE WINDOWS OPEN?

25   A.   NO, I'M NOT.

1    Q.    ARE YOU AWARE OF FEMA DOING THAT?

2    A.    NO, NOT SPECIFICALLY IN THAT CONFIGURATION.

3    Q.    AND AGAIN, YOU'RE AWARE OF THE FACT IN THIS STUDY WE'RE

4    LOOKING AT HERE, EXHIBIT 148, THAT THE AIR CONDITIONER WAS RUN

5    WITH THE WINDOWS CLOSED AND THE BATH VENT OPEN?

6    A.    WITH RESPECT TO THE ALEXANDER TRAILER?

7    Q.    NO, WITH RESPECT TO THIS STUDY.

8    A.    OH, YES, OKAY.  YES.

9            MR. SCANDURRO:  NO FURTHER QUESTIONS, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU CAN STEP

11   DOWN.

12           THE WITNESS:  THANK YOU, YOUR HONOR.

13           THE COURT:  LET'S DO THIS.  FIRST OF ALL, LET ME ASK

14   THOSE OF YOU WHO ARE HERE OBSERVING TO STAY JUST FOR A SECOND

15   AFTER WE RELEASE THE JURY, AND, LADIES AND GENTLEMEN OF THE JURY,

16   WE'RE GOING TO TAKE OUR LUNCH BREAK.  I'LL ASK YOU TO BE READY,

17   IT'S A LITTLE BIT -- IT'S ABOUT 12:20, SO WHY DON'T WE SAY 1:30.

18   SO IF YOU'LL BE READY, WE'LL RESUME AT 1:30.  PLEASE DON'T

19   DISCUSS THE CASE AMONGST YOURSELVES DURING THE LUNCH BREAK OR

20   WITH ANYONE ELSE, FOR THAT MATTER.  LET'S GO AHEAD AND RELEASE

21   THE JURY.

22           THE COURT SECURITY OFFICER:  ALL RISE.

23           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

24   PANEL LEAVES THE COURTROOM, AND THE COURT WAS IN LUNCHEON

25   RECESS.)

1                          REPORTER'S CERTIFICATE

2

3        I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

4   MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

5   REPORTER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT

6   COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE

7   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY

8   ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

9   THE ABOVE-ENTITLED AND NUMBERED MATTER.

10

11

12                          *S/CATHY PEPPER*_____

13                          CATHY PEPPER, CRR, RMR, CCR

14                          OFFICIAL COURT REPORTER

15                          UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25