1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3   ****************************************************************

4   IN RE:  FEMA TRAILER
    FORMALDEHYDE PRODUCTS
5   LIABILITY LITIGATION

6                          DOCKET MDL NO. 1873 "N"
                           NEW ORLEANS, LOUISIANA
7                          WEDNESDAY, SEPTEMBER 23, 2009, 8:30 A.M.

8   THIS DOCUMENT IS RELATED TO

9   CHARLIE AGE, ET AL V
    GULF STREAM COACH, INC.,
10  ET AL, DOCKET NO. 09-2892;
    ALANA ALEXANDER,
11  INDIVIDUALLY AND ON BEHALF
    OF CHRISTOPHER COOPER
12

13  ****************************************************************

                              **DAY 8**
14                       **MORNING SESSION**
                     TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15           HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                       UNITED STATES DISTRICT JUDGE
16

17  APPEARANCES:

18

    FOR THE PLAINTIFFS:
19

                          GAINSBURGH BENJAMIN DAVID MEUNIER AND
20                        WARSHAUER
                          BY:  GERALD E. MEUNIER, ESQUIRE
21                        2800 ENERGY CENTRE
                          1100 POYDRAS STREET, SUITE 2800
22                        NEW ORLEANS LA  70163

23
                          THE BUZBEE LAW FIRM
24                        BY:  ANTHONY G. BUZBEE, ESQUIRE
                          600 TRAVIS, SUITE 7300
25                        HOUSTON TX  77002

```
 1  APPEARANCES CONTINUED:

 2
                              WATTS GUERRA CRAFT
 3                            BY:  MIKAL C. WATTS, ESQUIRE
                              FOUR DOMINION DRIVE
 4                            BUILDING THREE, SUITE 100
                              SAN ANTONIO TX 78257
 5

 6                            HILLIARD MUNOZ GUERRA
                              BY:  ROBERT C. HILLIARD, ESQUIRE
 7                            719 S. SHORELINE BOULEVARD #500
                              CORPUS CHRISTI TX 78401
 8

 9                            CHRIS PINEDO
                              ATTORNEY AT LAW
10                            802 N. CARANCAHUA, SUITE 2250
                              CORPUS CHRISTI TX  78470
11

12  FOR GULF STREAM COACH, INC.:

13                            DUPLASS ZWAIN BOURGEOIS MORTON
                              PFISTER & WEINSTOCK
14                            BY:  ANDREW D. WEINSTOCK, ESQUIRE
                                   JOSEPH G. GLASS, ESQUIRE
15                            THREE LAKEWAY CENTER
                              3838 N. CAUSEWAY BOULEVARD
16                            SUITE 2900
                              METAIRIE LA  70002
17

18                            SCANDURRO & LAYRISSON
                              BY:  TIMOTHY D. SCANDURRO, ESQUIRE
19                            607 ST. CHARLES AVENUE
                              NEW ORLEANS LA  70130
20

21
    FOR FLUOR ENTERPRISES, INC.:
22
                              MIDDLEBERG RIDDLE & GIANNA
23                            BY:  CHARLES R. PENOT, JR., ESQUIRE
                                   RICHARD A. SHERBURNE, ESQUIRE
24                                 SONIA MALLETT, ESQUIRE
                              717 N. HARDWOOD
25                            DALLAS TX  75201
```

1  OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RMR, CRR
                                 500 POYDRAS STREET, ROOM B406
2                                NEW ORLEANS LA  70130
                                 (504) 589-7779
3
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
4  PRODUCED BY COMPUTER.

5
                          **I N D E X**
6

7  EXAMINATIONS                                              PAGE

8

9  **DR. PHILIP COLE**........................................  7

10 VOIR DIRE EXAMINATION BY MR. WEINSTOCK.................  7

11 DIRECT EXAMINATION BY MR. WEINSTOCK...................  9

12 CROSS-EXAMINATION BY MR. WATTS........................ 27

13 REDIRECT EXAMINATION BY MR. WEINSTOCK................. 70

14 **H. JAMES WEDNER**...................................... 86

15 DIRECT EXAMINATION BY MR. WEINSTOCK................... 86

16 CROSS-EXAMINATION BY MR. WATTS....................... 112

17 REDIRECT EXAMINATION BY MR. WEINSTOCK................ 152

18 GULF STREAM PROFFER NUMBER 1 BY MR. WEINSTOCK.......... 202

19 PLAINTIFF'S PROFFER NUMBER 3 BY MR. MEUNIER........... 202

20 GULF STREAM PROFFER NUMBER 2 BY MR. GLASS.............. 203

21

22

23

24

25

E X H I B I T S

DESCRIPTION                                                PAGE

EXHIBIT 353...........................................   33

EXHIBIT 269...........................................   56

EXHIBIT 346...........................................  158

EXHIBIT 515...........................................  158

EXHIBIT 516...........................................  159

EXHIBIT 15............................................  164

EXHIBIT 118...........................................  165

EXHIBIT 167...........................................  165

EXHIBIT 347.5.........................................  165

EXHIBIT 347.4.........................................  165

EXHIBIT 347.3.........................................  165

EXHIBIT 376...........................................  165

EXHIBIT 374...........................................  166

EXHIBIT 375...........................................  166

**P-R-O-C-E-E-D-I-N-G-S**

MORNING SESSION

WEDNESDAY, SEPTEMBER 23, 2009, 8:30 A.M.

(COURT CALLED TO ORDER)

1
2
3
4
5
6

7          THE DEPUTY CLERK:  ALL RISE.

8          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

9    PANEL ENTERS THE COURTROOM.)

10          THE COURT:  YOU MAY BE SEATED.

11          MR. WEINSTOCK:  YOUR HONOR, IF WE COULD JUST APPROACH

12    VERY BRIEFLY BEFORE I BEGIN.

13          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A

14    CONFERENCE WAS HELD AT THE BENCH.)

15          THE COURT:  WHAT'S THE PROBLEM?

16          MR. WEINSTOCK:  IT'S NOT A PROBLEM.  IT CAME OUT

17    YESTERDAY AND IT'S GOING TO COME OUT TODAY, THE FORMALDEHYDE

18    COUNCIL, THE FORMALDEHYDE COUNCIL, THE FORMALDEHYDE COUNCIL.

19    WHEN WE'RE DONE, I WOULD LIKE A LIMITING INSTRUCTION THERE, WE'RE

20    NOT A MEMBER OF THE FORMALDEHYDE COUNCIL.  WE HAVE NOTHING TO DO

21    WITH THE FORMALDEHYDE COUNCIL OR THE EUROPEAN CONSORTIUM THEY

22    SUGGESTED THAT HAD SOMETHING TO DO WITH PREPARING THE LANG REPORT

23    IN DIRECT RESPONSE TO THIS LITIGATION.

24          MR. WATTS:  INSTEAD OF THE LIMITING INSTRUCTION, WHY

25    DON'T YOU GET YOUR WITNESS TO SAY IT AND WE WON'T OBJECT.

1          MR. WEINSTOCK:  HE DOESN'T KNOW.  HE'S NOT A MEMBER OF

2   THE FORMALDEHYDE COUNCIL.

3          THE COURT:  CAN WE JUST HAVE AN ADDITIONAL STIPULATION?

4   IS THAT REALLY CONTESTED?  CAN'T WE STIPULATE?

5          MR. WEINSTOCK:  IS THAT FINE?

6          MR. WATTS:  WHY DON'T YOU JUST WRITE --

7          MR. MEUNIER:  I WOULD LIKE TO KNOW WHAT THE LANGUAGE IS

8   FIRST.

9          MR. WEINSTOCK:  GULF STREAM IS NOT A MEMBER OF THE

10  FORMALDEHYDE COUNCIL.

11         MR. MEUNIER:  YOU SAID "NOTHING TO DO WITH."  THAT'S THE

12  PART I WAS GOING TO OBJECT TO.

13         MR. WEINSTOCK:  WHAT DO WE HAVE TO DO WITH IT?

14         THE COURT:  WHY DON'T YOU WRITE IT AND SHOW IT TO THEM,

15  AND I'LL BE HAPPY TO READ IT.  I THINK IT'S UNCONTESTED, SO I'LL

16  BE HAPPY TO READ IT.

17         MR. WEINSTOCK:  AND WHILE WE'RE AT IT, THE EUROPE

18  WHATEVER THAT YOU WERE TRASHING, WE DON'T HAVE A EUROPEAN

19  DIVISION.

20         MR. MEUNIER:  DID I TRASH THEM?

21         THE COURT:  I DON'T RECALL THAT.

22             (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

23  BENCH CONFERENCE WAS CONCLUDED.)

24         THE COURT:  MR. WEINSTOCK, WOULD YOU CALL THIS GENTLEMAN

25  OFFICIALLY TO THE WITNESS STAND, EVEN THOUGH HE SEEMS PREPARED.

1          MR. WEINSTOCK:  YOUR HONOR, WE CALL DR. PHILIP COLE TO

2   THE STAND.

3          THE DEPUTY CLERK:  PLEASE STAND AND RAISE YOUR RIGHT

4   HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE

5   ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

6   THE TRUTH, SO HELP YOU GOD?

7          THE WITNESS:  I DO.

8          THE DEPUTY CLERK:  YOU MAY BE SEATED.  PLEASE STATE AND

9   SPELL YOUR FULL NAME FOR THE RECORD.

10          THE WITNESS:  MY NAME IS PHILIP, PHILIP WITH ONE L,

11   C-O-L-E.

12                          **DR. PHILIP COLE**

13   WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

14   CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

15                        VOIR DIRE EXAMINATION

16   BY MR. WEINSTOCK:

17   Q.   GOOD MORNING, DR. COLE.

18   A.   GOOD MORNING.

19   Q.   WHAT ARE YOU A DOCTOR IN?

20   A.   I'M A PHYSICIAN AND I'M ALSO A CANCER EPIDEMIOLOGIST.

21   Q.   HOW LONG HAVE YOU BEEN STUDYING CANCER EPIDEMIOLOGY?

22   A.   ABOUT 40 YEARS.

23   Q.   WHERE DID YOU GO TO MEDICAL SCHOOL?

24   A.   I WENT TO MEDICAL SCHOOL AT THE UNIVERSITY OF VERMONT.

25   Q.   DID YOU GET ANY ADDITIONAL EDUCATION THEREAFTER?

1  A.   NEXT, I DID A TRAINING IN SURGERY AT THE ROYAL VICTORIA

2  HOSPITAL IN MONTREAL.  THEN I WENT TO HARVARD UNIVERSITY WHERE I

3  EARNED A MASTER'S DEGREE AND A DOCTORATE DEGREE IN EPIDEMIOLOGY.

4  AND THEN I JOINED THE FACULTY AT HARVARD, AND I WAS THERE FOR

5  ABOUT 12 YEARS.  THEN I BECAME THE CHAIRMAN OF THE DEPARTMENT OF

6  EPIDEMIOLOGY AT THE UNIVERSITY OF ALABAMA, BIRMINGHAM, OR UAB.

7  AND I HAVE BEEN THERE EVER SINCE, IN THE LAST YEARS AS A

8  PROFESSOR EMERITUS, THAT MEANS RETIRED.  AND SO I'M NOW

9  SELF-EMPLOYED AS A CONSULTANT IN EPIDEMIOLOGY.

10  Q.   HAVE YOU OFFERED ANY PEER-REVIEWED PUBLICATIONS?

11  A.   I HAVE PUBLISHED MORE THAN 200 PAPERS IN THE PEER-REVIEWED

12  SCIENTIFIC LITERATURE.  ALMOST ALL OF THEM RELATE TO THE CAUSES

13  OF CANCER IN HUMAN BEINGS.

14  Q.   HAVE YOU REVIEWED ANY OF YOUR PEERS' PUBLICATIONS?

15  A.   I'M SORRY.  I MISSED A WORD THERE.

16  Q.   HAVE YOU REVIEWED ANY OF YOUR PEERS' PUBLICATIONS?

17  A.   I DO PEER REVIEW OF PUBLICATIONS ALL THE TIME, WHETHER THOSE

18  THAT ARE SUBMITTED FOR PUBLICATION OR THOSE THAT HAVE ACTUALLY

19  BEEN PUBLISHED.

20  Q.   HAVE YOU EVER AUTHORED ANY PAPERS REGARDING FORMALDEHYDE?

21  A.   YES.  I BELIEVE IT WAS IN 2005 OR SIX, I AUTHORED A REVIEW

22  OF THE THEN-AVAILABLE STUDIES ON THE RELATIONSHIP BETWEEN

23  FORMALDEHYDE AND CANCER, PARTICULARLY LEUKEMIA AND LYMPHOMA.

24       THE COURT:  LET ME ASK, DO WE HAVE A STIPULATION

25  REGARDING THIS WITNESS'S EXPERTISE?

1          MR. WATTS:  WE DO.

2          THE COURT:  AND HE'S BEING OFFERED IN THE FIELD OF?

3          MR. WEINSTOCK:  HE'S AN M.D. EPIDEMIOLOGIST.

4          THE COURT:  ALL RIGHT.  THE COURT WILL THEREFORE ACCEPT

5     THIS WITNESS AS AN EXPERT IN THE FIELD OF MEDICINE AND

6     EPIDEMIOLOGY.

7                          DIRECT EXAMINATION

8     BY MR. WEINSTOCK:

9     Q.    DOCTOR, WHAT IS FORMALDEHYDE?

10    A.    FORMALDEHYDE IS A SMALL MOLECULE.  IT'S A

11    NATURALLY-OCCURRING COMPOUND.  IT OCCURS IN ALL MAMMALIAN

12    SPECIES, SPONTANEOUSLY.  IT IS ALSO A CHEMICAL OF TREMENDOUS

13    COMMERCIAL IMPORTANCE.

14    Q.    IN THE HUMAN BODY, DOES FORMALDEHYDE MAKE A PART OF THE

15    ONE-CARBON POOL?

16    A.    YES, IT DOES.

17    Q.    WHAT IS THE ONE-CARBON POOL?

18    A.    WELL, THE ONE-CARBON POOL CONSISTS OF ALL OF THE CHEMICALS,

19    THERE ARE ONLY ACTUALLY SIX OR SEVEN, THAT CONSISTS OF JUST A

20    SINGLE CARBON AS OPPOSED TO, WELL, UP TO MANY.

21    Q.    AND IS THAT USED IN NORMAL METABOLISM?

22    A.    IT IS, YES.

23    Q.    DOCTOR, WHAT IS IARC?

24    A.    IARC.  IARC STANDS FOR THE INTERNATIONAL AGENCY FOR RESEARCH

25    ON CANCER.  IT IS THE CANCER RESEARCH ARM OF THE WORLD HEALTH

1   ORGANIZATION.  IT IS BASED IN LYON, FRANCE, AND IT CONDUCTS

2   GLOBAL STUDIES INTO THE CAUSES OF CANCER, BOTH IN ANIMALS AND IN

3   MAN.

4   Q.   HAVE YOU EVER WORKED AT IARC?

5   A.   WELL, I WAS NOT ACTUALLY ON THE PAYROLL AT IARC, BUT I DID

6   SPEND A YEAR THERE ON SABBATICAL A WHILE BACK AS A CONSULTANT IN

7   EPIDEMIOLOGY.

8   Q.   WHEN IARC CONSIDERS A CHEMICAL, FOR EXAMPLE, FORMALDEHYDE,

9   IS THERE A REVIEW BOARD OR REVIEW PANEL THAT GOES WITH THESE

10  CHEMICALS?

11  A.   ONE OF THE FUNCTIONS OF IARC IS TO CONTINUOUSLY RUN A SERIES

12  OF WORKSHOPS TO EVALUATE ALL OF THE DIFFERENT CHEMICALS AS TO

13  THEIR LIKELY CARCINOGENICITY FOR HUMAN BEINGS.  THIS WORK IS DONE

14  IN WHAT IS CALLED "WORKSHOPS".  THESE WORKSHOPS CONSIST OF

15  ANYWHERE FROM 15 TO 20 OR SO EXPERTS IN EVERY DIFFERENT AREA,

16  EPIDEMIOLOGY, BIOSTATISTICS, PATHOLOGY, BIOCHEMISTRY AND SO ON.

17            AND THE MEMBERS OF THE WORKSHOP REVIEW THE ENTIRE WORLD

18  LITERATURE ON THE SUBJECT OF ANY GIVEN CHEMICAL, IN OUR CASE,

19  FORMALDEHYDE.  AND THEN AT THE END OF THEIR SESSION, WHICH IS

20  USUALLY A WEEK LONG, THEY VOTE AS TO HOW THE CHEMICAL SHOULD BE

21  CLASSIFIED.

22  Q.   HAVE YOU EVER SERVED ON SUCH A PANEL OR COMMITTEE?

23  A.   YES, I'VE SERVED MANY TIMES.

24  Q.   TURNING TO FORMALDEHYDE, WHAT HUMAN STUDIES DID IARC REVIEW

25  IN ITS DECISION TO DECLARE FORMALDEHYDE A KNOWN HUMAN CARCINOGEN?

1   A.   IARC MAKES AN EFFORT TO REVIEW ALL THE AVAILABLE STUDIES,

2   HUMAN, ANIMAL, CHEMICAL LABORATORY.   SOME EFFORT IS MADE TO

3   REVIEW THEM ALL.   BUT TYPICALLY THE HUMAN STUDIES, PARTICULARLY

4   IF THEY ARE LARGE, WILL GET MORE DETAILED ATTENTION.

5   Q.   WHICH ONES, IF ANY, DID IARC CONSIDER IN TERMS OF A COHORT

6   STUDY FOR THE DISCUSSION ABOUT FORMALDEHYDE?

7   A.   THERE ARE THREE MAJOR COHORT STUDIES OF FORMALDEHYDE IN

8   CANCER IN HUMAN BEINGS.   THESE ARE THE NATIONAL CANCER INSTITUTE

9   STUDY, WHICH IS THE LARGEST ONE; THE UNITED KINGDOM STUDY, WHICH

10   IS ALSO FAIRLY LARGE; AND THEN A THIRD STUDY WHICH WAS DONE IN

11   THE UNITED STATES, WHICH IS CALLED THE NIOSH, THAT'S THE NATIONAL

12   INSTITUTE OF OCCUPATIONAL SAFETY AND HEALTH STUDY.   THOSE THREE,

13   I THINK, FORM THE BULK OF THEIR -- THE EVIDENCE RELATING TO HUMAN

14   BEINGS.

15   Q.   I'VE PUT UP A CHART FROM YOUR REPORT, AND IT'S ON THE SCREEN

16   IN FRONT OF YOU, AS WELL.   I THINK YOU TOLD US THE NCI STUDY, THE

17   NIOSH STUDY AND WHAT'S THE MRC?

18   A.   THAT STANDS FOR MEDICAL RESEARCH COUNCIL OF THE UNITED

19   KINGDOM.   THAT'S THE ENGLISH STUDY.

20   Q.   THESE ARE COHORT STUDIES?

21   A.   YES, THEY ARE.

22   Q.   WHAT IS A "COHORT"?

23   A.   A COHORT IS A GROUP OF PEOPLE WHO HAVE BEEN SELECTED AND

24   INCLUDED IN A STUDY BECAUSE OF A COMMON CHARACTERISTIC.   IN THIS

25   CASE, THE COMMON CHARACTERISTIC IS THAT THEY HAVE ALL BEEN

1   EXPOSED TO FORMALDEHYDE IN THE COURSE OF THEIR WORK.  SO A COHORT

2   IS A STUDY OF A GROUP OF PEOPLE WITH A COMMON EXPOSURE OF

3   INTEREST.

4   Q.   HOW DOES ONE GET INTO A COHORT?

5   A.   WELL, YOU GET INTO A COHORT BY BECOMING AN EMPLOYEE.  I'LL

6   TALK ABOUT IT IN THE CONTEXT OF OCCUPATIONAL STUDIES, SINCE

7   THAT'S WHAT WE'RE LOOKING AT HERE, BY BECOMING AN EMPLOYEE AT ONE

8   OF THE FACILITIES THAT'S INCLUDED IN ONE OF THESE STUDIES.

9   Q.   HOW DOES ONE GET OUT OF A COHORT?

10  A.   YOU DON'T GET OUT OF A COHORT STUDY.  ONCE YOU'RE IN THE

11  STUDY, YOU'RE IN IT FOREVER.  EVEN IF YOU PASS AWAY, YOU STILL

12  REMAIN ENUMERATED IN THAT STUDY, OBVIOUSLY AS A DECEDENT.  WHILE

13  YOU'RE ALIVE, YOU CONTRIBUTE WHAT'S CALLED "PERSON TIME."  YOU

14  ARE UNDER OBSERVATION, NOT ACTIVELY, OF COURSE, BUT FROM TIME TO

15  TIME, YOUR VITAL STATUS, ALIVE OR DEAD, IS EVALUATED.

16  Q.   WHAT COHORT OR WHAT GROUP OF PEOPLE DID COGGON STUDY?

17  A.   COGGON STUDIED A GROUP OF PEOPLE WHO WORKED AT, I BELIEVE IT

18  WAS FIVE OR SIX DIFFERENT PLANTS IN ENGLAND AND WALES, GOING BACK

19  TO ABOUT THE 1950S.  THAT STUDY CONSISTED OF ABOUT 16,000 PEOPLE.

20  IT WAS LAST PUBLISHED IN, I BELIEVE, 2005.

21  Q.   WHAT KIND OF DOSES DID THEY ESTIMATE?

22  A.   IT WAS BELIEVED THAT THESE MEN, SOME WOMEN, TOO, BUT MAINLY

23  MEN, HAD VERY HIGH EXPOSURES TO FORMALDEHYDE.  IT'S NEVER CLEAR

24  EXACTLY HOW MUCH THE EXPOSURE IS.  VERY DIFFICULT TO MEASURE

25  FORMALDEHYDE IN A LARGE NUMBER OF PEOPLE AT A NUMBER OF DIFFERENT

1   PLANTS PERFORMING DIFFERENT DUTIES, BUT I WOULD SAY THAT THE

2   EXPOSURE IS CONSIDERED TO BE -- I THINK I'VE GOT SOME ESTIMATE,

3   SOME ROUGH ESTIMATE HERE, AVERAGE EXPOSURE GREATER THAN 2,000

4   PARTS PER BILLION, THAT WOULD BE 2 PARTS PER MILLION.  THAT'S

5   JUST AN AVERAGE, OF COURSE.

6   Q.   AND WHAT WAS YOUR CONCLUSION REGARDING THE RELATIONSHIP

7   BETWEEN EXPOSURE TO FORMALDEHYDE AND NASOPHARYNGEAL CANCER?

8   A.   I CAN'T REMEMBER NOW, BUT THEY DIDN'T FIND ANY

9   NASOPHARYNGEAL CANCERS AT ALL, OR MAYBE ONE OR TWO, BUT CERTAINLY

10  IT WAS LESS THAN THE NUMBER THAT WOULD HAVE NORMALLY BEEN

11  EXPECTED TO OCCUR IN A GROUP THAT SIZE OVER THAT PERIOD OF TIME.

12  IT WAS ACTUALLY A LOWER-THAN-EXPECTED NUMBER.

13  Q.   AND THAT'S AN ISSUE WE'VE TALKED ABOUT, BUT IF YOU CAN HELP

14  THE JURY UNDERSTAND HOW YOU COMPARE PEOPLE EXPOSED TO UNEXPOSED

15  AND WHAT YOU'RE LOOKING FOR.

16  A.   IN THESE STUDIES, I GUESS THE FIRST THING I SHOULD SAY IS

17  THE MOST IMPORTANT UNEXPOSED GROUP IS NOT ACTUALLY IN THE STUDY.

18  IT'S THE GENERAL POPULATION OF COMPARABLE AGE, RACE, AND SEX.

19          AND FROM THERE ON, IT'S PRETTY STRAIGHTFORWARD.  YOU

20  COMPARE THE NUMBER OF DEATHS THAT YOU SEE, THAT YOU RECORD IN THE

21  EXPOSED COHORT, AND YOU ASK THE QUESTION, HOW MANY DEATHS WOULD I

22  NORMALLY EXPECT IF THESE PEOPLE WERE DYING AT THE SAME RATE AS

23  THE GENERAL POPULATION?  AND YOU JUST COMPARE THOSE NUMBERS.

24  THAT'S CALLED THE "OBSERVED NUMBER," THE NUMBER OF DEATHS THAT

25  OCCUR IN THE COHORT.  THE EXPECTED NUMBER, THE NUMBER THAT WOULD

1 HAVE BEEN EXPECTED IF THEY DIED AT THE SAME RATE AS THE GENERAL

2 POPULATION.

3        AND THAT OBSERVED TO EXPECTED RATIO IS WHAT YOU SEE

4 SORT OF IN THE MIDDLE OF THE TABLE, ABOUT HALFWAY DOWN, LEFT-HAND

5 COLUMN, CALLED THE SMR OR STANDARDIZED MORTALITY RATIO.  AND THAT

6 JUST COMPARES THE OBSERVED AND THE EXPECTED NUMBERS.

7        FOR EXAMPLE, IF WE LOOK AT THE FIRST STUDY, THE COGGON

8 BRITISH STUDY, AND LOOK AT ALL OF THE CAUSES, WE SEE THE NUMBER

9 104, MEANING THAT THE WORKERS HAD ABOUT A FOUR PERCENT HIGHER

10 MORTALITY RATE FROM ALL CONDITIONS THAN THE GENERAL POPULATION.

11 THAT, OF COURSE, IS COMPLETELY INSIGNIFICANT, THE FOUR PERCENT

12 INCREASE.  THAT MEANS THEY ARE PERFECTLY NORMAL.

13 Q.   WHEN YOU DO THESE SMR'S, THESE BACKGROUNDS, IS THERE A

14 RANGE?  HOW DO THEY CALCULATE THIS 104 OR .4 PERCENT?

15 A.   WELL, IT'S ACTUALLY VERY SIMPLE.  YOU SIMPLY DIVIDE THE

16 OBSERVED NUMBER BY THE EXPECTED NUMBER, AND THAT'S IT.

17 Q.   AND IS THERE A CONFIDENCE INTERVAL IN WHAT IS A STANDARD

18 DEVIATION?

19 A.   THERE IS A CONFIDENCE INTERVAL THAT IS ORDINARILY PUT AROUND

20 AN SMR, AND IT GIVES YOU SOME IDEA OF HOW UNCERTAIN YOU ARE AS TO

21 JUST HOW ACCURATE THAT SMR IS BY CHANCE ALONE.  I MEAN, YOU

22 WOULDN'T EXPECT TO GET THE PERFECTLY CORRECT ANSWER IN EVERY

23 SINGLE SMR IN EVERY SINGLE STUDY FOR EVERY SINGLE DISEASE, SO

24 THERE IS GOING TO BE SOME RANDOM VARIATION, AND THAT IS EXPRESSED

25 IN THE CONFIDENCE INTERVAL.

1           I DID NOT PUT THE CONFIDENCE INTERVAL ON THIS TABLE

2    BECAUSE MOST OF THESE NUMBERS ARE PRETTY LARGE AND PRETTY STABLE.

3    THAT'S BECAUSE THEY RELATE TO ALL CAUSES, ALL CANCER.  WHEN YOU

4    GET DOWN TO INDIVIDUAL CANCERS, YOU GET ANOTHER STORY.

5    Q.   NOW, FOR A CONFIDENCE INTERVAL THAT INCLUDES 1.0, WHAT IS

6    THAT?

7    A.   CONFIDENCE INTERVAL THAT INCLUDES 1.0 ON THE CASE OF THE

8    SMR, WE USUALLY REFER TO IT AS 100.  IF IT INCLUDES 100 OR 1.0,

9    THAT MEANS THAT THE SMR IS NOT SIGNIFICANT.  IT MEANS IT COULD BE

10   1 BY CHANCE ALONE.

11   Q.   AND 1 IS --

12   A.   NORMAL.

13   Q.   NORMAL.

14   A.   OBSERVED AND EXPECTED ARE EQUAL.

15   Q.   SO JUST TO LOOK HERE, I MEAN, WE'LL GET TO PINKERTON IN A

16   MINUTE, BUT THE SMR'S YOU FOUND WERE ACTUALLY BELOW ONE OR BELOW

17   100?

18   A.   WELL, THERE IS ONE, I GUESS, THAT IS ABOVE 100.  THERE IS A

19   COUPLE OF THEM THAT ARE ABOVE 100, BUT IF YOU LOOK AT COGGON, THE

20   FIRST TWO OR THREE WE SEE THERE, 104, 110 AND 85, ARE ALL JUST

21   RANDOM VARIATION AROUND NORMAL VALUES.

22   Q.   AND YOU KNOW, DOCTOR, NOW THAT I LOOK MORE CAREFULLY AT YOUR

23   CHART, LET'S LOOK AT NASOPHARYNGEAL CANCER, WHICH HAS BECOME THE

24   CANCER IN THIS CASE.  THE STANDARD MORTALITY RATIO WAS LESS THAN

25   100 IN THE COGGON STUDY, CORRECT?

1 A.    YES.  I THINK -- I HOPE I MENTIONED THAT.

2 Q.    YOU PROBABLY DID AND I PROBABLY MISSED IT.

3        AND IN THE PINKERTON STUDY, IT WAS MUCH LESS THAN 100;

4 WAS IT NOT?

5 A.    PINKERTON IS NO DATA.  IT SAYS ND, NO DATA.  THEY DIDN'T

6 ACTUALLY SEPARATE NOSE AND NASAL SINUS FROM OTHER CANCERS OF THE

7 UPPER AIRWAY, THAT IS, THE MOUTH AND NOSE AND SINUSES.

8 Q.    BUT THEIR OVERALL STANDARD MORTALITY RATIO FOR ALL CANCERS

9 WAS BELOW 100?

10 A.    PINKERTON, ALL CANCER IS 89.  AND YOU SEE THE LETTER B

11 THERE, THE LITTLE SUPERSCRIPT B, MEANING THAT THAT IS A

12 SIGNIFICANTLY DEPRESSED, A SIGNIFICANTLY BELOW-NORMAL CANCER

13 RATE.

14 Q.    JUST LOOKING AT THAT DATA, IF ONE WANTED TO BE SILLY, IT

15 WOULD SUGGEST THAT FORMALDEHYDE CURES CANCER?

16 A.    WELL, I GUESS, PERHAPS YOU MEAN PREVENT, BUT, NO, WE

17 WOULDN'T SAY THAT.  OF COURSE NOT.  THIS IS JUST A RANDOM

18 VARIATION.

19 Q.    RANDOM VARIATION.

20        WHAT WAS THE COHORT, THE PINKERTON STUDY --

21 A.    THE PINKERTON STUDY IS THE NIOSH STUDY.  IT'S THE SECOND

22 AMERICAN STUDY LIKE THE HAUPTMANN STUDY.  IT IS A STUDY OF A

23 GROUP OF PEOPLE, I BELIEVE ABOUT 12,000, WHOSE WORK INVOLVED

24 HANDLING GARMENTS THAT HAD BEEN TREATED WITH FORMALDEHYDE.

25 ESSENTIALLY, WHAT THEY DID WAS FOLD THESE GARMENTS, IRON THEM,

1   WRAP THEM AND PACKAGE THEM FOR SALE IN RETAIL OUTLETS.

2            SO WE CALL IT THE "GOVERNMENT WORKERS' STUDY".

3   Q.   NOW WE COME TO THE HAUPTMANN PAPER.

4   A.   YES.

5   Q.   WHO IS MICHAEL HAUPTMANN?

6   A.   MICHAEL HAUPTMANN, AT THE TIME THAT HE DID THIS RESEARCH,

7   WAS A STAFF MEMBER IN THE EPIDEMIOLOGY UNIT AT THE NATIONAL

8   CANCER INSTITUTE HERE IN THE UNITED STATES.  HE IS NOW A STAFF

9   MEMBER AT A CANCER CENTER IN AMSTERDAM.

10  Q.   HE'S NO LONGER WITH NCI?

11  A.   I THINK HE STILL HAS SOME CONNECTION WITH THEM, BUT HE IS

12  NOT FORMALLY ON THEIR STAFF ANY LONGER.

13  Q.   AND I THINK WHAT I ALLUDED TO, BUT IS IT CORRECT THAT IARC'S

14  DECISION TO CLASSIFY FORMALDEHYDE AS A KNOWN HUMAN CARCINOGEN WAS

15  BASED ON THE HAUPTMANN PAPER'S CONCLUSION THAT IT CAUSES

16  NASOPHARYNGEAL CANCER, CORRECT?

17            MR. WATTS:  OBJECTION.  LEADING.

18            THE COURT:  LET'S NOT LEAD THE WITNESS.

19            MR. WEINSTOCK:  FAIR ENOUGH.

20                              EXAMINATION

21  BY MR. WEINSTOCK:

22  Q.   DID IARC CLASSIFY FORMALDEHYDE AS A KNOWN HUMAN CARCINOGEN?

23  A.   THEY PUT IT IN WHAT THEY REFERRED TO AS "GROUP 1," WHICH IS

24  ACTUALLY -- WE CAN CALL IT "KNOWN HUMAN CARCINOGEN" FOR SHORT,

25  BUT IT ACTUALLY SAYS THE AVAILABLE EVIDENCE IS SUFFICIENT TO

1  CONSIDER IT A HUMAN CARCINOGEN.

2  Q.   AND TO YOUR KNOWLEDGE, WHAT WAS THE AVAILABLE EVIDENCE TO

3  WHICH THEY WERE REFERRING?

4  A.   IT'S VERY DIFFICULT TO SAY EXACTLY WHAT THEY RELIED UPON,

5  BUT IN TERMS OF THE HUMAN EVIDENCE, YES, IT WOULD HAVE BEEN THE

6  HAUPTMANN STUDY.  THEY MAY HAVE RELIED ON OTHER KINDS OF

7  EVIDENCE, AS WELL.

8  Q.   BUT IN TERMS OF HUMAN EVIDENCE, THE HAUPTMANN STUDY?

9  A.   WELL, THAT'S THE ONLY STUDY THAT IS REPRESENTED TO BE

10  POSITIVE, YES.

11  Q.   AND IN THIS REPORT, WAS THERE ANY OTHER TARGET ORGANS

12  BESIDES NPC THAT THEY MADE THAT DETERMINATION BASED ON THE

13  HAUPTMANN STUDY?

14  A.   I WANT TO BE SURE I UNDERSTAND YOUR QUESTION.  DID THEY

15  DECIDE THAT FORMALDEHYDE CAUSES ANY OTHER FORM OF CANCER?

16  Q.   ESSENTIALLY, YES.

17  A.   IT CERTAINLY DID NOT.

18  Q.   LET'S TAKE A LOOK AT THE HAUPTMANN PAPER, WHICH I KNOW

19  EVERYBODY WANTS TO LEARN ABOUT EPIDEMIOLOGY TODAY.  IT'S VERY

20  EXCITING.

21  A.   WELL, I THINK IT IS.

22       MR. WATTS:  JUDGE, WE HAVE BEEN IN TRIAL TOO LONG.

23       MR. WEINSTOCK:  IF WE COULD PUT UP TABLE 2 OF THE

24  HAUPTMANN PAPER, I BELIEVE IS THE CORRECT ONE.

25       THE WITNESS:  MR. WEINSTOCK, COULD YOU SHOW US A LITTLE

1  BIT MORE OF THE HEADER ON IT?

2       MR. WEINSTOCK:  YES.

3       THE WITNESS:  THANK YOU.

4                           EXAMINATION

5  BY MR. WEINSTOCK:

6  Q.   NOW, I BELIEVE IF I JUMP BACK, THE SMR FOR HAUPTMANN WAS

7  210, CORRECT?

8  A.   YES.

9  Q.   IF WE COME BACK TO THIS TABLE, WE FIND OUR 210 IS -- IS THAT

10  WHAT YOU WERE REFERRING TO IN YOUR REPORT?

11  A.   YES.

12  Q.   NOW, WHERE DOES THAT FIGURE COME FROM?

13  A.   THIS FIGURE IS THE OVERALL OBSERVED TO EXPECTED RATIO AMONG

14  THE EXPOSED SUBJECTS.  VIRTUALLY ALL OF THE SUBJECTS, OVER

15  90 PERCENT IN THIS STUDY WERE, IN FACT, EXPOSED TO FORMALDEHYDE.

16  SO THIS SAYS THAT IN THAT EXPOSED GROUP, THE SMR IS 2.10.

17  Q.   AND WE TALKED PREVIOUSLY ABOUT CONFIDENCE INTERVALS.  IS

18  THIS THE CONFIDENCE INTERVAL?

19  A.   THE CONFIDENCE INTERVAL EXTENDS HERE ON THIS LINE OF THIS

20  TABLE FROM 1.05 TO 4.21.

21  Q.   AND SO THAT'S ABOVE 1?

22  A.   THOSE NUMBERS ARE ABOVE 1, YES, BUT YOU'LL NOTICE THAT THERE

23  IS A SUPERSCRIPT THERE.

24  Q.   THERE IS A FOOTNOTE?

25  A.   THIS NUMBER IS INCORRECT.  THIS NUMBER IS INCORRECT.  IF YOU

1    LOOK AT THE FOOTNOTE, YOU WILL SEE THAT SAYS, I'LL READ IT, "THE

2    EXACT 95 PERCENT CONFIDENCE INTERVAL IS .91 TO 4.14."

3    Q.    SO THE FOOTNOTE NOW INCLUDES A CONFIDENCE INTERVAL THAT GOES

4    BELOW 1?

5    A.    THAT IS CORRECT.

6    Q.    WHAT DOES THAT MEAN?

7    A.    THE FOOTNOTE SAYS THAT THE FINDING OF 2.1 IS NOT

8    STATISTICALLY SIGNIFICANT AND COULD HAVE ARISEN BY CHANCE.

9    Q.    NOT STATISTICALLY SIGNIFICANT, SO IT COULD BE RANDOM CHANCE?

10   A.    YES.

11   Q.    WELL, WHICH ONE IS RIGHT, COLUMN A OR COLUMN B?  THE COLUMN

12   UP HERE OR THE FOOTNOTE?

13   A.    I DON'T UNDERSTAND WHY IT WOULD BE TWO CONFLICTING NUMBERS

14   IN THE SAME PAPER, INDEED, IN THE SAME TABLE.  I CAN ONLY TELL

15   YOU THAT I HAVE CALCULATED THE CONFIDENCE LIMITS MYSELF, BOTH THE

16   APPROXIMATE ONES AND THE EXACT ONES.  THAT GETS A LITTLE BIT INTO

17   STATISTICAL BUSINESS.  AND THE ONE IN THE FOOTNOTE IS CORRECT AND

18   THEY DO CORRECTLY CALL IT THE EXACT ONE.  I DON'T KNOW WHAT THIS

19   ONE IS.  I CANNOT REPRODUCE IT, THE ONE IN THE TABLE, ITSELF.

20   Q.    THE ONLY ONE YOU COULD REPRODUCE IS THE ONE IN THE FOOTNOTE?

21   A.    VERY CLOSELY REPRODUCE IT WITHIN ONE FIGURE IN THE SECOND

22   DECIMAL PLACE.

23   Q.    WELL, IF THAT'S THE CASE, THEN OF THE THREE COHORTS THAT

24   IARC LOOKED AT, DO ANY OF THEM SUPPORT STATISTICALLY SIGNIFICANT

25   ASSOCIATIONS BETWEEN FORMALDEHYDE EXPOSURE AND NASOPHARYNGEAL

1    CANCER?

2    A.    I WOULD PHRASE IT THAT NONE OF THEM SHOWS A STATISTICALLY

3    SIGNIFICANT ELEVATION OF NASOPHARYNGEAL CANCER IN THESE EXPOSED

4    WORKERS.

5    Q.    WELL, THAT WOULD BE SUGGESTING THAT YOU'RE RIGHT AND IARC IS

6    WRONG.  IS THAT WHAT YOU'RE SUGGESTING?

7    A.    I THINK THAT IN THIS CASE, TO THE EXTENT THAT THEY WERE

8    RELYING UPON THIS PARTICULAR FINDING FOR THEIR JUDGMENT, THEY

9    WERE IN ERROR.  AND I WANT TO SAY, I DON'T SAY THAT LIGHTLY.  I

10   DID WORK AT IARC.  I KNOW THE PEOPLE THERE.  I HOLD THEM IN HIGH

11   REGARD.  WHY THEY REACHED THIS PARTICULAR JUDGMENT, I'M JUST NOT

12   SURE OF.

13   Q.    LET'S SAY IARC IS RIGHT AND YOU'RE WRONG.  LET'S TAKE

14   ANOTHER LOOK AT HOW.  LET'S SAY HAUPTMANN'S IS EXACTLY RIGHT.

15   HIS DATA IS CORRECT.  YOU'VE MISCALCULATED IT.  THERE IS A

16   STATISTICALLY SIGNIFICANT RELATIONSHIP, 2.0 SMR.  BUT THERE IS

17   ANOTHER FACTOR, ISN'T THERE, DOCTOR, DOSE RESPONSE?  WHAT IS DOSE

18   RESPONSE?

19   A.    WELL, IN ANY INDIVIDUAL STUDY, THE PRESENCE OR ABSENCE OF

20   DOSE RESPONSE IS THE SINGLE MOST IMPORTANT BENCHMARK OF WHETHER

21   OR NOT THERE IS A CAUSAL RELATIONSHIP.  IT MEANS THAT IF THERE IS

22   AN OVERALL ASSOCIATION, IT IS FURTHER SUPPORTED BY THE IDEA THAT

23   AS THE DOSE GOES UP, THE EXPOSURE -- AS THE DOSE OR EXPOSURE GOES

24   UP, THE RISK OF DISEASE GOES UP.  IN OTHER WORDS, IF SOME IS BAD,

25   MORE IS WORSE.  COMMON SENSE.

1   Q.   LET'S TAKE A LOOK AT NASOPHARYNGEAL CANCER ON HAUPTMANN'S

2   TABLE.   THIS IS A TABLE REGARDING PEAK EXPOSURE, CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   WELL, HERE WE HAVE THE UNEXPOSED GROUP, THAT WOULD BE ZERO,

5   NO EXPOSURE TO FORMALDEHYDE.   HOW MANY CANCERS FOR NASOPHARYNGEAL

6   DO WE HAVE?

7   A.   TWO.

8   Q.   AND IN THE GROUP OF 0 PARTS PER MILLION TO 2.0 PARTS PER

9   BILLION, HOW MANY CANCERS DO WE HAVE?

10  A.   WELL, I THINK THAT'S A ZERO.

11  Q.   IN THE GROUP BETWEEN 2 PARTS PER MILLION AND 4 PARTS PER

12  MILLION, HOW MANY NASOPHARYNGEAL CANCERS DO WE HAVE?

13  A.   ALSO A ZERO.

14  Q.   NOW, IN THE GROUP ABOVE 4 PARTS PER MILLION OR 4,000 PARTS

15  PER BILLION, HOW MANY CANCERS DO WE HAVE?

16  A.   THERE ARE SEVEN.

17  Q.   ALL OF THE CANCERS COME IN THE GROUP WHERE THE EXPOSURE IS

18  ABOVE 4,000 PARTS PER BILLION?

19  A.   THAT'S CORRECT.

20  Q.   WHICH I BELIEVE -- YOU WEREN'T HERE -- IS EXACTLY WHAT

21  DR. MCGWIN TOLD US, YOU WOULD AGREE WITH THAT, THAT THAT'S WHAT

22  THIS TABLE SAYS?

23  A.   YES, OF COURSE, IT'S A DESCRIPTION OF THE TABLE.

24  Q.   WELL, IF DOSE MAKES THE POISON AND YOU'RE DEAD WRONG AND

25  MICHAEL HAUPTMANN IS DEAD RIGHT, WHAT DOSE OF PEAK EXPOSURE DO WE

1  NEED TO MAKE HIM RIGHT?

2  A.   THE EXPOSURE OF GREATER THAN 4 PARTS PER MILLION.

3  Q.   OR 4,000 PARTS PER BILLION?

4  A.   4,000 PARTS PER BILLION, 4 PARTS PER MILLION, THAT'S THE

5  SAME THING.

6  Q.   SO WE UNDERSTAND, IF WE CAN TALK A LITTLE BIT MORE ABOUT

7  HAUPTMANN -- WHAT COHORT WAS HE STUDYING?

8  A.   THIS IS CALLED THE "NATIONAL CANCER INSTITUTE COHORT."  IT'S

9  A GROUP OF 26,000 PEOPLE, MAINLY MEN.  THEIR EXPOSURES GO BACK

10  INTO THE 1930S AND 1940S.  THEY HAVE BEEN FOLLOWED UP FOR

11  40 YEARS.  MORE THAN HALF OF THEM ARE NOW DEAD.  SO THIS IS A

12  VERY LONG-TERM STUDY OF A LARGE NUMBER OF VERY HEAVILY-EXPOSED

13  PEOPLE.

14         AND ACTUALLY, ALTHOUGH YOU SHOWED US PEAK EXPOSURE,

15  DR. HAUPTMANN LOOKED AT THE RELATIONSHIP BETWEEN FORMALDEHYDE AND

16  NASOPHARYNGEAL CANCER FIVE DIFFERENT WAYS, AND THIS IS ONE THAT

17  APPEARS TO SHOW A RELATIONSHIP, BUT ONLY AT THE EXTREME OF

18  EXPOSURE.  THE OTHERS, FOR THE MOST PART, DO NOT.

19  Q.   WELL, I CAN'T SAY WE'VE HEARD IT ALL WEEK, BUT WE'VE HEARD

20  IT SINCE YESTERDAY.  IS FORMALDEHYDE A BIOACCUMULANT?

21  A.   NO, IT DOES NOT ACCUMULATE IN HUMAN BEINGS.

22  Q.   SO WHEN WE TALK IN TERMS OF A DOSE OF FORMALDEHYDE, IS IT

23  CONCENTRATION DEPENDENT OR TOTAL LONG-TERM BUILDUP DEPENDENT?

24  A.   WELL, THERE ARE ELEMENTS OF BOTH, BUT IT IS PRIMARILY

25  SHORT-TERM.

1  Q.   SO WHAT WE'RE LOOKING FOR IS HOW MUCH YOU GET HIT WITH AT

2  ONE PARTICULAR TIME, NOT OVER THE COURSE OF A LIFETIME?

3  A.   THE FACT THAT IT DOES NOT BIOACCUMULATE DOES NOT MEAN THAT

4  THE DURATION OF EXPOSURE IS NOT IMPORTANT.  IN FACT, MOST CANCER

5  EPIDEMIOLOGISTS BELIEVE THAT THE DURATION OF EXPOSURE IS THE MOST

6  IMPORTANT MEASURE OF EXPOSURE IN THE OLDER, SUCH AS THESE,

7  EPIDEMIOLOGIC STUDIES BECAUSE THAT IS SOMETHING THAT IS USUALLY

8  PRETTY WELL KNOWN; WHEREAS, THE ACTUAL MAGNITUDE OF THE EXPOSURE,

9  WHETHER IT'S EXPRESSED AS PEAK OR AVERAGE, IS SOMETHING THAT IS

10  OFTEN ESTIMATED.  IN FACT, THERE ARE NO ACTUAL MEASUREMENTS EVER

11  MADE OF PEAK EXPOSURE IN THE NATIONAL CANCER INSTITUTE COHORT

12  STUDY.  HAUPTMANN SAYS THAT VERY CLEARLY IN HIS PAPER, NO PEAK

13  MEASUREMENT WAS EVER MADE.

14          SO THAT IS A SURMISE OF THAT DATA ON PEAK.  WHAT IS NOT

15  A SURMISE IS THE DATA ON DURATION.

16  Q.   THAT IS AN ESTIMATE OF PEAK EXPOSURE?

17  A.   YES.  ONLY AN ESTIMATE.

18  Q.   THAT'S WHAT ALL THOSE PAPERS DO?

19  A.   WELL, I DON'T KNOW THAT FOR A FACT.

20  Q.   LET'S GO BACK TO HAUPTMANN.  HOW MANY PLANTS WERE STUDIED IN

21  THAT POPULATION?

22  A.   TEN.

23  Q.   HOW MANY PLANTS SHOWED AN EXCESS OF NASOPHARYNGEAL CANCER?

24  A.   ONE.

25  Q.   WHICH PLANT WAS THAT?

1  A.    WALLINGFORD, CONNECTICUT, PLANT.

2  Q.    HOW MANY CANCERS WERE SEEN AT THE WALLINGFORD, CONNECTICUT,

3  PLANT?

4  A.    WELL, I'VE FORGOTTEN THE EXACT NUMBER, BUT I THINK IT WAS --

5  I THINK IT WAS SEVEN, I GUESS.  MAYBE IT WAS -- NO, THREE OR --

6  FOUR OR FIVE.  I DON'T REMEMBER EXACTLY.  FOUR OR FIVE, I THINK.

7  Q.    SO OUT OF THIS TOTAL POPULATION OF 26,000 PEOPLE, WE HAVE

8  EIGHT NASOPHARYNGEAL CANCER CASES, AND AT LEAST HALF OF THOSE ARE

9  AT ONE PLANT?

10 A.    YES.

11 Q.    SO THE OTHER NINE PLANTS WOULD BE CONSISTENT WITH WHAT YOU

12 WOULD EXPECT, OR WOULDN'T IT?

13 A.    WELL, CERTAINLY THE OTHERS ARE CONSISTENT WITH NO INCREASED

14 RISK AT ALL.  I BELIEVE THE WALLINGFORD PLANT IS ALSO CONSISTENT

15 WITH THAT DESPITE THE FACT THAT YOU HAVE THIS FINDING WITH REGARD

16 TO THE PEAK EXPOSURE.

17 Q.    WELL, IF WE WERE GOING TO TAKE OUT THIS ONE PLANT, WOULD

18 THERE BE AN EXCESS OF NASOPHARYNGEAL CANCER AT THE OTHER NINE?

19 A.    NO.

20 Q.    SO WE'VE GOT THREE COHORTS AND ONE PLANT, AND THREE COHORTS

21 THAT'S GIVING US THIS ASSOCIATION?

22 A.    YES.  YES.

23 Q.    WHY WOULD IARC HAVE BASED THEIR DECISION ON THIS TYPE OF

24 DATA?

25 A.    I'M NOT SURE WHETHER OR NOT THE IARC WORKSHOP WAS AWARE THAT

1   ALL OF THE POSITIVE FINDINGS WERE COMING FROM ONE PLANT, AND I'M

2   NOT SURE JUST EXACTLY WHAT THEY KNEW ABOUT THE CIRCUMSTANCES OF

3   THAT PLANT, AND THEY CERTAINLY WOULD NOT HAVE KNOWN INFORMATION

4   THAT HAS SUBSEQUENTLY COME TO LIGHT ABOUT THE HAUPTMANN STUDY.

5   Q.   THIS IS A DISCUSSION WE'VE HAD ALL WEEK.  FORMALDEHYDE IS

6   EVERYWHERE; ISN'T IT, DOCTOR?

7   A.   IT'S A UBIQUITOUS COMPOUND, YES.

8   Q.   HOW COMMON IS NASOPHARYNGEAL CANCER IN THE GENERAL

9   POPULATION?

10  A.   OF THE UNITED STATES?

11  Q.   YES.

12  A.   A LITTLE BIT LESS THAN ONE CASE PER THOUSAND PEOPLE PER

13  LIFETIME.

14  Q.   NOT PER YEAR, PER LIFETIME?

15  A.   PER LIFETIME.

16  Q.   IS THAT A RARE CANCER?

17  A.   IT'S AN EXTREMELY UNCOMMON CANCER.  IT'S ONE OF THE LEAST

18  COMMON CANCERS.

19  Q.   WELL, IF FORMALDEHYDE IS EVERYWHERE AND IT CAUSES

20  NASOPHARYNGEAL CANCER, WHERE IS THE EPIDEMIC OF NASOPHARYNGEAL

21  CANCER?

22  A.   I DON'T KNOW.

23  Q.   IT'S NOT IN THESE PAPERS --

24  A.   IT'S NOT IN THE UNITED STATES.

25  Q.   IT'S NOT IN THESE PAPERS, IS IT?

1    A.    NO.

2            MR. WEINSTOCK:  I'M GOING TO PASS THE WITNESS.  PLEASE

3    ANSWER MR. WATTS'S QUESTIONS.

4            THE COURT:  WELL, AGAIN, I DON'T WANT TO LEAVE OUT OUR

5    COUNSEL HERE.

6            MR. SHERBURNE:  I HAVE NO QUESTIONS FOR THIS WITNESS,

7    YOUR HONOR.

8            THE COURT:  AGAIN, I DON'T WANT TO ASSUME THAT, BUT JUST

9    CHECKING.

10              MR. WATTS.

11           MR. WATTS:  MAY I PROCEED, YOUR HONOR?

12           THE COURT:  YES, PLEASE.

13                       CROSS-EXAMINATION

14   BY MR. WATTS:

15   Q.    GOOD MORNING, DR. COLE.

16   A.    GOOD MORNING.

17   Q.    YOU AND I MET FOR THE FIRST TIME OUTSIDE; IS THAT RIGHT?

18   A.    YES.

19   Q.    I'VE GOT QUITE A FEW QUESTIONS FOR YOU THIS MORNING, BUT LET

20   ME JUST START OFF WITH A QUESTION THAT CAME UP WITH SEVERAL OF MY

21   WITNESSES.

22            YOU'RE BEING PAID HERE; IS THAT RIGHT?

23   A.    I EXPECT SO.

24   Q.    AND THE RATE THAT YOU CHARGE FOR YOUR PAYMENT -- I MEAN, FOR

25   YOUR WORK?

1    A.    $650 PER HOUR.

2    Q.    650 AN HOUR.  HOW MANY HOURS HAVE YOU PUT INTO YOUR WORK IN

3    THIS CASE?

4    A.    WELL, I'VE LOST TRACK OF THE TIME.  PROBABLY SOMETHING IN

5    THE VICINITY OF 30 OR 40 HOURS.

6    Q.    SO SOMEWHERE AROUND $30,000 WOULD BE FAIR?

7    A.    I GUESS THAT'S ABOUT RIGHT.

8    Q.    ALL RIGHT.  NOW, I WANT TO TALK A LITTLE BIT ABOUT YOUR

9    BACKGROUND.  YOU HAVE CONSULTED WITH CHEMICAL COMPANIES IN THE

10   PAST; IS THAT RIGHT?

11   A.    YES.  YES, I HAVE.

12   Q.    BACK SOME TIME AGO, YOU SAT ON ONE OF DOW CHEMICAL'S BOARDS

13   RELATING TO DIOXIN?

14   A.    I DON'T KNOW THAT THAT IS CORRECT, ACTUALLY.  I WAS ASKED TO

15   SERVE, I AGREED TO SERVE, BUT THE PROJECT THAT WAS IN QUESTION, I

16   THINK, WAS -- DID NOT GO FORWARD.

17   Q.    SO IN MARCH OF 2007, YOU WERE SITTING ON DOW CHEMICAL'S

18   BOARD MAKING 350 TO $450 AN HOUR CONSULTING WITH THEM ON DIOXINS;

19   IS THAT CORRECT?

20   A.    THAT'S NOT TO MY RECOLLECTION.

21         MR. WATTS:  MAY I APPROACH, YOUR HONOR?

22         THE COURT:  YES.

23                        EXAMINATION

24   BY MR. WATTS:

25   Q.    DO YOU RECALL TESTIFYING IN A TRIAL IN JONES COUNTY,

1  MISSISSIPPI, ENTITLED *EDITH LADNER VERSUS E.I. DUPONT DE NEMOURS*

2  *& COMPANY*?

3  A.   I DO RECALL THAT, YES.

4  Q.   PAGE 1251 OF YOUR TRANSCRIPT, DID YOU TELL THAT JURY THAT IN

5  MARCH OF 2007, YOU WERE SITTING ON DOW CHEMICAL'S BOARD MAKING

6  350 TO $450 AN HOUR CONSULTING WITH THEM ON DIOXINS?

7  A.   YES, YOU'RE RIGHT, I WAS.  I HAD FORGOTTEN EXACTLY WHAT THAT

8  ARRANGEMENT WAS.

9  Q.   IT'S NOT A MEMORY TEST.  TRUST ME.

10 A.   WELL, SOMETIMES YOU SIT ON A BOARD; SOMETIMES YOU REVIEW

11 PAPERS.  I --

12 Q.   I'M NOT GOING TO ASK YOU A QUESTION I DON'T KNOW THE ANSWER

13 TO --

14         THE COURT:  ONE AT A TIME.  GO AHEAD, FINISH, DOCTOR.

15         THE WITNESS:  I'M THROUGH.

16                         EXAMINATION

17 BY MR. WATTS:

18 Q.   AND MY STATEMENT IS, IT'S NOT A MEMORY TEST.  I'VE GOT ONE

19 OF THOSE FOR EVERY QUESTION THAT I ASK YOU, SO IF WE NEED TO DO

20 THAT, THAT'S FINE.  OKAY?

21        IN ADDITION TO SITTING ON A BOARD DEALING WITH DIOXIN,

22 YOU HAVE TESTIFIED IN LITIGATION A NUMBER OF TIMES; IS THAT

23 RIGHT?

24 A.   YES.

25 Q.   AND THE WAY THE FEDERAL RULES WORK IS WHEN YOU SHOW UP FOR A

1   DEPOSITION, YOU'RE SUPPOSED TO HAVE WHAT'S CALLED "A RULE 26 LIST

2   OF TESTIMONY," IT'S OVER THE LAST FOUR YEARS; IS THAT RIGHT?

3   A.   THAT'S MY UNDERSTANDING, YES.

4   Q.   AND YOU PROVIDED SUCH A LIST TO US AT YOUR DEPOSITION?

5   A.   I DID, YES.

6   Q.   AND WE'VE MARKED THAT AS EXHIBIT 353.1.

7        YOU HAVE TESTIFIED FOR CSXT ON ISSUES OF DIESEL EXHAUST

8   AND BLADDER CANCER; IS THAT CORRECT?

9   A.   YES.

10   Q.   *WORKMAN VERSUS POMA DISTRIBUTING COMPANY*, EXHAUST, FUELS AND

11   MDS?

12   A.   YES.

13        MR. WEINSTOCK:  YOUR HONOR, I JUST OBJECT TO THE

14   RELEVANCE OF ALL OF THIS.  HE WAS NOT A PARTY TO ANY OF THIS

15   LITIGATION AND I DON'T THINK ANY OF IT INVOLVED FORMALDEHYDE.

16        MR. WATTS:  WELL, ACTUALLY, HE'S INCORRECT ABOUT THAT.

17        THE COURT:  I THINK THIS IS A PRETTY STANDARD SET OF

18   QUESTIONS FOR AN EXPERT, SO I'LL OVERRULE IT.  LET'S NOT SPEND

19   TOO MUCH TIME ON IT BECAUSE WE WANT TO GET TO HIS OPINION IN THIS

20   CASE.

21                          EXAMINATION

22   BY MR. WATTS:

23   Q.   ALL OF THESE DIFFERENT KINDS OF CANCERS, BOTTOM LINE IS

24   WE'VE COLLECTED ALL THESE DEPOSITIONS, YOU'VE TESTIFIED, AS YOU

25   DID HERE, THAT THE SUBSTANCE INVOLVED IN THAT LITIGATION, THE

1  EPIDEMIOLOGICAL LITERATURE DOES NOT ALLOW ONE TO ATTRIBUTE

2  CAUSATION IN THAT SUBSTANCE; RIGHT?

3  A.   THAT IS CORRECT.

4  Q.   NOW, I NOTICED THAT ON EXHIBIT 12 -- I MEAN, ON NUMBER 12

5  YOU TESTIFIED IN *REGULO RIOS VERSUS ABCO INDUSTRIES*, FORMALDEHYDE

6  AND CANCER OF THE LARYNX; IS THAT RIGHT?

7  A.   YES.

8  Q.   WE'LL GET BACK TO THAT.  ABCO INDUSTRIES IS HOECHST

9  CELANESE; IS THAT CORRECT?

10  A.   I DON'T KNOW THAT.

11  Q.   NOW, SOME OF THE TESTIMONIES THAT YOU TALKED ABOUT WAS MOUTH

12  CANCER IN SMOKELESS TOBACCO; IS THAT RIGHT?

13  A.   I TESTIFIED TO MY RECOLLECTION IN ONE CASE REGARDING

14  SMOKELESS TOBACCO AND CANCER OF THE MOUTH, YES.

15  Q.   AND IT WAS YOUR CONCLUSION THAT THE EPIDEMIOLOGICAL

16  LITERATURE DOES NOT ALLOW ONE TO REACH THE CONCLUSION THAT

17  SMOKELESS TOBACCO CAUSES MOUTH CANCER; IS THAT RIGHT?

18  A.   YES.

19       MR. WATTS:  MAY I APPROACH?

20       THE COURT:  YES.

21                              EXAMINATION

22  BY MR. WATTS:

23  Q.   ON THE CAN OF SKOAL THAT WE PICKED UP THIS MORNING, DOES IT

24  SAY, "WARNING:  THIS PRODUCT MAY CAUSE MOUTH CANCER"?

25  A.   YES, IT DOES.

1   Q.   ON THE CAN OF REDMAN -- OR THE BAG OF REDMAN WE PICKED UP

2   THIS MORNING, DOES IT SAY, "WARNING:   THIS PRODUCT MAY CAUSE

3   MOUTH CANCER"?

4   A.   MAY IS CORRECT.

5   Q.   BUT YOU WENT INTO LITIGATION AND SAID THAT EPIDEMIOLOGY DOES

6   NOT ALLOW ONE TO SAY THAT; RIGHT?

7   A.   NO.  ACTUALLY, WHAT I SAID WAS THAT THAT RELATIONSHIP HAD

8   BEEN WELL ESTABLISHED IN THE PAST, BUT MODERN PRODUCTS, INCLUDING

9   THE ONES THAT THE PLAINTIFF IN THAT CASE HAD USED, HAD BEEN SHOWN

10  NOT TO CONVEY ANY INCREASED RISK OF ORAL CANCER.

11  Q.   WOULD YOU AGREE WITH ME THAT A PRODUCT THAT I PICKED UP THIS

12  MORNING AT THE STORE IS LIKELY A MODERN PRODUCT?

13  A.   NO.  THOSE TWO PRODUCTS ARE NOT WHAT I CONSIDER TO BE MODERN

14  PRODUCTS.  THEY ARE OLD-STYLE PRODUCTS.

15  Q.   I GOT YOU.  SO DOES SKOAL CAUSE MOUTH CANCER?

16  A.   THAT FORM OF IT MAY, BUT THE GENTLEMAN IN THE CASE IN

17  QUESTION USED A DIFFERENT PRODUCT.

18  Q.   DOES REDMAN CHEWING TOBACCO CAUSE MOUTH CANCER?

19  A.   IT MAY VERY WELL.  I DON'T KNOW.

20  Q.   LET'S MOVE ON.

21        IN ADDITION TO THE TESTIMONY LISTS THAT WE'VE TALKED

22  ABOUT, YOU HAVE PROVIDED A CURRICULUM VITAE THAT I HAVE MARKED AS

23  EXHIBIT 353.

24        MR. WATTS:  HAS THAT BEEN OFFERED?

25        MR. WEINSTOCK.  NO.

1          MR. WATTS:  WE OFFER 353 TOGETHER WITH ANDY, THEN.

2          THE COURT:  SO ORDERED.

3              (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

4    EXHIBIT NO. 353 WAS ADMITTED INTO EVIDENCE.)

5                              EXAMINATION

6    BY MR. WATTS:

7    Q.   NOW, I NOTICED --

8    A.   EXCUSE ME, SIR.  MAY I ASK IF WE COULD JUST LOOK AT THE

9    BOTTOM LEFT CORNER SO WE COULD SEE THE DATE OF THIS?  IT MIGHT

10   HELP ME.

11   Q.   YES, SIR.  I'M SORRY.  THIS ONE IS PREPARED JULY 2ND OF

12   2007.  I'M SURE IT'S BEEN UPDATED SINCE THEN; IS THAT FAIR?

13   A.   IT HAS.

14   Q.   NOW, IN YOUR CURRICULUM VITAE, YOU HAVE A LIST OF YOUR

15   DIFFERENT PUBLICATIONS; IS THAT RIGHT?

16   A.   YES.

17   Q.   AND I THINK YOU TOLD THIS JURY THAT YOU HAVE PUBLISHED OVER

18   200 ARTICLES?

19   A.   YES.

20   Q.   AND IN FAIRNESS, YOUR CURRICULUM VITAE IN 2007 HAS 201, SO

21   WE KNOW THAT'S TRUE; RIGHT?

22   A.   YES.  I THINK THERE IS A FEW MORE NOW.

23   Q.   WITH RESPECT TO THE CURRICULUM VITAE THAT WE WERE PROVIDED

24   THAT HAS BEEN MARKED AS EXHIBIT 353, OF THE 201 ARTICLES THAT ARE

25   LISTED, 200 OF THEM HAVE NOTHING TO DO WITH FORMALDEHYDE AND

1   DON'T MENTION IT, RIGHT?

2   A.    THAT MAY BE CORRECT.

3   Q.    WITH RESPECT TO THE PUBLICATIONS THAT ARE LISTED, THE 201,

4   200 OF THEM HAVE NOTHING TO DO WITH FORMALDEHYDE AND LEUKEMIA,

5   RIGHT?

6   A.    THAT'S PROBABLY CORRECT, YES.

7   Q.    THE ONLY EPIDEMIOLOGY ARTICLE THAT YOU HAD WRITTEN RELATED

8   TO FORMALDEHYDE IS NUMBER 190, COLE, P. AND AXTEN, C.,

9   "FORMALDEHYDE AND LEUKEMIA, AN IMPROBABLE CAUSAL RELATIONSHIP,"

10  PUBLISHED IN *REGULATORY TOXICOLOGY AND PHARMACOLOGY*, 40: 107-112,

11  IN 2004; IS THAT RIGHT?

12  A.    YES, IT IS.

13  Q.    ALL RIGHT.  YOU HAVE NEVER WRITTEN AN ARTICLE THAT RELATES

14  TO THE RELATIONSHIP BETWEEN FORMALDEHYDE AND NASOPHARYNGEAL

15  CANCER, CORRECT?

16  A.    THAT'S CORRECT.

17  Q.    BY THE WAY, THE ARTICLE THAT HAS BEEN REFERENCED ON 190, I

18  HAVE IT UP ON THE SCREEN; IS THAT RIGHT?

19  A.    YES, YOU DO.

20  Q.    AND WE'LL TALK ABOUT IT IN MORE DETAIL, BUT JUST SO THAT

21  WE'RE CLEAR, THIS WORK WAS SUPPORTED BY THE FORMALDEHYDE COUNCIL;

22  IS THAT RIGHT?

23  A.    YES.

24  Q.    AND YOU HAVE TESTIFIED IN PAST DEPOSITIONS THAT THIS WORK

25  WAS ENTIRELY FUNDED BY THE FORMALDEHYDE COUNCIL; TRUE?

1  A.    YES.

2  Q.    WHAT IS THE NATIONAL CANCER INSTITUTE?

3  A.    THE NATIONAL CANCER INSTITUTE IS ONE OF THE SEVERAL

4  INSTITUTES OF HEALTH THAT MAKE UP OUR NATIONAL INSTITUTES OF

5  HEALTH.  IT IS ESSENTIALLY A RESEARCH ORGANIZATION.

6              MR. WATTS:  MAY I APPROACH?

7              THE COURT:  YES, SIR.

8                                EXAMINATION

9  BY MR. WATTS:

10  Q.    I WANT TO HAND YOU WHAT I'VE MARKED AS EXHIBIT 272.1.  THE

11  WAY THAT THE INSTITUTE OF HEALTH WORKS AND THE NATIONAL CANCER

12  INSTITUTE IS THEY HAVE A WEB SITE THAT SOMEBODY CAN GO ON THIS

13  MORNING AND FIGURE OUT WHAT IT IS THAT THEY HAVE TO SAY ABOUT

14  FORMALDEHYDE, TRUE?

15  A.    YES.

16  Q.    THE NATIONAL CANCER INSTITUTE, IN TERMS OF REGULATORY BODIES

17  OR RESEARCH BODIES OR SCIENTIFIC BODIES SPONSORED BY THE

18  GOVERNMENT, THAT'S ABOUT AS GOOD AS IT GETS ON THE SUBJECT OF

19  CANCER, CORRECT?

20  A.    WELL, I'M NOT SURE EXACTLY WHAT YOU MEAN BY THAT.

21  Q.    WELL, I TELL YOU WHAT, IS THE NATIONAL CANCER INSTITUTE A

22  BUNCH OF GUYS STUCK OUT IN LEFT FIELD, OR DO THEY KNOW WHAT THEY

23  ARE TALKING ABOUT?

24  A.    I THINK FOR THE MOST PART THEY KNOW WHAT THEY ARE TALKING

25  ABOUT.

1   Q.   ALL RIGHT.  IF YOU COULD TURN TO PAGE 2, I HAVE GOT SOME

2   QUESTIONS THAT I WANT TO ASK YOU.

3          MR. WEINSTOCK:  YOUR HONOR, I WOULD OBJECT.  I NEVER SAW

4   THIS BEFORE IT WAS JUST HANDED TO ME.

5          MR. WATTS:  I'M NOT PUTTING IT UP.  I'VE GOT SOME

6   QUESTIONS I WANT TO ASK HIM ABOUT IT.

7          THE COURT:  IF HE'S FAMILIAR WITH IT --

8          MR. WATTS:  SURE.

9          THE COURT:  -- THEN I THINK IT'S FAIR GAME FOR HIM TO BE

10  QUESTIONED ON IT.

11                          EXAMINATION

12  BY MR. WATTS:

13  Q.   AND LET ME TELL YOU WHERE I'M GOING WITH THIS, DOCTOR, AS

14  YOU READ THAT PARAGRAPH ON THE TOP.  I WANT TO TALK TO YOU ABOUT

15  THE SEQUENCING OF DIFFERENT EVENTS WITH RESPECT TO FORMALDEHYDE.

16  OKAY?  ARE YOU READY?

17  A.   SURE.

18  Q.   NOW, HERE IS MY QUESTION.  IN 1980, WERE LABORATORY STUDIES

19  DONE SHOWING THAT FORMALDEHYDE CAUSED NASAL CANCER IN RATS?

20  A.   YES.

21          MR. WATTS:  MAY I APPROACH, YOUR HONOR?

22          THE COURT:  YES.

23          MR. WATTS, WHILE YOU'RE DOING THAT, I THINK I

24  SHOULD POINT OUT TO THE JURY THAT WHEN YOU REFERENCE SOMETHING

25  THAT IS ON-LINE, AS WE INSTRUCTED YOU AT THE OUTSET OF THE TRIAL,

1  THE CASE WILL BE DECIDED ON THE EVIDENCE THAT IS PRESENTED IN

2  THIS COURTROOM.  SO, PURSUANT TO THE COURT'S INSTRUCTIONS, YOU

3  ARE NOT TO, AND YOU SHOULD NOT HAVE DONE ANY OUTSIDE RESEARCH ON

4  ANY ISSUE IN THIS CASE BECAUSE THAT'S WHY WE HAVE WITNESSES HERE,

5  TO INFORM YOU OF ALL THAT YOU NEED TO KNOW SUBJECT TO EXAMINATION

6  AND CROSS-EXAMINATION ON EVERYTHING THAT IS GOING TO BE RELEVANT

7  TO YOUR DELIBERATIONS.

8            SO WHEN MR. WATTS REFERENCED SOMETHING THAT MIGHT

9  APPEAR ON-LINE, THAT'S NOT AN INVITATION OR A SUGGESTION TO YOU

10 TO EITHER GO DOUBLE CHECK THAT OR LOOK AT ANYTHING ELSE ON-LINE.

11 THE CASE WILL BE DECIDED ONLY ON WHAT IS PRESENTED IN THE

12 COURTROOM.  SO PLEASE REFRAIN FROM DOING THAT.  THE IDEA POPPED

13 IN MY MIND WHEN HE MENTIONED IT, AND I JUST WANT TO BE CLEAR ON

14 THAT.

15            ALL RIGHT.  MR. WATTS.

16       MR. WATTS:  THANK YOU.

17                      EXAMIMATION

18 BY MR. WATTS:

19 Q.   AND TO BE FAIR, I'M NOT ASKING WHETHER THIS IS ON-LINE.  I'M

20 ASKING YOU WHETHER, AS A MATTER OF FACT, YOU KNOW THAT WHAT THE

21 NATIONAL CANCER INSTITUTE SAYS HERE, YOU KNOW ABOUT THE AVAILABLE

22 STUDIES, RIGHT, IN RATS?

23 A.   I'M AWARE OF THEIR EXISTENCE.  I WOULD NOT REPRESENT MYSELF

24 AS EXPERT ON THEM, NO.

25 Q.   NOW, IN TERMS OF CHRONOLOGY, IN 1987, THE UNITED STATES

1  ENVIRONMENTAL PROTECTION AGENCY CLASSIFIED FORMALDEHYDE AS A

2  PROBABLE HUMAN CARCINOGEN UNDER CONDITIONS OF UNUSUALLY HIGH OR

3  PROLONGED EXPOSURE, TRUE?

4  A.   I DON'T KNOW THAT TO BE TRUE.  I DON'T FOLLOW THE

5  CLASSIFICATIONS MADE BY REGULATORY AGENCIES, ONLY BY SCIENTIFIC

6  BODIES.

7  Q.   OKAY.  SO IN TERMS OF WHAT THE EPA SAID ABOUT PROBABLE

8  CARCINOGEN, YOU WERE NOT AWARE OF THAT WHEN IT HAPPENED IN 1987?

9  A.   I MAY OR MAY NOT HAVE BEEN AWARE OF IT, BUT I DON'T WANT TO

10  REPRESENT THAT I AM FAMILIAR WITH IT OR THE BASIS FOR IT.

11  Q.   DO YOU DENY IT?

12  A.   NO.

13  Q.   FAIR ENOUGH.

14       NOW, IN ADDITION TO THE UNITED STATES ENVIRONMENTAL

15  PROTECTION AGENCY, I WANT TO SHOW YOU SOMETHING THAT'S ALREADY IN

16  EVIDENCE, EXHIBIT 453.  THIS IS ENTITLED, "FORMALDEHYDE CHEMICAL

17  BACKGROUNDER."  LET ME JUST ASK YOU, ARE YOU FAMILIAR WITH THESE

18  ANNUAL REPORTS ON CARCINOGENS PUBLISHED BY THE NATIONAL

19  TOXICOLOGY PROGRAM OF THE UNITED STATES DEPARTMENT OF HEALTH AND

20  HUMAN SERVICES?

21  A.   MR. WATTS, I MISSED SOMETHING.  YOU DID YOU SAY SOMETHING

22  ABOUT ANNUAL, ANNUAL REPORTS OR CLASSIFICATIONS?

23  Q.   SURE.  YOU SEE WHERE IT SAYS SIXTH ANNUAL REPORT?

24  A.   I DON'T ACTUALLY SEE THAT, NO.

25  Q.   LET ME POINT IT TO YOU.  YOU SEE THE WORD "ANNUAL" RIGHT AT

1  THE TIP OF MY --

2  A.   OKAY.  YEAH.

3  Q.   YEAH.

4  A.   THESE REPORTS, HOWEVER, ARE NOT ACTUALLY PUBLISHED ANNUALLY.

5  Q.   FAIR ENOUGH.

6  A.   THE LAST ONE HASN'T BEEN PUBLISHED SINCE 2004, FOR EXAMPLE.

7  Q.   I THINK THAT'S FAIR.  AND I WILL GIVE YOU, I MADE AN

8  ASSUMPTION THAT WHEN IT SAID "SIXTH ANNUAL REPORT" THAT IT WAS

9  ANNUAL.

10  A.   WELL, I JUST DIDN'T FOLLOW WHAT YOU WERE -- I DIDN'T REALIZE

11  YOU WERE REFERRING TO THE ACTUAL TITLE OF THE DOCUMENT.

12  Q.   FAIR ENOUGH.  AND HERE IS MY QUESTION:  IN 1991, DID THE

13  NATIONAL TOXICOLOGY PROGRAM OF THE UNITED STATES DEPARTMENT OF

14  HEALTH AND HUMAN SERVICES ISSUE A REPORT STATING THAT

15  FORMALDEHYDE GAS IS CLASSIFIED AS A SUBSTANCE WHICH MAY

16  REASONABLY BE ANTICIPATED TO BE A CARCINOGEN?

17  A.   THEY HAVE SO CLASSIFIED IT FOR SURE.  I DON'T KNOW EXACTLY

18  IN WHICH YEAR THEY DID THAT.

19  Q.   DO YOU DENY THAT IT HAPPENED IN 1991?

20  A.   NO, I DON'T KNOW IN WHAT YEAR IT WAS DONE.

21  Q.   NOW, AS WE GO BACK TO THE NATIONAL CANCER INSTITUTE, IS IT

22  TRUE THAT IN 1995, THE INTERNATIONAL AGENCY FOR RESEARCH ON

23  CANCER, OR IARC, CONCLUDED AT THAT TIME THAT FORMALDEHYDE IS A

24  PROBABLE HUMAN CARCINOGEN?

25  A.   YES.

1    Q.   AND IN 2006 -- OR IN 2004, EXCUSE ME, DID IARC UPGRADE ITS

2    CLASSIFICATION OF FORMALDEHYDE TO A KNOWN HUMAN CARCINOGEN?

3    A.   YES.

4    Q.   DOCTOR, AS WE LOOK AT WHAT I'VE JUST WRITTEN ON THE BOARD,

5    DO YOU DENY THAT ANY OF THE EVENTS WRITTEN ON THE BOARD ARE --

6    THAT THEY HAPPENED ON THOSE DATES?

7    A.   NO.

8    Q.   OKAY.  IN FAIRNESS TO YOU, YOU WERE STUDYING OTHER THINGS;

9    AND, WHAT YOU'RE SAYING IS I CAN'T CONFIRM THE EXACT DATE AT THIS

10   TIME, FAIR?

11   A.   WELL, I CAN CONFIRM THE 2004 DATE AND THE 1980 STATEMENT.

12   AND THOSE ARE THE ONLY ONES IN WHICH I'M SURE OF THE ACTUAL

13   DATES.

14   Q.   LET ME JUST ASK YOU A FEW OTHERS.  IF DR. KORNBERG TESTIFIED

15   THAT THE EPA HAS CATEGORIZED IT AS A PROBABLE HUMAN CARCINOGEN,

16   DO YOU DENY THAT?

17   A.   NO.

18   Q.   THAT THE WORLD HEALTH ORGANIZATION CALLS IT A KNOWN HUMAN

19   CARCINOGEN, DO YOU DENY THAT?

20   A.   THAT'S THE SAME AS SAYING IARC.

21   Q.   SURE.  THAT NIOSH CLASSIFIES IT AS A POTENTIAL OCCUPATIONAL

22   CARCINOGEN, DO YOU DENY THAT?

23   A.   I KNOW THAT TO BE A FACT.

24   Q.   THAT THE NATIONAL --

25   A.   BUT IT IS POTENTIAL.

1   Q.   SURE.   THAT THE NATIONAL TOXICOLOGY PROGRAM OF THE

2   UNITED STATES CLASSIFIES FORMALDEHYDE AS A KNOWN HUMAN

3   CARCINOGEN?

4   A.   THAT IS INCORRECT.

5   Q.   KNOWN TO BE A HUMAN CARCINOGEN, THEY HAVE NOT QUALIFIED IT

6   LIKE THAT?

7   A.   I SAID THAT IS INCORRECT.   THE NATIONAL TOXICOLOGY PROGRAM,

8   I THINK AS YOU HAVE IT HERE, CLASSIFIED IT ON THEIR SO-CALLED

9   "B LIST," WHICH IS REASONABLY ANTICIPATED TO BE.   THEY HAVE NOT

10  UPGRADED IT TO THEIR A LIST, WHICH IS KNOWN.

11          AND REASONABLY ANTICIPATED TO BE PRIMARILY MEANS THAT

12  IT IS A RECOGNIZED ANIMAL CARCINOGEN.   MANY OF THE AGENTS ON THE

13  B LIST, IN FACT, MOST OF THEM, NEVER GET UPGRADED TO THE A LIST.

14  Q.   DOES OSHA REGULATE THE WORKPLACE SAFETY OF ANIMALS?

15  A.   THE WORKPLACE SAFETY OF ANIMALS?

16  Q.   YES, SIR.

17  A.   WELL, I DON'T THINK SO.   I DON'T ACTUALLY KNOW, BUT I WOULD

18  BE SURPRISED TO LEARN THAT.

19  Q.   HAS OSHA CATEGORIZED FORMALDEHYDE AS A CARCINOGEN DEFINED

20  WITH NO FURTHER CATEGORIZATION?

21  A.   I DON'T KNOW.

22  Q.   HAS THE AMERICAN CONFERENCE FOR GOVERNMENTAL INDUSTRIAL

23  HYGIENISTS CLASSIFIED FORMALDEHYDE AS A SUSPECTED HUMAN

24  CARCINOGEN?

25  A.   AGAIN, I DON'T KNOW.

1   Q.   ALL RIGHT.

2   A.   I FOLLOW IARC AND THE NTP.

3   Q.   NOW, THE SUBJECT OF THE FORMALDEHYDE COUNCIL CAME UP AS THE

4   ONES THAT FUNDED YOUR 2004 STUDY.  DO YOU REMEMBER THAT?

5   A.   YES.

6   Q.   THE FORMALDEHYDE COUNCIL IS A GROUP OF MANUFACTURERS OF

7   CHEMICALS, TIMBER PRODUCTS, CABINETRY, FOREST AND PAPER, THIS

8   KIND OF THING?

9   A.   I DON'T KNOW WHAT THEIR MEMBER COMPANIES MAKE.  I KNOW THAT

10  THEIR DESCRIPTION IS THAT THEIR MEMBERSHIP IS MADE UP OF

11  COMPANIES THAT MAKE AND USE FORMALDEHYDE.

12  Q.   WHAT IS TODAY'S DATE, SIR?

13  A.   I THINK IT'S THE 23RD OF SEPTEMBER.

14          MR. WATTS:  MAY I APPROACH, YOUR HONOR?

15          THE COURT:  YES.

16                          EXAMINATION

17  BY MR. WATTS:

18  Q.   DOES THE FORMALDEHYDE COUNCIL HAVE A WEB SITE --

19  A.   YES, THEY HAVE A WEB SITE.

20  Q.   -- THAT ONE CAN PULL OFF THE MEMBERSHIP LIST ON THIS MORNING

21  AT 7:17 IN THE MORNING?

22  A.   I SUPPOSE YOU COULD HAVE, YES.

23  Q.   IS GEORGIA-PACIFIC, LLC, A MEMBER OF THE FORMALDEHYDE

24  COUNCIL?

25  A.   WELL, IT'S NOT ON THIS LIST.

1  Q.   THERE IT IS, RIGHT THERE.

2  A.   OH, YES, THANK YOU.  YES.  YES, IT IS.

3  Q.   CELANESE CORPORATION A MEMBER OF THE FORMALDEHYDE COUNCIL?

4  A.   YES.

5  Q.   NOW, I WANT TO POINT OUT SOMETHING THAT NEEDS TO BE SAID IN

6  FAIRNESS.  GULF STREAM IS NOT LISTED AS A MEMBER OF THE

7  FORMALDEHYDE COUNCIL; IS THAT FAIR?

8  A.   CORRECT.

9       MR. WEINSTOCK:  COULD I POSSIBLY SEE THE LIST WE'RE ALL

10 LOOKING AT?

11      MR. WATTS:  I'M SORRY, MY BAD.

12      THE COURT:  COULD YOU GIVE HIM A COPY?

13      MR. WATTS:  I'M SORRY.

14      MR. WEINSTOCK:  SAY THAT OTHER ONE, AGAIN.

15      THE COURT:  WELL, ASK HIM, AGAIN, BECAUSE I SAW HIM

16 STAND UP, AND I --

17                          EXAMINATION

18 BY MR. WATTS:

19 Q.   OKAY.  LET ME -- GULF STREAM IS NOT LISTED -- THIS IS

20 SOMETHING THAT WE'VE TALKED TO THE COURT ABOUT GETTING OUT INTO

21 EVIDENCE -- THEY ARE NOT LISTED AS A MEMBER OF THE FORMALDEHYDE

22 COUNCIL, IN FAIRNESS, RIGHT?

23 A.   THAT IS CORRECT.

24 Q.   BUT ORGANIZATIONS SUCH AS THE AMERICAN FOREST AND PAPER

25 ASSOCIATION ARE MEMBERS; IS THAT RIGHT?

1  A.    WELL, THE AMERICAN FOREST AND PAPER ASSOCIATION IS, YES.

2  Q.    KITCHEN CABINET MANUFACTURERS ASSOCIATION?

3  A.    YES.

4  Q.    SO MY PREVIOUS QUESTION ABOUT THE FORMALDEHYDE COUNCIL IS

5  MADE UP OF MANUFACTURERS OF CHEMICALS, INCLUDING FORMALDEHYDE,

6  THAT'S TRUE, RIGHT?

7  A.    I DON'T KNOW THAT THEY ALL MANUFACTURE IT.  MANY OF THEM, I

8  THINK, ARE JUST USERS.

9  Q.    SURE.  AND THEN IT'S MADE UP OF PEOPLE THAT UTILIZE WOOD

10  PRODUCTS, RIGHT?

11  A.    YES.

12  Q.    NOW, LET'S MOVE ON.  AT THE TIME THAT YOU WROTE THIS PAPER

13  WITH MR. AXTEN, DR. AXTEN, YOU WERE RECEIVING FUNDING FROM THE

14  FORMALDEHYDE INSTITUTE; IS THAT RIGHT?

15  A.    WELL, I WAS PAID FOR THAT PARTICULAR PIECE OF WORK, YES.

16  Q.    YOU HAVE RECEIVED FUNDING FROM THE CHEMICAL MANUFACTURERS

17  ASSOCIATION?

18  A.    I HAVE IN THE PAST, YES.

19  Q.    YOU HAVE RECEIVED FUNDING FROM THE AMERICAN PETROLEUM

20  INSTITUTE; IS THAT RIGHT?

21  A.    YES.

22  Q.    BEFORE THE FORMALDEHYDE COUNCIL CONTACTED YOU, HAD YOU EVER

23  TESTIFIED BEFORE ANY REGULATORY AGENCY WITH RESPECT TO

24  FORMALDEHYDE?

25  A.    I MAY HAVE.  I DON'T HAVE ANY SPECIFIC MEMORY OF DOING THAT,

1   BUT IT'S POSSIBLE.  I'VE TESTIFIED IN A LOT OF REGULATORY

2   HEARINGS.

3   Q.   SURE.  BUT WHEN ASKED ABOUT IT IN YOUR DEPOSITION, YOU SAID

4   YOU CAN'T RECALL WHETHER YOU HAD EVER TESTIFIED BEFORE ANY AGENCY

5   ON FORMALDEHYDE BEFORE THE FORMALDEHYDE COUNCIL CONTACTED YOU,

6   FAIR?

7   A.   THAT IS CORRECT.

8   Q.   YEAH.  NOW, DR. AXTEN IS THE ONE THAT CONTACTED YOU; IS THAT

9   RIGHT?

10   A.   YES.

11   Q.   DR. AXTEN WAS ALREADY BEING FUNDED BY THE FORMALDEHYDE

12   COUNCIL WHEN HE CONTACTED YOU, RIGHT?

13   A.   I DON'T KNOW THAT.

14   Q.   AND HAD YOU EVER WORKED WITH DR. AXTEN ON A PAPER BEFORE?

15   A.   NO.

16   Q.   HAD YOU EVER DONE ANY EPIDEMIOLOGICAL STUDIES WITH DR. AXTEN

17   BEFORE THE FORMALDEHYDE COUNCIL BEGAN FUNDING YOUR WORK ON THIS

18   ISSUE?

19   A.   NO.

20   Q.   NOW, THE WORK THAT IS RELATED TO FORMALDEHYDE THAT YOU HAVE

21   BEEN INVOLVED IN THAT'S PUBLISHED IS "FORMALDEHYDE AND LEUKEMIA,"

22   AND YOU CALL IT "AN IMPROBABLE CAUSAL RELATIONSHIP," TRUE?

23   A.   YES.

24   Q.   NOW, I WANT TO ASK YOU JUST ABOUT A COUPLE OF THINGS THAT

25   YOU WROTE IN THAT PAPER.  IN THE BACKGROUND YOU SAY,

1   "FORMALDEHYDE HAS BEEN SUSPECT AS A CAUSE OF CANCER IN HUMAN

2   BEINGS FOR NEARLY 25 YEARS"; RIGHT?

3   A.   YES.

4   Q.   AND HERE IS WHAT I WANT TO ASK YOU ABOUT.  "BY 2002, AT

5   LEAST 60 EPIDEMIOLOGIC REPORTS OF FORMALDEHYDE AND CANCER HAD

6   APPEARED, YET, FORMALDEHYDE IS NOT CURRENTLY KNOWN AS A 'KNOWN'

7   HUMAN CARCINOGEN BY THE NATIONAL TOXICOLOGY PROGRAM OF THE

8   UNITED STATES OR BY THE INTERNATIONAL AGENCY FOR RESEARCH ON

9   CANCER," IARC 1995.

10  A.   YEAH.

11  Q.   AND YOU DROP FOOTNOTE ONE, RIGHT?

12  A.   YES.

13  Q.   NOW, THIS PAPER WAS PUBLISHED IN 2004 --

14  A.   YES.

15  Q.   -- IS THAT RIGHT?

16  A.   YES.

17  Q.   AND AFTER YOU FINISHED WRITING IT, THE PAPER GOES TO

18  DIFFERENT REVIEWERS FOR WHAT'S CALLED "PEER REVIEW"; IS THAT

19  RIGHT?

20  A.   THAT IS CORRECT.

21  Q.   AND THAT TAKES A CERTAIN AMOUNT OF TIME BEFORE IT WILL

22  APPEAR IN A PUBLICATION, CORRECT?

23  A.   YES.  YES.

24  Q.   THE ORIGINAL DRAFT OF YOUR PAPER CONTAINED THE STATEMENT

25  THAT, "FORMALDEHYDE IS NOT CURRENTLY CLASSIFIED AS A KNOWN HUMAN

1    CARCINOGEN BY IARC," RIGHT?

2    A.    THAT'S CORRECT.

3    Q.    BUT BY THE TIME IT GOT PUBLISHED, YOU ALL HAD TO DROP

4    FOOTNOTE ONE WHERE IT SAID, "IN JUNE OF THIS YEAR, IARC DID

5    CLASSIFY FORMALDEHYDE AS A 'KNOWN' HUMAN CARCINOGEN BASED ON

6    SUFFICIENT EVIDENCE OF NASOPHARYNGEAL CANCER IN HUMANS."  DID I

7    READ THAT CORRECTLY?

8    A.    YES.

9    Q.    NOW, THE SPONSOR OF THIS WORK WAS THE FORMALDEHYDE COUNCIL,

10   RIGHT?

11   A.    YES.

12   Q.    SPONSORS ARE ALWAYS GIVEN AN OPPORTUNITY TO REVIEW A PAPER?

13   A.    YES.  I DON'T KNOW ABOUT ALWAYS, BUT USUALLY.  AND IN THIS

14   CASE, THEY WERE.

15            MR. WATTS:  MAY I APPROACH?

16            THE COURT:  YES.

17                              EXAMINATION

18   BY MR. WATTS:

19   Q.    DID YOU GIVE TESTIMONY BEFORE A JURY IN THE *LADNER VERSUS*

20   *I.E. DUPONT* CASE ON JUNE THE 1ST OF 2007 IN JONES COUNTY,

21   MISSISSIPPI?

22   A.    YES.

23   Q.    ON PAGE 1258 DID YOU SAY, "SPONSORS ARE ALWAYS GIVEN AN

24   OPPORTUNITY TO REVIEW A PAPER"?

25   A.    THAT WAS IN THE CONTEXT OF WORK THAT WAS DONE BY ME, BY MY

1    WORK.  I INSIST UPON IT, BUT IT IS NOT ALWAYS DONE.

2         MR. WEINSTOCK:  BEFORE THE NEXT QUESTION, YOUR HONOR,

3    IT'S THE SECOND TIME HE'S STEPPED UP THERE TO IMPEACH HIM ON

4    STUFF THAT'S NOT INCONSISTENT, HAS NOT ASKED HIM TO REVIEW IT TO

5    SEE IF IT REFRESHES HIS MEMORY, AND JUST READ THE TESTIMONY OUT

6    LOUD.

7         THE COURT:  I THINK --

8         MR. WATTS:  I'LL SLOW IT DOWN.  THAT'S FINE.  HE DID SAY

9    NOT ALWAYS.

10        THE COURT:  WELL, WAIT ONE SECOND.

11        MR. WATTS:  I'M SORRY, JUDGE.

12        THE COURT:  HERE'S HOW WE'RE GOING TO DO THIS.  ASK HIM

13   THE QUESTION.  I DON'T THINK IT WAS UNFAIR TO SHOW HIM THE

14   PREVIOUS, BUT LET HIM LOOK AT IT --

15        MR. WATTS:  I WILL.

16        THE COURT:  -- AND THEN ASK HIM IF IT REFRESHES HIS

17   RECOLLECTION, AND HE CAN MAKE A DISTINCTION SUCH AS HE'S MADE

18   HERE --

19        MR. WATTS:  I'LL DO IT.

20        THE COURT:  -- AND YOU CAN FOLLOW UP.

21        MR. WATTS:  YES, SIR.

22        THE COURT:  AND, ALSO, IF YOU HAVE SOMETHING THAT YOU'RE

23   GOING TO SHOW HIM, OF COURSE, SHOW IT TO MR. WEINSTOCK AND

24   COUNSEL PRIOR TO USING IT.

25        MR. WATTS:  WILL DO.

1                         EXAMINATION

2    BY MR. WATTS:

3    Q.    LET ME COME BACK JUST FOR A SECOND AND FIGURE OUT WHERE WE

4    ARE.  I BELIEVE YOU SAID IN YOUR TESTIMONY SPONSORS ARE NOT

5    ALWAYS SHOWN A COPY OF THE PAPER.  I SHOWED YOU YOUR TESTIMONY IN

6    THE MATTER IN MISSISSIPPI WHERE YOU SAY SPONSORS ARE ALWAYS GIVEN

7    AN OPPORTUNITY, AND THE DISTINCTION IS, IS THAT YOU SAY WITH

8    RESPECT TO PAPERS THAT YOU WRITE, FAIR?

9    A.    WORK THAT I DO AND PAPERS THAT I WRITE, YES.

10   Q.    NOW, THE EXHIBIT THAT'S UP ON THE SCREEN, THAT IS A PAPER

11   THAT YOU WROTE, RIGHT?

12   A.    YES.

13   Q.    ALL RIGHT.  SO FROM THE DISCUSSION THAT WE JUST HAD WITH

14   RESPECT TO PAPERS THAT YOU WROTE, LIKE THE ONE ON THE SCREEN

15   DEALING WITH FORMALDEHYDE AND LEUKEMIA, WE CAN TAKE IT TO THE

16   BANK THAT THE FORMALDEHYDE COUNCIL, BEING A SPONSOR OF THAT

17   PAPER, GOT TO REVIEW IT BEFORE IT WAS SENT OUT FOR PUBLICATION?

18   A.    WELL, THAT'S NOT ACTUALLY CORRECT IN THIS CASE BECAUSE THIS

19   IS A VERY EXCEPTIONAL CIRCUMSTANCE.

20   Q.    WELL --

21   A.    MAY I EXPLAIN WHAT THE CIRCUMSTANCE IS?

22   Q.    I'LL TELL YOU WHAT, LET ME JUST ASK YOU THIS:  DID YOU

23   EXPLAIN THAT CIRCUMSTANCE ON JUNE THE 1ST OF 2007 WHEN YOU

24   TESTIFIED BEFORE A JURY IN JONES COUNTY, MISSISSIPPI?

25   A.    NO.  I DON'T BELIEVE I WAS ASKED ABOUT IT.

1  Q.   OKAY.  SO IT'S YOUR TESTIMONY THAT IN THIS EXCEPTIONAL

2  CIRCUMSTANCE, THE FORMALDEHYDE COUNCIL DID NOT SEE THIS PAPER

3  BEFORE IT WAS PUBLISHED?

4  A.   THEY DID SEE IT, BUT THEY DIDN'T COMMENT ON IT BECAUSE THIS

5  PAPER WAS GIVEN AS PART OF A PROCEEDINGS OF WHICH I WAS THE

6  CHAIRMAN AND WHICH WAS SPONSORED BY THE AMERICAN TOXICOLOGICAL

7  SOCIETY.  AND IT WAS PREDETERMINED THAT UNLESS THE PAPERS WERE

8  FUNDAMENTALLY FLAWED, THEY WOULD BE PUBLISHED TOGETHER AS A

9  SEMINAR PROCEEDINGS.

10         THE FORMALDEHYDE COUNCIL HAD INFORMED ME THAT THEY

11  WOULD LIKE TO LOOK AT THE PAPER, BUT THAT UNDER NO CIRCUMSTANCES

12  WOULD THEY OFFER ANY COMMENT ON IT.

13  Q.   ALL RIGHT.  SO, BOTTOM LINE, THE THING THAT GOT PUBLISHED

14  WAS WORK THAT WAS FUNDED BY THE FORMALDEHYDE COUNCIL, RIGHT?

15  A.   YES.

16  Q.   NUMBER TWO, THAT THEY ASKED YOU THAT THEY WOULD LIKE TO LOOK

17  AT IT, RIGHT?

18  A.   YES.

19  Q.   NOW, NUMBER THREE, WITH RESPECT TO FORMALDEHYDE AND

20  LEUKEMIA, THERE IS NOT ONE WORD IN THIS PAPER DEALING WITH THE

21  SUBJECT OF NASOPHARYNGEAL CANCER, TRUE?

22  A.   THAT IS CORRECT.  THE WHOLE SYMPOSIUM WAS ON LEUKEMIA.

23  Q.   NOW, LET'S KEEP -- WITH RESPECT TO IARC, YOU TOLD THE JURY

24  THAT YOU TOOK A YEAR AND WORKED AT IARC, RIGHT?

25  A.   YES.

1  Q.    YOU RESPECT THE PEOPLE THERE, RIGHT?

2  A.    YES, I DO.

3  Q.    THEY DO AN OUTSTANDING JOB OF BRINGING TOGETHER ALL THE

4  WORLD'S LITERATURE AND DETERMINING WHAT IT SHOWS?

5  A.    I THINK THEY DO, YES.

6  Q.    YOU HAVE CITED IARC IN OTHER PAPERS?

7  A.    YES, I HAVE.

8            MR. WATTS:  OKAY.  JUST TO SHORT CIRCUIT IT, JUDGE, ANDY

9  SAYS I CAN PUT THIS UP WITHOUT FOLLOWING THE PROCEDURE.

10                         EXAMINATION

11  BY MR. WATTS:

12  Q.    JUST AN EXAMPLE, IN MARCH OF 1988 YOU WROTE A PAPER ABOUT

13  BENZENE AND LEUKEMIA, CORRECT?

14  A.    YES.

15  Q.    AND THE FIRST THING THAT'S IN THE BACKGROUND IS THAT IN

16  1981, A WORKING GROUP ON THE INTERNATIONAL AGENCY FOR RESEARCH ON

17  CANCER CONCLUDED THAT THERE WAS SUFFICIENT EVIDENCE THAT BENZENE

18  IS CARCINOGENIC TO HUMANS, TRUE?

19  A.    YES.

20  Q.    YOU HAVE TESTIFIED IN PREVIOUS LITIGATIONS WITH RESPECT TO

21  THE CARCINOGENICITY OF PRODUCTS BASED UPON IARC CLASSIFYING THEM

22  AS CARCINOGENIC, RIGHT?

23  A.    YES, I HAVE.

24  Q.    WHEN YOU ARE CLAIMING THAT SOMETHING IS NOT CARCINOGENIC,

25  YOU HAVE UTILIZED THE IMPRIMATUR OF IARC TO SAY THEY HAVE NOT YET

1 CLASSIFIED IT AS A KNOWN HUMAN CARCINOGEN, AS SOME OF THE

2 EVIDENCE THAT YOU HAVE THAT IS NOT PROVEN?

3 A.   WELL, I QUOTE IARC IRRESPECTIVE OF WHATEVER THEIR POSITION

4 IS, SIMILARLY, THE NTP, THE NATIONAL TOXICOLOGY PROGRAM, WHETHER

5 I AGREE WITH THEM OR NOT, WHETHER THEY HAVE SAID YES OR NO.

6 Q.   WITH RESPECT TO IARC, I THINK MY SPECIFIC QUESTION WAS, HAVE

7 YOU, IN LITIGATION, AS SUPPORT FOR A CONCLUSION THAT SOMETHING IS

8 NOT CARCINOGENIC, CITED THE FACT THAT IARC HAS NOT CLASSIFIED

9 SOMETHING AS A KNOWN HUMAN CARCINOGEN?

10 A.   WELL, I PROBABLY HAVE, MAYBE MANY TIMES.  I DON'T RECALL ANY

11 SPECIFIC INSTANCE RIGHT NOW.

12 Q.   WHEN YOU SAY MAYBE MANY TIMES, WE CAN AGREE THAT ON NUMEROUS

13 OCCASIONS YOU PROBABLY HAVE CITED IARC'S FAILURE TO CLASSIFY

14 SOMETHING AS A KNOWN HUMAN CARCINOGEN AS EVIDENCE IN LEGAL

15 PROCEEDINGS THAT THERE IS NOT ENOUGH EVIDENCE TO PROVE IT'S

16 CARCINOGENIC?

17 A.   WELL, OF COURSE.

18 Q.   NOW, IN THIS CASE, IARC HAS CLASSIFIED FORMALDEHYDE AS A

19 KNOWN HUMAN CARCINOGEN, TRUE?

20 A.   THAT IS CORRECT, YES.

21 Q.   NOW, IARC HAS THE ABILITY, IF THEY ARE CONVINCED OTHERWISE,

22 TO DOWNGRADE A CLASSIFICATION FROM KNOWN HUMAN CARCINOGEN, TRUE?

23 A.   THEY HAVE THE ABILITY TO DO IT, BUT IT HAS NEVER BEEN DONE,

24 AND IT IS NOT A SIMPLE PROCESS THAT WOULD BE INVOLVED.

25         MR. WATTS:  MAY I APPROACH?

1          THE COURT:  YES.

2                        EXAMINATION

3   BY MR. WATTS:

4   Q.   IS THE PAPER I'M HANDING YOU A PAPER ENTITLED,

5   "ACRYLONITRILE AND CANCER:  A REVIEW OF THE EPIDEMIOLOGY," BY

6   PHILIP COLE, JACK MANDEL AND JAMES COLLINS?

7   A.   YES.

8   Q.   IS PHILIP COLE THE MAN THAT I'M STANDING NEXT TO?

9   A.   YES, SIR.

10  Q.   IF YOU COULD READ THE ABSTRACT PORTION THAT I HAVE

11  HIGHLIGHTED, AND THEN I'LL HAVE SOME QUESTIONS FOR YOU.

12  A.   OKAY.

13  Q.   DOES REVIEW OF THE PAPER THAT YOU WROTE REFRESH YOUR

14  RECOLLECTION THAT, IN FACT, IARC HAS DOWNGRADED CHEMICALS IN THE

15  PAST?

16  A.   NO, THAT'S NOT WHAT I SAID.  WHAT I SAID WAS THEY HAVE NEVER

17  DOWNGRADED IT FROM A GROUP ONE, THAT IS, A KNOWN, TO A LOWER

18  CATEGORY.  THAT WAS A DOWNGRADE FROM A 2A TO A 2B.

19  Q.   I SEE.  FAIR ENOUGH.

20  A.   A VERY IMPORTANT DISTINCTION.

21  Q.   LET ME TALK TO YOU ABOUT IT.

22          MR. WATTS:  MAY I APPROACH?

23          THE COURT:  YES.

24                        EXAMINATION

25  BY MR. WATTS:

1  Q.   IN 1995 --

2       THE COURT:  YOU'RE GOING TO HAVE TO USE THAT MICROPHONE

3  IF YOU'RE GOING TO BE UP HERE, MR. WATTS.

4       MR. WATTS:  YES, SIR.

5                          EXAMINATION

6  BY MR. WATTS:

7  Q.   IN 1995, IARC CLASSIFIED FORMALDEHYDE AS A PROBABLE HUMAN

8  CARCINOGEN; IS THAT RIGHT?

9  A.   YES.

10 Q.   AND AFTER REVIEWING ALL OF THE STUDIES, THEY COULD REVIEW

11 THE PAPER THAT YOU'RE RELYING UPON BY GARY MARSH THAT SAYS, AH,

12 THE WALLINGFORD COHORT DOESN'T SAY WHAT WE THINK IT SAYS; THEY

13 COULD DO THAT, RIGHT?

14 A.   WELL, I DON'T THINK THEY WOULD HAVE HAD ACCESS TO THAT PAPER

15 UNTIL AFTER THEIR 2004 EVALUATION.

16 Q.   NO QUESTION.  MY QUESTION IS, ONCE SOMETHING IS PUBLISHED,

17 IARC CAN GET THEIR HANDS ON IT AND REVIEW IT, RIGHT?

18 A.   YES.

19 Q.   ALL RIGHT.  WITH RESPECT TO THE LITERATURE THAT WAS CREATED

20 BETWEEN 1995 AND 2004, IARC DID NOT DOWNGRADE FORMALDEHYDE FROM A

21 PROBABLE HUMAN CARCINOGEN TO A POSSIBLE CARCINOGEN, RIGHT?

22 A.   CORRECT.

23 Q.   IN FACT, BASED ON THE LITERATURE AND THE STUDIES THAT WERE

24 DONE BETWEEN 1995 AND 2004, THEY UPGRADED IT FROM A PROBABLE

25 HUMAN CARCINOGEN TO A KNOWN HUMAN CARCINOGEN, TRUE?

1  A.   YES.

2  Q.   I WANT TO SHOW YOU EXHIBIT 269.  THIS IS THE IARC MONOGRAPH

3  ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS; IS THAT RIGHT?

4  A.   WELL, THE TITLE THAT YOU READ IS THE TITLE OF THE SERIES.

5  ALL OF THE MONOGRAPHS CARRY THE SAME.

6  Q.   SURE.

7  A.   THIS IS VOLUME 88, OBVIOUSLY, RELATING TO FORMALDEHYDE.

8  Q.   FAIR ENOUGH.  NOW, WE'RE ON PAGE 274.  THIS IS THE SECTION

9  THAT DEALS WITH NASOPHARYNGEAL CANCER; IS THAT CORRECT?

10  A.   YES.

11  Q.   THEY SAY, "SINCE THE LAST MONOGRAPH ON FORMALDEHYDE IN

12  1995" --

13  A.   I CAN'T FOLLOW YOU.

14  Q.   CAN YOU SEE IT OKAY?

15        THE COURT:  IS THAT 269, MR. WATTS?

16        MR. WATTS:  YES, YOUR HONOR.

17        THE COURT:  I DON'T HAVE THAT ONE MARKED.

18        MR. WEINSTOCK:  IT'S 274.

19        MR. WATTS:  DO I HAVE THE NUMBER WRONG?  I TELL YOU

20  WHAT, WE OFFER IARC AS 269, JUST TO MAKE SURE WE'VE GOT IT IN

21  THERE.

22        MR. WEINSTOCK:  OH, EXHIBIT NUMBER.  IT'S PAGE 274.  I

23  APOLOGIZE.

24        THE COURT:  THAT'S THE EXHIBIT NUMBER, 269.

25        MR. WATTS:  WE OFFER THE IARC MONOGRAPH AS 269.

1          MR. WEINSTOCK:  I DON'T THINK IT WAS OBJECTED TO.

2          MR. WATTS:  YEAH, I DON'T THINK IT IS EITHER.  I JUST

3     WANT TO MAKE SURE IT GETS IN.

4          THE COURT:  NEITHER MS. RADOSTA NOR I HAVE IT DOWN, SO

5     WE'LL GO AHEAD AND PUT 269 INTO EVIDENCE.

6          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

7     EXHIBIT 269 WAS ADMITTED.)

8          THE COURT:  GO AHEAD, MR. WATTS.

9          MR. WATTS:  THANK YOU, YOUR HONOR, AND I APPRECIATE THE

10    HOUSEKEEPING HELP.

11                          EXAMINATION

12    BY MR. WATTS:

13    Q.   THE SECTION DEALING WITH NASOPHARYNGEAL CANCER, IT BEGINS,

14    "SINCE THE LAST MONOGRAPH ON FORMALDEHYDE IN 1995, THE FOLLOW-UP

15    OF THREE MAJOR COHORT STUDIES HAS BEEN EXTENDED AND THREE NEW

16    CASE CONTROL STUDIES HAVE BEEN PUBLISHED."  DID I READ THAT

17    CORRECTLY?

18    A.   YES, SIR.

19    Q.   "IN THE LARGEST AND MOST INFORMATIVE COHORT STUDY OF

20    INDUSTRIAL WORKERS EXPOSED TO FORMALDEHYDE, A STATISTICALLY

21    SIGNIFICANT EXCESS OF DEATHS FROM NASOPHARYNGEAL CANCER WAS

22    OBSERVED IN COMPARISON WITH THE U.S. NATIONAL POPULATION, WITH

23    STATISTICALLY SIGNIFICANT EXPOSURE RESPONSE RELATIONSHIPS FOR

24    PEAK AND CUMULATIVE EXPOSURE.  AN EXCESS OF DEATHS FROM

25    NASOPHARYNGEAL CANCER WAS ALSO OBSERVED IN A PROPORTIONATE

1   MORTALITY ANALYSIS OF THE LARGEST U.S. COHORT OF EMBALMERS AND IN

2   A DANISH STUDY OF PROPORTIONATE CANCER INCIDENCE AMONG WORKERS AT

3   COMPANIES THAT USED OR MANUFACTURED FORMALDEHYDE."  DID I READ

4   THAT CORRECTLY?

5   A.   YES.

6   Q.   NOW, ARE THOSE THE THREE STUDIES THAT ARE ON THE REPORT THAT

7   YOU AND ANDY PUT UP ON THE SCREEN?

8   A.   I'LL NEED A MINUTE.   (WITNESS REVIEWS THE DOCUMENT.)

9        NO.   THIS MAKES REFERENCE TO A STUDY OF U.S. EMBALMERS,

10  WHICH IS NOT ONE THAT I HAVE INCLUDED.

11  Q.   FAIR ENOUGH.  NOW, I WANT TO ASK YOU ABOUT THE CASE CONTROL

12  STUDIES.  IT SAYS IN THE THIRD FULL PARAGRAPH, "THE RELATIONSHIP

13  BETWEEN NASOPHARYNGEAL CANCER AND EXPOSURE TO FORMALDEHYDE HAS

14  ALSO BEEN INVESTIGATED IN SEVEN CASE CONTROL STUDIES, FIVE OF

15  WHICH FOUND ELEVATED RISKS FOR OVERALL EXPOSURE TO FORMALDEHYDE

16  OR IN HIGHER EXPOSURE CATEGORIES, INCLUDING ONE IN WHICH THE

17  INCREASE IN RISK WAS STATISTICALLY SIGNIFICANT.  THREE STUDIES,

18  TWO OF WHICH HAVE BEEN PUBLISHED SINCE THE LAST MONOGRAPH, FOUND

19  HIGHER RISKS AMONG SUBJECTS WHO HAD THE HIGHEST PROBABILITY,

20  LEVEL OR DURATION OF EXPOSURE."  DID I READ THAT CORRECTLY?

21  A.   YES.

22  Q.   NOW, ARE THE CASE CONTROL STUDIES, ARE ANY OF THOSE CASE

23  CONTROL STUDIES REFERENCED IN THE THREE STUDIES THAT YOU AND ANDY

24  TALKED ABOUT THAT YOU PUT UP ON THE SCREEN FROM YOUR REPORT?

25  A.   NO.

1  Q.   "THE MOST RECENT META-ANALYSIS, WHICH WAS PUBLISHED IN 1997,

2  INCLUDED SOME BUT NOT ALL OF THE ABOVE STUDIES AND FOUND AN

3  INCREASED OVERALL META-RELATIVE RISK FOR NASOPHARYNGEAL CANCER."

4  WAS THIS META-ANALYSIS PUBLISHED IN 1997 ONE OF THE THREE STUDIES

5  THAT YOU AND ANDY PUT UP ON THE SCREEN?

6  A.   I'M SORRY, YOU ARE SAYING THAT I AND WHO?

7  Q.   AND ANDY.  MR. WEINSTOCK.

8  A.   NO.  I ONLY REVIEWED THE THREE --

9  Q.   THE THREE.

10 A.   -- IN-DEPTH COHORT STUDIES.

11 Q.   SO WITH RESPECT TO THE COHORT STUDIES, WE KNOW THAT THERE IS

12 AT LEAST ONE THAT YOU HAVE NOT REVIEWED, RIGHT?

13 A.   YES.

14 Q.   WITH RESPECT TO THE CASE CONTROL STUDIES, WE KNOW THAT THERE

15 ARE SEVEN THAT YOU HAVE NOT REVIEWED, RIGHT?

16 A.   YES.  WELL, I HAVE REVIEWED THEM, BUT I DID NOT CHOOSE TO

17 INCLUDE THEM.

18 Q.   AND WITH RESPECT TO META-ANALYSIS, WE KNOW THAT YOU DID NOT

19 REVIEW THAT BEFORE YOU GAVE THE CONCLUSION TO THE JURY?

20 A.   I HAVE REVIEWED IT, YES.  THERE IS A MUCH MORE RECENT

21 META-ANALYSIS, AND THAT'S WHY I DON'T USE THE OLD ONE.

22 Q.   WHO IS THE AUTHOR OF THE 1997 META-ANALYSIS THAT YOU

23 REVIEWED?

24 A.   I DON'T RECALL.

25 Q.   WHO ARE THE AUTHORS OF THE SEVEN CASE CONTROL STUDIES THAT

1  YOU SAY THAT YOU REVIEWED?

2  A.   AGAIN, I DON'T RECALL THEM.

3  Q.   "THE WORKING GROUP WHO DID REVIEW ALL OF THE COHORT STUDIES,

4  ALL OF THE CASE CONTROL STUDIES, AND THE META-ANALYSIS CONCLUDES,

5  OVERALL, THE WORKING GROUP CONCLUDED THAT THE RESULTS OF THE

6  STUDY OF INDUSTRIAL WORKERS IN THE USA, SUPPORTED BY THE LARGELY

7  POSITIVE FINDINGS FROM OTHER STUDIES, PROVIDED SUFFICIENT

8  EPIDEMIOLOGICAL EVIDENCE THAT FORMALDEHYDE CAUSES NASOPHARYNGEAL

9  CANCER IN HUMANS."  DID I READ THAT CORRECTLY?

10  A.   YES.

11  Q.   I WANT TO TAKE YOU BACK TO SOMETHING THAT WE STARTED WITH,

12  YOUR LIST OF TESTIMONIES.  IF WE GO TO NUMBER 12, *REGULO RIOS*

13  *VERSUS ABCO INDUSTRIES*, DO YOU SEE THAT, SIR?

14  A.   YES.

15  Q.   REGULO RIOS WAS A GENTLEMAN FROM CORPUS CHRISTI, TEXAS,

16  WHERE I GREW UP; DID YOU KNOW THAT?

17  A.   NO.

18         MR. WATTS:  MAY I APPROACH?

19         THE COURT:  YES.

20                          EXAMINATION

21  BY MR. WATTS:

22  Q.   DO YOU AGREE THAT IT'S A SMALL WORLD SOMETIMES?

23  A.   I'M NOT SURE WHAT YOU'RE REFERRING TO.

24  Q.   WELL, LET ME SHOW YOU.  FIRST OF ALL, THE DEPOSITION OF

25  PHILIP COLE TAKEN ON DECEMBER THE 6TH OF 2005, CORRECT?

1   A.   YES.

2   Q.   IT'S IN A CASE THAT IS OFFICIALLY STYLED AS *LEONEL GARCIA*

3   *VERSUS ABCO INDUSTRIES*, RIGHT?

4   A.   YES.

5   Q.   CAUSE NUMBER 032966-B, RIGHT?

6   A.   YES.

7   Q.   BEFORE THE DISTRICT COURT OF NUECES COUNTY, TEXAS.  YOU KNOW

8   NUECES COUNTY INCLUDES CORPUS CHRISTI, RIGHT?

9   A.   I DIDN'T KNOW THAT, BUT I DO NOW.

10   Q.   IN THE 117TH DISTRICT COURT, RIGHT?

11   A.   I DON'T KNOW WHAT THE NUMBERS OF THE COURTS ARE.

12   Q.   DID YOU KNOW THAT THE JUDGE OF THAT COURT IS HER HONOR,

13   JUDGE SANDRA WATTS, MY MOTHER?

14   A.   NO.

15   Q.   SMALL WORLD, HUH?

16   A.   I SUPPOSE IT IS.

17   Q.   ALL RIGHT.  IN THE *REGULO RIOS* CASE, THIS WAS A GENTLEMAN

18   THAT CONTRACTED CANCER AT THE HOECHST CELANESE PLANT THAT'S OVER

19   IN BISHOP IN NUECES COUNTY, RIGHT?

20   A.   I'M NOT SURE WHAT YOU MEAN WHEN YOU SAY THAT HE CONTRACTED

21   IT AT THE HOECHST CELANESE PLANT.

22   Q.   SURE.  WE DON'T NEED TO ARGUE THAT YET.  HE WORKED AT THE

23   HOECHST CELANESE PLANT FOR DECADES, RIGHT?

24   A.   I DON'T RECALL HIS DURATION OF EMPLOYMENT.

25   Q.   HE GOT CANCER, RIGHT?

1  A.    UH-HUH.  HE HAD A CASE OF LARYNX CANCER, YES, UH-HUH.

2  Q.    AND I WANT TO TALK TO YOU ABOUT SOME OF THE THINGS THAT YOU

3  HAVE SAID.  ONE OF THE REASONS THAT WE HAVE THESE LISTS IS THE

4  LAWYERS CAN GO BACK AND GET THE TESTIMONIES AND SEE WHAT YOU HAVE

5  SAID IN THE PAST, RIGHT?

6  A.    THAT'S WHAT I WOULD HAVE UNDERSTOOD THAT -- THE PURPOSE TO

7  BE, YES.

8  Q.    AND WE SHOULD BE ABLE TO TAKE TO THE BANK WHAT YOU SAID IN

9  THE PAST BECAUSE YOU SWORE TO TELL THE TRUTH THEN, AS WELL,

10  RIGHT?

11  A.    YES.

12  Q.    NOW, DID YOU TESTIFY HERE TODAY THAT, QUOTE, THE HAUPTMANN

13  PAPER IS NOT SUPPORTIVE OF A CAUSAL RELATIONSHIP BETWEEN

14  FORMALDEHYDE AND ANY CANCER?

15  A.    THAT IS CORRECT.

16  Q.    HAVE YOU TESTIFIED IN THE PAST THAT, "MY OPINION IS THAT THE

17  HAUPTMANN PAPER IS SUPPORTIVE OF A CAUSAL RELATIONSHIP BETWEEN

18  FORMALDEHYDE AND CANCER OF THE LARYNX"?

19  A.    YES.

20  Q.    DID YOU DO THAT IN THE *REGULO RIOS* CASE?

21  A.    WELL, YES, BUT THERE HAS BEEN A SIGNIFICANT CHANGE -- THERE

22  HAS BEEN A SIGNIFICANT CHANGE IN THE HAUPTMANN PAPER.  THE PAPER

23  HAS BEEN SHOWN TO BE FLAWED.

24  Q.    YOU UNDERSTAND THAT WE'VE GOT TO ASK SPECIFIC QUESTIONS AND

25  ANSWERS.

1  A.   I UNDERSTAND THAT, BUT I --

2  Q.   LET ME START WITH THE QUESTION.

3  A.   -- HAVE ATTEMPTED TO MAKE THAT POINT ON SEVERAL OCCASIONS.

4  Q.   DID YOU TESTIFY IN DECEMBER OF 2005, THAT IT WAS YOUR

5  OPINION THAT THE HAUPTMANN PAPER IS SUPPORTIVE OF A CAUSAL

6  RELATIONSHIP BETWEEN FORMALDEHYDE AND CANCER OF THE LARYNX?

7       MR. WEINSTOCK:  YOUR HONOR, I BELIEVE HE'S ANSWERED THAT

8  QUESTION, AND HE'S ENTITLED TO EXPLAIN -- HE ANSWERED DIRECTLY,

9  AND HE'S ENTITLED TO EXPLAIN HIS ANSWER.

10      THE COURT:  AS LONG AS IT'S VERY DIRECTLY LIMITED TO

11  THAT QUESTION, I THINK THE WITNESS WAS ABOUT TO DO THAT, SO LET

12  HIM ANSWER IT FULLY.

13                      EXAMINATION

14  BY MR. WATTS:

15  Q.   DID YOU SO TESTIFY?

16  A.   I DID SO TESTIFY IN 2005.

17  Q.   NOW --

18      MR. WEINSTOCK:  HE'S CUTTING HIM OFF BEFORE HE FINISHES

19  HIS ANSWER.

20      THE COURT:  WERE YOU FINISHED, DOCTOR?

21      THE WITNESS:  HONESTLY, YOUR HONOR, I DON'T KNOW WHETHER

22  I'M FINISHED OR NOT BECAUSE I DON'T KNOW WHAT THE RULES ARE.  I

23  WANT TO COMPLY WITH RULES.

24      THE COURT:  LET'S CLARIFY THAT.  ANSWER THE QUESTION

25  VERY SPECIFICALLY.  IF YOU HAVE AN EXPLANATION THAT IS LIMITED TO

1  THAT QUESTION, VERY LIMITED TO THAT QUESTION, YOU CAN EXPLAIN IT.

2  BUT WHAT WE WANT TO AVOID IS GOING OFF AND SAYING SOMETHING THAT

3  YOU WANT TO SAY THAT ISN'T RESPONSIVE TO THE QUESTION.  SO --

4        THE WITNESS:  I WILL DO MY BEST.  IN 2005, I SAID THAT

5  THE HAUPTMANN PAPER SUPPORTED, AND I AGREE, THE RELATIONSHIP

6  BETWEEN FORMALDEHYDE AND LARYNX CANCER.  BUT I WANT TO MAKE IT

7  CLEAR THAT THAT IS NOT INCONSISTENT WITH THE FACT THAT I SAY

8  SOMETHING DIFFERENT TODAY BECAUSE, IN THE INTERIM, THERE HAS BEEN

9  A SIGNIFICANT CHANGE IN MY PERCEPTION AND THE PERCEPTION OF HIS

10  COAUTHORS OF THE VALIDITY OF THAT PAPER.  AND IT IS PUBLISHED,

11  THIS QUESTION.  IT IS NOT OF MY MAKING.

12        THE COURT:  OKAY.

13                      EXAMINATION

14  BY MR. WATTS:

15  Q.   IT IS PUBLISHED BY DR. GARY MARSH FROM THE UNIVERSITY OF

16  PITTSBURGH --

17  A.   NO, SIR.  NO, SIR.

18  Q.   -- WHO WAS HIRED BY THE FORMALDEHYDE COUNCIL?

19        THE COURT:  WAIT.  LET HIM FINISH THE QUESTION, AND THEN

20  YOU CAN RESPOND.

21             GO AHEAD, MR. WATTS.

22                      EXAMINATION

23  BY MR. WATTS:

24  Q.   IT WAS PUBLISHED BY DR. GARY MARSH, A DESIGNATED EXPERT

25  WITNESS IN THIS CASE WHO WAS HIRED BY THE FORMALDEHYDE COUNCIL

1  WHO PAID HIM TO DO A RE-REVIEW, TRUE?

2  A.   WHAT YOU HAVE SAID IS TRUE, BUT IT'S NOT RELEVANT TO WHAT I

3  WAS SAYING.

4  Q.   WELL, I THINK THE JUDGE HAS TOLD OTHER WITNESSES HE DECIDES

5  WHAT'S RELEVANT, AND IT'S RELEVANT TO ME.  SO THE ANSWER TO MY

6  QUESTION IS, WHAT HAS CHANGED IS A DESIGNATED EXPERT OF

7  GULF STREAM'S IN THIS CASE WAS HIRED BY THE FORMALDEHYDE COUNCIL

8  AND PAID TO DO A REEVALUATION OF THE HAUPTMANN PAPER, TRUE?

9  A.   THAT IS NOT THE ONLY THING THAT HAS CHANGED.

10  Q.   BUT THE SPECIFIC QUESTION THAT I ASKED IS TRUE?

11       THE COURT:  I THINK HE'S ALREADY SAID.

12                         EXAMINATION

13  BY MR. WATTS:

14  Q.   NOW, LET'S GO BACK.  DO YOU AGREE THAT FORMALDEHYDE IS TOXIC

15  AND MUTAGENIC TO HUMAN CELLS?

16  A.   TOXIC, YES.  AS TO THE MUTAGENICITY, I DON'T WANT TO TAKE A

17  POSITION ON THAT.

18       MR. WATTS:  MAY I APPROACH?

19       THE COURT:  YES.

20       MR. WATTS:  PAGE 97, LINES 2 THROUGH 8, COUNSEL.

21                         EXAMINATION

22  BY MR. WATTS:

23  Q.   IF YOU WOULD READ THAT AND SEE IF THAT REFRESHES YOUR

24  RECOLLECTION.

25  A.   MAY I ASK WHAT I'M READING?

1  Q.   SURE.  YOU'RE READING YOUR DEPOSITION FROM THE CASE IN MY

2  MOMMA'S COURT IN 2005.

3  A.   OH, OKAY.  YES.  YES, I SAID THAT IT WAS MUTAGENIC.

4  Q.   AND DID YOU SAY THAT IT WAS MUTAGENIC TO HUMAN CELLS?

5  A.   YES.

6  Q.   AND DO YOU AGREE AS A MEDICAL DOCTOR THAT A CHEMICAL THAT IS

7  TOXIC AND MUTAGENIC TO HUMAN CELLS CAN POTENTIALLY CAUSE CANCER?

8  A.   YES.

9  Q.   IN 2005, DID YOU HOLD THE OPINION THAT AS TO WHETHER

10  FORMALDEHYDE CAUSES NASOPHARYNGEAL CANCER IN HUMAN BEINGS, IT MAY

11  OR MAY NOT PROVE TO BE TRUE?

12  A.   I MAY VERY WELL HAVE HELD THAT OPINION AND EXPRESSED THAT AT

13  THAT TIME, YES.

14  Q.   GARY MARSH.  YOU UNDERSTAND THAT I TRAVELED TO PITTSBURGH

15  AND TOOK HIS DEPOSITION IN THIS CASE BECAUSE YOU'VE READ IT,

16  RIGHT?

17  A.   YES.

18  Q.   DID YOU HAVE ANYTHING AT ALL TO DO WITH THE GARY MARSH

19  REEVALUATION THAT WAS FUNDED BY THE FORMALDEHYDE COUNCIL?

20  A.   NO.

21  Q.   BEFORE IT WAS PUBLISHED, DID YOU EVEN KNOW THAT IT WAS GOING

22  ON?

23  A.   NO.

24  Q.   YOU AND COUNSEL TALKED ABOUT THIS ONE PLANT IN WALLINGFORD,

25  CONNECTICUT, RIGHT?

1  A.   YES.

2  Q.   AND YOU SAID NONE OF THE OTHER NINE PLANTS HAD A

3  NASOPHARYNGEAL CANCER; IS THAT RIGHT?

4  A.   NO.

5  Q.   IN FACT, BY 2005, YOU HAD WORKED WITH CELANESE ON FOUR

6  CASES, RIGHT?

7  A.   FOUR CASES OF?

8  Q.   FOUR CASES AT THE PLANT?

9  A.   I'M NOT SURE WHAT YOU'RE REFERRING TO.

10 Q.   HAD YOU WORKED WITH CELANESE ON PREVIOUS CASES BEFORE THIS

11 DEPOSITION?

12 A.   WHAT DEPOSITION IS THIS?

13 Q.   IN THE SAME CASE THAT I WAS TALKING ABOUT, *LEONEL GARCIA*

14 *VERSUS ABCO INDUSTRIES*?

15        MR. WEINSTOCK:  I'M SORRY, YOUR HONOR.  CAN WE GET

16 CLARIFICATION?  ARE THESE FOUR CASES IN THE STUDY OR FOUR CASES

17 SOMEWHERE ELSE?

18        MR. WATTS:  I'M NOT ASKING ABOUT THAT.

19                              EXAMINATION

20 BY MR. WATTS:

21 Q.   I'M ASKING HAVE YOU WORKED ON FOUR PREVIOUS CASES AT THE

22 HOECHST CELANESE PLANTS?

23 A.   I HAVE CERTAINLY WORKED ON CASES THAT AROSE AMONG THE

24 WORKFORCE AT ONE OR ANOTHER HOECHST CELANESE PLANT.  I DON'T

25 ACTUALLY KNOW THAT THERE WERE FOUR.  THERE MAY HAVE BEEN MORE.

1  THERE MAY HAVE BEEN LESS.

2  Q.   I'LL TAKE THAT.

3  A.   I DON'T KNOW EXACTLY WHAT THE CANCERS WERE.

4  Q.   NOW, WHEN DR. GARY MARSH EVALUATED THE COUNTS OF

5  NASOPHARYNGEAL CANCERS IN THESE TEN PLANTS ACROSS THE

6  UNITED STATES, DID HE CONCLUDE THAT THE NUMBER OF COUNTS THAT

7  WERE EXPRESSED IN THE PAPERS WERE, IN FACT, TRUE?

8  A.   I'M NOT SURE I UNDERSTAND YOUR QUESTION.  ARE YOU ASKING ME

9  IF HE CONFIRMED THE CORRECTNESS OF THE OBSERVED IN NUMBERS?

10 Q.   YES, SIR.

11 A.   I DON'T RECALL HIM ACTUALLY STATING THAT; BUT, HE DIDN'T

12 CHALLENGE THEM, SO PERHAPS HE DID.

13 Q.   NOW, YOU SAY THAT WITH RESPECT TO THE SO-CALLED "WALLINGFORD

14 COHORT," THAT THERE WERE AN UNUSUAL NUMBER OF NASOPHARYNGEAL

15 CANCERS UP THERE, RIGHT?

16 A.   YES.

17 Q.   AND DR. MARSH SAYS, HEY, I WENT BACK AND CHECKED THEIR

18 EMPLOYMENT FILES, AND SOME OF THEM WORKED IN THE FERROUS AND

19 NONFERROUS METALS INDUSTRIES, RIGHT?

20 A.   THAT'S CORRECT.

21 Q.   NOW, YOU READ WHERE HE AND I TALKED ABOUT THE FACT THAT,

22 NUMBER ONE, HE CAN'T TELL ANYBODY HOW LONG THEY WORKED IN THOSE

23 INDUSTRIES, RIGHT?

24 A.   THAT'S CORRECT.

25 Q.   NUMBER TWO, HE CAN'T TELL ANYBODY WHETHER THEY WERE GUYS IN

1  THE OFFICE WEARING TIES LIKE ME AND ANDY OR GUYS THAT WERE DOWN

2  NEAR THE SMELTER, RIGHT?

3  A.   YES.

4  Q.   NUMBER THREE, HE CAN'T TELL ANYTHING WITH RESPECT TO THE

5  AMOUNT OF EXPOSURE THAT THOSE PEOPLE HAD, RIGHT?

6  A.   THAT'S RIGHT.

7  Q.   AND WITH RESPECT TO THOSE FIVE GENTLEMEN THAT HE WENT BACK

8  AND LOOKED AT THEIR EMPLOYMENT HISTORIES, YOU DON'T KNOW WHETHER

9  ONE OF THEM WORKED THERE FOR A SUMMER JOB ONE SUMMER AND THEN

10 WENT AND WORKED AROUND FORMALDEHYDE FOR 28 YEARS?

11 A.   I'M NOT SURE WHAT FIVE GENTLEMEN YOU'RE REFERRING TO.

12 Q.   IN FACT, THE LEVEL OF YOUR ANALYSES OF DR. MARSH'S WORK IS

13 SO KEEN THAT WHEN ANDY ASKED YOU HOW MANY NASOPHARYNGEAL CANCERS

14 WERE IN THE STUDY, YOU SAID, "FOUR OR FIVE, I DON'T REMEMBER IT

15 EXACTLY."  RIGHT?

16 A.   I DON'T THINK THIS WAS IN THE STUDY.  I THINK THIS WAS AT

17 THE WALLINGFORD PLANT.

18 Q.   IF THERE WERE SEVEN, YOU DON'T REMEMBER IT EXACTLY?

19 A.   I DON'T REMEMBER IT.

20 Q.   DO YOU REMEMBER THAT DR. MARSH TOLD ME, HEY, WALLINGFORD,

21 CONNECTICUT, IS IN A TWO- OR THREE-COUNTY AREA THAT IS THE

22 FERROUS AND NONFERROUS SILVER SMELTING CAPITAL OF THE WORLD?

23 A.   I DON'T RECALL THOSE EXACT WORDS, AND I DON'T KNOW IF HE

24 SAID IT IS OR WAS.

25 Q.   DESPITE THE FACT THAT HE SAID THIS IS THE EPICENTER OF

1  FERROUS AND NONFERROUS SMELTING IN THE UNITED STATES, THE

2  EXPECTED NUMBER OF NASOPHARYNGEAL CANCERS IN MIDDLESEX AND

3  NEW HAVEN COUNTY SURROUNDING THAT PLANT IS LOWER THAN THE

4  EXPECTED LEVEL OF NASOPHARYNGEAL CANCERS NATIONALLY, TRUE?

5  A.  YES.

6  Q.  ALL THE PLANTS OR A LOT OF THE PLANTS THAT ARE RIGHT THERE

7  IN THAT COUNTY, BUT THE EXPECTED RATE OF NASOPHARYNGEAL IS LOWER

8  THAN WHAT YOU EXPECT ACROSS THE UNITED STATES, RIGHT?

9  A.  YES.

10  Q.  WITH RESPECT TO WHAT YOU TESTIFIED TO IN 2005 VERSUS WHAT

11  YOU ARE TESTIFYING TO HERE TODAY, THE ONLY STUDY THAT YOU HAVE

12  ANALYZED WITH RESPECT TO NASOPHARYNGEAL CANCER IN THE INTERIM IS

13  THE WORK BY GARY MARSH, WHO WAS HIRED AND PAID BY THE

14  FORMALDEHYDE COUNCIL TO DO THE WORK THAT WE HAVE JUST BEEN

15  TALKING ABOUT, RIGHT?

16  A.  I WANT TO BE SURE I UNDERSTAND THIS QUESTION.  YOU'RE SAYING

17  THAT BETWEEN 2005 AND NOW?

18  Q.  THE ONLY WORK THAT YOU HAVE REVIEWED WITH RESPECT TO

19  NASOPHARYNGEAL CANCER AND FORMALDEHYDE IS THE MARSH PAPER THAT

20  THE FORMALDEHYDE COUNCIL PAID FOR?

21  A.  YES, THAT'S CORRECT.

22  Q.  THAT'S THE ONLY THING THAT'S CHANGED FROM THE OPINIONS THAT

23  YOU GAVE UNDER OATH ON DECEMBER 6TH OF 2005 AND THE CASE IN

24  CORPUS CHRISTI, TEXAS, RIGHT?

25  A.  WELL, NO, NOT EXACTLY.  THERE IS SOMETHING ELSE THAT HAS

1   CHANGED.

2   Q.    LET'S TALK ABOUT THAT.  WITH RESPECT TO SOMETHING ELSE THAT

3   HAS CHANGED, IS THERE A PAPER WITH RESPECT TO THE CARCINOGENICITY

4   OF CANCER THAT WAS PUBLISHED -- I MEAN OF FORMALDEHYDE THAT WAS

5   PUBLISHED THIS YEAR?

6   A.    YES.

7   Q.    WAS THERE A PAPER THAT WAS PUBLISHED THIS YEAR THAT

8   ATTRIBUTES FORMALDEHYDE AS HAVING A CAUSATIVE EFFECT ON CANCER?

9   A.    NO.

10  Q.    WITH RESPECT TO THIS DR. PHILIP COLE VERSUS IARC, WE KNOW

11  THAT ON THE ONE HAND, YOU LOOKED AT THREE PAPERS THAT YOU'VE TOLD

12  US ABOUT, RIGHT?

13  A.    I LOOKED AT ALL OF THE PAPERS.  THAT WAS A PRESENTATION THAT

14  WAS COMMITTED TO REVIEWING THE MAJOR COHORT STUDIES.

15  Q.    BUT YOU CAN'T TELL ME THE AUTHOR OF ANY OF THE PAPERS OTHER

16  THAN THE THREE THAT YOU SHARED WITH ANDY RIGHT HERE.  RIGHT?

17  A.    I DID NOT SHARE THOSE PAPERS WITH HIM.  HE GENERATED THOSE

18  ON HIS OWN.

19  Q.    HE GENERATED THOSE.  AND THEY SHOWED UP IN YOUR EXPERT

20  REPORT.

21  A.    THAT'S TRUE.  BOTH THINGS ARE TRUE.

22          MR. WATTS:  THOSE ARE ALL OF MY QUESTIONS, THANK YOU.

23          THE COURT:  THANK YOU.  REDIRECT?

24          MR. WEINSTOCK:  YES.

25                      REDIRECT EXAMINATION

1  BY MR. WEINSTOCK:

2  Q.   THOSE THINGS ARE TRUE, BUT WHICH CAME FIRST, THE CHICKEN OR

3  THE EGG?  DID I GIVE YOU THE PAPERS OR DID YOU PUT THEM IN YOUR

4  REPORT?

5  A.   I HAD THEM, I HAD ACCESS TO THESE PAPERS FROM THE TIME THEY

6  APPEARED ONLINE, EVERY SINGLE ONE OF THEM.

7  Q.   WELL, THAT'S GOOD, BECAUSE I NEVER SAW THEM BEFORE I SAW

8  THEM IN YOUR REPORT.

9            MR. WATTS:  IS THAT A QUESTION OR A SPEECH, JUDGE?

10           THE COURT:  LET'S STICK WITH QUESTIONS.  STICK WITH THE

11  QUESTIONS.

12           MR. WEINSTOCK:  FAIR ENOUGH.

13                          EXAMINATION

14  BY MR. WEINSTOCK:

15  Q.   WHAT ELSE CHANGED ABOUT THE HAUPTMANN PAPER SINCE 2004?

16  A.   IN MAY OF THIS YEAR, A PAPER APPEARED FROM THE SAME GROUP AT

17  THE NATIONAL CANCER INSTITUTE THAT HAD PRODUCED THE HAUPTMANN

18  PAPER, INCLUDING HAUPTMANN HIMSELF AS ONE OF THE AUTHORS.  THIS

19  PAPER IS FOCUSED ON LEUKEMIA AND LYMPHOMA.  NONETHELESS, IT TALKS

20  IN SOME DETAIL ABOUT SPECIFIC ISSUES IN THE DESIGN AND CONDUCT OF

21  THE HAUPTMANN PAPER FROM 2004, THE ONE THAT RELATES TO

22  NASOPHARYNGEAL CANCER.

23           THIS PAPER, WHICH I'LL REFER TO AS THE "FREEMAN PAPER,"

24  THAT BEING THE LAST NAME OF THE FIRST AUTHOR, POINTS OUT THAT IN

25  THE HAUPTMANN PAPER, THERE HAD BEEN A SIGNIFICANT DEFICIT OF

1   DEATHS, THAT IS, ABOUT 11 PERCENT OF THE TOTAL NUMBER OF DEATHS

2   THAT SHOULD HAVE BEEN INCLUDED IN THE HAUPTMANN PAPER HAD, IN

3   FACT, NOT BEEN INCLUDED.

4           SHE, THAT IS FREEMAN, ALSO POINTED OUT THAT WITH

5   RESPECT TO THE CANCERS THAT SHE WAS STUDYING, WHICH IS THE

6   LEUKEMIAS, LYMPHOMAS, THAT THE EFFECT OF INCLUDING THE 1,000

7   ADDITIONAL DEATHS, THAT IS, 10 PERCENT OF THE TOTAL, HAD A MUTING

8   EFFECT ON DOSE-RESPONSE RELATIONSHIPS; THAT IS, IT REDUCED THE

9   APPARENT STRENGTH OF THE DOSE-RESPONSE RELATIONSHIP FOR EVERY

10  FORM OF LEUKEMIA AND LYMPHOMA IN CONNECTION WITH ALMOST EVERY ONE

11  OF THE FIVE MEASURES OF FORMALDEHYDE USE.

12          NOW, I DO NOT KNOW THAT IT WOULD HAVE THE SAME EFFECT

13  ON NASOPHARYNGEAL CANCER, BUT IT CERTAINLY CALLS INTO QUESTION

14  THE VALIDITY OF THE 2004 HAUPTMANN PAPER, WHICH WAS MISSING

15  11 PERCENT OF THE DEATHS THAT IT SHOULD HAVE HAD INCLUDED.  THAT

16  IS WHAT HAS CHANGED.

17  Q.   IF I HEARD YOU EARLIER, WE HAVE 26,000 PEOPLE IN THE

18  WALLINGFORD COHORT.

19  A.   NO, IN THE TOTAL COHORT.  ALL TEN STUDIES.

20  Q.   OH, I'M SORRY.  26,000 PEOPLE IN THE OVERALL COHORT?

21  A.   YES, SIR.

22  Q.   WE HAD, WE THOUGHT, SOMETHING LIKE 10,000 DEATHS, AND NOW WE

23  HAVE --

24  A.   IN HAUPTMANN?

25  Q.   IN HAUPTMANN.

1  A.   NO, WE HAD 8500 DEATHS AND SHOULD HAVE HAD 9500.

2  Q.   AND WHEN WE KEPT USING THAT TERM, SMR, STANDARD MORTALITY

3  RATIO, WHAT DOES THAT MEAN?  I MEAN, ARE THESE STUDIES OF PEOPLE

4  WHO HAVE ESSENTIALLY EXPIRED FROM CANCER?

5  A.   NO, THEY ARE PEOPLE WHO HAVE DIED FROM ANY CAUSE.  ANY CAUSE

6  AT ALL.

7  Q.   WE'RE STUDYING MORTALITY?

8  A.   YES.

9  Q.   SO MISSING 11 PERCENT OF THE DEATHS PUTS A CHILL ON THE

10 STUDY, PUTS A DAMPER ON THE RESULTS?

11 A.   IT WOULD NEED TO BE EXPLAINED, AND FREEMAN HAS WRITTEN IN

12 HER PAPER THAT SHE CANNOT EXPLAIN IT.

13 Q.   WE HAD A CONVERSATION EARLIER ABOUT WHETHER MAYBE IARC IS

14 RIGHT AND YOU'RE WRONG.

15 A.   IT'S POSSIBLE.

16 Q.   IT'S POSSIBLE.  WE ALSO HAD ANOTHER ONE ABOUT DOSE MAKING A

17 POISON.  FOR EXAMPLE, DOES CIGARETTE SMOKING CAUSE CANCER?

18 A.   OF COURSE.

19 Q.   DOES SMOKING ONE CIGARETTE CAUSE CANCER?

20 A.   PROBABLY NOT.

21 Q.   IS IT POSSIBLE?  I MEAN, EVERYTHING -- MR. WATTS IS VERY

22 CONVINCING, HE SHOWED YOU ALL OF THESE PAPERS FROM IARC.  IS IT

23 JUST POSSIBLE THAT IARC IS RIGHT AND YOU'RE WRONG?

24 A.   YES, OF COURSE.

25 Q.   BUT DOESN'T THE DOSE MATTER?

1   A.    CERTAINLY.

2   Q.    WOULD YOU EXPECT TO SEE IT IN THE LEVELS WE SEE IT IN THE

3   TRAILERS?

4   A.    NO.

5   Q.    IN FACT, IF I SPEND A LITTLE TOO MUCH TIME IN THE SUN, I

6   MIGHT GET A MELANOMA.

7   A.    YOU MIGHT.

8   Q.    IF I JUST GO OUTSIDE ONE DAY, IT'S HIGHLY UNLIKELY.

9   A.    IT'S CERTAINLY NOT GOING TO HAPPEN FROM ANY ONE DAY'S

10  EXPOSURE.

11  Q.    WE TALKED BEFORE ABOUT LENGTH OF EXPOSURE.  THE PEOPLE IN

12  THESE STUDIES ARE FOLLOWED FOR DECADES; IS THAT RIGHT?

13  A.    WELL, THE LENGTH OF THE EXPOSURE AND THE LENGTH OF THE

14  FOLLOW-UP ARE TWO ENTIRELY DIFFERENT THINGS.  THE LENGTH OF THE

15  EXPOSURE IS WHEN THEY ARE ACTIVELY EMPLOYED, AND THE LENGTH OF

16  THE FOLLOW-UP IS FROM THE TIME THEY BECOME ELIGIBLE FOR THE STUDY

17  UNTIL THEY DIE.

18  Q.    IF WE CAN GO THROUGH SOME OF THESE PHRASEOLOGIES AND THESE

19  DIFFERENT AGENCIES MR. WATTS ASKED YOU ABOUT.

20          WHAT DOES IT MEAN FOR THE NATIONAL TOXICOLOGICAL

21  PROGRAM TO CLASSIFY SOMETHING AS A SUBSTANCE WHICH MAY BE

22  REASONABLY ANTICIPATED TO BE A CANCER?  I WAS WRITING AS FAST AS

23  I COULD, I'M SORRY.

24  A.    THE NATIONAL TOXICOLOGICAL PROGRAM, UNLIKE IARC, USES ONLY A

25  TWO-POINT CLASSIFICATION, AN A LIST AND A B LIST, WHICH WE CALL

1  THE "KNOWN" AND THE "SUSPECT," FOR SHORT, BUT YOU DESCRIBED IT

2  CORRECTLY AS REASONABLY ANTICIPATED TO BE.

3          THE FACT OF THE MATTER IS THAT THE AGENTS ON THE B

4  LIST, THE SUPPOSEDLY REASONABLY ANTICIPATED TO BE, ARE NOT

5  REASONABLY ANTICIPATED TO BE.  MOST OF THEM DO NOT MOVE FROM THE

6  B LIST TO THE A LIST.  THEY ARE, IN FACT, ANIMAL CARCINOGENS.

7  MANY HAVE BEEN ON THE LIST FOR DECADES.

8          FORMALDEHYDE IS ON THE B LIST.  AND IS GOING TO BE

9  REEVALUATED THIS FALL.

10 Q.   WHAT IS THE B LIST?

11 A.   THE B LIST IS THE SUSPECT, THE REASONABLY ANTICIPATED TO BE

12 LIST.

13 Q.   DOES THAT MEAN IT'S A KNOWN CARCINOGEN?

14 A.   NO, THAT IT IS A SUSPECT.

15 Q.   KNOWN CARCINOGEN TO ANIMALS?

16 A.   YES.

17 Q.   IS IT RATS AND MONKEYS OR JUST RATS?

18 A.   I DON'T KNOW.

19 Q.   WHAT ABOUT -- WHAT DOES IT MEAN FOR THE EPA TO CALL SOMEBODY

20 A PROBABLE -- CALLS SOMETHING A "PROBABLE CARCINOGEN"?

21 A.   MR. WEINSTOCK, AS I WANTED TO MAKE CLEAR, I DO NOT FOLLOW

22 THE CLASSIFICATIONS OF REGULATORY AGENCIES.  I FOLLOW ONLY IARC

23 AND NTP, WHICH TRY TO BASE THEIR JUDGMENTS STRICTLY ON SCIENCE.

24 Q.   THAT'S AN EXCELLENT POINT.  WHY DO YOU FOLLOW ONLY IARC AND

25 NTP?  I HOPE I SAID IT RIGHT.

1  A.   THE ISSUE WITH THE REGULATORY AGENCIES, SUCH AS NIOSH, SUCH

2  AS OSHA, EPA, AN ISSUE WITH WHICH I HAVE NO PROBLEM WHATSOEVER IS

3  THAT THEY HAVE A DIFFERENT MANDATE THAN DOES IARC AND NTP.  IT IS

4  THEIR DUTY TO PROTECT THE PUBLIC HEALTH.  AND SO THEY

5  SPECIFICALLY SAY THAT THEY ARE WILLING TO CLASSIFY AN AGENT AS IF

6  IT IS A CARCINOGEN, IF, IN THEIR OPINION, IT IS A DISTINCT

7  POSSIBILITY.

8           IARC AND NTP DO NOT DO THAT.  NOW, OF COURSE, THIS IS

9  NOT A BRIGHT LINE IN ACTUAL PRACTICE, BUT NONETHELESS, THE

10  PHILOSOPHIES, THE UNDERLYING PRINCIPLES OF THOSE TWO GROUPS OF

11  AGENCIES ARE QUITE DIFFERENT.  ONE IS STRICTLY SCIENCE BASED.

12  ONE IS PUBLIC-HEALTH BASED.

13  Q.   SO IF I UNDERSTOOD CORRECTLY, YOU'RE FOCUSING ON THE ONES

14  THAT ARE SCIENCE BASED?

15  A.   ABSOLUTELY.

16  Q.   IF IARC REVIEWED CASE CONTROL STUDIES AND YOU REVIEWED CASE

17  CONTROL STUDIES, WHY DIDN'T YOU RELY ON CASE CONTROL STUDIES?

18  A.   MY VIEW, AND I THINK A WIDELY-HELD VIEW IN EPIDEMIOLOGY, IS

19  THAT COHORT STUDIES OR FOLLOW-UP STUDIES TRUMP THE CASE CONTROL

20  STUDIES.  THEY ARE MUCH LARGER, THEY ARE MUCH LONGER, MUCH

21  HEAVIER EXPOSURE, AND GENERALLY CONSIDERED VASTLY SUPERIOR.

22           IN THE PRESENCE OF NEGATIVE COHORT STUDIES, I WOULD NOT

23  PRESUME TO MAKE A JUDGMENT OF CAUSALITY ON A CASE CONTROL STUDY,

24  AND VICE VERSA.  CASE CONTROL STUDIES ARE FINE AS EXPLORATORY

25  STUDIES, BUT THEY VIRTUALLY NEVER PROVIDE DEFINITIVE FINDINGS.

1    Q.   IARC REFERRED TO A 1997 META-ANALYSIS, AND I THINK YOU

2    SUGGESTED THERE WAS A LATER ONE.

3    A.   THERE IS.

4    Q.   AND WHAT DID THAT ONE REVEAL?

5    A.   THAT ONE, I CAN'T RECALL SPECIFICALLY WHETHER IT LOOKED AT

6    NASOPHARYNGEAL CANCER, BUT IT CONCLUDED THAT THERE WAS NO, THAT

7    THERE WAS NOT EVIDENCE THAT, OF A SUFFICIENT NATURE TO CLASSIFY

8    FORMALDEHYDE AS A CARCINOGEN FOR ANY FORM OF CANCER.

9    UNFORTUNATELY, I DIDN'T BRING THAT PAPER WITH ME, BUT...

10   Q.   GARY MARSH.  THE GARY MARSH STUDY, WHAT DID SAY, THE

11   WALLINGFORD PLANT?

12   A.   GARY MARSH DID TWO COMPLETELY DIFFERENT, AT LEAST TWO

13   COMPLETELY DIFFERENT KINDS OF INVESTIGATIONS.  HE DID A DETAILED

14   REANALYSIS OF THE WALLINGFORD PLANT, AND HE ALSO DID A

15   BROADER-BASED REANALYSIS OF THE DATA FOR ALL OF THE PLANTS.

16   Q.   WELL, IF WE CAN BACK UP.  WE'VE TALKED ABOUT SOME OF THESE

17   EPIDEMIOLOGICAL CONCEPTS.  WHAT IS A CONFOUNDING FACTOR?

18   A.   A CONFOUNDING FACTOR IS SOMETHING THAT IS ASSOCIATED WITH

19   WHAT YOU'RE STUDYING AND WHICH MAY BE A CAUSE OF THE DISEASE.  IN

20   OUR SPECIFIC CASE, THE CONFOUNDING FACTOR, I THINK, OF RELEVANCE

21   HERE IS WORK IN THE NONFERROUS INDUSTRIES.

22        GARY MARSH HAS CONTENDED THAT THE EXCESS OF

23   NASOPHARYNGEAL CANCER IN THE WALLINGFORD COHORT MAY BE A RESULT

24   OF THE FACT THAT A NUMBER OF ITS WORKERS WOULD HAVE PREVIOUSLY

25   WORKED IN THE NONFERROUS INDUSTRIES, WHERE THERE WOULD BE AN

1   INCREASED RISK OF NASOPHARYNGEAL CANCER, SO THAT'S THE

2   CONFOUNDING FACTOR.

3   Q.   SO I WANT TO JUST DRILL DOWN ON THAT.   BECAUSE WE KEPT GOING

4   BACK AND FORTH ON THE NUMBERS BETWEEN MR. WATTS'S MOTHER'S CASE

5   AND THE WALLINGFORD STUDY, THE STUDY OF THE WALLINGFORD PEOPLE.

6   HOW MANY CASES OF NASOPHARYNGEAL CANCER DO WE HAVE IN THE

7   HAUPTMANN PAPER?

8   A.   WE HAVE TEN.   IN TABLE ONE, WE HAVE TEN.

9   Q.   AND HOW MANY OF THESE ARE RELATED TO PLANT NUMBER 1?

10  A.   WELL, I HAD THOUGHT IT WAS FOUR OR FIVE, AND MR. WATTS HAS

11  APPARENTLY CORRECTED ME AND POINTED OUT THAT THERE WERE SEVEN

12  THERE.

13  Q.   SEVEN IN THE ONE PLANT?

14  A.   WELL, THAT'S WHAT HE SAYS.   I DON'T RECALL ANYTHING

15  DIFFERENT, SO I'LL ACCEPT THAT.

16  Q.   SO WHEN YOU SAY THERE -- YOU NEVER SUGGESTED THERE WERE ZERO

17  CASES IN THE OTHER NINE PLANTS?

18  A.   NO, NO, OF COURSE NOT.

19  Q.   I THOUGHT THAT'S WHAT HE WAS ASKING YOU, BUT MAYBE I HEARD

20  IT WRONG.

21        IN THE ONE PLANT THERE IS SEVEN CASES, HOW MANY OF

22  THOSE CASES DID GARY MARSH ANALYZE IN TERMS OF A POTENTIAL

23  CONFOUNDING FACTOR?

24  A.   ALL OF THEM.

25  Q.   HOW MANY DID HE FIND HAD WORKED IN THESE NONFERROUS METAL

1  INDUSTRY?

2  A.    I DON'T REMEMBER THE NUMBER.

3  Q.    DO YOU REMEMBER THIS:  WOULD THE NUMBER CHANGE THE

4  STATISTICAL SIGNIFICANCE OF THE OUTCOME?

5  A.    OH, YES.

6  Q.    IF GARY MARSH IS RIGHT?

7  A.    YES.

8  Q.    DOES EVEN THAT ONE PLANT LOSE ITS STATISTICAL SIGNIFICANCE?

9  A.    WELL, THE STATISTICAL SIGNIFICANCE IN THAT ONE PLANT IS VERY

10 DUBIOUS.  AS I'VE ALREADY POINTED OUT, THERE IS ONE OF THE

11 STATISTICAL SIGNIFICANCE TESTS THAT IS INCONSISTENT WITH ANOTHER.

12 I DON'T THINK I MENTIONED THAT THEY ACTUALLY LOOKED AT

13 FORMALDEHYDE EXPOSURE FIVE DIFFERENT WAYS IN THAT STUDY AND FOUND

14 STATISTICAL SIGNIFICANCE IN ONLY TWO.  AND EVEN ONE OF THOSE WAS

15 BORDERLINE, SO IT IS FAR FROM A PERSUASIVE STATISTICALLY

16 SIGNIFICANT STUDY, AND YES, A REDUCTION OF ONE OR TWO OR THREE OF

17 THOSE CASES WOULD COMPLETELY WIPE OUT THE -- ANY PROSPECT OF

18 STATISTICAL SIGNIFICANCE.

19 Q.    AND IF WE LOSE HAUPTMANN, WHAT COHORT STUDY SUPPORTS IARC'S

20 POSITION?

21 A.    NO COHORT STUDY.  THEY WOULD HAVE TO RELY ENTIRELY ON THE

22 CASE CONTROL STUDIES.

23 Q.    GOING BACK TO HAUPTMANN, I'M SORRY, GOING BACK TO MARSH,

24 MR. WATTS POINTS OUT THAT, BUT THEY DON'T -- IT'S THE SILVERSMITH

25 CAPITAL OF THE WORLD.  WHY DON'T THEY HAVE A HIGHER INCIDENCE OF

1    NASOPHARYNGEAL CANCER COMPARED TO THE GENERAL POPULATION?

2    A.    THE AREA IN QUESTION IS THE TWO COUNTIES OF NEW HAVEN AND I

3    BELIEVE IT'S MIDDLESEX.   THESE TWO COUNTIES TOGETHER CONSIST OF

4    APPROXIMATELY A MILLION PEOPLE.   THE NUMBER OF PEOPLE IN THE

5    WALLINGFORD AREA IS ABOUT 40,000, OR 4 PERCENT.

6              I DO NOT KNOW WHAT PERCENT OF PEOPLE IN THE WHOLE AREA

7    WERE ACTUALLY EMPLOYED IN THE NONFERROUS METAL INDUSTRIES.   BUT

8    UNLESS IT WAS AN OVERWHELMING MAJORITY OF THE PEOPLE, THAT

9    PHENOMENON COULD NOT DRIVE THE EXPECTED NUMBER FOR THE TWO

10   COUNTIES AS A WHOLE.   THE EXPECTED NUMBER FOR THE TWO COUNTIES AS

11   A WHOLE IS GOING TO BE DRIVEN BY THE GENERAL CAUSES OF

12   NASOPHARYNGEAL CANCER, WHICH MAY BE QUITE LOW IN THAT COUNTY.

13   Q.    THE WALLINGFORD AREA HAD 40,000 PEOPLE?

14   A.    I THINK IT'S ABOUT 43,000.

15   Q.    AND IT --

16   A.    THAT'S THE CITY OF WALLINGFORD ITSELF.

17   Q.    BUT THE TWO-COUNTY AREA INCLUDED, WELL, DOWN HERE WE CALL

18   THEM "PARISHES," BUT THE TWO-COUNTY AREA INCLUDED HARTFORD,

19   CONNECTICUT, THE LARGEST CITY IN CONNECTICUT; DID IT NOT?

20   A.    I DON'T KNOW IF IT DOES OR NOT, IT CERTAINLY INCLUDES

21   NEW HAVEN.

22   Q.    NEW HAVEN, CONNECTICUT.   YOU DON'T KNOW IF IT INCLUDES

23   HARTFORD?

24   A.    I DON'T KNOW IF IT INCLUDES HARTFORD.   ACTUALLY, I DON'T

25   THINK IT DOES.

1   Q.   BUT YOU KNOW THE POPULATION OF THE TWO-COUNTY AREA IS A

2   WHOLE LOT MORE THAN JUST THE PART OF WALLINGFORD?

3   A.   IT'S A MILLION PEOPLE.

4   Q.   FIFTY TIMES MORE THAN THE 40,000 IN WALLINGFORD?

5   A.   TWENTY-FIVE TIMES MORE.

6   Q.   TWENTY-FIVE TIMES.  I ALWAYS BLOW THE MATH.

7        I'M CORRECT THAT YOU'VE NEVER PUBLISHED A PAPER AT THE

8   REQUEST OF THE FORMALDEHYDE COUNCIL ON NASOPHARYNGEAL CANCER; IS

9   THAT RIGHT?

10  A.   THAT IS CORRECT.

11  Q.   YOU DID PUBLISH ONE PAPER THAT WAS FUNDED BY THE

12  FORMALDEHYDE COUNCIL ON FORMALDEHYDE, CORRECT?

13  A.   YES.  IT'S THE ONE THAT MR. WATTS SHOWED US.

14  Q.   WHAT WERE THE CIRCUMSTANCES OF YOU PRODUCING THAT PAPER?

15  A.   THE AMERICAN TOXICOLOGICAL SOCIETY WANTED TO HAVE A

16  SYMPOSIUM ON FORMALDEHYDE AND LEUKEMIA LYMPHOMA.  THEY ASKED ME

17  IF I WOULD CHAIR THAT SYMPOSIUM AND IF I WOULD WRITE AN OVERVIEW

18  OF THE EPIDEMIOLOGY OF FORMALDEHYDE AND LEUKEMIA LYMPHOMA.

19       DR. AXTEN'S, ACTUALLY AS THEY ARE, I DON'T KNOW WHAT TO

20  SAY, AGENT, I GUESS, APPROACHED ME AND ASKED ME IF I WOULD DO

21  THIS AND I AGREED.  AND HE HAD ARRANGED THE FINANCIAL SPONSORSHIP

22  WITH THE FORMALDEHYDE COUNCIL TO PAY ME AND HIM TO WRITE THAT

23  PAPER AND FOR ME TO SERVE AS THE CHAIRMAN OF THAT SYMPOSIUM.

24  Q.   DID THEY INSTRUCT YOU TO GET THE HAUPTMANN PAPER AND MAKE

25  SURE WE CAN DISCREDIT IT?

1    A.    I NEVER HAD ANY DIRECT CONTACT WITH THE FORMALDEHYDE COUNCIL

2    AT THAT TIME.   THEY DIDN'T DIRECT ME TO DO ANYTHING.

3    Q.    YOU SAID THEY -- IT WAS AN UNUSUAL SITUATION, BUT YOU

4    ACTUALLY GAVE THEM, WELL, PART OF YOUR ROUTINE PRACTICE, IF

5    SOMEBODY SPONSORS IT, YOU LET THEM TAKE A LOOK AT IT, CORRECT?

6    A.    ABSOLUTELY.

7    Q.    AND THEY LOOKED AT THIS?

8    A.    WELL, I SENT IT TO THEM.   AND I GOT A MESSAGE BACK THROUGH

9    DR. AXTEN THAT THEY WOULD NOT COMMENT ON IT BECAUSE OF THE FACT

10   THAT IT WAS PART OF A SYMPOSIUM PROCEEDINGS.   I HAD ACTUALLY

11   PRESENTED THE PAPER VERBALLY AT THE MEETING.   THERE WOULD BE,

12   WELL, IT WOULD BE EXTREMELY AWKWARD TO MAKE ANY SUBSTANTIVE

13   CHANGE IN THE PRINTED PAPER.

14   Q.    SO YOU HAD ACTUALLY PRESENTED THE RESULTS BEFORE ANYBODY

15   FROM THE FORMALDEHYDE COUNCIL SAW IT, TO YOUR KNOWLEDGE?

16   A.    ABSOLUTELY.   ABSOLUTELY.

17        MR. WEINSTOCK:   THANK YOU VERY MUCH, DOCTOR.   WELL,

18   MAYBE NOT.   I'M SORRY, YOUR HONOR, VERY BRIEFLY.

19                          EXAMINATION

20   BY MR. WEINSTOCK:

21   Q.    ON THAT LAST POINT, IF SOMEBODY HAD CALLED YOU AND TOLD YOU

22   WHAT RESULT THEY EXPECTED BEFORE YOU WROTE YOUR PAPER, WHAT WOULD

23   YOUR RESPONSIBILITY BE?

24   A.    WELL, I DON'T KNOW WHO THIS SOMEBODY WOULD BE.   I MIGHT HANG

25   UP THE PHONE OR I MIGHT SIMPLY TELL THEM THAT THAT WAS JUST

1    SOMETHING I WASN'T GOING TO DISCUSS.

2    Q.   WE TALKED ABOUT THESE SEVEN DEATHS, MR. WATT'S FIGURE OF

3    SEVEN DEATHS.   THAT'S NOT TO SUGGEST THAT SEVEN DEATH ARE ALL

4    EXCESS DEATHS, CORRECT?

5    A.   OH, NO, THERE ARE ONLY ABOUT THREE OR FOUR EXCESS.

6    Q.   WE'D STILL EXPECT TO SEE SOME LEVEL OF NASOPHARYNGEAL CANCER

7    IN THAT PLANT, CORRECT?

8    A.   THE EXPECTED NUMBER IN THAT PLANT IS FOUR.

9    Q.   SO THE EXCESSES?

10   A.   MAY BE THREE.

11   Q.   MAY BE THREE, MAY BE FOUR, DEPENDING ON MR. WATTS'S NUMBERS,

12   CORRECT?

13   A.   YES.

14            MR. WEINSTOCK:   THANK YOU VERY MUCH.

15            THE COURT:   THANK YOU, DOCTOR, YOU MAY STEP DOWN.

16               WE'RE GOING TO TAKE A SHORT BREAK HERE.   WE WILL

17   RESUME AT 10:30, WHICH IS ABOUT A 10-, 15-MINUTE BREAK.   WE'LL

18   RESUME AT 10:30.

19            THE MARSHAL:   ALL RISE.

20            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

21   PANEL LEAVES THE COURTROOM AND A BRIEF RECESS WAS TAKEN.)

22            THE DEPUTY CLERK:   ALL RISE.

23            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

24   PANEL ENTERS THE COURTROOM.)

25            THE COURT:   YOU MAY BE SEATED.

1           LADIES AND GENTLEMEN OF THE JURY, LET ME GIVE YOU A

2    LITTLE UPDATE ON WHERE WE ARE IN TERMS OF OUR PLANS FOR THE DAY.

3    I'M ADVISED BY COUNSEL THAT WE WILL HAVE ONE MORE WITNESS THAT

4    MR. WEINSTOCK IS GOING TO PUT ON AT THIS TIME.  WE ARE GOING TO

5    HEAR HIS TESTIMONY.  WE'RE GOING TO GO AHEAD AND CLEAN UP A FEW

6    THINGS, HOUSEKEEPING-TYPE THINGS, WITH THE ATTORNEYS.  AND AT

7    THAT POINT, WE WILL LET YOU GO FOR THE DAY; HOWEVER, WE MAY GO

8    INTO THE LUNCH HOUR AS PART OF THIS PROCESS.  RATHER THAN TAKE A

9    LUNCH HOUR AND BRING YOU BACK FOR ANOTHER 45 MINUTES OR SO OR

10   HALF HOUR OR WHATEVER IT IS, WE THINK WE CAN GET ALL OF THIS DONE

11   BEFORE WE GET THROUGH TOO MUCH OF THE LUNCH HOUR.

12           SO IN THE INTEREST OF LETTING YOU GO FOR THE DAY,

13   WE WILL TRY TO WORK THROUGH, EVEN IF IT EXTENDS INTO THE LUNCH

14   HOUR.  THE BALANCE OF THE DAY, OF COURSE, YOU'LL BE FREE TO GO.

15   I WILL WORK WITH THE ATTORNEYS ON CERTAIN THINGS THAT MUST BE

16   DONE PRIOR TO OUR PROCEEDINGS TOMORROW.

17           TOMORROW WILL BE -- IF WE START AT 8:30, WE WILL

18   HAVE CLOSING ARGUMENTS.  WE'LL TALK ABOUT THAT AT THE END OF THE

19   DAY.  AND THEN I'LL GIVE YOU THE INSTRUCTIONS, AND YOU'LL GET THE

20   CASE TO DELIBERATE SOMETIME LATE IN THE MORNING TOMORROW.

21           SO THAT'S THE SCHEDULE.  LET'S GO AHEAD AND

22   CONTINUE ON AND SEE IF WE CAN WRAP UP THE EVIDENTIARY PORTION OF

23   THE CASE BEFORE WE LET YOU GO FOR THE DAY.

24           MR. WEINSTOCK:  YOUR HONOR, WE'D CALL DR. JAMES WEDNER

25   TO THE STAND.

1          THE COURT:  DR. WEDNER.

2          MR. WATTS:  MICHAEL AND I NEED TO DISCUSS SOMETHING WITH

3    YOU VERY BRIEFLY.

4          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

5    A CONFERENCE HELD AT THE BENCH.)

6          MR. WEINSTOCK:  I DON'T KNOW HOW TO DO THIS BECAUSE HE

7    DID AN IME ON BOTH THE MOTHER AND THE SON.  THE MOTHER TESTIFIED

8    THAT SHE'S NOT MAKING A CLAIM.  THERE IS NOTHING WRONG WITH HER.

9    I DO NOT WANT TO GO THROUGH HIS IME ON THE MOTHER IF WE DON'T

10   HAVE THAT CLAIM ANYMORE.

11         THE COURT:  WELL, LET'S BE CLEAR ON IT.

12         MR. WATTS:  WE ARE CLEAR.  HER ONLY CLAIM IS FOR THE

13   FEAR OF CANCER RELATED TO HER SON AND THE MENTAL ANGUISH ASPECTS.

14         THE COURT:  WELL, AS LONG AS WE HAVE AN AGREEMENT THAT'S

15   CLEAR ON THE RECORD, THEN THAT'S FINE.

16         MR. WATTS:  YOU DO.  AND YOU'LL HAVE PAPERS FROM ME

17   SAYING TAKE THAT OUT OF THE CHARGE BECAUSE OF IT.

18         THE COURT:  GOOD.

19         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

20   CONFERENCE CONCLUDED.)

21         THE DEPUTY CLERK:  PLEASE RAISE YOUR RIGHT HAND.  DO YOU

22   SOLEMNLY SWEAR THE TESTIMONY YOU ARE ABOUT TO GIVE WILL BE THE

23   TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU

24   GOD?

25         THE WITNESS:  I DO.

1                          **H. JAMES WEDNER**

2   WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE

3   CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:

4              THE DEPUTY CLERK:  THANK YOU, YOU MAY BE SEATED.

5                      DIRECT EXAMINATION

6   BY MR. WEINSTOCK:

7   Q.   DR. WEDNER, I BELIEVE WE HAVE A STIPULATION TO YOUR --

8              THE DEPUTY CLERK:  CAN YOU STATE AND SPELL YOUR FULL

9   NAME FOR RECORD.

10             THE WITNESS:  MY NAME IS H. JAMES WEDNER, W-E-D-N-E-R.

11                         EXAMINATION

12  BY MR. WEINSTOCK:

13  Q.   I BELIEVE WE HAVE A STIPULATION AS TO YOUR EXPERTISE IN --

14  AS A MEDICAL DOCTOR IN THE FIELDS OF ALLERGY AND IMMUNOLOGY --

15             MR. WATTS:  THAT'S TRUE.

16                         EXAMINATION

17  BY MR. WEINSTOCK:

18  Q.   -- BUT I WOULD LIKE TO GO INTO NOT ONLY THAT BUT -- TO SOME

19  EXTENT.

20             THE COURT:  WE'LL LET YOU ASK A FEW QUESTIONS ON THAT.

21  THE COURT WILL GO AHEAD AND ACCEPT THE WITNESS AS AN EXPERT IN

22  THE STATED FIELDS, AND YOU CAN GO AHEAD AND PROCEED.

23                         EXAMINATION

24  BY MR. WEINSTOCK:

25  Q.   AND I DO WANT TO ASK YOU NOT ONLY ABOUT THAT, BUT ABOUT YOUR

1  WORK WITH ASTHMATICS.  WHAT IS YOUR CURRENT INVOLVEMENT WITH

2  ASTHMATICS?

3  A.   I'M THE CHIEF OF THE DIVISION OF ALLERGY AND IMMUNOLOGY AT

4  WASHINGTON UNIVERSITY SCHOOL OF MEDICINE, WHICH IS IN ST. LOUIS,

5  MISSOURI.  AND I RUN TWO CLINICS.  ONE IS CALLED THE ASTHMA AND

6  ALLERGY CENTER.  IT'S A LARGE CLINIC IN WHICH WE SEE PATIENTS,

7  BOTH ADULTS AND CHILDREN, WHO HAVE ASTHMA AND ALLERGIC DISEASES.

8  IT'S IN SUBURBAN ST. LOUIS COUNTY.

9           AND THEN WE HAVE ANOTHER CLINIC, WHICH IS CALLED THE

10  LUNG CENTER, WHICH IS ON THE CAMPUS OF WASHINGTON UNIVERSITY

11  SCHOOL OF MEDICINE.  ALSO, WE SEE BOTH ADULTS AND CHILDREN.

12  AGAIN, THAT'S MORE OF AN INNER CITY POPULATION.  THE OTHER IS

13  MORE OF A COUNTY, SUBURBAN POPULATION.

14  Q.   IN THE HIERARCHY OF MEDICAL SCHOOLS, WHERE DOES WASHINGTON

15  UNIVERSITY FALL?

16  A.   CURRENTLY, WE'RE THIRD.

17  Q.   WORKING YOUR WAY UP?

18  A.   WE'RE TRYING TO STAY WHERE WE ARE.

19  Q.   HOW LONG HAVE YOU WORKED WITH ASTHMATICS?

20  A.   35 YEARS.

21  Q.   ARE YOU -- HAVE YOU -- DO YOU JUST WORK WITH ASTHMATICS, OR

22  DO YOU REVIEW THE WORLD'S LITERATURE ON ASTHMA?

23  A.   I SPEND MOST OF MY TIME WORKING AND REVIEWING THE

24  LITERATURE, SPENDING A LOT OF TIME STUDYING ASTHMATICS.  WE'VE

25  STUDIED ASTHMA, PARTICULARLY INNER CITY ASTHMA, FOR MANY, MANY

1   YEARS.

2   Q.   WE'VE HAD A LOT OF DIFFERENT EXPERTS COME IN HERE IN THE

3   LAST WEEK AND A HALF.   WHAT WERE YOU DOING YESTERDAY AFTERNOON?

4   A.   TAKING CARE OF ASTHMATICS.

5   Q.   IS THAT WHAT YOU CALL CLINICALS?

6   A.   YEAH, I SAW -- I HAD CLINIC ALL DAY YESTERDAY.   I FLEW IN

7   AFTER CLINIC.

8   Q.   IN YOUR 30, 35 YEARS OF WORKING WITH ASTHMATICS, WHAT TYPE

9   OF EXPERIMENTAL STUDIES HAVE YOU DONE REGARDING ASTHMA IN KIDS?

10  A.   WE DID THE FIRST LARGE-SCALE STUDY OF INNER CITY ASTHMA.   IT

11  WAS CALLED THE NATIONAL INNER CITY ASTHMA STUDY.   THERE WERE FIVE

12  LARGE CENTERS.   AND WHAT WE DID WAS THE FIRST INTERVENTIONAL

13  STUDY, FIRST OF ALL, LOOKING AT WHAT WERE THE CAUSES OF THE

14  MARKED INCREASE IN ASTHMA THAT OCCURS IN THE INNER CITY AND,

15  SECOND, LOOKING AT WHAT WE MIGHT DO ABOUT THAT.   AND WE WERE THE

16  FIRST GROUP TO EVER SHOW AN INTERVENTION THAT ACTUALLY WORKED IN

17  A STATISTICALLY SIGNIFICANT BASIS.

18  Q.   WHAT INTERVENTION WAS THAT?

19  A.   WE DID WHAT WAS CALLED AN ASTHMA COUNSELOR STUDY.   WHAT WE

20  HAD HOPED TO SHOW WAS THAT THERE WAS A FACTOR THAT, IF YOU WENT

21  INTO THE INNER CITY, YOU WOULD FIND PERHAPS ONE OR TWO THINGS

22  THAT DIFFERENTIATED THE INNER CITY FROM SUBURBIA.

23       AND WHAT WE FOUND IS THAT OUR INITIAL FEELINGS WERE

24  TOTALLY WRONG.   THAT FOR EACH CHILD IN THE INNER CITY, THERE WAS

25  SOMETHING THAT WE COULD LINK TO THE FACT THAT THEY HAD ASTHMA

1   THAT WASN'T DOING VERY WELL.  BUT, ALTHOUGH THERE WERE CERTAIN

2   FACTORS THAT WERE COMMON, FOR EXAMPLE, WE WERE THE FIRST PEOPLE

3   THAT IDENTIFIED THE NUMBER ONE ALLERGIN IN THE INNER CITY IS

4   COCKROACHES.  IT'S NOT DUST MITE OR CATS LIKE IT IS IN SUBURBIA.

5   WE ALSO IDENTIFIED THE NUMBER TWO ALLERGIN BEING MICE.

6           BUT PSYCHOSOCIAL PROBLEMS ARE ALSO VERY IMPORTANT.  AND

7   SO WHAT WE DID IS EACH GROUP HAD AN ASTHMA COUNSELOR WHO WORKED

8   WITH EACH CHILD AND THEIR PARENTS AND OTHER AREAS SO THAT WE

9   WOULD IDENTIFY WHAT THE PROBLEM WAS, TRY AND SOLVE THE PROBLEM.

10  AND THEN, ALONG WITH GETTING THEM APPROPRIATE MEDICATION, MAKING

11  SURE THEY TOOK THEIR MEDICINE, WE WERE THE FIRST ONES TO SHOW

12  THAT THAT KIND OF AN APPROACH COULD ACTUALLY MAKE THESE YOUNG

13  PEOPLE BETTER.

14  Q.   DID YOU CONSIDER THAT THERE WERE OTHER ENVIRONMENTAL FACTORS

15  THAT MIGHT BE CAUSING OR AGGRAVATING ASTHMA?

16  A.   WE MEASURED A HUGE NUMBER OF ENVIRONMENTAL FACTORS.  WE

17  LOOKED AT EVERYTHING THAT WE COULD GET OUR HANDS ON.

18  Q.   WAS ONE OF THOSE THINGS FORMALDEHYDE?

19  A.   EARLY ON, WE MEASURED FORMALDEHYDE.  WE WERE UNABLE TO

20  DOCUMENT THE FORMALDEHYDE.  WE MEASURED NITROGEN DIOXIDE AND

21  OTHER NITROGEN OXIDES.  WE WERE UNABLE TO DOCUMENT THAT THEY WERE

22  A FACTOR, SO IN THE LATER PARTS OF THE STUDY WE DIDN'T MEASURE

23  THEM.

24  Q.   SO IN THE EARLY PARTS OF THIS STUDY YOU CONSIDERED

25  FORMALDEHYDE, BUT, BECAUSE OF WHAT YOU HAD FOUND, IT FELL OUT OF

1  THE STUDY?

2  A.   IT FELL OUT.  NITROGEN DIOXIDE.  OTHER IRRITANTS ALL FELL

3  OUT.

4  Q.   YOU SAID ONE THING THAT I GLOSSED OVER TOWARDS THE END OF

5  YOUR ANSWER AS TO WHAT YOU WERE DOING.  DID YOU SAY THAT THERE

6  WAS A SIGNIFICANT RELATIONSHIP BETWEEN IMPROVEMENT AND TAKING THE

7  PROPER MEDICINE?

8  A.   OH, ABSOLUTELY.

9  Q.   WELL, IT MAY BE JUMPING THE GUN, BUT WHAT IS THE PROPER WAY

10  TO TREAT ASTHMA WITH MEDICINE?

11  A.   THE PROPER WAY TO TREAT ASTHMA, THERE ARE TWO KINDS OF

12  MEDICINES FOR ASTHMA.  WE CALL THOSE CONTROLLERS AND RELIEVERS.

13  ASTHMA IS A DISEASE WHERE YOU HAVE INFLAMMATION IN THE LUNGS, AND

14  A CONTROLLER IS A MEDICINE THAT CONTROLS THE INFLAMMATION.  AND

15  IT'S A MEDICINE THAT ASTHMATICS -- AND IT DOESN'T MATTER WHAT

16  YOUR AGE IS -- SHOULD TAKE EVERY SINGLE DAY TO CONTROL THE

17  INFLAMMATION.

18        RELIEVERS ARE LARGELY SHORT-ACTING BRONCHODILATORS,

19  LIKE ALBUTEROL.  AND THAT IS TAKEN TO RELIEVE THE ACUTE SYMPTOMS.

20  SO YOUNG PEOPLE OR OLD PEOPLE SHOULD TAKE A CONTROLLER MEDICINE

21  EVERY SINGLE DAY FOR THEIR ASTHMA, AND THAT WILL MINIMIZE THE USE

22  OF THE RELIEVER MEDICINES LIKE ALBUTEROL.

23  Q.   ONE OF THE THINGS I NOTICED IN YOUR REPORT IS THAT YOU STATE

24  THERE'S A -- BECAUSE OF THE WIDE USE OF FORMALDEHYDE, THERE IS A

25  LARGE BODY OF MEDICAL LITERATURE INVESTIGATING THE ALLEGED HEALTH

1  EFFECTS OF FORMALDEHYDE?

2  A.   THAT'S CORRECT.

3  Q.   DID ALL OF THIS LITERATURE START AFTER THE FEMA FORMALDEHYDE

4  TRAILERS WERE MADE?

5  A.   NO.  ACTUALLY, THE INTEREST IN FORMALDEHYDE BEGAN IN THE

6  LATE '60S, EARLY '70S.  AND IT ACTUALLY STARTED WITH UREA

7  FORMALDEHYDE FOAM INSULATION WHICH WAS PUT IN A LOT OF HOMES AND

8  OTHER BUILDINGS.  AND THERE WAS A LOT OF INTEREST IN WHETHER OR

9  NOT THE FORMALDEHYDE MIGHT BE CAUSING SOME DEGREE OF HEALTH --

10  ADVERSE HEALTH EFFECTS, WHETHER IT WAS PULMONARY, UPPER AIRWAY OR

11  OTHER HEALTH EFFECTS.

12         AND THOSE BEGAN A SERIES OF STUDIES WHICH ACTUALLY

13  STARTED PROBABLY IN THE VERY EARLY 1970S, AND HAVE CONTINUED TO

14  TODAY.  SO THIS IS A VERY OLD PROBLEM.  IT'S NOT A BRAND-NEW

15  PROBLEM.

16  Q.   AND IN TERMS OF THAT WORLD LITERATURE, IS THAT SOMETHING YOU

17  STAY CURRENT WITH?

18  A.   I'VE BEEN READING THAT LITERATURE SINCE THE EARLY '70S.

19  Q.   AS A CLINICIAN, DO YOU FIND THAT LITERATURE HELPS YOU

20  UNDERSTAND WHAT'S GOING ON WITH YOUR PATIENTS?

21  A.   ALL THE LITERATURE HELPS US UNDERSTAND WHAT'S GOING ON WITH

22  OUR PATIENTS.

23  Q.   WHAT EXACTLY IS FORMALDEHYDE?

24  A.   FORMALDEHYDE IS A LOW MOLECULAR WEIGHT SINGLE CARBON

25  MOLECULE.  IT'S A VERY SIMPLE BUT HIGHLY REACTIVE SINGLE CARBON

1   MOLECULE.  IT'S ONE CARBON, ONE OXYGEN AND TWO HYDROGENS.

2   Q.   IS IT USED IN NORMAL METABOLISM?

3   A.   IT IS A NORMAL METABOLIC BY-PRODUCT.

4   Q.   WHAT IS THE ODOR THRESHOLD TO FORMALDEHYDE?

5   A.   THERE ARE -- THE ODOR THRESHOLD VARIES WIDELY AMONG THE

6   NORMAL POPULATION.  MOST PEOPLE CAN DETECT -- AND BY DETECT, I

7   MEAN THAT IF YOU -- IF IT WERE THERE, YOU WOULD KIND OF SNIFF

8   AROUND AND SAY, GEE, IT'S THERE -- SOMETHING IN THE NEIGHBORHOOD

9   OF ABOUT 50 PARTS PER BILLION.  THERE ARE SOME VERY, VERY

10  SENSITIVE PEOPLE THAT CAN DETECT IT PERHAPS TENFOLD LOWER.  SO

11  THAT'S THE ODOR THRESHOLD.

12  Q.   WELL, I WANT TO FOLLOW YOU.  DID YOU SAY 50 PARTS PER

13  BILLION OR 500?

14  A.   50 PARTS PER BILLION IS THAT -- IS THAT YOU CAN DETECT IT.

15  Q.   IS IT DIFFERENT FOR EVERYBODY?

16  A.   YES.  THERE ARE SOME PEOPLE WHO HAVE REALLY GOOD NOSES AND

17  SOME PEOPLE LIKE ME WHO DON'T HAVE GOOD NOSES AT ALL.

18  Q.   WELL, WHEN WE SMELL FORMALDEHYDE, WHAT DOES THAT TRIGGER?

19  A.   WELL, IT JUST TRIGGERS THE FACT THAT YOU DETECT SOMETHING IN

20  YOUR ENVIRONMENT THAT IS -- THAT IS DIFFERENT.

21  Q.   AND HOW DO PEOPLE REACT WHEN THEY SMELL SOMETHING LIKE

22  FORMALDEHYDE?

23  A.   WELL, EVERYBODY REACTS DIFFERENTLY; BUT, IF YOU DON'T

24  PERCEIVE IT AS BAD, EVENTUALLY YOU WILL FORGET IT, TO BE HONEST.

25  Q.   IS THAT A CONCEPT CALLED ADAPTATION?

1  A.   WE ALL HAVE OR WERE PERCEIVED -- AND WE PERCEIVE MULTIPLE

2  ODORS IN OUR ENVIRONMENT ALL THE TIME.  WE'RE VERY GOOD AT

3  DETECTING THINGS, AND WE'RE ALSO VERY GOOD AT ADAPTING TO THEM SO

4  THAT WE CAN DETECT NEW ODORS.

5       SENSE OF SMELL IS THE MOST ANCIENT SENSE WE HAVE, AND

6  IT GOES TO A VERY ANCIENT PART OF OUR BRAIN, SO THAT WE CAN PUT

7  AWAY, IN ESSENCE, WE CAN ADAPT TO ODORS; SO, IF IS THERE A NEW

8  ODOR, WE'LL BE ABLE TO SENSE THAT.  IF YOU COULDN'T DO THAT, YOU

9  WOULD BE -- WOULDN'T BE ABLE TO DISCRIMINATE ODORS.  WE CAN DO

10  THAT FOR ALL OF OUR SENSES, BUT WE CAN DO IT VERY WELL FOR ODORS.

11  Q.   IS THAT PART OF THE BODY'S NORMAL DEFENSE MECHANISMS, TO GET

12  ADAPTED TO ONE SMELL SO THAT IF A SMELL, LIKE, FOR EXAMPLE, THE

13  ROOM IS ON FIRE, YOU WOULD STILL BE ABLE TO DISTINGUISH THAT?

14  A.   ABSOLUTELY.

15  Q.   CAN FORMALDEHYDE ACT AS AN IRRITANT?

16  A.   YES, IT CAN.

17  Q.   WHEN IT ACTS AS AN IRRITANT, WHAT PART OF THE BODY DOES IT

18  IRRITATE?

19  A.   IT USUALLY IRRITATES THE MUCUS MEMBRANES OF THE UPPER

20  AIRWAY.  SO THE MOST SENSITIVE IS PROBABLY THE EYES, SO YOU CAN

21  GET EYE IRRITATION.  AND THEN THE NOSE, WHICH IS A VERY SENSITIVE

22  MUCUS MEMBRANE.  AND THEN, ULTIMATELY, THE ORAL MUCOSA.  WHEN YOU

23  OPEN YOUR MOUTH, YOU CAN GET A SORE MOUTH.

24       SO, YES, IT'S DEFINITELY WHAT WE CALL A PRIMARY

25  IRRITANT, WHICH MEANS THAT EVERYBODY, TO A GREATER OR LESSER

1    EXTENT, WILL BE IRRITATED BY FORMALDEHYDE.

2    Q.    WHAT ABOUT THE LUNGS?

3    A.    IT'S NOT A PRIMARY IRRITANT TO THE LUNGS BECAUSE IT DOESN'T

4    GET INTO THE LUNGS.  ONE OF THE THINGS ABOUT FORMALDEHYDE IS THAT

5    IT IS SO REACTIVE THAT IT LITERALLY BINDS TO THE UPPER AIRWAY,

6    AND IT NEVER GETS INTO THE LUNGS.

7    Q.    WE'VE SEEN OR WE'VE HAD PEOPLE DISCUSS VARIOUS RESPONSES THE

8    BODY CAN MAKE TO FORMALDEHYDE.  WHAT ABOUT THE -- AND I ALWAYS

9    GET THIS ONE WRONG -- THE TRIGEMINAL NERVE -- TRIGEMINAL NERVE?

10   A.    TRIGEMINAL.

11   Q.    I KNEW I'D GET IT WRONG.

12   A.    THE TRIGEMINAL NERVE IS PART OF THE VAGUS SYSTEM, WHICH IS A

13   VERY IMPORTANT SYSTEM THAT WE USE BOTH TO SENSE THINGS AND TO

14   TELL PARTS OF THE BODY THAT WE'VE SENSED THEM.

15        SO THE TRIGEMINAL NERVE IS A BIG NERVE WHICH INNERVATES

16   MOST OF OUR UPPER HEAD.  AND IT'S CALLED TRIGEMINAL BECAUSE IT'S

17   GOT THREE PARTS TO IT.  ONE PART GOES HERE, AND IT BASICALLY

18   IS -- PART OF IT IS WHAT THE DENTIST DOES WHEN HE ANESTHETIZES

19   YOUR JAW.  AND ANOTHER PART GOES TO THE NOSE, AND ANOTHER PART

20   THAT GOES UP HERE.

21        AND THERE ARE DISEASES THAT CAUSE INTENSE PAIN CALLED

22   TRIGEMINAL NEURALGIA.  IF YOU'VE EVER MET EVERYBODY THAT HAS

23   THAT, THEY CAN TELL WHERE EACH BRANCH IS BECAUSE SOMETIMES YOU

24   GET ONE BRANCH AND SOMETIME THE OTHER.

25        BUT THE TRIGEMINAL NERVE CARRIES THESE WHAT ARE CALLED

1    IRRITANT FIBERS.  IRRITANT FIBERS ARE VERY, VERY TINY NERVE

2    FIBERS, THE SMALLEST NERVE FIBERS, OFTEN REFERRED TO AS C FIBERS.

3    AND THAT'S BECAUSE THEY ARE TINY AND THEY ARE NOT MYELINATED.

4    THEY DON'T HAVE A COATING ON THEM.

5              AND WE USED TO THINK THAT THESE FIBERS --

6              THE COURT:  LET'S --

7              THE WITNESS:  IS THAT ENOUGH?

8              THE COURT:  -- GET TO THE NEXT QUESTION.

9                          EXAMINATION

10   BY MR. WEINSTOCK:

11   Q.   LET ME THROW IN A QUESTION; ALTHOUGH, IT IS GETTING CLOSER

12   TO THE LUNCH HOUR.

13              WOULD IRRITATING THAT NERVE AFFECT ASTHMA?

14   A.   THERE ARE INDIVIDUALS IN WHOM SENSORY SMELLS AFFECT ASTHMA,

15   BUT IRRITANT, PER SE, DOES NOT APPEAR TO.

16   Q.   SO THE IRRITANT PROPERTY OF FORMALDEHYDE HAS NO IMPACT ON

17   ASTHMA --

18   A.   THAT'S CORRECT.

19   Q.   -- THROUGH THAT MECHANISM?

20   A.   THROUGH THAT MECHANISM.

21   Q.   AND I THINK, IF I UNDERSTOOD YOU EARLIER, IT DOESN'T GET

22   INTO THE LUNGS TO DIRECTLY CONTACT IT?

23   A.    IT DOES NOT GET INTO THE LUNGS.

24   Q.   WHAT DOES IT MEAN TO BE SENSITIZED TO ASTHMA -- TO

25   FORMALDEHYDE?

1  A.   WELL, THERE ARE A NUMBER OF TERMS THAT ARE BATTED AROUND

2  CALLED SENSITIZATION.  TO AN ALLERGIST, WHICH IS ONE OF THE

3  THINGS THAT I DO, WHEN YOU'RE SENSITIZED, I THINK YOU'RE

4  ALLERGIC.

5       AND FORMALDEHYDE, NO ONE IS ALLERGIC TO FORMALDEHYDE IN

6  THE CLASSIC SENSE.  YOU DON'T BREATHE IN FORMALDEHYDE AND BECOME

7  ALLERGIC TO IT.  SOME PEOPLE ARE SENSITIZED TO IT IN THE SENSE

8  THAT WHEN THEY DETECT THE ODOR OF IT, THEY PERCEIVE IT AS BAD.

9  AND SO THAT'S ONE OF THE THINGS THAT PEOPLE TALK ABOUT AS

10 SENSITIZATION TO FORMALDEHYDE.  IT'S NOT SENSITIZATION IN THE

11 ALLERGIC SENSE.  IT'S SENSITIZATION IN THAT YOU'RE SENSITIZED TO

12 SOMETHING AS YOU THINK IT AS BAD.

13 Q.   LET'S TURN TO YOUR EXAMINATION OF CHRIS COOPER.  FIRST, I

14 WILL TELL YOU WE'VE HAD TESTIMONY FROM DR. KORNBERG, PACHECO, AND

15 BARNES, AND I THINK THEY AGREE WITH YOU, THAT CHRIS COOPER DOES

16 NOT HAVE IGE-MEDIATED ASTHMA AS A RESULT OF EXPOSURE TO

17 FORMALDEHYDE.  DO YOU AGREE WITH THAT?

18 A.   I AGREE WITH ME, YES.

19 Q.   I WOULD THINK YOU WOULD.

20       SO IF WE CAN FOCUS ON WHAT I THINK IS NOW THE THEORY

21 THAT THE IRRITATING EFFECTS OF FORMALDEHYDE SOMEHOW AGGRAVATED

22 HIS ASTHMA.  FIRST OF ALL, WHAT HISTORY DID YOU TAKE?

23 A.   I SAT WITH CHRIS AND HIS MOTHER, AND WE TOOK AN EXTENSIVE

24 HISTORY, CONCENTRATING, A, ON WHAT HAD GONE ON, WHAT HE WAS DOING

25 NOW, AS HE SAT THERE IN THE OFFICE, AND THEN DOING A HISTORY

1    GOING BACK THROUGH BEFORE KATRINA AND THEN AFTER KATRINA AND WHEN

2    THEY MOVED INTO THE TRAILER.

3    Q.   WHEN YOU -- WHEN HE CAME THROUGH -- WELL, STRIKE THAT.

4             WHEN YOU EVALUATED HIM, IT WAS IN EARLY JUNE; IS THAT

5    RIGHT?

6    A.   YES.

7    Q.   HE HAD ALREADY BEEN TO NATIONAL JEWISH CENTER?

8    A.   THAT'S CORRECT.

9    Q.   WAS HE CURRENTLY ON STEROID MEDICATION?

10   A.   AT THAT TIME HE WAS TAKING HIS STEROIDS, YES.

11   Q.   HOW DID HE PRESENT IN TERMS OF AN ASTHMATIC?

12   A.   HE WAS -- WE -- THE CURRENT TERMINOLOGY FOR ASTHMA IS WELL

13   CONTROLLED, NOT WELL CONTROLLED, AND VERY POORLY CONTROLLED.  SO

14   THOSE ARE THE WAY WE CHARACTERIZE ASTHMA.  AND SO HE WOULD BE

15   CHARACTERIZED, THE DAY I SAW HIM, AS A WELL CONTROLLED ASTHMATIC.

16   Q.   BECAUSE AT THAT POINT HE WAS ON HIS STEROID MEDICATION?

17   A.   HE WAS ON HIS STEROID MEDICATION, HE WASN'T WHEEZING, HE WAS

18   ABLE TO -- HE WASN'T WAKING UP SHORT OF BREATH AT NIGHT, HE

19   WASN'T COUGHING AT NIGHT, HIS PULMONARY FUNCTION TESTING WAS

20   WITHIN NORMAL LIMITS, ALL OF THE THINGS THAT YOU WOULD LIKE TO

21   SEE FROM A WELL CONTROLLED ASTHMATIC.

22   Q.   IF WE CAN GO BACK TO THAT ONE POINT, WHY IS IT SIGNIFICANT

23   ABOUT NIGHTTIME?

24   A.   EVERYBODY, EVERY HUMAN BEING, HAS WORSE BREATHING AT NIGHT

25   THAN THEY DO DURING THE DAY.  AND IT'S A -- WHAT WE CALL A

1  CIRCADIAN RHYTHM.  IF YOU WORK DURING THE NIGHT AND SLEEP DURING

2  THE DAY, YOUR BREATHING IS WORSE DURING THE DAY THAN IT IS AT

3  NIGHT.

4          FOR ASTHMATICS, THIS IS MAGNIFIED, SO THAT ONE OF THE

5  THINGS THAT HAPPENS TO ASTHMATICS WHO ARE NOT DOING WELL IS THEY

6  BREATHE POORLY AT NIGHT, AND THEY WILL TEND TO WAKE UP AT NIGHT.

7  AND ONE OF THE METRICS THAT WE USE TO MEASURE WHETHER OR NOT YOUR

8  ASTHMA IS WELL CONTROLLED OR NOT IS HOW MANY TIMES DO YOU WAKE UP

9  EACH MONTH?  AND SO ONE OF THE QUESTIONS WE ALWAYS ASK IS ARE YOU

10 WAKING UP SHORT OF BREATH AT NIGHT?  AND FOR CHILDREN, WHO OFTEN

11 WILL COUGH RATHER THAN WHEEZE, WE ASK ARE YOU WAKING UP COUGHING?

12          AND SO THAT'S A CLASSIC QUESTION.  WE DON'T WANT THEM

13 TO WAKE UP MORE THAN TWICE A MONTH.

14 Q.   IF CHRIS COOPER AND HIS MOTHER TESTIFIED THAT WHILE HE WAS

15 IN THE TRAILER HE NEVER WOKE UP COUGHING AS A RESULT OF ASTHMA OR

16 FOR ANY REASON, WOULD YOU CONSIDER THAT A SIGNIFICANT FACT?

17 A.   OH, YES.

18 Q.   WELL, IF YOU CAN GO THROUGH BASICALLY THE HISTORY THEY GAVE

19 YOU WHEN YOU SAW HIM IN EARLY JUNE.

20 A.   SO WE DIVIDE IT UP INTO HOW HE WAS DOING WHEN I SAW HIM, AND

21 HE GAVE A HISTORY THAT HIS MAIN PROBLEM WAS THAT WHEN THE WEATHER

22 GOT COOL, HE WOULD START TO WHEEZE, WHICH IS VERY CLASSIC FOR

23 ASTHMATICS.  THEY DON'T LIKE COLD WEATHER.  ONE OF THE THINGS

24 THAT YOU CAN DO TO MAKE AN ASTHMATIC WHEEZE IS BLOW COLD AIR AT

25 THEM.  AND WE -- ONE OF THE THINGS THAT HAS BEEN SHOWN IS THAT

1  YOU CAN CHALLENGE SOMEBODY WITH COLD AIR, AND THEY'LL WHEEZE TO

2  PROVE THAT THEY ACTUALLY HAVE ASTHMA.

3        BUT HE TOLD ME HE COULD WALK AS FAR AS HE WANTS ON

4  LEVEL GROUND.  A SIGN OF GOOD ASTHMA, HE CAN CLIMB TWO FLIGHTS OF

5  STAIRS.  HE HAD NO NIGHTTIME AWAKENING, NO MORNING SHORTNESS OF

6  BREATH, ANOTHER SIGN OF UNCONTROLLED ASTHMA.  AND HE SAID THAT

7  THE LAST TIME HE WAS IN THE EMERGENCY ROOM WAS IN JANUARY OF

8  2009, AND THE REASON FOR THAT WAS HE RAN OUT OF HIS MEDICINE,

9  WHICH IS ANOTHER PROBLEM THAT WE HAVE WITH ASTHMATICS.  THEY RUN

10  OUT OF MEDICINE, AND THEY FORGET TO GO GET NEW MEDICINE, SO THEY

11  END UP IN THE EMERGENCY ROOM.

12        HE WAS USING HIS ALBUTEROL TWICE A MONTH, WHICH IS A

13  SIGN OF WELL CONTROLLED ASTHMA.  AND HE SAID IN THE WINTER, WHEN

14  IT'S COLD, THIS MAY INCREASE FOR HIM TO OCCASIONALLY TWICE A

15  WEEK.

16        HE ALSO GAVE A HISTORY OF ITCHY, SCRATCHY, WATERY EYES,

17  WHICH IS A SIGN OF UPPER AIRWAY ALLERGIES.  HE USED PATANOL,

18  WHICH IS AN INTRAOCULAR ANTIHISTAMINIC AND MAST CELL STABILIZER

19  DRUG.  AND MOM SAID THAT HE RUBS THE TIP OF HIS NOSE CONSTANTLY,

20  AND THAT'S WHAT WE CALL THE ALLERGY SALUTE.  AND THAT'S PEOPLE

21  WHO DO THIS.  AND THE ONLY DISEASE KNOWN TO MAN THAT WILL MAKE

22  THE TIP OF YOUR NOSE ITCH IS ALLERGIES.

23        SO IF YOU SEE PEOPLE DO THIS, YOU KNOW THEY HAVE

24  ALLERGIES.  YOU DON'T EVEN NEED TO SEND THEM TO THE DOCTOR.  ALL

25  YOU NEED TO DO IS SAY, TAKE YOUR MEDICINE.  AND OFTEN YOU'LL SEE

1   CHILDREN WHO HAVE A LITTLE CREASE ON THE TIP OF THEIR NOSE, AND

2   THAT'S FROM DOING THIS ALL THE TIME.

3          HIS PAST MEDICAL HISTORY WAS THAT HE WAS FIRST

4   DIAGNOSED WITH ASTHMA AT THE AGE OF TWO OR THREE.  HE HAD A

5   CROUPY COUGH, WHICH IS THE CLASSIC PRESENTATION FOR ASTHMA AS A

6   CHILD.  MOM WILL SAY, HE'S GOT THE CROUP.  HE ENDS UP IN THE

7   EMERGENCY ROOM, AND THEY HEAR WHEEZING, AND THAT'S THE CLASSIC.

8          HE WAS HOSPITALIZED AND TOLD THAT HE HAD PNEUMONIA,

9   TREATED WITH ALBUTEROL AND THEN WITH PULMICORT.  PULMICORT IS A

10  STEROID THAT COMES IN A LITTLE VIAL.  YOU PUT IT IN A NEBULIZER.

11  AND IT'S VERY CONVENIENT FOR BABIES BECAUSE IT'S VERY DIFFICULT

12  TO TEACH A TWO-YEAR-OLD HOW TO USE A METERED DOSE INHALER.

13         HE WAS HOSPITALIZED, AGAIN, AT THE AGE OF FIVE.  HE HAD

14  A NOSE PROBLEM, WHICH WAS NOT AS MUCH, BUT HE DID SAY, AND MOM

15  AGREED, THAT HIS EYES BOTHERED HIM WHEN THE POLLEN WAS OUT,

16  ANOTHER SIGN THAT HE'S PROBABLY AN ALLERGIC YOUNG MAN.

17         HE SAID THAT HE LOST HIS NEBULIZER WHEN HE -- DURING

18  THE KATRINA PROBLEMS, WHICH WAS A PROBLEM FOR HIM.  HE MOVED TO

19  FLORIDA.  HE SAW A PHYSICIAN THERE.  HE WAS PRESCRIBED ADVAIR.

20  ADVAIR IS A COMBINATION DRUG WITH A LONG-ACTING BETA-AGONIST.

21  IT'S KIND OF A LONG ALBUTEROL PLUS A STEROID.  MOM DID NOT USE

22  THAT BECAUSE THERE IS A WARNING ON IT, NOW REFERRED TO AS A BOX

23  WARNING, PARTICULARLY FOR AFRICAN-AMERICANS.

24         THEY WERE SUPPOSED TO SWITCH TO FLOVENT 110, TWO PUFFS

25  IN THE MORNING AND THE EVENING.

1   Q.   DOCTOR, IF I CAN STOP YOU VERY QUICKLY, YOU SAID HE HAD BEEN

2   USING PULMICORT.  WAS IT YOUR UNDERSTANDING THAT PULMICORT SHOULD

3   BE USED ANNUALLY OR DAILY?

4   A.   DAILY.  I MEAN, STEROIDS ARE CONTROLLERS, AND CONTROLLERS

5   SHOULD BE USED EVERY SINGLE DAY.  THE HARDEST PART IS TO CONVINCE

6   PEOPLE TO TAKE THEIR MEDICINE.  AND ASTHMATICS ARE NO DIFFERENT

7   THAN ANY OTHER.  IF YOU TAKE YOUR MEDICINE EVERY DAY, YOU GET

8   BETTER.  IF YOU DON'T TAKE YOUR MEDICINE EVERY OTHER DAY, YOU

9   DON'T GET BETTER.  THE MEDICINE ONLY WORKS IN THE PATIENT.  IT

10  DOESN'T WORK IN THE BOTTLE.

11  Q.   AND THEN WHAT DID THEY TELL YOU NEXT ON THE HISTORY?

12  A.   WE TALKED ABOUT THE TRAVEL TRAILER.  HE SAID THAT HE USED

13  HIS CLARITIN, MOVING IT FROM EVERY OTHER DAY TO EVERY DAY.  HE

14  USED HIS INHALER EVERY -- PERHAPS TWICE A WEEK, AS OPPOSED TO

15  ONLY ONCE A WEEK.

16          AND ONE OF THE QUESTIONS WE ASK IS DID YOU GO TO THE

17  DOCTOR?  SICK PATIENTS TEND TO GO TO THE DOCTOR OR THE EMERGENCY

18  ROOM.  AND HE DID NOT HAVE TO GO TO THE DOCTOR UNTIL DECEMBER OF

19  '07, WHICH WAS A NUMBER OF MONTHS, WHICH SUGGESTS THAT HE REALLY

20  WASN'T BECOMING ILL AT THAT TIME.

21  Q.   DOCTOR, IF I CAN STOP YOU, JUST TO BE CLEAR, THIS IS WHAT

22  THEY WERE SITTING TELLING YOU IN JUNE OF THIS YEAR, CORRECT?

23  A.   CORRECT.

24  Q.   WELL, GO AHEAD AND CONTINUE WITH THE HISTORY, IF YOU WOULD.

25  A.   OKAY.  SO THE CHANGE THAT THEY -- THE ONLY REAL CHANGE WAS

1  THAT HE WAS NOT NOW IN THE TRAILER USING HIS FLOVENT.  THAT'S THE

2  CONTROLLER.  SO HE HAD ACTUALLY STOPPED USING THE CONTROLLER WHEN

3  THEY MOVED INTO THE TRAILER, AND HE WAS USING THE ALBUTEROL ABOUT

4  TWICE A WEEK RATHER THAN ONCE A WEEK.

5        ONE THING THAT WE ASKED HIM WAS IS IT BETTER INSIDE

6  THAN OUTSIDE OR OUTSIDE THAN INSIDE?  AND HE SAID THAT WHEN THE

7  POLLEN WAS HIGH, HE'D RATHER BE IN THE TRAILER THAN OUTSIDE OF

8  THE TRAILER.  WHEN THE POLLEN WASN'T HIGH, HE'D RATHER BE OUTSIDE

9  THAN INSIDE.  SO IT WAS KIND OF A WASH.

10 Q.  WHY WOULD THAT BE SIGNIFICANT?

11 A.  WELL, I MEAN, IF -- WE TALK TO OUR ASTHMATICS ABOUT FINDING

12 A PLACE WHERE YOU CAN GO WHERE YOU'RE BETTER.  AND SO HERE IS A

13 YOUNG MAN WHO CLEARLY IN MY MIND HAS ALLERGIES.  AND SO WHEN THE

14 POLLEN WAS OUT, HE WOULD GO INSIDE THE TRAILER BECAUSE THAT'S

15 WHERE HE FELT BETTER.  SO IF HE WAS HAVING A PROBLEM IN THE

16 TRAILER, HE'D FIND SOMEPLACE ELSE TO GO.

17        AND THEN WE TALKED ABOUT THE OTHER PROBLEMS WITH THE

18 TRAILER, BECAUSE YOU ALWAYS LOOK FOR CO -- FOR OTHER PROBLEMS

19 THAT MIGHT BE THERE.  SO THERE WAS MOLD IN THE TRAILER.  THERE

20 WAS A -- WHAT MOM DESCRIBED AS A NEW TRAILER SMELL.  I COULDN'T

21 GET HER TO REALLY GIVE ME ANY MORE THAN THAT.  WE WENT OVER THAT

22 SMELL A COUPLE OF TIMES, BUT IT WAS A NEW TRAILER SMELL WHICH

23 LASTED ABOUT TWO MONTHS AND THEN WENT AWAY.

24        CHRIS TOLD ME THAT HE DIDN'T SMELL ANYTHING, ALTHOUGH

25 WE KEPT ASKING ABOUT THAT.  AND THEN THERE WERE SOME MICE IN THE

1  TRAILER, WHICH MOM WAS VERY JUDICIOUS ABOUT TRYING TO GET RID OF

2  THE MICE.  AND SHE ACTUALLY DID THE RIGHT THING WAS TO PUT STEEL

3  WOOL AND CAULKING AND FOAM INSULATION AROUND THE PIPES, BECAUSE

4  THE ONLY THING MICE WON'T EAT THROUGH IS ACTUALLY STEEL WOOL.

5          AND THEY DIDN'T HAVE ANY COCKROACHES.  AS SOMEBODY WHO

6  FOUND THE ASSOCIATION BETWEEN COCKROACHES AND ALLERGIN, I ALWAYS

7  ASK ABOUT THAT.

8  Q.   DID YOU REVIEW HIS MEDICAL RECORDS?

9  A.   WE DID REVIEW HIS MEDICAL RECORDS.

10  Q.   I KNOW WE'VE HAD THIS ISSUE, BECAUSE OF KATRINA THERE IS NOT

11  A WHOLE LOT AVAILABLE PRE-STORM.  WHAT DID YOU FIND POST-STORM?

12  A.   WELL, THE THINGS THAT WERE MOST INTERESTING, ONE IS THAT

13  WHEN HE FIRST SAW THE PHYSICIAN HERE IN NEW ORLEANS -- I MEAN, HE

14  SAW A PHYSICIAN IN FLORIDA, AND HE WAS ACTUALLY DOING QUITE WELL.

15  THE REASON HE WAS STARTED ON ADVAIR BY HIS PHYSICIAN IN FLORIDA

16  WAS BECAUSE HE NEEDED -- HE WAS A CHILD WHO HAD ASTHMA.  HE

17  NEEDED TO BE ON A CONTROLLER.  SO THAT WAS NOT A PROBLEM.

18          AND THEN HERE IN NEW ORLEANS, WHEN HE WAS IN THE

19  TRAILER, HIS PHYSICAL EXAM BY THE PHYSICIAN WHO FIRST SAW THEM

20  WAS LISTED AS ABSOLUTELY NORMAL.  UNFORTUNATELY, WE DON'T HAVE

21  PULMONARY FUNCTION TESTING ON THAT DAY, SO I DON'T KNOW WHAT HIS

22  LUNG FUNCTION WAS, BUT HER EXAM WAS THAT IT WAS NORMAL AT THAT

23  TIME.  SO THAT'S -- AND THAT WAS THE ONLY VISIT THAT WE HAVE

24  UNTIL HE HAD THE EMERGENCY-ROOM VISIT IN DECEMBER.

25  Q.   AND LET'S TALK ABOUT THE EMERGENCY-ROOM VISIT IN DECEMBER.

1   A.   I THINK I HAVE TO BACK UP.

2   Q.   I'M TECHNOLOGICALLY CHALLENGED, AS WE ALL KNOW.

3            THE WEATHER DROPS, HE GOES IN ON DECEMBER 4, 2007.  IS

4   THIS CONSISTENT WITH WHAT YOU FOUND IN HIS HISTORY?

5   A.   YES.  I MEAN, THIS IS -- THE ONE THING THAT WOULD BE VERY

6   CONSISTENT, HE TOLD ME THAT WHEN THE WEATHER CHANGES, OR

7   PARTICULARLY WHEN IT GETS COLD, THAT'S WHEN HE STARTS TO HAVE

8   PROBLEMS.  AND SO THIS IS VERY CONSISTENT WITH WHAT HAPPENED TO

9   HIM.

10           HE STARTED TO USE HIS ALBUTEROL MORE.  ONE OF THE

11  PROBLEMS WITH USING YOUR ALBUTEROL, PARTICULARLY WHEN YOU'RE NOT

12  ON A CONTROLLER, IS IT STOPS WORKING.  AND SO THE MORE -- YOU RUN

13  FASTER AND FASTER JUST TO STAY WHERE YOU ARE.  AND EVENTUALLY IT

14  STOPS WORKING, SO YOU HAVE TO GO TO THE EMERGENCY ROOM.

15  Q.   DECEMBER -- DECEMBER GOES.  WHEN IS THE NEXT TIME HE'S

16  TREATED?

17  A.   I THINK IT WAS IN JANUARY.  AND THEN THAT WAS WHEN HE TOLD

18  ME THAT HE RAN OUT OF HIS MEDICINE.

19  Q.   THEN HE SEES DR. BARNES IN APRIL OF 2008?

20  A.   CORRECT.

21  Q.   DOES HE SEE HER FOR ASTHMA ISSUES?

22  A.   NO.  HE ACTUALLY SAW HER BECAUSE HE HAD UPPER AIRWAY ISSUES.

23  HIS ASTHMA WAS BASICALLY UNDER GOOD CONTROL AT THAT TIME.

24  Q.   ONE OTHER ISSUE THAT CAME UP, AT LEAST IN THE NATIONAL

25  JEWISH CENTER, WAS THE QUESTION OF WHETHER HE SUFFERS FROM VOCAL

1   CORD DYSFUNCTION.  DOES HE SUFFER FROM VOCAL CORD DYSFUNCTION?

2   A.   I DON'T THINK CHRIS HAS VOCAL CORD DYSFUNCTION.  I DON'T

3   KNOW IF WE'VE TALKED ABOUT VOCAL CORD DYSFUNCTION AND WHAT IT

4   REALLY IS, BUT --

5   Q.   PERHAPS WE SHOULD DO THAT FIRST.  WHAT IS VOCAL CORD

6   DYSFUNCTION?

7   A.   I'LL GIVE YOU THE SHORT VERSION, OKAY.  EVERYBODY'S VOCAL

8   CORDS LOOK LIKE THIS.  THEY ARE TETHERED AT ONE END, AND THEY

9   MOVE LIKE THIS.  AND, TRADITIONALLY, WHEN YOU TAKE A DEEP BREATH,

10  YOUR VOCAL CORDS OPEN WIDE.  WHEN YOU BREATHE OUT, YOUR VOCAL

11  CORDS GO ABOUT HALFWAY IN.  AND THEN WHEN YOU TALK, WHAT I'M

12  DOING NOW, THEY GO TOGETHER AND THEY VIBRATE, AND THAT'S HOW WE

13  TALK.

14         AND VOCAL CORD DYSFUNCTION, OR WHAT -- THE BETTER TERM

15  IS INAPPROPRIATE VOCAL CORD MOVEMENT, WHEN YOU TAKE A DEEP

16  BREATH, YOUR VOCAL CORDS, INSTEAD OF GOING WIDE, THEY GO THE

17  WRONG DIRECTION.  THEY GO TOGETHER.  AND IN SOME PATIENTS, THEY

18  JUST SIT THERE AND DO NOTHING.  IN OTHER PATIENTS THEY WILL

19  LITERALLY COME TOGETHER AND CLOSE.  AND THESE PATIENTS, ACTUALLY,

20  IF IT GETS BAD ENOUGH, THEY'LL TURN BLUE, AND THEY END UP IN THE

21  EMERGENCY ROOM.

22         AND MANY PATIENTS ARE MISDIAGNOSED FOR A LONG PERIOD OF

23  TIME.  IT USED TO BE THOUGHT TO BE A VERY RARE DISEASE.  WE NOW

24  KNOW IT'S QUITE A COMMON DISEASE.  IT USED TO BE THOUGHT TO BE

25  ONLY A DISEASE OF YOUNG WOMEN.  WE NOW KNOW IT'S A DISEASE OF NOT

1   ONLY YOUNG WOMEN, BUT OLD WOMEN AND YOUNG MEN AND OLD MEN, SO WE

2   CAN NO LONGER ACCUSE THIS OF BEING A DISEASE OF YOUNG WOMEN.

3   Q.    HOW DO YOU DIAGNOSE VOCAL CORD DYSFUNCTION?

4   A.    WELL, THERE ARE TWO WAYS TO DIAGNOSE IT.  ONE IS TO DO

5   WHAT'S CALLED A RHINOLARYNGOSCOPY.  YOU PUT A TUBE DOWN, AND YOU

6   LOOK AT THE VOCAL CORDS AS THE PERSON BREATHES.  AND YOU

7   CAN LITERALLY -- YOU ASK THEM TO BREATHE, AND YOU WATCH THEIR

8   CHEST RISE AND FALL, AND YOU WATCH THE MOVEMENT OF THE VOCAL

9   CORDS, AND THEY MOVE THE WRONG WAY.  AND SOMETIMES YOU JUST SEE

10  THEM CLOSE.  AND YOU CAN DO IT WITH AN OXYGEN SATURATION ON.  OR

11  YOU CAN LOOK AT THE -- WHAT'S CALLED THE FLOW VOLUME LOOP ON

12  THEIR PULMONARY FUNCTION TEST.

13  Q.    LET'S TALK ABOUT THE LARYNGOSCOPY.  WAS THERE A DVD MADE OF

14  THE LARYNGOSCOPY --

15  A.    THERE WAS.

16  Q.    -- THAT WAS DONE AT NATIONAL JEWISH CENTER?

17  A.    THERE WAS.

18  Q.    DID YOU REVIEW THAT DVD?

19  A.    I DID.

20  Q.    DID THAT DVD CONFIRM VOCAL CORD DYSFUNCTION?

21  A.    NO.

22  Q.    NOW, PULMONARY FUNCTION, DO YOU HAVE THE FLOW LOOP?

23  A.    I DO.

24  Q.    MAYBE WE CAN PUT IT UP ON THE BIG BOARD.

25  A.    THIS IS HIS, THE ONES THAT WERE DONE.  THIS IS THE CHRIS.

1  Q.   OKAY.

2  A.   ALL RIGHT.  I'LL EXPLAIN VERY QUICKLY WHAT YOU'RE LOOKING AT

3  HERE.  THIS IS CALLED A FLOW VOLUME LOOP.  AND THE PART THAT GOES

4  UP TOWARD THE CEILING IS ACTUALLY WHEN THE PATIENT IS BLOWING

5  OUT, AND THE PART THAT GOES DOWN IS WHEN THE PATIENT IS TAKING AN

6  INSPIRATION OR BREATHING IN.

7          VOCAL CORD DYSFUNCTION IS NOT A DISEASE OF BREATHING

8  OUT.  ASTHMA IS A DISEASE OF BREATHING OUT.  SO YOU LOOK AT THE

9  INSPIRATORY LOOP, NOT AT THE EXPIRATORY LOOP.  AND WHAT YOU SEE

10  WITH PATIENTS WHO HAVE VOCAL CORD DYSFUNCTION IS FLATTENING OF

11  THAT INSPIRATORY.  SO IF YOU WERE TO JUST KIND OF DRAW A LINE

12  WHERE THE MINUS TWO IS ON THAT LOOP STRAIGHT ACROSS -- AND I

13  DON'T HAVE A POINTER, SO I CAN'T DO IT -- BUT IF YOU --

14          THE COURT:  YOU CAN MARK IT ON THE SCREEN THERE IF YOU

15  WOULD.

16          THE WITNESS:  I CAN?  NO, IT'S NOT WORKING FOR ME.

17          MR. WEINSTOCK:  CAN I HAND HIM THIS?

18          THE COURT:  YES.  WE KNOW IT WORKS.

19          THE WITNESS:  OKAY.  IF YOU WERE TO DRAW A LINE HERE,

20  RIGHT ACROSS HERE --

21          MR. WEINSTOCK:  IF YOU HOLD IT, THEY'RE TELLING ME IT

22  WILL WORK, BUT I HAVEN'T PROVED TOO ADEPT AT THIS.

23          THE WITNESS:  I LIKE THIS SYSTEM, BUT --

24          MR. WEINSTOCK:  LET ME CLEAR IT AND START AGAIN.

25          THE WITNESS:  LET ME JUST TRY IT HERE.  YES.  OKAY.

1           IF YOU DREW A LINE STRAIGHT ACROSS WHERE I DREW IT,

2   IF CHRIS HAD HAD VOCAL CORD DYSFUNCTION, THAT LOOP WOULD GO DOWN,

3   ACROSS WHERE THE YELLOW LINE IS AND BACK UP, BECAUSE THAT'S A

4   SIGN OF A FIXED EXTRATHORACIC, BECAUSE YOUR LARYNX IS NOT IN YOUR

5   CHEST, OBSTRUCTION TO FLOW.  DOWN, FLAT AND UP.  AND HE'S GOT AN

6   ABSOLUTELY NORMAL INSPIRATORY LOOP, SO THIS IS EVIDENCE THAT THIS

7   YOUNG MAN DOES NOT HAVE VOCAL CORD DYSFUNCTION.

8                              EXAMINATION

9   BY MR. WEINSTOCK:

10  Q.   SO YOU'VE GOT TWO WAYS OF FINDING IT; YOU LOOKED AT BOTH,

11  AND YOU COULD NOT CONFIRM THIS DIAGNOSIS, CORRECT?

12  A.   NO.

13  Q.   MAYBE HE'S GOT IT.  IS THERE ANY LITERATURE THAT SUGGESTS

14  THAT VOCAL CORD DYSFUNCTION IS ASSOCIATED WITH FORMALDEHYDE

15  EXPOSURE?

16  A.   NO.

17  Q.   LET'S RETURN TO THE POTENTIAL IRRITATING EFFECTS OF

18  FORMALDEHYDE.  CAN IRRITATING EFFECTS OF FORMALDEHYDE AGGRAVATE

19  ASTHMA?

20  A.   NO.  IT'S ACTUALLY BEEN LOOKED AT.  BACK IN THE BEGINNING,

21  IN THE MID '70S, WHEN THERE WAS THIS REAL QUESTION OF WHETHER

22  FORMALDEHYDE COULD CAUSE ASTHMA OR COULD AGGRAVATE ASTHMA, THERE

23  WERE A NUMBER OF STUDIES IN WHICH THEY LITERALLY TOOK PEOPLE, PUT

24  THEM IN CHAMBERS, AND EXPOSED THEM TO HIGH LEVELS OF

25  FORMALDEHYDE, BEGINNING WITH, LET'S SAY, .1 PARTS PER MILLION OR

1   A HUNDRED PARTS PER MILLION AND GOING UP TO AS HIGH AS THREE

2   PARTS PER MILLION, AMOUNTS OF FORMALDEHYDE THAT YOU WOULD REALLY

3   NOT LIKE TO BE IN.

4          AND THEY DID BASICALLY THREE GROUPS OF INDIVIDUALS.

5   THE FIRST GROUP WERE NORMAL PEOPLE.  AND WHAT THEY SHOWED IS THAT

6   IF YOU TAKE A NORMAL PERSON AND EXPOSE THEM TO THREE PARTS PER

7   MILLION FORMALDEHYDE, ALTHOUGH THEY DON'T LIKE IT, THEY DON'T

8   WHEEZE, AND THERE'S NO CHANGE IN THEIR PULMONARY FUNCTION.

9          THE SECOND GROUP WERE PEOPLE WHO HAD ASTHMA.  AND THEY

10  EXPOSED THEM TO AMOUNTS OF FORMALDEHYDE UP TO THREE PARTS PER

11  MILLION, AND ASTHMATICS DON'T WHEEZE.

12         AND THE THIRD GROUP WERE PEOPLE WHO HAD ASTHMA AND

13  BELIEVED THAT THEIR ASTHMA WAS CAUSED BY FORMALDEHYDE, AND THEY

14  BLEW FORMALDEHYDE AT THEM BUT THEY MASKED THE ODOR.  YOU CAN TAKE

15  SOMETHING THAT SMELLS WORSE, AND SO IN THAT CASE THEY USED METHYL

16  MERCAPTAN, THE SMELL OF ROTTEN EGGS.  AND EVEN THEN,

17  FORMALDEHYDE, WHEN THE PATIENTS DIDN'T KNOW THAT IT WAS

18  FORMALDEHYDE, THEY WERE UNABLE TO DOCUMENT THAT FORMALDEHYDE

19  EITHER CAUSES OR MAKES YOU WHEEZE, EVEN AT VERY HIGH

20  CONCENTRATIONS.

21         NOW, AT THESE HIGH CONCENTRATIONS, YOU HAVE TO

22  UNDERSTAND THAT PEOPLE WOULD GET, YOU KNOW, RUNNY NOSE, AND THEY

23  WOULD GET ITCHY EYES, SO IT WAS IRRITATING AT THAT LEVEL.

24  Q.   WE HAVE BEEN HEARING IT, BUT THOSE ARE STUDIES OF ADULTS.

25  A.   CORRECT.

1  Q.   AREN'T KIDS DIFFERENT?

2  A.   WELL, SURE.  THEY ARE A LOT LITTLER.  AND IN MANY CASES,

3  CHILDREN ARE DIFFERENT, AND THEIR PULMONARY TREES ARE DIFFERENT.

4  BUT TO THE EXTENT THAT THEY ARE THE SAME PHYSIOLOGICALLY, THERE

5  SHOULD BE A LOT OF CONCORDANCE.

6         FIRST OF ALL, A NUMBER OF AGENCIES, ATSDR, THE AGENCY

7  FOR TOXIC SUBSTANCE AND DISEASE REGISTRY, SUGGESTED THAT THERE

8  REALLY SHOULDN'T BE MUCH DIFFERENCE BETWEEN CHILDREN AND ADULTS.

9         AND THE OTHER THING IS THAT THE DIFFERENCE IN THE LUNGS

10  OF CHILDREN VERSUS ADULTS IS CHILDREN HAVE MORE LUNG AND LESS

11  TUBE PER VOLUME.  SO AS YOUR LUNGS GROW, THE BRONCHIAL TUBES

12  ELONGATE, AND THE AMOUNT OF ALVEOLI BASICALLY STAY PRETTY MUCH

13  THE SAME.  SO YOU HAVE MORE TUBE, WHICH IS -- ASTHMA IS A DISEASE

14  OF TUBES, AND LESS ALVEOLI PER UNIT TUBE.

15         SO YOU WOULD EXPECT, ACTUALLY, THAT FORMALDEHYDE, IN

16  THAT SITUATION, WOULD BE LESS LIKELY TO CAUSE PROBLEMS IN

17  CHILDREN THAT HAVE MORE ALVEOLI AND LESS TUBE, THAN IN ADULTS

18  THAT HAVE MORE TUBE AND LESS ALVEOLI.

19         BUT THE FACT THAT FORMALDEHYDE NEVER EVEN GETS INTO THE

20  LUNG WOULD SUGGEST THAT THERE IS NO CHANCE THAT IT WOULD CAUSE IT

21  EITHER ADULTS OR IN CHILDREN.

22  Q.   HOW DO YOU KNOW FORMALDEHYDE DOESN'T GET INTO THE LUNGS?

23  A.   WELL, IT'S BEEN STUDIED IN A NUMBER OF WAYS, BUT THE MOST

24  UNIQUE WAY WAS THAT THEY TOOK RADIOACTIVE FORMALDEHYDE, WHICH THE

25  RADIOACTIVITY WAS IN THE CARBON, SO IT WOULD STAY WITH THE

1    CARBON.  AND THEY EXPOSED RATS TO HIGH LEVELS OF FORMALDEHYDE, UP

2    TO 14 PARTS PER MILLION.  UNLIKE PEOPLE, RATS HAVE TO GO WHERE

3    YOU PUT THEM, BECAUSE NO HUMAN BEING WOULD STAY AROUND AT

4    14 PARTS PER MILLION.

5            AND THEN, AFTER THEY HAD EXPOSED THEM FOR SIGNIFICANT

6    PERIODS OF TIME, THEY THEN SACRIFICED THE RATS AND LITERALLY

7    FROZE THEM IN LIQUID NITROGEN, CUT THEM IN HALF AND EXPOSED THEM

8    TO X-RAY FILM SO YOU COULD DETECT WHERE THE RADIOACTIVITY IS.

9            NOW, THESE STUDIES WERE ORIGINALLY DONE TO FIND OUT IF

10   THE FORMALDEHYDE GOT INTO THE BRAIN, BUT WHAT THEY ACTUALLY

11   SHOWED IS ALL OF THE FORMALDEHYDE IS IN THE UPPER AIRWAY OF THE

12   RAT.  NONE GOT INTO THE LUNGS.  NONE GOT INTO THE BLOODSTREAM.

13   NONE GOT INTO THE BRAIN.  FORMALDEHYDE IS SO REACTIVE THAT IT

14   JUST STAYS IN THE UPPER AIRWAY.  NONE GETS INTO THE LUNGS.

15   Q.   I JUST WANT TO CLARIFY ONE THING.  THIS PULMONARY FUNCTION

16   TEST YOU SHOWED US, THIS IS A PULMONARY FUNCTION TEST THAT YOU

17   HAD RUN, SO YOU COULD EVALUATE HIS ASTHMA?

18   A.   YES.

19   Q.   WHAT ELSE DID YOU DO IN THAT CLINICAL EVALUATION?

20   A.   WE -- HE HAD A CHEST X-RAY THAT WAS -- THAT WAS NORMAL FOR A

21   CHILD OF HIS SIZE.  WE DID A HISTORY, AND I DID A COMPLETE

22   PHYSICAL EXAMINATION ON HIM.

23   Q.   DID YOU DO SOMETHING CALLED A METHACHOLINE CHALLENGE?

24   A.   WE DID A METHACHOLINE CHALLENGE.

25   Q.   WHAT DID THAT SHOW?

1    A.    METHACHOLINE CHALLENGE PROVED THAT HE HAD ASTHMA.

2    Q.    NO DISPUTE?

3    A.    NO DISPUTE.

4    Q.    CHRIS COOPER HAS ASTHMA, RIGHT?

5    A.    HE'S AN ASTHMATIC.   THERE IS NO DISPUTE.   THIS IS A YOUNG

6    MAN WHO HAS ASTHMA, AND HE HAS UPPER AIRWAY ALLERGIES, AND THERE

7    IS ABSOLUTELY NO DISPUTE THERE.

8    Q.    DOCTOR, I WOULD ASK YOU, BASED ON YOUR 30, 35 YEARS

9    EXPERIENCE DEALING WITH ASTHMATICS, YOUR REVIEW OF ALL THE

10   RECORDS, YOUR -- THE TESTS AND THE LAB WORK YOU RAN AND REVIEWED,

11   DOES CHRIS COOPER HAVE ASTHMA THAT WAS EXACERBATED BY

12   FORMALDEHYDE WHILE HE LIVED IN A TRAILER FOR 19 MONTHS?

13   A.    HE DID NOT.

14         MR. WEINSTOCK:   I'M GOING TO PASS THE WITNESS, BUT FIRST

15   RETURN THIS COPY TO THE DOCTOR.

16         THE COURT:   ALL RIGHT.

17         MR. PENOT:   NO QUESTIONS, YOUR HONOR.

18         THE COURT:   JUST CHECKING.   MR. WATTS.

19         MR. WATTS:   WE'RE TO THE POINT OF JUST BAITING HIM NOW.

20                      CROSS-EXAMINATION

21   BY MR. WATTS:

22   Q.    GOOD MORNING, SIR.

23   A.    GOOD MORNING.

24   Q.    MY NAME IS MIKAL WATTS.   YOU AND I HAVE NOT MET BEFORE; IS

25   THAT RIGHT?

1    A.    WE HAVE NOT.

2    Q.    I HAVE READ YOUR DEPOSITION AND YOUR REPORT.  AND I DO HAVE

3    SOME QUESTIONS FOR YOU, BUT I DON'T THINK IT'S GOING TO TAKE VERY

4    LONG.  WILL YOU TRY YOUR BEST TO DIRECTLY ANSWER MY QUESTIONS?

5    A.    I WILL GIVE IT MY BEST SHOT, YES.

6    Q.    SUPER.  THANK YOU.

7          I NOTICED -- WE HAVE BEEN GIVEN A COPY OF YOUR CV.

8    THAT'S A DOCTOR TERM FOR RÉSUMÉ, RIGHT?

9    A.    CORRECT.

10   Q.    IN YOUR RESUMÉ, IT'S GOT A BUNCH OF STUFF, AND THEN IT TALKS

11   ABOUT YOUR PUBLICATIONS.  HOW MANY PUBLICATIONS HAVE YOU DONE?

12   A.    130-SOME.  ONE, TWO.

13   Q.    132.  AS I SEARCHED THROUGH THAT THIS MORNING GETTING READY,

14   I NOTICED YOU DID A STUDY IN THE TOWN WHERE I'M FROM, CORPUS

15   CHRISTI, TEXAS?

16   A.    THAT'S CORRECT.

17   Q.    DID YOU GO TO CORPUS CHRISTI?

18   A.    WE -- WE ACTUALLY -- I WAS THERE A NUMBER OF TIMES, YES.  WE

19   ACTUALLY DID THREE STUDIES THERE.

20   Q.    DID YOU GO BY THE HOECHST CELANESE PLANT THERE IN

21   NUECES COUNTY?

22   A.    I MAY HAVE, BUT I DIDN'T GO THERE SPECIFICALLY, NO.

23   Q.    DID YOU DO ANY STUDIES OF THE PEOPLE THAT WORKED AT THE

24   HOECHST CELANESE PLANT WHILE YOU WERE THERE?

25   A.    NOT UNLESS THEY HAD ALLERGIES.

1  Q.   WITH RESPECT TO THE 132 STUDIES THAT YOU HAVE WRITTEN, AM I

2  CORRECT THAT NOT ONE OF THEM DEALS WITH FORMALDEHYDE?

3  A.   SPECIFICALLY, NO.

4  Q.   NOT ONE OF THEM DEALS WITH THE RELATIONSHIP BETWEEN

5  FORMALDEHYDE AND THE PREVALENCE OF ASTHMA, TRUE?

6  A.   THAT'S CORRECT.

7  Q.   NOT ONE OF THEM DEALS WITH FORMALDEHYDE AND ALLEGED

8  EXACERBATION OF ASTHMA, RIGHT?

9  A.   CORRECT.

10  Q.   HAVE YOU CONDUCTED ANY EPIDEMIOLOGICAL STUDIES INVOLVING

11  FORMALDEHYDE AND ASTHMA?

12  A.   NO.

13  Q.   NOW, I NOTICED AFTER I LOOKED THROUGH YOUR CV THAT YOU ALSO

14  GAVE A LIST OF TESTIMONIES IN THE PAST FEW YEARS; IS THAT RIGHT?

15  A.   YES.

16  Q.   AND YOU'VE DONE SOME WORK FOR ROGER SCOTT CUSTOM HOMES,

17  RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   GEMINI HOME BUILDERS?

20  A.   CORRECT.

21  Q.   AND YOU GAVE A DEPOSITION IN, IN RE:  FEMA FORMALDEHYDE

22  PRODUCT LIABILITY LITIGATION?

23  A.   YES.

24  Q.   AND THEN YOU'VE GIVEN A DEPOSITION IN THIS CASE?

25  A.   THAT'S CORRECT.

1  Q.   NOW, I WANT TO TALK TO YOU ABOUT THE HISTORY OF YOUR

2  INVOLVEMENT IN LITIGATION.  IT IS TRUE THAT IN THIS CASE, YOU

3  WERE CALLED BY A GENTLEMAN REPRESENTING GULF STREAM AND RETAINED,

4  RIGHT?

5  A.   YES.

6  Q.   HIS NAME IS HYNES; IS THAT RIGHT?

7  A.   THAT'S CORRECT.

8  Q.   WHAT IS MR. HYNES' FIRST NAME, FOR THE RECORD?

9  A.   RICHARD.

10  Q.   RICHARD HYNES IS ONE OF THE LAWYERS REPRESENTING

11  GULF STREAM?

12         MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

13         MR. WATTS:  AM I WRONG?

14         MR. WEINSTOCK:  THAT'S COMPLETELY INCORRECT.

15         MR. WATTS:  WELL, THEN I APOLOGIZE.

16            WHO DOES HE REPRESENT?

17         MR. WEINSTOCK:  I THINK HE REPRESENTS --

18         THE COURT:  WAIT, LET'S ASK THE WITNESS THE QUESTION.

19  IF HE DOESN'T KNOW --

20         THE WITNESS:  FLEETWOOD.

21         MR. WEINSTOCK:  I'LL KEEP MY MOUTH SHUT, YOUR HONOR.

22                    EXAMINATION

23  BY MR. WATTS:

24  Q.   I GUESS WHAT I'M TRYING TO FIGURE OUT -- HE REPRESENTS

25  FLEETWOOD; IS THAT WHAT I'M HEARING?

1  A.    RIGHT.

2  Q.    AND THEN YOU GOT CALLED BY FLEETWOOD, BUT YOU GOT HIRED BY

3  GULF STREAM IN THE CASE, FAIR?

4  A.    IN THIS PARTICULAR CASE, YES.

5  Q.    I GOT YOU.  NOW, BACK IN THE 1980S, YOU HAD DONE A NUMBER OF

6  CASES INVOLVING FORMALDEHYDE EXPOSURE ALLEGING PERSONAL INJURY IN

7  THE 1980S, RIGHT?

8  A.    THAT'S CORRECT.

9  Q.    I THINK YOU SAID IN THE 1980S, YOU HAD PROBABLY BEEN

10 INVOLVED IN TEN SUCH CASES; IS THAT RIGHT?

11 A.    PROBABLY, YES.

12 Q.    AND THAT WAS DURING THE TIME WHERE THE UREA FORMALDEHYDE WAS

13 USED BEFORE THE CHANGES; IS THAT RIGHT?

14 A.    CORRECT.

15 Q.    AFTER THE CHANGES WERE MADE TO THE REGULATORY STRUCTURE OF

16 FORMALDEHYDE IN THESE KINDS OF HOMES, DID YOU HAVE ANY MORE CASES

17 THAT YOU RECALL DONE IN THE 1990S?

18 A.    THERE WERE A NUMBER OF CASES THAT KIND OF I GOT CALLED

19 ABOUT.  NONE OF THEM EVER WENT ANYWHERE.

20 Q.    SURE.  YOU DIDN'T DO ANY WORK ON FORMALDEHYDE IN THE 1990S

21 AFTER THESE REGULATIONS WERE CHANGED, CORRECT?

22 A.    WE SAW A NUMBER OF PATIENTS THAT HAD QUESTIONS ABOUT

23 FORMALDEHYDE.  THEY COME UP FROM TIME TO TIME.

24 Q.    SURE.

25 A.    BUT THERE WERE NO CASES THAT I GOT CALLED ON.

1    Q.    LET ME BE MORE SPECIFIC.   DID YOU EVER GET CALLED ABOUT ANY

2    CASE WITH RESPECT TO A HOME THAT WAS BUILT AFTER THE CHANGE IN

3    THE REGULATIONS?

4    A.    CASES?

5    Q.    SURE.   THERE IS NONE, RIGHT?

6    A.    NO.

7    Q.    IN THE 2000'S, BEFORE WE GOT INVOLVED IN THE FEMA

8    FORMALDEHYDE TRAILER LITIGATION, YOU, SINCE THE 1980S, BEFORE THE

9    REGULATIONS ON FORMALDEHYDE IN THESE KINDS OF HOMES WERE CHANGED,

10   UP UNTIL THE MIDDLE OF 2000'S WHEN THIS KATRINA BUSINESS

11   HAPPENED, YOU HAD NO CASES WHERE YOU WERE RETAINED WITH RESPECT

12   TO ALLEGATIONS OF PERSONAL INJURY FROM FORMALDEHYDE EXPOSURE IN

13   HOMES, RIGHT?

14   A.    THERE -- THERE WAS ONE CASE, AND I JUST CAN'T REMEMBER

15   EXACTLY WHEN IT WAS, BUT THAT'S IT.

16   Q.    ALL RIGHT.   DO YOU KNOW WHETHER THAT CASE INVOLVED ONE OF

17   THE OLDER HOMES THAT WAS BUILT BEFORE THE REGULATIONS WERE

18   CHANGED?

19   A.    NO, IT WAS A NEWER HOME.

20   Q.    SO YOU'VE GOT AT LEAST TEN IN THE OLD STYLE HOMES; AND,

21   THEN, OVER THE NEXT 15 YEARS, MAYBE ONE?

22   A.    CORRECT.

23   Q.    NOW, SINCE THE FELLOWS THAT ARE REPRESENTING THESE FOLKS IN

24   THE FEMA FORMALDEHYDE TRAILER LITIGATION, YOU'VE BEEN HIRED AT

25   LEAST BY FLEETWOOD, WHO CALLED YOU, AND GULF STREAM IN THIS CASE;

1  IS THAT RIGHT?

2  A.    YES.

3  Q.    YOU'VE BEEN ASKED TO LOOK AT OTHER PEOPLE, RIGHT?

4  A.    YES.

5  Q.    BEFORE YOU WERE CALLED BY THE FOLKS DEFENDING THIS FEMA

6  FORMALDEHYDE LITIGATION, YOU RECEIVED A PHONE CALL FROM A

7  DR. GOLDEN, WHO IS A TOXICOLOGIST IN ARLINGTON, VIRGINIA; IS THAT

8  RIGHT?

9  A.    SUBSEQUENT TO THAT, YES.

10  Q.    AND DR. GOLDEN HAD DONE WORK WITH THE FORMALDEHYDE COUNCIL?

11  A.    CORRECT.

12  Q.    AND DR. GOLDEN CONTACTED YOU AND ASKED YOU WHETHER YOU WOULD

13  CONSENT TO BEING RETAINED BY THE FORMALDEHYDE COUNCIL TO DO SOME

14  WORK FOR IT?

15  A.    THAT'S CORRECT.

16  Q.    AND YOU AGREED THAT IF THE FORMALDEHYDE COUNCIL WOULD PAY

17  YOU, YOU WOULD DO WORK FOR THEM, RIGHT?

18  A.    I DID.

19  Q.    AND WHAT AMOUNT OF MONEY DID YOU AGREE THAT YOU WOULD WORK

20  FOR, FOR THE FORMALDEHYDE COUNCIL?

21  A.    $500 AN HOUR.

22  Q.    WHAT AMOUNT OF MONEY ARE YOU CHARGING FOR YOUR TIME HERE

23  TODAY, SIR?

24  A.    $500 AN HOUR.

25  Q.    AS I TOLD ONE OF MY WITNESSES, I'M GOING TO HURRY.

1       IN TERMS OF THE FORMALDEHYDE COUNCIL, HAVE YOU BEEN

2  PAID BY THE FORMALDEHYDE COUNCIL TO GO TESTIFY ON ITS BEHALF AT

3  HEARINGS BEING CONDUCTED BY THE ENVIRONMENTAL PROTECTION AGENCY

4  ON THE SUBJECT OF FORMALDEHYDE?

5  A.   YES.

6  Q.   DID YOU TRAVEL TO CHICAGO, ILLINOIS, TO TESTIFY ON BEHALF OF

7  THE FORMALDEHYDE COUNCIL AT AN EPA HEARING ON FORMALDEHYDE?

8  A.   I DID.

9  Q.   DID YOU TRAVEL DOWN HERE TO NEW ORLEANS, LOUISIANA, TO

10 TESTIFY ON BEHALF OF THE FORMALDEHYDE COUNCIL ON THE SUBJECT OF

11 FORMALDEHYDE?

12 A.   NO, I DID NOT.

13 Q.   DID YOU ANSWER QUESTIONS FOR REPORTERS RELATED TO ANOTHER

14 HEARING IN NEW ORLEANS?

15 A.   YEAH, WE HAD -- THERE WAS A TELEPHONE CONFERENCE.  I WAS IN

16 ST. LOUIS.

17 Q.   YOU HAVEN'T GONE ANY YOUTUBE PRESENTATIONS FOR THE

18 FORMALDEHYDE COUNSEL LIKE DR. COLE, HAVE YOU?

19 A.   NO, I HAVEN'T DONE ANY YOUTUBES.

20      MR. WEINSTOCK:  OBJECT.  WHAT?  CAN WE APPROACH?  WHAT

21 IS THAT?

22      THE COURT:  COME ON UP.

23      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS

24 A CONFERENCE HELD AT THE BENCH.)

25      THE COURT:  I DON'T RECALL ANY TESTIMONY ABOUT YOUTUBE

1   STUFF.  WHAT ARE WE DOING HERE?

2          MR. WATTS:  WELL, I TELL YOU, IT WAS IN MY OUTLINE, IF

3   IT DIDN'T COME UP.  I'LL SHOW YOU THE YOUTUBE.  AND I APOLOGIZE

4   IF IT DIDN'T.

5          THE COURT:  IT DIDN'T COME UP AT ALL.

6          MR. WATTS:  MY BAD.

7          MR. WEINSTOCK:  I WOULD HAVE COVERED IT ON REDIRECT IF

8   IT HAD COME UP.

9             AND I MEANT TO BRING IT UP, AND I'LL DO IT UP HERE.

10   I JUST WANTED TO BE CLEAR ABOUT SOMETHING.  WHEN THEY CALLED A

11   MOTION IN LIMINE THAT WE COULDN'T TALK ABOUT EXPERTS THEY DIDN'T

12   CALL, BUT NOW THEY'RE REFERENCING, YOU KNOW, THAT WE DIDN'T CALL

13   DR. MARSH.  SO I THINK THAT'S FAIR GAME ON CLOSING WHEN WE GET TO

14   IT.

15          THE COURT:  CLOSING ARGUMENTS CAN BE LIMITED TO WHAT

16   CAME FROM THE WITNESS STAND.  SO, TO THE EXTENT THAT MARSH WAS

17   DISCUSSED BY DR. COLE, YOU CAN DISCUSS WHAT MARSH HAD; BUT, WE

18   CAN'T DISCUSS AN EXPERT WHO DIDN'T TESTIFY AND IF THE JURY HADN'T

19   HEARD THAT EVIDENCE.

20          MR. WEINSTOCK:  I'LL MOVE ON.

21          THE COURT:  I'M GOING TO GO AHEAD AND STRIKE THE LAST.

22          MR. WATTS:  I APOLOGIZE.  IT WAS IN THE OUTLINE.

23          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

24   CONFERENCE CONCLUDED.)

25          THE COURT:  ALL RIGHT.  THE COURT WILL STRIKE THE LAST

1   STATEMENT BY COUNSEL -- OR LAST QUESTION BY COUNSEL.  LET'S MOVE

2   ON TO THE NEXT QUESTION.  YOU'RE TO DISREGARD THE QUESTION THAT

3   WAS ASKED.

4           MR. WATTS:  THANK YOU.

5                           EXAMINATION

6   BY MR. WATTS:

7   Q.    THE FORMALDEHYDE COUNCIL PUBLISHES COMMENTS WITH RESPECT TO

8   FORMALDEHYDE THAT QUOTE YOU, RIGHT?

9   A.    THEY MAY.  I DON'T KNOW.  I'VE NEVER SEEN THEM.

10  Q.    LET ME ASK YOU:  QUOTE, THE WEIGHT OF THE SCIENTIFIC

11  EVIDENCE SUPPORTS A LACK OF ASSOCIATION BETWEEN FORMALDEHYDE

12  EXPOSURE AND ASTHMA INDUCTION (SIC) OR EXACERBATION.  DR. JAMES

13  H. WEDNER TESTIFIED TO THIS AT THE EPA HEARING IN CHICAGO,

14  ILLINOIS.  THE FORMALDEHYDE COUNSEL SUPPORTS HIS COMMENTS AND

15  URGES EPA TO GIVE THEM DUE CONSIDERATION.

16          MR. WEINSTOCK:  YOUR HONOR, I'M GOING TO OBJECT.  HE'S

17  CERTAINLY WELCOME TO ASK HIM IF THAT'S HIS POSITION AND IF THAT'S

18  WHAT HE SAID.

19          MR. WATTS:  THAT'S WHAT I'M ASKING.

20          MR. WEINSTOCK:  BUT HE'S QUOTING A DOCUMENT THAT THE

21  WITNESS SAID HE HAS NOT SEEN.  THERE IS NO FOUNDATION LAID FOR

22  IT.

23          THE COURT:  LET'S ASK HIM ABOUT SOMETHING, RATHER THAN

24  JUST READ SOMETHING AND THEN ASK HIM, CONFIRM THAT HE'S NEVER

25  SEEN IT, LET'S STICK WITH WHAT HE HAS SEEN, AND THEN WE CAN

1    QUESTION HIM ALL ABOUT THAT.

2                              EXAMINATION

3    BY MR. WATTS:

4    Q.   LET ME FINISH THE QUESTION.  AND THAT WAS, DO YOU AGREE WITH

5    THAT STATEMENT, IF SOMEBODY IS QUOTING YOU THAT WAY?

6    A.   I AGREE WITH THE STATEMENT.  I WISH THEY'D GOTTEN MY NAME

7    RIGHT.

8    Q.   FAIR ENOUGH.  NOW, WE WENT THROUGH YOUR CV WHERE THERE ARE

9    NO ARTICLES WITH RESPECT TO FORMALDEHYDE, RIGHT?

10   A.   THAT'S CORRECT.

11   Q.   BUT THE FORMALDEHYDE COUNCIL, SINCE THE TIME YOU WERE CALLED

12   BY MR. HYNES FOR THIS LITIGATION, HAS CALLED YOU?

13   A.   CORRECT.

14   Q.   AND THEY HAVE ASKED YOU, WILL YOU WORK FOR US IF WE FUND YOU

15   IN WRITING ARTICLES WITH RESPECT TO FORMALDEHYDE AND ASTHMA?

16   A.   THAT'S CORRECT.

17   Q.   AND AS WE SPEAK, YOU HAVE NOT PUBLISHED ANY OF THOSE

18   ARTICLES FUNDED BY THE FORMALDEHYDE COUNCIL, BUT YOU ARE WORKING

19   ON THEM?

20   A.   THAT'S CORRECT.

21   Q.   COUNSEL ASKED YOU SOME QUESTIONS WITH RESPECT TO ODOR

22   THRESHOLD.  DID YOU GIVE A REPORT IN THIS CASE?

23   A.   YES.

24           MR. WATTS:  MAY I APPROACH, YOUR HONOR?

25           THE COURT:  YES.

```
1                         EXAMINATION
2  BY MR. WATTS:
3  Q.   IS IT TRUE THAT THE AVERAGE INDIVIDUAL CAN DETECT
4  FORMALDEHYDE AT ABOUT 500 PARTS PER BILLION?
5  A.   YES.
6  Q.   WHEN YOU TOLD MR. WEINSTOCK 50 TO A 100, AND HE SAID, ARE
7  YOU SURE IT'S NOT 500, HE LOOKED KIND OF SURPRISED.  DID YOU SEE
8  HIM?
9  A.   NO, NO.  WHAT I SAID WAS --
10 Q.   HOLD ON.  DID YOU SEE HIM FIRST?
11           THE COURT:  WAIT.
12           MR. WEINSTOCK:  CAN HE ANSWER THE QUESTION?
13           THE COURT:  YOU'RE CHARACTERIZING --
14           MR. WATTS:  THE QUESTION IS, DID YOU SEE HIM?
15           THE COURT:  YOU'RE CHARACTERIZING THE WAY --
16           THE WITNESS:  DID I SEE HIM?
17           THE COURT:  STOP.  WHOA, WHOA.  LET'S --
18           MR. WATTS:  HOWEVER HE LOOKED.  I DON'T WANT TO
19 CHARACTERIZE --
20           THE COURT:  MR. WATTS, I'M TALKING.
21           MR. WATTS:  I'M SORRY, I THOUGHT YOU WERE DONE, SIR.  I
22 APOLOGIZE.
23           THE COURT:  THAT'S NOT AN INVITATION TO FIRE OFF THREE
24 MORE QUESTIONS --
25           MR. WATTS:  YES, SIR.
```

1          THE COURT:  -- WHILE I'M IN THE MIDDLE OF A SENTENCE.

2          MR. WATTS:  I APOLOGIZE TO THE COURT.

3          THE COURT:  ALL RIGHT.  NOW, YOUR QUESTION IS, AS I

4    UNDERSTAND IT, YOU WANT HIM TO CONFIRM WHAT YOU SAW ON

5    MR. WEINSTOCK'S FACE?  THAT'S AN IMPROPER QUESTION.

6          MR. WATTS:  LET ME GO ON --

7          THE COURT:  YOU NEED TO BACK UP A LITTLE BIT AND ASK A

8    PROPER QUESTION, AND THEN HE CAN ANSWER.

9                              EXAMINATION

10   BY MR. WATTS:

11   Q.   DID MR. WEINSTOCK ASK YOU WHETHER THE AVERAGE INDIVIDUAL CAN

12   DETECT FORMALDEHYDE AT ABOUT 500 PARTS PER BILLION?

13   A.   YES.

14   Q.   IS THAT WHAT YOU PUT IN YOUR REPORT?

15   A.   YES.

16   Q.   HAVE YOU SEEN THE ATSDR REPORT AS TO WHAT THE ODOR THRESHOLD

17   IS FOR FORMALDEHYDE?

18   A.   I'VE SEEN IT.  I CAN'T QUOTE IT FOR YOU RIGHT AS I SIT HERE.

19   Q.   IF IT SAYS .5 TO ONE, WOULD YOU AGREE WITH THAT?

20   A.   PARTS PER BILLION?

21   Q.   .5 PARTS PER MILLION TO ONE IS THE AVERAGE?

22   A.   MILLION OR BILLION?

23   Q.   .5 PARTS PER MILLION OR 500 PARTS PER BILLION?

24   A.   YES.

25   Q.   YOU AGREE THAT THAT'S THE ODOR THRESHOLD FOR THE AVERAGE

1    PERSON AND FORMALDEHYDE?

2    A.    AVERAGE, YES.

3    Q.    ALL RIGHT.    IRRITANT THRESHOLD, .4 PARTS PER BILLION TO

4    3 PARTS PER MILLION.    DO YOU AGREE THAT THAT IS THE IRRITANT

5    THRESHOLD?

6    A.    I THINK THE LOWER LIMIT'S A LITTLE LOW.

7    Q.    DO YOU AGREE THAT THE LOWER LIMIT FOR IRRITANT THRESHOLD

8    SHOULD BE AT LEAST 500 PARTS PER BILLION?

9    A.    AT LEAST, AND PROBABLY HIGHER.

10    Q.    AND PROBABLY HIGHER; IN OTHER WORDS, YOU AGREE WITH THAT

11    RANGE --

12    A.    YEAH.

13    Q.    -- THAT GOES UP TO THREE, RIGHT?

14          SO WHAT THE ODOR THRESHOLD TELLS US, IF SOMEBODY COMES

15    IN AND CAN SMELL THE FORMALDEHYDE, THAT THE FORMALDEHYDE LEVEL IS

16    AT A POINT ABOVE THE ODOR THRESHOLD, RIGHT?

17    A.    ASK THAT QUESTION, AGAIN.

18    Q.    SURE.    WHAT THE ODOR THRESHOLD TELLS US --

19    A.    THAT WAS A TAUTOLOGY.

20    Q.    OKAY.    LET ME TRY IT AGAIN.    IT IS KIND OF A TAUTOLOGY.

21    YOU'RE RIGHT.    IF THE ODOR THRESHOLD IS X, AND SOMEBODY CAN SMELL

22    THE FORMALDEHYDE, WE KNOW THE LEVEL IS AT X OR ABOVE, RIGHT?

23    A.    IT DEPENDS UPON -- YOU HAVE TO REMEMBER THAT IT'S AN

24    INDIVIDUAL ODOR THRESHOLD.

25    Q.    SURE.

1  A.   IF THAT INDIVIDUAL DETECTS FORMALDEHYDE AT THAT LEVEL, THEN

2  THAT IS THE LEVEL THAT'S THERE OR HIGHER.

3  Q.   SO, IN ANSWER TO MY QUESTION, IF YOUR AVERAGE INDIVIDUAL CAN

4  SMELL FORMALDEHYDE AT 500 PARTS PER BILLION --

5  A.   CORRECT.

6  Q.   -- AND THEY WALK IN AND THEY SMELL FORMALDEHYDE, THAT WILL

7  TELL YOU THAT THE LEVEL OF THE FORMALDEHYDE IS 500 PARTS PER

8  BILLION OR HIGHER, TRUE?

9  A.   CORRECT.

10  Q.   IRRITANT THRESHOLD, YOU SAY IT SHOULD BE LEAST 500 PARTS PER

11  BILLION OR UP THROUGH TO THREE.  IF SOMEBODY WALKS INTO A TRAILER

12  AND THEIR NASAL SYSTEM IS IRRITATED BECAUSE OF FORMALDEHYDE, THAT

13  WILL TELL YOU THAT THE LEVEL OF THE FORMALDEHYDE IS AT OR ABOVE

14  THE MINIMUM IRRITANT THRESHOLD, RIGHT?

15  A.   WELL, YOU'RE MAKING THE ASSUMPTION THAT THE REASON THEY ARE

16  IRRITATED IS BECAUSE OF FORMALDEHYDE.

17  Q.   LET ME GIVE YOU AN EXAMPLE.  YOU'VE SEEN THE LITERATURE THAT

18  FORMALDEHYDE CAUSES NOSEBLEEDS?

19  A.   IT CAN.  NOT AT THE LEVELS WE'RE TALKING ABOUT.

20  Q.   WELL, IF SOMEBODY WALKS INTO A TRAILER AND THEY HAVE A

21  NOSEBLEED, AND JUST ASSUME FOR PURPOSES OF MY QUESTION

22  HYPOTHETICALLY THAT THE FORMALDEHYDE CAUSED THE NOSEBLEED, OKAY?

23  A.   YES.

24  Q.   IF THE FORMALDEHYDE CAUSED THE NOSEBLEED, WE KNOW THAT THE

25  LEVEL OF FORMALDEHYDE THAT THAT PERSON WALKED INTO THE TRAILER

1    AND WAS EXPOSED TO IS ABOVE THE MINIMUM IRRITANT THRESHOLD FOR

2    FORMALDEHYDE?

3    A.    NO.

4    Q.    NO.

5            THE COURT:  USE THE MICROPHONE, DOCTOR.

6            THE WITNESS:  I'M SORRY.  THE ASSUMPTION IS THAT THE

7    MINIMUM IRRITANT LEVEL IS THE MINIMUM LEVEL THAT WOULD CAUSE SOME

8    DISCOMFORT.  IT'S NOT THE LEVEL THAT WOULD CAUSE A NOSEBLEED.

9                                    EXAMINATION

10   BY MR. WATTS:

11   Q.    WOULD THAT LEVEL BE HIGHER?

12   A.    SIGNIFICANTLY.

13   Q.    OKAY.  SO IF SOMEBODY WALKED IN AND HAD A NOSEBLEED, WHERE

14   IN THAT .5 PARTS PER MILLION TO 3 PARTS PER MILLION AREA ARE WE

15   TALKING ABOUT?  ARE WE ON THE HIGHER END, THEN?

16   A.    NO, NO, NO.  YOU'RE TALKING APPLES AND ORANGES.

17   Q.    I'M TRYING TO UNDERSTAND.

18   A.    YOU'RE TALKING IRRITANT LEVEL.

19   Q.    I'M TALKING NOSEBLEEDS NOW.

20   A.    I'LL GET TO NOSEBLEEDS.

21   Q.    GO AHEAD.

22   A.    IF SOMEBODY HAS A NOSEBLEED, YOU CAN'T OBVIOUSLY ASSUME --

23   AND AS ALLERGISTS WE HEAR THIS ALL THE TIME, PARTICULARLY WITH

24   KIDS, MY SON HAD A NOSEBLEED, RIGHT -- YOU CAN'T ASSUME THAT IT

25   WAS THE MEDICINE THEY WERE SUPPOSED TO PUT IN THEIR NOSE OR AN

1   IRRITANT AT HOME.

2            THE NUMBER ONE CAUSE OF NOSE BLEEDING IS BECAUSE YOU

3   PUT YOUR FINGER IN SOMEPLACE YOU'RE NOT SUPPOSED TO.  SO THAT'S

4   THE NUMBER ONE CAUSE OF NOSEBLEEDS.  SO IT USUALLY HAS NOTHING TO

5   DO WITH THE IRRITANT OR THE FORMALDEHYDE OR ANYTHING ELSE.

6            IN ORDER FOR AN IRRITANT TO CAUSE A NOSEBLEED, IT HAS

7   TO BE RELATIVELY HIGH, AND THAT HAS VERY LITTLE TO DO WITH

8   IRRITATION.

9   Q.   IN ORDER FOR THE IRRITANT TO CAUSE A NOSEBLEED, IT HAS TO BE

10  RELATIVELY HIGH?

11  A.   RIGHT.

12  Q.   IF THE IRRITANT CAUSES THE NOSEBLEED, IF WE DON'T HAVE

13  SOMEBODY PUTTING THEIR FINGER IN AN ELECTRICAL SOCKET -- AND I

14  GET THE JOB, BUT THAT'S NOT REALLY WHAT I'M TALKING ABOUT HERE --

15  IF THE IRRITANT CAUSES THE NOSEBLEED, WHERE IN THAT RANGE OF

16  IRRITATION BETWEEN 500 PARTS PER BILLION AND 3,000 PARTS PER

17  BILLION WOULD YOU NEED THE FORMALDEHYDE LEVEL TO BE TO CAUSE A

18  NOSEBLEED?

19  A.   ABOVE ANYTHING YOU'VE JUST TALKED ABOUT.  AND THE MOST

20  LIKELY CAUSE OF FORMALDEHYDE CAUSING -- AND I'M NOT TRYING TO BE

21  FACETIOUS HERE, I'M TRYING TO MAKE A POINT -- AND THAT IS, IF YOU

22  WERE A CHILD, AND YOU WALKED INTO A ROOM THAT HAD AN IRRITANT, IN

23  THIS CASE FORMALDEHYDE, AND IT MADE YOUR NOSE IRRITATED, WHAT

24  WOULD YOU DO IF YOU WERE A THREE-YEAR-OLD OR A FIVE-YEAR-OLD OR

25  EVEN A TEN-YEAR-OLD?  YOU'D PUT YOUR FINGER IN YOUR NOSE.  AND

1   THE REASON IT BLED WAS BECAUSE YOU PUT YOUR FINGER IN YOUR NOSE.

2   Q.   OH, I GOT YOU.

3   A.   AND IT HAD NOTHING TO DO WITH BECAUSE FORMALDEHYDE, PER SE,

4   CAUSES NOSES TO BLEED.

5   Q.   I GOT YOU.  SO LET ME CARRY THAT ALONG ONE MORE.  USE THIS

6   HYPOTHETICAL.  WE'VE GOT A LITTLE KID, LET'S CALL HIM HEATH.

7   OKAY.  AND HE WALKS INTO A TRAILER.  AND THIS KID, HEATH, LAST

8   NAME ALLEN, GETS A NOSE BLEED.  THAT'S BECAUSE THE LITTLE KID PUT

9   THE FINGER UP THE NOSE; IS THAT RIGHT?

10  A.   COULD BE.

11  Q.   WHAT IF HIS NEXT-DOOR NEIGHBOR, HIS BUDDY, GATOR, GETS A

12  NOSEBLEED, IS THAT BECAUSE HE PUT HIS FINGER UP HIS NOSE?

13  A.   WELL, I DON'T KNOW.  ALL I CAN GIVE YOU IS STATISTICALLY THE

14  NUMBER ONE CAUSE OF CHILDREN'S NOSE BLEEDING IS PICKING THEIR

15  NOSE.

16  Q.   EVEN IF THEY ARE 12-YEAR-OLD LITTLE GIRLS, THEY WERE PICKING

17  THEIR NOSE; IT WASN'T THE FORMALDEHYDE THAT DID IT.  IS THAT YOUR

18  TESTIMONY?

19       MR. WEINSTOCK:  I'M SORRY, IS THAT A HYPOTHETICAL

20  QUESTION?

21       MR. WATTS:  SURE.  LET ME REPHRASE.

22                      EXAMINATION

23  BY MR. WATTS:

24  Q.   WHETHER THE KID'S NAME IS HEATH ALLEN OR GATOR OR ERICA, IF

25  THEY GOT A NOSEBLEED FROM WALKING INTO A FEMA TRAILER, IT

1   PROBABLY WASN'T THE FORMALDEHYDE, IT'S PROBABLY BECAUSE THEY

2   PICKED THEIR NOSE?

3   A.   YES, STATISTICALLY, BY A LARGE SHOT.

4   Q.   DID YOU EVER SEE THE MOVIE *CADDYSHACK*?

5   A.   YES.

6   Q.   50 BUCKS SAYS THE SMELLS KID PICKS HIS NOSE?

7   A.   YES.

8   Q.   ALL RIGHT.  THAT'S THE THEORY?

9   A.   YES.

10  Q.   NOW, IF THEY DIDN'T PICK THEIR NOSE, WHAT YOU'RE SAYING

11  IS --

12  A.   THEY WOULDN'T HAVE A NOSEBLEED.

13  Q.   WELL, IF THEY GOT A NOSEBLEED ANYWAY, IF THEY GOT A

14  NOSEBLEED ANYWAY, DESPITE THE FACT THEY DIDN'T PICK THEIR NOSE,

15  THE LEVEL OF FORMALDEHYDE NEEDS TO BE PRETTY DARN HIGH?

16  A.   YES.

17  Q.   I GOT YOU.  OKAY.

18       NOW, ONE OTHER ASPECT OF THE IRRITANT PROPERTIES OF

19  FORMALDEHYDE IS, I THINK YOU SAID IT ONLY RELATES TO THE MUCOSA

20  OF THE UPPER AIRWAYS IN THE EYES; IS THAT RIGHT?

21  A.   CORRECT.

22  Q.   ARE YOU A GOOD DRAWER?

23  A.   AM I A GOOD DRAWER?  YOU SAW HOW WELL I DID ON THE SCREEN.

24  Q.   YEAH, I'M PRETTY BAD AS WELL.  I TELL YOU WHAT, INSTEAD OF

25  MAKING A DRAWING OF A HUMAN BODY, COULD YOU USE YOUR OWN HEAD AND

1   CHEST TO TELL ME, THE TRIGEMINAL NERVE, YOU SAID -- AND I THINK

2   YOU SAID IT VERY WELL -- PART OF IT FEEDS THE HEAD, RIGHT?

3   A.   YES.

4   Q.   PART OF IT FEEDS THIS AREA OF JAWS, WHICH IS WHY WE KIND OF

5   GET LOCKED UP SOMETIMES WHEN WE'RE -- YOU KNOW -- I MEAN, THERE'S

6   PART OF IT IN THERE, RIGHT?

7   A.   YES.

8   Q.   AND THEN PART OF IT IS IN THE NOSE?

9   A.   CORRECT.

10  Q.   THE TRIGEMINAL NERVE DOES NOT GO DOWN INTO THE CHEST, RIGHT?

11  A.   CORRECT.

12  Q.   AND YOUR POINT, AND I DON'T DISAGREE WITH IT, IS THAT

13  FORMALDEHYDE, I THINK YOU SAID, IS VERY ACTIVE AND IT BINDS; IS

14  THAT RIGHT?

15  A.   THAT'S CORRECT.

16  Q.   IT'S SO REACTIVE IT BINDS TO THE UPPER AIRWAY?

17  A.   CORRECT.

18  Q.   SO THAT PREVENTS THE FORMALDEHYDE FROM GETTING DOWN INTO THE

19  LOWER AIRWAY?

20  A.   CORRECT.

21  Q.   SO THE FORMALDEHYDE IS NOT GOING TO GET DOWN INTO THE CHEST,

22  RIGHT?

23  A.   CORRECT.

24  Q.   IT'S NOT GOING TO CAUSE LUNG CANCER BECAUSE IT NEVER GOT

25  THERE, CORRECT?

1   A.   CORRECT.

2   Q.   IT'S NOT GOING TO GET UP IN THE HEAD AND CAUSE BRAIN CANCER

3   BECAUSE IT NEVER GOT THERE, RIGHT?

4   A.   CORRECT.

5   Q.   AND I KNOW YOU'RE NOT AN ONCOLOGIST, BUT THE AREA WHERE

6   FORMALDEHYDE DOES GO IS IN THIS NASAL AREA, RIGHT?

7   A.   CORRECT.

8   Q.   ALL RIGHT.  NASAL PHARYNGEAL, WHERE IS THE NASAL PHARYNGEAL

9   AREA?  POINT THAT OUT FOR THE JURY, PLEASE.

10  A.   WELL, YOUR NOSE IS HERE, AND YOUR PHARYNX IS WHAT'S BEHIND

11  IT.

12  Q.   OKAY, WHAT'S BEHIND IT.  AND THE PHARYNX GOES DOWN TO WHAT?

13  A.   YOUR THROAT.

14  Q.   AND THE THROAT AREA, IS THAT WHERE THE LARYNX IS?

15  A.   CORRECT.

16  Q.   BUT IN TERMS OF THE NOSE, THE PHARYNX THAT GOES DOWN TO MY

17  THROAT AND THE LARYNX THAT'S IN MY THROAT, FORMALDEHYDE IS NOT

18  GOING TO GET BELOW THAT?

19  A.   PROBABLY NOT, NO.

20  Q.   BECAUSE FORMALDEHYDE IS SO REACTIVE IT BINDS TO THE UPPER

21  AIRWAY?

22  A.   CORRECT.

23  Q.   AND THE UPPER AIRWAY WOULD INCLUDE THE NOSE, THE PHARYNX AND

24  THE LARYNX?

25  A.   I'M NOT SAYING IT WOULD GET INTO THE LARYNX, BUT LET'S

1   ASSUME THAT IT GETS INTO THE UPPER AIRWAY.  THE LARYNX IS

2   ACTUALLY NOT PART OF THE UPPER AIRWAY.

3   Q.   NOW -- BY THE WAY, WHEN YOU SAW CHRIS -- YOU'VE SEEN A LOT

4   OF KIDS?

5   A.   A TON.

6   Q.   ONE THING, YOU KNOW, IN LAWSUITS THERE IS AREAS WHERE WE CAN

7   AGREE AND AREAS THAT WE HAVE TO DISAGREE.  YOU'D AGREE THIS IS A

8   GREAT KID?

9   A.   YES.

10  Q.   I MEAN, YES, SIRS; NO, SIRS; YES, MA'AM; NO, MA'AM; GOOD

11  KID?

12          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  WE AGREE WITH

13  THAT.  CAN WE MOVE ON?  IT'S NOT A POPULARITY CONTEST.

14          MR. WATTS:  I'LL TAKE THE STIPULATION AND MOVE ON.

15          THE COURT:  SINCE YOU'LL ACCEPT THE STIPULATION, THEN

16  LET'S GO AHEAD AND MOVE ON.

17          MR. WATTS:  THE GREAT KID STIPULATION IN THE RECORD,

18  LET'S MOVE ON.

19                          EXAMINATION

20  BY MR. WATTS:

21  Q.   DID YOU LOOK AT HIS REPORT CARDS OF HOW WELL HE DID ONCE HE

22  CAME BACK TO NEW ORLEANS AND GOT BACK HOME?

23  A.   NO.

24          MR. WEINSTOCK:  OBJECTION, YOUR HONOR.

25          MR. WATTS:  I THOUGHT YOU SAID I COULD DO THIS.

 1          MR. WEINSTOCK:  WHEN I DID SAY IT?

 2          MR. WATTS:  YOU SAID WE WERE GOING TO DO THAT INSTEAD OF

 3  DOING IT AFTERWARDS --

 4          MR. WEINSTOCK:  OH, OKAY.  I'M SORRY.

 5          MR. WATTS:  WITH THIS WITNESS.  THAT'S WHAT WE AGREED

 6  TO.

 7          THE COURT:  GO AHEAD AND PUT IT UP THERE.  I ASSUME YOU

 8  WANT TO SHOW HIS GRADES?

 9          MR. WATTS:  YEAH.  WE'RE JUST SAVING TIME, REAL QUICK.

10                         EXAMINATION

11  BY MR. WATTS:

12  Q.   DID YOU LOOK AT HIS REPORT CARD TO SEE HIS GRADES WHEN HE

13  GOT BACK HOME AND WAS BACK IN HIS SURROUNDINGS?

14  A.   I DID NOT.

15          MR. WATTS:  THOSE ARE IN EXHIBIT 20, WHICH IS IN

16  EVIDENCE, YOUR HONOR.

17                         EXAMINATION

18  BY MR. WATTS:

19  Q.   ALL RIGHT.  LET'S GO BACK TO YOUR EXAMINATION OF HIM.  HAVE

20  YOU TESTIFIED IN THE PAST THAT WHEN CHILDREN HAVE ASTHMA, THEIR

21  ASTHMA IS MANIFEST AS COUGH RATHER THAN WHEEZE?

22  A.   CAN BE, YES.

23  Q.   DO YOU REMEMBER TESTIFYING IN A CASE CALLED CROWDER?

24  A.   YES.

25  Q.   THEIR ASTHMA IS MANIFEST AS COUGH RATHER THAN WHEEZE.  WHY

1   IS THAT SO?

2   A.   ACTUALLY, NO ONE KNOWS THE ANSWER TO THAT QUESTION; BUT,

3   PARTICULARLY IN LITTLE CHILDREN, CROWDER WAS A LITTLE CHILD, THEY

4   MAY NEVER WHEEZE.  I HAVE ASTHMATIC CHILDREN, AND I'VE NEVER

5   HEARD THEM WHEEZE.  ALL THEY DO IS COUGH.

6   Q.   AND CHRIS HAD A CLASSIC CROUPY COUGH, RIGHT?

7   A.   WHEN HE WAS A CHILD.

8   Q.   NOW, I WANT TO HIT ANOTHER AREA WITH YOU JUST REAL BRIEFLY,

9   AND THAT IS THE ISSUE OF THIS DOCTOR IN FLORIDA AND THE ADVAIR.

10  YOU ARE FAMILIAR, BECAUSE YOU'VE TREATED ASTHMATICS, WITH WHAT

11  ADVAIR IS; IS THAT RIGHT?

12  A.   YES.

13       MR. WATTS:  MAY I APPROACH, YOUR HONOR?

14       THE COURT:  YES.

15                    EXAMINATION

16  BY MR. WATTS:

17  Q.   YOU REFERENCED WITH MR. WEINSTOCK THAT ADVAIR CAME OUT WITH

18  A BLACK BOX WARNING; IS THAT RIGHT?

19  A.   ACTUALLY, THE CORRECT TERM NOW IS A BOXED WARNING.  I HAVE

20  TO GIVE THE FDA ITS DUE.

21  Q.   IT USED TO BE A BLACK BOX, NOW IT'S CALLED A BOXED WARNING?

22  A.   JUST A BOXED WARNING, YES.

23  Q.   WELL, GOOD, BECAUSE MY COPY IS IN BLACK AND WHITE.

24       HERE IS WHAT I WANT TO ASK YOU ABOUT, WHAT'S IN THE

25  ADVAIR WARNING.  APPARENTLY THERE WAS SOME SORT OF A STUDY THAT

1   YOU WERE TELLING THE JURY ABOUT; IS THAT RIGHT?

2   A.   IT'S CALLED A SMART STUDY, YES.

3   Q.   THE SALMETEROL MULTICENTER ASTHMA RESEARCH TRIAL?

4   A.   RIGHT.

5   Q.   S-M-A-R-T.

6   A.   SMART.

7   Q.   ALL RIGHT.   COOL.

8           AND I THINK YOU VERY ACCURATELY PUT IT IN, BUT I NEED

9   TO JUST ASK YOU ABOUT THIS.   THERE WERE AN INTERIM STUDY ANALYSIS

10  OF 26,355 FOLKS; IS THAT RIGHT?

11  A.   CORRECT.

12  Q.   WERE THEY ALL KIDS OR ADULTS OR BOTH?

13  A.   THEY WERE ALL ADULTS.

14  Q.   THE WAY THESE STUDIES GO IS, IS THAT IF YOU'RE RUNNING A

15  STUDY AND YOU REALIZE YOU'RE DOING HARM, ETHICALLY YOU HAVE TO

16  STOP THE STUDY; IS THAT RIGHT?

17  A.   CORRECT.

18  Q.   AND SO THEY WERE RUNNING A STUDY THAT HAD PEOPLE ON THIS

19  ADVAIR, RIGHT?

20  A.   RIGHT.

21  Q.   AND THEY NOTICED IN THEIR NUMBERS THAT THEIR ETHICAL

22  GUIDELINES SAID WE HAVE GOT TO STOP THIS STUDY, RIGHT?

23  A.   YES.

24  Q.   AND SO THEY TERMINATED THE STUDY, RIGHT?

25  A.   YES.

1  Q.    AND IT WAS DUE TO FINDINGS IN AFRICAN-AMERICANS?

2  A.    CORRECT.

3  Q.    AND THERE WAS AN INCREASE IN RESPIRATORY RELATED DEATHS OF

4  GREATER THAN 2.0 THAT WAS STATISTICALLY SIGNIFICANT, RIGHT?

5  A.    CORRECT.

6  Q.    AND WHEN YOU LOOKED AT AFRICAN-AMERICAN DEATHS WITH PEOPLE

7  ON ADVAIR, THE DIFFERENCE WAS EVEN MORE ACUTE, IT WAS A 4.1 ODDS

8  RATIO; IS THAT RIGHT?

9  A.    CORRECT.

10  Q.    AND THAT 4.1 ODDS RATIO WAS STATISTICALLY SIGNIFICANT; IS

11  THAT RIGHT?

12  A.    RIGHT.

13  Q.    SO WHAT THEY REALIZED WAS THAT WHEN YOUNG AFRICAN-AMERICAN

14  KIDS GO ON ADVAIR, THEY DIE AT A RATE 410 PERCENT OF THAT OF

15  PEOPLE THAT AREN'T ON IT?

16  A.    NO.

17  Q.    HOW DID I GET THAT WRONG?  THE 4.10?

18  A.    FIRST OF ALL, IT HAD NOTHING TO DO WITH YOUNG

19  AFRICAN-AMERICAN KIDS.

20  Q.    JUST SO HAPPENS?

21  A.    NO, THESE WERE ALL ADULTS.

22  Q.    AFRICAN-AMERICANS.

23  A.    OKAY.  AND SECOND OF ALL, THE PROBLEM WITH THE SMART STUDY

24  WAS --

25  Q.    HOLD ON.  GO AHEAD.

1  A.  -- THEY DIDN'T KNOW WHETHER THEY WERE TAKING THEIR STEROIDS

2  OR NOT.  SO THE PROBLEM WAS THAT IT WAS A VERY POORLY DONE STUDY.

3  AND IF YOU READ THAT ARTICLE BY HAL NELSON THAT YOU'RE LOOKING

4  AT, YOU'LL SEE THAT IN HIS CRITIQUE OF IT, WHAT HE SHOWED WAS

5  THAT IF YOU TAKE A STEROID ALONG WITH THE LONG-ACTING

6  BRONCHODILATOR, THE SALMETEROL, THAT IT PROTECTS YOU FROM THESE

7  ADVERSE EFFECTS.

8        NOW, LAST -- IN 2008, THERE WAS A STUDY THAT WAS

9  PUBLISHED IN THE COCHRANE REVIEWS, WHICH IS A HUGE REVIEW OF ALL

10 OF THE STUDIES THAT HAVE EVER BEEN DONE ON THESE COMBINATION

11 THERAPIES, WHICH CLEARLY SHOWED THAT THE COMBINATIONS WORK.  IT'S

12 TAKING SALMETEROL ALONE THAT IS -- PUTS YOU AT RISK.

13 Q.  I SEE.  YOU KNOW THAT BECAUSE OF YOUR 30 YEARS EXPERIENCE

14 AND YOU'RE A MEDICAL DOCTOR AND ALL THAT GOOD STUFF, RIGHT?

15 A.  SURE.

16 Q.  BUT PUT YOURSELF IN THE SHOES OF MY CLIENT.  ALL SHE KNOWS

17 IS WHAT'S IN THE PACKAGE INSERT THAT COMES WITH THE ADVAIR,

18 RIGHT?

19 A.  CORRECT.

20 Q.  SHE COULD NOT POSSIBLY KNOW WHO HAROLD NELSON IS AND WHETHER

21 HE DID A GOOD STUDY OR NOT, ACCORDING TO YOU, RIGHT?

22 A.  WELL, I MEAN, THE POINT IS THAT IF SHE STOPPED TAKING -- IF

23 CHRIS STOPPED TAKING ADVAIR, HE SHOULD HAVE BEEN ON --

24 Q.  WHAT WAS MY QUESTION?

25 A.  SHE COULDN'T POSSIBLY HAVE KNOWN.  THAT'S CORRECT.

1    Q.    YOU AGREE THAT SHE COULDN'T POSSIBLY HAVE KNOWN?

2    A.    WELL, SHE COULD HAVE GONE ON THE WEB, SO THE ANSWER IS YES,

3    SHE CAN HAVE KNOWN.

4    Q.    COULD HAVE GONE ON THE WEB.   OKAY.   LET'S GO BACK.

5          YOU TOLD ME THAT THERE WAS A PUBLICATION DONE THIS YEAR

6    THAT SHOWED THE PROBLEMS WITH THE SMART STUDY, RIGHT?

7    A.    RIGHT.

8    Q.    ALL RIGHT.   I'M TALKING ABOUT BACK IN 2006, SHE'S BEEN

9    DISPLACED FROM HER HOME, SHE'S IN FLORIDA, SHE'S GIVEN ADVAIR,

10   SHE SEES THIS WARNING THAT SAYS AFRICAN-AMERICANS KIDS DIE WHEN

11   THEY ARE ON ADVAIR.   SHE COULDN'T POSSIBLY HAVE KNOWN ABOUT THE

12   STUDY THAT WAS GOING TO ANALYZE THE SMART STUDY THAT WOULD SOON

13   BE PUBLISHED IN 2009; YOU WOULD AGREE WITH THAT?

14   A.    I WOULD AGREE WITH THAT.

15   Q.    NOW, A COUPLE OTHER THINGS ABOUT ASTHMA.   WE'VE HAD SOME

16   BACK AND FORTH ABOUT WHETHER YOU GROW OUT OF ASTHMA, AND YOU'VE

17   TALKED TO SOME PEOPLE ABOUT THAT ISSUE, AS WELL; IS THAT RIGHT?

18   A.    CORRECT.

19   Q.    THE FACT OF THE MATTER IS, IS THAT YOU -- YOU AGREE THAT

20   ABOUT 50 PERCENT OF KIDS, SOME PEOPLE CALL IT OUTGROW IT, SOME

21   PEOPLE SAY THEY WILL LOSE THEIR ASTHMA SYMPTOMS WHEN THEY HIT

22   PUBERTY, RIGHT?

23   A.    ABOUT HALF WILL.

24   Q.    NOW, IN FAIRNESS, SOME OF THOSE KIDS THAT LOSE THEIR ASTHMA

25   SYMPTOMS WHEN THEY HIT PUBERTY CAN GET IT BACK AFTER THEY HIT THE

1 AGE OF 18 UP TO THE AGE OF 40?

2 A.   ABOUT HALF WILL.

3 Q.   BUT HALF OF THEM ARE LUCKY, AND IT JUST GOES AWAY FOREVER?

4 A.   THAT'S CORRECT.

5 Q.   SO WHEN ANDY OR TONY SAY, YOU KNOW, KIDS CAN OUTGROW ASTHMA,

6 THAT'S REALLY WHAT THEY ARE TALKING ABOUT; THEY ARE JUST USING

7 THE WRONG TERMS, RIGHT?

8 A.   HOWEVER YOU WANT TO DO IT.  YOU HAVE -- IF YOU START OFF AT

9 THE OF TWO WITH ASTHMA, YOU HAVE ABOUT A ONE IN FOUR CHANCE AT

10 THE AGE OF PUBERTY OF NOT HAVING ASTHMA ANYMORE.

11 Q.   GOOD ENOUGH.  I'LL TAKE THAT.  THAT'S FAIR.

12        THE NEXT ISSUE.  BEFORE YOU EVER EXAMINED MY CLIENT --

13 BY THE WAY, SHE DID NOT COME TO YOU TO EXAMINE HER CHILD; YOU

14 WERE HIRED BY THE DEFENDANTS, AND THERE IS A PROCEDURE IN THE LAW

15 THAT SAYS YOU'RE ENTITLED, AS A DEFENSE EXPERT, TO LOOK AT THE

16 KID, RIGHT?

17 A.   THAT'S CORRECT.

18 Q.   SO YOU'RE HIRED BY GULF STREAM.  FIRST MR. HYNES, AND THEN

19 GULF STREAM.  AND YOU ARE GIVEN THE RIGHT TO LOOK AT HER CHILD,

20 RIGHT?

21 A.   THAT'S CORRECT.

22 Q.   BEFORE YOU EVER LOOKED AT HER CHILD, YOU HELD THE BELIEF

23 THAT YOU DO NOT BELIEVE THAT FORMALDEHYDE IN A GASEOUS FORM CAN

24 INDUCE ASTHMA?

25 A.   THAT'S CORRECT.

1   Q.   BEFORE YOU EVER LOOKED AT HER CHILD, YOU DISCOUNTED THE

2   EFFECT OF FORMALDEHYDE IRRESPECTIVE OF WHATEVER LEVEL IT WOULD

3   BE?

4   A.   DISCOUNTED IT FOR WHAT REASON?

5   Q.   WELL, LET ME TRY TO BE MORE SPECIFIC.  QUESTION:  AND IN

6   REACHING YOUR CONCLUSION, YOU ARE DISCOUNTING THE EFFECT OF THE

7   FORMALDEHYDE, IRRESPECTIVE OF WHAT LEVEL IT MAY HAVE BEEN AT?

8   A.   YOU'LL HAVE TO TELL ME WHAT CONCLUSION I'M DISCOUNTING.

9   Q.   NO, NO, NO.

10         THE COURT:  WAIT.  ARE YOU REFERRING TO DEPOSITION

11  TESTIMONY?

12         MR. WATTS:  SURE.

13         THE COURT:  WHY DON'T WE GO AHEAD AND SHOW IT TO HIM.

14         MR. WATTS:  PAGE 123.

15         THE COURT:  SHOWN IT TO HIM, PAGE AND LINE.

16         MR. WATTS:  SURE.

17                         EXAMINATION

18  BY MR. WATTS:

19  Q.   MY FRIEND ANDY IS LETTING ME USE HIS BIGGER ONE, SO WE'RE

20  OUT OF THE DISH ON THE SIDES HERE.  PAGE 123, LINE 5 THROUGH 13,

21  IF YOU COULD READ THAT JUST REAL QUICK.

22  A.   CAN YOU GET THE PAGE BEFORE THAT?

23  Q.   SURE.

24  A.   OKAY.  NOW I KNOW WHAT I WAS TALKING ABOUT.

25  Q.   SO JUST TO REVIEW, SINCE IT TOOK ME AWHILE TO FIND THE

1    TRANSCRIPT, NUMBER ONE, IT IS TRUE THAT YOU DON'T BELIEVE THAT

2    FORMALDEHYDE IN AN OFF-GAS FORM CAN INDUCE ASTHMA OR EXACERBATE

3    ASTHMA, AND YOU HELD THAT OPINION BEFORE YOU EVER SAW THIS KID?

4    A.    THAT'S CORRECT.

5    Q.    AND, NUMBER TWO, BECAUSE OF THAT OPINION YOU HELD BEFORE YOU

6    EVER SAW THIS KID, YOU HAVE DISCOUNTED THE EFFECT OF FORMALDEHYDE

7    THAT HE WAS EXPOSED TO, IRRESPECTIVE OF WHAT LEVEL IT WOULD HAVE

8    BEEN AT?  TRUE?

9    A.    NO.

10   Q.    WELL, IN REACHING YOUR CONCLUSION, YOU WERE DISCOUNTING THE

11   EFFECT OF THE FORMALDEHYDE IRRESPECTIVE OF WHAT LEVEL IT MAY HAVE

12   BEEN AT?

13   A.    WHAT WE WERE TALKING ABOUT IN THAT PARAGRAPH AND THE ONE

14   PRIOR TO IT WAS HIS -- HIS ENVIRONMENT.  SO WE WERE TALKING ABOUT

15   I DISCOUNTED IT BECAUSE IT WAS NOT IN HIS ENVIRONMENT.

16          NOW, WE KNOW THAT I EXAMINED HIM, SO WE WERE TALKING

17   ABOUT HIM, SO I DISCOUNTED IT BECAUSE I KNEW WHAT WAS IN HIS

18   ENVIRONMENT.

19          SO WE'RE TALKING ABOUT HIS ENVIRONMENT.  WE KNOW

20   THAT -- WE WEREN'T TALKING ABOUT ANY LEVEL.  WE WERE TALKING

21   ABOUT HIS ENVIRONMENT.

22   Q.    LET ME JUST ASK YOU THE QUESTION -- WAS YOUR ANSWER YES, IS

23   MY QUESTION, TO THE QUESTION:  AND IN REACHING YOUR CONCLUSION,

24   YOU ARE DISCOUNTING THE EFFECT OF THE FORMALDEHYDE, IRRESPECTIVE

25   OF WHAT LEVEL IT MAY HAVE BEEN AT?

1   A.   YES.

2   Q.   THANK YOU.

3           NOW, YOU HELD THIS OPINION THAT YOU DO NOT BELIEVE

4   FORMALDEHYDE IN A GASEOUS FORM CAN INDUCE ASTHMA, AND YOU HELD IT

5   BEFORE WE EVER STARTED WITH THIS CASE, RIGHT?

6   A.   THAT'S CORRECT.

7   Q.   YOU WERE GIVEN NO SCIENTIFIC ARTICLES REGARDING FORMALDEHYDE

8   TO REVIEW BY COUNSEL IN THIS CASE?  TRUE?

9   A.   I GAVE THEM TO THEM.  THEY DON'T GIVE THOSE TO ME.

10  Q.   YOU NEVER VISITED THE TRAILER?

11  A.   NO.

12  Q.   YOU NEVER ATTEMPTED TO CONTACT DR. BARNES TO FIGURE OUT WHAT

13  HER OBSERVATION AND IMPRESSIONS REGARDING CHRISTOPHER COOPER'S

14  ASTHMA CONDITIONS WERE?

15  A.   NO.

16  Q.   DID YOU READ THE DEPOSITIONS OF DR. BARNES AND DR. PACHECO?

17  A.   YES.

18  Q.   DO YOU AGREE OR DISAGREE WITH THE OPINION THAT FORMALDEHYDE

19  IN THE TRAVEL TRAILER EXACERBATED HIS ASTHMA?

20  A.   I DISAGREE WITH IT.

21  Q.   DID YOU READ THE DEPOSITION OF JANET BARNES, KARIN PACHECO

22  AND JAMES KORNBERG WITH RESPECT TO VOCAL CORD DYSFUNCTION?

23  A.   YES.

24  Q.   DO YOU AGREE OR DISAGREE WITH THEIR CONCLUSION?

25  A.   I DISAGREE.

1  Q.   DID YOU READ THE DEPOSITION OF JANET BARNES, KARIN PACHECO

2  AND JAMES KORNBERG WITH RESPECT TO THE ISSUE OF EPITHELIAL

3  DAMAGE?

4  A.   YES.

5  Q.   DO YOU AGREE OR DISAGREE WITH THEIR CONCLUSION?

6  A.   I DISAGREE.

7  Q.   I SEE.  NOW, YOU SAID THAT YOU DID AN EXAMINATION OF MY

8  CLIENT, BUT, BEFORE YOU SAID THAT, YOU SAID THE SENSE OF SMELL IS

9  THE MOST ANCIENT SENSE WE HAVE.

10 A.   YES.

11 Q.   I'M A LITTLE LOST.  DID SMELL COME BEFORE HEARING AND SIGHT

12 AND TOUCH AND TASTE?

13 A.   YES.

14 Q.   BY HOW MANY MINUTES?

15 A.   A COUPLE OF MILLION.

16 Q.   OKAY.  WERE YOU RIGHT THERE IN THE BOOK OF GENESIS?  I MEAN,

17 WHAT'S YOUR POINT?  I'M LOST.

18 A.   THE POINT IS THAT SMELL, THE SENSE OF SMELL, GOES TO A PART

19 OF THE BRAIN CALLED THE RHINENCEPHALON, WHICH MEANS THE OLDEST

20 PART OF THE BRAIN.  AND IT'S THE ONLY PART OF OUR SENSE -- SENSES

21 THAT ISN'T INTERRUPTED FROM THE NOSE TO ITS PART OF THE BRAIN.

22 THERE IS NO CONNECTION.  SIGHT GOES TO A CONNECTION.  HEARING

23 GOES TO A CONNECTION.

24 Q.   I GOT YOU.

25 A.   SO IT IS A VERY ANCIENT, HENCE THE COUPLE OF MILLION

1  MINUTES.

2  Q.   SURE.  I THINK YOUR POINT IS NOT SO MUCH IN THE BOOK OF

3  GENESIS, BUT MORE FROM THE STANDPOINT OF DARWINISTIC EVOLUTIONARY

4  THEORY; IS THAT KIND OF WHAT YOU'RE SAYING?

5  A.   WELL, I DON'T WANT TO GET INVOLVED IN THAT.  WE COULD BE

6  HERE FOR A LONG TIME.

7  Q.   LET'S KEEP GOING.  LET'S KEEP GOING THEN.

8  A.   FROM A PHYSIOLOGIC STANDPOINT AS WE SIT HERE, IT IS PART OF

9  THE BRAIN WHICH IS CONSIDERED TO BE OLDER THAN OTHER PARTS OF THE

10  BRAIN.

11  Q.   I SEE.  NOW, YOU DID THIS EXAMINATION OF CHRIS COOPER ON

12  WHAT DAY?  IF WE BALL PARKED IT AND CALLED IT EARLY JUNE OF 2009,

13  WOULD THAT BE ABOUT RIGHT?

14  A.   WELL, I'M GOING TO GIVE YOU THE EXACT DATE.

15  Q.   COOL.

16  A.   SO IT WAS DONE JUNE 2, 2009.

17  Q.   SO WE'RE TALKING APPROXIMATELY 18 MONTHS AFTER HE GOT OUT OF

18  THE FEMA TRAILER?

19  A.   CORRECT.

20  Q.   NOW, 18 MONTHS AFTER HE GOT OUT OF THE FEMA TRAILER, YOU

21  PERFORMED A MEDICAL EVALUATION ON CHRIS COOPER?

22  A.   THAT'S CORRECT.

23  Q.   WHEN YOU PERFORMED THAT MEDICAL EVALUATION ON CHRIS COOPER,

24  WERE YOU IN METAIRIE, LOUISIANA?

25  A.   YES.

1  Q.   WERE YOU A PHYSICIAN THAT IS LICENSED IN THE STATE OF

2  LOUISIANA AT THAT TIME?

3  A.   NO.

4  Q.   DID YOU GET WITH THE LOUISIANA MEDICAL AUTHORITIES AND GET A

5  SPECIAL DISPENSATION FOR AN UNLICENSED PHYSICIAN TO CONDUCT A

6  MEDICAL EVALUATION IN THE STATE OF LOUISIANA?

7  A.   NO.

8  Q.   DO YOU KNOW THAT THE STATE OF LOUISIANA SAYS YOU'VE GOT TO

9  HAVE A LICENSE TO DO WHAT YOU DID?

10          MR. WEINSTOCK:  I OBJECT TO THE FORM.

11                         EXAMINATION

12  BY MR. WATTS:

13  Q.   DO YOU KNOW THAT?

14          MR. WEINSTOCK:  CALLING FOR A LEGAL CONCLUSION.

15          THE COURT:  IF YOU'RE ASKING HIM FOR A LEGAL CONCLUSION,

16  I'LL SUSTAIN THE OBJECTION.  IF YOU'RE JUST ASKING HIM GENERAL

17  AWARENESS.

18                         EXAMINATION

19  BY MR. WATTS:

20  Q.   ARE YOU AWARE OF THAT?

21          THE COURT:  I MEAN, YOU'RE MAKING A STATEMENT THAT I

22  DON'T KNOW WHETHER HE CAN AGREE OR DISAGREE WITH.

23                         EXAMINATION

24  BY MR. WATTS:

25  Q.   I'M NOT ASKING WILL YOU AGREE WITH IT.  ARE YOU AWARE OF THE

1  REQUIREMENT THAT YOU BE LICENSED IN LOUISIANA?

2  A.   THE ANSWER IS NO.

3  Q.   ALL RIGHT.  CHRIS COOPER IS AN ATOPIC CHILD, TRUE?

4  A.   CORRECT.

5  Q.   YOU TALKED ABOUT YOUR DISAGREEMENT WITH KARIN PACHECO AND

6  OTHERS CONCERNING VOCAL CORD DYSFUNCTION.  YOU ARE FAMILIAR WITH

7  THE REGARD WITH WHICH NATIONAL JEWISH HOSPITAL IS HELD IN THE

8  PULMONARY COMMUNITY?

9  A.   YES.

10 Q.   YOU ARE NOT A LICENSED PULMONOLOGIST?

11 A.   NO.

12 Q.   KARIN PACHECO IS?

13 A.   YES.

14      MR. WEINSTOCK:  OBJECTION, YOUR HONOR.  SHE IS NOT.

15      THE COURT:  I'M SORRY.  WHAT'S THE OBJECTION?

16      MR. WEINSTOCK:  SHE IS NOT A PULMONOLOGIST.

17      MR. WATTS:  WHY DID HE JUST SAY YES?

18      MR. WEINSTOCK:  WELL, IMMUNOLOGY.

19      THE COURT:  SHE'S TESTIFIED AND SHE WAS QUALIFIED AT THE

20 TIME THE VIDEO TESTIMONY WAS --

21      MR. WATTS:  I SURE THOUGHT SO.

22      MR. WEINSTOCK:  IMMUNOLOGY, NOT PULMONOLOGY.

23      THE COURT:  IN IMMUNOLOGY?  THAT WAS -- WELL, I COULD

24 CHECK MY NOTES.  BUT IF SHE WAS QUALIFIED AS A PARTICULAR EXPERT,

25 I MEAN, AN EXPERT IN A PARTICULAR FIELD, THAT'S WHAT SHE IS HERE

1    TODAY.

2                              EXAMINATION

3    BY MR. WATTS:

4    Q.    SURE.  LET ME GO TO HOSPITAL.  IN TERMS OF THE FIELD OF

5    PULMONOLOGY, NATIONAL JEWISH HOSPITAL IS AS GOOD AS IT GETS IN

6    THE UNITED STATES.

7    A.    THE NATIONAL JEWISH DOESN'T HAVE A HOSPITAL ANYMORE.  THERE

8    IS NO SUCH THING.

9    Q.    WHY DO THEY CALL IT NATIONAL JEWISH?

10   A.    IT'S A CLINIC.

11   Q.    A CLINIC.  AS CLOSE AS IT GETS.

12   A.    IN SOME AREAS IT'S NOT RANKED HIGHER THAN BARNES ANYMORE.

13   Q.    IN THE FIELD OF PULMONOLOGY?

14   A.    NO, I'M SERIOUS.

15   Q.    I'M JUST ASKING THE QUESTIONS HERE.  IN THE FIELD OF

16   PULMONOLOGY, NATIONAL JEWISH IS VERY HIGHLY RANKED?

17   A.    IT'S RATED HIGHLY.

18   Q.    YOU MENTIONED THE SUBJECT OF MOLD.  HE WAS TESTED FOR

19   ALLERGIES, RIGHT?

20   A.    YES.

21   Q.    HE'S NOT ALLERGIC TO MOLD?

22   A.    AS FAR AS I KNOW.

23   Q.    BUT IN FAIRNESS, YOU SAID MOLD LOVES WATER.

24   A.    YOU BET YOU.

25   Q.    AND YOU BELIEVE THAT THE RELATIVE HUMIDITY INSIDE OF A

1  TRAILER LIKE THIS IS WELL ABOVE 50 PERCENT?

2  A.   I HAVE NO IDEA.

3  Q.   WELL, IN YOUR DEPOSITION, DID YOU DEPOSIT A THOUGHT ABOUT

4  THAT?

5  A.   I MAY HAVE SAID THAT.

6         THE COURT:  IS THERE AN OBJECTION?

7         MR. WEINSTOCK:  MAY WE ON APPROACH?

8           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE

9  WAS A CONFERENCE HELD AT THE BENCH.)

10        THE WEINSTOCK:  THIS CAME UP EARLIER ON.  THE AGREEMENT

11 WAS THIS WAS NOT A MOLD CASE, WHICH THEY ARE ABOUT TO TRY TO TURN

12 IT INTO.

13        MR. WATTS:  HE BROUGHT IT UP ON DIRECT.

14        MR. WEINSTOCK:  I DID NOT.

15        THE COURT:  HE MENTIONED IT.  MOLD, THE PRESENCE OF MOLD

16 HAS A FUNCTION OF MOISTURE OR HUMIDITY I THINK WAS SUBJECT TO A

17 PRETRIAL RULING BY THE COURT.  SO I THINK IT'S A PERMISSIBLE

18 QUESTION, AS LONG AS IT'S NOT COUCHED IN TERMS OF ANY PLAINTIFF

19 HAVING --

20        MR. WEINSTOCK:  MEDICAL OPINIONS.

21        THE COURT:  -- MEDICAL PROBLEMS RELATED TO MOLD.

22        MR. WATTS:  I'M NOT GOING THERE.

23        THE COURT:  I THINK HIS TESTIMONY WAS, IN FACT, THE

24 OPPOSITE, THAT HE WAS NOT ALLERGIC TO MOLD.

25        MR. WATTS:  YEAH, EXACTLY.  BUT HE BROUGHT IT UP -- OR

1  HE DIDN'T BRING IT UP, HE SAID IT.  I GOT TO DEAL WITH IT.  BUT I

2  KNOW WHERE THE LINE IS.

3           MR. WEINSTOCK:  I JUST WANT TO MAKE SURE.  THAT'S WHY --

4  I JUST WANTED TO GET UP HERE AND GET CLEAR THAT'S IT'S NOT A MOLD

5  CASE.

6           THE COURT:  IT'S NOT, AND I THINK THE WITNESS HAS SAID

7  HE'S SUFFERED NO INJURIES, NOT ALLERGIC TO MOLD.

8           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

9  CONFERENCE CONCLUDED.)

10          MR. WATTS:  YES.  MAY I APPROACH, YOUR HONOR?

11          THE COURT:  YES.

12                          EXAMINATION

13  BY MR. WATTS:

14  Q.   I THINK THE QUESTION WAS, WHAT WOULD THE RELATIVE HUMIDITY

15  HAVE BEEN IN THAT TRAILER?  DO YOU HAVE A SENSE OF WHERE IT WOULD

16  HAVE BEEN?

17  A.   I SAID ABOVE 50.

18  Q.   GOOD ENOUGH.  SO WHEN YOU SAID ABOVE 50, YOU MEANT THE

19  RELATIVE HUMIDITY INSIDE THE TRAILER WAS ABOVE 50 PERCENT, RIGHT?

20  A.   YES.

21  Q.   IT WAS CERTAINLY A MOIST ENVIRONMENT.

22  A.   CORRECT.

23  Q.   LET ME SHOW YOU SOMETHING THAT'S IN EVIDENCE AS EXHIBIT 35.

24  THERE'S A STATEMENT IN THIS E-MAIL THAT SAYS, "THE RULE OF THUMB,

25  THE HCHO LEVEL DOUBLES FOR EVERY 12 DEGREES FAHRENHEIT INCREASE

1  IN TEMPERATURE."

2          HERE IS MY QUESTION:  ARE YOU AWARE OF THE RELATIONSHIP

3  BETWEEN FORMALDEHYDE OFF-GASSING AND INCREASES IN TEMPERATURE?

4  A.   YES.

5  Q.   AND WITHOUT PINNING YOU DOWN TO THIS SPECIFIC MAP, A

6  STATEMENT, THE HCHO LEVEL DOUBLES FOR EVERY 12 DEGREES FAHRENHEIT

7  INCREASE IN TEMPERATURE, THAT'S NOT SOMETHING YOU WOULD QUIBBLE

8  WITH?

9  A.   I CAN'T QUIBBLE WITH IT BECAUSE I DON'T KNOW WHETHER IT'S

10 CORRECT OR NOT.

11 Q.   ONE LAST TOPIC AND THEN WE'RE GOING TO LET YOU GO.  YOU SAID

12 SOMETHING ABOUT ATR SUGGESTS THAT THE LOWER AIRWAYS OF KIDS

13 AREN'T THAT DIFFERENT FROM ADULTS; DO YOU REMEMBER WHAT?

14 A.   NO, WHAT I SAID WAS THAT ATSDR SAYS THAT THE IRRITANT EFFECT

15 SHOULD BE NO DIFFERENT IN CHILDREN THAN IN ADULTS.

16 Q.   WHO IS ATSDR?

17 A.   THE AGENCY FOR TOXIC SUBSTANCE AND DISEASE REGISTRY.

18 Q.   WHO ARE THEY?  I MEAN, WHAT IS?

19 A.   THAT'S A GOVERNMENT BRANCH.  IT'S PART OF THE NCDC, THE

20 NATIONAL COMMUNICABLE DISEASE AND PREVENTION CENTER.  IT'S PART

21 OF NIH.

22 Q.   NIH IS?

23 A.   NATIONAL INSTITUTES OF HEALTH.

24 Q.   WHEN YOU INVOKE THE ATSDR, IS THIS JUST SOME GUY ON THE

25 STREET CORNER OR IS THIS FOLKS THAT KNOW WHAT THEY'RE TALKING

```
 1  ABOUT?

 2  A.   IT'S A LARGE GROUP.

 3  Q.   AND DO THEY KNOW WHAT THEY'RE TALKING ABOUT WHEN YOU INVOKE

 4  THEM LIKE THAT?

 5  A.   IN SOME CASES, YES.

 6  Q.   AND THE CHRONIC EXPOSURE LEVEL FOR ATSDR, DO YOU KNOW WHAT

 7  THAT IS?

 8  A.   I CAN'T QUOTE IT FOR YOU, NO.

 9  Q.   DID YOU QUOTE IT IN YOUR DEPOSITION AS .008 PARTS PER

10  MILLION?

11  A.   I MAY HAVE DONE IT, BUT I HAVEN'T REVIEWED THAT SO I CAN'T

12  TELL YOU.

13  Q.   YOU DON'T HAVE ANY QUIBBLING WITH THIS LARGE ORGANIZATION

14  THAT KNOWS WHAT IT'S DOING IN TERMS OF WHERE THAT LEVEL SHOULD

15  BE, RIGHT?

16  A.   I THINK THEIR LEVELS ARE DRAMATICALLY LOWER THAN THEY SHOULD

17  BE.

18  Q.   IS THAT THE FIRST TIME YOU'VE EVER SAID THAT?

19  A.   PROBABLY.

20  Q.   FAIR ENOUGH.

21       MR. WATTS:  THOSE ARE ALL MY QUESTIONS.

22       THE COURT:  ALL RIGHT.  THANK YOU, MR. WATTS.

23          REDIRECT?

24                   REDIRECT EXAMINATION

25  BY MR. WEINSTOCK:
```

1   Q.   THE E-MAIL MR. WATTS JUST SHOWED YOU A FEW MINUTES AGO, HAVE

2   YOU EVER SEEN THAT BEFORE IN YOUR LIFE?

3   A.   NO.

4   Q.   DO YOU RECOGNIZE ANY OF THOSE PEOPLE ON THAT E-MAIL AS SOME

5   KIND OF FORMALDEHYDE SCIENTISTS?

6   A.   NO.

7   Q.   OF COURSE THEY HAND THIS BACK TO ME WHEN EVERYBODY WANTS TO

8   LEAVE, SO I'LL TRY TO BE QUICK.

9        THE EXAMINATION YOU PERFORMED, WHERE DID YOU PERFORM

10  THIS EXAMINATION?

11  A.   THIS WAS AT EAST JEFFERSON HOSPITAL AT THE PULMONARY CLINIC.

12  Q.   AND WHO WAS WITH YOU WHEN YOU WERE DOING THAT?

13  A.   DR. SMITH, WAS THERE.

14  Q.   IS DR. SMITH A LICENSED PULMONOLOGIST IN THE STATE OF

15  LOUISIANA?

16  A.   HE IS.

17  Q.   WE HAD SOME QUESTIONS ABOUT VOCAL CORD DYSFUNCTION, AND I

18  THINK WE HAVE A HEALTHY DEBATE WHETHER CHRIS COOPER HAS VOCAL

19  CORD DYSFUNCTION, BUT DID YOU READ ANYWHERE THAT DR. PACHECO SAID

20  IT WAS RELATED TO FORMALDEHYDE?

21  A.   NO.

22  Q.   DID YOU READ ANYWHERE THAT DR. BARNES SAID IT WAS RELATED TO

23  FORMALDEHYDE?

24  A.   NO.

25  Q.   AND DID YOU READ ANYWHERE WHERE ANYBODY CITED ANY

1   EPIDEMIOLOGICAL PAPER OF ANY TYPE THAT SAID IT WAS RELATED TO

2   FORMALDEHYDE?

3   A.   NO.

4   Q.   I THINK WE HAVE A STIPULATION HERE THAT CHRIS COOPER IS A

5   GOOD KID, A GOOD, HONEST KID, I THINK?

6   A.   I THINK SO.

7   Q.   AND HE TOLD YOU HE SMELLED NOTHING.

8   A.   THAT'S CORRECT.

9   Q.   WITH HIS MOTHER SITTING RIGHT THERE.

10  A.   YES.

11  Q.   AND WE TALKED ABOUT ANOTHER YOUNG MAN, HEATH ALLEN?

12  A.   YES.

13  Q.   HEATH ALLEN SAID HE HAD A NOSEBLEED WHEN HE WENT IN A

14  TRAILER THAT WAS 140 DEGREES.  WOULD YOU ATTRIBUTE THAT TO

15  FORMALDEHYDE?

16  A.   NO.

17  Q.   HE SAID HE HAD NO PROBLEMS WHEN HE OPENED THE WINDOWS AND

18  GOT IT DOWN TO 75 DEGREES.  WOULD YOU EXPECT HIM TO GET A

19  NOSEBLEED FROM FORMALDEHYDE AT 75 DEGREES IN THAT TRAILER?

20  A.   NO.

21  Q.   YOU WERE ASKED ABOUT AVERAGE THRESHOLDS.

22  A.   YES.

23  Q.   AVERAGE ODOR THRESHOLDS.  IS AN AVERAGE MADE UP OF THE SUM

24  OF THE DATA POOL?

25  A.   YES.  WE, WE USE THE TERM AVERAGE A LOT.  AND WE ASSUME

1   THAT, YOU KNOW, THAT'S -- BUT AS WE SAY IN MEDICINE, THERE IS NO

2   SUCH THING AS AN AVERAGE INDIVIDUAL.

3   Q.   SOME WOULD HAVE SMELLED IT AT A LOWER LEVEL, SOME WOULD HAVE

4   SMELLED IT AT A HIGHER LEVEL?

5   A.   CORRECT.

6   Q.   APPARENTLY CHRIS COOPER DIDN'T SMELL IT AT A LEVEL HIS

7   MOTHER THOUGHT SHE SMELLED IT AT?

8   A.   THAT'S CORRECT.

9   Q.   YOU WERE ASKED ABOUT PAPERS YOU'VE AUTHORED.  BY THE WAY,

10  ARE YOU AN EPIDEMIOLOGIST?

11  A.   NO.

12  Q.   BUT YOU'VE DONE --

13  A.   I'VE DONE A LOT OF EPIDEMIOLOGY BUT ONLY WITH OTHERS AND

14  WITH AN EPIDEMIOLOGIST WITH US.

15  Q.   DID IT TURN OUT ON THE EVALUATION AT NATIONAL JEWISH THAT

16  CHRIS COOPER WAS ALLERGIC TO SOMETHING?

17  A.   YEAH, HE WAS ALLERGIC TO TREES.

18  Q.   HOW ABOUT DUST MITES?

19  A.   AND DUST MITES.

20  Q.   WE ALL GOT TO SEE CHRIS COOPER HERE THE OTHER DAY.  IS HE IN

21  PUBERTY YET?

22  A.   I THOUGHT HE WAS.

23  Q.   THE BLACK BOX WARNING ON THE ADVAIR THAT WE'VE TALKED ABOUT

24  AT LENGTH, WAS THERE ANYTHING YOU KNOW OF PRECLUDING

25  MS. ALEXANDER FROM GOING BACK TO THE DOCTOR TO GET A MEDICATION

1   SHE WAS MORE COMFORTABLE AND MORE FAMILIAR WITH?

2   A.   OH, NO.

3   Q.   THESE EPA HEARINGS THAT YOU WENT TO.

4   A.   YES.

5   Q.   WERE YOU ASKED TO COMMENT ON THE IDEA THAT YOU MIGHT USE

6   ISOCYANATE GLUE INSTEAD OF FORMALDEHYDE?

7   A.   ACTUALITY, AS I WAS READING THE EPA'S SUGGESTIONS FOR

8   ALTERNATIVES TO FORMALDEHYDE, IT OCCURRED TO ME THAT THAT WAS

9   SOMETHING THAT NEEDED TO BE MENTIONED, SO I WASN'T ASKED BY

10  ANYBODY TO TALK ABOUT IT, I POINTED IT OUT ALL ON MY OWN, THAT WE

11  HAD BETTER NOT JUMP OUT OF THE FRYING PAN INTO THE FIRE BECAUSE

12  ISOCYANATES ARE WELL KNOWN TO CAUSE ASTHMA AND HYDRIDES ARE WELL

13  KNOWN TO CAUSE ASTHMA, AND THESE ARE THE KINDS OF COMPOUNDS THAT

14  THE EPA WAS SUGGESTING IN THEIR ARTICLE.

15          WHEN THEY, WHEN THEY SET UP THESE HEARINGS, THEY SET UP

16  THE IDEA THAT THERE WERE SOME ALTERNATIVES TO FORMALDEHYDE.  AND

17  SO I WENT THROUGH THE LIST OF ALTERNATIVES, AND MOST OF THOSE

18  WERE MORE LIKELY TO CAUSE ASTHMA THAN FORMALDEHYDE, WHICH, AS FAR

19  AS I KNOW, DOESN'T.  SO THAT'S ONE OF THE THINGS THAT I POINTED

20  OUT.

21  Q.   DID YOU CALL THE FORMALDEHYDE COUNCIL?

22  A.   NO.

23  Q.   DID THEY CALL YOU?

24  A.   YES.

25  Q.   DO THEY HAVE CONTROL OVER ANYTHING YOU WRITE IN THAT PAPER?

1   A.   NO.

2   Q.   WOULD YOU WRITE A PAPER IF THEY HAD TO EDIT IT FIRST?

3   A.   NO.   THAT WAS -- THE AGREEMENT WAS THAT THEY GET TO READ IT.

4   THAT'S ALL THEY GET TO DO.

5   Q.   DO THEY GET TO EDIT IT AND CHANGE IT?

6   A.   NO.

7        MR. WEINSTOCK:  I THINK I HAVE JUST ONE MORE THING, YOUR

8   HONOR.

9                              EXAMINATION

10  BY MR. WEINSTOCK:

11  Q.   YOU WERE ASKED ABOUT TEMPERATURE AND HUMIDITY?

12  A.   YES.

13  Q.   LET ME SHOW YOU THE CONCLUSION OF THE LEMUS STUDY.  THIS WAS

14  AN ACTUAL STUDY OF LOUISIANA HOMES.  UNDER THE THEORY THAT

15  TEMPERATURE AND HUMIDITY ARE HIGHER IN THE SUMMER, THEY ACTUALLY

16  FOUND THAT THE HUMIDITY LEVELS IN LOUISIANA, AS THOSE OF US WHO

17  ACTUALLY LIVE HERE KNOW, ARE PRETTY HIGH IN WINTER.

18       WAS IT FOUND THAT FORMALDEHYDE LEVELS IN LOUISIANA

19  HOUSES DID NOT APPEAR TO BE DEPENDENT ON TEMPERATURE AND RELATIVE

20  HUMIDITY, PERHAPS BECAUSE OF THE LIMITED CHANGES IN INDOOR

21  RELATIVE HUMIDITIES AND TEMPERATURES DURING THE FOUR SEASONS.

22  THIS OBSERVATION WAS IN CONTRAST TO THE RESULTS OF STUDIES ON THE

23  DEPENDENCY OF AIRBORNE FORMALDEHYDE CONCENTRATIONS TO TEMPERATURE

24  OR RELATIVE HUMIDITY THAT WERE CARRIED OUT IN TEST CHAMBERS,

25  ENVIRONMENTS WHERE AIR EXCHANGE AND TEMPERATURE WERE -- HUMIDITY

1   AND -- AIR EXCHANGE, HUMIDITY AND TEMPERATURE WERE CONTROLLED.

2   A.   I THINK THAT'S PROBABLY QUITE VALID.

3   Q.   THEREFORE, ONLY A ROUGH RELATION CAN BE EXPECTED BECAUSE

4   LOUISIANA HOUSE SAMPLING WAS CARRIED OUT UNDER REAL CONDITIONS,

5   AND DIRECT COMPARISONS WITH CHAMBER TESTS CANNOT BE MADE.   IS

6   THAT VALID AS FAR AS YOU UNDERSTAND THE PRINCIPAL?

7   A.   AS FAR AS I UNDERSTAND IT.   I MEAN, WE GENERALLY HAVE A

8   TENDENCY TO KEEP OUR HOMES AT THE SAME TEMPERATURE NO MATTER WHAT

9   THE OUTSIDE AMBIENT TEMPERATURE IS.

10          MR. WEINSTOCK:   EVERYBODY MAY GO HOME, YOUR HONOR.

11          THE COURT:   NOT JUST YET.   ARE YOU FINISHED WITH THIS

12   WITNESS?

13          MR. WEINSTOCK:   I AM.

14          THE COURT:   THANK YOU, DOCTOR, YOU MAY STEP DOWN.   THANK

15   YOU FOR YOUR TIME.

16          MR. WATTS:   WE WOULD OFFER HIS CURRICULUM VITAE AND THE

17   ADVAIR PACKAGE INSERT AT 513.

18          MR. WEINSTOCK:   NO OBJECTION.

19          THE COURT:   513?   OKAY, 513 IS IN.

20          MR. BUZBEE:   525.

21          THE COURT:   515 IS THE CV?

22          THE DEPUTY CLERK:   THIS WOULD BE THE NEXT NUMBER.   THIS

23   IS THE NEXT NUMBER.

24          MR. WATTS:   THE CV AS 346 AND THE ADVAIR PACKAGE INSERT

25   IS 515.   ARE THOSE ADMITTED, YOUR HONOR?

1           THE CCOURT:  I TAKE IT THERE IS NO OBJECTION?

2           MR. WEINSTOCK:  NO OBJECTION, YOUR HONOR.

3           THE COURT:  SO ORDERED.

4               ANYTHING MORE FROM GULF STREAM AT THIS TIME?

5           MR. WEINSTOCK:  NO, YOUR HONOR.

6           THE COURT:  MR. PENOT, OTHER THAN THE WITNESSES WHO HAVE

7  ALREADY TESTIFIED IN THIS CASE AND THE EXHIBITS THAT HAVE BEEN

8  INTRODUCED, DOES FLUOR HAVE ANY PRESENTATION AT THIS POINT?

9           MR. PENOT:  YOUR HONOR, WE BELIEVE THAT FLUOR'S CASE HAS

10  BEEN PRESENTED ADEQUATELY THROUGH THE WITNESSES THAT HAVE

11  TESTIFIED PREVIOUSLY AND CROSS-EXAMINATION OF SOME OF THE

12  PLAINTIFFS' WITNESSES, AND WE DO HAVE ONE STIPULATION, I BELIEVE,

13  MR. WATTS, NAMELY THAT --

14           MR. WATTS:  WE DO.

15           MR. PENOT:  -- MR. PAUL BLANCHARD, SOMETIMES CALLED

16  GATOR, ACTUALLY WORKED FOR A COMPANY IN INSTALLING TRAILERS

17  CALLED KATO PROPERTIES, L.L.C.

18           MR. WATTS:  SO STIPULATED.

19           MR. PENOT:  AND WE WOULD OFFER, INTRODUCE AND FILE INTO

20  EVIDENCE AS EXHIBIT, THE NEXT ONE WOULD BE 516, THE REDACTED

21  VERSION OF MR. BLANCHARD'S 1099S, REDACTED TO REMOVE HIS PERSONAL

22  INFORMATION.

23           MR. WATTS:  NO OBJECTION, YOUR HONOR.

24           THE COURT:  THE COURT WILL ADMIT 516.  WOULD YOU PREPARE

25  A WRITTEN STIPULATION THAT I CAN INCLUDE WHEN I INSTRUCT THE JURY

1  TOMORROW?

2         MR. PENOT:  YES, YOUR HONOR.

3         MR. WEINSTOCK:  YOUR HONOR, THERE ARE SOME EXHIBITS THAT

4  WE WOULD LIKE TO PUT IN THAT DOES NOT HAVE TO BE IN THE PRESENCE

5  OF THE JURY.

6         THE COURT:  WELL, WAIT.  IF THEY ARE GOING INTO

7  EVIDENCE, WE PROBABLY OUGHT TO --

8         MR. WEINSTOCK:  THEY CAN.  THEY'VE SEEN ALL OF THEM AT

9  ONE TIME OR ANOTHER.

10         THE COURT:  ARE THESE UNCONTESTED?

11         MR. MEUNIER:  NO, YOUR HONOR, WE DO HAVE SOME CONCERNS

12  ABOUT THEM, AND WE TALKED ABOUT ARGUING THIS OUT OF THE PRESENCE

13  OF THE JURY.

14         MR. SCANDURRO:  WE JUST WANTED TO LEAVE THE RECORD OPEN,

15  YOUR HONOR, BRIEFLY SO WE CAN PUT THESE IN.

16         THE COURT:  WELL, I GUESS I'M KIND OF CONFUSED BECAUSE

17  THE JURY NEEDS TO KNOW THAT THEY ARE IN EVIDENCE.  IF WE PUT THEM

18  IN EVIDENCE AND THE JURY DOESN'T HEAR THEM, I GUESS IT'S SORT OF

19  LIKE THE TREE FALLING IN THE FOREST.

20         MR. MEUNIER:  JUDGE, IF WE COULD DISMISS THE JURY AND

21  AFTER THE LUNCH BREAK, YOU'LL EITHER ANNOUNCE WHETHER THEY ARE IN

22  OR NOT, DEPENDING ON YOUR RULINGS.

23         THE COURT:  OKAY.  BUT THE JURY HAS TO KNOW WHAT'S IN

24  AND WHAT'S NOT BECAUSE THEY HAVE TO GO BACK AND DELIBERATE AND IF

25  THEY DON'T KNOW WHAT WE DID WHEN THEY'RE NOT HERE, THEN I GUESS

1   THEY'LL JUST NOT KNOW ABOUT THEM.  WHY ARE WE EVEN BOTHERING WITH

2   THEM?  WE EITHER DO THEM NOW IN FRONT OF THE JURY OR WE FORGET

3   ABOUT IT.

4           MR. WEINSTOCK:  I DON'T WANT TO FORGET ABOUT IT.

5           THE COURT:  WELL, WHAT DO WE HAVE TO OFFER?  I THINK I

6   HAD INSTRUCTED YOU ALL DURING THE BREAK TO CONFER ON THOSE TO

7   WHICH THERE IS NO OBJECTION.  LET'S GET THOSE IN.

8           MR. MEUNIER:  MAY WE APPROACH THE BENCH?

9           THE COURT:  YES.

10              (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE

11  WAS A CONFERENCE HELD AT THE BENCH.)

12          MR. WEINSTOCK:  FIRST FOR THE RECORD FROM THE SABAL PALM

13  ELEMENTARY SCHOOL, WHICH SHE IDENTIFIED THAT SHE FILLED OUT.

14          THE COURT:  RIGHT.  WHY IS THAT ONE NOT ADMITTED?

15          MR. MEUNIER:  WHICH IS THIS?

16          MR. WEINSTOCK:  NUMBER 15, THE SCHOOL RECORDS.

17          MR. MEUNIER:  I WAS GOING TO LEAVE THAT TO --

18          MR. WATTS:  NO OBJECTION.  LET'S GO.

19          THE COURT:  COME ON.  YEAH.

20          MR. WEINSTOCK:  NEXT IS THE ADVERTISEMENT THE FOUR

21  WITNESSES SAID THEY SAW.

22          MR. MEUNIER:  I DIDN'T HAVE ANY.

23          MR. WEINSTOCK:  SO IT WAS RUNNING IN THE L CART (SPELLED

24  PHONETICALLY).

25          THE COURT:  THE WITNESSES TESTIFIED ABOUT THAT.

1            MR. WATTS:  OH, YEAH, I'M SORRY, YEAH, NO OBJECTION.

2            MR. WEINSTOCK:  THAT'S NUMBER 118.

3                 NEXT IS THE CV OF PHIL COLE, WHICH I THINK DID GO

4    IN ALREADY.

5            MR. WATTS:  NO OBJECTION.

6            MR. MEUNIER:  THE PLAINTIFF FACT SHEET.  WHY IS THE

7    ENTIRE PLAINTIFF FACTS SHEET GOING INTO EVIDENCE?

8            THE COURT:  THERE WAS SOME DISCUSSION OF IT.  DID YOU

9    SHOW IT TO HER ON THE STAND?

10           MR. WEINSTOCK:  I SHOWED IT TO HER.  SHE IDENTIFIED THAT

11   SHE HAD SAID WALGREENS.  SHE REVIEWED IT IN HER DEPOSITION AND

12   DID NOT CHANGE IT.  IT'S ENTIRELY RELEVANT TO HER CREDIBILITY.

13           MR. MEUNIER:  YOUR HONOR, IT'S JUST LIKE SHOWING AN

14   ENTIRE SET OF INTERROGATORIES AND RESPONSES THAT WERE NEVER

15   TALKED ABOUT.

16           THE COURT:  WELL, IT WAS TALKED ABOUT.

17           MR. MEUNIER:  NO, BUT THE RESPONSES WERE.

18           MR. WEINSTOCK:  THIS IS IMPORTANT, AND WE CAN GET THE

19   PAGES.  SHE WENT THROUGH IT PAGE BY PAGE DURING HER DEPOSITION TO

20   CONFIRM THE ACCURACY.

21           THE COURT:  WELL WAIT.  WE'RE TALKING ABOUT WHAT SHE DID

22   HERE IN COURT.

23           MR. WEINSTOCK:  BUT I'M JUST SAYING THAT THERE IS NO

24   QUESTION THAT IT'S ACCURATE IN HER MIND, AND I SHOWED HER A PAGE

25   AND I THINK WE'RE ENTITLED TO HAVE THIS IN EVIDENCE.  WE SIGNED

1   UNDER PENALTY OF PERJURY.

2         MR. WATTS:  WE WOULD THROW IN AS AN ALTERNATIVE AND THAT

3   IS IS THAT I THINK HE'S ENTITLED ON THE QUESTION OF WHAT THE MEDS

4   WERE, THAT CLEARLY CAME IN, BUT WHAT I OBJECT TO IS A 26-PAGE,

5   YOU KNOW, FACTS SHEET THAT WASN'T TALKED ABOUT.

6         THE COURT:  WHAT PART DO YOU WANT?  SHE DID IDENTIFY THE

7   MEDS AND SHE DID SO BY LOOKING AT THE FACT SHEET.

8         MR. WATTS:  TAKE PAGE 17, AND WE'RE FINE WITH THAT.

9         MR. WEINSTOCK:  AND 18?

10         MR. WATTS:  YEAH, 17 AND 18.

11         MR. WEINSTOCK:  17 AND 18, NO PROBLEM.  THAT SAYS TO

12   CHRIS COOPER, CORRECT?  THAT'S AS TO CHRIS COOPER, THAT'S

13   CORRECT?

14         MR. GLASS:  YES.

15         MR. WEINSTOCK:  WE DON'T NEED MS. ALEXANDER'S BECAUSE

16   SHE'S DROPPED HER CLAIM.

17         MR. SCANDURRO:  THOSE ARE THE PHOTOGRAPHS OF SERAUSKAS.

18         MR. WATTS:  NO OBJECTION.

19         MR. SCANDURRO:  YOUR HONOR, THE LAST THING IS AN E-MAIL

20   THAT MR. MCNEESE DISCUSSED IN HIS DEPOSITION YESTERDAY.

21         THE COURT:  ALL RIGHT.  WE TALKED ABOUT THAT.

22         MR. SCANDURRO:  WE TOOK OUT THE REFERENCE TO THE NUMBER

23   OF COMPLAINTS.  WE REDACTED THAT FROM THE E-MAIL, AND I WOULD

24   PROPOSE ONLY PUTTING IN THE FIRST PAGE, WHICH HE TALKED ABOUT,

25   AND TAKING OUT THE OTHER THINGS IN THE STREAM.

1          THE COURT:  THAT'S FINE.

2          MR. WEINSTOCK:  AND LAST BUT NOT LEAST, TIM.  IS THAT

3    THE SAME ONE?

4          MR. SCANDURRO:  THAT'S IT.

5          MR. MEUNIER:  THAT'S NOT THE REDACTED VERSION.

6          MR. WATTS:  AND ANDY, ONE OTHER THING I JUST REMEMBERED.

7    WE HAD 374 INTO EVIDENCE AND BOTH SIDES' PARALEGALS TELL ME WE

8    NEED TO WITHDRAW IT AND SUBMIT A NEW 374 AND 375 FOR SOME REASON.

9          MR. WEINSTOCK:  NO OBJECTION.

10          THE COURT:  GO AHEAD AND WORK THAT OUT.

11          MR. WEINSTOCK:  SOME DAY SOMEBODY IS GOING TO TELL ME

12    THE DIFFERENCE BETWEEN THOSE TWO SETS OF DOCUMENTS.

13          MR. WATTS:  DID YOU GET THE 374?

14          THE COURT:  WE'LL HAVE TO DO IT AFTER.  ALL RIGHT.

15    WELL, LET'S GO AHEAD AND FINISH THIS UP AND THEN WE'RE GOING TO

16    CLOSE THE RECORD UP.

17          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH

18    CONFERENCE CONCLUDED.)

19          THE COURT:  OKAY.  I THINK WE'VE GOT THIS FIGURED OUT UP

20    HERE.  LET'S GO AHEAD AND FINISH THE RECORD WITH REGARD TO SOME

21    EXHIBITS THAT I THINK WERE IDENTIFIED DURING THE COURSE OF

22    VARIOUS TESTIMONY THAT WILL NOW BE MADE A PART OF THE RECORD.

23    MR. WEINSTOCK, DID YOU WANT TO GO AHEAD AND PUT THOSE IN?

24          MR. WEINSTOCK:  YES.  WE'RE PUTTING IN EXHIBIT 15, WHICH

25    IS THE SABAL PALM ELEMENTARY SCHOOL RECORDS THAT WERE DISCUSSED

1    DURING ALANA ALEXANDER'S CROSS-EXAMINATION.

2         MR. MEUNIER:  NO OBJECTION.

3         MR. WEINSTOCK:  WE'RE PUTTING IN A COPY OF THE

4    ADVERTISEMENT THAT WAS RUN IN INDIANA FOR THE FLUOR FORMER

5    EMPLOYEES RESPONDED TO.

6         THE COURT:  WHAT NUMBER?

7         MR. WEINSTOCK:  118.

8         THE COURT:  118.

9         MR. MEUNIER:  NO OBJECTION.

10         MR. WEINSTOCK:  WE'RE PUTTING IN EXHIBIT 167, WHICH WAS

11    THE E-MAIL REFERRED TO BY MARTIN MCNEESE IN HIS DEPOSITION.

12         MR. MEUNIER:  NO OBJECTION.

13         THE COURT:  AND WHAT NUMBER WAS THAT AGAIN?

14         MR. WEINSTOCK:  167.

15         THE COURT:  167.

16         MR. WEINSTOCK:  STOP ASKING ME THESE TRICK QUESTIONS,

17    JUDGE.

18         WE'RE PUTTING IN 347.5, WHICH WAS THE AC GRILL

19    DISCUSSED BY SERAUSKAS.

20         MR. MEUNIER:  IT'S THE PHOTOGRAPH OF THE GRILL.

21         MR. WEINSTOCK:  CORRECT.  NOT THE GRILL ITSELF.

22         WE'RE PUTTING IN 347.4, WHICH IS THE BATH VENT;

23    347.3, WHICH IS THE ROOFLINE; AND THEN LAST BUT NOT LEAST,

24    EXHIBIT 376, PAGES 17 AND 18, FROM THE FAX SHEET ALANA ALEXANDER

25    FILLED OUT ON BEHALF OF CHRIS COOPER, IDENTIFYING WALGREENS AS

1  HER PHARMACY.

2        THE COURT:  376?

3        MR. WEINSTOCK:  376.

4        MR. MEUNIER:  NO OBJECTION.

5        THE COURT:  SO ORDERED.  WE'LL GO AHEAD AND ADD THOSE TO

6  THE LIST OF ADMITTED EXHIBITS.

7        MR. WATTS:  YOUR HONOR, AS WE DISCUSSED AT BENCH, WE

8  WITHDREW A VERSION OF EXHIBIT 374 AND, BY AGREEMENT OF COUNSEL,

9  HAVE SUBMITTED A NEW 374 AND A NEW 375, AND WE WOULD ASK THAT

10  THOSE BE ADMITTED AT THIS TIME.

11        THE COURT:  SO ORDERED.

12        MR. WEINSTOCK:  NO OBJECTION.

13        THE COURT:  BUT AGAIN, I WILL ASK ALL COUNSEL AT SOME

14  POINT BETWEEN NOW AND WHEN THE CASE IS GIVEN TO THE JURY, SINCE

15  THEY ARE GOING TO HAVE THE EXHIBITS, ALL COUNSEL HAVE TO CONFER

16  WITH THE COURTROOM DEPUTY TO MAKE CERTAIN THAT ALL EXHIBITS THAT

17  BELONG IN THE SET OF EXHIBITS ARE, IN FACT, THERE AND ARE CORRECT

18  AND COMPLETE.  AND ANY EXHIBITS THAT, IN THIS INSTANCE, THAT HAVE

19  BEEN WITHDRAWN ARE, IN FACT, PHYSICALLY NO LONGER WITH THE SET

20  THAT THE COURT KEEPS, THAT MS. RADOSTA IS KEEPING.  SO LET'S BE

21  VERY SPECIFIC ON THAT AND BE VERY DILIGENT ON THAT.

22            NOW, WITH THAT, FLUOR, I UNDERSTAND WITH THE

23  STIPULATION RESTS; IS THAT CORRECT?

24        MR. PENOT:  YES, YOUR HONOR.

25        THE COURT:  ANY REBUTTAL FROM THE PLAINTIFFS?

1          MR. WATTS:  NO, SIR, THE PLAINTIFFS CLOSE.

2          THE COURT:  GOOD.  NOW, WE'RE AT THE POINT IN THE TRIAL

3   WHERE ALL OF THE EVIDENCE THAT YOU WILL NEED TO DELIBERATE ON

4   THIS CASE HAS BEEN GIVEN TO YOU BY WAY OF WITNESS TESTIMONY,

5   WHETHER IT'S LIVE WITNESSES OR VIDEOTAPE, AND THROUGH DOCUMENTARY

6   EVIDENCE THAT IS NOW, HAVE BEEN INTRODUCED INTO EVIDENCE.

7          SO TOMORROW WHAT WE WILL DO, WE'LL LET YOU GO FOR

8   THE DAY, BUT TOMORROW WE WILL START AT 8:30.  AND THE WAY THIS

9   PROCESS IS GOING TO WORK ON CLOSING ARGUMENTS, AND AS I INDICATED

10  AT THE OUTSET, CLOSING ARGUMENTS ARE NOT EVIDENCE, JUST AS

11  OPENING STATEMENTS ARE NOT EVIDENCE.  THEY ARE SIMPLY THE

12  ATTORNEYS' EXPLANATION OF THEIR RESPECTIVE CLIENT'S POSITION, AND

13  IN THE CASE OF CLOSING ARGUMENTS, THEY ARE HIGHLIGHTING TO YOU OF

14  EVIDENCE WHICH THEY BELIEVE SUPPORTS THAT POSITION.

15         THE PLAINTIFFS WILL BE GIVEN A TOTAL OF 60 MINUTES

16  OF WHICH THEY MAY RESERVE UP TO 15 MINUTES FOR REBUTTAL, WHICH

17  MEANS THEY WILL HAVE THE LAST SAY ON THE CLOSING STATEMENTS.  THE

18  DEFENDANTS, BETWEEN THE TWO OF THEM, GULF STREAM AND FLUOR, WILL

19  HAVE A TOTAL OF 60 MINUTES, WHICH THEY MAY DIVIDE UP BETWEEN THEM

20  ANY WHICH WAY THEY LIKE.  I WILL BE THE OFFICIAL SCOREKEEPER AND,

21  OF COURSE, IF THE PLAINTIFFS GO OVER 45 MINUTES FOR THEIR CLOSING

22  ARGUMENTS, INITIALLY, THAT TIME WILL BE SUBTRACTED FROM THE

23  REBUTTAL TIME.

24         SO WHAT WE'RE GOING TO DO FOR THE BALANCE OF THE

25  DAY AFTER WE LET YOU GO, IS THAT WE ARE GOING TO PREPARE FOR

1  CLOSING ARGUMENTS, THEY ARE GOING TO PREPARE FOR THAT.  AND WE

2  ARE ALSO GOING TO REVIEW THE JURY INSTRUCTIONS, WHICH I WILL GIVE

3  YOU, WE WILL TAKE A SHORT BREAK AT THE END OF CLOSING ARGUMENTS,

4  I WILL GIVE YOU THE JURY INSTRUCTIONS AS TO THE LAW AND AS TO HOW

5  TO DELIBERATE IN THIS CASE, AND THEN YOU WILL BE SENT TO THE JURY

6  ROOM TO FINALLY BE ABLE TO DISCUSS THE CASE BETWEEN YOURSELVES.

7            SO THAT WILL BE THE PROCEDURE TOMORROW.

8            WE ARE GOING TO START PRECISELY AT 8:30, ABSENT

9  SOMETHING UNEXPECTED AND UNFORTUNATE, WE WILL START PRECISELY AT

10 8:30 AS WE HAVE EVERY DAY.

11           I, AS A POLICY, FOR THOSE OF YOU WHO APPEAR TO

12 LISTEN TO CLOSING ARGUMENTS TOMORROW, AS A POLICY AND AS A

13 COURTESY TO THE ATTORNEYS, I DO NOT ALLOW PEOPLE TO GO IN AND OUT

14 OF THE COURTROOM DURING CLOSING ARGUMENTS.  I THINK IT'S

15 IMPORTANT THAT WE BE FOCUSED ON THE TASK AT HAND.  I WILL ASK THE

16 CSO TOMORROW, ONCE WE GET UNDERWAY AND PARTICULARLY DURING THE

17 JURY INSTRUCTIONS, TO SECURE THE DOOR.  YOU WILL BE ALLOWED TO

18 LEAVE, IF YOU HAVE TO LEAVE.  BUT IF YOU WOULD LIKE TO HEAR

19 CLOSING ARGUMENTS, YOU NEED TO BE HERE AT 8:30 SHARP, BECAUSE

20 WHEN THE DOOR IS LOCKED, WE WILL NOT BE ADMITTING ANYONE INTO THE

21 COURTROOM UNTIL THE BREAK.  AND WHEN I DO -- WHEN I GIVE THE JURY

22 CHARGE, WE WILL NOT BE ADMITTING ANYONE TO THE COURTROOM DURING

23 THAT.  SO ONCE YOU'RE IN, YOU CAN LEAVE, BUT IF YOU'RE NOT HERE

24 IN TIME, YOU WON'T BE ALLOWED TO COME IN.  SO LET'S MAKE SURE WE

25 TEND TO THAT.

1          AND WITH THAT, I WILL YET AGAIN INSTRUCT YOU NOT TO

2    DISCUSS THE CASE AMONGST YOURSELVES OR WITH ANYONE ELSE UNTIL WE

3    GIVE THE CASE TO YOU FOR DELIBERATIONS TOMORROW, WHICH SHOULD BE

4    PRIOR TO THE LUNCH HOUR.

5          THANK YOU ALL.

6          THE COURT SECURITY OFFICER:  ALL RISE.

7          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE JURY

8    PANEL LEAVES THE COURTROOM.)

9          THE COURT:  Y'ALL CAN BE SEATED.  WE RESERVED OUR RIGHT

10   RELATIVE TO SOME MOTION PRACTICE, I BELIEVE.  I DO HAVE IN

11   WRITING THE FLUOR MOTION.  WHY DON'T WE START WITH GULF STREAM.

12   I HAVE IN WRITING THE FLUOR MOTION AND THE OPPOSITION MEMORANDUM

13   OF THE PLAINTIFFS.  BEFORE WE DO THAT, WHY DON'T WE START WITH

14   THE PLAINTIFFS.

15         MR. MEUNIER:  WELL, YOUR HONOR, I KNOW WE'RE GOING TO

16   ARGUE THE DEFENDANT MOTIONS UNDER RULE 50, BUT THE PLAINTIFFS

17   ALSO HAVE SOME MOTIONS UNDER RULE 50, WHICH I GUESS WE'LL MAKE

18   AFTER WE'RE FINISHED WITH THIS.

19         THE COURT:  WELL, WHICHEVER WAY YOU ALL WANT TO DO IT.

20         MR. MEUNIER:  YOUR HONOR, MAYBE I CAN JUST AT LEAST

21   IDENTIFY WHAT OUR ISSUES ARE AND THEN YOU CAN HEAR ARGUMENT OR

22   WHATEVER, WHICHEVER WAY YOU CHOOSE.

23         WE MOVE TO DISMISS UNDER RULE 50 A THE GOVERNMENT

24   CONTRACT DEFENSE ASSERTED BY FLUOR.  WE MOVE TO DISMISS UNDER

25   RULE 50 A THE DEFENSE ASSERTION OF PRODUCT MISUSE.  WE MOVE TO

1   DISMISS UNDER RULE 50 A, THE DEFENSE ASSERTION OF FEMA FAULT

2   BASED ON THE SO-CALLED, QUOTE, RULING OF THE TRAVEL TRAILERS.

3           THE COURT:  SAY THAT AGAIN.

4           MR. MEUNIER:  THE DEFENSIVE ASSERTION OF FEMA FAULT

5   BASED ON, QUOTE, RUIN, CLOSE QUOTE, OF THE TRAVEL TRAILER UNDER

6   LOUISIANA CODE ARTICLE 2322.  WE MOVE TO DISMISS UNDER RULE 50 A

7   THE DEFENSIVE ASSERTION OF SOPHISTICATED USER.  AND FINALLY, WE

8   MOVE UNDER 50 A TO DISMISS THE DEFENSE OF COMPARATIVE FAULT

9   ALLOCATION TO FEMA.

10              AND, YOUR HONOR, ALL OF THESE ISSUES ARE ALSO

11  EMBEDDED IN THE COURT'S PROPOSED JURY INSTRUCTIONS, AND I KNOW

12  WE'LL HAVE A DISCUSSION ABOUT THAT AT A LATER TIME, BUT I WANT TO

13  GO ON RECORD IN SAYING THAT WE DON'T THINK THERE IS EVIDENCE TO

14  GO TO THE JURY ON THOSE ISSUES, AND SO UNDER 50 A WE THINK WE'RE

15  ENTITLED TO A MATTER-OF-LAW DISMISSAL.  AND WHEN I SAID

16  GOVERNMENT CONTRACTOR, I SHOULD INCLUDE BOTH GULF STREAM AND

17  FLUOR.  I THINK BOTH DEFENDANTS ARE ASSERTING THAT.

18          THE COURT:  CORRECT.  THAT'S HOW I UNDERSTOOD IT.  WOULD

19  ANYBODY LIKE TO RESPOND TO THAT?

20          MR. MEUNIER:  YOUR HONOR, MAY I LAY OUT OUR REASONS?

21          THE COURT:  YES.

22          MR. MEUNIER:  AND I'LL BE BRIEF.  I MEAN THE COURT IS

23  CERTAINLY --

24          MR. SHERBURNE:  SOMEONE JUST KNOOCKED ON THIS DOOR, ON

25  THE JURY DOOR.

1           THE COURT:  THAT'S ALL RIGHT.  PAM WILL TAKE A LOOK.

2           WAIT, LET'S MAKE SURE THAT DOOR IS CLOSED.

3           MR. MEUNIER:  YOUR HONOR, AS YOU KNOW, THE STANDARD

4    UNDER RULE 50 A IS THAT THE COURT MUST DECIDE WHETHER A

5    REASONABLE JURY WOULD OR WOULD NOT HAVE A LEGALLY-SUFFICIENT

6    EVIDENTIARY BASIS TO FIND FOR A PARTY ON THE ISSUE.  AND AS TO

7    ALL OF THESE ISSUES, WE DON'T THINK THAT ANY REASONABLE JUROR

8    COULD ADOPT THE DEFENDANT POSITION.  BASED UPON THE EVIDENCE THAT

9    HAS BEEN PRESENTED.

10          YOU HAVE RECEIVED AND HAVE FROM BOTH DEFENDANTS THE

11   ELEMENTS FIRST OF THE GOVERNMENT CONTRACTOR DEFENSE.  ELEMENT ONE

12   IS THAT THE FEDERAL GOVERNMENT MUST BE SHOWN TO HAVE APPROVED

13   REASONABLY PRECISE SPECIFICATIONS, AND OF COURSE, WE'RE TALKING

14   HERE IN THE CASE OF GULF STREAM, AS TO FORMALDEHYDE LEVELS, AND

15   AS TO THE CASE OF FLUOR, PRESUMABLY SPECIFICATIONS ON HOW TO

16   BLOCK A UNIT.  WE DON'T THINK THERE HAS BEEN ANY EVIDENCE IN THIS

17   CASE THAT THE GOVERNMENT SET FORTH REASONABLY-PRECISE

18   SPECIFICATIONS ON EITHER OF THOSE MATTERS, WHICH IS THE FIRST AND

19   THRESHOLD ELEMENT OF THE DEFENSE.

20          THE SECOND ELEMENT IS THAT THE CONTRACTOR'S WORK

21   CONFORMED, AND WE CAN ARGUABLY SAY THERE IS A JURY QUESTION ON

22   CONFORMITY, BUT IF YOU GO TO THE THIRD ELEMENT, WHICH IS THAT THE

23   CONTRACTOR WARNED THE GOVERNMENT OF PRODUCT DANGERS THAT WERE

24   KNOWN TO THE CONTRACTOR BUT NOT KNOWN TO THE GOVERNMENT.  THERE

25   IS ZERO EVIDENCE IN THIS CASE THAT IN THE CASE OF FORMALDEHYDE,

1  THE CONTRACTOR WARNED FEMA ABOUT SOMETHING THAT WAS KNOWN TO

2  GULF STREAM BUT NOT KNOWN TO FEMA.

3          AND CERTAINLY IN THE CASE OF BLOCKING THERE IS

4  NOTHING HERE TO -- NOTHING IN THIS RECORD TO THE EFFECT THAT

5  FLUOR WARNED THE GOVERNMENT OF PROBLEMS WITH BLOCKING, WHICH

6  PROBLEMS IT KNEW ABOUT AND THE GOVERNMENT DID NOT KNOW ABOUT.  SO

7  THIS IS A VERY STRICT DEFENSE.  THE ELEMENTS ARE LAID OUT IN YOUR

8  PROPOSED CHARGE AND WE DON'T THINK THERE IS A RECORD.

9          ON PRODUCT MISUSE, AND THIS IS YOUR JURY CHARGE

10  NUMBER 21, WE DON'T THINK THERE IS ANY EVIDENCE IN THIS CASE THAT

11  THE PLAINTIFF ALANA ALEXANDER, CERTAINLY NOT HER SON CHRISTOPHER,

12  MISUSED THIS PRODUCT, CERTAINLY NOT IN ANY WAY THAT LED TO ANY OF

13  THE RISKS OR CLAIMS WHAT ARE AT ISSUE, SO I'LL BE CURIOUS,

14  PERHAPS I CAN REBUT WHAT THE DEFENDANTS MAY SAY ON IT WHEN THEY

15  SPEAK, BUT WE DON'T SEE ANY EVIDENCE OF THAT.

16          ON FEMA FAULT, AND, JUDGE, I WANT TO FIRST TALK

17  ABOUT RUIN.  THE SUBMITTED CHARGE IS THAT FEMA, AS THE OWNER OF A

18  BUILDING, IS RESPONSIBLE FOR FAULT BASED ON THE RUIN OF THE

19  BUILDING.  BUT THE CASE LAW ON THIS IS CLEAR, THAT WHEN THE OWNER

20  DOES NOT HAVE CUSTODY OF THE BUILDING, RUIN REFERS TO COLLAPSE OR

21  DESTRUCTION.  AND WE HAVE A CASE THAT I'LL CITE THE COURT, AND SO

22  WHEN THE OWNER IS NOT IN CUSTODY OF THE BUILDING, THE ONLY 23, 22

23  FAULT BASED ON RUIN IS IF THAT BUILDING HAS COLLAPSED OR BEEN

24  DESTROYED IN SOME WAY, AND THERE IS SIMPLY NO EVIDENCE THAT IT

25  APPLIES.

1     SOPHISTICATED USER.  THIS COURT HAS CITED TO THE

2  CASE OF *DAVIS VERSUS AVONDALE INDUSTRIES*, 975 F.2D 169, IN

3  SUPPORT OF A JURY CHARGE REQUESTED BY THE DEFENDANTS, THAT WHEN A

4  MANUFACTURER SELLS A PRODUCT TO A SOPHISTICATED PURCHASER, THERE

5  IS NO LPLA DUTY TO WARN THE USER OF THE PRODUCT.  THE IDEA HERE

6  BEING THAT THE SOPHISTICATED PURCHASER SHOULD BE RECEIVING AND

7  TRANSMITTING WARNINGS, BUT THE *DAVIS* CASE AND THE CASE LAW THAT

8  IS DISCUSSED IN THAT DECISION HAVE TO DO WITH EMPLOYER/EMPLOYEE

9  CASES.

10     IN OTHER WORDS, THE IDEA HERE IS THAT IF YOU SELL A

11  PRODUCT TO AVONDALE, DO YOU HAVE AS A MANUFACTURER THE DUTY TO

12  WARN ONE OF AVONDALE'S WORKERS ABOUT THE PRODUCT, AND THE COURT

13  IN *DAVIS* SAID NO.  AND IT'S BECAUSE OF THE EMPLOYER/EMPLOYEE

14  RELATIONSHIP, SO WE THINK IT'S A MISPLACED DOCTRINE IN THIS CASE

15  BECAUSE THERE IS CERTAINLY NO EMPLOYER/EMPLOYEE RELATIONSHIP

16  BETWEEN FEMA AND ALANA ALEXANDER.

17     FINALLY, YOUR HONOR, AS TO FEMA'S FAULT, THIS, OF

18  COURSE LIKE ALL THESE DEFENSES, IS THE DEFENDANT'S BURDEN.  THEY

19  HAVE TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT IN THIS CASE

20  THERE WAS FAULT ON THE PART OF FEMA, AND THAT IT CAUSED A

21  SUBSTANTIALLY OR CONTRIBUTED TO THE HARM.  AND, WHILE AS YOU KNOW

22  IN OTHER CASES, WE WILL CERTAINLY TAKE THE POSITION THAT THAT

23  CASE CAN BE MADE, AND WE DIDN'T CHOOSE TO MAKE IT HERE FOR

24  OBVIOUS REASONS, IT WAS THEIR BURDEN TO MAKE THAT CASE HERE AND

25  FRANKLY THEY DIDN'T.  THEY DIDN'T PUT ON SOME OF THE EVIDENCE

1  THAT THEY COULD HAVE PRESENTED WITH RESPECT TO FEMA'S FAULT.

2             THERE HAS CERTAINLY BEEN NO EVIDENCE THAT FEMA WAS

3  AT FAULT IN CHOOSING TRAVEL TRAILERS.  NONE.  THERE HAS BEEN NO

4  EVIDENCE THAT FEMA WAS AT FAULT BECAUSE IT KNEW OR SHOULD HAVE

5  KNOWN IN ADVANCE THAT THE TRAVEL TRAILERS WOULD BE PROBLEMATIC.

6  ZERO EVIDENCE ON THAT.  THERE IS NO EVIDENCE OF FAULT BASED ON

7  EVEN FEMA'S NOTIFICATION TO PEOPLE.  WHAT WE'VE HEARD ABOUT IS

8  FEMA PUTTING FLYERS OUT.  WHAT WE'VE HEARD ABOUT IS FEMA'S

9  WARNINGS PROGRAM, SO I DON'T KNOW WHERE THE EVIDENCED NEGLIGENCE

10  IS ON THE PART OF FEMA FOR FAILING TO COMMUNICATE TO OCCUPANTS,

11  IF THAT'S THE THEORY.

12             AND CERTAINLY, AS TO ANY OF THESE THEORIES OF FAULT

13  ON THE PART OF FEMA, WE DON'T SEE THAT THERE HAS BEEN ANY CAUSAL

14  RELATIONSHIP MADE UNDER THEIR SHOWING, BETWEEN WHATEVER THAT

15  FAULT WAS AND THE EXPOSURE EXPERIENCED BY ALANA ALEXANDER.

16        MR. WATTS:  MAY I CONFER JUST ONE SECOND?

17             (CONFERRING WITH MR. MEUNIER.)

18        MR. MEUNIER:  YOUR HONOR, AS YOU KNOW, WE DID SUBMIT A

19  GROSS FAULT CHARGE BECAUSE WE BELIEVE THAT, YOU KNOW, IF WE'RE

20  GOING TO DISCUSS FEMA FAULT IN THE CASE, THAT HAS TO BE IN THERE.

21  WE DON'T THINK THERE IS ANY EVIDENCE OF FEMA FAULT, INCLUDING

22  THAT, BUT IF YOU ARE GOING TO DISCUSS THE STANDARD OF CARE FOR

23  FEMA, YOU OBVIOUSLY HAVE TO TELL THE JURY THE BAR IS THAT HIGH.

24  BUT AGAIN, THIS IS THEIR BURDEN, IT'S A COMPARATIVE FAULT

25  ALLOCATION BURDEN THAT THEY HAVE, AND I DON'T THINK THEY'VE PUT

1   IN THIS RECORD EVIDENCE THAT ANY REASONABLE JURY COULD CONSIDER

2   ON THOSE ISSUES.  THANK YOU, JUDGE.

3          THE COURT:  THANK YOU.  MR. SCANDURRO, DO YOU WANT TO GO

4   AHEAD AND RESPOND TO THIS?

5          MR. SCANDURRO:  YES, YOUR HONOR.  WE MAY TAG TEAM ON ONE

6   OF THESE, BUT I THINK I CAN COVER THEM.

7              RELATIVE TO SOPHISTICATED USER, SOPHISTICATED USER

8   CASES ARE NOT LIMITED TO EMPLOYER/EMPLOYEE CASES.  PERHAPS THAT

9   CASE WAS, BUT IT FINDS WIDE APPLICATION, FOR EXAMPLE, WITH

10  MEDICAL DOCTORS AND PATIENTS.  IT IS A DOCTRINE THAT EXTENDED

11  BEYOND EMPLOYER/EMPLOYEE, AND AS WE FILED A MOTION ON THIS, AS

12  YOUR HONOR KNOWS, AND I WOULD ADOPT THE LAW WE LAID OUT THERE AS

13  WELL, THAT THE UNITED STATES OF AMERICA IS THE QUINTESSENTIAL

14  SOPHISTICATED PURCHASER, AND I WOULD ALSO POINT OUT, AT LEAST IN

15  MR. MCNEESE'S DEPOSITION TESTIMONY IT WAS VERY CLEAR, THIS CAME

16  AS NO SURPRISE TO THEM THAT FORMALDEHYDE WAS IN THESE TRAVEL

17  TRAILERS.  THEY KNEW IT.  THEY KNEW IT GOING IN.

18             SO WE CAN'T THINK OF A MORE SOPHISTICATED USER

19  UNDER THE LAW THAN THE UNITED STATES OF AMERICA AND ITS AGENCY

20  RESPONSIBLE FOR CHOOSING AND IMPLEMENTING HOUSING STRATEGIES

21  AFTER DISASTERS.

22             RELATIVE TO THE ISSUE OF RUIN AND LANDLORD RUIN,

23  IT'S CLEAR FROM THE EVIDENCE THAT THESE TRAILERS WERE OWNED,

24  INCLUDING THE ALEXANDER TRAILER, BY THE UNITED STATES, AND

25  LEASED, AS CONFIRMED, I BELIEVE, BY MS. ALEXANDER, THE

1   DOCUMENTATION SHE HAD TO SIGN, LEASED TO THE RESIDENTS, INCLUDING

2   HER.

3            AND JUST LIKE A LANDLORD DOESN'T ACTUALLY LIVE IN A

4   STRUCTURE WITH A TENANT, THE UNITED STATES WASN'T PRESENT INSIDE

5   THE TRAILER, BUT IT SENT MAINTENANCE PEOPLE OUT EVERY MONTH, YOU

6   HEARD MR. GARRETT SAY, WHICH WAS VERY IMPORTANT IN HIS VIDEO

7   TESTIMONY, THIS WAS OUR RESPONSIBILITY.  ONCE WE GOT THESE FROM

8   THE MANUFACTURERS IT WAS OUR RESPONSIBILITY TO MAKE SURE

9   EVERYBODY WAS TAKEN CARE OF AND OUR HOUSING, SO WE THINK IT FITS

10  THE CLASSIC PROFILE EVEN MORE SO BECAUSE VERY FEW LANDLORDS

11  ACTUALLY MAKE REGULAR VISITS TO MAINTAIN OR COME THE NEXT DAY

12  WHEN YOU CALL THEM.

13            RELATIVE TO THE GOVERNMENT CONTRACTOR DEFENSE,

14  AGAIN, WITH REGARD TO WHO KNEW WHAT AND WHEN, I WOULD POINT OUT

15  THE TESTIMONY OF THE FEMA WITNESSES, THAT THEY KNEW FORMALDEHYDE

16  WAS IN THESE TRAVEL TRAILERS.  WE'VE SEEN DOCUMENTS THAT MAKE

17  THAT VERY CLEAR, AND IT PREDATES THE MAY 25TH OR 26TH DATE WHEN

18  MS. ALEXANDER MOVED IN.

19            IMPORTANTLY, YOU WILL REMEMBER EXHIBIT 46, WHICH

20  WAS GULF STREAM'S LETTER TO FEMA ABOUT 15 DAYS BEFORE SHE MOVED

21  IN, CONFIRMING THAT THEY WENT TO WASHINGTON, THEY MET WITH FEMA,

22  THEY GAVE THEM A VENTILATION NOTICE, THEY GAVE THEM A HEALTH

23  NOTICE, AND THEY SAID, WE LOOKED AT YOUR BROCHURE THAT WE

24  UNDERSTAND YOU'RE HANDING OUT TO PEOPLE, THIS IS INFORMATION YOU

25  CAN PUT IN THERE.  SO FROM A KNOWLEDGE STANDPOINT OF WHO KNEW

1    WHAT AND WHEN, IT'S VERY CLEAR THAT THE LATEST AT THAT POINT,

2    FEMA WAS WELL AWARE OF AND WELL ON TOP OF THE FORMALDEHYDE ISSUE,

3    HAD THE WARNING INFORMATION AVAILABLE, AND AS MR. GARRETT SAID,

4    IT WAS OUR RESPONSIBILITY AS THE FEDERAL GOVERNMENT TO DEBATE

5    WHAT TO DO ABOUT IT, WHETHER TO GIVE THE WARNING, WHAT TYPE OF

6    WARNING TO GIVE, ET CETERA.

7            THE COURT:  YOU TOLD ME ABOUT THE THREE ELEMENTS IN THE

8    GOVERNMENT CONTRACTOR THAT MR. MEUNIER CITED AND THAT THE COURT

9    CITED IN ITS PRETRIAL RULING RELATIVE TO THAT DEFENSE.  TELL ME

10   WHAT EVIDENCE HAVE WE WITH REGARD TO THOSE THREE ELEMENTS IN

11   ORDER TO SUPPORT THAT PARTICULAR DEFENSE?

12           MR. SCANDURRO:  WELL, I WAS TRYING TO WRITE THESE DOWN

13   AS HE SAID THEM.  ONE I JUST COVERED, I THINK, RELATIVE TO, DID

14   THE CONTRACTOR WARN THE GOVERNMENT.

15           THE COURT:  WELL, THEN WE'RE A LITTLE OUT OF ORDER.  THE

16   FIRST ONE WAS WHETHER OR NOT -- I BELIEVE, THE FIRST ONE IS

17   WHETHER OR NOT THERE IS A SPECIFICATION, CONTRACT SPECIFICATION

18   THAT WOULD APPLY FOR THE CONTRACTOR TO SATISFY.

19           MR. SCANDURRO:  RIGHT.  THE SPECIFICATION CALLED FOR

20   INDUSTRY-STANDARD MATERIALS.  FEMA HAD BOUGHT INDUSTRY-STANDARD

21   TRAVEL TRAILERS FOR 12 YEARS BEFORE THIS.  THESE ARE THE SAME

22   MATERIALS, ACCORDING TO THE EVIDENCE WE PUT IN, THAT WERE USED IN

23   ALL OF THOSE OTHER DISASTERS.  AND DID THEY SAY ANYTHING ABOUT

24   FORMALDEHYDE?  NO.  IT WASN'T SPECIFIC TO FORMALDEHYDE, BUT

25   INDUSTRY-STANDARD MATERIALS, AGAIN, ACCORDING TO THE EVIDENCE THE

1   JURY HAS HEARD, ALWAYS INCLUDED FORMALDEHYDE IN ALL OF THE WOOD

2   PRODUCTS, AND THERE IS A STIPULATION TO THAT EFFECT.  SO THEY

3   KNEW WHAT THEY WERE BUYING, AND THEY SPEC'D, ON PURPOSE AND

4   DELIBERATELY, INDUSTRY-STANDARD MATERIALS, INCLUDING THE WOOD

5   PRODUCTS THAT WERE USED IN THE TRAVEL TRAILER.

6             SO WE BELIEVE THAT ELEMENT IS MET BECAUSE THAT

7   EVIDENCE IS -- I MEAN, THAT'S BEEN FROM THE FIRST DAY WE GOT HERE

8   TO THE LAST DAY WE GOT HERE, THEY'VE HEARD THAT EVIDENCE, AND

9   IT'S IN THERE RELATIVE TO THAT PARTICULAR SPECIFICATION.

10            AGAIN, I COVERED THE -- I FORGET WHAT THE THIRD

11  FACTOR WAS.  I COVERED THE WARNING ISSUE, I THINK, EARLIER.  WHAT

12  WAS THE OTHER ONE YOU WANTED TO --

13            THE COURT:  THE THIRD ONE, I BELIEVE, WAS THE WARNING.

14            MR. BUZBEE:  DID YOU CONFORM TO THE SPECIFICATION?

15            THE COURT:  THE SECOND ONE IS CONFORMITY --

16            MR. SCANDURRO:  I THINK HE ACKNOWLEDGED THAT ONE IS

17  DISPUTED AS TO WHETHER WE CONFORMED WITH THE SPEC OR NOT.

18  CERTAINLY THERE IS COMPETING TESTIMONY ON WHETHER THAT WAS DONE

19  RELATIVE TO THE WOOD PRODUCTS THAT WERE USED.

20            THE THIRD ONE IS THE WARNING, I THINK, WHICH I'VE

21  COVERED.

22            RELATIVE TO FEMA FAULT GLOBALLY, YOUR HONOR, I

23  DON'T DISAGREE WITH MR. MEUNIER THAT THERE PROBABLY ISN'T

24  EVIDENCE TO SUPPORT A GROSS WILLFUL WANTON MISCONDUCT

25  INSTRUCTION.  WE DIDN'T ASK FOR THAT INSTRUCTION.  HE DID.

1              BUT RELATIVE TO NEGLIGENCE, WE HAVE SEVERAL

2    DIFFERENT THINGS GOING ON HERE.  THE CHOICE OF TRAVEL TRAILERS,

3    YOU HEARD FROM MR. SOUZA OF FEMA THAT THEY MADE A DELIBERATE

4    ESSENTIALLY POLITICAL DECISION TO USE TRAVEL TRAILERS RATHER THAN

5    MOBILE HOLES.  THEIR FIRST CHOICE WAS MOBILE HOMES, BUT WHEN THEY

6    LOOKED AT THE FACT THEY WOULD HAVE TO BE NORTH OF BATON ROUGE AND

7    YOU COULDN'T GET THEM IN PEOPLE'S DRIVEWAYS AND YARDS, AND WHEN

8    THEY HEARD THE POLITICAL FALLOUT FROM THAT, THEY MADE THE

9    DECISION, AGAINST THEIR FIRST INSTINCT, TO USE TRAVEL TRAILERS.

10   THAT WAS A POLICY TRADE-OFF, THEY CERTAINLY HAVE IMMUNITY FROM

11   THAT, WHICH THE COURT HAS RECOGNIZED, BUT IT'S STILL FAULT FROM

12   THE STANDPOINT OF THE SELECTION OF THE TRAVEL TRAILERS BY FEMA.

13              THE COURT:  WHAT ABOUT MISUSE?

14              MR. SCANDURRO:  MISUSE BY THE PLAINTIFF?

15              THE COURT:  YES.

16              MR. SCANDURRO:  I DON'T THINK WE HAVE ANY EVIDENCE OF

17   MISUSE BY THE PLAINTIFF, YOUR HONOR.

18              THE COURT:  I DON'T THINK SO, EITHER.

19              MR. SCANDURRO:  I'M GLAD I GOT THAT ONE RIGHT.  BECAUSE

20   THAT ADDS CREDIBILITY TO THIS ONE I'M GOING TO GIVE YOU RIGHT

21   HERE.

22              THE COURT:  LET'S GET THE LOW-HANGING FRUIT HERE.  WE'LL

23   GRANT THAT ONE.

24              MR. SCANDURRO:  RELATIVE TO -- AND I WOULD ALSO POINT

25   OUT ON THAT THAT THERE IS A LINE ON THE VERDICT FORM, I THINK,

1    RELATIVE TO YOUNG COOPER'S FAULT THAT WE'RE PROBABLY GOING TO ASK

2    YOU NOT TO SUBMIT AS WELL ALONG THE SAME GROUND.

3              THE COURT:  SURE.

4              MR. SCANDURRO:  RELATIVE TO FEMA'S FAULT, IN ADDITION TO

5    THE CHOICE OF THE TRAVEL TRAILERS, OF COURSE, DEFINITELY A BIG

6    DEAL IN THIS CASE ABOUT MOISTURE IN THE WALL CAVITIES AND THAT

7    BOARD THAT WAS SPLIT AND ALL OF THOSE THINGS AND HOW THAT MIGHT

8    HAVE CONTRIBUTED TO THE FORMALDEHYDE CONCENTRATIONS IN THE

9    TRAILER, AS MR. GARRETT SAID, ONCE WE GOT THOSE TRAVEL TRAILERS,

10   THEY WERE OUR RESPONSIBILITY.

11             FEMA HAD A WHOLE NETWORK OF MAINTENANCE PEOPLE.

12   REMEMBER THE PEOPLE COMING OUT TO FIX THE ROOF.  THEY SAID THEY

13   COULDN'T FIX THE ROOF.  THEY DIDN'T KNOW IF THEY WOULD EVER FIND

14   IT.  THE LADY SAID IT CONTINUED TO LEAK.  YOUNG ERICA SAID IT

15   CONTINUED TO LEAK.  ALL OF THESE THINGS, ACCORDING TO THEIR

16   THEORY THAT THEY'VE INTRODUCED, ENHANCE, EXACERBATE, DRIVE UP

17   FORMALDEHYDE CONCENTRATIONS, AND WE'VE PUT IN PLENTY OF EVIDENCE

18   OF THE LACK OF MAINTENANCE OF THESE TRAVEL TRAILERS ALL THE WAY

19   UP UNTIL THE TIME THEY WERE INSPECTED IN MAY OF 2009.

20             I THINK THE MOST IMPORTANT THING IN THIS CASE

21   RELATIVE TO FEMA HAS BEEN SOME TESTIMONY ABOUT THE DELAY IN

22   DECIDING TO WARN AND DECIDING HOW TO DO IT AND DECIDING TO TEST.

23   I THINK THAT EVIDENCE IS IN THE RECORD AND CAN BE CONSIDERED BY

24   THE JURY GIVEN THE TIME SPAN THAT THIS WOMAN LIVED IN THE

25   TRAILER.

1        BUT THE MOST IMPORTANT IS, WE WENT TO FEMA, WE MET

2   WITH THEM, WE OFFERED THE TEST RESULTS THAT THEY ARE GOING TO

3   ARGUE ABOUT IN CLOSING ARGUMENT, THAT THE GOVERNMENT SUPPOSEDLY

4   DIDN'T GET.  WE GAVE THEM THE VENTILATION INSTRUCTIONS, WE GAVE

5   THEM THE HEALTH WARNING, ALL IN ADVANCE OF MS. ALEXANDER EVER

6   STEPPING FOOT INTO THAT TRAILER.  SO THAT IF THERE IS AN ISSUE OF

7   WHETHER OR NOT WE FAILED TO DO SOMETHING, OUR DEFENSE IS GOING TO

8   BE, WE BROUGHT IT TO FEMA.  WE HAD NO IDEA WHO THIS PERSON WAS.

9   WE WENT TO THE ONLY PERSON OR ENTITY WE COULD GO TO WHO COULD

10  MAKE THAT WARNING EFFECTIVE.

11        SO I THINK, OBVIOUSLY, THERE HAS BEEN PLENTY OF

12  EVIDENCE RELATIVE TO FEMA'S FAULT WITH RESPECT TO ALL ASPECTS OF

13  THIS TRAILER AFTER IT LEFT OUR CONTROL.

14        THE COURT:  ALL RIGHT.  MR. PENOT.

15        MR. PENOT:  YOUR HONOR, JUST TO RESPOND, ON PLAINTIFF

16  MISUSE AS IT RELATES TO THE CLAIMS AGAINST FLUOR, OKAY,

17  MS. ALEXANDER TESTIFIED, IT'S UNCONTESTED, THAT SHE NEVER CALLED

18  MAINTENANCE OR NEVER COMPLAINED TO MAINTAIN ABOUT THE CRACK IN

19  THE WALL IN THE BEDROOM, ABOUT THE CRACK IN THE WALL IN THE

20  BATHROOM, SO I WOULD NOT CONCEDE THAT THERE IS NO EVIDENCE WITH

21  RESPECT TO IF, IF SOMETHING WAS WRONG WITH THE SHELL OF THE

22  TRAILER THAT CAUSED INTRUSION OF MOISTURE, THAT CAUSED ENHANCED

23  OFF-GASSING, THAT THERE IS NO BASIS FOR PLAINTIFF FAULT ON THAT

24  CLAIM.

25        AND SHE NEVER COMPLAINED.  SHE NEVER COMPLAINED TO

1    MAINTENANCE ABOUT THE SMELL.  THAT'S ALL IN THE RECORD.

2         THE COURT:  AREN'T YOU TALKING ABOUT LIKE A FAILURE TO

3    MITIGATE TYPE AS OPPOSED TO A MISUSE, WHERE SHE WAS NOT USING IT

4    FOR ITS INTENDED PURPOSES?  I MEAN, I HARDLY -- WELL, GO AHEAD.

5         MR. PENOT:  EXCUSE ME, YOUR HONOR.  YOU ASKED ABOUT

6    MISUSE.  DON'T FORGET, THERE IS NO PRODUCTS LIABILITY CLAIM LEFT

7    AGAINST ME.  I'M NOT TALKING ABOUT PRODUCT MISUSE, BUT I'M

8    TALKING ABOUT SOME BASIS FOR ALLOCATING FAULT TO MS. ALEXANDER.

9    I THINK THAT EVIDENCE IS IN THERE.

10             WITH RESPECT TO COMPARATIVE FAULT OF FEMA, I WOULD

11   SIMPLY ADOPT THE ARGUMENTS THAT MR. SCANDURRO MADE.

12             THE OTHER ARGUMENT OR MOTION THAT WAS MADE WITH

13   RESPECT TO FLUOR WOULD BE THE GOVERNMENT CONTRACTOR.

14        THE COURT:  THE GOVERNMENT CONTRACTOR.  I THINK WE

15   TALKED ABOUT THAT IN A PRETRIAL RULING.  IF YOU WOULD CARE TO

16   RESPOND, HOW THAT RULING MIGHT BE IMPACTED BY ANYTHING THAT I'VE

17   HEARD OVER THE LAST EIGHT DAYS OF TESTIMONY.

18        MR. PENOT:  YOUR HONOR, I WOULD SAY THIS:  TO BE DIRECT,

19   I DON'T THINK IT'S BEEN IMPACTED BY THE TESTIMONY.  YOUR HONOR'S

20   RULING, AS I RECALL IT, WAS BASED ON A PURELY LEGAL ISSUE, AND

21   THAT IS, ON THE FIRST ELEMENT OF GOVERNMENT CONTRACTORS,

22   REASONABLY-PRECISE SPECIFICATIONS, AND YOUR HONOR SAID -- AND

23   THIS FACT IS ABSOLUTELY UNCONTESTED.  THAT IS TO SAY, FEMA SAID,

24   YOU SHALL PROVIDE, AT THE END OF THE JOB, THIS IS WHAT THE

25   TRAILER SHALL LOOK LIKE, IT WILL BE SITTING ON THESE SIX BLOCKS,

1   THEY'LL BE CONSTRUCTED AS SUCH.

2           THEY NEVER GAVE ANY DIRECTIONS AS TO HOW TO JACK.

3   I RESPECTFULLY WANT TO PRESERVE FLUOR'S ARGUMENTS IN THAT REGARD

4   AND DISAGREE WITH THAT RULING, THAT TO FOCUS JUST ON THE JACKING,

5   WHICH WAS CLEARLY CONTEMPLATED AND REQUIRED BY THE

6   SPECIFICATIONS, THAT THAT SOMEHOW MAKES IT NOT REASONABLY

7   SPECIFIC, BUT THAT WAS A PURELY, AS I APPRECIATE IT, LEGAL CALL

8   BASED ON WHAT IS TRULY AN UNCONTESTED FACT.  SO I CANNOT SAY THAT

9   YOU'VE HEARD ANY EVIDENCE TODAY THAT CHANGES THAT.

10          ON THE THIRD ELEMENT, THOUGH, IF YOUR HONOR WERE TO

11  REVISIT THE FIRST ELEMENT, ON THE THIRD ELEMENT THAT MR. MEUNIER

12  RAISED, WHICH IS, I THINK HE SAID AS TO FLUOR, WITH THE

13  CONTENTION WOULD BE THAT FLUOR DIDN'T WARN.  FLUOR HAD SOME

14  SUPERIOR KNOWLEDGE CONCERNING PROBLEMS WITH BLOCKING THAT WAS

15  SUPERIOR TO THAT OF THE GOVERNMENT AND DIDN'T SHARE THAT.

16          WELL, THE EVIDENCE IS THAT THERE IS NO PROBLEM WITH

17  BLOCKING AND THERE IS NO PROBLEM WITH JACKING.  MR. PULLEN, THE

18  30-YEAR TECHNICAL GUY FROM THE MANUFACTURER ITSELF, SAID THERE IS

19  NO PROBLEM WITH DOING IT THAT WAY.  THEIR OWN EXPERT, MR. MALLET,

20  SAID, SO I JACKED UP MY TRAILER.  SO I DON'T THINK THE THIRD

21  ELEMENT IS REALLY THE ISSUE.  I THINK THE -- ON THE GOVERNMENT

22  CONTRACTOR FOR FLUOR, IT COMES DOWN TO THE LEGAL ANALYSIS OF

23  WHETHER YOU CAN FOCUS ON JACKING ALONE.

24          THE COURT:  OKAY.

25          MR. PENOT:  I BELIEVE THAT'S EVERYTHING ON RESPONDING TO

1  THEIR MOTION.

2          THE COURT:  RIGHT.

3          MR. MEUNIER:  MAY I HAVE A VERY BRIEF REBUTTAL, YOUR

4  HONOR?

5          THE COURT:  LET ME LET MR. MEUNIER BRIEFLY, BRIEFLY

6  RESPOND, AND THEN WE'LL TAKE UP GULF STREAM AND THEN WE'LL GET TO

7  FLUOR.

8          MR. MEUNIER:  YOUR HONOR, I DON'T FRANKLY HEAR ANYTHING

9  FROM MY COLLEAGUES ON THE OTHER SIDE, AND CERTAINLY THERE IS

10 NOTHING IN THE RECORD THAT DEMONSTRATES TWO OF THE THREE

11 GOVERNMENT CONTRACT DEFENSE ELEMENTS THAT ARE SET OUT IN THE JURY

12 CHARGE.  I'VE HEARD NOTHING FROM GULF STREAM TO INDICATE THAT

13 THERE IS EVIDENCE IN THIS CASE THAT THE GOVERNMENT PROVIDED

14 PRECISE SPECIFICATIONS LEAVING NO DISCRETION TO THE ENTITY, WHICH

15 IS THE REQUIREMENT, AS TO LEVELS OF FORMALDEHYDE.  I'VE HEARD

16 NOTHING FROM FLUOR THAT THE GOVERNMENT PROVIDED PRECISE

17 SPECIFICATIONS AS TO HOW TO BLOCK.

18          AND ON THE THIRD ELEMENT OF THE CONTRACT HAVING

19 SUPERIOR KNOWLEDGE AND WARNING THE GOVERNMENT, THERE IS NONE OF

20 THAT, EITHER.

21          SO UNLESS I'M MISSING SOMETHING, I DON'T SEE THIS

22 AS BEING A RECORD THAT SUPPORTS THE DEFENSE FOR EITHER

23 GULF STREAM OR FLUOR BECAUSE TWO OF THE THREE ELEMENTS ARE

24 MISSING.

25          ON VICE DEFECT, I TOLD THE COURT I WOULD CITE A

1    CASE, AND LET ME PUT THAT ON THE RECORD, IT'S -- THE PROPOSITION

2    IS THIS:  UNDER 2322, WHICH IS THE RUIN ARTICLE, WHEN THE OWNER

3    DOES NOT HAVE ACTUAL CUSTODY OF THE BUILDING, RUIN IS LIMITED TO

4    AN ACTUAL FALL OR COLLAPSE OF THE BUILDING.  *GRIFFIN V FOTI*, 523

5    SO.2D 935, WRIT DENIED; 531 SO.2D 272, IT'S A 1988 CASE.  THE

6    ONLY 2322 FAULT THAT CAN BE ESTABLISHED IN THIS CASE WOULD BE IF

7    FEMA, YOU KNOW, NOT A CUSTODIAN, IF WE WERE DEALING WITH A

8    COLLAPSE OR DESTRUCTION.  IT'S NOT THERE.  THERE IS NO EVIDENCE

9    OF THAT.

10            I WAS GLAD TO HEAR MR. SCANDURRO CONCEDE, THERE IS

11   NO EVIDENCE IN THE RECORD ON THE GROSS FAULT OF FEMA.  IF THAT'S

12   TRUE, FEMA IS OUT.  IF THAT'S TRUE, FEMA IS OUT.

13          THE COURT:  WOULDN'T FEMA'S NEGLIGENCE BE ON THE JURY

14   VERDICT FORM AND THAT WOULD BE ALLOWED TO GO TO THE JURY?

15          MR. MEUNIER:  WELL, JUDGE, YOU'RE GIVING THE JURY

16   CHARGE, THAT THE OWNER OF SOME PROPERTY THAT MAKES IT AVAILABLE

17   TO SHELTER PEOPLE AFTER A STORM IN LOUISIANA CAN ONLY BE HELD

18   LIABLE FOR GROSS FAULT.

19          THE COURT:  YEAH, BUT YOU'RE OVERLOOKING THEIR IMMUNITY

20   FOR NEGLIGENT ACTS.  THEY CAN STILL BE APPORTIONED

21   RESPONSIBILITY, FAULT FOR NEGLIGENT ACTS FOR WHICH THEY WOULD BE

22   IMMUNE UNDER THAT STATUTE IF THEY WERE NOT OTHERWISE IMMUNE UNDER

23   THE DISCRETIONARY FUNCTION ANALYSIS, WHICH WE'VE SPENT

24   CONSIDERABLE TIME ON.  FEMA CAN BE BOTH NEGLIGENT AND GROSS

25   NEGLIGENT, GROSSLY NEGLIGENT, IN ANY NUMBER OF WAYS.

1        IF WE HAVE NO EVIDENCE THAT THEY COMMITTED GROSSLY

2   NEGLIGENT ACTS, THAT MIGHT STILL BE EVIDENCE THAT A REASONABLE

3   JUROR COULD FIND THEY ACTED NEGLIGENTLY.  AND THAT IS PART OF THE

4   COMPARATIVE FAULT ANALYSIS, SIMPLY BECAUSE THOSE ACTS MAY HAVE

5   CONTRIBUTED TO THE HARM, BUT THEY MAY BE IMMUNE FROM LIABILITY

6   FOR THEM AND, OF COURSE, THEY ARE NOT A DEFENDANT IN THIS CASE,

7   SO THEIR LIABILITY IS NOT AT ISSUE, BUT CERTAINLY THE

8   APPORTIONMENT OF A NONPARTY FOR A NEGLIGENT ACT WOULD STILL BE AT

9   ISSUE.

10        MR. MEUNIER:  WELL, YOUR HONOR, I THINK, IF WE LOOK --

11        THE COURT:  I JUST WOULDN'T GIVE THE INSTRUCTION ON

12   GROSS FAULT BECAUSE WE DON'T HAVE AN EVIDENTIARY BASIS FOR THAT.

13        MR. MEUNIER:  IF FEMA AS AN OWNER, PUTTING ON THEIR HAT

14   AS OWNER, IS CLAIMED TO BE AT FAULT, THEN THEY DO.  THEY SAY

15   UNDER 2322, THEY ARE LIABLE FOR RUIN, I DON'T THINK THERE IS ANY

16   EVIDENCE OF THAT.

17        BUT IF THE CLAIM IS, LADIES AND GENTLEMEN, YOU

18   SHOULD CONSIDER ALLOCATING FAULT TO FEMA AS AN OWNER, AS AN

19   OWNER, THEN I THINK THAT GROSS FAULT STANDARD HAS TO BE GIVEN TO

20   THEM.  NOW, IF THERE IS SOME OTHER FAULT OF FEMA, NOT AS AN

21   OWNER, AS A RESPONDER TO THE EMERGENCY, BEFORE THEY EVER OWNED A

22   TRAILER.

23        THE COURT:  PLAINTIFFS HAVE VIGOROUSLY ARGUED A

24   CONTINUING DUTY TO WARN, BOTH PRETRIAL AND AT THIS TRIAL,

25   WOULDN'T FEMA TO THE EXTENT THERE IS EVIDENCE THAT THEY DID OR

1    DID NOT ALSO HAVE A CONTINUING DUTY TO WARN, WOULDN'T THAT BE

2    SOMETHING THE JURY COULD CONSIDER IN RESPONDING TO THE JURY

3    INTERROGATORIES AND WHETHER OR NOT THEY DID IT NEGLIGENTLY OR

4    HAPHAZARDLY OR EVEN GROSSLY NEGLIGENTLY?

5              MR. MEUNIER:  I THINK THE CONTINUING DUTY TO WARN

6    DOCTRINE, YOUR HONOR, IS LIMITED TO LPLA CASES.  A MANUFACTURER

7    HAS A CONTINUING DUTY TO WARN.

8              THE COURT:  BUT STILL, WE'RE TALKING ABOUT COMPARATIVE

9    FAULT FOR THE INJURY SUSTAINED.

10             MR. MEUNIER:  ALL RIGHT.  SO IF THE ARGUMENT IS FEMA IS

11   NOT -- IF THEY ARE LOOKED AT AS AN OWNER, THERE IS A GROSS FAULT

12   STANDARD.  IF THE FAULT IS THAT OF FEMA AS A NONOWNER, THEN HOW

13   ABOUT THEM NOT TELLING PEOPLE?  THAT THEY SHOULD HAVE KNOWN MORE

14   ABOUT THIS THAN THEY KNEW.

15             I SUBMIT TO YOU THERE HASN'T BEEN SUFFICIENT PROOF

16   TO GO TO THE JURY ON THAT.  THERE IS EVIDENCE OUT THERE.

17             THE COURT:  BUT NOW WE'RE TALKING ABOUT SUFFICIENCY OF

18   THE EVIDENCE.

19             MR. MEUNIER:  I'M BACK TO RULE 50.  I DON'T THINK

20   THERE'S A LEVEL OF EVIDENCE ON THAT POINT TO GO TO THIS JURY.

21             AND, JUDGE, I SAID I WOULD BE BRIEF.  I HAVE ONE

22   MORE POINT TO MAKE AND THAT, JUST TO CLARIFY OUR POSITION ON THE

23   SOPHISTICATED USER.  THIS IS A DOCTRINE THAT IS LIMITED TO THE

24   LPLA.  AND IT'S ACTUALLY IN THE STATUTE.  IT'S 92800.57

25   SUBDIVISION B 2.

1          SO THE SOPHISTICATED USER -- PURCHASER, I'M SORRY,

2    SOPHISTICATED PURCHASER DOCTRINE IS AN LPLA DOCTRINE, AND WHAT IT

3    SAYS IS, OKAY, WE'VE TALKED ABOUT THE MANUFACTURER'S DUTY TO

4    WARN, AND THEN THE STATUTE SAYS, BUT, THE MANUFACTURER HAS NO

5    DUTY TO WARN SOPHISTICATED PURCHASERS.  THAT'S THE STATUTE.  WHAT

6    DOES THAT MEAN?  THAT MEANS THAT IF FEMA IS A SOPHISTICATED

7    PURCHASER, THEY WOULD SAY THEY HAD NO DUTY TO WARN FEMA.  I MEAN,

8    THAT'S THE DOCTRINE.

9          NOW, THE CASE THAT WE'VE ALL KIND OF BEEN TALKING

10   ABOUT, *DAVIS*, WAS ONE WHERE AN EMPLOYEE OF THE PURCHASER BROUGHT

11   AN LPLA CLAIM FOR FAILURE TO WARN.  AND WHAT THE COURT SAID IN

12   THIS CASE IS, I'M SORRY, EMPLOYEE, WHEN YOUR EMPLOYER IS A

13   SOPHISTICATED PURCHASER AND THERE IS NO STATUTORY DUTY TO WARN

14   THE EMPLOYER PURCHASER, THAT COVERS YOU, TOO.

15         WHAT I'M SUGGESTING TO THE COURT IS THAT TO PUT

16   SOPHISTICATED USER IN THE CONTEXT IT'S BEING SOUGHT HERE IS NOT

17   SUPPORTED BY THE STATUTE AND THE CASE LAW.  IN OTHER WORDS,

18   THERE'S NO -- YOU DON'T CUT OFF THE DUTY TO WARN ALANA ALEXANDER

19   BECAUSE THE UNIT WAS SOLD TO FEMA AND FEMA MIGHT BE CONSIDERED A

20   SOPHISTICATED PURCHASER.  WHAT THAT MEANS IS, YOU DON'T HAVE A

21   DUTY TO WARN FEMA.  AND IF A FEMA EMPLOYEE TRIED TO COME IN AND

22   SAY OTHERWISE, THEY WOULD BE IN TROUBLE.  BUT IT DOESN'T HAVE TO

23   DO WITH THE USER WHO IS NOT EMPLOYED BY THE PURCHASER.

24         THANK YOU, JUDGE.

25         THE COURT:  ALL RIGHT.  I AM GOING TO DENY THE 50 A

1  MOTION RELATIVE TO THE COMPARATIVE FAULT ARGUMENT.  I'M GOING TO

2  GRANT IT AS TO THE MISUSE ARGUMENT.  THAT'S ON THE LPLA CLAIM

3  AGAINST GULF STREAM.

4          I'M GOING TO DENY IT AS TO THE GOVERNMENT

5  CONTRACTOR DEFENSE AS TO GULF STREAM BUT GRANT IT AS TO THE

6  GOVERNMENT CONTRACTOR DEFENSE AS TO FLUOR, AS WAS SET FORTH IN

7  THE COURT'S RULING PRETRIAL, OR AT LEAST INDICATED AS MUCH.  I'M

8  GOING TO TAKE UNDER ADVISEMENT THE -- BECAUSE I WANT TO

9  DOUBLE-CHECK ON THE 2322 ARGUMENT AND ON THE SOPHISTICATED

10  PURCHASER ARGUMENT.

11          SO WE'LL TAKE A LOOK AT THOSE AND WE'LL LET YOU

12  KNOW ON THOSE.

13          ALL RIGHT.  GULF STREAM.

14      MR. GLASS:  YOUR HONOR, I'LL BE VERY, VERY BRIEF BECAUSE

15  WE'RE GETTING VERY CLOSE TO EVERYONE BEING HUNGRY.

16          THE LOW-LYING FRUIT THAT I WOULD LIKE TO START WITH

17  FOR GULF STREAM --

18          THE COURT:  IT'S NOT LOW-LYING.  IT'S LOW-HANGING.

19          MR. GLASS:  THAT'S RIGHT, LOW-HANGING, I'M SORRY.

20          THE COURT:  YOU RUINED THE METAPHOR BY.

21          MR. GLASS:  IT'S ON THE GROUND FOR ME, YOUR HONOR.  IT'S

22  DROPPED.

23          THE COURT:  THESE ARE NOT TRUFFLES ON THE GROUND.

24          MR. GLASS:  THE FIRST MOTION I WOULD LIKE TO MAKE IS A

25  RULE 50 MOTION ON ALANA'S PERSONAL INJURY CLAIMS.  I THINK WE

1   HEARD HER TESTIMONY WHEN SHE WAS ON THE STAND THAT SHE IS NOT

2   MAKING A CLAIM.  SHE TOLD THE JURY THAT DESPITE WHATEVER

3   IRRITATION SHE PERCEIVED WHILE SHE WAS IN THE TRAILER, SHE WAS

4   NOT ASKING THIS JURY TO AWARD MONEY.  SO THAT'S WHY I SAY --

5           MR. WEINSTOCK:  JUDGE, I THINK, YOUR HONOR, IT WAS THE

6   SUBJECT OF A BENCH CONFERENCE WHERE IT WAS ACTUALLY STIPULATED

7   TO.

8           THE COURT:  IT'S NOT DISPUTED?

9           MR. BUZBEE:  NO, IT'S NOT.

10          MR. WATTS:  AS TO HER OWN PERSONAL INJURIES.

11          THE COURT:  AS TO HER OWN INJURIES.

12          MR. BUZBEE:  SHE WANTS FEAR OF CANCER FOR A CHILD.

13          THE COURT:  RIGHT, RIGHT, OBVIOUSLY WE'LL GRANT THAT

14  ONE.  LET'S MOVE ON.

15          MR. GLASS:  MOVING ON, WE WOULD MOVE UNDER RULE 54

16  CHRIS COOPER'S FEAR OF CANCER CLAIM.  HE DID NOT PROVIDE ANY

17  TESTIMONY THAT HE IS PROVIDING ANY EMOTIONAL DISTRESS OR DAMAGES.

18  I ALSO BELIEVE THAT DR. SHWERY WAS ON THE STAND, HE DID NOT

19  TESTIFY THAT CHRIS COOPER HAD ANY PROBLEMS MENTALLY CONCERNING

20  HIS TIME IN THE TRAILER, SO I DO NOT BELIEVE THE RECORD HAS ANY

21  EVIDENCE CONCERNING HIS OWN MENTAL ANGUISH THAT HE IS CLAIMING.

22          AND FINALLY, YOUR HONOR, WE WILL MOVE UNDER RULE 50

23  FOR A DIRECTED VERDICT ON THE ALTERNATIVE DESIGN CLAIM BY

24  PLAINTIFFS.  AS YOU WILL INSTRUCT THE JURY, FOR THERE TO BE A

25  CLAIM UNDER THE LPLA, THAT THE PLAINTIFFS MUST PROVE BY A

1  PREPONDERANCE OF THE EVIDENCE THAT THERE WAS AN ALTERNATIVE

2  DESIGN FOR THE PRODUCT THAT WAS CAPABLE OF PREVENTING THE

3  INJURIES, AND THAT THE LIKELIHOOD OF THE PRODUCT'S DESIGN WOULD

4  CAUSE THE INJURIES AND THE SERIOUSNESS OF THAT INJURY OUTWEIGHED

5  THE BURDEN ON THE DEFENDANTS'S ABUSING AN ALTERNATIVE DESIGN AND

6  THE ADVERSE EFFECT OF USING THAT ALTERNATIVE DESIGN ON THE

7  UTILITY OF THE PRODUCT.

8            SO THERE ARE SEVERAL FACTORS UNDER THE LPLA THAT

9  THE PLAINTIFFS HAVE THE BURDEN OF PROVING.  ALL THEY'VE DONE IS

10 PUT DR. SMULSKI ON THE STAND TO STATE THAT THERE ARE WOOD

11 PRODUCTS THAT COULD HAVE BEEN USED IN THE CONSTRUCTION OF THE

12 TRAILER THAT WERE NOT USED.  THERE HAS BEEN NO EVIDENCE THAT

13 THERE HAS BEEN ANALYSIS OF THE ADVERSE EFFECT ON USING THOSE

14 ALTERNATIVE DESIGNS OR THAT THERE WAS A BENEFIT BALANCING TEST

15 THAT WAS DONE BY PLAINTIFFS.  IN FACT, YOU HEARD TESTIMONY FROM

16 JEFF ZUMBRUN, WHO TOLD YOU THAT, IN FACT, YOU CAN'T USE THESE

17 PRODUCTS, THEY'VE BEEN TESTED BY GULF STREAM AND THEY'RE NOT

18 APPROPRIATE.

19            YOU HEARD DR. WEDNER JUST STATE THAT ISOCYANATE

20 GLUES HAVE THEIR OWN PROBLEMS.  ISOCYANATES CAN CAUSE ASTHMA.  SO

21 WE DON'T BELIEVE THAT THE PLAINTIFFS HAVE BORE THEIR BURDEN OF

22 ESTABLISHING ALL THE ELEMENTS THAT THEY NEED TO ESTABLISH UNDER

23 THE LPLA.

24            I BELIEVE THAT'S ALL WE HAVE, YOUR HONOR.

25            THE COURT:  MR. WATTS, ARE YOU GOING TO ARGUE THAT?

1        MR. WATTS:  YES, SIR.  YOUR HONOR, LET ME TAKE A SECOND,

2   BUT FIRST, COUNSEL IS INCORRECT.  WE WENT THROUGH THE VERY

3   SPECIFIC ELEMENTS OF THE LPLA WITH RESPECT TO THE ALTERNATIVE

4   DESIGN CLAIM.

5        WITH RESPECT TO EACH OF THE PROPOSED ALTERNATIVE

6   DESIGNS, MR. SMULSKI GAVE THE OPINION THAT THE ALTERNATIVE

7   DESIGNS WERE AVAILABLE, THAT THEY WERE BOTH TECHNOLOGICALLY AND

8   ECONOMICALLY FEASIBLE, THAT HAD THEY BEEN USED, THE LEVEL OF

9   FORMALDEHYDE BEING EMITTED FROM THEM WAS EITHER NO FORMALDEHYDE

10  OR A LEVEL SO LOW THAT IT WOULDN'T BE SUBJECT TO ANY OF THESE

11  REGULATIONS.

12       NUMBER 3, WITH RESPECT TO HIS SECOND ARGUMENT THAT,

13  IN EFFECT, THAT THERE IS NOT THIS EVALUATION GOING ON, THERE WERE

14  SPECIFIC QUESTIONS ASKED WHETHER THERE WOULD BE ANY IMPAIRMENT TO

15  THE UTILITY OF THE PRODUCT OR ANY PROBLEMS WITH USING THAT AND

16  THERE WAS NOT, AND THAT'S SUFFICIENT UNDER THE LPLA.

17       WITH RESPECT TO THE FIRST ARGUMENT, AND THAT IS AS

18  CHRIS COOPER'S FEAR OF CANCER, NUMBER 1, THE EVIDENCE THAT YOU

19  HAVE IS SPECIFIC TO DR. SHWERY, WHO SAYS THAT THE MOTHER IS VERY

20  CONCERNED ABOUT IT, THAT SHE KNOWS THE CHILD KNOWS ABOUT IT AND

21  THE MOTHER TRIES NOT TO TALK TO HIM ABOUT IT BECAUSE OF THAT

22  CONCERN, AND THE MOTHER REITERATED THAT.  HIS ARGUMENT BASICALLY

23  GOES TO THE AMOUNT OF THE DAMAGES THAT SHOULD BE AWARDED FOR THAT

24  CONCERN AS OPPOSED TO ELIMINATING IT.

25       THE COURT:  ALL RIGHT.

1      MR. GLASS:  BRIEF REBUTTAL, YOUR HONOR?

2      THE COURT:  YES.

3      MR. GLASS:  VERY BRIEF.  I THINK YOU JUST HEARD COUNSEL

4   SAY THAT IT WAS FEAR THAT SHE HAD FOR CHRIS.  WE'RE TALKING ABOUT

5   CHRIS' MENTAL ANGUISH, SO SHE MAY BE CONCERNED, BUT CHRIS DID NOT

6   EXPRESS THAT CONCERN.

7        AND THEN SECONDLY, ON THE LPLA, I CAN CITE,

8   YOUR HONOR, TO SOME FIFTH CIRCUIT CASE LAW THAT SAID -- WELL,

9   FIRST OFF, YOU HEARD DR. SMULSKI WAS NOT AN EXPERT IN TRAVEL

10  TRAILER DESIGN, SO HE'S JUST POSITING THAT YOU CAN USE A WOOD

11  PRODUCT WITHOUT HAVING TESTED IT, AS I POINTED OUT, AND THE

12  FIFTH CIRCUIT IN THE CASE OF, GIVE ME ONE MOMENT, YOUR HONOR,

13  *LAWRENCE* CASE, *LAWRENCE V GENERAL MOTORS*, 73 F.3D 587,

14  FIFTH CIRCUIT 1986, THEY CONCLUDED THAT ON THE EVIDENCE PRESENTED

15  AT TRIAL, SIMPLY SAYING YOU CAN USE ANOTHER PRODUCT WITHOUT

16  EVALUATING THE UTILITY OF THAT PRODUCT AND HOW IT WAS GOING TO

17  ADVERSELY EFFECT THE USE OF THAT PRODUCT WAS NOT GOOD ENOUGH, AND

18  THEY GRANTED A REVERSE, ALLOWING IT TO GO TO THE JURY.

19      THE COURT:  I'M GOING TO DENY THE, WELL, BOTH OF THE

20  RULE 50 MOTIONS RELATIVE TO CHRIS COOPER'S CLAIM AND ALSO WITH

21  REGARD TO ALTERNATIVE DESIGN.  I THINK THAT IT'S NOT THE ROLE OF

22  THE COURT AT THIS POINT TO WEIGH THAT EVIDENCE WITH ANY DEGREE OF

23  CERTAINTY WITH REGARD TO THE HOLDING IN THE CASE, BUT RATHER

24  SIMPLY EVALUATE WHETHER THERE IS AN EVIDENTIARY BASIS FOR A

25  REASONABLE JUROR TO CONSIDER RELATIVE TO THOSE CLAIMS.  AND THE

1    COURT IS GOING TO DENY THOSE TWO MOTIONS AS PREVIOUSLY INDICATED

2    BY COUNSEL AND, BY THE COURT, GRANT THE MOTION RELATIVE TO

3    ALANA ALEXANDER'S PERSONAL INJURY CLAIM.

4            ALL RIGHT.  FLUOR.  MR. PENOT, I HAVE YOUR WRITTEN

5    BRIEF AND I HAVE THE WRITTEN OPPOSITION TO IT.  AND I HAVE

6    CONSIDERED THAT.  IS THERE ANYTHING YOU WOULD LIKE TO ADD IN

7    ADDITION TO THAT?

8            MR. PENOT:  NOT MUCH, YOUR HONOR.  ONE THING WE WOULD

9    JOIN IN, GULF STREAM'S MOTION TO DISMISS CHRIS COOPER'S FEAR OF

10   CANCER CLAIM.  I UNDERSTAND THAT'S BEEN DENIED.

11           THE COURT:  RIGHT.

12           MR. PENOT:  IF YOU GIVE ME JUST ONE MOMENT, YOUR HONOR,

13   TO CHECK.  SINCE YOU PUT IT THAT WAY, I WANT TO MAKE SURE THERE

14   WASN'T SOMETHING I WAS GOING TO ADD ORALLY THAT WAS NOT IN THE

15   WRITTEN BRIEF.

16           THE COURT:  THERE WERE SEVERAL THINGS, AND LET ME JUST

17   RECAP TO MAKE THE RECORD CLEAR.  THE WRITTEN MEMORANDUM THAT WAS

18   FILED ON BEHALF OF FLUOR SEEKS A JUDGMENT AS A MATTER OF LAW AS

19   TO THE -- FLUOR ARGUES THAT ITS CONDUCT WAS NOT THE CAUSE OF THE

20   PLAINTIFF'S ALLEGED INJURIES; AS PART AND PARCEL OF THAT, THAT

21   FLUOR DID NOT OWE A DUTY TO THE PLAINTIFFS, AND THAT THE INJURIES

22   WERE OUTSIDE THE SCOPE OF ANY DUTY THAT FLUOR MIGHT HAVE HAD, IF

23   THERE WERE SUCH A DUTY;

24           SECONDLY, THAT FLUOR HAD NO DUTY TO WARN THE

25   PLAINTIFFS OF ANY ALLEGED FORMALDEHYDE DANGER UNDER EHU;

1           AND THIRDLY, THAT FLUOR IS NOT LEGALLY RESPONSIBLE

2   FOR THE CONDUCT OF AN INDEPENDENT CONTRACTOR;

3           AND LASTLY, THERE IS NO EVIDENCE ANY PARTY

4   NEGLIGENTLY INSTALLED THE TRAILER AT ISSUE IN THIS CASE.

5           THOSE WERE THE ARGUMENTS THAT HAVE BEEN OFFERED IN

6   WRITING.

7           MR. PENOT:  AND, YOUR HONOR, JUST LOOKING AT MY NOTES, I

8   NOTICE ON THE "NO DUTY TO WARN," I WOULD POINT OUT THAT FLUOR,

9   WHEN ASKED BY ITS CUSTOMER ABOUT, YOU KNOW, WOULD YOU HELP US

10  WITH AN ISSUE WITH RESPECT TO FORMALDEHYDE WITH RESPECT TO THE

11  UNO SOUTHERN UNIVERSITY OF NEW ORLEANS PART, INFORMATION WAS

12  PROVIDED.  WHATEVER INFORMATION WAS AVAILABLE TO IT WAS PROVIDED.

13          THE COURT:  IN ADDITION TO WHAT HAS BEEN SUBMITTED IN

14  WRITING, COUNSEL, WOULD YOU LIKE TO ARGUE THE FLUOR MOTION OR

15  WOULD YOU RELY ON THE WRITTEN MATERIAL?

16          MR. MEUNIER:  YOUR HONOR, I'M NOT SURE THIS IS IN OUR

17  WRITTEN MATERIAL.  I WANT TO POINT TO THE TESTIMONY, THOUGH, OF

18  AL WHITAKER, WHO HAS TAKEN THE STAND AS THE WITNESS SPEAKING FOR

19  THE DEFENDANT FLUOR.

20          AND HE WAS SPECIFICALLY ASKED THE QUESTION,

21  WHETHER, IF THEY HIRE SOMEONE WHO KNOWS NOTHING ABOUT INSTALLING

22  TRAVEL TRAILERS, PUTS IT'S UP WRONG, BREAKS IT AND DOESN'T TIE IT

23  DOWN RIGHT, HE WAS ASKED, YOUR HANDS ARE CLEAN?  NO, SIR, HE

24  SAID, I WOULDN'T SAY THAT.  I WOULD HAVE A PROBLEM WITH THEM

25  HIRING SOMEONE LIKE THAT.  QUESTION, WHY?  ANSWER, WHY?  BECAUSE

1   THAT'S NOT THE MISSION.  THAT'S NOT THE JOB.  QUESTION, SO BACK

2   TO THE MISSION AND BACK TO THE JOB.  IF THE GUY THAT DID IT IS

3   NOT LICENSED?  ANSWER, THERE IS NO PROBLEM WITH HIM NOT BEING

4   LICENSED TO INSTALL A TRAVEL TRAILER.  IF YOU WOULD TURN THE PAGE

5   OF THIS EXHIBIT, AND HE TALKS ABOUT THAT.

6           THE OTHER TESTIMONY OF MR. WHITAKER, WHICH I THINK

7   CREATES, AT THE VERY LEAST, A JURY ISSUE ON THIS, IS THIS

8   QUESTION AND ANSWER:  QUESTION, TO BE CLEAR ON THIS, ONCE FLUOR,

9   WHO GETS THE CONTRACT WITH THE GOVERNMENT AND TURNS IT OVER TO

10  MLU, THEN THE SINS OF MLU ARE NOT THE SINS OF FLUOR, IS THAT WHAT

11  YOU'RE SAYING?  ANSWER, NO, SIR, I'M NOT SAYING THAT AT ALL.

12          JUDGE, THERE WAS AN INTERESTING STATEMENT IN THE

13  BRIEF ON THE PART OF FLUOR.  AND THEY CITED YOU TO THIS LAW,

14  WHICH WE'RE GOING TO ASK BE MADE A JURY CHARGE.  AND THIS IS

15  FLUOR'S STATEMENT OF THE LAW.

16          BEGIN WITH THE GENERAL PROPOSITION THAT THEY ARE

17  NOT VICARIOUSLY LIABLE LIKE AN EMPLOYER WOULD BE.  RIGHT?  WE ALL

18  AGREE WITH THAT.  A PRINCIPAL IS NOT LIABLE FOR THE OFFENSES AN

19  INDEPENDENT CONTRACTOR COMMITS IN THE COURSE AND THE SCOPE OF

20  PERFORMING HIS CONTRACTUAL DUTY.  THIS RULE IS SUBJECT TO AN

21  EXCEPTION.  WHEN THE PRINCIPAL RESERVES THE RIGHT TO SUPERVISE OR

22  CONTROL THE WORK OF THE INDEPENDENT CONTRACTOR OR GIVES EXPRESS

23  OR IMPLIED AUTHORIZATION OF AN UNSAFE PRACTICE.

24          SO IF THAT'S THE LAW, THE EVIDENCE IS CLEAR THAT

25  FLUOR HAD THE RIGHT TO SUPERVISE THE CONTROL.  NOW WHETHER THEY

1    REACHED OUT AND DID IT OR NOT IS THE NEGLIGENCE PART.

2            AND THEN DISJUNCTIVE OR GIVES EXPRESS OR IMPLIED

3    AUTHORIZATION.  I CAN'T IMAGINE SOMETHING MORE IMPLICIT OR MORE

4    EXPLICIT THAN HAVING A SAFETY RULE THAT YOU HAVE TO IMPROPERLY

5    JACK UP THE TRAILER A CERTAIN WAY AND THEN NOT EVEN HAVE IT

6    COMMUNICATED TO THE MAN WHO DID IT.

7            SO, YOUR HONOR, WE THINK THERE IS CERTAINLY A VERY

8    SIGNIFICANT JURY ISSUE OF FAULT AS TO FLUOR AND WE OPPOSE THE

9    MOTION.

10           THE COURT:  ALL RIGHT.  MR. PENOT, DO YOU WANT TO GO

11   AHEAD AND RESPOND?

12           MR. HILLIARD:  YOUR HONOR, MAY I ADD ONE MORE THING ON

13   THAT BRIEFLY THAT WAS NOT IN OUR BRIEF?  IT WAS THE TESTIMONY --

14           THE COURT:  WELL, I REALLY DON'T WANT TO TAG TEAM THIS

15   THING.

16           MR. HILLIARD:  OKAY, JUDGE.

17           THE COURT:  WHY DON'T YOU CONFER WITH MR. MEUNIER AND

18   LET HIM FINISH.  TELL HIM VERY BRIEFLY.

19           MR. MEUNIER:  DO YOU WANT TO TELL ME, BOB?

20           THE COURT:  WE COULD DO THIS, THEORETICALLY, FOR QUITE A

21   WHILE IF WE LET EVERY ATTORNEY AT THESE TABLES GET UP AND ADD

22   THEIR TWO CENTS.

23           MR. MEUNIER:  ALSO NOT IN THE BRIEF IS THE TESTIMONY

24   FROM ANGIE BAKSH THAT SHE SHOULD NOT -- THAT SHE DID NOT SIGN OR

25   INSPECT.  REMEMBER, THERE IS ANOTHER ISSUE, IT'S NOT JUST THE

1   IMPROPER JACKING, IT'S THE FAILURE TO REPAIR THE WALL DAMAGE THAT

2   SHOWED UP ON THE DOCUMENTS BEFORE INSTALLATION.

3        THE COURT:  DOES THAT NOT FALL UNDER THE MAINTENANCE

4   CLAIM, WHICH WAS DISMISSED PURSUANT TO A SUMMARY JUDGMENT?

5        MR. MEUNIER:  NO, SIR.  THE MAINTENANCE CLAIM HAS TO DO

6   WITH ONCE THE TRAILER'S INSTALLED.  WHAT WE'RE TALKING ABOUT IS

7   BEFORE THAT TRAILER EVER GOT HAULED, THERE IS EVIDENCE IN THIS

8   RECORD THAT THERE WAS WALL DAMAGE.  THAT THERE WAS SOMETHING

9   WRONG WITH THE WALL.

10       WE HEARD TESTIMONY ABOUT HOW THAT IS FLUOR'S

11   RESPONSIBILITY.  THEY ARE NOT SUPPOSED TO GO SET UP A UNIT THAT'S

12   GOT DAMAGE WHEN THEY KNOW ABOUT THE DAMAGE.  SO WE HEARD

13   TESTIMONY ABOUT INSPECTORS WHO SAW THAT DOCUMENT, HOW DID IT GET

14   OVERLOOKED, ET CETERA, ET CETERA.

15       SO THERE IS ACTUALLY TWO THINGS GOING ON WITH

16   RESPECT TO FLUOR'S FAULT, AND I HOPE THAT THE COURT HAS BEEN

17   DIRECTED TO BOTH THEORIES IN THE BRIEF, BUT TO THE EXTENT THAT

18   PART OF THE FAILURE TO REPAIR THE WALL DAMAGE IS NOT CLEAR, IT

19   SHOULD BE.

20       THE COURT:  ALL RIGHT.  MR. PENOT.

21       MR. PENOT:  YOUR HONOR, WITH RESPECT TO MR. WHITAKER'S

22   TESTIMONY THAT WAS PUT UP THERE, I'M NOT SURE WHAT THE POINT IS.

23   THE GUY WHO STOOD UP HERE, THE GUY WITH HIS BOOTS IN THE DIRT,

24   WAS A GUY WHO SAID, I'VE BEEN DOING IT FOR 20 OR 30 YEARS.  SO I

25   DON'T KNOW EVEN KNOW WHAT RELEVANCE THAT IS.

1          WITH RESPECT TO WALL DAMAGE, ALL WE KNOW IS THAT

2    SOME LADY WHO SAID SHE DIDN'T WRITE IT SAW IT, SOMEBODY SAW

3    SOMETHING WRONG WITH A WALL.  DO WE KNOW THAT THAT HAD ANYTHING

4    TO DO WITH PERMITTING INTRUSION OF MORE MOISTURE?  IT COULD HAVE

5    JUST BEEN A COSMETIC THING.  MR. PULLEN SAID SOMETIMES GUYS MISS

6    STUDS WITH A STAPLE GUN.  THE LEAK DOESN'T SHOW UP FOR ANOTHER

7    EIGHT MONTHS AFTER THEY MOVE IN.  SO I'M NOT SURE WHERE THAT GETS

8    THEM.

9          THE -- I'M SORRY, I'VE FORGOTTEN THE OTHER POINT.

10         MR. MEUNIER:  YOU COVERED IT.

11         MR. PENOT:  NO, I DIDN'T.

12         OH, INDEPENDENT, INDEPENDENT CONTRACTOR RIGHT TO

13   CONTROL.  THIS GENTLEMAN WHO CAME UP HERE WITH THE BOOTS IN THE

14   DIRT AND JACKED UP THE TRAILER SAID, I HAD MY OWN STUFF AND MY

15   OWN JACKS, I DID IT MY WAY.  AND IF FLUOR HAD TOLD ME TO DO IT

16   THAT WAY, I WOULDN'T DO IT BECAUSE I KNOW HOW TO DO THAT.  JUST

17   LIKE ON THE GOVERNMENT CONTRACTOR DEFENSE, YOUR HONOR SAYS TO ME,

18   YOU KNOW, THERE IS NOT REASONABLY-PRECISE SPECIFICATIONS FROM THE

19   GOVERNMENT ON HOW TO JACK.

20         YOU LOOK AT THE SUBCONTRACT.  THE SUBCONTRACT JUST

21   FOLLOWS THE GOVERNMENT CONTRACT.  WHAT WE DO IS, WE SAY,

22   SUBCONTRACTOR, WHEN YOU'RE DONE, THIS IS WHAT THE TRAILER SHOULD

23   LOOK LIKE.  WE DON'T TELL THEM HOW TO JACK.  NOW, WE HAVE SAFETY

24   TRAINING, WHICH THIS GENTLEMAN SAID, I WOULDN'T HAVE PAID

25   ATTENTION TO BECAUSE I KNOW BETTER IN TERMS OF HOW TO ACTUALLY DO

1  IT.

2          THE COURT:  ALL RIGHT.  THANK YOU.

3              IF YOU WILL BEAR WITH ME, SOMEHOW MY COPY OF THE

4  FEDERAL RULES THAT I HAD MARKED UP HAS BEEN REPLACED WITH ONE

5  THAT IS NOT MARKED, SO I'M TRYING TO FIND SOMETHING IN PARTICULAR

6  IN HERE.

7          MR. PENOT:  YOUR HONOR, MAY I JUST REMIND THE COURT OF

8  ONE OTHER POINT?

9          THE COURT:  GO AHEAD AND DO THAT.

10         MR. PENOT:  WE'RE TALKING ABOUT TWO LEVELS DOWN, ALL

11 RIGHT?  LEMIEUX WAS NOT FLUOR'S CONTRACTOR.  MLU WAS FLUOR'S

12 SUBCONTRACTOR.

13         THE COURT:  I UNDERSTAND.

14             IN THE COMMENTS UNDER RULE 50, THE COURT SAYS, THE

15 COURT MAY OFTEN WISELY DECLINE TO RULE ON A MOTION FOR JUDGMENT

16 AS A MATTER OF LAW MADE AT THE CLOSE OF THE EVIDENCE, AND IT IS

17 NOT INAPPROPRIATE FOR THE MOVING PARTY TO SUGGEST A POSTPONEMENT

18 OF THE RULING UNTIL AFTER THE VERDICT HAS BEEN RENDERED.

19             I THINK I WILL -- WELL, IT'S THE COMMENT'S WORD --

20 I WOULD WISELY DECLINE TO RULE ON THE RULE 50 MOTION OF FLUOR

21 UNTIL AFTER THE JURY HAS RENDERED ITS VERDICT.  I THINK THAT'S

22 THE MOST PRUDENT THING TO DO UNDER THESE CIRCUMSTANCES FOR A

23 VARIETY OF REASONS, WHICH, AT THIS POINT, I DON'T SEE ANY REASON

24 TO DISCUSS OTHER THAN THE ARGUMENTS THAT YOU ALL HAVE MADE, I

25 THINK, CERTAINLY IMPLICIT IN THOSE ARGUMENTS.

1              THE COURT WOULD DECLINE TO RULE ON RULE 50 AND

2    DEFER UNTIL THE CONCLUSION OF THE JURY'S DELIBERATIONS AND HAVE

3    DELIVERED A VERDICT.

4              ANYTHING ELSE WE NEED TO PUT ON THE RECORD AT THIS

5    TIME, COUNSEL?

6         MR. MEUNIER:  I HAVE A REBUTTAL PROFFER, JUDGE, I CAN DO

7    IT WITH THE COURT REPORTER.

8         THE COURT:  LET'S GO AHEAD AND DO THAT.  WHAT WE WOULD

9    LIKE TO DO IS TO HAVE OUR JURY CHARGE CONFERENCE HERE.  WE'LL

10   GIVE YOU A CHANCE TO GO OUT AND GRAB A QUICK SANDWICH BEFORE WE

11   RECONVENE.  I'VE GOT ABOUT 1:15 HERE.

12             MR. MEUNIER, HOW LONG IS IT GOING TO TAKE YOU TO DO

13   THAT?

14        MR. MEUNIER:  FIFTEEN SECONDS.

15        THE COURT:  GO AHEAD AND DO THAT.  IF YOU ALL CAN MEET

16   ME IN CHAMBERS AT -- LET ME ASK YOU THIS:  YOU'VE READ -- OTHER

17   THAN, OTHER THAN REVISIONS THAT WILL BE NECESSITATED BY THE

18   THINGS WE'VE ARGUED AND RULED ON HERE, HOW SUBSTANTIAL OF AN

19   EXERCISE IS THIS GOING TO BE?  BECAUSE WE HAVE ALREADY HAD A JURY

20   CHARGE CONFERENCE PRETRIAL, WHICH, OF COURSE, COULD NOT ENTIRELY

21   ANTICIPATE ALL OF THE EVIDENCE.  DO WE CONTEMPLATE WHOLESALE

22   CHANGES TO THE JURY INSTRUCTIONS?  BECAUSE IF WE ARE, WE'LL START

23   AT TWO.  IF NOT, WE'LL GIVE YOU A LITTLE LONGER FOR LUNCH.

24   THAT'S THE ONLY REASON I'M ASKING.

25             MR. MEUNIER:  WE'LL START AT TWO.  I THINK WE BETTER

1  START AT TWO.

2          THE COURT:  FAIR ENOUGH.  LET'S GO AHEAD AND START AT

3  2 O'CLOCK IN CHAMBERS.

4          (WHEREUPON, AT 1:13 P.M., THE PROCEEDINGS WERE

5  CONCLUDED.)

6                  GULF STREAM PROFFER NUMBER 1

7  BY MR. WEINSTOCK:

8          PAGE 215 OF KAREN PACHECO'S DEPOSITION.  QUESTION, HAVE

9  YOU SPOKEN WITH ANY OTHER PERSONS WHO ARE EXPERTS IN THIS CASE

10  SUCH AS DR. KORNBERG OR DR. BARNES?  ANSWER, ALL RIGHT.  NO,

11  ACTUALLY, I HAVEN'T.  DR. KORNBERG WANTED TO HAVE A CONVERSATION

12  ABOUT THIS PATIENT, BUT I NEVER DID DISCUSS IT WITH HIM.

13  QUESTION, WHY NOT?  ANSWER, BECAUSE, AGAIN, MY CHARGE IS TO BE AS

14  OBJECTIVE AS POSSIBLE.  REGARDLESS OF WHO IS USING ME, I WAS

15  CONCERNED THAT DR. KORNBERG WAS HEAVILY VESTED IN THE PLAINTIFFS,

16  AND I DIDN'T WANT TO HEAR HIS POINT OF VIEW.

17          SO WE'LL MAKE THIS 3.  WE'LL MAKE THIS NUMBER 3.

18  YES, MA'AM.

19          THAT'S THE END OF GULF STREAM'S PROFFER.

20

21                  PLAINTIFF'S PROFFER NUMBER 3

22  BY MR. MEUNIER:

23          THIS IS PLAINTIFFS' REBUTTAL PROFFER NUMBER.  WE MAY

24  HAVE A PROFFER DURING OUR CASE IN CHIEF.

25          PLAINTIFFS WOULD PROFFER THE FOLLOWING PORTION OF

1   THE TRANSCRIPT FROM THE TRIAL DEPOSITION OF DR. CHRIS DEROSA.

2   AND IT BEGINS AT LINE 22, PAGE 84.  QUESTION, IN THE ANALYSIS OF

3   THE 96 UNOCCUPIED UNITS THAT WAS PERFORMED, I THINK YOU SAID

4   UNDER THE DIRECTION OF LITTLE AND WRIGHT, ANSWER, YES.  QUESTION,

5   WHAT WAS THE REFERENCE VALUE PPM VALUE USED?  WE THEN GO TO

6   PAGE 85, LINE 4.  ANSWER, MY RECOLLECTION IS THAT IT WAS .3 PARTS

7   PER MILLION.

8           WE THEN GO TO PAGE 85, BEING AT LINE 7.  QUESTION,

9   SO NOT .04 FOR SHORT-TERM, NOT .03 FOR INTERMEDIATE, NOT .008 FOR

10  LONG-TERM, BUT .3 PPM WAS USED FOR THAT STUDY?  ANSWER, FOR THAT

11  EVALUATION, .3 PARTS PER MILLION WAS USED.  IT WAS A VALUE

12  DERIVED FROM A SERIES OF DOCUMENTS CALLED "MANAGING HAZARDOUS

13  MATERIALS INCIDENTS," INTENDED FOR FIRST RESPONDERS AND

14  HEALTHCARE PROVIDERS IN EMERGENCY EVENTS.  IT'S A LEVEL AT WHICH

15  SENSITIZED INDIVIDUALS WOULD BEGIN TO EXHIBIT SYMPTOMS UPON ENTRY

16  AND UP TO THREE HOURS AFTER ENTRY INTO THE TRAILER.

17          AND WE'LL MARK THAT AS PLAINTIFF PROFFER NUMBER 3,

18  AND I'LL ALSO GIVE THE WRITTEN TRANSCRIPT TO THE COURT.

19               GULF STREAM PROFFER NUMBER 2

20  BY MR. GLASS:

21      THIS IS THE TRIAL DEPOSITION, THOUGH I DON'T KNOW WHAT

22  NUMBER IT IS, I THINK IT WOULD BE NUMBER 2, EXCUSE ME?  YES, 2.

23          THIS IS REGARDING THE TRIAL TESTIMONY OF STANLEY

24  LARSON.  AND WE WOULD LIKE TO PROFFER INTO THE EVIDENCE SOME

25  TESTIMONY CONTAINED ON PAGE 40, STARTING ON PAGE 40, LINE 17.

1        QUESTION, AND THIS IS A PAGE FROM THE DOCUMENT YOU

2   JUST DISCUSSED EARLIER, EXHIBIT NUMBER 4?  ANSWER, IT LOOKS THE

3   SAME.  QUESTION, AND THIS HAS ONE OF THE UNITS IN THE COLUMN HERE

4   THAT'S NOT ALL BLACKED OUT, DO YOU SEE THAT?  ANSWER, YES.

5   QUESTION, AND THE INFORMATION AS PROVIDES IN THE COLUMNS THAT ARE

6   NOT BLACKED OUT, WHAT IS THE INFORMATION PROVIDED IN THOSE

7   FIELDS?  THE ADDRESS -- THE ANSWER, THE ADDRESS TO THE UNIT,

8   GEOGRAPHICAL INFORMATION, THE GEOLAT AND LONG, AND THEN THE GREEK

9   CODE FOR EACH.

10        QUESTION, IF A TRAILER WAS LISTED ON THE DOCUMENT

11  EXHIBIT 4 AND EXHIBIT 5 HERE, WERE THOSE UNITS THAT DHOPS WAS

12  INSTRUCTED TO DELIVER FLYERS TO?  YES.

13        THEN I'M JUMPING TO PAGE 40, LINE 9.  QUESTION,

14  THUS, FOR EXAMPLE, ON EXHIBIT 5 HERE, IF YOU LOOK AT THE FIFTH

15  COLUMN THERE, IT SAYS STATUS?  ANSWER, YES.  QUESTION, IS THAT

16  CORRECT?  ANSWER, WELL, UXA, ALL CAPS, STATUS.  QUESTION, UXA,

17  WHAT DOES THAT REFER TO?  ANSWER, THAT'S THE STATUS OF THE UNIT

18  IN THE FRRATS, F-R-R-A-T-S, ALL CAPS, DATABASE, AND QUESTION, AND

19  IF YOU GO DOWN TO THE COLUMN THAT IS NOT BLOCKED OUT THAT RUNS

20  ACROSS THERE IN THE FIRST COLUMN THAT HAS 16903; IS THAT CORRECT?

21  YES.  ANSWER, YES.

22        QUESTION, WHAT IS THAT REFERRING TO?  ANSWER,

23  THAT'S THE KEY NUMBER FOR EACH RECORD WITHIN THE DATABASE SO THAT

24  WE CAN UPDATE THE CORRECT DATABASE WITH THE INFORMATION THAT

25  COMES IN.

1        THEN I'M GOING TO JUMP DOWN TO PAGE 42, LINE 18.

2   QUESTION, AND THEN THE NEXT COLUMN SAYS, UXA STATUS, COMMA,

3   VACANT, NOT READY, PERIOD.  WHAT IS THAT REFERRING TO, QUESTION

4   MARK?  ANSWER, IT MEANS THAT IN, IN THE SYSTEM, THERE IS NOBODY

5   ASSIGNED TO THAT TRAILER, BUT IT'S STILL ON THE GROUND.

6   QUESTION, THE FACT -- QUESTION, THE FACT THAT IT WAS IDENTIFIED

7   IN FRRATS AS VACANT AND NOT READY, COMMA, DOES THAT MEAN THAT A

8   FLYER WOULD NOT HAVE BEEN SENT TO THAT UNIT?  ANSWER, NO, NO.

9   EVERY ONE OF THESE, THEY WERE SUPPOSED TO DELIVER A FLYER TO.

10        QUESTION, AND WHY WOULD YOU BE DELIVERING A FLYER

11  TO A UNIT THAT WAS MARKED IN THE FRRATS SYSTEM AS VACANT, NOT

12  READY?  ANSWER, A LOT OF OUR TRAILERS THAT WERE MARKED VACANT

13  STILL HAD OCCUPANTS IN THEM.  IT HADN'T BEEN SET TO BE

14  DEACTIVATED YET.  THERE'S A POSSIBILITY SOMEBODY COULD BE LIVING

15  IN THEM.  QUESTION, WHEN YOU MADE THE SELECTION OF WHICH UNITS

16  WOULD GET FLYERS DELIVERED AND WHICH ONES WOULDN'T, HOW DID YOU

17  MAKE THAT?  WAS THERE, WHAT WAS THE DETERMINATION OF WHICH ONES

18  WOULD AND WOULDN'T GET IT?  ANSWER, I DIDN'T PULL FROM FRRATS

19  ANYTHING THAT HAD A DEACTIVATION WORK ORDER CUT FROM IT.

20        QUESTION, AND A DEACTIVATION WORK ORDER, WHAT IS

21  THAT REFERRING TO?  ANSWER, A DEACTIVATION WORK ORDER IS WHAT WE

22  SENT TO THE CONTRACTORS TO GO AND REMOVE THE TRAILERS AND BRING

23  IT BACK.  QUESTION, AND WHAT -- AT WHAT POINT IN TIME WOULD YOU

24  ISSUE A DEACTIVATION ORDER?  ANSWER, WHEN THE -- THE APPLICANT NO

25  LONGER NEEDED THE TRAILER.  QUESTION, AND IN THOSE CASES, WOULD

1    THE APPLICANT HAVE AFFIRMATIVELY CONTACTED FEMA AND SAID I NO

2    LONGER NEED THE UNIT?  ANSWER, YES.

3           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE

4    PROFFERS WERE CONCLUDED.)

5                         *    *    *

6

7

8

9

10                   REPORTER'S CERTIFICATE

11

12     I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

13   MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

14   REPORTER, OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT

15   COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE

16   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY

17   ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN

18   THE ABOVE-ENTITLED AND NUMBERED MATTER.

19

20

21                         *S/CATHY PEPPER*

22                         CATHY PEPPER, CRR, RMR, CCR

23                         OFFICIAL COURT REPORTER

24                         UNITED STATES DISTRICT COURT

25