```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2      ***********************************************************

 3
        IN RE:  FEMA TRAILER
 4      FORMALDEHYDE PRODUCTS              Docket No. MDL-1873(N)
        LIABILITY LITIGATION              New Orleans, Louisiana
 5                                        Friday, July 17, 2009

 6      ***********************************************************

 7
                     TRANSCRIPT OF TELEPHONE CONFERENCE
 8            HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                      UNITED STATES DISTRICT JUDGE
 9

10      APPEARANCES:

11      FOR THE PLAINTIFF
        STEERING COMMITTEE:       GAINSBURGH BENJAMIN DAVID
12                                MEUNIER AND WARSHAUER
                                  BY:  JUSTIN I. WOODS, ESQ.
13                                2800 Energy Centre
                                  1100 Poydras Street, Suite 2800
14                                New Orleans, LA 70163

15
                                  LAW OFFICES OF FRANK J. D'AMICO, JR.
16                                BY:  FRANK J. D'AMICO, JR., ESQ.
                                       AARON AHLQUIST, ESQ.
17                                622 Baronne St.
                                  New Orleans, LA 70113
18

19      FOR THE GOVERNMENT:       UNITED STATES DEPARTMENT OF JUSTICE
                                  BY:  HENRY T. MILLER, ESQ.
20                                     JONATHAN R. WALDRON, ESQ.
                                       Civil Division - Torts Branch
21                                P.O. Box 340, Ben Franklin Station
                                  Washington, D.C. 20004
22

23      FOR SHAW:                 BAKER DONELSON BEARMAN
                                  CALDWELL & BERKOWITZ
24                                BY:  MICHAEL DAVID KURTZ, ESQ.
                                       KAREN K. WHITFIELD, ESQ.
25                                201 St. Charles Ave., Suite 3600
                                  New Orleans , LA 70170
```

```
 1

 2    FOR FOREST RIVER, INC.:      GEIGER, LABORDE & LAPEROUSE
                                   BY:  ERNEST P. GEIGER, JR., ESQ.
 3                                      CARSON STRICKLAND, ESQ.
                                   One Shell Square
 4                                 701 Poydras St., Suite 4800
                                   New Orleans, LA 70139-4800
 5

 6
      Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
 7                                 500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
 8                                 (504) 589-7776

 9


10
         Proceedings recorded by mechanical stenography, transcript
11    produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2                  (FRIDAY, JULY 17, 2009)

 3                  (TELEPHONE CONFERENCE)

 4

 5         THE COURT:  Hello.  Good morning.  Who all do we have on

 6    the line?  Let's do a quick role call.

 7         MR. WOODS:  Justin Woods.

 8         MR. MILLER:  Henry Miller and Jonathan Waldron.

 9         MR. GEIGER:  Ernie Geiger and Carson Strickland for

10    Forest River.

11         MR. KURTZ:  David Kurtz and Karen Whitfield for Shaw.

12         THE COURT:  Anybody else?

13         MR. D'AMICO:  Frank D'Amico and Aaron Ahlquist on behalf

14    of Lyndon Wright.

15         THE COURT:  Anybody else?  All right.  And on my end here

16    I have the court reporter, Karen, and my law clerk Amanda.

17         We have pending this motion to amend the complaint with

18    regard to the, I think it's the third bellwether, Lyndon T. Wright

19    v. Forest River, Inc., 09-2977.  This was a motion for leave to

20    file first supplemental and amended complaint and in it, as I

21    understand the briefing and the complaint itself, there is some

22    allegations regarding injury to the plaintiff caused by mold and

23    inhalation of substances that are mold related, as opposed to

24    inhalation or exposure to formaldehyde.  Am I correct in that?

25         MR. D'AMICO:  This is Frank D'Amico, may I address the
</pre>

12:15:51  1    court on that issue?

12:15:54  2              THE COURT:  Just tell me if that's the intent of the

12:16:00  3    complaint, that's what it seems to say.  Is that not correct?

12:16:07  4              MR. D'AMICO:  Yes.  Can I tell you why we made those

12:16:15  5    allegations?

12:16:17  6              THE COURT:  Not yet.

12:16:24  7              MR. D'AMICO:  Okay.

12:16:28  8              THE COURT:  Let me tell you the problem with that is that

12:16:39  9    this case is called in re:  FEMA Trailer Formaldehyde Products

12:16:49 10    Liability Litigation.  The MDL was designed to handle common

12:16:56 11    allegations from several districts relative to formaldehyde

12:17:02 12    exposure.  I have set five bellwether trials so that we can get

12:17:08 13    results which can be -- from which we can broadly extrapolate some

12:17:17 14    prediction or prophecy or general notion of how the vast majority

12:17:43 15    of these cases are going to be determined, if all of them were

12:17:48 16    tried separately.  My concern is that --

12:17:52 17              And by the way, out of the five we have picked, this is

12:17:58 18    the first and only case where mold exposure as a component claim

12:18:10 19    for compensation has been made.  My understanding of the expert

12:18:13 20    reports was that mold was found in some of the subject trailers was

12:18:22 21    simply evidence of moisture which contributed to the amount of

12:18:28 22    formaldehyde in the air which the plaintiff or the various

12:19:06 23    plaintiffs would have been exposed to, but not a cause of the

12:19:15 24    injury itself.

12:19:15 25              So I am very concerned about injecting an entirely new

12:19:25  1   claim for injury based on mold exposure, which is directed against

12:19:36  2   one defendant, in this case Shaw.  I don't think that result tells

12:19:52  3   us anything about how the MDL can be resolved.  If it is to be

12:19:59  4   resolved, in this venue.  Certainly that claim, if it's intended to

12:20:14  5   be asserted and certainly if Mr. Wright believes that's the cause

12:20:19  6   of his injury, that case can be tried when all of these cases are

12:20:29  7   broken up and sent back out of the MDL and that would be my intent.

12:20:48  8          MR. D'AMICO:  Judge, can I address it now?

12:20:54  9          THE COURT:  Go ahead.

12:20:55  10         MR. D'AMICO:  You may have read our brief which we've

12:21:00  11  outlined the CDC findings.  In that the CDC found that 21 percent

12:21:09  12  of all trailers they tested had mold, significant amounts of mold.

12:21:24  13  You may have also looked at a document that FEMA circulated to all

12:21:31  14  of the housing residents warning them of the confounding factors

12:21:42  15  and what to do about mold in their trailers.  And what they state

12:22:01  16  in that warning is that the symptoms may not last when you're away

12:22:22  17  from your home but reappear, they reappear, the indoor pollutants

12:22:58  18  that may include formaldehyde or other pollutants consisting of

12:23:16  19  dust, mold and smoke.  Those factors have been well-known to the

12:23:26  20  government and scientific community for years.

12:23:29  21         This is a formaldehyde case but as a defendant Forest

12:23:35  22  River has pointed out in its opposition to our supplemental and

12:23:43  23  amended petition, they intend to pursue the issue of mold and

12:23:56  24  smoking in the Lyndon Wright case as confounding factors that may

12:24:10  25  have affected his health.  And because of that factor --

12:24:20  1        Look, the plaintiffs have tried every way possible not to

12:24:27  2  talk about mold.  We don't want to have to talk about the smoking

12:24:33  3  or dust or mold and we would like the court to keep all of those

12:24:50  4  factors out and just try bellwether plaintiffs that are purely

12:24:59  5  formaldehyde cases, but your Honor hasn't done that.  Your Honor

12:25:17  6  did not exclude cases where smokers were involved and your Honor

12:25:22  7  has not excluded cases where mold may be involved, and I think for

12:25:28  8  good reason.  Because in this case, in this MDL we know from the

12:25:45  9  CDC at least --

12:25:49 10        THE COURT:  It's never been raised that mold was

12:26:00 11  involved.  It's never been raised on any of the bellwether

12:26:03 12  selections that I have made that, well, Judge, this case has the

12:26:16 13  coinciding factors of formaldehyde and mold.  That was not a

12:26:21 14  criteria for picking.  It was raised that this person's a smoker,

12:26:28 15  that one is not, and that would be, of course, something that the

12:26:37 16  defendants would not be held responsible for if a smoker, if

12:26:47 17  plaintiff's health was affected by a history of smoking.

12:26:53 18        But it was not part of the bellwether criteria that,

12:26:59 19  well, this case contains a claim for mold exposure.

12:27:06 20        Go ahead, I'm sorry to interrupt you, but go ahead.

12:27:10 21        MR. D'AMICO:  Well, Judge, we did not get to select who

12:27:16 22  the plaintiffs would be, unfortunately.

12:27:20 23        THE COURT:  Wait, wait.  That's news to me.

12:27:36 24        MR. D'AMICO:  Judge, we would like to have had a criteria

12:27:41 25  where we had certain statistical analysis and we could look at the

12:28:06 1   greater group and try to select certain plaintiffs who were

12:28:14 2   representative of certain things.

12:28:18 3           THE COURT:  Justin, do you want to step in here?  How did

12:28:25 4   we wind up with Mr. Wright?  That brings me to the point of my

12:28:36 5   e-mail, maybe we need somebody else.

12:28:42 6           MR. WOODS:  I am not certain that we knew at the time

12:28:46 7   that we came to agreement on Lyndon Wright that we knew that mold

12:29:01 8   would be an issue in his claim.  I believe that that occurred,

12:29:07 9   Frank, please correct me if I'm wrong, I believe that came about --

12:29:27 10          MR. D'AMICO:  After he was selected sometime in May.

12:29:31 11          MR. WOODS:  After he was selected.

12:29:33 12          MR. D'AMICO:  He was selected on April 8th, we met with

12:29:37 13  him, reviewed his case, went over facts, and the defendants point

12:29:47 14  out it's not stated in his plaintiff fact sheet, mold is not stated

12:30:04 15  in the plaintiff fact sheet so we didn't have any notice.

12:30:10 16          THE COURT:  I saw that, I asked for that and it's not

12:30:16 17  stated.

12:30:18 18          MR. D'AMICO:  But I don't think there is a line on there

12:30:25 19  or anything that would require him to say that.  But I asked for

12:30:34 20  the fact sheet for that reason, not that he was trying to hide it.

12:31:37 21          THE COURT:  I understand your point.

12:31:40 22          MR. D'AMICO:  We didn't find out until after he was

12:31:43 23  selected.  Now faced with the fact that he is selected and the

12:31:56 24  defendants certainly have stated to you that they want to go into

12:32:09 25  the mold and the smoking, how do we allow the defendants to raise

12:32:33  1   it as a confounding factor and the plaintiffs aren't allowed then

12:32:42  2   to speak and find out in fact it is causes of his injuries?

12:32:53  3           THE COURT:  That's a good question and we're going to get

12:33:00  4   them to answer that as soon as you're finished.

12:33:23  5           MR. D'AMICO:  That's the point.  I don't think it's

12:33:29  6   disrupting your orderly fashion of handling this MDL if we do kick

12:33:41  7   out the mold case.  My statistical analysis showed that about 15 to

12:33:50  8   20,000 of the known plaintiffs will have mold in their trials, so

12:33:59  9   do we want to exclude 15 to 20,000 of this potential pool of

12:34:10  10  plaintiffs and just kick them to the rear and cash them out?

12:34:23  11          I don't think that helps the court do what you've stated

12:34:28  12  you want to do on this call, so to try to get some guidance and try

12:34:40  13  to bring resolution to the whole case the problem is that we -- the

12:35:06  14  problem isn't the claim or the group of people who have a mold

12:35:12  15  exposure that they believe supports an award of damages, the

12:35:20  16  problem is that it is one of the bellwethers that is going to be

12:35:30  17  fast approaching in the coming months, I think this one is set for

12:35:36  18  December, that's the problem.

12:35:39  19          If we want to have a bellwether that specifically

12:35:44  20  involves a mold claim in order so that we can get a representative

12:35:54  21  sample, we can try Mr. Wright's case, but it was not designed to be

12:36:02  22  one of the first of the bellwethers.  So maybe we need to put

12:36:09  23  Mr. Wright on ice and go ahead and pick another one to try in

12:36:36  24  December and try a mold case.  The problem is we've got deadlines

12:36:45  25  that have already come and we haven't heard from the defense yet,

12:36:53  1    but I sure hope that when they're allowed to speak they're not

12:37:02  2    going to say, yeah, we intend to bring out that his injuries were

12:37:26  3    not the cause of formaldehyde, they were caused by mold.  Because

12:37:31  4    if they are arguing that then they are opening the door to both

12:37:39  5    plaintiff and defendant expert representing the effects of mold.

12:37:49  6         MR. WOODS:  I can tell you, your Honor, that I believe

12:37:54  7    that that will be the position.

12:37:56  8         THE COURT:  Well, let's hear from them.

12:38:04  9         MR. GEIGER:  Judge, this is Ernie Geiger.  First of all,

12:38:17 10    the issue of mold may be raised first by this plaintiff, Judge, but

12:38:34 11    this is not or shouldn't have been a new issue to the plaintiffs.

12:38:41 12    It may not have been in their fact sheet but we finished deposing

12:38:49 13    Mr. Wright Friday a week ago and Mr. Wright clearly indicated that

12:39:07 14    he knew about this issue, knew about it when he moved into the

12:39:21 15    trailer, complained about it early on --

12:39:48 16         THE COURT:  He knew about mold?  You say this issue.

12:39:52 17         MR. GEIGER:  Yes.  And it never appeared in any fact

12:39:58 18    sheet.  I don't know if he's had a chance to read what we filed

12:40:12 19    last night.

12:40:14 20         THE COURT:  I haven't.  And quite honestly, you know,

12:40:20 21    following something in response to my e-mail really, you know, I

12:40:31 22    don't know why we keep clogging up the record.

12:40:39 23         But go ahead.

12:40:46 24         MR. GEIGER:  Because it became an issue with your e-mail.

12:40:52 25         THE COURT:  In response to my e-mail but that's not a

12:40:59 1   motion.  Go ahead -- wait.  I want to finish hearing what

12:41:34 2   Mr. Geiger says.

12:41:40 3        Are we going to argue about the effect of mold on this

12:41:47 4   plaintiff, are the defendants going to argue that the plaintiff's

12:41:55 5   injuries were caused not by formaldehyde but rather by mold, and,

12:42:05 6   therefore, the plaintiff should recover zero, is that going to be

12:42:33 7   the defense strategy?

12:42:38 8        MR. GEIGER:  Judge, I will tell you that when I first

12:42:42 9   learned of the mold issue I went to my experts and asked them the

12:42:52 10  effect.  Frank told me that my expert, one of the experts hired by

12:43:05 11  the defendant said it had an effect in a deposition last week -- I

12:43:16 12  mean this week.  I didn't attend it but the response I got back

12:43:29 13  late last night was, no, Dr. Cole didn't say that mold could cause

12:43:40 14  asthma.

12:43:52 15       So the answer to your question is, Judge, since he just

12:43:57 16  raised this, I've just raised it with my experts.

12:44:16 17       THE COURT:  Right.

12:44:22 18       MR. GEIGER:  I can't tell you.  I certainly know now from

12:44:31 19  taking a deposition he's been exposed to mold not only in this case

12:44:49 20  in his trailer, but he's been exposed to mold in all of his

12:44:59 21  employment history outside of the use -- outside of the time in the

12:45:09 22  trailer because he is an HVAC maintenance engineer when he did that

12:45:29 23  at City Hall, so his exposure to other things at other locations

12:46:08 24  and whether or not they have an effect on his health going to be an

12:46:14 25  issue, sure they are, Judge.

1   I mean, he was exposed to other chemicals when he was a

2   maintenance mechanic at CDC, he was exposed to other chemicals when

3   he was a maintenance engineer at the Hyatt, he was exposed to mold

4   at both of those locations.  He changed filters at those locations,

5   we found all of that out on Friday.  So are those going to be

6   issues relative to his health, well, of course they are.

7   THE COURT:  But then won't the defendants agree then that

8   if we're going to talk about the effect of mold on this plaintiff

9   that plaintiffs should then be allowed to make a claim for the

10  effect of mold that was caused, perhaps -- obviously they've got to

11  meet their burden of proof -- but mold that was exposure that was

12  caused by a defendant or defendants?

13  MR. KURTZ:  The answer to that question is no.

14  THE COURT:  Why not in light of what Mr. Geiger just

15  said?

16  MR. KURTZ:  First of all, Judge, I mean, we do not, we

17  are not going to contend that mold in his trailer is a cause of

18  whatever health effects that he is currently suffering.  Now,

19  Mr. Geiger listed a bunch of other locations and this person's work

20  and experiences outside of work history outside of the trailer are

21  relevant to this case.  And if he is picking up health problems

22  from other locations, then that's pretty relevant.

23  But mold within this trailer we don't think is relevant

24  to this case.  We don't think that he should be allowed to amend

25  his pleadings to add something new at this late date.

01:04:48 1      THE COURT:  If mold, if any injury for this plaintiff is

01:04:53 2 going to be attributed to his exposure to mold and not formaldehyde

01:04:59 3 then all of his exposure to mold is going to be relevant.  I don't

01:05:05 4 see how you can say, well, it's only relevant if it caused it

01:05:13 5 outside of my client's actions but it's not relevant if my client

01:05:21 6 caused mold to be present where the plaintiff resided.  You can't

01:05:28 7 have it both ways.

01:05:30 8      I'm telling you I did not want to have a mold claim as

01:05:38 9 part of one of these bellwether trials, I don't think that that is

01:05:43 10 the way to go.  But if we are going to litigate the effect of mold,

01:06:01 11 we are going to litigate the effect of mold wherever it comes from

01:06:08 12 and whoever caused it to be present.

01:06:13 13      MR. D'AMICO:  Judge, I have no information right now from

01:06:17 14 any of my experts that they are going to say that the exposure to

01:06:23 15 mold caused any of his present health conditions, if that's where

01:06:34 16 you think we are going with this.

01:06:37 17      THE COURT:  I hear what you're saying, but I hear

01:06:42 18 Mr. Kurtz saying something different, am I correct?

01:06:47 19      MR. KURTZ:  If you heard that from me, I didn't say that

01:07:23 20 very well.  I am saying that his other work experiences, not

01:07:31 21 necessarily mold, but whatever he is getting exposed to could be

01:07:38 22 relevant.  I don't think that mold has any part in this case

01:07:43 23 whether it's from within the trailer or without it.

01:07:50 24      THE COURT:  Okay.  Well, there are two ways we can do

01:08:09 25 this:  One is that we not have a mold exposure claim in this case.

01:08:15 1    That's entirely up to plaintiffs whether they want to continue on

01:08:20 2    with Mr. Wright and litigate the formaldehyde exposure claim, there

01:08:32 3    will be no expert opinion from any expert regardless of who calls

01:08:37 4    them saying that mold in any way contributed or caused the injury

01:08:44 5    that Mr. Wright complains about.  That's one way to go.  That would

01:08:50 6    require the plaintiff, in essence, to abandon a claim for injury

01:09:09 7    caused by mold if he has one.

01:09:13 8        I am not requiring him to do that and I am not going to

01:09:17 9    rule that he can't bring that claim because it is time barred at

01:09:23 10   this point based on the scheduling order.

01:09:29 11       The other way to do this, if Mr. Wright insists that he

01:10:10 12   does have a claim based on mold exposure which was caused by one or

01:10:16 13   more of the defendants in this case, is that we can pull him out of

01:10:26 14   the bellwether rotation, maybe put him next summer, and we will try

01:10:34 15   the combination formaldehyde/mold with expert opinions from both

01:10:41 16   sides about mold exposure, but it won't be the December bellwether.

01:10:50 17   We will substitute somebody else who has solely a formaldehyde

01:10:58 18   claim in the bellwether spot for December, the Forest River

01:11:04 19   bellwether spot.

01:11:06 20       So those are the two options that we have.  But I am not

01:11:10 21   going to hear anybody cite mold as the cause for his injuries if

01:11:32 22   the plaintiffs can't do it, the defendants can't do it, so I don't

01:11:38 23   want to have any expert testimony that talks about mold exposure as

01:11:43 24   a contributing cause to his injury.  So where does that leave us?

01:11:49 25       MR. D'AMICO:  This is Frank D'Amico.  I understand your

01:11:57  1    position and I don't take issue with it.  The only problem is we're

01:12:03  2    not able to abandon the issue of mold based on the fact that it is

01:12:10  3    a known confounding factor, and to satisfy the scientific method

01:12:16  4    our experts have to, they must do a differential diagnosis.  And,

01:12:58  5    look, it may turn out that we do the speciation and mold testing

01:13:14  6    that mold is not a factor in his case.  But unless we test it to

01:13:25  7    find out, we won't know that answer.

01:13:34  8         And if we tell our experts that, look, you can't follow

01:13:36  9    the scientific method, you can't do a differential diagnosis, you

01:14:09 10    are not allowed to rule out other confounding factors, they are

01:14:16 11    going to look at me and say, Frank, I am not going to testify in

01:14:26 12    your case.

01:14:28 13         THE COURT:  Frank, all of that is well and good, and I

01:14:33 14    encourage you all to continue to get expert opinions that are

01:14:41 15    rendered in good faith after all necessary investigation.  I am not

01:14:52 16    in any way suggesting that you short shirt that process for the

01:15:11 17    sake of meeting the requirements of a bellwether trial.  What I am

01:15:16 18    saying is that that can be another bellwether trial that

01:15:22 19    incorporates mold exposure as a factor of the plaintiff's injuries.

01:16:38 20    If that's what your expert tells you, then that's what the expert

01:16:43 21    can testify to.

01:16:45 22         But I need a formaldehyde case in December and this

01:16:51 23    apparently is not it.

01:16:53 24         MR. GEIGER:  Judge, if you get rid of the Lyndon Wright

01:17:03 25    case because the plaintiffs now want to substitute this assertion

01:17:12  1    or this additional allegation of negligence, that leaves us four

01:17:27  2    months to get prepared for trial.  And, Judge, that's just not

01:17:35  3    enough time, it's just not fair to the defendants.  It took us

01:17:46  4    three months just to get the workup ready for Wright and now with

01:17:53  5    the plaintiff's expert reports due on Monday, granted you wouldn't

01:18:01  6    do that, Judge, but under the present schedule, I would suggest to

01:18:08  7    you, Judge, that we are all very busy and give us four months, and

01:18:51  8    its starting new with this particular newly selected plaintiff and

01:18:59  9    we don't even know the realm of people we can select from, we are

01:19:23 10    not going to have enough time to get this case done in December.

01:19:29 11           THE COURT:  I understand that.  I understand that and,

01:19:35 12    you know, I am not going to tell Mr. Wright that he can't bring a

01:19:40 13    mold exposure claim if that's the claim that he's got.  If I have

01:19:47 14    to adjust the calendar, I will, only to the extent that we have to

01:19:54 15    accommodate additional discovery time.

01:19:59 16           You know, I am surprised that this hasn't come up before

01:20:05 17    when nobody said that he has not a formaldehyde claim but in

01:20:18 18    addition to that he has a mold exposure claim.  I don't understand

01:20:23 19    how this could have come up so late.  From what Mr. D'Amico is

01:20:33 20    telling me, there are many people out there, a percentage of these

01:20:43 21    people that do have a mold claim, so why is it coming up in July of

01:20:45 22    2009 and the MDL has been around now for some, at least here for

01:21:16 23    some 20 months?

01:21:18 24           MR. WOODS:  Your Honor, it's been coming up, I believe,

01:21:51 25    in all of the individual bellwether plaintiff depositions.  Mold I

01:21:59  1   believe we all have identified or has been on the radar as a

01:22:04  2   possible compounding factor.  So it's been there.  It's only in

01:22:12  3   Mr. Wright's case where it is truly an evident problem that needs

01:22:31  4   to be dealt with.  And because Frank tells you there are

01:22:36  5   approximately 13,000 individuals that will be asserting that same

01:22:41  6   sort of claim, isn't it just possible for the court to continue

01:22:46  7   with Mr. Wright's trial on the particular date chosen and that it

01:23:01  8   will address Mr. Wright's trial, it will address individuals that

01:23:18  9   have a formaldehyde/mold claim?

01:23:22 10         THE COURT:  Well, but we have expert reports that are due

01:23:27 11   and we have a whim that it wasn't formaldehyde alone that caused

01:23:41 12   his injuries, that it was mold.

01:23:47 13         Where are you all on expert reports on mold?

01:24:02 14         MR. D'AMICO:  Judge, the experts are not able to do the

01:24:06 15   reports on this deadline, we're filing a motion for a continuance

01:24:16 16   trying to get all sides to agree to it.  But the only way the

01:24:27 17   defendants would agree to a continuance of the existing deadlines

01:25:00 18   is if we got a continuance of the trial.  It's our belief we don't

01:25:07 19   need a continuance of the trial and we can go with a two-week

01:25:13 20   extension of the reports so that we can get a date from the

01:25:22 21   government to actually go out and do the testing on the trailer.

01:25:51 22   Once that's done, two weeks after the testing is complete we would

01:26:01 23   have our expert reports.

01:26:11 24         THE COURT:  Anybody want to comment on that?

01:26:24 25         MR. MILLER:  This is Henry Miller from the government.

01:26:28  1  Two things that I would say, that I think mold has always been in

01:26:34  2  the background of this litigation; I mean, in a certain sense a lot

01:26:43  3  of the occupants have indicated mold and that happened during the

01:26:54  4  class cert deposition or the class cert representative deposition.

01:26:57  5      What is new here is that this is the first time the

01:27:05  6  plaintiffs are alleging that a defendant is liable for the mold in

01:27:08  7  the trailers.  And that's the issue here.  It's not that we haven't

01:27:48  8  been aware and mold was potentially a confounding factor; if

01:27:56  9  someone has asthma, mold can potentially be a confounder of that

01:28:06  10  asthma.  What Frank has done in this case is put it dead center and

01:28:25  11  made it the claim at issue.

01:28:25  12      THE COURT:  Right, for compensation.

01:28:26  13      MR. MILLER:  That's the real issue.

01:28:36  14      As for testing protocol, I believe that Frank and I have

01:28:42  15  worked out the test protocol now, we're just waiting to get the

01:29:00  16  input from the other defendants; because the way with this

01:29:06  17  destructive testing, Frank can't go do his protocol -- it's a

01:29:13  18  three-step process, they have to do ambient air testing, and the

01:29:25  19  defendant needs to air it out, and the defendant manufacturers have

01:29:48  20  to do their jacking test or Shaw has to do their jacking test and

01:29:57  21  then it's probably going to be a co- or joint taking apart or

01:30:18  22  destruction of the unit.

01:30:22  23      So it's basically taking just a little bit longer than we

01:30:28  24  had hoped to work out the protocol, but we have everything

01:30:35  25  resolved.  The little brouhaha that happened with the Fleetwood

01:30:54 1  thing involving FEMA wanting some additional protection in the

01:31:09 2  protocol, Aaron and I worked with that and I think resolved that

01:31:18 3  yesterday.  But still subject to the other defendants approval and

01:31:30 4  agreement.

01:31:30 5       MR. GEIGER:  So that's where we're at, your Honor.  And

01:31:50 6  as far as the update from Forest River, we believe that by the end

01:31:56 7  of the day on Monday we should be in a position to give you the

01:32:06 8  additional testing protocol from our side.

01:32:10 9       THE COURT:  So this unit still needs to be tested?

01:32:15 10      MR. D'AMICO:  Judge, we have been asking for a date to

01:32:21 11  test, we circulated our protocol June 9th and we have been waiting

01:32:34 12  for dates to do the testing and comments from everybody.  We

01:32:40 13  finally worked everything out with the government but we still have

01:32:55 14  not received any comment from Forest River or Shaw.

01:33:00 15      MR. GEIGER:  That's not true, you've gotten a lot of

01:33:05 16  comments.

01:33:06 17      MR. D'AMICO:  We've gotten comments but not suggestions.

01:33:15 18      MR. MILLER:  That's not true --

01:33:18 19      THE COURT:  Wait, wait.  We can't have more people

01:33:23 20  talking.  We have a court reporter here and I have three people

01:33:29 21  talking at one time.

01:33:33 22      MR. MILLER:  We have had some input from the defendants,

01:33:38 23  we just don't have their test protocol to insert into the protocol.

01:33:54 24  Unlike the other protocols where you can have one protocol from the

01:34:01 25  plaintiffs and one from the defendants where they would go one and

01:34:09  1    then the other, here you need one protocol because in the end the

01:34:25  2    unit is being destroyed.

01:34:25  3            And so we're just waiting to get the defense protocol,

01:34:31  4    but we have had input from the defense counsel, there are some

01:34:39  5    objections that they've raised and we've been trying to deal with

01:34:45  6    those.

01:34:47  7            THE COURT:  Can we not on whatever time schedule we

01:35:17  8    agree, if the testing, if the hay is not in the barn with regard to

01:35:23  9    the testing, can we not test for mold while we're testing for

01:35:28 10    formaldehyde?

01:35:29 11            MR. D'AMICO:  We can, that's what we suggested in our

01:35:34 12    protocol.

01:35:36 13            MR. GEIGER:  You ruled that no multi-testing would be

01:35:41 14    permitted on this case.

01:35:45 15            THE COURT:  When I did not have a claim before me for

01:35:51 16    damages relative to mold inhalation.  All I had was an expert who

01:35:58 17    was going out and doing mold, some reference in an expert report to

01:36:14 18    mold testing.  That's why I ruled that way because no one was

01:36:21 19    asserting a claim for mold exposure.

01:36:25 20            MR. MILLER:  Obviously the protocol at this point since

01:36:29 21    the testing hasn't gone forward, it can be amended.  I would

01:36:41 22    suggest that I don't think, at least from the government's

01:36:51 23    perspective, we have a mold expert on board.

01:36:57 24            THE COURT:  So you have to get somebody else?

01:37:01 25            MR. MILLER:  I don't know if we would, your Honor, one

01:37:06  1   way or the other, I haven't looked into it.  It hasn't been an

01:37:22  2   issue to date and it's what Frank's amended complaint brings up and

01:37:32  3   the way this court resolves this one way or the other we'll have to

01:37:40  4   get a report to look at.

01:37:47  5          MR. GEIGER:  That would be true for us.  I don't know if

01:37:58  6   I need one, I just don't have one yet.  I would have to go get one.

01:38:08  7          THE COURT:  All right.  And you've got a plaintiff

01:38:13  8   deadline of July 22nd; is that right, Frank?

01:40:20  9          MR. D'AMICO:  Yes.

01:40:22 10          THE COURT:  And I've got an August 21st deadline for the

01:40:28 11   defendant's reports.

01:40:31 12          MR. GEIGER:  Yes, your Honor.

01:40:33 13          MR. D'AMICO:  Judge, another issue, and I think Henry

01:40:40 14   Miller has been raising it over and over again.  The Fleetwood

01:40:48 15   experts are due today and those are the same people in Fleetwood as

01:41:00 16   in Wright, in the Forest River/Wright trial.

01:41:06 17          MR. GEIGER:  But, Judge, I understand that I've been

01:41:10 18   raising this issue for two weeks to get an identity of the experts

01:41:17 19   that were going to be called because the plaintiffs are asking for

01:41:27 20   an extension of their expert reports.  I had understood they were

01:41:32 21   going to be the same experts that were in the Gulf Stream case and

01:41:40 22   they said, oh, same experts in the Gulf Stream and Fleetwood case.

01:41:51 23   Well, I haven't seen a Fleetwood report or Fleetwood experts --

01:42:17 24          I got a list yesterday and there are three new medical

01:42:23 25   experts and one new warning expert that have now been identified.

01:42:35  1   I haven't seen a report from any of those people.  So I would need

01:42:49  2   time to scramble to get new injury causation experts and in some

01:43:03  3   areas that we had not seen before.

01:43:08  4           THE COURT:  All right.

01:43:10  5           MR. D'AMICO:  All I can respond, Judge, is that the new

01:43:14  6   experts he is talking about are just fact specific position, it's

01:43:23  7   not like we're using new experts, we're using identically the same,

01:43:41  8   same experts, just the short-ended version of the Fleetwood trial,

01:43:52  9   not new experts.  Each plaintiff is going to be fact specific

01:44:11 10   positions.  I mean, you can't have the same positions for every

01:44:18 11   bellwether trial plaintiffs so those are going to change.

01:44:25 12           MR. GEIGER:  I've gone through every bit of his medical

01:44:54 13   records and three of those physicians never treated Mr. Wright

01:45:01 14   until I think they were retained by the plaintiffs.  They can

01:45:06 15   correct me if I'm wrong, but these are retained experts by the

01:45:12 16   plaintiffs, not his prior treating physician.

01:45:19 17           THE COURT:  When are we going to get the plaintiff expert

01:45:41 18   reports?  They're due on the 22nd, so what's up with that?  Are we

01:45:52 19   getting plaintiff's expert reports on the 22nd, are we ready to

01:46:00 20   give that?

01:46:03 21           MR. D'AMICO:  I don't think we can.  I think we can give

01:46:07 22   the medical expert reports on the 29th but we need to do some

01:46:13 23   testing because this whole issue of the confounding issue of mold

01:46:20 24   needs to be addressed; and I tried to discuss that earlier and told

01:46:31 25   him we can give a preliminary report, but it turns out the

01:46:59  1   speciation of mold that can aggravate asthma, those reports would

01:47:18  2   have to be amended to reflect that information.

01:47:29  3        MR. GEIGER:  I understand that as long as I have time to

01:47:34  4   react to it.

01:47:37  5        THE COURT:  Sorry, Henry.

01:47:41  6        MR. MILLER:  Judge, even if the plaintiff from the very

01:47:47  7   beginning had been asking for damages that were mold related, we

01:47:53  8   still would have opposed mold testing at this point in time because

01:47:59  9   what is the point of hiring a bunch of mold experts to go out to a

01:48:14 10   trailer that's been sitting out in a field in Louisiana through the

01:48:20 11   winter, summer, all seasons for 18 months?  God knows what kind of

01:48:38 12   mold is growing in that thing.  I mean, no useful data are going to

01:48:47 13   come out of that expenditure of money on mold testing at this point

01:48:55 14   in time.

01:48:56 15        Regardless of the court's ruling on whether or not mold

01:49:03 16   can be added to Mr. Wright's claim, we would strongly object to

01:49:07 17   proceeding with any actual mold testing.

01:49:37 18        THE COURT:  Well, you might be right about that and that

01:49:42 19   sounds like the subject of a Daubert motion.  It may well be that a

01:49:52 20   test at this point in time is pretty meaningless seems to me, and

01:50:07 21   that's the subject of a Daubert motion and that will be the subject

01:50:12 22   of the merits of it, not the admissibility.

01:50:17 23        MR. KURTZ:  To a finer point on that, Judge, that mold

01:50:35 24   testing is going to normally complicate what we have to achieve

01:50:54 25   between now and trial.  It's going to make it relatively, not

01:51:14   1   relatively, it's going to make it impossible for us to evaluate all

01:51:27   2   of the different claims that are being made as they interact with

01:51:47   3   one another, we're going to have to expend a lot of money between

01:52:02   4   now and then on mold experts only to have a Daubert motion at the

01:52:11   5   very end.  I don't think it should be treated in an "in limine"

01:52:23   6   motion fashion, I think it should be treated up front because we

01:52:53   7   all know you can't go get useful data on a trailer that's been

01:53:08   8   sitting out in a field for 18 months.

01:53:17   9        THE COURT:  Does everybody agree with that?

01:53:32  10        MR. D'AMICO:  I do not agree.

01:53:37  11        THE COURT:  I didn't think so.  Go ahead, Henry.

01:53:57  12        MR. D'AMICO:  It's the same people who are going to be

01:54:00  13   dealing with mold.  The toxicologist is going to talk about the

01:54:10  14   exposure to formaldehyde and any confounding affect by any

01:54:52  15   confounders.  It's the same person, you couldn't go out and hire

01:55:06  16   new experts.  I am not going to go out and hire a mold expert, it's

01:56:25  17   the same toxicologist.  I don't know whether they're getting a new

01:56:37  18   expert.  We're trying to find out if the guy has an allergic

01:57:00  19   reaction to mold or not.  That's a skin test.  He is either

01:57:44  20   allergic or he isn't.  If he's not allergic to mold, it's not a

02:00:21  21   confounder; if he's allergic to mold, we need to know that so we

02:00:36  22   can defend against their claim that mold exposure at work caused

02:00:47  23   his asthma to be worse, not formaldehyde.

02:00:49  24        We are just trying to do a complete differential

02:00:56  25   diagnosis to adequately flush out the details of this case and

02:01:15   1   we're trying to meet the scientific method.  To do that we need to

02:01:29   2   exclude possible confounders.  I hope he is not allergic to mold

02:01:37   3   that way when the defendants have, oh, his asthma is bad because he

02:01:53   4   works around mold at work, we can say, no, it isn't because we

02:02:00   5   tested him for mold and he is not allergic to it.

02:02:08   6          But that may not be the case.  He may have an allergic

02:02:18   7   reaction to mold, therefore, we need to know what speciation of

02:03:16   8   mold may or may not have existed from the trailer that may or may

02:03:27   9   not have contributed to his problems that are primarily, we allege,

02:03:37  10   are caused from the exposure to the formaldehyde.

02:05:44  11          THE COURT:  All right.

02:05:48  12          MR. MILLER:  Two things, first, I think Frank is getting

02:06:05  13   a little bit off the issue.  On the differential diagnosis, nothing

02:06:15  14   prevents his expert from doing that differential diagnosis.

02:06:26  15          The issue is whether the plaintiffs can allege -- whether

02:07:21  16   the plaintiffs can allege a claim against Shaw essentially for the

02:07:30  17   mold that's in the unit.

02:07:32  18          THE COURT:  Right, I understand that.

02:07:35  19          MR. MILLER:  The second issue is, this is -- we had a

02:07:40  20   discussion, the parties, we exchanged e-mails as I framed the

02:08:02  21   issue, I thought the issue is distinctly framed, is that if the

02:08:48  22   plaintiff right now needed an extension on their expert witness

02:08:58  23   reports, that's the first thing, they basically told us they can't

02:09:11  24   get final expert reports even for their medical doctors as of the

02:09:22  25   date because those medical doctors and the other people need to

02:09:30  1   have the test results.

02:09:36  2              THE COURT:  I understand that.

02:10:00  3              MR. MILLER:  Anything that they get now is going to be

02:10:07  4   preliminary.  So if we would go depose them at this point, as Ernie

02:10:16  5   points out, we're going to have to redepose if they issue a

02:10:44  6   supplemental report, if they in any way change or modify their

02:10:50  7   opinions.

02:10:55  8              The second issue we had was that basically if you start

02:11:00  9   moving some of these deadlines back too far, a week or two more,

02:12:27 10   there's not much flexibility in these schedules, we are dealing

02:12:35 11   with very tight deadlines.  You basically, the government's

02:12:38 12   position -- and I won't speak for anyone else -- if it gets pushed

02:13:15 13   back more than a week or two, the government believes you have to

02:13:21 14   move the trial date.

02:13:24 15              And the third issue is if the court does not anticipate

02:13:54 16   and is not going to move the trial date, something has to give.

02:13:58 17   And if it's not going to be the trial date, then basically you

02:14:22 18   can't be injecting these new issues and plaintiffs have got to get

02:14:30 19   their reports done pretty promptly.

02:14:38 20              And part of that is to the extent we've been trying to

02:15:07 21   work with this destructive testing, we don't have a template in

02:15:49 22   place so we've had to work through that.  We've been working

02:15:57 23   diligently to that, both plaintiffs and the United States, to get

02:16:05 24   that template in order.  But I think that the parties, although you

02:16:15 25   had indicated that you were going to allow destructive testing, the

02:16:29  1   way the orders had come out this was a belief at least that the

02:16:37  2   destructive testing wouldn't take place with any of these

02:16:44  3   bellwether units.  So no one has been working on getting the

02:17:18  4   protocol finalized until we got our order on that.

02:17:26  5        And so since then we have been working very diligently to

02:17:33  6   do that.  That's the real crux of the issue.  The issue here then

02:17:40  7   when you deal with the mold, to the extent that Frank gets to amend

02:18:38  8   his complaint -- and I agree with the court and I agree with

02:18:43  9   Frank -- mold is, in fact, an issue and his client wants to claim

02:18:59 10   it, then he should be allowed to do so, he doesn't become a

02:19:13 11   bellwether claimant and he has claim.

02:19:48 12        I don't see how -- the court notes you add an issue at

02:19:56 13   that late date --

02:19:58 14        We deal with mold cases in our office and it's a whole

02:20:06 15   different bailiwick, that's different experts who come on board and

02:20:26 16   address those issues.  There is some crossover, but mold and

02:20:31 17   formaldehyde are not the same thing.  And so --

02:20:35 18        We're kind of stuck in a dilemma here with all of us

02:21:12 19   trying to accomplish what the court wants to achieve, but I am not

02:21:34 20   sure we can do that and satisfy the due process of Mr. Wright if

02:21:41 21   he, in fact, wants to seek mold as a claim or cause of action

02:22:01 22   against Shaw.

02:22:03 23        THE COURT:  Frank, can you get your preliminary expert

02:22:08 24   reports, all of them, to counsel by July 27th?

02:22:12 25        MR. D'AMICO:  Can we have the 29th?

02:22:15   1          THE COURT:  Well, I mean every day counts.  You can't do

02:22:21   2   it by the 27th?  I asked you about the 27th.

02:22:46   3          MR. D'AMICO:  Those same experts are doing reports for

02:22:52   4   Fleetwood today and we have to turn around and get these out and we

02:23:31   5   need some information on Mr. Wright yet.  If we can get the 29th

02:23:41   6   I'll do it.

02:23:43   7          THE COURT:  All right.  And let me ask the defendants.

02:23:48   8   With those preliminary expert reports, I understand your point

02:23:55   9   about wanting to get their final expert reports before you take

02:24:02  10   depositions, how helpful will it be to get the preliminary reports?

02:24:25  11          MR. GEIGER:  Better than nothing.

02:24:30  12          THE COURT:  Well, I understand that.

02:24:31  13          MR. GEIGER:  I don't know what the supplement is if it's

02:24:41  14   the same?  It's very difficult, Judge, to say how helpful they're

02:25:02  15   going to be if I hear a whole lot here, Judge, to say how helpful

02:25:48  16   they're going to be if I hear a whole lot more when I get a

02:25:56  17   supplemental report.

02:25:58  18          THE COURT:  When you go to get the full reports, assuming

02:26:08  19   you get the preliminary on the 29th, when can we expect you to get

02:26:53  20   the full reports?  Assuming you get preliminary on the 29th, when

02:27:07  21   can we expect you to get full reports?

02:28:46  22          MR. D'AMICO:  I still don't have a test for the trailer,

02:28:57  23   that's what hinges, they need to test speciation of the mold; and

02:29:07  24   depending on what we find, it takes about a week to speciate that.

02:29:24  25   As soon as we get that we'll get the speciation in another week and

02:29:30   1   another week or two we can have a full report.  It just depends

02:29:52   2   when Henry can give us a date to do the test.

02:30:16   3        THE COURT:  What are the dates we are talking about?

02:30:21   4   Henry mentioned you all had been communicating, what are the dates?

02:30:30   5        MR. D'AMICO:  We don't have any dates yet.

02:30:53   6        MR. MILLER:  What we're talking about is we need to get

02:30:57   7   the issue put, the --

02:31:05   8        THE COURT:  When can we get the protocol from the

02:31:49   9   defendants?  Can we not get that within the next few days?

02:32:11  10        MR. MILLER:  I will defer to them.

02:32:17  11        THE COURT:  That's what I'm asking them.

02:32:22  12        MR. GEIGER:  Judge, I would normally say yes --

02:32:30  13        THE COURT:  Why do we not have it already, maybe that's a

02:32:34  14   better question?

02:32:36  15        MR. KURTZ:  We do not.  We do not have it already, at

02:32:56  16   least on behalf of Shaw, I can't speak for Ernie, but, you know, we

02:33:05  17   were not thinking about what has to be done for mold, that was not

02:33:10  18   part --

02:33:12  19        THE COURT:  We're talking about putting mold aside, why

02:33:31  20   do we not have a protocol for testing, even not counting the mold,

02:33:39  21   what you did think was in the case, why do we not have a protocol?

02:33:48  22        MR. GEIGER:  Judge, you will have my protocol for air

02:33:55  23   sampling and my protocol for the HVAC testing by Monday at five

02:34:16  24   o'clock.

02:34:17  25        THE COURT:  All right.

02:34:18 1        MR. GEIGER:  And part of that delay, your Honor, is

02:34:27 2   because there was a discussion about jacking -- not jacking, when

02:34:32 3   are we going to jack, what are we going to jack, how are we going

02:34:39 4   to do what when, so that's part of the answer.

02:34:45 5        THE COURT:  I understand.  Can we not get all of the

02:35:00 6   defendants' protocol by Monday, close of business on Monday?

02:35:16 7        MR. MILLER:  Your Honor, essentially talking about Ernie,

02:35:24 8   I need to figure out how long it will take the defendants to do

02:35:39 9   their testing.  But what we roughly estimate is that all testing

02:35:45 10  should be done within three weeks after the commencement.

02:35:50 11       So the plaintiffs would commence by sending a person out

02:36:15 12  to check the door -- inspect, close the unit up, they then do their

02:36:31 13  ambient testing, open the doors later, that takes two days.  After

02:36:40 14  that the defendants have to compliment their protocol which

02:36:54 15  basically air conditions the unit, does whatever they do.  That

02:37:14 16  takes about another 72 hours or three days to do the ambient air

02:37:32 17  testing then.

02:37:33 18       After that the parties will doing the jacking test, all

02:37:43 19  done, sign off on the ambient air, do the jacking, whatever they do

02:37:54 20  with that.  The jacking is done.  At that point the parties will

02:38:02 21  then tear the unit apart, tear it apart and throw the stuff into

02:38:30 22  the dumpster, that will basically take two to three days, however

02:38:36 23  much time.

02:38:38 24       THE COURT:  That's all fine but the question is finding

02:38:42 25  out when that's going to start.

02:38:47  1        MR. MILLER:  And we should be able to start it, if we get

02:38:49  2   the protocol all lined up and finished, they should be checking for

02:39:11  3   the plaintiffs to lock it up at the end of next week.  You can

02:39:22  4   start the three weeks starting hopefully at the end of the next

02:39:28  5   week, that's what my hope would be.

02:39:39  6        MR. GEIGER:  If you want to start on the 24th, that's

02:39:44  7   fine with me.  But the plaintiff's true air testing takes a week,

02:40:13  8   three days lockup and two days testing.  That's a week.  My air

02:40:19  9   testing takes a week just like the plaintiffs' does, so that's two

02:40:29 10   weeks.  Now I understand the manufactures HVAC testing takes at

02:40:43 11   least a day, mine is going to take, I think my preliminary estimate

02:40:54 12   is three days, so that's four days.  So now you've got to jack it,

02:41:03 13   do the destructive testing.  I don't think you're going to jack it

02:41:26 14   and do the destructive testing in a day.

02:41:29 15        So I really believe it's going to take a little closer to

02:41:45 16   four weeks total than it is going to be three.

02:41:51 17        MR. MILLER:  And that's fine, Judge.  Aaron and I had

02:41:57 18   discussed since we did not get input with Ernie when we came up

02:42:10 19   with the three weeks, I would probably defer to Ernie better at

02:42:28 20   what his testing will be when we start.

02:42:30 21        THE COURT:  Let's do this:  On the 29th, by the 29th

02:42:36 22   plaintiffs are going to have to provide their preliminary expert

02:42:44 23   reports and they're going to be complete in terms of who is going

02:42:55 24   to be the expert and what they're going to opine about and any

02:43:03 25   preliminary opinions they're going to have.  Can we do that?

02:43:10  1            MR. D'AMICO:  Yes.

02:43:12  2            THE COURT:  By Monday, the close of business on Monday,

02:43:21  3    all parties, including all of the defendants, will have set forth

02:43:30  4    their protocol for testing such that the testing can begin.

02:43:35  5    Anybody have a problem with that?

02:43:37  6            MR. KURTZ:  My only problem with that is I can give my

02:43:53  7    air testing protocol and certainly my HVAC testing protocol.  It's

02:44:16  8    a little difficult for me to give you my mold testing protocol, but

02:44:24  9    I am sure I can work it in if I need to do it while we are doing

02:44:35  10   this three-week testing.

02:44:37  11           THE COURT:  Why don't we do that.  Not to cut you off,

02:44:42  12   but let me back that date up then.  Why don't we give you

02:44:53  13   plaintiffs until the 29th -- wait.  Let me look at my calendar.

02:44:59  14           MR. GEIGER:  Judge, I don't know that mold testing is as

02:45:04  15   important to me as it is to other parties, but I would at least

02:45:16  16   want more time than Monday to go hire somebody to find that out.

02:45:28  17           MR. KURTZ:  Judge, this is David.  If you could give us

02:45:38  18   the flexibility to insert mold testing into the protocol that is

02:45:45  19   developed on Monday at a later date, then we will be able to work

02:45:51  20   with that.  I don't see why our mold expert, whoever it is, and we

02:45:58  21   don't have one yet, couldn't go out during some of the other

02:46:13  22   testing that is outlined in this protocol.  So I can't imagine it

02:46:46  23   injecting further delay.

02:46:51  24           THE COURT:  Now we're getting somewhere.  Why don't we go

02:46:53  25   ahead and stick with Monday for the protocol with the understanding

02:47:06  1    that if the plaintiffs in submitting their preliminary reports have

02:47:13  2    issues relative to mold, which we think that based on the pleadings

02:47:21  3    they will, you will have the opportunity to include mold testing,

02:47:26  4    which you can add beyond Monday and there will not be an objection

02:47:39  5    to you including that testing.

02:47:42  6                MR. GEIGER:  That's agreed.

02:48:01  7                THE COURT:  So let's stick with the 29th going to be the

02:48:09  8    plaintiffs submit their preliminary reports.  The protocol for all

02:48:20  9    testing is going to be done, is going to be provided by the close

02:48:37 10    of business Monday with that one exception, and that exception

02:48:43 11    applies only to the defendants with regard to mold testing

02:48:52 12    protocol.

02:48:52 13                We are not going to have anybody else on the plaintiffs'

02:48:57 14    side go out and get another expert or an additional protocol, not

02:49:08 15    going to happen.

02:49:15 16                MR. D'AMICO:  We agree.

02:49:21 17                THE COURT:  All right.  Now, in terms of the plaintiffs

02:49:31 18    final reports, assuming testing can begin in the last week of July

02:49:42 19    or on August the 2nd I guess or 3rd, if we're talking about four

02:49:48 20    weeks that petty much takes us through the month of August; is that

02:49:56 21    not correct?

02:49:57 22                MR. D'AMICO:  That's correct.

02:50:03 23                MR. GEIGER:  Correct.

02:50:05 24                THE COURT:  When can we get the plaintiffs' final reports

02:50:09 25    after that final testing?

02:50:11 1          MR. D'AMICO:  I say we need two weeks after that, so

02:50:22 2     September 15th.

02:50:25 3          MR. GEIGER:  You agreed earlier to September the 1st.

02:50:31 4          MR. D'AMICO:  Well, but, Ernie, you just told the court

02:50:37 5     it would take four weeks.

02:50:44 6          THE COURT:  That's for their testing, yours is going to

02:50:50 7     be finished.

02:50:53 8          MR. D'AMICO:  Ours takes three weeks and do the

02:50:59 9     speciation of mold which takes another week, so we're still looking

02:51:07 10    at four weeks.  So I would need two weeks to complete the reports,

02:51:14 11    we can do it by September 10th.

02:51:25 12         MR. KURTZ:  Judge, the original proposal Mr. Geiger said

02:51:38 13    was for September 1st, injected into that because of no small part

02:51:53 14    that those deadlines do, it jams us on the fourth bellwether trial.

02:52:03 15    There are all kinds of overlapping deadlines.  If we have expert

02:52:08 16    reports being issued that late in this case, it's really going to

02:52:14 17    hamper our ability to handle the fourth bellwether.

02:52:26 18         THE COURT:  I understand that.  Why don't we say the

02:52:37 19    plaintiffs will have final completed expert reports, comprehensive

02:52:41 20    reports prepared and exchanged by September the 8th.  Defendants

02:52:56 21    final completed expert reports will be due on October the 1st.

02:53:01 22    Does that help or hurt?

02:53:05 23         MR. GEIGER:  If we start the testing on the, August --

02:53:40 24    no, why are we going to start August 2nd?

02:53:45 25         MR. MILLER:  We will start it as quickly as we can.  The

02:53:49  1    August 2nd date will be the drop-dead late.

02:54:06  2             THE COURT:  That's correct.  I said August 2nd but I am

02:54:10  3    hoping you can do it the week of the 27th of July.

02:54:24  4             MR. GEIGER:  If you do -- it's the 27th of July, I can

02:55:40  5    look at my calendar, it's one week, you'll be finished by the 21st

02:56:18  6    of August with testing.  If he does his mold testing first, I mean,

02:56:48  7    why can't the original proposal by the plaintiffs was they would

02:57:00  8    have their expert reports by September 1st and the defendants would

02:57:06  9    have theirs by October 1st.

02:57:09  10            THE COURT:  If we start the testing on July 27th, do we

02:57:18  11   know definitive we can do that?

02:57:24  12            MR. MILLER:  Your Honor, I would say yes, and the reason

02:57:29  13   why that all plaintiffs need to do is send someone out to inspect

02:57:47  14   the trailer to close the windows, to put witness tape because they

02:57:55  15   seal the units up for 72 hours before they test it.  If they get

02:58:04  16   started on the Friday they can start Monday on the ambient air, the

02:58:15  17   22nd.

02:58:17  18            THE COURT:  Let's start on the 27th if we all think

02:58:35  19   that's doable, let's plan on the 27th.  That would back everything

02:58:41  20   up a week, which would be good, September 1st would be for the

02:58:46  21   plaintiffs and we'll make September 24th, I guess, for the

02:58:52  22   defendants.  Or September 25th, which is a Friday.  Can we do that?

02:59:02  23            MR. MILLER:  Your Honor, the answer from the government

02:59:04  24   is whatever you order we will do.

02:59:18  25            I will note given that this is on the record that the

02:59:24  1    United States is going to object to any extension of these

02:59:29  2    deadlines because I think it interferes with our ability to prepare

02:59:35  3    for the various trials.

02:59:37  4              THE COURT:  Right, I understand you guys are limited.

02:59:48  5              MR. MILLER:  I just need to state that for the record.

02:59:52  6              THE COURT:  I understand that and you guys don't have as

02:59:57  7    many people and you're spread thin already.  I understand that.

03:00:05  8    And if that becomes a problem, certainly logistic problem, go ahead

03:00:21  9    and raise that with me and I'll see what I can do to accommodate

03:00:33  10   you.

03:00:34  11             MR. MILLER:  Let me point out, to put this into context,

03:00:40  12   it's become a logistic problem, I missed for the first time in 22

03:00:53  13   years in practicing at the Department of Justice we missed a

03:01:02  14   deposition because we didn't get it on the calendar.  We are doing

03:01:19  15   four to five depositions a day, we will have done 50 depositions

03:01:40  16   this month for the Gulf Stream trial.  I suspect we're going to be

03:01:51  17   doing the same amount for each of the succeeding trials.

03:01:56  18             The amount of work that is being injected here is a

03:02:07  19   nominal amount, at the same time being in the Gulf Stream trial for

03:02:14  20   two weeks is going to take me out of the league and the ability to

03:02:30  21   direct other persons who will be doing the follow-up trials or at

03:02:35  22   least monitoring those.  So it's putting us in a very, very

03:02:41  23   difficult position.

03:02:42  24             But I will note my objection for the record and I'll

03:02:46  25   insert those there, but we will obviously comply with whatever the

03:02:53   1   court orders.

03:03:01   2          THE COURT:  I know that you all are doing, all of you, in

03:03:12   3   terms of time and the fact that this is, you know, a huge amount of

03:03:18   4   work to be done so I am not insensitive to it.  As the problems

03:03:31   5   develop, let me know and we'll try to accommodate you so that we

03:03:41   6   can get this done.

03:03:42   7          Can we go ahead and agree, for now at least, that

03:03:48   8   September 1st is going to be the plaintiff's deadline for final

03:04:00   9   comprehensive expert reports and opinions and September 25th is

03:04:09   10  going to be for defendants?

07:37:06   11         MR. MILLER:  Your Honor, over the government's objection.

07:37:17   12         MR. D'AMICO:  The only thing I would ask is can we get to

07:37:23   13  Friday, September 4th?

07:37:26   14         THE COURT:  No, September 1st is good.

07:37:30   15         MR. D'AMICO:  Okay.  We'll live with it, Judge.

07:37:37   16         THE COURT:  You're going to have to.  Everybody, as Henry

07:46:55   17  described, everybody is trying to meet deadlines and we can always

07:47:04   18  add-on more time and be working on this for a long time but I don't

07:47:10   19  see why.  We've been at this quite awhile, I don't see why we can't

07:47:19   20  get it done now on the plaintiff side.  You've made an allegation

07:47:33   21  about mold, I hope under Rule 12 you've got some basis to make that

07:47:42   22  allegation.  You should already have a lot of information on that.

07:47:58   23  You're asking me to allow this amended complaint, I hope you've

07:48:07   24  already done your homework to a large degree.

07:48:17   25         MR. D'AMICO:  We have, Judge.

07:48:20  1          THE COURT:  Then you don't need the extra days.

07:48:25  2          MR. D'AMICO:  I want to ask for a clarification on

07:48:28  3   something, Judge.  Obviously there's no reason to give preliminary

07:48:36  4   reports on the experts who are doing the testing.  Some of those

07:48:44  5   are just medical testing who are going to be jacking HVAC stuff.  I

07:48:55  6   think the defendants would all agree that that would be pretty

07:49:05  7   futile to give a preliminary report for somebody who is going to be

07:49:18  8   doing the testing.

07:49:20  9          THE COURT:  Anybody want to respond to that?  What are

07:49:25 10   your expectations?

07:49:31 11          What I would like to see and what I envision, and maybe I

07:49:39 12   am misunderstanding, but what I am understanding is a report that

07:49:46 13   describes the task is going to be for the expert, what he or she

07:50:05 14   intends to do to accomplish that task and if we can render any type

07:50:19 15   of an opinion or preliminary analysis based on whatever documents

07:50:30 16   we have that they render that.  Is that not what we understand the

07:50:37 17   preliminary report to be and that the testing is going to elaborate

07:50:45 18   on all of that and add opinions that are gleaned from test results?

07:51:09 19          MR. GEIGER:  That's my understanding.

07:51:11 20          MR. D'AMICO:  I am a little confused because Al Millet,

07:51:22 21   for instance, who is a general construction guy, he's been deposed

07:51:31 22   already in Gulf Stream.  He is going to be doing work for

07:51:59 23   Fleetwood, he is also going to be doing work in this case.  I think

07:52:00 24   all the defendants really want to know is what did he find when he

07:52:07 25   went out and did the jacking.  I mean, we've all talked about the

07:52:16  1   protocol ad nauseam which talks about what he anticipates doing.  I

07:56:25  2   think the final report is the final culmination of his protocol.

07:56:33  3        I mean, I am not trying to complicate things, Judge, if

07:56:40  4   that's what you want I'll give a preliminary report that basically

07:57:11  5   regurgitates the protocol.

07:57:16  6        THE COURT:  Well, it's got to be more than the protocol.

07:57:21  7   His task, if that's the case, then he's basically a fact witness

07:57:29  8   that goes out and checks on things and makes measurements and

07:57:35  9   recites what the results of that is, are going to be.

08:05:25 10        MR. D'AMICO:  I see what you're saying.

08:05:36 11        THE COURT:  What we need to know is if somebody is going

08:05:41 12   to be an expert, we need to know:  (A) who it is; (B) what are

08:05:54 13   their qualifications, all of their qualifications, CV, what field

08:06:05 14   are they being tendered in, what is their assigned task, what is it

08:06:31 15   that they are going to opine on, and then if they can state what

08:06:38 16   methodology or perhaps this is where your protocol comes in, how

08:07:45 17   are they going to go about formulating such an opinion.

08:07:49 18        And if they have any preliminary opinions at this point

08:08:00 19   based upon a review of documents, deposition transcripts, anything

08:08:05 20   else they should provide that.  Any opinions that they can render

08:08:13 21   on a preliminary basis they should provide.

08:08:16 22        Then the report that is going to be issued on September

08:08:23 23   1st is going to be the "full blown" here is all that we did, here

08:08:44 24   is the finding that we've made, this is what we've discovered, this

08:08:54 25   is how we went about discovering it, the methodology involved, and

08:09:02  1  now finally, here are our opinions based upon all of that research

08:09:19  2  and testing and methodology, here are the opinions we intend to

08:09:24  3  render in court before a jury.

08:09:37  4          MR. D'AMICO:  Okay.

08:09:37  5          THE COURT:  That's how I envision it.  You all tell me if

08:09:42  6  I am missing the boat, but that is how I am envisioning the

08:09:49  7  process.  The defendants in response to their preliminary opinions

08:10:00  8  had been able to decide what experts they're going to need and what

08:10:09  9  opinions they're going to need to elicit.  We haven't set a

08:10:23 10  deadline, I don't know that it's necessary, for preliminary reports

08:10:37 11  from defendants' experts because they will largely be based on what

08:10:44 12  the plaintiffs do.

08:10:46 13          What you will get by September 25th is a comprehensive

08:10:52 14  report from the defendants' experts that contain all of the same

08:11:09 15  similar type information that I've described for the September 1st

08:11:19 16  report, then we can depose those people.

08:11:26 17          MR. MILLER:  If I can interject here.  What Frank can do

08:11:40 18  to streamline this is Al Millet's, plaintiff's expert in Gulf

08:12:08 19  Stream, he is being deposed right now as we speak.  The plaintiffs

08:12:13 20  can probably just take his expert report from the Gulf Stream case,

08:12:18 21  which includes all of that information, and just note his specific

08:12:31 22  opinions that he issued for the Gulf Stream case and then submit

08:12:37 23  that.

08:12:40 24          THE COURT:  Well, that would be efficient if we can do

08:12:43 25  that.  We are going to have some recurring characters.

08:12:53   1        MR. MILLER:  And fourthly, considering ones which are the

08:13:13   2   ones I believe Frank are talking about inspecting the units, unless

08:13:20   3   he brings in people on board, that would seem a fairly efficient

08:13:29   4   and effective way to do it.

08:13:32   5        I would also point out a second point, that as Mr. Kurtz

08:13:39   6   identified, those units have been sitting at a FEMA storage lot and

08:13:47   7   they're not being maintained.  They are sitting there wasting away

08:14:03   8   and deteriorating and their value is decreasing as they're sitting

08:14:17   9   there.  I believe from the depositions, and these parties haven't

08:14:22  10   been participating in those, the government has, that plaintiff's

08:14:27  11   only expert has indicated that current condition of these units is

08:14:35  12   not indicative of the condition when they were being occupied.

08:15:03  13        THE COURT:  That's understood and your experts are going

08:15:08  14   to have to figure out a way to opine based upon some type of

08:15:27  15   available information.  That obviously is the first line of a

08:15:34  16   cross-examination I can see, if an expert is going to base his or

08:15:48  17   her testimony solely on what they saw in August of 2009.

08:15:57  18        MR. MILLER:  Or that mold present there is even the same

08:16:07  19   mold that was present when the trailer was occupied.

08:16:12  20        THE COURT:  That's exactly right.

08:16:27  21        MR. MILLER:  Frank should examine this very carefully

08:16:36  22   because in a certain sense their experts are locked up with some

08:16:37  23   opinions in the Gulf Stream case, which I think he is going to find

08:16:43  24   is pretty inconsistent with what he is arguing now.

08:16:49  25        THE COURT:  I agree with you just as the plaintiff would

08:17:00  1   not be able to sustain his burden of proof by saying that in August

08:17:06  2   of 2009, mold X was present without any proof whatsoever that it

08:17:19  3   existed to any extent while the plaintiff lived in the trailer, and

08:17:31  4   likewise, a defense expert report that says mold, this mold was

08:17:42  5   present on August the 6th, 2009 and it did not contribute.  You

08:18:00  6   know, you're right, that's going to be a problem that the experts

08:18:06  7   have to overcome.

08:18:09  8          MR. MILLER:  Just wanted to point it out because I think

08:18:19  9   we might be going up --

08:18:22  10         THE COURT:  I agree with you it's clearly a problem in

08:18:27  11  meeting a burden of proof when it's with regard to an affirmative

08:18:32  12  defense or when it's the plaintiffs' case in chief.  But that's

08:18:50  13  what --

08:18:50  14         MR. MILLER:  That's what they want to allege and that's

08:18:53  15  their case.

08:18:54  16         THE COURT:  We'll see what he does to try to meet that

08:19:00  17  burden of proof.  The question is can he allege it, and at this

08:19:07  18  point in time if we have time to do the testing and if it's a

08:19:22  19  representative sample of plaintiffs, then I am satisfied -- which I

08:19:35  20  was not when we started this conference, I was not satisfied that

08:19:42  21  this was representative of any portion of the bellwether -- of the

08:19:50  22  entirety of the plaintiffs such that it belonged in a bellwether

08:19:57  23  trial.

08:19:57  24         My second concern was if it did belong in a bellwether

08:20:06  25  trial, we would not have time to incorporate any treatment of the

08:20:11   1   issue because it had been raised so late.  But since we have not

08:20:26   2   tested this trailer but we're about to do that, seems like we can

08:20:33   3   go ahead and get that done.

08:20:36   4        MR. D'AMICO:  Judge, I think and we know there are

08:20:42   5   problems with speciation, we know other mold culture grow out

08:22:27   6   afterward, but we believe there would be trace evidence of some

08:22:36   7   initial stages of mold growth.  And we believe we can speciate by

08:22:45   8   doing an adequate examination.

08:22:48   9        We know that there will be challenges from the defense

08:23:00  10   and whether or not we've met our burden of proof and whether or not

08:23:05  11   it meets scientific methodology, but that's an issue for another

08:23:11  12   day.

08:23:14  13        THE COURT:  All right.  Assuming that the defendants

08:23:20  14   decide that they would like to have a protocol for mold testing

08:23:25  15   that will not be forthcoming on Monday, when would we think that we

08:23:34  16   could get that?  I am asking defense counsel, I would like to put a

08:23:48  17   deadline on that.  Can we get that July the 31st or August the 2nd?

08:24:03  18        MR. KURTZ:  It's hard for me to commit to July 31st

08:24:14  19   because we don't have a mold expert, I have to go find somebody and

08:24:22  20   then work with a protocol.  I will make a best effort to achieve

08:24:28  21   July 31st.  And if the court wants to put that in an order then,

08:24:34  22   you know, we will do our best to accommodate it.  But I can't

08:24:41  23   commit to that date.

08:24:44  24        THE COURT:  We are going to put August the 2nd and if you

08:24:50  25   can get it earlier, that would be great.  If you can't get it by

08:25:01 1   August the 2nd then you'll have to let us know why and how much

08:25:23 2   progress you've made on it.  But we would like to have it, that

08:25:30 3   testing done during this few weeks in August heeding up to the

08:25:36 4   plaintiffs' reports.

08:25:38 5           MR. KURTZ:  Yes, sir.  We will perform the mold testing

08:25:41 6   in a way that will not disrupt the protocol that is circulated on

08:25:48 7   the next Monday.

08:25:53 8           THE COURT:  Okay.  All right.  That's fine.  We'll go

08:26:04 9   ahead and put August 2nd to get a mold testing protocol from the

08:26:11 10  defense if they choose to do that, they would go ahead and give us

08:26:17 11  a protocol by August the 2nd which is a date one week after the

08:26:25 12  plaintiff begins to complete their protocol on July the 27th.

08:26:36 13          MR. D'AMICO:  August the 2nd is a Sunday.

08:26:44 14          THE COURT:  I'm sorry, August 3rd, the following Monday,

08:26:49 15  the 3rd.

08:26:50 16          MR. MILLER:  We also need the plaintiffs' protocol for

08:26:57 17  the mold testing, your Honor, we don't have that.

08:27:08 18          THE COURT:  I thought we had that.  Frank, when can you

08:27:22 19  get that?

08:27:23 20          MR. D'AMICO:  Haven't we provided that?  Aaron?

08:27:31 21          MR. AHLQUIST:  No.

08:27:31 22          MR. D'AMICO:  I thought we provided the mold.

08:27:35 23          THE COURT:  I thought you had, too.

08:27:37 24          MR. D'AMICO:  It's in this, I think we already provided

08:27:43 25  it.

08:27:44 1    THE COURT: Why don't we double check. If we haven't for

08:27:52 2 some reason, let's get it over today to all involved.

08:27:57 3    MR. KURTZ: There were a couple of remarks that you made

08:28:02 4 and I feel like I have to do something like Mr. Miller did on

08:28:15 5 behalf earlier for the government and that is preserve an objection

08:28:31 6 to the record for the introduction of mold into one of these

08:28:37 7 bellwether cases. I don't think they're a considerable size of the

08:28:46 8 fraction that have been filed that make mold complaints, I didn't

08:28:56 9 read every one of them, but most of them that I've read do.

08:29:03 10    To my knowledge this is the only one specifically that

08:29:13 11 makes a mold claim, and I heard what Frank said about CDC and

08:29:33 12 15,000 complaints, to my knowledge no one has filed mold suits

08:29:44 13 within the MDL, so I feel we have to preserve an objection for the

08:29:50 14 record into the introduction of mold into the MDL.

08:29:55 15    THE COURT: I understand that and as I told you at the

08:30:03 16 outset --

08:30:03 17    I was also very interested as to how mold -- and you're

08:30:11 18 right, mold has been in the background of this but it has never

08:30:16 19 been offered as a claim for which damages were sought and for which

08:30:22 20 injury was caused. It's never been alleged, that's why my prior

08:30:35 21 rulings were, if an expert talks about mold in any of the

08:30:41 22 bellwethers -- and that is still the rule, by the way, for all of

08:30:49 23 the other bellwethers, it can only be referred to as evidence of

08:30:56 24 moisture as it would affect the formaldehyde level in the units.

08:31:06 25    So to be clear, our conversation today pertains only to

Mr. Wright's claim in the December bellwether.  Because I have not

seen mold -- you're right, I have not seen mold alleged as a

specific cause of injury for which a defendant could be held

responsible if the plaintiffs were successful in meeting that

burden.  But I am going to allow it in this case given that we can

get the testing done and given that this may be, sounds like there

are other plaintiffs out there who might want to make a mold

allegation -- this is not a unique, it's not unique that mold has

come up in connection with this case, it is unique or I should say

that this is the first time we broached the issue of it being a

cause for some damages for which compensation is sought.

          MR. MILLER:  This is Henry Miller.  I just want to make a

couple of points very clear from the government's perspective.

What in my opinion is happening when this MDL started the

defendants in the case were the manufacturers and potentially the

United States and the MDL court certified the formaldehyde issue.

None of the maintenance issues were at issue in the litigation.

          But when you expand to mold, now any issue that relates

to maintenance that could potentially be a confounding factor on

these person's health is going to basically be injected into the

trial because the IA/TAC contractor and the fellow contractor are

responsible for maintenance.  So once we added the IA/TAC

contractor as defendants, we're now expanding this case so now this

case is going to envision any and all types of injuries that could

have been the result of faulty maintenance and that would not just

08:35:48  1    be mold but something else, for example, a gas leak.

08:35:55  2              THE COURT:  No --

08:35:56  3              MR. MILLER:  And I understand the court's position, but

08:36:03  4    that is essentially from my perspective when I see and hear what's

08:36:12  5    happening that's the first issue.  And the government objects to

08:36:19  6    that expansion of the litigation in that sense.

08:36:23  7              Secondly, the government objects, for the record, that

08:36:30  8    its decision of the mold at this late date given the December trial

08:36:49  9    unduly prejudices the government and interferes with our ability to

08:36:57  10   adequately prepare and defend the government's defenses in this

08:37:06  11   case.  I do understand if it's added that it's added, but I think

08:37:12  12   all of the deadlines need to be moved back and I don't think it's

08:37:18  13   reasonable to expect the parties, the defendants to come up with

08:37:23  14   mold experts by August 2nd.

08:37:27  15             I mean, when you have a mold case, it is a separate

08:37:32  16   action and you go out and find experts and you figure out what it

08:37:49  17   is, we're literally being given essentially ten days while I have

08:37:59  18   two other cases in front of it that I am preparing and have expert

08:38:05  19   reports due on expert depositions going on.  And I do not believe

08:38:17  20   that that is fair and appropriate and so, therefore, I object not

08:38:25  21   necessarily on adding the mold cases if the court wants to do that

08:38:38  22   on that ground, I object on the MDL ground.

08:38:47  23             But if the court is going to allow the amendment, I think

08:39:05  24   you have to change all of the deadlines in this case, including the

08:39:11  25   trial deadline.  And that's the objection I am making.

08:39:15  1          With that said obviously we will do our best to comply

08:39:20  2  with the court's orders.

08:39:23  3          THE COURT:  File a motion with regard to any other

08:39:35  4  deadlines that need to be changed, file a motion if you need to do

08:39:42  5  that and I will certainly be willing to change over deadlines short

08:39:52  6  of changing the trial date.  If we get further down the road where

08:40:05  7  this is going to be a problem and we can't meet the trial date, we

08:40:13  8  will take that issue up at the appropriate time.  I don't see right

08:40:19  9  now that we need to continue the trial date.

08:40:28 10          But if there are other deadlines other than these expert

08:40:29 11  deadlines, file a motion and we'll address those.  I understand all

08:40:39 12  of that.

08:40:46 13          Insofar as mold allegations are concerned, that will be

08:40:49 14  the only bellwether where that is going to be a component.  So

08:41:00 15  plaintiffs, if any other bellwether -- I assume it's not going to

08:41:22 16  be for any of the first two bellwether trials since those deadlines

08:41:29 17  have already come and gone -- but if any of the bellwether

08:41:35 18  plaintiffs that have been identified for the January and I think

08:41:42 19  the one after that, the fifth bellwether are going to make a mold

08:41:49 20  allegation, you need to replace them with somebody else.  And I am

08:41:54 21  telling you that now on July the 17th so that we don't have this

08:42:01 22  happen again.  This will be the only bellwether that relates to a

08:45:18 23  mold allegation.  Am I clear on that?

08:45:22 24          MR. GEIGER:  Understood, your Honor.

08:45:26 25          THE COURT:  Tell me soon like within the next day or two

08:45:46  1   if one of those other people is going to have a mold allegation,

08:45:52  2   because if that's the case, we can now substitute a new bellwether

08:46:01  3   plaintiff now and not have to worry about trying to patch things

08:46:13  4   together to get expert reports relative to mold.  So double check

08:54:32  5   that.

08:54:32  6        And I have the same concern about expanding beyond

08:54:43  7   formaldehyde, my responsibility was to try to handle in a

08:55:12  8   multidistrict fashion complaints about formaldehyde exposure.  The

08:55:17  9   problem with not handling the mold at this point that in order to

08:55:27  10  hopefully achieve a resolution of all of these cases I've got to be

08:55:33  11  able to pick up that piece to the extent that it is not unique to

08:55:39  12  this plaintiff alone but that it may be a common component to a

08:56:09  13  larger group of plaintiffs.

08:56:11  14       MR. D'AMICO:  And, Judge, I would say that that's the

08:56:32  15  point if I felt that was an oddball case and it was one of a rarity

08:56:49  16  I would not be proposing that we go forward with this case.  I

08:57:06  17  would say, look, we have an anomaly, let's kick him out.  All of

08:57:15  18  our statistical analysis and what CDC showed, just like you did in

08:57:33  19  this selection process, one is going to be a mold case and that's

08:57:39  20  what we found.

08:57:41  21       THE COURT:  Frank, all I can tell you, cautionary word,

08:57:45  22  if you do not have an expert who can help you with your burden of

08:58:00  23  proof, I would expect you to abandon the claim with regard to mold

08:58:29  24  exposure.

08:58:30  25       MR. D'AMICO:  Absolutely.  And the only reason I am

08:58:35  1   addressing, if you look at the attachment from FEMA about important

08:58:55  2   information about formaldehyde residents, they warn that other

08:59:12  3   pollutants, mold and smoke --

08:59:22  4        THE COURT:  All of that is well and good, but you need

08:59:35  5   testimony to meet your burden of proof that this man --

08:59:42  6        MR. D'AMICO:  Judge --

08:59:48  7        THE COURT:  Frank, would you let me talk, please.  That

08:59:53  8   this plaintiff suffered an injury as a result of not just any mold

09:00:03  9   but mold that was present in his unit while he lived in it and not

09:00:17 10   mold from any other source.  So you better be prepared to meet that

09:00:26 11   burden.  And if you can't, I would expect you to abandon the claim,

09:00:45 12   sooner rather than later.

09:00:48 13        MR. D'AMICO:  Absolutely, Judge.

09:00:51 14        THE COURT:  All right.  What else, anything else?

09:00:56 15        All right.  Like I said, we have a transcript of this but

09:01:04 16   we will issue an order with the upshot of what we've accomplished

09:01:10 17   here today.  And I appreciate all of your hard work on this, I know

09:01:16 18   it's difficult and I know it's a daily thing that you all are

09:01:22 19   putting a lot of time in on it, but let's see if we can get it done

09:01:37 20   and try to avoid any other Johnny-come-lately issues that were not

09:01:47 21   the subject of some allegation.

09:01:56 22        All right.  Thank you all.

09:01:58 23        MR. MILLER:  Thank you, your Honor.

09:02:02 24        MR. GEIGER:  Thank you, your Honor.

09:02:04 25     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

* * * * * *

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

Karen A. Ibos, CCR, RPR, CRR
Official Court Reporter