UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | MDL NO. 1873<br><br>SECTION "N-5" |
| THIS DOCUMENT IS RELATED TO: *Joann Snyder; Anjell Snyder; Keyanta Clay, individually, and for her minor child, D. Clay; and The Estate of Marie Dixon, vs. Forest River, Inc. and Shaw Environmental, Inc. No. 09-06782* | JUDGE ENGELHARDT MAG. JUDGE CHASEZ |

## FIRST SUPPLEMENTAL AND AMENDING PETITION FOR DAMAGES

NOW INTO COURT, through the undersigned counsel, comes Joann Snyder; Anjell Snyder; Keyanta Clay, individually, and for her minor child, D. Clay; and The Estate of Marie Dixon, persons of full age of majority, on behalf of themselves and on behalf of individuals who lack the capacity to sue individually (hereinafter, "Plaintiffs"), through undersigned counsel, wish to amend their Petition for Damages as follows:

1.

By supplementing and amending paragraph II to add an additional defendant to read as follows:

"I.

The Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the 'Federal Government,' 'Government' and/or 'FEMA'."

2.

By adding the following additional paragraphs as paragraph IIIA-F to read as follows:

"IIIA.

The Named Plaintiffs resided or lived in a travel trailer, park model, and mobile home (hereinafter referred to as "housing unit") in the State of Louisiana was provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

"IIIB.

Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet.  They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

"IIIC.

Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square

feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

"IIID.

Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

"IIIE.

The residence of the Named Plaintiffs was rendered uninhabitable following Hurricanes Katrina and/or Rita, leaving the plaintiffs homeless and in need of housing assistance.

"IIIF.

FEMA contracted with Forest River, Inc. to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

3.

By adding the following additional paragraphs as paragraph XA, B, C, D, E and F to read as follows:

"XA.

Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the

housing units.  Pursuant to federal law, the defendants are required to display a "Health

Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde.  Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure.  Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk.  Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air.  Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer.  Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels.  When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels.  Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.
        *See* 24 C.F.R. §3280.309.
                                    "XB.

According to the National Cancer Institute, formaldehyde has been classified as

a human carcinogen (cancer-causing substance) by the International Agency for

Research on Cancer and as a probable human carcinogen by the U.S. Environmental

Protection Agency ("EPA").  Additionally, the Agency for Toxic Substances and Disease

Registry ("ATSDR") has reported to FEMA and members of Congress that not only is

formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also

that there is no recognized safe level of exposure, and that any level of exposure to

formaldehyde may pose a cancer risk, regardless of duration.

"XC.

Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases.   Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects.  In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to1 ppm.  In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

"XD.

HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes).   HUD has far stricter exposure limits for residential formaldehyde emissions.  By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...".  *See* 24 C.F.R. §3280.308.

"XE.

Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the

5

FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|--------|----------|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, *available at* http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

"XF.

FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. §

5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance"  provided under subparagraph (c)(1)(A).

4.

By adding the following additional paragraphs as paragraph XIA-XIF to read as follows:

"XIA.

Forest River, Inc. is a manufacturer of each of the housing units occupied by the Named Plaintiffs, which units constitute products under the Louisiana Products Liability Act [LPLA].

"XIB.

The exposure to the Named Plaintiffs to formaldehyde fumes from Forest River, Inc.'s products and equipment resulted from the normal, foreseeable, and intended use of the products and equipment, without substantial alteration in the condition in which Forest River, Inc. sold these housing units.

"XIC.

The design of the housing units, using plywood, press board, other composite wood products and other products that contain formaldehyde is defective and posed an unreasonable risk of harm to the Named Plaintiffs.

7

"XID.

Alternatively, the use of plywood, press board, other composite wood products and other products that contain formaldehyde constitutes a defect in composition or manufacture that posed an unreasonable risk of harm to the Named Plaintiffs.

"XIE.

Forest River, Inc.'s product, equipment and supplies used by the Named Plaintiffs were in a defective condition and were unreasonably dangerous under normal use at the time the products and equipment left Forest River, Inc.'s control.   The Named Plaintiffs were intended and foreseeable user of the alleged defective products and damages and losses to the Named Plaintiffs reasonably could have been anticipated by Forest River, Inc..

"XIF.

The defects in Forest River, Inc.'s housing units are the result of and/or include, but are not limited to, the following:

i.  In failing to design their respective products so as not to emit dangerous levels of formaldehyde;

ii.  In providing housing units which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;

iii.    In providing housing units which, by virtue of a lack of an adequate warning(s), were unreasonably dangerous under reasonably anticipated use;

8

iv.     In providing housing units which did not conform to the express warranties made by Forest River, Inc. regarding their fitness for use as reasonably anticipated;

v.     In manufacturing, testing, marketing, distributing, licensing and selling of unreasonably dangerous housing units;

vi.     In failing to properly test the housing units to property evaluate the level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

vii.     In failing to warn the Named Plaintiffs of the unreasonably dangerous nature of the housing unit occupied by the Plaintiffs, or warn adequately of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.

viii.     In failing to ensure that the housing units it manufactured and provided to the Named Plaintiffs were suitable for their intended use;

ix.     In failing to adhere to any and all express warranties of fitness and safety for the housing units they manufactured and provided;

x.     In manufacturing and providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

xi.     Such other indicia of fault under the LPLA  as will be shown at the trial of this matter.

5.

By adding the following additional paragraphs as paragraph XXIXA-XXIXL to read as follows:

9

"XXIXA.

Shaw Environmental, Inc. qualifies as manufacturers under the Louisiana Products Liability Act ("LPLA"), as they performed work pursuant to their contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing units constitute products under the LPLA.

XXIXB.

The increased exposure to formaldehyde fumes from the alteration of the temporary housing units by Shaw Environmental, Inc. resulted from the normal, foreseeable, and intended use of the products and equipment.

XXIXC.

The installation and alteration of the temporary housing units, the modifications to the manufacturers' designs, and the "blocking" of units off their wheel base, altered the product which increased the effects of the product's defect and posed an unreasonable risk of harm to each Named Plaintiffs.

XXIXD.

The Named Plaintiffs were intended and foreseeable users of the alleged defective products, and damages and losses to the Named Plaintiffs reasonably could have been anticipated by Shaw Environmental, Inc.

XXIXE.

Shaw Environmental, Inc., by installing the temporary housing units on concrete blocks for extended occupancy and, further, by installing residential appliances and heating and air conditioning units, knowingly and intentionally modified the design and the actual use of the units.

XXIXF.

The defects in Shaw Environmental, Inc. product are the result of and/or include, but are not limited to the following:

a. In creating stress and flexing on the frames of the units by lifting significant weight from the wheel base, which distorted the travel trailers' shells allowing for increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

b. In providing temporary housing units to the Named Plaintiffs which, by virtue of their composition, refurbishment, reconditioning, and/or construction were unreasonably dangerous under reasonably anticipated use;

c. In providing temporary housing units to the Named Plaintiffs which, lacking adequate warnings, were unreasonably dangerous under reasonably anticipated use;

d. In failing to warn the Named Plaintiffs of the unreasonably dangerous nature of the travel trailer(s) converted to temporary housing units  for their intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

e. In failure to ensure that the temporary housing units they installed, refurbished, and reconditioned were suitable for their intended use, as long term housing;

f. In failing to adhere to any and all of the warning against the jacking of the units with weight off their wheel base by the manufacturers;

11

g.  In failing to follow the manufacturers' instructions for the installation and intended use of the temporary housing units;

h.  In providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

i.  Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

XXIXG.

At all relevant times Shaw Environmental, Inc. was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

XXIXH.

Shaw Environmental, Inc. owed a duty to the Named Plaintiffs to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

XXIXI.

Shaw Environmental, Inc. knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each plaintiff, and that the temporary housing units would be used in the manner that each plaintiff herein used the temporary housing units.

XXIXJ.

Shaw Environmental, Inc. breached their duty to the Named Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

a.      Failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy;

b.      Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

XXIXK.

Shaw Environmental, Inc. actions were the proximate cause of the increased exposure of formaldehyde to the each Named Plaintiff.

XXIXL.

Shaw Environmental, Inc. contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

6.

By adding the following additional paragraphs as paragraph XXXA-XXXFF to read as follows:

XXXA.

The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the

HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

XXXB.

Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or "off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

XXXC.

In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006. The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels. *See* Response of the U.S. Department of Labor,

14

Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

XXXD.

Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs.  *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

XXXE.

The Federal Government also continued to supply the defective and dangerous housing units to the Plaintiffs after March of 2006.

XXXF.

The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

15

XXXG.

The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied  housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value.  Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf)    and  D (*available at*    http://oversight.house.gov/documents/20070719113219.pdf)  attached thereto.

XXXH.

The Federal Government continued to supply the defective and dangerous housing units to the Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, *supra*, and              Exhibits              E              (*available              at* http://oversight.house.gov/documents/20070719113322.pdf),   I   (*available   at* http://oversight.house.gov/documents/20070719113515.pdf)   and   M   (*available   at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

XXXI.

While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government

intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."   Union of Concerned Scientists, *supra*, and Supplemental       A       (various       emails       *available*       *at* http://oversight.house.gov/documents/20070809120917.pdf)   and   Supplemental   B (various       emails       *available*       *at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

XXXJ.

Named Plaintiffs aver that, even as the Named Plaintiffs were being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

XXXK.

FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much

17

lower than previously expected, with anticipated levels being more than 100 times higher.  The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light.  Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

## XXXL.

FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers.  This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months,  were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana.  Union of Concerned Scientists and Exhibit R attached thereto, *supra*.  *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available at* http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report _0507.pdf.

## XXXM.

This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the

trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years.   Union of Concerned Scientists, *supra*.

### XXXN.

FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing unit occupied by the plaintiffs supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiffs herein as a result of their exposure to formaldehyde.  FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

### XXXO.

FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review.  FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units.  *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin,

19

Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

XXXP.

FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006.  The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern,"a level nearly 400 times the ATSDR's annualized exposure limit.  Yet even applying this "level of concern," the average sampling results still were higher.  *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

XXXQ.

Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics."  Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19,

2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

### XXXR.

On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

### XXXS.

Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation "did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

### XXXT.

The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

XXXU.

It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

XXXV.

The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile

home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.  *Id.* at 4.

XXXW.

The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions.  *Id.* at 5-6, 11.

XXX X.

As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing.  The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

XXXY.

The Federal Government's actions with regard to these plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies

23

regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

XXXZ.

Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

XXXAA.

At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to each and all of the Named Plaintiffs herein.

XXXBB.

The Federal Government was obligated to promptly warn each Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal Government was aware.

XXXCC.

The Federal Government, after becoming aware of the potential for such harm, violated this duty to the Named Plaintiffs, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

XXXDD.

As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, each Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

XXXEE.

Further, since the Plaintiffs are within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiffs specifically plead the application of the doctrine of negligence *per se.*

XXXFF.

The Federal Government was negligent and at fault in the following non-exclusive particulars:

a.  In failing to warn the Named Plaintiffs of the unreasonably dangerous nature of the housing unit which that Plaintiffs occupied

b.  In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

c.  In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of the Named Plaintiffs, on becoming aware of the formaldehyde danger associated with the unit.

d.  Such other actions of negligence and fault as will be shown at the trial of this matter.

7.

All other statements and allegations contained in the original Petition for Damages are realleged and incorporated herein as if copied *in extenso.*

WHEREFORE, Plaintiffs pray that:

I.      Defendant United States of America, through the Federal Emergency Management Agency, be cited and served with a copy of the original Petition for Damages and this First Supplemental and Amending Petition, and that defendants Forest River, Inc. and Shaw Environmental, Inc. be cited and served with a copy of this First Supplemental and Amending Petition for Damages;

II.     After due proceedings are had, Plaintiffs pray for judgment in her favor and against all Defendants in an amount reasonable under the premises, together with legal interest thereon from the date of judicial demand, and for all costs of these proceedings, and for all appropriate legal and equitable relief, and for trial by jury.

J. MICHAEL VERON (#7570)
J. ROCK PALERMO III (#21793)
VERON, BICE, PALERMO & WILSON, L.L.C.
P. O. BOX 2125
LAKE CHARLES, LA  70602
(337) 310-1600
(337) 310-1601 (FAX)

PAUL A. DOMINICK
RICHARD L. TAPP, JR
DENNIS J. LYNCH
NEXSEN PRUET, L.L.C.
P. O. BOX 486
CHARLESTON, SC  29402
(843) 577-9440
(843) 720-1777

SEAN K. TRUNDY
SEAN KEVIN TRUNDY, L.L.C.
P. O. BOX 41343
NORTH CHARLESTON, SC  29423
(843) 747-4424
(843) 747-4489


BY:    /s/  J. Rock Palermo III