UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | MDL NO. 07-1873 <br><br> SECTION N(5) <br><br> JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO: <br> *Earline Castanel v. Recreation by Design, L.L.C., et al.*, No. 09-3251 (E.D. La.) | MAGISTRATE CHASEZ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT
OF SHAW ENVIRONMENTAL, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT REGARDING PRESCRIPTION</u>**

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. ("Shaw") moves this Court for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing all claims against Shaw in this matter for the reason that plaintiff Earline Castanel's claims have prescribed.  Ms. Castanel moved into her trailer in March 2006, and she now has testified under oath that she began to experience symptoms that she associates with formaldehyde exposure shortly after moving into the Trailer. Ms. Castanel, however, did not file this action until April 8, 2009.  More than a year passed between the accrual of her action and the date of filing, with the effect that her claims against Shaw have prescribed on their face.  Moreover, on the facts of this case, Shaw had no responsibility – whether maintenance or otherwise – with regard to the emergency housing unit

at issue in this litigation after June 1, 2006.  Therefore, to the extent that plaintiff is claiming that she continued to be harmed after she moved into the EHU, any Shaw conduct at issue concluded prior to or on June 1, 2006.  This was nearly three years before Ms. Castanel filed suit.

Shaw recognizes, of course, the fact that this Court has previously ruled on a similar motion by Shaw (and one by Fluor) in other cases in this MDL.[1]  As an initial matter, Shaw respectfully disagrees with the Court's analysis set forth in those orders, and Shaw has requested that the Court certify for interlocutory review the legal principles set forth therein.  Leaving a possible appellate review aside, however, there is a critical distinction present in this case; namely, that Recreation by Design (the manufacturer of the trailer at issue in this case) was not named as a defendant in the *Hillard* case.  In the prior motion practice on prescription, the plaintiffs used the fact that Gulf Stream and Forest River had been named in *Hillard* as a "hook" to relate the claims against Fluor and Shaw (respectively) all the way back to the *Hillard* filing date.  But because Recreation by Design was not originally named in *Hillard*, that hook is not present here, and accordingly prescription was not interrupted in this case.  Moreover, this motion presents a critical issue that will be common to a sizeable fraction of the cases in this MDL in which no defendant – neither the contractor nor the manufacturer – were originally named in *Hillard.*

Thus, under the facts of this case, Ms. Castanel's claims against Shaw prescribed, and Shaw respectfully urges the Court to enter a summary judgment dismissing those claims.

---

[1] The Court's Order and Reasons, dated September 2, 2009 (Rec. Doc No. 3012); The Court's Order and Reasons, dated November 16, 2009 (Rec. Doc. No. 7241).

# BACKGROUND

**A.    *Ms. Castanel Occupied the Trailer in March 2006.***

As part of its Individual Assistance / Technical Assistance Contract (the "FEMA Contract") with the Federal Emergency Management Agency ("FEMA"), Shaw was directed to install a travel trailer on property owned by an acquaintance of Ms. Castanel at 2261 Urquhart, New Orleans, Louisiana.  Shaw discharged this responsibility by having one of its subcontractors install a Recreation by Design trailer bearing VIN # 5CZ200R2461125294 (the "Trailer") as directed.  Then, on March 11, 2006, one of Shaw's subcontractors and Ms. Castanel conducted a "Ready for Occupancy" inspection.  The inspection showed the Trailer to be in good condition, and Ms. Castanel signed the inspection form and accepted the Trailer.[2]  At that point, Ms. Castanel was considered to be "Leased-In" to the Trailer.

**B.    *Ms. Castanel Knew About Her Alleged Injuries Shortly After Moving into the Trailer in March 2006.***

Ms. Castanel contends that she began to suffer a litany of allegedly formaldehyde-related complaints immediately upon occupancy in early 2006, as shown by the following excerpt from Ms. Castanel's Plaintiff Fact Sheet:[3]

---

[2]   *See* Temporary Housing Unit Inspection Report, dated March 11, 2006, a copy of which is attached as Exhibit "B."  Although Ms. Castanel's Plaintiff Fact Sheet (PFS) indicates that she moved into the Trailer in February 2006, documentation associated with a FEMA aid recipient moving into that Trailer was signed and dated by Ms. Castanel on March 11, 2006.  For purposes of this motion, whether Ms. Castanel moved into the trailer in February 2006 or March 2006 is irrelevant because in either case her claim accrued more than one year before filing the instant action, and thus, is time-barred.

[3]   *See* Earline Castanel's Plaintiff Fact Sheet ("PFS"), attached as Exhibit "A," pp. 3-4.

3. <u>During the time that you lived</u> in your FEMA trailer, did you experience or report to a physician any of the following symptoms? If yes, place a check mark (✓) by the symptom that you experienced.

- ☒ irritation to eyes
- ☐ burning of eyes
- ☒ tearing of eyes
- ☒ irritation to nasal membranes (inside of nose)
- ☐ burning of nasal membranes (inside of nose)
- ☐ bleeding of nasal membranes (inside of nose)
- ☒ irritation or itching of skin
- ☐ burning of skin
- ☒ rashes on skin
- ☒ drying or scaling of skin
- ☐ scaling or itching of eyelids

- ☒ irritation or swelling of eyelids or eye area
- ☒ tingling or swelling of lips or face area
- ☒ headaches
- ☒ nausea
- ☐ vomiting
- ☐ bloody vomiting
- ☒ abdominal pain
- ☒ diarrhea
- ☒ difficulty in breathing
- ☐ wheezing
- ☒ shortness of breath

- ☐ persistent cough
- ☒ tightness of the chest
- ☐ bronchitis
- ☒ throat irritation
- ☒ hoarseness
- ☐ laryngitis
- ☐ pneumonia
- ☒ upper respiratory tract infections
- ☐ pulmonary edema
- ☐ asthma attacks for the first time in your life
- ☐ asthma attacks that are recurrence of childhood asthma
- ☐ allergies for the first time in your life
- ☒ worsening of allergies that you had previous to living in FEMA trailer

- ☐ allergic contact dermatitis
- ☒ dizziness
- ☐ unconsciousness
- ☐ convulsions or seizures
- ☐ blood in urine
- ☐ abnormal liver enzymes
- ☐ nephritis (inflammation of kidneys)
- ☐ low blood pressure
- ☒ hypothermia (low body temperature)
- ☐ miscarriage or stillbirth
- ☐ abnormal laboratory tests on blood
- ☐ abnormal laboratory tests on urine

Please list any other symptoms you have suffered as a result of residing in a FEMA trailer (not listed above) and any conditions for which you have been diagnosed by a physician._____
sinus_____
_____
_____

4

At her deposition, plaintiff testified she began to experience health-related problems associated with exposure to formaldehyde a few weeks after moving into the Trailer. Specifically, within four to five weeks of moving into the Trailer she began to experience breathing and sinus problems.

> A: Well, when I was in the trailer, after I was in there for awhile, not too long, then I started having my nose stopped up. I would get so stopped up like I had to go to the door to see if I can catch some air, I couldn't like hardly breathe.
>
> Q: So you had breathing problems?
>
> A: Yes. My sinus. When I get like that I couldn't, I don't know, I keep going like that (demonstrating), trying to catch my breath because I couldn't breathe through my nose.
>
> Q: And this happened soon after you moved into the trailer?
>
> A: It was like five weeks or so after I got in there, four or five weeks it started getting like that.[4]

According to Ms. Castanel, within five to six weeks of moving into the trailer "everything got worse,"[5] her eyes became puffy and itchy, and she suffered headaches that hurt much more than a regular headache.[6] Three months after moving into the trailer she began to suffer dry itchy skin, nausea, abdominal pain, and diarrhea. Ms. Castanel testified that before moving into the trailer she was not sick.

> Q: Just to make it clear, within five to six weeks of moving in you started suffering these symptoms, sinus problems, itching, dry itching skin, generally not feeling good; is that right?

---

[4] *See* Exhibit "C" to Memorandum, Castanel Deposition, pp. 32-33.

[5] *Id*. at 41-42.

[6] *Id*. at 36-38; 41-42.

5

> A: Yes.
>
> Q: Prior to moving into the trailer you weren't experiencing those symptoms or those problems?
>
> A: No.
>
> Q: You didn't have those problems before?
>
> A: No. I had---I used to have my nose stop us a little bit but nothing like I had it in there.
>
> Q: It was different and it was much worse?
>
> A: Yes, it was much worse.[7]

Most tellingly, Ms. Castanel attributed the above-referenced injuries to living in the Trailer.

> Q: And did these problems go away after you moved back into your house?
>
> A: I might have a – well, I'll say yes, because I don't have that anymore.
>
> Q: So these were problems that you had because you attributed because of the trailer?
>
> A: Yeah.[8]
>
> . . .
>
> Q: And after you were in there a while you thought the trailer was making you sick?
>
> A: There was nothing else I see could be making me sick, there was nothing else. Like I said, I don't drink, I don't smoke, and I don't run the streets, so I don't see nothing else could make me sick.

In light of the statements made in Ms. Castanel's PFS, together with her deposition testimony, there can be no serious dispute that she actually knew about her symptoms, and that

---

[7] *Id.* at 68-69.

[8] *Id.* at 70.

6

she specifically associated them with the Trailer, shortly after she first began to occupy the Trailer in March 2006.

### C. *Shaw Had Nothing To Do With the Trailer After June 1, 2006.*

FEMA's contract with Shaw originally called for a term of service that expired on January 15, 2006. Although the terms of certain FEMA Contract tasks were extended, during May 2006, FEMA elected to separately contract maintenance responsibility for trailers installed at private sites directly to "Maintenance and Deactivation Contractors," or "MDCs." FEMA's process for transferring the contractual maintenance responsibility directly to the MDCs became known as the "MDC turnover."[9]

As discussed during a May 18, 2006, meeting among representatives of FEMA, Shaw, and certain MDCs, the MDC turnover was to proceed by zip code, in that different MDCs would assume responsibilities for trailers located in different zip codes.[10] Because the Trailer was located in zip code 70117,[11] C. Martin Company was the MDC that accepted responsibility for the Trailer.[12] C. Martin accepted the Trailer on June 1, 2006.[13]

---

[9] The Affidavit of Allison Hansen (the "Hansen Affidavit"), Shaw's Operations Manager during the FEMA Contract, is attached hereto as Exhibit "D." *See* ¶¶ 3-4.

[10] Ex. "D," Hansen Affidavit, ¶ 5.

[11] Ex. "A," PFS, p.6. It should be noted that Ms. Castanel's PFS incorrectly states plaintiff lived in her Trailer on property located in a 70116 zip code. In any event, regardless of whether the Trailer was located in a 70116 or 70117 zip code, C. Martin was responsible for taking over all duties and responsibilities for Trailers located in both of those zip codes.

[12] Ex. "D" Hansen Affidavit, ¶ 7.

[13] Ex. "D," Hansen Affidavit, ¶ 7.

7

Once C. Martin accepted the Trailer through the FEMA MDC turnover process, Shaw no longer had any responsibilities with regard to the Trailer, through the FEMA Contract or otherwise. Moreover, it is clear that FEMA directed, participated in, was informed of, and accepted, the transfer of responsibilities from Shaw to C. Martin, which included responsibility for the Trailer. On June 1, 2006, C. Martin's Robyn Williams emailed Shaw's Pamela Wolfe a spreadsheet that listed all of the trailers that had been transferred to C. Martin.[14] At line 318 of the spreadsheet, the Trailer is indicated as having been transferred to C. Martin.[15] Moreover, as reflected on the "To:" line of Ms. Williams' email, C. Martin notified FEMA of its acceptance of the trailers through Gary Keyser (the FEMA Contracting Officer's Technical Representative assigned to Shaw) and James Blair of FEMA.[16]

In sum, as of June 1, 2006, responsibility for the Trailer had been transferred from Shaw to C. Martin. This turnover occurred at the direction of, and with the full knowledge of, FEMA. Shaw simply had no responsibility for the Trailer after that date. Shaw did not maintain the Trailer after that date, and Shaw did not participate in the deactivation of the Trailer.[17]

---

[14] Ex. "D," Hansen Affidavit, ¶¶ 8-9.

[15] A copy of an excerpt from the spreadsheet (which is quite long) is attached to the Hansen Affidavit as Exhibit "2" to that document. Information about other disaster relief applicants, which is protected by the Privacy Act, has been redacted.

[16] Ex. "D," Hansen Affidavit, ¶ 10. In fairness, Mr. Keyser's email address is spelled incorrectly, but FEMA received notice through Mr. Blair at a minimum, and there is no evidence or contention that FEMA lacked knowledge of the turnover.

[17] Ex. "D," Hansen Affidavit, ¶ 12.

### D. *The Court's Previous Rulings On Prescription*

As mentioned above, this Court previously issued rulings on the issue of prescription presented in Motions for Summary Judgment filed by Shaw (Rec. Doc. No. 2581) and Fluor (Rec. Doc. 2728) on August 10, 2009 and August 17, 2009, respectively. Based on the record in each of the relevant lawsuits (*Wright* and *Alexander*), Shaw and Fluor asserted that the claims of the respective plaintiffs had prescribed on their face, and thus, it was plaintiffs' burden to prove suspension, interruption, or some other exception to prescription.

In this regard, both plaintiffs argued that under the doctrine of *American Pipe* tolling, prescription of their respective claims against Shaw and Fluor was suspended by the filing of *Hillard, et al. v. United States of America, et al.*, 06-cv-2576 on May 18, 2006. To support this argument, plaintiffs relied on a decision from the Seventh Circuit, *Appleton Electric Co. v. Graves Truck Line*, which held the doctrine of *American Pipe* tolling applied to unnamed defendants in a class action suit against a **"defendant class."**[18] Alternatively, the plaintiffs argued that the statutory period was suspended under Article 2324 of the Louisiana Civil Code.

This Court agreed with plaintiffs and denied both motions, holding that each of these theories applied to suspend the running of prescription.[19] Specifically, the Court agreed that notwithstanding the fact that there was no clear assertion of a defendant class in *Hillard*, adding "Unnamed Mobile Home Vendors to the Federal Emergency Management Agency" to the master class action complaint equated to naming a defendant class because "there [were]

---

[18] 635 F.2d 603 (7th Cir. 1980).

[19] Order and Reasons dated September 2, 2009, denying Fluor's Motion for Summary Judgment Based on Prescription (Rec. Doc. No. 3012); Order and Reasons dated November 16, 2009, denying Shaw's Motion for Summary Judgment Regarding Prescription (Rec. Doc. No. 7241).

numerous manufacturing defendants as well as contractor defendants and insurers named therein." In effect, the Court found that (1) the "Unnamed Mobile Home Vendors to the Federal Management Agency," i.e. the manufacturing defendants, was a "defendant class" and (2) Shaw and Fluor, both contractor defendants, would fit into that class. Thus, based on the holding in the *Appelton* case, the Court determined that *American Pipe* applied to save plaintiffs' claims from prescribing in the *Alexander* and *Wright* cases.

The Court also found that Article 2324 of the Louisiana Civil Code, which provides that interruption of prescription (caused by the filing of *Hillard*) as to one joint tortfeasor is effective against all joint tortfeasors, should be combined with *American Pipe* tolling so as to affect putative class members who have not yet made claims in their own names.

## LAW AND ARGUMENT

### I.     SUMMARY JUDGMENT STANDARD

Plaintiff's claims against Shaw are ripe for summary resolution and should be dismissed as a matter of law. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[20]

Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed. However, once it is shown that more than a year has elapsed between the time of the tortious conduct and the filing of a tort suit, the burden shifts to the plaintiff to

---

[20] Fed. R. Civ. Pro. 56, *see also American Crew Boats and Marine Transportation, LLC v. Fisk Corp. et al.*, 2008 WL 4449966, *1 (E.D. La. 9/29/08) (Engelhardt, J.) (quoting Fed. R. Civ. Pro. 56(c)).

prove suspension, interruption, or some other exception to prescription.[21] To satisfy this burden, the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.[22]

Summary judgment dismissing Shaw from this lawsuit is appropriate because the record clearly reflects that Ms. Castanel did not file her claim against Shaw within the one-year prescriptive period as required under Louisiana law. Accordingly, the only way for plaintiff to defeat Shaw's Motion for Summary Judgment is to prove that prescription somehow was suspended or interrupted or that some other exception to prescription applies. Plaintiff cannot do so.

**II. MS. CASTANEL'S CLAIMS ARE BARRED BY LIBERATIVE PRESCRIPTION OF ONE YEAR.**

The character of an action disclosed in the pleadings determines the prescriptive period applicable to that action.[23] It is well settled under Louisiana law that a cause of action based on negligence is a delictual action subject to a one year prescriptive period commencing on the "day the injury or damage is sustained."[24] This period is equally applicable to claims brought under the LPLA.[25]

---

[21] *Terrebonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002), *citing In re Moses,* 788 So.2d 1173, 1177-78 (La. 2001); *Stett v. Greve,* 810 So.2d 1203, 1208 (La. App. 2nd Cir. 2002); *Strata v. Patin,* 545 So.2d 1180, 1189 (La. App. 4th Cir.), *writ denied,* 550 So.2d 618 (La.1989).

[22] *American Crew Boats*, 2008 WL 4449966 at 1 (citations omitted).

[23] *Kendall Co. v. Southern Medical Supplies, Inc.*, 913 F. Supp. 483 (E.D. La. 1996).

[24] La. Civ. Code. Art. 3492.

[25] *Denoux v. Vessel Management Services, Inc.*, 2007-0163 (La. App. 4 Cir. 7/11/07), 964 So.2d

As a general rule, prescription begins to run "when plaintiff has actual or constructive notice of the alleged tortious act."[26] Stated another way, prescription begins to run when it can be objectively determined that the exercise of reasonable diligence would have alerted a reasonably minded plaintiff of the reasonable possibility that it was a victim of tortious conduct.[27]

Here, the plaintiff's knowledge of her alleged injuries was clear. She acknowledged feeling sick soon after moving in, and she attributed her illness to the trailer.[28] This fact alone – and especially taken together with all of the other admissions set forth above – means that Ms. Castanel's claims against Shaw prescribed in 2007. However, even if this was not the case, by plaintiff's own account she claims that she "first became aware of the presence of formaldehyde and that it could have been causing her injuries" in March 2007.[29] Based on this assertion, plaintiff's claims would have prescribed at the latest in March 2008. Plaintiff did not file this action until April 2009. Thus, even based on plaintiff's own assertion, her claims would have prescribed before the filing of this action.

---

1081 (Louisiana's one-year prescriptive period applies to all delictual actions, including those brought pursuant to the Louisiana Products Liability Act); *see also Bultman v. Danek Medical, Inc*., 1999 WL 33537321 (E.D. La. 1999).

[26] *Mistich v. Cordis Manufacturing Co*., 607 So. 2d 955, 956 (La. App. 4th Cir. 1992).

[27] *Griffin v. Minberger*, 507 So. 2d 821, 823 (La. 1987).

[28] Ex."C", Castanel Deposition, pp. 32-33, 35-38, 41-42, 68-71, 111-112.

[29] Plaintiff's Memorandum In Opposition to Defendant's Motion to Dismiss the Claims of Plaintiff Earline Castanel's FTCA for Lack of Subject Matter Jurisdiction (Rec. Doc. No. 9402), p. 3.

### III. PRESCRIPTION WAS NOT SUSPENDED OR INTERRUPTED.

Because Shaw has established that more than one year has passed between the time Ms. Castanel discovered her alleged injuries and the filing of this suit, the burden shifts to the plaintiff to prove an exception to prescription.

#### A. The Putative Class Actions Against Trailer Manufacturers Had No Effect on the Prescription of Ms. Castanel's Claims Against Shaw.

Shaw anticipates that plaintiff may argue that prescription was suspended by the commencement of the *Hillard* class action pursuant to the doctrine of *American Pipe* tolling (or, equivalently, Article 596 of the Louisiana Code of Civil Procedure). In general, when a putative class action is filed, *American Pipe* tolling operates to suspend the prescription of certain claims: "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."[30]

Plaintiff presumably would argue that she was a putative class member of the *Hillard* class and therefore should benefit from *American* Pipe tolling. However, this argument fails to recognize that the putative *Hillard* class **did not** purport to assert any claims against Shaw. *American Pipe* speaks only of claims actually brought by the putative class members and not every claim that might have been added against **potential, unnamed defendants**. Indeed, the whole premise of *American Pipe* tolling is that the tolling would not be inconsistent with the

---

[30]   *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974).

function of a prescriptive period (or, equivalently, a statute of limitations) because the defendants named in the putative class action had been made aware of the claims against them:

> The policies of ensuring essential fairness to defendants and of barring a plaintiff who 'has slept on his rights,' are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies ***the defendants*** not only of the substantive claims being brought against ***them***, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, ***the defendants*** have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.[31]

The logic of the United States Supreme Court is compelling. When a defendant is actually named in a putative class action, it is on notice of the action against it and can take steps to defend itself, thereby satisfying the fundamental public policy of the applicable limitations period. Conversely, when a defendant is not named in the putative class action, there is absolutely no reason to assume that the unnamed, potential defendant knows about the possibility of a later lawsuit and is taking steps to preserve essential information. *American Pipe* simply has no application to claims against parties who are not defendants in the putative class action.

The Court's previous rulings in the *Alexander* and *Wright* cases on the application of *American Pipe* tolling are distinguishable from the present matter. Specifically, the manufacturing defendant in the *Alexander* case, Gulf Stream, and the manufacturing defendant in the *Wright* action, Forest River, were both originally named in *Hillard* action. In previous filings, plaintiffs have suggested that because co-defendants Gulf Stream and Forest River were named in the *Hillard* action, the suspension of prescription for the claims asserted against the

---

[31] *Id.* at 554-555 (emphases added; internal citation omitted).

manufacturing defendants should somehow apply to the claims asserted against the unnamed, contractor defendants, Fluor and Shaw. Notwithstanding the fact that there is no support for this assertion, plaintiff cannot make the same insinuation here. Unlike the *Alexander* and *Wright* cases, the manufacturing defendant in the present action, Recreation by Design, was not named in the *Hillard* action.

To extend *American Pipe* tolling to defendants who were not named in the original putative class action would run contrary to the Supreme Court's logic and contrary to the public policy behind prescriptive / limitations periods. Aside from the Court's prior rulings in *Alexander* and *Wright*, no court has ever extended *American Pipe* to a defendant who was not named in the original putative class action. With all due respect to the Court's prior rulings, that reasoning should not be repeated, especially given the distinction present here that Recreation by Design was not named in *Hillard*. Because neither Shaw nor Recreation by Design was named as a defendant in *Hillard*, plaintiff may not benefit from *American Pipe* tolling.

### B. Prescription of Ms. Castanel's Claims Has Not Been Interrupted.

Shaw also anticipates that plaintiff may try to avoid prescription by arguing that she should benefit from Article 2324 of the Louisiana Civil Code, which provides that interruption of prescription as to one joint tortfeasor is effective against all joint tortfeasors. First, plaintiff presumably would argue that Shaw is a joint tortfeasor with the manufacturer defendants who were named in the *Hillard* action. Plaintiff would then argue that because prescription against the *Hillard* defendants was interrupted by the filing of that lawsuit,[32] interruption of prescription

---

[32] La. Civ. Code art. 3462 provides for the interruption of prescription upon the commencement of a lawsuit.

15

is also effective against the claims asserted against joint tortfeasor, Shaw, in the instant matter. Leaving aside the question of whether Shaw really is a joint tortfeasor, the anticipated argument will fail for two reasons. Unlike *American Pipe* tolling, Article 2324 does not apply to the claims of every putative class member and/or every conceivable plaintiff. Only the named plaintiffs in *Hillard* interrupted prescription by filing their action, and accordingly only they can avail themselves of the joint tortfeasor doctrine under that article. Because Ms. Castanel did not purport to bring claims in her own name in *Hillard* – or in any other case prior to April 8, 2009 – Article 2324 does not apply to her.

Finally, even if *American Pipe* tolled the prescription of claims against the Trailer's manufacturer or FEMA, that tolling is clearly a suspension of prescription, and not an interruption.[33] The two theories are distinguishable and apply under completely different circumstances. Article 2324 of the Civil Code applies only when prescription is interrupted, not when it is merely suspended: "Interruption of prescription against one joint tortfeasor is effective against all joint tortfeasors." The distinction between interruption and suspension is both clear and well-known to the redactors of the Civil Code. The prescription of Ms. Castanel's claims against the manufacturers and FEMA was merely suspended by *American Pipe*, and therefore, Article 2324 simply has no application to her claims against Shaw, even if Shaw were shown to be a joint tortfeasor. To conclude otherwise would be to write "suspension" into Article 2324.

---

[33] *American Pipe* referred to the days remaining in the applicable limitations period at the time when the putative class action was filed. Eleven days remained in the period at the time when the putative class was filed; because the intervenors sought to join the case eight days after the denial of class certification, the Court held that the intervention was timely and should have been allowed. 414 U.S. at 561. Though expressed in common law terms, clearly this is an application of suspension rather than interruption. *Compare* La. C.C. art. 3466 (interruption) with La. C.C. art. 3472 (suspension).

16

Shaw respectfully submits that this is the province of the Louisiana Legislature alone, and not the Court.

### C. The Continuing Tort Doctrine Does Not Apply.

Finally, Shaw anticipates that plaintiff will seek to avoid the consequences of her late filing by invoking the doctrine of continuing tort. "Continuing tort," however, refers only to a tort "where the operating cause of injury is a continuous one and gives rise to successive damages."[34] Stated another way, "a continuing tort is occasioned by unlawful acts, not the continuation of ill effects of an original, wrongful act."[35] The continuing tort doctrine only applies when continuous conduct causes continuing damages.[36]

When a plaintiff attempts to avail herself of the continuing tort theory, the plaintiff bears the burden of establishing its applicability.[37] To allege a continuing tort, plaintiff must allege both continuous actions and continuous damage.[38] However, no such allegations are present in plaintiff's Complaint.

In *Crump v. Sabine River Authority*, the Louisiana Supreme Court rejected the contention that a continuing tort could consist of a defendant's failure to remedy the harm caused by the initial tortious conduct, stating that "the breach of the duty to right the wrong and make the

---

[34] *Miller v. Conagra, Inc.*, 2008-0021 (La. 09/08/08), 991 So.2d 445, 456, *citing Crump v. Sabine River Authority,* 1998-2326, p. 7 (La. 06/29/99), 737 So.2d 720, 726.

[35] *Id*.

[36] *Risin v. D.N.C. Investments, LLC*, 2005-0415, p. 4 (La. App. 4 Cir. 120/7/05), 921 So.2d 133, 136.

[37] *James v. New Century Mortgage Corp.*, 2006 WL 2989242 (E.D. La. 2006), *citing In re Med. Review Panel for Maria Moses*, 2000-2643, p. 6 (La. 05/25/01), 788 So. 2d 1173, 1177.

[38] *Stanford v. Administrators of Tulane Educational Fund*, 2007-0678, pp. 8-9 (La. 4 Cir. 01/09/08), 975 So.2d 104, 109-110.

plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor."[39] Here, a majority of the claims asserted by plaintiff involve Shaw's alleged failure to remedy a harm caused by its initial conduct. Based on the reasoning in *Crump*, such conduct does not constitute a continuing tort.

Plaintiff also complains of Shaw's alleged failure to warn "of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde." In *GHR Energy Corp. v. Carboline Co.*, this Court specifically noted that "the continuing tort theory of prescription cannot apply to a failure to warn since a failure to warn is not capable of abatement, especially if there is no disclosure. . . . Were courts to find otherwise, prescription would for all practical purposes cease to exist in failure to warn cases – regardless of whether the plaintiff had learned of the danger of the occurrence of the injury."[40]

In this case, even assuming that Shaw committed a continuing tort, there have been no acts or conduct by Shaw since June 1, 2006.[41] Even where the cause of injury is a continuous one giving rise to successive damages, prescription begins to run when the conduct stops.[42] Shaw is alleged to have installed Ms. Castanel's travel trailer incorrectly – a point that will be hotly debated but certainly occurred only once, and not continuously. As for Shaw's maintenance responsibilities, those duties ended a few months after plaintiff moved into the

---

[39] *Crump v. Sabine River Authority,* 1998-2326, (La. 06/29/99), 737 So.2d 720, 726.

[40] 744 F. Supp. 1405, 1407 (E.D. La. 1990).

[41] Ex "D," Hansen Affidavit, ¶ 11.

[42] *South Central Bell Telephone Co. v. Texaco, Inc*. 418 So.2d 531, 533 (La. 1982).

Trailer. Thus, any alleged wrongful conduct ended when Shaw ceased maintenance operations with regard to the Trailer on June 1, 2006.

Ms. Castanel did not file her lawsuit until well more than a year had passed after Shaw's maintenance of the Trailer ended. Accordingly, the continuing tort doctrine does not revive her untimely claim against Shaw.

## CONCLUSION

The question of whether Ms. Castanel's claims against Shaw have prescribed is a simple one that is ripe for summary disposition. Ms. Castanel filed this action on April 8, 2009, roughly three years after she moved into the Trailer and told her neighbor and daughter that the Trailer was making her sick, and two years and ten months after FEMA hired a different contractor to maintain the Trailer. Undoubtedly, Ms. Castanel did not file this action within a year of being injured or within a year of knowing that she had been injured.

Having brought a claim that is so plainly prescribed on its face, Ms. Castanel presumably will seek respite in *American Pipe*, Article 2324, or the continuing tort doctrine. But none of these theories helps her. *American Pipe* does not affect claims not asserted in the former putative class action – such as the claims now asserted against Shaw – and this Court should not extend it. Article 2324 relates to the effect of a claim actually brought by a plaintiff, not a claim made later in a separate lawsuit by someone else who perhaps had been a putative class member, and this Court should not extend it. And any continuing tort, even if that doctrine applies at all, must have ceased when Shaw's responsibilities for the Trailer ended on June 1, 2006.

Ms. Castanel's attempts to avoid prescription are without merit. She filed her action three years after her alleged injury, and nothing suspended prescription in the interim. Her

19

claims against Shaw prescribed in 2007, two years before she brought this action. Shaw respectfully urges the Court to give effect to Louisiana's one-year prescriptive period by dismissing all claims against Shaw in this action.

        Respectfully submitted,

        **BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

        /s/ M. David Kurtz
        M. DAVID KURTZ (#23821)
        KAREN KALER WHITFIELD (#19350)
        CATHERINE N. THIGPEN (#30001)
        201 St. Charles Avenue, Suite 3600
        New Orleans, Louisiana 70170
        Telephone: (504) 566-5200
        Facsimile: (504) 636-4000

        **ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2009, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

        /s/ M. David Kurtz