UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | MDL NO. 1873<br><br>SECTION "N-5"<br><br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |

**THIS DOCUMENT IS RELATED:**
*Nunnery, et al v. Keystone RV Industries., et al,*
*E.D. La. Case No. 09-3871*

******************************************************************************

**FIRST SUPPLEMENTAL AND AMENDING COMPLAINT FOR DAMAGES**

Plaintiff David McGraw, pursuant to the provisions of Rule 15 of the Federal Rules of Civil Procedure and to this Honorable Court's Scheduling Order, respectfully supplements and amends the Original Complaint herein as follows:

1. Plaintiff David McGraw is a Named Plaintiff in the Original Complaint.

2. Under Section I, Parties,

    a. By adding as a defendant with respect to David McGraw, the United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA".

1

    b. All other allegations with respect to the identification of Parties (Paragraphs 1 though 4 of the Original Complaint), respectfully are reiterated and incorporated herein by reference.

3. Under Section II, Jurisdiction and Venue,

    a. By adding, this Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, *et seq.*.

    b. The allegations of the Original Complaint with respect to Jurisdiction and Venue (Paragraphs 5 through 9), respectfully are reiterated and incorporated herein by reference.

4. Under Section III, Facts and General Allegations, by adding as follows:

    a. The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricanes, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith. *See* Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, *available at* http://oversight.house.gov/documents/20070719131219.pdf.

    b. Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers

    associated with the "out" or "off-gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

c. In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  *See* Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

d. Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiff, the Inspector General of the Department of Homeland Security,  testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiff.  *See* Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on

      Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, *available at* http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

e. The Federal Government also continued to supply the defective and dangerous housing units after March of 2006.

f. The Federal Government continued to supply the defective and dangerous housing units even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, *supra*.

g. The Federal Government continued to supply the defective and dangerous housing units even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value. Union of Concerned Scientists, *supra*, and Exhibits B (*available at* http://oversight.house.gov/documents/20070719113015.pdf) and D (*available at* http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

h. The Federal Government continued to supply the defective and dangerous housing units even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists,

*supra*, and Exhibits E (*available at* http://oversight.house.gov/documents/20070719113322.pdf), I (*available at* http://oversight.house.gov/documents/20070719113515.pdf) and M (*available at* http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

i.  While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue."  Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

j.  David McGraw avers that, even as the Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning

formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

k. FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

l. FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra*. *See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, *available*

      *at*http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_0507.pdf.

m. This testing methodology did not simulate the living conditions, temperatures, humidities, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years. Union of Concerned Scientists, *supra*.

n. FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Plaintiff herein as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

o. FEMA further manipulated the governmental testing by involving a little-known office of the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review. FEMA did so in order to avoid

p. FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern," a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

q. Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can

draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

r. On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

s. Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation" did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions." *See* An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, *available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

t. The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Plaintiff's exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

u.  It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Louisiana and Mississippi between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  *See* Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control and Prevention, U. S. Department of Health and Human Services, CDC'S RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBIL HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

v.  The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel

trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

w. The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

x. As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

y. The Federal Government's actions with regard to the response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political

    policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

   z. Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

   aa. In addition, and more specifically, plaintiff avers that the defendant FEMA negligently failed to take prompt and appropriate remedial action, and/or to communicate promptly and effectively to him, with respect to the safety and health risks and concerns related to formaldehyde exposure in this travel trailer, even though FEMA became aware of such risks and concerns generally, as early as Fall/Winter of 2005. As a result, plaintiff was negligently and unnecessarily exposed to unsafe and potentially dangerous levels of formaldehyde in the travel trailer.

5. All allegations of the Original Complaint dealing with general factual information (Paragraphs 10 through 49), also are reiterated and incorporated herein by reference.

6. By adding a Count IV to reflect as follows,

### CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT

   a. At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to David McGraw herein.

b. The Federal Government was obligated to promptly warn David McGraw of any defects in the housing unit which could cause harm and of which the Federal Government was aware.

c. The Federal Government, after becoming aware of the potential for such harm, violated this duty to David McGraw, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

d. As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, David McGraw has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

e. Further, since the Plaintiffs are within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiffs specifically plead the application of the doctrine of negligence *per se*.

f. The Federal Government was negligent and at fault in the following non-exclusive particulars:

(i) In failing to warn David McGraw of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied.

(ii) In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

   (iii) In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of David McGraw, on becoming aware of the formaldehyde danger associated with the unit.

   (iv) Such other actions of negligence and fault as will be shown at the trial of this matter.

7. By amending Section IV: Compensatory Damages to read as follows,

 a. In addition to and by way of summarizing the compensatory damages prayed for herein, David McGraw avers that the defendants, the United States of America through FEMA and Keystone as well as CH2M Hill, individually and/or jointly are responsible for all damages which Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

8. By amending the Prayer for Relief to reflect the following,

WHEREFORE, David McGraw prays that Keystone, CH2M Hill, and the Federal Government be served with a copy of this Complaint, and that, after due proceedings:

i. there be a judgment herein in favor of David McGraw and against Defendants for all compensatory damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

ii. there be specially included in the judgment in David McGraw's favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   1. past and future physical injuries,

   2. past and future pain and suffering,

   3. plaintiff's mental anguish and emotion distress, including the fear of an increased risk of future serious disease;

   4. past and future physical impairments and disability,

   5. the past, continuing and future medical expenses of plaintiff which have been necessitated by the injuries sustained herein, including costs for future medical treatment, services, and/or procedures to address physical and/or mental injuries from formaldehyde exposure which currently are manifest.

      6. past and future loss of earning capacity,

      7. past and future loss of enjoyment and quality of life,

      8. loss of consortium and/or society,

      9. compensable out-of-pocket expenses related to defendants' wrongdoing, and

      10. costs of court,

    iii. all other general, equitable, and further relief as the Court may deem just and proper.

9. Plaintiff David McGraw was displaced from his permanent home as a result of Hurricane Katrina. Since his home was rendered uninhabitable as a result of Hurricane Katrina, plaintiff was deemed eligible to receive emergency housing assistance from the defendant FEMA, pursuant to the Stafford Act and applicable federal regulations.

10. The emergency housing assistance provided to David McGraw was in the form of a travel trailer manufactured by the defendant Keystone RV, Company., with Vehicle Identification Number (VIN) 4YDT260226N132486.

11. This travel trailer was manufactured by the defendant Keystone in the year 2006.

12. The travel trailer was delivered to plaintiff for occupancy in New Orleans, Louisiana at 5212 Dauphine Street.

13. The travel trailer was installed at the above location and hooked up to utilities, etc. for residential purposes by defendant CH2M Hill Constructors, Inc., pursuant to a contract between CH2M Hill and defendant FEMA.

14. Upon information and belief, plaintiff began living in the travel trailer in or about June of 2006, and stopped living in it in or about July of 2007. He resided continuously in the unit during this period of time.

15. The travel trailer was vacated by the plaintiff once his permanent home was again habitable.

16. Plaintiff respectfully reiterates and reincorporates all allegations in the Original Complaint with respect to the cause of action against the defendant FEMA (Paragraphs 79 through 84 of the Original Complaint).

17. Plaintiff respectfully reiterates and incorporates all of the allegations set forth in the Original Complaint with respect to the cause of action against defendant Keystone under the Louisiana Product Liability Act (Paragraphs 50 through 55 of the Original Complaint). Additionally, and more specifically, plaintiff alleges that the defendant manufacturer's duty to warn him about the dangers and risks of formaldehyde in this travel trailer was continuing in nature, and legally was owed to plaintiff by the defendant manufacturer during the entire period that plaintiff occupied this travel trailer.

18. Plaintiff respectfully reiterates and incorporates all of the allegations in the Original Complaint with respect to the cause of action against defendant CH2M Hill under the Louisiana Product Liability Act (Paragraphs 56 through 62) of the Original Complaint.

19. Plaintiff respectfully reiterates and incorporates all of the allegations with respect to the cause of action for negligence against CH2M Hill under Louisiana law (Paragraphs 63

20. Plaintiff respectfully reiterates his request for trial by jury of all claims herein, to the extent permitted by law.

WHEREFORE, plaintiff David McGraw respectfully supplements and amends the Original Complaint in the foregoing respects, and he otherwise reiterates and reavers all of the allegations and prayers for relief contained therein.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

BY:   s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
ROBERT BECNEL, #14072
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
DENNIS REICH, Texas #16739600
MIKAL WATTS, Texas # 20981820

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served upon counsel of record as indicated below in accordance with the Federal Rules of Civil Procedure on January 14, 2009.

/s/Justin I. Woods
JUSTIN I. WOODS