UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION

MDL NO. 07-1873

SECTION N(5)

JUDGE ENGELHARDT

THIS DOCUMENT RELATES TO:
*Lyndon Wright v. Forest River, Inc., et al.*
No. 09-2977 (E.D. La.)

MAGISTRATE CHASEZ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF SHAW ENVIRONMENTAL, INC.'S MOTION FOR SUMMARY JUDGMENT ON CAUSATION

Shaw Environmental, Inc. ("Shaw") respectfully submits this memorandum in support of its motion for summary judgment on causation.  Plaintiff has presented no evidence that raises a genuine issue of material fact as to whether Shaw's actions and/or inactions actually increased the concentration of formaldehyde in Plaintiff's trailer.  Accordingly, Shaw is entitled to judgment as a matter of law, dismissing all of Plaintiff's claims against it with prejudice.

## PRELIMINARY STATEMENT

In the aftermath of Hurricane Katrina, Shaw Environmental, Inc. ("Shaw") was tasked with assisting FEMA in the provision of certain forms of what is known as "individual assistance" to tens of thousands of hurricane victims.  Shaw finds itself a defendant in this action because of one aspect of Shaw's post-hurricane activities – the installation of emergency housing units ("EHUs") provided by FEMA.

Plaintiff Lyndon Wright filed this action on the ground that he was injured through exposure to formaldehyde while living in an EHU – a travel trailer that Shaw, through its subcontractors, installed.[1]   Given that Shaw plainly had nothing to do with the formaldehyde directly, Mr. Wright – like all plaintiffs in this MDL asserting claims against government contractor defendants – has confected a tortuous chain of "causation" in a futile attempt to connect Shaw to his claimed injuries.   Specifically, Plaintiff claims that somehow Shaw did something when installing the Trailer that raised the level of formaldehyde in the Trailer, thereby causing or exacerbating his claimed injuries.   In order to get from installing a travel trailer to formaldehyde exposure, Plaintiff postulates a Rube Goldberg causation chain that involves twisting the Trailer, broken seals, water leaks and accelerated formaldehyde offgassing in the Trailer.  All of these steps fall far short of what is needed to prevail at trial, but for the purposes of this motion for summary judgment, Shaw will focus solely on the last one: Is there any evidence that Shaw did, or did not, do something that actually increased the concentration of formaldehyde in the Trailer while the Plaintiff lived there?   The answer is no, and given that Plaintiff plainly bears the burden of proof with regard to this issue, his claims against Shaw should be summarily dismissed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

Pursuant to its contract with FEMA, Shaw (through its subcontractor) installed the Trailer on November 21, 2005.[2]  Due to the difficulties that Entergy experienced in restoring electrical

---

[1]  The travel trailer in which Mr. Wright lived was manufactured by Forest River and bore VIN number 4X4TSMH296C008992 (the "Trailer").

[2]  Affidavit of Geoffrey C. Compeau, ¶ 17, attached hereto as Exhibit A (the "Compeau Affidavit").

power to the area where the Trailer was located, the Trailer could not be powered up and made ready for occupancy until February 2006.[3]   Once power became available, however, Shaw was able to make the Trailer fully ready for occupancy.   On February 13, 2006, Plaintiff conducted a "lease-in" process with Shaw (through its subcontractor).[4]   During that process, Plaintiff conducted a walk-through inspection of the Trailer and found nothing wrong with it, as indicated by his signature on the lease-in forms.[5]   After lease-in, Plaintiff elected to remain on the cruise ship where he had been staying until some time in March, 2006, at which point he moved to the Trailer.[6]

After Plaintiff moved into the Trailer, Shaw maintained it for less than three months, until June 1, 2006, when C. Martin Company assumed maintenance responsibility.[7]   During the period of Shaw's maintenance, Plaintiff lodged no formaldehyde or other odor-related complaints; indeed, he reported only one maintenance issue -- a broken furnace that was repaired to his satisfaction.[8]   Plaintiff then lived in the trailer for over two more years.[9]

---

[3]     Compeau Affidavit, ¶ 19, Exh. A.

[4]     Compeau Affidavit, ¶ 22, Exh. A.   Notably, because the Plaintiff was not the FEMA disaster relief applicant, Plaintiff was able to complete the lease-in process only because of the written authorization of his mother.

[5]     Compeau Affidavit, ¶ 22, Exh. A  and Exhibit "13" thereto; Deposition of Lyndon Wright, pp. 96, 257-258, attached hereto as Exhibit B.

[6]     Wright Deposition, p. 73, Exh. B.

[7]     Affidavit of Allison Hansen, ¶ 12, attached hereto as Exhibit C.

[8]     Compeau Affidavit, ¶¶ 24-26 and Exhibits 15 and 16 thereto, Exh. A.

[9]     Wright Deposition, pp. 73, 132, Exh. B.

# LAW AND ARGUMENT

## I.   SUMMARY JUDGMENT STANDARD

### A.   General Standard

Summary judgment is proper when there is "no genuine issue as to any material fact" and "the movant is entitled to a judgment as a matter of law."[10] "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[11] Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[12]

The moving party must initially demonstrate that no genuine issue of material fact exists and identify those portions of the record which it believes show the absence of a genuine issue of material fact.[13] However, once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."[14] To satisfy this burden, the non-movant must proffer *sufficient* evidence to show that a reasonable jury could find in its favor — that is, that "reasonable jurors could find by a preponderance of the evidence

---

[10]   Fed. R. Civ. P. 56(c).

[11]   *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).

[12]   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citations and internal quotations omitted); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.") (citations omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

[13]   *Celotex Corp.,* 477 U.S. at 323; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

[14]   *Id.* at 322.

that the plaintiff is entitled to a verdict."[15]   The existence of "some evidence" favoring the nonmoving party will not prevent summary judgment unless the evidence is "of such a character that it would warrant the jury in finding a verdict in favor of that party."[16]

### B.   To Avoid Summary Judgment the Record Must Show a "Genuine Issue," Not Just a Factual Dispute.

A "genuine issue" may be lacking even when the non-moving party purports to "dispute" facts in issue.   In particular, summary judgment is proper, even when a "dispute" exists, if the evidence is not sufficient to allow a reasonable jury to find for the non-moving party.[17]   The Fifth Circuit has held that "summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[18]   Furthermore, "[e]vidence purporting to create doubts as to the facts that is too incredible to be accepted by reasonable minds will not prevent summary judgment."[19]   Several points of law follow from these basic principles.

---

[15]      *Anderson,* 477 U.S. at 249-50, 252.  *See also Frakes v. Crete Carrier Corp.,* 579 F.3d 426, 430-431 (5th 2009) ("[P]laintiff has the burden to put forth sufficient evidence to create a genuine dispute" as to a material fact); *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n,* 274 F.3d 924, 928 (5th Cir. 2001) ("After a defendant properly moves for summary judgment, the non-movant plaintiff must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists on every element of a claim."); *Ginsberg 1985 Real Estate P'ship v. Cadle Co.,* 39 F.3d 528, 531 (5th Cir. 1994) ("An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.").

[16]      *Id.* at 251 (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448 (1872)).

[17]      *See Anderson,* 477 U.S. at 248-49.

[18]      *Little,* 37 F.3d at 1075 (citation and quotation omitted).

[19]      *Barker v. Norman,* 651 F.2d 1107, 1127 (5th Cir. 1981).

First, "[e]vidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict."[20]  In *Molden v. Georgia Gulf Corp.,* the court granted summary judgment despite the plaintiffs' testimony that they suffered physical injuries within a short time of a toxic chemical release because the scientific evidence showed that their level of exposure was not sufficiently high to give rise to their physical injuries.[21]

Second, equivocal or vague testimony cannot be relied on to overcome summary judgment.  For example, in *Stahl v. Novartis Pharm. Corp.,* the Fifth Circuit held that "equivocal and ill-supported [expert] testimony is simply insufficient to preclude summary judgment on this inadequate warning claim."[22]

Likewise, expert testimony is insufficient to create a genuine issue of material fact if that testimony consists of "conclusory, unsupported assertions."[23]  For example, the Fifth Circuit has held that expert testimony that goes beyond the bounds of the expert's expertise, contains internal inconsistencies, and provides no comment on key considerations is not sufficient to defeat summary judgment.[24]   In *White v. Black & Decker (U.S.) Inc.,* this Court granted summary judgment to the defendant in a product defect case because the plaintiffs' expert did

---

[20]     *Ralston Purina Co. v. Hobson,* 554 F.2d 725, 729 (5th Cir. 1977).

[21]     465 F. Supp. 2d 606, 613-614 (M.D. La. 2006).

[22]     283 F.3d 254, 271-72 (5th Cir. 2002).

[23]     *Kampen v. American Isuzu Motors, Inc.,* 157 F.3d 306, 318 (5th Cir. 1998).

[24]     *Id.*

not provide adequate factual support or explanation for his assertions, admitted he was unaware of studies that supported his statements, and conducted no tests himself to support his position.[25]

Finally, a party may not avoid summary judgment by relying on an unsubstantiated interpretation of its own evidence. Thus, although the evidence is viewed in the light most favorable to the non-moving party, summary judgment is appropriate when the moving party shows that the evidence relied upon by the other party is simply not susceptible to the interpretation which the other party gives it.[26] In *Little v. Liquid Air Corp.,* for instance, the Fifth Circuit rejected the plaintiff's inference that "nasal fatigue" was the cause of the decedent's failure to smell the combustible gas that caused a fatal explosion, finding that the reason for his failure to smell the gas could not be inferred from his failure to evacuate the area.[27] In *Sievers,* the court refused to infer a causal connection between an airplane crash and an alleged aircraft defect, and granted summary judgment on that basis, because there was no physical evidence of a causal relationship, an investigation by a federal agency did not conclude the crash was caused by defendant's negligence, and there was a reasonable alternative explanation for the cause of the crash.[28]

---

[25]    Civ. A. No. 03-0874, 2004 WL 1373271 at *9 (E.D. La. June 16, 2004).

[26]    *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968); *Sievers v. Beechcraft Mfg. Co.,* 497 F. Supp. 197, 200 (E.D. La. 1980).

[27]    37 F.3d at 1077.

[28]    497 F. Supp. at 199-202.

### C.     Summary Judgment on Causation is Appropriate.

Causation is the first element of proof of a negligence claim.[29]   The Louisiana Supreme Court has stated that "[a] negligent party may not be held liable where his negligence is not a cause-in-fact of the accident . . . ."[30]   The plaintiff in a negligence action has the burden of proving causation by a preponderance of the evidence, *i.e.* the plaintiff must show that based on the evidence it is more probable than not that harm was caused by tortious conduct of the defendant.[31]   "To be actionable the defendant's conduct must be both the cause-in-fact and a legal cause of the plaintiff's damages.   Conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm, i.e., but for the defendant's conduct, the plaintiff would not have sustained the injury."[32]   It is not enough for the plaintiff to prove tortious conduct on the part of the defendant; "the plaintiff has the burden of establishing a causal connection between the defendant's act or omission and the plaintiff's damages."[33]

In cases involving multiple causes, the Fifth Circuit has concluded that the threshold test for cause-in-fact is "an inquiry of 'to what extent' did the defendant's conduct have something to do with the plaintiff's injuries."[34]   In other words, a defendant's conduct is a cause-in-fact of a

---

[29]     *Quick v. Murphy Oil Co.*, 93-2267 (La. App. 4 Cir. 9/20/94), 643 So. 2d 1291, 1295.

[30]     *LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471, 475 (La. 1978) (citations omitted).

[31]     *Morris v. Orleans Parish School Bd.*, 553 So. 2d 427, 430 (La. 1989).

[32]     *Succession of Harvey*, 97-2815 (La. App. 4 Cir. 6/24/98), 716 So.2d 911, 914.

[33]     *Francis v. Lafon Nursing Home of Holy Family*, 2002-1863 (La. App. 4 Cir. 3/19/03), 840 So. 2d 1281, 1283.

[34]     *Westchester Fire Ins. Co. v. Haspel-Kansas Inv. Partnership*, 342 F.3d 416, 420-421 (5th Cir. 2003).

plaintiff's injuries only if that conduct was a substantial factor in bringing about the plaintiff's harm.[35]

The determination of whether an action is the cause-in-fact of the injury can be resolved on summary judgment if reasonable minds could not differ.[36]  A factual dispute about causation can only survive summary judgment if the dispute is genuine.  In *Little v. Liquid Air Corp.,* the Fifth Circuit found that plaintiffs' evidence, including expert proof, did not establish a genuine issue of fact concerning their theory of causation in a gas leak explosion case.[37]  Similarly in *Bach v. Trident S.S. Co.,* the Fifth Circuit held that the plaintiff could not avoid summary judgment on causation without introducing "evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result."[38]  The Fifth Circuit, and other courts, have not hesitated to grant summary judgment on causation where the evidence did not raise a genuine issue of material fact.[39]

---

[35]     *Id., citing, e.g., Adams v. Traina*, 36,306 (La .App. 2 Cir. 10/25/02), 830 So. 2d 526, 533.

[36]     *Gullie v. Comprehensive Addict Program*, 98-2605 (La. App. 4 Cir. 4/21/99), 735 So. 2d 775, 778, *citing Fowlers v. Roberts*, 556 So.2d 1, 4 (La. 1989).

[37]     37 F.3d at 1075.

[38]     920 F.2d 322, 327 (5th Cir. 1991) (overruled on other grounds) (quoting W. Keeton, Prosser & Keeton on Torts § 41, at 269).

[39]     *See, e.g., Little*, 37 F.3d at 1077 (affirming summary judgment on causation of shipboard accident); *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977) (setting aside jury verdict on causation of poultry mortality); *In re Ingram Towing Co.*, 1995 WL 601027 (E.D. La. Oct. 11, 1995) (granting summary judgment on causation in toxic exposure case, finding that it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident; *Molden*, 465 F. Supp. at 613-14 (M.D. La. 2006) (granting summary judgment on causation in chemical exposure case).

II.     **MR. WRIGHT CANNOT MEET HIS BURDEN OF PROVING THAT SHAW CAUSED THE CONCENTRATION OF FORMALDEHYDE IN THE TRAILER TO INCREASE.**

      A.     **There Is No Evidence or Expert Opinion Suggesting that Shaw Increased the Level of Formaldehyde in the Trailer.**

Notwithstanding the fact that Plaintiff's entire claim against Shaw is predicated upon proving that Shaw's actions or inactions exacerbated his exposure to formaldehyde, and further notwithstanding that the Plaintiff retained no less than 15 experts to formulate opinions in this matter, Plaintiff has offered no expert opinion to the effect that Shaw actually increased the level of formaldehyde in the Trailer. For example, Plaintiff's expert Al Mallet testified:

Q.     Did you ever perform any testing to quantify the amount of increased formaldehyde concentration within the living space of this particular trailer by operation of the air-conditioning system?

A.     No. Quantification, we did not.

Q.     So you couldn't tell me if it increased it by 1 part per billion or 100 parts per billion, could you?

A.     No, I could not.

* * *

Q.     With respect to the heating system, would the same be true? In other words, did you perform any testing that would quantify the increase in formaldehyde concentration within the Lyndon Wright unit by operation of the heating system?

A.     No, no quantification.

Q.     Okay. Again, so you couldn't say, if called upon to testify, that the operation of the heating system would have increased the formaldehyde concentration in the Lyndon Wright unit by 1 part per billion or 100 parts per billion. True?

A.     That's correct.

* * *

Q.     All right.  But the actual impact on air quality, you can't tell me?

A.     I can't quantify.

Q.     Right.  And there's a way to test how the formaldehyde level in this trailer would be impacted by the operation of either the heating or air-conditioning system, isn't there?

A.     That's beyond the scope of my expertise.[40]

Plaintiff expert David Moore testified:

Q     So you have no opinions at all about formaldehyde or concentrations of formaldehyde?

A     No, sir.  That's beyond my expertise.[41]

Plaintiff expert Stephen Smulski testified:

Q.     Dr. Smulski, you are not opining specifically that anything in the installation process of this trailer actually caused the ambient level of formaldehyde to be higher than it otherwise would have been, are you?

A.     That is correct.  I am merely acknowledging in that paragraph 14 that is something that could happen, but I don't know that it did in fact happen here.[42]

No other Plaintiff experts even mention installation-related damage to the Trailer.  Therefore, there is a complete lack of evidence, even in the form of opinion, that Shaw actually increased the concentration of formaldehyde in the Trailer.

---

[40]     Deposition of Al Mallet, pp. 164-168, attached hereto as Exhibit D.

[41]     Deposition of Charles David Moore, p. 79, attached hereto as Exhibit E.

[42]     Deposition of Stephen J. Smulski, June 10, 2009, pp. 355-56, attached hereto as Exhibit F.  This quote is taken from a deposition taken in connection with the first bellwether trial.  He testified similarly in this case on January 29, 2010, but that transcript is not yet available.

In an exposure case such as this, it is incumbent upon the plaintiff to prove a causal connection between the actions of the defendant and the exposure that is alleged.[43]  Moreover, without an expert opinion, the plaintiff cannot meet his burden with regard to this element.[44] Given that Plaintiff has offered no opinion that Shaw caused or exacerbated Plaintiff's exposure to formaldehyde, he lacks proof on an element necessary to his case, and as such his claims against Shaw should be dismissed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### B.    Offgassing Rates and Ambient Concentrations Are Not the Same Thing.

Plaintiff seems to want to paper over this hole in his case by claiming that Shaw is responsible for introducing water into the Trailer, leading to an increase in the rate of formaldehyde offgassing from the wood products in the Trailer.[45]  There are numerous problems with this theory, not the least of which is a lack of evidence to support it, but for purposes of this

---

[43]     *See Molden v. Georgia Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006) (In tort action for personal injury under Louisiana law, plaintiff must establish by preponderance of evidence that it is more probable than not that personal injury of which he complains was caused by defendant's conduct). *See also Vodanovich v. A.P. Green Industries, Inc.*, 2003-1079 (La. App. 4 Cir. 3/3/04), 869 So. 2d 930, 933 ("Under Louisiana law, the plaintiff bears the burden of proving that the defendants' conduct caused asbestos exposure, and that the conduct was a substantial contributing factor of the plaintiff's injury."); *Watters v. Department of Social Services*, 2008-0977 (La. App. 4 Cir. 6/17/09), 15 So. 3d 1128, 1142-1143 ("Plaintiffs in a mold personal injury case must establish causation on five different levels:  (i) the presence of mold, ***(ii) the cause of the mold and the relationship of that cause to a specific defendant,*** (iii) actual exposure to the mold, (iv) the exposure was a dose sufficient to cause health effects (general causation), and (v) a sufficient causative link between the alleged health problems and the specific type of mold found (specific causation)") (emphasis added).

[44]     *See Brown v. Olin Chemical Corp.*, 231 F.3d 197, 201 (5th Cir. 2000) (When the source of the harm is not apparent on the face of the facts alleged, the plaintiff must put forth expert testimony to show that the harm could only have been caused by the negligence of the defendant). *See also Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citation omitted) (In a toxic tort suit, the plaintiff must present admissible expert testimony to establish general causation as well as specific causation.  General causation is whether a substance is capable of causing a particular injury or condition in the general population.  Specific causation is whether a substance caused a particular individual's injury).

[45]     For example, despite having no expertise in wood science or chemistry, Plaintiff expert Al Mallet wrote in his report, "This writer is aware through research that relative humidity and temperature affect formaldehyde off-gassing and mold growth."  October 2, 2009 Mallet Report at p. 119.  No Plaintiff expert has quantified this increase or explained it.  Nevertheless, Shaw assumes that an increase in offgassing occurred for purposes of this motion.

motion, Shaw is willing to assume that it is true.  Even if Shaw managed to increase the rate of formaldehyde offgassing by some tiny amount,[46] that does not necessarily mean that the concentration of formaldehyde actually went up.

Dr. Stephen Smulski, Plaintiff's wood science expert, candidly admitted that offgassing rate and formaldehyde concentration are not the same and are not correlated on a one-to-one basis:

> Q.   Dr. Smulski, I wanted to start with some definitional matters.  There were some terms that have been discussed I want to make sure we are clear about.  Formaldehyde release rates and emission rates, those are the same thing, right?
>
> A.   In my mind, yes.
>
> Q.   And another set of terms, formaldehyde concentration, formaldehyde level, formaldehyde ambient level, those three things are all the same, right?
>
> A.   Yes.
>
> Q.   But those two groups of things are different, right?
>
> A.   Yes, they are.
>
> Q.   And they are not correlated on a one-to-one basis.  In other words, there are other variables in between those two things?
>
> A.   That is correct.[47]

Given this distinction, and given that other variables must be accounted for when attempting to extrapolate from emission rates to ambient concentration, Plaintiff cannot simply rest on the notion – assumed to be true for purposes of this motion – that Shaw increased the offgassing rate.

---

[46]   There is no evidence at all regarding how much the offgassing rate increased due to Shaw's actions or inactions.  In fact, there is no evidence at all regarding the offgassing rate, period.

[47]   Smulski Deposition, pp. 344-45, Exh. F.

Shaw anticipates that Plaintiff will argue that formaldehyde concentration is logically correlated to emission rates, such that an increase in emission rate automatically leads to an increase in concentration. As an initial matter, Shaw urges the Court to see this for what it is: the argument of Plaintiff's counsel, not evidence. No expert says this. And indeed, the experts do not say this for a good reason – there are many other variables involved.

For example, even Plaintiff admits, through his experts, that an increase in ventilation will lead to a decrease in formaldehyde concentration. Therefore, one cannot conclude that just because emission rates went up, concentration also went up, without accounting for the effect of ventilation. No expert has accounted for this, and therefore Plaintiff's argument must fail.

Moreover, the foregoing example is not academic. Recall that the entire case against Shaw rests on the notion that Shaw somehow broke a seal, allowing water or moisture intrusion, ultimately leading to formaldehyde offgassing. But, as Dr. Smulski acknowledges, a hole that could let water in could also let formaldehyde out:

Q.   You mentioned some of these joint failures and other sorts of damage might allow water and moisture intrusion into the wall cavity from the exterior environment, right?

A.   Yes.

Q.   And that's because these joint failures, for example, create a physical pathway to allow water or water vapor to enter the cavities, right?

A.   Yes. They can allow air, which would carry water vapor with it, or they could actually allow entry of liquid water.

Q.   They could also allow for the escape of formaldehyde from within the wall cavity into the exterior environment, right?

A.   That's right. It could go both ways. Depending on which direction are the driving forces of temperature difference, air pressure difference,

concentration gradient acting, but really, which direction is the wind blowing, et cetera.[48]

Because there is no such thing as a one-way hole that lets water in but does not let formaldehyde out, Plaintiff cannot simply assume that a water-induced increase in formaldehyde emission will lead to an increase in formaldehyde concentration in the living space.   To prove causation, Plaintiff would have to introduce evidence that the additional emission of formaldehyde that Shaw caused (again, assuming that occurred for purposes of this motion) was not counterbalanced by the ventilation that Shaw caused.  No expert has analyzed this point, with the effect that Plaintiff has a complete lack of proof.

Again, it is useful to illustrate this point using an example from this case.  Plaintiff testified at his deposition that beginning in 2007, he noticed a gap over the Trailer's exterior door, and that water leaked through that gap when it rained.  Plaintiff's experts have seized on that gap, claiming that much of the water damage that they observed when they dismantled the Trailer in the FEMA trailer graveyard in August 2009 came from that gap.[49]   But Plaintiff testified that the gap was of a significant size:

Q.      How wide was the gap? Was it the whole length of the door?

A.      Well, the hinges of the door, so it was like a diagonal-type --

Q.      Triangular?

A.      Yeah, like a triangular-type opening.

---

[48]      Smulski Deposition, pp. 352-53, Exh. F.

[49]      Plaintiff's experts also claim that the gap was caused by Shaw's installation, despite the fact that Shaw installed the Trailer in November 2005, despite the fact that Plaintiff signed an inspection form showing that the trailer was in good shape and there was nothing wrong with the door in February 2006, and despite the fact that Plaintiff testified that the gap did not manifest itself until 2007.  Despite these obvious flaws, Shaw is willing to assume, solely for purposes of this motion, that it caused the gap above the door.

> Q.     So it came to a point by the hinge side of the door, and it would have been at its widest on the opposite side of the door; is that right?
>
> A.     That's correct.
>
> Q.     And how wide? You said wide enough to stick your hand through, but was it 2 inches, 3 inches, 6 inches?
>
> A.     Well, it was enough for my hand to go through. But somebody with bigger hands probably would have just got their fingers, you know.[50]

It is perhaps common sense that a gap like that could allow rainwater into the Trailer, but it is equally common sense that the same gap would have allowed formaldehyde to escape.  No expert has claimed that the rainwater that came through that gap resulted in increased offgassing in sufficient quantities to raise the concentration of formaldehyde in the air despite the increased ventilation that the gap allowed.  Without expert testimony on that point, there is no proof that the gap over the door – or any other alleged Shaw damage – actually increased the level of formaldehyde in the Trailer.  And without any proof, there is a lack of evidence on an essential element of Plaintiff's case, and it should be dismissed pursuant to Rule 56.

### C.     Any Claimed Association Between Formaldehyde Concentration and Humidity Has Been Statistically Disproven by Plaintiff's Own Experts.

Besides the fact that Plaintiff has offered no evidence directly showing that Shaw's actions caused an increase in formaldehyde levels, Plaintiff's statistical analysis actually showed the opposite.  Plaintiff's statistical expert, Dr. Paul Hewett, performed a regression analysis on a dataset consisting of 101 emergency housing units[51] manufactured by Forest River.[52]   From

---

[50]     Wright Deposition, pp. 341-42, Exh. B.

[51]     101 trailers is a large enough sample from which to derive valid statistics.  Deposition of Paul Hewett p. 117, attached hereto as Exhibit G.

[52]     Well after his deposition, Dr. Hewett produced another report.  This second report is untimely and will be

16

among that dataset, Dr. Hewett concluded that there was no statistically significant correlation between humidity and ambient formaldehyde concentration.  His findings in this regard were set forth in the following table:[53]

Table 8: Linear Regression Model results for Forest River, Inc.

| Data Source | N | Model p-value | Model Coefficients - Independent Variables | | | | | |
| | | | Intercept | THU Age (years) [1] | Temp (°F) | RH% (%) | Windows (Y, N) [2] | Mold (Y, N) [3] |
|---|---|---|---|---|---|---|---|---|
| Bureau Veritas [4] (occupied THU's) | 68 | 0.0042 | -5.1029 * | -0.2127 ($t_{1/2}$=3.36) | 0.0511 * | -0.0078 | -0.3418 | 0.4706 |
| FEMA CDC [5] (occupied THU's) | 33 | 0.3123 | -3.6973 * | -0.7389 ($t_{1/2}$=0.94) | 0.0244 | 0.0132 | -0.0234 | 0.2282 |
| Combined: Bureau Veritas and FEMA CDC (occupied THU's) | 101 | 0.0007 | -5.0796 * | -0.1611 ($t_{1/2}$=4.30) | 0.0439 * | -0.0013 | -0.2727 | 0.5096 |

1 - THU age at the time sampling was calculated from the "year and month" of manufacture (if available) and the date of sampling. The Age coefficient was used to calculate the half-life: $t_{1/2}$.
2 - Windows, scuttles, and/or doors were open in the 3 hours prior to sampling (1=Y,0=N) (CDC, 2008).
3 - More than 1 ft² of mold was visible in the living areas (1=Y,0=N) (CDC, 2008).
4 - Bureau Veritas collected formaldehyde concentration data for FEMA from occupied trailers from 3/2/2008 through 12/18/2008.
5 - CDC analyzed formaldehyde concentration data that was collected by Bureau Veritas during December, 2007 and January, 2008.  The CDC study was requested by FEMA.
* The coefficient was significantly different from zero at the 0.05 level.

Dr. Hewett explained this entry as follows:

Q    Now, for relative humidity, there's no asterisk in the combined or in either of the two underlying datasets, right?

A    Right.

Q    So there is no statistically significant correlation between humidity and formaldehyde concentration as far as you can tell by your analysis?

A    Well, it didn't reach statistical significance, and the value itself, .001, you know, is very close to zero anyway.

Q    Right.  It's actually negative .0013, right?

---

the subject of a motion to strike.  The Court should be aware that Dr. Hewett did not include his regression analysis in the second report; however, that hardly means it did not occur.

[53]    This table is taken from the original expert report of Paul Hewett submitted in this case.  September 26, 2009 Hewett Report at p. 24.  The red oval has been added to emphasize the relevant entry.

17

A      Yes, but whether it's negative or positive, it's close to zero, indicating that
– With this particular dataset, relative humidity did not seem to be a
predictive variable.[54]

Dr. Hewett's analysis effectively disproves Plaintiff's theory.  Plaintiff claims that Shaw

damaged the Trailer in some way, that this damage resulted in a little more humidity than

otherwise would have been in the Trailer, that this additional humidity led to an increase in

formaldehyde offgassing beyond the rate it otherwise would have offgassed, and that this

additional offgassing (notwithstanding other factors like ventilation) led to a concentration of

formaldehyde above the concentration that otherwise would have been present.  Even if Plaintiff

were permitted to skip the last step – to submit proof that increased offgassing led to increased

formaldehyde concentration in the Trailer – Plaintiff's theory necessarily assumes a relationship

between humidity levels and formaldehyde concentration.  Dr. Hewett found none.[55]

Given that there is no proof that any increase in formaldehyde emissions caused by Shaw

led to an increase in formaldehyde concentration in the Trailer, and given further the position of

Plaintiff expert Dr. Hewett that there is no statistically significant correlation between relative

humidity and formaldehyde concentration, Plaintiff cannot meet his burden of proving that Shaw

caused the concentration of formaldehyde to increase.

## CONCLUSION

Ultimately, Plaintiff has not presented, and cannot present, any evidence at all that shows

that anything Shaw did or did not do resulted in an increase in formaldehyde levels in the

---

[54]      Hewett Deposition, pp. 119-120, Exh. G.

[55]      Or, technically, he found no statistically significant correlation between humidity and
formaldehyde concentration.  What he did find was a negative relationship – in other words, that as humidity
increases, in the Forest River dataset that he studied, formaldehyde concentrations actually *decreased* slightly.

Trailer. This should come as no surprise. All Shaw did was haul the Trailer to Plaintiff's homesite, install it on piers as specified by FEMA, and maintain it for a few months. Shaw did nothing with regard to formaldehyde. Plaintiff would like to present to the jury a convoluted scheme whereby Shaw twisted the trailer, let water in, and let more formaldehyde escape, but Plaintiff simply has no evidence that this occurred. This is precisely the sort of scenario contemplated by Rule 56 – where the plaintiff cannot present evidence of an essential element of his claim, summary judgment must be entered.

There is no evidence in this case that raises a genuine issue of material fact on the question of whether Shaw caused the formaldehyde level in the Trailer to increase. Therefore summary judgment should be entered, dismissing all claims against Shaw with prejudice.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

    /s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

/s/ M. David Kurtz