# Transcript of the Testimony of
# Videotaped Deposition of Lyndon Wright

**Date taken: July 10, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation**

***Note***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

EXHIBIT "B"

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER              MDL NO. 1873

FORMALDEHYDE PRODUCTS             SECTION "N"(4)

LIABILITY LITIGATION              JUDGE ENGELHARDT

\* \* \*

VIDEOTAPED DEPOSITION OF LYNDON WRIGHT, 3417 SOUTH CLAIBORNE AVENUE, APARTMENT 5, NEW ORLEANS, LOUISIANA 70113, TAKEN AT THE OFFICES OF FRANK D'AMICO, 622 BARONNE STREET, NEW ORLEANS, LOUISIANA 70130, ON THE 10TH DAY OF JULY, 2009.

REPORTED BY:

    CATHY RENEE' POWELL, CCR
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255

VIDEOGRAPHER:

    BRIAN SOILEAU
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255

```
 1   cruise ship that was docked out at the
 2   riverfront?
 3        A.   That's correct.
 4        Q.   How long did you live on that
 5   cruise ship?
 6        A.   I would say roughly between
 7   October of '05 to about March of '06.
 8        Q.   And why was it that you came to
 9   leave the cruise ship?  Was the cruise ship
10   leaving or were you -- was there a lease
11   period and they said you have to leave after
12   this point in time?  Why was it you got off
13   the ship?
14        A.   The cruise ship was leaving.
15        Q.   And at that time, when you left
16   the cruise ship, where did you go after
17   that?
18        A.   At that time, that's when I had
19   the trailer.
20        Q.   Let's talk about the period from
21   October '05 to March '06.
22             Did you, in fact, work at the
23   Hyatt during that period?
24        A.   No.
25        Q.   So other than going in and being
```

Page 96

```
 1   the trailer, inspected it, made sure it was
 2   on the blocks, I guess. Showed me how the
 3   electrical was tied into the temporary pole.
 4   We went inside the trailer.
 5             Pretty much checked off everything
 6   was in working order. I had water, the
 7   electricity was working. Just pretty much
 8   went over the checklist of everything in the
 9   trailer.
10        Q.   So you initially took a walk
11   around the outside of the trailer to look at
12   it, correct?
13        A.   Yes.
14        Q.   Did you notice anything at that
15   point unusual to you that you commented to
16   the person from FEMA about?
17        A.   No.
18        Q.   Did you have the chance yourself
19   to look at the unit from the outside before
20   you went into the interior?
21        A.   Yes.
22        Q.   So I take it from the fact that
23   you didn't say anything to the folks from
24   FEMA that you didn't see anything that you
25   thought was out of the ordinary?
```

```
 1      Q.   Did you ever ask FEMA for a new
 2  unit?
 3      A.   No.
 4      Q.   By the summer of 2008, which I
 5  believe was around the last time that you
 6  lived in the unit, correct --
 7      A.   Yes.
 8      Q.   -- July of 2008 was the last time
 9  you lived in the unit?
10      A.   Yes.
11      Q.   By the summer of 2008, had the
12  smell changed in any way?
13      A.   No.  It was just a constant odor.
14  It didn't change.
15      Q.   So from --
16      A.   I mean, I was always deodorizing.
17  It never changed.
18      Q.   So from the time you first noticed
19  it in the winter of 2006 until the time you
20  moved out in the summer of 2008, the smell
21  didn't change in the way it smelled,
22  correct?
23      A.   No, it was just a constant odor,
24  yes.
25      Q.   I'm saying it was the same smell?
```

Page 257

```
 1   right?
 2       A.   No, she just visited.
 3       Q.   She visited occasionally?
 4       A.   Yes.
 5       Q.   Spent the night sometimes?
 6       A.   About a week.
 7       Q.   A week at a time?
 8       A.   Yes, because that was her only
 9   place to reside.
10       Q.   Okay.  I'm going to mark as
11   Exhibit 8 an inspection report bearing Bates
12   SHAW-WRI-00007.
13       Q.   Mr. Wright, first of all, is that
14   your mother's signature in the bottom left
15   corner of Exhibit 8?
16       A.   I don't think it is.
17       Q.   Okay.  Do you know whose
18   signature --
19       A.   I really can't relate.  I don't
20   know if my mom came down and took care of
21   this or not.  Because I know there was a
22   couple of documents they told me I had to
23   sign my mother's name on it.
24       Q.   I was about to ask you, is that
25   your handwriting of her name on Exhibit 8 in
```

Page 258

```
 1   the lower left-hand --
 2       A.   I don't know.
 3       Q.   Okay.  This is a document that was
 4   created when the trailer was inspected,
 5   right?
 6       A.   Yes.  I signed her name.
 7       Q.   Your mom was not present at the
 8   inspection of the unit, right?
 9       A.   No.
10       Q.   It was just you acting on her
11   behalf?
12       A.   Yes.
13       Q.   Okay.  Now, you see the name
14   that's to the right of your mother's name,
15   "M.B. Weddington," you see that?
16       A.   Weddington, yes.
17       Q.   Is that the person who walked
18   around the trailer with you at that time?
19       A.   That's correct.
20       Q.   And is the date accurate,
21   February 13, 2006, for the inspection of the
22   trailer?
23       A.   Approximately.
24       Q.   Okay.  You had walked around the
25   exterior of the trailer prior to signing
```

Page 341

1    you and I talked about?
2         A.   Yes.
3         Q.   How big was it?  Can you describe
4    how long it was and how wide it was?
5         A.   It started off as a little gap,
6    but by the time I got out of it, it was,
7    like, a good piece.  I mean, you could
8    actually, like, put your finger down into
9    it.  The handle side of the door, you could
10   actually put your hand down into the top of
11   it.
12        Q.   You could be standing on the
13   outside of the trailer and put your hand
14   into the inside of the trailer?
15        A.   Yeah.
16        Q.   How wide was the gap?  Was it the
17   whole length of the door?
18        A.   Well, the hinges of the door, so
19   it was like a diagonal-type --
20        Q.   Triangular?
21        A.   Yeah, like a triangular-type
22   opening.
23        Q.   So it came to a point by the hinge
24   side of the door, and it would have been at
25   its widest on the opposite side of the door;

Page 342

 1   is that right?
 2       A.   That's correct.
 3       Q.   And how wide?  You said wide
 4   enough to stick your hand through, but was
 5   it 2 inches, 3 inches, 6 inches?
 6       A.   Well, it was enough for my hand to
 7   go through.  But somebody with bigger hands
 8   probably would have just got their fingers,
 9   you know.
10       MR. KURTZ:
11            All right.  That's all I have.
12   Thank you.
13   EXAMINATION BY MR. AHLQUIST:
14       Q.   Lyndon, I have just a few
15   questions and I'll go as fast as I can.
16            A quick question is with a gap
17   like that on the door like you just
18   described, when it would rain, water would
19   come in that door, correct?
20       A.   Yes.
21       Q.   Would a dehumidifier have made any
22   difference if water was coming in --
23       MR. BONE:
24            Objection.
25       MR. KURTZ: