UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER                          MDL NO. 07-1873
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION                          SECTION N(5)

                                              JUDGE ENGELHARDT

THIS DOCUMENT RELATES TO:
*Lyndon Wright, et al.  v. Forest River, Inc.,*     MAGISTRATE CHASEZ
*et al.*, 09-2977 (E.D. La.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**SHAW ENVIRONMENTAL, INC.'S
MEMORANDUM IN SUPPORT OF MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT REGARDING "BLOCKING"</u>**

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. ("Shaw") submits this memorandum in support of its motion for partial summary judgment in connection with claims relating to the improper "blocking" of Plaintiff's emergency housing unit ("EHU").  Plaintiff's improper "blocking" claim against Shaw must be dismissed because Shaw is entitled to immunity from liability under the well-established federal government contractor defense and/or La. R.S. 9:2771.

By this motion, Shaw focuses on the completed, or "blocked," state of the EHUs rather than the process that Shaw (or its subcontractors) used to achieve that state.  The reason for this distinction is, of course, the Court's ruling on the motion filed by Fluor Enterprises, Inc. ("Fluor")

regarding the government contractor defense,[1] in which the Court held that FEMA had not given Fluor a "reasonably precise specification" of the process.  While respectfully disagreeing with that ruling, Shaw submits that, leaving aside the process by which the trailer was actually placed on piers, all aspects of its work were, in fact, subject to reasonably precise specifications. Therefore, claims arising from anything other than the process itself are subject to the government contractor defense, as well as La. R.S. 9:2771.  This motion seeks the entry of a partial summary judgment dismissing all claims arising from Shaw's work that relate to the completed or "blocked" state of the Wright trailer.

## PRELIMINARY STATEMENT

Pursuant to the Stafford Act, the United States Congress assigned to FEMA the task of providing EHUs to victims of federally declared disasters.  Hurricanes Katrina and Rita were, of course, such disasters, and the resulting massive damage to housing in the Gulf Coast Region created an urgent and immediate need for an unprecedented number of EHUs.  To meet the urgent and immediate massive demand for temporary housing, FEMA contracted with Shaw and three other Individual Assistance/Technical Assistance Contractors ("IA/TACs") to haul, install, maintain, and deactivate EHUs from disaster victims.  Without Shaw and the other IA/TACs' involvement, FEMA would not have been able to accomplish its statutory mandate – to provide housing assistance to those affected by Hurricanes Katrina and Rita and/or their aftermath.  It is of the utmost importance that government agencies and their private contractors be able to

---

[1]    Court's Order and Reasons dated September 10, 2009, Rec. Doc. No. 3205 (denying Fluor's Motion for Summary Judgment on the Government Contractor Defense in *Age, et al. v. Gulf Stream Coach, Inc., et al.*, 09-2892); *See also* Court's Order and Reasons dated October 1, 2009, Rec. Doc. No. 4366 (denying Bechtel National, Inc.'s Rule 12(b)(6) Motion to Dismiss based on the government contractor defense in the *Bartel, et al. v. Gulf Stream Coach, Inc., et al.*, C.A. 09-3943, and *Kujawa, et al., v. Keystone RV Company, et al.*, C.A. 09-3944).

seamlessly and productively work together to respond to emergency situations with the extreme speed and efficiency required.  Failing to extend federal government contractor immunity to private contractors such as Shaw would frustrate the purpose of the Stafford Act and hamper the nation's ability to most effectively respond to future crises.

Another important public policy is at work here too: in Louisiana, contractors are not held liable for building what is specified, even if that construction later results in damage.  This policy is embodied in La. R.S. 9:2771, which holds simply that "[n]o contractor … shall be liable for … defects in any work … if he constructed … the work according to plans and specifications furnished to him."  Again, leaving aside the construction process for the purposes of this motion, there is no dispute that Shaw was provided specifications showing exactly what the completed EHU installation must entail; there is no evidence that Shaw failed to comply with those specifications.  Under these circumstances, it is the public policy and the law of Louisiana that Shaw cannot be held liable for its work.

## BACKGROUND

This multi-district litigation (MDL) is the consolidation of numerous federal tort suits in which plaintiffs claim to have been injured while inhabiting EHUs that were provided to them by FEMA.[2]  After selecting and purchasing these EHUs, FEMA provided them to plaintiffs by contracting with certain companies, like Shaw, to deliver the EHUs, set them up, and make them ready for occupancy.[3]

---

[2]    Rec. Doc. No. 1, C.A. No. 09-2977 (Wright), art. I.; *see also* Rec. Doc. No. 109, ¶ 96.

[3]    Rec. Doc. No. 717, ¶ 22.

Shaw's contract with FEMA set forth specifics on how the travel trailers were to be delivered, installed, blocked, leveled, anchored, attached to utilities, outfitted with steps or handicap ramps/platform steps, winterized, and otherwise be made ready for occupancy.[4]   In particular, the contract required Shaw to "block" and level travel trailers on six concrete piers constructed in a precise fashion.[5]   The contract provided, among other things, detailed specifications as to the number of concrete piers that were to be used; the manner in which the concrete piers were to be constructed; and the spacing between the concrete piers.[6]  Shaw had no discretion whatsoever with regard to how the piers would look or the fact that trailers had to be installed on these piers.[7]

Lyndon Wright filed suit on March 2, 2009.[8]   Thereafter, he was selected as the bellwether plaintiff in a trial scheduled to commence on March 15, 2010, against the USA (now dismissed from the case), Forest River, Inc. (the manufacturer of the travel trailer in which Plaintiff resided) and Shaw, the government contractor who was responsible for having the travel trailer delivered and installed.[9]   Plaintiff's action against Shaw attacks, among other things, Shaw's (and/or its subcontractor's) installation of the trailer Plaintiff occupied ("the Trailer").

---

[4]     Affidavit of Geoffrey C. Compeau, ¶ 4, attached hereto as Exhibit A.  Exhibit 1 to that Affidavit is a copy of certain relevant portions of the IA/TAC between FEMA and Shaw; Exhibit 2 is a copy of Task Order 15; and Exhibit 3 is a copy of Exhibit 7 ("Travel Trailer Installation") to the Performance of Work Statement (Attachment A to Section J) of the IA/TAC.

[5]     Compeau Affidavit, ¶¶ 9-10, Exh. A and Exhibit 3 thereto ("Exhibit 7 - Travel Trailer Installation").

[6]     *Id.*

[7]     *Id.*; *see also* Deposition of David Garratt, p. 221, attached hereto as Exhibit B (the "Garratt Deposition").

[8]     Rec. Doc. No. 1., C.A. 09-2977.

[9]     Pre-Trial Order No. 34, Rec. Doc. No. 1299.

Specifically, Plaintiff alleges that by "blocking" his Trailer on concrete piers, "Shaw created stress and flexing" on the unit's frame "as it was not designed to be lifted off of the wheel base."[10]  In other words, Plaintiff claims that the mere fact that his Trailer rested on concrete piers is actionable.  As a result of the "blocking," Plaintiff alleges that the stress and flexing of the EHU's frame created "distortion," cracks, and openings in the unit's shell, which allowed moisture intrusion, contributing to increased formaldehyde exposure.[11]

Shaw avers, however, that it is immune under the government contractor defense and/or La. R.S. 9:2771 from any liability related to placing Plaintiff's EHU on concrete piers because it was specifically required to do so under its contract with FEMA.  The Court's prior ruling supports this result.[12]  Fluor's motion sought government contractor immunity on every aspect of the installation process.  This Court denied Fluor's motion only because it encompassed the jacking process, not just the completed state: "[w]hile the Government gave Fluor detailed specifications on the EHU 'blocking' procedure," the Government did not give Fluor detailed specifications as to the "means and method for 'jacking up' the EHUs (i.e. lifting the EHU up from the ground up onto concrete blocks."[13]  Thus, all claims relating to "blocking," as opposed to "jacking," are barred.

This distinction is important in this case because Plaintiff has alleged claims arising out of things other than the installation process itself.  For example, certain of Plaintiff's experts

---

[10]    Rec. Doc. No. 1, C.A. 09-2977, ¶ 38.

[11]    *Id.*, ¶ 39.

[12]    Court's Order and Reasons dated September 10, 2009, Rec. Doc. No. 3205.

[13]    *Id.* at pp. 5-6.

argue that the Trailer, as installed on piers and used as temporary housing, violates the Building Code of the City of New Orleans, and that for this reason alone, they claim that Shaw (and, for that matter, Forest River) should be held liable. Moreover, based on questioning at recent depositions, it is evident that Plaintiff's counsel intends to argue that soil subsidence damaged the Trailer, and that Shaw should have anticipated this and built a foundation that would prevent or withstand this phenomenon. Leaving aside the many other problems with these theories, neither of them relates specifically to the installation process, the one feature of the IA/TAC as to which this Court previously found the IA/TAC to lack precise detail. Rather, these theories attack the as-completed state of the Trailer once it was installed on piers. But that state was precisely defined by FEMA through Exhibit 7 to the IA/TAC. Eliminating these sorts of claims will narrow the scope of the trial and give force to the protections afforded by the government contractor defense and La. R.S. 9:2771.

## STATEMENT OF FACTS

**I.     The Contract Between FEMA and Shaw Precisely Specifies Trailer Installation.**

On September 30, 2005, FEMA and Shaw executed an Individual Assistance/Technical Assistance Contract ("IA/TAC"), No. HSFEHQ-05-D-0573.[14] This contract contemplated that Shaw would assist FEMA in its mission to provide certain forms of assistance to disaster victims, pursuant to individual task orders to be issued by FEMA.[15]

---

[14]     Compeau Affidavit, ¶¶ 2, 4, Exh. A and Exhibit 1 thereto.

[15]     Compeau Affidavit, ¶¶ 4-6, Exh. A and Exhibits 1 and 2 thereto.

Exhibit 7 to the IA/TAC governs "Travel Trailer Installation" and provides specific instructions about trailer installation that Shaw was required to follow.[16]   The following is FEMA's specification for installation of travel trailers:

> The Contractor shall clean away all grass roots, loose dirt, rocks or debris where at the base of the piers.  Travel trailers shall be set-up on concrete piers and after the weight of the travel trailer is transferred to the piers, if the unit is not leveled properly the contractor will reinstall the unit at no additional cost to the government.  The travel trailer set-up will also include a minimum of six piers (three on each side) evenly placed.  The end piers should not be directly on the end of the unit, but approximately six inches off the edge of the unit.  The contractor shall provide a base for each pier.  The base will be ¾" x 24" x 24" exterior grade plywood.  The piers will have at minimum two solid cap blocks on the base and two solid cap blocks at the top of the piers.

> The space between the top of the pier's solid cap blocks and the bottom of the travel trailer I-beam frame shall not exceed seven inches (7").  Up to four inches (4") of this space may be filled with a solid concrete block laid parallel to the travel trailer steel I-beam frame.  Up to three inches (3") of this space may be filled with blocking timber and wedges laid perpendicular to the travel trailer steel I-beam.  No more than one inch (1") of this area shall be shimmed with wedges.

> After the weight of the travel trailer is transferred to the concrete piers, the piers must be vertical aligned and tightly shimmed with wooden wedges.  If the piers are not vertical at the time of final inspection, they shall be removed and reinstalled by the Contractor at no additional cost.  The Contractor will be responsible for all necessary re-leveling and re-blocking of the travel trailer for a period of 90 days after final inspection.[17]

At his deposition, David Garratt, Deputy Administrator of FEMA, testified that it was an explicit FEMA directive to put the travel trailers on blocks.  If Shaw did not put the trailers on blocks, or failed to hook up the trailers to utilities, it would have violated the IA/TAC FEMA contract.[18]

---

[16]   Compeau Affidavit, ¶¶ 9, 10, Exh. A and Exhibit 3 thereto.

[17]   Exhibit 3 to Compeau Affidavit, Exh. A, at Section 2.1.2.

[18]   Garratt Deposition, p. 221, Exh. B.

It is undisputed that these precise specifications for putting the EHU on concrete piers were drafted by FEMA and provided to Shaw by FEMA.[19]   Shaw had no role in developing, testing or engineering any aspect of Exhibit 7 or any other aspect of FEMA's instructions to place the travel trailers on concrete blocks.[20]   Additionally, FEMA provided Shaw with a pier diagram prepared by Terry Zien of the U.S. Army Corps of Engineers.[21]   Shaw was never directed or asked, and therefore never undertook, to perform any engineering services concerning this diagram.[22]   FEMA never requested any engineering/support/expertise from Shaw relating to the Government's method for blocking the trailers.[23]

## II.     Shaw's Work Conformed to FEMA's Precise Specifications.

Shaw utilized a rigorous quality control program that checked each trailer to ensure that it met the requirements of Exhibit 7 precisely, and the records generated during that process with regard to the Trailer confirm that it did.[24]   Shaw had a construction lead who worked with each subcontractor and who checked the work of that subcontractor.   Additionally, Shaw separately inspected, or had one of its subcontractors inspect, every single installation during the "Ready for

---

[19]     Compeau Affidavit, ¶ 10, Exh. A.

[20]     *Id.*

[21]     Compeau Affidavit, ¶ 11, Exh. A and Exhibit 4 thereto (Government Diagram for "Typical Travel Trailer Pier Construction").

[22]     *Id.*

[23]     Compeau Affidavit, ¶¶ 10-11, Exh. A.

[24]     Compeau Affidavit, ¶¶ 20-21, Exh. A and Exhibits 10-12 thereto (RFO Checklist; Trailer Lease Check In List; and Bobbie Wright RFO Checklist).

Occupancy" (or, "RFO") process.[25]   The RFO Checklist confirms that the Trailer was properly blocked on concrete piers, anchored with required straps and utilities (*i.e.*, sewer, water, and electricity) as well as propane tanks, battery and metal steps.[26]

Finally, during the "lease-in"[27] process, Shaw or its subcontractor would check the trailer again, this time with occupant present.  Plaintiff confirmed at his deposition that he participated in that process and found nothing to be wrong with the Trailer; moreover, he signed a form indicating that the Trailer was in good condition:

> Q.    So you initially took a walk around the outside of the trailer to look at it, correct?
>
> A.    Yes.
>
> Q.    Did you notice anything at that point unusual to you that you commented to the person from FEMA about?
>
> A.    No.
>
> Q.    Did you have the chance yourself to look at the unit from the outside before you went into the interior?
>
> A.    Yes.
>
> Q.    So I take it from the fact that you didn't say anything to the folks from FEMA that you didn't see anything that you thought was out of the ordinary?
>
> A.    Out of the ordinary on the outside?  No.
>
> Q.    Did you notice any damage to the unit from the outside?

---

[25]    *Id.*

[26]    Compeau Affidavit, ¶ 21, Exh. A and Exhibit 10 thereto (RFO Checklist).

[27]    When an applicant is provided with an EHU, he undergoes a "lease-in" process by which he takes possession of the EHU.  During this process, the EHU's functions are explained, and the applicant has an opportunity to check the EHU's condition.

A.      No.

Q.      Now, once you had done the initial visual inspection of the exterior, did you move to the interior of the unit?

A.      Yes.

                                        * * *

Q.      With respect to when you actually observed the interior of the unit during that first meeting, did you see any signs of damage to the unit on the interior?

A.      No.

                                        * * *

Q.      Was there anything unusual to you about that initial inspection of the unit that you went through with the folks from FEMA?

A.      Unusual?  At the time, no.

Q.      Did you express any to these folks who gave you the unit about any problems that you thought you might have while living in the unit?

A.      At the initial meeting?

Q.      Yes.

A.      No.

                                        * * *

Q.      Okay.  You had walked around the exterior of the trailer prior to signing this, right, signing your mother's name to Exhibit 8?

A.      Yes.

                                        * * *

Q.      Okay.  Was the trailer level at the time you inspected it or participated in the inspection on February 13, 2006?

A.      What about?

Q.      Was it level?

A.      Yes.

Q.      Okay.  Do you recall seeing any leaks at the time of the inspection,
        February 13, 2006, or any evidence that water had leaked into the trailer?

A.      No.[28]

In addition to Shaw's own quality control program, FEMA sent an inspector out to the

Wright Trailer on February 21, 2006, to conduct an inspection.[29]   The Trailer passed that

inspection, as well.[30]

Although Plaintiff was "leased-in" on February 13, 2006, he elected to remain on the

cruise ship where he had been living until some time in March, 2006, at which point he moved to

the Trailer.[31]   After Plaintiff moved into the Trailer, Shaw maintained it for less than three

months, until June 1, 2006, when C. Martin Company assumed maintenance responsibility.[32]

During the period of Shaw's maintenance, Plaintiff lodged no formaldehyde or other odor-

related complaints; indeed, he reported only one maintenance issue – a broken furnace that was

repaired to his satisfaction.[33]   Further, the Preventative Maintenance Form ("PMI"), which was

signed by a representative of C. Martin, indicates that no maintenance issue existed at that time

---

[28]     Deposition of Lyndon Wright, pp. 96-97, 102-103, 258-259, 265, 267, attached hereto as Exhibit C (the "Wright Deposition").

[29]     Compeau Affidavit, ¶ 23, Exh. A and Exhibit 14 thereto (AFO DHOPS Master Expedite List).

[30]     *Id*.

[31]     Wright Deposition, p. 73, Exh. C.

[32]     Affidavit of Allison Hansen, ¶¶ 4-12, attached hereto as Exhibit D (the "Hansen Deposition") and Exhibits 1 and 2 thereto (June 2, 2006 Email from C. Martin's Robyn Williams; and C. Martin's MDC Turnover Spreadsheet).

[33]     Compeau Affidavit, ¶¶ 24-26, Exh. A and Exhibits 15 and 16 thereto (FEMA Maintenance Transmission Report and Call Center Maintenance Request Form, date March 19, 2006).  *See* Mr. Wright's signature on the form.

of the MDC Turnover with respect to the Trailer.[34]  Plaintiff lived in the Trailer for a little more than two more years after Shaw's responsibility for the Trailer ended.[35]  Even at the end of that period, Plaintiff and his mother continued to sign off on inspection reports from other FEMA contractors and/or subcontractors, confirming that nothing was wrong with the Trailer.[36]

## LAW AND ARGUMENT

### I.      Summary Judgment Standard

Summary judgment should be granted "when the pleadings and summary judgment evidence establish that 'there is no genuine issue as to any material fact and that judgment as a matter of law is appropriate.'"[37]  Federal Rule of Civil Procedure 56 would be thwarted if a defendant had "to bear the costs of trying all of the issues in a case when some can and should be resolved on summary judgment."[38]

After the moving party meets its burden of demonstrating the absence of a genuine issue of material fact, the non-moving party "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."[39]  This burden cannot be met merely by pointing to "'some metaphysical doubt as to the material facts,' . . . by 'conclusory allegations,'

---

[34]      Hansen Affidavit, ¶¶ 5, 11, Exh. D and Exhibit 3 thereto (June 1, 2006 PMI for Wright Trailer).

[35]      Wright Deposition, pp. 73, 132, Exh. C.

[36]      Crown Roofing Services, Inc. Maintenance Records, pp. 7, 9-10, 12, attached hereto as Exhibit E.

[37]      *Parker v. Crescent Guardian, Inc.*, No. 04-1801, 2006 WL 901756, at *2 (E.D. La. Apr. 3, 2006) (citing Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

[38]      *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

[39]      *Id.* at 1075.

[or] by 'unsubstantiated assertions.'"[40]   Courts routinely grant summary judgment and hold federal contractors immune from liability under state law based on the government contractor defense.[41]

## II.   Applicable Law – Government Contractor Defense

The Supreme Court has long recognized that private contractors who perform work at the request and direction of the federal government cannot be held liable for damages caused by the contractor's implementation of that work. For example, in *Yearsley v. W.A. Ross Constr. Co.,* plaintiff sued a private construction company that built dikes for the federal government.[42]   As a result of the dikes' construction, 95 acres of plaintiff's land suffered from erosion.[43]   The parties did not dispute that "the work which the contractor had done in the river bed was all authorized and directed by the Government of the United States for the purpose of improving the navigation of this navigable river."[44]   Accordingly, the Court held that the government contractor was immune from liability: "if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."[45]

---

[40]       *Id.,* (citing *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Lujan v. Nat'l Wildlife Fed.,* 497 U.S. 871, 871-73 (1990); *Hopper v. Frank,* 16 F.3d 92 (5th Cir. 1994)).

[41]       *See, e.g., Hudgens v. Bell Helicopters,* 328 F.3d 1329, 1344-45 (11th Cir. 2003); *Kerstetter v. Pac. Sci. Co.,* 210 F.3d 431, 437-39 (5th Cir. 2000); *In re Air Disaster at Ramstein Air Base, Germany,* 81 F.3d 570, 574-76 (5th Cir. 1996); *Stout v. Borg-Warner Corp.,* 933 F.2d 331, 334-37 (5th Cir. 1991), cert. denied, 502 U.S. 981 (1991).

[42]       309 U.S. 18, 20 (1940).

[43]       *Id.*

[44]       *Id.*

[45]       *Id.* at 20-21.

In *Boyle v. United Tech. Corp.,* the Supreme Court applied the rationale behind *Yearsley,* which protected contractors from liability where they were "'executing [the government's] will'" under a performance contract, to a military procurement contract.[46]  In doing so, the Court held that the applicability of the so-called "government contractor defense" did not depend on whether the contractor was an agent of the government or an independent contractor, or whether the contract was for services or for the procurement of equipment.[47]  Rather, the Court focused on the existence of "uniquely federal interests," which "are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced ... by 'federal common law.'"[48]  *Boyle* established a three-part test that determines whether the defense applies (1) the federal government approves reasonably precise specifications, (2) the contractor's work conforms to those specifications, and (3) the contractor is not aware of reasons not known to the government why the work product required by the specifications is unsafe or unreasonable.[49]

If the contractor satisfies these three conditions, the nature of the contractor's work (military, non-military, service or procurement) is irrelevant. The defense applies with equal force to service and maintenance contracts like Shaw's contract with FEMA.[50]  Indeed, where

---

[46]     487 U.S. 500, 505-06 (1988).

[47]     *Id.* (citing *Yearsley,* 309 U.S. at 20-21).

[48]     *Id.* at 504 (citations omitted).

[49]     487 U.S. at 512.

[50]     *See e.g., In re World Trade Ctr. Litig.,* 521 F.3d 169, 197 (2d Cir. 2008) (government contractor defense applies to contractors providing disaster relief & clean-up services); *Hudgens,* 328 F.3d at 1334 (maintenance-service contractor may assert defense; *In re Katrina Canal Breaches Consol. Litig.,* No. 05-4182, 2007 WL 763742, at *4 (E.D. La. 3/9/07) (granting dredging service contractor's motion on government

the government has directed a contractor to do the very thing that is the subject of the claim, the contractor is entitled to the defense.[51]

### III. The Government Contractor Defense Bars Plaintiff's Claim that Shaw's Placing of the EHU on Concrete Piers Was Improper.

#### A. The FEMA Contract Specifically Required Shaw to Install Plaintiff's EHU By Placing the Unit on Concrete Blocks.

The government contractor defense "requires only that the government approve *reasonably* precise specifications."[52]  This requirement was created to "assure that the design feature in question was considered by a government officer and not merely by the contractor itself."[53]  Though it is necessary only that the government approve, rather than create the specifications, it is not disputed that FEMA created and provided the specifications for the blocking of travel trailers on concrete piers.

The IA/TAC clearly meets this test, particularly since there is no requirement that the government specify every last detail of the design feature in question.  Here, Exhibit 7 to the IA/TAC provided, among other things, the specifications for the number of piers that were to be used (**"a minimum of six piers (three on each side)"**); the spacing between the piers (**"the end piers should not be directly on the end of the unit, but approximately six inches off the edge of the unit. . . .[t]he space between the top of the pier's solid cap blocks and the bottom of**

---

contractor defense); *Richland-Lexington Airport v. Atlas Prop.*, 854 F.Supp. 400, 421-24 (D.S.C. 1994) (remediation contractor working for EPA immune under defense); *Askir v. Brown & Root*, 1997 WL 598587 at *2, 5-7 (S.D.N.Y. 1997) (contractor that provided "logistical, operational, maintenance, and construction services" to the U.S. immune from liability under defense).

[51]    *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 74 n.6 (2001) (citing *Boyle,* 487 U.S. at 500).

[52]    *Smith v. Xerox Corp.*, 866 F.2d 135, 138 (5th Cir. 1989) (with emphasis).

[53]    *Boyle*, 487 U.S. at 512.

the travel trailer I-beam frame shall not exceed seven inches (7")")**; the size of the base for

each pier **("[t]he base will be ¾" x 24" x 24" exterior grade plywood.  The piers will have at

minimum two solid cap blocks on the base and two solid cap blocks at the top of the

piers")**; and the alignment of the piers ("**the piers must be vertically aligned**").[54]

Shaw was merely a vehicle for executing FEMA's "blocking" instructions.  These facts

are not disputed.  Indeed this Court has held that FEMA gave the IA/TAC defendants "detailed

specifications for the EHU 'blocking' procedure.'"[55]  The first prong of *Boyle* is therefore met.

### B.   Shaw's Work Involving "Blocking" Conformed to FEMA-Approved Plans and Specifications.

Just as clearly, Shaw faithfully followed these FEMA-approved plans and specifications

in its installation work.  The Fifth Circuit has held that the government's issuance of a form or

report indicating acceptance of the product and/or its conformity with all required specifications is

compelling evidence that the contractor's work met the government's requirements.[56]  This

condition also may be satisfied by showing that the United States "supervise[d] and control[led]

the [contractor's] implementation of" approved specifications,[57] or that the government inspected,

accepted as complete or used the contractor's work.[58]  As discussed above, a representative of

---

[54]      Exhibit 3 to Compeau Affidavit (Exhibit 7 to Performance Work Statement of the IA/TAC).

[55]      Court Order and Reasons Dated September 10, 2009, Rec. Doc. 3205, pp. 5-6.

[56]      *Miller v. Diamond Shamrock Co.,* 275 F.3d 414, 420 (5th Cir. 2001) (collecting cases).

[57]      *In re Katrina,* 2007 WL 4219351, at *5.

[58]      *See Kerstetter,* 210 F.3d at 435-36; *Tate v. Boeing Helicopters,* 55 F.3d 1150, 1156 (6th Cir. 1995) (second condition satisfied by proof the government "inspected and approved" contractor's work); *Kleemann v. McDonnell Douglas Corp.,* 890 F.2d 698, 701-02 (4th Cir. 1989) (where there is a "continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications"). (*See infra* pp. 48-50).

FEMA inspected the Trailer on February 21, 2006, to make sure it complied with the specifications set forth in Exhibit 7 to the IA/TAC Performance Work Statement.[59]  The Trailer passed inspection.[60]

Even Plaintiff's engineering expert, C. David Moore, admitted that there was no evidence that Shaw failed to comply with the specifications:

> Q.    Let me ask you to look at Exhibit 6.[61]  When you look at Section 2.1.2 -- do you see that, sir, on Exhibit 6?
>
> A.    Yes, Sir.
>
> Q.    And it continues to the second page, right?
>
> A.    Correct.
>
> Q.    Okay.  Leaving aside the jacking for a moment, Section 2.1.2 adequately describes the finished product, does not it?
>
> A.    It appears to, yes.
>
> Q.    Okay.  Anything about this trailer that you think fails to comply with that specification as it was installed?
>
> A.    I don't know of anything that would have been different, no.  I guess the only thing that I see here that I really -- and again, I don't know -- is it says, "The contractor will be responsible for all necessary re-leveling and re-blocking for a period of 90 days after final inspection." I don't see -- I didn't see anything that said that they either looked at it or didn't look at it.  They may have or they may not have.
>
> Q.    You don't know one way or the other?
>
> A.    No, sir.

---

[59]    Compeau Affidavit, Exh. A, ¶ 23 and Exhibit 14 thereto (AFO DHOPS Master Expedite List).

[60]    *Id.*

[61]    Confusingly, Exhibit 7 to the IA/TAC Performance Work Statement happened to be Exhibit 6 to Mr. Moore's deposition.

Q.    You don't know whether Shaw went back out there and releveled it or not, do you?

A.    No, I do not know.  As far as I know, there was no documents that I saw that indicated either way.

Q.    Okay.  You don't know whether FEMA went out there and checked to see if Shaw had installed this trailer right, do you?

A.    I think they had the FEMA inspector there at the time of installation. After the installation, I don't know if they went back or not.

Q.    Okay.  So the person who inspected the trailer at the time of installation didn't find anything wrong with the installation, did they?

A.    I don't remember seeing that on any of the documents, no.

Q.    You probably would have noticed that, wouldn't you?

A.    I would think so, yes.  And, in fact, I would think that that would be noticed, that there should have been additional work or should have been some additional documents that were produced until they got to a point to where they were satisfied.[62]

The testimony and contemporaneous documents establish that the Trailer was installed in accordance with Exhibit 7; there is no evidence to suggest that Shaw failed to conform to these specifications.

Plaintiff cannot negate a contractor's showing of conformance with reasonably precise specifications merely by asserting that defendant's work did not comply with some "general admonition against an unwanted condition."[63]  Instead, Plaintiff must provide evidence of an allegedly defective feature – which caused his damages – "result[ed] from" the contractor's

---

[62]    Deposition of C. David Moore, pp. 95-97, attached hereto as Exhibit F.

[63]    *Kleemann*, 890 F.2d at 703 (*quoting Harduvel v.  General Dynamics*, 878 F.2d 1311, 1319 n.3 (11th Cir. 1989) (precatory contract terms "represent little more than the hopes of the participants that the project on which they are about to embark will turn out well"); *In re Air Disaster*, 81 F.3d at 575 (holding overly general contract language "calling for such vagaries as a failsafe, simple or inexpensive" work have no role in the government contractor defense analysis) (quoting *Kleemann,* 890 F.2d at 703).

departure from reasonably precise specifications.[64]  Plaintiff cannot raise a genuine issue of fact to dispute Shaw's satisfaction of the second element of the government contractor defense.

### C.   Shaw Had No Actual Knowledge Not Otherwise Known to FEMA About Any Danger Relating to FEMA's Instruction to Place the EHU on Concrete Piers.

To satisfy the third condition of the government contractor defense, the contractor must prove it knew of no "reasons not known to the government why the application" of the approved plans and specifications were "unsafe or unreasonable."[65]  Importantly, however, *Boyle's* third condition does not oblige the contractor to test for or discover inherent risks that neither the United States nor its contractor ever considered to be unsafe.[66]  Rather, the contractor must warn the United States only "of dangers about which it has *actual knowledge,*" and not about dangers which, in hindsight, the contractor allegedly *should have* identified.[67]

As a preliminary matter, Shaw would like to point out that there is no evidence to support Plaintiff's assertion that the placing of travel trailers (including the Wright Trailer) on concrete piers results in increased formaldehyde exposure.  Nonetheless, even if that were the case, the

---

[64]     *See Kerstetter*, 210 F.3d at 435-36; *see also Beaver Valley Power Co. v. Nat'l. Eng'g.,* 883 F.2d 1210, 1219 n.9 (3d Cir. 1989) (partially aff'd summary judgment because plaintiff never showed how the contractor's alleged non-conformance with a contractual permitting requirement "caused its damages").

[65]     *In re Katrina*, 2007 WL 4219351, at *5; see also *Kerstetter*, 210 F.3d at 436; *In re Air Disaster*, 81 F.3d at 575-76.

[66]     See *Boyle*, 487 U.S. at 513 (rejecting an alternative test for what the contractor could have "reasonably known" as inadequately "protect[ing] the federal interest embodied in the 'discretionary function' exemption").

[67]     *Trevino,* 865 F.2d at 1487 (emphasis added). (*See infra* pp. 50-52).  Shaw submits that Plaintiff can present no evidence to suggest that Shaw was in a position where it "should have identified" an alleged formaldehyde danger (assuming one existed), but since "actual knowledge" is the relevant test, further discussion of this point is unnecessary.

record establishes that Shaw had no actual knowledge that the specifications and plans for placing the EHUs on concrete blocks were in any way unsafe or unreasonable or that the implementation of the FEMA-approved specifications would adversely affect the frame of Plaintiff's unit and thereby lead to an allegedly dangerous formaldehyde exposure.  The test is not whether Shaw should have known of a formaldehyde problem allegedly created by implementation of FEMA's mandatory specifications for "blocking" procedures.  Shaw is only responsible for warning the government of dangers about which it had actual knowledge.  Simply put, there is absolutely no evidence that would demonstrate such actual knowledge.  The undisputed evidence shows that Shaw has met the third and final condition of the government contractor defense with respect to Plaintiff's assertion that placing his EHU on concrete blocks was improper, and Shaw's motion for partial summary judgment should be granted, dismissing Plaintiff's claim on this issue against Shaw.

**IV.    Additionally, Shaw is Immune From Tort Liability under La. R.S. 9:2771.**

Shaw also cannot be found liable to the Plaintiff in this action because it is protected from liability pursuant to La. R.S. 9:2771.  Shaw performed all of its work pursuant to specifications provided and mandated by the government through FEMA.  In particular, Shaw did not design the concrete pier installation, and, therefore, Shaw is entitled to immunity from suit regarding any claims arising from those actions.

La. R.S. 9:2771 provides:

> ***No contractor***, including but not limited to a residential building contractor as defined in R.S. 37:2150.1(9), ***shall be liable for*** destruction or deterioration of or ***defects in any work*** constructed, or under construction***, by him if he constructed***, or is constructing, ***the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or***

>*specifications*. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.

(emphases added).

The contractor is not required to prove fault or insufficiency of the plans and specifications. Rather, immunity results from proof of compliance alone.[68] The contractor immunity statute applies to third-party tort claims.[69] The contractor's immunity to third parties for defects in work constructed results from proof of compliance with plans and specifications alone.[70] Accordingly, an experienced contractor is not under a duty to check specifications furnished to the contractor by another to determine if they are sufficient before proceeding.[71]

In light of Shaw's quality control reports that establish that the Trailer was installed in accordance with Exhibit 7, as well as FEMA's inspection of the Trailer, Plaintiff expert Moore's admissions, and further in light of the fact that there is no evidence at all to suggest that Shaw failed to conform to the specifications, there is no genuine issue of material fact on the question of whether Shaw's work with regard to the Trailer conformed to Exhibit 7. Accordingly, Shaw

---

[68] *Bernard v. State of La. Through DOTD*, 93-1376 (La. App. 3d Cir. 6/1/94), 640 So. 2d 694, 700; *City of Covington v. Heard*, 428 So. 2d 1132, 1134 (La. App. 1st Cir. 1983).

[69] *Morgan v. LaFourche Recreation Dist. No. 5*, 2001-1191 (La. App. 1st Cir. 6/21/02), 822 So. 2d 716, 721, writ denied, 827 So. 2d 1156 (La. 2002).

[70] *Cormier v. Honiron Corp.*, 2001-446 (La. App. 3d Cir. 9/27/00), 771 So. 2d 193, 197; *Allstate Enterprises, Inc.*, 39,467 (La. App. 2d Cir. 6/29/05), 907 So. 2d 904, 912 (9:2771 provides safe harbor to contractor so long as plans and specifications are not provided by contractor; contractor is immune from liability upon constructing and compliance with plans and specifications); *Lyncker v. Design Engineering, Inc.*, 2007-1522 (La. App. 4th Cir. 6/25/08), 988 So. 2d 812, 814 (contractor is not the guarantor of the sufficiency of plans and specifications drawn by another, and if it complies with those plans and specifications, it is entitled under the statute to immunity for destruction or deterioration of work).

[71] *Lebreton v. Brown*, 260 So. 2d 767, 767 (4th Cir. 1972).

is immune from suit under La. R.S. 9:2771, entitling it to partial summary judgment and dismissal of all claims related to blocking of Plaintiff's Trailer on concrete piers.

## CONCLUSION

Plaintiff should not be permitted to pursue claims against Shaw relating to the completed state of the Trailer. Even if one were to assume that the Trailer, as "blocked," somehow caused or contributed to Plaintiff's alleged injuries, whether through building code violations, subsidence, or some other mechanism, still Shaw would be immune from suit as a result of its having performed the work that the government asked Shaw to do. The undisputed evidence proves that the IA/TAC precisely specified the completed state of the Trailer on blocks, and that Shaw installed it that way. Shaw is entitled to the government contractor defense and protection under La. R.S. 9:2771, and as such, Shaw urges the Court to enter summary judgment in its favor, dismissing all claims against it that relate to the completed or "blocked" state of the Trailer.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


　　/s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

    /s/ M. David Kurtz