UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
|     FORMALDEHYDE | * | |
|     PRODUCTS LIABILITY | * | |
|     LITIGATION | * | SECTION:  N(5) |
| | * | |
| This Document Relates to:  *Lyndon T. Wright  v.* | * | JUDGE: ENGELHARDT |
| *Forest River, Inc., et al*, Docket No. 09-2977 | * | |
| | * | MAG: CHASEZ |

**************************************************************************

**FOREST RIVER INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT ON GOVERNMENT CONTRACTOR DEFENSE**

**MAY IT PLEASE THE COURT:**

Defendant Forest River, Inc. ("Forest River") respectfully submits this memorandum in

support of its Motion for Summary Judgment regarding its status as a government contractor.  As

explained more fully below, Forest River is entitled to government contractor immunity due to its

unique interactions with FEMA, interactions that distinguish Forest River from prior bellwether

defendants like Gulf Stream and Fleetwood.  In particular, prior to Hurricane Katrina, FEMA

conducted an on-site inspection of Forest River's "FEMA spec" prototype unit, the same unit built

by Forest River in the months following Hurricane Katrina.  During that inspection, FEMA

personnel personally examined the prototype unit, toured Forest River's manufacturing facilities, and

had access to the documentation related to the unit.  Forest River and FEMA even shared ideas for

improving the FEMA spec units.

Thus, rather than simply receive a piece of paper with FEMA's trailer specifications, Forest River engaged in the sort of "substantive review" and "continuous back and forth" with FEMA that should shield Forest River from liability via the government contractor defense. Accordingly, plaintiff's claims against Forest River should be dismissed with prejudice.

In support of the instant motion, Forest River would demonstrate unto this Honorable Court as follows:

## **BACKGROUND**

As the Court is well aware, this Multi-District Litigation is the consolidation of hundreds of federal toxic tort suits in which an estimated seventy thousand named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita. (Rec. Doc. 109, at ¶ 96). Forest River's bellwether plaintiff, Lyndon Wright, originally filed suit in March of 2009; on April 6, 2009, the Court entered Pre-Trial Order No. 34, confirming Wright as Forest River's first trial plaintiff. (Rec. Doc. No. 1299). On June 24, 2009, Wright filed a Motion for Leave to File First Supplemental and Amended Complaint, seeking to add new claims of mold exposure. (Rec. Doc. 1862). The Court granted that motion on July 17, 2009. (Rec. Doc. 2201).

The uncontradicted evidence establishes that the design and construction of plaintiff's EHU was dictated by specifications provided by the United States, through the Federal Emergency Management Agency. FEMA has long used travel trailers as emergency housing units in responding to disasters, including in Louisiana. *See* Deposition of David Garratt, taken on July 7, 2009, p. 32, attached as Exhibit "A" (stating that travel trailers were used in the disaster relief efforts undertaken

since Hurricane Andrew in 1992).  FEMA believed that trailers were the preferred direct temporary

housing product.  *Id.* at 207.  Their size allowed them to be transported and installed quickly, they

were less expensive than mobile homes, and they could be placed on an individual's property so that

the individual could return home and rebuild his or her property more quickly.  *Id.* at 207-08.

In June of 2004, Richard Spillane, a Contracting Specialist from FEMA, contacted Forest

River with a Request for Proposal setting out FEMA specifications for travel trailers to be used in

future disasters.  *See* Deposition of Doug Gaeddert depo, dated August 6, 2008, p. 39, attached as

Exhibit "B."  These FEMA-issued procurement specifications detailed how the EHUs were to be

built.  *See, e.g.*, FEMA Travel Trailer Procurement Specifications, dated 5/8/04 (FOREST 2485-88),

attached as Exhibit "C."  These "FEMA specs" were comprehensive, setting forth information about

the size and configuration of the trailers, electrical service, plumbing service, appliances, furnishings,

heating and cooling mechanisms, safety equipment, coverings, transportation methods, and other

issues.  *Id*.  The specifications were thorough, detailing all aspects of the trailers' construction from

the overall square footage to the quantity of master key sets that were required for each unit.  *Id*.

Lyndon Wright resided in a FEMA spec trailer.  Deposition of Doug Gaeddert, dated November 5,

2009, p. 165, attached as Exhibit "D."[1]

At the time Forest River initially received these FEMA specs in 2004, none of its

commercially available travel trailers was equipped with the items mandated by FEMA.  2008 Depo

of Gaeddert, p. 38.  In particular, the existing Forest River models did not have any "FEMA

---

[1]  Because PSC conducted two FRCP 30(b)(6) depositions of Forest River via Doug
Gaeddert in August of 2008 and November of 2009, the two deposition transcripts will be
referred to as either "2008 Depo of Doug Gaeddert" or "2009 Depo of Doug Gaeddert"
throughout this Motion.

upgrades" related to air conditioning, plumbing, bathroom, kitchen and heating components, nor did the commercially available floor plans address FEMA's requests.  2009 Depo of Gaeddert, p. 174-75; Deposition of Jamie Albrecht, production manager at Forest River, taken 1/20/10, p. 30-32; 108-110, attached as Exhibit "E."  Consequently, Forest River had to create a unique floor plan design and integrate other specialized components in order to meet FEMA's specifications.  2008 Depo of Gaeddert, p. 38; 2009 Depo of Gaeddert, p. 197-99.

Additionally, FEMA required the manufacturer to produce a "first article" or prototype to be inspected by FEMA prior to large scale production.  A FEMA representative was sent to inspect this prototype during a "First Article Inspection," which consisted of an in-person visit to the manufacturer's location to ensure conformance with FEMA's specifications.   2009 Depo of Gaeddert, p. 127-28.  This visit was conducted in the summer of 2004 by Dave Porter, an emergency management specialist with FEMA.  2009 Depo of Gaeddert, p. 127-28; Deposition of D. Porter, p. 15, attached as Exhibit "F."   Porter had worked at FEMA since 1993 and helped to coordinate specifications for housing following disasters from 1997 to 2007.  Depo. of Porter, p. 15-16.  His responsibilities included inspection of emergency housing units, monitoring refurbishment of those units, and dispatching those units to various sites following disasters. *Id.* at 16.

During the First Article Inspection at Forest River's manufacturing facility in Indiana, Porter spent three hours at the plant, during which time he performed inspections of both the plant and FEMA spec prototype, as Forest River's Doug Gaeddert explained:

> Q  You mentioned that, in 2004, Mr. Porter came to do
>    an inspection of a prototype of what would become
>    the FEMA run unit; right?
> A  Correct.
> Q  What did his inspection entail?

A  A walk-through part of the plant, part of the
facility, Plant No. 27, with plant manager that was
involved in this -- we brought his name up a time
or two -- Jamie Albrecht, myself, Elton Keifer,
Eric Sharp, who is also a plant manager for a
couple of other facilities.
Review of this particular prototype, specific
prototype that we built to the FEMA specifications,
including the aluminum roof and the oven like we
talked about, the four-burner cooktop.
  Open book for any documentation, any materials
he wanted to see.
  We did take him up on a scaffolding -- it
wasn't actually a scaffolding; a mezzanine would be
the correct word, to show him the difference from a
distance between the one-piece seamless aluminum
roof, which we had one of in the building, and the
EPDM rubber roof so he could see, you know, what we
were saying was going to be a supply issue if it
actually came to that.
  And just prior to lunch is when we completed
that inspection of that unit and the walk-through
in the plant and the short Q and A's that we had.

2009 Depo of Gaeddert, p. 147-49.

Following this inspection, Forest River employees made several recommendations to the

existing FEMA specs to facilitate production on the scale required by FEMA.  For instance, Forest

River raised concerns over the ability to provide this roofing on a large scale following a disaster,

and therefore recommended that a rubber roof, which was standard in the travel trailer industry,  be

used in place of an aluminum roof.  2009 Depo of Gaeddert , p. 127-29.  Forest River also suggested

that a three-burner stovetop was more readily available than the four-burner stovetop requested by

FEMA and suggested that the procurement specifications be broadened to allow for the inclusion

of a three burner range.  *Id.*  FEMA responded to these suggestions later that summer by

incorporating the rubber roof into the specs and allowing the option of either a three or four-burner

-5-

stovetop.  *Id.; see also* Deposition of Jamie Albrecht, production manager at Forest River, taken 1/20/10, p. 30-32; 108-110, attached as Exhibit "E."

In September 2005, Forest River was contacted by North American Catastrophe Services ("NACS") with an invitation to submit a bid for production of the FEMA spec travel trailers.  2008 Gaeddert depo, p. 32-34.  In response, Forest River submitted a bid to NACS to produce 5,000 FEMA spec models.  *Id*.  These units were ultimately produced in conformance with the August 2004 FEMA specs and delivered to FEMA through NACS.  2009 Gaeddert depo., p. 20-21; 78-79. Each individual unit was then inspected, and accepted, by FEMA prior to delivery to the inhabitant. *See* Deposition of Geoffrey Compeau, representative of Shaw Environmental, Inc.,dated 1/7/10, p. 453-54, attached as Exhibit "G."  The unit in which Lyndon Wright resided was specifically inspected and approved by FEMA.  *See* FEMA Unit Inspection Report, dated 11/19/05, Shaw-WRI 00008; FEMA Temporary Housing Unit Inspection Report, dated 2/13/06, Shaw-Wri 00007, attached as Exhibit "H."

In producing units to FEMA's specifications for FEMA's exclusive use, Forest River was acting as and is entitled to the immunity afforded a government contractor.  Forest River built plaintiff's unit in accordance with specifications that had been drafted and approved by FEMA. FEMA inspected and reviewed Forest River's ultimate design, even going so far as to inspect a prototype unit and discuss alternative designs based on Forest River's suggestions.  Finally, Forest River did not learn of any dangers associated with its product which were not already known by FEMA.  Therefore, Forest River is entitled to summary judgment dismissing plaintiff's claims.

## LAW AND ARGUMENT

**I.     Summary Judgment Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be rendered if the pleadings, discovery, disclosure materials and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*  Further, "It is axiomatic that where questions of law alone are involved in a case, summary judgment is appropriate." *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tx. Steel Co.,* 538 F.2d 1116, 1119 (5th Cir. 1976).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.,* 910 F.2d 167, 178 (5th Cir. 1990).  Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must go beyond the pleadings and through affidavits, depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial.  *Celotex,* 477 U.S. at 324; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F .3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). The nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied,* 513 U.S. 871 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir. 2002).

## II.    Forest River Is A Government Contractor

## A.    Forest River is Entitled to Invoke the Government Contractor Defense

As it relates to the allegations at bar, Forest River is entitled to the immunity afforded a government contractor.  While it is undisputed that there is no direct contract between Forest River and FEMA, the absence of a contract does not impair Forest River's right to invoke the government contractor defense.  The Fifth Circuit has implicitly extended the government contractor defense to subcontractors that do not have a direct government contract in *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570 (5th Cir. 1996).[2]  Further, courts around the country have held that a manufacturer need not have a direct contract with the government in order to invoke the defense.  *See*, *e.g., Ramey v. Martin-Baker Aircraft Co.*, 656 F.Supp. 984 (D.Md.1987), aff'd, 874 F.2d 946 (4th Cir.1989); *Maguire v. Hughes Aircraft Corp.*, 725 F. Supp. 821 (D. N.J. 1989), affirmed on other grounds, 912 F. 2d 67 (3rd Cir. 1990), (holding that the policies of *Boyle* apply to a subcontractor)[3]; *Feldman v. Kohler Co.*, 918 S.W. 2d 615, 625 (Tex. App.– El Paso 1996) (holding that, as a matter of law, the government contractor defense "trickles down" to

---

[2]  In its ruling on a similar motion in the Fleetwood bellwether, this Court recognized that the specific issue – whether the government contractor defense applies to entities who did not directly contract with the government – was not directly addressed in *In re Air Disaster.*  (Rec. Doc. 7682).  Forest River submits that the Fifth Circuit's failure to examine the issue in that case is evidence, albeit tacit, of acceptance of other circuit court holdings that there need not be a direct contract for the government contractor defense to apply.

In any event, Forest River asserts that its role as a subcontractor is different from that of Fleetwood.  Although discussed in more detail *infra*, Forest River worked with FEMA to develop a prototype, allow for a personal inspection of that prototype, and provide feedback and changes to the original FEMA specs.  *See* 2009 Depo of Gaeddert, p. 127-29.  Forest River worked closely with the government, just as the subcontractor did in *In re Air Disaster.*

[3]  Indeed, "[t]he fact that ... a subcontractor [deals with the contractor], rather than directly with the government, is not sufficient to defeat [the defense]." *Maguire v. Hughes Aircraft Corp.*, 725 F.Supp. 821, 825 (D.N.J.1989), aff'd, 912 F.2d 67 (3d Cir.1990).

subcontractors); *see also Lewis v. Babcock Industries, Inc.*, 985 F.2d 83 (2nd Cir. 1993) (a sub of a sub-contractor presented the defense).

These cases have found the policies behind *Boyle* – discouraging the cost of liability from being built into the price of products supplied to the government – apply in the context of subcontractors as well as those who contract directly with the government.  Were this not the case, plaintiffs would simply sue the subcontractors without joining the primary contractor.  The costs associated with liability verdicts against subcontractors would be added to the cost of the subcontracts, thereby increasing the cost of the prime contract and thus frustrating the policy underlying the defense.  *See generally Miller v. United Technologies Corp.*, 660 A.2d 810, 820 (Conn.,1995). Accordingly, based on both (1) existing jurisprudence and (2) the underlying rationale for the government contractor defense, Forest River is properly entitled to invoke the government contractor defense.

**B.      The Government Contractor Defense**

The question of immunity for government contractors begins with the question of federal pre-emption of state law.  In *Boyle v. United Tech Corp.*, the U.S. Supreme Court held that some areas of activity – those involving "uniquely federal interests" – are so committed to federal control that any applicable state law becomes pre-empted.  *See* 487 U.S. 500, 504 (1988).  The government's procurement of equipment (and specifically military equipment, as in the *Boyle* decision) is one of those areas.  *See id.* at 507.  From a policy standpoint, the Supreme Court found that imposition of liability on government contractors would directly affect the terms of government contracts: either the contractor would decline to manufacture the design specified by the government, or it would raise its price.  *Id*.

The fact that procurement is a uniquely federal interest, however, does not automatically mean that state law will be pre-empted. *Id.* Preemption, or "displacement," of state law will occur only when a significant conflict exists between an identifiable federal interest and the operation of applicable state law, or when the operation of state law would hinder the specific objectives that federal legislation was designed to achieve. *Id.* In determining whether such "displacement" is warranted, the Court held that state-law liability for design defects in military equipment cannot be imposed when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. (emphasis added).

In decisions that have followed *Boyle*, the scope of the government contractor immunity defense was expanded beyond the military equipment context. The Court later described the defense in much broader terms: "The Government contractor defense . . . shields contractors from tort liability for products manufactured for the Government in accordance with Government specifications, if the contractor warned the United States about any hazards known to the contractor but not to the Government." *Hercules, Inc. v. U.S.*, 516 U.S. 417, 421-22 (1996). Likewise, a court within the U.S. Court of Appeals for the Fifth Circuit jurisdiction held that the defense applied to all contractors, not just military contractors. *Guillory v. Ree's Contract Serv.*, 872 F.Supp. 344, 346 (S.D. Miss. 1994) (citing *Carley v. Wheeled Coach,* 991 F.2d 1117, 1119 (3d Cir. 1993); *Richland-Lexington Airport v. Atlas Properties,* 854 F. Supp. 400, 422 (D.S.C. 1994); *Lamb v. Martin Marietta Energy Sys.,* 835 F. Supp. 959, 966 n. 7 (W.D. Ky. 1993)).

Under the jurisprudence that sets forth the government contractor defense and makes it applicable beyond the military context, Forest River submits that it is entitled to the defense because it can show that the United States approved "reasonably precise" specifications for EHUs, Forest River's equipment conformed to those specifications, and Forest River had no obligation to warn the government about any alleged dangers in the 2005 units of which it was unaware.

**C.   Forest River Meets All Three Prongs of the *Boyle* Test for Government Contractors**

   *I.   Government's Approval of Reasonably Precise Specifications*

The first prong of the defense calls for the government to "approve" specifications that are "reasonably precise." The government's approval turns on whether it exercised discretion over the product design, or simply delegated discretion to the contractor. *See Trevino v. Gen. Dynamics*, 865 F.2d 1474, 1480 (5th Cir. 1989). Mere acceptance of the contractor's design choice without significant evaluation is "rubber stamping," not substantive review. *See Stout v. Berg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991). The government exercises its discretion when it actually chooses a design feature. *Trevino,* 865 F.2d at 1480.

Furthermore, the approval does not mean the government has to prepare the specifications. *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). All that is required is that the government performs a "substantive review" of the specifications. *Trevino,* 865 F.2d at 1480. Whether the government has undertaken such a review is based on several factors, including an examination of drawings, periodic evaluation, criticism, and extensive government testing. *Kerstetter*, 210 F.3d at 435. To complete a substantive review, there must be a "continuous back and forth between the contractor and government." *Id.*

-12-

Several decisions from the Fifth Circuit have dealt with the issue of whether the government approved reasonably precise specifications.  In *Stout v. Berg-Warner Corp.*, the manufacturer alleged that the government approved reasonably precise specifications on an air conditioning unit used to cool a U.S. Army missile repair unit.  *Id*. at 335.  The manufacturer pointed out that the Army controlled the design process by modifying the design of the air conditioner; reviewed, evaluated, tested and approved detailed design drawings at different stages during the process, including the prototype phase; and approved over fifty pages of design drawings.  *Id*.  The court agreed with the manufacturer and further acknowledged that the government had reviewed detailed drawings that the contractor submitted at various progressive stages of the design, performed critical design reviews, and evaluated and tested for months the prototype models produced by the manufacturer.

In *Smith v. Xerox Corp.*, an Army soldier was injured when a weapon simulator he was using exploded prematurely and burned his arm and torso.  866 F.2d 135, 136 (5th Cir. 1989).  The soldier sued Xerox, the manufacturer of the weapon, for his personal injuries.  *Id*.  Xerox filed for summary judgment under the government contractor defense, and it won the motion.  *Id*.  On appeal, the Fifth Circuit noted that although Xerox failed to produce complete specifications for the original simulator, Xerox did produce a listing of those specifications, a copy of the original government performance criteria dictating the environmental specifications the government wanted the simulator to meet, and a production contract furnished by Xerox for a series of simulators containing specific reference to government-approved specifications.  *Id*. at 138.  Further, a Xerox employee who was involved with the development of the simulator testified that the Army reviewed and approved the drawings and specifications prepared by Xerox.  *Id*.  Because the government in this case supplied the relevant environmental specifications, and because the employee's unrebutted testimony was that

the government reviewed and approved Xerox's final drawings and specifications, the court held that the government had approved reasonably precise specifications. *Id*.

In *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, the plaintiffs brought product liability claims against the manufacturers of a military plane that crashed, tragically killing 13 of the 17 servicemen aboard. 81 F.3d 570, 571-72 (5th Cir. 1996). In considering the government contractor defense, the court acknowledged that the U.S. Air Force's substantive review, evaluation and testing of the aircraft "clearly implicate[d] the Government's discretionary function and approval of reasonably precise specifications." *Id*. at 575. Affidavits established that the manufacturers and the Air Force had worked closely together on the development of the plane from planning through production. *Id*. In addition, the Air Force inspected and supervised all aspects of the aircraft's production. *Id*. As the court said, "Clearly, the approvals in this case go far beyond mere rubber stamping." *Id*.

Decisions outside of the Fifth Circuit also have instructive value in this case, as several fact patterns bear close resemblance to the Forest River-FEMA spec scenario. For instance, in *Ramey v. Martin-Baker Aircraft Co.,* 656 F.Supp. 984, 985 (D.Md.,1987), an aircraft mechanic suffered a serious injury while attempting to remove an ejection seat from a Navy F-18 aircraft and filed suit against the seat's manufacturers. The Court granted the manufacturing defendants' motion for summary judgment based on the government contractor defense, holding that the United States Navy approved reasonably precise specifications for allegedly defective components and that the manufacturer and Navy had equal knowledge about dangers involved in maintenance. *Id.* at 1000-1001. In reaching that conclusion, the Court pointed to the fact that the Navy had tested the ejection seat and required the manufacturers to prepare and install a mock-up of the escape system.

-14-

*Id.* at 994. In fact, this mock-up contained the components of the aircraft that plaintiffs claimed were defective. *Id.* Concluding that the "reasonably precise" specifications requirement had been met, the Court noted, "In *Boyle*, . . . the Court stated that the requirement was satisfied when a defendant manufacturer and the Navy worked together to prepare detailed specifications for the aircraft, there were "back-and-forth" discussions between the manufacturer and the Navy during the development of the design, and when the Navy had an opportunity to review a mock-up of the aircraft and approve the design." *Id.* at 995 (*citing Boyle* at 414).

Finally, in *Dowd v. Textron, Inc.*, 792 F.2d 409 (4th Cir. 1986), the Fourth Circuit held that the government contractor defense applied to shield a helicopter manufacturer from liability for an alleged design defect in the helicopter's rotor system. Plaintiffs argued that since the manufacturer originally designed the rotor system in the early 1960's without any participation by the Army, the government neither set nor approved reasonably detailed specifications. *Id.* at 412. The Court dismissed that argument, noting:

> That argument overlooks a wealth of subsequent history. The Army had been using helicopters equipped with the 540 rotor system for some twenty years before Ellis and Dowd's accident; almost 9,000 UH-1 and AH-1 helicopters flew in Vietnam. . . . The **length and breadth** of the Army's experience with the 540 rotor system-and its decision to continue using it-amply establish government approval of the alleged design defects.

> *Id.* at 412 (emphasis added).

In other words, the specifications were not to be viewed in a narrow context; instead, the history of the government's use of those products was deemed to be an important factor in deciding whether "governmental approval" existed.

Applying these cases to the instant litigation, Forest River asserts that the government approved reasonably precise specifications for its EHUs. First, FEMA prepared the procurement

specifications for FEMA Model Travel Trailers.  *See* FEMA Specs, Exhibit C.  FEMA's specifications described minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions necessary to provide emergency housing during periods of disaster relief.  *Id.*  The manufacturer who produced these emergency units had to construct them with a superior quality of workmanship, and the specifications did not constitute any type of deviation from federal regulatory requirements.  *Id.*  By making these pronouncements, FEMA supplied the relevant specifications that formed the basis of the production of travel trailers, much like the U.S. Army did in the *Smith* decision.  FEMA specifically chose the design features for the trailer, and in doing so exercised discretion over the complete design.  *See Trevino,* 865 F.2d at 1480.  FEMA never delegated design choices to Forest River or gave the company carte blanche to decide on issues such as the roof, stovetop, etc.  Instead, FEMA enumerated each design feature and confirmed that such specifications had been met through its own inspection and acceptance of the FEMA spec prototype.

The FEMA spec units were not merely "rubber stamped" with minimal review from FEMA. Unlike the Gulf Stream and Fleetwood bellwethers, the evidence in this case reveals that David Porter, a FEMA employee, personally visited the Forest River manufacturing facilities in 2004.  *See* 2009 Depo of Gaeddert, p. 127-29.  He examined the prototype FEMA spec unit, inspected the manufacturing facilities, and afterward took part in a Q&A session.  *Id.*  During the course of its inspection, FEMA considered Forest River's suggestions, including changing the unit's roofing material and the type of stovetop, both of which were ultimately incorporated into FEMA's design parameters.  *Id.*  Forest River's status as a government contractor is unique among other bellwether defendants precisely because FEMA took such meaningful role in developing the trailer design and

finalizing the detailed specifications for the Forest River units.  Just as in *In re Air Disaster*, the government "worked closely together" with input from Forest River to design and implement a plan for the travel trailer at issue.

The evidence establishes that FEMA substantively evaluated and examined the ultimate design of its EHU specification and approved the ultimate product produced by Forest River.  In so doing, FEMA went well beyond simply providing a "rubber stamp" to the units produced to its specifications.  Accordingly, the first element of the *Boyle* analysis is satisfied.

    *ii.*     *Conformance to Specifications*

The second prong requires the contractor to prove that the equipment it produced conformed to the specifications that were approved by the government.  *Boyle*, 487 U.S. at 512.  The Fifth Circuit has held:

> Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications. Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications.
> *Kerstetter*, 210 F.3d at 435-36.

Decisions from the Fifth Circuit have reinforced the general rule.  *In re Air Disaster*, discussed previously, held that the manufacturer's equipment conformed to specifications because the government inspectors were present and actively involved throughout the design, review, development and testing of the plane that crashed.  81 F.3d at 575.  Furthermore, the evidence showed that the Air Force accepted and had used the plane for over 20 years without any significant problems before the crash.  *Id*.  Likewise, in the *Xerox* decision, the court held that the evidence

-17-

showed the manufacturer of the weapon that discharged prematurely had complied with the specifications for the product. *See* 866 F.2d at 138. When technicians analyzed the weapon after the accident, they could not duplicate the problem. *Id*. at 139. After the product was reassembled, the government put the product back into use. *Id*. Therefore, the court held that the product complied with the applicable specifications. *See id*.

In this case, Forest River submits that its production of the subject EHU conformed to the specifications set forth by FEMA. As discussed above, FEMA thoroughly inspected Forest River's manufacturing process and design of the trailer. There has been no evidence to show that Forest River's EHUs were built out of conformance with FEMA's specifications. With regard to the Forest River trailer delivered to plaintiff, this unit complied with all FEMA specifications. *See* "Traveler" file for trailer 4X4TSMH296C008992 (FOREST 151924-946), attached as Ex. "I." Additionally, the Forest River unit delivered to plaintiff was also inspected by FEMA personnel prior to being inhabited by plaintiff. *See* FEMA Unit Inspection Report, dated 11/19/05, Shaw-WRI 00008; FEMA Temporary Housing Unit Inspection Report, dated 2/13/06, Shaw-Wri 00007, attached as Exhibit "H." After inspection, the unit was accepted by FEMA for use as emergency housing. *Id*. Indeed, FEMA's own expert on trailer design, Mark Polk, concluded that the unit issued to Lyndon Wright met or exceeded the FEMA specifications.

> Q   Okay. Mr. Polk, have you reviewed the FEMA
> specifications for production of travel trailers for use in
> the Temporary Housing Assistance Program?
> A   Yes.
> Q   Do you have an opinion, sir, as we sit here
> today, based upon your education, training, and experience
> relating to the RV industry, as to whether the Lyndon
> Wright unit met or exceeded the FEMA specifications for its
> construction?

* * *

A   Yes, the best I could tell, it did meet the specifications.

Deposition of Mark Polk, dated 12/22/09, p. 76-77, attached as Exhibit "K."   Accordingly, the second prong of the *Boyle* test has been satisfied.

### iii.   Warnings about Dangers in the Equipment Not Known by the Government

The final prong requires the contractor to warn the government about dangers in the use of the equipment that are known to the contractor but not known to the government.   *Kerstetter*, 210 F.3d at 436.   The contractor has no obligation to inform the government of those dangers already known to the government.   *Boyle*, 487 U.S. at 512.   Additionally, "the purpose of this element is not to create an incentive to discover latent defects in a product designed for the government." *Kerstetter*, 210 F.3d at 436 (emphasis in original).   Thus, the contractor only has a duty to inform of dangers it actually knows about, not those it should have known about.   *Id.*[4]

With respect to this prong, Forest River asserts – as it has done before – that it learned of absolutely no alleged dangers with respect to the component parts of its EHUs.   FEMA's personnel testified there was no evidence or documentation that showed health problems related to formaldehyde in travel trailers prior to Katrina.   *See* Exhibit "A," Depo. of Garratt, p. 179; Exhibit "M," Depo of McNeese, pp. 100-01.   Consequently, Forest River did not know and could not have known of any alleged formaldehyde problems with its units.   Without actual knowledge of any dangers, Forest River had no responsibility to communicate any information to FEMA.   Forest River

---

[4] *See also Ramey v. Martin-Baker Aircraft Co.*, 656 F. Supp. 984, 999 (D. Md. 1987) ("[W]hen the government designs a product or approves a design of a product which calls for some physical safeguards but not others, the government contractor is not held liable for the safeguards not provided for in the specifications.").

-19-

maintains that the very low levels of formaldehyde present in any of its units would not constitute a "danger."

Even assuming, *arguendo*, the presence of such low levels of formaldehyde as those found in the unit in question would qualify as a "danger," which is specifically denied, FEMA was well aware of the presence of formaldehyde, and thus had equal or greater knowledge of the issue than Forest River. *See* Deposition of Stephen Miller, dated 7/9/09, p. 35, attached as Ex. "L." As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers contained formaldehyde. *See* Deposition of Martin McNeese, dated 7/14.09, p. 108, attached as Ex. "M." Clearly, FEMA knew that the subject unit contained the compound. In fact, it was known to FEMA that not only an industry standard travel trailer, but also a conventional home, would contain formaldehyde. *Id.* at 107-08.[5]

Indeed, FEMA had extensive experience with the use of Travel Trailers as emergency housing, including but not limited to Forest River units. The agency's use of travel trailers as part of its disaster relief operations was extensive and well documented. Deposition of David Garratt, p. 22, attached as Ex. "A." Travel trailers were not a revolutionary product – FEMA was well versed in the use of travel trailers and routinely deployed them, without incident, prior to Hurricane Katrina. *See* Deposition of McNeese, p. 100-01; 106-08, attached as Exhibit "M."

Forest River's history of providing travel trailers to the government was, likewise, an ongoing process – the sort of "length and breadth" of experience discussed in *Dowd, supra.* Forest River

_____

[5] Of course, the Forest River owner's manual contained a statement that the building material contained formaldehyde and that small quantities might be released into the air. *See*, Forest River Owner's Manual, page 77, attached as Exhibit J. FEMA was therefore aware of the existence of formaldehyde through that communication as well.

provided travel trailers to FEMA through NACS in the early 2000s for disasters in Texas.  2009 Depo of Gaeddert, p. 131-33.  In 2005, prior to Hurricane Katrina, Forest River provided 800 travel trailers that were used by FEMA in relief efforts in Florida.  2009 Depo of Gaeddert, p. 72-73. Of course, FEMA itself had used travel trailers since the early 1990s in south Louisiana.  *See* Ex. "A," Depo of David Garratt, p. 22.  Through its wealth of experience utilizing travel trailers as emergency housing, FEMA was uniquely suited to appreciate the risks alleged by plaintiff and had superior knowledge of the purported "dangers," if any, of these travel trailers.

Finally, Forest River did warn consumers, including FEMA and NACS, of potential issues relating to formaldehyde.  Each Forest River unit, including those sold to NACS for use by FEMA, is accompanied by an owner's manual.  *See* 2009 Depo of Gaeddert, p. 181-82.  Each owner's manual contains a statement regarding the emission of formaldehyde from the materials of construction.  *See* Forest River Owner's Manual, p. 77,  attached hereto as Ex. "J."  This statement identifies the potentially formaldehyde emitting materials contained within the unit and instructs the owner and/or occupant to ventilate the unit, if necessary.  *Id.*  Accordingly, Forest River made the government aware of any potential issues relating to the presence of formaldehyde in the EHU's supplied, including that occupied by Lyndon Wright, and in so doing, satisfied the final element of the *Boyle* analysis.

## CONCLUSION

In light of the above and foregoing, Forest River has satisfied each element necessary  to establish its immunity as a government contractor defense, insofar as the uncontested facts establish that the United States, through FEMA, approved reasonably precise specifications for the production of EHU's, that Forest River complied with those specifications, and that the United States had equal

or superior knowledge of the alleged "danger," if any, posed by the presence of formaldehyde. Accordingly,  Forest River respectfully requests this Honorable Court enter summary judgment in its favor on all claims.

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ Jason D. Bone
ERNEST P. GIEGER, JR. (No. 6154)
JASON D. BONE (No. 28315)
CARSON W. STRICKLAND (No. 31336)
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
*ATTORNEYS FOR FOREST RIVER, INC.*

</div>

**C E R T I F I C A T E**

I hereby certify that on the 1st day of February, 2009, a copy of the foregoing *Memorandum in Support* was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

<div style="margin-left: 40%;">

/s/ Jason D. Bone
JASON D. BONE

</div>