1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF LOUISIANA

3             NEW ORLEANS DIVISION

4   In Re:  FEMA Trailer    )

5   Formaldehyde Products   ) MDL No. 1873

6   Liability Litigation    )

7

8                          Washington, D.C.

9                          Tuesday, July 14, 2009

10  Videotape Deposition of MARTIN EDWARD McNEESE, called

11  for examination by counsel for Plaintiffs in the

12  above-entitled matter, the witness being duly sworn

13  by CHERYL A. LORD, a Notary Public in and for the

14  District of Columbia, taken at the offices of NELSON

15  MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16  Avenue N.W., Suite 900, Washington, D.C., at

17  9:03 a.m., and the proceedings being taken down by

18  Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

1      A.    Yes, I do.

2      Q.    And you recall that your conclusion was

3   that based on those tests, you felt like travel

4   trailers in combination with ventilation were a

5   viable option for emergency housing.

6            Correct?

7      A.    That's correct.

8      Q.    Okay.  And you were asked a followup

9   question as to whether you were basing that solely on

10  the ATSDR test or whether you had any personal

11  training or experience or knowledge.

12           Do you recall those questions?

13     A.    I do.

14     Q.    Am I correct that you did in fact have

15  some personal experience while you were with FEMA

16  with the use of travel trailers in other disasters

17  prior to Hurricane Katrina?

18     A.    That's correct.

19           I have actually been working in housing

20  programs over the past -- over the years before

21  Katrina.

22     Q.    And am I also correct that part of your

1    experience would have been working with travel

2    trailers in hurricane disaster areas, including the

3    Gulf Coast in Florida?

4         A.   That's correct.

5         Q.   Is -- am I also correct that to the best

6    of your knowledge and experience working with travel

7    trailers prior to Hurricane Katrina, you weren't

8    aware of any health concerns associated with

9    formaldehyde in the travel trailers; is that right?

10        A.   That's correct.  I was not.

11        Q.   And you dealt directly with occupants,

12   didn't you, in those other hurricane disaster areas

13   from time to time?

14        A.   I did.

15        Q.   And again, prior to Hurricane Katrina, you

16   weren't aware of any complaints by occupants relating

17   to formaldehyde or health effects of living in these

18   trailers?

19             MR. MILLER:   Objection, compound.

20        A.   Yeah,.

21             Actually I was not aware of any.

22             BY MR. SCANDURRO:

```
 1    conclusion wasn't that everybody who might be exposed

 2    to a level above that .3 level of concern would have

 3    a problem.  It was only conceivably people with a

 4    prior sensitization.

 5              Was that your understanding?

 6        A.    That was my interpretation.

 7        Q.    Let me ask you also about McNeese number

 8    7.

 9              There's a reference in the second

10    paragraph here to the -- what's been described to us

11    in other depositions as the swapout program or the

12    swapping out of newer units for older units.

13              Do you see that discussion there on

14    McNeese 7 under number 2?

15        A.    Yes.

16        Q.    Was it your conclusion that the program at

17    this time of swapping out a newer trailer for an

18    older trailer with people who had complained an

19    adequate response that was in fact effective in

20    addressing the complaints of those individuals?

21        A.    It was my feeling that that was in fact a

22    valid program and valid process, realizing that if
```

```
 1    people did not want to do that, we would put them in
 2    a hotel or somewhere else.
 3            I mean, that was always the other option
 4    that went with it, but the ones we swapped out with
 5    older units, we never to my knowledge got a complaint
 6    back from them again, so --
 7       Q.   And the older units would be for example
 8    units from the 2004 hurricanes in Florida?
 9       A.   Or from any other disasters, but prior to
10    Katrina-type units, yes.
11       Q.   So some of the swapout units were in fact
12    from the 2004 hurricanes in Florida; is that right?
13       A.   That's probably true, yes.
14       Q.   And you're not aware of any followup
15    problems in those 2004 units once they were swapped
16    out from a formaldehyde standpoint?
17       A.   I'm not aware of any, that's correct.
18       Q.   Also in McNeese 7, you refer under number
19    3 to the fact that it is a given that the materials
20    used in the construction of mobile homes and travel
21    trailers in addition to other residential structures
22    contain formaldehyde.
```

```
 1              Do you see that?
 2       A.     I do.
 3       Q.     It was no surprise to you that there was
 4   some formaldehyde in these travel trailers, was it?
 5       A.     No, it was not.
 6       Q.     And in fact, you're generally aware that
 7   there is also formaldehyde not only in travel
 8   trailers but in mobile homes and in stick-built
 9   residential structures; is that right?
10       A.     That's correct.
11       Q.     In some of the documents that we looked at
12   this morning, I noted that you made references to the
13   fact that there were no standards, residential indoor
14   air standards that FEMA could look to for guidance.
15              Do you recall having that concern at the
16   time?
17       A.     I do --
18       Q.     Could you --
19       A.     -- recall that.
20       Q.     -- elaborate on what -- what your reaction
21   was to learning that there were in fact no standards
22   that FEMA could look to regarding residential indoor
```