UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER               *        MDL NO. 1873
      FORMALDEHYDE             *
      PRODUCTS LIABILITY       *
      LITIGATION               *        SECTION:  N(5)
                                           *
This Document Relates to:  *Lyndon T. Wright  v.*   *        JUDGE: ENGELHARDT
*Forest River, Inc., et al*, Docket No. 09-2977      *
                                           *        MAG: CHASEZ
*************************************************************************

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Defendant, Forest River, Inc. ("Forest River") respectfully submits this memorandum of law in support of its motion for partial summary judgment regarding Plaintiff's inadequate warning claims under the Louisiana Products Liability Act ("LPLA").  Forest River asserts that it satisfied its duty to warn under the LPLA in all respects.

## FACTUAL BACKGROUND

As the Court is well aware, this Multi-District Litigation is the consolidation of hundreds of federal toxic tort suits in which an estimated seventy thousand named plaintiffs claim to have inhabited emergency housing units ("EHUs") that were provided to them by the Federal Emergency Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita. (Rec. Doc. 109, at ¶ 96).  Forest River's bellwether plaintiff, Lyndon

Wright, originally filed suit in March of 2009; on April 6, 2009, the Court entered Pre-Trial Order No. 34, confirming Wright as Forest River's first trial plaintiff. *(*Rec. Doc. No. 1299). On June 24, 2009, Wright filed a Motion for Leave to File First Supplemental and Amended Complaint, seeking to add additional claims related to mold exposure. (Rec. Doc. 1862). The Court granted that motion on July 17, 2009. (Rec. Doc. 2201).

In his original Complaint for Damages, Plaintiff alleged the EHU in which he resided was defective and unreasonably dangerous. (Rec. Doc. 1, ¶ 101, *Lyndon T. Wright v. Forest River, et al*, case no. 09-2977). He further alleged that the defects in the unit were the result of Forest River's failure to warn him of the unreasonably dangerous nature of the housing unit, or to warn him adequately of the presence of excessive levels of formaldehyde emissions and all associated hazards. *Id*. at ¶ 102(iii) and (vii). Plaintiff's First Supplemental and Amended Complaint alleges that the duty to warn by Forest River was continuing in nature and was owed to him during the entire period he occupied the trailer. (Rec. Doc. No. 2203 at ¶10).

At the outset, it should be noted that the Owner's Manual for the Forest River travel trailer in question contained the following statements regarding use of formaldehyde containing products:

> Certain building products such as particleboard, fiberboard, and hardwood plywood are manufactured with an adhesive containing urea-formaldehyde. These products emit a small quantity of formaldehyde into the air.
>
>         \*        \*        \*
>
> The concentration of formaldehyde in the indoor air depends on the quantity and emission rates of all emission rates of emitting products in the structure compared to the volume of indoor air and the fresh air ventilation rate. As with other indoor pollutants, ventilation should reduce formaldehyde levels.
>
> WARNING:  FORMALDEHYDE LEVELS IN THE INDOOR AIR CAN CAUSE TEMPORARY EYE AND RESPIRATORY IRRITATION AND MAY AGGRAVATE RESPIRATORY CONDITIONS OR ALLERGIES.

*See* Forest River Owner's Manual, p. 77,  attached hereto as Ex. "A."  (emphasis in original).

## LAW & ARGUMENT

I.     **Summary Judgment Standard**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be rendered if the pleadings, discovery, disclosure materials and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*  Further, "It is axiomatic that where questions of law alone are involved in a case, summary judgment is appropriate." *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tx. Steel Co.*, 538 F.2d 1116, 1119 (5th Cir. 1976).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.,* 910 F.2d 167, 178 (5th Cir. 1990).  Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must go beyond the pleadings and through affidavits, depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial.  *Celotex,* 477 U.S. at 324; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F .3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied,* 513 U.S. 871 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir. 2002).

II.     **Forest River Satisfied Its Duty To Warn**

    A.     **FEMA's status as a sophisticated purchaser absolved Forest River of any duty to warn**

Under the LPLA, a manufacturer is liable for damage caused by a characteristic of the manufacturer's product that renders the product unreasonably dangerous. La. Rev. Stat. § 9:2800.54(A) (2009). A product is considered "unreasonably dangerous" when the manufacturer who made the product fails to provide an adequate warning about a characteristic of the product that may cause damage, assuming that characteristic was present at the time the product left the manufacturer's control. *Id.* § 9:2800.57(A).

However, the manufacturer is not required to provide an adequate warning about its product when the user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic. *Id.* § 9:2800.57(B)(2). These knowledgeable users are sometimes referred to as sophisticated users or intermediaries, and, in fact, many cases use the terms sophisticated user and sophisticated purchaser interchangeably. *Jones v. Flowserve FCD Corp.*, 73 Fed. Appx. 706, 711 (5th Cir. 2003); *Laird v. Deep Marine Technology, Inc.*, 2005 WL 22949, *4 (E.D. La. 2005); *Abadie v. Metropolitan Life Ins. Co.*, 784 So.2d 46, 78 (La. App. 5 Cir. 2001). A manufacturer has no duty to warn a sophisticated purchaser. *See Davis v. Avondale Indus.*, 975 F.2d 169, 172 (5th Cir. 1992). Louisiana courts presume that sophisticated users know about the danger because of their familiarity with the product. *Mallery v. International Harvester Co.*, 690 So.2d 765, 768 (La. App. 3 Cir. 1996).

In the instant case, a review of FEMA's use of travel trailers underscores the United States's role as a sophisticated user and purchaser of these emergency housing units. FEMA has used travel

trailers as emergency housing following various disasters, including those in Louisiana, since Hurricane Andrew in 1992.  *See* Deposition of David Garratt, taken on July 7, 2009, p. 32, attached as Exhibit B.  FEMA believed that trailers were the preferred direct temporary housing product.  *Id*. at 207.  Their size allowed them to be transported and installed quickly; they were less expensive than mobile homes; and they could be placed on an individual's property so that the individual could return home and rebuild his or her property more quickly.  *Id*. at 207-08.

Forest River has had a particularly extensive interaction with FEMA.[1]  In June of 2004, Richard Spillane, a Contracting Specialist from FEMA, contacted Forest River with a Request for Proposal setting out FEMA specifications for travel trailers to be used in future disasters.  *See* Deposition of Doug Gaeddert depo, dated August 6, 2008, p. 39, attached as Exhibit C.  These FEMA-issued procurement specifications detailed how the trailers were to be built. *See, e.g.*, FEMA Travel Trailer Procurement Specifications, dated 5/8/04 (FOREST 2485-88), attached as Exhibit D. These "FEMA specs" were comprehensive, setting forth information about the size and configuration of the trailers, electrical service, plumbing service, appliances, furnishings, heating and cooling mechanisms, safety equipment, coverings, transportation methods, and other issues.  *See id.* The specifications detailed all aspects of the trailers' construction from the overall square footage to the quantity of master key sets that were required for each unit.  *See id.*  Lyndon Wright resided in a FEMA spec trailer.  *See* Deposition of Doug Gaeddert, dated November 5, 2009, p. 165, attached as Exhibit E.

---

[1]  Beginning in the early 2000s, Forest River provided travel trailers to FEMA through a separate entity, North American Catastrophe Services, for disasters in Texas.  Deposition of Doug Gaeddert, dated 11/5/09, at p. 131-33, attached as Ex. E.  In 2005, prior to Hurricane Katrina, Forest River provided 800 travel trailers that were used by FEMA for relief efforts in Florida.  *Id.* at p. 72-73.

At the time Forest River initially received these FEMA specs in 2004, none of its travel trailer models were equipped with the exact layout mandated by FEMA.  *See* Deposition of Doug Gaeddert depo, dated August 6, 2008, p. 38, attached as Exhibit C.  In particular, the existing Forest River models did not have any "FEMA upgrades" related to air conditioning, plumbing, bathroom, and heating components.  *See* Deposition of Doug Gaeddert, dated November 5, 2009, p. 174-75, attached as Exhibit E.

As a result, Forest River designed a model to meet those specific design criteria.  *See.* Ex. C, 2008 Depo of Gaeddert, p. 38; Ex. E., 2009 Depo of Gaeddert, p. 199.  Personnel from FEMA inspected this "prototype" FEMA spec unit during a "First Article Inspection," which consisted of an in-person visit to the manufacturer's location to ensure conformance with the new specifications. *See* Ex. E, 2009 Depo of Gaeddert, p. 127-28.  This visit was conducted in May of 2004 by Dave Porter, an emergency management specialist with FEMA.  *Id.; see also* Deposition of D. Porter, p. 15, attached as Exhibit F.   Porter had worked at FEMA since 1993 and helped to coordinate specifications for housing following disasters from 1997 to 2007.  *See* Deposition of D. Porter, p. 15-16, attached as Ex. F.  His responsibilities included inspection of emergency housing units, monitoring refurbishment of those units, and dispatching those units to various sites following disasters. *Id.* at 16.

During the First Article Inspection at Forest River's manufacturing facility in Indiana, Porter spent three hours at the plant, during which time he performed inspections of both the plant and FEMA spec prototype.  *See* Ex. E, 2009 Depo of Gaeddert, p. 147-49.  After Porter completed his walk-through, he participated in a question and answer session with Forest River personnel.  *Id.*

Following this inspection, Forest River employees made several recommendations to FEMA regarding the existing FEMA specs. For instance, although the FEMA specs called for an aluminum roof, Forest River raised concerns over the ability to provide this roofing on a large scale following a disaster and therefore recommended that a rubber roof be used instead. *See* Ex. E, 2009 Depo of Gaeddert, p. 127-29. Forest River also noted that a three-burner stovetop was more readily available than the FEMA spec four-burner stovetop and suggested that the specifications be altered accordingly. *Id*. FEMA responded to these suggestions later that summer by incorporating the rubber roof into the specs and allowing the option of either a three or four-burner stovetop. *Id*.

In September 2005, after Hurricane Katrina struck, Forest River was contacted by North American Catastrophe Services ("NACS") with an invitation to submit a bid for production of the FEMA spec travel trailers. *See* Ex. C, 2008 Gaeddert depo, p. 32-34. In response, Forest River submitted a bid to NACS to produce 5,000 FEMA spec models. *Id*. These units were ultimately produced in strict conformance with the August 2004 FEMA specs and delivered to FEMA through NACS. *See* Ex. E, 2009 Gaeddert depo., p. 20-21; 78-79.

As this review demonstrates, FEMA conducted a thorough and comprehensive review of not only Forest River's FEMA spec units, but its manufacturing facilities and personnel as well. FEMA was also keenly aware of the issues related to formaldehyde levels in indoor air, as this topic has been the subject of federal regulation for decades. In the 1970s and 1980s, the U.S. Department of Housing and Urban Development ("HUD") set forth regulations dealing with formaldehyde in the indoor ambient air of manufactured homes. *See, e.g.,* 42 U.S.C. § 3280.308 & 3280.309; *see generally Liberty Homes, Inc. v. Department of Industry, Labor and Human Relations*, 374 N.W.2d 142, 146 (Wis. App. 1985). Thus, the federal government and, consequently, FEMA, were aware

of the historical backdrop of HUD's regulatory efforts when FEMA inspected the Forest River units in 2004 and delivered them to housing applicants in 2005. *See U.S. ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 487 (S.D.N.Y., 2006) (noting that the federal legislature which enacted the law, the federal agencies which enforce the law, and the federal courts which apply the law are all charged with knowledge of the statute).

Based on FEMA's knowledge of (1) travel trailers in general, (2) Forest River's products, manufacturing process, and FEMA spec trailer, and (3) the issues related to formaldehyde in indoor air via HUD's regulatory history, Forest River was under no obligation to provide a warning about any potentially damage-causing characteristics in the EHUs, and plaintiff's claims regarding same should be dismissed.

Federal jurisprudence has addressed the sophisticated user/purchaser doctrine in relation to the actions of the federal government.[2] In *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 706 (E.D. Tenn. 2001), the plaintiffs brought a products liability action against the United States and multiple manufacturers for injuries sustained after the plaintiffs were exposed to beryllium. The defendant-manufacturers supplied beryllium to a number of facilities owned by the United States and used for the construction of nuclear weapons. *Id*. at 708, 713. The plaintiffs worked at these facilities and were in turn exposed to beryllium-containing parts of nuclear weapons. *Id*. at 706.

In response to the plaintiff's allegations, the court acknowledged that Tennessee law provides that a manufacturer is relieved of its duty to warn about the dangers of its products when the products

---

[2] Although these cases are also discussed in Gulf Stream's prior Motion for Summary Judgment regarding plaintiffs' inadequate warnings (Rec. Doc. 2719), Forest River includes them herein for ease of reference.

are sold to a sophisticated user.[3]  *Id.*  The court then concluded that the United States was a sophisticated user because it used beryllium in the creation of the first atomic bomb, the Dept. of Energy performed the first studies on beryllium toxicity and set the standards for occupational and out-of-plant exposures, and other U.S. agencies executed comprehensive safety programs for worker protection from beryllium dangers.  *Morgan*, 165 F.2d at 718.  In the court's opinion, "the United States is arguably the world's most sophisticated user of special nuclear materials, including beryllium."  *Id.*  Thus, all of the plaintiff's claims against the manufacturing defendants based on their alleged failure to warn were barred by the defense.  *Id.*

In *Akin v. Ashland Chem. Co.*, the plaintiffs alleged they were injured while cleaning jet engine parts due to low-level, chronic exposure to chemicals produced by the defendant manufacturer.  156 F.3d 1030, 1037 (10th Cir. 1998).  The plaintiffs suffered these injuries while working at a United States Air Force base in Oklahoma.  *See id.* at 1035 n. 3.  In considering whether the manufacturer failed to warn the plaintiffs about the dangers associated with the chemicals at issue, the court acknowledged that – just as under the LPLA – where the product's danger or potential for danger is known to the user, the duty to warn is eliminated.  *Id.* at 1037.  The court held that the United States, which had purchased the chemicals from the manufacturer, was a sophisticated purchaser that should have known the risks involved with low-level chemical exposure because there was a wealth of research available on the topic, the Air Force was able to conduct studies, and it had an extremely knowledgeable staff.  *Id.*

---

[3]While the court did not compare the Tennessee law to counterparts in other states, it is important to note that this law and Louisiana law both relieve a manufacturer of its duty to warn when the user is "sophisticated" with respect to product characteristics. *See id.*; LA. REV. STAT. § 9:2800.57(B)(2) (2009).

*Morgan* and *Akin* are directly applicable to the instant litigation and demonstrate that the United States, through FEMA, is a sophisticated user/purchaser of EHUs.   As discussed above, prior to Hurricane Katrina, FEMA had many years of experience supplying both travel trailers and other forms of temporary housing to disaster victims, including Louisiana residents. *See* Deposition of David Garratt, dated 7/7/09, p. 22, attached as Ex. B (stating that travel trailers were used in the disaster relief efforts undertaken for Hurricane Andrew in 1992).

With respect to Forest River in particular, FEMA utilized Forest River travel trailers as part of its disaster response efforts throughout the 2000s.  For instance, Forest River provided travel trailers to FEMA through a separate entity, North American Catastrophe Services, in the early 2000s for disasters in Texas.  *See* Ex. E, 2009 Depo of Doug Gaeddert, p. 131-33.  In 2005, prior to Hurricane Katrina, Forest River provided 800 travel trailers that were used by FEMA for relief efforts in Florida.  *Id.* at p. 72-73.

Significantly, FEMA representative David Porter personally inspected a FEMA-specification unit during a 2004 visit to a Forest River manufacturing facility.  Doug Gaeddert, Forest River's general manager, explained:

> Q  You mentioned that, in 2004, Mr. Porter came to do
>    an inspection of a prototype of what would become
>    the FEMA run unit; right?
> A  Correct.
> Q  What did his inspection entail?
> A  A walk-through part of the plant, part of the
>    facility, Plant No. 27, with plant manager that was
>    involved in this -- we brought his name up a time
>    or two -- Jamie Albrecht, myself, Elton Keifer,
>    Eric Sharp, who is also a plant manager for a
>    couple of other facilities.
>    Review of this particular prototype, specific
>    prototype that we built to the FEMA specifications,

including the aluminum roof and the oven like we
talked about, the four-burner cooktop.
　　Open book for any documentation, any materials
he wanted to see.
　　We did take him up on a scaffolding -- it
wasn't actually a scaffolding; a mezzanine would be
the correct word, to show him the difference from a
distance between the one-piece seamless aluminum
roof, which we had one of in the building, and the
EPDM rubber roof so he could see, you know, what we
were saying was going to be a supply issue if it
actually came to that.
　　And just prior to lunch is when we completed
that inspection of that unit and the walk-through
in the plant and the short Q and A's that we had.

　　　　Deposition of Doug Gaeddert, dated 11/5/09, at p. 147-49, attached as Ex. E.

Forest River allowed Porter to conduct an in-person inspection of the unit and even "opened the

books" to allow him to examine the documentation associated with the trailer and Forest River's

operations.   As a result, FEMA possessed detailed knowledge of travel trailers from (1) past

experiences using travel trailers in general (2) past experiences using Forest River travel trailers and

(3) its own inspection of Forest River's manufacturing plant and FEMA-spec prototype, the same

model of trailer that was deployed post-Katrina and occupied by Lyndon Wright.

　　　　In the end, because of this extensive experience, FEMA knew exactly what it was buying

when it purchased travel trailers for disaster relief post-Katrina.   *See* Deposition of David Garratt,

p. 157-58, attached as Ex. B; Deposition of David Porter, dated 7/8/09, p. 115-16, 161-62, attached

as Ex. F.  FEMA knew that, although manufacturers of manufactured housing had to build units that

complied with HUD standards, manufacturers of travel trailers did not have to follow these HUD

standards.[4]  *See id*.  FEMA also knew that travel trailers contained formaldehyde.  *See* Deposition of Martin McNeese, dated 7/14/09, p. 35, attached as Ex. G.  As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers contained that chemical.  *Id*. at 108.  In fact, FEMA knew that not only an industry-standard travel trailer but also a conventional home would contain formaldehyde.  *Id*. at 107-08.[5]

Even if the Court were to find that FEMA did not have actual knowledge of any alleged health hazards due to the presence of formaldehyde in these trailers, FEMA clearly had constructive knowledge.  To be relieved of the duty to warn, the manufacturer need not show that the user had actual knowledge of the danger, but rather need show only that the user *should have known* of the danger.  *Harvey v. Toyota Material Handling, USA, Inc*., 2007 WL 1115235 *7 (W.D.La. 2007), citing *Mallery v. International Harvester Co.*, (La. App. 3 Cir. 1996), 690 So.2d 765, 768 (emphasis added).

First, as noted above, FEMA was aware of issues related to formaldehyde as a result of HUD's regulatory work from the 1970s and 1980s.  In addition, FEMA representative David Porter had unfettered access to virtually all aspects of Forest River's FEMA spec travel trailer's design,

---

[4] FEMA chose travel trailers over mobile homes because of their practicality and functionality.  *See* Deposition of D. Garratt, dated 7/7/09, p. 207-08, attached as Ex. B.

[5] FEMA's status as sophisticated user is underscored when one examines their role in responding to formaldehyde complaints.  As part of FEMA's overarching responsibility, FEMA hired multiple contractors to install and setup EHUs after Katrina, and these contractors aired out the units to make them ready for occupancy.   Deposition of David Porter, dated 7/8/09, p. 56, 93-95, attached as Ex. F.  FEMA expected its contractors to interact with occupants and handle complaints.  *See*  Deposition of D. Garratt, dated 7/7/09, p. 39-40, attached as Ex. C.  FEMA also addressed the limited air quality complaints it received on a case-by-case basis with ventilation instructions, and if necessary, made a "swap" of the trailer for a different one.  *See id*. at 88-89; 92-96.  The fact that FEMA used its contractors to air out the units shows that FEMA was aware of the characteristics inherent in these units.

construction, and associated documentation.  He had the opportunity to examine a prototype of the

Forest River FEMA-spec trailer and review Forest River's documents on site.  *See* Deposition of

Doug Gaeddert, dated 11/5/09, p. 147-149, attached as Ex. E.  Porter spent hours at the Forest River

plant performing a review of Forest River's manufacturing process.  *Id*.  Porter toured the Forest

River plant with Forest River production managers.  *Id*.  Forest River allowed him to inspect any

materials used in the plant.  *Id*.  Accordingly, FEMA had constructive knowledge of any alleged

"dangers" associated with formaldehyde.

    Moreover, Forest River Owner's Manual explicitly warns of the presence of formaldehyde-

containing products in Forest River manufactured trailers.  *See* Forest River Owner's Manual, p. 77,

attached as Ex. A.  The Owner's Manual identifies the products contained within the coach which

may contain formaldehyde and explicitly states that formaldehyde can cause "temporary eye and

respiratory irritation and may aggravate respiratory conditions or allergies."  This Owner's Manual

was provided with every trailer produced to FEMA.  Deposition of Doug Gaeddert, dated 11/5/09,

at p. 178, attached as Ex. E.  FEMA was clearly and unequivocally notified as to the presence of

formaldehyde and its associated health risks via the Owner's Manual supplied in every trailer.

    Thus, even if FEMA did not have actual knowledge of the presence of formaldehyde in travel

trailers, FEMA clearly had ample opportunity to learn that the Forest River trailer contained products

using formaldehyde adhesives.  FEMA should have known of any allegedly dangerous condition

within the units, and, as such, FEMA should be classified as a sophisticated user.  Consequently,

Forest River is absolved of its duty to warn as a matter of law, and plaintiff's claims involving Forest

River's duty to warn should be dismissed.

**B.      Forest River did provide a warning**

Forest River satisfied its duty to warn by providing its Owner's Manual to FEMA to deliver to end-users.  As stated above, the Forest River Owner's Manual contained a warning of the presence of formaldehyde and recommended that the trailer be properly ventilated to minimize any adverse health effects.   The owners' manual was shipped in a special packet with the keys to the unit, the certificate of origin, and other important paperwork to FEMA through NACS.  *See* Deposition of Gaeddert, dated 11/5/09,  p. 181-183, attached as Ex. E.  These packets were handed to the delivery driver and were to be hand-delivered at the trailer's ultimate destination.  *Id.*  Delivery of these items was especially important, as NACS, and consequently Forest River, would not be paid if FEMA did not receive this paperwork.  *Id.*

Although Wright claims that he never received the owner's manual, this assertion does not negate the United States's status as a sophisticated user of the product.  Forest River had no means of ensuring that the end-users of their trailers received this manual.  Forest River had  no direct contact with FEMA outside of David Porter's visit to the Forest River plant.  *See* Deposition of Gaeddert, dated 11/5/09, p. 55, attached as Ex. E.  Forest River therefore had no means to ascertain the identity of any occupants of FEMA supplied travel trailers.  Additionally, Forest River had no direct contact with any occupants, as FEMA instructed these individuals to address concerns to the agency directly or through its subcontractors.  *See* Deposition of D. Garratt, p. 39-40; 222-26, attached as Ex. B.  Accordingly, Forest River satisfied its duty to warn.

**C.      Forest River had no continuing duty to warn the plaintiff**

As stated above, Wright amended his complaint to include the claim that Forest River's duty to warn them about the dangers and risks of formaldehyde in the subject EHU was continuing in

nature and was owed during the pendency of the plaintiffs' occupancy in the EHU. (Doc. No. 2203, ¶ 10). This allegation implicates provisions of the LPLA; namely, if the manufacturer *acquires knowledge* after the product has left the manufacturer's control that any characteristic of the product may cause damage, he is liable for his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product. La. Rev. Stat. § 9:2800.57(C) (emphasis added). Thus, "the manufacturer's duty to warn is a continuing one." *Am. Cent. Ins. Co. v. Terex Crane*, 861 So.2d 228, 231 (La. App. 1 Cir. 2003).

However, this continuing duty to warn is inapplicable to Forest River. While Forest River warned users of potential issues related to formaldehyde in its products via the Owner's Manual, Forest River never acquired any actual or constructive knowledge of any alleged health hazards relating to the use of its trailers until this litigation began. *See* Deposition of Doug Gaeddert, dated 11/5/09, p. 179-180, attached as Ex. E. This is made even more significant given the fact that Forest River has been in the business of manufacturing trailers since 1996 and manufactured an estimated one million trailers since that time. *Id.* The utter lack of any verifiable complaints regarding formaldehyde – not only in the trailers provided to FEMA but also in the hundreds of thousands of other trailers manufactured by Forest River – clearly demonstrates that Forest River had no reason to believe that any of the trailers provided to FEMA contained harmful levels of formaldehyde. Because Forest River never learned of any potentially dangerous characteristics in its trailers, no continuing duty to warn ever arose.

## CONCLUSION

In light of the above and foregoing, Forest River respectfully requests that the Court grant its motion for partial summary judgment, as it has satisfied its duty to warn under the LPLA in all respects.

Respectfully submitted,

/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (La. State Bar Roll No.6154)
JASON D. BONE (La. State Bar Roll No. 28315)
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
*ATTORNEYS FOR FOREST RIVER, INC.*

## C E R T I F I C A T E

I hereby certify that on the 1st day of February, 2010, a copy of the foregoing *Memorandum in Support* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone
JASON D. BONE