1            UNITED STATES DISTRICT COURT

2              DISTRICT OF LOUISIANA

3              NEW ORLEANS DIVISION

4    In Re:  FEMA Trailer    )

5    Formaldehyde Products  ) MDL No. 1873

6    Liability Litigation    )

7

8                              Washington, D.C.

9                              Tuesday, July 7, 2009

10   Videotape Deposition of DAVID EDWARD GARRATT, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at 9:07

17   a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22

1           What was your -- do you recall what your

2    first job title was?

3        A.   Just a program specialist.  I'm not sure I

4    had a title per se, other than the position that I

5    applied for.  It was in the federal planning branch,

6    I believe.

7        Q.   So once you began your tenure with FEMA,

8    you began as a program specialist, but eventually,

9    throughout the past 14 years worked in various

10   positions and through the reorganization of FEMA, and

11   that was in 2007?

12       A.   Couple of reorganizations.

13       Q.   To where you're now the acting deputy

14   director?

15       A.   Deputy administrator.  And again, this is

16   a temp gig.

17       Q.   What does that mean?

18       A.    It means that this is a Senate-confirmed

19   position, so there will be a Senate-confirmed

20   appointee coming in to replace me, and I'll be

21   reverting back to the deputy assistant administrator

22   of disaster assistance, career position that I

1          Q.    With that being said, I want to direct you

2      to page 2 of 6, and particularly section 3 of your

3      declaration.  And this is where you're talking about

4      temporary emergency housing assistance to disaster

5      victims.  And I want to direct you to the sentence

6      that begins -- the second sentence of 3.

7              It begins:  From September 2005 to May 1,

8      2009, FEMA has provided a significant number of

9      Hurricane Katrina and Rita disaster victims with at

10     no cost travel trailers, park model trailers, and

11     manufactured housing, also commonly referred to as

12     mobile homes, hereinafter collectively referred to as

13     emergency housing, or EHUs.

14              Did I read that statement correctly, that

15     sentence?

16         A.    Yes.

17         Q.    Mr. Garratt, I want to ask a question:

18     What is the purpose of this sentence in this

19     statement in your declaration?

20         A.    Other than to convey the information that

21     it conveys?

22              (Mr. Fried and Ms. Williams-Jones entered

1      A.     Well, because the emergency housing units

2   are provided under the aegis of the individual

3   assistance program and the public assistance program,

4   those programs are managed at least at the

5   headquarters level by our directorate, so I don't

6   think there was any doubt that this was our

7   directorate's responsibility at the time.

8      Q.     Well, go on to say that prior to the

9   disaster assistance directorate assuming response

10  coordination responsibility of the formaldehyde issue

11  in June 2006, FEMA's Gulf Coast recovery office had

12  through its assigned transitional recovery offices in

13  each state been responding to occupants' air quality

14  complaints on a case-by-case basis.

15          What was your understanding in June of

16  2006 of how the Gulf Coast recovery office was

17  responding to air quality complaints?

18     A.     I'm not sure what you mean when you say my

19  understanding of how they were responding to

20  complaints.

21          You mean the -- the mechanism by which

22  they respond to complaints, how they're set up to

1   respond to complaints?

2       Q.    How they're set up to respond to

3   complaints and how did they actually respond to

4   complaints, if you know?

5           MR. MILLER:  Objection, compound.

6       A.    In terms of the former, the transitional

7   recovery offices, which are really extended versions

8   of our joint field offices that we set up in every

9   disaster operation, but these are there long term,

10  and we typically staff them with longer-term

11  employees, have maintenance and deactivation

12  contracts, and those maintenance and deactivation

13  contractors -- and they had numerous maintenance and

14  deactivation contractors -- supporting each of the

15  transitional recovery offices, depending on which

16  state that you're in are assigned a certain sector

17  area, and occupants of emergency housing units in

18  those areas would call this particular maintenance

19  and deactivation contractor if they have an issue or

20  a problem with a unit, and it was that contractor's

21  responsibility to respond and address and deal with

22  the issue.

1    any way to answer that.

2        Q.    What if any mechanism was in place for

3    FEMA to follow up on the installation work by these

4    contractors in order to determine whether or not in

5    fact formaldehyde levels might have been affected by

6    what they did?

7            MR. MILLER:  Objection, foundation.

8        A.    I'm not aware that any retroactive

9    activity took place to see if any of the installation

10   actions of any of the contractors may have contribute

11   to do an increase in formaldehyde.

12           BY MR. MEUNIER:

13       Q.    Now, in your declaration at page 3, you

14   also talked today about the fact that prior to June

15   of 2006, FEMA was responding to occupant complaints

16   about air quality in the units on a case-by-case

17   basis.

18           Correct?

19       A.    Correct.

20       Q.    And do you know as you sit here today when

21   the first complaints reached FEMA concerning air

22   quality in these units?

1          A.     I do not.

2          Q.     Would you be in a position to deny the

3     fact that the first complaints reached FEMA as early

4     as October of 2005?

5          A.     I've got no basis to deny that.

6          Q.     And so assuming that to be true, between

7     October 2005 and June 2006, for roughly an 8-month

8     period of time, FEMA was handling complaints about

9     these units -- complaints by occupants on a

10    case-by-case rather than programmatic basis.

11               MR. MILLER:  Objection, assumes --

12               BY MR. MEUNIER:

13         Q.     True?

14               MR. MILLER:  Objection, assumes facts not

15    in evidence, hypothetical.

16         A.     Certainly true as far as air quality

17    issues.

18               BY MR. MEUNIER:

19         Q.     So there was no programmatic coordination

20    of FEMA's responses to the complaints that it was

21    receiving about formaldehyde concerns for the 8-month

22    period of time we're talking about?

1                So they are the ones who would be

2       responsible for generating at their level direction

3       and guidance to the entities operating under their

4       authority.

5                BY MR. MEUNIER:

6           Q.    They were not receiving any direction from

7       above, that is, from FEMA.

8                True?

9                MR. MILLER:   Objection.

10          A.    I would say that's false.

11               They were receiving a lot of general

12      policy-related direction from FEMA.   I am not aware

13      that they were receiving any specific direction

14      regarding air quality from FEMA headquarters at that

15      time.

16               BY MR. MEUNIER:

17          Q.    Now, you've testified today that there

18      were a, quote, slew, in your words, or, quote, many

19      complaints that were being received and handled on a

20      case-by-case basis prior to June 2006.

21               Correct?

22          A.    Correct.

1      Q.    Any idea, how many?

2            Can you quantify?

3      A.    When I said, slew, I was referring to the

4    full range of occupant-related issues, whether it be

5    a refrigerator that's not working or a crack in the

6    door, or, my unit is -- is wobbly.

7            I'm talking about the range of concerns.

8    And, no, I --

9      Q.    Okay.

10     A.    -- don't have an idea.

11     Q.    Does -- do you know of any records that

12   exist today which would tell us the number of

13   complaints that were received by these various

14   offices in the field specifically regarding air

15   quality or formaldehyde?

16     A.    They're all required to -- those

17   maintenance and deactivation contractors maintain

18   records and keep those records, so, yes, those

19   records should be available.

20     Q.    Have you reviewed those records?

21     A.    I recall seeing a -- one set of records

22   probably about year and a half to 2 years ago.   I

1      don't remember from which MDC, or maintenance and

2      deactivation contractor, that was, but I do recall

3      seeing some records.

4          Q.     And what did those records indicate to you

5      in terms of the volume or number of air quality or

6      formaldehyde-related calls?

7          A.     At the time, there were not that many.  I

8      don't remember how many there were, and I'm not even

9      sure I remember exactly what the circumstances were

10     under which we requested that information.

11             It may have been for a snapshot in time as

12     opposed to everything to that point.  I recall us

13     asking to be pro- -- asking the field to provide us

14     records dealing with some period in time, but I don't

15     recall what that time was or even the -- necessarily

16     the impetus -- the impetus for that request.

17         Q.     And what do the records reflect was being

18     said to people who complained about air quality or

19     formaldehyde?

20             What -- what kind of response was being

21     given to those types of complaints?

22         A.     I would -- as I recall, different types of

1    responses were being provided to individuals, but

2    those responses were generally related to what it was

3    that was being reported.

4              For example, air quality issues:  my unit

5    has an odor to it, or, my eyes are watering.  And I'm

6    not saying that these are specific things that they

7    reported at the time.

8              I don't recall for most of the complaints

9    that I saw prior to -- and my memory is vague here --

10   that formaldehyde was mentioned.  It was typically

11   air -- general air quality issues that were

12   mentioned.  It was characterized that way.

13             It wasn't really formaldehyde being

14   reported as the problem until after this became a

15   public issue.

16        Q.    Yes, sir.

17             But my question was, if you can tell me

18   what types of responses were being given to those who

19   called about things like air quality, smell, watery

20   eyes, et cetera?

21             MR. MILLER:  Objection, foundation.

22             BY MR. MEUNIER:

1       Q.      According to the records that you

2    reviewed.

3       A.      I recall imperfectly different responses.

4               In some cases, individuals were told to

5    try and ventilate their units or air it out and then

6    (phonetic) call back.  In some cases, people went out

7    to the units to check on them themselves.  In some

8    cases, a determination was made they needed to swap

9    out a unit.

10              It depends, but different responses.

11      Q.      Now, again, in your declaration, and this

12   is at page 3, you talk about Mr. Souza making a

13   recommendation in late June, which you authorized

14   and -- and supported that FEMA both prepare and issue

15   a safety notice and proceed with testing.

16              Correct?

17      A.      Correct.

18      Q.      You then in late June of '06 as the acting

19   deputy administrator of FEMA had the authority

20   whether or not to approve safety notices, whether or

21   not to approve testing of these trailers.

22              Correct?

1   necessarily made any awards on that contract at this

2   stage of the game, just that we had a protocol for

3   going forward to execute the new contracts using

4   these specs and this testing protocol.

5       Q.    Did the new contract protocol extend to

6   each and every manufacturer that was a source of

7   emergency housing units?

8       A.    Yes.

9       Q.    Prior to that change, did -- was it the

10  prevailing view, at least your view, that the con- --

11  that the manufacturers were in fact providing units

12  that complied with the required safety standards for

13  formaldehyde?

14      A.    It was our understanding that the

15  manufacturers were -- if they were producing mobile

16  homes or manufactured housing, producing units that

17  complied with HUD standards.

18      Q.    M-hm.

19      A.    For those who were not producing

20  manufactured housing, they were producing park models

21  or travel trailers, which were recreational vehicles

22  that met or exceeded industry standards since there

```
 1    were no federal standards that applied -- there were

 2    no HUD standards that applied to their construction

 3    at the time that those units were purchased for

 4    Hurricane Katrina.

 5         Q.    Well, how did the new specifications for

 6    travel trailer manufacturing change what you refer to

 7    as the industry standards?

 8         A.    Well, our new specifications for park

 9    models and mobile homes require that the units test

10    at point- -- what they ended up requiring is that

11    below .016 PPM.

12               Now, how the manufacturers and what the

13    manufacturers did to achieve that level in terms of

14    reducing components, materials, glues, et cetera,

15    that emit formaldehyde was up to them.  We were

16    interested in the outcome, which was a unit that

17    emitted no more than this amount of formaldehyde.

18               For travel trailers, we faced a different

19    or additional concern, and that was, they don't have

20    the ventilation systems that a park model or a mobile

21    home has.

22               So even if they use reduced formaldehyde,
```

1      problem was on March 16, 2006.  This issue has been

2      around a long time, and as I recall, surfaced in

3      previous disasters.  Has anyone researched this.

4              Now, did you know what Gil Jamieson was

5      referring to there?

6          A.    No.

7          Q.    Did you research it or have anyone else

8      research it?

9          A.    Yes.

10         Q.    And what was the result of the research?

11         A.    Inconclusive, anecdotal, no one was able

12     to provide any written documentation that there were

13     prior formaldehyde issues.

14         Q.    From prior disaster responses --

15         A.    Correct.

16         Q.    -- in particular.

17         A.    Gil was one individual who raised this

18     issue in this email.  I'm also aware and I don't

19     remember who the individual was, but somebody from

20     our logistics organization, had also suggested that

21     they had recalled dealing with formaldehyde problems

22     or a formaldehyde issue in a previous disaster, and I

1    asked staff to look into that and find out what the

2    background was on that, but came back and no one

3    could find anything, and all they were able to

4    identify were these anecdotal beliefs of some people

5    that this existed.

6              Don't have anything more on that.

7         Q.    So there was nothing in the re- -- in the

8    research of that issue to indicate that prior to

9    choosing travel trailers to use for example in

10   connection with this disaster that FEMA, the federal

11   government had any experience from prior disasters

12   suggesting that that would be a formaldehyde problem?

13        A.    Well, I can only speak for myself, and

14   that is that -- and let's keep in my mind, I'd been

15   in this particular job for about 5 months, so it's

16   not like I had a lot of corporate experience with

17   direct housing missions prior to that point.  There's

18   certainly other people in the agency who do.

19              I have no prior knowledge of that.  As I

20   indicated, asked folks to look into it.  I cannot

21   tell you what kind of a job was done in terms of

22   looking into that, how thorough, how comprehensive,

1        Q.      From a formaldehyde standpoint.

2        A.      None whatsoever.

3        Q.      Can you talk a little bit about why FEMA

4    used travel trailers by the thousands both prior to

5    Hurricane Katrina and during the Hurricane Katrina

6    response?

7        A.      They were the preferred direct temporary

8    housing product because of their -- because of their

9    size, because we could move them in and set them up

10   quickly.  I think 80 percent of the units that we

11   provided in response to hurricanes Katrina and Rita

12   were on individuals' private property.  And typically

13   we put travel trailers on private property or often

14   because we can't fit anything else on their private

15   property.  They simply can't accommodate a mobile

16   home on their driveway.

17            So they were used because, number 1, they

18   filled a need that could not be met any other way.

19   2, they were inexpensive compared to a mobile home.

20   3, they allowed people to stay at their property and

21   rebuild their home as opposed to relocating them to a

22   community site that might be miles away and might be

1   far more expensive to build.

2           So a number of reasons I think contributed

3   to the use of travel trailers and their popularity at

4   least within a certain segment of the disaster

5   population on those small properties and wanted to

6   stay on their property and rebuild their home.

7       Q.    Am I also correct that during the prior

8   natural disaster events that we talked about prior to

9   Hurricane Katrina, can we assume that there were

10  young children and elderly people and stay-at-home

11  moms living in those travel trailers as well?

12      A.    I think that's safe to assume.

13      Q.    And again you're not aware of any

14  formaldehyde claims by any of those people in those

15  prior disasters?

16      A.    I'm not personally aware of any.

17      Q.    When you were working with the CDC after

18  Hurricane Katrina, did you become aware of the

19  results of a study that they did in Hancock County,

20  Mississippi, of children's pre-Katrina and

21  post-Katrina doctor visits?

22      A.    Not by -- not by that reference.

1          A.     Correct.

2          Q.     Over the course of the deposition, I heard

3     some questions about maintenance, and I just want to

4     make sure I have all of this down right.

5                 At different times, some of these

6     contractors or maybe even all of the contractors

7     contracted with FEMA to undertake certain maintenance

8     responsibilities.

9                 True?

10         A.     True.

11         Q.     And you discussed with Mr. Meunier if some

12    way FEMA's procedure for air quality issues, when it

13    was that those sorts of complaints were made early on

14    in the project.

15                Right?

16                Do you recall that?

17         A.     I think I know -- know to which you refer,

18    yes.

19         Q.     Okay.  And I'm going to say earlier on in

20    the project, the policy -- or FEMA's policy was to

21    handle those sorts of complaints on a case-by-case

22    basis.

1          Is that fair to say?

2     A.    I would say yes.  More practice, I think

3     than policy, but, yes.

4     Q.    Okay.  And if for instance a complaint of

5     formaldehyde -- let's call it a formaldehyde

6     complaint came through, and it either made its way

7     through the temporary recovery office which then sent

8     it on to a contractor or if the temporary recovery

9     office handled it directly, the policy was at least

10    in the early days to recommend venting, opening

11    doors, opening windows to get rid of the odor.

12          Is that true?

13    A.    I think that's generally true, if you're

14    referring to the guidance provided by the maintenance

15    and deactivation contract personnel who visited and

16    talked to the occupants who had made the complaint?

17    Q.    Correct?

18    A.    Right.

19          I think they did explore options short of

20    swapping out the trailer before they would agree to

21    swap out a travel trailer.  And among them was

22    ventilating the unit.

1        Q.    Was that a FEMA directive?

2        A.    Not that I'm aware of.

3        Q.    Okay.  Where did that policy come from?

4        A.    If -- I don't know.

5        Q.    Was that ever a FEMA policy?

6        A.    Was what ever a FEMA policy?

7        Q.    If an air quality complaint, in this case,

8    a complaint about formaldehyde, was brought to FEMA's

9    attention or a maintenance contractor's attention,

10   and they were to deal with it on a case-by-case

11   basis, was it the policy to recommend airing out the

12   trailer before swapping out the trailer.

13       A.    I don't know if it was a FEMA policy or

14   not.

15             By, policy, we need to be careful here.  A

16   written policy is different than again a practice or

17   an unwritten policy.  In this case I'm not aware that

18   of any policies dictating or governing exactly what

19   contractors or anybody who is receiving complaints

20   from occupants says and how they respond to -- to

21   those particular complaints.

22             I'm not saying they didn't exist.  They

1    may exist within the contract acquisitions framework,

2    but I'm not familiar with the existence of any such

3    policy.

4          Q.    Was it a FEMA practice to make that

5    recommendation?

6          A.    Yes.

7          Q.    Okay.  And you explained that at some

8    point, FEMA came to the realization that it might

9    have a possible systemic formaldehyde problem.  I

10   think that's the way you described it.

11               Is that a fair way to describe it?

12         A.    Yes.

13         Q.    Okay.  And I'm not trying to dictate a

14   date on that, whatever it turns out to be, but at

15   some point in time around the time of the Sierra Club

16   results, I understand that the problem seemed to be

17   one that needed greater attention than perhaps it was

18   getting.

19               Is that true?

20         A.    Yes.

21         Q.    And as I understand your testimony, FEMA

22   assumed the responsibility for coordinating the

1    response to this issue at that time, whenever it was.

2              Isn't that fair?

3         A.    That is fair.

4         Q.    And FEMA debated what an appropriate

5    response might be, whether it be testing, warnings,

6    or taking people out of the trailers.

7              Is that true?

8         A.    True.

9         Q.    Okay.  And you would agree with me that

10   the responsibility for determining an appropriate

11   programmatic response to this issue lay within the

12   FEMA organization?

13        A.    Let me caveat my response to that and

14   that -- or let me characterize this carefully.

15             FEMA is delegated responsibility for the

16   disaster environment and coordinating the engagement

17   and application of all federal resources and assets

18   to support that state.  So at the top of that

19   multiorganizational activity is FEMA, who is solely

20   or responsible for what goes on by all of those

21   agencies.

22             So, yes, we are ultimately responsible,