1

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF LOUISIANA

 3                  NEW ORLEANS DIVISION

 4   In Re:  FEMA Trailer    )

 5   Formaldehyde Products   ) MDL No. 1873

 6   Liability Litigation    )

 7

 8                              Washington, D.C.

 9                              Tuesday, July 14, 2009

10   Videotape Deposition of MARTIN EDWARD McNEESE, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at

17   9:03 a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21

22
```

1            Objection.

2            There's no question pending.

3            MS. GILBREATH:  Okay.

4            MR. MILLER:  You can have the court

5    reporter read the que- -- answer back if you want.

6            MS. GILBREATH:  Can you read back his

7    previous answer.

8            (The reporter read the last

9            answer.)

10           BY MS. GILBREATH:

11      Q.   So did you believe the task of EPA and

12   ATSDR in terms of determining whether venting was an

13   effective response was to determine whether or not it

14   lowered the levels of formaldehyde?

15      A.   No, I didn't believe that.

16           If the test -- the test that was given to

17   EPA was to, number 1, establish a baseline or

18   establish a level of volatile inorganic compounds and

19   specifically formaldehyde, and number 2, to --

20   because we weren't denying that there was

21   formaldehyde in the units -- we knew there was -- to

22   see if -- what the impact of venting was on the

107

1    people did not want to do that, we would put them in

2    a hotel or somewhere else.

3              I mean, that was always the other option

4    that went with it, but the ones we swapped out with

5    older units, we never to my knowledge got a complaint

6    back from them again, so --

7         Q.   And the older units would be for example

8    units from the 2004 hurricanes in Florida?

9         A.   Or from any other disasters, but prior to

10   Katrina-type units, yes.

11        Q.   So some of the swapout units were in fact

12   from the 2004 hurricanes in Florida; is that right?

13        A.   That's probably true, yes.

14        Q.   And you're not aware of any followup

15   problems in those 2004 units once they were swapped

16   out from a formaldehyde standpoint?

17        A.   I'm not aware of any, that's correct.

18        Q.   Also in McNeese 7, you refer under number

19   3 to the fact that it is a given that the materials

20   used in the construction of mobile homes and travel

21   trailers in addition to other residential structures

22   contain formaldehyde.

```
1                Do you see that?
2        A.      I do.
3        Q.      It was no surprise to you that there was
4    some formaldehyde in these travel trailers, was it?
5        A.      No, it was not.
6        Q.      And in fact, you're generally aware that
7    there is also formaldehyde not only in travel
8    trailers but in mobile homes and in stick-built
9    residential structures; is that right?
10       A.      That's correct.
11       Q.      In some of the documents that we looked at
12   this morning, I noted that you made references to the
13   fact that there were no standards, residential indoor
14   air standards that FEMA could look to for guidance.
15               Do you recall having that concern at the
16   time?
17       A.      I do --
18       Q.      Could you --
19       A.      -- recall that.
20       Q.      -- elaborate on what -- what your reaction
21   was to learning that there were in fact no standards
22   that FEMA could look to regarding residential indoor
```