UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N(5)<br><br>JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO:<br>*Lyndon Wright v. Forest River, Inc., et al.*<br>No. 09-2977 (E.D. La.) | MAGISTRATE CHASEZ |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF THEIR MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL EXPERT REPORTS

**MAY IT PLEASE THE COURT:**

Defendants, Forest River Inc., ("Forest River") and Shaw Environmental, Inc. ("Shaw") (collectively, "defendants"), submit this memorandum in support of their Motion to Strike Plaintiff's Supplemental Expert Reports. As detailed below, these late disclosures should not be permitted, as they were produced nearly four months after the October 2009 expert report deadline. Additionally, plaintiff has no justification for these late submissions, as the materials relied upon were available prior the production of their expert reports. Accordingly, the supplemental reports from experts Williams, Hewett, Lagrange and Miller should be excluded in

their entirety.[1]

## BACKGROUND

Bellwether plaintiff Lyndon Wright originally filed suit in March of 2009; on April 6, 2009, the Court entered Pre-Trial Order No. 34, confirming Wright as Forest River's first trial plaintiff. (Rec. Doc. No. 1299). On June 24, 2009, Wright filed a Motion for Leave to File First Supplemental and Amended Complaint, seeking to add new claims related to mold exposure in the trailer. (Rec. Doc. 1862). The Court granted that motion on July 17, 2009, with the caveat that the Wright case would be the only bellwether trial to deal with mold. (Rec. Doc. 2201).

Due to the late addition of Wright's mold claim, the Court required plaintiff to submit both preliminary and final expert reports. (Rec. Doc. 2201). Preliminary reports were due on July 29, 2009, with final reports due on September 1, 2009. *Id.* The Court was clear that this second round of reports were to be the "last word" from plaintiff's experts, as the Order described these as "**final, complete, and comprehensive expert reports.**" *Id.* (emphasis added). That September expert report deadline was later moved back to October 2, 2009. (Rec. Doc. 2716).

As discussed below, plaintiff has disregarded this deadline, in one instance issuing a supplemental report a mere two days before the close of discovery. It should not be overlooked that these late reports, if permitted, would substantially disrupt the orderly progress of this case and prejudice the defendants. Needless to say, the Scheduling Order required Plaintiff to issue his experts' reports by a certain date in order to ensure that the defense would have a chance to

---

[1]  Defendants have filed a separate Motion to Strike the supplemental report of Dr. Miller (Rec. Doc. 10321) and incorporate it herein by reference.

respond, and for both parties to conduct discovery relating to the other's experts, all before the discovery cut-off and dispositive motion deadline. As a corollary, this schedule ensured that the parties would not be distracted with last-minute discovery and motion practice when they should be focused on the numerous activities that must be accomplished immediately before trial: motions in limine (Feb. 9); the submission of a trial plan (Feb. 17); the submission of the Pre-Trial Order (Feb. 19); deposition designations (March 3), just to name a few. "Supplemental" expert reports that change the nature and subject matter of the prior reports would turn all this on its head, requiring more depositions, responsive reports from the defense, additional motions in limine, and so on. This would burden the parties and the Court, and if, as seems likely in the event the supplements are permitted, depositions and responsive reports go on beyond mid-February, they would undermine the completeness of the trial plan and Pre-Trial Order.

Forest River and Shaw respectfully submit that the lateness of these supplements creates a substantial burden that wholly outweighs Plaintiff's justification (if any) for these supplements; moreover, these supplemental reports are based on information available to each expert well before their October 2009 expert deadline. Accordingly, the Court should strike these eleventh-hour submissions in their entirety.

## LAW & ARGUMENT

**1. Dr. Williams.**

Dr. Patricia Williams, a toxicologist with whom this Court is exceedingly familiar, is the sole expert retained by plaintiff to offer opinions on general causation in this case. Dr. Williams issued two timely expert reports in this case: the first on July 29, 2009, and the second on October 2, 2009. In those reports, she conducts a review of the literature on the heath effects of both formaldehyde and mold exposure and asserts, among other things, that a cause-effect

3

relationship exists between formaldehyde and cancer.[2]  Significantly, while she does cite articles dealing with nasopharyngeal cancer, neither of these prior expert reports discusses the alleged link between formaldehyde and leukemia.

After reviewing these reports, defendants deposed Dr. Williams on December 3, 2009. Nothing further was provided from Dr. Williams until recently, when, on January 27, 2010 – three months after the final expert report deadline, nearly two months after her deposition, and two days before the close of discovery – Dr. Williams submitted a "Supplemental Affidavit" (hereinafter, the "supplement").[3]  Aside from reiterating some preliminary information on her qualifications and methodology, this supplement contains entirely new opinions.  Dr. Williams specifically focuses on the alleged link between formaldehyde and leukemia, and, after an eight-page review of leukemia studies, she concludes, "A cause-effect relationship exists between formaldehyde and leukemia."[4]  To be clear, Lyndon Wright has never been diagnosed with leukemia, and none of plaintiff's medical experts has opined that Wright faces an increased risk of leukemia as a result of formaldehyde and/or mold exposure.[5]

**A. Dr. Williams' Supplemental Affidavit is untimely and contains new opinions never discussed in any of her prior reports.**

Defendants submit that Dr. Williams' supplement should be excluded in its entirety, as the opinions contained therein are both untimely and relate to topics never before addressed in

---

[2]  *See generally* Expert report of Dr. Williams, dated 10/2/09, p. 63-64, attached as Ex. A.

[3]  *See* Williams' supplement, dated 1/26/10, attached as Ex. B.

[4]  *Id.* at p. 16.

[5]  Because Wright has never been diagnosed with either leukemia or an increased risk of leukemia by any physician, Dr. Williams' supplemental opinions are likely offered to support plaintiff's fear of cancer claim.

any of her prior expert reports. Additionally, Dr. Williams has no good cause for this delayed report, as the information she relied upon was available to her prior to the submission of her expert report.

As described above, Dr. Williams' supplement is exceedingly late and was provided to opposing counsel over three months after the October 2, 2009 deadline for disclosure of expert reports set by this Court's Scheduling Order. *See* R. Doc. 2716. The Scheduling Order clearly mandates that the written reports of experts, setting forth **_all_** matters about which they will testify, shall be delivered to counsel for defendant no later than October 2, 2009. *Id*. (emphasis added).

A party must make the disclosures of expert reports at the times and in the sequence that the Court orders. Fed. Rule Civ. Pro. 26(a)(2)(C). If a party fails to provide this information, it may not use that information at trial unless the failure was substantially justified or harmless. *See* Fed. Rule Civ. Pro. 37(c)(1).

Given that the expert report deadline passed over three months ago, and Dr. Williams' own deposition occurred nearly two months ago, the submission of her supplement at this late juncture is egregious. Moreover, plaintiff's counsel has offered no justification for this late submission, simply emailing it to defense counsel without any explanation. This late submission, offered two days before the close of discovery, should not be allowed.

Further, a party cannot skirt expert disclosure requirements of Rule 26 by characterizing new opinions as "supplemental." *See, Simmons v. Johnson*, 2008 WL 474203 *2 (M.D. La. 2008). As discussed above, Dr. Williams' July 29, 2009 and October 2, 2009 reports do not contain any opinions regarding formaldehyde and its link to leukemia. In fact, the word "leukemia" does not appear anywhere in the body of her original reports and is conspicuously

absent from the section discussing formaldehyde's alleged link to cancer.[6] These leukemia opinions are wholly new, and, consequently, plaintiff should not be allowed to offer this testimony at trial.

### B. The supplement is based on materials available to Dr. Williams prior to the submission of her expert report.

Courts have routinely rejected untimely "supplemental" expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures. *See, Lampe Berger USA, Inc v. Scentier, Inc.,* 2008 WL 3386716 (M.D. La. 2008); *Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc.*, 1999 WL 135297 (E.D. La. 1999) (Duval, J.); *Simmons v. Johnson*, 2008 WL 474203 (M.D. La. 2008); *Buxton v. Lil' Drug Store Products, Inc.*, 2007 WL 2254492 (S.D. Miss. 2007).

In *Lampe Berger USA, Inc v. Scentier, Inc.*, the court excluded a "supplemental report" which was filed after the deadline for expert reports had passed. 2008 WL 3386716 (M.D. La. 2008). There, plaintiff produced a supplemental report from its financial expert in July of 2008, two months after the deadline to produce expert reports had passed. *Id.* at *2-4. Plaintiff's expert stated that, after preparation of her initial report, she received "new information" from plaintiff's counsel – the defendant's discovery responses from 2006. *Id.* The defendant filed a motion to strike this report, contending that the report was based on information that was available at the time the expert prepared her first report. *Id.* The court agreed, holding that

---

[6] Curiously, Dr. Williams does list studies dealing with leukemia and formaldehyde in her October 2009 report. *See, e.g.,* Ex. A, p. 69, reference article by Linos, et al. entitled "Leukemia and non-Hodgkin's lymphoma among embalmers and funeral directors (Letter to the Editor)," J Natl Cancer Inst., 82:66, 1990. The fact that Dr. Williams (allegedly) reviewed this paper and others related to leukemia and chose not to discuss them in her prior reports is yet another factor that should weigh against allowing her supplemental opinions to be included in this case.

6

failure of plaintiff's counsel to provide the expert with all of the information necessary to form her opinions prior to the expiration of the expert report deadline was not a sufficient justification for disregarding the court-imposed expert deadline. *Id.*

Here, Dr. Williams had access to the overwhelming majority of the studies listed in her supplement prior to the expert deadline of October 2009. For instance, in support of her opinions on leukemia, she references numerous studies from the late 1990s up through 2008, all of which would obviously have been available to her well before this case even began. In fact, of the twenty-one references included in her addendum, thirteen have a publication date of 2008 or before.[7] If plaintiff planned to present this evidence to the jury, it should have been provided long ago. There is no excuse for Dr. Williams' delay in discussing her opinions on leukemia.

Moreover, even for those leukemia articles referenced by Dr. Williams that were published in 2009 and 2010, only three were published within the last three months.[8] In other words, Dr. Williams had access to eighteen of her twenty-one referenced studies as of October of 2009. Any assertion that her evaluation of formaldehyde's alleged link to leukemia was delayed due to newly published articles is simply untrue.[9] At a minimum, Dr. Williams should have included at least some discussion of leukemia in her prior timely submitted reports, such that a supplement of two or three recent studies would not have come as a complete surprise.

---

[7]     *See* Ex. B, p. 16-18.

[8]     Due to time constraints, undersigned counsel was only able to search the specific month of publication of these articles via an internet search.

[9]     The timing of plaintiff's submission of Dr. Williams' supplement undercuts any argument that this delay was justified. Plaintiff deposed Dr. Cole, Forest River's expert in epidemiology, the morning of January 27, 2010 and asked him numerous questions on leukemia and its association with formaldehyde. **Less than four hours** after Dr. Cole's deposition concluded, plaintiff submitted the supplement from Dr. Williams. One cannot help but conclude that plaintiff manipulated the submission of this supplement for purely tactical reasons, and, in doing so, he has completely undermined his right to present these leukemia opinions.

Instead, Dr. Williams' supplement is simply an attempt to blindside defendants days before the close of discovery. As the Court knows, the *Wright* case is different from prior bellwether trials (and more burdensome to defendants) in that the plaintiff was allowed to (1) add claims related to his alleged mold exposure and (2) conduct extensive destructive testing of the Forest River unit. Defendants were forced to expend considerable resources preparing for these portions of the case. Now, days before the discovery cutoff, plaintiff should not be allowed to test out another theory of recovery and force defendants to jump through yet another hoop.[10] Plaintiff's right to add additional theories to his case ended on October 2, 2009, the date his final expert reports were due.

This supplementation is even more inappropriate in light of Dr. Williams' prior sworn testimony. At her deposition in December, Dr. Williams was specifically asked if her July and October reports constituted the entirety of her opinions in the *Wright* case. She testified:

> Q   Since you authored this report, which is Exhibit No. 3, have you reviewed that report in anticipation of this deposition, in preparation for this deposition?
>
> A   Of course.
>
> Q   Okay. And is there any changes or revisions that you have made to that report? You have reviewed it?
>
> A   I have not made any changes to this report.
>
> Q   That's all I asked you, whether or not -- You wrote the report it. You read it in preparation for the deposition. There are no changes or additions that you have made to that report, correct?

---

[10]   Defendants have also filed a Motion for Summary Judgment seeking to dismiss all of plaintiff's claims for lack of causation testimony. As demonstrated in that motion, the mold claim in particular has absolutely no evidence to support it, and defendants will move for the costs associated with the testing, analysis and defense of that meritless claim.

>   A       No, it's in its entirety at this time.
>
>   Q       And you believe it to be correct?
>
>   A       It is.
>
>   Q       It's your opinion in this case?
>
>   A       No, it's not just my opinion. There's scientific literature. Yes.
>
>   Q       It's your opinion in this case, right?
>
>   A       It's my opinion and the facts, scientific facts.
>
>   Q       Okay. **And it's all of your opinions in this case?**
>
>   A       **Yes, those are all the opinions I will be issuing in this case.**[11]

Defendants ask that the Court strike the supplemental report and thereby hold Dr. Williams to her word.

Furthermore, in prior bellwether cases, this Court has consistently limited an expert to those opinions contained in timely submitted expert reports. During the Gulf Stream bellwether trial, plaintiffs attempted to question one of their expert witnesses, Charles Moore, on issues related to jacking of the unit. The Court cautioned plaintiff's counsel:

> By Mr. Hilliard:
>
>   Q.      Let me start with a question. Using these cups just as examples of how the trailer was lifted, can you show the jury what you remember Mr. Lemieux's testimony to be in regards to how he was jacking this side to side; and, in showing that to the jury, explain to them what happens to the structure of this trailer, as you understand that structure to be, when it's jacked that way.
>
>   A.      Okay.

---

[11] *See* Deposition of Dr. Patricia Williams, dated 12/3/09, p. 53-54, attached as Ex. C (emphasis added).

> Mr. Penot: Objection, your Honor. That's not in the report.
>
> The Court: Counsel, we're going to stick to the expert report that's been given. He's going to have to – **his testimony is going to have to be that which is reflected in his expert report**.[12]

The same rule should apply in the instant case as well.

Finally, should the Court allow Dr. Williams' opinions on leukemia, the current March trial date would necessarily have to be continued. Defendants would certainly be entitled to issue their own supplemental reports on an issue as important as formaldehyde's alleged link to leukemia, and an additional round of depositions would be required, not just of Dr. Williams, but of Drs. Cole, Dyson, James, etc. The evaluation and discussion of leukemia is too complex an issue to add in at the last minute, and, should the Court wish to maintain the March trial setting, Dr. Williams' supplement must be excluded.

    **2.  Paul Hewett.**

Paul Hewett is Plaintiff's statistical expert. He submitted timely reports in July and October 2009. In general, his reports purported to analyze, from a statistical perspective, certain aspects of formaldehyde test results from certain travel trailers. Dr. Hewett was deposed on December 2, 2009 based on the July and October reports.

On January 21, 2010, Dr. Hewett issued a report that was described as a "supplement."[13] Although movants use that term for ease of reference in this motion, it is not a supplement at all. It is a complete re-write of the report. Although much of the original text remains, some sections have been deleted, and others added. Not one of the tables and figures at the end of the report –

---

[12]    *See* Trial Transcript from morning session of Day 4 of Gulf Stream bellwether trial, 9/17/09, p. 80-81, attached as Ex. D (emphasis added).

[13]    *See* Hewett's supplement, dated 1/21/10, attached as Ex. E.

the tables and figures that represent Dr. Hewett's fundamental conclusions – is the same as before. The January 21, 2010 report should not be seen as a supplement, but as a wholly new report.

> A. The Section on "Additional Analyses" (or, the Attempted Rehabilitation of DeVany Industrial's Data) Should Be Stricken.

Perhaps the most significant addition to the January 21, 2010, report is Section 4.3, "Additional Analyses," which was not present at all in the July or October reports. This section re-analyzes data that were available to Dr. Hewett in July and October and are therefore not new. Moreover, they represent a transparent attempt to paper over one of the largest flaws in his analysis: the heavy reliance on data provided by Mary DeVany's company, DeVany Industrial Consultants.[14] Interestingly, in his October 2009 report, Dr. Hewett included tables that were supposed to allow him to compare the data sources side-by-side in order to see if any of them were significantly higher than the rest:

> Q   You can look at the data plots, like Figure 8 in your report, and see that DeVany's data are different than everyone else's, right?
>
> A   Right.
>
> Q   And they're actually a lot different, right?
>
> A   Yes.[15]

Clearly, the fact that DeVany's data are different is a phenomenon that was not unknown to Dr. Hewett when he drafted his original reports. In fact, this phenomenon was so readily apparent

---

[14]   DeVany Industrial contributed 520 of the 883 measurements in the "Forest River" dataset that Dr. Hewett analyzed in his October 2009 report.

[15]   *See* Ex. F, Hewett Deposition, p. 77.

that Dr. Hewett did not need to run the standard test to check to see whether DeVany Industrial's data were statistically different from the other measurements:

> Q      Okay. Did you ever run a two-sample t-test comparing DeVany's formaldehyde concentration measurements to those of everyone else to see if they reflected two different underlying populations?
>
> A      No, I did not.
>
> Q      And you probably don't need to know in advance that if you did that, you would conclude that they came from two different populations at a very high level of statistical significance?
>
> A      I would not be surprised that that would happen. [16]

However, the notion that DeVany Industrial's data might be statistically different than the other measurements in his dataset (technically, that come from a different population) posed a problem for the Plaintiff, because the inclusion of DeVany Industrial's data caused Dr. Hewett to calculate a higher mean for the Forest River dataset than he otherwise would have – in other words, DeVany's data allow the Plaintiff to claim that the average formaldehyde concentration in Forest River EHUs is higher:

> Q      If you calculated descriptive statistics, such as the mean for Forest River units or for just the Salem models using data from all other data sources other than DeVany Industrial, you would come up with lower means, right?
>
> A      Yes, you would, as an aggregate statistic. [17]

Indeed, this topic was the subject of effective cross-examination during the Alexander trial, and it is certainly nothing new.

---

[16]    *See* Ex. F, Hewett Deposition, pp. 84-85.

[17]    *See* Ex. F, Hewett Deposition, p. 85.

Yet in light of this problem, in January 2010, Plaintiff now seeks to introduce a wholly new analysis of the underlying data – an "ANOVA" analysis – that apparently is meant to show that DeVany Industrial's data really are not so different, after all.  Ultimately, in Section 4.3 of the January 21, 2010 report, Dr. Hewett concludes that there is no basis for excluding DeVany Industrial's data from his analysis.  This wholly new conclusion is supported by new Appendix 9.1, which is, to say the least, a complex set of tables of numbers and figures.[18]  None of these numbers or figures were present in the original report.

As a preliminary matter, Appendix 9.1 and the conclusions derived from it ought to be stricken for failure to comply with Rule 26(a)(2)(B)(i), which requires a "complete" statement of the opinions that an expert witness will express.  Appendix 9.1 is nothing more than a printout of a computer calculation that is almost impossible to understand.  It is hardly a complete statement of the opinion regarding this subject.

Fortunately, the question of completeness is not before the Court.  Even if a timely report in this form were permissible, it should not be permitted three and a half months after the applicable deadline, and only ten days before the close of discovery.  Certainly, if permitted, the defense would have to have an opportunity to hire their own expert(s) to double-check these conclusions, particularly in light of the fact that Dr. Hewett has previously admitted that DeVany Industrial's data were different than everyone else's.  To hire experts would take considerable time, even if the defense had access to the data used to generate Appendix 9.1 (we do not); then a highly technical deposition would have to be taken;[19] and pre-trial preparations would certainly

---

[18]   A copy of Appendix 9.1 is attached hereto as Ex. "G."

[19]   For example, it appears that Appendix 9.1 relates only to measurements taken in occupied travel trailers. Accordingly, to the extent that it is being used to say anything about whether to segregate out DeVany Industrial's

be disrupted. Forest River and Shaw urge the Court not to permit Dr. Hewett to supplement his report with this material at this late date.

### B. The Analysis of Occupied Versus Unoccupied Units Should Be Stricken.

Dr. Hewett also was questioned extensively at his deposition about why he did not distinguish between measurements that were taken of occupied versus unoccupied units. Again, this is not a new topic: "Well, I think you could have another graph, one graph for occupied and one graph for unoccupied trailers, which is indeed what we did with ... Fleetwood."[20] The January 21, 2010 report includes several new graphs that purport to analyze the statistical distinctions between measurements of occupied and unoccupied trailers. This analysis is not based on new data and should not be permitted. Although the defense agrees that differentiation between occupied and unoccupied units is necessary, and indeed the defense intends to file a motion in limine on this point, at this late date it is simply too late to cure this error through a "supplement."

### C. Analyses Dependent on New Data Should Be Stricken.

Another addition to the January 21, 2010 report is the use of a dataset comprising 933 measurements in his report, as opposed to the 883 in the earlier reports. Although no explanation of this is given, email correspondence with Plaintiff's counsel suggests that Dr. Hewett included in the later report some 50 additional measurements from trailers that were tested in late 2009. If

---

data, such a conclusion would pertain only to DeVany Industrial's measurements of occupied trailers. There are only six such measurements, only one of which occurred in a "Salem" model like the one at issue. But Dr. Hewett also reaches conclusions about measurements from unoccupied trailers, and DeVany Industrial contributed 475 of those. Obviously, this sort of point would have been covered in the December 2, 2009, deposition had this analysis been performed timely.

[20]   *See* Ex. F, Hewett Deposition, p. 178.

this is the explanation for the different sample sizes, it should not be permitted.  There was nothing preventing the PSC, or Plaintiff's counsel in particular, from testing all of those trailers much earlier.  Moreover, the addition of these 50 test results is not academic: a different sample by necessity affects the averages calculated, and even if those changes were small, they would require additional and unnecessary analysis by the defense in preparation for another deposition.

>    **D.    Conclusions About Age-Related Decay in Formaldehyde Concentrations Should Be Stricken, or Dr. Hewett Should Not Be Permitted to Delete from His Report the Regression Analysis that Supported Those Conclusions.**

The forgoing sections cover the discussion of additional material in the new report, but there is an important subtraction as well: Sections 3.5 and 4.3 of the October 2, 2009 report, entitled "Estimation of the Formaldehyde Decay Coefficient," have been deleted from the January 21, 2010, report.  These sections pertained to a regression analysis of certain variables that were hypothesized to correlate with formaldehyde levels in the trailers within Dr. Hewett's dataset.  In particular, the Plaintiff apparently expected that a regression analysis would reveal that formaldehyde concentrations in tested trailers within Dr. Hewett's dataset declined with the age of the trailer.

This analysis, however, was flawed in several respects, and the defense expected to file a motion in limine with regard to these sections of the October 2, 2009 report as failing the *Daubert* tests.  Accordingly, at some level the movants would not take issue with the withdrawal of these sections, except that they have not been fully withdrawn.  Section 5.3 of the October 2, 2009 report was entitled "Age-related Decline in Formaldehyde Concentrations" and was explicitly supported by the regression analysis performed in Sections 3.5 and 4.3.  In the January 21, 2010, report, Section 5.3 remains, and it still reaches the conclusion that "[t]he true age coefficient, when evaluated across years, is expected to be negative," ***but all references to the***

15

supporting regression analysis have been deleted.  In other words, Plaintiff apparently wants to keep the conclusion but hide the means by which that conclusion was reached.  Plaintiff cannot have his cake and eat it too; Plaintiff should be required to withdraw entirely the discussion of a correlation between age and formaldehyde concentration, or Plaintiff should live with the flaws and other negative (to the Plaintiff) implications of the regression analysis.

### 3. Paul Lagrange.

In an effort to address construction and design issues related to the Wright unit, plaintiff retained a number of experts to examine the unit during the August 2009 destructive testing. Paul Lagrange was retained to perform a blower door test to assess the air leakage of thermal envelope and a duct blaster testing to determine the rates of air leakage of supply and return duct work.[21]

Lagrange issued timely expert reports in July and October of 2009.  He was deposed on October 26, 2009.  No additional materials were received until January 8, 2010, when plaintiff submitted a "Supplemental Summary" (hereinafter, the "supplement").[22]  As with the supplement from Dr. Williams, plaintiff provided no explanation for this late report.

The supplement provides two new pieces of information.  First, Lagrange has revised his calculations regarding the envelope air leakage rate and the manual J load calculation (regarding

---

[21] *See* Ex. H, Expert report of P. Lagrange, pp. 1-3.

[22] *See* Ex. I, Supplemental Summary of Lagrange.

16

A/C equipment sizing).[23] In addition, Lagrange's supplement includes a revised animation to "more closely depict the share of the trailer with relation to attic space."[24]

Lagrange offers no clear explanation as to the justification for these changes, merely stating that his prior figures were "inaccurate." It is unclear what factual circumstances have changed since the drafting of Lagrange's October 2009 report that would justify this revision. Defendants can only surmise that Lagrange miscalculated the size and shape of the attic space in the trailer. In any event, there is no new information that justifies this supplement. Nothing has changed with respect to the trailer at issue, a trailer that Lagrange had complete and unrestricted access to for over a month during the August 2009 destructive testing. Accordingly, the Court should not allow him to have an additional opportunity to correct his flawed calculations.

Moreover, even assuming that the supplementation is warranted, such an analysis should have been completed long ago and provided to defendants in a timely manner. Lagrange was deposed on October 26, 2009, and he had access to defendants' expert reports by November 2, 2009. If Lagrange felt compelled to supplement his report, he should have provided it months ago, thereby allowing defense counsel to have sufficient opportunity to review it and re-depose him if necessary. By providing this supplement on Friday, January 8, 2009, plaintiff seriously impaired defendants' ability to address these new opinions, especially in light of the fact that (1) other depositions were already booked almost every day in January and (2) the upcoming dispositive motion deadline was set for the end of the month. Lagrange's delay in submitting this report is without good cause, and the Court should strike it as a result.

---

[23] *Id.*

[24] *Id.*

## CONCLUSION

For the foregoing reasons, defendants Forest River, Inc. and Shaw Environmental, Inc. respectfully request the Court to strike any and all opinions contained in the supplements to plaintiffs' expert reports.

Respectfully submitted,

/s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
*ATTORNEYS FOR SHAW
ENVIRONMENTAL, INC.*

/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (#6154)
JASON D. BONE (#28315)
CARSON W. STRICKLAND (#31336)
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
*ATTORNEYS FOR FOREST RIVER, INC.*

## **C E R T I F I C A T E**

  I hereby certify that on the 1st day of February, 2010, a copy of the foregoing Memorandum in Support was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

                /s/ M. David Kurtz
                M. DAVID KURTZ