```
                                                                    1

            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA


IN RE:   FEMA TRAILER                    MDL NO. 1873
         FORMALDEHYDE PRODUCTS
         LIABILITY LITIGATION            SECTION "N" (5)

THIS DOCUMENT IS RELATED TO              JUDGE ENGELHARDT

                                         MAGISTRATE CHASEZ
_____

LYNDON T. WRIGHT, et al.
            Plaintiffs,
     vs.                                 CASE NO. 09-2977

FOREST RIVER, INC., et al.,
            Defendants.

_____




             VIDEOTAPED DEPOSITION OF

          WILLIAM L. DYSON, PHD, CIH


            MONDAY, DECEMBER 21, 2009
                   12:59 P.M.

            _____




         WOMBLE, CARLYLE, SANDRIDGE & RICE

      150 FAYETTEVILLE STREET, SUITE 2100

             RALEIGH, NORTH CAROLINA


      _____
```

1  Q   Let me show you what's been marked as
2  Plaintiffs' Exhibit 2, and ask you if you can identify this
3  as your report in this matter?
4  A   (Witness examines document.)  Yes, I can.
5  Q   And in going through this, I'm not going
6  to -- I'm going to try not to go really back through
7  everything we went through in the Dubuclet matter; don't
8  really see any need for that.  I want to focus primarily on
9  your work in this case.  But just as a general matter, I do
10 recall in the Dubuclet case we were discussing how you
11 viewed or how you worked on matters as an industrial
12 hygienist and your approach.
13         Could you tell me about, when you say that
14 you've done this report from the standpoint of an
15 industrial hygienist, what that means?
16 A   In more modern terminology, we're talking
17 about a risk assessment.  And the predecessors to a risk
18 assessment are a hazard determination and then an exposure
19 assessment.
20         From an industrial hygiene standpoint, you
21 have to determine whether formaldehyde and/or mold has the
22 intrinsic ability to cause the health effects that are
23 being claimed; and then beyond that, to see whether there
24 is sufficient exposure based on what is known in the
25 scientific literature for there to be some assignment of

1   risk based on that exposure.
2            The exposure portion of it is the exposure
3   assessment, and then a risk assessment or risk
4   determination follows that.  So that's my role as an
5   industrial hygienist.
6       Q    And just following up on the hazard
7   determination, does formaldehyde have the intrinsic ability
8   to cause the physical complaints of Mr. Wright in this
9   case?
10           MR. BONE:  Object to the form.  You can
11     answer.
12      A    If I knew precisely what physical complaints
13  he's describing and claiming, I might be able to answer,
14  but I'm not sure that I have a complete list of those.
15      Q    Okay.  Well, then let me -- and this is out
16  of your report.  Two of them that are mentioned
17  specifically were asthma and dermatitis.  What about
18  asthma?
19      A    The association between asthma and
20  formaldehyde has only been shown in individuals such as
21  nurses who had extraordinarily high exposure levels or
22  concentrations to formaldehyde.  We don't see exacerbation
23  of preexisting asthma in people at very low concentrations,
24  such as below 1 part per million, nor do we see the onset
25  of asthma as a result of exposures below 1 part per million

1  imposed.

2  Q   So the -- the lower number of the range
3  would take that into consideration?

4  A   That's right. It -- there's only a certain
5  range of susceptibilities in people, and if you include a
6  large enough group, you'll get that range. And
7  formaldehyde has certainly been studied in very large
8  numbers of people.

9  Q   Okay, if -- let's look at Conclusion Number
10 4; if you would read that into the record for us.

11 A   "Even though the measurement was made after
12 his occupancy, the best estimate of the formaldehyde
13 exposure potentially experienced by Mr. Wright is the 0.035
14 to 0.044 ppm measured in the Forest River travel trailer
15 with standardization of environmental conditions in
16 August 2009."

17 Q   If you would, explain your basis for that
18 conclusion.

19 A   The -- well, it starts with the fact that
20 there were no measurements made in that travel trailer
21 during the period of occupancy, and so we're all left with
22 the problem of estimating the exposures that Mr. Wright may
23 have experienced.

24     To get such an estimate, we have to start
25 with actual data points. We have data points from that

27

1  particular, I don't think it's viable with a starting point
2  of the measurements made in a closed, unventilated trailer
3  at a temperature that I consider to be excessive for actual
4  living conditions.
5             So although we can't say with absolute
6  certainty that this represents the exposure of Mr. Wright,
7  it's the only set of reasonable data points that we have on
8  which to base our judgments.
9             If an estimate is not acceptable, which
10 would be in the case rather than doing a modeling, I think
11 we could look at the actual manner in which Mr. Wright
12 lived, whether he opened the door, went in and out of his
13 trailer, whether he operated the air conditioner from time
14 to time, those types of things.  We have measurements in
15 the FEMA litigation that show that occupied travel trailers
16 have a much, much lower concentration than unoccupied
17 travel trailers, so by a factor of four to five, as I
18 recall.
19            So measuring it in an unoccupied condition
20 with the doors closed but with the air conditioner on, if
21 you want to estimate the exposure that Mr. Wright had when
22 he actually lived in it, we would then apply a reduction
23 factor of four to five to get an estimate.  That's a --
24 that's an alternative approach to the modeling and would
25 result in a dramatically different conclusion than the

1  were not a recirculating unit, it would make a difference.
2  But in this case it's a recirculating unit, and so the only
3  impact that you have is not from the air or fresh outside
4  air coming in, but from the temperature. And so those two
5  conditions would be expected to be the same.
6       Q    So in Conclusion Number 6, basically the
7  improvement in the living conditions when you're talking
8  about that, you're talking about when he lowers the
9  temperature of the unit, the inside temperature; is that
10 correct?
11           MR. BONE: Object to the form. You can
12      answer.
13      A    That certainly is a way of reducing the
14 formaldehyde levels to which he was exposed, yes.
15      Q    But operating that air conditioner would not
16 provide more ventilation because it's a recirculating air
17 conditioner; is that correct?
18           MR. BONE: Object to the form.
19      A    It -- it would not; that's correct.
20      Q    Okay, if you would, please let's look at
21 Conclusion Number 7; if you would read that into the
22 record.
23      A    "More likely than not, Mr. Wright was
24 exposed to airborne formaldehyde and fungi from sources
25 other than the Forest River travel trailer during the time

1        A    No, and I see no ability to do so.

2        Q    Okay.  Let's look at Conclusion Number 8; if

3   you'd read that one into the record.

4        A    "More likely than not, Mr. Wright had direct

5   contact with formaldehyde in products he used such as

6   cleansers, cosmetics, and clothing."

7        Q    How did you make that determination?

8        A    It speaks to his claim of dermatitis from --

9   in this case, but -- and again, I don't have specific

10  evidence from his testimony about use of certain things,

11  but the ubiquitous nature of formaldehyde in such products,

12  especially permanent press clothing, I think, would suggest

13  that the probabilities are very high.  I can't say that

14  with absolute precision.

15       Q    Okay.  So would it be -- would it be fair to

16  say that this conclusion is really not -- it's not based on

17  anything that you determined directly from Mr. Wright as

18  far as knowledge?

19       A    No.  It's -- it's an expert's

20  generalization, yes.  I don't have specific facts in the

21  case to support that conclusion.

22       Q    Okay.  And if you would read Conclusion

23  Number 9.

24       A    "It is unlikely that Mr. Wright was exposed

25  to average formaldehyde levels higher than those

1    experienced by residents of conventional homes in Southern
2    Louisiana."
3        Q    Okay.  And what's your basis for that
4    conclusion?
5        A    We discussed this for the Dubuclet case, of
6    course, and that is the Lemus Study, and that is on page
7    16, where the average levels found in Louisiana homes were
8    0.53, 0.46, 0.56, and 1.04 parts per million in the various
9    seasons of the year.
10       Q    Did the Lemus Study -- I'm looking at
11   Footnote 51.  The title of that study was "Potential Health
12   Risks from Exposure to Indoor Formaldehyde"; is that
13   correct?
14       A    Yes.
15       Q    Did the Lemus Study put forth a parts per
16   million standard that they thought was a safe level for
17   indoor formaldehyde levels?
18       A    I don't recall them doing so.
19       Q    And this particular conclusion is based, and
20   I think you say, based on the average levels that would be
21   found --
22       A    Yes, it is.
23       Q    -- based on that study?  Okay.  There's a
24   pretty broad range from non-detectible to 5.4 parts per
25   million?

1      A     There is, and you know, that suggests
2  variability in the homes.  And as we've seen in these
3  travel trailers, there's variability in the travel trailers
4  as well, but -- so that's the reason I can only couch it in
5  terms of averages.
6      Q     Have you been involved in attempting to
7  determine the average of formaldehyde levels in these
8  travel trailers?
9      A     No.
10     Q     Okay, if you would, let's take a look at
11 number -- Conclusion Number 10; if you would read that into
12 the record.
13     A     "Air samples collected in August 2009 do not
14 suggest a problem with mold growth and proliferation in the
15 Forest River travel trailer, nor do they implicate mold as
16 the etiologic agent for Mr. Wright's claimed health
17 issues."
18     Q     And was the -- who did the sampling for
19 mold?
20     A     My understanding is that Mr. Scott did
21 that, --
22     Q     And you --
23     A     -- or his group, at least.
24     Q     And you reviewed those conclusions or
25 results?