UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION: N(5) |
| | | * | |
| This Document Relates to: *Lyndon T. Wright. v.* | | * | JUDGE ENGELHARDT: |
| *Forest River, Inc., et al*, Docket No. 09-2977 | | * | |
| | | * | MAG: CHASEZ |

**************************************************************************

**MEMORANDUM IN SUPPORT OF DEFENDANT FOREST RIVER, INC.'S
<u>MOTION TO EXCLUDE PLAINTIFF'S ANIMATION EXHIBIT</u>**

**MAY IT PLEASE THE COURT**:

Defendant Forest River, Inc. ("Forest River") submits this memorandum in support of its Motion to Exclude Plaintiff's Animation Exhibit. The animation, which does not comport with the evidence produced in this case, is highly prejudicial and is certain to mislead or confuse the jury under Rule 403. For the reasons discussed below, the exhibit should be excluded

<u>BACKGROUND</u>

This action stems from plaintiff's alleged exposure to formaldehyde while residing in a travel trailer provided by FEMA as emergency housing. Trial in this matter is scheduled for March 15, 2010. On January 15, 2010, plaintiff provided a copy of a computer-generated animation to be used as an exhibit at trial.[1] As late as January 22, 2010, Forest River received an amended version of the

---

[1] *See* Animation submitted by plaintiff, attached as Ex. A. A copy of this animation will be provided via disk to the Court's chambers.

animation. Although the animation is referenced on plaintiff's Exhibit List,[2] the creator of the exhibit, Reagan Johnson with C4 Animation, is neither designated as an expert, nor is he listed as a potential witness on plaintiff's Witness List.[3]

The animation, which purportedly depicts various aspects of the Forest River trailer at issue in this suit, can be broken down into three segments. First, the animation displays the basic layout and construction of the trailer and identifies the various component parts, particularly the wood products that contain formaldehyde. Next, the animation describes the process by which formaldehyde off-gasses and allegedly enters the trailer's living area. Finally, the animation demonstrates how gaseous formaldehyde was allegedly re-circulated by the trailer's air-conditioning system.

## LAW & ARGUMENT

Forest River contends that this animation should be excluded because it is highly prejudicial, duplicative, and will mislead and/or confuse the jury. Plaintiff's proffered animation misrepresents the conditions of occupancy and ignores testimony from plaintiff's own witnesses regarding the manner in which the unit was used. Accordingly, the animation should be excluded.

Under the Federal Rules of Evidence, only relevant evidence is admissible. Fed. Rule Evid. 402. Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Fed. Rule Evid. 401. The Court, however, may still exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

---

[2] *See* Rec. Doc. 10238 at p. 47 (#164).

[3] *See* Rec. Doc. 10232.

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. Rule Evid. 403.

Because computer-generated imagery gives boundless leeway to its creator and is unconstrained by the laws of gravity or other scientific principles, courts retain broad discretion under Federal Rule of Evidence 403 to exclude computer animations, particularly where they are based on questionable assumptions or project such a slanted or distorted view of the evidence as to be unfairly prejudicial or misleading. *See* 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 9:26 (3d ed. 2009).

The Fifth Circuit requires that, to be admissible, demonstrative evidence which resembles the disputed events must be "substantially similar" to the conditions presented in each particular case.[4] *See Muth v. Ford Motor Co.*, 461 F. 3d 557 (5th Cir. 2006). In *Muth*, plaintiff was injured when the car in which he was a passenger flipped and landed on its roof, rendering him a quadriplegic. *Id*. at 560. Plaintiff sued the car's manufacturer and alleged that a design defect in the roof was the cause of his injuries. *Id*. At trial, defendant sought to introduce video and photographic demonstrative evidence of previously conducted rollover crash tests through an expert witness. Defendant contended this evidence was to assist the jury in the understanding of their expert's testimony regarding the general dynamics of rollover accidents. *Id*. at 565-6. Plaintiff objected to the evidence, noting the differences between the conditions involved in the tests and the conditions involved in the accident at issue, specifically, that the conditions conformed too closely to defendant's version of the accident. *Id*. at 566. The district court excluded the evidence, finding that the demonstration

---

[4] This standard governing admissibility of demonstrative evidence has been applied to specifically to animations. *See Hinkle v. City of Clarksburg*, 81 F. 3d 416 (4th Cir. 1996).

resembled the disputed accident too closely to only illustrate abstract general principles, but not closely enough to be substantially similar to the actual accident in the case. *Id*. at 566.

On appeal, the Fifth Circuit upheld the ruling. The Fifth Circuit stated that the substantial similarity requirement applies when the demonstration resembles the disputed events. *Id*. The Court then stated that the similarities between defendant's theory of the accident and the conditions of the test heightened the visual evidence's prejudicial effect. *Id*. at 567.

In the instant action, the animation of the Wright trailer fails the substantial similarity analysis. After the animation depicts the layout and construction of the trailer, it simply re-creates plaintiff's version of events – that formaldehyde off-gassed, permeated throughout the living area of the trailer, and was re-circulated throughout the living area. Clearly, this animation is being used to suggest to the jury that plaintiff's version of disputed events actually occurred.

However, these factual assertions are simply not supported by the evidence in this case.[5] For instance, plaintiff's experts never measured the off-gassing rates of any wood products inside the unit. Plaintiff's expert Al Mallet conceded that he could not tell whether the formaldehyde off-gassing in the unit increased by 1 ppb or 100 ppb due to the alleged design defects in the unit:

> Q. Did you ever perform any testing
> to quantify the amount of increased
> formaldehyde concentration within the living
> space of this particular trailer by
> operation of the air-conditioning system?
>     A. No. Quantification, we did not.
>     Q. So you couldn't tell me if it
> increased it by 1 part per billion or 100
> parts per billion, could you?
>     A. No, I could not.

---

[5] These objections have also been noted in Forest River's Motions in Limine on Mallet, Ritter, and Lagrange.

\* \*\* \*

Q. With respect to the heating system, would the same be true?

In other words, did you perform any testing that would quantify the increase in formaldehyde concentration within the Lyndon Wright unit by operation of the heating system?

A. No, no quantification.

Q. Okay. Again, so you couldn't say, if called upon to testify, that the operation of the heating system would have increased the formaldehyde concentration in the Lyndon Wright unit by 1 part per billion or 100 parts per billion. True?

A. That's correct.

Q. Okay.

A. And the quantity, from my standpoint, is -- is of no consequence. The avenue, one, if there is off-gassing; and what conditions are conducive to the off-gassing; how does that off-gassing get into the living area?

So I was not -- it was not my charge to quantify any formaldehyde off-gassing.

Q. And I appreciate your answer, but my question relates specifically to this. It may increase formaldehyde off-gassing. I understand that's your opinion. But that increase in off-gassing, you can't tell me whether that results in any increase in concentration in the living quarters of the unit, correct?

A. Well, if it's drawing in even 1/10th part per billion more than is already in the unit, remember, we've got a vapor barrier on the inside, and we're bringing in more air than we're expelling from the attic.

So to the extent that we have off-gassing in the attic or the ceiling,

> even if 1/10th of a billion -- same thing with mold.
>      If we equate it to mold, when your system is operating under negative pressure, it's drawing in the hot, humid contaminants from the outside, whether it's mold, whether it's sulfur gases, whether it's formaldehyde gases, whatever is around the envelope of that building, that's what is going to be drawn into the building.
>    Q.  All right.  But the actual impact on air quality, you can't tell me?
>    A.  I can't quantify.
>    Q.  Right.  And there's a way to test how the formaldehyde level in this trailer would be impacted by the operation of either the heating or air-conditioning system, isn't there?
>    A.  That's beyond the scope of my expertise.
>    Q.  Did you ever ask Bill Scott, "Isn't there a way for us to test how the operation of the air-conditioning system affects formaldehyde concentration in this trailer?"
>    A.  No, I did not.  I had very little interaction with Bill Scott.

See Ex. B, Deposition of Al Mallet, dated 1/12/09, p. 164-68.

Plaintiff's failure to measure the alleged increased rate of formaldehyde off-gassing should preclude him from being able to offer this animation at trial. He has done nothing to substantiate the factual underpinnings necessary to support the proffered animation.

The animation also presents the argument that moisture, in the form of humidity, was present inside the wall cavities.[6] This portion of the video is used to support plaintiff's experts' assertion that negative pressure existed inside the unit. This negative pressure would have allegedly caused

---

[6] See Exhibit A at 8:20 mark.

"contaminants" to be pulled inside the unit. *See* Ex. C, expert report of E. Ritter, p. 7. Ervin Ritter, plaintiff's engineering expert, noted in his report that, "With a negative air pressure there is a risk of having condensation form in the walls, roof or floor cavities. Evidence of moisture in the walls was found." *Id.* Yet, at his deposition, Ritter could not identify any photos demonstrating condensation in the wall, floor, and ceiling cavities. He testified:

> Q. You say that "with a negative air pressure, there is a risk of having condensation form in the walls, roof or floor cavities."
> Can you point me to the photograph that demonstrates condensation forming in the wall?
> A. No, I cannot.
> Q. Can you point me to any photograph that demonstrates condensation forming in the floor cavity?
> A. No, I cannot.
> Q. Can you point me to any photograph that demonstrates condensation forming in the roof compartment?
> A. No.
> Q. Is there any other evidence that you have of condensation forming in those areas while Mr. Wright lived in this unit?
> A. No.

Deposition of E. Ritter, p. 68-69, attached as Ex. D.

The animation also suggests that the unit would have become hotter and more humid due to the alleged problems with the duct work and insulation installed in the unit. However, Ritter even admitted that he has no concrete evidence that the A/C system could not control the temperature and humidity inside the trailer:

> Q. You mention in here that one of the problems that you would expect to

> encounter using R-8 insulation for the walls, ceiling and floor is that during particularly hot days, the air conditioner in this unit would not be able to properly control for temperature and humidity, correct?
> A. That is correct.
> **Q. Do you have any evidence that in this unit, in August, in Melville, Louisiana, that the air-conditioning system did not control either temperature or humidity in the interior living spaces?**
> **A. Not in Melville, Louisiana.**
> **Q. Do you have any evidence that while Mr. Wright resided in this unit, that the air-conditioning system was not capable of controlling for temperature and humidity?**
> **MR. D'AMICO:**
>   **Object to the form.**
> **THE WITNESS:**
>   **No.**
> EXAMINATION BY MR. BONE:
> Q. And your answer was "no." Is that correct?
> A. That is correct.

Deposition of E. Ritter, p. 69-70, attached as Ex. D (emphasis added).

In short, plaintiff has not presented the necessary evidence and data to support the version of events depicted in his animation. Accordingly, plaintiff can offer no proof that the proffered animation bears a "substantial similarity" to the objective evidence established in this case. Consequently, it must be excluded.

In addition to its lack of scientific support, plaintiff's animation is in conflict with evidence provided by *his own witnesses*. Plaintiff's fact witnesses have testified that the plaintiff actively ventilated his unit. Numerous witnesses – including plaintiff's mother, sister, temporary roommate, and future wife – have testified that plaintiff regularly left the trailer's windows open. Plaintiff's

mother, Bobbie Wright, visited her son in the trailer on numerous occasions and testified the windows stayed cracked:

> Q. Would you ever open the doors and windows of the unit to get some air inside of the trailer?
> A. Open the windows? Yeah, the windows always stayed cracked.

Ex. E, Deposition of Bobbie Wright, p. 195

Michelle Wright, plaintiff's sister, confirmed that the windows were open when she visited plaintiff:

> Q. How about the windows, were they cracked?
> A. They was cracked.
> Q. Was that consistent throughout the whole time you were in the trailer?
> A. Yes.

Ex. F, Deposition of Michelle Wright at p. 12.

Nicole Dison, who lived with plaintiff from March to November of 2006, testified that plaintiff always kept the windows and doors open:

> Q    Okay. When you cooked in the trailer, did you ever raise the windows?
> A    The windows, we always had the windows up.
> Q    I'm sorry. "We always" -- I'm sorry.
> A    Me and Lyndon, we always had the windows up. When we were sitting in there watching TV or whatever, we would have the windows up.
> Q    When you said "the windows" --
> A    The window that's on this side by the sofa and they have a window that's over here by -- that would be by the table. So we would have both windows up.
> Q    My recollection is that there are five windows in the trailer, all of which can be made up and down. Are those the only

| | |
|---|---|
| | two you remember opening or did you open all five of them? |
| A | I only opened up them two. I never went in the bedroom. |
| Q | Okay. So I'm going to eliminate the bedroom windows. And you said you always had -- |
| A | Always had the front door open. |
| Q | Always had the front door open? |
| A | And the two windows up. |
| Q | And the two windows up. Why is that? |
| A | We just used to sit up there and it didn't make no sense to run the air conditioner all day. We just used to just sit in the front and watch TV or whatever or we were sitting at the table eating and we always had the window open or the front door open. |
| Q | You had the windows all the way up? |
| A | No, we would have them cracked up some. |
| Q | But you had them open, both windows open? |
| A | Uh-huh (affirmative response). And the front door. |
| Q | Always both? |
| A | Uh-huh (affirmative response). |
| Q | And always the front door open? |
| A | Right. |
| Q | So there was a lot of ventilation? |
| MR. AHLQUIST: | |
| | Object to the form. |
| EXAMINATION BY MR. GIEGER: | |
| Q | Right? |
| A | Yeah. |

Ex. G, Deposition of Nicole Dison, p. 59-61.

Tyshone Marsh, plaintiff's current fiancé, clearly and unequivocally testified that, throughout the plaintiff's entire occupancy of the trailer and throughout all four seasons, she always saw the windows and door open when she visited him:

> Q    When you and Lyndon were in the trailer during the day, did you open the windows and the doors?
> A    Yes
> Q    Okay. Every time?
> A    Well, when I got there, his windows used to be open.
>     *        *        *
> Q    Okay. But you said when you came to the trailer, the windows and door were always open?
> A    Uh-huh (affirmative response).
>     *        *        *
> Q    Okay. But on all those occasions when you came to the trailer in '06, '07 and '08, Lyndon was there and the windows and door were open, right?
> A    Uh-huh (affirmative response).
> Q    Every time?
> A    Yes.
>     *        *        *
> Q    So every time you came to the trailer, those two windows were open?
> A    Yes, and the door.
> Q    And the front door was open, too?
> A    Uh-huh (affirmative response).
> Q    Every time?
> A    Uh-huh (affirmative response).
> Q    Do you know why?
> A    No, sir. I don't know why.
> Q    So you came there during the summer, the spring -- the spring, the summer, the winter and the fall? All four seasons you were there in '06, '07, '08, right?
> A    Uh-huh (affirmative response).

>  Q    And every time you went, those two windows and that door were open?
>  A    Uh-huh (affirmative response).

Ex. H, Deposition of Tyshone Marsh, at p. 82-86

These four witnesses represent every witness deposed in this matter who visited the plaintiff's trailer and observed firsthand the conditions of Wright's occupancy. Their testimony is in accord – the plaintiff kept his windows open.[7] Plaintiff's animation neither references nor depicts the facts established by this testimony. Instead, the animation depicts (1) closed windows and (2) formaldehyde being trapped inside the living area and re-circulated by the air conditioning system. This is simply not an accurate depiction of Wright's use of the trailer. The animation fails the "substantially similar" test and should be excluded.

Even assuming, *arguendo*, the animation were supported by the facts of the case, which is denied, it should still be excluded as the animation' substantive value, if any, is far exceed by the risk of undue prejudice. Plaintiff's animation, which plays more like a settlement presentation than an actual scientific analysis of the facts at issue, depicts the Wright unit as an oven, in which heat, humidity and formaldehyde collect. All products containing urea-formaldehyde are red, and the same color is used to highlight the seams in the unit where plaintiff alleges formaldehyde entered the cabin. Red arrows are used throughout the exhibit to display the pathways by which formaldehyde traveled into the cabin. Perhaps most egregiously, the final scenes of the animation depict the cabin engulfed in a thick red fog. At the close of the video, the trailer is shown from the exterior, contrasting the

---

[7]In addition, plaintiff's expert Paul Lagrange tested plaintiff's trailer and concluded that the trailer was naturally well-ventilated. The trailer had 1.374 natural air changes per hour, which, in laymen's terms, meant that "100 percent of the air, the cubic volume of air that's inside of that trailer exchanges every – approximately every 44 minutes." Ex. I, Deposition of LaGrange p. 79.

pristine white exterior with this thick red fog visible through each of the windows of the unit. This imagery is of no probative value, is highly prejudicial, and is not corroborated by the testimony. Accordingly, the animation must be excluded.

 Finally, putting aside the clear factual inaccuracies, the animation is unnecessarily duplicative of the voluminous direct evidence collected during the month of destructive analysis and testing. As this Court is well aware, the parties engaged in extensive testing of this unit and have not only thousands of photographs but also video which depicts nearly every square inch of this unit. These photographs are a far more accurate depiction of the condition of the unit as well as the materials of construction. Given the scope and breadth of destructive examination of this unit, there is no need to rely on an animation to depict that which the parties, and their respective experts, can discuss via direct photographic and video evidence. The substantive value of plaintiff's animation is therefore greatly outweighed by the potential prejudicial effect of its inaccurate portrayal of the physical evidence and conditions within the unit. As there is ample evidence in this matter that accurately depicts the materials of construction, the configuration of the unit, and its condition at the time of inspection, plaintiff's proffered animation should be excluded.

 Finally, given the nature of animation evidence and the fact that opposing counsel does not intend to call the creator of the animation as a witness, cross-examination will not be a sufficient method for Forest River to examine the multiple inaccuracies contained therein. This exhibit appears to be based upon the testimony of multiple witnesses and experts, including the plaintiff's experts on wood science, building science, and engineering. Forest River does not have the opportunity to attack these deficiencies through one vigorous cross-examination. Rather, Forest River will be forced to address its points in piecemeal fashion, thereby substantially diluting the effectiveness of any cross-

examination. Because the danger of unfair prejudice is substantial, and because defendants have little ability to address all the factual inaccuracies with the presenting witness, the animation should be excluded in its entirety.

## CONCLUSION

Plaintiff's computer-generated animation is inaccurate and misleading, and the information sought to be depicted therein can be demonstrated through use of direct photographic and video evidence. For these reasons, Forest River respectfully requests that the Court enter an Order excluding such animation.

Respectfully submitted,

/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (La. Bar Roll No. 6154)
JASON D. BONE (La. Bar Roll No. 28315)
CARSON W. STRICKLAND (La. Bar Roll No. 31336)
GIEGER, LABORDE & LAPEROUSE, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
*ATTORNEYS FOR FOREST RIVER, INC.*

## C E R T I F I C A T E

I hereby certify that on the 9th day of February, 2010, a copy of the foregoing Memorandum in Support was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone
JASON D. BONE