to increase the ventilation rate of the THU by installing outdoor air on the AC system.

The onsite activities by LBFG and the plaintiffs occurred during a time period that the outdoor air conditions measured and recorded by LBFG were consistent with summertime conditions (i.e. warm, humid climate conditions) for Louisiana (refer to **Appendix B-1**).

## III. Review of Expert Report by Paul LaGrange

**Discussion**

Paul LaGrange states that the trailer is excessively leaky and that this leakiness causes excessive air infiltration, which, in turn, creates elevated indoor relative humidity (RH) in the indoor space and moisture condensation in exterior wall cavities. He also states that the AC system is oversized and, therefore, does not adequately control indoor RH. LBFG's testing reveals that the natural infiltration rate of this trailer falls at the lower end of typical residential infiltration rates, that the AC system is ideally suited to control of indoor RH, and that indoor RH was well-controlled during a period of typical hot, humid summer weather.

LaGrange also states that the trailer should have been made as tight as possible. He also states that the trailer will not then have sufficient infiltration or ventilation to properly dilute indoor pollutants (from occupants and materials), and, therefore, the AC system should have been installed with filtered outdoor air (fresh air). LBFG demonstrated that making the trailer "as tight as possible" and then having to rely on mechanical ventilation (filtered outdoor air) can be a problem for occupants. LBFG's authoritative documentation states that residential occupancies in the southern portion of the United States have historically relied upon natural infiltration to provide needed ventilation. LaGrange claims that natural infiltration is not an appropriate means for providing necessary ventilation of the trailer. LBFG's authoritative sources confirm that natural infiltration has been and continues to be widely used as a source for ventilation. Every residential occupancy has windows that open so that ventilation can be provided to the occupants.

LaGrange states that the air leakage of the duct system draws humid air and contaminants into the trailer and contributes to poor indoor air quality. LBFG's analyses demonstrate that the dominant return-side leakage creates positive air pressure in the trailer, which advantageously controls direction of air flow, pushing dry indoor air outward through exterior wall cavities and helping to keep those interstitial cavities dry. Furthermore, the humidity that is drawn into the return leak then passes over the cold cooling coil so that the water vapor contained in this infiltrating air flow is stripped away prior to its entry into the trailer. Finally, LBFG found that there was no evidence of mold growth in the ceiling space and that moisture and mold accumulation that occurred in the wall cavities is associated with rainwater intrusion.

LBFG calculations have revealed that there is a series of mistakes in LaGrange's analysis of test data and mistakes related to air infiltration and the ventilation requirements of ASHRAE Standard 62.

Failure to correctly analyze the data and the misinterpretation of the results has caused claims that are inaccurate regarding the quality of the indoor environment.

**Envelope Air Leakage**

LaGrange states that "This trailer is very leaky…The blower door test showed that the air changes per hour in the natural state were extremely high." LaGrange performed a blower door test, a test where a very large fan is installed into the front door of the trailer to pull air from the trailer. The test result was 181 CFM50. This means that when the trailer was depressurized to an extreme level (50 pascals), the air flowing into the trailer was 181 cubic feet per minute (cfm).

Since the trailer does not normally operate at 50 pascals, this test result has to be modified to estimate natural infiltration, which is defined as the amount of air that infiltrates into the trailer when exposed to normal wind and temperature effects. Various formulas are available to calculate the natural infiltration rate based on the blower door test result.

LaGrange calculates that the natural infiltration rate for this trailer would be 33 cfm (this is also expressed as 1.374 air changes per hour). While his report states that "This calculation was done through Energy Gauge USA software v.2.5," his infiltration calculation differs from what Energy Gauge USA actually says by a factor of five. When the LaGrange blower door test result (181 CFM50) is input to the program, the Energy Gauge USA software provides an answer of 6 cfm or 0.23 air changes per hour. (See **Appendix E** for a more detailed discussion of these calculations.)

According to Chapter 26.16 of the ASHRAE Fundamentals Handbook (2001), "typical infiltration values in housing in North America vary by a factor of 10, from tightly constructed housing with seasonal average air exchange rates of about 0.20 air changes per hour (ACH) to loosely constructed housing with air exchange rates as great as 2.0 ACH." Based on this information and upon the fact that Energy Gauge USA estimates 0.23 ACH for this trailer, it is evident that this is not "a very leaky trailer," as stated.

**Need for Outdoor air**

LaGrange states on page 16 of his report that ASHRAE claims the following: "Buildings should be as tight as possible and then vented mechanically." He does not acknowledge natural infiltration as an appropriate source of ventilation air especially for residential trailers. The International Residential Code (IRC 2000), which LaGrange references numerous times in his report, defines ventilation as "The natural or mechanical process of supplying conditioned or unconditioned air to, or removing such air from, any space." It is understood that IRC approves of natural ventilation, which of course does not include filtered air. Additionally, the ASHRAE Fundamentals Handbook (2001) states (in Chapter 26.18): "Traditionally, residential ventilation has been provided by natural ventilation and infiltration. Sherman and Matson (1997) showed that most of the older building stock is sufficiently leaky that infiltration alone can meet the minimum requirements of ASHRAE Standard 62." Furthermore, nearly 100% of homes in the Gulf region of the United States depend almost exclusively upon natural infiltration to meet ventilation needs. (See **Appendix E** for additional discussion of ventilation.)

There are considerable risks in making a building (or trailer) "as tight as possible." These risks relate to the fact that when the envelope is made too tight, there will be periods when the ventilation provided to the space is far below that which is needed, creating air quality issues or producing elevated indoor

RH. These problems can occur under the following circumstances. 1) If the filter for the OA is not regularly cleaned or replaced, then the ventilation air flow will be restricted or even stopped and the quality of the indoor air could become problematic. 2) During periods of low cooling or heating load, the AC will run very little and therefore the ventilation air will not be provided, and indoor air quality will suffer. 3) If, as an alternative, the AHU fan control is set to ON, then indoor RH will increase to 65% to 80% (during hot, humid weather) because moisture on the coil evaporates and the OA enters the trailer untreated when the compressor is OFF. (See **Appendix E** for additional discussion of problems associated with the tight envelope and filtered OA that LaGrange recommends.)

### The AC System Sizing and Humidity Control

LaGrange asserts that the AC system serving this trailer is oversized by 28% leading to short-cycling, poor RH control, and mold growth. The basis of his claim is a cooling load calculation performed by LaGrange using "Rhvac – Residential and Light Commercial HVAC Loads" by Elite Software Development. For New Orleans, he found the cooling load for this trailer was 11,865 Btu per hour. The AC system, as indicated by manufacturer literature, has a cooling capacity of 15,000 Btu per hour.

The unit provided by Forest River meets exactly the FEMA specification (refer to **Appendix B-1** and **Appendix D-9**) According to the FEMA Model Travel Trailer Procurement Specifications (Dated July 14, 2005), the Air Conditioner is to be "15,000 BTU Ducted Roof A/C wired and connected with the furnace." Beyond meeting exactly the FEMA specification, this AC system is ideally suited to providing good humidity control in this trailer, for the following reasons (refer to **Appendix E** for a more detailed discussion of why the AC system is ideally suited to the control of indoor RH).

- The system has two fan speeds. The cooling capacity of the AC system on the lower fan speed will be considerably less than 15,000 Btu per hour.
- On the lower fan speed, the system sensible heat ratio (SHR) will be lower, meaning that the unit will dehumidify very effectively.
- Measurements performed by LBFG found that the cooling coil and supply air were cold, which means that the unit removes moisture effectively from the room air.
- Recorded temperature and humidity on August 19-21, 2009, found that the AC system maintained indoor RH in the range of 32% to 47% for a period of 21 hours (for the period 1 PM on August 19 through 9:30 AM on August 20, at which time blower door and tracer gas decay tests interrupted the AC system operation). In other words, even with the operation of the AC system interrupted, the AC system still provided excellent dehumidification of the trailer (Refer to **Appendix B-1 and B-2**).

Based on this information, it is clear that this AC system is appropriately sized and well-suited to controlling humidity in this trailer.

**Duct Leaks Increase Air Infiltration**

LaGrange states that the air leakage of the duct system draws humid air and contaminants into the trailer and contributes to poor indoor air quality. LaGrange fails to consider a number of factors when making this claim:

- Duct leakage is actually providing a significant boost to the THU ventilation rate. When the AC fan is operating, the THU ventilation rate increases from about 7 cfm to about 22 cfm, thus in-line to satisfy the requirements of ASHRAE Standard 62.2.
- Return leaks are greater in this THU than supply leaks. Both LaGrange and LBFG found that the THU operated at positive pressure when the AC fan was operating. This positive air pressure in the THU creates the benefit of controlling the direction of air flow, pushing dry indoor air outward through exterior wall cavities, and helping to keep those interstitial cavities dry.
- Return leaks are drawing air in part from the ceiling space, so that air that may be leaking from supply ducts would be captured by the return leak and brought back into the space.
- Humidity that is drawn into the return leak then passes over the cold cooling coil so the water vapor contained in this infiltrating air flow is stripped away prior to its entry into the THU.
- There is no physical evidence of condensation or mold growth in the ceiling space, moisture and mold accumulation that occurs in the wall cavities is associated with rainwater intrusion. (See **Appendix E** for a more detailed discussion of the interaction of duct leakage with the THU and why duct leakage has not contributed to moisture and mold problems in this THU.)

**LaGrange Calculation and Analysis Mistakes**

LaGrange failed to correctly analyze the data, misinterpreting the results which led to inaccurate claims about the quality of the indoor environment. For example, his calculation of natural infiltration is mistaken by a factor of five. He states that his calculated natural infiltration rate of 1.374 air changes per hour came from *Energy Gauge USA v.2.5*. However, when LBFG inserted LaGrange's blower door test result (181 CFM50) into the *Energy Gauge USA* software, the software predicts a natural infiltration rate for New Orleans of 0.23 air changes per hour. This value is in agreement with other research-based methods for estimating natural infiltration from a blower door test. Furthermore, LBFG performed a tracer gas decay test on this trailer and found a natural infiltration rate of 0.30 air changes per hour.

LaGrange also states that his calculated natural infiltration rate of 1.374 air changes per hour came from a specific equation which he presents in his report. He refers to using a value W (weather factor) from ASHRAE Standard 136. When LBFG looked up the weather factor for New Orleans from Standard 136 and input LaGrange's blower door test values into that equation, the calculated value was greater than 78 air changes per hour. This yields an unrealistic result.

Looking at all of the estimated and measured natural infiltration rates discussed here and in **Appendix E**, it appears that the natural infiltration rate for this trailer would be expected to be in the 0.2 to 0.3 ach range during most of the year. LaGrange's estimate of 1.374 ach is higher than the real natural infiltration rate of this trailer by a factor of five and is far out of line with the more widely used

calculations, as well as the measured natural infiltration. The reason that this mistake is important is that he states that this trailer has excessive air leakage, and that this air leakage is creating a number of problems.

LaGrange states on page 16 of his report that "Buildings should be as tight as possible and then vented mechanically. The standard for good indoor air quality (according to ASHRAE) is a full change of indoor air every 2.8 hours." The source for this statement, he reports, is ASHRAE. As it turns out, this air change every 2.8 hours is equal to the 0.35 air changes per hour (ach) required by ASHRAE Standard 62 prior to 2004.[5] What LaGrange fails to mention is that the standard requires 0.35 ach or 15 cfm per person, whichever is greater. For this trailer, then, the ventilation requirement would not be 0.35 ach but rather 1.24 ach, or greater depending upon the number of bedrooms that one counts in this trailer. LaGrange is also mistaken because the ASHRAE Standard changed in 2004, so this was not the current standard at the time of the trailer's construction. (Refer to **Appendix E**, especially the Envelope Air Leakage section, for a more detailed discussion of the calculation and analysis errors committed by LaGrange.)

**Infrared Thermal Imaging and Moisture Meter Measurements**

Mr. LaGrange, as well as Mr. Mallet, performed Infrared Thermal Imaging of surfaces inside the trailer. Both plaintiff expert witnesses performed this testing during normal operation. Mr. LaGrange also performed this testing during the negatively-pressurized blower door test to identify thermal or air barrier irregularities.

Mr. LaGrange was observed taking moisture meter measurements; however, these results were not included in his report. If thermal imaging is used as part of a moisture assessment, it is used to identify areas with temperature differences that may require further assessment using a moisture meter.

LBFG performed infrared thermal imaging and moisture meter testing within the THU on various surfaces. Infrared Thermal Imaging results indicated temperature differences in several areas; however, most of these areas did not indicate elevated moisture levels within the materials. The areas that did indicate elevated moisture levels within the materials included areas affected by rainwater due to inadequate maintenance and physical damage and not due to outside humidity entering the THU. This included the following areas:

- Master Bedroom Wall (below window and opposite to entry door)
- Corner Master Bedroom (bottom of wall intersection behind night stand, opposite to trailer entry door)
- Carpet (stain location in center aisle adjacent to dinette)
- Bathroom perimeter and tub walls (up to approximately two inches above finish floor)

Mr. LaGrange documented incorrectly the thermal and air barrier irregularities in his report but failed to provide a comparative moisture assessment associated with the absence of condensation-related damage. Based upon his documentation, Mr. LaGrange cannot say that the areas he documented

---

[5] ASHRAE Standard 62-1999

through the infrared thermography were wet. In fact, based upon LBFG's measurements, those areas were not wet.

# IV. Review of Expert Report by Ervin L. Ritter, P.E.

**Discussion**

LBFG's response to the Ervin L. Ritter, P.E., investigation and inspection report (of the temporary housing unit [THU] discussed herein) dated October 1, 2009, is summarized below. Mr. Ritter indicates that his report evaluates the mechanical systems (air conditioning and heating system) in the trailer. Mr. Ritter also indicates that "the construction of the trailer and air conditioning and heating systems was inspected for deficiencies in installation and construction." Mr. Ritter includes discussion on building codes, certifications, installation, unit sizing, product manufacturer instructions, and onsite observations. He also claims that the primary problems with the trailer were the lack of:

- Outside/ventilation to reduce the building of indoor contaminants;
- Inadequate insulation on the air conditioning and heating ductwork;
- Inadequate insulation in walls, roof, and floor; and
- Inadequate vapor barrier in walls and floors to reduce the migration of water vapor into the structure, which causes water damage.

**Building Code Compliance**

The Forest River manufactured THU was required to comply with the procurement construction specifications provided by FEMA. Since the trailers were constructed to Federal Standards for a federally-funded procurement, state and local code compliance, while perhaps of interest, was not obligatory. Written acknowledgement by the City of New Orleans officials confirms that the FEMA THUs were not required to comply with their codes. (Also refer to **LBFG Executive Summary Section II** and **Appendix C-1**.)

**Positive Trailer Pressurization**

Mr. Ritter contends that the air conditioning system did not contain outside air for ventilation and that systems with outside air flush-out contaminants from entering the trailer. Mr. Ritter also contends that outside air tends to stop migration of water vapor in wall, floor, and roof cavities. Mr. Ritter fails to recognize the THU positive pressure test results and the outside air that contributed to the positive pressure (refer to the **Paul LaGrange Report, page 17, and Appendix D-10**). This positive pressure allowed cool, dehumidified air to exfiltrate from the space and outward across the ceiling and building envelope. Also refer to LBFG's responses to both the Paul LaGrange and the Al Mallet expert reports.

**Insulation Performance and Energy Efficiency Considerations**

LBFG testing demonstrated that the air conditioning unit adequately cooled the THU during August summer conditions in Louisiana in spite of differences in thermal resistance of installed ductboard compared to recommendations from the air conditioning unit manufacturer for more thermal resistance. Other plaintiff witness allegations identify inadequate insulation in the heating system and in the walls, roof, and floor. The opinions regarding inadequate insulation relate to energy efficiency considerations and do not impact indoor air quality of the unit.

**Vapor Barriers**

Mr. Ritter fails to recognize the metal siding as a vapor retarder and goes on to state that a vapor barrier would tend to reduce the risk of condensation in the walls. Furthermore, areas that did incur damage are clearly related to rainwater intrusion (not water vapor migration) which resulted from a lack of maintenance by the tenant and maintenance contractor. Refer to the discussion in the executive summary related to identification of damage patterns; refer to the discussion on misplaced wall vapor retarder under Al Mallet and **Appendix D-1** (**Keyed Notes 1 and 2**).

**Duct-board Leakage into Ceiling at Joints and Seams**

Onsite relative pressure testing from the parties in this case individually confirmed that the THU was under a positive pressure relative to outdoors when the air conditioning unit was in operation. LBFG confirmed and quantified through Tracer Gas Testing that return air leakage contributed to this positive pressure (7.0 percent or 15 cfm). LBFG assumes that supply air leakage is less than the return air leakage since the THU was pressurized. Plaintiff's expert witnesses also believed (but never quantified) that supply and return air leakage contributed to the THU positive pressure relative to outdoors (Refer to **Appendix D-10**). This is not uncommon since no air distribution system is airtight. Most importantly, no physical damage in the ceiling occurred because the THU was under a positive pressure relative to outdoors and relative to the ceiling space, or because cool dehumidified air was being pushed into the ceiling space.

**Air Conditioning Unit Sizing**

Mr. Ritter provides a statement in reference to the manufacturer's instruction related to the air conditioning unit sizing and indicates that the instruction gives the appearance that the unit capacity is marginal to be able to maintain a level of space temperature and comfort (refer to **Ritter Report, page 19**). In contrast, Mr. LaGrange (also plaintiff witness) indicates that the unit is more than 28 percent oversized (refer to **Page 54 of 92 of LaGrange Consulting Report**). Neither report provides temperature and relative humidity readings from their testing to document the ability of the air conditioning unit to

maintain space conditions, nor do these identified issues relate to the claim. Finally, it also suggests that plaintiff expert witnesses do not agree on the air conditioning unit sizing.

**Description of Responsibilities**

Forest River was responsible to provide a THU as specified in the FEMA specifications (refer to **Appendix C-1**). LBFG understands that Forest River received these specifications from FEMA and constructed this THU accordingly. LBFG also understands that a maintenance schedule existed for this unit and that maintenance responsibilities were performed by various entities at various times.