UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION: N(5) |
| | | * | |
| This Document Relates to: *Lyndon T. Wright. v.* | | * | JUDGE ENGELHARDT: |
| *Forest River, Inc., et al*, Docket No. 09-2977 | | * | |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FOREST RIVER INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STRIKE THE EXPERT TESTIMONY OF PAUL J. LAGRANGE**

Defendant, Forest River, Inc., (hereinafter "Forest River") respectfully submits the following memorandum in support of its Motion in Limine to Exclude the Testimony of Paul Lagrange:

**I.     Factual Background**

In an effort to address construction and design issues related to the Wright unit, plaintiff retained five experts, all of whom examined the unit during the August 2009 destructive testing. Paul Lagrange was retained to perform a blower door test to assess the air leakage of thermal envelope as well as a duct blaster test to determine the rates of air leakage of supply and return duct work.  He also examined the insulation properties of various sections of the unit and took infra-red photographs in the interior of the unit.  *See generally* Ex. A, expert report of P. Lagrange, submitted 10/2/09.

The other experts retained by plaintiff to examine the unit include Ervin Ritter, P.E., who examined the HVAC system, including issues related to insulation, ventilation, and moisture intrusion. Al Mallet issued a report incorporating the findings of both Lagrange and Ritter, as well as plaintiff's wood products expert, Dr. Smulski, to reach a wide range of conclusions related to the design and construction of the Wright unit. Charles Moore, P.E., was retained to opine on issues related to the jacking and installation of the unit, and Darryl Hicks' report comments on the unit's electrical wiring system.[1]

## II.     Argument & Citation to Authority

### A.     Lagrange's testimony is duplicative, and therefore it should be excluded in its entirety.

Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403 (2008).

This Court has already ruled that, "No duplicative testimony will be allowed. Multiple opinions on the same subject will generally not be admitted, absent prior consent of the Court based on a showing of compelling reasons." (Rec. Doc. 2062, p. 1). Furthermore, several courts have excluded experts who planned to offer cumulative testimony. In *Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 858 (5th Cir. 1973), the plaintiff appealed the district court's exclusion of an expert witness who planned to address the loading and unloading of anchor chains. The U.S. Fifth Circuit

---

[1] Separate *Motions in Limine* will be filed with regard to Ritter, Mallet, Smulski and Moore. Plaintiff has agreed not to call Darryl Hicks at trial, and therefore Forest River will not comment upon the findings of his report.

Court of Appeals rejected the appeal, holding that the plaintiff had qualified two other experts who testified to the proper unloading procedure. *Id*.

Similarly, an Eastern District of Louisiana case would not allow one of the plaintiff's two retained experts to discuss common truck driving practices because the other was already speaking to that issue. *See Young v. Am. Reliable Ins. Co.*, 1999 WL 600393, *3 (E.D. La. Aug. 9, 1999). A Western District of Louisiana decision blocked, as cumulative, two proffered experts in a product liability case from discussing the warnings included in the owners' manual of a rifle that malfunctioned and caused injury, as well as the cause of that injury. *See Matthews v. Remington Arms Co.*, 2009 WL 1220541, *2 (May 4, 2009).

Plaintiff has presented five witnesses to discuss design and construction issues related to the Wright unit. Three of these witnesses – Lagrange, Mallet and Ritter – comment specifically on the HVAC system and temperature/humidity conditions within the unit. As in the prior bellwether cases, Al Mallet utilizes both Ritter's and Lagrange's report to provide a comprehensive analysis of the HVAC, ventilation, insulation, and air quality issues within the Wright unit. *See* Ex. B, expert report of Al Mallet, dated 10/2/09. In reaching his ultimate conclusions, Mallet references and relies upon the underlying test data from Lagrange's blower door and duct blaster testing. Lagrange's report is incorporated in its entirety within the Mallet report and thus is duplicative as to those issues. *Id.* Since neither Lagrange nor Mallet is a trained engineer, neither has any particular expertise with regard to the mechanics behind this testing. The Court should not allow both to testify, as Lagrange's testimony would only be duplicative of Mallet's.

3

**B.     In the alternative, Lagrange's testimony should be limited to the testing performed.**

### 1. Building Code Compliance

A proposed expert witness must first be qualified to testify regarding the issues for which he is offered. *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004). Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked expertise with the specific nature of the claims being litigated. *See Kassim v. City of Schenectady*, 415 F.3d 246, 251 (2nd Cir. 2005) (expert lacked knowledge regarding Arabic translation); *In Re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue).

Even if an expert is qualified, his opinion can be excluded if not reliable. *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). A qualified expert's testimony is only admissible if it is based upon sufficient facts or data, it is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid.702. The reliability inquiry is flexible, and several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, and (4) whether the technique is generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009, p. 4 (Rec. Doc. 2181) *(citing Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). The expert testimony must also be relevant – not only in the way that all testimony must be relevant under Federal Rule of Evidence

402 – but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. Order dated July 15, 2009, p. 4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).

In this case, Lagrange has opined that the construction of the Wright trailer was governed by the International Residential Code (IRC 2000) and New Orleans 2003 Building Code. *See* Ex. A, Expert report of P. Lagrange, p. 75.[2] Before discussing the merits of this opinion, Forest River would first note that this statement is in direct contrast to Lagrange's opinion in the Gulf Stream bellwether. In that case, Lagrange asserted that standards promulgated by ASHRAE ( the American Society of Heating, Refrigerating, and Air-Conditioning Engineers) were the only regulations governing the HVAC systems in travel trailers. *See* Ex. C, Deposition of P. Lagrange, dated 10/26/09, p. 39.[3]

Following the Gulf Stream trial, Lagrange testified that "someone" from the plaintiff's testing team suggested that the New Orleans Building Code applied to travel trailers deployed in New Orleans following Hurricane Katrina. *Id.* at 41. Al Mallet then provided Lagrange with a copy of the City's Building Code. *Id.* at 40-41. After reading the definition of "dwelling" in the Code, Lagrange summarily concluded that, because the definition included both temporary and permanent housing, the Code therefore applied to these travel trailers. *Id.* at 48-49.[4]

---

[2] The New Orleans Building Code incorporates the provisions of the International Residential Code, and therefore, for the purposes of this motion, Forest River will not draw a distinction between the two. Because Lagrange assumed the N.O. Building Code applied, he thus assumed that the IRC applied as well.

[3] Lagrange does not provide any discussion of ASHRAE standards in his reports in this case.

[4] Lagrange admitted that the definition of "dwelling" contains no reference to "travel trailers." *See* Ex. C, Depo. of Lagrange, p. 48.

Forest River asserts that this conclusion is not only unsubstantiated but simply untrue, and Forest River's own experts have confirmed with officials at the City of New Orleans that the various building codes referenced by Lagrange did not apply to travel trailers provided by FEMA in the wake of hurricane Katrina. *See* Ex. D, Report of Liberty Building Forensics Group, dated 10/29/09, p. 16.

Regardless of that fact, Lagrange should not be allowed to testify as to the application of building codes to travel trailers, as he has performed no substantive research to confirm his assertions. Lagrange is uncertain of what training is necessary to determine whether certain codes apply to home construction. *See* Ex. C, Depo of Lagrange, at p. 46-47. He performed no factual or legal research as to whether the Code does in fact apply to FEMA supplied travel trailers or even travel trailers in general. *Id.* at 48. In fact, Lagrange originally thought that the 2003 building codes would have applied to this trailer and had to be corrected by Al Mallet that the 2000 codes applied instead. *Id.* at 41-43. Lagrange made no inquiries as to whether the City actually applied the Building Code to FEMA trailers post Katrina. *Id.* at 49-50. He never reviewed any articles dealing with the application of building codes to the construction of travel trailers. *Id.* at 244-46. Even if one assumes that the Code did indeed apply, Lagrange never inquired as to whether the City waived building code requirements following Katrina. *Id.* at 252.[5]

---

[5] Lagrange also failed to examine the question of whether the FEMA travel trailer procurement specifications required adherence to building codes. Lagrange read the FEMA spec requirement that the units comply with "U.S. regulatory requirements from any governing agency" and assumed that the units were therefore required to comply with these building codes. *See* Ex. C, Depo of Lagrange, p. 58-59.
   However, the FEMA specs make no explicit reference to compliance with any building code. *See* Ex. E, FEMA Specs. Further, Lagrange did not review any of the depositions of various FEMA personnel who discussed the meaning and requirements embodied in the FEMA specs or what the term "industry standard" required. *See* Ex. C, Depo of Lagrange, p. 276-77.
   Finally, on a common sense level, it seems highly unlikely that the FEMA would have required manufacturers to construct units with particular city building codes in mind. These units

In short, Lagrange's conclusion was based on his personal reading and unsupported interpretation of the Code, and indeed the wrong Code at that. *Id.* at 49. *Daubert* and its progeny are targeted at eliminating such speculative testimony. Lagrange is not a trained building permit official, does not know what training is involved in building code regulations, and did no research as to whether the City's Building Code or IRC would have applied or did in fact apply post Katrina. *Id.* at 48-50. Accordingly, Lagrange should be precluded from offering any testimony regarding the Wright unit's compliance, or lack thereof, with regard to any building codes referenced in his report.

### 2. Indoor Air Quality

As discussed above, Lagrange performed two tests – the blower door and duct blaster tests – to determine the air leakage rates in various portions of the Wright unit. Based on these tests, he concluded that leaks in the unit contributed to "poor" indoor air quality within the unit. *See* Ex. A, Lagrange report, p. 76. However, since he lacks expertise in this area and does not have critical data regarding this issue, Lagrange should be prohibited from offering any testimony as to the indoor air quality.

Lagrange is not an architect, engineer, building scientist, nor is he a licensed home inspector or certified indoor air specialist. *Id.* at 283-84. He has no experience in the design or construction of travel trailers. *Id.* at 283.

Further, Lagrange conceded that the most effective way to examine air quality inside a particular space is, not surprisingly, to test the air in that area. *Id.* at 132-33. Lagrange testified:

---

were deployed by FEMA throughout the Gulf Coast region. The trailer manufacturers would have had no way to know where each trailer was to be delivered or what local building codes would have applied.

    Q   In your discussion of findings on Page 18, you talk about the air quality most likely being very poor. Do you have any objective test results regarding the air quality of this trailer?
    A   I did not test for indoor air quality for this trailer. However, the evidence of the air leakage of the shell and of the differential pressures created by duct leakage can only lead you to the understanding that we had some indoor air quality that was poor and affected by the performance of the products installed.
    Q   Well, would you agree with me that the best way to tell that, whether the indoor air quality was poor, would be to test for the presence of these items that you have outlined, test for the presence of VOCs, test for the presence of mold, test for the presence of particulate matter?
    A   Yes.
    Q   Okay. And those tests are in and of themselves the best arbiter of whether the air quality was poor in this unit, correct?
    A   Those are the tests to best determine how well the air quality was inside the trailer, that's correct.
    Q   And you have not reviewed any tests, any of those tests that were done?
    A   No, sir.
    Q   And so because of that, although you may feel that the air quality might have been poor based upon the findings that you generated, you cannot say what the level of formaldehyde was in this particular trailer, for example, could you?
    A   No, sir, I cannot say what the level of formaldehyde was.
    Q   You cannot say that the level of VOCs was inappropriately high in this trailer, can you?
    A   No, sir.

> Q   You cannot say the level of mold was inappropriately high in this trailer, correct?
> * * *
> THE WITNESS:
> No, I cannot.

*See* Ex. C, Deposition of Lagrange, p. 132-34.

Indeed, Lagrange failed to monitor the temperature and humidity inside the unit while the air conditioner was in operation. *Id.* at 54-55. He also has no opinion on the air conditioner's ability to control the temperature or humidity inside the unit. *Id.* at 54-56. Lagrange candidly admitted that he will be unable to offer any testimony as to the humidity levels inside the unit while Wright lived in the trailer. *Id.* at 186-87. Lagrange has never spoken with plaintiff or read his deposition. *Id.* at 218. Thus, while he may claim to have studied the mechanics of the trailer, he never placed any emphasis on how Mr. Wright actually lived in the trailer (i.e., how often he opened the windows, how he operated the HVAC system, etc.).

Therefore, while Lagrange may testify regarding the testing he performed and the results of that testing, he cannot draw any conclusions as to the indoor air quality inside the Wright unit, as such opinions would be based on nothing more than speculation. He does not know what "contaminants" were drawn into to the unit through the HVAC system, nor does he know the impact that the HVAC and windows had on regulating temperature and humidity inside the unit. Thus, Lagrange should be precluded from offering testimony or other evidence relative to the indoor air quality of the unit at issue, including but not limited to the levels of any chemical, particulate or microbe that were allegedly present.

### III. Conclusion

Forest River requests that the Court exclude the testimony of Paul Lagrange, or, in the alternative, limit his testimony in the manner described above.

Respectfully submitted,

/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (La. Bar Roll No. 6154)
JASON D. BONE (La. Bar Roll No. 28315)
CARSON W. STRICKLAND (La. Bar Roll No. 31336)
GIEGER, LABORDE & LAPEROUSE, LLC
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana  70139-4800
Telephone:  (504) 561-0400
Facsimile:  (504) 561-1011
ATTORNEYS FOR FOREST RIVER, INC.

### **C E R T I F I C A T E**

I hereby certify that on the 9th day of February, 2010, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone