```
00001
   1           UNITED STATES DISTRICT COURT
   2           EASTERN DISTRICT OF LOUISIANA
   3
   4 IN RE:  FEMA TRAILER       MDL NO. 1873
   5 FORMALDEHYDE PRODUCTS      SECTION "N"(4)
   6 LIABILITY LITIGATION       JUDGE ENGELHARDT
   7
   8 This document relates to:  Lyndon T. Wright
   9         v. Forest River, Inc., et al
  10            Docket No. 09-2977
  11               *   *   *
  12
  13      Videotaped Deposition of PAUL J.
  14 LaGRANGE, 256 Calumet Drive, Madisonville,
  15 Louisiana 70447, taken at the Law Offices of
  16 Frank J. D'Amico, Jr., 622 Baronne Street,
  17 New Orleans, Louisiana 70113, on Monday, the
  18 26th day of October, 2009.
  19
  20 REPORTED BY:
  21      JAMES T. BRADLE, CCR
          PROFESSIONAL SHORTHAND REPORTERS
  22      (504)529-5255
  23 VIDEOGRAPHER:
  24      MICHAEL BERGERON
          PROFESSIONAL SHORTHAND REPORTERS
  25      (504)529-5255
```

```
00039
   1 initial walk-through inspection?
   2      A    No, sir.
   3      Q    You gave a deposition in July of
   4 2009, July 1st, 2009, in the Gulf Stream
   5 case, correct?
   6      A    That is correct.
   7      Q    At that time, it was your
   8 testimony that apart from the ASHRAE
   9 standard, you knew of no other standard that
  10 applied to the construction of a travel
  11 trailer; is that true?
  12      A    Specifically to the heating and
  13 cooling equipment?
  14      Q    Correct.
  15      A    That's true.  That's what I
  16 testified then.
  17      Q    Right.  You also testified that
  18 you knew of no other standard that applied
  19 to their construction; is that true?
  20      A    In reference to recreational
  21 vehicles, that's correct.
  22      Q    Okay.  When you authored this
  23 report -- And just for the sake of clarity,
  24 when did you author the final report in this
  25 case?
```

```
00040
   1        A     Sometime in the middle of
   2 September.  I believe the deadline was due
   3 September 23rd.
   4        Q     Did you submit a draft report to
   5 anyone before submitting this final report
   6 marked as Exhibit 4?
   7        A     I did.
   8        Q     Okay.  To whom did you submit the
   9 draft report?
  10        A     To Al Mallet and also Aaron.
  11        Q     Did the draft report that you
  12 submitted contain any statements regarding
  13 the New Orleans Building Code?
  14        A     I don't recall.
  15        Q     Okay.
  16        A     It contained statements in
  17 reference to building codes.  I don't know
  18 if it contained statements in reference to
  19 the New Orleans Building Code.
  20        Q     Is it true, Mr. LaGrange, that the
  21 New Orleans Building Code's application was
  22 suggested to you by someone else?
  23        A     The building codes were reviewed
  24 as we were testing and doing the
  25 deconstruction of how we're going to go
```

```
00041
    1 ahead and work with this case and what data
    2 we found and how we were going to present
    3 it, yes.
    4       Q    So the answer to my question, did
    5 someone else provide to you the New Orleans
    6 Building Code?
    7       A    Yes.
    8       Q    Who was that?
    9       A    Al Mallet.
   10       Q    Do you know if the suggestion that
   11 the New Orleans Building Code was applicable
   12 to travel trailers came from the attorneys
   13 and not from Mr. Mallet?
   14       A    I do not know that.
   15       Q    We would have to ask Mr. Mallet?
   16       A    Presumably, yes.
   17       Q    From the draft report you
   18 submitted, were substantive changes made
   19 before the final report was submitted?
   20       A    There were.
   21       Q    What changes were made to the
   22 draft report before it was finalized?
   23       A    The most substantive change is I
   24 was referring to the 2003 building codes,
   25 and it was suggested to me that it should be
```

00042
 1  applied to 2000 building codes, so I had to
 2  go back and research the differences between
 3  the '03 and the 2000 code.
 4       Q    Now, you were referencing the 2003
 5  building code.  Which 2003 building code
 6  were you referencing?
 7       A    The International Residential Code
 8  as well as the references of that code that
 9  refer to the Energy Efficiency Standards.
10       Q    And you had been referencing 2003
11  and someone told you you needed to reference
12  2000?
13       A    Al Mallet told me that, yes.
14       Q    Any other substantive changes to
15  the body of Exhibit 4 before it was
16  finalized?
17       A    Exhibit 4, meaning the report?
18       Q    Yes, sir.  Any substantive changes
19  to your draft report before it was finalized
20  into Exhibit 4?
21       A    No, sir.
22       Q    You mentioned that you looked
23  through and tried to make determinations as
24  to where there were differences between the
25  2000 and 2003, I will call it the IRC, the

```
00043
 1 International Residential Code, correct?
 2     A    That's correct.
 3     Q    Okay.  What differences, if any,
 4 did you find?
 5     A    As the code evolves to the next
 6 generation, there are some additional
 7 clarifications.  For instance, there's a
 8 portion of the code that is referenced in
 9 the report of air infiltration, of how those
10 leaks should be addressed, and as the codes
11 develop and evolve into the next generation,
12 they become a little more specific.
13          If you looked at today's 2009 code
14 and you would look at the very long list of
15 items that must be air sealed, it's much
16 longer today than it was back in 2000.
17     Q    Okay.  But specifically with
18 respect to what you did in this case,
19 finalizing your report and accepting
20 Mr. Mallet's proposed change, which was that
21 you use a different standard, you use the
22 2000 standard rather than the 2003 standard,
23 what was the difference that prompted him to
24 make that suggestion to you?
25     A    Oh, there was very little
```

00048
```
 1 that first made the assertion that it would
 2 apply to the construction of a travel
 3 trailer?
 4      A    Someone on our expert team, one of
 5 our reviews at the end of the testing days
 6 mentioned that the building codes referenced
 7 temporary housing, and I went back
 8 researched it, and the person was correct.
 9      Q    Does the word -- Where the
10 reference is made to temporary housing, is
11 the word "travel trailer" ever used?
12      A    I will have to look.  (Reviewing
13 documents).
14           The word "travel trailer" is not
15 used, but the word "dwelling" is used, and
16 it defines "dwelling" as "a means of living,
17 whether it's temporary or permanent."
18      Q    In the definition of "dwelling,"
19 is the word "travel trailer" used?
20      A    No, sir, it's not.  However, as it
21 defines what a dwelling is and how a
22 dwelling is being used, as these trailers
23 were being utilized under the FEMA
24 procurement, it certainly meets that
25 definition in my opinion.
```

```
00049
 1      Q    In your opinion.  And your opinion
 2 comes from reading the code, correct?
 3      A    That is correct.
 4      Q    And determining in your own mind
 5 that it applied to the construction of this
 6 travel trailer?
 7      A    That is correct, yes, sir.
 8      Q    Did you ever attempt to confirm
 9 whether the New Orleans Building Code was
10 ever applied to a travel trailer?
11      A    You mean did I research law and
12 see if there was an application for it?  No,
13 I did not.
14      Q    Did you do anything to determine
15 whether the New Orleans Building Code was
16 ever applied to a travel trailer?
17      A    The New Orleans Building Code is
18 to apply to a dwelling, and this travel
19 trailer, in its intended use as far as the
20 FEMA procurement is concerned, meets that
21 definition.
22           So besides doing my own research
23 of reading it and making that determination,
24 that's the only thing I have done.
25      Q    Okay.  In your opinion, it meets
```

```
00050
 1 the definition, correct?
 2     A    That is correct.
 3     Q    You have done nothing as we sit
 4 here today to determine whether in the City
 5 of New Orleans' opinion the New Orleans
 6 Building Code applies, have you?
 7     A    No, sir.
 8     Q    As we sit here today, do you
 9 intend to offer the opinion to the jury that
10 the New Orleans Building Code did apply to
11 this travel trailer?
12     A    To this temporary housing?  Yes,
13 sir, I do.
14     Q    No, to this travel trailer.
15     A    This trailer wasn't doing much
16 traveling.  It was permanently mounted and
17 connected to plumbing and electricity.  You
18 can play with words all day long, Counselor.
19 It was a dwelling as far as the building
20 code is concerned, and that is my opinion
21 and that's where I will stand.
22     Q    All right.  Let me strike that as
23 non-responsive.
24          My question is very simple.  Do
25 you intend to offer to the jury the opinion
```

```
00054
   1      Q    You don't know where you made that
   2 statement?
   3      MR. AHLQUIST:
   4           He's asking you to show him where
   5 he makes that statement.
   6 EXAMINATION BY MR. BONE:
   7      Q    Let's look at Page 54.
   8      A    Okay.
   9      Q    Okay.  In the sections where you
  10 discuss the sizing of the HVAC, you say that
  11 "frequent cycling of the HVAC system does
  12 not allow it," I assume referring to the AC
  13 system, "to remove humidity properly and
  14 shortens the life of the equipment,"
  15 correct?
  16      A    That's correct.
  17      Q    Okay.  With respect to this unit,
  18 did you find that the HVAC system did not
  19 control humidity properly?
  20      A    I didn't test for relative
  21 humidity over an extended period of time,
  22 whether that's a true statement or not.
  23 However, the system is oversized as per the
  24 Manual J load calculation.
  25      Q    Let me move to strike everything
```

00055
```
 1 after the initial statement.
 2            You did not test for relative
 3 humidity over time, correct?
 4      A    I did not.
 5      Q    And in order for you to say that
 6 the AC system in this unit did not properly
 7 control relative humidity, you would have to
 8 do that; isn't that a true statement?
 9      A    Before I would make a statement
10 like that, I think it would be necessary
11 that I would track relative humidity and
12 temperatures over an extended period of time
13 before making that statement, that is
14 correct.
15      Q    So if called upon to testify, you
16 could not offer the opinion that the air
17 conditioner in this particular unit did not
18 control the relative humidity properly over
19 time, correct?
20      A    That's a correct statement.
21      Q    Let's talk about temperature.
22 With respect to a statement that the AC
23 system in this unit did not properly control
24 temperature over time, you would have to
25 measure the temperature over time, correct?
```

00056
```
 1       A     In individual rooms, that is
 2 correct.
 3       Q     Did you take any of those
 4 measurements?
 5       A     I took the measurements of
 6 temperature and relative humidity as per the
 7 protocol for blower door, but not over a
 8 data logger over time.
 9       Q     Because you don't have any
10 information to demonstrate the temperature,
11 relative temperature indoors over time, you
12 cannot offer the opinion that this
13 particular AC unit was incapable of
14 controlling temperature over time; is that
15 true?
16       A     That is true.  Nor do I remember
17 making that statement in this report.
18       Q     Have you reviewed the FEMA
19 specifications for this particular unit?
20       A     Yes, sir, I have.
21       Q     Anywhere in the FEMA
22 specifications does it say that the unit is
23 to be built to the New Orleans Building
24 Code?
25       A     If you give me a copy of the
```

00132
```
 1  protocol was ever forwarded past the
 2  plaintiffs' expert group?
 3       A    I don't know.
 4       Q    Have you ever looked at the
 5  formaldehyde testing that was performed in
 6  this particular unit?
 7       A    No, sir, I have not.
 8       Q    "No"?
 9       A    No.
10       Q    In your discussion of findings on
11  Page 18, you talk about the air quality most
12  likely being very poor.  Do you have any
13  objective test results regarding the air
14  quality of this trailer?
15       A    I did not test for indoor air
16  quality for this trailer.  However, the
17  evidence of the air leakage of the shell and
18  of the differential pressures created by
19  duct leakage can only lead you to the
20  understanding that we had some indoor air
21  quality that was poor and affected by the
22  performance of the products installed.
23       Q    Well, would you agree with me that
24  the best way to tell that, whether the
25  indoor air quality was poor, would be to
```

00133
```
 1  test for the presence of these items that
 2  you have outlined, test for the presence of
 3  VOCs, test for the presence of mold, test
 4  for the presence of particulate matter?
 5      A    Yes.
 6      Q    Okay.  And those tests are in and
 7  of themselves the best arbiter of whether
 8  the air quality was poor in this unit,
 9  correct?
10      A    Those are the tests to best
11  determine how well the air quality was
12  inside the trailer, that's correct.
13      Q    And you have not reviewed any
14  tests, any of those tests that were done?
15      A    No, sir.
16      Q    And so because of that, although
17  you may feel that the air quality might have
18  been poor based upon the findings that you
19  generated, you cannot say what the level of
20  formaldehyde was in this particular trailer,
21  for example, could you?
22      A    No, sir, I cannot say what the
23  level of formaldehyde was.
24      Q    You cannot say that the level of
25  VOCs was inappropriately high in this
```

```
00186
    1  when you evaluated it in August of 2009?
    2      MR. AHLQUIST:
    3          I'm going to object to the form of
    4  that.
    5  EXAMINATION BY MR. BONE:
    6      Q    I would.
    7      A    I think you're proving my point
    8  perfectly.  Why was this trailer so clean?
    9      Q    My question is certainly different
   10  from that, so let me --
   11      A    It's not different.
   12      Q    -- strike it as non-responsive.
   13      A    You're saying it's bulk water.
   14  Rain is coming in.  You're showing evidence
   15  of bulk water coming in at numerous
   16  locations.  You're even adding a location.
   17  This trailer should have not been that
   18  clean.
   19      Q    Based upon what you observed at
   20  the site in August of 2009, I think what
   21  you're telling me is that there were ongoing
   22  bulk water leaks, and that if that unit were
   23  sitting in a field, you would expect the
   24  humidity within the unit to have been high
   25  over the period that it was unoccupied,
```

00187
1 correct?
2      A    Correct.
3      Q    And if the humidity was high, you
4 would expect to see some level of corrosion
5 to the underside of these springs?
6      A    That is correct.
7      Q    If they contain a ferrous metal,
8 which is how you get corrosion, correct?
9      A    Yes, sir.
10      Q    So by virtue of that, I take it
11 you can't tell us if this condition existed
12 during the time that Mr. Wright occupied
13 this particular trailer?
14      A    No, sir, there's no way for me to
15 tell that.
16      Q    And similarly, if the humidity is
17 high in the unit during the year that it's
18 out in the field in Melville, there's no way
19 to tell whether any of the microbial growth
20 was present during the time that Mr. Wright
21 occupied this trailer; is that correct?
22      A    I'm not in that expertise, so it's
23 hard for me to say.
24      Q    On Page 74 of 92, you have the top
25 two photographs depict some corrosion to the

```
00218
 1 properly heat and cool this home.
 2     Q    Have you ever spoken to Lyndon
 3 Wright?
 4     A    I'm sorry.  I didn't hear your
 5 question.
 6     Q    Have you ever spoken to Lyndon
 7 Wright?
 8     A    No, sir, I have not.
 9     Q    And you have not read his
10 deposition, correct?
11     A    No, sir, I have not.
12 MR. BONE:
13          Mr. LaGrange, I think for the time
14 being I'm going to pass you over to some of
15 these gentlemen.  I'm going to review my
16 notes so I don't waste time, and if I have
17 anything additional after they finish
18 questioning you, I will follow up with that.
19          But with that, I will give you
20 over to Mr. Barrios or Mr. Dinnell.
21 EXAMINATION BY MR. DINNELL:
22     Q    Mr. LaGrange, my name is Adam
23 Dinnell.  I represent the United States in
24 this case.  I believe we met last July,
25 right?
```

00244
```
 1      A    Mathematically, in support of a
 2 science, it has to be that way.  If one side
 3 is positive, the other side has to be
 4 negative if there is a duct leak, which we
 5 established there are duct leaks.
 6      Q    But you do not have the data, the
 7 measurement that reflects that that attic
 8 truss space was, in fact, in a negative
 9 pressure state?
10      A    That's a true statement.
11      Q    And you would have liked to
12 collect that data and measure that, one, it
13 is in a negative pressure state in the attic
14 truss space and, two, here's the degree to
15 which it was in a negative pressure state,
16 right?
17      A    That's correct.
18      Q    But you don't have the
19 measurement?
20      A    No, sir.
21      Q    And you would like to have the
22 measurement, right?
23      A    I would.
24      Q    That's why you asked to be able to
25 collect the measurement, right?
```

```
00245
 1      A    That's correct.
 2      Q    And I believe -- Is it true that
 3 the only person who said you couldn't or
 4 shouldn't go and collect that measurement
 5 was Mr. Mallet, right?
 6      A    Well, he was my contact for this
 7 particular project.  He was my lead, so he
 8 told me what I was there to do and not to
 9 do.
10      Q    Mr. Mallet told you that you
11 couldn't take that measurement?
12      A    That's correct.
13      Q    And whatever Mr. Mallet's reasons
14 for telling you that would have to be
15 explored with Mr. Mallet?  He didn't inform
16 you?
17      A    That's correct.  Yes, sir.
18      Q    Are you aware of any travel
19 trailers that are constructed with a
20 mechanical ventilation system?
21      A    No, sir, I'm not.
22      Q    In your research on this case, did
23 you come across any articles or any
24 documentation discussing the application of
25 building codes, municipal building codes to
```

00246
```
 1 travel trailers or travel trailers used as
 2 temporary housing units following a
 3 disaster?
 4      A    No, sir, I have not.
 5      Q    Are you familiar with any codes or
 6 regulations that deal specifically with
 7 emergency housing in the context of a
 8 disaster?
 9      A    No, sir, I'm not.
10      Q    You measured or you calculated the
11 air changes per hour within this Lyndon
12 Wright travel trailer, right?
13      A    I did.
14      Q    Have you done any research into
15 how that air changes per hour that you found
16 would compare with the number of air changes
17 per hour that are found in a typical travel
18 trailer?
19      A    No, sir.  The only other
20 comparison I would have would be the testing
21 that we did on the Alexander trailer.
22      Q    But as far as travel trailers go,
23 you don't know if Lyndon Wright's travel
24 trailer is more leaky, less leaky or normal,
25 right?
```

00252
```
 1  connecting to city services or
 2  infrastructure, then the subcontractors
 3  would file for their own permits to make
 4  those connections.
 5      Q    Have you done any research into
 6  what building permit and what building code
 7  requirements were waived in the aftermath of
 8  Hurricane Katrina?
 9      A   I have, yes.
10      Q   You have?
11      A   Yes.
12      Q   What did you find?
13      A    Building permits in this region,
14  specifically St. Tammany Parish where I did
15  my research, were not waived.  The builder
16  or homeowner, whoever was filing for the
17  building permit, was still required to have
18  filed for a building permit and have
19  inspections.
20      Q    What about in Orleans Parish or
21  the City of New Orleans?
22      A    I have not researched that.
23      Q    And that's where the Lyndon Wright
24  trailer was set up for occupancy by Lyndon
25  Wright, the Seminole Lane address, right?
```

```
00283
   1 for the Dubuclet trial?
   2      A    No, sir, I was not.
   3      Q    Do you know why?
   4      A    I was told that the judge was not
   5 allowing any blower door or duct blaster
   6 testing or infrared scans, so there was no
   7 need for me to go.
   8      Q    And who told you that?
   9      A    Mr. Mallet.
  10      Q    Did you have any discussions about
  11 that with anyone else?
  12      A    No, sir.
  13      Q    Have you had any discussions about
  14 your retention as an expert to conduct
  15 similar door blower tests or duct blaster
  16 tests for any future bellwether trials?
  17      A    I'm told they're interested in
  18 performing some of those tests.  It's just
  19 that the protocol has not been worked out
  20 yet, whether they will allow that or not.
  21      Q    Now, you're not a building
  22 scientist?
  23      A    No, sir, I'm not.
  24      Q    Now, you already told Mr. Bone
  25 that you're not an architect or engineer,
```

```
00284
    1 but you didn't have a building scientist or
    2 an architect or an engineer working with you
    3 as you developed your report in connection
    4 with the Wright matter?
    5      A    No, sir.
    6      Q    Okay.  And you're not a certified
    7 indoor air specialist?
    8      A    I am not.
    9      Q    And you're not a licensed home
   10 inspector?
   11      A    I am not.
   12      Q    And you have no experience in the
   13 design or construction of travel trailers?
   14      A    No, sir, I do not.
   15      Q    Is there anything else you plan to
   16 do in connection with the Wright trailer
   17 before the trial?
   18      A    No, sir.
   19      Q    So your work is done --
   20      A    Well, no, I take that back.  I
   21 would anticipate that when the defense
   22 experts offer their reports, they will ask
   23 me to review them.
   24      Q    Anything else?
   25      A    No, sir.  Not that I'm aware of.
```