UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION: N(5) |
| | | * | |
| This Document Relates to: *Lyndon T. Wright. v.* | | * | JUDGE ENGELHARDT: |
| *Forest River, Inc., et al*, Docket No. 09-2977 | | * | |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### FOREST RIVER INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO LIMIT THE TESTIMONY OF ALEXIS MALLET

Defendant, Forest River, Inc., (hereinafter "Forest River") respectfully submits the following

memorandum in support of its Motion in Limine to Exclude the Testimony of Alexis Mallet:

### I.    Factual Background

In an effort to address construction and design issues related to the Wright unit, plaintiff has

retained five experts, all of whom examined the unit during the August 2009 destructive testing of

the Wright unit.  Included among these is Alexis (Al) Mallet, a self-proclaimed "building scientist."[1]

This Court is familiar with Mr. Mallet, who has issued numerous opinions on a wide variety of

topics in both the Gulf Stream and Fleetwood bellwether cases.  Just as in those cases, Mallet has

---

[1]  Deposition of Al Mallet from Gulf Stream bellwether, dated 7/17/09, p. 36, attached as Ex. A. Mallet defines "building science" as the study of the relationship between buildings, air, moisture and temperature.  *Id.*  Mallet could not identify the source of this definition.  *Id.*

issued an equally broad array of opinions here, and, not surprisingly, Forest River will echo many of the same objections.  To that end, Forest River hereby incorporates those arguments made in both Gulf Stream's and Fleetwood's prior Motions to exclude Mallet's testimony, Rec. Docs. 2776 & 6655, respectively.  However, Mallet also offers some novel opinions which will be addressed separately herein.

A brief summary of Mallet's professional experience is instructive.  Mallet's only degree is in prelaw political science.[2]  While he maintains licenses in the fields of general contracting, residential construction and real estate (dormant), and certifications in mold remediation and manufactured housing installation, the main focus of his work is as an insurance repair specialist for First General Services of the South, Inc. handling insurance claims.[3]  The field of "building science" has no national or state board, licensing committee, accreditation process or certification standards.[4] There are no continuing education requirements for one to be a "building scientist."[5]  In essence, one is a "building scientist" whenever one says he or she is.  This makes it somewhat difficult to question one's professed expertise as a "building scientist" given that there exist no standards or qualifications by which to measure or define such expertise.  Thus, the nature of the opinions proffered by a tendered "building scientist" must be examined to determine whether the "building scientist" has the requisite qualification to render such opinion(s).

---

[2]  *See* Ex. A, Deposition of Al Mallet, dated 7/17/09, p. 22.

[3]  *Id.* at 25, 30.

[4]  *Id.*  at 36-37.

[5]  *Id.* at 38.

Mallet has no expertise in the design and construction of travel trailers, design and installation of HVAC systems, warnings, formaldehyde issues, materials, and mass production of products.[6]  Also, Mallet admittedly lacks expertise, specialized knowledge and qualification in the following areas: medical issues, chemistry, toxicology, architecture, engineering, industrial hygiene, indoor air quality and psychology.[7]  Mallet has never had any involvement with a claim of formaldehyde in a travel trailer.[8]  Mallet similarly concedes having absolutely no expertise whatsoever regarding "any kind of formaldehyde issues," including no expertise in materials containing formaldehyde or factors that promote off-gassing of formaldehyde (in fact, he expressly defers to other experts regarding mechanisms that may cause off-gassing of formaldehyde).[9]

In prior bellwether cases, Mallet admitted that, in reference to plaintiffs' other construction and design experts, he was ". . . just repeating their and taking their position in how the building affected it."[10]  In the Fleetwood bellwether, he similarly testified that, "I basically lead the team, disseminate who is going to look at what, and have them to either -- if there are calculations involved, perform the calculations that will back up or that will tell me whether a position that we have taken is accurate or inaccurate. They're the more technical end of the team, but, in general, I see

---

[6]  *Id.* at 39-40, 44-45, 46, 47, 49-50, 159, 217.

[7]  *Id.* at 33-34.

[8]  *See* Ex. B, Deposition of Alexis Mallet from Fleetwood bellwether, dated 10/28/09, p. 89.

[9]  *See* Ex. A, Deposition of Al Mallet, dated 7/17/09, p. 46, 61-64, 125, 163-68, 171-73, 185.

[10]  *Id.* at 126.

and understand how the whole package fits together, how the parts and system works or doesn't work together, and how – if it doesn't function, why it doesn't function properly."[11]

Here, Mallet has simply taken the opinions of plaintiffs' other experts on issues involving formaldehyde, materials and engineering (none of which he has expertise in) and given his "cumulative appreciation of other experts' testimony" – a tact disfavored by this Court. (Rec. Doc. 2181, p. 3).[12]  This team included the following experts who have issued their own reports in this case: Paul Lagrange, Charles Moore, Ervin Ritter, and Darryl Hicks.[13]  Stephen Smulski and Bill Scott, plaintiff's wood products and industrial hygiene experts, respectively, also consulted with Mallet.[14]

At the end of Mallet's 131 page report, he offers thirteen opinions.[15]  These conclusions, labeled A-M in the report, can be summarized in the following general categories:

**1. Building Codes (A & B)**: Forest River was required to follow certain standards, including the International Building Code, International Residential Code, and New Orleans Build Code.  Forest River did not comply with these codes.

**2. General Construction Issues (C, M)**: The Wright unit was not constructed for use in hot, humid climates.

---

[11]  *See* Ex. B, Deposition of Alexis Mallet, taken 10/28/09, p. 105-06.

[12]  Separate *Motions in Limine* will be filed with regard to Lagrange, Ritter, Moore, Scott and Smulski.  Forest River hereby incorporates the arguments made in those Motions as well.

[13]  *See* Ex. C, Deposition of A. Mallet, dated 1/12/10, p. 52-59.

[14]  *Id.*

[15]  *See* Ex. D, Mallet report, dated 10/2/09, Section IX , p. 128-130.

**3. Formaldehyde Off-Gassing and Mold Growth (D, F, G & K):** The construction means, methods and materials utilized in the trailer, combined with poor quality of workmanship, contributed to the growth of mold and the off-gassing of formaldehyde.

**4. Jacking (E):** Jacking and blocking caused the unit to flex, creating openings in the walls and allowing air, heat and moisture to enter the trailer.

**5. Vapor Barriers (I & J):** The vapor barrier inside the unit was not designed for humid climates and trapped moisture inside, leading to mold growth and formaldehyde off-gassing.

**6. Alternative Building Materials (L):** Products which were ultra low or non-formaldehyde emitting were available for use in 2005.

**7. Furnace Repairs (H):** Shaw failed to properly repair the furnace.

Forest River requests that the Court exclude the testimony of Al Mallet in its entirety. However, should the Court allow him to testify, Forest River requests that the Court limit and/or exclude certain portions of his testimony in the manner described below.

**II.   Argument & Citation to Authority**

    **A. Mallet's testimony should be excluded in its entirety, as he lacks the qualifications to provide any relevant testimony.**

The instant Motion will separately address each of the conclusions that Mallet provides above. Before that analysis can begin, however, Forest River requests the Court to take a step back and examine the relevancy of Mallet's testimony. The Fifth Circuit is clear that, regardless of whether it is reliable, expert testimony must also be relevant -- not only in the way that all testimony

5

must be relevant under Federal Rule of Evidence 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.[16]

Although one can easily lose sight of the issues at play in this case when reviewing a 131 page report, the fundamental questions to be resolved are relatively simple: (1) what levels of formaldehyde existed in the Wright trailer during his occupancy of the unit, and did they cause him any injury and (2) what types and amounts of mold existed in the trailer during Wright's occupancy of the trailer, and did they cause him injury?

Mr. Mallet spends pages upon pages of his report discussing topics ranging from building codes to vapor barriers, but, at the end of the day, he does not provide any answers to these two fundamental questions.  Mallet starts by creating a series of dots: the duct work leaked, the vapor barrier was improperly placed, the seals were improperly installed, etc.  Due to these alleged problems, he concludes that the unit may have allowed additional heat and moisture inside the cavities and interior living space.  At this point, though, Mallet fails to link these conclusions to the ultimate question:   how exactly did this increased temperature and humidity increase the formaldehyde or mold growth inside the Wright unit?

Mallet admits that he did not and cannot provide an analysis of how the construction and design defects impacted the formaldehyde and/or mold levels inside Wright's trailer:

> Q.  Did you ever perform any testing
> to quantify the amount of increased
> formaldehyde concentration within the living
> space of this particular trailer by
> operation of the air-conditioning system?
>    A.  No.  Quantification, we did not.

---

[16]  *See* Order dated July 15, 2009, p. 4 (Rec. Doc. 2181) (*citing Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 584 (5th Cir.2003)).

Q.   So you couldn't tell me if it increased it by 1 part per billion or 100 parts per billion, could you?

A.   No, I could not.

* * * *

Q.   With respect to the heating system, would the same be true?

In other words, did you perform any testing that would quantify the increase in formaldehyde concentration within the Lyndon Wright unit by operation of the heating system?

A.   No, no quantification.

Q.   Okay.  Again, so you couldn't say, if called upon to testify, that the operation of the heating system would have increased the formaldehyde concentration in the Lyndon Wright unit by 1 part per billion or 100 parts per billion.  True?

A.   That's correct.

Q.   Okay.

A.   And the quantity, from my standpoint, is -- is of no consequence.  The avenue, one, if there is off-gassing; and what conditions are conducive to the off-gassing; how does that off-gassing get into the living area?

So I was not -- it was not my charge to quantify any formaldehyde off-gassing.

Q.   And I appreciate your answer, but my question relates specifically to this. It may increase formaldehyde off-gassing.  I understand that's your opinion.  But that increase in off-gassing, you can't tell me whether that results in any increase in concentration in the living quarters of the unit, correct?

A.   Well, if it's drawing in even 1/10th part per billion more than is already in the unit, remember, we've got a vapor barrier on the inside, and we're bringing in more air than we're expelling from the attic.

7

So to the extent that we have off-gassing in the attic or the ceiling, even if 1/10th of a billion -- same thing with mold.

If we equate it to mold, when your system is operating under negative pressure, it's drawing in the hot, humid contaminants from the outside, whether it's mold, whether it's sulfur gases, whether it's formaldehyde gases, whatever is around the envelope of that building, that's what is going to be drawn into the building.

Q.   All right.  But the actual impact on air quality, you can't tell me?

A.   I can't quantify.

Q.   Right.  And there's a way to test how the formaldehyde level in this trailer would be impacted by the operation of either the heating or air-conditioning system, isn't there?

A.   That's beyond the scope of my expertise.

Q.   Did you ever ask Bill Scott, "Isn't there a way for us to test how the operation of the air-conditioning system affects formaldehyde concentration in this trailer?"

A.   No, I did not.  I had very little interaction with Bill Scott.[17]

The fundamental problem with Mallet's report is not what it says, but what it doesn't say. On the one hand, he will testify that the unit's interior would have become hotter and more humid due to construction and design defects.  On the other hand, he references information from Mary DeVany that formaldehyde emissions double for every 12 degree F rise in temperature.[18]  He never

---

[17]  *See* Ex. C, Depo. of Al Mallet, dated 1/12/09, p. 164-68.

[18]  *See* Report of Al Malllet, p. 125, attached as Ex. D.

connects these two opinions to offer an opinion on exactly how much more formaldehyde off-gassing and mold growth occurred as a result.

Recall that, unlike the Gulf Stream and Fleetwood cases, plaintiff had unfettered access to the trailer for over a month.  If the rise in temperature and humidity had such a tremendous impact on the formaldehyde and mold levels inside the trailer, why not test these issues?  His decision not to test becomes even more striking in light of the fact that Mallet admitted in his deposition that the air conditioning system was able to regulate temperature and humidity effectively.[19]

Because he never performed these tests, his report offers no concrete, relevant opinions, only a series of hypothetical "what ifs."  In doing so, Mallet and his team of experts have turned a products liability case into a construction defect case.  He has shifted the focus of the case to an examination of how hot and humid the trailer instead of how the heat and humidity impacted the formaldehyde levels inside the unit.  By failing to address this second issue, Mallet and his team have offered no relevant evidence that would assist the jury in reaching any conclusions in this case.  Mallet's testimony only serves to mislead the jury with vague implications that the formaldehyde and mold levels in the trailer must have been problematic.  He has no concrete evidence to support this.  Mallet's methodology is improper and incomplete, his report deficient and irrelevant, and, accordingly, the Court should strike Mallet's testimony in its entirety.

**I.  Mallet should not be able to offer any testimony on mold inside the trailer**

As the Court is well aware, Wright filed a Motion for Leave to File First Supplemental and Amended Complaint, seeking to add new claims related to mold exposure in the trailer.  (Rec. Doc. 1862).  The Court granted that motion on July 17, 2009.  (Rec. Doc. 2201).

---

[19]  *See* Ex. C, Depo. of Al Mallet, p. 236-37.

9

In an effort to prove his mold claims, plaintiff retained Mallet to offer a wide variety of opinion on mold issues related to the trailer's design and construction. Mallet's report is filled with references to the increased levels of mold that would have been present in Wright's trailer.

Forest River submits that, regardless of Mallet's conclusions with respect to mold, he should not be allowed to offer any testimony related to this issue for two reasons.  First, Mallet's mold analysis is completely irrelevant, as none of plaintiff's medical experts have found that mold caused **any** of Wright's alleged medical conditions.  Although discussed more fully in defendants' Motion for Summary Judgment on causation, plaintiff will be unable to carry his burden to show mold exposure in the trailer caused any of his alleged health problems.

For instance, Dr. Williams, plaintiff's general causation expert, lists the following in her expert report:

"An association exists between mold exposure and nonallergic rhinitis."[20]

This is the <u>only</u> opinion Dr. Williams provides with respect to mold exposure.[21]  Dr. Williams, who is well versed in the distinction between a causal link and an association, cannot provide any general causation testimony to link mold to any of Wright's alleged health conditions.

---

[20] *See* Williams report, dated 10/2/09, p. 63-64, attached as Ex. E.

[21] Dr. Williams does believe a cause-effect relationship exists for the following, however:

A cause-effect relationship exists between formaldehyde and upper respiratory tract damage and cancer.
A cause-effect relationship exists between formaldehyde and bronchocontriction/asthma.
A cause-effect relationship exists between formaldehyde and eczema.
*Id.*

Further, even Dr. Miller, one of plaintiff's specific causation experts, could not point to literature to support a causal link between mold exposure and Wright's respiratory symptoms.  He testified:

> Q   All right.  Let's talk a little
> bit about the October 2nd report.  On Page 6
> of the report, just above the paragraph
> wherein you list the complaints that
> Mr. Wright had, you state that "Mr. Wright
> was likely exposed to various fungal species
> while living in the trailer.  Exposure to
> fungi is associated with exacerbations of
> upper and lower airways disease, but
> limitations in the literature do not warrant
> a causal association."
>         Can you tell me what you meant by
> that, Doctor?
>     A   Well, very simply, that he was
> likely exposed to fungi.  Now, we know what
> the fungi were, you know, a year and some
> time after he left the trailer.  We can't
> know with certainty what they were prior to.
> And there certainly is -- There's no
> question about a literature existing on
> fungal toxins' effects on the respiratory
> tract.
>         **But in my understanding, that
> literature is not definitive at this point.
> There's a big literature.  It's not exactly
> clear what does what yet, so that's why I
> was hesitant to draw any conclusions at that
> point.**
>     Q   Okay.  When you say it does "not
> warrant a causal association," is what
> you're saying that if you were called upon
> to testify, your testimony would be that
> more probably than not there was no causal
> association between exposure to fungi in
> Mr. Wright's case and any of the symptoms
> he's complaining of?

> A   I wouldn't put it that way.  I
> would say based on limitations in the
> literature, we can't comment one way or the
> other.
>
> **Q   Okay.  You cannot say more
> probably than not that fungi caused any of
> the problems that Mr. Wright is complaining
> of?**
>
> **A   Right.**[22]

In a toxic tort case, the plaintiff must prove both general causation and specific causation --

and must do so with competent expert testimony.[23]  Wright will not be able to provide either specific

or general causation testimony to support any of his mold claims; therefore, Mallet's mold analysis

is completely irrelevant.  Mallet should not be allowed to discuss his mold findings related to the

trailer when there is no possibility for Wright to recover for his mold exposure.  If allowed to do so,

he will only serve to mislead and confuse the jury with respect to Wright's other claims.

> **B.     Should Mallet be allowed to testify, his opinions should be limited.**

> **I.  Building Codes (Mallet's Conclusions A & B)**

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*,

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) "provides the analytical framework for

determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*,

288 F.3d 239, 243 (5th Cir. 2002).  Both scientific and nonscientific expert testimony is subject to

the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine

whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal

Justice*, 393 F.3d 577, 584 (5th Cir.2004); see *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

---

[22]  Deposition of Dr. Miller, dated 11/10/09, p. 106-08, attached as Ex. F (emphasis added).

[23]  *Knight v. Kirby Inland Marine Inc.*, 483 F.3d 347, 351 (5th Cir. 2007).

147 (1999). District courts must review the reasoning used by an expert in applying a given methodology to the expert's ultimate opinion. It is imperative that an expert explains the "how" and the "why" behind his conclusions. *See Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (stressing that the expert must state both the foundation for his opinions and the reasoning from that foundation). Ultimately, when the evidence does not "fit" with the conclusion, the testimonial evidence is not reliable. *Cavallo v. Star Enterprises*, 892 F. Supp. 756, 761-63 (E.D. Va. 1995), *aff'd in part and rev'd in part*, 100 F.3d 1150 (4th Cir. 1996).

In his first two conclusions, Mallet opines that:

(1) Forest River was required to follow at a minimum the FEMA specifications, the ANSI, NFPA, NEC and ASHRAE Standards. It is also our opinion the IBC and IRC and New Orleans Building Codes should have been followed. (Conclusion A)

(2) Forest River did not comply with the applicable codes and standards. (Conclusion B)[24]

Forest River submits that any and all references to codes outside of ANSI and the NFPA should be excluded, as Mallet has no basis for his assertions. First, Mallet's own fellow expert, engineer Ervin Ritter, acknowledged that, "There are few codes which apply to the construction of this travel trailer. NFPA 1192 is the primary code which can be applied to this travel trailer."[25] Neither Ervin Ritter, Paul Lagrange, Darryl Hicks or Charles Moore, the other experts assembled by Mallet, discuss the application of ASHRAE (American Society of Heating, Refrigerating and Air Conditioning Engineers) standards in their reports. Al Mallet, who has no engineering degree or background, does not have the credentials to discuss ASHRAE standards, especially in light of the fact that other expert engineers in Mallet's team do not offer any substantive testimony on the subject.

---

[24] *See* Mallet expert report, p. 128, Section IX, A & B, attached as Ex. D.

[25] *See* Ex. G, Ritter expert report, dated 10/2/09, p. 23.

Also, in the Gulf Stream bellwether, Mallet admitted that (a) the ASHRAE standard is not specifically applicable to travel trailer HVAC systems and (2) he could not state what ASHRAE standard would apply to air conditioning duct work.[26]  He should not be allowed to discuss these standards at trial.

Mallet then goes a step further and offers opinions on the application of the National Electrical Code (NEC), International Building Code (IBC), International Residential Code (IRC), and New Orleans Building Code.

As a preliminary matter, Mallet is not an electrical engineer and should not be allowed to opine on the application of an electrical code such as the NEC in the Wright trailer.  With respect to the remaining construction codes, Mallet's testimony should again be limited.  Tellingly, Mallet writes that, **"It is also our opinion** the IBC and IRC and the New Orleans Buidling Codes should have been followed."[27]  Of course, the application of a code is not a matter of opinion – it either applies or does not.  Mallet's sole research into the issue was a brief email exchange with Johnny Odom, the chief building inspector at the City of New Orleans, in January 2010 (after Mallet's expert report was written).  Odom told him that the building code inspections normally done by the City were "suspended," and FEMA was allowed to conduct its own inspections of the unit.[28]  Mallet performed no research into how municipal building codes interact with federal property.[29]  Plaintiff

---

[26]  *See* Ex. A, Depo of Al Mallet, dated 7/17/09, p. 183-85.

[27]  Expert report of Al Mallet, dated 10/2/09, p. 128, attached as Ex. D (emphasis added).

[28]  *See* Ex. C, Depo of Al Mallet, dated 1/12/09, p. 20-21.

[29]  *Id.* at 245.  Plaintiff's other expert, Paul Lagrange, also opines that these building codes apply. He too, though, has done no research into whether they did in fact apply.  He is uncertain of what training is necessary to determine whether certain codes applies to home construction.  Depo. of

has produced no evidence to show that FEMA required trailers to comply with IBC, IRC or the City

of New Orleans, or more importantly, that any such alleged violation of these codes increased the

concentration of formaldehyde within this unit at all.[30]  Mallet is simply incorrect in concluding that

these codes applied to the construction of Wright's travel trailer, and what little "research" has been

completed via emails to Johnny Odom confirms this fact.  Mallet should not be allowed to offer any

testimony on these building or electrical codes and their application to the Wright unit, as it is

irrelevant to the issues at bar, constitutes an inaccurate legal conclusion and is misleading to the jury.

## II.  General Construction Issues  (Mallet's Conclusions C, M)

Mallet opines that:

(1) The Forest River unit was not constructed for use in hot, humid climates.  (Conclusion C)

(2) The quality of workmanship in the Forest River unit was less than superior.  Forest River failed to seal the bellyboard and other penetrations and did not install the HVAC, doors, and windows properly.  (Conclusion M)

Forest River requests the Court to exclude these opinions for two reasons.  First, as noted above,

Mallet does not have the expertise to comment on the workmanship or design capabilities of any

---

P. Lagrange, p. 46-47, attached as Ex. H.  He performed no factual or legal research as to whether the Code does in fact apply to FEMA supplied travel trailers or even travel trailers in general. *Id.* at 48.  In fact, Lagrange originally thought 2003 building codes would have applied to this trailer and had to be corrected by Mr. Mallet that the 2000 codes applied instead.  *Id.* at 41-43.  Lagrange made no inquiries as to whether the City actually applied the Building Code to FEMA trailers post Katrina.  *Id.* at 49-50.  He never reviewed any articles dealing with the application of building codes to the construction of travel trailers.  *Id.* at 244-46.  Even if one assumes that the Code did indeed apply, Lagrange never inquired as to whether the City waived building code requirements in the wake of Katrina.  *Id.* at 252.

[30]  For that matter, plaintiff has produced no evidence to show that FEMA required the travel trailers to comply with the NEC.

travel trailer, let alone this Forest River unit in particular.  He has no expertise in the design and construction of travel trailers or the design and installation of HVAC systems.[31]  His opinions on whether the unit was built for use in certain climates is outside his area of expertise.

Even if he had the necessary experience, Forest River again asserts that this testimony is entirely irrelevant for those reasons discussed in Section A of this Motion.  Again, these workmanship issues are more properly part of a construction defect case, not a products liability case.  Regardless of Mallet's findings, they are irrelevant and fail to address specifically how these alleged defects impacted the formaldehyde and/or mold concentration within the unit during the time of Wright's occupancy.

### III.  Formaldehyde Off-Gassing and Mold Growth (Mallet's Conclusions D, F, G & K)

*Daubert* cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith.  The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert."  *General Electric v. Joiner*, 522 U.S. 136, 146, 139 L. Ed. 508, 519 (1997).  If there exists too great an analytical gap between the data and the opinion offered, the testimony is not reliable.  *Id*.

Mallet states that Forest River "contributed to the manifestation and growth of mold and off-gassing" by designing a number of components improperly.  This included alleged defects with the

---

[31]   *See* Ex. A, Deposition of Al Mallet, at 39-40, 44-45, 46, 47, 49-50, 159, 217.

sealing of windows and doors (Conclusion D) and ductwork (Conclusion G).[32]  Also included in this category are Mallet's assertions that the formaldehyde emitting materials in the trailer contributed to mold growth and formaldehyde off-gassing in the unit's wall and ceiling cavities and interior space.  (Conclusions F & K).[33]

These opinions too are entirely irrelevant, since Mallet never links the construction defect to a quantifiable increase in the rate of formaldehyde off-gassing or mold growth.[34]  The vague assertions that the design and construction of the trailer **may** have increased the heat and humidity inside the trailer and **may** have therefore increased formaldehyde off-gassing and mold growth are entirely speculative and unsupported by any concrete testing data.  This testimony has no purpose but to confuse the trier of fact and should be excluded.

### IV.  Jacking (Mallet's Conclusion E)

Mr. Mallet's opinions on the effects of jacking and blocking should be excluded as well. Mallet has no engineering background that would allow for him to reach the types of conclusions found in Conclusion E of his report, where he concludes that jacking caused the unit to flex and allowed air, heat, and moisture to enter the unit.[35]

Mallet's opinions are also duplicative, in that engineer Charles Moore, another member of Mallet's team, has offered opinions on these same subjects.  Under FRE 403, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

---

[32]  Expert report of Al Mallet, dated 10/2/09, p. 128-30, attached as Ex. D (emphasis added).

[33]  *Id.*

[34]  *See* Ex. C, Depo of Al Mallet, p. 163-65.

[35]  Expert report of Al Mallet, dated 10/2/09, p. 128-30, attached as Ex. D.

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[36]  Based upon Mallet's admission that he merely collected and repeated plaintiff's other experts' work, he has, by his own admission, rendered his opinions purely duplicative of other experts.  Mallet even expressly deferred to the opinions of Moore with respect to an analysis of jacking the unit.[37]  Mallet should not be allowed to offer testimony on jacking and/or blocking.

### V.  Vapor Barriers (Mallet's Conclusions I & J)

Mallet states that the trailer was defective due to the presence of vinyl "vapor barriers" in the interior of the unit.  He asserts that these barriers were not suitable for hot, humid climates (Conclusion I) and that they caused moisture to be trapped inside the unit, leading to increased formaldehyde off-gassing and mold growth (Conclusion J).[38]

This opinion suffers not so much from lack of qualification but from the methodology upon which the opinion is based.  Mallet states that this application is problematic because it allows for the formation of condensation of water vapor in the wall space behind the wall-covering.[39]

---

[36]     Several courts have excluded experts who planned to offer cumulative testimony. In *Miley v. Delta Marine Drilling Co.*, the plaintiff appealed the district court's exclusion of an expert witness who planned to address the loading and unloading of anchor chains. 473 F.2d 856, 858 (5th Cir. 1973). The U.S. Fifth Circuit Court of Appeals rejected the appeal, holding that the plaintiff had qualified two other experts who testified to the proper onloading procedure.  *Id.*
     A Western District of Louisiana decision blocked, as cumulative, two products liability experts from discussing the warnings included in the owners' manual of a rifle that malfunctioned and caused injury, as well as the cause of that injury. *Matthews v. Remington Arms Co.*, 2009 WL 1220541, *2 (May 4, 2009).

[37]   *See* Ex. C, Depo of Al Mallet, p. 227.

[38]   Expert report of Al Mallet, dated 10/2/09, p. 128-30, attached as Ex. "D" (emphasis added).

[39]   *Id.*

However, Mallet testified that he did not observe any vapor damage in the area between the wallboard and vinyl covering.[40]  When asked to produce even a single photograph which depicted the alleged moisture damage and mold growth inside the unit's wall cabinet, Mallet could not do so.[41]  Likewise, Mallet could not offer any opinion on the exact permeability rating (PERM) of the vinyl covering.[42]  Not knowing the PERM rating of the wall-covering, combined with no evidence of condensation in the wall cavity, can lead to only one conclusion -- Mallet is simply speculating.  Indeed, in a prior bellwether case, Mallet admitted that he knew of no literature or studies supporting his opinions on the placement and use of vinyl wall coverings.[43]

Accordingly, any and all opinions regarding vapor barriers inside the Wright unit must be excluded, as this testimony is based upon an improper methodology and pure speculation.[44]

## VI.  Alternative Building Materials (Mallet's Conclusion L)

Mallet has offered opinions on the use of ultra low or non-formaldehyde emitting products and asserts that these alternative materials were available to Forest River at the time the Wright unit was manufactured in 2005 (Conclusion L).

---

[40]  *See* Ex. C, Depo of Al Mallet, dated 1/12/10, p. 139.

[41]  *Id.* at 127-30.

[42]  *Id.* at p. 133.

[43]  *See* Ex. A, Depo of Al Mallet, dated 6/17/09, p. 131.

[44]  Because Mallet has not conducted the proper research into alternative vinyl coverings, he should also be precluded from offering any testimony about these alternative products.  *See* Mallet report, p. 74, attached as Ex. D, discussing a "Tyvek type" barrier.

In the Gulf Stream bellwether, Mallet could not cite to any literature or standard that requires, specifies or recommends the use of admitted that he knew of no literature or studies recommending the use of such Tyvek products.  *See* Ex. A, Depo of Al Mallet, dated 6/17/09, p. 152.  These opinions are pure conjecture and should be excluded.

This testimony should be excluded for several reasons.  First, Mallet has no expertise in the design and construction of travel trailers.[45]  Dr. Smulski, not Mallet, has been retained as plaintiff's wood products expert, and Mallet's testimony is therefore duplicative.  The question of alternative building materials is outside his area of expertise and should be excluded at trial.

Moreover, Louisiana jurisprudence has established certain requirements to show an alternative design in a products liability case. In *Seither v. Winnebago Industries, Inc.*, the court found that the trial judge abused his discretion in failing to grant a directed verdict as to the alternative design issue. 853 So. 2d 37, 41 (La. App. 4 Cir. 2003). In that case, there was no valid alternative design presented. The expert "presented merely a concept that was untested, unengineered, and not presented to the jury in any fashion more than mere speculation." *Id.* at 40-41. The court also noted that the plaintiffs failed to present a risk/utility analysis of the proposed alternative design.  *Id.*  There was no examination of material prices or consideration of manufacturing labor expense.  *Id.*  Although *Seither* does not address the admissibility of an expert's opinion directly, it certainly shows the factors that an expert must present in order to have relevant and helpful information for the jury.

Mallet should not be allowed to opine on alternative building products, as he has not performed any  risk/utility analysis of these alternative products.  His report merely provides a list a alternative materials without any discussion of cost or product availability.[46]  In fact, Mallet simply writes that "cost will be provided upon request" when discussing alternative insulation.[47]  During

---

[45]  *See* Ex. A, Depo. of Mallet, at 39-40, 44-45, 46, 47, 49-50, 159, 217.

[46]  *See* Ex. D, expert report of Al Mallet, p. 119-124.

[47]  *Id.* at 120.

his deposition, Mallet testified he had done no testing of the strength or viability of masonite for over-the-road travel, nor was he aware of the quantities of masonite which would be needed by the RV industry in any given year.[48]  Indeed, Mallet conceded that he had never attempted to fabricate a travel trailer with any of the alternative products he suggested to determine either their viability or impact on indoor air quality.[49]  As such, Mallet cannot establish through recognized means, that masonite or any other material would have been a safer alternative to the hardwood plywood utilized in the unit at issue.  His analysis is insufficient and should therefore be excluded.

Finally, the parties in this case have entered into a stipulation that the wood products in the Forest River trailer at issue were constructed of low formaldehyde emitting (LFE) wood.  *See* Rec. Doc. 8334.  Mallet should be precluded from offering any testimony implying that Forest River's products were not LFE.

To the extent that Mallet attempts to opine on alternative designs of the trailer, Forest River asserts that any such testimony should be excluded, as Mallet has not performed the requisite risk/utility analysis to comment on these topics.

## VII.  Furnace (Mallet's Conclusion H)

In his report, Mallet opines that Shaw failed to repair the furnace system within the Wright unit properly (Conclusion H).  Mallet should not be permitted to testify regarding the repair of the furnace, first because he is no expert in furnace repair, second because this issue is a red herring, and third because his conclusion that ***Shaw*** failed to repair the furnace is contradicted by undisputed facts.

---

[48]Deposition of Alexis Mallet, p. 288-89

[49]*Id*.  p. 289

Mallet does not dispute that he is not a HVAC repairman; nor is he a mechanical engineer. [0]5 He did not even test the function of the furnace himself; rather, he relies on what Mr. Hicks said about his inability to make the furnace operable when he saw it at the Melville FEMA trailer graveyard in August 2009. Mallet performed no investigation of his own with regard to the furnace, and in fact his opinion is based on nothing other than Mr. Wright's testimony, which Mallet misinterpreted. Mallet lacks the credentials to testify about furnace repair, and he did not employ a reliable methodology to reach a conclusion about whether the furnace was repaired properly. He should not be allowed to testify about it.

The bigger issue, though, is that the furnace has nothing to do with this case. This lawsuit purports to be an action about formaldehyde, or mold. No one, not even Mallet, attempts to link the allegation of failure to repair the furnace to formaldehyde or mold. Thus, even if Mallet's opinion were true, it would be irrelevant, and it is therefore inadmissible.

In any event, Mallet's opinion is patently false and reflects a basic misunderstanding of the facts. Mr. Wright testified at his deposition that the first attempt at a repair of the furnace was in March 2006, and he acknowledged that his signature on the maintenance form reflected the fact that he was satisfied with the repair at that time.[49] ***This is the only instance of a furnace repair, or of a complaint about the furnace not working, prior to June 1, 2006, after which Shaw was no longer maintaining the trailer.*** Mr. Wright speaks of additional repair attempts in late 2006 and continuing well thereafter, but those issues arose (even assuming Mr. Wright's statements, which

---

[50] Mallet defers to Mr. Ritter with regard to issues of mechanical engineering. *See* Ex. C, Depo of Mallet, p. 56.

[49] *See* Ex. I, Deposition of Lyndon Wright, p. 273-74.

are not supported by records, to be true) while other contractors were responsible for maintenance, not Shaw.[50]  Perhaps when Mallet penned his opinion that "Shaw" failed to maintain the unit, Mallet was unaware of the facts, but since then the facts of the "MDC turnover" have become well known to all parties, and Mallet should have withdrawn this opinion.  He has not, however, and it therefore falls to the defendants to move for its exclusion from evidence.[51]

### C.     Miscellaneous Topics

Mallet discusses several other issues throughout his report which are not included in his "Conclusions" section.   Nevertheless, Forest River would request that the Court exclude any testimony from Mallet related to the following topics:

### I.  Tire Size

Mallet's report includes a section on the size of tires on the Wright unit.[52]  At his deposition, Mallet opined that this tire size may have had an impact on the stress placed on the unit's frame.[53] However, Mallet conceded that he (1) performed no testing to assess this alleged problem and (2)

---

[50]  *Id.*

[51]  Naturally, defendants are happy to cross-examine Mallet on this basic factual issue, but given that it is so obviously wrong, defendants respectfully submit that it would merely serve as a digression from the true factual issues in this case.  Aside from the possible confusion of the jury, there is really no need to spend time questioning Mallet about this, and having to introduce documents regarding it, given the fact that he is not an expert in this area, given further that his opinion bears no relevance to the claimed injuries, and given finally that he is demonstrably wrong.

[52]  *See* expert report of Al Mallet, p. 48-49, attached as Ex. D.

[53]  *See* Ex. C, Depo of Al Mallet, dated 1/12/10, p. 182.

deferred to engineer Charles Moore for an analysis of that issue.[54]  Accordingly, Mallet's testimony

on that subject is speculative, duplicative, and should not be allowed at trial.

## II.  Extent of Moisture Damage/Wood Degradation

Throughout his report, Mallet makes numerous references to moisture damage and the extent

of wood degradation inside the unit.[55]  These comments should be excluded, as Mallet has no

expertise in the forensic analysis of either issue.  He conducted no testing to determine how long

these alleged issues had existed.[56]  As a result, he cannot pinpoint when these alleged damages began

(*i.e.,* before the unit was delivered, while Wright resided in the trailer, or after the unit was stored

in Melville).  It is also important to note that, at the time of the August 2009 inspection, the Wright

unit had been exposed to the elements for over a year at the FEMA staging lot in Melville.  Not

surprisingly, Mallet acknowledged that several of the leaks he observed during testing were still

ongoing; consequently, he admitted that the current state of the trailer would not reflect those

conditions experienced by Wright.[57]  In sum, Mallet is unable to provide testimony on the moisture

damage and wood degradation issues that existed at the time of Wright's occupancy of the unit.  His

testimony on these issues lacks both sufficient factual support as well as expert analysis and should

be excluded accordingly.

---

[54]  *Id.*

[55]  *See*, *e.g.*, p.64, 83, 84 of Ex. D, expert report of Al Mallet.

[56]  *See* Ex. C, Depo of Mallet, p. 107-09.

[57]  *Id.*

### III.  Air Conditioner Size

Mallet should be precluded from offering any testimony relating to the size of the air conditioning unit installed in the Wright trailer.  At his deposition, Mallet conceded that "the size of that [A/C] unit was of no consequence to me."[58]  He also stated that he would leave this discussion to other experts retained in the case.[59]  Thus, Mallet should not be allowed to offer any opinions on the size of the A/C unit at trial.

### III.  Conclusion

For the foregoing reasons, Forest River requests that Mr. Mallet should be precluded from testifying at trial.  Should he be allowed to testify, Forest River requests that the Court limit his testimony described in the manner above.


Respectfully submitted,


/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (La. Bar Roll No. 6154)
JASON D. BONE (La. Bar Roll No. 28315)
CARSON W. STRICKLAND (La. Bar Roll No. 31336)
GIEGER, LABORDE & LAPEROUSE, LLC
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana  70139-4800
Telephone:  (504) 561-0400
Facsimile:  (504) 561-1011
ATTORNEYS FOR FOREST RIVER, INC.

---

[58]  *Id.* at 161.

[59]  *Id.*

## **C E R T I F I C A T E**

I hereby certify that on the 9th day of February, 2010, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone