```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4    IN RE:  FEMA TRAILER         MDL NO. 1873

 5    FORMALDEHYDE PRODUCTS         SECTION N(4)

 6    LIABILITY LITIGATION         JUDGE ENGELHARDT

 7    (This document is related

      to "Lyndon Wright, et al.

 8    v. Forest River, Inc.,

      et al.")

 9

10                      *   *   *

11

12           VIDEOTAPED DEPOSITION OF ALEXIS

13    MALLET, JR., 103 BRANDBERRY CROSSING,

14    LAFAYETTE, LOUISIANA 70598, TAKEN AT THE

15    OFFICES OF FRANK D'AMICO, ATTORNEY AT LAW,

16    622 BARONNE STREET, NEW ORLEANS, LOUISIANA

17    70112, ON THE 12TH DAY OF JANUARY, 2010.

18

19

20    REPORTED BY:

21        CATHY RENEE´ POWELL, CCR

          PROFESSIONAL SHORTHAND REPORTERS

22        (504)529-5255

23    VIDEOGRAPHER:

24        MICHAEL BERGERON

          PROFESSIONAL SHORTHAND REPORTERS

25        (504)529-5255
```

```
 1    temporary housing units supplied by FEMA?

 2         A.   Yes, sir.

 3         Q.   Who did you contact?

 4         A.   The chief building inspector.

 5         Q.   Who was that?

 6         A.   The same name -- I don't recall.

 7    I have to dig it up.  It's the same name --

 8    the man that Liberty contacted, the chief

 9    building inspector.

10         Q.   And did he give you the same

11    response as to whether the building codes

12    were, in fact, applied to travel trailers

13    that he gave to Liberty?

14         A.   The response that I got was that

15    the building codes were not waived, they

16    only suspended the inspections.

17         Q.   By "suspending the inspections,"

18    what did you take that to mean?

19         A.   That the contractor was to do his

20    own inspections.

21         Q.   Do you have a document from the

22    chief building inspector of the City of New

23    Orleans that says that the building codes

24    were not waived for these particular units?

25         A.   Yes, sir.
```

```
 1          Q.   Let me mark this as the next
 2     exhibit, Exhibit 3.
 3               Now, Mr. Mallet, what I have
 4     marked as Exhibit 3 is, in fact, the e-mail
 5     chain between you and Mr. Odom; is that
 6     correct?
 7          A.   Yes, sir.
 8          Q.   And this e-mail chain begins on
 9     January 8 of this year, correct?
10          A.   I guess.  Yes, sir.
11          Q.   Do you have a copy of your own?
12          A.   No, sir.
13          Q.   All right.
14          A.   This is the only copy that I have.
15          Q.   All right.
16          A.   Yes, sir.
17          Q.   And the response that you got was
18     on January 11, which was yesterday, correct?
19          A.   Yes, sir.
20          Q.   So Mr. Odom related to you that
21     "We did not waive code requirements, we did
22     allow FEMA to have their own inspections,"
23     correct?
24          A.   Yes, sir.  I misspoke, I said the
25     contractors, it's FEMA.
```

```
1        A.   Yes.  It's a little bit of both.
2   When you're talking about just --
3        MR. D'AMICO:
4            When you see the fork in the road,
5   take it.
6        MR. BONE:
7            That's right.
8        THE WITNESS:
9            When we talk about "our team," I'm
10  contacted, and I bring my engineers in or
11  testing people, but there were other people,
12  like Mr. Scott and Dr. --
13  EXAMINATION BY MR. BONE:
14       Q.   Smulski?
15       A.   -- Smulski and some other people
16  that I did not bring in.
17       Q.   And so with respect to the folks
18  who you did bring in, who was the team that
19  you assembled personally?
20       A.   Darrell Hicks, he's an electrical
21  engineer; Ervin Ritter, mechanical and
22  environmental engineer; Paul LaGrange to do
23  some air testing for us.  I had several of
24  my either employees or subcontractors
25  disassemble, take the trailer apart, block
```

1    up -- block it.

2          Q.    And that was Mr. Dalton Toups?

3          A.    And Micky Toups.

4          Q.    Micky Toups; and George --

5          A.    George Choate, C-H-O-A-T-E.   And

6    Charles David Moore.

7          Q.    With respect to Mr. LaGrange, why

8    was it important to have him on your team?

9          A.    He had the toys.  He had the

10   blower door and duct blaster testing

11   equipment and we usually employ him to

12   perform those tests for us.

13         Q.    Do you have any of that equipment

14   yourself?

15         A.    No, sir.

16         Q.    Does First General Services of the

17   South -- which I believe is your consulting

18   company, correct?

19         A.    Yes, sir.

20         Q.    Does First General Services of the

21   South have any of those -- the ability to

22   perform those tests independently?

23         A.    No, we do not have that equipment.

24         Q.    Okay.  Do you have anyone at First

25   General Services of the South who has the

1    expertise to perform those particular tests?

2         A.   No, sir.

3         Q.   With respect to Mr. Ritter, why

4    did you bring him on board?

5         A.   Because in other cases involving

6    the travel trailers, there were -- or

7    testing done, there were some issues with

8    mechanical, the ventilation and the

9    ductwork.

10        Q.   Okay.  And specifically with

11   respect to the mechanical, ventilation

12   systems and the ductwork, why was it you

13   felt that Mr. Ritter needed to be part of

14   your team?

15        A.   And also, initially, I did not

16   know that Mr. Scott was involved in the

17   indoor air quality.  And Mr. Ritter is also

18   an environmental engineer.  So, initially,

19   we brought him for that, and we found

20   problems with the air-conditioning system.

21   So that's why we brought him back on the

22   second and third cases.

23        Q.   Okay.  So Mr. Ritter, as a

24   mechanical engineer, had expertise in HVAC

25   systems that others at First General

1    Services of the South did not have, correct?

2        A.    The actual mechanics of the unit,

3    no.  The results of air and moisture

4    problems that result from malfunction of the

5    units, yes.

6        Q.    Okay.  So in terms of the

7    evaluation of the air-conditioning system

8    and its ductwork, was that why you brought

9    Mr. Ritter on board?

10       A.    More for the mechanical and

11   plumbing issues or -- mechanical issues that

12   may be found.

13       Q.    Okay.  When you say -- I

14   understand what you mean when you say

15   "plumbing issues," I assume that's simply

16   the water drains and so on and so forth,

17   correct?

18       A.    Yes, sir.

19       Q.    When you say "mechanical issues,"

20   what are you talking about?

21       A.    The actual air-conditioning and

22   heating units themselves.  Not necessarily

23   the branch outlets of the plenums and ducts.

24       Q.    So you brought him on board to

25   evaluate those particular systems, the HVAC

1    systems?

2         A.    Yes.

3         Q.    Because he has specific expertise

4    in those areas?

5         A.    Yes, sir.

6         Q.    And you have worked with

7    Mr. Ritter before, I take it?

8         A.    Many years.  He and I went to

9    college together, and I think we knew each

10   other in high school.  Went to high school

11   also.

12        Q.    And you have a high opinion of his

13   abilities with regard to evaluation of HVAC

14   systems, correct?

15        A.    Yes.  He's pretty well-regarded in

16   South Louisiana, I guess, in mechanical

17   systems.

18        Q.    And you respect his judgment on

19   those systems, correct?

20        A.    Yes.

21        Q.    Okay.  And you've deferred to him

22   in the past as it relates to his evaluation

23   of HVAC systems.  True?

24        A.    The mechanical units, yes.

25        Q.    In terms of Mr. Hicks being

1    brought on board, what was it specifically

2    with respect to Mr. Hicks that had you bring

3    him on board?

4         A.   To inspect the electrical system,

5    see if it was properly installed, if there

6    were any problems with it, so forth.

7              That was the trailer we were going

8    to take apart, so we asked to have that

9    examined also.

10        Q.   And Mr. Hicks is an electrical

11   engineer?

12        A.   Yes, sir.

13        Q.   And do you have any electrical

14   engineers on staff at First General Services

15   of the South?

16        A.   No, sir.

17        Q.   And you're not an electrical

18   engineer?

19        A.   No, sir.

20        Q.   And so because he had that

21   specific expertise, that's why you brought

22   him on board.  True?

23        A.   Yes, sir.

24        Q.   Now, take me through briefly, if

25   you would, there was a protocol put

1     together, correct?

2          A.   Yes, sir.

3          Q.   On the type of work that your team

4     was going to be doing and the type of work

5     that Mr. Scott and Mr. Smulski would be

6     doing, correct?

7          A.   Yes, sir.

8          Q.   How did that protocol, as it

9     relates to the work performed in the Lyndon

10    Wright case, how did that materialize?

11         MR. PINEDO:

12              Objection, form.

13         THE WITNESS:

14              It was a continuation of the

15    protocol that was established in the

16    Alexander case and then we added to that to

17    accommodate the extra functions we were

18    going to perform on the -- on the Wright

19    case.

20    EXAMINATION BY MR. BONE:

21         Q.   With respect to the Alexander

22    case, was it you and your team who put that

23    together with assistance from Mr. Scott and

24    Mr. Smulski, or was it -- how was that done,

25    if you were building off the Alexander

1    protocol?

2         A.   Well, originally, most of the

3    protocol was developed by me, and then I

4    discussed with Mr. Scott what functions and

5    when he needed to do those functions, and

6    the same with Dr. Smulski, what was it he

7    wanted to do and what time period or what

8    time frame or how much time he was going to

9    need.  And I inputted that into the --

10        Q.   I'm going to hand you a document

11   that's dated May 24, 2009, which is entitled

12   "Protocol Requests, FEMA, Lyndon Wright."

13        (Discussion off the record.)

14   EXAMINATION BY MR. BONE:

15        Q.   It's a 14-page document, beginning

16   at your Bates No. EXPERT7-01095 through 998.

17             Have you seen that document

18   before, Mr. Mallet?

19        MR. PINEDO:

20             Do you have an extra copy?

21        MR. BONE:

22             I do indeed.

23        MR. PINEDO:

24             Thank you.

25        THE WITNESS:

1   level of degradation of the building

2   materials, starting with the entry door, had

3   progressed since this unit left Mr. Wright's

4   control?

5       A.   No, sir.

6       Q.   Did you do any testing to

7   determine with respect to the area under the

8   master bedroom window the amount of

9   degradation that had occurred since

10  Mr. Wright's occupancy of that particular

11  unit?

12      A.   No, sir, just the observations

13  that there was moisture intrusion and that

14  it had been ongoing for some time.

15      Q.   Okay.  And you would agree with me

16  that the conditions as you observed them

17  with respect to the degradation of the

18  building material, the wallboard, for

19  example, below the bedroom window, would

20  have been worse when you observed it than it

21  would have been when Mr. Wright was

22  occupying the unit, correct?

23      A.   It's possible, yes.

24      Q.   Okay.  And the same would be true

25  of the area around the entry door by virtue

```
 1      of the ongoing degradation of that building
 2      material that forms the subfloor, for
 3      example, that would have been worse when you
 4      observed it than it would have been when
 5      Mr. Wright occupied the unit, correct?
 6           A.   Quite possibly, yes.
 7           Q.   Not just possibly, probably, true?
 8           A.   Well, in some areas, the
 9      degradation had proceeded to the point where
10      the wood was almost consumed with the decay.
11      So I can only get to a certain point of
12      decay, when that's not going to further
13      manifest.  So -- and I don't mean to dance
14      around your question, just trying to be
15      accurate.
16                At some point, there's nothing
17      more to decay, and when we opened some of
18      that area up, that's where we were, the
19      building material was pretty much gone.
20                Did some of it continue to get
21      wet?  Probably, yes.
22           Q.   And by virtue of it getting wet,
23      did degradation of those materials continue?
24           A.   The other materials not already --
25      yes.
```

1          Q.   And so by virtue of that, new

2     materials becoming degraded, the condition

3     in which you observed those areas was worse

4     than it had been when Mr. Wright occupied

5     the unit?

6          A.   Yes, quite -- quite possibly, yes.

7          Q.   Did you review any materials that

8     suggested that the leak in this window

9     existed prior to the time it was delivered?

10              And when I say "this window," I

11    mean the master bedroom window, emergency

12    exit window leak existed before the unit was

13    delivered to Mr. Wright?

14         A.   No, sir.

15         Q.   And so is it a fair statement,

16    sir, that you have no evidence to suggest

17    that the leak in the master bedroom

18    emergency exit window existed at the time

19    the unit was delivered to Mr. Wright?

20         A.   Not one way or the other.

21         Q.   With respect to the doorframe

22    damage that you noted, talking about the

23    bowing at the top of the door rather than

24    the damage, which we know occurred in 2008

25    from someone trying to pry the door open,

1        A.    Correct.

2        Q.    Which is four times a year?

3        A.    Correct.

4        Q.    And that it sat out in the field

5    in Melville for more than a year, correct?

6        A.    Less than a year, only about eight

7    months.

8        Q.    Eight months.

9        A.    Yes.

10       Q.    And in that period of time, was it

11   inspected?

12       A.    I don't have any indication that

13   it was.

14       Q.    And so, do you know or can you

15   testify that that particular crack in the

16   sealant occurred during the occupancy of

17   Lyndon Wright?

18       A.    Well, the separation, I can't.

19   But that's not, in my opinion, what caused

20   the leak, or not what caused the

21   manifestation of the mold.

22       Q.    Okay.  As to what caused the

23   manifestation of the mold, what you've

24   testified to was the increased humidity

25   levels, correct?

1          A.    Correct.

2          Q.    Okay.

3          A.    As a result of infiltration from

4     the operation of the air-conditioning system

5     and the unsealed area at the ceiling of

6     the -- of the vent pipe.

7          Q.    Okay.  Well, during the occupancy

8     of Lyndon Wright, did he testify there was

9     any mold in that area?

10         A.    This was inside the wall cavity.

11         Q.    Okay.

12         A.    And -- and Mr. Wright testified

13    that two to three times a week, he cleaned

14    the house down, trying to get rid of the

15    odor in the house.  So I doubt that there

16    would be any outward indication.  But,

17    again, it's inside the wall cavity that I

18    saw that.

19         Q.    And what was the size of the area

20    that you found inside the wall cabinet?

21         A.    Some -- back of the sheet of

22    plywood, say, 4 by 4, you know, indications

23    of mold growth.

24         Q.    Okay.  Is there a photograph that

25    depicts that?

1          A.   I know I have one --

2          Q.   I tell you what, I promised you a

3     break.  Why don't we take a break and you

4     can look through your photographs, we'll

5     take lunch, and then when we come back, if

6     you can show me the photograph that depicts

7     the phenomenon that you described, that

8     would be great.

9          THE VIDEOGRAPHER:

10              We're off the record; it's 12:12.

11         (Recess for lunch.)

12         THE VIDEOGRAPHER:

13              We are back on record; it is 1:43.

14    EXAMINATION BY MR. BONE:

15         Q.   Mr. Mallet, while we were on a

16    break, I had asked if you could locate a

17    photograph relating to the phenomenon you

18    described with respect to mold growth on the

19    interior of one of the walls on a 4-by-4

20    section.

21              Have you been able to locate any

22    documentation or photograph which depicts

23    that particular incident?

24         A.   No, I couldn't find it in my

25    report.  All I can think of is it was in

```
 1    someone else's report that documented it.  I

 2    don't have it.

 3         Q.   All right.  During the break, you

 4    had already given us the opportunity to

 5    review Exhibit 11, which is your notes file

 6    relating to this case.  And I found a

 7    particular document in there that I would

 8    like to question you about.

 9         MR. BONE:

10              Would you prefer 11A or should we

11    mark this as a different exhibit?

12         MR. PINEDO:

13              It's up to you.  I would just call

14    it a different exhibit.

15         MR. BONE:

16              All right.

17    EXAMINATION BY MR. BONE:

18         Q.   I'll mark this document as

19    Exhibit 14 and note that it came from

20    Exhibit 11.

21              And I'm going to hand you the only

22    copy that I have, so we'll have to share

23    with one another.

24              Could you identify that document

25    for me, please, Mr. Mallet?
```

1    were you referring to?

2         A.   The wall.  Wall data.  I mean,

3    wall panels.

4         Q.   Did you ever gather any

5    documentation which indicated the

6    permeability of that particular type of

7    vinyl?

8         A.   The exact permeability?  No.  But

9    it was vinyl, so it's going to be a barrier

10   retarder.

11        Q.   Okay.  A retarder is permeable,

12   correct?

13        A.   Semipermeable.

14        Q.   And a barrier is not permeable at

15   all, correct?

16        A.   It has less than a 1 perm rating

17   on it, so it has some movement, but very,

18   very, very little.

19        Q.   With respect to the Lyndon Wright

20   unit, the vinyl overlay on the hardwood

21   plywood of the wall and ceiling board, do

22   you know whether it was, in fact, a barrier

23   or a retarder?

24        A.   I found no information on it.

25        Q.   Okay.  So as we sit here today,

1    absorption.

2         Q.   Okay.  And with respect to this

3    particular unit, you didn't find any

4    evidence of vapor damage at the interface

5    between the wallboard and the vinyl

6    covering, except for those locations where

7    there was bulk moisture intrusion?

8         A.   That's correct.  The vapor -- the

9    vapor can absorb into the wood and not

10   absorb to the degree of damaging the wood,

11   and I think it's -- I think it's either 90

12   or 95 percent relative humidity; 95 plus

13   percent for damage or decay to begin on

14   paneling.

15          So the humidity can be anything

16   below that in the wall cavity and still not

17   cause damage to the wall paneling.

18        Q.   All right.  And you've testified

19   that mold growth occurs at levels above what

20   percent humidity?

21        A.   Most molds, and depending on the

22   material, will be above 80, 85 and

23   90 percent.

24        Q.   Okay.  And so you would expect to

25   see levels of roughly 80 percent relative

```
1    have got a drier wall cavity and a cooler

2    surface interior finish, the moisture is

3    going to migrate to the inside of that

4    cavity.

5            And then you have -- as in

6    Wright -- if you have a negative pressure in

7    the ceiling, that causes a negative pressure

8    in the wall.

9    EXAMINATION BY MR. BONE:

10       Q.   Are you going to offer any opinion

11   on the sizing of the A/C unit on this

12   particular unit?

13       A.   The size of that unit was of no

14   consequence to me.

15       Q.   Okay.  You leave that to others to

16   talk about?

17       A.   Yeah.  Actually, it was the

18   problem with the ductwork that was the

19   problem -- creating the problems, not the

20   unit itself.

21       Q.   Okay.  And with respect to the

22   ductwork, we've talked to Mr. Ritter about

23   that.  Are you going to offer additional

24   opinions to those expressed by Mr. Ritter?

25       MR. PINEDO:
```

1     A.   The introduction of the

2     off-gassing was introduced into the unit by

3     the leaky ductwork.

4     Q.   What I'm asking you is can you

5     tell me more probably than not that if I

6     started with a unit that had a level of

7     formaldehyde X, whatever X is, that X would

8     have been increased by a certain percentage

9     simply by operation of the air-conditioning

10    system as you found it in this travel

11    trailer?

12    A.   Yes, to the extent that hot, humid

13    air was drawn into the ceiling cavity by the

14    negative air pressures from the duct leakage

15    of the return air system, that would have

16    increased the temperature and relative

17    humidity in the attic cavity and wall

18    cavities.

19    Q.   But what I'm asking you is, what

20    did that do to the concentration of

21    formaldehyde inside the living space of the

22    unit?

23    A.   Well, to the extent that it had

24    off-gassing inside the unit, it's bringing

25    in off-gassing from the attic and the wall

1    system, because your vapor barrier, your

2    pressure barrier, is on the inside of that

3    unit.

4              So if it had X of formaldehyde

5    off-gassing inside the unit and then it's

6    bringing in Y from the -- from the cavities,

7    then it would be increasing that.

8         Q.   So by virtue of the operation of

9    the air-conditioning system, it would be

10   your expectation that the level of

11   formaldehyde in the living space of the

12   trailer would increase?

13        A.   That's how the gas -- yes, that's

14   how the gas would get into -- if there

15   wasn't already off-gassing occurring on the

16   inside of the living area, then the negative

17   air pressure would be drawing in -- even if

18   you had no formaldehyde on the inside, the

19   negative air pressure would be drawing in

20   that which was in the ceiling and wall

21   cavities.

22        Q.   Did you ever perform any testing

23   to quantify the amount of increased

24   formaldehyde concentration within the living

25   space of this particular trailer by

1    operation of the air-conditioning system?

2         A.   No.   Quantification, we did not.

3         Q.   So you couldn't tell me if it

4    increased it by 1 part per billion or 100

5    parts per billion, could you?

6         A.   No, I could not.

7         Q.   And the same question with respect

8    to the heating system --

9         MR. PINEDO:

10              Were you finished with your

11   answer, Mr. Mallet?

12        THE WITNESS:

13              Yes.

14        MR. PINEDO:

15              Sorry.

16        MR. BONE:

17              That's all right.

18   EXAMINATION BY MR. BONE:

19        Q.   With respect to the heating

20   system, would the same be true?

21              In other words, did you perform

22   any testing that would quantify the increase

23   in formaldehyde concentration within the

24   Lyndon Wright unit by operation of the

25   heating system?

1        A.   No, no quantification.

2        Q.   Okay.  Again, so you couldn't say,

3    if called upon to testify, that the

4    operation of the heating system would have

5    increased the formaldehyde concentration in

6    the Lyndon Wright unit by 1 part per billion

7    or 100 parts per billion.   True?

8        A.   That's correct.

9        Q.   Okay.

10       A.   And the quantity, from my

11   standpoint, is -- is of no consequence.   The

12   avenue, one, if there is off-gassing; and

13   what conditions are conducive to the

14   off-gassing; how does that off-gassing get

15   into the living area?

16            So I was not -- it was not my

17   charge to quantify any formaldehyde

18   off-gassing.

19       Q.   And I appreciate your answer, but

20   my question relates specifically to this.

21   It may increase formaldehyde off-gassing.   I

22   understand that's your opinion.  But that

23   increase in off-gassing, you can't tell me

24   whether that results in any increase in

25   concentration in the living quarters of the

1     unit, correct?

2          A.    Well, if it's drawing in even

3     1/10th part per billion more than is already

4     in the unit, remember, we've got a vapor

5     barrier on the inside, and we're bringing in

6     more air than we're expelling from the

7     attic.

8               So to the extent that we have

9     off-gassing in the attic or the ceiling,

10    even if 1/10th of a billion -- same thing

11    with mold.

12              If we equate it to mold, when your

13    system is operating under negative pressure,

14    it's drawing in the hot, humid contaminants

15    from the outside, whether it's mold, whether

16    it's sulfur gases, whether it's formaldehyde

17    gases, whatever is around the envelope of

18    that building, that's what is going to be

19    drawn into the building.

20         Q.    All right.  But the actual impact

21    on air quality, you can't tell me?

22         A.    I can't quantify.

23         Q.    Right.  And there's a way to test

24    how the formaldehyde level in this trailer

25    would be impacted by the operation of either

1    the heating or air-conditioning system,

2    isn't there?

3        A.   That's beyond the scope of my

4    expertise.

5        Q.   Did you ever ask Bill Scott,

6    "Isn't there a way for us to test how the

7    operation of the air-conditioning system

8    affects formaldehyde concentration in this

9    trailer?"

10       A.   No, I did not.  I had very little

11   interaction with Bill Scott.

12       Q.   Have you been provided the

13   stipulation regarding the use of

14   low-formaldehyde-emitting products in this

15   trailer?

16       A.   The stipulation that you-all have

17   stated that there was LFE in there?

18       Q.   There's a stipulation amongst all

19   the parties in this litigation that all of

20   the wood products contained within the

21   Lyndon Wright unit that may have contained

22   urea formaldehyde resin were

23   low-formaldehyde-emitting.  Were you aware

24   of that?

25       A.   No.  The only thing I was aware of

 1    would have caused damage to the frame or the

 2    body of this particular unit?

 3         A.   Well, it could have placed a

 4    stress differently than the other three

 5    where you would have been off on that right

 6    tire, left front area.  It would track

 7    differently.

 8         Q.   Were there any tests performed to

 9    determine what type of stresses that would

10    have caused on this particular unit?

11         A.   No.  Other than when the jacking

12    began when the Shaw consultant started to do

13    the jacking, they raised it in 1-inch

14    increments, and the unit squealed and

15    creaked and you can tell it was being placed

16    under some sort of a stress.

17         Q.   But with respect to the 14-inch

18    tire, I mean, what I'm asking you is, are

19    you going to testify more probably than not

20    that that 14-inch tire caused some problem

21    with respect to the structural integrity of

22    the envelope of this travel trailer?

23         A.   No.  That would have been -- that

24    would be Mr. Moore's area.

25         THE VIDEOGRAPHER:

```
 1              We are off the record; it is 2:59,

 2     the end of Tape 2.

 3        (Recess.)

 4        THE VIDEOGRAPHER:

 5              Back on the record.  It is 3:15,

 6     the beginning of Tape 3.

 7     EXAMINATION BY MR. BONE:

 8        Q.   Mr. Mallet, I have just a few more

 9     questions for you, and I think we will be

10     done.

11              I have marked as Mallet Exhibit 15

12     a document which appears to be some notes

13     that you had taken.

14              Can you identify those from your

15     file?  This is Bates numbered 2992 from

16     Lyndon Wright Forest River Expert 7.

17        A.   Yes, sir.  Those are some

18     transcribed notes.

19        Q.   And I want to direct your

20     attention on February 5 -- excuse me, on

21     Mallet Exhibit 15 to No. 3, where you talk

22     about "Fribley Technical Services out of

23     Indiana is one of the consultants for Forest

24     River.  He is in the travel trailer

25     industry.  We need to do some research on
```

1   him."

2            Who was going to be doing research

3   on Mr. Fribley?

4      A.  I was, to see what his background

5   was.  He showed up -- I think that was the

6   second case that he showed up on.  And they

7   told me that he had a business.  Yeah, a

8   consulting business.

9      Q.  Are you in the habit of

10  investigating the opposing counsel -- the

11  opposing side's experts?

12     MR. PINEDO:

13         Objection, form.

14     THE WITNESS:

15         Just to see who they are and what

16  their qualifications are.

17  EXAMINATION BY MR. BONE:

18     Q.  Were you asked to do that by

19  anyone or did you take it upon yourself to

20  do that?

21     A.  I took it upon myself.  It's not

22  unusual for me to see who the other people

23  involved in a case are.

24     Q.  I didn't see any research on

25  Mr. Fribley in your file materials that I've

1      gone through.  Do you have documents

2      relating to Mr. Fribley's qualifications

3      somewhere?

4           A.   I just pulled up his Web site, if

5      I remember.

6           Q.   Okay.  Any --

7           A.   And --

8           Q.   Go ahead.

9           A.   I was going to say, I didn't print

10     anything out.  I just saw who he was and

11     where he was from.

12          MR. PINEDO:

13               Let me state that, he has the

14     report and the CV somewhere in here.

15     Fribley's report and CV.

16     EXAMINATION BY MR. BONE:

17          Q.   Right.  But in terms of

18     independent investigation into the

19     background of Mr. Fribley, that's what I'm

20     trying to get at.

21               And you looked at his Web site,

22     but you don't have any other documentation

23     other than what Mr. Pinedo just referenced,

24     his report and curriculum vitae?

25          A.   Yes.  I meant that's something

1    that I would have produced.

2         Q.   And that was my intent in asking

3    the question.  I just wanted to make sure we

4    were clear.

5              I have a copy of Mallet Exhibit 2,

6    which is your fee or billing statements in

7    this particular case.

8              And as of December 9, 2009, you

9    had billed, or First General Services of the

10   South had invoiced Mr. D'Amico the amount of

11   $241,921.96.

12             Was that a complete bill for you

13   or were there others involved in generating

14   the bill in terms of, was this your bill or

15   was this the bill for you and Mr. Moore and

16   Mr. Ritter and others?

17        A.   That's everyone's bills.

18   Everyone's time, materials, expenses, office

19   personnel, copying, whatever materials we

20   had to buy for the jacking, blocking, that

21   sort of stuff.

22        Q.   And how many additional hours have

23   you expended on this particular case since

24   this invoice was produced?

25        A.   I don't really know.  I think all

1    I did was deposition prep, and I mean, there

2    may have been phone calls, but I think

3    that's all that I did.

4         Q.   All right.  Let me ask you and,

5    again, we only have one copy, so we'll have

6    to look on with each other.

7              On this description page, which is

8    page 16, you have "Ritter Consulting

9    Engineers, Mechanical Engineer, 178 hours at

10   $300, equaling $53,400."  Correct?

11        A.   Yes, sir.

12        Q.   And then for the draftsmen and

13   clerical work, we have an additional,

14   roughly, what, $9,000?

15        A.   Minus --

16        Q.   $3,000 here and $5,000 here for

17   the draftsmen and clerical for Ritter

18   Consulting?

19        A.   Yes.

20        Q.   Okay.  Do you know if his bill was

21   cut?

22        A.   Cut?

23        Q.   Did he submit a higher bill to

24   you, which was subsequently reduced?

25        A.   No.

```
 1          Q.   We took Mr. Ritter's deposition.
 2     At that time, his bill was somewhere in the
 3     range of $80,000.  Do you know how it came
 4     to be that it went from 80 to, essentially,
 5     63?
 6          A.   Unless he had not invoiced us for
 7     work after the -- can you back up one page?
 8          Q.   Sure.
 9          A.   That's as of September 30.  He
10     must have produced more work after that, but
11     not invoiced us for it.
12          Q.   Okay.  So from September 30 until
13     December 9, Mr. Ritter may have performed
14     more work, but he certainly didn't provide
15     an invoice to you for that work?
16          A.   That's correct, right.
17          Q.   Has this invoice been paid, Mallet
18     Exhibit 2?
19          A.   No, sir.  That has just been
20     submitted.
21          Q.   Do you expect to receive payment
22     within a certain amount of time?
23          A.   Probably by the end of the month.
24     It usually takes, I don't know, maybe 60
25     days to process.
```

1      Q.   Have you been paid for your work

2   in the Alexander case?

3      A.   As far as I know.

4      Q.   Have you been paid for your work

5   in the Dubuclet case?

6      A.   No, we actually billed Dubuclet

7   after -- after that.

8      Q.   After December 9 of this year?

9      A.   Yes.

10      Q.   Excuse me, last year?

11      A.   Last year, yes.

12      Q.   Okay.  Do you recall how much you

13   billed on the Dubuclet matter?

14      A.   No idea.

15      Q.   Was it more or less than $241,000?

16      A.   Oh, it would have been much less.

17      Q.   And do you recall what the total

18   bill in the Alexander case was?

19      A.   No idea.  My sister doesn't let me

20   anywhere around the money.

21      (Brief discussion between reporter and

22   witness off the record.)

23      A.   I will review the invoices, try to

24   make sure that they're accurate and they

25   make sense, but then I hand it back to the

190

1     girls, and they take care of it from there.

2          Q.   All right.  Was it the case in

3     Alexander that at the time of trial, you had

4     not been paid?

5          A.   I couldn't answer that.  I would

6     have to ask the girls.  I don't really know.

7          Q.   All right.  Well, Mr. Mallet, what

8     I'm going to do is I'm going to look through

9     some of your file materials while these

10    other gentlemen question you, and if

11    something comes up during my review of that

12    material, I may have some additional

13    questions.

14          But I certainly appreciate you

15    coming down here.  I understand you're under

16    the weather with a sore throat, but I

17    certainly appreciate your time.

18          A.   Thanks for your patience.

19          (Discussion off the record.)

20    EXAMINATION BY MR. KURTZ:

21          Q.   Good afternoon, Mr. Mallet, my

22    name is Dave Kurtz.  I believe we've met

23    before, but you know I represent Shaw

24    Environmental.

25          A.   Yes, sir.

```
 1        Q.   The same thing you were just doing
 2   with Mr. Bone, if I ask you any questions
 3   and for any reason you don't understand or
 4   if I ask a poor question or for any reason,
 5   please just let me know.  Is that all right?
 6        A.   Yes, sir.
 7        Q.   You recall Mr. Bone asking you
 8   some questions about a ready-for-occupancy
 9   checklist that was filled out by one of
10   Shaw's subcontractors?
11        A.   Yes, sir.
12        Q.   And he asked you whether that
13   reflected that the unit had been damaged
14   prior to delivery, right?
15        A.   Yes, sir.
16        Q.   Is that inspection-type document
17   the sort of thing that you typically rely on
18   as an expert?
19        A.   Yes.  I mean, it's the only
20   documentation that's provided to me, so,
21   yes.
22        Q.   And what -- what do inspection
23   reports tell an expert like you?
24        A.   If there  -- let's talk about this
25   trailer and what it meant to me, what I --
```

1        Q.   All right.

2        A.   If there would have been

3    information stating that the -- maybe the

4    roof was damaged during transportation, that

5    the windows had been broke out, if there was

6    a hole in the -- in the building, you know,

7    from some casualty in transportation; to

8    give me an idea whether there was anything

9    altered with the building, at least up until

10   the time of delivery, to the -- to the FEMA

11   yard.

12           And then the -- beyond there, the

13   maintenance records, you know, to give me an

14   indication of what took place before I got

15   involved.

16       Q.   Okay.  Those records might tell

17   you what took place and when, right?

18       A.   Correct.

19       Q.   And the -- the maintenance records

20   might reflect the occurrence of damage,

21   right?

22       A.   Yes.

23       Q.   Or the absence of damage, right?

24       A.   Yes.

25       Q.   Let me show you a document that

```
 1    bears Bates label CROWN 000010.  I'm going

 2    to ask Cathy to mark that as the next

 3    exhibit.  Are we on 16?  And ask if you have

 4    ever seen that document before, sir.

 5         A.   Yes, sir.

 6         Q.   When did you see that?

 7         A.   Whenever the file information was

 8    produced to me.  I couldn't tell you.  I

 9    mean, it was some time ago.

10         Q.   Did you see that before you

11    prepared your report?

12              And if you don't know, that's

13    okay.  I just -- I'll represent to you that

14    this may have been produced to us after your

15    report has been generated.  So I want to

16    know -- I want to try to nail down when you

17    first saw it.

18         A.   I couldn't tell you.  I -- I don't

19    know.

20         Q.   Okay.  Thank you.

21              Mr. Mallet, what does Mallet

22    Exhibit 16 reflect as the date of the

23    inspection that's being recorded on that

24    document?

25         A.   March 19, 2008.
```

194

1          Q.   I believe it's April; is that
2     right?
3          A.   Yes, sir.  April 19, 2008.
4          Q.   That's okay.  It's been a long
5     day, I understand.
6               And whose signature appears by
7     "Resident"?
8          A.   Lyndon Wright.
9          Q.   Okay.  Could you read into the
10    record, Mr. Mallet, what the second of the
11    inspection items is on this list?
12         A.   "Unit level/foundation
13    supports/anchor straps."
14         Q.   Okay.  And the condition marked
15    there is what?
16         A.   I'm sorry, "Pass."
17         Q.   Okay.  If you look down at the
18    eighth item, I'll read it, I'm sorry for
19    making you read the last one, I know you're
20    under the weather.
21              It says, "Exterior
22    doors/locks/hardware," and it indicates the
23    condition of pass, right?
24         A.   Yes, sir.
25         Q.   Further down, the second to the

1    last one has, "HVAC unit/thermostat/filter,"

2    and has the condition of pass, right?

3         A.   Yes, sir.

4         Q.   In fact, this document reflects

5    that on April 19, 2008, every aspect of the

6    trailer that was checked out passed the

7    inspection, correct?

8         A.   Yes, sir.

9         Q.   Okay.  Do you have any evidence to

10   contradict what this document shows about

11   the condition of the trailer on April 19,

12   2008?

13        A.   No, sir.

14        Q.   Okay.  Thank you.

15             Mr. Mallet, I'm going to have to

16   jump around a little bit because Mr. Bone

17   covered so much of what I wanted to cover,

18   so forgive me if I jump topics too much.

19             But I wanted to ask you about

20   caulk.  Do you understand that caulk can

21   degrade over time when exposed to the

22   elements?

23        A.   Yes, sir.

24        Q.   Were you able to identify the

25   specific type of caulk that was used to seal

196

1    the joints between the window frame and the

2    frame of the trailer on the unit that

3    Mr. Wright occupied?

4         A.   Not the type of caulk or the

5    brand.  What I was able to identify was what

6    NACS -- or NASC.

7         Q.   NACS, I believe.

8         A.   NACS?

9         Q.   Yes, sir.

10        A.   -- had specified.

11        Q.   Based on the specification, do you

12   have an understanding as to how long that

13   type of caulk can be expected to last when

14   exposed to the elements without maintenance?

15        A.   The specifications or standards

16   state that the caulk can be expected to last

17   50 years, and they have a 5-year warranty on

18   the -- on the material.

19        Q.   Okay.  But Forest River's owner's

20   manual suggests that all joints should be

21   inspected quarterly, right?

22        A.   Yes.

23        Q.   And wouldn't you agree that that's

24   important to do that?

25        A.   Yes, sir.

1          Q.   And part of the purpose of that is

2     to catch it if some of the caulk happens to

3     degrade earlier than the expected useful

4     life, right?

5          A.   Yes, sir.  An inspection may not

6     necessarily catch the problem.  It could be

7     within the wall system that is not

8     manifesting.  So we can have water intrusion

9     into an envelope for quite some time before

10    that -- that ever develops into a condition

11    that's observable just by inspection or

12    observation.

13         MR. BONE:

14              Objection, nonresponsive.

15         MR. KURTZ:

16              I join in that objection.

17    EXAMINATION BY MR. KURTZ:

18         Q.   But, Mr. Mallet, if there is no

19    inspection going on and there's no one

20    living in the unit, then, there's no one to

21    see it, regardless of whether it has

22    manifested itself as a water leak or not,

23    right?

24         A.   That's correct.  However, even if

25    it's occupied, they don't necessarily --

1      they are not able to necessarily see that

2      there's water infiltration.

3          Q.   Okay.

4          A.   The front door is a good example.

5      Until we actually took that door apart, we

6      had no idea that that floor system had

7      rotted through and through, the framing, in

8      that -- in that area there.

9          MR. KURTZ:

10              Object to the responsiveness of

11     that as well.

12     EXAMINATION BY MR. KURTZ:

13         Q.   Mr. Mallet, Mr. Wright testified

14     that water came -- let me scratch that and

15     start over.

16              I believe you testified earlier

17     that you understood that water started

18     coming in over the top of the door in

19     January of 2007, right?

20         A.   Somewhere in that neighborhood,

21     yes, sir.

22         Q.   All right.  And that type of leak

23     would be obvious to an occupant, right?  I

24     mean, there's no wall cavity to hide the

25     leak in that situation, right?

1      A.   Correct.

2      Q.   You don't have any reason to

3  believe that there was actually water

4  leaking there before January of 2007, do

5  you?

6      A.   Well, there's a potential, because

7  of the concealed decaying that we saw in the

8  framing and -- and the decking, floor

9  decking.  It could have very well because we

10  didn't see that until we actually pulled the

11  frame apart.

12      Q.   There's nothing in your report

13  about when that damage began to occur, is

14  there?

15      A.   No, sir, but I was just responding

16  to the question that there was no damage

17  observable.  And that's correct, however, it

18  doesn't mean that the damage wasn't there,

19  because we did find damage at the door when

20  we took the door apart.

21      Q.   But it's your opinion, Mr. Mallet,

22  that the water that led to that damage was

23  coming in over the top of the door, right?

24      A.   Well, there was water coming in

25  over the top of the door.  Whether that was

1    the only mode of entry, we don't know.

2         Q.   And there is nothing in your

3    report about any other alternative modes of

4    entry, right?

5         A.   That's correct.

6         Q.   Okay.

7         A.   And if the sealant was leaking, we

8    couldn't tell that by observing.  And in the

9    area that the decay was, there was no

10   other -- when we observed the water coming

11   into the building, it ran onto the linoleum

12   and then across -- across to the carpeting

13   at the -- toward the pantry.

14        MR. KURTZ:

15             Object to the responsiveness of

16   that.

17   EXAMINATION BY MR. KURTZ:

18        Q.   Mr. Mallet, you discussed with

19   Mr. Bone an e-mail that you had with the

20   building code official at the City of New

21   Orleans.  Do you recall that?

22        A.   Yes, sir.

23        Q.   Did you speak -- you spoke to

24   Mr. Odom on the telephone prior to that

25   e-mail exchange, right?

```
 1        A.   No.  We did it by e-mail to
 2   document.
 3        Q.   You never talked to him on the
 4   telephone?
 5        A.   No, sir.
 6        Q.   Okay.  So --
 7        A.   As a matter of fact, we called for
 8   him and never got a return call, so that's
 9   when we e-mailed for him.
10        Q.   You don't have any information
11   from the City of New Orleans about the
12   application of the building code to travel
13   trailer installations other than what's
14   reflected in that e-mail, right?
15        MR. PINEDO:
16             Objection, form.
17        THE WITNESS:
18             Application of the building codes?
19   Is that the question?
20   EXAMINATION BY MR. KURTZ:
21        Q.   Yes, sir.
22        A.   That's correct.
23        Q.   Okay.  You testified earlier, I
24   believe, that you're not a chemist, right?
25        A.   I didn't, but I'm not.
```

1      Q.   Okay.  And you're also not an

2   expert in the behavior of gases, right?

3      A.   No, but I have been involved in

4   problem areas that involved that, to

5   determine entry of problem gases into

6   buildings.

7      Q.   It would be outside of your

8   expertise to discuss things like partial

9   pressures of various gases, right?

10      A.   That's correct.

11      Q.   Okay.  Did you work with Mr. Moore

12   in connection with the preparation of his

13   report?

14      A.   Yes, sir.

15      Q.   Were there e-mail exchanges

16   between you and him about drafts of his

17   report?

18      A.   I couldn't tell you.

19      Q.   Did you bring any such e-mail

20   exchanges with you today?

21      A.   All of my e-mails are in the

22   files.

23      Q.   Do you know whether you did or you

24   didn't?

25      A.   That's a lifetime away.  I really

203

1    couldn't tell you.

2         Q.   Okay.  Did he work with you,

3    Mr. Moore work with you regarding the

4    preparation of your report?

5         A.   Well, we, I mean, collected the

6    data together and we worked on formulations

7    of opinions together while we were out at

8    the site and subsequent to that.

9         Q.   I'm thinking about the actual

10   drafting of your report, Mr. Mallet.  Did he

11   any input into how your report was written?

12        A.   No.  No.

13        Q.   Okay.  At a break, I'll look

14   through your files and see if I can't find

15   any of the e-mails and reserve questions on

16   that.

17             Did you ever speak to anybody who

18   claimed to have seen the actual installation

19   of the trailer that Mr. Wright occupied?

20        A.   No, sir.

21        Q.   Okay.  Have you talked to anyone

22   other than Mr. Wright himself who claimed to

23   have seen the trailer at 2315 Seminole Lane?

24        A.   Yes.  Bill Scott, I think.

25        Q.   Okay.  What did he tell you about

1    it?

2         A.   I just know that he saw it and

3    they did testing before it was removed, but

4    that was about it.  That was way at the

5    beginning.

6         Q.   Did you rely on anything Mr. Scott

7    told you in the preparation of your report?

8         A.   As far as its location, Seminole

9    Lane?

10        Q.   Yes, sir.

11        A.   No, sir.

12        Q.   Did you talk to anyone other than

13   Mr. Wright and Mr. Scott about the condition

14   of the trailer as it existed at 2315

15   Seminole Lane?

16        A.   No, sir.

17        Q.   Do you have any knowledge about

18   how the trailer that Mr. Wright occupied was

19   installed, the process that was used?

20        A.   I requested that process, and it

21   was my understanding that there was no

22   jacking protocol or installation protocol.

23        Q.   Okay.  So you don't know how many

24   jacks were used, right?

25        A.   Seems like I was told it was two

1    jacks.

2         Q.   Who told you that?

3         A.   I don't know.  I don't recall.

4         Q.   Did you rely on that information

5    in connection with preparing your report?

6         A.   No, sir.

7         Q.   Do you know if jacks were used at

8    all?

9         A.   No, sir.

10        Q.   Okay.  So your report talks about

11   jacking sort of throughout the report at

12   various points, but you don't know if there

13   was any actual jacking, do you?

14        A.   They put it on blocks, so it got

15   up there some kind of way.  And if you

16   lifted it -- I don't know how it would have

17   gotten on the jacks -- I mean, on the blocks

18   other than somebody picked it up, picked the

19   unit up.

20        Q.   Okay.  But you don't know what

21   process -- what mechanism was used to pick

22   it up, right?

23        A.   No, sir.

24        Q.   Okay.  When the trailer was

25   installed at 2315 Seminole Lane, were the

```
1     tires touching the ground when Mr. Wright
2     was living in the trailer?
3          A.   Yes.  Mr. Wright said he thought
4     they were touching the ground.
5          Q.   Okay.  You don't have any reason
6     to believe otherwise, do you?
7          A.   Well, when your experts jacked up
8     the trailer the way it was supposed to be
9     replicating the jacking, the wheels didn't
10    touch the ground.
11         Q.   That was at a different location
12    than where Mr. Wright lived, right?
13         A.   It was, but it was a level -- it
14    was a level surface.
15         Q.   Did you check the level of the
16    ground in Melville?
17         A.   It was reasonably level.
18         Q.   Did you check?
19         A.   No, we didn't put a level on it.
20         Q.   Okay.  Do you believe that it
21    is --
22         A.   And even if it was, there was no
23    indication that the tires were serviced
24    during the year and a half -- yeah, year and
25    a half that Mr. Wright was there.  So after
```

```
 1    the first month or so, it would begin losing

 2    between 2 and 3 pounds of pressure per tire.

 3              So, surely, the tires weren't

 4    touching the ground or pressure on the tires

 5    from the ground.

 6       MR. KURTZ:

 7              I object to the responsiveness of

 8    that.

 9        THE WITNESS:

10              Well, the indication is, is that

11    even if it was touching the ground, that

12    unless it was serviced, it would not have

13    been touching the ground.  Just -- your

14    expert said that.  Or one of your experts

15    said that.  That's in his report.

16       MR. KURTZ:

17              I object to the responsiveness of

18    that.

19    EXAMINATION BY MR. KURTZ:

20       Q.   Mr. Mallet, you didn't render any

21    opinions about how much a tire would shrink

22    over the period that Mr. Wright occupied the

23    trailer due to the loss of air pressure.

24    That's not in your report, is it?

25       A.   It is not.  I'm just repeating the
```

1   information in Mr. Mark Polk's report --

2   reports.

3        Q.   When you saw the trailer in

4   Melville, was it possible to stand on the

5   outside of the trailer and stick your

6   fingers over the door into the interior of

7   the trailer?

8        A.   I don't know.

9        Q.   Okay.  The condition that you

10  observed, the bowing of the door, is a

11  different condition than the one that

12  Mr. Wright testified about at his deposition

13  where there was a gap, a triangular-shaped

14  gap over the door that was larger near the

15  hinge than it was -- I'm sorry, larger near

16  the latch than it was near the hinge side of

17  the top of the door, right, those are two

18  different conditions?

19       A.   It is, but not necessarily

20  inconsistent.

21       Q.   Okay.  When did the trailer get to

22  Melville?

23       A.   Sometime after October 2008, but I

24  don't know the date.

25       Q.   Okay.  You don't have anything in

```
1    your report about the relative humidity

2    level in the trailer while Mr. Wright

3    occupied it, do you?

4         A.   No, sir.

5         Q.   Let me ask you to turn to your

6    report, please, Mr. Mallet, Exhibit 8 to

7    this deposition, page 2.

8              Item 10 shows that you were going

9    to undertake a review of any connections or

10   placement indications for blocking and

11   jacking of the temporary housing unit as it

12   was installed on the Wright property.

13             What do you mean by "connections

14   or placement indications"?

15        A.   Strapping and blocking of -- of

16   the unit, where the locations of the

17   connections are.

18        Q.   And how did you undertake to

19   review that?

20        A.   I think there was a drawing of --

21   of the strapping -- where the units were

22   strapped.

23        Q.   So you're talking about reviewing

24   a design-type document?

25        A.   Yes, sir.
```

1        Q.    Something that was generated by

2   FEMA?

3        A.    I don't know what the document

4   was.

5        Q.    Okay.

6        A.    I don't know who generated it, not

7   what it was.

8        Q.    What -- what relevance did that

9   review have to the preparation of your

10  report?

11       MR. PINEDO:

12            Objection, form.

13       THE WITNESS:

14            Other than it was -- removing the

15  possibility from that unit being used as a

16  recreational vehicle.  It was just inclusive

17  in the study of the documents of the unit.

18  EXAMINATION BY MR. KURTZ:

19       Q.    Let me ask you to look at page 6.

20  If I understand this introduction correctly,

21  Mr. Mallet, you were asked to do five

22  things, right?

23       A.    Yes.

24       Q.    Okay.  And on the fifth thing, you

25  were asked, "To determine if there was any

1    relationship between the jacking and

2    blocking undertaken to place the Wright THU

3    on piers and the entry of air, moisture and

4    radiation energy that caused deterioration

5    of the THU and contributed to the

6    proliferation of mold and off-gassing."

7           Did I read that correctly?

8       A.   Yes, sir.

9       Q.   What method did you employ to make

10   that determination, whether such a

11   relationship existed?

12      A.   Well, in the jacking and blocking,

13   the observation and measurements of the

14   movement in the -- in the framing and the

15   door unit in its -- after it was in place,

16   the recovery of that movement.  Observation

17   of some of the leakage in areas around the

18   windows and any distortion or movement in

19   the framing of the -- of the unit.

20      Q.   So your approach was to observe

21   the unit for movement and also examine

22   whatever damage you actually saw in

23   Melville, and from that, draw a conclusion

24   about whether there was a relationship

25   between the jacking process and the

1    infiltration of air, moisture and radiation

2    energy, right?

3         A.   Yes, sir.

4         Q.   Okay.  Now, you knew before

5    undertaking those observations that the

6    trailer is not infinitely stiff, right?

7         A.   Correct.

8         Q.   So you knew that there would be

9    some movement of trailer elements during the

10   jacking process, right?

11        A.   Correct.

12        Q.   Okay.  And in fact, trailers are

13   designed to go over the road, right?

14        A.   Correct.

15        Q.   And certain elements of trailers

16   move around during normal over-the-road use,

17   right?

18        A.   Yes.

19        Q.   And trailers are designed to do

20   that without sustaining damage -- if you

21   need some water, please.

22        A.   Thank you.

23        Q.   You knew that trailers were

24   designed to and do sustain those sorts of

25   transportation loads without developing

```
 1    leaks, right?

 2         A.   Correct.

 3         Q.   Okay.  So what did you do to check

 4    to see whether the movements that you were

 5    observing in Melville were worse than or

 6    greater than, or however you want to put it,

 7    as compared to transportation loading?

 8         A.   Let me correct my last answer that

 9    leaks can develop from just the movement of

10    the trailers.  That's why they request

11    checking the sealant material on a quarterly

12    basis, because of the continuous moving of

13    the -- of the unit as it's used.

14         Q.   They can, but you'd agree with me

15    that they don't always do that just from

16    over-the-road travel, right?

17         A.   No, not always.

18         Q.   So what did you do to check to see

19    whether the movements that you saw in

20    Melville were worse than or greater than, or

21    however you want to put it, as compared to

22    normal transportation loads that do not

23    always cause damage to trailers?

24         MR. PINEDO:

25              Objection, form.
```

```
 1        THE WITNESS:
 2             Well, the door, for one, remained
 3   out of square after it was jacked and the
 4   pressures on the jacks were released and the
 5   blocking was in place.
 6             The areas around at least one of
 7   the windows, we did not, or could not
 8   directly state that it was either from an
 9   installation of the caulking or did the
10   jacking exacerbate the condition to elongate
11   the caulking to allow for moisture to -- to
12   enter.  I think Mr. Osteras opined that
13   those are going to be the two reasons for
14   the caulking failure.
15        (Brief discussion between reporter and
16   witness off the record.)
17        Q.   Mr. Mallet, let me object to the
18   responsiveness of that and try to remind you
19   that my question is about, what did you do
20   to compare what you saw in Melville to
21   transportation loads?  Did you do anything
22   to do that?
23        A.   To transportation loads?
24        Q.   Yes, sir.
25        A.   Not to transportation loads, only
```

1    to the jacking.

2         Q.   Okay.  Would you agree with me,

3    Mr. Mallet, that the process of

4    de-installing a trailer is essentially the

5    reverse of the process of installing a

6    trailer?

7         A.   Yes, I would say that.

8         Q.   And when de-installing a trailer

9    from piers back onto its wheel base and the

10   tongue jack, the same sorts of loads are

11   imposed on the frame and on the box of the

12   trailer itself as during the installation

13   process, right?

14        A.   Correct.

15        Q.   Okay.  So -- okay.  Let -- what

16   did you understand Shaw's responsibility to

17   be with regard to releveling the trailer if

18   it came out of level?

19        A.   I don't know that I could point to

20   anything specific other than I think Shaw

21   was to maintain -- do the maintenance on the

22   trailer, at least for some period of time.

23        Q.   Do you know for how long?

24        A.   I think until June of 2006.

25        Q.   Okay.  Do you recall Mr. Bone

1   asked you some questions about the one

2   14-inch tire that you observed in Melville?

3           I'm sorry if you've already

4   answered this, but do you know when that

5   14-inch tire was put on the trailer?

6       MR. PINEDO:

7           Objection, form.

8       THE WITNESS:

9           No, sir.

10  EXAMINATION BY MR. KURTZ:

11      Q.   You did not observe any permanent

12  deformations of the frame, did you, in

13  Melville?

14      A.   Metal frame?

15      Q.   Yes, sir.

16      A.   No, sir.

17      Q.   Okay.  And can we agree that the

18  words "frame" and "chassis" in this context

19  mean the same thing?

20      A.   Yes, sir.

21      Q.   Okay.  Let me ask you to turn to

22  page 61.

23           I'm sorry, the next page, page 62.

24  Do you see item B at the top?

25      A.   Yes, sir.

1        Q.   The first sentence reads, "In

2   addition, during the jacking and blocking of

3   the unit, it was noted that the window units

4   appeared to move or open, breaking the air

5   seal between the window and the window

6   frame."

7             Did I read that correctly?

8        A.   Yes, sir.

9        Q.   I want to make sure I understand

10  what you're talking about.  You're talking

11  about the seal that is sealed by a gasket

12  that is -- well, it's between the window and

13  the window frame, not between the window

14  frame and the trailer itself, right?  That's

15  what's being talked about in this sentence?

16       A.   Right.

17       Q.   And the reason the gaskets are

18  used to seal openings like that is because,

19  first, the window is made to be opened from

20  time to time, right?

21       A.   Yes, sir.

22       Q.   And when it's closed, that air

23  seal is re-formed by the pressure of the

24  window against that gasket, right?

25       A.   Yes, sir.

```
 1        Q.   Which windows are you talking

 2   about here in Exhibit B -- I mean item B on

 3   page 62 of your report?

 4        A.   The one I remember was the kitchen

 5   window?  No.  Kitchen table window is the

 6   one I remember.

 7        Q.   Okay.  How much did the window

 8   move relative to the window frame during the

 9   jacking process?

10        A.   I don't know.  I couldn't measure

11   it.  Or I didn't measure it.  It opened

12   outwards, in contradiction to the -- to the

13   crack monitors.

14        Q.   You mean that the -- the window

15   moved out in the same direction that it

16   would normally move if you were opening the

17   window?

18        A.   Yes, correct.

19        Q.   You took some pictures from inside

20   the trailer during a rain event.  Do you

21   recall that?

22        A.   Yes, sir.

23        Q.   Do you know what day you took

24   those pictures?

25        A.   No, sir, I don't.
```

1        Q.   Okay.  Did it start raining and
2    you went into the trailer because that was
3    the only place to get out of the rain?
4        A.   No, I think we were either --
5    either inspecting or testing inside when
6    that -- when that occurred.
7        Q.   Okay.  Who was in the trailer with
8    you that day?
9        A.   Mr. Ritter, a lady photographer,
10   Celeste, maybe.  Mr. LaGrange.  Maybe
11   Mr. Bone.  I'm not certain.  And there may
12   have been one or two others.
13            Oh, and -- that's all I can tell
14   you for certain.
15       Q.   Let me ask you to look at page 64
16   of your report.  Item 6, towards the bottom,
17   do you see that?
18       A.   Yes, sir.
19       Q.   You see where you say that "The
20   exterior door moved significantly into an
21   out-of-square position"?
22       A.   Yes, sir.
23       Q.   You don't have in your report any
24   measurements of how far that door moved, do
25   you?

1        A.   I don't, because it moved beyond

2   the crack monitor's ability to record.

3        Q.   Did you have a crack monitor on

4   the door?

5        A.   We had several crack monitors on

6   the door, I believe.

7        Q.   Now, the -- the door opening is

8   also sealed with a gasket, right?

9        A.   Yes, sir.

10       Q.   For the obvious reason that you

11   have to be able to go in and out, and then

12   when you close the door, the seal is

13   re-formed by the pressure of the door

14   against the gasket, right?

15       A.   Yes, sir.

16       Q.   Now, in the last sentence of this

17   item 6, you say, "This distortion was not

18   relieved after the trailer was placed on the

19   piers."

20            Do you see that?

21       A.   Yes, sir.

22       Q.   Now, you say "distortion," it's a

23   comparative term.  You're talking about as

24   compared to the baseline, that state that

25   the trailer was in when the trailer was

```
1    resting only on the tires and the tongue

2    jack, right?

3         A.   Yes, that, and to -- into itself

4    in a level position.

5         Q.   Explain what you mean by that.

6         A.   In a level position, the door

7    should have been level.  If there was no

8    distortion in the frame or the door, the

9    door should have returned to a level

10   position if the trailer is level.

11        Q.   Okay.  Once the trailer was placed

12   on piers -- let's talk about the Shaw test

13   first -- was it level?

14        A.   Before it was put on piers?

15        Q.   After it was put on piers, was it

16   level?

17        A.   The door?  I don't recall.  I have

18   to look at that photograph.

19        Q.   Okay.

20        A.   No, no, it wasn't.

21        Q.   Okay.  How far out of level was

22   it?

23        A.   Like 1/7th inch -- inches, I

24   think.

25        Q.   Now, keep in mind, Mr. Mallet, I'm
```

```
 1    asking you not during the test, after it has

 2    been set on piers and has been leveled, the

 3    door came back to square, right?

 4         A.   I don't recall that.  I -- I

 5    thought I recalled from the report that

 6    it -- that it didn't return to its baseline.

 7         Q.   Did it return to baseline

 8    sufficiently to re-form the seal between the

 9    door and the gasket?

10         A.   No, sir.

11         Q.   Okay.  How do you know?

12         A.   Because the door was -- the door

13    was warped.

14         Q.   Warped where?

15         A.   At the top.

16         Q.   That warping was present at the

17    top before any of these jacking tests were

18    performed, right?

19         A.   Correct.

20         Q.   Okay.  So that distortion in the

21    door wasn't caused by the jacking test of

22    Shaw or First General Services, right?

23         A.   Correct.

24         Q.   Okay.

25         A.   But just to answer your question,
```

1   it wasn't sealed.

2         Q.   Okay.  Other than that condition

3   at the top of the door, once the trailer was

4   installed on piers, it came back to the

5   baseline condition within tolerances, right?

6         A.   It came back near to its baseline,

7   but I don't think it came back to the

8   baseline.

9         Q.   Within tolerances?

10        A.   I don't know what the tolerance

11   standard was.  I didn't see that before or

12   after.

13        Q.   Okay.  Let me ask you to look at

14   page 70.

15             Do you see in the second sentence

16   where you talk about "Additional distortion

17   in the wall framing occurring after the

18   jacking and blocking occurred"?

19        A.   The second sentence?

20        Q.   Second sentence -- I'm sorry.  The

21   third sentence.

22        A.   Oh.  Okay.  Yes, sir.

23        Q.   What additional distortion in the

24   wall framing occurred after jacking and

25   blocking?

1          A.   The upper portion of the wall was

2     bowed.

3          Q.   At what point?  Which -- which

4     wall are we talking about?

5          A.   The entry door side and maybe the

6     rear.  Not -- not the driver's side.

7          Q.   Okay.  Let's just take the entry

8     door side first.  It was bowed along the

9     entire length?

10         A.   I think, as I recall, yes.  I

11    know -- I know the front and the center, I

12    distinctly remember that.

13         Q.   Okay.  When did you observe that

14    condition?

15         A.   After we blocked.

16         Q.   While -- you're talking about

17    after the tests had been completed, you

18    observed this condition, right?

19         A.   Right.

20         Q.   So at that point in time, the

21    trailer is back resting on the tongue jack

22    and the tube tires, right?

23         A.   No.  I'm not sure.  I thought it

24    was while we had it in its blocked position.

25         Q.   Okay.  The report talks about a

```
 1    distortion that occurred after blocking and

 2    jacking.  I'm trying to figure out what you

 3    meant by "after."

 4         A.   After it was jacked up and

 5    blocked.

 6         Q.   Well --

 7         A.   It was blocked -- oh, I see what

 8    you're saying, right after it was taken

 9    down, after.

10         Q.   So while it was blocked?

11         A.   Right.  In other words, I didn't

12    observe that bowing prior to jacking and

13    blocking.

14         Q.   Okay.

15         A.   After the jacking and blocking

16    occurred.

17         Q.   Okay.  You don't have anything in

18    your report about measurements of this

19    bowing, do you?

20         A.   Not measurements.  I put either a

21    6- or 8-foot level on it.  I don't -- I

22    don't recall whether we measured the bow in

23    it or not, but we photographed the -- that

24    bow.

25         Q.   Okay.  I think at the next break,
```

1    I'm going to ask you to look for that.

2         A.   Okay.  That would be X13 to 21.

3    When you ask me questions outside of the

4    report, without following it, I don't know

5    where the photographs are.  But these are

6    X13 to 21.

7         Q.   Okay.  I'll bring up X13 to 21 at

8    the next break and let you look at them.

9         A.   Yes, sir.

10        Q.   You have not supplemented this

11   report, Exhibit 8 to the deposition, since

12   you issued it back in October, right?

13        A.   I have not.

14        Q.   You never went back and -- and

15   performed any analysis of Exponent's report,

16   right?

17        A.   I didn't issue a report on it, no.

18        Q.   Okay.  On page 107 of your report

19   in Section WW, that's your section on the

20   jacking tests that First General Services

21   performed.  Do you see that?

22        A.   Yes, sir.

23        Q.   And it continues on to page 108,

24   right?

25        A.   Yes, sir.

1        Q.    Do you defer to Mr. Moore for the

2   analysis of those jacking tests?

3        A.    Yes.

4        Q.    Okay.

5        A.    I observed and documented the

6   crack movement -- the crack -- crack monitor

7   movements, but the electronic data that was

8   produced by the instrumentation, Mr. Moore

9   took those calculations, took those

10  measurements and calculations.

11       Q.    Did you take the pictures of the

12  crack gauges?

13       A.    Some of them, yes.

14       Q.    Okay.  So those photographs, WW1

15  through 315, you took some of them, but not

16  all of them?

17       A.    No.  I think I took all of these.

18       Q.    Took all of those, okay?

19       A.    But I wasn't the only one taking

20  the photographs.

21       Q.    Okay.  So you made some

22  observations, but as far as the analysis of

23  those observations, you would defer to

24  Mr. Moore on that?

25       A.    Yes, sir.

```
 1          Q.   And the first time you saw it, it
 2     was sitting in a field in Melville,
 3     Louisiana, near thousands of other FEMA
 4     trailers, correct?
 5          A.   Yes, sir.
 6          Q.   This unit was tested and inspected
 7     for approximately one month's time; is that
 8     right?
 9          A.   Yes, sir.
10          Q.   From the beginning of August 2009
11     to the beginning of September 2009?
12          A.   Yes, sir.
13          Q.   And you were out at the site as a
14     part of that testing and inspection a number
15     of days -- we already went through the
16     specific days -- but you were out there
17     quite a number of days during that month's
18     time, right?
19          A.   Yes.
20          Q.   Now, during the testing and
21     inspection of the unit, is it correct that
22     the air conditioner on the Wright unit
23     successfully was able to cool the interior
24     temperature of the unit?
25          A.   Yes, sir.
```

1        Q.   Is it also correct that, based on

2    your testing and inspection and the data

3    you've seen, the air conditioner on the

4    Wright unit was successfully able to lower

5    the interior humidity inside of the unit?

6        A.   Yes, sir.

7        Q.   At any point while you were out

8    there looking at the Wright unit, did you

9    ever test to see if the windows functioned?

10   In other words, whether the windows

11   correctly opened and closed?

12       A.   Personally, no, but I saw them

13   opened and closed over the period of time

14   when we didn't have A/C on.

15       Q.   You have no reason to believe that

16   any one of the five windows on that unit did

17   not adequately open as they were intended to

18   open; is that correct?

19       A.   I don't.

20       Q.   When you were out there at the

21   Melville facility, did you ever notice any

22   chemical crop dusting going on nearby?  Do

23   you remember seeing anything like that?

24       A.   No, sir.

25       Q.   I believe you said you helped put

1    the -- whatever agency performs the

2    inspection for compliance with plans and

3    specifications on the project.

4        Q.   But you haven't done any research

5    specifically into the issue of how municipal

6    building codes interact when something is

7    federal property.  Am I correct?

8        A.   To the extent that -- is it

9    GSA? -- writes a more stringent plan, more

10    stringent set of specifications or

11    requirements, and typically the professional

12    of record utilizes the building codes,

13    building standards for their standard of

14    care in producing their design.

15        Q.   Have you seen any document, rule

16    or regulation that specifically addresses

17    the question of how municipal building codes

18    interact with federal property, specifically

19    federal property?

20        A.   No.

21       (Brief discussion between reporter and

22    witness off the record.)

23        Q.   Now, in talking about the

24    air-conditioning unit on the Lyndon Wright

25    unit, I believe you said you have problems

288

1    the dumpster.

2         Q.   And all those reports, if we add

3    up the pages, does about 375 pages sound

4    about right to you for the reports that you

5    did, Ervin Ritter did, Paul LaGrange did,

6    David Moore did, Darrell Hicks did?

7         A.   Of just reports --

8         Q.   Yes.

9         A.   -- without attachments?

10        Q.   Yes.

11        A.   Yes.

12        MR. PINEDO:

13             Pass the witness.

14   EXAMINATION BY MR. BONE:

15        Q.   Mr. Mallet, I'm sorry about this,

16   but I have to ask you a couple more

17   questions.

18        A.   Sure.

19        Q.   Specifically with respect to --

20   you discussed some Masonite, have you ever

21   retrofit a travel trailer with Masonite to

22   see if it's effective in the application to

23   which you would have put it?

24        A.   I have not.

25        Q.   Have you done any stress test

```
 1    analysis on Masonite to determine whether it

 2    is a suitable substitute for, I assume, wall

 3    paneling?

 4         A.   Yes.  Well, no.

 5         Q.   Yes to wall panel; no to the

 6    testing, correct?

 7         A.   Correct.

 8         Q.   Okay.  And in terms of supply

 9    chain issues, do you know what type of

10    volume of Masonite that you would need to

11    build the number of travel trailers that the

12    RV industry builds in a given year?

13         A.   No, I don't.

14         Q.   Okay.  So you don't know if it's

15    commercially viable to get Masonite in the

16    type of quantities that the RV industry

17    would use in a given year, correct?

18         A.   Actually, the Masonite is more

19    readily available, I believe, than the

20    hardwood plywood, because that's an imported

21    material from Indonesia, I think.

22         Q.   Have you done any vibration tests

23    on Masonite to see what happens to Masonite

24    if you subject it to consistent vibration,

25    such as over-the-road travel?
```