*Failure Analysis Associates*

# E$^x$ponent®

**Engineering Investigation
Lyndon Wright Trailer**

SWE-000001

# E$^x$ponent®
*Failure Analysis Associates*®

## Engineering Investigation
## Lyndon Wright Trailer

Prepared for

David Kurtz, Esq.
Karen Kaler Whitfield, Esq.
Baker, Donelson, Bearman,
Caldwell, & Berkowitz, PC

Prepared by

John D. Osteraas, Ph.D., P.E.
Exponent Failure Analysis Associates



November 2, 2009

© Exponent, Inc.

Doc. no.  0904415.000 A0T0 1109 RPT1

SWE-000002

# Contents

|  | Page |
|---|---|
| **List of Figures** | **iii** |
| **List of Tables** | **v** |
| **Introduction** | **1** |
| **Background** | **3** |
| **Data Collection** | **5** |
| Visual Examination | 5 |
| Field Testing | 6 |
| Structural Testing by Exponent | 7 |
| Structural Testing by Others | 9 |
| Destructive Examination | 10 |
| Exemplar Testing | 10 |
| **Analysis** | **13** |
| Field data | 13 |
| Exemplar data | 13 |
| **Discussion** | **14** |
| **Conclusions** | **19** |

| Appendix A | CV of John Osteraas, Ph.D., P.E. |
| Appendix B | References |
| Appendix C | Structural Testing of Wright Trailer |
| Appendix D | Structural Testing of Exemplar Trailer |
| Appendix E | Spray Testing of Exemplar Trailer |
| Appendix F | Review of Reports by Others |

## List of Figures

Page

Figure 1.    Overview of Wright trailer at storage facility in Melville, Louisiana.
(Exponent photo 0001)                                                      1

Figure 2.    Typical strain gage installation (SG1) shown (Exponent photo 2011).      25

Figure 3.    Location of strain gages at each of the two locations.                  25

Figure 4.    Vishay, Four channel, P3 Strain indicator (Exponent photo 2019).        26

Figure 5.    Example of measurement taken with digital caliper at reference location D5
(Exponent photo 1023).                                                     27

Figure 6.    Self leveling laser under trailer (Exponent photo 2008).                28

Figure 7.    One of six scales used to level trailer (Exponent photo 2022).          28

Figure 8.    Digital indicator installed diagonally across  Wright trailer door (Exponent
photos 2025 and 2026).                                                     29

Figure 9.    Typical crack gage installation (crack gage 1 shown) (Exponent photo
2032).                                                                     30

Figure 10.   Approximate crack gage locations.                                       30

Figure 11.   Vehicle route from Phoenix, AZ to Menlo Park, CA (source:
www.google.com)                                                            39

Figure 12.   Exemplar trailer instrumentation locations (see Table 1 for descriptions).
Not to scale, for illustration purposes only.                              41

Figure 13.   Location of strain gages at each cross section.                         42

Figure 14.   Stress range and number of cycles per stress range observed during over-the-
road experiment.                                                           43

Figure 15.   Displacement time-histories for the four strain gage channels similar to those
installed on the Wright trailer.  The red lines represents the range of peak
strains recorded during the Wright trailer tests.                          44

Figure 16.   Time-history of door displacement of exemplar trailer as it traveled from
Phoenix to Menlo Park..                                                    45

Figure 17.   Segment of time history recorded on westbound Hwy 58.                   45

Figure 18.   Number of cycles and amplitude of door racking recorded in travel trailer on
public roads from Phoenix, AZ to Menlo Park, CA.                           46

Figure 19.  Location where one of the many of the large amplitude recordings were recorded during the exemplar travel (Westbound Hwy 58 traveling 52.8 mph).    47

Figure 20.  Average accelerations from all 4 accelerometers during test. Note multiple excursions beyond -1.0g.    47

Figure 21.  Trailer on wheels and tongue jack (Exponent photo 2501).    50

Figure 22.  Trailer on jacks at four corners (Exponent photo 2790).    51

Figure 23.  Overview of water testing at front left window (Exponent photo 2649).    51

Figure 24.  Overview of water testing at front right window (Exponent photo 2614).    52

Figure 25.  Overview of water testing at door (Exponent photo 2672).    53

Figure 26:  Water test at door with trailer wheels and tongue jack – note white, moisture sensitive paper indicating no leakage (Exponent photo 2675).    53

Figure 27:  Water test of door with trailer supported on jacks at four corners – note white, moisture sensitive paper indicating no leakage (Exponent photo 2774).    54

# List of Tables

|  |  | Page |
|---|---|---|
| Table 1. | Summary of Test 1 Data | 8 |
| Table 2. | Summary of Test 2 Data | 8 |
| Table 3. | Summary of Test 3 Data | 9 |
| Table 4. | Summary of Over-the-road Testing | 11 |
| Table 5. | Tensioned reference cable reading locations | 26 |
| Table 6. | Baseline readings | 31 |
| Table 7. | Test 1 | 32 |
| Table 8. | Test 2 | 33 |
| Table 9. | Test 3 | 34 |
| Table 10. | Sensitivity to mid-point jacking | 35 |
| Table 11. | Truck scale measurements | 35 |
| Table 12. | Primary Channel List | 40 |

# Introduction

For a period of time following Hurricane Katrina, Lyndon Wright occupied a trailer (Wright trailer, the trailer, or subject trailer, see Figure 1) manufactured by Forest River, Inc., purchased by FEMA, installed by subcontractor of Shaw Environmental, Inc. (Shaw), and, for a period of time, maintained by subcontractor of Shaw.  In the matter of Lyndon Wright v. Forest River, et al, it is alleged that during his occupancy of the trailer, Mr. Wright was exposed to elevated levels of formaldehyde and mold.  It is further alleged that in the course of installation and/or maintenance of the subject trailer, Shaw and/or its subcontractors damaged the integrity of the exterior envelope of the subject trailer which allowed passage of abnormal quantities of water and/or air which allegedly caused or exacerbated the levels of formaldehyde and mold within the trailer.

Exponent Failure Analysis Associates (Exponent) was retained by Baker, Donelson, Bearman, Caldwell, & Berkowitz, PC on behalf of Shaw to perform an engineering evaluation of the Wright trailer.  The objective of that evaluation was to utilize the scientific method and engineering principles to determine whether the activities of Shaw and/or its subcontractors damaged the integrity of the exterior envelope of the subject trailer in a way that allowed passage of abnormal quantities of water and/or air through or into the exterior envelope of the Wright trailer.



Figure 1.      Overview of Wright trailer at storage facility in Melville, Louisiana. (Exponent photo 0001)

Exponent's evaluation was performed under the direction of Group Vice President and Principal Engineer Dr. John Osteraas, P.E.[1]  The scope of Exponent's work for that evaluation included:

1. Review of documentation, including reports, photos, video, deposition transcripts, pleadings, and various other documents, as listed in Appendix B.

2. Visual examination of the subject trailer at the FEMA storage area in Melville Louisiana on August 7, 2009.

3. Structural testing including:

   a. Field testing of the subject trailer at the FEMA storage area on August 26, 2009;
   b. Observation of field testing by others on August 27-28, 2009; and
   c. Testing of an exemplar trailer.

4. Engineering analysis; and

5. Preparation of this report.

This report summarizes work performed to-date and presents the findings resulting from that work.  The findings presented herein are made to a reasonable degree of engineering certainty. Exponent reserves the right to supplement this report and to expand or modify opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

---

[1]  Dr. Osteraas' CV is attached as Appendix A.

# Background

This section summarizes our understanding of key aspects of this case based on our review of the documents listed in Appendix B. The subject trailer was a 2006 model SMT32BHLE[2] trailer manufactured by Forest River at its Rialto, California plant.[3] The fabrication date of the subject trailer identified on the trailer tag is 9/8/05.[4] The completed trailer was identified by Forest River as being in conformance with US DOT requirements, ANSI/NFPA 1192, and RVIA standards. The trailer was purchased by North American Catastrophe Service Inc.[5] working under contract to FEMA and transported to the North American Catastrophe GSA Depot Baton Rouge[6] storage area, arriving 11/19/2005.[7] From that storage area, the trailer was transported to a Shaw staging yard. A Shaw subcontractor transported the trailer from the staging yard to the property located at 2315 Seminole Lane, New Orleans, Louisiana,[8] and installed the trailer in the rear yard of the property in an area landscaped with grass.[9]

Installation of the trailer was to be done in accord with *Exhibit 7* to *Contract between Shaw and FEMA: Travel Trailer Installation* and consisted of the following tasks:

1. Positioning the trailer in the designated location at the subject property.

2. Leveling and stabilizing the trailer on six piers consisting of dry-stacked concrete block and plywood resting on-grade. Installing wood blocking and/or wood shims on top of the concrete block piers as necessary to level the trailer such that there is no more than ¼inch difference between adjacent pier supports and the exterior doors, and windows of the home do not bind and can be properly operated.[10]

3. Installation of four tie-downs, with two on the tongue of the unit and two on the back bumper.

4. Connection to potable water and sanitary sewer.

---

[2] Forest River Inc. Invoice No. INV0322235, dated 11/17/2005, Stock Number SMC008992, VIN Number 4X4TSMH296C008992, Bates FOREST-0151932.

[3] Horizon Transport Inc. Bill of Lading, BCF1277021, VIN Number 4X4TSMH296C008992, Order Date 11/16/05, Bates FOREST-0151927.

[4] Photograph of tag on trailer, FEMA 165-000001.

[5] Forest River Inc. Invoice No. INV0322235, dated 11/17/2005, Stock Number SMC008992, VIN Number 4X4TSMH296C008992, Bates FOREST-0151932.

[6] Horizon Transport Inc. Bill of Lading, BCF1277021, VIN Number 4X4TSMH296C008992, Order Date 11/16/05, Bates FOREST-0151927.

[7] Ibid.

[8] Lyndon T. Wright Plaintiff Fact Sheet Section V.A.8.

[9] Lyndon T. Wright Deposition, July 10, 2009, Exhibit 11.

[10] Federal Register Vol. 72 No. 202

5. Connection to electrical power, including installation of a temporary power pole, if required.

6. Construction of wood framed stairs and landing for access to the trailer door.

7. Other tasks as necessary to make trailer functional in accord with FEMA requirements.

Following installation, a Shaw subcontractor provided maintenance services for the trailer through May 2006. During the time period of Shaw's maintenance contract, a single service request, regarding a problem with the trailer's furnace, was reflected in the documents reviewed. Through May 2006, no record of any complaints or service calls related to the installation of the trailer or water leakage into the trailer was reflected in the documents.

Lyndon Wright began his occupancy of the trailer in March 2006 and continued to occupy the trailer until July 2008.[11] In the course of his occupancy of the trailer, Mr. Wright noted what he believed to be two anomalies with the trailer:

1. Beginning in 2007, the entrance door would no longer close completely, allowing rain water to enter the trailer in the vicinity of the door.[12]

2. Condensation would form on the left[13,14] bedroom window and run down the wall, wetting the carpeting on the floor.[15]

Subsequent to the time Mr. Wright vacated the trailer in July 2008, it was removed from the property and towed by a FEMA subcontractor to the FEMA storage yard located in Melville, LA where it remained until inspections associated with the litigation were scheduled to begin in July of 2009. At that time, the trailer was relocated within the storage yard to an unimproved area adjacent to the main entrance of the facility.

---

[11] Lyndon T. Wright Plaintiff Fact Sheet Section V.E.

[12] Transcript of the Testimony of Videotaped Deposition of Lyndon Wright Date taken: July 10, 2009, pp 275-276.

[13] For purposes of directional references in this report, the tongue end of the trailer is the front and the entry door is located on the right side.

[14] Mr. Wright's deposition transcript does not explicitly identify on which of the two bedroom windows he observed the condensation. Rather, the window location has been inferred based on Mr. Wright's description of his observations and field observations of the trailer by Exponent.

[15] Transcript of the Testimony of Videotaped Deposition of Lyndon Wright Date taken: July 10, 2009, p 288.

# Data Collection

Exponent's data collection activities included visual examination of the Wright trailer; structural, non-destructive field testing of the trailer (including observation of structural, non-destructive testing by others); review of photo and video documentation of destructive examination of the trailer by others, and structural and spray testing of an exemplar trailer. Exponent's data collection activities are summarized in the following subsections.

## Visual Examination

The physical configuration and condition of the Wright trailer were examined and photo-documented by Exponent personnel on two occasions: by John Osteraas on August 7, 2009[16] and by John Osteraas & Patxi Uriz, Ph.D. on August 26 through August 28.[17] Structurally, the trailer was in excellent condition and overall it was in very good condition. Key observations are summarized as follows:

1. No significant physical damage was observed to the exterior siding or roofing.

2. All of the windows and window gaskets[18] were intact and in fully-operational condition.

3. Serious damage to the entry door, entry door gasket, and to a lesser extent, the frame was found near the latch from forced entry.[19] No scrape marks or damage indicative of interference between the door and frame were observed at the head of the door or doorframe. Wear patterns associated with interference between the screen door and the sill were observed on the sill of the door frame. There were, however, no wear patterns indicative of interference between the aluminum edge of the door and the aluminum sill. A hard plastic bumper attached to the bottom of the door would prevent contact between the entry door and the sill. A wear pattern on the sill coincides with the location of the bumper, indicating that at some point in time the door was operated with the bumper sliding along across the sill. No evidence of any significant current or past warping or deformation of the entry door was observed. The gasket around the perimeter of the door was intact and functional, although some axial shortening (shrinkage) of some pieces had occurred. The soft foam gasket on the door stop where the screen door meets the door frame was in good condition except for a section about one foot long at mid-height of the right jamb. Green mold/moss was observed on siding below the door.

---

[16] Exponent photos 0001 through 0348.

[17] Exponent photos 1001-1109 and 2001-2222.

[18] Gaskets provide a barrier sealing mechanism for two surfaces that are intended to be either separated or sealed during normal use and only needed to provide a barrier when the two surfaces are in contact; a gasket is only adhered to one of the two surfaces. An example of a gasket is the soft plastic installed along the edge of the interior face of a refrigerator – it seals against passage of air when the door is closed but separates easily when the door is opened.

[19] See photo 0202.

4. The caulked joints[20] between the trailer siding and window and door frames were found to be in excellent condition at all locations with a few exceptions at locations where there was evidence of minor openings or gaps in the perimeter fillet of caulk.[21]

5. The caulked joints[22] at the trailer corners were found to be in excellent condition at all locations with a few exceptions at locations where there was evidence of localized cohesive failure[23] in the caulking.

6. No damage was observed to the under carriage: the steel "I" beams (rail beams) were straight, exhibiting only expected elastic deflection and no permanent deformation or damage. The axles and wheels were in excellent condition, and the underside covering was intact and in good condition.

7. Interior finishes were found to be in very good condition with a few exceptions: a portion of the carpet near the left bedroom window was coated with an unknown material,[24] and some of the floor vents were damaged.[25] Of particular note, there was no cracking, buckling, or bowing of any interior finishes indicative of any abnormal or excessive structural deformation of the trailer at any time in the past.

8. The bathroom exhibited signs of water damage, the apparent result of both normal use and rain entry through the open or missing operable skylight in the ceiling/roof.

## Field Testing

Exponent performed non-destructive structural testing of the Wright trailer on August 26, 2009. In addition, Exponent personnel observed non-destructive structural testing by others on August 27-28, 2009. Test procedures and key observations are summarized in the following subsections. For more detailed information regarding Exponent's field testing, refer to Appendix C.

---

[20] Caulked joints provide a barrier sealing mechanism between two surfaces that are not expected to be disengaged during normal use. Elastomeric caulking bonds to both surfaces, and seals the joint, yet allows for minor differential movement between two surfaces while still maintaining its seal. An example of a caulked joint would be the caulking between a bathtub and the surrounding tile wall.

[21] See for example, Exponent photo 0158.

[22] Sealing of corner joints consists of what appears to be strips of preformed elastomeric sealant installed between the trailer siding and corner trim. In addition (or possibly in lieu of in some locations) a fillet of caulking was applied to the joint between the trim and the siding.

[23] See for example, Exponent photo 0308.

[24] See for example, Exponent photo 0215.

[25] See for example, Exponent photos 0259 and 0263.

## Structural Testing by Exponent

Exponent's test program for the Wright trailer consisted of three[26] different sequences of jacking and leveling while the trailer was instrumented as described later in this section. At all times during the testing the entry door was held in the closed position with a wooden wedge inserted into the handle adjacent to the door.[27] Lifting and leveling sequences were:

1. Lifting the front of the trailer using the tongue jack; installing concrete block piers 12-14 inches high at the front of the trailer; raising the rear of the trailer level with the front using bottle jacks and installing concrete block piers at the rear of the trailer; installing concrete block piers near the mid-span of the rail beams; and finally the trailer was leveled from side-to-side by lifting the left side of the trailer. During this test, a portion of the trailer weight was intended to be transferred through the tires. As such, all four wheels remained in contact with the ground, though due to the sloping site, it appeared that the tires on the left side were carrying minimal load.

2. Installing concrete block piers under the front of the trailer and raising the tongue jack; lifting the rear of the trailer to approximately 20 inches above grade and installing concrete block piers; lifting the front of the trailer level with the rear and installing concrete block piers; installing blocking at mid-span;[28] and finally leveling the trailer from side to side.

3. Installation similar to 2 above; during this sequence the front of the trailer was lifted first, followed by the rear of the trailer, and finally the middle of the trailer.

Following the completion of each lifting and leveling sequence, the trailer was lowered back onto the wheels and tongue jack prior to the subsequent test.

Layout of test instrumentation is summarized below. More complete information about instrumentation and testing can be found in Appendix C.

1. A total of four strain gages at two locations (on the top and bottom flanges of the left frame rail) to measure changes of strain in the frame rail associated with jacking.

2. A tensioned reference cable extending from the front-most cross beam to the rear bumper along the left frame rail to measure deflections of the frame rail associated with at-rest and lifted position.

---

[26] A fourth test was conducted utilizing truck scales solely to determine trailer weight; in this test no data other than trailer weight were collected. The trailer weight was measured to be approximately 5,200 lbs.

[27] Prior forced entry had so damaged the door and frame that securing the door in the closed position was not possible with the as-built latch assembly.

[28] Additional jacking was performed after test 2 near the door to determine the sensitivity of door racking to changes in height of the right, middle pier support.

3. A self leveling laser centered beneath the trailer and six scales attached to the rail beam to assist with precision leveling of the trailer.

4. A digital string potentiometer installed diagonally across the door opening to measure racking of the door opening.

5. Crack gages installed at five locations to measure relative movement across caulked joints between the trailer siding and the frames of the windows and door.

Test results are summarized in Table 1 through Table 3. It is important to note that all readings and recorded measurements returned to the baseline readings (within the limits of accuracy of the testing) when the trailer was replaced on the axles and the tongue jack.

Table 1.       Summary of Test 1 Data

| Recording Location | Peak Reading | As Installed |
|---|---|---|
| Strain at mid-span of rail beam | 34 µs[**] | 17 µs[**] |
| Strain between wheels at rail beam | 285µs[**] | 285µs[**] |
| Deflection of rail beam | 0.26 in | 0.26 in |
| Door Racking | 0.0365 in | 0.0365 in |
| Crack Gages | No detectable movement | No detectable movement |

** For reference, 1200 µs (microstrain) (1200x10-6 in/in) corresponds to a change in stress when steel permanently deforms

Table 2.       Summary of Test 2 Data

| Recording Location | Peak Reading | As Installed |
|---|---|---|
| Strain at mid-span of rail beam | 210 µs[**] | 62 µs[**] |
| Strain between wheels at rail beam | 478 µs[**] | 450µs[**] |
| Deflection of rail beam | 0.75 in | 0.40 in |
| Door Racking | 0.167 in | 0.145 in |
| Crack Gages | No detectable movement | No detectable movement |

** For reference, 1200 µs (microstrain) (1200x10-6 in/in) corresponds to a change in stress when steel permanently deforms.

Table 3.        Summary of Test 3 Data

| Recording Location | Peak Reading† | As Installed† |
|---|---|---|
| Strain between wheels at rail beam | 37 μs** | 37 μs** |
| Strain at mid-span of rail beam | 430 μs** | 430 μs** |
| Deflection of rail beam | ‡ | ‡ |
| Door Racking | 0.137 in | 0.137 in |
| Crack Gages | No detectable movement | No detectable movement |

** For reference, 1200 μs (microstrain) (1200x10-6 in/in) corresponds to a change in stress when steel permanently deforms.
† No recordings were made at the intermediate level.
‡ No rail beam deflection measurements were taken for Test 3.

## Structural Testing by Others

Additional structural testing of the trailer was performed by others on August 27 and 28, 2009. That testing sequence and corresponding results are summarized by Charles David Moore in Section 5.2 of his October 2, 2009 report.  Moore's test sequences 1 and 2 were similar to the corresponding sequences of Exponent.  Moore's test sequence 3 consisted of lifting a single corner at a time; test sequence 3 was aborted when the trailer exhibited signs of global instability.  Moore's instrumentation layout was entirely different than that used by Exponent. The only similarity in data collected by Moore and Exponent was the measurement of relative movement in the vicinity of the entry door.  Exponent measured racking of the opening along a diagonal while Moore measured relative vertical and horizontal movement between the door and the adjacent wall of the trailer.

Key observations noted from Moore's tests are:

1.   Crack gages around the windows monitored the displacement between the window sash (the operable or openable portion of the window assembly) and the trailer siding.  This measures the sliding between the gasket and the window frame.  Peak displacements observed between window sash and siding (i.e. sliding between gasket and window frame) was on the order of 1 mm or 1/32 of an inch.

2.   The maximum displacement measured at the door crack gage was nearly identical to the equivalent vertical displacement measured in the Exponent tests.

3.   During sequence 3, the front end of the trailer was lowered to approximately 12 inches from the ground, and lifting began from the rear left corner only.  When the rear corner reached its peak position (approximately 28 inches above the ground); the trailer was resting completely on the rear left jack and the right front support with all wheels lifted off the ground.  Peak displacements observed at the crack gages were similar to the

previous testing sequences, and returned to the "baseline" condition after the testing was terminated.

## Destructive Examination

Following completion of non-destructive testing, the trailer was systematically dismantled by others. Exponent reviewed photo and video documentation of that destructive examination. Key observations include:

1. In the front bedroom there was staining and deterioration on the carpet and floor sheathing beneath the left window. Portions of the backside of the plywood wall sheathing beneath the window were water stained. Portions of wall framing beneath the window were stained and deteriorated. There was a foreign material, similar to that observed on the carpeting below, on the rough sill of the window.

2. Deterioration of the plywood floor sheathing and wood framing was observed below the entry door threshold at the entry to the trailer. The deterioration was most severe below the jamb on the latch side of the door. Decay and water stain patterns suggest that water entered the plywood and wood framing at the juncture of the floor, wall, and door frame on the latch side of the door frame.

3. Water staining and possible minor deterioration was observed on the wood framing at the lower portions of framing at the front on the left side of the trailer. Water staining was also observed on the backside of plywood sheathing removed from the front wall of the bedroom.

4. Removal of window frames revealed two rows of caulking beneath the exterior flange of the windows. The inner row was applied before the window was set in the opening. The outer row was a fillet applied after the window was installed and secured.

5. In the bathroom, staining was observed on the plywood sheathing and wood framing at the tub enclosure.

## Exemplar Testing

In the course of structural testing of the Wright trailer, a hypothesis was developed that over-the-road travel may cause stresses in the trailer similar to those developed during the jacking process. To test this hypothesis, Exponent instrumented an exemplar Forest River trailer[29] and towed it over public roads and freeways from Phoenix, AZ to Menlo Park, CA. This subsection summarizes that testing. Instrumentation and test results are more fully described in Appendix D.

---

[29] Forrest River SMT32BHLE; vehicle Identification number 4X4TSMH246T104318; date of manufacture 9/19/2005; gross vehicle weight rating: 7,790 lbs.; gross axle weight rating: 3,500 lbs.; number of axles: 2; Exponent vehicle file number: 6804.

Instrumentation consisted of a portion of the field set of instrumentation augmented for redundancy and automated data collection while the trailer was in transit.  Instrumentation was installed at Exponent's Vehicle Testing and Engineering Center in Phoenix.  Instrumentation consisted of:

1. A total of eight strain gages at two locations on the top and bottom flanges of both the left and right frame rail to measure changes of strain in the frame rail associated with over-the-road travel.

2. Two digital string potentiometers installed diagonally across the door opening to measure racking of the door opening associated with over-the-road travel.

3. Accelerometers installed at four locations (at the front and rear of each steel rail beam) to measure vertical accelerations as well as roll of the trailer while in transit.

4. GPS receiver to log global position and speed of the trailer.

5. Digital data acquisition system continuously recording data from 26 channels at 250 Hz.

Approximately 12 hours of data over 750+ miles of freeway were collected on 26 channels, resulting in a total of about 10,800,000 readings.  Test data are summarized in Table 4.

Table 4.       Summary of Over-the-road Testing

| Recording Location | Peak From Field Testing | Equivalent Exemplar Range‡ | Channel | Number of cycles in equivalent strain range |
|---|---|---|---|---|
| Stress at mid-span of rail beam | 34-210μs | 122-747μs | 1 | 62 |
| | | | 2 | 287 |
| | | | 5 | 270 |
| | | | 6 | 1628 |
| Stress between wheels at rail beam | 285-478μs | 382-564μs | 3 | 19 |
| | | | 4 | 13 |
| | | | 7 | 9 |
| | | | 8 | 7 |
| Door Racking† | 5/32 in | 5/32 in (9/64 in-11/64 in) | 13 | 1 |
| | | | 14 | 7 |

‡ Here the equivalent strain range is defined as spanning from: 1.) the average of the peak strain in Test 1 and peak strain in Test 2 to 2.) the maximum strain recorded over-the-road.

Following its arrival in Menlo Park, the exemplar trailer was visually examined and instrumentation configuration was photo-documented.[30]  Structurally, the trailer was in excellent

---

[30] Photos 2400 through 2476.

condition and overall it was in very good condition.  Key observations are summarized as follows:

1.  No significant physical damage was observed to the exterior of the trailer; all roofing and siding were intact with the exception of a small (~1/8-inch diameter) hole under right rear window.

2.  All windows were intact and in fully operational condition.

3.  The entry door was in excellent condition and showed no evidence of forced entry as observed on the Wright trailer.  Door latch and lock were fully operational.  There was no indication of any significant current or past warping of the door.  There were no scrape marks or damage at the head of door frame.  Wear patterns associated with interference between the screen door and the sill were observed on the sill of the door frame.  Dents in the sill indicated likely contact with the door in transit.  A hard plastic bumper as observed on the door of the Wright trailer was not present on the door of the exemplar trailer.  The gasket around the perimeter of the door was intact and functional, although some axial shortening (shrinkage) of some pieces had occurred.  A soft foam gasket lined the door stop where the screen door met the door frame.

4.  The caulked joints were found to be in excellent condition throughout the trailer with a few exceptions at locations where there was evidence of minor gaps,[31] and localized cohesive failure[32] in the caulking.

5.  The under carriage was found to be corroded in certain areas but no damage was found.

6.  All interior finishes were found to be in excellent condition, including cabinets, linoleum tile, and furniture coverings.

7.  The ceramic toilet tank was cracked when it was received by Exponent.

Two series of standard spray tests were conducted on the front bedroom windows and the entry door.  The first series was performed with the trailer resting on its tires and tongue jack.  The second series were performed with the trailer supported solely by jack stands at the ends of the rail beams (i.e., four points of support).  In both series of tests, all three assemblies met requirements of ASTE E-1105 – no water passed beyond the assembly to interior finishes.  Details of the testing process and results are presented in Appendix E.  Flow rates for the testing corresponded to a rainfall rate of 8 inches per hour. Furthermore, it is important to note that this is applied horizontally.

---

[31] For example, see Exponent photo 2543.

[32] For example, see Exponent photos 2510-2511, 2535-2541.

# Analysis

## Field data

The strains measured in the rail beam, the deflections measured in the rail beams, the absence of detectable distortion between the caulking and the siding, and the racking of the door opening recorded during the Melville investigation have illustrated how the trailer is capable of withstanding the effects of installation without any deleterious effects. The strains measured between the wheels represents a strain reversal: in the baseline condition, the trailer is supported by the axles and the tongue jack, the end of the trailer cantilevers off the end of the axles; in the jacked condition without blocking, the beam is now simply supported. Thus, in the process the steel relaxes, and then picks up load again. The total stress range for this process is approximately 15ksi.

The deflections measured in the rail beam indicate a large contribution of load carrying by the trailer shell. The total deflection measured from the baseline condition to the simply supported condition are on the order of 0.75 inches; this value misrepresents the monotonic stress that is likely induced from a point somewhere between the baseline condition and the simply supported condition. Assuming a simply supported loading condition, the rail beam would have to deflect nearly 3 inches prior to permanently deforming the rail beam.

The door racking observed during the Melville testing could be attributed primarily to the tolerances between the door opening and the door itself. It was observed that once the door racking was about 0.17 inches (similar from both tests by Exponent and Moore), the racking no longer increased. This implies that the door and the frame are likely making contact; this stiffens the structural system, and the door frame no longer racks. In all of the testing sequences, this door frame racking returned to essentially zero, indicating the trailer installation sequence causes no damage or permanent deformation to the trailer.

## Exemplar data

To test Exponent's hypotheses that over-the-road testing would impose distortions and stresses equal to or greater than those caused by trailer installation, an instrumented exemplar trailer recorded strains and distortions at similar locations to those measured during the Melville testing. The peak strains on the rail beam and the racking of the door during transit were observed to be on the same order of magnitude as those measured during the Melville testing. In some instances, there were numerous cycles of distortion greater than those recorded during the Melville testing. Furthermore, the trailer was tested in the baseline condition and in the simply supported condition (see Appendix E) once it arrived in Menlo Park, to illustrate that the weatherproofing was unaffected by transit or installation.

# Discussion

The question posed to Exponent was whether the activities of Shaw or its subcontractors damaged the integrity of the trailer envelope and caused or contributed to the passage of abnormal amounts of water (or air) into or through the exterior envelope of the trailer. Addressing this question is made challenging by the fact that the trailer has been subjected to numerous events over the three and one half years that have elapsed since Shaw's subcontractor installed the trailer on the Wright property. The more significant of those events include the use and operation of the trailer by Mr. Wright, differential movement of the soils beneath the trailer over the time period of Mr. Wright's occupancy, lack of proper maintenance of the trailer after May of 2006, de-installation of the trailer, transportation of the trailer to the Melville storage facility, unprotected exposure to the elements for three and one half years, and damage to the door and frame and gasket caused by forced entry at some point in time. The cumulative effects of these events altered the condition of the trailer from that which existed at the completion of installation by Shaw's subcontractor.

How might these various effects be disaggregated? We can work backwards from what is known for certain: the condition of the trailer and damage patterns as documented by visual inspection and destructive testing in August of 2009. We can also compare the stresses[33] imposed upon the trailer during installation with those the trailer would have sustained in transit from the factory to the site and from the site to the FEMA storage yard.

As discussed earlier in this report, visual examination of the Wright trailer revealed isolated and minor anomalies in the caulked joints. These anomalies fall into two categories: holes or gaps in the caulking around windows and cohesive failure of caulking at the trailer corners. Holes and gaps are characterized by smooth edges and are generally short in length – characteristics of the holes or gaps observed at the Wright trailer. Holes or gaps can develop in caulk due to "burn through" of portions of the caulk due to exposure to the elements, primarily solar exposure,[34] a cause unrelated to installation or jacking of the trailer. Furthermore, holes or gaps in the perimeter fillet of caulk does necessarily result in leakage to the interior of the trailer. There is a second bead of caulk between the window and the siding that was placed when the window was installed. Leakage of water to the interior of the trailer requires the presence of holes in both beads of caulk.

Cohesive failure of caulk occurs when movement across the caulked gap exceeds the elongation capacity of the caulk. Characteristics of cohesive failures are ragged, sharp edged-tears along the longitudinal axis of the caulked joint with both portions of the caulking remaining firmly

---

[33] The term "stress" in this discussion is used in its general sense, and not its mechanics of materials specific definition.

[34] It is noted that two of the three documented locations of holes and gaps in the caulk occur on the southern edge of the windows located on the west side of the trailer – the most severe exposure for deterioration due to solar exposure. Deterioration of caulk over time is one reason why the manufacturer recommends inspection and repair, if necessary, of caulk joints on the trailer. Compass directions for the trailer refer to the as-installed orientation at the subject property.

14

adhered to the caulked surface.  These are the characteristics observed of the cracks in the caulking at the lower portions of caulk at the corners of the trailer.  Cohesive failures can result from deterioration of the caulk over time (it loses elongation capacity) and/or excessive movement across the caulked joint.  Excessive movement perpendicular to the joint causes tensile failure of the joint, resulting in an irregular tear and an open gap.  The length of tensile failures is dependent upon the flexibility of the substrate in the direction perpendicular to the joint.  Excessive differential movement parallel to the joint results in shear failure of the caulk, which is characterized by an en echelon tear pattern that will typically extend over the length of the joint.

Destructive testing revealed evidence of water intrusion in just a few locations: in the floor beneath the latch side of the entry door, below the left front bedroom window, and at the front, left, bottom corner of the trailer.[35]  To explain leakage at the observed locations requires examination of the unique circumstances and damage patterns at each location.

**Entry Door** – Decayed framing beneath the door and water staining on the plywood floor sheathing in the vicinity of the door clearly indicate that the point of intrusion into the wood framing of water causing that decay was just to the interior side of the latch side of the frame at the point where the door frame, exterior wall and floor covering intersect.  Once water entered the framing at this location it would be trapped by the plastic covering the bottom of the trailer and would provide necessary water for decay fungi to thrive.  Water entry into the framing requires that the water first reach the interior of the trailer.  The most obvious source of water entry into this area is rain entry when the door was not fully closed, as a result of damage to the door gasket as a result of forced entry, or some combination of the two.  Rain falling on the flooring would puddle and find its way through any discontinuities and into the framing.  When the trailer was examined in the Melville storage yard, there was no evidence of any physical damage to the door, door frame, or surrounding finishes that could have resulted from installation or jacking.  Clearly the key factor was the fact that the entry door did not close fully during the latter part of Mr. Wright's occupancy (and may have been left partially ajar in storage due to damage to the door and latch).  Mr. Wright's testimony as well as a photo of the trailer indicate that in 2007, he was unable to fully close the door, and that the problem of the door not closing fully became progressively worse over a period of time. These symptoms suggest interference between the door and the frame.  Yet, when inspected in the Melville yard, neither the door nor the frame exhibited any evidence of any interference between the aluminum of each.  Given the softness of aluminum, interference between the aluminum door and the aluminum frame would most certainly create witness marks on both.  How then do we reconcile Mr. Wright's observations with the lack of physical evidence?  The key is the black plastic bumper installed on the bottom edge of the trailer entry door.  That bumper was intended to prevent the door and sill from coming into contact with each other when the door was locked closed during transportation.  However, if there were differential movement of the trailer similar to that

---

[35] Evidence of water staining and damage was also found in the bathroom.  The sources of this water are clearly water associated with normal use of the bathroom during Mr. Wright's occupancy of the trailer and rainwater entry through the open or missing operable skylight in the ceiling/roof.

which occurs in transit, the bumper would come into contact with the outer edge of the sill before the door could close completely. (It is important to note that elastic deformations of the door frame are in the opposite direction of those during transit. Thus, any permanent damage to the door frame as a result of jacking would result in scraping at the door head, a condition that did not occur.) Given the fact that the support piers were simply supported on the ground surface any differential movement of the soil beneath the trailer over a period of several years is inevitable and would result in differential movement of the trailer. If either the front or rear piers on the right side of the trailer moved downward relative to the center pier, the door frame would rack and the plastic bumper would eventually contact the door frame. Since that bumper is tapered, the size of the gap between the door and the frame would increase with increasing differential movement of the piers, ultimately reaching a maximum of about 1-1/2 inches (resulting in an opening along the latch side of the door wide enough to insert fingers) and then stabilizing. Once the trailer was removed from the support piers, the trailer and frame rebounded to their original geometry, and the door could be fully closed. Once discovered by Mr. Wright, the problem could have been easily rectified by minor adjustment of shims as part of the in-service maintenance of the trailer installation.

**Bedroom Window** – Framing beneath the left front bedroom window exhibits a pattern of water staining, and possibly some decay, that indicates entry of water at the window sill, roughly in line with or just to the left of the joint in the wall paneling beneath the window. There are two possible paths for water entry at this location:

1. Through the joint between the primary window frame and the interior flange. Water can only reach this location by overflowing the window sill and seeping into the wall cavity. Water can enter the sill from only two sources: condensation on the interior of the window and leakage from the top hinged edge of the window. Such a mechanism is consistent with Mr. Wright's testimony that condensation would form on the window and flow down the wall. The only path of water from the window glass to the wall is across the joint between the window frame and the interior flange. During the initial inspection of the trailer on August 7, 2009, water was observed flowing to the exterior from the upper hinge and out of the sill when the window was first opened on that day.[36]

2. Through an opening in the outer bead of caulk, traveling downward between the inner and outer beads of caulk, then through a second opening in the inner bead of caulk and onto the window sill.

Based on the information available to us, it is not possible to definitively identify the source of or the path of the water. However, it is clear from test data that jacking and installation of the trailer were not possible causes. As shown by the absence of movement between the trailer wall and the window frame (the caulked interface) during Exponent's field testing and the minor movement across the gasketed interface between

---

[36] See Exponent photos 164 and 165.

the sash and the window frame, it is clear that structural movements of the trailer are accommodated across the window gasket and do not induce damaging deformations across the caulked joint. It is important to note that after three and one half years, leakage has occurred at only one window, indicating a unique circumstance at that window. The absence of leakage at other windows indicates that failure of the caulked joints was not a systematic problem, as would be expected if jacking and installation were the cause.

**Left Front Corner** – Very minor water staining was found in the framing at the base of the wall framing at the left front corner of the trailer. This location is particularly vulnerable to water entry during transportation of the trailer due to spray and splash from the towing vehicle. Short lengths of cohesive caulk failure were present on the lower few inches of caulking at both the lower left and lower right corners of the siding across the front of the trailer. The failure pattern of the caulk is tensile in nature, consistent with inward pressure on the siding. No data is available to definitively identify the source or timing of water entry responsible for the staining of the wood. The condition is clearly unrelated to jacking, as there is no systematic failure of the caulked corner joints that would occur if the cause were due to structural deformation resulting from jacking or installation.

It has been asserted that Shaw or its installation subcontractor damaged the caulked joints on the exterior face of the building envelope in the course of their work, facilitating entry of water into the wall cavity and the trailer interior. The physical condition of the trailer clearly indicates that such is not the case. The exterior caulking is in good condition. Of the several hundred feet of caulked seams in the exterior envelope of the trailer, there is only evidence of possible leakage at two locations, comprising at most several of feet of caulked joint. In other words, for all the events that have affected the trailer since its manufacture, including installation by Shaw's subcontractor, approximately 98% of the caulked seams in the trailer remained weathertight for three and one-half years. This is consistent with observations of the condition of the caulked joints on the exterior of the trailer.

It has also been suggested that Shaw or its installation subcontractor damaged the "seals" on the interior face of the envelope in the course of their work, facilitating air exchange between the wall cavity and the trailer interior. There are two serious flaws in this assertion of damage. First, there are no "seals" on the interior face of the envelope to be damaged. There is flexible plastic trim between the top of the wall and the ceiling and wood battens covering the vertical seams in the wall paneling. Secondly, both the plastic trim and wood battens were found to be in perfect condition throughout the trailer, so whatever nominal sealing effect provided is unchanged.

As part of Exponent's non-destructive structural testing of the subject trailer, two key indicators of the level of stress imposed upon the trailer in the course of various jacking scenarios were monitored: racking of the door frame and strain in the frame rail. Both of those indicators were also measured during over-the-road transport of the exemplar trailer. As presented in the Analysis section above, the <u>magnitude</u> of both indictors during jacking and over-the-road

transport were comparable. However, the frequency of occurrence was much different. While the stress imposed by installation occurred only once prior to Mr. Wright's occupancy, comparable stresses imposed by over-the-road transport occurred multiple times. The Forest River trailer was built to accommodate thousands of miles of over-the-road travel without damaging the integrity of is exterior envelope. The absence of structural deformation related damage to the seals in the exterior envelope of both the Wright trailer and the exemplar trailer demonstrate this fact. It is unreasonable to conclude that one more cycle of loading during jacking and installation is going to cause any damage to a vehicle designed to sustain thousands of loading cycles without damage.

As discussed in Appendix F, the reports submitted by Charles Moore and Alexis Mallet lack rational methodology and technical substance with respect to the issue of possible damage to the trailer envelope associated with jacking and installation. Moore's application of conventional building codes to recreational trailers is creative, likely unique, but contrary to long-established practice of treating travel trailers as vehicles rather than buildings. Much of the report consists of irrelevant analysis of the trailer using building code provisions for conventional woodframe construction. Moore concludes that the trailer was improperly jacked but fails to define or describe a proper jacking procedure. He also uses terms such as "large differential movements" and "warping [of] significant magnitude" without quantification and concludes that damage will result without ever defining a damage mechanism or a damage threshold. It appears that he ignores basic aspects of engineering such as the difference between elastic displacement and permanent deformation of structures and their components. Mallet appears to adopt Moore's conclusions and incorporate them into his report without critical evaluation or any independent analysis.

# Conclusions

Based upon document review and the observational, experimental, and analytical findings of our investigation, we conclude as follows:

1. The Wright trailer was not damaged during installation by Shaw or its subcontractor. In particular, installation and jacking caused no damage to the trailer that would compromise the integrity of its exterior envelope with respect to passage of water and/or air into or through the exterior envelope.

2. The Wright trailer exhibited no damage to seals (either caulking or gaskets) that can be correlated with structural stressing or deformation of the trailer.

3. Stressing of the Wright trailer during structural testing by Exponent and Moore and over-the-road testing of the exemplar trailer by Exponent caused no visible or measureable damage to seals in either trailer.

4. Stresses sustained by the trailer during over-the-road transport are comparable in magnitude and far exceed in frequency those sustained during installation in accord with FEMA requirements.

5. Available data do not support Moore and Mallet's conclusions regarding damage associated with installation and jacking-related stresses on the trailer. Their reports do not present any reproducible engineering or scientific methodology whereby the conclusions can be derived from available data.

## Appendix A

## CV of John D. Osteraas, Ph.D., P.E.

SWE-000026

# E^xponent•
*Failure Analysis Associates®*

Exponent
149 Commonwealth Drive
Menlo Park, CA 94025

telephone 650-326-9400
facsimile 650-326-8072
www.exponent.com

## John D. Osteraas, Ph.D., P.E.
### Group Vice President and Principal Engineer

### Professional Profile

Dr. John Osteraas is responsible for Exponent's Civil Engineering, Buildings and Structures, and Construction Consulting Practices.  He specializes in the evaluation of the performance of buildings under extreme loads, including earthquake, wind, flood, landslide, explosion, high-energy impact, and construction failure.  His research has focused on performance of structures under seismic loading and full-scale instrumentation and testing of structures under dynamic loading.  Dr. Osteraas' expertise in structural and earthquake engineering includes structural safety and damage assessment; structural analysis; soil-structure interaction; seismic site response assessment; and analysis and design of wood, steel, concrete, masonry, and composite systems.  His geotechnical engineering expertise extends to foundation and retaining structure analysis and design, slope stability analysis, and analysis of soil-structure interaction.  Drawing upon his construction experience, he addresses problems of construction failure analysis; design and construction codes and standards; properties, performance, response, and deterioration of construction materials; and repair methodology.

Dr. Osteraas also volunteers as a Structures Specialist with FEMA's Urban Search and Rescue program and has been deployed to New Orleans in 2005, the World Trade Center in 2001, and Oklahoma City in 1995 to assist with search and rescue activities.  He was a founding Board Member and Corporate Secretary for Krawinkler Luth and Associates, Inc., a structural design firm, and has held research and consulting positions with the John A. Blume Earthquake Engineering Center at Stanford University, the Counter Quake Corporation, Structural Research Inc., Engineering Research Inc., Marshall Erdman and Associates, and Fel-Pro Energy Systems.

### Academic Credentials and Professional Honors

Ph.D., Civil Engineering, Stanford University, 1990
M.S., Civil Engineering: Structural Engineering, Stanford University, 1977
B.S., Civil and Environmental Engineering, University of Wisconsin, Madison, 1976

Distinguished Service Citation, University of Wisconsin – Madison; Chi Epsilon Chapter Honor Member, University of Wisconsin – Madison; Commendation for service following the September 11, 2001 terrorist attack on the United States, Governor's Office of Emergency Services, State of California; Commendation for outstanding service to the Urban Search & Rescue Response System during the Oklahoma City 6th Street bombing incident, April 19, 1995, Governor's Office of Emergency Services, State of California; Outstanding Paper of 1992, American Society of Civil Engineers, Technical Council on Forensic Engineering, *Journal of Performance of Constructed Facilities*; 1989 Student Paper Award, Earthquake Engineering Research Institute; ARCS Foundation Scholar, Stanford University; Certificate of Recognition, National Aeronautics and Space Administration; Senior High Honors, University of Wisconsin

SWE-000027

## Licenses and Certifications

Registered Professional Engineer, California, #35844 (Civil), Wisconsin, #19023, Nevada #012603 (Civil), Utah, #93-190526-2202 (Structural), Arizona, #CE 012603 (Civil), Oregon, #71158PE, Illinois, #062-056070, New York, #080356, Mississippi, #16955, Louisiana, #31972, Ohio, #71970, District of Columbia, #PE901799 (Structural), Structural Engineering Certification Board #1577-0705, National Council of Examiners for Engineers and Surveyors 11393; Licensed General Contractor, California B 628753; Safety Assessment Evaluator, California Office of Emergency Services SAP10006

## Publications

Stone H, Barker M, Osteraas J, Hammond DJ.  Rescue engineering: practical aspects of building stabilization in a search & rescue environment.  Department of Homeland Security Science and Technology Directorate Building Stabilization Workshop, US Army Corps of Engineers Engineering Research and Development Center, Vicksburg MS, August 25-27, 2009. (Proceedings in press)

Osteraas J, Shusto L.  Assessment and repair of earthquake damaged woodframe buildings. Third Conference on Seismic Hazards in the Eastern San Francisco Bay Area, California State University - East Bay, October 24, 2008.  (Proceedings in press)

Osteraas J, Gupta, A.  Order out of chaos: application of earthquake damage assessment and repair guidelines in loss modeling.  Proceedings, 14th World Conference on Earthquake Engineering, Beijing China, October 12-17, 2008.

Osteraas J, Gupta A, Griffith M, McDonald B.  Woodframe seismic response analysis – benchmarking with buildings damaged during the Northridge Earthquake.  Proceedings, 2008 ASCE Structures Conference, Vancouver BC Canada, April 24-26, 2008.

Osteraas J (ed).  General guidelines for the assessment and repair of earthquake damage in residential woodframe buildings.  Consortium of Universities for Research in Earthquake Engineering, CUREE Publication No. EDA-02, October 2007.  Certificate of Merit, Structural Engineers Association of California 2008 Excellence in Engineering Awards Program.

Osteraas J.  Murrah building bombing revisited:  A qualitative assessment of blast damage and collapse patterns.  J Performance Constructed Facilities 2006; 20(4).

Gupta A, McDonald B, Griffith M, Osteraas J.  Displacement coefficients for conventional residential wood-frame structures.  Proceedings, 8th U.S. National Conference on Earthquake Engineering, San Francisco, CA, April 18–22, 2006

Gupta A, McDonald B, Alavi B, Osteraas J.  Rational seismic evaluation and retrofit design of a multistory RC shear wall structure.  Proceedings, 8th U.S. National Conference on Earthquake Engineering, San Francisco, CA, April 18–22, 2006

Osteraas J, Bonowitz D, Gupta A, McDonald B.  Development of guidelines for assessment and repair of earthquake damage in woodframe construction.  Paper No. 1580.  13th World Conference on Earthquake Engineering, Vancouver, BC, August 1–6, 2004.

Gupta A, Osteraas J.  Improved post-earthquake portfolio loss estimation.  Paper No. 1030. 13th World Conference on Earthquake Engineering, Vancouver, BC, August 1–6, 2004.

Arnold A, Uang CM, Osteraas J.  Cyclic performance and damage assessment of stucco and gypsum sheathed walls.  Paper No. 1484.  13th World Conference on Earthquake Engineering, Vancouver, BC, August 1–6, 2004.

McDonald B, Luth G, Osteraas J.  Review of safety factors for assessing column stability in existing braced frame buildings by Brian McDonald.  Proceedings, 2004 Structures Congress, The Structural Engineering Institute of the American Society of Civil Engineers, Nashville, TN, May 22–26, 2004.

Osteraas J, Shusto L, McDonald B.  Earthquake damage assessment and repair protocols. pp. 209–218.  In:  Forensic Engineering:  Proceedings, Second Congress.  American Society of Civil Engineers, San Juan, Puerto Rico, May 21–23, 2000.

McDonald B, Bozorgnia Y, Osteraas J.  Structural damage claims attributed to aftershocks. pp. 123–131.  In:  Forensic Engineering:  Proceedings, Second Congress.  American Society of Civil Engineers, San Juan, Puerto Rico, May 21–23, 2000.

Osteraas J, Shusto L, McDonald B.  Engineering involvement in post-Northridge damage assessment and repair of wood-frame dwellings.  Paper Number 2593.  12th World Conference on Earthquake Engineering, Auckland, New Zealand, January 30–February 4, 2000.

Hinman E, Durkin M, Osteraas J.  Preliminary analysis of casualties resulting from the Oklahoma City bombing.  Prepared for The Blast Injuries Study Group, Oklahoma State Department of Health, Oklahoma City, OK.  Exponent Failure Analysis Associates, Menlo Park, CA, 1996

Osteraas J, Barrett R.  Multimedia in dispute resolution.  The Construction Specifier 1996; 49(1):20–25.

Osteraas J (contributor).  Northridge Earthquake of January 17, 1994, Reconnaissance Report. Vol. 2 Supplement C to Volume 11, Earthquake Spectra.  Earthquake Engineering Research Institute, Oakland, CA, 1996.

Osteraas J (editorial committee).  Japan—The great Hanshin Earthquake.  Risk Management Solutions, Inc., and Failure Analysis Associates, Inc., 1995.

Ross B, Johnston P, Osteraas J, Barrett R.  Catastrophic collapse of a tower crane due to sequential failure of truss members.  3rd International Symposium on Structural Crashworthiness and Failure, University of Liverpool, UK, April 14–16, 1993.

Moncarz P, Hooley R, Osteraas J, Lahnert B.  Analysis of stability of L'Ambiance plaza lift-slab towers.  J Performance Constructed Facilities 1992; 6(4).

Nassar A, Osteraas J, Krawinkler H.  Seismic design based on strength and ductility demands.  Proceedings, Tenth World Conference on Earthquake Engineering, pp. 5861–5866, Madrid, Spain, July 19–24, 1992.

Krawinkler H, Nassar A, Osteraas J.  Ductility and strength demands for seismic design.  Proceedings, American Society of Civil Engineers Structures Congress, pp. 211–219, Indianapolis, IN, April 29–May 1, 1991.

Ross B, Osteraas J, Moncarz P.  The Loma Prieta Earthquake—a pictorial essay with engineering comment.  The Second Pan American Congress of Applied Mechanics, Valparasio, Chile, January 1991.

Osteraas J.  Strength and ductility considerations in seismic design.  Dissertation, Stanford University, 1990; also John A. Blume Earthquake Engineering Center Report No. 90, Department of Civil Engineering, Stanford University, August 1990.

Osteraas J, Krawinkler H. The Mexico Earthquake of September 19, 1985—Behavior of steel buildings.  Earthquake Spectra 1989; 5(1):51–88; also Costruzioni Metalliche1990; Part 1 XLII(2), Part 2, XLII(3).

Krawinkler H, Osteraas J.  Seismic design based on strength of structures.  Proceedings, Fourth U.S. National Conference on Earthquake Engineering, Palm Springs, CA, Earthquake Engineering Research Institute, Vol. 2, pp. 955–996, El Cerrito, CA, May 1990.

Moncarz P, Thomas J, Osteraas J.  Quality of constructed facilities:  Definition of safety, serviceability and economy in engineering decisions.  Proceedings, 33rd Meeting of the International Committee on Industrial Chimneys (CICIND), Barcelona, Spain, April 19–20, 1990.

Osteraas J, Krawinkler H.  Pino Suarez—Implications for modern steel structures.  Earthquake Engineering Research Institute Annual Meeting, San Francisco, CA, February 9, 1989.

Krawinkler H, Osteraas J.  Steel building design.  Seminar on Evolving Earthquake Hazard Mitigation Practices, 1998 Annual Meeting, Earthquake Engineering Research Institute, Mesa, AZ, February 4, 1988.

Moncarz P, Osteraas J, Wolf J.  Designing for maintainability.  Civil Engineering 1986.

Moncarz P, Osteraas J, Wolf J.  Impact of design/construction/maintenance practices on structural deterioration.  Proceedings, Structural Division of the American Society of Civil Engineers Convention 1985, Seattle, WA, April 1986.

Osteraas J (contributor).  Earth sheltered housing.  G. Klodt, Reston Publishing Co., 1985.

Moncarz P, Osteraas J, Curzon A. Modeling of reinforced concrete containment structures. Proceedings, Design of Concrete Structures The Use of Model Analysis, Joint Institution of Structural Engineers/B.R.E. Seminar Elsevier Applied Science Publishers, London, England, November 1984.

Moncarz P, Osteraas J. Major considerations in scale modeling of reinforced concrete containment structures. American Society of Civil Engineers Conference on Structural Engineering in Nuclear Facilities, Raleigh, NC, September 10–12, 1984.

Moncarz P, Osteraas J. Structural aspects of leakage in reinforced concrete containments—Experimental approach. Proceedings, 2nd Workshop on Containment Integrity, Sandia National Laboratories, June 1984.

Osteraas J (contributor). A review of fracture mechanics life technology. National Aeronautics and Space Administration Report, NAS 8-34746, September 1983.

Peyrot A, Lee J, Jensen H, Osteraas J. Application of cable elements concept to a transmission line with cross rope suspension structures. Institute of Electrical and Electronics Engineers, Transaction on Power Apparatus and Systems, July 1981.

Lee J, Peyrot A, Dupuis R, Osteraas J. Research considerations for the transmission line mechanical research facility. Electric Power Research Institute Report, EPRI TPS 80-719, 1980.

Osteraas J. Loads on wood-frame structures—A literature review. U.S. Forest Products Laboratory Internal Report, 1976.

Osteraas J. Structural potential of a Douglas-fir veneered urea-bonded extruded particleboard ('plyboard'). U.S. Forest Products Laboratory Internal Report, 1974.

## Presentations

Osteraas J, Hammond DJ. Multi-hazard post-disaster safety assessment training for evaluators. Naval Facilities Engineering Command (NAVFAC), Jacksonville FL, April 27,2009; San Diego, CA, July 14, 2009; Great Lakes, IL, August 18, 2009; Norfolk VA, Sept 9, 2009; Pearl Harbor, HI, September 15, 2009.

Osteraas J. Challenges with going green: what can go wrong? prospective failure analysis. Property Claims Association of the Pacific Annual Convention, Sacramento CA, September 10, 2009.

Osteraas J. Earthquake damage assessment and repair. PLRB/LIRB Claims Conference & Insurance Services Expo, Seattle WA, March 24, 2009; Boston MA, April 14, 2008; Orlando FL, March 20, 2007; Nashville, TN, April 4, 2006; San Antonio, TX, April 19, 2005.

Osteraas J.  Engineering response to catastrophic workplace accidents.  Oregon Governor's Occupational Safety & Health Conference, Portland OR, March 12, 2009.

Osteraas J.  Earthquake damage assessment and repair.  AllCat Claims Services Training Seminar, San Antonio TX, February 26, 2008.

Osteraas J.  Earthquake damage assessment and repair.  National Association of Catastrophe Adjusters 33rd Annual Convention, Las Vegas NV, January 22, 2009.

Osteraas J.  Lessons from failures great & small.  AIA Nevada - Triptych Design Conference, Olympic Valley CA, November 7, 2008.

Osteraas J.  ATC-20 procedures for post-earthquake safety evaluations of buildings.  Featured Speaker, Structural Engineers Association of Northern California Disaster Emergency Services Committee Safety Assessment Workshop, Santa Clara University, November 1, 2008; University of California - Berkeley, October 22, 2006;  The Presidio, San Francisco CA, May 2, 2004;  Exponent, Menlo Park CA, August 12, 2003;  Santa Clara University, October 5, 2002;  The Presidio, San Francisco CA, May 3, 2001;  University of California - Berkeley, March 20, 1999.

Osteraas J.  Assessment and repair of earthquake damaged woodframe buildings.  Third Conference on Seismic Hazards in the Eastern San Francisco Bay Area, California State University - East Bay, October 24, 2008.

Osteraas J.  Order out of chaos: application of earthquake damage assessment and repair guidelines in loss modeling.  14th World Conference on Earthquake Engineering, Beijing China, October 14, 2008.

Osteraas J.  Earthquake damage assessment and repair.  California Earthquake Authority Claim Manager Meeting, Sacramento CA, May 7, 2008.

Osteraas J.  Woodframe seismic response analysis – benchmarking with buildings damaged during the Northridge Earthquake.  2008 ASCE Structures Conference, Vancouver BC, April 26, 2008.

Osteraas J.  For want of a nail and other tales of engineering failure.  Stanford University, January 30, 2008.

Osteraas J.  The view from Ground Zero—Rescue, recovery, and reconstruction at the World Trade Center.  Stanford University, November 8, 2007; Stanford University, November 10, 2005; MIT Club of Northern California, Menlo Park, CA, November 9, 2005; O'Hagan, Smith & Amundsen, Chicago IL, January 28, 2004; Federation of Defense and Corporate Counsel, Quebec Canada, August 1, 2003.

Osteraas J.  Designing for failure—Lessons for California (?) courtesy of Katrina.  Earthquake Engineering Research Institute 2007 Annual Meeting, Los Angeles CA, February 9, 2007;

Stanford University, Stanford, CA, January 10, 2007; Structural Engineers of Northern California, Mountain View, CA, October 12, 2006.

Osteraas J. Evaluation and repair of earthquake damage in woodframe buildings. 8th U.S. National Conference on Earthquake Engineering, San Francisco, CA, April 18–22, 2006.

Osteraas J. Post-earthquake building assessment. 8th U.S. National Conference on Earthquake Engineering, San Francisco, CA, April 18–22, 2006.

Osteraas J. Overview of earthquake effects. IEEE Disaster Recovery Workshop, San Francisco CA, March 30, 2006.

Osteraas J. CUREE earthquake damage assessment project update. CEA Claims Liaison Meeting, Sacramento, CA, October 13, 2005.

Osteraas J. Urban search and rescue in the United States. International Diplomacy Council, Natural Disaster Response Group, San Francisco, CA, June 20, 2005.

Osteraas J. Pino Suárez collapse after 20 years—What have we (not) learned? Earthquake Engineering Research Institute 2005 Annual Meeting, Ixtapa, Mexico, February 5, 2005.

Osteraas J, Hammond DJ. The rescue engineer's new reality—Recent changes and deployments in the FEMA US&R response system. Structural Engineers of Northern California, San Francisco, CA, December 12, 2004.

Osteraas J. Engineering damage assessment and repair for residential construction. Pacific Earthquake Engineering Research Center (PEER) Earthquake Engineering Scholars' Course, University of California – Los Angeles, November 6, 2004.

Osteraas J. Development of guidelines for assessment and repair of earthquake damage in woodframe construction. 13th World Conference on Earthquake Engineering, Vancouver, BC, August 3, 2004

Osteraas J, Arnold AE. Cyclic behavior and repair of woodframe walls with finish materials. 13th World Conference on Earthquake Engineering, Vancouver, BC, August 2, 2004.

Osteraas J. Rescue engineering response to 9/11. Stanford University, Department of Civil Engineering, May 3, 2004, May 5, 2003, April 22, 2002.

Osteraas J. Earthquakes and the damage they cause. 2004 PCS Catastrophe Conference—Challenges from Coast to Coast, Hilton Long Beach Hotel, Long Beach CA, April 26, 2004.

Osteraas J. Earthquakes I: engineering assistance with post-earthquake damage assessment. PLRB/LIRB Claims Conference & Insurance Services Expo, Chicago IL, March 16, 2004.

Osteraas J.  CUREE-CEA woodframe project.  EERI Southern California Chapter, University of Southern California, Los Angeles CA, November 19, 2003.

Osteraas J.  Catastrophe response:  Lessons from Northridge.  LHB Pacific Law Partners Fall Symposium, Pan Pacific Hotel, San Francisco CA, October 23, 2003.

Osteraas J.  Pathology and lessons of the World Trade Center disaster.  San Francisco Public Utilities Commission Noon Seminar, San Francisco CA, September 11, 2002.

Osteraas J.  Why buildings collapse:  From natural disasters to terrorist attacks.  Tempo—Madison, Madison WI, July 9, 2002.

Osteraas J.  Urban search and rescue response to 9/11.  Western Construction Consultants Association, Alameda CA, April 17, 2002.

Osteraas J.  Urban search and rescue:  New York City/Oklahoma City.  Structural Engineers Association of Northern California Special Seminar:  Synopsis of the September 11, 2001, World Trade Center Attack and Recovery, San Francisco CA, January 31, 2002; San Francisco Fire Department and Structural Engineers Association of Northern California, Structural Integrity of High-Rise Buildings, San Francisco CA, November 28, 2001.

Osteraas J.  Measure twice, cut once:  Lessons from failures large & small.  National Council of Structural Engineers Associations, Structural Engineering Winter Institute, Phoenix AZ, January 21, 2002.

Osteraas J.  Assessment and repair of earthquake damage in residential buildings.  Costa Mesa CA, November 15, 2001; California Earthquake Authority Seminar, Sacramento CA, October 30, 2001.

Osteraas J.  Seismic building codes.  Stanford University, Department of Geophysics, Stanford CA, November 1, 2001; November 2, 2000.

Osteraas J.  Structural pathology of the Murrah Building bombing.  Stanford University, Department of Civil Engineering, Stanford CA, May 7, 2001; California Institute of Technology Department of Civil Engineering, Pasadena CA, February 22, 2001.

Osteraas J.  Reducing failures through computer graphics—A demonstration.  Civil Engineering Research Foundation, Washington, DC, April 25, 2001.

Osteraas J.  Working with experts—One expert's perspective.  National Asian Pacific American Bar Association Twelfth Annual Convention, Washington, DC, October 13, 2000.

Ross B, Osteraas J, Luth G, Bozorgnia Y.  Seismic collapse of reinforced concrete towers at Royal Palm Resort, Guam, USA.  25th Anniversary Conference on Our World in Concrete & Structures, Singapore, August 22–24, 2000.

Osteraas J.  Oklahoma City bombing—The limits of engineering.  Stanford University, Department of Civil Engineering, April 24, 2000; May 18, 1998.

Osteraas J.  The Oklahoma City bombing—Pushing the limits of engineering.  Structural Engineers Association of Arizona, Phoenix, AZ, May 18, 1999.

Osteraas J.  Decay and death in San Francisco—Consulting in the criminal arena.  Lessons Learned in Forensic Engineering, Fourth Annual Seminar on Issues in Forensic Engineering, ASCE Forensic Engineering Technical Group, Los Angeles Section, University of California, Irvine, CA, May 7, 1999.

Osteraas J.  Multimedia in construction dispute resolution.  The Nuts and Bolts of Nuts and Bolts, Association of Defense Counsel of Northern California Seminar, San Jose, CA, April 23, 1999.

Osteraas J.  Performance of structures under extreme loads.  Stanford University, Department of Civil Engineering, May 26, 1997.

Osteraas J.  Lesser known collateral seismic hazards.  Seismic Hazard Analysis Short Course, Association of Engineering Geologists, Menlo Park, CA, May 3, 1997.

Osteraas J.  Structural failures:  Four case studies.  Stanford University, Department of Aeronautics and Astrophysics, May 20, 1996.

Osteraas J.  Structural safety and damage assessment.  Stanford University, Department of Civil Engineering, May 6, 1996; May 8, 1995.

Osteraas J.  Shake, rattle, and roll—What you need to know about the Big One.  31st All-Industry Insurance Conference, Risk and Insurance Management Society, Washington Chapter, Seattle, WA, March 12, 1996.

Osteraas J.  The Great Hanshin Earthquake.  Uninterruptible Uptime Users Group, Fall Conference, San Diego, CA, November 15–17, 1995.

Osteraas J.  Observations of Kobe and Mexico with implications for California.  American Concrete Institute, Northern California & Western Nevada Chapter Meeting, Oakland, CA, November 14, 1995.

Osteraas J.  Oklahoma City Murrah Building structural lessons.  24th Annual ASCE Structural Design Conference, Ames, IA, November 13, 1995.

Osteraas J.  Earthquake update.  Claims Conference of Northern CA, Sacramento, CA, October 5–6, 1995.

Osteraas J.  The Great Hanshin Earthquake.  American Petroleum Institute Crisis Management Seminar, Houston, TX, September 25–27, 1995.

Osteraas J.  Earthquake engineering:  Reality meets insurance company expectations.  International Institute of Loss Adjusters, Inc., Annual Convention, San Rafael, CA, September 24–29, 1995.

Osteraas J.  The Kobe, Japan, Earthquake—A preview of a future California temblor?  Risk Insurance Management Society, Santa Clara Valley Chapter Meeting, May 11, 1995.

Osteraas J.  Kobe event report.  Disaster Recovery Journal's Sixth Annual Corporate Contingency Planning Seminar and Exhibition, San Diego, CA, March 27–29, 1995.

Osteraas J.  Japan's Great Hanshin Earthquake event report.  Business Recovery Managers Association Meeting, San Ramon, CA, March 23, 1995; Loss Executives Association Mid-Winter Meeting, Tampa, FL, January 26–27, 1995.

Osteraas J, Johnston P.  Case studies in failure analysis.  Stanford University, Department of Civil Engineering, February 15, 1995.

Osteraas J.  Northridge:  Earthquake engineering theory meets earthquake insurance reality.  Loss Executives Association Mid-Winter Meeting, Tampa, FL, January 26–27, 1995.

Osteraas J.  Failures in the design and construction process.  Stanford University, Department of Aeronautics and Astrophysics, May 22, 1995, May 9, 1994.

Osteraas J.  1994 Property Claim Services Catastrophe Conference:  Preparing for the California Earthquake, San Francisco, CA, April 18–20, 1994.

Osteraas J.  Regulatory ordinances:  The role of codes and standards, their evolution and mechanisms for correct implementation.  Stanford University, Department of Civil Engineering, May 2, 1994; May 3, 1993; April 27, 1992; April 29, 1991.

Osteraas J.  Technical aspects of earthquakes.  International Institute of Loss Adjusters, Inc., Singapore, October 23, 1992 (via videotape).

Osteraas J.  Technical and historical aspects of earthquakes.  Mt. Diablo Property Association, Pleasant Hill, CA, June 10, 1992; Earthquake, A Continuing Education Seminar, The Property Claims Association of the Pacific, May 6, 1992.

Osteraas J.  Construction failure retrospective.  Allianz Insurance Company, San Francisco, CA, July 17, 1991.

Osteraas J.  Civil PE review:  Timber design and seismic design.  Professional Engineering Institute, January 30 and February 6, 1001.

Osteraas J.  The eastern U.S. seismic hazard.  59th Annual Meeting, Loss Executives Association, Whitehaven, PA, June 13–15, 1990.

Osteraas J.  The role of codes and standards in failure prevention.  Stanford University, Department of Civil Engineering, May 7, 1990.

Osteraas J.  Predicting seismic performance of buildings.  Allianz Insurance Company, Los Angeles, CA, December 6, 1989.

Osteraas J.  The magnitude and intensities of earthquakes.  Mt. Diablo Property Association, Pleasant Hill, CA, July 12, 1989.

Osteraas J.  Geotechnical engineering for structural engineers.  Stanford University, Department of Civil Engineering, April 17, 1989.

Osteraas J.  Geotechnical causes of structural failures.  Stanford University, Department of Civil Engineering, April 25, 1988.

Osteraas J.  Implications of recent structural failures.  University of California, Berkeley, Department of Architecture, April 19, 1988.

Osteraas J.  Learning from structural failures.  University of California, Berkeley, Department of Architecture, May 5, 1987.

Osteraas J.  Performance evaluation of steel structures in Mexico City.  Blume Center Affiliates Meeting, April 24, 1987.

Osteraas J.  Review committee member for Naked City.  American Iron and Steel Institute Hands on Steel Project, University of California, Berkeley, Department of Architecture, October 29, 1982.

**Professional Affiliations**

- American Society of Civil Engineers (Fellow; editorial board member *Journal of Performance of Constructed Facilities*)
- Structural Engineers Association of Northern California (member and Director)
- Earthquake Engineering Research Institute (member)
- EERI Northern California Chapter (member and Director 2005-2008)
- International Code Council (professional member)

**Recent Testimony**

International School of Louisiana v Hanover Insurance.  US District Court, Eastern District of Louisiana, 2009 (Deposition).

Nordby Construction Company v Kenyon Plastering, Inc.  California Superior Court, Sonoma County, 2008 (Deposition).

Wyndham New Orleans Canal Place v Lexington Insurance Company, et al.  Louisiana Civil District Court for the Parish of New Orleans, 2008 (Deposition)

Gagne v State Farm.  U.S. District Court, Southern District of Mississippi, 2007, 2008 (Deposition).

Debadelone v State Farm.  U.S. District Court, Southern District of Mississippi, 2007 (Deposition).

Willis v State Farm.  U.S. District Court, Southern District of Mississippi, 2007 (Deposition).

Lott v State Farm.  U.S. District Court, Southern District of Mississippi, 2007 (Deposition).

Gonzales v Farmers.  Superior Court of California, County of Los Angeles, 2007 (Deposition).

Guttman v State Farm.  Superior Court of California, County of Los Angeles, 2007 (Deposition).

Fru-Con Construction v Sacramento Municipal Utilities.  U.S. District Court, Northern District of California, 2006 (Deposition).

Northshore v State Farm.  Superior Court of California, County of Los Angeles, 2006 (Deposition and Trial).

Arias v State Farm.  Superior Court of California, County of Los Angeles, 2005 (Deposition).

Paneno v Pasadena.  Superior Court of California, County of Los Angeles, 2005 (Deposition).

**Consulting and Testimony Billing Rate**

Three hundred sixty dollars per hour (calendar year 2009).

# Appendix B

## References

SWE-000039

| Document Date | Bates range | Title | Author/Source |
|---|---|---|---|
| 9/26/09 | LWFR-EXP 3-000027 - LWFR-EXP 3-000061 | Analysis of the Forest River, Inc. Formaldehyde Dataset | Paul Hewett, Exposure Assessment Solutions |
| 10/1/09 | LWFR-EXP 4-000004 - LWFR-EXP 4-000017 | Electrical Systems Observations Report for the FEMA-Lyndon Wright Trailer | J. Darrell Hicks, D. Hicks Consulting |
| August 2009 | LWFR-EXP 5-000004 - LWFR-EXP 5-000094 | Inspection Report | LaGrange Consulting |
| 10/2/09 | LWFR-EXP 7-000014 - LWFR-EXP 7-000144 | Inspection Report of the LYNDON WRIGHT FEMA Temporary Housing Unit | Alexis Mallet, First General Services of the South, Inc. |
| 10/2/09 | LWFR-EXP 5-000005 - LWFR-EXP 5-000042 | Structural Condition Assessment For FEMA Travel Trailer Wright/Forest River, Inc. Trailer Melville, Louisiana | Charles David Moore, Freyou, Moore and Associates, Inc. |
| 10/1/09 | LWFR-EXP 10-000008 - LWFR-EXP 10-000030 | Investigation and Inspection of FEMA Travel Trailer NO. 1277021 VIN 4X4TSMH296C008992 | Ervin L. Ritter, Ritter Consulting Engineers, Ltd. |
| 10/2/09 | LWFR-EXP 11-000043 - LWFR-EXP 11-000135 | AFFIDAVIT OF WILLIAM D. SCOTT, PE, CHMM | Bill Scott, W.D. Scott Group, Inc. |
| 9/29/09 | LWFR-EXP 13-000023 - LWFR-EXP 13-000061 | Affidavit of Stephen Smulski, Ph.D. | Stephen Smulski, Wood Science Specialists, Inc. |
| 8/14/08 | | Defendant Forest River Inc.'s Objections and Responses to Plaintiffs' First Interrogatories and Requests for Production of Documents | |
| 6/5/09 | | Defendant Forest River Inc.'s Objections and Responses to Plaintiffs' Second Revised Master Set of Interrogatories and Requests for Production of Documents | |
| | FOREST-0151924 - FOREST-0151946 | | |
| | FOREST-0000001 – FOREST-0000973 | | |
| | FOREST-0001978 – FOREST-0002397 | | |
| | FOREST-0002399 – FOREST-0002638 | | |
| | FOREST-0002966 – FOREST-0004729 | | |
| | FOREST-0004914 – FOREST-0151923 | | |
| | | Trailer pic.jpg | |
| | FOREST-0002399 – FOREST-0002483 (LWFR-EXP 5-000372 - LWFR-EXP 5-000456) | Forest River Recreational Vehicle Owner's Manual | Forest River |
| | SHAW-WRI 00001 – SHAW-WRI 00017, FOREST-0151924 – FOREST-0151946 (LWFR-EXP 5-000461 - LWFR-EXP 5-000500) | FR and Shaw Trailer Data | |
| | FOREST-0003132 – FOREST-0003391 | FR blueprints and specs | |

| Document Date | Bates range | Title | Author/Source |
|---|---|---|---|
| | (LWFR-EXP 5-000112 - LWFR-EXP 5-000371) | | |
| | LWFR-EXP 5-000579 - LWFR-EXP 5-000583 | International Building Code (2006) excerpts | |
| | LWFR-EXP 5-000584 - LWFR-EXP 5-000589 | International Residential Code (2006) excerpts | |
| | LWFR-EXP 5-000460 - LWFR-EXP 5-000461 | RVIA Adopted Standards | |
| | FEMA124-000001 – FEMA124-000078 (LWFR-EXP 5-000501 - LWFR-EXP 5-000578) (FGC009-000012 - FGC009-000089) | Wright Lyndon Disaster File | |
| | SHAW000480 – SHAW000519 | Exhibit 7-10 FEMA-Shaw contract | |
| 5/22/09 | | Defendant Forest River Inc.'s Objections and Responses to Plaintiffs' Revised Master Set of Interrogatories and Requests for Production of Documents to Forest River, Inc. | |
| 6/23/09 | | Lyndon Wright's First Supplemental and Amended Complaint | |
| 3/2/09 | | Complaint for Damages | |
| 4/14/09 | | Supplemental Plaintiff Fact Sheet | |
| 2/19/09 | | Plaintiff Fact Sheet | |
| 7/10/09 | | Transcript of the Testimony of Videotaped Deposition of Lyndon Wright and Exhibits 1-14 | |
| | LWFR-DT-005995 – LWFR-DT-006014, LWFR-DT-006120 – LWFR-DT-006127 | Mallet v. Forest River Destructive Testing | |
| | LWFR-DT-006167 - LWFR-DT-006183, LWFR-DT-006206 - LWFR-DT-006339 | Mallet v. Forest River Destructive Testing | |
| | LWFR-DT-006340 - LWFR-DT-006456 | Mallet v. Forest River Destructive Testing | |
| | LWFR-DT-006575 - LWFR-DT-006606, LWFR-DT-006657 - LWFR-DT-006661, LWFR-DT-006679 - LWFR-DT-006685, LWFR-DT-006689 - LWFR-DT-006692 | Mallet v. Forest River Destructive Testing | |
| | LWFR-DT-006693 - LWFR-DT-006729, LWFR-DT-006739 - LWFR-DT-006749, LWFR-DT-006798 - LWFR-DT-006815, LWFR-DT-006822 | Mallet v. Forest River Destructive Testing | |
| | LWFR-DT-007725 - LWFR-DT-007729, LWFR-DT-007758, LWFR-DT-007908 - | FEMA Formaldehyde (Selected Photos Videos from CDs) | |

| Document Date | Bates range | Title | Author/Source |
|---|---|---|---|
| | LWFR-DT-007928, LWFR-DT-007974 - LWFR-DT-007983 | | |
| | LWFR-DT-000724 - LWFR-DT-000768 | 2009 August 17 and 31 - ELR Photos | |
| | LWFR-DT-001020 - LWFR-DT-001029, LWFR-DT-001045 - LWFR-DT-001106, LWFR-DT-001141 - LWFR-DT-001142, LWFR-DT-001163 - LWFR-DT-001166, LWFR-DT-001218 - LWFR-DT-001230, LWFR-DT-001326 - LWFR-DT-001336, LWFR-DT-001426 - LWFR-DT-001430, LWFR-DT-001490 - LWFR-DT-001492, LWFR-DT-001495 - LWFR-DT-001496 | 2009 September 1 - ELR Photos | |
| | LWFR-DT-003407.AVI | Forest River-Lyndon Wright Photos by Ervin Ritter – Video | |
| | LWFR-DT-004580 - LWFR-DT-004804, LWFR-DT-004805 - LWFR-DT-004809, LWFR-DT-004954 - LWFR-DT-004956, LWFR-DT-004968 - LWFR-DT-004971, LWFR-DT-004977 - LWFR-DT-004979, LWFR-DT-005044 - LWFR-DT-005094 | Jacking and Destructive Testing FEMA Trailer - Wright v Forest River Photos 1-740 | |
| | LWFR-DT-003662 - LWFR-DT-003703, LWFR-DT-003751 - LWFR-DT-004163 | Lyndon Wright Case v. Forest River Trailer Lagrange Consulting 9-9-09 | |
| | | ANSI Technical Standard 1192 and 1194 (1192-08-PDF.pdf and 1194-08-PDF.pdf) | |
| | LWFR-EXP 5-000457 - LWFR-EXP 5-000459 | Manual of Steel Construction – Allowable Stress Design Ninth Edition (AISC), Minimum Design Loads for Buildings and other Structures (ASCE SEI 7-05), Timber Construction Manual | |
| 10/19/07 | LWFR-EXP 5-000043 - LWFR-EXP 5-000101 | Federal Register, Part II Department of Housing and Urban Development, 24 CFR Parts 3280 and 3285, Model Manufactured Home Installation Standards; Final | |

| Document Date | Bates range | Title | Author/Source |
|---|---|---|---|
| | | Rule | |
| | FEMA165-000001 - FEMA165-000012 | | |
| | FEMA165-000013 - FEMA165-000187 | | |
| | LWFR-EXP 5-000102 - LWFR-EXP 5-000111 (FL-FCA-000113 – FL-FCA-000122) | Fluor Contract Installation and Blocking Instructions | |
| | | General Test Protocol Rules.pdf | |
| 4/8/09 | | TRIAL III Scheduling Order | |
| | | Forest River Protocol (Final Revisions 07-20-09).doc | |
| | | Forest River Protocol (with Mold Protocol).doc | |
| | | Forest River Protocol (with US final edits incorporated).doc | |

**Compact Discs and Digital Video Discs**

| Document Date | Bates range | Title |
|---|---|---|
| | LWFR-DT-000024 LWFR-DT-000293 | Forest River Pics FEMA165-000001-187 |
| | LWFR-DT-000294 LWFR-DT-003420 | Forest River-Lyndon Wright Photos by Ervin Ritter |
| | LWFR-DT-003421 LWFR-DT-003491 | D. Hicks Consulting – Wright v. Forest River |
| 9-9-09 | LWFR-DT-003492 LWFR-DT-004163 | Lyndon Wright Case v. Forest River Trailer Lagrange Consulting 9-9-09 |
| 8/31/2009 – 9/1/2009 | LWFR-DT-004164 LWFR-DT-004354 | Dr. Stephen Smulski, Wright v. Forest River Destructive Testing Disassembly 8/31/2009 – 9/1/2009 |
| | LWFR-DT-004355 LWFR-DT-005094 | Jacking and Destructive Testing FEMA Trailer-Wright v. Forest River Photos 1 – 740 |
| | LWFR-DT-005095 LWFR-DT-006874 | Al Mallet, Wright v. Forest River Destructive Testing |
| | LWFR-DT-006875 LWFR-DT-007983 | FEMA: Formaldehyde |
| | LWFR-DT-007984 | FEMA: Formaldehyde Video |
| | LWFR-DT-007985 | FEMA: Formaldehyde Melville Site Video |
| | LWFR-DT-007986 | FEMA: D'Amico Tear Down I |
| | LWFR-DT-007987 | FEMA: D'Amico Tear Down II |
| | LWFR-DT-007988 | FEMA: D'Amico Tear Down III |
| | LWFR-DT-007989 | FEMA: D'Amico Tear Down IV |
| | LWFR-DT-007990 | FEMA: D'Amico Tear Down V |
| | LWFR-DT-007991 | FEMA: D'Amico Test I-A |
| | LWFR-DT-007992 | FEMA: D'Amico Test I-B |
| | LWFR-DT-007993 | FEMA: D'Amico Test II |
| | LWFR-DT-007994 | FEMA: D'Amico Test III |
| | LWFR-DT-007995 | FEMA: D'Amico Handheld I Surveillance |

| Document Date | Bates range | Title | Author/Source |
|---|---|---|---|
| | LWFR-DT-007996 | FEMA: D'Amico Handheld II Surveillance | |
| | LWFR-DT-007997 | FEMA: D'Amico Handheld III Surveillance | |
| | LWFR-DT-007998 | FEMA: D'Amico Static Camera Surveillance | |
| | LWFR-DT-007999 | Bill Scott, Wright v. Forest River | |
| | | | |

# Appendix C

# Structural Testing of Wright Trailer

SWE-000045

## Structural Testing of Wright Trailer

Exponent performed non-destructive structural testing of the Wright trailer on August 26, 2009. Exponent's test program consisted of three[37] different sequences of lifting and leveling of the instrumented trailer to observe the structural behavior of the trailer during trailer installation.

## Installation Sequences

At all times during the testing the entry door was held in the closed position with a wooden wedge inserted into the handle adjacent to the door.  Lifting and leveling sequences were:

1. Lifting the front of the trailer using the tongue jack; installing blocks at the front of the trailer approximately 12-14 inches high; raising the rear of the trailer using bottle jacks and installing appropriate blocking to level the trailer front to rear; installing blocking at mid-span of the rail beams; and finally the trailer was leveled from side-to-side by lifting the left side of the trailer.  During this test, a portion of the trailer weight was intended to be transferred through the tires. As such, the wheels remained in contact with the ground.

2. Installing blocking under the front of the trailer and disengaging the tongue jack; lifting the rear of the trailer to approximately 20 inches above grade; lifting the front of the trailer and installing blocking when level front to rear; installing blocking at the mid-span; and finally leveling the trailer side to side.

3. Installation similar to 2 above; during this sequence the front of the trailer was lifted first, followed by the rear of the trailer, and finally the middle of the trailer.

Following the completion of each lifting and leveling sequence, the trailer was lowered back onto the wheels and tongue jack prior to the subsequent test.

## Instrumentation

Instrumentation of the trailer consisted of:

1. A total of four strain gages at two locations on the top and bottom flanges of the left frame rail to measure changes of strain in the frame rail associated with jacking.

2. A tensioned reference cable extending from the front most cross beam to the rear bumper along the left frame rail to measure deflections of the frame rail associated with at-rest and lifted position.

---

[37] A fourth test was conducted utilizing truck scales solely to determine trailer weight; no data other than trailer weight was collected. The trailer weight was estimated to be 5200 lbs.

3. A self leveling laser centered beneath the trailer and six scales attached to the rail beam to assist with precision leveling of the trailer.

4. A digital string potentiometer installed diagonally across the door opening to measure racking of the door opening.

5. Crack gages installed at five locations to measure relative movement across caulked joints between the trailer siding and the frames of the windows and door.

## Strain gages

The four strain gages consisted of 120 Ohm electrical resistance strain gages: two placed near the wheels 10ft-2in from the rear end of the rail beam; and two at located at 14ft-0in from the end of the rail beam (Figure 2). Each pair of strain gages was placed on the outer flange of the rail beam as shown in Figure 3. The strain gages were connected to a Vishay, P3 strain indicator where each of the gages were installed as a quarter-Wheatstone bridge to output uniaxial strain data. Strain gages were balanced ("zeroed") in the baseline condition where the trailer was supported by the tongue jack and wheels.[38]

The strain gages measure in units of microstrain (μs). For reference, 1200 μs (1200x10-6 in/in) corresponds to a change in stress equal to the published yield stress of steel of 36,000 psi.

---

[38] Due to the temperature range and shifting sunlight at the inspection location, the strain gage data may shift during the testing. For this reason, the baseline values will not return to "zero" throughout the day.



Figure 2.     Typical strain gage installation (SG1) shown (Exponent photo 2011).



Figure 3.     Location of strain gages at each of the two locations.



Figure 4.      Vishay, Four channel, P3 Strain indicator (Exponent photo 2019).

## Tensioned reference cable

A 1/8 inch diameter steel cable was installed on the rail beam and tensioned at the back bumper and at the front channel running perpendicular to the trailer (Figure 3 above).  The distance between the cable and the flange of the rail beam was measured at 5 locations (see Table 5). Measurements were taken utilizing digital calipers (Figure 5). Deformations were computed by computing relative difference between baseline measurements and the lifted sequences described above.

Table 5.      Tensioned reference cable reading locations

| Displacement ID | Distance from end of rail beam |
|-----------------|--------------------------------|
| D1 | 24'-4" |
| D2 | 18'-10" |
| D3 | 14'-6" |
| D4 | 10'-6" |
| D5 | 2'-8" |



Figure 5.     Example of measurement taken with digital caliper at
              reference location D5 (Exponent photo 1023).

## Self-leveling laser

A self leveling laser was installed beneath the center of the trailer to provide a level reference plane. Scales were installed at six locations to determine the relative height of the trailer: Two near the front of the rail beam, two at the mid-span of the rail beam, and two at the rear of the rail beam. The use of the level aided both pitch and roll leveling of the trailer.



Figure 6.        Self leveling laser under trailer (Exponent photo 2008).



Figure 7.        One of six scales used to level trailer (Exponent photo
                 2022).

## Digital Indicator

A spring-loaded digital indicator was utilized to measure the racking during the sequences mentioned above.  The indicator was anchored to the wood framing just below the door opening; the end opposite to the digital indicator consisted of a lag screw anchored to the wood framing to the top and to the right of the door (Figure 8). The indicator measured the change in length of the diagonal, reading positive for extension and negative for shortening.



Figure 8.    Digital indicator installed diagonally across Wright trailer door (Exponent photos 2025 and 2026).

## Crack Gages

A total of 5 crack gages (Figure 9 and Figure 10) were mounted to measure the displacement between the siding and the frames (the distortion of the caulking).  The crack gages were installed using a quick setting epoxy putty.  Once the epoxy putty had set, the clear tape holding the two halves of the gage in setting alignment was cut to allow for unhindered movement of the gage.



Figure 9.       Typical crack gage installation (crack gage 1 shown)
                (Exponent photo 2032).



Figure 10.      Approximate crack gage locations.

## Test Results

Results from the lifting sequences are presented in Table 6 through Table 9. Table 10 and Table 11 contain information regarding sensitivity to jacking near the door and weight estimation of the trailer, respectively.

Table 6.        Baseline readings

| | | Readings | | |
|---|---|---|---|---|
| | | Baseline | Baseline‡ | Average |
| Strain Gage (µs) | SG1 | 0 | - | - |
| | SG2 | 0 | - | - |
| | SG3 | 0 | - | - |
| | SG4 | 0 | - | - |
| Disp. Readings (in) | D1 | 2.151 | 2.165 | **2.158** |
| | D2 | 2.050 | 2.024 | **2.037** |
| | D3 | 1.812 | 1.853 | **1.833** |
| | D4 | 1.724 | 1.7455 | **1.735** |
| | D5 | 1.960 | 1.9595 | **1.960** |
| Dial Indicator (in) | DI | 0 | - | - |
| Level Disp. Readings | LD1 | **-4 5/16** | - | - |
| | LD2 | **-2 9/16** | - | - |
| | LD3 | **-1 11/16** | - | - |
| | LD4 | **-1/8** | - | - |
| | LD5 | **-1 1/4** | - | - |
| | LD6 | **-2 3/4** | - | - |
| Crack Gages | C1 | - | - | - |
| | C2 | - | - | - |
| | C3 | - | - | - |
| | C4 | - | - | - |
| | C5 | - | - | - |

‡ The second baseline was recorded to verify that the tension reference cable measurements were taken accurately

Table 7.      Test 1

| | | Readings | | | |
|---|---|---|---|---|---|
| | | Baseline‡ | 1 | 2 | 3 |
| Strain Gage (µs) | SG1 | 0 | +34 | +28 | +17 |
| | SG2 | 0 | -14 | -10 | -3 |
| | SG3 | 0 | +42 | +38 | +244 |
| | SG4 | 0 | -71 | -80 | -285 |
| Disp. Readings (in) | D1 | **2.158** | 2.054 | Not recorded | 2.054 |
| | D2 | **2.037** | 1.993 | Not recorded | 2.034 |
| | D3 | **1.833** | 1.821 | Not recorded | 1.917 |
| | D4 | **1.735** | 1.741 | Not recorded | 1.995 |
| | D5 | **1.960** | 1.960 | Not recorded | 2.027 |
| Dial Indicator (in) | DI | 0 | 0.025 | 0.026 | 0.0365 |
| Level Disp. Readings (in) | LD1 | **-4 5/16** | -3 3/16 | Not recorded | -3 1/16 |
| | LD2 | **-2 9/16** | -2 3/4 | Not recorded | -3 |
| | LD3 | **-1 11/16** | -2 3/4 | Not recorded | -3 |
| | LD4 | **-1/8** | -1 3/16 | Not recorded | -2 9/16 |
| | LD5 | **-1 1/4** | -1 1/2 | Not recorded | -2 5/8 |
| | LD6 | **-2 3/4** | -1 1/2 | Not recorded | -2 5/8 |
| Crack Gages | C1 | - | No Change | Not recorded | No Change |
| | C2 | - | No Change | Not recorded | No Change |
| | C3 | - | No Change | Not recorded | No Change |
| | C4 | - | No Change | Not recorded | No Change |
| | C5 | - | No Change | Not recorded | No Change |

‡ Repeated from 'Baseline' for convenience.

1. Recordings prior to installing middle blocking, rear and front blocking installed

2. Recordings after middle blocking installed

3. Recordings after all blocking was installed and trailer leveled.

Table 8.        Test 2

| | | Readings | | | |
|---|---|---|---|---|---|
| | | **Baseline‡** | **1** | **2** | **3** |
| Strain Gage (µs) | SG1 | +18 | +143 | +228 | +10 |
| | SG2 | -11 | -33 | -137 | +51 |
| | SG3 | -9 | +384 | +456 | +403 |
| | SG4 | -30 | -463 | -508 | +(?) 420 |
| Disp. Readings (in) | D1 | **2.158** | Not recorded | 2.150 | 2.058 |
| | D2 | **2.037** | Not recorded | 2.350 | 2.058 |
| | D3 | **1.833** | Not recorded | 2.394 | 2.060* |
| | D4 | **1.735** | Not recorded | 2.489 | 2.130 |
| | D5 | **1.960** | Not recorded | 2.162 | 2.102 |
| Dial Indicator (in) | DI | 0.0075 | 0.061 | 0.167 | 0.1415 |
| Level Disp. Readings (in) | LD1 | **-4 5/16** | Not recorded | -6 5/8 | -6 5/8 |
| | LD2 | **-2 9/16** | Not recorded | -5 3/4 | -6 |
| | LD3 | **-1 11/16** | Not recorded | -6 1/4 | -6 1/4 |
| | LD4 | **-1/8** | Not recorded | -6 3/16 | -6 1/4 |
| | LD5 | **-1 1/4** | Not recorded | -6 | -6 1/8 |
| | LD6 | **-2 3/4** | Not recorded | -6 1/4 | -6 5/16 |
| Crack Gages | C1 | - | No Change | No Change | No Change |
| | C2 | - | No Change | No Change | No Change |
| | C3 | - | No Change | No Change | No Change |
| | C4 | - | No Change | No Change | No Change |
| | C5 | - | No Change | No Change | No Change |

‡ Strains and displacement indicator were recorded; displacement readings and level displacement readings are repeated from 'Baseline' for convenience.

1. Recordings after rear was lifted, front end on lowered blocking

2. Recordings after rear and front are lifted

3. Recordings after all blocking was installed and trailer leveled.

* Taken 4 inches towards front of trailer from D3 mark

Table 9.        Test 3

| | | Readings | |
|---|---|---|---|
| | | Baseline‡ | 1 |
| Strain Gage (µs) | SG1 | +60 | +67 |
| | SG2 | -12 | +25 |
| | SG3 | +6 | +419 |
| | SG4 | -20 | -450 |
| Disp. Readings (in) | D1 | 2.152 | Not Recorded |
| | D2 | 2.086 | Not Recorded |
| | D3 | 1.978 | Not Recorded |
| | D4 | 1.839 | Not Recorded |
| | D5 | 2.053 | Not Recorded |
| Dial Indicator (in) | DI | -0.025 | 0.112 |
| Level Disp. Readings (in) | LD1 | **-4 5/16** | -6 5/8 |
| | LD2 | **-2 9/16** | -6 1/4 |
| | LD3 | **-1 11/16** | -6 5/16 |
| | LD4 | **-1/8** | -6 1/4 |
| | LD5 | **-1 1/4** | -6 1/8 |
| | LD6 | **-2 3/4** | -6 3/8 |
| Crack Gages | C1 | - | No Change |
| | C2 | - | No Change |
| | C3 | - | No Change |
| | C4 | - | No Change |
| | C5 | - | No Change |

‡ Strains , displacement readings and displacement indicator were recorded; level displacement readings are repeated from 'Baseline' for convenience.

1. Recordings after trailer was fully blocked and leveled

Table 10.        Sensitivity to mid-point jacking

| LD5 displacement (in) | Dial indicator reading (in) |
|---|---|
| -6 | 0.1375 |
| -6 1/8 | 0.131 |
| -6 1/4 | 0.099 |
| -6 3/8 | 0.077 |
| -6 1/2 | 0.0585 |

Table 11.        Truck scale measurements

| Scale | Location | Weight (lbs) |
|---|---|---|
| 1 | Left front | 1185 |
| 2 | Left rear | 1610 |
| 3 | Right rear | 1530 |
| 4 | Right left | 890 |
| | **Total** | **5215 lbs.** |

## Trailer performance

### General

The jacking sequences utilized by Exponent during field testing did not cause any damage or permanent deformation of the trailer box, rail beams, windows, or door opening. This was verified by the return of the trailer to its original baseline condition after each test, and the visible condition of the trailer prior to and after testing the frame.

### Sensitivity to mid-point jacking

After the completion of Test 2, the trailer was jacked near the left side blocks (near the trailer door). The trailer was lifted only 1/2 inch at this location to observe the sensitivity of the door racking at this point (Table 10). It was observed that with the minor deflection at this location, the racking of the door diminished from 0.1375 inch down to a near-baseline condition.[39] As such, the amount door is racking is sensitive to relative pier heights, but as will be shown later, this has little consequence in the performance of the door's ability to act as a moisture barrier (see Appendix E).

---

[39]  This is consistent with the Forrest River Owner's Manual which states with respect to leveling "NOTE: If after leveling, the entrance door to the trailer "sticks", you have most likely lifted one side of the trailer excessively, causing a binding condition on the frame. If this condition exists, lower the trailer and relevel to obtain proper balance." [Forest 0002430]

# Appendix D

## Structural Testing of
## Exemplar Trailer

SWE-000060

## Structural Testing of Exemplar Trailer

In the course of structural testing of the Wright trailer, a hypothesis was developed that over-the-road travel may cause stresses in the trailer similar to those developed during the jacking process. To test this hypothesis, Exponent instrumented an exemplar Forest River trailer[40] and towed it over public roads and freeways from Phoenix, AZ to Menlo Park, CA.

This Appendix discusses that testing.

Instrumentation consisted of a portion of the field set of instrumentation augmented for redundancy and automated data collection while the trailer was in transit. Instrumentation was installed at Exponent's Vehicle Testing and Engineering Center in Phoenix (see Table 12 and Figure 12 for more information). Instrumentation consisted of:

1. Eight strain gages (SG1 through SG8). Four strain gages were installed on each rail beam (see Table 12, Figure 12, and Figure 13): two near the axle, and two near the mid-span of the rail beam.

2. Two digital string potentiometers installed diagonally across the door opening to measure racking of the door opening associated with over-the-road travel.

3. Accelerometers installed at 4 locations (at the front and rear of each rail beam) to measure vertical accelerations as well as pitch and roll of the trailer while in transit

4. GPS receiver to log global position and speed of the trailer.

5. Digital data acquisition system recording data continuously at 250 Hz from 26 channels.

Approximately 12 hours of data over 750 miles of freeway were collected on 26 channels, resulting in a total of about 10,800,000 readings.

---

[40] Forrest River SMT32BHLE; vehicle Identification number 4X4TSMH246T104318; date of manufacture 9/19/2005; gross vehicle weight rating: 7,790 lbs.; gross axle weight rating: 3,500 lbs.; number of axles: 2; Exponent vehicle file number: 6804.



Figure 11.    Vehicle route from Phoenix, AZ to Menlo Park, CA (source: www.google.com)

Table 12.        Primary Channel List

| | Readings | | | | |
|---|---|---|---|---|---|
| | Channel No. | Label | Description | Units | Positive Direction |
| Strain Gages | 1 | SG1 | Left, midspan, top (sim. to SG2 of field test) | μs | Tension |
| | 2 | SG2 | Left, midspan, bottom (sim. to SG1 of field test) | μs | Tension |
| | 3 | SG3 | Left, axle, top (sim to SG4 of field test) | μs | Tension |
| | 4 | SG4 | Left, axle, bottom (sim to SG3 of field test) | μs | Tension |
| | 5 | SG5 | Right, midspan, top | μs | Tension |
| | 6 | SG6 | Right, midspan, bottom | μs | Tension |
| | 7 | SG7 | Right, axle, top | μs | Tension |
| | 8 | SG8 | Right, axle, bottom | μs | Tension |
| Accel-erometer | 9 | A1 | Left, front rail beam | g | Up |
| | 10 | A2 | Right, front rail beam | g | Up |
| | 11 | A3 | Left, rear rail beam | g | Up |
| | 12 | A4 | Right, rear rail beam | g | Up |
| Wire Potentiometer | 13 | DI | Lower right to upper left door | in | out |
| | 14 | D2 | Lower left to upper right door | in | out |
| CAN Channels | 17 | C1 | Day | day | - |
| | 18 | C2 | Hours | hour | - |
| | 19 | C3 | Minutes | min | - |
| | 20 | C4 | Seconds | sec | - |
| | 21 | C5 | Longitude | deg | - |
| | 22 | C6 | Latitude | deg | - |
| | 23 | C7 | Altitude | ft | - |
| | 24 | C8 | Speed | mph | - |



Figure 12.   Exemplar trailer instrumentation locations (see Table 1 for descriptions). Not to scale, for illustration purposes only.

SWE-000064

41



Figure 13.        Location of strain gages at each cross section.

## Data

Once the trailer reached to Menlo Park, the data from the data acquisition system was downloaded onto a PC based computer for further analysis. In the event of data failure, the data was recorded in 12 x 1hour segments. Each of the segments thus recorded for 1 hour each, each channel was assembled together prior to processing. Once the data was read a Butterworth band-pass filter form 0.01 to 100 Hz was applied to the data. For the sake of brevity, only key observations will be discussed herein.

### Left Rail Beam Strain Gage Data

The left rail beam was instrumented nearly identically to the Wright trailer, tested in Melville, Louisiana. As such, the strains recorded provide a direct correlation between stresses from jacking and over-the-road travel; the data collected from over-the-road travel also provides a validation of the range of stresses recorded. Figure 15 contains the total time-history data for 12 hours of over-the-road testing. Each channel is plotted along with the peak strain recorded on the Wright trailer. From this figure, we note that the magnitude of strains recorded over-the-road at peak locations equal or exceed those recorded during testing of the Wright trailer. Furthermore, the strains recorded on the Wright trailer were monotonic, whereas the strains recorded over-the-road were cyclic. As such, the *range* of motion the exemplar trailer sustains in each cycle is significantly larger than those recorded (i.e. the amount of movement from peak-to-peak when hitting a pothole is nearly twice as large as the range of motion observed during simple jacking). Thus the amount of distortion (and number of cycles) is significantly greater during over-the-road testing.

Once the data was parsed and filtered a rainflow cycle counting script was used to count the number of cycles and half-cycles[41] of certain channels.  Figure 14 shows the results from this rainflow analysis.  Clearly from the data, the exemplar trailer sustained numerous cycles at strains near those observed during testing of the Wright trailer.



Figure 14.   Stress range and number of cycles per stress range observed during over-the-road experiment.

---

[41] Nieslonv, Adam, "Rain Flow Counting Method," 17 Feb 2003 (Updated 12 Jan 2005); Code covered by BSD License; site www.mathworks.com.



Figure 15.    Displacement time-histories for the four strain gage channels similar to those installed on the Wright trailer.  The red lines represents the range of peak strains recorded during the Wright trailer tests.

## Door Racking

Channel 14 of the exemplar trailer was set up to measure racking response in the same manner as the digital indicator placed on the Wright trailer during field testing. The time-history for the entire channel is shown in Figure 16, with a selected large excursion shown in Figure 17 (exact GPS location of this point is shown in Figure 19). The range of motion observed throughout the experiment is from approximately -3/16 inch to +1/8 inch. Observation of the data indicate that at around -1/8inch the door comes into contact with the surrounding frame and limits distortion of the frame to about -1/8inch. A similar limit is observed for the positive excursions as well.

Similar to the strain gage data, the number of cycles of data and their equivalent strain range are plotted Figure 18.



Figure 16.    Time-history of door displacement of exemplar trailer as it traveled from Phoenix to Menlo Park..



Figure 17.    Segment of time history recorded on westbound Hwy 58.



Figure 18.    Number of cycles and amplitude of door racking recorded in travel trailer on public roads from Phoenix, AZ to Menlo Park, CA.



Figure 19.    Location where one of the many of the large amplitude recordings were recorded during the exemplar travel (Westbound Hwy 58 traveling 52.8 mph).

## Vertical Acceleration

Acceleration time-history data was averaged from the four rail beam accelerometers. The results from this averaging is presented in Figure 20. In this figure, a negative acceleration corresponds to accelerations in the downward direction. Many peaks were recorded which were larger than or close to -1.0g. Such accelerations are normal when dealing with over-the-road travel, and are to be expected in the life of a trailer.



Figure 20.    Average accelerations from all 4 accelerometers during test. Note multiple excursions beyond -1.0g.

## Discussion

Careful review of the strain range data indicates that there is an apparent ceiling to the maximum strains. As observed during testing on the Wright trailer, the observed beam deflections were on the order of 0.75 inch, whereas an analysis assuming the rail beams taking full trailer loads would result in deflections of over 2 inches. The reasons for the observed behavior are:

- The trailer box is taking a large percentage of the load, and is functioning as a stiff structural element

- The trailer box is acting as a composite section with the rail beam during loading

- A combination of the above two: The trailer is acting a separate member until the connections between the rail beams and box are engaged, creating a response which is initially two individual elements and then later acting as one composite unit at larger displacements.

As such, the strains are likely limited to near 500 μs (~15ksi) due to the engaging of the box, at which point the increase in load is distributed between the box and the rail beam much more efficiently, and increases in strains on the rail beam correspond to significant loading.

Similar to the strain limit, there is a physical limit to the door racking that can be observed; this occurs when the door makes contact with the door frame. In the case of the door, this appears to be in the vicinity of 3/32 to 1/8 inch.

## Appendix E

## Spray Testing of Exemplar Trailer

SWE-000072

## Spray Testing of Exemplar Trailer

Following over-the-road transport from Maryland to California via Arizona, an exemplar Forest River trailer was spray tested to determine the nature and extent, if any, of damage to the seals around doors and windows.  The left and right front windows (in the bedroom) as well as the trailer entry door were water tested in accordance with ASTM E1105 under ambient pressure.  ASTM E1105 is applicable to windows, doors, and curtain-wall areas and determines the resistance of the installed materials to moisture penetration.  The spray rack used was calibrated the day before testing to be in accordance with ASTM E1105.  During each test, the rack emitted a uniform water spray at a rate of 5 to 6 gal/ft$^2$-hr, above the minimum required spray rate of 5 gal/ft$^2$-hr.  Each water test lasted for 15 minutes and at least one hour of time passed between tests in each area.  A failure at windows and doors is defined in ASTM E1105 as water entering inside the vertical plane of the frame or the perimeter of the frame to the interior finishes.  Water contained in the sills or frame itself is not considered to be a failure.  Water detection was performed utilizing strips of water finding test paper[42].  The strips turn lavender in the presence of moisture.

The water tests were conducted when the trailer was in two separate positions: (1) stationary - supported on the front jack at the hitch and on all four wheels (Figure 21) and (2) lifted - supported on four jacks, one at each corner of the trailer (Figure 22).  These two support conditions reflect static maximum negative and positive stresses on the trailer.



Figure 21.    Trailer on wheels and tongue jack
(Exponent photo 2501).

---

[42] Micro Essential ™ Hyrion Paper, Broklyn, N.Y. 11210, U.S.A



Figure 22.    Trailer on jacks at four corners (Exponent photo 2790).

## Left and Right Front Windows

Both windows and the surrounding exterior finishes were tested when the trailer was in the stationary position as well as when the trailer was lifted (Figure 23 and Figure 24). No leaks were observed on the interior finishes during any of these tests.



Figure 23.    Overview of water testing at front left window (Exponent photo 2649).



Figure 24.    Overview of water testing at front right window (Exponent photo 2614).

## Door

The trailer door and the surrounding exterior finishes were also tested. During the first test, the trailer was in the stationary position (Figure 25 and Figure 26). No leaks were observed on the interior finishes during this test. During the second test, the trailer was lifted. Minor leakage was observed just below the interior face of the door below the window. No water penetrated the vertical plane of the frame (Figure 27).



Figure 25.     Overview of water testing at door (Exponent photo 2672).



Figure 26:     Water test at door with trailer wheels and tongue jack – note white, moisture sensitive paper indicating no leakage (Exponent photo 2675).

0904415.000 A0T0 1109 RPT1

SWE-000076



Figure 27:    Water test of door with trailer supported on
              jacks at four corners – note white, moisture
              sensitive paper indicating no leakage
              (Exponent photo 2774).

## Appendix F

## Review of Reports by Others

SWE-000078

## Review of Reports by Others

Exponent's evaluation included review of relevant reports prepared by other consultants. Two reports address structural issues:

- The *Structural Condition Assessment* report prepared by Charles David Moore of Freyou, Moore and Associates, Inc, dated October 2, 2009 (Moore report). The report summarizes Moore's visual inspections and jacking tests of the trailer during the August 2009 field testing in Melville, Louisiana. The report also includes a summary of structural analyses performed by Moore to assess forces and deformations in selected structural members subject to various loading conditions.

- The *Inspection Report* prepared by Alexis Mallet of First General Services of the South, Inc, dated October 2, 2009 (Mallet report). Mallet's report presents much data on many topics regarding the trailer, but mentions structural aspects only in the context of referring the reader to Moore's report. Mallet appears to adopt Moore's conclusions and incorporate them into his report without critical evaluation or any independent analysis.

As the Moore report is the only document that presents original information and opinions, the balance of this appendix will address only Moore's report.

Moore's description of the general exterior and interior conditions include the statements: *"The exterior of the unit appeared to be intact with no major structural damage visible during the initial visual inspection."* and *"The interior of the unit was basically intact with no major structural damage visible during the initial visual observations."* It is important to note that Moore's initial visual observations were performed after the Wright trailer had been transported from California to Baton Rouge, transported from Baton Rouge to New Orleans, installed at the Wright property, occupied for over 2 years, removed from the Wright property, transported from New Orleans to Melville, then left exposed to the elements through August of 2009.

Damage to the trailer noted by Moore was limited to sealant holes/separations, doorframe bowing, and localized water damage. After several jacking tests and the removal of exterior and interior finishes, Moore identified no structural distress to the trailer framing with the exception of a broken roof truss caused by roof access during the Melville field testing (after plywood sheathing had been removed from the underside of the trusses). Moore alleges deficient construction of several structural members/connections but identifies no damage associated with those deficiencies.

The Moore report contains conclusions drawn from jacking tests performed during the Melville testing (described in a previous section of the present report). Moore surmises that water leaks in the Wright trailer were caused or made worse by "improper jacking." Yet he provides no details regarding the nature of that improper jacking nor the damage he believes occurred in that process. He does not specify the mechanism of damage nor the stresses on or capacities of components he concludes were damaged. Furthermore, the general lack of visible damage to the exterior and interior of the trailer observed by Moore as cited above does not support his

conclusion regarding improper jacking. Again, Moore's initial visual observations were performed after the trailer had been installed and taken out of service at the Wright property.

Moore makes incorrect assumptions in his calculation of the magnitude of compression strain developed in the trailer during testing. He assumes that the entire trailer assembly (upper box and rail beam) essentially rotate as a flexural beam. In reality, the distortion will be largely a shear deformation, given the depth to length aspect ratio of the trailer. As such, the data collected from the inclinometers is insufficient to calculate the true shortening of the top portion of the trailer, as there would be no shortening associated with the shear component of deformation. Even if one accepts his analysis of the distortion, he fails to analyze the effect of that distortion on the joints he believes were damaged by that distortion. An exemplar trailer that had been installed on four jack stands passed ASTM E1105 spray testing performed by Exponent

Moore draws a strange conclusion from Exponent's door frame racking data. Moore comments that the door frame racks from an initial value of 0.035 inches to 0.197 inches at the peak and back to <u>minus</u> 0.036 inches after returning the trailer to its original position. Moore incorrectly concludes that this indicates a permanent deformation of the trailer. The final reading is approximately -1/32 of an inch, which is a negligible elastic deformation by any rational assessment of the data. The final reading is also in a direction opposite the initial value, implying that the initial racking <u>improved</u> after the trailer was set down.

Moore aptly describes the Wright trailer as a "recreational vehicle" (RV) in Section 2 of his report. However, he proceeds to describe structural analyses of selected trailer components when subject to loads prescribed by design codes for <u>buildings</u>. We are unaware of any interpretations or applications of the building code that are consistent with Moore's interpretation.

In addition, Moore grossly underestimates structural capacities of trailer components. For example, he calculates the structural capacity of the main steel support beams but ignores the structural contribution of the wood frame portion of the trailer. By his logic the beams should have deflected several inches under the trailer self-weight when supported only by jacks near the beam ends. Measured deflections under such conditions during the jacking tests were less than one inch. Moore makes similar assumptions when calculating wall stud capacities by neglecting the structural contribution of plywood sheathing elements. Finally, Moore's analyses of forces in structural members subject to hypothetical building code-level wind and floor live loads are meaningless in the assessment of the trailer's performance subject to loads actually experienced over the life of the trailer.

The field testing jacking sequences utilized by Moore and others are similar to those used by Exponent. Crack gages during Exponent's field tests were installed between the siding and window and door frames (where distortions that could damage caulked joints would occur), whereas Moore located crack gages between the window sash and the siding (where distortions will occur across the window gasket). In comparison of the two tests, More recorded very small amounts of movement (typically on the order of 1/64 inch if observed at all), which returned to

nearly baseline conditions after the trailer was returned to its original baseline condition. This would indicate that any distortions noted were at the window gaskets, which can accommodate substantial movement. It is unclear to Exponent why this is highlighted in his report as being a significant distortion.

Exponent concludes that opinions expressed in the Moore report are fundamentally flawed in that they are inconsistent with observed conditions, based on an incorrect interpretation of building codes, and rely on analyses that neglect significant contributions of components not contemplated by those analyses as well as in conflict with actual field measurements.