*Failure Analysis Associates*

# E*x*ponent®

# Engineering Investigation
# Lyndon Wright Trailer

Errata 11/17/09

EXHIBIT
5
DATE: 12-16-09
NAME: Osteraas, John

SWE-000083



*Failure Analysis Associates®*

# Engineering Investigation
# Lyndon Wright Trailer

Errata 11/17/09

Prepared for

David Kurtz, Esq.
Karen Kaler Whitfield, Esq.
Baker, Donelson, Bearman,
Caldwell, & Berkowitz, PC

Prepared by

John D. Osteraas, Ph.D., P.E.
Exponent Failure Analysis Associates

November 2, 2009

© Exponent, Inc.

Doc. no. 0904415.000 A0T0 1109 RPT1

SWE-000084

# Contents

|  | Page |
|---|---|
| **List of Figures** | iv |
| **List of Tables** | vi |
| **Introduction** | 1 |
| **Background** | 3 |
| **Data Collection** | 5 |
|    Visual Examination | 5 |
|    Field Testing | 6 |
|       Structural Testing by Exponent | 7 |
|       Structural Testing by Others | 9 |
|    Destructive Examination | 10 |
|    Exemplar Testing | 10 |
| **Analysis** | 13 |
|    Field data | 13 |
|    Exemplar data | 13 |
| **Discussion** | 14 |
| **Conclusions** | 19 |
|    Structural Testing of Wright Trailer | 23 |
|    Instrumentation | 23 |
|       Strain gages | 24 |
|       Tensioned reference cable | 26 |
|       Self-leveling laser | 27 |
|       Digital Indicator | 29 |
|       Crack Gages | 29 |
|    Test Results | 31 |
|    Trailer performance | 36 |
|       General | 36 |

Sensitivity to mid-point jacking                                    36
Structural Testing of Exemplar Trailer                              38
Data                                                                42
    Left Rail Beam Strain Gage Data             42
    Door Racking                                45
Vertical Acceleration                                               47
Discussion                                                          48
Spray Testing of Exemplar Trailer                                   50
Left and Right Front Windows                                        51
Door                                                                53
Review of Reports by Others                                         56

Appendix A   CV of John Osteraas, Ph.D., P.E.
Appendix B   References
Appendix C   Structural Testing of Wright Trailer
Appendix D   Structural Testing of Exemplar Trailer
Appendix E   Spray Testing of Exemplar Trailer
Appendix F   Review of Reports by Others

# List of Figures

|  |  | Page |
|---|---|---|
| Figure 1. | Overview of Wright trailer at storage facility in Melville, Louisiana. (Exponent photo 0001) | 1 |
| Figure 2. | Typical strain gage installation (SG1) shown (Exponent photo 2011). | 25 |
| Figure 3. | Location of strain gages at each of the two locations. | 25 |
| Figure 4. | Vishay, Four channel, P3 Strain indicator (Exponent photo 2019). | 26 |
| Figure 5. | Example of measurement taken with digital caliper at reference location D5 (Exponent photo 1023). | 27 |
| Figure 6. | Self leveling laser under trailer (Exponent photo 2008). | 28 |
| Figure 7. | One of six scales used to level trailer (Exponent photo 2022). | 28 |
| Figure 8. | Digital indicator installed diagonally across Wright trailer door (Exponent photos 2025 and 2026). | 29 |
| Figure 9. | Typical crack gage installation (crack gage 1 shown) (Exponent photo 2032). | 30 |
| Figure 10. | Approximate crack gage locations. | 30 |
| Figure 11. | Vehicle route from Phoenix, AZ to Menlo Park, CA (source: www.google.com) | 39 |
| Figure 12. | Exemplar trailer instrumentation locations (see Table 1 for descriptions). Not to scale, for illustration purposes only. | 41 |
| Figure 13. | Location of strain gages at each cross section. | 42 |
| Figure 14. | Stress range and number of cycles per stress range observed during over-the-road experiment. | 43 |
| Figure 15. | Displacement time-histories for the four strain gage channels similar to those installed on the Wright trailer. The red lines represents the range of peak strains recorded during the Wright trailer tests. | 44 |
| Figure 16. | Time-history of door displacement of exemplar trailer as it traveled from Phoenix to Menlo Park. | 45 |
| Figure 17. | Segment of time history recorded on westbound Hwy 58. | 45 |
| Figure 18. | Number of cycles and amplitude of door racking recorded in travel trailer on public roads from Phoenix, AZ to Menlo Park, CA. | 46 |

Figure 19. Location where one of the many of the large amplitude recordings were recorded during the exemplar travel (Westbound Hwy 58 traveling 52.8 mph). .......... 47

Figure 20. Average accelerations from all 4 accelerometers during test. Note multiple excursions beyond -1.0g. .......... 47

Figure 21. Trailer on wheels and tongue jack (Exponent photo 2501). .......... 50

Figure 22. Trailer on jacks at four corners (Exponent photo 2790). .......... 51

Figure 23. Overview of water testing at front left window (Exponent photo 2649). .......... 51

Figure 24. Overview of water testing at front right window (Exponent photo 2614). .......... 52

Figure 25. Overview of water testing at door (Exponent photo 2672). .......... 53

Figure 26. Water test at door with trailer wheels and tongue jack – note white, moisture sensitive paper indicating no leakage (Exponent photo 2675). .......... 53

Figure 27. Water test of door with trailer supported on jacks at four corners – note white, moisture sensitive paper indicating no leakage (Exponent photo 2774). .......... 54

# List of Tables

|          |                                             | Page |
|----------|---------------------------------------------|------|
| Table 1. | Summary of Test 1 Data                      | 8    |
| Table 2. | Summary of Test 2 Data                      | 8    |
| Table 3. | Summary of Test 3 Data                      | 9    |
| Table 4. | Summary of Over-the-road Testing            | 11   |
| Table 5. | Tensioned reference cable reading locations | 26   |
| Table 6. | Baseline readings                           | 31   |
| Table 7. | Test 1                                      | 32   |
| Table 8. | Test 2                                      | 33   |
| Table 9. | Test 3                                      | 34   |
| Table 10.| Sensitivity to mid-point jacking            | 35   |
| Table 11.| Truck scale measurements                    | 35   |
| Table 12.| Primary Channel List                        | 40   |

# Introduction

For a period of time following Hurricane Katrina, Lyndon Wright occupied a trailer (Wright trailer, the trailer, or subject trailer, see Figure 1) manufactured by Forest River, Inc., purchased by FEMA, installed by subcontractor of Shaw Environmental, Inc. (Shaw), and, for a period of time, maintained by subcontractor of Shaw. In the matter of Lyndon Wright v. Forest River, et al, it is alleged that during his occupancy of the trailer, Mr. Wright was exposed to elevated levels of formaldehyde and mold. It is further alleged that in the course of installation and/or maintenance of the subject trailer, Shaw and/or its subcontractors damaged the integrity of the exterior envelope of the subject trailer which allowed passage of abnormal quantities of water and/or air which allegedly caused or exacerbated the levels of formaldehyde and mold within the trailer.

Exponent Failure Analysis Associates (Exponent) was retained by Baker, Donelson, Bearman, Caldwell, & Berkowitz, PC on behalf of Shaw to perform an engineering evaluation of the Wright trailer. The objective of that evaluation was to utilize the scientific method and engineering principles to determine whether the activities of Shaw and/or its subcontractors damaged the integrity of the exterior envelope of the subject trailer in a way that allowed passage of abnormal quantities of water and/or air through or into the exterior envelope of the Wright trailer.



Figure 1.    Overview of Wright trailer at storage facility in Melville, Louisiana. (Exponent photo 0001)

Exponent's evaluation was performed under the direction of Group Vice President and Principal Engineer Dr. John Osteraas, P.E.[1] The scope of Exponent's work for that evaluation included:

1. Review of documentation, including reports, photos, video, deposition transcripts, pleadings, and various other documents, as listed in Appendix B.

2. Visual examination of the subject trailer at the FEMA storage area in Melville Louisiana on August 7, 2009.

3. Structural testing including:

    a. Field testing of the subject trailer at the FEMA storage area on August 26, 2009;
    b. Observation of field testing by others on August 27-28, 2009; and
    c. Testing of an exemplar trailer.

4. Engineering analysis; and

5. Preparation of this report.

This report summarizes work performed to-date and presents the findings resulting from that work. The findings presented herein are made to a reasonable degree of engineering certainty. Exponent reserves the right to supplement this report and to expand or modify opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

---

[1] Dr. Osteraas' CV is attached as Appendix A.

# Background

This section summarizes our understanding of key aspects of this case based on our review of the documents listed in Appendix B. The subject trailer was a 2006 model SMT32BHLE[2] trailer manufactured by Forest River at its Rialto, California plant.[3] The fabrication date of the subject trailer identified on the trailer tag is 9/8/05.[4] The completed trailer was identified by Forest River as being in conformance with US DOT requirements, ANSI/NFPA 1192, and RVIA standards. The trailer was purchased by North American Catastrophe Service Inc.[5] working under contract to FEMA and transported to the North American Catastrophe GSA Depot Baton Rouge[6] storage area, arriving 11/19/2005.[7] From that storage area, the trailer was transported to a Shaw staging yard. A Shaw subcontractor transported the trailer from the staging yard to the property located at 2315 Seminole Lane, New Orleans, Louisiana,[8] and installed the trailer in the rear yard of the property in an area landscaped with grass.[9]

Installation of the trailer was to be done in accord with *Exhibit 7* to *Contract between Shaw and FEMA: Travel Trailer Installation* and consisted of the following tasks:

1. Positioning the trailer in the designated location at the subject property.

2. Leveling and stabilizing the trailer on six piers consisting of dry-stacked concrete block and plywood resting on-grade. Installing wood blocking and/or wood shims on top of the concrete block piers as necessary to level the trailer.

3. Installation of four tie-downs, with two on the tongue of the unit and two on the back bumper.

4. Connection to potable water and sanitary sewer.

5. Connection to electrical power, including installation of a temporary power pole, if required.

6. Construction of wood framed stairs and landing for access to the trailer door.

---

[2] Forest River Inc. Invoice No. INV0322235, dated 11/17/2005, Stock Number SMC008992, VIN Number 4X4TSMH296C008992, Bates FOREST-0151931-32.

[3] Horizon Transport Inc. Bill of Lading, BC 1277021, VIN Number 4X4TSMH296C008992, Order Date 11/16/05, Bates FOREST-0151927.

[4] Photograph of tag on trailer, FEMA 165-000001.

[5] Forest River Inc. Invoice No. INV0322235, dated 11/17/2005, Stock Number SMC008992, VIN Number 4X4TSMH296C008992, Bates FOREST-0151931-32.

[6] Horizon Transport Inc. Bill of Lading, BC 1277021, VIN Number 4X4TSMH296C008992, Order Date 11/16/05, Bates FOREST-0151927.

[7] Ibid.

[8] Lyndon T. Wright Plaintiff Fact Sheet Section V.A.8.

[9] Lyndon T. Wright Deposition, July 10, 2009, Exhibit 11.

    7. Other tasks as necessary to make trailer functional in accord with FEMA requirements.

Following installation, a Shaw subcontractor provided maintenance services for the trailer through May 2006. During the time period of Shaw's maintenance contract, a single service request, regarding a problem with the trailer's furnace, was reflected in the documents reviewed. Through May 2006, no record of any complaints or service calls related to the installation of the trailer or water leakage into the trailer was reflected in the documents.

Lyndon Wright began his occupancy of the trailer in March 2006 and continued to occupy the trailer until July 2008.[10] In the course of his occupancy of the trailer, Mr. Wright noted what he believed to be two anomalies with the trailer:

    1. Beginning in 2007, the entrance door would no longer close completely, allowing rain water to enter the trailer in the vicinity of the door.[11]

    2. Condensation would form on the left[12,13] bedroom window and run down the wall, wetting the carpeting on the floor.[14]

Subsequent to the time Mr. Wright vacated the trailer in July 2008, it was removed from the property and towed by a FEMA subcontractor to the FEMA storage yard located in Melville, LA where it remained until inspections associated with the litigation were scheduled to begin in July of 2009. At that time, the trailer was relocated within the storage yard to an unimproved area adjacent to the main entrance of the facility.

---

[10] Lyndon T. Wright Plaintiff Fact Sheet Section V.E.

[11] Transcript of the Testimony of Videotaped Deposition of Lyndon Wright Date taken: July 10, 2009, pp 275-276.

[12] For purposes of directional references in this report, the tongue end of the trailer is the front and the entry door is located on the right side.

[13] Mr. Wright's deposition transcript does not explicitly identify on which of the two bedroom windows he observed the condensation. Rather, the window location has been inferred based on Mr. Wright's description of his observations and field observations of the trailer by Exponent.

[14] Transcript of the Testimony of Videotaped Deposition of Lyndon Wright Date taken: July 10, 2009, p 288.

## Data Collection

Exponent's data collection activities included visual examination of the Wright trailer; structural, non-destructive field testing of the trailer (including observation of structural, non-destructive testing by others); review of photo and video documentation of destructive examination of the trailer by others, and structural and spray testing of an exemplar trailer. Exponent's data collection activities are summarized in the following subsections.

## Visual Examination

The physical configuration and condition of the Wright trailer were examined and photo-documented by Exponent personnel on two occasions: by John Osteraas on August 7, 2009[15] and by John Osteraas & Patxi Uriz, Ph.D. on August 26 through August 28.[16] Structurally, the trailer was in excellent condition and overall it was in very good condition. Key observations are summarized as follows:

1. No significant physical damage was observed to the exterior siding or roofing.

2. All of the windows and window gaskets[17] were intact and in fully-operational condition.

3. Serious damage to the entry door, entry door gasket, and to a lesser extent, the frame was found near the latch from forced entry.[18] No scrape marks or damage indicative of interference between the door and frame were observed at the head of the door or doorframe. Wear patterns associated with interference between the screen door and the sill were observed on the sill of the door frame. There were, however, no wear patterns indicative of interference between the aluminum edge of the door and the aluminum sill. A hard plastic bumper attached to the bottom of the door would prevent contact between the entry door and the sill. A wear pattern on the sill coincides with the location of the bumper, indicating that at some point in time the door was operated with the bumper sliding along across the sill. No evidence of any significant current or past warping or deformation of the entry door was observed. The gasket around the perimeter of the door was intact and functional, although some axial shortening (shrinkage) of some pieces had occurred. The soft foam gasket on the door stop where the screen door meets the door frame was in good condition except for a section about one foot long at mid-height of the right jamb. Green mold/moss was observed on siding below the door.

---

[15] Exponent photos 0001 through 0348.

[16] Exponent photos 1001-1109 and 2001-2222.

[17] Gaskets provide a barrier sealing mechanism for two surfaces that are intended to be either separated or sealed during normal use and only needed to provide a barrier when the two surfaces are in contact; a gasket is only adhered to one of the two surfaces. An example of a gasket is the soft plastic installed along the edge of the interior face of a refrigerator – it seals against passage of air when the door is closed but separates easily when the door is opened.

[18] See Exponent photo 0202.

4. The caulked joints[19] between the trailer siding and window and door frames were found to be in excellent condition at all locations with a few exceptions at locations where there was evidence of minor openings or gaps in the perimeter fillet of caulk.[20]

5. The caulked joints[21] at the trailer corners were found to be in excellent condition at all locations with a few exceptions at locations where there was evidence of localized cohesive failure[22] in the caulking.

6. No damage was observed to the under carriage: the steel "I" beams (rail beams) were straight, exhibiting only expected elastic deflection and no permanent deformation or damage. The axles and wheels were in excellent condition, and the underside covering was intact and in good condition.

7. Interior finishes were found to be in very good condition with a few exceptions: a portion of the carpet near the left bedroom window was coated with an unknown material,[23] and some of the floor vents were damaged.[24] Of particular note, there was no cracking, buckling, or bowing of any interior finishes indicative of any abnormal or excessive structural deformation of the trailer at any time in the past.

8. The bathroom exhibited signs of water damage, the apparent result of both normal use and rain entry through the open or missing operable skylight in the ceiling/roof.

## Field Testing

Exponent performed non-destructive structural testing of the Wright trailer on August 26, 2009. In addition, Exponent personnel observed non-destructive structural testing by others on August 27-28, 2009. Test procedures and key observations are summarized in the following subsections. For more detailed information regarding Exponent's field testing, refer to Appendix C.

---

[19] Caulked joints provide a barrier sealing mechanism between two surfaces that are not expected to be disengaged during normal use. Elastomeric caulking bonds to both surfaces, and seals the joint, yet allows for minor differential movement between two surfaces while still maintaining its seal. An example of a caulked joint would be the caulking between a bathtub and the surrounding tile wall.

[20] See for example, Exponent photo 0158.

[21] Sealing of corner joints consists of what appears to be strips of preformed elastomeric sealant installed between the trailer siding and corner trim. In addition (or possibly in lieu of in some locations) a fillet of caulking was applied to the joint between the trim and the siding.

[22] See for example, Exponent photo 0308.

[23] See for example, Exponent photo 0215.

[24] See for example, Exponent photos 0259 and 0263.

## Structural Testing by Exponent

Exponent's test program for the Wright trailer consisted of three[25] different sequences of jacking and leveling while the trailer was instrumented as described later in this section. At all times during the testing the entry door was held in the closed position with a wooden wedge inserted into the handle adjacent to the door.[26] Lifting and leveling sequences were:

1. Lifting the front of the trailer using the tongue jack; installing concrete block piers 12-14 inches high at the front of the trailer; raising the rear of the trailer level with the front using bottle jacks and installing concrete block piers at the rear of the trailer; installing concrete block piers near the mid-span of the rail beams; and finally the trailer was leveled from side-to-side by lifting the left side of the trailer. During this test, a portion of the trailer weight was intended to be transferred through the tires. As such, all four wheels remained in contact with the ground, though due to the sloping site, it appeared that the tires on the left side were carrying minimal load.

2. Installing concrete block piers under the front of the trailer and raising the tongue jack; lifting the rear of the trailer to approximately 20 inches above grade and installing concrete block piers; lifting the front of the trailer level with the rear and installing concrete block piers; installing blocking at mid-span;[27] and finally leveling the trailer from side to side.

3. Installation similar to 2 above; during this sequence the front of the trailer was lifted first, followed by the rear of the trailer, and finally the middle of the trailer.

Following the completion of each lifting and leveling sequence, the trailer was lowered back onto the wheels and tongue jack prior to the subsequent test.

Layout of test instrumentation is summarized below. More complete information about instrumentation and testing can be found in Appendix C.

1. A total of four strain gages at two locations (on the top and bottom flanges of the left frame rail) to measure changes of strain in the frame rail associated with jacking.

2. A tensioned reference cable extending from the front-most cross beam to the rear bumper along the left frame rail to measure deflections of the frame rail associated with at-rest and lifted position.

---

[25] A fourth test was conducted utilizing truck scales solely to determine trailer weight; in this test no data other than trailer weight were collected. The trailer weight was measured to be approximately 5,200 lbs.

[26] Prior forced entry had so damaged the door and frame that securing the door in the closed position was not possible with the as-built latch assembly.

[27] Additional jacking was performed after test 2 near the door to determine the sensitivity of door racking to changes in height of the right, middle pier support.

3. A self leveling laser centered beneath the trailer and six scales attached to the rail beam to assist with precision leveling of the trailer.

4. A digital string potentiometer installed diagonally across the door opening to measure racking of the door opening.

5. Crack gages installed at five locations to measure relative movement across caulked joints between the trailer siding and the frames of the windows and door.

Test results are summarized in Table 1 through Table 3. It is important to note that all readings and recorded measurements returned to the baseline readings (within the limits of accuracy of the testing) when the trailer was replaced on the axles and the tongue jack.

Table 1.   Summary of Test 1 Data

| Recording Location | Peak Reading | As Installed |
|---|---|---|
| Strain at mid-span of rail beam | 34 μs** | 17 μs** |
| Strain between wheels at rail beam | 285μs** | 285μs** |
| Deflection of rail beam | 0.26 in | 0.26 in |
| Door Racking | 0.0365 in | 0.0365 in |
| Crack Gages | No detectable movement | No detectable movement |

** For reference, 1200 μs (microstrain) (1200x10-6 in/in) corresponds to a change in stress when steel permanently deforms

Table 2.   Summary of Test 2 Data

| Recording Location | Peak Reading | As Installed |
|---|---|---|
| Strain at mid-span of rail beam | 210 μs** | 62 μs** |
| Strain between wheels at rail beam | 478 μs** | 450μs** |
| Deflection of rail beam | 0.75 in | 0.40 in |
| Door Racking | 0.167 in | 0.145 in |
| Crack Gages | No detectable movement | No detectable movement |

** For reference, 1200 μs (microstrain) (1200x10-6 in/in) corresponds to a change in stress when steel permanently deforms.

Table 3.   Summary of Test 3 Data

| Recording Location | Peak Reading† | As Installed† |
|---|---|---|
| Strain between wheels at rail beam | 37 μs** | 37 μs** |
| Strain at mid-span of rail beam | 430 μs** | 430 μs** |
| Deflection of rail beam | ‡ | ‡ |
| Door Racking | 0.137 in | 0.137 in |
| Crack Gages | No detectable movement | No detectable movement |

** For reference, 1200 μs (microstrain) (1200x10-6 in/in) corresponds to a change in stress when steel permanently deforms.
† No recordings were made at the intermediate level.
‡ No rail beam deflection measurements were taken for Test 3.

## Structural Testing by Others

Additional structural testing of the trailer was performed by others on August 27 and 28, 2009. That testing sequence and corresponding results are summarized by Charles David Moore in Section 5.2 of his October 2, 2009 report. Moore's test sequences 1 and 2 were similar to the corresponding sequences of Exponent. Moore's test sequence 3 consisted of lifting a single corner at a time; test sequence 3 was aborted when the trailer exhibited signs of global instability. Moore's instrumentation layout was entirely different than that used by Exponent. The only similarity in data collected by Moore and Exponent was the measurement of relative movement in the vicinity of the entry door. Exponent measured racking of the opening along a diagonal while Moore measured relative vertical and horizontal movement between the door and the adjacent wall of the trailer.

Key observations noted from Moore's tests are:

1. Crack gages around the windows monitored the displacement between the window sash (the operable or openable portion of the window assembly) and the trailer siding. This measures the sliding between the gasket and the window frame. Peak displacements observed between window sash and siding (i.e. sliding between gasket and window frame) was on the order of 1 mm or 1/32 of an inch.

2. The maximum displacement measured at the door crack gage was nearly identical to the equivalent vertical displacement measured in the Exponent tests.

3. During sequence 3, the front end of the trailer was lowered to approximately 12 inches from the ground, and lifting began from the rear left corner only. When the rear corner reached its peak position (approximately 28 inches above the ground); the trailer was resting completely on the rear left jack and the right front support with all wheels lifted off the ground. Peak displacements observed at the crack gages were similar to the

previous testing sequences, and returned to the "baseline" condition after the testing was terminated.

## Destructive Examination

Following completion of non-destructive testing, the trailer was systematically dismantled by others. Exponent reviewed photo and video documentation of that destructive examination. Key observations include:

1. In the front bedroom there was staining and deterioration on the carpet and floor sheathing beneath the left window. Portions of the backside of the plywood wall sheathing beneath the window were water stained. Portions of wall framing beneath the window were stained and deteriorated. There was a foreign material, similar to that observed on the carpeting below, on the rough sill of the window.

2. Deterioration of the plywood floor sheathing and wood framing was observed below the entry door threshold at the entry to the trailer. The deterioration was most severe below the jamb on the latch side of the door. Decay and water stain patterns suggest that water entered the plywood and wood framing at the juncture of the floor, wall, and door frame on the latch side of the door frame.

3. Water staining and possible minor deterioration was observed on the wood framing at the lower portions of framing at the front on the left side of the trailer. Water staining was also observed on the backside of plywood sheathing removed from the front wall of the bedroom.

4. Removal of window frames revealed two rows of caulking beneath the exterior flange of the windows. The inner row was applied before the window was set in the opening. The outer row was a fillet applied after the window was installed and secured.

5. In the bathroom, staining was observed on the plywood sheathing and wood framing at the tub enclosure.

## Exemplar Testing

In the course of structural testing of the Wright trailer, a hypothesis was developed that over-the-road travel may cause stresses in the trailer similar to those developed during the jacking process. To test this hypothesis, Exponent instrumented an exemplar Forest River trailer[28] and towed it over public roads and freeways from Phoenix, AZ to Menlo Park, CA. This subsection summarizes that testing. Instrumentation and test results are more fully described in Appendix D.

---

[28] Forrest River SMT32BHLE; vehicle Identification number 4X4TSMH246T104318; date of manufacture 9/19/2005; gross vehicle weight rating: 7,790 lbs.; gross axle weight rating: 3,500 lbs.; number of axles: 2; Exponent vehicle file number: 6804.

Instrumentation consisted of a portion of the field set of instrumentation augmented for redundancy and automated data collection while the trailer was in transit. Instrumentation was installed at Exponent's Vehicle Testing and Engineering Center in Phoenix. Instrumentation consisted of:

1. A total of eight strain gages at two locations on the top and bottom flanges of both the left and right frame rail to measure changes of strain in the frame rail associated with over-the-road travel.

2. Two digital string potentiometers installed diagonally across the door opening to measure racking of the door opening associated with over-the-road travel.

3. Accelerometers installed at four locations (at the front and rear of each steel rail beam) to measure vertical accelerations as well as roll of the trailer while in transit.

4. GPS receiver to log global position and speed of the trailer.

5. Digital data acquisition system continuously recording data from 26 channels at 250 Hz.

Approximately 12 hours of data over 750+ miles of freeway were collected on 26 channels, resulting in a total of about 10,800,000 readings. Test data are summarized in Table 4.

Table 4.    Summary of Over-the-road Testing

| Recording Location | Peak From Field Testing | Equivalent Exemplar Range‡ | Channel | Number of cycles in equivalent strain range |
|---|---|---|---|---|
| Strain at mid-span of rail beam | 34-210µs | 122-747µs | 1 | 62 |
|  |  |  | 2 | 287 |
|  |  |  | 5 | 270 |
|  |  |  | 6 | 1628 |
| Strain between wheels at rail beam | 285-478µs | 382-564µs | 3 | 19 |
|  |  |  | 4 | 13 |
|  |  |  | 7 | 9 |
|  |  |  | 8 | 7 |
| Door Racking† | 5/32 in | 5/32 in (9/64 in- 11/64 in) | 13 | 1 |
|  |  |  | 14 | 7 |

† Redundant channels were used to record door racking during over-the-road testing. Channel 14 recorded racking in the same sense as that of the field testing.

‡ Here the equivalent strain range is defined as spanning from: 1) the average of the peak strain in Test 1 and peak strain in Test 2 to 2) the maximum strain recorded over-the-road.

Following its arrival in Menlo Park, the exemplar trailer was visually examined and instrumentation configuration was photo-documented.[29] Structurally, the trailer was in excellent condition and overall it was in very good condition. Key observations are summarized as follows:

1. No significant physical damage was observed to the exterior of the trailer; all roofing and siding were intact with the exception of a small (~1/8-inch diameter) hole under right rear window.

2. All windows were intact and in fully operational condition.

3. The entry door was in excellent condition and showed no evidence of forced entry as observed on the Wright trailer. Door latch and lock were fully operational. There was no indication of any significant current or past warping of the door. There were no scrape marks or damage at the head of door frame. Wear patterns associated with interference between the screen door and the sill were observed on the sill of the door frame. Dents in the sill indicated likely contact with the door in transit. A hard plastic bumper as observed on the door of the Wright trailer was not present on the door of the exemplar trailer. The gasket around the perimeter of the door was intact and functional, although some axial shortening (shrinkage) of some pieces had occurred. A soft foam gasket lined the door stop where the screen door met the door frame.

4. The caulked joints were found to be in excellent condition throughout the trailer with a few exceptions at locations where there was evidence of minor gaps,[30] and localized cohesive failure[31] in the caulking.

5. The under carriage was found to be corroded in certain areas but no damage was found.

6. All interior finishes were found to be in excellent condition, including cabinets, linoleum tile, and furniture coverings.

7. The ceramic toilet tank was cracked when it was received by Exponent.

Two series of standard spray tests were conducted on the front bedroom windows and the entry door. The first series was performed with the trailer resting on its tires and tongue jack. The second series were performed with the trailer supported solely by jack stands at the ends of the rail beams (i.e., four points of support). In both series of tests, all three assemblies met requirements of ASTE E-1105 – no water passed beyond the assembly to interior finishes. Details of the testing process and results are presented in Appendix E. Flow rates for the testing corresponded to a rainfall rate of 8 inches per hour. Furthermore, it is important to note that this is applied horizontally.

---

[29] Photos 2400 through 2476.

[30] For example, see Exponent photo 2543.

[31] For example, see Exponent photos 2510-2511, 2535-2541.

# Analysis

## Field data

The strains measured in the rail beam, the deflections measured in the rail beams, the absence of detectable distortion between the caulking and the siding, and the racking of the door opening recorded during the Melville investigation have illustrated how the trailer is capable of withstanding the effects of installation without any deleterious effects. The strains measured between the wheels represents a strain reversal: in the baseline condition, the trailer is supported by the axles and the tongue jack, the end of the trailer cantilevers off the end of the axles; in the jacked condition without blocking, the beam is now simply supported. Thus, in the process the steel relaxes, and then picks up load again. The <u>total</u> stress range for this process is approximately 15ksi.

The deflections measured in the rail beam indicate a large contribution of load carrying by the trailer shell. The total deflection measured from the baseline condition to the simply supported condition are on the order of 0.75 inches; this value misrepresents the monotonic stress that is likely induced from a point somewhere between the baseline condition and the simply supported condition. Assuming a simply supported loading condition, the rail beam would have to deflect nearly 3 inches prior to permanently deforming the rail beam.

The door racking observed during the Melville testing could be attributed primarily to the tolerances between the door opening and the door itself. It was observed that once the door racking was about 0.17 inches (similar from both tests by Exponent and Moore), the racking no longer increased. This implies that the door and the frame are likely making contact; this stiffens the structural system, and the door frame no longer racks. In all of the testing sequences, this door frame racking returned to essentially zero, indicating the trailer installation sequence causes no damage or permanent deformation to the trailer.

## Exemplar data

To test Exponent's hypotheses that over-the-road testing would impose distortions and stresses equal to or greater than those caused by trailer installation, an instrumented exemplar trailer recorded strains and distortions at similar locations to those measured during the Melville testing. The peak strains on the rail beam and the racking of the door during transit were observed to be on the same order of magnitude as those measured during the Melville testing. In some instances, there were numerous cycles of distortion greater than those recorded during the Melville testing. Furthermore, the trailer was tested in the baseline condition and in the simply supported condition (see Appendix E) once it arrived in Menlo Park, to illustrate that the weatherproofing was unaffected by transit or installation.