# Appendix D

## Structural Testing of Exemplar Trailer



SWE-000143

## Structural Testing of Exemplar Trailer

In the course of structural testing of the Wright trailer, a hypothesis was developed that over-the-road travel may cause stresses in the trailer similar to those developed during the jacking process. To test this hypothesis, Exponent instrumented an exemplar Forest River trailer[39] and towed it over public roads and freeways from Phoenix, AZ to Menlo Park, CA.

This Appendix discusses that testing.

Instrumentation consisted of a portion of the field set of instrumentation augmented for redundancy and automated data collection while the trailer was in transit. Instrumentation was installed at Exponent's Vehicle Testing and Engineering Center in Phoenix (see Table 12 and Figure 12 for more information). Instrumentation consisted of:

1. Eight strain gages (SG1 through SG8). Four strain gages were installed on each rail beam (see Table 12, Figure 12, and Figure 13): two near the axle, and two near the mid-span of the rail beam.

2. Two digital string potentiometers installed diagonally across the door opening to measure racking of the door opening associated with over-the-road travel.

3. Accelerometers installed at 4 locations (at the front and rear of each rail beam) to measure vertical accelerations as well as pitch and roll of the trailer while in transit

4. GPS receiver to log global position and speed of the trailer.

5. Digital data acquisition system recording data continuously at 250 Hz from 26 channels.

Approximately 12 hours of data over 750 miles of freeway were collected on 26 channels, resulting in a total of about 10,800,000 readings.

---

[39] Forrest River SMT32BHLE; vehicle Identification number 4X4TSMH246T104318; date of manufacture 9/19/2005; gross vehicle weight rating: 7,790 lbs.; gross axle weight rating: 3,500 lbs.; number of axles: 2; Exponent vehicle file number: 6804.



Figure 11.    Vehicle route from Phoenix, AZ to Menlo Park, CA (source: www.google.com)

Table 12.     Primary Channel List

| | Channel No. | Label | Readings | | Units | Positive Direction |
|---|---|---|---|---|---|---|
| | Channel No. | Label | Description | | Units | Positive Direction |
| Strain Gages | 1 | SG1 | Left, midspan, top (sim. to SG2 of field test) | | μs | Tension |
| | 2 | SG2 | Left, midspan, bottom (sim. to SG1 of field test) | | μs | Tension |
| | 3 | SG3 | Left, axle, top (sim to SG4 of field test) | | μs | Tension |
| | 4 | SG4 | Left, axle, bottom (sim to SG3 of field test) | | μs | Tension |
| | 5 | SG5 | Right, midspan, top | | μs | Tension |
| | 6 | SG6 | Right, midspan, bottom | | μs | Tension |
| | 7 | SG7 | Right, axle, top | | μs | Tension |
| | 8 | SG8 | Right, axle, bottom | | μs | Tension |
| Accel-erometer | 9 | A1 | Left, front rail beam | | g | Up |
| | 10 | A2 | Right, front rail beam | | g | Up |
| | 11 | A3 | Left, rear rail beam | | g | Up |
| | 12 | A4 | Right, rear rail beam | | g | Up |
| Wire Potentiometer | 13 | DI | Lower right to upper left door | | in | out |
| | 14 | D2 | Lower left to upper right door | | in | out |
| CAN Channels | 17 | C1 | Day | | day | - |
| | 18 | C2 | Hours | | hour | - |
| | 19 | C3 | Minutes | | min | - |
| | 20 | C4 | Seconds | | sec | - |
| | 21 | C5 | Longitude | | deg | - |
| | 22 | C6 | Latitude | | deg | - |
| | 23 | C7 | Altitude | | ft | - |
| | 24 | C8 | Speed | | mph | - |

SWE-000147



Figure 12.   Exemplar trailer instrumentation locations (see Table 1 for descriptions). Not to scale, for illustration purposes only.

41

0904415.000 A0T0 1109 RPT1



Figure 13.      Location of strain gages at each cross section.

# Data

Once the trailer reached to Menlo Park, the data from the data acquisition system was downloaded onto a PC based computer for further analysis. In the event of data failure, the data was recorded in 12 x 1hour segments. Each of the segments thus recorded for 1 hour each, each channel was assembled together prior to processing. Once the data was read a Butterworth band-pass filter form 0.01 to 100 Hz was applied to the data. For the sake of brevity, only key observations will be discussed herein.

## Left Rail Beam Strain Gage Data

The left rail beam was instrumented nearly identically to the Wright trailer, tested in Melville, Louisiana. As such, the strains recorded provide a direct correlation between stresses from jacking and over-the-road travel; the data collected from over-the-road travel also provides a validation of the range of stresses recorded. Figure 15 contains the total time-history data for 12 hours of over-the-road testing. Each channel is plotted along with the peak strain recorded on the Wright trailer. From this figure, we note that the magnitude of strains recorded over-the-road at peak locations equal or exceed those recorded during testing of the Wright trailer. Furthermore, the strains recorded on the Wright trailer were monotonic, whereas the strains recorded over-the-road were cyclic. As such, the *range* of motion the exemplar trailer sustains in each cycle is significantly larger than those recorded (i.e. the amount of movement from peak-to-peak when hitting a pothole is nearly twice as large as the range of motion observed during simple jacking). Thus the amount of distortion (and number of cycles) is significantly greater during over-the-road testing.

Once the data was parsed and filtered a rainflow cycle counting script was used to count the number of cycles and half-cycles[40] of certain channels. Figure 14 shows the results from this rainflow analysis. Clearly from the data, the exemplar trailer sustained numerous cycles at strains near those observed during testing of the Wright trailer.



Figure 14.   Stress range and number of cycles per stress range observed during over-the-road experiment.

---

[40] Nieslonv, Adam, "Rain Flow Counting Method," 17 Feb 2003 (Updated 12 Jan 2005); Code covered by BSD License; site www.mathworks.com.



Figure 15.    Displacement time-histories for the four strain gage channels similar to those installed on the Wright trailer.  The red lines represents the range of peak strains recorded during the Wright trailer tests.

## Door Racking

Channel 14 of the exemplar trailer was set up to measure racking response in the same manner as the digital indicator placed on the Wright trailer during field testing. The time-history for the entire channel is shown in Figure 16, with a selected large excursion shown in Figure 17 (exact GPS location of this point is shown in Figure 19). The range of motion observed throughout the experiment is from approximately -3/16 inch to +1/8 inch. Observation of the data indicate that at around -1/8inch the door comes into contact with the surrounding frame and limits distortion of the frame to about -1/8inch. A similar limit is observed for the positive excursions as well.

Similar to the strain gage data, the number of cycles of data and their equivalent strain range are plotted Figure 18.



Figure 16.    Time-history of door displacement of exemplar trailer as it traveled from Phoenix to Menlo Park.



Figure 17.    Segment of time history recorded on westbound Hwy 58.



Figure 18.     Number of cycles and amplitude of door racking recorded
in travel trailer on public roads from Phoenix, AZ to Menlo
Park, CA.



Figure 19.    Location where one of the many of the large amplitude recordings were
recorded during the exemplar travel (Westbound Hwy 58 traveling 52.8 mph).

## Vertical Acceleration

Acceleration time-history data was averaged from the four rail beam accelerometers. The results from this averaging is presented in Figure 20. In this figure, a negative acceleration corresponds to accelerations in the downward direction. Many peaks were recorded which were larger than or close to -1.0g. Such accelerations are normal when dealing with over-the-road travel, and are to be expected in the life of a trailer.



Figure 20.    Average accelerations from all 4 accelerometers during
test. Note multiple excursions beyond -1.0g.

## Discussion

Careful review of the strain range data indicates that there is an apparent ceiling to the maximum strains.  As observed during testing on the Wright trailer, the observed beam deflections were on the order of 0.75 inch, whereas an analysis assuming the rail beams taking full trailer loads would result in deflections of over 2 inches.  The reasons for the observed behavior are:

- The trailer box is taking a large percentage of the load, and is functioning as a stiff structural element.

- The trailer box is acting as a composite section with the rail beam during loading.

- A combination of the above two: The trailer is acting a separate member until the connections between the rail beams and box are engaged, creating a response which is initially two individual elements and then later acting as one composite unit at larger displacements.

As such, the strains are likely limited to near 500 μs (~15ksi) due to the engaging of the box, at which point the increase in load is distributed between the box and the rail beam much more efficiently, and increases in strains on the rail beam correspond to significant loading.

Similar to the strain limit, there is a physical limit to the door racking that can be observed; this occurs when the door makes contact with the door frame.  In the case of the door, this appears to be in the vicinity of 3/32 to 1/8 inch.

## Appendix E

## Spray Testing of Exemplar Trailer



SWE-000155

## Spray Testing of Exemplar Trailer

Following over-the-road transport from Maryland to California via Arizona, an exemplar Forest River trailer was spray tested to determine the nature and extent, if any, of damage to the seals around doors and windows. The left and right front windows (in the bedroom) as well as the trailer entry door were water tested in accordance with ASTM E1105 under ambient pressure. ASTM E1105 is applicable to windows, doors, and curtain-wall areas and determines the resistance of the installed materials to moisture penetration. The spray rack used was calibrated the day before testing to be in accordance with ASTM E1105. During each test, the rack emitted a uniform water spray at a rate of 5 to 6 gal/ft$^2$-hr, above the minimum required spray rate of 5 gal/ft$^2$-hr. Each water test lasted for 15 minutes and at least one hour of time passed between tests in each area. A failure at windows and doors is defined in ASTM E1105 as water entering inside the vertical plane of the frame or the perimeter of the frame to the interior finishes. Water contained in the sills or frame itself is not considered to be a failure. Water detection was performed utilizing strips of water finding test paper.[41] The strips turn lavender in the presence of moisture.

The water tests were conducted when the trailer was in two separate positions: (1) stationary - supported on the front jack at the hitch and on all four wheels (Figure 21) and (2) lifted - supported on four jacks, one at each corner of the trailer (Figure 22). These two support conditions reflect static maximum negative and positive stresses on the trailer.



Figure 21.    Trailer on wheels and tongue jack
(Exponent photo 2501).

---

[41] Micro Essential ™ Hydrion Paper, Broklyn, N.Y. 11210, U.S.A



Figure 22.    Trailer on jacks at four corners (Exponent photo 2790).

## Left and Right Front Windows

Both windows and the surrounding exterior finishes were tested when the trailer was in the stationary position as well as when the trailer was lifted (Figure 23 and Figure 24).  No leaks were observed on the interior finishes during any of these tests.



Figure 23.    Overview of water testing at front left window (Exponent photo 2649).



Figure 24.    Overview of water testing at front right
window (Exponent photo 2614).

## Door

The trailer door and the surrounding exterior finishes were also tested. During the first test, the trailer was in the stationary position (Figure 25 and Figure 26). No leaks were observed on the interior finishes during this test. During the second test, the trailer was lifted. Minor leakage was observed just below the interior face of the door below the window. No water penetrated the vertical plane of the frame (Figure 27).



Figure 25.    Overview of water testing at door (Exponent photo 2672).



Figure 26.    Water test at door with trailer wheels and tongue jack – note white, moisture sensitive paper indicating no leakage (Exponent photo 2675).



Figure 27.     Water test of door with trailer supported on
               jacks at four corners – note white, moisture
               sensitive paper indicating no leakage
               (Exponent photo 2774).

# Appendix F

## Review of Reports by Others



SWE-000161

## Review of Reports by Others

Exponent's evaluation included review of relevant reports prepared by other consultants. Two reports address structural issues:

- The *Structural Condition Assessment* report prepared by Charles David Moore of Freyou, Moore and Associates, Inc, dated October 2, 2009 (Moore report). The report summarizes Moore's visual inspections and jacking tests of the trailer during the August 2009 field testing in Melville, Louisiana. The report also includes a summary of structural analyses performed by Moore to assess forces and deformations in selected structural members subject to various loading conditions.

- The *Inspection Report* prepared by Alexis Mallet of First General Services of the South, Inc, dated October 2, 2009 (Mallet report). Mallet's report presents much data on many topics regarding the trailer, but mentions structural aspects only in the context of referring the reader to Moore's report. Mallet appears to adopt Moore's conclusions and incorporate them into his report without critical evaluation or any independent analysis.

As the Moore report is the only document that presents original information and opinions, the balance of this appendix will address only Moore's report.

Moore's description of the general exterior and interior conditions include the statements: *"The exterior of the unit appeared to be intact with no major structural damage visible during the initial visual inspection."* and *"The interior of the unit was basically intact with no major structural damage visible during the initial visual observations."* It is important to note that Moore's initial visual observations were performed after the Wright trailer had been transported from California to Baton Rouge, transported from Baton Rouge to New Orleans, installed at the Wright property, occupied for over 2 years, removed from the Wright property, transported from New Orleans to Melville, then left exposed to the elements through August of 2009.

Damage to the trailer noted by Moore was limited to sealant holes/separations, doorframe bowing, and localized water damage. After several jacking tests and the removal of exterior and interior finishes, Moore identified no structural distress to the trailer framing with the exception of a broken roof truss caused by roof access during the Melville field testing (after plywood sheathing had been removed from the underside of the trusses). Moore alleges deficient construction of several structural members/connections but identifies no damage associated with those deficiencies.

The Moore report contains conclusions drawn from jacking tests performed during the Melville testing (described in a previous section of the present report). Moore surmises that water leaks in the Wright trailer were caused or made worse by "improper jacking." Yet he provides no details regarding the nature of that improper jacking nor the damage he believes occurred in that process. He does not specify the mechanism of damage nor the stresses on or capacities of components he concludes were damaged. Furthermore, the general lack of visible damage to the exterior and interior of the trailer observed by Moore as cited above does not support his

conclusion regarding improper jacking. Again, Moore's initial visual observations were performed after the trailer had been installed and taken out of service at the Wright property.

Moore makes incorrect assumptions in his calculation of the magnitude of compression strain developed in the trailer during testing. He assumes that the entire trailer assembly (upper box and rail beam) essentially rotate as a flexural beam. In reality, the distortion will be largely a shear deformation, given the depth to length aspect ratio of the trailer. As such, the data collected from the inclinometers is insufficient to calculate the true shortening of the top portion of the trailer, as there would be no shortening associated with the shear component of deformation. Even if one accepts his analysis of the distortion, he fails to analyze the effect of that distortion on the joints he believes were damaged by that distortion. An exemplar trailer that had been installed on four jack stands passed ASTM E1105 spray testing performed by Exponent

Moore draws a strange conclusion from Exponent's door frame racking data. Moore comments that the door frame racks from an initial value of 0.035 inches to 0.197 inches at the peak and back to minus 0.036 inches after returning the trailer to its original position. Moore incorrectly concludes that this indicates a permanent deformation of the trailer. The final reading is approximately -1/32 of an inch, which is a negligible elastic deformation by any rational assessment of the data. The final reading is also in a direction opposite the initial value, implying that the initial racking improved after the trailer was set down.

Moore aptly describes the Wright trailer as a "recreational vehicle" (RV) in Section 2 of his report. However, he proceeds to describe structural analyses of selected trailer components when subject to loads prescribed by design codes for buildings. We are unaware of any interpretations or applications of the building code that are consistent with Moore's interpretation.

In addition, Moore grossly underestimates structural capacities of trailer components. For example, he calculates the structural capacity of the main steel support beams but ignores the structural contribution of the wood frame portion of the trailer. By his logic the beams should have deflected several inches under the trailer self-weight when supported only by jacks near the beam ends. Measured deflections under such conditions during the jacking tests were less than one inch. Moore makes similar assumptions when calculating wall stud capacities by neglecting the structural contribution of plywood sheathing elements. Finally, Moore's analyses of forces in structural members subject to hypothetical building code-level wind and floor live loads are meaningless in the assessment of the trailer's performance subject to loads actually experienced over the life of the trailer.

The field testing jacking sequences utilized by Moore and others are similar to those used by Exponent. Crack gages during Exponent's field tests were installed between the siding and window and door frames (where distortions that could damage caulked joints would occur), whereas Moore located crack gages between the window sash and the siding (where distortions will occur across the window gasket). In comparison of the two tests, More recorded very small amounts of movement (typically on the order of 1/64 inch if observed at all), which returned to

nearly baseline conditions after the trailer was returned to its original baseline condition.  This would indicate that any distortions noted were at the window gaskets, which can accommodate substantial movement.  It is unclear to Exponent why this is highlighted in his report as being a significant distortion.

Exponent concludes that opinions expressed in the Moore report are fundamentally flawed in that they are inconsistent with observed conditions, based on an incorrect interpretation of building codes, and rely on analyses that neglect significant contributions of components not contemplated by those analyses as well as in conflict with actual field measurements.