```
                                                                    1

 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF LOUISIANA
 3
 4     IN RE:  FEMA TRAILER         MDL NO. 1873
 5     FORMALDEHYDE PRODUCTS        SECTION N(4)
 6     LIABILITY LITIGATION         JUDGE ENGELHARDT
 7     (This document is related
        to "Lyndon Wright, et al.
 8      v. Forest River, Inc.,
        et al.")
 9
10                         *   *   *
11
12              VIDEOTAPED DEPOSITION OF ALEXIS
13     MALLET, JR., 103 BRANDBERRY CROSSING,
14     LAFAYETTE, LOUISIANA 70598, TAKEN AT THE
15     OFFICES OF FRANK D'AMICO, ATTORNEY AT LAW,
16     622 BARONNE STREET, NEW ORLEANS, LOUISIANA
17     70112, ON THE 12TH DAY OF JANUARY, 2010.
18
19
20     REPORTED BY:
21         CATHY RENEE´ POWELL, CCR
           PROFESSIONAL SHORTHAND REPORTERS
22         (504)529-5255
23     VIDEOGRAPHER:
24         MICHAEL BERGERON
           PROFESSIONAL SHORTHAND REPORTERS
25         (504)529-5255
```

```
 1    temporary housing units supplied by FEMA?
 2         A.   Yes, sir.
 3         Q.   Who did you contact?
 4         A.   The chief building inspector.
 5         Q.   Who was that?
 6         A.   The same name -- I don't recall.
 7    I have to dig it up.  It's the same name --
 8    the man that Liberty contacted, the chief
 9    building inspector.
10         Q.   And did he give you the same
11    response as to whether the building codes
12    were, in fact, applied to travel trailers
13    that he gave to Liberty?
14         A.   The response that I got was that
15    the building codes were not waived, they
16    only suspended the inspections.
17         Q.   By "suspending the inspections,"
18    what did you take that to mean?
19         A.   That the contractor was to do his
20    own inspections.
21         Q.   Do you have a document from the
22    chief building inspector of the City of New
23    Orleans that says that the building codes
24    were not waived for these particular units?
25         A.   Yes, sir.
```

```
 1        Q.   Let me mark this as the next
 2   exhibit, Exhibit 3.
 3             Now, Mr. Mallet, what I have
 4   marked as Exhibit 3 is, in fact, the e-mail
 5   chain between you and Mr. Odom; is that
 6   correct?
 7        A.   Yes, sir.
 8        Q.   And this e-mail chain begins on
 9   January 8 of this year, correct?
10        A.   I guess.  Yes, sir.
11        Q.   Do you have a copy of your own?
12        A.   No, sir.
13        Q.   All right.
14        A.   This is the only copy that I have.
15        Q.   All right.
16        A.   Yes, sir.
17        Q.   And the response that you got was
18   on January 11, which was yesterday, correct?
19        A.   Yes, sir.
20        Q.   So Mr. Odom related to you that
21   "We did not waive code requirements, we did
22   allow FEMA to have their own inspections,"
23   correct?
24        A.   Yes, sir.  I misspoke, I said the
25   contractors, it's FEMA.
```

41

```
 1          A.   I think originally in just a phone
 2   conversation was maybe in February of 2009,
 3   and then I had, I guess, a formal meeting
 4   was -- initial meeting was maybe April 29 of
 5   2009.
 6          Q.   And who took part in that
 7   particular meeting?
 8          MR. PINEDO:
 9               Mr. Bone, I believe these are
10   matters that were already covered in prior
11   depositions.
12          MR. BONE:
13               I recall -- don't recall him
14   testifying as to who was present at the
15   first meeting that he was involved in.
16          THE WITNESS:
17               In the actual meeting was Tony --
18   EXAMINATION BY MR. BONE:
19          Q.   Mr. Buzbee?
20          A.   Buzbee, yes, Anthony Buzbee.
21          Q.   Who else?
22          A.   There were other attorneys that I
23   met with, but they were not part of the
24   meeting.  In the room, it was just
25   Mr. Buzbee and I.  I met, and Mr. Buzbee
```

1    introduced me to Mr. Taft and Mr. Daniels, I
2    think, but we really didn't have any
3    discussion.
4         Q.   Let me hand you what I have marked
5    as Exhibit 7 to your deposition.  This is a
6    consulting agreement dated May 1, 2009,
7    between yourself and Mr. D'Amico's law firm.
8              Is that, in fact, the consulting
9    agreement that relates to your work on the
10   FEMA formaldehyde cases or is that specific
11   to the Lyndon Wright case?
12        A.   Well, it began as the general
13   agreement, and then it was changed to us
14   producing one for each, each case in
15   particular.  So while this was done, I
16   think, on behalf of the Plaintiffs' --
17        Q.   Steering Committee?
18        A.   Steering Committee, then we had to
19   redo one for Mr. Buzbee and then one for
20   Mr. Bencomo, maybe, and then this one.
21        Q.   And so this is the actual -- is
22   this the actual document that relates to
23   your involvement in the Lyndon Wright case
24   or is there an amended contract or
25   consulting agreement relating to your work

```
 1    in this case?
 2         A.   I don't think there's a separate
 3    one.  I think this is it.
 4         Q.   And so although the original page
 5    is dated the first day of May, 2009, the
 6    document is actually signed the 13th day of
 7    July, 2009; is that correct?
 8         A.   Yes, sir, that's correct.  And I
 9    guess that would be about the time that we
10    moved into Mr. Wright's or began getting
11    sent materials in Mr. Wright's case.
12         Q.   And in terms of the fee schedule
13    that accompanies the consulting agreement,
14    which is page 5 of the document, is that the
15    accurate fee schedule relating to your
16    services in this particular case, the Lyndon
17    Wright case?
18         A.   Yes, sir, that is.
19         Q.   And your professional fees are
20    billed at $250 per hour?
21         A.   Yes, sir.
22         Q.   And deposition testimony --
23    preparation for depositions, mediations,
24    arbitrations or other court testimony is
25    billed at $325 per hour, correct?
```

1   the -- whatever agency performs the
2   inspection for compliance with plans and
3   specifications on the project.
4        Q.   But you haven't done any research
5   specifically into the issue of how municipal
6   building codes interact when something is
7   federal property.  Am I correct?
8        A.   To the extent that -- is it
9   GSA? -- writes a more stringent plan, more
10  stringent set of specifications or
11  requirements, and typically the professional
12  of record utilizes the building codes,
13  building standards for their standard of
14  care in producing their design.
15       Q.   Have you seen any document, rule
16  or regulation that specifically addresses
17  the question of how municipal building codes
18  interact with federal property, specifically
19  federal property?
20       A.   No.
21       (Brief discussion between reporter and
22  witness off the record.)
23       Q.   Now, in talking about the
24  air-conditioning unit on the Lyndon Wright
25  unit, I believe you said you have problems