*Expert Report*

## *Lyndon Wright vs. Forest River*

**Melville, Louisiana**



Prepared for

Gieger, Laborde & Laperouse, LLC

One Shell Square

Suite 4800

New Orleans, LA 70139

Submitted by



3700 Dohnavur Drive

PO Box 1120 (USPS Only)

Zellwood, Florida 32798

October 29, 2009

Norman L. Nelson, P.E.[1]

Donald B. Snell, P.E.[2]

---

[1] Florida, Oregon, North Carolina and South Carolina

[2] Pennsylvania and Georgia

Case 2:07-md-01873-KDE-MBN   Document 11389-18   Filed 02/09/10   Page 2 of 24

Lyndon Wright vs. Forest River Expert Report                                    11/2/09

*Expert Report*

# *Lyndon Wright vs. Forest River*
### Melville, Louisiana



Prepared for
Gieger, Laborde & Laperouse, LLC
One Shell Square
Suite 4800
New Orleans, LA 70139

Submitted by

**LIBERTY**
BUILDING FORENSICS GROUP®

3700 Dohnavur Drive
PO Box 1120 (USPS Only)
Zellwood, Florida 32798
October 28, 2009

Norman L. Nelson, P.E.[3]

Donald B. Snell, P.E.[4]

[3] Florida, Oregon, North Carolina and South Carolina

[4] Pennsylvania and Georgia

Case 2:07-md-01873-KDE-MBN   Document 11389-18   Filed 02/09/10   Page 3 of 24

Lyndon Wright vs. Forest River Expert Report                                    11/2/09

## Table of Contents

I.    Introduction ................................................................................................. 5

II.   Executive Summary ....................................................................................... 7

III.  Review of Expert Report by Paul LaGrange ................................................. 10

    Discussion ..................................................................................................... 10

    Envelope Air Leakage .................................................................................... 11

    Need for Outdoor air ..................................................................................... 11

    The AC System Sizing and Humidity Control ................................................. 12

    Duct Leaks Increase Air Infiltration .............................................................. 13

    LaGrange Calculation and Analysis Mistakes ............................................... 13

    Infrared Thermal Imaging and Moisture Meter Measurements .................... 14

IV.   Review of Expert Report by Ervin L. Ritter, P.E. .......................................... 16

    Discussion ..................................................................................................... 16

    Building Code Compliance ............................................................................. 16

    Positive Trailer Pressurization ...................................................................... 16

    Insulation Performance and Energy Efficiency Considerations ..................... 18

    Vapor Barriers ............................................................................................... 18

    Duct-board Leakage into Ceiling at Joints and Seams ................................... 18

    Air Conditioning Unit Sizing .......................................................................... 18

    Description of Responsibilities ....................................................................... 19

V.    Review of Expert Report by Al Mallet .......................................................... 20

    Compliance with Codes ................................................................................. 20

    Construction for Warm, Humid Climates ...................................................... 20

    Construction That Resulted in Mold Growth ................................................. 20

    HVAC System Contributed to Off-Gassing ................................................... 20

Misplaced Wall Vapor Retarder .................................................................................................. 20

Poor Quality of Workmanship ................................................................................................... 20

VI.      Review of Expert Report by J. Darrell Hicks, P.E. ........................................................... 22

Discussion .................................................................................................................................. 22

Voltage Drop Irregularities ....................................................................................................... 22

Lighting Switch Contact ............................................................................................................. 22

VII.     Conclusions ...................................................................................................................... 24

VIII.    Appendices ....................................................................................................................... 25

FR-LTW-EXP06-005628

Case 2:07-md-01873-KDE-MBN   Document 11389-18   Filed 02/09/10   Page 5 of 24

Lyndon Wright vs. Forest River Expert Report                                    11/2/09

# I.  Introduction

Liberty Building Forensics Group® (LBFG) was retained on July 24, 2009, by Geiger, Laborde & Laperouse, L.L.C., to provide consulting services in the case of Lyndon T. Wright v. Forest River, Inc., et al. These consulting services included forensic analysis of the Forest River trailer formerly occupied by Mr. Wright.

Temporary Housing Unit (THU) #1277021, Mr. Wright's former trailer, was parked at the FEMA Trailer Staging Area in Melville, LA 71353. LBFG understands that this particular temporary housing unit (THU) was originally manufactured by Forest River in November 2005 and was provided by FEMA as temporary housing for Mr. Wright following Hurricane Katrina. LBFG understands that Mr. Wright occupied the THU in March 2006 and vacated it in July 2008. LBFG also understands that since July 2008 the THU has not been occupied, serviced, or maintained.

LBFG was onsite at the FEMA Trailer Staging Area in Melville, LA on August 16 - 21, 26 & 27, 30 & 31; and September 1, 2009, to complete investigative analysis regarding Mr. Wright's claims of "safety and health risks and concerns related to formaldehyde and mold exposure" in the THU. Mr. Norman L. Nelson, P.E.[1]; Mr. Donald B. Snell, P.E.[2]; Mr. Jim Cummings; and Mr. Craig Lee of LBFG conducted the following:

> 1. Observed plaintiff expert witness investigation and testing.
>
> 2. Documented as-found conditions.
>
> 3. Performed moisture investigation and testing.
>
> 4. Performed testing and destructive observation.

LBFG received and reviewed seven expert reports. From the seven reports received, LBFG responded to four expert reports. These expert reports were from LaGrange Consulting, LLC (Paul LaGrange); Ervin L. Ritter, P.E.; First General Services of the South, Inc. (Al Mallet); and Hicks Consulting, Inc. (J. Darrell Hicks). These four reports were chosen based on their focus on HVAC, condensation, infiltration, and related testing. (Please refer to **Appendix F** for copies of these reports.) Reports by Stephen Smulski, Ph.D.; Charles David Moore, P.E., PLS; and William D. Scott, P.E., CHMM will be responded to by others.

As part of LBFG's onsite observations the following occurred:
- LBFG observed the absence of damage due to condensation from air infiltration.
- LBFG identified deficient tenant and maintenance responsibilities that contributed to the presence of isolated and concealed water intrusion damage due to water intrusion. LBFG understands that maintenance-related responsibilities were performed by different entities at various times during Mr. Wright's occupancy of the temporary housing unit (THU).[3]

---

[1] P.E.: Oregon, Florida, North Carolina, South Carolina
[2] P.E.: Pennsylvania, Georgia
[3] Based on reports LBFG received.

- LBFG documented how Building Codes normally enforced by the City of New Orleans for building construction did not apply to FEMA THUs.

*Curriculum Vitae* (CVs) for each contributor to this report[4] appear as **Appendix A** at the end of this report.

---

[4] Mr. Norman L. Nelson, P.E. (Oregon, Florida, North Carolina, South Carolina); Mr. Donald B. Snell, P.E. (Pennsylvania, Georgia); Mr. Jim Cummings.

## II.   Executive Summary

Plaintiff expert witnesses failed in the following manner:

1. The plaintiff expert failed to properly identify enforceable codes and standards that applied to the FEMA temporary housing unit (THU). The THU manufacturer was required to comply with FEMA Model Travel Trailer Procurement Specifications (refer to **Appendix C-1**). Also, LBFG believes that NFPA 1192, including references therein, applies to the THU.

   Because the THU was federal property, it was not under the jurisdiction of the City of New Orleans Building Department. In addition, the local building codes and International Building Code were not applicable. This was confirmed by LBFG after speaking with officials from the City of New Orleans.

2. The plaintiff expert failed to properly identify damage patterns, because they mistook rainwater intrusion for water vapor condensation (refer to **Appendix D-1 to D-6**). While wet trailer conditions can be caused by air-related moisture problems, rainwater, or plumbing leaks, each moisture source typically results in different and distinctive damage patterns. Humidity-related moisture problems can occur due to one or a combination of the following conditions:

   a) Infiltration of humid, outside air in warm, humid climates when there is an absence of building space pressurization versus outside;
   b) Introduction of unconditioned (or inadequately conditioned) outdoor ventilation air;
   c) Inadequate dehumidification control within the building spaces, usually compounded by one of the above two items.

   The patterns that result from humidity-related conditions are typically distinguished by more widespread damage throughout a trailer and can be predicted based on air pressure conditions and on equipment selection and trailer layout.

   In contrast to humidity-related conditions, the patterns that result from rainwater damage (due to lack of tenant and maintenance responsibilities) are concentrated and localized to a water entry point through the THU envelope. For contrast between the two conditions, refer to **Appendix D-7**.

   In this THU, any wet damage and mold problems were overwhelmingly the result of rainwater intrusion due to a lack of tenant and maintenance responsibilities and physical damage to the THU. These include:

   a) Entry door – physical damage that meant the door would not close

      b) Bedroom window – lack of tenant and maintenance responsibilities related to seals and adhesives that resulted in seal separation

      c) Bedroom corner – lack of tenant and maintenance responsibilities related to seals and adhesives that resulted in seal separation

      d) Water closet plumbing vent – lack of tenant and maintenance responsibilities related to seals and adhesives that resulted in seal separation

      e) Exhaust fan dome cap – absence of cap permitting rainwater to enter bathroom resulting in damage including (but not limited to) the floor, walls, partition and wall cavities and floor supply air grille (physical damage)

3. The plaintiff expert failed to acknowledge in their report or findings that the THU pressurization was positive to the outdoors and that there were no water vapor condensation problems found. Plaintiffs experts measured that the THU was under a positive pressure with respect to outdoors (refer to **LaGrange Consulting Expert Report, Appendix F-1; page 17 of 92**).

4. The plaintiff expert failed to properly identify maintenance and tenant responsibilities, which LBFG understands that throughout the time of occupancy were not adequately addressed and which ultimately led to rainwater intrusion and damage (refer to **Appendix C, Exhibit 2** Periodic Maintenance Chart, and pages from Forest River Recreational Vehicle Owners Manual, page 71.  For example:

      a) Each month, seals and adhesives were to be inspected and resealed (as necessary).

      b) Every three months, window and door seals were to be checked for damage and repaired (as needed).

      c) Page 71, Forest River Owner's Manual, "Seals and Adhesives…Be aware that weather, sun, and road vibration will have an effect on seals, causing them to dry, crack, or separate. If you are unsure what to look for, have your dealer instruct you, and also show you the correct method for renewing the seals. If you prefer, he will be able to perform seal maintenance for you also."

5. The plaintiff expert failed by continually providing conflicting hypothesis and opinion of results. For example:

      a) Contending condensation damage due to air infiltration but failed to demonstrate a driving mechanism through testing to support that opinion. In fact, the results of their testing countered this opinion.

      b) Contending that the THU envelope was allowing excessive amounts of uncontrolled infiltration, while also saying that it was necessary

to increase the ventilation rate of the THU by installing outdoor air on the AC system.

The onsite activities by LBFG and the plaintiffs occurred during a time period that the outdoor air conditions measured and recorded by LBFG were consistent with summertime conditions (i.e. warm, humid climate conditions) for Louisiana (refer to **Appendix B-1**).

# III.   Review of Expert Report by Paul LaGrange

**Discussion**

Paul LaGrange states that the trailer is excessively leaky and that this leakiness causes excessive air infiltration, which, in turn, creates elevated indoor relative humidity (RH) in the indoor space and moisture condensation in exterior wall cavities. He also states that the AC system is oversized and, therefore, does not adequately control indoor RH. LBFG's testing reveals that the natural infiltration rate of this trailer falls at the lower end of typical residential infiltration rates, that the AC system is ideally suited to control of indoor RH, and that indoor RH was well-controlled during a period of typical hot, humid summer weather.

LaGrange also states that the trailer should have been made as tight as possible. He also states that the trailer will not then have sufficient infiltration or ventilation to properly dilute indoor pollutants (from occupants and materials), and, therefore, the AC system should have been installed with filtered outdoor air (fresh air). LBFG demonstrated that making the trailer "as tight as possible" and then having to rely on mechanical ventilation (filtered outdoor air) can be a problem for occupants. LBFG's authoritative documentation states that residential occupancies in the southern portion of the United States have historically relied upon natural infiltration to provide needed ventilation. LaGrange claims that natural infiltration is not an appropriate means for providing necessary ventilation of the trailer. LBFG's authoritative sources confirm that natural infiltration has been and continues to be widely used as a source for ventilation. Every residential occupancy has windows that open so that ventilation can be provided to the occupants.

LaGrange states that the air leakage of the duct system draws humid air and contaminants into the trailer and contributes to poor indoor air quality. LBFG's analyses demonstrate that the dominant return-side leakage creates positive air pressure in the trailer, which advantageously controls direction of air flow, pushing dry indoor air outward through exterior wall cavities and helping to keep those interstitial cavities dry. Furthermore, the humidity that is drawn into the return leak then passes over the cold cooling coil so that the water vapor contained in this infiltrating air flow is stripped away prior to its entry into the trailer. Finally, LBFG found that there was no evidence of mold growth in the ceiling space and that moisture and mold accumulation that occurred in the wall cavities is associated with rainwater intrusion.

LBFG calculations have revealed that there is a series of mistakes in LaGrange's analysis of test data and mistakes related to air infiltration and the ventilation requirements of ASHRAE Standard 62.

Failure to correctly analyze the data and the misinterpretation of the results has caused claims that are inaccurate regarding the quality of the indoor environment.

FR-LTW-EXP06-005634

**Envelope Air Leakage**

LaGrange states that "This trailer is very leaky...The blower door test showed that the air changes per hour in the natural state were extremely high." LaGrange performed a blower door test, a test where a very large fan is installed into the front door of the trailer to pull air from the trailer. The test result was 181 CFM50. This means that when the trailer was depressurized to an extreme level (50 pascals), the air flowing into the trailer was 181 cubic feet per minute (cfm).

Since the trailer does not normally operate at 50 pascals, this test result has to be modified to estimate natural infiltration, which is defined as the amount of air that infiltrates into the trailer when exposed to normal wind and temperature effects. Various formulas are available to calculate the natural infiltration rate based on the blower door test result.

LaGrange calculates that the natural infiltration rate for this trailer would be 33 cfm (this is also expressed as 1.374 air changes per hour). While his report states that "This calculation was done through Energy Gauge USA software v.2.5," his infiltration calculation differs from what Energy Gauge USA actually says by a factor of five. When the LaGrange blower door test result (181 CFM50) is input to the program, the Energy Gauge USA software provides an answer of 6 cfm or 0.23 air changes per hour. (See **Appendix E** for a more detailed discussion of these calculations.)

According to Chapter 26.16 of the ASHRAE Fundamentals Handbook (2001), "typical infiltration values in housing in North America vary by a factor of 10, from tightly constructed housing with seasonal average air exchange rates of about 0.20 air changes per hour (ACH) to loosely constructed housing with air exchange rates as great as 2.0 ACH." Based on this information and upon the fact that Energy Gauge USA estimates 0.23 ACH for this trailer, it is evident that this is not "a very leaky trailer," as stated.

**Need for Outdoor air**

LaGrange states on page 16 of his report that ASHRAE claims the following: "Buildings should be as tight as possible and then vented mechanically." He does not acknowledge natural infiltration as an appropriate source of ventilation air especially for residential trailers. The International Residential Code (IRC 2000), which LaGrange references numerous times in his report, defines ventilation as "The natural or mechanical process of supplying conditioned or unconditioned air to, or removing such air from, any space." It is understood that IRC approves of natural ventilation, which of course does not include filtered air. Additionally, the ASHRAE Fundamentals Handbook (2001) states (in Chapter 26.18): "Traditionally, residential ventilation has been provided by natural ventilation and infiltration. Sherman and Matson (1997) showed that most of the older building stock is sufficiently leaky that infiltration alone can meet the minimum requirements of ASHRAE Standard 62." Furthermore, nearly 100% of homes in the Gulf region of the United States depend almost exclusively upon natural infiltration to meet ventilation needs. (See **Appendix E** for additional discussion of ventilation.)

There are considerable risks in making a building (or trailer) "as tight as possible." These risks relate to the fact that when the envelope is made too tight, there will be periods when the ventilation provided to the space is far below that which is needed, creating air quality issues or producing elevated indoor

RH. These problems can occur under the following circumstances. 1) If the filter for the OA is not regularly cleaned or replaced, then the ventilation air flow will be restricted or even stopped and the quality of the indoor air could become problematic. 2) During periods of low cooling or heating load, the AC will run very little and therefore the ventilation air will not be provided, and indoor air quality will suffer. 3) If, as an alternative, the AHU fan control is set to ON, then indoor RH will increase to 65% to 80% (during hot, humid weather) because moisture on the coil evaporates and the OA enters the trailer untreated when the compressor is OFF.  (See **Appendix E** for additional discussion of problems associated with the tight envelope and filtered OA that LaGrange recommends.)

### The AC System Sizing and Humidity Control

LaGrange asserts that the AC system serving this trailer is oversized by 28% leading to short-cycling, poor RH control, and mold growth. The basis of his claim is a cooling load calculation performed by LaGrange using "Rhvac – Residential and Light Commercial HVAC Loads" by Elite Software Development. For New Orleans, he found the cooling load for this trailer was 11,865 Btu per hour. The AC system, as indicated by manufacturer literature, has a cooling capacity of 15,000 Btu per hour.

The  unit provided by Forest River meets exactly the FEMA specification (refer to **Appendix B-1** and **Appendix D-9**) According to the FEMA Model Travel Trailer Procurement Specifications (Dated July 14, 2005), the Air Conditioner is to be "15,000 BTU Ducted Roof A/C wired and connected with the furnace." Beyond meeting exactly the FEMA specification, this AC system is ideally suited to providing good humidity control in this trailer, for the following reasons (refer to **Appendix E** for a more detailed discussion of why the AC system is ideally suited to the control of indoor RH).

- The system has two fan speeds. The cooling capacity of the AC system on the lower fan speed will be considerably less than 15,000 Btu per hour.
- On the lower fan speed, the system sensible heat ratio (SHR) will be lower, meaning that the unit will dehumidify very effectively.
- Measurements performed by LBFG found that the cooling coil and supply air were cold, which means that the unit removes moisture effectively from the room air.
- Recorded temperature and humidity on August 19-21, 2009, found that the AC system maintained indoor RH in the range of 32% to 47% for a period of 21 hours (for the period 1 PM on August 19 through 9:30 AM on August 20, at which time blower door and tracer gas decay tests interrupted the AC system operation). In other words, even with the operation of the AC system interrupted, the AC system still provided excellent dehumidification of the trailer (Refer to **Appendix B-1 and B-2**).

Based on this information, it is clear that this AC system is appropriately sized and well-suited to controlling humidity in this trailer.

**Duct Leaks Increase Air Infiltration**

LaGrange states that the air leakage of the duct system draws humid air and contaminants into the trailer and contributes to poor indoor air quality. LaGrange fails to consider a number of factors when making this claim:

- Duct leakage is actually providing a significant boost to the THU ventilation rate. When the AC fan is operating, the THU ventilation rate increases from about 7 cfm to about 22 cfm, thus in-line to satisfy the requirements of ASHRAE Standard 62.2.
- Return leaks are greater in this THU than supply leaks. Both LaGrange and LBFG found that the THU operated at positive pressure when the AC fan was operating. This positive air pressure in the THU creates the benefit of controlling the direction of air flow, pushing dry indoor air outward through exterior wall cavities, and helping to keep those interstitial cavities dry.
- Return leaks are drawing air in part from the ceiling space, so that air that may be leaking from supply ducts would be captured by the return leak and brought back into the space.
- Humidity that is drawn into the return leak then passes over the cold cooling coil so the water vapor contained in this infiltrating air flow is stripped away prior to its entry into the THU.
- There is no physical evidence of condensation or mold growth in the ceiling space, moisture and mold accumulation that occurs in the wall cavities is associated with rainwater intrusion. (See **Appendix E** for a more detailed discussion of the interaction of duct leakage with the THU and why duct leakage has not contributed to moisture and mold problems in this THU.)

**LaGrange Calculation and Analysis Mistakes**

LaGrange failed to correctly analyze the data, misinterpreting the results which led to inaccurate claims about the quality of the indoor environment. For example, his calculation of natural infiltration is mistaken by a factor of five. He states that his calculated natural infiltration rate of 1.374 air changes per hour came from *Energy Gauge USA v.2.5*. However, when LBFG inserted LaGrange's blower door test result (181 CFM50) into the *Energy Gauge USA* software, the software predicts a natural infiltration rate for New Orleans of 0.23 air changes per hour. This value is in agreement with other research-based methods for estimating natural infiltration from a blower door test. Furthermore, LBFG performed a tracer gas decay test on this trailer and found a natural infiltration rate of 0.30 air changes per hour.

LaGrange also states that his calculated natural infiltration rate of 1.374 air changes per hour came from a specific equation which he presents in his report. He refers to using a value W (weather factor) from ASHRAE Standard 136. When LBFG looked up the weather factor for New Orleans from Standard 136 and input LaGrange's blower door test values into that equation, the calculated value was greater than 78 air changes per hour. This yields an unrealistic result.

Looking at all of the estimated and measured natural infiltration rates discussed here and in **Appendix E**, it appears that the natural infiltration rate for this trailer would be expected to be in the 0.2 to 0.3 ach range during most of the year. LaGrange's estimate of 1.374 ach is higher than the real natural infiltration rate of this trailer by a factor of five and is far out of line with the more widely used

calculations, as well as the measured natural infiltration. The reason that this mistake is important is that he states that this trailer has excessive air leakage, and that this air leakage is creating a number of problems.

LaGrange states on page 16 of his report that "Buildings should be as tight as possible and then vented mechanically. The standard for good indoor air quality (according to ASHRAE) is a full change of indoor air every 2.8 hours." The source for this statement, he reports, is ASHRAE. As it turns out, this air change every 2.8 hours is equal to the 0.35 air changes per hour (ach) required by ASHRAE Standard 62 prior to 2004.[5] What LaGrange fails to mention is that the standard requires 0.35 ach or 15 cfm per person, whichever is greater. For this trailer, then, the ventilation requirement would not be 0.35 ach but rather 1.24 ach, or greater depending upon the number of bedrooms that one counts in this trailer. LaGrange is also mistaken because the ASHRAE Standard changed in 2004, so this was not the current standard at the time of the trailer's construction. (Refer to **Appendix E**, especially the Envelope Air Leakage section, for a more detailed discussion of the calculation and analysis errors committed by LaGrange.)

### Infrared Thermal Imaging and Moisture Meter Measurements

Mr. LaGrange, as well as Mr. Mallet, performed Infrared Thermal Imaging of surfaces inside the trailer. Both plaintiff expert witnesses performed this testing during normal operation. Mr. LaGrange also performed this testing during the negatively-pressurized blower door test to identify thermal or air barrier irregularities.

Mr. LaGrange was observed taking moisture meter measurements; however, these results were not included in his report. If thermal imaging is used as part of a moisture assessment, it is used to identify areas with temperature differences that may require further assessment using a moisture meter.

LBFG performed infrared thermal imaging and moisture meter testing within the THU on various surfaces. Infrared Thermal Imaging results indicated temperature differences in several areas; however, most of these areas did not indicate elevated moisture levels within the materials. The areas that did indicate elevated moisture levels within the materials included areas affected by rainwater due to inadequate maintenance and physical damage and not due to outside humidity entering the THU. This included the following areas:

- Master Bedroom  Wall (below window and opposite to entry door)
- Corner Master Bedroom (bottom of wall intersection behind night stand, opposite to trailer entry door)
- Carpet (stain location in center aisle adjacent to dinette)
- Bathroom perimeter and tub walls (up to approximately two inches above finish floor)

Mr. LaGrange documented incorrectly the thermal and air barrier irregularities in his report but failed to provide a comparative moisture assessment associated with the absence of condensation-related damage. Based upon his documentation, Mr. LaGrange cannot say that the areas he documented

---

[5] ASHRAE Standard 62-1999

through the infrared thermography were wet. In fact, based upon LBFG's measurements, those areas were not wet.

FR-LTW-EXP06-005639

# IV.   Review of Expert Report by Ervin L. Ritter, P.E.

**Discussion**

LBFG's response to the Ervin L. Ritter, P.E., investigation and inspection report (of the temporary housing unit [THU] discussed herein) dated October 1, 2009, is summarized below. Mr. Ritter indicates that his report evaluates the mechanical systems (air conditioning and heating system) in the trailer. Mr. Ritter also indicates that "the construction of the trailer and air conditioning and heating systems was inspected for deficiencies in installation and construction." Mr. Ritter includes discussion on building codes, certifications, installation, unit sizing, product manufacturer instructions, and onsite observations. He also claims that the primary problems with the trailer were the lack of:

- Outside/ventilation to reduce the building of indoor contaminants;
- Inadequate insulation on the air conditioning and heating ductwork;
- Inadequate insulation in walls, roof, and floor; and
- Inadequate vapor barrier in walls and floors to reduce the migration of water vapor into the structure, which causes water damage.


**Building Code Compliance**

The Forest River manufactured THU was required to comply with the procurement construction specifications provided by FEMA. Since the trailers were constructed to Federal Standards for a federally-funded procurement, state and local code compliance, while perhaps of interest, was not obligatory. Written acknowledgement by the City of New Orleans officials confirms that the FEMA THUs were not required to comply with their codes. (Also refer to **LBFG Executive Summary Section II** and **Appendix C-1**.)


**Positive Trailer Pressurization**

Mr. Ritter contends that the air conditioning system did not contain outside air for ventilation and that systems with outside air flush-out contaminants from entering the trailer. Mr. Ritter also contends that outside air tends to stop migration of water vapor in wall, floor, and roof cavities. Mr. Ritter fails to recognize the THU positive pressure test results and the outside air that contributed to the positive pressure (refer to the **Paul LaGrange Report, page 17, and Appendix D-10**). This positive pressure allowed cool, dehumidified air to exfiltrate from the space and outward across the ceiling and building envelope. Also refer to LBFG's responses to both the Paul LaGrange and the Al Mallet expert reports.

FR-LTW-EXP06-005641

**Insulation Performance and Energy Efficiency Considerations**

LBFG testing demonstrated that the air conditioning unit adequately cooled the THU during August summer conditions in Louisiana in spite of differences in thermal resistance of installed ductboard compared to recommendations from the air conditioning unit manufacturer for more thermal resistance.  Other plaintiff witness allegations identify inadequate insulation in the heating system and in the walls, roof, and floor. The opinions regarding inadequate insulation relate to energy efficiency considerations and do not impact indoor air quality of the unit.

**Vapor Barriers**

Mr. Ritter fails to recognize the metal siding as a vapor retarder and goes on to state that a vapor barrier would tend to reduce the risk of condensation in the walls.  Furthermore, areas that did incur damage are clearly related to rainwater intrusion (not water vapor migration) which resulted from a lack of maintenance by the tenant and maintenance contractor. Refer to the discussion in the executive summary related to identification of damage patterns; refer to the discussion on misplaced wall vapor retarder under Al Mallet and **Appendix D-1** (**Keyed Notes 1 and 2**).

**Duct-board Leakage into Ceiling at Joints and Seams**

Onsite relative pressure testing from the parties in this case individually confirmed that the THU was under a positive pressure relative to outdoors when the air conditioning unit was in operation. LBFG confirmed and quantified through Tracer Gas Testing that return air leakage contributed to this positive pressure (7.0 percent or 15 cfm). LBFG assumes that supply air leakage is less than the return air leakage since the THU was pressurized. Plaintiff's expert witnesses also believed (but never quantified) that supply and return air leakage contributed to the THU positive pressure relative to outdoors (Refer to **Appendix D-10**). This is not uncommon since no air distribution system is airtight. Most importantly, no physical damage in the ceiling occurred because the THU was under a positive pressure relative to outdoors and relative to the ceiling space, or because cool dehumidified air was being pushed into the ceiling space.

**Air Conditioning Unit Sizing**

Mr. Ritter provides a statement in reference to the manufacturer's instruction related to the air conditioning unit sizing and indicates that the instruction gives the appearance that the unit capacity is marginal to be able to maintain a level of space temperature and comfort (refer to **Ritter Report, page 19**). In contrast, Mr. LaGrange (also plaintiff witness) indicates that the unit is more than 28 percent oversized (refer to **Page 54 of 92 of LaGrange Consulting Report**). Neither report provides temperature and relative humidity readings from their testing to document the ability of the air conditioning unit to

maintain space conditions, nor do these identified issues relate to the claim. Finally, it also suggests that plaintiff expert witnesses do not agree on the air conditioning unit sizing.

**Description of Responsibilities**

Forest River was responsible to provide a THU as specified in the FEMA specifications (refer to **Appendix C-1**). LBFG understands that Forest River received these specifications from FEMA and constructed this THU accordingly. LBFG also understands that a maintenance schedule existed for this unit and that maintenance responsibilities were performed by various entities at various times.

FR-LTW-EXP06-005643

# V.   Review of Expert Report by Al Mallet

**Compliance with Codes**

Refer to the LBFG Executive Summary and Building Code Compliance response under the Ervin Ritter section above.

**Construction for Warm, Humid Climates**

The FEMA trailer was designed to comply with the FEMA procurement specifications. If the specifications had included specific requirements for warm, humid climate design, then it would have been required. The procurement specifications did not include this requirement.

**Construction That Resulted in Mold Growth**

Mold growth that was evident in the THU after several years of environmental conditions representative of Louisiana was minimal and was not the result of poor construction means and methods. The majority of mold growth observed was the direct result of rainwater intrusion through the intentional and non-intentional openings of the THU. Additional points of rainwater intrusion were due to mechanical damage, lack of maintenance, and a missing exhaust vent cap that allowed rainwater directly into the bathroom (Refer to **Appendix D-1**).

**HVAC System Contributed to Off-Gassing**

On-site testing confirms that the HVAC system, as installed, provided adequate air conditioning of the THU by maintaining temperature and relative humidity within the thermal comfort envelope included in ANSI/ASHRAE Standard 55. In addition, the system, as installed, provided positive pressurization with respect to outdoors, allowing conditioned air to exfiltrate through the wall assemblies. Refer to the test results included in the LaGrange section of this report.

**Misplaced Wall Vapor Retarder**

While Mr. Mallet describes the interior surfaces as vinyl clad, the report does not opine what the permeability of the wall paneling is. Nor does his report provide a vapor transmission analysis to support the claim that the wall assembly had misplaced vapor retarders. The primary vapor retarder within the wall is the metallic siding that is on the outdoor (warm side) of the wall. The moisture/mold patterns on the interior of the THU were not representative of a vapor diffusion problem but, rather, a rainwater intrusion problem. In fact, in locations where rainwater intrusion was evident, vapor diffusion moisture patterns were not evident; hence, the assertion that vapor retarders were misplaced is un-founded.

**Poor Quality of Workmanship**

LBFG understands that the unit at issue underwent an inspection process. LBFG is unaware of any reported construction issues (during inspections) associated with Mr. Wright's THU that did not comply

with the FEMA specification and RV construction practice. In the absence of these issues, then claims to the contrary are moot.

FR-LTW-EXP06-005645

# VI.   Review of Expert Report by J. Darrell Hicks, P.E.

**Discussion**

LBFG's response to opinions prepared by J. Darrell Hicks, P.E., dated October 1, 2009, with regard to the existing conditions of the THU, including construction methods used,  are summarized below. Mr. Hicks indicates that his two visits to the THU first consisted of a general overview of the THU, including locations of electrical devices, and review of the electrical power system.  His second visit was more in-depth observations after select portions of the electrical systems were exposed during destructive observation by others. Mr. Hicks includes discussion on the electrical code, installation, onsite observations, and summarizes that:

- Corrosion was observed on one of the lighting switch contacts and states that "this would be abnormal unless there had been a leak inside the wall or some other reason for a high moisture content."
- Cut in receptacle wire insulation.
- Smoke alarms not powered in accordance with the requirements of NFPA 72.
- Junction box not weatherproof.

While Mr. Hicks provides his opinion on deficiencies, the results are unrelated to condensation, infiltration, poor HVAC performance, and related testing and, thus, no further response in these areas is provided. LBFG understands that Mr. Hicks found no irregularities in voltage drop testing, indicating no electrical power impact on HVAC performance. In addition, the corrosion on the light switch contact was caused by the rainwater intrusion at the adjacent entry door as discussed in the above sections and identified in **Appendix D-1**.

**Voltage Drop Irregularities**

Voltage was measured by Mr. Hicks at various locations in the electrical system during generator operation. Excessive voltage drop can affect the power distributed to an HVAC unit and, consequently, its performance. Mr. Hicks indicated the absence of any irregularities in the voltage measurements during his onsite testing. Thus, it can be concluded that the voltage drop across the electrical distribution system during normal operation had no impact on the HVAC performance.

**Lighting Switch Contact**

Mr. Hicks indicates that a lighting switch had corrosion on the contacts. Mr. Hicks does not indicate where this switch is located, but LBFG believes that the switch was located adjacent to the entry door. It should be recalled that physical damage was incurred to the door and possibly door frame (refer to

**Appendix D-1, Keyed Note 3)** which resulted in rainwater damage in the wall below the switch. LBFG believes that the physical damage to the door contributed to this condition.

## VII.  Conclusions

- LBFG identified pathways for rainwater intrusion which correlated to damage patterns identified during destructive observation. Damage patterns were small and localized and were NOT consistent with condensation from air infiltration. LBFG further demonstrated the absence of condensation from air infiltration based on the following:
    - ➢ Testing demonstrated that the temporary housing unit (THU) maintained a positive pressure with the air conditioning operating;
    - ➢ Direction of airflow from the occupied space was outward and exfiltrated through the wall, ceiling, and floor cavities to the outdoors because of positive pressure, which minimized infiltration into the occupied space;
    - ➢ Operation of the air conditioning unit provided and maintained set-point temperature and acceptable relative humidity conditions during non-test periods.
- Tenant and maintenance responsibilities (re-sealing) were not maintained; gaps in sealant areas developed which led to rainwater intrusion and damage to interior.
- The THUs were constructed to Federal Standards for a federally-funded procurement, state and local code compliance, while perhaps of interest, was not obligatory.
- The unit provided by Forest River meets exactly the FEMA specification and is ideally suited to providing good humidity control in this THU. Recorded temperature and humidity readings during testing in August showed that the system was able to maintain acceptable RH levels even with system interruptions for testing purposes.