UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE | * | |
| | PRODUCTS LIABILITY | * | |
| | LITIGATION | * | SECTION: N(5) |
| | | * | |
| This Document Relates to: *Lyndon T. Wright. v.* | | * | JUDGE ENGELHARDT: |
| *Forest River, Inc., et al*, Docket No. 09-2977 | | * | |
| | | * | MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### FOREST RIVER INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO LIMIT THE TESTIMONY OF ERVIN L. RITTER

Defendant, Forest River, Inc. (hereinafter "Forest River") respectfully submits the following memorandum in support of its Motion in Limine to Exclude the Testimony of Ervin L. Ritter:

**I.   Factual Background**

This action stems from plaintiff's alleged exposure to formaldehyde while residing in a travel trailer provided by FEMA as emergency housing. In an effort to address construction and design issues related to the Wright unit, plaintiff retained five experts, all of whom examined the unit during the August 2009 destructive testing. Ervin Ritter, P.E., was retained to examine the HVAC system, including aspects related to insulation, ventilation, and moisture intrusion. *See generally* Ex. A, expert report of E. Ritter, dated 10/1/09.

Other experts retained by plaintiff to examine the unit include Paul Lagrange, who performed a blower door test to assess the air leakage of thermal envelope as well as a duct blaster test to

determine the rates of air leakage of supply and return duct work. Al Mallet issued a report incorporating the findings of both Lagrange and Ritter, as well as plaintiff's wood products expert, Dr. Smulski, to reach a wide range of conclusions related to the design and construction of the Wright unit. *See generally* expert report of A. Mallet, dated 10/2/09, attached as Ex. B. Charles Moore, P.E., was retained to opine on issues related to the jacking and installation of the unit, and Darryl Hicks' report comments on the unit's electrical wiring system.[1]

## II. Argument & Citation to Authority

### A. Ritter's Testimony is Duplicative, and therefore it should be excluded in its entirety.

Even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403 (2008).

This Court has already ruled that, "No duplicative testimony will be allowed. Multiple opinions on the same subject will generally not be admitted, absent prior consent of the Court based on a showing of compelling reasons." [Rec. Doc. 2062, p. 1]. Several courts have excluded experts who planned to offer cumulative testimony. In *Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 858 (5th Cir. 1973), the plaintiff appealed the district court's exclusion of an expert witness who planned to address the loading and unloading of anchor chains. The U.S. Fifth Circuit Court of Appeals rejected the appeal, holding that the plaintiff had qualified two other experts who testified

---

[1] Separate *Motions in Limine* will be filed with regard to Ritter, Mallet, Smulski and Moore. Plaintiff has agreed not to call Darryl Hicks at trial, and therefore Forest River will not comment upon the findings of his report.

to the proper unloading procedure. *Id*. Similarly, an Eastern District of Louisiana case would not allow one of the plaintiff's two retained experts to discuss common truck driving practices because the other was already speaking to that issue. *See Young v. Am. Reliable Ins. Co.*, 1999 WL 600393, *3 (E.D. La. Aug. 9, 1999). A Western District of Louisiana decision blocked, as cumulative, two products liability experts from discussing the warnings included in the owners' manual of a rifle that malfunctioned and caused injury, as well as the cause of that injury. *Matthews v. Remington Arms Co.*, 2009 WL 1220541, *2 (May 4, 2009).

Plaintiff has presented five witnesses to discuss design and construction issues related to the Wright unit. Three of these witnesses – Lagrange, Mallet and Ritter – comment specifically on HVAC, temperature, and humidity conditions within the unit. As noted above, Lagrange performed both a blower door test and duct blaster test to determine the amount of leakage in the unit and duct work, respectively. Lagrange also took infrared photographs of the unit immediately following the blower door test to supplement the ventilation data obtained by the other two tests. Ritter, an engineer, has opined on the mechanical systems in the trailer, including an analysis of ventilation and insulation issues associated with the HVAC system.

Al Mallet utilizes both Ritter's and Lagrange's report to provide a comprehensive analysis of the HVAC, ventilation, insulation, and air quality issues within the Wright unit. *See* Report of A. Mallet, attached as Ex. B. As such, Ritter's report is incorporated in its entirety within the Mallet report and thus is duplicative as to those HVAC, ventilation and insulation issues. Ritter testified that he has expressed all of the opinions in his report to Mallet. *See* Deposition of E. Ritter, 12/9/09, p. 94, attached as Ex. C. Ritter has merely provided underlying opinions on the mechanical systems

3

within the unit that Mallet then relies upon to reach his conclusions. Allowing both to testify as to those issues is repetitive, and Ritter's testimony should therefore be excluded.[2]

### B. In the Alternative, Ritter's Testimony on the Following Topics should be Excluded.

#### 1. Building Code Compliance

Federal Rule of Evidence 702 permits a witness who, through his expertise, has the knowledge, skill, experience, training, or education to offer scientific, technical, or other specialized knowledge may testify regarding that knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue. A proposed expert witness must first be qualified to testify regarding the issues for which he is offered. *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004). Courts have routinely refused to admit a proffered expert's testimony where the proffered expert, despite a generalized or professed knowledge of issues arguably relevant to the subject matter, nevertheless lacked expertise with the specific nature of the claims being litigated. *See, e.g,. Kassim v. City of Schenectady*, 415 F.3d 246, 251 (2nd Cir. 2005) (expert lacked knowledge regarding Arabic translation); *In Re: Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543-544 (S.D.N.Y. 2004) (expert's opinion not based on qualification or experience but on subjective views of ethical standards at issue).

Even if an expert is qualified, his opinion can be excluded if not reliable. *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). A qualified expert's testimony is only admissible if it is based

---

[2] It should be noted that, while Mallet's report contains references to the deposition of Lyndon Wright, Ritter candidly admits that he has never spoken with plaintiff or read his deposition. *See* Ex. C, Depo. of Ritter, p. 87. Therefore, Mallet will be able to provide more relevant commentary than Ritter, who has merely studied the mechanics of the trailer in a vacuum with no eye towards how Mr. Wright actually lived in the trailer (*i.e.*, how often he opened the windows, how he operated the HVAC system, etc.).

upon sufficient facts or data, it is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid.702. The reliability inquiry is flexible, and several nonexclusive factors may be considered, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, and (4) whether the technique is generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993) (discussing the four nonexclusive factors); Order dated July 15, 2009, p. 4 (Rec. Doc. 2181) *(citing Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). The expert testimony must also be relevant – not only in the way that all testimony must be relevant under Federal Rule of Evidence 402 – but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *See* Order dated July 15, 2009, p. 4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).

Forest River asserts that Ritter should be precluded from offering any testimony on the application of building codes to the Wright travel trailer. In opining on the codes and standards allegedly applicable to the travel trailer at issue in this litigation, Ritter's report waivers between the specific and vague, stating:

> There are few codes which apply to the construction of this travel trailer. NFPA 1192 is the primary code which can be applied to this travel trailer. For this report the pertinent part of NFPA 1192 is Chapter 5. This chapter contains the requirements for the air conditioning cooling and heating systems.
> * * * *
> However, all building codes which were in effect prior to the construction/manufacture of this trailer should be applicable. This trailer is not and never was intended to be a recreational vehicle.
> * * * *
> This discuss (sic) on applicability of building codes can be found in other expert reports. The writer of this report is in agreement with the conclusions of the experts applying the

5

building codes to these units.

Ritter report, dated 10/2/09, p. 22, attached as Ex. A.

Ritter only identified one code that applied to the travel trailer: NFPA 1192.[3] Forest River does not contest that NFPA 1192 did in fact apply to the construction of the trailer. However, Forest River does object to Ritter's discussion of any other building codes and their application to this travel trailer.

As a preliminary matter, Ritter should not be able to offer testimony on the application of any other building codes, as he has admittedly failed to conduct any independent analysis or investigation into the issue. His report leaves this responsibility in the hands of other experts, noting the "discuss (sic) on applicability of building codes can be found in other expert reports." *Id.* Ritter's report never even identifies the building codes to which he refers. *Id.* Indeed, during Ritter's deposition, plaintiff's counsel stipulated that Ritter would not be able to discuss codes outside of the NFPA:

>MR. D'AMICO:
>[Ritter] has been tendered as an expert in HVAC systems only, not as an expert knowledgeable about all of the requirements to complete a travel trailer in compliance with all of the codal applications that go into building a travel trailer. That's well beyond the scope of what this witness is being tendered for.
>
>    * * *
>
>MR. BONE:
>And the only building code that's contained in his report is the NFPA.
>MR. D'AMICO:

---

[3] Ritter confirmed that NFPA 1192 was the only code cited in his report. *See* Ex. C, depo of Ritter, p. 61-62.

>       I'm not testifying, it's –
> MR. BONE:
>       I want to be clear.  Is that what
> we're going to be limited to?
> MR. D'AMICO:
>       If that is what is in his report,
> that's what we are limited to.  That's my
> understanding.

Ex. C, depo of Ritter, p. 148-49; 163-64.

Further, there are fundamental flaws in Ritter's reliance upon other expert's application of these building codes.  Although detailed fully in Forest River's *Motions in Limine* related to Lagrange and Mallet, the International Residential Code (IRC 2000) and New Orleans 2003 Building Code do not, and did not, apply to travel trailers in New Orleans.  Ritter's reliance on other these other experts' findings on the subject is improper, as neither Lagrange nor Mallet performed any substantive research to confirm his assertions.

For instance, Mallet's sole research into the issue was a brief email exchange with Johnny Odom, the chief building inspector at the City of New Orleans, in January 2010 (after Mallet's expert report was written).  Odom told him that the building code inspections normally done by the City were "suspended," and FEMA was allowed to conduct its own inspections of the unit.  *See* Ex. D, Depo of Al Mallet, dated 1/12/09, p. 20-21.  Mallet performed no research into how municipal building codes interact with federal property.  *Id.* at 245.  Plaintiff has produced no evidence to show that FEMA required trailers to comply with IBC, IRC or the City of New Orleans, or more importantly, that any such alleged violation of these codes increased the concentration of formaldehyde within this unit at all.

Another expert who comments on the application of building codes, Paul Lagrange, is uncertain of what training is necessary to determine whether certain codes apply to home construction. *See* Deposition of Lagrange, p, 46-47, attached as Ex. E. He performed no factual or legal research as to whether the Code does in fact apply to FEMA supplied travel trailers or even travel trailers in general. *Id.* at 48. In fact, Lagrange originally thought 2003 building codes would have applied to this trailer, resulting in the need for Al Mallet to point out that the 2000 code applied instead. *Id.* at 41-43. Lagrange made no inquiries as to whether the City actually applied the Building Code to FEMA trailers post Katrina. *Id.* at 49-50. He never reviewed any articles dealing with the application of building codes to the construction of travel trailers. *Id.* at 244-46.

Even if one assumes that the Code did indeed apply, a fact which Forest River denies, Lagrange never inquired as to whether the City waived building code requirements in the wake of Katrina. *Id.* at 252.[4] In fact, Forest River's own experts have confirmed with officials at the City of New Orleans that the various building codes referenced by plaintiff's experts do not apply. *See* Ex. F, Report of Liberty Building Forensics Group, dated 10/29/09, p. 16.

---

[4] Lagrange also failed to examine the question of whether the FEMA travel trailer procurement specifications required adherence to building codes. Lagrange assumed that the FEMA spec requirement that the units comply with "U.S. regulatory requirements from any governing agency" translated into a requirement to comply with the New Orleans Building Code and the International Residential Code. *See* Ex. E, Depo of Lagrange, p. 58-59.
However, the FEMA specs make no explicit reference to compliance with any building code. *See* Ex. G, FEMA Specs. Further, Lagrange reviewed none of the depositions of various FEMA personnel who discussed the meaning and requirements embodied in the FEMA specs or what the term "industry standard" required. *See* Ex. E, Depo of Lagrange, p. 276-77. Finally, on a common sense level, it seems highly unlikely that the FEMA specs would require the manufacturers to construct units with particular city building codes in mind. Given that these units were to be deployed by FEMA throughout the Gulf Coast region, it would be virtually impossible for travel trailer manufacturers to tailor their products to meet the standards of each and every city throughout Louisiana, Mississippi, Texas, etc. in which they would be located.

In short, these experts' conclusions were simply based on their personal reading of the codes. *See, e.g,* Deposition of Lagrange, p, 49, attached as Ex. E. This assertion is exactly the type of *ipse dixit* that *Daubert* and its progeny were meant to exclude. Mallet and Lagrange, and, by extension, Ritter, do not have the expertise or evidence to support their contention that these building codes applied to the trailer, and none of them should be able to comment on this topic at trial.

### 2. The Performance of the Mechanical Systems within the Trailer

Mr. Ritter offers several conclusions on the performance of the Wright unit's mechanical systems. He opines that problems in the design and/or construction of the (1) ductwork, (2) insulation and (3) air ventilation systems rendered the HVAC system ineffective in controlling the air quality inside the unit. *See* Deposition of E. Ritter, 12/9/09, p. 85, attached as Ex. C.

Although one can easily lose sight of the issues at play in this case when reviewing Ritter's report, the fundamental questions to be resolved are relatively simple: (1) what levels of formaldehyde existed in the Wright trailer during his occupancy of the unit, and did they cause him any injury and (2) what types and amounts of mold existed in the trailer during Wright's occupancy of the trailer, and did they cause him injury?

Ritter goes through a lengthy discussion of the alleged problems with the ductwork, insulation, and ventilation system in the trailer, but, at the end of the day, he does not provide any analysis that assists the trier of fact in answering these two fundamental questions. He fails to identify any specific increase in temperature or humidity allegedly caused by these defects, and, accordingly, neither he nor any other expert can opine on how such an increase might impact the

levels of formaldehyde or mold inside the Wright unit.[5] His opinions are thus irrelevant, and his testimony should be excluded in its entirety.

Forest River further submits that, regardless of the substance of Ritter's arguments, his methodology is so fundamentally flawed that all testimony on these topics should be excluded. Rather than use **actual, available** temperature, humidity, and air quality testing data from the Wright trailer to assess the capabilities of the mechanical systems in the trailer, Ritter instead focuses on how the trailer's mechanical systems failed **in theory.** In doing so, he has removed his methodology from a real world analysis of the Wright trailer and switched the focus to a hypothetical analysis of "what ifs." Ritter's approach is misleading and confusing, as he attempts to pick apart the Wright unit's HVAC system without any discussion of the temperatures and relative humidity data obtained from testing. Given the wide latitude the Court granted Wright in testing this unit, this omission is unacceptable and provides sufficient grounds for excluding Ritter's testimony on the subject in its entirety.

As this Court will recall, plaintiff insisted that his trailer be tested in August and September of 2009 to obtain a second formaldehyde air sampling result and explore issues related to mold, the HVAC system, jacking, etc. This extensive testing, which took nearly a month to complete, stands in stark contrast to that of the two prior bellwether trials, where testing was more limited in scope. Like other experts who examined the trailer, Ritter was given vast discretion in how he chose to test

---

[5] In other words, even if one assumes his analysis is correct, he has only really shown that the unit's HVAC system may have had theoretically higher energy costs due to the alleged duct work and insulation issues. As discussed more fully *infra,* this theory is not supported out by the actual evidence obtained from the Wright unit with respect to temperature/humidity data and evidence of condensation damage. In any event, whether the theory is correct or incorrect, the trailer's energy efficiency is clearly not the focus of this lawsuit. Ritter's opinions are irrelevant and should be excluded.

the trailer. He ultimately elected to deploy data loggers inside the trailer. *See* Deposition of E. Ritter, p. 93-94, attached as Ex. C. These devices measure on-site temperature and relative humidity conditions. Ritter also had an opportunity to inspect and photograph the insulation inside the Wright unit.

Armed with this data and photographs from this inspection, Ritter would presumably have been in a position to answer the central questions in his report: did the HVAC system properly control the (1) temperature and (2) relative humidity within the unit?

These questions are never fully answered, though, because **Ritter omitted the temperature and humidity data that he obtained via the data loggers**. Indeed, this information does not appear in either Ritter's report or the accompanying reliance file. Ritter could not even offer an explanation as to why this data was not included in his analysis:

> Q.  Did Ritter Consulting utilize data loggers to track temperature and humidity inside the trailer?
> A.  We provided data loggers for doing that. And that may be something, if you want, I will correct my statement on that. Doing -- taking those tests, that data should be in our files that you have. But most of this information was provided to First General.
> Q.  I'll represent to you that there are no data logger readings in your reliance materials. Would that surprise you?
> A.  No.
> Q.  The data logger readings, you did not rely on in generating your report, correct?
> A.  No.
> Q.  Is my statement correct?
> A.  Correct.
> Q.  Is there any particular reason why

11

>    you didn't rely on the data logger readings as they relate to the temperature and humidity within the trailer while the A/C system was running?
>        A.   I was looking at the systems as-installed.  **I don't have a good answer for you on that one right there, okay?**
>        Q.   Okay.  In the Fleetwood case, for example, you used data loggers, correct? You used the information generated by the data loggers as the basis for your opinion, true?
>        A.   That is correct.
>        Q.   And in this case, even though you had data logger readings, you did not rely upon them as they related to the temperature and humidity in this trailer, correct?
>        A.   That's correct.
>        Q.   And you did not rely upon them in formulating your opinions in this case, correct?
>        A.   That's correct.

  Deposition of E. Ritter, p. 48-49 (emphasis added), attached as Ex. C.

Ritter's decision to focus on the trailer's "systems as installed" in lieu of an analysis of the system's actual functional capacity is improper.  Ritter even admitted that he has no concrete evidence that the A/C system could not control the temperature and humidity inside the trailer:

>    Q.  You mention in here that one of the problems that you would expect to encounter using R-8 insulation for the walls, ceiling and floor is that during particularly hot days, the air conditioner in this unit would not be able to properly control for temperature and humidity, correct?
>        A.   That is correct.
>    **Q.  Do you have any evidence that in this unit, in August, in Melville, Louisiana, that the air-conditioning system**

12

> **did not control either temperature or humidity in the interior living spaces?**
>    A.   Not in Melville, Louisiana.
>    Q.   Do you have any evidence that **while Mr. Wright resided in this unit, that the air-conditioning system was not capable of controlling for temperature and humidity?**
>    MR. D'AMICO:
>        Object to the form.
>    THE WITNESS:
>        No.
> EXAMINATION BY MR. BONE:
>    Q.   And your answer was "no." Is that correct?
>    A.   That is correct.

Deposition of E. Ritter, p. 69-70, attached as Ex. C (emphasis added).

Mr. Ritter's failure to include an analysis of the data logger data – data that is obviously critical to the question of whether the HVAC system controlled temperature and humidity – is highly suspect. Although Ritter may have inadvertently failed to include it in his report, it seems more likely that his decision to omit this material may be an attempt to "hide the ball" and withhold data that would not support his preconceived, theoretical conclusions. This second option seems even more probable given the fact that Ritter included an analysis of this temperature/humidity data in the report he generated for both the Fleetwood and Recreation by Design bellwether cases. Regardless of Ritter's motivation, his failure to provide an analysis of this data should preclude him from offering any testimony regarding the operation of the trailer's mechanical systems at trial.

Ritter's report also assets that negative pressure existed inside the unit; this situation would have allegedly caused "contaminants" to be pulled inside the unit. *See* Ex. A, expert report of Ritter, p. 7. He notes that, "With a negative air pressure there is a risk of having condensation form in the walls, roof or floor cavities. Evidence of moisture in the walls was found." *Id.* Yet, at his

13

deposition, Ritter could not identify any photos demonstrating condensation in the wall, floor, and ceiling cavities. He testified:

> Q.  You say that "with a negative air pressure, there is a risk of having condensation form in the walls, roof or floor cavities."
> Can you point me to the photograph that demonstrates condensation forming in the wall?
> A.  No, I cannot.
> Q.  Can you point me to any photograph that demonstrates condensation forming in the floor cavity?
> A.  No, I cannot.
> Q.  Can you point me to any photograph that demonstrates condensation forming in the roof compartment?
> A.  No.
> Q.  Is there any other evidence that you have of condensation forming in those areas while Mr. Wright lived in this unit?
> A.  No.
>
>    * * *
>
> Q.  All right. Can you point me to the photograph that would show condensation in the ceiling compartment of this particular unit when you disassembled it?
> A.  Not without going through all my thousands of photographs. I cannot recall one to go to right off the top, okay?
> Q.  Right, well --
> A.  I will answer it "no."
> Q.  Understood. But I want to be clear, you have the opportunity right here, right now, to find me that picture.
> A.  I understand that.
> Q.  Okay.
> MR. AHLQUIST:
>     You want to take a break so I can

14

print those up?
EXAMINATION BY MR. BONE:
   Q.  I mean, you brought your entire reliance file, right?
   A.  That is correct.
   Q.  With all of your pictures, correct?
   A.  That is correct.
   **Q.  And if you had a picture that showed condensation in the ceiling compartment, I would assume that would be important to you, wouldn't it?**
   **MR. AHLQUIST:**
     **Object to the form.**
   **THE WITNESS:**
     **Yes.**
EXAMINATION BY MR. BONE:
   Q.  And you would have marked it as "Condensation in Ceiling Compartment"?
   MR. AHLQUIST:
     Object to the form.
   THE WITNESS:
     That is correct.
EXAMINATION BY MR. BONE:
   Q.  And you don't have such a picture as you sit here today?
   MR. AHLQUIST:
     Object to the form.
   THE WITNESS:
     I do not have one at hand.  You are correct.

Deposition of E. Ritter, p. 68-69; 79-81, attached as Ex. C.

**Ritter could not point to a single photograph or any other objective evidence to support his contention that negative pressure drew contaminants into the unit and caused condensation damage.**  This testimony underscores the fact that Ritter's analysis and methodology are fundamentally flawed.  He should not be allowed to provide purely speculative opinions when the physical evidence completely refutes his arguments.

In the end, Ritter's refusal to examine actual data from the Wright trailer is not only unsound methodology; it also has a high likelihood of misleading the jury. Because the Court gave Ritter and other experts the chance to disassemble and examine the trailer down to its studs, the jury will naturally assume that these experts' opinions correlate to their on-site observations. This is simply not the case, as Ritter has avoided the test data and instead focused on hypothetical "results" based on how the HVAC system *might* operate. By way of analogy, if this were an unsolved murder case, Ritter would have concluded the victim died by gunshot wound simply because of the presence of a nearby gun, the whole time ignoring autopsy's findings that the death was due to a heart attack. Ritter's findings are irrelevant, his methodology improper, and *Daubert* requires that his testimony regarding the trailer's mechanical systems – including the HVAC, ventilation, and duct systems – be excluded.

### 3.     Alternative Designs

To the extent that Ritter opines on alternative designs of the trailer's HVAC and ventilation systems, Forest River asserts that any such testimony should be excluded, as Ritter has not performed the requisite risk/utility analysis to comment on these topics.

Louisiana jurisprudence has developed a set of requirements to show an alternative design in a products liability case. In *Seither v. Winnebago Industries, Inc.*, 853 So. 2d 37, 41 (La. Ct. App. 2003), the court found that the trial judge abused his discretion in failing to grant a directed verdict as to the alternative design issue. In that case, there was no valid alternative design presented. *Id.* The expert "presented merely a concept that was untested, unengineered, and not presented to the jury in any fashion more than mere speculation." *Id.* The court also noted that the plaintiffs failed to present a risk/utility analysis of the proposed alternative design. *Id.* In that case, the expert

16

presented an economic feasibility analysis, but it did not have a material quote or manufacturing labor factor. *Id.* Although Seither does not address the admissibility of an expert's opinion directly, it certainly shows the factors that an expert must present in order to have relevant and helpful information for the jury.

*Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith. The Supreme Court in *General Electric v. Joiner,* 522 U.S. 136, 146 (1997), acknowledged, "[t]rained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the ipse dixit of the expert." *Id.* If the analytical gap between the data and the opinion offered is too great, the testimony is not reliable. *Id.*

Here, Ritter has not performed the necessary research on alternative designs, such as mechanical ventilation or insulation, that would allow him to comment on these topics at trial. He was unsure of the cost of installation of a mechanical ventilation system in the trailer. *See* Deposition of E. Ritter, p. 167-68, attached as Ex. C. His report fails to provide any analysis of the availability or practicality of (1) adding a ventilation system to the trailer or (2) installing alternative insulation/duct work. Accordingly, Ritter should not be allowed to testify as to any alternative designs for the Wright trailer.

### III. Conclusion

For the foregoing reasons, Forest River requests that Mr. Ritter should be precluded from testifying at trial.

Respectfully submitted,

/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (La. Bar Roll No. 6154)
JASON D. BONE (La. Bar Roll No. 28315)
CARSON W. STRICKLAND (La. Bar Roll No. 31336)
GIEGER, LABORDE & LAPEROUSE, LLC
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana  70139-4800
Telephone:  (504) 561-0400
Facsimile:  (504) 561-1011
ATTORNEYS FOR FOREST RIVER, INC.

## **C E R T I F I C A T E**

I hereby certify that on the 9th day of February, 2010, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone