1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  FEMA TRAILER        MDL NO. 1873

5    FORMALDEHYDE PRODUCTS       SECTION N(4)

6    LIABILITY LITIGATION        JUDGE ENGELHARDT

7    (This document is in reference to

      "Lyndon Wright v. Forest

8        River, et al.")

9                    *   *   *

10

11            VIDEOTAPED DEPOSITION OF ERVIN

12   RITTER, P.E., 201 BOCAGE CIRCLE, LAFAYETTE,

13   LOUISIANA 70503, TAKEN AT THE OFFICES OF

14   FRANK D'AMICO, ATTORNEY AT LAW, 622 BARONNE

15   STREET, NEW ORLEANS, LOUISIANA 70112, ON THE

16   9TH DAY OF DECEMBER, 2009.

17

18

19   REPORTED BY:

20       CATHY RENEE´ POWELL, CCR

         PROFESSIONAL SHORTHAND REPORTERS

21       (504)529-5255

22   VIDEOGRAPHER:

23       BRIAN SOILEAU

         PROFESSIONAL SHORTHAND REPORTERS

24       (504)529-5255

25

1      Q.    Did Ritter Consulting perform the

2    blower door analysis?

3      A.    No.

4      Q.    Did Ritter Consulting utilize data

5    loggers to track temperature and humidity

6    inside the trailer?

7      A.    We provided data loggers for doing

8    that.  And that may be something, if you

9    want, I will correct my statement on that.

10   Doing -- taking those tests, that data

11   should be in our files that you have.  But

12   most of this information was provided to

13   First General.

14     Q.    I'll represent to you that there

15   are no data logger readings in your reliance

16   materials.  Would that surprise you?

17     A.    No.

18     Q.    The data logger readings, you did

19   not rely on in generating your report,

20   correct?

21     A.    No.

22     Q.    Is my statement correct?

23     A.    Correct.

24     Q.    Is there any particular reason why

25   you didn't rely on the data logger readings

1    as they relate to the temperature and

2    humidity within the trailer while the A/C

3    system was running?

4        A.   I was looking at the systems

5    as-installed.  I don't have a good answer

6    for you on that one right there, okay?

7        Q.   Okay.  In the Fleetwood case, for

8    example, you used data loggers, correct?

9    You used the information generated by the

10   data loggers as the basis for your opinion,

11   true?

12       A.   That is correct.

13       Q.   And in this case, even though you

14   had data logger readings, you did not rely

15   upon them as they related to the temperature

16   and humidity in this trailer, correct?

17       A.   That's correct.

18       Q.   And you did not rely upon them in

19   formulating your opinions in this case,

20   correct?

21       A.   That's correct.

22       Q.   You said that you provided the

23   data logger information to Mr. Mallet; is

24   that true?

25       A.   That is correct.  Mr. Mallet has

1    being designed by a contractor, he is going

2    to continue designing and installing the

3    same methods that he has in the past years.

4        Q.   So if I understood that answer,

5    what you're saying is, folks are still

6    building houses using recirculating

7    air-conditioning systems, correct?

8        A.   That is correct, if they are using

9    builders.  If they are using architects and

10   engineers, it's a different story.

11       Q.   Now, the next issue that you

12   address in your report is building codes.

13           In the third paragraph of your --

14   excuse me, the fourth paragraph of your

15   executive summary, you state that "All

16   building codes that were applicable at the

17   time of this -- at the time this unit was

18   manufactured required the introduction of

19   outside air into the air-conditioning

20   system."

21           Correct?

22       A.   That's correct.

23       Q.   And you say "All building codes."

24           The only building code that you

25   refer to in your report is contained on

1    page 22, correct?

2         A.   That's correct.

3         Q.   And that is the National Fire

4    Prevention Association's 1192, correct?

5         A.   That is for travel trailers.

6         Q.   Right.  And that's the only

7    building code that you cite in your report?

8         A.   That is correct.

9         Q.   The NFPA, which version of the

10   NFPA code did you use?

11        A.   Talking about the year version?

12        Q.   Yes, please.

13        A.   I want to say it was 2003.  Let me

14   see.  Do I have it listed there?  I thought

15   I had it listed on that sheet.

16             No, I do not have it listed, but

17   as I recall, it's either 2002 or 2003.  It's

18   the edition that is prior -- just prior to

19   the construction of this travel trailer.  So

20   that it would be the one that would be in

21   force.

22        Q.   Understood.  It is the version

23   that appears in your reliance file, correct?

24        A.   That's correct.

25        Q.   Okay.  And if that version is the

```
1            A.   No, I have not.

2            Q.   I assume, then, you didn't see the

3       diagram that Mr. LaGrange drew for us where

4       he described the difference between bulk

5       water intrusion and condensation within the

6       unit?

7            MR. AHLQUIST:

8                 Object.

9            THE WITNESS:

10                No, I have not.

11      EXAMINATION BY MR. BONE:

12           Q.   You say that "with a negative air

13      pressure, there is a risk of having

14      condensation form in the walls, roof or

15      floor cavities."

16                Can you point me to the photograph

17      that demonstrates condensation forming in

18      the wall?

19           A.   No, I cannot.

20           Q.   Can you point me to any photograph

21      that demonstrates condensation forming in

22      the floor cavity?

23           A.   No, I cannot.

24           Q.   Can you point me to any photograph

25      that demonstrates condensation forming in
```

1    the roof compartment?

2          A.   No.

3          Q.   Is there any other evidence that

4    you have of condensation forming in those

5    areas while Mr. Wright lived in this unit?

6          A.   No.

7          Q.   The next item in your report is

8    that "The walls did not have a vapor

9    barrier," and you state that "A vapor

10   barrier would tend to reduce the risk of

11   condensation in the walls and the walls only

12   have an R-8 unfaced fiberglass batt

13   insulation," correct?

14         A.   That is correct.

15         Q.   You indicated that one of the

16   problems that you would expect to find with

17   only using R-8 would be that you could not

18   control for temperature or for humidity

19   using the 15,000 BTU air conditioner.  True?

20         A.   Say again?  I'm sorry.

21         Q.   You mention in here that one of

22   the problems that you would expect to

23   encounter using R-8 insulation for the

24   walls, ceiling and floor is that during

25   particularly hot days, the air conditioner

1   in this unit would not be able to properly

2   control for temperature and humidity,

3   correct?

4        A.   That is correct.

5        Q.   Do you have any evidence that in

6   this unit, in August, in Melville,

7   Louisiana, that the air-conditioning system

8   did not control either temperature or

9   humidity in the interior living spaces?

10       A.   Not in Melville, Louisiana.

11       Q.   Do you have any evidence that

12  while Mr. Wright resided in this unit, that

13  the air-conditioning system was not capable

14  of controlling for temperature and humidity?

15       MR. D'AMICO:

16            Object to the form.

17       THE WITNESS:

18            No.

19  EXAMINATION BY MR. BONE:

20       Q.   And your answer was "no."  Is that

21  correct?

22       A.   That is correct.

23       Q.   Now, the next issue is with

24  respect to the installation of the supply

25  and return ductwork in the ceiling cavity.

1        Q.   You didn't observe any

2   condensation in the ceiling cavity, did you?

3        MR. AHLQUIST:

4             Object to the form.

5        THE WITNESS:

6             We were -- we had already shut the

7   system down before we were -- we did not

8   have the cavity open during operation.

9   EXAMINATION BY MR. BONE:

10       Q.   My question to you, that unit ran

11  for a few weeks before disassembly of the

12  unit, correct?

13       A.   That is correct.

14       Q.   And when you took that ceiling

15  compartment apart, you didn't find any

16  condensation, did you?

17       A.   I don't recall seeing any evidence

18  on the -- on the parts that were taken out,

19  but we photographed them, and if it was

20  there, we do have photo documentation of it.

21       Q.   All right.  Can you point me to

22  the photograph that would show condensation

23  in the ceiling compartment of this

24  particular unit when you disassembled it?

25       A.   Not without going through all my

1    thousands of photographs.  I cannot recall

2    one to go to right off the top, okay?

3         Q.   Right, well --

4         A.   I will answer it "no."

5         Q.   Understood.  But I want to be

6    clear, you have the opportunity right here,

7    right now, to find me that picture.

8         A.   I understand that.

9         Q.   Okay.

10   MR. AHLQUIST:

11             You want to take a break so I can

12   print those up?

13   EXAMINATION BY MR. BONE:

14        Q.   I mean, you brought your entire

15   reliance file, right?

16        A.   That is correct.

17        Q.   With all of your pictures,

18   correct?

19        A.   That is correct.

20        Q.   And if you had a picture that

21   showed condensation in the ceiling

22   compartment, I would assume that would be

23   important to you, wouldn't it?

24   MR. AHLQUIST:

25             Object to the form.

1        THE WITNESS:

2            Yes.

3    EXAMINATION BY MR. BONE:

4        Q.   And you would have marked it as

5    "Condensation in Ceiling Compartment"?

6        MR. AHLQUIST:

7            Object to the form.

8        THE WITNESS:

9            That is correct.

10   EXAMINATION BY MR. BONE:

11       Q.   And you don't have such a picture

12   as you sit here today?

13       MR. AHLQUIST:

14           Object to the form.

15       THE WITNESS:

16           I do not have one at hand.  You

17   are correct.

18       (Discussion off the record.)

19   EXAMINATION BY MR. BONE:

20       Q.   The capacity of the 15,000 BTU air

21   conditioner was specified by FEMA.  True?

22       A.   Yes.

23       Q.   And you state on page 19 of your

24   report, "The statement by the air

25   conditioner unit manufacturer gives the

1  Other than the ductwork, do you have any

2  other complaints with how this unit was

3  installed?

4      A.   All you have is a unit and

5  ductwork.

6      Q.   We talked about the ductwork and

7  your complaints with respect to the

8  ductwork, correct, the R-value?

9      A.   Correct.

10     Q.   Is there any other complaint you

11 have regarding the installation of this

12 particular unit?

13     A.   Other than it lacking a means of

14 being able to bring in some outside air, no.

15     Q.   On the last page of your report,

16 page 22, you state in the second paragraph

17 before the end, the last two and a half

18 lines, "FEMA provided a specification for

19 modifications, which had to be included in

20 the manufacture of the units, which made

21 those units no longer suitable for the

22 typical recreational travel trailer."

23          Correct?

24     A.   Correct.

25     Q.   And so it was -- in your opinion,

1          Q.   Did you review any depositions

2     before preparing your report?

3          A.   No.

4          Q.   Did you talk to the plaintiff

5     before preparing your report?

6          A.   No.

7          Q.   Did you have any contact with any

8     of the other manufacturers of the heating

9     system, Suburban, regarding the heating

10    system before preparing your report?

11         A.   No.

12         Q.   And there is no mold sampling data

13    in your reliance materials anywhere, is

14    there?

15         A.   No.

16         Q.   Have you reviewed any of the mold

17    sampling that was performed in this

18    particular case?

19         A.   No.

20         Q.   There's no formaldehyde sampling

21    data anywhere in your reliance materials?

22         A.   No.

23         Q.   And have you reviewed any of that

24    before preparing your report in this case?

25         A.   No, I have not.

1    correct?

2         A.    Correct.

3         Q.    And is that as Dr. Specter says,

4    "from portal to portal," or is that just

5    while you're testifying?

6         A.    Portal to portal.

7         Q.    From the time you leave your door

8    until the time you get home?

9         A.    That's right.

10        Q.    So it is portal to portal?

11        A.    Correct.

12        Q.    Turning back to Ritter Exhibit 5,

13   on page 4 of 14 again, there's an entry

14   there in the middle of the page entered by

15   the initials "LEE."  Would that be your son,

16   Lee Ritter?

17        A.    That is correct.

18        Q.    And it says, "Set up data loggers

19   for Clark to use if needed," and then "data

20   loggers set up."  And then there's an hour,

21   essentially, billed to that process over the

22   course of two separate days, true?

23        A.    That's correct.

24        Q.    Does that confirm for you that

25   Ritter Consulting Engineers did, in fact,

1    provide data loggers for this particular

2    project?

3        A.   That is correct.  And we provided

4    those for First General's use.

5        Q.   On page 11 of 14, about three

6    entries down, the entry is ELR, which is

7    you, correct?

8        A.   Correct.

9        Q.   And it says, "Lunch meeting with

10   Al to discuss the case and prepare for a

11   conference call," and you've billed an hour

12   and a half for that?

13       A.   Correct.

14       Q.   When you say "Al," I assume that's

15   Mr. Mallet?

16       A.   That is correct.

17       Q.   And is it a fair statement that

18   you have expressed all of the opinions in

19   your report to Mr. Mallet regarding your

20   findings and evaluation?

21       A.   Yes, I have.

22       Q.   Do you recall if this specific

23   conference was to -- with Mr. Mallet was

24   about, to prepare for a conference call?

25       A.   We had lunch that day, and instead

1            Object to the form.

2      MR. D'AMICO:

3            Object.  I don't know if this

4  witness is competent to testify about

5  whether or not a travel trailer met all of

6  the requirements as set forth under the

7  codes that apply to travel trailers.

8  EXAMINATION BY MR. MILLER:

9      Q.   Go ahead and answer it.

10     MR. D'AMICO:

11           Henry --

12     MR. MILLER:

13           Okay, hold on.

14     MR. D'AMICO:

15           -- he has been tendered --

16     MR. MILLER:

17           You can object.  You are making a

18  speaking objection, please stop it.

19     MR. D'AMICO:

20           You're going beyond the scope of

21  his report.  He has been tendered as an

22  expert in HVAC systems only, not as an

23  expert knowledgeable about all of the

24  requirements to complete a travel trailer in

25  compliance with all of the codal

1    applications that go into building a travel

2    trailer.  That's well beyond the scope of

3    what this witness is being tendered for.

4         MR. MILLER:

5              And Mr. D'Amico, we can put you

6    under oath and then you can testify, but

7    right now, it's the witness.  Speaking

8    objections are inappropriate --

9         MR. D'AMICO:

10             Listen --

11        MR. MILLER:

12             -- and unless -- unless you want

13   to go up there and testify, please stop.

14        MR. D'AMICO:

15             You know you are well beyond his

16   -- the scope of his report.  He's not been

17   tendered as an expert in those fields.

18        MR. MILLER:

19             Mr. D'Amico can have a standing

20   objection on this matter.

21        MR. D'AMICO:

22             I have a standing objection.

23   EXAMINATION BY MR. MILLER:

24        Q.   Okay.  As to these travel trailers

25   Forest River manufactured in this case, as

1          THE WITNESS:

2              Okay.  We did not do any testing

3      on the thermostat to determine at what rate

4      that the compressor would be cycling on and

5      off.

6              In general, the observation was

7      that when the unit was running, the load on

8      the structure was such that the compressor

9      ran the majority of the time.  But to say

10     that there was a measurement of how often it

11     did cycle, no.  There was none, and I don't

12     believe it was done by any of the experts.

13     EXAMINATION BY MR. BONE:

14         Q.   Understood.  So you couldn't

15     present any evidence to our jury in this

16     case to tell them that the compressor cycled

17     on and off at any given rate, true?

18         A.   That is correct.

19         MR. BONE:

20             Frank, just a quick clarification.

21     Are you telling me you're not going to

22     present him with regard to any issues

23     relating to building code compliance?

24         MR. D'AMICO:

25             Only as it relates to his

1    expertise.  Not to the frame, not to the

2    roofing.

3              My objection to Henry's questions

4    was it went beyond the scope of his

5    expertise.  As long as we're limited to what

6    is contained in his report, in those areas,

7    I'm not going to carry it outside of those

8    areas.

9         MR. BONE:

10             And the only building code that's

11    contained in his report is the NFPA.

12        MR. D'AMICO:

13             I'm not testifying, it's --

14        MR. BONE:

15             I want to be clear.  Is that what

16    we're going to be limited to?

17        MR. D'AMICO:

18             If that is what is in his report,

19    that's what we are limited to.  That's my

20    understanding.

21        MR. BONE:

22             Thank you.  Then I don't have any

23    other questions.

24    EXAMINATION BY MR. KURTZ:

25        Q.  Mr. Ritter, I have a couple of

1    said, hey, I want to buy one unit.  I -- I

2    don't know if we can --

3        Q.   That's fine.  You haven't

4    investigated that issue?

5        A.   No.

6        Q.   Okay.  The mechanical

7    air-conditioning unit that you think should

8    have been installed in these units, is that

9    correct, that's generally your opinion?

10       A.   It would be a ventilation.

11       Q.   A ventilation unit.  Do you know

12   whether they are more expensive, less

13   expensive or the same cost as the unit, the

14   air-conditioning unit that Forest River used

15   for these travel trailers?

16       A.   They would probably be comparable

17   in cost, but it would be an addition because

18   I would still use the Dometic

19   air-conditioning unit, but add a mechanical

20   ventilation unit that would bring in outside

21   air, dehumidify it and put it inside the

22   unit to positively pressurize it.

23       Q.   So there would have been an

24   additional cost associated with that

25   modification of the travel trailer that

1    you're proposing?

2        A.   Yes, there would be.

3        Q.   Do you know how much that cost

4    would have been?

5        A.   Considering that the retail cost

6    of that unit was probably about $1,200, plus

7    you have to factor in the fact that they

8    would be buying in vast quantities and

9    probably getting some type of discount,

10   maybe on the order of 25, 30, maybe even

11   50 percent of that, they would probably

12   increase their overall cost maybe $1,000,

13   just off the top of my head with -- as I sit

14   here in front of the camera putting the

15   numbers together.

16       Q.   Understood.  I was just looking

17   for your best estimate.

18       A.   Okay.

19   MR. MILLER:

20           Thank you very much, sir.

21   MR. AHLQUIST:

22           I do have some questions, but I

23   have to use the restroom.

24   THE VIDEOGRAPHER:

25           We're off the record; it is 12:52.