UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * | MDL NO. 1873  SECTION: N(5) |
| This Document Relates to: *Lyndon T. Wright. v. Forest River, Inc., et al*, Docket No. 09-2977 | | * * * | JUDGE ENGELHARDT:  MAG: CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FOREST RIVER INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF WILLIAM D. SCOTT**

Defendant, Forest River, Inc., (hereinafter "Forest River"), respectfully requests that the Court exclude certain opinions of William D. Scott. First, Scott's testimony on mold sampling in the trailer should be excluded in its entirety. No medical expert has found a cause-effect relationship between mold and any of plaintiff's alleged health conditions, and Scott's opinions are irrelevant as a result.

Further, Scott's second round of formaldehyde air sampling results should be excluded, as they were obtained through an improper testing methodology. Scott also provided incorrect calculations and figures in his report, all of which should be excluded at trial. Finally, Scott should be precluded from offering any opinions relating to the Lemus study.

I.     **Factual Background**

Plaintiff retained Bill Scott and his company, W.D. Scott Group (collectively, "Scott"), to conduct formaldehyde and mold sampling in the Wright travel trailer. Scott tested the Wright unit on two separate occasions. The first test was performed in October of 2008, only a few months after Wright moved out of his travel trailer in July of 2008. *See generally* Expert Reports of Bill Scott, dated 7/28/09 and 10/2/09, attached as Exs. A and B, respectively; *see also* Deposition of Bill Scott, dated 11/13/09, p. 20-21; 166, attached as Ex. C. This initial 24 hour passive sampling event resulted in a formaldehyde measurement of 0.048 ppm inside the unit.[1]  *See* Exs. A & B.

Following this Court's Order that allowed for additional testing of the Wright unit, Scott conducted a second air sampling, this time following a different protocol. Rather than test the unit as he found it (as he did with his first testing protocol), Scott sealed the unit for three consecutive days; he then conducted a 24 hour passive sampling of the unit followed by a one hour active sample. *See* Deposition of B. Scott, p. 28-29, attached as Ex. C. These tests resulted in levels of 0.13 ppm and .095 ppm, respectively. *See* Ex. B, p. 12. Scott also conducted mold testing inside the Wright unit, the results of which can be found in his October 2, 2009 report. *See* Ex. B, p. 16-18.

II.    **Argument & Citation to Authority**

    **A. Applicable Law Governing Expert Testimony**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness

---

[1] The initial sampling event consisted of a 24 hour passive sample using an Assay Technology, Inc. ChemDisk 571 Aldehyde Monitor. The monitor was placed in the master bedroom near the night stand at a height of twenty-seven inches above floor level. The monitor was exposed to the environment for approximately twenty-three and one-half hours. The monitor was then recovered, placed on ice, and shipped via overnight delivery for laboratory analysis. *See* Ex. A, p. 8.

testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir.2004); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed.Appx. 377, 381 (5th Cir.2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's

reliability.'" (citing *Kumho Tire*, 526 U.S. at 152)). With respect to the determination of relevancy pursuant to Rule 702 and *Daubert*, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003).

     *Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith. The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert." *General Electric v. Joiner*, 522 U.S. 136, 146, 139 L. Ed. 508, 519 (1997). If there exists too great an analytical gap between the data and the opinion offered, the testimony is not reliable. *Id*. *Joiner* reminds district courts that they must review the reasoning used by an expert in applying a given methodology to the expert's ultimate opinion. It is imperative that an expert explains the "how" and the "why" behind his conclusions. *See id*. at 144; *see also Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (stressing that the expert must state both the foundation for his opinions and the reasoning from that foundation). Ultimately, when the evidence does not "fit" with the conclusion, the testimonial evidence is not reliable. *Cavallo v. Star Enterprises*, 892 F. Supp. 756, 761-63 (E.D. Va. 1995), *aff'd in part and rev'd in part*, 100 F.3d 1150 (4th Cir. 1996).

     A district court is to allow the submission of expert testimony only if the expert is qualified to testify by virtue of his "knowledge, skill, experience, training, or education." Fed. Rule of Evid.

702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1998). The qualification of a witness as an expert, separate and apart from the witness' opinion, is a determination that is a discreet, independent and important requirement in considering the admissibility of an expert's testimony. *See U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).

> **B. Any and all testimony from Scott related to mold or mold testing should be excluded in its entirety.**

As the Court is well aware, Wright filed a Motion for Leave to File First Supplemental and Amended Complaint, seeking to add new claims related to mold exposure in the trailer. (Rec. Doc. 1862). The Court granted that motion on July 17, 2009. (Rec. Doc. 2201).

In an effort to prove his mold claims, plaintiff retained Scott to obtain samples of mold inside the unit during the August 2009 testing. Scott did just that and dedicated three pages of his October 2009 expert report to a discussion of his fungal sampling. *See* Ex. "B," October 2009 expert report of Bill Scott, p. 16-18.[2]

Forest River submits that, regardless of Scott's testing methodologies and results, he should not be allowed to offer any testimony related to mold for two reasons. First, Scott's mold analysis is completely irrelevant, as none of plaintiff's medical experts have found that mold caused **any** of Wright's alleged medical conditions. Although discussed more fully in Forest River's Motion for Summary Judgment on causation, plaintiff will be unable to carry his burden to show mold exposure in the trailer caused any of his alleged health problems.

---

[2] A detailed discussion of the mold sampling results can be provided, should the Court request it. For the purposes of the instant motion, however, this analysis is not particularly necessary.

For instance, Dr. Williams, plaintiff's general causation expert, lists the following in her expert report:

"An association exists between mold exposure and nonallergic rhinitis."[3]

This is the <u>only</u> opinion Dr. Williams provides with respect to mold exposure.[4] Dr. Williams, who is well versed in the distinction between a causal link and an association, cannot provide any general causation testimony to link mold to any of Wright's health conditions.

Further, even Dr. Miller, one of plaintiff's specific causation experts, could not point to literature to support a causal link between mold exposure and Wright's respiratory symptoms. He testified:

> Q   All right. Let's talk a little
> bit about the October 2nd report. On Page 6
> of the report, just above the paragraph
> wherein you list the complaints that
> Mr. Wright had, you state that "Mr. Wright
> was likely exposed to various fungal species
> while living in the trailer. Exposure to
> fungi is associated with exacerbations of
> upper and lower airways disease, but
> limitations in the literature do not warrant
> a causal association."
>      Can you tell me what you meant by
> that, Doctor?
> A   Well, very simply, that he was

---

[3] *See* Williams report, p. 63-64, attached as Ex. D.

[4] Dr. Williams does believe a cause-effect relationship exists for the following, however:

> A cause-effect relationship exists between formaldehyde and upper respiratory tract
> damage and cancer.
> A cause-effect relationship exists between formaldehyde and bronchocontriction/asthma.
> A cause-effect relationship exists between formaldehyde and eczema.
>
> *Id.*

> likely exposed to fungi. Now, we know what the fungi were, you know, a year and some time after he left the trailer. We can't know with certainty what they were prior to. And there certainly is -- There's no question about a literature existing on fungal toxins' effects on the respiratory tract.
> **But in my understanding, that literature is not definitive at this point. There's a big literature. It's not exactly clear what does what yet, so that's why I was hesitant to draw any conclusions at that point.**
> Q   Okay. When you say it does "not warrant a causal association," is what you're saying that if you were called upon to testify, your testimony would be that more probably than not there was no causal association between exposure to fungi in Mr. Wright's case and any of the symptoms he's complaining of?
> A   I wouldn't put it that way. I would say based on limitations in the literature, we can't comment one way or the other.
> Q   **Okay. You cannot say more probably than not that fungi caused any of the problems that Mr. Wright is complaining of?**
> A   **Right.**[5]

In a toxic tort case, the plaintiff must prove both general causation and specific causation -- and must do so with competent expert testimony.[6] Wright will not be able to provide either specific or general causation testimony to support any of his mold claims, and, therefore, Scott's mold

---

[5] Deposition of Dr. Miller, p. 106-08, attached as Ex. E (emphasis added).

[6] *Knight v. Kirby Inland Marine Inc.*, 483 F.3d 347, 351 (5th Cir. 2007).

sampling is completely irrelevant. Scott should not be allowed to discuss his mold sampling and analysis when there is no possibility for Wright to recover for his mold exposure.

Furthermore, Scott candidly admitted that he could not determine the type or extent of mold growth that Wright would have been exposed to while he lived in the trailer from March 2006 to July 2008. Scott also has no opinion on the heath effects that such alleged mold exposure would have caused.

> Q. So by virtue of that, there is no opinion contained in your report that connects any health effects with the levels of mold that were sampled in Mr. Wright's unit, correct?
> A. That's correct.
> Q. Have you ever offered those opinions in the past?
> A. No, I'm an engineer.
> Q. Do you believe that's beyond the scope of your expertise to offer any opinion regarding the health effects of mold as it relates to human health effects?
> A. I do.
> * * * *
> Q: Is there any opinion contained in your report that says the level of mold or fungus contained within the Wright trailer as tested in August of 2009, that it would be comparable in any way to the level of mold which was in the trailer at any point between March of 2006 and July of 2008?
> A. No.[7]

Given that the trailer was stored on a FEMA lot for months on end, the critical question for Scott to resolve is not the type of mold in the trailer today, but rather the type that existed in 2006, 2007, or 2008, i.e., when Wright lived in the trailer. As the deposition testimony reveals, he is unable to

---

[7] Deposition of B. Scott, p. 73-75, attached as Ex. C.

make this determination. Thus, should he offer the mold testimony at trial, Scott will only serve to mislead and confuse the jury with respect to Wright's other claims. Because he cannot offer any opinions on the past presence of mold or mold's impact on Wright's heath, his testimony on mold should be excluded in its entirety.

### C. Any and all testimony from Scott related to his second round of formaldehyde air sampling should be excluded.

As discussed above, Scott changed the manner in which he performed the second round of formaldehyde air sampling of the Wright unit. Rather than perform sampling of the unit in the condition he found it, Scott elected to seal the unit for three days without the use of the air conditioner before he began any testing.

Forest River requests that the Court exclude any references to the air sampling results obtained from this second round of testing. By sealing the unit for three days in the middle of August without running the A/C, Scott increased the temperature inside the unit to levels that would not have been experienced by Wright. At his deposition, Wright testified that he utilized the air conditioner to keep the temperature inside the unit around 75 to 80 degrees Fahrenheit. *See* Deposition of Lyndon Wright, p. 126-27, attached as Ex. F. He also opened the windows to allow for air circulation in the unit. *Id.* at p. 128. Numerous witnesses, including plaintiff's mother and former roommate, have also testified that plaintiff regularly left the trailer's windows open. Plaintiff's mother, Bobbie Wright, stayed with Wright in the trailer on multiple occasions and testified the windows stayed cracked:

> Q. Would you ever open the doors and windows of the unit to get some air inside of the trailer?
> A. Open the windows? Yeah, the windows always stayed cracked.

Ex. G, Deposition of Bobbie Wright, p. 195.

Nicole Dison, who lived with plaintiff from March to November of 2006, testified that Wright always kept the windows and doors open:

> Q    Okay. When you cooked in the trailer, did you ever raise the windows?
> A    The windows, we always had the windows up.
> Q    I'm sorry. "We always" -- I'm sorry.
> A    Me and Lyndon, we always had the windows up. When we were sitting in there watching TV or whatever, we would have the windows up.
> * * *
> Q    So there was a lot of ventilation?
> * * *
> A    Yeah.

Ex. H, Deposition of Nicole Dison, p. 59-61.

Scott purposefully avoided simulating these conditions, instead allowing hot air to be trapped inside the unit without the A/C running or windows open. This manipulation of the interior of the trailer, done ostensibly to increase the off-gassing rate of formaldehyde, constitutes an improper testing methodology. As proof, at the end of Scott's one hour sample, the humidity level inside the unit was at the scale's maximum reading, 99.9 % relative humidity. *See* Depo. of Bill Scott, p. 31-33, attached as Ex. C. Even Scott acknowledged that this reading was "out of the ballpark." *Id.* at 33-34. Scott's testing methodology, performed under such extreme conditions, is clearly flawed, and the results unreliable. As such, the formaldehyde sampling performed by Scott should be excluded.

Scott then exacerbated an already improper test by failing to take temperature and humidity readings throughout his sampling event. His report notes an average interior temperature of 84.9

degrees F with 77.1% relative humidity for the 24 hour sample, and an average of 81.9 degrees F at 86.5% relative humidity for the one hour active sample. *See* Scott report, p. 13, attached as Ex. B. These "averages," however, are misleading, in that Scott only took readings at the beginning and end of testing. He did not record temperature and humidity throughout either the 24 hour or 1 hour testing periods. *See* Ex. C, Deposition of Scott, p. 31; 35. Without these continuous measurements, Scott cannot provide data on how hot and humid the trailer became over the course of testing, and other experts cannot fully analyze the impact that these environmental factors had on the formaldehyde levels inside the unit.

By excluding Scott's second round of testing, the jury will be presented with a more accurate depiction of the levels of formaldehyde inside the unit. In fact, Scott himself acknowledged that his prior October 2008 testing was "consistent" with the air sampling results obtained by Forest River's experts at Workplace Hygiene ("Workplace") during their August 2009 testing. Rather than seal with the unit with no air conditioning, Workplace elected to mimic Wright's living conditions by (1) ventilating the unit for approximately 30 hours and then (2) running the air conditioner, set at 75 degrees F, for 48 hours. *See generally* expert report of T. Watson, attached as Ex. I. The one hour active sample returned a level of 0.035 ppm, with the 24 hour passive sample at 0.044 ppm. Significantly, Bill Scott agreed that his October 2008 testing (which found a level of 0.048 ppm) was in line with Workplace's August 2009 test results. He testified:

> A. Well, it's interesting. We,
> obviously, did the sealed test, if you will.
> Okay? Workplace Hygiene followed our work,
> ventilated the trailer for 72 hours, ran the
> HVAC for 72 hours, and then sampled and came
> up with virtually identical results in
> August to what we, the Scott Group, got in

11

>    the October 2008 sampling evolution.
>    Q. All right.
>    A. So either way, you know, pick one,
> you still have all, to my mind, very
> consistent data as to what's going on with
> the formaldehyde levels in the trailer.

> Depo. of Bill Scott, p. 47, attached as Ex. C.

Since Bill Scott maintains that his October 2008 sampling result is both valid and consistent with test results obtained in August of 2009 by Workplace, what is the purpose of Scott's second test? That second test produced artificially high formaldehyde levels that would not have been experienced by Wright. As such, the second test provides no instructive value and is merely an attempt to mislead the jury.

**The Berge Equation**

Scott also has attempted to validate this second round of testing by comparing his October 2008 testing to his August 2009 testing via the Berge Equation. *See* Scott expert report, p. 14, Section D, attached as Ex. B. Scott utilized this equation, which is designed to correlate the off-gassing rate of formaldehyde to temperature and humidity, to confirm that his various sampling events were "consistent." *Id.* Unfortunately for Scott, he failed to input the correct temperature data in his equation, and thus his conclusions were admittedly "flawed." *See* Ex. C, Depo. of B. Scott, p. 57-61. Scott never submitted an amended or supplemental expert report, and, accordingly, Scott should be precluded from discussing the Berge equation or asserting that his two sampling events were "consistent" with one another.[8]

---

[8] Forest River also reasserts those points concerning the Berge equation raised in Gulf Stream's prior Motion to Exclude the Expert Testimony of William D. Scott, Rec. Doc. 3264.
   In that prior Motion, Gulf Stream pointed out that (1) the Berge Formula has no quantifiable rate of error and (2) other courts have excluded its use at trial. *See* Rec. Doc. 3264-

**CDC Testing**

Similarly, Scott's report contains another error which was never corrected. On page 16 of his report, Scott provides a comparison of the Wright trailer to the formaldehyde sampling results obtained by the Centers for Disease Control (CDC). *See* Expert report of Scott, p. 16, attached as Ex. B. At several points in this discussion, however, Scott refers to <u>Fleetwood's</u>, not Forest River's, data sets from the CDC testing. During deposition, Scott could not confirm whether these data sets were that of Forest River or Fleetwood. *See* Deposition of B. Scott, p. 70-72, attached as Ex. C. Scott never submitted a revised or supplemental expert report to address these deficiencies. Accordingly, Scott should not be allowed to provide any comparison of the Wright trailer's formaldehyde sampling to the CDC's results.

**D.     Scott should be precluded from discussing the Lemus study.**

Finally, Scott dedicates a portion of his October 2009 expert report to a critique of the Lemus study. *See* Ex. B, Scott expert report, p. 3-4. Defendants rely on the Lemus study for its discussion and analysis of indoor air quality in Louisiana homes. *Id.* Scott opines that the study has "significant flaws and shortfalls" and lists several alleged weaknesses: the study does not (1) include precise temperature/humidity data; (2) distinguish "rural" from "urban" homes; (3) discuss the size of the homes or their HVAC systems; (4) examine a statistically significant portion of homes in Louisiana.

Even if Scott's criticisms are valid, a point that Forest River vehemently denies, he should still not be allowed to offer these opinions at trial. Scott has not conducted a sufficient examination

---

2, p. 8-9 (*citing Wallace v. Meadow Acres Manufactured Housing Inc.,* 730 N.E.2d 809 (Ind. Ct. App. 2000), trans. denied, (Ind. Feb. 5, 2001)). The formula should be excluded here for those same reasons.

of this study and its underlying data, and he therefore lacks a proper foundation upon which to offer any legitimate analysis of the Lemus study. Scott testified:

> Q. All right. Did you ever contact the folks who wrote the Lemus study to see if you could get access to their background data?
> A. No.
> Q. Didn't do that?
> A. No.
> * * *
> Q. Was any attempt made by you to gather the data that went into creating the Lemus study?
> A. No. I read the data that was presented in the study.
> Q. All right. So you didn't try to go behind the four corners of the study to determine what the data was and where it came from?
> A. No. I read the study at its face value and commented on it.
> Q. So you don't know if they actually had temperature readings for all of the data points that they took?
> A. No. They don't have temperature data in the report that was published that everybody seems to be relying on.
> * * *
> Q: Have you ever written anything in peer-reviewed literature challenging that study?
> A. Of course not. You know that.
> * * *
> Q. Now, you mentioned that there are only 53 data points related to the Lemus study; is that accurate?
> A. I believe that's what he indicated.
> Q. Weren't there more than 400 data points relating to 53 homes?
> A. Fifty-three locations, yeah.

14

> Q. Right.
> A. Fifty-three locations. More than 400 data points related to 53 locations. Yes, you are correct.
> Q. And again, you don't know whether all of these factors may have been controlled for in the raw data; in other words, whether the Lemus study sought out just 53 single-family residences of similar size?
> A. One would assume that would have been stated in the paper.
> Q. Okay. But you don't know?
> A. Since it wasn't stated, the presumption is, they did not.
> Q. Do you know how they selected the homes for the study in the Lemus study?
> A. Obviously not, there's not a word spoken about it.
> Q. And you did no independent investigation to determine that, did you?
>   I have to ask the questions.
> A. I am critiquing the Lemus study. Okay? I did not conduct, once again, an independent investigation of something that was written a dozen years ago.

Depo. of Bill Scott, p. 92-94; 96; 103-04, attached as Ex. C.

As the testimony above demonstrates, Scott has done nothing to substantiate his criticisms of the Lemus study. He has not performed any meaningful investigation or examination of the underlying data or methodologies used in the study, nor has he provided a detailed, scientific assessment of the sample size used in this study. In short, Scott has resorted to a mere *ipse dixit* critique – *i.e.,* because he says it, it must be a valid expert opinion. This is not the case, as he has not gone behind any aspects of the study to provide any foundation to his rebuttal. Any references by Scott to the Lemus study should therefore be excluded.

### III.  Conclusion

For the foregoing reason, Forest River requests that this Honorable Court enter an Order precluding the discussion of Bill Scott's mold sampling, formaldehyde sampling, use of the Berge equation, or unfounded criticisms of the Lemus study as such sampling and testimony does not meet the requisite standards of relevance or reliability required for its admission.

Respectfully submitted,

/s/ Jason D. Bone
ERNEST P. GIEGER, JR. (6154)
JASON D. BONE (28315)
CARSON W. STRICKLAND (31336)
GIEGER, LABORDE & LAPEROUSE, LLC
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana  70139-4800
Telephone:  (504) 561-0400
Facsimile:  (504) 561-1011
ATTORNEYS FOR FOREST RIVER, INC.

### **C E R T I F I C A T E**

I hereby certify that on the 9th day of February, 2010, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone