1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  FEMA TRAILER        MDL NO. 1873

5    FORMALDEHYDE PRODUCTS       SECTION N(4)

6    LIABILITY LITIGATION        JUDGE ENGELHARDT

7    (This document relates

     to "Lyndon Wright v. Forest

8       River, et al.")

9                    *   *   *

10

11           VIDEOTAPED DEPOSITION OF WILLIAM

12   D. SCOTT, P.E., 1117 WRIGHT AVENUE, GRETNA,

13   LOUISIANA 70056, TAKEN AT THE OFFICES OF

14   FRANK D'AMICO, ATTORNEY AT LAW, 622 BARONNE

15   STREET, NEW ORLEANS, LOUISIANA 70112, ON THE

16   13TH DAY OF NOVEMBER, 2009.

17

18

19   REPORTED BY:

20       CATHY RENEE´ POWELL, CCR

         PROFESSIONAL SHORTHAND REPORTERS

21       (504)529-5255

22   VIDEOGRAPHER:

23       BRIAN SOILEAU

         PROFESSIONAL SHORTHAND REPORTERS

24       (504)529-5255

25

1    you intend to express in this case, correct?

2         A.   Yes.

3         Q.   In terms of the relation between

4    the July report that you produced and this

5    report, is this report intended to supersede

6    your July report?

7         A.   Yes.

8         Q.   Let's talk about your October 2

9    report then.

10        The report you generated in this

11   particular case in terms of the work that

12   was performed that went into the report,

13   what did that consist of in terms of on-site

14   work related to the Wright trailer?

15        A.   And we're speaking of the second

16   sampling event?

17        Q.   Well, in terms of the work that

18   was performed by the Wright -- excuse me, by

19   the Scott Group in relation to the Wright

20   trailer, what work was performed that forms

21   the basis for the opinions contained in this

22   report?

23        A.   I understand.  It covers the --

24   the report covers the initial sampling

25   event, which I believe was October 8, 2008,

1    where the trailer was still located at its

2    position on Wright's, or, I guess, correctly

3    Wright's mother's property on Seminole

4    Street.  And then it speaks to the work done

5    in August 2009 that was conducted at the

6    Melville FEMA marshaling yard for several

7    days, several weeks.

8              So those two events are covered.

9         Q.   And as I appreciate it, the test

10   that was performed in October of 2008 was a

11   test purely for the presence of

12   formaldehyde, correct?

13        A.   The -- well, the test, yes, the

14   analytical testing was purely for

15   formaldehyde.  There was a visual inspection

16   as well.

17        Q.   All right.  There was a visual

18   inspection for what?  For what purpose?

19        A.   For the purpose of establishing

20   the general condition of the trailer at the

21   time of the sampling.

22              For example, was the HVAC system

23   in operation or not?  Were the windows open

24   or closed?  What was the temperature?  What

25   was the relative humidity pretesting,

1    that was performed, what did you use to

2    collect that particular sample?

3         A.   We used a ChemDisk Model 571

4    aldehyde unit, which I brought a physical --

5    as you call it, an exemplar.  And it's --

6    that's exactly what we used.  Perhaps a --

7    or, surely, a different lot number.

8         Q.   At the time you began testing, was

9    there a protocol in place for how the unit

10   was to be prepared before you began your

11   formaldehyde sampling?

12        A.   Yes.  It was -- I had previous --

13   previous to the sampling event, probably by

14   four calendar days, we can pin that down if

15   you need me to, I verified that I visually

16   inspected the unit, made sure everything was

17   closed, windows, doors, vents, put security

18   tape on them to validate their closure and

19   so it sat 72, 96 hours prior to testing in a

20   closed condition with the HVAC, obviously,

21   off.  There was no power.

22        Q.   So before performing the

23   formaldehyde sampling that you performed in

24   August of 2009, the unit was sealed,

25   essentially, in terms of making sure all the

1    openings to the unit were closed, and no

2    entry was permitted for at least 72 hours

3    prior to sampling, correct?

4         A.    Correct.

5         Q.    What was the purpose of sealing

6    the unit for 72 hours?

7         A.    The purpose was just to -- just to

8    stabilize the unit in that condition as a --

9    as a point of normalization and get rid of a

10   bunch of variables in terms of diesel

11   exhaust from one-ton pickup trucks, you name

12   it, the activities that occurred on the

13   site.

14             And that's what we did.

15        Q.    You mentioned that the purpose was

16   to eliminate certain variables.  Other than

17   diesel exhaust, what types of variables were

18   you intending to exclude?

19        A.    Well, I don't know.  I mean, the

20   point being, that was just an easily

21   recognizable, easily implementable baseline

22   condition.

23             It didn't depend on external

24   power, it didn't depend on which way the

25   wind was blowing or whether it rained that

1   active, you simply took a measurement at the

2   commencement of the test and at the end of

3   the test, correct?

4       A.   That's right.

5       Q.   Was there any data logger deployed

6   that measured the temperature of the course

7   of that hour?

8       A.   No.

9       Q.   What was the relative humidity

10  during that test?

11      A.   In the beginning, we had

12  81.6 degrees Fahrenheit and 73.7 percent

13  relative humidity.

14           At the end point, 0902, we had

15  82.2 degrees Fahrenheit and 99.9 percent

16  humidity.

17      Q.   All right.  At the end of the

18  testing for the active sample, in fact, your

19  humidity meter was pegged off the scale.

20  That was the highest reading, 99.9 percent,

21  that that meter could read?

22      A.   It wasn't pegged off the scale.

23  It was indicating maximum, yes.

24      MR. D'AMICO:

25           What page are you reading from?

```
 1          THE WITNESS:
 2                  Well, this is in the appendices,
 3     it is attachment 5.
 4          MR. D'AMICO:
 5                  Can you give me the Bates number?
 6          THE WITNESS:
 7                  Well, I'm working off my copy, I
 8     don't --
 9          MR. BONE:
10                  Let me see.  I can probably pull
11     it.
12          MR. D'AMICO:
13                  093.
14          MR. BONE:
15                  It's Bates No. 91, I believe.
16          THE WITNESS:
17                  No, that's the passive sampling.
18          MR. D'AMICO:
19                  It's 93, like I said.
20          MR. BONE:
21                  93.
22          THE WITNESS:
23                  Yes, 93.
24     EXAMINATION BY MR. BONE:
25          Q.   So at the end of the active
```

1     sample, we were at 99.9 percent relative

2     humidity, which is when the passive sample

3     for 24 hours began, correct?

4          A.   Yes.

5          Q.   All right.  In terms of the

6     passive sampling that was performed, that

7     was performed over a period of roughly 24

8     hours?

9          A.   Yes.  Well, let's go back to the

10    commencement of the sampling for a minute.

11            The -- the -- I attribute,

12    obviously, the 99.9 percent humidity as an

13    aberration, okay?  I attribute that to two

14    things in retrospect.

15            One is, we put a passel of people

16    in there.  I don't know precisely how many,

17    but a bunch, and they were all concentrated

18    in that front bedroom exhaling water vapor.

19            And the second thing was that

20    there was a water bottle sitting in that

21    room that was sweating like -- drinking

22    water, a cold bottle of water that somebody

23    brought in and set up.  It was sweating like

24    crazy.  I suspect that that was the reason

25    that the humidity value was there.

1       Q.   Right.  How the humidity value got

2   there, the humidity value was still 99 --

3       A.   It was still -- it was still --

4   yeah, no question about that.

5       Q.   All right.  So --

6       A.   It's just interesting because it's

7   kind of out of the ballpark.

8       Q.   Even though you considered it to

9   be an aberration, the aberration still

10  existed at the time of your sampling?

11      A.   No doubt.

12      Q.   And at the time of the

13  commencement of the 24-hour sampling, the

14  relative humidity in that trailer was

15  99.9 percent.

16  MR. D'AMICO:

17          Object to the form.

18  THE WITNESS:

19          Well, it's whatever we recorded at

20  the commencement of that.  What did it say?

21  EXAMINATION BY MR. BONE:

22      Q.   And that I believe is Bates No.

23  91.

24      A.   Again, I don't have the benefit of

25  the Bates number, but yeah, I believe

1   it's --

2       MR. D'AMICO:

3           Here is 91.

4       THE WITNESS:

5           Correct.

6   EXAMINATION BY MR. BONE:

7       Q.   All right.  Now, did you deploy

8   data loggers to record temperature and

9   humidity over the course of this 24-hour

10  sampling?

11      A.   No.

12      Q.   So you have no objective data to

13  verify at what point the humidity level

14  changed from the 99.9 percent to

15  54.2 percent, correct?

16      A.   Well, there wasn't a point where

17  it changed.  It was a gradual change.

18      Q.   Right.  But we don't know --

19      A.   There was not a step change, for

20  sure.

21      Q.   But we don't know whether it was

22  maintained for 12 hours, 10 hours, 5 hours

23  or 23 hours, do we?

24      MR. AHLQUIST:

25          Object to the form.

1    months, ten months, that the unit was opened

2    up and in operation.

3         Q.    Okay.  So what you're telling me

4    is, you would expect at least the readings

5    to be comparable if all other variables were

6    equal.

7         A.    Uh-huh.

8         Q.    "Yes"?

9         A.    Yes.  And that's what happened.

10        Q.    And let's talk about that.

11             How do you -- how do you know that

12   to be true?

13        A.    Well, it's interesting.  We,

14   obviously, did the sealed test, if you will.

15   Okay?  Workplace Hygiene followed our work,

16   ventilated the trailer for 72 hours, ran the

17   HVAC for 72 hours, and then sampled and came

18   up with virtually identical results in

19   August to what we, the Scott Group, got in

20   the October 2008 sampling evolution.

21        Q.    All right.

22        A.    So either way, you know, pick one,

23   you still have all, to my mind, very

24   consistent data as to what's going on with

25   the formaldehyde levels in the trailer.

1       A.    Okay.

2       Q.    What would you be looking for in

3   terms of a difference between the two

4   corrected values to determine whether the

5   fit was good or not?  What percentage

6   difference would trigger, in your mind, that

7   the fit was not good?

8       A.    There is not a bright-line

9   threshold that the fit is good or the fit is

10  bad.  It's -- it's a judgment call.

11      Q.    All right.  Fifty percent

12  difference.  Good fit or not good fit?

13      A.    I'm not going to play the game,

14  counselor.  It's -- it's a judgment call,

15  and I don't know what that number is.  Okay?

16      Q.    So you couldn't offer an opinion

17  as to what that value would be?

18      A.    Let's look at a specific case,

19  let's crank the numbers and we can talk

20  about that.

21      Q.    All right.  Well, specifically in

22  this case, you corrected the August value

23  from an average temperature of 84.9 degrees

24  Fahrenheit down to 72 degrees using the

25  Berge equation, correct?

1          A.    Correct.

2          Q.    And it went from 130 to 59,

3    correct?

4          A.    Correct.

5          Q.    And then you said the event --

6          MR. D'AMICO:

7                130 PPB.

8    EXAMINATION BY MR. BONE:

9          Q.    130 PPB to 59 PPB.

10         MR. D'AMICO:

11                Just so the record is correct.

12         MR. BONE:

13                Oh, absolutely.  I don't want to

14   be unclear.

15   EXAMINATION BY MR. BONE:

16         Q.    On page 14 of 19 of your report,

17   you state that "The increase to an average

18   temperature of 84.9 degrees Fahrenheit for

19   the second passive sampling event from the

20   average temperature of 72 degrees Fahrenheit

21   encountered in the THU in the initial

22   passive sampling event results in a

23   temperature adjusted second passive sampling

24   event airborne formaldehyde concentration of

25   approximately .059 PPM or 59 parts per

1    billion from the measured 130 parts per

2    billion."

3              Correct?

4         A.   That's what it says, yeah.

5         Q.   All right.

6         A.   I'm looking at something.  Please

7    bear with me.

8              Okay.  That -- counsel, that's

9    flawed.  That's flawed.  I think that's a

10   legacy from a prior report.

11        Q.   It's not just flawed, it's

12   extraordinarily flawed, isn't it?

13        A.   It's flawed in the temperature

14   term.

15        Q.   Right.

16        A.   It's not extraordinarily flawed.

17   It's flawed, you know, is 10 degrees F

18   extraordinary?  Okay.

19        Q.   Okay.

20   MR. D'AMICO:

21              What are you looking at?

22   MR. BONE:

23              We'll get to it.

24   EXAMINATION BY MR. BONE:

25        Q.   When you said you determined there

1    was a flaw now in your calculation, what

2    flaw are you referring to?

3          A.    Using -- using the average

4    temperature for the initial passive

5    sampling.

6          Q.    Right.  The initial -- what was

7    the real --

8          A.    The real --

9          Q.    -- temp -- the real average

10   temperature during your initial --

11         A.    Approximately 85 degrees.

12         Q.    85 degrees, not 72 degrees?

13         A.    You are correct.

14         Q.    So it was actually a higher

15   average temperature than what you got in

16   August of 2009?

17         A.    You are correct.

18         Q.    So if we ran the Berge equation to

19   correct the temperature on that test, do you

20   know what the result would be?

21         A.    Yes.  It would be an increase.

22         Q.    It would be an increase from 48

23   parts per billion?

24         A.    If we took -- I'll tell you what,

25   I am going to look at that, okay?

1        Q.   It's not in your report, is it?

2        A.   It's not in my report.  You are

3   quite correct, I will cede that to you.

4        Q.   All right.  And it's not in your

5   report because the average temperature you

6   used for the initial sampling event in 2008

7   is wrong and it's off by at least

8   13 degrees?

9        A.   I'll buy that.

10       Q.   That's correct?

11       A.   That's correct.

12       Q.   So the conclusion of Section D of

13   your report on page 14 of 19, you can't say

14   that that is an accurate conclusion,

15   correct?

16       A.   Well, I can't say it based on the

17   data in the prior paragraph.  You are quite

18   right.

19       Q.   All right.

20       A.   The fact is, real world, it still

21   is, but you're reading it like a machine and

22   you are correct.

23       Q.   Well, you obviously relied on the

24   Berge equation or you wouldn't have included

25   it in your report; isn't that true?

```
1    it, we'll come back and talk about it.  If

2    the Court says he can't testify about it,

3    then it's obviously moot.

4         MR. D'AMICO:

5              Again, he's already talked about

6    it, you questioned him about it at length.

7    You wouldn't let the court reporter take a

8    break so you could question him about it.

9    And he testified to it already.  And he's

10   already disputed your hypothetical as to the

11   correction of 0.21.  He said, "I don't know

12   where you got that number."

13             That doesn't jibe with my

14   calculations.

15        MR. BONE:

16             All right.  How long were we off

17   the record?

18        THE VIDEOGRAPHER:

19             Fourteen minutes.

20   EXAMINATION BY MR. BONE:

21      Q.   All right.  Mr. Scott, turning now

22   to page 16 of your report, you referenced

23   "The CDC in its final report states the

24   following."

25             And under Section 1, you
```

1   referenced "The range of formaldehyde

2   concentrations detected in the 36 Forest

3   River travel trailers sampled was from 17

4   PPB to 510 PPB.  The CDC's Fleetwood data

5   set geometric mean was reported as 82 parts

6   per billion."

7            Did I read that correctly?

8        A.   That's a typo.

9        Q.   Are you sure the data set's

10  geometric mean for Forest River was 82 parts

11  per billion?

12       A.   Not without looking at this point,

13  no.

14       Q.   Okay.  Do you know if Fleetwood's

15  geometric mean was 82 parts per billion?

16       A.   At this point, I recognize there

17  is a typo, and without further looking at

18  it, I can't tell you either.

19       Q.   Okay.  So as we sit here today --

20       A.   That may have be an artifact

21  regarding Fleetwood that may have been a

22  failure to substitute Forest River for

23  Fleetwood in that statement.  I don't know

24  which, standing here right now.

25       Q.   So as we sit here today, you can't

1    determine whether this statement,

2    "Fleetwood's data set's geometric mean was

3    reported as 82 parts per billion" is

4    accurate as it would relate to Forest River?

5        A.   That's correct.

6        Q.   Two paragraphs down, "Given the

7    behavior of formaldehyde concentrations in

8    air with respect to temperature, as shown in

9    Paragraph D above," which relates to your

10   Berge calculations, "the actual formaldehyde

11   concentration measured in the Wright THU

12   sampling event, the sampling event results

13   are consistent with the CDC's finding for

14   Fleetwood's THUs."

15             Did I read that correctly?

16       A.   You did.

17       Q.   Again, this is incorrect, right?

18       A.   That is a typo, you are correct.

19       Q.   All right.  Now, you turn to the

20   sampling relating to fungus, or mold,

21   correct?

22       A.   Yes.

23       Q.   All right.  In terms of the

24   sampling that was performed, that was

25   performed in August of 2009, correct?

1       A.    Correct.

2       Q.    And the only sampling that your

3  group would have performed would have been

4  during that period of time, August 8th, 9th

5  of 2009?

6       A.    Well, it was later than that, but

7  in that couple-of-week period.

8       Q.    In that week period.  So there was

9  no sampling done, for example, in October of

10  2008 relating to mold?

11      A.    That's correct.

12      Q.    You offered the opinion, or the

13  statement on page 18 of your report just

14  before the end of the report text, "The

15  laboratory analysis results are contained in

16  Appendix 8.  The association of results of

17  the fungal organism sampling and analysis

18  with human health effects are beyond the

19  scope of this investigation."

20          Did I read that correctly?

21      A.    You did.

22      Q.    So by virtue of that, there is no

23  opinion contained in your report that

24  connects any health effects with the levels

25  of mold that were sampled in Mr. Wright's

1    unit, correct?

2         A.    That's correct.

3         Q.    Have you ever offered those

4    opinions in the past?

5         A.    No, I'm an engineer.

6         Q.    Do you believe that's beyond the

7    scope of your expertise to offer any opinion

8    regarding the health effects of mold as it

9    relates to human health effects?

10        A.    I do.

11        Q.    Is there any opinion in your

12   report that discusses whether the sampling

13   performed in August of 2009 would accurately

14   reflect what Mr. Wright would have been

15   exposed to prior to July of 2008?

16        A.    If I understand your question

17   correctly, do we quantitatively predict what

18   Mr. Wright was exposed to based on the

19   sampling we've done at any time?  No.

20        Q.    Is it --

21        A.    But --

22        Q.    I'm simply asking, is it in your

23   report?

24        A.    But contained in my report is the

25   strong opinion that the levels of

1    formaldehyde within the trailer prior to

2    either sampling event were significantly

3    higher as a result of that off-gassing

4    phenomenon we discussed earlier.

5        Q.   I understood all that.  I am

6    simply relating to mold here.

7        A.   Oh, mold, I'm sorry.  I don't

8    think you said that.  If you did, I

9    apologize.

10       Q.   I tried to.  If I didn't, the

11   record will reflect that.  So let me ask my

12   question again.

13            Is there any opinion contained in

14   your report that says the level of mold or

15   fungus contained within the Wright trailer

16   as tested in August of 2009, that it would

17   be comparable in any way to the level of

18   mold which was in the trailer at any point

19   between March of 2006 and July of 2008?

20       A.   No.

21       Q.   There is an attachment to your

22   report, the handwritten notes of

23   Ms. Diamond, which is Bates No. 84 for those

24   of us who have Bates-numbered copies.

25            Are you at that document?

1    got 53 data points, and he says they were

2    distributed, but he doesn't say how.  One

3    was taken in the fall, 52 were taken in the

4    summertime?  I don't know.

5        Q.   All right.  But my question is

6    more discrete, and if you can answer it,

7    please do.

8              Are you saying, as your

9    criticisms, one of the criticisms that you

10   have enumerated here, that you cannot rely

11   upon a study that measures formaldehyde

12   levels if you do not have the temperature

13   readings when those formaldehyde levels were

14   recorded?

15       A.   Yes.  It's an important component

16   in understanding what the formaldehyde

17   levels are.

18       Q.   All right.  Did you ever contact

19   the folks who wrote the Lemus study to see

20   if you could get access to their background

21   data?

22       A.   No.

23       Q.   Didn't do that?

24       A.   No.

25       Q.   You mentioned that you knew two of

1    the individuals involved in creating the

2    Lemus study, correct?

3        A.   Yes.

4        Q.   And knew them well enough to pick

5    up the phone and call them as one of them

6    was your advisor, true?

7        A.   I'm not sure about that; but yeah,

8    I know who they are.

9        Q.   All right.

10       A.   Actually, Tom Akers is retired and

11   no longer in the area.  I don't know where

12   he is.

13       Q.   Was any attempt made by you to

14   gather the data that went into creating the

15   Lemus study?

16       A.   No.  I read the data that was

17   presented in the study.

18       Q.   All right.  So you didn't try to

19   go behind the four corners of the study to

20   determine what the data was and where it

21   came from?

22       A.   No.  I read the study at its face

23   value and commented on it.

24       Q.   So you don't know if they actually

25   had temperature readings for all of the data

Case 2:07-md-01873-KDE-MBN   Document 11397-4   Filed 02/09/10   Page 25 of 29

1   points that they took?

2        A.   No.  They don't have temperature

3   data in the report that was published that

4   everybody seems to be relying on.

5        Q.   Okay.  So they didn't have

6   temperature readings in the report, but you

7   don't know if temperature readings were

8   taken --

9        A.   No.

10       Q.   -- at the --

11       A.   They didn't specify the seasonal

12  distribution of the samples.  That's what

13  that comment says.

14       Q.   Understood.  And --

15       A.   That's what the comment says.

16       Q.   And do you know why temperature

17  was not included in the report itself?

18       A.   Well, obviously not.

19       Q.   Did you read in the report, for

20  example, that there were mild to minimal

21  temperature variations due to the use of

22  HVAC systems?

23       A.   What does that mean?

24       MR. AHLQUIST:

25            Object.

1       MR. AHLQUIST:

2              Object to the foundation.

3   EXAMINATION BY MR. BONE:

4       Q.   Correct?

5       A.   My objections to the paper are

6   what they are.  You can create whatever

7   comments you choose to from that, but the

8   fact is, it's a crummy paper.

9       Q.   All right.  It's a crummy paper.

10  Have you ever written anything in

11  peer-reviewed literature challenging that

12  study?

13      A.   Of course not.  You know that.

14      Q.   And I may know that, the jury

15  doesn't know that.  So I have to ask these

16  questions, and I know that you may be

17  uncomfortable answering some of these

18  questions --

19      A.   It's not -- it's not a matter of

20  comfort.

21      Q.   -- but I need you to answer the

22  questions.

23      A.   I answered it.

24      Q.   All right.  And because you

25  haven't seen the raw data, I take it then

1    EXAMINATION BY MR. BONE:

2         Q.   Now, you mentioned that there are

3    only 53 data points related to the Lemus

4    study; is that accurate?

5         A.   I believe that's what he

6    indicated.

7         Q.   Weren't there more than 400 data

8    points relating to 53 homes?

9         A.   Fifty-three locations, yeah.

10        Q.   Right.

11        A.   Fifty-three locations.  More than

12   400 data points related to 53 locations.

13   Yes, you are correct.

14        Q.   And again, you don't know whether

15   all of these factors may have been

16   controlled for in the raw data; in other

17   words, whether the Lemus study sought out

18   just 53 single-family residences of similar

19   size?

20        A.   One would assume that would have

21   been stated in the paper.

22        Q.   Okay.  But you don't know?

23        A.   Since it wasn't stated, the

24   presumption is, they did not.

25        Q.   Do you know how they selected the

1    homes for the study in the Lemus study?

2        A.   Obviously not, there's not a word

3    spoken about it.

4        Q.   And you did no independent

5    investigation to determine that, did you?

6             I have to ask the questions.

7        A.   I am critiquing the Lemus study.

8    Okay?  I did not conduct, once again, an

9    independent investigation of something that

10   was written a dozen years ago.

11       Q.   The levels you discussed in your

12   report relating to various exposure levels

13   set forth by OSHA, NOSH -- NIOSH -- OSHA,

14   NIOSH, excuse me, ACGIH, et cetera.

15   (Discussion off the record.)

16   EXAMINATION BY MR. BONE:

17       Q.   You take issue with whether OSHA,

18   NIOSH or ACGIH standards could be applied to

19   a residential dwelling, correct?

20       A.   Yes.

21       Q.   And you take issue with whether

22   they can be applied to any situation outside

23   the occupational setting, correct?

24       A.   My point is, when you say "any,"

25   see, that's a real global word.  Okay?  And

1    were putting your report for this case

2    together?

3        A.   I may have.  I don't recall

4    specifically.

5        Q.   Do you recall talking to her about

6    these notes?

7        A.   Again, not specifically.

8        Q.   See at the bottom, there are some

9    notes, "Lyndon Wright, 701-6079"?

10       A.   Yes.

11       Q.   Do you know what the purpose of

12   that notation is?

13       A.   I presume that's a contact phone

14   for Mr. Wright.

15       Q.   Okay.  Do you know why Ms. Diamond

16   would have been calling Mr. Wright in

17   connection --

18       A.   I would expect, as we discussed

19   before, as part of gaining access to the

20   trailer because I imagine Mr. Wright had the

21   key.

22       Q.   Okay.  Do you know when Mr. Wright

23   moved out of this trailer?

24       A.   I understand it was July of 2008.

25       Q.   So at the time the sample was