```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE:  FEMA TRAILER        MDL NO. 1873
 5   FORMALDEHYDE PRODUCTS       SECTION N(4)
 6   LIABILITY LITIGATION        JUDGE ENGELHARDT
 7   (This document relates
     to "Lyndon Wright, et al.
 8   v. Forest River, Inc.,
     et al.")
 9
10                      *   *   *
11
                VIDEOTAPED DEPOSITION OF STEPHEN
12   SMULSKI, Ph.D., 453 WENDELL ROAD,
     SHUTESBURY, MASSACHUSETTS 01072, TAKEN AT
13   THE LAW OFFICES OF FRANK D'AMICO, 622
     BARONNE STREET, NEW ORLEANS, LOUISIANA
14   70112, ON THE 29TH DAY OF JANUARY, 2010.
15
16   REPORTED BY:
17       CATHY RENEE´ POWELL, CCR
         PROFESSIONAL SHORTHAND REPORTERS
18       (504)529-5255
19   VIDEOGRAPHER:
20       MICHAEL BERGERON
         PROFESSIONAL SHORTHAND REPORTERS
21       (504)529-5255
22
23
24
25
```

1   of the formulation of the testing protocol

2   that was going to be employed, was that

3   suggestion something that you suggested be

4   done?

5        A.   It was a question that needed to

6   be answered, were these composite wood

7   products made with urea-formaldehyde

8   adhesive or not.

9             There were basically three ways to

10  do that.  The other party, yourself, could

11  stipulate that yes, they were; we could rely

12  on information contained in the grade stamps

13  on those products; or we could actually have

14  some type of chemical testing done to make

15  that determination.

16       Q.   And so the chemical testing that

17  would be done would be simply to determine

18  what the bonding agent was?

19       A.   Right.  Was it a urea-formaldehyde

20  adhesive or some other adhesive.

21       Q.   Is it a true statement then, sir,

22  that based upon the age of a trailer, that

23  chemical testing cannot evaluate or -- let

24  me put it this way.

25             The testing in general of the

1    component wood products cannot determine

2    what the emission rate would have been in

3    the past?

4         MR. D'AMICO:

5              Object to the form.

6         THE WITNESS:

7              Yes, because what you would be

8    seeing is a point in time snapshot.  If you

9    were to remove the materials today and test

10   them, that would tell you what is happening

11   today.

12   EXAMINATION BY MR. BONE:

13        Q.   And from what was happening today,

14   is there any way to extrapolate what would

15   have been happening four years ago?

16        A.   That question is outside of my

17   expertise.

18        Q.   But from your perspective in

19   discussing the wood products with respect to

20   the unit at issue in this case, you never

21   made the representation that if we take

22   component samples of these wood products and

23   test them, we can determine what the

24   particular emission rate of that wood would

25   have been in the past?

1          A.   That's correct, I never made that

2     statement.

3          Q.   Did you ever make -- maybe not

4     worded exactly that way, but did you ever

5     make that representation?

6          MR. D'AMICO:

7               Object to the form.

8          THE WITNESS:

9               I don't believe so, no, because

10    again, it is outside of my expertise.

11    EXAMINATION BY MR. BONE:

12         Q.   So would you agree, then, with the

13    statement that testing of this wood four

14    years out would not prove anything other

15    than the wood product contained UF resins?

16         MR. D'AMICO:

17               Object to the extent it is beyond

18    this expert's scope of his report.

19         THE WITNESS:

20               Again, it would indeed confirm

21    what the preservative -- excuse me, the

22    adhesive was, but again, it is a point in

23    time snapshot.

24    EXAMINATION BY MR. BONE:

25         Q.   And so do you agree or disagree

1    with the statement that I read to you?

2         A.   Could you repeat it, please?

3         Q.   Certainly.

4              "Testing of this wood four years

5    out would not prove anything other than the

6    wood product contained urea-formaldehyde

7    resin."

8         A.   In general, yes.

9         Q.   And do you agree with this

10   statement:  "There would be absolutely no

11   way to determine, based upon such testing,

12   if the wood product was, in fact, low

13   formaldehyde-emitting or not."

14        A.   In general, but it may be possible

15   if there is a difference in formulation

16   between what I will call regular

17   urea-formaldehyde adhesives and low-emitting

18   formaldehyde adhesives.

19        Q.   And what would the difference in

20   formulation that you would be looking for

21   be?

22        A.   I don't know.  Again, I'm not a

23   chemist.  It's outside my area of expertise.

24        Q.   Are you aware of any difference in

25   formulation of LFE UF bonding resins versus

```
 1          THE WITNESS:

 2              I was allowed to remove, cut into,

 3      disassemble things at will, yes.

 4      EXAMINATION BY MR. BONE:

 5          Q.   Was there any portion of your

 6      testing protocol that you wished to perform

 7      that you were in any way precluded from

 8      performing in this case?

 9          A.   No.

10          MR. D'AMICO:

11              Is that part of his reliance

12      material?

13          MR. BONE:

14              This is actually part of the file

15      material that I got today.

16          MR. D'AMICO:

17              I don't know that I have seen

18      that.  I would like a copy of it.

19          MR. BONE:

20              Sure.  There may be a couple more

21      before we take a break, and you want to do

22      that and make copies?

23          MR. D'AMICO:

24              That would be fine.  You want to

25      take a break now?
```

1          A.   Yes.

2          Q.   Was that water intrusion ongoing

3     at the time you observed it?

4          A.   There's no indication that that

5     area was wet.

6          Q.   Did you take any moisture or

7     observe any moisture samples being taken of

8     that location?

9          A.   My recollection is somebody in the

10     trailer was using a moisture meter, yes.  I

11     don't recall who it was.

12          Q.   And having looked through your

13     reliance material and your file, I see none

14     of the moisture meter readings taken by

15     either the defense or plaintiff's experts.

16     Do you have any of those somewhere else and

17     you just haven't included them?

18          A.   I have never seen them.

19          Q.   And so if those -- Mr. LaGrange,

20     for example, and Mr. Mallet have testified

21     that that was an active leak, do you have

22     any reason to dispute that?

23          A.   No.

24          Q.   At the door, you mentioned that

25     you found a leak.  Was that leak also active

1    where you found water intrusion into this

2    particular unit during your August 2009

3    visit?

4         A.   Yes, it is.

5         Q.   Now, you say that the intrusion of

6    water allowed mold fungi to grow on some of

7    the solid softwood wall framing, hardwood

8    plywood wall panels and softwood plywood

9    subfloors of these locations.  Did I read

10   that correctly?

11        A.   Yes.

12        Q.   Do you know when that mold growth

13   first occurred?

14        A.   No.

15        Q.   I note from your file materials

16   that there is no mold testing data contained

17   within any of your reliance or file

18   materials.  Is that accurate?

19        A.   That's correct.

20        Q.   And do you take any position as to

21   whether there was a level of mold or fungi

22   within this unit during the time that

23   Mr. Wright occupied it that would have been

24   sufficient to cause him any problems?

25        A.   All I can tell you is that on the

1    two days I was there doing the inspection,

2    there was rot fungi in three locations and

3    mold fungi.

4         Q.   And the levels of that fungi were

5    measured by others, not yourself, correct?

6         A.   Correct.

7         Q.   And you have not seen those

8    results?

9         A.   Correct.

10        Q.   And you don't know whether the

11   levels as measured in August of 2009 in any

12   way reflect the levels of mold or fungi that

13   would have been present during Lyndon

14   Wright's occupancy of this particular unit,

15   correct?

16        A.   That's correct.

17        Q.   You don't take any position or

18   offer any opinion within the body of your

19   report that the presence of mold somehow

20   increases the rate of off-gassing from

21   composite wood products, do you?

22        A.   That's correct.  There is no

23   position.

24             Let me just amend that.  You said,

25   "the presence of mold."  The mold -- this is

1        (Discussion off the record.)

2    EXAMINATION BY MR. BONE:

3        Q.    I might be able to circumvent

4    this.

5            Do you offer any opinion in your

6    report that these units are or are not

7    appropriate in terms of their wood products

8    for use on a short-term basis?

9        A.    Let me answer it this way:  If it

10   is being used as a travel trailer for

11   someone to go camping for a week, two weeks,

12   no, I have no problem with it being used in

13   that respect.

14           If it is being used for

15   longer-term housing, the problem is exposure

16   to or chronic exposure to formaldehyde

17   inside the unit.

18       Q.    Let's look at paragraph 21 on

19   page 7 of 39.

20           You state that "It is my

21   understanding that during the process of

22   installation that the frame and exterior

23   shell can bend and twist, causing sealed

24   joints in the walls, roof, ceiling and floor

25   to open."

1           Let me ask you this:  Do you have

2    any knowledge that that, in fact, did occur

3    with respect to the unit occupied by Lyndon

4    Wright?

5         A.   I do not.

6         Q.   "This can allow formaldehyde gas

7    inside the wall and ceiling cavities to more

8    easily enter the living space and increase

9    the concentration of formaldehyde gas inside

10   the trailer."

11          Did I read that correctly?

12        A.   Yes.

13        Q.   Do you have any indication that

14   that condition did, in fact, occur in the

15   unit occupied by Lyndon Wright?

16        A.   I do not.

17        Q.   Did anyone take any measurements,

18   to your knowledge, of the formaldehyde

19   concentration inside the wall cavities of

20   the Lyndon Wright unit?

21        A.   I don't know if anybody did or did

22   not.

23        Q.   Did you ever ask that Bill Scott

24   take such a measurement so that you could

25   compare it with the interior compartment?

1          A.   No.

2          Q.   In order to confirm your

3    hypothesis regarding the concentrations of

4    formaldehyde gas within the wall cavities,

5    isn't that information that you would need

6    to have?

7          A.   I don't believe it is a

8    hypothesis, it is a known fact; this has

9    been studied previously.

10          I can produce the RADCO study that

11   was produced in the Fleetwood trial.  The

12   RADCO study did exactly what you are asking:

13   Made measurements within the interior of, in

14   this case, manufactured homes, made

15   measurements within the ceiling cavities and

16   the wall cavities and showed that the

17   mechanism was release of formaldehyde from

18   the raw wood on the back of the wall and

19   ceiling panels in the wall and ceiling

20   cavities, and then that would then escape

21   into -- the same principle applies here.

22          Q.   I appreciate that position.

23          My question is is there any

24   particular reason that you know of that it

25   wasn't done in this case with the level of

1    testing that was performed on this trailer?

2         A.   No.

3         Q.   In terms of the rate of

4    off-gassing, the rate of off-gassing is only

5    a single component of concentration,

6    correct?

7         A.   Yes.

8         Q.   So if I wanted to know what the

9    concentration was within that wall cavity,

10   even if I believed the rate of off-gassing

11   to have increased, I would need to measure

12   that concentration objectively to determine

13   what it was?

14        A.   If you want to know what is going

15   on inside the wall, you need to measure what

16   is going on inside the wall, yes.

17        Q.   So to your knowledge, there is not

18   one expert on the plaintiff's side of this

19   case that can tell us what the concentration

20   of formaldehyde inside the wall cavity of

21   the unit occupied by Lyndon Wright was in

22   August when it was tested, correct?

23        A.   To the best of my knowledge, yes.

24        Q.   And there is not one expert on the

25   plaintiff's side of this case who can tell

1    you what the formaldehyde concentrations in

2    the wall cavity was during the time Lyndon

3    Wright ever occupied this unit?

4         A.   Yes.

5         Q.   And, in fact, there is not anyone

6    from the plaintiff's side of the case who

7    can tell us what the concentration of

8    formaldehyde was inside this unit at any

9    point in time during the time Lyndon Wright

10   occupied it, correct?

11        MR. D'AMICO:

12             Are you talking about from

13   specific measurements?

14        THE WITNESS:

15             For specific measurements?

16   EXAMINATION BY MR. BONE:

17        Q.   Sure.

18        A.   Yes.  Nobody made those

19   measurements while Mr. Wright was in the

20   trailer.

21        Q.   And, in fact, the only measurement

22   that we have while that unit was on his

23   homesite and subject to the same ventilation

24   conditions as it would have been during his

25   occupancy was 48 parts per billion measured

1   by Bill Scott, correct?

2        A.   Yes.  On October 1 and 2, 2008.

3        Q.   And again, that measurement was

4   taken with the air conditioner turned off,

5   true?

6        A.   Again, I don't know the test

7   parameters.

8             Actually, I am a little bit

9   confused here.  Did you say while Mr. Wright

10  was living in the trailer?

11       Q.   No, while the trailer was actually

12  at his homesite.

13       A.   Oh, okay.  Right.  Because in

14  October of 2008, Mr. Wright was not living

15  in the trailer.

16       Q.   Understood.  But the trailer was

17  actually tested while it was still at his

18  homesite?

19       A.   That is my understanding, yes.  I

20  just wanted to be clear on that.

21       Q.   I appreciate the qualification.

22            Now, you cite to the CDC study

23  regarding the levels of formaldehyde in

24  units, including Forest River units,

25  correct?  I believe that is in paragraph 24

1    significant quantities within the travel

2    trailer at issue, correct?

3        A.   Yes.

4        Q.   And your testimony is that you

5    believe that there is an alternative product

6    to replace that hardwood plywood in the same

7    quantities, correct?

8        A.   Yes, and that alternative product

9    would be 1/8th-inch hardboard.

10       Q.   Which contains a phenolic resin as

11   a bonding agent?

12       A.   Phenol formaldehyde, yes.

13       Q.   And that phenolic resin, have you

14   done any studies or reviewed any studies

15   which discuss the potential problems of

16   using a phenolic resin in the same

17   quantities as would be needed to replace the

18   hardwood plywood in this particular trailer?

19       A.   I have done no personal studies,

20   and again, I have seen nothing in the

21   literature that even suggests that there is

22   a concern.

23            Let me say further that in

24   construction of a stick-framed house, for

25   example, where we would use softwood plywood

1    EXAMINATION BY MR. BONE:

2         Q.   All right.  Can you say -- well,

3    let me put it to you this way:  You don't

4    offer any opinion in your report that these

5    alternate products are safer than what was

6    being used in this trailer, you simply offer

7    the opinion that they released less

8    formaldehyde.  Correct?

9         A.   Yes.

10        Q.   And you have not retrofitted a

11   travel trailer with wallboard or hardwood

12   plywood or any composite wood product bonded

13   with an isocyanate resin to determine how

14   that would impact air quality, have you?

15        A.   I personally have not done that,

16   no.

17        Q.   Do you know if anyone has ever

18   done that?

19        A.   I don't know if anyone has done

20   that.

21        Q.   How about melamine?  Melamine

22   bonded resins, do you know what type of

23   chemical constituents are released from

24   those components when they are bonded in

25   composite wood products?

1    have been off in my assumptions."

2             He didn't really know.  He needed

3    to get back and confer with some others in

4    his office.

5        Q.   And when he conferred with them,

6    what they told him was there may have been

7    some by 2006, but for most, it was by the

8    end of 2006?

9        A.   For the particular ones he cited

10   here.

11            Again, here is the documentation

12   that shows these products were available at

13   that time.  Medium-density fiberboard,

14   particleboard and hardwood plywood that were

15   not made with urea-formaldehyde adhesives.

16       Q.   But the adhesives they were made

17   with, you don't know if they were safer for

18   the application to which you would have them

19   put?

20       A.   Again, these adhesives have been

21   used for decades in tremendous quantities,

22   and there is nothing in the literature that

23   suggests there is a problem with these

24   adhesives.

25       Q.   Do you know the volume of wood

1    product that would have been needed to

2    supply Forest River for a year?

3        A.   No.

4        Q.   Do you know the volume of wood

5    product that would have been required to

6    supply the RV industry for a year?

7        A.   No.

8        Q.   I don't think you have been asked

9    before, but you are not a human factors

10   expert, are you, sir?

11       A.   Correct.

12       Q.   And you don't hold yourself out as

13   a human factors expert, do you?

14       A.   I do not.

15       Q.   And where you cited various

16   statements from Forest River's owner's

17   manual, those are simply your readings of

18   those particular instructions or notices

19   contained within the manual for the purposes

20   of supporting your opinion that Forest River

21   had some knowledge of air quality issues

22   within their trailers, correct?

23       A.   Yes.

24       Q.   And do you know -- for example, in

25   paragraph 34 on page 12, you state that the

1          Are these the three documents that

2     I am holding up, so that I can go ahead and

3     mark them?

4          A.   Yes.

5          Q.   And I will mark them as 11, 12 and

6     13, respectively.

7          Now, Doctor, I have not read one

8     of those documents before from the position

9     of someone who was purchasing any of this

10    type of composite wood products.  Where do

11    these documents tell me the -- and you can

12    just show them to me -- where do these

13    documents tell me the quantities of the type

14    of wood available bonded with non-UF resins?

15         A.   They don't.  They tell you that

16    these products are available.

17         Q.   So from review of those documents,

18    you can't tell me whether I could have

19    bought 10,000 sheets or only 500 sheets of a

20    certain product?

21         A.   From these documents, no.

22         Q.   Do you have any documentary

23    evidence to say that I could go out and buy

24    500,000 sheets of OSB or plywood or other

25    types of product bonded with non-UF product

1    in 2005?

2         A.   No.

3         Q.   Let me hand you what I have marked

4    as Smulski Exhibit 14.

5              Could you identify that photograph

6    for us, please, Doctor?

7         A.   It looks like a photograph I may

8    have taken, but I don't know if it is one of

9    mine or not.

10        Q.   I don't know if it bears your

11   Bates stamp or not.

12             Yes, it does.  It bears a Bates

13   stamp.  I don't know if this is your Bates

14   stamp.

15        A.   You have got good eyes.  I can see

16   a smudge.

17        Q.   We can blame Aaron for that one

18   later.  That's fine.

19             But do you recognize that as the

20   type of mill stamp that you find with

21   respect to some of the wood products that

22   were removed from the Forest River unit?

23        A.   Yes.

24        Q.   And does that give us a date on

25   which that particular board was milled?