UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N(5)<br><br>JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO:<br>*Lyndon Wright v. Forest River, Inc., et al.,*<br>*L.L.C., et al.*, No. 09-2977 (E.D. La.) | MAGISTRATE CHASEZ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF SHAW ENVIRONMENTAL, INC.'S MOTION *IN LIMINE* TO EXCLUDE <u>EXPERT TESTIMONY OF PAUL HEWETT, PH.D</u>

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. (hereinafter referred to as "Shaw") respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude Expert Testimony of Paul Hewett. Dr. Hewett's opinions and methodology are so unreliable that he should be precluded from presenting them at the trial of this matter.

### <u>BACKGROUND</u>

Plaintiff has retained statistician Paul Hewett as an expert to testify regarding certain statistical analyses of the "Forest River, Inc. formaldehyde dataset," which consists of measurements of formaldehyde concentrations and certain environmental data (like temperature and humidity) taken from emergency housing units manufactured by Forest River. Dr. Hewett

candidly admits that he did not participate in the collection of the data that comprise the Forest River dataset.[1] In fact, the dataset that he used was provided to him by the Plaintiffs' Steering Committee ("PSC"),[2] and Dr. Hewett made no effort to double-check the accuracy of the data that he received in that manner.[3] He also admits that he formed no opinions about the trailer that Plaintiff occupied specifically.[4] Rather, his opinions are based on the statistical interpretation of the dataset.

Based on the PSC dataset, Dr. Hewett issued three expert reports in the *Wright v. Forest River* case. His July 29 report was preliminary and was superseded by his October 1, 2009, report. Dr. Hewett also issued a supplement on January 21, 2010, but that supplement is the subject of a pending motion to strike, so movants herein refer to the October 1, 2009, report as the "Report." That said, movants submit that the arguments set forth herein apply equally to the supplement, and even if the Court denies the motion to strike the supplement, Dr. Hewett should be precluded from testifying for the reasons set forth herein.

Although the Report examines five questions, the analysis that Dr. Hewett performed fits into two broad categories.[5] First, he used the Forest River dataset to calculate estimates of the

---

[1] Hewett Deposition, p. 27.

[2] Report, pp. 1-2.

[3] Hewett Deposition, pp. 42-43.

[4] Hewett Deposition, p. 26.

[5] Dr. Hewett wrote that he was asked to: (1) compare the data to the ASTDR minimum risk level; (2) compare the data to the NIOSH occupational exposure limit; (3) determine whether formaldehyde levels were related to season (and temperature); (4) determine whether formaldehyde levels decline with the age of the trailer; and (5) prepare a formula that could be used to estimate the level of formaldehyde in an untested Forest River trailer. Report, p.2. The first two questions fit into the first broad category, while questions 3, 4, and 5 fit into the second.

true average formaldehyde level in Forest River housing units, as a means of comparing them to selected levels. Second, he used data plots and a regression analysis to see if formaldehyde levels displayed a correlation with other variables, like temperature and age, which in turn could be used to predict the formaldehyde level in a trailer where the other variables are known or assumed.

With regard to the first broad category, it is worth noting that Dr. Hewett played no role in picking out the levels against which he would compare the Forest River dataset. The same sort of statistical analysis could have been used to compare the Forest River dataset to other levels, such as the HUD target levels of .2 ppm or .3 ppm. Instead, the PSC instructed him to use only the two lowest known "standards" – the ATSDR MRL of .008 ppm, and the NOISH level of .016 ppm.[6] Given that these "standards" are so low, it comes as no surprise that Dr. Hewett calculated that the average in his dataset exceeds them.

Also, Dr. Hewett performed no analysis to determine if any of the data sources comprising the Forest River dataset actually came from a different underlying population.[7] As a result, his estimates of the average formaldehyde levels depended upon data collected by several different testing groups, some of which differed significantly from the others, as detailed below.

With regard to the second category, Dr. Hewett reports that there "appear[s]" to be a cyclic pattern showing a relationship between formaldehyde concentration and season, but rather

---

[6] Hewett Deposition, pp. 169-70.

[7] The Report reflects one exception to this – Dr. Hewett used a standard two-sample t-test to show that the data compiled by Bureau Veritas and the Centers for Disease Control were sufficiently similar to be treated as a single dataset when performing a regression analysis on them. Report, pp. 11-12. This has nothing to do with the problem data described below, and indeed it only shows that Dr. Hewett knew how to, and could have. tested the problem data in the same way.

than form his own conclusion, he merely repeats what the CDC (which also did not study this) hypothesized about it.[8]  As for the relationship between trailer age and formaldehyde concentration, Dr. Hewett predicted a decline in estimated formaldehyde concentration over a three-year period, using his regression analysis as the basis for his calculations.[9]  The regression analysis also is the foundation of his formulate for the estimate of the formaldehyde concentration when certain variables (age, temperature, humidity, whether the windows are open, and whether there is visible mold in the trailer) are known.[10]

Because Dr. Hewett's conclusions rely so heavily on (1) the collection of data by several sources; and (2) the regression analysis, additional background on these points is informative. Dr. Hewett analyzed a "Forest River" dataset comprising 833 readings, as well as a "Salem"[11] subset of that dataset, comprising 178 readings.  Of the 833 readings in the Forest River dataset, 520 were supplied by DeVany Industrial Consultants, a firm headed by former PSC expert Mary DeVany.[12]  Her firm supplied 113 of the 178 "Salem" readings.[13]

---

[8] Report, p. 16.

[9] Report, p. 17.

[10] Report, p. 24 (Table 8).

[11] Although there are differences between the Forest River Salem model on the market and the "FEMA 32BH" model in which Plaintiff actually resided, Salem is the name of a model similar to the FEMA model, and it was the name used in the PSC database for trailers similar to Plaintiff's.

[12] Hewett Deposition, p. 78.

[13] Hewett Deposition, pp. 78-79.

DeVany's readings had a disproportionate effect on Dr. Hewett's calculations, a fact that is graphically represented on Figure 8 of his report, which makes plain that DeVany's readings are quite a bit higher than the others.[14]  Dr. Hewett admitted as much:

> Q. Okay. What's the purpose of Figure 8?
>
> A. To simply show the datasets or the data by data source without reference to time of collection.
>
> Q. And why is that relevant to you as a data analyst?
>
> A. Well, I thought this graph or chart would be useful to those viewing the report and trying to get a sense of what the data mean. It would allow them to compare the various datasets side by side. And as I said, time of collection is not factored in, which is why I generated the charts that follow this, but one can look at these and get a sense that the datasets are very similar and cover similar ranges.
>
> Q. With one prominent exception, right?
>
> A. No, two prominent exceptions.
>
> Q. Okay, what are the two prominent exceptions?
>
> A. Well, most of the Boston Chemical data were from unoccupied trailers, as were the DeVany Industrial Consultants datasets. Now, those two datasets tend to be higher than the other datasets and they are very consistent between each other in terms of range and central tendency. Well, I don't know about central tendency, but certainly the range.[15]

* * *

> Q. You can look at the data plots, like Figure 8 in your report, and see that DeVany's data are different than everyone else's, right?
>
> A. Right.
>
> Q. And they're actually a lot different, right?

---

[14] Report, p. 28.

[15] Hewett Deposition, p. 64-65.

  A. Right.[16]

  In the same vein, Dr. Hewett could not dispute that among the 833 readings, DeVany was responsible for 288 of the top 300 readings,[17] that some of the DeVany readings came from trailers with unrealistically inflated temperatures,[18] that he did not check to see whether the DeVany data came from a statistically different population but that had he done so he would not be surprised to conclude that they did,[19] and, most importantly, that DeVany's data affected his calculations of the average formaldehyde concentration in Forest River trailers.[20]

  The opinions based on the regression analysis are similarly flawed. In a regression analysis, a statistician determines whether there is a statistically significant correlation between the variables being tested (for example, age) and the "dependent" variable – here, formaldehyde concentration. In other words, if there is no statistically significant relationship, the statistician cannot confidently say that a relationship or correlation between age and formaldehyde concentration exists at all. Dr. Hewett admitted that his own calculation revealed that there was no statistically significant correlation between formaldehyde concentration and the age of the trailer.[21] Furthermore, Dr. Hewett candidly admitted further that his estimation formula does not

---

[16] Hewett Deposition, p. 77.

[17] Hewett Deposition, p. 76.

[18] Hewett Deposition, p. 83. Some of the temperatures exceeded 110 degrees.

[19] Hewett Deposition, p. 85.

[20] Hewett Deposition, p. 84.

[21] Hewett Deposition, p. 118.

predict actual formaldehyde concentrations at all.[22] Indeed, when PSC expert Bill Scott recorded an actual formaldehyde concentration of .048 ppm in the trailer that Plaintiff actually occupied, Dr. Hewett's formula predicted a concentration of .255 – off by a factor of five.[23]

## LAW AND ARGUMENT

### A.  Governing Law on Expert Testimony

The requirements for admitting or excluding expert testimony are set forth in Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably in the facts of the case.[24]

*Plaintiff,* as the proponent of the expert evidence, bears the burden of showing that it is admissible.[25] "[T]he party seeking to have the district court admit the expert testimony must demonstrate that the expert's finding and conclusions are based on the scientific method, and therefore, are reliable. This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific

---

[22]  Hewett Deposition, p. 132.

[23]  Hewett Deposition, pp. 131-32.

[24]  Fed. R. Evid. 702.

[25]  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002) (emphasis added) (the party offering expert testimony must prove by a preponderance of the evidence that the proffered evidence satisfies the criteria of Fed. R. Evid. 702).

methodology is insufficient. . . ."[26] If challenged expert testimony is determined admissible, the district court must "articulate its basis for admitting expert testimony."[27]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (U.S. 1993) "provides the analytical framework for determination whether expert testimony is admissible under Rule 702."[28] Both scientific and nonscientific expert testimony are subject to the *Daubert* framework.[29] *Daubert* and its progeny charge district courts to act as "gatekeepers" to exclude unreliable expert testimony. In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court explained "the importance of *Daubert's* gatekeeping requirement. . . . is to make certain that an expert. . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field."[30] The Court should consider whether the expert has been "as he would be in his regular professional work outside his paid litigation consulting."[31]

---

[26]  *Huren v. Employer's Mutual Cas. Co.*, 2009 WL 700201 * 1 (W.D. La. 2009) (citation omitted).

[27]  *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (*citing Tanner v. Westbrook*, 174 F.3d 542, 545 (5th Cir. 1999)).

[28]  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).

[29]  *In re FEMA Trailer Formaldehyde Products Liability Litigation,* 2009 WL 2169224 * 1 (E.D. La. 2009).

[30]  526 U.S. 137, 152 (U.S. 1999).

[31]  *Sheehan v. Daily Racing Form, Inc*. 104 F.3d 940, 942 (7th Cir. 1997) (noting that financial incentive may induce an expert in litigation into considering looser standards to apply than he would otherwise in the context of his professional work outside of litigation.). *See also Braun v. Lorillard Inc*., 84 F.3d 230, 235 (7th Cir. 1996) (Indeed, "the abuse, or one of the abuses, at which *Daubert* and its sequelae are aimed...is the hiring of [experts] to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to vie an opinion helpful to one side in a lawsuit.").

To that end, under *Daubert*, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[32] *Daubert* sets forth a number of nonexclusive factors to be considered in assessing whether an expert's proffered testimony is reliable: (1) whether the theory has or can be objectively tested and validated; (2) whether the theory has been subjected to relevant peer review and publication; (3) whether the theory has known or potential error rate; (4) whether there exists and were maintained standards and controls; and (5) whether the theory has been generally accepted in the relevant scientific community.[33]

Courts have also considered a number of other factors in assessing reliability, including (1) whether the proffered testimony grew out of research independent of litigation; (2) whether the expert has been as careful in developing his testimony for trial as he would be in his regular profession; (3) whether the expert has accounted for alternative explanations; and (4) whether the expert has extrapolated for an accepted premise to reach an unfounded conclusion given the data available.[34] "Any step that renders the analysis unreliable...renders the expert's testimony inadmissible."[35]

As "gatekeepers" courts should consider whether there is "an analytical gap between the data and the opinion offered."[36] Without more than credentials and subjective opinion, an

---

[32] 509 U.S. at 589.

[33] *Id.* at 580-594.

[34] *In Re Vioxx Products Liability Litigation*, 414 F. Supp. 2d 574, 579 (E.D. La. 2006).

[35] *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 279 (5th Cir. 1998).

[36] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (U.S. 1997).

expert's testimony that "it is so" is not admissible.[37] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."[38]

### B. Hewett's Opinions Regarding The Average Concentration of Formaldehyde in the Forest River Dataset Are Based on Unreliable Data and Should Be Excluded.

*Daubert* has been interpreted to require trial courts to ensure that the underlying facts and/or data upon which a proffered expert's opinions are based are reliable in and of themselves.[39] If an expert's opinion is based on unreliable facts, the opinion must be excluded.[40]

For any opinion about the average formaldehyde concentration in trailers other than the one at issue to be relevant in this case, the measurements taken in those other trailers must be taken while the trailer is occupied, or at least while the trailer is under conditions that simulate the circumstances under which an occupant might be living. Put another way, any comments about the average formaldehyde concentration in unoccupied trailers that have been closed up for extended periods and exposed to high temperatures have nothing to do with Plaintiff's experience and are therefore irrelevant.

Yet the substantial majority of the formaldehyde concentration measurements upon which Hewett relies were taken by DeVany. Hewett acknowledges that DeVany's readings are

---

[37] *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007), (*quoting Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

[38] *Kumho,* 526 U.S. at 151.

[39] *See Allen v. Pa. Eng. Corp.*, 102 F.3d 194, 196 ( 5th Cir. 1996); *Daubert*, 509 at 595.

[40] *See Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311 (5th Cir. 1990); *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999); *Montgomery City. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003).

much higher than anyone else's – so much so, that they actually form a different population of measurements in a statistical sense. DeVany's data are not reliable if they are to be used as a basis for testimony about the average formaldehyde concentration in occupied Forest River trailers, which is the only conceivably relevant point that could be made. The point here is not that Dr. Hewett's calculations are incorrect but that the inclusion of data that have nothing to do with real-world conditions in occupied trailers makes the results of his calculations meaningless. Phrased in terms of *Daubert* and its progeny, the inclusion of these artificial data make the calculations unreliable as means of expressing information about actual conditions in occupied trailers.

Given that Hewett's calculations of the average concentrations were inflated due to his use of data supplied by DeVany, Dr. Hewett should not be permitted to testify regarding the conclusions that he reached based on those calculations.

### C. Dr. Hewett's Conclusions about Correlations between Formaldehyde Concentration and Other Variables Are Unreliable and Should Be Excluded.

Dr. Hewett opines that formaldehyde concentrations vary with the season and decline with the age of the trailer.[41] Neither of these opinions should be permitted into evidence.

Dr. Hewett's conclusion that concentrations vary with the season is supported only by the observation that "there does appear to be a cyclic pattern to the formaldehyde levels"[42] and a citation to the CDC's report. The appearance of a pattern, however, is driven again by the heavy reliance on DeVany data, which were collected in the summer of 2008. Because DeVany's data

---

[41] Report, p. 16, §§ 5.2-5.3.

[42] Report, p. 16.

11

were collected in the summer, and DeVany's data were significantly higher than anyone else's, it is not surprising that DeVany's data cause there to be the appearance of a seasonal variation. But DeVany's data were collected in unoccupied trailers that had been closed up for some time, allowing formaldehyde levels to build under extreme temperatures, and do not reflect conditions that actual trailer occupants might have experienced. Dr. Hewett made no effort to determine if there is a seasonal variation in the formaldehyde levels in occupied trailers.[43] Because occupied trailers are the only ones that matter, his opinion should be excluded.

The CDC study also does not support the conclusion that formaldehyde levels in Forest River trailers varied seasonally. As Dr. Hewett acknowledges in his Report, the CDC collected data in December and January.[44] Obviously, this is not enough to extrapolate a seasonal variance. The CDC did posit the notion that because formaldehyde emissions are affected by temperature, winter levels may be different than summer, but that is not the same thing as reporting a finding that the levels varied in that manner. In fact, there is a very good reason to expect that despite outdoor temperature changes, formaldehyde levels would not vary seasonally: air conditioning. The temperature in *occupied* trailers is relatively constant regardless of season, and accordingly, without a study of actual data, no conclusion may be reached about whether formaldehyde levels in fact varied seasonally in occupied trailers.

With regard to age, Dr. Hewett should not be permitted to testify on a relationship between age and formaldehyde levels for the simple reason that his regression analysis failed to find that such a relationship exists. Dr. Hewett reports that the CDC reported a "very strong

---

[43] Hewett Deposition, p. 127-28.

[44] Report, p. 16.

possibility" that there was such a relationship, and he further speculates that the age coefficient is "expected to be negative" (meaning that formaldehyde levels decline with age).  But his analysis shows differently.  His Report, Table 8, places an asterisk next to each coefficient that is correlated with formaldehyde concentration in a statistically significant way.[45]  Some of the coefficients have asterisks.  Age does not – not for the data collected by Bureau Veritas, not for the data collected by CDC, and not for the combined group.  Therefore, among the data that Dr. Hewett analyzed, *there is no statistically significant relationship between trailer age and formaldehyde levels*.

Forming an opinion that is contradicted by the expert's own analysis is, by definition, unreliable.  He should not be permitted to testify on this subject.

### D. Dr. Hewett's Formula for Estimating Formaldehyde Levels Is Unreliable.

Section 5.4 of the Report, along with Table 8, develop a formula for estimating the formaldehyde levels in a trailer when certain information is known or assumed about the trailer's age, temperature, humidity, whether the windows are open, and whether mold is present.  The estimates should not be permitted because the formula does not work.

In the trailer that Plaintiff occupied, Bill Scott recorded a temperature of 85.3 degrees, a humidity of 32.9%, closed windows, and mold present; at the time, the trailer was 3 years and one month old.  Plugging those numbers into Dr. Hewett's formula yields a predicted formaldehyde concentration of .255 ppm.  The actual concentration was .048 ppm.  There is no point in introducing at trial an estimation formula that is known to give values that are off by a factor of five.

---

[45]     Report, p. 24.

This discrepancy is inherent in Dr. Hewett's approach and simply reflects what Dr. Hewett candidly acknowledged, that a regression analysis does not predict an actual value:

> Q.   And, in fact, it [the regression analysis] doesn't say what any given actual trailer would have recorded on a given day, does it?
>
> A.   No, it does not. It tells you – It's giving you an idea of what the group of trailers, the population of trailers, what the mean or the median would be for the population.[46]

Moreover, Dr. Hewett's regression analysis is dependent upon variables that are related to one another, like temperature and humidity. Although this is a technical point, it is important to note that when variables being used as the basis for a regression analysis are related to one another – a phenomenon known as multicollinearity – the analysis itself is undermined. Dr. Hewett said as much:

> Q    What is multicollinearity?
>
> A    What is multicollinearity? Well, that's a situation, as I recall, where the independent -- where you have two explanatory variables that operate in pretty much the same direction with respect to the dependent variable.
>
> Q    There is a correlation between two or more independent variables, right?
>
> A    (Nods head affirmatively).
>
> Q    And the presence of multicollinearity can decrease the predictive power of regression analysis, right?
>
> A    That's my understanding.
>
> Q    Okay. And in response to questioning by Mr. Dinnell, you agreed that temperature and relative humidity are correlated, right?
>
> A    Yes.

---

[46] Hewett Deposition, p. 115.

> Q   So there is some multicollinearity built into the variables that you used for your regression analysis?
>
> A   Yes, built in the variables that I used and that others used.[47]

The presence of correlations among the variables that Dr. Hewett studied makes the predictive power of his formula much weaker. It is unreliable, and should be excluded.

Because the estimation formula is not even designed to predict what an actual trailer would have experienced, and because its estimation of the population median / mean is known to vary substantially from actual results, it is unreliable and confusing. It should not be permitted into evidence.

### E.   The Flaws in Hewett's Opinions Cannot Be Cured Through Cross-Examination.

*Daubert* carefully distinguishes between the threshold reliability inquiry that Plaintiff must satisfy and the role of cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . . . These conventional devices... are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702."[48] In other words, Plaintiff must first satisfy his burden of demonstrating that the proffered evidence is admissible.[49]

---

[47]   Hewett Deposition, pp. 240-41.

[48]   *Daubert*, 509 U.S. at 596.

[49]   *See McLendon v. Georgia Kaolin, Co., Inc.*, 841 F. Supp. 415, 418 (M.D. Ga. 1994) ("these devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702"); *see also Porter v. Whitehall Labs.*, 791 F. Supp. 1335, 1345 & n. 10 (S.D. Ind. 1992) ("[A]n expert's opinion must have some basis other than hypothesis before the opinion may have the privilege of being assailed on cross-examination."); *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297 (8th Cir. 1996) ("We reject the suggestion that cross-examination at trial...can take the place of scientific peer review.").

Shaw anticipates that Plaintiff will argue that Hewett's testimony is admissible because it can be cross-examined. This argument, however, misses the mark. Hewett's testimony must first be proven admissible before it can be subjected to cross-examination. For the reasons discussed above, Plaintiff cannot prove that Hewett's testimony is admissible. Thus, cross-examination is not the remedy, but rather Hewett's testimony must be precluded in its entirety.

Naturally, some of the points made in this memorandum will be cross-examination material, if the Court denies this motion. But Shaw submits that these opinions are so unreliable and confusing that they should be excluded in the first place. Technical cross-examination about the implications of the fact that DeVany's data constitute a separate population from the group of measurements taken from occupied trailers, or what multicollinearity means, is likely to be lengthy and confusing to the jury. There is a real danger in allowing experts to pose unreliable opinions when the analytical flaws are technical. This is precisely why *Daubert* and its progeny require the Court to play the role of gatekeeper, excluding opinions that are not based on scientifically reliable methods.

Cross-examination alone is not likely to be sufficient to expose all of the flaws in Dr. Hewett's opinions. *Daubert* requires the Court as gatekeeper to exclude unreliable opinions from evidence, regardless of the availability of cross-examination. Dr. Hewett's opinions should not be permitted.

## CONCLUSION

Dr. Hewett's opinions about the average concentration of formaldehyde are unreliable because they are being offered in the context of trying to prove something about the trailer in which Plaintiff lived, when the opinions are based heavily on data that do not come from

occupied trailers. His opinions about the relationships between formaldehyde levels and other variables are unreliable because they are contradicted by his own analysis, because they are not supported, or because their results are at odds with real world conditions. Shaw accordingly urges the Court to exclude all of his opinions.

Respectfully submitted,

**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**

   /s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

**ATTORNEYS FOR DEFENDANT, SHAW ENVIRONMENTAL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

   /s/ M. David Kurtz