1

2

IN THE UNITED STATES DISTRICT COURT

3

FOR THE EASTERN DISTRICT OF LOUISIANA

4

5

6

IN RE:  FEMA TRAILER          *   MDL NO. 1873

7   FORMALDEHYDE PRODUCTS        *   SECTION:N(5)

LITIGATION                    *

8                                  *

*

9   THIS DOCUMENT RELATES TO:    *

LYNDON T. WRIGHT V.           *

10   FOREST RIVER, INC., ET AL.,  *

DOCKET NO. 09-2977            *

11                                  *

******************************

12

13

14

15

16            DEPOSITION OF BOBBIE R. WRIGHT, 15406 Blue

17   Ridge Drive, Missouri City, Texas, taken in the

18   offices of Reich & Binstock, LLP, 4265 San Felipe

19   Street, Ste. 1000, Houston, Texas, on Tuesday, the

20   5th day of January 2010.

21

22

23

24

25

1    (BY MR. BONE)

2        Q.   This is a mailing from FEMA, dated

3    September 7th, 2005.  I'll ask if you've seen this

4    document before.

5        A.   Yeah, I guess I received this.  I'm not

6    sure.  I forwarded them all the papers, so I guess

7    this is one of them.

8        Q.   Okay.  Do you have any reason to dispute

9    that you did or did not receive those?

10       A.   No, I don't, but I know I had a lot of

11   papers.  But, of course, I can't recognize if this

12   is one of them.

13       Q.   Yes, ma'am.

14       A.   They all look alike.

15       Q.   Did you -- did you keep the letters that

16   you received from FEMA?

17       A.   Some of them I did.

18       Q.   Okay.

19       A.   But I know I'm sure I didn't keep all of

20   them.

21       Q.   Did you receive a number of mailings from

22   FEMA over the time period from Katrina to the

23   present?

24       A.   Yes.

25       Q.   Are you still in correspondence with FEMA

1    relating to disaster relief?

2        A.    No.

3        Q.    Have you -- when was the last time you

4    received any aid from FEMA in terms of rental

5    assistance or living assistance?

6        A.    I haven't.

7        Q.    Is it your testimony you never received

8    any --

9        A.    I say other than the trailer.

10       Q.    Yes, ma'am.

11       A.    That's all I received from FEMA.

12       Q.    All right.  It's your testimony that you

13   never received any financial compensation from FEMA?

14       A.    Oh, no.  No.  That's not my answer.

15       Q.    Okay.

16       A.    I mean, like now.

17       Q.    Yes, ma'am.  In terms of --

18       A.    Yeah, I did receive disaster funds.  What

19   you asking me?

20       Q.    I'm asking -- the records indicate that you

21   received --

22       A.    I did receive money, yeah --

23       Q.    Yes, ma'am.

24       A.    -- from FEMA, yes.

25       Q.    When was the last time you received any

1   monetary compensation or money from FEMA?

2        A.   I guess around December or January,

3   February, of '06.  Either '05 or '06.

4        Q.   Okay.  Let me hand you what we'll mark as

5   the next exhibit --

6             MR. BONE:

7                  Exhibit 5?

8             THE REPORTER:  5.

9   (BY MR. BONE)

10       Q.   -- which is a letter from FEMA, dated

11  September 25th, 2005.

12            MR. PINEDO:

13                 Do we have a Bates page on that?

14            MR. BONE:

15                 Yes.  It's two pages.  It's 7 and 8.

16                 (Exhibit No. 5 Marked)

17  (BY MR. BONE)

18            MR. BONE:

19                 Actually, it's 7 through -- 7 through

20                10, excuse me.

21            MR. DINNELL:

22                 That's Exhibit 5?

23            MR. BONE:

24                 Yes.

25       A.   Uh-huh.

1    (BY MR. BONE)

2        Q.   Do you recall receiving that correspondence

3    from FEMA?

4        A.   I guess so.

5        Q.   All right, ma'am.

6             And if you look at the second page of that

7    -- excuse me, the first page, it says, in order to

8    receive additional funds in the future, you must

9    provide FEMA with a valid contact information,

10   address and telephone number.  Please use the web at

11   FEMA.gov or call this number, 1-800-621-3362.

12            Do you see that?

13       A.   That's on the first page?

14       Q.   Yes, ma'am.  It's in bold at the bottom.

15       A.   Oh, yeah.  Okay.  Uh-huh.

16       Q.   And then there's some additional pages

17   including a declaration and release page --

18       A.   Uh-huh.

19       Q.   -- when you're to provide certain

20   information to FEMA to release certain information.

21            Do you see that?

22       A.   Uh-huh.

23       Q.   And do you recall completing this release?

24       A.   Yes, I do.

25       Q.   I'm going to hand you what we'll mark as

```
 1    Exhibit 6.  This starts at Bates number No. 11, FEMA

 2    124-000011.

 3                 (Exhibit No. 6 Marked)

 4              THE DEPONENT:

 5                 You want all of it?

 6              MR. PINEDO:

 7                 Yes, ma'am.

 8              THE DEPONENT:

 9                 Oh, okay.

10    (BY MR. BONE)

11        Q.   This is a letter from FEMA, dated

12    11-21-2005.

13              Do you recall receiving that particular

14    correspondence?

15        A.   Uh-huh, yes.

16        Q.   And this was -- what was your understanding

17    of the purpose of this letter from FEMA?

18        A.   This one here?

19        Q.   Yes, ma'am.

20        A.   Now, what is it you want to know?

21        Q.   What was your understanding of the

22    information that was being conveyed to you in this

23    mailing?

24        A.   That this -- what it says, for personal

25    property replacement housing.
```

 1        Q.    Yes, ma'am.  And so the total grant amount

 2     that you were going to receive from FEMA, according

 3     to the letter dated November 21st, 2005 is $21,242?

 4        A.    Uh-huh, yes.

 5        Q.    And did you, in fact, receive those

 6     amounts?

 7        A.    Yes.

 8        Q.    And the grant was broken up into two

 9     separate categories, one for personal property in

10     the amount of $10,742, correct?

11        A.    Yes.

12        Q.    And the second was replacement housing in

13     the amount of $10,500, correct?

14        A.    Yes.

15        Q.    Of that $21,000 that you received from

16     FEMA, did you provide any of that money to Lyndon

17     Wright?

18        A.    No, I didn't.

19        Q.    Was that money solely used for rent or

20     personal items for the Missouri City, Texas,

21     address?

22        A.    Which part?

23        Q.    Either part.  In terms of --

24        A.    Was it used for -- well, I'll tell you

25     what, it said replacement housing.  So I had a house

1    in New Orleans that was demolished almost at that

2    time.  So I just assumed it was to get that

3    together.

4         Q.    All right.  Did you spend the $10,500 on

5    renovating or refurbishing the property at the

6    Seminole Lane address, 2315?

7         A.    Not yet.

8         Q.    Do you still have that money in an account?

9         A.    Not all of it, no.

10         Q.    In terms of the money that was earmarked

11    for replacement housing that you have spent, did you

12    spend it on rental property, or did you spend it on

13    other -- other things?

14         A.    It was all house associated, replacing the

15    things that were lost and stuff like that.  That's

16    what it was used for.

17         Q.    Okay.  So as we sit here today, is it your

18    testimony that none of the $10,500 that you received

19    has yet been put towards refurbishing or renovating

20    the damaged property, 2315 Seminole Place?

21         A.    It hasn't been used for renovating or

22    refurbishing, but it has been used for other things

23    concerning the house.

24         Q.    What specifically?

25         A.    Demolishing it, No. 1, and going towards

1    the taxes that you're still getting for it.

2         Q.   In terms of the demolition, do you know if

3    the property at Seminole Lane has been demolished as

4    we sit here today?

5         A.   It was demolished last month.

6         Q.   Let me hand you what we'll mark as

7    Exhibit 7, which is Bates No. 124-00015.

8                   (Exhibit No. 7 Marked)

9    (BY MR. BONE)

10        Q.   This is a letter from FEMA, dated

11   January 5th, 2006.  Do you recall receiving this

12   particular letter?

13        A.   Yes.

14        Q.   And this is actually another lengthy letter

15   which goes through Page 19.

16             MR. PINEDO:

17                   May I suggest we start using that

18   stapler there, so we can --

19             MR. BONE:

20                   Yes.

21                   (Discussion off the record.)

22        A.   Uh-huh.

23   (BY MR. BONE)

24        Q.   All right.  Do you recall receiving this

25   letter dated January 5th, 2006, from FEMA regarding

1    times anymore, because there's not even enough time

2    for anything to have happened in these little days

3    here.  So I know -- you probably couldn't even get

4    through to FEMA on some of these dates they got

5    here.

6        Q.   Ma'am, are you saying that you didn't make

7    the telephone call?

8        A.   I know I didn't call FEMA about wondering

9    when the trailer was coming.  Because they asked me

10   if I wanted a trailer on my property, or could I --

11   you know, one fit.

12       Q.   And what was the reason that you decided to

13   have a trailer put on your property?

14       A.   Well, I figured if the trailer was there

15   and somebody was in it, they could keep an eye on

16   the house.  My son, he could keep an eye on the

17   house --

18       Q.   Was it --

19       A.   -- instead of, you know, just leaving it

20   sitting there.

21       Q.   Was it your intent to ever live in this

22   particular travel trailer?

23       A.   It was my intent to -- and it -- and it

24   still was as time went on, but it just never

25   happened.

```
 1        Q.   And what was the reason that -- that you
 2   ended up not living in that particular travel
 3   trailer?
 4        A.   Well, one of the reasons was because my son
 5   worked a lot, and he worked at night.  And the few
 6   times I was there, when I did go there, that wasn't
 7   too safe I didn't think.  So that kind of pushed me
 8   back from wanting to go there and stay.
 9        Q.   Right.  Because your son wasn't there at
10   night.  And after Katrina, the neighborhood changed
11   a little bit, and it wasn't as safe as it was
12   before?
13        A.   Not at all, because nothing was there.  No
14   houses occupied.  It was just kind of funny, so, you
15   know, I didn't trust just to go there and stay
16   there.
17        Q.   Right.
18        A.   I don't think that would have been a good
19   idea.
20        Q.   And that was because of the potential for
21   crime in the area, correct?
22        A.   Right.  And somebody breaking in the house
23   and taking whatever was in there and all that kind
24   of stuff.  So I figured, maybe, if the trailer was
25   there, it would kind of be a deterrent, but it
```

1   wasn't, so...

2       Q.   When you saw it wasn't, what do you mean by

3   that?

4       A.   Because people went in it, in the house.

5       Q.   People broke into the home on -- at 2315

6   Seminole Lane?

7       A.   Yes.

8       Q.   And they stole -- what did they steal?

9       A.   Well, they had stuff that was packed.  You

10  know, stuff that was in the house that was gathered

11  up that wasn't destroyed, and it was still in there.

12      Q.   And was that stolen?

13      A.   Yeah.

14      Q.   Was there ever a point in time when someone

15  attempted to break into the travel trailer?

16      A.   Yeah, somebody did try to break in the

17  travel trailer.

18      Q.   And tell -- and tell me about that.

19      A.   I wasn't there then, but you could -- I

20  think they -- I think they got into the trailer.

21  Kind of like pried it, not breaking the lock, but

22  could pry it --

23      Q.   Uh-huh.

24      A.   -- some kind of way.

25      Q.   They attempted to pry the door open to gain

1    trailer at that time.  I know they didn't.

2        Q.    Okay.  Were you ever present when the

3    travel trailer was inspected by any of the

4    maintenance companies tasked with inspections?

5        A.    I believe so.

6        Q.    And did you ever express to any of those

7    folks while they were out on the site any concerns

8    related to the issues you talked about earlier

9    relating to Lyndon Wright's complaints of sinus

10   irritation?

11       A.    To the maintenance guys?

12       Q.    Yes.

13       A.    No.

14       Q.    Is there any particular reason that you

15   didn't express any concerns or raise that issue with

16   those folks?

17       A.    No, it's no reason.  I just didn't.

18       Q.    Okay.  Was there ever a time that you lived

19   in this travel trailer?

20       A.    Lived -- I was there for about almost two

21   months one time.

22       Q.    During what period of time, if you can

23   recall, were you actually, you know, temporarily

24   residing in the travel trailer?

25       A.    It might have been '08, I think or was it?

1   I don't know for sure if it was '08 or '07.  I'm not

2   sure.

3        Q.   Okay.  Was it -- was the two-month period a

4   continuous period of two months that you were there,

5   or was it two months total --

6        A.   No.

7        Q.   -- from the time the unit was installed?

8        A.   What time I went there and I stayed that

9   long.

10        Q.   And was Lyndon Wright living in the unit,

11   as well, during that period of time?

12        A.   Uh-huh, yeah.

13        Q.   Was anyone else living in the travel

14   trailer during that period of time that you lived

15   there for the two months?

16        A.   No.

17        Q.   Is there any way that you can tell for us

18   what period of time that you lived in the travel

19   trailer?  Do you have any records or documents that

20   would tell us when you actually lived in the travel

21   trailer?

22        A.   Any documents?  Like what?

23        Q.   For example, receipts or gas purchases,

24   things like that which would show that you were in

25   New Orleans rather than being in Texas for a

1    specific period of time.

2         A.   Not that I can put my hands on, no.

3         Q.   All right.  So to the best of your

4    recollection, you lived continuously for a two-month

5    period between 2007 and 2008 in this travel trailer?

6         A.   Yeah.

7         Q.   Were there any other periods of time that

8    you were at the travel trailer for an extended

9    period of time, say, for more than one evening?

10        A.   Yeah.

11        Q.   Okay.  And how many times did you stay at

12   the travel trailer for more than a day?

13        A.   How many times?

14        Q.   Yes, ma'am.

15        A.   A few times, I stayed more than a day.

16   I've been there and stayed a week.  Been there and

17   stayed two weeks.

18        Q.   Well, you told us this morning the first

19   time that you were actually -- that you actually

20   laid eyes on this trailer was December of 2006,

21   correct?

22        A.   That was the first time I went there was

23   for Christmas.

24        Q.   Correct.  And you told us that you stayed

25   in a -- in a hotel during that visit --

1      A.    Hotel.

2      Q.    -- correct?

3      A.    Yeah, that's right.  We did stay in a

4   hotel --

5      Q.    All right.

6      A.    -- then.  That's right.

7      Q.    The next time that you came to New Orleans

8   was when?

9      A.    And I think the next time was for

10  Thanksgiving of '07.

11     Q.    Okay.  So November of 2007.  Did you stay

12  in the travel trailer at that time?

13     A.    Yes.

14     Q.    And how long did you stay in New Orleans?

15     A.    About a week and a half.

16     Q.    Okay.  About ten days.  Did anyone else

17  stay with you during your November 2007 visit?

18     A.    My daughter and my grandson, yeah.

19     Q.    So there were four of you in the trailer at

20  that point in time?

21     A.    Yes.

22     Q.    When was the next occasion that you had to

23  come back to New Orleans?

24     A.    I guess that was when I stayed a couple of

25  months.  I'm not -- I'm not -- between -- I know I

```
1    went back for that Thanksgiving of 2007, but I don't

2    think I had been there and stayed.  So it had to be

3    '08 when I stayed a little while.  I don't know what

4    months.

5         Q.   Do you recall --

6         A.   It was-- it might -- I think it was during

7    the summer.  I think it was during the summer of,

8    I'm going to say '08.

9         Q.   So your best recollection is that you

10   stayed the two months sometime during the summer of

11   2008?

12        A.   Uh-huh.

13        Q.   Yes?  After that two-month period, was

14   there ever another time that you stayed in the

15   travel trailer?

16        A.   I don't think I was back since then.

17        Q.   Okay.  So what you've told us about is

18   December of 2006 you stayed in a hotel.  November

19   of 2007, you spent ten days in a travel trailer.

20   And in the summer of 2008, you spent about two

21   months in a travel trailer, correct?

22        A.   Uh-huh.  If that's the date.  It's

23   somewhere -- it was sometime or another.  I'm not

24   sure exactly, but it was -- I'm trying to -- it had

25   to be '08.  It had to be.
```

1    deposed in this case?

2         A.    Do I suppose so, I don't know that.

3         Q.    You haven't read the transcript of his --

4    of his deposition, have you?

5         A.    Oh, no, no, no, no, no.

6         Q.    Have you read any kind of documents in

7    preparation for today's deposition?

8         A.    No.  How can you prepare for this?

9         Q.    Now, at the time of Hurricane Katrina, you

10   were living at 2315 Seminole, right?

11        A.    Right.

12        Q.    Did you own that house?

13        A.    Yeah, me and my sister.

14        Q.    You and your sister?  And what's her name,

15   again?

16        A.    Margaret Gardener.

17        Q.    Right.  Had that initially been your

18   father's home?

19        A.    Yeah.

20        Q.    And he transferred the property to you?

21        A.    When he passed, it went to me and my

22   sister.

23        Q.    Now, before moving into 2315 Seminole, you

24   lived at 415 2nd Street also in New Orleans, right?

25        A.    Right.

```
 1        Q.    And was that a property that you owned or
 2   your family owned?
 3        A.    No, it was -- it was rental property.
 4        Q.    All right.  And you moved out of that --
 5   out of 415 2nd Street a pretty long while ago,
 6   right?
 7        A.    Into 2315.  In '92, we moved --
 8        Q.    Okay.
 9        A.    -- to Seminole Lane.
10        Q.    Did 415 2nd Street have any air
11   conditioning units in it?
12        A.    Yeah.  Yes, it had air conditioning units
13   in it.
14        Q.    Window air conditioning units or --
15        A.    Uh-huh.
16        Q.    -- central air?
17        A.    Window air.  Window air conditioning.
18        Q.    In all of the rooms or just some of the
19   rooms?
20        A.    In some of them.  Some.
21        Q.    Okay.  And for some period of time, Lyndon
22   lived at 415 2nd Street --
23        A.    Uh-huh.
24        Q.    -- prior to your moving out in 1992, right?
25        A.    Right.
```

1    Q.   Then you guys moved to 2315 Seminole.   Did

2    2315 Seminole have air conditioning in it, in that

3    house?

4    A.   Window air, yeah.   Window air conditioning.

5    Q.   In how many rooms?   Do you remember?

6    A.   There was five rooms.

7    Q.   Okay.   In the living room?

8    A.   Uh-huh.

9    Q.   In the bedrooms?

10   A.   Three bedrooms and a den.   They had air

11   conditioners in all those rooms.

12   Q.   Okay.   When he was growing up, were there

13   any pets in the house?

14   A.   No.

15   Q.   Now, we talked about after the hurricane,

16   you came to Houston and Lyndon came with you

17   briefly.   And then he chose to go back to New

18   Orleans shortly after the storm, right?

19   A.   Right.

20   Q.   You were then asked eventually by FEMA

21   whether you wanted a travel trailer placed at 2315

22   Seminole, correct?

23   A.   Right.

24   Q.   And you said that that was something that

25   you'd be interested in, right?

 1          A.    Uh-huh, yes.

 2          Q.    And then you and Lyndon were going to

 3     jointly live in the travel trailer to keep a watch

 4     on 2315 Seminole, correct?

 5          A.    Uh-huh.

 6          Q.    Lyndon went back to New Orleans and

 7     eventually lived in the travel trailer, right?

 8          A.    Right.

 9          Q.    But you never ended up going to live in the

10     travel trailer, except for short periods of time

11     visiting Lyndon, right?

12          A.    Right.

13          Q.    Did you ever call or write to FEMA to let

14     them know that only your son would actually be

15     occupying the unit and not you and your son?

16          A.    No.

17          Q.    Okay.  Do you remember if Lyndon -- you had

18     listed Lyndon as a joint applicant on your

19     application for assistance from FEMA, or was it just

20     you as the applicant?

21          A.    It was just me.  We -- both our names were

22     on there, but they only considered one person.

23          Q.    So you -- you were the loan applicant,

24     right?

25          A.    Uh-huh.  Uh-huh.

1    demolishing the house at 2315 Seminole, right?

2         A.    Uh-huh.

3         Q.    Outside of that, can you think of any other

4    ways in which you've used that FEMA money that was

5    given to you after Hurricane Katrina?

6         A.    Yeah.  We used it to put -- pay the taxes

7    on the property and to get -- with everything gone,

8    everything -- we trying to reestablish yourself.  So

9    it -- it was used to -- that of it that was used was

10   to kind of get back on your feet.

11        Q.    Okay.  Do you know how much of that money

12   is still in your possession or has not yet been

13   spent?

14        A.    I think -- yeah, I know.

15        Q.    I'm sorry?

16        A.    I know how much --

17        Q.    How much?

18        A.    -- has been spent.

19        Q.    Do you know how much?

20              THE DEPONENT:

21                   What you all want to do, take a break?

22   (BY MR. DINNELL)

23        Q.    No.  No.  I'm just -- I'm -- I'm just

24   asking --

25        A.    A few dollars.  Not many.

1        Q.    Okay.

2        A.    I mean, a few but, you know --

3        Q.    Less than a thousand?

4        A.    Less than a thousand?  Oh.

5        Q.    More than a thousand?

6        A.    Uh-huh.

7        Q.    Less than 5,000?

8        A.    No.

9        Q.    Now, when you moved to Texas right after

10   the storm, your initial residence was the Blue Ridge

11   address, correct?

12       A.    When I first moved to Texas?  Yeah, that --

13   that's right.

14       Q.    All right.  And at Blue Ridge, you were

15   living with relatives, right?

16       A.    Right.

17       Q.    And did you have to pay any rent there?

18       A.    We -- well, we wasn't calling it rent, but

19   we would give them money.

20       Q.    Was there -- was there some sort of

21   specific arrangement as to how much you'd pay?

22       A.    No.  We would just give my brother-in-law

23   money.

24       Q.    So every --

25       A.    That's -- that's the way it went.  We would

```
 1        A.     Not at all.

 2        Q.     -- pre-disaster gross income?

 3        A.     No.  No.

 4        Q.     And Lyndon was living at 2315 Seminole --

 5        A.     Right.

 6        Q.     -- at the time of the storm with you,

 7   right?

 8        A.     Uh-huh.  Uh-huh.

 9        Q.     Now, you were asked earlier about -- we may

10   be able to take a look at a document if you'd just

11   bear with me for one second.

12             You were shown another document earlier,

13   which was titled Exhibit 11.  And this is another

14   one of these letters that you were sent by FEMA.

15   This particular one is dated September 13th, 2006.

16   And we've marked that as Exhibit 11.

17             And I want you to -- I want you to take a

18   look at the third paragraph in this letter that you

19   were sent by FEMA.  And it begins, if the handrail

20   leading to your door.

21             Do you see that paragraph?

22        A.     Yes.

23        Q.     Okay.  Now, in the second sentence, it

24   says, talking about this specific condition that

25   they're talking about in the letter, if this
```