UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N(5)<br><br>JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO:<br>*Lyndon Wright v. Forest River, Inc., et al.,*<br>*L.L.C., et al.*, No. 09-2977 (E.D. La.) | MAGISTRATE CHASEZ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF SHAW ENVIRONMENTAL, INC.'S
MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF CHARLES DAVID MOORE**

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. (hereinafter referred to as "Shaw") respectfully submits the following Memorandum in Support of its Motion *in Limine* to Exclude Testimony of Charles David Moore because his opinions are unreliable advocacy rather than acceptable scientific analyses.

**BACKGROUND**

Plaintiff has submitted an expert report from Charles David Moore ("Moore"), who holds himself out as a structural condition assessment expert in this case.[1]  Moore intends to offer

---

[1] A copy of certain excerpts of his report is attached hereto as Exhibit "A," Moore's October 2, 2009 Structural Condition Assessment for FEMA Travel Trailer Wright/Forest River, Inc. Trailer Melville, Louisiana ("Moore's Report").

expert opinions and testimony regarding the condition of the FEMA Trailer assigned to Plaintiff Lyndon Wright. In addition, Moore intends to offer expert opinions with respect to the causes of the conditions he observed, which he relates back to the installation of the Trailer. It should be noted that Moore was not present at the installation of Plaintiff's Trailer.[2] In fact, Moore's initial inspection of the Trailer did not occur until August of 2009, which was four years after the installation of Trailer and nearly a year after the Trailer had been sitting in an open field with no utilities and no maintenance whatsoever.[3]

In his report, Moore states that he observed certain damage to the interior and exterior of the Trailer, including holes in the sealants around the windows, door, and lighting fixtures, and an opening in the front door, which led to water damage at the front door, under the bedroom window, and in other sections of the wood framing.[4] Moore attributes all of this damage to improper jacking.

> Testing the installation procedures indicates that the trailer will experience large differential movements in the structure, causing openings in the door, window, and other fixtures, in addition to putting stress on the caulk and other seals around the unit. Depending on the actual method used to jack up the trailer, warping will occur in significant magnitude to cause these problems. Documents reviewed in this process warned of possible damages to the unit if it is improperly jacked. However, none of the documents included instructions on how to do it properly to prevent the damage from occurring. Water leaks in this trailer was either caused by improper jacking or made worse by improper jacking.[5]

---

[2]   Deposition of Charles David Moore, p. 71, attached hereto as Exhibit "B" ("Moore Deposition").

[3]   *Id.*

[4]   Moore's Report, pp. 6-9, Exh. A.

[5]   *Id*, p. 19, Exh. A.

The opinions of Moore, as discussed below, should be excluded because they lack reliable bases and scientific methodology, and are conclusory. Further, in rendering his opinions, Moore failed to adequately consider and rule out alternative causes.

## LAW AND ARGUMENT

### A.   Governing Law on Expert Testimony

The requirements for admitting or excluding expert testimony are set forth in Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably in the facts of the case.[6]

Plaintiff, as the proponent of the expert evidence, bears the burden of showing that it is admissible.[7]  "[T]he party seeking to have the district court admit the expert testimony must demonstrate that the expert's finding and conclusions are based on the scientific method, and therefore, are reliable. This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific

---

[6]   Fed. R. Evid. 702.

[7]   *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002) (emphasis added) (the party offering expert testimony must prove by a preponderance of the evidence that the proffered evidence satisfies the criteria of Fed. R. Evid. 702).

methodology is insufficient..."[8]  If challenged expert testimony is determined admissible, the district court must "articulate its basis for admitting expert testimony."[9]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (U.S. 1993) "provides the analytical framework for determination whether expert testimony is admissible under Rule 702."[10]  Both scientific and nonscientific expert testimony are subject to the *Daubert* framework.[11]

*Daubert* and its progeny charge district courts to act as "gatekeepers" to exclude unreliable expert testimony.  In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court explained "the importance of *Daubert's* gatekeeping requirement . . . is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field."[12]  The Court should consider whether the expert has been "as he would be in his regular professional work outside his paid litigation consulting."[13]

---

[8]    *Huren v. Employer's Mutual Cas. Co.*, 2009 WL 700201 * 1 (W.D. La. 2009) (citation omitted).

[9]    *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001) (citing *Tanner v. Westbrook,* 174 F.3d 542, 545 (5th Cir.1999)).

[10]   *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).

[11]   *In re FEMA Trailer Formaldehyde Products Liability Litigation*, 2009 WL 2169224 * 1 (E.D. La. 2009).

[12]   526 U.S. 137, 152 (U.S. 1999).

[13]   *Sheehan v. Daily Racing Form, Inc*. 104 F.3d 940, 942 (7th Cir. 1997) (noting that financial incentive may induce an expert in litigation into considering looser standards to apply than he would otherwise in the context of his professional work outside of litigation.).  *See also Braun v. Lorillard Inc*., 84 F.3d 230, 235 (7th Cir. 1996) (Indeed, "the abuse, or one of the abuses, at which *Daubert* and its sequelae are aimed….is the hiring of [experts] to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to vie an opinion helpful to one side in a lawsuit.").

To that end, under *Daubert*, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[14] *Daubert* sets forth a number of nonexclusive factors to be considered in assessing whether an expert's proffered testimony is reliable: (1) whether the theory has or can be objectively tested and validated; (2) whether the theory has been subjected to relevant peer review and publication; (3) whether the theory has known or potential error rate; (4) whether there exists and were maintained standards and controls; and (5) whether the theory has been generally accepted in the relevant scientific community.[15]

Courts have also considered a number of other factors in assessing reliability, including (1) whether the proffered testimony grew out of research independent of litigation; (2) whether the expert has been as careful in developing his testimony for trial as he would be in his regular profession; (3) whether the expert has accounted for alternative explanations; and (4) whether the expert has extrapolated for an accepted premise to reach an unfounded conclusion given the data available.[16]

**B.     Moore's Opinions Lack Reliable Bases and Are Conclusory.**

In performing their threshold screening function under *Daubert,* district courts must confirm the reliability of an expert's methodology. For every conclusion contained in an expert's proposed testimony, the court must determine if the methodology leading to that

---

[14]     509 U.S. at 589.

[15]     *Id.* at 580-594.

[16]     *In Re Vioxx Product Liability Litigation*, 414 F. Supp. 2d 574, 579 (E.D. La. 2006).

conclusion is sound.[17] In order to be reliable, the testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief.[18] In determining whether an expert's testimony is reliable, the focus must be solely on the principles and methodology, not on the conclusions that they generate.[19] The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on scientifically valid methodology, and are therefore reliable.[20]

As "gatekeepers" courts should consider whether there is "an analytical gap between the data and the opinion offered."[21] Without more than credentials and subjective opinion, an expert's testimony that "it is so" is not admissible.[22] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."[23]

The "analytical gap" pervades Moore's report. For example, Moore makes the broad conclusory statement that the damage observed (i.e. openings in the front door, cracks and holes in the window sealants, which led to water intrusion) was consistent with the effects of uneven movement of the Trailer that would occur with improper jacking techniques. Although Moore

---

[17]  *See Allen v. Pa. Eng. Corp.,* 102 F.3d 194, 196 (5th Cir. 1996);

[18]  *Daubert,* at 590; *Curtis v. M&S Petroleum, Inc.,* 174 F.3d 661, 668 (5th Cir. 1999).

[19]  *Daubert,* at 595.

[20]  *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 275 (5th Cir. 1998); *Curtis,* at 668.

[21]  *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (U.S. 1997).

[22]  *Hathaway v. Bazany,* 507 F.3d 312, 318 (5th Cir. 2007), (*quoting Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

[23]  *Kumho,* 526 at 157.

opines that he observed installation-related damage to the Trailer, he confirmed in his deposition that he could not determine with any type of reasonable certainty when the damage actually occurred.

> Q. Okay. Would you look at page 26 of your report, please?
>
> A. 26?
>
> Q. Yes, sir.
>
> A. Okay.
>
> Q. This is the water damage we're talking about in the bottom photo, right?
>
> A. That's correct.
>
> Q. Okay. You don't know how old that water damage is, do you?
>
> A. No.[24]

Because responsibility for the Trailer changed several times between installation in November 2005, and Moore's inspection in August 2009, timing of the alleged damage is an important issue in this case.

Indeed, Moore never fully explains why certain damage he attributes to the installation of the Trailer in 2005, like the opening above the front door and rotting wood in the frame, took over a year or more to manifest itself. Moore simply concludes without any explanation that it is possible for installation-related damage to manifest itself a year or more after the installation. Saying that something "can" occur, or that it is "possible," is of course very different from saying that, to a reasonable degree of engineering certainty, it is more likely than not that it ***did***

---

[24] Moore Deposition, p. 142, Exh. B

7

occur. Interestingly, although he opines that the delayed manifestation of the front door damage was possible, he admits in his deposition that it is unlikely.

> Q. You wouldn't expect a jacking problem that occurred during installation to cause a gap to appear above a door over a year later, would you?
>
> A. It's possible, in that some of those stresses could cause a failure in a connection that would then -- or move later, possible. I wouldn't normally expect it, but it would be possible.
>
> Q. It's unlikely?
>
> A. Somewhat, yes.[25]

The reality of the matter is that Moore already had his mind made up before even viewing the Trailer. He started with the mind-set that the damage observed in the Trailer could only have been caused by improper jacking. In fact, he testified that he believed that 99 percent of the travel trailers used in Hurricanes Katrina and Rita were improperly jacked:

> Q. Is that [Moore's hypothesis that jacking caused the damage at issue] a question that can go either way in your mind, or do you think all of the FEMA trailers were jacked improperly?
>
> A. Based on what I've seen, I would say at least 99 percent of them were jacked improperly, and I would venture to say 100 percent of them were.[26]

Worse still, he could not identify any test results that would have disproved his hypothesis:

> Q. Okay. What test results would have suggested to you that there wasn't any improper jacking?
>
> A. If we had tested and found very little differential movements and problems with any of these things, I would say that we'd have said, Wait a minute, our hypothesis is wrong.
>
> Q. How big is "very little"?

---

[25] Moore Deposition, p. 135-136, Exh. B.

[26] Moore Deposition, p. 269, Exh. B.

8

> A. I would say – well, I don't know that I could really tell that just right of the top of my head like this, but much smaller than the things we found out in our testing.
>
> Q. Okay. Isn't that the kind of thing that you need to figure out where your criteria is, your cutoff line, before you do the testing, not afterwards, so we're not wondering if you've made the criteria lower than your test results were?
>
> A. No, I don't think so.
>
> Q. In any event, you didn't set a, okay if it's below a 32nd of an inch movement, then you know what, it's not improper jacking; you didn't set a –
>
> A. We didn't set that –
>
> Q. -- line like that?
>
> A. No, we didn't set that prior to the testing, no.[27]

Moore's methodology is actually no methodology at all. He entered the testing process without a clear view of what would prove, or what would disprove, his hypothesis. Not surprisingly, with no criteria for determining what would show, or would not show, that installation damaged the trailer, he now claims the results prove the theory that benefits his client. This is advocacy, not science, and his testimony is therefore the very definition of impermissible and inadmissible "ipse dixit."

Ultimately, Moore concludes, "Water leaks in this trailer was [sic] either caused by improper jacking or made worse by improper jacking."[28] As a basis for this conclusion, he writes that during jacking "the trailer will experience large differential movements in the structure, causing openings in the door, windows, and other fixtures, in addition to putting stress

---

[27] Moore Deposition, pp. 269-70.

[28] Moore's Report, p. 19.

9

on the caulk and other seals around the unit."[29] But despite being present when the Trailer was jacked up six different times,[30] incredibly, he doesn't know if a single seal was broken – and not only that, he didn't even bother to check:

> Q   During your jacking test, how many seals did you break; how many caulk seals did you break?
>
> A   I don't know that.
>
> Q   Did you check?
>
> A   No. We were only watching the crack gauges and the monitors like that.
>
> Q   How many seals were broken during Exponent's testing?
>
> A   Again, I don't know that.
>
> Q   So you don't know if these movements actually caused any caulk at all on this trailer to actually break?
>
> A   No. But then again, it might have broken them all, so ...
>
> Q   You didn't check?
>
> A   No.[31]

Given that his whole theory is that jacking induced forces in the Trailer that caused seals to break and lead to water leaks, there is no better evidence that Moore already had formed a conclusion in his mind before he conducted "tests" than the fact that when he jacked up the Trailer himself, and watched others do it, he did not even look to see if any seals really did break during jacking.

---

[29]   Moore's Report, p. 19.

[30]   Three jacking sequences were performed by Shaw's expert, John Osteraas (Exponent); two were performed by or under the direction of Moore. Moore attempted a third by jacking the unit up one corner at a time, but he abandoned that effort due to safety concerns. Moore Report, pp. 11-12.

[31]   Moore Deposition, p. 243.

Because Moore uses no methodology whatsoever in reaching his conclusions, his testimony should be excluded in its entirety.

### C. Moore Fails to Properly Consider and Rule Out Alternative Causes.

In order to survive *Daubert,* Moore needs to have adequately accounted for alternative explanations or scenarios for the water damage that he observed.[32] Because Moore did not consider alternative factual scenarios for the damage to the Trailer, his opinions are suspect and not reliable.

The "exclusion of alternative causes" is required for a reliable causation opinion.[33] In order for causation testimony to be admissible, there must be a reliable basis for concluding that the theory advanced by the expert is the probable cause of the damage.[34] An expert's failure to negate possible alternative causes of a plaintiff's damages "renders his methodology unreliable," and inadmissible.[35] Indeed, when there are multiple alternate theories of causation, the expert must weigh his proposed theory against the combined probability of the alternates, if he is to claim that his theory is "more likely than not."[36] So, too, "if plaintiffs' experts failed to rule out alternative causes, it means that these alternative causes may have been the sole causes" of a

---

[32] Fed. R. Evid. 702 (Advisory Committee's Notes, 2002).

[33] *Michaels v. Avitech, Inc.,* 202 F.3d 746, 753 (5th Cir. 2000); *accord United States v. Elf,* 461 F. Supp. 2d 529, 534 (E.D. Tex. 2006). *See also Dart v. Kitchens Bros. Mfg. Co.,* 2007 WL 3283750, at 3 (5th Cir. Nov. 7, 2007) (The "inadequate treatment of other potential causes" necessarily undermines the reliability of an expert's opinion); *accord Burleson v. Tex. Dep't of Criminal Justice,* 393 F.3d 577, 587 (5th Cir. 2004); *Winters,* 498 F.3d at 743.

[34] *See, e.g., Brown v. Parker-Hannifin Corp.,* 919 F.2d 308, 312 (5th Cir. 1990).

[35] *Alexander v. Smith & Nephew, P.L.C.,* 98 F. Supp. 2d 1310, 1316 (N.D. Okla. 2000).

[36] *See Cavallo v. Star Enter.,* 892 F. Supp. 756, 771 (E.D. Va. 1996), *aff'd in relevant part,* 100 F.3d 1150 (4th Cir. 1996).

plaintiff's damages.[37] Thus, an expert must rigorously evaluate and rule out potential alternative causes and not simply pick "the cause that is most advantageous to [plaintiff's] claim."[38]

With respect to causation, Moore opines that the Trailer sustained water damage from improper jacking. In reaching this unreliable conclusion, Moore fails to adequately consider and rule out a number of obvious alternative explanations for this damage. First, and most obviously, Moore fails to adequately consider that the Trailer had been sitting in an open field for at least ten months prior to his inspection. During that time, there was absolutely no maintenance whatsoever performed on the Trailer. Surely, being exposed to the elements of southeastern Louisiana for almost a year could have had a role in causing caulk seals in the Trailer to crack, leading to leaks and other damage observed by Moore in August 2009.[39] However, Moore's report is void of any discussion concerning these circumstances.

Moore's report also fails to consider that the Trailer could have been damaged during its deactivation; a process for which Shaw was not responsible. Interestingly, Moore admits in his deposition that he could not rule out the possibility that the damages observed in August 2009 could have been caused during the deactivation of the Trailer.

> Q. So the deactivation could have damaged the trailer?
> 
> A. Yes, sir.
> 
> Q. Okay.
> 
> A. Additional damage to the trailer, yeah.

---

[37] *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 761 & n.31 (3d Cir. 1994).

[38] *Viterbo,* 826 F.2d at 424.

[39] Moore admits that caulk loses elasticity when exposed to the sun. Moore Deposition, p. 168.

> Q. Well, and you can't tell whether -- you can't tell installation damage from deactivation damage, can you?
>
> A. No.[40]

Moreover, road travel and lack of maintenance could equally have been to blame for leaks in the Trailer, but Moore could not rule out any of those scenarios before attributing improper jacking as the cause for the cracks and openings observed in the unit.

> Q. Okay. You can't exclude the possibility that a leak or damage to the head jam manifested itself after Shaw was responsible for maintaining the trailer and that whoever had become responsible for maintenance failed to fix those issues, can you?
>
> A. No. Again, I don't know who was responsible for fixing those issues, no. And I guess the question that comes to mind is that then, what was the cause of those, but ... [ellipsis in original; quote ends]
>
> ***
>
> Q. Lack of maintenance while in the FEMA yard for the year it sat there before you saw it could have led to or exacerbated water damage that you saw, right?
>
> A. Yes. By nobody resealing it, if there needed to be resealing, yes, that would definitely create additional water damage, yes.
>
> Q. Right. Or prying the door open and bending the door out so that water could get in there, right?
>
> A. That's correct, right.
>
> Q. What about lack of maintenance even while Mr. Wright was in the trailer but after June 1, 2006?
>
> A. Depends on what maintenance would have been actually required from the manufacturer, I guess. Like we talked about the seals, caulk may have needed to be checked and that kind of thing; so in that regard any caulk that wasn't replaced that should have been would have contributed additional problems, yes.

---

[40] Moore Deposition, p. 159, Exh. B.

\*\*\*

Q. What about driving the trailer from 2315 Seminole Lane to Melville and parking it in the yard, that could have –

A. It shouldn't have.

Q. -- cracked some seals, right?

A. It shouldn't have, because the units were supposed to be designed for that, and then particularly, the units were supposed to be designed for multiple travel and setup. So it shouldn't have caused those problems.

Q. We have already agreed that driving around could induce differential movements of the same magnitude that you observed during the testing procedure, right?

A. It's possible. Like I say, it shouldn't have for this particular unit.

Q. And if the caulk wasn't being maintained the way Forest River said you should maintain it, then the caulk has lost its elasticity during that four years, right; some amount of its elasticity, right?

A. It's probably just now reaching four years, yes.

Q. Well, it was built in September of 2005, and you saw it in August of 2009, so that's pretty close to –

A. Pretty close.

\*\*\*

Q. In any event, whether it's three years and ten months or whatever, the elasticity –

A. Close to four years.

Q. -- of the caulk has declined during that period if it wasn't kept up the way Forest River said you should?

A. Declined, yes. Whether it was declined to a point where it needed replacement, don't know that.

Q. You don't know that. And you don't know whether it had declined all the way to the point where normal road use would cause caulk seals to break?

14

  A. Don't know that, correct.[41]

While Moore acknowledges in his deposition that the damage observed could have been caused by a number of factors not related to the installation of Trailer, there is no indication in his report or otherwise that he has a rational basis for excluding these alternative causes. For example, he tries to exclude transportation loads– the forces from over the road driving – as an alternate cause of the damage he observed because the trailer is designed to withstand those loads without damage.[42] But for this argument to support his conclusion that jacking was the cause, he would have to show that jacking induces greater forces than transportation. Yet Moore does not know whether transportation loads are greater or lesser than jacking, and he did not even test that.[43]

Shaw submits that the need to adequately consider alternative causes is particularly important in the *Daubert* framework when the expert ignores a seemingly obvious cause – that the Trailer simply deteriorated and leaked while in the FEMA trailer graveyard – in favor of one that stands in contradiction to common sense. Moore's theory defies common sense because it assumes that jacking up the trailer – a process that is essentially just like changing a tire – is more stressful to a trailer than the forces induced by towing the trailer over the highway. Anyone who has ever hit a pothole knows that the impacts that vehicles routinely encounter can be significant, and since trailers routinely endure such forces without springing leaks, Moore must assume that jacking is somehow worse for a trailer than hitting a pothole. Despite this, he

---

[41] Moore Deposition, pp. 162, 247, 250-252, Exh. B.

[42] Moore Deposition, p. 262.

[43] Moore Deposition, p. 191-93.

neither tests his assumption about the relative magnitude of the forces involved; nor can he exclude lack of maintenance as a cause. His failure to exclude lack of maintenance makes his whole opinion unreliable and inadmissible.

There are several alternative causes that could have solely caused, or contributed to, the openings and cracks observed in the Trailer in August 2009, which Moore leaves unconsidered. His hypothesis that the damage was caused by improper jacking in 2005 is no more plausible – and, indeed, far less plausible – than any of the other possible alternative causes that he ignored. Thus, his testimony cannot be helpful to the jury and must be excluded.

### D. The Flaws in Moore's Opinion Cannot Be Cured Through Cross-Examination.

*Daubert* carefully distinguishes between the threshold reliability inquiry that Plaintiff must satisfy and the role of cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence . . . . These conventional devices . . . are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702."[44] In other words, Plaintiff must first satisfy his burden of demonstrating that the proffered evidence is admissible.[45]

Shaw anticipates that Plaintiff will argue that Moore's testimony is admissible because it can be cross-examined. This argument, however, misses the mark. Moore's testimony must first

---

[44] *Daubert*, 509 U.S. at 596.

[45] *See McLendon v. Georgia Kaolin, Co., Inc.*, 841 F. Supp. 415, 418 (M.D. Ga. 1994) ("these devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702"); *see also Porter v. Whitehall Labs.*, 791 F. Supp. 1335, 1345 & n. 10 (S.D. Ind. 1992) ("[A]n expert's opinion must have some basis other than hypothesis before the opinion may have the privilege of being assailed on cross-examination."), *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 297 (8th Cir. 1996) ("We reject the suggestion that cross-examination at trial...can take the place of scientific peer review.").

16

be proven admissible before it can be subjected to cross-examination. When an expert jumps to conclusions without a reliable method, and fails to consider alternate causes, it would be unfair and prejudicial to the defense to require that these defects be cured through cross-examination – indeed, if that were the rule, *Daubert* would not exist.

For the reasons discussed above, Plaintiff cannot prove that Moore's testimony is admissible. Thus, cross-examination is not the remedy, but rather Moore's testimony should be precluded in its entirety.

## **CONCLUSION**

Moore's opinions are the product of conclusory leaps that benefit his client, rather than opinions formed after analysis and testing. He formed the hypothesis that jacking caused the damage he observed, but rather than test that hypothesis in a manner such that the question could be answered either way, he simply concluded that his observations proved the hypothesis. This is not science, and it certainly is not a generally accepted method of testing the question of whether jacking caused any damage. Moreover, Moore failed to exclude alternative causes, including ones that make much more sense, like the leaks that he found in the Trailer in August 2009, being due to its having sat in a field, unmaintained, for a year. His opinions are not reliable scientific conclusions; they are advocacy. As such, Moore's opinions fail the *Daubert* test and should be excluded.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

  /s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

  /s/ M. David Kurtz