UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER | * | MDL NO. 1873 |
| | FORMALDEHYDE PRODUCTS | * | |
| | LIABILITY LITIGATION | * | SECTION "N" (5) |
| | | * | |
| | | * | JUDGE ENGELHARDT |
| | | * | MAGISTRATE CHASEZ |
| | | * | |
| THIS DOCUMENT IS RELATED TO | | * | |
| | | * | |
| *Lyndon T. Wright v. Forest River, Inc., et al,* | | * | |
| Docket No. 09-2977; | | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN OPPOSITION TO DEFENDANT SHAW ENVIRONMENTAL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING "BLOCKING"**

Plaintiff Lyndon Wright ("Plaintiff") opposes Defendant Shaw Environmental, Inc.'s ("Shaw") "Motion for Partial Summary Judgment Regarding 'Blocking'" (Docket Entry No. 10935) and in support, would show:

BACKGROUND

Plaintiff is one of thousands of people displaced by Hurricanes Katrina and Rita. Following the devastation of these hurricanes, the Federal Emergency Management Agency ("FEMA") contracted with Shaw and other Individual Assistance/Technical Assistance Contractors ("IA/TACs") to aid in the delivery, installation, and maintenance of emergency housing units (each an "EHU") for the displaced victims of the disasters.

As an IA/TAC, Shaw was responsible for the delivery, installation, and initial maintenance of Plaintiff's specific EHU (the "Trailer"). Plaintiff's claims against Shaw arise out of Shaw's installation of the Trailer and ultimately allege that Shaw's installation process created stress and distortion that allowed increased moisture

intrusion and formaldehyde exposure due to cracks and opening in the shell of the Trailer.

**ARGUMENT AND AUTHORITIES**

**I.      SUMMARY JUDGMENT STANDARD.**

**A.      Generally**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be granted if the pleadings, discovery, disclosure materials, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* F. R. Civ. P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir.1995). A party moving for summary judgment "must demonstrate the absence of a genuine issue of material fact." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Little, 37 F.3d at 1075.

"If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial." *Harvey v. Toyota Material Handling, USA, Inc.*, No.

05-0561, 2007 WL 1115235 (W.D. La. April 13, 2007) (citing *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996)).    When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party.  *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (5th Cir. 2001).  If there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is a genuine issue for trial, and thus, summary judgment is inappropriate. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**B.    In the Context of the Government Contractor Defense**

The government contractor defense is an affirmative defense, for which Shaw bears the burden of proof.  *See Bailey v. McDonnell Douglas Corp.,* 989 F.2d 794, 802 (5th Cir. 1993).    Accordingly, Shaw must show evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial and demonstrate the absence of any material fact. *See id.* (citations omitted).  As a non-moving party without the burden of proof, the Plaintiff need only produce significant, probative evidence demonstrating the existence of a material fact *after* Shaw meets its initial burden.  *See International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264-65 (5th Cir. 1991)(emphasis added).

**II.    THE GOVERNMENT CONTRACTOR DEFENSE**

**A.    Prior Rulings by This Court**

This Court has previously ruled on similar motions for summary judgment in this multi-district litigation filed by Flour Enterprises, Inc. ("Fluor") (*Charlie Age, et al., v. Gulf Stream Coach, Inc. et al.)* and Bechtel National, Inc. ("Bechtel") (*Bartel, et al. v. Gulf*

*Stream Coach Inc., et al.* and *Kujawa, et al. v. Keystone RV Company, et al.*).   *See* Rec. Doc. 3205 (this Court's Order and Reasons dated 9/10/09).   In each case, this Court denied the motion, holding that the first element in the *Boyle* test – regarding the approval of "reasonably precise specifications" – is not met in under these facts as to the entire EHU installation process.   *See id.*

In an attempt to differentiate itself from this Court's prior ruling on this very issue, Shaw has asked this Court to apply the general contractor defense only to "claims arising from anything other than the [jacking] process itself" therefore "dismissing all claims arising from Shaw's work that relate to the completed or "blocked" state of the Wright trailer."   Rec. Doc. 10935-2, pg. 2.   While creative, Shaw's attempt to separate the process of construction – more precisely, the arguably defective process of construction – from the results of such construction is not consistent with the purpose of the government contractor defense.   Moreover, such a ruling would not be appropriate on summary judgment.   Shaw simply cannot delineate between so-called "process damage" and "design damage" as a matter of law.   Therefore, as a preliminary matter, Shaw's attempt to differentiate itself from earlier unsuccessful arguments to this Court must fail.

Although the Plaintiff asserts that Shaw's entire argument should fail for the practical reasons set forth above, the blocking argument – if viewed as a valid argument – still must fail for the reasons set forth below.

B.   **Applicable Law**

As set forth by the United States Supreme Court in *Boyle v. United Technologies Corp.,* 487 U.S. 500 (1988), state laws holding government contractors liable for design defects do "in some circumstances present a 'significant conflict' with federal policy and

[therefore] must be displaced." *Id.* at 512.  Accordingly, the government contractor defense exists "to prevent the contractor from being held liable when the government is actually at fault" *Trevino v. General Dynamics Corp.,* 865 F.2d 1474 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989).  This is consistent with tort liability principles that "seek to impose liability on the wrongdoer whose act or omission caused the injury, not the otherwise innocent contractor whose only role in causing the injury was the proper performance of a plan supplied by the government." *In re Agent Orange Products Liability Litigation,* 506 F.Supp. 762, 793 (E.D.N.Y), *rev'd on other grounds*, 635 F.2d 987 (2d Cir. 1980), *cert. denied sub nom; Chapman v. Dow Chemical Co.,* 454 U.S. 1128 (1981).

Although the government contractor defense exists to provide immunity to those contractors that are able to demonstrate that its application is proper, the Fifth Circuit Court of Appeals has noted the following:

> The protective shield in favor of the contractor collapses when the actions of the government contractor – and not those of the Government – produce the damaging defect.  In such a situation, fairness dictates that a government contractor should not be permitted to escape liability by asserting the sovereign immunity of the Government.

> *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 245-46 (5th Cir. 2000).

To determine whether or not the protective shield should remain, the United States Supreme Court articulated the following three elements in *Boyle*:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the         equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not the United States.

*Boyle,* 487 U.S. at 513.

If a contractor is unable to establish <u>all</u> of the above elements, the general contractor defense is ineffective and the contractor remains subject to liability. *See Smith v. Xerox Corp.,* 866 F.3d 135, 136-37 (5th Cir. 1989)(emphasis added). In the case at hand, Shaw may not avail itself of the government contractor defense or for the following reasons: (1) the specifications were not reasonably precise as to all aspects of blocking; (2) Shaw failed to comply with the given specifications; (3) FEMA's limited inspection did not rise to the level of approval necessary to demonstrate compliance; and (4) questions of fact remain as to Shaw's and FEMA's knowledge regarding the dangers of using formaldehyde in travel trailers.

## C.   The FEMA Specifications were not Reasonably Precise as to All Aspects of the Blocking Procedure

The first element of the government contractor defense requires a showing that the governmental agency at issue approved reasonably precise specifications. *See Boyle,* 487 U.S. at 512. Whether the specifications were "reasonably precise" and whether actual approval occurred are fact-specific inquiries. *See Stout v. Bourg-Warner Corp.,* 933 F.2d 331, 336-37 (5th Cir. 1991). Both issues ultimately turn on whether the government agency exercised substantial oversight of the product's original design, development and production. *See id.* (the government examined production drawings and actually tested the prototypes); *Kerstetter v. Pacific Scientific Company,* 210 F.3d 431, 435 (5th Cir. 2000)(The government continuously interacted with the contractor over a period of eight years and addressed design issues specific to the case during the design process); *Smith v. Xerox Corp.,* 866 F.2d 135, 137-38 (5th Cir. 1989)(the government provided initial specifications that were incorporated into the production

contract, and reviewed and approved the contractor's final drawings); *see also Harduvel v. General Dynamics Corp.*, 878 F.2d. 1311, 1320 (11th Cir. 1989); *Kleeman v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir. 1989).

As this Court has previously noted, FEMA provided detailed specifications on some aspects the EHU blocking procedure, but they did not address all aspects of the procedure, and in so doing, left some tasks to the discretion of the contractor.  Rec. Doc. 3205, pg. 6.  One such task was the procedure for "jacking" the trailers off the ground, as this Court has already ruled.  *See id.*  In addition to jacking, however, Plaintiff contends that FEMA also deferred to the contractor's discretion with respect to site preparation and analysis.

Provision #2 of Section 3.2 of the Statement of Work required IA/TACs to "[p]erform all site preparation, as necessary, for proper installation of the units."  Exhibit 7 entitled "Travel Trailer Installation" to IA/TAC Performance Work Statement (SHAW000480-SHAW000489), See Exhibit A attached.  Although the specifications set forth in Section 2.1.2 of Exhibit 7 to the IA/TAC Performance Work Statement are detailed with respect to the construction of the piers and to some extent the leveling process, they do not address the notion of site preparation in any manner other than requiring the clearing of debris and roots.  *See* IA/TAC Performance Work Statement Page 2 of 3, SHAW000639, Exhibit B attached.  This lack of guidance from FEMA as to all aspects of site preparation signifies their reliance on the IA/TAC's discretion to determine what needed to be done to make each site appropriate for the "proper installation' of the EHUs.  Given each IA/TAC's expertise in engineering and construction, this deference in discretion seems appropriate.

As explained above, the government contractor defense does not apply where the decisions of the contractor – not the government – result in the defect at issue. *See Mitchell,* 913 F.2d at 245-46. Accordingly, Shaw's ability to exercise its own discretion with respect to site preparation bars the application of the government contractor defense, at least with respect to any issues caused by Shaw's exercise of such discretion. *See Trevino,* 865 F.2d at 1486 (*Boyle* protects government contractors from liability only where "discretion over the design feature in question was exercised by the government").

Shaw now takes the position that any soil issues relate to the completed state of the Trailer and not the installation process. Rec. Doc. 10935-2, pg. 6. Once again, Shaw is attempting to draw a distinction between the process and the results. As noted above, the Statement of Work clearly required "**all** site preparation, as necessary, for the **proper installation** of the units." See Exhibit A, SHAW000480 (emphasis added). Shaw's implicit assertion, therefore, is that site preparation does not involve any sort of soil sampling or testing. However, Shaw's own expert, Dr. John D. Osteraas, recognized the likelihood of a travel trailer shifting over time when installed on piers in the conditions present at the Trailer. *See* Deposition of Dr. John D. Osteraas, pg. 88-89, Exhibit C attached, (discussing the inevitability of the soil shifting and the travel trailer moving over time). Despite this likelihood, questions of fact exist as to whether or not Shaw engaged in any testing of the soil. *See* Deposition of Geoffrey C. Compeau, pg. 264-65, Exhibit D attached, (not aware of any soil capacity testing in connection with the installation of the EHUs pursuant to Exhibit 7).

In light of Dr. Osteraas' testimony and the apparent lack of any soil testing by

Shaw, material fact questions exist as to whether Shaw's exercise of discretion as site preparation contributed to the damage and warping of the trailer.  In fact, Dr. Osteraas noted the likelihood that the shifting of the soil did contribute to the settling and warping of the Trailer.  *See* Deposition of Dr. John Osteraas, pg. 97-98, Exhibit C attached.

Accordingly, regardless of the detail given with respect to the construction of the piers, summary judgment over the entire "blocking" process remains inappropriate. Where the specifications leave discretion over one of the potential causes of damage to the Trailer, the first prong of *Boyle* cannot be established as a matter of law.

D.    **Shaw's Work Did Not Comply with the FEMA Specifications**

The second prong of the *Boyle* test requires a government contractor to establish compliance with the government-provided reasonably precise specifications.  *See generally Boyle,* 487 U.S. at 512.   Nonconformance with a specification ultimately means that the alleged defect must (i) exist independently of the design itself and (ii) result from a deviation from the required military specification.  *See Kerstetter,* 210 F.3d at 435.

1.    **The Blocking was not in Conformance with the Specifications**

Putting aside the question of whether or not the blocking specifications were reasonably precise, Shaw's argument for the imposition of the government contractor defense must fail due to Shaw's failure to comply with the given specifications in the first place.  Although the pier construction specifications clearly required the use of "exterior grade plywood" in the construction of the base plate, *see* Exhibit A of Shaw's Motion (Exhibit "4" thereto marked SHAW002020), *See* Exhibit E attached, Shaw's subcontractor testified as to using plastic pads instead:

Q.    Your testimony from my understanding is RCG only used ABS

plastic pads, they never used plywood pads?

A.    That's correct.

Q.    Okay.  You don't recall any instruction relating to the pads versus plywood?

A.    I think it's just preference. We – we liked the pads and we had a ton of them. You know, the other one you deal with the splinters and things when you're putting them down there. And it's just a pain. So they're a lot more expensive, the ABS pads, but we liked them better, just personal preference.

Deposition of Edith Young, pg. 65, ln. 2-14, Exhibit F attached.

In addition to the use of plastic base plates, Shaw's subcontractor also testified as to variances in pier construction that did not conform with the specifications' requirement for the use of both solid and hollow blocking:

Q.    And a pier would be the plastic blocking followed by however many concrete blocks were necessary followed by the wood on top?

A.    Sometimes you only – yes, that's correct.  Sometimes you only needed like the solid blocks and the pad and the solid blocks.  And sometimes you needed the pad and the hollow blocks with the – you know, the solid on top or whatever the situation is.

*Id.*, pg. 132, ln. 1-9, Exhibit F attached.

These deviations from the required specifications arguably exacerbated the dangerous conditions existing in the EHUs and became an additional cause of the warping and loosening of the wall panels in the Trailer, increased moisture intrusion into the Trailer, and other circumstances increasing the level of off-gassing formaldehyde within the Trailer while the Plaintiff resided in it.  At a minimum, the failure to construct the piers as required by the very specifications Shaw relies on constitutes a significant non-conformity with the specifications provided to Shaw (and its subcontractors). Accordingly, Shaw cannot meet its burden with respect to the second element of *Boyle*

as a matter of law.

> 2.    **C. David Moore's Testimony Does Not Indicate Compliance**

Shaw's Motion references certain testimony by C. David Moore as evidence of Shaw's compliance with the FEMA specifications. Rec. Doc. 10935-2, pg. 17-18. While the testimony referenced by Moore does not reveal evidence of non-conformity, it hardly rises to the level of evidence of conformity with all FEMA specifications. As Moore states, he simply did not know either way whether the Trailer was in conformity with Section 2.1.2 of Exhibit 7 to the IA/TAC Performance Work Statement, *See* Exhibit A attached, and Deposition of C. David Moore, pg. 95-97, Exhibit G attached. Ultimately, Moore's testimony regarding whether he was aware of non-compliance is largely irrelevant in the face of the clear testimony referenced above regarding the construction of the piers.

> E.    **Shaw Cannot Establish Sufficient Acceptance of its Work Such that it Should Be Deemed to be Conforming as a Matter of Law**

Acceptance and use of an item following its production can establish that an item conformed to its specifications. *See Kerstetter,* 210 F.3d at 435. However, the notion of acceptance is rare and typically limited to particular circumstances. *See, e.g., Tate v. Boeing Helicopters,* 921 F.Supp. 1562, 1567 (W.D. Ky. 1996), *aff'd* 140 F.3d 654 (6th Cir. 1998). One such example where acceptance has been recognized is upon the government's issuance of a DD Form 250 (Material Inspection Receiving Report) signifying the government's acceptance and the "conformance of the goods." *United States v. Cannon,* 41 F.3d 1462, 1468 (11th Cir. 1995); *see also Tate,* 921 F.Supp. at 1567 (finding that Defendants were entitled to summary judgment on the second prong of the government contractor defense because the Army executed a "DD250"

documenting an operating manual's conformance to its specifications; *Hendrix v. Bell Helicopter Textron, Inc.,* 634 F.Supp. 1551, 1557 (N.D. Tex. 1986)(holding that absent proof that the government's acceptance of a helicopter was not correct, the "DD250 acceptance conclusively established that [the] helicopter . . . conformed to the contract specifications.")

Shaw has attempted to demonstrate acceptance through Geoffrey C. Compeau's affidavit and various attached reports and checklists reflecting Shaw's (or its subcontractors') own quality control procedures and FEMA's satisfactory inspection of the Trailer.    Shaw relies on such evidence as conclusive evidence of either: (i) the inspection and acceptance of Shaw's work by the government; or (ii) sufficient government supervision and control of Shaw's work such that it should be deemed compliant as a matter of law.  For the reasons set forth below, however, this evidence cannot support either conclusion as a matter of law.

> 1.    **The Various Inspection Reports Cannot be Characterized as "Acceptance" for Purposes of the Government Contractor Defense**

As noted above, Shaw has offered various reports as evidence of the acceptance of their work in compliance with the FEMA specifications.  However, for purposes of the *Boyle* test, and especially considering the limitations on the use of acceptance as evidence of compliance, these reports cannot constitute conclusive proof of the government's approval of Shaw's "blocking" of the Trailer.

As a primary matter, there is nothing in either Geoffrey C. Compeau's affidavit or the referenced "AFO DHOPS Master Expedite List 03/31/2006" (hereinafter the "AFO Inspection Report") conclusively establishing that, as a matter of law, the blocking of the Trailer was in full compliance with the FEMA-provided specifications, or, more

importantly, that FEMA accepted the site preparation, blocking, and other aspects of the Trailer's installation.   In reality, the AFO Inspection Report reveals very little detail regarding any inspection by FEMA and does not specifically address the construction of the piers or other aspects of the installation procedure.

It is also worth noting that the AFO Inspection Report does not appear to have been signed or acknowledged by any representative of FEMA or the government. However, even if the AFO Inspection Report was signed or created by a government employee, neither it or the related fact that the Trailer passed FEMA's February 21, 2006 inspection rises to the level of a DD250 such that it should now be considered conclusive evidence of compliance.

Aside from the lack of detail as to whether or not the piers and other components were definitively inspected, *Miller v. United Technologies Corp.*, 660 A.2d 810 (Conn. 1995), provides precise reasoning why such reports cannot serve to support a finding of acceptance considering that "preliminary acceptance cannot foreclose the possibility that the [product], in fact, was nonconforming."   Although the Trailer is not military aircraft as in *Miller*, the underlying reasoning is the same in that "slight deviations from required specifications may pass an initial inspection unnoticed, only to become apparent later after further examination." *Id.* at 833-34.

In this case, total government acceptance of Shaw's actions, thereby removing all liability, should not be extracted from a single simple inspection by a FEMA representative or a spreadsheet indicating some degree of compliance by Shaw.  Given the nature of the pier construction and site preparation, it cannot be assumed that the deviations from the specifications would have been immediately recognizable.

Additionally, as noted by the Fifth Circuit in *Trevino*, if a simple signature of a government employee could eliminate liability, "government contractors would make sure that they would never face liability . . . merely by bargaining for a guarantee that some federal employee would place his signature at the bottom of every sheet of paper involved in the design of a product and thus confer the government's 'approval.'" *Trevino*, 865 F.2d at 1480, n. 5 (noting, in connection to the first *Boyle* element, that the signature of a government employee must not be enough by itself to establish approval). Thus, even if it were signed during the inspection process, a simple government official signature on the AFO Inspection Report cannot be enough in and of itself to establish approval. Ultimately, Shaw's negligence simply cannot and should not be exonerated because a government employee made a single inspection of the Trailer and did not discover Shaw's non-compliance.

2.     **Shaw's Internal Checklists Cannot be Considered Government Approval**

In addition to the AFO Inspection Report, Shaw also references its own internal quality control process as evidence of compliance. *See* pg. 8-11 of Shaw's Motion. While Shaw has not expressly cited these checklists as evidence of the government's approval, it should be noted that the checklists are by their very nature internal documents prepared by Shaw's own employees (or its subcontractors) that cannot now serve as conclusive evidence of the government's approval of the work.

3.     **FEMA did not Exercise the Type of Control and Supervision Required to Establish Compliance as a Matter of Law**

As an alternative to outright acceptance, Shaw implicitly asserts that FEMA supervised or controlled its implementation of the specifications such that compliance may be found as a matter of law. *See generally* Rec. Doc. 10935-2, pg. 16-17. As to

FEMA's control and supervision over Shaw's work, Shaw again references the single FEMA inspection on February 21, 2006. Rec. Doc. 10935-2, pg. 16-17.

Ignoring for a moment the issue of whether or not the February 21, 2006 inspection rose to the level required to establish acceptance, there is no evidence of a "continuous exchange" between Shaw and FEMA sufficient to support an argument that the process itself should now be considered persuasive evidence of compliance. *Cf. Kleeman v. McDonnell Douglas Corp.,* 890 F.2d 698, 701-02 (4th Cir. 1989). Unlike *Kleeman,* in this case there was no extensive exchange of ideas between Shaw and FEMA. In fact, Shaw's own motion notes that Shaw had "no role in developing, testing or engineering any aspect of Exhibit 7...." Rec. Doc. 10935-2, pg. 8. Nevertheless, Shaw now implicitly references a single visit by FEMA <u>occurring after completion of the blocking</u> as conclusive proof of a continuous back and forth process between the parties such that FEMA should now be deemed to have controlled and supervised the blocking and installation of the Trailer. Because Shaw cannot demonstrate any evidence of a back and forth exchange of ideas (and supervision and control by FEMA) <u>during the entire installation process</u>, however, this argument must fail as a matter of law.

### F. Questions of Fact Remain as to Shaw's and FEMA's Knowledge Regarding the Dangers of Formaldehyde

The third *Boyle* element requires proof that the contractor warned the government about possible dangers in the use of the product known to the contractor but not to the government. *Boyle,* 487 U.S. at 512. A contractor can satisfy this element by proving that (1) it lacks knowledge of any alleged danger relating to the product, or (2) that the government already knew of the alleged danger or hazard. *See Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 1003-04 (7th Cir. 1996). The logic behind

the third element is simple – "in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." *Boyle*, 487 U.S. at 512.

In the case at hand, Shaw was aware of certain odors early on in the process, prior to installation of the trailers, but did nothing to communicate this fact to FEMA or any other representative of the government.  *See generally,* Deposition of Geoffrey C. Compeau, pp. 100 – 103, Exhibit D attached.  A Shaw representative even went so far as to recommend that Shaw make FEMA "**aware** of [the formaldehyde issues] (as the 'owners' of the trailers)."  Deposition of Geoffrey C. Compeau, pp. 158 – 160 (Exhibit D attached) and Exhibit 8 thereto, *See* Exhibit H attached (emphasis added).  The obvious suggestion of this email is that FEMA was in fact not aware of the formaldehyde issues.

Shaw has offered no evidence to demonstrate that, as a matter of law, FEMA had knowledge of the presence of odors or formaldehyde issues in the trailers (and the associated danger) prior to the placement of the trailers in the forward yards. Furthermore, the correspondence referenced above from Shaw's own representative suggests that fact questions do in fact exist as to whether or not FEMA was aware of the formaldehyde issues at the time they came to Shaw's attention.  Therefore, as a matter of law, Shaw cannot meet its burden with respect to the third element of the *Boyle* test.

## III.   SHAW'S LIABILITY UNDER LA. R.S. 9:2771.

Shaw has also argued as a matter of law that it cannot be found liable to the Plaintiff pursuant to La. R.S. 9:2771 which Shaw asserts provides immunity to a contractor if he can establish compliance with specific plans and specifications provided

to the contractor.  Like the *Boyle* test, a key component of contractor immunity under state law is the demonstration of compliance with the referenced specifications.  *See generally, City of Covington v. Heard,* 428 So. 2d 1132, 1134 (La. App. 1st Cir. 1983). Incorporating the arguments set forth above regarding Shaw's non-compliance with the FEMA blocking specifications and its failure to meet the related element of the *Boyle* test, Shaw cannot now claim contractor immunity under state law given that it cannot establish compliance with the specifications as a matter of law.

## CONCLUSION

The government contractor defense is only available to those who can meet all of the *Boyle* elements.  Absent a showing that no reasonable jury could find for the Plaintiff, "[w]hether the facts establish the conditions for the [government contractor] defense is a question for the jury." *Boyle,* 487 U.S. at 514.  Moreover, because the government contractor defense is an affirmative defense and Shaw carries the burden of persuasion, this Court must evaluate whether or not Shaw has met its burden with respect to each prong of *Boyle. See Bailey,* 989 F.2d at 802.

In this case, Shaw arguably cannot meet its burden of showing an absence of a genuine issue of material fact as to the government contractor defense and each underlying element. *See id.* However, if this Court finds that Shaw has met its initial burden with respect to the government contractor defense, the Plaintiff has offered significant and probative evidence demonstrating the existence of material facts with respect to multiple elements of the *Boyle* test.  Accordingly, summary judgment is not appropriate. *See International Shortstop,* 939 at 1264-65.

Respectfully Submitted,

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:    s/Gerald E. Meunier
        GERALD E. MEUNIER, #9471
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:   504/522-2304
        Facsimile:    504/528-9973
        gmeunier@gainsben.com

        s/Justin I. Woods
        JUSTIN I. WOODS, #24713
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:   504/522-2304
        Facsimile:    504/528-9973
        jwoods@gainsben.com

        **COURT-APPOINTED PLAINTIFFS'
        STEERING COMMITTEE**
        ANTHONY BUZBEE, Texas # 24001820
        RAUL BENCOMO, #2932
        FRANK D'AMICO, #17519
        MATT MORELAND, #24567
        LINDA NELSON, #9938
        MIKAL WATTS, Texas # 20981820
        Dennis Reich, Texas #16739600

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing on February 12, 2010.


 s/Gerald E. Meunier
 GERALD E. MEUNIER, #9471