```
                                                                      1

 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:  FEMA TRAILER           MDL NO. 1873

 4    FORMALDEHYDE PRODUCTS          SECTION "N"(5)

 5    LIABILITY LITIGATION           JUDGE ENGELHARDT

 6
      This document relates to:  Lyndon T. Wright
 7         v. Forest River, Inc., et al
                  Docket No. 09-2977
 8                    * * *

 9

10        Videotaped Federal Rule 30(b)(6)

11    Deposition of SHAW ENVIRONMENTAL, INC.,

12    through its designated representative,

13    GEOFFREY C. COMPEAU, Ph.D., 4171 Essen Lane,

14    Baton Rouge, Louisiana 70810, taken at the

15    offices of Baker Donelson, Bearman, Caldwell

16    & Berkowitz, PC, 201 St. Charles Avenue,

17    Suite 3600, New Orleans, Louisiana 70170, on

18    Thursday, the 7th day of January, 2010.

19

20    REPORTED BY:

21       JAMES T. BRADLE, CCR
         PROFESSIONAL SHORTHAND REPORTERS
22       (504)529-5255

23    VIDEOGRAPHER:

24       BRIAN SOILEAU
         PROFESSIONAL SHORTHAND REPORTERS
25       (504)529-5255
```

EXHIBIT D

264

1    Q    And Exhibit 8, park models?
2    A    Yes.
3    Q    Now, my question is, did Shaw
4    perform soil capacity tests as requested,
5    and you said you believed that they did?
6    A    For this instance.
7    Q    For this instance.  Now, a new
8    question.  Exhibit 7, travel trailers, did
9    Shaw ever perform any soil capacity tests to
10   determine whether or not the "Blocking and
11   Leveling" sections as it related to travel
12   trailers was suitable?
13        MR. KURTZ:
14             Objection, scope.
15        THE WITNESS:
16             Not to my knowledge.
17   EXAMINATION BY MR. D'AMICO:
18   Q    Okay.  And if that had been done,
19   would that have been something that you
20   would have been made aware of?
21        MR. KURTZ:
22             Objection, form.
23        THE WITNESS:
24             In the consequence of, you know,
25   looking at data, hearing about daily reports

Compeau, Geoffrey 01/07/10

265

1  and so on, I likely would have been made
2  aware of that.
3  EXAMINATION BY MR. D'AMICO:
4      Q   Were there ever any discussions,
5  to your knowledge, relative to the
6  suitability of the blocking and leveling
7  protocol as established in the contract we
8  have been discussing all morning relative to
9  travel trailer installation?
10      MR. KURTZ:
11          Objection, form, scope.
12      THE WITNESS:
13          Was there ever any discussion?
14  EXAMINATION BY MR. D'AMICO:
15      Q   Discussions about the suitability
16  for travel trailer installations regarding
17  this section 2.1.2, "Blocking and Leveling"
18  for travel trailers?
19      MR. KURTZ:
20          Objection, form.
21      THE WITNESSN:
22          Was there ever any discussion
23  regarding blocking and leveling of travel
24  trailers?
25  EXAMINATION BY MR. D'AMICO:

Compeau, Geoffrey 01/07/10

100

1       Q    Not at installation.  When did
2  these problems arise?
3       MR. BONE:
4            Objection, form.
5       MR. KURTZ:
6            Objection, form.
7       THE WITNESS:
8            We understand that in the forward
9  yards, where we worked side by side with
10 FEMA, that, you know, on arrival, some of
11 the trailers may have had odors, but again,
12 these were brand new equipment built to
13 those specifications, and so we simply
14 ventilated the trailers.
15 EXAMINATION BY MR. D'AMICO:
16      Q    Shaw identified odors emanating
17 from the trailers in the storage yards?
18      MR. KURTZ:
19           Objection, form.
20      THE WITNESS:
21           Shaw personnel indicated there
22 were odors from time to time in some of the
23 trailers that came into the forward yards.
24 EXAMINATION BY MR. D'AMICO:
25      Q    Were these chemical odors?

Compeau, Geoffrey 01/07/10

101

1        MR. BONE:
2             Object to the form.
3        THE WITNESS:
4             Well, all odors are chemical.
5   EXAMINATION BY MR. D'AMICO:
6        Q    And did Shaw ever ascertain what
7   the nature of the odor or cause of the odor
8   was?
9        MR. BONE:
10            Objection, form.
11       MR. KURTZ:
12            Objection, form and scope.
13       THE WITNESS:
14            It was a new trailer smell is how
15  it often came up.
16  EXAMINATION BY MR. D'AMICO:
17       Q    Shaw did not endeavor to determine
18  what the cause or source of the odor was?
19       MR. BONE:
20            Object to the form.
21       MR. KURTZ:
22            The same.
23       THE WITNESS:
24            We did not.
25  EXAMINATION BY MR. D'AMICO:

Compeau, Geoffrey   01/07/10

                                                                102

1       Q    Did Shaw ever endeavor to find out
2  if these chemical odors were causing or were
3  capable of causing health problems to the
4  occupants of the temporary housing units?
5       MR. BONE:
6            Object to the form.
7       MR. KURTZ:
8            And scope.
9       THE WITNESS:
10           Again, we ventilated the trailers,
11  and typically that was sufficient to deal
12  with the issue, so we didn't believe there
13  was any sustained issue with the odor.
14  EXAMINATION BY MR. D'AMICO:
15      Q    All right.  My question was, did
16  Shaw ever endeavor to determine whether or
17  not any of these chemical odors posed a
18  health risk to the occupants of the
19  temporary housing units?
20      MR. BONE:
21           Object to the form.
22      MR. KURTZ:
23           And scope.
24      THE WITNESS:
25           No, we did not.

Compeau, Geoffrey 01/07/10

1  EXAMINATION BY MR. D'AMICO:

2     Q   You did not. Okay. And did you

3 ever do any testing, Shaw do any testing of

4 the chemicals that were emanating in these

5 travel trailers to determine what the

6 chemicals were?

7     MR. BONE:

8         Object to the form.

9     MR. KURTZ:

10         And scope.

11     THE WITNESS:

12         We relied on --

13     MR. KURTZ:

14         Go ahead.

15     THE WITNESS:

16         We relied on -- When it came to

17 our attention, we relied on FEMA, who we

18 understood was studying the issue, and we

19 anticipated would get back and direct us as

20 appropriate.

21 EXAMINATION BY MR. D'AMICO:

22     Q   What did you understand FEMA to be

23 studying?

24     MR. MILLER:

25         Objection, vague, time.

```
                                                              158
 1    identify this for the ladies and gentlemen
 2    of the jury?
 3          MR. KURTZ:
 4               Read the Bates label first,
 5    please.
 6          THE WITNESS:
 7               The Bates label?  Shaw 013548.
 8    EXAMINATION BY MR. D'AMICO:
 9          Q    And 013549?
10          A    Yes.
11          Q    Go ahead, please.
12          A    It's from M.K. Baldwin to John
13    Bruton, a copy to Jim Brixius and myself,
14    and it's entitled "Formaldehyde notes and
15    video link on CNN."
16          Q    Again, the importance is "high,"
17    correct?
18          A    The importance is "high."
19          Q    All right.  Do you recall ever
20    seeing this e-mail transmission?
21          A    I don't have an explicit
22    recollection of this e-mail transmission.
23          Q    When is the first time that you
24    saw this that you can recall?
25          A    Well, you know, I probably saw it
```

Compeau, Geoffrey 01/07/10

```
 1    on May 17th when it was originally sent to
 2    me.  Again, Trina and I spoke regularly and
 3    had weekly conference calls regarding her
 4    status.
 5        Q    Do you believe you would have had
 6    a conversation with Trina about this if she,
 7    in fact, did send this e-mail transmission
 8    to you?
 9        A    You know, it's highly likely we
10    would have discussed it in the realm of a
11    number of other things.
12        Q    Okay.  Who is John?
13        A    John Bruton?
14        Q    John Bruton.
15        A    I believe John Bruton is the
16    contracting officer's technical
17    representative for FEMA in Texas.
18        Q    Okay.  If we could, let's talk
19    about this e-mail a little bit.  Trina
20    Baldwin writes to John, "Right now, it seems
21    to be a few isolated cases, but I think FEMA
22    needs to be aware of this (as the 'owners'
23    of the trailers).  Here is some additional
24    information," and she talks about the EPA
25    site and talks about some information
```

1  relative to formaldehyde, correct?
2      A    Yes.
3      Q    All right.
4      A    Reasonably, as I read it along,
5  also, yes.
6      Q    All right. As a chemist, were you
7  familiar with the properties of
8  urea-formaldehyde that are stated in this
9  EPA site link?
10     A    Not that familiar with this
11 chemistry particularly.
12     Q    All right. For instance, did you
13 know that formaldehyde is a colorless,
14 pungent-smelling gas which can cause watery
15 eyes, burning sensation in the eyes and
16 throat, nausea, and difficulty in breathing
17 in some humans exposed at elevated levels,
18 above .1 parts per million?
19     MR. BONE:
20          Object to the form.
21     MR. KURTZ:
22          Object to the form.
23     THE WITNESS:
24          You know, again, to those
25 specifics, I knew that formaldehyde could