# Transcript of the Testimony of
# Videotaped Deposition of Edward Halie Shwery, Ph.D.

Date taken: November 9, 2009
Vol. I

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

Case 2:07-md-01873-KDE-MBN   Document 11542-7   Filed 02/12/10   Page 2 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Edward Halie Shwery, Ph.D.

## Page 1

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER              MDL NO. 1873
FORMALDEHYDE PRODUCTS             SECTION "N"(4)
LIABILITY LITIGATION              JUDGE ENGELHARDT

This document relates to:  Lyndon T. Wright
     v. Forest River, Inc., et al
         Docket No. 09-2977
             * * *
           (Volume I)
     Videotaped Deposition of EDWARD HALIE
SHWERY, Ph.D., 315 Metairie Road, Suite 200,
Metairie, Louisiana 70005, taken at the Law
Offices of Frank J. D'Amico, Jr., 622
Baronne Street, New Orleans, Louisiana
70113, on Monday, the 9th day of November,
2009.

REPORTED BY:
    JAMES T. BRADLE, CCR
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255
VIDEOGRAPHER:
    MICHAEL BERGERON
    PROFESSIONAL SHORTHAND REPORTERS
    (504)529-5255
```

## Page 2

```
 1   APPEARANCES:
 2       THE LAW OFFICES OF FRANK
         J. D'AMICO, JR.
 3       (BY: AARON Z. AHLQUIST, ESQUIRE)
         622 BARONNE STREET
 4       NEW ORLEANS, LOUISIANA 70113
 5       DAVID McLENDON
         4731 CANAL STREET
 6       NEW ORLEANS, LOUISIANA 70119
 7         ATTORNEY FOR THE PLAINTIFFS
 8       U.S. DEPARTMENT OF JUSTICE
         (BY: MICHELE S. GREIF, ESQUIRE)
 9       CIVIL DIVISION
         1331 PENNSYLVANIA AVENUE, N.W.
10       ROOM 8022S, NAT'L PLACE
         WASHINGTON, D.C. 20004
11
         ATTORNEYS FOR DEFENDANT, UNITED
12       STATES OF AMERICA
13       BAKER DONELSON
         (BY: KAREN KALER WHITFIELD, ESQUIRE)
14       201 ST. CHARLES AVENUE, SUITE 3600
         NEW ORLEANS, LOUISIANA 70170
15
         ATTORNEYS FOR DEFENDANTS,
16       CH2M HILL CONSTRUCTORS, INC. AND
         SHAW ENVIRONMENTAL, INC.
17
         GIEGER, LABORDE & LAPEROUSE, LLC
18       (BY: JASON D. BONE, ESQUIRE)
         701 POYDRAS STREET
19       SUITE 4800
         NEW ORLEANS, LOUISIANA 70139
20
         ATTORNEYS FOR DEFENDANT, FOREST
21       RIVER, INC.
22
23
24
25
```

## Page 3

```
 1   APPEARANCES CONTINUED:
 2       WILLINGHAM, FULTZ & COUGILL
         (BY: THOMAS L. COUGILL, ESQUIRE -
 3         VIA TELEPHONE)
         NIELS ESPERSON BUILDING
 4       808 TRAVIS, SUITE 1608
         HOUSTON, TEXAS  77002
 5
         ATTORNEYS FOR DEFENDANTS,
 6       JAYCO, INC. AND STARCRAFT
         RV, INC.
 7
         JONES, WALKER, WAECHTER, POITEVENT,
 8       CARRERE & DENEGRE, LLP
         (BY: MADELEINE FISCHER, ESQUIRE -
 9         VIA TELEPHONE)
         201 ST. CHARLES AVENUE
10       NEW ORLEANS, LOUISIANA 70170
11       ATTORNEYS FOR DEFENDANTS,
         KEYSTONE RV COMPANY, THOR
12       CALIFORNIA, THOR INDUSTRIES,
         DUTCHMEN MANUFACTURING, DS CORP
13       (d/b/a CROSSROADS RV) AND KZ RV,
         LP
14
         LUGENBUHL, WHEATON, PECK,
15       RANKIN & HUBBARD
         (BY: KRISTOPHER M. REDMANN, ESQUIRE -
16         VIA TELEPHONE)
         601 POYDRAS STREET, SUITE 2775
17       NEW ORLEANS, LOUISIANA 70130
18       ATTORNEYS FOR DEFENDANT,
         LIBERTY MUTUAL INSURANCE
19       CORPORATION
20
21
22
23
24
25
```

## Page 4

```
 1              * * *
 2          EXAMINATION INDEX
 3                                          Page
 4   EXAMINATION BY MR. BONE ...............8
 5              * * *
 6          INDEX OF EXHIBITS
 7                                          Page
 8   Exhibit No. 1 ........................9
 9   Notice of Video Deposition of Edward H.
10   Shwery, Ph.D.
11   Exhibit No. 2 ........................10
12   Curriculum Vitae of Edward Halie Shwery,
13   Ph.D. (PSC025369 through PSC025384)
14   Exhibit No. 3 ........................11
15   Bill from Edward Halie Shwery, Ph.D. to Ms.
16   Cynthia Wallace dated October 30, 2009
17   Exhibit No. 4 ........................12
18   Edward H. Shwery, Ph.D. Court Testimony for
19   2009
20   Exhibit No. 5 ........................37
21   BDI-II questionnaire dated 7-17-09
22   (0154018392)
23   Exhibit No. 6 ........................43
24   RISB Adult Response Sheet dated 7-17-09
25   (0154685844)
```

1 (Pages 1 to 4)

Case 2:07-md-01873-KDE-MBN   Document 11542-7   Filed 02/12/10   Page 3 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)    Videotaped Deposition of Edward Halie Shwery, Ph.D.

1  is coming to me, what problems they have,
2  and then from there, I would design what I'm
3  going to do.
4       Usually it's clinical interviewing
5  and the administration of testing. With a
6  child, it would vary, it would differ a
7  little bit, in that I would first talk to a
8  parent to get developmental history and
9  background information.
10      But essentially, it's the same,
11 whether it's for purposes of writing a
12 report for litigation or developing a
13 treatment plan.
14      Q   Okay. What differences in the
15 treatment of an individual in private
16 practice are there as opposed to someone
17 that you would see for litigation? Is it
18 simply that you would see them on a single
19 occasion and not see them again?
20      A   No. First of all, private
21 practice encompasses all of it. It's not a
22 separate entity from a private practice. A
23 private practice refers to my office and the
24 work I do as a clinical psychologist.
25      The examinations for people that

Page 17

1  are coming for litigation purposes don't
2  necessarily preclude treatment. Often what
3  I will do is examine somebody, do a thorough
4  work-up, review all the history, and then
5  write a report, and then after having done
6  that, then engage in treatment for people.
7  So there's really no difference.
8       But some people I would only see
9  for examination. For example, if a court
10 refers somebody to me and says, "I want you
11 to see this person," I wouldn't necessarily
12 be engaging in treatment. I would be
13 answering whatever questions the court has
14 posed.
15      Q   And in terms of your evaluation of
16 Lyndon Wright, which category would he fall
17 into? Would he be the person you simply
18 evaluate or would he be someone that you
19 would create a psychologist/patient
20 relationship with?
21      A   Initially, when I saw him in July,
22 I had intended not to see him again. His
23 problems were of a limited nature. And then
24 he called and he had had some additional
25 development of problems. And then I saw him

Page 18

1  again in, I think it was September, and I
2  started seeing him in counseling until he
3  gets into a long-term treatment with
4  somebody.
5       Q   Before you saw Lyndon Wright --
6  And I believe the first time you saw him was
7  July -- Was it July 19th of 2009?
8       A   It was July 17, and then July 20,
9  2009. I'm looking at my report of July 21.
10      Q   Before you saw Lyndon Wright on
11 July 17th, what communication had you had
12 with either Mr. Wright or his counsel
13 regarding the work you were being asked to
14 perform in this case?
15      A   Okay. I received a call from an
16 attorney, and I believe it was Ms. Cynthia
17 Wright, I think her last name is, and she
18 asked -- I had already seen someone for her
19 involved in the generically called "FEMA
20 litigation," and asked me if I would see
21 somebody. I had already seen children, and
22 she said, "This is an adult," and I said,
23 "Okay. Send me the background information,
24 records, whatever medical records you have,
25 and then I will schedule it."

Page 19

1       Q   I have been provided a copy of
2  your background materials. Were you ever
3  provided with Mr. Wright's deposition
4  transcript?
5       A   No.
6       Q   Were you ever provided with any
7  deposition transcripts relating to this
8  particular case?
9       A   No.
10      Q   Other than some limited medical
11 records, were you provided with, for
12 example, Dr. Field's medical records?
13      A   I don't think so. Because it's
14 not -- it's not on this disk that I got.
15      Q   All right. Other than some
16 medical records from Dr. Cruz and
17 Dr. Worley, were you provided any other
18 medical records?
19      A   Since then, I have.
20      Q   Okay. Before evaluating
21 Mr. Wright on July 17th and the 20th of
22 2009, had you been provided those records?
23      A   I was not.
24      Q   You said subsequently you have
25 received additional records, correct?

Page 20

Case 2:07-md-01873-KDE-MBN   Document 11542-7   Filed 02/12/10   Page 4 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)     Videotaped Deposition of Edward Halie Shwery, Ph.D.

1  developing a treatment regimen"?
2  A  Yes.
3  Q  And they make three
4  recommendations or three -- make you aware
5  of three issues that need to be considered
6  with respect to Mr. Wright, correct?
7  A  Yes.
8  Q  And the first is "because of his
9  psychiatric profile, this individual may be
10 at increased risk for having an exaggerated
11 negative reaction to serious medical
12 information that follows diagnostic
13 testing," correct?
14 A  Yes.
15 Q  And that "this patient may be at
16 risk for overusing healthcare services,"
17 correct?
18 A  Yes.
19 Q  Did you discuss either of these
20 two particular issues that were raised by
21 the folks who administered -- the folks who
22 created the MBMD?
23 A  Well, yeah.  In fact, that first
24 one about he may be at increased risk for
25 negative reaction or heightened negative

Page 65

1  reaction was really right on point.
2       When he went for that biopsy in --
3  I think it was later in July after I saw
4  him, I think it was late July, that really
5  triggered the reason I saw him again in
6  September when the clinical presentation was
7  much different, and a lot of those
8  underlying things were really flourishing as
9  you saw in my second report.
10      So, yeah, and that, again, is why
11 I recommended some counseling.  I thought,
12 you know, this guy, he doesn't have any
13 significant anxiety or depression that would
14 render somebody to go for counseling or
15 psychotherapy, but there's enough -- there
16 are enough issues under the surface that it
17 would be prudent to get him into treatment
18 or recommend it.  But I didn't think he was
19 going to need as much as I think he does
20 now.
21 Q  All right.
22 A  So that's really consistent with
23 that whole change after the head and neck
24 surgeon began to biopsy that growth on his
25 tongue and so on.

Page 66

1  Q  And if he requires future medical
2  care or future psychiatric or psychological
3  care, it would be likely due to issues that
4  were triggered based upon his neuroma?
5  A  Well, it started -- It's two
6  things, really.  It's the current medical
7  problems that are specifically focused on a
8  risk of cancer or something pretty severe,
9  the idea that you might get cancer.  Even
10 though the doctor said he doesn't have
11 cancer, but the doctor doesn't know why he's
12 continuing to bleed, that kind of ambiguity
13 or lack of clarity medically.
14      The other thing is it really
15 crystallized the recurrent theme of when he
16 was in that trailer and looking back and
17 wondering "what was I doing to myself by
18 living there."  Those things are kind of
19 getting all intertwined and crystallized,
20 and that's what's cooking with this man.
21 Q  Okay.  And so it's going to be
22 your testimony that the reason that this
23 gentleman needs counseling has nothing to do
24 with the biopsy that diagnosed a benign
25 neuroma?

Page 67

1     MR. AHLQUIST:
2        Object to the form.
3  EXAMINATION BY MR. BONE:
4  Q  But rather has to do simply with
5  his time living in the trailer and being
6  made aware of problems that may have
7  occurred as a result of his living in the
8  trailer?
9  A  No, no, no.  As he reflected back
10 on living in the trailer, he recognized that
11 he had a number of symptoms, coughing up
12 blood in his mucus, going to the doctor a
13 lot more and so on, and he attributed those
14 at the time and during that year he was out
15 of the trailer in an apartment when the
16 symptoms declined, he attributed that to,
17 well, it must be just general health issues,
18 and I think he said things like -- No, I
19 remember he said things like "I just go to
20 the doctor and I get medicine and he treats
21 me, and then I get well."  So he was kind of
22 like regarding all of that.
23      Now, with the development of a
24 neuroma, he was encouraged that the doctor
25 said it's not cancer, but he's alarmed that

Page 68

Case 2:07-md-01873-KDE-MBN   Document 11542-7   Filed 02/12/10   Page 5 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Edward Halie Shwery, Ph.D.

**Page 169**

1 from a psychiatrist or a psychologist
2 dealing with mental health issues.
3  Q  And what specific areas would a
4 psychiatrist probe or what treatment
5 modalities would they offer that another
6 practitioner would not that Mr. Wright would
7 need?
8  A  Well, a psychiatrist might explore
9 different medications. It may be
10 anti-anxiety medication. It may be -- it
11 wouldn't -- it's really -- I think a
12 psychologist or a psychiatrist could address
13 the problems that I have identified with
14 this man.
15  Q  What I'm trying to understand is
16 how a psychiatrist would offer a different
17 service than a medical doctor in that
18 regard? I mean, you have mentioned you
19 could try different medications.
20  A general practitioner could
21 prescribe, you know, a different type of
22 medication rather than Effexor. If Effexor
23 doesn't work, he could use a different type
24 of anti-depressant, anti-anxiety medication.
25  What is it about a psychiatrist's

**Page 170**

1 treatment of Mr. Wright that would be
2 different from a regular doctor?
3  A  Well, I wasn't recommending that
4 he necessarily should go to a psychiatrist.
5 I was saying that a psychologist would be
6 fine. If he goes to a psychiatrist, that's
7 fine. I don't have any problem with that.
8 But it wouldn't be in lieu of him seeing his
9 general physician or his specialist in
10 medicine.
11  A psychiatrist might explore with
12 more expertise the medications that are used
13 for psychological problems, but I'm not sure
14 that would be a big deal with the treatment
15 of this patient.
16  I think the bigger issue is
17 getting into some psychological care and
18 ongoing consultation. I don't think you
19 would necessarily have that much more
20 advantage. A psychologist would give you
21 more advantage with additional diagnostic
22 testing and reexamination, that way, and the
23 psychiatrist would bring more expertise
24 about if additional psychiatric medications
25 were helpful.

**Page 171**

1  Q  Okay.
2  A  But this case wouldn't be the kind
3 of thing that he needs to see a
4 psychiatrist, because I don't think his
5 problems, at least at that date, I don't
6 think his problems were that bad. I thought
7 he would do pretty well in treatment that I
8 outlined.
9  Q  Okay. And so it was your
10 recommendation or your opinion as of July
11 21st, 2009, that Mr. Wright did not need to
12 see a psychiatrist?
13  A  It would be okay with me, but I
14 didn't think he needed to.
15  Q  When was the next occasion that
16 you had to visit with Mr. Wright?
17  A  It was September 23rd, 2009.
18  Q  Had you had any contact with
19 Mr. Wright between the authoring of your
20 report in July and his next office visit
21 September 23rd?
22  A  Yes. He had called me at some
23 point. I think when I saw him in July, I
24 knew that he was being followed -- well, I
25 knew he was being followed by his doctors,

**Page 172**

1 and he called me at some point and said his
2 doctor found a growth on his tongue and had
3 removed it and they thought maybe it was
4 cancer, but he's pretty sure it's not
5 cancer, but he doesn't know what it is, and
6 he was distressed and upset on the phone,
7 and I said, "Well, why don't you come on
8 back in. Let's talk about what's going on
9 with you."
10  Q  Okay. Did the attorneys in this
11 case set up the second appointment or did
12 you set it up of your own volition?
13  A  I set it up directly with
14 Mr. Wright.
15  Q  Did you contact the plaintiffs'
16 attorneys in the case to inform them that
17 you would be seeing him again, since they
18 would be paying for it?
19  A  Yes, at some point, I said, "Look,
20 I'm going to see this man. Apparently, he's
21 got some problems. I'm going to see him and
22 I will write a report."
23  Q  Okay. Do you know why Mr. Wright
24 called you? Do you know if he was
25 instructed to call you by his attorneys?