1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA

3   IN RE:  FEMA TRAILER        MDL NO. 1873

4   FORMALDEHYDE PRODUCTS        SECTION "N"(5)

5   LIABILITY LITIGATION        JUDGE ENGELHARDT

6

7   This document relates to:  Lyndon T. Wright
              v. Forest River, Inc., et al
8                  Docket No. 09-2977
                        *   *   *

9

**EXHIBIT A**

10        Videotaped Federal Rule 30(b)(6)

11   Deposition of SHAW ENVIRONMENTAL, INC.,

12   through its designated representative,

13   GEOFFREY C. COMPEAU, Ph.D., 4171 Essen Lane,

14   Baton Rouge, Louisiana 70810, taken at the

15   offices of Baker Donelson, Bearman, Caldwell

16   & Berkowitz, PC, 201 St. Charles Avenue,

17   Suite 3600, New Orleans, Louisiana 70170, on

18   Thursday, the 7th day of January, 2010.

19

20   REPORTED BY:

21        JAMES T. BRADLE, CCR
          PROFESSIONAL SHORTHAND REPORTERS
22        (504)529-5255

23   VIDEOGRAPHER:

24        BRIAN SOILEAU
          PROFESSIONAL SHORTHAND REPORTERS
25        (504)529-5255

80

1       A     In Section 1.1.

2       Q     1.1?

3       A     Yes.   "FEMA is authorized pursuant

4    to the Disaster Relief and Emergency

5    Assistance Act to provide assistance to

6    disaster victims under a Presidential

7    declaration of a disaster and emergency.

8    This contract will facilitate the

9    implementation of the Individual Assistance

10   program by providing project management

11   resources, expertise and technical

12   assistance."

13      Q     Okay.   What was your position

14   relative to this at Shaw, if any?

15      A     I was the program manager for

16   Shaw's IA-TAC program.

17      Q     The program manager for Shaw's

18   IA-TAC.   What is the IA-TAC?

19      A     The IA-TAC is the Individual

20   Assistance-Technical Assistance Contract,

21   but they're under Performance Work

22   Statement.

23      Q     And as such, as the project

24   manager, or program manager --

25      A     Program manager.

1     Q    -- were you familiar with this

2  Performance Work Statement?

3     A    Yes.

4     Q    Had you read it prior to

5  implementing Shaw's work on this project?

6     A    It probably quite candidly after

7  the hurricane was probably concurrent to our

8  mobilization.

9     Q    All right.  And as the program

10  manager, did you feel it was your obligation

11  to implement this Performance Work

12  Statement?

13     A    Yes, those areas of the

14  Performance Work Statement that applied to

15  the tasks given to us by FEMA.

16     Q    And as the program manager, did

17  you do your best to see that Shaw performed

18  pursuant to this contract?

19     A    I did.

20     Q    If we could turn to the second

21  page, 433, 2.1.4, would you agree that "the

22  contractor has the overall responsibility of

23  ensuring all tasks are performed

24  satisfactory as dictated by individual task

25  orders" under this contract?

86

1       A    To provide safe and quality

2   temporary housing to the victims of the

3   disasters that occurred in 2005.

4       Q    All right.  If we look at

5   Page 463, under Exhibit 4, "Site

6   Inspection."

7       A    463?

8       Q    Yes, Bates 000463.

9       A    All right.

10      Q    It's Exhibit 4, "Site Inspection."

11  It states an objective there, doesn't it?

12      A    Yeah, it does.

13      Q    Yeah.  And read that for the

14  record, please.  What is the objective?

15      A    The objective of "Site

16  Inspection"?

17      Q    Yes.

18      A    "The objective is to inspect for

19  feasibility, within three days, for proper

20  installation of the temporary housing in a

21  safe, secure, and sanitary manner."

22      Q    Okay.  Do you believe it was

23  Shaw's responsibility to inspect the sites

24  for feasibility for the installation of

25  temporary housing in a safe, secure, and

1    sanitary manner?

2        MR. KURTZ:

3            Objection.

4        THE WITNESS:

5            Yes.

6    EXAMINATION BY MR. D'AMICO:

7        Q    Do you believe in installing the

8    travel trailers, that Shaw had a

9    responsibility to install the trailers for

10   the temporary housing in a safe, secure, and

11   sanitary manner?

12       MR. KURTZ:

13           Objection.

14       THE WITNESS:

15           Yes.

16   EXAMINATION BY MR. D'AMICO:

17       Q    Do you believe this objective

18   applied to all scope of work relative to the

19   installation, set-up and maintenance of the

20   travel trailers?

21       MR. KURTZ:

22           Objection.

23       THE WITNESS:

24           To provide it in a safe, secure,

25   sanitary manner?

88

1    EXAMINATION BY MR. D'AMICO:

2         Q    Yes.

3         A    Following the directions provided

4    to us by FEMA?

5         Q    Yes.

6         A    Yes.

7         Q    Do you also believe that pursuant

8    to those previous sections we read, that

9    Shaw had a duty to identify problems that

10   may arise that would cause -- that would

11   impact the temporary disaster housing

12   mission?

13        MR. KURTZ:

14             Objection, form and scope.

15        THE WITNESS:

16             Let me have that back again.

17   (Whereupon, the court reporter read back the

18   requested testimony as follows:

19        THE COURT REPORTER:

20             Question:  "Do you also believe

21   that pursuant to those previous sections we

22   read, that Shaw had a duty to identify

23   problems that may arise that would cause --

24   that would impact the temporary disaster

25   housing mission?"

1      THE WITNESS:

2          You know, I believe as a team

3   working with FEMA, working with our

4   subcontractors, if there were conditions

5   that were concerned, they were raised very

6   rapidly.

7   EXAMINATION BY MR. D'AMICO:

8      Q    The question is, do you believe

9   that Shaw had a responsibility to do so?

10     A    To raise issues?

11     Q    Yes, to raise issues that came up?

12     A    Yes.

13     MR. KURTZ:

14          Objection to form and scope.

15  EXAMINATION BY MR. D'AMICO:

16     Q    In particular, I'm reading 437,

17  "the contractor shall develop" -- Under

18  2.5.2, that section we previously read.

19     A    437?

20     Q    437, 2.5.2.

21     MR. KURTZ:

22          I'm sorry.  What's the question,

23  Frank?

24  EXAMINATION BY MR. D'AMICO:

25     Q    That "the contractor shall develop

1   a work plan specific to temporary disaster

2   housing that will identify the various

3   factors which could impact the temporary

4   disaster housing mission and what it would

5   take to perform each task in the most

6   effective, efficient and expeditious manner

7   available."

8          We read that before, correct?

9       A    Yes.

10      Q    Yes.  And that applies to all

11   aspects of site identification, site

12   preparation, installation of the travel

13   trailer and maintenance, correct?

14      MR. KURTZ:

15          Objection.

16      THE WITNESS:

17          Yes.

18   EXAMINATION BY MR. D'AMICO:

19      Q    And if you had problems that came

20   up with any of those areas, pursuant to this

21   section of the contract, do you believe that

22   Shaw had a duty to identify that to FEMA and

23   to discuss possible solutions to the

24   problems?

25      A    Yes.

1    problems associated with the travel trailers

2    that Shaw identified early on in its efforts

3    to start installing trailers in Orleans

4    Parish?"

5         MR. BONE:

6              The same objection.

7    EXAMINATION BY MR. D'AMICO:

8         Q    Were there any environmental

9    problems identified?

10        A    Not that I'm aware of.

11        Q    Not that you're aware of?

12        A    No.

13        Q    Okay.  Have you ever seen any

14   communications within Shaw identifying

15   problems with chemical odors emanating from

16   the travel trailers when Shaw personnel were

17   attempting to install the trailers at

18   private residences?

19        MR. BONE:

20              Objection, form.

21        MR. KURTZ:

22              Objection, form and scope.

23        THE WITNESS:

24              Again, not at installation.

25   EXAMINATION BY MR. D'AMICO:

1        Q     Not at installation.   When did

2   these problems arise?

3        MR. BONE:

4             Objection, form.

5        MR. KURTZ:

6             Objection, form.

7        THE WITNESS:

8             We understand that in the forward

9   yards, where we worked side by side with

10  FEMA, that, you know, on arrival, some of

11  the trailers may have had odors, but again,

12  these were brand new equipment built to

13  those specifications, and so we simply

14  ventilated the trailers.

15  EXAMINATION BY MR. D'AMICO:

16       Q    Shaw identified odors emanating

17  from the trailers in the storage yards?

18       MR. KURTZ:

19            Objection, form.

20       THE WITNESS:

21            Shaw personnel indicated there

22  were odors from time to time in some of the

23  trailers that came into the forward yards.

24  EXAMINATION BY MR. D'AMICO:

25       Q    Were these chemical odors?

1          MR. BONE:

2                  Object to the form.

3          THE WITNESS:

4                  Well, all odors are chemical.

5     EXAMINATION BY MR. D'AMICO:

6          Q     And did Shaw ever ascertain what

7     the nature of the odor or cause of the odor

8     was?

9          MR. BONE:

10                 Objection, form.

11         MR. KURTZ:

12                 Objection, form and scope.

13         THE WITNESS:

14                 It was a new trailer smell is how

15    it often came up.

16    EXAMINATION BY MR. D'AMICO:

17         Q     Shaw did not endeavor to determine

18    what the cause or source of the odor was?

19         MR. BONE:

20                 Object to the form.

21         MR. KURTZ:

22                 The same.

23         THE WITNESS:

24                 We did not.

25    EXAMINATION BY MR. D'AMICO:

1      Q    Did Shaw ever endeavor to find out

2  if these chemical odors were causing or were

3  capable of causing health problems to the

4  occupants of the temporary housing units?

5      MR. BONE:

6         Object to the form.

7      MR. KURTZ:

8         And scope.

9      THE WITNESS:

10         Again, we ventilated the trailers,

11  and typically that was sufficient to deal

12  with the issue, so we didn't believe there

13  was any sustained issue with the odor.

14  EXAMINATION BY MR. D'AMICO:

15      Q    All right.  My question was, did

16  Shaw ever endeavor to determine whether or

17  not any of these chemical odors posed a

18  health risk to the occupants of the

19  temporary housing units?

20      MR. BONE:

21         Object to the form.

22      MR. KURTZ:

23         And scope.

24      THE WITNESS:

25         No, we did not.

103

1    EXAMINATION BY MR. D'AMICO:

2        Q    You did not.  Okay.  And did you

3    ever do any testing, Shaw do any testing of

4    the chemicals that were emanating in these

5    travel trailers to determine what the

6    chemicals were?

7        MR. BONE:

8            Object to the form.

9        MR. KURTZ:

10           And scope.

11       THE WITNESS:

12           We relied on --

13       MR. KURTZ:

14           Go ahead.

15       THE WITNESS:

16           We relied on -- When it came to

17   our attention, we relied on FEMA, who we

18   understood was studying the issue, and we

19   anticipated would get back and direct us as

20   appropriate.

21   EXAMINATION BY MR. D'AMICO:

22       Q    What did you understand FEMA to be

23   studying?

24       MR. MILLER:

25           Objection, vague, time.

104

```
 1        THE WITNESS:
 2              The issue of what was potentially
 3   causing some of the odors.
 4   EXAMINATION BY MR. D'AMICO:
 5        Q    What was the time frame that FEMA
 6   was studying this, to your knowledge?
 7        MR. MILLER:
 8              Objection, foundation.
 9        MR. KURTZ:
10              And scope.
11        THE WITNESS:
12              Roughly, spring of -- spring of
13   2006.
14   EXAMINATION BY MR. D'AMICO:
15        Q    So it was your understanding from
16   conversations with whom that FEMA was
17   studying this issue in the spring of 2006?
18        MR. KURTZ:
19              Objection, foundation.
20        THE WITNESS:
21              Yeah, once again -- I'm sorry.  I
22   just want to make sure I'm clear about who
23   is asking whom?
24        MR. D'AMICO:
25              I understand.  There are a lot of
```

105

1    objections.

2        THE WITNESS:

3            There's a lot of objections.

4        MR. D'AMICO:

5            They don't want you answering

6    these questions.  Go ahead.

7        MR. BONE:

8            Object to the side bar.

9        MR. KURTZ:

10           Object to that.

11       MR. MILLER:

12           Let me make this very clear.  I

13   want the witness to answer the question.

14   The objections are solely for opposing

15   counsel, to notify him that I think there's

16   something wrong with the question.

17           You should answer the question

18   asked, and because of my objections, don't

19   modify your answer in any way.

20       MR. D'AMICO:

21           Thank you, Henry.

22           Now, please read it back.

23   (Whereupon, the court reporter read back the

24   requested testimony as follows:

25       THE COURT REPORTER:

109

1      Q      All right.  Do you know who

2   Raysin, Shawn Raysin is?

3      A      You know, I know Shawn's name.  I

4   believe he worked in our haul and install

5   yard down here in New Orleans.

6      Q      Okay.  And this seems to be some

7   e-mail transmissions dated Tuesday,

8   March 21st, 2006, 7:57 a.m., correct?

9      A      Yes.

10      Q      And do you know who John Neal is?

11      A      I do.

12      Q      Who is John Neal?

13      A      John Kevin Neal was my project

14   manager for the day-to-day haul and install

15   activities.

16      Q      In which region?

17      A      Out of New Orleans, so for Orleans

18   and Jefferson Parish.

19      Q      All right.  And what was the

20   subject of these e-mail transmissions?

21      A      Let's see.  It's a March 20th

22   e-mail from Brian Boyle, who was also

23   involved in trailer installation, but worked

24   for FEMA, and he's indicating that -- I

25   believe the headquarters safety office of

110

1    FEMA was interested in what we were doing --

2    Oh, "our safety office."  I'm not sure what

3    safety office this is.

4            "Needs to know from each

5    contractor the process of airing out all

6    travel trailers and mobile homes to handle

7    the existence of formaldehyde inside the

8    units and what you are doing to handle this

9    problem.  Please e-mail your process for

10   combating this problem, so Larry can pass

11   this on to Safety in DC."

12       Q    All right.  Do you know, to your

13   knowledge, was this problem of formaldehyde

14   in the travel trailers being discussed with

15   Shaw personnel in March of 2006?

16       A    Based on this e-mail, the answer

17   is "yes."

18       Q    Did anyone ever discuss it with

19   you in March of 2006 that there was a

20   problem with formaldehyde in the travel

21   trailers?

22       A    No, they did not.

23   MR. BONE:

24            Object to the form.

25   EXAMINATION BY MR. D'AMICO:

111

1       Q    When was the first time you saw

2   this e-mail?

3       A    This e-mail, I believe it was

4   during my preparation for this deposition.

5       Q    Have you ever spoken to Shawn

6   Raysin about the problem of formaldehyde in

7   the travel trailers?

8      MR. KURTZ:

9          Objection, form.

10      MR. BONE:

11         Objection, form.

12      THE WITNESS:

13         No, I have not.

14  EXAMINATION BY MR. D'AMICO:

15       Q    Have you ever spoken to John Neal

16   about the problem of formaldehyde in travel

17   trailers?

18      MR. BONE:

19         Objection, form.

20      MR. KURTZ:

21         Objection, form.

22      THE WITNESS:

23         Again, during the preparation for

24   this deposition.

25  EXAMINATION BY MR. D'AMICO:

112

1       Q     You did speak to John Neal?

2       A     Yes.

3       Q     When did you speak to him?

4       A     John works for me.  We speak all

5    the time.

6       Q     When did you speak to him?

7       MR. KURTZ:

8            Objection.  Asked and answered.

9       THE WITNESS:

10           That's kind of vague.  I spoke to

11   John just yesterday, but it wasn't about

12   anything related to FEMA.

13   EXAMINATION BY MR. D'AMICO:

14       Q     Okay.  My question in particular

15   was when did you speak to John Neal relative

16   to this problem of formaldehyde?

17       MR. KURTZ:

18           Objection, form.

19       THE WITNESS:

20           It really wouldn't have been --

21   Let me see now.  I don't recall

22   conversations prior to this year.

23   EXAMINATION BY MR. D'AMICO:

24       Q     Okay.  Let's try to be more

25   specific, if we can.  You said you had some

113

1  conversations this year with John Neal about

2  problems with formaldehyde in the travel

3  trailers, correct?

4      MR. KURTZ:

5          Objection, form.

6      THE WITNESS:

7          Correct.

8  EXAMINATION BY MR. D'AMICO:

9      Q    When this year?

10     A    Probably through roughly the

11 summer of this year.

12     Q    You're talking about '09?

13     A    Yes.

14     Q    Okay.  We're in 2010.

15     A    Excuse me.

16     Q    Last year.  Okay.  So you spoke to

17 John Neal in 2009, sometime in the summer of

18 2009, that the travel trailers were having a

19 problem with formaldehyde, correct?

20     MR. KURTZ:

21         Objection, form.

22     MR. BONE:

23         Objection, form.

24     THE WITNESS:

25         Actually, again, this says "the

114

1    existence of formaldehyde."  Our sense was

2    that, was it verified or not, we didn't know

3    at that time.

4    EXAMINATION BY MR. D'AMICO:

5        Q    Okay.  I'm going to identify for

6    the record this document that was produced

7    to us last night as Shaw No. 4, Bates 13515

8    through 13516, and ask you some more

9    questions.

10            Is it your testimony as you sit

11   here today as the representative of Shaw

12   that you never saw this document that has

13   been identified as Shaw 4 until you prepared

14   for your deposition today?

15       MR. KURTZ:

16            Objection, scope.

17       THE WITNESS:

18            That's correct.

19   EXAMINATION BY MR. D'AMICO:

20       Q    When did you first see this

21   document?

22       A    I believe over the last few days.

23       Q    Were you ever at any time while

24   you were here overseeing the operations for

25   Orleans and Jefferson, ever informed by any

115

```
1    Shaw personnel that there was a problem with

2    odors of formaldehyde emanating from the

3    travel trailers?

4        MR. BONE:

5            Objection, form.

6        MR. KURTZ:

7            Objection.

8        THE WITNESS:

9            With odors?  Yes.  During, as I

10   said, in the forward yards, but that was

11   handled by ventilation.

12           Specific to formaldehyde, it

13   really wasn't until approximately this time,

14   May -- excuse me, March of 2006, that FEMA

15   began to raise it to us as formaldehyde.

16   EXAMINATION BY MR. D'AMICO:

17       Q    So let me understand your

18   question.  There was some notice of odors

19   emanating from the travel trailers in the

20   storage yards prior to March of '06, but it

21   had not been identified as formaldehyde; is

22   that what you're saying?

23       A    Yes.

24       MR. BONE:

25           Objection.
```

116

1      MR. KURTZ:

2            Objection, form.

3   EXAMINATION BY MR. D'AMICO:

4      Q    Okay.  So that the Shaw personnel

5   noticed some chemical odors, but didn't know

6   what it was initially?

7      MR. KURTZ:

8            Objection, form.

9      MR. BONE:

10           Objection.

11     THE WITNESS:

12           They noticed transient odors,

13  assuming they were residual from

14  manufacture, aired out the trailers, and

15  found out that the odors dissipated.  I

16  mean, that was by and large the case.

17           We had very few, to my knowledge,

18  complaints of any odors when these trailers

19  were actually installed and people were

20  habitating them in the over, I think, 20,000

21  trailers that we had successfully installed.

22  EXAMINATION BY MR. D'AMICO:

23     Q    Are you saying you had no

24  complaints of odors from the people who were

25  inhabiting these 20,000 trailers?

1     A    You know, we had a few.  I would

2  have to look at the records for a number.

3  But we had a few, to my recollection.

4     Q    All right.

5     A    And again, it was not a systemic

6  issue.

7     Q    Isn't it true that pursuant to the

8  contract with FEMA, you were required to

9  keep a complaint log of resident complaints,

10  residents of the travel trailers?

11     A    Yes.

12     MR. KURTZ:

13          Objection, form.

14  EXAMINATION BY MR. D'AMICO:

15     Q    All right.  Did Shaw do such?

16     A    Shaw and subcontractors.  We had a

17  responsibility for operations and

18  maintenance of the trailers.

19     Q    Yes.  And you were supposed to

20  keep a complaint log on a disk in a certain

21  format, correct?

22     MR. KURTZ:

23          Objection, form.

24     THE WITNESS:

25          We created a database, so it would

1   have had a certain format.

2   EXAMINATION BY MR. D'AMICO:

3       Q    Yes, created a database.  And I

4   think it spells out what the format of that

5   database is to be in the contract, correct?

6       A    I would have to refresh, but, you

7   know, we had lots of discussions back and

8   forth between FEMA, Information Technologies

9   and our folks to make sure that we had data

10  that could be moved easily between the two.

11      Q    In preparation of your deposition

12  today, did you ever review any of those

13  complaint logs to determine if any

14  complaints were made relative to odors

15  emanating from the travel trailers?

16      MR. BONE:

17          Object to the form.

18      MR. KURTZ:

19          Object to the form.

20      THE WITNESS:

21          I reviewed a number of O & M

22  records, some of which may have had odors,

23  but I can't recall specifically if they did.

24  Again, there's not a stack of odor

25  complaints.

119

1    EXAMINATION BY MR. D'AMICO:

2        Q    Okay.  When did you review those

3    logs?

4        A    Well, I probably saw logs during

5    my time that I was here and I saw logs --

6        Q    Let's be specific.  During the

7    time that you were here back in '05 and '06?

8        A    Oh, yeah, during '05 and '06, how

9    that came together, how we were keeping

10   track of our subcontractors.

11       Q    Okay.  So you believe you became

12   aware of complaints of odors from residents

13   in '05 and '06?

14       MR. KURTZ:

15           Objection, form.

16       MR. MILLER:

17           Objection.  It mischaracterizes

18   the witness' testimony.

19   EXAMINATION BY MR. D'AMICO:

20       Q    You can answer.

21       A    Well, let's have it again then.

22   (Whereupon, the court reporter read back the

23   requested testimony as follows:

24       THE COURT REPORTER:

25           Question:  "So you believe you

120

1    became aware of complaints of odors from

2    residents in '05 and '06?"

3         THE WITNESS:

4              Among other things, that, you

5    know, there may have been some issues with

6    odors, there may have been some issues with

7    propane, there may have been some issues

8    with "my furnace is out," "my air

9    conditioning is out," you know, these kind

10   of things.

11   EXAMINATION BY MR. D'AMICO:

12        Q    So the answer is "yes"?

13        MR. KURTZ:

14              Objection.  It mischaracterizes

15   his testimony.

16        THE WITNESS:

17              Yeah, there were a number of

18   complaints, a relatively low number, and

19   odor may have been one of them.

20   EXAMINATION BY MR. D'AMICO:

21        Q    Okay.  I would like you to read a

22   section of Shaw 4, 13515, at the bottom of

23   the page.

24              "Our safety office needs to know

25   from each contractor the process of airing

121

1    out of all travel trailers and mobile homes

2    to handle the existence of formaldehyde

3    inside the units and what you are doing to

4    handle this problem.  Please e-mail your

5    process for combating this problem, so Larry

6    can pass this on to Safety in D.C.  Thank

7    you for your attention to this, and I'll

8    wait to hear from each of you and send it on

9    to Larry."

10              Now, do you know who wrote that?

11      A    Mr. Brian Boyle.

12      Q    Do you know who Brian Boyle is?

13      A    I do.

14      Q    Who is Brian Boyle?

15      A    At the time -- You know, the

16   titles has change.  At the time, Brian was

17   the quality assurance contractor liaison at

18   the area field office for FEMA to the IA-TAC

19   contractors in Louisiana.

20      Q    And who was Brian Boyle writing

21   this e-mail to?

22      A    Well, according to the subject

23   line there, above the subject line, Jay

24   Moylan, Todd Novak, Mike Falino, Paul

25   Caruso, Robert Aubert, and William Deane.

128

1      A     Right.  So is good food.

2      Q     And, to your knowledge, this topic

3  of these chemical odors, specifically

4  formaldehyde inside the units, was being

5  discussed back in March of 2006 with

6  personnel at Shaw?

7      MR. BONE:

8          Object to the form.

9      MR. KURTZ:

10          Objection.

11     THE WITNESS:

12          Being discussed?  Yeah, I would

13  suspect that it was coming up in

14  discussions.

15  EXAMINATION BY MR. D'AMICO:

16     Q     All right.  And what I'm trying to

17  find out is what, if anything, Shaw did to

18  further explore the nature and extent of the

19  problem other than just simply to air out

20  the trailers by opening the doors and

21  windows?

22     MR. KURTZ:

23          Objection, form.  Go ahead.

24     THE WITNESS:

25          We understood it was an emerging

143

1          MR. KURTZ:

2               Objection, form.

3          MR. BONE:

4               The same objection.

5          THE WITNESS:

6               Yeah, at the time, it was odors in

7     the trailers.

8     EXAMINATION BY MR. D'AMICO:

9          Q    All right.  And at some point FEMA

10    identified this odor as formaldehyde to

11    Shaw, correct?

12         MR. BONE:

13              Objection, form.

14         MR. KURTZ:

15              Objection, form.

16         THE WITNESS:

17              You know, again, I would have to

18    really look and understand when FEMA told us

19    definitively it was formaldehyde in the

20    trailers.

21    EXAMINATION BY MR. D'AMICO:

22         Q    All right.  But Shaw did not test

23    any of the trailers to determine what the

24    odors were?

25         A    That's true.  That's correct.

144

```
1      Yes, we did not test the trailers.
2          Q     And Shaw did not independently
3      study the issue of the odors to determine if
4      it was formaldehyde or not?
5          A     That's correct.  We understood
6      that FEMA -- Well, we were following FEMA's
7      lead.
8          Q     All right.  Did Shaw advise any of
9      the entities taking over the housing
10     contract that there could be an issue
11     relating to formaldehyde?
12         A     I don't -- I would have to look
13     into our -- I don't know that.
14         Q     Did Shaw advise or notify any
15     occupants of the travel trailers that there
16     could be an issue with formaldehyde inside
17     the trailers?
18         MR. KURTZ:
19             Objection, scope.
20         THE WITNESS:
21             I don't know that either.
22     EXAMINATION BY MR. D'AMICO:
23         Q     Did Shaw advise or notify the
24     occupants in writing that there could be an
25     issue with formaldehyde in the trailers and
```

146

1    the trailers for odors, and that's when

2    requested by Brian about formaldehyde, as

3    well, we explained that we were ventilating

4    the trailers.

5    EXAMINATION BY MR. D'AMICO:

6        Q    All right.  I'm going to ask it

7    one more time, and I know it's difficult

8    being a witness.

9            Did Shaw advise FEMA as to the

10   corrective/mediating actions to be taken

11   relative to formaldehyde inside the travel

12   trailers?

13       MR. BONE:

14           Objection, form.

15       MR. KURTZ:

16           Objection, form.

17       THE WITNESS:

18           No, we did not.

19   EXAMINATION BY MR. D'AMICO:

20       Q    Were the documents produced to

21   counsel last evening after close of business

22   the only communications or other internal

23   documents related to formaldehyde in the

24   temporary housing units in Shaw's

25   possession?

148

```
 1    formaldehyde inside the travel trailers at

 2    any time during the scope of their contract

 3    with FEMA?

 4         MR. MILLER:

 5              Objection, relevance and scope.

 6         MR. KURTZ:

 7              Objection.

 8         THE WITNESS:

 9              We knew there was an issue with

10    odor that was transient that may have been

11    linked to apparently formaldehyde.

12    EXAMINATION BY MR. D'AMICO:

13         Q    So the answer would be "yes"?

14         MR. BONE:

15              Objection.

16         MR. KURTZ:

17              Objection, mischaracterizes.

18         THE WITNESS:

19              Can I have the question again?

20    EXAMINATION BY MR. D'AMICO:

21         Q    Did Shaw believe there was a

22    problem with formaldehyde in the travel

23    trailers at any time during the scope of

24    their contract with FEMA?

25         MR. MILLER:
```

149

```
 1              Objection, asked and answered,
 2    beyond the scope.
 3         MR. KURTZ:
 4              I join.
 5    EXAMINATION BY MR. D'AMICO:
 6         Q    I'm asking for a definitive answer
 7    first.  You can explain later.  Did Shaw
 8    believe there was a problem, yes or no, and
 9    then you can explain?
10         A    Yeah, we believed there were odor
11    issues that could be mitigated by
12    ventilation, but we were not -- it was
13    unclear as to whether those were
14    specifically related to formaldehyde.
15         Q    Well, at some point, though, we
16    have proof that FEMA was discussing that it
17    was a formaldehyde problem, correct?
18         MR. BONE:
19              Object to the form.
20         MR. KURTZ:
21              Objection.
22         THE WITNESS:
23              Again, they studied the problem.
24    Whether FEMA, again, sitting here, whether
25    FEMA actually ever determined that, in fact,
```

158

```
 1    identify this for the ladies and gentlemen

 2    of the jury?

 3        MR. KURTZ:

 4             Read the Bates label first,

 5    please.

 6        THE WITNESS:

 7             The Bates label?  Shaw 013548.

 8    EXAMINATION BY MR. D'AMICO:

 9        Q    And 013549?

10        A    Yes.

11        Q    Go ahead, please.

12        A    It's from M.K. Baldwin to John

13    Bruton, a copy to Jim Brixius and myself,

14    and it's entitled "Formaldehyde notes and

15    video link on CNN."

16        Q    Again, the importance is "high,"

17    correct?

18        A    The importance is "high."

19        Q    All right.  Do you recall ever

20    seeing this e-mail transmission?

21        A    I don't have an explicit

22    recollection of this e-mail transmission.

23        Q    When is the first time that you

24    saw this that you can recall?

25        A    Well, you know, I probably saw it
```

159

1    on May 17th when it was originally sent to

2    me.  Again, Trina and I spoke regularly and

3    had weekly conference calls regarding her

4    status.

5        Q     Do you believe you would have had

6    a conversation with Trina about this if she,

7    in fact, did send this e-mail transmission

8    to you?

9        A     You know, it's highly likely we

10   would have discussed it in the realm of a

11   number of other things.

12       Q     Okay.  Who is John?

13       A     John Bruton?

14       Q     John Bruton.

15       A     I believe John Bruton is the

16   contracting officer's technical

17   representative for FEMA in Texas.

18       Q     Okay.  If we could, let's talk

19   about this e-mail a little bit.  Trina

20   Baldwin writes to John, "Right now, it seems

21   to be a few isolated cases, but I think FEMA

22   needs to be aware of this (as the 'owners'

23   of the trailers).  Here is some additional

24   information," and she talks about the EPA

25   site and talks about some information

160

1    relative to formaldehyde, correct?

2       A   Yes.

3       Q   All right.

4       A   Reasonably, as I read it along,

5    also, yes.

6       Q   All right.  As a chemist, were you

7    familiar with the properties of

8    urea-formaldehyde that are stated in this

9    EPA site link?

10       A   Not that familiar with this

11   chemistry particularly.

12       Q   All right.  For instance, did you

13   know that formaldehyde is a colorless,

14   pungent-smelling gas which can cause watery

15   eyes, burning sensation in the eyes and

16   throat, nausea, and difficulty in breathing

17   in some humans exposed at elevated levels,

18   above .1 parts per million?

19     MR. BONE:

20         Object to the form.

21     MR. KURTZ:

22         Object to the form.

23     THE WITNESS:

24         You know, again, to those

25   specifics, I knew that formaldehyde could