UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | MAGISTRATE CHASEZ |
| | * | |
| THIS DOCUMENT IS RELATED TO | * | |
| | * | |
| *Lyndon Wright v. Forest River, Inc., et al.*; | * | |
| Docket No. 09-2977 | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT SHAW ENVIRONMENTAL, INC.'S
MOTION FOR SUMMARY JUDGMENT ON CAUSATION**

Plaintiff Lyndon Wright (hereinafter "Wright" or "Plaintiff") responds to Defendant,

Shaw Environmental, Inc.'s ("Shaw") Motion for Summary Judgment regarding causation

(Docket Entry No. 10929) and, in support, would show:

**SUMMARY OF ARGUMENT**

Shaw brings its Motion for Summary Judgment on causation and argues that Plaintiff has

failed to show that Shaw has in any way caused an increase in the formaldehyde exposure he was

subjected to living in the trailer manufactured by Forest River, Inc. ("Forest River").  This

position is premised upon arguments that the Plaintiff has not shown how the warping or flexing,

and water leaks resulting there-from actually increased formaldehyde off-gassing.  Further, they

argue that the maintenance records do not reflect complaints of leaks during their contractual

responsibility to maintain the Plaintiff's trailer, and Shaw further concocts a bizarre argument

that any holes which were created or contributed to by Shaw are just as likely to allow formaldehyde to escape as to allow moisture in.

Simply put, Shaw's Motion for Summary Judgment must fail at each and every turn. In fact, Shaw's arguments barely need to be addressed, as Shaw knew of a formaldehyde problem as early as March 2006, and was aware of odors in the FEMA emergency housing units in the fall of 2005. Shaw neither warned FEMA about the problem, nor did they warn Wright, or any other occupant of the travel trailers problem. Therefore, Shaw's failure to warn the Plaintiff in March 2006, or any time thereafter, resulted in 27 months of additional and unnecessary exposure to formaldehyde.

Plaintiff, in this Opposition, will also show how Shaw contributed and exacerbated to the exposure to formaldehyde suffered by the Plaintiff as follows: (1) Shaw, through its subcontractor RCG Enterprises, Inc. ("RCG") failed to comply with jacking and blocking instructions, (2) Defense experts acknowledge that there were water leaks in at least three places in the Wright unit, (3) Defense expert acknowledges that it was "inevitable" that the soil under the trailer would shift, and soil settlement has been commonly known for thousands of years, (4) moisture and vapor intrusion into the trailer created increased relative humidity which has a positive correlation to formaldehyde off-gassing, (5) water itself can lead to increased off-gassing, (6) even small amounts of increase are important and relevant, when the unit of measure is parts per billion, (7) Defendants' own destructive testing shows warping and flexing caused by installing the unit onto block piers, and (8) the Forest River acknowledged that the unit was not designed to be blocked onto concrete piers and that they were not consulted with or notified that

2

this was the method of installing the emergency housing units.  To refute a motion for summary judgment, Plaintiff need not prevail on the issues, but must show that there is a material issue of fact which is in dispute.  This is clearly the case in the instant motion.  In fact, Plaintiff avers that several of his positions are supported by Defendants' own witnesses and experts.  As such, because of the numerous and clear disputed issues of material fact, Shaw's Motion for Summary judgment on the issue of causation must fail.

## FACTUAL BACKGROUND

In the immediate aftermath of Hurricane Katrina, the United States, through the Federal Emergency Management Agency ("FEMA"), engaged Shaw in a no-bid contract to provide a number of tasks to assist with the implementation of the Disaster Housing response.[1]  The contract between FEMA and Shaw tasked Shaw with a number of areas of disaster response implementation,[2] including but not limited to: (1) hauling and transportation of Emergency Housing Units ("EHU"), (2) installation and make-ready of EHU's, (3) inspecting the EHU's, and (4) maintaining the EHU's once they had been installed.  Shaw was one of three contracting entities in Louisiana charged with the implementation of FEMA's disaster housing response, the other two were Fluor Enterprises, Inc. and CH2M Hill Constructors, Inc.

Included in the thousands of EHU's assigned to Shaw pursuant to its contract, was a Forest River, Inc. ("Forest River") travel trailer, VIN # 4X4TSMH296C008992 (the "Trailer").  The Trailer was designed by Forest River as a recreational vehicle which was not intended for

---

[1] See Initial Contract Communications between Shaw and FEMA, attached as Exhibit "A".
[2] See Excerpts from Shaw Scope of Work attached as Exhibit "B".

long term habitation.[3]   The Trailer was to be moved to and installed at 2315 Seminole Lane, New Orleans, Louisiana.  It was originally assigned to a Ms. Bobbie Wright, who in turn granted her son, the Plaintiff, power of attorney to sign on her behalf and occupy the unit.[4]   The trailer was delivered to the address and installed onto concrete piers by RCG, a subcontractor to Shaw. Wright moved into the unit in early March 2006.

Within days of moving in to the Trailer, the heater stopped working.  Shaw sent out a maintenance team to repair the heater on or about March 19, 2006, which almost immediately broke down again.[5]  Despite multiple verbal complaints from the Plaintiff to Shaw that the heater was still not working, no additional actions were taken to repair it.[6]

On March 20 and 21, 2006, Shaw received emails from Brian Boyle with FEMA asking what Shaw (and the other IA/TAC contractors) was doing about possible formaldehyde in the emergency housing units it was contracted to maintain.[7]  Shaw also had internal communications relating to formaldehyde concerns over the months following these initial emails.[8]  Shaw never notified or warned FEMA or any occupant of any emergency housing unit about the very serious safety and health concerns of formaldehyde in the EHUs.[9]

Shaw contends that on May 18, 2006, Shaw began discussions with C. Martin Company to begin a sequenced hand over of "Maintenance and Deactivation" for the EHUs originally

---

[3] See excerpt of Forest River Owner's Manual attached as Exhibit "C".
[4] This is attached hereto as Exhibit "D".
[5] See Exhibit E of the Shaw Motion for Summary Judgment which is the March 19, 2006 Call Center Maintenance Request Form.
[6] See deposition of Lyndon Wright attached as Exhibit E, pp. 109-113.
[7] Boyle 3/20/06 email attached as Exhibit F, Boyle 3.21.06 email attached as Exhibit G.
[8] See emails attached as exhibits H, I, J.
[9] See Shaw 30(b)(6) deposition of Geoffrey Compeau, attached as Exhibit "K", pp. 143-146.

tasked to Shaw. This included Wright's EHU, and Shaw's transfer/hand-off of Wright's Trailer was to took place on or about June 1, 2006. However, Shaw never notified C. Martin of its concerns about formaldehyde in the trailers.

While Shaw claims that it had nothing else to do with the Trailer subsequent to June 1, 2006, a major impact of their involvement manifested several months later. As the piers of the Trailer settled over the months following the installation and make ready, the frame began warping, and a large gap formed between the door and the door jamb. As this developed, water began to pour in through the door whenever it would rain. Additionally, the warping of the frame caused by Shaw's jacking and installing the unit on concrete piers created a break in the seal above one of the bedroom windows and at the front left corner of the trailer, also causing water to leak in to the Trailer.[10]

This moisture exposure caused mold to develop and increased off-gassing of formaldehyde.[11] At his deposition, Wright spoke of the mold that built up around the window and door frame and that he was constantly forced to clean the build-up.[12] Further, not only did the moisture contribute to the off-gassing of formaldehyde, but also contributed to the breakdown of the Trailer's component wood products, which lead to increased formaldehyde release.[13] Plaintiff contends that the warping and flexing of the frame was a direct result of Shaw's failure to properly install, construct and make ready for use the Trailer in February/March 2006.

_____

[10] See Exhibit "E" pps. 264-266. (MAY WANT TO ALSO CITE LIBERTY EXHIBIT)
[11] See the August 21, 2009 Affidavit of Dr. Stephen Smulski attached as Exhibit "L".
[12] See Exhibit "E" p. 122
[13] See Exhibit "L".

Wright continued to reside in the Trailer from his March 2006 move-in until July 2008.[14] During this time, his physical condition continued to deteriorate, and he began noticing the presence of blood in his sputum every day.[15] The Plaintiff sought treatment from Dr. Knight Worley for the bleeding, but Dr. Worley never indicated to the Plaintiff that it was caused by living in the Trailer. Dr. Worley diagnosed the Plaintiff with sinusitis and prescribed antibiotics (which did not work).[16]  In October, 2008, Wright's Trailer was tested for formaldehyde and a level of .048 ppm was found by the WD Scott Group.[17]  Additional formaldehyde sampling of this unit during the destructive testing conducted in August, 2009, showed readings as high as .130 ppm.[18]

## ARGUMENT AND AUTHORITIES

## I.    SUMMARY JUDGMENT STANDARD.

### A.    Generally

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

---

[14] Exhibit "E" p. 299
[15] *Id.* at p. 148
[16] *Id.* at p. 147
[17] Test Results are attached as Exhibit "M".
[18] " " "

6

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (5th Cir. 2001).

In evaluating evidence to determine whether a factual controversy exists, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.  Instead, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the non-moving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached."  *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

## II.  GENUINE ISSUES OF FACT EXIST AS TO CAUSATION

In Louisiana, issues concerning fault in a civil action are decided based on a preponderance of the evidence, which requires a fact-finder to consider all evidence, direct or circumstantial, to determine whether a fact is more probable than not. *Hanks v. Entergy Corp.*, 06-477 (La.12/18/06), 944 So.2d 564, 578.  Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, establishes that the fact or causation sought to be proved is more probable than not.  *Cay v. State Dep't. of Trans. and Dev.* 93-0887 (La.1/14/94), 631 So.2d 393, 395; *Riley v. Salley*, 03-1601, p. 2 (La. App. 4 Cir. 4/21/04), 874 So.2d 874, 876.

7

Use of circumstantial evidence and the deductions and inferences arising therefrom is a common process for establishing liability in negligence cases. *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654 (La.1989). It is well established that circumstantial evidence can be used to defeat a motion for summary judgment. *Independent Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, 99-2257 (La.2/29/00), 755 So.2d 226.

Causation is a factual question to be determined by the factfinder.    *Benjamin ex rel. Benjamin v. Housing Authority of New Orleans*, 04-10585 (La.12/1/04), 893 So.2d 1, 7; *Wallace v. State Farm Mutual Automobile Insurance Co.*, 36,099 (La.App. 2d Cir.6/14/02), 821 So.2d 704; *Maryland Cas. Co. v. Advance Transformer Co.* (La. App. 3d Cir. 4/6/94), 635 So.2d 565, 567.

Unlike the cases cited to by Shaw, Plaintiff has extensive evidence that Shaw's negligence was a cause-in-fact of Mr. Wright's injuries.  Further, there is a very clear path from Shaw's negligence to Mr. Wright's injuries.

**A.      Shaw knew about a possible formaldehyde problem in March, 2006.**

Prior to the consideration or refutation of any other point argued by Shaw in its Motion for Summary Judgment, it is necessary to show the extent of Shaw's knowledge relating to formaldehyde as of March 20, 2006.  In an email from Brian Boyle of FEMA to the collective IA/TAC contractors, including Shaw, states:[19]

Gentlemen,

---

[19] See Exhibit F.  It is interesting to note that this exhibit, amongst other similar documents were produced by Shaw the night before the 30(b)(6) deposition was taken, after the close of business.  These documents were responsive to open discovery requests, and should have been produced weeks, if not months, earlier.

> Our safety office needs to know from each contractor the process of airing out of all TT's and Mobil homes to handle the existence of formaldehyde inside the units and what YOU are doing to handle this problem.   Please e-mail YOUR process for combating this problem so Larry can pass this on to Safety in D.C. Thank you for your attention to this and I'll wait to here [sic] from each of you and send it on to Larry.

Notice the emphasis used by FEMA, "YOU" and "YOUR".  This clearly indicates FEMA was looking to Shaw for instruction/direction.  Shaw apparently did not respond, as there is an email the next day, March 21, 2006, again from Brian Boyle this time to Shaw employees alone, wherein he states, all in bold:

> **Good Morning**
>
> **I received responses from the other two contractors on this and I'm still waiting to hear from you guys so Larry can pass this on to Washington D.C. Your immediate attention is requested.**

As of March 20/21, 2006, Shaw could not deny they had knowledge of a potential problem with formaldehyde in the trailers.  While these two documents are sufficient to indicate Shaw's knowledge, there are additional internal Shaw emails wherein the source and health effects of formaldehyde are discussed.  On May 17, 2006, an internal Shaw email entitled: "FW: Formaldehyde notes and video link on CNN" states: "To the best of our knowledge, the smell may be related to the glue used in final construction: for [sic] the carpet, the wood paneling, the veneer on the bed supports, etc."[20]   In another May 17, 2006 internal Shaw email, on the same subject, a Shaw engineer pulled toxicological documentation from the EPA website, and wrote:

---

[20] See email attached as Exhibit "I"

"Right now, it seems to be a few isolated cases, but I think FEMA needs to be aware of this (as the "owners" of the trailers).  Here is some additional information…"[21]

With this obvious awareness of the issue, and an internal recommendation that Shaw should notify FEMA, it is inexplicable why Shaw failed to notify or warn both FEMA and the trailer occupants.  At deposition, however, when asked if they notified or warned either FEMA or the occupants, Shaw's Project Manager, who was tasked with Shaw's institutional knowledge, responded that he had no idea if Shaw ever notified FEMA or the trailer occupants of any concerns relating to formaldehyde.[22]  Shaw also acknowledges that it began receiving odor complaints in 2005 from occupants of the trailers.[23]  Further, Shaw indicated that it did not maintain owner's manuals separate from the trailers, and never consulted with any manufacturer regarding their statements that the travel trailers were not designed for long-term or residential occupancy.[24]

Because of Shaw's clear institutional knowledge of odors and formaldehyde in the various EHUs, and their failure to show any proof that they notified either FEMA or any trailer occupant of the health risks or methods of reducing same, their Motion for Summary Judgment on Causation must fail before any analysis of its arguments is even necessary.  That said, upon closer evaluation, Shaw's other arguments fall flat and a clear dispute as to material facts remains, thus also necessitating the denial of the Motion for Summary Judgment.

---

[21] See Exhibit "J"
[22] See Exhibit "K" pp. 144-146.
[23] Id. 118-120
[24] Id. pp.207-211.

**B**.        **Shaw negligently blocked the Trailer onto piers**

Despite their claims to the contrary, Shaw did not follow FEMA's protocol when placing the Trailer on blocks.  They also failed to examine the owner's manual or consult with Forest River, or any other manufacturer, to determine the proper manner in which the block a trailer, or even if the trailer could be safely blocked.  In fact, a Forest River employee who designed the FEMA spec unit testified that Forest River never knew it was going to be blocked onto piers. Shaw also failed to consult with any manufacturer on the frequency of method of inspecting caulking or seals.

The Travel Trailer Installation Instructions contained in the Shaw Scope of Work Documents is very clear in its instructions for the installation onto piers for the travel trailers.  It states in pertinent part:[25]

**2.1.2   Blocking and Leveling**

…Travel trailers shall be set-up on concrete piers and after the weigh[t] of the travel trailer is transferred to the piers…The travel trailer set-up will also include a minimum of six piers (three on each side) evenly spaced…The Contractor shall provide a base for each pier.  The base will be ¾" x 24" x 24" exterior grade plywood.  The piers will have at a minimum two solid cap blocks on the base and two solid cap blocks at the top of the piers…

After the weight of the of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned and tightly shimmed with wooden wedges…

Shaw engaged RCG to install a number of EHU's, including Wright's trailer.  Shaw had an inspector sign off on RCG's installations.[26] While the FEMA travel trailer installation specs

---

[25] Relevant pages of the Shaw Scope of Work are attached hereto as Exhibit "N"

are very precise calling for specific concrete blocks, and exterior grade plywood to be used, RCG, believed these were not necessary to follow.  At deposition, when shown a blocking diagram supplied by Shaw, RCG's corporate representative clearly did not feel bound by either the drawing or the travel trailer installation instructions.[27]  Curiously, in a response specific to installing the unit with wheels off the ground, RCG stated: "So it didn't require block.  If it required that blocking, I would have to charge a lot more than I was for my installs."  When asked about the plywood bases for the piers, RCG stated:[28]

> Mr. D'Amico: All right.  Your testimony, from my understanding, is RCG only used ABS plastic pads, they never used plywood pads?
>
> The Witness:  That's correct.
>
> Mr. D'Amico: Okay.
>
> Q.      (By Mr. Ahlquist)      You don't recall any instruction relating to the pads versus plywood?
>
> A.      I think it's just preference.  We – we liked the pads and we had a ton of them.  You know, the other ones deal with the splinters and the things when you're putting them down there.  And it's just a pain…

Further, Shaw was aware, or should have been aware, that the settlement or shifting of the soil, particularly in an area like New Orleans, underneath the Trailer was an inevitability. Shaw's expert, Dr. John Osteraas, PhD, at his deposition, when questioned about statements in his reports replied as follows:[29]

---

[26] See RCG Depo, Exhibit "O" p. 59-60
[27] See RCG Depo, Exhibit "O" p. 22-3.
[28] Id. p.71.  Interestingly, RCG acknowledged that the pads were only 16" x 16" instead of the 24" x. 24" called for in the FEMA instruction.
[29] See relevant pages of Osteraas Deposition, attached as Exhibit "P", p. 88-9.

Q.     Okay.  And if we turn to page 16, I'm going to ask you to read this sentence, "Given the fact that the support piers were simply supported on the ground surface any differential movement of the soil beneath the trailer over a period of several years is inevitable and would result in differential movement of the trailer."  What did you mean by that statement, Doctor?

A.     Well, several things.  First and foremost, the fact that the piers were placed on plywood supported on the topsoil at the surface at the ground, we would expect, over a period of years some minor differential movement of that soil…
And part of the reason that we build structures – well, one other thing, you know, just given the types of – or the problems we have in New Orleans, in general, with long-term subsidence, I would expect to see some movement over time without installation of deep foundations.

Q.     Okay.  In fact you say that, "movement of the soil beneath the travel trailer over a period of years is inevitable."  That's a true statement, isn't it?

A.     I believe that entire sentence is a true statement.

However, Shaw took no steps to correct or account for this problem.  It neither notified FEMA of the potential soil shifting problems (or even tested for them),[30] nor did it require its contractor to actually adhere to FEMA's blocking instructions, or material requirements. Therefore, it should come as no surprise that Trailer showed extensive signs of damage associated with negligent blocking.  As such, this supports Plaintiff's contention that the summary judgment should be dismissed.

   **C.     Negligent blocking warped and flexed the frame and allowed for the entrance of water in to the trailer**.

The destructive testing performed on this unit in August 2009 by both Plaintiff and Defendant experts found evidence of significant moisture intrusion in at least three locations identified by Defendant Experts Liberty Building Forensics Group (as well as Plaintiff experts).

---

[30] See Compeau Deposition, Exhibit "K" p. 264.

The attached diagram is produced in the Liberty Building Forensics Report at Appendix D, p.67.[31]  This diagram actually shows seven points of moisture intrusion, but Plaintiff specifically would argue that points 1-4 are most significantly related to water leaks caused by seal failure and/or frame flexation.   These are: (1) the areas around the entry door, as stated by Lyndon Wright at deposition, and as discussed by defense in their Motion for Summary Judgment; (2) the area above the bedroom door; and (3) the area at the front left corner of the trailer.   As is shown by numerous photographs taken over a month of destructive testing by both Plaintiff and Defendants, there was significant water damage and rot at these three location, and as is supported by expert reports on both sides, Mallet, Moore, Ritter and LaGrange for the Plaintiff and Liberty Building Forensics Group for the Defense.   Further, Defense expert Thomas Fribley states in his expert report:[32]

> Based upon my experience, my investigation, Mr. Wright's deposition, and inspection of the trailer, I conclude there were no water leaks attributable to the manufacturer.   Water leakage was caused after the trailer was transferred into FEMA's care and responsibility.

It is also important to note that neither Shaw, nor its installation subcontractor, RCG, ever contacted Forest River about jacking the trailer onto concrete blocks.   In fact, Jamie Albrecht, a Forest River division manager and one of three individuals who specifically worked to develop Forest River's FEMA spec unit stated at deposition when asked about whether the frames were

---

[31] Liberty Building Report Cover Page and Appendix D Attached hereto as Exhibit "Q"
[32] Fribley Report attached as Exhibit "R"

designed to be installed on block piers: "I don't think we were aware they were going to be installed on piers or foundations.  I know I wasn't."[33]

Further, the Forest River Owner's Manual has a maintenance checklist and discusses the inspection of seals and caulking.[34]   However, Shaw's corporate representative stated, when asked about whether Shaw kept owner's manuals:   "You know, they probably would have been kept at the yards or – No, actually, let me correct that. I don't believe we did keep copies of the operating manuals…"   Shortly after volunteering that information, Shaw's representative also stated that they did not consult with any manufacturer about the use of travel trailers as temporary housing or for long-term housing.[35]

The negligent acts of Shaw for failing to follow the FEMA blocking instructions, for failing to take the "inevitable" subsidence of the soil, and the failure to consult with the manufacturers about proper maintenance (or even keeping copies of the various owner's manuals or operating manuals) all led to a situation where leaks developed, and which defendant expert testimony and reports support.  Without even examining the Plaintiff's expert positions in this matter, the Shaw Motion for Summary Judgment must fail.

**D.     Water and moisture increases the rate of off-gassing and increased the level of formaldehyde in the Trailer.**

Shaw's arguments that the intrusion of moisture and water into the trailer through warping or flexing (and the resulting leaks caused thereby) which can be attributed to Shaw's negligent acts caused no additional impact, contravene existing science, the facts of this case and

---

[33] Relevant pages of Albrecht's deposition attached as Exhibit "S"
[34] See Exhibit "C" pps. 71, 76
[35] See Compeau testimony, Exhibit "K", p. 207-210

must be dismissed.  Further, Shaw's position is mere argument contrary to established Plaintiff position, and therefore must be dismissed as a clearly disputed material fact.

The Plaintiff's assertion that the introduction of moisture and bulk water intrusion led to an increase in the formaldehyde off-gassing and exposure to Wright are supported by his own experts, but also the Center for Disease Control and, again, defense expert Liberty Building Forensics Group, not to mention the laws of thermodynamics.

The Centers for Disease Control conducted a study of 519 trailers, and issued a final report in July of 2008.  This report clearly finds a connection between increased relative humidity and increased formaldehyde levels.[36]  At p. 12, the report states:

> Increased indoor temperature and RH were associated with increased formaldehyde levels.  These associations indicate exposure risks could increase during the summer, perhaps dramatically, with warmer and more humid weather. Formaldehyde levels during the winter may not represent summer levels.

Plaintiff's wood science expert, Dr. Stephen Smulski, Ph.D., makes several statements in his report relating to the water intrusion and humidity influencing off-gassing.[37]  At paragraph 16 of his final expert report he states:

> The intrusion of water into the wall cavity caused the relative humidity inside the wall to increase which in turn increased the release of formaldehyde gas from the hardwood plywood wall panels.  Wetting of the hardwood plywood wall panels by the water caused their moisture content to increase which in turn increases the release of formaldehyde gas from the wall panels.

At paragraph 19, Dr. Smulski goes on to state:

> The trailer was installed in New Orleans, Louisiana, a location whose climate for much of the year is hot and humid.  These are the exact conditions that increase

---

[36] The cover and p. 12 of the report are attached hereto as Exhibit "T"
[37] Dr. Smulski's final report is attached hereto as Exhibit "U"

the release of formaldehyde gas from wood composite products including particleboard, medium density fiberboard, and hardwood plywood.

These statements, made by the federal agency and by a wood science expert already admitted to testify on nearly identical issues in the first bellwether trial, clearly establish that there is an articulated and supportable dispute as to what impact Shaw's negligence had in the formaldehyde suffered by Lyndon Wright.

It is important to note that the exposure levels at issue in this litigation, and Plaintiff's would argue, which are needed to create an adverse health effect are as Shaw argues, very small. The Agency for Toxic Disease Study and Registry (ATSDR) puts its minimal risk level for chronic exposure at 8 parts per billion. Any argument by Shaw that it may only have increase off-gassing by a little bit is meaningless when the issue is in parts per billion. Any increase is significant. In fact, defense expert G. Graham Allan, PhD, states at paragraph 7 of his report:

> It is important to understand how very tiny a part per billion of anything actually is. One penny in ten million dollars is 1 ppb. A regular sized postage stamp laying on the playing field of the New Orleans Superdome is about 80 parts per billion.

Finally, when addressing Shaw's borderline ridiculous argument that any leaks or gaps created by Shaw's negligence are just as likely to let formaldehyde out as let water in must fail as it not only fails to take this trailer's physical properties into account, but also ignores the laws of thermodynamics.

It is commonly understood that, pursuant to the laws of thermodynamics, in an effort to create equilibrium, warm will move towards cool, wet to dry, and high pressure to low pressure. As such, any leaks caused by Shaw create an opportunity for warm, moist outdoor air, or water

17

to move into the relatively cooler and relatively drier trailer.  Further, as was discussed by Liberty Building Forensics Group at their depositions, this trailer had a pressure envelope during periods where the air conditioner was turned off and the windows closed that was negative.[38] This means that at times when the windows and doors were closed (i.e. any time Wright was away from his trailer), there tended to be more pressure on the exterior of the trailer pushing in, than on the interior pressing out.  This would confound Shaw's argument that the formaldehyde inside the trailer was just as likely to escape through the cracks or gaps as exterior water or moisture (in the form of humidity) to enter the trailer.

The increase of moisture and water intrusion do in fact lead to an increase of formaldehyde off-gassing, as is the position taken by the CDC and the Plaintiffs.  This is further supported by the physical properties of the Wright unit, as reported by Defendant expert Liberty Building Forensics.  As such, Shaw's Motion for Summary Judgment must fail.  If nothing else, there clearly exists a dispute of material facts that would preclude an award of summary judgment.

## CONCLUSION

Shaw's Motion for Summary Judgment must fail for the reasons articulated herein. While there is a significant body of argument included throughout the Plaintiff's own expert reports, except for a few instances, undersigned has attempted to illustrate to this honorable Court that the Expert's retained by Defendants in this case contradict the position taken by Shaw in its Motion for Summary Judgment.  If there are material disputes amongst Defendant experts

---

[38] See Norm Nelson Deposition, select pages, attached as Exhibit "V"

as to the assertions made by Shaw, then there are certainly disputes of material facts which preclude the granting of a Summary Judgment.

Shaw caused or exacerbated Wright's exposure by a factor of 24-27 months for their complete failure to warn either him or FEMA of its awareness or concerns relating to formaldehyde in the units. As such, and without addressing a single point raised in the Shaw Motion, summary judgment must be denied. However, the Motion for Summary judgment must also be denied because Shaw negligently installed the unit, it failed to consider the well known problems of soil subsidence, and it failed to consult with Forest River about the proper maintenance or application of the travel trailer. The resulting water and moisture intrusion caused by the foreseeable outcome of Shaw's negligence caused increases in humidity which led to increased off-gassing, and the deterioration and breakdown of the wet wood products also caused an increased release of formaldehyde into the trailer environment. Further, once the formaldehyde was in the trailer, it didn't have anywhere to go due to the pressure envelope characteristics of the trailer.

## **PRAYER**

WHEREFORE, for all the reasons articulated herein, Plaintiff Lyndon Wright respectfully requests that the Court deny Shaw's Motion for Summary.

19

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION**

BY:    s/Gerald E. Meunier
        GERALD E. MEUNIER, #9471
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:    504/522-2304
        Facsimile:    504/528-9973
        gmeunier@gainsben.com

        s/Justin I. Woods
        JUSTIN I. WOODS, #24713
        **PLAINTIFFS' CO-LIAISON COUNSEL**
        Gainsburgh, Benjamin, David, Meunier &
        Warshauer, L.L.C.
        2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
        Telephone:    504/522-2304
        Facsimile:    504/528-9973
        jwoods@gainsben.com

        **COURT-APPOINTED PLAINTIFFS'
        STEERING COMMITTEE**
        ANTHONY BUZBEE, Texas # 24001820
        RAUL BENCOMO, #2932
        FRANK D'AMICO, #17519
        MATT MORELAND, #24567
        LINDA NELSON, #9938
        MIKAL WATTS, Texas # 20981820
        ROBERT BECNEL
        DENNIS REICH, Texas # 16739600

20

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
