UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * * * | MDL NO. 1873 SECTION "N" (5) JUDGE ENGELHARDT MAGISTRATE CHASEZ |
| THIS DOCUMENT IS RELATED TO | | * * | |
| *Lyndon Wright, et al v. Forest River, Inc., et al,* Docket No. 09-2977 (E.D. La.) | | * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANT SHAW ENVIRONMENTAL, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
PLAINTIFF'S MAINTENANCE CLAIMS**

Plaintiff Lyndon Wright ("Mr. Wright" or "Plaintiff") responds to Defendant Shaw Environmental, Inc.'s ("Shaw") Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims (Docket Entry No. 10947) and in support, would show:

**GENERAL BACKGROUND**

In the immediate aftermath of Hurricane Katrina, the United States, through the Federal Emergency Management Agency ("FEMA"), engaged Shaw in a no-bid contract to provide a number of tasks to assist with the implementation of the Disaster Housing response.[1] The contract between FEMA and Shaw tasked Shaw with a number of areas of disaster response implementation,[2] including but not limited to: (1) hauling and transportation of Emergency Housing Units ("EHU"), (2) installation and make-ready of

---

[1] See Initial Contract Communications between Shaw and FEMA, attached as Exhibit "A".

[2] See Excerpts from Shaw Scope of Work attached as Exhibit "B".

1

EHU's, (3) inspecting the EHU's, and (4) maintaining the EHU's once they had been installed. Shaw was one of three contracting entities in Louisiana charged with the implementation of FEMA's disaster housing response. The other two were Fluor Enterprises, Inc. and CH2M Hill Constructors, Inc.

Included in the thousands of EHU's assigned to Shaw pursuant to its contract, was a Forest River, Inc. ("Forest River") travel trailer, VIN # 4X4TSMH296C008992 (the "Trailer"). The Trailer was designed by Forest River as a recreational vehicle which was not intended for long term habitation.[3] The Trailer was to be moved to and installed at 2315 Seminole Lane, New Orleans, Louisiana. It was originally assigned to a Ms. Bobbie Wright, who in turn granted her son, the Plaintiff, power of attorney to sign on her behalf and occupy the unit.[4] The trailer was delivered to the address and installed onto concrete piers by RCG, a subcontractor to Shaw. Wright moved into the unit in early March 2006. The Plaintiff complained of an odor similar to a new car smell to a Shaw maintenance person as early as February 13, 2006.[5]

Within days of moving in to the Trailer, the heater stopped working. Shaw sent out a maintenance team to repair the heater on or about March 19, 2006, which almost

---

[3] See excerpt of Forest River Owner's Manual attached as Exhibit "C".

[4] This is attached hereto as Exhibit "D".

[5] See deposition of Lyndon Wright attached as Exhibit E, pp. 267-68.

immediately broke down again.[6]  Despite multiple verbal complaints from the Plaintiff to Shaw that the heater was still not working, no additional actions were taken to repair it.[7]

Proper care and maintenance of the Trailer requires that the Shaw maintenance team wash the Trailer's fiberglass siding at least once a month[8].  During the monthly washing, the seals were also to be inspected for signs of drying out, wear, cracking and/or separation.[9]  The Shaw maintenance team never performed proper care and maintenance of the Trailer as required by the Forest River Recreational Vehicle Owner's Manual.  In addition, Shaw never had any discussions with Forest River about anything, including how to properly maintain Forest River trailers.[10]

On March 20 and 21, 2006, Shaw received emails from Brian Boyle with FEMA asking what Shaw (and the other IA/TAC contractors) was doing about possible formaldehyde in the emergency housing units it was contracted to maintain.[11]  Shaw also had internal communications relating to formaldehyde concerns over the months following these initial emails.[12]  Shaw, including Shaw maintenance teams, never notified or warned FEMA or any occupant of any emergency housing unit about the very

---

[6] See Exhibit L, the March 19, 2006 Call Center Maintenance Request Form, contained in the Shaw Maintenance file.

[7] See Exhibit E, pp. 109-113.

[8] See Exhibit C at pp. 70-71.

[9] Id.

[10] See, e.g., Forest River 30(b)(6) deposition of Doug Gaeddert, attached as Exhibit "M", p. 99.

[11] Boyle 3/20/06 email attached as Exhibit F, Boyle 3.21.06 email attached as Exhibit G.

[12] See emails attached as exhibits H, I, J.

serious safety and health concerns of formaldehyde in the EHUs – including the Plaintiff.[13]

Shaw contends that on May 18, 2006, Shaw began discussions with C. Martin Company to begin a sequenced hand over of "Maintenance and Deactivation" for the EHUs originally tasked to Shaw.  This included Wright's EHU, and Shaw's transfer/hand-off of Wright's Trailer was to took place on or about June 1, 2006. However, Shaw never notified C. Martin of its concerns about formaldehyde in the trailers.

While Shaw claims that it had nothing else to do with the Trailer subsequent to June 1, 2006, a major impact of their involvement manifested several months later.  As the piers of the Trailer settled over the months following the installation and make ready, the frame began warping, and a large gap formed between the door and the door jamb. As this developed, water began to pour in through the door whenever it would rain. Additionally, the warping of the frame caused by Shaw's jacking and installing the unit on concrete piers created a break in the seal above one of the bedroom windows and at the front left corner of the trailer, also causing water to leak in to the Trailer.[14]  Shaw maintenance teams, although they did perform maintenance on the furnace in March of 2006, never washed or inspected the seals of the Trailer to discover the breaks in the seals of the Trailer, nor did the Maintenance teams ever make note of and correct the improper installation of the Trailer on concrete piers.

---

[13] See Shaw 30(b)(6) deposition of Geoffrey Compeau, attached as Exhibit "K", pp. 143-146.

[14] See Exhibit "E" pps. 264-266.

**ARGUMENT AND AUTHORITIES**

**I.     SUMMARY JUDGMENT STANDARD.**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show no genuine issue as to any material fact. FED. R. CIV. P. 56(c). "[T]he substantive law will identify which facts are material [and] [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Ultimately, this Court's concerns is to ascertain "whether there is a need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only be a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. As such, "[a] District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990), and draw all justifiable inferences in favor of the non-movant. *Anderson*, 477 U.S. at 255; *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir. 2002).

In evaluating evidence to determine whether a factual controversy exists, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Instead, "the court must

5

disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the non-moving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

Essentially, factual issues of controversy exist only where "there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted). Louisiana state circuit courts are split as to which party bears the burden of persuasion at summary judgment phase. *See Lyncker v. Design Engineering, Inc.*, 988 So.2d 812, 815 (La. App. 4th Cir. 2008).

However, regardless of the summary judgment standard, this Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (citing *Lujan*, 497 U.S. at 888). Moreover, where "evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). Thus, under Rule 56, this Court is not required to search for evidence that is not properly raised by the non-movant. *Id.* Instead, the non-moving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994), *cert. denied*, 513 U.S. 871 (1994). A factual controversy precludes summary judgment if the "record, taken as a whole, could lead a rational trier of fact to find for the non-moving party." *Smith v. Amedisys,* 298 F.3d 434,

440 (5th Cir. 2002) (citing *Geoscan, Inc. of Tx. V. Geotrace Techs., Inc.*, 226 F.3d. 387, 390 (5th Cir. 2000)).

**II.   SHAW DID BREACH ITS MAINTENANCE DUTIES TO PLAINTIFF.**

Shaw's Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims must be denied as there is evidence that Shaw breached its maintenance duties to Plaintiff.  Under Louisiana law, a tortfeasor is generally liable for any damage caused by his or her fault.  LA. CIV. CODE ART. 2315.  Louisiana has adopted a duty-risk analysis in determining whether to impose liability under a particular set of facts.  For liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements:  (1) the defendant had a duty to the plaintiff to conform defendant's conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and (5) actual damages (the damage element).  Plaintiff can prove all five separate elements.

> The existence of a duty is a question of law, as is the question of whether a specific risk is included within the scope of the duty owed.  *Ellison v. Conoco, Inc.,* 950 F.2d 1196, 1205 (5th Cir. 1992). Nevertheless, "[t]here is no 'rule' for determining the scope of the duty." *Roberts v. Benoit,* 605 So. 2d 1032, 1044 (La. 1991). That inquiry typically requires consideration of the facts of each case, and dismissal is therefore proper "only where no duty exists as a matter of law and no factual or credibility disputes exist." *Parish v. L.M. Daigle Oil Co.,* 742 So. 2d 18, 25 (La. Ct. App. 1999).[15]

---

[15] *Barasich v. Columbia Gulf Transmission Co.,* 467 F. Supp. 2d 676, 691 (E.D. La. 2006).

7

Shaw's Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims addresses only 1) whether Plaintiff's claim for improper maintenance incorrectly assumes that Shaw's maintenance duties were owed to Plaintiff, and 2) whether Plaintiff can present evidence of breach.

Prior to the consideration or refutation of any other point argued by Shaw in its Motion for Partial Summary Judgment, it is necessary to show the extent of Shaw's knowledge relating to formaldehyde as of March 20, 2006. In an email from Brian Boyle of FEMA to the collective IA/TAC contractors, including Shaw, states:[16]

> Gentlemen,
>
> Our safety office needs to know from each contractor the process of airing out of all TT's and Mobil homes to handle the existence of formaldehyde inside the units and what YOU are doing to handle this problem. Please e-mail YOUR process for combating this problem so Larry can pass this on to Safety in D.C. Thank you for your attention to this and I'll wait to here [sic] from each of you and send it on to Larry.

Notice the emphasis used by FEMA, "YOU" and "YOUR". This clearly indicates FEMA was looking to Shaw for instruction/direction. Shaw apparently did not respond, as there is an email the next day, March 21, 2006, again from Brian Boyle this time to Shaw employees alone, wherein he states, all in bold:

---

[16] See Exhibit F. It is interesting to note that this exhibit, amongst other similar documents were produced by Shaw the night before the 30(b)(6) deposition was taken, after the close of business. These documents were responsive to open discovery requests, and should have been produced weeks, if not months, earlier.

**Good Morning**

**I received responses from the other two contractors on this and I'm still waiting to hear from you guys so Larry can pass this on to Washington D.C.  Your immediate attention is requested.**

As of March 20/21, 2006, Shaw could not deny they had knowledge of a potential problem with formaldehyde in the trailers.  While these two documents are sufficient to indicate Shaw's knowledge, there are additional internal Shaw emails wherein the source and health effects of formaldehyde are discussed.  On May 17, 2006, an internal Shaw email entitled: "FW: Formaldehyde notes and video link on CNN" states: "To the best of our knowledge, the smell may be related to the glue used in final construction: for [sic] the carpet, the wood paneling, the veneer on the bed supports, etc."[17]  In another May 17, 2006 internal Shaw email, on the same subject, a Shaw engineer pulled toxicological documentation from the EPA website, and wrote: "Right now, it seems to be a few isolated cases, but I think FEMA needs to be aware of this (as the "owners" of the trailers).  Here is some additional information…"[18]

With this obvious awareness of the issue, and an internal recommendation that Shaw should notify FEMA, it is inexplicable why Shaw failed to notify or warn both FEMA and the trailer occupants, including the Plaintiff.  At deposition, however, when asked if they notified or warned either FEMA or the occupants, Shaw's Project Manager, who was tasked with Shaw's institutional knowledge, responded that he had no idea if Shaw ever notified FEMA or the trailer occupants of any concerns relating to

---

[17] See email attached as Exhibit "I"

[18] See Exhibit "J"

9

formaldehyde.[19] Shaw also acknowledges that it began receiving odor complaints in 2005 from occupants of the trailers.[20] Further, Shaw indicated that it did not maintain owner's manuals separate from the trailers, and never consulted with any manufacturer regarding their statements that the travel trailers were not designed for long-term or residential occupancy.[21]

Because of Shaw's clear institutional knowledge of odors and formaldehyde in the various EHUs, and their failure to show any proof that they notified either FEMA or any trailer occupant of the health risks or methods of reducing same, their Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims must fail before any analysis of its arguments is even necessary.  That said, upon closer evaluation, Shaw's other arguments fall flat and a clear dispute as to material facts remains, thus also necessitating the denial of the Motion for Partial Summary Judgment.

### A.  Shaw owed a duty to Plaintiff to properly maintain the Trailer

Shaw asserts that Plaintiff's claim for improper maintenance incorrectly assumes that Shaw's maintenance duties were owed to Plaintiff.[22]  Shaw's only argument as to whether a duty was owed to the Plaintiff is that Shaw's maintenance duties arose from its contract with FEMA, and that Plaintiff can produce no evidence that FEMA ever rejected or complained about Shaw's maintenance work.  However, Shaw's assertions are incorrect, and Shaw does not cite to any evidence or authorities for their assertions.

---

[19] See Exhibit "K" pp. 144-146.

[20] Id. 118-120

[21] Id. pp.207-211.

[22] Rec. Doc. 10947-2 at 6.

The Plaintiff complained of an odor similar to a new car smell to a Shaw maintenance person when he first moved into the trailer. As was stated *supra,* in March of 2006, FEMA was looking to Shaw for instruction/direction regarding formaldehyde problems. As of March 2006, Shaw could not deny they had knowledge of a potential problem with formaldehyde in the trailers, and throughout the whole time period Shaw was responsible for maintenance of the Trailer Shaw never warned the Plaintiff of the existence and dangers of formaldehyde even though the Plaintiff complained about odors. These facts also negate Shaw's assertion that FEMA never complained about Shaw's maintenance work.

Shaw also had a duty to Plaintiff to properly maintain the Trailer according to the manufacturer's instructions. As stated *supra*, Shaw never contacted Forest River about anything, including how to properly maintain Forest River trailers such as Plaintiffs. Had Shaw contacted Forest River, or simply read the Forest River owner's manual, Shaw would have known that a monthly washing of the exterior was necessary, and that the seals were also to be inspected for signs of drying out, wear, cracking and/or separation.

These facts certainly present fact issues for the jury to decide with respect to whether Shaw had a duty to the Plaintiff to provide proper maintenance to the Trailer, and dismissal would be improper because a duty exists as a matter of law and there are factual and credibility issues that exist in this case.

**B. Shaw breached its duty to Plaintiff to properly maintain the Trailer**

Because Shaw owed Plaintiff a duty to properly maintain the Trailer as discussed supra, the question becomes whether Shaw breached its duty to Plaintiff. Whether the duty was breached is a question of fact.[23]

**1. Improper blocking and maintenance inspection**

Despite their claims to the contrary, Shaw did not follow FEMA's protocol when placing the Trailer on blocks. They also failed to examine the owner's manual or consult with Forest River, or any other manufacturer, to determine the proper manner in which the block a trailer, or even if the trailer could be safely blocked. In fact, a Forest River employee who designed the FEMA spec unit testified that Forest River never knew it was going to be blocked onto piers. Shaw also failed to consult with any manufacturer on the frequency of method of inspecting caulking or seals. None of these deficiencies in installation were ever noted or reported by a Shaw maintenance team and brought to either FEMA's or the Plaintiff's attention.

The Travel Trailer Installation Instructions contained in the Shaw Scope of Work Documents is very clear in its instructions for the installation onto piers for the travel trailers. It states in pertinent part:[24]

> **2.1.2  Blocking and Leveling**
>
> …Travel trailers shall be set-up on concrete piers and after the weigh[t] of the travel trailer is transferred to the piers…The travel trailer set-up will also include a minimum of six piers (three on each side) evenly spaced…The Contractor shall provide a base for each pier. The base will be ¾" x 24" x 24" exterior grade plywood. The piers will have at a

---

[23] *Westbrook v. Germann*, 2004 U.S. Dist. LEXIS 21818 (E.D. La. 2004), *citing to Hodge v. Liquid Ventures,* 634 So. 2d 1337, 1339 (La. 3 Cir. 1994).

[24] Relevant pages of the Shaw Scope of Work are attached hereto as Exhibit "N"

minimum two solid cap blocks on the base and two solid cap blocks at the top of the piers…

After the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned and tightly shimmed with wooden wedges…

Shaw engaged RCG to install a number of EHU's, including Wright's trailer. Shaw had an inspector sign off on RCG's installations.[25] While the FEMA travel trailer installation specs are very precise calling for specific concrete blocks, and exterior grade plywood to be used, RCG, believed these were not necessary to follow. At deposition, when shown a blocking diagram supplied by Shaw, RCG's corporate representative clearly did not feel bound by either the drawing or the travel trailer installation instructions.[26] Curiously, in a response specific to installing the unit with wheels off the ground, RCG stated: "So it didn't require block. If it required that blocking, I would have to charge a lot more than I was for my installs." When asked about the plywood bases for the piers, RCG stated:[27]

> Mr. D'Amico: All right. Your testimony, from my understanding, is RCG only used ABS plastic pads, they never used plywood pads?
>
> The Witness: That's correct.
>
> Mr. D'Amico: Okay.
>
> Q. (By Mr. Ahlquist) You don't recall any instruction relating to the pads versus plywood?

---

[25] See RCG Depo, Exhibit "O" p. 59-60

[26] See RCG Depo, Exhibit "O" p. 22-3.

[27] Id. p.71. Interestingly, RCG acknowledged that the pads were only 16" x 16" instead of the 24" x. 24" called for in the FEMA instruction.

> A. I think it's just preference. We – we liked the pads and we had a ton of them. You know, the other ones deal with the splinters and the things when you're putting them down there. And it's just a pain…

Once again, no one from a Shaw maintenance team ever noted or reported the improper installation and use of improper installation materials to either FEMA or the Plaintiff.

### 2. Breach of duty with respect to shifting or settling soils

Further, Shaw was aware, or should have been aware, that the settlement or shifting of the soil, particularly in an area like New Orleans, underneath the Trailer was inevitable. Shaw's expert, Dr. John Osteraas, PhD, at his deposition, when questioned about statements in his reports replied as follows:[28]

> Q. Okay. And if we turn to page 16, I'm going to ask you to read this sentence, "Given the fact that the support piers were simply supported on the ground surface any differential movement of the soil beneath the trailer over a period of several years is inevitable and would result in differential movement of the trailer." What did you mean by that statement, Doctor?
>
> A. Well, several things. First and foremost, the fact that the piers were placed on plywood supported on the topsoil at the surface at the ground, we would expect, over a period of years some minor differential movement of that soil…
> And part of the reason that we build structures – well, one other thing, you know, just given the types of – or the problems we have in New Orleans, in general, with long-term subsidence, I would expect to see some movement over time without installation of deep foundations.
>
> Q. Okay. In fact you say that, "movement of the soil beneath the travel trailer over a period of years is inevitable." That's a true statement, isn't it?
>
> A. I believe that entire sentence is a true statement.

---

[28] See relevant pages of Osteraas Deposition, attached as Exhibit "P", p. 88-9.

However, Shaw took no steps to correct or account for this problem. Shaw maintenance teams neither notified FEMA of the potential soil shifting problems (or even tested for them),[29] nor did it require its contractor to actually adhere to FEMA's blocking instructions, or material requirements.

### 3. Lack of proper maintenance and inspection led to moisture intrusion

The destructive testing performed on this unit in August 2009 by both Plaintiff and Defendant experts found evidence of significant moisture intrusion in at least three locations identified by Defendant Experts Liberty Building Forensics Group (as well as Plaintiff experts). The attached diagram is produced in the Liberty Building Forensics Report at Appendix D, p.67.[30] This diagram actually shows seven points of moisture intrusion, but Plaintiff specifically would argue that points 1-4 are most significantly related to water leaks caused by seal failure and/or frame flexation. These are: (1) the areas around the entry door, as stated by Lyndon Wright at deposition, and as discussed by defense in their Motion for Summary Judgment; (2) the area above the bedroom door; and (3) the area at the front left corner of the trailer. As is shown by numerous photographs taken over a month of destructive testing by both Plaintiff and Defendants, there was significant water damage and rot at these three locations, and as is supported by expert reports on both sides, Mallet, Moore, Ritter and LaGrange for the Plaintiff and Liberty Building Forensics Group for the Defense. Further, Defense expert Thomas Fribley states in his expert report:[31]

---

[29] See Compeau Deposition, Exhibit "K" p. 264.

[30] Liberty Building Report Cover Page and Appendix D Attached hereto as Exhibit "Q"

[31] Fribley Report attached as Exhibit "R"

> Based upon my experience, my investigation, Mr. Wright's deposition, and inspection of the trailer, I conclude there were no water leaks attributable to the manufacturer.  Water leakage was caused after the trailer was transferred into FEMA's care and responsibility.

It is also important to note that neither Shaw, nor its installation subcontractor, RCG, ever contacted Forest River about jacking the trailer onto concrete blocks.  In fact, Jamie Albrecht, a Forest River division manager and one of three individuals who specifically worked to develop Forest River's FEMA spec unit stated at deposition when asked about whether the frames were designed to be installed on block piers: "I don't think we were aware they were going to be installed on piers or foundations.  I know I wasn't."[32]

Further, the Forest River Owner's Manual has a maintenance checklist and discusses the inspection of seals and caulking.[33]  However, Shaw's corporate representative stated, when asked about whether Shaw kept owner's manuals:   "You know, they probably would have been kept at the yards or – No, actually, let me correct that. I don't believe we did keep copies of the operating manuals…"  Shortly after volunteering that information, Shaw's representative also stated that they did not consult with any manufacturer about the use of travel trailers as temporary housing or for long-term housing.[34]  Clearly, Shaw breached its duty to Plaintiff by not properly maintaining and inspecting the seams of the Trailer.

By failing to report that FEMA blocking instructions were not followed by the installer, for failing to report to FEMA or the Plaintiff the "inevitable" subsidence of the

---

[32] Relevant pages of Albrecht's deposition attached as Exhibit "S"

[33] See Exhibit "C" pps. 71, 76

[34] See Compeau testimony, Exhibit "K", p. 207-210

16

soil, and the failure to consult with the manufacturers about proper maintenance (or even keeping copies of the various owner's manuals or operating manuals) all led to a situation where leaks developed during Shaw's period of responsibility for maintenance, and which defendant expert testimony and reports support.  All these facts support a finding that Shaw breached its duty to Plaintiff to properly maintain the Trailer. Therefore, Shaw's Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims must fail.

## CONCLUSION

For summary judgment to be granted, there must be no factual questions with regard to any of these issues.  Plaintiff has shown evidence that indicates that Shaw had a duty to properly maintain the Trailer, and failed to properly maintain Plaintiff's the Trailer; consequently, Shaw's Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims should be denied.

## PRAYER

WHEREFORE, Plaintiff Lyndon Wright respectfully requests that the Court deny Shaw Environmental, Inc.'s Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims and for such other relief to which he is entitled.

Respectfully submitted:

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

BY:  s/Gerald E. Meunier
GERALD E. MEUNIER, #9471
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
gmeunier@gainsben.com

s/Justin I. Woods
JUSTIN I. WOODS, #24713
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone:   504/522-2304
Facsimile:    504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
Dennis Reich, Texas #16739600

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing on February 15, 2010.

 s/Gerald E. Meunier
GERALD E. MEUNIER, #9471