UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER FORMALDEHYDE            MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

                                            SECTION N(5)

                                            JUDGE ENGELHARDT

THIS DOCUMENT IS RELATED TO:
*Aldridge, et al. v. Gulf Stream Coach, Inc., et al.*    MAGISTRATE CHASEZ
No. 07-9228

************************************************************************

## PLAINTIFFS' FIRST SUPPLEMENTAL AND AMENDING COMPLAINT

NOW INTO COURT, through undersigned counsel, come the Plaintiffs, who respectfully request that this honorable Court allow them to supplement and amend the Plaintiffs' Original Complaint (the "Original Complaint") with this the Plaintiffs' First Supplemental and Amending Complaint (the "Amended Complaint"), and include, insert and add the following to the Complaint:

1.

In the Amended Complaint, the Plaintiffs adopt, incorporate and restate all allegations, assertions of fact, causes of action, claims and requests for relief raised and set forth in the Original Complaint.



EXHIBIT
B

## PARTIES

2.

The Plaintiffs wish to supplement Section II (Parties) of the Original Petition by naming and adding new defendants as follows:

MADE DEFENDANT HEREIN:

Shaw Group, Inc. ("Shaw"), a Louisiana corporation, received a No-Bid contract from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

Fluor Enterprises, Inc. ("Fluor"), a California corporation with its principal place of business in Irving, Texas, licensed to do business in the State of Louisiana and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

Bechtel Corporation ("Bechtel"), a Nevada corporation with its principal place of business in San Francisco, California, licensed to do business in the State of Louisiana and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

2

CH2M Hill, Inc. ("CH2M")(collectively with Shaw, Fluor and Bechtel, hereinafter the "No-Bid Defendants"), a Florida corporation with its principal place of business in Englewood, Colorado, licensed to do business in the State of Louisiana and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

North American Catastrophe Services, Inc. ("NACS"), a Florida corporation, not licensed to do business in Louisiana, received a contract from the United States to identify, select and procure temporary housing units for those displaced by hurricanes Katrina and Rita.

Morgan Building & Spa Manufacturing Corporation ("Morgan")(collectively with NACS, hereinafter the "Procurement Defendants"), a Nevada corporation with its principal place of business in Garland, Texas, licensed to do business in the State of Louisiana and in good standing, received a contract from the United States to identify, select and procure temporary housing units for those displaced by hurricanes Katrina and Rita.

Also made defendant herein is the United States of America, through the Federal Emergency Management Agency (FEMA), referred to, interchangeably as the "Federal Government", "Government" and "FEMA".

## JURISDICTION

3.

In addition to the venue and jurisdictional assertions raised in the Original Petition, the Plaintiffs assert the following:

3

This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d)(11) because this is a mass action in which there is at least minimal diversity and the matter in controversy exceeds the sum or value of $5 million dollars, exclusive of interest and costs. Alternatively, this Court has jurisdiction because there is diversity of citizenship between the Plaintiffs and the Defendants due to the fact that the United States is a Defendant to this action and that the other Defendants were contractors of the Federal Government. Alternatively, this Court has federal question jurisdiction because the project at issue was a federal project administered through FEMA.

## BACKGROUND

4.

Plaintiffs incorporate all previous assertions of fact made in the Original Complaint.

5.

Despite the fact that the scope of the damage to Louisiana, Mississippi, Texas and Alabama coastal areas was foreseeable, the Federal Government was unprepared to handle the devastation resulting from the forces of hurricanes Katrina and Rita, such as wind and storm driven surge, in addition to the failure of the hurricane protection systems. The damage was too great to be handled by state and local governments alone.

6.

The homes of hundreds of thousands of citizens of the United States who resided along the Gulf Coast were rendered uninhabitable and such citizens were left homeless.

4

7.

FEMA was established in 1979 to provide a single point of accountability for the Federal Government's disaster response.  Since its inception, FEMA has been charged with providing temporary housing to victims of numerous major disasters other hurricanes, earthquakes, wildfires, and civil unrest.  FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act").

8.

The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

9.

In response to Hurricanes Katrina and Rita, FEMA, upon information and belief, tasked the Procurement Defendants with the identification, selection and procurement of approximately 143,000 temporary housing units (i.e., travel trailers, park models and manufactured housing) pursuant to the direct housing assistance provisions of the Stafford Act, which FEMA purchased from the manufacturers and off dealer lots, and intended for Gulf Coast residents in the four

5

states at issue. The vast majority of the temporary housing units purchased were travel trailers which became widely known as "FEMA Trailers".

10.

At all times, the Procurement Defendants identified, selected and procured travel trailers for FEMA to utilize as temporary housing units under the Stafford Act, while failing to consult with the manufacturers regarding the warnings or instructions against the use of travel trailers for extended occupancy.

11.

The Procurement Defendants communicated with manufacturers prior to hurricanes Katrina and Rita regarding the financial opportunities associated with the provision of travel trailers as temporary housing units, but failed to take into account or research the health concerns relating to formaldehyde exposure to occupants of the travel trailers and other foreseeable problems and defects which would occur during an extended occupancy.

12.

The Procurement Defendants knew or should have known that the Federal Government's intended use of the travel trailers and other temporary housing units was for residential occupancy for periods up to eighteen months, if not longer, pursuant to the emergency housing mandate of the Stafford Act.

13.

The Procurement Defendants knew or should have known that the manufacturers' intended use of the travel trailers was for intermittent, recreational use, and that the travel trailers were designed as recreational vehicles rather than permanent or long-term housing units.

6

Further, the Procurement Defendants knew or should have known that the manufacturers' warned against long-term occupancy of the travel trailers.

14.

Following the procurement of the temporary housing units by the Procurement Defendants, the Federal Government contracted with the No-Bid Defendants to implement the mandates of the Stafford Act in the areas affected by hurricanes Katrina and Rita.

15.

In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged the No-Bid Defendants with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the No-Bid Defendants and the Procurement Defendants to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

16.

The provision of temporary housing to Plaintiffs created a duty on the part of the Federal Government to insure that such housing was habitable in a safe and sanitary condition. However, the housing provided is and was, at all times pertinent hereto, unsafe and presented a clear and present danger to the health and well-being of the Plaintiffs and their families by exposing them to elevated and hazardous levels of formaldehyde.

17.

Upon information and belief, the four No-Bid Defendants are the only contractors engaged by FEMA to assist with the implementation of the Stafford Act in Louisiana,

7

Mississippi, Alabama and Texas in the aftermath of hurricanes Katrina and Rita, from the pick-up of a unit at a FEMA staging area through the decommissioning and de-installation of the units at the end of the contracts.

18.

The No-Bid Defendants were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

19.

Under the terms of their contracts, the No-Bid Defendants were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contracts with FEMA, the No-Bid Defendants were obligated to advise and instruct FEMA regarding the implementation of those contracts. The No-Bid Defendants failed to properly fulfill either of these tasks.

20.

The No-Bid Defendants contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which the No-Bid Defendants were tasked with operating. These new areas included staging areas specific to each of the No-Bid Defendants, group sites to be managed and maintained as assigned to one of the No-Bid Defendants or individual locations and addresses where the No-Bid Defendant assigned that temporary housing unit would have obligations to manage and maintain it.

8

21.

To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, the No-Bid Defendants entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

22.

The No-Bid Defendants were tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations each No-Bid Defendant would operate. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. The No-Bid Defendants knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

23.

Once the temporary housing units were transported and delivered to a particular location, that No-Bid Defendant had the responsibility for installing the temporary housing unit. The No-Bid Defendants installed the temporary housing units by "blocking" the unit. This meant raising the unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

24.

By blocking the temporary housing units, the No-Bid Defendants created stress and flexing on the frames of the units as they were not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that the units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

9

25.

The stress and flexing of the temporary housing units' frames caused by the No-Bid Defendants "blocking" them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

26.

The temporary housing units provided by FEMA were for the most part travel trailers. The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, the No-Bid Defendants knowingly and intentionally modified the design and the actual use of these units by converting them into temporary housing units to be used as a residence for long term occupancy in some instances exceeding 18 months.

27.

The No-Bid Defendants failed to consult with the Original Defendants or any other manufacturers of the temporary housing units with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation. The No-Bid Defendants took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

28.

Once the No-Bid Defendants had completed the transportation, delivery and installation of the temporary housing units, the No-Bid Defendants were tasked with inspecting the units to ensure that they were safe and habitable, prior to occupancy by hurricane disaster victims. Upon information and belief, the No-Bid Defendants failed to adequately inspect the temporary

10

housing units to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

29.

In addition to transportation, site identification, installation and inspection, all FEMA temporary housing units provided in response to hurricanes Katrina and Rita in Louisiana, Mississippi, Texas and Alabama were also managed, maintained and repaired by one of the four No-Bid Defendants, or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, the No-Bid Defendants failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst many thousands of residents of the temporary housing units.

30.

Parallel to their duty to manage, maintain and repair the temporary housing units, the No-Bid Defendants failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by occupants of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

31.

Following the occupancy of the temporary housing units, the New Defendants were tasked with their de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, the No-Bid Defendants failed to identify the unsuitability of the temporary housing units for long-term occupancy.

11

32.

In addition to de-installation of the temporary housing units, the No-Bid Defendants were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future.  By restoring and refurbishing these temporary housing units, the No-Bid Defendants warranted that the units were fit for their intended use, long term occupancy in response to disaster related displacement.  By restoring and refurbishing these temporary housing units, the No-Bid Defendants created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units.  Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

33.

The No-Bid Defendants failed, at every stage of their involvement, to warn the residents of the temporary housing units of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the trailer residents.

34.

Through their actions and omissions, the No-Bid Defendants created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. The No-Bid Defendants negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the

12

manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

35.

The No-Bid Defendants failed to warn the occupants of the temporary housing units of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

36.

By restoring and refurbishing the trailer for future habitation, the No-Bid Defendants improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

37.

Finally, despite these failures, the No-Bid Defendants received billions of dollars in contracts from FEMA and the United States government, at the expense of the health, and in some cases lives, of thousands of occupants of these temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

38.

The Procurement Defendants knowingly and intentionally identified, selected and procured approximately 140,000 travel trailers for converted use by FEMA as temporary housing units, despite the manufacturers' clearly expressed warnings against using the travel trailers for that purpose. In doing so, the Procurement Defendants created and contributed to a situation

13

where hundreds of thousands of people displaced by hurricanes Katrina and Rita were exposed to elevated and hazardous levels of formaldehyde.

39.

In October, 2005, the Federal Government, through the Occupational Health and Safety Administration ("OSHA"), conducted formaldehyde air sampling at the request of two FEMA contractors at a staging area in Mississippi. Upon information and belief, the Federal Government, as of October 2005, had sufficient evidence to put it on notice that there were hazardous concentrations of formaldehyde in the travel trailers that were being converted into temporary housing units at the instruction of FEMA.

40.

In March 2006, FEMA instructed its personnel to allow a period of off-gassing to occur prior to entering the temporary housing units. FEMA then (along with OSHA) initiated testing of the formaldehyde levels in the air of the temporary housing units due to concerns for FEMA employee exposure to formaldehyde.

41.

In March 2006 FEMA began receiving health complaints from occupants of the temporary housing units relating to formaldehyde exposure. Despite this knowledge that the temporary housing units contained hazardous levels of formaldehyde and FEMA's own safety instructions to its employees, no move was made to begin transitioning the occupants of the temporary housing units out of the converted travel trailers and into safe and sanitary alternative habitation.

42.

In April 2006, the Sierra Club published its report relating to the testing of the temporary housing units and the detection of hazardous levels of formaldehyde in the housing units pursuant to accepted ranges within the Environmental Protection Agency ("EPA") and the Agency for Toxic Substances and Disease Registry ("ATSDR"), both agencies within the Federal Government. The levels detected in the temporary housing units also exceeded OSHA standards. Following the publication of this testing, FEMA knowingly and intentionally failed to generally transition the occupants of the temporary housing units into safe and sanitary alternative housing.

43.

FEMA knowingly and intentionally sought to avoid litigation liability relating to formaldehyde levels in the temporary housing units by refusing to take affirmative action to prevent continued formaldehyde exposure to the occupants of the temporary housing units, rather, as illustrated by a number of emails among and between its officers and employees, FEMA avoided and suppressed the issue. This failure to adequately warn of, address and respond to the hazardous conditions in the temporary housing units caused continued exposure to the occupants which foreseeably contributed to and exacerbated the adverse health effects caused by formaldehyde exposure.

44.

Following the release of the Sierra Club study, there was ongoing and intense scrutiny of the FEMA temporary housing units by the local and national media as well as the United States Congress through its relevant committees. Despite this national scrutiny and criticism on the use

15

of the travel trailers as temporary housing units, FEMA knowingly and intentionally continued to utilize travel trailers as temporary housing units without considering alternative placements.

45.

FEMA knowingly and intentionally sold travel trailers without testing them to occupants until and through the end of July, 2007, approximately seventeen months after the latest possible date that FEMA was aware that at least some of the travel trailers contained hazardous levels of formaldehyde.

46.

Further, FEMA set up a formaldehyde call center which received thousands of health related complaints from occupants of the temporary housing units, all of which contributed to FEMA's awareness of the formaldehyde in the temporary housing units that was adversely affecting the occupants.

47.

A study undertaken by the Centers for Disease Control ("CDC") examined 519 temporary housing units and measured the formaldehyde levels in each. The results of this test showed that the average levels of formaldehyde in the FEMA temporary housing units was 77 parts per billion (ppb). The level of 77 ppb is medically significant as it exceeds levels generally accepted as capable of causing adverse health effects. This level was an average, and many of the temporary housing units showed levels of formaldehyde significantly higher than that. Further, the CDC indicated that the testing had been done in the cold, dry winter months and that the levels and concentrations found in the temporary housing units would be higher in the warmer, more humid summer months in the affected states.

16

48.

Despite the complaints, studies, congressional inquiries, warnings, amongst others, FEMA failed to take proactive steps to remove occupants from the hazardous formaldehyde exposure until the spring of 2008. In fact, there are still thousands of people residing in FEMA temporary housing units at the time of filing this Amended Complaint.

49.

Rather than focus on the health and safety of the occupants of the temporary housing units once it was determined that the units contained hazardous levels of formaldehyde, FEMA took steps only to protect itself from liability exposure in anticipation of litigation.

## AMENDED AND SUPPLEMENTAL CAUSES OF ACTION

50.

Plaintiffs amend and supplement the causes of action asserted and raised in the Original Complaint with the following:

## FIFTH CAUSE OF ACTION:
## NO-BID DEFENDANTS UNDER THE LOUISIANA PRODUCTS LIABILITY ACT

51.

Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

52.

The No-Bid Defendants qualify as manufacturers under the Louisiana Products Liability Act ("LPLA"), as they performed work pursuant to their contracts with FEMA which altered the character, design, construction, and/or quality of the product and the housing units constitute products under the LPLA.

17

53.

The increased exposure to formaldehyde fumes from the alteration of the temporary

housing units by the No-Bid Defendants resulted from the normal, foreseeable, and intended use

of the products and equipment.

54.

The installation and alteration of the temporary housing units, the modifications to the

manufacturers' designs, and the "blocking" of units off their wheel base, altered the product

which increased the effects of the product's defect and posed an unreasonable risk of harm to

Plaintiffs.

55.

The Plaintiffs were intended and foreseeable users of the alleged defective products, and

damages and losses to the Plaintiffs reasonably could have been anticipated by the No-Bid

Defendants.

56.

The No-Bid Defendants, by installing the temporary housing units on concrete blocks for

extended occupancy and, further, by installing residential appliances and heating and air

conditioning units, knowingly and intentionally modified the design and the actual use of the

units.

57.

The defects in the No-Bid Defendants' product are the result of and/or include, but are

not limited to the following:

     a. In creating stress and flexing on the frames of the units by lifting significant weight

        from the wheel base, which distorted the travel trailers' shells allowing for increased

moisture intrusion and formaldehyde exposure due to cracks and openings in the shell;

b. In providing temporary housing units to the Plaintiffs which, by virtue of their composition, refurbishment, reconditioning, and/or construction were unreasonably dangerous under reasonably anticipated use;

c. In providing temporary housing units to the Plaintiffs which, lacking adequate warnings, were unreasonably dangerous under reasonably anticipated use;

d. In failing to warn Plaintiffs of the unreasonably dangerous nature of the travel trailer(s) converted to temporary housing units for their intended use by FEMA or of the presence of excessive levels of emissions of formaldehyde;

e. In failure to ensure that the temporary housing units they installed, refurbished, and reconditioned were suitable for their intended use, as long term housing;

f. In failing to adhere to any and all of the warning against the jacking of the units with weight off their wheel base by the Manufacturing Defendants;

g. In failing to follow the manufacturers' instructions for the installation and intended use of the temporary housing units;

h. In providing housing units which were unduly dangerous due to their emissions of formaldehyde; and,

i. Such other indicia of fault under the LPLA as will be shown at the trial of this matter.

### SIXTH CAUSE OF ACTION:
### NEGLIGENCE OF NO-BID DEFENDANTS UNDER LOUISIANA LAW

#### 58.

Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

59.

At all relevant times the No-Bid Defendants were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

60.

The No-Bid Defendants owed a duty to Plaintiffs to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

61.

The No-Bid Defendants knew or should have known when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each plaintiff, and that the temporary housing units would be used in the manner that each plaintiff herein used the temporary housing units.

62.

The No-Bid Defendants breached their duty to Plaintiffs in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

a. Failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy;

b. Failing to adhere to the Manufacturing Defendants' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

63.

The No-Bid Defendants' actions were the proximate cause of the increased exposure of formaldehyde to the Plaintiffs.

64.

The No-Bid Defendants contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## SEVENTH CAUSE OF ACTION:
## NEGLIGENCE OF PROCUREMENT DEFENDANTS

65.

Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

66.

At all relevant times the Procurement Defendants were tasked with the identification, election and procurement of FEMA temporary housing units for use in Louisiana, Mississippi, Alabama and Texas following hurricanes Katrina and Rita.

67.

The Procurement Defendants owed a duty to Plaintiffs to select units which were suitable for the intended purpose of extended habitation up to and exceeding 18 months.

68.

At all relevant times, the Procurement Defendants were in communication with the manufacturers of the travel trailers regarding their use as temporary housing units for FEMA in response to hurricanes Katrina and Rita.

21

69.

The Procurement Defendants knew or should have known when they identified, selected and procured the travel trailers for use as temporary housing units that the manufacturers specifically warned against such use and clearly indicated in the various owners' manuals that the travel trailers were recreational vehicles designed to be mobile and towable, and were expressly not designed for use as permanent dwellings.

70.

The Procurement Defendants knew or should have known that the travel trailers off-gassed formaldehyde and that extended habitation would expose residents to elevated levels of formaldehyde, increased moisture and condensation and a deterioration of the internal soft goods, all of which rendered the travel trailers unfit for FEMA's intended purpose of extended occupancy.

71.

The Procurement Defendants knowingly and intentionally elected to procure travel trailers instead of alternative housing more fit for extended occupancy.

72.

The Procurement Defendants breached their duty to Plaintiffs in failing to act reasonably in the identification, selection and procurement of the temporary housing units, specifically by:

   a. Failing to sufficiently consult with the manufacturers of the travel trailers regarding the use of the trailers as FEMA temporary housing units;

22

b. Failing to advise FEMA as to the inadequacy of the travel trailers as temporary housing units; and

c. Knowingly and intentionally selecting travel trailers for use as temporary housing units, rather than alternative housing more fit for extended occupancy.

73.

The Procurement Defendants' actions were the proximate cause of the increased exposure of formaldehyde to the Plaintiffs, by selecting travel trailers for use as temporary housing units.

74.

The Procurement Defendants contributed to the adverse health impacts upon the residents of the temporary housing units by selecting units unfit for extended occupancy.

## EIGHTH CAUSE OF ACTION:
## NEGLIGENCE OF THE UNITED STATES GOVERNMENT

75.

Named Plaintiffs incorporate the above allegations as if fully repeated verbatim herein.

76.

From the time the Federal Government knew or should have known of the existence of elevated levels of formaldehyde in the temporary housing units, it was under a duty to use due care and caution for the safety of the foreseeable users and occupants, Plaintiffs, of the subject housing units.

23

77.

From the time the Federal Government knew or should have known of the existence of elevated levels of formaldehyde in the temporary housing units, the Federal Government was under a duty to provide reasonably safe, functional and habitable housing units for the use of the Plaintiffs.

78.

The Federal Government assumed these duties when it implemented the "direct assistance" method of relief under the Stafford Act and as owner/lessor of the housing units which were ultimately provided to the Plaintiffs.

79.

From the time the Federal Government knew or should have known of the existence of elevated levels of formaldehyde in the temporary housing units, it was obligated to ensure that the housing units which it provided to the Plaintiffs for use as temporary residences were free of defects, including but not limited to elevated levels of formaldehyde, which could visit harm upon Plaintiffs through the anticipated and intended use of the housing units.

80.

From the time the Federal Government knew or should have known of the existence of elevated levels of formaldehyde in the temporary housing units, it was obligated to warn the Plaintiffs of any defects in the housing units which could cause harm.

24

81.

The Federal Government violated all of the referenced duties to the Plaintiffs, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

82.

As a direct and proximate result of the acts and/or omissions of the Federal Government, the Plaintiffs have suffered, and will continue to suffer, injuries and damages, for which they are entitled to recover from the Federal Government, all as alleged herein.

83.

The Federal Government was negligent and at fault in the following non-exclusive particulars:

    a.    In continuing to provide unreasonably dangerous housing units to the Plaintiffs after FEMA became aware of elevated levels of formaldehyde;

    b.    In failing to ensure that the housing units it purchased and provided to the Plaintiffs were habitable, functional, and suitable for their intended use;

    c.    In failing to adequately warn the plaintiffs of the unreasonably dangerous nature of the housing units after FEMA became aware of the elevated levels of formaldehyde;

    d.    In failing to remedy the dangerous nature of the housing units they provided to the Plaintiffs once FEMA became aware of the elevated levels of formaldehyde;

    e.    In failing to timely implement adequate safety measures and procedures to remove the defects in the housing units or to remove or protect the Plaintiffs from

the defective housing units by providing them with alternative housing;

f.      In knowingly and intentionally suppressing and withholding information from the public that the temporary housing units contained elevated levels of formaldehyde;

g.      In knowingly and intentionally allowing litigation concerns to take priority over its safety mandate relating to the elevated levels of formaldehyde;

h.      In continuing to house Plaintiffs in hazardous temporary housing units for extended periods of time after FEMA became aware of elevated levels of formaldehyde in the temporary housing units;

i.      In continuing to house Plaintiffs in hazardous, unreasonably dangerous temporary housing units rather than warning Plaintiffs of the dangers and offering rental assistance that would allow Plaintiffs to leave the defective temporary housing units;

j.      In failing to offer Plaintiffs rental assistance or other housing assistance when the Federal Government knew or should have known that the temporary housing units supplied to Plaintiffs were unsafe and uninhabitable.

k.      Such other actions of negligence and fault as will be shown at the trial of this matter.

WHEREFORE, the Plaintiffs respectfully supplement and amend the Original Complaint in the above and foregoing respects, and they otherwise reiterate and re-aver all of the allegations, claims and prayers for relief contained therein.

26

Respectfully submitted,

/s/ Frank J. D'Amico, Jr.
FRANK J. D'AMICO, JR. (Bar No. 17519).
**FRANK J. D'AMICO, JR., APLC**
622 Baronne Street
New Orleans, LA 70113
Telephone:    (504) 525-7272
Fax:          (504) 525-9522

*Counsel for James H. Aldridge, et al. and
member of the PSC*

## PLEASE SERVE:

1.  The Shaw Group, Inc.
    **through its registered agent for service:**
    C T Corporation System
    5615 Corporate Blvd, Ste. 400B
    Baton Rouge, Louisiana 70808

2.  Fluor Corporation
    **through its registered agent for service:**
    Corporation Service Company
    320 Somerulos St.
    Baton Rouge, Louisiana 70802-6129

3.  Bechtel Corporation
    **through its registered agent for service:**
    C T Corporation System
    5615 Corporate Blvd, Ste. 400B
    Baton Rouge, Louisiana 70808

4.  CH2M Hill, Inc.
    **through its registered agent for service:**
    C T Corporation System
    5615 Corporate Blvd, Ste. 400B
    Baton Rouge, Louisiana 70808

5.  North American Catastrophe Services, Inc.
    **VIA LONG-ARM**

27



CLERK'S OFFICE
A TRUE COPY

JAN 2 2 2009

Deputy Clerk, U. S. District Court
Eastern District Of Louisiana
New Orleans, La.

6.  Morgan Building & Spa Manufacturing Corporation
    **through its registered agent for service:**
    C T Corporation System
    5615 Corporate Blvd, Ste. 400B
    Baton Rouge, Louisiana 70808

7.  The United States of America
    **through**
    U.S. Attorney's Office, Eastern District of Louisiana
    500 Poydras Street
    Room B210
    New Orleans, Louisiana 70130
    **and through**
    Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530-0001
    **and through**
    Federal Emergency Management Agency
    Office of the Director, Office of the General Counsel
    500 C Street, SW
    Washington, DC 20472

## CERTIFICATE OF SERVICE

I **HEREVY CERTIFY** that the above and foregoing pleadings were served on all counsel of record through electronic notification pursuant to the electronic filing in the United States District Court for the Eastern District of Louisiana this 13th day of January, 2009.

　　　　　　　　　　　　　　　　　　　/s/ Frank J. D'Amico, Jr.
　　　　　　　　　　　　　　　　　　　**FRANK J. D'AMICO, JR.**

28