IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | MDL No. 07-1873 |
| | SECTION N(5) |
| THIS DOCUMENT RELATES TO: | JUDGE ENGLEHARDT |
| *Lyndon Wright v. Forest River, Inc., et al., L.L.C., et al.*, No. 09-2977 (E.D.La.) | MAGISTRATE CHASEZ |

## PLAINTIFF'S RESPONSE TO DEFENDANT SHAW ENVIRONMENTAL'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF CHARLES DAVID MOORE

Plaintiff Lyndon Wright ("Mr. Wright") respectfully submits the following Response to Defendant Shaw Environmental's ("Shaw") Motion *In Limine* to Exclude Testimony of Charles David Moore (Docket Entry No. 11417-1).

I.  **STANDARD OF ADMISSIBILITY FOR EXPERT TESTIMONY.**

Defendant's Motion to Exclude is one to exclude evidence, specifically expert testimony. Therefore, the Federal Rules of Evidence should govern the Court's analysis of the motion.

FED. R. EVID. 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

FED. R. EVID. 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other

rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

FED. R. EVID. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Expert testimony need only be based on a reliable and scientifically valid methodology that fits the facts of a case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993). The inquiry into the expert's testimony is "a flexible one" where the individual factors are neither exclusive nor dispositive. *See Id.* at 594-95. As such, this Court essentially considers whether the expert retains a broad range of knowledge, skills and training. *Id.*

In analyzing the reliability of proposed expert testimony, the role of the Court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999). While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule

2

702 specifically contemplates the admission of testimony whose knowledge is based on experience. *See Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000)(citing *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir.2000), *Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 590 (7th Cir. 2000); *Kumho,* 526 U.S. at 156 ("No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")

Though the role of the court may be to serve as a gatekeeper of admissible evidence, it is not intended to replace the adversary system. *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595. It is certainly not the trial Court's role to determine whether the expert's conclusions are actually correct. *Id.* at 595. So long as the testimony rests upon "good grounds" it should be tested by the adversary process -- competing expert testimony and active cross-examination — rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. *See Ruiz-Trioche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998) (citing *Daubert,* at 596).

## II. MOORE'S TESTIMONY IS ADMISSIBLE UNDER RULE 702.

### A. MOORE IS QUALIFIED TO TESTIFY.

Though the usual first step in a Rule 702 inquire is to determine whether the expert is qualified, Shaw has not challenged Moore's qualifications as a basis for

3

excluding Moore's testimony. Rather, Shaw's motion is based on the premise that Moore's opinions should be excluded for lacking reliable bases and scientific methodology, and for being conclusory. Shaw's Memorandum, p. 3. Since Shaw has not raised any issue with Moore's qualification as an expert Shaw should be deemed to agree that Moore is qualified to testify by his knowledge, skill, experience, training and education to offer testimony in this case. Moreover, as the court is probably well aware, Moore was admitted and testified as a fully qualified expert in the first bellwether case of this litigation, *Alexander, et al. v. Gulf Stream Coach Inc., et al.*, Docket No. 09-2892.

### B. MOORE'S TESTIMONY IS RELIABLE.

Shaw asserts that Moore's opinions should be excluded because there is an "analytical gap" in his report. Shaw never defines this term but suggests through its arguments that Moore's opinions are nothing more than overbroad conclusory statements provided without any explanation or support. "Analytical gap" is a term used by the US Supreme Court, but was used before that by the United States Court of Appeals for the Sixth Circuit, to describe situations in which experts had failed to explain how the results of certain animal studies — studies upon which the experts had relied in formulating their opinions about human health conditions at issue in their cases — actually correlated to those health conditions. *General Electric Co. v. Joiner*, 118 S.Ct. 512, 519, 522 U.S. 136, 146 (U.S.1997); *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir.1992). In *Joiner* the analytical gap occurred because the animal studies were so dissimilar to the facts presented in the litigation. *Joiner*, 118 S.Ct. at 518, 522 U.S. at 144. In *Turpin*, the experts failed to "make clear why the varying doses of Bendectin … given to the [animals] would permit a jury to conclude that Bendectin more probably than

4

not causes limb defects in children born to mothers who ingested the drug at prescribed doses during pregnancy." *Turpin*, 959 F.2d at 1360. Moore's testimony and this case is simply not analogous to either situation.

Shaw's characterizations of Moore's opinions are inaccurate and wholly incorrect. The extensive report prepared by Moore establishes what he was requested to do – assess the structural condition of Mr. Wright's trailer – and the methodology used by Moore to do this. *See* Report of Charles David Moore, PE, PLS re: Wright/Forest River, Inc. Trailer, attached as Ex. A, p. 2-3. The bulk of Moore's report is devoted to explaining the significance of the findings obtained with each method and analyzing the contribution of each finding on the structural condition of Mr. Wright's trailer. *See* Ex. A, p. 6-19. Mr. Moore summarized his overall opinion regarding the impact of activities undertaken by Shaw to install Mr. Wright's trailer as follows:

> Q: Okay. And what testimony do you intend to offer at trial regarding Shaw's activities with respect to this trailer?
>
> A: In particular, my testimony regards the installation process. I mentioned the jacking and blocking, anchoring procedures that would have been used, techniques that were – that may or many not have been used to install that, and that particularly my opinion of that is that they were probably done improperly.
>
> Q: Okay. Just to be clear, you're not saying that you can say definitively that any of Shaw's activities were done improperly; you're saying probably they were not done properly?
>
> A: Based on my observations, the calculations that I've provided there, and my engineering background, I can say that most likely they were causing problems with the trailer, structural problems with the trailer.

Deposition of Charles David Moore, dated October 27, 2009, p. 80-81, attached as Ex. B. In short, Moore has left no "analytical gap" between his opinions and specific findings obtained by varied methodology.

Under *Daubert* and its progeny, Moore's methodology is reliable and bears numerous hallmarks of reliability. *See Ancar v. Murphy Oil, U.S.A., Inc.*, 2007 WL 3270763, *2 (E.D. La. Nov. 2, 2007); *In re Katrina Canal Breaches Consol. Litigation*, 2007 WL 3245438, *12 (E.D. La. Nov. 2, 2007). As set forth in Moore's report, he used direct visual observations, basic floor plans and elevations, verifications of physical size and characteristics of structural systems, mechanical and electrical plans, framing diagrams, digital photographs, a testing protocol to establish jacking procedures and to record movements and response of the trailer structure to forces applied during the jacking process, technical documents including manufacturer's manuals and data, FEMA documents, contractor installation procedures, and general engineering reference manuals such as "The Manual of Steel Construction" from the American Institute of Steel Construction, "The Timber Construction Manual" from the American Institute of Timber Construction," ASCE 7-05 – Minimum Designs Loads for Buildings and Other Structures," and NFPA 1192-Standard for Recreational Vehicles. *See* Ex. A, pp. 2, 5-6. These indicia of reliability are sufficient to satisfy the standards set forth in both *Daubert* and *Ancar*. *See Daubert*, 509 U.S. at 589, 593-595; *Ancar*, 2007 WL 3270763 at *2.

Shaw has also incorrectly asserted that Moore failed to explain why installation-related damage to Mr. Wright's trailer might not manifest itself for more than a year after the installation. Just before the portion of the testimony that is included in Shaw's Motion in Limine was a discussion in which Moore explains what evidence he observed of "slow manifestation" and how the condition was probably caused:

> Q:   Okay. Did you find any evidence of this slow manifestation idea where hidden connections take a while to show up in the form of a bowing over the door?

6

A: Yes, actually, there was. There was some significant water damage to the left side of the doorframe at the floor, and actually, the first indication of that that I saw was the steps going up to the door were loose. And I remember thinking as we first were going in and out there that boy, somebody should have looked at that and fixed that step, it's loose.

As we got into the testing and particularly later where we did the destructive testing, pulling the thing apart, we found that at that location there was actually a significant amount of water damage to the wood there, such that the bolt was actually not loose, but physically, it was pulling through the wood, and therefore, not holding the steps tight; and that was, again part of the doorframe. So that could have been caused at the jacking, caused some water to leak in there, caused damage to the wood, which would then later show up as the door having problems with its physical location, whether there would be a bow in the doorway or not.

Ex. B, p. 137-138.

Q: So if the evidence shows that the leak that you saw the rotten wood from didn't show up until later, then there would be no evidence that jacking in 2005 could have manifested itself in the form of a bent head jam in 2007?

A: If you had evidence that there was no leak between there, I would say yes. Now, I guess what I would have to be careful about saying there is that it could have been leaking and nobody could see that. It could have been leaking into the cavity of the wall without anybody actually seeing that happening.

Q: Right.

A: Which is one of the things that I really think is happening and would definitely be caused by improper jacking techniques which would warp and create loose connections, create seams that would allow small amounts of water to lead. Then what happens is it becomes a progressive failure so that as the water damage begins and starts causing damage to other member, then that can open up other openings, causing additional water leaks, such that you maybe could see later, or opening up the gap in the head frame that you could see later. So it's very possible that this is all a progressive damage. What we saw out there in 2009 was extensive and quite progressed water damage to the wood.

Ex. B, p. 141. When the testimony cited in Shaw's Memorandum is put in its intended context, Moore has testified beyond mere possibility that improper jacking techniques

7

were used by Shaw and supported his overall opinion on causation of the observed damage.

Shaw has also misrepresented Moore's approach in this case as arising from a "mind-set that the damage observed in the Trailer could only have been caused by improper jacking." Shaw's Memorandum, p. 8. Again Shaw disregards the fact that Moore continued, after the testimony cited in this section of its Memorandum, to specifically refute Shaw's contention that his mind was already made up about Wright's trailer:

> Q: Okay. So you don't really need to go through all this testing stuff to get to the opinion that this one was jacked improperly because you think they were all jacked improperly, right?
>
> A: No. I think the testing of this was designed such that to test that hypothesis, to see what kind of problems that it would create, and so that testing actually supported the hypothesis.

Ex. B, p. 269.   In fact, this entire line of testimony was given by Moore to explain the methodology used to prepare his report and formulate his opinions. Shaw cannot pretend to misunderstand this since its own lawyer posed this very question, as shown below. Further, Moore then immediately went on to clarify that he had considered multiple hypotheses regarding the condition of Mr. Wright's trailer:

> Q: Okay. Mr. Moore, did you use the scientific method in approaching the preparation of your report and the formulation of your opinions?
>
> * * *
>
> A: I don't think I know what you're referring to, no.
>
> Q: Generally, it refers to the formulation of a hypothesis, and well, there's some – there's step in it.  There's an observation, and a hypothesis is formed, and then there's a test and an experiment and a result.
>
> A: Okay.

> Q: Did you do that?
>
> A: I guess somewhat, yes.
>
> Q: Okay. What was the hypothesis that you were testing?
>
> A: Well, **one of the hypotheses was that jacking could have caused some problems with this trailer.**

Ex. B, p. 268 – 269 (emphasis added).

Finally, there is absolutely no merit to Shaw's argument that failure by Moore to check caulk breakage during the testing proves that Moore's approach was based on a foregone conclusion. As Moore explained, checking the caulk would not have been helpful because, as Shaw knows and actually argues at another point in its Memorandum, the caulk "already exhibited quite a bit of damage, and so anything that we would have seen would have been very hard to tell whether it was done during that particular test or the test previous or beforehand or what." Ex. B, p. 243. As he explained, Moore did not have to rely on observance of caulk condition to form his opinions on structural damage from jacking because the testing he observed, a portion of which was actually designed and run by Shaw, used instrumentation including crack gauges and inclinometers to specifically measure overall movements in structure elements of the trailer such as the frame, floor and walls during jacking and blocking following the FEMA/Shaw Scope of Work. *See* Ex. A, pp. 10 -11.

Though Moore was not provided a full set of the testing data, his report explains observations he made during the testing, including significant movement in the door frame resulting from relatively minor jacking of the unit and angular movements in the structure of the trailer occurring during jacking, did not return to a "zero" state after

completion of the jacking. *See* Ex. A, pp. 15 - 19. As further explained by Moore, the test results corroborated "significant movement of joints and openings and seams in the trailer" and fully supported his conclusion that "improper jacking was a major contributor to the problems with [Mr. Wright's] trailer." Ex. B, p. 257 - 258. That the effects of the jacking were present before the last round of testing was corroborated by Mr. Wright's observations of leaks in the same areas that showed movement during the testing. Ex. B, p. 255 - 256.

Moore's testimony clearly establishes that Moore considered how to best assess the structural condition of Mr. Wright's trailer, formulated several hypotheses based on his personal knowledge as an engineer and from previous assessments of other trailers involved in this litigation, undertook appropriate and reliable methodology to test these hypotheses and then analyzed the findings obtained through the methodology to arrive at the opinions provided in his report and subsequent testimony. Shaw did not ask, and therefore gave Moore no opportunity to explain, whether this is a reasonable and customary approach to performing a structural assessment from an engineering perspective. Shaw asked only about Moore's knowledge of pure scientific methodology which is irrelevant to this inquiry because Moore is not a pure research scientist. This is not to say that engineering has no basis in science; the Supreme Court has specifically recognized that engineering testimony does rest upon scientific foundations. *Kumho*, 526 U.S. at 148, 150. Rather, the point is that reliability of Moore's testimony must be properly assessed through an inquiry focusing upon Moore's knowledge and experience as an engineer. *Id.* at 148. Moore's testimony would survive such an inquiry.

C. **MOORE PROPERLY CONSIDERED AND RULED OUT ALTERNATIVE CAUSES.**

10

Shaw's contention that Moore failed to consider alternative causes is disingenuous and inaccurate. Following a very long response by Moore to the question posed by Shaw's attorney of how to look at a trailer to conclude whether structural problems were caused by improper jacking, Shaw's own counsel recognized that Moore did consider and rule out alternative explanations for the problems:

> Q: All right. Mr. Moore, **you told me just now, I think, why you discounted some alternative explanations.** You would agree with me, as an engineer, that knocking out a few alternate explanations doesn't equal proof that it was improper jacking, right?
>
> A: I would not agree to that, particularly because if you dis – if you find enough evidence that it was not these, then more likely than not, it's this.

Ex. B, p. 267 (emphasis added). In addition to improper jacking, Moore testified during his explanation to a belief that the trailer's structure was not designed properly, which also contributed to its problems. Ex. B, p. 266. Shaw's Memorandum does not address this alternative explanation provided by Moore. Thus, Shaw's motion in no way impinges upon Moore's ability to discuss opinions regarding manufacturing and design defects that he may have formed based upon his observations. Further, as previously discussed, Moore testified that improper jacking was only one of the hypotheses he considered in assessing the trailer's structural condition.

Moore has not denied that deactivation could have damaged Mr. Wright't trailer. Instead, he agrees that damage could very well have occurred at deactivation but it would have been <u>additional</u> damage to whatever was caused by jacking. Ex. B, p. 159. This testimony, which was cited in Shaw's Memorandum, does not change Moore's overall opinion that condition of Mr. Wright's trailer was due primarily to improper jacking.

11

Shaw's Memorandum fails to acknowledge this point. Again, with reference to Moore's lengthy explanation to counsel, Shaw fails to acknowledge Moore's testimony that the testing process confirmed that the jacking procedures directly applied isolated loads to areas of the structure that were observed by Moore and by Mr. Wright during the time that he lived in the trailer to be problematic. Moore does not completely rule out any of the alternative causes, i.e., transportation loads, wind loads, temperature loads, live loads, because he does not hold the opinion that they can appropriately be completely ruled out. Ex. B, p. 266. Instead, his opinion considers the alternatives in the context of what he believes to be the "worst culprit" behind the specific problems observed with Mr. Wright's trailer. *Id.*

None of the case law cited by Shaw establishes a bright line rule that exclusion of alternative causes is always required for a reliable causation opinion. Further, the cases are fact specific and not analogous to the facts of the instant case. *Michaels v. Avitech* required exclusion of alternative causes because the plaintiff's only evidence of negligence was through *res ipsa loquitur*, which requires exclusion of alternative causes. *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir.2000). Shaw has correctly reproduced language from the *Dart* case but failed to explain that the statement was made as one of several shortcomings cited by the court with the expert review of that particular case. *Dart v. Kitchens Bros. Mfg. Co.*, 2007 WL 3283750, at *3 (5th Cir. Nov. 7, 2007). In *Brown v. Parker-Hannifin Corp.* the expert had failed to establish one of two possible theories as the most probable cause of the accident at issue. *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 312 (5th Cir.1991). There, the Fifth Circuit Court actually says that the burden is not to rule out every conceivable explanation for the failure but rather to

12

present sufficient evidence to enable a jury to find one conceivable explanation as the most probable cause." *Id.* *Alexander v. Smith & Nephew, P.L.C.*, involved a medical issue in which the expert failed to explain his basis for attributing the plaintiff's pain to a medical device rather than to a particular medical procedure or even the plaintiff's underlying condition. *Alexander v. Smith & Nephew, P.L.C.*, 98 F.Supp.2d 1310, 1316 (N.D.Okla.2000). In short, the expert in *Smith & Nephew* did not demonstrate performance of a differential diagnosis, which the district court noted has been called an important if not necessary factor in determining reliability of a medical causation opinion. *Id.* None of these cases establish a general requirement for exclusion of alternative sources to establish reliability in every case.

D. **MOORE'S TESTIMONY IS ADMISSIBLE BECAUSE IT IS RELIABLE AND RELEVANT.**

Wright agrees with Shaw that cross examination is an appropriate means for attacking evidence. Shaw's Memorandum, p. 16. However, he does not agree that any authority has established a rule that testimony is admissible simply because it can be cross examined. Wright clearly understands that admissibility depends upon three factors: 1) presenting an expert who is qualified to testify competently, 2) methodology being used by the expert that is reliable and 3) that the testimony proffered by the expert assists the trier of fact on the issue that is before it. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004).

Moore must not be excluded as an expert in this case because he is qualified by his knowledge, skill, experience, training and education to offer testimony to testify competently as a civil engineer in this case as he has in other cases in this litigation.

Second, Moore has explained the methodology he used to assess the structural condition of Wright's trailer – some of which was designed and performed by Shaw itself – and established through his report the findings obtained with each method and analyzing the contribution of each finding on the structural condition of Mr. Wright's trailer, thereby satisfying the requirement of reliability. Finally, by confirming the mechanism and time that Mr. Wright's trailer sustained damages, Moore's testimony will assist the trier of fact in determining whether there was improper jacking by Shaw that affected the condition of the trailer. As such, Moore's testimony is admissible and must not be excluded from the trial of this matter.

### III. CONCLUSION.

For the reasons set forth above, this Court must deny Shaw's Motion *In Limine* to Exclude Testimony of Charles David Moore and issue an Order allowing his testimony to be presented at the trial of this matter.

Respectfully submitted,

**FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION**

s/ Gerald E. Meunier
GERALD E. MEUNIER, # 9471
**PLAINTIFF'S' CO-LIAISON COUNSEL**
Gainsburg, Benjamin, David, Meunier &
Warshauer, L.L.C
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
T: 504/522-2304
F. 504/528-9973
gmeunier@gainsben.com


s/ Justin I Woods
JUSTIN I WOODS, #24713
**PLAINTIFF'S' CO-LIAISON COUNSEL**
Gainsburg, Benjamin, David, Meunier &
Warshauer, L.L.C
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
T: 504/522-2304
F. 504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON. #9938
MIKAL WATTS, Texas #20981820
DENNIS REICH, Texas #16739600


Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

      I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing on February 18, 2010.

                                      s/ Gerald E. Meunier
                                      GERALD E. MEUNIER, # 9471