UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: | FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * | MDL NO. 1873 SECTION: N(5) |
| This Document Relates to: *Lyndon T. Wright v. Forest River, Inc., et al*, Docket No. 09-2977 | | * * * | JUDGE ENGELHARDT: MAG: CHASEZ |

*************************************************************************

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* ON ANY REFERENCE TO MALINGERING, ALCOHOL ABUSE, OR DRINKING PROBLEMS

**MAY IT PLEASE THE COURT:**

Defendants Forest River Inc. and Shaw Environmental, Inc. (collectively "defendants") submit this memorandum in opposition to plaintiff's motion *in limine*.

In this motion, plaintiff seeks to exclude any reference to malingering, alcohol abuse or drinking problems, as this evidence would allegedly be inflammatory and prejudicial. As is detailed below, evidence regarding these matters is directly relevant to plaintiff's claims of mental anguish. As plaintiff has placed his mental health at issue in this case, these issues are probative of his mental conditions prior, during and following his occupancy of the unit at issue. Accordingly, plaintiff's motion should be denied.

### BACKGROUND

Plaintiff claims to have suffered mental anguish and emotional distress as a result of his alleged exposure to formaldehyde and/or mold while living in the Forest River travel trailer. [Rec.

Doc. 2203, Plaintiff's First Supplemental and Amended Complaint]. As noted in plaintiff's motion *in limine*, Wright has been examined by a psychologist retained by the PSC, Dr. Edward Shwery, and as well as Dr. John Thompson, a psychiatrist at Tulane University Medical Center, retained by the defense.

Dr. Edward Shwery found Wright to suffer from depression and anxiety and prescribed therapy at a cost of $65,400.[1] Particularly germane to the instant motion, Dr. Shwery administered the MMPI-2, a psychological test that focuses on personality and psychopathology.[2] Although he discussed various aspects of depression/anxiety portions, Dr. Shwery provided no commentary on the alcohol/substance abuse section of this test.

On November 5, 2009, plaintiff was evaluated by Dr. John Thompson, a psychiatrist with Tulane University School of Medicine. Dr. Thompson reviewed plaintiff's medical history, conducted a psychiatric examination of Wright, and evaluated the results of psychological testing performed at Dr. Thompson's request by psychologist Dr. Gina Manguno-Mire.[3]

Dr. Thompson first noted that plaintiff's depressive symptoms were present years before Wright ever lived in the travel trailer.[4] He found that plaintiff's current anxiety symptoms were primarily driven by litigation and that his symptoms were not causally related to his alleged

---

[1] *See* Shwery report, dated September 24, 2009, attached as Ex. "A," p. 5.

[2] *Id.* at p.8.

[3] *See generally* Thompson report, attached as Ex. "B."

[4] *Id.* at 14

formaldehyde exposure in the Forest River trailer.[5] He also opined that Wright does not legitimately believe that he will develop cancer from his exposure to formaldehyde in the trailer.[6]

Although plaintiff's motion downplays Dr. Thompson's findings with respect to alcohol abuse and malingering, this testimony is critical causation evidence that the jury should consider when assessing Wright's alleged mental heath damages. During his evaluation with Dr. Thompson, plaintiff stated that he currently drinks three sixteen-ounce beers everyday after getting off from work; Wright also reported drinking up to a six-pack of sixteen-ounce beers on weekends.[7] Plaintiff mentioned to Dr. Thompson that, while in the FEMA trailer, he drank from the time he got home until two or three in the morning and that he would consume at least a six-pack of sixteen-ounce beers everyday while in the trailer.[8] **In fact, Thompson's report noted the following:**

> **"[Wright] reported that he wanted to cut down on his use of beer and *felt he had a problem* while he was in the FEMA trailer."[9]**

Wright echoed this same sentiment to Dr. Shwery during prior evaluations. Dr. Shwery asked Wright to complete a psychological test which required the participant to write down his response to a particular phrase. In response to the prompt of "Sometimes," Wright wrote, "I drink

---

[5] *Id.*

[6] *Id.*

[7] *Id.* at 9.

[8] *Id.* at 9.

[9] *Id.* at 12 (emphasis added).

(beer) too much."[10] Despite his decision to omit any discussion of alcohol use from his reports, Dr. Shwery conceded in deposition that Wright viewed alcohol use as a concern:

> Q 28, "Sometimes I drink (beer) too much." Did you discuss Mr. Wright's drinking with him and whether he thought he had a problem?
> A Yes. He drinks socially and he will drink, you know, like on the weekend or when he's not working. He tends to regard things like drinking and smoking as probably things you ought not to do, and so his perception of drinking is he does it, he enjoys drinking socially.
> * * *
> It's not like -- I specifically ruled out things like, "Oh, I drink so much that I go out and do things to get me in trouble," for example. It's not that. **It's more "this is probably not good for me."**[11]

In addition to interviewing Wright about his alcohol consumption, Dr. Thompson administered a number of psychological tests. Like Dr. Shwery, Dr. Thompson utilized the MMPI-2 test to examine aspects of Wright's personality. Unlike Dr. Shwery, however, Dr. Thompson actually commented on the sections of the test that deal with alcohol/substance abuse. Dr. Thompson's report noted that Wright "showed an elevation on the alcohol/substance abuse scales" and that the MMPI-2 scores "indicate a potential alcohol problem."[12]

Dr. Thompson's report went on to explain that alcohol is a central nervous system depressant which is "notorious for causing depressive symptoms or making them worse" and felt that plaintiff's

---

[10] *See* Deposition of Dr. Shwery, dated 11/9/09, p. 43; 48-49, attached as Ex. "C."

[11] Deposition of Dr. Shwery, dated 11/9/09, p. 48-49, attached as Ex. "C."

[12] Thompson report, attached as Ex. "B," at 7; 12.

consumption of alcohol while in the trailer was likely a "major contributor to his depressive symptoms."[13]

Additionally, Dr. Thompson's report noted plaintiff's behavior demonstrated some evidence of malingering. Specifically, plaintiff acted against medical advice by failing to adhere to the regimen of anti-depressant medication prescribed by his doctor, and he also reported inaccurate dates with reference to the onset of his depression and sexual dysfunction.[14]

Plaintiff now brings this motion seeking to exclude any reference to "malingering," "alcohol abuse," and "drinking problems," alleging that these terms are inflammatory and prejudicial.

## ARGUMENT

Plaintiff's motion should be denied in its entirety. Plaintiff has placed his mental and emotional health at issue in this case, and evidence of alcohol use/abuse and malingering is extremely relevant to these issues. As such, and any evidence of substance abuse, drinking problems, or malingering is directly relevant to the plaintiff's mental and emotional condition and should not be excluded.

**I.   Evidence of alcohol consumption is relevant and not overly prejudicial**

Any prejudice to the plaintiff by the mention of the terms "alcohol abuse" and "drinking problems" does not substantially outweigh the probative value of this evidence. Plaintiff informed Dr. Thompson that, each night that he lived in the trailer, he consumed ninety-six ounces of beer a night – a significant amount of alcohol for a man who weighs approximately 130 lbs.[15] This amount

---

[13]   *Id.* at 14.

[14]   *Id.*

[15]   For reference, 96oz. is the equivalent of eight 12oz. beers a night.

of alcohol was heavy enough that leave plaintiff would feel the effects the next morning, such that Wright was still inebriated when he arrived at work that day.[16]  **Indeed, Wright admitted to Dr. Thompson that he felt he had a drinking "problem" during his time in the trailer, and even now he wants to "cut down" on his beer consumption.**[17]  Wright also acknowledged that he "drank (beer) too much" during Dr. Shwery's testing.  These description came from Wright himself, not Dr. Thompson, and defendants should certainly be able to present Dr. Thompson's testimony on this point.

Defendants should also be allowed to discuss the results from the MMPI-2 test.  As discussed above, both Dr. Shwery and Dr. Thompson administered this exact test.  The fact that Dr. Shwery chose not to discuss the alcohol/substance abuse portions of the test should not preclude Dr. Thompson from doing so.  In other words, plaintiff should not be allowed to excise those portions of a test – a test which his own expert utilized – simply because he does not like the results.

Further, Dr. Thompson categorized alcohol as a substance that is "notorious for causing depressive symptoms or making them worse."[18]  Consequently, Wright's use of alcohol is highly probative as to the cause of plaintiff's alleged anxiety and depression.  At his deposition, Dr. Thompson explained:

> Q.  Why don't you identify for me in
> this causation analysis that you have done
> with respect to Mr. Wright all the factors
> that you included in your differential that
> may play a role in contributing to or

---

[16]  *See* Thompson deposition, attached as Ex. "D," p. 105-107

[17]  *See* Ex. B, Thompson report, p. 12.

[18]  *Id.* at 14.

causing any diagnosable psychiatric conditions.

 A. Okay, sure. With reference to his depressive symptoms, depressive symptoms were present prior to the litigation. They started in 2000 and, you know, are likely a result of a condition that started earlier than him going into the FEMA trailer. They did remanifest while he was in the FEMA trailer.

 That could have been due to him living in a confined space, him consuming a lot of alcohol when he was in the FEMA trailer, him dealing with post-Katrina New Orleans and the realities of that and what was going on.

\* \* \*

 Q. Are there any criteria that you, as a psychiatrist, would use in determining whether a person has some difficulty, moderate difficulty or severe difficulty with respect to alcohol use?

 A. There's multiple different scales. So there's -- there's screening questions from four questionnaires, they are very long ones, very detailed analyses. He did not describe to me that he was having particular problems with alcohol, such that when he was drinking, he was getting involved in altercations with the law or having difficulty with family or relationships, and that would commonly lead to a diagnosis of alcohol abuse, which would be a common diagnosis that I might give. Or that he did not indicate that he was having withdrawal symptoms or the typical symptoms that would be present with alcohol dependence.

 He did admit to two of what we call the cage criteria or screening criteria in that he at one point in time felt that he had the need to cut back on the amount of alcohol that he used and he felt that he may be consuming too much alcohol. And he

> reported that time frame was the time frame that he was in the FEMA trailer.
> That his typical use of alcohol is similar to what he described to me presently, that he will drink three 16-ounce beers regularly during the week, and maybe up to a six-pack of beer on the weekend. That's sort of his standard drinking. But during Katrina, he was reporting that almost every night he was drinking a six-pack of 16 ounces. And sometimes he was doing that to the point where when he would wake up the next morning to go to work, he would still fell the effects of it. So he was drinking until, like, 2:00 in the morning and then still feeling the effects the next morning.
> So that's what leads me to conclude that his depressive symptoms were likely affected by that particular use of alcohol. From what I see in my experience and dealing with individuals when they are drinking that level on a daily basis, it is going to affect their mood, it is going to affect their level of depression over time. So that's why I mentioned it as one of the causative factors.[19]

Dr. Thompson has not offered testimony on Wright's alcohol use for the purpose of "tarnishing" his character. Rather, the alcohol use that Wright reported to Dr. Thompson is an important factor for the jury to consider in determining the causative source of Wright's depression and anxiety. In sum, evidence of alcohol use is extremely relevant, especially given the correlation between Wright's alleged increase in depression while in the trailer and his admittedly increased alcohol consumption during that same time frame.[20]

---

[19] See Deposition of Dr. John Thompson, attached as Ex. "D," p. 99-100;105-07.

[20] *See Auenson v. Lewis*, 1996 WL 457258 *1 (E.D. La. 1996) (Mentz, J.) (noting alcohol abuse evidence is "highly relevant as to damages sustained").

Finally, plaintiff argues that Dr. Thompson did not formally diagnose him with "alcohol abuse." At his deposition, Dr. Thompson acknowledged that was accurate, but he then explained that this was a term of art. To make that diagnosis, there must be evidence that the person is engaging in behavior that demonstrates "poor judgment."[21] Plaintiff is certainly free to distinguish this point (*i.e.,* the lack of diagnosis by Dr. Thompson) via cross examination at trial, but defendants should be allowed to present the findings contained in Dr. Thompson's report – namely, (1) the elevated levels of substance abuse on the MMPI-2 test; (2) Wright's discussions with Dr. Thompson related to alcohol use and (3) conclusions and opinions offered by Dr. Thompson related to these topics. All of these areas of testimony are based on reliable methodologies and supported by valid psychological testing and/or Wright's own statements to Dr. Thompson.

Evidence of plaintiff's alcohol use is highly probative as to plaintiff's mental anguish claims, and the value of this evidence is not substantially outweighed by the danger of unfair prejudice to plaintiff. This evidence should not be excluded.

## II. Evidence of malingering is relevant and not overly prejudicial

Plaintiff also seeks to exclude evidence that plaintiff is "malingering" or "trying to influence the litigation to his advantage." [Rec. Doc. 11352-1, p. 3]. As with Dr. Thompson's discussion of alcohol abuse, defendants simply ask that Dr. Thompson be allowed to discuss those findings contained in his report. In that report, Dr. Thompson noted that plaintiff demonstrated evidence of malingering in two instances: (1) by acting against medical advice with regard to taking his anti-

---

[21] *See* Deposition of Dr. John Thompson, attached as Ex. "D," p. 109-110.

depressant medication; and (2) by noting inaccurate dates with regard to the onset of depression and sexual dysfunction.[22]

At his deposition, Dr. Thompson also explained that "malingering" is not necessarily a specific diagnosis, but rather a spectrum of behavior:

> Q. Would a fair definition of a malingerer be a person who intentionally exaggerates a claim or, in fact, makes up a claim in order to obtain some type of monetary benefit through litigation?
> MR. BONE:
>     Object to the form. You can answer.
>   THE WITNESS:
>     The term "malingering," rather than the term you used before, "pathological liar," really is a continuum of how people present in the context of litigation or in the context of any other situation.
>     So if we take it out of the context of litigation, and let's just say we're looking at malingering to avoid military duty, you may find that certain individuals will go to certain lengths to avoid certain kinds of military duty that they find unfavorable, but they won't necessarily outright lie in order to avoid it. So they may try and manipulate to avoid it, but they won't necessarily outright lie.
> EXAMINATION BY MR. REICH:

---

[22] *See* Thompson report, Ex. "B," p. 14. One glaring example of this inaccurate reporting can be found in Wright's complaints regarding erectile dysfunction. In his first report, Dr. Shwery explained that, based on Wright's medical history, Wright never had erectile dysfunction problems prior to his time in the trailer. *See* Ex. E, Shwery expert report, dated 7/29/09, p. 5-6 Wright apparently told Shwery that, prior to his time in the trailer, he took Viagra and other erectile dysfunction medication to "enhance his sexual life," not for impotence. *Id.*

This assertion, though, is simply not true. Dr. Field, Wright's treating physician from 2000 to 2005, stated that Wright was specifically experiencing erectile dysfunction prior to Hurricane Katrina. *See* Ex. F, Depo of Dr. Field, p. 101-03.

Q. But malingering does involve some component of intentional or deceptive conduct, correct?

A. It can involve that and it should involve that. An intention by the person -- there is an intention by the person to either make the facts look a particular way that's favorable to them in one context or another.

It may be for monetary gain, it may be to avoid some unpleasant activity, it may be to engage in a pleasant activity. So there are different kinds of categories and there are different types of malingering.

So you can have what's referred to in the literature by Dr. Resnick, who writes the most about this, as partial malingering or false amputation where a person can say, "Well, all of my psychiatric symptoms started after the accident," when in fact, some of them started before the accident and some of them started after the accident.

So some people might call that partial malingering. I wouldn't.

**I didn't call him malingering, but I think there's parts of that that he's doing probably on a conscious level and parts of that he's doing on an unconscious level, meaning he may remember that he was, in fact, taking antidepressants and all that when you mention it to him and bring it up, right, but in this context, what's present in his mind is what happened in the FEMA trailer.**

**So he thinks that, you know, the depressive symptoms started in the FEMA trailer when they may have started a little before. In fact, if you look in the record, they started several years before, and he has been going on and off with it.**

> **So malingering is more like a
> spectrum rather than a particular diagnosis.**[23]

Dr. Thompson will testify that plaintiff, whether consciously or unconsciously, has engaged in behavior that is indicative of malingering. Regardless of his motivations, plaintiff has not accurately reported details of symptoms related to his depression and sexual dysfunction, both of which he has put at issue in this lawsuit. Dr. Thompson's testimony on these points is relevant, highly probative, and therefore admissible.

Additionally, the use of the term "malingering" is not unfairly prejudicial. Again, defendants acknowledge that Dr. Thompson never diagnosed plaintiff as a "malingerer." Dr. Thompson explained that his role as psychiatrist is not that of a lie detector, but he did note that questions over malingering are important when placed in the appropriate context:

> Q. Okay. Have you ever been specifically retained in litigation for the purpose of determining whether a plaintiff in litigation is a malingerer, for that specific purpose?
> A. I usually refuse to participate in those kinds of evaluations. So if there is a psychiatric issue and the psychiatric issue is important, I always address malingering in the context. But I usually don't participate in evaluations where an attorney comes to me and says, you know, I think this guy is a malingerer and that's your primary role here. Because I'm not a lie detector test, and although I can look for indicia of malingering, I don't usually participate in those kinds of evaluations. Or I will tell the attorney about the limitations of trying to participate in those kinds of evaluations.

---

[23] *See* Deposition of Dr. John Thompson, attached as Ex. "D," p. 79-81.

> So there are certain tests that you can do, certain psychological tests and neuropsychological tests that will give you indications of the probability of someone malingering. So if an attorney is interested in that particular issue, I usually refer them to someone else. But I will address the issue of malingering if it comes up during the evaluation.[24]

Defendants will not offer Dr. Thompson to serve as a "lie detector" for the jury, but he should be allowed to discuss those indicia of malingering revealed during his evaluation of Wright. Plaintiff can of course cross examine him on these points. However, the clinical discussion of these events is accurate and not prejudicial, and references to malingering should therefore not be excluded.

## CONCLUSION

Plaintiff has placed his own mental health at issue in this case and references to alcohol abuse and/or malingering are highly probative of and directly relevant to plaintiff's mental/emotional conditions prior, during and following his occupancy of the unit at issue. Accordingly, plaintiff's motion to exclude these issues should be denied.

Respectfully submitted,

/s/  Jason D. Bone
Ernest P. Gieger, Jr. (Bar Roll No. 6154)
Jason D. Bone (Bar Roll No. 28315)
Carson W. Strickland (Bar Roll No. 31336)
Gieger, Laborde & Laperouse, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
*ATTORNEYS FOR FOREST RIVER, INC.*

---

[24]   *See* Deposition of Dr. John Thompson, attached as Ex. "D," p. 77-78.

/s/ M. David Kurtz
David Kurtz (Bar Roll No. 23821)
Karen K. Whitfield (Bar Roll No. 19350)
Catherine N. Thigpen (Bar Roll No. 30001)
Baker Donelson Bearman Caldwell & Berkowitz, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
*ATTORNEYS FOR SHAW ENVIRONMENTAL, INC*

**C E R T I F I C A T E**

I hereby certify that on the 18th day of February, 2010, a copy of the foregoing Memorandum in Support was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this file will be sent to liaison counsel by operation of the court's electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone
JASON D. BONE