```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  FEMA TRAILER      MDL NO. 1873

 5   FORMALDEHYDE PRODUCTS     SECTION N(4)

 6   LIABILITY LITIGATION      JUDGE ENGELHARDT

 7

 8                   *   *   *

 9

10            VIDEOTAPED DEPOSITION OF JOHN W.

11   THOMPSON, JR., M.D., DEPARTMENT OF

12   PSYCHOLOGY AND NEUROLOGY, TB53, NEW ORLEANS,

13   LOUISIANA 70112, TAKEN AT THE OFFICES OF

14   GIEGER, LABORDE & LAPEROUSE, 701 POYDRAS

15   STREET, SUITE 4800, NEW ORLEANS, LOUISIANA

16   70139, ON THE 8TH DAY OF JANUARY, 2010.

17

18

19   REPORTED BY:

20       CATHY RENEE´ POWELL, CCR

         PROFESSIONAL SHORTHAND REPORTERS

21       (504)529-5255

22   VIDEOGRAPHER:

23       BRIAN SOILEAU

         PROFESSIONAL SHORTHAND REPORTERS

24       (504)529-5255

25
```

1    answer.

2        THE WITNESS:

3            Well, I mean, I don't usually call

4    people pathological liars, but -- and it

5    would be pretty rare that you would see

6    something like that in a particular

7    individual.

8            I think what I saw on that end of

9    it was that his time frame for when he

10   presented to me that he started to

11   experience depressive symptoms did not

12   correlate with the review of the records.

13   So that he saw -- it's more of a time line

14   issue in that he saw his depression as

15   starting when he went in the FEMA trailer.

16   But, in fact, the depression had been going

17   on for some time prior to that, and he had

18   been treated prior to that for depressive

19   symptoms.  And may have even had them as a

20   teenager.

21           But he reported that he remembers

22   the symptoms starting when he was in the

23   FEMA trailer.  So that would be the major

24   issue that I think I addressed in my report.

25   EXAMINATION BY MR. REICH:

1     Q.   You have discussed in your report

2     the concept of malingering, correct?

3     A.   Yes, I do that in all of my

4     reports.

5     Q.   Okay.  Have you ever been

6     specifically retained in litigation for the

7     purpose of determining whether a plaintiff

8     in litigation is a malingerer, for that

9     specific purpose?

10    A.   I usually refuse to participate in

11    those kinds of evaluations.  So if there is

12    a psychiatric issue and the psychiatric

13    issue is important, I always address

14    malingering in the context.  But I usually

15    don't participate in evaluations where an

16    attorney comes to me and says, you know, I

17    think this guy is a malingerer and that's

18    your primary role here.  Because I'm not a

19    lie detector test, and although I can look

20    for indicia of malingering, I don't usually

21    participate in those kinds of evaluations.

22    Or I will tell the attorney about the

23    limitations of trying to participate in

24    those kinds of evaluations.

25              So there are certain tests that

1    you can do, certain psychological tests and
2    neuropsychological tests that will give you
3    indications of the probability of someone
4    malingering.  So if an attorney is
5    interested in that particular issue, I
6    usually refer them to someone else.  But I
7    will address the issue of malingering if it
8    comes up during the evaluation.
9         Q.   Would a fair definition of a
10   malingerer be a person who intentionally
11   exaggerates a claim or, in fact, makes up a
12   claim in order to obtain some type of
13   monetary benefit through litigation?
14        MR. BONE:
15             Object to the form.  You can
16   answer.
17        THE WITNESS:
18             The term "malingering," rather
19   than the term you used before, "pathological
20   liar," really is a continuum of how people
21   present in the context of litigation or in
22   the context of any other situation.
23             So if we take it out of the
24   context of litigation, and let's just say
25   we're looking at malingering to avoid

1   military duty, you may find that certain
2   individuals will go to certain lengths to
3   avoid certain kinds of military duty that
4   they find unfavorable, but they won't
5   necessarily outright lie in order to avoid
6   it.  So they may try and manipulate to avoid
7   it, but they won't necessarily outright lie.
8   EXAMINATION BY MR. REICH:
9        Q.   But malingering does involve some
10  component of intentional or deceptive
11  conduct, correct?
12       A.   It can involve that and it should
13  involve that.  An intention by the person --
14  there is an intention by the person to
15  either make the facts look a particular way
16  that's favorable to them in one context or
17  another.
18            It may be for monetary gain, it
19  may be to avoid some unpleasant activity, it
20  may be to engage in a pleasant activity.  So
21  there are different kinds of categories and
22  there are different types of malingering.
23            So you can have what's referred to
24  in the literature by Dr. Resnick, who writes
25  the most about this, as partial malingering

1    or false amputation where a person can say,
2    "Well, all of my psychiatric symptoms
3    started after the accident," when in fact,
4    some of them started before the accident and
5    some of them started after the accident.
6            So some people might call that
7    partial malingering. I wouldn't.
8            I didn't call him malingering, but
9    I think there's parts of that that he's
10   doing probably on a conscious level and
11   parts of that he's doing on an unconscious
12   level, meaning he may remember that he was,
13   in fact, taking antidepressants and all that
14   when you mention it to him and bring it up,
15   right, but in this context, what's present
16   in his mind is what happened in the FEMA
17   trailer.
18           So he thinks that, you know, the
19   depressive symptoms started in the FEMA
20   trailer when they may have started a little
21   before. In fact, if you look in the record,
22   they started several years before, and he
23   has been going on and off with it.
24           So malingering is more like a
25   spectrum rather than a particular diagnosis.

1   his concerns about -- or just living

2   post-Katrina or living in a small place when

3   he's used to living in a normal-sized house

4   or he's used to living in better

5   accommodations.  Can you parcel that out and

6   say it's due to one thing versus due to

7   another thing?

8         My contention is that it would be

9   due to multiple things, but I look at what

10  are the most probable things, okay?  And

11  so -- and that is what I try to do when I do

12  a causation analysis.

13        Q.   Let's talk about --

14        MR. BONE:

15             Were you finished, Doctor?

16        THE WITNESS:

17             I'm finished enough.

18        (Brief discussion between reporter and

19  witness off the record.)

20  EXAMINATION BY MR. REICH:

21        Q.   Let me just ask you a few more

22  questions so we can take a break, if that's

23  okay.

24        A.   Okay.

25        Q.   Why don't you identify for me in

1   this causation analysis that you have done
2   with respect to Mr. Wright all the factors
3   that you included in your differential that
4   may play a role in contributing to or
5   causing any diagnosable psychiatric
6   conditions.
7        A.   Okay, sure.  With reference to his
8   depressive symptoms, depressive symptoms
9   were present prior to the litigation.  They
10  started in 2000 and, you know, are likely a
11  result of a condition that started earlier
12  than him going into the FEMA trailer.  They
13  did remanifest while he was in the FEMA
14  trailer.
15           That could have been due to him
16  living in a confined space, him consuming a
17  lot of alcohol when he was in the FEMA
18  trailer, him dealing with post-Katrina New
19  Orleans and the realities of that and what
20  was going on.
21           All of those things could have
22  played a role in the re-exacerbation of his
23  depressive symptoms, okay?
24           He reported that when he moved out
25  of the trailer, he was in a more pleasant

1          A.   The scale on the MMPI is called
2     the MacAndrew scale, M-A-C and then Andrew.
3     Both the test that I gave and the test that
4     Dr. Mire -- when Dr. Mire looked at the raw
5     data from the test that Dr. Shwery gave had
6     elevation on that particular scale.
7               The questions that the individual
8     answers that, in essence, may lead you to
9     ask additional questions or may indicate
10    that they had difficulty with alcohol or
11    drugs.  So on the testing, that was evident
12    in both tests, to my understanding.
13         Q.   Are there any criteria that you,
14    as a psychiatrist, would use in determining
15    whether a person has some difficulty,
16    moderate difficulty or severe difficulty
17    with respect to alcohol use?
18         A.   There's multiple different scales.
19    So there's -- there's screening questions
20    from four questionnaires, they are very long
21    ones, very detailed analyses.  He did not
22    describe to me that he was having particular
23    problems with alcohol, such that when he was
24    drinking, he was getting involved in
25    altercations with the law or having

1   difficulty with family or relationships, and
2   that would commonly lead to a diagnosis of
3   alcohol abuse, which would be a common
4   diagnosis that I might give.  Or that he did
5   not indicate that he was having withdrawal
6   symptoms or the typical symptoms that would
7   be present with alcohol dependence.
8           He did admit to two of what we
9   call the cage criteria or screening criteria
10  in that he at one point in time felt that he
11  had the need to cut back on the amount of
12  alcohol that he used and he felt that he may
13  be consuming too much alcohol.  And he
14  reported that time frame was the time frame
15  that he was in the FEMA trailer.
16          That his typical use of alcohol is
17  similar to what he described to me
18  presently, that he will drink three 16-ounce
19  beers regularly during the week, and maybe
20  up to a six-pack of beer on the weekend.
21  That's sort of his standard drinking.  But
22  during Katrina, he was reporting that almost
23  every night he was drinking a six-pack of 16
24  ounces.  And sometimes he was doing that to
25  the point where when he would wake up the

1    next morning to go to work, he would still
2    fell the effects of it.  So he was drinking
3    until, like, 2:00 in the morning and then
4    still feeling the effects the next morning.
5            So that's what leads me to
6    conclude that his depressive symptoms were
7    likely affected by that particular use of
8    alcohol.  From what I see in my experience
9    and dealing with individuals when they are
10   drinking that level on a daily basis, it is
11   going to affect their mood, it is going to
12   affect their level of depression over time.
13   So that's why I mentioned it as one of the
14   causative factors.
15       Q.   Were you aware that Mr. Wright was
16   a pretty hard worker and had a good work
17   history?
18       MR. BONE:
19            Object to the form.  You can
20   answer.
21       THE WITNESS:
22            Yes.  I'm aware that -- I know
23   that he was a regular worker, someone who
24   was working prior to Katrina, he was working
25   after Katrina.  It looks like his level of

1    Q.   He didn't describe any stresses
2 associated with money to you?  Not making
3 enough money?
4    A.   No.  No.  He was a single guy, he
5 has remained single.  And so, he didn't
6 express that to me, that he had other
7 economic concerns or worries.
8    Q.   With respect to alcohol abuse, a
9 person who is in their mid to late 30s,
10 drinks one to two beers a day, let's say a
11 male, and the male weighs at least
12 150 pounds or so, would you consider that to
13 be alcohol abuse?
14    MR. BONE:
15         Object to the form.
16    THE WITNESS:
17         No.  As I said before, in order to
18 give a diagnosis of alcohol abuse, you would
19 have to demonstrate that when they were
20 consuming alcohol, they were doing something
21 that demonstrated poor judgment.  And he did
22 not describe that to me, and I didn't find
23 that in the records.
24 EXAMINATION BY MR. REICH:
25    Q.   So you found no evidence of poor

1    judgment in the records resulting from

2    alcohol use by Mr. Wright, correct?

3        MR. BONE:

4            Object to the form, you can

5    answer.

6        THE WITNESS:

7            Yes.

8    EXAMINATION BY MR. REICH:

9        Q.   Let's talk about anxiety

10   associated with cancer.  Approximately what

11   percentage of males in the United States

12   contract cancer?

13       A.   I don't know that particular

14   number.

15       Q.   Have you ever seen cancer

16   statistics for Louisiana?

17       A.   I'm sure I have, but I don't have

18   a recollection where I could pull those

19   numbers out of my head.

20       Q.   Does Louisiana have a fairly high

21   cancer incidence rate relative to other

22   states for males?

23       A.   I have seen that reported, yes.

24       Q.   Have you seen reports recently

25   that environmental factors are being