```
                                                                 1


   1
   2
                IN THE UNITED STATES DISTRICT COURT
   3
             FOR THE EASTERN DISTRICT OF LOUISIANA
   4
   5
   6
        IN RE:   FEMA TRAILER          *  MDL NO. 1873
   7    FORMALDEHYDE PRODUCTS          *  SECTION:N(5)
        LITIGATION                     *
   8                                   *
                                       *
   9    THIS DOCUMENT RELATES TO:      *
        LYNDON T. WRIGHT V.            *
  10    FOREST RIVER, INC., ET AL.,    *
        DOCKET NO. 09-2977             *
  11                                   *
        *****************************
  12
  13
  14
  15
  16          DEPOSITION OF BOBBIE R. WRIGHT, 15406 Blue
  17    Ridge Drive, Missouri City, Texas, taken in the
  18    offices of Reich & Binstock, LLP, 4265 San Felipe
  19    Street, Ste. 1000, Houston, Texas, on Tuesday, the
  20    5th day of January 2010.
  21
  22
  23
  24
  25
```

1      Q.   Yes, ma'am.  And so the total grant amount
2  that you were going to receive from FEMA, according
3  to the letter dated November 21st, 2005 is $21,242?
4      A.   Uh-huh, yes.
5      Q.   And did you, in fact, receive those
6  amounts?
7      A.   Yes.
8      Q.   And the grant was broken up into two
9  separate categories, one for personal property in
10 the amount of $10,742, correct?
11     A.   Yes.
12     Q.   And the second was replacement housing in
13 the amount of $10,500, correct?
14     A.   Yes.
15     Q.   Of that $21,000 that you received from
16 FEMA, did you provide any of that money to Lyndon
17 Wright?
18     A.   No, I didn't.
19     Q.   Was that money solely used for rent or
20 personal items for the Missouri City, Texas,
21 address?
22     A.   Which part?
23     Q.   Either part.  In terms of --
24     A.   Was it used for -- well, I'll tell you
25 what, it said replacement housing.  So I had a house

1    in New Orleans that was demolished almost at that
2    time.  So I just assumed it was to get that
3    together.
4        Q.   All right.  Did you spend the $10,500 on
5    renovating or refurbishing the property at the
6    Seminole Lane address, 2315?
7        A.   Not yet.
8        Q.   Do you still have that money in an account?
9        A.   Not all of it, no.
10       Q.   In terms of the money that was earmarked
11   for replacement housing that you have spent, did you
12   spend it on rental property, or did you spend it on
13   other -- other things?
14       A.   It was all house associated, replacing the
15   things that were lost and stuff like that.  That's
16   what it was used for.
17       Q.   Okay.  So as we sit here today, is it your
18   testimony that none of the $10,500 that you received
19   has yet been put towards refurbishing or renovating
20   the damaged property, 2315 Seminole Place?
21       A.   It hasn't been used for renovating or
22   refurbishing, but it has been used for other things
23   concerning the house.
24       Q.   What specifically?
25       A.   Demolishing it, No. 1, and going towards

1    the taxes that you're still getting for it.

2        Q.   In terms of the demolition, do you know if

3    the property at Seminole Lane has been demolished as

4    we sit here today?

5        A.   It was demolished last month.

6        Q.   Let me hand you what we'll mark as

7    Exhibit 7, which is Bates No. 124-00015.

8              (Exhibit No. 7 Marked)

9    (BY MR. BONE)

10       Q.   This is a letter from FEMA, dated

11   January 5th, 2006.  Do you recall receiving this

12   particular letter?

13       A.   Yes.

14       Q.   And this is actually another lengthy letter

15   which goes through Page 19.

16            MR. PINEDO:

17                 May I suggest we start using that

18   stapler there, so we can --

19            MR. BONE:

20                 Yes.

21                 (Discussion off the record.)

22       A.   Uh-huh.

23   (BY MR. BONE)

24       Q.   All right.  Do you recall receiving this

25   letter dated January 5th, 2006, from FEMA regarding

1          A.   Uh-huh, yes.

2          Q.   And then you and Lyndon were going to

3     jointly live in the travel trailer to keep a watch

4     on 2315 Seminole, correct?

5          A.   Uh-huh.

6          Q.   Lyndon went back to New Orleans and

7     eventually lived in the travel trailer, right?

8          A.   Right.

9          Q.   But you never ended up going to live in the

10    travel trailer, except for short periods of time

11    visiting Lyndon, right?

12         A.   Right.

13         Q.   Did you ever call or write to FEMA to let

14    them know that only your son would actually be

15    occupying the unit and not you and your son?

16         A.   No.

17         Q.   Okay.  Do you remember if Lyndon -- you had

18    listed Lyndon as a joint applicant on your

19    application for assistance from FEMA, or was it just

20    you as the applicant?

21         A.   It was just me.  We -- both our names were

22    on there, but they only considered one person.

23         Q.   So you -- you were the loan applicant,

24    right?

25         A.   Uh-huh.  Uh-huh.

197

1      Q.   Did you ever have to pay any kind of rent
2   for the travel trailer?
3      A.   No.
4      Q.   Now, at the time of the storm, were you
5   working, or were you receiving Social Security?
6      A.   At the time in '05, I had just started
7   receiving Social Security.
8      Q.   Okay.  And you told us earlier about how
9   after the hurricane, FEMA gave you aid in --
10     A.   Uh-huh.
11     Q.   -- excess of $20,000, right?
12     A.   Uh-huh.  Uh-huh.
13     Q.   Now, to date, you haven't used any of that
14  money to fix up 2315 Seminole, right?
15     A.   No.  Only to pay for the demolition.  Some
16  of that was that money.
17     Q.   And how much did the demolition cost?  Do
18  you remember?
19     A.   $5,000.
20     Q.   Okay.  And you had to pay for the
21  demolition?
22     A.   Uh-huh.
23     Q.   Do you remember who you paid?  Was it a
24  private company?
25     A.   Crescent City Demolition.

199

1    demolishing the house at 2315 Seminole, right?
2        A.   Uh-huh.
3        Q.   Outside of that, can you think of any other
4    ways in which you've used that FEMA money that was
5    given to you after Hurricane Katrina?
6        A.   Yeah.  We used it to put -- pay the taxes
7    on the property and to get -- with everything gone,
8    everything -- we trying to reestablish yourself.  So
9    it -- it was used to -- that of it that was used was
10   to kind of get back on your feet.
11       Q.   Okay.  Do you know how much of that money
12   is still in your possession or has not yet been
13   spent?
14       A.   I think -- yeah, I know.
15       Q.   I'm sorry?
16       A.   I know how much --
17       Q.   How much?
18       A.   -- has been spent.
19       Q.   Do you know how much?
20            THE DEPONENT:
21               What you all want to do, take a break?
22   (BY MR. DINNELL)
23       Q.   No.  No.  I'm just -- I'm -- I'm just
24   asking --
25       A.   A few dollars.  Not many.

```
 1       Q.   Okay.
 2       A.   I mean, a few but, you know --
 3       Q.   Less than a thousand?
 4       A.   Less than a thousand?  Oh.
 5       Q.   More than a thousand?
 6       A.   Uh-huh.
 7       Q.   Less than 5,000?
 8       A.   No.
 9       Q.   Now, when you moved to Texas right after
10  the storm, your initial residence was the Blue Ridge
11  address, correct?
12       A.   When I first moved to Texas?  Yeah, that --
13  that's right.
14       Q.   All right.  And at Blue Ridge, you were
15  living with relatives, right?
16       A.   Right.
17       Q.   And did you have to pay any rent there?
18       A.   We -- well, we wasn't calling it rent, but
19  we would give them money.
20       Q.   Was there -- was there some sort of
21  specific arrangement as to how much you'd pay?
22       A.   No.  We would just give my brother-in-law
23  money.
24       Q.   So every --
25       A.   That's -- that's the way it went.  We would
```