# Structural Condition Assessment

# For

# FEMA Travel Trailer
# Wright/Forest River, Inc. Trailer
# Melville, Louisiana

### Prepared for

### First General Services of the South

### October 2, 2009

### Prepared by:



Freyou, Moore and Associates, Inc.
Civil Engineering & Land Surveying

**Charles David Moore, PE, PLS**
1833 East Main Street
New Iberia, LA 70560

Phone: (337) 365-9535
FAX: (337) 367-8131

EXHIBIT

_A_

LWFR-EXP 5-000005

1.  INTRODUCTION

A visual inspection along with a series of non-destructive and destructive testing of a FEMA travel trailer in Melville, Louisiana, was performed over a period of several days in August 2009. This inspection was conducted to provide a structural condition assessment of the trailer for First General Services of the South as part of litigation proceedings.  This litigation is entitled "FEMA Trailer Formaldehyde Product Liability Litigation" in the United States District Court, Eastern District of Louisiana, New Orleans Division.  The case is under Judge Kurt D. Engelhardt.  This report provides the details of the inspection and testing along with the conclusions and recommendations resulting from the visits.

1.1. PURPOSE – The purpose of this structural condition assessment is to form a portion of litigation proceedings regarding the trailer.  The intent of this assessment is to provide an evaluation of several characteristics of the structural capabilities of the trailer.

1.1.1.  This evaluation is to determine the current conditions including any deficiencies of the structural systems of the trailer.  It includes an analysis of the performance of the structure, particularly as it relates to the use of the structure.   Also included is an assessment of the serviceability of the structure for its intended use.

1.1.2.   Inherent in an evaluation of structures is a review of code compliance issues. The codes to be addressed include minimum building construction requirements as well as life safety requirements.

1.1.3.  The durability of the structure based upon the occupancy and/or function of the structure is also to be addressed.  These durability issues relate to distress, failure or damage to the structural systems that may be caused by system or material failure, water intrusion, wind/storm forces, foundation problems, and environmental effects.

1.2. SCOPE  OF  INVESTIGATION  AND  ASSESSMENT  –  The  scope  of work  to  be provided included visual observations; verification of physical size and characteristics of the structural systems present; and analysis of the structural systems and elements to assess their current condition and load carrying capabilities.  Basic floor plans and elevations were prepared by others involved in the assessment of the trailer.  Conditions at the time of the investigation were documented with the use of digital photography.

Testing of the structural system response to various jacking procedures was also conducted.  A test protocol was prepared in advance of the site visit to establish the jacking procedures to follow in conducting this portion of testing.  The testing included various instruments to record the movements and response of the structure to the forces applied during the jacking process.

The scope of work also included removal of cladding and outer components of the trailer to reveal the underlying structural components.   These structural elements were measured and documented to determine the physical characteristics of the structure.

Structural Condition Assessment                                                                Page 2
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000006

These characteristics were then analyzed to assess the structural condition as noted in the purpose section above.

This investigation does not cover issues related to either electrical or mechanical systems in the building. These systems are being reviewed by qualified personnel as part of the overall assessment of the trailer.

## 2. DESCRIPTION OF STRUCTURE

2.1. GENERAL – The trailer is a recreational vehicle manufactured by Forest River, Inc. The manufacturer's tag has a manufacturing date of September 8, 2005. The trailer is approximately 8' wide by 28' in length. The manufacturer's tag identifies the trailer with a vehicle ID number (VIN) 4X4TSMH296C008992. It is also identified as "Type: Trailer TRA". The trailer also has a tag identifying it as unit #1277021.

Throughout this report, different areas of the trailer will be discussed. In order to describe the specific location of these different areas the following conventions will be used to orient the reader to the physical trailer. The tongue end of the unit will be referred to as the front of the trailer. The opposite end will then be referred to as the rear of the unit. The rear is the end where the brake lights and bumper are installed. The right side of the trailer will refer to the long side of the unit where the entry door is located. The opposite long side, which only has windows (no door) will be called the left side of the trailer.

This travel trailer is constructed with two longitudinal steel beams to carry the primary load of the trailer. The beams run from the tongue end to the rear bumper and are approximately 5'8" apart. These beams are connected with cross members of light gage steel "Z" sections. The two beams are also connected to two steel tube beams in a vee configuration to form the tongue of the trailer. The longitudinal steel support beams are mounted on axles with a spring suspension system to carry the load during transport. These steel elements form the main frame of the travel trailer.

The walls of the shell of the trailer are constructed with wall studs of 1½"x1⅛" members at 16" on center. The studs are in filled with unfaced batt insulation. The interior faces of the walls are covered with thin (approximately 1/8") plywood with vinyl cladding for the interior finish and the exterior is covered with aluminum sheeting.

The floor of the trailer is constructed with 2"x3" floor joists at approximately 10" to 12" on center running longitudinally through the unit. These floor joists are supported directly on the light gage steel "Z" sections of the trailer frame. Batt insulation is also present in the cavities between the joists. A poly sheet is attached between the steel trailer frame and the wood floor structure.

Structural Condition Assessment                                                                                          Page 3
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000007

The ceiling/roof structure is constructed with $1\frac{1}{2}$"x$1\frac{1}{8}$" members put together in a form of bow truss. The truss is covered on the top and bottom with thin plywood sheets. The top is then covered with a rubber roof material.

The connections between the various wall, floor, and ceiling/roof assemblies are primarily glue and/or staple connections. The plywood interior finishes and the outer metal sheets are also attached to the wood framing with staples.

2.2. MISCELLANEOUS – The trailer steel frame is mounted on two axles with a spring suspension system to carry the load of the trailer during transport. The two axles were fitted with 15" tires, except that one of the right side tires was a 14" tire.

Scissors style jacks are mounted near the ends of each of the two main trailer beams. Two jacks are mounted approximately 14" from the front of the trailer and two jacks are mounted approximately 5" from the rear of the trailer. The main beams are also fitted with tie-down tabs approximately 21" inboard of the jacks. The tongue of the trailer is fitted with a jack labeled as 2000 lb. capacity.

Other information noted on the exterior of the trailer included the weight ratings of the unit. These ratings are:

> GVWR: 3534 kg (7790 lb)
> GAWR: (Each Axle) 1588 kg (3500 lb) Tires: ST205/75R15C
> Rims: 15X5.0JJ
> Cold Infl. Press.: 345 kPa (50 psi)

A "Tire and Loading Information" tag read "The weight of Cargo should never exceed 1177 Kgs or 2590 Lbs." This tag also tabulates the sizes for the front and rear tires as noted above, ST205/75R15C with 50 (psi) cold tire pressure.

A metallic tag was installed on the side of the trailer next to the entrance door with the "RVIA" logo. This tag read "The manufacturer certifies compliance with Standard for Recreational Vehicles ANSI/NFPA 1192." It is also stamped with the number, S1713297 and indicates "Member Recreational Vehicle Industry Association."

2.3. HISTORY – Hurricane Katrina hit the Gulf Coast on August 28, 2005. Widespread flooding of the New Orleans, Louisiana area occurred in the days immediately following the landfall of the hurricane. As a result of the natural disaster, many people were left homeless. FEMA provided housing units that included travel trailers, park models, and mobile homes.

2.3.1. This travel trailer was manufactured by Forest River, Inc. to be used as temporary housing for flood victims after Hurricane Katrina. The manufacturer's tag is marked with a manufacturing date of September 8, 2005. Actual manufacture of the unit may have occurred later, as indicated by documents supplied by Forest River.

Structural Condition Assessment        Page 4
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000008

Sales documents indicate an order being placed on September 6, 2005 and a confirmation of that order dated September 8, 2005. The order was confirmed with a customer name of North American Catastrophe Service, Inc., located in Melbourne, Florida. Production Inspection Sheets supplied by Forest River were dated November 11, 2005.

2.3.2. The unit was shipped to the FEMA Staging Yard, located on Sherwood Forest Boulevard in Baton Rouge, Louisiana on November 16, 2005. The origin of the shipment was a Forest River site in Rialto, California. The shipment was checked in and noted with no driver damage on November 19, 2005.

2.3.3. The unit was installed at 2315 Seminole Lane, New Orleans, Louisiana on February 12, 2006, as shown on the Ready for Occupancy Status. A "Temporary Housing Unit Inspection Report" lists the condition of the trailer and it's furnishings as "New" with the exception of a 12" scratch and dent noted on the left side exterior panel.

2.3.4. A Shaw Unit Installation Work Order, dated March 11, 2006 and March 15, 2006 indicates the installation of TT Power pole with meter, platform, and P-trap insulation.

2.3.5. The occupant of the trailer, Mr. Lyndon Wright, said that he moved into the trailer in late February or early March 2006. He moved out of the trailer in July 2008.

2.3.6. The trailer was transported from the New Orleans site to a FEMA storage facility in Melville, Louisiana. The storage facility is located approximately 130 miles northwest of New Orleans.

3. COLLECTED DATA

3.1. AVAILABLE DRAWINGS – Drawings from the manufacturer were not available to utilize in this assessment report. Basic floor plans, elevations, mechanical and electrical plans were produced from dimensions measured during the on-site investigation by others. Framing diagrams were also produced during the on-site investigation by others.

3.2. PHOTOGRAPHS – Digital photography was used to document existing conditions. These photographs were taken by several members of the inspection and testing team. Due to the volume of photographs taken, they will not be reproduced in this report, except as noted.

3.3. TESTING DATA – Movements produced from various jacking procedures were taken during the testing of the unit. These movements were measured with inclinometers and crack gages. The inclinometers were electronic units manufactured by Rieker, Inc. in

Aston, Pennsylvania. A total of six units were utilized in the test as more fully described later in this report. A transcription of the data recorded from these inclinometers is included in Appendix A at the end of this report.

The movements of the windows and the door were measured with crack gages. These plastic units were manufactured with a calibrated grid and crosshair to measure the movements of these units. The measurements were documented with digital photography.

3.4. TECHNICAL DOCUMENTS – Several documents were used in the preparation of this assessment. These documents include manufacturer's manuals and data in addition to other documentation produced from FEMA and contractor's installation procedures.

Other technical documents utilized include general engineering reference manuals, such as "The Manual of Steel Construction" from the American Institute of Steel Construction, "The Timber Construction Manual" from the American Institute of Timber Construction, "ASCE 7-05 – Minimum Design Loads for Buildings and Other Structures", and NFPA 1192-Standard for Recreational Vehicles.

Code documents consulted include City of New Orleans Ordinance No. 11,625, M.C.S., The International Building Code, and The International Residential Code.

## 4. DISCUSSION OF SITE VISIT

4.1. OVERVIEW – The on-site investigation of this travel trailer occurred during the month of August 2009 over a period of several days. This assessment focuses on the structural aspects of the travel trailer. Other personnel as part of the overall investigation of the unit observed the existing condition of the mechanical and electrical features of the unit.

4.2. OBSERVATIONS AND THEIR SIGNIFICANCE

4.2.1. General, Exterior – This unit is currently in a FEMA storage lot located in Melville, Louisiana, along with other similar travel trailer units. The unit had been moved to a location near the front entrance to the storage lot to allow access to the unit by the inspection team. It was sitting on its wheels with the attached jack stand supporting the unit at the tongue of the trailer. It was not leveled and blocked during the majority of the inspection and testing visits. A portion of the testing involved jacking the unit up and blocking it. That testing will be discussed more thoroughly later in this report. The exterior of the unit appeared to be intact with no major structural damage visible during the initial visual inspection. However, a few problems with the exterior of the unit were observed and listed below.

Structural Condition Assessment                                                                    Page 6
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000010

The seams, seals, and caulk joints around the unit were inspected for integrity of the seal. This includes the sealant around the windows, door, lighting fixtures, and other penetrations of the outer skin. Throughout the structure, holes and/or separations of the sealants were noted. These holes represent failure in the primary defense from water intrusion into the building. (See photos for example)

The upper portion of the front door frame appeared to be bowed. This corroborates the statements of the occupant concerning the leaks at the front door area. In addition to the bowed frame, the inspection team witnessed water streaming through the door frame during a thunder shower that happened during a portion of the site visits. (See photos for door frame bow)

One of the tires for the unit did not match the other tires nor did it match the tire size noted on the manufacturer's tag. Three of the four tires were ST205/75D15 while the front, right side tire was ST205/75D14. The difference between the tire sizes is the diameter of the rim. The odd tire has a 14" rim versus the 15" rim as called out on the manufacturer's data. This discrepancy will cause a shift in the ride of the unit to be abnormal. This situation is similar to a table that has one leg shorter than the rest, causing a wobble in the stability of the table. The smaller tire also has a slightly less load rating than the 15" size on the manufacturer's tag. (Approximately 60 pounds less load per tire. - See photos for tire documentation) Another item to note concerning the tires is that all of the tires installed are bias construction tires as opposed to the manufacturer's label calling for radial construction tires. This does not really alter the load carrying capacity of the tires, but may affect the overall life and performance of the tires during transport.

The front entry steps were loose during the site visit. These metal steps were bolted to the wood structure of the floor. Throughout the visit, the left side of the steps was loose. It first appeared that the bolts were not tightened on that side to properly support the steps. However, during the destructive testing, it was discovered that the wood structure at that location had rotted due to water leaks. The bolt then had no structure to hold onto. This area also corresponds to the leaks reported by the occupant at the front door. (See photos for this area)

4.2.2.  General, Interior – The interior of the unit was basically intact with no major structural damage visible during the initial visual observations. Some additional observations from the interior are as follows.

The carpet under the window in the bedroom (left side of the trailer) was observed to have some damage (see photos). This area appeared to have some type of material "melted" to the surface of the carpeting. This area also corresponds to the location of reported leaking by the occupant of the trailer. Further investigation of the wall under the window and above this location on the carpet indicated the wall to be soft to the touch. This indicated possible damage from water leaking. Other members of the inspection team used meters to determine a high moisture presence

in the wall directly under the window. The interior and exterior sheeting was removed during the destructive testing phase of the investigation, which revealed water damage to the wood framing members.

4.2.3.  Trailer Frame – The frame of the trailer is constructed with steel elements. The main load carrying members are 6" deep steel "I" beams. These beams have flanges that are approximately 2" in width and 1/8" thick. There are two of these beams running the total length of the trailer. They are positioned approximately 5'8" apart. No structural drawings were supplied by the owner, but based on the dimensions measured in the field, it appears that the longitudinal beams are designated by size and weight as M6x4.4. This designation is found in "The Manual of Steel Construction" from the American Institute of Steel Construction, which is the industry standard for utilizing steel elements in construction. The "M" designation generally refers to "Miscellaneous" shapes that cannot be classified in one of the larger classifications of steel "I" shaped elements. These beams are usually only available from a limited number of producers. The number 6 in the designation refers to the depth of the member being 6". The numbers 4.4 refer to the weight of the steel beam being 4.4 pounds per foot of length. The manual documents the physical characteristics of commonly used steel elements to determine the allowable load capacity of those elements.

The longitudinal beams have lateral bracing consisting of 4½" tall "Z" shaped light gage steel members. These Z members had 1" flanges. The actual thickness was not measured during the inspection. The lateral braces were placed at different spacing ranging from 4'0" to 4'8". These lateral bracing also directly supported the wood floor joists of the trailer.

In addition to the lateral bracing/beams, the steel frame has triangular shaped members extending from the longitudinal beams towards the exterior sides of the unit. These "outlookers" or "runners" are also fabricated from light gage steel. Their purpose for the frame is to provide support for the outer portions of the floor and the external walls.

4.2.4.  Wood Framing for Shell – The structure of the actual living area of the trailer or shell of the trailer is constructed with wood framing members as documented in section 2 of this report. As noted, the wood structural framing is very small in comparison to the sizes of typical wood framing found in manufactured housing, mobile homes, and site built houses. Based on the members cross sectional area, the wall studs used in this trailer provide only 32% of the available strength of a conventional 2x4 wood stud.

In addition to the water damage noted at the front door and under the bedroom window, additional water damage was found in other sections of the wood framing after the interior and exterior finishes were removed. The front left corner of the unit had rotten wood framing from water leaking into that wall cavity. The rear left

Structural Condition Assessment                                                    Page 8
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000012

corner also exhibited similar water damage.  This evidence of leaks correspond to the separation and damage noted to the caulk sealants and seals around the exterior of the trailer.

Some of the construction methods found in the wood framing present problems for the structural capacity of the trailer.  These construction methods are shown in the connections of the different elements of the trailer, such as the connections of the wall to the floor, wall to the ceiling, etc.  The front wall framing is angled to form a more streamlined shape for the front of the trailer.  However, in examining the connections for this framing, no attempt was made by the manufacturer to bevel the members to fit them tight to the other members.  While this is probably quicker and easier to manufacture, the gaps and spaces formed by the different wood members make a joint that only relies on the connector for its strength and stability.  Most of these connectors are staples and the joint can then hinge and flex around these staples. (See photos for joint connections at the front wall)

As noted above, most of the connections throughout the trailer use staples.  The inspection of the wood framing found many areas where the staples missed the proper connection point and only penetrated one of the pieces to be connected.  This leaves areas where the elements are not connected and provide for additional flexibility in the framing.

Several locations in the wall framing have electrical or mechanical wires and pipes extend through the wood framing to allow those systems to remain hidden in the wall, roof, and/or floor cavities.  However, the holes drilled to allow the wires and/or pipes to pass through the wood members, have weakened these members.  Some of the areas have holes large enough to destroy the structural integrity of the wood member. (See photos for examples)

In addition to the wall framing, a floor joist was notched to allow water pipe to pass through the floor cavity.  This type of notching is not allowed by building codes due to the fact that it severely weakens the structural capacity of the joist.  With the joist starting out as only 2½" in depth, the manufacturer had to cut approximately half of the material away to allow for passage of the water pipe. (See photos)

The construction of the roof framing is a type of "bow" truss.  This construction is actually a framework made up of several smaller members to create a truss to span between the walls and form the roof.  It is a convenient method for creating a curved roof surface, providing a small gap for mechanical and electrical systems, and providing structure to support the roof and walls.  However, these frames were constructed so that the bottom member does not actually span all the way from wall to wall.  A solid bearing block creates the end pieces and a smaller wood member is then spliced into the bearing block on the side without having any positive support underneath.  This splice creates a weak point in the roof structure.  In fact, during

Structural Condition Assessment                                                    **Page 9**
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000013

the inspection, one of these trusses broke at this splice when workers walked across the roof to access the air conditioning unit.

The splices and connections in the roof framework were made using a toothed splice plate. These steel plates are stamped to create a series of steel tabs or teeth that are then pressed into the wood. The toothed splice plate is designed so that it takes the place of nails or staples to connect multiple pieces of wood and forms a convenient way to put this type of framework together. Several areas throughout this trailer were observed to have the teeth missing the desired connection point, which further weakens the roof bow trusses. (See photos)

The framing under the windows does not have the normal construction pattern for the studs. Standard construction practice is to place a stud under each end of the window frame and then fill the remaining window frame with studs to distribute the load of the window and wall. The framing under the windows in this unit appear to be somewhat random in the placing of studs and most of the windows are not supported at the ends of the window framing.

The rubber roof membrane was visible at the bathroom vent area where it was extended into the framed opening. However, this did not occur on all sides of the opening. Two of the four sides appeared to have the roof membrane cut too short to lap over into the framed opening. These areas also had a visible gap between the vent framing and the roof area with daylight visible. This is an area of air leaks and a possible area of water leaking. Evidence of water damage was also found in the wall framing around the bathroom area.

5. **TEST PROGRAM** – A series of tests were performed on the trailer during the on-site inspections by various inspection team members and by the defendants. This section describes the testing program for jacking and blocking by Shaw, jacking and blocking by Freyou, Moore and Associates, Inc.(FMA) and First General Services of the South, Inc. (FGS), and the destructive testing. A discussion of the results and analysis of these tests appears in section 6 of this report.

5.1. Jacking/Blocking Testing (Shaw) – Shaw set up a series of tests for the process of jacking and blocking of the trailer. Their protocol included the use of truck scales, strain gauges, digital indictor, rail beam reference line, and crack gauges. The truck scales were intended to monitor loads at various locations and instances during the jacking process. The strain gauges were mounted to one of the I-beams to measure the deformation or strain of the beam. The digital indicator was mounted diagonally across the door opening to monitor movements during the jacking process. The rail beam reference line was installed along the length of one of the main trailer beams to measure the deflection during the jacking process. The crack gauges were installed at various locations to monitor trailer response.

Structural Condition Assessment                                                  Page 10
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000014

Data from this series of testing was not provided by the defendants at the time of preparing this report.

5.2. Jacking/Blocking Testing (FMA and FGS) – The jacking and blocking testing by FMA and FGS was set up to jack up the trailer and install it on blocks according to installation guidelines, instructions and diagrams provided by Shaw. In particular, this test was set up to comply with the Installation section of the FEMA/Shaw Scope of Work Exhibit 7. The purpose of the test was to provide data regarding the effects of jacking up the trailer on the frame, floors, walls, etc.

Instrumentation used to monitor the jacking tests included inclinometers and crack monitors. Inclinometers are instruments for measuring the inclination of an object with respect to gravity. They are also known as tilt sensors, tilt indicators, etc. The inclinometers for this test were installed at the four top corners of the trailer to measure the amount of tilt of each corner during the jacking process. The inclinometers used were digital instruments manufactured by Rieker Electronics, Inc. Two instruments mounted at the two front corners of the trailer were capable of measuring the tilt in two separate directions (dual axis) that can be described as pitch and roll of the trailer. Four instruments were mounted on the rear two corners. These instruments were single axis measurements, so that it required two instruments at each corner to measure the two separate directions of tilt. Measurements from these instruments were manually recorded on jacking logs during the course of the testing. The jacking logs were transcribed and presented in Appendix A of this report. The data read from the instruments was in decimal degrees.

Crack monitors were attached to each window and the entry door to monitor the movements of each of these items throughout the testing. The crack monitors used were manufactured by PRG, Inc. and consisted of two acrylic plates which are able to move independently of each other. Each plate was fixed on its end to either the trailer shell or the window(door). The plates were stamped with a calibrated graph and crosshair to measure the movement between the two fixed points.

Three separate jacking tests were performed on the trailer utilizing different sequences of jacking. The sequence of the first test started with two jacks placed at the front corners of the trailer. The trailer was jacked up (both corners at the same time) to a height to accommodate the concrete block piers. The weight of the trailer was lowered onto these piers. Next the jacks were moved to the rear of the trailer and used to jack up both rear corners at once to a height basically level with the front. The jacks were then placed at the middle of the unit to install the middle piers. Finally, shims were installed to level the trailer in both directions (front to rear and side to side). After all measurements were recorded, the trailer was lowered back to the ground.

The second test basically reversed the sequence of the first test. The trailer was initially jacked up and blocked at the rear. The jacks were then moved to the front to jack up and block the front of the trailer. Finally, the middle piers were installed and the trailer

shimmed to a level position. At the end of the test, the trailer was again lowered to its starting position on the ground.

The final test utilized a single jack and was intended to jack up and block the trailer one corner at a time. Due to instability of the trailer on the single jack at the height for the piers, safety concerns forced this portion of the test to halt.

The height of the piers installed for this test was based upon photos and drawings received from various trailer installations from the Hurricane Katrina recovery. Each pier consisted of a ¾"x24"x24" plywood base, two solid masonry blocks (4" height), two layers of two each hollow masonry blocks (8" height), and two solid masonry cap blocks (4" height). Blocking timber was placed on top of the solid cap blocks and wood wedges were used for shims for the final leveling procedure.

5.3. Destructive Testing – At the end of the non-destructive testing and the jacking/blocking testing, the trailer was basically disassembled for destructive testing. This entailed removing samples of various components of the trailer to perform additional testing on the materials. The discussion of the sampling and testing of the materials is provided by others in the inspection team. The interior and exterior sheeting and finish materials were also removed to reveal the inner framework and construction of structure. Discussion and analysis of the framework is in other sections of this report.

# 6. ANALYSIS

6.1. CODE CONFORMANCE – Building codes and other regulatory codes and standards are instituted to create minimum standards to which structures are constructed. These codes and standards are intended to protect the general public by providing a minimum standard of construction. This trailer has tag displayed stating that the manufacturer certifies compliance with Standard for Recreational Vehicles ANSI/NFPA 1192. The tag also acknowledges membership in the Recreational Vehicle Industry Association (RVIA). This association is a group of manufacturers and others involved in the recreational vehicle industry. They have adopted a set of standards which govern many aspects of the RV. These standards are outlined on the web site for the RVIA and are primarily aimed at the electrical, plumbing and other mechanical systems of the RV. These also include standards specifically aimed at Life Safety, which is the provisions for protecting life during emergency events, such as fire emergencies. These type of codes or standards specifically exclude construction standards that would be addressed in building codes. The standards reviewed from RVIA, including NFPA 1192, have no direct provisions for the structural performance of this structure.

The Building Code of the City of New Orleans, Louisiana was passed by the City Council of New Orleans. The building code in effect at the time of the Hurricane Katrina disaster and recovery efforts appears to be an ordinance passed on June 27, 2003

Structural Condition Assessment
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

Page 12

LWFR-EXP 5-000016

and became effective January 1, 2004. The intent of the ordinance is explicitly stated in section 101.3:

> "The purpose of this code is to establish the minimum requirements to safeguard the public health, safety and general welfare through structural strength, means of egress facilities, stability, sanitation, adequate light and ventilation, energy conservation, and safety to life and property from fire and other hazards attributed to the built environment."

The scope of the building code is stated in section 101.2 as applying The International Building Code (IBC) (2000 edition) to the construction of every building or structure with the exception of one- and two- family dwellings, which shall comply with the International Residential Code (IRC). Chapter 4 of the New Orleans building code also refers to prefabricated and modular buildings, which are defined as "structures transportable in one or more sections and which are built on a permanent chassis..." Therefore, this trailer should comply with either IBC or IRC

It has been argued that these trailers are strictly temporary housing and as such do not have to comply with the building code. However, Section 107 of the New Orleans Building Code deals directly with Temporary Structures and Uses. This section provides for the issuance of permits for temporary structures and also mandates compliance with the provisions of the code for structural strength, etc. The International Residential Code has a similar provision for temporary structures in Section R107.

The structural strength provisions of the IRC give prescriptive methods of construction of wood frame structures using minimum lumber sizes and spacing. The Code also allows for alternative methods, sizes, etc. if the designer provides an engineering analysis preserving the strength to certain levels. To this end, the IRC and the IBC both provide for minimum design loads to be used in the engineering analysis. This structure would require a minimum design live load of 30 pounds per square foot (psf) for sleeping areas and 40 psf for all other areas under both IBC and IRC building codes.

6.2. LOAD COMPUTATION ANALYSIS – The manufacturer's tag for the trailer indicated a GVWR of 7790 lb and a GAWR of 3500 lb for each axle. GVWR is defined as the maximum permissible weight of the vehicle when fully loaded. It includes all weight at the trailer axle(s) and tongue or pin. GAWR is defined as the maximum weight a specific axle is designed to carry. This refers to the transport loads to be carried by the suspension and axle systems. An additional tire loading information tag indicates "weight of cargo should never exceed 1177 kg or 2590 lbs."

The load carrying capacity of the trailer frame beams was analyzed using steel properties of standard carbon steel complying with ASTM A-36. This ASTM specification for steel is common for most structural steel shapes readily available throughout the country. Analysis of the beams also assumed that the trailer was leveled and blocked in

Structural Condition Assessment                                                                            Page 13
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000017

accordance with the Shaw contract documents, including the use of six (6) concrete block piers with three piers evenly spaced along each side.

Using the manufacturer's tag showing a GVWR of 7790 lb, I first assumed that the load is uniformly distributed to each of the two frame beams. This yields a load of 139.1 pounds per linear foot (lb/ft) of beam or approximately 34.8 pounds per square foot (psf). Being supported as outlined in the Shaw installation documents, the beams can safely support up to 209 lb/ft or 52 psf. Therefore, the beams are strong enough to carry the published load rating from the manufacturer.

As noted above, the minimum design live loads for residential use are designated to be 30 psf in sleeping areas and 40 psf in all other areas. Live loads are defined as "A load produced by the use and occupancy of the building or other structure that does not include construction or environmental loads, such as wind load, snow load, rain load, earthquake load, flood load, or dead load." The live load is in addition to dead loads which are defined to include the weight of all materials of construction incorporated into the structure. The manufacturer has limited the weight of cargo to a maximum of 2590 lbs, which calculates to approximately 11.6 psf. This is significantly less than the prescribed live loads required for residential structures.

I substituted the manufacturer's cargo limitation with the ASCE 7 live load requirements and re-analyzed the support beams. This yielded a total load on the structure of approximately 60.3 psf. The main longitudinal beams would be in an overloaded condition of 115% of the allowable carrying capacity.

Analysis of deflections for the steel trailer was performed using the GVWR of the trailer and also the live load requirements from ASCE 7. Deflections calculated with these loads were found to be within an acceptable range for steel structural components as prescribed by the IRC and the IBC. However, the connections between the various wood components were shown to be compromised with missing staples and poor workmanship in addition to being smaller elements than the normal prescriptive construction. Small deflections of the trailer framing could produce problems with the connections of the various structural members and be magnified to other portions of the structure.

If the unit were not blocked in accordance with the Shaw installation guidelines, the above loading discussion would be significantly changed. For example, if the unit was only supported at the corners with no middle support pier or tires, the beam carrying capacity would be reduced to approximately 13 pounds per square foot. Using the ASCE 7 live loads as shown above, these beams would then be overloaded to approximately 464% of the allowable capacity and would probably exhibit severe permanent distortions. Since these types of severe permanent distortions of the structural beams were not evident, there were probably more supports than just the four corners.

Structural Condition Assessment                                                            Page 14
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000018

The consequences would be somewhat less if the middle pier were to be moved forward or backward creating uneven spaces between the piers. If the piers were placed with uneven spacing, the loading would be unbalanced and may cause one section of the supporting structure to become overloaded and deflect more than other sections of the trailer. This unbalanced loading of the supporting structure could cause damage to the interior finishes of the unit, such as separations in the paneling. The differential deflections in the supporting structure could also cause the shell construction to warp and deflect causing air and/or water leaks through the deformations.

The blocking and anchoring procedures also present other problems with the trailer. These procedures only address the stability of the base trailer frame. In other words, the base trailer frame (steel under carriage of the unit) may be structurally sound, but the connections of the shell of the living unit also must be structurally sound to hold it to the steel frame. With the compromised connections found in the inspection of this unit, environmental forces could cause the shell to warp and deflect. These deflections could lead to air and/or water leaks into the structure.

The wall construction differs from typical manufactured homes and other normal residential units. The walls in this unit are 1½"x1⅛" whereas the walls in typical manufactured homes and other residential units would be nominal 2"x4" members at either 16" or 24" on center. The additional depth of these members increases the capability of the walls to resist wind loading. In addition, the wood framing in this unit was manufactured from White Fir, which has a nominal strength slightly less than normal construction for this area. Typical lumber used in this area is Southern Pine. The allowable bending stress for White Fir is approximately 1000 psi as compared to Southern Pine at approximately 1250 psi. The capacity of the trailer wall studs is approximately 4.1 psf. This compares to hurricane wind loads required for residential construction of approximately 30 psf. The 4.1 psf allowable loading of the wall studs equates to approximately 45-50 mph wind speeds.

The floor joists are also much smaller than typical manufactured homes and other residential units. The floor joists for this unit are nominal 2x3 members running the length of the unit and supported on the light gage steel cross members of the trailer frame. The floor joists are spaced fairly close together at about 10" for a majority of the floor. These joists at this spacing will provide the basic structure to support the required live load from the IRC and the IBC. However, an analysis of the deflections of these members yields a live load deflection of 0.21" versus an allowable deflection of only 0.16".

6.3. JACKING/BLOCKING TEST (SHAW) – The data from the various instruments installed for the Shaw jacking and blocking tests were not provided for review. Therefore, I cannot give a detailed analysis of their tests. However, I did witness the tests and have the following observations concerning this work.

Structural Condition Assessment                                              Page 15
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000019

The first observation concerning this work is the sounds emanating from the unit. Upon applying pressure to the unit with their jacks, popping and cracking could be heard throughout the structure. These sounds were created by the movement of the various components of the structure, particularly at their joints and connections. These sounds were obvious at the onset of the pressure from the jacks before there was any significant movement of the trailer.

The digital indicator installed diagonally across the door was visible throughout the testing of the trailer. It was set to 0 before starting to jack up the unit. The first part of the test consisted solely of jacking the unit to just level it off, without lifting it off of it's axles. This created a movement in the door diagonally measuring 0.0365" which is approximately 1/32". The second portion of their test lifted the unit to a point where the tires were just barely off of the ground and could be turned by hand. The movement of the door increased to 0.197". After removing their blocks and lowering the trailer back to its tires, the indicator showed a measurement of -0.036.

These movements indicate a significant movement of the door frame with relatively minor jacking of the unit. It also shows that the movements will not go back to a zero point even after removing the load, but actually induce permanent deformations with the door frame.

I reserve the right to revise the analysis of the Shaw testing after receipt of the remaining data from their installed instruments.

6.4. JACKING/BLOCKING TEST (FMA/FGS) – The main instrumentation used for this jacking and blocking testing was a set of inclinometers mounted to the top of the trailer at each corner. These instruments measured the angular movement of the trailer throughout the jacking process. The data, as manually recorded, is presented in Appendix A. Each column of numbers represent the angles recorded in decimal degrees. The purpose of placing instruments at each corner was to show the difference of movements at each corner, which measures how much the shell of the trailer warps and distorts during the jacking process.

There was a total of 8 different measurement points; 2 measurement points for each of the four corners. The angular movement was measured in 2 directions for each corner showing the pitch (rotation of the trailer in a forward/backward direction) and the roll (rotation of the trailer from side to side). The positive and negative readings from the units are controlled by the orientation of the unit itself in addition to the polarity of the electrical signal for the unit. The following chart translates what the positive and negative readings represent.

| UNIT NO. | LOCATION | ROTATION MODE | POSITIVE DIRECTION |
|---|---|---|---|
| 1 - Top | Front Left | Pitch | Toward Front |
| 1 - Bottom | Front Left | Roll | Toward Right |
| 2 - Top | Front Right | Pitch | Toward Rear |
| 2 - Bottom | Front Right | Roll | Toward Left |
| 3 | Rear Right | Pitch | Toward Rear |
| 4 | Rear Right | Roll | Toward Left |
| 5 | Rear Left | Roll | Toward Left |
| 6 | Rear Left | Pitch | Toward Front |

The first two jacking tests were set up to use the primary strength of the trailer. This follows from the main beams making up the steel trailer frame. These beams run from front to back to support the body of the trailer, during transport of the unit and while it is set up. Therefore, we set up two jacks to lift one end of the trailer up. This would in theory keep the trailer from warping side to side and use the strength of the trailer beam to keep it from warping front to back. This method is also what has been presented from other trailers as a preferred method to jack these trailers up.

The third test was set up to illustrate what may happen when the jacking process utilized only one jack in a non-preferred method. Other methods are also possible in jacking, but were not tested here in consideration of the time and expense to put these together.

In studying the data from the test, it is the difference between the different units measuring the same rotation mode that illustrate the magnitude of the warping of the trailer. For example, in the first test at the reading for jack height of 6 inches on the front corners, the front left corner (Unit 1-Top) has rotated toward the rear 2.14 degrees while the front right corner (Unit 2-Top) has rotated toward the rear 2.20 degrees. This difference of 0.06 degrees translates to a lateral distance of 0.09 inches (approximately 3/32 inches) difference between the left and right top corners. In a perfect world, with a totally stiff, strong framework for the shell of the trailer, the four corners would rotate identically, with no differences between the readings.

As expected in the first test, with the two jacks being operated to simultaneously pick up the front of the trailer, very little difference was measured in the pitch of the unit (rotation from front to back). The average difference in readings between unit 1 and unit 2 for pitch was 0.03 degrees, which translates to a difference of 0.04 inches (approximately 1/32 inches). However, the average difference measured in the roll (side to side rotation) between the 2 front corners averaged 0.13 degrees, or 0.20 inches (almost ¼"). The final difference in these two measurements in the fully blocked position was slightly greater at 0.21 inches.

The difference from front to back in the first test revealed that the rear right moved from the front left an average difference of 0.05 degrees (0.08") in pitch and 0.11 degrees

Structural Condition Assessment                                                    Page 17
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000021

(0.16") in roll. The total difference in the final blocked position measured 0.09 degrees (0.14") in pitch and 0.20 degrees (0.30") in roll. The largest difference was measured from front left to rear left, along the same side of the trailer. The average here was 0.21 degrees (0.32") in pitch and 0.05 degrees (0.07") in roll. The final blocked position measured a difference of 0.19 degrees (0.29") in pitch and 0.34 degrees (0.51") in roll.

That means that the shell of the trailer warped in both directions, front to back rotations and side to side direction. The top corners of the trailer actually moved toward each other in magnitude of ½" in the final blocked position. This would squeeze the joints and would be of enough magnitude to separate caulk and other seals in the siding, windows, doors, and other openings in the shell as well as putting pressure on the seal of the roof covering.

The second test revealed similar movement between the different corners, but were not as great in magnitude. The largest difference was again noted between the front left and rear left corners. The average difference here was 0.11 degrees (0.16") in pitch and 0.04 degrees (0.06") in roll. The final blocked position measured a difference of 0.12 degrees (0.18") in pitch and 0.17 degrees (0.26") in roll. Again, these differences would be large enough to cause problems with the various joints in the trailer causing air and water leaks into the structure.

As anticipated, the third test produced the largest relative movements between the different corners. This method only applied the jacking force in one corner, which would obviously cause a large warping effect on the trailer. Since the test was terminated before completion, the data cannot be completely compared to the other tests. It produced average pitch differences in the order of 0.03-0.06 degrees (0.05"-0.08") in pitch and 0.08-0.41 degrees (0.12"-0.61")

In all 3 of the tests, the differences between the corners were fairly consistent throughout the jacking process. It did not appear that the overall height significantly affected the magnitude of warping that occurred.

The crack gauges were photo documented at stages in the jacking operations similar to the inclinometer logs. Included with this report is a photo showing crack gauge no. 18, which was mounted on the door. This photo was taken during test 2 and shows a vertical separation of approximately 10mm or 0.39" (over 3/8"). Notice also the slanted red horizontal crosshair, which indicates that the door has actually rotated in reference to the shell. This measurement fully illustrates the opening of joints and seals allowing air and water to enter the structure. In addition to the crack gauges, the warping of the door was fully visible and is shown in the photo section of this report.

In each of the tests, including those performed by Shaw, another observation was that none of the measured movements returned to a zero point after removing the jacks and blocks and setting the trailer back on its tires and tongue jack.

Structural Condition Assessment                                                 Page 18
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000022

7. CONCLUSIONS – Based upon my observations at the site, photographs submitted, and technical documents, and testing performed, the trailer is inadequate in construction considering the use of this trailer for temporary residential occupancy. The structure cannot perform to air and water resistance needs under the loads from the intended use.

The construction of the trailer does not meet the minimum requirements provided for in the Building Code for New Orleans. The code allows for a prescriptive construction method including size and spacing of wood structure or an alternate allowance for an engineered solution meeting minimum strength requirements. The structural members of this trailer are much smaller than the prescriptive methods in the Code. In addition, an engineering analysis of the structure revealed that it does not meet the minimum strength requirements.

Testing the installation procedures indicates the trailer will experience large differential movements in the structure, causing openings in the door, windows, and other fixtures, in addition to putting stress on the caulk and other seals around the unit. Depending on the actual method used to jack up the trailer, warping will occur in significant magnitude to cause these problems. Documents reviewed in this process warned of possible damages to the unit if it is improperly jacked. However, none of the documents included instructions on how to do it properly to prevent the damage from occurring. Water leaks in this trailer was either caused by improper jacking or made worse by improper jacking.

Since the movements measured during the testing of the unit did not return to a "zero" state, this unit would have problems that would be compounded if it experienced multiple set-ups and uses as required in the procurement documents.

The roof truss breaking from a worker walking on the roof is a large area of concern. This type of load would be considered normal maintenance for a worker to access the air conditioning unit. It should be noted that this incident occurred after the removal of most of the interior furnishings and walls. However, while I would expect the dividing walls to contribute to the structural stability and strength of the trailer, the incident occurred away from where those walls could have helped. I also recognize that the furnishing, such as the cabinets, would also contribute some stiffness and strength to the unit. However, since these units do not cover the entire trailer and change locations in different trailer models, the basic strength requirements must be met by the primary structural framing members. For example, there are several locations in the trailer where the bow truss roof members do not receive any additional support from cabinetry and span the entire width of the trailer. These members must be capable of withstanding the full structural load.

8. LIMITATIONS – This report is furnished for the exclusive and confidential use of the addressee. Release to any other company, concern or individual is solely the responsibility of the addressee. The opinions and conclusions drawn in this report are based upon observations and information available, known and declared at the date of the investigation and/or the time of the preparation of this report. No warranty is made to the accuracy of data provided by others in the preparation of this report. The right to amend and/or modify the conclusions contained in this report is reserved based upon any new information provided.

Structural Condition Assessment                                                         Page 19
FEMA Travel Trailer, Wright/Forest River, Inc. Trailer, Melville, Louisiana
October 2, 2009

LWFR-EXP 5-000023