

# First General Services of the South, Inc.

## General Contractors

*Building & Restoration Contractors - Insurance Repair Specialists - Construction Specialists*
*Forensic Construction Specialists*

P. O. Box 80857, Lafayette, LA 70598-0857 - Phone: (337) 988-3556 - Fax: (337) 988-1264 - Email: firstgeneral@cox.net

### Inspection Report

### of the

### LYNDON WRIGHT FEMA Temporary Housing Unit

### Wright -- Forest River, Inc.
### Melville, Louisiana
### October 2, 2009

Re:   FEMA Trailer Formaldehyde Products Liability Litigation
United States District Court
Eastern District of Louisiana

Aldridge, et al. V. Gulf Stream          MDL No. 1873 Section N(5)
   Coach, Inc., et al.          Judge Engelhardt
No. 07-9228

### SECTION I

### PREAMBLE

In accordance with the request by the attorneys for the FEMA Trailer
Formaldehyde Products Liability Litigation Plaintiff's Steering Committee, this
organization made onsite inspections, observations, testing and evaluations of the
FEMA Forest River Temporary Housing Unit occupied by Mr. Lyndon Wright.
Our study included the following areas:

1.  The tires and axles;

2.  The steel framing system with our structural engineer;



**EXHIBIT**

*C*

Page 1 of 131

LWFR-EXP 7-000014

3.     The barrier material between the steel framing and the wood framing of the floor system;

4.     The floor insulation;

5.     The ductwork within the floor cavity;

6.     The structural members used for the floor system;

7.     Penetrations in the floor barrier system at the underside of the trailer and the methods used to seal those areas;

8.     Observation and review of the jacking and leveling procedures performed on the Forest River Unit.  Various types of tests were taken by Shaw Consultants;

9.     Observation and review of the jacking and leveling of the THU under various scenarios of the protocol established by First General Services of the South, Inc.;

10.    A review of any connections or placement indications for blocking and jacking of the temporary housing unit as it was installed on the Wright property;

11.    Observations of the methods used to seal of the belly board or material at the perimeter of the Wright THU (Temporary Housing Unit);

12.    Removal of portions of the belly board for identification purposes;

13.    A review of the floor sheeting;

14.    A review of the finished flooring materials;

15.    A review of the means and methods of attachment of the finished floor materials;

16.    A review of the means and methods of attachments of all the various components;

LWFR-EXP 7-000015

17.    A review of the framing material for the walls, ceiling and roof;

18.    A review of the finish materials for the interior and exterior of the walls, ceiling and roof;

19.    A review of all other materials, such as roof decking and blocking for walls and other areas;

20.    A review of all of the other various components;

21.    A review of the materials, means and methods used to seal the openings and penetrations of the unit;

22.    A review of the wall and ceiling insulation;

23.    A review of all air, moisture and temperature barriers;

24.    A review of the air conditioning system and duct system;

25.    A review of the heating system and duct work;

26.    Observations of movement instrumentation installed on the THU including crack monitors, levels, and digital measuring devices on the I-beam frame and exterior door by the Shaw consultants;

27.    Observations of movement instrumentation installed and procedures performed by First General Services of the South, Inc. These included digital inclinometers, crack monitors, and digital and bubble levels;

28.    Movement recordation of the unit as jacking is implemented by First General Services of the South, Inc.;

29.    Observation and direction of the pier installation procedures by First General Services of the South, Inc.;

30.    Observation and documentation of the envelope air leakage testing by LaGrange Consulting and First General Services of the South, Inc.;

LWFR-EXP 7-000016

31. Observations and written and photographic documentation of the envelope air leakage testing by The Liberty Group;

32. Observation and documentation of the air conditioning and heating duct leakage testing by LaGrange Consulting and First General Services of the South, Inc.;

33. Observations and written and photographic documentation of the air conditioning and heating duct leakage testing by The Liberty Group;

34. Observation of the envelope leakage test by gas method performed by The Liberty Group;

35. Review of the plumbing, heating and air conditioning systems with our mechanical and environmental engineer;

36. Review of the electrical system with our electrical engineer;

37. Review of the structural metal and wood framing with our structural engineer;

38. Observation and direction of the destructive testing performed;

39. Direction and supervision of materials removed from the unit;

40. Supervision and observations of site cleaning as a result of the destructive testing;

41. Photographic documentation of pertinent observations;

42. Written documentation of pertinent observations;

43. Infrared thermographic imaging of the Wright THU for the identification of temperature anomalies;

44. A review of reports, testing, photographs and inspections by others;

LWFR-EXP 7-000017

45.   A review of all penetrations in the floors, walls, ceilings and roof of the Wright THU;

46.   A review of the plumbing system;

47.   Identification of the heating and air conditioning systems;

48.   Installation of temperature and relative humidity data loggers. These monitoring devices were installed on the interior, and when times were appropriate, on the roof and underside of unit;

49.   Documentation of observed mold-like substances noted;

50.   Observation of micro-organism samples taken by others;

51.   Direction of measurements taken of the Wright THU for purposes of producing as-built plans of the unit;

52.   Review wood materials, took measurements and assisted in the audit of materials with Dr. Stephen Smulski;

53.   Documentation of any certifying seals, stamps or warnings throughout the unit and owner's manual; and

54.   Observations of the removal of areas surrounding the fenestrations of the Wright THU including but not limited to the window and door units.

LWFR-EXP 7-000018

## SECTION II

## INTRODUCTION

First General Services of the South, Inc. was requested to:

1. Perform all necessary testing, observations, and documentation regarding the materials, means, methods and systems utilized in the construction of the Wright THU;

2. To document the relationship and the functions between the all systems and components of the temporary housing unit;

3. To address the effects of air, moisture and temperature on the various components and the entire system of the Wright THU;

4. To address any relationship between the construction of the Lyndon Wright Temporary Housing Unit and the introduction of any moisture or temperature increases that can affect off-gassing and / or mold presence and manifestation within that unit; and

5. To determine if there was any relationship between the jacking and blocking undertaken to place the Wright THU on piers and the entry of air, moisture and radiation energy that caused deterioration to the THU and contributed to the proliferation of mold and off-gassing.

The background of this writer in areas relating to this matter includes, but is not limited to, the following:

1. Pre-college and college years:  Worked on residential and commercial construction projects with his father;

2. Employment with A & A Home Supplies and Appliance Center, 1969 - 1971;

    a. Performed office duties, accounting and assisted with electronic, appliance and air conditioning servicing and repairs;

3. Employment with Voorhies Supply Company – Industrial and Commercial Supply and Designs, 1971 – 1974;

LWFR-EXP 7-000019

    a.    Knowledge gained in industrial, oilfield, refinery production, salt production, construction and other miscellaneous manufacturing devices, processes, systems and components

    b.    Use and Design of:

        i.    Hydraulic lift and other hydraulic type systems;
        ii.    Drive systems;
        iii.    Electric motors;
        iv.    Specifying and / or providing data to clients regarding gears, reducers, shafts and couplings;
        v.    Shaft and flange mounted drives; screw conveyor drives; fluid powered drives;
        vi.    Metals, such as steel, iron, aluminum, stainless steel and others;
        vii.    Fastening systems;
        viii.    Seals, bearings and gears; industrial belts, etc.;
        ix.    Other varied and miscellaneous commercial, industrial and manufacturing components, systems and materials.

4.    Attended University of Southwestern Louisiana (now University of Louisiana at Lafayette), Bachelor of Arts in Political Science – Pre-Law, 1971 – 1975;

5.    1973 – 1974 worked with Benny David Hauling and Equipment Company – Hauling, sitework, excavation, equipment and operator contracting, demolition, etc.  This writer purchased this company in 1978.

6.    Louisiana State Licensed General Contractor 1974-Present;

7.    Louisiana State Licensed Building Contractor;

8.    Louisiana State Licensed Real Estate Agent;

9.    Louisiana State Licensed Mold Remediation Contractor;

LWFR-EXP 7-000020

10. Louisiana State Licensed Manufactured Housing Set up and Installation Contractor;

11. Certified Restorer - National Institute of Disaster Restoration;

12. Certified Insurance Repair Specialist;

13. Certified Mold Remediator;

14. WDR Designation:  Water Damage Restoration Specialist;

15. Certified Microbial Remediation Supervisor;

16. Certified Building Science Thermographer;

17. Training and Continued Education (Post-College):

    a. As the owner of several on-going construction companies for the past 35 years, this writer has gained vast knowledge of building designs, construction codes, construction standards and failure analysis.  He has successfully worked with architects, structural engineers, geotechnical engineers, environmental engineers, industrial hygienist, mechanical engineers, electrical engineers, steel building manufacturers, metallurgists, testing facilities and other experts in various fields of construction.  He has a day to day relationship with a number of architects, engineers and testing facilities.  He has qualified for and holds numerous certifications and licenses.  He has obtained and continues to receive numerous continuing educational hours in construction, restoration, remediation and other related areas.  He has obtained the designation of Certified Restorer, the highest certification in the restoration industry.  A brief overview of his post-college areas of continuing education as it relates to the issues associated with this action are:

        i. Steel structures;

        ii. Water, smoke and fire restoration;

LWFR-EXP 7-000021

iii.     Mold restoration;

iv.     Building science thermography;

v.      Roofing;

vi.     Dehumidification;

vii.    Fungal and bacterial causes, investigations and treatment;

viii.   The use and installation of various components of buildings and manufactured homes;

ix.     Multiple chemical sensitivities;

x.      Air conditioning functions and duct systems;

xi.     Particle distribution in ventilation systems;

xii.    Healthy building syndrome;

xiii.   Insulation;

xiv.    HVAC testing methods;

xv.     Costing and estimating;

xvi.    Moisture and air intrusion into and out of buildings;

xvii.   Detecting moisture damage and remediation;

xviii.  Psychrometry;

xix.    Energy efficient construction-air, moisture and temperature;

xx.     Indoor air solutions;

LWFR-EXP 7-000022

xxi.     Building codes and building standards;

xxii.    Engineered wood panels;

xxiii.   Drying technologies-air, moisture and temperature;

xxiv.    Thermal treatments;

xxv.     Indoor environmental cleaning and management in buildings;

xxvi.    Building practices of the gulf coast region; and

xxvii.   Bacteria and air handling systems.

This writer has been involved in the construction, estimating, inspection, testing and analysis of thousands of commercial, industrial, and residential projects. Experience in repairs, remediation, reconstruction and restoration to commercial, industrial, residential, mobile home, and travel trailers precedes the inception of his company thirty-five years ago.  Installation of roofing systems to mobile homes and travel trailers have been performed using Thermal Seal and Thermal Coating products as a part of the work produced under his supervision.

The restoration, moving and renovation of historical, antebellum structures and homes has been a part of the work performed by his company under his supervision.  Restoration of such places as the Godcheaux Plantation Home, Shadows-on-the-Teche, The Grevemberg House and Museum, Christ Church, Jazzman's and others have been restored or moved and restored by this writer.

Both major and minor insurance claims regarding commercial buildings, residential structures, property, contents, products, mobile homes and travel trailer damages of various kinds have been estimated, repaired, rebuilt or restored under his supervision.  Different types of damage restoration and repairs from wind storm, water, fire, flooding, auto mobile accidents and other such casualties, construction or design defects have been ongoing.

Since 1974, this writer has been involved in the identification of the issues regarding damage claims; costing of damage and building construction; identification of design and construction defects and failures regarding buildings and manufactured housing components, building systems and their interaction

LWFR-EXP 7-000023

between their components including their relationship to the environment and the building system as a whole.  Over the years, he has handled thousands of damage repairs and reconstruction projects.  Claims ranging from several hundred dollars to several million dollars have been successfully handled.

As a member of the International Code Council and the Standard Building Code Congress International, he has been called upon on many occasions to render opinions regarding the application and compliance with the building code, building and performance standards, manufacturer's compliance requirements in relation to the design, construction, performance and manufacture of various types buildings, and the application of manufactured products.  Opinions have been rendered in court regarding all facets of code, building standard, and performance compliance.

The writer has been qualified in state and federal courts throughout Louisiana in areas of construction; general contracting; the various components in the construction of buildings, mobile homes and travel trailers; the various systems and their relationship to the function of the building as a whole; mold remediation; infrared thermography; moisture and moisture damages; moisture, temperature and air relationship to buildings and their effect on buildings and building components; and numerous other areas regarding buildings and their components.

For a more complete view of the areas of continuing education and / or training, please see the attached resume' of the writer.

LWFR-EXP 7-000024

# SECTION III

# BACKGROUND INFORMATION

Following the passage of Hurricanes Katrina and Rita, hundreds of thousands of homes were severely damaged or destroyed as a result of either wind or flooding. These homes were unlivable for one reason or another and FEMA provided temporary housing for these displaced individuals and families. One of the means utilized by FEMA to provide temporary housing was to contract with various manufacturers to provide travel trailers, park models and manufactured homes for these displaced individuals. Travel trailers, park trailers and manufactured homes were sent to the gulf coast of Louisiana and Mississippi to provide housing. The travel trailers were then jacked up and set on blocks by contractors hired by FEMA. The units that were then connected to permanent sewage, water, and electrical services converting them from travel trailers to housing units. It is the understanding of this writer that jacking up may have twisted or damaged the unit while the conversion of the units from a travel trailer to a housing unit was implemented.

It is reported that individuals began to experience health problems after moving into the temporary housing units. Complaints were filed regarding these health problems with FEMA and some of the manufacturers. Subsequent to the reports of these health problems, testing of the temporary housing units was performed by various organizations.

The involvement of our organization was requested to determine if the installation, construction means, methods, materials and systems of the Forest River Travel Trailer and their interactions with air, moisture and temperature contributed in any way to the health related complaints that were filed.

One of the numerous homes damaged by Hurricane Katrina belonged to Ms. Bobbie Wright. She occupied the home located at 2315 Seminole Lane, New Orleans, Louisiana, with her son Lyndon.

After the storm, Ms. Wright and her son relocated to Houston, Texas. Once there, Ms. Wright made an application with FEMA for a temporary housing unit. Her application was approved, and one of the FEMA Temporary Housing Units was provided to Ms. Wright and her son Lyndon.

LWFR-EXP 7-000025

Mr. Lyndon Wright was born, grew up and worked in New Orleans his entire life. Mr. Wright was employed by both the Hyatt Hotel and the City District Court prior to the storm. Shortly after moving to Houston, Mr. Wright contacted his employer at the hotel regarding his return to work. His supervisor informed him that he was needed and Mr. Wright returned to New Orleans. During the first part of his return, Mr. Wright lived in his automobile. During that time, he contacted his supervisor with the City District Court and asked if he was needed there. His supervisor requested he report to work at the CDC. A few weeks later, he was given a placed to live on a ship that was harbored in New Orleans for the relief effort.

A FEMA trailer was eventually set up in the back yard of their home on Seminole Lane. He was not aware the trailer had been installed on the property. He noticed the trailer was set up one day when passing by the house. He did not witness the installation of the trailer.

A meeting was set up on February 13, 2006 for the inspection of the trailer. Mr. Wright's mother was the primary applicant for the FEMA THU but was not available for the inspection. Mr. Wright attended the inspection on behalf of his mother. He met with a Mr. Weddington, the person sent to inspect the THU with the owner, on February 13, 2006. He believes Mr. Weddington was a Shaw employee because of the name on his hat or helmet.[1] He performed the inspection with Mr. Weddington and signed the checklist on his mother's behalf. He also may have signed the lease in January 2006 on his mother's behalf but does not remember that specifically.

Mr. Wright stated that he moved into the THU in February or March of 2006, sometime after Mardi Gras. Through documents reviewed, it appears the move-in occurred sometime in March of 2006. He stated he had several problems with his health during the time he resided in the trailer. These health concerns are not a part of this report. He lived in the FEMA THU until July 2008.[2]

1.   Noted Issues

According to Mr. Wright's deposition and our telephone interview with him, the following events occurred:

---

[1] From the deposition of Lyndon Wright dated July 10, 2009, Page 110.
[2] Ibid., 55.

LWFR-EXP 7-000026

## 1.1.  FURNACE

a.  The first problem he had with the THU was with the furnace not working properly.[3]

b.  The first time they attempted to repair the heater was on March 19, 2006.[4]

c.  He continued to have problems with the furnace that they attempted to fix.[5]

d.  They did not know what the problem was with the furnace.[6]

e.  The second time they came to fix the furnace, they turned it on after working on it and it came on.  He told them to turn it off and then try to restart it, but it wouldn't.  They said they would have to send someone else to see about it.[7]

f.  When it was cold, he had to use space heaters to warm the THU.[8]

g.  At first, he used an electric space heater to warm the trailer.  He eventually purchased a second space heater.[9]

h.  Sometimes, he would have to turn all three burners of the stove on in addition to the space heaters to warm the THU.  He probably had to keep the stove burners on for 15 to 20 minutes to warm the trailer.[10]

i.  He did see the warning not to use the stove to heat the unit, but the furnace did not work to heat the house.[11]

---

[3] Ibid., 46.
[4] Ibid., 113.
[5] Ibid., 45.
[6] Ibid., 46.
[7] Ibid., 47.
[8] Ibid., 49.
[9] Ibid., 54.
[10] Ibid., 54, 352 and 353.
[11] Ibid., 55.

LWFR-EXP 7-000027

## 1.2.  ELECTRICAL

a.   He called the maintenance phone number regarding the electrical problem.[12]

b.   The power would go out if the trailer vibrated, shook or was bumped.[13]

c.   He noticed the electrical problem within months of moving in.

d.   The maintenance contractor resolved this problem.  It appears that it was a loose connection on a breaker.

## 1.3.  ODORS

a.   The first time he noticed an unusual smell in the house was in the winter of 2006, and that odor remained until he moved out in the summer of 2008.[14]

b.   He checked to see if it was a propane leak.  It was not.[15]

c.   He checked everything he could think of to find the leak.[16]

d.   He found mold in the bedroom but the odor was pervasive throughout the THU.[17]

e.   He stated his mother thought she called for maintenance.[18]

f.   The odor was constant.  He thought it was something dead outside, but when he inspected the exterior, there was no odor.[19]

g.   The smell was the same throughout the period he occupied the THU except when he used deodorizers or opened the windows.[20]

---

[12] Ibid., 44.
[13] Ibid., 44.
[14] Ibid., 49.
[15] Ibid., 49.
[16] Ibid., 49.
[17] Ibid., 49.
[18] Ibid., 44.
[19] Ibid., 48.
[20] Ibid., 55.

LWFR-EXP 7-000028

h.   He told the people sent to repair the furnace about the smell.[21]

i.   He told the maintenance people about the odor when they came out to check the electrical problem.[22]

j.   When he turned the stove and the space heaters on, the smell worsened.[23]

k.   If the THU was cold, it did not smell as much.[24]

l.   He used deodorizers and carpet spay in the attempt to remove the smell.[25]

m.   He wiped down the walls with deodorizers to try to remove the smell, but it would resurface.[26]

n.   He used Lysol and Tilex cleaners twice a week.[27]

o.   He told the monthly maintenance people about the smell when they came around and he was at home.[28]

p.   He noticed the smell before he noted water infiltration in and around the front door.[29]

q.   He would open some of the windows when he used the carpet deodorizer.[30]

r.   He would open the windows sometimes to air out the house.  It would reduce the smell somewhat.  He mainly used the deodorizers to reduce the smell.[31]

---

[21] Ibid., 47.
[22] Ibid., 45.
[23] Ibid., 50.
[24] Ibid., 50.
[25] Ibid., 50.
[26] Ibid., 52.
[27] Ibid., 52.
[28] Ibid., 50.
[29] Ibid., 51.
[30] Ibid., 53.
[31] Ibid., 54.

LWFR-EXP 7-000029

s.   He did not use the bathroom vent if he was not home.[32]

t.   His air conditioning unit was usually set on75°F – 80°F.[33]

u.   He usually turned the A/C off if he was not home.[34]

v.   He did not leave the windows open if he was not home.[35]

w.   If it was hot when he came home, he would set the A/C unit on 60°F until the unit would cool down the house.[36]

x.   After he moved out of the unit, indoor air quality tests were performed in his THU by W.D. Scott and Associates in October 2008.

y.   He stated he purchased and used a fan inside the trailer primarily in the summertime.[37]

## 1.4.   WATER LEAKS

a.   He did not notice any leaks when they inspected the trailer in February 2006.[38]

b.   He began having problems with water leaking into the door after the electrical problem occurred.[39]

c.   He first noticed the water leak after the winter of 2006.[40]

d.   He noticed the leak after the trailer had shifted out of level following the rainfall.[41]

---

[32] Ibid., 53.
[33] Ibid., 53.
[34] Ibid., 53.
[35] Ibid., 53.
[36] Ibid., 53.
[37] Ibid., 131.
[38] Ibid., 111.
[39] Ibid., 46.
[40] Ibid., 51.
[41] Ibid., 266.

LWFR-EXP 7-000030

e.   He noticed the gap above the door in 2007 but does not remember when in 2007.[42]

f.   The gap above the door grew larger over time.  The door did not fit square within the framed opening for the door.[43]

g.   He informed the furnace repair personnel about the water leak.[44]

h.   He told the monthly maintenance people about the leak at the door when they came around and he was home.[45]

## 1.5.  MOLD

a.   He told the maintenance people about the rain and the mold problem in his bedroom when they came out to see about the electrical issue.[46]

b.   When he moved out of the THU, mold was still visible.  There was mold around the window and down to the carpet.  The window in the bedroom had condensation around it, but he never saw water dripping down the wall.[47]

c.   The vents of the A/C unit blew air towards the window and may have been the cause of the condensation.  The vents were not adjustable.[48]

## 1.6.  THU SET-UP INSPECTION

Regarding the inspection of February 13, 2006, Mr. Wright offered the following:

a.   The trailer was set up on cinder blocks.[49]

b.   The tires were touching the ground.[50]

---

[42] Ibid., 115.
[43] Ibid., 116 and 279.
[44] Ibid., 46.
[45] Ibid., 50.
[46] Ibid., 34 and 120.
[47] Ibid., 288.
[48] Ibid., 141.
[49] Ibid., 110.
[50] Ibid., 110.

LWFR-EXP 7-000031

c.   The trailer was level when they inspected it in February 2006; however, it did not remain level. It shifted after it started raining.[51]

d.   He did not notice any holes in the trailer.[52]

e.   He did not notice any leaks in the trailer.[53]

f.   After the trailer was set up in the back yard, it was never moved for any reason until it was removed from his yard to the FEMA storage facility.[54]

g.   The tires were on the ground the entire time he lived in the trailer but the weight of the trailer was on the blocks and the frame of the trailer.[55]

---

[51] Ibid., 110.
[52] Ibid., 111.
[53] Ibid., 111.
[54] Ibid., 117.
[55] Ibid., 117.

LWFR-EXP 7-000032

## SECTION IV

## PURPOSE AND SCOPE

The purpose of the inspections and observations was to render opinions regarding the construction and installation methods utilized in the Lyndon Wright temporary housing unit. This was to determine to a degree of probability if the construction and installation of the Wright THU was made defective. The scope of our study to make those determinations included the following:

1.  An extensive study was performed by our group of the components, systems and construction methods utilized in the construction and installation of that housing unit along with a series of tests;

2.  Observations and tests performed included the interaction between the various components of the housing unit and the affect the construction and installation methods had upon the components;

3.  Testing for air infiltration of the unit's envelope;

4.  Testing for duct air leakage of the air conditioning and furnace systems;

5.  Calculations of air exchange rates;

6.  Evaluations of temperature, air and moisture as it relates to the infiltration or exfiltration of those elements of the atmosphere and their effects on various building components;

7.  Inspection of all of the components of the housing unit;

8.  Detailed measurements of the unit;

9.  Production of as-built Drawings produced from site measurements;

10. Photographic documentation of pertinent observations;

11. Written documentation of pertinent observations;

12. Interviews with Dr. Stephen Smulski, consulting wood scientist, to gather

LWFR-EXP 7-000033

further data regarding the products utilized in the construction of the Wright housing unit. To verify with him that our assessment of alternative products available for use as of the date of manufacture would have eliminated or significantly lowered formaldehyde emissions in the Wright unit;

13. An interview with Ervin Ritter, P.E., mechanical and environmental engineer, to review notes, data and findings regarding our inspection of the FEMA unit;

14. An interview with William Scott, P.E., of W. D. Scott Consultants regarding the results of the formaldehyde and micro-organism (mold) tests performed in Forest River temporary housing units;

15. A review of notes from a deposition and our interview with Mr. Lyndon Wright, the former occupant;

16. An infrared thermographic survey of the Wright unit to identify temperature anomalies;

17. Observations of any and all notices or labels on the interior and exterior of the unit;

18. Review of any notices in the owner's manual;

19. Review of notices from FEMA, Forest River or Shaw regarding the possible presence of formaldehyde in the unit;

20. Observations regarding the presence of penetrations and sealants in the floor, wall, ceiling and roof systems of the unit;

21. Observations regarding the presence of moisture or water infiltration into or in the unit;

22. Assessment of conditions and source(s) of occurrence;

23. Preparation of this report to present the results of our findings and to render conclusions and statements of opinion as they relate in part to the following questions:

LWFR-EXP 7-000034

a. The Forest River travel trailer was converted into a THU per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005. Was the manufacturer required to conform to the building codes and standards applicable at the time of construction and installation?

See Conclusion A.

b. Did the Forest River travel trailer comply with industry codes and standards such as NFPA, ANSI and state and local building codes?

See Conclusion B.

c. Was the Forest River Wright THU constructed for use in various weather conditions per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005?

See Conclusion C.

d. Did the Forest River THU construction means, methods and materials contribute to the manifestation and growth of mold and off-gassing by failing to properly seal windows, doors, plumbing pipes, etc. as required by the FEMA procurement specifications?

See Conclusion D.

e. Did the jacking and blocking by Shaw Environmental cause damage to the housing unit and what affect did it have on air and moisture infiltration into the wall, roof and floor system of the THU?

See Conclusion E.

f. Did the quality of the workmanship during construction of the Wright THU contribute to the manifestation and growth of mold and off-gassing in the walls, ceilings, floors and interior of the THU?

See Conclusion F.

g. Did the workmanship quality of constructing and installing the air

LWFR-EXP 7-000035

conditioning and heating ductwork in the Wright housing unit contribute to the entry of any formaldehyde off-gassing that may have been present in the wall, ceiling and floor cavities?

See Conclusion G.

h. Did Shaw Environmental fail to properly repair the furnace system?

See Conclusion H.

i. Are the vapor barriers or retarders of the Wright THU placed in the recommended location for a building located in the hot, humid climate zone?

See Conclusion I.

j. What problems manifest when a vapor barrier or retarder is placed on the cold side of walls, ceilings or floors of a building located in the hot, humid climate zone?

See Conclusion J.

k. Was the Wright THU constructed with formaldehyde emitting materials?

See Conclusion K.

l. Was ultra low or non-formaldehyde emitting building materials readily available at the time the Wright THU was manufactured?

See Conclusion L.

m. Was the Forest River THU occupied by Mr. Wright constructed utilizing superior quality workmanship?

See Conclusion M.

LWFR-EXP 7-000036

# SECTION V

## RESEARCH AND DATA REVIEWED

### FOREST RIVER DOCUMENTS

Forest River provided a number of documents relating to this matter. A review of the following documents sets a chronology of events and provides data regarding the FEMA trailer provided to Mr. Lyndon Wright:

1. Confirmation of the order between Forest River, Inc. and North American Catastrophe Services dated September 8, 2005[56]

    a. The order number is DRD0064193.

    b. The date ordered is September 8, 2005.

    c. The product description was a Salem Towables.

    d. The Serial Number is SMC008992.

    e. The VIN is 4X4TSMH296C008992.

    f. The confirmation order identifies the following items:

        i. The air condition is a ducted system, 15,000 BTU.

        ii. The furnace is a 35,000 BTU system.

        iii. The RVIA Seal of Certification was included.

2. Production Inspection Sheet[57]

    a. This document produced during the construction of the Wright unit contains a number of items relating to our observations during the

---

[56] Bate Stamp: Forest – 0151925.
[57] Bate Stamp: Forest – 0151937, 0151938 and 0151939.

LWFR-EXP 7-000037

inspection of this trailer by our group.   In particular, the following items were of note:

   i. On November 10, 2005, the group leader signed that the heat duct / plenum was sealed and free from debris.

      1. We know as a result of our inspection and demolition that if the heat duct system and plenum were closely inspected or tested for duct leakage, the system would have failed inspection.   Numerous holes penetrating the duct system as a result of nail or staple penetrations would have caused the ducts to leak.   The duct seams were not sealed with any type of approved tape or mastic material and through testing we know the ductwork leaked air and was not properly sealed.

   ii. The area of inspection sheet dated November 11, 2005 and signed by the group leader indicates that the furnace was installed correctly (plenum area).

      1. We know from destructive testing and duct air leakage tests that the furnace was not properly installed and attached to the plenum.

  iii. The next area on the production sheet dated November 11, 2005 and signed by a separate group leader indicates that the moldings were straight and sealed on the unit.

      1. We know through our observations and destructive testing that the moldings were not properly sealed around the unit.   Both air and moisture infiltration was allowed to penetrate through the outer envelope into the trailer.

  iv. The inspection report also states that the unit was insulated at all sides and there contained no gaps in the insulation.

      1. We know through infrared thermographic imaging and destructive testing that this was not an accurate assessment regarding insulation installation.   Insulation cuts did not fully fill the wall and ceiling cavities, there

LWFR-EXP 7-000038

were some cavities especially in the wall system that contained no insulation, some areas of insulation were depressed especially where wiring, piping, ducts and roof truss were installed rendering the insulation ineffective. The insulation installation as a whole was of poor quality.

   v. Windows, doors, etc. are sealed correctly.

      1. We know through infrared thermography and destructive testing that the windows and doors were not properly sealed. Air and water infiltration penetrated the window and door systems. Decayed areas of walls and floors were noted and were a result of improperly sealed penetrations such as windows and doors.

   vi. An area of the inspection report unsigned by a group leader provides space for inspections of floor penetrations sealed properly, windows sealed properly, and wiring routed and protected.

      1. It is noted that no one indicates inspecting these items and there is no signature for a group leader indicting these items were in fact inspected.

      2. We know through inspections and observations prior to and during the disassembly of the trailer that the floor penetrations were not properly sealed, windows were not properly sealed and the wiring was not properly protected in various areas observed.

3. A review of the Forest River Appliance Information Sheet[58] indicates the following:

   a. The furnace is a Suburban 33,000 BTU unit, Serial Number: 054410412.

---

[58] Bate Stamp: Forest – 0151943 (Forest River Appliance Information Sheet)

    b. The air conditioning system was a Dometic Duo 15K unit, Serial Number: 54138084.

4. The Certificate of Origin for the trailer was reviewed.[59]  It contained the following information:

    a. The date of origin is November 17, 2005.

    b. The year and make are a 2006 Salem Towables.

    c. The shipping weight is 5,150 pounds.

    d. The gross vehicular weight rating is 7,790 pounds (GVWR).

    e. The model number is SMT32BHLE.

    f. The VIN is 4X4TSMH296C008992.

    g. The dimensions of the unit are 32'4" in length with the hitch and 29'8" long without the hitch by 8' in width.

5. Forest River Invoice 0322235 is dated November 17, 2005.[60]

6. Delivery Check In Sheet[61]

    a. It appears that the Forest River Rialto, California plant produced this unit.  The unit was delivered on November 19, 2005 to North American Catastrophe, GSA Depot, Baton Rouge, 2695 North Sherwood Forest Boulevard, Baton Rouge, Louisiana.

7. Forest River Documents Bate Stamped #3132 through #3170.

8. Forest River Documents Bate Stamped #3171 through #3249.

9. Forest River Documents Bate Stamped #3251 through #3253.

---

[59] Bate Stamp: Forest – 0151931.
[60] Bate Stamp: Forest – 0151933.
[61] Bate Stamp: Forest – 0151926.

LWFR-EXP 7-000040

10. Forest River Documents Bate Stamped #3255 through #3261.

11. Forest River Documents Bate Stamped #3265 through #3283.

12. Forest River Documents Bate Stamped #3290 through #3391.

13. Forest River Drawing #109257, Revision X.

14. Forest River Documents Bate Stamped 0151924 through 0151946.

15. Forest River Documents Bate Stamped 0002399 through 0002483.

16. Forest river Documents Bate Stamped 0003134  through 0003170.

LWFR-EXP 7-000041

## SHAW DOCUMENTS

1. Exhibit 7:  Travel Trailer Installation[62]

2. Site plan for the location of the travel trailer to be located at 2315 Seminole Lane, New Orleans, Louisiana[63]

    a. Site description indicates the location of the trailer and the house and its relationship to the lot and existing house.  The inspector was M. B. Wethington.

3. Call Center Maintenance Request Form dated February 10, 2006[64]

    a. It appears that there is a request from Shaw Construction dated February 10, 2006 to fax a permit to Entergy for a meter on the electrical pole.  The bottom of the document is stamped delivered February 13, 2006 but the work order is dated February 10, 2006.

4. FEMA Temporary Housing Inspection Report dated February 13, 2006[65]

    a. An inspection was conducted as indicated on the document on February 13, 2006.  The signature is that of Bobbie R. Wright was signed by Mr. Lyndon Wright.  He stated his mother could not make the inspection and he signed on her behalf.

    b. The document indicates there are no issues with the unit except a 12" scratch and dent on the left side of the unit.

    c. Mr. Wright states that he could not occupy the house after the inspection because the electricity was not connected to the unit and he was not able to receive the keys for the unit.

5. Shaw Unit Installation Work Order dated March 15, 2006[66]

---

[62] Bate Stamp: Shaw – 000480 - 000489
[63] Bate Stamp: Shaw – WRI00006
[64] Bate Stamp: Shaw – WRI00017
[65] Bate Stamp: Shaw – WRI00007
[66] Bate Stamp: Shaw – WRI00013.

LWFR-EXP 7-000042

    a. An inspector requested a travel trailer power pole with meter to be furnished and installed with a 30 amp breaker and travel trailer loop to be installed 30' from the unit. The request was made on March 11, 2006 by the supervisor and the contractor signed the document on March 15, 2006. This appears to verify Mr. Wright's statement that he could not move into the unit immediately after the inspection because there was no electricity to the unit.

6. FEMA / Shaw Contract

    a. Section 2.9.1: The contractor shall transport and install the mobile temporary structure to be ready to occupy in a safe and sanitary condition. [67]

    b. Section 2.9.2, Code Adherence: The contractor is responsible for adherence to applicable local, state and federal building regulations and laws. The contractor shall be responsible for meeting manufacturer recommended installation specifications.[68] (Note: There are no manufacturer's "installation specifications" reviewed.)

    c. Section 2.10, Maintenance (Exhibit 10): The contractor shall resolve maintenance issues and needs relating to the structures. The contractor shall have the technical capabilities to make necessary repairs to the mobile / temporary structure as specified in each task order.[69]

    d. Section 2, Maintenance areas of responsibility

        i. Section 2.3, Heating and Cooling System includes all major components to include wiring and all associated parts.

1. Regarding the heating system, it was identified by Mr. Wright that the heating system did not work in the trailer despite at least two attempts by the service people to rectify that condition.

---

[67] Bate Stamp: Shaw – 000438.
[68] Bate Stamp: Shaw – 000439.
[69] Bate Stamp: Shaw – 000439.

LWFR-EXP 7-000043

    e.  Section 2.5, Entrance / Exit components (Exhibit 10):

        i.  This includes all panels, siding, windows, screens and doors.

       ii.  Maintenance of the exterior areas of the unit was to be performed by the contractor including problems with water infiltration such as areas around windows and doors.

7.  The RFO Checklist.[70]

---

[70] Shaw.WRI000010

LWFR-EXP 7-000044

# FEMA DOCUMENTS

1. The Model Travel Trailer Procurement Specifications dated July 14, 2005 outlined by FEMA for the manufacture and purchase of travel trailers pages 1 – 8 were reviewed. The following requirements relate specifically to the issues regarding the Wright unit:

   a. "Travel trailers being procured under this contract are for the purpose of providing temporary housing."

      i. According to the document, it establishes that this unit is to be used for residential housing. Temporary residential housing is regulated by the building codes in force at the time and governs the codes and standards by which this unit was to be constructed.

   b. "The units are subjected to continuous road travel, multiple installations and deactivations, and various weather conditions."

      i. The specification requires the manufacturer to construct a unit that is capable of multiple activations, deactivations and will be used for multiple applications in different climate conditions.

      ii. This portion of the specifications will be a factor in our review of the construction means, methods, and materials for use in hot, humid climates.

      iii. The standard is not to be considered as restrictive and the manufacturer may provide equal or better units.

   c. "The construction and outfitting standards identified minimum square footage of living space, floor plan configuration, finishes, furnishing and environmental living conditions necessary to provide emergency housing for disaster operations."

      i. This portion of the standard requires the provider to furnish a unit to satisfy minimum environmental living conditions and again establishes the unit is to be used for housing.

LWFR-EXP 7-000045

    d. "All exterior openings such as windows, doors, drain pipes, etc…will be caulked with a clear and non-hardening weatherproof sealant to prevent air and moisture penetration."

        i. This section of the standard will also be used to gauge whether or not the construction method or material met this criteria.

    e. "The delivery locations are subject to change due to circumstances or situations associated with disaster recovery efforts."

        i. Once again, the specifications state that deliveries of the unit may be associated with no particular location and may require transferring the unit to any area of the country.  Construction means, methods and materials should accommodate multiple climate zones.

    f. "The manufacturer shall design and construct all units under this contract with a superior grade quality of workmanship."

        i. A superior level will be the gauge we use in the assessment, review and comparison regarding the quality of workmanship, building standards or other construction requirements.

    g. Under the heating and cooling section, the specifications require that the unit will be equipped with an electric furnace capable of maintaining an average of 75°F temperature.

        i. This specification will be utilized farther in the report.

2. Letter from Mrs. Wright dated January 18, 2006 to FEMA giving Mr. Wright authority to sign the lease – FEMA Document 124-000041.

3. CDC – FEMA Document, Formaldehyde Levels in FEMA Supplied Trailers.

4. Important Information for Travel Trailer Occupants.

LWFR-EXP 7-000046

## MISCELLANEOUS DOCUMENTS

1.  Review of FEMA Accessible One Bedroom Park Model (RP) Procurement Specifications dated April 25, 2006;

2.  Review of FEMA 10-000463, IAQ Screening Testing Procedures for FEMA Temporary Housing Units;

3.  Review of "FEMA to Introduce New Type of Manufactured Home," Release date: December 18, 2008, Release Number: 1791-343;

4.  Review of "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes and Park Models," Release date: April 11, 2008, Release Number: HQ-08-56;

5.  Review of "FEMA Awards Contracts For Low Emissions Travel Trailers," Release date: April 7, 2009, Release Number: HQ-09-034b;

6.  Review of ASHRAE 62 – Indoor Air Quality;

7.  Review of Installation Instructions for Dometic 595 Series QUICK COOL air conditioning unit;

8.  Review of Exhibit 7; Travel Trailer Installation;

9.  Review of ANSI A119.2 NFPA 1192, Standard on Recreational Vehicles, 2002 Edition;

10. Review of ANSI A119.4 NFPA 1194, Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition;

11. Review of complaints from occupants to FEMA;

12. Review of ASTM Designation E 1827 – 96 (Reapproved 2007) – Standard Test Methods for Determining Airtightness of Buildings Using an Orifice Blower Door;

13. Review of ASTM Designation: E 779-03 – Standard Test Method for Determining Air Leakage Rate by Fan Pressurization;

LWFR-EXP 7-000047

14. Review of ASTM Designation E 1186 – 03 – Standard Practices for Air Leakage Site Detection in Building Envelopes and Air Barrier Systems:

15. Review of ASTM Designation E 1554 – 03 – Standard Test Methods for Determining External Air Leakage of Air Distribution Systems by Fan Pressurization;

16. Review of International Standard 6781, Thermal insulation – Qualitative Detection of Thermal Irregularities in Building Envelopes – Infrared method;

17. Review of Delivery Inspection Report dated November 19, 2005;

18. Review of photographs and video recording to First General Services of the South, Inc. of the Wright THU taken by Scott Johnson;

19. Review of the Transcript of the Testimony of Mary C. DeVany, MS, CSP, CHMM, Date taken: October 7, 2008, in reference to FEMA Trailer Formaldehyde Products Liability Litigation;

20. Review of "The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items – Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform U.S. House of Representatives July 19, 2007;

21. Review of Application / Registration for Disaster Assistance for Ms. Bobbie Wright;

22. Review of Table 3 – ATSDR Health Guidance Values for Formaldehyde Exposure (Reference 1.2) and Table 4 – Occupational Exposure Levels for Formaldehyde (Reference 9);

23. Review of Indoor Air Quality Guideline No. 1 dated August 2004, "Formaldehyde in the Home;"

24. Review of Plaintiffs' Original Complaint;

LWFR-EXP 7-000048

25.   Review of Plaintiffs' First Supplemental And Amending Complaint;

26.   Review of miscellaneous formaldehyde documents;

27.   Review of Environmental Health's publication, "What You Should Know about Formaldehyde in Mobile Homes;"

28.   Review of photographs taken by Stephen Smulski, Ph.D.;

29.   Review of photographs taken by W. D. Scott and Associates;

30.   Review of photographs taken by Lyndon Wright;

31.   Review of photographs taken by Charles David Moore, P.E. with Freyou, Moore and Associates;

32.   Review of photographs taken by J. Darrell Hicks, P.E., with J. Hicks Consulting Engineers;

33.   Review of photographs and video taken by Ervin Ritter, P.E. with Ritter Consulting Engineers;

34.   Review of photographs taken by Paul LaGrange with LaGrange Consulting;

35.   Review of Plans and Specifications from Forest River;

36.   Review of Forest River's Travel Trailers Owner's Manual;

37.   Review of "An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary – Housing Trailers, Baton Rouge, Lousiana, September – October, 2006, dated October 2007 by U. S. Department of Health and Human Services;

38.   Review of "The Use of Blower Door Data" by Max Sherman dated March 13, 1998;

LWFR-EXP 7-000049

39.   Review of CDC's "Final Report on Formaldehyde Levels in FEMA –
Supplied Travel Trailers, Park Models, and Mobil Homes" dated July 2,
2008;

40.   Review of Composite Panel Association's Technical Bulletin, "VOC
Emission Barrier Effects of Laminates, Overlays and Coatings for
Particleboard, Medium Density Fiberboard (MDF) and Hardboard;"

41.   Review of a report prepared by Charles David Moore, P.E. with Freyou,
Moore and Associates;

42.   Review of a report prepared by Darrell Hicks, P.E., with J. Hicks
Consulting, Electrical Engineers;

43.   Review of a report by LaGrange Consulting;

44.   Review of a report by Stephen Mullet (travel trailer manufacturing
consultant) dated August 20, 2008;

45.   Review of a report by Ervin Ritter, P.E. with Ritter Consulting Engineers;

46.   Review of a report by Dr. Stephen Smulski;

47.   Review of Affidavit of Mary D. DeVany Concerning IN RE: FEMA
Trailer Formaldehyde Products Liability Litigation, "Overview of
Formaldehyde Exposure Standards; Toxicological Effects; Airborne
Formaldehyde Sampling Strategy, Methodology and Selection Basis; Air
Sampling Results; and Bibliography / References," dated August 2008;

48.   Review of Analytical Communications March 1998 report, "Effect of
relative humidity on the determination of formaldehyde with NIOSH
3500 method (chromatropic acid method);

49.   Review of report, "Formaldehyde CAS number: 50-00-0;"

50.   Review of report, "Formaldehyde Indoors," by Stephen Smulski;

LWFR-EXP 7-000050

51.   Review of report by Anne V. Baughman and Edward A. Arens, "Indoor Humidity and Human Health – Part 1:  Literature Review of Health Effects of Humidity – Influenced Indoor Air Pollutants;"

52.   Review of Exposure Assessment Solutions, Inc.'s Chapter 16: "Industrial Hygiene Exposure Assessment – Data Analysis and Interpretation;"

53.   Review Of "Interim Findings on Formaldehyde Levels in FEMA – Supplied Travel Trailers, Park Models, and Mobile Homes" from the CDC dated February 29, 2008;

54.   Review of an Affidavit of Marco Kaltofen, P.E. (Civil, Mass.) dated August 20, 2008;

55.   Review of Earnest Orlando Lawrence, Berkeley National Laboratory's "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report" dated November 2008;

56.   Review of 1991 NIST's MOIST program data;

57.   Review of 1993 ASHRAE study, "A Computer Analysis of Moisture Accumulation in the Walls of Manufactured Housing;"

58.   Review of February 1994 ASTM study, "Moisture Control in Buildings;"

59.   Review of January 1995 U.S. Department of Commerce report, "manufactured Housing Walls that Provide Satisfactory Moisture Performance in all Climates;"

60.   Review of 1999 ASTM book, <u>Water Problems in Building Exterior Walls: Evaluation, Prevention, and Repair</u>;

61.   Review of 2008 Manufactured Housing Research Alliance study, "Moisture Problems in Manufactured Homes;"

62.   Review of September 2003 MHRA publication, "Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates;"

63.   Review of CDC Summary of Lawrence Berkely National Laboratory

LWFR-EXP 7-000051

Final VOC Report and Interim VOC Report;

64.  Review of "Mechanisms of Formaldehyde Release from Bonded Wood Products" published by American Chemical Society, 1986;

65.  Review of the Florida Solar Energy Center Publication Number: FSEC-GP-212-01, "Moisture Problems in Manufactured Housing: Probable Cause and Cures;"

66.  Review of "Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units" dated 12/13/07;

67.  Review of Formaldehyde Passive Monitoring Data – EMA Housing Units by W.D. Scott Group, Inc.;

68.  Review of various test results by W.D. Scott Group, Inc. dated 08/13/09, 08/21/09, 08/27/09, 09/04/09 and 09/21/09;

69.  Review of "Volatile Organic Compound Concentrations and Emission Rates Measured over One Year in a New Manufactured House" by Alfred T. Hodgson, Steven J. Nabinger and Andrew K. Persily;

70.  Review of "Wood Adhesives 2005" edited by Charles R. Frilhart dated November 2005;

71.  Review of FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005;

72.  Review of the Air Resources Board study, "Air Quality Modeling of Emissions from Composite Wood Products;"

73.  Review of the Air Resources Board's "Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated March 9, 2007;

74.  Review of the Air Resources Board's "Staff Report: Initial Statement of Reasons for Rulemaking – Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde

LWFR-EXP 7-000052

Emissions From Composite Wood Products" dated April 26, 2007;

75.    Review of Air Resources Board's "Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Responses – Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007:

76.    Review of the following internet articles:

    a.    http://www.rvbusiness.com/tag/tl-industries/

    b.    http://www.chemicaldesigncorp.net/ClosedCellFoam.htm

    c.    http://www.robertlordbuilders.com/press_releasr1.htm

    d.    http://www.suburbanmanufacturing.com/ (RV Products)

77.    A review of the pamphlet by Bayseal CC for Residential Builders, "Insulation that Adds Value;"

78.    A review of Bayseal CC Division 7 – Thermal and Moisture Protection Closed-Cell Insulation Technical Data Sheet 06/10/08;

79.    A review of a fax from Wyatt Rankin with SPI-Dallas dated May 19, 2009 regarding formaldehyde foams;

80.    A review of Suburban, Dynatrail Installation Instructions for Models SF-20F, SF-25F, SF-30F and SF-35F;

81.    A review of Performance Work Statement #000432 – 450;

82.    A review of the International Building Code, 2000;

83.    A review of the International Residential Code, 2000;

84.    A review of The Building Code of the City of New Orleans, 2003;

LWFR-EXP 7-000053

85.   A review of the Ball State report;

86.   A review of Shaw's <u>Motion for Summary Judgment Regarding Prescription</u>;

87.   A review of Composite Panel Association Products Documents Regarding Low and Non-Formaldehyde Emitting Materials;

88.   A review of RADCO Test Report RAD-138, Interim Report on Formaldehyde in Mobile Homes, revised July 20, 1978; and

89.   RADCO Correspondence to Jordan Dentz with MHRA dated July 9, 2004.

LWFR-EXP 7-000054

# SECTION VI

## RESULTS OF INSPECTIONS, OBSERVATIONS AND TESTING

Testing and inspections on the Lyndon Wright FEMA THU commenced according to the approved protocol on August 3, 2009 and proceeded until completed on September 1, 2009.  In the course of our study and analysis, the effects of air, temperature and moisture were observed and tested.  Various tests for micro-organisms, envelope air leakage tests, air conditioning and furnace duct air leakage tests, air exchange rates, infrared thermographic imaging, and recordation of ongoing temperature and relative humidity readings were performed.

Observation and testing helped to identify the relationship between the exterior and interior environments, the ability for communications between the exterior and interior environments and their effect upon the components of the temporary housing unit.

Tests were performed regarding the effect jacking and placing the unit on piers had on the structure from air and moisture infiltration.

The testing has provided data to assist in identifying if there were pathways of air, heat and moisture transfer from the exterior of the THU into the interior, what factors contributed to that transfer and its effect upon the various components of the unit.  The pathways and means allowing any off-gassing of materials or micor-organisms to move into the living area were explored and identified.  The causes for conditions favorable for the manifestation of fungi and other micro-organisms in the walls, ceilings, floors and living area were identified.

OBSERVATIONS AND TESTS:

    A.     Identification

        1. Observations:

              i. Identification of the Wright trailer was made by reviewing the stamps and numbering on the trailer.

LWFR-EXP 7-000055

2. Photographs:

    i. See enclosed Photographs A-1 through A-8.

B.    Interior Overview

1. Observations:

    i. The initial interior overview revealed a relatively well kept living area. There are some indications of:

        a. deteriorated carpet by one of the windows in the bedroom,
        b. debris in the supply air duct system,
        c. the appearance of a mold-like substance on the window frames, and
        d. apparent moisture intrusion in the bathroom. Mold growth on the commode and floors and rust on the furnace supply air register and commode bolts were noted.

    ii. Other than these items, the trailer appeared to be maintained and showed very little wear despite the occupation of the trailer by Mr. Wright from March 2006 through July 2008.

2. Photographs:

    i. Please see Photographs B-1 through B-18.

3. Comments:

    i. The interior and exterior of the trailer was measured for the purposes of providing detailed drawings of the "as-built" condition of the unit.

LWFR-EXP 7-000056

ii. Please see Enclosure 1, Plans and Details by FGS / RCE of the FEMA Wright THU.

C.     Data Plate

1. Observations:

i. The following information was collected from the data plate:

a. Make and Year:  2006 Salem Towables,
b. Model Number:  SMT32BHLE,
c. VIN:  4X4TSMH296C008992
d. Serial Number:  SMC008992,
e. Size:   32'4" in length with the hitch and 29'8" long without the hitch by 8' in width,
f. Front and Rear Tire Sizes:  ST205/75R15/C

2. Photographs:

i. Please see Photographs C1-C3.

3. Comments:

i. The information gleaned from the data will be used further in the report.

D.     Certification Tag

1. Observations:

i. The RIVA Certification Tag, S1713297, was fixed near the handle of the exterior door.  This Certification Tag states, "Manufacturer certifies compliance with standard for recreational vehicles ANSI NFPA 1192. * ELECTRICAL * PLUMBING * HEATING * SAFETY *.  Information

LWFR-EXP 7-000057

identified on the Certification Tag will be analyzed further in the report.

2. Photographs:

    i. Please see photographs D-1 through D-2.

3. Codes, Standards, Tests or Engineering Assessments:

    i. Please see ANSI 119.2, NFPA 1192, Codes and Standards for Recreational Vehicles.

4. Comments:

    i. While the trailer manufacturer has certified compliance with the ANSI 119.2 and NFPA 1192 codes and standards, we will address further in the report are the manufacturer did not meet the compliance requirements of these codes.

    ii. Additionally, it will be discussed further in the report whether or not there or other codes and standards that applied to the construction and use of this travel trailer as temporary housing.

E.    Inspection Tags

1. Observations:

    i. We observed a number of colored stickers on the front or tongue end of trailer. It appears the stickers were used at least in part to identify inspections of the trailer by the maintenance contractor. There may have been a date, signature and time on these inspection stickers; however, there were no dates or names identifiable at the time of our inspection.

LWFR-EXP 7-000058

ii. There was one other sticker on the front / tongue end of the trailer. The sticker read, "OK to ship. Inspected by _____." It appeared this sticker was placed over some other sticker. Parts of the "OK to Ship" sticker were torn. Removal of the "OK to Ship - Inspected" sticker appeared to have been applied over another sticker. The top sticker was peeled back and revealed another sticker below it. The sticker at the underside of the top sticker read, "Don't Ship" in red and white letters.

2. Photographs:

    i. Please see photographs E-1, Re: Section Ei. above.

    ii. Please see photographs E-3 through E-6 for Section ii above.

3. Comments:

    i. It appears that there are eleven inspection stickers that were placed on the trailer by the maintenance contractors. Mr. Wright states that while he was home on occasion, the inspectors did come by the house and place stickers on the front exterior wall of the house. It is unknown what areas were inspected when Mr. Wright was not home and the inspectors came to the trailer. There are no indications as to what data was reviewed or items inspected.

    ii. It is also unknown why the "Don't Ship" sticker was placed on the front of the trailer. It is also unknown what was included on the part of the sticker that was torn.

    iii. It is unknown what was inspected and approved or when and by whom the trailer was released for shipment. There were no records made available that gave indication as to the issues that surrounded the placement of the "Don't Ship" sticker.

LWFR-EXP 7-000059

F.   Tongue Jack

    1. Observations:

        i. The tongue jack on the front end of the trailer is a B & L trailer jack with a 2,000 pound capacity.

    2. Photographs:

        i. Please see Photographs F-1 through F-2.

    3. Comments:

        i. The shipping weight was 5,150 pounds and the gross vehicular weight of the trailer is 7,790 pounds. The capacity of the jack is 2,000 pounds. We observed this component of the trailer to assess its capacity and ability to lift the trailer. To use the tongue jack or stabilizing jack to lift the trailer would be inappropriate. It has the potential for causing damage to the trailer. Based on the low rated capacity of the trailer tongue jack in relation to the weight of the trailer, it does not appear that the tongue jack would have been used to raise or level the trailer.

G.   Scissor Jacks

    1. Observation:

        i. Four screw-type scissor jacks were installed at the corners of the trailer for the purpose of stabilizing the trailer when it is set up as a travel unit.

LWFR-EXP 7-000060

    ii. The notations in the owner's manual regarding the possible damage to the trailer give some indication as to the potential for damage to the trailer from a jacking process.

2. Photographs:

    i. Please see photographs G-1 through G-4.

3. Codes, Standards, Testing or Engineering Assessments:

    i. See Owner's Manual, page 30, "Warning" regarding stabilizer jacks.

4. Comments:

    i. The trailer jacks should not be used to lift the trailer from the ground. The label on the jack indicates that damage to the frame and door openings are possible if these jacks are utilized.

    ii. The same criteria would appear to apply to other types of jacking methods. The warning states damage to the jack, trailer frame or both can occur.

H.    Tires

1. Observations:

    i. The tires of the unit were observed. There were three 15" tires and one 14" tire installed on the unit.

2. Photographs:

    i. Please see photographs H-1 through H-9.

LWFR-EXP 7-000061

3. Codes, Standards, Tests or Engineering Assessments:

   i. Data Plate: Tire Loading Information.

   ii. Please Enclosure 2, Freyou, Moore and Associates Structural Condition Assessment.

4. Comments:

   i. It was observed that the two tires and rims on the right side of the trailer were installed with two 15" wheels. The tires are Tow Master II ST 205/75D15. The number 15 indicates that they are 15" in diameter.

   ii. Observations on the left side of the trailer indicate the rear tire is a 15" tire and the front tire is a 14" tire. The left side rear tire is a Tow Master II ST 205/75D15 and the front tire on the left side is a Tow Master II ST 205/75D14.

   iii. There is a 1" difference in the diameter between the front and the rear tire on the left side of the trailer.

   iv. Please see the report by David Moore regarding the effects this has on the unit.

I.    Axles

1. Observations:

   i. The underside of the chassis or steel frame was inspected for its connection to the axles. The axles were connected to the frame with a series of U-clips and bolts and fasteners. The axles were provided by Lippert Components, Inc. The date of manufacture was November 2. 2005. The model number is LC135-85.0-68.5US. The gross axle weight rating (GAWR): 3,500 lbs. The

axles are connected to suspension springs which allow the axles to move independently of one another.

2. Photographs:

    i. Please see photographs I-1 through I-12.

3. Comments:

    i. The axles are connected to the frame with a series of framing members and springs. When jacking of the unit occurred, the axles were allowed to be suspended with no blocking below the axles. If jacking was to occur, at a minimum, the axles should have been lifted at the same time the entire frame was lifted. That would have taken weight off the frame of the trailer and prevented some of the deflection that was noted during our jacking and blocking tests. As stated above, jacking of the unit can cause damage to the frame. It is our assessment that not failure to jack the axles at the same time the frame was lifted caused additional deflection.

## J.   Chassis

1. Observations:

    i. The chassis or steel frame of the trailer was inspected. The frame was constructed with I-beams, angle iron, Z-members and other miscellaneous metals.

    ii. The connection of the steel chassis to the wood frame structure of the trailer was inspected.

2. Photographs:

    i. Please see photographs J-1 through J-14.

LWFR-EXP 7-000063

3. Codes, Standards, Tests or Engineering Assessments:

   i. Please see the Building Code of the City of New Orleans, Section 101.1, Title; Section 101.2, Scope; Section 107.1, General; Section 107.2, Conformance; Section 420.1, Scope; Section 420.2, Definition; Section 420.4, Construction Documents; and Chapter 36, International Residential Code.

   ii. Please see Enclosure 2, Freyou, Moore and Associates' report, Structural Conditions Assessment.

4. Comments:

   i. It appears from the definitions in the building code that the Building Code of the City of New Orleans was the effective code that was in force for single family dwellings, temporary structures and Section 420, Prefabricated and Modular Buildings.

   ii. The outrigger connections to the wood structure were connected at the end of a reduced angle iron outrigger. The wood structural members and blocking appeared to be less than adequate for single family dwelling according to the building codes.

   iii. The wall framing of the trailer was 1 ½" x 1 1/8" studs placed 16" apart.

   iv. The floor framing is constructed with 2" x 3" floor joists spaced 10" to 12" apart.

LWFR-EXP 7-000064

K.     Belly-board

1.  Observations:

i.  The underside of the temporary housing unit was protected with a vapor barrier between the steel chassis and the wood floor structure.

2.  Photographs:

i.  Please see photographs K-1 through K-8.

3.  Codes, Standards, Tests or Engineering Assessments:

i.  Please see FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

4.  Comments:

i.  In the FEMA procurement specifications, the temporary housing unit was to be constructed to prevent air and moisture infiltration. The installation methods did not meet the procurement specifications.

L.     Bellyboard Penetrations

1.  Observations:

i.  Unsealed penetrations and openings in and around the bellyboard were observed.

2.  Photographs:

i.  Please see photographs K1 – K8 and L-1 through L-17.

LWFR-EXP 7-000065

3. Codes, Standards, Tests or Engineering Assessments

    i. Please see the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

    ii. Please see Enclosure 3, the LaGrange Consulting, L.L.C. Inspection Report.

    iii. Please see International Building Code, 2000, and the New Orleans City Building Code, 2003.

4. Comments:

    i. Observation of the underside of the unit revealed penetrations through the bellyboard that were unsealed. Penetrations around plumbing pipes, electrical components, cuts and tears in the board and a lack of sealing material around the perimeter of the underside were noted. The FEMA procurement specifications require the penetrations to be sealed to prevent air and moisture infiltration into the temporary housing unit. In addition, the building codes require the envelope of the building to be sealed to prevent the transfer of air, moisture and other unwanted elements from the outside to the interior of the unit.

    ii. When negative air pressure conditions exist in hot humid climates, unfiltered unconditioned air is drawn into the wall, ceiling, floor and living areas. This unfiltered air entering into the floor, wall and ceiling cavities provide the needed heat and moisture differentials to cause condensation and the manifestation of mold and off-gassing in those areas.

    iii. Pressure differentials from the hot humid outside to the colder drier air of the interior forces air through unsealed penetrations and openings in the walls and ceiling cavities of the home. This

LWFR-EXP 7-000066

air and moisture vapor transmittal occurs as a result of diffusion.

iv. In the winter months, the opposite occurs. The typically higher humidity on the interior of the building seeks to escape to the cooler, drier outside air in the winter months. Moisture can be forced into wall, floor and ceiling cavities. If the temperature differential is great enough, the moisture will condense on the colder surfaces.

M.   Aluminum Exterior Sheeting

1. Observations:

i. A review of the exterior sheeting or skin around the unit was performed. The horizontal joints of the sheeting were not sealed. This allows for the movement of air through the joints of the exterior wall sheeting.

2. Photographs:

i. Please see photographs M-1 through M-8.

3. Codes, Standards, Tests or Engineering Assessments:

i. Please see the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

ii. Please see Enclosure 3, the LaGrange Consulting, L.L.C. Inspection Report.

iii. Please see the International Building Code 2000 and The New Orleans City Building Code 2003.

LWFR-EXP 7-000067

4. Comments:

    i. A review of the installation means and methods of the exterior aluminum wall sheeting was performed. The wall sheeting was rolled or crimped in a horizontal manner. Panel joints were approximately 12"+ apart and ran from front to back and side to side. Photographs M-1, M-7 and M-8 indicate the type of connection that was used between one panel and the other. Also noted was a lack of a sealant to prevent air and moisture infiltration through the crimped or rolled joint between the panels. As indicated above in Section L: Bellyboard Penetrations, the same forces are at play regarding the infiltration of air and moisture through these horizontal joints that occur in the underbelly penetrations around the pipes and electrical components. This creates conditions conducive to microbial growth and off-gassing.

N.    Wall Trim-Exterior: Corners, Roof to Wall and Window/Doors

1. Observations:

    i. A close inspection of the exterior corners, the roof to wall connection, and the trim around the doors was performed. We observed the material utilized to seal these intersections. It was deteriorated.

2. Photographs:

    i. Please see photographs N-1 through N-102.

3. Codes, Standards, Tests or Engineering Assessments:

    i. FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

LWFR-EXP 7-000068

    ii.  International Building Code 2000

    iii.  City of New Orleans Building Code 2003

    iv.  HUD publication, "Durability by Design"

4. Comments:

    i.  Moisture and infrared thermographic surveys were conducted on the interior of the unit. Indications of moisture penetration were given during the moisture and infrared thermographic survey. This led to a more in depth inspection of the sealed intersections on the exterior of the building. Sealant material was used at through-wall penetrations, roof and wall intersections and the corner sections. It was noted during the exterior inspection and the interior wall and ceiling cavity inspections that the only method of sealing penetrations or intersections was the use of caulking or sealant. It is indicated in the HUD publication, "Durability by Design," caulking should be used as a secondary means to prevent air and moisture penetration into a structure. There should be some other primary means of moisture and air penetration prevention at intersections and penetrations in wall systems. The reason caulking or other like sealants should not be used for primary prevention of air and moisture penetration is that any breach of the caulking or sealant material allows air and moisture through the opening. There is no primary flashing or material to prevent that air and moisture penetration from entering into the wall cavity or the interior of the building. Holes or cracks can form either during the installation or as a result of the material degradation. It is not usually apparent that this has occurred. Deterioration or decay of building materials, decrease of the R-value of the insulation, and indoor air quality issues become a problem usually long before the problem of infiltration is noted by the occupant.

LWFR-EXP 7-000069

ii. The trim of the outside corners were installed with a sealant material for water and air penetration protection. Close observations of the sealant indicated a drying and cracking of that sealant material. When investigating the interior of the trailer and removing interior wall panels, it became evident that air and moisture was infiltrating into the wall cavities from these areas. Decay of the interior wall panels and mold growth was observed and photographed.

iii. Photographs N-1 through N-3 and N-7 through N-16 indicate what appears to be a pliable sealant around window openings. The areas appear to be well sealed. When close inspection of the window units were performed after their removal, apparent water infiltration through breeches in the sealant material became evident.

iv. Please see Section O, photographs O-142, O-143, O-146 – O-157, O-161, O-164, and O-165 for examples of areas water penetration that circumvented the caulking or sealant material.

v. Indications of indoor moisture penetrations were discovered by use of the handheld moisture meter. Two different moisture meters were used to verify the moisture content of wood products.

vi. Please see photographs N-19 through N-36.

vii. Once the demolition of the interior walls and ceilings began, it became quite evident that there was a significant amount of air and moisture penetration into the wall and ceiling cavities of the housing unit. Mold, deterioration of wood materials, or water damage was noted on various components.

LWFR-EXP 7-000070

viii. The following photographs give indication of hidden water damage occurring to the wood components of the Wright trailer: N-40 through N-95.

O.    Wall penetrations: Lights, Pipes, Electrical, Etc.

1. Observations:

i. The exterior wall penetrations were inspected. Areas such as lights, pipes, electrical and other penetrations were closely examined.

2. Photographs:

i. Please see photographs O-1 through O-46.

3. Codes, Standards, Tests or Engineering Assessments:

i. Please see the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

ii. Please see Enclosure 4, Electrical Systems Observations Report by J. Darrell Hicks, P.E.

4. Comments:

i. Inspection of the exterior and interior areas of wall penetrations was performed. Areas such as lights, water heater access panel, electrical outlets, electrical connection box, water lines, and other such penetrations were inspected. While the exterior of most of these items were sealed with caulking or a sealant material from the exterior, some areas appeared to have water penetrate through breeches in the sealant material. Other areas were not sealed through the wall opening to prevent air and moisture vapor movement between the exterior and interior of

LWFR-EXP 7-000071

the building.   Some of these areas included, but were not limited to, the water heater access and exhaust opening, and the electrical connection box.   Other areas of penetration through the interior wall were not sealed.   These areas included the light fixtures, water connection piping, and other miscellaneous electrical wiring penetrations. Air and moisture infiltration from the unsealed underbelly, especially around the perimeter of the wall to floor systems and the attic, were not sealed to prevent moisture movement from outside to inside of the house.

   ii.  Other areas, such as wiring penetrating through top and bottom plates of the wall allow for communication between the attic and floor spaces into the wall cavities.

   iii.  Corrosion was identified on one or more low voltage switches. Indications are moisture infiltration in the exterior wall of the house allowed moisture to corrode the device.

P.    Floor Penetrations

1.  Observations:

   i.  There are a number of areas of unsealed penetrations noted during the inspection.

   ii.  Floor penetrations are not properly sealed to meet the FEMA procurement specifications or the NFPA, ANSI or the Building Codes.

2.  Photographs:

   i.  Please see photographs P-1 through P-37.

LWFR-EXP 7-000072

3. Codes, Standards, Tests or Engineering Assessments:

    i. FEMA Model Travel Trailer Procurement Specifications

    ii. NFPA Codes

    iii. ANSI Codes

    iv. Building Codes

4. Comments:

    i. Penetrations through the floor of the unit were inspections. These penetrations through the floor were not sealed or only partially sealed. This allowed for the transfer of air and moisture between floor cavity and the interior of the house. The specifications required all penetrations including piping to be sealed. It appears that some attempt was made to seal some of the areas penetrating the floor, but many of the other penetrations were not sealed at all. It is unknown why it was elected to seal some of the penetrations but not others.

    ii. Section 7.3.3.3, Damage, on page 28 of the code states that "all exterior openings around piping shall be sealed to prevent the entrance of rodents." As discussed earlier in the report in the section referring to the underbelly penetrations of the housing unit, it was noted in our discussion and is documented with photographs that there are openings in the underbelly of the Wright housing unit that are in violation of this code. The unsealed areas are also through the flooring and floor sheeting. Component penetration such as water lines, drain pipes and wiring penetrating the unit are in violation of the code.

LWFR-EXP 7-000073

Q.    Windows

1. Condensation:

   i.  Observations:

      a.  Window installation method and jacking up the trailer and positioning the unit on piers appear to have allowed air infiltration in the window units causing condensation to occur.

   ii.  Photographs:

      a.  Please see photographs Q-1 through Q-23.

      b.  Please see photographs Q-2-1 through Q-2-28.

   iii.  Codes, Standards, Tests or Engineering Assessments:

      a.  Please see FEMA Model Travel Trailer Procurement Specifications.

      b.  Building Standards.

      c.  Please see Enclosure 5, Microbial Growth Report by W.D. Scott and Associates.

   iv.  Comments:

      a.  It appears there is a combination of condensation occurring from a lack of insulation around the metal window units and air seepage as a result of the jacking and blocking of the unit.  The metal windows were installed without insulation placed around the perimeter

of the unit or any type of sealant, such as a foam insulation, to prevent condensation from occurring.

b. In addition, during the jacking and blocking of the unit, it was noted the window units appeared to move or open, breaking the air seal between the window and the window frame. Any air leakage through the window created conditions conducive to condensation, especially in the hot, humid months of the summertime.

c. A mold-like substance was growing on the interior side of the window frame. Samples were taken for testing. The results of the mold tests indicate the substance is mold.

d. Please see photographs Q 2-1 and Q 2-2.

e. Areas around the interior of the windows were not sealed with any sort of insulating materials. Those non-insulated areas around the window created conditions conducive to condensation. Areas such as those found in photographs O-89 through O-104 show the absence of insulating material around these metal framed windows. Some of these photographs also indicate rusting of the fasteners that were used to connect the windows to the wall system. The rust indicates the presence of moisture either through water penetration around the window or condensation occurring from these non-insulated areas.

2. Leaks

   i. Observations:

      a. Observations as previously noted regarding window leakage was identified under Section O, Wall Penetrations. Aside from the other damages noted,

interior finishes, such as carpeting and wall panels, were also damaged from the water intrusion at the windows.

    ii. Photographs:

        a. Please see photographs Q 3-1 through Q3-26.

    iii. Codes, Standards, Tests, or Engineering Assessments

        a. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

    iv. Comments:

R.    Doors-Exterior

  1. Observations:

    i. According to Mr. Wright, the exterior door of the unit house leaked water. During inspections by our organization, rain water penetrated the door of the unit.

  2. Photographs:

    i. Please see photographs R-1 through R-35.

  3. Codes, Standards, Tests or Engineering Assessments:

    i. FEMA Model Travel Trailer Procurement Specifications

  4. Comments:

    i. Mr. Wright stated that water began to enter into the house at some point after he moved in. It is understood that it is sometime after the winter of 2006 when this occurred.

LWFR-EXP 7-000076

ii. During our inspections, it began raining and water began to infiltrate the unit through the top of the door. We were able to photograph and document this. In addition, water stains and an apparent mold-like substance was noted on the inside surface of the door. The water streaks, mold-like substance and the water infiltration were photographed.

iii. As the water infiltrated into the unit, it followed a pathway across the floor of the unit. Later as that pathway was followed during out demolition of that area of the unit, the damage to the walls and contents were documented. Water absorbed into the carpeting, the vinyl flooring, the contents and cabinetry.

iv. When the exterior door was disassembled, deterioration of the framing and subflooring was noted. The fasteners utilized to install the threshold were rusted, the subfloor was decayed and some of the framing was also beginning to decay. The attachment for the steps was not supported because of the decay.

v. Placement of a level on the top of the door indicated the door was bowed.

vi. During the jacking and blocking procedures by both consultants with Shaw and consultants with First General Services, the door frame for the exterior door moved significantly into an out-of-square position. The opening between the frame and the door was noticeable without the use of measuring instruments. It appears that jacking and placing of the house on piers caused stress on the door and frame and allowed for water penetration. This distortion was not relieved after the trailer was placed on the piers.

LWFR-EXP 7-000077

S.      Floor Insulation

    1. Observations:

        i. The floor decking was removed and the insulation in the floor cavity was observed. The floor insulation was not properly installed.

    2. Photographs:

        i. Please see photographs S-1 through S-9.

    3. Codes, Standards, Tests or Engineering Assessments

        i. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

    4. Comments:

        i. The plywood subfloor was removed for inspection of the floor cavity. The floors were insulated with fiberglass batt material. The insulation was approximately 2 1/2" thick. Further observations indicated the insulating material did not fill the space between joists or between the bellyboard and the underside of the floor sheeting. This creates conditions conducive to condensation and mold growth. The gaps in the insulation, insulation not fully fitted between framing members or insulation that does not fill the cavity, especially at the underside of the interior colder surfaces, creates conditions that allow for the air to reach the dew point in these areas and condense. This led to mold growth and any off-gassing.

        ii. This installation did not meet superior quality workmanship standards.

LWFR-EXP 7-000078

T.    Floor Joist

   1.  Observations:

      i.  The floor joist system was observed.  The floor joists were 1 ½"
          x 2 ½" wood members.  One joist was notched to a dimension
          approximately 1" to 1 ½".

   2.  Photographs:

      i.  Please see photographs T-1 through T-9.

   3.  Codes, Standards, Tests or Engineering Assessments:

      i.  Please see Enclosure 2, Freyou, Moore and Associates –
          Structural Condition Assessment.

   4.  Comments:

      i.  Dimensioned lumber was utilized for floor joists.  The floor
          joists were 1 ½" x 2 ½" in dimension.  The floor joists were not
          continuous or were notched out or not properly installed in
          areas opened during the destructive testing.

      ii. Please see photograph T-8.

      iii. Also noted during the inspection was a mold-like substance on
          the floor framing material.   Given the ability for air and
          moisture to infiltrate the bellyboard of the house around the
          perimeter and at various penetrations in the bellyboard, the lack
          of proper insulation installation and the cavity formed between
          the colder surfaces and the insulation, the conditions were
          available for mold growth to occur.

LWFR-EXP 7-000079

U.    Plywood Subfloor

    1. Observations:

        i. Mold-like growth was observed on the upper and lower side of the plywood subfloor sheathing.

    2. Photographs:

        i. Please see photographs U-1 through U-14.

    3. Codes, Standards, Testing or Engineering Assessments:

        i. FEMA Model Travel Trailer Procurement Specifications

        ii. Please see Enclosure 5, Microbial Growth Report by W.D. Scott and Associates.

        iii. Please see Enclosure 3, LaGrange Consulting L.L.C. Inspection Report.

    4. Comments:

        i. When the carpet and vinyl flooring were removed away from the plywood subfloor, it was evident that moisture infiltration had occurred and mold-like substances were observed and documented.

        ii. When the plywood subflooring was removed, indications of mold growth were present and photographed.

V.    Flooring-Vinyl

    1. Observations:

LWFR-EXP 7-000080

        i.  Water damage and mold growth were present at the underside of the vinyl flooring.

  2.  Photographs:

        i.  Please see photographs V-1 through V-15.

  3.  Codes, Standards, Testing or Engineering Assessments:

        i.  Please see Enclosure 5, Microbial Growth Report by W. D. Scott and Associates.

  4.  Comments:

        i.  As indicated in Section U, Plywood Subflooring, noted above, once the vinyl sheet flooring was removed, there were indications of moisture problems and moisture intrusion. Numerous areas around the perimeter and field of the back sides of the vinyl flooring indicated mold growth. Typically, the underside of vinyl siding is manufactured with materials that provide a food source available for mold growth.

W.    Flooring-Carpets

  1.  Observations:

        i.  Carpets were installed in the bedroom and living room area of the trailer. Water and possible mold damage was noted on the carpets.

  2.  Codes, Standards, Testing and Engineering Assessments:

        i.  Please see Enclosure 5, Microbial Growth Report by W. D. Scott and Associates.

LWFR-EXP 7-000081

3. Comments:

    i. The carpets at the right exterior wall under the window appear to have been damaged. Mold growth was noted in this area. It is unknown whether the damage to the carpet is a result of mold; however, tests performed by W. D. Scott and Associates identified mold as being present in the carpet.

    ii. Once the carpets were removed in both the living room and the bedroom areas, it became quite obvious that moisture infiltration had been occurring in the trailer. Water stains on the back of the carpets and on the subfloor were noted.

X.    Wall Framing

1. Observations:

    i. The walls of the trailer were noted during the inspection. Bulges in the exterior wall panels were noted. The deflection of the wall framing was telegraphing through the exterior aluminum sheeting.

    ii. The workmanship of the wood wall framing was observed. The attachments, blocking and methods were inadequately installed.

2. Photographs:

    i. Please see photographs X-1 through X-24.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure 2, Freyou, Moore and Associates – Structural Condition Assessment.

LWFR-EXP 7-000082

4. Comments:

    i. It appears the wall framing deflected. Bulging of the wall panels at a number of areas around the perimeter was noted. Results of the jacking and blocking tests of the unit indicated that additional distortion in the wall framing occurred after the jacking and blocking occurred. The indications are the jacking and blocking created flexing of the framing system that telegraphed to the walls. The subsequent result is a distortion in the wall unit and the connections at the corners around the windows, door and roof to wall intersections.

    ii. As noted in photographs X-13 through X-21, the workmanship as it relates to the wall framing was less than superior in nature. The framing was placed together with members that did not fully come in contact with one another, small pieces of blocking utilized to fill in for framing members that were misfit or overcut, or framing members that did not come in contact with one another at all. The workmanship did not meet the requirements by FEMA.

    iii. As noted in some of the photographs, the fasteners utilized to connect the wall framing to the floors and other areas showed signs of rusting. This is due to exposure to water or moisture vapor.

    iv. Inadequate blocking and connections were made at the wall to roof and wall to floor intersections.

Y.    Wall Insulation

1. Observations:

    i. Wall insulation was cut, fit and installed in a manner that would allow condensation to occur within the wall cavities of the unit.

LWFR-EXP 7-000083

ii. The insulation in the walls of this unit were 1 ½" thick unfaced fiberglass batting.  The low ·R- value of the insulation would allow condensation to occur.

2. Photographs:

   i. Please see photographs Y-1 through Y-74.

   ii. Please see Infrared photographs.

3. Codes, Standards, Testing or Engineering Assessments:

   i. FEMA Model Travel Trailer Procurement Specifications

   ii. Please see LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

   i. As the walls were disassembled, it became readily apparent that the fiberglass batt insulation was not properly cut, fit and installed.  Gaps between framing members existed because the width of the insulation was cut too narrow.  Insulation was stuffed into some areas, insulation was absent all together in some areas, or the insulation was compressed or moved to install wiring, equipment or other items.

   ii. The voids and compressed insulation allowed for air and moisture movement into the wall cavities and to come in contact with colder surfaces.  This created conditions conducive to condensation forming and mold growth manifestation.  Some signs of moisture infiltration aside from the obvious mold growth or water marks were in areas where the insulation adhered to the back side of the aluminum exterior wall sheets.  It has been our experience that areas of high moisture

LWFR-EXP 7-000084

concentration create conditions that allow insulation to stick to surfaces in which it is in contact.

iii. The batt insulation was identified as an R-8 value.

iv. Please see photograph Y-74.

v. The wall insulation was 1 ½" thick and did not meet the insulation value for residential structures.

vi. The R- value was too low to prevent condensation from occurring in the wall cavities.

vii. Forest River either did not consider or ignored the fact that condensation would occur in the walls, ceiling and possibly the floor systems of the Wright house. There are studies dating back to the 1980s or earlier demonstrating condensation occurs in the cavities of a structure when air and surface temperatures reach the dew point.

viii. HUD has required the control and management of condensation in mobile homes from air and moisture infiltration into the cavities and envelopes since 1986.

ix. While travel trailers do not fall under the manufactured housing code, it has been common knowledge this condition causes condensation and deterioration.

x. An example of condensation occurring in a wall system is to take a glass filled with water and ice cubes and place it on a countertop or outside of a building. Soon water droplets collect on the outside face of the glass. This is an example of what occurs when the temperature on the outside of the glass reaches the dew point. The air next to the cold surface of the glass is no longer able to hold the moisture as a vapor and the moisture

LWFR-EXP 7-000085

vapor is converted to its liquid form.  The droplets of water on the exterior face of the glass are condensation.

xi. Because the insulation in the wall cavities has such a low R-value (resistance to the temperature), this condition occurs in the cavities of the housing unit anytime during May, June, July, August or September in the New Orleans area.  The manufacturer did not account for or address the probability of this occurrence.

Z.   Walls - Interior Finishes:  Vinyl Covering

1. Observations:

i. The manufacturer has utilized an applied vinyl covering over the plywood sheathing on the wall and ceiling panels.

2. Photographs:

i. Please see photographs Z-1 through Z-14.

3. Codes, Standards, Testing and Engineering Assessments:

i. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

ii. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

4. Comments:

i. The interior face of the wall panels is covered with a vinyl material.  Vinyl materials usually have a lower ability to allow air and moisture vapor to filter through.  This resistance is known as the perm rating of the material.  Any material with a

LWFR-EXP 7-000086

perm rating low enough will prevent or slow the passage of air and moisture vapor from the outside into the wall cavity or living area. To prevent air and moisture from entering a building cavity, a Tyvek type material should be installed on the warm side of the wall in the hot humid climate zone. If the vapor barrier or Tyvek type of material is placed on the cold side of the wall in this climate, moisture collection and condensation can be expected. The drying process will be affected. Deterioration of the building materials will occur, mold growth will proliferate and other contaminants present will not dissipate into the outdoor atmosphere, especially when there are negative air pressure conditions. When this occurrence is coupled with a negative air pressure condition, this will significantly increase problems in the wall, ceiling and floor cavities of the housing unit. Once the wall system allows air and moisture to enter, the vinyl surface of the wall and ceiling panels prevents or retards the moisture from passage through to the interior, the moisture vapor collects on the interior of the wall cavity, and as the surfaces on the interior of the temporary housing unit gets colder and falls below the dew point, the vapor in the wall cavity of the trailer begin to cool and turn to water.

ii. The manufacturer did not provide for the management of air, water and water vapor intrusion into the wall, ceiling and floor cavities. As a result, the lack of a management system has caused mold growth and deterioration of the building components which increase formaldehyde off-gassing per Dr. Smulski's report.

AA.   Interior Trim

1. Observations:

     i. Interior trim above the windows were identified as formaldehyde emitting products.

2. Photographs:

     i. Please see video by Scott Johnson.

3. Codes, Standards, Testing or Engineering Assessments:

     i. Please see Enclosure 6, the Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

4. Comments:

     i. According to the investigation and identification of wood components by Dr. Smulski, the wood valance trims over the windows contained formaldehyde emitting products.

BB.   Doors – Interior

1. Observations:

     i. The interior doors were constructed with 1 1/8" medium density fiberboard stile.

2. Codes, Standards, Testing or Engineering Assessments:

     i. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

3. Comments:

     i. The sliding door to the bedroom and the door to the bathroom were identified as containing 1 1/8" thick medium density

LWFR-EXP 7-000088

fiberboard styles.   As noted by Dr. Stephen Smulski in his report, these items are formaldehyde emitting products.

CC.   Ceilings

1. Observations:

i. The ceilings throughout the house were vinyl covered hardboard paneling.

2. Photographs:

i. Please see photograph CC-1.

3. Codes, Standards, Testing or Engineering Assessments:

i. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

ii. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

i. Wall panels throughout were covered with vinyl material.   The wood panel is a hardwood material.   As identified and discussed in Dr. Stephen Smulski's report, these panels are formaldehyde emitting materials.

ii. As discussed in Section Z, Walls – Interior, the same issues identified with the vinyl covered wallboards apply to the vinyl covered ceiling boards.   Air and moisture are not allowed to permeate through the materials to dry out to the interior.   Any condensation that occurs in the ceiling cavity is trapped against

the cold surface of the ceiling panel.  This creates conditions conducive to mold growth and formaldehyde off-gassing.

DD.   Ceiling Penetrations

1. Observations:

i.  There were numerous unsealed penetrations through the ceiling panels.   Unsealed electrical wiring penetrations, unsealed plumbing pipe penetrations, numerous fastener penetrations used to install the wall cabinets, the areas between ceilings and walls, air conditioning duct penetrations, and other such penetrations were noted.

2. Photographs:

i.  Please see photographs DD-1 through DD-18.

3. Codes, Standards, Testing or Engineering Assessments:

i.  FEMA Model Travel Trailer Procurement Specifications

ii.  Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

i.  The numerous penetrations through the ceiling were not properly sealed to prevent air and moisture movement between the ceiling cavity and the interior air of the home.   The construction makeup of the unit as discussed earlier allows for the transfer of air and moisture into walls, ceilings and cavities. This moisture will migrate from the warmer, more moist ceiling cavity areas into the drier, cooler air of the interior of the home.

LWFR-EXP 7-000090

Movement of any micro-organisms, contamination or formaldehyde gas into the living area occurs.

EE.   Ceiling Insulation

1. Observations:

   i. Observations of the ceiling insulation material and installation methods were reviewed. Compressed insulation, missing insulation, and a lack of insulation around the duct system were observed.

2. Photographs:

   i. Please see photographs EE-1 through EE-10.

3. Codes, Standards, Testing or Engineering Assessments:

   i. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

   ii. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

   iii. Please see Enclosure 7, Ritter Consulting Engineers' report.

4. Comments:

   i. The insulation installed in the ceiling system is an unfaced 2 ½" thick fiberglass insulation batt. The insulation was installed in the same fashion as the wall insulation. There were miscut and misfit areas of insulation. The insulation did not fill the voids between the framing members. The insulation was significantly compressed in a number of areas. It appears the insulation was installed prior to the installation of the roof deck. Once the roof

LWFR-EXP 7-000091

deck was installed, the insulation was crushed or compressed between the roof deck and the roof truss. This rendered the insulating capacity of the material relatively useless at those locations. The consequence of this method of installation allowed for unnecessary heat transfer into the ceiling cavity. The high heat and humidity that were allowed into the ceiling cavity produced conditions conducive to condensation and formaldehyde off-gassing when the hot, humid air came into contact with the colder ceiling panels. As the temperature and moisture came into contact with the panels, mold manifestation and off-gassing were permitted to occur. There was available cold air in the ceiling cavity to create conditions of condensation. This will be discussed later in the report.

ii. One other observation regarding the insulation is the lack of insulation around the ductwork. This will be discussed further in another section of this report.

iii. The workmanship of the insulation installation was far below satisfactory and did not reach the levels of superior quality.

iv. The thin insulation and low R- value allow the dew point to be reached easily in this area.

FF.   Roof Truss

1. Observations:

i. Observations of the roof truss construction, materials and installation methods were performed.

2. Photographs:

i. Please see photographs FF-1 through FF-14.

LWFR-EXP 7-000092

3. Codes, Standards, Testing and Engineering Assessments:

    i. Please see Enclosure 2, report by Freyou, Moore and Associates – Structural Condition Assessment.

4. Comments:

    i. The framing materials and means and methods were closely observed. Numerous areas indicated the roof panel was not properly fastened to the roof truss. The fastener or one leg of the fastener did not penetrate the 1 ½" framing member used to connect the roof truss to the roof deck.

    ii. The roof truss was installed by placing the end bearing points on top of the wall framing. The truss was placed with only ¾" of bearing on the wall framing system. This is inadequate. The bearing point should have been in full contact with the top plate of the wall framing.

    iii. Please see photographs FF-1 through FF-5.

    iv. Close observations of the truss plates indicated very little of the cleats of the entire truss plate were installed into the bottom or top chord of some of the truss.

    v. Please see photographs FF-6, FF-9, F-11, FF-13 and FF-14.

    vi. Condensation or water infiltration was noted at the ceiling line or at the connection to the top part of the roof truss and the bottom of the roof deck.

    vii. Please see photographs FF-13 and FF-14.

    viii. Spliced connections on the truss were noted. In lieu of utilizing full length pieces of 1 ½" x 1 ½" framing material for the truss,

LWFR-EXP 7-000093

multiple pieces of 1 ½" x 1 ½" framing members were used and attached together by use of numerous staples to hold the truss framing members together.

ix.  Please see photographs FF-7 and FF-8.

x.  Substandard quality of workmanship was used in the construction and installation of the roof truss.

GG.  Roof Deck Sheeting

1.  Observations:

i.  The underside of the roof sheeting appeared to have some form of laminate or seal applied.  This appears to act as a vapor barrier.  It is unknown why this material was used other than it was available at the time of construction.

2.  Photographs:

i.  Please see photographs GG-1 through GG-3.

HH.  Roof Membrane

1.  Observations:

i.  The roof covering of the unit was a rubberized type of material or EPDM roofing.  It was a single sheet, full length, full width membrane.

2.  Photographs:

i.  Please see photographs HH-1 through HH-2.

3.  Comments:

LWFR-EXP 7-000094

i. The rubberized roof system acted as a water and air barrier. There were several penetrations through the roof and will be discussed in a following section. There did not appear to be any issues with the roof membrane as installed outside of the penetration seals.

II.   Roof Penetrations

1. Observations:

   i. There are four roof penetrations.

   ii. Two of the penetrations are vent pipes for the plumbing, one is the roof cap or hood for the exhaust vent in the bathroom, and the fourth is the air conditioning cooling unit situated on the roof. The sealant material was not properly installed causing water leaks.

2. Photographs:

   i. Please see photographs II-1 through II-48.

3. Codes, Standards, Testing or Engineering Assessments:

   i. FEMA Model Travel Trailer Procurement Specifications

4. Comments:

   i. The observations of the roof penetrations indicate the sealant material was somewhat brittle. The sealant appeared to have separations between layers.

   ii. Please see photographs II-1 through II-6.

LWFR-EXP 7-000095

iii. The roof structure and decking around the air conditioning rooftop unit appeared to pond water. Close examination of the roof deck indicated a deflection which would allow water to accumulate around the opening of the air conditioning unit.

iv. Please see photographs II-9 through II-11.

v. The area around the bathroom exhaust vent was inspected. The interior side of the exhaust vent indicated the area to have leaked water into the bathroom causing deterioration of the supply air grill for the furnace, water damage to the floor and room components and mold growth.

vi. Please see photographs II-12 through II-14.

vii. The areas immediately around the roof exhaust vent opening indicated water infiltration. Water marks were noted on the vent. A mold-like substance appeared to be attached to the cover.

viii. Please see photographs II-15 through II-18.

ix. It appears that the roof vent and vent pipes were leaking and allowing water to infiltrate the inside of the bathroom. Moisture readings taken on the floor and wall systems in the bathroom indicate high moisture content of the materials.

x. Please see photographs II-24 through II-43.

xi. When the ceiling panel was removed, further indications of roof leaks became apparent. Water stains and / or apparent mold growth was noted in the area near and around the vent pipe ceiling and roof penetrations.

xii. Please see photographs II44 through II-48.

LWFR-EXP 7-000096

JJ.    Roof Deck Deflections

1. Observations:

   i. As noted earlier, the roof deck showed deflections.  Water entry around those deflections appeared to be possible.

2. Photographs:

   i. Please see photographs JJ-1 through JJ-10.

3. Codes, Standards, Testing or Engineering Assessments:

   i. FEMA Model Travel Trailer Procurement Specifications

   ii. Please see Enclosure 2, LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

   i. The deflection around the air conditioning unit is indicative of other units observed where roof deflection has occurred.  These areas of deflection will allow air and moisture infiltration into the ceiling cavity.

KK.    Appliances

1. Observations:

   i. The stove vent was part of a microwave and ventilator for the stove.

2. Photographs:

      i.  Please see photographs KK-1 through KK-4.

   3.  Comments:

      i.  The stove hood vent was a combination microwave and hood vent by Dometic.  There is no fresh air intake in the exhaust. Air exhausted from the house is not replaced with filtered air. If the ventilator is operating during cooking and the doors and windows are closed, especially in the summertime when the air conditioning is in operation, the ventilator can place the house in a negative pressure condition.

LL.    Furnishings

   1.  Observations:

      i.  The beds, sofa, table and seating for the dining table were disassembled for identification of formaldehyde containing materials.  These content items indicated signs of moisture, water damage and mold growth.

   2.  Photographs:

      i.  Please see photographs LL-1 through LL-34.

   3.  Codes, Standards, Testing or Engineering Assessments

      i.  Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

     ii.  Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

   4.  Comments:

LWFR-EXP 7-000098

i. The bedroom and bunkbed framing and decks were disassembled for inspection, identification, measuring and photographing. The various components were observed and investigated by Dr. Smulski. These items were identified by Dr. Smulski as formaldehyde emitting materials. The locations and effects of these materials and the relationship to the housing unit are discussed in Dr. Smulski's report. The content materials added to the overall amount of materials in the trailer that contained formaldehyde.

ii. Close inspection of the decking utilized for the large bed revealed the cavity below the bed was utilized for storage. A piano hinge was installed between the two sections of OSB sheeting. The hinge material indicated oxidation or rusting had occurred evidently from exposure to moisture.

iii. Please see photographs LL-13 through LL-17.

iv. In inspecting the sofa that converts to a bed, the metal frame, cloth material and springs were inspected. The springs and framing members at the underside of the sofa indicated corrosion or rusting had occurred. Mold growth appeared on the cloth material. This is indication of high moisture content in the area of the sofa.

v. Please see photographs LL-19 through LL-30.

vi. Moisture damage was noted at the base of the sofa. This is indicative of water or moisture infiltration into the house.

vii. Please see photographs LL-32 through LL-34.

MM. Cabinets-Kitchen

1. Observations:

LWFR-EXP 7-000099

     i. The cabinets for the kitchen were made up of 1/2" hardwood plywood, 5/8" particle board and ¾" particle board. The kitchen cabinets consisted of upper cabinets, lower cabinets and a pantry area. These materials contained formaldehyde.

2. Photographs:

     i. Please see photographs MM-1 through MM-7.

3. Codes, Standards, Testing or Engineering Assessments:

     i. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

4. Comments:

     i. The cabinets were taken apart for measuring, photographing and identification of the various materials utilized in their construction. Dr. Smulski identified a number of the components that composed the cabinets as being materials that contained formaldehyde.

NN. Cabinets – Bedroom

1. Observations:

     i. Cabinets were observed on either side of the bed in the bedroom. The nightstands were taken apart for observation and documentation.

2. Codes, Standards, Testing or Engineering Assessments:

     i. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

LWFR-EXP 7-000100

3. Comments:

    i. The right and left nightstands in the bedroom were disassembled for photographing and documentation. The nightstands were constructed 1/8" hardwood plywood and 5/8" particle board with a solid wood frame. Dr. Smulski has identified these items as formaldehyde emitting materials.

OO.   Cabinets-Bath

1. Observations:

    i. The cabinet in the bathroom was disassembled for inspection, photographing and documentation.

2. Photographs:

    i. Please see photographs OO-1 through OO-17.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

4. Comments:

    i. The bathroom cabinet was taken apart for observation and identification. The cabinet was constructed with 1/8" plywood and ¾" particle board material. Dr. Smulski has identified these items as formaldehyde emitting materials.

    ii. During our inspection of the wood product panels, signs of moisture damage were noted.

LWFR-EXP 7-000101

     iii.  Please see photographs OO-13 through OO-17.

PP.    Cabinets-Wall and Built-In Units

   1.  Observations:

      i.  The wall and built-in clothes and pantry cabinets were disassembled for observation, photographing and documentation.

   2.  Photographs:

      i.  Please see photographs PP-1 through PP-34.

   3.  Codes, Standards, Testing or Engineering Assessments:

      i.  Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

   4.  Comments:

      i.  These units were constructed with 1/8" hardwood plywood, ½" particle board, and 3/8" hardwood plywood. The materials have been identified by Dr. Smulski as formaldehyde emitting materials. Several of the components were noted to have moisture damage and / or mold growth. These wood components have apparently been subjected to moisture and mold is present on those components.

     ii.  Please see photographs PP-2 through PP-5, PP-7 through PP-14 and PP-18 through PP-34.

QQ.   Furnace and Duct System

   1.  Observations:

LWFR-EXP 7-000102

    i.  Observations of the furnace duct system were performed prior to the disassembling of the travel trailer. A boroscope with photo and video capabilities was utilized to inspect the ducts in place. Indications were offsets and possible penetrations were present in the duct system.

    ii.  Physical inspection of the furnace duct system occurred during the time of the disassembling of the temporary housing unit. Observations noted in the condition of the ducts and their installation methods will be discussed in the comments section.

2.  Photographs:

    i.  Please see photographs of the furnace: QQ-1 through QQ-21.

    ii.  Please see photographs of the duct system:  QQ-22 through QQ-46.

3.  Codes, Standards, Testing or Engineering Assessments:

    i.  Suburban Manufacturing Corporation's Manufacturer's Instructions.

    ii.  NFPA 1192 and ANSI 119.2

    iii.  Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

4.  Comments:

    i.  The furnace was installed in the kitchen area. The ductwork was installed in the floor cavity between the floor joists. The unit is and LP gas operated furnace system.

LWFR-EXP 7-000103

ii. The plywood floor sheeting was removed for inspection of the furnace duct system. The furnace duct was not able to be removed without damaging portions of the duct. The ducts were fastened to the plywood floor sheeting and fasteners penetrated through the metal duct material.

iii. See photographs QQ-24, QQ-26 through Q-33, QQ-35 through QQ-41, and QQ-44. These photographs illustrate the unusual method of installing the duct system by stapling the ducts through the sheetmetal to the plywood and framing system.

iv. One area of the duct was cut at the seam to allow passage of a plumbing vent pipe.

v. Please see photograph QQ-26.

vi. The duct system did not have any stamps or markings to indicate the material met the codes and standards for proper materials or sealing methods.

RR.   Air Conditioning and Duct System

1. Observations – Boroscope Inspection:

i. A boroscope inspection was performed prior to the removal of the ceiling and air conditioning duct system. The boroscope with a small camera lens and a long extension allows us to view into typically inaccessible places and perform inspections. Photographic and video documentation were performed during that inspection.

2. Photographs:

LWFR-EXP 7-000104

    i. Please see photographs RR-1 through RR-3, RRII-1 through RRII-12, RRIII-1 through RRIII-8, RRIV-1 through RRIV-33, RRV-1 through RRV-14, RRVI-1 through RRVI-37.

3. Codes, Standards, Testing and Engineering Assessments:

    i. Please see NFPA 1192 and ANSI 119.2.

    ii. Please Enclosure 7, Ritter Consulting Engineers' report.

    iii. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

    i. The first observation noted the placement of the air conditioning supply register immediately next to the bathroom ventilation unit. The air conditioner is producing cold air and is placed immediately next to a non-insulated unsealed exhaust vent that leaks water. The mixture of hot and cold air is conducive to mold growth. There were areas on both sides of the ceiling panels that indicated that mold growth was occurring.

    ii. Please see photographs RR-1 through RR-3.

    iii. Please see photographs RRII10 through RRII12.

5. Observations: Physical Inspection

    i. Physical inspection of the duct penetration through the ceiling was performed. The penetration was sealed with unlabeled aluminum tape. The transition between the ducts and the ceiling was not insulated. This allowed for condensation to occur in the ceiling or on the ceiling area at the duct

LWFR-EXP 7-000105

penetration. Without a sufficient insulation around the duct and transition area, the hot, humid air in the attic will come into contact with the cold surface of the aluminum tape.

6. Photographs:

    i. Please see photographs RRII-1 through RRII-9.

7. Observation: Thermostat

    i. An inspection of the thermostat was performed. The thermostat combined the heating and cooling system controlling both systems with one thermostat. Photographs of the front and back side of the thermostat were taken for identification and documentation purposes.

8. Photographs:

    i. Please see photographs RRIII-1 through RRIII-8.

9. Observations: Mechanical Unit-Interior

    i. The interior portion of the air conditioning unit was inspected. The ceiling cover and filter were removed for inspection. Access to the unit and ceiling cavity was available. Mold growth was observed and photographed in the return and supply side sections of the air conditioning system. Mold was growing on wood, insulation and other materials inside the ceiling cavity and unit.

10. Photographs:

    i. Please see photographs RRIV-1 through RRIV-33.

11. Observations: Mechanical Unit-Exterior

LWFR-EXP 7-000106

i.  The exterior portion of the air conditioning unit was inspected. The unit was identified as a Duo-Therm QUICK COOL high efficiency unit. The model number was 59516.531.

ii. Please see photographs RRV-1 through RRV-11.

iii. The cover of the roof top unit was removed for inspection. There appeared to be a direct unsealed pathway between the interior of the roof cavity and housing unit and the exterior. Air and moisture infiltration can occur at this location.

iv. Please see photographs RRV-12 through RRV-14.

12. Observations:  Ceiling Duct System

i.  The ceiling duct system was exposed when the ceiling panels were removed.  The ducts were constructed of a thin foam board material and sealed with an aluminum tape.  No markings identified the duct material or the tape sealant material for compliance with the applicable code or standard for use of those materials.

ii. Inspection of the air condition duct revealed the following:

a.  The tape used to seal the joints was not fully adhered to the duct material.  Air leakage was made possible through those penetrations.

b.  Please see photographs RRVI-3 through RRVI-5, RRVI-8 through RRVI-27 and RRVI-31 through RRVI-37.

c.  The end caps of the ceiling duct were formed with aluminum tape.  There was no insulation board or insulation at the end of the duct.  Condensation can occur

LWFR-EXP 7-000107

because of the lack of insulation between inside and outside of the duct system. The dew point can be reached.

d. Please see photographs RRVI-1 through RRVI-2.

e. The manufacturer required an R-7 insulation material to encompass the duct system. This was not installed by Forest River. The ducts were insulated only over the top side of the duct. Even this one area formed an inadequate insulating barrier. The ductwork and roof truss compressed the ceiling insulation to the bottom side of the roof sheeting. This rendered the effectiveness of the insulation useless. The remainder of the duct system on the sides and bottom were fully exposed to the hot, humid air of the cavity.

f. Please see photographs RRIV-2 through RRIV-25.

13. Observation: Dometic Duo-Therm A/C unit:

i. Observations and Comments:

a. As is mentioned earlier in the report, the air-conditioning system installed in the Wright trailer is a Dometic Duo-Therm 595 QUICK COOL. The installation instructions were downloaded from Dometic.

On the first page of the Dometic document, a warning stating, "This manual must be read and understood before installation, adjustment, service, or maintenance is performed. This unit must be installed by a qualified service technician. Modification of this product can be extremely hazardous and could result in personal injury or property damage."

LWFR-EXP 7-000108

Along the lines of this warning, further modifications that could fall into this warning category can be the failure to properly install the ductwork system. Failure to install the ducts properly can and does cause negative air pressure drawing in the hot, humid, contaminated air into the trailer. In addition, drawing moist air into wall, ceiling and floor cavities can cause conditions conducive electrical shorts and fires. As the humid air is drawn into walls, ceiling and floor cavities, they come in contact with the metal components of electrical devices and appliances. The high moisture content of the air interacting with the metals of the electrical devices causes corrosion through oxidation. This corrosion or rust then creates a pitting of the metal parts of the device. This pitting or eating away of the metal can cause arcing or a jumping of the electrical charge between the various metal components, it can raise the temperature of the metal components and the sparks created by the arcing can cause fires.[71]

b. Under Section 1C, page 2, the manufacturer states, "The ability of the air-conditioner to maintain the desired inside temperature depends on the heat gain of the R.V." Some of the recommendations made by the manufacturer to reduce the heat gain is to keep windows and doors shut or minimizing usage.

The heat gain is a measurement of heat absorption and gain in temperature as a result of various conditions. The position of a unit or building; the number and size of doors and windows; the types of doors and windows and their insulating value and their ability to resist heat and air penetration; the types walls, ceilings and floors and the thickness of those systems; and the types of insulation and the thickness of insulation in the walls, ceiling and floor areas. The higher the resistance values of the walls,

---

[71] "The Effects of Smoke & Moisture on Residential and Commercial Electrical Systems" by Alexis Mallet, Jr.

LWFR-EXP 7-000109

ceilings and floors and the greater the ability to resist heat transferring from the outside to the inside of the trailer, the smaller the heat gain is. The lower the heat gain, the quicker and easier it is to cool the interior of the temporary housing unit. As we will discuss shortly, the type of wall, ceiling and floor construction did not permit a low heat gain transfer. This also makes higher temperatures available to increase off-gassing of formaldehyde.

Part of the calculations performed by Lagrange Consulting included the BTU gain. According to the report, the THU had a BTU gain of approximately 1,927 BTUs per hour.

c. As noted earlier, the air-conditioning manufacturer recommends to keep the windows and doors shut and / or minimizing usage. FEMA advised residents to open windows and doors to reduce odor levels. The recommendations are in contradiction to the air conditioning manufacturer's specifications.

The reason for the recommendation for opening the window is to balance the pressure in a normally air-tight unit. The air exhaust has to be made up by some introduction of outside air. The problem is that opening windows introduces hot, humid, unfiltered air in hot, humid climates.

The operation of the bathroom exhaust fan pulls hot air from high inside the coach and will pull fresh air from openings in the envelope.

d. Under Section 1D, Condensation, on page 2, the manufacturer has written, "**Note**: The manufacturer of this air-conditioner will not be responsible for damage caused by condensed moisture on ceilings or other surfaces. Air contains moisture and this moisture tends to condense on cold surfaces. When air enters the R.V., condensed moisture may appear on ceilings, windows, metal parts,

LWFR-EXP 7-000110

etc.  **The air-conditioner removes this moisture from the air during normal operations.  Keeping doors and windows closed when the air conditioner is in operation will minimize condensed moisture on cold surfaces.**" (Emphasis added)

The importance of this statement as it relates to the issues at hand with this temporary housing unit is that in a short paragraph, it explains what is occurring in the walls, ceilings and potentially floors of the unit.  It states that "the air contains moisture and the moisture tends to condense on cold surfaces."  Because of the failure of the manufacturer to construct a unit that prevents heat transfer from the exterior to the interior surfaces and the construction of the temporary housing unit is such that air is being transferred from the outside atmosphere to the walls, ceilings and floor areas and then to the interior surfaces, the dew point is reached the walls, ceiling and possibly floor areas.

It further states in Section D, "the air-conditioner removes the moisture from the air during normal operations." Normal operation is not meant to include the transfer of hot, humid air from the exterior to the interior raising the heat gain of the unit.   The reason the air-conditioning manufacturer is directing to keep the windows and doors closed when the air-conditioning system is in operation is because the fenestration or openings in the exterior walls in the form of windows and doors will cause the hot, humid air to come into the unit and cause condensation on the cold interior surfaces.  With the doors and windows closed, the air is drawn into the air leaks in the envelope of the unit and the condensation occurs inside the wall, ceiling and possibly floor system behind the finished vinyl or plastic covering of the wall and ceiling panels.

e.   Once again on page 6 of the Dometic installation instructions, the manufacturer warns that improper installation may damage equipment, could endanger life, or cause serious injury and / or property damage.

LWFR-EXP 7-000111

We reiterate this because the air-conditioning system was not properly installed because of the air duct leakage. The manufacturer requires the ducts and their joints to be sealed to prevent condensation.

f.  Air distribution system:

i.  On page 7 of the Dometic installation instructions of the Dometic manual, directions for the air distribution system are given. They state as follows:

"The installer of this air-conditioner / heat pump system must design the air distribution for their particular application. Several requirements for this system **MUST** be met for the air-conditioner / heat pump to operate properly. These requirements are as follows:

1.  The duct material must neither exceed any agency or RVIA standard that may be in existence at the time of production.

2.  All discharge air ducts must be properly insulated to prevent condensation from forming on their surfaces or adjacent surfaces during operation of the air-conditioner / heat pump. This insulation must be R-7 minimum.

3.  Ducts and their joints must be sealed to prevent condensation from forming on adjacent surfaces during operation of the air – conditioner / heat pump."

There is a caution block below the sizing information near the center of the page. It states, "**CAUTION**. It is the responsibility of the installer to insure the ductwork will not collapse or bend during or after the installation. Dometic Corporation will not be liable for roof, structural or ceiling damage due to improperly insulated, sealed or collapsed ductwork."

LWFR-EXP 7-000112

It is clear by the instructions given by Dometic that the joints and ducts must be sealed to prevent air leakage and condensation. It is also very clear that Dometic is informing the installer of the air-conditioning system that structural or ceiling damage due to improperly sealed ductwork is a distinct possibility. This is directly on point with the information that we have provided regarding hot, humid air infiltration from the exterior into the wall and ceiling cavities and that the duct leakage will result in negative air pressure and that negative air pressure will suck in the hot, humid air from the exterior into the ceiling and wall cavities and that severe damage to the unit as well as potential harm to the occupants are a very distinct possibility.

g.  Prevention of Air Leakage:

i.  Page 8 of the Dometic manual, Section 5b(4) under Air Distribution System Installation instructs the installer to provide adequate support and prevent air from being drawn into the roof cavity during the installation of the air conditioning unit on the roof. Once again, this coincides with our presentation that air infiltration bring in hot, humid contaminated unfiltered air is harmful to the building and the occupants.

14. Codes, Standards, Tests or Engineering Assessments:

a.  Please see Enclosure 7, Ritter Consulting Engineers' report.

b.  Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

c.  NFPA and ANSI Standards.

15. A review of the Standard on Recreational Vehicles 2002 Edition produced by ANSI and NFPA was performed. The particular standards that govern the design, construction and operation of recreational

vehicles under these organizations are ANSI A119.2 and NFPA 1192. The particular edition that would govern the Alexander temporary housing unit would be the 2002 Edition.

a. The standard on page 8 gives the definition of recreational vehicles, camping trailers and travel trailers that are governed under this standard. The Wright temporary housing unit falls within the definition of this standard.

b. Section 5.6.2.5, Special Requirement for Forced - Air Heating Appliances, states, "A forced-air heating appliance and its return-air system shall be designed and installed so that negative pressure created by the air circulating fan cannot effect its or another appliance's, combustion air supply or act to mix products of combustion with circulating air."

The standard is very clear that negative air pressure has the potential for a detrimental effect as a result of the operations of the furnace. Contaminated air and fumes from the forced-air system can re-enter the home as a result of the negative air situation sucking those fumes back into the housing unit.

c. Section 5.6.3.1 (3), Venting, Ventilation and Combustion Air, Installation of Venting and Combustion Air Systems requires that every joint of a vent, vent connector, exhaust duct, and combustion air intake shall be secure and in alignment. This is to prevent air leakage into the interior living space of the housing unit. Because the malalignment of joints and ducts cause leakage, the intent of the code is to prevent re-entry of the fumes from the forced-air system into the living space.

d. Section 5.6.9.3, Prevention of Negative Pressure in Recreational Vehicles, found on page 19, specifically deals with fuel burning clothes dryers. While there is no clothes dryer designed for or installed in the Alexander unit, it is clear that prevention of negative air pressure is the intent of the code and on every section involving areas of potential re-entry of contaminants and moist air, the code is designed to prevent such events from occurring.

LWFR-EXP 7-000114

e. Section 5.7.1, Supply System Ducts, directs the manufacturer to use durable construction that can be demonstrated to equally resist fire and deterioration. The call for ducts that are resistant to deterioration is once again to prevent air leakage into non-air-conditioned spaces which cause negative air situations to occur which is conducive to potential deterioration to the building's components and unwanted contamination that may affect the occupants of the housing unit.

f. Section 5.7.7, Return Air Duct Permanent Unclosable Openings, page 21, requires some mechanism to prevent areas from being closed off to the return air of the furnace system. This is meant to prevent imbalanced air pressures in various areas of the house. By closing areas off from one room or one area to another preventing air return to the forced-air furnace system creates a negative air pressure condition within the housing unit. If air from a room that is closed off cannot be returned to the unit, the unit will then draw from other openings in the envelope of the trailer drawing in unconditioned, unfiltered, contaminated air.

g. Section 5.7.8, Air Duct Joints and Seams can be found on page 21 of the code. The code requires that joints and seams of ducts shall be securely fastened and made substantially air-tight. Noted in that section of the code is the permissible use of tape or caulking compounds to force mechanically sealing the joints and seams of the ductwork. It is also noted that within that portion of the code that the use of tape and caulking compounds shall not be subject to long exposure to conditions of high humidity, excessive moisture or mildew.

Exposure to tapes such as duct tape or other similar type adhesive compounds do not stick under high moisture, high humidity or when mildew is present. Negative air pressure drawing in humid air from the exterior of the building will attack these sealants.

h. Section 5.8.1, General Requirements - Air-Condition Appliances, can be found on page 21 of the code. This portion of the code requires every air-conditioning appliance or combustion air-conditioning and heating appliance to be installed in accordance with the terms of its listing and the manufacturer's instructions.

LWFR-EXP 7-000115

i. Section 5.8.2.1, Installation of Air-Condition Appliances, reiterates the requirement to conform with the manufacturer's installation instructions.

It is a requirement of the code to follow the installation instructions of the air-conditioning manufacturer. It has been well documented earlier in this report that duct leakage and negative air conditions as a result of improper installation of the system not only fails to follow the instructions of the manufacturer of the air-conditioning system but in fact is a code violation.

SS.   Ventilation

1. Observations:  Bathroom and Kitchen Hood

   i. Inspection of the bathroom exhaust vent and kitchen hood exhaust indicates there is no fresh air intake to make up the air exhausted from these ventilators.

   ii. The methods of ventilation were reviewed.  The available methods were limited to mechanical units and passive air movement.

   iii. Also noted during the inspection is that air is infiltrating into the ceiling cavity.  The penetrations are not properly sealed and insulated to prevent air movement into the conditioned air space of the house.

2. Photographs:

   i. Please see photographs SS-1 through SS-22.

3. Codes, Standards, Testing or Engineering Assessments:

   i. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

LWFR-EXP 7-000116

i.   Noted during the inspection is that air is infiltrating into the ceiling cavity.  The penetrations are not properly sealed and insulated to prevent air movement into the conditioned air space of the house.

ii.   Please see photographs SS-4 through SS-17.

iii.   Mold growth and moisture were noted on the ceiling cavity side of the ceiling sheeting.

iv.   Please see photographs SS-19 through SS-22.

v.   The different ways of ventilation available in this THU are by means of mechanical or passive methods.

vi.   The mechanical method utilized was exhaust fans in the kitchen and bathroom areas.  These fans operate only when manually engaged.  Someone has to turn a switch on for them to operate. There is no automatic means installed to start the operations of these units if ventilation is needed.

vii.   As mechanical exhaust fans remove air, they do not draw in air that can be filtered prior to it entering into the living space of the home.  The air drawn into the house is unfiltered and moist.

viii.   The Dometic air conditioning manufacturer's installation instructions state this method of ventilation is not proper for the occupants living in the hot, humid climate zone of New Orleans, Louisiana.

ix.   The other method of ventilation is to open the windows and doors on an on-going basis to ventilate the contaminants, such as formaldehyde.  This is not a desirable option in the months of May through September in this climate.  The goal is to have the indoor air quality in a house that is cleaner and drier than the outside air.

LWFR-EXP 7-000117

    x. The issue regarding the exfiltration of high indoor relative humidity and other contaminants, such as formaldehyde gases within the Wright temporary housing unit is not limited to a matter of simply opening windows and doors for ventilation or the addition of a vent in the bathroom to introduce fresh air or expel the formaldehyde within the housing unit.

## TT. Plumbing Fixtures

1. Observations:

    i. The plumbing fixtures utilized in the travel trailer were a double kitchen sink and faucet and a lavatory, commode and tub/shower in the bathroom.

2. Photographs:

    i. Please see photographs TT-1 through TT-10.

3. Comments:

    i. Moisture damage was noted at the base of the commode. Apparent water infiltration through the unsealed exhaust vent in the bathroom caused corrosion of the bolts that hold down the commode.

    ii. Please see photographs TT-1, TT-6, TT-7 and TT-8.

    iii. The tub / shower unit was composed of a tub with a three-piece shower surround. Moisture was noted behind the tub area.

    iv. Please see photographs TT-2, TT-9 and TT-10.

    v. The plumbing system was reconfigured on the FEMA units. The fresh water, gray water and black water holding tanks were removed and direct connections to the city sewer system were made. The vent pipe was installed externally on the right wall of the unit.

LWFR-EXP 7-000118

      vi. These steps along with placing the unit on piers converted the travel trailer to a temporary housing unit.

     vii. Please see photographs TT-3, TT-4 and TT-5.

UU.   Electrical Lights, Wiring and Systems

  1. Observations:

     i. The service panel, electrical wiring and electrical devices were removed, inspected and photographed. Deficiencies were noted during the inspection.

  2. Photographs:

     i. Please see photographs UU-1 through UU-9.

  3. Codes, Standards, Testing or Engineering Assessments:

     i. Please see Enclosure 4, Electrical Systems Observations Report by J. Darrell Hicks Consulting, P.E.

  4. Comments:

     i. The electrical system was entirely exposed for inspection. Corrosion was noted on one or more of the outlets or switches inspected. Additionally, low voltage wiring was not installed per the NEC or NFPA codes.

     ii. As a housing unit, the smoke alarm should have been hard-wired to the electrical system. The smoke alarms installed in the Wright THU were battery operated.

     iii. Wires noted were consistently cut in the same location on almost all of the outlets in the unit. It appears that this was a workmanship issue.

     iv. Wires below the trailer were not installed to code.

LWFR-EXP 7-000119

VV.   Jacking, Blocking and Measurements - Shaw

   1. Observations:

      i. Our organization made observations of the jacking and blocking performed and measurements taken by consultants on behalf of Shaw.

   2. Photographs:

      i. Photographs have been previously provided in exchange of photographic and video documentation.

   3. Comments:

      i. Comments regarding the jacking, blocking and measurements performed and taken by consultants for Shaw will be supplemented once their reports have been produced and made available to our organization.

WW.   Jacking, Blocking and Measurements – First General Services

   1. Observations:

      i. Our organization performed jacking, blocking and measurements of movement in the wall, window and door system of the Wright temporary housing unit. Our findings will be discussed in the comment section below.

   2. Photographs:

      i. Please see photographs WW-1 through WW-315.

   3. Codes, Standards, Testing or Engineering Assessments:

      i. Please see Enclosure 2, Freyou, Moore and Associates – Structural Condition Assessment.

4. Comments:

    i. Our organization utilized 12-ton hydraulic hand jacks, digital and bubble levels, PRG, Inc. crack monitor devices, and Rieker Electronics, Inc. digital inclinometers. The frame was jacked up from the rear to the front in 2" increments. The inclinometer and crack monitor device readings were photographed at most increments. The movement between the window frame and window sashes, the door frame and door leaf, and the pitch and roll of the trailer were measured and documented.

    ii. The end result was 3/8" to ½" flexing of the unit. The unit did not fully recover after it was placed on the piers.

    iii. Please see Freyou, Moore and Associates report for in-depth analysis and explanation.

XX.    Wood Component Inspection

1. Observations:

    i. The wood walls, ceilings, floors, cabinets and other wood products, excluding the structure, were removed, observed, photographed for identification of formaldehyde emitting products.

2. Photographs:

    i. Please see photographs XX-1 through XX-77.

    ii. This is a partial documentation of the wood components removed from the Wright unit. The items noted in these photographs were damaged by water or mold.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure 6, Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009.

4. Comments:

    i. Each wood component of the interior of the housing unit was taken apart for inspection, photographing and documentation. First General Services and Dr. Smulski disassembled the unit to perform this inspection.  As the unit was being disassembled, notes or photographs were taken to record the condition of paneling with either moisture or mold damage, then the paneling was removed to a location on site for further documentation and identification of these items.

    ii. Dr. Smulski then identified the various wood components as formaldehyde emitting or non-formaldehyde emitting materials. From these components, samples were taken for testing purposes if necessary.

    iii. Dr. Smulski produced his report and filed it with this writer for his use and incorporation in the production of this report.

    iv. All formaldehyde emitting wood products are noted in Dr. Smulski's report.

YY.   Temperature and Humidity Data Loggers

1. Observations:

    i. Data loggers were placed by First General Services and Ritter Consulting Engineers to monitor and document the temperature and relative humidity on the interior and exterior of the unit during a one week time period that inspections were on-going.

2. Photographs:

    i. Please see photographs YY-1 through YY-10.

3. Comments:

    i. Data logger #1 was placed on the roof top for the duration of one day.

LWFR-EXP 7-000122

     ii. Data loggers #2, #3 and #4 were placed on the bedroom wall adjoining the kitchen. RCE data logger #5 was placed at the underside of the air conditioning vent near the return air.

     iii. RCE data logger #6 was placed on the inside of the air conditioning unit at the ceiling.

     iv. RCE data loggers #7, #8 and #9 were placed on the wall between the bunk bed area and the dining room table area.

     v. RCE data logger #10 was placed on the under-carriage of the unit at the rear, left area.

ZZ.    Envelope Air Leakage Test

   1. Observations:

     i. The Wright temporary housing unit was tested for envelope air leakage. This test indicates the quantity of air that is leaking through the walls, ceilings and floor system and quantifies the amount of leakage.

     ii. Envelope air leakage tests and infrared thermographic imaging identified and quantified air leakage into the THU.

   2. Photographs:

     i. Please see photographs ZZ-1 through ZZ-3.

     ii. Please see photographs in the LaGrange Consulting report.

   3. Codes, Standards, Testing or Engineering Assessments:

     i. Please see Enclosure 3, LaGrange Consulting L.L.C. Inpsection Report.

   4. Comments:

LWFR-EXP 7-000123

i. Envelope air leakage tests and HVAC (heating, ventilating and air-conditioning) duct leakage tests were performed to assess and measure any air leakage in the walls, ceilings and floors of the unit.

ii. Mr. Paul LaGrange with LaGrange Consulting, Inc. was engaged to perform the air leakage tests on the unit and ductwork.

iii. The envelope of the building was first tested for air leakage. The building was depressurized. The natural air change per hour was documented at 2.8 times per hour every 43.7 minutes or equivalent air leakage of 58 square inches.

iv. According to the ACH 50 calculations, the air exchange is 181 cfm.

v. This hot, moist air comes into contact with the untreated raw surfaces and edges of the formaldehyde emitting wood and wood products and also mixes with the colder air leaking from the return air duct allowing condensation to form in the ceiling cavity.

vi. According to the experts, formaldehyde off-gassing is doubled for each 12°F with the rise in temperature, humidity or both. This unfiltered, contaminated air filled with moisture and heat is transported into the living area of the trailer through cracks in the seams, around duct registers, light fixtures, and all other penetrations that are not sealed.

AAA. Infrared Thermographic Survey – First General Services

1. Observations:

i. Infrared thermographic imaging of the envelope revealed deficiencies in the heat and air barrier of the house.

2. Photographs:

       i. Please see the infrared photographic images 1 through 39.

3. Codes, Standards, Testing or Engineering Assessments:

       i. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

4. Comments:

       i. An infrared thermographic survey was performed on the interior of the building prior to the envelope air leakage tests and the furnace and air-conditioning duct leakage testing utilizing a Flir Infrared camera model BS20. Not all areas were easily accessible to perform a survey. The survey was performed for the purposes of identifying temperature anomalies in the walls, ceilings and floors of the Wright temporary housing unit. Air and moisture leaks or condensation would show as temperature differentials noted by the variations of color during the survey. A number of these anomalies were photographed using the Flir BS20 camera.

BBB. Air Conditioning Duct Leakage Test

1. Observations:

       i. Testing confirms and quantifies the leakage of air from the duct supply portion of the air conditioning system.

2. Photographs:

       i. Please see photographs BBB-1 through BBB-6.

      ii. Please see photographs including in the report by LaGrange Consulting.

3. Codes, Standards, Testing or Engineering Assessments:

       i. Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

LWFR-EXP 7-000125

4. Comments:

    i. In conjunction with the leakage testing on the trailer, the ductwork for the air-conditioning system was also tested for leaking. The results for that test indicated the air-conditioning ductwork had a leakage rate of 16 cubic feet per minute of air to the outside and 18 cubic feet to the inside. This totals 34 cubic feet of air loss from the ductwork.

    ii. More importantly, the air leakage to the exterior of the ceiling and wall cavities can create a negative pressure condition on the interior of the trailer. As the air from the ducts leak into the ceiling and wall cavities from the ductwork supplying the cold filtered air into the trailer, the return air portion of the air conditioner is drawing back into the air-conditioning unit the same quantity of air that it is producing.

    iii. With the air-conditioning duct leaking 16 cubic feet of air per minute outside of the trailer, the return air system can draw in or suck in air into the ceiling system of the trailer through these various unsealed cracks and joints into the inside of the building. This hot, humid contaminated air is unfiltered. This air intermingles with the wood and wood products that can emit formaldehyde gas and draw them into the building.

    iv. The ducts for the air-conditioning system are not properly sealed. This is a workmanship issue. Had the ducts been properly installed and sealed at the factory, the duct leakage would not have occurred.

    v. In the hot, humid temperature zone in which New Orleans, Louisiana is located, temperatures are in the 90°F range for most of the late spring through early autumn. This begins somewhere in may and continues through the months of June, July, August and September. Along with the rise in temperature, South Louisiana also experiences a significant rise in relative humidity. The higher the relative humidity, the more "muggy or sticky" the contents inside your home and body feel. Dropping temperatures down from 100°F or more degrees on the interior of the trailer down to 70°F to 75°F which is the

LWFR-EXP 7-000126

normal comfort level would take quite a number of hours to obtain. While the cooling is not the issue and the number of hours it actually takes to cool is not the issue, the real issue is the air conditioning system is running for many hours sucking in the contaminated, hot, humid air from the exterior to the ceiling of the trailer.

vi. As the temperature gets colder on the interior of the trailer, vapor pressure differentials become a factor. The colder, drier air will attract the hotter, wetter air from the exterior drawing it in towards the interior. The vapor pressure is assisting in the transportation of the hot, humid, contaminated air from the outside into the wall, ceiling and floor cavities and eventually into the interior of the trailer where the occupants are living. An example to explain how the wet, hot air of the exterior is driven into the colder, drier air on the interior of the trailer, we can use the example of a small amount of water spilled on the floor. If we take a dry sheet of paper towel and place it flat on the floor and just place one corner of the paper towel connecting with the spilled water, the water will be attracted to the sheet of dry paper.

CCC.  Furnace Duct Leakage Test

1. Observations:

    i.  Duct leakage test indicates the ducts are not properly sealed.

2. Photographs:

    i.  Please see photograph CCC-1.

3. Code, Standards, Testing or Engineering Assessments:

    i.  Please see Enclosure 3, LaGrange Consulting, L.L.C. Inspection Report.

    ii. Please see Enclosure 7,R itter Consulting Engineers' Report

    iii. Please see NFPA 1192.

LWFR-EXP 7-000127

     iv.  Please see ANSI 119.2.

4.  Comments:

     i.  The information provided by the HUD Procurement Specifications indicated a 34,000 BTU unit was to be provided with this housing unit. Examination of the Wright unit revealed that it was a Suburban Manufacturing Company forced-air heating unit.

     ii.  The furnace is believed to operate on LP gas. The source of the LP gas is two LP tanks located at the tongue end of the trailer.

     iii.  The exhaust vent for the furnace is located outside the unit on the right side.

     iv.  We engaged the services of one of our team members, LaGrange Consulting, L.L.C. Part of the LaGrange Consulting's charge was to test the heating duct system for air leakage.

     v.  The results of the heat system duct leakage tests indicated the following:'

         a.  Leakage of the 18 cubic feet per minute of air to the outside and duct leakage to the inside of 178 cubic feet per minute of air for a total duct leakage of the heating system of 196 cubic feet per minute.

         b.  The furnace duct leakage is attributed to poor quality workmanship during the construction of the unit. The ducts were not sealed, numerous nails and staples penetrated the duct work, the ducts were not insulated and the ducts were not constructed with a stamped UL rated material. The manufacturer failed to design or construct a duct system that:

            i.  Did not leak air

LWFR-EXP 7-000128

ii. Would have not created a negative air pressure condition in the temporary housing unit and;

iii. Would have created unsafe conditions by the potential of drawing the fumes from cooking and operations of the furnace back into the living area of the trailer.

Please see Enclosure 3, Lagrange Consulting, L.L.C. Inspection Report.

DDD. Indoor Air Quality Tests

1. Observations:

i. Indoor air quality tests were performed to identify the present levels of formaldehyde off-gassing in the Wright trailer. Tests were previously performed in the first part of 2008, just after Mr. Wright moved out of the FEMA unit.

ii. Microbial testing was performed during our testing and inspection in August 2009 to identify microbial contaminants.

2. Photographs:

i. Please see photographs DDD-1 through DDD-7.

ii. Please see photographs in Section Q.

3. Codes, Standards, Testing and Engineering Assessments:

i. Please see W.D. Scott and Associates Urea Formaldehyde Test Results.

ii. Please see Enclosure 5, W.D. Scott and Associates Microbial Growth Report.

4. Comments:

LWFR-EXP 7-000129

i. Mr. Wright reported that he experienced an odor in the FEMA trailer throughout the time he occupied it. He stated originally the temporary housing unit had a "new smell." Once that new smell dissipated, it was replaced with an odor. As stated earlier in the report, he made repeated attempts to discover or remove the odor from his home. He stated he cleaned constantly with cleaning materials and deodorized the carpets, but as soon as the masking from the scents of the deodorants dissipated, the odor would return. He noted mold growth in at least one area of the home in the bedroom area below the window.

ii. Tests for formaldehyde emission levels were performed on October 1 and 2, 2008 by W.D. Scott and Associates. The test results indicated the level of formaldehyde at 44 ppb.

iii. The formaldehyde emissions tests were performed again on August 6 and 7, 2009. The results of those tests indicated formaldehyde emissions of 130 ppb.

iv. During the testing and inspection phase in August 2009, microbial tests of different sorts and different materials or areas were performed in or on the unit and its components. W.D. Scott and Associates performed these tests. The test results are shown in his report.

EEE. Warning Labels

1. Observations:

i. There were numerous warning provided on the interior, exterior and owner's manual of the THU.

ii. One of the warnings above the stove area stated, "Warning. Your vehicle like other vehicles may contain small amounts of one or more substances that are known to the State of California to cause cancer, birth defects or other reproductive harm." In addition, the owner's manual also contained a statement regarding formaldehyde in building materials.

LWFR-EXP 7-000130

    iii. The owner's manual states the R.V. is designed for short term and recreational use.

2. Photographs:

    i. Please see photograph EEE-1.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure 6, Affidavit by Stephen Smulski, Ph.D., dated September 29, 2009.

    ii. The building codes provide a requirement for a safe and healthy environment.

4. Comments:

    i. In Dr. Stephen Smulski's report dated September 29, 2009, there is an in-depth analysis of the amount of wood product and formaldehyde containing products that were utilized in the design and construction of the Wright housing unit. Dr. Smulski goes into great detail regarding each and every wood product, wood containing product, or other formaldehyde products that were utilized in this housing unit. He stated, "the subfloor, walls, ceiling, doors, cabinets, dining table, countertops, built-in seating and other furniture, and bed supports are all constructed from wood based composite products, particle board, medium density fiberboard and hardwood plywood that are all known to release formaldehyde gas after being placed in service." He also observes and notes that the back side and edges of most of these items are exposed with no overlay to prevent infiltration of the formaldehyde emissions from entering into the living area of the trailer. He notes the location of the FEMA temporary housing unit's location in New Orleans, Louisiana and its exposure to the hot, humid climates of this region. He states, "These are the exact conditions that maximize the release of formaldehyde from

wood based composite panels including particle board, medium density fiberboard, and hardwood plywood."

ii. Because of the small size of the unit, the formaldehyde emissions are more concentrated in the temporary housing units than they would be in either a normal sized house or a commercial building. The larger the building, the less the concentration of formaldehyde disbursement in the building by proportion. The larger the house or the building, the less the formaldehyde that is in that building. Dr. Smulski opines "the travel trailer supplied by FEMA to Mr. Wright was not suitable for use as long-term housing because it was foreseeable and predictable that formaldehyde gas would be released from the wood based composite panels including particle board, medium fiber density fiberboard, and hardwood plywood used in the trailer and that Mr. Wright would potentially suffer adverse health effects from chronic exposure to the formaldehyde gas."

Alternative non-formaldehyde containing methods and materials that were available use in the construction of the Wright temporary housing unit are listed below.

This writer is aware through research that relative humidity and temperature affect formaldehyde off-gassing and mold growth. To prevent or lessen these conditions, he is aware of and uses the following materials, means and methods in construction and consulting companies.

1. Materials and methods were available at the time of construction of the Wright temporary housing unit that would have lowered or prevented formaldehyde off-gassing concentrations within the Wright house. In Dr. Smulski's report, he itemizes and enumerates the various wood products that were available at the time of the construction of the Wright temporary housing unit and that would have eliminated this problem. Items such as hardboard paneling in lieu of hardwood paneling, OSB board using non-formaldehyde materials and other products using non-formaldehyde releasing materials were also available at that time.

a. This information is available from Composite Panel Association publications.

LWFR-EXP 7-000132

    b. This writer is familiar with the use of low or non-formaldehyde emitting products. Our organization performs repairs and reconstruction of damaged mobile homes. HUD requires the use of low formaldehyde emitting products in manufactured houses. When performing our repairs, we must adhere to the HUD code and use conforming products.

2.    One type of product that was available when the Wright house was built is an air seal barrier placed below the exterior skin of the exterior walls. This air barrier would have eliminated or severely reduced the amount of air and moisture penetration through the wall system. This moisture became available to raw materials that contained formaldehyde. The use of a Tyvek type product is a common practice utilized in the hot, humid temperature region of the country. This method of construction has been researched and written about in various books and publications for approximately twenty years.

3.    The alternative use of a hardboard paneling with a permeable finish (a finish that would allow the wall system to breathe and not retain moisture within the panel material or in the cavity of the wall) could have been used. Hardboard panels have been used in manufactured homes (mobile homes) for a number of years. This is not a new technology or is it new to the industry. These materials could be used on both the walls and ceiling areas.

4.    Higher density insulation could have been utilized within the thin wall system, such as foam insulation or an insulation board. This would have not only assisted in limiting the penetration of moisture from the exterior to the interior of the temporary housing unit but would have also helped to address the issues with condensation occurring as a result of dew point temperatures being reached in the wall and ceiling cavity. The cost will be provided upon request.

    a. One of the most significant changes or alternative methods that could have been utilized in the construction of the Wright unit is the replacement of the 1 ½" fiberglass unfaced insulation with a closed cell spray foam polyurethane insulation. If we achieve an R-14 insulating value in the wall system and approximately R-18 in the ceiling system, we will eliminate the material in the wall system from reaching a dew point. Each inch of closed cell SPF insulation has an R- value of 7. Two

LWFR-EXP 7-000133

inches of closed cell SPF insulation would give us the needed R-14 rating. At least as important as the R- value is the perm rating of the closed cell SPF insulation. The perm rating is 1 or less which means it is classified as a water and vapor barrier. This would accomplish several different challenges. With the SPF closed cell insulation, the designer of the housing unit could achieve the R-14 value desired and have a vapor barrier installed in one function. As a precaution, we would want to also include the air and moisture barrier wrap around the perimeter of the exterior walls. This would then carry over the separation in the SPF insulation at the wall framing and prevent thermal shorting from occurring.

b. One added bonus to the use of the closed cell insulation is the additional strength this product adds to the framing system. The closed cell material attaches to the framing wall and also creates a solid unit within the cavity of the wall increasing the strength of the wall. This would help to address some of the concerns that were expressed by Charles David Moore, a structure engineering expert, in the report attached in our enclosures.

c. Addressing the ceiling cavity, we want to achieve somewhere around an R-18 value. Using 2 ½" of SPF insulation gives the 17 ½ to 18 R- value we are looking to accomplish. In addition to the EPDM type roof membrane, the SPF material would prevent any water or water vapor from transmitting from the exterior to the interior through the roof or attic system.

d. The additional benefits of added strength to the roof system would be applicable with the SPF material in the ceiling cavity.

e. The use of the SPF insulation material also has the benefit of sealing the areas of air leakage in the exterior surfaces of the wall system in conjunction with the Tyvek-type air barrier covering.

f. There are major benefits to the use of the closed cell SPF insulation material:

LWFR-EXP 7-000134

i. We achieve the R- value necessary to prevent the dew point from being reached in the wall and ceiling cavities of the unit which in turn prevents the manifestation of condensation.

ii. The air leaks in the envelope are sealed to prevent the passage or movement of hot, humid air from the exterior of the unit to the interior living space and filtering any contaminants.

iii. The SPF insulation adds strength to the structure assisting the structure as it pertains to wind loads as discussed by our engineer.

iv. The increase of R- value in the wall and ceiling systems will assist in retaining the cold air conditioned air in the living unit.  The occupant would have a more comfortable temporary housing unit; a housing unit that has a lower cost of operation of air conditioning and heating; and a healthier safer environment for the family.

v. Another benefit of the usage of the spray foam insulation is it would seal the ducts in the attic and prevent air leakage from the ducts and adding to the R- value of the duct system thereby preventing condensation occurring around the ducts.

vi. Closed – Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation gives the data for the use of this product.

5. While this is not an alternative method of construction, it is one of absolute necessity in the prevention of negative air pressure occurring and drawing hot, humid unfiltered contaminated air into the living area of the Wright house.  This item is simply for the Forest River to have performed the work in which they were commissioned to do in a superior workmanlike manner according to the FEMA Procurement Specifications.  Simply having taken the time to properly install the air conditioning and heating ductwork and insuring it was sealed air-tight would have an improvement in lowering the amount of moisture and hot air available to reduce formaldehyde off-gassing.  The manufacturer either failed to properly train the installers of the air conditioning and heating duct system and / or the manufacturer failed to properly supervise the workers installing the air conditioning and heating duct system.  The manufacturer failed to not only fulfill the requirements of FEMA

LWFR-EXP 7-000135

Procurement Specifications, Forest River also failed to follow the air conditioner manufacturer's installations and the NFPA and ANSI codes and standards that apply to this unit.

6.      Positive pressure inside the unit pushing the hot, humid contaminated air away from the wall, ceiling and floor cavities would have helped to significantly reduce the possibility of the introduction of any vapors into the living area of the unit.

7.      The workmanship of the overall construction of the FEMA trailer could have also prevented many of the air leaks into this housing unit. The lack of superior workmanship and the failure to properly supervise the installation of the sealing of the envelope has produced pathways for the hot, humid, unfiltered air to penetrate into the living area. Once again, the requirements of the specifications for procurement regarding air and moisture sealing of the unit failed to be adhered to by the manufacturer.

8.      In addition to the above mentioned quality control methods, the manufacturer could have tested the ductwork for air leakage. Instruments are readily available and are reasonably inexpensive for testing of duct installation for air leakage. The cost per unit of production to purchase the equipment to test the duct leakage should have been minimal. That cost will be provided upon request.

9.      A fresh air venting system could have been installed to the HVAC system. The air exchange rate would be increased by the use of that ventilating system.

10.     The use of a lower BTU capacity air conditioning system should be a cost savings rather than an expense. The additional expense would be in adding the fresh air system to this unit. In lowering the BTU capacity of the system, dehumidification would be increased on the interior of the building making it drier and cooler to the senses. The drier the air on the interior of the unit, the less need to have the air conditioning system cycle on and off; therefore, the thermostat and the comfort level of the occupants would remain satisfactory.

11.     Use of better construction controls would have produced a higher quality unit.

LWFR-EXP 7-000136

12.     Performing calculations or jacking tests would have identified issues with that procedure.

13.     Use of better building methods would have eliminated water leaks.

## SECTION VII

### DISCUSSION OF RESEARCH AND DATA REVIEWED

4. The numerous rounds of testing for formaldehyde in the FEMA trailers began after occupants began filing health complaints with FEMA. Occupants informed FEMA that they were having issues with strong odors, burning or irritated eyes, skin irritations, sinus problems and headaches shortly after occupying their homes or during the course of their occupancy.

5. Reports by Lawrence Berkely Laboratory, the National Center for Environmental Health, Dr. Stephen Smulski and other documents reviewed, give indication of the following:

   a. Of the studies reviewed, persons interviewed, and test reports and data gleaned in preparation of our assessment, the following factors appear to be held in common:

      i. As temperature rises, the rate of release of formaldehyde increases.

      ii. As humidity rises, so does the release of formaldehyde.

      iii. Adequate ventilation is required to ex-filtrate formaldehyde released into the envelope of the travel trailers.

6. A review of the testimony of Mary DeVany before Congress gave indications that formaldehyde emissions double for every 12°F increase in temperature.

7. The FEMA temporary housing units were apparently constructed as per the minimum procurement specifications established by FEMA for Model Travel Trailers dated July 14, 2005.

   The standards state that "the travel trailers being procured under this contract are for the purpose of providing temporary housing. The units are subjected to continuous road travel, multiple installation and deactivations, and various weather conditions. The standards shall not be considered restrictive in that the supplier may provide equal or better units considering that the competitive price and delivery requirement can be met."

LWFR-EXP 7-000138

The construction outfitting standards identify minimum square footage of living space, floor plan configuration, finishes, finishing and environmental living conditions necessary to provide emergency housing for disaster relief operations.   All exterior openings, such as windows, doors, drain pipes, etc...will be caulked with a clear, non-hardening waterproof sealant to prevent air and moisture penetration.

The units shall meet industry standards except where identified.

The specifications establish the minimum standards for travel trailer construction and outfitting to meet FEMA contract requirements.   "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."

LWFR-EXP 7-000139

# SECTION VIII

## DISCUSSION OF RESULTS

As a result of observations made, components and systems reviewed, testing performed, and disassembly of the THU, we have assessed there is enough information available to determine to a degree of probability or certainty whether or not the construction and installation of the Wright THU was made defective by the effects of jacking and blocking the housing unit, the assembly of the housing unit components, the air conditioning duct air leakage, the quality of workmanship employed, the use and placement of certain materials and failing to follow industry standards and codes.  The data presented in the body of this report supports the conclusions drawn and discussed in the "Conclusions" section below.

LWFR-EXP 7-000140

## SECTION IX

## CONCLUSIONS

Based upon observations, photographic documentation, our testing results, a review of documents provided to us, a review of testing data provided to us and other technical studies and reliance materials, the rendering of the following conclusions and statement of opinions would appear to be warranted regarding the Lyndon Wright temporary housing unit:

A. The Forest River Travel Trailer was converted into a THU per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005. Was the manufacturer required to conform to the building codes and standards applicable at the time of construction and installation?

Conclusion: Forest River was required to follow at a minimum the FEMA specifications, the ANSI, NFPA, NEC and ASHRAE Standards. It is also our opinion the IBC and IRC and the New Orleans Building Codes should have been followed.

B. Did the Forest River travel trailer comply with industry codes and standards such as NFPA, ANSI and state and local building codes?

Conclusion: No. Forest River did not comply with the applicable codes and standards.

C. Was the Forest River Wright THU constructed for use in various weather conditions per the FEMA model travel trailer procurement specifications dated July 14, 2005?

Conclusion: The Wright THU was not constructed for use in hot, humid climates.

D. Did the Forest River THU construction means, methods and materials utilized contribute to environmental living conditions that contributed to the manifestation and growth of mold and off-gassing by failing to properly seal windows, doors, plumbing pipes, etc. as required by the FEMA procurement specifications?

Conclusion: Yes. Forest River did not construct a unit that would prevent

LWFR-EXP 7-000141

water, air, heat and moisture from penetrating into the THU.

E. Did the jacking and blocking cause damage to the housing unit and what affect did it have on air and moisture infiltration into the wall, roof and floor system of the THU?

Conclusion:   Jacking and blocking caused the unit to flex creating openings in the walls and around doors and windows allowing air, heat and moisture to enter the trailer.

F. Did the quality of the workmanship during construction of the Wright THU contribute to the manifestation and growth of mold and off-gassing in the walls, ceilings and floors and interior of the THU?

Conclusion:   Yes.   As noted in the report, less than superior quality workmanship caused moisture and mold problems.

G. Did the quality of workmanship of the air conditioning and heating ductwork in the Wright housing unit contribute to the entry of any formaldehyde off-gassing that may have been present in the wall, ceiling and floor cavities of the THU?

Conclusion:  Yes, the quality of workmanship contributed to the presence of the elements that increase formaldehyde off-gassing.

H. Did Shaw fail to properly repair the furnace system?

Conclusion:   Yes.   The furnace was never properly repaired and did not function.

I. Are the vapor barriers of the Wright THU placed in the recommended location for building located in the hot, humid climate zones?

Conclusion:  No. The vapor barrier on the wall is placed for frigid and cold climates – not humid climates.

J. What problems manifest when the vapor barrier of a building is placed on the cold side of walls, ceilings or floors of a building located in the hot, humid climate zone?

LWFR-EXP 7-000142

Conclusion:   Moisture is trapped, building materials deteriorate, mold proliferates and formaldehyde off-gassing can increase.

K. Was the Wright THU constructed with formaldehyde emitting materials?

Conclusion:  Yes, per the documentation of Dr. Stephen Smulski.

L. Was ultra low or non-formaldehyde emitting building materials readily available at the time the Wright THU was manufactured?

Conclusion:  Yes.  We are aware of a number of products available and were ultra low or non-formaldehyde emitting products in 2005.

M. Was the Forest River THU occupied by Mr. Wright constructed utilizing superior quality workmanship?

Conclusion:  No. The quality of workmanship overall was documented as much less than superior.  Some are as follows:

1. Failure to seal the bellyboard;
2. Failure to seal the penetrations;
3. Failure to properly seal penetrations;
4. Failure to install insulation properly;
5. Failure to install the HVAC ducts properly;
6. Failure to install framing members properly;
7. Failure to seal doors and windows properly;
8. Failure to seal door trim properly;
9. Failure to insure jacking and blocking did not cause damage to the trailer; and
10. Failure to properly maintain the trailer.

Conclusions drawn in this report are based on observations and information available, known and declared at the date of the investigation and/or the time of the preparation of this report.  This report is furnished as privileged and confidential to the addressee.  Release to any other company, concern or individual is solely the responsibility of the addressee.

LWFR-EXP 7-000143

With kindest regards,

Alexis Mallet, Jr., President

AMJ:cms

Enclosure 1:  Plans and Details by FGS / RCE of the FEMA Wright THU
Enclosure 2:  Freyou, Moore and Associates - Structural Condition Assessment
Enclosure 3:  LaGrange Consulting, L.L.C. Inspection Report
Enclosure 4:  Electrical Systems Observations Report by J. Darrell Hicks, P.E.
Enclosure 5:  Microbial Growth Report by W.D. Scott and Associates
Enclosure 6:  Affidavit of Stephen Smulski, Ph.D., dated September 29, 2009
Enclosure 7:  Ritter Consulting Engineers' report
Enclosure 8:  Resume' of Alexis Mallet, Jr. (Previously Sent)
Enclosure 9:  List of Trial and Deposition Testimony (Previously Sent)
Enclosure 10: First General Services Fee Schedule (Previously Sent)

LWFR-EXP 7-000144