1

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE:  FEMA TRAILER        MDL NO. 1873

 5   FORMALDEHYDE PRODUCTS       SECTION N(4)

 6   LIABILITY LITIGATION        JUDGE ENGELHARDT

 7   (This document is related
     to "Lyndon Wright, et al.
 8   v. Forest River, Inc.,
     et al.")
 9

10                    *   *   *

11

12           VIDEOTAPED DEPOSITION OF ALEXIS

13   MALLET, JR., 103 BRANDBERRY CROSSING,

14   LAFAYETTE, LOUISIANA 70598, TAKEN AT THE

15   OFFICES OF FRANK D'AMICO, ATTORNEY AT LAW,

16   622 BARONNE STREET, NEW ORLEANS, LOUISIANA

17   70112, ON THE 12TH DAY OF JANUARY, 2010.

18

19

20   REPORTED BY:

21       CATHY RENEE' POWELL, CCR
         PROFESSIONAL SHORTHAND REPORTERS
22       (504)529-5255

23   VIDEOGRAPHER:

24       MICHAEL BERGERON
         PROFESSIONAL SHORTHAND REPORTERS
25       (504)529-5255
```

EXHIBIT
E

1      Q.    Was that the e-mail from the City

2   of New Orleans building inspector?

3      A.    Yes, sir.

4      Q.    Had you ever seen that document

5   before preparing for your deposition?

6      A.    Yes, sir.  At least part of it I

7   had.

8      Q.    When you reviewed the Liberty

9   report?

10     A.    I don't remember if it was when I

11  reviewed the Liberty report, if it was an

12  attachment to that or if it was in the file

13  material that was sent to me.  I don't

14  recall which one it was.

15     Q.    And what, if anything, did you

16  gather from the substance of the e-mail that

17  you reviewed?

18     A.    That it was basically the same

19  thing that I had reviewed prior to -- from

20  the report or the reliance material.

21     Q.    Have you done anything to contact

22  the folks at the City of New Orleans to

23  determine whether the City of New Orleans

24  actually applied any of the building codes

25  that are referenced in your report to

20

1    temporary housing units supplied by FEMA?

2        A.    Yes, sir.

3        Q.    Who did you contact?

4        A.    The chief building inspector.

5        Q.    Who was that?

6        A.    The same name -- I don't recall.

7    I have to dig it up.  It's the same name --

8    the man that Liberty contacted, the chief

9    building inspector.

10       Q.    And did he give you the same

11   response as to whether the building codes

12   were, in fact, applied to travel trailers

13   that he gave to Liberty?

14       A.    The response that I got was that

15   the building codes were not waived, they

16   only suspended the inspections.

17       Q.    By "suspending the inspections,"

18   what did you take that to mean?

19       A.    That the contractor was to do his

20   own inspections.

21       Q.    Do you have a document from the

22   chief building inspector of the City of New

23   Orleans that says that the building codes

24   were not waived for these particular units?

25       A.    Yes, sir.

21

1      Q.   Let me mark this as the next

2  exhibit, Exhibit 3.

3         Now, Mr. Mallet, what I have

4  marked as Exhibit 3 is, in fact, the e-mail

5  chain between you and Mr. Odom; is that

6  correct?

7      A.   Yes, sir.

8      Q.   And this e-mail chain begins on

9  January 8 of this year, correct?

10     A.   I guess. Yes, sir.

11     Q.   Do you have a copy of your own?

12     A.   No, sir.

13     Q.   All right.

14     A.   This is the only copy that I have.

15     Q.   All right.

16     A.   Yes, sir.

17     Q.   And the response that you got was

18  on January 11, which was yesterday, correct?

19     A.   Yes, sir.

20     Q.   So Mr. Odom related to you that

21  "We did not waive code requirements, we did

22  allow FEMA to have their own inspections,"

23  correct?

24     A.   Yes, sir.  I misspoke, I said the

25  contractors, it's FEMA.

22

1    Q.   Right.  And so is it then your

2    opinion that FEMA was required to inspect

3    these properties to ensure code -- code

4    compliance?

5        MR. DINNELL:

6            Objection, foundation.

7        THE WITNESS:

8            Yes, sir.

9    EXAMINATION BY MR. BONE:

10       Q.   And what would that have required

11   of FEMA, in your opinion?

12       A.   To have a person competent in

13   building inspections in the various trades

14   to perform a third-party inspection, which

15   is typically -- it's not unusual.

16       Q.   And the inspection would ensure

17   code compliance?

18       A.   Yes, sir.

19       Q.   And the inspection would have to

20   be performed before occupancy could be

21   allowed?

22       A.   Typically, that's correct.

23       Q.   And the unit in question would

24   have had to have met all building codes

25   pursuant to the inspection before occupancy

23

1   would have been permitted, correct?

2       MR. PINEDO:

3           Objection, form.

4       THE WITNESS:

5           Building inspectors -- it should

6   have, yes.  Whether it did or not is

7   something different.  I mean, the building

8   inspectors themselves with the City are

9   going to check for general compliance, but

10  they don't go item by item through a project

11  to see if there is compliance on everything.

12  EXAMINATION BY MR. BONE:

13      Q.   So what you're saying is, building

14  inspectors inspected the buildings, but they

15  may pass a building that is not code

16  complaint?

17      A.   No, it is the responsibility of

18  the design professional and/or the

19  contractor or subcontractor to produce work

20  that is code and building standard

21  compliant.  And the building inspectors

22  check for general compliance, but they are

23  not responsible for supervising the project

24  or overseeing the design professional's

25  work.

1   report, and I want to be sure I quote you

2   correctly, but unfortunately, with 131 pages

3   in the report, it's hard to find exactly

4   what you're looking for.

5           And the statement -- and I have to

6   paraphrase it because I don't have it right

7   in front of me.  But the statement

8   essentially says that, in your opinion, this

9   unit was converted to residential purposes

10  by the FEMA travel trailer procurement

11  specification.

12          Is that an accurate summarization

13  of what you stated in your report?

14      A.   Yes.  That's the gist of it.

15      Q.   And take me through what about the

16  FEMA procurement -- travel trailer

17  procurement specification causes you to hold

18  that belief.

19      A.   Well, one is that it was to be

20  constructed for temporary housing or

21  emergency housing usage.  Travel trailers

22  are not constructed, designed or

23  constructed, for long-term habitable use.

24  They're, by their very code, are for

25  recreational camping and seasonal use and

177

1    not for housing.

2         Q.    Okay.  What specifically about the

3    FEMA specification that gives it -- that

4    makes you think that that is -- that's what

5    converted it to a residence rather than a

6    travel trailer?

7         A.    Well, the physical specifications

8    were to delete the holding tanks for the

9    gray and black water and the Class 1 water.

10   It was to be directly hooked to sewerage.

11   It was to be permanently connected to the

12   electrical system.  It was placed on blocks,

13   or to be placed on blocks.  And it was

14   strapped down.  It was an immovable -- it

15   was immoveable and meant for the housing of

16   catastrophe victims.

17        Q.    And the FEMA -- the -- and it was

18   the pronouncement set forth in the FEMA

19   travel trailer procurement specification

20   that converted a travel trailer into a

21   residence, in your opinion?

22        A.    Yes.  Its intended use, that's

23   correct.

24               Because when we build a house or

25   we build a commercial building or a hospital