1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA

2

3    IN RE:  FEMA TRAILER          MDL NO. 1873

4    FORMALDEHYDE PRODUCTS         SECTION "N"(5)

5    LIABILITY LITIGATION          JUDGE ENGELHARDT

6

     EXHIBIT
     J

7    This document relates to:  Lyndon T. Wright
          v. Forest River, Inc., et al
8              Docket No. 09-2977
                    *   *   *

9

10        Videotaped Federal Rule 30(b)(6)

11   Deposition of SHAW ENVIRONMENTAL, INC.,

12   through its designated representative,

13   GEOFFREY C. COMPEAU, Ph.D., 4171 Essen Lane,

14   Baton Rouge, Louisiana 70810, taken at the

15   offices of Baker Donelson, Bearman, Caldwell

16   & Berkowitz, PC, 201 St. Charles Avenue,

17   Suite 3600, New Orleans, Louisiana 70170, on

18   Thursday, the 7th day of January, 2010.

19

20   REPORTED BY:

21        JAMES T. BRADLE, CCR
          PROFESSIONAL SHORTHAND REPORTERS
22        (504)529-5255

23   VIDEOGRAPHER:

24        BRIAN SOILEAU
          PROFESSIONAL SHORTHAND REPORTERS
25        (504)529-5255

69

1    you right before the break about this

2    proposal for technical services to FEMA that

3    was provided by Shaw on September 27th, '05?

4        A    Yes.

5        Q    And I asked you to look at

6    Page 1898?

7        A    Yes, sir.

8        Q    And under 1.2, does it state the

9    statutory authority and FEMA's mission in

10   Shaw's proposal to FEMA?

11       A    Let's see.  Can you read that

12   back?

13   (Whereupon, the court reporter read back the

14   requested testimony as follows:

15       THE COURT REPORTER:

16           Question:  "And under 1.2, does it

17   state the statutory authority and FEMA's

18   mission in Shaw's proposal to FEMA?"

19       THE WITNESS:

20           Generally, yes, I would agree with

21   it.

22   EXAMINATION BY MR. D'AMICO:

23       Q    And is it your understanding that

24   Shaw said "all activities conducted for the

25   TOs-0001 and -0010 will conform and comply

1   with all applicable, relevant, or

2   appropriate Federal, State, and local laws,

3   rules, and regulations as determined by FEMA

4   in conjunction with appropriate regulatory

5   and oversight agencies"?  Do you see where I

6   read that?

7       A    Where it begins "such laws and

8   regulations include, but are not limited to,

9   the following"?

10      MR. KURTZ:

11          It's the second paragraph.

12      THE WITNESS:

13          "All activities conducted for

14  TOs-0001 and -0010 will conform and comply

15  with all applicable" -- "as determined by

16  FEMA." Yes, to the best of our ability.

17  EXAMINATION BY MR. D'AMICO:

18      Q    Yes.  And was that Shaw's intent,

19  to comply with all local laws, rules,

20  regulations, Federal, State, all relevant

21  codes?

22      A    Yes.

23      MR. KURTZ:

24          Objection.  Outside the scope of

25  the deposition.

1    EXAMINATION BY MR. D'AMICO:

2        Q    To your knowledge?

3        A    It really depended.

4        Q    Okay.  It depended on what?

5        A    We had to put trailers at private

6    sites and we had to put trailers at group

7    sites.

8        Q    Let's talk about a private site

9    first.  What code did Shaw need to comply

10    with for installation of a travel trailer at

11    a private site?

12        MR. KURTZ:

13            Objection, form and scope.

14        THE WITNESS:

15            The permits that we had for

16    private sites consisted of water, sewer and

17    electrical permits.

18    EXAMINATION BY MR. D'AMICO:

19        Q    And was it the contractor, Shaw's

20    responsibility to obtain those permits when

21    they were installing a travel trailer at a

22    private residence?

23        A    We assured --

24        MR. KURTZ:

25            Objection to form and scope.  Go

94

1    ahead.

2        THE WITNESS:

3            Okay.  I will slow down.  We

4    assured that our subcontractors had these

5    permits.

6    EXAMINATION BY MR. D'AMICO:

7        Q    Explain that, please.  You assured

8    that the subcontractor had the permits?

9        A    Yes.

10       Q    Explain that.

11       A    We hired licensed and experienced

12   installers of travel trailers, who were

13   responsible to install the trailer and also

14   to get the necessary permits for

15   installation of the trailer.

16           And the way we assured that is

17   when we sat down with the contractors to

18   review their billings or completion of their

19   work, it wasn't considered complete until

20   they provided the evidence of the water,

21   sewer and electrical permits.

22       Q    Water, sewer and electrical

23   permits from where?

24       A    From the jurisdiction in which

25   they were working.

1      Q    So the local building code and

2   ordinances as it pertained to water, sewer

3   and electrical applied?

4      MS. PETROVICH:

5         Objection.

6      MR. BONE:

7         Objection.

8      MR. MILLER:

9         Objection.

10      MR. KURTZ:

11         Objection, form.

12      MR. D'AMICO:

13         That must be a good question.

14   Everybody objected.

15         Could you read it back?  He

16   doesn't know what it is.

17   (Whereupon, the court reporter read back the

18   requested testimony as follows:

19      THE COURT REPORTER:

20         Question:  "So the local building

21   code and ordinances as it pertained to

22   water, sewer and electrical applied?"

23      THE WITNESS:

24         Yeah.  That's our understanding,

25   yes.

1   in this site and will be inquiring into the

2   ready for occupancy status of these mobile

3   homes."  Do you see that?

4       A    Yes.

5       Q    "Shaw has had personnel working

6   all night on the utilities and the next to

7   last ready for occupancy issue is the

8   placement of electrical meters this

9   morning"?

10      A    Yes.

11      Q    Okay.  Now, what is the waiver

12  that he's talking about?

13      A    "However, Shaw QC reports that the

14  blocking of the trailers does not meet the

15  standards provided by FEMA."  Is that where

16  we're looking?  "However, I am advised that

17  the blocking was provided and installed by a

18  licensed Louisiana subcontractor who

19  certifies that the blocking conforms to all

20  Louisiana standards.  Therefore, in

21  accordance with Exhibit 6 to the statement

22  of work, paragraph 2.4.1, second sentence

23  which states:  'The number and location of

24  piers shall be in accordance with HUD and

25  manufacturer's instruction unless local

1    codes provide for differing specifications."

2          Is that it?

3      Q    Yes.  The first sentence talks

4    about "Shaw requests immediate waiver on the

5    blocking requirements for mobile homes."

6      A    All right.  I have to look at the

7    statement of work, paragraph 2.4.1,

8    Exhibit 6.

9          Oh, "Blocking and Leveling" for

10   manufactured homes.  These are not personal

11   sites.  This is a commercial mobile home

12   site, and we're just placing some of the

13   FEMA-supplied mobile homes and making them

14   ADA compliant with the issue -- the long

15   pole in this tent was building all the ramps

16   on all those ADA compliant homes overnight

17   to make them ready for occupancy by the ADA

18   occupants the next morning.

19          So let's see.  So basically, 2.4.1

20   is the section specifically regarding

21   "Blocking and Leveling," and what we're

22   doing through Andy, who worked with our

23   COTR, is asking for a variance from this

24   specification provided by FEMA.

25          Because in the early going, you

1   know, our QC caught up and went out to QC

2   what the contractor in this instance had

3   done, and found that the mobile homes were

4   not put on the piers consistent with the

5   FEMA specification, although they had been

6   installed by a Louisiana contractor.

7           Ordinarily, we would have said,

8   "This has to be compliant with the FEMA

9   specification." Because of the urgency of

10  the matter, the request was made for a

11  variance, so we could provide accommodation

12  for the ADA occupants.

13      Q   And was a waiver granted?

14      A   I will have to go back and look at

15  this. You know, I would have to look

16  through our e-mails to see exactly how this

17  was resolved.

18          I know that the ADA applicants got

19  into those homes the next day, as we assured

20  FEMA they would, but I have to take a look

21  at how we got the -- whether we got the

22  variance or whether they deferred to the

23  Louisiana State code.

24      Q   All right. The last paragraph,

25  "Should the models at Greenwell be park

252

1    models, covered by Exhibit 8" -- and

2    Exhibit 8 refers to "Park Model"

3    specifications -- "of the statement of work,

4    the language in paragraph 2.4 remains

5    essentially identical, except for the

6    identification of the unit itself."

7            Did I read that correctly?

8       A    Yes.

9       Q    What is your understanding of

10   that?

11      A    I will have to take a look.  So

12   Exhibit 8 must be park models.

13      Q    Yes.

14      A    Okay.  So I guess he's comparing,

15   you know -- I could do it here, I suppose,

16   but he's comparing the language in

17   section 2.4.1 of Exhibit 8 -- Exhibit 8 --

18   to the language in 2.4.1 of Exhibit 6.

19   Right?  And noting that in Exhibit 6, it's

20   manufactured homes; in Exhibit 8, it's

21   called park models.

22      Q    Okay.  Now, if we continue on,

23   Mike Goetz on October 18th, 2005, on

24   Exhibit 2261, Tuesday, October 18th, 2005 to

25   Clifford Oliver, David Orris, David Porter,

1   James Ariail; Re:  Request Waiver on

2   Blocking Requirements for Mobile Homes at

3   the Greenwell Street Site, importance

4   "high," read that, please.

5       A    This is the one from Mike Goetz?

6       Q    Yes.

7       A    To Cliff Oliver, Dave Orris.  So

8   this is October 18th at 9:57?

9       Q    Yes.

10      A    "Since Shaw is" -- I think that

11  word is "citing Exhibit 6, I assume that we

12  are talking 'manufactured homes,' and

13  therefore David's question is valid.  Again,

14  as I read the Shaw request, it appears that

15  the blocking meets State Code.  If that is

16  the case, 2.4.1 says that the blocking must

17  meet HUD codes unless codes provided for

18  differing specifications."

19      Q    "Again, this is a really short

20  fuse item and David and I need a decision.

21  Please!  Thanks, Mike."

22           Okay.  The next communications, if

23  you read up -- I'm trying to do it in --

24      A    Order?

25      Q    -- chronological order.

1      A     Reverse chronological order.

2      Q     Right.  Exactly.

3      MR. MILLER:

4           I would just note that the time

5      there shows that the next one up is an

6      earlier e-mail.

7      MR. D'AMICO:

8           You're right.  Sometimes they

9      cross.  Yes, it is several minutes earlier.

10     EXAMINATION BY MR. D'AMICO:

11     Q     This is from Clifford Oliver to

12     Mike Goetz, correct?  "I think there is much

13     confusion here.  This issue has been about

14     travel trailers, not manufactured homes.

15     Manufactured homes have to be blocked.

16     There is no alternative, since they don't

17     come with jacks."

18     A     Yeah.  I think even that's

19     confusing.

20     Q     It is.  And that's why I'm trying

21     to see if we can make heads or tails of this

22     and what you know, if anything.  You said

23     you did have some personal knowledge of what

24     happened at the Greenwell Street --

25     A     Greenwell Street.

1      Q      -- site and you're familiar with

2  it?

3      A      Yes.

4      Q      So I would like to explore it a

5  little bit to see if you can shed some light

6  on it.

7           Okay.  The next one up, which does

8  appear to be later in the day, October 18th,

9  2005, at 11:03 a.m., from Mike Goetz to

10  Clifford Oliver, David Orris and David

11  Porter, again, the same subject, the same

12  importance.  "It's not a question of jacks.

13  My understanding is that the MHs" -- Mobile

14  homes?

15      A      Yes.

16      Q      -- "have been placed on blocks,

17  but the blocking adheres to the State

18  permitting and code requirements (certified

19  by the sub installing them) and not

20  necessarily to the HUD requirements."

21      A      And again, I don't see all the

22  details here.  It was probably an issue of

23  the height of the blocks and/or the number

24  of piers.  Okay.  And so there's a Louisiana

25  State code that determines not like there

1   weren't blocks or there were blocks.  These

2   things were on blocks.  These things were on

3   piers, on a concrete pad.

4           And so probably, I surmise the

5   issue is they were on blocks according to a

6   Louisiana specification that differed in

7   some fashion from what we were required to

8   do under our Performance Work Statement from

9   FEMA.  And so we're asking for a variance in

10  this case, because it still was installed by

11  a licensed Louisiana contractor and still

12  complied with Louisiana code, roughly very

13  early on into the recovery here on the 18th,

14  to get people into housing.

15      Q    And these were, like you said, on

16  concrete pads?

17      A    Yes, in a commercial park.

18      Q    What was the purpose for placing

19  them on concrete pads?

20      A    They were available.  You know,

21  one of the first and easiest things to do

22  with respect to, you know, getting people in

23  communities is use existing available empty

24  commercial site pads, and those were fairly

25  well exhausted early on in the process.

1        Q    And would concrete pads help

2    alleviate a problem with differential

3    settlement?

4        MR. KURTZ:

5             Objection, foundation and scope.

6    EXAMINATION BY MR. D'AMICO:

7        Q    If you know?

8        A    Actually, I don't know.  You know,

9    it seems like a better foundation to me.

10       Q    Okay.  Again, let's read up.  Mike

11   Goetz, Tuesday, October 18th, 2005.  Now

12   it's 1:56 p.m.  To Clifford Oliver and David

13   Porter, cc'ing David Orris.  The same

14   subject, the same importance.

15            "Please!  I'm trying to cut the

16   fuse before this thing blows up, and frankly

17   I'm feeling a bit exposed.  Mike."

18            And if we can continue on, so we

19   can try to get to the meat of the matter,

20   another e-mail, at 1:35 on October 18th from

21   David Orris to Mike Goetz, Clifford Oliver,

22   David Porter, with a "cc" to Jim Brixius and

23   Andrew Burgess.

24            "I stand by to grant the waiver

25   when I get the revised statement of work

1   language from the contractor."

2           Now, who is the contractor?

3      A    Oh, that would be us.

4      Q    Okay.  "And a confirmation from

5   IA."  Who's the IA?

6      A    Individual assistance.

7      Q    "Or the COTR."

8      A    That would be he's referring to

9   Mike Goetz.

10     Q    Okay.  "That there are no safety

11  concerns with granting this request.  I also

12  have to confirm that I am not being asked to

13  waive any HUD or building codes."

14          Okay.  Was it your understanding

15  that the HUD and building codes had to be

16  complied with?

17     MR. KURTZ:

18          Objection, form.

19  EXAMINATION BY MR. D'AMICO:

20     Q    In this context?

21     A    "Not being asked to waive HUD or

22  building codes."

23          You know, reasonably, those would

24  be regulations that we would have reviewed

25  and determined which ones were applicable,

Compeau, Geoffrey 01/07/10

259

1    apparently.

2        Q    All right.  Now we get to the

3    first part, in which you are again cc'ed?

4        A    Yeah.

5        Q    October 18, 2005, at 2:48 p.m.,

6    and I think this is the last time reference

7    we have, the latest time reference we have

8    with this string of e-mails.

9            And if you would -- Again, it's

10   the same subject, "Request Waiver on

11   Blocking Requirements for Mobile Homes at

12   the Greenwell Street Site"?

13       A    Yeah.

14       Q    All right.  Would you read that,

15   please?

16       A    Yes.  The subject is "Request

17   Waiver on Blocking Requirements for Mobile

18   Homes at the Greenwell Street Site."

19       Q    Yes.

20       A    "Mr. Goetz" -- So this is our Andy

21   Burgess writing to Mr. Goetz.  "As requested

22   by the PCO, I have revised

23   paragraph 2.4.1" -- And the "PCO," I think

24   that's basically the project contracting

25   officer.  That's David Orris.  "As requested

1   by the PCO, I have revised paragraph 2.4.1

2   of Exhibit 6 to the SOW.  I suggest that

3   similar revisions be made to Exhibit 8 for

4   Park Models.  I have made the changes to be

5   more generic in nature, rather than worst

6   case (soil bearing capacity of 1,000 psf),

7   and to conform to the requirements (and

8   eliminate the ambiguity with the last

9   sentence) of paragraph 2.1.  My suggested

10  paragraph 2.4.1 is as follows."

11          Go ahead and read that?

12      Q   Well, let's talk about some of the

13  previous sentences.  So here, it's my

14  understanding that this is referring to

15  Exhibit 6, which would be the manufactured

16  homes, mobile homes, and Exhibit 8, park

17  models, correct?

18      A   Correct.

19      Q   That's what we have been

20  discussing --

21      A   Yes.

22      Q   -- throughout this string of

23  e-mails that we're looking at?

24      A   Yes.

25      Q   Is that your understanding?

1          Object to the form.

2      THE WITNESS:

3          Really, the permitting -- We

4   really, in the area of permitting, we met

5   with permitting at the various parishes

6   early on almost daily to establish

7   particularly with respect to what would be

8   required to build a group site, and as a

9   consequence to that, we gained a lot of

10  knowledge, obviously, also about what we

11  needed to do at our private sites.

12         So there were more requirements,

13  reasonably, because of grading and other

14  issues, there were more requirements at the

15  group sites.

16  EXAMINATION BY MR. AHLQUIST:

17     Q   Did plumbing, water and electrical

18  codes apply at private sites?

19     MR. BONE:

20         Object to the form.

21     MR. KURTZ:

22         Object to the form, but go ahead.

23     THE WITNESS:

24         As I mentioned earlier, we had

25  water, sewer and electric permits for the

274

1    private sites.

2    EXAMINATION BY MR. AHLQUIST:

3        Q    I just wanted to make sure that

4    you were talking in addition to the group

5    sites, that application was also to the

6    private sites?

7        A    Yes, private sites had those

8    requirements.

9        Q    Okay.  So back to my original

10   question.  How did Shaw engage its

11   subcontractors or identify subcontractors?

12       A    Okay.  You know, we had a

13   performance work statement and the exhibits

14   from FEMA, and we, you know, organized those

15   into statements of work and we requested

16   bids from qualified subcontractors who had

17   experience in installing travel trailers.

18       Q    Were there different entities

19   tasked or subcontracted to perform different

20   functions under the housing implementation

21   contract?

22       A    Broadly, yes.

23       Q    Because you just said that they

24   were engaged for installation.  Let's talk

25   about installation.  How many subcontractors

359

1   in his role in the joint field office at

2   this time.

3       Q    Do you have any information that

4   would indicate that these would not also

5   apply to private residences?

6       MR. KURTZ:

7           Objection.  Asked and answered.

8       THE WITNESS:

9           We have talked about the permits

10  we determined -- deemed to be required for

11  the private sites.

12  EXAMINATION BY MR. AHLQUIST:

13      Q    Do you know if -- No. 3 on this

14  list is "Building."  Do you know if Shaw was

15  obtaining building permits for its group

16  sites?

17      A    I believe we were.  I would have

18  to go back and refresh on that specifically.

19          Again, in the early going,

20  different parishes and all the requirements,

21  especially for something kind of novel, like

22  a group community site, was something that

23  made everybody say, "Okay.  How do we do

24  this," particularly in the environment.  So

25  I think we were exercising caution.

1      Q    Was Shaw exercising caution in

2   getting building permits for the private

3   sites as well?

4      MR. KURTZ:

5           Objection.  Asked and answered.

6      THE WITNESS:

7           Yeah, we may have early on, and

8   then recognized that it wasn't necessary for

9   a temporary travel trailer.

10  EXAMINATION BY MR. AHLQUIST:

11     Q    When you say "recognized it wasn't

12  necessary," who made that recognition?

13     A    You know, we looked quite a bit

14  for specifically where that was, but we were

15  meeting with building officials from the

16  various parishes for both private sites and

17  group sites at this point several times a

18  week, and likewise, we had thousands of

19  units all over the city, so we were clear

20  that we needed the electrical, the sewer and

21  the water permits, but we made no

22  determination -- we couldn't find the

23  specifics that said "you don't need a

24  building permit," so we stopped looking for

25  building permits.

1      And, in fact, the other issue is

2  we have in our records that we applied, but

3  we don't have any one issued, the building

4  permit for a temporary site.

5      Q    So you have in your records

6  applications of building permits or building

7  permits?

8      A    I believe so.  On private site

9  you're asking?

10     Q    On private sites, correct.  Did

11 Shaw ever seek written clarification from

12 the City of New Orleans regarding whether or

13 not the building code or building permits

14 were necessary?

15     A    You know, so many of these early

16 meetings were happening verbally and in

17 quick succession.  I looked for -- We looked

18 for written concurrence with that, but have

19 not found that.

20     Q    So you're not aware of any written

21 indication of either yea or nay on that

22 issue?

23     A    From the City?

24     Q    Correct.

25     A    It hasn't come to my attention

362

1    yet.

2         Q    Okay.  If you look at the first

3    page of that e-mail, it contains the larger

4    paragraph.  Can you read that into the

5    record, please?

6         A    Let's see.  "Mike" from Bob

7    Waigand?

8         Q    Correct.

9         A    "Mike, I don't think I did a very

10   good job in explaining to Kathy what I was

11   looking for" -- "what I was really looking

12   for.  I don't think that you were at the

13   meeting held on 13 November that attempted

14   to identify all of the impediments to

15   housing progress.  One of the issues that

16   was brought up by the contractors had to do

17   with the difficulties at the local and

18   Parish level obtaining permits, getting

19   inspections completed, getting electric

20   hooked up, et cetera.  Things like 'no one

21   works on the weekend' and 'we have to use

22   their contractors' are just an example of

23   what was reported.  The group established an

24   action item for the contractors to provide a

25   specific list of these difficulties, by

Compeau, Geoffrey 01/07/10