# Transcript of the Testimony of
# Videotaped Deposition of Charles David Moore, PE, PLS

**Date taken: October 27, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)**

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

## Professional Shorthand Reporters, Inc.

Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

EXHIBIT "C"

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)         Videotaped Deposition of Charles David Moore, PE, PLS

Page 145

```
 1      A     Don't know.
 2      Q     Do you know if FEMA did or one of
 3   the plaintiff's experts did that?
 4      A     I don't know.
 5      Q     Why is that wedge there?
 6      A     Again, I'm only supposing that it
 7   was there to keep the door closed.
 8      Q     Okay.  I'm going to show you
 9   another photo that I'm going to mark as
10   Exhibit 19.  This is Bates labeled
11   LWFR-DT-007140.  That's a close-up of the
12   same door with the wedge gone, right?
13      A     Correct.
14      Q     You can see in Exhibit 19 that the
15   door has been crowbarred open by somebody,
16   right?
17      A     Yes, sir.
18      Q     Okay.  Do you know when that
19   happened?
20      A     No, sir.
21      Q     The door is actually also resting
22   in a slightly open state, isn't it?
23      A     It looks like it is, yes.
24      Q     So you would agree with me that
25   even if somebody were holding the door
```

Case 2:07-md-01873-KDE-MBN   Document 11750-3   Filed 02/18/10   Page 3 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)          Videotaped Deposition of Charles David Moore, PE, PLS

Page 146

1   closed or even if that wedge were jammed in
2   there, that water could penetrate through
3   the damage that was done during the
4   crowbarring process, right?
5        A    Could be, yes.
6        Q    Okay. And maybe the damage that
7   you see on page 26 of your report was caused
8   by water that went in through the damaged
9   doorframe that's shown in Exhibit 19, right?
10       A    It's possible, yes.
11       Q    No way to tell that from any other
12  source, is there?
13       A    No. I would probably say that
14  water that would be entering there would be
15  exacerbating that. This is probably some of
16  the worst water damage that we saw there.
17  Some of the other water damage that we saw
18  was not quite as extensive, so I would think
19  that there would be some circumstances that
20  would cause this to accelerate, and that
21  water entering in that would probably be at
22  least some of that.
23       Q    Now, you've already told me that
24  you can't tell how old the damage is as
25  reflected on page 26 of your report, right?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)    Videotaped Deposition of Charles David Moore, PE, PLS

Page 147

1    A    That's correct.
2    Q    And you can't tell me, sitting
3  here, with any scientific certainty whether
4  that damage came from one or more than one
5  water leak --
6    A    That's correct.
7    Q    -- can you?
8    A    No.
9    Q    And you told me that Exhibit 19
10 shows a condition that you don't know how
11 long it was like that --
12   A    Correct.
13   Q    -- right?
14       So it could have been like that
15 for a year?
16   A    Possible.
17   Q    Okay.  And plenty of water could
18 have gotten in in a year to cause the
19 condition that's shown on page 26 of your
20 report, right?
21   A    That's possible, yes.
22   Q    Now, the door hadn't been
23 crowbarred open when Mr. Wright lived in the
24 trailer, right?
25   A    I don't think so.  Yeah.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)     Videotaped Deposition of Charles David Moore, PE, PLS

Page 158

1  got us off on this was I asked you whether
2  you had any explanation for why the
3  deflection -- the shape of the deflection
4  that Mr. Wright observed, which was sort of
5  like a V, a triangular shape lying on its
6  side, turned into an arch.  You started
7  talking about testing that occurred after
8  the first time you saw the head jam and the
9  gutter in a bowed condition, right?
10      A   Uh-huh.
11      Q   So I'm asking you again, how do
12 you think it got from the condition that
13 Mr. Wright saw it to the condition you saw
14 it before anybody did any jacking testing?
15      A   Well, I guess my explanation
16 really is you have to connect the dots.
17 During the testing, like I say, each time
18 that it was jacked up and released, it never
19 went back to the same position.
20          So what he saw in the triangular
21 shape that you describe was when it was on
22 blocks at his house while he was living in
23 it.  Sometime between there and Melville
24 they had to take it off the blocks and move
25 it, so during that removal and bringing it

Case 2:07-md-01873-KDE-MBN   Document 11750-3   Filed 02/18/10   Page 6 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)    Videotaped Deposition of Charles David Moore, PE, PLS

Page 159

1   off there, could and probably did cause it
2   to go to a different shape.
3        Q    So the deactivation could have
4   damaged the trailer?
5        A    Yes, sir.
6        Q    Okay.
7        A    Additional damage to the trailer,
8   yeah.
9        Q    Well, and you can't tell
10  whether -- you can't tell installation
11  damage from deactivation damage, can you?
12       A    No.
13       Q    Who deactivated the trailer?
14       A    I don't know that.
15       Q    Do you know whether it was Shaw or
16  not?
17       A    I think that there are some
18  documents in here that has some deactivation
19  orders, but I don't know that.  I don't
20  remember just right off.
21       Q    Okay.  Do you know when the
22  trailer was deactivated?
23       A    Sometime after he moved out in
24  July of '08, so ...
25       Q    Okay.  And the deactivation

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)  Videotaped Deposition of Charles David Moore, PE, PLS

Page 162

1  possibility that a leak or damage to the
2  head jam manifested itself after Shaw was
3  responsible for maintaining the trailer and
4  that whoever had become responsible for
5  maintenance failed to fix those issues, can
6  you?
7      A    No.  Again, I don't know who was
8  responsible for fixing those issues, no.
9  And I guess the question that comes to mind
10 is that then, what was the cause of those,
11 but ...
12     Q    Okay.  All right.  In your report
13 you identified some problems with caulk,
14 right?
15     A    Yes.
16     Q    I want to be careful about my
17 terms, so is there a relevant distinction
18 between caulk and sealant?
19     A    There could be, yes.
20     Q    Okay.  The tears and other
21 problems that we saw around -- around
22 windows and other seams were caulk issues,
23 not sealant, right?
24     A    Yes.  I think there was a picture
25 here on the same page that would be a caulk

Case 2:07-md-01873-KDE-MBN   Document 11750-3   Filed 02/18/10   Page 8 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Charles David Moore, PE, PLS

Page 247

1    A    Correct.
2    Q    And the only bit of evidence with
3    regard to the water coming over the door, or
4    the water, whether it's condensation or
5    leaking, that occurred by the bedroom
6    window, the only evidence that you have on
7    those two points to put it before
8    deactivation is Mr. Wright's testimony,
9    right?
10   A    That's basically correct, yes.
11   Q    Lack of maintenance while in the
12   FEMA yard for the year it sat there before
13   you saw it could have led to or exacerbated
14   water damage that you saw, right?
15   A    Yes.  By nobody resealing it, if
16   there needed to be resealing, yes, that
17   would definitely create additional water
18   damage, yes.
19   Q    Right.  Or prying the door open
20   and bending the door out so that water could
21   get in there, right?
22   A    That's correct, right.
23   Q    What about lack of maintenance
24   even while Mr. Wright was in the trailer but
25   after June 1, 2006?

Case 2:07-md-01873-KDE-MBN   Document 11750-3   Filed 02/18/10   Page 9 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Charles David Moore, PE, PLS

Page 250

1   right; some amount of its elasticity, right?
2       A    It's probably just now reaching
3   four years, yes.
4       Q    Well, it was built in September of
5   2005, and you saw it in August of 2009, so
6   that's pretty close to --
7       A    Pretty close.
8       Q    -- four years, right?
9       MR. AHLQUIST:
10          I'm going to object to your timing
11  of that construction.
12  EXAMINATION BY MR. KURTZ::
13      Q    In any event, whether it's three
14  years and ten months or whatever, the
15  elasticity --
16      A    Close to four years.
17      Q    -- of the caulk has declined
18  during that period if it wasn't kept up the
19  way Forest River said you should?
20      A    Declined, yes.  Whether it was
21  declined to a point where it needed
22  replacement, don't know that.
23      Q    You don't know that.  And you
24  don't know whether it had declined all the
25  way to the point where normal road use would

Case 2:07-md-01873-KDE-MBN   Document 11750-3   Filed 02/18/10   Page 10 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)     Videotaped Deposition of Charles David Moore, PE, PLS

Page 251

```
 1   cause caulk seals to break?
 2        A    Don't know that, correct.
 3        Q    What about the differential
 4   settlement of land, that happens quite a bit
 5   here in south Louisiana, right?
 6        A    Yes, it does.
 7        Q    That can cause the elements of the
 8   trailer to move while it's installed on six
 9   piers, right?
10        A    Right.  If there was some
11   differential, yes.
12        Q    You don't know whether that
13   happened?
14        A    I would expect that it didn't
15   happen, but --
16        Q    Have you spent much time here in
17   New Orleans?
18        A    I've lived in Louisiana for
19   27 years --
20        Q    Okay.  So you --
21        A    -- and deal with differential
22   movements all the time.
23        Q    Yeah.  I mean, that's a very
24   common phenomenon, right?
25        A    Right.  But typically, you're
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Charles David Moore, PE, PLS

Page 252

1   looking at much larger areas.  A confined
2   space like 8-by-28, you wouldn't expect a
3   lot of differential movement from one side
4   to the other.
5        Q    I think in your report you
6   referred to .036 inches as a permanent
7   deformation, right?
8        A    Yes, sir.
9        Q    You could experience that amount
10  of differential settlement pretty easily
11  across the span of a FEMA trailer, couldn't
12  you?
13       A    It's possible, yes.
14       Q    What about the damage that
15  occurred due to the fact that there wasn't a
16  vent cover over the bathroom vent; that
17  could have been a source of water damage in
18  the trailer, right?
19       A    If that was off, yes.
20       Q    Is there a vapor barrier in the
21  wall cavity of this trailer?
22       A    No.  Well, I believe that they
23  refer to the vinyl covering of the wall as
24  the vapor barrier; but other than that, no,
25  not a separate --