Transcript of the Testimony of
# Videotaped Deposition of Lawrence G. Miller, M.D.

Date taken: November 10, 2009
Vol. I

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

Case 2:07-md-01873-KDE-MBN   Document 11755-5   Filed 02/18/10   Page 2 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)                    Videotaped Deposition of Lawrence G. Miller, M.D.

## Page 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER          MDL NO. 1873
        FORMALDEHYDE PRODUCTS  SECTION "N"(4)
        LIABILITY LITIGATION   JUDGE ENGELHARDT

This document relates to:  Lyndon T. Wright
     v. Forest River, Inc., et al
           Docket No. 09-2977
              *   *   *
                (Volume I)
    Videotaped Deposition of LAWRENCE
G. MILLER, M.D., 118 Upland Road, Waban,
Massachusetts 02468, taken at the Law
Offices of Frank J. D'Amico, Jr., 622
Baronne Street, New Orleans, Louisiana
70113, on Tuesday, the 10th day of November,
2009.

REPORTED BY:
     JAMES T. BRADLE, CCR
     PROFESSIONAL SHORTHAND REPORTERS
     (504)529-5255
VIDEOGRAPHER:
     BRIAN SOILEAU
     PROFESSIONAL SHORTHAND REPORTERS
     (504)529-5255
```

## Page 2

```
 1  APPEARANCES:
 2     THE LAW OFFICES OF FRANK
           J. D'AMICO, JR.
 3     (BY: FRANK J. D'AMICO, JR. AND
           AARON Z. AHLQUIST, ESQUIRE)
 4     622 BARONNE STREET
       NEW ORLEANS, LOUISIANA 70113
 5
          ATTORNEY FOR THE PLAINTIFFS
 6
       U.S. DEPARTMENT OF JUSTICE
 7     (BY: MICHELE S. GREIF, ESQUIRE)
       CIVIL DIVISION
 8     1331 PENNSYLVANIA AVENUE, N.W.
       ROOM 8022S, NAT'L PLACE
 9     WASHINGTON, D.C. 20004
10        ATTORNEYS FOR DEFENDANT, UNITED
           STATES OF AMERICA
11
       BAKER DONELSON
12     (BY: KAREN KALER WHITFIELD, ESQUIRE)
       201 ST. CHARLES AVENUE, SUITE 3600
13     NEW ORLEANS, LOUISIANA 70170
14        ATTORNEYS FOR DEFENDANTS,
           CH2M HILL CONSTRUCTORS, INC. AND
15         SHAW ENVIRONMENTAL, INC.
16     GIEGER, LABORDE & LAPEROUSE, LLC
       (BY: JASON D. BONE, ESQUIRE)
17     701 POYDRAS STREET
       SUITE 4800
18     NEW ORLEANS, LOUISIANA 70139
19        ATTORNEYS FOR DEFENDANT, FOREST
           RIVER, INC.
20
21
22
23
24
25
```

## Page 3

```
 1  APPEARANCES CONTINUED:
 2     WILLINGHAM, FULTZ & COUGILL
       (BY: THOMAS L. COUGILL, ESQUIRE -
 3          VIA TELEPHONE)
       NIELS ESPERSON BUILDING
 4     808 TRAVIS, SUITE 1608
       HOUSTON, TEXAS 77002
 5
          ATTORNEYS FOR DEFENDANTS,
 6        JAYCO, INC. AND STARCRAFT
          RV, INC.
 7
       JONES, WALKER, WAECHTER, POITEVENT,
 8     CARRERE & DENEGRE, LLP
       (BY: MADELEINE FISCHER, ESQUIRE -
 9          VIA TELEPHONE)
       201 ST. CHARLES AVENUE
10     NEW ORLEANS, LOUISIANA 70170
11        ATTORNEYS FOR DEFENDANTS,
           KEYSTONE RV COMPANY, THOR
12         CALIFORNIA, THOR INDUSTRIES,
           DUTCHMEN MANUFACTURING, DS CORP
13         (d/b/a CROSSROADS RV) AND KZ RV,
           LP
14
       LUGENBUHL, WHEATON, PECK,
15     RANKIN & HUBBARD
       (BY: KRISTOPHER M. REDMANN, ESQUIRE -
16          VIA TELEPHONE)
       601 POYDRAS STREET, SUITE 2775
17     NEW ORLEANS, LOUISIANA 70130
18        ATTORNEYS FOR DEFENDANT,
           LIBERTY MUTUAL INSURANCE
19         CORPORATION
20     MIDDLEBERG, RIDDLE & GIANNA
       (BY: LEZLY LYN PETROVICH, ESQUIRE -
21          VIA TELEPHONE)
       201 ST. CHARLES AVENUE, 31ST FLOOR
22     NEW ORLEANS, LOUISIANA 70170
23        ATTORNEYS FOR FLUOR ENTERPRISES,
           INC.
24
25
```

## Page 4

```
                *   *   *

              EXAMINATION INDEX
                                          Page
    EXAMINATION BY MR. BONE ..............8
    EXAMINATION BY MS. GREIF ............120

                *   *   *

              INDEX OF EXHIBITS
                                          Page
    Exhibit No. 1 .......................8
    Notice of Video Deposition of Lawrence
    Miller, M.D.
    Exhibit No. 2 ......................39
    Affidavit of Lawrence G. Miller, M.D.,
    M.P.H. in the Trial of Lyndon T. Wright
    dated July 28, 2009 (LWFO-EXP8-000001
    through 000009)
    Exhibit No. 3 .....................100
    Affidavit of Lawrence G. Miller, M.D.,
    M.P.H. in the Trial of Lyndon T. Wright
    dated October 2, 2009 (LWFR-EXP8-000010
    through 000019)
    Exhibit No. 4 .....................115
    Invoice from Lawrence G. Miller, M.D.,
    M.P.H. to Mr. Frank D'Amico and Mr. Aaron
    Ahlquist dated July 31, 2009
```

1 (Pages 1 to 4)

Case 2:07-md-01873-KDE-MBN   Document 11755-5   Filed 02/18/10   Page 3 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Lawrence G. Miller, M.D.

Hyatt?
A   No.
Q   Have you reviewed any documents that relate to the air quality at the City of New Orleans or the Hyatt?
A   No.
Q   Now, the next paragraph down is the physical examination. Is this where you actually performed your physical examination of Mr. Wright?
A   That's correct.
Q   Take me through how the examination was performed and what you found.
A   And this is a standard examination. I don't believe I do it differently from any other physician. You simply examine system by system, and then note your results. And I, of course, summarized the results, as you know, in general. When areas are negative, you don't list the detail.
Q   In terms of the upper respiratory area, the head, the ears, the nose, the throat, did you examine all of those areas

Page 57

yourself?
A   I did.
Q   And what did you find with respect to those particular areas?
A   I think it's stated here the only thing -- the only thing that was remarkable was a hearing aid on the left.
Q   The remaining portions of the exam were normal?
A   Well, he indicated he has had the multiple surgeries on that ear, in that context, but otherwise, yes, there was nothing unremarkable.
Q   You note here that there were patch testing areas on the upper back to be evaluated by Dr. Farber, correct?
A   That's correct.
Q   Did you perform any evaluation of the patch testing that was done on Mr. Wright?
A   I did not.
Q   In terms of the torso, the abdomen, was there anything remarkable about the physical examination of Mr. Wright in that respect?

Page 58

A   No.
Q   You listened to his heart, you have already told us that, and that was normal, correct?
A   Correct.
Q   Regular rate, regular rhythm?
A   Correct.
Q   In terms of the lungs, did you listen to his lungs?
A   I did.
Q   While he inhaled and exhaled?
A   That's the way it's usually done.
Q   Understood. Many of us who will be in the courtroom, especially those sitting on a jury, may not be physicians and don't know how it's done. And I know you know how it's done, but --
A   I suspect you have been examined before.
Q   -- we may not know. So you listened to his lungs upon inhalation and exhalation, and in both instances the results were normal, correct?
A   That's correct.
Q   And his lungs were clear?

Page 59

A   They were.
Q   The examination of the lower extremities, was there anything unusual about his lower extremities?
A   No.
Q   How about his upper extremities?
A   No.
Q   Did you administer a pulmonary function test?
A   I did not.
Q   Is there any particular reason why not?
A   I was not asked to do so. Again, that's not part of a routine examination.
Q   All right. Given the particular complaints and the allegations in this lawsuit, was it something that you recommended be done?
A   I was told that a pulmonary function test had been done I believe during an independent medical examination, so there was one pending, but it took quite some time to get those results. I don't know why.
Q   Okay. Was that the reason that you didn't perform one, because you

Page 60

15 (Pages 57 to 60)

Case 2:07-md-01873-KDE-MBN   Document 11755-5   Filed 02/18/10   Page 4 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)　　Videotaped Deposition of Lawrence G. Miller, M.D.

**Page 69**

1  most cases.
2    Q   The level of that particular
3  exposure?
4    A   Generally, yes.
5    Q   And what particular problems
6  exposure to that particular substance can
7  cause?
8    A   Yeah, in general those are
9  correct. It depends on the specific
10 situation.
11   Q   Okay. If I have two substances
12 that could cause the same particular
13 issues -- Let's just say you have two
14 substances that can cause redness and watery
15 eyes. Okay?
16   A   Okay.
17   Q   And we know that an individual has
18 been exposed to both. How is it that you go
19 about determining whether one is the
20 particular cause as opposed to the other?
21   A   You would attempt to understand
22 the circumstances of the exposure as we just
23 described and you try to compare those with
24 the reported symptoms, and sometimes you can
25 differentiate the two and sometimes you

**Page 70**

1  can't.
2    Q   Okay. And in terms of this
3  particular individual, Mr. Wright, you only
4  know of one completed exposure pathway that
5  relates to his symptomatology, correct?
6    A   You know, I don't think we're
7  using the terms the same way. I'm
8  specifically referring to the exposure in
9  this case through the FEMA trailers, so it's
10 not that I don't know of other substances he
11 might be exposed to, but what this specific
12 paragraph refers to is the FEMA trailer
13 exposure. I think that's your question.
14   Q   Have you taken any steps to
15 exclude exposures to other substances as a
16 potential cause of Mr. Wright's complaints?
17   A   That would be very difficult to
18 do, to exclude other substances, but you
19 need to consider them in context.
20   Q   In terms of context, if Mr. Wright
21 was working 12 hours a day at a worksite,
22 wouldn't it be important to know what
23 chemicals he was exposed to for that half of
24 every day that he worked there?
25   A   It would certainly be helpful.

**Page 71**

1    Q   Let's talk a little bit about some
2  of the statements you make later in the
3  report. Again, Page 4 of the report, the
4  last full paragraph, there's a statement
5  contained therein where it says, "To
6  summarize, in animals, subchronic and
7  chronic exposure to formaldehyde leads to
8  rhinitis as determined by observation and
9  histopathology."
10       Did I read that correctly?
11   A   You did.
12   Q   In terms of histopathology, what
13 would we be looking for to determine whether
14 a particular individual had been exposed to
15 formaldehyde?
16   A   I'm not sure I understand your
17 question as applied to a particular
18 individual. Could you explain that?
19   Q   Sure. When you refer to
20 histopathology here, what specifically are
21 you referring to?
22   A   The histopathology reported in the
23 literature.
24   Q   Which would be damage to
25 epithelial cells?

**Page 72**

1    A   Broadly speaking, damage to the
2  lining or to the lining or mucosa of the
3  upper respiratory tract, yes.
4    Q   Including metaplasia and
5  dysplasia?
6    A   Those are specific types of
7  histopathology.
8    Q   Correct. And that's an objective
9  measure of whether someone has been exposed
10 to a level of a chemical, in this case
11 formaldehyde, sufficient to cause cellular
12 damage?
13   A   No, I don't think you stated that
14 properly.
15   Q   All right. How would I state it
16 to state it properly?
17   A   Histopathological abnormalities
18 are what they are. That's what you see when
19 you look under the microscope. They can't
20 tell you whether an individual was exposed
21 or to what was exposed. They simply show
22 you what's happening in the tissue.
23   Q   Okay. They give you a marker as
24 to whether cell damage has occurred?
25   A   That's correct, yes, broadly

18 (Pages 69 to 72)

Case 2:07-md-01873-KDE-MBN   Document 11755-5   Filed 02/18/10   Page 5 of 5

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Lawrence G. Miller, M.D.

1  allow us to draw a causal conclusion at this
2  point. Now, that could change in six months
3  or a year for all I know, as you see more
4  studies coming out.
5  EXAMINATION BY MR. BONE:
6      Q   But as we sit here today, the
7  literature that you have reviewed on which
8  you formulated opinion does not warrant a
9  causal association between exposure to fungi
10 and the symptomatology that Mr. Wright is
11 complaining of?
12     A   I believe the answer is "yes."
13     Q   Do you have any documents or
14 evidence that demonstrate any damage to the
15 epithelial cells of the upper respiratory
16 tract of Mr. Lyndon Wright?
17     A   I don't believe any biopsy of the
18 upper respiratory tract was ever performed,
19 so I don't believe we have tissue, because
20 the only way to answer the question as you
21 put it is to be able to look at the tissue.
22     Q   Okay. If we were to biopsy the
23 tissue, that would give us an objective
24 means of verifying whether any tissue damage
25 has occurred, correct?

Page 109

1      A   Yes, taking the limitations of the
2  small biopsies, which aren't always
3  representative, but, yes.
4      Q   But that has not been done?
5      A   Not to my knowledge, no.
6      Q   The evidence we have before us
7  does not support that there is any
8  epithelial damage to the upper respiratory
9  tract of Lyndon Wright, correct?
10     A   No, I don't agree.
11     Q   Okay. Tell me why you don't
12 agree.
13     A   Again, we're working with the
14 medical and scientific literature here,
15 which to me I think provides overwhelming
16 evidence that formaldehyde exposure causes
17 damage to the upper respiratory mucosa.
18         We know, as we talked about the
19 completed exposure pathway, that Mr. Wright
20 was exposed during his time in the FEMA
21 trailer.
22         Now, I think it's fair, it's more
23 than reasonable to assume, as I have
24 concluded, that he likely did sustain
25 further effects to his upper respiratory

Page 110

1  tract associated with a formaldehyde
2  exposure.
3      Q   Okay. From the testing that has
4  been done -- Let's set the literature aside.
5  None of those papers were written about
6  Lyndon Wright, were they?
7      A   You're correct.
8      Q   And none of those papers studied
9  Lyndon Wright's upper respiratory airway,
10 did they?
11     A   They did not.
12     Q   Okay. As it relates to Lyndon
13 Wright, we have testing that has been done,
14 correct?
15     A   We do.
16     Q   And none of that testing
17 demonstrates epithelial cell damage in the
18 upper respiratory tract of Lyndon Wright,
19 correct?
20     A   I think now I understand your
21 question. Let me add one more point, now
22 that I think I understand it.
23         Obviously, we have tests showing
24 the presence of chronic sinusitis in
25 Mr. Wright. We have imaging that supports

Page 111

1  that.
2          Now, does the imaging get down to
3  the individual cell level? No, it does not.
4  It's at the tissue level, so it's one level
5  up. But there's certainly evidence of
6  abnormalities at the tissue level. So I
7  think, if I understand your question, that's
8  how I would respond.
9      Q   Okay. Perhaps my questions are
10 inartful. Do you have a document or
11 evidence that shows me epithelial cell
12 damage of the upper respiratory tract of
13 Mr. Lyndon Wright?
14     A   I would go back to what I stated
15 earlier. To my knowledge, no biopsy was
16 performed, so we can't answer that question.
17     Q   And the only way to answer that
18 question, in your opinion, is to perform a
19 biopsy?
20     A   Well, I think your question is
21 circular. If you want to see epithelial
22 cells, you've got to look at cells. And if
23 cells weren't looked at, you don't know the
24 answer.
25     Q   Okay. Have you looked at the

Page 112

28 (Pages 109 to 112)