John Osteraas PhD                                              December 16, 2009

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In re: FEMA TRAILER FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION
MDI. NO. 1873
SECTION "N" (5)

DEPOSITION OF JOHN D. OSTERAAS, Ph.D.
Taken on behalf of the Plaintiffs
Wednesday, December 16, 2009

**Page 2**

1                   APPEARANCES
2
3     Appearing on behalf of the Plaintiff:
4     PETER PINEDO
5     THE LAW OFFICE OF CHRIS PINEDO
6     4550 Jericho Road
7     Corpus Christi, TX 78413
8     (361) 964-1474
9     (361) 244-2278
10    Cpinedo@cpinedolaw.com
11
12    Appearing on behalf of the Plaintiff:
13    FRANK J. D'AMICO, JR.
14    THE LAW OFFICE OF FRANK J. D'AMICO, JR.
15    622 Baronne Street
16    New Orleans, LA 70113
17    (504) 525-7272
18    Fdamicojr@damicolaw.net
19
20
21
22
23
24
25

**Page 3**

1     Appearing on behalf of,
2     the United States:
3     HENRY T. MILLER
4     US DEPARTMENT OF JUSTICE
5     Environmental Torts
6     1331 Pennsylvania Avenue NW
7     Washington, DC 20004
8     (202) 616-4223
9     (202) 616-4989
10    Henry.miller@usdoj.gov
11
12    Appearing on behalf of,
13    the Forest River:
14    JASON D. BONE
15    ERNEST GIEGER, JR.
16    GIEGER, LABORDE & LAPEROUSE, LLC
17    One Shell Square
18    701 Poydras Street, 48th floor
19    New Orleans, LA 70139
20    (504) 561-0400
21    (504) 561-1011
22    Jbone@glllaw.com
23    Egieger@glllaw.com
24
25

**Page 4**

1     Appearing on behalf of,
2     the Defendant Shaw Environmental, Inc.:
3     DAVID KURTZ
4     KAREN ALER WHITFIELD
5     BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
6     201 St. Charles Avenue, Suite 3600
7     New Orleans, LA 70170
8     (504) 566-5216
9     (504) 636-3916 Fax
10    dkurtz@bakerdonelson.com
11    Kwhitfield@bakerdonelson.com
12
13    Appearing on behalf of,
14    Fluor Enterprises:
15    RICHARD A. SHERBURNE JR. (Via telephone)
16    MIDDLEBERG, RIDDLE & GIANNA
17    450 Laurel Street, Suite 1101
18    Baton Rouge, LA 70801
19    (225) 381-7700
20    (225) 381-7730 Fax
21    RSherburne@midrid.com
22
23
24
25

EXHIBIT "B"

1 (Pages 1 to 4)

John Osteraas PhD                                           December 16, 2009

| | | | |
|---|---|---|---|
| 1 | Appearing on behalf of the Defendant, | 1 | ALSO PRESENT: |
| 2 | Bechtel National, Inc.: | 2 | |
| 3 | A.J. KROUSE (via telephone) | 3 | Sid Fox, |
| 4 | FRILOT, LLC | 4 | Videographer, |
| 5 | 1100 Poydras Street | 5 | Naegeli Reporting Corporation |
| 6 | 3700 Energy Centre | 6 | |
| 7 | New Orleans, LA 70163 | 7 | |
| 8 | (504) 599-8016 | 8 | |
| 9 | (504) 599-8116 Fax | 9 | |
| 10 | AKrouse@Frilot.comom | 10 | |
| 11 | | 11 | |
| 12 | Appearing on behalf of, | 12 | |
| 13 | Jayco, Inc., and Starcraft RV, Inc.: | 13 | |
| 14 | HAL L. ROACH, JR. (Via telephone) | 14 | |
| 15 | WILLINGHAM, FULTZ & COUGILL | 15 | |
| 16 | 808 Travis, Suite 1608 | 16 | |
| 17 | Houston, TX 77002 | 17 | |
| 18 | (713) 333-7600 | 18 | |
| 19 | (713) 333-7601 | 19 | |
| 20 | Halr@willingham-law.com | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |

Page 5                                                      Page 7

| | | | |
|---|---|---|---|
| 1 | Appearing on behalf of, | 1 | INDEX |
| 2 | Crum & Forster: | 2 | Page |
| 3 | HEATHER CHEESBRO (via telephone) | 3 | |
| 4 | LOBMAN, CARNAHAN, BATT, ANGELLE & NADER | 4 | EXAMINATION BY MR. D'AMICO          12 |
| 5 | 400 Poydras Street | 5 | |
| 6 | Texaco Center, Suite 2300 | 6 | |
| 7 | New Orleans, LA 70130 | 7 | |
| 8 | (504) 586-9292 | 8 | |
| 9 | (504) 586-1290 Fax | 9 | |
| 10 | Hfc@lcba-law.com | 10 | |
| 11 | | 11 | |
| 12 | Appearing on behalf of, | 12 | |
| 13 | Recreation by Design, TL Industries, | 13 | |
| 14 | Frontier RV, Play'Mor Trailers, Cruiser RV: | 14 | |
| 15 | KELLY M. MORTON (via telephone) | 15 | |
| 16 | GARRISON, YOUNT, FORTE & MULCAHY, L.L.C. | 16 | |
| 17 | 909 Poydras Street, Suite 1800 | 17 | |
| 18 | New Orleans, LA 70112 | 18 | |
| 19 | (504) 527-0680 Main | 19 | |
| 20 | (504) 412-7131 Direct Dial | 20 | |
| 21 | (504) 527-0686 Facsimile | 21 | |
| 22 | Kmorton@garrisonyount.com | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |

Page 6                                                      Page 8

|   | EXHIBITS | |
|---|---|---|
| Exhibit | | Page |
| 1 | NOTICE OF ORAL AND VIDEOTAPED DEPOSITION OF JOHN D. OSTERAAS | 54 |
| 2 | EXPONENT - INVOICES | 54 |
| 3 | LETTER TO DAVID KURTZ FROM JOHN D. OSTERAAS DATED 11-17-2009 | 55 |
| 4 | EXPONENT - ENGINEERING INVESTIGATION LYNDON WRIGHT TRAILER | 119 |
| 5 | EXPONENT - ENGINEERING INVESTIGATION LYNDON WRIGHT TRAILER | 101 |
| 6 | WORK PLAN FOR SITE INSPECTION, ASSESSMENT, INSTALLATION, MAINTENANCE, TRANSPORTATION, AND DE-INSTALLATION OF TEMPORARY HOUSING UNITS | 120 |
| 7 | PART 2 - DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | 102 |

Page 9

DEPOSITION OF JOHN D. OSTERAAS, Ph.D.,
Taken on behalf of the Plaintiffs
Wednesday, December 16, 2009

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of JOHN D. OSTERAAS, Ph.D., was taken before Tia B. Reidt, #2798, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on December 16, 2009, commencing at the hour of 9:09 a.m., the proceedings being reported at Naegeli Reporting, 601 Union Street, Suite 1624, Seattle, Washington, Seattle, Washington.

Page 10

DEPOSITION OF JOHN D. OSTERAAS, Ph.D.
Wednesday, December 16, 2009
9:09 a.m.

THE VIDEOGRAPHER:  We are on the record.  This is a statement for a video deposition.  I'm the videographer, and my name is Sid Fox.

This videotaped deposition has been noticed by attorney Aaron Ahlquist and is being held on December 16th, 2009, at approximately 9:10 a.m.  The location is Naegeli Reporting, 601 Union Street, Suite 1624, Seattle, Washington 98101.

The case caption is in regards to the FEMA trailer formaldehyde products liability litigation filed in the United States District Court, Eastern District of Louisiana, Case No. MDL No. 1873.

The deponent is John Osteraas Ph.D.

Would counsel and all present please identify yourselves and state whom you represent.

MR. KURTZ:  Dave Kurtz on behalf of Shaw Environmental, Inc.

MS. WHITFIELD:  Karen Whitfield on behalf of Shaw Environmental, Inc.

MR. GIEGER:  Ernie Gieger on behalf of Forest River.

Page 11

MR. BONE:  Jason Bone on behalf of Forest River.

MR. MILLER:  Henry Miller on behalf of the Defendant, United Stated States of America.

MR. D'AMICO:  Frank and Chris Pinedo on behalf of the Plaintiff Steering Committee and the Plaintiff, Lyndon Wright.

THE VIDEOGRAPHER:  The deposition is being taken before Tia Reidt, who will now swear in the witness.

JOHN DAVID OSTERAAS, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. D'AMICO:

Q.  Would you please state your name for the record?

A.  John David Osteraas.

Q.  And what do you do, sir?

A.  I am an engineer with Exponent, Incorporated.

Q.  And are you licensed?

A.  Yes, I am licensed.

Q.  And where are you licensed?

A.  I am licensed in about 11 jurisdictions, which are listed on my CV.  I'm licensed in Louisiana, of course, also California, Wisconsin, Nevada, Utah, Arizona, Oregon, Illinois, New York, Mississippi, Ohio, and the District of

Page 12

John Osteraas PhD                                December 16, 2009

Page 13

1  Columbia.
2     Q.  When did you become licensed in Louisiana?
3     A.  Late 2005.
4     Q.  When you say late 2005, do you know what month?
5     A.  Offhand, I do not, no.
6     Q.  Why is it you obtained a license for professional
7  engineering in Louisiana?
8     A.  So that I could offer engineering services in the
9  state of Louisiana.
10    Q.  Was it in connection with any assignment?
11    A.  It was in connection with work our firm was doing,
12  related to Hurricane Katrina damage assessment.
13    Q.  And who hired you?
14    A.  I'm sorry?
15    Q.  Who hired you to do work in connection with
16  Katrina damage assessment?
17    A.  In Louisiana, we were retained by All America
18  Insurance Company.
19    Q.  And what was your task in relationship to that
20  work?
21    A.  To do damage assessment of insured properties that
22  had sustained damage as a result of Hurricane Katrina.
23    Q.  Tell me a little bit about Exponent.
24       Where is that firm principally located?
25    A.  We have offices across the country, I think about

Page 14

1  20 offices across the country & 4 international offices.
2     Q.  Any offices in Louisiana or Mississippi?
3     A.  We do not have offices in Louisiana or
4  Mississippi.
5     Q.  What about Florida?
6     A.  We have an office in Florida.
7     Q.  Where is that located?
8     A.  Miami.
9     Q.  And what about Alabama?
10    A.  We do not have an office in Alabama.
11    Q.  Texas?
12    A.  We have an office in Texas.
13    Q.  And where is that office?
14    A.  Houston.
15    Q.  Other Houston, do you have any other offices in
16  Texas?
17    A.  No.
18    Q.  Other than Miami, do you have any other offices
19  in Florida?
20    A.  No.
21    Q.  All right.  Looking at your CV, it appears that
22  you have some specialization in the evaluation of the
23  performance of buildings under extreme loads, including
24  earthquakes.
25       Why don't you tell us about that, please.

Page 15

1     A.  In what regard?  I could go on all day about
2  earthquakes and buildings.
3     Q.  Give us the skinny.  When did you first become
4  involved in the evaluation of performance of buildings under
5  extreme loads, including earthquakes?
6     A.  Well, you want me to start with just buildings
7  under extreme loads or earthquakes?  Which?
8     Q.  Let's start with the first one.
9     A.  Buildings under extreme loads?
10    Q.  Yes.
11    A.  Okay.  My work in that regard began in probably
12  1978.  Either '78 or '79, where I began looking at buildings
13  that had either been destroyed by high winds or overload
14  from -- oh, I shouldn't say destroyed.  Destroyed or damaged
15  by high winds or snow overload.  I've continued doing that
16  work for, basically, the balance of my professional career
17  up until this date.
18    Q.  Okay.  I was asking about earthquakes, and maybe
19  my question wasn't clear.  And if it wasn't -- if I ask an
20  unartful question, please tell me.  I didn't sleep well last
21  night and I'm a little groggy today, and so my questions may
22  not be clear.
23       I was asking about your experience with
24  earthquakes.  And it seems that from your CV, you have
25  expressed that you have a specialization in the evaluation

Page 16

1  of the performance of buildings under extreme loads,
2  including earthquakes; is that true?
3     A.  No, you haven't read the sentence in its entirety.
4     Q.  Okay.  Go ahead.  If you want to expand upon that.
5  Earthquakes in relation to wind, flood, landslide,
6  explosion?
7       Explain it, please.  What is your --
8     A.  I'm sorry.  Waiting -- I don't understand what
9  your question is.  I thought you were asking me about my
10  experience with the evaluation of performance of buildings
11  under extreme loads.
12    Q.  Particularly with regard to earthquakes.
13    A.  Okay.  So you want to know my experience with
14  performance of buildings during earthquakes?
15    Q.  Earthquakes.  Yeah.
16    A.  Fair enough.
17    Q.  I wanted to know where you first got involved with
18  that and where that was.
19    A.  My first experience with earthquake damage
20  assessment was, in practice, as opposed to academics, was
21  following the Kalinga earthquake in, I believe, 1983.
22    Q.  Okay.  Where did you reside at that time?
23    A.  I was in California at that time.
24    Q.  And where do you reside today?
25    A.  I'm still in California.  I still reside in

John Osteraas PhD                                      December 16, 2009

| | |
|---|---|
| 1    California. I'm not currently in California, but... | 1      Q. We read the first line, and then you read the |

1    California. I'm not currently in California, but...
2        Q. Okay. And from looking at your academic
3    credentials, you received a Ph.D. in civil engineering from
4    Stanford University?
5        A. That is correct.
6        Q. All right. And you received your MS in civil
7    engineering, structural engineering from Stanford University
8    in 1977?
9        A. That is correct.
10       Q. And a BS was obtained at the University of
11   Wisconsin, Madison in 1976?
12       A. That's correct.
13       Q. So, is it safe to assume that once you graduated
14   from the University of Wisconsin in 1976, you moved to
15   California?
16       A. I relocated to California for about nine months
17   while I did my -- worked on my master's degree at Stanford,
18   and then I returned to Wisconsin.
19       Q. Okay. So when did you move to California after
20   that?
21       A. 1982.
22       Q. '82. Okay. So from 82 to the present, you have
23   been residing, where, in California?
24       A. I've been residing in the San Francisco bay area,
25   California.

Page 17

1        Q. We read the first line, and then you read the
2    second line and we're on the third line.
3        A. Well, I didn't read the second line, I just went
4    through a summary of the first paragraph.
5        Q. Okay. I want to ask you about that sentence where
6    you say, "Dr. Osteraas has experience in structural and
7    earthquake engineering, including structural safety and
8    damage assessment."
9        Do you see that?
10       A. I see that sentence.
11       Q. Okay. That is an accurate sentence, correct?
12       A. You didn't quote it quite correctly. It says,
13   "Dr. Osteraas' expertise in structural and earthquake
14   engineering includes structural safety and damage
15   assessment, structural analysis, soil structure interaction,
16   seismic site response assessment and analysis and design of
17   wood, steel, concrete, masonry and composite systems."
18       Q. Okay. I was going to break it down, I didn't read
19   the whole sentence, I did stop at safety and damage
20   assessment. That part of the sentence, I think we discussed
21   a little bit, your earthquake engineering. And you have
22   studied that in some detail, correct?
23       A. I have studied earthquake engineering in some
24   detail, yes.
25       Q. And the next part of the sentence, structural

Page 19

1        Q. And San Francisco has been known to have a few
2    earthquakes, has it not?
3        A. It is one of its better known attributes, yes.
4        Q. What other fields of specialty besides
5    earthquakes do you hold yourself out in?
6        A. Well, there are really three general areas that
7    I've identified. One is evaluation of performance of
8    buildings under extreme loads, which includes earthquakes,
9    wind, flood, landslide, explosion, high energy impact, and
10   construction failure.
11       I also have expertise in, basically, geotechnical
12   aspects of structural engineering, looking at soil
13   structural -- soil structure interaction. And then the
14   third area would be the general area of design and
15   construction, related to the process of construction and
16   problems that arise in the course of construction, as well
17   as performance, long term performance of building structures
18   and building envelopes.
19       Q. Okay. I'm reading from it, looks like Page 1 of
20   your CV, base 000110. And it says here that you have
21   expertise in structural and earthquake engineering,
22   including structural safety and damage assessment, correct?
23       It's in the middle of the paragraph. I'm just
24   reading the lines down. It's not tricky.
25       A. No, no, I'm just trying to figure out where --

Page 18

1    analysis, what does that relate to?
2        A. What does structural analysis relate to.
3        Q. Yes, in your field of expertise.
4        A. Well, that is the analysis of structures,
5    primarily the analysis of structures in response to imposed
6    or environmental loading.
7        Q. Okay. What type of structures have you been
8    trained in analyzing?
9        A. Well the -- the training and expertise in
10   structural analysis is more related to the process of
11   analysis, and it can involve structures as small as computer
12   chips or as large as high-rise buildings.
13       Q. Okay. But I'm asking about you, in particular,
14   not the general trade of structural analysis.
15       Do you have training in computer chip analysis?
16       A. Well, you were asking me questions about what
17   training I had in structural analysis, and I'm saying
18   structural analysis is a process that, it's the same process
19   whether you're looking at a computer chip or a high-rise
20   building.
21       Q. Okay. I understand that answer, I think, but I'm
22   just wanting to find out about your background. These are
23   all general background questions about you, Mr. Osteraas.
24       And I want to know when you say this in this first
25   page of your CV, where you're referring to structural

Page 20

5 (Pages 17 to 20)

John Osteraas PhD                                                    December 16, 2009

| | |
|---|---|
| 1 | analysis, what type of structures you claim to have |
| 2 | expertise in.  Now, you mentioned it can go anywhere from a |
| 3 | computer chip to a high-rise. |
| 4 |       Do you have training in computer chip structural |
| 5 | analysis? |
| 6 |    A.  The -- again, you know, the analysis -- give me a |
| 7 | structure, I can analyze it in terms of my training.  My |
| 8 | training is not particular to any type of structure in terms |
| 9 | of structures I have analyzed, if that's the question you're |
| 10 | asking me. |
| 11 |    Q.  I'm just trying to understand the third or forth |
| 12 | sentence in your CV right now.  You say you have expertise |
| 13 | in structural and earthquake engineering, "includes |
| 14 | structural safety and damage assessment."  And then next |
| 15 | part is "structural analysis."  I just want to know what |
| 16 | structures you claim expertise in. |
| 17 |    A.  Okay.  So that's a different question. |
| 18 |    Q.  Well, I thought it was the same question. |
| 19 |       But do you claim expertise in structural analysis |
| 20 | of computer chips? |
| 21 |    A.  I do not, no. |
| 22 |    Q.  Okay.  Then can you tell me what structural -- |
| 23 | what structures you do claim expertise in analyzing? |
| 24 |    A.  Again, I think to clear this up.  I will -- I can |
| 25 | tell you what kind of structures I have analyzed. |

Page 21

| | |
|---|---|
| 1 |    Q.  And where did this work take place? |
| 2 |    A.  You mean, where were the accident sites? |
| 3 |    Q.  Okay.  Tell me about that. |
| 4 |       What did Champion ask you to do, what was your |
| 5 | assignment? |
| 6 |    A.  Well, our assignment was to investigate several |
| 7 | accidents that had occurred in the course of installing |
| 8 | several mobile homes, and we did site investigations, |
| 9 | exemplar testing, analysis. |
| 10 |    Q.  Okay.  Now, let's talk about the site |
| 11 | investigations -- let's talk about the state first. |
| 12 |       In which state did these site investigations |
| 13 | occur? |
| 14 |    A.  The first one was in Texas. |
| 15 |    Q.  Okay.  Was that involving litigation? |
| 16 |    A.  That did involve litigation, yes. |
| 17 |    Q.  Okay.  And that's the first time you had |
| 18 | experience investigating accidents that occurred in |
| 19 | installing mobile homes? |
| 20 |    A.  That is my first -- I believe that was the first |
| 21 | case I worked on, where there was personal claim related to |
| 22 | installation of a mobile home. |
| 23 |    Q.  And did this case go to court? |
| 24 |    A.  You mean did it go to trial? |
| 25 |    Q.  Well, was a suit filed, first? |

Page 23

| | |
|---|---|
| 1 |    Q.  If that [speaking simultaneously] -- |
| 2 |    A.  I would have no trouble of doing structural |
| 3 | analysis of a computer chip.  I haven't done that in my |
| 4 | career, but types of structures I have analyzed include wood |
| 5 | frame structures, steel structures, concrete structures, |
| 6 | masonry structures, composite systems.  I have done |
| 7 | structural analysis of mobile homes.  I have done structural |
| 8 | analysis of single family residences, I have done structural |
| 9 | analysis of the World Trade Center towers.  I have done |
| 10 | structural analysis of the Murrah Building. |
| 11 |    Q.  Okay.  Let's slow down.  Mobile homes.  Let's |
| 12 | start with that. |
| 13 |       When did you do analysis, structural analysis of |
| 14 | mobile homes? |
| 15 |    A.  Late 1980s, early to mid 1990s would be my best |
| 16 | estimate on that. |
| 17 |    Q.  And in what capacity were you analyzing mobile |
| 18 | homes, in the early 1980s to mid 1990s? |
| 19 |    A.  What do you mean, "in what capacity?" |
| 20 |    Q.  What were you doing? |
| 21 |    A.  We were doing structural analysis of the |
| 22 | performance of mobile homes and their stability under -- |
| 23 | during the process of jacking and blocking. |
| 24 |    Q.  Who hired you to do that? |
| 25 |    A.  We were retained by Counsel for Champion Homes. |

Page 22

| | |
|---|---|
| 1 |    A.  Oh, it's my understanding, yes, there was a suit |
| 2 | filed. |
| 3 |    Q.  I'm moving real slow.  These are not complicated |
| 4 | questions, I'm going very basic. |
| 5 |       First question is:  Was a suit filed?  Now, I'm going |
| 6 | to ask you if a deposition was taken, and then I'll ask you |
| 7 | if it went to trial.  I'm not trying to be tricky. |
| 8 |       So, you think suit was filed in this case in |
| 9 | Texas? |
| 10 |    A.  That is my understanding. |
| 11 |    Q.  All right.  Do you know the year that this |
| 12 | occurred? |
| 13 |    A.  Not off the top of my head, I don't. |
| 14 |    Q.  All right.  I believe you told us earlier that you |
| 15 | started doing this in the early '80s.  Would this be in the |
| 16 | early '80s? |
| 17 |    A.  No.  In response to your question about mobile |
| 18 | homes, I said it was late '80s to early to mid '90s. |
| 19 |    Q.  Okay.  Sorry.  I thought you said early '80s to |
| 20 | mid '90s.  Okay. |
| 21 |       So do you know the year when you would have been |
| 22 | involved in this litigation? |
| 23 |    A.  Not any more specifically than the time frame I |
| 24 | just gave you. |
| 25 |    Q.  All right.  What part of Texas did it occur? |

Page 24

John Osteraas PhD                                                           December 16, 2009

1    A.   Amarillo.
2    Q.   And you were retained by Champion to investigate
3    what?
4    A.   To investigate the structural aspects -- well, the
5    structural and human aspect factors of that accident.
6    Q.   All right.  Do you have expertise in human factors
7    design?
8    A.   I do not.  I got a colleague involved in that
9    aspect of it.
10   Q.   What was your role in the case?
11   A.   My role was overall project management, overall
12   technical responsibility for the project.  I conducted the
13   site investigation, conducted the testing of the trailer and
14   conducted the analysis of the -- conducted and oversaw the
15   analysis of the trailer.
16   Q.   All right.  What were the allegations of the
17   lawsuit?
18   A.   The allegations against Champion were that the
19   home, the mobile home was defective in design and
20   construction, and that defect led to the accident.  The
21   second allegation was that the mobile home was defective due
22   to lack of adequate warnings of the possibility that gravity
23   might exist at a site, and the thing might fall off the
24   jacks if it was not jacked properly.
25   Q.   Okay.  So the Plaintiff in this case in Amarillo,

Page 25

1    recall specifically if it was a fatality or just a permanent
2    injury, but a similar situation:  A mobile home that fell on
3    the installer while it was being jacked and up onto blocks.
4    Q.   Okay.  So these first two cases, you believe, were
5    what, mid to late '80s?  I'm not trying to pin you down to
6    an exact date, I'm just trying to get a reference in time.
7    A.   Late '80s to early to mid '90s.
8    Q.   These are the first two cases you were involved
9    in?
10   A.   Yes.
11   Q.   To your recollection, how many mobile home cases
12   have you been involved in?
13   A.   Well there are three that stand out.  We have
14   talked about two of those.  There have been -- there have
15   been others, the details of which have long since faded.
16   Q.   Okay.  These first two that you were involved in,
17   I believe you told us the second one involved a fatality
18   when the installer was trying to jack up the mobile home.
19   A.   It was either a fatality or serious injury.
20   Q.   Okay.  And in these both of these first two cases,
21   were the mobile homes being placed on piers?
22   A.   Yes, they were being jacked up to be installed on
23   -- in one case, in the first case, it was essentially just
24   concrete block piers.  In the second situation, I believe it
25   was a double-wide being put onto a permanent foundation.

Page 27

1    Texas got injured while trying to jack the trailer?
2    A.   He did yes.
3    Q.   And did you give a deposition in this case?
4    A.   I believe so, but I don't have any specific
5    recollection.
6    Q.   Did the case go to trial?
7    A.   I didn't go to trial, it settled.
8    Q.   So you gave no trial testimony in this case?
9    A.   No.
10   Q.   Do you recall the name of the Plaintiff?
11   A.   I don't, no.
12   Q.   Is it written down someplace, where you have a log
13   of cases you've been involved in?
14   A.   I'm sure it is.  Probably, somewhere in our
15   archives.
16   Q.   Okay.  So if you were asked to do so, do you
17   believe you could search the archives and tell us the name
18   of this case?
19   A.   It may be possible.
20   Q.   Okay.  What is the next time you were involved in
21   a mobile home litigation case?
22   A.   It would have been perhaps a year or two after the
23   first one, the one we just discussed.  That involved a case
24   in Idaho or Montana, similar circumstances, I believe there
25   may have been a fatality involved in that one.  I don't

Page 26

1    Q.   Okay.  So in the first one it was, you believe,
2    concrete block piers that it was being placed onto?
3    A.   The first one was concrete block piers.
4    Q.   Okay.  The concrete block piers, was there any
5    kind of pad underneath the piers, to your recollection?
6    A.   Not that I recall.
7    Q.   And what do you recall about the allegations of
8    this case, in which the Plaintiff in Amarillo sustained
9    injury when trying to block and install this mobile home
10   that Champion had manufactured?
11   A.   You mean beyond what I have already answered about
12   that?
13   Q.   I'm wanting to get into a little more detail about
14   that case, if you recall.
15   A.   Well there were two primary allegations against
16   Champion.  One was failure to warn, the other was --
17   Q.   Stop.  Let's go slow.  Failure to warn about what?
18   A.   About the -- basically, the existence of gravity
19   and the possibility that these things could fall off jacks
20   if one didn't properly jack and maintain stability of the
21   trailer.
22   Q.   Okay.  You may be saying that a little
23   facetiously, or tongue in cheek.
24        Was that really an allegation, that the Plaintiff
25   wasn't warned about gravity?

Page 28

John Osteraas PhD                                               December 16, 2009

| | |
|---|---|
| 1   A.  Essentially.  The allegation was that the | 1   A.  Well, no, that there were no warnings actually on |
| 2   Plaintiff was not warned about the possibility that the | 2   the rail beam where he was jacking it. |
| 3   mobile home could fall and cause serious injury to anybody | 3   Q.  Okay.  So there may have been a warning in the |
| 4   who happened to be under the mobile home while it was being | 4   manual, but he didn't have the manual in front of him.  He |
| 5   jacked up. | 5   was looking at the i-beam and there was no warning at the |
| 6   Q.  Do you recall what the Plaintiff did incorrectly | 6   i-beam? |
| 7   that caused his injury? | 7   A.  That was essentially the allegation. |
| 8   A.  I do, yes. | 8   Q.  Okay.  So it was basically placement of the |
| 9   Q.  Tell us about that.  What did he do wrong, other | 9   warning, is what he was complaining about? |
| 10   than not knowing about gravity? | 10   A.  Essentially, yes. |
| 11   A.  There were two things.  And -- well, three things, | 11   Q.  All right.  Do you recall if there was a warning |
| 12   I think, if you go back and include his employer.  My | 12   that this could happen in the manual for this Champion |
| 13   recollection was that this was somebody who had received | 13   trailer? |
| 14   eventually no training from his employer, this was one of -- | 14   A.  I don't recall what information was contained in |
| 15   he had been set out to install this home. | 15   the manual. |
| 16   This was the first, or one of the first, if not | 16   Q.  Okay.  But this case you said went to trial and |
| 17   the first mobile homes he installed.  He was working with a | 17   the Plaintiff did not recover? |
| 18   partner who had just a little bit more experience than he | 18   A.  No.  I said I -- as far as I know it didn't go to |
| 19   did.  They had one jack.  They were attempting to jack the | 19   trial, it was settled before trial. |
| 20   trailer, the mobile home to it's final elevation in just one | 20   Q.  Okay.  I'm sorry.  I misunderstood.  All right. |
| 21   setup, one operation, and they ended up getting the mobile | 21   Now the second case involving a Champion mobile home, you |
| 22   homes supported onto diagonally opposite corners. | 22   said, occurred in Idaho? |
| 23   Q.  Okay. | 23   A.  Idaho or Montana. |
| 24   A.  And to the point where it became unstable, and | 24   Q.  Idaho or Montana, and you don't know the year of |
| 25   simply reached the point of instability and the jack toppled | 25   that, correct? |
| Page 29 | Page 31 |
| 1   over. | 1   A.  The same window of time that I gave you |
| 2   Q.  And the trailer crushed the guy? | 2   previously. |
| 3   A.  The trailer crushed the installer who was under -- | 3   Q.  But you know Champion was the Defendant? |
| 4   actually under the trailer doing the jacking. | 4   A.  Yes. |
| 5   Q.  All right.  What kind of mobile home was this?  It | 5   Q.  And you were retained by Champion to look at what? |
| 6   wasn't a travel trailer, was it? | 6   A.  Outside counsel for Champion.  It was a very |
| 7   A.  No, it was a -- you know, more or less | 7   similar set of issues, the worker had been either seriously |
| 8   conventional single-wide mobile home. | 8   injured or killed in the process of installing this |
| 9   Q.  Okay.  And I think you said there was no pad, no | 9   particular mobile home, and we investigated that accident, |
| 10   concrete pad underneath the travel trailer where they were | 10   as well. |
| 11   trying to install it on these piers? | 11   Q.  All right.  Now, I believe you said that in the |
| 12   A.  No, there was no concrete pad.  This was just out | 12   second accident, the trailer was set up on a concrete pad? |
| 13   in the plains, outside of Amarillo. | 13   A.  Yeah, and let me back up on that one.  I think -- |
| 14   Q.  Okay.  And so this person was inexperienced and he | 14   now that I think about it, I think the accident actually |
| 15   claimed a lack of failure to warn. | 15   happened someplace other than the site that we ultimately |
| 16   What was the other allegation that he claimed? | 16   inspected the mobile home.  I think, as a result of the |
| 17   A.  The other allegation was that the trailer -- I'm | 17   accident that the mobile home was returned and sold to |
| 18   sorry, the mobile home was structurally defective because it | 18   somebody else, and then installed on a different foundation. |
| 19   would become unstable when just -- when supported to -- | 19   But it was -- |
| 20   Q.  Diagonally -- | 20   Q.  Let's stop there.  Before you go on, what was |
| 21   A.  Diagonally opposite points on the trailer. | 21   different about the foundation? |
| 22   Q.  Okay.  And he said there was no warnings in the | 22   A.  Well, the foundation at the place that I inspected |
| 23   manual to warn of this, and therefore Champion was liable | 23   it was a, what I would characterize as, essentially, a |
| 24   because they failed to warn him that this was an improper | 24   permanent foundation.  It was not a pad, but I believe there |
| 25   way to jack and block this trailer.  Is that basically it? | 25   were concrete stem walls around the perimeter, and again I'm |
| Page 30 | Page 32 |

John Osteraas PhD                                                      December 16, 2009

1    going on memory from about 15 or 20 years ago but there were
2    --
3        Q.   Okay, let me ask you --
4        A.   There was a foundation around the perimeter.  I
5    think it went below the frost line.  And there were probably
6    interior piers, as well.  I don't have any specific
7    recollection of those.
8        Q.   Okay.  You say it wasn't a pad.  You think it was
9    a foundation around the perimeter with interior piers.
10       Is that similar to a chain wall?
11       A.   I don't know what a chain wall is.
12       Q.   Well, explain to me what you're talking about a
13   foundation around the perimeter with the interior piers.
14   Explain that to me.
15       See, in Louisiana we know something called a chain
16   wall.  And it's typically a concrete -- you pour concrete
17   along the perimeter where the pads -- where the concrete
18   piers are going to go, and it goes around the whole
19   perimeter of the structure.  And colloquially, we call that
20   a chain wall.
21       Is that what you're referring to?
22       A.   I'm not -- I'm not sure the two are equivalent.
23   What I was referring to was what, I believe, was actually a
24   concrete foundation that was placed in the ground, the depth
25   of which went below the frost line into, perhaps, 3 and-a-

Page 33

1        Q.   What is frost heave?
2        A.   When ground freezes in the winter, in certainly
3    the northern tier of states, depending on the soil type and
4    the moisture content, the ground surface can actually heave,
5    rise up.
6        Q.   Shifts?
7        A.   It can shift differentially, especially relative
8    to the perimeter, where the ground will likely freeze deeper
9    than under the interior of the trailer, where you'll have a
10   more shallow situation.  And, you know, in Alaska you can
11   see extreme cases of this, where after a few years,
12   buildings are quite a bit out of level and distressed as a
13   result of repeated cycles of frost heave.
14       Q.   Okay.  I don't think we have a lot of that in New
15   Orleans.  I think I'm familiar with another term called soil
16   subsidence.
17       Are you familiar with that phenomenon?
18       A.   Soil subsidence, in terms of what is going on in
19   New Orleans?  I am familiar with that.
20       Q.   Okay.  That's been a problem that has existed for
21   some quite some time in New Orleans, has it not?
22       A.   It has, yes.
23       Q.   Okay.  And if one were to use just a concrete pier
24   system for a travel trailer, such as the one that was being
25   installed in Amarillo, Texas, in New Orleans, would there be

Page 35

1    half of 4 feet into the ground and probably extended above
2    the ground 18 to 24 inches.  It would have been, probably, a
3    six- or eight-inch wide concrete or concrete block wall
4    around the entire perimeter.
5        Q.   Okay.  What would be the purpose of doing this
6    perimeter foundation around the travel trailer?
7        A.   Well, to essentially, again, this was a double-
8    wide, essentially to provide it with a permanent foundation,
9    long-term foundation.
10       Q.   And what are the advantages of this type of
11   foundation versus the concrete piers that were being used to
12   set up the first travel trailer you told us about?
13       MR. KURTZ:  Objection; form.
14   BY MR. D'AMICO:
15       Q.   If any.
16       A.   What is the difference?
17       Q.   Yeah.  What is the difference, and are there any
18   benefits for one over the other?
19       A.   Well, I think the -- yeah, obviously there are
20   benefits to each of the techniques.  The use of blocks, as
21   was done in Texas is quick and economical, and certainly
22   works fine, where one doesn't have to contend with issues of
23   frost heave.
24       Q.   Frost heave?
25       A.   Frost heave.

Page 34

1    a potential for some soil subsidence, if it was installed
2    using concrete piers as opposed to this perimeter foundation
3    used in Idaho?
4        MR. KURTZ:  Objection; form.
5        THE WITNESS:  I think subsidence is a phenomenon
6    that's totally independent of the installation of trailers.
7    That's just, you know, what is happening with, you know, the
8    whole Mississippi delta.  So I don't think either foundation
9    would address the issue of subsidence in New Orleans.
10   BY MR. D'AMICO:
11       Q.   Interesting.  So what would be an adequate
12   foundation to address the issue of subsidence in New
13   Orleans?
14       MR. KURTZ:  Objection; form.
15       THE WITNESS:  Well, I think we would have to look
16   at the foundations that are used under some of the major
17   buildings in downtown New Orleans.  I expect it would
18   probably be deep pilings, to get down to a depth of soil,
19   where it is basically relatively dense and in a short
20   geologic time frame, relatively stable.
21   BY MR. D'AMICO:
22       Q.   Maybe a lower plasticine level, as opposed to the
23   organic peat and clay that might exist in the top layers?
24       MR. KURTZ:  Objection; form.
25       THE WITNESS:  I haven't -- you know, I haven't

Page 36

9  (Pages 33 to 36)

John Osteraas PhD                                    December 16, 2009

Page 37

1    studied the variation in soil profiles around the city.
2    BY MR. D'AMICO:
3         Q.  Okay.  You're just not familiar with that?
4         A.  I haven't studied them in any detail to
5    characterize the depth of adequate bearing, but certainly,
6    you know, peat and organic soils are not considered to be --
7    certainly wouldn't be capable of supporting a high-rise
8    building or the Super Dome or something of that sort.
9         Q.  Or maybe even a single family home?
10        MR. KURTZ:  Objection; form.
11   BY MR. D'AMICO:
12        Q.  Do you know if there are requirements for piles
13   for single family homes built on organic peat and clays in
14   the New Orleans area?
15        MR. KURTZ:  Same objection.
16        THE WITNESS:  I have not looked into specific soil
17   reports, but I would expect that there would be some design
18   recommendation for, certainly, more modern individual homes
19   as far as -- as far as permanent foundation design.
20   BY MR. D'AMICO:
21        Q.  Okay.  I think I cut you off.  We were talking
22   about the second case you were involved in in Idaho.  Tell
23   me about this foundation, this perimeter foundation where
24   they pour the concrete down two or three feet.
25        How wide was that foundation around the perimeter?

Page 38

1         A.  Well, the foundation stem wall -- I don't recall
2    specifically in this case, but it would typically either be
3    6 inches or 8 inches wide.  And the footing itself, beneath
4    the wall, may be sort of 18, probably on the order of 16, 18
5    inches wide.
6         Q.  Okay.  And the purpose of this perimeter
7    foundation is what, in engineering terms?  What is the
8    purpose of doing that?
9         A.  The --
10        Q.  As opposed to just putting up on concrete blocks
11   on soil.
12        MR. KURTZ:  Objection; form.
13        THE WITNESS:  I think there are probably multiple
14   purposes for putting in a perimeter foundation.  One could
15   obviously put a mobile home up just on blocks on the
16   surface, and we talked about the problems, the long-term
17   problems that may ensue with multiple cycles of frost heave.
18        A perimeter foundation also provides protection --
19   or enclosure protection of the crawl space beneath the
20   mobile home, from, of course, vermin, as well as keeps it a
21   bit warmer and dryer than it might otherwise be if it was
22   just up on blocks.  And that -- you know, that matters when
23   you're -- it's the middle of the winter in Idaho or Montana.
24   BY MR. D'AMICO:
25        Q.  You say there may have been some other cases

Page 39

1    involving mobile homes that you were involved in, in the
2    past.
3         Can you tell us about any of those?
4         A.  Well, there was one other one that I remember
5    distinctly.  It was one I looked at in Wisconsin, late '70s,
6    early '80s.  It involved a mobile home where there was an
7    insurance claim, I don't recall the specific nature of the
8    insurance claim, itself, but I was asked to go take a look
9    at it.
10        It turns out it was a mobile home that -- I should
11   say under which the owner had excavated a basement and
12   actually had a full-height basement beneath the mobile home,
13   concrete block walls around the perimeter, and he had -- he
14   had filled the basement with -- I think this was after one
15   of the -- from the second oil embargo, and so he was living
16   off the grid and had a wood stove installed.  And to see
17   him through the winter, he filled the basement with
18   firewood.
19        It happened to, unfortunately, be all green wood
20   that he had cut, so he had several thousand gallons of water
21   his basement that were gradually evaporating into the living
22   space and had humidity levels approaching 100 percent inside
23   his house.  And in winters in Wisconsin, that led to
24   considerable ice on his windows and other problems.
25        Q.  Did he get frozen in?

Page 40

1         A.  I don't know.  I think he was probably too
2    resourceful to get frozen in, but he did have a problem.
3         Q.  I'm born in raised in New Orleans, we don't have
4    many basements.  And usually if you dig down 6 feet, you're
5    in water.
6         MR. GIEGER:  6 feet?
7    BY MR. D'AMICO:
8         Q.  Okay.  This guy sounds like a mountain man who was
9    living off the grid and surviving off the land?
10        A.  He was.  He was a nice guy, he just didn't quite
11   understand how much water there was in green firewood.
12        Q.  Okay.  He didn't die or anything?  He just had
13   problems with the mobile home freezing, is that it, from the
14   ice, from the water?
15        A.  You know, there was some insurance claim -- no, he
16   didn't die.  And I don't remember the details of what the
17   insurance claim were, but it was --
18        Q.  Were you also retained by Champion in that case,
19   to investigate, or was it another manufacturer?
20        A.  I don't know who the manufacturer was in that
21   case.  My company at the time was retained by, I believe it
22   was the property insurance company.
23        Q.  Okay.
24        A.  For the homeowner.
25        Q.  All right.  Your title that I see in this -- the

John Osteraas PhD                                    December 16, 2009

1   Appendix A of your CV, it says you're group vice president
2   and principal engineer.
3       Is that of Exponent?
4       A.  Yes.
5       Q.  Okay.  Do you have an ownership interest in
6   Exponent?
7       A.  Well, Exponent is a corporation.
8       Q.  Oh, okay.
9       A.  And I do own a very small amount of stock in the
10  company, but --
11      Q.  How big is Exponent?  I just don't know.
12      A.  I -- we have roughly 900 employees or so.
13      Q.  And who hired you in this case?
14      A.  I was -- or Exponent was retained by counsel for
15  Shaw Environmental.
16      Q.  And to your knowledge, had Exponent ever worked
17  for Shaw Environmental before?
18      A.  Not to my knowledge.
19      Q.  Okay.  We were looking at your expertise in the
20  first paragraph of your CV, and I stopped you at structural
21  analysis, and you told us about some of the structures you
22  have experience in working on.
23      I believe you talked about wood construction,
24  correct?
25      A.  Yes.

Page 41

1   designed a number of single family residences and I've
2   provided specialized design consulting to architects and
3   engineers, regarding unique or problematic aspects of their
4   designs.
5       I've also done peer review of new or innovated
6   structural systems, as well as retrofit systems for existing
7   buildings.
8       Q.  Okay.  You said, "peer review."  Explain that,
9   please.
10      A.  Yeah, it would be different than the piers that go
11  under a trailer.
12      Q.  I figured that.  Is this in peer-reviewed
13  journals, as opposed to a pier that holds a trailer up?
14      MR. GIEGER:  Or one you walk out or fish on.
15      THE WITNESS:  Actually, I have done some work on
16  piers.  But, no --
17  BY MR. D'AMICO:
18      Q.  Thrown a few fishes, have you?
19      A.  This would be doing a review of another engineer's
20  design, a formal review, formal independent review of that
21  design to, well, for the purposes of overall quality, but
22  also for purposes of determining compliance with building
23  codes, when we are dealing with systems that are new,
24  innovative, unusual, something, you know, a little bit
25  outside the box.

Page 43

1       Q.  Steel construction?
2       A.  Yes.
3       Q.  Concrete construction?
4       A.  Yes.
5       Q.  Masonry construction?
6       A.  Yes.
7       Q.  And composite systems?
8       A.  Yes.
9       Q.  By "composite systems," what are you referring to?
10      A.  Systems that, basically, employ multiple materials
11  to achieve the final structure, which is something that's
12  becoming more and more common as designers and owners seek
13  to optimize the cost of construction.  So that could be a
14  building that consists of reinforced concrete, steel framing
15  and wood construction.  It could also be a structural system
16  that employs things like fiber-reinforced concrete or fiber-
17  reinforced plastics, that would be used as structural
18  elements.
19      Q.  Have you ever designed structures in your capacity
20  as a civil engineer?
21      A.  I have, yes.
22      Q.  What kind of structures have you designed?
23      A.  I have design hospitals, medical office buildings.
24  I designed remodelling for commercial office buildings.
25  I've designed residential condominium buildings.  I've

Page 42

1       Q.  Explain that, please.  A new system that may not
2   necessarily be covered in a codes, so you would have to find
3   some way for it to be compliant.
4       Is that what you're referring to?
5       MR. KURTZ:  Objection; form.
6       THE WITNESS:  No.
7   BY MR. D'AMICO:
8       Q.  Explain it, please.
9       A.  The building code has different levels at which a
10  compliance can be achieved.  There are prescriptive
11  provisions in the building code, you know, for example
12  building a house, you put two-by-four studs at 16 inches on
13  center, and you don't have to higher an engineer, you don't
14  have to think about it.  Just put them in at 16 inches on
15  center, and we'll call it good.
16      There are provisions of the code where there are
17  designed guidelines provided, such as for steel, concrete,
18  timber, other -- aluminum.  Whereby if you follow the design
19  criteria of those codes, your design is, again, deemed
20  compliant with the code.
21      There are materials and systems that have
22  basically obtained pre-approval through the ICC or other
23  organizations where --
24      Q.  What is the ICC?
25      A.  The International -- the International Code

Page 44

1  Commission.  Basically, the publishers of the International
2  Building Code, they have an evaluation service whereby a
3  vendor or manufacturer can submit components for evaluation,
4  the end result of which is a report that says this component
5  is basically equivalent to the building code requirements
6  for this particular application.
7          And lastly is, the building code official's
8  latitude, if you will, to approve other systems that have
9  been -- that he deems to be -- he or she deem to be in
10  general conformance with the intent and requirement of the
11  code.
12          So it's in that last category that building
13  officials will look to an outside peer reviewer to take a
14  look at a design and provide some level of assurance to
15  them, perhaps some political cover for them that this is a
16  design that will perform, you know, in accordance with the
17  intent of the building code.
18      Q.  What is the intent, generally, of the building
19  code, what is that designed to do?
20      MR. KURTZ:  Objection; form.
21      THE WITNESS:  Well, I think there are a number of
22  things that the building code does.  I think it, first and
23  foremost, it codifies existing practices, it identifies a
24  common set of basic requirements for construction in a
25  community.

Page 45

1  BY MR. D'AMICO:
2      Q.  For health and safety of the residents and
3  occupants of the buildings?
4      A.  That is one of the stated objectives of the
5  building code.
6      Q.  Okay.  Have you ever had an occasion to design a
7  mobile home?
8      A.  Actually, in my 11th grade drafting class, I
9  designed a motor home.
10      Q.  A motor home.
11      A.  Basely a motor home with an engine.
12      Q.  Did you build it?
13      A.  No.  I never did build it.
14      Q.  Have you ever designed a mobile home that has been
15  constructed?
16      A.  I have not, no.
17      Q.  Have you ever consulted with the mobile home
18  industry about designing a mobile home?
19      A.  In the -- yes, in Champion projects we did -- I
20  did, yes.
21      Q.  What did you do for Champion, as far as designing
22  a mobile home?
23      A.  Okay.  Well I guess I misunderstood your question.
24  In the context of projects that we have already talked
25  about, I had some discussion with the chief engineer at

Page 46

1  Champion about their design process, and that was the
2  question I was answering.
3      Q.  Okay.  Did you make modifications to their design
4  process?
5      A.  We were not asked to.  The purpose of that
6  consultation was to understand basically how they went about
7  their design, and how they got to the design that they, that
8  was in use in the trailers we were investigating.
9      Q.  And it was in the context of litigation, correct?
10      A.  Those two cases were in litigation, yes.
11      Q.  I guess my question goes to the basic role of a
12  design engineer.
13          Have you ever consulted with the mobile industry
14  to create a design for a mobile home that was actually
15  implemented and put into practice.
16      A.  I have not, no.
17      Q.  Have you ever designed a travel trailer for the
18  travel trailer industry that was actually manufactured and
19  put into commerce?
20      A.  I have not, no.
21      Q.  Have you ever designed a park model that was
22  actually designed and built and put into commerce?
23      A.  I have not, no.
24      Q.  What about modular homes?  Have you before
25  designed a modular home?

Page 47

1      A.  I have not -- I don't belief I have ever been
2  engaged to design a modular home.  I have had some
3  discussions with architects about modular homes, but I don't
4  recall doing any detailed design work.
5      Q.  Have you ever designed a building to be
6  constructed in Louisiana?
7      A.  I have not done any design work in Louisiana.
8      Q.  Have you ever designed a being or structure that
9  was going to be constructed in Mississippi?
10      A.  I have not been the engineer of record of any
11  buildings in Mississippi, but I was part of a company that
12  did design some casinos and hotels for Mississippi.
13      Q.  What company was that?
14      A.  That was Krawinkler, Luth and Associates. K-R-A-W-
15  I-N-K-L-E-R, Luth, L-U-T-H, and associates.
16      Q.  Where is that firm located?
17      A.  Well, that particular firm doesn't exist anymore,
18  but it was located in California and Colorado.
19      Q.  Okay.  And how long were you with that firm?
20      A.  I think it was about three years.
21      Q.  I guess I should ask you:  How long have you been
22  with Exponent?
23      A.  Since 1982, in one capacity or another.
24      Q.  And when did you do this design work for a casino
25  in Mississippi?  Well, let me clarify.

Page 48

John Osteraas PhD                                        December 16, 2009

1    Did you actually do design work for the casino in
2 Mississippi, or was it your firm that was involved in that?
3    A.  It was the firm that was involved and -- --
4    Q.  Okay.  You didn't actually do the design?
5    A.  I was not doing the design.
6    Q.  Okay.  So you say you've been with Exponent since
7 1982 in various capacities, is that what you said?
8    A.  Yes.
9    Q.  You have in front of you a notice of oral
10 videotaped deposition.
11    Have ever seen this document before?
12    A.  (Witness peruses document.)
13 Yes, I have.
14    Q.  Okay.  Do you see Exhibit A, which requests a list
15 of things to be produced?
16    A.  Yes.
17    Q.  In an effort to save time, have you complied with
18 all of the requests to produce things or objects that you
19 have reviewed in connection with this case?
20    A.  I believe so.  I think there are a couple of
21 additional things we have to provide today, but otherwise
22 the production we did a week or so ago was pretty much
23 exhaustive, in terms of the, all of the materials that are
24 called for in Exhibit A.
25    Q.  Okay.  Do you have a list of the additional things

Page 49

1 you want to produce today?
2    A.  I have the materials here.  I don't have a list.
3    Q.  Okay.
4    A.  So.
5    Q.  Is it voluminous, or can we go through it on the
6 record?
7    MR. KURTZ:  It's up to you, Frank.  I mean, I
8 think I can describe on the record what we're giving to you
9 that wasn't part of the reliance materials but is responsive
10 to the subpoena.
11    THE WITNESS:  Right.
12    MR. KURTZ:  There's some e-mails, that's one
13 category, there's some invoices, there's an engagement
14 letter, and there's a disk with videos of some of the
15 testing that Exponent performed.
16 BY MR. D'AMICO:
17    Q.  Okay.  Let's let the doctor, on the record,
18 describe what he is bringing today in response to the
19 subpoena that is in addition to the materials that have
20 already been produced.
21    If you don't mind, Doctor.  Did you understand
22 that request?
23    A.  I understand.
24    Q.  Okay.  For the record, for our files, please
25 identify the additional materials that you are producing in

Page 50

1 response to this subpoena to produce things, in reference to
2 this case?
3    A.  Okay.
4    MR. KURTZ:  Frank, let me just object to the form
5 of the question because you didn't actually issue a
6 subpoena, but it is attached to the notice of deposition.
7    MR. D'AMICO:  You're correct.  It's not a
8 subpoena.  You're correct.  It is a request for production
9 that is attached to the notice of deposition.
10 BY MR. D'AMICO:
11    Q.  Go ahead.
12    A.  Okay.  The first item is a DVD that contains video
13 of the spray testing that we did on the exemplar trailer.
14 The second packet of materials contains the engagement
15 letter sent to Mr. Kurtz.
16    Q.  May I see that, please?
17    A.  As well as copies of our billings.
18    Q.  Okay.
19    A.  For this project.
20    MR. KURTZ:  And Frank, what he's handing you is
21 four or five copies of each one, so if you don't mind
22 passing them out.
23 BY MR. D'AMICO:
24    Q.  Are they broken up into various categories with --
25    MR. KURTZ:  Yeah, the paper clips ought to --

Page 51

1    MR. D'AMICO:  Okay.  Then I'll ask Chris to assist
2 me with this, so I don't take up time in the deposition, and
3 we'll pass them out.
4 BY MR. D'AMICO:
5    Q.  With this recent production, do we now have all of
6 your reliance materials and all of the things you looked at
7 in connection with your work in this case?
8    A.  Almost.
9    Q.  Okay.  What else don't we have?
10    A.  I have -- the last thing I have here is a binder
11 of e-mail related to -- of correspondence amongst various
12 parties in this case.
13    Q.  And this is one copy of the e-mails?
14    MR. KURTZ:  That is one copy, yes.
15    MR. D'AMICO:  So it's not multiple copies.
16 BY MR. D'AMICO:
17    Q.  Okay.  When we take a break, I'll look through it
18 and if there's any questions I want to ask on it, I will.
19 Obviously, I'm just seeing it for the first time, so I'm not
20 prepared to ask questions about those e-mails today.
21    And the video is of this spray testing that you
22 make reference to in your report, correct?
23    A.  Yes.
24    Q.  All right.  I realized yesterday that I was
25 working from a copy of the original report that you

Page 52

John Osteraas PhD                                                    December 16, 2009

| | |
|---|---|
| 1  submitted in this matter, and I believe counsel for the | 1  I would also like to identify and attach a copy of |
| 2  government pointed out that there was a more recent errata | 2  that, but I only have one copy here. So we'll have to copy |
| 3  version of your report, correct? | 3  it at a break and identify it for the record as Exhibit No. |
| 4       A. Well, yes, there is a more recent errata version of | 4  3. |
| 5  our report. | 5       MR. KURTZ: Frank, just for the record, by "that" |
| 6       Q. And I believe the first report is dated November | 6  you're talking about November 17th, 2009, cover letter? |
| 7  2nd, 2009; is that correct? | 7       MR. D'AMICO: Correct, cover letter -- it's a one- |
| 8       A. I don't have a copy of the -- | 8  page letter, correct, Doctor? |
| 9       Q. The original? | 9       THE WITNESS: It is a one-page letter. |
| 10      A. -- the original in front of me. | 10  BY MR. D'AMICO: |
| 11      Q. Okay. That was all I had until yesterday. It was | 11      Q. All right. And that was, describe for us what |
| 12  pointed out to me that -- and I know what you're going to | 12  this letter is. |
| 13  say, you provided it, but I didn't have it physically until | 13      (Discussion off the record.) |
| 14  yesterday. | 14      MR. D'AMICO: I think we have one DVD that has |
| 15      MR. KURTZ: I believe you. | 15  been produced, one binder of e-mails that has been produced |
| 16  BY MR. D'AMICO: | 16  and four copies of the other exhibits that were referred to |
| 17      Q. How is it that you came to produce an errata | 17  in the earlier statements by the doctor. |
| 18  version of the report dated November 17th, 2009? | 18      MR. KURTZ: Right. |
| 19      A. Well, we did it to correct a number of errors in | 19      MR. D'AMICO: Okay. |
| 20  the original report that were pointed out by Mr. Kurtz and | 20      And now for purposes of this record, we're going |
| 21  Ms. Whitfield after they had a chance to review our original | 21  to identify just the one page cover letter as Exhibit No. 3 |
| 22  report. | 22  to this deposition. |
| 23      Q. Okay. And after Mr. Kurtz and Ms. Whitfield | 23      And I would like you to identify for the court, |
| 24  pointed out those errors, did you make changes to your | 24  what is this November 17th, 2009, cover letter? |
| 25  original report? | 25      THE WITNESS: It is a cover letter that has been |
| Page 53 | Page 55 |

| | |
|---|---|
| 1       A. I made corrections of those items, where there | 1  Bates stamped SWE-000082. This was a cover letter that |
| 2  was, in fact, either an error with respect to the location | 2  accompanied the November 17th errata report that I sent to |
| 3  of text and comments, or where there were the typographical | 3  Mr. Kurtz and Ms. Whitfield identifying the modifications |
| 4  or editorial errors that -- had resulted in missing text in | 4  that were made to the errata report. |
| 5  a couple of the locations. | 5  BY MR. D'AMICO: |
| 6       Q. Okay. I'm going to ask you some questions about | 6       Q. Okay. And this is your signature on this letter? |
| 7  this report later, but was there a cover letter that | 7       A. Yes. |
| 8  accompanied the issuance of the errata report? | 8       Q. All right. Okay. Soil analysis and structure |
| 9       A. Yes. | 9  interaction. You profess to have some expertise in the |
| 10      Q. Okay. And is that a November 17th, 2009, letter | 10  analysis of soil structure interaction, correct? |
| 11  addressed to Dave Kurtz and Karen Whitfield of Baker, | 11      A. I do believe I have some expertise in that area, |
| 12  Donelson? | 12  yes. |
| 13      A. Yes. | 13      Q. Describe for us what expertise you profess to hold |
| 14      Q. And do you have that in front of you? | 14  in the areas of analysis of soil structure and interaction. |
| 15      A. Yes, I do. | 15      A. There are several aspects of that. The first |
| 16      MR. D'AMICO: And let's start marking some | 16  aspect of soil structure interaction where I have done quite |
| 17  exhibits, Tia. And we'll mark the notice of videotape | 17  a bit of work has been to look at the -- or to include in |
| 18  deposition as Exhibit 1. | 18  the analysis of structures the effects of soil movement on |
| 19      (Whereupon, a notice of oral and videotaped | 19  the performance of structures, and also vice versa to |
| 20  deposition of John D. Osteraas, Ph.D., PE was marked | 20  evaluate and analyze the effect of structures and structural |
| 21  Exhibit 1 for identification.) | 21  loading on soil movement. |
| 22  BY MR. D'AMICO: | 22      Soil structure interaction is also related to |
| 23      Q. And we're going to mark the production, the | 23  dynamic events such as earthquakes, explosions, wind and |
| 24  additional production in globo as Exhibit 2 with it's | 24  flood, and then lastly would be the area of soil structure |
| 25  various attachments that were identified on the record. | 25  interaction on buried objects, primarily utility lines and |
| Page 54 | Page 56 |

John Osteraas PhD                                    December 16, 2009

1  pipelines.
2      Q.  Do you possess any expertise in the area of soil
3  subsidence and structure interaction?
4      A.  Yes, certainly soil subsidence is a very common
5  phenomenon, affecting buildings built on soil that is, for
6  one reason or another, less than perfectly stable over time.
7      Q.  Okay.  This issue of soil structure interaction,
8  is this a new field in your profession or has that
9  phenomenon been known for some time?
10     A.  I'm not sure which phenomenon you're referring to.
11  Subsidence?
12     Q.  Subsidence, yeah.  Is that a recent advent in your
13  education, or is that something you have known about for
14  some time?
15     A.  Oh, I personally have known about it for, I guess,
16  as long as I've been practicing engineering.
17     Q.  Okay.  And the phenomenon is not new is it,
18  Doctor, soil subsidence and its affect on structures?
19     A.  I think it goes back to, at least, the Egyptians.
20     Q.  And to your knowledge has that been something that
21  engineers have studied, civil engineers have studied since
22  that time?
23         MR. KURTZ:  Objection; form I don't think they had
24  civil engineers in the Egyptian era.
25         THE WITNESS:  Yes --

                                                    Page 57

1  settlement of saturated soil under load.
2      Q.  And is that something that engineers in your
3  relevant field of study have known since that time?
4         These mathematical models.
5      A.  Yeah, I think that was sort of the beginning of
6  the whole specialty of soils engineering or geotechnical
7  engineering, and that work eventually made its way into
8  textbooks, and that's certainly something that's taught at
9  the undergraduate level and certainly at all accredited
10  engineering schools in the US.
11         MR. KURTZ:  We'll been at it about an hour and-a-
12  half.  Are you close to a break point?
13         MR. D'AMICO:  I'm sorry.  I'm moving real slow
14  today.
15         MR. KURTZ:  It's all right.
16         MR. D'AMICO:  We can take a break.
17         THE VIDEOGRAPHER:  This marks the end of videotape
18  No. 1 in the deposition of John Osteraas.
19         The time is approximately 10:35 a.m.
20         We are off the record.
21         (Pause in the proceedings.)
22         THE VIDEOGRAPHER:  We are on the record.
23         Here marks the beginning of videotape label No. 2
24  in the deposition of John Osteraas Ph.D.
25         The time is approximately 10:51 a.m.

                                                    Page 59

1  BY MR. D'AMICO:
2      Q.  Well, maybe they weren't registered.  But ask the
3  guys building the pyramids, I think they would disagree.
4      A.  I'm sorry, the serious academic study of soil
5  subsidence is really something that began in the 1930s,
6  maybe.
7      Q.  Okay.  And what are you referring to the serious
8  academic studies beginning in the '30s, was there some event
9  that brought this about or some advent in building
10  technology?
11     A.  There may have been.  I don't know what it was.  My
12  recollection is that that's probably when Professor
13  Tzerghai, I think he was at Harvard at the time, basically
14  began looking at the behavior of soil under load and
15  developing a mathematical models that explained subsidence
16  of soil.
17     Q.  Mathematical models.  I know about that.  What
18  kind of mathematical models does Professor -- how do you
19  spell that?  Tzerghai.
20     A.  I believe it's T-Z-E-R-G-H-A-I.
21     Q.  He was a professor at Harvard, you said?
22     A.  I think he was at Harvard at the time.
23     Q.  Okay.  And this professor came up with
24  mathematical models to do what?
25     A.  To describe, basically, the time rate of

                                                    Page 58

1  BY MR. D'AMICO:
2      Q.  Doctor, in looking through your CV, I see on the
3  last page you have a list of recent testimony.
4      A.  Yes.
5      Q.  Do you have that in front of you?
6      A.  I do.
7      Q.  Okay.  The first case listed, International School
8  of Louisiana versus Hanover Insurance.
9         What were you asked to do in that case and who
10  retained you?
11     A.  In that particular case, Exponent was retained by,
12  it happened to be All America Insurance at the time, and we
13  did -- at one point, one of my engineers did a damage
14  assessment of several properties that were owned by -- owned
15  or leased by the International School of Louisiana.  That
16  damage assessment was I believe back in late 2005, early
17  2006, and the case was headed for trial and I had my
18  deposition taken a couple months ago.
19     Q.  It's in the Eastern District of Louisiana,
20  correct?
21     A.  That's my understanding from the pleadings that I
22  received.
23     Q.  And you were retained by -- or your firm was
24  retained by which insurance company?
25     A.  We were retained by All America Insurance Company

                                                    Page 60

                              15 (Pages 57 to 60)

John Osteraas PhD                                              December 16, 2009

1    originally.  I think they may have changed their name back
2    to Hanover.  I'm not quite sure of all of the different name
3    changes they have gone through.
4        Q.  And your were, or your firm was working with All
5    America to do a damage assessment for property to the
6    International School of Louisiana as a result of Hurricane
7    Katrina?
8        A.  That's correct.
9        Q.  Okay.  And what is it that your firm did for All
10   America in this case?
11       A.  One of my engineers conducted inspection of, I
12   think it was, two or three properties in New Orleans looking
13   at and documenting the nature and extent of damage to the
14   building shell and structural components of the building as
15   well as the building envelope, the roof and exterior facade
16   of the buildings.
17       Q.  Okay.  What was the nature of the dispute?
18       A.  Well, at the time we did our work, I don't know
19   that there was any dispute.  It was just simply, we were
20   retained to do a damage assessment report as part of the
21   adjustment of the insurance claim.
22       Q.  Okay.  But it's your understand that the
23   International School of Louisiana was suing All America, now
24   Hanover, to recover monies under an insurance policy due to
25   damage from Hurricane Katrina.

                                                     Page 61

1    but I think they had suits going back and forth, so our
2    client was both a plaintiff and a defendant, is my
3    understanding.
4        Q.  This next case, Wyndham New Orleans Canal Place
5    versus Lexington Insurance Company, who retained you in that
6    case and what were you asked to do?
7        A.  Exponent was retained by Christopher Kindee, and
8    we were asked to basically do an investigation and
9    assessment of the curtain wall of the hotel at Canal Place
10   to determine both the cause of damage and other problems
11   with curtain wall, the extent to which those damages may
12   have been a result of Hurricane Katrina.  And to make
13   recommendations regarding appropriate repair of the curtain
14   wall, both in general and with respect to, specifically,
15   with respect to any damage that may have occurred during
16   Katrina.
17       Q.  And which party retained you in this case?
18       A.  We were retained by actually a consortium of three
19   companies, three property insurance companies.
20       Q.  And you were asked by the insurance companies to
21   do an assessment of the damage?
22       A.  To do an assessment of the curtain wall, identify
23   damages, determine the cause of those damages.
24       Q.  And what is your understanding of Wyndham New
25   Orleans Canal Place, were they a plaintiff suing the

                                                     Page 63

1        A.  That suit occurred sometime after we did our
2    initial work.
3        Q.  Has that case been settled?
4        A.  My understanding is that it did settle just
5    recently.
6        Q.  Okay.  And you gave a deposition in that case?
7        A.  I did.
8        Q.  And do you have a copy of that deposition?
9        A.  I do not.  It settled before I ever got a copy.
10       Q.  Okay.  Do you know who the counsel was for the
11   International School of Louisiana?
12       A.  I do not, no.
13       Q.  All right.  The next case you have listed as
14   Nordby Construction Company versus Kenyon Plastering, Inc.
15       Tell us about that case.  Who retained you and
16   what were you asked to do?
17       A.  Again Exponent was retained by counsel for Kenyon
18   Plastering.  It involved a construction dispute, basically
19   water damage -- two components, one was water damage, two,
20   the building during construction and the second aspect was
21   the construction delays and the time and money associated
22   with those delays.
23       Q.  And who retained you in this case, the Plaintiff
24   or the Defendant?
25       A.  The -- well, as styled here, it was the Defendant,

                                                     Page 62

1    insurance company for those damages?
2        A.  My understanding is the current owner, or the
3    entity that took ownership of Canal Place around the time of
4    Katrina was suing these three carriers for, I think, not so
5    much damages, but failure to identify the damages and
6    conduct a thorough inspection of possible hurricane damages
7    in the aftermath of Katrina.
8        MR. MILLER:  Is the telephone muted or unmuted?
9        MR. KURTZ:  It's off mute.
10       MR. MILLER:  Thank you.
11       MR. D'AMICO:  Can you hear us on the line?
12       MR. MILLER:  They can, it was just a question
13   during the break.
14       MR. D'AMICO:  Just checking because we had a
15   problem yesterday.
16       MR. GIEGER:  They had a problem.
17       MR. D'AMICO:  Of course nobody said anything.
18   BY MR. D'AMICO:
19       Q.  Okay.  Has this case settled?
20       A.  That's my understanding, yes.
21       Q.  And you gave a deposition in that case?
22       A.  I did, yes.
23       Q.  And did you have a copy of that deposition?
24       A.  I don't believe so, no.
25       Q.  Okay.  In general, Doctor, is it your practice to

                                                     Page 64

16  (Pages 61 to 64)

John Osteraas PhD                                         December 16, 2009

| | |
|---|---|
| 1  keep copies of depositions? | 1   Q.  Okay.  And you were retained by State Farm to do |
| 2    A.  It is my practice to keep copies of depositions | 2  what in particular? |
| 3  with the project file.  And as long as the project is | 3    A.  We were retained by State Farm to do a damage |
| 4  active, obviously I keep copies of depositions.  Once a | 4  assessment of his property in the aftermath of the |
| 5  project, you know, once we close a project, we generally | 5  hurricane. |
| 6  dispose of the project file within 30 days or so. | 6   Q.  And to try to determine if it was wind versus |
| 7    Q.  Okay.  So you have a 30-day retention period? | 7  flood? |
| 8    A.  That's correct. | 8    A.  That was one aspect.  We would identify what the |
| 9    Q.  All right.  Do you know if Exponent would have a | 9  nature and extent of the damage was to the property, and |
| 10  copy of this deposition? | 10  then provide an opinion as to what portions of the damage we |
| 11    A.  That was my answer in the context of Exponent.  Not | 11  believed were caused by wind and which portion we believed |
| 12  my personal policy.  That's Exponent's policy. | 12  were caused by flooding. |
| 13    Q.  Okay.  So it would have been purged after 30 days | 13    Q.  I have to ask you, because this is in the southern |
| 14  and discarded, to the best of your knowledge? | 14  district of Mississippi, did Mr. Gagne still have a |
| 15    A.  To the best of my knowledge, yes. | 15  structure left? |
| 16    Q.  Okay.  So to the best of your knowledge, do you | 16    A.  He did not. |
| 17  have a copy or does Exponent -- when I say you I'm referring | 17    Q.  This was a slab remaining only? |
| 18  to Exponent -- does Exponent have a copy of this deposition, | 18    A.  It was called a slab case, but there were |
| 19  currently? | 19  basically pilings left. |
| 20    A.  To the best of my knowledge, no. | 20    Q.  And I guess Exponent was trying determine if the |
| 21    Q.  All right.  The next case, Gagne versus State | 21  structure was destroyed by the wind first versus the tidal |
| 22  Farm.  That what was in the US district court for the | 22  surge? |
| 23  southern district of Mississippi. | 23    A.  No.  We identified what we believed to be the |
| 24        Who retained you in that case? | 24  sequence of events at the property in terms of damage, and |
| 25    A.  We were -- again Exponent was originally retained | 25  provided that opinion in our report. |
| Page 65 | Page 67 |
| 1  by State Farm to do damage assessment of the property | 1   Q.  Okay.  Is there a file still remaining on this |
| 2  following Katrina, as part of they're claims adjustment. | 2  case, or has that been purged? |
| 3  This had subsequently turned into litigation and we | 3    A.  As far as I know, it would have been purged. |
| 4  continued to do work with State Farm as part of that | 4    Q.  Okay.  The next case, please pronounce that name, |
| 5  litigation. | 5  so I don't slaughter it. |
| 6    Q.  Has this case settled? | 6    A.  I don't know that I can do any better.  Debadelone. |
| 7    A.  It has, yes. | 7    Q.  Versus State Farm.  I got State Farm. |
| 8    Q.  All right.  And you gave a deposition in that | 8    A.  Okay. |
| 9  case? | 9    Q.  Who retained you in that case? |
| 10    A.  I did. | 10    A.  Essentially identical circumstances to the Gagne |
| 11    Q.  All right.  And do you know how long ago it | 11  case.  We were retained to do damage assessment of the |
| 12  settled? | 12  property and it subsequently turned into litigation. |
| 13    A.  I think February of this year or earlier this | 13    Q.  And was this a slab only case? |
| 14  year.  It may have been late last year. | 14    A.  I don't know -- I don't know for certain.  It may |
| 15    Q.  Okay.  So when I ask you if you have -- if | 15  have been, but I don't have any specific recollection. |
| 16  Exponent has a copy of the deposition, what is your answer? | 16    Q.  Okay.  And again, has this case been settled? |
| 17    A.  Not to my knowledge. | 17    A.  It has. |
| 18    Q.  Okay.  Consistent with the 30-day retention | 18    Q.  And you didn't testify at trial, you just gave a |
| 19  policy? | 19  deposition? |
| 20    A.  Yes. | 20    A.  I only gave a deposition.  My understanding is it |
| 21    Q.  Okay.  What was the nature of the Gagne versus | 21  settled before trial. |
| 22  State Farm case? | 22    Q.  All right.  The next case, Willis versus State |
| 23    A.  It was fundamentally over money, whether, you | 23  Farm. |
| 24  know, the extent to which damage Mr. Gagne's property was | 24        Who retained Exponent, and what were you asked to |
| 25  covered under his homeowners policy versus his flood policy. | 25  do? |
| Page 66 | Page 68 |

John Osteraas PhD                                                                December 16, 2009

| | |
|---|---|
| 1  A.  Same circumstances as the previous two. | 1  damage.  A small component was sorting out those conditions |
| 2  Q.  Okay.  Do you know the extent of the damage to the | 2  that were, really, caused by the earthquake, and those that |
| 3  Willis property? | 3  were just due to other factors unrelated to the earthquake. |
| 4  A.  I don't recall specifically as I sit here. | 4  Q.  Did that case settle? |
| 5  Q.  And do you know if the case is still pending? | 5  A.  That case did settle, yes. |
| 6  A.  My understanding is it settled some time ago. | 6  Q.  Greater than 30 days ago? |
| 7  Q.  Was Exponent hired to do a similar analysis, for | 7  A.  It settled shortly after my deposition in 2007, |
| 8  the Willis property as you did in the Gange and this next | 8  so... |
| 9  poor individual who lost their structure? | 9  Q.  The next case, Guttman versus State Farm.  I |
| 10  A.  Gagne, Debadelone, Willis and lot were all cases | 10  assume State Farm retained Exponent in that case, as well? |
| 11  where we were hired to do damage assessments of the property | 11  A.  Yes. |
| 12  as part of the adjustment of the Hurricane Katrina damage | 12  Q.  And do you know what the nature of the claim was? |
| 13  claims for those properties. | 13  A.  That was also a claim of earthquake damage to an |
| 14  Q.  On behalf of State Farm the? | 14  apartment building in Los Angeles as a result of the 1994 |
| 15  A.  We were retained by State Farm. | 15  Northridge earthquake. |
| 16  Q.  Okay.  This next case Gonzales versus Farmers. Is | 16  Q.  The case went on for 13 years? |
| 17  this case still pending? | 17  A.  How much do you want to know about earthquake |
| 18  A.  No. | 18  litigation in California?  It is not over yet. |
| 19  Q.  Who retained you in that case? | 19  Q.  So that one is still -- |
| 20  A.  Retained by counsel for Farmers Insurance. | 20  A.  This case is over, but earthquake litigation from |
| 21  Q.  And what were you asked to do on behalf of Farmers | 21  the '94 litigation continues to this day in California. |
| 22  Insurance in that case? | 22  Q.  So it's a very lucrative field? |
| 23  A.  In that particular case, it was basically review | 23  MR. MILLER:  Only for the lawyers. |
| 24  of documentation that was available regarding damage to the | 24  MR. GIEGER:  Only for the defense lawyers. |
| 25  property that had occurred 11 years earlier, and to try and | 25  MR. D'AMICO:  I don't know.  When I come back, I |
| Page 69 | Page 71 |

| | |
|---|---|
| 1  sort out conflicting engineering reports concerning the | 1  want to be an expert. |
| 2  appropriate repair of the damage. | 2  BY MR. D'AMICO: |
| 3  Q.  And the Gonzaleses were suing their insurer, their | 3  Q.  That case has settled? |
| 4  insurance for what, damage to their home? | 4  A.  Oh, yeah, that settled, again, probably back in |
| 5  A.  These were two commercial apartment buildings at - | 5  2007, shortly after my deposition. |
| 6  - actually it was multiple apartment buildings at two | 6  Q.  Okay.  Fru-Con Construction versus Sacramento |
| 7  different locations in Los Angeles. | 7  Municipal Utilities. |
| 8  Q.  All right.  And do you recall what precipitated | 8  What was the nature of that dispute and who |
| 9  the damage to the two apartment buildings in Los Angeles? | 9  retained you? |
| 10  A.  Well -- | 10  A.  That was a construction dispute between Fru-Con, |
| 11  Q.  I have to ask you.  Was it an earthquake? | 11  the contractor and Sacramento Municipal Utilities district |
| 12  A.  The earthquake is what precipitated the claim.  I | 12  over a power plant.  And again, they were, I think, suits |
| 13  wouldn't say the earthquake precipitated all of the damages | 13  back and forth and between the parties regarding delays, |
| 14  that were claimed. | 14  damages, improper construction, things of that sort. |
| 15  Q.  Okay.  So there was an earthquake in Los Angeles | 15  Q.  And who retained you? |
| 16  and the Gonzales entity filed a claim against Farmers | 16  A.  We were retained by counsel for the utility |
| 17  Insurance for damage to two of their apartment buildings? | 17  district. |
| 18  A.  Two of their properties, which, both of which | 18  Q.  The Defendant in that matter? |
| 19  contained multiple buildings. | 19  A.  Well, they were defendant and a plaintiff. |
| 20  Q.  Or multiple buildings, okay. | 20  Q.  Who was the Sacramento Municipal Utilities suing? |
| 21  A.  Yeah. | 21  A.  They were suing Fru-Con. |
| 22  Q.  And it was a dispute over whether or not was | 22  Q.  So there were suits back and forth? |
| 23  caused from the earthquake or what?  Predated the earthquake | 23  A.  There was suits back and forth, yes. |
| 24  or other causes? | 24  Q.  And what was the nature of the dispute?  Was there |
| 25  A.  The biggest aspect was appropriate repair of the | 25  a construction delay and Municipal Utilities sued the |
| Page 70 | Page 72 |

John Osteraas PhD                                                December 16, 2009

| | |
|---|---|
| 1  construction company, and vice versa? | 1    A.  We were retained by counsel for I believe -- I |
| 2    A.  Yeah, I thought I just answered that question, | 2  believe it was Pasadena, a community college district for -- |
| 3  but, there were -- there was a delay that was -- there were | 3  or some related entity in that case. |
| 4  ongoing problems with the quality of concrete on the | 4    Q.  What was the nature of the dispute? |
| 5  project. | 5    A.  The there was a rather tragic accident involving a |
| 6    Q.  Okay. | 6  student who had gone to a semester abroad in Italy, |
| 7    A.  Eventually the utility district dismissed Fru-Con | 7  community college student doing a semester abroad in Italy |
| 8  because they failed to correct their construction that | 8  and had fallen from a sixth floor balcony of the apartment |
| 9  didn't pass quality control tests, and of course there were, | 9  house where he was residing. |
| 10  you know, significant costs associated with that. | 10    Q.  In Italy? |
| 11    Q.  Was there a failure analysis that had be to be | 11    A.  In Italy. |
| 12  done regarding concrete work in this case? | 12    Q.  And -- okay.  And your firm was retained by the |
| 13    A.  There was, yes.  The issue we were engaged to | 13  Pasadena school, community college? |
| 14  address was the quality of the concrete. | 14    A.  I believe it was the community college district |
| 15    Q.  Next case, North Shore versus State Farm. | 15  or, again, one of their related entities that organized |
| 16       Who retained you in that case and what were you | 16  semesters abroad. |
| 17  retained to do? | 17    Q.  Okay.  And did you have to travel to Italy to do |
| 18    A.  We were retained by counsel for State Farm and we | 18  the analysis? |
| 19  were retained to do a damage assessment on 215 individual | 19    A.  Unfortunately, I did, yes. |
| 20  condominium units that had allegedly sustained serious | 20    Q.  Okay.  We're not going there. |
| 21  damage as a result of the Northridge earthquake. | 21       What part of Italy? |
| 22    Q.  Has that case settled? | 22    A.  This was -- the nice part.  I'm just blanking on |
| 23    A.  It went to trial. | 23  the name. |
| 24    Q.  And what was the verdict? | 24       MR. GIEGER:  There's a bad part? |
| 25    A.  The verdict was that there was no earthquake | 25       MR. BONE:  If you have ever been to Rimini, you |
| Page 73 | Page 75 |

| | |
|---|---|
| 1  danger at the property. | 1  would know. |
| 2    Q.  Defense verdict? | 2       THE WITNESS:  Help me out here.  It's due east of |
| 3    A.  Defense verdict. | 3  Pisa and due north of Rome and that gets to -- |
| 4    Q.  In favor of State Farm? | 4       MR. KURTZ:  Tuscany? |
| 5    A.  Yes. | 5       THE WITNESS:  It's in Tuscany and what's the town |
| 6    Q.  Okay.  The next case, Arias versus State Farm. | 6  in Tuscany?  Florence.  Florence. |
| 7       Was your firm also retained by State Farm in this | 7  BY MR. D'AMICO: |
| 8  case? | 8    Q.  I was about to say, you found fault in Florence? |
| 9    A.  Yes. | 9    A.  Well, the weather was worse than it is here. |
| 10    Q.  And was this also earthquake damage related to the | 10    Q.  What time were you there? |
| 11  1994 earthquake? | 11    A.  Like, March. |
| 12    A.  Yes. | 12    Q.  I was in Florence one Christmas, and it was |
| 13    Q.  And did this case go to trial? | 13  absolutely splendid. |
| 14    A.  No. | 14       So this person, this student named Paneno fell |
| 15    Q.  Did it settle? | 15  from a balcony and died? |
| 16    A.  It did settle, yes. | 16    A.  No, he was, I believe, paraplegic and had very |
| 17    Q.  And I suppose it settled greater than 30 days ago? | 17  serious long-term injuries. |
| 18    A.  Again, I think it would have been settled sometime | 18    Q.  Okay.  And did the balcony fail? |
| 19  in 2005. | 19    A.  The railing of the balcony failed as part of the |
| 20    Q.  Okay.  And what was the nature of that dispute? | 20  accident. |
| 21    A.  Extent of damage and appropriate repairs of an | 21    Q.  And he fell off of the balcony when the railing |
| 22  apartment building. | 22  failed? |
| 23    Q.  And the last case I see listed is Paneno versus | 23    A.  Yes. |
| 24  Pasadena. | 24    Q.  Okay.  And did this case go to trial? |
| 25       Who retained you in that litigation? | 25    A.  It did not.  well, no, I'm sorry.  It did -- a |
| Page 74 | Page 76 |

19 (Pages 73 to 76)

John Osteraas PhD                                            December 16, 2009

1    trial started, and then it settled abruptly after a ruling
2    by the judge that surprised everybody, so...
3        Q.   And was there a settlement in favor of the
4    Plaintiff?
5        A.   Yes.  Yes.  The there was a considerable
6    settlement.
7        Q.   And what was the ruling that surprised everybody?
8        A.   That the testimony regarding Mr. Paneno's alcohol
9    consumption that evening would be allowed.
10       Q.   And that was a surprise to everybody?
11       A.   Well, and I'm just speaking third-hand, but it was
12   a surprise to the attorneys because, I think, based on their
13   interpretation of prior rulings, both Plaintiffs and -- both
14   the plaintiff and defense counsel believed that any
15   testimony regarding alcohol would not be allowed, but --
16       Q.   And did Mr. Paneno fall from a building that was
17   somehow owned by the Pasadena community college?  I'm
18   wondering how a school in Pasadena gets sued for a fall in
19   Florence.
20       A.   Yeah, they, it was through a series of contracts
21   that the school had contracted with an organization that
22   organizes semesters abroad.  That organization had, in turn,
23   contracted with an agent in Florence who went around and
24   found housing and leased housing for the students.
25       Q.   Okay.  And what were your opinions in that case?

                                              Page 77

1    Did you find there were structural problems with the railing
2    of the balcony?
3        A.   Indeed, there were problems with the railing of
4    the balcony, which were fixed subsequent to the accident.
5        Q.   Okay.  Is this the only list of cases you have in
6    your possession, of prior testimony, whether it be by
7    deposition or trial?
8        A.   This is the list for the last five years.
9        Q.   Okay.  About how often do you get retained to
10   consult in forensic matters that may go to trial, on a
11   yearly basis.
12       A.   Where I, personally, am involved, maybe half a
13   dozen.
14       Q.   So on average, it's six times a year?
15       A.   That's a very rough number.  It's not something
16   that I track.
17       Q.   Okay.  It appears from the testimony thus far and
18   in review of your CV, that Exponent is frequently retained
19   to look at failure analysis for structures.
20       A.   We are frequently retained to look at failures of
21   structures or damaged structures, yes.
22       Q.   Is this principally what Exponent does?
23       A.   No.  I would say it's just one small part of our
24   business.
25       Q.   Just tell me:  What is the predominant business

                                              Page 78

1    that Exponent does?
2        A.   Our predominant business and the, sort of, the
3    umbrella is we sort of provide specialized engineering and
4    scientific consulting to clients who have out of the box
5    problems to deal with, technical problems to be addressed.
6        Q.   What percentage of Exponent's business, if you
7    know, is related to court testimony, as opposed to providing
8    expert consultation to those out-of-the-box-type questions?
9        A.   I don't know what the breakdown is.
10       Q.   Would it be greater than 10 percent?
11       A.   Would which be greater than 10 percent?
12       Q.   The litigation portion?
13       A.   Oh, I think in all of our projects, we are
14   retained to do the technical out of the box consulting on
15   projects.  Some of those projects do end up in litigation,
16   but I would say that the vest majority do not.
17       Q.   That's what I'm getting at.  Vast majority, is it
18   something less than 10 percent?
19       A.   I don't have even the basis to give you a good
20   estimate.
21       Q.   Okay.  Fair enough.
22       Earlier when we were speaking, I was asking you
23   questions about soil analysis and soil subsidence, and I
24   wanted to know:  When you were talking about soil
25   subsidence, is that the same as soil shifting under the

                                              Page 79

1    foundation of a structure, or do you consider soil shifting
2    under a structure as something different from soil
3    subsidence?
4        A.   Well, soil shifting is not a term that I would say
5    has a well defined meaning.  I would characterize, you know,
6    what can happen with soil is you can have subsidence, you
7    can have -- we can have heave, we can have differential
8    settlement.  And certainly, if you get into slopes and
9    earthquake effects you can have lateral movement of soil.  I
10   would characterize the term "shifting" as just sort of a
11   generic term for different types of soil movement that might
12   occur.
13       Q.   Nonspecific general term.
14       A.   That would be how I would characterize it, yes.
15       Q.   Okay.  And earlier, also, you were telling me
16   about two mobile home cases that you first became involved
17   with in mobile homes, and I believe you said there was a
18   difference between a pad and the perimeter foundation.
19       Would you explain, what is that difference?
20       A.   I don't think I said anything about a pad.  There
21   wasn't pad in either case.  One was a trailer up on concrete
22   blocks, piers, just stacked concrete blocks.  The other one
23   was a double-wide that was really installed as a,
24   essentially, a permanent building on a perimeter foundation.
25       Q.   Right.  What is a concrete pad, if you know?

                                              Page 80

                                      20 (Pages 77 to 80)

John Osteraas PhD                                                    December 16, 2009

1    MR. KURTZ:  Objection; form.
2    THE WITNESS:  Well, just in general or... are you
3  talking about a concrete slab on grade?
4  BY MR. D'AMICO:
5    Q.  Yeah.  For foundations.  Is that frequently
6  referred to as a concrete pad?
7    A.  Well, there are -- with respect to a house, I
8  would refer to it as a slab on grade foundation, which would
9  include perimeter footings.  I think there are also concrete
10  pads that are used in mobile home parks, which are, you
11  know, similar to a driveway that's, you know, probably a
12  four-, or so, inch think slab of concrete that's poured
13  beneath the footprint of the mobile home.
14    Q.  And that's what I'm referring to.  In the context
15  of a mobile home, there's such things as a pad on which the
16  mobile home may be jacked up and piers holding it. And then
17  there is a situation where you have concrete piers on soil,
18  and then there is a situation, as you described in that
19  other case, where there is a perimeter foundation of
20  concrete.
21    Are there any other types of foundation structures
22  that you know of for mobile homes or trailers?
23    MR. KURTZ:  Objection; form.
24    THE WITNESS:  Besides piers, piers, jacks, there
25  are a variety of different jack, jack types on the market.

Page 81

1  I guess I have seen -- I've seen cast in place concrete
2  piers used.  And certainly in -- in cold weather regions, I
3  know there are different foundation systems that are used
4  for, in the oil and gas industry for modular buildings.
5  BY MR. D'AMICO:
6    Q.  Have you ever seen an installation or heard of an
7  installation for a mobile home or a trailer in which a
8  concrete pad has been used to support the structure?
9    A.  I think that is what is commonly done in mobile
10  home parks.  There will be pads that are constructed on each
11  lot, if you will.
12    Q.  And in engineering terms, what is the purpose for
13  installing a mobile home on a concrete pad?
14    A.  Well, I don't know that it's so much engineering,
15  as it may have more to do with aesthetics and layout of the
16  mobile home park.
17    Q.  So to your knowledge, there is no structural
18  engineering component that goes into considering whether or
19  not to use a concrete pad for a travel trailer?
20    MR. KURTZ:  Objection; form.
21    THE WITNESS:  I don't -- I don't think it's a
22  solution that's really driven by engineering and I don't --
23  to the best of my knowledge, there isn't really any
24  engineering involved in the process.
25  BY MR. D'AMICO:

Page 82

1    Q.  In trying to determine what is the most
2  appropriate foundation to support a travel trailer, what are
3  some of the considerations that you, as a structural
4  engineer, would want to consider?
5    MR. KURTZ:  Objection; form.
6    THE WITNESS:  Well, if we're talking about a
7  travel trailer like Mr. Wright's, I wouldn't -- I wouldn't
8  even consider a -- anything that I would think of as a
9  foundation.  I don't -- I think to use a foundation when
10  you're constructing permanent buildings, I don't -- I
11  wouldn't certainly think of using a foundation under a
12  travel trailer.
13  BY MR. D'AMICO:
14    Q.  Define "permanent building."
15    A.  Something you plan to keep in service for 50 years
16  or more.
17    Q.  50 years or more?
18    A.  That's the typical design life that is used by
19  engineers in the design of buildings, and it's a service
20  life that's implicit in a lot of code requirement related to
21  possible events that may occur, in terms of wind and flood
22  and earthquake.
23    Q.  Well, if we were going to be placing a mobile home
24  on a site, what are some of the considerations that you
25  would be looking at, as far as the type of foundation that

Page 83

1  would be necessary to safely install a mobile home?
2    MR. KURTZ:  Objection; form.
3    THE WITNESS:  Well, as far as -- and you're
4  talking about a mobile home park or some place you would be
5  setting up a mobile home for long-term --
6  BY MR. D'AMICO:
7    Q.  18 months or longer.
8    A.  Well, I think that the main thing that I would be
9  concerned about from an engineering perspective would be
10  strapping or hold downs to keep the mobile home in place
11  under high winds.  I think under that scenario I think high
12  winds would be the most likely environmental loading that we
13  would have to be concerned with.
14    Q.  In considering a site assessment would you want to
15  know, from an engineering perspective, anything about the
16  soil that the trailer would be resting on?
17    MR. KURTZ:  Objection; form.
18    THE WITNESS:  Well I guess I wouldn't propose, you
19  know, putting a mobile home on a sandy beach or on a swamp,
20  but generally, if it's soil that will support foot traffic
21  it's probably adequate to support the weight of a mobile
22  home or a travel trailer.
23  BY MR. D'AMICO:
24    Q.  And what is the basis for that opinion?
25    A.  Just as a general rule of thumb from an

Page 84

21 (Pages 81 to 84)

John Osteraas PhD                                                                    December 16, 2009

1    engineering perspective, that if you have soil that is firm
2    under foot pressure or under a car wheel, car tire, a car
3    tire, you know, assume it's 30, 30 psi over a square foot,
4    that is 4,500 pounds per square foot typically for
5    residential foundations, we're looking at maybe 2,000 pounds
6    per square foot or less.
7         So, just as a general rule of thumb, if you can
8    walk it, the soil is firm enough to walk on or drive on, it
9    will support the load of a 1- or 2-story building.  I think
10   travel trailers and mobile homes are even lighter, so from a
11   safety perspective, there wouldn't be any problem whatsoever
12   supporting one of those -- either of those on, sort of,
13   ordinary soil.
14        Q.  Have you ever undertaken an analysis of the soil
15   conditions that exist in New Orleans to determine whether or
16   not they can support the load of a travel trailer on piers?
17        A.  We, I think the existence of certainly tens of
18   thousands of homes in New Orleans illustrates that the soils
19   are generally capable of supporting the types of load we see
20   from residential construction, and that would include
21   certainly travel trailers and mobile homes in that category
22   of very light loads.
23        Q.  Is subsidence a problem in the New Orleans area?
24        MR. KURTZ:  Objection; form.
25        THE WITNESS:  Subsidence is -- and you can look at

Page 85

1    varying degrees of soil subsidence.  There's sort of the
2    global subsidence that's going on in the whole Mississippi
3    delta, and there are areas of New Orleans, certainly towards
4    the north closer to Lake Pontchartrain, where there is quite
5    a bit of peat and organic soil that has been deteriorating
6    over time.  So depending on where you are in the city, there
7    are varying depths and degrees of subsidence occurring.
8    BY MR. D'AMICO:
9         Q.  Isn't it true that much of the New Orleans area is
10   built on ground that was formerly swamp or wetland that has
11   been filled?
12        MR. KURTZ:  Objection; form; foundation.
13        THE WITNESS:  I know that there are portions of
14   the city that were formerly wetlands.  I don't know to what
15   extent they have been filled.  I know they have been, they
16   have certainly been drained.  I don't know how much fill was
17   placed in those areas.
18   BY MR. D'AMICO:
19        Q.  Is that the kind of area that would contain
20   agitation as peat and organic clays that would be suspected
21   to have soil subsidence?
22        MR. KURTZ:  Objection; form.
23        THE WITNESS:  I think -- certainly wetlands areas
24   that have certainly peat.  Depending on drainage, they may
25   have varying degrees of unconsolidated clays, and I don't

Page 86

1    know exactly where those areas are in New Orleans.  I would
2    say they're, you know, generally in the northern, certainly
3    in the northern half of the city to one degree or another.
4    BY MR. D'AMICO:
5         Q.  Do you know if the area where Lyndon Wright's
6    trailer was installed was formerly a swamp region?
7         MR. KURTZ:  Objection; form; foundation.
8         MR. D'AMICO:  I'm asking if he knows.
9         THE WITNESS:  I have not looked at that issue.
10   BY MR. D'AMICO:
11        Q.  Did you consider that issue in rendering any of
12   the opinions in your report?
13        A.  I don't think that was an issue that was relevant
14   to any of the opinions that I presented in my report.
15        Q.  I would like to ask you to turn to Page 16 of your
16   report.
17        MR. KURTZ:  Frank, just for the record you're
18   looking at the original report or the errata report?
19        MR. D'AMICO:  I'm looking at the original report,
20   and we can see if he made any changes to that errata report,
21   but.  It appears to be the same paginated number in the
22   errata report as it does in the original report but we'll
23   see and go through it word for word to see if there are any
24   changes.
25        MR. KURTZ:  Just for the record Dr. Osteraas has

Page 87

1    in front of him the errata report, I don't think he has a
2    copy of the original report.
3    BY MR. D'AMICO:
4         Q.  Okay.  I think this is the section of the report
5    where you were analyzing the entry door.  Okay, let's turn
6    to Page 15 and start with, "Mr. Wright's testimony, as well
7    as a photo of the trailer, indicate that in 2007 he was
8    unable to fully close the door.  And that the problem of the
9    door not closing fully became progressively worse over a
10   period of time."
11        Do you see where I'm reading in your report?
12        A.  Yes.
13        Q.  Okay.  Did I read that correctly?
14        A.  I believe so.
15        Q.  All right.  Is that your understanding of what Mr.
16   Wright's testimony was?
17        A.  That's is my summary of my understanding of his
18   testimony.
19        Q.  Okay.  And if we turn to page 16, I'm going to ask
20   you to read this sentence, "Given the fact that the support
21   piers were simply supported on the ground surface any
22   differential movement of the soil beneath the trailer over a
23   period of several years is inevitable and would result in
24   differential movement of the trailer."
25        What did you mean by that statement, Doctor?

Page 88

John Osteraas PhD                                    December 16, 2009

1    A.  Well, several things.  First and foremost, the
2    fact that the piers were placed on plywood supported on the
3    topsoil at the surface at the ground, we would expect, over
4    a period of years some minor differential movement of that
5    soil, either as a result of normal precipitation,
6    periods of drought or heavy rains, and anything that would
7    really affect the, essentially, the soil volume.  So you
8    could have either swelling or minor differential settlement
9    of the soil.
10        And part of the reason that we build structures --
11   well, one other thing, you know, just given the types of --
12   or the problems we have in New Orleans, in general, with
13   long-term subsidence, I would expect to see some movement
14   over time without installation of deep foundations.
15        Q.  Okay.  In fact you say that, "movement of the soil
16   beneath the travel trailer over a period of several years is
17   inevitable."
18        That's a true statement, isn't it?
19        A.  I believe that entire sentence is a true
20   statement.
21        Q.  Particularly given the soil conditions that exist
22   in New Orleans, and particularly the areas where Lyndon
23   Wright's trailer was located?
24        MR. KURTZ:  Objection; form.
25        THE WITNESS:  I think this is a true statement in

Page 89

1    just about every place in the United States.  Well, just
2    about anyplace you would set up a trailer.  I don't think
3    this is particularly unique to New Orleans.
4    BY MR. D'AMICO:
5        Q.  Okay.  Did you read in Mr. Wright's deposition
6    where he testified that over a period of time, the trailer
7    shifted?
8        A.  I don't recall that specific -- that specific
9    testimony.
10        Q.  Let me see if I can find it for you.
11        While Mr. Pinedo is looking for that, I'll
12   continue to ask you some questions.
13        You further state, in the next sentence, "If
14   either the front or rear piers on the right-side of the
15   trailer moved downward relative to the center pier, the door
16   frame would wrack and the plastic bumper would eventually
17   contact the door frame."
18        Did I read that correctly?
19        A.  I believe so.
20        Q.  Is that a true statement, Doctor?
21        A.  That is a true statement as written in the report.
22        Q.  Okay.  And that didn't change from the initial
23   report, as I just read it.  It's the same in the errata
24   version.
25        A.  That's correct.  There are actually very few

Page 90

1    changes between the two reports.
2        Q.  Okay.  So that I understand and the jury is clear,
3    if either the front or rear piers on the right side of the
4    trailer moved downward relative to the center pier, the door
5    frame would wrack and the plastic bumper would eventually
6    contact the door frame; is that correct?
7        A.  If -- again, the assumption in here is that there
8    is enough movement of these piers to cause contact.  So
9    without sufficient movement, you wouldn't have the contact.
10        Q.  Do you have a copy of Lyndon Wright's deposition
11   in front of you?
12        A.  I do not, no.
13        Q.  Do you have it in your reliance materials?
14        A.  Yes, it's in my reliance materials.
15        Q.  Is it something you reviewed in rendering your
16   opinions in this case?
17        A.  It is, yes.
18        Q.  Is it something you relied on in rendering your
19   opinions in this case?
20        A.  Well, it is one piece of information, or one
21   collection of information, that we considered as part of the
22   overall assessment.
23        Q.  All right.  Do you have any reason to doubt the
24   credibility of Mr. Lyndon Wright, when he was testifying
25   about movement of the trailer as he resided in it?

Page 91

1        MR. KURTZ:  Objection; form.
2        THE WITNESS:  Can I see his testimony?
3    BY MR. D'AMICO:
4        Q.  First it's a general question, and then I'm going
5    to you about specifics.
6        But do you have any reason to doubt his
7    credibility, based on your training and experience as a
8    civil engineer?
9        MR. KURTZ:  Objection; form.
10        THE WITNESS:  I think there are two issues, one is
11   credibility and one is interpretation of observations.
12   BY MR. D'AMICO:
13        Q.  Okay.
14        A.  I have no reason to doubt his credibility,
15   although I have, you know, irrespective of Mr. Wright, I
16   have often found that lay observers of engineering
17   phenomenon don't always correctly interpret what they see.
18        Q.  Okay.  I would ask you to start reading the
19   question on the bottom of Page 340, and read through Page
20   341.  That question and this section on Page 341.
21        (Indicating.)
22   Read it out loud, please, Doctor.
23        MR. MILLER:  Objection; hearsay.
24        THE WITNESS:  Okay, I think the document speaks
25   for itself.  I'm not going to read it into the record.

Page 92

John Osteraas PhD                                         December 16, 2009

```
 1    BY MR. D'AMICO:
 2        Q.  Well, I'd like to ask you some questions about it.
 3    I can read it, if you don't want to.
 4        A.  Yeah, that's fine, if you want to read it into the
 5    record.
 6        Q.  Because I want to ask you some questions about
 7    those statements.  So we need to have them read allow, so
 8    that the jury understand what the questions are in context
 9    to.
10        MR. GIEGER:  What line are you on?
11    BY MR. D'AMICO:
12        Q.  The last page on Page 340, the question starting
13    with, "Okay, the gap above the door that..."
14        If you would, please read further.
15        A.  Okay.  Well, here, you can do it, that's fine.
16        Q.  Okay.  I can do it.
17        I'm reading the testimony of Lyndon Wright given
18    in this matter, in his deposition, question at Line 25,
19    bottom of Page 340, "Okay.  The gap above the door that you
20    and I talked about."
21        Answer at Line 2, "Yes."
22        Question at Line 3, "How big was it?  Can you
23    describe how long it was and how long it was?"
24        Answer at Line 5, "It started off as a little gap,
25    but by the time I got out of it, it was like a good piece.
```
                                                      Page 93

```
 1    I mean you could actually, like, put your finger down into
 2    it.  The handle side of the door, you could actually put
 3    your hand down into the top of it."
 4        Question at Line 12, "You could be standing on the
 5    outside of the trailer and put your hand into the inside of
 6    the trailer?"
 7        Answer at Line 15, "Yeah."
 8        Question at Line 16, "How wide was the gap?  Was it
 9    the whole length of the door?"
10        Answer at Line 18, "Well the hinges of the door,
11    so it was, like, a diagonal-type.
12        Question at Line 20, "Triangular?
13        Answer:  "Yeah, like, a triangular-type opening. " "So
14    it came to a point by the hinge side of the door, and it
15    would be widest on the opposite side of the door; is that
16    right?"
17        Answer on Page 342, Line 23, "That is correct."
18        Did you read that section in Lyndon Wright's
19    deposition, prior to rendering your report?
20        A.  I did.
21        Q.  Okay.  And was it your understanding that this
22    problem with the entry door began sometime after he moved
23    into the trailer?
24        A.  That was my understanding.
25        Q.  What is your understanding of when this problem
```
                                                      Page 94

```
 1    with the door not closing actually began?
 2        A.  My recollection from reading his deposition was
 3    that that problem occurred sometime, or he first noticed it
 4    sometime in 2007.
 5        Q.  In the beginning of 2007, correct?
 6        MR. KURTZ:  Objection; form.
 7        Go ahead.
 8        THE WITNESS:  I believe it was early- to mid-2007.
 9    BY MR. D'AMICO:
10        Q.  Okay.  Let's look at your report on Page 5,
11    Doctor.  Page 4, rather.  I'm looking at the original report
12    so I don't know if it's the same in the errata.
13        A.  Is it Page 4?
14        Q.  Page 4.
15        A.  Okay.
16        Q.  You state Lyndon Wright began his occupancy of
17    trailer in March 2006 and continued to occupy the trailer
18    until July of 2008; is that correct?
19        A.  That is my understanding.
20        Q.  Yeah.  And that's what you wrote in your report,
21    correct?
22        A.  That is correct.
23        Q.  "In the course of his occupancy of the trailer,
24    Mr. Wright noted what he believed to be two anomalies with
25    the trailer."
```
                                                      Page 95

```
 1        That is the next sentence you wrote, correct?
 2        A.  That is correct.
 3        Q.  And is that a true statement, as I have stated it
 4    for the record?
 5        A.  That is a true statement as to what is written in
 6    the report, yes.  That is my understanding.
 7        Q.  Okay.  And No. 1, what to you write in your
 8    report?  Please read that for the jury.
 9        A.  "Beginning in 2007, the entrance door would no
10    longer close completely allowing rain water to enter the
11    trailer in the vicinity of the door."
12        Q.  Okay.  Does that refresh your recollection of when
13    it began?
14        A.  Well I think this is exactly what I've just
15    testified to.  It was in 2007.  I don't know that I can say
16    any more precisely, when in 2007, it began.
17        Q.  Right.
18        A.  My recollection is he was not that specific with
19    respect to the first date when he noticed it.
20        Q.  But it's your understanding that beginning in 2007
21    the entrance door would no longer close completely, allowing
22    rain water to enter the trailer in the vicinity of the door.
23        That's your understanding of his testimony,
24    correct?
25        A.  That is my understanding, that is correct.
```
                                                      Page 96

John Osteraas PhD                                           December 16, 2009

| | |
|---|---|
| 1  Q.  All right.  And as we sit here today, do you have | 1  You have seen that photograph, have you not? |
| 2  any reason or any information to believe otherwise? | 2  A.  I've seen that photograph, but I would take issue |
| 3  A.  I do not.  I have -- I have accepted his testimony | 3  with, that it's ajar at the top.  I think the whole latch |
| 4  at face value on this issue. | 4  side is ajar. |
| 5  Q.  Is it also your understanding from the review of | 5  Q.  So you think the whole latch side is ajar? |
| 6  Mr. Wright's testimony that this condition with the door | 6  A.  Yes.  Yes. |
| 7  became progressively worse over time? | 7  Q.  Okay.  And in fact you make reference to that in |
| 8  A.  That is my understanding, that it began as a | 8  your report, that photograph that you have seen? |
| 9  problem, small crack or sticking of the door, and eventually | 9  A.  Yes, I believe so. |
| 10  progressed to a larger gap. | 10  Q.  And that is, "photographic evidence supporting the |
| 11  Q.  And given the fact that the support piers were | 11  statements of Lyndon Wright, that the door, over time, |
| 12  simply supported on the ground surface, any differential | 12  became wracked and would not close completely. " |
| 13  movement of the soil beneath the travel trailer over a | 13  MR. KURTZ:  Objection; form. |
| 14  period of several years would be inevitable and would result | 14  THE WITNESS:  The assumption that I'm making is |
| 15  in differential movement of the trailer, correct? | 15  that the door shown in that photo was closed as far as it |
| 16  MR. KURTZ:  Objection; asked and answered. | 16  would close.  We unfortunately, don't have a close-up photo |
| 17  BY MR. D'AMICO: | 17  to see if the door was intentionally left ajar, or whether |
| 18  Q.  Correct? | 18  it was -- whether that was just the -- as far as it would |
| 19  A.  I think we've covered that. | 19  close. |
| 20  Q.  Yeah.  And from your forensic analysis of the | 20  BY MR. D'AMICO: |
| 21  case, haven't you found objective evidence to support the | 21  Q.  I would like to ask you to direct your attention |
| 22  statements made by Mr. Wright, that in fact there was | 22  to another portion of Mr. Wright's testimony at Page 277. |
| 23  differential settlement of the trailer over time, which | 23  Question from one of the attorneys for the defense, at Line |
| 24  eventually caused the front entry door not to close | 24  6, question, "Okay.  And seeing the daylight is what told |
| 25  completely? | 25  you that the trailer had moved around a little bit?" |
| Page 97 | Page 99 |

| | |
|---|---|
| 1  MR. KURTZ:  Objection; form. | 1  Answer, line 9, "Yes, I knew it had shifted." |
| 2  THE WITNESS:  There's -- | 2  Question:  "Okay, it wasn't like the trailer was off- |
| 3  BY MR. D'AMICO: | 3  level, to the point where you could feel it rocking or |
| 4  Q.  Go ahead. | 4  things were rolling around or anything like that?" |
| 5  A.  Yeah, there is just one door.  But that is my | 5  Answer at line 14, "No, sir, not like that." |
| 6  understanding that the -- there was movement.  I believe | 6  Question, "Were there any other leaks besides the |
| 7  there was movement of the soil beneath the piers that led | 7  one over the door?" |
| 8  the sticking of the front door.  I think our physical | 8  Answer, "None that I saw." |
| 9  testing, or the results of our physical testing -- let me | 9  If we look at Page 279, question, "Okay.  Did the |
| 10  back up. | 10  gap over the door get any worse over time?" |
| 11  Based on the results of our physical testing, we | 11  Answer at Line 6, "It appeared to have, yes." |
| 12  can -- we have been able to identify a reasonable physical | 12  Question at Line 7, "It grew?" |
| 13  scenario that is consistent with Mr. Wright's testimony | 13  Answer, "Yes.  You could see the door actually |
| 14  regarding his observations of what was occurring with the | 14  lean if you were standing outside the trailer." |
| 15  door. | 15  Now, you did see that testimony prior to rendering |
| 16  Q.  And in fact, Doctor, you have reviewed a | 16  your opinions in this case, did you not? |
| 17  photograph of the front of Lyndon Wright's travel trailer | 17  A.  Yes. |
| 18  that he occupied, taken in 2008, which shows that the door | 18  Q.  And isn't that testimony consistent with the |
| 19  is partially ajar at the latch side of the door up to the | 19  phenomenon that you describe on Page 15 and 16 of your |
| 20  right, correct? | 20  report, whereby a shifting of the soil can cause the door to |
| 21  A.  I'm sorry.  I didn't catch the last part of it.  At | 21  wrack and not close properly? |
| 22  the latch side of the door... | 22  A.  As I testified to a few minutes ago, I think what |
| 23  Q.  Yes, that the door does not completely close and | 23  we were able to show from our testing, or determine from our |
| 24  it's partially ajar up at the top, above the latch side of | 24  testing, was that we can explain the scenario that is |
| 25  the door. | 25  consistent with Mr. Wright's testimony regarding the door |
| Page 98 | Page 100 |

John Osteraas PhD                                                    December 16, 2009

1    not closing and the condition getting worse over time.  And
2    that scenario is related to, or is a result of wracking of
3    the door frame and the plastic bumper on the bottom of the
4    door basically interfering with the sill of the door and
5    gradually causing the gap to widen.
6        Q.   And given what we know about the soil conditions
7    in the New Orleans area, in particular the area where Mr.
8    Wright's trailer was installed, do you think that should
9    have been a consideration that was taken into effect in
10   determining how to support this trailer on piers?
11       MR. KURTZ:  Objection; form.
12       THE WITNESS:  Well, I don't think as far as New
13   Orleans, I don't think there's anything in this context
14   there's anything unique about the soil in New Orleans.  And
15   I think this is something that was -- it was the effect of
16   soil and possible shifting and something that was taken into
17   consideration, certainly by FEMA and addressed in the
18   installation contract.
19       I don't think there was anybody that expected that
20   this travel trailer would perform the same as a building
21   designed to last 50 years.
22       Q.   Let's hope not.
23       If we look at that contract that you're referring
24   to between FEMA and Shaw, I would like you to look at what
25   has been marked as Exhibit No. 5 to the Shaw deposition and
                                                      Page 101

1        A.   That was not an issue that I have addressed as
2    part of my work on this project.
3        Q.   Isn't it true that the assessment teams were
4    specifically looking to determine if sites had suitable and
5    accessible areas for the placement of the housing units?
6        Isn't that specifically what they were charged to
7    do?
8        A.   I think the document speaks for itself.  That's
9    not an area I have done any work.
10       Q.   You didn't consider that in rendering the opinions
11   in this case?
12       A.   I don't think that issue really has any bearing on
13   the opinions that I presented in my report.
14       Q.   Oh.  If we look at Page 7 of 32 on the same
15   document, Bates Shaw 000675, 2.2.1, "placement of travel
16   trailer on pad."
17       Do you know what they're referring to there when
18   they say, "Placement of travel trailer on pad?"
19       Here, I have one that is not marked, so we can
20   read together.
21       My question is do you know they're referring to,
22   Doctor?
23       A.   (Witness peruses document.)
24       Q.   Let's read further on --
25       A.   Just a minute.  Just a minute.  I want to read
                                                      Page 103

1    see if this is something you have seen before.
2        A.   (Witness peruses document.)
3    Yeah, I don't recall reviewing this specific document.  I
4    think I've seen variations of it.  My main focus was on
5    Exhibit 7.
6        Q.   Exhibit 7 was part of the bigger contract that
7    Shaw initially signed for the procurement of the services,
8    correct, with FEMA?
9        MR. KURTZ:  Objection; form.
10       THE WITNESS:  I haven't gone into detail as to the
11   contract structure.
12   BY MR. D'AMICO:
13       Q.   Okay.  Under "site assessment" it says, "Site
14   conditions are observed and recorded in field reports.
15   Sites are assessed only after any required owner's
16   agreement, right of entry is obtained."
17       Were you aware of that provision in the site
18   assessment provisions for the work plan for site inspection
19   assessment and installation for travel trailers?
20       MR. KURTZ:  Where are you reading from, Frank?
21       MR. D'AMICO:  6 of 32, Bates 000674 under 1.3.1,
22   site assessment.
23   BY MR. D'AMICO:
24       Q.   Is that your understanding of one of the
25   conditions that had to be met?
                                                      Page 102

1    this in context.
2        Q.   Isn't it true that Shaw was to install the travel
3    trailers, delivered to sites --
4        A.   Just a minute.  I'm --
5        Q.   -- that are assessed to be feasible as requested
6    by FEMA?
7        A.   Okay.  I'm still reading.  I haven't done...
8        (Witness peruses document.)
9        Q.   The question is simple.
10       Do you know what it's referring to?
11       A.   So the question is what do 2.2.1 and 2.2.2 refer
12   to?
13       Q.   Yes.
14       A.   As I read this in context, they appear to refer to
15   installing the trailer on the site or at the location that
16   has been identified under task 1.3, which was the site
17   assessment.
18       Q.   It says specifically, "placement of the travel
19   trailer on pad," does it not?
20       A.   That is the language that is used, yes --
21       Q.   Okay.  Now let's turn to your report.  If we look
22   at Page 36 of your appendix --
23       A.   Let me finish that answer.  I don't think "pad"
24   necessarily implies a concrete pad.  I would -- I interpret
25   this to be the location, identified as the pad for the
                                                      Page 104

1  trailer, not a -- not something you would find in a park, a
2  mobile home park.
3      Q.  But it's your understanding that Shaw, under this
4  contract was tasked with first assessing the site to see if
5  it was suitable for placement of a travel trailer, correct?
6      MR. KURTZ:  Objection; form.
7      THE WITNESS:  The exact language is, "assessment
8  teams are specifically looking to determine if sites have
9  suitable and accessible areas for placement of the housing
10  units, access to potable water, a working sewer connection
11  and electrical power accessibility."
12  BY MR. D'AMICO:
13      Q.  Thank you.  Now can we turn to Page 36 of your
14  appendix.
15          Appendix C, "Structural testing of the Wright
16  trailer."  Appendix C Page 36.  There's a footnote at the
17  bottom, Doctor.
18          Can you read those portions of the footnote, or
19  would you like me to?
20      A.  No, I'm happy to testify regarding my report.
21      Q.  Please, then, for the jury, read what is written
22  on footnote 38.
23      A.  Okay.  Footnote 38 and I have to back up to the
24  text up above, this is in a footnote to the section
25  entitled, "Sensitivity to mid-point jacking."

Page 105

1  entrance door to the trailer sticks, you have most likely
2  lifted one side of the trailer excessively, causing a
3  binding condition of the frame."
4      Q.  Stop there, please.
5          Is it your understanding that, from reviewing the
6  Forest River owners manual, this phenomenon of the entrance
7  door sticking was something that Forest River knew could
8  happen if the trailer was not completely level?
9      MR. GIEGER:  Objection; form and foundation.
10  BY MR. D'AMICO:
11      Q.  What is your understanding of that sentence?
12      A.  Well, my understanding is quite simply that if you
13  have a door frame that is out of square, the door may stick.
14      Q.  And that's from -- if we can read, "after
15  levelling, the entrance door of the trailer sticks, you have
16  most likely lifted one side of the trailer excessively,
17  causing a binding condition on the frame."
18          Did I read that correctly?
19      A.  That you have read that portion of the note
20  correctly.
21      Q.  All right.  And, "If this condition exists, lower
22  the trailer and re-level it to obtain proper balance."
23          Is that what it says?
24      A.  That is what it says.
25      Q.  And that's referenced Forest River 0002430,

Page 107

1      Q.  Mm-hm.
2      A.  And in that paragraph we made the statement --
3  well, I'll just read the paragraph.
4      Q.  Thank you.
5      A.  "After the completion of test 2, the --
6      Q.  No, no, I'm not asking you to do that.
7      A.  I understand, but I want to put this in context
8  because otherwise the footnote doesn't make sense.  "After
9  completion of test 2, the trailer was jacked near the left
10  side blocks, near the trailer door.  The trailer was lifted
11  only half an inch at this location to observe the
12  sensitivity of the door wracking at this point.  It was
13  observed that the width, that with the minor deflection at
14  this location, the wracking of the door diminished from
15  0.1375 inches down to a near baseline condition."
16          And then we have reference to footnote 38.
17      Q.  Now, would you please read footnote 38 for the
18  jury?
19      A.  That's where I'm going.
20      Q.  Thank you.
21      A.  Footnote 38, "The flexibility of travel trailers
22  and the sensitivity of their door openings to elastic
23  wracking during installation of the trailer is consistent
24  with the Forest River owners manual, which states with
25  respect to levelling, quote, "Note, if after levelling, the

Page 106

1  correct?
2      A.  Yes.
3      Q.  So that, as far as you can tell from reading this,
4  what was Forest River's manual telling the person who was
5  installing the trailer and levelling it, with reference to
6  if the door is sticking, the front door is sticking?
7      MR. GIEGER:  Objection; form.
8  BY MR. D'AMICO:
9      Q.  If you know?
10      A.  Well, I can tell you what my interpretation is.  If
11  the door sticks, you need to adjust the levelling of the
12  trailer, whether it's with jacks or whether it's up on
13  blocks, you need to make adjustments so that the door frame
14  -- so that the door does not stick in the door frame.
15      Q.  And is it also your understanding that if the
16  trailer is out of level, it can wrack the frame and stop the
17  front door from a closing completely?
18      A.  That is a statement we make elsewhere in the
19  report.
20      Q.  In fact, you go on to say, "The travel trailers
21  are not unique in the regard.  The relationship between
22  levelness and operability of doors is common to all
23  buildings, including manufactured housing and conventional
24  site built houses."
25          Correct?

Page 108

John Osteraas PhD                                         December 16, 2009

1    A.  That is the statement.
2    Q.  And that, "while not part of the Shaw contract,"
3  you state, "the flexibility of manufactured homes and the
4  sensitivity of their windows and door openings to wracking
5  during installation is also consistent with the federal
6  requirements for mobile home installation."
7        Correct?  Did I read that correctly?
8    A.  I see that.  I'm following you.
9    Q.  Did I read that correctly?
10   A.  I believe so.
11   Q.  And is that your statement?
12   A.  That is my statement, yes.
13   Q.  And you stand by that statement?
14   A.  Well, I think you have to read the --
15   Q.  We're going to keep going.  I'm just --
16   A.  No, I think you need to [speaking simultaneously]
17  --
18   Q.  I'm going to read one statement at a time.
19   A.  Well, no you have to read it in context with the
20  rest of this, the rest of the paragraph.
21   Q.  We're going to get to the rest of the paragraph.
22  Believe me, the jury is going to hear this whole paragraph.
23   A.  Okay.  Well, that's fine.  I think --
24   Q.  Is that statement, still, today as we sit here,
25  your opinion, or are you going to change it?

Page 109

1    A.  Well, I'm not going to answer a question where
2  you're just looking at a portion of a sentence.
3    Q.  Yes or no?
4    A.  I'm not --
5    Q.  Is it still your opinion, Doctor?
6    A.  I'm not going to answer a question where you're
7  just reading part of a sentence.
8    Q.  I read the whole sentence.
9    A.  No you didn't.
10        MR. KURTZ:  No you didn't.
11  BY MR. D'AMICO:
12   Q.  All right, let's read the whole sentence then, if
13  that will make you happy.  "While not part of Shaw contract,
14  the flexibility of manufactured homes and a sensitivity of
15  their window and door openings to wracking during
16  installation is also consistent with the federal
17  requirements for mobile home installation, which state, in
18  part, the manufactured home must be adequately levelled
19  prior to completion of the installation so that the home's
20  performance will not be adversely affected."
21        Now, did I read the whole sentence?
22   A.  You did.
23   Q.  Is that your statement?
24   A.  That is my statement.
25   Q.  Is it an accurate statement?

Page 110

1    A.  I believe it's an accurate statement.
2    Q.  And you stand by that statement?
3    A.  I stand by that statement.
4    Q.  You further state that, "The home will be
5  considered adequately levelled if there is no more than one
6  quarter inch difference between the adjacent pier supports,
7  frame on perimeter, and the exterior doors and windows of
8  the home do nod bind and can be properly operated."
9        Did I read that statement correctly?
10   A.  Mostly.  It's "frame or perimeter" not "frame on
11  perimeter."
12   Q.  I'm sorry.  Frame or perimeter.
13        Is that an accurate statement?
14   A.  You -- I believe it's an accurate statement.
15   Q.  And do you stand by that?
16   A.  Well, --
17        MR. KURTZ:  Objection; form.  That's a quote from
18  the federal register.
19  BY MR. D'AMICO:
20   Q.  You quoted it, right?
21   A.  I --
22   Q.  This is your report?
23   A.  I quoted it, yes.
24        Well, I will note for the record that the close
25  quotes are missing at the end of the --

Page 111

1    Q.  Federal register, Volume 72, No. 202?
2    A.  Yeah, just before that we need a close quote.
3    Q.  Close quote.  Okay.
4    A.  After "operated."
5    Q.  Do you have a copy of Federal Register, Volume 72,
6  No. 202 with you, Doctor?
7    A.  I do not, no.
8    Q.  But you do cite it and make it a reference in your
9  report, correct?
10   A.  I do reference it, yes.
11   Q.  And you are stating, by analogy, that this section
12  of the federal register, although not part of the Shaw
13  contract would apply to manufactured homes and travel
14  trailers, correct?
15        MR. KURTZ:  Objection; form; asks for a legal
16  conclusions.
17        THE WITNESS:  No, I said nothing of the sort.
18  BY MR. D'AMICO:
19   Q.  Well, what did you say?  Why did you include this
20  footnote?
21   A.  This whole footnote is really addressing the,
22  basically, the common occurrence and the recognition of the
23  common occurrence of the fact that the operability of doors
24  and windows, be they in travel trailers, mobile homes,
25  manufactured housing, your house, my house, this building,

Page 112

John Osteraas PhD                                               December 16, 2009

1   can be affected by differential movement of the structure,
2   which causes doors to stick.
3          And the intent of the reference to the federal
4   register was to basically note that this is something that's
5   recognized by HUD as a potential problem and an issue that
6   needs to be addressed when installing mobile homes.
7      Q.   And according to you, it's true of all structures,
8   whether we're talking about a home, a mobile home a
9   manufactured house, the principals all apply equally.
10         MR. KURTZ:  Objection; form.
11         THE WITNESS:  The wracking of doors, wracking of
12  door frames and window frames is a common and widespread
13  problem.
14  BY MR. D'AMICO:
15     Q.   Okay.  You have the copy of the federal register
16  in front of you now, correct?
17     A.   I do.
18     Q.   And if we look to Subpart C, "Site preparation,"
19  under this section that you're referring to, Volume 72 No.
20  202.  That is the reference you have given, correct, for the
21  federal register in your report?
22         The footnote we just read, that is -- I do have
23  the right section of the federal register, do I not?
24         I'm sorry.  Correct.  Not Lyndon Wright, correct.
25     A.   Yes, this is the -- this is the same document we

Page 113

1   were referring to, a particular reference to the quote in
2   footnote 38 comes from Section 3285.6 of that document.
3      Q.   All right.  If we can, for the jury, please read
4   Section 3258.6, "Final levelling of manufactured home."
5          Can you read that for the jury, please?
6          MR. KURTZ:  Why don't you start with a page
7   citation.
8   BY MR. D'AMICO:
9      Q.   Sure.  It's Page 59366, federal register Volume 72
10  No. 202, Friday October 19th, 2007, Rules and regulations.
11         This is the same federal register that you made
12  reference to in your report, correct?
13     A.   It is, yes.
14     Q.   All right.  Now, and you make reference to Section
15  3285.6, correct?
16     A.   I just did, yes.
17     Q.   And please, so that the jury knows what that
18  section is, would you read it into the record?
19     A.   I think that the document speaks for itself.
20     Q.   Well, I'll read it if you won't.
21     A.   That's fine.
22     Q.   "The manufactured home must be adequately levelled
23  prior to completion of the installation so that the home's
24  performance will not be adversely affected.  The home will
25  be considered adequately leveled if there is no more than

Page 114

1   one quarter inch between the adjacent pier
2   supports, frame or perimeter, and the exterior doors and
3   windows of the home do nod bind and can be properly
4   operated."
5          Did I read that correctly?
6      A.   I believe so.
7      Q.   Okay.  Now, on that same page, "Site suitability
8   with design zone maps," Section 3285.103.
9          Do you see that, Doctor?
10     A.   I see that.
11     Q.   "Prior to the initial installation of a new
12  manufactured home, and as part of making the certification
13  of the installation required under Part 3286, upon effect
14  the installer is to verify that the design and construction
15  of the manufactured home, as indicated on the design zone
16  maps provided with the home, are suitable for the site
17  location where the home is to be installed.  The design zone
18  maps are those identified in part 33280 of this chapter."
19         Did I read that correctly?
20     A.   I believe so.
21     Q.   All right.  Now, is that also part of the same
22  federal register you make reference to in your report?
23     A.   It is part of the same document.
24     Q.   And by analogy, do you believe those portions of
25  site suitability with design zone maps would also apply?

Page 115

1          MR. KURTZ:  Objection; form.
2          THE WITNESS:  Would also apply to the Lyndon
3   Wright trailer?
4   BY MR. D'AMICO:
5      Q.   Yes.
6      A.   I don't believe this document at all applies to
7   the Lyndon Wright trailer.
8      Q.   Then why did you include it in your report?
9          MR. KURTZ:  Objection; mischaracterizes the
10  testimony.
11         THE WITNESS:  I think I have already answered
12  that.  To really address the issue that binding of doors in
13  their frames is a common problem, whether we're talking
14  about a travel trailer, mobile homes or other buildings,
15  such as the one we're in.
16  BY MR. D'AMICO:
17     Q.   If we look at section 3285.201, Subpart C on that
18  same page, "Site preparation, soil conditions."  "To help
19  present settling or sagging, the foundation must be
20  constructed on firm, undisturbed soil or fill compacted to
21  at least 90 percent of its maximum relative density."
22         Do you see that?
23     A.   I see that.
24     Q.   Do you know if the travel trailer that Lyndon
25  Wright was residing in was set up on a foundation

Page 116

29 (Pages 113 to 116)

John Osteraas PhD                                              December 16, 2009

**Page 117**

1  constructed on firm, undisturbed soil or fill compacted to
2  at least 90 percent of its maximum relative density?
3      A.  I don't -- again, I'll repeat.  I don't think that
4  this document has any relevance with respect to the Wright
5  trailer.  The provisions that you just quoted are common
6  provisions for construction of permanent foundations for
7  buildings, and certainly are not applicable for temporary
8  support or, well, blocking or temporary support of emergency
9  housing.
10     Q.  Well, how does that jibe with the statement you
11 made on Page 16, "given the fact that the support piers were
12 simply supported on the ground surface and any differential
13 movement of the soil beneath the trailer over a period of
14 several years is inevitable and will result in differential
15 movement of the trailer."
16     If this section doesn't apply to the Lyndon Wright
17 trailer, then how does it jibe with that statement you make
18 on Page 16?
19     MR. KURTZ:  Objection; form.
20     THE WITNESS:  Well, I think, you know, your -- you
21 know, not to belabor an old adage, but you're comparing
22 apples and oranges.  We talked about the federal register is
23 applying, applies to permanent foundations for permanent
24 structures.
25     What I'm addressing on Page 16 of the report is

**Page 118**

1  what is going to happen to a temporary support of a trailer,
2  such as Mr. Wright's.  There will be movement over time and
3  what one would do is exactly what one would do if this was
4  movement that was happening in your house.  You would do
5  some minor adjustments with shimming, you know, which are
6  easy enough that I could do it in about two or three
7  minutes.  I mean, they're two entirely different
8  considerations.
9  BY MR. D'AMICO:
10     Q.  Minor adjustments with shimming that you could do
11 in two or three minutes, that's all it took to level Mr.
12 Wright's trailer?
13     MR. KURTZ:  Objection; form.  That's not what he
14 said.
15     THE WITNESS:  Minor shimming would be all that
16 would be required to address the problem of the sticking
17 door, and it could be done in a matter of minutes.
18     MR. KURTZ:  It's a little after 12:30.  Are you at
19 a lunch break spot?
20     MR. D'AMICO:  That's fine.
21     THE VIDEOGRAPHER:  This marks the end of end of
22 videotape labeled No. 2 in the deposition of John Osteraas,
23 Ph.D.
24     The time is approximately 12:35 p.m.
25     We are off the record.

**Page 119**

1      (Pause in the proceedings.)
2      (Whereupon, 29 pages of invoices was marked
3  Exhibit 2 for identification.)
4      (Whereupon, a 1-page letter from John Osteraas to
5  David Kurtz and Karen Whitfield dated 11/17/09 was marked
6  Exhibit 3 for identification.)
7      THE VIDEOGRAPHER:  We are back on the record.
8  Here marks the beginning of videotape labeled No.
9  3 in the deposition of John Osteraas, Ph.D.
10     The time is approximately 1:40 p.m.
11 BY MR. D'AMICO:
12     Q.  Osteraas, is that how you pronounce it?
13     A.  Osteraas.  That's correct.
14     Q.  For purposes of the record, I want to make sure we
15 have all of the exhibits.
16     MR. D'AMICO:  Do you have the exhibits ready to
17 mark?
18     MR. PINEDO:  Yes, we do.
19 BY MR. D'AMICO:
20     Q.  The original report, dated November 2nd, 2009
21 we'll mark as Exhibit 4.
22     (Whereupon, an 81-page Engineering Investigation
23 Lyndon Wright Trailer by Exponent was marked Exhibit 4 for
24 identification.)
25 BY MR. D'AMICO:

**Page 120**

1      Q.  I would like to ask you about your billing in this
2  case.
3      How much time have you spent working on this time?
4      A.  What time I've spent is reflected in the invoices
5  you have in front of you.
6      Q.  Do you know how much it is?
7      A.  Not without looking at the invoices, I don't.
8      Q.  If you don't mind, will you tell us how much you
9  have billed on this file to date?
10     A.  How much Exponent has billed?
11     Q.  Yes.
12     A.  (Witness peruses document.)
13     (Whereupon, an 82-page Engineering Investigation
14 Lyndon Wright Trailer by Exponent was marked Exhibit 5 for
15 identification.)
16     THE WITNESS:  It looks like about $130,000 plus
17 expenses.
18 BY MR. D'AMICO:
19     Q.  Okay.  And what is your hourly rate?
20     A.  My time is billed out at $360 an hour.
21     Q.  We're going to mark the errata deposition dated
22 November 17th, 2009 as Exhibit 5.
23     I would like to keep the Exhibit 6 on the Shaw
24 exhibit, that way it can be 6 in this deposition and 6 in
25 the Shaw deposition.

John Osteraas PhD                                           December 16, 2009

| | |
|---|---|
| 1      Actually it wasn't 6, it was 5. | 1      MR. KURTZ:  Thank you. |
| 2      MR. KURTZ:  I think it was 5 earlier. | 2      THE VIDEOGRAPHER:  Here marks the end of videotape |
| 3      MR. D'AMICO:  Yeah, it wasn't 6, it was 5. | 3  labeled No. 3 in the deposition of John Osteraas, Ph.D. |
| 4  BY MR. D'AMICO: | 4      The transcript orders will now be taken by the |
| 5      Q.  Exhibit 5 is going to be Exhibit No. 6 in this | 5  court reporter. |
| 6  case. | 6      THE COURT REPORTER:  Standard orders, everybody? |
| 7      And for purposes of the deposition, I would | 7      MR. BONE:  Yes, please. |
| 8  designate the pages that we referred to, the first page, 1 | 8      MR. MILLER:  Yes. |
| 9  of 32 -- | 9      MR. KURTZ:  Mm-hm. |
| 10      MS. WHITFIELD:  What is the Bates number? | 10      MR. D'AMICO:  Yes. |
| 11      MR. D'AMICO:  Bates No. 669. | 11      THE VIDEOGRAPHER:  The time is 1:48 p.m. |
| 12  BY MR. D'AMICO: | 12      We are off the record. |
| 13      Q.  Page 6 of 32, 674, and Page 7 of 32, 675, | 13      (Whereupon, the deposition was concluded at 1:27 |
| 14  designate those three pages.  I have no objections if you | 14  p.m.) |
| 15  want to put the whole thing in, I'm just trying to save | 15      (Signature reserved.) |
| 16  money for people copying. | 16 |
| 17      MR. KURTZ:  I think we need to put the whole thing | 17 |
| 18  in. | 18 |
| 19      MR. D'AMICO:  That's fine. | 19 |
| 20  BY MR. D'AMICO: | 20 |
| 21      Q.  For my purposes, though, I'm only referring to | 21 |
| 22  those pages.  I have no objection to the whole thing going | 22 |
| 23  in. | 23 |
| 24      (Whereupon, a 32-page work plan for site | 24 |
| 25  inspection, assessment, installation, maintenance, | 25 |
| Page 121 | Page 123 |

| | |
|---|---|
| 1  transportation, and de-installation of temporary housing | 1      VIDEOTAPE LOG |
| 2  units - direct assistance for temporary housing solutions in | 2 |
| 3  Louisiana was marked Exhibit 6 for identification.) | 3  Deposition of: JOHN OSTERAAS, PH.D., P.E. |
| 4  BY MR. D'AMICO: | 4  Date: 12/16/2009 |
| 5      Q.  Exhibit 7, the federal register pages that we read | 5  Regarding:FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY |
| 6  from.  Page 1 is the Department of Housing and Urban | 6  LITIGATION |
| 7  Development, federal register cover page, and I believe we | 7 |
| 8  referred to -- what section was it?  Volume 72, Page 202. | 8  Videographer:  SID FOX |
| 9  It was 59366, Section 3285.6, Final levelling manufactured | 9  Began: 9:10 AM        Ended: 1:48 PM |
| 10  home. Section 3285.103, Site suitability with design zone | 10 |
| 11  maps. And Subpart C, Site preparation, Section 3285.201, | 11  TIME   TAPE  KEY WORD   EXAMINATION  OBJECTION |
| 12  Soil conditions. | 12  9:10:40  1    ON RECORD  DAMICO |
| 13      That one page and the cover page are the two pages | 13  9:48:19  1    FORM      DAMICO      KURTZ |
| 14  that I referred to.  If you want to put the whole thing in | 14  9:51:03  1    FORM      DAMICO      KURTZ |
| 15  its fine with me. | 15  9:51:48  1    FORM      DAMICO      KURTZ |
| 16      MR. KURTZ:  Yeah, I think we probably should. | 16  9:52:42  1    FORM      DAMICO      KURTZ |
| 17      THE WITNESS:  Exhibit 7. | 17  9:53:30  1    FORM      DAMICO      KURTZ |
| 18      (Whereupon, a 59-page Department of Housing and | 18  9:55:12  1    FORM      DAMICO      KURTZ |
| 19  Urban Development, model manufactured home installation | 19  10:09:41 1    FORM      DAMICO      KURTZ |
| 20  standards; final rule was marked Exhibit 7 for | 20  10:18:52 1    FORM      DAMICO      KURTZ |
| 21  identification.) | 21  10:31:25 1    FORM      DAMICO      KURTZ |
| 22      MR. D'AMICO:  With that I'll pass the witness. | 22  10:35:45 1    OFF RECORD DAMICO |
| 23      MR. GIEGER:  Forest River has no questions.  We'll | 23  10:51:15 2    ON RECORD  DAMICO |
| 24  reserve our time. | 24  11:29:58 2    FORM      DAMICO      KURTZ |
| 25      MR. MILLER:  The United States has no questions. | 25  11:31:32 2    FORM      DAMICO      KURTZ |
| Page 122 | Page 124 |

John Osteraas PhD                                    December 16, 2009

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 1 | 11:34:02 | 2 | FORM | DAMICO | KURTZ |
| 2 | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
| 3 | 11:34:47 | 2 | FORM | DAMICO | KURTZ |
| 4 | 11:36:37 | 2 | FORM | DAMICO | KURTZ |
| 5 | 11:37:50 | 2 | FORM | DAMICO | KURTZ |
| 6 | 11:40:54 | 2 | FORM | DAMICO | KURTZ |
| 7 | 11:42:01 | 2 | FORM | DAMICO | KURTZ |
| 8 | 11:42:34 | 2 | FORM | DAMICO | KURTZ |
| 9 | 11:43:43 | 2 | FORM | DAMICO | KURTZ |
| 10 | 11:48:58 | 2 | FORM | DAMICO | KURTZ |
| 11 | 11:52:07 | 2 | FORM | DAMICO | KURTZ |
| 12 | 11:52:24 | 2 | FORM | DAMICO | KURTZ |
| 13 | 11:53:24 | 2 | HEARSAY | DAMICO | KURTZ |
| 14 | 11:56:31 | 2 | FORM | DAMICO | KURTZ |
| 15 | 11:59:47 | 2 | ASKED/ANSW | DAMICO | KURTZ |
| 16 | 12:00:08 | 2 | FORM | DAMICO | KURTZ |
| 17 | 12:02:27 | 2 | FORM | DAMICO | KURTZ |
| 18 | 12:05:50 | 2 | FORM | DAMICO | KURTZ |
| 19 | 12:07:06 | 2 | EX. # 5 | DAMICO | |
| 20 | 12:09:01 | 2 | FORM | DAMICO | KURTZ |
| 21 | 12:15:27 | 2 | FORM | DAMICO | KURTZ |
| 22 | 12:18:53 | 2 | FORM | DAMICO | KURTZ |
| 23 | 12:24:48 | 2 | FORM | DAMICO | KURTZ |
| 24 | 12:25:44 | 2 | FORM | DAMICO | KURTZ |
| 25 | 12:27:22 | 2 | FORM | DAMICO | KURTZ |

Page 125

CERTIFICATE OF VIDEOGRAPHER

1
2
3    I the undersigned, Sid Fox, videographer with the firm of
4    The NAEGELI REPORTING CORPORATION, do hereby certify that I
5    have accurately made the videotaped recording of the
6    deposition of John Osteraas, Ph.D., P.E., in the above
7    captioned matter on the sixthteenth day of December, 2009,
8    taken at the location of Naegeli Reporting, 601 Union
9    Street, Suite 1624, Seattle, WA 98101, consisting of 3
10   tape(s).
11
12   No alterations, additions or deletions were made thereto.
13
14   I further certify that I am not related to any of the
15   parties in the action and have no financial interest in the
16   outcome of this matter.
17
18   12/16/2009              Sid Fox
19   Date                    Videographer

Page 127

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 1 | 12:31:17 | 2 | FORM | DAMICO | KURTZ |
| 2 | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
| 3 | 12:31:40 | 2 | OBJECT | DAMICO | KURTZ |
| 4 | 12:34:02 | 2 | FORM | DAMICO | KURTZ |
| 5 | 12:35:26 | 2 | FORM | DAMICO | KURTZ |
| 6 | 12:35:58 | 2 | OFF RECORD | DAMICO | |
| 7 | 1:40:00 | 3 | ON RECORD | DAMICO | |
| 8 | 1:43:50 | 3 | EX. # 6 | DAMICO | |
| 9 | 1:45:36 | 3 | EX. # 7 | DAMICO | |
| 10 | 1:48:16 | 3 | OFF RECORD | DAMICO | |

Page 126

CERTIFICATE

1
2
3    I, Tia B. Reidt, do hereby certify that pursuant
4    to the Rules of Civil Procedure, the witness named
5    herein appeared before me at the time and place set
6    forth in the caption herein; that at the said time
7    and place, I reported in stenotype all testimony
8    adduced and other oral proceedings had in the
9    foregoing matter; and that the foregoing transcript
10   pages constitute a full, true and correct record of
11   such testimony adduced and oral proceeding had and
12   of the whole thereof.
13
14   IN WITNESS HEREOF, I have hereunto set my hand this
15   22nd day of December, 2009.
16
17
18
19
20   /Signed              June 03, 2010
21   Tia B. Reidt          Commission Expiration

Page 128

32 (Pages 125 to 128)