UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                        *          MDL NO. 1873
        FORMALDEHYDE                        *
        PRODUCTS LIABILITY                  *
        LITIGATION                          *          SECTION:  N(5)
                                            *
This Document Relates to:  *Lyndon T. Wright v.*   *   JUDGE: ENGELHARDT
*Forest River, Inc., et al*, Docket No. 09-2977    *
                                            *          MAG: CHASEZ
*************************************************************************

## DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT REGARDING CAUSATION

Defendants Forest River, Inc. ("Forest River") and Shaw Environmental, Inc. ("Shaw) (collectively, "defendants") submit the following memorandum in response to plaintiff's Opposition to the Motion for Summary Judgment on Causation.

Although plaintiff's First Supplemental and Amended Complaint listed a variety of injuries allegedly caused by Wright's exposure to formaldehyde and/or mold, plaintiff has essentially dismissed all but four of his claims based on his response to defendants' Motion for Summary Judgment.[1]  The only remaining claims plaintiff has elected to pursue are those related to (1) the exacerbation of rhinosinusitis due to formaldehyde (2) the development or exacerbation of Wright's asthma due to formaldehyde (3) mental anguish claims, including a fear of cancer and (4) "nuisance" claims.  *See* Rec. Doc. 11546, p. 8, 16.  Forest River will address

---

[1]  For instance, Wright listed walking pneumonia, high blood pressure induced by stress, aggravation of preexisting allergies, sleep loss and decreased appetite.  *See* Rec. Doc. 2203, para. 17.  None of these ailments are addressed in plaintiff's response to defendants' MSJ on causation, presumably because none have sufficient general and specific causation testimony to survive summary judgment.

each of these issues in turn; as demonstrated below, plaintiff has still failed to present the requisite specific and general causation testimony necessary to support any of his claims.

## **ARGUMENT**

### A.  MOLD

Before delving into the four issues listed above, a brief detour is warranted.  Plaintiff's response to defendants' MSJ on causation is perhaps most striking in what it fails to discuss: mold.  In their Motion for Summary Judgment, defendants asked that the Court dismiss any and all claims related to Wright's alleged mold exposure due to the failure to provide specific or general causation testimony.

Plaintiff apparently agrees with defendants' position, as he has utterly and completely failed to provide any response to this portion of defendants' Motion for Summary Judgment. Indeed, the word "mold" does not even appear in his response.  *See* Rec. Doc. 11546.  Perhaps the omission of the mold issue in his response to the MSJ is the closest plaintiff will come to an admission that this claim was a complete waste of the parties' and Court's time and resources. Plaintiff has maintained the same team of experts from the time his July 2009 preliminary expert reports were due, and it is simply inexcusable that it has taken until February 2010 for plaintiff to concede that his mold claim is meritless.  Defendants submit that all expert fees related to mold testing and analysis, as well as the fees for those expert reports, should be awarded as a result.

In any event, there can be no doubt that Wright's mold claim must be dismissed, and any testimony regarding the presence of mold in the trailer must be excluded at trial.

2

**B.   EXACERBATION OF RHINOSINUSITIS**

Like the mold issue, plaintiff's silence in this particular section of their response is telling.  Defendants argued that, while Dr. Miller provided specific causation testimony, no general causation testimony existed to support the exacerbation of rhinosinusitis claim.

The Court is very familiar with Dr. Patricia Williams, and, in this case, plaintiff submitted a seventy-six page expert report from Dr. Williams which surveyed countless articles. Indeed, her "References" section is over eleven pages of single-spaced type.  *See* expert report of Dr. Williams, attached as Ex. A to defendants' MSJ on Causation, Rec. Doc. 10933.  Yet, curiously, plaintiff does not make one reference to Dr. Williams' report or opinions to show that his exacerbation of rhinosinusitis claim has supporting general causation testimony.  Of course, this omission is not all that surprising when one takes a closer look at the studies she lists in her report.  Although she explicitly discusses scientific literature on the "association" between **mold** and rhinosinusitis, the word "rhinosinusitis" never appears in any section of her expert report that deals with formaldehyde.  *Id.* at p. 32.  In other words, plaintiff cannot cite to Dr. Williams to help him prove the general causation side of this condition, because she never addresses it.

Instead, plaintiff has retreated to Dr. Miller's report and has characterized it as containing both general and specific causation.  **This assertion is directly contrary to plaintiff's own Expert Witness designation list**.  While Dr. Williams' Areas of Testimony are listed as "General Causation on Adverse Health Effects from Exposure to Formaldehyde, Mechanism of Injury regarding Exposure to Formaldehyde and Asthma, Formaldehyde Causation of Cancers," Dr. Miller's are "Toxicologist/Pulmonologist, Medical Examination of Wright, Review and Analysis of Records and Specific Causation; Mold Analysis and Causation."  *See* Rec. Doc.

3

2359, Plaintiff's Designation of Expert Witnesses, dated 7/29/09; *see also* Rec. Doc. 4488, Plaintiff's Supplemental Designation of Expert Witnesses, dated 10/2/09. Plaintiff obviously knows the distinction between general and specific causation, as he described Dr. Williams as an expert in "general causation" but referred to Miller performing a "review and analysis of records and specific causation" with no mention of general causation.[2] Plaintiff's recent response to Forest River's motion *in limine* on Dr. Miller even states, "Dr. Miller, **who will testify as to specific causation, …"** and never discusses his alleged general causation opinions. Rec. Doc. 11757, filed 2/18/10.

Plaintiff counters by arguing that Dr. Miller wears "many hats – an MD, internal medicine and pulmonary specialist, but also specialist in pharmacology and an M.P.H. in environmental health." *See* Rec. Doc. 11546, p.8-9. While this may be true, none of the hats he wears is that of an expert regarding general causation.

General causation deals with whether a substance is capable of causing a particular injury or condition in the general population. *See Seaman v. Seacor Marine LLC,* 564 F.Supp.2d 598, 600. In the Fifth Circuit, "epidemiological proof of causation is the most useful and conclusive type of evidence." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996). Epidemiological studies assess causal relationships via statistical probability, comparing the incidence of a particular disease in people exposed to a particular substance as opposed to people not so exposed. *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, *mod'd on other grounds*, 884 F.2d 166 (5th Cir. 1989), *cert den'd* 494 U.S. 1046, 110 S.Ct. 1511 (1990). Epidemiology is the "primary generally accepted methodology for demonstrating a causal

---

[2]  Plaintiff's failure to list Dr. Miller as an expert in general causation is even more egregious given the fact that he was allowed to file a Supplemental Designation of Expert Witnesses in early October 2009, yet his description of Dr. Miller's areas of expertise remained unchanged from those in the July 2009 designation.

relation between a chemical compound and a set of symptoms or a disease." *Conde v. Veliscol Chem. Corp.*, 804 F.Supp. 972, 1025-26 (S.D. Ohio 1992), *aff'd,* 24 F.3d 809 (6th Cir. 1994).

Dr. Miller, however, is not an epidemiologist.  *See* Ex. A, Deposition of Dr. Miller from Fleetwood bellwether, dated 9/22/09, p. 34-35.[3]  He currently works as a venture capitalist and serves as president of Mediphase, a company that is involved in biotech investments.  *Id.* at 12. Since the early 1990s, the overwhelming majority of his work – 80-90% – has been on the business side, not the clinical side, of medicine.  *Id.* at 14-19; 23-24.  In the 1990s, his clinical work was limited to teaching medical students internal medicine, usually just one afternoon a week.  *Id.* at 19.  He has not published regularly since the early 1990s.  *Id.* at 22.  When he did publish, it was primarily pharmacology publications.  *Id.* at 23.  He has not written any articles on formaldehyde and has not had any experience in reviewing formaldehyde-related diseases, stating, "I don't recall dealing with formaldehyde in the past."  *Id.* at 23, 45.

In addition to his lack of credentials, Dr. Miller's October 2009 expert report is also lacking; it spends just over one page discussing his alleged "general causation" opinions, most of which are one line conclusions with little to no explanation.[4]  His conclusions are not couched in "cause-effect" language, and the most direct statement Miller provides is that "there is strong evidence supporting chronic inhalation of formaldehyde with the development of rhinosinusitis." *See* Ex. F attached to defendants' MSJ, Rec. Doc. 10933, p. 7.  However, the only discussion of general causation relating to rhinosinusitis is located in one paragraph on page 5 of his report.

---

[3]  Dr. Miller testified:
> Q:  You're not an epidemiologist?
> A:   I am not.

Ex. A, p. 34-35.

[4]  Plaintiff claims Dr. Miller discusses in "great detail" his general causation opinions on pages 4-5.  Barely two sentences discussing a discussion of scientific literature are contained on page 4.

That section reads, "While most series are small, there is broad agreement that formaldehyde exposure is correlated with rhinosinusitis." *See* Ex. F attached to defendants' MSJ, Rec. Doc. 10933, p. 5.  Dr. Miller's report never comes close to offering a sentence as direct as "A cause effect relationship exists in general between the exacerbation of rhinosinusitis and formaldehyde exposure."

The contrast between Dr. Miller and Dr. Williams – two of plaintiff's own experts – is glaring.  Although defendants disagree with Dr. Williams' conclusions, plaintiff clearly knows what a general causation analysis should looks like, *e.g.,* Dr. Williams' report, and Dr. Miller's one page recap falls far short of it.  Plaintiff is clearly scrambling to grasp at any general causation he can find to support this failing claim, and, in doing so, he is forcing both defendants and the Court to read the proverbial tea leaves in Dr. Miller's report to find a general causation opinion.  The problem with plaintiff's approach is that no such opinion exists.

Finally, plaintiff has discussed the deposition of Dr. Miller in his response.  First, it should be noted that, because plaintiff never designated Miller as a general causation expert, defendants justifiably did not direct any questions regarding his supposed general causation opinions.  Plaintiff is now attempting to manipulate the question of re-deposing Dr. Miller as somehow justifying their right to expand his opinions.

Defendants admit that they agreed to keep the deposition of Dr. Miller open.  However, plaintiff has left out a key piece of information: defendants did so because Dr. Miller failed to bring his entire reliance file to his deposition.  As with every other expert deposition, Forest River requested that Dr. Miller produce a number of documents that he reviewed in connection

with this case.  The parties had a standing agreement that these materials would be provided one week in advance of the deposition.

When counsel for defendants arrived at the deposition, they were informed that Dr. Miller had failed to produce a number of notes and other materials from his file.  See Ex. B, Deposition of Dr. Miller, dated 11/10/09, p. 22-24.  These materials – including notes from his meeting with Wright– were back in his office in Boston, and Dr. Miller agreed to produce them following his deposition.   In order to reserve their right to question Dr. Miller about these documents should the need arise, counsel for Forest River held the deposition open:

> Q   Again, because we don't have the notes relating to the meeting, we will call upon the production of those notes, and obviously keep the deposition open pending receipt of these documents.

> *Id*. at 27.

Plaintiff disingenuously contends that, because defendants were already planning to depose Dr. Miller a second time, plaintiff now has a right to discuss general causation opinions with Dr. Miller.  Plaintiff should not be allowed to withhold certain reliance file materials and then, when defendants are necessarily forced to keep the deposition open, use that opportunity to supply new causation testimony.

Plaintiff is now using the deposition as an excuse to plug the holes in his case, noting that, because the deposition was held open by defendants, "counsel for Plaintiff did not offer any rehabilitative or direct lines of questions to the effect of Dr. Miller's credentials to give both specific and general causation testimony."  *See* Rec. Doc. 11546, p. 9.  It is not defense counsel's obligation to provide plaintiff's counsel with an opportunity to question his own witness;

defendants did nothing to preclude plaintiff's counsel from asking these questions. The bigger take-away from this portion of plaintiff's response, though, is that plaintiff is impliedly admitting that Dr. Miller's report did not adequately address general causation, with plaintiff feeling the need to use deposition testimony to "fix" Miller's inadequate opinions. Plaintiff should not be allowed to offer supplemental opinions from Dr. Miller on the basis of the deposition of his own expert witness.[5]

Moreover, as the Court will recall, Dr. Miller attempted to provide additional expert testimony on Wright's mental anguish/fear of cancer claim via an Addendum submitted in January of this year. Although the Court rightly excluded it, Dr. Miller certainly had an opportunity in that report (or, more appropriately, earlier) to expound on any general causation theories he wished to express. He never did so. Defendants can only conclude that Miller's alleged "general causation opinions" are simply a recent invention of plaintiff aimed at addressing a gaping hole in plaintiff's case.

In the end, plaintiff has attempted to use Dr. Miller's testimony as a panacea to cure the deficiencies of his other expert's findings. This is now becoming a clear pattern with plaintiff in this case. Miller's Addendum was a precursor to what plaintiff is now attempting to do now via this motion – *i.e.,* to expand and inject Dr. Miller's testimony into whatever areas of his case he feels are weak. Here, he has attempted to transform Miller's specific causation testimony into general causation, despite prior representations to the contrary. Just as with the Addendum, the Court should deny this attempt as well. Plaintiff has failed to present the necessary general

---

[5] In his response, plaintiff discusses the CT scans of Wright solely for the purpose of misdirection. For the purposes of this Motion, defendants have not contested Miller's ability to present specific causation testimony. These CT scans are only relevant for use in a specific causation analysis, not general causation analysis, and plaintiff's discussion of these records is entirely irrelevant.

causation testimony with respect to the exacerbation of rhinosinusitis claim, and it therefore fails as a matter of law.

### C.  ASTHMA

While plaintiff presented specific causation without general causation testimony on the exacerbation of rhinosinusitis claim, the inverse is true with respect to the asthma claim.  Dr. Williams provides a general causation analysis for asthma, but none of plaintiff's experts provide a specific causation link for this condition.[6]

In an effort to cobble together specific causation testimony on asthma, plaintiff has turned to Forest River's pulmonologist Dr. Kenneth Smith.  Defendants fully recognize that Dr. Smith diagnosed Wright as an occult asthmatic.  However, contrary to plaintiff's implications, defendants have nothing to hide with respect to Dr. Smith's opinions.  Dr. Smith accepted the plaintiff's medical history as true – (1) that Wright had "rhinitis, conjunctivitis, and headaches *possibly* on the basis of an irritating substance in the travel trailer and (2) that his "cough that he experienced while living in the trailer was mild, historically, but may have been worse than it might have otherwise have been because of underlying asthma."  *See* expert report of Dr. Smith, p. 3, attached as Ex. C.  However, Dr. Smith went on to note that, "**There is no objective evidence that exposure to formaldehyde or mold in the FEMA-provided travel trailer has caused or will cause any permanent injury."** *Id.*

He does **NOT** offer any specific causation testimony that Wright's asthma was either caused or exacerbated by Wright's time in the trailer.  In fact, Dr. Smith has explicitly stated that Wright's asthma pre-dated his time in the trailer.  *See* Deposition of Dr. Smith, attached as Ex.

---

[6]  This is despite the fact that, according to plaintiff's motion, Dr. Miller wears the "hat" of a "pulmonary specialist."

D, p. 114-15.  With regard to the question of exacerbation of his asthma, Dr. Smith uses words like "may" and "possibly" in his report when describing plaintiff's alleged exacerbation of asthma.  Again, he uses these words to indicate that these are symptoms Wright was reporting to him **by history.**  Dr. Smith accepted these as true, but he did not ever state that, in his expert opinion, these symptoms were caused by formaldehyde exposure.  In sum, a careful reading of his report demonstrates that Dr. Smith has never opined that Wright's asthma was, more probably than not, caused or exacerbated by Wright's time in the trailer.

However, like he did with Dr. Miller, plaintiff is now stretching Dr. Smith's testimony to fabricate a genuine issue of material fact.  The first clue of plaintiff's real motivation with regard to asthma at trial can be found on page eight of his response to defendants' MSJ, where he writes:

> The Plaintiff avers that there are very simple and straightforward claims to which dispute clearly remains.  They are: . . .  (2) Plaintiff **either developed asthma or his existing asthma was made worse due to Trailer**. . . .

*See* Rec. Doc. 11546, p.8.

As this language demonstrates, Wright is still fishing for theories relates to asthma, claiming that it was either caused OR exacerbated by formaldehyde.  At this late stage in the litigation, just a month away from trial, the time for "or" is long past.  Plaintiff should presumably know what his theory of the case is at this point:  asthma was either caused or it was exacerbated.  The fact that plaintiff is still wavering between these theories underscores the fact that he has no theory at all.

The plain fact is that **<u>no</u>** expert has ever provided specific causation testimony that Wright developed asthma due to his formaldehyde exposure in the trailer.  **No** expert has ever

provided specific causation testimony that Wright's asthma was exacerbated by formaldehyde exposure from the trailer.  **It is clear that, at trial, plaintiff will attempt to confuse the jury by referencing Wright's asthma, with the implication being that, because Wright was never diagnosed with asthma before he lived in the trailer, he must have developed asthma as a result of his time in the trailer.  This is contrary to the expert evidence in this case.**  To avoid this confusion – confusion that will undercut the instructive value of this case as a bellwether trial – the asthma claim must be dismissed, and all references to asthma excluded at trial.

Finally, plaintiff has argued that he is entitled to the *Housley* presumption.  Under Louisiana law, causation may be established if, before an accident, the plaintiff was in good health, but, commencing with the accident, the symptoms of the disabling condition appear.  *See Housley v. Cerise,* 579 So. 2d 973, 980 (La. 1991).[7]  Plaintiff argues that, since he was never diagnosed with asthma before living with the trailer, Dr. Smith's diagnosis allow him to meet his burden of proof.

First, Wright is not entitled to the *Housley* presumption based on his medical history. The expert testimony from Drs. Field, Smith and Miller reveals that Wright had every medical complaint at issue in this suit – including asthma and rhinosinusitis – **prior** to living in the trailer.  He was not therefore in "good health" before living in the trailer, his alleged symptoms did not first appear after he began residing in his trailer, and the *Housley* presumption cannot apply.

---

[7]  Regardless of *Housley,* the test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident.  *Maranto v. Goodyear Tire & Rubber Co.,* 650 So.2d 757, 759 (La., 1995); *Mart v. Hill,* 505 So.2d 1120 (La.1987).

Further, other Louisiana courts have distinguished *Housley* and noted that it is more applicable in a personal injury suit involving one discrete accident.  For instance, in *Whiteman v. Worley*, 688 So. 2d 207, 208 (La.App. 4 Cir., 1997), defendants' child struck plaintiff in the eye with a ballpoint pen.  Plaintiff suffered a corneal abrasion which healed satisfactorily.  *Id.* However, soon thereafter, plaintiff developed an infection in her eye that left with some visual impairment.  *Id.*  The court noted that plaintiff had to prove that, more probably than not, her infection was caused by the jab in her eye with the ballpoint pen. *Id.* at 211.  However, the Court found that plaintiff failed to meet her burden, since none of the medical experts established that the pen caused the eye infection.  *Id.*  Plaintiff argued that she was aided by the *Housley* presumption; because she had no symptoms of an eye infection before the injury but did afterwards, the jab should be presumed to have caused the eye infection.  *Id.*  However, the Court noted that the *Housley* presumption did not fit that fact pattern, however:

> In the present case, in contrast, the first symptoms of an eye infection (chlamydia, as it turned out) did not commence until ten days after the accident and three days after the corneal abrasion had healed.  Thus, the present case has much less of the "close temporal relationship". . . between accident and symptoms than was present in *Housley* and is suggested by the reference "commencing with the accident".

Like the plaintiff's injury in *Whiteman,* Wright's injuries did not manifest themselves in close proximity to his first time in the trailer.  He lived in the trailer for a month before ever telling his mother that he thought the trailer was "making him sick."  His problems with bloody mucous did not begin until over eight months after he moved into the trailer, and he was not diagnosed with a neuroma until 2009.  The logic of the *Housley* presumption does not fit in this case, and that presumption should not be applied.

Furthermore, in *Kemp v. Metabolife Int'l, Inc.*, 2004 WL 2095618 at *2 (E.D. La. 9/13/04), the court considered *Housley* in the context of a toxic tort case.  There, plaintiff sued the manufacturers of the weight loss supplement Metabolife 356.  Defendants moved for summary judgment, arguing that plaintiff had failed to provide evidence of specific causation that the drug caused the alleged health effects.  *Id.* at *3.  Plaintiff pointed to *Housley* and argued that they had met their burden of proof with respect to causation.  *Id.* at *4.  However, the court examined *Housley* and found it to be inapplicable in the context of a toxic tort case, noting:

> The Court finds that the test for the Housley presumption, even if it were applicable in this situation, is not satisfied under these facts.  **The Housley presumption will not be met if the injury only gradually arises from the accident.**  . . . It is questionable whether *Housley* should even apply to a situation where injury allegedly arises not from one incident, as in most personal injury suits and *Housley,* but from repeated behavior, such as the regular use of dietary supplements.  The Housley presumption makes sense in situations involving a single incident because a reasonable person, presumably, would not continually repeat behavior that had a close temporal relationship with an injury. **Conversely, the Housley presumption is not easily applied in situations where injury allegedly arises not from a single "accident" or incident but rather from a series of incidents** which, for that matter, where not "accidental."
> * * *
> **Therefore, *Housley* does not switch the burden to Defendant, and the burden remains on Plaintiffs to prove through medical testimony that Metabolife is the actual cause of injury.**

*Id.* at *4 (emphasis added).

The logic of *Kemp* is controlling here.  *Housley* is inapplicable, and Wright still must prove medical causation through **expert medical testimony** and show that formaldehyde exposure caused his injuries.  *See Seaman v. Seacor Marine LLC,* 564 F.Supp.2d 598, 600 (stating that, in a toxic tort suit, plaintiff must present admissible expert testimony to establish general causation as well as specific causation) (*citing Knight v. Kirby Inland Marine, Inc.*, 482

F. 3d 347, 351 (5th Cir. 2007).  As discussed above, Wright has not met his burden to prove causation on any of his claims, including but not limited to asthma.

### D.  MENTAL ANGUISH

As noted above, without specific or general causation, the claims for Wright's mental damages also fail as a matter of law.  Mental anguish claims, which include the fear of cancer, must be causally related to a defendant's actions.    *Smith v. A.C. & S., Inc.*, 843 F.2d 854, 857-58 (5th Cir. 1988); *see also Maurer v. Heyer-Schulte Corp.*, No. 92-3485, 2002 WL 31819160, at *3 (E.D. La. Dec. 13, 2002) (causation is required for fear of cancer claims).  Moreover, damages for mental anguish are only recoverable when that mental anguish results from the fear of developing a condition "as a result of a present injury."  *Smith*, 843 F.2d at 857-58.  As discussed above, Wright has failed to carry his burden of proof to provide the expert causation testimony necessary to recover for any present injury.

Leaving that issue aside, defendants emphasize that plaintiff has never provided any expert testimony to demonstrate that Wright specifically faces an increased risk of cancer due to his alleged formaldehyde exposure in the trailer.  In the Gulf Stream bellwether trial, Dr. Kornberg opined that plaintiff was seventeen times more likely to develop cancer as a result of formaldehyde exposure in the trailer.  None of plaintiff's experts have presented similar evidence.

Moreover, unlike other toxic tort cases that involve exotic chemicals that humans are not typically exposed to, formaldehyde is ubiquitous.  Urban background levels of formaldehyde have been measured between 0.008 and 0.068 ppm; formaldehyde is present in the exhaled air of humans at concentrations between 0.001 and 0.072 ppm.  *See* Ex. E, expert report of Dr. Dyson,

14

dated 11/2/09, p. 3.  If the Court accepts plaintiff's position – that Wright need only that he was exposed to *some* formaldehyde to recover damages for fear of cancer – then every human on earth would conceivably have a fear of cancer claim.  Even if plaintiff need not quantify the exact increased risk of cancer, defendants submit it is unreasonable for Wright to recover these damages in this case due to the lack of expert medical testimony.  None of plaintiff's specific causation experts have examined the question of formaldehyde and cancer, and Wright should not be able to recover these damages accordingly.

Finally, defendants will briefly address plaintiff's arguments relative to Dr. Spector's report.  As noted in his response to defendants' MSJ, Wright has had recurring episodes of hemoptysis (spitting up blood) in his mucous upon waking in the morning.  *See* Ex. F to Rec. Doc. 10933, Affidavit of Dr. Spector, p.1.  Plaintiff's expert otolaryngologist, Dr. Richard Spector, was concerned about a mass at the base of Mr. Wright's tongue and biopsied it in July 2009 in an effort to determine the potential cause of this problem.    *See id.* at 2.  In his subsequent expert report, Dr. Spector reached three conclusions: (1) the tongue mass was in fact a benign neuroma  (2) the neuroma was not causally related to formaldehyde exposure and (3) he could not identify the source of Mr. Wright's current bloody sputum.  *Id.*  During the biopsy procedure, Dr. Spector also took a swab sample of plaintiff's nasal epithelial tissue.  *See* Deposition of Dr. Spector, dated 10/29/09, p. 106-07, attached as Ex. G to Rec. Doc. 10933. That study revealed no evidence of malignancy or cellular damage of any kind, including but not limited to ciliated columnar epithelial cells.  *Id.* at 106-108.

Plaintiff casts Spector's report as support for Wright's fear of cancer claim.  He concedes that Dr. Spector did not link the neuroma or bloody sputum to Wright's alleged formaldehyde

exposure, but he notes that Dr. Spector could not rule it out either.  *See* Rec. Doc. 11546, p. 13.

This is simply plaintiff's effort to use a negative to prove a positive, and this twisted logic cannot

allow plaintiff to carry his burden of proof with regard to causation.  To be clear:  Dr. Spector

did not relate any of Wright's medical issues to formaldehyde exposure.  He explained:

> Q.   Doctor, you stated in your report
> that you cannot find or cannot attribute
> this neuroma to the alleged formaldehyde
> exposure, correct?
> A.   That's correct.
> * * * *
> Q.   As we sit here today, you can't
> say more probably than not what caused that
> particular neuroma, correct?
> A.   That's correct.
> * * * *
> Q:   Understood.  As we sit here today,
> you cannot say more probably than not that
> any of the physical complaints or issues for
> which you have treated Mr. Wright are
> related to formaldehyde, correct?
>  A:   That's a fair statement.
> * * * *
>  Q.   And then about four paragraphs
> down from that you state that:  Based upon
> my medical knowledge, Mr. Wright's history,
> prior medical records and medical surgical
> examinations, I cannot find a source for his
> complaint of bloody mucous.  Is that true
> today?
>     A.  It is.
>     Q.   In addition, I cannot identify any
> relationship between his exposure to
> formaldehyde and his complaint of bloody
> mucous or ear drainage.  Is that true today?
> A.  It is true today.

*See* Deposition of Dr. Spector, p. 105; 128-29; 131; 164, attached as Ex. G to Rec. Doc.
10933.

In his response to the MSJ, plaintiff cherry-picked one line[8] from Dr. Spector's deposition in an effort to imply that Spector is hesitating over the cause of the neuroma and bloody mucous.  As these deposition excerpts demonstrate, no hesitation exists, as Dr. Spector does not believe formaldehyde caused either problem.

Dr. Miller confirmed that Spector could find no cause for the bloody mucous and noted in his report, "Dr. Spector reports that he is 'unable to find a source for [Wright's] complaint of bloody mucous'. . . . **With regard to the neuroma recently diagnosed, there is no evidence**

---

[8]  The full discussion reads:

> Q.  Doctor, you stated in your report that you cannot find or cannot attribute this neuroma to the alleged formaldehyde exposure, correct?
> A.  That's correct.
> Q.  All right.  And based on your explanation, I think I understand but just to be clear, by that positive statement that you can't attribute it to it, is it also true that you can't rule it out as a possible cause?
> A.  Yes, I think the converse is a fair statement.  I have no evidence to blame the formaldehyde for the tumor, but neither do I have any evidence that it wouldn't have any role in it.  The problem that I have in answering your question in that way is that what literature I have read has not incriminated formaldehyde in that specific tissue type.  It talks about squamous carcinomas.  It talks about lymphomas.  It talks about Hodgkin's disease, **but never** mentioned neuromas, so it's difficult for me to give you any strong association.
> Q.  You don't have enough information to do that?
> A.  Yes, sir.
> Q.  You also said in your report that you cannot find a source for his complaint of the bloody mucous?
> A.  That's correct.

*See* Deposition of Dr. Spector, dated 10/29/09, p. 164-65, attached as Ex. G to Rec. Doc. 10933 (emphasis added).

17

**that this is associated with formaldehyde exposure**." *See* Dr. Miller report, p. 3 & 7, attached as Ex. F to defendants' MSJ on causation, Rec. Doc. 10933 (emphasis added).

Plaintiff cannot survive summary judgment on claims related to either the neuroma or bloody mucous based on the future possibility that Dr. Spector **might** one day link these issues to formaldehyde exposure.  Both of plaintiff's experts unequivocally stated that no such link exists, and if plaintiff has in fact suffered mental harm from the neuroma and bloody mucous, this harm has nothing to do his alleged formaldehyde exposure, and thus nothing to do with either Forest River or Shaw.

### E.   NUISANCE CLAIMS

Finally, plaintiff asserts that his "nuisance claims" should survive summary judgment. These claims relate to damages for Wright's alleged headaches, cough, sinus problems, eye irritation, skin rashes, etc.  *See* Rec. Doc. 11546, p. 16.

The fact that these are only "nuisance" claims does not relieve plaintiff of his burden to provide general and specific causation evidence from qualified medical experts.  As with every other claim in this case, plaintiff has failed to do so.  None of plaintiff's specific causation experts have provided testimony to support the nuisance claims.

As explained in defendants' MSJ, Dr. Farber will not testify at trial, and his dermatological findings are therefore meaningless.[9]  Dr. Spector provided no specific causation link between formaldehyde and these nuisance claims.  Dr. Miller did not either, instead only offering an opinion of Wright's exacerbation of rhinosinusitis.  Dr. Miller testified:

> Q   Let me ask you this.  In your
> final conclusion in your October 2nd report,
> you state, "In summary, it is my

---

[9]   The parties have stipulated that all of Dr. Farber's reports and opinions are inadmissible.  *See* Rec. Doc. 11729.

professional opinion that, within a
reasonable degree of medical probability,
the exposure to formaldehyde emissions
during his approximately 28 months of
residence in the FEMA trailer significantly
exacerbated Mr. Lyndon Wright's
rhinosinusitis," correct?
   A   That's correct.
   Q   Is that the only opinion that you
hold in this case?
   A   That's the only one certainly
stated here, yes.
   Q   And so if called upon to testify,
the only causal link that you can draw to
any of Mr. Wright's symptomatology is that
you believe exposure to some level of
formaldehyde caused an exacerbation of his
rhinosinusitis?
   A   That's what's stated here, yes.

* * * *

   Q   Other than rhinosinusitis, did you
diagnose any other condition, syndrome or
other medical issue with respect to
Mr. Wright?
   A   He has a number, obviously, of
other illnesses that I believe are not
relevant here, but the answer to your
question is, putting those aside, no.

Ex. B, Deposition of Dr. Miller, dated 11/10/09, p. 113-14; 118-19.

Plaintiff has once again failed to provide the requisite causation evidence on the nuisance claims,

and the Court should dismiss them accordingly.

## CONCLUSION

Opposing counsel has twisted and stretched the meaning of nearly all the expert reports in

this case, but the basic flaw in his claim remains.   PSC has failed to assemble specific and

general causation evidence sufficient to support any of Wright's alleged health complaints.   As

Wright has failed to support his burden of medical causation, this matter is ripe for summary adjudication. Accordingly, for the reasons discussed above, defendants are entitled to and respectfully request that this Honorable Court enter summary judgment in their favor on all claims.

Respectfully submitted,

/s/ Jason D. Bone
Ernest P. Gieger, Jr. (Bar Roll No. 6154)
Jason D. Bone (Bar Roll No. 28315)
Carson W. Strickland (Bar Roll No. 31336)
Gieger, Laborde & Laperouse, L.L.C.
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana  70139-4800
Telephone:  (504) 561-0400
Facsimile:  (504) 561-1011
*ATTORNEYS FOR FOREST RIVER, INC.*

/s/ M. David Kurtz
M. David Kurtz (Bar Roll No. 23821)
Karen K. Whitfield (Bar Roll No. 19350)
Catherine N. Thigpen (Bar Roll No. 30001)
Baker Donelson Bearman Caldwell & Berkowitz, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
*ATTORNEYS FOR SHAW ENVIRONMENTAL, INC.*

# **C E R T I F I C A T E**

I hereby certify that on the 19th day of February, 2010, a copy of the foregoing

Memorandum in Support was filed electronically with the Clerk of Court using the CM/ECF

system.   Notice of this filing will be sent to liaison counsel by operation of the Court's

electronic filing system and all other counsel of record via e-mail and U.S. Mail.

/s/ Jason D. Bone
JASON D. BONE

21