UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * | MDL NO. 1873 |
| | * | SECTION: N(5) |
| This Document Relates to: | * | |
| *Lyndon Wright, et al. v. Forest River, Inc., et al.* | * * | |
| | * | JUDGE: ENGELHARDT |
| | * | |
| Case No. 09-2977 | * | |
| | * | MAG: CHASEZ |

*********************************************************************

Expert Report of
William L. Dyson, Ph.D., CIH

November 2, 2009

## Introduction

At the request of attorneys representing Forest River, Inc. in litigation involving FEMA temporary housing units (THUs) I was asked to review certain case-specific documents, evaluate the facts of the case, and provide expert opinions on issues arising in the referenced case from the standpoint of an industrial hygienist based on available technical and scientific knowledge. This document will serve as my report in response to this request.

## Professional Qualifications

My qualifications as an industrial hygienist are summarized on the attached curriculum vitae. I have worked as an industrial hygienist since 1967. My educational background includes a Ph.D. in Environmental Health Engineering from Northwestern University in 1975. The American Board of Industrial Hygiene certified me in the comprehensive practice of industrial hygiene in 1978. I am a member and Past President of the Academy of Industrial Hygiene, a Fellow member and former officer of the American Industrial Hygiene Association, a former director and officer of the American Board of Industrial Hygiene, a Professional member of the American Society of Safety Engineers, and a former Trustee of the American Industrial Hygiene

Foundation.  Lists of cases in which I have provided deposition and trial testimony during the last four years are attached.  My fee schedule is attached.

## Brief Background Regarding Case

My understanding is that Mr. Lyndon Wright moved into a FEMA-issued temporary housing unit in March 2006.   The temporary housing unit provided to Mr. Wright was a one bedroom travel trailer, Salem model, manufactured by Forest River, Inc., Vehicle Identification Number (VIN) 4X4TSMH296C008992 and FEMA Identification Number 1277021.  This unit was manufactured by Forest River in November 2005.  Mr. Wright lived in the travel trailer until July 2008, approximately twenty eight months.

Mr. Wright claims to have developed various health problems, including asthma and dermatitis. as result of living in the travel trailer.  Through his attorneys, Mr. Wright attributes these health effects to formaldehyde and mold exposure with the travel trailer as the source,

## Basic Considerations Regarding Formaldehyde in Homes

Formaldehyde is only one of several volatile organic chemicals emitted into home environments from building materials and other sources that have a low odor threshold, can be a respiratory irritant, and is potentially carcinogenic.  However, due to its prevalence, formaldehyde has been the focus of numerous studies in homes, primarily since the late 1970s and early 1980s when its use in urea-formaldehyde foam insulation (UFFI) caused concern in home occupants and its carcinogenic potential was identified in animal studies.

The exposure routes of concern in the Wright case are inhalation and skin, eye, and upper respiratory contact with formaldehyde gas.  At normal room temperature formaldehyde is colorless gas with a pungent, irritating odor at elevated concentrations. Formaldehyde is highly reactive and readily soluble in water.  It is ubiquitous in the environment.  Fresh, outside air that enters a home brings with it a certain amount of formaldehyde.  Formaldehyde can also be released into the air of homes from a variety of products.  These include wood products used to build the home and furnishings (e.g., particleboard, plywood, medium-density fiberboard), fabric materials with crease-resistant finishes (e.g., clothing, draperies, linens, upholstery), and coatings for walls and furnishings.  In addition, human activities add to the formaldehyde levels in homes (e.g., cooking, smoking).

Factors that influence the level of formaldehyde in the air of a home are numerous.  They include:

1.   The level of formaldehyde in the ambient air where the home is located;
2.   The type of products from which the home was built;
3.   Loading factors for formaldehyde emitting products;
4.   Age of the home;
5.   Natural air exchange rate or tightness of the home;
6.   The presence and use of ventilation systems;
7.   Use of doors and windows;

2

FR-LTW-EXP04-000002

8.  Temperature and humidity conditions inside and outside the home;
9.  Selection and presence of furnishings in the home;
10. Occupant activities; and
11. The presence of formaldehyde removal sinks and absorber/re-emitter products.

The interrelationships between these factors are complex. Much effort has gone into the development of models to predict the levels of formaldehyde in the air of homes. Several such models have been proposed. Field tests of these models have shown that none can accurately predict the level of formaldehyde in an occupied home. Occupancy creates too many variables. It is widely recognized that the rate of formaldehyde emission from certain products increases with increasing temperature and to a lesser extent with increasing humidity.

**Formaldehyde in Non-Home Environments**

Formaldehyde is ubiquitous. It is found in many environments at airborne concentrations similar to, and higher than, those found in homes. For example:[1]

| Description | Formaldehyde levels, ppm |
|---|---|
| Urban background | 0.008 – 0.068 |
| Buildings in which smoking not permitted | Up to 0.22 |
| Indoor air while cooking fish | 0.48 – 5.31 |

Other locations in which formaldehyde levels in air have been reported include:[2]

| Description | Formaldehyde levels, ppm |
|---|---|
| Biology laboratories | 2.75 – 14.8 |
| Clothing store | 0.9 – 3.3 |
| Offices (3 locations) | 0.12 – 0.20 |

Formaldehyde is present in the exhaled air of humans at concentrations between 0.001 and 0.072 ppm, in the same range as concentrations found in homes, with a median level of 0.004 ppm.[3] It

---

[1] ASTDR: *Toxicological Profile for Formaldehyde*. U. S. Department of Health and Human Service, Agency for Toxic Substances and Disease Registry, Atlanta, GA (1999) and Sexton, K., M. X. Petreas, and K. S. Liu: Formaldehyde Exposures Inside Mobile Homes. *Environ Sci Technol 23*: 985-988 (1989).
[2] Bardana, E. J., A. Montanaro, and M. T. O'Hollaren: *Occupational Asthma*. Hanley & Belfus, Philadelphia (1988). P. 155
[3] Moser, B., F. Bodrogi, G. Eibl, M. Lechner, J. Rieder, and P. Lirk: Mass Spectrometric Profile of Exhaled Breath – Field Study by PTR-MS. *Respir Physiol Neurobio 145*: 295-300 (2005).

Expert Report of William L. Dyson, Ph.D., CIH

November 2, 2009

is found in the mainstream and side stream smoke from cigarettes at levels from 10 ppm to 279 ppm.[4]  Formaldehyde is also present in many foods such as milk, mushrooms, pork, catfish, shrimp, and codfish.[5]  Formaldehyde and formaldehyde releasing compounds are found in many consumer products including shampoos, skin creams, cleaning products, clothing, and cosmetics.

**Basic Considerations Regarding Mold in Homes**

Fungi, including molds are present in most home environments.  Like the fire triangle, there are three basic requirements for mold proliferation and growth – moisture, food, and an initiating spore.  The primary source of initiating spores in an indoor environment is outside air.  Airborne mold infiltrates whenever outside air is introduced into a home.  Leakage, outside make-up air to ventilation systems, and open doors and windows bring mold indoors.  Once initiating spores are inside there is no shortage of food.  Mold feeds on organic matter - wood, paper, paints, and adhesives - found indoors.  For mold to proliferate and grow inside homes moisture is necessary.  This can be in the form of water vapor (greater than 70 percent relative humidity) or liquid water.  The most common sources of moisture that support mold growth are intrusion of water from the outside or leakage of interior pipes.  Eliminating sources of moisture prevents mold proliferation and growth.

**Potential Health Effects of Formaldehyde Exposure via Inhalation**

*Odor Threshold*

The odor threshold for formaldehyde has been reported to be in the range of 0.05 to 1.0 parts of formaldehyde per million parts of air by volume (ppm).[6]  The odor threshold for formaldehyde seems to be highly variable with positive reporting frequencies in a chamber study of 5, 44, 26, 58, and 78 percent for concentrations of 0, 0.5, 1.0, 2.0, and 3.0 ppm respectively.[7]  In light of the placebo effect noted in chamber studies with humans[8] (i.e., odors noted at zero formaldehyde concentration), reports that individuals are able to detect formaldehyde in air at extremely low levels (as low as 0.05 ppm) must be viewed with some skepticism.

---

[4] Godish, T.: Formaldehyde Exposures from Tobacco Smoke: A Review. *Amer J Pub Health 79 (8)*: 1044-1045 (1989).

[5] Kaminski, J., A. S. Atwal, and S. Mahadevan:  Determination of Formaldehyde in Fresh and Retail Milk by Liquid Column Chromatography. *J AOAC Inter 76 (5)*:  1010-1013 (1993) and Weng, X., C. H. Chon, H. Jiang, and D. Li: Rapid Detection of Formaldehyde Concentration in Food on a Polydimethylsiloxane Microfluidic Chip. *Food Chem 114*:  1079-1082 (2009).

[6] ACGIH: *Documentation of Threshold Limit Values and Biological Exposure Limits*. American Conference of Governmental Industrial Hygienists, Cincinnati, OH (2001).

[7] Kulle, T. J.: Acute Odor and Eye Irritation Response in Healthy Non-Smokers with Formaldehyde Exposure. *Inhal Toxicol 5*: 323-332 (1993).

[8] See Kulle, T. J.: Acute Odor and Eye Irritation Response in Healthy Non-Smokers with Formaldehyde Exposure. *Inhal Toxicol 5*:  323-332 (1993); Bender, J. R., L. S. Mullins, G. J. Graepel and W. E. Wilson:  Eye Irritation Response of Humans to Formaldehyde. *Amer Ind Hyg Assoc J 44*:  463-465 (1983).

FR-LTW-EXP04-000004

Expert Report of William L. Dyson, Ph.D., CIH

November 2, 2009

*Sensory Irritation*

Eye, nose, and upper respiratory tract irritation has been observed in individuals exposed to formaldehyde in air, with eyes generally being most sensitive. Irritant effects are concentration-dependent rather than dose-dependent. The formaldehyde levels at which sensory irritation occurs has been explored through chamber, community observation, and workplace studies. Chamber studies provide the best opportunity for determining the presence of eye, nose, and throat irritation at known levels of formaldehyde.[9] Conclusions from a recent, well designed chamber study[10] with both subjective and objective observations were as follows:

> "The results of the present study indicated eye irritation as the most sensitive parameter. Minimal objective eye irritation was observed at a level of 0.5 ppm with peaks of 1 ppm. The subjective complaints of ocular and nasal irritation noted at lower levels were not paralleled by objective measurements of eye and nasal irritation and were strongly influenced by personality factors and smell. It was concluded that the no-observed effect level for subjective and objective eye irritation due to formaldehyde exposure was 0.5 ppm in case of a constant exposure level and 0.3 ppm with peaks of 0.6 ppm in case of short-term peak exposure."

Irritant effects – burning and itching of the eyes, rhinitis, and sore throat – are temporary and cease once cessation of exposure. Acclimatization has been observed in continuing exposure situations.

After reviewing scientific studies through 1995 a panel of experts[11] recommended an occupational exposure limit for formaldehyde of 0.3 ppm as an eight-hour, time weighted average with a ceiling limit of 1.0 ppm based on sensory irritation potential and protection of nearly all workers. In large part, the panel based this recommendation on controlled studies of humans in chambers where formaldehyde was the only contaminant. Even though the panel recognized that sensory irritation from formaldehyde is concentration rather than dose dependant, they applied a safety factor and concluded that "if concentrations of formaldehyde are kept below 0.1 ppm in the indoor environment (where exposure might occur 24h/d) this should prevent irritation in virtually all persons."

More recent reviews have reached similar conclusions. Based on a "Benchmark dose analysis" one set of reviewers estimated that at a level of 1 ppm formaldehyde only 9.5 percent of healthy volunteers experience moderate (i.e., annoying) eye irritation.[12] These same reviewers noted that

---

[9] Bender, J.: The Use of Noncancer Endpoints as a Basis for Establishing a Reference Concentration for Formaldehyde. *Regul Toxicol Pharmacol 35*: 23-31 (2002).
[10] Lang. I., T. Bruckner and G. Triebig: Formaldehyde and Chemosensory Irritation in Humans: A Controlled Human Exposure Study. *Regul Toxicol Pharmacol 50*: 23-36 (2008).
[11] Paustenbach, D., Y. Alarie, T. Kulle, N. Schachter, R. Smith, et al.: A Recommended Occupational Exposure Limit for Formaldehyde Based on Irritation. *J Toxicol Environ Health 50*: 217-262 (1997).
[12] Arts, J. H., M. A. Rennen, and C. de Herr: Inhaled Formaldehyde: Evaluation of Sensory Irritation in Relation to Carcinogenicity. *Regul Toxicol Pharmacol 44(2)*: 144-160 (2006).

FR-LTW-EXP04-000005

Expert Report of William L. Dyson, Ph.D., CIH

November 2, 2009

slight sensory irritation could be observed at formaldehyde concentrations of 0.2 to 0.3 ppm and concluded that 0.1 ppm can be considered a "safe and appropriate level" for indoor air.[13]

*Respiratory Effects*

Formaldehyde is highly reactive and soluble in water. The majority of inhaled formaldehyde, especially at low concentrations, is absorbed in the moist lining of the nose and throat.[14] This has been demonstrated in rats exposed to radioactive-labeled formaldehyde at levels of 5 to 24 ppm.[15] Lower respiratory tract effects occur, if at all, only at high (3 ppm or more) formaldehyde concentrations.

Bronchial provocation studies of selected individuals with symptoms suggestive of asthma, and in whom formaldehyde was believed to be a major trigger, were conducted with formaldehyde concentrations as high as 3 ppm. The authors were unable to substantiate the hypothesis that formaldehyde exposure at up to 3 ppm was either causing or aggravating asthmatic symptoms.[16] A double-blind, random exposure challenge using formaldehyde at concentrations up to 2 ppm was performed in laboratory workers routinely exposed to formaldehyde at work. No lower airway symptoms were noted and pulmonary function remained unchanged.[17] Volatile organic chemicals[18] and formaldehyde[19] in homes have been implicated as potential risk factors for the onset of asthma and wheezing in children. However, these studies of respiratory health effects in home environments have been cross-sectional, not longitudinal, and there are important questions that cannot be answered using this study design.[20] Indeed the divergent results between controlled exposure studies in chambers, where formaldehyde levels up to 3 ppm did not result in changes in pulmonary function or bronchial reactivity in asthmatics,[21] and cross-

[13] Arts, J. H., H. Muijser, C. F. Kuper, and R. A. Woutersen: Setting an Indoor Air Exposure Limit for Formaldehyde: Factors of Concern. *Regul Toxicol Pharmacol 52(2)*: 189-194 (2008).
[14] Franks, S. J.: A Mathematical Model for the Absorption and Metabolism of Formaldehyde Vapour by Humans. *Toxicol Appl Pharmacol 206*: 309-320 (2005).
[15] Heck, H. d'A., T. Y. Chin and M. C. Schmitz: Distribution of [$^{14}$C] Formaldehyde in Rats after Inhalation Exposure. Chap. 4 in J. E. Gibson (Ed.), *Formaldehyde Toxicity*, Hemisphere, Washington, DC (1983), pp. 26-37.
[16] Frigas, E., W. V. Filley, and C. E. Reed: Bronchial Challenge with Formaldehyde Gas: Lack of Bronchoconstriction in 13 Patients Suspected of Having Formaldehyde-Induced Asthma. *Mayo Clin Proc 59*: 295-299 (1984).
[17] Schachter, E. N., T. J. Witek, T. Tosun, et al. Respiratory Effects of Exposure to 2.0 ppm of Formaldehyde in Asthmatic Subjects. *Amer Rev Respir Dis* 131: A170 (1985); Witek, T. J., E. N. Schachter, D. Brody, et al.: A Study of Lung Function and Irritation from Exposure to Formaldehyde in Routinely Exposed Laboratory Workers. *Chest* 88: 65 (1985); Schachter, E. N., T. J. Witek, T. Tosun, and G. J. Beck: A Study of Respiratory Effects from Exposure to 2 ppm Formaldehyde in Healthy Subjects. *Arch Environ Health 41*: 229-239 (1986); and Schachter, E. N., T. J. Witek, D. Brody, T. Tosun, et al.: A Study of Respiratory Effects from Exposure to 2.0 ppm Formaldehyde in Occupationally Exposed Workers. *Environ Res 44*: 188-205 (1987).
[18] Rumchev, K., J. Spickett, M. Bulsara, M. Phillips, and S. Stick: Association of Domestic Exposure to Volatile Organic Compounds with Asthma in Young Children. *Thorax 59*: 746-751 (2004).
[19] Rumchev, K. B., J. T. Spickett, M. K. Bulsara, M. R. Phillips, and S. M. Stick: Domestic Exposure to Formaldehyde Significantly Increase the Risk of Asthma in Young Children. *Eur Respir J 20*: 403-408 (2002).
[20] Franklin, P. J.: Indoor Air Quality and Respiratory Health of Children. *Paed Respir Rev* : 281-286 (2007).
[21] See Frigas, et al. and Schachter, et al. cited above as well as Harving, H., J. Korsgaard, O. F. Pedersen, and L. Molhave: Pulmonary Function and Bronchial Reactivity in Asthmatics during Low-Level Formaldehyde Exposure. *Lung 168*: 15-24 (1990) and Harving, H., J. Korsgaard, R. Dahl, O. F. Pedersen, and L. Molhave: Low Concentrations of Formaldehyde in Bronchial Asthma: A Study of Exposure under Controlled Conditions. *Brit Med J (Clin Res Ed) 293*: 310 (1986).

6

sectional case control studies requires further exploration.  Controlled animal studies have failed to elicit an allergic response via inhalation.[22]  There is uncertainty as to whether even high, occupational exposures to formaldehyde will induce respiratory sensitization or asthma in humans.[23]  Something other than formaldehyde may be involved.

*Carcinogenicity*

Rats exposed to formaldehyde at levels of 6 ppm and more for extended periods have developed nasal tumors, the site of contact or absorption of formaldehyde upon inhalation.[24]  Formaldehyde exposure has been associated with cancers of nasal cavities, nasopharnyx, prostate, pancreas, and lung in epidemiological studies of industrial workers; however, these associations are inconsistent and controversial.  Follow up through 1994 suggested that formaldehyde exposure in industrial workers increased the relative risk of nasopharyngeal cancer (based on nine deaths), but no association was found between formaldehyde exposure and cancers of the lung, pancreas, or brain.[25]  In light of the fact that the majority of nasopharyngeal cancers occurred in one plant, the findings regarding this association with formaldehyde exposure has been questioned.[26]  Another review of studies through 2006 concluded:[27]

> "Comprehensive review of cancer in industry workers and professionals exposed to formaldehyde shows no appreciable excess risk for oral and pharyngeal, sinonasal, or lung cancers.  A non-significantly increased RR for nasopharyngeal cancer among industry workers is attributable to a cluster of deaths in a single plant."

Whether current occupational exposure limits for formaldehyde, which are currently based on protection from sensory irritation, should be changed (lowered) as a result of cancer risk has been considered[28]  The conclusion was that current occupational exposure standards were adequate because:

> "…the carcinogenic activity of formaldehyde is associated with cytotoxic/proliferative mechanisms.  Therefore, protecting from these effects associated with formaldehyde exposure should be sufficient to protect from its potential carcinogenic effects, if an, in humans."

[22] Lee, H. K., Y. Alarie, and M. H. Karol:  Induction of Formaldehyde Sensitivity in Guinea Pigs. *Toxicol Appl Pharmacol 75*:  147-155 (1984).
[23] Kranke, B. and W. Aberer:  Indoor Exposure to Formaldehyde and Risk of Allergy. *Allergy 55*:  402-404 (2000).
[24] Kerns, W. D., K. L. Pavkov, D.J. Donofrio, et al.:  Carcinogenicity of Formaldehyde in Rats and Mice after Long-Term Inhalation Exposure. *Cancer Res 43*:  4382-4392 (1983).
[25] Hauptmann, M., J. H. Lubin, P. A. Stewart, R. B. Hayes, and A. Blair:  Mortality from Solid Cancers Among Workers in Formaldehyde Industries. *Amer J Epidemiol 159 (12)*:  1117-1130 (2004).
[26] Marsh, G. M., A. O. Youk, and P. Morfeld:  Mis-Specified and Non-Robust Mortality Risk Models for Nasopharyngeal Cancer in the National Cancer Institute Formaldehyde Worker Cohort Study. *Regul Toxicol Pharmacol 47*:  59-67 (2007).
[27] Bosetti, C., J. K. McLaughlin, R. E. Tarone, E. Pira, and C. La Vecchia:  Formaldehyde and Cancer Risk:  A Quantitative Review of Cohort Studies Through 2006. *Ann Oncology 19*:  29-43(2008).
[28] Duhayon, S., P. Hoet, G. Van Maele-Fabry, and D. Lison:  Carcinogenic Potential of Formaldehyde in Occupational Settings:  A Critical Assessment and Possible Impact on Occupational Exposure Levels. *Int Arch Occup Environ Health 81*:  695-710 (2008).

Expert Report of William L. Dyson, Ph.D., CIH                              November 2, 2009

The lowest average concentration of formaldehyde at which changes in the nasal mucosa of humans has been observed is 0.24 ppm, but it should be noted that exposures above 0.8 ppm occurred frequently and peak exposures were not reported.[29]

*Dermal Effects*

Dermal contact with aqueous solutions of formaldehyde (formalin) at high concentrations can cause immediate irritation. Skin contact with lower concentrations (as low as five percent formaldehyde) may result in dermatitis after prolonged exposure. Contact dermatitis from exposure to gaseous formaldehyde has not been reported outside the occupational setting.[30] Irritation from gaseous formaldehyde has been reported in an occupational setting only where there is concomitant exposure to liquid formaldehyde solution.[31]

Because of its ubiquity and presence in a wide variety of products encountered in everyday living, large numbers of people have developed allergic dermal sensitization to formaldehyde. Patch testing with one to two percent formaldehyde solutions shows positive results in up to ten percent of the population in North America.[32] Inadvertent skin contact with products that contain formaldehyde or formaldehyde-releasing products, such as cleansers and cosmetics, rather than exposure to gaseous formaldehyde seems to be the route to dermal sensitization.[33]

**Guidelines for Formaldehyde Exposure in Homes**

To date, no national standard has been established in the United States for formaldehyde levels in homes. The nearest thing to a national standard is the product standard promulgated by the U. S. Department of Housing and Urban Development. In addition, there are guidelines from professional organizations, several states, various foreign countries, and the World Health Organization.

*Housing and Urban Development*

The U. S. Department of Housing and Urban Development (HUD) addressed the issue of formaldehyde in homes in 1984.[34] At that time HUD chose a product standard – limitation on the amount of formaldehyde emitted from wood products – as the most effective way to control formaldehyde exposures in homes. Emission limits of 0.2 ppm for plywood and 0.3 ppm for

[29] Holmstrom, M., et al.: Histological Changes in the Nasal Mucosa in Persons Occupationally Exposed to Formaldehyde Alone and in Combination with Wood Dust. *Acta Otolaryngol (Stockholm) 107*: 120-129 (1989).
[30] Dooms-Goossens, A. and H. Deleu: Airborne Contact Dermatitis: An Update. *Contact Dermatitis 25*: 211-217 (1991).
[31] Holness, D. L., and J. R. Nethercott: Health Status of Funeral Service Workers Exposed to Formaldehyde. *Arch Environ Health 44*: 222-228 (1989) and Takahashi, S., K. Tsuji, K. Fuji, F. Okazaki, T. Takigawa, A. Ohtsuka and K. Iwatsuki: Prospective Study of Clinical Symptoms and Skin Test Reactions in Medical Students Exposed to Formaldehyde Gas. *J Dermatology 34*: 283-289 (2007).
[32] Warshaw, E. M., et al.: North American Contact Dermatitis Group Patch Test Results, 2003-2004 Study Period. *Dermatitis 19(3)*: 129*-136 (2008) and Zug, K. A., et al.: Patch-Test Results of the North American Contact Dermatitis Group. *Dermatitis 20(3)*: 149-160 (2009).
[33] ATSDR: *Toxicological Profile for Formaldehyde.* Agency for Toxic Substances and Disease Registry, U. S. Public Health Service, Atlanta, GA (July 1999). p. 189
[34] *Federal Register 49 (155)*: 31986-32013 (August 8, 1984).

8

Expert Report of William L. Dyson, Ph.D., CIH

November 2, 2009

particleboard based on large chamber testing were established. In setting these product emission limits HUD considered 0.4 ppm formaldehyde as the goal for airborne levels in homes. Based on scientific evidence available at the time, HUD believed that a target level of 0.4 ppm formaldehyde was reasonably protective of the health of home occupants. This is a standard of comparison that is closely akin, if not directly on point, to the Wright travel trailer.

*American Society of Heating, Refrigeration, and Air Conditioning Engineers*

An example of a guideline regarding formaldehyde levels in homes is that of the American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE). [35]  To determine ventilation needs for acceptable indoor air quality, ASHRAE addressed guideline levels for formaldehyde and other airborne contaminants in homes. In the early 1980s ASHRAE suggested a formaldehyde level of 0.1 ppm as a goal in determining ventilation design parameters for homes. In the latest version of its standard ASHRAE refers to guidelines recommended by various governmental and non-governmental organizations – including HUD, ACGIH, WHO, Cal-EPA and others - as levels of interest. Referring to a table of guideline values for formaldehyde and other substances ASHRAE notes that the "user of any value in this table should take into account the purposes for which it was adopted and the means by which it was developed." Indoor air quality guidelines are established for many reasons and are not necessarily health-based.

*American Conference of Governmental Industrial Hygienists*

The American Conference of Governmental Industrial Hygienists (ACGIH) recommends occupational exposure limits referred to as Threshold Limit Values (TLVs). The current TLV for formaldehyde in 0.3 ppm as a ceiling limit which should not be exceeded during any part of the workday. [36]  Documentation of the TLVs shows that the limit for formaldehyde is based on prevention of irritation. TLVs are applicable to workplace settings where exposures are normally limited to eight hours per day, 40 hours per week. However, since potential irritancy of formaldehyde is concentration-dependent rather than dose-dependent, the ceiling TLV for formaldehyde should serve to protect home occupants from irritation effects as well employees in a workplace.

Numerous other organizations, countries, and states (e.g., World Health Organization, Canada, Australia, and Denmark) use guidelines referred to use guidelines of 0.08 ppm to 0.1 ppm for formaldehyde in homes. These guidelines reflect public policy decisions, include a margin of safety, and are not an indication of the minimum levels of formaldehyde exposure that produce adverse health effects as shown by good, scientific studies.

---

[35] ASHRAE: ASHRAE Standard 62.1-2004 – *Ventilation for Acceptable Indoor Air Quality.* American Society of Heating, Refrigeration, and Air Conditioning Engineers, Inc., Atlanta, GA (2004).
[36] ACGIH: *Threshold Limit Values for Chemical Substances and Physical Agents.* American Conference of Governmental Industrial Hygienists, Cincinnati, OH (2008).

FR-LTW-EXP04-000009

## Formaldehyde Monitoring Data – FEMA THUs

Several organizations have monitored airborne formaldehyde levels in THUs provided by FEMA after Hurricane Katrina. Datasets from the Sierra Club, the Centers for Disease Control (CDC), and Lawrence Berkley National Laboratory are publicly available for review and consideration of the methodologies used. Datasets obtained by private consulting firms for plaintiffs (e.g., DeVany Industrial Consultants, Boston Chemical Data, and W. D. Scott) are not publicly available.

## Formaldehyde Monitoring Data for Forest River Products

A subset of the public and private monitoring data collected in travel trailers manufactured by Forest River has been analyzed statistically.[37] A total of 883 measurements made in travel trailers manufactured by Forest River by nine different groups were analyzed and compared to exposure limits suggested by the Agency for Toxic Substances and Disease Registry (ATSDR) and the National Institute for Occupational Safety and Health (NIOSH). One conclusion of the Forest River dataset analysis was that:

> "…the sample mean of formaldehyde level for each data source was greater than both the ATSDR and the NIOSH limits, providing evidence that the true means for the Forest River models in general, and the Salem model in particular, were greater than the two limits."

This conclusion is not unexpected since the levels recommended by ATSDR and NIOSH are exceptionally low in comparison to formaldehyde levels that exist in outdoor air and conventionally built residences as well as manufactured houses and travel trailers. A discussion of the appropriateness of the limits recommended by these agencies follows below.

This statistical analysis is problematic, not due to the analysis itself but because the input data are questionable. Two examples serve to illustrate the problem.

### Lack of Standardization of Environmental Conditions Prior to Sampling

It is clear that environmental conditions in the travel trailers were not standardized prior to taking formaldehyde measurements in the various datasets. In particular, samples collected at the behest of plaintiff attorneys (datasets from Boston Chemical Data, DeVany Industrial Consultants, W. D. Scott Group, and Technical Environmental Services) followed a protocol in which standardization of environmental conditions was not addressed.[38] Active and passive samples for formaldehyde were collected as the travel trailers were found (i.e., at different temperature and relative humidity levels, different ventilation conditions, and different occupancy status). It has been known at least since the late 1970s and early 1980s that environmental conditions, particularly temperature, dramatically affect the levels of

---

[37] Hewett, P.: Analysis of the Forest River Inc. Formaldehyde Dataset. Technical Report from Exposure Assessment Solutions, Inc., September 26, 2009.
[38] DeVany, M. C.: Formaldehyde Sampling: Active and Passive Sampling Protocols – Procedures for Evaluating Formaldehyde Levels in FEMA Temporary Housing Units. DeVany Industrial Consultants, 2008

FR-LTW-EXP04-000010

Expert Report of William L. Dyson, Ph.D., CIH

November 2, 2009

formaldehyde found in residences and mobile homes.  Protocols for monitoring formaldehyde in manufactured homes in the States of Wisconsin and Minnesota in the 1980s reflected the need for standardization of environmental conditions.  The need for standardization of environmental conditions was recognized by ATSDR in their health consultation to FEMA.[39]

More likely than not, environmental conditions affected the measurements made in Forest River travel trailers to such a degree that they are unreliable as indicators of actual exposure of occupants and cannot be compared to one another or to measurements made elsewhere.  This methodological flaw substantially reduces the usefulness of the measurement data.  Statistical analysis of datasets in which environmental conditions were not standardized is fundamentally unsound and will lead to erroneous conclusions.

An example from the Forest River formaldehyde monitoring dataset serves to illustrate the effects of non-standardized environmental conditions.  As determined by Dr. Hewett, the overall mean formaldehyde concentration found in Forest River travel trailers was 0.53 ppm.  This mean value included 520 measurements made by DeVany Industrial Consultants in totally closed travel trailers without air conditioning in the heat of the summer – certainly not representative of normal occupancy conditions.  The mean value of these 520 measurements was 0.80 ppm.  Without these 520 measurements the overall mean value of the remaining 363 measurements made in Forest River travel trailers (some of which were also made in closed, unventilated conditions) was 0.14 ppm.  Similar considerations apply to the Forest River Salem model dataset where the mean value after exclusion of 520 measurements made by DeVany Industrial Consultants was 0.13 ppm in comparison to 0.46 ppm when they are included.

*Lack of Contemporaneous Ambient Air Measurements*

At the levels of formaldehyde at issue in the travel trailers, the contribution of ambient air to the formaldehyde levels found in the homes may be significant.  Ambient levels measured by FEMA in the Baton Rouge staging area for THUs ranged from 0.001 ppm to 0.07 ppm with an average of approximately 0.005 ppm.[40]  Ambient formaldehyde levels measured in eight U. S. cities averaged 0.010 to 0.020 ppm,[41] ranged up to 0.023 ppm in eight urban sites in Canada,[42] and has been observed at up to 0.180 ppm in Los Angeles in the summer.[43]  In other words, ambient air levels of formaldehyde often exceed the MRL of 0.008 ppm suggested by ATSDR and the TWA occupational exposure limit of 0.016 ppm suggested by NIOSH.  Ambient formaldehyde levels on the days samples were collected could have affected the levels of formaldehyde found in the Forest River travel trailers to a significant degree.  The potential extent of this confounding factor could have been easily determined but was not.  Again, statistical analysis of a monitoring

---

[39] ATSDR:  Health Consultation:  Formaldehyde Sampling at FEMA Temporary Housing Units, Baton Rouge, LA, February 1, 2007.
[40] FEMA:  Formaldehyde in FEMA Family Units Sampling Program, Baton Rouge, LA, Field Documentation, Data Files, and Analytical DATA DVD, November 13, 2006 (Cited by ATSDR above).
[41] Salas, L. J. and H. B. Singh:  Measurements of Formaldehyde and Acetaldehyde in the Urban Air.  *Atmos Environ* *20(6):* 1301-1304 (1986)
[42] Liteplo, R. G. and M. E. Meek:  Inhaled Formaldehyde:  Exposure Estimation, Hazard Characterization, and Exposure-Response Analysis. *J Toxicol Environ Health, Part B, 6:* 85-114 (2003).
[43] Meyer, B.:  *Urea-Formaldehyde Resins.* Addison-Wesley, Reading, MA (1979), p. 255

11

datasets in which the ambient air contributions are not known is unreliable and may lead to erroneous conclusions.

The statistical analysis done by Dr. Hewett is incomplete. In particular, even though several subsets of the Forest River measurements were made in occupied travel trailers, there was no comparison of results from occupied versus unoccupied units. Occupied travel trailers would likely have lower formaldehyde levels than unoccupied units because of the ventilation provided by opening and closing doors for entry into the travel trailers. This effect can be seen in the Forest River dataset. Mean formaldehyde levels found by CDC and Bureau Veritas in occupied travel trailers were both 0.12 ppm in comparison to and overall mean of 0.53 ppm for the entire dataset.

**Monitoring Data for the Wright Travel Trailer**

Formaldehyde levels have been measured three times in the Forest River travel trailer provided to Mr. Wright. Two measurements were made by the W. D. Scott Group, Inc.[44] The first measurement was done October 1 and 2, 2008 while the travel trailer was located at 2315 Seminole Lane, New Orleans, LA. A single passive monitor was placed in the master bedroom with sample collection for approximately 23.25 hours. The second measurement was made August 6 and 7, 2009.[45] The Wright travel trailer had been relocated to the FEMA storage facility in Melville, LA. Two samples were taken - a 30-minute active sample collected on August 6, 2009 and an overnight (approximately 24 hours) passive sample collected August 6-7, 2009. The travel trailer was completely sealed for several days prior to the second set of measurements. Collection media were located immediately above the top surface of the nightstand in the bedroom. Environmental conditions in the Wright travel trailer were not standardized in any way prior to these two measurement events. Every effort was made to minimize the number of entries made into the travel trailer and concomitant fresh air infusion prior to sample collection. Sample blanks were submitted to the laboratory. It is not clear whether these were laboratory blanks or true field blanks. No ambient air samples were collected simultaneously outside the travel trailer to determine the potential contribution of ambient air to the formaldehyde level found inside the travel trailer. Results of the W. D. Scott Group measurements were as follows:

| Type and date | Temperature °F | Relative humidity % | HCHO level ppm |
|---|---|---|---|
| 24 hr Passive 10/1-2/08 | 72 | 47 | 0.048 |
| 30 min Active 8/6/09 | 82 | 87 | 0.095 |
| 24 hr Passive 8/6-7/09 | 85 | 77 | 0.130 |

An air sample was collected by Mr. Anthony Watson, CIH, CSP of Workplace Hygiene in the Wright travel trailer immediately upon completion of sampling by W. D. Scott on August 7,

---

[44] Affidavit of William D. Scott, PE, CHMM executed October 2, 2009.
[45] The sampling dates shown in the written portion of the Scott affidavit do not correspond to the dates recorded on sampling sheets. The dates August 8 and 9, 2009 shown in the written portion of the affidavit were on a Saturday and Sunday when the FEMA storage facility was not open.

2009.[46]  This was a one-hour measurement taken as the travel trailer was found.  An ambient air sample was collected simultaneously outside the travel trailer. After the weekend the travel trailer was aired out for approximately one day and closed up approximately two days with the air conditioner operating and the thermostat set at 75 °F.  One-hour active and 24-hour passive measurements were then taken.  Appropriate field and laboratory blanks were submitted with the samples.  Results of the Workplace Hygiene measurements are as follows:

| Type and date | Temperature | Relative humidity | HCHO level |
|---|---|---|---|
| | °F | % | ppm |
| 1 hr Active     8/7/09 | 81-86 | 64-82 | 0.097 |
| 1 hr Active-Outside 8/7/09 | 86-90 | 64-67 | 0.004 |
| 1 hr Active     8/13/09 | 79.5-80 | 51 | 0.035 |
| 24 hr Passive   8/13-14/09 | 75-80 | 51-55 | 0.044 |
| 1 hr Active-Outside 8/13/09 | 92-93 | 48-54 | 0.003 |

*Effects of Environmental Conditions*

The samples taken by W. D. Scott Group were collected in a closed, unventilated condition.  The temperature and humidity were not representative of normal living conditions.  Results under such conditions were replicated by Workplace Hygiene prior to standardization of environmental conditions with similar results (0.095 and 0.130 ppm versus 0.097 ppm).  A comparison of active samples shows that formaldehyde levels found under closed, high temperature conditions were elevated in relation those found in the same travel trailer with environmental conditions adjusted to approximate normal living conditions (0.095 ppm versus 0.035 ppm).  Comparison of 24-hour passive samples shows that lower formaldehyde levels were present when environmental conditions were standardized to approximate normal living conditions (0.130 ppm versus 0.044 ppm).  These two sampling events in the same travel trailer demonstrate the influence of environmental conditions, particularly temperature, on formaldehyde monitoring results and confirm the need for standardization of environmental conditions prior to sampling.

*Ambient Formaldehyde Levels*

The sampling location of both the second W. D. Scott and Workplace Hygiene measurements reported above were made in Lottie, LA, a very rural area.  The ambient formaldehyde levels measured in Lottie were low – 0.004 to 0.005 ppm.  It is possible, even likely, that ambient formaldehyde levels at 2315 Seminole Lane – an urban address - would be higher and contribute more to the formaldehyde level found inside the travel trailer when it was located there.  For example, ambient formaldehyde levels of 0.005 ppm to 0.020 ppm, the average levels found in Baton Rouge and urban areas in the U. S. respectively, could have contributed 15 to 50 percent of the 0.035 to 0.044 ppm formaldehyde levels found in the Wright travel trailer by Workplace Hygiene in August 2009.

*Extrapolation to Date of Occupancy*

[46] Watson, T.:  Letter report re Formaldehyde Air Sampling – Wright Temporary Housing Unit to Mr. Carson Strickland, Esquire dated August 20, 2009

13

Dr. Hewett was asked to evaluate the Forest River dataset for evidence that formaldehyde levels tend to decline with age of the travel trailer. Dr. Hewett chose to make this evaluation using only the 187 measurements made by CDC and Bureau Veritas in occupied trailers. Regression analysis of two subsets of the Forest River dataset (CDC and Bureau Veritas) showed "negative Age coefficients" indicating that formaldehyde levels tend to decline as the travel trailer ages. A half-life of 4.3 years was estimated from the data. Dr. Hewett did not attempt to determine the concentration of formaldehyde to which Mr. Wright was exposed while living in the travel trailer between March 2006 and July 2008 based on measurements made by W. D. Scott Group in October 2008 and August 2009. The airborne formaldehyde concentration to which Mr. Wright was exposed during occupancy of the travel trailer cannot be answered quantitatively with any reasonable degree of certainty due to the complex interactions of numerous variables that influence the formaldehyde levels. Since no contemporaneous measurements of formaldehyde levels in the Wright travel trailer during occupancy, we have to rely upon measurements made long after he was no longer living in the travel trailer.

## Comparison Guidelines Used by Plaintiffs' Experts

Numerous exposure guidelines have been suggested for formaldehyde. None are specifically applicable to occupancy of a travel trailer for a nineteen month period. As noted above, monitoring data in FEMA supplied travel trailers have been compared to two standards by plaintiffs' experts: 1) the chronic duration Minimum Risk Level (MRL) of 0.008 parts of formaldehyde per million parts of air by volume (ppm) recommended by the Agency for Toxic Substances and Disease Control (ATSDR) and 2) the eight-hour, time-weighted average (TWA) occupational exposure limit of 0.016 ppm recommended by the National Institute for Occupational Safety and Health (NIOSH). To determine whether these are appropriate comparison standards, consideration must be given to their bases.

### *ATSDR Minimum Risk Level*

ATSDR's toxicological profiles for chemical substances are developed in response to requirements of Superfund regulations. They review, synthesize, and interpret available scientific data to "ascertain the levels of significant human exposure for the substance and the associated acute, sub acute, and chronic health effects" primarily for environmental remediation purposes. A toxicological profile for formaldehyde[47] was published in July 1999.

ATSDR develops Minimum Risk Levels (MRLs) for acute (1-14 days), intermediate (15-364 days), and chronic (365 and longer days) durations for oral and inhalation routes of exposure. MRLs are derived using the no-observed effect level/uncertainty factor approach and are below levels that might cause adverse health effects in the people most sensitive to such chemical-induced effects. For formaldehyde MRLs suggested for various durations by inhalation exposure by ATSDR are as follows:

Acute (1-14 days) MRL: 0.040 ppm

---

[47] Agency for Toxic Substances and Disease Registry. *Toxicological Profile for Formaldehyde.* U. S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry, July 1999.

14

Intermediate (15-364 days) MRL:  0.030 ppm
Chronic (365 days or longer) MRL:  0.008 ppm

Plaintiff experts assert that the chronic MRL of 0.008 ppm is an appropriate standard for comparison in the Wright case since he lived in the travel trailer for more than 365 days. Thus, it is important to understand the scientific basis of the chronic MRL suggested by ATSDR.

The worksheet for the ATSDR's chronic MRL for formaldehyde is attached. This worksheet indicates that the chronic MRL was based on a 1989 paper by Holmstrom and others.[48] Other studies that had similar outcomes were also considered by ASTDR. The lowest observed adverse effect level (LOAEL) for formaldehyde exposure derived from the Holmstrom research was 0.24 ppm.[49] As noted above, 0.24ppm was an extrapolated average value that did not account for unreported peak exposures frequently exceeding 0.8 ppm. ATSDR then applied two uncertainty factors to the LOAEL:

1.  A factor of 3 for use of a LOAEL – the exposed histological effects are considered to be mild and subclinical in nature, suitable for 0.24 ppm to be designated as a minimal LOAEL; and
2.  A factor of 10 for human variability.

The chronic MRL of 0.008 ppm was derived by dividing the LOAEL of 0.24 ppm by 30, the multiplication product of these two uncertainty factors.

It is certainly reasonable to question whether the chronic MRL derived in this way is an appropriate comparison criterion for the Wright travel trailer. In particular, I note that ambient formaldehyde levels measured in urban areas often exceed the chronic MRL of 0.008 ppm recommended by ATSDR. The LOAEL of 0.24 ppm on which the MRL was based is well above the levels of formaldehyde measured in the Wright travel trailer in October 2008 and August 2009.

*NIOSH Recommended Exposure Limit*

The National Institute for Occupational Safety and Health (NIOSH) issues Recommended Exposure Limits (RELs) for various substances. The intended application of RELs is in the workplace. The NIOSH REL for formaldehyde is 0.016 ppm as an eight-hour, time-weighted average (TWA).

The important thing to know about the NIOSH REL for formaldehyde is that it is not a health-based standard. NIOSH classifies formaldehyde as a potential occupational carcinogen. NIOSH's policy on occupational carcinogens is to maintain exposures to the lowest level

---

[48] Holmstrom, M., et al.: Histological Changes in the Nasal Mucosa in Persons Occupationally Exposed to Formaldehyde Alone and in Combination with Wood Dust. *Acta Otolaryngol (Stockholm) 107*: 120-129 (1989).
[49] ATSDR notes: "Clinical symptoms of mild irritation of the eyes and upper respiratory tract and mild damage to the nasal epithelium were observed in workers exposed for 10.4 years (range 1-36 years) to an average TWA concentration of 0.24 ppm (range (0.04 to 0.4 ppm). The LOAEL of 0.24 ppm is considered to be a minimal LOAEL."

15

possible. RELs for carcinogens, such as the one for formaldehyde, are not based not on evaluation and synthesis of health risk data. The REL for formaldehyde is based on the lowest airborne level that NIOSH believes can be reliably measured in a workplace setting. As such it is a totally inappropriate standard for comparison with monitoring data from the Wright travel trailer. Like the ATSDR chronic MRL, ambient formaldehyde levels often exceed the REL of 0.016 ppm recommended by NIOSH.

## Effect of Air Conditioning and Ventilation

One of the questions addressed by ATSDR in their February 2007 Health Consultation[50] regarding the FEMA THUs was whether simple measures, such as operating the air conditioner or opening windows, would lower the levels of formaldehyde in the units. Based on a large number of observations the answer is clearly yes. For example, mean formaldehyde levels dropped from 1.04 ppm (n=96) in closed, unventilated units to 0.39 ppm (n=852) when the air conditioner was operated and to 0.09 ppm (n=863) when windows were opened.

It is clear from his testimony that Mr. Wright operated the air conditioner in the travel trailer when temperature conditions warranted. It is not clear that he opened windows for ventilation when outside temperatures were moderate. The net effect, however, is that formaldehyde levels in the travel trailer were reduced by operating the air conditioner.

## Formaldehyde Levels in Louisiana Homes

Formaldehyde levels have been measure in 53 conventional homes in Southern Louisiana.[51] The levels found ranged from non-detectable to 5.4 ppm. Approximately 60 percent of the samples exceeded 0.1 ppm with average levels of 0.53 ppm, 0.46 ppm, 0.56 ppm, and 1.04 ppm in spring, summer, fall, and winter respectively. These results suggest that formaldehyde levels in Mr. Wright's travel trailer were low in comparison to other, conventionally built residences in Southern Louisiana.

## Fungi (Mold) Sampling and Analysis

Mr. Wright recalled water leaks around a window in the bedroom while he lived in the travel trailer. An effort was made by FEMA to correct this problem during the occupancy period. The question has been raised as to whether mold growth inside the travel trailer associated with this water leak caused or exacerbated the asthma and dermatitis Mr. Wright claims to have experienced. In an attempt to answer this question, W. D. Scott Group collected air and surface samples during the second sampling event at the Wright travel trailer on August 6 and 7, 2009. Results of these samples were reported by Mr. Scott in his affidavit.[52]

---

[50] ATSDR: *An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers, Baton Rouge, Louisiana, September-October, 2006.* Agency for Toxic Substances and Disease Registry, Atlanta, GA (October 2007).
[51] Lemus, R., A. A. Abdelghani, T. G. Akers, and W. E. Horner: Potential Health Risks from Exposure to Indoor Formaldehyde. *Rev Environ Health 13*: 91-98 (1998).
[52] Affidavit of William D. Scott, PE, CHMM executed October 2, 2009.

16

The fungi samples were collected more than two years after Mr. Wright occupied the travel trailer. For this reason, it is highly unlikely that the results reflect actual living conditions experienced by Mr. Wright. The travel trailer had been sitting in a field at the FEMA storage facility in Melville, LA for an extended period. The bathroom exhaust vent was missing. Water leaks around a window and in the roof were apparent on visual inspection. Mr. Scott noted carpet deterioration beneath a window in the master bedroom and visible mold at the base of a cabinet immediately to the rear of the entrance door, on aluminum window frames, and on bathroom fixtures. Whether these conditions existed when Mr. Wright occupied the travel trailer is not known. Despite the obvious problem of retrospective assessment, Mr. Scott collected both surface and air samples.

*Air Samples for Fungi*

No standards for acceptable airborne fungi levels in homes or travel trailers have been established. For that reason monitoring normally involves collecting an air sample in the complaint area for comparison with samples collected in a non-complaint area and outside. In this case the W. D. Scott Group took two samples on August 7, 2009, one in the Wright travel trailer and the second of ambient air outside. Sample volumes for both were 141.5 L. Results by species expressed in colony forming units per cubic meter of air (cfu/m$^3$) were as follows:

| Fungi species | Inside Wright trailer | Outdoor ambient |
|---|---|---|
| | cfu/m$^3$ | cfu/m$^3$ |
| | | |
| *Aspergillis niger* | 14 | |
| *Cladosporium cladosporioides* | 260 | 1700 |
| *Fusarium chlamydosporum* | 35 | 49 |
| *Mucor hiemalis* | | 7 |
| *Non-sporulating fungi* | 42 | 78 |
| *Penicillium citrinum* | 14 | |
| *Penicillium oxalium* | 7 | |
| *Pithomyces chartarum* | 14 | |
| | | |
| Total cfu/m$^3$ | 390 | 1800 |

These results suggest three major observations. First, the total fungi level found outside was significantly greater than that found inside the travel trailer. This is a typical finding for this type of sampling and suggests that Mr. Wright would be better protected by staying inside the travel trailer rather than going outside. The species of fungi found inside at highest concentrations – *Cladosporium cladosporioides, Fusarium chlamydosporum,* and non-sporulating fungi - came from the air outside the travel trailer. Third, the fungi species found indoors but not outside – principally *Aspergillis* and *Penicillium* species – were present at very low concentrations, are very common in indoor air, and come from a variety of sources. These results do not suggest gross contamination with fungi nor do they suggest significant growth and proliferation of fungi in the Wright travel trailer.

17

*Surface Samples for Fungi*

W. D. Scott Group took a large number of swab and tape samples that were analyzed for fungi. Small numbers of fungal spores of various species were found on all of these samples. Such a result is not surprising since fungi are ubiquitous. Highest levels of colony forming units were found in swab samples around the window in the master bedroom and in the air handling system. This finding is also normal in that these are the locations where moisture was available to support fungal growth. No samples were collected outside the travel trailer or in a non-complaint area, such as Mr. Wright's current home, for comparison. The only conclusion that can be drawn from the surface sampling for fungi in the Wright travel trailer is that they are interesting but, especially in light of the air sampling results, not useful in identifying fungi as the etiologic agent for Mr. Wright's claimed health issues.

*Other Sources of Mold Exposure*

Mr. Wright worked in maintenance at the New Orleans Civil District Court where, among other duties, he changed filters on air handling units. Investigations of mold contamination were made in the Civil District Court building in May 2006 and June 2008.[53] These investigations revealed the presence of numerous species of fungi. Air samples collected in the building showed high levels of *Stachybotrys*, widely recognized as a toxic mold. These findings suggest the Mr. Wright was potentially exposed to airborne mold at locations other than the travel trailer.

**Conclusions**

Based on the considerations described above, it is my opinion to a reasonable degree of scientific certainty that:

1. The chronic MRL of 0.008 ppm formaldehyde recommended by ATSDR and the TWA REL of 0.016 ppm formaldehyde recommended by NIOSH are not appropriate guidelines for comparison with measurements made in closed, unventilated FEMA travel trailers since they are less than levels of formaldehyde found in urban air;
2. Measurements of formaldehyde levels in closed, unventilated FEMA travel trailers without standardization of environmental conditions and considerations of ambient formaldehyde levels are not reliable indicators of the potential formaldehyde exposure of travel trailer occupants and statistical analysis of such results leads to erroneous conclusions;
3. In light of available scientific data on sensory irritation from formaldehyde, it is unlikely that Mr. Wright would have experienced ocular, olfactory, or upper respiratory irritation at the formaldehyde levels found in his travel trailer with the air-conditioner operating in August 2009;
4. Even though the measurement was made after his occupancy, the best estimate of the formaldehyde exposure potentially experienced by Mr. Wright is the 0.035 to 0.044 ppm measured in the Forest River travel trailer with standardization of environmental conditions in August 2009;

---

[53] Materials Management Group, Inc.: Letter to Mr. Ted Melson from Dr. C. Paul Lo dated May 31, 2006 and Mold Investigation Report – Civil District Court, June 06, 2008.

Expert Report of William L. Dyson, Ph.D., CIH                                    November 2, 2009

5. Although the concentration of formaldehyde in the Forest River travel trailer may have been somewhat higher than 0.035 to 0.044 ppm when Mr. Wright began occupancy in March 2006, it is not possible to determine quantitatively what the level might have been at that time;

6. By operating the air conditioner in his travel trailer Mr. Wright made an improvement in his living conditions with respect to formaldehyde exposure;

7. More likely than not, Mr. Wright was exposed to airborne formaldehyde and fungi from sources other than the Forest River travel trailer during the time they resided in it;

8. More likely than not, Mr. Wright had direct contact with formaldehyde in products he used such as cleansers, cosmetics, and clothing;

9. It is unlikely that Mr. Wright was exposed to average formaldehyde levels higher than those experienced by residents of conventional homes in Southern Louisiana; and

10. Air samples collected in August 2009 do not suggest a problem with mold growth and proliferation in the Forest River travel trailer, nor do they implicate mold as the etiologic agent for Mr. Wright's claimed health issues.


Submitted by:
Workplace Environments, LLC

William L. Dyson, Ph.D., CIH
November 2, 2009

19

FR-LTW-EXP04-000019