UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N(5)<br><br>JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO:<br>*Lyndon Wright, et al. v. Forest River, Inc., et al.*,<br>09-2977 (E.D. La.) | MAGISTRATE CHASEZ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### SHAW ENVIRONMENTAL, INC.'S
### REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
### <u>PARTIAL SUMMARY JUDGMENT REGARDING "BLOCKING"</u>

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. ("Shaw") submits this reply memorandum in support of its motion for partial summary judgment in connection with claims relating to the improper "blocking" of Plaintiff's emergency housing unit ("EHU") (R. Doc. 10935) and in response to Plaintiff's Memorandum in Opposition to Shaw's motion (R. Doc. 11539) (the "Opposition"). The Opposition reflects a basic misunderstanding of Shaw's motion as well as the underlying facts. Plaintiff's improper "blocking" claim against Shaw must be dismissed because Shaw is entitled to immunity from liability under the well-established federal government contractor defense and/or La. R.S. 9:2771.

This Court previously indicated that the government provided reasonably precise specifications for the concrete block piers upon which trailers, like the one that Plaintiff occupied, were to be installed.[1] It follows that Shaw should not be held liable for damages that flow from a completed installation that adheres to the government's specifications and, indeed, was inspected and approved by FEMA. In this case, unlike in *Alexander v. Gulf Stream*, the Plaintiff has made claims that flow from the mere fact that trailers were installed on blocks, in accord with government specifications, and without permanent foundations. Specifically, Plaintiff claims that installation of trailers on blocks violates the building code, and that the lack of a permanent foundation leads to damage through soil subsidence. These claims therefore place at issue the question of whether Shaw can be held liable for doing what the government told it to do. *Boyle* holds that it cannot, and Shaw's motion therefore should be granted.

In an effort to avoid this outcome, Plaintiff makes three main arguments, which mischaracterize the underlying law, or facts, or both. First, Plaintiff incorrectly assumes that site preparation was within Shaw's discretion (and further that Shaw should have been performing geotechnical investigations at every single trailer site), when in fact Shaw's site preparation contractual requirements are quite clear. Second, Plaintiff argues that Shaw's work did not conform to the specifications, despite documents and testimony from FEMA that Shaw's work was accepted. Finally, Plaintiff resorts to claiming, despite written evidence to the contrary, that the government did not know about formaldehyde as late as May 2006, in order to claim that Shaw should have warned the government about "odors" of which the government was already aware. None of these arguments holds water, and Shaw's motion should be granted.

---

[1] R. Doc. 3205.

### A. The IA/TAC Did Not Require Shaw to Perform Geotechnical Investigations.

Plaintiff candidly admits that Section 2.1.2 of Exhibit 7 to the Performance Work Statement provides a reasonably detailed specification of the construction of the piers. Opposition, p. 7. In an effort to avoid the consequences of this fact, however, Plaintiff claims that the specification of what Shaw was required to do to the site *before* building the piers was not specific. Plaintiff is wrong.

Section 2.1.2 actually specifies exactly what Shaw is supposed to do prior to setting up trailers: "The Contractor shall clean away all grass roots, loose dirt, rocks or debris where at the base of the piers."[2] There is nothing unspecific about this statement; to the contrary, it tells Shaw exactly what to do. The first *Boyle* element – that the contract must contain "reasonably detailed specifications" – is met.

The Statement of Work does not alter this conclusion. As an initial matter, Plaintiff fails to mention that the Statement of Work applies both to mobile homes and to travel trailers. Mobile homes have a different site assessment requirement – indeed, checking the soil bearing capacity is an explicit part of the set up of a mobile home.[3] Because the contractual requirements for the site preparation for mobile homes and travel trailers are different, it is not surprising that the Statement of Work uses a general term like "as necessary" to refer back to the more specific provisions of Exhibits 6 and 7.

Beyond that, however, Plaintiff's argument is really that Shaw should have been doing something that is not specified in the IA/TAC – soil borings, or moisture readings, or some other

---

[2] Exhibit 7 ("Travel Trailer Installation") to the Performance Work Statement (Attachment A to Section J) of Shaw's Individual Assistance/Technical Assistance Contract with FEMA (the "IA/TAC") attached hereto as Exhibit "A."

[3] Exhibit 6 § 2.4.1 ("Manufactured Home Set-Up – Blocking and Leveling") to the Performance Work Statement (Attachment A to Section J) of the IA/TAC attached hereto as Exhibit "B".

form of geotechnical investigation. This after-the-fact argument is exactly the sort of theory against which government contractors are immunized. If a contractor follows the specifications given, it cannot be held liable for not doing what the government did not even request.[4]

**B.    Shaw Complied with the Contract Specifications.**

Brian Boyle was FEMA's "Quality Assurance Lead Inspector" in the New Orleans area following Hurricane Katrina. In this role, Mr. Boyle personally inspected some trailer installations, and he supervised a team of inspectors who had the goal of inspecting all trailer installations. The Trailer was among the trailers inspected by Mr. Boyle's team, and they created records to reflect that. Yet despite Mr. Boyle's explicit testimony to the contrary, Plaintiff argues that: (1) Shaw used the wrong type of base plate; and (2) FEMA never accepted the Trailer. Both of these assertions are flatly disproven by Mr. Boyle's sworn testimony.

Plaintiff claims that the use of an ABS pad[5] beneath the concrete piers constituted an unacceptable deviation from the contract. Plaintiff even goes so far as to claim – without expert opinion or any other evidence to support this assertion – that this "arguably exacerbated the dangerous conditions existing in the EHUs and became an additional cause of the warping and loosening of the wall panels in the Trailer, increased moisture intrusion into the Trailer, and other circumstances increasing the level of off-gassing formaldehyde within the Trailer while the

---

[4]    Shaw wishes to emphasize, though, that the government had in place a robust system for dealing with soil subsidence issues, if any arose: maintenance. The IA/TACs had an obligation to re-level any trailer for a 90-day period following installation. (Exhibit 7, p. 2 of 10; SHAW 000481) (Exh. "A"). Beyond that, the maintenance contractor could have been called at any time. After all, if soils shifted, and if that caused any given trailer to move out of level, there was a simple fix – just have a contractor shim the trailer back into a level state. Deposition of John D. Osteraas, pp. 117-18, attached hereto as Exhibit "C." It simply makes sense to fix soil problems after they arose with a shim, as opposed to grinding the disaster relief effort to a crawl while contractors took unnecessary geotechnical readings at every trailer site in the New Orleans area. But even if that approach did not make sense, it was the government's choice to implement that approach, and Shaw cannot be held liable for following the government's chosen approach.

[5]    ABS pads are hard plastic pads. They are commonly used as the bases for concrete or metal piers as support for mobile homes.

4

Plaintiff resided in it."[6]  This argument strains credulity to the breaking point – Plaintiff is saying that, if a contractor uses a hard plastic pad underneath a pier of cinder blocks, rather than an exterior grade plywood pad of the same shape and size, this will cause walls to pop open and lead to formaldehyde exposure.  Again, no expert supports this bizarre conclusion.  But, in any event, FEMA specifically accepted the ABS pads.  In fact, in the FEMA Field Inspector's Guide – the document FEMA inspectors took into the field to make certain that the IA/TACs were following the contract specifications – there are pictures showing both types of pads as acceptable installations.[7]  When shown this exact picture, Mr. Boyle again confirmed that it showed both types of pads as being acceptable:

> Q.   Let me ask you to look at Exhibit 3.  Yes, sir.  Could you look at page FL-FCA 06917.
>
> A.   917.
>
> Q.   There are three photographs on that page.  Do you see that, sir?
>
> A.   Yes, sir.
>
> Q.   And to your understanding, because this is the FEMA field inspector's guide, those photographs depict acceptable installations of piers; right?
>
> A.   Yes.
>
> Q.   Okay.  Do you see in the upper right photograph there are two piers depicted in that photograph; right?
>
> A.   Yes.
>
> Q.   What sort of base is the one -- is the pier on the right sitting on?
>
> A.   Wood.
>
> Q.   And what sort of base is the pier on the left sitting on?

---

[6] No wall panels warped or came loose in Plaintiff's Trailer.  There is absolutely no evidence to support this claim, and it is patently false.  Perhaps Plaintiff was thinking of the trailer at issue in the first bellwether.

[7] Deposition of Brian Boyle (attached hereto as Exhibit "D"), Exhibit 3 thereto at pp. FL-FCA 06917 and 06919.

> A.   The plastic or the rubberized material, whatever.
>
> Q.   Have you ever heard that called "ABS"?
>
> A.   Yes, I have.
>
> Q.   If you would flip two more pages to page 6919, what sort of base is that pier sitting on?
>
> A.   It looks like the ABS.
>
> Q.   Okay. And again, that's an acceptable pier installation; right?
>
> A.   Yes.[8]

Plaintiff also argues that FEMA did not accept the trailer. The Compeau Affidavit, however, establishes this fact. When Plaintiff claims that FEMA did not sign the AFO Inspection Report to which Mr. Compeau refers, he grossly misstates the law of summary judgment. Mr. Compeau is competent to testify what the record – which was created by FEMA and shared with Shaw daily – meant, and he has done so. This is evidence, and it is wholly unrebutted by Plaintiff. Now that Shaw has presented competent evidence that the Trailer was installed properly and accepted by FEMA, it is up to the Plaintiff to present contrary evidence. He has failed to do so.

This alone supports summary judgment in Shaw's favor, but FEMA's records further reflect three inspections of the installed Trailer by FEMA inspectors, and Mr. Boyle confirmed the meaning of those records:

> Q.   All right. Now, we've talked about a few inspections of this particular unit to check it at the RFE stage, at the RFO stage, and at the leased-in stage; right?
>
> A.   Yes, we have.
>
> Q.   Okay. Now, at any of those points in time, if your field inspectors had determined that this unit had not been built in accord with the specifications, you would have

---

[8] *Id.* at pp. 149-50 (Exh. "D") and Exhibit 3 thereto.

> expected that they would tell you that and you would have Shaw go back out and correct that; right?
>
> A.   You're saying "built." Shaw didn't build the units. Do you mean install?
>
> Q.   I meant install. Thank you.
>
> A.   Yes.[9]

The Trailer was installed properly according to FEMA's specifications, and inspected multiple times and accepted by FEMA. Plaintiff has presented no evidence to the contrary. Rather, Plaintiff has submitted only his counsel's argument that the pier base was made from the wrong material. Argument is insufficient to defeat summary judgment, and in any event Plaintiff's argument is wrong. As proven by the contemporary inspections by FEMA, the Trailer was installed properly; as proven by the testimony of Mr. Boyle, ABS pads are acceptable. The second element of the *Boyle* test is met, and Shaw's motion should be granted.

### C.   There Is No Question of Fact Regarding Warnings of Formaldehyde.

The third element of the government contractor defense requires only that the contractor warn the government about dangers of which the contractor has actual knowledge but about which the government does not know.[10] Plaintiff would have the Court turn this element on its head, by requiring that Shaw submit proof that it told the government about an odor – not a danger – about which the government already knew.

Plaintiff claims that "Shaw was aware of certain odors …" Opposition, p. 16. Being aware of odors is of no more consequence than being aware of sights and sounds. The trailers did not smell of anything dangerous, such as natural gas. Rather, most people who noticed an

---

[9] *Id*. at pp. 53-54 (Exh. "D"), and Exhibits 4, 5, & 7 thereto. Due to page limitations, Shaw does not separately discuss La. R.S. 9:2771, but Mr. Boyle's testimony supports that statutory defense equally.

[10] *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988); *In re Katrina Canal Breaches Consol. Litig*., No. 05-4182, 2007 WL 763742, at *4 (E.D. La. 3/9/07).

odor – including Plaintiff himself – describe the smell as a "new smell." There was absolutely no reason for Shaw to believe that the smell was dangerous.[11] Shaw had no actual knowledge of a danger, and therefore it had no duty to warn.

Moreover, FEMA knew about the odors and the presence of formaldehyde in trailers. FEMA accepted delivery of the trailers at a staging yard in Baton Rouge and inspected the trailers before turning them over to the IA/TACs. Obviously, if the IA/TACs were smelling odors in the trailers, FEMA smelled the same thing. Besides that, it was no secret that trailers were built with materials that contained urea-formaldehyde:

> Q. It was no surprise to you that there was some formaldehyde in these travel trailers, was it?
>
> A. No, it was not.[12]

Finally, Plaintiff reveals just how far he is willing to distort the facts when he points to a May 17, 2006, email from a Shaw employee regarding formaldehyde, and argues that "The obvious suggestion of this email is that FEMA was in fact not aware of the formaldehyde issues." Opposition, p. 16. This argument flies in the face of established facts and evidence, as well as allegations made in Plaintiff's own Complaint.[13] Plaintiff disingenuously fails to point out to the Court that this communication came roughly ***two months after FEMA's Brian Boyle asked the IA/TACs about formaldehyde in trailers and received a satisfactory response from Shaw:***

> Q. Do you recognize this [the March 21, 2006 email from Mr. Deane] as being Mr.

---

[11] Even today, there is no proof that formaldehyde in the concentrations present in trailers was dangerous.

[12] Deposition of Martin McNeese, p. 108, attached hereto as Exhibit "E." Mr. McNeese was an emergency management specialist with FEMA during the Katrina relief effort.

[13] Lyndon T. Wright's Complaint for Damages, C.A. No. 09-2977 (R. Doc. 1), ¶¶ 52-55.

8

> Dean's response to you with regard to the e-mail that you sent about formaldehyde, Exhibit 9 [the March 20, 2006 email from Mr. Boyle]?
>
> A.   According to the e-mail, yes.
>
> Q   Okay. On the second-to-last page of exhibit 10, it's marked SHAW 13567. Can you read item 39 into the record?
>
> A.   39, "leave door open on trailer to vent. Lock door open using" -- well, "lock door open using door cradle handle."
>
> Q   Okay. So as of the time of this e-mail, Shaw's standing operating procedure was to leave the door open on the trailer to vent, according to this e-mail; right?
>
> A   According to this document, yes.
>
> Q.   Now, did Shaw's response to your question about their process for airing out the travel trailers satisfy your request?
>
> A   Yes.[14]

Merely because a single Shaw employee did not know on May 17, 2006, that Shaw and FEMA had had discussions about formaldehyde on March 20 and 21, 2006, does not mean that a question of fact exists about whether FEMA was aware of formaldehyde issues in March 2006. The undisputed facts are that this email discussion did take place. That Plaintiff would resort to smoke and mirrors to hide FEMA's knowledge – especially when, in other contexts, plaintiffs have argued that FEMA knew about formaldehyde well before May 2006[15] – merely shows the lengths to which Plaintiff will go.

There were no dangers about which Shaw had actual knowledge and failed to warn the government. *Boyle* does not require Shaw to have told the government about an odor. It requires that Shaw warn the government of dangers. The third element of *Boyle* is met.

---

[14]   Boyle Deposition at pp. 54-55 (Exh. "D").

[15]   For example, plaintiffs have argued throughout this litigation that FEMA should be charged with formaldehyde knowledge gained through OSHA testing in October, 2005. *See, e.g.,* Plaintiffs' Memorandum in Opposition to USA's Motion to Dimiss, R.Doc. 348, p.36. For purposes of their arguments therein, plaintiffs used March 2006 as the *latest* date when FEMA had knowledge of formaldehyde in trailers.

## CONCLUSION

The installation of travel trailers on blocks to serve as emergency housing units was a government decision. The contractors who implemented that decision cannot be held liable for doing what the government asked of them. If the problem complained of relates not to the process of installation, but to the use of trailers installed on blocks for emergency housing – as is the case with Plaintiff's recent building code and soil subsidence theories – then the government contractor defense applies. Plaintiff, in response to Shaw's motion, presented argument, but no evidence, that Shaw failed to install the Trailer just as the government asked. Mr. Boyle's testimony stands unrebutted, and as such, all claims arising from the completed state of the Trailer, including building code violations and soil subsidence, should be dismissed.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


  /s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

  /s/ M. David Kurtz