UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N(5)<br><br>JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO:<br>*Lyndon Wright, et al. v. Forest River, Inc., et al.*,<br>09-2977 (E.D. La.) | MAGISTRATE CHASEZ |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## SHAW ENVIRONMENTAL, INC.'S
## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT REGARDING CAUSATION

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. ("Shaw") submits this memorandum in support of its motion for summary judgment relating to causation (R. Doc. 10929) and in response to Plaintiff's Memorandum in Opposition to Shaw's motion (R. Doc. 11544) (the "Opposition"). The Opposition proves Shaw's point by failing to introduce a shred of evidence that anything Shaw did or did not do actually raised the level of formaldehyde in the Trailer. Accordingly, Shaw's motion should be granted.

Plaintiff's Opposition is divided into four main sections. Each of these arguments fails, and Shaw will address them[1] in the order in which they appear.

---

[1] In the space allowed, Shaw cannot respond to every factual misstatement in the Opposition and instead focuses only on the four principal sections, which begin on page 8 of the Opposition.

### A. Shaw Responded to FEMA's Inquiry about Airing Out Trailers and Formaldehyde the Next Day.

The first section of Plaintiff's Opposition constitutes a misrepresentation of the facts to this Court. The argument revolves around a March 20, 2006, inquiry by FEMA's Brian Boyle to the IA/TACs about their processes for airing out trailers and formaldehyde. It is a testament to the Plaintiff's desperation that he would say, "Shaw apparently did not respond," (Opposition, p. 9), knowing full well that on March 21, 2006, Shaw's William Deane wrote back to Mr. Boyle (with a copy to Mr. Boyle's supervisor, Larry Woodruff), attaching Shaw's trailer staging yard procedures (which showed that Shaw routinely ventilated trailers).[2] Mr. Deane even asked Mr. Boyle, "Let me know if this is what you are looking for."[3] At his deposition, Mr. Boyle was questioned about this document, and he confirmed that he was satisfied with Shaw's response:

Q. Do you recognize this [the March 21, 2006 email from Mr. Deane] as being Mr. Dean's response to you with regard to the e-mail that you sent about formaldehyde, Exhibit 9 [the March 20, 2006 email from Mr. Boyle]?

A. According to the e-mail, yes.

Q Okay. On the second-to-last page of exhibit 10, it's marked SHAW 13567. Can you read item 39 into the record?

A. 39, "leave door open on trailer to vent. Lock door open using" -- well, "lock door open using door cradle handle."

Q Okay. So as of the time of this e-mail, Shaw's standing operating procedure was to leave the door open on the trailer to vent, according to this e-mail; right?

A According to this document, yes.

Q. Now, did Shaw's response to your question about their process for airing out the travel trailers satisfy your request?

---

[2] Deposition of Brian Boyle, attached hereto as Exhibit "A," Exhibit 10 (SHAW 013563-68).

[3] *Id.*

A    Yes.[4]

Notwithstanding what is written in the Opposition, the actual facts are that Mr. Boyle asked Shaw about airing out trailers and what Shaw was doing to handle formaldehyde on March 20, 2006, at 10:14 a.m. Shaw responded on March 21, 2006, at 10:41 a.m. – just more than 24 hours later. When Plaintiff argues that Shaw failed to respond to this inquiry, he is arguing contrary to the facts.[5] This should not be countenanced, and moreover there is absolutely no reason to impose upon Shaw an obligation to "warn" FEMA about formaldehyde in trailers – a subject about which FEMA already knew.

**B.    Plaintiff's Argument about Pier Construction Is Both Wrong and Misses the Point.**

Plaintiff claims that the use of an ABS pad underneath the cinderblock piers upon which the Trailer was installed violates the IA/TAC. Again, this contention seems to pretend that the deposition of Brian Boyle did not occur. At his deposition, Mr. Boyle specifically testified that the use of ABS pads was authorized. In fact, ABS pads were shown in the FEMA Guide that its inspectors used to confirm that trailers had been installed correctly:

Q    Let me ask you to look at Exhibit 3. Yes, sir. Could you look at page FL-FCA 06917.

A    917.

Q    There are three photographs on that page. Do you see that, sir?

---

[4]    Boyle Deposition at pp. 61-62 (Exh. "A").

[5]    Plaintiff's contention that Shaw's Project Manager had "no idea" if Shaw ever responded to Mr. Boyle (Opposition, p. 10) is also a brazen mischaracterization of the testimony. Plaintiff's counsel repeatedly asked this question (leading to form objections), and Mr. Compeau repeatedly testified that although he could not point to a specific document, he was sure that Shaw did respond, because in the absence of a response, Mr. Boyle would have continued to ask Shaw about it. Deposition of Geoffrey C. Compeau, pp. 132-35, attached hereto as Exhibit "B."

3

A    Yes, sir.

Q    And to your understanding, because this is the FEMA field inspector's guide, those photographs depict acceptable installations of piers; right?

A.    Yes.

Q.    Okay. Do you see in the upper right photograph there are two piers depicted in that photograph; right?

A.    Yes.

Q.    What sort of base is the one -- is the pier on the right sitting on?

A.    Wood.

Q.    And what sort of base is the pier on the left sitting on?

A.    The plastic or the rubberized material, whatever.

Q.    Have you ever heard that called "ABS"?

A.    Yes, I have.

Q.    If you would flip two more pages to page 6919, what sort of base is that pier sitting on?

A.    It looks like the ABS.

Q.    Okay. And again, that's an acceptable pier installation; right?

A.    Yes.[6]

In any event, both the ABS pad issue, as well as the soil subsidence issue, miss the point of Shaw's motion. Shaw's motion shows that, *even assuming improper installation*, there is *no* evidence that Shaw caused or contributed to any formaldehyde exposure. Shaw vehemently denies that it did anything wrong when installing the trailer – whether in its subcontractor's using ABS pads, or its failure to drive piles under every trailer in New Orleans – but the point of this

---

[6] Boyle Deposition at pp. 149-50 and Exhibit 3 thereto (Exh. "A").

motion is that there is no causal connection between Shaw's actions and the claimed injuries. Plaintiff's second argument does not present any evidence of such a connection.

### C. Evidence of Water Damage in August 2009 Also Misses the Point.

Plaintiff relies on destructive testing performed in August 2009 to point out the existence of water damage in the Trailer at that time. The fact that there was water damage observed in the Trailer after it had sat in a FEMA trailer graveyard for a year ought to come as no surprise (especially since one of the vent caps was missing and the door latch had been damaged, both of which allowed water into the Trailer). But again, this has nothing to do with the issue presented by Shaw's motion – whether there is evidence that Shaw caused or contributed to formaldehyde exposure. Evidence of water damage (especially in August 2009) is not evidence of formaldehyde exposure.[7] The third section of the Opposition cannot defeat Shaw's motion.

### D. An Increased Offgassing Rate in a Chamber Test Is Not the Same Thing As An Increased Exposure to Formaldehyde in a Real Trailer.

In the fourth section of the Opposition, Plaintiff makes three basic arguments: (1) the Centers for Disease Control found an association between humidity and increased formaldehyde levels; (2) Plaintiff's expert Dr. Smulski claims that humidity increases the offgassing rate; and (3) the laws of thermodynamics are such that holes in the Plaintiff's trailer let in humidity but do not let out formaldehyde. The first of these is irrelevant to the question of whether Shaw's

---

[7] Section C of the Opposition also attacked Shaw for not contacting Forest River about installing the trailer on piers (which Shaw did not do because it had specifications from FEMA) and about owner's manuals. Although Shaw cannot respond in ten pages to every incorrect factual point in the Opposition, the owner's manual issue is a mischaracterization of Shaw's testimony. Mr. Compeau repeatedly testified that if owner's manuals were in the trailers when Shaw received the trailers from FEMA, Shaw left them there. Compeau Deposition at pp. 190-91 (Exh. "B"). In fact Mr. Boyle testified that FEMA inspectors checked to make sure that occupants had access to owner's manuals. Boyle Deposition at p. 87 (Exh. "A"). By taking an answer given by Mr. Compeau completely out of context, the Opposition makes it sound as if Shaw was discarding the manuals. The question was whether Shaw kept *copies* of the manuals – no, Shaw did not do that. Compeau Deposition at pp. 206-07 (Exh. "B").

actions or inactions *caused* formaldehyde levels to increase in the Trailer; the second is about offgassing, not formaldehyde concentration; and the third is just wrong.

    1.    *The CDC Report Does Not Prove that Shaw Increased Formaldehyde Levels in the Trailer.*

Association is not causation. The CDC found that there was a statistical association between humidity levels in the trailers that it studied and formaldehyde concentrations; nothing more. This is not at all the same thing as saying that humidity caused the levels to be higher.

Moreover, the CDC report is contradicted by Plaintiff's own expert, Paul Hewett, at least as to Forest River trailers. Dr. Hewett conducted a focused study that looked only at Forest River trailers from within the CDC and Bureau Veritas sets of measurements. Because Plaintiff resided in a trailer manufactured by Forest River, obviously if any statistical study can be probative of causation, Dr. Hewett's study is more probative than CDC's. And, as detailed in Shaw's original memorandum in support of its motion (R. Doc. 10929, pp. 16-18), Dr. Hewett found no statistically significant correlation between humidity and formaldehyde levels.

    2.    *Offgassing Rates and Concentration Levels Are Not the Same Thing.*

For his second argument, Plaintiff relies heavily on the opinion of Dr. Smulski that offgassing rates increase in the presence of formaldehyde. But again, Dr. Smulski candidly admitted that offgassing and concentration are two different things, and they are not even correlated on a one-to-one basis.[8]

---

[8] Deposition of Stephen Smulski, dated June 10, 2009, pp. 344-45, attached hereto as Exhibit "C."

Human beings do not care about offgassing rates; they care about concentration levels.[9] As an illustration, imagine being in a room with a beaker full of formaldehyde. Now imagine being in a wind tunnel with several beakers of formaldehyde. Despite the higher evaporation rate in the wind tunnel – due to there being more formaldehyde to begin with – common sense would tell you that you are likely to smell the formaldehyde more strongly in the closed room. The reason for this, of course, is that ventilation lowers the concentration of formaldehyde and overwhelms the higher evaporation rate.

In fact, Dr. Smulski admitted that the offgassing of formaldehyde is a wood science matter, and is therefore within his expertise, but *concentrations are not wood science*.[10]  Dr. Smulski does not even have the expertise to opine on the subject of whether the formaldehyde concentration in the air might go up or down, because he cannot account for other processes that remove formaldehyde from the air. When asked whether bulk water, such as that which may result from a leak, might actually **reduce** the level of formaldehyde in the air,[11] Plaintiff's counsel tellingly objected that the question was beyond the scope of the witness's expertise, and Dr. Smulski candidly acknowledged that he did not know.[12]

The point of Shaw's motion is that there is *no* evidence that Shaw's actions or inactions raised the concentration of formaldehyde in the Trailer. Claiming that the offgassing rate

---

[9] Of course, this is especially true of a litigant who has to prove a dangerous level of exposure to an airborne contaminant.

[10] June 10, 2009 Smulski Deposition at pp. 345-46 (Exh. "C").

[11] Formaldehyde is attracted to water and, when in contact with it, goes into a solution called formalin. By triggering this process, a leak could reduce the concentration of airborne formaldehyde.

[12] Deposition of Stephen Smulski, dated January 29, 2010, pp. 120-21, attached hereto as Exhibit "D."

increased is not a response to Shaw's position. Offgassing and concentration are two different things, and Plaintiff's arguments regarding offgassing are simply not evidence of increased formaldehyde concentration.

    3.    *Gaps that Let In Humidity Would Let Out Formaldehyde.*

Shaw points out in its motion that one cannot simply assume that increased offgassing would lead to increased formaldehyde concentration because the mechanism that Plaintiff invokes – a hole in the trailer that let in humidity – would also have a tendency to allow formaldehyde out. Even assuming Plaintiff's worldview that Shaw broke seals and let in water, there is no expert testimony to say whether the resulting increase in humidity would cause enough additional offgassing to offset the lowering of formaldehyde concentration because some formaldehyde would escape by the same path. Therefore, there is a failure of proof on the point of whether Shaw actually increased the level of formaldehyde in the Trailer.

Again, a simple factual scenario illustrates this point. If, as Ms. Marsh testified, Plaintiff often left the windows open,[13] that would obviously let humidity into the Trailer. But common sense tells us that those same windows would also let formaldehyde out. To understand the net effect on formaldehyde concentration, one would have to calculate just how much humidity came in and how much more formaldehyde offgassed as a result, and then one would have to weigh that against the increased ventilation through the open windows.[14] Clearly, this is a matter upon which expert testimony is required, but Plaintiff has presented no such evidence.

---

[13]     Deposition of Tyshone Marsh, pp. 83-87, attached hereto as Exhibit "E."

[14]     *See also* Shaw's discussion of the gap over the Trailer's door, at pages 15-16 of Shaw's original memorandum (R. Doc. 10929).

Plaintiff derides this argument as "borderline ridiculous" and loftily invokes the laws of thermodynamics[15] to support his position, but in fact Plaintiff's own experts agree with Shaw. Dr. Smulski admitted that gaps in the Trailer's skin would let formaldehyde out.[16] Ervin Ritter, Plaintiff's expert in mechanical engineering, also acknowledged that the phenomenon of "diffusion pressure" – which, in gases, drives higher concentration towards lower concentrations – would move formaldehyde out of the Trailer and toward the exterior environment, even in the absence of temperature or pressure-driven[17] movement.

The true question presented by Shaw's motion is whether there is any proof that Shaw increased the level of formaldehyde in the Trailer. There is none, and neither the CDC report, nor offgassing rates, nor the laws of thermodynamics, can resurrect Plaintiff's claims.

## CONCLUSION

In response to Shaw's motion, Plaintiff has misstated facts and presented unsupported arguments, but these sideshows cannot hide the fact that there is no evidence that Shaw actually increased the concentration of formaldehyde in the Trailer. Because Plaintiff plainly bears the burden of proof on this point, this failure of proof is fatal to his case. Accordingly, Shaw's motion for summary judgment on causation should be granted.

---

[15] Shaw is constrained to point out that Plaintiff could not cite to any of his experts to support his claim that the laws of thermodynamics prohibit Shaw's position; this statement is purely the argument of Plaintiff's counsel. Moreover, it is flatly wrong. The laws say nothing about gas concentrations (they deal with the conservation of energy and entropy); although they do imply things about gas behavior, they certainly do not preclude gasses from moving from areas of high concentration to low concentrations. Indeed, this everyday phenomenon is an important part of the explanation why opening windows is an effective way of reducing indoor smells.

[16] June 10, 2009 Smulski Deposition at pp. 352-53 (Exh. "C").

[17] Notably, Plaintiff fails to mention to the Court that his own expert found the Trailer to be positively pressurized when the air conditioner was running. Deposition of Paul LaGrange, pp. 129-130, attached hereto as Exhibit "F."

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


  /s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 19, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

  /s/ M. David Kurtz