UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N(5)<br><br>JUDGE ENGELHARDT |
| THIS DOCUMENT RELATES TO:<br>*Lyndon Wright, et al. v. Forest River, Inc., et al.*,<br>09-2977 (E.D. La.) | MAGISTRATE CHASEZ |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### SHAW ENVIRONMENTAL, INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF CHARLES DAVID MOORE

**MAY IT PLEASE THE COURT:**

Shaw Environmental, Inc. ("Shaw") submits this memorandum in support of its motion *in limine* to exclude expert testimony of Charles David Moore (R. Doc. 11417) and in response to Plaintiff's Memorandum in Opposition to Shaw's motion (R. Doc. 11709) (the "Opposition"). Shaw's motion seeks to exclude the testimony of Charles David Moore ("Moore") on the basis that the methodology and testing procedures employed by Moore fail to comport with the requirements concerning the reliability of scientific evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

As previously discussed, Moore intends to offer expert opinions and testimony regarding the condition of the FEMA Trailer occupied by Plaintiff Lyndon Wright. In addition, Moore

intends to offer expert testimony with respect to the causes of the conditions he observed, which he relates back to the installation of the Trailer.[1]  Specifically, Moore states in his expert report that in August 2009, after the Trailer had been sitting in a field for about a year, unmaintained, he observed certain damage to the interior and exterior of the Trailer.[2]  Moore attributes all of this damage, including the water leaks at the front door, to the installation of the Trailer in November 2005.[3]

The bases of Moore's opinions depend largely, if not entirely, on a series of jacking tests conducted in August 2009, which utilized different sequences of jacking.  During the jacking process, Moore measured the angular movement of the Trailer with an inclinometer to determine how much the corners of the Trailer moved and more specifically, "how much the shell of the trailer warps and distorts during the jacking process."[4]  Based on this exercise, Moore determined that during jacking "the trailer will experience large differential movements in the structure, causing openings in the door, window, and other fixtures, in addition to putting stress on the caulk and other seals around the unit."[5]  This determination led Moore to ultimately conclude that "[w]ater leaks in this trailer was [sic] either caused by improper jacking or made worse by improper jacking."[6]

---

[1]  Deposition of Charles David Moore, p. 71, attached hereto as Exhibit "A."

[2]  Expert Report of Charles David Moore, pp. 6-9, attached hereto as Exhibit "B."

[3]  *Id.*, p. 19, Exh. "B."

[4]  *Id.*, p. 16, Exh. "B."

[5]  *Id.*, p. 19, Exh. "B."

[6]  *Id.*, Exh. "B."

In his Opposition, Plaintiff spends a great deal of time describing the *type* of method used by Moore in reaching the above conclusions, but fails to address whether this methodology was in fact reliable. Shaw does not disagree that Moore attempted to test his hypothesis. Shaw merely points out that the methodology employed by Moore is scientifically unreliable because it neither proves nor disproves his hypothesis.

Engineering is a field of applied science.[7] It relies on the scientific method, which calls for the formulation of a hypothesis and then subjecting the hypothesis to tests designed to falsify or confirm the hypothesis.[8] Testing, which is actually performed, must be appropriate and must analytically prove the expert's hypothesis.[9]

Here, Moore's hypothesis was that jacking caused or contributed to damage to the Trailer. To test this hypothesis, however, Moore only jacked up the trailer and monitored its *movement*. However, this alone is insufficient to support an opinion that jacking up the Trailer may cause *damage*. To properly test his theory, Moore would have needed to establish some sort of objective threshold to determine at what level damage will actually occur to the Trailer's frame. Moore did no such thing.

> Q. Okay. What test results would have suggested to you that there wasn't any improper jacking?
>
> A. If we had tested and found very little differential movements and problems with any of these things, I would say that we'd have said, Wait a minute, our hypothesis is wrong.

---

[7] *Kumho Tire Co., Ltd v. Carmichael,* 526 U.S. 137, 148 (1999).

[8] *See Daubert,* 509 U.S. at 590.

[9] *See Shuck v. CNH America, LLC,* 498 F.3d 868, 875 n. 3 (8th Cir. 2007) (stating, "testing, if performed, must be appropriate in the circumstances and must actually prove what the experts claim it proves").

| | |
|---|---|
| Q. | How big is "very little"? |
| A. | I would say – well, I don't know that I could really tell that just right of the top of my head like this, but much smaller than the things we found out in our testing. |
| Q. | Okay. Isn't that the kind of thing that you need to figure out where your criteria is, your cutoff line, before you do the testing, not afterwards, so we're not wondering if you've made the criteria lower than your test results were? |
| A. | No, I don't think so. |
| Q. | In any event, you didn't set a, okay if it's below a 32nd of an inch movement, then you know what, it's not improper jacking; you didn't set a – |
| A. | We didn't set that – |
| Q. | -- line like that? |
| A. | No, we didn't set that prior to the testing, no.[10] |

This fatal oversight flies in the face of established engineering and scientific methodology. Moore's jacking sequence exercise was not designed to test his hypothesis. Indeed, Moore's conclusions are unsupported by anything approaching the rigor associated with generally accepted testing protocols. Moore's failure to comport with these principles further calls into question the reliability of his conclusions.

Without an objective threshold level, the only thing Moore's test proved was that jacking up the Trailer will cause *some* movement in the frame and/or shell of the unit. This of course should come as no surprise since travel trailers by their very nature are mobile and are intended to withstand some movement. Moore admitted as much, and besides that, he admitted that he did not check to see if the movement induced by jacking was greater than the movements normally experienced by trailers during normal use:

---

[10] Moore Deposition, pp. 269-70, Exh. "A."

Q. Would you agree with me that the box of the trailer experiences transportation loads while being driven around?

A. I would probably expect that, yes.

Q. The suspension, even in an ideal situation, isn't going to completely isolate the box from transportation loads?

A. I would say in an ideal situation it would, but in actual conditions, probably not.

Q. Okay. I appreciate the clarification. There is no such thing as an ideal suspension, right?

A. Right.

Q. So some transportation loads will be transmitted up from the road -- well, from the tires, let's say -- through the suspension and up into the box of the trailer?

A. That's correct.

Q. Okay. And those forces will induce some amount of differential movement between the elements of the travel trailer just during normal road use, right?

A. Most likely, yes.

Q. Okay. Wouldn't you think that that -- those forces and the differential movement that occurs during normal road use would be greater than anything that was experienced during any logical jacking sequence when these trailers were being installed?

A. I don't know that I could say that, no.

Q. You don't know one way or the other whether it's greater or lesser?

A. Right.

Q. You haven't attempted to measure that or test it?

A. No, I have not.[11]

---

[11] Moore Deposition, pp. 191-92, Exh. "A."

5

The question is how much movement is too much movement. Moore's test did not answer this question. Moore failed to quantify the level of movement necessary to cause damage to the Trailer. Thus, Moore's methodology is actually no methodology at all. He entered the testing process without a clear view of what would prove, or what would disprove, his hypothesis. Rather, Moore employed the quintessential "hired-gun" approach of starting with the conclusion already in-place, and designing a "test" tailored to reach that conclusion. The scientific validity of any "opinion" rendered from such an approach, which is more akin to advocacy than objective analysis, is necessarily suspect and certainly does not satisfy the *Daubert* threshold of reliability.

## CONCLUSION

Based on the reasoning and jurisprudence cited in Shaw's Motion *In Limine* to Exclude Expert Testimony of Charles David Moore, and for the reasons stated herein, Shaw Environmental, Inc. respectfully urges the Court to enter an order excluding Moore's testimony in its entirety.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

  /s/ M. David Kurtz
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.

  /s/ M. David Kurtz