# Transcript of the Testimony of
# Videotaped Deposition of Lyndon Wright

## Date taken: July 10, 2009

### In Re: FEMA Trailer Formaldehyde Products Liability Litigation

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

### Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER          MDL NO. 1873
FORMALDEHYDE PRODUCTS        SECTION "N"(4)
LIABILITY LITIGATION         JUDGE ENGELHARDT

* * *

VIDEOTAPED DEPOSITION OF LYNDON WRIGHT, 3417 SOUTH CLAIBORNE AVENUE, APARTMENT 5, NEW ORLEANS, LOUISIANA 70113, TAKEN AT THE OFFICES OF FRANK D'AMICO, 622 BARONNE STREET, NEW ORLEANS, LOUISIANA 70130, ON THE 10TH DAY OF JULY, 2009.

REPORTED BY:
  CATHY RENEE' POWELL, CCR
  PROFESSIONAL SHORTHAND REPORTERS
  (504) 529-5255

VIDEOGRAPHER:
  BRIAN SOILEAU
  PROFESSIONAL SHORTHAND REPORTERS
  (504) 529-5255

### Page 2

APPEARANCES:

THE LAW OFFICES OF FRANK J. D'AMICO, JR.
(BY: FRANK J. D'AMICO, JR., ESQUIRE
     AARON AHLQUIST, ESQUIRE)
622 BARONNE STREET
NEW ORLEANS, LOUISIANA 70113
    ATTORNEYS FOR THE PLAINTIFF

DAVID McCLENDON, ESQUIRE
4731 CANAL STREET
NEW ORLEANS, LOUISIANA 70119

    ATTORNEYS FOR THE PSC

U.S. DEPARTMENT OF JUSTICE
(BY: MICHELLE GREIF, ESQUIRE)
CIVIL DIVISION
1331 PENNSYLVANIA AVENUE, N.W.
ROOM 8210-N
WASHINGTON, D.C. 20004

    ATTORNEYS FOR DEFENDANT, UNITED
    STATES OF AMERICA

BAKER DONELSON
(BY: DAVID KURTZ, ESQUIRE
     KAREN WHITFIELD, ESQUIRE)
201 ST. CHARLES AVENUE
SUITE 3600
NEW ORLEANS, LOUISIANA 70170
    ATTORNEYS FOR DEFENDANTS,
    CH2M HILL CONSTRUCTORS, INC. AND
    SHAW ENVIRONMENTAL, INC.

### Page 3

APPEARANCES CONTINUED:

GIEGER, LABORDE & LAPEROUSE, LLC
(BY: JASON BONE, ESQUIRE
     CARSON STRICKLAND, ESQUIRE)
701 POYDRAS STREET
SUITE 4800
NEW ORLEANS, LOUISIANA 70139
    ATTORNEYS FOR DEFENDANT, FOREST RIVER, INC.

GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
(BY: KELLY MORTON, ESQUIRE)
909 POYDRAS STREET
SUITE 1800
NEW ORLEANS, LOUISIANA 70112
    (VIA TELEPHONE)

    ATTORNEYS FOR DEFENDANTS,
    RECREATION BY DESIGN, LLC, TL
    INDUSTRIES, INC., FRONTIER
    RV, INC. AND PLAY'MOR TRAILERS,
    INC.

### Page 4

EXAMINATION INDEX
EXAMINATION BY MR. BONE: ................9
EXAMINATION BY MR. KURTZ: .............248
EXAMINATION BY MS. GREIF: .............298
EXAMINATION BY MR. BONE: ..............326
EXAMINATION BY MR. KURTZ: .............337
EXAMINATION BY MR. AHLQUIST: ..........342

* * *

INDEX OF EXHIBITS
Exhibit No. 1 .........................99
  Ready for Occupancy Check List,
  SHAW-WRI 00011.
Exhibit No. 2 ........................204
  Bankruptcy petition filed on behalf
  of Lyndon Wright, May 24, 2001.
Exhibit No. 3 ........................212
  FEMA Document, Important
  Information for Travel Trailer
  Occupants, FEMA08-000013, 14.
Exhibit No. 4 ........................213
  Formaldehyde Levels in
  FEMA-Supplied Trailers.
Exhibit No. 5 ........................214
  FEMA Document, Important

1  A. Yes.
2  Q. The same smell from the time you
3  smelled it in the winter of '06 until the
4  summer of 2008, correct?
5  A. (Witness nods head affirmatively.)
6  Q. And the severity of the smell, the
7  amount of the smell that you could perceive,
8  didn't change except for when you deodorized
9  the unit, correct?
10 A. That's right.
11 Q. So if you were asked, it was your
12 perception that it wasn't -- the smell
13 wasn't worse at any given point in time from
14 the time you first perceived it until the
15 time you left the trailer, correct?
16 A. Other than when the stove was on
17 in that particular area. No, I couldn't say
18 it got worse. Like I said, I was on top of
19 it. I mean, it could have been worse, but
20 by me always deodorizing it, I just probably
21 didn't pay attention to it.
22 Q. But if called upon to testify,
23 your testimony would be that the smell was
24 the same --
25 A. The same.

Page 133

1  Q. The same across the top?
2  A. Yes.
3  MR. D'AMICO:
4  I object to the form of that
5  question. I don't know that that is what he
6  just said. But --
7  EXAMINATION BY MR. BONE::
8  Q. Do you ever recall being asked by
9  FEMA if you had any health problems that you
10 associated with this particular unit?
11 A. Repeat the question.
12 Q. Do you ever recall being asked by
13 FEMA if you had any health problems that you
14 associated with this particular unit?
15 A. By FEMA? No.
16 Q. Do you recall being asked by
17 anyone if you had any health problems
18 associated with this particular unit?
19 A. My mom.
20 Q. When did that conversation take
21 place?
22 A. Basically, when I was on the phone
23 talking to her at one time and I was doing a
24 lot of coughing. I made the mention that I
25 woke up choking, you know, looking for

Page 134

1  water. I believe I made the comment that I
2  think this trailer has made me sick because
3  I wasn't like this when I was on the cruise
4  ship.
5  She said, "Well, I'm going to call
6  FEMA and have somebody come out. You think
7  there's a leak going on up in there?"
8  I said, "Not that I know of, I
9  don't smell propane or nothing, I'm just not
10 feeling like I was feeling on the cruise
11 ship."
12 Q. Explain to me the difference in
13 the way you were feeling from the time -- as
14 compared to the cruise ship, which is why
15 you thought there was some problem with the
16 unit.
17 A. I mean, I slept comfortably. I
18 was actually -- what word can I use? I felt
19 a lot better on the cruise ship than I did
20 in the trailer. When I got in the trailer,
21 my eyes started getting irritated and I just
22 associated it with my allergies, and I think
23 it was this trailer, but it was just
24 constant. And the coughing, just a plain
25 old dry cough. And I started seeing blood

Page 135

1  in my mucus when I expelled, you know.
2  Q. Uh-huh.
3  A. And I would wake up with this
4  choking feeling out of my sleep. And I
5  started keeping water by the bed -- by the
6  sofa, really, I slept on the sofa.
7  It just didn't feel right, I mean,
8  between telling the people about the
9  rainwater and -- I don't know. It was just
10 aggravating.
11 Q. Okay. During that period of time
12 that you were living in this unit, you had
13 health insurance with the City of New
14 Orleans, correct?
15 A. Yes.
16 Q. And you also had health insurance
17 with Hyatt still, correct?
18 A. Yes, for a short period, yes.
19 Q. So if you needed to go to the
20 doctor, you had insurance to cover your
21 access to care, correct?
22 A. Yes.
23 Q. And did you ever seek out medical
24 care for the problems that you're telling us
25 about today?

Page 136

34 (Pages 133 to 136)

A. Yes. I went to the doctor about my eyes, because I thought I had the pink eye, because I woke up one morning and my eyes was closed.

When I went to the doctor, he said it was -- it wasn't pink eye, it was just like a severe allergic reaction.

I went to the doctor about my chest being so congested and my coughing so much. I think they gave me antibiotics. Gave me an inhaler.

When I was congested sinus-wise, they gave me Nasonex. I complained about all of this being swollen -- well, you know, inside, not out, not physically out, but just being swollen, they said it was probably a viral infection or what have you.

Q. Let's talk about that.

You said you had some eye issues, some chest congestion, some sinus problems. You said that you had some swelling, you felt, around your throat area. Was there anything else, any other physical problems that you had while living in this particular unit?

Page 137

A. I mean, other than the headaches associated with all the coughing I was doing.

Q. Anything else?

A. Physical problems? I broke out with a rash a few times.

Q. Anything else?

A. Did you get the blood in my mucus and everything?

And I noticed -- well, I noticed my ear ran a lot more. I mean, it was already a problem, but I only go to the doctor to see them about twice a year, but at that particular time, I had to go, like, three or four times just for cleaning.

Q. Anything else?

A. No.

Q. The eye irritation, chest congestion, the mucus issue, the sinuses and the viral infections and the headaches, did you go to see Dr. Crews and Dr. Fields for that?

A. Yes.

Q. Did you see anyone else for those issues?

Page 138

MR. D'AMICO:
    Did you mean to skip some of the things he complained about?
MR. BONE:
    We're going down.
MR. D'AMICO:
    Okay.
THE WITNESS:
    Dr. Fox. I mean, it's all in one facility.
    Dr. Reginelli.
EXAMINATION BY MR. BONE::
Q. And they are all with Uptown Nephrology?
A. That's correct.
Q. Did you see them for the rashes or did you see somebody else?
A. No, I pretty much did my own thing with the rash, the calamine lotion and stuff. I pretty much did self-help on them.
Q. The rashes, where were they located?
A. Like on the back of my neck and my elbows.
Q. How often did you have a rash?

Page 139

A. It would be -- it lingered. I mean, it would be real bad at one time, and it would be like it was going away, but it always had little fine bumps. But it would stay with me.

Q. I think you said you had used calamine lotion on it?

A. Yeah. The stuff in that pink bottle or something, yes.

Q. Okay. Did that resolve the issue for you?

A. The itching part, yeah. The rash itself pretty much stayed, but the itching was resolved.

Q. When you were in the clinic with the folks from Uptown Nephrology, did you ever mention that you had rashes on the back of your neck and your elbows?

A. No, I didn't mention it.

Q. Is there any reason why you didn't bring this to the attention of the doctors if you were in their office anyway?

A. No. Like I say, I was putting calamine lotion on it, so --

Q. So, to your knowledge, no doctor

Page 140

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255
New Orleans * Baton Rouge * Covington * Shreveport                                                  (504) 529-5255

Q. What kind of information or articles have you gotten from the City of New Orleans' Web site?
A. Pretty much the recovery information they had on the Web site. That's all.
Q. Did you ever read anything on the City of New Orleans' Web site about issues relating to formaldehyde or otherwise pertaining to these travel trailers?
A. No.
MR. AHLQUIST:
    The point of confusion was probably that he works at the CDC.
MR. BONE:
    I understand. That's why I was clarifying.
EXAMINATION BY MR. BONE:
Q. Did you at any point review any information online about formaldehyde or about any issues other folks were having relating to these trailers?
A. No.
Q. When you first believed or came to the belief that your occupancy of this

Page 169

particular unit was impacting your health, did you tell your mother immediately?
A. Yes. I made the comment, because I was coughing so much, I made the comment, "Ma, I think this trailer is making me sick."
Q. Did you ask her to take any action on your behalf in that regard?
A. Initially, she wanted me to call the maintenance people, but they gave me the runaround. They wanted all kinds of personal information from my mom, so I told my mom she had to call.
    So she said she called to tell them that I was smelling a foul odor. They gave her the runaround. She said they gave her another number to call. She called that number and somebody said they would get back in touch with her.
    She never did get a phone call, and it just pretty much fell from there on. That's when I started telling the maintenance people when I saw them.
Q. Do you recall when the phone call was with your mother that you expressed to

Page 170

her that you believed your occupancy of this unit was causing you a health problem?
A. I would say probably April.
Q. Of what year?
A. '06. Right after I got in the trailer.
Q. So in April of '06, you were of the opinion that your occupancy of this unit was causing you a health problem?
A. I would say I thought it was making me sick, yes.
Q. And you expressed that to your mother by May of 2006, correct?
A. By April.
Q. By April of 2006, correct?
A. Yes.
Q. Do you have any information as to why your mother would have represented to FEMA by February of 2008, that there were no health concerns that she had about you regarding your occupancy of this unit?
A. No, I don't know.
Q. Were you ever offered the opportunity to purchase this unit?
A. You would have to ask my mom. I

Page 171

wasn't.
Q. If that contact was made, it was typically made through your mother, correct?
A. Huh?
Q. If contact with FEMA was made, it was typically made through your mother?
A. Yes.
Q. Is your mother a smoker?
A. Huh?
Q. Is your mother a smoker?
A. Used to be.
Q. When was she a smoker?
A. '86 back. Backward.
Q. When you were growing up in the house, she was a smoker?
A. Yes.
Q. And you lived with her all the way up until Katrina, correct?
A. Yes.
Q. Do you know what types of cigarettes your mom liked to smoke?
A. Salems.
Q. When she was smoking, how many packs a day did she typically smoke?
A. I have no idea.

Page 172

43 (Pages 169 to 172)

```
 1    Q.  Who paid your utility bills?
 2    A.  I did.
 3    Q.  Was it a problem for you to pay
 4  the bills?
 5    A.  No.
 6    Q.  Did you ever -- well, did you
 7  testify earlier that the first time you had
 8  heard about formaldehyde was from the person
 9  who had stopped by your trailer to talk to
10  Lucretia?
11    A.  That's when it was mentioned to me
12  about formaldehyde in the trailers.
13    Q.  Had you ever heard of formaldehyde
14  before that?
15    A.  No.  I mean, I have heard of the
16  word, but not in this context.
17    Q.  So that's when you first learned
18  that there may be formaldehyde in your
19  travel trailer?
20    A.  Yes.
21    Q.  Did you ever attend any meetings
22  regarding this FEMA formaldehyde litigation?
23    A.  No.
24    Q.  After you learned that there may
25  be a formaldehyde issue in your travel
                                      Page 313
```

```
 1  trailer, did you go to the computer and
 2  Google "formaldehyde" or do any research on
 3  it?
 4    A.  No.
 5    Q.  When you were living in the
 6  trailer, did you have any kind of bug
 7  problem or rodent problem?
 8    A.  No.
 9    Q.  When you worked at the Riverside
10  Court Condos, I think you mentioned that you
11  did some groundwork?
12    A.  Yes.  Cleanup and stuff like that.
13    Q.  Cleaned the -- cleaned litter?
14    A.  Yeah, trash.
15    Q.  So you didn't mow the lawn?
16    A.  No.
17    Q.  Did you do any weeding?
18    A.  No, that was contracted out.
19    Q.  What about at your home before the
20  storm, did you cut the grass there?
21    A.  Yes, I did.
22    Q.  Did you do the weeding?
23    A.  Yes, I did.
24    Q.  Did you use any herbicides?
25    A.  Who?
                                      Page 314
```

```
 1    Q.  Herbicides to kill weeds, that
 2  sort of thing?
 3    A.  No.
 4    Q.  Did you ever do that -- have you
 5  ever used an herbicide or a chemical to --
 6    A.  No, no.
 7    Q.  Now, since you have worked for the
 8  City of New Orleans at the CDC, in the
 9  building where you work, has there been any
10  renovation to that building?
11    A.  Any renovations?
12    Q.  Do you recall any kind of
13  renovation?
14    A.  Not that I know of.
15    Q.  Did you ever use fans in your
16  trailer?
17    A.  Fans?
18    Q.  Yes.
19    A.  Yes, I had one fan.
20    Q.  Pardon?
21    A.  Yes, I had one fan.
22    Q.  That you brought in?
23    A.  Yes.
24    Q.  And you would use that in the
25  summertime, or all year round?
                                      Page 315
```

```
 1    A.  In the summertime, primarily.
 2    Q.  Do you use any mail order
 3  pharmacies?
 4    A.  Mail order pharmacies?
 5    Q.  Like your insurance sometimes will
 6  have them?
 7    A.  Back in the early 2000s, maybe.
 8    Q.  The kind of pharmacy where you
 9  would send in the prescription and they
10  would send you --
11    A.  It was a prescription for Viagra,
12  and I pretty much -- if I'm not mistaken, I
13  saw an ad on TV and I transferred a
14  prescription from, like, Rite Aid to that
15  particular company.  I don't know the name
16  of it.
17    Q.  Have you ever had any pets?
18    A.  Any what?
19    Q.  Pets.  Cats, dogs?
20    A.  No.
21    Q.  All right.  You have testified
22  about the mucus and the blood in your mucus.
23  When was the first time that you ever
24  experienced that?
25    A.  It was -- first time?  I mean,
                                      Page 316
```

about the odor? Like called FEMA?
A. No, my mom. My mom did.
Q. Your mom has?
A. Yes.
Q. I think you testified earlier that she called, and then what happened?
A. They did a runaround, gave her another number and said they would get back in touch with her. And we just never followed up on it.
   I mean, that's when I started telling the maintenance people during their little checkoff, you know, that I was having these problems.
MS. GREIF:
   I have no other questions. I have a statement to make. I'm asking that Mr. Wright read and sign the transcript.
THE WITNESS:
   Read it and sign it?
MS. GREIF:
   Yes. You will receive the transcript from today's deposition, so I ask that you read it and sign it.
THE WITNESS:

Page 325

   Okay.
EXAMINATION BY MR. BONE:
Q. Mr. Wright, I have just a few follow-up questions to close out.
   One of the things you mentioned during examination by counsel for the government was that as late as 2008, when your mother was asking for renewals of the travel trailer lease, that if you didn't live in that travel trailer, you would live in your car, right?
A. Yes.
Q. Did you ever attempt to locate another apartment or another place to live?
A. No.
Q. Okay. So there is no documentation of you looking or requesting alternate housing between you and FEMA saying, "I can't live in this travel trailer, I would request that you put me somewhere else"?
A. No.
Q. And there is no document between you and FEMA or your mother and FEMA saying, "There's an odor in this unit and we need

Page 326

corrective action to be taken," correct?
A. She made the phone call and nobody called her back. I told the maintenance people. They never wrote nothing down, but they always told me they would have somebody come out about the situation.
Q. I understand.
   But my question is, did you ever write a document, did you ever write a letter or did you ever have anyone on your behalf write a letter to FEMA or anyone to say, "There's an odor in my unit, it's irritating to me and I want corrective action to be taken"?
A. No.
Q. In 2005 -- let's say 2006, you were a single man with no dependents making approximately $30,000 a year, correct?
A. That's correct.
Q. You were financially able to get an apartment if you wanted to?
A. Basically, yeah.
Q. All right. In 2007, you were a single gentleman with no dependents making $47,000 -- over $47,000 a year. You were

Page 327

financially able to get an apartment if you wanted one, correct?
A. Yes.
Q. In 2008, we have already established that you made roughly $72,000 a year as a single individual with no dependents. You were financially able to get an apartment if you had wanted one, correct?
A. Yes.
Q. And yet, despite the fact that you made these complaints and you testified about the complaints you had and you testified that as early as 2006, you believed the trailer you were living in made you sick, you never attempted to locate alternate housing on your own or through FEMA; isn't that true?
A. That's true. But I also didn't know the trailer was formaldehyde riddled.
Q. Let me ask you about something. If you had been provided the owner's manual to this particular trailer, would you have read it?
A. If I had -- I mean, as far as the

Page 328

owner's manual or something, I might have skimmed through it if I came across it.

I mean, you asked if I had ever heard of formaldehyde in trailers. If I had had the owner's manual and came across the word, I probably would have had some kind of knowledge about a chemical in the trailer, but I never had that.

Q. Right. So in answer to my question, if you had had access to the owner's manual for this particular trailer, you would have read it?

A. Yes, I would have read it.

Q. And if you had read in this owner's manual that "formaldehyde levels in indoor air can cause temporary eye and respiratory irritation and may aggravate respiratory conditions of allergies," what action would you have taken?

A. I would have called my mom and told her to see about getting me to stay in a hotel or something.

Q. So if you had had that knowledge, if you had read that statement, you would have taken immediate action to move out of

Page 329

the trailer?

A. Yes, I would have.

Q. Do you have any other lawsuits other than the car accident we talked about earlier and the one you're here for today?

A. No.

Q. Have you ever had any other lawsuits for any reason, whether it be contract issues or other issues that you're aware of?

A. No.

Q. You said that formaldehyde is used on dead people. How did you come to that knowledge?

A. I mean, like in funerals and stuff. That's what they use, I thought.

Q. Did you ever work in a funeral parlor or as an embalmer?

A. No, just went to services.

Q. Do you know what other products contain formaldehyde?

A. Other products?

Q. Yes.

A. What products? I mean, other than wood and -- okay. Cigarettes have some

Page 330

degree of formaldehyde I've heard, yes.

Q. So you have knowledge that cigarette smoke contains formaldehyde?

A. Yes.

Q. Other than cigarette smoke, are you aware of any other products that contain formaldehyde?

A. I have heard it mentioned that fish gives off a form of formaldehyde, but I don't know the truth in that one, so --

Q. Okay. Do you know if there is a level of formaldehyde in this room right now?

A. Do I know it?

MR. AHLQUIST:
    Don't guess.
THE WITNESS:
    No, I don't know that.
EXAMINATION BY MR. BONE:

Q. How long have you had the knowledge that cigarette smoke contains formaldehyde?

A. Since this litigation started.

Q. And for you, when did this litigation start? Was that April of 2008 or

Page 331

before that?

A. Pretty much -- well, I assume the litigation started with this in 2008. I mean, April of '08, but I mean, I didn't get the knowledge of that until I really got with my lawyers and everything.

Q. Right. Well, assuming that that is true, that cigarette smoke gives off a significant amount of formaldehyde, would you agree with me that you've been exposed to an awful lot of formaldehyde both before and after your time in this trailer?

MR. AHLQUIST:
    I'm going to object to the form of the question.
MR. BONE:
    Go ahead.
EXAMINATION BY MR. BONE:

Q. You can answer.

A. Yes.

Q. Were you present during the testing of your unit the Scott group did?

A. I opened up the unit, let them place the equipment inside and then we left and came back the next day. It was a

Page 332

```
 1   years before Katrina.
 2          So from 2000 to 2005, you saw the
 3   folks from Uptown Nephrology who we have
 4   talked about; Reginelli, Fox, Crews, Fields
 5   and Dr. Worley, we have talked about.
 6          Did you see anyone else from 2000
 7   to 2005, any other doctors, any other
 8   hospital visits, anything of that nature?
 9      A.  If I did, I don't recall.  Like I
10   say, I had gotten my insurance for
11   2000-2003, so that's when I really started
12   going to the doctor.  If I had made a stop
13   one time because of something, I can't
14   remember.
15      Q.  Before 2003 when you got health
16   insurance, were you simply not going to the
17   doctor because you couldn't afford to go to
18   the doctor without health insurance?
19      A.  Exactly.
20   MR. BONE:
21          I have my 15 minutes reserved and
22   I will make great use of every one of them.
23   EXAMINATION BY MR. KURTZ:
24      Q.  Mr. Wright, a few more follow-ups.
25          Why did you not call FEMA about
                                         Page 337
```

```
 1   your statement that the trailer was making
 2   you sick?  Or why did you not call the
 3   maintenance line?
 4      A.  The statement I made to my mom
 5   when I said that, I mean, it wasn't like it
 6   was a dead serious thing.  She's the one
 7   that aggravated it and said, "Well, you need
 8   to get somebody to come check it."
 9      Q.  I guess I'm asking because you had
10   your mom call the maintenance number, right?
11      A.  Yes.
12      Q.  And you spoke to people when you
13   happened to see them when they were out at
14   the trailer?
15      A.  Yes.
16      Q.  But why wouldn't you pick up the
17   phone and make the call to the maintenance
18   people?
19      A.  Really, well, initially, it was
20   mainly because of personal information that
21   my mom had to give them.  But as time went
22   on, I mean, I just pretty much just let it
23   go.
24          I mean, I wasn't familiar with
25   formaldehyde issues with the trailer.
                                         Page 338
```

```
 1      Q.  Right.  You didn't know about that
 2   at that point in time?
 3      A.  It was just a statement I said to
 4   my mom, but she wanted to call and have
 5   somebody come check it.
 6      Q.  Okay.  You said initially your mom
 7   was going to come back and live in the
 8   trailer as well; is that correct?
 9      A.  That's correct.
10      Q.  Did either you or her ever tell
11   FEMA that she wasn't going to come back and
12   live in the trailer?
13      A.  Not that I recall.
14      Q.  You talked about having a packet
15   of materials in a white envelope.  Do you
16   recall that?
17      A.  Yes.
18      Q.  And you said you had no idea what
19   was in it, right?
20      A.  No.
21      Q.  It could have been owner's
22   manuals, right?
23      A.  Could have been.
24      Q.  The condensation on the window,
25   you described condensation on the inside of
                                         Page 339
```

```
 1   the window, right?
 2      A.  Yes.
 3      Q.  That would have occurred during
 4   the winter, right, when the window was
 5   getting cold from the outside, right?
 6      A.  Well, it was pretty much -- it
 7   occurred in the wintertime, too, because the
 8   air conditioner would be on and the vent
 9   was, like, if I'm not mistaken, pointing
10   toward the -- the vents were pointing toward
11   the windows, if I'm not mistaken.
12      Q.  The vanes in the vent directed the
13   cold from the air-conditioning onto the
14   window to the point where water was
15   condensing on the inside of the window even
16   in the summertime?
17      A.  Yes.
18      Q.  Were the vanes adjustable?  Could
19   you move them around at all?
20      A.  Excuse me?
21      Q.  Were the vanes adjustable, could
22   you move them around at all?
23      A.  Oh, God.
24          No, no.
25      Q.  Okay.  The gap above the door that
                                         Page 340
```

```
 1     Q.  How long would you leave the stove
 2  on for?
 3     A.  To really warm it up real quick,
 4  probably about 15, 20 minutes.
 5     Q.  Why didn't you tell the women who
 6  came to stay with you that you were
 7  concerned that the trailer was making you
 8  sick?
 9     A.  Like I say, when I told my mom
10  that I thought the trailer was making me
11  sick, I mean, it was like a freelance-type
12  statement, but like I said, my mom tried to
13  get somebody --
14     Q.  I'm going to restate the question.
15         Why didn't you tell the women who
16  came to stay with you, Nicole Dyson and then
17  Lucretia and Vanessa and their children, why
18  didn't you tell them that the trailer was
19  making you sick?
20     A.  Because I didn't actually know
21  that the trailer was making me sick.  I
22  mean, I didn't want to alarm them, but I
23  didn't really actually know, even though I
24  was going to the doctor with these symptoms.
25     Q.  Just a couple more.
                                        Page 353
```

```
 1         We talked about Bio-Treat and
 2  Coolite, which are HVAC chemicals.
 3         Did you ever notice any container
 4  of Bio-Treat or Coolite leaking at CDC?
 5     A.  No.
 6     Q.  What would you do if you saw a
 7  container leaking?
 8     A.  We would have to call the
 9  contractor company to come out.
10     Q.  Would you handle it in any way?
11     A.  Depending on how bad the leak is,
12  we would probably have to call the fire
13  department.
14     Q.  Would you handle it in any way?
15  MR. BONE:
16         Objection.
17  THE WITNESS:
18         Oh, me?  Me specifically?  No.
19  MR. AHLQUIST:
20         All right.  I think that that's
21  it.  Lyndon, I really appreciate your time.
22  Does anybody have anything else?
23  THE VIDEOGRAPHER:
24         That concludes our deposition; it
25  is 4:46.
                                        Page 354
```

```
 1  (Which concluded the deposition.)
```
Page 355

```
            WITNESS' CERTIFICATE

     I have read or have had the foregoing
testimony read to me and hereby certify that
it is a true and correct transcription of my
testimony with the exception of any attached
corrections or changes.



            _____
                    LYNDON WRIGHT

PLEASE INDICATE
( ) NO CORRECTIONS
( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
```
Page 356

```
 1     A.  Right after Rita.  So it might
 2  have been the first of October or the very
 3  end of September.
 4     Q.  When you got back into New Orleans
 5  at the Hyatt, did you actually live in the
 6  hotel?
 7     A.  No.
 8     Q.  Was there ever a time that you
 9  resided in that hotel for any period of
10  time?
11     A.  Any period of time?
12     Q.  Yes.
13     A.  Yes.
14     Q.  Take me through that.  When you
15  first get back to New Orleans, how long do
16  you live in the hotel?
17     A.  One night.
18     Q.  After the night in the hotel,
19  where did you live after that?
20     A.  My car.
21     Q.  Why was it that you slept in your
22  car rather than in a hotel room?
23     A.  Well, the situation was,
24  Mr. Haggerty wanted his workforce back.
25  When I came back, his boss said the hotel
                                        Page 69
```

```
 1     Q.  Had you actually been to your
 2  first day of work before Katrina?
 3     A.  Yes.
 4     Q.  Do you recall when that was?
 5     A.  I would have to say probably the
 6  second week in August, before the storm.
 7     Q.  What was your intent with respect
 8  to whether you were going to continue your
 9  work with Hyatt or not?  Had you planned to
10  transition solely to working for the City of
11  New Orleans or were you planning to work for
12  both Hyatt and the City of New Orleans?
13     A.  I had planned to work for both
14  Hyatt and the City of New Orleans.
15     Q.  Had you spoken with your
16  supervisor at the Hyatt regarding the fact
17  that you intended to start working two jobs?
18     A.  Had I spoken with my supervisor
19  about that?
20     Q.  Had you spoken with him about
21  that?
22     A.  No.
23     Q.  We'll come back to that.
24         But with respect to your job with
25  the City, how was it that you came back to
                                        Page 71
```

```
 1  couldn't afford nobody to come back as far
 2  as employees.  So Hyatt ruled, or what have
 3  you, that I couldn't stay there.
 4         I mean, I was still employed with
 5  them, but as far as being on the payroll for
 6  that moment, I couldn't be.  So that's how I
 7  wound up staying in my car.
 8     Q.  How long did you have to stay in
 9  your car before you found other
10  accommodations?
11     A.  About a week or two.
12     Q.  And how was it that you came to
13  find other accommodations?
14     A.  How was it --
15     Q.  How was it that you came to find
16  another place to stay?
17     A.  Through my job with the City.
18     Q.  As I recall from the records that
19  we have, you were hired on with the City
20  just before Katrina, correct?
21     A.  That's correct.
22     Q.  But they hadn't placed you in a
23  position; is that true?
24     A.  No, I was working in the Civil
25  District Court building.
                                        Page 70
```

```
 1  work for them after the hurricane?  Did you
 2  call your supervisor once you found out you
 3  were going to be living in your car to find
 4  out if they needed you to work?
 5     A.  That's correct.
 6     Q.  And who was the person you
 7  contacted at the City of New Orleans?
 8     A.  Keith Lanier.
 9     Q.  Keith --
10     A.  Lanier.
11     Q.  Lanier?
12     A.  Yes.
13     Q.  And what did Keith tell you?
14     A.  I told him I was back in the city
15  and I was staying in my car.  And he was
16  like, "Are you available for work?"
17         And I'm like, "Yeah."
18         He told me to come back to work
19  and I was back to work.
20     Q.  What did the City do for you in
21  terms of finding you a place to stay?
22     A.  They gave me residency on the
23  Carnival cruise ship.
24     Q.  So because you were available to
25  work for the City, they placed you on the
                                        Page 72
```

**Page 225**

A. Due from the exposure of formaldehyde? No.
Q. Has any doctor --
A. But I did ask my doctor if it was possible that the trailer was making me sick like I was, and he said it was very possible.
Q. Which doctor did you have that conversation with?
A. I think Crews, Jr.
Q. When did that conversation take place?
A. I can't relate that. That's one of my follow-up visits. I can't pinpoint when it was.
Q. Do you know if it happened in 2006, 2007 or 2008?
A. In '07.
MR. AHLQUIST:
    Is that a guess or to the best of your recollection?
THE WITNESS:
    To the best of my recollection, it was '07, yes.
EXAMINATION BY MR. BONE:

**Page 226**

Q. Have you talked about those issues with Dr. Worley?
A. No.
Q. When was the last time you actually saw a doctor?
A. January.
Q. Okay. January of this year?
A. Of what?
Q. Of this year, of 2009?
A. Yes.
Q. When is your next appointment to see any doctor?
A. I have to make one. I missed my last appointment, which was supposed to be in March.
Q. So as we sit here today, in July, it has been six months since you have seen a doctor?
A. About.
Q. And until I asked you that question, when was your next plan to schedule an appointment with a doctor?
A. When I got extremely sick again.
Q. So you had no plans to contact a doctor?

**Page 227**

A. No.
Q. Are you currently using any breathing treatment?
A. No.
Q. When was the last time you used an inhaler?
A. I can't recall. One of the incidents when I went to the doctor for being congested in my chest so much and he gave me an inhaler. I used it once and I can't recall exactly when that was.
Q. You used it one time and then you have not used it since?
A. I have not used it since, no.
Q. As we sit here today, do you have any ongoing health problems, apart from your osteoporosis, hyperthyroidism and hypertension?
A. Well, I know that my eyes get irritated more easily now. I wake up at night and my mouth is just dried out and I still have that blood in my mucus when I expel.
Q. This March and April, did you have any problems with seasonal allergies?

**Page 228**

A. Yes. My eyes got extremely irritated.
Q. You had irritation to your eyes. Did you have any other problems?
A. I sneezed, and like a tickle in my throat, coughing. I took me some allergy medicine for about a week, I think, and everything subsided.
Q. You take over-the-counter allergy medicines --
A. Yes, I just go to the store, the Walgreens brand.
Q. And within a couple of weeks, the symptoms subsided as before?
A. Yes.
Q. Now, as we sit here today, you're working more than you ever worked in your life, correct?
A. Yes.
Q. You're working more hours than you ever worked in your life, correct?
A. With having two jobs, yes.
Q. And you're earning more money than you ever earned in your life before, correct?

**Page 229**

1  A. Yes.
2  Q. The amount of money you made last
3  year was approximately $76,000, wasn't it?
4  A. $72,000.
5  Q. $72,000. And that was from
6  payments from the City of New Orleans and
7  the Hyatt for the work that you were
8  performing, correct?
9  A. That's correct.
10 Q. What is your anticipated income
11 for this year?
12 A. Probably $60,000.
13 Q. Okay. In 2008, Hyatt Corporation
14 paid you $41,822.60. Did you work for Hyatt
15 the entire year of 2008?
16 A. Yes. I was employed in '07, yes.
17 Q. In 2009, do you expect to make the
18 same amount of money or an equivalent amount
19 of money with Hyatt?
20 A. No.
21 Q. And is that due to the budgetary
22 cutbacks you told me about?
23 A. Yes.
24 Q. The City of New Orleans, after
25 last year, did you receive a pay increase?

**Page 230**

1  A. Yes. It was a pay increase, what,
2  last year sometime?
3  Q. Yes. From 2007 -- in 2007, you
4  earned $30,873.88. In 2008, they paid you
5  $35,606.06.
6      What type of raise did you get for
7  2009?
8  A. I think it was a dollar or two
9  increase. I don't know when it took effect.
10 I didn't really know we had a raise until
11 one of my colleagues noticed his check was a
12 little more than usual.
13 Q. It was a little bit bigger.
14 A. But I was doing overtime at the
15 time and I wouldn't have noticed it in a
16 regular paycheck.
17 Q. So in addition to working the
18 40-hour week, you will also work overtime if
19 it's available?
20 A. Occasionally, yes.
21 Q. Is there any reason that, as we
22 sit here today, that you believe that the
23 amounts that you will earn in the future
24 will not be commensurate with the amount you
25 are earning presently?

**Page 231**

1  A. The amount I'm earning right
2  now --
3  MR. D'AMICO:
4      Do you understand the question?
5  THE WITNESS:
6      Can you repeat the question?
7  EXAMINATION BY MR. BONE:
8  Q. Sure. Is there any reason you can
9  think of as you sit here today that the
10 amount that you are earning, as we sit here,
11 that you have reported, that has been
12 reported, $72,000 from last year, that you
13 will not earn a commensurate amount of
14 money, in other words, the same amount of
15 money in the future?
16 A. In the future at any given time?
17 Q. Sure.
18 A. I think my pay will probably go
19 down. Yeah, I think it would go down.
20 Q. Why?
21 A. I would have to say due to health
22 reasons.
23 Q. And what health reasons, as we sit
24 here today, have prevented you from earning
25 the $72,000 that you earned?

**Page 232**

1  A. Well, at this particular time,
2  it's more of a budget thing, but you said at
3  any given time if I thought I would make
4  less.
5  Q. Sure. Is there anything that you
6  know today that makes you believe you will
7  earn less money in the future?
8  A. That I know today?
9  Q. Yes.
10 A. Yes. Because I was diagnosed with
11 asthma, so I'm quite sure that's going to
12 progressively -- well, progress into
13 something more where it limits me to work.
14 Q. Okay. You believe you have been
15 diagnosed with asthma?
16 A. Yes.
17 Q. And who told you that?
18 A. And independent doctor for the
19 defense.
20 Q. Has anyone else told you that?
21 A. No.
22 MR. D'AMICO:
23     Object to that phrase. I object
24 to that phrase.
25 MR. McCLENDON:

```
 1    Q.  I think you just said that your
 2  skin rash has been attributed to the asthma?
 3    MR. AHLQUIST:
 4        I don't think that's what he said.
 5    THE WITNESS:
 6        No.  That's another personal
 7  injury I'm claiming.
 8  EXAMINATION BY MS. GREIF:
 9    Q.  Okay.  And what are the long-term
10  effects of formaldehyde?
11    A.  Oh, I don't know that.  I mean, I
12  know that -- I mean, formaldehyde is
13  something they use on dead people, I mean,
14  and I stayed in the trailer all of that time
15  inhaling that stuff.  I mean, I didn't know.
16    Q.  Have you ever filled out an SF 95
17  form before in any other context?
18    A.  No.
19    Q.  Have you ever sued the federal
20  government before or sought to sue the
21  federal government before?
22    A.  No.
23    Q.  Has your mother filled out -- if
24  you're aware -- has your mother filled out
25  any SF 95 forms as a result of Hurricane
```
Page 309

```
 1  Katrina?
 2    A.  No.
 3    Q.  Has she filled out an SF 95 form
 4  in the FEMA litigation?
 5    A.  No.
 6    Q.  Has she filled out an SF 95 form
 7  against the Corps of Engineers for damage to
 8  her home?
 9    A.  No.
10    Q.  You mentioned this morning that
11  you came home one day and there was an
12  abandonment notice on the trailer?
13    A.  Yes.
14    Q.  When did that occur?
15    A.  I really can't remember.  It was
16  around that first time when the trailers
17  were supposed to be picked up and my mom had
18  already made an extension.  But I guess when
19  they made their rounds, they didn't know
20  about that extension.  So I really don't
21  know that time period.
22    Q.  And why did your mom make an
23  extension?
24    A.  I needed a residence.
25    Q.  You wanted to stay in the trailer?
```
Page 310

```
 1    A.  Well, not wanted to, but I needed
 2  a residence, I mean.
 3    Q.  So you had to stay in the trailer?
 4    A.  Yes.
 5    Q.  If you weren't living in the
 6  trailer, where would you have lived?
 7    A.  In my car.
 8    Q.  You mentioned this morning that
 9  you had discussed with a friend at work the
10  travel trailers; is that correct?
11    A.  Discussed the travel trailers?
12    Q.  There was someone at work, you had
13  said this morning, in this deposition this
14  morning, that there was a friend at work
15  with whom you had discussed the problems
16  that you had had with the travel trailer.
17    A.  Yeah.  That it was too small and
18  cooped up.  Just pretty much talking about
19  it.
20    Q.  And was this friend living in a
21  travel trailer as well?
22    A.  He was staying in a trailer park.
23    Q.  What is this friend's name?
24    A.  Isaac Frezel.
25    Q.  Can you spell his last name?
```
Page 311

```
 1    A.  F-R-E-Z-E-L.
 2    Q.  Has he filed an SF 95 form against
 3  FEMA?
 4    A.  I don't know.
 5    Q.  You said earlier this morning that
 6  you sometimes cooked in your trailer?
 7    A.  That I what?
 8    Q.  Cooked in your trailer.
 9    A.  Yes.
10    Q.  When you cooked, did you open your
11  windows?
12    A.  Yes.  I would open the windows,
13  yes.
14    Q.  And you also mentioned that you
15  would turn on the stove when it was really
16  cold out to help warm up the trailer for a
17  period.
18    A.  Yes.
19    Q.  When you did that, would you open
20  the windows?
21    A.  No.
22    Q.  When you were living in the travel
23  trailer, who paid your utility bills?
24    A.  When I was living in the travel
25  trailer, what?
```
Page 312

```
 1    Q.  Who paid your utility bills?
 2    A.  I did.
 3    Q.  Was it a problem for you to pay
 4  the bills?
 5    A.  No.
 6    Q.  Did you ever -- well, did you
 7  testify earlier that the first time you had
 8  heard about formaldehyde was from the person
 9  who had stopped by your trailer to talk to
10  Lucretia?
11    A.  That's when it was mentioned to me
12  about formaldehyde in the trailers.
13    Q.  Had you ever heard of formaldehyde
14  before that?
15    A.  No.  I mean, I have heard of the
16  word, but not in this context.
17    Q.  So that's when you first learned
18  that there may be formaldehyde in your
19  travel trailer?
20    A.  Yes.
21    Q.  Did you ever attend any meetings
22  regarding this FEMA formaldehyde litigation?
23    A.  No.
24    Q.  After you learned that there may
25  be a formaldehyde issue in your travel
                                    Page 313
```

```
 1  trailer, did you go to the computer and
 2  Google "formaldehyde" or do any research on
 3  it?
 4    A.  No.
 5    Q.  When you were living in the
 6  trailer, did you have any kind of bug
 7  problem or rodent problem?
 8    A.  No.
 9    Q.  When you worked at the Riverside
10  Court Condos, I think you mentioned that you
11  did some groundwork?
12    A.  Yes.  Cleanup and stuff like that.
13    Q.  Cleaned the -- cleaned litter?
14    A.  Yeah, trash.
15    Q.  So you didn't mow the lawn?
16    A.  No.
17    Q.  Did you do any weeding?
18    A.  No, that was contracted out.
19    Q.  What about at your home before the
20  storm, did you cut the grass there?
21    A.  Yes, I did.
22    Q.  Did you do the weeding?
23    A.  Yes, I did.
24    Q.  Did you use any herbicides?
25    A.  Who?
                                    Page 314
```

```
 1    Q.  Herbicides to kill weeds, that
 2  sort of thing?
 3    A.  No.
 4    Q.  Did you ever do that -- have you
 5  ever used an herbicide or a chemical to --
 6    A.  No, no.
 7    Q.  Now, since you have worked for the
 8  City of New Orleans at the CDC, in the
 9  building where you work, has there been any
10  renovation to that building?
11    A.  Any renovations?
12    Q.  Do you recall any kind of
13  renovation?
14    A.  Not that I know of.
15    Q.  Did you ever use fans in your
16  trailer?
17    A.  Fans?
18    Q.  Yes.
19    A.  Yes, I had one fan.
20    Q.  Pardon?
21    A.  Yes, I had one fan.
22    Q.  That you brought in?
23    A.  Yes.
24    Q.  And you would use that in the
25  summertime, or all year round?
                                    Page 315
```

```
 1    A.  In the summertime, primarily.
 2    Q.  Do you use any mail order
 3  pharmacies?
 4    A.  Mail order pharmacies?
 5    Q.  Like your insurance sometimes will
 6  have them?
 7    A.  Back in the early 2000s, maybe.
 8    Q.  The kind of pharmacy where you
 9  would send in the prescription and they
10  would send you --
11    A.  It was a prescription for Viagra,
12  and I pretty much -- if I'm not mistaken, I
13  saw an ad on TV and I transferred a
14  prescription from, like, Rite Aid to that
15  particular company.  I don't know the name
16  of it.
17    Q.  Have you ever had any pets?
18    A.  Any what?
19    Q.  Pets.  Cats, dogs?
20    A.  No.
21    Q.  All right.  You have testified
22  about the mucus and the blood in your mucus.
23  When was the first time that you ever
24  experienced that?
25    A.  It was -- first time?  I mean,
                                    Page 316
```

PROFESSIONAL SHORTHAND REPORTERS, INC    (800) 536-5255                                    (504) 529-5255
New Orleans * Baton Rouge * Covington * Shreveport

```
 1   about the odor?  Like called FEMA?
 2       A.  No, my mom.  My mom did.
 3       Q.  Your mom has?
 4       A.  Yes.
 5       Q.  I think you testified earlier that
 6   she called, and then what happened?
 7       A.  They did a runaround, gave her
 8   another number and said they would get back
 9   in touch with her.  And we just never
10   followed up on it.
11           I mean, that's when I started
12   telling the maintenance people during their
13   little checkoff, you know, that I was having
14   these problems.
15       MS. GREIF:
16           I have no other questions.  I have
17   a statement to make.  I'm asking that
18   Mr. Wright read and sign the transcript.
19       THE WITNESS:
20           Read it and sign it?
21       MS. GREIF:
22           Yes.  You will receive the
23   transcript from today's deposition, so I ask
24   that you read it and sign it.
25       THE WITNESS:
```
Page 325

```
 1       Okay.
 2   EXAMINATION BY MR. BONE:
 3       Q.  Mr. Wright, I have just a few
 4   follow-up questions to close out.
 5           One of the things you mentioned
 6   during examination by counsel for the
 7   government was that as late as 2008, when
 8   your mother was asking for renewals of the
 9   travel trailer lease, that if you didn't
10   live in that travel trailer, you would live
11   in your car, right?
12       A.  Yes.
13       Q.  Did you ever attempt to locate
14   another apartment or another place to live?
15       A.  No.
16       Q.  Okay.  So there is no
17   documentation of you looking or requesting
18   alternate housing between you and FEMA
19   saying, "I can't live in this travel
20   trailer, I would request that you put me
21   somewhere else"?
22       A.  No.
23       Q.  And there is no document between
24   you and FEMA or your mother and FEMA saying,
25   "There's an odor in this unit and we need
```
Page 326

```
 1   corrective action to be taken," correct?
 2       A.  She made the phone call and nobody
 3   called her back.  I told the maintenance
 4   people.  They never wrote nothing down, but
 5   they always told me they would have somebody
 6   come out about the situation.
 7       Q.  I understand.
 8           But my question is, did you ever
 9   write a document, did you ever write a
10   letter or did you ever have anyone on your
11   behalf write a letter to FEMA or anyone to
12   say, "There's an odor in my unit, it's
13   irritating to me and I want corrective
14   action to be taken"?
15       A.  No.
16       Q.  In 2005 -- let's say 2006, you
17   were a single man with no dependents making
18   approximately $30,000 a year, correct?
19       A.  That's correct.
20       Q.  You were financially able to get
21   an apartment if you wanted to?
22       A.  Basically, yeah.
23       Q.  All right.  In 2007, you were a
24   single gentleman with no dependents making
25   $47,000 -- over $47,000 a year.  You were
```
Page 327

```
 1   financially able to get an apartment if you
 2   wanted one, correct?
 3       A.  Yes.
 4       Q.  In 2008, we have already
 5   established that you made roughly $72,000 a
 6   year as a single individual with no
 7   dependents.  You were financially able to
 8   get an apartment if you had wanted one,
 9   correct?
10       A.  Yes.
11       Q.  And yet, despite the fact that you
12   made these complaints and you testified
13   about the complaints you had and you
14   testified that as early as 2006, you
15   believed the trailer you were living in made
16   you sick, you never attempted to locate
17   alternate housing on your own or through
18   FEMA; isn't that true?
19       A.  That's true.  But I also didn't
20   know the trailer was formaldehyde riddled.
21       Q.  Let me ask you about something.
22   If you had been provided the owner's manual
23   to this particular trailer, would you have
24   read it?
25       A.  If I had -- I mean, as far as the
```
Page 328

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255                            (504) 529-5255
New Orleans * Baton Rouge * Covington * Shreveport