# Transcript of the Testimony of
# **Bobbie R. Wright**

## Date taken: January 5, 2010

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)

## *\*\*Note\*\**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)                                          Bobbie R. Wright

```
          IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF LOUISIANA


   IN RE:  FEMA TRAILER        *   MDL NO. 1873
   FORMALDEHYDE PRODUCTS       *   SECTION:N(5)
   LITIGATION                  *
                               *
                               *
   THIS DOCUMENT RELATES TO:   *
   LYNDON T. WRIGHT V.         *
   FOREST RIVER, INC., ET AL., *
   DOCKET NO. 09-2977          *
                               *
   *****************************


           DEPOSITION OF BOBBIE R. WRIGHT, 15406 Blue
   Ridge Drive, Missouri City, Texas, taken in the
   offices of Reich & Binstock, LLP, 4265 San Felipe
   Street, Ste. 1000, Houston, Texas, on Tuesday, the
   5th day of January 2010.
```

Page 1

```
 1
 2        MIDDLEBERG, RIDDLE & GIANNA
            (By:  Richard A. Sherburn, Jr., Esquire)
 3          (Via Conference Call)
            450 Laurel Street, Ste. 1101
 4        Baton Rouge, Louisiana 70801
            (Attorneys for Defendant
 5            Flour Enterprises, Inc.)
 6
 7        JONES WALKER
            (By:  Amy B. Hanegan)
 8          (Not Present)
            8555 United Plaza Blvd.
 9        Baton Rouge, Louisiana 70809-7028
            (Attorneys for Defendant
10            Keystone)
11
12
13
14
15
16        ALSO PRESENT:
17          DOUG OVERSTREET
            CLS Legal Video
18
19
20        REPORTED BY:
21
            KATERI FLOT-DAVIS, CCR
22          Certified Court Reporter
            State of Louisiana
23
24
25
```

Page 3

```
 1
 2   APPEARANCES:
     REICH & BINSTOCK, LLP
 3     (By:  Dennis C. Reich, P.C.)
       (By:  Chris Pinedo, P.C.)
 4   4265 San Felipe, Ste. 1000
     Houston, Texas 77027
 5     (Attorneys for the Plaintiff)
 6
 7   GIEGER, LABORDE & LAPEROUSE, LLC
       (By:  Jason D. Bone, Esquire)
 8     (By:  Carson W. Strickland, Esquire)
     701 Poydras Street, Ste. 4800
 9   New Orleans, Louisiana 70139-4800
       (Attorneys for the Defendant,
10        Forest River, Inc.)
11   BAKER DONELSON BEARMAN CALDWELL
     & BERKOWITZ, PC
12     (By:  M. David Kurtz, Esquire)
     201 St. Charles Avenue, Ste. 3600
13   New Orleans, Louisiana  70170
       (Attorneys for the Defendant
14        Shaw Environmental)
15
     U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
16     (By:  Adam Dinnell, Esquire)
     1331 Pennsylvania Ave., NW., Room 8220-N
17   Washington, D.C. 20004
       (Attorneys for the Defendant
18        United States of America)
19
20
21
22
23
24
25
```

Page 2

```
 1              EXAMINATION INDEX
 2                              Page No.
 3
 4   By Mr. Bone.................................   9
 5
 6
 7   By Mr. Kurtz...............................   173
 8
 9
     By Mr. Dinnell.............................   188
10
11
12   By Mr. Pinedo..............................   221
13
14
15
16
17
18
19
20
21
22
23
24
25          *    *    *    *    *
```

Page 4

1 (Pages 1 to 4)

1    the rental assistance was for?
2         A.   What it was for?
3         Q.   In other words, if you received money for
4    rental assistance, what -- what you could put it
5    towards.
6         A.   I -- I'm not -- I -- I won't say I did or
7    didn't, because it was a lot of calls during that
8    time.  That was -- that was right after the storm,
9    so I probably did.
10        Q.   Okay.  And on 10-19, two days later, you
11   called -- it said -- the log reflects that applicant
12   called, and it says inference to how long it will
13   take for an inspector to come to her home and
14   request for a travel trailer to be put in her
15   backyard or as close as possible to New Orleans.
16            Informed applicant inspector will call to
17   inspect residence unless already out in the area.
18            Do you recall making a call to FEMA
19   specifically requesting that a travel trailer be
20   placed in the backyard of your property on Seminole
21   Lane?
22        A.   I was calling about the status in October?
23   No, no, no, no.  That don't -- not that I called
24   them.  Maybe they called me.  But I know I wasn't
25   asking about no trailer in October.

Page 81

1         Q.   Okay.  Do you recall how it was that you
2    came to get a travel trailer?
3         A.   That's what I'm trying to think about now.
4    I'm thinking they asked me if I had somewhere to put
5    a trailer.  If my property was enough -- big enough
6    for a travel trailer.  I -- I didn't even know they
7    were giving you trailers.  They the one asked me
8    about it.
9         Q.   Okay.  So it's your recollection that FEMA
10   asked you if you would like a travel trailer --
11        A.   Uh-huh.
12        Q.   -- and you indicated that you would,
13   correct?
14        A.   Right.
15        Q.   And do you recall when that conversation
16   would have taken place?
17        A.   No, no idea.
18        Q.   10-21, this is, again, two days after the
19   last entry.  Applicant called for status and update.
20            Do you recall making numerous calls to FEMA
21   during the period of September and October of 2005
22   regarding your status as it related to disaster
23   assistance?
24        A.   When I called FEMA the very first time --
25   -- I don't think I needed to call them all these

Page 82

1    times anymore, because there's not even enough time
2    for anything to have happened in these little days
3    here.  So I know -- you probably couldn't even get
4    through to FEMA on some of these dates they got
5    here.
6         Q.   Ma'am, are you saying that you didn't make
7    the telephone call?
8         A.   I know I didn't call FEMA about wondering
9    when the trailer was coming.  Because they asked me
10   if I wanted a trailer on my property, or could I --
11   you know, one fit.
12        Q.   And what was the reason that you decided to
13   have a trailer put on your property?
14        A.   Well, I figured if the trailer was there
15   and somebody was in it, they could keep an eye on
16   the house.  My son, he could keep an eye on the
17   house --
18        Q.   Was it --
19        A.   -- instead of, you know, just leaving it
20   sitting there.
21        Q.   Was it your intent to ever live in this
22   particular travel trailer?
23        A.   It was my intent to -- and it -- and it
24   still was as time went on, but it just never
25   happened.

Page 83

1         Q.   And what was the reason that -- that you
2    ended up not living in that particular travel
3    trailer?
4         A.   Well, one of the reasons was because my son
5    worked a lot, and he worked at night.  And the few
6    times I was there, when I did go there, that wasn't
7    too safe I didn't think.  So that kind of pushed me
8    back from wanting to go there and stay.
9         Q.   Right.  Because your son wasn't there at
10   night.  And after Katrina, the neighborhood changed
11   a little bit, and it wasn't as safe as it was
12   before?
13        A.   Not at all, because nothing was there.  No
14   houses occupied.  It was just kind of funny, so, you
15   know, I didn't trust just to go there and stay
16   there.
17        Q.   Right.
18        A.   I don't think that would have been a good
19   idea.
20        Q.   And that was because of the potential for
21   crime in the area, correct?
22        A.   Right.  And somebody breaking in the house
23   and taking whatever was in there and all that kind
24   of stuff.  So I figured, maybe, if the trailer was
25   there, it would kind of be a deterrent, but it

Page 84

21 (Pages 81 to 84)

1    Q.  Then you guys moved to 2315 Seminole.  Did
2  2315 Seminole have air conditioning in it, in that
3  house?
4    A.  Window air, yeah.  Window air conditioning.
5    Q.  In how many rooms?  Do you remember?
6    A.  There was five rooms.
7    Q.  Okay.  In the living room?
8    A.  Uh-huh.
9    Q.  In the bedrooms?
10   A.  Three bedrooms and a den.  They had air
11 conditioners in all those rooms.
12   Q.  Okay.  When he was growing up, were there
13 any pets in the house?
14   A.  No.
15   Q.  Now, we talked about after the hurricane,
16 you came to Houston and Lyndon came with you
17 briefly.  And then he chose to go back to New
18 Orleans shortly after the storm, right?
19   A.  Right.
20   Q.  You were then asked eventually by FEMA
21 whether you wanted a travel trailer placed at 2315
22 Seminole, correct?
23   A.  Right.
24   Q.  And you said that that was something that
25 you'd be interested in, right?

                                        Page 193

1    A.  Uh-huh, yes.
2    Q.  And then you and Lyndon were going to
3  jointly live in the travel trailer to keep a watch
4  on 2315 Seminole, correct?
5    A.  Uh-huh.
6    Q.  Lyndon went back to New Orleans and
7  eventually lived in the travel trailer, right?
8    A.  Right.
9    Q.  But you never ended up going to live in the
10 travel trailer, except for short periods of time
11 visiting Lyndon, right?
12   A.  Right.
13   Q.  Did you ever call or write to FEMA to let
14 them know that only your son would actually be
15 occupying the unit and not you and your son?
16   A.  No.
17   Q.  Okay.  Do you remember if Lyndon -- you had
18 listed Lyndon as a joint applicant on your
19 application for assistance from FEMA, or was it just
20 you as the applicant?
21   A.  It was just me.  We -- both our names were
22 on there, but they only considered one person.
23   Q.  So you -- you were the loan applicant,
24 right?
25   A.  Uh-huh.  Uh-huh.

                                        Page 194

1    Q.  Now, you've talked about -- I know we're
2  having some -- some trouble pinning down the exact
3  time periods that you went and visited Lyndon --
4    A.  Right.
5    Q.  -- when he was in the trailer.
6    A.  Right.  Right.
7    Q.  But I believe you said when you'd stay in
8  the trailer with Lyndon on a couple of these trips
9  to visit him, you'd use the air conditioning in the
10 unit or the air conditioning would be on in the unit
11 if it was hot outside, right?
12   A.  Uh-huh.
13   Q.  Would you ever open the doors and windows
14 of the unit to get some air inside of the trailer?
15   A.  Open the windows?  Yeah, the windows always
16 stayed cracked.
17   Q.  Okay.  Did you ever directly talk with
18 Lyndon about whether he was looking for other places
19 to live?
20   A.  Did I talk to him about whether he was
21 looking?
22   Q.  Yeah.  Did you ever have any conversations
23 about, you know, I'm looking at apartments here, I'm
24 looking around for a new place to live?
25   A.  Well, I mean, not -- not just talked about

                                        Page 195

1  it.  I mean, I guess he mentioned it a couple of
2  times, but not just had deep conversations about it.
3    Q.  Okay.  He didn't tell you specifically
4  about any plans that he had in terms of apartments
5  that he was looking into or homes that he was
6  looking into?
7    A.  Just kind of randomly.  You know, not --
8  not specific places of intention or found something.
9  I'm looking at this, like that.  But he was thinking
10 about apartments, houses.  He was thinking about it.
11   Q.  Okay.  Do you know if while Lyndon was
12 occupying the trailer -- I know you said he came to
13 Texas at some point to visit you.  Do you know if
14 Lyndon would ever stay with friends or neighbors
15 instead of staying in the trailer during that time
16 period?  By that I mean, friends or neighbors --
17   A.  I don't think -- I don't think so.
18   Q.  Okay.  Now, we had talked a couple minutes
19 back, you were offered the travel trailer, you
20 accepted it.  Lyndon ended up living in it, but you
21 never ended up joining him, right?
22   A.  Right.
23       MR. PINEDO:
24          Objection.  Form.
25 (BY MR. DINNELL)

                                        Page 196

49 (Pages 193 to 196)