1

1     P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Going on the video
3     record.  This is the beginning of Tape No. 1 in
4     the deposition of Robert C. James.  Counsel, will
5     you please identify yourselves.

88

1     Q.   And that would be 14.4, 13.3 10.6, 9.4 with
2     a mean of 3.63.  Those are parts per billion of
3     formaldehyde; is that right?
4     A.   At the bottom of 14?
5     Q.   Yes.
6     A.   Yes.
7     Q.   And Kenner, Louisiana, that's just down the
8     road from or its part of the New Orleans metro area,
9     isn't it?
10    A.   I don't know where Kenner is, to be honest.
11    It's an outdoor air study.
12    Q.   If somebody represented to you that it's
13    directly adjacent to and considered part of the larger
14    New Orleans area, you wouldn't have any basis to
15    disagree with that, would you?
16    A.   No, I wouldn't.

17    Q.   You also reordered certain sections of your
18    report, certain sections have moved around; is that
19    right?
20    A.   Yes.
21    Q.   Why was that done?
22    A.   I thought it gave a better line of logic.
23    Q.   Now, Section 4.4 also contains some new
24    material, doesn't it?
25    A.   I don't know.

89

1     Q.   Formaldehyde and other aldehyde compounds in
2     foods?
3     A.   I don't remember that that's new or not.  I
4     mean on some of these subjects, I had discussions
5     about background exposure levels in different areas,
6     and I just tried to keep them separated.  I might have
7     added some additional references to a subject but --
8     Q.   Well, Section 4.4, formaldehyde and other
9     aldehyde compounds in foods, that's not -- that
10    doesn't deal with the background formaldehyde rate,
11    does it?
12    A.   Well, in a sense it does.  It's
13    concentrations that you eat in your diet.
14    Q.   All right.  There's new text beginning on
15    the bottom of page 22 where it states, it is
16    estimated.  That's new next, isn't it, that paragraph?

17   A.   I don't know.  I don't have the other one in
18   front of me.  I know I made some changes.  I tried to
19   make it a better report, more thorough report.
20   Q.   Now, this Table 4.4, that's new, isn't it?
21   A.   Like I said, I don't know.  I don't have the
22   other one in front of me.  I don't know whether I did
23   a table or not.  I know we discussed formaldehyde in
24   foods in the first report, I'm pretty sure.
25   Q.   I'm going to show you my copy of your report

                                            90

1   on Alexander Cooper.  I have some highlights on there.
2   I'm going to ask for that back.  Do you see Section
3   4.4?
4   A.   Uh-huh (affirmative).
5   Q.   Is that a yes.
6   A.   Yes.  This versus this.  It's been expanded.
7   Q.   And Table 4.4 is not included in your prior
8   report, is it?
9   A.   No, it's not.
10   Q.   And this is where you give the formaldehyde
11   in food levels; is that right?
12   A.   It's one table, yes.
13   Q.   And formaldehyde in food really isn't
14   relevant to these numbers you have here in comparison
15   to free formaldehyde in the ambient air, is it?

16        MR. HINES:  Object to form.
17        THE WITNESS:  Concentrations in food
18   are not comparable to concentrations in air.
19   They're two different things.  Those are same as
20   concentrations in water.
21   BY MR. PINEDO:
22   Q.   So it would be silly to compare the amount
23   of formaldehyde in food with the amount of
24   formaldehyde that's in the ambient air, wouldn't it?
25        MR. HINES:  Object to form.

                                            91

1        THE WITNESS:  I don't do that.
2   BY MR. PINEDO:
3   Q.   No good scientist should do that, should
4   they?
5   A.   I didn't do that.
6   Q.   Well, do you think any scientist should make
7   a comparison between formaldehyde in food and
8   formaldehyde in air to show that there's similarities
9   between those two?
10   A.   They could, depending on dose.  I mean if
11   you were worried about some systemic toxicity or you
12   thought that some of the alleged diseases or injuries
13   in the person were caused by absorbed formaldehyde,
14   then one consideration would be the dose that you've
15   got by inhalation versus the dose you get from food

16    and inhalation and other sources.
17        Q.    Well, you would agree with me that people
18    don't get sick from formaldehyde in food when they
19    just naturally eat food?
20        A.    I'm not aware of anybody that does.
21        Q.    But you are --
22        A.    I don't know if any have had food allergies.
23        Q.    But that's a different story than -- a food
24    allergy is different from just a normal person, for
25    example, eating meat, poultry, or fish, isn't it?

92

1        A.    I would say that a normal person should not
2    be concerned about the levels of formaldehyde in any
3    of these.
4            MR. PINEDO:  Let's take a break.
5            THE VIDEOGRAPHER:  Going off the
6    record.
7    BY MR. PINEDO:
8        Q.    You cite the Owen paper for this.  Sir, is
9    the Owen paper, should it be somewhere in that stack
10   or in the stack that Mr. Hines is bringing up to us?
11       A.    I've been told every reference in this
12   report will be on that disk and will be copied.
13       Q.    Did you see the Owen paper in that stack
14   such that I'm going to be able to review it at

15   lunchtime or --
16       A.    I was not looking for it.  I was looking for
17   the ones that I remembered, on sections that I
18   remember I really added to.  I did not remember adding
19   a few here and a few on the other exposures.
20           MR. PINEDO:  Well, with that proviso,
21   I'm going to look for the -- see if I can't find
22   the Owen paper.  Rather than saying we just have
23   a half-hour lunch because we've got some
24   logistics to do --
25           THE WITNESS:  If you want longer,

93

1    that's fine.
2           MR. PINEDO:  If we want to say be back
3    here at 1:00.
4           MR. HINES:  That's fine.
5           THE WITNESS:  Yeah.
6        (Lunch recess taken.)
7           THE VIDEOGRAPHER:  Back on video
8    record.  This is the beginning of Tape No. 3.
9    The time is 1:18.
10   BY MR. PINEDO:
11       Q.    Doctor, before we took a break, we were
12   talking about some additions to your report that you
13   made after you did your analysis in the Alexander
14   Cooper case.  Do you remember that?

15     A.    Yes.
16     Q.    And I'd like to ask you to turn to your
17 report, Exhibit No. 3.  This is the report you issued
18 in the Dubuclet case.  Do you have that in front of
19 you?
20     A.    Exhibit No. 3?
21     Q.    Yes.
22     A.    Oh, you mean the report itself.  Okay.
23     Q.    Exhibit No. 3 is the report you issued in
24 the Dubuclet case?
25     A.    Yes.

94

1      Q.    Could you turn to page 23, please.
2      A.    Sure.
3      Q.    And do you have that table in front of you?
4      A.    Yes.
5      Q.    And that talks about formaldehyde in food;
6  is that right?
7      A.    Yes.
8      Q.    And the Owen paper, which we don't have with
9  us right now, did it mention, did it measure
10 formaldehyde in parts per million or was it milligrams
11 per deciliter or weight by volume?  What was it -- how
12 was it reported in the Owen paper?
13     A.    It's weight by weight.  It says the

14 formaldehyde concentration is parts per million.  I'm
15 sure that means micrograms per gram.
16     Q.    So you would have had to convert it;
17 correct?
18     A.    Or the table gave it that way.  I don't
19 know.  I'm just saying parts per million in a --
20 something like food, it would be micrograms per gram
21 of food tissue.
22     Q.    So we'd have to look at the Owen paper to
23 see how they reported it to determine whether or not
24 you or your staff did a conversion factor?
25     A.    Yes.

95

1      Q.    And you would agree with me that it would be
2  confusing talking about the amount of formaldehyde in
3  food in trying to make a comparison with the amount of
4  formaldehyde that is in the air?
5      A.    Yes.
6            MR. HINES:  Object to form.
7            THE WITNESS:  Yes.  I don't think you
8      compare the concentrations in the routes of
9      exposures.  They're different doses.
10 BY MR. PINEDO:
11     Q.    And you would consider that confusing to
12 make a comparison like that?
13     A.    Yes.  It can be, yes.

14  Q.   And it would also be misleading, wouldn't
15  it?
16  A.   Depends on what you're doing.  It could be
17  misleading.
18  Q.   Why did you include this report -- excuse
19  me.  Let me start over.  Table 4.4, why did you
20  include this in your Dubuclet report, as it was not
21  included in your prior report that you rendered about
22  formaldehyde in the Alexander Cooper case?
23  A.   I don't have any specific recollection.  I
24  reorganized.  I did not like some of the early
25  sections.  We reorganized them.  We added a few

96

1  papers.  I added a few papers to some new sections or
2  expanded on the Pamela Dalton work.  As I sit here, I
3  can't remember why.
4  Q.   If there was a conversion factor for
5  formaldehyde concentration in these foods because it
6  was reported weight by weight, was that a calculation
7  you would have done or somebody on your staff would
8  have done?
9  A.   It's whoever did the table.  I don't
10  remember who did the table.  But my scientific staff
11  knows how to go from parts per million to micrograms.
12  Q.   So it wouldn't have been you who did this

13  table?
14  A.   I don't think I did this table.  If I picked
15  this table, I would hand it to my secretary and have
16  her type it up the way it is.
17  Q.   During the break, there were some copies
18  from your file that were brought up.  Are you familiar
19  with that?
20  A.   I was told they were trying to finish the
21  copying.  That's all I know.
22  Q.   I don't believe that they're finished, but
23  they have made, it seems, substantial progress.
24  (Plaintiff's Exhibit No. 17 was marked for
25  identification.)

97

1  BY MR. PINEDO:
2  Q.   I'm going to show you what's been marked as
3  Exhibit No. 17.  Could you please identify that
4  document for me, sir.
5  A.   That's a bill from my accountant.
6  Q.   And is it a bill for Terra, Inc., your
7  corporation?
8  A.   Yes.
9  Q.   Is Chelsea Conanan with the United States
10  Department of Justice?
11  A.   Yes.
12  Q.   And what are the amount of that bill?

13   A.   It says $26,776.
14   Q.   And that's for the work you and your staff
15   have done in the Dubuclet case; is that right?
16   A.   Yes.
17   Q.   Do you know what the arrangement is?  The
18   United States pays the bill, and the attorneys for
19   Fleetwood reimburse them?  Do you know anything about
20   that?
21   A.   I don't.
22   Q.   Does it seem unusual to you that you're
23   being paid by the United States, but you're offering
24   testimony on behalf of somebody different?  In that
25   case, it would be Fleetwood?

                                    98

1          MR. HINES:  Object to form.
2          THE WITNESS:  I doubt that the United
3    States paid this.  My understanding is that we
4    sent them to the people we had contacts with.
5          I was told that we would be sending them
6    directly to the lawyers after this.  Denise,
7    having had the one contact, just probably sent it
8    on.
9  BY MR. PINEDO:
10   Q.   So you don't know what who paid that bill
11   that we have marked here as Discovery Exhibit No. 17?

12   A.   I do not.
13        (Plaintiff's Exhibit No. 18 was marked for
14   identification.)
15 BY MR. PINEDO:
16   Q.   I'm going to show you what we've marked as
17   Discovery Exhibit 18.  Could you please identify that
18   for me, sir.
19   A.   Yes.  It says it's another bill.
20   Q.   Is that a bill for your entity, Terra, Inc.,
21   for services you and your staff did on the Dubuclet
22   case?
23   A.   It says it is.
24   Q.   What's the date of Discovery Exhibit No. 18?
25   A.   October 13.  Date of the letter?

                                    99

1    Q.   Yes.
2    A.   Yes, October 13.
3    Q.   And what's the date of Discovery Exhibit No.
4  17?
5    A.   I don't know.  What does it say on it?
6          MR. PINEDO:  Mr. Hines?
7          THE WITNESS:  What's the date on the
8    letter?
9          MR. HINES:  September 2, 2009, for
10   Exhibit 17.
11 BY MR. PINEDO:

12   Q.   Exhibit 18, what's the total amount of the
13   bill?
14   A.   The total amount is $17,737.
15   Q.   And on the other invoice, the bill was
16   $26,000; is that right?
17   A.   Right.
18   Q.   So we add those two together, and we get
19   about $43,000?
20   A.   That sounds about right.
21   Q.   Do you know how much time has been spent by
22   your firm since these last two bills were sent out?
23   A.   I have no idea.  I never know.
24   Q.   If you would look at Discovery Exhibit No.
25   18, do you see anything in there --

                              100

1           If I could see that, Mr. Hines.
2           Do you see anything in there that would be
3   consistent with somebody doing some type of table or
4   chart or conversion from weight by weight to parts per
5   million?
6   A.   No.  I don't know if that means that one of
7   the scientific support staff typed it in or whether
8   Brenda Murphy typed it in.  I have no idea.  It might
9   be in their day-to-day work sheet.
10   Q.   So your employees -- like Harry James, Kevin

11   Tebrugge, Kelly McElroy -- would have a daily work
12   sheet?
13   A.   Kelly is assistant librarian.  She just runs
14   and gets the papers.  They have day-to-day time
15   sheets, yes.
16   Q.   So those day-to-day time sheets might
17   reflect in greater detail what these individuals did
18   on these specified dates and times?
19   A.   They may.  Generally we have a general
20   discussion as it -- for example, it says, deposition
21   summary, literature search.  And that covers a number
22   of tasks, so it will be like this.  I think I could
23   probably better ask -- take a table and ask who
24   remembers doing the table and figure out who it is.
25   Q.   Well, I only have one copy of this, and I'm

                              101

1   looking at Discovery Exhibit No. 17, which is the
2   invoice of September 2, 19 -- 2009, and there's an
3   entry for 81409, four hours, new sections drafted.
4   That's by Robert James is the recorded name.  That
5   would be you; correct?
6   A.   Yes.
7   Q.   What does information dissemination mean?
8   A.   A lot of that has to do with the library.
9   They pull the papers that we need.  They get them
10   downloaded or they go to the library and get it, and

11   then they get it to the person who wants to review
12   that information.
13       Q.   There is an entry here for Robert James for
14   fourth generation, 8/18/09, which says -- and the
15   billing amount was $2,275.  It says, worked on
16   Kornberg affidavit, edit, draft new version of report?
17       A.   Then that would mean that this bill came to
18   them for the wrong amount of work, wrong type of work.
19       Q.   Because Dr. Kornberg wasn't involved in this
20   case?
21       A.   I don't know that he is.  I think he was
22   involved in the first one, and I think what has
23   happened is Denise has -- had used cutoff times to
24   attribute work and put work that may have been under
25   the first case under the second case, which would

                                102

1    explain why the bills are a little larger than I
2    expected them.
3        Q.   How large did you expect the bills to be?
4        A.   I figured on something like this about
5    20,000 plus or minus 5.
6        Q.   There's another entry here for you on 8/13,
7    updated report, completing suggestions for Kornberg.
8    Did you make some kind of suggestions for questioning
9    for Kornberg or something like that?

10       A.   I was asked to evaluate his risk assessment
11   and to -- I mean I think I was asked to give some
12   questions.
13       Q.   Did you do so?
14       A.   Yes.  So it sounds like we've got stuff from
15   the first trial lapping over here because of the
16   timing.  And I think, to defend Denise, she probably
17   just assumed it was always going the same place and it
18   didn't matter much.  But it sounds like I'll have to
19   correct your bills.
20       Q.   He's in bankruptcy.  He wants that bill
21   corrected.
22            MR. HINES:  Thank you, Chris.
23            THE WITNESS:  I don't like to see the
24       wrong person get billed, but I don't watch what
25       Denise does.  But every once in a while, we have

                                103

1        a complaint.  It's a mistake she's made.
2    BY MR. PINEDO:
3        Q.   There's an entry here by Henry James.  It
4    says, review of new literature, incorporation into
5    Section 4 of Dr. James report.  Write, edit, and
6    rewrite this section.  And Section 4 --
7        A.   That was the food -- was the food section.
8        Q.   That's what we were just talking about;
9    correct?

10    A.    Yes.
11    Q.    There's another entry here that says,
12 discuss with JKB.  Prep for teleconference.
13 Calculated comparative risk and sent files to
14 attorney.  What is JKB?
15    A.    Janice Broden.
16    Q.    And she's with your firm; correct?
17    A.    Yes.
18    Q.    And what is the comparative risk that you
19 were calculating?
20    A.    Well, I don't remember.  My recollection is
21 that we looked at the risk assessment performed by
22 Kornberg and then went through calculations.  We might
23 have done comparative risk analysis, or we might have
24 talked about what those levels meant and the
25 limitations of those levels.

                            170

1        identification.)
2  BY MR. PINEDO:
3     Q.    Let me show you what's been marked as
4  Exhibit No. 27.  Could you please identify that
5  document.
6     A.    Looks like a summary of the deposition and
7  questions asked by Timia -- Timia, I'm sorry --

8  Dubuclet.
9     Q.    And Exhibits 27, 26, 25, and 24 were all
10 created by somebody in your office; is that right?
11    A.    That's correct.
12        MR. PINEDO:  Pass the witness.
13        MR. HINES:  I've got no questions of
14 this witness at this time.
15        MR. PINEDO:  I will repeat that
16 plaintiffs will be filing a motion to limit
17 testimony with regard to any that was not
18 previously submitted in his report.
19        THE VIDEOGRAPHER:  Going off video
20 record.  The time is 3:22.
21        (Deposition concluded at 3:22 p.m.)
22
23
24
25