# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| IN RE: | **FEMA TRAILER FORMALDEHYDE** | * | **MDL NO. 1873** |
| | **PRODUCTS LIABILITY LITIGATION** | * | |
| | | * | **SECTION "N" (5)** |
| | | * | |
| **THIS DOCUMENT IS RELATED TO:** 09-2977 | | * | **JUDGE ENGELHARDT** |
| *Lyndon Wright, et al. vs. Forest River and* | | * | |
| *Shaw Environmental, Inc.* | | * | **MAGISTRATE CHASEZ** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PRE-TRIAL ORDER

**1.    PRE-TRIAL CONFERENCE**

A Pre-Trial Conference in the above captioned matter will occur before this

Honorable Court on Thursday, February 25, 2010 at 9:30 a.m. at the United States District

Court for the Eastern District of Louisiana before the Honorable Judge Kurt Engelhardt.

**2.    APPEARANCE OF COUNSEL**

**FOR PLAINTIFF, LYNDON T. WRIGHT:**

GERALD E. MEUNIER
JUSTIN I. WOODS
**PLAINTIFFS' CO-LIAISON COUNSEL**
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
gmeunier@gainsben.com
jwoods@gainsben.com

        *-and-*



-1-

FRANK J. D'AMICO, JR.
AARON Z. AHLQUIST
The Law Offices of Frank J. D'Amico, Jr.
622 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-7272
Facsimile: (504) 525-1073
frank@damicolaw.net
aahlquist@damicolaw.net

    *-and-*

DENNIS C. REICH
Reich & Binstock, LLP
4265 San Felipe Street, Suite 1000
Houston, Texas 77027
Telephone: (713) 622-7271
Facsimile: (713) 623-8724
dreich@reichandbinstock.com

    *-and-*

MIKAL C. WATTS
Watts Guerra Craft
Four Dominion Drive
Building Three, Suite 100
San Antonio, Texas 78257
Telephone: (210) 447-0500
Facsimile: (210) 447-0501
mcwatts@wgclawfirm.com

    *-and-*

PAUL DOMINICK
Nexsen Pruet
205 King Street, Suite 400
Charleston, South Carolina 29401
Telephone: (843) 577-9440
Facsimile: (843) 720-1777
pdominick@nexsenpruet.com

    *-and-*

T. CHRISTOPHER PINEDO
Attorney at Law
802 N. Carancahua, Suite 2250
Corpus Christi, Texas 78470
Telephone: (361) 866-7444
Facsimile: (361) 866-7440
cpinedo@cpinedolaw.com

*On Behalf of Plaintiff, Lyndon T. Wright*

**FOR DEFENDANTS:**

ERNEST P. GIEGER, JR.
JASON D. BONE
CARSON W. STRICKLAND
Gieger, Laborde & Laperouse, LLC
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
egieger@glllaw.com
jbone@glllaw.com
cstrickland@glllaw.com

*On Behalf of Forest River, Inc.*

   -and-

M. DAVID KURTZ
KAREN K. WHITFIELD
ROY C. CHEATWOOD
Baker Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
dkurtz@bakerdonelson.com
kwhitfield@bakerdonelson.com
rcheatwood@bakerdonelson.com

*On Behalf of Shaw Environmental, Inc.*

3.   **REPRESENTED PARTIES**

    **A.**   **PLAINTIFF LYNDON T. WRIGHT**

        Plaintiff Lyndon T. Wright is a resident of the Parish of Orleans.

    **B.**   **DEFENDANT, FOREST RIVER, INC.**

        Forest River, Inc. is a corporation headquartered in Indiana.

    **C.**   **DEFENDANT, SHAW ENVIRONMENTAL, INC.**

        Shaw Environmental, Inc. is a corporation headquartered in Louisiana.

4.   **JURISDICTION**

In his Complaint, Plaintiff alleges that jurisdiction is proper based on 28 U.S.C. § § 1332 (diversity of citizenship) and based on 28 U.S.C. § § 1331 (federal question), as well as 28 U.S.C. § § 1367 (supplemental jurisdiction).  Jurisdiction is not contested by Defendants.

5.   **PENDING MOTIONS**

As of <u>February 22, 2010</u> at 4:30 p.m., the following motions remain outstanding:

    **A.**   **PLAINTIFF:**

      1.    Plaintiff's Motion for Partial Summary Judgment with Respect to Certain Affirmative Defenses of Forest River, Inc. (Doc. # 10940)

      2.    Plaintiff's Motion for Partial Summary Judgment with Respect to a Certain Affirmative Defenses of Shaw Environmental, Inc. (Doc. # 10942)

      3.    Plaintiff's Motion in Limine to Reference to Plaintiff Witnessing Previous Expert Testimony (Doc. # 11348)

      4.    Plaintiff's Motion in Limine to Any Reference to Malingering, Alcohol Abuse or Drinking Problems (Doc. #11352)

      5.    Plaintiff's Motion in Limine to Limit the Testimony of William Dyson (Doc. # 11354)

      6.    Plaintiff's Motion in Limine to Prohibit Reference to Unrelated, Non-Pled Claims (*Resolved by stipulation*) (Doc. # 11356)

7.  Plaintiff's Motion in Limine to Prohibit Reference to Formaldehyde in Foods and Other Products (Doc. # 11357)

8.  Plaintiff's Motion in Limine to Prohibit References to Matters in the Personal History of Tyshone Marsh (Doc. # 11360)

9.  Plaintiff's Motion in Limine to Prohibit References to the Inapplicability of Building Codes (Doc. #11362)

10. Plaintiff's Motion in Limine to Prohibit References to an Exemplar Trailer (Doc. # 11384)

11. Plaintiff's Motion in Limine to Prohibit References or Suggestions that the Water Leak at the Door was Caused by a Break In (Doc. #11387)

12. Plaintiff's Motion in Limine to Prohibit References to the Financial Matters of Bobbie Wright (Doc. # 11416)

13. Plaintiff's Motion for Reconsideration of the Court's Ruling Granting Defendant's Motion to Strike the Addendum to Dr. Larry Miller's Expert Reports (Doc. # 11695)

14. Plaintiff's Motion for Reconsideration on the Court's Ruling Granting Defendant's Motion to Strike the Plaintiff's Expert Supplemental Reports (Doc. # 11758)

## B.  DEFENDANT, FOREST RIVER, INC.:

1.  Defendants' Motion for Summary Judgment on Causation (Rec. Doc. 10933)

2.  Forest River, Inc.'s Motion for Partial Summary Judgment on Plaintiff's Mental Anguish Claims (Rec. Doc.10934)

3.  Forest River, Inc.'s Motion for Summary Judgment as to the Government Contractor Defense (Rec. Doc. 10936)

4.  Forest River, Inc.'s Motion for Partial Summary Judgment (regarding Forest River's duty to warn) (Rec. Doc.10937)

5.  Forest River, Inc.'s Motion to Exclude Plaintiff's Animation Exhibit (Rec. Doc. 11355)

6.      Forest River, Inc.'s Motion to Exclude Expert Testimony of Paul J. Lagrange (Rec. Doc. 11380)

7.      Forest River, Inc.'s Motion to Exclude Expert Testimony of Alexis Mallet (Rec. Doc. 11383)

8.      Forest River, Inc.'s Motion to Exclude Expert Testimony of Dr. Lawrence Miller (Rec. Doc. 11385)

9.      Forest River, Inc.'s Motion to Exclude Certain Comments to the Jury (Rec. Doc. 11389)

10.      Forest River, Inc.'s Motion to Limit the Testimony of Ervin L. Ritter (Rec. Doc. 11393)

11.      Forest River, Inc.'s Motion to Exclude the Expert Testimony of Dr. Edward H. Shwery (Rec. Doc. 11400)

12.      Motion to Limit the Testimony of Stephen Smulski, PhD (Rec. Doc. 11403)

13.      Motion to Exclude the Expert Testimony of Patricia Williams, PhD, DABT (Rec. Doc. 11404)

**C.      DEFENDANT, SHAW ENVIRONMENTAL, INC.:**

1.      Shaw Environmental, Inc.'s Motion for Summary Judgment on Causation (Rec. Doc. 10929)

2.      Motion for Summary Judgment Based Shaw Environmental, Inc.'s Status as a Government Contractor (Rec. Doc. 10941)

3.      Shaw Environmental, Inc.'s Motion for Partial Summary Judgment Regarding "Blocking" (Rec. Doc. 10935)

4.      Shaw Environmental, Inc.'s Motion for Partial Summary Judgment Regarding Failure to Warn (Rec. Doc. 10946)

5.      Shaw Environmental, Inc.'s Motion for Partial Summary Judgment Regarding Plaintiff's Maintenance Claims (Rec. Doc. 10947)

6.      Shaw Environmental, Inc.'s Motion for Partial Summary Judgment on Plaintiff's Mental Anguish Claims (Rec. Doc. 10945)

7.      Shaw Environmental, Inc.'s Motion in Limine to Exclude References to Building Codes (Rec. Doc. 11414)

8.  Shaw Environmental, Inc.'s Motion in Limine to Exclude Expert Testimony of Paul Hewett, Ph.D. (Rec. Doc. 11415)

9.  Shaw Environmental, Inc.'s Motion in Limine to Exclude Expert Testimony of Charles David Moore (Rec. Doc. 11417)

6.  **BRIEF SUMMARY OF MATERIAL FACTS**

A.  **PLAINTIFF'S SUMMARY OF THE FACTS**

Prior to Hurricane Katrina, Plaintiff Lyndon Wright (hereinafter "Lyndon") resided with his mother Bobbie Wright (hereinafter "Ms. Wright") in her home.  As a result of Hurricane Katrina, Lyndon and Ms. Wright were displaced from their permanent home at 2315 Seminole Lane in New Orleans, Louisiana.  Since Ms. Wright's home was rendered uninhabitable as a result of Hurricane Katrina, she was deemed eligible to receive emergency housing assistance from the defendant Federal Emergency Management Agency (hereinafter "FEMA"), pursuant to the Stafford Act and applicable federal regulations.  The emergency housing assistance provided to Ms. Wright was in the form of a travel trailer (hereinafter "the Trailer") manufactured by the defendant, Forest River, Inc. (hereinafter "Forest River"), with Vehicle Identification Number (VIN) 4X4TSMH296C008992. The trailer was manufactured in Rialto, California in November, 2005.  Ms. Wright moved to Houston and gave full authority for her son Lyndon to occupy and reside in the Trailer.

The Trailer was delivered to Lyndon for occupancy in New Orleans, Louisiana, at 2315 Seminole Lane in late November 2005, but was not ready for occupancy until mid-Febrary 2006, due to lack of electrical hook-up.

The Trailer was installed at the above location and made ready for residential occupancy by Shaw Environmental, Inc. (hereinafter "Shaw"), and/or its subcontractor RCG Enterprises (hereinafter "RCG") on behalf of Shaw, by being hooked up to residential utilities, residential sewerage and water.  The trailer was also installed onto concrete block piers, with its weight off of

the wheel base, and stairs and a landing were attached to allow access to the Trailer, pursuant to a contract between Shaw and FEMA.

Lyndon began living in the Trailer in March, 2006 and stopped living there in July, 2008 when permanent housing became available. He resided continuously in the Trailer during this period of time. When Wright moved into the trailer he noticed a smell, but was told it was a "new car smell." Over a number of months this odor changed into a "musty, wet carpet smell."

Forest River had a duty to warn Lyndon about the dangers and risks of formaldehyde in the travel trailer; this duty was continuing in nature, and legally was owed to Lyndon by Forest River during the entire period that Lyndon occupied this travel trailer. The exposure of Plaintiff Lyndon Wright to formaldehyde off-gassing from the travel trailer resulted from the normal, foreseeable, and intended use of the travel trailer as an emergency housing unit, without substantial alteration, in the condition in which Forest River sold the travel trailer. The design of the travel trailer as a housing unit, including the use of particle board, hardwood plywood, medium density fiberboard, other composite wood products, and other products that contain urea-formaldehyde or urea-formaldehyde resins, is dangerous and defective and posed an unreasonable risk of injury to Plaintiff Lyndon Wright. The use of particle board, hardwood plywood, medium density fiberboard, and other composite wood products that contain formaldehyde constitutes a dangerous defect in composition or manufacture that posed an unreasonable risk of harm to Lyndon Wright. While Forest River sold the Trailer to be uses as temporary housing, the owner's manual indicates clearly that the Trailer is a "recreational vehicle" and not intended for residential occupancy. The Forest River travel trailer was in a defective condition and was unreasonably dangerous under its intended use as temporary residential housing at the time the travel trailer left Forest River's control. Lyndon Wright was an intended and foreseeable user of the travel trailer, and the damages and losses to Lyndon reasonably

could have been anticipated by Forest River.  Further, an alternative design was already in place at Forest River which would have eliminated or greatly reduced Lyndon's exposure to formaldehyde.

The defects in the travel trailer are the result of and/or include, but are not limited to, the following:

1.    failing to design the travel trailer so as not to emit dangerous levels of formaldehyde;

2.    providing a travel trailer which, by virtue of its design and/or manufacture and/or composition, was unreasonably dangerous under reasonably anticipated use as an emergency housing unit;

3.    providing a travel trailer which, by virtue of a lack of an adequate warning(s), was unreasonably dangerous under its anticipated use as an emergency housing unit;

4.    providing a travel trailer which did not conform to the implied warranties made by Forest River regarding its fitness for use as a Temporary Housing Unit;

Further, Forest River negligently failed to: (1) adequately test the travel trailer to properly evaluate the levels of emissions of formaldehyde under foreseeable conditions for extended periods of time; (2) conduct formaldehyde testing of travel trailers for Urea Formaldehyde prior to shipping them from Forest River plants; (3) test the travel trailer for formaldehyde once becoming aware of same through the news media and other outlets; and (4) adhere to residential or building codes in the manufacture of a unit intended for residential occupancy.

The Forest River travel trailer provided to Lyndon Wright by FEMA was installed and hooked up to utilities and services for residential purposes by Shaw and/or its subcontractors, RCG, pursuant to a contract between Shaw and FEMA.  Shaw and/or its subcontractor installed the travel trailer unit by "jacking" and "blocking" the unit up onto concrete piers, transferring the weight off of its wheels.  In the process of jacking the trailer, and by jacking and blocking the trailer up off of its wheel base, Shaw created stress and flexing on the frame of the unit.  The unit and frame were not designed to be supported off of its wheel base.  Such stress and flexing created distortion of the

trailer's shell allowing water moisture and air and heat intrusion, which contributed to increased formaldehyde off-gassing and exposure and mold intrusion into this unit. Further, Shaw failed to follow explicit instruction as to the actual installation of the travel trailer. Shaw also failed to take into account the shifting or settlement of soil under the travel trailer which led to uneven weight distribution. Shaw knew of problems with formaldehyde emissions in travel trailers it was installing, but took no action to warn or protect residents and took no actions to ensure its resident would receive the owners manual which contained warnings and information about Formaldehyde.

Lyndon seeks compensatory damages for: physical pain and suffering; mental anguish and emotional distress including, but not limited to fear of cancer; future medical expenses; including costs for future medical treatment, services, and/or procedures to address physical and/or mental injuries from formaldehyde exposure which are currently manifest; the aggravation of Lyndon's pre-existing allergies, development of asthma, exacerbation of rhinosinusitis, the growth of a tumor in his throat and coughing up blood every morning, and other conditions; fear of cancer; and/or daily life activities suffered and to be suffered by Lyndon as a result.

### B.   DEFENDANT, FOREST RIVER, INC.'S SUMMARY OF THE FACTS

Forest River is a leading manufacturer of recreational vehicles and has been in business since 1996. After hurricane Katrina, Forest River was approached by FEMA, through North American Catastrophe Services, to produce travel trailers for disaster relief efforts on the Gulf Coast. In response to FEMA's request, Forest River produced 5,000 units, all built to specifications supplied by FEMA. Forest River manufactured these units utilizing the same materials, production facilities, employees and quality control procedures as it did its commercially available units. Indeed, Forest River postponed commercial production to supply FEMA's need.

Wright's travel trailer, VIN No. 4X4TSMH296C008992, was manufactured in November

2005 at Forest River's facility in Rialto, California. The parties in this case have stipulated that this trailer was manufactured using only low formaldehyde emitting ("LFE") wood products. Prior to providing this trailer to plaintiff, FEMA inspected and accepted the unit for use.

In March 2006, plaintiff Lyndon Wright moved into a Forest River travel trailer originally provided to his mother by FEMA. The unit was installed by a subcontractor of Shaw Environmental, Inc. at 2315 Seminole Lane in New Orleans. At the time of delivery, there was no damage to the unit. Wright occupied the trailer until July 2008.

Wright has claimed various physical and emotional injuries resulting from his time in the trailer. Despite these allegations, plaintiff has not been diagnosed with any formaldehyde-related condition by any of his treating physicians and has failed to demonstrate any causal relationship between his alleged exposure to formaldehyde and any medical condition.

Forest River denies that there is any aspect of the construction or design of the unit occupied by Lyndon Wright which render the unit unreasonably dangerous and denies plaintiff's allegation that Forest River failed to warn Wright of any such condition.

## C.  DEFENDANT, SHAW ENVIRONMENTAL, INC.'S SUMMARY OF THE FACTS

In the aftermath of Hurricane Katrina, FEMA was tasked with providing various forms of assistance to tens of thousands of displaced citizens in the Gulf Coast Region. On September 30, 2005, FEMA and Shaw executed an Individual Assistance/Technical Assistance Contract ("IA/TAC"), No. HSFEHQ-05-D-0573, under which Shaw would assist FEMA in its mission to provide assistance to disaster victims, pursuant to individual task orders issued by FEMA. Task Order 15 covered the hauling, installing, maintenance and deactivation of mobile homes, park models and travel trailers, all of which are various types of emergency housing units ("EHUs") that FEMA chose to provide to displaced residents. Shaw played no role in, was not asked to, and did

not evaluate the use of any of these structures as forms of temporary housing. Rather, that decision was made by FEMA, which had experience in using mobile homes and travel trailers as emergency housing since Hurricane Andrew struck Florida in 1992.

Shaw's contract with FEMA set forth precise specifications on how the travel trailers were to be delivered, installed, blocked, leveled, anchored, attached to utilities, outfitted with steps or handicap ramps/platform steps, winterized, and otherwise be made ready for occupancy. In particular, the contract required Shaw to "block" and level travel trailers on six concrete piers constructed in a precise fashion. Shaw had no discretion whatsoever with regard to how the piers would look or the fact that trailers had to be installed on piers. These detailed specifications were drafted by FEMA and provided to Shaw by FEMA, along with a pier diagram prepared by the U.S. Army Corps of Engineers. FEMA never requested any engineering/support/expertise from Shaw relating to the Government's method for blocking the trailers.

Shaw retained qualified and experienced subcontractors to perform the actual installation of travel trailers. Shaw's installation subcontractors were licensed mobile home installers, and although there are no federal, state or local regulations concerning installation of travel trailers, these subcontractors were more than capable of performing the simpler task of installing travel trailers as well. Shaw also conducted 100% quality control ("QC") inspections on travel trailers installed by its subcontractors, utilizing a rigorous program that checked each trailer to ensure that it met the FEMA requirements. Shaw separately inspected, or had one of its subcontractors inspect, every single installation during the "Ready for Occupancy" ("RFO") process, and again during the "lease-in" process, this time with the trailer occupant present. Additionally, FEMA had various types of technical monitors and QC inspectors in the field on a regular basis checking on the contractors' compliance with the installation specifications.

-12-

A travel trailer manufactured by Forest River, Inc., bearing VIN No. 4X4TSMH296C008992 ("the Trailer"), was provided by FEMA to Plaintiff's mother, Bobbie Wright, as emergency housing. Shaw was assigned the task of delivering, installing and making ready for use the EHU assigned to Bobbie Wright.  The Trailer was picked up at FEMA's designated staging area and installed in accordance with the FEMA specifications at 2315 Seminole Lane, New Orleans, Louisiana, on November 21, 2005, by one of Shaw's subcontractors, RCG Enterprises, Inc.

Due to the difficulties that Entergy experienced in restoring electrical power to the area where the Trailer was located, the Trailer could not be powered up and made ready for occupancy until February 2006.  Once power was established on February 11, 2006, Shaw was able to make the Trailer fully ready for occupancy.  Shaw's RFO Checklist confirms that the Trailer was inspected on February 12, 2006, and confirmed to be properly blocked on concrete piers, anchored with required straps, connected to all utilities, and outfitted with propane tanks, battery and steps.  On February 13, 2006, Plaintiff conducted a "lease-in" walk-through inspection of the Trailer with Shaw's subcontractor, and found it to be in good condition, as indicated by his signature on the lease-in forms. In addition to Shaw's own quality control program (and Plaintiff's inspection of the Trailer), FEMA sent inspectors out to the Trailer on at least four separate occasions – February 8, 10, 17, and  21, 2006 – to conduct inspections.  FEMA never indicated to Shaw that there was anything wrong with the Trailer or its installation.

Although Plaintiff was "leased-in" on February 13, 2006, he elected to remain on the cruise ship where he had been living until some time in March, 2006, at which point he moved to the Trailer.  After Plaintiff moved into the Trailer, Shaw maintained it for less than three months, until June 1, 2006, when C. Martin Company (another FEMA contractor) assumed maintenance responsibilities.  During the brief period of Shaw's maintenance, Plaintiff lodged no formaldehyde

or other odor-related complaints; indeed, he reported only one maintenance issue – a broken furnace that was repaired to his satisfaction.  Also during this period, Shaw made two monthly maintenance inspections of the Trailer; on both occasions, no deficiencies were noted.  At the time Shaw turned over maintenance responsibilities, a representative of C. Martin signed a Preventative Maintenance Form, indicating that no maintenance issue existed with regard to the Trailer as of June 1, 2006.

Plaintiff continued to live in the Trailer for over two more years after Shaw's maintenance responsibility for the Trailer ended.  Even at the end of that period, Plaintiff and his mother continued to sign off on inspection reports from other FEMA contractors and/or subcontractors, confirming that nothing was wrong with the Trailer.

Sometime after Plaintiff moved out of the Trailer in July 2008, it was deactivated and hauled (by a third party, not Shaw) to Melville, Louisiana, where it was hauled off road and sat in a field until August 2009, when it was first seen by plaintiff's experts.  FEMA did not maintain the Trailer at all once it was parked in the FEMA trailer "graveyard."

Throughout Shaw's response to Hurricane Katrina, the presence of formaldehyde or strong odors in the trailers was never a major issue.  Based on the "new smell" that some individuals noticed when first entering a trailer that had been closed up, a practice had developed of airing out the trailers at Shaw's trailer staging yard prior to installation.  FEMA, however, never requested that Shaw do anything with regard to formaldehyde, and nothing was required of Shaw other than to install the trailers precisely as required by the IA/TAC.

On March 20, 2006 – after a Biloxi news station had aired a story concerning formaldehyde in the travel trailers selected and provided by FEMA – Shaw received an email from FEMA's Brian Boyle to the IA/TACs inquiring about their processes for airing out trailers and formaldehyde.  The very next morning, Shaw responded to Mr. Boyle by email, attaching its trailer staging yard

operating procedures, which showed that Shaw routinely ventilated trailers. According to Mr. Boyle, FEMA was satisfied with Shaw's response, and FEMA required nothing further from Shaw.

At all times during its contract with FEMA, Shaw acted reasonably and prudently, and in compliance with its FEMA contract. Shaw denies that it was negligent in any manner, particularly with regard to the installation and maintenance of the trailer occupied by Mr. Wright. The evidence will show that Shaw did not damage the Trailer in any way and that Shaw certainly did not cause or exacerbate the level of formaldehyde in the Trailer.

7.     **UNCONTESTED MATERIAL FACTS**

A.     Plaintiff, Lyndon Wright, is a resident of the Parish of Orleans in the State of Louisiana.

B.     FEMA provided a trailer with Vehicle Identification Number (VIN) 4X4TSMH296C008992 to Plaintiff's mother, Ms. Bobbie Wright.

C.     Plaintiff Lyndon Wright occupied this travel trailer.

D.     This travel trailer was a SMT32BHLE manufactured by Defendant Forest River in Rialto, California on or about November 14, 2005 for use by FEMA as emergency housing.

E.     Forest River provided approximately 5,000 travel trailers to FEMA through North American Catastrophe Services (hereinafter "NACS") following hurricane Katrina.

F.     The travel trailer ultimately provided to Lyndon Wright was ordered from Forest River by NACS on or about September 8, 2005, and was shipped on or about November 16, 2005, pursuant to a Master Sales Agreement between Forest River and NACS.

G.     Certain components parts used by Forest River in the manufacture of this travel

trailer contained urea formaldehyde and/or urea formaldehyde resins.

I.     The Forest River travel trailer at question in this litigation was manufactured using only Low-Formaldehyde Emitting (LFE) wood products.

J.     The Forest River travel trailer was delivered and installed at 2315 Seminole Lane, New Orleans, LA on or about November 21, 2005.

K.     The Forest River travel trailer lease-in inspection took place on or about February 13, 2006.

L.     Lyndon Wright resided in this Forest River unit from approximately March 2006 to approximately July 2008.

M.     NACS sold this travel trailer to FEMA for use as emergency housing.

N.     This trailer arrived at the FEMA Staging Yard in Baton Rouge, Louisiana by Forest River on or about November 19, 2005.

O.     The travel trailer occupied by Lyndon Wright was 29'8" (without hitch) and 8' in width.

P.     The initial formaldehyde sampling taken via passive dosimetry of the Forest River unit bearing VIN 4X4TSMH296C008992 on October 1 and 2, 2008 by WD Scott Group was taken with an average interior temperature of approximately 85.3° F and average relative humidity of approximately 32.9%, and detected a formaldehyde concentration of .048 part per million (ppm), or 48 parts per billion (ppb).

Q.     When applying the Berge equation to the October 2008 sampling taken by the WD Scott Group (correcting the temperature calculation to 70° F), the sampling corrects from 48 ppb to 19 ppb.

R.     A one-hour active formaldehyde sample was taken on August 8, 2009 by WD Scott

Group of the same unit and pursuant to Plaintiff's testing protocol, which called for the unit to be closed and sealed for 72 hours prior to the sample collection, and found an indoor formaldehyde concentration of .095 ppm or 95 ppb, with an average interior temperature of 81.9° F and an average interior relative humidity of 86.6%.

S. A twenty-four hour passive dosimetry formaldehyde sample was taken by WD Scott Group, of the same unit and pursuant to the same Plaintiff testing protocol, on August 8 and 9, 2009, which found an indoor formaldehyde concentration of .130 ppm or 130 ppb at an average interior temperature of 84.9° F and an average interior relative humidity of 77.1%.

T. A one-hour active formaldehyde sample was also taken by Workplace Hygiene on August 8, 2009, contemporaneously with the sample taken by the WD Scott Group, and found an indoor formaldehyde concentration of .097 ppm or 97 ppb under the same environmental conditions.

U. Pursuant to the Defendants' testing, the trailer was ventilated for 29.5 hours and then air conditioned with the HVAC system set at 72° F for 48 hours prior to the sampling.

V. Workplace Hygiene collected a one hour active formaldehyde sample on August 13, 2009, pursuant to Defendants' testing protocol, and detected an indoor formaldehyde concentration of .035 ppm or 35 ppb.

W. Workplace Hygiene collected a twenty-four hour passive dosimetry sample on August 13 and 14, 2009 of the same unit, pursuant to Defendants' testing protocol, and detected indoor formaldehyde concentrations of .044 ppm or 44 ppb.

X. When applying the Berge equation to the August 8 and 9, 2009 sampling taken by the WD Scott Group (correcting the temperature calculation to 70° F), the August 8,

2009 one-hour active sampling corrects from 95 ppb to 46 ppb, and the twenty-four

hour passive dosimetry sampling corrects from 130 ppb to 53 ppb.

Y.   The weather data collected by Dr. Lee Branscome, Ph.D., a certified meteorologist,

attached to his report dated July 9, 2009, is representative of the weather conditions

at 2315 Seminole Lane in New Orleans, Louisiana and Melville, Louisiana, for all

time periods relevant to the travel trailer's actual location.

Z.   On March 20 and 21, 2006, Shaw was contacted by FEMA regarding formaldehyde

in the emergency housing units, to which Shaw responded on March 21, 2006 to

FEMA by providing a standard operating procedure which indicated that the unit

doors were left open to ventilate in the Shaw staging yards.

AA.   Shaw conducted no formaldehyde testing of travel trailers during its contract with

FEMA following hurricanes Katrina and Rita.

BB.   FEMA has provided thousands of travel trailers to displaced residents following

natural disasters in the United States since 1992, including displaced residents from

the Gulf Coast region.

CC.   FEMA provided approximately 143,000 emergency housing units to families across

the Gulf Coast, in response to Hurricanes Katrina and Rita.

DD.   On September 30, 2005, FEMA and Shaw executed an Individual

Assistance/Technical Assistance Contract ("IA/TAC") under which Shaw would

provide certain services for disaster relief anywhere in the United States, pursuant to

individual task orders issued by FEMA.

EE.   In response to Hurricane Katrina, FEMA issued Task Order 15 to Shaw to provide,

among other things, hauling, installation, and maintenance services to further

FEMA's mission of providing emergency housing solutions for citizens displaced by the hurricane.

FF.     Shaw's contract with FEMA provides specifications for travel trailer installation, including requirements for delivery, blocking and leveling, anchoring and straps, utilities hook-ups (including sewer, water, and electrical), steps, winterization, handicap ramps/platform steps, and numerous other minor tasks to make the trailers ready for occupancy.

GG.    FEMA directed Shaw to install the travel trailers on concrete piers constructed in a precise fashion, as set forth in Exhibit 7 ("Travel Trailer Installation") to the Performance Work Statement of the IA/TAC.

HH.    These specifications were drafted by FEMA and provided to Shaw by FEMA. FEMA also provided Shaw a pier diagram prepared by the U.S. Army Corps of Engineers.

II.     FEMA tasked Shaw with delivering, installing and making the trailer FEMA assigned to Bobbie Wright (the "Trailer") ready for occupancy.

JJ.     The Trailer was picked up at Shaw's staging yard and installed at 2315 Seminole Lane, New Orleans, Louisiana, on November 21, 2005, by RCG Enterprises, Inc., one of Shaw's subcontractors.

KK.    RCG Enterprises, Inc. held a license to install mobile homes in Louisiana.

LL.     Shaw inspected every travel trailer installed by its subcontractors to ensure that FEMA requirements were met.

-19-

MM.    Shaw separately inspected, or had one of its subcontractors inspect, every single trailer installation during the "Ready for Occupancy" ("RFO") process, and again during the "lease-in" process, this time with the occupant present.

NN.    Due to the difficulties that Entergy experienced in restoring electrical power to the area where the Trailer was located, the Trailer could not be powered up and made ready for occupancy until February 11, 2006.

OO.    On February 12, 2006, Shaw inspected the Trailer and confirmed that it was properly blocked on concrete piers, anchored with the required straps, connected to all utilities (i.e. sewer, water, and electricity), and outfitted with propane tanks, battery and steps.

PP.    On February 13, 2006, Plaintiff conducted a walk-through inspection of the Trailer with one of Shaw's subcontractors. Plaintiff signed off on the Trailer and was leased-in on February 13, 2006.

QQ.    After lease-in, Plaintiff remained on the cruise ship where he had been living until some time in March, 2006, at which point he moved to the Trailer.

RR.    After Plaintiff moved into the Trailer, Shaw maintained it for less than three months, until June 1, 2006, when C. Martin Company assumed maintenance responsibility.

SS.    During the period of Shaw's maintenance, Shaw conducted monthly inspections of the Trailer in April 2006 and May 2006. No problems with the Trailer were noted during those inspections.

TT.    At the time Shaw turned over maintenance responsibilities, a representative of C. Martin Company signed a Preventative Maintenance Form indicating that no maintenance issue existed with regard to the Trailer as of June 1, 2006.

UU.    Plaintiff continued to live in the Trailer for two more years after Shaw's maintenance

responsibility for the Trailer ended.

VV.   Plaintiff first noticed a leak in the Trailer in 2007.

WW.   Sometime after Plaintiff moved out of the Trailer in July 2008, the Trailer was deactivated and hauled by a third party (not Shaw) to Melville, Louisiana, where it was hauled off road and sat in a field until August 2009, when it was inspected by the parties' experts in this case.

XX.   FEMA did not maintain the Trailer at all once it was located in the FEMA storage yard in Melville, Louisiana.

YY   At all times the travel trailer bearing VIN 4X4TSMH296C008992 (the "Wright unit") was located at plaintiff's residence at 2315 Seminole Lane, New Orleans, Louisiana, a vent cap was present on the roof of the travel trailer.

ZZ.   During the first day of inspection and testing of the Wright unit in August 2009 at the FEMA storage site in Melville, Louisiana, the vent cap that was once present on the roof was missing.

AAA.   Any and all moisture damage observed in the bathroom area of the Wright unit during the August and September 2009 testing was the result of bulk water intrusion caused by the missing vent cap.

## 8.   CONTESTED ISSUES OF FACT

1.   Whether or not the Forest River travel trailer provided to Lyndon Wright by FEMA contained levels of formaldehyde which were hazardous to the health and well being of Lyndon Wright.

2.   Whether or not the Forest River travel trailer provided to Lyndon Wright by FEMA contained levels of formaldehyde which injured Lyndon Wright.

3.      Whether or not Plaintiff Lyndon Wright was given an Owner's Manual with this travel trailer.

4.      The nature, extent and adequacy of all pertinent warnings allegedly provided to the Plaintiff Lyndon Wright by Defendant Forest River.

5.      Whether or not the Forest River trailer occupied by Plaintiff was unreasonably dangerous in its design for its intended or reasonably foreseeable use by Plaintiff, Lyndon Wright.

6.      Whether or not the Forest River trailer occupied by Plaintiff was unreasonably dangerous in its construction or composition for its intended or reasonably foreseeable use by Plaintiff, Lyndon Wright.

7.      Whether or not Forest River had alternative designs available to it at the time it manufactured the unit occupied by Lyndon Wright.

8.      Whether or not the Forest River trailer was unreasonably dangerous in its intended or reasonably foreseeable use, based on inadequate warnings to Plaintiff Lyndon Wright.

9.      Whether or not Shaw failed to provide an adequate warning regarding Urea Formaldehyde inside the trailer occupied by Plaintiff Lyndon Wright that rendered the unit unreasonably dangerous.

10.     Whether or not Shaw failed to provide adequate warning of Formaldehyde in the Emergency Housing Units to Lyndon Wright.

11.     The facts and circumstances surrounding the handling of the Forest River unit by Shaw and/or its employees and/or agents.

12.     The amount of damages owed to Plaintiff Lyndon Wright as a result of the actions of Defendants, Forest River and Shaw, regarding:

    A.     Past, present, and future physical pain and suffering of Lyndon Wright;

    B.     Past, present, and future mental anguish and emotional distress of Lyndon Wright including, but not limited to fear of cancer;

    C.     Future medical expenses for Lyndon Wright; and

    D.     Loss or impairment of life's pleasures for Lyndon Wright and other damages which the trier of fact deems appropriate in accordance with the evidence.

13.     The specifications in all contractual agreements between the United States/FEMA and/or Forest River and/or Shaw; and the respective parties' knowledge of, and communication with one another about, the risks to Plaintiff Lyndon Wright arising from any such specifications.

14.     Whether Lyndon Wright has any current medical conditions as a result of exposure to formaldehyde emitted by the Forest River travel trailer while he lived there.

15.     Whether Lyndon Wright has any permanent medical conditions as a result of exposure to formaldehyde from the Forest River trailer.

16.     Whether formaldehyde can cause permanent damage; and if so, at what level of exposure.

17.     Whether formaldehyde can cause cancer; and if so, what type of cancer and at what level of exposure.

18.    Whether Lyndon Wright has been exposed to levels of formaldehyde from the Forest River trailer sufficient to cause him to have an increased risk of cancer.

19.    Whether exposure to formaldehyde at the levels present in the Wright trailer would cause a person to have a reasonable fear of contracting cancer.

20.    Whether or not composite wood products containing formaldehyde caused formaldehyde off-gassing in this travel trailer thereby causing Plaintiff to be exposed to formaldehyde for approximately 27 months.

21.    Whether the amount, composition and manner of use of composite wood products can cause formaldehyde off-gassing in a travel trailer sufficient to cause Plaintiff to be exposed to hazardous levels of formaldehyde.

22.    Whether the manufacture of the Forest River trailer took any residential or building codes into account.

23.    What level of formaldehyde is necessary, if any, is capable of causing eye, nose and/or throat irritation, asthma, neuroma development, skin irritation or other health effects.

24.    Whether the trailer used by Lyndon Wright was damaged prior to, during, or after the initial installation on Seminole Lane in New Orleans, such that the interior air formaldehyde levels were actually increased.

25.    Whether Shaw and/or its subcontractor which jacked and blocked the Wright trailer were trained and/or competent to do so.

26.    Whether the installation of the Forest River trailer on Seminole Lane was in compliance with government specifications.

27.    Whether the installation of the Wright trailer complied with applicable codes.

28.    Whether Shaw's jacking, blocking and/or installation of this unit caused an increase in formaldehyde off-gassing.

29.    Whether Shaw's jacking, blocking, and/or installation of this unit caused any warping or flexing of the frame sufficient to cause damage to the Trailer.

30.    Whether Shaw knew or should have known that soil would have shifted after the Trailer was installed leading to uneven weight distribution on the frame of the Trailer.

31.    Whether or not the travel trailer could have been tested for formaldehyde off-gassing prior to leaving the Rialto, California plant.

32.    Whether or not there existed an unreasonably dangerous level or levels of formaldehyde emissions during the period of Plaintiff's occupancy of the Forest River trailer.

33.    Whether formaldehyde in a gaseous state can cause asthma, and if so, at what level.

34.    Whether Lyndon Wright has any current medical condition caused by exposure to formaldehyde emitted by the Forest River trailer while he lived there.

35.    Whether Plaintiff would have read and heeded any warning provided by Forest River.

36.    Whether FEMA had knowledge of any alleged damage-causing characteristics and the extent of that knowledge.

37.  Whether FEMA is a sophisticated purchaser/user of emergency housing units.

38.  Whether Plaintiff failed to mitigate his damages, if any.

39.  Whether Plaintiff's pre-existing medical and/or emotional conditions caused or contributed to Plaintiff's alleged injuries or damages.

40.  Whether Plaintiff, through action or inaction, contributed to his alleged injuries or damages.

41.  Whether any alleged defect in the trailer was open and obvious.

42.  Whether the harm caused to Plaintiff, if any, resulted from the acts or omissions of third parties.

43.  The nature and extent of Forest River's interaction with FEMA, either directly or indirectly through NACS.

44.  Whether Forest River is a government contractor.

45.  The nature and extent of FEMA's review of the design of the Forest River prototype trailer.

46.  Whether any alleged alternate design was economically feasible for use.

47.  Whether any alleged alternate design would have adversely affected the utility and/or safety of the product.

48.  Whether any defect existed at the time the product left Forest River's control.

49.  Whether FEMA by experience and expertise was aware of the presence and possible hazards, if any, associated with formaldehyde.

50.  Whether the unit at issue was subject to misuse or abuse after it left Forest River's control.

51.     Whether the unit at issue was substantially modified from its original form after it left Forest River's control.

52.     Whether there was any damage to the unit at the time it was accepted for use.

53.     Whether Shaw had any role in developing, testing or engineering any aspect of FEMA's instructions to place travel trailers on concrete blocks, including Exhibit 7.

54.     Whether FEMA inspected and/or accepted the Wright trailer installation.

55.     Whether any action or inaction by Shaw (or one of its subcontractors) actually increased the level of formaldehyde in the Wright trailer.

56.     Whether the installation process damaged the frame or structure of the Wright trailer in any way.

57.     Whether during the period of Shaw's maintenance of the Wright trailer, Plaintiff reported only one maintenance issue – a broken furnace that was repaired to his satisfaction.

58.     Whether during the period of Shaw's maintenance of the Wright trailer, Plaintiff ever lodged a formaldehyde or other odor-related complaint.

59.     Whether Plaintiff ever complained to FEMA or any maintenance contractor of any odor-related issues in the Trailer during the entire time he occupied it.

60.     Whether, after Shaw's maintenance responsibilities ended, Plaintiff and his mother continued to sign off on inspection reports from other FEMA contractors and/or subcontractors, confirming that nothing was wrong with the Wright trailer.

61.   Whether the company that deactivated the Wright trailer damaged the trailer in any way.

62.   Whether the Wright trailer was damaged during the year it sat unmaintained in a field in Melville, Louisiana, in addition to damage relating to the missing vent cap.

63.   Whether Shaw was ever aware that the level of formaldehyde in travel trailers was dangerous.

64.   Whether FEMA knew that travel trailers were built with products containing urea-formaldehyde.

65.   Whether there was any damage to the Wright trailer as of June 1, 2006.

66.   Forest River conducted no ambient air formaldehyde sampling at any of its production facilities in any of the units manufactured in response to the FEMA hurricane disaster response in 2005 prior to their shipment.

## 9.   CONTESTED ISSUES OF LAW:

A.   Whether Defendant, Forest River is liable to Plaintiff Lyndon Wright under the Louisiana Product Liability Act (LPLA).

B.   Whether Shaw was negligent in failing to warn of the existence of Urea Formaldehyde in the Travel Trailer occupied by the Plaintiff.

C.   Whether the Defendants' legal fault, if any, was a cause-in-fact and proximate cause of damages sustained and recoverable by Plaintiff Lyndon Wright.

D.   Whether Plaintiff Lyndon Wright may be assessed with comparative fault.

E.   Whether or not the "government contractor defense" is available to Forest River and/or Shaw.

F.  Whether the Wright unit was unreasonably dangerous in design and/or construction and whether that design and/or construction caused Lyndon Wright to suffer damages.

G.  Whether the Wright unit was unreasonably dangerous; whether Forest River had a legal duty to the plaintiff to warn of such alleged danger; whether Forest River inadequately warned of that danger; and whether that inadequate warning caused damages to Lyndon Wright.

H.  Whether Shaw and/or its subcontractors was negligent, and did said negligence cause damages to Lyndon Wright.

I.  Whether Shaw had knowledge of Formaldehyde; whether Shaw inadequately warned; and whether that inadequate warning caused damages to Lyndon Wright.

J.  The amount of damages, if any, sustained by Lyndon Wright.

K.  Whether the Wright unit was defective because of a lack of and/or an inadequate warning, and said lack of and/or inadequate warning caused damages to Lyndon Wright.

L.  Whether specifications provided by the government are reasonably precise as a matter of law when they describe exactly the result desired but do not prevent the contractor from exercising some discretion as to methods of interpretation and action/compliance.

M.  Whether Shaw negligently maintained this travel trailer and caused damage to Plaintiff Lyndon Wright.

N.  Whether there is a basis for asking the jury to allocate fault to a specific non-party person or entity, and, in the case of FEMA, whether that fault must rise to the

level of gross or willful misconduct for fault to be allocated to FEMA.

O.  Whether RCG, the subcontractor hired by Shaw to jack and block the Wright trailer in November 2005, was negligent, and did said negligence cause damages to Lyndon Wright.

P.  Whether Shaw is responsible for any negligence of its subcontractor RCG for the manner in which it jacked and blocked the Wright trailer in November of 2005.

Q.  Whether Shaw and/or its subcontractor responsible for maintaining the Wright travel trailer from March 2006 until June 1, 2006 or any period therein was negligent in any way that proximately caused damage to plaintiff.

R.  Whether Shaw failed to adequately warn Lyndon Wright of formaldehyde in his trailer during his occupancy, and if Shaw's failure to adequately warn caused damage to Plaintiff Lyndon Wright.

S.  Whether the manufacture and/or installation of the Forest River trailer used by Lyndon Wright was subject to residential or building codes in its use as temporary housing.

T.  Whether Plaintiff has failed to mitigate his damages.

U.  Whether Forest River owed any pre- or post-sale duty to warn Plaintiff of the dangers he alleges.

V.  Whether FEMA's status as a sophisticated purchaser/user relieves Forest River any alleged duty to warn.

W.  Whether Plaintiff is entitled to recover for fear of cancer.

X.  Whether plaintiff is judicially estopped from asserting contrary claims.

Y.  Whether any alleged defects were open and obvious.

Z.      Whether Plaintiff's injuries or damages were a result of the actions/inactions of a third party for which Forest River is not responsible.

AA.     Whether Forest River's warning was adequate.

BB.     Whether Plaintiff's alleged injuries and damages, if any, were caused by Plaintiff's pre-existing medical and/or emotional conditions.

CC.     Whether FEMA has an obligation to inform end users of any alleged health hazards associated with formaldehyde.

DD.     Whether Plaintiff has an obligation to locate, review and adhere to the warnings provided by the manufacturer.

EE.     Whether Plaintiff has an obligation to locate, review and adhere to the warnings provided by FEMA and/or any other individual or entity.

FF.     Whether Shaw owed Plaintiff a duty to warn.

GG.     Whether Shaw's contractual duty to perform maintenance on the Forest River travel trailer extended to Plaintiff and if so, whether Shaw breached this duty.

HH.     Whether FEMA's actions or inactions caused damage to Plaintiff.

II.     Whether any subsequent FEMA maintenance contractor was negligent in maintaining the Wright trailer and, if so, did that negligence cause damage to Plaintiff.

JJ.     Whether Shaw is protected from Plaintiff's demands by operation of La. R.S. 9:2771.

KK.     Whether Plaintiff's claims against Shaw are prescribed.

LL.     Whether Shaw is responsible to Plaintiff for any negligence of its subcontractors.

MM.     Whether the injuries alleged by Plaintiff, if any at all, were legally or proximately caused by intervening and superseding causes and circumstances.

NN.   Whether Plaintiff's alleged injuries were caused by acts or omissions that occurred after Shaw no longer had any responsibility for the Wright trailer.

OO.   Whether Plaintiff's alleged injuries were caused by acts or omissions of a third party for which Shaw is not responsible.

**10.   EXHIBITS**

Attached hereto as Exhibit A is Plaintiff's Exhibit List.  Defendant Forest River, Inc.'s Exhibit List is attached as Exhibit B, and Defendant Shaw Environmental, Inc.'s Exhibit List is attached as Exhibit C.  Because of the outstanding motions, parties attach their entire exhibits lists out of an abundance of caution.  The parties will consolidate these lists into a joint submission prior to trial.

**11.   DEPOSITIONS:**

The parties will offer the deposition testimony, or portions thereof, of witnesses identified in the attached Trial Plan as being presented by videotape or transcribed deposition.  The parties reserve the right to introduce by deposition the testimony of any witness who is unavailable to testify at trial, though subpoenaed to do so, or when an attempt to subpoena said witness is unsuccessful, or the person resides out of the jurisdiction of this Honorable Court.  However, in an effort to make it easier on this honorable Court, all parties identify the following individuals who will likely be called by video deposition at trial:

1.   Dr. Charles Field

2.   Dr. Christopher DeRosa

3.   David Garratt

4.   James Brixius

5.   RCG Enterprises, Inc., through corporate representative, Edith Young.

6.       Jamie Albrecht

7.       Jeffrey Burian

8.       Brian Boyle

9.       Guy Bonomo

10.      Faye Green

11.      Brian Deckle

12.      Michael Lapinski

13.      Stanley Larson

14.      Joseph Little

15.      Brian McCreary

16.      Martin McNeese

17.      Travis Morris

18.      Mark Polk

19.      Coreen Robbins

20.      Kevin Souza

21.      Michelle Wright

## 12.  CHARTS AND GRAPHS

The parties may use charts, graphs, powerpoints, and other demonstrative aids contained in their experts' reports and/or utilized during expert depositions and/or marshalled and/or exchanged prior to trial.  The parties have agreed to exchange charts and graphs, and other visual aides to be used at trial at the offices of Frank J. D'Amico, Jr., 622 Baronne Street, New Orleans, Louisiana 70113 on or before March 10, 2010, or as otherwise instructed by the Court.

13.    **WITNESSES**

Attached hereto as Exhibit D is the Trial Plan in this regard.

The parties will offer certain designated portions of deposition testimony of witnesses identified in the attached Trial Plan as being presented by videotape or transcribed deposition. The parties reserve the right to introduce by deposition the testimony of any witness identified on the Trial Plan who is unavailable to testify at trial, though subpoenaed to do so, or when an attempt to subpoena said witness is unsuccessful, or the person resides out of the jurisdiction of this Honorable Court.

14.    **STIPULATIONS**

The following list of stipulations have been agreed to by all parties:

1.    Joint Stipulation of Fact (Rec. Doc. 8334) regarding wood products

2.    Joint Stipulation (Rec. Doc. 10346) dismissing claims

3.    Joint Stipulation of Facts (Rec. Doc. 10347) regarding authenticity of records

4.    Joint Stipulation (Rec. Doc. 11181) regarding MILs in prior bellwether trials

5.    Joint Stipulation (Rec. Doc. 11240) dismissing medical monitoring and future earnings claims

6.    Joint Stipulation of Facts (Rec. Doc. 11604) regarding Darrian Griffin

7.    Joint Stipulation of Fact (Rec. Doc. 11608) regarding vent cap

8.    Joint Stipulation of Facts (Rec. Doc. 11729) regarding Dr. George Farber

9.    Joint Stipulation of Facts (Rec. Doc. 11730) regarding formaldehyde testing and William Scott

15.    **JURY TRIAL**

The parties will submit jury questions/instructions, and objections thereto, and will participate in a jury charge conference with the Court as instructed by this Honorable Court.

**16.    DAMAGES**

The issues of liability will not be tried separately from that of quantum.

**17.    OTHER MATTERS THAT MIGHT EXPEDITE A DISPOSITION OF THE CASE**

Upon discussion by all parties, and with the understanding that as a bellwether, trial is the desired outcome, there are none.

**18.    TRIAL**

Trial shall commence on Monday, March 15, 2010, at 8:30 a.m. and will require approximately ten days of trial to complete.

**19.    STATEMENT OF COMPLIANCE-I**

This Pre-Trial Order has been formulated after conference at which counsel for the respective parties have appeared in person.   Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing.  Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

**20.    STATEMENT OF COMPLIANCE-II**

Counsel acknowledge that cell phones, pagers, beepers, and any other electronic communication devices are not allowed in the courtroom, and shall abide by this rule.  Counsel shall further notify all clients and his/her witnesses of this rule.  Only counsel for the parties and their technical support are allowed to have computers in the courtroom.

**21.    SETTLEMENT**

The instant matter is an MDL bellwether trial, and, as such, there have been no discussions between and amongst any parties relating to a settlement of claims.

## 22.    SIGNATURES

Respectfully submitted:

BY: _____

GERALD E. MEUNIER, #9471
PLAINTIFFS' CO-LIAISON COUNSEL
Gainsburgh, Benjamin, David, Meunier & Warshauer,
L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
**gmeunier@gainsben.com**

*-and-*

*/s/Justin I. Woods*
JUSTIN I. WOODS, #24713
PLAINTIFFS' CO-LIAISON COUNSEL
Gainsburgh, Benjamin, David, Meunier & Warshauer,
L.L.C.
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
**jwoods@gainsben.com**


COURT-APPOINTED PLAINTIFFS'
STEERING COMMITTEE
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, Jr., #17519
MATT MORELAND, #24567
LINDA NELSON, #9938
MIKAL WATTS, Texas # 20981820
DENNIS REICH, Texas # 16739600
ROBERT BECNEL, #14072

*-and-*

_(signature)_

ERNEST P. GIEGER, JR. (La. Bar Roll No. 6154)
JASON D. BONE (La. Bar Roll No. 28315)
CARSON W. STRICKLAND (La. Bar Roll No. 31336)
GIEGER, LABORDE & LAPEROUSE, LLC
One Shell Square
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
**egieger@glllaw.com**
**jbone@glllaw.com**
**cstrickland@glllaw.com**

*On Behalf of Forest River, Inc.*

*-and-*

_(signature)_

M. DAVID KURTZ (LA BAR 23821)
KAREN K. WHITFIELD (LA BAR 19350)
ROY C. CHEATWOOD (LA BAR 04010)
Baker Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
**dkurtz@bakerdonelson.com**
**kwhitfield@bakerdonelson.com**
**rcheatwood@bakerdonelson.com**

*On Behalf of Shaw Environmental, Inc.*

New Orleans, Louisiana, this _____ 25th _____ day of ___ February ___, 2010.

_(signature)_

HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE