UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE:  FEMA TRAILER | * | |
| FORMALDEHYDE | * | |
| PRODUCT LIABILITY LITIGATION | * | MDL NO. 07-1873 |
| | * | |
| | * | SECTION "N" (5) |
| | * | |
| | * | JUDGE ENGELHARDT |
| THIS DOCUMENT IS RELATED TO: | * | MAG. JUDGE CHASEZ |
| *Lyndon Wright v. Forest River, Inc., et al.* | * | |
| *Case No. 09-2977 (E.D. La.)* | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR RECONSIDERATION

**NOW INTO COURT**, through undersigned counsel, comes defendant, Shaw

Environmental, Inc. ("Shaw"), who respectfully offers this Memorandum in Support of its

motion requesting that this Honorable Court reconsider its ruling of March 5, 2010 (Rec. Doc.

12447) (the "Exemplar Order") disallowing any reference to the exemplar trailer tested by Shaw

as part of its defense in this matter.

## INTRODUCTION

The Exemplar Order unfairly prejudices Shaw by precluding it from presenting certain

support for a key element of its defense.  With all due respect, the Exemplar Order errs when it

groups together the exemplar "test" and previous "testing" of evidence.  Every prior order and conversation with the Court pertained to the testing of actual evidence.  The exemplar analysis, on the other hand, did not involve an object that was itself evidence in the MDL.  Rather, it was an information gathering exercise of the sort commonly performed outside of the view of opposing counsel or experts.  Every expert in this case has gathered data or information without being watched.  The Exemplar Order therefore imposes on Shaw a rule that applies to no one else – that Shaw's expert must gather data only after inviting the Plaintiff to observe.   This is unfair, and the Exemplar Order should be rescinded.

Plaintiff was not prejudiced by his not watching the exemplar tests.  The Federal Rules of Civil Procedure, which Shaw complied with, require the circulation of reports and allow for the depositions of experts.  These vehicles give Plaintiff all he needs to know in order to challenge any perceived flaw in the methodology.  There is no requirement in the Rules, or anywhere else, that Shaw allow the opposition to observe tests.  Nor is there any requirement that Shaw allow the opposition to check or comment on its expert's methodology in advance of the test.  Given that Plaintiff has in his possession all of the data obtained through the test, as well as a complete description of the methodology and instrumentation, there is literally nothing that Plaintiff does not have now that he would have had if his experts were there.

Moreover, as is more fully explained below, it is not the case that all PSC testing has been performed with prior notice to defendants.  Formaldehyde testing of occupied units occurred without any notice to the defense – not just the contractors, who were not even parties then, but also the manufacturers and the United States, who most certainly were.  In fact, a number of these formaldehyde tests, unquestionably performed for litigation purposes, form an integral part of the statistical analysis submitted to this Court for the Wright trial by PSC expert

Paul Hewett. Thus, Shaw respectfully avers that, if fairness and consistency are to be maintained, Dr. Osteraas must be allowed to testify regarding his own exemplar testing just as the PSC is being allowed to present its results.

Further, because of the highly relevant and exculpatory nature of evidence adduced from the exemplar analysis, a reasonable jury, once presented with this evidence, will find the PSC's "jacking" theory to be implausible. Thus, should this evidence be excluded from the Wright trial, any negative result would simply be an aberration remedied for future trials and therefore of no inferential value in the context of the larger MDL. Given the substantial expenditure of judicial and party resources on this trial, such an outcome should be avoided.

## BACKGROUND

By Order dated August 17, 2009 (Rec. Doc. 2716) this Court explicitly set forth its expectations regarding disclosure of matters about which defense experts are to testify at the trial of this matter and the basis of those expert opinions. The court unambiguously ordered that

> [w]ritten reports of experts, as defined by Federal Rules of Civil Procedure 26(a)(2)(B), who may be witnesses for defendant fully **setting forth all matters about which they will testify and the basis therefor** shall be obtained and delivered to counsel for plaintiff as soon as possible, but **in no event later than November 2, 2009.**[1]

Shaw complied with that Order. On November 2, 2009, the day selected by this Court for disclosure of matters about which Shaw's expert, John D. Osteraas, Ph.D., P.E. will testify, Shaw "delivered to counsel for plaintiff" the expert report of Dr. Osteraas "fully setting forth all matters about which [he] will testify and the basis therefor". Thus, on November 2, 2009, opposing counsel knew: (1) the basis of Dr. Osteraas' opinions; (2) that Dr. Osteraas had

---

[1]         Trial Scheduling Order (Rec. Doc. 2716) at p. 2 (emphasis added).

scientifically tested an exemplar trailer to test one of his opinions; (3) **exactly** how, when and where Dr. Osteraas conducted this testing; and (4) the results of those tests.  Indeed, Shaw even provided the raw data (data logger files) in order to afford opposing experts the opportunity to draw their own conclusions.  Thus, Plaintiff was in possession of everything necessary to dissect and/or replicate Dr. Osteraas' experiment.  Instead, they chose to do nothing, foregoing the opportunity afforded by the Federal Rules of Civil Procedure to explore the opinions of the opposing expert through his deposition.

No order had imposed an obligation upon Shaw to allow the opposition to observe Shaw's experts as they gathered data to support and confirm their opinions.  As noted in the Exemplar Order, "the court has never said or ordered that all testing done in this MDL shall be conducted jointly."[2]  Indeed, until issuance of the Exemplar Order, no party to this litigation had reason to believe, whether based the Federal Rules, this Court's rulings, or rulings of any other court, that opposing parties should be privy to, much less invited to participate in, independent data gathering performed by a testifying expert to confirm his or her own hypotheses.  Tests conducted on objects that are themselves evidence raise different concerns, but that is not what happened with regard to the exemplar.  Thus, the Exemplar Order excludes highly probative scientific evidence timely provided as explicitly ordered by this Court.  Shaw respectfully avers that the results of the Exemplar Order are manifestly unjust.

## ARGUMENT

As noted in this Court's 7/13/2009 Order and Reasons, (Rec. Doc. 2149), "[a] district court has 'considerable discretion in deciding whether to reopen a case in response to a motion

---

[2]        Order And Reasons (Rec. Doc. 12447) at p. 3.

for reconsideration under' Rule 59(e). … [and] … grounds upon which a Rule 59(e) motion can be granted include 'the need to prevent manifest injustice …'"  The word '[m]anifest,' as in 'manifest injustice,' is defined as 'clearly apparent or obvious.' *Englewood Terrace Ltd. Partnership v. U.S.*, 86 Fed.Cl. 720, 725 (2009).  Waste of money and judicial resources has been held to be "manifest injustice."  See, for example, *National Medical Enterprises, Inc. v. U.S.*, 28 Fed.Cl. 540, 549 (1993).  That is precisely what would happen if the Exemplar Order were allowed to stand.

I.    **Unlike the Trailers at Issue In All Prior Orders And Conversations, The Exemplar Trailer Itself Is Not Evidence.**

The exemplar analysis was designed to gather information necessary to support an opinion that Dr. Osteraas developed while inspecting the trailer actually at issue in this matter -- that the forces induced by jacking were comparable to or smaller than those created by over-the-road travel, for which the trailer was designed.  Rather than simply stating this opinion in the manner of Plaintiff's experts, Dr. Osteraas took the additional step of checking his conclusion by retrieving actual data from a trailer of the same make and model (but one that is not at issue herein and is not itself evidence) and measuring the actual road forces that it sustained.  This analysis can, of course, be considered a "test", but it did not involve evidence.  It was, rather, simply a means of gathering information.

The testing of the Wright unit was of a very different nature.  There is only one Wright unit, and at the PSC's insistence, it was dismantled.  Obviously, this destruction of evidence could not be performed without notice to the other parties.  Discussions and orders relating to the Wright unit resulted from the fundamental necessity of equal access to a unique piece of evidence, the trailer actually at issue herein.  There was, however, no reason to infer from those

5

discussions and rulings, driven as they were by considerations unique to the Wright unit, that the Court might insist that all information gathering, by testing or otherwise, be conducted jointly; nor was there any reason to believe that the plaintiff was entitled to a preview of Dr. Osteraas' expert analysis.

The Wright testing order, and the various orders addressing formaldehyde testing, illustrate the idea that evidence must be preserved, and all parties must be given equal access to it. Thus, the Wright trailer could not be ripped apart before all parties had an opportunity to inspect it. Formaldehyde readings taken from trailers occupied by plaintiffs in this MDL are also evidence.[3] As such, they also present special considerations. The testing process can itself disturb the concentration of formaldehyde in the air, and given the special importance placed on the concentration of formaldehyde, it only made sense for the Court to enter an order requiring notice of that testing (although, notably, the Court did not exclude or strike the prior results for which notice had not been provided).[4]

Conversely, the exemplar analysis was not a test of evidence. The fact that the exemplar analysis was a physical means of gathering information does not distinguish it from other methods of analysis employed by Plaintiff's experts. For example, when PSC engineering expert David Moore spoke to the Plaintiff about his experiences in the trailer, the defense was not invited to listen or to ask questions. When PSC toxicologist expert Patricia Williams gathered information by researching studies on formaldehyde exposure, the defense was not invited to watch. Nor was the defense given notice of her methodology or invited to suggest additional

---

[3]     Most formaldehyde readings taken by the PSC were taken from a trailer in which a plaintiff resided. The readings are therefore evidence in this MDL.

[4]     Rec. Doc. 689.

studies that she might review.  In fact, the physical nature of the exemplar test makes it less prejudicial than other data-gathering activities in the sense of preserving the expert's methods for opposing counsel.  While the exemplar still exists and could be inspected by Plaintiff, there is no transcript of the Moore-Wright conversation, and we will never know for sure whether Moore reported it accurately.  It is up to the defense to explore these information gathering activities through depositions and cross-examination.  The Plaintiff must uncover any "taint" in Dr. Osteraas' activities in the same manner – the one afforded by the Federal Rules of Civil Procedure.

As Dr. Osteraas points out in his affidavit, there is a bright-line demarcation between the treatment of evidence and the treatment of exemplars.[5]  Indeed, the relevant ASTM standard recommending notification of interested parties if testing of **actual evidence** may alter the condition of the evidence is, by its own terms, only applicable only to "actual items or systems (hereinafter termed evidence) that may have been involved in a specific incident that are or may be reasonably expected to be the subject of civil or criminal litigation."[6]  In his experience as a consultant who has testified many times before courts and arbitration panels, it is routine (as suggested in the ASTM standard) to invite opposing experts to observe the testing of a physical object that is itself evidence.  It is equally routine not to invite opposing experts to watch testing where the object of the test is not "evidence" (*i.e.* actual items or systems that may have been involved in a specific incident that are or may be reasonably expected to be the subject of civil or criminal litigation).

---

[5]     See Affidavit of John D. Osteraas, Ph.D., P.E. attached hereto as Exhibit "A" at ¶¶ 5-7.

[6]     See. Exhibit "B": ASTM E860 - 07 Standard Practice for Examining And Preparing Items That Are Or May Become Involved In Criminal or Civil Litigation at ¶ 1.1.

The distinction between evidence and exemplar is precisely why the Exemplar Order should be rescinded. None of the spoliation and other special considerations that attach to evidence is relevant to the exemplar trailer. Testing of an exemplar robs no party of anything; the opposing party is free to challenge the test methods and equipment through discovery, just as Shaw is free to ask about the data gathering processes of each of Plaintiff's experts, like the conversation between Moore and Wright. There is no unfair prejudice to the Plaintiff for not having been able to watch Dr. Osteraas gather information.

## II. Exclusion of the Exemplar Test Results Would Prejudice Shaw's Defense.

The Exemplar Order excludes critical and admittedly relevant[7] evidence gathered, analyzed, and reported by a recognized expert so as to be scientifically valid and of the utmost assistance to the jury in deciding the veracity of claims asserted by Plaintiff Wright. Indeed, as noted on page six of Shaw's opposition (Rec. Doc. 11761) Dr. Osteraas' conclusion that "[s]tresses sustained by the trailer during over-the-road transport are comparable in magnitude and far exceed in frequency those sustained during installation in accord with FEMA requirements" is well supported, easily understood, essential to Shaw's defense, and likewise essential to the jury's ability to correctly decide this matter.

Conversely, introduction of the exemplar results in no way prejudices Plaintiff. Plaintiff cannot credibly suggest that, had the results of the exemplar test been "good" for the Plaintiff, Plaintiff would not have learned about it. Dr. Osteraas was a testifying expert well known to Plaintiff far before the exemplar testing occurred. Dr. Osteraas first saw the trailer that Plaintiff occupied in August, 2009, when he, along with a bevy of opposing experts, lawyers,

---

[7] *See* Plaintiff's Memo in Support, Rec. Doc. 11384 at p. 3. ("Although testimony regarding testing and examination of an exemplar travel trailer may be relevant, …")

photographers, and others inspected it.  Dr. Osteraas was going to, and still is going to, testify regarding the results of his inspections of that unit.  The exemplar test was conducted after those inspections.  Regarding the questions posed by the Court on page three of the Exemplar Order, Shaw knowingly took the inherent risk that results of the exemplar analysis might not be favorable to Shaw's defense.  Shaw knew that, by asking a testifying expert to conduct a test after he was already known to be a testifying expert, if the result was "bad" for Shaw, Shaw would have to live with it.  This is a risk common in litigation and one that Shaw understood very well.

While the nature of the PSC's jacking theory greatly reduced the risk of an adverse result, it is unfair to imply that Shaw might have attempted to hide such a result.  The point of scientific investigation, after all, is to find the truth of a matter.  Because Dr. Osteraas was a testifying expert, there could be no hiding the results of the exemplar analysis from the Plaintiff, who was free to cross-examine Dr. Osteraas on all aspects of his retention by Shaw.  Dr. Osteraas would have been required, upon proper questioning at his deposition, to explain the results of his tests, under oath.  Obviously Dr. Osteraas would have testified truthfully.  There is no prejudice to Plaintiff for having missed the chance to be present at a "positive" test, since he would have had the opportunity to learn about it, and obtain testimony regarding it, anyway.

Plaintiff has suffered no injury.  The only thing that Plaintiff did not have the opportunity to do was follow the trailer.  Shaw is not required to inform Plaintiff of its research or to seek Plaintiff's concurrence with whatever protocol Shaw's expert deems appropriate to support his conclusions.  Had Plaintiff been given the exemplar protocol in advance he would, by no means, have any right to interject or to object to any part of Dr. Osteraas' plan.  Opposing experts simply have no place in Shaw's marshalling of its defense.  Moreover, Plaintiff has received literally all

of the data from the exemplar tests; Shaw produced, in advance of Dr. Osteraas' deposition, all of the information gathered during his analysis, including millions of readings from the data loggers installed in the trailer, numerous photographs of all aspects of the testing, and videos of the spray testing.  Plaintiff had everything upon which Dr. Osteraas relied, in advance of his deposition.  Yet, remarkably, Dr. Osteraas was not asked even one question about the exemplar analysis.

Moreover, if there were any prejudice, Plaintiff should have brought it up as soon as he learned about the exemplar – on November 2, 2009 – not just before trial.  Had the Plaintiff wanted to see the exemplar for himself, that could have been arranged.  By waiting to the eve of trial to cry "prejudice," Plaintiff reveals that his true intent is not to cure any issue with the testing but to gain a tactical advantage.

That there is no prejudice to Plaintiff for not having seen the test is evidenced by the fact that, had Dr. Osteraas performed similar over the road trailer testing previous to this litigation, or if third parties or other agencies had performed similar tests and written articles about it, there would be no doubt that the results obtained from such testing would be admissible in this litigation, despite the fact that Plaintiff was not there for those tests, either.  In terms of the Plaintiff's ability to challenge the results of such tests, there is no difference between a test performed before the litigation began, and one performed thereafter.  It is inconsistent for such testing to be admissible had it existed before the trial, but not to be admitted when performed by an expert in preparation of the trial.

Ultimately, Shaw ought to be permitted to present proof to the jury that trailers endure greater stresses when being towed over the road than they do when being installed in the manner prescribed by FEMA.  Some "tests" – those that involve evidence – evoke considerations of

spoliation and equal access to unique evidence that counterbalance a party's right to defend itself as it sees fit within the bounds of the Federal Rules. But when those considerations are not present, to forbid a party to present test results in support of its expert opinions would result in a manifest injustice. Shaw urges the Court to avoid such a result.

### III.    The PSC Has Conducted Testing Without Prior Notice to the Defense.

With all due respect, the Court is incorrect in saying that all PSC testing was performed with prior notice to defendants. Joint Report No. 4 in this MDL reflects that the PSC had performed some 1182 formaldehyde tests in trailers while they were still occupied.[8] The undersigned has confirmed with counsel for the government and liaison counsel for the manufacturing defendants that at least some of these tests -- performed at the request of the PSC by their experts and/or the occupants themselves -- occurred without any notice whatsoever. Indeed, it appears that all 1182 of those tests were conducted without notice. Nor did the PSC call the court to find out if conducting these tests would be alright.

The issue of formaldehyde testing in trailers without notice to the defense is one that dragged on for months. On March 14, 2008, when the contractor defendants were not even parties to the MDL, Mr. Weinstock, on behalf of the manufacturer defendants, sent his second request for a listing of trailers that the plaintiffs had already tested.[9] Mr. Weinstock's initial request, dated February 22, 2008, had gone unanswered. All the while, the plaintiffs were busy testing trailers. That they were doing so for litigation purposes cannot be questioned; as reported by the Jackson Clarion-Ledger at the time, PSC member Tony Buzbee and other lawyers

---

[8]       Rec. Doc. 387, p.5.

[9]       See email from Andrew Weinstock to Justin Woods and Gerald Meunier dated March 14, 2008 attached hereto as Exhibit "C".

"continue to test trailers in preparation for the legal battle";[10]  PSC member Raul Bencomo is reported as having said that the testers "are out in the field every day."[11]  Despite this, the PSC did not give advance notice of the tests, and beyond that would not even tell the defense which trailers had been tested.[12]  It was not until June 11, 2008 that the PSC told the defense which units had been previously tested.[13]

Even then, the issue of prior tests dragged on.  Ultimately, the Court had to enter an order on August 26, 2008 – again before the contractors were joined – requiring the plaintiffs to give the defense additional information about the units that the PSC had tested without notice.[14]  Moreover, that order provided for notice going forward of formaldehyde tests in units at issue.  But the Order did not exclude the results of the prior tests.

It is clear that the PSC conducted tests of formaldehyde concentrations in trailers occupied by people who are plaintiffs in this MDL without having given notice to the defense.  There was no penalty imposed on the PSC for having done this.  And the prospective application of the order that resulted from the formaldehyde testing issue was quite clear what it applied to – formaldehyde testing.  In no way did that order suggest that it might be applied to other things, much less "tests" that do not involve actual evidence.  Under these circumstances, to impose a

---

[10]        See Ana Radelat, Hurricane Victims Expected to Sue FEMA, The Clarion-Ledger, March 17, 2008, attached hereto as Exhibit "D".

[11]        Id.

[12]        See email from Andrew Weinstock to Justin Woods and Gerald Meunier dated March 27, 2008 attached hereto as Exhibit "E".

[13]        See email from Linda Nelson to defense counsel dated June 11, 2008 attached hereto as Exhibit "F".

[14]        Rec. Doc. 689.

penalty on Shaw for having tested something that was not evidence, while not penalizing the PSC for their tests of evidence, would be manifestly unjust.

Shaw's counsel indeed has participated in numerous telephone conferences with the Court and with other counsel regarding testing of the Wright unit.  If the undersigned's interpretation of those calls, or of the orders regarding the testing of the Wright unit, was misplaced, then he sincerely apologizes to the Court.  Certainly, the undersigned did not believe any action or testing being undertaken was in violation of the spirit, much less the letter, of any order.  Nor did it occur to the undersigned that a telephone conference with the Court was in order or even appropriate.  Naturally the undersigned would not normally think to call the Court to ask whether a particular activity proposed by an expert will or will not result in the creation of admissible evidence.

It bears noting what the Rules of Civil Procedure do, and do not, require of experts.  Rule 26(a)(2) defines what a party must do to disclose expert testimony.  The Court, being well familiar with that Rule, certainly realizes that it says nothing about joint attendance at any sort of analysis or testing.  Rules regarding experts were instituted to cure a perceived prejudice resulting from the appearance at trial of experts who might testify on technical matters that could not be subjected to a thorough cross examination on the spur of the moment.  The 1970 and 1993 amendments to the Federal Rules of Civil Procedure specifically authorized discovery from experts and required them to produce reports outlining their opinions.  The Rules did not, however, go so far as to require that experts notify the opposing side of their information-gathering intentions.  Rather, the Rules contemplate that, with knowledge of the expert's opinions and methods afforded by the report and deposition, opposing counsel will be fully armed to cross-examine the witness at trial.

Even where there is a flawed analysis, the appropriate cure is deposition, *Daubert* motion, and/or cross-examination, not the right to watch over the shoulder of the expert as he performs his scientific inquiry.   In the absence of any order, Rule of Civil Procedure, or jurisprudence imposing a requirement that opposing counsel be notified of testing of non-evidence by experts, there was no reason to believe that such notice was required.   It would, therefore, be manifestly unjust to impose upon Shaw such a drastic limitation on its defense based solely on the spirit of previous orders.   In stark contrast, the Pretrial Order (Rec. Doc. 2716) explicitly set forth this Court's expectations regarding disclosure of matters about which defense experts are to testify and the basis of those expert opinions.   Shaw complied with that order.

## IV.       Without the Jury's Consideration of Dr. Osteraas' Full Opinion, This Matter Will Have Reduced Value as a Bellwether.

Since the outset of this litigation, the Court has adhered to a process that it designed to ensure, to the greatest extent possible, the inferential value of results reached in trials of the various bellwether plaintiffs.   Great care was, thus, taken by the Court and the parties who participated in selection of bellwether plaintiffs and examination of bellwether units to ensure, to the extent possible, that results of a bellwether trial will be reasonably inferential.

Shaw has, by Dr. Osteraas' exemplar analysis, proven that loads experienced by a trailer during routine transportation equal, in magnitude, and greatly exceed, in frequency, loads experienced during installation of a trailer.   In essence, Shaw now has scientific proof that it did nothing to harm any EHU, much less the residents thereof.   Thus, Shaw believes that a reasonable jury, once presented with this evidence, will find the PSC's jacking theory to lack credible proof.

Should the exemplar results be excluded from this trial, however, clearly the contractor defendants would have the ability to ensure that similar test results are admitted in the future. Therefore, there would be no reason to place inferential value on any adverse result reached in the absence of highly relevant evidence. Thus, while Shaw fully intends to vigorously defend itself in the Wright matter with or without the exemplar test results, an aberrant verdict will mean little in the context of the larger MDL.

## **CONCLUSION**

A Rule 59(e) motion should be granted when necessary to prevent manifest injustice. The Exemplar Order would result in a manifest injustice by excluding the results of a scientific investigation of whether trailer installations are more stressful on trailers than the forces they are designed to, and do, endure routinely. That Shaw did not invite Plaintiff to watch data being gathered through this investigation is irrelevant because the test did not involve evidence. There is no concern about spoliation, and no prior order of this Court or Rule of Civil Procedure suggests that experts must be invited to watch each other as they investigate their opinions. Rather, Plaintiff's avenue for exploring the exemplar test results is through the vehicles provided by the Federal Rules – the review of Dr. Osteraas' report, his deposition, and cross-examination at trial. The Exemplar Order is further a manifest injustice because it does not apply equally to all parties; the PSC has collected formaldehyde readings without notice, despite the fact that those readings are evidence, and no order yet has excluded those results. Shaw, therefore, respectfully suggests that, in order to prevent the wholesale waste of resources, and to avoid materially prejudicing Shaw's ability to defend itself using appropriate scientific investigation, the Exemplar Order be rescinded and replaced with an order allowing Dr. Osteraas to fully testify.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


   /s/ M. David Kurtz
ROY C. CHEATWOOD (#4010)
M. DAVID KURTZ (#23821)
KAREN KALER WHITFIELD (#19350)
CATHERINE N. THIGPEN (#30001)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
SHAW ENVIRONMENTAL, INC**


## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2010, I electronically filed the foregoing pleading using the Court's CM/ECF system, which sent notification of such filing to all court-appointed liaison counsel.


   /s/ M. David Kurtz