# Transcript of the Testimony of
# Videotaped Deposition of Lyndon Wright

**Date taken: July 10, 2009**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation**

***Note***

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA


IN RE:  FEMA TRAILER         MDL NO. 1873
FORMALDEHYDE PRODUCTS        SECTION "N"(4)
LIABILITY LITIGATION         JUDGE ENGELHARDT

              *   *   *

     VIDEOTAPED DEPOSITION OF LYNDON WRIGHT,
3417 SOUTH CLAIBORNE AVENUE, APARTMENT 5,
NEW ORLEANS, LOUISIANA 70113, TAKEN AT THE
OFFICES OF FRANK D'AMICO, 622 BARONNE
STREET, NEW ORLEANS, LOUISIANA 70130, ON THE
10TH DAY OF JULY, 2009.
REPORTED BY:
     CATHY RENEE' POWELL, CCR
     PROFESSIONAL SHORTHAND REPORTERS
     (504)529-5255
VIDEOGRAPHER:
     BRIAN SOILEAU
     PROFESSIONAL SHORTHAND REPORTERS
     (504)529-5255
```
Page 1

```
 1   APPEARANCES:
 2
     THE LAW OFFICES OF FRANK
 3     J. D'AMICO, JR.
     (BY: FRANK J. D'AMICO, JR., ESQUIRE
 4      AARON AHLQUIST, ESQUIRE)
     622 BARONNE STREET
 5   NEW ORLEANS, LOUISIANA 70113
 6       ATTORNEYS FOR THE PLAINTIFF
 7
     DAVID McCLENDON, ESQUIRE
 8   4731 CANAL STREET
     NEW ORLEANS, LOUISIANA 70119
 9
         ATTORNEYS FOR THE PSC
10
11   U.S. DEPARTMENT OF JUSTICE
     (BY: MICHELLE GREIF, ESQUIRE)
12   CIVIL DIVISION
     1331 PENNSYLVANIA AVENUE, N.W.
13   ROOM 8210-N
     WASHINGTON, D.C. 20004
14
         ATTORNEYS FOR DEFENDANT, UNITED
15         STATES OF AMERICA
16
     BAKER DONELSON
17   (BY: DAVID KURTZ, ESQUIRE
         KAREN WHITFIELD, ESQUIRE)
18   201 ST. CHARLES AVENUE
     SUITE 3600
19   NEW ORLEANS, LOUISIANA 70170
20       ATTORNEYS FOR DEFENDANTS,
         CH2M HILL CONSTRUCTORS, INC. AND
21       SHAW ENVIRONMENTAL, INC.
22
23
24
25
```
Page 2

```
 1  APPEARANCES CONTINUED:
 2
      GIEGER, LABORDE & LAPEROUSE, LLC
 3    (BY: JASON BONE, ESQUIRE
          CARSON STRICKLAND, ESQUIRE)
 4    701 POYDRAS STREET
      SUITE 4800
 5    NEW ORLEANS, LOUISIANA 70139
 6       ATTORNEYS FOR DEFENDANT, FOREST
           RIVER, INC.
 7
      GARRISON, YOUNT, FORTE &
 8      MULCAHY, L.L.C.
      (BY: KELLY MORTON, ESQUIRE)
 9    909 POYDRAS STREET
      SUITE 1800
10    NEW ORLEANS, LOUISIANA 70112
        (VIA TELEPHONE)
11
         ATTORNEYS FOR DEFENDANTS,
12         RECREATION BY DESIGN, LLC, TL
           INDUSTRIES, INC., FRONTIER
13         RV, INC. AND PLAY'MOR TRAILERS,
           INC.
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 3

```
 1
 2            EXAMINATION INDEX
 3   EXAMINATION BY MR. BONE: ................9
 4   EXAMINATION BY MR. KURTZ: .............248
 5   EXAMINATION BY MS. GREIF: .............298
 6   EXAMINATION BY MR. BONE: ..............326
 7   EXAMINATION BY MR. KURTZ: .............337
 8   EXAMINATION BY MR. AHLQUIST: ..........342
 9                *  *  *
10            INDEX OF EXHIBITS
11   Exhibit No. 1  .........................99
12     Ready for Occupancy Check List,
13     SHAW-WRI 00011.
14   Exhibit No. 2  ........................204
15     Bankruptcy petition filed on behalf
16     of Lyndon Wright, May 24, 2001.
17   Exhibit No. 3  ........................212
18     FEMA Document, Important
19     Information for Travel Trailer
20     Occupants, FEMA08-000013, 14.
21   Exhibit No. 4  ........................213
22     Formaldehyde Levels in
23     FEMA-Supplied Trailers.
24   Exhibit No. 5  ........................214
25     FEMA Document, Important
```
Page 4

Page 65

1  work from 2002 until 2005 due to what you
2  believed were seasonal allergies?
3      A.  No, I don't recall it.
4      Q.  Are you saying that didn't happen
5  or you just don't recall?
6      A.  That I called off because of
7  seasonal allergies?
8      Q.  Because of allergies.
9      A.  I don't recall.
10     Q.  Were you ever hospitalized from
11 '99 to 2002?  I mean, excuse me, from '99 to
12 August 29, 2005?
13     A.  Hospitalized?  No.
14     Q.  Did you ever have to go to the
15 emergency room during that period?
16     A.  Not that I recall.
17 MR. D'AMICO:
18     We have been going about an hour
19 and 15 minutes.  Do you mind if we take a
20 bathroom break?
21 MR. BONE:
22     Sure, go ahead.
23 THE VIDEOGRAPHER:
24     We are off the record; it is 9:25.
25 (Recess.)

Page 66

1  THE VIDEOGRAPHER:
2      We are back on the record; it is
3  9:40.
4  EXAMINATION BY MR. BONE:
5      Q.  Mr. Wright, when we left off, we
6  were talking a little bit about your time
7  with the Hyatt.  What I want to do now is
8  talk a little bit about what occurred after
9  the hurricane, August 29, 2005, at the
10 Hyatt.
11     Were you actually on duty or
12 called in during the hurricane at the Hyatt?
13     A.  No.
14     Q.  Okay.  Were you actually in New
15 Orleans at the time of the storm?
16     A.  Yes.
17     Q.  Let me just talk to you about the
18 Hyatt for a minute and we'll get to the
19 other areas.
20     But from August 29, 2005, when was
21 the first time you were actually back at the
22 Hyatt building for work?
23     A.  Right after Rita.  Which would be
24 probably September.
25     Q.  And how was it the Hyatt had

Page 67

1  contacted you in terms of asking you to come
2  back to work?
3      A.  I made the call to my supervisor
4  at the Hyatt, and he said, "Yeah, come on
5  back," because I was out there in Houston.
6      Q.  So after the storm, you relocated
7  to Houston, and within a few weeks after the
8  storm, you called your supervisor, which was
9  who?
10     A.  Eddie.
11     Q.  Eddie who?
12     A.  Haggerty.
13     Q.  Eddie Haggerty?
14     A.  Yes.
15     Q.  And within a few weeks after the
16 storm, you called Mr. Haggerty and said, "I
17 would like to come back to work if work is
18 available"?
19     A.  That's correct.
20     Q.  What did he tell you when you made
21 that request?
22     A.  He said the hotel had got messed
23 up pretty bad, he could use the workforce
24 because he needed as many people as possible
25 to come back.

Page 68

1      Q.  At this point, were you aware that
2  your home had been damaged?
3      A.  Aware of?  Yes, I was aware of it.
4      Q.  Did you discuss with Mr. Haggerty
5  where you would be living while you were
6  doing work for the Hyatt?
7      A.  Yes.
8      Q.  What did he tell you in that
9  regard?
10     A.  We would be staying in the hotel
11 because they already had employees that had
12 stayed during the storm and they had
13 employees and I could stay in a room.
14 MR. D'AMICO:
15     Off the record.
16     (Off the record discussion.)
17 EXAMINATION BY MR. BONE::
18     Q.  So Mr. Haggerty related to you
19 there was a place for you at the hotel if
20 you wanted to come back to New Orleans and
21 help assist Hyatt in the rebuilding process,
22 correct?
23     A.  That's correct.
24     Q.  Do you recall when you came back?
25 It was sometime in September?

**Page 69**

A. Right after Rita. So it might have been the first of October or the very end of September.

Q. When you got back into New Orleans at the Hyatt, did you actually live in the hotel?

A. No.

Q. Was there ever a time that you resided in that hotel for any period of time?

A. Any period of time?

Q. Yes.

A. Yes.

Q. Take me through that. When you first get back to New Orleans, how long do you live in the hotel?

A. One night.

Q. After the night in the hotel, where did you live after that?

A. My car.

Q. Why was it that you slept in your car rather than in a hotel room?

A. Well, the situation was, Mr. Haggerty wanted his workforce back. When I came back, his boss said the hotel

**Page 70**

couldn't afford nobody to come back as far as employees. So Hyatt ruled, or what have you, that I couldn't stay there.

I mean, I was still employed with them, but as far as being on the payroll for that moment, I couldn't be. So that's how I wound up staying in my car.

Q. How long did you have to stay in your car before you found other accommodations?

A. About a week or two.

Q. And how was it that you came to find other accommodations?

A. How was it --

Q. How was it that you came to find another place to stay?

A. Through my job with the City.

Q. As I recall from the records that we have, you were hired on with the City just before Katrina, correct?

A. That's correct.

Q. But they hadn't placed you in a position; is that true?

A. No, I was working in the Civil District Court building.

**Page 71**

Q. Had you actually been to your first day of work before Katrina?

A. Yes.

Q. Do you recall when that was?

A. I would have to say probably the second week in August, before the storm.

Q. What was your intent with respect to whether you were going to continue your work with Hyatt or not? Had you planned to transition solely to working for the City of New Orleans or were you planning to work for both Hyatt and the City of New Orleans?

A. I had planned to work for both Hyatt and the City of New Orleans.

Q. Had you spoken with your supervisor at the Hyatt regarding the fact that you intended to start working two jobs?

A. Had I spoken with my supervisor about that?

Q. Had you spoken with him about that?

A. No.

Q. We'll come back to that.

But with respect to your job with the City, how was it that you came back to

**Page 72**

work for them after the hurricane? Did you call your supervisor once you found out you were going to be living in your car to find out if they needed you to work?

A. That's correct.

Q. And who was the person you contacted at the City of New Orleans?

A. Keith Lanier.

Q. Keith --

A. Lanier.

Q. Lanier?

A. Yes.

Q. And what did Keith tell you?

A. I told him I was back in the city and I was staying in my car. And he was like, "Are you available for work?"

And I'm like, "Yeah."

He told me to come back to work and I was back to work.

Q. What did the City do for you in terms of finding you a place to stay?

A. They gave me residency on the Carnival cruise ship.

Q. So because you were available to work for the City, they placed you on the

1  A. Yes.
2  Q. The same smell from the time you
3  smelled it in the winter of '06 until the
4  summer of 2008, correct?
5  A. (Witness nods head affirmatively.)
6  Q. And the severity of the smell, the
7  amount of the smell that you could perceive,
8  didn't change except for when you deodorized
9  the unit, correct?
10  A. That's right.
11  Q. So if you were asked, it was your
12  perception that it wasn't -- the smell
13  wasn't worse at any given point in time from
14  the time you first perceived it until the
15  time you left the trailer, correct?
16  A. Other than when the stove was on
17  in that particular area. No, I couldn't say
18  it got worse. Like I said, I was on top of
19  it. I mean, it could have been worse, but
20  by me always deodorizing it, I just probably
21  didn't pay attention to it.
22  Q. But if called upon to testify,
23  your testimony would be that the smell was
24  the same --
25  A. The same.

Page 133

1  Q. The same across the top?
2  A. Yes.
3  MR. D'AMICO:
4    I object to the form of that
5  question. I don't know that that is what he
6  just said. But --
7  EXAMINATION BY MR. BONE::
8  Q. Do you ever recall being asked by
9  FEMA if you had any health problems that you
10  associated with this particular unit?
11  A. Repeat the question.
12  Q. Do you ever recall being asked by
13  FEMA if you had any health problems that you
14  associated with this particular unit?
15  A. By FEMA? No.
16  Q. Do you recall being asked by
17  anyone if you had any health problems
18  associated with this particular unit?
19  A. My mom.
20  Q. When did that conversation take
21  place?
22  A. Basically, when I was on the phone
23  talking to her at one time and I was doing a
24  lot of coughing. I made the mention that I
25  woke up choking, you know, looking for

Page 134

1  water. I believe I made the comment that I
2  think this trailer has made me sick because
3  I wasn't like this when I was on the cruise
4  ship.
5    She said, "Well, I'm going to call
6  FEMA and have somebody come out. You think
7  there's a leak going on up in there?"
8    I said, "Not that I know of, I
9  don't smell propane or nothing, I'm just not
10  feeling like I was feeling on the cruise
11  ship."
12  Q. Explain to me the difference in
13  the way you were feeling from the time -- as
14  compared to the cruise ship, which is why
15  you thought there was some problem with the
16  unit.
17  A. I mean, I slept comfortably. I
18  was actually -- what word can I use? I felt
19  a lot better on the cruise ship than I did
20  in the trailer. When I got in the trailer,
21  my eyes started getting irritated and I just
22  associated it with my allergies, and I think
23  it was this trailer, but it was just
24  constant. And the coughing, just a plain
25  old dry cough. And I started seeing blood

Page 135

1  in my mucus when I expelled, you know.
2  Q. Uh-huh.
3  A. And I would wake up with this
4  choking feeling out of my sleep. And I
5  started keeping water by the bed -- by the
6  sofa, really, I slept on the sofa.
7    It just didn't feel right, I mean,
8  between telling the people about the
9  rainwater and -- I don't know. It was just
10  aggravating.
11  Q. Okay. During that period of time
12  that you were living in this unit, you had
13  health insurance with the City of New
14  Orleans, correct?
15  A. Yes.
16  Q. And you also had health insurance
17  with Hyatt still, correct?
18  A. Yes, for a short period, yes.
19  Q. So if you needed to go to the
20  doctor, you had insurance to cover your
21  access to care, correct?
22  A. Yes.
23  Q. And did you ever seek out medical
24  care for the problems that you're telling us
25  about today?

Page 136

```
 1      A.  Yes.  I went to the doctor about
 2  my eyes, because I thought I had the pink
 3  eye, because I woke up one morning and my
 4  eyes was closed.
 5         When I went to the doctor, he said
 6  it was -- it wasn't pink eye, it was just
 7  like a severe allergic reaction.
 8         I went to the doctor about my
 9  chest being so congested and my coughing so
10  much.  I think they gave me antibiotics.
11  Gave me an inhaler.
12         When I was congested sinus-wise,
13  they gave me Nasonex.  I complained about
14  all of this being swollen -- well, you know,
15  inside, not out, not physically out, but
16  just being swollen, they said it was
17  probably a viral infection or what have you.
18      Q.  Let's talk about that.
19         You said you had some eye issues,
20  some chest congestion, some sinus problems.
21  You said that you had some swelling, you
22  felt, around your throat area.  Was there
23  anything else, any other physical problems
24  that you had while living in this particular
25  unit?
                                        Page 137
```

```
 1      A.  I mean, other than the headaches
 2  associated with all the coughing I was
 3  doing.
 4      Q.  Anything else?
 5      A.  Physical problems?  I broke out
 6  with a rash a few times.
 7      Q.  Anything else?
 8      A.  Did you get the blood in my mucus
 9  and everything?
10         And I noticed -- well, I noticed
11  my ear ran a lot more.  I mean, it was
12  already a problem, but I only go to the
13  doctor to see them about twice a year, but
14  at that particular time, I had to go, like,
15  three or four times just for cleaning.
16      Q.  Anything else?
17      A.  No.
18      Q.  The eye irritation, chest
19  congestion, the mucus issue, the sinuses and
20  the viral infections and the headaches, did
21  you go to see Dr. Crews and Dr. Fields for
22  that?
23      A.  Yes.
24      Q.  Did you see anyone else for those
25  issues?
                                        Page 138
```

```
 1  MR. D'AMICO:
 2         Did you mean to skip some of the
 3  things he complained about?
 4  MR. BONE:
 5         We're going down.
 6  MR. D'AMICO:
 7         Okay.
 8  THE WITNESS:
 9         Dr. Fox.  I mean, it's all in one
10  facility.
11         Dr. Reginelli.
12  EXAMINATION BY MR. BONE::
13      Q.  And they are all with Uptown
14  Nephrology?
15      A.  That's correct.
16      Q.  Did you see them for the rashes or
17  did you see somebody else?
18      A.  No, I pretty much did my own thing
19  with the rash, the calamine lotion and
20  stuff.  I pretty much did self-help on them.
21      Q.  The rashes, where were they
22  located?
23      A.  Like on the back of my neck and my
24  elbows.
25      Q.  How often did you have a rash?
                                        Page 139
```

```
 1      A.  It would be -- it lingered.  I
 2  mean, it would be real bad at one time, and
 3  it would be like it was going away, but it
 4  always had little fine bumps.  But it would
 5  stay with me.
 6      Q.  I think you said you had used
 7  calamine lotion on it?
 8      A.  Yeah.  The stuff in that pink
 9  bottle or something, yes.
10      Q.  Okay.  Did that resolve the issue
11  for you?
12      A.  The itching part, yeah.  The rash
13  itself pretty much stayed, but the itching
14  was resolved.
15      Q.  When you were in the clinic with
16  the folks from Uptown Nephrology, did you
17  ever mention that you had rashes on the back
18  of your neck and your elbows?
19      A.  No, I didn't mention it.
20      Q.  Is there any reason why you didn't
21  bring this to the attention of the doctors
22  if you were in their office anyway?
23      A.  No.  Like I say, I was putting
24  calamine lotion on it, so --
25      Q.  So, to your knowledge, no doctor
                                        Page 140
```

35 (Pages 137 to 140)

**Page 297**

1  to anyone else, I don't think.
2      Q.  You mentioned the trailer, the
3  move-in inspection, that you thought the
4  gentleman who walked around the trailer with
5  you had a Shaw helmet on, right?
6      A.  He pretty much did all the walking
7  himself.  I mean, pretty much everything
8  was, like, done when I met him.  But he
9  just, like, showed me down the side of the
10 trailer.  Just looked at.
11         When we went inside, he showed me
12 everything was working.
13     Q.  Have you ever spoken to anybody
14 else that you thought was employed by Shaw?
15     A.  About the trailer itself, other
16 than the maintenance people?  I mean --
17     Q.  Were there any maintenance people
18 who you thought were employed by Shaw that
19 you were speaking with?
20     A.  Is FEMA and Shaw the same thing or
21 is that different companies or what?  I
22 mean, I don't know --
23     Q.  That's part of why I'm asking.
24 You don't know whether any individual was
25 working for FEMA or Shaw or somebody else,

**Page 298**

1  right?
2      A.  No, I don't.  I don't.
3      Q.  Okay.  When did you first notice
4  blood in your mucus?
5      A.  In '06.  '06.
6      Q.  About when in '06?  Still
7  summertime or was it starting to get cold?
8      A.  Probably during the summertime
9  because it was hot.  It was hot at the time.
10 So the summer of '06.
11     Q.  Have you ever been arrested or
12 convicted of anything, Mr. Wright?
13     A.  No.
14     MR. KURTZ:
15         I think that's all I have.  Thank
16 you.
17 EXAMINATION BY MS. GREIF:
18     Q.  Mr. Wright, my name is Michelle
19 Grief.  I represent the United States in
20 this action.  I just have some questions for
21 you.  It shouldn't take long at this point.
22     A.  Okay.
23     Q.  I think you have been asked most
24 questions.
25         Just so I'm clear here, you

**Page 299**

1  started living in the unit in March of '06
2  and you moved out in July of '08; is that
3  correct?
4      A.  Yes.
5      Q.  You lived in the trailer the
6  entire time?
7      A.  Yes, I did.
8      Q.  And you moved directly from the
9  cruise ship to the travel trailer; is that
10 correct?
11     A.  Yes.
12     Q.  Did you evacuate before Hurricane
13 Katrina?
14     A.  Evacuate before?  No.
15     Q.  Evacuate New Orleans before the
16 hurricane?
17     A.  No.
18     Q.  You stayed in New Orleans during
19 Hurricane Katrina?
20     A.  Yes.
21     Q.  But your mother evacuated?  Did
22 your mother evacuate?
23     A.  Before?
24     Q.  Before.
25     A.  No.

**Page 300**

1      Q.  She stayed also?
2      A.  She stayed also.
3      Q.  At what point did she leave?
4      A.  After the storm had hit.  Like two
5  days after the storm had hit.
6      Q.  Okay.  At some point you went to
7  Houston, too, I think.  I think you had
8  testified earlier between Hurricane Katrina
9  and then October, the beginning of October,
10 you were in Houston and then you came back
11 to New Orleans?
12     A.  In October I came back to New
13 Orleans, yes.  Roughly October, late
14 September.  Right after Rita.
15     Q.  And why did you come back to New
16 Orleans?
17     A.  I mean, it's my home.  I wanted to
18 be part of the rebuilding process.  I mean,
19 I was more stable here.  I had a job here
20 and my job wanted me back and I wanted to
21 come back and I came back.
22     Q.  Let's mark this as an exhibit.
23 It's a form called an SF 95 that you filled
24 out.  Will you just take a look at it and
25 review it?  It's three pages.  Can you just

```
 1    SF 95 form. You signed it on April 2, 2008?
 2       A.   Yes.
 3       Q.   That was the date that someone
 4    from Schmidt's firm came to your trailer?
 5       A.   Yes.
 6       Q.   On this Form 12A, it says,
 7    "Property Damage"--
 8       A.   Yes.
 9       Q.   And it says, is that $100,000?
10       A.   Yes.
11       Q.   What's the basis of that $100,000?
12    That means you are seeking $100,000 in
13    property damage, is that correct?
14       A.   Yes.
15            (Off the record discussion.)
16    EXAMINATION BY MS. GREIF:
17       Q.   My question, what does that
18    $100,000 that you're seeking in property
19    damage represent?
20       MR. AHLQUIST:
21            I'm going to object in that it
22    asks for a legal foundation.
23    EXAMINATION BY MS. GREIF:
24       Q.   Well, in this form, you wrote
25    down -- it says in here that you are seeking
                                        Page 305
```

```
 1    $100,000 in property damage; is that
 2    correct?
 3       A.   I didn't write the $100,000.
 4       Q.   You didn't write that?
 5       A.   No. I didn't write that.
 6       Q.   My question is, are you seeking
 7    $100,000 in property damage from the United
 8    States in this litigation?
 9       A.   I'm seeking as much as I can
10    possibly get.
11       Q.   What property damage have you
12    sustained as a result of the allegations
13    that you're making in this claim?
14       MR. AHLQUIST:
15            I'm going to reassert my objection
16    as far as vested property interest. As we
17    have voiced in several pleadings, this is a
18    vested property right that has yet to be
19    decided by the Court. You can continue to
20    ask and I will continue to object.
21    EXAMINATION BY MS. GREIF:
22       Q.   Okay. You can answer.
23       A.   I can't answer that question.
24       Q.   And then in 12B, it says "Personal
25    Injury, $200,000."
                                        Page 306
```

```
 1       A.   When the guy wrote that, he was,
 2    like, that was because of the formaldehyde
 3    exposure from staying in the trailer.
 4    That's what that number would be for.
 5       Q.   Okay. And what personal injuries
 6    have you sustained in this litigation? What
 7    personal injuries have you sustained in this
 8    litigation that you are seeking compensation
 9    for?
10       A.   My main thing is the blood that
11    comes out of my sinuses, you know, when I
12    expel mucus. That's my main one because I
13    don't know what is keeping that going on.
14            I mean, it's just progressively
15    getting -- I wasn't going to say getting
16    worse, but it got noticeably bad in the
17    trailer.
18            I mean, I wasn't sick before I got
19    into that trailer. I mean, my eyes wasn't
20    always irritated, waking up with mucus in
21    them and all that, going to the doctor,
22    trying to get treatment because I'm thinking
23    something is seriously wrong, but it's just
24    an irritation. And the coughing that gave
25    me headaches and things like that.
                                        Page 307
```

```
 1       Q.   Okay. So you're seeking
 2    compensation for the blood in your mucus?
 3       A.   Uh-huh.
 4       Q.   For irritated eyes, for coughing
 5    and what else?
 6       MR. AHLQUIST:
 7            I'm going to object also in that
 8    we spent an hour and a half plus talking
 9    about his physical impairments from
10    formaldehyde. I think it's safe to assume
11    that all of those are factors that he will
12    be seeking compensation for.
13    EXAMINATION BY MS. GREIF:
14       Q.   Okay. Do you have any other
15    symptoms that you can --
16       A.   I mean, from having skin rashes
17    and stuff like that. Because of this, I
18    found out that I have asthma, some form,
19    which I never was diagnosed with before.
20       Q.   Are you done?
21       A.   The long-term effects of
22    formaldehyde, period. I mean, I'm not a
23    chemist, but, I mean, how much formaldehyde
24    is too much and how much did I inhale over
25    two years staying there.
                                        Page 308
```