1     UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF LOUISIANA

2      NEW ORLEANS DIVISION

3

4 IN RE:  FEMA TRAILER

 FORMALDEHYDE PRODUCT

5 LIABILITY LITIGATION

6        MDL NO. 1873

7        SECTION "N-5"

8        JUDGE ENGELHARDT

9        MAG. JUDGE CHASEZ

10

11

12

13   ORAL AND VIDEOTAPED DEPOSITION OF

14   CHRISTOPHER T. DE ROSA M.S., Ph.D.

15      July 6, 2009

16      9:25 a.m.

17     201 17th Street

18     Suite 1700

19    Atlanta, Georgia

20

21  Maureen S. Kreimer, RPR, CCR-B-1379

22

23

24

25



EXHIBIT
C

```
 1                          CERTIFICATE

 2

 3    STATE OF GEORGIA:

 4    COUNTY OF FULTON:

 5

 6            I hereby certify that the foregoing

 7    transcript was taken down, as stated in the caption,

 8    and the colloquies, questions and answers were

 9    reduced to typewriting under my direction; that the

10    transcript is a true and correct record of the

11    evidence given upon said proceeding.

12            I further certify that I am not a relative

13    or employee or attorney of any party, nor am I

14    financially interested in the outcome of this action.

15            This, the 17th day of July, 2009.

16

17


18                      _____

                        MAUREEN KREIMER, CCR-B-1379

                        Notary Public in and for the

19                      State of Georgia.  My Commission

                        expires August 14, 2012.

20

21

22

23

24

25
```

1          A.     I was the Deputy Associate Administrator
2     for Science initially.   I then became the acting
3      for the Division of Toxicology within ATSDR,
4     which was later, following the reorganization, the
5     Division of Toxicology and Environmental Medicine.
6               I held that position until October of
7     2007.
8          Q.     And was that your last position with
9     ATSDR?
10         A.     No, it was not.  Following my removal of
11    the position, I was reassigned as the Assistant
12    Director for Toxicology and Risk Analysis within the
13    Office of the Director of the Agency for Toxic
14    Substances Disease Registry and the National Center
15    for Environmental Health, which are both within the
16    Centers for Disease Control and Prevention, Health
17    and Human Services.
18         Q.     And was that your last position with the
19    Federal Government?
20         A.     It was.
21         Q.     When did that position end?
22         A.     I resigned my position effective June 17th
23    of this year, 2009, although that's still subject of
24    some discussion.
25         Q.     So you were the Director of the Division

1    of Toxicological and Environmental Medicine at ATSDR

2    for how long?

3         A.    Roughly 16 years.

4         Q.    And what was your responsibility in that

5    position?

6         A.    They were fairly broad responsibilities.

7    I oversaw a staff of approximately 70 individuals,

8    perhaps 10 onsite contractors, and a budget of around

9    $10 million annually in research and development.

10             I represented the Department on the

11    Executive Committee of the National Toxicology

12    Program, the Agency, I should say.

13             I also represented the Department on the

14    National Response Team, which is comprised of the 16

15    member Agencies responsible for responses to

16    emergency events under the National Contingency Plan.

17             Other responsibilities included

18    representing the Agency as a member of the Science

19    Advisory Board for the International Joint

20    Commission.

21             I was also a member of the Steering

22    Committee on Risk Assessment for the World Health

23    Organization, and provided expertise in broad areas

24    of toxicology, environmental medicine, including

25    health education materials, and the development of a

1     education, training, and experience, have you formed

2     opinions specifically regarding the potential health

3     effects of exposure to formaldehyde?

4             MR. WEINSTOCK:  Object to the form.

5        A.   Yes, I have.

6     BY MR. MEUNIER:

7        Q.   Does the ATSDR maintain a toxicological

8     profile on various toxic chemicals, and on

9     formaldehyde in particular?

10        A.   Yes.

11        Q.   When you were at the ATSDR, were your

12     opinions about the potential health effects of

13     formaldehyde articulated in the Agency's

14     toxicological profile on formaldehyde?

15             MR. WEINSTOCK:  Object to the form.

16        A.   The opinions proffered in the document

17     represented the result of a two-year effort to review

18     the world's literature in the broad areas of exposure

19     to toxicology and epidemiology.  It was peer-reviewed

20     independently, and also open to public comment.

21     Those comments are all part of a public record in

22     formal disposition of those comments as provided

23     there.

24          My responsibility was to assume authority,

25     or responsibility, for the final signoff on all the

1    toxicological profiles since I became director in

2    1991, it's a delegated authority from the department

3    to the administrator to the assistant administrator,

4    and then that was delegated to me.

5              So it was my responsibility to provide the

6    final approval of all the conclusions both

7    qualitatively and quantitatively presented in the

8    documents generated by the Division of Toxicology and

9    Environmental Medicine.

10             MR. WEINSTOCK:  Object to responsiveness.

11   BY MR. MEUNIER:

12        Q.    Have you served, Dr. De Rosa, as an expert

13   witness on behalf of the Federal Government?

14        A.    Yes, I have.

15        Q.    How many times?

16        A.    Well, I believe formally, depending on

17   what one considers to be an expert witness, at least

18   three times, four times.

19        Q.    And on those occasions, did you testify as

20   an expert in the field of environmental health

21   science?

22        A.    I did.

23             MR. MEUNIER:  On Plaintiff's behalf and

24   for purposes of potentially presenting this witness's

25   testimony at trial, we will ask the Court to

1    another agency, we would contact our Office of

2    General Counsel, whether it be an agency, or whether

3    it would be a private firm, or whomever, we were

4    always very cautious in that regard.

5         Q.    Let me turn your attention now to a

6    document which begins on Bates number DEROSA-7.

7              And it's a majority staff report of

8    September '08 for the Subcommittee on Investigation

9    and Oversight Committee on Science and Technology,

10   U.S. House of Representatives.  Are you familiar with

11   that document?

12        A.    I am.

13        Q.    And turn, if you will, to -- it's page 20

14   of the document, but it's Bates numbered DEROSA-28,

15   the bottom of that page.

16        A.    Yes.

17        Q.    You indicated earlier that you understood

18   Rick Preston, on receiving this letter that

19   ultimately was sent to him in March of '07 and signed

20   by Dr. Keim, put the letter away in a file and didn't

21   share it with anyone.

22              Is the source of that information what's

23   referenced here in this staff report, namely the

24   testimony of Mr. Preston himself?

25              MR. WEINSTOCK:   Object to the form.

1        -- the Federal Science Policy of the Federal

2    Government is that there is no safe level of exposure

3    to a carcinogen, irrespective of the duration of

4    exposure.

5            This is based on the premise of a study

6    done with ionizing radiation in the late Seventies

7    and early Eighties where they exposed large numbers

8    of rodents to doses of radiation and were unable to

9    find a dose at which a carcinogenic response was not

10   elicited.  It's called the Mega-Mouse Study, for

11   those who are interested.

12           But at any rate, that has formed the

13   backbone of science policy within the U. S. Federal

14   Government since that time.  And it's the premise of

15   all cancer risk assessments done by the Federal

16   Government.

17       Q.    Let me refer you once again to the Toxic

18   Trailers, Toxic Lethargy, Majority Staff Report of

19   September '08.  It's DEROSA-00 -- it's DEROSA-7,

20   and...

21       A.    I have two 060's here.

22       Q.    I'm sorry.  This is it.

23       A.    Okay.  I see it.

24       Q.    Yes.  And turn to the next Bates numbered

25   page DEROSA-10.  And in the top paragraph the

1    statement is made here that:  The ATSDR Health

2    Consultation used an inappropriate 'level of concern'

3    of zero part three -- of 0.3 parts per million, 10

4    times higher than ATSDR's own minimal risk level of

5    up to one year of exposure (.03 ppm) and three times

6    higher than the level of exposure widely accepted by

7    other federal agencies to cause potential ill health

8    effects, (0.1 ppm).

9              Do you agree with that statement?

10             MR. WEINSTOCK:  Object to the form.

11        A.    Yes, I do agree with that statement.

12   BY MR. MEUNIER:

13        Q.    I'm sorry.  Lost the page here.

14             And do you also agree with the sentence

15   that follows that one, which is that the

16   consultation, and again, this is referring to the

17   Health Consultation of February '07 that grew out of

18   that analysis by Little of the data in the unoccupied

19   trailers, that the consultation also failed to

20   address potential long term health effects of

21   formaldehyde exposure including cancer risk, and

22   neglected to mention the fact that formaldehyde is

23   described as a probable or known carcinogen by U. S.

24   government agencies and international health

25   organizations.  Do you agree with that statement?

 1         Q.     Let me turn now to another part of this

 2    Majority Staff Report, which is at De Rosa 34.

 3              And there is reference in the last full

 4    paragraph to a ATSDR industrial hygienist by the name

 5    of Lynn Wilder.  Do you know Ms. Wilder?

 6         A.     I do.

 7         Q.     Were you aware in early August of '07, she

 8    also outlined her concerns about the Health

 9    Consultation in an e-mail after seeing it for the

10    first time?

11         A.     I was not.

12         Q.     Do you see where this report references

13    her criticism of the .3 ppm reference used in that

14    analysis?

15              MR. WEINSTOCK:  Object to the form.

16              MR. MILLER:  Objection, foundation.

17         A.     I don't see --

18    BY MR. MEUNIER:

19         Q.     Well, let me reference exactly what I'm

20    speaking of.  About the middle of the paragraph the

21    quote from Ms. Wilder is "even with the doors and

22    windows open, formaldehyde levels exceed all three

23    ATSDR MRLs", minimum risk levels, "NIOSH, OSHA, and

24    other standards.  I'm extremely concerned that we

25    have compared the air sampling results with an

1    occupational exposure level of 300 parts per billion

2    .3 ppm.  Residents are exposed up to 24 hours a day

3    and may reside in these homes for years.  This

4    exposure should not be compared to a 15-minute

5    occupational value."  I mean --

6              MR. WEINSTOCK:  Object to the form.

7    BY MR. MEUNIER:

8        Q.    -- referring you to that, my question is

9    do you share Ms. Wilder's concerns about the analysis

10   being referenced to a .3 ppm for the reason she

11   mentioned?

12             MR. WEINSTOCK:  Object to the form.

13   Sorry.  I object to the form of the question.

14       A.    I feel as --

15             MR. MEUNIER:  Let the objection be made

16   first, Dr. De Rosa.

17             THE WITNESS:  Okay.

18             MR. WEINSTOCK:  I object to the form of

19   the question.  There is no foundation.  Ms. Wilder's

20   statement, at best, is a hearsay statement, and most

21   importantly of all, it has absolutely no relevance to

22   the Alexander case.  With that, you can proceed,

23   Doctor.

24             MR. MILLER:  My objection is that you're

25   asking the witness to testify regarding matters that

1    he didn't do in his official capacity while he was

2    working at the ATSDR, asking expert testimony, not

3    fact testimony.

4    BY MR. MEUNIER:

5        Q.    So --

6        A.    Yeah.  I totally agree with the statements

7    that are made here that .3 was an inappropriate value

8    to use.  I don't think there is any question about

9    that.  And that I also recall even some reports from

10   FEMA correspondence indicating that people at FEMA

11   felt that the value would be challenged because it

12   was so high.

13           I believe some expert testimony given

14   before Congress in the Waxman Committee also said

15   that this was a breach of professional -- the code of

16   professional conduct to use such a value.

17           So I think that there is general agreement

18   that this is a indefensible level to have been used.

19   BY MR. MEUNIER:

20       Q.    Do you know who Vincent Garry is?

21       A.    No, I don't believe so.  I may have heard

22   the name, but I don't attach any...

23       Q.    Environmental Medicine Director at the

24   University of Minnesota.

25       A.    Oh, yeah.  He was one of the peer

1           The NTP bioassay, considered the gold

2    standard, is a pretty messy situation.  I think

3    physicists would be appalled.  As you get into the

4    hard sciences, the life sciences become more and more

5    ambiguous.  But nevertheless, that is what we're

6    tasked with, providing answers in the absence of

7    perfect information.

8        Q.    You just mentioned the NTP, is that the

9    National Toxicology Program?

10       A.    Yes, sir.

11       Q.    Did the National Toxicology Program make a

12   determination with respect to the carcinogenic

13   classification of formaldehyde?

14       A.    Yes, it did.

15       Q.    And what was the classification?

16       A.    The classification was actually done by

17   the NTP Executive Committee, it's chaired by the

18   National Toxicology Program.  The Executive Committee

19   is comprised of representatives from agencies such as

20   ATSDR.  I was a representative, until about a year or

21   two ago, since about 1993.  And you know, there is a

22   very rigorous review process.  There are a number of

23   different subject matter working groups that then

24   forward their recommendations on up to the Executive

25   Committee, and then it's us for us to determine

1    whether we agree with a recommended classification.

2              In the case of formaldehyde, it's

3    currently listed as reasonably anticipated to be a

4    human carcinogen in the 10th Report on Carcinogen

5    that was released several years ago.

6              And my sense is that while one cannot

7    predict that the lead of IARC will be followed, in

8    the case of EPA and the Department as it reevaluates

9    formaldehyde because of the growing body of

10   information, particularly in light of the recently

11   released NCI bioassay which was specifically designed

12   to address some of the limitations of the Hauptmann

13   study that was cited earlier, and which is now coming

14   back to me, as I get closer to this.

15             But the limitations of that study were

16   taken into account, that -- there was one particular

17   cohort of workers that really skewed the 2003 report.

18             That was not the case in the most recent

19   evaluation, and it wasn't just one group of workers

20   that showed somewhat skewed or high incidences of

21   nasopharyngeal cancer.

22             So again, the point is that we've become

23   more refined and more focused in terms of the types

24   of issues that are addressed in these studies as the

25   limitations are brought to bear and brought to light,

1      and that's the strength of the scientific method is

2      it's self-correcting by virtue of repeated testing.

3          Q.    Can you identify the most recent study

4      that you are referencing with respect to cancer risk

5      from formaldehyde?

6          A.    Yes.  It was the NCI study.  It had a

7      group of high exposed workers versus low exposed

8      workers, and as I mentioned earlier, there was a

9      threefold increase in cancers of the blood,

10     blood-forming tissues, in the high exposed versus the

11     low exposed workers, which address the issue of the

12     healthy worker effect that was associated with the

13     CIIT-sponsored study by industry in which the

14     Formaldehyde Council was instrumental in funding.

15         Q.    During your service as Director of

16     Toxicology and Environmental Medicine at the ATSDR,

17     did you have occasion to provide guidance, or input,

18     or vote, with respect to the cancer classification of

19     formaldehyde either through the NTP program or IARC?

20             MR. HINES:  Object to the form.

21         A.    I did serve on the NTP Review Committee.

22     It was already classified as reasonably anticipated.

23     I did participate in the discussions around

24     formaldehyde with IARC when it was upgrading from --

25     we refer to it as upgraded -- when it was

1    developmental effects.

2         Q.    I'm going to try to wrap this up fairly

3    quickly, because I know the hour is late and people

4    do want to leave to catch planes.

5         Did you have any involvement with respect

6    to the convening of an expert panel in September of

7    2007 to evaluate health effect issues concerning the

8    trailer residents?

9         MR. HINES:  Same objection as being

10   improper.  And let me just put a continuing objection

11   here to improper line of redirect.  Go ahead.

12        A.    No, I had no involvement --

13   BY MR. REICH:

14        Q.    Okay.

15        A.    -- after September 19th, basically.  I did

16   review some aspects of the consultation as it went

17   forward and provided some comment, but my involvement

18   following the September time frame was virtually nil.

19        Q.    Did you develop an understanding as to why

20   a panel of experts was convening in Boulder,

21   Colorado, to discuss health effect issues pertaining

22   to the trailer residents?

23        A.    Did I understand why that was being done?

24        Q.    Yes.

25        A.    I think that there was a desire on the

1 Agency to demonstrate that they were moving forward

2 and trying to deal with the science on formaldehyde

3 and the impacts of trailer residents.

4   Q. By 2007, was it your view that the science

5 on formaldehyde, at least with respect to short term

6 effects, was fairly well established?

7   A. Yes.

8   Q. Okay.  And with respect to chronic effects

9 by 2007, was it well-recognized that formaldehyde

10 does present a carcinogenic risk?

11   A. Yes.

12   Q. You mentioned in response to Mr. Hines'

13 question that concentration is more important than

14 dose, and you gave a reason for that; correct?

15   A. I said that depending on the

16 circumstances, concentration can be -- dose can be

17 expressed as a concentration, or a level of exposure

18 expressed as per unit body weight.  And typically in

19 inhalation studies, such as this, concentrations are

20 used parts per million, for example.

21    And that is considered to be the delivered

22 dose, or the administered dose.  There is, you know,

23 several different definitions of dose; one is the

24 administered dose, one is the absorbed dose, and then

25 there is the delivered dose at target tissue.