UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | | |
|---|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 | |
| FORMALDEHYDE | * | | |
| PRODUCTS LIABILITY | * | | |
| LITIGATION | * | SECTION:  N(4) | |
| | * | | |
| This Document Relates to:  *Eugene Robertson, et al* | * | JUDGE: ENGELHARDT | |
| *v. Gulf Stream Coach, Inc.*; Docket No. 10-216 | * | MAG: CHASEZ | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

**NOW INTO COURT,** through undersigned counsel, comes defendant, Gulf Stream Coach, Inc., ("Gulf Stream") and, with a full reservation of rights, files this Opposition to Plaintiffs' Motion to Remand and, based on the laws and facts stated herein, avers that this matter has been properly removed to this Court on the following grounds:

(1)     Federal jurisdiction is proper in this matter under 28 U.S.C. §1332 as all plaintiffs named are diverse in citizenship from all named defendants and the amount in controversy more likely than not exceeds $75,000.00 per plaintiff.

    (a)     It is facially apparent from the Plaintiffs' Original Petition for Damages that potential damages in this matter exceed $75,000.00 for any individual plaintiff.

    (b)     Based on evidence provided personally by the plaintiffs and a sample of awards granted by Louisiana courts for symptoms similar to those complained of by individual plaintiffs, the allegations of the plaintiffs, if proven at trial, are reasonably valued over $75,000.00, thus invoking federal jurisdiction.

    (c)     Four named Plaintiffs have judicially admitted to having claims in excess of $75,000.00

(2)     In addition and/or alternatively, Federal jurisdiction over this case is proper under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1). Gulf Stream meets all three requirements established in the *Mesa* decision for jurisdiction.

(3)     In addition and/or alternatively, this Court has jurisdiction under the Class Action Fairness Act, 28. U.S.C. §1332(d)

1

I.      **Background**

On or about December 10, 2009, Plaintiffs, through attorney John Munoz of the firm

Garner & Munoz, filed the Petition for Damages in this action, entitled *"Eugene Robertson,*

*together with all individuals whose names appear in paragraph "I" v. Gulf Stream Coach, Inc."*

and bearing Docket Number 09-12799, Division "G-11," (the "Petition"), in the Civil District

Court for the Parish of Orleans, State of Louisiana.

For purposes of allotment, this Petition arises solely from operative facts that are the

subject of multidistrict litigation ongoing in the U.S. District Court for the Eastern District of

Louisiana, entitled *In re: FEMA Trailer Formaldehyde Products Liability Litigation* and bearing

MDL docket number 07-1873.

On January 28, 2010, Gulf Stream properly removed this matter to the Federal Court for the

Eastern District of Louisiana. Plaintiffs filed a motion to remand in this matter on February 26,

2010, alleging that the Eastern District lacks jurisdiction under 28 U.S.C. §1332 and 28 U.S.C.

§1442(a)(1). Hearing on this Motion is set for March 24, 2010.

II.     **Federal jurisdiction is proper in this matter under 28 U.S.C. §1332 as all plaintiffs named are diverse in citizenship from all named defendants and the amount in controversy more likely than not exceeds $75,000.00 per plaintiff.**

Plaintiffs, in their Memorandum in Support of their Motion to Remand, concede that all

plaintiffs and defendants are citizens of different states.[1]  The Plaintiffs, however, allege that

Gulf Stream has failed to show that the damages sought exceed $75,000.00.

Under 28 U.S.C. § 1332(a), a federal court has diversity jurisdiction if the matter in

controversy (1) exceeds $75,000.00, exclusive of interest and costs, and (2) is between citizens

of different states. In 2005, the United States Supreme Court held that where the other elements

_____

[1]        Plaintiffs' Memorandum in Support of Their Motion to Remand, page 2, Section II (Rec. Doc. 11994-1).

of jurisdiction are present <u>and at least one named plaintiff in the action satisfies 28 U.S.C. §1332(a)'s amount-in-controversy requirement</u>, 28 U.S.C. §1367 authorizes supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the requisite amount." *Exxon Mobile Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 2616-2628 (2005)(Emphasis Added).

Because plaintiffs in Louisiana state courts, by law, may not quantify damages in the petition, the removing defendant has the burden of showing, by a preponderance of the evidence, that the amount in controversy exceeds $75,000.00. *Gebbia v. Wal-Mart Stores, Inc.,* 233 F.3d 880, 882 (5th Cir. 2000). A defendant makes that showing when it is "facially apparent" from a reading of the complaint that the plaintiff's claims are likely to exceed $75.000.00. *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir.1995).  If it is not "facially apparent" from a plaintiff's petition that the amount in controversy exceeds $75,000.00, the Court may rely on "summary judgment-type" evidence relevant to the amount in controversy at the time of removal to make the determination. *White v. FCI USA, Inc.,* 319 F.3d 672, 675 (5th Cir. 2003); *Luckett v. Delta Airlines, Inc.,* 171 F.3d 295, 298 (5th Cir.1999). Under any manner of proof, <u>jurisdictional facts must be judged at the time of removal</u>, and post-petition affidavits are allowable only if relevant to that period of time. *Allen,* 63 F.3d at 1335 (Emphasis Added).

If a removing defendant shows that the amount in controversy is likely to exceed the federal jurisdictional minimum, the plaintiff must then show that it is a "legal certainty" that he or she will not be able to recover the jurisdictional amount. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938). The plaintiffs' burden can be met by: (1) showing state procedural rules binding a plaintiff to his pleadings; or (2) filing with the complaint a binding stipulation or affidavit to that effect. *De Aguilar v. Boeing Co.,* 47

F.3d 1404 (5th Cir.1995).

**A.      It is facially apparent from the Plaintiffs' Original Petition for Damages that potential damages in this matter exceed $75,000.00 for any individual plaintiff.**

In their Original Petition for Damages,[2] filed in the Civil District Court for the Parish of

Orleans, State of Louisiana, the plaintiffs state:

XII.

"As a result of the foregoing, Plaintiffs were caused to sustain injuries including, but not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during a period of displacement from a natural disaster, as well as, all general, special, incidental, and consequential damages shall be proven."

**1.      The U.S. Fifth Circuit Court of Appeals' decision in *In re 1994 Exxon Chemical Fire* discusses, in detail, the categories of damages alleged in chemical exposure cases which justify removal to federal courts. These categories of damages align with the categories of damages asserted by the Plaintiffs in this matter.**

The Fifth Circuit has held that removal is justified where alleged damages in a chemical

exposure case include:

"individual and familial suffering; injuries to physical and mental health, including, but not limited to, emotional distress and mental anguish from the knowledge of exposure to a hazardous substance; expenses incurred by reason of illness caused by the nuisance; fear and apprehension of further exposure to, and impact from, hazardous chemicals; economic and financial harm; loss of enjoyment of life and peaceful use of property; and, other consequential, incidental, general, and special damages."

*In re 1994 Exxon Chemical Fire,* 558 F.3d 378 (5th Cir. 2009).

The listed damages cited by the Federal Fifth Circuit in *In re 1994 Exxon Chemical Fire*

---

[2]      Plaintiffs' Original Petition for Damages, filed in the Civil District Court for the Parish of Orleans, State of Louisiana, is attached here as *Exhibit "A."*

closely mirrors the listed damages alleged by Plaintiffs here, justifying this removal under the "facially apparent" standard set forth in *Allen, supra*.  Indeed, the Plaintiffs here assert one additional category of damages above and beyond those asserted in *In re 1994 Exxon Chemical Fire*.  Plaintiffs here have alleged "past and future physical impairments and disability." A brief look at the method in which these allegations of "past and future disability and impairment" are handled by the Fifth Circuit and surrounding courts further establishes that an amount in controversy above $75,000.00 is facially apparent in Plaintiffs' petition.

> **2.      Recent U.S. Fifth Circuit decisions hold that petitions that seek damages for disability and impairment support a substantially larger monetary basis for federal jurisdiction.**

The Federal Fifth Circuit has noted that emotional distress, functional impairment, and disability are the kinds of damages that if alleged, "support a substantially larger monetary basis for federal jurisdiction." *Simon v. Wal-Mart Stores, Inc.* 193 F.3d 848, 851 (5th Cir. 1999).

In *Robinson v. Delchamps,* the plaintiff sought remand, citing a failure to establish the requisite jurisdictional amount of $75,000.00. The defendant argued that the jurisdictional amount was facially apparent from the plaintiff's petition which cited nine separate types of damages, including physical and mental pain and suffering (past and future), loss of income (past and future), medical expenses (past and future), loss of enjoyment of life (past and future), and disability (past and future). The Louisiana Eastern District held, "[t]he number of claims, the nature of those claims, and the allegations that plaintiff will continue to suffer damages into the future, all weigh against plaintiff's argument. It is facially apparent that if all damages alleged in this case are recovered, the amount of the judgment would likely be well in excess of the jurisdictional amount." *Robinson v. Delchamps, Inc.,* No. 98-0503 1998 WL 352131 (E.D. La. 06/30/98)(emphasis added). In a similar holding, the Western District of Louisiana has

5

found that the jurisdictional amount of $75,000.00 was facially apparent where the plaintiff sought damages for physical pain and suffering (past and future); mental anguish, emotional distress, worry, anxiety, and inconvenience (past and future); medical and related expenses (past and future); loss of enjoyment of life; and underline disability and impairment. *Lowery v. J.C. Penny Corp., Inc.* No. 06-1710 2006 WL 3827527 (W.D. La. 12/28/06)(Citing *Robinson.*)(emphasis added.) Furthermore, the Federal Fifth Circuit has found that the Louisiana Eastern District did not err in finding that it was facially apparent from the plaintiff's petition that the amount in controversy exceeded $75,000 when the petition sought damages for past and future medical expenses, past and future pain and suffering, past and future lost wages and past and future disability. *Davis v. Grider,* 214 F.3d 1350 (Table), 2000 WL 634655 (5th Cir. 2000)(Emphasis Added).

> **3.    The Louisiana Eastern District's decision in *Aisola* is directly on point.**

Recently and most directly on point, this Court found that the jurisdictional amount requirement was met in a chemical exposure case. In *Aisola,* thirteen minor school children were allegedly injured when the defendant negligently released chemicals into the air. *Aisola v. Exxonmobil Corp.,* No. 08-1105 2009 WL 1455788 at *1 (E.D. La. 05/22/09). Each plaintiff cited damages "inclusive of past, present, and future medical expenses; past, present, and future lost wages; past, present, and future mental anguish; past, present, and future pain and suffering; disability and disfigurement; and other damages." *Id.* at *2. Furthermore, the plaintiffs claimed the exposure "necessitated and will further necessitate medical treatment." *Id.* The Court, based primarily on the *In re 1994 Exxon Chemical Fire* holding and a thorough discussion of damages sought for disability, found that it was facially apparent from the plaintiffs' petition that the amount in controversy exceeded $75,000. *Id.*

6

 The damages asserted in *Aisola* are almost identical to the damages asserted in the current matter. Both cases seek damages for 1) past and future mental anguish/pain and suffering, 2) past and future physical pain and suffering, 3) past and future medical expense, and 4) disability and impairment/disfigurement. The Plaintiffs here also seek damages not cited in *Aisola* such as past and future physical injury and loss of enjoyment of life. Using *Aisola* and *Robinson* as guides, it is facially apparent from the Plaintiffs' Original Petition for Damages that if all damages alleged by the plaintiffs were recovered, then this amount would more likely than not be in excess of $75,000.00.

 The Plaintiffs' own allegations of damages show that Gulf Stream has met its burden of proving that the requisite amount in controversy under 28 U.S.C. §1332 is facially apparent from the Plaintiffs' Original Petition for Damages, and this Court need not look further.

> **B. Alternatively, based on evidence provided personally by the plaintiffs and a sample of awards granted by Louisiana Courts for symptoms similar to those complained of by individual Plaintiffs, the allegations of the Plaintiffs, if proven at trial, are reasonably valued over $75,000.00, thus invoking federal jurisdiction.**

 Although Section I(A) clearly indicates that the jurisdictional amount required under 28 U.S.C. §1332 is facially apparent from Plaintiffs' Original Petition for Damages, in an abundance of caution and in accordance with *Luckett* and *White, supra*, Gulf Stream submits the following exhibits and jurisprudence which clearly shows that Plaintiffs' claims for damages could be reasonably calculated to exceed $75,000.00. To reiterate the law stated earlier, so long as one named plaintiff in this action meets the jurisdictional requisite amount under 28 U.S.C. 1332, then jurisdiction is obtained over all other plaintiffs. *See Exxon Mobile Services, supra.*

 In the course of discovery, most of the Plaintiffs in this matter submitted to Gulf Stream a "Plaintiff Fact Sheet," which, among other things, cites the symptoms and consequences that

each Plaintiff has allegedly suffered in this case as a result of the alleged exposure.

> **1.    Despite the testimony cited in the Affidavit filed by attorney J. Scott Daniels, fifteen of the Plaintiffs named in this suit have specifically alleged to suffer damages far in excess of the jurisdictional requisite of $75,000.00**

Fifteen of the Plaintiffs who submitted a "Plaintiff Fact Sheet" attached to the fact sheet the Department of Justice's Form 95 "Claim for Damage, Injury or Death " (hereafter "Form 95"). Form 95 asks Plaintiffs to cite, in specific dollar amounts, the amount of damages they seek. For purposes of convenience, these fifteen Plaintiffs who submitted a Form 95 will hereafter be referred to as "Plaintiff Group One."[3] As seen in Exhibit "B," all fifteen members of Plaintiff Group One cite damages above the jurisdictional amount. The sought damages range from $115,000.00 to $500,000.00[4]:

> Billy Shelby seeks $500,000.00 in damages.
> Theodore Simon seeks $400,000.00 in damages.
> Stella Washington seeks $350,000.00 in damages.
> Norris Sam seeks $338,000.00 in damages.
> Glorious Santos seeks $300,000.00 in damages.
> Deborah Webb seeks $300,000.00 in damages.
> Terry Simon seeks $300,000.00 in damages.
> Eddie Webb seeks $300,000.00 in damages.
> Mae Williams seeks $266,000.00 in damages.
> Rosalyn Ross seeks $254,000.00 in damages.
> Lee Wilson seeks $230,000.00 in damages.
> Eugene Robertson seeks $211,000.00 in damages.
> Loretta Tanks seeks $190,000.00 in damages.
> Earl Wilright, III, seeks $125,000.00 in damages.
> Delores Brown seeks $115,000.00 in damages.

Plaintiffs have attempted to avoid jurisdiction under 28 U.S.C. §1332 by submitting

---

[3]    Attached to this Opposition is Exhibit "B," the Plaintiff Fact Sheets and completed Form 95 for Plaintiff Group One.

[4]    It should be noted that Plaintiff Group One comprises all of the Plaintiffs who submitted Form 95s. No single Plaintiff has submitted a Form 95 seeking less than $75,000.00.

post-removal affidavits and declarations stating that no individual claim exceeds $75,000.00[5]; this matter is discussed in more detail below. However, it is apparent from Exhibit "C" that many of the named Plaintiffs, in sworn claims to the federal government, disagree with their counsel on the value of their claims.

> 2.    **The symptoms and conditions allegedly suffered by individual Plaintiffs, if proven at trial, could be reasonably calculated to exceed $75,000.00 when compared to other awards by Louisiana juries in similar exposure cases.**

In *In re New Orleans Train Car Leakage Fire Litgation,*[6] a Louisiana jury awarded $2,100,000[7] to twenty plaintiffs (with two plaintiffs receiving over $100,000 each) in general damages for physical pain and suffering, mental anguish, and evacuation and inconvenience after the plaintiffs were exposed to butadiene caused by a train car leak.[8] The plaintiffs also cited a general fear of negative health consequences due to the exposure. *In re New Orleans Train Car Leakage Fire Litgation,* 2000-0479 (La. App. 4 Cir. 06/27/01), 795 So.2d 364.

In *In re New Orleans Train Car Leakage Fire Litgation,*[9] a Louisiana jury awarded a single plaintiff in a mass action suit $60,000 for physical pain and suffering and $25,000 for mental anguish after the plaintiff was exposed to the chemical, butadiene, after a train car leaked.[10] The plaintiff suffered from three symptoms - skin irritation, vomiting, and diarrhea - for approximately three days following the exposure. The plaintiff also suffered from being evacuated to an unsanitary facility. *In re New Orleans Train Car Leakage Fire Litgation,* 2000-

---

[5]  T      he affidavit of J. Scott Daniels is attached to this Opposition as *Exhibit "C."*

[6]        This matter refers to the first set of plaintiffs selected by the parties for trial.

[7]        In addition, the jury awarded $850,000,000 in punitive damages to the plaintiffs.

[8]        These damages do not include any special damages for medical expenses.

[9]        This matter refers to the third phase of plaintiffs selected by the parties for trial

[10]       These damages do not include any special damages for medical expenses.

1919 (La. App. 4 Cir. 04/20/05), 903 So.2d 9.

Attached as *Exhibit "D"* are Plaintiff Fact Sheets from five of the named plaintiffs.[11] For convenience, these five Plaintiffs will be referred to as "Plaintiff Group Two." Every plaintiff in Plaintiff Group Two has indicated that they suffered symptoms similar to the three symptoms as the plaintiff in *In re New Orleans,* namely skin irritation, vomiting, and diarrhea. Furthermore, the Plaintiffs in Plaintiff Group Two allege suffering between 8 and 24 total symptoms or conditions as a result of the purported exposure. The average number of symptoms and conditions alleged by members of Plaintiff Group Two is 14. This means that, on average, in addition to three identical symptoms to the plaintiff in *In re New Orleans,* for which a Louisiana jury awarded $85,000.00, the Plaintiffs in this group are seeking damages for an additional 11 symptoms or conditions. Based on the award granted in *In re New Orleans,* and the additional damages sought by these current Plaintiffs, it is not unreasonable to believe that damages in excess of $75,000.00 could be awarded to plaintiffs, if the damages sought were proven at trial, particularly when combined with a special damage award.

In *Lemaire,* a Louisiana jury awarded $270,000.00 in general damages and $150,000.00 in potential future medical damages to a plaintiff after he was exposed to the chemicals, Atrazine and Galecron. The plaintiff suffered from nausea, vomiting, diarrhea, headaches, and nostril burning. He also suffered kidney and flank pain, as well as proteinuria and hematuria. He experienced some mental anguish, trouble sleeping, and developed a fear of cancer. *Lemaire v. CIBA-GEICY Corp.,* 1999-1809 (La. App. 1 Cir. 06/22/01) 793 So.2d 349.

Attached as *Exhibit "E,"* are Plaintiff Fact Sheets from eleven of the named plaintiffs.[12]

---

[11]    These plaintiffs are: Kevin Scott, Billy Shelby, Ireyon Smith, Robert Smith, and Dominique Townsend.

[12]    These plaintiffs are: Oscar Robinson, Wanda Roy, Deborah Ruffin, Crystall Smith, Charlena Steward, Loretta Tanks, Cleo Trotter, Joseph Tyler, Eddie Webb, Elodie White, and John Williams.

For convenience, they will be referred to as "Plaintiff Group Three." Every plaintiff in Plaintiff Group Three has indicated that they suffered from symptoms similar to the plaintiff in *Lemaire,* namely nausea, vomiting, diarrhea, headaches, sinus irritation, and problems with the kidneys. The Plaintiffs in Plaintiff Group Three allege suffering between 11 and 25 total symptoms or conditions as a result of the alleged exposure. The average number of symptoms and conditions alleged by members of Plaintiff Group Three is 18. This means that, on average, in addition to six symptoms similar to the plaintiff in *Lemaire,* for which a Louisiana jury awarded $420,000.00 (not including special damages), the Plaintiffs in this group are seeking damages for an additional 12 symptoms or conditions. Based on the award granted in *Lemaire* and the additional damages sought by these plaintiffs in Plaintiff Group Three, it is not unreasonable to believe that damages in excess of $75,000.00 could be awarded to plaintiffs, if the damages sought were proven at trial, particularly when combined with a special damage award.

In *Manuel,* a Louisiana judge awarded a plaintiff $250,000.00 in general damages (total awarded including future medicals and lost wages was $955,936.79) after the plaintiff was exposed to benzene. The plaintiff suffered from headaches, dizziness, chills, and nausea. He also suffered from anxiety, depression, fatigue, and confusion. Medical experts testified that he was at increased risk of cancer. *Manuel v. Shell Oil Co.,* 94-590 (La. App. 5 Cir. 10/18/95), 664 So.2d 470.

Attached as *Exhibit "F"* are Plaintiff Fact Sheets from eighteen of the named Plaintiffs.[13] For convenience, these Plaintiffs will be referred to as "Plaintiff Group Four." Every Plaintiff in Plaintiff Group Four has indicated that they suffered symptoms similar to the plaintiff in *Manuel,* namely dizziness, headaches, nausea, and fatigue. The Plaintiffs in Plaintiff

---

[13]     These plaintiffs are: Delores Brown, Rosalyn Ross, Norris Sam, Andrea Scott, Terry Simon, Theodore Simon, Donna Smith, Harlean Smith, Angela Wagner, Stella Washington, Sehara Webb, Dorothy Wells, Mae Williams, Earl Wilright, Angela Wilson, Kenneth Wilson, Cheryl Wren, and Marilyn Wright.

Group Four allege suffering between 5 and 29 total symptoms or conditions as a result of the alleged exposure. The average number of symptoms and conditions alleged by members of Plaintiff Group Four is 20. This means that, on average, in addition to the four symptoms similar to the plaintiff in *Manuel,* for which a Louisiana jury awarded $250,000.00 (just general damages), the Plaintiffs in this group are seeking damages for an additional 16 symptoms or conditions. Based on the award granted in *Manuel* and the additional damages sought by these Plaintiffs in Plaintiff Group Four, it is not unreasonable to believe that damages in excess of $75,000.00 could be awarded to plaintiffs, if the damages sought were proven at trial, particularly when combined with a special damage award.

Every Plaintiff who submitted a Form 95 valued their claim far in excess of the requisite amount under 28 U.S.C. §1332. Furthermore, the decisions in *In re New Orleans, Lemaire,* and *Manuel* demonstrate that Louisiana juries have valued individual subsets of the symptoms alleged by the Plaintiffs far in excess of the jurisdictional requisite. Gulf Stream has met its burden under *Luckett* and *White.*

     **C.**    **The affidavit of attorney, J. Scott Daniels, and the declarations of seventy-six of the named Plaintiffs are irrelevant and cannot be considered under the rules governing removals.  Furthermore, four named Plaintiffs have judicially admitted to having a claim in excess of $75,000.00.**

Plaintiffs filed their Motion to Remand on February 26, 2010. Attached to this Motion for Remand is *Plaintiffs' Exhibits "C"* which is an affidavit from attorney J. Scott Daniels, signed February 25, 2010, asserting that an employee of his firm spoke with all plaintiffs in this matter prior to the filing of suit, and these plaintiffs instructed the firm to seek damages less than $75,000.00 per claim[14]. Also attached is *Plaintiffs' Exhibit "D"* which are "Declarations Under Penalty of Perjury" signed on behalf of seventy-six of the ninety-five of the named Plaintiffs, all

---

[14]    See Exhibit "C."

dated in February of 2010, asserting that no Plaintiff is seeking damages greater than $75,000.00 and that this intention was made clear to Plaintiff counsel prior to the suit being filed.[15]

> 1. **If Plaintiffs and Plaintiff Counsel had information regarding the valuation of damages prior to filing of the State Petition for Damages, then, under U.S. Fifth Circuit precedent, they were required to make this information known at the time suit was filed.**

Plaintiffs and their representative counsel must make all information regarding complaints known at the time suit is filed. *DeAguilar,* at 1412; *Aisola,* at 3 (n.1). If plaintiff counsel knew of his clients' alleged requests to seek less than $75,000.00 at the time the original suit was filed, as asserted in the affidavit and declarations, then this should have been, as was required to be, stated in the Original Petition for Damages. "Events occurring subsequent to removal of cause from state to Federal District Court reducing amount recoverable below requisite amount, whether beyond plaintiff's control or the result of his volition by stipulation, affidavit, or amendment of his pleadings, do not oust District Court's jurisdiction once it has attached." *St. Paul Mercury Indemnity Company v. Red Cab Company,* 303 So.2d 283, 292; 58 S.Ct. 586, 592 (1938). Litigants who want to prevent removal must file a binding stipulation or affidavit <u>with their complaints</u>; once a defendant has removed the case; *St. Paul* makes later filings irrelevant. *DeAguilar* at 1412, *citing In re Shell Oil Co.,* 970 F.2d 355, 356 (7th Cir.1992) (Emphasis Added). Thus, the affidavit filed by Daniels and the Declarations in behalf of the seventy-six named Plaintiffs are irrelevant under the law.

> 2. **The U.S. Fifth Circuit decision in *ANPAC* provides for the admission of a post-removal affidavit concerning amount of damages only when three narrow conditions are present. Neither the affidavit nor the declarations meet these three requirements and are, therefore, inadmissible.**

---

[15] The Declarations of the seventy-six named plaintiffs are attached to this Opposition, *in globo,* as *Exhibit "G."*

In support of the affidavits, the plaintiffs cite *Asociacion Nacional de Pescadores a Pequena Escala O Artesanales de Colombia (ANPAC) v. Dow Quimcia de Columubia S.A.* In *ANPAC*, the Federal Fifth Circuit allowed a post-removal affidavit to be used in support of the plaintiffs' Motion to Remand. The Court reasoned that the affidavit was attempting to "clarify" and not change the previously asserted damages. *Asociacion Nacional de Pescadores a Pequena Escala O Artesanales de Colombia (ANPAC) v. Dow Quimcia de Columubia S.A.,* 988 F.2d 559 (5th Cir. 1993), *abrogated by Marathon Oil Co. v. A.G. Ruhrgas,* 145 F.2d 211 (5th Cir. 1998).

Plaintiffs claim that ANPAC presents a situation very similar to this matter.[16] This is not the case; here, the only plausible reason for the submission of these affidavits and declarations is to change, not clarify, the previously stated damages.

The U.S. Court of Appeals for the Fifth Circuit, mere months after deciding *ANPAC,* described, in detail, its very limited application.[17] In *Marcel,* the Fifth Circuit stated, "*ANPAC,* though controlling authority, is very narrowly drawn and circumscribed and is plainly distinguishable." *Marcel v. Pool Co*., 5 F.3d 81, 84 (5th Cir. 1993). *ANPAC* only allows a post-removal affidavit to be considered when: (1) the jurisdictional amount is not facially apparent from the Plaintiff's Original Complaint, (2) the defendants provide only a conclusory statement regarding jurisdictional amount <u>prior to the ruling on the remand,</u>[18] and (3) the plaintiffs offer an unrebutted stipulation or affidavit of damages. *Marcel,* at 85. The Fifth Circuit concluded, "[n]othing in *ANPAC* suggests that stipulations or affidavits--from the plaintiffs, their attorneys,

---

[16]     Plaintiffs' Memorandum in Support of their Motion to Remand, page 5 (Rec. Doc. 11994-1).

[17]     *ANPAC* has since been abrogated on other grounds by *Marathon Oil Co. v. A.G. Ruhrgas,* 145 F.2d 211 (5th Cir. 1998).

[18]     *Marcel* is similar to the current matter in that the *Marcel* defendants did not put forth any "summary judgment type" evidence in the actual removal, but, using information received in discovery, provided a detailed explanation as to why the requisite jurisdictional amount was present in their Opposition to Plaintiffs' Remand. *See Marcel* at 85.

14

or otherwise--always or even usually should be given effect to defeat removal." *Marcel* at 85.

       J. Scott Daniel's affidavit in this case meets none of the three *ANPAC* requirements. First, as seen by the argument in Section I (A) of this Opposition, it is facially apparent that the damages asserted in Plaintiffs' Original Petition, if proven at trial, would more likely than not exceed $75,000.00. Second, as in the *Marcel* case, a lengthy and detailed description of the categories of damages sought, the evidence regarding damage amounts, and the relevant jurisprudence interpreting each comprise this section of the Opposition to Plaintiffs' Motion to Remand.  This information provides this Court with much more than a mere conclusory statement regarding the jurisdictional amount. Thus, the second condition under *ANPAC* is not present. Finally, the affidavit by Plaintiff Counsel is not unrebutted. Gulf Stream has clearly displayed why this affidavit is inadmissible and irrelevant.

       The "Declarations Under Penalty of Perjury" from Plaintiffs are even less akin to the situation in *ANPAC*. First, these documents are not affidavits as required by *ANPAC*. None of these documents have been notarized. Seven of the declarations have no parish identified even though the document specifically provides for one.[19] Five of these documents are not dated. Also, for the reasons stated directly above, *ANPAC* is inapplicable to this matter because none of the three requirements for the admissibility of post-removal affidavits have been met.

       It is difficult to understand why Plaintiffs would go through all the trouble of sitting down with each of the seventy-three clients "prior to suit being filed" in order to obtain agreements to limit damages and then fail to timely make a binding stipulation in the petition as required, or to mention this limitation in the Original Petition at all.

       The plaintiffs also cite in support *Royal Cosmopolitan, L.L.C. v. Star Realty Estate*

---

[19]    One additional Declaration identifies the Parish of signature as "New Orleans Parish." No such Parish exists in the State of Louisiana.

*Group, L.L.C.,* 629 F. Supp. 2d 594 (E.D. La. 2008). *Royal* is inapplicable to this matter for the reasons already stated.[20]

### 3.   J. Scott Daniel's Affidavit contains hearsay within hearsay and is, therefore, inadmissible.

 The affidavit of J. Scott Daniel is also hearsay. In *Aisola,* a plaintiffs' counsel seeking remand offered an affidavit attesting that no plaintiff had damages exceeding $75,000. The Court correctly noted that the plaintiffs' counsel was not a fact witness to the case and, thus, his testimony regarding the extent of his clients' injuries was not admissible.[21] *Aisola,* at 3 (n.1). In the current matter, Plaintiffs' counsel has worded his affidavit in such an indirect way as to avoid directly testifying about his clients' damages. He attests to having personal knowledge of an employee of his firm speaking to the clients at which time the clients allegedly relayed to an employee the proposition that their claims do not equal $75,000.00. This amounts to hearsay within hearsay. Rule 802 of the Federal Code of Evidence deems inadmissible the substance of any conversations taking place between the Plaintiffs and an employee of Buzbee Law Firm unless directly testified to by the Plaintiff making the statement. Furthermore, any third-party knowledge of these conversations, such as J. Scott Daniel's personal knowledge that the conversations took place, still amounts to hearsay unless testified to by the firm's employee or the individual plaintiff who was present during the conversation.

### 4.   The Plaintiffs' declarations directly contradict prior, relevant evidence as to the valuation of damages.

 In the declarations signed in February of 2010, the individual Plaintiffs state that they

---

[20]    In *Royal,* the Court found that the plaintiff's affidavit met the three requirements under *ANPAC.* The Court held that jurisdictional amount was not facially apparent, the defendants offered only a conclusory statement regarding damages, and offered no rebuttal to the affidavit. *Royal* at 597.

[21]    It should also be noted that Court went on to state that it is an ethical violation for an attorney to assert personal knowledge of facts at issue when he is not a witness. *Aisola* at 3 (FN1)(citing Louisiana Rule of Professional Conduct 3.4(e).)

will not seek damages in excess of $75,000.00.[22] They further state that the Plaintiffs made their attorneys aware of this limitation of damages prior to the suit being filed.[23] However, attached to Plaintiff Group One's "Plaintiff Fact Sheets" are Form 95s which clearly indicates that these fifteen plaintiffs valued their total claims between $115,000.00 to $500,000.00.[24] These "Plaintiff Fact Sheets" were signed in 2008, and were relevant at the time this removal was filed, unlike their post-removal declarations.

> **5.    Four of the named Plaintiffs – Norris Sam, Casey Smith, Crystall Smith, and Donna Smith - have judicially admitted to having claims in excess of $75,000.00.**

Norris Sam, Casey Smith, Crystall Smith, and Donna Smith are named plaintiffs in a Federal Complaint filed against Defendant, Gulf Stream, in the Eastern District of Louisiana under the MDL No. 07-1873, Docket No. 09-2963[25]. The Complaint asserts the same allegations and seeks the same relief as the current matter. Interestingly, paragraphs seven and eight of this complaint state:

> 7.    Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of costs and interests.

> 8.    Pursuant to 28 U.S.C. 1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than the plaintiff(s) because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest of costs.

Normally, factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them. *White v. ARCO/Polymers Inc.,*

---

[22]    *See Exhibit "G," paragraph 3*

[23]    *See Exhibit "G," paragraph 4*

[24]    *See Exhibit "B"*

[25]    See Docket No. 09-2963, *Michelle Abram, et al v. Gulf Stream Coach, Inc., et al* attached hereto as *Exhibit "H."*

720 F.2d 1391 (5th 1983); *Myers v. Manchester Insurance & Indemnity Co.,* 572 F.2d 134 (5th Cir. 1978); *State Farm Mutual Auto Insurance Co. v. Worthington,* 405 F.2d 683, 686 (8th Cir. 1968); *Mull v. Ford Motor Co.,* 368 F.2d 713, 716 (2nd Cir. 1966). Norris Sam, Casey Smith, Crystall Smith, and Donna Smith are bound to their judicial admissions of claims in excess of $75,000.00 regardless of the statements made in a post-removal declaration.

For the many reasons stated above, Gulf Stream has met its burden for jurisdiction under 28 U.S.C. §1332.

**III.    Federal jurisdiction over this case is proper under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1). Gulf Stream meets all three requirements established in the *Mesa* decision for jurisdiction.**

In addition to diversity jurisdiction, this Court also has jurisdiction over this case under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1). Under that statute, the Court has jurisdiction over any civil action involving any officer of the United States or officer of any federal agency, when that officer is sued for any act done under the color of his office. *Id.* The statute provides a federal forum for any case in which a federal official can raise a defense arising out of his official duties. *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981); *see Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 58 (5th Cir. 1975). Courts give a liberal interpretation to the statute and resolve any factual disputes in favor of federal jurisdiction. *Preston v. Tenet Healthsystem Memorial Med. Ctr.*, 463 F.Supp.2d 583, 588 (E.D. La. 2006). As this very Court has stated, "removal jurisdiction under the Federal Officer Removal Statute must be broadly construed." *Id*.

Three requirements must be met to invoke the Federal Officer Removal statute: (1) the defendant must be a "person" within the meaning of § 1442(a)(1); (2) the defendant must have acted under color of federal authority when committing the acts that allegedly caused plaintiffs'

injuries; and (3) the defendant must have a colorable federal defense. *Williams v. Todd Shipyards Co.,* 154 F.3d 416, 1998 WL 526612, *2 (5th Cir. 1998) (citing *Mesa v. California,* 489 U.S. 121, 129, 131 (1989)). Once these factors are established, the right of removal under the statute is absolute. *Willingham v. Morgan*, 395 U.S. 402, 406 (1969). In this case, the plaintiffs have stipulated that Gulf Stream is a "person," so only factors two and three warrant discussion.

### A.      Requisite Federal Control

The second factor hinges on whether Gulf Stream acted under the color of federal authority when committing the acts that allegedly caused the plaintiffs to suffer damages. The color of federal authority requirement is "neither limited nor narrow, but should be afforded a broad reading so as not to frustrate the statute's underlying rationale." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). In determining this prong, courts examine the level of official control, which is only sufficient when the control is direct and detailed. *Breaux v. Gulf Stream Coach, Inc.*, No. 08-893, 2009 WL 152109, *3 (E.D. La. Jan. 21, 2009). In this case, Gulf Stream asserts that FEMA – in various ways and over a significant period of time – exerted direct, detailed and substantial control over the construction and design of Gulf Stream's Temporary Housing Units.

First of all, Gulf Stream has not, as the plaintiffs wrongly allege, overstated FEMA's role in monitoring and inspecting Gulf Stream's construction of the units. In 2005 and 2006, FEMA traveled to Gulf Stream's facility in Napanee, Indiana, to inspect the trailers that were produced for Katrina disaster relief.[26] Government inspectors worked inside Gulf Stream's manufacturing facilities – not outside only, as stated by the witnesses cited in the plaintiffs' Motion for Remand – during the period of the contracts to inspect the Gulf Stream THUs and to attest to their

---

[26]      *See* Deposition of Gulf Stream Coach, Inc., through James Shea, dated May 28, 2009, 237:21—24, attached as *Exhibit "I"*

sufficiency <u>before</u> they were shipped into the disaster zone. *Id.* at 299:3—23. These inspections were quite detailed, to the point that the inspectors were examining "down to the last nuts-and-bolts." *Id.* at 299:24—300:4. The inspectors used a comprehensive checklist, which encompassed all manner of trailer aspects. Using the checklist, FEMA checked every appliance, furnishing and instance of damage in order to ensure that Gulf Stream supplied a proper trailer. *See Id*. And not only was the government inspection detailed, it was also done on **<u>every</u>** trailer.[27] Finally, in reference to the plaintiffs' suggestion that FEMA's control was limited because it was allegedly not allowed inside the manufacturing plant, Gulf Stream first points out that Linda Esparza only worked at a single Gulf Stream plant (plant 75), so she would have no knowledge of how the inspections were conducted at the other plants.[28] But regardless of what she and Terry Slone have said about where the inspections took place, their testimony (even if assumed to be true) does not change the fact that FEMA performed an extensive inspection of every trailer produced by Gulf Stream. The relevant fact is that FEMA performed comprehensive inspections while at Gulf Stream's facility, and these units could not be cleared for shipment to the disaster areas unless they passed FEMA's inspection. Where FEMA personnel actually performed these inspections is totally irrelevant.

Additionally, FEMA's control over the process was long-standing. Gulf Stream first sold travel trailers to FEMA for disaster relief after Hurricane Andrew in 1992.[29] Because of FEMA's extensive experience, FEMA knew what it was buying when it purchased these THUs for disaster relief after Katrina.[30] FEMA was aware that the units contained formaldehyde.[31] Martin

---

[27]     *See* Deposition of Joseph Cleland, dated July 16, 2009, 41:13, attached as *Exhibit "J."*

[28]     *See* Deposition Transcript of Linda Esparza, dated July 17, 2009, at 9:11—13, attached as *Exhibit "K."*

[29]     *See Exhibit "I,"* 280:1—2.

[30]     *See* Deposition of David Garratt, taken on July 7, 2009, p. 157—58, attached as *Exhibit "L"; Deposition of

McNeese, FEMA's Emergency Program Specialist, said that it was not surprising to him that the travel trailers contained formaldehyde.[32] Nevertheless, FEMA deliberately chose to use travel trailers because of their practicality and functionality.[33] Second, FEMA's control started well before construction, at the time when it supplied specific and detailed specifications for travel trailer procurement.[34] As a manufacturer of these trailers, Gulf Stream was compelled to abide by these specifications during manufacture. The specifications were incredibly detailed, describing square footage requirements, floor plan configurations, finishes, furnishings, and environmental living conditions. *See id*. The specifications also required the manufacturer to construct them with a superior quality of workmanship and in total compliance with federal regulatory requirements. *See id*. The instructions were direct and detailed, and they controlled precisely how Gulf Stream was to build the THUs.

Regarding the argument that the specifications did not rise to the level of "official control" needed for Federal Officer Removal, Gulf Stream asserts that the case cited by the plaintiffs is distinguishable with respect to this issue. In that case, *Joseph v. Fluor Corp.*, the defendants relied upon the FEMA trailer specifications as the only basis for Federal Officer Removal. *See* 513 F.Supp.2d 664, 672 (E.D. La. 2007). The Court specifically noted that the defendants never presented any other evidence that FEMA exercised control over the defendants' other activities (*e.g.*, on-site inspections and installation of travel trailers). *Id*. at 673 n. 11. In this case, the opposite is true – Gulf Stream has shown that FEMA exercised control over Gulf

---

David Porter, taken on July 8, 2009, p. 115—16, 161—62, attached as *Exhibit "M."*

[31]   *See* Deposition of Martin McNeese, taken on July 14, 2009, p. 35, attached as *Exhibit "N."*

[32]   *Id.* at Exhibit "*N*," at p. 108.

[33]   *See* Exhibit *"M."* at 207—08.

[34]   *See* Document HFSE04-04-Q-8000, attached as *Exhibit "O."*

Stream's actions not only through the production of specifications but also through FEMA's extensive inspection and monitoring during the construction process. Thus, regarding the question of whether it worked under color of federal authority, Gulf Stream stands apart from the defendants in the *Joseph* case. Gulf Stream was the only manufacturer with a direct contract with FEMA, and Gulf Stream was the only manufacturer with FEMA inspectors on-site, monitoring and examining trailer production at the point of origin.

Third and finally, the plaintiffs themselves have acknowledged that Gulf Stream's involvement in this case arose out of its federal contract to provide temporary housing. The plaintiffs allege that Gulf Stream contracted with FEMA to "sell temporary housing units for provision to the Plaintiffs as temporary housing following Hurricane Katrina."[35] By manufacturing and selling the Temporary Housing Units to FEMA – as the plaintiffs have alleged Gulf Stream did – Gulf Stream's only "work" in this case was performed pursuant to FEMA's direction under the contract. Clearly, Gulf Stream was acting under color of federal authority when complying with its obligations under the contract.

Taking this evidence into account, Gulf Stream respectfully submits that FEMA exercised direct, detailed and substantial control over Gulf Stream's construction of the Temporary Housing Units. FEMA inspected and monitored Gulf Stream's construction, it specifically told Gulf Stream what to build and how to build it, and the plaintiffs have essentially admitted that Gulf Stream's very involvement in this case arose because of its contract with FEMA. Thus, Gulf Stream acted under the color of federal authority, and in doing so satisfied the second prong of Federal Officer Removal.

**B.      Colorable Defense**

The third factor centers on whether Gulf Stream has a colorable federal defense –

---

[35]      *See Exhibit "A,"* Petition, at ¶ IV.

namely, the government contractor defense. This is essentially a moot issue. In a Federal Officer Removal case involving Temporary Housing Units provided after Hurricane Katrina, this Court ruled that the trailer manufacturers have a colorable claim to the government contractor defense. *See Joseph v. Fluor Corp.*, 513 F.Supp.2d 664, 671 (E.D. La. 2007). Additionally, during the *Alexander* trial, this Court heard the plaintiffs' Rule 50 motion to dismiss Gulf Stream's government contractor defense, yet still allowed the defense to be submitted to the jury. Thus, it is evident by these decisions that Gulf Stream meets the minimum threshold of having a colorable federal defense.

If this Court feels, however, that these decisions are inapplicable to this action, Gulf Stream nevertheless asserts that it has a colorable defense on the basis that it was a government contractor and is therefore immune from liability under state tort law. At the outset, it is critical to note that Gulf Stream has no obligation to actually prove the defense at this stage. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998). All that is required is a showing that the defense is plausible. *U.S. v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). Furthermore, the liberal construction given to the Federal Officer Removal statute is even more warranted in a case involving an immunity defense. The Fifth Circuit has recognized that one of the most important functions of Federal Officer Removal is to allow a federal court to explore the validity of an asserted official immunity defense. *Winters*, 149 F.3d at 397.

As for the defense itself, the main focus is whether the federal preemption of state law is justified under the circumstances. In *Boyle v. United Tech Corp.*, the U.S. Supreme Court held that some areas of activity – those involving "uniquely federal interests" – are so committed to federal control that any applicable state law becomes pre-empted. *See* 487 U.S. 500, 504 (1988). However, preemption, or "displacement," of state law will occur only when a significant conflict

23

exists between an identifiable federal interest and the operation of applicable state law, or when the operation of state law would hinder the specific objectives that federal legislation was designed to achieve. *Id*. In determining whether such "displacement" is warranted, the Court held that state-law liability for design defects in military equipment cannot be imposed when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id*. at 512.

### 1. Government's Approval of Reasonably Precise Specifications

The first prong of the defense calls for the government to "approve" specifications that are "reasonably precise." The government's approval turns on whether it exercised discretion over the product design, or whether it simply delegated discretion to the contractor. *See Trevino v. Gen. Dynamics*, 865 F.2d 1474, 1480 (5th Cir. 1989). Mere acceptance of the contractor's design choice without significant evaluation is "rubber stamping," not substantive review. *See Stout v. Berg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991). The government exercises its discretion when it actually chooses a design feature. *Trevino*, 865 F.2d at 1480. As the Fifth Circuit has stated:

> The government delegates the design discretion when it buys a product designed by a private manufacturer; when it contracts for the design of a product or a feature of a product, leaving the critical design decisions to the private contractor; or when it contracts out the design of a concept generated by the government, requiring only that the final design satisfy minimal or general standards established by the government.

*Id*.

However, the government's approval does not mean the government has to prepare the specifications itself. *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000). All that is required is that the government performs a "substantive review" of the specifications. *Trevino*,

865 F.2d at 1480. Whether the government has undertaken such a review is based on several factors, including an examination of drawings, periodic evaluation, criticism, and extensive government testing. *Kerstetter*, 210 F.3d at 435. To complete a substantive review, there must be a "continuous back and forth between the contractor and government." *Id*. Furthermore, it is not necessary that the specifications depict the alleged defect, as long as the government evaluated the design aspect in question. *Id*.

Several decisions from the Fifth Circuit have dealt with the issue of whether the government approved reasonably precise specifications. In *Stout v. Berg-Warner Corp.*, the manufacturer alleged that the government approved reasonably precise specifications on an air conditioning unit used to cool a U.S. Army missile repair unit. *Id*. at 335. The manufacturer pointed out that the Army controlled the design process by modifying the design of the air conditioner; reviewed, evaluated, tested and approved detailed design drawings at different stages during the process, including the prototype phase; and approved over fifty pages of design drawings. *Id*. The court agreed with the manufacturer and further acknowledged that the government had reviewed detailed drawings that the contractor submitted at various progressive stages of the design, performed critical design reviews, and evaluated and tested for months the prototype models produced by the manufacturer.

In *Smith v. Xerox Corp.*, an Army soldier was injured when a weapon simulator he was using exploded prematurely and burned his arm and torso. 866 F.2d 135, 136 (5th Cir. 1989). The soldier sued Xerox, the manufacturer of the weapon, for his personal injuries. *Id*. Xerox filed for summary judgment under the government contractor defense, and it won the motion. *Id*. On appeal, the Fifth Circuit noted that although Xerox failed to produce complete specifications for the original simulator, Xerox did produce a listing of those specifications, a copy of the original

government performance criteria dictating the environmental specifications the government wanted the simulator to meet, and a production contract furnished by Xerox for a series of simulators containing specific reference to government-approved specifications. *Id.* at 138. Further, a Xerox employee who was involved with the development of the simulator testified that the Army reviewed and approved the drawings and specifications prepared by Xerox. *Id.* Because the government in this case supplied the relevant environmental specifications, and because the employee's unrebutted testimony was that the government reviewed and approved Xerox's final drawings and specifications, the court held that the government had approved reasonably precise specifications. *Id.*

In *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, the plaintiffs brought product liability claims against the manufacturers of a military plane that crashed, tragically killing 13 of the 17 servicemen aboard. 81 F.3d 570, 571—72 (5th Cir. 1996). In considering the government contractor defense, the court acknowledged that the U.S. Air Force's substantive review, evaluation and testing of the aircraft "clearly implicate[d] the Government's discretionary function and approval of reasonably precise specifications." *Id.* at 575. Affidavits established that the manufacturers and the Air Force had worked closely together on the development of the plane from planning through production. *Id.* In addition, the Air Force inspected and supervised all aspects of the aircraft's production. *Id.* As the court said, "Clearly, the approvals in this case go far beyond mere rubber stamping." *Id.*

Decisions from outside of the Fifth Circuit are also instructive. In *Dowd v. Textron, Inc*., 792 F.2d 409 (4th Cir. 1986), the Fourth Circuit held that the government contractor defense applied to shield a helicopter manufacturer from liability for an alleged design defect in the helicopter's rotor system. Plaintiffs argued that since the manufacturer originally designed the

rotor system in the early 1960s without any participation by the Army, the government neither set nor approved reasonably detailed specifications. *Id.* at 412. The Court dismissed that argument, noting:

> That argument overlooks a wealth of subsequent history. The Army had been using helicopters equipped with the 540 rotor system for some twenty years before Ellis and Dowd's accident; almost 9,000 UH-1 and AH-1 helicopters flew in Vietnam . . . The <u>length and breadth</u> of the Army's experience with the 540 rotor system-and its decision to continue using it-amply establish government approval of the alleged design defects.

*Id.* at 412 (emphasis added).

Applying these cases to the instant litigation, Gulf Stream asserts that the government approved reasonably precise specifications for the EHUs. In fact, FEMA did more than any of the other governmental entities discussed in the aforementioned cases – it actually prepared the original set of procurement specifications for FEMA Model Travel Trailers. [36] FEMA's specifications described minimum square footage of living space, floor plan configuration, finishes, furnishings, and environmental living conditions necessary to provide emergency housing during periods of disaster relief. *Id.* The manufacturer who produced these emergency units had to construct them with a superior quality of workmanship, and the specifications adhered completely to federal regulatory requirements. *Id.* By making these pronouncements, FEMA supplied the relevant specifications that formed the basis of the production of travel trailers, much like the U.S. Army did in the *Smith* decision. FEMA specifically chose the design features for the trailer, and in doing so exercised great discretion over the complete design. *See Trevino,* 865 F.2d at 1480. Never did FEMA delegate design choices to Gulf Stream carte blanche; instead, FEMA created the preferred design itself.

Additionally, FEMA exercised its discretion over the product design by specifically

---

[36] *See Exhibit "O."*

choosing to use travel trailers as part of its disaster relief efforts.[37] FEMA had used this product since at least the early 1990s in south Louisiana. *See id*. at 22. Its use of these trailers as part of its disaster relief operations, especially in the same type of hot and humid climate that exists in this area, was extensive and well documented. *See id*. Travel trailers were not a revolutionary product – FEMA knew exactly what was in them and used them without incident prior to Hurricane Katrina.[38] Just like the Army in *Dowd*, FEMA had a long and broad track record of using Gulf Stream THUs and continued to lose those units over the course of some 15 years. This clearly establishes the government approval over the alleged design defects. Therefore, FEMA's approval of these reasonably precise specifications satisfies the first prong of the *Boyle* test. At the very least, the evidence establishes that Gulf Stream has a plausible defense that FEMA reasonably approved these specifications.

### 2.   Conformance to Specifications

The second prong requires the contractor to prove that the equipment it produced conformed to the specifications that were approved by the government. *Boyle*, 487 U.S. at 512. The Fifth Circuit has held:

> Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications. Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications.

*Kerstetter*, 210 F.3d at 435—36.

---

[37]   *See Exhibit "L,"* p. 203 (stating that FEMA supplied thousands of travel trailers for natural disasters prior to Katrina).

[38]   *See Exhibit "N,"* pages 100-01, 106-08

Decisions from the Fifth Circuit have reinforced the general rule. *In re Air Disaster*, discussed previously, held that the manufacturer's equipment conformed to specifications because the government inspectors were present and actively involved throughout the design, review, development and testing of the plane that crashed. 81 F.3d at 575. Furthermore, the evidenced showed that the Air Force accepted and had used the plane for over 20 years without any significant problems before the crash. *Id*. Likewise, in the *Xerox* decision, the court held that the evidence showed the manufacturer of the weapon that discharged prematurely had complied with the specifications for the product. *See* 866 F.2d at 138. When technicians analyzed the weapon after the accident, they could not duplicate the problem. *Id*. at 139. After the product was reassembled, the government put the product back into use. *Id*. Thus, the court held that the product complied with the applicable specifications. *See id*.

In this case, Gulf Stream submits that its production of the units conformed to the specifications set forth by FEMA. Gulf Stream reviewed nearly 20 years worth of records related to the production of THUs for FEMA and found zero complaints relating to formaldehyde in THUs.[39] Additionally, FEMA's own personnel testified that prior to Katrina, there was not a shred of written evidence or documentation that showed problems with formaldehyde.[40,41,42] Additionally, just as with the *In re Air Disaster* and *Xerox* cases, the government used Gulf Stream's products extensively as part of its disaster relief efforts following Hurricane Katrina. Such evidence shows that Gulf Stream complied with FEMA's specifications, and thus satisfied the second prong of the *Boyle* test.

---

[39]    *See Exhibit "I,"* p. 130.

[40]    *See Exhibit "L,"* p. 179.

[41]    *See Exhibit "N,"* p. 100-01.

[42]    *See* Deposition Transcript of Stephen Miller, taken on July 9, 2009, p. 184—85, attached as *Exhibit "P"*

### 3.   Warnings about Dangers in the Equipment Not Known by the Government

The final prong requires the contractor to warn the government about dangers in the use of the equipment that are known to the contractor but not known to the government. *Kerstetter*, 210 F.3d at 436. The contractor has no obligation to inform the government of those dangers already known to the government. *Boyle*, 487 U.S. at 512. Additionally, "the purpose of this element is <u>not</u> to create an incentive to discover latent defects in a product designed for the government." *Kerstetter*, 210 F.3d at 436 (emphasis in original). Thus, the contractor only has a duty to inform of dangers it actually knows about, not those it should have known about. *Id*.

Gulf Stream avers that to the extent the existence of formaldehyde would qualify as a "danger" that Gulf Stream needed to tell FEMA about, FEMA was well aware of the presence of this danger. [43] As Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, stated, it was no surprise that the travel trailers contained formaldehyde. *Id*. at 108. Clearly, FEMA knew that the subject unit contained the compound. In fact, it was known to FEMA that not only an industry standard travel trailer, but also a conventional home, would contain formaldehyde. [44] Because FEMA already knew the existence of formaldehyde in the Emergency Housing Units, Gulf Stream had no obligation to warn them about any condition in the trailer.

Additionally, if Gulf Stream in fact had an obligation to tell FEMA about the danger, it did so as soon as Gulf Stream learned of occupant complaints. Gulf Stream first learned of complaints in March 10, 2006. [45] In April, Gulf Stream had a meeting with FEMA officials, at

---

[43]     *See Exhibit "N,"* p. 35.

[44]     *See Exhibit "N,"* p. 107-08.

[45]     *See* TRANSCRIPT OF JURY TRIAL PROCEEDINGS, DAY 2, *Age et al. v. Gulf Stream Coach, Inc. et al.*, Docket No. 09-2892, p. 248:20 – 249:1 and p. 132:17-24, attached as *Exhibit "Q," in globo.*

which time Gulf Stream believed it would be working collectively to address the occupants' concerns.[46] Shortly thereafter, on May 11, 2006, Gulf Stream's Executive Vice President Philip Savari sent correspondence to FEMA's Director of Operations in which Gulf Stream provided instructions on how to ventilate the units in order to address the occupant complaints. Gulf Stream also attached a set of specific ventilation instructions to the letter.[47] This evidence establishes that as soon as Gulf Stream learned of complaints, it met with FEMA worked with FEMA on appropriate methods for resolving the problems of which the THU occupants were complaining. By advising the government, Gulf Stream complied with the third prong of the *Boyle* test. At the least, Gulf Stream has established that it has a plausible defense that it complied with the responsibility to warn under the circumstances.

In conclusion, Gulf Stream avers that by establishing it has a plausible argument that it can satisfy each of the three elements to obtain government contractor immunity, it has proven its possession of a colorable federal defense. In doing so, it has satisfied the third and final prong of Federal Officer Removal. Accordingly, this Court has jurisdiction over the plaintiffs' claims against Gulf Stream.

**IV.    This Court has jurisdiction under the Class Action Fairness Act (28 U.S.C. 1332(d)). Based on relevant jurisprudence, Plaintiffs are not able to segment this mass action into five different suits for the sole purposes of defeating federal diversity.**

Plaintiffs have filed Motions to Remand in five separate lawsuits. Including the current matter, Plaintiffs have filed remand motions in *Andrews, Floyd, Lewis,* and *Robertson.* Based on the jurisprudence below, this indiscriminate segmenting of the mass action is not permissible to defeat federal jurisdiction.

---

[46]    See *Exhibit "Q."*

[47]    *See* GULF 0002336, 0002338—0002340, attached as *Exhibit "R."*

28 U.S.C. 1332(d) states in relevant parts:[48]

**(11)(A)** For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

In *Freeman,* three hundred diverse plaintiffs, segmented their mass action into five different suits based on six-month intervals, and asserted damages of 4.9 million dollars per six-month period. The Plaintiffs argued that since no single suit met the jurisdictional minimum, the federal courts lacked jurisdiction under CAFA. *Freeman v. Blueridge Paper Products, Inc.,* 551 F.3d 405 (6th Cir. 2008). In holding that CAFA jurisdiction existed, the U.S. Court of Appeals for the Sixth Circuit stated, "CAFA was clearly designed to prevent plaintiffs from artificially structuring their suits to avoid federal jurisdiction." *Id.* at 407. "Generally, if a plaintiff 'does not desire to try his case in the federal court, he may resort to the expedient of suing for less than the jurisdictional amount, and though he would be justly entitled to more, the defendant cannot remove.' (citing *St. Paul Mercury* at 294). But where recovery is expanded, rather than limited, by virtue of splintering of lawsuits for no colorable reason, the total of such identical splintered lawsuits may be aggregated." *Id.* at 409 (Emphasis Added).

In order to obtain jurisdiction under CAFA, the mass action must 1) contain at least 100 plaintiffs and 2) the aggregate amount in controversy must exceed $5,000,000. The Plaintiffs argue that this Court lacks federal jurisdiction under CAFA because no single suit contains the

---

[48] The Class Action Fairness Act generally requires minimum diversity and $5,000,000 in controversy. *See 28 U.S.C. 1332(d)(2).*

necessary 100 plaintiffs under 28 U.S.C. 1332(d).

The total number of plaintiffs in the five remanded suits equals 407. *Abram* claims damages on behalf of 97 plaintiffs.[49] *Andrews* claims damages on behalf of 17 plaintiffs.[50] *Floyd* claims damages on behalf of 99 plaintiffs.[51] Lewis claims damages on behalf of 99 plaintiffs.[52] Finally, *Robertson* claims damages on behalf of 95 plaintiffs.[53] These five suits assert, verbatim, the same allegations, damages, and prayers for relief. In fact, the only difference in the five suits "paragraph 1" which lists the named plaintiffs. The suits are obviously aligned in alphabetical order, such that it appears that all 407 plaintiffs were alphabetized and then segmented such that no single suit had more than 100 plaintiffs. This is the exact type "artificial structuring" of lawsuits referred in *Freeman.* There is no colorable reason for splintering these five suits other than the intentional avoidance of CAFA jurisdiction. Thus, the claims of all 407 plaintiffs may be aggregated in order to reach the $5,000,000 jurisdictional amount required by 28 U.S.C. 1332(d)(2). In order to reach this amount, each of the 407 plaintiffs must average a claim of $12,285.11. Based on the arguments made in Section (II) of this Opposition regarding damages asserted and the evidence presented as to symptoms alleged due to the exposure, recovery will more likely than not exceed $12,285.11 per plaintiff, if these allegations are proven at trial. Thus, this Court has jurisdiction under the Class Action

---

[49]     See *Michelle Abram, et al v. Gulf Stream, et al,* filed in Civil District Court for Orleans Parish, attached here as *Exhibit "S".*

[50]     See *Karen Andrews, et al v. Gulf Stream, et al,* filed in Civil District Court for Orleans Parish, attached here as *Exhibit "T".*

[51]     See *Pamela Floyd, et al v. Gulf Stream, et al,* filed in Civil District Court for Orleans Parish, attached here as *Exhibit "U."*

[52]     See *Pearl Lewis, et al v. Gulf Stream, et al,* filed in Civil District Court for Orleans Parish, attached here as *Exhibit "V."*

[53]     See *Exhibit "A".*

Fairness Act.

**WHEREFORE,** defendant, Gulf Stream Coach, Inc. prays that this matter be removed to the United States District Court for the Eastern District of Louisiana for further proceedings and disposition.

Respectfully submitted:

**DUPLASS, ZWAIN, BOURGEOIS,**
**PFISTER & WEINSTOCK**

s/Andrew D. Weinstock

_____
**ANDREW D. WEINSTOCK (#18495)**
**JOSEPH G. GLASS (#25397)**
3838 N. Causeway Boulevard, Suite 2900
Metairie, Louisiana 70002
Telephone: (504) 832-3700
andreww@duplass.com
jglass@duplass.com

and

**SCANDURRO & LAYRISSON**
Timothy D. Scandurro #18424
Dewey M. Scandurro #23291
607 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 522-7100
tim@scanlayr.com
dewey@scanlayr.com
**Counsel for Defendant, Gulf Stream Coach, Inc**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 16th day of March, 2010, a copy of the foregoing Opposition to Plaintiffs' Motion to Remand was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this file will be sent to all known counsel of record by operation of the court's electronic filing system.

s/Andrew D. Weinstock
_____

ANDREW D. WEINSTOCK #18495
andreww@duplass.com