Martin Edward McNeese                                           July 14, 2009
                           Washington, DC

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF LOUISIANA
 3                  NEW ORLEANS DIVISION
 4   In Re:  FEMA Trailer     )
 5   Formaldehyde Products    ) MDL No. 1873
 6   Liability Litigation     )
 7
 8                           Washington, D.C.
 9                           Tuesday, July 14, 2009
10   Videotape Deposition of MARTIN EDWARD McNEESE, called
11   for examination by counsel for Plaintiffs in the
12   above-entitled matter, the witness being duly sworn
13   by CHERYL A. LORD, a Notary Public in and for the
14   District of Columbia, taken at the offices of NELSON
15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution
16   Avenue N.W., Suite 900, Washington, D.C., at
17   9:03 a.m., and the proceedings being taken down by
18   Stenotype by CHERYL A. LORD, RPR, CRR.
19
20
21
22
```

Page 35

1               Objection.

2               There's no question pending.

3               MS. GILBREATH: Okay.

4               MR. MILLER: You can have the court
5   reporter read the que- -- answer back if you want.

6               MS. GILBREATH: Can you read back his
7   previous answer.

8               (The reporter read the last
9               answer.)

10              BY MS. GILBREATH:

11       Q.    So did you believe the task of EPA and
12  ATSDR in terms of determining whether venting was an
13  effective response was to determine whether or not it
14  lowered the levels of formaldehyde?

15       A.    No, I didn't believe that.

16              If the test -- the test that was given to
17  EPA was to, number 1, establish a baseline or
18  establish a level of volatile inorganic compounds and
19  specifically formaldehyde, and number 2, to --
20  because we weren't denying that there was
21  formaldehyde in the units -- we knew there was -- to
22  see if -- what the impact of venting was on the

Martin Edward McNeese

July 14, 2009

Washington, DC

Page 100

```
 1        A.    Yes, I do.
 2        Q.    And you recall that your conclusion was
 3   that based on those tests, you felt like travel
 4   trailers in combination with ventilation were a
 5   viable option for emergency housing.
 6              Correct?
 7        A.    That's correct.
 8        Q.    Okay.  And you were asked a followup
 9   question as to whether you were basing that solely on
10   the ATSDR test or whether you had any personal
11   training or experience or knowledge.
12              Do you recall those questions?
13        A.    I do.
14        Q.    Am I correct that you did in fact have
15   some personal experience while you were with FEMA
16   with the use of travel trailers in other disasters
17   prior to Hurricane Katrina?
18        A.    That's correct.
19              I have actually been working in housing
20   programs over the past -- over the years before
21   Katrina.
22        Q.    And am I also correct that part of your
```

Page 101

1  experience would have been working with travel
2  trailers in hurricane disaster areas, including the
3  Gulf Coast in Florida?
4      A.   That's correct.
5      Q.   Is -- am I also correct that to the best
6  of your knowledge and experience working with travel
7  trailers prior to Hurricane Katrina, you weren't
8  aware of any health concerns associated with
9  formaldehyde in the travel trailers; is that right?
10     A.   That's correct.  I was not.
11     Q.   And you dealt directly with occupants,
12 didn't you, in those other hurricane disaster areas
13 from time to time?
14     A.   I did.
15     Q.   And again, prior to Hurricane Katrina, you
16 weren't aware of any complaints by occupants relating
17 to formaldehyde or health effects of living in these
18 trailers?
19          MR. MILLER:  Objection, compound.
20     A.   Yeah,.
21          Actually I was not aware of any.
22          BY MR. SCANDURRO:

1  conclusion wasn't that everybody who might be exposed
2  to a level above that .3 level of concern would have
3  a problem.  It was only conceivably people with a
4  prior sensitization.
5           Was that your understanding?
6      A.  That was my interpretation.
7      Q.  Let me ask you also about McNeese number
8  7.
9           There's a reference in the second
10 paragraph here to the -- what's been described to us
11 in other depositions as the swapout program or the
12 swapping out of newer units for older units.
13          Do you see that discussion there on
14 McNeese 7 under number 2?
15     A.  Yes.
16     Q.  Was it your conclusion that the program at
17 this time of swapping out a newer trailer for an
18 older trailer with people who had complained an
19 adequate response that was in fact effective in
20 addressing the complaints of those individuals?
21     A.  It was my feeling that that was in fact a
22 valid program and valid process, realizing that if

1   people did not want to do that, we would put them in
2   a hotel or somewhere else.
3           I mean, that was always the other option
4   that went with it, but the ones we swapped out with
5   older units, we never to my knowledge got a complaint
6   back from them again, so --
7       Q.   And the older units would be for example
8   units from the 2004 hurricanes in Florida?
9       A.   Or from any other disasters, but prior to
10  Katrina-type units, yes.
11      Q.   So some of the swapout units were in fact
12  from the 2004 hurricanes in Florida; is that right?
13      A.   That's probably true, yes.
14      Q.   And you're not aware of any followup
15  problems in those 2004 units once they were swapped
16  out from a formaldehyde standpoint?
17      A.   I'm not aware of any, that's correct.
18      Q.   Also in McNeese 7, you refer under number
19  3 to the fact that it is a given that the materials
20  used in the construction of mobile homes and travel
21  trailers in addition to other residential structures
22  contain formaldehyde.

1            Do you see that?
2       A.   I do.
3       Q.   It was no surprise to you that there was
4  some formaldehyde in these travel trailers, was it?
5       A.   No, it was not.
6       Q.   And in fact, you're generally aware that
7  there is also formaldehyde not only in travel
8  trailers but in mobile homes and in stick-built
9  residential structures; is that right?
10      A.   That's correct.
11      Q.   In some of the documents that we looked at
12 this morning, I noted that you made references to the
13 fact that there were no standards, residential indoor
14 air standards that FEMA could look to for guidance.
15           Do you recall having that concern at the
16 time?
17      A.   I do --
18      Q.   Could you --
19      A.   -- recall that.
20      Q.   -- elaborate on what -- what your reaction
21 was to learning that there were in fact no standards
22 that FEMA could look to regarding residential indoor