## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA
## NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                          MDL NO. 07-1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION                 SECTION N-5
                                             JUDGE ENGELHARDT
                                             MAG. JUDGE CHASEZ


**************************************************************************


## UNITED STATES OF AMERICA'S EXHIBITS IN SUPPORT OF ITS REPLY
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN AWARD OF COSTS
### (Rec. Doc. 11936)



## U.S. EXHIBIT NO. 2

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

In re: FEMA TRAILER FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION
MDI. NO. 1873
SECTION "N" (5)
_____


            DEPOSITION OF BRUCE J. KELMAN, Ph.D.
              Taken on behalf of the Plaintiff
                 Tuesday, December 15, 2009
```

Page 1

1   Appearing on behalf of,
2   the United States:
3   HENRY T. MILLER
4   US DEPARTMENT OF JUSTICE
5   Environmental Torts
6   1331 Pennsylvania Avenue NW
7   Washington, DC 20004
8   (202) 616-4223
9   (202) 616-4989
10  Henry.miller@usdoj.gov
11
12  Appearing on behalf of,
13  the Forest River:
14  JASON D. BONE
15  ERNEST GIEGER, JR.
16  GIEGER, LABORDE & LAPEROUSE, LLC
17  One Shell Square
18  701 Poydras Street, 48th floor
19  New Orleans, LA 70139
20  (504) 561-0400
21  (504) 561-1011
22  Jbone@glllaw.com
23  Egieger@glllaw.com
24
25

Page 3

1              APPEARANCES
2
3   Appearing on behalf of the Plaintiff:
4   PETER PINEDO
5   THE LAW OFFICE OF CHRIS PINEDO
6   4550 Jericho Road
7   Corpus Christi, TX 78413
8   (361) 964-1474
9   (361) 244-2278
10  Cpinedo@cpinedolaw.com
11
12  Appearing on behalf of the Plaintiff:
13  FRANK J. D'AMICO, JR.
14  THE LAW OFFICE OF FRANK J. D'AMICO, JR.
15  622 Baronne Street
16  New Orleans, LA 70113
17  (504) 525-7272
18  Fdamicojr@damicolaw.net
19
20
21
22
23
24
25

Page 2

1   Appearing on behalf of the Defendant,
2   Shaw Environmental, Inc.:
3   DAVID KURTZ
4   KAREN ALER WHITFIELD
5   BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ
6   201 St. Charles Avenue, Suite 3600
7   New Orleans, LA 70170
8   (504) 566-5216
9   (504) 636-3916 Fax
10  dkurtz@bakerdonelson.com
11  Kwhitfield@bakerdonelson.com
12
13  Appearing on behalf of,
14  the United States:
15  ADAM M. DINNELL
16  UNITED STATES DEPARTMENT OF JUSTICE
17  Ben Franklin Station
18  P.O. Box 340
19  Washington, DC 20044
20  (202) 616-4211
21  (202) 616-4473
22  Adam.dinnell@usdoj.gov
23
24
25

Page 4

Bruce Kelman PhD                                                        December 15, 2009

| | |
|---|---|
| 1  Appearing on behalf of, | 1  ALSO PRESENT: |
| 2  Fluor Enterprises: | 2 |
| 3  RICHARD A. SHERBURNE JR. (via telephone) | 3  Sid Fox, |
| 4  MIDDLEBERG, RIDDLE & GIANNA | 4  Videographer, |
| 5  450 Laurel Street, Suite 1101 | 5  Naegeli Reporting Corporation |
| 6  Baton Rouge, LA 70801 | 6 |
| 7  (225) 381-7700 | 7 |
| 8  (225) 381-7730 Fax | 8 |
| 9  RSherburne@midrid.com | 9 |
| 10 | 10 |
| 11 | 11 |
| 12  Appearing on behalf of the Defendant, | 12 |
| 13  Bechtel National, Inc.: | 13 |
| 14  A.J. KROUSE (via telephone) | 14 |
| 15  FRILOT, LLC | 15 |
| 16  1100 Poydras Street | 16 |
| 17  3700 Energy Centre | 17 |
| 18  New Orleans, LA 70163 | 18 |
| 19  (504) 599-8016 | 19 |
| 20  (504) 599-8116 Fax | 20 |
| 21  AKrouse@Frilot.comom | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 5 | Page 7 |

| | |
|---|---|
| 1  Appearing on behalf of, | 1  INDEX |
| 2  Jayco, Inc., and Starcraft RV, Inc.: | 2  Page |
| 3  HAL L. ROACH, JR. (via telephone) | 3 |
| 4  WILLINGHAM, FULTZ & COUGILL | 4  EXAMINATION BY MR. PINEDO          14 |
| 5  808 Travis, Suite 1608 | 5 |
| 6  Houston, TX 77002 | 6 |
| 7  (713) 333-7600 | 7 |
| 8  (713) 333-7601 | 8 |
| 9  Halr@willingham-law.com | 9 |
| 10 | 10 |
| 11 | 11 |
| 12  On behalf of, | 12 |
| 13  Liberty Mutual Insurance Corporation: | 13 |
| 14  KRISTOPHER M. REDMANN (via telephone) | 14 |
| 15  LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD | 15 |
| 16  601 Poydras Street, Suite 2775 | 16 |
| 17  New Orleans, LA 70130 | 17 |
| 18  (504) 568-1990 | 18 |
| 19  (504) 310-9195 Fax | 19 |
| 20  Kredmann@lawla.com | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 6 | Page 8 |

2 (Pages 5 to 8)

Bruce Kelman PhD                                                December 15, 2009

EXHIBITS

| | Exhibit | | Page |
|---|---|---|---|
| 1 | | NOTICE OF ORAL AND VIDEOTAPED | 16 |
| | | DEPOSITION OF BRUCE J. KELMAN, PH D., | |
| | | DABT, ATS | |
| 2 | | LETTER TO ADAM DINNELL DATED | 17 |
| | | 11-02-2009 | |
| 3 | | A METHOD FOR DETECTING FUNGAL | 18 |
| | | CONTAMINANTS IN WALL CAVITIES | |
| 4 | | PREVALENCE AND AIRBORNE SPORE LEVELS | 18 |
| | | OF STACHYBOTRYS SPP. IN 200 HOUSES | |
| | | WITH WATER INCURSIONS IN HOUSTON, | |
| | | TEXAS | |
| 5 | | CAUSATION AND EPIDEMIOLOGY | 19 |
| 6 | | VERITOX - INVOICE NO. 111812 DATED | 57 |
| | | 11-15-2009 | |
| 7 | | VERITOX - INVOICE NO. 111684 DATED | 57 |
| | | 10-31-2009 | |

Page 9

| 8 | | VERITOX - INVOICE NO. 111546 DATED | 57 |
|---|---|---|---|
| | | 10-02-2009 | |
| 9 | | VERITOX - INVOICE NO. 111497 DATED | 58 |
| | | 09-18-2009 | |
| 10 | | VERITOX - INVOICE NO. 111381 DATED | 60 |
| | | 08-31-2009 | |
| 11 | | VERITOX - INVOICE NO. 111334 DATED | 60 |
| | | 08-15-2009 | |
| 12 | | VERITOX - INVOICE NO. 111238 DATED | 60 |
| | | 07-31-2009 | |
| 13 | | MEDICAL RECORD SUMMARY - LYNDON | 64 |
| | | WRIGHT | |
| 14 | | KENNER DERMATOLOGY CLINIC - LYNDON | 66 |
| | | WRIGHT - MEDICAL RECORD | |
| 15 | | TIMELINE | 142 |
| 16 | | HEALTH CLAIMS | 143 |

Page 10

| 17 | | IMPORTANCE OF DOSE-RESPONSE IN | 144 |
|---|---|---|---|
| | | TOXICOLOGY | |
| 18 | | CAUSATION | 154 |
| 19 | | MICROBIAL VOLATILE ORGANIC COMPOUNDS | 155 |
| | | (MVOC) | |
| 20 | | TRAILER INSPECTION/EXAMINATION | 155 |
| | | SCHEDULE FOR FOREST RIVER PLAINTIFF | |

Page 11

DEPOSITION OF BRUCE J. KELMAN, Ph.D.

Taken on behalf of the Plaintiff

Tuesday, December 15, 2009

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of BRUCE J. KELMAN, Ph.D., was taken before Tia B. Reidt, #2798, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on December 15, 2009, commencing at the hour of 9:15 a.m., the proceedings being reported at Naegeli Reporting, 601 Union Street, Suite 1624, Seattle, Washington, Seattle, Washington.

Page 12

Bruce Kelman PhD                                                    December 15, 2009

| | |
|---|---|

1      DEPOSITION OF BRUCE J. KELMAN, Ph.D.
2          Tuesday, December 15, 2009
3              9:15 a.m.
4
5      THE VIDEOGRAPHER:  We are on the record.  This is
6  a statement for a video deposition.  I'm the videographer,
7  and my name is Sid Fox.
8      This videotaped deposition has been noticed by
9  attorney Aaron Ahlquist and is being held on December 15th,
10  2009, at approximately 9:16 a.m.
11     The location is Naegeli Reporting Corporation, 601
12  Union Street, Suite 1624, Seattle, Washington 98101.  The
13  case caption is in regards to FEMA trailer formaldehyde
14  products liability litigation filed in the United States
15  District Court, Eastern District of Louisiana, Case No. MDL
16  No. 1873.
17     The deponent is Bruce Kelman, Ph.D., DABT, ATS.
18     Will counsel and all present please identify
19  yourselves and state whom you represent?
20     MR. PINEDO:  Chris Pinedo for the Plaintiff.
21     MR. D'AMICO:  Frank D'amico Jr. on behalf of the
22  PSC and the Plaintiff, Lyndon Wright.
23     MS. WHITFIELD:  Karen Whitfield on behalf of Shaw
24  Environmental, Inc.
25     MR. KURTZ:  Dave Kurtz on behalf of Shaw

Page 13

1      Q.  Are you a toxicologist?
2      A.  Yes.
3      Q.  If at anytime I ask you a question and it's not
4  clear to you what my question is, will you let me know and
5  I'll do my best to restate it?
6      A.  Yes.
7      Q.  You understand I'm an attorney representing Lyndon
8  Wright in a lawsuit that's been filed in the Eastern
9  district of Louisiana?
10     A.  Yes.
11     Q.  And the United States has -- is a party to this
12  lawsuit.  Do you understand that?
13     A.  Yes.
14     Q.  And you are an expert retained by who?
15     A.  By the United States.
16     Q.  And when were you first contacted with regard to
17  this case?
18     A.  I'll have to look at the -- our invoices.  I don't
19  have an independent recollection.
20     Q.  And what were you asked to do in this case?
21     A.  I was told I would be sent a bunch of case
22  material and --
23     Q.  You were asked to review that case material once
24  you received it?
25     A.  Yes.

Page 15

1  Environmental, Inc.
2      MR. GIEGER:  Ernie Gieger on behalf of Forest
3  River.
4      MR. BONE:  Jason Bone on behalf of Forest River.
5      MR. DINNELL:  Adam Dinnell on behalf of the United
6  States.
7      MR. MILLER:  Henry Miller on behalf of the United
8  States.
9      MS. THOM:  And Jadine Thom.
10     MR. MILLER:  Who are you with?
11     MS. THOM:  From Veritox.
12     THE VIDEOGRAPHER:  The deposition is being taken
13  before Tia Reidt, who will now swear in the witness:
14
15  BRUCE JERRY KELMAN, having been first duly sworn, was
16  examined and testified as follows:
17
18  EXAMINATION
19  BY MR. PINEDO:
20     Q.  Sir, could you please state your full name?
21     A.  Bruce Jerry Kelman, with a J.
22     Q.  And you hold a Ph.D., is that correct?
23     A.  Yes.
24     Q.  And what is your Ph.D. in?
25     A.  The Ph.D. is in pharmacology and physiology.

Page 14

1      Q.  And did you prepare a report in this case?
2      A.  I did.
3      Q.  Did you receive a deposition notice to appear here
4  today?
5      A.  Yes.
6      Q.  I'm going to show you what has been marked as
7  Exhibit 1.
8      (Whereupon, a 7-page Notice of Oral and Videotaped
9  Deposition of Bruce J. Kelman, Ph.D., DABT, ATS was marked
10  Exhibit 1 for identification.)
11  BY MR. PINEDO:
12     Q.  Is this a copy of the deposition notice you
13  received with regard to your deposition today?
14     A.  Yes, it appears to be one that I got.
15     Q.  And that deposition notice requests you to bring
16  your file with you today: is that right?
17     A.  I would assume so.
18     Q.  And did you --
19     A.  There's a lot of requests on it, so...
20     Q.  Did you bring your file in this case with you
21  today?
22     A.  I did.
23     Q.  And is it contained in those notebooks that are to
24  your left-hand side?
25     A.  Yes.

Page 16

4 (Pages 13 to 16)

Bruce Kelman PhD                                                December 15, 2009

1    Q.   And how many notebooks are we talking about?
2    A.   There's seven volumes and a few extra materials.
3    Q.   What are those extra materials?
4    A.   There's copies of -- one set of references that I
5    had forgot to include in my reliance list, and then a
6    delineation of the Bradford Hill criteria, which I also
7    forgot to include.
8    Q.   Can you show me those materials that you forgot to
9    include in your reliance materials?
10   A.   Yes.
11   Q.   So these are copies of the two articles.
12        And I apologize, I can reach about that far and
13   that's it.
14        And the first article that you have handed to me
15   is, "Prevalence of airborne spore levels of -- how do you
16   say that -- Stachybotrys -- "
17   A.   Stachybotrys.
18   Q.   "-- Stachybotrys spp. in 200 houses with water
19   incursions in Houston, Texas," by Kuhn, et al, dated 2005.
20        And a second article is, "A method for detecting
21   fungal contaminants in wall cavities," by Joe Spurgeon,
22   2003: is that right?
23   A.   Yes.
24        (Whereupon, a 65-page expert report of Bruce
25   Kelman, Ph.D., DABT, ATS was marked Exhibit 2 for

Page 17

1    identification.)
2    BY MR. PINEDO:
3    Q.   I'm going to show you a copy of what is Exhibit 2.
4        Is this a copy of your report in this matter?
5    A.   (Witness peruses document.)
6        MR. MILLER:  Are there multiple copies of the
7    article?
8        THE WITNESS:  There are.
9    BY MR. PINEDO:
10   Q.   Is Exhibit 2 your report in this matter?
11   A.   Well, I haven't looked at every page, but it
12   appears to be, yes.
13        (Whereupon, an 8-page article, "A method of
14   detecting fungal contaminants in wall cavities" was marked
15   Exhibit 3 for identification.)
16   BY MR. PINEDO:
17   Q.   I'm showing you what is Exhibit 3.
18        Is this a copy of the article you brought with
19   you, "A method for detecting fungal contaminants in wall
20   cavities," that was inadvertently not included in your
21   reliance materials in this matter?
22   A.   Yes.
23        (Whereupon, a 4-page article, Prevalence and
24   airborne spore levels of Stachybotrys spp. in 200 houses
25   with water incursions in Houston, Texas was marked Exhibit 4

Page 18

1    for identification.)
2    BY MR. PINEDO:
3    Q.   And I'm showing you what has been marked as
4    Exhibit 4.
5        Is this a copy of the -- of another article that
6    was inadvertently not included in your reliance materials,
7    by Kuhn, regarding spore levels in 200 houses with water
8    intrusions in Houston, Texas?
9    A.   Yes.
10   Q.   Now, there was a third item that was inadvertently
11   not included in your reliance items, what might that be?
12   A.   Well, actually, this is not for reliance
13   materials.  This is -- it's a delineation of the Bradford
14   Hill criteria.
15   Q.   Can I see that, please?
16   A.   (Witness complies.)
17   Q.   And this particular document you just handed me is
18   included in your notebooks here.
19        Is there a specific reason that it is separate
20   here today?
21   A.   Oh, well the copy that you saw in the notebook, I
22   put in since we produced the materials.
23        (Whereupon, a 1-page Causation and Epidemiology
24   notes was marked Exhibit 5 for identification.)
25   BY MR. PINEDO:

Page 19

1    Q.   And I'm going to show you what has been marked as
2    Exhibit 5.
3        Is that a copy of the Bradford Hill criteria as
4    you are describing them, sir?
5    A.   Yes.
6    Q.   And this is a document you created?
7    A.   Yes.
8    Q.   Do you have any billing records in this case?
9    A.   Yes.
10   Q.   Could you please show those to me, sir?
11   A.   (Witness complies.)
12   Q.   All right, I'm going to review those more at a
13   break here, but let me ask you a few questions.
14        Let's turn to your report.  Do you have that in
15   front of you, sir?
16   A.   I do.
17   Q.   And your report has various attachments to it; is
18   that right?
19   A.   Yes.
20   Q.   Your report is dated November 2nd, 2009?
21   A.   That's correct.
22   Q.   And Attachment A to your report is your curriculum
23   vitae; is that correct?
24   A.   Yes.
25   Q.   And that sets forth your experience, training and

Page 20

Bruce Kelman PhD                                             December 15, 2009

1   background?
2        A.  It would -- not exactly.  It has normal CV
3   citations in it.  It would not include teachings, or
4   lectures I've given or lay presentations.
5        Q.   What would you have to add to this curriculum
6   vitae, such that it would include your experience, training
7   and background, relative to this field of toxicology?
8            MR. MILLER:  Objection: vague, compound,
9   narrative.
10           Go ahead and answer.
11  BY MR. PINEDO:
12       Q.   I'm going to withdraw the question.  There's an
13  objection.
14       Let me ask you:  Is this CV here, is it a complete CV?
15       A.  Yes.
16       Q.   So what is it that's not included in here, that
17  you were telling me about?
18       A.  Oh, I don't normally include lay presentations,
19  teaching lectures, professional lectures.
20       Q.   So this CV does not include professional lectures,
21  does it?
22       A.  No.
23       Q.   Does not include lay presentations, does it?
24       A.  That's correct.
25       Q.   Is there any reason you don't include professional

                                            Page 21

1   presentations in your CV?
2        A.  I don't consider them proper CV material.
3        Q.   What kind of professional presentations have you
4   given?
5        A.   That would include -- I would include teaching
6   presentations for toxicology courses.  I would include some
7   lectures I would give at professional meetings.  Most of
8   them are in here, but I don't make an effort to make it
9   comprehensive.  And I don't include any lay presentations.
10       Q.   Such as?  What do you consider a lay presentation?
11       A.  If I were asked to talk to a group of
12  nonprofessionals about the risk associated with certain
13  chemicals for example.
14       Q.   And that's something you have routinely done as a
15  toxicologist; is that right?
16       A.  Yes.
17       Q.   And what is the field of toxicology?
18       A.  Toxicology is the study -- it's the study of
19  poisons and includes the safe use of chemicals.
20       Q.   And how long have you been in the field of
21  toxicology?
22       A.  About -- well, in excess of 30 years.
23       Q.   Do you consider mold a poison?
24       A.  Not mold.  No, mold is not a poison.
25       Q.   Do you consider mycotoxins a poison?

                                            Page 22

1        A.  They can be at sufficient dose.
2        Q.   Do you consider mold a chemical, such as you
3   defined toxicology, "includes the safe use of chemicals?"
4        A.  Mold itself is not a chemical, mold can contain
5   chemicals at sufficient quantity, which could cause injury.
6        Q.   Do you consider formaldehyde a chemical?
7        A.  Oh, yes.
8        Q.   And at sufficient quantities it can cause
9   injuries?
10       A.  At sufficient quantities, yes.
11       Q.   Do you consider formaldehyde a poison?
12       A.  Again at sufficient quantities.  And in fact, a
13  basic tenet of toxicology is all chemicals, in sufficient
14  quantities, can cause adverse effects and death.
15       Q.   And formaldehyde, in sufficient quantities, can
16  cause death?
17       A.  Certainly.
18       Q.   And that is a discussion about chemicals or
19  poisons in sufficient quantities can be harmful, that's a
20  discussion you include in your report; is that right?
21       A.  Yes.
22       Q.   In appendix B to your report, Exhibit No. 2, is a
23  rate schedule; is that correct?
24       A.  Yes, that's a rate schedule for the company.
25       Q.   And your time is billed out at $425 an hour?

                                            Page 23

1        A.  That's correct.
2        Q.   And do you receive some percentage of that?
3        A.  No.
4        Q.   Are you, like, on salary or whatever from Veritox?
5        A.  Yes.
6        Q.   And Exhibit C, does that set forth your testimony?
7        A.  That's my list that I'm -- list of testimonies I'm
8   required to keep for federal cases.
9        Q.   So that list goes back four years?
10       A.  Yes.
11       Q.   And how long have been testifying as an expert?
12       A.  Well, I believe the very first time I testified
13  was in 197-, somewhere between 1976 and 1978.
14       Q.   Some 31 to 32 years ago; is that right?
15       A.  Yes.
16       Q.   And over 31 to 32 years in your professional
17  career as a toxicologist and as an expert witness,
18  approximately how many cases have you offered testimony in?
19       A.  I don't have any idea what the total number is.
20       Q.   How many cases have you testified in for the last
21  four years?
22       A.  I'd have to count them.  This list lists
23  depositions and court testimony as two different entries.
24       Q.   When I look at the list, I see 45 different cases
25  involved.

                                            Page 24

                                    6  (Pages  21  to  24)

| | |
|---|---|
| 1      Do you have the same list as I do? | 1     Q. So then '79 to about 1989 you were giving |
| 2     A. That would not be correct. There's 45 entries, | 2 depositions? |
| 3 but if I give a deposition and testify, that's two entries. | 3     A. No, I was not. |
| 4     Q. So you have either given a deposition or testified | 4     Q. I see. You're giving me the time frame from the |
| 5 45 times in the last four years; is that right? | 5 beginning and the time frame from the end of that span, |
| 6     A. Yes. | 6 where you were not giving depositions. |
| 7     Q. Does somewhere in the neighborhood of 10 to 12 | 7     A. Yes. |
| 8 depositions or appearances in court to give testimony, seem | 8     Q. And so what were you doing during that time frame, |
| 9 to be consistent with your practice for the last four years? | 9 as a toxicologist? |
| 10     A. Well, there's many -- fewer court testimonies than | 10     A. Mostly bench research. I also managed a large |
| 11 depositions, but I would have to count. I don't know what | 11 biology and chemistry department in a research institution. |
| 12 the number is. | 12 But my focus was on the conduct of bench research, so that |
| 13     Q. I'm just talking about if you combine them | 13 was writing grants and conducting reproductive studies, |
| 14 together. The times you have offered testimony in court or | 14 inhalation studies, heating studies. |
| 15 by virtue of deposition, you have done that 45 times in the | 15     Q. Did you do any inhalation studies with regards to |
| 16 last four years; is that right? | 16 formaldehyde? |
| 17     A. Yes, yes. | 17     A. I don't believe I did, but I did a lot of |
| 18     Q. So does that come out to about 10 to 12 times a | 18 different chemicals and I just don't remember specifically. |
| 19 year that you're offering testimony, either in deposition or | 19     Q. And were you doing these studies for specific |
| 20 in court? | 20 corporations or based upon grants from corporations? How |
| 21     A. On average, something like that, yes. | 21 would you describe it? |
| 22     Q. And for the 28 years prior, that are not | 22     A. Most of them were research from grants from, |
| 23 encompassed on this list, because you've testified it's been | 23 primarily, the US government. Some of them were from |
| 24 some 31, 32 years you have been offering expert testimony, | 24 private companies. |
| 25 does that seem to be about an average, 10 to 12 times year | 25     Q. What kinds of things were you researching with |
| Page 25 | Page 27 |

| | |
|---|---|
| 1 you would be offering testimony, either in trial or by way | 1 regard to grants from the United States government? |
| 2 of giving a deposition? | 2     A. There's a long series of experiments that were |
| 3     A. Oh, no. | 3 done with energy-related materials. |
| 4     Q. You think it was more or less than that on | 4     Q. What do you mean by that? |
| 5 average? | 5     A. Well, for example benzopyrene is a carcinogen that |
| 6     A. Oh, far less. | 6 is produced as a result of combustion. So one of the things |
| 7     Q. And how would you approximate that? Four or five | 7 we were looking at were the effects of benzopyrene. |
| 8 times a year, in the prior years? How would you estimate | 8     Q. And one of the effects you were looking at is the |
| 9 that? | 9 potential for it to be a carcinogen? |
| 10      MR. MILLER: Objection; vague. | 10     A. Yes, it was. |
| 11      THE WITNESS: Well, there was a long hiatus | 11     Q. Do you know if it's been designated as a |
| 12 between my initial time that I testified and the next time | 12 carcinogen by the International Association for Research on |
| 13 that I was asked to do a deposition or -- actually, I was | 13 Cancer? |
| 14 asked, but agreed to do a deposition. And I probably did | 14     A. Benzopyrene? Actually, I don't know. |
| 15 none between '76 to '78 and somewhere in the 1990 to 1992 | 15     Q. But you're familiar that formaldehyde has been |
| 16 time frame. | 16 designated as a human carcinogen by the International |
| 17 BY MR. PINEDO: | 17 Association for Research on Cancer? |
| 18     Q. You did none? | 18      MR. BONE: Object to the form. |
| 19     A. Right. | 19      THE WITNESS: I'm sorry. I lost the question. |
| 20     Q. And why did you -- so somewhere around 1979 to | 20 Could you give it to me again? |
| 21 1990 or so, you were giving depositions on a regular basis. | 21 BY MR. PINEDO: |
| 22     A. No, the other way around. I did not do any | 22     Q. I'll just ask the court reporter to read it back. |
| 23 depositions or court appearances. | 23     A. Okay. |
| 24     Q. Between what years again? | 24      (The following encompasses the entire readback |
| 25     A. '76 to '78 and I would say '90 to '92. | 25 portion.) |
| Page 26 | Page 28 |

Bruce Kelman PhD                                              December 15, 2009

| | |
|---|---|
| 1   "Q. But you're familiar that formaldehyde has been | 1   occasions; is that right? |
| 2   designated as a human carcinogen by the International | 2       A.  Well, it's the last four years, and I have given |
| 3   Association for Research on Cancer?" | 3   deposition and court testimony 45 times. |
| 4       (Whereupon, the readback was concluded.) | 4       Q.  And so for the some 12 to 15 years prior to that, |
| 5   MR. BONE:  Same objection. | 5   10 to 15 years prior to that, depending upon whether we're |
| 6       THE WITNESS:  Yes, it's my understanding it has | 6   talking about 1990 to 1992 all the way up to the beginning |
| 7   been designated a human carcinogen. | 7   of 2005, we would be talking somewhere in the neighborhood |
| 8   BY MR. PINEDO: | 8   of two to five deposition a year. |
| 9       Q.  And you don't disagree with that designation, do | 9       Does that sound -- depositions or trial |
| 10  you? | 10  appearances to give sworn testimony.  Does that sounds about |
| 11      MR. MILLER:  Objection; beyond the scope of this | 11  right to you? |
| 12  expert's report and what we're offering him for in this | 12      A.  I'm sure it was at least that much, but I really |
| 13  case. | 13  don't have any way of even estimating how many actual times. |
| 14      Go ahead. | 14      Q.  If we said it was five times over 15 years, that |
| 15      MR. GIEGER:  Join in the objection. | 15  would be 75, and if we said it was three times over 15 years |
| 16      THE WITNESS:  I think from a public health | 16  that would be 45.  So we could add -- to these 46, we could |
| 17  standpoint, that's a prudent designation. | 17  add somewhere between another 40 to, say, 70 depositions, |
| 18  BY MR. PINEDO: | 18  couldn't we, or times that you have offered trial testimony? |
| 19      Q.  So somewhere around -- did you say 1990 or 1992, | 19      A.  By that count, on average, but I just -- I don't |
| 20  you began testifying on a more regular basis, offering | 20  have any recollection or any way of -- nor do I keep those |
| 21  expert testimony: is that right? | 21  records, so I really don't know. |
| 22      A.  Yes. | 22      Q.  Have you before involved in any other cases |
| 23      Q.  So from 1990 to 1992, anywhere from the last 17 to | 23  regarding mold? |
| 24  19 years, you've been giving expert testimony in the context | 24      A.  Yes. |
| 25  of court proceedings, whether it is at trial or in | 25      Q.  Where you have offered sworn testimony? |
| Page 29 | Page 31 |
| 1   depositions such as we're doing today; is that correct? | 1       A.  Yes. |
| 2       A.  Yes. | 2       Q.  Have you been involved in cases involving |
| 3       Q.  And during that time frame, from 1990 or 1992 | 3   formaldehyde, where you have offered sworn testimony? |
| 4   until 2005, about how often were you giving a deposition on | 4       A.  Yes. |
| 5   an annual basis? | 5       Q.  Which cases have you offered testimony in, with |
| 6       A.  I -- it's fewer than the last four years, but I | 6   regard to formaldehyde? |
| 7   really don't have a way of even estimating the number. | 7       A.  Thornton versus National Genetics Institute. Ward |
| 8       Q.  Would you say that some years you gave four or | 8   versus Simone. |
| 9   five, and some years you might have given two or three? Or | 9       Q.  Thornton is the first case you have identified on |
| 10  would you say it was even lower than that? | 10  exhibit -- let me start over. |
| 11      A.  No, four or five -- two or three, to four or five | 11      Thornton is Case No. 1 on Appendix C; is that |
| 12  would certainly -- I certainly did that, that many on | 12  right? |
| 13  average. | 13      A.  Yes. |
| 14      Q.  Do you think you did more than that on average, | 14      Q.  And Sarah Ward versus Rumi Simone that you just |
| 15  six or seven for certain years during that time frame, from | 15  mentioned, is Case No. 4 on Appendix C; is that right? |
| 16  1990, 1992 to 2005? | 16      A.  Yes. |
| 17      MR. MILLER:  Objection; vague. | 17      Q.  Please continue identifying cases that you have |
| 18      THE WITNESS:  Again, I don't have any way of | 18  been involved in, regarding formaldehyde. |
| 19  estimating that. | 19      A.  I believe there's a couple more, but looking at |
| 20  BY MR. PINEDO: | 20  the names of the cases, I don't remember at this point. |
| 21      Q.  And what I'm trying to get at is a total number of | 21      Q.  And this list -- the oldest case identified on |
| 22  times you've given depositions, some type of estimate. | 22  Appendix C is December 22nd, 2005; is that right? |
| 23      And what we have here in Exhibit 2, Appendix C, | 23      A.  Yes. |
| 24  your list of testimony, we know at least for the last five | 24      Q.  And your testimony is you started testifying |
| 25  years you have appeared in court and given testimony on 46 | 25  somewhere between 1990 and 1992 up to the present, which |
| Page 30 | Page 32 |

Bruce Kelman PhD                                          December 15, 2009

**Page 33**

1  some of those cases that you testified in between, a
2  starting point between 1990 and 1992 up to December 22nd,
3  2005, also have involved formaldehyde?
4      A.  A few of them probably did, but they would be long
5  enough ago that I really don't have a specific recollection.
6      Q.  Do you have a general recollection of any of the
7  allegations or issues involved in those cases prior to
8  December 22nd, 2005, in which you would have offered
9  testimony related to formaldehyde?
10     A.  It would have been in relation to -- in that time
11 period, inhalation injury from exposure to formaldehyde.
12     Q.  In what context or what realm were these people
13 exposed to formaldehyde, such that they inhaled it?
14     A.  I believe those were occupational case.
15     Q.  Have you ever been involved in any cases regarding
16 homes, where people in mobile homes have made a claim they
17 have inhaled or been exposed to formaldehyde?
18     A.  No.  That hasn't come up.
19     Q.  And what type of occupational settings were
20 involved, where people made claims that they were exposed to
21 formaldehyde and inhaled it?
22         MR. MILLER:  Objection; vague, time.
23         THE WITNESS:  Assuming we're talking about the
24 same time frame, they were generally individuals who worked
25 directly with formaldehyde, so for example, people who

**Page 34**

1  worked in an histology lab.
2  BY MR. PINEDO:
3      Q.  Anything else?
4      A.  That's the only thing that specifically comes the
5  mind.  There may have been some chemical manufacturers,
6  also, but I'm not remembering anything specific.
7      Q.  Let me ask you:  If we included all of your
8  testimony, have you ever offered any opinions as an expert
9  on people being exposed to formaldehyde in residential
10 settings?
11     A.  No, I don't think any were residential settings.
12     Q.  Let me ask a different question.
13         Have you ever offered any testimony with regard to
14 people being exposed to formaldehyde, say, for example, in
15 an office building?
16     A.  Actually let me -- as I think about it, let me
17 correct that.  I think there has been -- I don't know if
18 they're included in this list, it may be older than that,
19 but there may have been one or two situations in residential
20 settings, not in trailers, but residential settings.
21     Q.  And by "trailers," you're saying travel trailers?
22         What do you mean?
23     A.  Anything on wheels, I consider a trailer.
24     Q.  So your testimony is that you have not offered an
25 expert opinion on people being exposed to formaldehyde while

**Page 35**

1  living in travel trailers or any other type of mobile living
2  unit.
3      A.  That's correct.
4      Q.  Tell me what you remember about offering testimony
5  where people would have been exposed to formaldehyde in some
6  type of residential setting.
7      A.  The one -- the one -- actually, a couple that I
8  could vaguely remember, the allegation was that mold was
9  producing formaldehyde and that was the source of exposure.
10     Q.  Anything else.
11     A.  From the early time periods?
12     Q.  Any time period.
13     A.  Any time period?  Oh.  Well, as I said,
14 occupational exposure.
15     Q.  Right.  I'm talking in a residential setting.
16     A.  Oh, in a residential setting, no, I think that was
17 the only residential setting.
18     Q.  And is it your opinion that mold does not release
19 formaldehyde?
20     A.  At this point, actually, I don't remember.
21 Formaldehyde is a normal metabolite, so it's likely, but I
22 don't remember the specific literature I was looking at at
23 the time.
24     Q.  You would agree with me that, at least in a
25 residential setting, that the presence of moisture makes

**Page 36**

1  that setting more likely to be favorable to the propagation
2  of mold?
3          MR. BONE:  Object to the form.
4          THE WITNESS:  Actually, I haven't looked into the
5  issue, and I don't have an opinion.
6  BY MR. PINEDO:
7      Q.  You don't know -- you don't have an opinion as to
8  whether or not dampness or moistness is favorable to the
9  propagation of mold in a residential setting?
10         MR. BONE:  Object to the form.
11         THE WITNESS:  I'm sorry.  I thought you were
12 saying formaldehyde, so let's go back.  We're talking about
13 mold, now?
14 BY MR. PINEDO:
15     Q.  Yes.
16     A.  Dampness is one of the factors that allows mold to
17 grow.
18     Q.  And likewise, you're aware that dampness and
19 moisture is one thing that causes the acceleration of
20 formaldehyde off-gassing from composite wood products?
21         MR. BONE:  Object to the form.
22         MR. MILLER:  Objection; form.  Beyond the scope of
23 the expert's report, and beyond the scope of the expert's
24 qualifications and expertise.
25         Go ahead.

Bruce Kelman PhD                                          December 15, 2009

```
 1        THE WITNESS:  That was the question I thought you
 2  were asking.  And I haven't studied the issue.
 3  BY MR. PINEDO:
 4        Q.  I saw in your expert reliance materials that you
 5  have reviewed the expert reports of the plaintiff's and
 6  defendant's experts; is that right?
 7        A.  Yes.
 8        Q.  And you have seen in those various expert reports
 9  that moisture dampness or humidity, however you want to term
10  it, increases the off-gassing of formaldehyde from composite
11  wood products.
12        You have seen that before, haven't you?
13        MR. BONE:  Objection to the form.
14        MR. MILLER:  Same objection.
15        THE WITNESS:  I have not done my own research, I
16  have not looked at the literature, so --
17        MR. D'AMICO:  That's not the question.  The
18  question is --
19        THE WITNESS:  Let me finish my answer.
20        When I looked at those reports, I was focusing on
21  mold as an issue, not formaldehyde.  So if it didn't deal
22  with mold, I really didn't pay any attention to those
23  sections.
24  BY MR. PINEDO:
25        Q.  What case was it, where it was alleged that mold
```
                                                       Page 37

```
 1  was releasing formaldehyde?
 2        A.  I really -- I don't remember if it's on, from the
 3  last four years or previous to that.
 4        Q.  So if it's on this list, that goes from December
 5  22nd, 2005, to the present, you wouldn't recognize it?
 6        A.  No.
 7        Q.  Were you -- were you representing or offering
 8  testimony on behalf of the plaintiff or the defendant in
 9  that particular case?
10        A.  Well, it may have been more than one case, but I
11  was most likely -- I had most likely been hired by the
12  defense.
13        Q.  Why do you say that, "most likely"?
14        A.  I, historically, tended to do more defendant work
15  than plaintiff work.
16        Q.  Why is that?
17        A.  I guess --
18        MR. MILLER:  Objection; foundation.
19        Go ahead.
20        THE WITNESS:  I would guess that the opinions I
21  had were more helpful to the defense than the plaintiffs,
22  but since I only present the science, and the attorneys
23  decide whether or not they want to use the opinions, I don't
24  really know.
25        Q.  So historically speaking, your opinions have been
```
                                                       Page 38

```
 1  more helpful for the defendants, as opposed to the
 2  plaintiffs?
 3        MR. DINNELL:  Objection; form.
 4        MR. BONE:  Objection to the form.
 5        THE WITNESS:  I have certainly been retained by
 6  more defendants.
 7  BY MR. PINEDO:
 8        Q.  But that's your conclusion; isn't it?
 9        A.  Well, I would assume that's true, but that's as
10  far as I can go.
11        Q.  Now, you said it might have been more than one
12  case that you were involved in, where the allegation or
13  claim was that mold released formaldehyde.  Tell me about
14  that.
15        Do you remember more than one case, or you think
16  you're pretty certain it was just one case?
17        A.  I can't specifically remember more than one case.
18  What I can remember is there, for a little while, there was
19  a theory that significant amounts of formaldehyde were --
20  was released from the growth of mold.  It turned out there
21  was no data to support that.  It's not that there's no
22  formaldehyde release, but it's so small it's insignificant.
23        Q.  So you would agree that mold releases
24  formaldehyde?
25        A.  As I remember it -- formaldehyde is a normal
```
                                                       Page 39

```
 1  metabolite for all living organisms that I know of, so I
 2  certainly wouldn't be able to say it's impossible.  It's
 3  just when you deal with concentrations that are so low that
 4  they're not biologically significant for any organism
 5  besides the mold.
 6        Q.  So you're telling us mold does release
 7  formaldehyde?
 8        MR. D'AMICO:  Objection; vague.
 9        THE WITNESS:  I believe nearly all living
10  organisms potentially have formaldehyde as metabolites.
11  BY MR. PINEDO:
12        Q.  I'm trying to understand because you were involved
13  in some cases where the allegation was that mold released
14  formaldehyde, and my question to you is real simple: Yes or
15  no.  Does mold release formaldehyde?
16        MR. KURTZ:  Objection; vague.
17        MR. BONE:  Asked and answered.
18        MR. MILLER:  Same objection.
19        THE WITNESS:  Under appropriate laboratory
20  conditions, some mold, sometimes, I think, if I remember the
21  literature right, have been shown to release formaldehyde.
22  BY MR. PINEDO:
23        Q.  Did you observe some mold in the Lyndon Wright
24  travel trailer?
25        A.  I believe I did.
```
                                                       Page 40

Bruce Kelman PhD                                           December 15, 2009

1      Q.   Did you have any knowledge as to whether or not
2  that mold is the type of mold that would release
3  formaldehyde?
4      A.   I would have no way of knowing without testing,
5  and I didn't do any testing.
6      Q.   You could have, but you didn't do such testing; is
7  that right?
8      A.   That's correct.  I already knew, from previous
9  cases, if there is formaldehyde released, it's in such small
10 levels that it's equivalent to other metabolic formaldehyde.
11     Q.   And that's your opinion?
12     A.   Yes.
13     Q.   But you didn't include that opinion in your report
14 in this case, did you?
15     A.   Didn't even occur to me.  I mean, it turned out as
16 an issue it was so insignificant that it hasn't been brought
17 up for many years.  So it would have occurred to me.
18         MR. PINEDO: :  Objection; nonresponsive.
19 BY MR. PINEDO:
20     Q.   You're telling us you didn't include that in your
21 opinion, that mold releases formaldehyde or can release
22 formaldehyde, but you knew that formaldehyde was at issue in
23 this case, didn't you?
24     A.   Yes, I did.
25     Q.   And when was it that the literature or the reports

Page 41

1  came out that first raised this type of issue, that mold
2  releases formaldehyde?
3      A.   It's been long enough ago that I don't remember.
4      Q.   Would you have any articles relating to that back
5  at your office?
6      A.   I may have.  They're not identified as such.  I
7  mean, it was basically a silly theory to begin with, and it
8  stopped quickly.
9          MR. PINEDO:  Objection; move to strike everything
10 after, "may have," as nonresponsive.
11 BY MR. PINEDO:
12     Q.   Let's look at Case No. 1, Thornton, et al, versus
13 National Genetics Institute, which you have identified in
14 appendix C, which related formaldehyde.
15         Please tell us what you recollect in that case
16 regarding formaldehyde.
17         MR. MILLER:  I would note for the record that your
18 objections and motions to strike are inappropriate because
19 it is not a form objection and they're not preserved anyway.
20         MR. D'AMICO:  Responsiveness is an acceptable
21 objection.
22         MR. MILLER:  It's not a form objection, which is
23 what is supposed to be preserved for depositions, sir.
24         MR. D'AMICO:  We'll talk about this later.
25         MR. MILLER:  Go ahead.

Page 42

1          MR. PINEDO:  I instruct you to take a look at the
2  rules.
3  BY MR. PINEDO:
4      Q.   Please tell us, sir.
5      A.   What did you ask me?
6          MR. D'AMICO:  He asked you to disregard the
7  colloquy between the lawyers and pay attention to the
8  question.
9  BY MR. PINEDO:
10     Q.   You identified Thornton, et al, versus National
11 Genetics Institute as a case where you offered expert
12 testimony that involved formaldehyde.
13         Tell me about that case and what the issues were
14 regarding formaldehyde?
15     A.   The allegation was that exposure to formaldehyde
16 had caused a preterm birth.
17     Q.   Was that an occupational exposure?
18     A.   Yes.
19     Q.   And what occupation was involved there?
20     A.   This was an individual who processed medical
21 samples that came into a pathology lab.  And by
22 "processing," I mean they recorded the label and entered
23 that data into a data set.
24     Q.   And when you're talking about medical samples,
25 you're talking about tissue samples from human beings?

Page 43

1      A.   Yes.
2      Q.   And is one of the things that formaldehyde does,
3  is it retards decay in human tissues?
4      A.   Well, it's classified as a fixative, so at
5  sufficient concentrations, yes.
6      Q.   So what it does, is then it would kill or inhibit
7  the propagation of micro organisms that would decay that
8  human tissue: is that right?
9      A.   That's part of what it does, yes.
10     Q.   And was it your opinion that the exposure that
11 this particular individual had was insufficient to cause any
12 type of premature birth or adverse health consequences for
13 this individual?
14     A.   Well as it turned out, when I looked at the
15 literature, exposure was not relevant.
16     Q.   What do you mean, "exposure was not relevant?"
17     A.   The formaldehyde, inhaled formaldehyde, does not
18 cause premature birth.
19     Q.   You could find no literature on that.
20     A.   Oh, no, I found numerous statements from learned
21 bodies, inhalation studies in animals, epidemiology, and it
22 all indicated exposure to formaldehyde did not cause
23 premature birth.
24     Q.   And part of what you relayed upon in rendering
25 your opinion there, was using animal studies to make

Page 44

11 (Pages 41 to 44)

Bruce Kelman PhD                                          December 15, 2009

| | |
|---|---|
| 1  comparisons as to what would occur in human beings; is that | 1   Q.   Do you know how it was resolved? |
| 2  right? | 2   A.   There was a jury trial that came back with a |
| 3     A.   No, actually the -- there was human epidemiology | 3  defense verdict. |
| 4  and some really excellent analyses of the epidemiology, so | 4   Q.   And you testified at the trial, as well? |
| 5  it was sufficient to look at human epidemiology.  The | 5   A.   I did. |
| 6  mechanism for why that was true, I think, has been -- was | 6   Q.   And that date there, September 22nd, 2009, is when |
| 7  elucidated in animals. | 7  you offered deposition testimony: is that right? |
| 8     Q.   So it is helpful to you, in your field as a | 8   A.   That's right. |
| 9  toxicologist, to look at animal studies, as well, to | 9   Q.   And when did you offer trial testimony? |
| 10  determine the toxic properties of chemicals, such as | 10   A.   November -- I believe it was November 24th or |
| 11  formaldehyde? | 11  23rd, in that time frame. |
| 12     A.   Yes. | 12   Q.   Just a few weeks ago? |
| 13     MR. MILLER:  Objection; mischaracterizes the | 13   A.   Yes. |
| 14  witness' testimony. | 14   Q.   And I see your report is dated November the 2nd. |
| 15  BY MR. PINEDO: | 15   A.   That's correct. |
| 16     Q.   And -- | 16   Q.   And the last case that appears here because you've |
| 17     MR. D'AMICO:  Was that an objection to form? | 17  done it in the most recent, is the lowest number, and the |
| 18     MR. MILLER:  Yes. | 18  oldest is the higher numbers.  The last case you have |
| 19     MR. D'AMICO:  Okay. | 19  identified here, September 22nd, 2009, is the Thornton case |
| 20  BY MR. PINEDO: | 20  which we just have a been discussing. |
| 21     Q.   In the case Thornton, et al, versus National | 21     How many times have you offered deposition |
| 22  Genetics Institute, were you offering testimony on behalf of | 22  testimony or trial testimony since September 22nd, 2009, |
| 23  the defendant? | 23  besides the trial testimony you just told us about in the |
| 24     A.   Yes. | 24  Thornton case? |
| 25     Q.   And who -- which particular defendant were you | 25     A.   I think that was it.  I don't think I have done |
| Page 45 | Page 47 |

| | |
|---|---|
| 1  offering testimony on behalf of? | 1  any other depositions or trial testimony in that time frame. |
| 2     A.   I assume it was National Genetics Institute. There | 2     Q.   Tell us about the Sarah Ward case, Case No. 4 on |
| 3  were some other entities named that seemed to be related to | 3  appendix C, which involved formaldehyde and you offered |
| 4  National Genetics Institute, and I didn't know the | 4  testimony. |
| 5  relationship between them. | 5     A.   This was a case where it was about adverse effects |
| 6     Q.   And you gave that deposition just some three | 6  of hair conditioning chemicals on hair. |
| 7  months ago on September 22nd, 2009; is that right? | 7     MR. MILLER:  Did you say hair conditioning? |
| 8     A.   That's correct. | 8     THE WITNESS:  Hair. |
| 9     Q.   And if I was interested in getting a copy of that | 9  BY MR. PINEDO: |
| 10  deposition, how would I do that? | 10     Q.   Did you offer testimony on behalf of the |
| 11     A.   I have no idea. | 11  defendant? |
| 12     Q.   What was the name of the attorney who hired you in | 12     A.   No, actually, on that one it was on behalf of the |
| 13  that case? | 13  plaintiff. |
| 14     A.   Gibson. | 14     Q.   And what was your opinion in that case? |
| 15     Q.   Do you have a first name? | 15     A.   That the chemical -- there was evidence that the |
| 16     A.   Richard. | 16  chemical had -- the chemicals used to treat her hair had, in |
| 17     Q.   And where is he located? | 17  fact, damaged it. |
| 18     A.   I believe his firm was Snell & Wilmer, out of | 18     Q.   And one of the chemicals -- and one of chemicals |
| 19  Orange County. | 19  in that hair treatment was formaldehyde? |
| 20     Q.   And who was the attorney who questioned you during | 20     A.   It was one of the components, yes. |
| 21  that deposition? | 21     Q.   And formaldehyde was one of the components that |
| 22     A.   I, actually, don't remember. | 22  caused this particular individual harm; is that right? |
| 23     Q.   Do you know if that case has been resolved in the | 23     MR. DINNELL:  Objection: form. |
| 24  last three months? | 24     MR. BONE:  Object to the form. |
| 25     A.   Yes, it has. | 25     THE WITNESS:  It had -- those chemicals had |
| Page 46 | Page 48 |

Bruce Kelman PhD                                    December 15, 2009

---

1  definitely damaged her hair.
2  BY MR. PINEDO:
3     Q.  Was there any other damages she was claiming,
4  besides damage to her hair?
5     A.  Yes.
6     Q.  What else was she claiming she suffered damage?
7     A.  There were financial damages and emotional
8  damages.  That was the only thing that related to adverse
9  effects of the chemicals.  Actually, that's not true.  The
10  emotional damages would indirectly be a claim, but anyway
11  that was the scope.
12     Q.  How about physical damages?  What physical damage
13  did she have to her person or to her body, besides the
14  complaint about her hair?
15     A.  It was strictly about damage to the hair.
16     Q.  And we had some objections, and I just want to be
17  clear.
18        One of the components in that hair treatment that
19  caused her harm was formaldehyde; is that right?
20     A.  One of the components that had damaged her hair
21  was formaldehyde.
22     Q.  And that testimony was offered on May 5th, 2009,
23  some seven months ago; is that right?
24     A.  Yes.
25     Q.  And has that case been resolved to your knowledge.

Page 49

---

1     A.  It has.
2     Q.  And how was that resolved?
3     A.  There was a defense verdict in that case.
4     Q.  So this testimony here, is this deposition
5  testimony or trial the testimony?
6     A.  No. 4 is trial testimony.
7     Q.  And you also offered a deposition?
8     A.  It's on here if I did, but I don't remember.
9     Q.  And how would I go about getting a copy of your
10  trial testimony in that case?
11     A.  Again, I have no idea.
12     Q.  Who was the attorney who hired you in that case?
13     A.  At this point, I don't remember her name.
14     Q.  It says Clackamas County Circuit Court.
15        What state are we talking about for Clackamas
16  County?
17     A.  Oregon.
18     Q.  And what city did you go to to offer testimony
19  there?
20        THE WITNESS:  I remember the location, but it's
21  south of Portland.  I don't remember the name of the
22  particular town.
23  BY MR. PINEDO:
24     Q.  Half an hour, an hour, do you remember anything
25  like that?

Page 50

---

1     A.  Within a half hour.  It's a -- I think it's
2  considered a suburb of Portland.
3     Q.  Do you remember the names of any of the other
4  attorneys involved in that case?
5     A.  No.
6     Q.  Have you done any of your own research on mold-
7  emitting formaldehyde, whether it was in a case where you
8  had been retained as an expert or written papers or anything
9  like that?
10     A.  Long ago, yes.
11     Q.  Tell me about that.
12     A.  More than four years ago.
13     Q.  Tell me about that.
14     A.  I would have done -- I did the same thing I do for
15  any of these cases, and that was, went to the literature,
16  did a comprehensive literature search, and determined the
17  quality of that literature as part of what I do to make a
18  determination of whether formaldehyde could have been
19  released, and the amounts.
20     Q.  How do you determine the quality of the
21  literature?
22     A.  It depends on the type of study.  If it's an
23  epidemiology study, I would have evaluated how the study was
24  conducted, whether the study had adequate controls, whether
25  the statistical analyses were reasonable for the study,

Page 51

---

1  whether the conclusions drawn from the study matched the
2  actual data.
3        If it was an animal study, I would have looked at
4  the study design, the -- again, the -- what was found in the
5  study, how it was statistically analyzed and whether the
6  conclusions matched -- actually matched the data.
7        If it was a review, or proceedings from a learned
8  body -- actually, I probably wouldn't have used proceedings,
9  but it was a physician statement or analysis done by a
10  learned body, I would have looked to see what literature
11  they included, how they went about their analysis and
12  whether the -- again, whether their conclusions matched what
13  was present in the data.
14     Q.  Let me ask you:  When you examined the issue with
15  regard to mold-releasing formaldehyde, was that in a
16  litigation context or was that outside of litigation context
17  that you did that?
18     A.  My initial curiosity was just because I was
19  curious, but it did come up.  As I said there was a brief
20  period of time where that seemed to be presented as a
21  theory, until it became -- actually, I don't know why it
22  went away. My conclusion was it became clear there was just
23  not enough formaldehyde released, if any was released, to
24  have caused any kind of adverse effects on anything outside
25  of the mold, itself.

Page 52

---

13 (Pages 49 to 52)

Bruce Kelman PhD                                          December 15, 2009

| | |
|---|---|
| 1       MR. PINEDO:  Objection; nonresponsive. | 1       And I'm going to make a request of him for your |
| 2   BY MR. PINEDO: | 2   file materials related to that case? |
| 3       Q.  So you're telling us you did this on your own, and | 3       A.  Well, I would have to contact the attorney that |
| 4   then later on this work you did became something where you | 4   hired me, but I could, yes. |
| 5   were asked to offer expert testimony; is that right? | 5       Q.  When you contact that attorney, one of the things |
| 6       MR. BONE:  Objection; vague. | 6   you can inform that attorney of is that you're involved with |
| 7       MR. MILLER:  Objection: mischaracterizes witness' | 7   a case with formaldehyde, and the Plaintiff's attorneys want |
| 8   testimony. | 8   to know what your opinions were related to formaldehyde, and |
| 9   BY MR. PINEDO: | 9   you've been retained by the Defendants in that case. |
| 10       Q.  Let me start over.  I asked you whether or not you | 10       Could you do that? |
| 11   did this work in a litigation context, and didn't you tell | 11       A.  If there's any materials. |
| 12   me you started this on your own and then, later on, you | 12       Q.  Thank you.  Would you have any file materials |
| 13   offered expert testimony about it? | 13   related to the Thornton case in which you offered testimony |
| 14       MR. MILLER:  Same objection. | 14   just some three weeks ago? |
| 15       THE WITNESS:  I conduct ongoing review of | 15       A.  I probably still have materials. |
| 16   literature.  It's -- and I look at a lot of different | 16       Q.  What is Appendix B -- D, as in David, to your |
| 17   issues. | 17   report? |
| 18   BY MR. PINEDO: | 18       A.  This is a list of materials I had received and |
| 19       Q.  So you read this and you decided to look it up, | 19   reviewed at the time we issued the report. |
| 20   yourself? | 20       Q.  And who prepared this list? |
| 21       A.  Yes, it would have -- I would have encountered in | 21       A.  The actual list would have been prepared by one of |
| 22   the literature and it looked interesting, so I looked at it | 22   my staff, and then I would have checked it to see if it was |
| 23   some more.  And sometime later the theory presented itself | 23   correct. |
| 24   in the litigation context. | 24       Q.  I'm referring to your bill in this case, which is |
| 25       Q.  Have you done any lab research, yourself, on | 25   dated November 15th, 2009. |
| **Page 53** | **Page 55** |

| | |
|---|---|
| 1   whether or not mold releases formaldehyde? | 1   This is one of your invoices isn't it, sir? |
| 2       A.  No. | 2       A.  Yes. |
| 3       Q.  Do you have any older lists that set forth your | 3       Q.  And it states here, "Read case materials prepared |
| 4   testimony?  Something that goes beyond four years? | 4   for deposition, prepared report, consults with Dr. Robbins, |
| 5       A.  No.  I don't. | 5   consult with counsel." |
| 6       Q.  What do you -- | 6       Is Dr. Robbins one of your staff? |
| 7       A.  I don't keep it beyond four years. | 7       A.  She's one of the principals of the company. |
| 8       Q.  What do you do with those lists? | 8       Q.  So is that a "yes"? |
| 9       A.  They're either deleted or overwritten.  This is | 9       A.  Well, in the sense that she's an employee of |
| 10   one document, and as things get older than four years, | 10   Veritox. |
| 11   they're dropped off and new cases are added on at the | 11       And so what type of consults did you have with Dr. |
| 12   beginning. | 12   Robbins on this case? |
| 13       Q.  Do you have -- still have a file on the Sarah Ward | 13       A.  Again, they were primarily related to the mold |
| 14   case? | 14   parts of the case. |
| 15       A.  Probably not at this point.  Again it's my general | 15       Q.  Dr. Robbins is not a toxicologist, is she? |
| 16   practice, at the conclusion of a case, to ask the attorney | 16       A.  No. |
| 17   involved whether they want me to keep the materials, discard | 17       Q.  Would you agree with me that you have a greater |
| 18   them, destroy them or do something else.  And it's up to | 18   knowledge of the issues and principals of toxicology than |
| 19   them what they want me to do with the materials. | 19   Dr. Robbins? |
| 20       Q.  Would you be able to go back to your office and | 20       MR. BONE:  Objection. |
| 21   make a determination as to whether or not you have any file | 21       MR. MILLER:  Objection; form. |
| 22   materials on the Sarah Ward case? | 22       THE WITNESS:  Well, I certainly have much more |
| 23       A.  I could look, sure. | 23   experience.  Dr. Robbins has a pretty good grasp of the |
| 24       Q.  And then once you do that, would you be able to | 24   fundamentals, but I don't believe she considers herself a |
| 25   inform Mr. Miller of that? | 25   toxicologist. |
| **Page 54** | **Page 56** |

Bruce Kelman PhD                                                    December 15, 2009

BY MR. PINEDO:

Q.  And you don't consider her a toxicologist, do you?

A.  Well, I would consider her an industrial hygienist, and to the extent there's overlap between industrial hygiene and toxicology, she's competent in those areas.  So actually, I don't know exactly how to answer that question.

MR. MILLER:  Counsel, we have been going a little bit over an hour.  Is this a good time to take a break?

MR. PINEDO:  Sure, we can take a break.

And during the break, let's go ahead get a copy of the bill.

MR. MILLER:  We can just ask Naegeli Court Reporting to make a copy of it, Counsel.

THE VIDEOGRAPHER:  The time is 10:28 a.m.

We are off the record.

(Pause in the proceedings.)

THE VIDEOGRAPHER:  We are back on the record.

The time is approximately 10:32 a.m.

(Whereupon, a 2-page Veritox invoice dated 11/15/09 was marked Exhibit 6 for identification.)

(Whereupon, a 2-page Veritox invoice dated 10/31/09 was marked Exhibit 7 for identification.)

(Whereupon, a one-page Veritox invoice dated 10/2/09 was marked Exhibit 8 for identification.)

Page 57

(Whereupon, a one-page Veritox invoice dated 9/18/09 was marked Exhibit 9 for identification.)

BY MR. PINEDO:

Q.  Sir, before we took a break, we discussed your invoices in this case.

Do you recollect that?

A.  Yes, you asked me a question about an invoices, we were on the topic.

BY MR. PINEDO:

Q.  I'm going to hand you a series of exhibits, Exhibit 6, 7, and 8 and 9.

Are those your invoices in this case?

Before you do that, I want to make sure I numbered these correctly.  Perhaps I have not.

I'm going to hand you what has been marked as Exhibit 6.

Is that your invoice for November 15th, 2009, for your work in this case?

A.  This covers the period through November 13th.

Q.  And what is the total amount of that invoice?

A.  $31,856.

Q.  I'm going to show you what has been marked as Exhibit 7.

Is that another one of your invoices from this case?

Page 58

A.  That actually contains two invoices, but those are my invoices.

Q.  Let me pass that back to you -- and you pass that back to me.

Exhibit 7, I've now taken out the third page that was attached there, is an invoice dated October 31st, 2009; is that right?  Exhibit 7?

A.  October 31st is the invoice date.

Q.  Is what is total amount of that invoice?

A.  $11,864.89.

Q.  I'm handing you what has been marked as Exhibit 8.

Is that an invoice dated October 2nd, 2009, for a total of $2,103.45?

A.  Yes.

Q.  And what is the next invoice you have in your notebook there?

A.  That would be the invoice dated September 18th.

Q.  I'm going to show you what has been marked as Exhibit 9.

Is that the September 18th invoice?

A.  It is.

Q.  And what is the total amount of that invoice?

A.  $3,680.14.

Q.  And what is the next invoice you have?

A.  It's the invoice dated August 31st, 2009.

Page 59

(Whereupon, a one-page Veritox invoice dated 8/31/09 was marked Exhibit 10 for identification.)

BY MR. PINEDO:

Q.  I'm going to hand you what has been marked as Exhibit 10.

Is that a copy of the invoice from August 31st?

A.  Yes.

Q.  And what is the total amount of this invoice?

A.  $2,267.75.

Q.  And what is the next invoice you have?

A.  It's dated August 15th, 2009.

(Whereupon, a 2-page Veritox invoice dated 8/15/09 was marked Exhibit 11 for identification.)

BY MR. PINEDO:

Q.  And I'm going to hand you a copy of what has been marked as Exhibit 11.

Is that a copy of the August 15th invoice?

A.  Okay.

Q.  And what is the total amount of that invoice?

A.  $29,062.48.

Q.  And what is the next invoice you have?

A.  It's dated July 31st.

(Whereupon, a one-page Veritox invoice dated 7/31/09 was marked Exhibit 12 for identification.)

BY MR. PINEDO:

Page 60

Bruce Kelman PhD                                                      December 15, 2009

1     Q.   I'm going to show you what has been marked as
2   Exhibit 12.
3          Is that a copy of that July 31st invoice?
4     A.   Yes.
5     Q.   And what is the total of that invoice?
6     A.   $6,686.
7     Q.   Are those all of your invoices in this case, or do
8   you have some more?
9     A.   As far as I know, those are all of the invoices.
10    Q.   The last invoice was dated, what, November the
11  15th?
12    A.   Yes.
13    Q.   And could I see all of those invoices, please,
14  sir?
15    A.   (Witness complies.)
16    Q.   The November the 15th invoice, which we have
17  marked as Exhibit 6, covers your work up through November
18  the 10th, 2009; is that right?
19    A.   That's correct.
20    Q.   And so do you have any idea how much additional
21  time you have spent on this case after November 10th, 2009?
22    A.   I estimate on the order of 15 to 20 more hours,
23  not including today.
24    Q.   And you're charging $425 an hour for your time?
25    A.   That's correct.

Page 61

1     Q.   So if we added up all of these invoices, then that
2   would give us the total amount of your billings in this
3   case; is that right?
4          MR. GIEGER:  Objection; form.
5          THE WITNESS:  Yes, through the time of the
6   invoice.
7   BY MR. PINEDO:
8     Q.   And then we would need to add the additional time
9   you told us about; is that correct?
10    A.   That's right.
11    Q.   Did you examine some medical records on Lyndon
12  Wright?
13    A.   I did.
14    Q.   Can you pull out the notebook that contains the
15  medical records that you reviewed?
16    A.   (Witness complies.)
17  He's asking for all of the records.
18    Q.   As your assistant is pulling those notebooks, let
19  me ask you, you said an assistant helped you.
20         What assistants did you have, or staff people, did
21  you have that helped you in this case in any regard?
22    A.   I don't -- I don't understand the question.
23    Q.   You testified earlier you had some staff people
24  assist you in this case?
25    A.   Yes.

Page 62

1     Q.   Who are those staff people?  Their names.
2     A.   Actually, I would have to go back and ask them.  I
3   can generally tell you who the group of staff people is that
4   would look at medical records, but I don't know who worked
5   on the case.
6     Q.   Generally speaking, who is that?
7     A.   That would be Clara Chan, possibly Laura Diener,
8   Jennifer Hobden.  That's all I can think of at the moment.
9     Q.   All right.  Let's take a look at the medical
10  records that you reviewed.
11         Which medical records on Lyndon Wright did you
12  review?  Could you identify those providers for whom you
13  reviewed medical records on Lyndon Wright?
14    A.   I have records from Cruz-Field Clinic, George
15  Farber, MD, Rite Aid, Walgreens, Richard Spector, MD.
16         THE WITNESS:  Is this all of them?
17         MS. THOM:  I hope so.
18         THE WITNESS:  I think we have another one, of
19  records.
20         We have records from LabCorp, Memorial Medical
21  Center, Charles Field, MD.
22  BY MR. PINEDO:
23    Q.   You already mentioned Cruz-Field clinic, and I
24  would assume that's the same.
25         Does that sound right to you?

Page 63

1     A.   Yes.  I have them noted differently in my notes.
2          Quest Diagnostics.
3     Q.   Is that separate record from Quest Diagnostics, or
4   is that Quest Diagnostics record contained within the
5   medical records of one of the providers, such as Spector,
6   Farber or Cruz-Field?
7     A.   I can't tell from the way I took my notes.  It's
8   probably contained within those records.
9     Q.   As opposed to records specifically requested from
10  Quest Diagnostics, for example?
11    A.   I believe that's true, but I'm not certain.
12    Q.   And what you're reviewing right now is a medical
13  summary, as opposed to the notebooks containing the records
14  themselves; is that right?
15    A.   Yes.  It's far handier.  So this is -- these are
16  my notes on the medical records.
17         THE WITNESS:  Can I have the first volume?
18         (Whereupon, a 30-page Medical Record Summary was
19  marked Exhibit 13 for identification.)
20  BY MR. PINEDO:
21    Q.   Right.  Now, Doctor, you're checking your list of
22  materials reviewed; is that right?
23    A.   This is a list of materials we received.  So for
24  broad groups that would include Dr. Farber, the medical
25  records from Cruz-Field Clinic, medical records from Richard

Page 64

Bruce Kelman PhD                                                     December 15, 2009

1   Spector, and then pharmacy -- two sets of pharmacy records,
2   one from Walgreens and one is from Rite Aid.
3       Q.   You don't have a separate sets of documents from
4   Quest Diagnostics, Memorial Medical, or LabCorp, do you?
5       A.   That's correct.
6       Q.   I'm going to show you what's been marked as
7   Exhibit 13.
8            Is that that medical summary you were referring
9   to?
10      A.   That's the summary, and there are some
11  additional record pages at the end of the summary.
12      Q.   Those additional pages, are those meant to be part
13  of the summary or not?
14      A.   No, they're not.
15      Q.   Okay.  Let's go ahead and take those out.
16           The summary is 30 pages long; is that right?
17      A.   That's correct.
18      Q.   Now, I notice in your notebook you have the
19  summary and then you have a yellow page, and then after that
20  you have some selected medical records; is that right?
21      A.   Yes.
22      Q.   And that is in your notebook, all behind the time
23  -- behind the tab called, "Medical records."
24           What is the significance of these selected 10 to
25  15 pages of the medical summary that you have there?

Page 65

1       A.   They contain pages that I was particularly
2   interested in, so they're duplicate pages for what follows.
3       Q.   Okay.  Why don't you hand back to me Exhibit 13
4   then, please.  That's your medical summary --
5       A.   (Witness complies.)
6       Q.   -- and I'm now taking out these duplicate pages of
7   medical records you had a particular interest in, and we'll
8   set them aside for further discussion.
9            Is that fine with you, sir?
10      A.   Yes.
11      Q.   I'm now handing you back Exhibit 13.
12           That exhibit is only your medical summary,
13  correct?
14      A.   Right.  These are my notes on the medical records.
15           (Whereupon, a 3-page Kenner Dermatology Clinic
16  notes was marked Exhibit 14 for identification.)
17  BY MR. PINEDO:
18      Q.   I'm going to hand you what has been marked as
19  Exhibit 14.  This is the first page that you have -- that
20  you had some particular interest in.
21           Can you tell us the significance of Exhibit No.
22  14, and why you would have pulled this out separately, this
23  page of the medical records of Lyndon Wright?
24      A.   (Witness peruses document.)
25  There's actually a series of three pages from the Kenner

Page 66

1   Dermatology Clinic.
2       Q.   All right.  And those all go together in your
3   mind?
4       A.   Yes.
5       Q.   Okay.  Well, let's collect those three pages.
6            Are they a chart entry of July the 16th 2009, a
7   chart entry of July the 13th, 2009 and then some test
8   results?
9       A.   Yes.
10      Q.   Okay.  We have now pulled out those pages and
11  marked them as Exhibit 14.
12           Can you please tell us the significance of Exhibit
13  14, which are these chart entries and the test results?  How
14  is this relevant to your opinions in this case?
15      A.   At the time, I was looking for anything that would
16  indicate either an illness related to mold exposure or
17  allergy testing for mold exposure.
18      Q.   And please continue.  How are these documents that
19  we have before us in Exhibit 14 relevant to that?
20      A.   Well my practice would be to pull out the
21  documents or duplicate the documents as I go, that I think
22  are going to be particularly pertinent.
23      Q.   And how are these documents, Exhibit 14, these
24  three pages, particularly pertinent to your opinions in this
25  case?

Page 67

1       A.   Well, in this -- as I recall, and I have to go
2   back to my notes, I believe there was some testing done at
3   the dermatology clinic.
4       Q.   And by your notes, are you talking about the
5   medical summary that's been marked as Exhibit 13?
6       A.   Yes.
7       Q.   Is this the summary you prepared or somebody on
8   your staff prepared?
9       A.   My general practice would be that -- it's a
10  combination.  The staff would go through the notes or the
11  records, give me what they have summarized.  I would then
12  check that summary against the original records, in some
13  cases I make changes, sometimes it's fine.  I mean, these
14  are people that are -- have all been trained by me and they
15  know what I'm looking for.
16           So I make the changes that I think they either
17  didn't put sufficient emphasis on or may have missed parts.
18  Then the document is finalized and then the staff checks my
19  changes to see that they're accurate against the report.
20      Q.   Okay.  So we were talking about Exhibit No. 14,
21  which is three pages from the Kenner Dermatology Clinic and
22  you had mentioned these were pertinent to your opinions.
23           My question to you is:  How are these three pages from
24  the Kenner Dermatology Clinic pertinent to your opinions in
25  this case?

Page 68

17 (Pages 65 to 68)

Bruce Kelman PhD                                                    December 15, 2009

| | |
|---|---|
| 1     A.   In this case there was a RAST test, that's the | 1   Appendix E; is that right? |

1      A.   In this case there was a RAST test, that's the
2   general class of tests performed.  And I was looking to see
3   if there were antibodies directed against any type of mold.
4      Q.   And is that the test results that we have on the
5   third page of Exhibit No. 14?
6      A.   (Witness peruses document.)
7   No, actually these look like --
8      Q.   A CBC?
9      A.   Right.  These are blood chemistry and these are
10  blood measurements.
11     Q.   So that particular page isn't particularly
12  pertinent --
13     A.   That's just a reflection of his -- I'm sorry.
14          We were both talking at the same time.
15     Q.   I'm sorry.  I was speaking over you.
16          That particular page isn't particularly pertinent
17  to your opinions in this case, is it?
18     A.   Well, it gives me an idea of his overall health,
19  but it's not specific to the testing that was done.
20     Q.   Okay.  We'll probably return to that.
21          You have, Appendix D is materials reviewed and we
22  discussed that; is that right?  Materials reviewed to your
23  report, Exhibit 2.
24     A.   (Witness peruses document.)
25  These are the materials that we received that I reviewed.

Page 69

1      Q.   And is it your testimony you reviewed each one of
2   the materials identified here in Appendix D?
3      A.   Yes.
4      Q.   Including the medical records, which we had just
5   discussed earlier today; is that right?
6      A.   That's correct.
7      Q.   And then Appendix E is the maximum myotoxin [sic]
8   exposure; is that right?
9      A.   It's mycotoxins.
10     Q.   Exhibit E is the maximum mycotoxin exposure; is
11  that right?
12     A.   That's the label.  That's correct.
13     Q.   And you created this appendix; is that right?
14     A.   Yes.
15     Q.   Or did somebody in your staff create this at your
16  request?
17     A.   The most likely sequence is we would have looked
18  for the maximum indoor spore concentration.  The staff would
19  have done the spreadsheet calculations, and then I went back
20  to check each calculation.
21     Q.   And there's only a limited number of molds that
22  you examined here in Appendix E; is that right?
23     A.   Well, these are actually mycotoxins, as opposed to
24  mold.
25     Q.   There's only five mycotoxins you examined here in

Page 70

1   Appendix E; is that right?
2      A.   Well, "examined" is not quite the right term.
3   These are the mycotoxins that I chose to represent a
4   spectrum of potential mycotoxins.  There were no mycotoxins
5   measured as present in this trailer, but this represents,
6   for example, a neurotoxin, fumitremorgin is a neurotoxin.
7      Q.   There was no mycotoxins in this trailer when you
8   examined it; is that right?
9      A.   I found no measurements of mycotoxins at all,
10  ever.
11     Q.   Let's be clear.  When did you examine this
12  trailer?  The Lyndon Wright trailer.
13     A.   That was in, that was August 7th of 2009.
14     Q.   Is that approximately a year after he moved out?
15     A.   Approximately, yes.
16     Q.   And so you don't know what mycotoxins might have
17  been present in this trailer while Lyndon Wright lived in
18  it, do you?
19     A.   That's correct.  We have no data -- there's no
20  indication there was any, but there's none.
21     Q.   Appendix F, what is Appendix F to your report,
22  Exhibit 2?
23     A.   Appendix F takes the concentration, the amount of
24  mycotoxin that has calculated, as an upper limit of what
25  could have been present, and relates them back to known

Page 71

1   effects levels for the individual mycotoxin.
2      Q.   And what is Appendix G?
3      A.   Appendix G relates the highest possible amount of
4   Aflatoxin B1 to the maximum daily intake that's allowed by
5   the federal government.
6      Q.   And Aflatoxin B1 is a specific type of mycotoxin;
7   is that correct?
8      A.   That's correct.
9      Q.   However, you didn't do a similar type of analysis
10  for Saratoxin G, Saratoxin H or the other mycotoxins that
11  you had listed in Appendix E, other than Aflatoxin B1; is
12  that right?
13     A.   I believe those are Saratoxin, and there are no
14  regulatory limits for those mycotoxins, so Aflatoxin is the
15  only mycotoxin for which there's a federal limit.
16     Q.   And why is that?
17          MR. MILLER:  Objection; foundation.
18          THE WITNESS:  Actually, I don't know why.  The
19  government has just come out with the one level.
20  BY MR. PINEDO:
21     Q.   And when did they come out with that level?
22     A.   I don't remember at this point.
23     Q.   But it was prior to the date of the manufacture of
24  the Lyndon Wright travel trailer, wasn't it?
25     A.   Oh, yes.

Page 72

18 (Pages 69 to 72)

Bruce Kelman PhD                                    December 15, 2009

| | |
|---|---|
| 1   Q.   It been in existence for some period of time, | 1   A.   Something like that. |

---

1    Q.   It been in existence for some period of time,
2   hasn't it?
3    A.   Yes.
4    Q.   What is Appendix H?
5    A.   That's another way of looking at the maximum
6   amount of mycotoxin that could be present, and it relates it
7   back to the number of spores that you would need per cubic
8   meter in air to -- where if each spore contained the maximum
9   amount of mycotoxin known, to achieve a level which is
10   generally recognized as having absolutely no potential for
11   effects.
12    Q.   Did you carefully review the medical records for
13   Lyndon Wright to see what types of complaints he had while
14   he was living in his travel trailer?
15    A.   That was one of sources of complaints that I
16   reviewed.
17    Q.   You reviewed his entire medical history as you
18   could find in the medical records of Cruz-Field Clinic,
19   George Farber and Dr. Spector; is that right?
20    A.   I think that covered the four areas, yes.
21    Q.   And you paid particular attention to what types of
22   medical complaints he was having at the time, while he was
23   living in the travel trailer and afterwards; is that right?
24    A.   Well, I would have paid attention also to what
25   preexisting conditions were present.

                                                    Page 73

1    A.   Something like that.
2    Q.   -- depending on when in March he moved in, and
3   when he moved out.  Does that sound right to you?  Two and-
4   a-quarter years, roughly?
5    A.   Roughly, yes.
6    Q.   And did you record his complaints in your report
7   on Page 10 in a summary-type fashion?
8    A.   Actually, that wouldn't be the list of complaints.
9   I think that's earlier in the report.
10    Q.   Okay.  Show me where that might be.
11    A.   Maybe it's later.  Let me take a moment to look
12   for it.
13      (Witness peruses file.)
14   Okay.  At the moment I'm not finding the narrative
15   paragraph, but the list you identified on Page 10 would be
16   the -- oh, there it is.  It is on Page 10.  I apologize.
17   It's the first paragraph on Page 10.
18    Q.   Now, in your work as a toxicologist, have you
19   become familiar with the types of complaints or physical
20   ailments people may suffer due to exposure to molds or
21   mycotoxins?
22    A.   I'm familiar --
23      MR. MILLER:  Objection; compound.
24      Go ahead.
25   BY MR. PINEDO:

                                                    Page 75

---

1    Q.   So you paid careful attention to his entire
2   medical record, as you saw it; is that right?
3    A.   As I received it, yes.
4    Q.   While he was -- in the period of time -- let me
5   start over.
6      Do you have an understanding of the period of time
7   that he was living in this travel trailer?
8    A.   I do.
9    Q.   Please tell us.  Would it be in your report?
10    A.   It would be in the report, and there's also a
11   timeline that I prepared, which is more detailed and more
12   useful.
13      So according to my records, he moved into the
14   trailer in March of '06 and he moved out in July of '08.
15    Q.   If you can just put a flag on that timeline, we'll
16   make a copy of it during the break and mark it as a separate
17   exhibit.  So we'll just have it as a place holder for now.
18    A.   (Witness complies.)
19    Q.   So it's your understanding, he moved into this
20   trailer in March of 2006 and he moved out in July of 2008;
21   is that right?
22    A.   Yes.
23    Q.   That's some 29 months?
24    A.   I haven't counted it by months.
25    Q.   28, 29 months --

                                                    Page 74

1    Q.   You didn't understand the question?
2    A.   Why don't you ask it again.  I can't quite answer
3   it the way you asked it.
4    Q.   Okay.  What part of that are you having difficulty
5   with?
6    A.   I'm familiar with the -- well, first of all
7   there's a huge constellation of effects that you can get
8   from mycotoxins because there's many mycotoxins.
9    Q.   Okay.  Let me ask you this question:  In your work
10   as a toxicologist, have you become familiar with the types
11   of complaints people might have due to exposures to
12   mycotoxins?
13    A.   I have read many, yes.
14    Q.   So you're familiar with the body of literature and
15   the types of complaints that have been associated with
16   mycotoxin exposure?
17    A.   Both inhalation, residential and occupational
18   inhalation, and by ingestion.  That's why I was having
19   trouble answer the question.
20    Q.   By ingestion, do you include inhalation, as well
21   as consumption through the mouth?
22    A.   No.
23    Q.   What do you mean by ingestion?
24    A.   The principal of way of getting enough mycotoxin
25   to cause an adverse effect is by eating the mycotoxin.  The

                                                    Page 76

Bruce Kelman PhD                                                    December 15, 2009

1    amount of mycotoxin that's ingested from inhalation is very
2    minor.
3        Q.   All right.  In your work as a toxicologist, have
4    you become familiar with the type of complaints that people
5    have, due to exposure to mycotoxins in residential,
6    occupational -- let me start over.
7            In your work as a toxicologist, have you become
8    familiar with types of complaints that humans have due to
9    mycotoxin exposure in residential and occupational settings?
10       A.   Yes.
11       Q.   Have you also been familiar, in your work as a
12   toxicologist, with the types of complains that humans may
13   have due to injections of mycotoxins?
14       A.   I'm very familiar with what has been reported as a
15   result of mycotoxin ingestion.
16       Q.   Based on your work as a toxicologist, you're very
17   familiar with what has been reported as to complaints or ill
18   effects humans have suffered due to mycotoxin ingestion?
19       A.   Well, on the ingestion side, since it's much more
20   likely you'll get sufficient exposure to cause an adverse
21   effect, those reports tend to be less about the complaints
22   and more about the actual adverse effect.
23       Q.   Okay.  So in your work as a toxicologist, you have
24   become familiar with the adverse effects that humans have
25   suffered due to mycotoxin ingestion?

                                                    Page 77

1        A.   Yes.
2        Q.   In your work as a toxicologist, including the
3    three or more cases that you have been involved with, with
4    formaldehyde, have you become familiar with the adverse
5    effects that humans have due to exposure to formaldehyde?
6        A.   Generally, yes.
7        Q.   And you saw in the medical records that -- and it
8    has been recorded in your report that Lyndon Wright had eye
9    irritation; is that right?
10       A.   Yes.
11       Q.   And you do not think that has anything to do with
12   mycotoxin or mold exposure for Lyndon Wright; is that right?
13       A.   That's correct.
14       Q.   In your work as a toxicologist, have you become
15   familiar with what type of adverse health effects
16   individuals might have due to exposure to mold?
17       A.   I didn't.
18       Q.   You don't believe that Lyndon Wright's exposure to
19   mold while he was living in this travel trailer caused him
20   to have any eye irritation, do you?
21       MR. BONE:  Objection to the form.
22       Proceed.
23       MR. MILLER:  I'm sorry.  Can you read that back to
24   me?
25       I apologize.

                                                    Page 78

1        BY MR. PINEDO:
2        Q.   Let me restate the question.
3            You don't believe that Lyndon Wright's exposure to
4    mold, while he was living in this travel trailer, caused him
5    any eye irritation, do you?
6        MR. BONE:  Object to the form.
7        THE WITNESS:  I could find no records that would
8    lead me to conclude that.
9        BY MR. PINEDO:
10       Q.   You are aware of scientific and medical literature
11   however, that exposure to formaldehyde can cause eye
12   irritation?
13       MR. MILLER:  Objection: beyond the scope of the
14   this expert's report; beyond the scope of what he's been
15   proffered for in this litigation by the government.
16       THE WITNESS:  In general, sufficient concentration
17   exposure to formaldehyde can cause mucous membrane
18   irritation.  I don't have an opinion, nor have I looked at
19   it specific to this case.
20       BY MR. PINEDO:
21       Q.   You said mucous membrane irritation.  Are you
22   referring to the eyes or are you referring to the nose?
23   What are you referring to?
24       MR. MILLER:  Same objection.
25       THE WITNESS:  Again, in general, that could cover

                                                    Page 79

1    both.
2        BY MR. PINEDO:
3        Q.   So at what level does exposure to formaldehyde
4    cause eye irritation?
5        MR. BONE:  Object to the form.
6        MR. MILLER:  Objection: beyond the scope of this
7    expert's report; beyond the scope of what he's been
8    proffered for in this case.
9        Go ahead.
10       THE WITNESS:  Well, I haven't refreshed myself on
11   that real recently, certainly at .3 parts per million, you
12   would not expect to see any irritation.  Or at least you
13   wouldn't expect to see any objective signs of irritation.
14       Q.   Do you believe that, then, over 3 parts per
15   million, you start to see objective signs of eye irritation?
16       MR. DINNELL:  Objection: form.
17       MR. MILLER:  Objection: mischaracterizes the
18   witness' testimony.
19       BY MR. PINEDO:
20       Q.   -- due to formaldehyde exposure?
21       MR. MILLER:  Same objection.
22       THE WITNESS:  It would be -- you would begin to
23   see -- well, there's two parts to this.
24       If you're talking about groups of people, you
25   would begin, I think, to generally see it at higher

                                                    Page 80

                                        20  (Pages 77 to 80)

Bruce Kelman PhD                                    December 15, 2009

1  concentrations, with more people showing irritation the
2  higher the concentration you go.  If you're, for an
3  individual, I would have to know more about the individual,
4  and I didn't look here.
5  BY MR. PINEDO:
6      Q.  When you say at higher concentrations you tend to
7  see more of a response, is that part of the dose-response
8  concept that you discuss in your report and has been well
9  recognized and accepted in the field of toxicology?
10     MR. BONE:  Object to the form.
11     THE WITNESS:  Well, dose-response is certainly the
12  heart of toxicology.  You -- the data indicates it would be
13  at considerably above .3 parts per million to get actual
14  irritation, but I didn't study it specifically enough to
15  give you specific numbers.
16 BY MR. PINEDO:
17     Q.  You note in your report, "Lyndon Wright
18  experienced burning and tearing."
19         Are you talking about burning and tearing of the
20  eyes?
21     A.  Yes.
22     Q.  And is it your opinion that mold or mycotoxin
23  exposure to Lyndon Wright, while he was living in this
24  travel trailer, did not play any role in causing him to have
25  burning of the eyes?

Page 81

1      MR. BONE:  Object to the form.
2      MR. MILLER:  Same objection.  I think it was a
3  double negative.
4  BY MR. PINEDO:
5      Q.  All right.  Let me ask a different question then.
6         Is it your opinion that mold and myotoxin -- let
7  me start over --
8         Is it your opinion that mold and mycotoxin
9  exposure did not cause Lyndon Wright to have any burning and
10  tearing of eyes?
11     A.  Yes.
12     Q.  But you're aware of medical and scientific
13  literature that exposure to formaldehyde can cause burning
14  or tearing of the eyes?
15     MR. MILLER:  Objection; beyond the expert's report
16  and the scope of what he's been asked to do in this
17  litigation. Go ahead and answer.
18     MR. DINNELL:  Objection; form.
19     MR. GIEGER:  We'll join in the objections.
20     THE WITNESS:  At some concentration, yes.
21 BY MR. PINEDO:
22     Q.  At some concentration, exposure to formaldehyde
23  can cause burning or tearing to the eyes?
24     MR. MILLER:  Same objection.
25     THE WITNESS:  Yes.  The key issue is at what that

Page 82

1  concentration is, and what was actually present.
2  BY MR. PINEDO:
3      Q.  And at what concentration does exposure to
4  formaldehyde cause burning or tearing of the eyes?
5      MR. MILLER:  Objection: asked and answered --
6      MR. BONE:  Same.
7      MR. MILLER:  -- beyond the scope of the witness'
8  expert report and what he's been called to provide expert
9  testimony on.
10     MR. BONE:  Same objection.
11         And Chris, so we don't have to keeping objecting,
12  can we have an agreement that one objection is good for all
13  defendants?
14     MR. PINEDO:  That's fine with me.
15     MR. BONE:  All right.
16     THE WITNESS:  I'm sorry.  It wasn't that difficult
17  of a question, but I'm going to have to either get it read
18  back, or ask you to say it again.
19 BY MR. PINEDO:
20     Q.  Sure.  I'll ask it again.
21         You testified that some level of exposure to
22  formaldehyde would caused burning or tearing of the eyes,
23  and
24         I'm asking you:  At what level does exposure to
25  formaldehyde cause burning or tearing to the eyes?

Page 83

1      MR. MILLER:  Beyond the scope of the expert's
2  report.
3      THE WITNESS:  Again in general, I mean, I haven't
4  looked at that specifically for this case, it would be
5  somewhere above the .3 parts per million, but I just haven't
6  looked to see how far above.
7  BY MR. PINEDO:
8      Q.  In your report, you mentioned skin rashes with
9  regard to Lyndon Wright; is that correct?
10     A.  Yes.
11     Q.  Is it your opinion that mold exposure or mycotoxin
12  exposure had no relation to the skin rashes that Lyndon
13  Wright had while he was living in this travel trailer?
14     MR. BONE:  Object to the form.
15     THE WITNESS:  That's correct.
16 BY MR. PINEDO:
17     Q.  Have you seen or are you aware of medical
18  literature to the effect that exposure to formaldehyde can
19  cause skin rashes, itching or irritation?
20     MR. MILLER:  Beyond the scope of the expert
21  report; vague.
22     THE WITNESS:  Again, in general, with sufficient
23  amounts, yes.
24 BY MR. PINEDO:
25     Q.  And in your report, you also describe skin itching

Page 84

21 (Pages 81 to 84)

1    and skin irritation that Lyndon Wright had while he was
2    living in this travel trailer: is that correct?
3        A.   That he reports, yes.
4        Q.   And it's your opinion that that skin itching, skin
5    irritation had nothing to do with mold exposure or mycotoxin
6    exposure Lyndon Wright might have had while he was living in
7    his travel trailer?
8        A.   That's correct.
9        Q.   But you cannot rule out that that skin itching or
10   irritation or rashes may have been due to formaldehyde
11   exposure, while he was living in his travel trailer, can
12   you?
13           MR. BONE:  Object to the form.
14           MR. DINNELL:  And foundation.
15           MR. MILLER:  Beyond the scope of the expert's
16   report.
17           THE WITNESS:  I didn't look at the issue of
18   formaldehyde, so I can answer it in relation to mold but not
19   formaldehyde.
20   BY MR. PINEDO:
21       Q.   Since you didn't look at that, you cannot rule it
22   out that formaldehyde was the cause of that skin itching
23   irritation or rashes, can you?
24           MR. BONE:  Object to the form.
25           THE WITNESS:  I just don't have an opinion.

                                              Page 85

1    BY MR. PINEDO:
2        Q.   Does that mean you cannot rule it out?
3            MR. BONE:  Same objection.
4            THE WITNESS:  Well, I just haven't done that
5    exercise, so I just don't have an opinion.
6    BY MR. PINEDO:
7        Q.   You're not going to be offering any opinions about
8    formaldehyde exposure by Lyndon Wright, are you?
9        A.   I have not been asked to.
10       Q.   And you're not going to be offering any, are you?
11       A.   Well, I don't know what will happen at trial, but
12   I wasn't asked to address that issue.
13           MR. MILLER:  Just to make it very clear, this
14   witness' opinions are set forth in his report, and the bases
15   for those opinions, pursuant to Rule 26, those are the
16   opinions that he may be asked for at trial, nothing more
17   nothing less.
18           If he is asked to call on additional matters, he
19   would obviously be required to supplement his report.
20           MR. D'AMICO:  But as we sit here today, it's not
21   your intention to ask him questions about formaldehyde?
22           MR. MILLER:  I will stick by what I just said,
23   which is the report he has presented.
24           MR. D'AMICO:  All right.  Well, you understand why
25   I have to ask these questions.

                                              Page 86

1            MR. MILLER:  He can ask whatever questions he
2    wants, and I'll raise my objections.
3            MR. D'AMICO:  Okay.  All right.
4            MR. MILLER:  I'm not stopping the question, I was
5    just hoping that might cut things off a little bit.
6            MR. D'AMICO:  And we appreciate that, Henry.  I
7    understand where you're coming from, but --
8            MR. MILLER:  We tried to do it on Patricia
9    Williams and other ones, and we had the same problems.
10           MR. PINEDO:  We need to change tapes, so let's
11   take a break.
12           THE VIDEOGRAPHER:  This is the end of video tape
13   labeled No. 1 in the deposition of Bruce Kelman, Ph.D.
14           The time is approximately 11:20 a.m.
15           We are off the record.
16           (Pause in the proceedings.)
17           THE VIDEOGRAPHER:  We are back on the record.
18           Here marks the beginning of videotape labeled No.
19   2 in the deposition of Bruce Kelman, Ph.D.
20           The time is 11:37 a.m.
21   BY MR. PINEDO:
22       Q.   Sir, do you consider yourself a scientist?
23       A.   Yes.
24       Q.   And you consider yourself a professional in the
25   area of toxicology?

                                              Page 87

1        A.   Yes.
2        Q.   And one of the things that you look at as a
3    toxicologist is cause and effect relationships with regard
4    to chemical agents; is that right?
5        A.   Yes.
6        Q.   And one of the things that you consider in that
7    regard is the Bradford Hill criteria; is that right?
8        A.   That would be -- when you're determining whether a
9    chemical can cause an effect, or has caused an effect, in
10   general, the Bradford Hill criteria are useful in evaluating
11   epidemiological data.
12       Q.   And the Bradford Hill criteria are also useful in
13   making a cause and effect determination, aren't they?
14       A.   Well, they address one element of a causal
15   determination.
16       Q.   What do you mean by that?
17       A.   Well, using the language of a toxicologist,
18   there's basically four or five steps that you would go
19   through.  One of those steps is -- has exposure to the
20   chemical or environmental agent been shown to cause the
21   effect that's claimed.
22           And the best data for dealing with humans is human
23   data, and we're pretty much limited to either epidemiologic
24   data or, sometimes, clinical case trial -- clinical trials
25   for -- in the case of very limited number of chemicals and

                                              Page 88

Bruce Kelman PhD                                                December 15, 2009

Page 89

1    drugs.
2        Q.   One of the factors that epidemiologists look at in
3    making judgments about causation are temporal relationships;
4    isn't that right?
5        A.   These one of the factors, yes.
6        Q.   And by "temporal relationships" that means that
7    there is a consistency or relationship between when somebody
8    is exposed to an agent and when they suffer side effects; is
9    that right?
10       A.   That wasn't badly put.  Yes, I would agree with
11   that.
12       Q.   There's a relationship in time?
13       A.   For chemicals, there's generally a known
14   relationship between the exposure and the effect that you're
15   looking at.
16       Q.   And for example, if they have some type of
17   physical effect and then are later exposed to the chemical,
18   you would say there's no temporal relationship there because
19   the condition proceeded to exposure?
20       A.   Yes, that's the simplest analysis.  And if the
21   condition is present before the exposure, the exposure
22   couldn't have caused that condition.
23       Q.   So by temporal relationship, you're looking for
24   the condition existing sometime after the exposure, in
25   reasonable proximity: is that right?

Page 90

1        A.   Yes.
2        Q.   And then another thing that toxicologists look at
3    in making judgments about causation are -- is a dose-
4    response relationship: isn't that right?
5        A.   That's another element, yes.
6        Q.   And another element that epidemiologists and
7    toxicologists look at, is a replication of findings, that is
8    other studies or other scientific research finds a similar
9    type of relationship between an exposure and a side effect.
10       A.   Well, okay.  We're actually confusing two
11   paradigms.  So that's one of the Bradford Hill criteria for
12   looking at epidemiologic data.  For a causal determination
13   that wouldn't make sense for an individual, so that the
14   paradigm is different for a toxicologist determining whether
15   exposure to a chemical or environmental agent has caused a
16   particular effect.  The Bradford Hill criteria are used to
17   evaluate the epidemiological data, which address one element
18   of that analysis.
19       Q.   And one of those elements is a replication of
20   findings: isn't that right?
21       A.   Within the epidemiological research, yes.
22       Q.   And by replication of findings, you're talking
23   about several studies finding the same thing.
24       A.   In general, that's correct.  I mean, no two
25   studies are truly identical, but you look to see if a number

Page 91

1    of different investigators doing different studies reach --
2    have data showing the same conclusions.
3        Q.   And another thing that is examined is biological
4    plausibility: is that right?
5        A.   Yes, that's another one of the Bradford Hill
6    criteria.
7        Q.   That's something that's examined in making a
8    causation determination: isn't that right?
9        A.   Yes.  It's really important that, with the
10   Bradford Hill criteria, you don't have to meet every single
11   one of the original nine elements that Bradford Hill brought
12   out in modern day, they're slightly re -- I use the original
13   Bradford Hill, but some of these are redundant, so there's
14   really seven criteria that are currently used by
15   epidemiologists.
16            But in epidemiology, you don't have to have
17   biological plausibility.  But that's one element that would
18   strengthen your determination of epidemiologic data.
19       Q.   And another category is consistency with other
20   knowledge: isn't that right?
21       A.   Yes, that's one of the redundant items because
22   it's really not different than biological plausibility.
23       Q.   So some of the factors that are considered in
24   making a causation determination are temporal relationship,
25   dose-response relationship, replication with other findings

Page 92

1    and biological plausibility: is that right?
2        A.   When we're talking about epidemiological data,
3    yes.  But again, epidemiological data only go to one element
4    of that causal determination.
5        Q.   And what are the other elements?
6        A.   Within -- well, the first one, the question you
7    would ask is:  Is the chemical or environmental agent, has
8    it been shown to be present?
9            The second one is where you would use the
10   epidemiological data or, maybe, in rare occasions, clinical
11   studies and that is:  Has the chemical or environmental
12   agent been shown to cause the effect that's been claimed?
13           The third element is dose-response:  Was there enough
14   present to have caused the effect?  The fourth element is
15   timing, temporality:  Is the timing right?  And the fifth
16   element is:  Is there a better, alternative explanation for
17   that effect?
18           The principal difference between the two
19   approaches is if you fail any one of those five steps -- or
20   some people leave out the first one, and it would be four
21   steps -- you have to conclude that you have not established
22   causation.  Whereas Bradford Hill is a weighing of the
23   elements.  And it applies only to that second -- in my
24   discussion, that second step.
25       Q.   Well, you would agree with me that in the case of

23 (Pages 89 to 92)

Bruce Kelman PhD                                          December 15, 2009

1 Lyndon Wright there was a temporal relationship between him
2 living in this travel trailer and having eye irritation,
3 wouldn't you?
4        MR. BONE:  Objection: form.
5        THE WITNESS:  Yes, he did -- there's evidence in
6 the medical record where the timing is correct.
7 BY MR. PINEDO:
8     Q.  And likewise, there's a temporal relationship
9 between him having burning and tearing of the eyes and
10 moving into his travel trailer?
11       MR. BONE:  Object to the form.
12       THE WITNESS:  Well, burning and tearing of eyes
13 comes and goes, and there may have been earlier complaints,
14 I didn't look specifically for that because it's a -- it's
15 short term.  But he did have some complaints of burning and
16 tearing of the eyes when he was living in the trailer.
17 BY MR. PINEDO:
18    Q.  As you sit here today, you don't remember any
19 specific complaints of burning or tearing of the eyes prior
20 to him moving into his travel trailer, do you?
21    A.  Well, I don't remember the medical records well
22 from memory, but I can looked at my notes.
23       No, I don't find evidence in the record before he
24 moved in.
25    Q.  And you would agree with me it's biologically
Page 93

1 plausible that exposure to formaldehyde can cause eye
2 irritation burning and tearing of the eye?
3       MR. MILLER:  Objection: beyond the scope of this
4 witness' report and what he has been proffered for.
5       MR. DINNELL:  Objection: form.
6       THE WITNESS:  Well, you're using the wrong
7 paradigm because you're referring to an individual.  So
8 remember, the Bradford Hill criteria are for evaluating
9 epidemiological data.
10 BY MR. PINEDO:
11    Q.  I didn't refer to Lyndon Wright.  I said:  Is it
12 biologically plausible that exposure to formaldehyde can
13 cause eye irritation, burning and tearing of the eyes?
14       MR. BONE:  Objection: form.
15       MR. MILLER:  Same objection.
16       THE WITNESS:  At sufficient quantity, yes.  I
17 thought that was in the context of -- you just asked me a
18 question about Lyndon Wright.  So if it's in general, yes.
19 BY MR. PINEDO:
20    Q.  And there's numerous toxicological and
21 epidemiological studies indicating that exposure to
22 formaldehyde can cause eye irritation, burning of the eyes
23 or tearing; is that correct?
24       MR. BONE:  Object to the form.
25       MR. GIEGER:  Objection: form.
Page 94

1        MR. MILLER:  Beyond the scope of this expert's
2 report.
3        THE WITNESS:  Again at sufficient concentrations,
4 yes.
5 BY MR. PINEDO:
6     Q.  Is it your opinion that -- let me start over.
7        Did you see some indication in the medical records
8 that Lyndon Wright had asthma?
9     A.  Yes.
10    Q.  And is it your opinion that exposure to mold or
11 mycotoxins at work or in the travel trailer did not play any
12 role in that asthma?
13       MR. GIEGER:  Objection: form.
14       THE WITNESS:  It would be my opinion that mold or
15 mycotoxins in the trailer did not cause any asthmatic
16 response.
17 BY MR. PINEDO:
18    Q.  Same question with regard to any mold or mycotoxin
19 exposure for Lyndon Wright while he was at work.
20       MR. BONE:  Objection.
21       THE WITNESS:  Yes.
22 BY MR. PINEDO:
23    Q.  Now you're aware of medical literature that links
24 exacerbation or onset of asthma to exposure to formaldehyde?
25       MR. GIEGER:  Objection: form.
Page 95

1        MR. BONE:  Objection: form.
2        MR. GIEGER:  Beyond the scope.
3        THE WITNESS:  There's universal agreement that the
4 literature falls short of a causal relationship, I'm not
5 sure what you mean by "linked."
6 BY MR. PINEDO:
7     Q.  You would agree with me that there is medical and
8 scientific literature finding an association between
9 formaldehyde exposure and exacerbation of asthma.
10       MR. GIEGER:  Objection: form.
11       MR. DINNELL:  Objection: form.
12       MR. MILLER:  Beyond the scope of his report.
13       THE WITNESS:  Yes.
14 BY MR. PINEDO:
15    Q.  You're aware that there's medical literature to
16 the effect that there's an association between exposure to
17 formaldehyde and new onset asthma diagnosis?
18       MR. BONE:  Object to the form.
19       MR. GIEGER:  Object to form; beyond the scope.
20       THE WITNESS:  Actually I haven't looked.  I don't
21 know.
22 BY MR. PINEDO:
23    Q.  So if that literature exists, you're just not
24 aware of it?
25    A.  I just --
Page 96

24 (Pages 93 to 96)

Bruce Kelman PhD                                           December 15, 2009

1      Q.   Is that right?
2      A.   I didn't investigate that for this case.
3      Q.   I understand that.  But if literature exists to
4   that effect, you're not aware of it, are you?
5           MR. BONE:  Asked and answered.
6           THE WITNESS:  I may have read something.  I wasn't
7   focusing for this, and for this particular case, I don't
8   have an opinion.  And in general, I would have to go back
9   and look at the literature.  At this point, I don't recall
10  the literature.
11  BY MR. PINEDO:
12     Q.   Is it your opinion that mold or mycotoxin exposure
13  that Lyndon Wright may have had at work played no role in
14  his eye irritation or burning or tearing sensation of his
15  eyes?
16          MR. BONE:  Object to the form.
17          MR. GIEGER:  Foundation.
18          THE WITNESS:  Not from the data that I had.
19  BY MR. PINEDO:
20     Q.   You did indeed look at data from the locations
21  where Lyndon Wright was working, didn't you?
22          MR. MILLER:  Objection; vague.
23          THE WITNESS:  I have some locations in the file.
24  BY MR. PINEDO:
25     Q.   And what we're talking about is locations where

                                                  Page 97

1   might have had at work or in the travel trailer played no
2   role in irritating his nasal membranes?
3           MR. BONE:  Object to the form.
4           MR. MILLER:  Objection; compound; foundation.
5           THE WITNESS:  If I followed the negatives
6   correctly -- let me just --
7   BY MR. PINEDO:
8      Q.   Let me ask you a different question.
9           Is it your opinion that mold or mycotoxin exposure
10  at work played no role in the irritation of the nasal
11  membranes of Lyndon Wright?
12          MR. MILLER:  Objection; foundation.
13          MR. BONE:  Objection beyond the scope of the
14  report.
15          THE WITNESS:  Based on the data I have, that would
16  be my opinion.
17  BY MR. PINEDO:
18     Q.   Is it your opinion that mold or mycotoxin exposure
19  Lyndon Wright may have had while living in the travel
20  trailer, did not play any role in irritating his nasal
21  membranes?
22     A.   Yes.
23     Q.   You are aware of medical and scientific literature
24  to the effect that formaldehyde exposure can cause
25  irritation of the nasal membranes?

                                                  Page 99

1   Lyndon Wright was working, you have some mold data; is that
2   right?
3      A.   Yes.
4      Q.   And you do not have -- let me start over.
5           It's your opinion, you saw no indication that mold
6   or mycotoxin exposure that Lyndon Wright might have had
7   while he was at work played any role in his eye irritation,
8   burning of the eyes or tearing of the eyes?
9           MR. DINNELL:  Objection; form.
10          MR. GIEGER:  Objection; form.
11          MR. BONE:  Objection; form; and it's beyond the
12  scope of it report.
13          THE WITNESS:  That's correct.
14  BY MR. PINEDO:
15     Q.   Is it your opinion that exposure to mold or
16  mycotoxins did not play any role in irritation of nasal
17  membranes that Lyndon Wright complained of?
18          MR. GIEGER:  Objection; form and foundation.
19          THE WITNESS:  We're talking about his work
20  environment now; is that right?
21          Actually it wouldn't matter, work environment or
22  not.  No.
23  BY MR. PINEDO:
24     Q.   Okay let me ask a different question:  Is it your
25  opinion any mold or mycotoxin exposure that Lyndon Wright

                                                  Page 98

1           MR. BONE:  Objection; form.
2           MR. GIEGER:  Beyond the scope.
3           THE WITNESS:  In general, at sufficient
4   concentration, yes.
5   BY MR. PINEDO:
6      Q.   And that's something you became aware of as a
7   toxicologist; is that right?
8      A.   Yes, I've known that for a long time.
9      Q.   How many years have you known that?
10     A.   More than 30.
11     Q.   And you learned that in school when you were
12  getting your original degrees; is that right?
13     A.   Well, from a scientific standpoint, it would
14  probably relate to my post doctorate.  But from a practical
15  standpoint, that's an effect that's been known for a long
16  time.  At sufficient concentrations.
17     Q.   And it's well-known in the field of toxicology,
18  isn't it?  That exposure to formaldehyde can cause
19  irritation of the nasal membranes.
20          MR. DINNELL:  Objection; form.
21          MR. MILLER:  Objection; asked and answered.
22          THE WITNESS:  Again, at sufficient concentrations,
23  yes.
24  BY MR. PINEDO:
25     Q.   And what concentration is that, that formaldehyde

                                                  Page 100

                                    25 (Pages 97 to 100)

Bruce Kelman PhD                                             December 15, 2009

1   causes irritation to the nasal membranes?
2        MR. MILLER:  Objection; asked and answered.
3        MR. BONE:  Form and foundation; asked and
4   answered.
5        MR. GIEGER:  Objection.
6        MR. PINEDO:  We have the agreement, one is good
7   enough.
8        MR. BONE:  I was just giving it to the court
9   reporter.
10       THE WITNESS:  Okay.  Would you repeat it?
11       MR. MILLER:  Reread the question?
12       THE WITNESS:  That's fine.
13       (The following encompasses the entire readback
14   portion.)
15       "Q. And what concentration is that, that
16   formaldehyde causes irritation to the nasal membranes?"
17       (Whereupon, the readback was concluded.)
18       THE WITNESS:  Again, I didn't study formaldehyde
19   for this.  I can tell you at .3 I would not expect to find
20   any irritation, .3 parts per million, but I would have to go
21   back to the literature to determine higher, at what point
22   you would begin to find it.
23   BY MR. PINEDO:
24       Q.  Did you see in the medical records that Lyndon
25   Wright complained of throat irritation while he was living

Page 101

1   in his travel trailer?
2        A.  (Witness peruses file.)
3        Q.  You can turn to Page 10 of your report, as well.
4        A.  (Witness complies.)
5   Well, the list comes off of his deposition, so I have to go
6   back to the medical record.
7        Well, what I find are assessments that indicate
8   some nasal irritation concurrent with when he was in the
9   trailer.
10       Q.  In your report, you have on page 10, you say he
11   was complaining about throat irritation.
12       A.  Yes, but that -- you asked me about the medical
13   records, and that paragraph on Page 10 comes from his
14   deposition.
15       Q.  Okay.  Is it your understanding he was complaining
16   of throat irritation while he was living in the travel
17   trailer?
18       A.  Well, it's my understanding that at his deposition
19   he said he was.
20       Q.  And you have no reason to doubt that, do you?
21       A.  No, and in fact, it's supported by the medical
22   record.
23       Q.  And is it your opinion that mold or mycotoxin
24   exposure while he was living in the travel trailer played no
25   role in that throat irritation?

Page 102

1        A.  Yes.
2        Q.  Is it your opinion that mold or mycotoxin
3   exposure, while he was at work played no role in that throat
4   irritation?
5        MR. BONE:  Object to the form.
6        MR. GIEGER:  Objection; form and foundation.
7        THE WITNESS:  It's extremely unlikely.
8   BY MR. PINEDO:
9        Q.  But you're aware of the medical literature to the
10   effect that formaldehyde exposure can cause throat
11   irritation?
12       MR. BONE:  Object to the form.
13       MR. GIEGER:  Form and foundation; beyond the scope
14   of this expert's report.
15       THE WITNESS:  In general, and at sufficient
16   concentrations, yes.
17   BY MR. PINEDO:
18       Q.  And you have known that for some 30 years, haven't
19   you?
20       MR. MILLER:  I'm going to object; asked and
21   answered on multiple occasions.
22       Go ahead and answer, if you know.
23       THE WITNESS:  Yes.
24   BY MR. PINEDO:
25       Q.  Lyndon Wright also had complaints of headaches, as

Page 103

1   well, while he was living in his travel trailer; is that
2   right?
3        A.  According to his deposition, yes.
4        Q.  And is it your opinion that those headaches were
5   not caused by mycotoxin or mold exposure while he was living
6   in the travel trailer?
7        A.  Yes.
8        Q.  Is it your opinion that those headaches were not
9   caused by mold or mycotoxin exposure while he was at work?
10       MR. GIEGER:  Form and foundation.
11       MS. WHITFIELD:  Objection.
12       THE WITNESS:  I can't answer to the same degree
13   because headaches are very nonspecific and some people will
14   -- can develop headaches in response to odors.  So it not a
15   direct effect at all, but it could be present.
16   BY MR. PINEDO:
17       Q.  And people can develop headaches due to -- as a
18   response to the odor of formaldehyde; is that right?
19       MR. BONE:  Object to the form.
20       MR. MILLER:  Objection; form; beyond the scope of
21   this expert's report.
22       THE WITNESS:  Well, again, since you -- since this
23   is very nonspecific, and some people will develop headaches
24   as a result of any identifiable odor, it's possible.
25   BY MR. PINEDO:

Page 104

Bruce Kelman PhD                                                December 15, 2009

1     Q.   Have you read that, in the medical literature and
2   scientific literature, exposure to formaldehyde can cause
3   people to have headaches?
4           MR. MILLER:  Objection; form; beyond the scope of
5   the report.
6           THE WITNESS:  Actually I haven't found a causal
7   statement.  People report headaches after exposure to
8   formaldehyde.
9   BY MR. PINEDO:
10    Q.   You have seen that in the medical literature, that
11  people report headaches after exposure to formaldehyde?
12    A.   Yes, at sufficient quantity -- I mean, they have
13  to be able to detect it, first, so at sufficient
14  concentrations.
15    Q.   And what concentration would that be?
16          MR. GIEGER:  Form; foundation; beyond the scope of
17  this expert's report.
18          MR. BONE:  Asked and answered.
19          THE WITNESS:  Well, again, since we're talking
20  generally, for most individuals, you would detect
21  formaldehyde well below the PEL, and I don't remember how
22  much below, but it's significantly below the PEL.  You could
23  develop a headache, then, in response to that odor
24  detection.
25  BY MR. PINEDO:

                                                    Page 105

1     Q.   In your report on Page 10, you have a list of
2   complaints for Lyndon Wright, health complaints, which are
3   cough, headache associated with coughing, eye irritation,
4   burning, tearing and swelling, chest congestion, blood and
5   sputum from sinuses, skin rashes, itching or irritation,
6   burning and drying or scaling, tingling or swelling of lips
7   or face area, asthma, waking up with a choking feeling,
8   worsening of allergies, irritation, burning and bleeding of
9   the nasal membranes, diarrhea, difficulty breathing,
10  wheezing, shortness of breath, tightness of chest, sneezing,
11  bronchitis, throat irritation, hoarseness, laryngitis,
12  pneumonia, upper respiratory tract infections, dizziness,
13  nephritis, hypothermia, abnormal laboratory tests, high
14  blood pressure and numbness of hands.
15          Is that what you have reported as complaints for
16  Lyndon Wright?
17    A.   Well, those are his complaints from his
18  deposition.
19    Q.   And some of those are also contained in his
20  medical records; is that right?
21    A.   Some of them are, yes.
22    Q.   And that is what you have recorded for Lyndon
23  Wright; is that correct?
24          MR. DINNELL:  Objection; form.
25          MR. MILLER:  Objection; mischaracterizes the

                                                    Page 106

1   witness' report.
2           THE WITNESS:  I don't know what you're asking.
3   Those are what he reported, after he was out of the trailer,
4   as his complaints.
5   BY MR. PINEDO:
6     Q.   While he was living in the trailer?
7           MR. BONE:  Object to the form.
8           MR. GIEGER:  Object to the form.
9           THE WITNESS:  No, he's reporting it after he lived
10  in the trailer, but he's saying it, after the fact, that
11  those are the symptoms that he suffered when he was in the
12  trailer.
13  BY MR. PINEDO:
14    Q.   That list that I just read to you; is that
15  correct?
16    A.   Yes.
17    Q.   And is it's your opinion that none of those health
18  claims, that's the way you describe them in your report on
19  Page 10; is that right?
20    A.   Yes.
21    Q.   Is it your opinion that none of those health
22  claims that Lyndon Wright had were due to his exposure to
23  mold or mycotoxins, while he was living in the travel
24  trailer?
25    A.   Yes.

                                                    Page 107

1     Q.   And likewise, it's your opinion that none of those
2   health claims are due to mycotoxin or mold exposure he may
3   have had while he was at work?
4           MR. GIEGER:  Form and foundation.
5           MS. WHITFIELD:  Objection.
6           THE WITNESS:  Well, again, we discussed headache
7   already.
8   BY MR. PINEDO:
9     Q.   And by headache, you're saying it's possible, but
10  you can't say one way or the other?
11          This is headache associated with coughing.
12    A.   Oh, well, anybody can have a headache associated
13  with coughing.  So you would have to go back to, was the
14  could have -- could the cough have been caused by his
15  workplace?  That's possible.  It's unlikely it was caused by
16  mold or mycotoxins.
17  BY MR. PINEDO:
18    Q.   I want you to take a look at this list of the
19  health claims you have in your report, Exhibit 2, Page 10,
20  and tell me if you think that any of these, more likely than
21  not, were due to mold or mycotoxin exposure while he was at
22  work?
23          MR. GIEGER:  Form and foundation.
24          THE WITNESS:  (Witness peruses document.)
25          MR. MILLER:  Counsel, I'm going to object; vague.

                                                    Page 108

                                      27 (Pages 105 to 108)

Bruce Kelman PhD                                    December 15, 2009

**Page 109**

1    And to clarify your -- the caveat is based upon
2 the information he has regarding exposures at his workplace.
3    MR. GIEGER:  Foundation.
4    MR. PINEDO:  It's whatever documents you gave him
5 regarding his exposure at work.
6    THE WITNESS:  It's possible he could have stirred
7 up enough dust, including mold, to have caused sneezing.
8 That and the cough are the only symptomology that I see any
9 potential from the mold or the mycotoxins.
10 BY MR. PINEDO:
11    Q.  Regardless of where he may have been, either at
12 work or living in the travel trailer?
13    A.  Yes.
14    Q.  You don't think it's biologically plausible, other
15 than coughing or sneezing that mold or mycotoxin exposure at
16 work or in the travel trailer caused any of these health
17 claims, as you have set forth on Page 10 in your report for
18 Lyndon Wright, do you?
19    MR. GIEGER:  Form and foundation.
20    THE WITNESS:  No, that's not correct.
21 BY MR. PINEDO:
22    Q.  Okay.  What part of that do you disagree with?
23    A.  Well, you have to relate back to concentrations.
24 So we have air measurements, and going with the spore
25 measurements that were taken, they're too low to have caused

**Page 110**

1 any of these effects.
2    We know that under agricultural conditions, where
3 you have extremely high spore counts, tens to hundreds of
4 millions of spores per cubic meter, then you can get some
5 additional symptomology, that's well recorded.  It just has
6 no relevance to these exposure conditions.
7    Q.  Well it sounds like, to me, you're agreeing with
8 me.  You're saying it's too low to be biologically plausible
9 in any of these complaints that you have identified here on
10 Page 10 of your report.  You don't think it's biologically
11 plausible, other than, perhaps, sneezing or coughing, have
12 any relationship to exposure to mold or mycotoxins for
13 Lyndon Wright?
14    MR. BONE:  Object to form.
15    MR. GIEGER:  Form; foundation.
16    THE WITNESS:  Well you're using the term
17 "biologically plausible" in a different way than it's meant
18 -- the way it's normally considered.  Biological
19 plausibility usually pertains to the presence of a material
20 at any concentration.  The dose-response is what allows you
21 to conclude what that response doesn't occur at very low
22 doses.
23    So I suspect we're not disagreeing, but just the
24 language you're using doesn't work.
25 BY MR. PINEDO:

**Page 111**

1    Q.  Well, let's be clear then.  You're saying that
2 some of these health claims might be biologically plausible
3 to be due to mold or mycotoxin exposure for Lyndon Wright,
4 however you do not believe that the dose was sufficient at
5 work or in a travel trailer to cause any of these claims?
6    MR. GIEGER:  Form and foundation.
7 BY MR. PINEDO:
8    Q.  Is that right?
9    A.  Well, you almost made it --
10    Q.  Let me stop you.  How would you explain it then?
11    A.  Okay.  Actually the way I just did.
12    At sufficient concentrations, you could have some
13 of the symptomology.  In the case of Mr. Wright, from the
14 data we've got, he was not at a high enough concentration to
15 have caused any of the symptomology, other than what we were
16 talking about.
17    Q.  And that would be the data that you have regarding
18 his exposures at work and the travel trailer, you don't
19 think that they are high enough or great enough to cause any
20 of the symptomology identified here on Page 10 of your
21 report, other than perhaps sneezing or coughing?
22    MR. GIEGER:  Form and foundation.
23 BY MR. PINEDO:
24    Q.  Is that right?
25    MR. GIEGER:  Form and foundation.

**Page 112**

1    THE WITNESS:  In the workplace, that's correct.
2 BY MR. PINEDO:
3    Q.  And also in the trailer; is that right?
4    A.  No, I don't think it was even sufficiently high
5 concentrations in the trailer.
6    Q.  To cause sneezing or coughing?
7    A.  That's right.
8    Q.  Otherwise -- let me say it this way then:  You
9 didn't think any of these listed complaints that you have on
10 Page 10 of your report, you don't think mold or mycotoxin
11 exposure in the trailer was sufficient to cause any of these
12 complaints in the case of Lyndon Wright?
13    MR. GIEGER:  Form and foundation.
14    THE WITNESS:  Yes, that's correct.
15 BY MR. PINEDO:
16    Q.  I noticed in your expert materials that you have
17 the reports of the Defendants and the Plaintiffs.
18    MR. DINNELL:  Objection: form.
19 BY MR. PINEDO:
20    Q.  Is that right?
21    A.  I don't think I have reports from the Plaintiffs.
22    Q.  From the Plaintiff's experts?
23    A.  Oh, from the experts, yes.
24    Q.  That's what I meant.
25    A.  Oh, yes, from both -- yes, I have some -- I don't

Bruce Kelman PhD                                                    December 15, 2009

```
 1   know if it's all of them, but I have some from each set of
 2   experts.
 3        Q.  You have expert reports from both sides, you don't
 4   know exactly which ones, but you do have reports from
 5   both sides in this case; is that right?
 6        A.  Yes.
 7        MR. DINNELL:  Objection; form.
 8        THE WITNESS:  Yes.
 9        MR. D'AMICO:  What is the basis of the objection?
10        MR. DINNELL:  Vague as to who, on which side.
11   BY MR. PINEDO:
12        Q.  Okay.  You have some reports from the Plaintiff in
13   the case, Lyndon Wright from the experts retained for the
14   Plaintiff; is that right?
15        A.  I have some reports from the Plaintiff's side,
16   yes.
17        Q.  And you also have reports from experts retained by
18   the United States in this case?
19        A.  Yes.
20        Q.  And you also have reports from Forest River in
21   this case; is that right?
22        MR. DINNELL:  Objection; vague as to time period.
23        THE WITNESS:  Actually, I didn't keep track of
24   what expert was working for who, so I can't answer that.
25   BY MR. PINEDO:
```
Page 113

```
 1        Q.  But you agree with me that you have reports from
 2   some of the Defendant's experts in this case; is that right?
 3        MR. DINNELL:  Objection; vague as to this case,
 4   versus class certification.
 5        THE WITNESS:  Well, I certainly have Dr. Robbins'
 6   report, so I would have to answer, yes.
 7   BY MR. PINEDO:
 8        Q.  Do you remember ever seeing a report by an expert
 9   by the name of Osteraas?
10        A.  No.
11        Q.  You cannot rule out, though, that that indeed is
12   in your file materials, can you?
13        A.  Well, I can't rule anything out without checking.
14   I didn't memorize that list.
15        Q.  Do you recognize a name of an entity called
16   Exponent that might have issued a report in this case?
17        A.  Yes.
18        Q.  And I'll represent to you that that is the report
19   that was prepared by an expert by the name of John Osteraas,
20   who is retained by David Kurtz.  And I have a section of
21   that report that I want to ask you about.
22        But before I do that, you indeed, made an
23   inspection of this travel trailer, didn't you?
24        A.  Yes, I did.
25        Q.  And when you inspected it, it had already been
```
Page 114

```
 1   cleaned hadn't it?
 2        MR. BONE:  Object to the form.
 3        MR. GIEGER:  Foundation.
 4        MR. BONE:  Foundation.
 5        THE WITNESS:  Not to my understanding.
 6   BY MR. PINEDO:
 7        Q.  Okay.  Nobody told you, from the United States or
 8   any other Defendants involved in this matter, that this
 9   travel trailer had been cleaned before you inspected it?
10        MR. BONE:  Objection; form foundation.
11        THE WITNESS:  No.  I was not told it had been
12   cleaned.
13   BY MR. PINEDO:
14        Q.  Now, if this trailer had been cleaned --
15        A.  Well, let me rephrase that.
16        I mean, after Mr. Wright no longer was living in
17   it.  I have no indication it was cleaned after that.
18        Q.  Now --
19        A.  He may have cleaned it when he was in it.
20        Q.  And if he -- let me start over.
21        If somebody had cleaned this trailer after he
22   moved out, it's possible some of the traces of mold would
23   have been removed; isn't that correct?
24        MR. GIEGER:  Objection; form; foundation.
25        THE WITNESS:  Well, anything is -- it depends on
```
Page 115

```
 1   what kind of cleaning was done.  I don't -- in there's no
 2   way to know.
 3   BY MR. PINEDO:
 4        Q.  Maybe so, maybe not, is that what you're saying?
 5        MR. DINNELL:  Objection; form.
 6        MR. MILLER:  Objection; asked and answered.
 7        THE WITNESS:  Some types of cleaning will remove
 8   mold.  I'm unaware there was any cleaning that went on.
 9   BY MR. PINEDO:
10        Q.  Well, let me ask it a different way:  If this
11   trailer had been cleaned, it's possible that some of the
12   mold that was there while he was living would have been
13   removed; is that right?
14        MR. BONE:  Object to the form.
15        MR. GIEGER:  Objection; form.
16        THE WITNESS:  Well, I had no indication it was
17   cleaned, but it's possible.  It's possible, if it was
18   cleaned, that there was mold removed, but I had no
19   indication it had been cleaned.
20   BY MR. PINEDO:
21        Q.  I'm going to read this section from if Osteraas
22   report.  It states --
23        MR. BONE:  What page are you referring to?
24   BY MR. PINEDO:
25        Q.  It's on Page 15.
```
Page 116

29  (Pages 113 to 116)

Bruce Kelman PhD                                                        December 15, 2009

1     A.   Okay.  Wait.  I don't find the Osteraas report in
2   my list.
3         Oh, wait.  There's another section here.
4         MR. MILLER:  Just to make it clear, all of these
5   reports would been issued the same day his was issued, so he
6   may have never seen it, unless he received it afterwards.
7         MR. PINEDO:  Well, that's a running list of
8   materials that he has reviewed, from what I understand of
9   his testimony.
10        MR. MILLER:  I understand.  You're free to ask him
11  the questions, I'm just...
12        MR. PINEDO:  Okay.
13        MR. D'AMICO:  We want to ask him some questions
14  about this report.  Should we make a copy of it for him?
15        MR. MILLER:  If you're going to ask him questions,
16  I think you should because I don't think it's in his
17  materials.
18        MR. D'AMICO:  Let's take a break right now and
19  make copies of it.  Let's take our lunch break right now.
20        MR. MILLER:  That's fine.
21        MR. D'AMICO:  And we'll make a copy of it and he
22  can read the report.  But we're going to ask him
23  specifically about some parts of this report.
24        MR. MILLER:  Yeah, that's fine.
25        MR. D'AMICO:  Let's go off the record for a lunch

                                              Page 117

1   break.
2         What should we say, an hour?
3         THE VIDEOGRAPHER:  The time is 12:19 p.m.
4         We are off the record.
5         (Pause in the proceedings for lunch.)
6         THE VIDEOGRAPHER:  We are back on the record.
7         The time is approximately 1:26 p.m.
8         MR. GIEGER:  Before we get started with the
9   questioning, I discussed with Frank a stipulation relative
10  to this deposition.  You asked me whether or not the other
11  parties will agree, I think they will.
12        But that stipulation is that to shorten this
13  deposition, that there is an agreement that the issues in
14  this case for this witness are limited to the areas in which
15  he has expounded opinions in his report, which we know is
16  going to be the Judge's ruling in this case, anyway, which
17  would eliminate questions related to formaldehyde.
18        Do we have that agreement?
19        MR. D'AMICO:  I don't know if we can agree to it
20  that broadly.  I think we have a right to explore certain
21  issues relative to other exposures in this case.
22        MR. GIEGER:  So you're not going to agree?
23        MR. D'AMICO:  No.
24        MR. GIEGER:  Okay.  So that is a change from what
25  you told me before, so we will be spending a lot of time

                                              Page 118

1   this afternoon.  But for purposes of this record, let it be
2   clear that we will take a position in this case that his
3   testimony is limited to his report as the judge has ruled --
4   and Frank, you're aware he has ruled in every case so far,
5   correct?
6         MR. D'AMICO:  Correct.
7         MR. GIEGER:  Okay.
8   BY MR. PINEDO:
9     Q.   Are you ready to proceed, sir?
10    A.   Yes.
11    Q.   What were you asked to do in this case?
12    A.   Look at the materials that I was sent, look at any
13  -- use whatever reference materials I needed to and come up
14  with opinions regarding effects from mold and mycotoxin,
15  exposures, as they relate to this case.
16    Q.   You were not asked to examine issues related to
17  formaldehyde?
18    A.   No.
19    Q.   Were you told not to examine formaldehyde?
20    A.   I was told that's not the area they wanted me
21  looking at.
22    Q.   Tell me --
23    A.   I was specifically told I was to deal with the
24  issues of mold and mycotoxin.
25    Q.   Were you told not to examine issues of

                                              Page 119

1   formaldehyde?
2     A.   No, but I was told that was not my purpose in --
3   that's not what they wanted me opining about.
4     Q.   What were you told was your purpose?
5     A.   To -- well, actually, they wanted my opinions --
6   look at the materials, and give us your opinions as they
7   relate to mold and mycotoxins in this case.
8     Q.   Are you aware of what the Plaintiff's claims are
9   in this case?
10    A.   To the -- I think to the extent they relate to
11  mold and mycotoxin, yes.
12    Q.   Are you aware of any complaints that the plaintiff
13  has with regard to formaldehyde?
14    A.   I may have heard them.  I didn't spend time
15  investigating them.
16    Q.   I would like you to take a look at this report of
17  Osteraas that's in front of you.
18        Could you turn to Page 1, please?
19    A.   (Witness complies.)
20        MR. KURTZ:  Chris what is the Bates number of the
21  page you're asking him to look at?
22        MR. PINEDO:  7.
23  BY MR. PINEDO:
24    Q.   Do you have that in front of you?  It's Page 1,
25  but it's Bates No. 7.

                                              Page 120

Bruce Kelman PhD                                                 December 15, 2009

1       MR. KURTZ:  Let me just note for the record this
2   is from Dr. Osteraas's original report, not the errata
3   report that came later.
4       MR. GIEGER:  Oops.
5   BY MR. PINEDO:
6       Q.  Do you have that page in front of you?
7       A.  Yes.
8       Q.  It starts out here, "For a period of time
9   following Hurricane Katrina, Lyndon Wright occupied a
10  trailer (Wright trailer, trailer or subject trailer, see
11  Figure 1) manufactured by Forest River, Inc., purchased by
12  FEMA, installed by a subcontractor of Shaw Environmental,
13  Inc., and for a period of time maintained by a subcontractor
14  of Shaw."
15      Is that your understanding of the general nature
16  of this lawsuit?
17      MR. GIEGER:  Objection; foundation.
18      MR. KURTZ:  Objection; foundation. THE WITNESS:  I
19  --
20  BY MR. PINEDO:
21      Q.  Let me ask you a different question.  There's some
22  objections.
23      It says right here in this introduction to Mr.
24  Osteraas's report that, "For a period of time following
25  Hurricane Katrina, Linda Wright lived in a travel trailer

                                                    Page 121

1   manufactured by Forest River."
2       Is that consistent with your understanding of what
3   has occurred, in some part, in this lawsuit, that Lyndon
4   Wright was living in a travel trailer after Hurricane
5   Katrina?
6       A.  That part is my understanding.
7       Q.  It goes on here, "In the matter of Lyndon Wright
8   versus Forrest River, et al, it's alleged during his
9   occupancy of his trailer, Mr. Wright was exposed to elevated
10  of formaldehyde and mold."
11      Is that your understanding of part of the
12  Plaintiff's allegations in this lawsuit?
13      MR. GIEGER:  Objection; foundation.
14      MR. KURTZ:  Same.
15      THE WITNESS:  Actually, no.  My understanding was
16  that Mr. Wright was claiming some of the symptomology that
17  he had, originated from exposure to mold.
18  BY MR. PINEDO:
19      Q.  Were you aware any of that of the symptomology he
20  had, he was alleging was due to formaldehyde exposure?
21      A.  I was aware formaldehyde was an issue in the case
22  but it's not -- I only looked at the mold part.
23      Q.  Is that unusual for you as a toxicologist, just to
24  be asked to look at one part of a case where somebody might
25  have been involved with exposure to two types of elements

                                                    Page 122

1   that could cause ailments?
2       MR. DINNELL:  Objection; form.
3       THE WITNESS:  It's not unusual.  Sometimes I'm
4   asked to look at the whole case, and sometimes I'm asked to
5   look at one narrow part of the case.
6   BY MR. PINEDO:
7       Q.  And who is it that asked you to look at one narrow
8   part of this case?
9       MR. DINNELL:  Objection; form.
10      THE WITNESS:  I believe the -- well -- I don't
11  consider just looking at mold, potential mold exposures in
12  effect narrow in this particular case, but that instruction
13  would have -- actually I don't have a specific recollection.
14  BY MR. PINEDO:
15      Q.  Did you, indeed, receive an instruction only to
16  look at mold?
17      A.  As I think about it, I don't think I was ever
18  instructed -- I certainly was instructed that was the focus
19  and that was my purpose.  And that there were other experts
20  that would address formaldehyde exposures.
21      Q.  So you understood that mold was your focus, but
22  you were aware of formaldehyde being involved in this case?
23      A.  Yes.
24      Q.  And how were you aware that formaldehyde was
25  involved in this case?

                                                    Page 123

1       A.  I was aware of the general context of the
2   litigation, and I was aware Dr. Robbins was working with
3   formaldehyde.
4       Q.  Do you believe that any of the Plaintiff's claims,
5   his health related claims such as we read through on Page 10
6   of your report, are associated with exposure to
7   formaldehyde?
8       MR. MILLER:  Objection; beyond the scope of his
9   report; foundation.
10      THE WITNESS:  I haven't really looked at the
11  issue.  A central part of that would go back to dose.  I
12  haven't looked at the measurements, the literature, I just
13  don't have an opinion for the formaldehyde in this case.
14  BY MR. PINEDO:
15      Q.  If you knew more information about dose, you might
16  be able to arrive at an opinion about formaldehyde as being
17  a causative agent, based upon your experience and training
18  as a toxicologist; isn't that right?
19      MR. DINNELL:  Objection; form.
20      THE WITNESS:  Well, the potential effects of
21  formaldehyde are certainly well within the scope of what I
22  have done in the past, and you know, what is consistent with
23  my training experience.  And so it's -- it would be possible
24  to do that with sufficient background and time to look at
25  the literature.

                                                    Page 124

Bruce Kelman PhD                                    December 15, 2009

| | |
|---|---|
| 1   BY MR. PINEDO: | 1   element because you made the determination that the first |
| 2      Q.  And the sufficient background you're talking | 2   four elements were not satisfied for mycotoxins in the case |
| 3   about, what would that be?  Would that be tests of the | 3   of Lyndon Wright? |
| 4   amount of formaldehyde in a travel trailer? | 4      A.  That's right. |
| 5      A.  Well, I would be particularly interested in any | 5      Q.  In fact, on your report -- |
| 6   measurements taken at the time of occupancy, probably what | 6      A.  Now, wait.  At least one of those was not -- could |
| 7   the construction of the trailer was, what kind of emission | 7   not answer yes to one of the questions.  If you're not able |
| 8   rates to expect from the particular construction.  I would | 8   to do any one of those elements, then you can't conclude |
| 9   have to spend some time thinking about all of the different | 9   that exposure to that chemical has caused the injury. |
| 10   elements I need. | 10   Because the first question for mold:  Was he exposed to |
| 11      I would certainly need to go back to the | 11   mold?  Everybody is exposed to mold, so the answer to that |
| 12   literature and see what the epidemiology shows in terms of | 12   has to be yes. |
| 13   people's ability to even detect formaldehyde. | 13      Q.  So the second question, "Toxicological and/or |
| 14      Q.  You were not asked to consider whether or not | 14   epidemiological studies must show that the chemicals in |
| 15   Plaintiff's claims were due to formaldehyde exposure, were | 15   question are able to cause the claim adverse effect." |
| 16   you? | 16      What is your answer to that? |
| 17      A.  No. | 17      A.  In these circumstances, no. |
| 18      Q.  Now, in your report, you identify five different | 18      Q.  If the same question was asked, the chemical in |
| 19   steps that you go through with regard to making an opinion | 19   question must first be present, and the chemical in question |
| 20   on whether or not an agent, for example, a mycotoxin, causes | 20   is formaldehyde, and we're talking about in this trailer, |
| 21   injury: is that correct? | 21   would your answer be yes, that formaldehyde was present in |
| 22      A.  Yes, that's what we discussed previously. | 22   the trailer? |
| 23      Q.  The first one is, "The chemical in question must | 23      MR. GIEGER:  Form; foundation. |
| 24   be present;" is that true? | 24      MR. MILLER:  Beyond the scope of the witness' |
| 25      A.  Yes. | 25   report and request for opinions in this case. |
| Page 125 | Page 127 |

| | |
|---|---|
| 1      Q.  The second one is, "The toxicological and/or | 1      THE WITNESS:  There was probably some |
| 2   epidemiological studies must show that the chemical in | 2   formaldehyde.  I mean, I didn't look at the literature and |
| 3   question are able to cause the claimed adverse effect;" is | 3   the data in terms of what was there.  But if Mr. Wright was |
| 4   that right? | 4   present, then he was exhaling some formaldehyde, so |
| 5      A.  Yes. | 5   formaldehyde is ubiquitous, it's pretty difficult to get |
| 6      Q.  The third one is, "Exposure of an individual to | 6   away from it. |
| 7   the chemical must be in sufficient quantities and sufficient | 7   BY MR. PINEDO: |
| 8   length of time to cause the claimed adverse effect;" is that | 8      Q.  I'm not talking about the amount of formaldehyde |
| 9   right? | 9   he would be emitting in his own breath, I'm talking about |
| 10      A.  That's correct. | 10   the amount of formaldehyde that would be coming from |
| 11      Q.  The forth one is, "Exposure to the chemical must | 11   manufactured wood products in his travel trailer. |
| 12   precede the claimed adverse effect with an appropriate time | 12      MR. BONE:  Objection: that's not a question. |
| 13   frame specific to the individual chemical in which the | 13   BY MR. PINEDO: |
| 14   development of the effect occurs;" is that correct? | 14      Q.  Do you understand that? |
| 15      A.  Yes. | 15      MR. BONE:  Objection. |
| 16      Q.  And you examined all four of those steps with | 16      THE WITNESS:  Well, that consideration, that first |
| 17   regard to mycotoxins in the case of Lyndon Wright? | 17   element, the question you asked is:  Has the chemical been |
| 18      A.  That's correct. | 18   shown to be present?  In this case, there's no data from the |
| 19      Q.  The fifth one is, "If the above criteria are met, | 19   time of occupancy. |
| 20   then alternative known causes of the claimed adverse effect | 20   BY MR. PINEDO: |
| 21   must be considered and weighted against the probability that | 21      Q.  But you're aware that there's tests that were done |
| 22   the chemical in question caused or contributed to the | 22   after the time of occupancy, revealing there was |
| 23   adverse effect;" is that right? | 23   formaldehyde present in his travel trailer? |
| 24      A.  Yes. | 24      A.  I was aware there was some testing.  I didn't look |
| 25      Q.  And you didn't do an analysis of that fifth | 25   at it.  Well, let me rephrase it.  I looked at it long |
| Page 126 | Page 128 |

Bruce Kelman PhD                                                     December 15, 2009

1    enough to determine it had nothing to do with mold or
2    mycotoxins.
3         Q.   Assume with me that there are tests both by the
4    experts for Forest River, as well as by the Plaintiff, that
5    formaldehyde was in this trailer after he moved out.
6              Would that satisfy your first criteria here, that
7    the chemical in question is present?
8              MR. DINNELL:  Objection; foundation beyond the
9    scope.
10             THE WITNESS:  I think I would have to look at the
11   actual materials that were involved.  It's a different
12   situation than mold, and I just -- at this point, I don't
13   have an opinion, I haven't looked at that material.
14   BY MR. PINEDO:
15        Q.   What do you mean "the materials in involved?" What
16   are you talking about?
17        A.   The materials used to construct the trailer.
18        Q.   But you are aware, generally speaking, that the
19   allegation, that some of the allegations that are being made
20   in these cases involving FEMA trailers is they contained
21   formaldehyde while people were living there, and that caused
22   them physical harm?
23        A.   I'm aware -- generally aware that that's an
24   allegation.
25        Q.   And you're aware that the Centers for Disease

                                                       Page 129

1    Control has issued reports with regard to findings of the
2    amount of formaldehyde that were contained in some of these
3    travel trailers?
4         A.   Actually I haven't read those reports, so I don't
5    know what the content is.
6         Q.   If the United States Centers for Disease Control
7    has reported levels of formaldehyde in these travel trailers
8    you would not have any reason, independently, to dispute
9    those results, would you?
10             MR. DINNELL:  Objection; form.
11             MR. GIEGER:  Foundation.
12             THE WITNESS:  Well, normally I would look at how
13   they took the measurements, what circumstances the
14   measurements were taken under.  Just the fact that CDC took
15   the measurements wouldn't legitimize them, but it certainly
16   wouldn't indicate there was no formaldehyde there.  So I
17   really can't answer that without -- I would be looking hard
18   at the report and how the measurements were done and the
19   timing of the measurements.
20   BY MR. PINEDO:
21        Q.   Suffice it to say, are you telling us you're not
22   aware that the United States government did their own tests
23   of the amount of formaldehyde in these travel trailers, is
24   that what you're telling us?
25             MR. MILLER:  Objection; vague; secondly, beyond

                                                       Page 130

1    the scope of the witness' report; and foundation.
2              THE WITNESS:  On a popular level, I had -- was
3    aware that some measurements were taken, I just haven't
4    looked at the reports.
5    BY MR. PINEDO:
6         Q.   Were you aware that any branch or division of the
7    United States government had done tests to determine the
8    amount of formaldehyde in these travel trailers?
9              MR. MILLER:  Objection; foundation; vague; asked
10   and answered; beyond the scope of his report.
11             THE WITNESS:  I have read popular press indicating
12   that.  I haven't looked at the reports.  I tend to -- I
13   rarely use the poplar press as the basis of my opinions.
14   BY MR. PINEDO:
15        Q.   And you have no reason, as you sit here right now,
16   to question the findings of the Centers For Disease Control
17   with regards to the amount of formaldehyde they found in
18   these travel trailers, do you?
19             MR. GIEGER:  Foundation.
20             THE WITNESS:  I wouldn't know one way or another,
21   without actually looking at the report.
22   BY MR. PINEDO:
23        Q.   In your report, you say that, on Page 23, "As
24   discussed above, all four of the above criteria were not met
25   in order to show that exposure to a chemical has caused an

                                                       Page 131

1    injury.  No. 1, mycotoxins were not present.  2, mycotoxins
2    did not cause the claim effects.  No. 3, there was
3    insufficient -- "
4         A.   Which page are you on?
5         Q.   On Page 23.  Do you have Page 23 in front of you,
6    now, sir?
7         A.   Yes.
8         Q.   It's at the bottom of the page.  The second
9    sentence, last paragraph.
10             Do you see that?
11        A.   Yes.  The first point that -- yes.
12        Q.   You write, "As discussed above, all four of the
13   criteria were not met in order to show that exposure to a
14   chemical has caused an injury, i.e. mycotoxins were not
15   present.  2, mycotoxins did not cause the claimed effects.
16   3, there was insufficient exposure to cause any known
17   effects.  And 4, the claimed effects preceded the time of
18   exposure.  Therefore, I have not further considered this
19   element of the analysis;" is that right?
20        A.   Yes.
21        Q.   And that fifth element that you did not consider
22   was, "Alternative known causes of Mr. Wright's claimed
23   adverse effects;" is that right?
24        A.   Yes.  Well, only to a very limited extent.
25        Q.   And you would agree with me that some of these

                                                       Page 132

33 (Pages 129 to 132)

Bruce Kelman PhD                                           December 15, 2009

| | |
|---|---|
| 1  known alternative causes for Mr. Wright's adverse effects | 1  BY MR. PINEDO: |
| 2  such as burning eyes, throat irritation, and nasal | 2    Q.  But you would agree with me that formaldehyde is |
| 3  irritation was formaldehyde? | 3  an alternative cause for some of Lyndon Wright's complaints, |
| 4         MR. MILLER:  Objection; asked and answered. | 4  which you have set forth on Page 10 of your report? |
| 5         MR. GIEGER:  Objection; form and foundation. | 5         MR. GIEGER:  Form; foundation. |
| 6         MR. MILLER:  Go ahead. | 6         MR. MILLER:  Asked and answered, beyond the scope |
| 7         Well, no.  Wait.  Hold on. | 7  of this witness' report. |
| 8         Are you done with your objections? | 8         Go ahead. |
| 9         MR. GIEGER:  Yes. | 9         THE WITNESS:  No, I wouldn't agree because in |
| 10         MR. MILLER:  Objection; mischaracterizes the | 10  order to consider those alternative causes for Mr. Wright, I |
| 11  witnesses testimony; objection; asked and answered; and | 11  would need a lot more information than I have, currently. |
| 12  objection; beyond the scope of this expert's report. | 12  BY MR. PINEDO: |
| 13         With that said, go ahead. | 13    Q.  As a toxicologist, wouldn't you want to know about |
| 14         THE WITNESS:  You're putting two concepts together | 14  all environmental toxins before you rendered an opinion on |
| 15  that I couldn't, at this point -- I answered the question | 15  the matter? |
| 16  about general effects, now you're talking specifically about | 16    A.  About mold and mycotoxin?  No. |
| 17  Mr. Wright.  There's a world of difference between those | 17    Q.  Did you observe the Lyndon Wright travel trailer |
| 18  two. | 18  before it was disassembled? |
| 19  BY MR. PINEDO: | 19    A.  Yes. |
| 20    Q.  Well, your report addresses Mr. Wright, doesn't | 20    Q.  When you observed the travel trailer, did you |
| 21  it? | 21  notice anything unusual about the front door? |
| 22    A.  Yes. | 22         MR. MILLER:  Objection; vague. |
| 23    Q.  And you go through -- | 23         THE WITNESS:  I don't know if I would use the term |
| 24    A.  Not with respect to formaldehyde. | 24  "unusual."  The -- it had apparently been jimmied.  There |
| 25    Q.  You, in your report, address Mr. Wright with | 25  was damage to the front door. |
| **Page 133** | **Page 135** |
| 1  regard to mycotoxins as causing injury; is that correct? | 1  BY MR. PINEDO: |
| 2    A.  Yes. | 2    Q.  What kind of damage was there to the front door? |
| 3    Q.  And you have five steps that you examined; is that | 3    A.  It looked like somebody had forcibly tried to |
| 4  right? | 4  enter the front door. |
| 5    A.  Yes. | 5    Q.  I'm going to read a description on Page 15 of the |
| 6    Q.  You have four that you examined, and then when you | 6  Osteraas report that you have in front of you. |
| 7  come around to the fifth one, alternative causes, you say, | 7         Are you on Page 15 of the Osteraas report? |
| 8  "well, since the first four were not satisfied, I'm not even | 8    A.  Yes.  This is not the Bates number 15, but just |
| 9  going to look at all alternative causes;" isn't that right? | 9  the report No. 15? |
| 10         MR. DINNELL:  Objection; form; | 10    Q.  Correct. |
| 11  mischaracterization. | 11    A.  Yes. |
| 12         THE WITNESS:  At this point, based on the previous | 12    Q.  It states that, "Decayed framing beneath the door |
| 13  points, yes.  Normally in this type of analysis, if the | 13  and water staining on the plywood floor sheeting in the |
| 14  exposures don't cause the effects, you're done. | 14  vicinity of the door clearly indicate the point of intrusion |
| 15         In general, there's still interest in whether | 15  into the wood framing of water causing decay." |
| 16  they're under a maximal exposure condition, and there could | 16         Do you see that? |
| 17  have been enough mycotoxin present.  So that's why I went on | 17    A.  Yes. |
| 18  to the third step.  And the forth step is actually more of a | 18    Q.  Did you observe that? |
| 19  factual issue, so it's relatively easy to bring out. | 19         MR. MILLER:  Objection; vague; compound. |
| 20         Consideration of alternative causes involve -- | 20         THE WITNESS:  Not being an engineer, I did observe |
| 21  involves not only a lot of analysis by itself, but would | 21  staining, but I really was not paying attention to where the |
| 22  involve a consideration of disease processes that have | 22  staining originated from. |
| 23  nothing to do with toxicology because that's the nature of | 23  BY MR. PINEDO: |
| 24  the alternative causes.  So there was just no point in | 24    Q.  Which staining did you observe? |
| 25  continuing the analysis. | 25    A.  It appeared there had been moisture intrusion at |
| **Page 134** | **Page 136** |

Bruce Kelman PhD                                                          December 15, 2009

| |
|---|

1    the base of that entryway.  I attributed to it what appeared
2    to be the damage to the door, but that's as much as I did
3    with the door.
4        Q.   You read Lyndon Wright's deposition, didn't you?
5        A.   Yes.
6        Q.   And he testified about water coming into the door?
7        A.   Yes, he did.
8        Q.   And this report, in Osteraas, he goes on to write,
9    "Once water entered the framing at this location," that
10   being the door location, "it would be trapped by the plastic
11   covering the bottom of the trailer and would provide
12   necessary water for decay and fungi to thrive."
13       Do you see that?
14       A.   Yes, I see that.
15       Q.   Would you agree with that, that water being
16   trapped would provide an area for fungi to thrive?
17       MR. KURTZ:  Objection; outside the scope of his
18   report.
19       THE WITNESS:  I did not specifically -- I don't
20   remember seeing a plastic cover underneath.  It could have
21   been there.  I was just paying more attention at that point
22   to the interior on the trailer, so I -- that -- I did not
23   observe the plastic covering that would have trapped the
24   water.
25   BY MR. PINEDO:

                                                      Page 137

1    intrusions can provide an area for the propagation of mold;
2    isn't that right?
3        MR. MILLER:  Objection; asked and answered.
4        THE WITNESS:  Yes, I have.
5    BY MR. PINEDO:
6        Q.   So wouldn't that be important to your opinion, to
7    examine areas where there was water intrusion that would
8    provide an area or opportunity for mold to propagate?
9        A.   Well, I'm particularly interested in exposure of
10   the individual.  That's why I'm looking at the trailer.
11   There was -- on the surface inside the door, if there was
12   any decay, it was slight, and I didn't notice it.  That
13   would indicate to me that the potential for mold spore
14   release into the air was low, that's as far as I would have
15   gone.
16       So I would not have looked, structurally, under
17   the floor.  Once it's -- once that entry was substantially
18   intact, and that is what I was looking for as a potential
19   route of exposure.  So it doesn't -- if you have a plastic
20   or a linoleum cover -- cover is a wrong word.  If you have a
21   linoleum floor, and I would have to go back to look at the
22   pictures, I don't remember what was there.  But if there was
23   decay below that, and I didn't see a route into the trailer,
24   that would probably be bad for the trailer, but it's not
25   something I'm interested in as a route of exposure to the

                                                      Page 139

1        Q.   Can you answer my question?
2        A.   You'll have to have the question read back.
3        Q.   Let me ask you:  If there's a plastic covering on
4    the bottom of this trailer and water is trapped, would that
5    provide an area for fungi to thrive?
6        MR. BONE:  Objection; improper hypothetical.
7        THE WITNESS:  Under the right conditions, it
8    could.
9    BY MR. PINEDO:
10       Q.   I want you to take a look further there towards
11   the lower portion of that paragraph on, "Entry door."
12   There's a section there that states, "Mr. Wright's
13   testimony, as well as the photo of the trailer, indicate
14   that in 2007, he was unable to fully close the door, and the
15   problem of the door not closing fully became progressively
16   worse over a period of time."
17       Is that consistent with your understanding of his
18   testimony during his deposition?
19       MR. KURTZ:  Objection; outside the scope of his
20   report.
21       THE WITNESS:  I have to go back to my notes.
22   Again, you're into a structural issue that, as a health guy,
23   I wouldn't have been particularly paying attention to.
24   BY MR. PINEDO:
25       Q.   You have already testified that moisture and water

                                                      Page 138

1    mold spores.
2        Q.   And you didn't examine each and every route that
3    those mold spores, assuming they existed underneath, might
4    have made it up into the interior of the trailer, did you?
5        MR. GIEGER:  Form; foundation: speculation.
6        MR. DINNELL:  Form.
7        THE WITNESS:  I generally looked for any interior
8    mold.  That's what I was looking for.  So the only way you
9    can determine what the actual exposure was, was of course to
10   get measurements.  But in that situation, the -- any decay
11   that's occurring essentially out of the site would have been
12   of much less interest to me as a route of exposure.
13   BY MR. PINEDO:
14       Q.   You did not search for routes for mold from
15   underneath the trailer to reach the interior of the trailer,
16   did you?
17       A.   No.  We do -- there is some fairly robust
18   scientific literature indicating that mold in a wall, and I
19   would equate under the floor as equivalent to in a wall,
20   does not, in fact, influence mold spore concentrations on
21   the interior of a room.
22       Q.   And you're making two assumptions there, aren't
23   you?  You're making an assumption that a wall is similar to
24   a floor, and you're also making the assumption that in this
25   particular travel trailer, there's no way for the mold to

                                                      Page 140

Bruce Kelman PhD                                                    December 15, 2009

1   communicate from the area underneath the trailer, such as
2   we're talking about here where the water was trapped in the
3   plastic covering, up into the interior of the trailer.
4        MR. GIEGER:  Objection; form; foundation.
5   BY MR. PINEDO:
6        Q.  Isn't that right?
7        A.  Well, to the first part, I am making that
8   assumption.  To the second part, I did not see any
9   indication that there was a route.
10       Q.  But you didn't search for such a route, did you?
11       A.  Well, I looked.  I would count that under
12  searching.  I didn't do any destructive testing to look for
13  routes.
14       Q.  And your look was -- you just spent a few minutes
15  looking at the floor, is that what you did?
16       A.  Well, it was more than a few minutes, but yes, I
17  just looked.
18       Q.  You didn't do any type of tests to make a
19  definitive determination as to whether or not there was a
20  route of communication for mold or air from that lower area
21  that was talked about here, plastic covering trapping water,
22  up into the interior of the trailer, did you?
23       MR. GIEGER:  Foundation.
24       THE WITNESS:  No, I did not.
25  BY MR. PINEDO:

                                                    Page 141

1        Q.  That one paper you were referring to about mold in
2   walls, is that one of the papers we marked earlier today
3   that you identified as a reference material that was
4   inadvertently not included in the reliance materials that
5   was sent to us?
6        A.  Actually there were two papers, but the answer is
7   yes.
8        Q.  Were those both involving mold in wall cavities?
9        A.  One, specifically, yes.  The other is more
10  general.
11       Q.  One of them was the method for detecting fungal
12  contaminants in wall cavities; is that right?
13       A.  Yes.
14       Q.  And is the over one was about 200 houses in
15  Houston, Texas; is that right?
16       A.  Yes.
17       (Whereupon, a 5-page timeline was marked Exhibit
18  15 for identification.)
19  BY MR. PINEDO:
20       Q.  I'm going to show you what has been marked as
21  Exhibit 15.
22       Is that a timeline that you or your staff has
23  prepared in this case?
24       A.  Yes.
25       (Whereupon, a 2-page Health Claims list was marked

                                                    Page 142

1   Exhibit 16 for identification.)
2   BY MR. PINEDO:
3        Q.  I'm going to show you what has been marked as
4   Exhibit 16.
5        Is this list of health claims that you or your
6   staff has prepared in this case?
7        A.  Yes.
8        Q.  And just to be clear, Exhibit 15 is a timeline
9   relative to the -- for the events of Lyndon Wright; is that
10  correct?
11       A.  I don't -- they're specific to this case.  Is that
12  what you're asking?
13       Q.  Yes.  Lyndon Wright is the plaintiff in this case.
14       A.  Yes.
15       Q.  Okay.  What part of that question did you not
16  understand?
17       A.  Somehow you seemed to indicate it could have been
18  for something other than this case.  It only pertains to
19  this case.
20       Q.  This is a timeline of the events that you consider
21  relevant to the case of Lyndon Wright, Exhibit 15?
22       MR. GIEGER:  Form; foundation.
23       THE WITNESS:  Yes.
24  BY MR. PINEDO:
25       Q.  Would you describe it any differently, sir?

                                                    Page 143

1        A.  No, the way you described it was, just now, was, I
2   think, reasonable.
3        Q.  In Exhibit 16 is a list of the health claims for
4   Lyndon Wright as you understand it from this deposition; is
5   that correct.  And this fax sheet.
6        A.  I believe that was -- yes, and the fax sheet.
7        Q.  I'm going to show you what has been marked as
8   Exhibit 17.
9        (Whereupon, a 2-page Importance of Dose-Response
10  in Toxicology was marked Exhibit 17 for identification.)
11  BY MR. PINEDO:
12       Q.  Exhibit 17, this is a document entitled
13  "Importance of Dose-Response Toxicology."
14       THE WITNESS:  In toxicology, yes.
15  BY MR. PINEDO:
16       Q.  And is this a document you have prepared?
17       A.  Yes.
18       Q.  And are these items that you examined in your
19  analysis in this case, involving Lyndon Wright and his
20  exposure to mold or mycotoxins?
21       A.  This is a general documentation indicating that
22  dose-response is the heart of toxicology and its
23  relationship to toxicology.
24       Q.  Are these items you examined in your report
25  relative to Lyndon Wright and his exposure to mold and

                                                    Page 144

Bruce Kelman PhD                                                    December 15, 2009

1    mycotoxins?
2         MR. MILLER:  Objection; vague; compound.
3         THE WITNESS:  These would be the elements that I
4    would consider, part of the elements I would consider in
5    looking at a potential exposure.
6    BY MR. PINEDO:
7         Q.  And you considered these elements in the case of
8    Lyndon Wright?
9         A.  Yes, with regard to mold and mycotoxins.
10        Q.  Then you did not examine these elements with
11   regard to formaldehyde in the case of Lyndon Wright?
12        A.  That's correct.
13        Q.  And on what page of your report is that discussion
14   incorporated?
15        A.  Which discussion?
16        Q.  Important response of dose-response toxicology.
17        A.  The elements would be there.  The discussion about
18   toxicology, it would be on page 5.
19        Q.  Don't you go through these in more detail
20   elsewhere in your report, the dose-response in toxicology?
21        A.  There's a subsequent discussion, when we're
22   talking about calculating the maximal -- a maximal possible
23   dose, which would be on Page 20.
24        Q.  Or page 20, the first sentence you write, "The
25   dose-response relationship is the most fundamental and

                                                    Page 145

1    pervasive concept in toxicology, and an understanding of
2    this relationship is essential for the study of toxic
3    materials."
4         A.  That's correct.
5         Q.  And is that true with regard to formaldehyde?
6         MR. DINNELL:  Objection; foundation.
7         MR. GIEGER:  Beyond the scope of his --
8         MR. DINNELL:  Beyond the scope.
9         THE WITNESS:  In general, yes.
10   BY MR. PINEDO:
11        Q.  And you then write, "The fundamental basis of the
12   quantitative relationships between exposure to an agent and
13   the incidence of an adverse response is the dose-response
14   assessment;" is that correct?
15        A.  Yes.
16        Q.  And that's true for mold and mycotoxins?
17        A.  Yes.
18        Q.  And that's true for formaldehyde?
19        MR. GIEGER:  Objection; form; foundation beyond
20   the scope.
21        THE WITNESS:  Again, in general, it's true for all
22   chemical assessments.  I should mention that this section
23   particularly pertains to mycotoxins as opposed to mold
24   spores.  So, I'm really just talking about mycotoxins in
25   this section.

                                                    Page 146

1    BY MR. PINEDO:
2         Q.  You then write "All chemicals have toxic
3    properties that become apparent as increasing quantities are
4    consumed or absorbed.
5         It follows, "there may be," quote, "safe," end
6    quote, "levels of exposure to even the most toxic
7    substances."
8         Is that true of mycotoxins?
9         A.  Yes.
10        Q.  And is that true of formaldehyde?
11        A.  Yes.
12        MR. GIEGER:  Objection; form.
13   BY MR. PINEDO:
14        Q.  You write, "A particularly important term in
15   toxicology is "threshold," which means the level of exposure
16   at which an effect is first observed."
17        That is your opinion, and you wrote it here in
18   your report; is that correct?
19        A.  Yes.
20        Q.  And that's true of mycotoxins?
21        A.  Yes.
22        Q.  And that is also true of formaldehyde?
23        MR. GIEGER:  Objection --
24        MR. DINNELL:  Objection; foundation, yes, there
25   is.

                                                    Page 147

1    BY MR. PINEDO:
2         Q.  There a there's a threshold at which an effect is
3    first observed?
4         A.  That is correct.
5         Q.  And you testified about that earlier today with
6    regard to formaldehyde; is that right?
7         MR. DINNELL:  Okay form.
8         MR. GIEGER:  Objection; misstate his testimony.
9         THE WITNESS:  Actually at this point, I don't
10   remember, but it's true for all chemicals.
11   BY MR. PINEDO:
12        Q.  Let me ask you this:  What is the threshold at
13   which an effect is first observed with formaldehyde in human
14   beings?
15        MR. GIEGER:  Objection; form; foundation; beyond
16   the scope of this his testimony.
17        MR. BONE:  Asked and answered.
18        MR. GIEGER:  Asked and answered.
19   BY MR. PINEDO:
20        Q.  He said he couldn't remember, so I want to be
21   clear.
22        A.  Well, actually, we weren't talking about the
23   threshold at that point, but again I would have to -- I
24   haven't focused on formaldehyde, so I can give you -- I
25   think I had said earlier that I wouldn't expect symptomology

                                                    Page 148

                                   37 (Pages 145 to 148)

Bruce Kelman PhD                                                    December 15, 2009

1   at .3 parts per million, but that was the only -- at this
2   point, the only number I could give you.  And I have not
3   investigated where I'd expect to see effects, and it would
4   be highly dependent on the individual effect you're talking
5   about.
6       Q.  And what is the threshold for mycotoxins?
7       A.  Well, mycotoxins are a broad range of chemicals,
8   so I probably couldn't give you an answer for most specific
9   mycotoxins as a threshold.  Thresholds are very difficult to
10  determine.  What you determine is the level at which there's
11  no effect.
12      Q.  You have a discussion about some specific
13  mycotoxins in your report, don't you?
14      A.  Yes.
15      Q.  And what is the threshold for the mycotoxins that
16  you discuss in your report?
17      A.  Well, again, either I was looking at an effects
18  level or a level that doesn't cause effects.  I haven't
19  defined a threshold.
20      Q.  For any mycotoxins?
21      A.  No, that would be very difficult.
22      Q.  You then go to write, "the erroneous opinion that
23  exposure to," quote, "toxic chemicals," end quote, "at any
24  dose, produces deleterious effects of bounds in the lay
25  public."

Page 149

1       Is that right?  That's what you wrote?
2       A.  Yes.
3       Q.  That's your opinion?
4       A.  Yes.
5       Q.  Is that true of mycotoxins?
6       A.  I believe it is.
7       Q.  Is that also true of formaldehyde, there's an
8   opinion that exposure to it at any level is deleterious?
9           MR. GIEGER:  Objection, that's not what he said.
10  BY MR. PINEDO:
11      Q.  Let me ask a different question.
12          You state here, "There's an erroneous opinion that
13  exposure to toxic chemicals at any dose produces deleterious
14  effects of bounds in the lay public."
15          Does that opinion exist in the lay public with
16  regard to formaldehyde?
17          MR. DINNELL:  Objection; foundation.
18          THE WITNESS:  I believe it does.  Every time
19  there's a mention of exposure without dose or the amount of
20  the exposure.  It's going back to the -- the idea that
21  somehow the term "exposure" is meaningful in relationship to
22  the effects, and it's not.
23  BY MR. PINEDO:
24      Q.  Because as you've been talking about it today, at
25  length, there's certain exposure levels where chemical

Page 150

1   doesn't cause harm.  Above that there's a threshold where it
2   is considered to cause harm; is that right?
3       A.  Yes, that was a pretty good definition of
4   threshold.
5       Q.  And that concept of threshold exists for
6   mycotoxins, as you have alluded to in some extent in your
7   report, although you said the threshold is very hard to
8   determine; is that right?
9       A.  Well, what I indicated in my report is there are
10  levels -- we can define levels that don't cause effects, and
11  we can define levels that do cause effects.  Coming up with
12  the exact number of the threshold in between that is a very
13  difficult exercise, and I really didn't address that in the
14  report.
15      Q.  And likewise, is that -- you have with mycotoxins,
16  there's levels that don't cause harmful effects and levels
17  that do.  Likewise, with formaldehyde there are levels that
18  are recognized not to cause harmful effects, and there are
19  levels that are recognized, that do cause harmful effects.
20          MR. GIEGER:  Foundation, beyond his report.
21  BY MR. PINEDO:
22      Q.  Would you agree with that?
23      A.  Yes.
24      Q.  You then go on to write, "The fact that dose
25  defines toxicity for all chemicals has been recognized for

Page 151

1   centuries."
2       Is that what you wrote?
3       A.  Yes.
4       Q.  And that's your opinion?
5       A.  Yes.
6       Q.  And that's true for mycotoxins?
7       A.  Yes.
8       Q.  And that's true for formaldehyde?
9       A.  In general, yes, certainly.
10      Q.  That dose defines toxicity for formaldehyde?
11          MR. MILLER:  Objection; asked and answered.
12          THE WITNESS:  Yes, for all chemicals.
13  BY MR. PINEDO:
14      Q.  You then go on to write, "Exposure response
15  relationships are among the most important criteria for
16  inferring causality;" is that right?
17      A.  Yes.
18      Q.  It's true for mycotoxins?
19      A.  Yes.
20      Q.  And it's true for formaldehyde?
21          MR. MILLER:  Objection; beyond the scope of his
22  report; foundation.
23          THE WITNESS:  Again in general, yes, it is true.
24  BY MR. PINEDO:
25      Q.  Skipping a few lines, you then go on to write,

Page 152

Bruce Kelman PhD                                            December 15, 2009

1  "The dose of a chemical determines whether that chemical is
2  toxic or nontoxic;" is that right?
3      A.  Yes.
4      Q.  That kind of summarizes what you're saying this in
5  this section, doesn't it?
6      A.  Yes.
7      Q.  And that's true for mycotoxins?
8      A.  That's correct.
9      Q.  And it's also true for formaldehyde.
10         MR. MILLER:  Objection; beyond the scope of his
11  report; foundation.
12         Go ahead.
13         THE WITNESS:  Again, in general, it's true for all
14  chemicals including formaldehyde.
15  BY MR. PINEDO:
16      Q.  You write, above that, "Characterizing the dose-
17  response relationship requires an understanding of the
18  importance of intensity of the exposure, the concentration
19  times time relationship, whether a chemical has a threshold
20  and the shape of the dose-response curve."
21         Is that what you write?
22      A.  Yes.
23      Q.  And that is true of mycotoxins?
24      A.  That's correct.
25      Q.  And that's also true of formaldehyde?

                                                   Page 153

1          MR. MILLER:  Objection; beyond the scope of the
2  report; foundation.
3          THE WITNESS:  Again, in general, it's true of all
4  chemicals including formaldehyde.
5  BY MR. PINEDO:
6      Q.  And what do you mean by the "concentration times
7  time relationship" that, what you're discussing in that
8  section is the level that somebody is exposed to and the
9  period of time that they're exposed to it, is that right?
10     A.  Yes.
11         (Whereupon, a 2-page causation list was marked
12  Exhibit 18 for identification.)
13  BY MR. PINEDO:
14     Q.  I'm going to show you what has been marked as
15  Exhibit 18 from your last of materials and it's entitled,
16  "Causation."
17         Could you please tell us what that document is?
18     A.  This is the generally accepted methodology for
19  determining whether exposure to a chemical or environmental
20  agent has caused a specific effect.  And these are the
21  points that we have discussed previously.
22     Q.  And this would apply to mycotoxin, which you have
23  written here in Exhibit 18.
24     A.  Yes.
25     Q.  And it would also apply to formaldehyde exposures,

                                                   Page 154

1  wouldn't it?
2      A.  In general, yes, it would.
3          (Whereupon, a 2-page Microbial Volatile Organic
4  Compounds (MVOC) list was marked Exhibit 19 for
5  identification.)
6  BY MR. PINEDO:
7      Q.  I'm going to show you what has been marked as
8  Exhibit 19.
9          Could you please identify that document for me?
10     A.  This addresses the issue of whether the smell from
11  mold, which is -- which are called microbial volatile
12  organic compounds, is toxic in a residential environment.
13         (Whereupon, a 2-page Trailer
14  Inspection/Examination Schedule for Forest River Plaintiff
15  list was marked Exhibit 20 for identification.)
16  BY MR. PINEDO:
17     Q.  I'm going to show you what has been marked as
18  Exhibit 20.
19         Can you please identify that document for me from
20  your files?
21         MR. MILLER:  Do you have a copy of that?
22         MR. PINEDO:  (Witness complies.)
23         THE WITNESS:  I believe this is some of the
24  supplied material that outlines the inspection schedule for
25  the unit that I inspected.

                                                   Page 155

1  BY MR. PINEDO:
2      Q.  And what days did you show up?  I see we have week
3  two, week three, week one.  What days were you there?
4      A.  I believe that was August 7th, but.  Yes, August
5  7th.
6      Q.  Now returning to Exhibit 6, which is one of your
7  invoices, and we have some other copies here.  Let me see if
8  I can find one, it says "Contract No. 9W-C1V01-0861."
9          Do you see that?
10     A.  Yes.
11     Q.  And below that it has a DJ file.  Is that
12  Department of Justice?
13     A.  Yeah, I believe it is.
14     Q.  And then underneath that it says, "Litigation No.
15  07-1873."
16         Do you see that?
17     A.  Yes.
18     Q.  And then that's a number below that $55,672.  What
19  does that represent?
20     A.  I believe that -- actually, I don't know.
21     Q.  Do you think that's the total amount billed to
22  date on this project?
23         MR. GIEGER:  Form.
24         THE WITNESS:  No, actually I suspect it's a
25  contract amount, but I don't know.

                                                   Page 156

Bruce Kelman PhD                                                    December 15, 2009

| | |
|---|---|
| 1 BY MR. PINEDO: | 1      MR. PINEDO: Yes. |
| 2      Q.   And underneath that it says, "7/22/09 - 9/24/10," | 2      MR. D'AMICO: Yes. |
| 3  and beneath that it says, "$125,000 modification 0001." | 3      MR. MILLER: Yes. |
| 4      What does that mean to you? | 4      MR. BONE: Yes.  Except you have to make sure when |
| 5      A.   That the contract was amended to go to that level. | 5  you mail it to us, you use our federal express account. |
| 6      Q.   $125,000? | 6      MR. PINEDO: Everybody on the phone, we came back |
| 7      A.   That's -- I believe that's the authorized amount. | 7  and ended the deposition. |
| 8      Q.   That is the authorized amount for your services in | 8      THE VIDEOGRAPHER: The time is 2:27 p.m. |
| 9  this case, under this contract with the Department of | 9      We are off the record. |
| 10  Justice, $125,000? | 10      (Whereupon, the deposition was concluded at 2:26 |
| 11      MR. MILLER: Objection; foundation. | 11  p.m.) |
| 12      MR. DINNELL: Form. | 12      (Signature reserved.) |
| 13      MR. GIEGER: Form. | 13 |
| 14      THE WITNESS: I believe that was the amount that | 14 |
| 15  we were -- we could bill to. | 15 |
| 16 BY MR. PINEDO: | 16 |
| 17      Q.   And you don't know if you have billed to that full | 17 |
| 18  amount, do you? | 18 |
| 19      A.   I suspect not, but I don't really know. | 19 |
| 20      MR. PINEDO: Does anybody else have any other | 20 |
| 21  questions? | 21 |
| 22      MR. BONE: Let's take a break if you don't. | 22 |
| 23      Are you done? | 23 |
| 24      MR. D'AMICO: Maybe.  I was going to read my | 24 |
| 25  notes. | 25 |
| **Page 157** | **Page 159** |

| | |
|---|---|
| 1      MR. BONE: Why don't we take a break, review your | 1      VIDEOTAPE LOG |
| 2  notes and we'll discuss it. | 2 |
| 3      MR. D'AMICO: Let's take a break. | 3  Deposition of: BRUCE KELMAN, PHD, DABT, ATS |
| 4      THE VIDEOGRAPHER: The time is 2:20 p.m. | 4  Date: 12/15/2009 |
| 5      We are off the record. | 5  Regarding:FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY |
| 6      (Pause in the proceedings.) | 6  LITIGATION |
| 7      THE VIDEOGRAPHER: We are back on the record. | 7  Videographer: SID FOX |
| 8      The time is approximately 2:27 p.m. | 8  Began: 9:16 AM          Ended: 2:27 PM |
| 9 BY MR. PINEDO: | 9 |
| 10      Q.   You haven't been asked to do any further work on | 10  TIME   TAPE  KEY WORD   EXAMINATION   OBJECTION |
| 11  this case have you, sir? | 11  9:16:42  1   ON RECORD   PINEDO |
| 12      A.   No, I have not. | 12  9:19:33  1   EX. # 1     PINEDO |
| 13      MR. PINEDO: Pass the witness. | 13  9:21:43  1   EX. # 2     PINEDO |
| 14      MR. GIEGER: Forest River will reserve at this | 14  9:22:20  1   EX. # 3     PINEDO |
| 15  time. | 15  9:22:36  1   EX. # 4     PINEDO |
| 16      MR. KURTZ: So will Shaw. | 16  9:23:50  1   EX. # 5     PINEDO |
| 17      MR. DINNELL: No questions from the US.  We'll | 17  9:26:41  1   VAGUE    PINEDO      MILLER |
| 18  reserve our questioning until the time of trial. | 18  9:34:45  1   VAGUE    PINEDO      MILLER |
| 19      MR. PINEDO: Thank you, sir.  You're done. | 19  9:38:38  1   FORM     PINEDO      BONE |
| 20      THE WITNESS: Thank you. | 20  9:39:32  1   FORM     PINEDO      BONE |
| 21      THE VIDEOGRAPHER: Here marks the end of videotape | 21  9:39:47  1   SCOPE    PINEDO      MILLER |
| 22  labeled No. 2 in the deposition of Bruce Kelman, Ph.D. | 22  9:41:23  1   VAGUE    PINEDO      MILLER |
| 23      The transcript orders will now be taken by the | 23  9:47:47  1   VAGUE    PINEDO      MILLER |
| 24  court reporter. | 24  9:51:44  1   FORM     PINEDO      BONE |
| 25      THE COURT REPORTER: Standing orders, everybody? | 25  9:52:06  1   FORM     PINEDO      BONE |
| **Page 158** | **Page 160** |

Bruce Kelman PhD                                                    December 15, 2009

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 1 | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
| 2 | 9:52:16 | 1 | SCOPE | PINEDO | MILLER |
| 3 | 9:52:49 | 1 | FORM | PINEDO | MILLER |
| 4 | 9:54:42 | 1 | FOUNDATION | PINEDO | MILLER |
| 5 | 9:55:06 | 1 | FORM | PINEDO | MILLER |
| 6 | 9:56:40 | 1 | VAGUE | PINEDO | KURTZ |
| 7 | 9:57:09 | 1 | VAGUE | PINEDO | KURTZ |
| 8 | 9:57:10 | 1 | ASKED/ANSW | PINEDO | MILLER |
| 9 | 9:58:37 | 1 | NONRESP | PINEDO | PINEDO |
| 10 | 9:59:37 | 1 | NONRESP | PINEDO | PINEDO |
| 11 | 10:03:33 | 1 | FORM | PINEDO | MILLER |
| 12 | 10:08:02 | 1 | FORM | PINEDO | MILLER |
| 13 | 10:14:38 | 1 | NONRESP | PINEDO | PINEDO |
| 14 | 10:14:54 | 1 | VAGUE | PINEDO | BONE |
| 15 | 10:14:58 | 1 | FORM | PINEDO | MILLER |
| 16 | 10:15:14 | 1 | FORM | PINEDO | MILLER |
| 17 | 10:20:25 | 1 | FORM | PINEDO | MILLER |
| 18 | 10:21:23 | 1 | OFF RECORD | PINEDO | |
| 19 | 10:32:20 | 1 | ON RECORD | PINEDO | |
| 20 | 10:33:54 | 1 | EX. # 6 | PINEDO | |
| 21 | 10:34:35 | 1 | EX. # 7 | PINEDO | |
| 22 | 10:35:35 | 1 | EX. # 8 | PINEDO | |
| 23 | 10:36:25 | 1 | EX. # 9 | PINEDO | |
| 24 | 10:36:56 | 1 | EX. # 10 | PINEDO | |
| 25 | 10:37:33 | 1 | EX. # 11 | PINEDO | |

Page 161

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 1 | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
| 2 | 11:48:01 | 2 | FORM | PINEDO | MILLER |
| 3 | 11:48:36 | 2 | FORM | PINEDO | MILLER |
| 4 | 11:49:30 | 2 | FORM | PINEDO | MILLER |
| 5 | 11:50:07 | 2 | FORM | PINEDO | BONE |
| 6 | 11:50:21 | 2 | SCOPE | PINEDO | MILLER |
| 7 | 11:50:58 | 2 | FORM | PINEDO | MILLER |
| 8 | 11:51:20 | 2 | FORM | PINEDO | MILLER |
| 9 | 11:51:42 | 2 | ASKED/ANSW | PINEDO | BONE |
| 10 | 11:52:20 | 2 | FORM | PINEDO | BONE |
| 11 | 11:52:51 | 2 | VAGUE | PINEDO | MILLER |
| 12 | 11:53:28 | 2 | FORM | PINEDO | MILLER |
| 13 | 11:53:58 | 2 | FORM | PINEDO | GIEGER |
| 14 | 11:54:25 | 2 | COMPOUND | PINEDO | MILLER |
| 15 | 11:54:49 | 2 | FORM | PINEDO | MILLER |
| 16 | 11:55:18 | 2 | FORM | PINEDO | BONE |
| 17 | 11:56:17 | 2 | ASKED/ANSW | PINEDO | MILLER |
| 18 | 11:56:30 | 2 | FORM | PINEDO | MILLER |
| 19 | 12:00:14 | 2 | FORM | PINEDO | GIEGER |
| 20 | 12:00:30 | 2 | FORM | PINEDO | MILLER |
| 21 | 12:00:43 | 2 | ASKED/ANSW | PINEDO | MILLER |
| 22 | 12:02:15 | 2 | FORM | PINEDO | BONE |
| 23 | 12:02:50 | 2 | FORM | PINEDO | MILLER |
| 24 | 12:03:21 | 2 | FORM | PINEDO | MILLER |
| 25 | 12:05:28 | 2 | FORM | PINEDO | DINNELL |

Page 163

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 1 | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
| 2 | 10:38:09 | 1 | EX. # 12 | PINEDO | |
| 3 | 10:39:51 | 1 | FORM | PINEDO | BONE |
| 4 | 10:46:30 | 1 | EX. # 13 | PINEDO | |
| 5 | 10:48:38 | 1 | EX. # 14 | PINEDO | |
| 6 | 10:58:31 | 1 | FOUND | PINEDO | MILLER |
| 7 | 11:06:22 | 1 | COMPOUND | PINEDO | MILLER |
| 8 | 11:10:46 | 1 | FORM | PINEDO | BONE |
| 9 | 11:11:00 | 1 | FORM | PINEDO | BONE |
| 10 | 11:11:24 | 1 | SCOPE | PINEDO | MILLER |
| 11 | 11:11:52 | 1 | SCOPE | PINEDO | MILLER |
| 12 | 11:12:10 | 1 | SCOPE | PINEDO | MILLER |
| 13 | 11:12:45 | 1 | FORM | PINEDO | BONE |
| 14 | 11:14:41 | 1 | FORM | PINEDO | MILLER |
| 15 | 11:15:13 | 1 | SCOPE | PINEDO | MILLER |
| 16 | 11:15:36 | 1 | SCOPE | PINEDO | MILLER |
| 17 | 11:15:54 | 1 | ASKED/ANSW | PINEDO | MILLER |
| 18 | 11:16:36 | 1 | SCOPE | PINEDO | MILLER |
| 19 | 11:17:39 | 1 | SCOPE | PINEDO | MILLER |
| 20 | 11:18:29 | 1 | FORM | PINEDO | MILLER |
| 21 | 11:18:55 | 1 | FORM | PINEDO | MILLER |
| 22 | 11:20:30 | 1 | OFF RECORD | PINEDO | |
| 23 | 11:37:16 | 2 | ON RECORD | PINEDO | |
| 24 | 11:45:50 | 2 | FORM | PINEDO | BONE |
| 25 | 11:47:27 | 2 | SCOPE | PINEDO | MILLER |

Page 162

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 1 | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
| 2 | 12:05:49 | 2 | FORM | PINEDO | MILLER |
| 3 | 12:06:42 | 2 | FORM | PINEDO | GIEGER |
| 4 | 12:07:55 | 2 | FORM | PINEDO | GIEGER |
| 5 | 12:08:02 | 2 | VAGUE | PINEDO | MILLER |
| 6 | 12:09:33 | 2 | FORM | PINEDO | GIEGER |
| 7 | 12:10:46 | 2 | FORM | PINEDO | MILLER |
| 8 | 12:11:42 | 2 | FORM | PINEDO | GIEGER |
| 9 | 12:13:04 | 2 | FORM | PINEDO | GIEGER |
| 10 | 12:14:00 | 2 | FORM | PINEDO | DINNELL |
| 11 | 12:14:42 | 2 | VAGUE | PINEDO | DINNELL |
| 12 | 12:14:59 | 2 | VAGUE | PINEDO | DINNELL |
| 13 | 12:16:35 | 2 | FORM | PINEDO | BONE |
| 14 | 12:16:56 | 2 | FORM | PINEDO | BONE |
| 15 | 12:17:29 | 2 | FORM | PINEDO | GIEGER |
| 16 | 12:17:49 | 2 | ASKED/ANSW | PINEDO | MILLER |
| 17 | 12:18:14 | 2 | FORM | PINEDO | GIEGER |
| 18 | 12:19:40 | 2 | OFF RECORD | PINEDO | |
| 19 | 1:26:00 | 2 | ON RECORD | PINEDO | |
| 20 | 1:30:49 | 2 | FORM | PINEDO | GIEGER |
| 21 | 1:32:54 | 2 | FORM | PINEDO | DINNELL |
| 22 | 1:33:12 | 2 | FORM | PINEDO | DINNELL |
| 23 | 1:35:00 | 2 | SCOPE | PINEDO | MILLER |
| 24 | 1:35:43 | 2 | FORM | PINEDO | MILLER |
| 25 | 1:40:19 | 2 | FORM | PINEDO | GIEGER |

Page 164

Bruce Kelman PhD                                                                December 15, 2009

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 2 | 1:41:04 | 2 | OBJECT | PINEDO | BONE |
| 3 | 1:42:15 | 2 | SCOPE | PINEDO | DINNELL |
| 4 | 1:43:29 | 2 | FORM | PINEDO | DINNELL |
| 5 | 1:44:15 | 2 | VAGUE | PINEDO | MILLER |
| 6 | 1:44:44 | 2 | VAGUE | PINEDO | MILLER |
| 7 | 1:45:15 | 2 | FOUNDATION | PINEDO | BONE |
| 8 | 1:47:35 | 2 | FORM | PINEDO | BONE |
| 9 | 1:47:43 | 2 | ASKED/ANSW | PINEDO | MILLER |
| 10 | 1:48:44 | 2 | FORM | PINEDO | BONE |
| 11 | 1:50:07 | 2 | FORM | PINEDO | BONE |
| 12 | 1:51:17 | 2 | VAGUE | PINEDO | DINNELL |
| 13 | 1:52:28 | 2 | VAGUE | PINEDO | DINNELL |
| 14 | 1:54:04 | 2 | SCOPE | PINEDO | KURTZ |
| 15 | 1:54:45 | 2 | FORM | PINEDO | BONE |
| 16 | 1:55:40 | 2 | SCOPE | PINEDO | KURTZ |
| 17 | 1:56:13 | 2 | ASKED/ANSW | PINEDO | MILLER |
| 18 | 1:57:56 | 2 | FORM | PINEDO | GIEGER |
| 19 | 1:59:30 | 2 | FORM | PINEDO | GIEGER |
| 20 | 2:00:20 | 2 | FOUNDATION | PINEDO | GIEGER |
| 21 | 2:01:25 | 2 | EX. # 15 | PINEDO | |
| 22 | 2:01:45 | 2 | EX. # 16 | PINEDO | |
| 23 | 2:02:41 | 2 | FORM | PINEDO | DINNEL |
| 24 | 2:03:22 | 2 | EX. # 17 | PINEDO | |
| 25 | 2:04:20 | 2 | VAGUE | PINEDO | DINNELL |

Page 165

| # | TIME | TAPE | KEY WORD | EXAMINATION | OBJECTION |
|---|------|------|----------|-------------|-----------|
| 2 | 2:06:56 | 2 | SCOPE | PINEDO | DINNELL |
| 3 | 2:07:18 | 2 | FORM | PINEDO | GIEGER |
| 4 | 2:08:02 | 2 | FORM | PINEDO | DINNELL |
| 5 | 2:08:25 | 2 | FOUNDATION | PINEDO | DINNELL |
| 6 | 2:08:41 | 2 | FORM | PINEDO | DINNELL |
| 7 | 2:09:02 | 2 | FORM | PINEDO | GIEGER |
| 8 | 2:11:08 | 2 | OBJECT | PINEDO | GIEGER |
| 9 | 2:11:34 | 2 | FOUNDATION | PINEDO | DINNELL |
| 10 | 2:13:02 | 2 | FOUNDATION | PINEDO | DINNELL |
| 11 | 2:13:34 | 2 | ASKED/ANSW | PINEDO | MILLER |
| 12 | 2:14:26 | 2 | SCOPE | PINEDO | MILLER |
| 13 | 2:15:01 | 2 | SCOPE | PINEDO | MILLER |
| 14 | 2:15:40 | 2 | EX. # 18 | PINEDO | |
| 15 | 2:16:21 | 2 | EX. # 19 | PINEDO | |
| 16 | 2:16:56 | 2 | EX. # 20 | PINEDO | |
| 17 | 2:19:27 | 2 | FOUNDATION | PINEDO | MILLER |
| 18 | 2:20:21 | 2 | OFF RECORD | PINEDO | |
| 19 | 2:27:00 | 2 | ON RECORD | PINEDO | |
| 20 | 2:27:00 | 2 | OFF RECORD | PINEDO | |

Page 166

CERTIFICATE OF VIDEOGRAPHER

I the undersigned, Sid Fox, videographer with the firm of
The NAEGELI REPORTING CORPORATION, do hereby certify that I
have accurately made the videotaped recording of the
deposition of Bruce Kelman, PhD., in the above captioned
matter on the fifteenth day of December, 2009, taken at the
location of Naegeli Reporting, 601 Union Street, Suite 1624,
Seattle, WA 98101, consisting of 2 tape(s).

No alterations, additions or deletions were made thereto.

I further certify that I am not related to any of the
parties in the action and have no financial interest in the
outcome of this matter.

12/15/2009                    Sid Fox
Date                          Videographer

Page 167

CERTIFICATE

I, Tia B. Reidt, do hereby certify that pursuant
to the Rules of Civil Procedure, the witness named
herein appeared before me at the time and place set
forth in the caption herein; that at the said time
and place, I reported in stenotype all testimony
adduced and other oral proceedings had in the
foregoing matter; and that the foregoing transcript
pages constitute a full, true and correct record of
such testimony adduced and oral proceeding had and
of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this
22nd day of December, 2009.

/Signed                June 03, 2010
Tia B. Reidt          Commission Expiration

Page 168

42 (Pages 165 to 168)

Bruce Kelman PhD                                                    December 15, 2009

| | |
|---|---|
| 1   Date:   January 8, 2010   Assignment #:  11303-8 | 1   DECLARATION |
| 2   Attorney:  Henry Miller, Esquire | 2 |
| 3   Deponent:  Bruce Kelman, Ph.D. | 3   Deposition of:  Bruce Kelman, Ph.D.   Date: 12/15/09 |
| 4   Case:    Fema Trailer Litigation | 4   Regarding:    Fema Trailer Litigation |
| 5 | 5   _____ |
| 6   ATTORNEY - TRANSCRIPT ENCLOSED:  Signature of your client | 6 |
| 7   is required.  Please have your client make any corrections | 7 |
| 8   necessary.  Sign the Correction Sheet where indicated. | 8   I declare under penalty of perjury the following to |
| 9   Forward a COPY of the executed Correction Sheet directly | 9   be true: |
| 10   to the attorney(s) listed below.  (The Address(es) can be | 10 |
| 11   found on the Appearance page of the deposition.)  Also, | 11   I have read my deposition and the same is true and |
| 12   send a COPY of the executed Correction Sheet to our | 12   accurate save and except for any corrections as made |
| 13   corporation. | 13   by me on the Correction Page herein. |
| 14 | 14 |
| 15 | 15   Signed at _____, _____ |
| 16 | 16   on the _____ day of _____, 2010. |
| 17   CC:  Frank D'Amico, Jr., Esquire | 17 |
| 18       David Kurtz, Esquire | 18 |
| 19       Jason Bone, Esquire | 19 |
| 20       Richard Sherburne, Jr., Esquire | 20 |
| 21       Kristopher Redmann, Esquire | 21 |
| 22       Hal Roach, Esquire | 22 |
| 23       A.J. Krouse, Esquire | 23       _____ |
| 24       Brent Maggio, Esquire | 24       Bruce Kelman, Ph.D. |
| 25 | 25 |
| **Page 169** | **Page 171** |

| |
|---|
| 1   CORRECTION SHEET |
| 2 |
| 3   Deposition of:  Bruce Kelman, Ph.D.   Date: 12/15/09 |
| 4   Regarding:    Fema Trailer Litigation |
| 5   _____ |
| 6   Please make all corrections, changes or clarifications |
| 7   to your testimony on this sheet, showing page and line |
| 8   number.  If there are no changes, write "none" across |
| 9   the page.  Sign this sheet on the line provided. |
| 10   Page   Line   Reason for Change |
| 11   _____ _____ _____ |
| 12   _____ _____ _____ |
| 13   _____ _____ _____ |
| 14   _____ _____ _____ |
| 15   _____ _____ _____ |
| 16   _____ _____ _____ |
| 17   _____ _____ _____ |
| 18   _____ _____ _____ |
| 19   _____ _____ _____ |
| 20   _____ _____ _____ |
| 21   _____ _____ _____ |
| 22   _____ _____ _____ |
| 23   _____ _____ _____ |
| 24       Signature_____ |
| 25       Bruce Kelman, Ph.D. |
| **Page 170** |

Bruce Kelman PhD

December 15, 2009

**A**

**Aaron** 13:9
**ability** 125:13
**able** 40:2 54:20
  54:24 105:13
  124:16 126:3
  127:7,15
**abnormal**
  106:13
**absolutely** 73:10
**absorbed** 147:4
**acceleration**
  36:19
**acceptable** 42:20
**accepted** 81:9
  154:18
**account** 159:5
**accurate** 68:19
  171:12
**accurately** 167:5
**achieve** 73:9
**action** 167:14
**actual** 31:13
  52:2 55:21
  77:22 81:13
  129:11 140:9
**Adam** 4:15 9:8
  14:5
**Adam.dinnell...**
  4:22
**add** 21:5 31:16
  31:17 62:8
**added** 54:11
  62:1
**additional** 61:20
  62:8 65:11,12
  86:18 110:5
**additions** 167:11
**address** 86:12
  88:14 90:17
  123:20 133:25
  151:13
**addresses**
  133:20 155:10
**Address(es)**
  169:10
**adduced** 168:8
  168:11

**adequate** 51:24
**adverse** 23:14
  44:12 48:5
  49:8 52:24
  76:25 77:20,22
  77:24 78:4,15
  126:3,8,12,20
  126:23 127:15
  132:23 133:1
  146:13
**Aflatoxin** 72:4,6
  72:11,14
**afternoon** 119:1
**agent** 88:20 89:8
  90:15 92:7,12
  124:17 125:20
  146:12 154:20
**agents** 88:4
**ago** 24:14 33:5
  42:3 46:7
  47:12 49:23
  51:10,12 55:14
**agree** 35:24
  39:23 56:17
  89:10 92:25
  93:25 96:7
  114:1 118:11
  118:19,22
  132:25 135:2,9
  137:15 151:22
**agreed** 26:14
**agreeing** 110:7
**agreement** 83:12
  96:3 101:6
  118:13,18
**agricultural**
  110:2
**ahead** 21:10
  29:14 36:25
  38:19 42:25
  57:11 65:15
  75:24 80:9
  82:17 103:22
  133:6,13 135:8
  153:12
**Ahlquist** 13:9
**Aid** 63:15 65:2
**ailments** 75:20
  123:1

**air** 73:8 109:24
  139:14 141:20
**airborne** 9:14
  17:15 18:24
**AKrouse@Fri...**
  5:21
**al** 17:19 42:12
  43:10 45:21
  122:8
**ALER** 4:4
**allegation** 35:8
  39:12 40:13
  43:15 129:19
  129:24
**allegations** 33:7
  122:12 129:19
**alleged** 37:25
  122:8
**alleging** 122:20
**allergies** 106:8
**allergy** 67:17
**allowed** 72:4
**allows** 36:16
  110:20
**alluded** 151:6
**alterations**
  167:11
**alternative**
  92:16 126:20
  132:22 133:1
  134:7,9,20,24
  135:3,10
**amended** 157:5
**amount** 58:20
  59:9,22 60:8
  60:19 62:2
  71:23 72:3
  73:6,9 77:1
  125:4 128:8,10
  130:2,23 131:8
  131:17 150:19
  156:21,25
  157:7,8,14,18
**amounts** 39:19
  51:19 84:23
**analyses** 45:4
  51:25
**analysis** 52:9,11
  72:9 89:20

90:18 126:25
  132:19 134:13
  134:21,25
  144:19
**analyzed** 52:5
**and/or** 126:1
  127:13
**animal** 44:25
  45:9 52:3
**animals** 44:21
  45:7
**annual** 30:5
**answer** 21:10
  37:19 57:6
  76:2,19 82:17
  85:18 103:22
  104:12 113:24
  114:6 127:7,11
  127:16,21
  130:17 138:1
  142:6 149:8
**answered** 40:17
  83:5 97:5
  100:21 101:2,4
  103:21 105:18
  116:6 131:10
  133:4,11,15
  135:6 139:3
  148:17,18
  152:11
**antibodies** 69:3
**anybody** 108:12
  157:20
**anytime** 15:3
**anyway** 42:19
  49:10 118:16
**apologize** 17:12
  75:16 78:25
**apparent** 147:3
**apparently**
  135:24
**appear** 16:3
**Appearance**
  169:11
**appearances** 2:1
  25:8 26:23
  31:10
**appeared** 30:25
  136:25 137:1

168:5
**Appearing** 2:3
  2:12 3:1,12 4:1
  4:13 5:1,12 6:1
**appears** 16:14
  18:12 47:16
**appendix** 23:22
  30:23 32:11,15
  32:22 42:14
  48:3 55:16
  69:21 70:2,7
  70:13,22 71:1
  71:21,21,23
  72:2,3,11 73:4
**applies** 92:23
**apply** 154:22,25
**appreciate** 87:6
**approaches**
  92:19
**appropriate**
  40:19 126:12
**approximate**
  26:7
**approximately**
  13:10 24:12
  57:19 71:14,15
  87:14 118:7
  158:8
**area** 87:25 106:7
  119:20 137:16
  138:5 139:1,8
  141:1,20
**areas** 57:6 73:20
  118:14 139:7
**arrive** 124:16
**article** 17:14,20
  18:7,13,18,23
  19:5
**articles** 17:11
  42:4
**aside** 66:8
**asked** 15:20,23
  22:11 26:13,14
  40:17 43:6
  53:5,10 58:7
  76:3 82:16
  83:5 86:9,12
  86:16,18 94:17
  97:5 100:21

101:2,3 102:12
103:20 105:18
116:6 118:10
119:11,16
122:24 123:4,4
123:7 125:14
127:18 128:17
131:9 133:4,11
135:6 139:3
148:17,18
152:11 158:10
**ASKED/ANSW**
161:8 162:17
163:9,17,21
164:16 165:9
165:17 166:11
**asking** 37:2
62:17 83:24
107:2 120:21
143:12
**assessment**
146:14
**assessments**
102:7 146:22
**Assignment**
169:1
**assist** 62:24
**assistant** 62:18
62:19
**assistants** 62:20
**associated** 22:12
76:15 106:3
108:11,12
124:6
**association**
28:12,17 29:3
96:8,16
**assume** 16:17
39:9 46:2
63:24 129:3
**assuming** 33:23
140:3
**assumption**
140:23,24
141:8
**assumptions**
140:22
**asthma** 95:8,12
95:24 96:9,17

106:7
**asthmatic** 95:15
**ATS** 9:6 13:17
16:9 17:25
160:3
**attached** 59:6
**Attachment**
20:22
**attachments**
20:17
**attention** 37:22
43:7 73:21,24
74:1 136:21
137:21 138:23
**attorney** 13:9
15:7 46:12,20
50:12 54:16
55:3,5,6 169:2
169:6
**attorneys** 38:22
51:4 55:7
**attorney(s)**
169:10
**attributed** 137:1
**August** 59:25
60:6,11,17
71:13 156:4,4
**authorized**
157:7,8
**Avenue** 3:6 4:6
**average** 25:21
25:25 26:5
30:13,14 31:19
**aware** 36:18
79:10 82:12
84:17 95:23
96:15,24 97:4
99:23 100:6
103:9 119:4
120:8,12
122:19,21
123:22,24
124:1,2 128:21
128:24 129:18
129:23,23,25
130:22 131:3,6
**a-quarter** 75:4
**A.J** 5:14 169:23
**a.m** 12:17 13:3

13:10 57:15,19
87:14,20

─────────
**B**
**B** 12:14 23:22
55:16 168:3,21
**back** 24:9 28:22
36:12 42:4
47:2 54:20
57:18 59:3,4
63:2 66:3,11
68:2 70:19
71:25 73:7
78:23 83:18
87:17 97:8
101:21 102:6
108:13 109:23
118:6 124:11
125:11 138:2
138:21 139:21
150:20 158:7
159:6
**background**
21:1,7 124:24
125:2
**bad** 139:24
**badly** 89:10
**BAKER** 4:5
**Baronne** 2:15
**base** 137:1
**based** 27:20
77:16 99:15
109:1 124:17
134:12
**bases** 86:14
**basic** 23:13
**basically** 42:7
88:18
**basis** 26:21
29:20 30:5
113:9 131:13
146:11
**Bates** 120:20,25
136:8
**Baton** 5:6
**BEARMAN** 4:5
**Bechtel** 5:13
**began** 29:20
160:8

**beginning** 27:5
31:6 54:12
87:18
**behalf** 1:12 2:3
2:12 3:1,12 4:1
4:13 5:1,12 6:1
6:12 12:8
13:21,23,25
14:2,4,5,7 38:8
45:22 46:1
48:10,12
**beings** 43:25
45:1 148:14
**believe** 24:12
27:17 32:19
33:14 40:9,25
46:18 47:10
56:24 64:11
68:2 72:13
78:18 79:3
80:14 111:4
123:10 124:4
144:6 150:6,18
155:23 156:4
156:13,20
157:7,14
**Ben** 4:17
**bench** 27:10,12
**beneath** 136:12
157:3
**benzopyrene**
28:5,7,14
**BERKOWITZ**
4:5
**best** 15:5 88:22
**better** 92:16
**beyond** 29:11
36:22,23 54:4
54:7 79:13,14
80:6,7 82:15
83:7 84:1,20
85:15 94:3
95:1 96:2,12
96:19 98:11
99:13 100:2
103:13 104:20
105:4,16 124:8
127:24 129:8
130:25 131:10

133:12 135:6
146:7,8,19
148:15 151:20
152:21 153:10
154:1
**bill** 55:24 57:12
157:15
**billed** 23:25
156:21 157:17
**billing** 20:8
**billings** 62:2
**biological** 91:3
91:17,22 92:1
110:18
**biologically** 40:4
93:25 94:12
109:14 110:8
110:10,17
111:2
**biology** 27:11
**birth** 43:16
44:12,18,23
**bit** 57:9 87:5
**bleeding** 106:8
**blood** 69:9,10
106:4,14
**bodies** 44:21
**body** 49:13 52:8
52:10 76:14
**Bone** 3:14 14:4,4
28:18 29:5
36:3,10,21
37:13 39:4
40:17 48:24
53:6 56:20
78:21 79:6
80:5 81:10
82:1 83:6,10
83:15 84:14
85:13,24 86:3
93:4,11 94:14
94:24 95:20
96:1,18 97:5
97:16 98:11
99:3,13 100:1
101:3,8 103:5
103:12 104:19
105:18 107:7
110:14 115:2,4

Bruce Kelman PhD                                                December 15, 2009

115:10 116:14
116:23 128:12
128:15 138:6
148:17 157:22
158:1 159:4
160:19,20,24
160:25 161:14
162:3,8,9,13
162:24 163:5,9
163:10,16,22
164:13,14
165:2,7,8,10
165:11,15
169:19
**bottom** 132:8
137:11 138:4
**bounds** 149:24
150:14
**Box** 4:18
**Bradford** 17:6
19:13 20:3
88:7,10,12
90:11,16 91:5
91:10,11,13
92:22 94:8
**branch** 131:6
**break** 20:13 57:9
57:10,11 58:4
74:16 87:11
117:18,19
118:1 157:22
158:1,3
**breath** 106:10
128:9
**breathing** 106:9
**Brent** 169:24
**brief** 52:19
**bring** 16:15,20
134:19
**broad** 64:24
149:7
**broadly** 118:20
**bronchitis**
106:11
**brought** 18:18
41:16 91:11
**Bruce** 1:11 9:5
12:7,13 13:1
13:17 14:15,21

16:9 17:24
87:13,19
158:22 160:3
167:6 169:3
170:3,25 171:3
171:24
**building** 34:15
**bunch** 15:21
**burning** 81:18
81:19,25 82:9
82:13,23 83:4
83:22,25 93:9
93:12,15,19
94:2,13,22
97:14 98:8
106:4,6,8
133:2
**B1** 72:4,6,11

---
**C**
---

**C** 24:6 30:23
32:11,15,22
42:14 48:3
**calculated** 71:24
**calculating**
145:22
**calculation**
70:20
**calculations**
70:19
**CALDWELL**
4:5
**call** 86:18
**called** 65:23 83:8
114:15 155:11
**Cancer** 28:13,17
29:3
**caption** 13:13
168:6
**captioned** 167:6
**carcinogen** 28:5
28:9,12,16
29:2,7
**career** 24:17
**careful** 74:1
**carefully** 73:12
**case** 13:13,15
15:17,20,21,23
16:1,20 20:8

29:13 32:9,11
32:15,21 33:14
37:25 38:9,10
39:12,15,16,17
41:14,23 42:12
42:15 43:11,13
45:21 46:13,23
47:16,18,19,24
48:2,2,5,14
49:25 50:3,10
50:12 51:4,7
54:14,16,22
55:2,7,9,13,24
56:3,12,14
58:5,12,18,25
61:7,21 62:3
62:21,24 63:5
67:14,25 68:25
69:1,17 79:19
80:8 84:4
88:24,25 92:25
97:2,7 111:13
112:12 113:5
113:13,18,21
114:2,3,16
118:14,16,21
119:2,4,11,15
120:7,9 122:21
122:24 123:4,5
123:8,12,22,25
124:13 126:17
127:2,25
128:18 142:23
143:6,11,13,18
143:19,21
144:19 145:7
145:11 157:9
158:11 169:4
**cases** 24:8,18,20
24:24 31:22
32:2,5,17,20
33:1,7,15
40:13 41:9
51:15 54:11
68:13 78:3
129:20
**category** 91:19
**causal** 88:14
90:12 92:4

96:4 105:6
**causality** 152:16
**causation** 9:19
11:4 19:23
89:3 90:3 91:8
91:24 92:22
154:11,16
**causative** 124:17
**cause** 23:5,8,14
23:16 44:11,18
44:22 76:25
77:20 79:11,17
80:4 82:9,13
82:23 83:4,25
84:19 85:22
88:3,9,13,20
92:12 94:1,13
94:22 95:15
99:24 100:18
103:10 105:2
111:5,19 112:6
112:11 123:1
126:3,8 127:15
132:2,15,16
134:14 135:3
149:18 151:1,2
151:10,11,16
151:18,19
**caused** 43:16
48:22 49:19
52:24 78:19
79:4 83:22
88:9 89:22
90:15 92:14
104:5,9 108:14
108:15 109:7
109:16,25
111:15 126:22
127:9 129:21
131:25 132:14
154:20
**causes** 36:19
101:1,16
125:20 126:20
132:22 133:1
134:7,9,20,24
135:10
**causing** 81:24
134:1 136:15

**caveat** 109:1
**cavities** 9:12
17:21 18:14,20
142:8,12
**CBC** 69:8
**CC** 169:17
**CDC** 130:14
**Center** 63:21
**Centers** 129:25
130:6 131:16
**central** 124:11
**Centre** 5:17
**centuries** 152:1
**certain** 22:12
30:15 39:16
64:11 118:20
150:25
**certainly** 23:17
30:12,12 39:5
40:2 56:22
80:11 81:11
114:5 123:18
124:21 125:11
130:15 152:9
**CERTIFICATE**
167:1 168:1
**certification**
114:4
**Certified** 12:14
**certify** 167:4,13
168:3
**Chan** 63:7
**change** 87:10
118:24 170:10
**changes** 68:13
68:16,19 170:6
170:8
**Characterizing**
153:16
**charging** 61:24
**Charles** 4:6
63:21
**chart** 67:6,7,13
**check** 68:12
70:20
**checked** 55:22
**checking** 64:21
114:13
**checks** 68:18

**chemical** 23:2,4
  23:6 34:5
  48:15,16 88:4
  88:9,20 89:17
  90:15 92:7,11
  125:23 126:2,7
  126:11,13,22
  127:9,18,19
  128:17 129:7
  131:25 132:14
  146:22 150:25
  153:1,1,19
  154:19
**chemicals** 22:13
  22:19 23:3,5
  23:13,18 27:18
  45:10 48:6,16
  48:18,18,25
  49:9 88:25
  89:13 127:14
  147:2 148:10
  149:7,23
  150:13 151:25
  152:12 153:14
  154:4
**chemistry** 27:11
  69:9
**chest** 106:4,10
**choking** 106:7
**chose** 71:3
**Chris** 2:5 13:20
  83:11 120:20
**Christi** 2:7
**Circuit** 50:14
**circumstances**
  127:17 130:13
**citations** 21:3
**city** 50:18
**Civil** 12:13
  168:4
**Clackamas**
  50:14,15
**claim** 33:16
  39:13 49:10
  127:15 132:2
**claimed** 88:21
  92:12 126:3,8
  126:12,20
  132:15,17,22

**claiming** 49:3,6
  122:16
**claims** 10:24
  33:20 107:18
  107:22 108:2
  108:19 109:17
  111:2,5 120:8
  124:4,5 125:15
  142:25 143:5
  144:3
**Clara** 63:7
**clarifications**
  170:6
**clarify** 109:1
**class** 69:2 114:4
**classified** 44:4
**cleaned** 115:1,9
  115:12,14,17
  115:19,21
  116:11,17,18
  116:19
**cleaning** 116:1,7
  116:8
**clear** 15:4 49:17
  52:22 71:11
  86:13 111:1
  117:4 119:2
  143:8 148:21
**clearly** 136:14
**client** 169:6,7
**clinic** 10:19
  63:14,23 64:25
  66:15 67:1
  68:3,21,24
  73:18
**clinical** 88:24,24
  92:10
**close** 138:14
**closing** 138:15
**collect** 67:5
**colloquy** 43:7
**combination**
  68:10
**combine** 25:13
**combustion** 28:6
**come** 25:18
  33:18 52:19
  72:19,21
  119:13 134:7

**comes** 34:4
  93:13 102:5,13
**coming** 87:7
  128:10 137:6
  151:11
**commencing**
  12:16
**Commission**
  168:21
**communicate**
  141:1
**communication**
  141:20
**companies** 27:24
**company** 23:24
  56:7
**comparisons**
  45:1
**competent** 57:5
**complained**
  98:17 101:25
**complaining**
  102:11,15
**complains** 77:12
**complaint** 49:14
**complaints**
  73:13,15,22
  75:6,8,19
  76:11,15 77:4
  77:8,17,21
  93:13,15,19
  103:25 106:2,2
  106:15,17
  107:4 110:9
  112:9,12
  120:12 135:3
**complete** 21:14
**complies** 19:16
  20:11 61:15
  62:16 66:5
  74:18 102:4
  120:19 155:22
**components**
  48:20,21 49:18
  49:20
**composite** 36:20
  37:10
**compound** 21:8
  75:23 99:4

  136:19 145:2
  162:7 163:14
**compounds** 11:6
  155:4,12
**comprehensive**
  22:9 51:16
**concentration**
  70:18 71:23
  79:16 81:2
  82:20,22 83:1
  83:3 100:4,25
  101:15 105:15
  110:20 111:14
  153:18 154:6
**concentrations**
  40:3 44:5 81:1
  81:6 95:3
  100:16,22
  103:16 105:14
  109:23 111:12
  112:5 140:20
**concept** 81:8
  146:1 151:5
**concepts** 133:14
**conclude** 79:8
  92:21 110:21
  127:8
**concluded** 29:4
  101:17 159:10
**conclusion** 39:8
  52:22 54:16
**conclusions** 52:1
  52:6,12 91:2
**concurrent**
  102:8
**condition** 89:19
  89:21,22,24
  134:16
**conditioning**
  48:6,7
**conditions** 40:2
  73:25 110:2,6
  138:7
**conduct** 27:12
  53:15
**conducted** 51:24
**conducting**
  27:13
**confusing** 90:10

**congestion** 106:4
**consequences**
  44:12
**consider** 22:2,10
  22:23,25 23:2
  23:6,11 34:23
  57:2,3 87:22
  87:24 88:6
  123:11 125:14
  132:21 135:10
  143:20 145:4,4
**considerably**
  81:13
**consideration**
  128:16 134:20
  134:22
**considered** 51:2
  91:23 110:18
  126:21 132:18
  145:7 151:2
**considers** 56:24
**consistency** 89:7
  91:19
**consistent** 25:9
  122:2 124:22
  138:17
**consisting** 167:9
**constellation**
  76:7
**constitute**
  168:10
**construct** 129:17
**construction**
  125:7,8
**consult** 56:5
**consults** 56:4,11
**consumed** 147:4
**consumption**
  76:21
**contact** 55:3,5
**contacted** 15:16
**contain** 23:4
  66:1
**contained** 16:23
  64:4,8 73:8
  106:19 129:20
  130:2
**containing** 64:13
**contains** 59:1

Bruce Kelman PhD

December 15, 2009

62:14
**contaminants**
9:12 17:21
18:14,19
142:12
**content** 130:5
**context** 29:24
33:12 52:16,16
53:11,24 94:17
124:1
**continue** 32:17
67:18
**continuing**
134:25
**contract** 156:8
156:25 157:5,9
**contributed**
126:22
**Control** 130:1,6
131:16
**controls** 51:24
**copies** 17:4,11
18:6 117:19
156:7
**copy** 16:12 18:3
18:4,18 19:5
19:21 20:3
46:9 50:9
57:11,14 60:6
60:15,17 61:3
74:16 117:14
117:21 155:21
169:9,12
**corporation**
6:13 7:5 13:11
167:4 169:13
**corporations**
27:20,20
**Corpus** 2:7
**correct** 14:22
20:21,23 21:24
23:23 24:1
25:2 30:1
34:17 35:3
41:8 46:8
47:15 55:23
61:19,25 62:9
65:5,17 66:13
70:6,12 71:19

72:7,8 78:13
84:9,15 85:2,8
90:24 93:6
94:23 98:13
106:23 107:15
109:20 112:1
112:14 115:23
119:5,6 125:21
126:10,14,18
134:1 136:10
143:10 144:5
145:12 146:4
146:14 147:18
148:4 153:8,24
168:10
**Correction**
169:8,9,12
170:1 171:13
**corrections**
169:7 170:6
171:12
**correctly** 58:14
99:6
**cough** 106:3
108:14 109:8
**coughing** 106:3
108:11,13
109:15 110:11
111:21 112:6
**COUGILL** 6:4
**counsel** 13:18
56:5 57:8,14
108:25
**count** 24:22
25:11 31:19
141:11
**counted** 74:24
**counts** 110:3
**County** 46:19
50:14,16
**couple** 32:19
35:7
**course** 140:9
**courses** 22:6
**court** 1:1 13:15
24:23 25:8,10
25:14,20 26:23
28:22 29:25
30:25 31:3

50:14 57:13
101:8 158:24
158:25
**cover** 79:25
137:20 139:20
139:20
**covered** 73:20
**covering** 137:11
137:23 138:3
141:3,21
**covers** 58:19
61:17
**Cpinedo@cpi...**
2:10
**create** 70:15
**created** 20:6
70:13
**criteria** 17:6
19:14 20:3
88:7,10,12
90:11,16 91:6
91:10,14 94:8
126:19 129:6
131:24 132:13
152:15
**Cruz-Field**
63:14,23 64:6
64:25 73:18
**cubic** 73:7 110:4
**curiosity** 52:18
**curious** 52:19
**currently** 91:14
135:11
**curriculum**
20:22 21:5
**curve** 153:20
**cut** 87:5
**CV** 21:2,14,14
21:20 22:1,2

――――――――
**D**
**D** 3:14 9:5 55:16
69:21 70:2
**DABT** 9:6 13:17
16:9 17:25
160:3
**daily** 72:4
**damage** 49:4,6
49:12,15

135:25 136:2
137:2
**damaged** 48:17
49:1,20
**damages** 49:3,7
49:8,10,12
**dampness** 36:8
36:16,18 37:9
**data** 39:21 43:23
43:23 52:2,6
52:13 71:19,20
81:12 88:11,22
88:23,24 90:12
90:17 91:2,18
92:2,3,10 94:9
97:18,20 98:1
99:15 111:14
111:17 128:3
128:18
**date** 47:6 59:8
72:23 156:22
160:4 167:18
169:1 170:3
171:3
**dated** 9:8,21,24
10:1,4,7,10,13
17:19 20:20
47:14 55:25
57:20,22,24
58:1 59:6,12
59:17,25 60:1
60:11,12,22,23
61:10
**Dave** 13:25
**David** 4:3 55:16
114:20 169:18
**day** 91:12 117:5
167:7 168:15
171:16
**days** 156:2,3
**DC** 3:7 4:19
**deal** 37:21 40:3
119:23
**dealing** 88:22
**death** 23:14,16
**decay** 44:3,7
136:15 137:12
139:12,23
140:10

**Decayed** 136:12
**December** 1:12
12:9,16 13:2,9
32:22 33:2,8
38:4 167:7
168:15
**decide** 38:23
**decided** 53:19
**DECLARATI...**
171:1
**declare** 171:8
**defendant** 4:1
5:12 38:8,14
45:23,25 48:11
**defendants** 39:1
39:6 55:9
83:13 112:17
115:8
**defendant's** 37:6
114:2
**defense** 38:12,21
47:3 50:3
**define** 151:10,11
**defined** 23:3
149:19
**defines** 151:25
152:10
**definitely** 49:1
**definition** 151:3
**definitive** 141:19
**degree** 104:12
**degrees** 100:12
**deleted** 54:9
**deleterious**
149:24 150:8
150:13
**deletions** 167:11
**delineation** 17:6
19:13
**department** 3:4
4:16 27:11
156:12 157:9
**dependent** 149:4
**depending** 31:5
75:2
**depends** 51:22
115:25
**deponent** 13:17
169:3

Bruce Kelman PhD

December 15, 2009

**deposition** 1:11
9:5 12:7,13
13:1,6,8 14:12
16:3,9,12,13
16:15 25:3,4
25:15,19 26:2
26:13,14 30:4
31:3,8 46:6,10
46:21 47:7,21
50:4,7 56:4
87:13,19 102:5
102:14,18
104:3 106:18
118:10,13
137:4 138:18
144:4 158:22
159:7,10 160:3
167:6 169:11
170:3 171:3,11
**depositions**
24:23 25:8,11
26:21,23 27:2
27:6 30:1,22
31:9,17 42:23
48:1
**dermatology**
10:19 66:15
67:1 68:3,21
68:24
**describe** 27:21
84:25 107:18
143:25
**described** 144:1
**describing** 20:4
**description**
136:5
**design** 52:4
**designated**
28:11,16 29:2
29:7
**designation** 29:9
29:17
**destroy** 54:18
**destructive**
141:12
**detail** 145:19
**detailed** 74:11
**detect** 105:13,20
125:13

**detected** 69:3
**detecting** 9:11
17:20 18:14,19
142:11
**detection** 105:24
**determination**
51:18 54:21
88:13,15 90:12
91:8,18,24
92:4 127:1
141:19
**determine** 45:10
51:20 101:21
129:1 131:7
140:9 149:10
149:10 151:8
**determined**
51:16
**determines**
153:1
**determining**
88:8 90:14
154:19
**develop** 104:14
104:17,23
105:23
**development**
126:14
**diagnosis** 96:17
**Diagnostics** 64:2
64:3,4,10 65:4
**diarrhea** 106:9
**Diener** 63:7
**difference** 92:18
133:17
**different** 24:23
24:24 27:18
34:12 53:16
82:5 90:14
91:1,1,22
98:24 99:8
110:17 116:10
121:21 125:9
125:18 129:11
150:11
**differently** 64:1
143:25
**difficult** 83:16
128:5 149:9,21

151:13
**difficulty** 76:4
106:9
**DINNEL** 165:23
**Dinnell** 4:15 9:8
14:5,5 39:3
48:23 80:16
82:18 85:14
94:5 96:11
98:9 100:20
106:24 112:18
113:7,10,22
114:3 116:5
123:2,9 124:19
129:8 130:10
134:10 140:6
146:6,8 147:24
148:7 150:17
157:12 158:17
163:25 164:10
164:11,12,21
164:22 165:3,4
165:12,13,25
166:2,4,5,6,9
166:10
**direct** 104:15
**directly** 33:25
169:9
**disagree** 29:9
109:22
**disagreeing**
110:23
**disassembled**
135:18
**discard** 54:17
**discuss** 81:8
149:16 158:2
**discussed** 58:4
69:22 70:5
108:6 118:9
125:22 131:24
132:12 154:21
**discussing** 47:20
154:7
**discussion** 23:18
23:20 66:8
92:24 145:13
145:15,17,21
149:12

**disease** 129:25
130:6 131:16
134:22
**dispute** 130:8
**disregard** 43:6
**district** 1:1,1
13:15,15 15:9
**division** 131:6
**dizziness** 106:12
**DJ** 156:11
**dkurtz@bake...**
4:10
**Doctor** 64:21
**doctorate**
100:14
**document** 18:5
19:17 20:6
54:10 66:24
68:18 69:6,24
108:24 144:12
144:16 154:17
155:9,19
**documentation**
144:21
**documents** 65:3
67:18,21,21,23
109:4
**doing** 27:8,19
30:1 91:1
**DONELSON**
4:5
**door** 135:21,25
136:2,4,12,14
137:2,3,6,10
138:11,14,15
139:11
**dose** 23:1 90:3
111:4 124:11
124:15 145:23
149:24 150:13
150:19 151:24
152:10 153:1
153:16
**doses** 110:22
**dose-response**
11:1 81:7,11
91:25 92:13
110:20 144:9
144:13,22

145:16,20,25
146:13 153:20
**double** 82:3
**doubt** 102:20
**Dr** 56:4,6,11,15
56:19,23 64:24
73:19 114:5
121:2 124:2
**drawn** 52:1
**dropped** 54:11
**drugs** 89:1
**drying** 106:6
**due** 75:20 76:11
77:5,8,13,18
77:25 78:5,16
80:20 85:10
104:17 107:22
108:2,21 111:3
122:20 125:15
**duly** 14:15
**duplicate** 66:2,6
67:21
**dust** 109:7
**D'amico** 2:13,14
13:21,21 37:17
40:8 42:20,24
43:6 45:17,19
86:20,24 87:3
87:6 113:9
117:13,18,21
117:25 118:19
118:23 119:6
157:24 158:3
159:2 169:17

---

**E**

**E** 70:7,10,22
71:1 72:11
**earlier** 62:23
70:5 75:9
93:13 142:2
148:5,25
**early** 35:11
**Eastern** 1:1
13:15 15:8
**easy** 134:19
**eating** 76:25
**effect** 76:25
77:21,22 84:18

Bruce Kelman PhD

December 15, 2009

88:3,9,9,13,21
89:14,17 90:9
90:16 92:12,14
92:17 96:16
97:4 99:24
100:15 103:10
104:15 123:12
126:3,8,12,14
126:20,23
127:15 147:16
148:2,13 149:4
149:11 154:20
effects 23:14
28:7,8 48:5
49:9 52:24
72:1 73:11
76:7 77:18,24
78:5,15 89:8
110:1 119:14
124:20 132:2
132:15,17,17
132:23 133:1
133:16 134:14
149:3,17,18,24
150:14,22
151:10,11,16
151:18,19
effort 22:8
Egieger@gllla...
3:23
either 25:4,19
26:1 54:9
67:16 68:16
83:17 88:23
109:11 149:17
element 88:14
90:5,6,17
91:17 92:3,13
92:14,16 127:1
128:17 132:19
132:21
elements 90:19
91:11 92:5,23
122:25 125:10
127:2,8 145:3
145:4,7,10,17
elevated 122:9
eliminate 118:17
elucidated 45:7

emission 125:7
emitting 51:7
128:9
emotional 49:7
49:10
emphasis 68:17
employee 56:9
ENCLOSED
169:6
encompassed
25:23
encompasses
28:24 101:13
encountered
53:21
ended 159:7
160:8
Energy 5:17
energy-related
28:3
engineer 136:20
enter 136:4
entered 43:22
137:9
Enterprises 5:2
entire 28:24
73:17 74:1
101:13
entities 46:3
entitled 144:12
154:15
entity 114:15
entries 24:23
25:2,3 67:13
entry 67:6,7
138:11 139:17
entryway 137:1
environment
98:20,21
155:12
environmental
3:5 4:2 13:24
14:1 88:20
90:15 92:7,11
121:12 135:14
154:19
epidemiologic
88:23 90:12
91:18

epidemiological
88:11 90:17,21
92:2,3,10 94:9
94:21 126:2
127:14
epidemiologists
89:2 90:6
91:15
epidemiology
9:19 19:23
44:21 45:3,4,5
51:23 91:16
125:12
equate 140:19
equivalent 41:10
140:19
ERNEST 3:15
Ernie 14:2
errata 121:2
erroneous
149:22 150:12
Esquire 169:2
169:17,18,19
169:20,21,22
169:23,24
essential 146:2
essentially
140:11
established
92:21
estimate 26:8
30:22 61:22
estimating 30:7
30:19 31:13
et 17:19 42:12
43:10 45:21
122:8
evaluate 90:17
evaluated 51:23
evaluating 88:10
94:8
events 143:9,20
everybody
127:11 158:25
159:6
evidence 48:15
93:5,23
EX 160:12,13,14
160:15,16

161:20,21,22
161:23,24,25
162:2,4,5
165:21,22,24
166:14,15,16
exacerbation
95:24 96:9
exact 151:12
exactly 21:2 57:6
113:4
EXAMINATI...
8:4 14:18
160:10 161:1
162:1 163:1
164:1 165:1
166:1
examine 62:11
71:11 119:16
119:19,25
139:7 140:2
145:10
examined 14:16
52:14 70:22,25
71:2,8 91:3,7
126:16 134:3,6
144:18,24
example 22:13
28:5 33:25
34:14 64:10
71:6 89:16
125:20
excellent 45:4
excess 22:22
executed 169:9
169:12
exercise 86:5
151:13
exhaling 128:4
exhibit 9:2 16:7
16:10 17:25
18:3,10,15,17
18:25 19:4,24
20:2 23:22
24:6 30:23
32:10 57:21,23
57:25 58:2,11
58:16,23 59:5
59:7,11,19
60:2,5,13,16

60:24 61:2,17
64:19 65:7
66:3,11,12,16
66:19,21 67:11
67:12,19,23
68:5,20 69:5
69:23 70:10
71:22 74:17
108:19 142:17
142:21 143:1,4
143:8,21 144:3
144:8,10,12
154:12,15,23
155:4,8,15,18
156:6
exhibits 9:1
58:10
exist 150:15
existed 140:3
existence 73:1
existing 89:24
exists 96:23 97:3
151:5
expect 80:12,13
101:19 125:8
148:25 149:3
experience
20:25 21:6
56:23 124:17
124:23
experienced
81:18
experiments
28:2
expert 15:14
17:24 24:11,17
25:24 29:21,24
34:8,25 37:4,5
37:8 43:11
51:8 53:5,13
83:8,8 84:20
112:16 113:3,4
113:24 114:8
114:19
expertise 36:24
experts 37:6
112:22,23
113:2,13,17
114:2 123:19

Bruce Kelman PhD                                                    December 15, 2009

| | | | | |
|---|---|---|---|---|
| 129:4 | 109:15 110:6 | **fact** 23:12 48:17 | 114:12 156:11 | **focused** 148:24 |
| **expert's** 29:12 | 110:12 111:3 | 102:21 107:10 | **filed** 13:14 15:8 | **focusing** 37:20 |
| 36:23,23 79:14 | 112:11 122:17 | 127:5 130:14 | **files** 155:20 | 97:7 |
| 80:7 82:15 | 122:20,25 | 140:20 151:24 | **finalized** 68:18 | **followed** 99:5 |
| 84:1 85:15 | 124:6 125:15 | **factors** 36:16 | **financial** 49:7 | **following** 28:24 |
| 95:1 103:14 | 126:6,11 127:9 | 89:2,5 91:23 | 167:14 | 101:13 121:9 |
| 104:21 105:17 | 131:25 132:13 | **factual** 134:19 | **find** 44:19 73:18 | 121:24 171:8 |
| 133:12 | 132:16,18 | **fail** 92:19 | 79:7 93:23 | **follows** 14:16 |
| **Expiration** | 134:16 139:9 | **fairly** 140:17 | 101:19,22 | 66:2 147:5 |
| 168:21 | 139:19,25 | **falls** 96:4 | 102:7 117:1 | **forcibly** 136:3 |
| **explain** 111:10 | 140:9,12 | **familiar** 28:15 | 156:8 | **foregoing** 168:9 |
| **explanation** | 144:20,25 | 29:1 75:19,22 | **finding** 75:14 | 168:9 |
| 92:16 | 145:5 146:12 | 76:6,10,14 | 90:23 96:8 | **Forest** 3:13 |
| **explore** 118:20 | 147:6,15 | 77:4,8,11,14 | **findings** 90:7,20 | 11:10 14:2,4 |
| **Exponent** | 149:23 150:8 | 77:17,24 78:4 | 90:22 91:25 | 113:20 121:11 |
| 114:16 | 150:13,19,20 | 78:15 | 130:1 131:16 | 122:1 129:4 |
| **exposed** 33:13 | 150:21,25 | **far** 17:12 26:6 | **finds** 90:8 | 155:14 158:14 |
| 33:17,20 34:9 | 152:14 153:18 | 39:10 61:9 | **fine** 66:9 68:13 | **forgot** 17:5,7,8 |
| 34:14,25 35:5 | 154:19 | 64:15 84:6 | 83:14 101:12 | **form** 28:18 36:3 |
| 89:8,17 122:9 | **exposures** 76:11 | 119:4 139:14 | 117:20,24 | 36:10,21,22 |
| 127:10,11 | 109:2 111:18 | **Farber** 63:15 | **finish** 37:19 | 37:13 39:3,4 |
| 154:8,9 | 118:21 119:15 | 64:6,24 73:19 | **firm** 46:18 167:3 | 42:19,22 45:17 |
| **exposure** 33:11 | 123:11,20 | **fashion** 75:7 | **first** 14:15 15:16 | 48:23,24 56:21 |
| 35:9,14 43:15 | 134:14 154:25 | **favorable** 36:1,8 | 17:14 24:12 | 62:4 78:21 |
| 43:17 44:10,15 | **expounded** | **fax** 4:9 5:8,20 | 32:9 42:1 | 79:6 80:5,16 |
| 44:16,22 67:16 | 118:15 | 6:19 144:5,6 | 46:15 64:17 | 81:10 82:1,18 |
| 67:17 70:8,10 | **express** 159:5 | **Fdamicojr@d...** | 66:19 75:17 | 84:14 85:13,24 |
| 75:20 76:16 | **extent** 57:4 | 2:18 | 76:6 92:6,20 | 93:4,11 94:5 |
| 77:5,9,20 78:5 | 120:10 132:24 | **federal** 24:8 72:5 | 105:13 125:23 | 94:14,24,25 |
| 78:12,16,18 | 151:6 | 72:15 159:5 | 127:1,10,19 | 95:13,25 96:1 |
| 79:3,11,17 | **extra** 17:2,3 | **feeling** 106:7 | 128:16 129:6 | 96:10,11,18,19 |
| 80:3,20 81:23 | **extremely** 103:7 | **Fema** 1:3 13:13 | 132:11 134:8 | 97:16 98:9,10 |
| 82:9,13,22 | 110:3 | 121:12 129:20 | 141:7 145:24 | 98:11,18 99:3 |
| 83:3,21,24 | **eye** 78:8,20 79:5 | 169:4 170:4 | 147:16 148:3 | 100:1,20 101:3 |
| 84:11,12,18 | 79:11 80:4,15 | 171:4 | 148:13 | 103:5,6,12,13 |
| 85:5,6,11 86:8 | 93:2 94:1,2,13 | **fewer** 25:10 30:6 | **five** 26:7 30:9,11 | 104:10,19,20 |
| 88:19 89:14,19 | 94:22 97:14 | **field** 21:7 22:17 | 30:11,24 31:8 | 105:4,16 |
| 89:21,21,24 | 98:7 106:3 | 22:20 45:8 | 31:14 70:25 | 106:24 107:7,8 |
| 90:9,15 94:1 | **eyes** 79:22 81:20 | 63:21 81:9 | 88:18 92:19 | 108:4,23 |
| 94:12,21 95:10 | 81:25 82:10,14 | 100:17 | 125:18 134:3 | 109:19 110:14 |
| 95:19,24 96:9 | 82:23 83:4,22 | **fifteenth** 167:7 | **fixative** 44:4 | 110:15 111:6 |
| 96:16 97:12 | 83:25 93:9,12 | **fifth** 92:15 | **flag** 74:15 | 111:22,25 |
| 98:6,15,25 | 93:16,19 94:13 | 126:19,25 | **floor** 3:18 | 112:13,18 |
| 99:9,18,24 | 94:22 97:15 | 132:21 134:7 | 136:13 139:17 | 113:7 115:2,10 |
| 100:18 102:24 | 98:8,8 133:2 | **Figure** 121:11 | 139:21 140:19 | 115:24 116:5 |
| 103:3,10 104:5 | ——————— | **file** 16:16,20 | 140:24 141:15 | 116:14,15 |
| 104:9 105:2,7 | **F** | 54:13,21 55:2 | **Fluor** 5:2 | 123:2,9 124:19 |
| 105:11 107:22 | **F** 71:21,21,23 | 55:12 75:13 | **focus** 27:12 | 127:23 130:10 |
| 108:2,21 109:5 | **face** 106:7 | 97:23 102:2 | 123:18,21 | 133:5 134:10 |

Bruce Kelman PhD                                                December 15, 2009

| | | | | |
|---|---|---|---|---|
| 135:5 140:5,6 | 79:11,17 80:3 | 85:14 97:17 | **FRILOT** 5:15 | **George** 63:14 |
| 141:4 143:22 | 80:20 82:13,22 | 98:18 99:4,12 | **front** 20:15 | 73:19 |
| 146:19 147:12 | 83:4,22,25 | 101:3 103:6,13 | 120:17,24 | **getting** 46:9 50:9 |
| 148:7,15 | 84:18 85:10,18 | 104:10 105:16 | 121:6 132:5 | 76:24 100:12 |
| 156:23 157:12 | 85:19,22 86:8 | 108:4,23 109:3 | 135:21,25 | **GIANNA** 5:4 |
| 157:13 160:19 | 86:21 94:1,12 | 109:19 110:15 | 136:2,4,6 | **Gibson** 46:14 |
| 160:20,24,25 | 94:22 95:24 | 111:6,22,25 | **full** 14:20 157:17 | **Gieger** 3:15,16 |
| 161:3,5,11,12 | 96:9,17 99:24 | 112:13 115:3,4 | 168:10 | 14:2,2 29:15 |
| 161:15,16,17 | 100:18,25 | 115:10,24 | **fully** 138:14,15 | 62:4 82:19 |
| 162:3,8,9,13 | 101:16,18 | 121:17,18 | **FULTZ** 6:4 | 94:25 95:13,25 |
| 162:14,20,21 | 103:10 104:18 | 122:13 124:9 | **fumitremorgin** | 96:2,10,19 |
| 162:24 163:2,3 | 105:2,8,11,21 | 127:23 129:8 | 71:6 | 97:17 98:10,18 |
| 163:4,5,7,8,10 | 118:17 119:17 | 130:11 131:1,9 | **fundamental** | 100:2 101:5 |
| 163:12,13,15 | 119:19 120:1 | 131:19 133:5 | 145:25 146:11 | 103:6,13 |
| 163:16,18,19 | 120:13 122:10 | 135:5 140:5 | **fundamentals** | 104:10 105:16 |
| 163:20,22,23 | 122:20,21 | 141:4,23 | 56:24 | 107:8 108:4,23 |
| 163:24,25 | 123:20,22,24 | 143:22 146:6 | **fungal** 9:11 | 109:3,19 |
| 164:2,3,4,6,7,8 | 124:3,7,13,16 | 146:19 147:24 | 17:21 18:14,19 | 110:15 111:6 |
| 164:9,10,13,14 | 124:21 125:4 | 148:15 150:17 | 142:11 | 111:22,25 |
| 164:15,17,20 | 125:13,15 | 151:20 152:22 | **fungi** 137:12,16 | 112:13 115:3 |
| 164:21,22,24 | 127:20,21 | 153:11 154:2 | 138:5 | 115:24 116:15 |
| 164:25 165:4,8 | 128:2,4,5,8,10 | 157:11 161:4 | **further** 66:8 | 118:8,22,24 |
| 165:10,11,15 | 128:23 129:5 | 165:7,20 166:5 | 132:18 138:10 | 119:7 121:4,17 |
| 165:18,19,23 | 129:21 130:2,7 | 166:9,10,17 | 158:10 167:13 | 122:13 127:23 |
| 166:3,4,6,7 | 130:16,23 | **four** 24:9,21 | | 130:11 131:19 |
| **formaldehyde** | 131:8,17 133:3 | 25:5,9,16 26:7 | ——————— | 133:5,9 135:5 |
| 1:3 13:13 23:6 | 133:24 135:2 | 30:6,8,11,11 | **G** | 140:5 141:4,23 |
| 23:11,15 27:16 | 145:11 146:5 | 31:2 38:3 | **G** 72:2,3,10 | 143:22 146:7 |
| 28:15 29:1 | 146:18 147:10 | 51:12 54:4,7 | **general** 33:6 | 146:19 147:12 |
| 32:3,6,18 33:3 | 147:22 148:6 | 54:10 73:20 | 54:15 68:9 | 147:23 148:8 |
| 33:9,11,13,17 | 148:13,24 | 88:18 92:20 | 69:2 79:16,25 | 148:15,18 |
| 33:21,25 34:9 | 150:7,16 | 126:16 127:2 | 84:3,22 88:10 | 150:9 151:20 |
| 34:14,25 35:5 | 151:17 152:8 | 131:24 132:12 | 90:24 94:18 | 156:23 157:13 |
| 35:9,19,21 | 152:10,20 | 134:6,8 | 97:8 100:3 | 158:14 163:13 |
| 36:12,20 37:10 | 153:9,14,25 | **fourth** 92:14 | 103:15 121:15 | 163:19 164:3,4 |
| 37:21 38:1 | 154:4,25 160:5 | **Fox** 7:3 13:7 | 124:1 133:16 | 164:6,8,9,15 |
| 39:13,19,22,24 | **Forrest** 122:8 | 160:7 167:3,17 | 134:15 142:10 | 164:17,20,25 |
| 39:25 40:7,10 | **forth** 20:25 24:6 | **frame** 26:16 | 144:21 146:9 | 165:18,19,20 |
| 40:14,15,21 | 54:3 86:14 | 27:4,5,8 30:3 | 146:21 152:9 | 166:3,7,8 |
| 41:3,9,10,21 | 109:17 126:11 | 30:15 33:24 | 152:23 153:13 | **give** 22:7 25:3,8 |
| 41:22,22 42:2 | 134:18 135:4 | 47:11 48:1 | 154:3 155:2 | 28:20 31:10 |
| 42:14,16 43:12 | 168:6 | 126:13 | **generally** 33:24 | 62:2 68:11 |
| 43:14,15 44:2 | **Forward** 169:9 | **framing** 136:12 | 63:3,6 73:10 | 81:15 120:6 |
| 44:17,17,22 | **found** 44:20 52:4 | 136:15 137:9 | 78:6 80:25 | 148:24 149:2,8 |
| 45:11 48:3,19 | 71:9 105:6 | **Frank** 2:13,14 | 89:13 105:20 | **given** 21:4 22:4 |
| 48:21 49:19,21 | 131:17 162:6 | 13:21 118:9 | 129:18,23 | 25:4 30:9,22 |
| 51:7,18 52:15 | 169:11 | 119:4 169:17 | 140:7 154:18 | 30:25 31:2 |
| 52:23 54:1 | **foundation** | **Franklin** 4:17 | **Genetics** 32:7 | **gives** 69:18 |
| 55:7,8 78:4,5 | 38:18 72:17 | **free** 117:10 | 42:13 43:11 | **giving** 26:2,21 |
| | | | 45:22 46:2,4 | |

Bruce Kelman PhD

December 15, 2009

27:1,4,6 29:24
30:4 101:8
**go** 21:10 29:14
36:12,25 38:19
39:10 42:25
50:9,18 54:20
57:11 63:2
65:15 67:2,21
68:1,10 75:24
80:9 81:2
82:17 88:18
92:3 97:8
101:20 102:5
103:22 108:13
117:25 124:11
125:11,19
133:6,13,23
135:8 138:21
139:21 145:19
149:22 151:24
152:14,25
153:12 157:5
**goes** 24:9 38:4
54:4 93:13
122:7 137:8
**going** 16:6 18:3
20:1,12 21:12
55:1 57:8
58:10,15,22
59:18 60:4,15
61:1 65:6
66:18 67:22
83:17 86:7,10
103:20 108:25
109:24 116:21
117:15,22
118:16,22
134:9 136:5
142:20 143:3
144:7 150:20
154:14 155:7
155:17 157:24
**good** 56:23 57:9
83:12 101:6
151:3
**government**
27:23 28:1
72:5,19 79:15
130:22 131:7

**grants** 27:13,20
27:22 28:1
**grasp** 56:23
**great** 111:19
**greater** 56:17
**group** 22:11
63:3
**groups** 64:24
80:24
**grow** 36:17
**growth** 39:20
**guess** 38:17,20
**guy** 138:22

**H**
**H** 72:10 73:4
**hair** 48:6,6,7,8
48:16,19 49:1
49:4,14,15,18
49:20
**Hal** 6:3 169:22
**half** 50:24 51:1
**Halr@willing...**
6:9
**hand** 58:10,15
60:4,15 66:3
66:18 168:14
**handed** 17:14
19:17
**handier** 64:15
**handing** 59:11
66:11
**hands** 106:14
**happen** 86:11
**hard** 130:17
151:7
**harm** 48:22
49:19 129:22
151:1,2
**harmful** 23:19
151:16,18,19
**headache** 105:23
106:3 108:6,9
108:11,12
**headaches**
103:25 104:4,8
104:13,14,17
104:23 105:3,7
105:11

**health** 10:24
29:16 44:12
69:18 78:15
106:2 107:17
107:21 108:2
108:19 109:16
111:2 124:5
138:22 142:25
143:5 144:3
**heard** 120:14
**heart** 81:12
144:22
**heating** 27:14
**held** 13:9
**helped** 62:19,21
**helpful** 38:21
39:1 45:8
**Henry** 3:3 14:7
87:6 169:2
**Henry.miller...**
3:10
**HEREOF**
168:14
**hereunto** 168:14
**hiatus** 26:11
**high** 106:13
110:3 111:14
111:19 112:4
**higher** 47:18
80:25 81:2,6
101:21
**highest** 72:3
**highly** 149:4
**Hill** 17:6 19:14
20:3 88:7,10
88:12 90:11,16
91:5,10,11,13
92:22 94:8
**hired** 38:11
46:12 50:12
55:4
**histology** 34:1
**historically**
38:14,25
**history** 73:17
**hoarseness**
106:11
**Hobden** 63:8
**hold** 14:22 133:7

**holder** 74:17
**homes** 33:16,16
**hope** 63:17
**hoping** 87:5
**hour** 12:16
23:25 50:24,24
51:1 57:9
61:24 118:2
**hours** 61:22
**houses** 9:15
17:18 18:24
19:7 142:14
**Houston** 6:6
9:16 17:19
18:25 19:8
142:15
**HUBBARD** 6:15
**huge** 76:7
**human** 28:16
29:2,7 43:25
44:3,8 45:1,3,5
88:22 148:13
**humans** 77:8,12
77:18,24 78:5
88:22
**humidity** 37:9
**hundreds** 110:3
**Hurricane** 121:9
121:25 122:4
**hygiene** 57:5
**hygienist** 57:4
**hypothermia**
106:13
**hypothetical**
138:6

**I**
**idea** 24:19 46:11
50:11 61:20
69:18 150:20
**identical** 90:25
**identifiable**
104:24
**identification**
16:10 18:1,15
19:1,24 57:21
57:23,25 58:2
60:2,13,24
64:19 66:16

142:18 143:1
144:10 154:12
155:5,15
**identified** 32:9
32:21 42:6,13
43:10 47:19
70:2 75:15
110:9 111:20
142:3
**identify** 13:18
63:12 125:18
155:9,19
**identifying**
32:17
**ill** 77:17
**illness** 67:16
**importance** 11:1
144:9,13
153:18
**important** 91:9
139:6 145:16
147:14 152:15
**impossible** 40:2
**improper** 138:6
**inadvertently**
18:20 19:6,10
142:4
**inappropriate**
42:18
**incidence** 146:13
**include** 17:5,7,9
21:3,6,18,20
21:23,25 22:5
22:5,6,9 23:20
41:13,20 64:24
76:20
**included** 18:20
19:6,11,18
21:16 34:7,18
52:11 142:4
**includes** 22:19
23:3
**including** 61:23
70:4 78:2
109:7 153:14
154:4
**incorporated**
145:14
**increases** 37:10

Bruce Kelman PhD                                December 15, 2009

increasing 147:3
incursions 9:16
    17:19 18:25
independent
    15:19
independently
    130:8
INDEX 8:1
indicate 67:16
    102:7 130:16
    136:14 138:13
    139:13 143:17
indicated 44:22
    151:9 169:8
indicates 81:12
indicating 94:21
    131:11 140:18
    144:21
indication 71:20
    95:7 98:5
    115:17 116:16
    116:19 141:9
indirectly 49:10
individual 43:20
    44:11,13 48:22
    72:1 81:3,3
    90:13 94:7
    126:6,13
    139:10 149:4
individuals
    33:24 78:16
    105:20
indoor 70:18
industrial 57:3,5
infections
    106:12
inferring 152:16
influence 140:20
inform 54:25
    55:6
information
    109:2 124:15
    135:11
ingested 77:1
ingestion 76:18
    76:20,23 77:15
    77:18,19,25
inhalation 27:14
    27:15 33:11

44:21 76:17,18
    76:20 77:1
inhaled 33:13,17
    33:21 44:17
inhibit 44:6
initial 26:12
    52:18
injections 77:13
injuries 23:9
injury 23:5
    33:11 125:21
    127:9 132:1,14
    134:1
inside 139:11
insignificant
    39:22 41:16
inspected 114:25
    115:9 155:25
inspection
    114:23 155:24
Inspection/Ex...
    11:9 155:14
installed 121:12
Institute 32:7
    42:13 43:11
    45:22 46:2,4
institution 27:11
instruct 43:1
instructed
    123:18,18
instruction
    123:12,15
insufficient
    44:11 132:3,16
Insurance 6:13
intact 139:18
intake 72:4
intensity 153:18
intention 86:21
interest 66:7,20
    134:15 140:12
    167:14
interested 46:9
    66:2 125:5
    139:9,25
interesting
    53:22
interior 137:22
    140:4,7,15,21

141:3,22
International
    28:12,16 29:2
introduction
    121:23
intrusion 136:14
    136:25 139:7
intrusions 19:8
    139:1
investigate 97:2
investigated
    149:3
investigating
    120:15
investigators
    91:1
invoice 9:21,24
    10:1,4,7,10,13
    57:20,22,24
    58:1,17,20
    59:6,8,9,12,15
    59:17,20,22,24
    59:25 60:1,6,8
    60:10,12,17,19
    60:21,23 61:3
    61:5,10,16
    62:6
invoices 15:18
    56:1 58:5,7,12
    58:24 59:1,2
    61:7,9,13 62:1
    156:7
involve 134:20
    134:22
involved 24:25
    31:22 32:2,18
    33:3,7,15,20
    39:12 40:12
    43:12,19 48:3
    51:4 54:17
    55:6 78:3
    115:8 122:25
    123:22,25
    129:11,15
involves 134:21
involving 32:2
    129:20 142:8
    144:19
irritating 99:2

99:20
irritation 78:9
    78:20 79:5,12
    79:18,21 80:4
    80:12,13,15
    81:1,14 84:19
    85:1,5,10,23
    93:2 94:2,13
    94:22 97:14
    98:7,16 99:10
    99:25 100:19
    101:1,16,20,25
    102:8,11,16,25
    103:4,11 106:3
    106:5,8,11
    133:2,3
issue 36:5 37:2
    37:21 41:16,22
    42:1 52:14
    82:25 85:17
    86:12 122:21
    124:11 134:19
    138:22 155:10
issued 55:19
    114:16 117:5,5
    130:1
issues 33:7 43:13
    53:17 56:18
    118:13,21
    119:16,24,25
itching 84:19,25
    85:4,9,22
    106:5
item 19:10
items 19:11
    91:21 144:18
    144:24
i.e 132:14

            J
J 1:11 2:13,14
    9:5 12:7,13
    13:1 14:21
    16:9
Jadine 14:9
January 169:1
Jason 3:14 14:4
    169:19
Jayco 6:2

Jbone@glllaw...
    3:22
Jennifer 63:8
Jericho 2:6
Jerry 14:15,21
jimmied 135:24
Joe 17:21
John 114:19
join 29:15 82:19
Jr 2:13,14 3:15
    5:3 6:3 13:21
    169:17,20
judge 119:3
Judge's 118:16
judgments 89:3
    90:3
July 60:22 61:3
    67:6,7 74:14
    74:20
June 168:20
jury 47:2
Justice 3:4 4:16
    156:12 157:10

            K
Karen 4:4 13:23
Katrina 121:9
    121:25 122:5
keep 24:8 31:20
    54:7,17 113:23
keeping 83:11
Kelman 1:11 9:5
    12:7,13 13:1
    13:17 14:15,21
    16:9 17:25
    87:13,19
    158:22 160:3
    167:6 169:3
    170:3,25 171:3
    171:24
Kenner 10:19
    66:15,25 68:21
    68:24
key 82:25 160:10
    161:1 162:1
    163:1 164:1
    165:1 166:1
kill 44:6
kind 22:3 52:24

116:1 125:7
136:2 153:4
**kinds** 27:25
**knew** 41:8,22
124:15
**know** 15:4 25:11
28:11,14 30:24
31:21 34:17
36:7 38:24
40:1 46:4,23
47:1 52:21
55:8 57:6 61:9
63:4 68:15
71:16 72:18
81:3 86:11
96:21 103:22
107:2 110:2
113:1,4 116:2
118:15,19
124:22 130:5
131:20 135:13
135:23 156:20
156:25 157:17
157:19
**knowing** 41:4
**knowledge** 41:1
49:25 56:18
91:20
**known** 71:25
73:9 89:13
100:8,9,15
103:18 126:20
132:16,22
133:1
**Kredmann@l...**
6:20
**Kristopher** 6:14
169:21
**Krouse** 5:14
169:23
**Kuhn** 17:19 19:7
**Kurtz** 4:3 13:25
13:25 40:16
114:20 120:20
121:1,18
122:14 137:17
138:19 158:16
161:6,7 165:14
165:16 169:18

**Kwhitfield@b...**
4:11

**L**

**L** 6:3
**LA** 2:16 3:19 4:7
5:6,18 6:17
**lab** 34:1 43:21
53:25
**LabCorp** 63:20
65:4
**label** 43:22
70:12
**labeled** 87:13,18
158:22
**laboratory**
40:19 106:13
**LABORDE** 3:16
**language** 88:17
110:24
**LAPEROUSE**
3:16
**large** 27:10
**laryngitis**
106:11
**Laura** 63:7
**Laurel** 5:5
**LAW** 2:5,14
**lawsuit** 15:8,12
121:16 122:3
122:12
**lawyers** 43:7
**lay** 21:4,18,23
22:9,10 149:24
150:14,15
**lead** 79:8
**learned** 44:20
52:7,10 100:11
**leave** 92:20
**lectures** 21:4,19
21:19,20 22:7
**left-hand** 16:24
**legitimize**
130:15
**length** 126:8
150:25
**LETTER** 9:8
**let's** 20:14 36:12
42:12 57:11

63:9 65:15
67:5 71:11
87:10 111:1
117:18,19,25
157:22 158:3
**level** 72:19,21
73:9 80:3
83:21,24 131:2
147:15 149:10
149:18,18
150:8 154:8
157:5
**levels** 9:14 17:15
18:24 19:7
41:10 72:1
130:7 147:6
150:25 151:10
151:10,11,16
151:16,17,19
**liability** 1:4
13:14 160:5
**Liberty** 6:13
**likewise** 36:18
93:8 108:1
151:15,17
**limit** 71:24
72:15
**limited** 70:21
88:23,25
118:14 119:3
132:24
**limits** 72:14
**Linda** 121:25
**line** 170:7,9,10
**lines** 152:25
**linked** 96:5
**links** 95:23
**linoleum** 139:20
139:21
**lips** 106:6
**list** 17:5 24:7,7,9
24:22,24 25:1
25:23 30:24
32:21 34:18
38:4 55:18,20
55:21 64:21,23
75:8,15 102:5
106:1 107:14
108:18 114:14

117:2,7 142:25
143:5 144:3
154:11 155:4
155:15
**listed** 72:11
112:9 169:10
**lists** 24:22 54:3,8
**literature** 35:22
37:16 40:21
41:25 44:15,19
51:15,16,17,21
52:10 53:16,22
76:14 79:10
82:13 84:18
95:23 96:4,8
96:15,23 97:3
97:9,10 99:23
101:21 103:9
105:1,2,10
124:12,25
125:17 128:2
140:18
**litigation** 1:4
13:14 52:16,16
53:11,24 79:15
82:17 124:2
156:14 160:6
169:4 170:4
171:4
**little** 39:18 57:8
87:5
**lived** 71:17
107:9 121:25
**living** 35:1,1
40:1,9 73:14
73:23 74:7
78:19 79:4
81:23 84:13
85:2,6,11 93:2
93:16 99:19
101:25 102:16
102:24 104:1,5
107:6,23
109:12 115:16
116:12 122:4
129:21
**LLC** 3:16 5:15
**located** 46:17
**location** 13:11

50:20 137:9,10
167:8
**locations** 97:20
97:23,25
**LOG** 160:1
**long** 22:20 24:11
26:11 28:2
33:4 42:3
51:10 65:16
100:8,15
128:25
**longer** 115:16
**look** 15:18 24:24
42:12 43:1
45:5,9 53:16
53:19 54:23
63:4,9 69:7
75:11 81:4
85:17,21 88:2
89:2 90:2,7,25
93:14 97:9,20
108:18 119:12
119:12 120:6
120:16,21
122:24 123:4,5
123:7,16
124:24 128:2
128:24 129:10
130:12 134:9
138:10 139:21
141:12,14
**looked** 18:11
36:4 37:16,20
44:14 52:3,10
53:22,22 70:17
79:18 84:4,6
93:22 96:20
122:22 124:10
124:12 128:25
129:13 131:4
131:12 136:3
139:16 140:7
141:11,17
**looking** 28:7,8
32:19 35:22
67:15 68:15
69:2 73:5
89:15,23 90:12
119:21 123:11

Bruce Kelman PhD

December 15, 2009

130:17 131:21
139:10,18
140:8 141:15
145:5 149:17
**lost** 28:19
**lot** 16:19 27:17
53:16 118:25
134:21 135:11
**Louisiana** 1:1
13:15 15:9
**low** 40:3 109:25
110:8,21
139:14
**lower** 30:10
138:11 141:20
**lowest** 47:17
**LUGENBUHL**
6:15
**lunch** 117:19,25
118:5
**Lyndon** 10:16
10:19 13:22
15:7 40:23
62:11 63:11,13
66:23 71:12,17
72:24 73:13
78:8,12,18
79:3 81:17,23
82:9 84:9,12
85:1,6 86:8
93:1 94:11,18
95:8,19 97:13
97:21 98:1,6
98:17,25 99:11
99:19 101:24
103:25 106:2
106:16,22
107:22 109:18
110:13 111:3
112:12 113:13
121:9 122:3,7
126:17 127:3
135:3,17 137:4
143:9,13,21
144:4,19,25
145:8,11

———————
**M**
**M** 4:15 6:14

**Maggio** 169:24
**mail** 159:5
**maintained**
121:13
**making** 88:13
89:3 90:3 91:7
91:24 125:19
140:22,23,24
141:7
**managed** 27:10
**manufacture**
72:23
**manufactured**
121:11 122:1
128:11
**manufacturers**
34:5
**March** 74:14,20
75:2
**mark** 74:16
**marked** 16:6,9
17:25 18:14,25
19:3,24 20:1
57:21,23,25
58:2,15,22
59:11,18 60:2
60:4,13,16,24
61:1,17 64:19
65:6 66:16,18
67:11 68:5
142:2,17,20,25
143:3 144:7,10
154:11,14
155:4,7,15,17
**marks** 87:18
158:21
**matched** 52:1,6
52:6,12
**material** 15:22
15:23 22:2
110:19 129:13
142:3 155:24
**materials** 17:2,3
17:8,9 18:21
19:6,13,22
28:3 37:4
54:17,19,22
55:2,11,12,15
55:18 56:3

64:22,23 69:21
69:22,25 70:2
112:16 114:12
117:8,17
119:12,13
120:6 129:11
129:15,17
142:4 146:3
154:15
**matter** 18:4,10
18:21 98:21
115:8 122:7
135:15 167:7
167:15 168:9
**matters** 86:18
**maximal** 134:16
145:22,22
**maximum** 70:7
70:10,18 72:4
73:5,8
**MD** 63:15,15,21
**MDI** 1:5
**MDL** 13:15
**mean** 28:4 34:22
41:15 42:7
43:22 44:16
68:13 76:23
84:3 86:2
88:16 90:24
96:5 105:12
115:16 128:2
129:15 154:6
157:4
**meaningful**
150:21
**means** 89:6
147:15
**meant** 65:12
110:17 112:24
**measured** 71:5
**measurements**
69:10 71:9
109:24,25
124:12 125:6
130:13,14,15
130:18,19
131:3 140:10
**mechanism** 45:6
**medical** 10:16

10:20 43:20,24
62:11,15 63:4
63:9,11,13,20
64:5,12,16,18
64:24,25 65:4
65:8,20,23,25
66:4,7,12,14
66:23 68:5
70:4 73:12,17
73:18,22 74:2
78:7 79:10
82:12 84:17
93:6,21 95:7
95:23 96:7,15
99:23 101:24
102:6,12,21
103:9 105:1,10
106:20
**meet** 91:10
**meetings** 22:7
**membrane**
79:17,21
**membranes**
98:17 99:2,11
99:21,25
100:19 101:1
101:16 106:9
**Memorial** 63:20
65:4
**memorize**
114:14
**memory** 93:22
**mention** 146:22
150:19
**mentioned** 32:15
63:23 68:22
84:8
**met** 126:19
131:24 132:13
**metabolic** 41:10
**metabolite** 35:21
40:1
**metabolites**
40:10
**meter** 73:8 110:4
**method** 9:11
17:20 18:13,19
142:11
**methodology**

154:18
**micro** 44:7
**microbial** 11:6
155:3,11
**MIDDLEBERG**
5:4
**Miller** 3:3 14:7,7
14:10 18:6
21:8 26:10
29:11 30:17
33:22 36:22
37:14 38:18
40:18 42:17,22
42:25 45:13,18
48:7 53:7,14
54:25 56:21
57:8,13 72:17
75:23 78:23
79:13,24 80:6
80:17,21 82:2
82:15,24 83:5
83:7 84:1,20
85:15 86:13,22
87:1,4,8 94:3
94:15 95:1
96:12 97:22
99:4,12 100:21
101:2,11
103:20 104:20
105:4 106:25
108:25 116:6
117:4,10,15,20
117:24 124:8
127:24 130:25
131:9 133:4,6
133:10 135:6
135:22 136:19
139:3 145:2
152:11,21
153:10 154:1
155:21 157:11
159:3 160:17
160:18,21,22
160:23 161:2,3
161:4,5,8,11
161:12,15,16
161:17 162:6,7
162:10,11,12
162:14,15,16

Bruce Kelman PhD

December 15, 2009

162:17,18,19
162:20,21,25
163:2,3,4,6,7,8
163:11,12,14
163:15,17,18
163:20,21,23
163:24 164:2,5
164:7,16,23,24
165:5,6,9,17
166:11,12,13
166:17 169:2
**million** 80:11,15
81:13 84:5
101:20 149:1
**millions** 110:4
**mind** 34:5 67:3
**minor** 77:2
**minutes** 141:14
141:16
**mischaracteri...**
134:11
**mischaracteri...**
45:13 53:7
80:17 106:25
133:10
**missed** 68:17
**misstate** 148:8
**mobile** 33:16
35:1
**modern** 91:12
**modification**
157:3
**moistness** 36:8
**moisture** 35:25
36:19 37:9
136:25 138:25
**mold** 22:23,24
22:24 23:2,4,4
31:23 35:8,18
36:2,9,13,16
37:21,22,25
39:13,20,23
40:5,6,13,15
40:20,23 41:2
41:2,21 42:1
51:6 52:25
54:1 56:13
67:16,17 69:3
70:24 78:12,16

78:19 79:4
81:22 82:6,8
84:11 85:5,18
95:10,14,18
97:12 98:1,5
98:15,25 99:9
99:18 102:23
103:2 104:5,9
107:23 108:2
108:16,21
109:7,9,15
110:12 111:3
112:10 115:22
116:8,12,18
119:14,24
120:7,11
122:10,17,22
123:11,11,16
123:21 127:10
127:11,11
129:1,12
135:16 139:1,8
139:13 140:1,3
140:8,14,18,20
140:25 141:20
142:1,8 144:20
144:25 145:9
146:16,23
155:11
**molds** 70:21
75:20
**mold-releasing**
52:15
**moment** 63:8
75:11,14
**months** 46:7,24
49:23 74:23,24
74:25
**motions** 42:18
**mouth** 76:21
**move** 42:9
**moved** 71:14
74:13,14,19,20
75:2,3 93:24
115:22 129:5
**moving** 93:10,20
**mucous** 79:17,21
**multiple** 18:6
103:21

**Mutual** 6:13
**MVOC** 11:7
155:4
**mycotoxin** 70:10
71:24 72:1,6
72:15 73:6,9
76:16,24,25
77:1,9,15,18
77:25 78:12
81:22 82:8
84:11 85:5
95:18 97:12
98:6,25 99:9
99:18 102:23
103:2 104:5,9
108:2,21
109:15 111:3
112:10 119:14
119:24 120:11
125:20 134:17
135:16 154:22
**mycotoxins**
22:25 70:9,23
70:25 71:3,4,4
71:7,9,16
72:10,14 75:21
76:8,8,12 77:5
77:13 95:11,15
98:16 107:23
108:16 109:9
110:12 120:7
126:17 127:2
129:2 132:1,1
132:14,15
134:1 144:20
145:1,9 146:16
146:23,24
147:8,20 149:6
149:7,9,13,15
149:20 150:5
151:6,15 152:6
152:18 153:7
153:23
**myotoxin** 70:7
82:6

___

**N**

**N** 1:5
**Naegeli** 7:5

12:17 13:11
57:13 167:4,8
**name** 13:7 14:20
46:12,15 50:13
50:21 114:9,15
114:19
**named** 46:3
168:4
**names** 32:20
51:3 63:1
**narrative** 21:9
75:14
**narrow** 123:5,7
123:12
**nasal** 98:16 99:2
99:10,20,25
100:19 101:1
101:16 102:8
106:9 133:2
**National** 5:13
32:7 42:13
43:10 45:21
46:2,4
**nature** 121:15
134:23
**nearly** 40:9
**necessary**
137:12 169:8
**need** 62:8 73:7
87:10 125:10
125:11 135:11
**needed** 119:13
**negative** 82:3
**negatives** 99:5
**neighborhood**
25:7 31:7
**nephritis** 106:13
**neurotoxin** 71:6
71:6
**never** 117:6
**new** 2:16 3:19
4:7 5:18 6:17
54:11 96:17
**nine** 91:11
**nonprofession...**
22:12
**NONRESP**
161:9,10,13
**nonresponsive**

41:18 42:10
53:1
**nonspecific**
104:13,23
**nontoxic** 153:2
**normal** 21:2
35:21 39:25
**normally** 21:18
110:18 130:12
134:13
**nose** 79:22
**Notary** 12:15
**note** 42:17 81:17
121:1
**notebook** 19:21
59:16 62:14
65:18,22
**notebooks** 16:23
17:1 19:18
62:18 64:13
**noted** 64:1
**notes** 19:24 64:1
64:7,16 66:14
66:16 68:2,4
68:10 93:22
138:21 157:25
158:2
**notice** 9:4 16:3,8
16:12,15 65:18
135:21 139:12
**noticed** 13:8
112:16
**November** 20:20
47:10,10,14
55:25 58:17,19
61:10,16,17,21
**number** 24:19
25:12 30:7,21
47:17 70:21
73:7 88:25
90:25 120:20
136:8 149:2
151:12 156:18
170:8
**numbered** 58:13
**numbers** 47:18
81:15
**numbness**
106:14

Bruce Kelman PhD

December 15, 2009

**numerous** 44:20
94:20
**NW** 3:6

**O**

**object** 28:18
36:3,10,21
48:24 79:6
80:5 81:10
82:1 84:14
85:13,24 93:11
94:24 96:18,19
97:16 99:3
103:5,12,20
104:19 107:7,8
108:25 110:14
115:2 116:14
165:2 166:8
**objecting** 83:11
**objection** 21:8
21:13 26:10
29:5,11,15
30:17 33:22
36:22 37:13,14
38:18 39:3,4
40:8,16,18
41:18 42:9,19
42:21,22 45:13
45:17 48:23
53:1,6,7,14
56:20,21 62:4
72:17 75:23
78:21 79:13,24
80:6,16,17,21
82:2,15,18,24
83:5,10,12
86:3 93:4 94:3
94:5,14,15,25
95:13,20,25
96:1,10,11
97:22 98:9,10
98:11,18 99:4
99:12,13 100:1
100:20,21
101:2,5 103:6
104:11,20
105:4 106:24
106:25 108:5
112:18 113:7,9

113:22 114:3
115:10,24
116:5,6,15
121:17,18
122:13 123:2,9
124:8,19
128:12,15
129:8 130:10
130:25 131:9
133:4,5,10,11
133:12 134:10
135:22 136:19
137:17 138:6
138:19 139:3
141:4 145:2
146:6,19
147:12,23,24
148:8,15 150:9
150:17 152:11
152:21 153:10
154:1 157:11
160:10 161:1
162:1 163:1
164:1 165:1
166:1
**objections** 42:18
49:16 82:19
87:2 121:22
133:8
**objective** 80:13
80:15
**observe** 40:23
135:17 136:18
136:20,24
137:23
**observed** 135:20
147:16 148:3
148:13
**obviously** 86:19
**occasions** 31:1
92:10 103:21
**occupancy** 122:9
125:6 128:19
128:22
**occupation**
43:19
**occupational**
33:14,19 35:14
43:17 76:17

77:6,9
**occupied** 121:9
**occur** 41:15 45:1
110:21
**occurred** 41:17
122:3
**occurring**
140:11
**occurs** 126:14
**October** 59:6,8
59:12
**odor** 104:18,24
105:23
**odors** 104:14
**offer** 47:9 48:10
50:18 53:5
**offered** 24:18
25:14 31:18,25
32:3,5 33:8
34:8,13,24
43:11 47:7,21
48:3 49:22
50:7 53:13
55:13
**offering** 25:19
25:24 26:1
29:12,20 35:4
38:7 45:22
46:1 86:7,10
**office** 2:5,14
34:15 42:5
54:20
**off-gassing**
36:20 37:10
**oh** 19:21 21:18
23:7 26:3,6
35:13,16 44:20
72:25 75:16
108:12 112:23
112:25 117:3
**okay** 28:23
45:19 60:18
65:15 66:3
67:5,10 68:20
69:20 75:10,14
76:4,9 77:23
87:3 90:10
98:24 101:10
102:15 109:22

111:11 113:12
115:7 117:1,12
118:24 119:7
143:15 148:7
**older** 34:18 54:3
54:10
**oldest** 32:21
47:18
**once** 15:23 54:24
137:9 139:17
139:17
**ones** 87:9 113:4
**one-page** 57:24
58:1 60:1,23
**ongoing** 53:15
**onset** 95:24
96:17
**Oops** 121:4
**opining** 120:3
**opinion** 34:25
35:18 36:5,7
41:11,13,21
44:10,25 48:14
79:18 81:22
82:6,8 84:11
85:4,25 86:5
95:6,10,14
97:8,12 98:5
98:15,25 99:9
99:16,18
102:23 103:2
104:4,8 107:17
107:21 108:1
124:13,16
125:19 129:13
135:14 139:6
147:17 149:22
150:3,8,12,15
152:4
**opinions** 34:8
38:20,23,25
55:8 67:14,24
68:22,24 69:17
86:7,14,15,16
118:15 119:14
120:5,6 127:25
131:13
**opportunity**
139:8

**opposed** 39:1
64:9,13 70:23
146:23
**oral** 9:4 16:8
168:8,11
**Orange** 46:19
**order** 61:22
131:25 132:13
135:10
**orders** 158:23,25
**Oregon** 50:17
**organic** 11:6
155:3,12
**organism** 40:4
**organisms** 40:1
40:10 44:7
**original** 68:12
91:11,12
100:12 121:2
**originated**
122:17 136:22
**Orleans** 2:16
3:19 4:7 5:18
6:17
**Osteraas** 114:9
114:19 116:21
117:1 120:17
136:6,7 137:8
**Osteraas's** 121:2
121:24
**outcome** 167:15
**outlines** 155:24
**outside** 52:16,24
137:17 138:19
**overall** 69:18
**overlap** 57:4
**overwritten** 54:9

**P**

**page** 8:2 9:2
18:11 59:5
65:19 66:19,23
69:5,11,16
75:7,15,16,17
102:3,10,13
106:1 107:19
108:19 109:17
110:10 111:20
112:10 116:23

Bruce Kelman PhD                                                December 15, 2009

116:25 120:18
120:21,24
121:6 124:5
131:23 132:4,5
132:5,8 135:4
136:5,7 145:13
145:18,23,24
169:11 170:7,9
170:10 171:13
**pages** 65:11,12
65:16,25 66:1
66:2,6,25 67:5
67:10,24 68:21
68:23 168:10
**paid** 73:21,24
74:1
**paper** 142:1
**papers** 51:8
142:2,6
**paradigm** 90:14
94:7
**paradigms**
90:11
**paragraph**
75:15,17
102:13 132:9
138:11
**part** 44:9,24
51:17 65:12
76:4 81:7
109:22 122:3,6
122:11,22,24
123:5,8 124:11
141:7,8 143:15
145:4
**particular** 19:17
38:9 44:11
45:25 48:22
50:22 66:7,20
69:11,16 73:21
90:16 97:7
123:12 125:8
140:25
**particularly**
66:1 67:22,24
69:11,16 125:5
138:23 139:9
146:23 147:14
**parties** 118:11

167:14
**parts** 56:14
68:17 80:11,14
80:23 81:13
84:5 101:20
117:23 149:1
**party** 15:11
**pass** 59:3,3
158:13
**pathology** 43:21
**Patricia** 87:8
**Pause** 57:17
87:16 118:5
158:6
**pay** 37:22 43:7
**paying** 136:21
137:21 138:23
**PECK** 6:15
**PEL** 105:21,22
**penalty** 171:8
**Pennsylvania**
3:6
**people** 33:12,16
33:20,25 34:9
34:14,25 35:5
62:20,23 63:1
63:3 68:14
75:20 76:11
77:4 80:24
81:1 92:20
104:13,17,23
105:3,7,11
129:21
**people's** 125:13
**percentage** 24:2
**performed** 69:2
**period** 33:11
35:12,13 52:20
58:19 73:1
74:4,6 113:22
121:8,13,24
138:16 154:9
**periods** 35:11
**perjury** 171:8
**person** 49:13
**pertains** 110:19
143:18 146:23
**pertinent** 67:22
67:24 68:22,24

69:12,16
**peruses** 18:5
66:24 69:6,24
75:13 102:2
108:24
**pervasive** 146:1
**PETER** 2:4
**PH** 9:5
**pharmacology**
14:25
**pharmacy** 65:1
65:1
**PhD** 160:3 167:6
**phone** 159:6
**photo** 138:13
**physical** 49:12
49:12 75:19
89:17 129:22
**physician** 52:9
**physiology**
14:25
**Ph.D** 1:11 12:7
12:14 13:1,17
14:22,24,25
16:9 17:25
87:13,19
158:22 169:3
170:3,25 171:3
171:24
**pictures** 139:22
**Pinedo** 2:4,5 8:4
13:20,20 14:19
16:11 18:2,9
18:16 19:2,25
21:11 26:17
28:21 29:8,18
30:20 34:2
36:6,14 37:3
37:24 39:7
40:11,22 41:18
41:19 42:9,11
43:1,3,9 45:15
45:20 48:9
49:2 50:23
53:1,2,9,18
57:1,10 58:3,9
60:3,14,25
62:7 63:22
64:20 66:17

72:20 75:25
79:1,9,20 80:2
80:19 81:5,16
82:4,21 83:2
83:14,19 84:7
84:16,24 85:20
86:1,6 87:10
87:21 93:7,17
94:10,19 95:5
95:17,22 96:6
96:14,22 97:11
97:19,24 98:14
98:23 99:7,17
100:5,24 101:6
101:23 103:8
104:16,25
105:9,25 107:5
107:13 108:8
108:17 109:4
109:10,21
110:25 111:7
111:23 112:2
112:15,19
113:11,25
114:7 115:6,13
116:3,9,20,24
117:7,12 119:8
120:22,23
121:5,20
122:18 123:6
123:14 124:14
125:1 128:7,13
128:20 129:14
130:20 131:5
131:14,22
133:19 135:1
135:12 136:1
136:23 137:25
138:9,24 139:5
140:13 141:5
141:25 142:19
143:2,24
144:11,15
145:6 146:10
147:1,13 148:1
148:11,19
150:10,23
151:21 152:13

152:24 153:15
154:5,13 155:6
155:16,22
156:1 157:1,16
157:20 158:9
158:13,19
159:1,6 160:11
160:12,13,14
160:15,16,17
160:18,19,20
160:21,22,23
160:24,25
161:2,3,4,5,6,7
161:8,9,9,10
161:10,11,12
161:13,13,14
161:15,16,17
161:18,19,20
161:21,22,23
161:24,25
162:2,3,4,5,6,7
162:8,9,10,11
162:12,13,14
162:15,16,17
162:18,19,20
162:21,22,23
162:24,25
163:2,3,4,5,6,7
163:8,9,10,11
163:12,13,14
163:15,16,17
163:18,19,20
163:21,22,23
163:24,25
164:2,3,4,5,6,7
164:8,9,10,11
164:12,13,14
164:15,16,17
164:18,19,20
164:21,22,23
164:24,25
165:2,3,4,5,6,7
165:8,9,10,11
165:12,13,14
165:15,16,17
165:18,19,20
165:21,22,23
165:24,25
166:2,3,4,5,6,7

Bruce Kelman PhD

December 15, 2009

166:8,9,10,11
166:12,13,14
166:15,16,17
166:18,19,20
**place** 74:17
168:5,7
**plaintiff** 1:12 2:3
2:12 11:10
12:8 13:20,22
38:8,15 48:13
113:12,14
120:12 129:4
143:13 155:14
**plaintiffs** 38:21
39:2 112:17,21
**plaintiff's** 37:5
55:7 112:22
113:15 120:8
122:12 124:4
125:15
**plastic** 137:10,20
137:23 138:3
139:19 141:3
141:21
**plausibility** 91:4
91:17,22 92:1
110:19
**plausible** 94:1
94:12 109:14
110:8,11,17
111:2
**play** 81:24 95:11
98:16 99:20
**played** 97:13
98:7 99:1,10
102:24 103:3
**please** 13:18
14:20 19:15
20:10 32:17
42:15 43:4
61:13 66:4
67:12,18 74:9
120:18 154:17
155:9,19 169:7
170:6
**plywood** 136:13
**PM** 160:8
**pneumonia**
106:12

**point** 32:20 33:2
35:20 50:13
54:15 72:22
97:9 101:21
129:12 132:11
133:15 134:12
134:24 136:14
137:21 148:9
148:23 149:2
**points** 134:13
154:21
**poison** 22:23,24
22:25 23:11
**poisons** 22:19
23:19
**poplar** 131:13
**popular** 131:2
131:11
**portion** 28:25
101:14 138:11
**Portland** 50:21
51:2
**position** 119:2
**possible** 72:3
104:24 108:9
108:15 109:6
115:22 116:11
116:17,17
124:23 145:22
**possibly** 63:7
**post** 100:14
**potential** 28:9
71:4 73:10
109:9 123:11
124:20 139:13
139:18 145:5
**potentially**
40:10
**Poydras** 3:18
5:16 6:16
**practical** 100:14
**practice** 25:9
54:16 67:20
68:9
**precede** 126:12
**preceded** 132:17
**preexisting**
73:25
**premature**

44:12,18,23
**prepare** 16:1
**prepared** 55:20
55:21 56:3,4
68:7,8 74:11
114:19 142:23
143:6 144:16
**presence** 35:25
110:19
**present** 7:1
13:18 32:25
38:5,22 52:13
71:5,17,25
73:6,25 83:1
89:21 92:8,14
104:15 125:24
127:19,21
128:4,18,23
129:7 132:1,15
134:17
**presentation**
22:10
**presentations**
21:4,18,23
22:1,3,6,9
**presented** 52:20
53:23 86:23
**preserved** 42:19
42:23
**press** 131:11,13
**pressure** 106:14
**preterm** 43:16
**pretty** 39:16
56:23 88:23
128:5 151:3
**Prevalence** 9:14
17:15 18:23
**previous** 38:3
41:8 134:12
**previously**
125:22 154:21
**primarily** 27:23
56:13
**principal** 76:24
92:18
**principals** 56:7
56:18
**prior** 25:22 26:8
31:4,5 33:7

72:23 93:19
**private** 27:24
**probability**
126:21
**probably** 26:14
33:4 52:8
54:15 55:15
64:8 69:20
100:14 125:6
128:1 139:24
149:8
**problem** 138:15
**problems** 87:9
**Procedure** 12:13
168:4
**proceed** 78:22
119:9
**proceeded** 89:19
**proceeding**
168:11
**proceedings**
12:17 29:25
52:7,8 57:17
87:16 118:5
158:6 168:8
**processed** 43:20
**processes** 134:22
**processing** 43:22
**produced** 19:22
28:6
**produces** 149:24
150:13
**producing** 35:9
**products** 1:4
13:14 36:20
37:11 128:11
160:5
**professional**
21:19,20,25
22:3,7 24:16
87:24
**proffered** 79:15
80:8 94:4
**progressively**
138:15
**project** 156:22
**propagate** 139:8
**propagation**
36:1,9 44:7

139:1
**proper** 22:2
**properties** 45:10
147:3
**provide** 83:8
137:11,16
138:5 139:1,8
**provided** 170:9
**providers** 63:12
64:5
**proximity** 89:25
**prudent** 29:17
**PSC** 13:22
**public** 12:15
29:16 149:25
150:14,15
**pull** 62:14 67:20
**pulled** 66:22
67:10
**pulling** 62:18
**purchased**
121:11
**purpose** 120:2,4
123:19
**purposes** 119:1
**pursuant** 12:12
86:15 168:3
**put** 19:22 68:17
74:15 89:10
**putting** 133:14
**p.m** 118:3,7
158:4,8 159:8
159:11
**P.O** 4:18

_____

**Q**

**qualifications**
36:24
**quality** 51:17,20
**quantitative**
146:12
**quantities** 23:8
23:10,12,14,15
23:19 126:7
147:3
**quantity** 23:5
94:16 105:12
**Quest** 64:2,3,4
64:10 65:4

Bruce Kelman PhD                                              December 15, 2009

**question** 15:3,4
  21:12 28:19
  34:12 37:1,17
  37:18 40:14
  43:8 57:7 58:7
  62:22 68:23
  76:1,9,19 79:2
  82:5 83:17
  87:4 92:6
  94:18 95:18
  98:24 99:8
  101:11 121:21
  125:23 126:3
  126:22 127:10
  127:13,15,18
  127:19,19
  128:12,17
  129:7 131:16
  133:15 138:1,2
  143:15 150:11
**questioned**
  46:20
**questioning**
  118:9 158:18
**questions** 20:13
  86:21,25 87:1
  117:11,13,15
  118:17 127:7
  157:21 158:17
**quickly** 42:8
**quite** 71:2 76:2
**quote** 147:5,6
  149:23,23

**R**

**raise** 87:2
**raised** 42:1
**range** 149:7
**RANKIN** 6:15
**rare** 92:10
**rarely** 131:13
**rashes** 84:8,12
  84:19 85:10,23
  106:5
**RAST** 69:1
**rate** 23:23,24
**rates** 125:8
**reach** 17:12 91:1
  140:15

**read** 28:22 53:19
  56:3 76:13
  78:23 83:17
  97:6 105:1
  107:14 116:21
  117:22 124:5
  130:4 131:11
  136:5 137:4
  138:2 157:24
  171:11
**readback** 28:24
  29:4 101:13,17
**ready** 119:9
**real** 40:14 80:11
**really** 30:7 31:12
  31:21 33:5
  37:22 38:2,24
  45:4 91:9,14
  91:22 124:10
  130:17 136:21
  146:24 151:13
  157:19
**realm** 33:12
**reason** 19:19
  21:25 102:20
  130:8 131:15
  170:10
**reasonable**
  51:25 89:25
  144:2
**recall** 68:1 97:9
**receive** 16:3 24:2
  123:15
**received** 15:24
  16:13 55:18
  64:23 69:25
  74:3 117:6
**recognize** 38:5
  114:15
**recognized**
  73:10 81:9
  151:18,19,25
**recollect** 42:15
  58:6
**recollection**
  15:19 31:20
  33:5,6 123:13
**record** 10:16,20
  13:5 42:17

  57:16,18 64:3
  64:4,18 65:11
  74:2 75:6
  87:15,17 93:6
  93:23 102:6,22
  117:25 118:4,6
  119:1 121:1
  158:5,7 159:9
  160:11 161:18
  161:19 162:22
  162:23 164:18
  164:19 166:18
  166:19,20
  168:10
**recorded** 43:22
  78:8 106:22
  110:5
**recording** 167:5
**records** 20:8
  31:21 62:11,15
  62:17 63:4,10
  63:11,13,14,19
  63:20 64:5,8,9
  64:13,16,25,25
  65:1,20,23
  66:7,14,23
  68:11,12 70:4
  73:12,18 74:13
  78:7 79:7
  93:21 95:7
  101:24 102:13
  106:20
**Redmann** 6:14
  169:21
**redundant** 91:13
  91:21
**refer** 94:11
**reference** 119:13
  142:3
**references** 17:4
**referring** 55:24
  65:8 79:22,22
  79:23 94:7
  116:23 142:1
**reflection** 69:13
**refreshed** 80:10
**regard** 15:16
  16:13 28:1
  32:6 34:13

  52:15 62:21
  84:9 88:3,7
  95:18 120:13
  125:19 126:17
  130:1 134:1
  145:9,11 146:5
  148:6 150:16
**regarding** 19:7
  31:23 32:18
  33:15 42:16
  43:14 109:2,5
  111:17 119:14
  170:4 171:4
**Regarding:FE...**
  160:5
**Regardless**
  109:11
**regards** 13:13
  27:15 131:17
**regular** 26:21
  29:20
**regulatory** 72:14
**Reidt** 12:14
  14:13 168:3,21
**relate** 100:14
  109:23 119:15
  120:7,10
**related** 33:9
  42:14 46:3
  49:8 55:2,8,13
  56:13 67:16
  118:17 119:16
  124:5 167:13
**relates** 71:25
  72:3 73:6
**relating** 42:4
**relation** 33:10
  84:12 85:18
**relationship**
  46:5 89:7,12
  89:14,18,23
  90:4,9 91:24
  91:25 93:1,8
  96:4 110:12
  144:23 145:25
  146:2 150:21
  153:17,19
  154:7
**relationships**

  88:3 89:3,6
  146:12 152:15
**relative** 21:7
  118:9,21 143:9
  144:25
**relatively** 134:19
**relayed** 44:24
**release** 35:18
  39:22 40:6,15
  40:21 41:2,21
  139:14
**released** 39:13
  39:20 40:13
  41:9 51:19
  52:23,23
**releases** 39:23
  41:21 42:2
  54:1
**releasing** 38:1
**relevance** 110:6
**relevant** 44:15
  44:16 67:14,19
  143:21
**reliance** 17:5,9
  18:21 19:6,11
  19:12 37:4
  142:4
**remember** 27:18
  32:20 35:4,8
  35:20,22 38:2
  39:15,17,18,25
  40:20 42:3
  46:22 50:8,13
  50:20,21,24
  51:3 72:22
  93:18,21 94:8
  105:21 114:8
  137:20 139:22
  148:10,20
**REMEMBER...**
  12:12
**remembering**
  34:6
**remove** 116:7
**removed** 115:23
  116:13,18
**rendered** 135:14
**rendering** 44:24
**repeat** 101:10

Bruce Kelman PhD

December 15, 2009

**rephrase** 115:15
128:25
**replication** 90:7
90:19,22 91:25
**report** 16:1
17:24 18:4,10
20:14,17,20,22
23:20,22 29:12
36:23 41:13
47:14 55:17,19
56:4 68:19
69:23 71:21
74:9,10 75:6,9
78:8 79:14
80:7 81:8,17
82:15 83:8
84:2,8,21,25
85:16 86:14,19
86:23 94:4
95:2 96:12
98:12 99:14
102:3,10
103:14 104:21
105:5,7,11,17
106:1 107:1,18
108:19 109:17
110:10 111:21
112:10 114:6,8
114:16,18,21
116:22 117:1
117:14,22,23
118:15 119:3
120:16 121:2,3
121:24 124:6,9
125:18 127:5
127:25 130:18
131:1,10,21,23
133:12,20,25
135:4,7 136:6
136:7,9 137:8
137:18 138:20
144:24 145:13
145:20 147:18
149:13,16
151:7,9,14,20
152:22 153:11
154:2
**reported** 12:17
77:14,17

106:15 107:3
130:7 168:7
**reporter** 12:15
28:22 101:9
158:24,25
**reporting** 7:5
12:18 13:11
57:14 107:9
167:4,8
**reports** 37:5,8
37:20 41:25
77:21 85:3
112:17,21
113:3,4,12,15
113:17,20
114:1 117:5
130:1,4 131:4
131:12
**represent** 13:19
71:3 114:18
156:19
**representing**
15:7 38:7
**represents** 71:5
**reproductive**
27:13
**request** 55:1
70:16 127:25
**requested** 64:9
**requests** 16:15
16:19
**required** 24:8
86:19 169:7
**requires** 153:17
**Reread** 101:11
**research** 27:10
27:11,12,22
28:12,17 29:3
37:15 51:6
53:25 90:8,21
**researching**
27:25
**reserve** 158:14
158:18
**reserved** 159:12
**residential** 34:9
34:11,19,20
35:6,15,16,17
35:25 36:9

76:17 77:5,9
155:12
**resolved** 46:23
47:1 49:25
50:2
**respect** 133:24
**respiratory**
106:12
**response** 81:7
90:4 95:16
104:14,18
105:23 110:21
145:16 146:13
152:14 153:17
**Responsiveness**
42:20
**restate** 15:5 79:2
**result** 28:6 77:15
104:24
**results** 67:8,13
69:4 130:9
**retained** 15:14
39:5 51:8 55:9
113:13,17
114:20
**retards** 44:3
**return** 69:20
**returning** 156:6
**revealing** 128:22
**review** 15:23
20:12 52:7
53:15 63:12
73:12 158:1
**reviewed** 37:5
55:19 62:15
63:10,13 64:22
69:21,22,25
70:1 73:16,17
117:8
**reviewing** 64:12
**Richard** 5:3
46:16 63:15
64:25 169:20
**RIDDLE** 5:4
**right** 16:16
17:22 20:12,18
22:15 23:20
24:14 25:5,16
26:19 29:21

31:1,11 32:12
32:15,22 35:15
37:6 40:21
41:7 44:8 45:2
46:7 47:7,8
48:22 49:19,23
53:5 59:7
61:18 62:3,10
63:9,25 64:12
64:14,21,22
65:16,20 66:14
67:2 69:9,22
70:5,8,11,13
70:22 71:1,2,8
72:12 73:19,23
74:2,21 75:3
77:3 78:9,12
82:5 83:15
86:24 87:3
88:4,7 89:4,9
89:25 90:4,20
91:4,8,20 92:1
92:15 97:1
98:2,20 100:7
100:12 104:2
104:18 106:20
107:19 111:8
111:24 112:3,7
112:20 113:5
113:14,21
114:2 116:13
117:18,19
118:20 121:23
124:18 126:4,9
126:23 127:4
131:15 132:19
132:23 134:4,9
138:7 139:2
141:6 142:12
142:15 148:6
150:1 151:2,8
152:16 153:2
154:9
**risk** 22:12
**Rite** 63:15 65:2
**River** 3:13 11:10
14:3,4 113:20
121:11 122:1,8
129:4 155:14

158:14
**Roach** 6:3
169:22
**Road** 2:6
**Robbins** 56:4,6
56:12,15,19,23
114:5 124:2
**robust** 140:17
**role** 81:24 95:12
97:13 98:7,16
99:2,10,20
102:25 103:3
**room** 140:21
**Rouge** 5:6
**roughly** 75:4,5
**route** 139:19,23
139:25 140:2
140:12 141:9
141:10,20
**routes** 140:14
141:13
**routinely** 22:14
**RSherburne@...**
5:9
**rule** 85:9,21 86:2
86:15 114:11
114:13
**ruled** 119:3,4
**rules** 12:12 43:2
168:4
**ruling** 118:16
**Rumi** 32:14
**running** 117:7
**RV** 6:2

_____
**S**

**safe** 22:19 23:3
147:5
**salary** 24:4
**samples** 43:21
43:24,25
**Sarah** 32:14
48:2 54:13,22
**Saratoxin** 72:10
72:10,13
**satisfied** 127:2
134:8
**satisfy** 129:6
**save** 171:12

Bruce Kelman PhD

December 15, 2009

**saw** 19:21 37:4
74:2 78:7 98:5
**saying** 34:21
36:12 107:10
108:9 110:8
111:1 116:4
153:4
**says** 50:14
121:23 156:8
156:14 157:2,3
**scaling** 106:6
**schedule** 11:10
23:23,24
155:14,24
**school** 100:11
**science** 38:22
**scientific** 79:10
82:12 90:8
96:8 99:23
100:13 105:2
140:18
**scientist** 87:22
**scope** 29:11
36:22,23 49:11
79:13,14 80:6
80:7 82:16
83:7 84:1,20
85:15 94:3
95:1 96:2,12
96:19 98:12
99:13 100:2
103:13 104:20
105:4,16 124:8
124:21 127:24
129:9 131:1,10
133:12 135:6
137:17 138:19
146:7,8,20
148:16 152:21
153:10 154:1
160:21 161:2
162:10,11,12
162:15,16,18
162:19,25
163:6 164:23
165:3,14,16
166:2,12,13
**search** 51:16
140:14 141:10

**searching**
141:12
**Seattle** 12:18,19
13:12 167:9
**second** 17:20
92:9,23,24
126:1 127:13
132:8 141:8
**secondly** 130:25
**section** 1:5
114:20 116:21
117:3 138:12
146:22,25
153:5 154:8
**sections** 37:23
**see** 19:15 24:24
27:4 47:14
52:10 55:22
61:13 68:19
69:2 73:13
80:12,13,15,23
80:25 81:7
84:6 90:25
95:7 101:24
109:8 121:10
125:12 132:10
136:16 137:13
137:14 139:23
141:8 149:3
156:2,7,9,16
**seeing** 114:8
137:20
**seen** 37:8,12
84:17 105:10
117:6
**selected** 65:20
65:24
**send** 169:12
**sensation** 97:14
**sense** 56:9 90:13
**sent** 15:21
119:12 142:5
**sentence** 132:9
145:24
**separate** 19:19
64:3 65:3
74:16
**separately** 66:22
**September** 46:7

47:6,19,22
59:17,20
**sequence** 70:17
**series** 28:2 58:10
66:25
**services** 157:8
**set** 17:4 24:6
43:23 54:3
66:8 86:14
109:17 113:1
135:4 168:5,14
**sets** 20:25 65:1,3
**setting** 35:6,15
35:16,17,25
36:1,9
**settings** 33:19
34:10,11,20,20
77:9
**seven** 17:2 30:15
49:23 91:14
**shape** 153:20
**Shaw** 4:2 13:23
13:25 121:12
121:14 158:16
**sheet** 144:5,6
169:8,9,12
170:1,7,9
**sheeting** 136:13
**Shell** 3:17
**Sherburne** 5:3
169:20
**short** 93:15 96:4
**shorten** 118:12
**Shorthand**
12:15
**shortness** 106:10
**show** 16:6 17:8
18:3 20:1,10
58:22 59:18
61:1 65:6
75:10 126:2
127:14 131:25
132:13 142:20
143:3 144:7
154:14 155:7
155:17 156:2
**showing** 18:17
19:3 81:1 91:2
170:7

**shown** 40:21
88:20 92:8,12
128:18
**shows** 125:12
**sic** 70:7
**Sid** 7:3 13:7
160:7 167:3,17
**side** 16:24 77:19
89:8 90:9
113:10,15
**sides** 113:3,5
**Sign** 169:8 170:9
**Signature**
159:12 169:6
170:24
**Signed** 168:20
171:15
**significance**
65:24 66:21
67:12
**significant** 39:19
40:4
**significantly**
105:22
**signs** 80:13,15
**silly** 42:7
**similar** 72:9
90:8 140:23
**Simone** 32:8,14
**simple** 40:14
**simplest** 89:20
**single** 91:10
**sinuses** 106:5
**sir** 14:20 20:4,10
20:15 42:23
43:4 56:1 58:4
61:14 66:9
87:22 119:9
132:6 143:25
158:11,19
**sit** 86:20 93:18
131:15
**site** 140:11
**situation** 129:12
140:10
**situations** 34:19
**six** 30:15
**skin** 84:8,12,19
84:25 85:1,4,4

85:9,22 106:5
**Skipping** 152:25
**slight** 139:12
**slightly** 91:12
**small** 39:22 41:9
**smell** 155:10
**sneezing** 106:10
109:7,15
110:11 111:21
112:6
**Snell** 46:18
**somebody** 68:7
70:15 89:7
115:21 122:24
136:3 154:8
**sorry** 28:19
36:11 69:13,15
78:23 83:16
**sound** 31:9
63:25 75:3
**sounds** 31:10
110:7
**source** 35:9
**sources** 73:15
**south** 50:21
**span** 27:5
**speaking** 38:25
63:6 69:15
129:18
**specific** 19:19
27:19 33:5
34:6 35:22
69:19 72:6
79:19 81:15
93:19 123:13
126:13 143:11
149:8,12
154:20
**specifically**
27:18 34:4
39:17 64:9
81:14 84:4
93:14 117:23
119:23 133:16
137:19 142:9
**Spector** 63:15
64:5 65:1
73:19
**spectrum** 71:4

Bruce Kelman PhD

December 15, 2009

**speculation**
  140:5
**spend** 120:14
  125:9
**spending** 118:25
**spent** 61:21
  141:14
**spore** 9:14 17:15
  18:24 19:7
  70:18 73:8
  109:24 110:3
  139:13 140:20
**spores** 73:7
  110:4 140:1,3
  146:24
**spp** 9:15 17:18
  18:24
**spreadsheet**
  70:19
**Spurgeon** 17:21
**sputum** 106:5
**Square** 3:17
**St** 4:6
**Stachybotrys**
  9:15 17:16,17
  17:18 18:24
**staff** 55:22 56:6
  62:20,23 63:1
  63:3 68:8,10
  68:18 70:15,18
  142:22 143:6
**staining** 136:13
  136:21,22,24
**Standing** 158:25
**standpoint**
  29:17 100:13
  100:15
**Starcraft** 6:2
**start** 32:10 53:10
  74:5 77:6
  80:15 82:7
  95:6 98:4
  115:20
**started** 32:24
  53:12 118:8
**starting** 33:2
**starts** 121:8
**state** 12:15 13:19
  14:20 50:15

150:12
**statement** 13:6
  52:9 105:7
**statements**
  44:20
**states** 1:1 3:2
  4:14,16 13:14
  14:6,8 15:11
  15:15 28:1
  56:3 113:18
  115:7 116:22
  130:6,22 131:7
  136:12 138:12
**Station** 4:17
**statistical** 51:25
**statistically** 52:5
**stenotype** 168:7
**step** 92:24
  134:18,18
**steps** 88:18,19
  92:19,21
  125:19 126:16
  134:3
**stick** 86:22
**stipulation**
  118:9,12
**stirred** 109:6
**stop** 111:10
**stopped** 42:8
**stopping** 87:4
**Street** 2:15 3:18
  5:5,16 6:16
  12:18 13:12
  167:8
**strengthen**
  91:18
**strictly** 49:15
**strike** 42:9,18
**structural**
  138:22
**structurally**
  139:16
**studied** 37:2
**studies** 27:13,14
  27:14,15,19
  44:21,25 45:9
  90:8,23,25
  91:1 92:11
  94:21 126:2

127:14
**study** 22:18,18
  51:22,23,23,24
  51:25 52:1,3,4
  52:5 81:14
  101:18 146:2
**subcontractor**
  121:12,13
**subject** 121:10
**subsequent**
  145:21
**substances**
  147:7
**substantially**
  139:17
**suburb** 51:2
**suffer** 75:20 89:8
**suffered** 49:6
  77:18,25
  107:11
**Suffice** 130:21
**sufficient** 23:1,5
  23:8,10,12,13
  23:15,19 44:5
  45:5 68:17
  77:20 79:16
  84:22 94:16
  95:3 100:3,16
  100:22 103:15
  105:12,13
  111:4,12
  112:11 124:24
  125:2 126:7,7
**sufficiently**
  112:4
**Suite** 4:6 5:5 6:5
  6:16 12:18
  13:12 167:8
**summarized**
  68:11
**summarizes**
  153:4
**summary** 10:16
  64:13,18 65:8
  65:10,11,13,16
  65:19,25 66:4
  66:12 68:5,7
  68:12
**summary-type**

75:7
**supplement**
  86:19
**supplied** 155:24
**support** 39:21
**supported**
  102:21
**supposed** 42:23
**sure** 31:12 54:23
  57:10 58:13
  83:20 96:5
  159:4
**surface** 139:11
**suspect** 110:23
  156:24 157:19
**swear** 14:13
**swelling** 106:4,6
**sworn** 14:15
  31:10,25 32:3
**symptomology**
  109:8 110:5
  111:13,15,20
  122:16,19
  148:25
**symptoms**
  107:11

──────────
        **T**
──────────
**T** 3:3
**tab** 65:23
**take** 43:1 57:9
  57:10 63:9
  65:15 75:11
  87:11 108:18
  117:18,19
  119:2 120:16
  138:10 157:22
  158:1,3
**taken** 1:12 12:8
  12:14 14:12
  59:5 109:25
  125:6 130:14
  131:3 158:23
  167:7
**takes** 71:23
**talk** 22:11 42:24
**talked** 141:21
**talking** 17:1
  25:13 31:6,7

33:23 35:15
  36:12 43:24,25
  50:15 68:4,20
  69:14 80:24
  81:19 90:22
  92:2 97:25
  98:19 105:19
  111:16 125:2
  127:20 128:8,9
  129:16 133:16
  141:2 145:22
  146:24 148:22
  149:4 150:24
**tape** 87:12
  160:10 161:1
  162:1 163:1
  164:1 165:1
  166:1
**tapes** 87:10
**tape(s)** 167:9
**teaching** 21:19
  22:5
**teachings** 21:3
**tearing** 81:18,19
  82:10,14,23
  83:4,22,25
  93:9,12,16,19
  94:2,13,23
  97:14 98:8
  106:4
**telephone** 5:3,14
  6:3,14
**tell** 35:4 39:13
  42:15 43:4,13
  48:2 51:11,13
  53:11 63:3
  64:7 66:21
  67:12 74:9
  101:19 108:20
  119:22 154:17
**telling** 21:17
  40:6 41:20
  53:3 130:21,24
**temporal** 89:3,6
  89:18,23 91:24
  93:1,8
**temporality**
  92:15
**tend** 77:21 81:6

Bruce Kelman PhD

December 15, 2009

131:12
**tended** 38:14
**tenet** 23:13
**tens** 110:3
**term** 37:9 71:2
93:15 110:16
135:23 147:14
150:21
**terms** 125:12
128:3
**test** 67:7,13 69:1
69:4
**testified** 14:16
24:12,20 25:4
25:23 26:12
33:1 47:4
62:23 83:21
137:6 138:25
148:5
**testify** 25:3
**testifying** 24:11
29:20 32:24
**testimonies** 24:7
25:10
**testimony** 24:6
24:18,23 25:8
25:14,19,24
26:1 29:21,24
30:24,25 31:3
31:10,18,25
32:3,5,24 33:9
34:8,13,24
35:4 38:8
43:12 45:14,22
46:1 47:7,9,22
47:22,23 48:1
48:4,10 49:22
50:4,5,5,6,10
50:18 53:5,8
53:13 54:4
55:13 70:1
80:18 83:9
117:9 119:3
133:11 138:13
138:18 148:8
148:16 168:7
168:11 170:7
**testing** 41:4,5,6
67:17 68:2

69:19 128:24
141:12
**tests** 69:2 106:13
125:3 128:21
129:3 130:22
131:7 141:18
**Texas** 9:17 17:19
18:25 19:8
142:15
**Thank** 55:12
158:19,20
**theory** 39:19
42:7 52:21
53:23
**thereof** 168:12
**thereto** 167:11
**thing** 34:4 36:19
49:8 51:14
90:2,23 91:3
**things** 27:25
28:6 44:2
54:10 55:5
87:5 88:2,6
**think** 26:4 29:16
30:14 34:11,16
34:17 35:16
39:15 40:20
45:6 47:25,25
51:1 63:8,18
67:21 68:16
73:20 75:9
78:11 80:25
82:2 108:20
109:14 110:10
111:19 112:4,9
112:10,21
117:16,16
118:11,20
120:10 123:17
123:17 129:10
144:2 148:25
156:21
**thinking** 125:9
**third** 19:10 59:5
69:5 92:13
126:6 134:18
**Thom** 14:9,9,11
63:17
**Thornton** 32:7,9

32:11 42:12
43:10 45:21
47:19,24 55:13
**thought** 36:11
37:1 94:17
**three** 30:9,11
31:15 46:6,24
55:14 66:25
67:5,24 68:21
68:23 78:3
156:3
**threshold**
147:15 148:2
148:12,23
149:6,9,15,19
151:1,4,5,7,12
153:19
**Thresholds**
149:9
**thrive** 137:12,16
138:5
**throat** 101:25
102:11,16,25
103:3,10
106:11 133:2
**Tia** 12:14 14:13
168:3,21
**tightness** 106:10
**time** 23:25 24:12
26:12,12,16
27:4,5,8 30:3
30:15 33:10,22
33:24 35:11,12
35:13,23 47:11
48:1 52:20
55:19 57:9,15
57:19 61:21,24
62:5,8 65:22
67:15 69:14
73:1,22 74:4,6
87:14,20 89:12
100:8,16
113:22 118:3,7
118:25 120:14
121:8,13,24
124:24 125:6,9
126:8,12
128:19,22
132:17 138:16

150:18 153:19
154:7,9 158:4
158:8,15,18
159:8 160:10
161:1 162:1
163:1 164:1
165:1 166:1
168:5,6
**timeline** 10:22
74:11,15
142:17,22
143:8,20
**times** 25:5,14,15
25:18,25 26:8
30:22 31:3,13
31:14,15,18
47:21 153:19
154:6
**timing** 92:15,15
93:6 130:19
**tingling** 106:6
**tissue** 43:25 44:8
**tissues** 44:3
**today** 16:4,13,16
16:21 19:20
30:1 61:23
70:5 86:20
93:18 142:2
148:5 150:24
**told** 15:21 47:23
62:9 115:7,11
118:25 119:19
119:20,23,25
120:2,4
**topic** 58:8
**Torts** 3:5
**total** 24:19 30:21
58:20 59:9,13
59:22 60:8,19
61:5 62:2
156:21
**town** 50:22
**toxic** 45:10
146:2 147:2,6
149:23 150:13
153:2 155:12
**toxicity** 151:25
152:10
**toxicological**

94:20 126:1
127:13
**toxicologist** 15:1
22:15 24:17
27:9 45:9
56:15,25 57:2
75:18 76:10
77:3,7,12,16
77:23 78:2,14
88:3,17 90:14
100:7 122:23
124:18 135:13
**toxicologists**
90:2,7
**toxicology** 11:2
21:7 22:6,17
22:18,21 23:3
23:13 56:18
57:5 81:9,12
87:25 100:17
134:23 144:10
144:13,14,22
144:23 145:16
145:18,20
146:1 147:15
**toxins** 135:14
**traces** 115:22
**track** 113:23
**tract** 106:12
**trailer** 1:3 11:9
13:13 34:23
40:24 71:5,7
71:12,12,17
72:24 73:14,23
74:7,14,20
78:19 79:4
81:24 84:13
85:2,7,11 93:2
93:10,16,20
95:11,15 99:1
99:20 102:1,9
102:17,24
104:1,6 107:3
107:6,10,12,24
109:12,16
111:5,18 112:3
112:5,11
114:23 115:9
115:14,21

Bruce Kelman PhD                                    December 15, 2009

Page 194

116:11 121:10
121:10,10,10
121:25 122:4,9
125:4,7 127:20
127:22 128:11
128:23 129:5
129:17 135:17
135:20 137:11
137:22 138:4
138:13 139:10
139:23,24
140:4,15,15,25
141:1,3,22
155:13 160:5
169:4 170:4
171:4
**trailers** 34:20,21
34:21 35:1
129:20 130:3,7
130:23 131:8
131:18
**trained** 68:14
**training** 20:25
21:6 124:17,23
**transcript**
158:23 168:9
169:6
**trapped** 137:10
137:16,23
138:4 141:2
**trapping** 141:21
**travel** 34:21 35:1
40:24 72:24
73:14,23 74:7
78:19 79:4
81:24 84:13
85:2,7,11 93:2
93:10,20 95:11
99:1,19 102:1
102:16,24
104:1,6 107:23
109:12,16
111:5,18
114:23 115:9
121:25 122:4
125:4 128:11
128:23 130:3,7
130:23 131:8
131:18 135:17

135:20 140:25
**Travis** 6:5
**treat** 48:16
**treatment** 48:19
49:18
**trial** 26:1 29:25
31:9,18 47:2,4
47:9,22,23
48:1 50:5,6,10
86:11,16 88:24
158:18
**trials** 88:24
**tried** 87:8 136:3
**trouble** 76:19
**true** 39:9 45:6
49:9 64:11
125:24 146:5
146:16,18,21
147:8,10,20,22
148:10 150:5,7
152:6,8,18,20
152:23 153:7,9
153:13,23,25
154:3 168:10
171:9,11
**truly** 90:25
**trying** 30:21
40:12
**Tuesday** 1:12
12:9 13:2
**turn** 20:14 102:3
120:18
**turned** 39:20
41:15 44:14
**two** 17:11 24:23
25:3 30:9,11
31:8 34:19
59:1 65:1 75:3
80:23 90:10,24
92:18 122:25
133:14,18
140:22 142:6
156:3
**TX** 2:7 6:6
**type** 30:22 33:19
35:1,6 41:2
42:1 44:12
51:22 56:11
69:3 72:6,9

77:4 78:15
89:16 90:9
134:13 141:18
**types** 73:13,21
75:19 76:10,15
77:8,12 116:7
122:25

———————
**U**
**ubiquitous**
128:5
**unable** 138:14
**unaware** 116:8
**underneath**
137:20 140:3
140:15 141:1
156:14 157:2
**undersigned**
167:3
**understand** 15:7
15:12 40:12
62:22 76:1
86:24 87:7
97:3 117:8,10
128:14 143:16
144:4
**understanding**
29:6 74:6,19
102:15,18
115:5 121:15
122:2,6,11,15
138:17 146:1
153:17
**understood**
123:21
**Union** 12:18
13:12 167:8
**unit** 35:2 155:25
**United** 1:1 3:2
4:14,16 13:14
14:5,7 15:11
15:15 28:1
113:18 115:7
130:6,22 131:7
**universal** 96:3
**unusual** 122:23
123:3 135:21
135:24
**upper** 71:24

106:12
**use** 22:19 23:3
38:23 91:12
92:9 119:13
131:13 135:23
159:5
**useful** 74:12
88:10,12
**usually** 110:19

———————
**V**
**vague** 21:8 26:10
30:17 33:22
40:8,16 53:6
84:21 97:22
108:25 113:10
113:22 114:3
130:25 131:9
135:22 136:19
145:2 160:17
160:18,22,23
161:6,7,14
163:11 164:5
164:11,12
165:5,6,12,13
165:25
**vaguely** 35:8
**various** 20:17
37:8
**verdict** 47:3 50:3
**Veritox** 9:21,24
10:1,4,7,10,13
14:11 24:4
56:10 57:20,22
57:24 58:1
60:1,12,23
**versus** 32:7,8,14
42:12 43:10
45:21 114:4
122:8
**vicinity** 136:14
**video** 13:6 87:12
**videographer**
7:4 13:5,6
14:12 57:15,18
87:12,17 118:3
118:6 158:4,7
158:21 159:8
160:7 167:1,3

167:18
**videotape** 87:18
158:21 160:1
**videotaped** 9:4
13:8 16:8
167:5
**virtute** 25:15
**vitae** 20:23 21:6
**volatile** 11:6
155:3,11
**volume** 64:17
**volumes** 17:2

———————
**W**
**WA** 167:9
**wait** 117:1,3
127:6 133:7
**waking** 106:7
**Walgreens**
63:15 65:2
**wall** 9:12 17:21
18:14,19
140:18,19,23
142:8,12
**walls** 142:2
**want** 37:9 38:23
49:16 54:17,19
55:7 58:13
108:18 114:21
117:13 135:13
138:10 148:20
**wanted** 119:20
120:3,5
**wants** 87:2
**Ward** 32:7,14
48:2 54:13,22
**Washington** 3:7
4:19 12:12,16
12:19,19 13:12
**wasn't** 72:24
83:16 86:12
89:10 97:6
**water** 9:16 17:18
18:25 19:7
136:13,15
137:6,9,12,15
137:24 138:4
138:25 139:7
141:2,21

Bruce Kelman PhD                                    December 15, 2009

| | | | | |
|---|---|---|---|---|
| **way** 26:1,22 30:7 | 26:11 28:19 | 136:20 137:19 | 130:15,16 | **wrote** 147:17 |
| 30:18 31:6,13 | 29:6,16 30:18 | 138:7,21 139:4 | 131:20 135:9 | 150:1 152:2 |
| 31:20 41:4 | 33:23 36:4,11 | 140:7 141:24 | 135:13 138:23 | **Y** |
| 64:7 73:5 76:3 | 37:1,15,19 | 143:23 144:14 | 139:6 148:25 | |
| 76:24 107:18 | 38:20 39:5 | 145:3 146:9,21 | 155:1 | **Yeah** 117:24 |
| 108:10 110:17 | 40:9,19 45:14 | 148:9 150:18 | **Wright** 10:17,20 | 156:13 |
| 110:18 111:11 | 48:8,25 50:20 | 152:12,23 | 13:22 15:8 | **year** 25:19,25 |
| 112:8 116:2,10 | 53:7,15 56:22 | 153:13 154:3 | 40:23 62:12 | 26:8 31:8 |
| 131:20 140:8 | 61:15 62:5,16 | 155:22,23 | 63:11,13 66:23 | 71:14 |
| 140:25 144:1 | 63:16,18 64:17 | 156:24 157:14 | 71:12,17 72:24 | **years** 22:22 24:9 |
| **week** 156:2,3,3 | 66:5,24 69:6 | 158:13,20 | 73:13 78:8,12 | 24:14,16,21 |
| **weeks** 47:12 | 69:24 72:18 | 168:4,14 | 81:17,23 82:9 | 25:5,9,16,22 |
| 55:14 | 74:18 75:13 | **witnesses** 133:11 | 84:9,13 85:1,6 | 25:24 26:8,24 |
| **weighing** 92:22 | 79:7,16,25 | **wood** 36:20 | 86:8 93:1 | 29:24 30:6,8,9 |
| **weighted** 126:21 | 80:10,18,22 | 37:11 128:11 | 94:11,18 95:8 | 30:15,25 31:2 |
| **well-known** | 81:11 82:20,25 | 136:15 | 95:19 97:13,21 | 31:4,5,14,15 |
| 100:17 | 83:7,16 84:3 | **word** 139:20 | 98:1,6,17,25 | 38:3 41:17 |
| **went** 51:15 | 84:15,22 85:17 | 160:10 161:1 | 99:11,19 | 51:12 54:4,7 |
| 52:11,22 70:19 | 85:25 86:4,14 | 162:1 163:1 | 101:25 103:25 | 54:10 75:4 |
| 116:8 134:17 | 93:5,12 94:4,6 | 164:1 165:1 | 106:2,16,23 | 100:9 103:18 |
| **weren't** 148:22 | 94:16 95:3,14 | 166:1 | 107:22 109:18 | **yellow** 65:19 |
| **we'll** 42:24 66:7 | 95:21 96:3,13 | **work** 38:14,15 | 110:13 111:3 | **$** |
| 69:20 74:15,17 | 96:20 97:6,18 | 53:4,11 58:18 | 111:13 112:12 | **$11,864.89** 59:10 |
| 82:19 117:21 | 97:23 98:13,19 | 61:17 75:18 | 113:13 115:16 | **$125,000** 157:3,6 |
| 158:2,17 | 99:5,15 100:3 | 76:9 77:3,7,11 | 121:9,10,25 | 157:10 |
| **we're** 29:12 30:1 | 100:22 101:10 | 77:16,23 78:2 | 122:4,7,9,16 | **$2,103.45** 59:13 |
| 31:5 33:23 | 101:12,18 | 78:14 95:11,19 | 126:17 127:3 | **$2,267.75** 60:9 |
| 36:12 88:23 | 102:2,4 103:7 | 97:13 98:7,19 | 128:3 133:17 | **$29,062.48** 60:20 |
| 90:10 92:2 | 103:15,23 | 98:21 99:1,10 | 133:20,25 | **$3,680.14** 59:23 |
| 97:25 98:19 | 104:12,22 | 103:3 104:9 | 135:10,17 | **$31,856** 58:21 |
| 105:19 110:23 | 105:6,19 107:1 | 108:3,22 109:5 | 143:9,13,21 | **$425** 23:25 61:24 |
| 117:22 127:20 | 107:2,9 108:6 | 109:12,16 | 144:4,19,25 | **$55,672** 156:18 |
| 141:2 145:21 | 108:24,24 | 110:24 111:5 | 145:8,11 | **$6,686** 61:6 |
| **we've** 111:14 | 109:6,20 | 111:18 158:10 | **Wright's** 78:18 | |
| **WHEATON** | 110:16 112:1 | **worked** 33:24 | 79:3 132:22 | **#** |
| 6:15 | 112:14 113:8 | 34:1 63:4 | 133:1 135:3 | **#2798** 12:14 |
| **wheels** 34:23 | 113:23 114:5 | **working** 97:21 | 137:4 138:12 | **0** |
| **wheezing** 106:10 | 115:5,11,25 | 98:1 113:24 | **write** 132:12 | |
| **Whitfield** 4:4 | 116:7,16 | 124:2 | 137:8 145:24 | **0001** 157:3 |
| 13:23,23 | 118:14 120:19 | **workplace** | 146:11 147:2 | **03** 168:20 |
| 104:11 108:5 | 121:18 122:15 | 108:15 109:2 | 147:14 149:22 | **06** 74:14 |
| **Williams** 87:9 | 123:3,10 | 112:1 | 151:24 152:14 | **07-1873** 156:15 |
| **WILLINGHA...** | 124:10,20 | **world** 133:17 | 152:25 153:16 | **07-31-2009** |
| 6:4 | 127:24 128:1 | **worse** 138:16 | 153:21 170:8 | 10:14 |
| **Wilmer** 46:18 | 128:16 129:10 | **worsening** 106:8 | **writing** 27:13 | **08** 74:14 |
| **withdraw** 21:12 | 130:12 131:1,2 | **wouldn't** 38:5 | **written** 51:8 | **08-15-2009** |
| **witness** 14:13 | 131:11,20 | 40:2 52:8 75:8 | 154:23 | 10:11 |
| 18:5,8 19:16 | 133:14 134:12 | 80:13 90:13 | **wrong** 94:6 | **08-31-2009** 10:8 |
| 20:11 24:17 | 135:7,9,23 | 93:3 98:21 | 139:20 | |

Bruce Kelman PhD

December 15, 2009

| | | | | |
|---|---|---|---|---|
| **09-18-2009** 10:5 | **1:55:40** 165:16 | **11:11:24** 162:10 | **12/15/09** 170:3 | 143:21 165:21 |
| | **1:56:13** 165:17 | **11:11:52** 162:11 | 171:3 | **15th** 13:9 55:25 |
| **1** | **1:57:56** 165:18 | **11:12:10** 162:12 | **12/15/2009** | 58:17 60:11,17 |
| **1** 9:4 16:7,10 | **1:59:30** 165:19 | **11:12:45** 162:13 | 160:4 167:17 | 61:11,16 |
| 32:11 42:12 | **10** 10:7 25:7,18 | **11:14:41** 162:14 | **12:00:14** 163:19 | **154** 11:4 |
| 87:13 120:18 | 25:25 31:5 | **11:15:13** 162:15 | **12:00:30** 163:20 | **155** 11:6,9 |
| 120:24 121:11 | 60:2,5 65:24 | **11:15:36** 162:16 | **12:00:43** 163:21 | **16** 9:4 10:24 |
| 132:1 160:11 | 75:7,15,16,17 | **11:15:54** 162:17 | **12:02:15** 163:22 | 143:1,4 144:3 |
| 160:12,12,13 | 102:3,10,13 | **11:16:36** 162:18 | **12:02:50** 163:23 | 165:22 |
| 160:14,15,16 | 106:1 107:19 | **11:17:39** 162:19 | **12:03:21** 163:24 | **16th** 67:6 |
| 160:17,18,19 | 108:19 109:17 | **11:18:29** 162:20 | **12:05:28** 163:25 | **1608** 6:5 |
| 160:20,21,22 | 110:10 111:20 | **11:18:55** 162:21 | **12:05:49** 164:2 | **1624** 12:18 13:12 |
| 160:23,24,25 | 112:10 124:5 | **11:20** 87:14 | **12:06:42** 164:3 | 167:8 |
| 161:2,3,4,5,6,7 | 135:4 161:24 | **11:20:30** 162:22 | **12:07:55** 164:4 | **17** 9:8 11:1 |
| 161:8,9,10,11 | **10th** 61:18,21 | **11:37** 87:20 | **12:08:02** 164:5 | 29:23 144:8,10 |
| 161:12,13,14 | **10-02-2009** 10:2 | **11:37:16** 162:23 | **12:09:33** 164:6 | 144:12 165:24 |
| 161:15,16,17 | **10-31-2009** 9:25 | **11:45:50** 162:24 | **12:10:46** 164:7 | **18** 9:11,14 11:4 |
| 161:18,19,20 | **10/2/09** 57:25 | **11:47:27** 162:25 | **12:11:42** 164:8 | 154:12,15,23 |
| 161:21,22,23 | **10/31/09** 57:23 | **11:48:01** 163:2 | **12:13:04** 164:9 | 166:14 |
| 161:24,25 | **10:03:33** 161:11 | **11:48:36** 163:3 | **12:14:00** 164:10 | **18th** 59:17,20 |
| 162:2,3,4,5,6,7 | **10:08:02** 161:12 | **11:49:30** 163:4 | **12:14:42** 164:11 | **1873** 1:5 13:16 |
| 162:8,9,10,11 | **10:14:38** 161:13 | **11:50:07** 163:5 | **12:14:59** 164:12 | **19** 9:19 11:6 |
| 162:12,13,14 | **10:14:54** 161:14 | **11:50:21** 163:6 | **12:16:35** 164:13 | 29:24 155:4,8 |
| 162:15,16,17 | **10:14:58** 161:15 | **11:50:58** 163:7 | **12:16:56** 164:14 | 166:15 |
| 162:18,19,20 | **10:15:14** 161:16 | **11:51:20** 163:8 | **12:17:29** 164:15 | **197** 24:13 |
| 162:21,22 | **10:20:25** 161:17 | **11:51:42** 163:9 | **12:17:49** 164:16 | **1976** 24:13 |
| **1-page** 19:23 | **10:21:23** 161:18 | **11:52:20** 163:10 | **12:18:14** 164:17 | **1978** 24:13 |
| **1:26** 118:7 | **10:28** 57:15 | **11:52:51** 163:11 | **12:19** 118:3 | **1979** 26:20 |
| **1:26:00** 164:19 | **10:32** 57:19 | **11:53:28** 163:12 | **12:19:40** 164:18 | **1989** 27:1 |
| **1:30:49** 164:20 | **10:32:20** 161:19 | **11:53:58** 163:13 | **13** 10:16 64:19 | **1990** 26:15,21 |
| **1:32:54** 164:21 | **10:33:54** 161:20 | **11:54:25** 163:14 | 65:7 66:3,11 | 29:19,23 30:3 |
| **1:33:12** 164:22 | **10:34:35** 161:21 | **11:54:49** 163:15 | 68:5 162:4 | 30:16 31:6 |
| **1:35:00** 164:23 | **10:35:35** 161:22 | **11:55:18** 163:16 | **13th** 58:19 67:7 | 32:25 33:2 |
| **1:35:43** 164:24 | **10:36:25** 161:23 | **11:56:17** 163:17 | **1331** 3:6 | **1992** 26:15 29:19 |
| **1:40:19** 164:25 | **10:36:56** 161:24 | **11:56:30** 163:18 | **14** 8:4 10:19 | 29:23 30:3,16 |
| **1:41:04** 165:2 | **10:37:33** 161:25 | **1100** 5:16 | 66:16,19,22 | 31:6 32:25 |
| **1:42:15** 165:3 | **10:38:09** 162:2 | **1101** 5:5 | 67:11,13,19,23 | 33:2 |
| **1:43:29** 165:4 | **10:39:51** 162:3 | **111238** 10:13 | 68:20 69:5 | |
| **1:44:15** 165:5 | **10:46:30** 162:4 | **111334** 10:10 | 162:5 | **2** |
| **1:44:44** 165:6 | **10:48:38** 162:5 | **111381** 10:7 | **142** 10:22 | **2** 9:8 17:25 18:3 |
| **1:45:15** 165:7 | **10:58:31** 162:6 | **111497** 10:4 | **143** 10:24 | 18:10 23:22 |
| **1:47:35** 165:8 | **11** 10:10 60:13 | **111546** 10:1 | **144** 11:1 | 30:23 69:23 |
| **1:47:43** 165:9 | 60:16 161:25 | **111684** 9:24 | **15** 1:12 10:22 | 71:22 87:19 |
| **1:48:44** 165:10 | **11-02-2009** 9:9 | **111812** 9:21 | 12:9,16 13:2 | 108:19 132:1 |
| **1:50:07** 165:11 | **11-15-2009** 9:22 | **11303-8** 169:1 | 31:4,5,14,15 | 132:15 158:22 |
| **1:51:17** 165:12 | **11/15/09** 57:21 | **12** 10:13 25:7,18 | 61:22 65:25 | 160:13 162:23 |
| **1:52:28** 165:13 | **11:06:22** 162:7 | 25:25 31:4 | 116:25 136:5,7 | 162:24,25 |
| **1:54:04** 165:14 | **11:10:46** 162:8 | 60:24 61:2 | 136:8,9 142:18 | 163:2,3,4,5,6,7 |
| **1:54:45** 165:15 | **11:11:00** 162:9 | 162:2 | 142:21 143:8 | 163:8,9,10,11 |

Bruce Kelman PhD

December 15, 2009

163:12,13,14
163:15,16,17
163:18,19,20
163:21,22,23
163:24,25
164:2,3,4,5,6,7
164:8,9,10,11
164:12,13,14
164:15,16,17
164:18,19,20
164:21,22,23
164:24,25
165:2,3,4,5,6,7
165:8,9,10,11
165:12,13,14
165:15,16,17
165:18,19,20
165:21,22,23
165:24,25
166:2,3,4,5,6,7
166:8,9,10,11
166:12,13,14
166:15,16,17
166:18,19,20
167:9
**2nd** 20:20 47:14
59:12
**2-page** 57:20,22
60:12 142:25
144:9 154:11
155:3,13
**2:00:20** 165:20
**2:01:25** 165:21
**2:01:45** 165:22
**2:02:41** 165:23
**2:03:22** 165:24
**2:04:20** 165:25
**2:06:56** 166:2
**2:07:18** 166:3
**2:08:02** 166:4
**2:08:25** 166:5
**2:08:41** 166:6
**2:09:02** 166:7
**2:11:08** 166:8
**2:11:34** 166:9
**2:13:02** 166:10
**2:13:34** 166:11
**2:14:26** 166:12
**2:15:01** 166:13

**2:15:40** 166:14
**2:16:21** 166:15
**2:16:56** 166:16
**2:19:27** 166:17
**2:20** 158:4
**2:20:21** 166:18
**2:26** 159:10
**2:27** 158:8 159:8
160:8
**2:27:00** 166:19
166:20
**20** 11:9 61:22
145:23,24
155:15,18
166:16
**200** 9:15 17:18
18:24 19:7
142:14
**20004** 3:7
**2003** 17:22
**20044** 4:19
**2005** 17:19 30:4
30:16 31:7
32:22 33:3,8
38:5
**2006** 74:20
**2007** 138:14
**2008** 74:20
**2009** 1:12 12:9
12:16 13:2,10
20:20 46:7
47:6,19,22
49:22 55:25
58:17 59:6,12
59:25 60:11
61:18,21 67:6
67:7 71:13
167:7 168:15
**201** 4:6
**2010** 168:20
169:1 171:16
**202** 3:8,9 4:20,21
**22nd** 32:22 33:2
33:8 38:5 46:7
47:6,19,22
168:15
**225** 5:7,8
**23** 131:23 132:5
132:5

**23rd** 47:11
**24th** 47:10
**244-2278** 2:9
**26** 86:15
**2775** 6:16
**28** 25:22 74:25
**29** 74:23,25

_____

**3**

**3** 9:11 18:15,17
80:11,14 81:13
84:5 101:19,20
132:2,16 149:1
160:14
**3-page** 66:15
**30** 22:22 65:16
100:10 103:18
**30-page** 64:18
**31** 24:14,16
25:24
**31st** 59:6,8,25
60:6,22 61:3
**310-9195** 6:19
**32** 24:14,16
25:24
**333-7600** 6:7
**333-7601** 6:8
**340** 4:18
**3600** 4:6
**361** 2:8,9
**3700** 5:17
**381-7700** 5:7
**381-7730** 5:8

_____

**4**

**4** 9:14 18:25
19:4 32:15
48:2 50:6
132:17 160:15
**4-page** 18:23
**40** 31:17
**45** 24:24 25:2,5
25:15 31:3,16
**450** 5:5
**4550** 2:6
**46** 30:25 31:16
**48th** 3:18

_____

**5**

**5** 1:5 9:19 19:24
20:2 145:18
160:16
**5th** 49:22
**5-page** 142:17
**504** 2:17 3:20,21
4:8,9 5:19,20
6:18,19
**525-7272** 2:17
**561-0400** 3:20
**561-1011** 3:21
**566-5216** 4:8
**568-1990** 6:18
**57** 9:21,24 10:1
**58** 10:4
**599-8016** 5:19
**599-8116** 5:20

_____

**6**

**6** 9:21 57:21
58:11,16 61:17
156:6 161:20
**60** 10:7,10,13
**601** 6:16 12:18
13:11 167:8
**616-4211** 4:20
**616-4223** 3:8
**616-4473** 4:21
**616-4989** 3:9
**622** 2:15
**636-3916** 4:9
**64** 10:16
**65-page** 17:24
**66** 10:19

_____

**7**

**7** 9:24 57:23
58:11,23 59:5
59:7 120:22,25
161:21
**7th** 71:13 156:4
156:5
**7-page** 16:8
**7/22/09** 157:2
**7/31/09** 60:24
**70** 31:17
**701** 3:18
**70113** 2:16
**70130** 6:17

**70139** 3:19
**70163** 5:18
**70170** 4:7
**70801** 5:6
**713** 6:7,8
**75** 31:15
**76** 26:15,25
**77002** 6:6
**78** 26:15,25
**78413** 2:7
**79** 27:1

_____

**8**

**8** 10:1 57:25
58:11 59:11
161:22 169:1
**8-page** 18:13
**8/15/09** 60:12
**8/31/09** 60:2
**808** 6:5

_____

**9**

**9** 10:4 58:2,11
59:19 161:23
**9W-C1V01-08...**
156:8
**9/18/09** 58:2
**9/24/10** 157:2
**9:15** 12:17 13:3
**9:16** 13:10 160:8
**9:16:42** 160:11
**9:19:33** 160:12
**9:21:43** 160:13
**9:22:20** 160:14
**9:22:36** 160:15
**9:23:50** 160:16
**9:26:41** 160:17
**9:34:45** 160:18
**9:38:38** 160:19
**9:39:32** 160:20
**9:39:47** 160:21
**9:41:23** 160:22
**9:47:47** 160:23
**9:51:44** 160:24
**9:52:06** 160:25
**9:52:16** 161:2
**9:52:49** 161:3
**9:54:42** 161:4
**9:55:06** 161:5

Bruce Kelman PhD                                    December 15, 2009

**9:56:40** 161:6
**9:57:09** 161:7
**9:57:10** 161:8
**9:58:37** 161:9
**9:59:37** 161:10
**90** 26:25
**92** 26:25
**964-1474** 2:8
**98101** 13:12
   167:9