UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | |
|---|---|
| IN RE: FEMA TRAILER<br>FORMALDEHYDE PRODUCTS<br>LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION N-5<br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |
| THIS DOCUMENT RELATES TO:<br>Member Cases No. 10-196, 10-198,<br>10-204, 10-212, 10-216 | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### THE UNITED STATES' RESPONSE TO GULF STREAM COACH, INC.'S OPPOSITIONS TO PLAINTIFFS' MOTIONS TO REMAND
(Rec. Docs. 13012, 13013, 13014, 13015, 13016)

Before the Court are a number of motions to remand actions brought by various plaintiffs against Gulf Stream Coach, Inc. ("Gulf Stream") to state court based upon a lack of federal subject-matter jurisdiction. At the outset, it should be made clear that none of the above-styled member cases in this multi-district litigation that Plaintiffs seek to have remanded appear to name the United States or its agencies as a defendant. The United States takes no position on whether these motions to remand should be granted, and is not submitting this response in an attempt to advocate for or against any of the legal arguments advanced by the parties. The United States writes solely in its capacity as a general defendant in the context of this multi-district litigation in an attempt to augment and clarify the factual record currently pending before the Court – specifically, the factual record as it relates to the activities of certain Government employees.

In connection with its argument that this Court possesses federal subject-matter

jurisdiction over the specified member cases pursuant to the Federal Officer Removal statute, Gulf Stream has characterized its relationship with FEMA as one where FEMA "exerted direct, detailed and substantial control over the construction and design of Gulf Stream's Temporary Housing Units."[1]  Opp. at 12 (Rec. Doc. 13012) (emphasis in original).  Gulf Stream supports this line of argument, in part, by asserting that FEMA traveled to Gulf Stream's manufacturing facility in 2005 and 2006 to "extensively" inspect the trailers that were produced for Katrina disaster relief.[2]  *Id*.  In discussing these inspections, Gulf Stream describes a factual scenario where FEMA inspectors worked inside Gulf Stream's manufacturing facilities in order to "attest to [the] sufficiency" of each and every unit before the unit would be shipped to the disaster zone.  *Id.*  According to Gulf Stream, the inspections conducted by FEMA were "quite detailed," "extensive," and went so far as to be "down to the last nuts-and-bolts," to the point where FEMA inspectors would use a "comprehensive checklist" that "encompassed all manner of trailer aspects . . . in order to ensure that Gulf Stream supplied a proper trailer."[3]  *Id.*

---

[1] Although the argument at issue is only raised in Gulf Stream's "Opposition to Plaintiffs' Motion to Remand" filed in the case of *Pamela Floyd, et al. v. Gulf Stream Coach, Inc.,* Docket No. 10-204 (Rec. Doc. 13012), Gulf Stream has sought to incorporate the factual discussion and corresponding legal arguments set forth in Rec. Doc. 13012, "Section III," by reference in a number of additional oppositions to motions to remand filed in other cases.  See Rec. Docs. 13013 (*Michelle Abram, et al. v. Gulf Stream Coach, Inc.*, Docket No. 10-196), 13014 (*Karen Andrews, et al. v. Gulf Stream Coach, Inc.*, Docket No. 10-198), 13015 (*Peal Lewis, et al. v. Gulf Stream Coach, Inc.*, Docket No. 10-212), 13016 (*Eugene Robertson, et al. v. Gulf Stream Coach, Inc.*, Docket No. 10-216).

[2] As described in Gulf Stream's opposition, "Gulf Stream was the only manufacturer with a direct contract with FEMA."  Opp. at 15 (Rec. Doc. 13012).  Other manufacturers named in other actions throughout this multi-district litigation were not similarly situated.  In addition, there is no evidence that Government personnel were ever on-site at Gulf Stream outside of the 2005/2006 time frame.

[3] Gulf Stream's opposition also discusses certain Government specifications regarding the kind of temporary housing units that the Government had unilaterally specified that it wanted to procure.  Opp. at 14 (Rec. Doc. 13012).  The specifications consist of four pages describing the desired square footage, desired floor plan, desired appliances, and desired finishings for units sought by the Government.  U.S. Ex. C (Specifications).  As stated in the specifications, they were intended to be "minimum standards" and were "not to be considered restrictive in that the supplier may provide 'equal or better' units"

The Government activity that Gulf Stream describes as "extensive inspection and monitoring during the construction process," *id.* at 15, has previously been discussed by FEMA employee Stephen C. Miller in his affidavit. During the 2005/2006 time frame, Mr. Miller served FEMA as its Inventory Supervisor, FEMA HQ Logistics, Emergency Housing Units. U.S. Ex. A (Miller Declaration) ¶ 1. In connection with this position, Mr. Miller was responsible for overseeing the movement, transfer, and delivery of all emergency housing units provided by FEMA in response to Hurricanes Katrina and Rita. *Id*. As part of his duties as Inventory Supervisor, Mr. Miller became familiar with the temporary housing unit receipt and inspection processes that took place at various facilities. *Id*. Whenever FEMA employees and representatives would inspect an emergency housing unit, regardless of location or context, they would utilize a document entitled "Standard Form 90-13, Temporary Housing Unit Inspection Report." *Id. ¶* 3; U.S. Ex. B (Standard Form 90-13). The 90-13 form was the script or roadmap used by FEMA employees for all inspections. Throughout the lifetime of a temporary housing unit, the 90-13 form would be completed at different intervals on various occasions to record the condition of the unit. Among its uses, the 90-13 form was sometimes used to ascertain whether FEMA should "accept or reject new EHUs" prior to FEMA taking possession, custody, and ownership. U.S. Ex. A ¶ 3-4. Consistent with the 90-13 form, a FEMA employee or representative completing the form was to verify that the unit was new, that it contained the

---

assuming certain considerations are met. *Id*. at 1. While the specifications required that units "meet industry standards," nothing in the specifications discusses formaldehyde, indoor air quality, or the specific type of wood products that were to be used in units procured under the contract. *Id*. The specifications generally required that "[t]he manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship." *Id*. at 2. As noted in the specifications, FEMA reserved the right to reject units at the time of acceptance. *Id*. at 4.

contracted for amenities (*i.e.*, basic appliances, furniture, etc.), and that it had not been damaged in transit.  *Id.* ¶ 4.

In connection with his former duties as Inventory Supervisor, Mr. Miller also possesses personal knowledge of FEMA's dealings with Gulf Stream.  According to Mr. Miller, FEMA maintained between three and five Contract Officer Technical Inspectors (TI) at various times at the Gulf Stream manufacturing site in Indiana.  *Id.* ¶ 5.  The primary responsibility of these individuals was to facilitate the transportation of trailers from Gulf Stream's facility to the Gulf Coast region.  *Id*.  The Technical Inspectors also "inspected approximately one out of every five EHUs that came off the Gulf Stream production line."  *Id*.  When they would inspect the Gulf Stream units, the Technical Inspectors would use the Standard Form 90-13 discussed above.  As set forth on the form (U.S. Ex. B), a Technical Inspector inspecting a Gulf Stream unit on site in Indiana would have conducted a "walk through inspection to ensure that the units contained contracted for amenities, i.e., basic appliances, furniture, and that the [sic] had not been physically damaged during their production."  U.S. Ex. A ¶ 5.  Specifically, these on site inspections of Gulf Stream units would have involved the Technical Inspector recording the identifying information for the unit being inspected; the manufacturer, year, size, and number of bedrooms; the manufacturer, model, and serial number for the appliances in the unit; the type of unit, the type of inspection (*e.g.*, storage, site, move in); and the condition (new, good, poor, damaged, or missing) of numerous furnishings within the various rooms of the emergency housing unit.  *See id*. (specifying the items to be filled in on the form).  If there was any visible exterior damage on the unit, there was also a space on the 90-13 form for the Technical Inspector to note the location of such damage.  This information gathering was conducted as a part of the

unit acceptance process and to prepare for the eventual transportation effort.  Simply put, the inspections conducted by Technical Inspectors (following the 90-13 script) on site at Gulf Stream were intended to document the condition of completed units before they entered the hands of the Government – not to supervise, oversee, or prescribe the manufacturing processes of Gulf Stream or its employees.  *See* U.S. Ex. B (describing the purpose of the Temporary Housing Unit Inspection Report).  Technical Inspectors could accept or reject units produced by the manufacturer, but they would rely upon the manufacturer's expertise in the construction and manufacture of emergency housing units and did not have the ability to inspect whether units had hidden problems.  U.S. Ex. A ¶ 5.  As the 90-13 form makes clear, Government inspectors were recording information about their receipt of a finished product at the conclusion of construction – not monitoring or dictating how each unit was being constructed or assessing the means and methods of construction.  This process allowed the Government to accept units for shipment and track their condition throughout the course of transportation, occupancy, and deactivation.

| | |
|---|---|
| Dated: March 24, 2010 | Respectfully Submitted, |
| TONY WEST<br>Assistant Attorney General, Civil Division | HENRY MILLER<br>ADAM BAIN<br>Senior Trial Counsel |
| J. PATRICK GLYNN<br>Director, Torts Branch, Civil Division | MICHELE GREIF<br>MICHELLE BOYLE<br>JONATHAN WALDRON |
| DAVID S. FISHBACK<br>Assistant Director | Trial Attorneys |
| OF COUNSEL:<br>JORDAN FRIED<br>JANICE WILLIAMS-JONES<br>FEMA/DHS | *s/ Adam M. Dinnell*<br>ADAM M. DINNELL<br>Trial Attorney<br>United States Department of Justice |

        Civil Division – Torts Branch
        P.O. Box 340, Ben Franklin Station
        Washington, D.C. 20004
        Telephone No: (202) 616-4211
        E-mail: Adam.Dinnell@usdoj.gov

        Attorneys for the United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2010, the foregoing document was filed via the U.S. District Court's CM/ECF electronic filing system and a copy thereof was served upon Liaison Counsel.

        *s/ Adam M. Dinnell*
        ADAM M. DINNELL