UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

|  |  |  |
|---|---|---|
| | * | |
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCT LIABILITY | * | SECTION "N-5" |
| LITIGATION | * | |
| | * | |
| | * | JUDGE ENGELHARDT |
| | * | |
| | * | MAG. JUDGE CHASEZ |
| | * | |
| THIS DOCUMENT RELATES TO: | * | |
| *EARLINE CASTANEL, ET AL v.* | * | |
| *RECREATION BY* | * | |
| *DESIGN, LLC, SHAW* | * | |
| *ENVIRONMENTAL, INC.,* | * | |
| *and UNITED STATES OF AMERICA* | * | |
| *THROUGH THE FEDERAL* | * | |
| *EMERGENCY MANAGEMENT* | * | |
| *AGENCY,* NO. 09-3251 | * | |

**************************************************************************

DEFENDANT RECREATION BY DESIGN, LLC'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO PLAINTIFF'S FAILURE TO WARN CLAIM

**MAY IT PLEASE THE COURT:**

Defendant, Recreation By Design, LLC ("RBD"), respectfully submits this memorandum of

law in support of its motion for partial summary judgment regarding Plaintiff's failure to warn claim

under the Louisiana Products Liability Act ("LPLA"). RBD asserts that it had no duty to warn under

the LPLA in all respects.

## I.  BACKGROUND

As the Court is well aware, this Multi-District Litigation is the consolidation of hundreds of

state and federal toxic tort suits in which several thousand named plaintiffs claim to have inhabited

temporary housing units ("THUs") that were provided to them by the Federal Emergency

Management Agency ("FEMA") as a result of the alleged uninhabitability of their residences due to Hurricanes Katrina and Rita.   Earline Castanel was named as a plaintiff in the underlying complaint, *Earline Castanel, et al v. Recreation By Design, LLC, et al,* Member Case 09-3251, filed on April 8, 2009.

In her original Complaint for Damages, the Plaintiff alleged the THU in which she resided was defective and unreasonably dangerous.[1]  She further alleged that the defects in the unit were the result of RBD's failure to warn of the unreasonably dangerous nature of the housing unit, or to warn her adequately of the presence of excessive levels of formaldehyde and the hazards associated with the excess levels of emissions of formaldehyde in the unit.[2]

Further, the Plaintiff made the following allegation in paragraph eleven of her First Supplemental and Amended Complaint for Damages:

> Plaintiff respectfully reiterates and reincorporates all allegations in the Original Complaint with respect to the cause of action against the defendant Recreation By Design under the Louisiana Product Liability Act (Paragraphs 85 through 90 of the Original Complaint).   Additionally, and more specifically, plaintiff alleges that the defendant manufacturer's duty to warn her about the dangers and risk of formaldehyde in the travel trailer was continuing in nature, and legally was owed to plaintiff by the defendant manufacturer during the entire period that plaintiff occupied this travel trailer.[3]

Essentially, the Plaintiff alleges that the duty to warn by RBD was continuing in nature and was owed to her during the entire period she occupied the trailer.

## II.  LAW AND ARGUMENT

---

[1]Complaint for Damages, Rec. Doc. 1, Docket No. 09-3251,¶ 89.

[2]*Id.* at ¶ 90(vii).

[3]First Supplemental and Amended Complaint for Damages, ¶ 11, R. Doc. 9401.

### A.    Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be rendered if the pleadings, discovery, disclosure materials and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[4] The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant.[5] A fact is materials if it "might affect the outcome of the suit under the governing law."[6]  Further, "It is axiomatic that where questions of law alone are involved in a case, summary judgment is appropriate."[7]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the records contains insufficient proof concerning an essential element of the nonmoving party's claim.[8]   Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must go beyond the pleadings and through affidavits, depositions, answers to interrogatories, and admissions on file to designate specific facts showing that there is a genuine issue for trial.[9]

---

[4]Fed. R. Civ. P. 56(c).

[5]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[6]*Id.*

[7]*Int'l Ass'n of Machinists & Aerospace Workers, Dist. 776 v. Tx. Steel Co.,* 538 F.2d 1116, 1119 (5th Cir. 1976).

[8]*See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.,* 910 F.2d 167, 178 (5th Cir. 1990).

[9]*Celotex,* 477 U.S. at 324; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgement, the Court views the evidence in the light most favorable to the nonmoving party[10], and draws all reasonable inferences in favor of that party.[11]  Factual controversies are to be resolved in favor or the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[12]  The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[13]

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment.  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, the evidence is not properly before the district court."[14] Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[15]

The nonmovant's burden of demonstrating a genuine issue is not satisfied by merely creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[16]  Rather, a factual dispute precludes a grant of

---

[10]*Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002).

[11]*Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001).

[12]*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

[13]*Id.* (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

[14]*Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003).

[15]*Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied,* 513 U.S. 871 (1994).

[16]*Little,* 37 F.3d at 1075.

summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party.[17]

**B.      Recreation By Design had no duty to warn**

   **I.      FEMA's status as a sophisticated purchaser absolved RBD of any duty to warn**

Under the LPLA, a manufacture is liable for damage caused by a characteristic of the manufacturer's product that renders the product unreasonably dangerous.[18]  A product is considered "unreasonably dangerous" when the manufacturer who made the product fails to provide an adequate warning about a characteristic of the product that may cause damage, assuming that characteristic was present at the time the product left the manufacturer's control.**[19]**

However, the manufacturer is not required to provide an adequate warning about its product when the user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.[20] These knowledgeable users are sometimes referred to as sophisticated users or intermediaries, and, in fact, many cases use the terms sophisticated user and sophisticated purchaser interchangeably.[21] A manufacturer has no duty to warn a sophisticated purchaser.[22] Louisiana courts presume that

---

[17]*Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir. 2002).

[18]La. Rev. Stat. § 9:2800.54(A)(2009).

[19]*Id. § 9:2800.57(A).*

[20]*Id. § 9:2800.57(B)(2).*

[21]*Jones v. Flowserve FCD Corp.,* 73 Fed. Appx. 706, 711 (5th Cir. 2003); *Laird v. Deep Marine Technology, Inc.,* 2005 WL 22949, *4 (E.D. La. 2005); *Abadie v. Metropolitan Life Ins. Co.,* 784 So.2d 46,7 8 (La. App. 5 Cir. 2001).

[22]*Davis v. Avondale Indus.,* 975 F.2d 169, 172 (5th Cir. 1992).

sophisticated users know about the danger because of their familiarity with the product.[23]

In this case, the United States is a sophisticated user and purchaser of Temporary Housing Units, and thus RBD was under no obligation to provide an adequate warning about any potentially damage-causing characteristics in the THUs.  Multiple cases have analyzed whether the federal government can be a sophisticated user/purchaser.  In *Morgan v. Bruch Wellman, Inc.,* the plaintiffs brought a products liability action against the United States and multiple manufacturers for injuries sustained after the plaintiffs were exposed to beryllium.[24]  The defendant-manufacturers supplied beryllium to a number of facilities owned by the United States and used for the construction of nuclear weapons.[25]  The plaintiffs worked at these facilities and were in turn exposed to beryllium-containing parts of nuclear weapons.[26]

In response to the plaintiff's allegations, the court acknowledged that Tennessee law states a manufacturer is relieved of its duty to warn about the dangers of its products when the products are sold to a sophisticated user.[27]  The court then concluded that the United States was a sophisticated user because it used beryllium in the creation of the first atomic bomb, the Dept. Of Energy performed the first studies on beryllium toxicity and set the standards for occupational and out-of-

---

[23]*Mallery v. International Harvester Co.,* 690 So.2d 765, 768 (La. App. 3 Cir. 1996).

[24]165 F. Supp.2d 704, 706 (E. D. Tenn. 2001).

[25]*Id.* at 708, 713.

[26]*Id.* at 706.

[27]*Id.*  While the court did not compare the Tennessee law to counterparts in other states, it is important to note that this law and Louisiana law both relieve a manufacturer of its duty to warn when the user is "sophisticated" with respect to product characteristics. *See id.;* La. Rev. Stat. § 9:2800.57(B)(2).

plant exposures, and other U.S. agencies executed comprehensive safety programs for worker protection from beryllium dangers.[28] The court stated in its opinion, "the United States is arguably the world's most sophisticated user of special nuclear materials, including beryllium."[29]  Thus, all of the plaintiff's claims against the manufacturing defendants based on their alleged failure to warn were barred by the defense.[30]

In *Akin v. Ashland Chem. Co.,* the plaintiffs alleged they were injured while cleaning jet engine parts due to low-level, chronic exposure to chemicals produced by the defendant-manufacturer.[31]  The plaintiffs suffered these injuries while working at a United States Air Force base in Oklahoma.[32]  In considering whether the manufacturer failed to warn the plaintiffs about the dangers associated with the chemicals as issue, the court acknowledged that - just as under the LPLA - where the product's danger or potential for danger is known to the user, the duty to warn is eliminated.[33] The court held that the United States, which had purchased the chemicals from the manufacturer, was a sophisticated purchaser that should have known the risks involved with low-level chemical exposure because there was a wealth of research available on the topic, the Air Force was able to conduct studies, and it had an extremely knowledgeable staff.[34]

---

[28]*Morgan,* 165 F.2d at 718.

[29]*Id.*

[30]*Id.*

[31]156 F.3d 1030, 1037 (10th Cir. 1998).

[32]*Id.* at 1035 n.3.

[33]*Id.* at 1037.

[34] *Id.*

*Morgan* and *Akin* are quite applicable to the instant litigation to show that the United States, through FEMA, is a sophisticated user/purchaser of THUs.  First, prior to Hurricane Katrina, FEMA had many years of experience supplying both travel trailers and other forms of temporary housing to disaster victims, including Louisiana residents.  In fact, David porter, a FEMA employee testified in his July 8, 2009 deposition that FEMA used travel trailers in its response to Hurricane Andrew, which made landfall  in 1992.[35] Because of its extensive experience, FEMA knew exactly what it was buying when it purchased THUs for disaster relief post-Katrina.  For example, it knew that manufacturers of manufactured housing built units that complied with HUD standards, and it knew that the manufacturers of travel trailers were providing recreational vehicles to which no HUD standards applied.[36] FEMA also knew that travel trailers contained formaldehyde.  Martin McNeese, FEMA's Emergency Program Specialist at the time of Hurricane Katrina, testified at his July 14, 2009 deposition that it was no surprise that the travel trailers contained that chemical.[37] In fact, FEMA knew that not only did an industry-standard travel trailer contain formaldehyde, but also knew that a conventional home would contain formaldehyde.[38] Despite this knowledge, FEMA chose to use travel trailers, rather than mobile homes, because of their practicality and functionality.[39]

---

[35]Deposition of David Porter, taken on July 8, 2009, at 22:2-13, excerpts attached as Ex. A.

[36]Deposition of David Porter, taken on July 8, 2009, at 115:1-22 and 116:1-22, excerpts attached as Ex. A.

[37]Deposition of Martin McNeese, taken on July 14, 2009, at 108:3-10, excerpts attached as Ex. B.

[38]*Id.*

[39]Deposition of David Garratt, taken on July 9, 2009, at 207:3-22 and 208:1-6, excerpts attached as Ex. C.

In the instant matter, just like the government in *Morgan,* FEMA's extensive use of THUs prior to Hurricane Katrina and its knowledge of the component parts therein make it a sophisticated user/purchaser of the product.

Further evidence in support of FEMA being a sophisticated user of THUs is the fact that FEMA developed and required that the travel trailers be manufactured in strict compliance with FEMA-issued specifications.  RBD did not contract directly with FEMA nor did it have any contact with a FEMA representative.  Rather, in late September 2005, RBD and Morgan Buildings and Spas ("Morgan") reached an agreement wherein RBD would manufacture 2600 travel trailers for Morgan that Morgan contracted to sell to FEMA.[40]  Morgan notified RBD of its requirements, and RBD built a unit following Morgan's instructions.[41]  This model was approved by Morgan as being in compliance with FEMA specifications, and RBD moved forward with production of the 2600 travel trailers (according to Morgan).  FEMA accepted the units manufactured by RBD as compliant with its contract with Morgan.[42]

At the time FEMA selected THUs as the housing option, it was keenly aware of the  issues related to formaldehyde levels in indoor air, as this topic has been the subject of federal regulation for decades.  In the 1970s and 1980s, the U.S. Department of Housing and Urban Development ("HUD") set forth regulations dealing with formaldehyde in the indoor ambient air of manufactured

---

[40]Deposition of James Schilligo, taken on October 22, 2009, at 24:20, excerpts attached as Ex.D.

[41]See 30(b)(6) Deposition of RBD, taken on February 23, 2010, at 36:1-22, excerpts attached as Ex. E.

[42]Deposition of James Schilligo, taken on October 22, 2009, at 130:15-25, 131:14-23, 132:4-23, and 133:1, excerpts attached as Ex. D.

homes.[43]     The court in *U.S. ex rel. Finney v. Nextwave Telecom, Inc.* noted that the federal

legislature which enacted the law, the federal agencies which enforce the law, and the federal courts

which apply the law are all charged with knowledge of the statute.[44]  Thus, the federal government,

and consequently, FEMA, were aware of the historical backdrop of HUD's regulatory efforts when

it inspected and delivered the THUs to housing applicants in 2005.

Further, with respect to the installation of THUs after Katrina and the formaldehyde issues

that followed, FEMA showed its sophistication by taking responsibility for handling the situation.[45]

During emergencies, FEMA is solely responsible for the disaster environment, as well as the

coordination, engagement and application of all federal resources - including THUs - to support the

affected state.[46]  In terms of expertise and agency responsibility, FEMA shares the accountability

with other agencies, but FEMA is at the top of the multi-organizational activity.[47]  As part of this

overarching responsibility, FEMA hired multiple contractors to install and setup THUs after Katrina,

and these contractors aired out the units to make them ready for occupancy.[48]  FEMA expected its

---

[43]*See, e.g.,* 42 U.S.C. § 3280.308 & 3280.309; *see generally Liberty Homes, Inc., v. Department of Industry, Labor and Human Relations,* 374 N.W.2d 142, 146 (Wis. App. 1985).

[44]337 B.R. 479, 487 (S.D.N.Y., 2006).

[45]Deposition of David Garratt, taken on July 9, 2009, at 225:7-22  and 226:1-21, excerpts attached as Ex. C.

[46]Deposition of David Garratt, taken on July 9, 2009, at  and 226:1-22 and 227:1-5, excerpts attached as Ex. C.

[47]*Id.*

[48]Deposition of David Porter, taken on July 8, 2009, at 56:16-21, 93:20-22, and 94:1-15, excerpts attached as Ex. A.

contractors to interact with occupants, and receive and handle complaints in the first instance.[49]

FEMA was also solely in control of addressing the limited air quality complaints it received on a case-by-case basis with ventilation instructions, and if necessary, made a "swap" of the trailer for a different one.[50] Additionally, FEMA ran formaldehyde tests on unoccupied trailers in its inventory beginning in March of 2006, the month FEMA says it learned of the formaldehyde concern. Thus, just as in the *Akin* decision, FEMA had the ability to study the effects of the product it purchased, and it did so. The fact that FEMA used its contractors to air out the units, and that FEMA tested the units for formaldehyde levels, shows that FEMA was aware of the characteristics inherent in these units.

Considering the above, specifically, FEMA's involvement in purchasing, utilizing, and responding to complaints regarding THUs,  its knowledge of travel trailers in general, and its prior knowledge of the issues related to formaldehyde in indoor air via HUD's regulatory history, RBD asserts that FEMA is a sophisticated user/purchaser of THUs.  From its prior experience, FEMA knew what it was purchasing when it decided to use travel trailers in its Hurricane Katrina response, and this knowledge included the awareness that the units contained formaldehyde.

###### ii.        Morgan was a sophisticated purchaser absolving RBD of any duty to warn

In addition to FEMA being a sophisticated user, RBD asserts that it was also absolved of the duty warn as Morgan was also a sophisticated purchaser.  Morgan has been in the business of

---

[49]Deposition of David Garratt, taken on July 9, 2009, at 39:15-22 and 40:1-22, excerpts attached as Ex. C.

[50]Deposition of David Garratt, taken on July 9, 2009, at 88:20-22, and pgs. 89-94, excerpts attached as Ex. C.

procuring travel trailers for FEMA for several years.[51]  Morgan has done so for disasters predating

hurricanes Katrina and Rita, and was called upon again by FEMA to procure travel trailers for

hurricanes Katrina and Rita.[52]  Pursuant to Morgan's agreement with FEMA, Morgan contacted RBD

as one of three entities to supply travel trailers to Morgan.[53]  Morgan notified RBD of its

requirements, and RBD built a unit following Morgan's instructions.[54]  Morgan accepted the units

built by RBD as meeting Morgan's, and thereby, FEMA's specifications.[55]  The RBD units would

then be shipped to a FEMA staging area and then inspected by both FEMA and Morgan.[56]

As Morgan is an entity with experience in procuring units on behalf of FEMA, had the

opportunity to inspect, accept, and/or reject a unit, and was familiar with the industry practices of

travel trailer manufacturing, it was well versed in all aspects of the units it purchased.  Accordingly,

RBD asserts that not only was FEMA a sophisticated purchaser of the units, but that Morgan was

also a sophisticated purchaser of the units based upon its knowledge and involvement in procurement

of the units.  Due to this dual layer of sophisticated purchasers, RBD submits that it had no duty to

warn regarding formaldehyde in the units.

---

[51]Schilligo depo, taken on Oct. 22, 2009, at 68:7-17, excerpts attached as Ex. D

[52]Schilligo depo, taken on Oct. 22, 2009, at 68:7-25; 69:1-6, excerpts attached as Ex. D

[53]Schilligo depo, taken on Oct. 22, 2009, at 20:17-21, excerpts attached as Ex. D.

[54]See 30(b)(6) Deposition of RBD, taken on February 23, 2010, at 36:1-22, excerpts attached as Ex. E.

[55]See 30(b)(6) Deposition of RBD, taken on February 23, 2010, at 250:8-02, excerpts attached as Ex. E.

[56]Schilligo depo, taken on Oct. 22, 2009, at 132:4-11, 133:1-3, excerpts attached as Ex. D.

    **iii.    RBD had no continuing duty to warn the plaintiff in this case.**

As stated above, the Plaintiff amended her complaint to include the claim that RBD's duty to warn her about the dangers and risks of formaldehyde in the subject THU was continuing in nature and was owed during the pendency of her occupancy in the THU.[57] This allegation implicates provisions of the LPLA; namely, if the manufacturer acquires knowledge after the product has left the manufacturer's control that any characteristic of the product may cause damage, he is liable for his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.[58] Thus, "the manufacturer's duty to warn is a continuing one."[59]

A Louisiana state court decision, *Am Cent Ins. Co. v. Terex Crane,* provides an example of the continuing duty a manufacturer owes to the users and handlers of its product. The plaintiff sought damages from a number of defendants, including the manufacturer of an industrial crane, for injuries sustained when that crane malfunctioned in 1996. The malfunction occurred when an anchor bolt securing the brakes on the crane failed. The parties learned that the same type of anchor bolt failed in 1985.[60] As part of its adequate warning analysis, the court stated that failure of the bolt in 1985 put the manufacturer on notice that the anchor bolt required maintenance critical for safety.[61] The manufacturer's failure to advise the user about the danger inherent in the bolt could have

---

[57]First Supplemental and Amended Complaint for Damages, ¶ 11, R. Doc. 9401.

[58]La. Rev. Stat. § 9:2800.57(C).

[59]*Am. Cent. Ins. Co. v. Terex Crane,* 861 So.2d 228, 231 (La. App. 1 Cir. 2003).

[60]*Id.* at 231 - 233.

[61]*Id.* at 233.

resulted in the same accident occurring in 1996.[62]  Thus, the court upheld the trial court's ruling that

the manufacturer was at fault for failing to warn the crane operator about the problems with the

anchor bolt.[63]

In this case, the Plaintiff has attempted to make the same type of argument that the plaintiff

did in *Terex Crane:* RBD learned of a potentially damage-causing characteristic after the THU left

its control, and thus it had an obligation to warn its users about that characteristic.  However, there

is a crucial fact present in *Terex Crane* that is not present in this case - in 1985, the crane

manufacturer learned of a problem with the same type of bolt that eventually failed again in 1996.

Conversely, RBD never acquired any actual or constructive knowledge of any alleged health hazards

relating to formaldehyde and the use of its trailers until this litigation began.[64]  This is made even

more significant given the fact that RBD has been in the business of manufacturing trailers since

1999 and  had no verifiable complaint regarding formaldehyde - not only in the trailers provided to

FEMA but also in the numerous of other trailers it manufactured.  This fact clearly demonstrates that

RBD had no reason to believe that any of the RBD trailers provided by FEMA to residents contained

harmful levels of formaldehyde.   Because RBD never learned of any potentially dangerous

characteristic in its trailers, no continuing duty to warn ever arose.

### III.  CONCLUSION

In light of the above and foregoing, RBD respectfully requests that the Court grant its motion

---

[62]*Id.*

[63]*Id.* at 233 - 234.

[64]See 30(b)(6) Deposition of RBD, taken on February 23, 2010, at 232:7-13, excerpts
attached as Ex. E.

for partial summary judgment, as it had no duty to warn under the LPLA in all respects.

Respectfully submitted,

*/s/ Randall C. Mulcahy*

LYON H. GARRISON, Bar No. 19591
SCOTT P. YOUNT, Bar No. 22679
RANDALL C. MULCAHY, Bar No. 26436
DARRIN L. FORTE, Bar No. 26885
KELLY M. MORTON, Bar No. 30645
GARRISON, YOUNT, FORTE
& MULCAHY, LLC
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 527-0680
Facsimile: (504) 527-0686
Attorneys for defendant,
Recreation By Design, LLC
Email: rmulcahy@garrisonyount.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2010, I electronically filed the foregoing with the Clerk of court by using the CM/ECF system which will send a notice of this electronic filing to all known counsel of record.

*/s/ Randall C. Mulcahy*

RANDALL C. MULCAHY, Bar No. 26436