Page 1

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF LOUISIANA

3              NEW ORLEANS DIVISION

4    In Re:  FEMA Trailer      )

5    Formaldehyde Products  ) MDL No. 1873

6    Liability Litigation   )

7

8                              Washington, D.C.

9                              Tuesday, July 7, 2009

10   Videotape Deposition of DAVID EDWARD GARRATT, called

11   for examination by counsel for Plaintiffs in the

12   above-entitled matter, the witness being duly sworn

13   by CHERYL A. LORD, a Notary Public in and for the

14   District of Columbia, taken at the offices of NELSON

15   MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16   Avenue N.W., Suite 900, Washington, D.C., at 9:07

17   a.m., and the proceedings being taken down by

18   Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21                                            EXHIBIT

22                                               C

1    A.    Well, because the emergency housing units
2    are provided under the aegis of the individual
3    assistance program and the public assistance program,
4    those programs are managed at least at the
5    headquarters level by our directorate, so I don't
6    think there was any doubt that this was our
7    directorate's responsibility at the time.
8    Q.    Well, go on to say that prior to the
9    disaster assistance directorate assuming response
10   coordination responsibility of the formaldehyde issue
11   in June 2006, FEMA's Gulf Coast recovery office had
12   through its assigned transitional recovery offices in
13   each state been responding to occupants' air quality
14   complaints on a case-by-case basis.
15         What was your understanding in June of
16   2006 of how the Gulf Coast recovery office was
17   responding to air quality complaints?
18   A.    I'm not sure what you mean when you say my
19   understanding of how they were responding to
20   complaints.
21         You mean the -- the mechanism by which
22   they respond to complaints, how they're set up to

David Edward Garratt | Washington, DC | July 7, 2009

Page 40

```
 1   respond to complaints?
 2        Q.    How they're set up to respond to
 3   complaints and how did they actually respond to
 4   complaints, if you know?
 5              MR. MILLER:  Objection, compound.
 6        A.    In terms of the former, the transitional
 7   recovery offices, which are really extended versions
 8   of our joint field offices that we set up in every
 9   disaster operation, but these are there long term,
10   and we typically staff them with longer-term
11   employees, have maintenance and deactivation
12   contracts, and those maintenance and deactivation
13   contractors -- and they had numerous maintenance and
14   deactivation contractors -- supporting each of the
15   transitional recovery offices, depending on which
16   state that you're in are assigned a certain sector
17   area, and occupants of emergency housing units in
18   those areas would call this particular maintenance
19   and deactivation contractor if they have an issue or
20   a problem with a unit, and it was that contractor's
21   responsibility to respond and address and deal with
22   the issue.
```

```
 1   any way to answer that.
 2        Q.   What if any mechanism was in place for
 3   FEMA to follow up on the installation work by these
 4   contractors in order to determine whether or not in
 5   fact formaldehyde levels might have been affected by
 6   what they did?
 7             MR. MILLER:  Objection, foundation.
 8        A.   I'm not aware that any retroactive
 9   activity took place to see if any of the installation
10   actions of any of the contractors may have contribute
11   to do an increase in formaldehyde.
12             BY MR. MEUNIER:
13        Q.   Now, in your declaration at page 3, you
14   also talked today about the fact that prior to June
15   of 2006, FEMA was responding to occupant complaints
16   about air quality in the units on a case-by-case
17   basis.
18             Correct?
19        A.   Correct.
20        Q.   And do you know as you sit here today when
21   the first complaints reached FEMA concerning air
22   quality in these units?
```

1    A.    I do not.

2    Q.    Would you be in a position to deny the

3    fact that the first complaints reached FEMA as early

4    as October of 2005?

5    A.    I've got no basis to deny that.

6    Q.    And so assuming that to be true, between

7    October 2005 and June 2006, for roughly an 8-month

8    period of time, FEMA was handling complaints about

9    these units -- complaints by occupants on a

10   case-by-case rather than programmatic basis.

11         MR. MILLER:   Objection, assumes --

12         BY MR. MEUNIER:

13   Q.    True?

14         MR. MILLER:   Objection, assumes facts not

15   in evidence, hypothetical.

16   A.    Certainly true as far as air quality

17   issues.

18         BY MR. MEUNIER:

19   Q.    So there was no programmatic coordination

20   of FEMA's responses to the complaints that it was

21   receiving about formaldehyde concerns for the 8-month

22   period of time we're talking about?

Page 207

1  Q.  From a formaldehyde standpoint.
2  A.  None whatsoever.
3  Q.  Can you talk a little bit about why FEMA
4  used travel trailers by the thousands both prior to
5  Hurricane Katrina and during the Hurricane Katrina
6  response?
7  A.  They were the preferred direct temporary
8  housing product because of their -- because of their
9  size, because we could move them in and set them up
10 quickly.  I think 80 percent of the units that we
11 provided in response to hurricanes Katrina and Rita
12 were on individuals' private property.  And typically
13 we put travel trailers on private property or often
14 because we can't fit anything else on their private
15 property.  They simply can't accommodate a mobile
16 home on their driveway.
17      So they were used because, number 1, they
18 filled a need that could not be met any other way.
19 2, they were inexpensive compared to a mobile home.
20 3, they allowed people to stay at their property and
21 rebuild their home as opposed to relocating them to a
22 community site that might be miles away and might be

David Edward Garratt                                                                                       July 7, 2009
                                        Washington, DC

Page 208

1   far more expensive to build.
2            So a number of reasons I think contributed
3   to the use of travel trailers and their popularity at
4   least within a certain segment of the disaster
5   population on those small properties and wanted to
6   stay on their property and rebuild their home.
7        Q.   Am I also correct that during the prior
8   natural disaster events that we talked about prior to
9   Hurricane Katrina, can we assume that there were
10  young children and elderly people and stay-at-home
11  moms living in those travel trailers as well?
12       A.   I think that's safe to assume.
13       Q.   And again you're not aware of any
14  formaldehyde claims by any of those people in those
15  prior disasters?
16       A.   I'm not personally aware of any.
17       Q.   When you were working with the CDC after
18  Hurricane Katrina, did you become aware of the
19  results of a study that they did in Hancock County,
20  Mississippi, of children's pre-Katrina and
21  post-Katrina doctor visits?
22       A.   Not by -- not by that reference.

```
 1   may exist within the contract acquisitions framework,
 2   but I'm not familiar with the existence of any such
 3   policy.
 4        Q.   Was it a FEMA practice to make that
 5   recommendation?
 6        A.   Yes.
 7        Q.   Okay.  And you explained that at some
 8   point, FEMA came to the realization that it might
 9   have a possible systemic formaldehyde problem.  I
10   think that's the way you described it.
11             Is that a fair way to describe it?
12        A.   Yes.
13        Q.   Okay.  And I'm not trying to dictate a
14   date on that, whatever it turns out to be, but at
15   some point in time around the time of the Sierra Club
16   results, I understand that the problem seemed to be
17   one that needed greater attention than perhaps it was
18   getting.
19             Is that true?
20        A.   Yes.
21        Q.   And as I understand your testimony, FEMA
22   assumed the responsibility for coordinating the
```

Page 226

1  response to this issue at that time, whenever it was.

2          Isn't that fair?

3     A.   That is fair.

4     Q.   And FEMA debated what an appropriate

5  response might be, whether it be testing, warnings,

6  or taking people out of the trailers.

7          Is that true?

8     A.   True.

9     Q.   Okay.  And you would agree with me that

10 the responsibility for determining an appropriate

11 programmatic response to this issue lay within the

12 FEMA organization?

13    A.   Let me caveat my response to that and

14 that -- or let me characterize this carefully.

15         FEMA is delegated responsibility for the

16 disaster environment and coordinating the engagement

17 and application of all federal resources and assets

18 to support that state.  So at the top of that

19 multiorganizational activity is FEMA, who is solely

20 or responsible for what goes on by all of those

21 agencies.

22         So, yes, we are ultimately responsible,

David Edward Garratt  July 7, 2009
Washington, DC

Page 227

```
 1   but in terms of expertise and agency responsible --
 2   agency responsibility, this was something we believed
 3   that we shared.
 4        Q.   Okay.  With other agencies?
 5        A.   Yes.
 6        Q.   Okay.
 7             MR. HAINKEL:  That's all the questions I
 8   have.
 9             Thank you.
10             MR. MILLER:  I've got a couple followup,
11   not many.
12             MR. MEUNIER:  We will have some brief
13   redirect after all the cross-examination is
14   completed.
15             MR. MILLER:  Let's go off the record.
16             THE VIDEOGRAPHER:  We're going off the
17   record.  The time on the video is 3:08 PM.
18             (Discussion off the record.)
19             THE VIDEOGRAPHER:  This begins tape number
20   6 in the video deposition of David Garratt.  The time
21   on the video is 3:38 PM.  We are on the record.
22             EXAMINATION BY COUNSEL FOR
```