# Transcript of the Testimony of
# **Earline Castanel**

## Date taken: December 2, 2009

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)

### **\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**



PLAINTIFF'S
EXHIBIT
A

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS DIVISION

\*     \*     \*     \*     \*

IN RE: FEMA TRAILER                 MDL NO. 07-1873

FORMALDEHYDE PRODUCTS               SECTION "N"(5)

LIABILITY LITIGATION                JUDGE ENGELHARDT

This document relates to:

    Earline Castanel v. Recreation by Design,

              L.L.C., et al

            Docket No. 09-3251


            \*     \*     \*     \*     \*


        Deposition of EARLINE CASTANEL,

2925 St. Peters Street, New Orleans, Louisiana

70163, taken at the Law Offices of Gainsburgh,

Benjamin, David, Meunier & Warshauer, L.L.C.,

2800 Energy Centre, 1100 Poydras Street, New

Orleans, Louisiana 70163-2800, on Wednesday,

December 2, 2009.

REPORTED BY:

        PAMELA C. BLACK, CCR, RPR
        PROFESSIONAL SHORTHAND REPORTERS
        (504) 529-5255

Page 2

```
 1   APPEARANCES:
 2        GAINSBURGH, BENJAMIN, DAVID,
          MEUNIER & WARSHAUER, L.L.C.
 3        (BY: GERALD MEUNIER AND
              TARA GILBREATH, ESQUIRE)
 4        2800 Energy Centre, 1100 Poydras Street
          New Orleans, Louisiana 70163
 5
              ATTORNEYS FOR THE PLAINTIFFS
 6            STEERING COMMITTEE
 7        LAW OFFICES OF DAVID V. MCLENDON, L.L.C.
          (BY: DAVID V. MCLENDON, ESQUIRE)
 8        721 Henry Clay Avenue
          New Orleans, Louisiana 70118
 9
              ATTORNEYS FOR PLAINTIFF STEERING
10            COMMITTEE
11
          U.S. DEPARTMENT OF JUSTICE
12        (BY: HENRY MILLER, ESQUIRE)
          CIVIL DIVISION
13        1331 Pennsylvania Avenue, N.W.
          Washington, D.C. 20004
14
              ATTORNEYS FOR DEFENDANT, UNITED
15            STATES OF AMERICA
16        GARRISON, YOUNT, FORTE &
          MULCAHY, L.L.C.
17        (BY: RANDALL C. MULCAHY, ESQUIRE)
          909 Poydras Street, Suite 1800
18        New Orleans, Louisiana 70112
19            ATTORNEYS FOR DEFENDANTS,
              RECREATION BY DESIGN, L.L.C., TL
20            INDUSTRIES, INC., FRONTIER EV, INC.
              AND PLAY'MOR TRAILERS, INC.
21
          ALLEN & GOOCH
22        (BY: BRENT MAGGIO, ESQUIRE)
          3900 N. Causeway Blvd., Suite 1450
23        Metairie, Louisiana 70002
24            ATTORNEYS FOR DEFENDANTS,
              HEARTLAND REC. VEHICLES, L.L.C.
25
```

Page 3

```
 1    APPEARANCES CONTINUED:

 2          BAKER, DONELSON
            (BY: KAREN WHITFIELD, ESQUIRE)
 3          201 St. Charles Avenue
            Suite 3600
 4          New Orleans, Louisiana 70163

 5              ATTORNEYS FOR DEFENDANTS,
                CH2M HILL CONSTRUCTORS, INC. AND
 6              SHAW ENVIRONMENTAL, INC.

 7
            JONES, WALKER, WAECHTER, POITEVENT,
 8          CARRERE & DENEGRE, L.L.P.
            (BY:   RYAN JOHNSON, ESQUIRE, VIA
 9                 TELEPHONE)
            Four United Plaza, 5th Floor
10          8555 United Plaza Boulevard
            Baton Rouge, Louisiana 70809
11
                ATTORNEYS FOR KEYSTONE RV COMPANY,
12              THOR CALIFORNIA, THOR INDUSTRIES,
                DUTCHMEN MANUFACTURING, DS CORP
13              (d/b/a CrossRoads RV), KZ RV, LP

14

15

16

17

18

19

20

21

22

23

24

25
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Earline Castanel

Page 4

1                    EXAMINATION INDEX

2                                              PAGE

3    EXAMINATION BY HENRY MILLER              6, 111

4    EXAMINATION BY RANDALL MULCAHY          73, 113

5    EXAMINATION BY KAREN WHITFIELD            102

6
                    INDEX OF EXHIBITS
7                                             PAGE

8    Exhibit No. 1 (Notice of Deposition)       12

9    Exhibit No. 2 (Plaintiff Fact Sheet)       21

10   Exhibit No. 3 (Collection of Photographs)  26

11   Exhibit No. 4                              57
     (Letter Dated 8/6/08 to FEMA from
12    Gainsburgh, Benjamin)

13   Exhibit No. 5                              57
     (Form 95 Claim Form/Rider, Contingency
14    Fee Retainer, FEMA 000983 through 986)

15   Exhibit No. 6                              64
     (FEMA, Emergency Shelter Agreement to Rules
16    of  Occupancy, FEMA 159-000009 - 012)

17   Exhibit No. 7                             106
     (FEMA Temporary Housing Unit Inspection
18    Report)

19   Exhibit No. 8                             108
     (Shaw Trailer Lease Check In List)
20
     Exhibit No. 9                             110
21   (Shaw Document Dated 3/11/06)

22

23

24

25

Page 5

```
 1                S T I P U L A T I O N

 2

 3

 4                     It is stipulated and agreed by

 5     and among counsel that the deposition of

 6     Earline Castanel, is hereby being taken

 7     pursuant to Rules 26, 28 and 30 of the Federal

 8     Rules of Civil Procedure in accordance with the

 9     Code.

10                     The witness reserves the right to

11     read and sign the deposition transcript.  The

12     formalities of sealing and certification are

13     hereby waived.  The party responsible for

14     service of the discovery material shall retain

15     the original.

16                     All objections, except those as

17     to the form of the questions and/or

18     responsiveness of the answers, are reserved

19     until the time of the trial of this cause.

20

21              *    *    *    *    *

22                     PAMELA C. BLACK, Registered

23     Professional Reporter, Certified Court Reporter

24     in and for the State of Louisiana officiated in

25     administering the oath to the witness.
```

Page 6

1      MR. MULCAHY:

2           On the record, though, I'd like to

3  put on that this deposition is being held for

4  the limited purposes of prescription and

5  statute of limitation; and that we reserve the

6  full right to come back and depose her on the

7  merits in the case should we get to that point

8  with the prescription motion and the deadlines

9  that were set.

10                     EARLINE CASTANEL,

11  2925 St. Peter Street, New Orleans, Louisiana

12  after having first been duly sworn, was

13  examined and testified on her oath as follows:

14  EXAMINATION BY MR. MILLER:

15      Q.  Ma'am, can you please state your full

16  name and spell your name?

17      A.  Earline Castanel, E-A-R-L-I-N-E,

18  C-A-S-T-A-N-E-L.

19      Q.  Ms. Castanel, my name is Henry

20  Miller.  I'm a lawyer with the United States

21  Department of Justice, and I've be assigned to

22  represent the United States in this case which

23  is captioned "Earline Castanel, et al versus

24  Recreation by Design," and it's Case No.

25  09-3251.  This case has been filed in the

Page 7

1    Eastern District of Louisiana, and it's been

2    consolidated in what is called a multidistrict

3    litigation before Judge Engelhardt here in the

4    Eastern District of Louisiana.

5           The purpose of this deposition is to

6    allow the United States to discover information

7    relating to or that may lead to the discovery

8    of information regarding whether your claims

9    against the United States are time barred.  The

10   United States reserves the right to conduct and

11   to participate in a merits deposition should

12   the court deny the United States's motion or

13   should be the court not rule in a sufficient

14   time and we need to proceed with your

15   deposition on the merits.  Do you understand

16   that?

17        A.   (Witness indicates an affirmative

18   response.)

19        Q.   I'm sorry, you have to say "yes" or

20   "no."

21        A.   Yes.

22        Q.   Have you ever been deposed before,

23   Ms. Castanel, asked questions like this under

24   oath?

25        A.   No.

Page 8

1          Q.   You've never done this before?

2          A.   No.

3          Q.   Have you had a chance to speak to

4    your lawyers, Ms. Gilbreath, Mr. Meunier or

5    Mr. Woods about what was going to take place

6    here today?

7          A.   Yes.

8          Q.   Did they explain to you generally the

9    rules that govern this type of proceeding?

10         MS. GILBREATH:

11              Objection, calls for privilege.

12   BY MR. MILLER:

13         Q.   Do you generally understand the rules

14   that govern this proceeding?

15         A.   I think I do.  I'm not sure.

16         Q.   Okay.  I'm going to go over those

17   rules with you again to make sure that you

18   understand them.  Okay?  The court reporter

19   just swore you in and administered an oath and

20   that oath requires you to answer my questions

21   today truthfully.  Do you understand that?

22         A.   Yes.

23         Q.   Further, because you're under oath if

24   you were to lie or provide an intentionally

25   misleading answer, you may be subject to

Page 9

1    criminal and/or civil penalties.  Do you

2    understand that?

3          A.   Yes.

4          Q.   Although this is an informal

5    proceeding, we're not in a courtroom, there's

6    no judge, there's no jury, this proceeding

7    itself has the same effect as if you were

8    testifying in a courtroom before a judge or a

9    jury.  Do you understand that?

10         A.   Yes.

11         Q.   Now, the court reporter is recording

12   my questions and your answer, that's what she's

13   doing right now.  To make sure it's recorded

14   accurately, only one of us can talk at a time.

15   Do you understand that?

16         A.   Yes.

17         Q.   In addition, because the testimony is

18   being recorded and will be transcribed, she's

19   going to type it out and we'll get a document,

20   you have to give a verbal answer.  A shrug, a

21   nod of the head, a shake of the head, uh-huh is

22   not sufficient, you need to say yes, no, I

23   don't know.  Do you understand that?

24         A.   Yes.

25         Q.   If for any reason you do not

Page 10

1    understand a question, you require

2    clarification, explanation of any words or want

3    to refer to a document you must tell me and

4    we'll get that matter resolved before you

5    answer the question.  Do you understand that?

6          A.   Yes.

7          Q.   The converse of this rule, the flip

8    side, is if you answer a question, it is

9    assumed that you understood the question and

10   are providing a complete and truthful response

11   to that question.  Do you understand that?

12         A.   Yes.

13         Q.   After the deposition is completed you

14   will be provided an opportunity to review the

15   transcript.  The rules allow you 30 days to

16   review and make any changes or corrections.

17   The United States encourages you to review that

18   transcript for any errors and make any

19   corrections within that 30-day period.  Do you

20   understand you have that right and an

21   opportunity to do that?

22         A.   Yes, sir.

23         Q.   However, to the extent when you

24   review that transcript, if you make any

25   substantive changes, the Unites States reserves

Page 11

1    the right to reopen this deposition or to

2    question you at a later deposition regarding

3    any such changes.  Do you understand that?

4         A.   I guess so, yes.

5         Q.   Are you currently suffering from any

6    medical disease or illness that in any way

7    interferes with your ability to answer

8    truthfully and completely my questions to you

9    today?

10        A.   Yes.

11        Q.   What is the problem that you're

12   suffering from that would prevent you from

13   answering my questions truthfully today?

14        A.   Well, I'm answering whatever you ask

15   me I can answer you yes or no.

16        Q.   Okay.  No, that was my question, are

17   you suffering from any medical illness or

18   disease that prevents you from answering my

19   questions?

20        A.   No.

21        Q.   Are you currently taking any

22   medication or drugs that in any way interfere

23   with your ability to listen to or understand or

24   answer my questions?

25        A.   No.

Page 12

1          Q.  Finally, I try to take a break every

2     hour or so.  If at any time before I take a

3     break, if you want to take a break earlier,

4     please let me know, and once I come to an end

5     of a line of questioning we'll take a break.

6     Is that fair?

7          A.  Yes.

8          Q.  Ms. Castanel, I'm going to hand you a

9     document which is marked Exhibit No. 1, and

10    it's a notice of deposition for today's

11    deposition.  Have you seen this document before

12    (tenders)?

13         A.  (Views document.)  I can't see this

14    too well.  I think I've seen this.

15         Q.  Okay.  This was the document that we

16    issued in agreement with your counsel for the

17    deposition today.  You understood that this

18    deposition was going to take place and that you

19    had to come forth here at 2:30 to testify;

20    right?

21         A.  Uh-huh (affirmative response).

22         Q.  You have to say "yes" or "no."

23         A.  Yes.

24         Q.  It's okay.  It's an unusual procedure

25    and it's going to happen and I'll remind you.

Page 13

1    Other than this lawsuit which you've filed

2    against the United States and several other

3    parties, have you ever filed any other lawsuit

4    against any other persons?

5         MS. GILBREATH:

6              Objection, what does this have to do

7    with prescription?  Isn't that why we're here

8    today?

9         MR. MILLER:

10             I get to do background questions,

11   Counsel.  Unless you're instructing the witness

12   not to answer the question, you can state an

13   objection, but if you're going to instruct the

14   witness not to answer, then that's fine and

15   I'll go on, but you're going to need to

16   instruct the witness not to answer.  Okay?

17        MR. MEUNIER:

18             No.  She can make objections or

19   instruct the witness.

20        MR. MILLER:

21             No.  The objections in deposition are

22   form objections, Mr. Meunier.

23        MR. MEUNIER:

24             Yeah.  But the objection is to the

25   form because it doesn't adhere to the rules of

Page 14

1    the court for what this deposition is to cover.

2    So we'll reserve the objection for the record

3    and reserve the right to strike the answer to

4    this question and any others that go beyond the

5    question of prescription.

6         MR. MILLER:

7              So, Counsel, what is your objection?

8         MS. GILBREATH:

9              I'm objecting that it goes beyond the

10   scope of the deposition for the record.

11        MR. MILLER:

12             That's fine.

13   BY MR. MILLER:

14        Q.  Ms. Castanel, have you ever filed any

15   other lawsuits?

16        A.  No.

17        Q.  Have you ever filed any other claims

18   against the United States?

19        A.  No.

20        Q.  Ms. Castanel, what is your date of

21   birth?

22        A.  8/10/30.

23        Q.  What is that last?

24        A.  8/10/30.

25        Q.  And how old are you?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)          Earline Castanel

Page 15

```
 1        A.   79.

 2        Q.   And what are your current telephone

 3   numbers?

 4        A.   931-9560, my home -- I mean, my cell.

 5   My home is 404-1408.

 6        Q.   And are both of those in area code

 7   504?

 8        A.   Right.

 9        Q.   Do you have an e-mail address?

10        A.   No.

11        Q.   Do you have a computer?

12        A.   No.

13        Q.   What was the highest level of

14   education that you ever obtained?

15        A.   I think it was sixth or seventh

16   grade.

17        Q.   Were you born here in New Orleans?

18        A.   Yeah.

19        Q.   And you went to school here in New

20   Orleans?

21        A.   Yeah.

22        Q.   Have you lived your entire life in

23   New Orleans?

24        A.   Yes.

25        Q.   When were you last employed?
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Earline Castanel

Page 16

1          A.   I went for about a couple of weeks

2     after Katrina at St. Peter Claver.

3          Q.   And St. Peter Claver, is that a

4     school?

5          A.   Well, it's a school and a church, I

6     was working in the rectory.

7          Q.   How long did you work at St. Peter

8     Claver?

9          A.   You mean before the --

10         Q.   Before or after?

11         A.   I'd say about 30 years.

12         Q.   And what was your position?

13         A.   I used to keep the house for the

14    priests, did the housecleaning.

15         Q.   How many hours did you work a week?

16         A.   About 15 hours.  I used to go three

17    times a week.

18         Q.   And when did you stop working there?

19         A.   I don't remember exactly.

20         Q.   What's your best estimate?

21         A.   I think year before last I think it

22    was.  I'm not sure.

23         Q.   2007, 2008?

24         A.   I'd say the beginning of 2008, I'd

25    say.

```
                                            Page 17
 1          Q.  I want to go back to August of 2005
 2   prior to Katrina.  Where did you live?
 3          A.  St. Peter Street, 2925 St. Peter.
 4          Q.  2925 St. Peter Street?
 5          A.  Yes.
 6          Q.  And that's here in New Orleans?
 7          A.  Yes.
 8          Q.  Did you own or rent?
 9          A.  It was my mother's place.
10          Q.  Is your mother still alive?
11          A.  No.
12          Q.  Did anyone else from your family live
13   there besides yourself?
14          A.  It was sister but she's dead.
15          Q.  Are you considered the owner of that
16   house?
17          A.  Yeah.
18          Q.  And what type of house is it, is it a
19   stand-alone unit, is it a condo, is it a row
20   house?
21          A.  It's a standard house, a double.
22          Q.  And when you say "double," what do
23   you mean?
24          A.  It was two sides, my sister live on
25   one side and I lived on one side, but now it's
```

Page 18

1    -- it's one house, you know.

2         Q.   Got it.   It's one house but two

3    units.

4         A.   Yeah.

5         Q.   And how long had you lived there

6    prior to Katrina?

7         A.   All my life.   I was raised there.

8         Q.   Was your home damaged by Katrina?

9         A.   Yes.

10        Q.   Did you have homeowner's insurance

11   that covered the damage?

12        A.   Some of it.

13        Q.   And did you use that money to repair

14   the house?

15        A.   Yes.

16        Q.   And besides homeowner's insurance,

17   did any other entities provide you with money

18   to assist you in the repair of your house?

19        A.   Yes.

20        Q.   And who else provided you with monies

21   to repair your house?

22        A.   Oh, boy, FEMA.

23        Q.   And by "FEMA," are you referring to

24   the Federal Emergency Management Agency?

25        A.   Well, I don't know, I guess that's

1    what it is.  They came in and helped me that's

2    all I know.

3         Q.  Was the total amount that you got

4    from your insurance and FEMA sufficient to pay

5    for the repairs of your house?

6         A.  Well, I'm still doing a little

7    repairing, I still have some to do.

8         Q.  Was it sufficient to repair it so you

9    could move back in?

10        A.  Well, it was, you know, enough for me

11   to get back in the house, you know, I still

12   have some things to do.

13        Q.  When Katrina struck, did you evacuate

14   -- let me step back and start over.  Did you

15   evacuate New Orleans prior to Katrina striking?

16        A.  I left New Orleans the Saturday

17   before.  I went to Texas.

18        Q.  And where did you go in Texas?

19        A.  It was a -- they had a -- it was a

20   church or something that took us in, we was

21   sleeping on the floor.

22        Q.  And how long did you stay at that

23   church?

24        A.  We stayed a while and then we went

25   to, I don't know what you call it, I have to

Page 20

1    think of the name of that place.

2         Q.   Was it an apartment?

3         A.   It was like a hotel -- I can't think

4    of the name of it right now.

5         Q.   How long did you stay in Texas?

6         A.   I stayed in Texas until -- well, it

7    was while I was fixing my house.  I stayed in

8    Texas and then I came back down and I asked for

9    a trailer.  And then they told me they would

10   get me a trailer.  And when I got the trailer,

11   the lady told me that I could come and live in

12   her yard, you know, bring the trailer in her

13   yard.  So I had them to put the trailer there.

14   They gave me a handicap trailer.  And I don't

15   know, the man's name was Harry, that's all I

16   know, and he came and gave me the key and I

17   went in the trailer.  And that's where I was

18   staying while they was fixing my house.

19        Q.   Let me step back.  When did you leave

20   Texas and come back to Louisiana?

21        A.   I don't remember exactly when.  That

22   was about in about the beginning of 2006, I

23   think it was.  I'm not sure, I don't know

24   exactly.

25        Q.   I'm going to show you a document

Page 21

1    which we're going to mark as Exhibit No. 2

2    (tenders).  This is a plaintiff fact sheet for

3    Earline M. Castanel.  It's Bates stamped

4    PL_Castanel 02-000001 through 19.  And this is

5    a fact sheet that was provided to the United

6    States by your counsel.  And I believe that if

7    you turn to the last page of this document, do

8    you have that in front of you?

9         A.   This page (indicating)?

10        Q.   Yes.  Is that your signature?

11        A.   Yes.

12        Q.   And it's dated November 18th, 2009?

13        A.   Yes.

14        Q.   Do you recall going over this

15   document on or about November 18th, 2009?

16        A.   Yes.

17        Q.   And did you check this document to

18   make sure that everything was true and

19   accurate?

20        A.   Yes.

21        Q.   And to the best of your knowledge,

22   everything recorded in this document, is it

23   truthful and correct?

24        A.   Yes, as far as I know.  Because I'm

25   the one that answered the questions.

Page 22

1         Q.   And the reason why I ask you this is

2    that if you turn to the ninth page of Exhibit

3    No. 2, which is also Bates stamped 09 at the

4    end, do you have that in front of you?

5         A.   Yeah.

6         Q.   And it shows is there questions at

7    the top, 5, 6 and 7 and 6 it says -- 5 it says,

8    was the temporary housing unit provided to you

9    by FEMA a travel trailer or a mobile home and

10   travel trailer is marked, did FEMA provide you

11   with a travel trailer?

12        A.   It was just a trailer that sits on

13   blocks, that's all I know.  It sit on blocks,

14   that's all I could tell you.

15        Q.   And No. 6 it has move in date and it

16   has 2/2006 which, I think, means February 2006.

17   Is that your best recollection about when you

18   moved into the travel trailer?

19        A.   It's about around that time, I guess.

20   Like I said, around the first part of 2006.

21        Q.   Correct, and February is the early

22   part of 2006.

23        A.   I guess so.

24        Q.   Do you have any reason to believe

25   that this is incorrect or inaccurate?

Page 23

```
 1          A.   Well, that's about right there.
 2          Q.   And then it says, the next question
 3     there 7, move out date and it has 3/2007, which
 4     would be March 2007.  Is that the approximate
 5     date you moved out of the trailer?
 6          A.   I can't say exactly because I don't
 7     exactly remember.  But I do know I moved out
 8     around that time, but I don't know exactly.
 9          Q.   Understood.  That was your best
10     estimate of when you moved out.
11          A.   That's right.
12          Q.   Now, between the time you evacuated
13     the city and came back to Louisiana and moved
14     into the trailer, were you in Texas the entire
15     time?
16          A.   Yeah, I wasn't nowhere else.  I ain't
17     had nowhere else to stay down here.
18          Q.   I understand that.  And that's all I
19     wanted to make sure.  So between the first week
20     or the week before Katrina hit until you moved
21     into the trailer on or about February 2006, you
22     were in Texas.
23          A.   Yes.
24          Q.   When you came back to Louisiana in
25     February of 2006, what was the condition of
```

1    your house?

2         A.   Everything was messed up, water,

3    toilet, I mean, everything, the walls was all

4    wet and they had water all on the floor where

5    it went down, but where it was settled at was

6    higher than I -- taller than me.  You could see

7    all against the wall like where the mantlepiece

8    was, all that was messed, my furniture was all,

9    some parts was coming apart, mattresses was

10   soaked with water, I had lost all of my clothes

11   in the closet.  It was just a mess.

12        Q.   It was a disaster?

13        A.   Yes.

14        Q.   The house was not liveable, it wasn't

15   habitable.

16        A.   No, you couldn't live in it.  The

17   stove, all that was -- like the pots in the

18   cabinet where the dishes and pans and pots was,

19   you know, had water in it.  Water was soaking

20   in the pots, I had to throw all that out.

21        Q.   Was there mold and everything growing

22   in places?

23        A.   Yes.  It was a mess.

24        Q.   Other than this trailer, was there

25   anywhere else you could have lived when you

Page 25

1    came back to New Orleans?

2         A.   No, nowhere else.

3         Q.   Did you request that FEMA provide you

4    with the travel trailer?

5         A.   Well, I asked and I went around and

6    find out and they told me I could get some

7    help.  I went to this place it was on Frenchmen

8    where they had this trailer that you go in to

9    ask to get help with the trailer.

10        Q.   And you asked for them to provide you

11   with a travel trailer or some emergency

12   housing?

13        A.   Some place that I could live in.

14        Q.   And did you understand that that

15   travel trailer was for temporary purposes while

16   you repaired your house?

17        A.   Yes.

18        Q.   I'm sorry, what?

19        A.   Yes.

20        Q.   From February of 2006 until you moved

21   out of the trailer in March of 2007, did you

22   live in that trailer continuously?

23        A.   Yes.

24        Q.   You didn't go back to Texas or move

25   anyplace else?

Page 26

1        A.  No.

2        Q.  When you lived in that trailer, did

3   anyone else live in it with you?

4        A.  No.

5        Q.  When you received that trailer, was

6   it a new trailer or was it a used trailer?

7        A.  Well, now, I don't know, I didn't pay

8   attention.  I was just glad to get in it.

9        Q.  Did it seem to you that it had been

10  used before or did it seem new?

11       A.  I don't know, I didn't pay attention

12  to all that.

13       Q.  You can never find something when

14  you're looking for it -- here we go.  I'm going

15  to hand you a document which is marked Exhibit

16  No. 3 (tenders).  And this is a collection of

17  photographs.

18       MR. MILLER:

19           And there are copies coming around,

20  counsel.

21  BY MR. MILLER:

22       Q.  If you would look through these very

23  briefly?

24       A.  (Views documents.)

25       Q.  Have you had a chance to look through

Page 27

1    Exhibit No. 3?

2         A.   This looks like the same trailer I

3    was in.  I didn't see no background like this.

4         Q.   They're now in a storage facility.

5         A.   Oh, because I know it doesn't have no

6    background that looks like this.

7         Q.   How about the inside of the trailer?

8         A.   Now, the inside, now, this here, the

9    inside of the trailer was something like this

10   but this part here, the table was round.

11        Q.   Okay.

12        A.   The table was round.  And the part

13   where you come in the door, they had the sofa

14   here (indicating).

15        Q.   Was it a slide out unit where the

16   sofa slid out, part of the trailer popped out?

17        A.   I don't know, it was narrow, I know

18   that, that's all I know, it was a little narrow

19   spot just that you can walk in and make your

20   little turn and go to the bath, take your bath

21   and the kitchen.

22        Q.   It was a small space, wasn't it?

23        A.   It was very small.  It was set for

24   just one person, ain't no two persons could

25   live up in there, it was too tiny.

Page 28

1        Q.   Having looked at these photos, the

2    interior of this, does it appear to be similar

3    to the trailer that you lived in?

4        A.   All I know, this part here

5    (indicating), the table was round.

6        Q.   Okay.

7        A.   And this don't look like no round

8    table.

9        MS. GILBREATH:

10           For the record, the picture you're

11    referring to with the square-looking table is

12    FEMA 207-000006.

13        MR. MILLER:

14           Just for the record, I would note

15    that if you look at the picture, you'll see

16    that it's a table where the leafs on the side

17    are folded down and if those leafs would be

18    raised up, it would probably be a round table.

19        THE WITNESS:

20           Oh, well, maybe it's that then.

21    BY MR. MILLER:

22        Q.   Okay.

23        A.   But I know that it was round when I

24    went in there and it stayed round til I left

25    out.

Page 29

1      Q.  Got it.  Besides the table, does this

2  look similar to the interior of the unit that

3  you had, ma'am?

4      A.  This part right here and this the

5  refrigerator, and that was the bathroom right

6  here, and way back up in here was the bedroom.

7      Q.  Right.  So does it look similar?

8      A.  It looks similar right here.  But I

9  know one thing, this thing here, this part here

10  where the air condition was, every time you

11  turned around I had to be calling them for

12  that, that thing wouldn't work and water would

13  be leaking down.

14      Q.  Okay.  And let me ask you about this,

15  this trailer, from the pictures that I've seen,

16  looks very clean.  When you left the trailer,

17  did you clean it up before you left?

18      A.  Yeah, I didn't leave no mess.

19      Q.  No.  I agree with you.  I mean --

20      A.  I swept it, you know.

21      Q.  A lot of people didn't do that.

22      A.  Well, I swept the trailer and put the

23  sheet on the bed and left it straight.  I

24  didn't leave it in no mess.

25      Q.  You left it the way they gave it to

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                    Earline Castanel

Page 30

1    you.

2          A.   Clean.

3          Q.   Now, this trailer during the time

4    period it was provided to you, did FEMA ever

5    charge you any money for rent?

6          A.   No.

7          Q.   At any point, did the government also

8    provide a contractor who provided maintenance?

9          A.   Well, when I call in, I know the man

10   came and fixed the air condition a couple of

11   times.

12         Q.   Did they ever charge you for

13   repairing the air conditioner, doing any repair

14   work?

15         A.   No.

16         Q.   They never charged you for that?

17         A.   No.

18         Q.   And you understood that when you took

19   this trailer that it was a temporary shelter

20   until you got your home repaired?

21         A.   Yes.

22         Q.   And as soon as you had your home

23   repaired you moved out of your trailer and back

24   into your house.

25         A.   Right.

Page 31

1          Q.   And your house would be much more

2     comfortable rather than this small confined

3     space?

4          A.   Yes.

5          Q.   During the entire time you lived in

6     that trailer, was there any other housing

7     option you had available to you, apartment or

8     anything like that?

9          A.   No.

10         Q.   If you didn't have that trailer,

11    would you have been able to move back here in

12    New Orleans?

13         A.   Could I --

14         Q.   Without that trailer, could you have

15    come back to New Orleans?

16         A.   Well, there was nowhere for me to

17    come unless I go find a little apartment or

18    something.

19         Q.   Were there apartments available?

20         A.   I don't know.  I just went on and see

21    if I could get a trailer.

22         Q.   Okay.  Now, I want to go through this

23    fact sheet, which is Exhibit No. 2.  Okay?

24    Your counsel will direct you to the third page

25    of that document, of Exhibit No. 2.  Now, it

Page 32

```
 1    indicates here that you had some problems,
 2    symptoms or complaints when you were in the
 3    trailer.  Do you see that?  There's a whole
 4    bunch of -- on C3, there's a whole bunch of
 5    boxes and many of them are checked such as
 6    irritation to the eyes, irritation to nasal
 7    membrane inside the nose, do you see those?
 8         A.   You're talking about down here?
 9         Q.   Yes.  Do you see that?
10         A.   Yeah.
11         Q.   When you were in the trailer, did you
12    suffer irritation to your eyes?
13         A.   Well, when I was in the trailer,
14    after I was in there for a while, not too long,
15    then I started having my nose stopped up.  It
16    would get so stopped up like I had to go to the
17    door to see if I can catch some air, I couldn't
18    like hardly breathe.
19         Q.   So you had breathing problems?
20         A.   Yes.  My sinus.  When I get like that
21    I couldn't, I don't know, I keep going like
22    that (demonstrating), trying to catch my breath
23    because I couldn't breathe through my nose.
24         Q.   And this happened soon after you
25    moved into the trailer?
```

Page 33

1          A.   It was like five weeks or so after I
2    got in there, four or five weeks it started
3    getting like that.
4          Q.   And when you went outside of the
5    trailer, did that relieve the symptoms?
6          A.   Well, I would stand up by the door
7    until I keep doing that (demonstrating), and
8    then I would get some of that stuff, it's A-Y-R
9    I think it is, and spray in my nose to try to
10   open it up some.  And when it opened up a
11   little bit, well, I'd go back in there.
12         Q.   So you'd experience this symptom,
13   this difficulty breathing when you were inside
14   the trailer.
15         A.   Yeah.
16         Q.   And this started happening about five
17   weeks after you moved into the trailer?
18         A.   Yeah.
19         Q.   And to relieve those symptoms, you
20   would go outside the trailer.
21         A.   Yes.
22         Q.   And when you went outside the trailer
23   it would get better?
24         A.   Not that much.
25         Q.   A little bit?

Page 34

1          A.   Not that much.

2          Q.   Okay.  Besides this problem with your

3     sinus and breathing problems, did you have any

4     other problems that you attributed to the

5     trailer?

6          A.   No, I'd just feel bad sometimes, you

7     know, start feeling bad.  I know it wasn't very

8     comfortable, that's for sure.

9          Q.   Understood.  And what I want to know

10    is, what specific type symptoms were present,

11    how you presented, what was the problem, was it

12    a stomachache, was it headache, was it just

13    general malaise?

14         A.   I just would feel bad, I know that.

15    And I'd get that little funny feeling and I

16    would go lay down.

17         Q.   Let me ask you, you're 79 years old;

18    is that right?

19         A.   Yes.

20         Q.   Was the illness that you were

21    experiencing when you were in the trailer

22    different than other illnesses that you were

23    suffering?

24         A.   Before I didn't have all that problem

25    with that, you know, getting like -- sometimes

Page 35

1    I'd get like nauseated and I just thought it

2    was just one of them things.

3        Q.   And that's what I'm trying to get at,

4    was this something different, something unique

5    that you thought was being caused by the

6    trailer?

7        A.   I don't know what it was being caused

8    by, I just know I felt it.

9        Q.   So let's go through the symptoms you

10   had, sinus problems, breathing problems; is

11   that right?

12       A.   Yeah.

13       Q.   And those started about five weeks

14   after you moved in?

15       A.   Yes.

16       Q.   You had some generally just not

17   feeling well.

18       A.   Yes.

19       Q.   Anything else?

20       A.   That's about it I can think about

21   right now.

22       Q.   Did you ever suffer any irritation or

23   itching of the skin?

24       A.   Yeah.  My arm.  I have some marks

25   now, you see where it's like dry skin.  And you

Page 36

 1    can see the marks right here (indicating).

 2          Q.   Did that happen when you were in the

 3    trailer?

 4          A.   When I was in the trailer that

 5    happened, you know, I would be like dry, itchy.

 6          Q.   And when did that first present?

 7          A.   I don't know.  I know it happened

 8    while I was in there.

 9          Q.   Did it happen shortly after you were

10    in there, were you in there a couple of months,

11    how long before you started presenting with dry

12    itchy skin?

13          A.   I'd say about three months or

14    something, something like that, I don't know.

15    I can't remember exactly.

16          Q.   And I understand, just the best of

17    what your recollection is.  Did you have any

18    irritation or swelling of your eyelids or your

19    lips?

20          A.   It would get a little puffy, my eye.

21          Q.   And that happened when you were in

22    the trailer?

23          A.   Yes.  And I don't know, I'd get like

24    a dry feeling, you know.  Like I said, I would

25    get like a dry feeling.  And then I would get

Page 37

1    like itchy.  And then I'd look at my arm and it

2    would be kind of a little scaly.  And when I'd

3    do like this, you know, dry.  You could see all

4    the little spots where it was.

5         Q.  And the irritation, swelling of your

6    eyelids or the puffiness that you just

7    described, how long were you in the trailer

8    before you presented with that?

9         A.  I would say around the same time I

10   was getting my sinus trouble.

11        Q.  So about five weeks?

12        A.  About the same time around up in that

13   time.

14        Q.  Is that about five weeks?  And it's

15   not an exact science, just your best

16   recollection.

17        A.  I'll say about five or six weeks,

18   something like that.

19        Q.  And I'm sorry, because I have to --

20   we have to be clear on it, so is your best

21   estimate that you started suffering the

22   irritation or swelling of your eyelids --

23        A.  Around the same time I started with

24   the sinus thing stopping up and that's when my

25   eyes started puffing and then I started feeling

Page 38

1    all this itchy stuff.

2         Q.   Okay.  And you indicated earlier that

3    your eyes or your sinus was about five weeks

4    after you moved in?

5         A.   Yeah.

6         Q.   So that would be about five weeks

7    after you started suffering the puffiness and

8    irritation of the eyelids?

9         A.   Yeah.  About five or six weeks,

10   something like that.

11        Q.   Did you ever suffer any headaches

12   that you associated with the trailer?

13        A.   Well, I'd get a little headache, my

14   head would hurt like right up in here

15   (indicating).

16        Q.   Were those different from headaches

17   that you had prior to moving in the trailer?

18        A.   I know they'd hurt me more than when

19   I would have a regular headache.

20        Q.   And when did you start having those

21   headaches?

22        A.   Around the same time.  Everything

23   started around the same time, around 5, 6,

24   6 1/2 weeks, around that time.

25        Q.   You also indicate that you suffered

Page 39

1    nausea, abdominal pain, diarrhea, did those

2    symptoms start occurring about five or six

3    weeks after you moved into the trailer?

4        A.   It was about I would say three

5    months.

6        Q.   About three months after you moved

7    in?

8        A.   Yeah.   That's when I started getting

9    all kind of problems.

10       Q.   If we turn to the next page of

11   Exhibit No. 2, Ms. Castanel, there are some

12   other complaints here that are marked at the

13   top of that page.   And you see it says

14   tightness of chest, throat irritation,

15   hoarseness, are those symptoms that you also

16   suffered within five or six weeks after you

17   moved into the trailer?

18       A.   I wasn't looking at the time, I just

19   know I got them, you know, I had those problems

20   after, but I didn't know exactly what, if it

21   was like two weeks, three weeks, I didn't

22   notice all of that, I just know I had them.

23       Q.   And I guess what I'm just trying to

24   do is put the best estimate date that you think

25   it was, was it one month, two months, three

Page 40

1     months, four months after moving in?  I

2     understand it happened a while ago.

3              A.   I don't know exactly when.

4              Q.   And I understand that.  What's your

5     best estimate of when you started suffering

6     tightness of the chest, throat irritation and

7     hoarseness?

8              A.   It was I'd say around the fourth

9     month or something like that, third month,

10    fourth month.

11             Q.   Three or four months?

12             A.   Yeah.

13             Q.   And you also checked that you had an

14    upper respiratory tract infection.  Did you

15    have an upper respiratory tract infection that

16    you thought was caused by the trailer?

17             A.   I don't know.  I had a throat thing

18    and I went to my doctor and he gave me -- put

19    me in front of the heat lamp and looked at my

20    throat, put some medicine in my throat, he

21    packed my nose, he put me in front of the heat

22    lamp, he gave me a shot.

23             Q.   So when you marked upper respiratory

24    tract infection, you were talking about that

25    treatment that the doctor provided?

Page 41

1          A.  Yeah, up in my throat.

2          Q.  Now, did you have allergies before

3     you moved into the trailer?

4          A.  Well, I ain't never had nothing like

5     I had when I got in the trailer, you know, I

6     mean, I get a little headache.

7          Q.  And I understand that.  And the

8     reason I ask you is because it says the

9     worsening of allergies that you had previously.

10    Did you have allergies beforehand?

11         A.  Before, I might have a little stopped

12    up nose, but nothing compared to after I got in

13    that trailer what I was having.

14         Q.  Once you got in that trailer --

15         A.  It was like everything got worse.

16         Q.  And that started happening about five

17    or six weeks after you moved into the trailer?

18         A.  Yes.

19         Q.  And this is separate and apart from

20    that, were you ever treated or diagnosed with

21    allergies before you moved into the trailer?

22         A.  I had a little, I guess a little

23    light sinus trouble but nothing like I had when

24    I got in there.  After I was in there, that's

25    when I started really having it bad, I couldn't

Page 42

1    breathe.

2         Q.   When you moved into the trailer, was

3    there any odor or anything like that?  Was

4    there any smell or anything that you noticed?

5         A.   I'm not gonna lie, I didn't really

6    pay attention, you know.  It had something

7    going on in there to cause me to be having this

8    but, I mean, you know, I never gave it a

9    thought.

10        Q.   And I understand that.  And it's a

11   while ago, I understand that.

12        A.   Yeah.

13        Q.   The question is, did you notice any

14   odors or was there any special smell that was

15   different from things that you'd smelled

16   before?

17        A.   I can't say.

18        Q.   Let me approach it a different way.

19   If you burn something in your house most people

20   open up their windows; is that right, is that

21   reasonable?

22        A.   Yeah.

23        Q.   And you do that to get rid of that

24   burnt smell; right?

25        A.   Yeah.

Page 43

```
 1          Q.  At any point when you were living in
 2    the trailer, was there any odor or anything in
 3    there that caused you to want to open up the
 4    windows, open up the doors --
 5          A.  Well, I would open the window and I
 6    opened the door in there when it would get warm
 7    and then, you know, it would get -- I don't
 8    know, I just would open them up.  I don't know.
 9          Q.  Whenever it got warm inside, would
10    you generally open up the windows?
11          A.  Well, when the air condition was
12    working, I wouldn't bother with opening it up.
13    But when the air condition started acting up,
14    sometimes it would be a couple of days before
15    they'd come and check it and I'd have to open
16    the windows too.
17          Q.  Got you.  Did you have a fan or
18    anything that you would use inside the trailer?
19          A.  No.
20          Q.  Did the trailer also have ceiling
21    vents that you could open up?
22          A.  They only had that one little vent in
23    the center, it was an air conditioner.
24          Q.  Okay.
25          A.  That's all they had up in there.
```

1          Q.  Was there a ceiling vent in the

2    bathroom that would open up?

3          A.  No.  They ain't had no vent in the

4    bathroom, only that one thing where they had

5    that air conditioner.

6          Q.  The door that you had, was there a

7    screen door so you could open the door and

8    leave the door open?

9          A.  Yeah, they had a screen door.  And

10   one time something got loose with that, I had

11   to call them up to come and fix that.  I can't

12   tell you exactly what date it was or when it

13   was, you know, but I had to call them to come

14   and check that.

15         Q.  Now, if we turn to the form, Exhibit

16   No. 2, page No. 4 if you go down to point No. 5

17   there, do you see that, it says:  When do you

18   claim this injury or disease first occurred?

19   And it's written in there 3/2006 or what I

20   believe would be March 2006; is that correct?

21         A.  I'd imagine.

22         Q.  Is that when you first believe you

23   started experiencing problems in the trailer?

24         A.  Around the third and fourth month,

25   something like up in there, that's when I

Page 45

 1   started having this bad sinus condition and all

 2   this.

 3        Q.   And just to make it accurate, you

 4   have March 2006, it may have been April 2006,

 5   it could have been a little bit earlier or a

 6   little bit later.

 7        A.   It could have been.

 8        Q.   This is just your best estimate.

 9        A.   That's it.

10        Q.   Now, before that -- now, you said you

11   had some problems with your air conditioning

12   and also some problems with the screen door,

13   when you had those problems, did you contact

14   the maintenance persons?

15        A.   I call up and they send a guy out

16   there.  But sometimes I'd have to wait like

17   maybe three days before they'd come out and fix

18   it.  It was leaking -- had water dripping from

19   it down in there.

20        Q.   When you called up, did they

21   eventually come out to fix it though?

22        A.   They came out and fix it but it

23   wasn't that same day.  It would be like two or

24   three days, sometimes four days before they

25   come, and that happened about three times.

Page 46

1          Q.   And each time that it happened, did

2     they send someone out to fix it within two or

3     three days?

4          A.   Yeah, they sent someone out.

5          Q.   Besides the air conditioning, I think

6     you said you complained because the screen door

7     broke or there was some problem with the screen

8     door.

9          A.   Yeah, with the door.

10         Q.   And did they send someone out to fix

11    that?

12         A.   Yeah.

13         Q.   Again, within two or three days?

14         A.   That must have been about I'd say

15    five days before they came out for that.

16         Q.   Okay.  So within about five days they

17    sent someone out to repair the screen door.

18         A.   Yeah.

19         Q.   Other than complaining about your air

20    conditioning those times and the screen door,

21    were there any other complaints that you had

22    about the travel trailer?

23         A.   I don't know, that's about it, I

24    think.

25         Q.   Are those all the complaints that you

Page 47

1    can recall at this time?

2         A.  At this time right now that's about

3    all I can recall.

4         Q.  Did you ever contact FEMA and say

5    hey, this trailer is causing me problems with

6    my sinuses or I'm having problems, I think it's

7    not good for my health?

8         A.  No, I didn't know what to do then.

9         Q.  Okay.  And I'm just asking you.  But

10   did you ever call up FEMA and say hey, I have

11   these problems?

12        A.  I'd just call up when something went

13   wrong, that's when I'd call.

14        Q.  Is it fair to say that you never

15   called FEMA and said, this trailer is causing

16   me health problems?

17        A.  No.  I don't remember calling them

18   for that.

19        Q.  Did you ever call FEMA and say hey,

20   there's bad odors in this unit, you need to do

21   something about this?

22        A.  I'm trying to think.  So much done

23   happened since then I can't remember right now.

24        Q.  Do you ever recall other than asking

25   FEMA for the trailer and calling them up and

1    asking them to pick up the trailer, do you ever

2    recall calling FEMA up and asking them anything

3    about the trailer?

4         A.   I can't remember.

5         Q.   I'm sorry?

6         A.   I can't remember right now.

7         Q.   To the best of your recollection, did

8    you ever call up FEMA with any complaints about

9    the trailer?

10        A.   Other than what I told you about the

11   air conditioning and the door.

12        Q.   Other than the air conditioning and

13   the door, anything else that you can recall?

14        A.   I can't recall right now.  I'm trying

15   to think.  There was something else I called

16   for, but I can't think what it was for.  It was

17   something else happened in there.  I don't know

18   if it was -- it was something with some line

19   around there they had to come check on almost

20   by the door in that corner, but I can't think

21   about what it was, if it was something about

22   that heater, whatever they had going around

23   there, I called for something for that.  But I

24   can't exactly remember exactly what it was.

25        Q.   Did someone come out and fix that

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Earline Castanel

Page 49

1    then?

2         A.   They sent somebody out but I don't

3    know what they was doing, it was some little

4    pipe they was fooling with.

5         Q.   Is it fair to say that every time

6    that you called up and complained about

7    something, someone came out and did something

8    in response to that complaint?

9         A.   They came out, but they didn't come

10   out exactly right then and there, I mean, I had

11   to wait.

12        Q.   I understand that.  And that is

13   understood that they didn't come out right

14   away.  But from what I gather from what you've

15   testified, every time you did complain,

16   eventually someone came out, sometimes it was

17   two or three days later, sometimes five days

18   later, maybe even longer than that, but someone

19   came out and repaired that problem.

20        A.   Yeah.

21        Q.   Is that "yes"?

22        A.   Yeah, they came out.

23        Q.   Now, did you ever complain to anyone

24   about these health problems or symptoms which

25   you believe were caused by the trailer?

Page 50

1          A.   Well, the lady I did tell it too, the

2     lady is dead now.

3          Q.   And who was that?

4          A.   Her name was Maude Robert (assumed

5     spelling), Robert, that's all I know.

6          Q.   And was she a friend of yours?

7          A.   Yeah, she was an older lady.

8          Q.   And what did you tell her?

9          A.   I would just tell her oh, I feel bad

10    and tell her how I was feeling, you know, about

11    my sinuses.  Because there was a side yard, her

12    house was sitting like here, this was the side

13    yard.  They had a backyard and side yard, so my

14    trailer was on the side of the house, you know,

15    in that side yard.

16         Q.   So you were neighbors?

17         A.   Right, we were neighbors.

18         Q.   And like most neighbors you would

19    talk about things with each other.

20         A.   Yeah.  When I'd see her because I

21    didn't see her that much, she mostly stayed

22    inside.  She was 80 something years old, she

23    stayed inside mostly.

24         Q.   And what did you tell her were the

25    problems that you thought were being caused by

Page 51

1    the trailer?

2         A.   I just told her what was going on

3    about the air condition and the door and things

4    like that, you know.

5         Q.   Did you tell her that you thought the

6    trailer --

7         A.   I told her about my -- there's

8    something going on, I say because I keep

9    feeling bad and my nose will get stopped up and

10   I couldn't breathe.  I'd tell her things like

11   that, you know, just talking with her like

12   that.

13        Q.   And you indicated that these symptoms

14   started happening about five, six weeks after

15   you moved into the trailer, is that when you

16   were talking about with her about these things?

17        A.   Well, I didn't know exactly what was

18   going on then while I was feeling like that.

19   But then after that, you know, when she would

20   come out and I'd see her she'd say how you

21   feeling today, I'd tell her, well, I ain't

22   feeling too hot, you know, I don't know what it

23   is but I feel all stopped up and whatever.

24        Q.   Besides talking to Ms. Robert, did

25   you talk to anyone else about your health

Page 52

1    problems or symptoms that you were experiencing

2    in the trailer?

3         A.  Well, I would tell my daughter.  When

4    I see them, I tell them or when I get on the

5    phone, when they phone me and I tell them I

6    feel bad.  And I tell them how I was feeling.

7         Q.  Did you tell them that you hadn't

8    felt bad like this before you moved into the

9    trailer?

10        A.  Yeah, that's right.

11        Q.  And how often would you talk to your

12   daughter?

13        A.  Like maybe twice a week or something

14   like that.  But they be busy working.  And my

15   other daughter, she would traveling so whenever

16   I have a chance to talk to her, I'd talk to her

17   and I'd tell her how I felt.

18        MS. GILBREATH:

19             Can we take a break?

20        MR. MILLER:

21             We certainly can.

22             We're off the record.

23             (Whereupon, a short break was taken.)

24        MR. MILLER:

25             Back on the record.

Page 53

1    BY MR. MILLER:

2        Q.   When we broke, we were talking about

3    discussions that you had with persons about the

4    complaints or concerns that you experienced

5    when you were in the trailer, and you told me

6    that you talked to a Ms. Robert, to one of your

7    daughters; is that right?

8        A.   To tell them how I feel.

9        Q.   And besides your daughter and Ms.

10   Robert, anyone else who you talked to about the

11   complaints or concerns that you experienced in

12   the trailer?

13       A.   No.

14       Q.   Now, did you tell them that you

15   thought that these things were happening to you

16   after you moved into the trailer?

17       A.   Yeah.

18       Q.   And did you tell them that these were

19   things that you didn't experience before moving

20   into the trailer?

21       A.   Yeah.

22       Q.   What advice did they give you, if

23   any?

24       A.   They didn't really tell me, they

25   just, you know, take your medicine whatever the

Page 54

1    doctor give you and that's what I did, you

2    know.

3         Q.   Anything else other than take your

4    medicine?

5         A.   That's all they said.

6         Q.   I mean, I'm sitting here and I

7    understand that you're complaining to your

8    daughter and to your neighbor that in this

9    trailer, you've moved in, you're having these

10   sinus problems, you're having this itchy skin,

11   you're having these problems that you didn't

12   have before moving in the trailer and all they

13   told you was to take your medicine?

14        A.   Well, when I was feeling like that,

15   like my daughter would be out of town, well, I

16   just went to the doctor and I took the

17   medicine.  When she came in town, I told her I

18   had the medicine and I told her what they told

19   me and I took the medicine.  And she would tell

20   me:  Well, Mama, all you can do is take your

21   medicine.  Nothing else she could tell me.

22        Q.   Now, these are symptoms these

23   problems that you're talking about, these were

24   things that you weren't experiencing or

25   presenting with before you moved in the

Page 55

1    trailer?

2         A.   What do you mean?

3         Q.   You didn't have these problems before

4    the trailer?

5         A.   Oh, no, I ain't had all this.

6         Q.   And I just want to make sure it's

7    clear, when you were in Texas, did you have

8    these problems with your sinuses, did you have

9    these problems with the itching, with this bad

10   feeling?

11        A.   No.

12        Q.   Is that no?

13        A.   No, I didn't have that in Texas.

14        Q.   After you moved into the trailer

15   within five or six weeks you started

16   experiencing these problems.

17        A.   Yes.

18        Q.   And when you were talking to Ms.

19   Robert and your daughter you told them that

20   when you moved into the trailer that these

21   things started happening.

22        A.   It was, like I said, three or four

23   weeks, five weeks like that I started feeling

24   that.

25        Q.   And did you tell your daughter and

Page 56

1    your neighbor --

2           A.   Well, I didn't tell them just then.

3           Q.   Did you tell them shortly after that?

4           A.   Yeah, a while after.

5           Q.   Besides Ms. Robert and your daughter,

6    anyone else that you talked about regarding

7    these complaints or concerns with the trailer?

8           A.   I didn't know anyone around there.

9           Q.   How did you learn about this lawsuit,

10   that people were filing suit against the

11   government, manufacturers, government

12   contractors because of the formaldehyde in the

13   trailers?

14          A.   Well, I didn't know about it till I

15   just -- I just hear people talking about it,

16   then I said well, I'm going check it.

17          Q.   Who did you hear talking about this?

18          A.   I don't know those people, I just see

19   them talking.  And I'm not the type of person

20   to ask questions.

21          Q.   I'm sorry, what was that?

22          A.   I say, I'm not the type that if I see

23   somebody -- hear somebody talking to go ask

24   them what you talking about and all that.  I

25   sit and listen.

Page 57

```
 1          Q.   Who did you hear talking about this
 2     lawsuit?
 3          A.   I don't know those people, I just see
 4     them talking.
 5          Q.   Well, at some point in time you went
 6     and contacted counsel; is that right?
 7          A.   I don't know.
 8          Q.   Well, let me ask you this another
 9     way, do you know, did you know Mr. Woods,
10     Justin Woods before this lawsuit?
11          A.   No.
12          Q.   How did you come to meet Mr. Woods?
13          A.   Who is Mr. Woods?
14          Q.   Justin Woods.  Do you recall filling
15     out a form --
16          A.   Oh, the other lady was over at that
17     office, I don't know names.
18          Q.   Okay.  I'm going to show you a couple
19     of documents and maybe we'll --
20          MR. MILLER:
21               What are we at Exhibit 4?
22               (Whereupon, the court reporter
23     responded affirmatively.)
24     BY MR. MILLER:
25          Q.   Exhibit 4 and Exhibit No. 5, I'll ask
```

Page 58

1    you if you've seen either of those before

2    (tenders). Exhibit No. 4 is a letter to FEMA

3    from Gainsburgh, Benjamin dated August the 6th,

4    2008, and it says that it's enclosing claims

5    regarding various persons. And on that first

6    page it's Bates stamped, for the record, FEMA

7    179-000001 through 03. And the first two pages

8    are the letter and the third page is a Federal

9    Express cover letter. Have you ever seen

10   Exhibit 4 before, that letter (tenders)?

11        A.   I may have seen it but I don't

12   remember.

13        Q.   Okay. You don't remember seeing the

14   document that's marked Exhibit 4; is that

15   right?

16        A.   I don't remember.

17        Q.   Now, Exhibit No. 5 is a document that

18   is Bates stamped, there's two Bates stamped

19   numbers and I'm just going to give one range,

20   FEMA 000983 through 986. The first three pages

21   are a standard form 95 claim form and the last

22   page is a contingency fee arrangement, a

23   retainer?

24        A.   I can't see this, it's too small.

25   The writing, I can't see none of it.

Page 59

1        Q.  Do you have glasses?

2        A.  No.

3        Q.  Well, go to the last page of that

4    document, Exhibit No. 5.

5        A.  It's my signature but I can't make

6    out nothing there.

7        Q.  Let me ask you first, if you go down

8    to the bottom third of that page that last

9    third it has your name, do you see Earline

10   Castanel?

11       A.  Yeah, I see that but it's larger than

12   this up here.

13       Q.  I understand.  And your signature is

14   there as well; is that right?

15       A.  Yes.

16       Q.  And I will tell you that what this

17   says is a contingent fee retainer.  And it

18   says, "I, Earline Castanel hereby retain and

19   authorize the law firm of Gainsburgh, Benjamin,

20   David, Meunier, & Warshauer, L.L.C. to act as

21   my attorneys and to represent me in connection

22   with my claim for damages or loss resulting

23   from residing in a FEMA, Federal Emergency

24   Management Agency provided travel trailer."  Do

25   you see that?

Page 60

1       A.  Yeah.

2       Q.  Do you remember signing a document

3   like that?  Let me step back, you hired this

4   law firm; is that right?

5       A.  I did.  But I can't see all of this

6   and I can't remember.

7       Q.  I understand.  Don't worry about the

8   document right now.  Did you hire this law firm

9   to act as your attorneys?

10      A.  Yes.

11      Q.  Okay.  And you hired them to bring a

12  lawsuit because of your claims for injuries

13  that you believe were caused from living in the

14  travel trailer.

15      A.  Yes.

16      Q.  And were you aware that Mr. Justin

17  Woods had filed a claim against FEMA seeking to

18  recover on your behalf $106,500?

19      A.  I can't see that.

20      Q.  I would just represent to you this

21  document Exhibit No. 5 was sent to FEMA by your

22  counsel.

23      A.  I know I spoke to them.

24      Q.  And this document says that you

25  suffered property damage of $6,500.  What

Page 61

1    property damage did you suffer?

2          A.  Well, my home.

3          Q.  I understand from the flood your home

4    got damaged.

5          A.  Yeah.

6          Q.  But when you were living in the

7    trailer --

8          A.  Oh, yeah.

9          Q.  -- did you have any property damage

10   because of the trailer?

11         A.  I don't know nothing about that.

12         Q.  And that's what I want to get at.

13   Did the trailer cause any damage to your

14   property?

15         A.  Well, I told you where I was staying.

16         Q.  I understand that.  My point is, did

17   something you own, clothing, furniture that was

18   in the trailer, was that damaged because of the

19   trailer and the formaldehyde in the trailer?

20         A.  I'm trying to think.  I don't know.

21   The only thing I could say like a couple of

22   times like my little spread and stuff was kind

23   of close to the -- that bed part was close to

24   the back part where they had that whatever you

25   call it, the heat or -- that's all I know.

Page 62

```
 1        Q.  And all I want to know if there's
 2   anything of your property that you think was
 3   damaged by formaldehyde, which is the chemical
 4   at issue?
 5        A.  Well, I don't know.  Some of the
 6   things I had like my clothes that I had in that
 7   little closet, you know, they wasn't looking
 8   too hot, they wasn't smelling too hot, that's
 9   all I know.
10        Q.  Did you throw the clothes out or did
11   you keep them?
12        A.  Well, I didn't keep that, not them
13   things that was smelling, I didn't keep that.
14   I throwed (sic) that out, that.
15        Q.  What did you throw out?
16        A.  A couple of outfits I had.  I didn't
17   have too much.
18        Q.  And that's because of the odors or
19   whatnot in the trailer?
20        A.  This was in that closest where I had
21   the clothes hanging.
22        Q.  What was the odor that was in the
23   closest?
24        A.  It smelled rancid or something.
25        Q.  Did you ever complain about that to
```

Page 63

1    FEMA or to the maintenance contractor?

2          A.    No.

3          Q.    I'm sorry?

4          A.    No.  I just figured it was just a

5    closest, you know, like you have something a

6    while in the closest and you take them out how

7    they smell.

8          Q.    Now, you're also claiming $100,000

9    for the injuries, the sinuses, the problems

10   with your skin, feeling bad in the trailer.  Is

11   that the amount that you are seeking here?

12   Actually, did you have any discussions with

13   anybody regarding --

14         A.    I just went to my lawyer and I just

15   talked to him.

16         Q.    Don't tell me what you said with your

17   lawyer, but is it fair to say that you were

18   relying upon your lawyer's advice for that?

19         A.    Right.

20         Q.    And you hired your lawyers to take

21   care of that for you.

22         A.    Right.

23         Q.    I think I'm almost about done here.

24   Why don't we take about a three or four or five

25   minute break, if that's okay, I'll go over my

Page 64

1    notes then I'll finish up my questions.  This

2    gentleman here and Ms. Whitfield might have

3    some questions after that.  Okay.

4         A.  Okay.

5         MR. MILLER:

6             Thank you, ma'am.

7             (Whereupon, a short break was taken.)

8         MR. MILLER:

9             Let's go back on the record.

10   BY MR. MILLER:

11        Q.  You have in front of you a document

12   which is marked Exhibit No. 6, it's Bates

13   stamped FEMA 159-000009 through 012.  The first

14   page is a document that is titled U.S.

15   Department of Homeland Security, Federal

16   Emergency Management Agency, Emergency Shelter

17   Agreement to Rules of Occupancy, and in the

18   middle of the page it has the name Earline

19   Castanel and I believe your signature; is that

20   correct?

21        A.  Uh-huh (affirmative response).

22        Q.  And have you to say "yes" or "no."

23        A.  Yes.

24        Q.  And it also appears to be dated

25   3/11/06, or March 11th, 2006; is that right?

Page 65

```
 1          A.   Yes.

 2          Q.   And is that also your handwriting?

 3          A.   Yes.

 4          Q.   And so is it fair to say that you

 5     would have signed this document on or about

 6     March 11th, 2006?

 7          A.   Yes.

 8          Q.   It has a name Edwin Ganier a little

 9     bit below your name.  Do you see that?

10          A.   Uh-huh (affirmative response).

11          Q.   Who is Mr. Ganier?

12          A.   Just a friend of mine.

13          Q.   And was the trailer that you occupied

14     installed on his property?

15          A.   His mother's property.

16          Q.   And what was the address where your

17     trailer was installed?

18          A.   It's 2261 but that was a lot, so I

19     don't know if it go with the address or the

20     house.

21          Q.   What was the address that you thought

22     that the trailer was installed on?

23          A.   2250 something, I don't know.

24          Q.   If you look on this document there at

25     the top of the page there, it says location,
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                Earline Castanel

Page 66

1    very top it says location 22 --

2         A.   2261.

3         Q.   Right.  And what was the street?

4         A.   Urquhart.

5         Q.   How do you spell that?

6         A.   I don't know how you spell that.

7    It's all screwed up here.  I didn't write that,

8    that's not my handwriting.

9         Q.   Is it U-R-Q-U-H-A-R-T?

10        A.   Yeah, Urquhart.

11        Q.   Urquhart Street?

12        A.   It's right there on this page here,

13   it's printed.

14        Q.   And you're talking about the third

15   page of Exhibit No. 6 which is Bates stamped

16   FEMA 159-000011; is that correct?  At the

17   bottom of the page, I'm referring to that.

18        MS. GILBREATH:

19             For the record, I think she was

20   actually referring to the second page.

21        MR. MILLER:

22             Okay, that's fine.

23        THE WITNESS:

24             I was telling him about the name of

25   the street.

Page 67

1        MS. GILBREATH:

2            Right.  On the second page of the

3    document.

4        THE WITNESS:

5            Yeah, it's written right here.

6    BY MR. MILLER:

7        Q.  So the address where the trailer was

8    installed was 2261 Urquhart, and it's spelled

9    U-R-Q-U-H-A-R-T; is that right?

10       A.  Right.

11       Q.  And the trailer was on that location

12   the entire time you occupied it.

13       A.  Right.

14       Q.  And the land that the trailer was on

15   was owned by Mr. Ganier or his family?

16       A.  I know his mother.  I don't know who

17   it's owned by.

18       Q.  Okay.  But he's the one who gave you

19   permission to put the trailer there.

20       A.  The mother.

21       Q.  His mother gave you permission.

22       A.  Yeah.

23       Q.  Now, this document is signed March

24   11th, 2006.  You indicated on your fact sheet,

25   Exhibit No. 2, that your best estimate of the

Page 68

1   date that you moved in was February 2006 that

2   you moved into the trailer.  Do you think that

3   it may, in fact, be the date you moved into the

4   trailer may have been March 11th, 2006, when

5   you signed this agreement?

6        A.   I don't know if it was March 6th or

7   March the 11th.

8        Q.   And that's what I'm getting to.  When

9   you moved into the trailer, did you have to

10  sign some papers?

11       A.   I think, but I don't know if it was

12  before I went in the trailer or after.  I can't

13  remember.

14       Q.   Okay.

15       A.   All I remember is --

16       Q.   What do you remember?

17       A.   That Mr. Harry, the one that gave me

18  the key, that's all I remember.  And I don't

19  know what day that was.

20       Q.   So your best recollection as you sit

21  here stays the same, you moved in, best

22  estimate was February of 2006?

23       A.   Yeah.

24       Q.   Just to make it very clear, within

25  five to six weeks of moving in you started

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Earline Castanel

Page 69

1    suffering these symptoms, sinus problems,

2    itching, dry itching skin, generally not

3    feeling good; is that right?

4           A.   Yes.

5           Q.   Prior to moving into the trailer you

6    weren't experiencing those symptoms or those

7    problems?

8           A.   No.

9           Q.   You didn't have those problems

10   before?

11          A.   No.  I had a -- I used to have my

12   nose stop up a little bit but nothing like I

13   had it in there.

14          Q.   It was different and it was much

15   worse.

16          A.   Yes, it was much worse.

17          Q.   It was different than what you'd

18   experienced before and it was worse than you

19   experienced before?

20          A.   Yes.

21          Q.   And that happened within five or six

22   weeks of moving in the trailer.

23          A.   Yes.

24          Q.   And you had discussions with your

25   neighbor and your daughter about these

Page 70

1    problems?

2         A.   Yes.

3         Q.   And I think you also indicated that

4    you mentioned it to your doctor; is that right?

5         A.   Yes.

6         Q.   And did these problems go away after

7    you moved back into your house?

8         A.   I might have a -- well, I'll say yes,

9    because I don't have that anymore.

10        Q.   So these were problems that you had

11   because you attributed because of the trailer?

12        A.   Yeah.

13        Q.   And at no time did you complain to

14   FEMA or the maintenance contractor about these

15   problems?

16        A.   No.  I mean, when the guy came and

17   fixed that I told him I wasn't feeling good,

18   but I don't know who he was or nothing.  You

19   know, when they come in and say, good evening,

20   how you doing, I'd just say, well, I'm not

21   doing too well, that's all.

22        Q.   But you never called up FEMA and said

23   hey, I need for you to replace this trailer or

24   put me someplace else?

25        A.   No.

Page 71

1      Q.   And the complaints that you called up

2   about were the air conditioning several times,

3   the screen door that needed to be repaired, and

4   some wire thing that was running around that

5   had to be repaired; and in each of those

6   occasions within 2, 3, 4, 5, 6 or 7 days

7   someone came out and fixed it; is that correct?

8          A.   Yeah.

9      Q.   And when you were in this trailer, if

10   the air conditioning wasn't working and it was

11   warm you would open the windows.

12          A.   Yeah.

13      Q.   And if it was warm out and the air

14   conditioner was working you'd run the air

15   conditioning?

16          A.   Yes.

17      Q.   And during the time in there, as you

18   sit here today, you don't recall any strange

19   odors or anything like that?

20          A.   No.   Just when I'd -- like I say,

21   when I took my clothes out that's what -- I

22   smelled my clothes, they had a funny odor,

23   that's all I know.

24      Q.   Those were just from the clothes that

25   were in the closet; right?

Page 72

1       A.   That were in the closet.

2       Q.   Okay.  When you were in the trailer

3   yourself, you don't recall any strange odors or

4   any bad odors or anything like that?

5       A.   I don't know.  I can't say right now.

6       Q.   You don't recall one way or the

7   other?

8       A.   No.

9       Q.   And so as we sit here today, you

10  don't remember whether or not there was any bad

11  odor in the unit?

12      A.   No.

13      Q.   Any odor that would be a chemical

14  type smell?

15      A.   I don't know.

16      Q.   Did you ever, when you were in the

17  trailer, have an odor that you thought smelled

18  like chemicals or a bad chemical type smell?

19      A.   Well, like a car pass or something

20  I'd say -- you know, sometime and they -- I

21  don't know what you would call it, a muffler or

22  whatever, well, once in a while I smell that

23  and I don't know if it was coming from a car or

24  not, I can't say.  Because I'd have the door

25  open and the screen closed, you know, when it's

Page 73

1   cool weather so I couldn't tell you.

2        MR. MILLER:

3             Ms. Castanel, I really appreciate

4   your patience with me.  I have no further

5   questions at this point.  I reserve the right,

6   if we go forward with this case, to come back

7   to talk to you about some other things.  But I

8   really do appreciate your patience very much.

9   Thank you, ma'am.

10  EXAMINATION BY MR. MULCAHY:

11       Q.  Ms. Castanel, I'm Randall Mulcahy.

12  I'm here on behalf of Recreation by Design.

13  We're asking a little bit of questions.  And

14  I'm going to ask questions kind of maybe a

15  little more all over the place because

16  Mr. Miller has already asked several and I'm

17  going to be doing a little bit more follow ups,

18  so I might be kind of all over the place, but

19  I'll try to get you to follow along.  But this

20  -- where the unit was located, where the travel

21  trailer was set up on Urquhart Drive location,

22  do you know if that area flooded as part of

23  Katrina?

24       A.  Well, I know it didn't flood there.

25       Q.  It was a vacant lot?