```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF LOUISIANA

 3                    NEW ORLEANS DIVISION

 4    In Re:  FEMA Trailer     )

 5    Formaldehyde Products    ) MDL No. 1873

 6    Liability Litigation     )

 7

 8                              Washington, D.C.

 9                              Tuesday, July 7, 2009

10    Videotape Deposition of DAVID EDWARD GARRATT, called

11    for examination by counsel for Plaintiffs in the

12    above-entitled matter, the witness being duly sworn

13    by CHERYL A. LORD, a Notary Public in and for the

14    District of Columbia, taken at the offices of NELSON

15    MULLINS RILEY & SCARBOROUGH LLP, 101 Constitution

16    Avenue N.W., Suite 900, Washington, D.C., at 9:07

17    a.m., and the proceedings being taken down by

18    Stenotype by CHERYL A. LORD, RPR, CRR.

19

20

21
                                                    EXHIBIT
22                                                    "G"
```

**EXHIBIT "G"**

Page 207

1    Q.    From a formaldehyde standpoint.

2    A.    None whatsoever.

3    Q.    Can you talk a little bit about why FEMA
4 used travel trailers by the thousands both prior to
5 Hurricane Katrina and during the Hurricane Katrina
6 response?

7    A.    They were the preferred direct temporary
8 housing product because of their -- because of their
9 size, because we could move them in and set them up
10 quickly.  I think 80 percent of the units that we
11 provided in response to hurricanes Katrina and Rita
12 were on individuals' private property.  And typically
13 we put travel trailers on private property or often
14 because we can't fit anything else on their private
15 property.  They simply can't accommodate a mobile
16 home on their driveway.

17        So they were used because, number 1, they
18 filled a need that could not be met any other way.
19 2, they were inexpensive compared to a mobile home.
20 3, they allowed people to stay at their property and
21 rebuild their home as opposed to relocating them to a
22 community site that might be miles away and might be

Page 208

1  far more expensive to build.
2          So a number of reasons I think contributed
3  to the use of travel trailers and their popularity at
4  least within a certain segment of the disaster
5  population on those small properties and wanted to
6  stay on their property and rebuild their home.
7     Q.   Am I also correct that during the prior
8  natural disaster events that we talked about prior to
9  Hurricane Katrina, can we assume that there were
10 young children and elderly people and stay-at-home
11 moms living in those travel trailers as well?
12    A.   I think that's safe to assume.
13    Q.   And again you're not aware of any
14 formaldehyde claims by any of those people in those
15 prior disasters?
16    A.   I'm not personally aware of any.
17    Q.   When you were working with the CDC after
18 Hurricane Katrina, did you become aware of the
19 results of a study that they did in Hancock County,
20 Mississippi, of children's pre-Katrina and
21 post-Katrina doctor visits?
22    A.   Not by -- not by that reference.

David Edward Garratt                                              July 7, 2009
                           Washington, DC

```
                                                              Page 211
 1    FEMA, dash, Waxman 23.
 2              Looks to be a memorandum from Secretary
 3    Chertoff -- to Secretary Chertoff from David
 4    Paulison.
 5              Let me -- let me show you that document
 6    and ask you first if you've seen it before.
 7       A.     I think I have seen this before, and I
 8    think I probably participated in the review and
 9    editing of this document, I think.
10       Q.     What does that document say about the
11    number of complaints FEMA had recorded in Louisiana
12    on formaldehyde as of July 2006, compared to the
13    total number of trailers on the ground in Louisiana?
14       A.     You want to give me a clue as to where
15    in --
16       Q.     Yes.
17              On the first page in about the middle.
18       A.     Okay.  Well, the number of complaints
19    recorded by FEMA thus far has been minimal, 20 plus
20    complaints out of 79,000 trailers deployed in
21    Louisiana.
22              Is that the reference?
```

```
                                                        Page 225
 1    may exist within the contract acquisitions framework,
 2    but I'm not familiar with the existence of any such
 3    policy.
 4         Q.    Was it a FEMA practice to make that
 5    recommendation?
 6         A.    Yes.
 7         Q.    Okay.  And you explained that at some
 8    point, FEMA came to the realization that it might
 9    have a possible systemic formaldehyde problem.  I
10    think that's the way you described it.
11               Is that a fair way to describe it?
12         A.    Yes.
13         Q.    Okay.  And I'm not trying to dictate a
14    date on that, whatever it turns out to be, but at
15    some point in time around the time of the Sierra Club
16    results, I understand that the problem seemed to be
17    one that needed greater attention than perhaps it was
18    getting.
19               Is that true?
20         A.    Yes.
21         Q.    And as I understand your testimony, FEMA
22    assumed the responsibility for coordinating the
```

```
                                                          Page 226
 1    response to this issue at that time, whenever it was.
 2              Isn't that fair?
 3    A.   That is fair.
 4    Q.   And FEMA debated what an appropriate
 5    response might be, whether it be testing, warnings,
 6    or taking people out of the trailers.
 7              Is that true?
 8    A.   True.
 9    Q.   Okay.  And you would agree with me that
10    the responsibility for determining an appropriate
11    programmatic response to this issue lay within the
12    FEMA organization?
13    A.   Let me caveat my response to that and
14    that -- or let me characterize this carefully.
15              FEMA is delegated responsibility for the
16    disaster environment and coordinating the engagement
17    and application of all federal resources and assets
18    to support that state.  So at the top of that
19    multiorganizational activity is FEMA, who is solely
20    or responsible for what goes on by all of those
21    agencies.
22              So, yes, we are ultimately responsible,
```

David Edward Garratt                                      July 7, 2009
                        Washington, DC

```
                                                         Page 227
 1    but in terms of expertise and agency responsible --
 2    agency responsibility, this was something we believed
 3    that we shared.
 4         Q.   Okay.  With other agencies?
 5         A.   Yes.
 6         Q.   Okay.
 7              MR. HAINKEL:  That's all the questions I
 8    have.
 9              Thank you.
10              MR. MILLER:  I've got a couple followup,
11    not many.
12              MR. MEUNIER:  We will have some brief
13    redirect after all the cross-examination is
14    completed.
15              MR. MILLER:  Let's go off the record.
16              THE VIDEOGRAPHER:  We're going off the
17    record.  The time on the video is 3:08 PM.
18              (Discussion off the record.)
19              THE VIDEOGRAPHER:  This begins tape number
20    6 in the video deposition of David Garratt.  The time
21    on the video is 3:38 PM.  We are on the record.
22                   EXAMINATION BY COUNSEL FOR
```