UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | ) | **MDL NO. 07-1873** |
| FORMALDEHYDE | ) | |
| PRODUCT LIABILITY LITIGATION | ) | |
| | ) | SECTION: N(5) |
| | ) | |
| | ) | JUDGE: ENGELHARDT |
| | ) | MAG: Chasez |
| | ) | |
| | ) | |
| | ) | |

<u>**PRELIMINARY AFFIDAVIT OF PATRICIA M. WILLIAMS, PH.D.DABT
IN THE TRIAL OF EARLINE MONROE CASTANEL**</u>

STATE OF LOUISIANA
PARISH OF ORLEANS

Before me, the undersigned notary on this day personally appeared Patricia M. Williams,

Ph.D. DABT, a person whose identity is known to me. After I administered the oath to

her, upon her oath she stated as follows:

    All statements contained herein are true and correct and based upon my personal
knowledge, education, and experience and I am a person of full age of majority,
competent to execute this affidavit.

**Section 1.0 – Expert Witness Qualifications**

**1.1** My qualifications as expert witness include the following:

**Board certification: Diplomate of the American Board of Toxicology
Tulane University, School of Medicine, Department of Anatomy, Ph.D., 1983.
   Major: Anatomy; Minor: Biochemistry
Louisiana State University in Baton Rouge; M.S. in Microbiology, 1975
Louisiana State University in Baton Rouge; B.S. in Medical Technology, 1966
Clinical Laboratory Scientist-Generalist, Louisiana License Number: G00023
Laboratory Director – CLIA Certification 19D0898394 (1993-2005)**

    I am board-certified in Toxicology and a Diplomate of the American Board of
Toxicology. I am a tenured Associate Professor and currently serve as Coordinator for



EXHIBIT

A 1of2

1

CAST002002

Toxicology Research Laboratories of the Pontchartrain Institute for Environmental Sciences, University of New Orleans. In that capacity, I am also responsible for teaching courses in Toxicology to Graduate and Undergraduate students.

I served for ten years as the Director of the Occupational Toxicology Outreach Program of the Department of Medicine of the LSU Medical Center in Shreveport. In that capacity, I surveyed or evaluated over 17,000 workers or community members with occupational or environmental toxic exposures for adverse health effects of such exposures. I was a tenured Associate Professor of Medicine of the Department of Medicine of LSU Medical School in Shreveport. Additionally, I served as the Laboratory Director of an in-house research laboratory for Medical Surveillance for adverse health effects of chemical exposure. In this capacity, I was responsible for identifying the laboratory parameters that are clinical indicators of environmental and occupational toxic exposure and for the interpretation of the laboratory parameters to the attending physicians. I am licensed by the State of Louisiana and certified by the American Society for Clinical Pathologists and meet the requirements of federal law, specifically, the Clinical Laboratory Improvement Act, to serve as the Laboratory Director. I have been certified and have had work experience in the performance and interpretation of clinical laboratory procedures for over thirty-nine years. My work experience includes serving as Department Head of Medical Technology at LSU Medical Center for seven years. In that capacity, I was responsible for the development, organization, administration, review, revision, and direction of the educational program to train students at the baccalaureate and masters levels in the performance and the interpretation of clinical laboratory procedures in the areas of hematology, immunology, immunohematology, microbiology, parasitology, urinalysis, clinical chemistry, toxicology, phlebotomy, and management. In that capacity, I also designed and taught courses in the various areas of clinical pathology to cytotechnology students, pathology residents, and maxillo-facial surgery dental residents, as well as medical students. I also developed an in-house departmental clinical practicum, which was nationally accredited, in the performance and interpretation of laboratory procedures. This clinical practicum substituted for six months of the required hospital training program in the various areas of clinical pathology for the baccalaureate students.

By virtue of my doctoral degree in Anatomy, I have extensive training and teaching in the areas of gross anatomy, medical histology, embryology, neuroscience, and cell biology. I have a minor in biochemistry at the doctoral level with doctoral research in the areas of hematology, specifically megakaryocytopoiesis, thrombopoiesis, and erythropoiesis, and the stem cell compartment. Also, I have graduate credit in epidemiology from Tufts University New England Epidemiology Institute. I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. I have taught in numerous HASMET (hazardous materials) conferences, workshops, and seminars for union workers and industrial corporations. I have assisted numerous physicians in the understanding of the etiology of occupational and environmental diseases and provided Continuing Medical Education for physicians and Continuing Education programs for

2

Industrial Hygienists.  I conducted disease prevention programs for workplace, communities, homes, and schools including prevention of prostate cancer, inhalant abuse, fetal alcohol syndrome, alcohol toxicity, and abuse of drugs and alcohol.

I lectured to second year medical students on the "Environmental Etiology of Disease", which includes: recognizing the adverse health patterns commonly observed in chemically associated diseases, the multifactorial nature of disease, effects of chemical interactions in a mixture, dose-response, and the cellular effects of DNA reactive carcinogens.

I was commissioned to conduct a health assessment and medical surveillance using laboratory procedures of the people of Grand Bois who reside next to a Non-hazardous oilfield waste site that received shipments of Benzene-contaminated wastes that were ordered removed from an out-of- state facility because of the toxic nature of the wastes. The preliminary results of this study resulted in announcement of funding provided from the Department of Health and Hospitals budget by the then Governor of Louisiana, Mike Foster, for an additional medical surveillance research project of which I was designated the Principal Investigator.  Internal Review Board approval from the LSU Medical Center in Shreveport was granted for the conduct of both research studies.  Soon thereafter, the Louisiana Legislature granted an additional funding amount of $100,000 in the 1998 Legislative Session for additional medical surveillance of the adults and children of Grand Bois for the 1998-1999 fiscal year.  This study was not related to litigation and was an independent research project.  The results of this study are located in all of the State Libraries throughout Louisiana.  It consists of two volumes: Volume 1 consists of a "Retrospective Study of Health Effects of the Grand Bois Community" utilizing a health survey for data collection.  Volume 2 consists of a one year medical surveillance project with the performance of clinical laboratory procedures that would serve as indicators of developing disease or indicators of abnormalities of concern with the potential for future disease development.  As laboratory director under Federal Law, specifically the Clinical Laboratory Improvement Amendments Subpart A Section 493,  I was responsible for ensuring that my consultation was available to the laboratory clients for the interpretation of the test results reported concerning specific patient conditions.  (pg. 7176, Federal Register, vol 57, No. 40, Friday, February 28, 1992)

I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors.  In the Combustion litigation of Livingston Parish in Louisiana, I served as the expert witness for a population of 10,000 who had exposures to benzene and other toxic chemicals. Leukemias and Neuroblastomas were prominent among the adverse consequences of chemical exposure.  Another case of 4,000 individuals, in the Thompson Hayward Case in Orleans Parish of Louisiana, involved pesticide exposure.  I examined the reproductive health outcomes from chemical exposure, which included spontaneous abortions, stillbirths, live births with short survival time, and children with birth defects and mothers with multiple children with birth defects.  In the Lincoln Creosote case in Bossier Parish of Louisiana, I examined a population exposed to Benzene, creosote, Pentachlorophenol,

3

Toluene, Styrene, and other toxic compounds. Leukemias, reproductive cancers, and birth defects were prominent among the adverse consequences of the toxic exposure in the Lincoln Creosote case. Two Worker Compensation cases and one toxic tort suit, each with single person complainants/plaintiffs, in which I served as Expert Witness or Consultant involved benzene-related hematologic malignancies.

I have conducted doctoral research on stem cell precursors for erythrocytic and megakaryocytic cell lineages. My doctoral research included characterization of megakaryocytopoiesis under the hormonal influence of thrombopoietin and the development of an in vitro assay for thrombopoietin. This was a study of stem cell precursors of the megakaryocytic cell line that differentiates into the mature cells that produce blood platelets. Further doctoral research included the immunocytochemical localization of erythropoietin receptors on the cell surface of early erythrocytic precursors at the ultrastructural level. For this research, I received the Arceneaux Memorial ward in Recognition of Outstanding Student Research in Electron Microscopy in May of 1981. I have conducted funded research by the American Heart Association on the development of an assay for thrombopoietin and an additional grant for the characterization of megakaryocytopoiesis. I conducted funded research from the American Cancer Society on an immunocytochemical characterization of skin biopsies in the diagnosis of human acute Graft-versus-Host Disease in Leukemia. The American Heart Association further funded my research for the Isolation and Characterization of 4N and 8N Megakaryocytes. I served as a consultant to Karel A. Dicke, M.D., chief oncologist and Director of the Bone Marrow Transplantation Unit at M.D. Anderson Hospital for electron microscopic evaluation of in vitro chemotherapeutic treatment for autologous bone marrow transplantation therapeutic techniques. I have written, developed, and taught numerous courses and lectures in Hematology and Immunology to students at the associate, baccalaureate, and masters levels, as well as, medical students, pathology residents, and maxillo-facial surgery residents. I am qualified by both State and Federal Law to perform and interpret clinical laboratory procedures in the areas of hematology and immunology. I am further qualified by Federal Law (CLIA-Clinical Laboratory Improvement Act) to serve as a Laboratory Director for all levels of complexity in the interpretation of laboratory procedures, which include hematology and immunology. I served as the Laboratory Director of an in-house medical surveillance laboratory for ten years and have interpreted hematological parameters in a population of residents exposed to benzene and other toxic substances. I have also served as principal investigator in a project to screen for Lupus Erythrematosus, an autoimmune disease of the hematologic/immunologic systems of the body.

In the area of Forensic Drug Testing, I have served as an expert witness and consultant on collection of specimens, chain of custody, and drug-testing in the workplace to numerous clients, including the Department of Education, School Boards, Unions, Medical Care Corporations, municipalities, the State of Louisiana, and private entities, and served as consultant to a collection company for collection of forensic urine and blood specimens and, in that capacity, designed and oversaw the administration of chain of custody and collection procedures. Furthermore, I have served as expert witness in drug-testing litigation in State Court, Workman's Compensation and Unemployment

CAST002005

compensation hearings, and arbitration hearings. I have served as expert witness in numerous legislative committees on the subject of drug-testing and minimal guidelines for collection and testing of forensic specimens. I drafted the bill for Louisiana Act 1036 of the 1990 Legislative Session establishing minimal guidelines for collection of forensic specimens and drug-testing in the State of Louisiana. Additionally, I drafted Act 396 of the 1993 Legislative Session for Mandatory Licensure of Clinical Laboratory Personnel and Certification of Phlebotomists in the State of Louisiana. I was the expert witness testifying for both bills at the request of Senators and Representatives, the Commissioner of Administration, the AFL-CIO, and the Louisiana State Society for Medical Technology during the course of passage into Law by the Louisiana Legislature.

By virtue of my educational, research, and work experience, I am qualified to identify and interpret patterns of development of disease in association with toxic exposure and to determine the etiology/causation of environmental and occupational diseases. I am qualified to conduct community health assessments and interpret the etiology/causation of environmental diseases and birth defects. I am qualified to identify and interpret patterns of adverse reproductive outcomes, including fetal birth defects and embryonal tumors, in association with toxic exposure. I am qualified to review the scientific and medical literature, and medical and laboratory data associated with occupational and environmental exposures and to interpret said data as to the etiology/causation. I am qualified to perform and interpret medical surveillance utilizing laboratory procedures as to the development and causation of environmental and occupational diseases. I am qualified to interpret the causation of hematological diseases as related to environmental and occupational exposures.

Additionally, I am qualified to interpret the role of contributing factors in the development of cancer and birth defects. I have qualified as an expert in anatomy, hematology, toxicology, medical surveillance utilizing laboratory procedures, neuroanatomy, and performance and interpretation of health assessments of environmentally exposed communities. Additionally, in the areas of forensic drug testing, I am qualified to review and interpret medical and laboratory data, including the phlebotomy, chain of custody, and accessioning techniques utilized in the collection of medical and forensic drug specimens.

## 1.2 Methodology

Methodology for the formation of an opinion on General Causation of adverse health effects from toxic exposure includes the following scientifically accepted investigative techniques as listed below for evaluation and causation of occupational and environmental diseases. This methodology is published in the **Reference Manual for Scientific Evidence** of the **Federal Judiciary Center**. This affidavit reports on adverse health effects caused from toxic exposure to formaldehyde and the body of evidence documented in the scientific literature on said causation. This General Causation analysis includes review of the following documents:

1. An extensive review of the scientific literature on formaldehyde including but not

limited to publications concerning the following: mechanism of action of formaldehyde at the anatomical, histological, and cellular levels; epidemiologic studies; clinical studies; studies of genotoxic damage due to formaldehyde; mechanisms of bronchoconstriction, mechanisms of carcinogenesis, and animal experimentation.

2. United States Government documents concerning formaldehyde exposure levels of the residents in FEMA trailers post-Hurricane Katrina.

3. The potential for a completed exposure pathway consisting of the five elements required by the EPA in investigation of superfund sites as published by Joseph LaDou, 1997:   a source of contamination, an environmental medium, a point of exposure, route(s) of exposure, and a receptor person or population.

5. Chemical causation was evaluated using the published Points for Consideration in Causal Reasoning as published by Kenneth Rothman, PhD, based on and including the proposals of Bradford Hill in 1965.

6. Chemical causation was evaluated using the published diagnostic and investigative methods of Janette D. Sherman, M.D which are based on the Bradford Hill Causal Considerations.

7. The causal criterion for temporality (as first proposed by Bradford Hill in 1965)

8. Biologic plausibility as defined by Bradford Hill MD and Kenneth Rothman, PhD, exists for the chemical exposure and the mechanism of development of the adverse health effects.

9. Methods for causal reasoning in determining General and Specific Causation: in accordance with the Reference Manual on Scientific Evidence 2nd edition: Reference Guides on toxicology, epidemiology, and medical testimony: external causation.

10. Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Centers for Disease Control and Prevention, July 2, 2008

11. Press Release, CDC July 2, 2008; 1 pm EST

12. Fact Sheet: Final Report on formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Centers for Disease Control and Prevention; FEMA

13. Fact Sheet: Lawrence Berkeley National Laboratories Study of Unoccupied Trailers, Centers for Disease Control and Prevention; FEMA

14. CDC Media Relations: February 14, 2008; CDC and FEMA Discuss Preliminary Test Results from Trailers and Mobile Homes in Louisiana and Mississippi.

15. Interim Findings on formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Centers for Disease Control and Prevention, February 29, 2008.

16. Interim Report: VOC and Aldehyde Emissions in Four FEMA Temporary Housing Units, Indoor Environment Department Lawrence Berkeley National Laboratory, May 8, 2008

17. Interim Staff Analysis: Formaldehyde and FEMA Trailers, July 2008

18. US House of Representatives, Committee on Science and Technology Subcommittee on Investigations and Oversight: Response to concerns of Formaldehyde in FEMA Travel Trailers, April 1, 2008

19. OSHA Formaldehyde Standard 1910.1048 including Appendix C

20. Medical records of Earline Monroe Castanel

CAST002007

**An opinion of General Causation focuses on the question as to whether the toxic agent is capable of causing disease, cancer, or other health effects.  The following considerations are included in rendering an opinion of General Causation:**

In reviewing the scientific literature, considerations of the following are made to determine whether a cause—effect relationship exists between an agent and disease. *(Reference Manual on Scientific Evidence, Federal Judiciary Center)*

> Strength of the Association of disease and exposure
> - The higher the relative risk, the stronger the association and the lower the probability that the effect is due to chance.
>
> Consistency- Is there consistency—repeated observation of an association in different populations?
>
> Dose-response or biological gradients–Are there dose-response relationships or evidence of biological gradients (duration of employment; years since last employment, etc.)?  Are there exposure measures that are applicable to the exposures of the individual?
>
> Temporal –Is there a temporal relationship of disease to exposure?
>
> Biologic Plausibility –Is the association biologically plausible?
>
> Coherence-an association does not conflict with the natural history and biology of the disease
>
> Experimental evidence

## Section 2.0  Formaldehyde

Formaldehyde ($CH_2O$) is a flammable, colorless and readily polymerized gas at ambient temperatures.  Formaldehyde is readily soluble in water, alcohols, and other polar solvents, but has a low degree of solubility in non-polar fluids.  Air is the most relevant compartment in the formaldehyde cycle. (WHO, 1989)

There are several indoor environmental sources that can result in human exposure to formaldehyde, including cigarettes and tobacco products and smoke, furniture containing formaldehyde-based resins, building materials containing urea-formaldehyde resins, adhesives containing formaldehyde used for plastic surfaces and parquet, carpets, paints, disinfectants, gas cookers, and open fireplaces. (WHO, 1989)  Other background sources may include cooking oils, milk, fabrics, etc. (IARC, 2004)  Actual exposure is effected only if there is a completed exposure pathway. (LaDou, 1997) *(When evaluating and comparing  exposures from background sources, the units of measurement, comparison units of measurement, concentration of exposure, duration of exposure, and frequency of exposure must be considered.)*

Formaldehyde is a gas at room temperature.  It is available commercially as the solid polymer paraformaldehyde, and as formalin, a 37% aqueous solution that contains a small amount of methanol as a stabilizer to prevent polymerization. (Patty's Toxicology, Fifth edition, 2001)

CAST002008

Formalin releases vapor or mists and must be used only with adequate ventilation. It is stored in a cool, dry, well-ventilated flammables area in tightly closed and sealed containers. Engineering controls require providing exhaust ventilation to keep vapor concentrations below their respective threshold limit values in the workplace. (MSDS SPI-CHEM™)

## Section 3.0 Toxicokinetics of Formaldehyde

Formaldehyde has a pungent odor detected at low concentrations, and its vapor and solutions are known skin and eye irritants in human beings. Formaldehyde is readily absorbed in the respiratory and gastrointestinal tracts. Dermal absorption of formaldehyde appears to be very slight. The common effects of formaldehyde exposure are various symptoms caused by irritation of the mucosa in the eyes and upper airways. In the non-industrial indoor environment, sensory reactions are typical effects, but there are large individual differences in the normal population and between hyperreactive and sensitized people. (WHO, 1989)

Formaldehyde (HCHO) is a carbonyl molecule that is highly reactive with tissues because it is a reactive electrophile. An electrophile is a molecule with a deficiency of electrons and so it reacts with other molecules to gain these electrons. As a result of this molecular bonding, formaldehyde forms protein-protein crosslinks, DNA-protein crosslinks, or incorporates itself into macromolecules and alters the integrity of the molecules with which it bonds.     (Casarett & Doull's, 2001) (IARC, 2004)

In humans, as well as in other animals, formaldehyde is an essential metabolic intermediate in all cells. It is produced endogenously from serine, glycine, methionine, and choline and is generated in the demethylation of nitrogen-, oxygen-, and S-methyl compounds. It is an essential intermediate in the biosynthesis of purines, thymidine and certain amino acids. The endogenous concentration of formaldehyde determined in the blood of human subjects not exposed to formaldehyde was $2.61 \pm 0.14$ µg/g blood. This concentration represents the total concentration of both free and reversibly bound endogenous formaldehyde in the blood. The concentration of formaldehyde measured in the blood of six human volunteers immediately after exposure by inhalation to 1.9 ppm [2.3 mg/m3] for 40 minutes was $2.77 \pm 0.28$ µg/g blood which did not differ from the pre-exposure concentration due to metabolically formed formaldehyde. The absence of an increase is due to the fact that formaldehyde reacts rapidly at the site of contact and is swiftly metabolized by human erythrocytes which contain formaldehyde dehydrogenase and aldehyde dehydrogenase. The half-time of formaldehyde in rat plasma after intravenous administration is reported to be approximately 1 minute. The blood concentrations of formaldehyde immediately after a single exposure of rats to 14.4 ppm were indistinguishable from those before exposure. (IARC, 2004)

The absorption of inhaled gases takes place mainly in the lungs. However, before a gas reaches the lungs, it passes through the nose, with its turbinates, which increase the surface area. Because the mucosa of the nose is covered by a film of fluid, gas molecules can be retained by the nose and not reach the lungs if they are very water soluble or react

8

with cell surface components. In this regard, the nose acts as a "scrubber" for water-soluble gases and highly reactive gases, partially protecting the lungs from potentially injurious insults. (Casarett & Doull's, 2001)  Formaldehyde is water soluble and exerts its initial mechanistic toxicity on the nasal mucosa. The structure of the nose gives rise to complex airflow patterns, which have been correlated with the location of formaldehyde-induced nasal lesions in animal studies. (IARC, 2004)

Formaldehyde is used as a fixative in vitro because of its mechanistic properties of forming DNA-protein cross-links. In the nasal mucosa upon formaldehyde deposition, such DNA-protein cross-links are formed. Contact of formaldehyde with any mucosal or epithelial surface will result in DNA-protein cross-links upon contact. Thus the eyes, nose, and skin are vulnerable to formaldehyde contact with subsequent symptomology of the irritant properties and potential for DNA-protein crosslinks. Toxicity of formaldehyde exposure is most likely to occur at sites that are near the portal of entry. Airborne formaldehyde irritates the eyes, nose, and throat in healthy humans. (IARC, 2004)

Sustained or high concentrations of formaldehyde may reach the pulmonary alveoli and diffuse through cell membranes in the pulmonary absorption of gases. DNA-protein cross-links in blood leukocytes have been used as a marker for exposure to formaldehyde in workers with chronic exposure. Formaldehyde is allergenic in nature and can result in allergic contact dermatitis and provocation of asthma attacks and increased respiratory symptoms in sensitized individuals. (IARC, 2004)

Formaldehyde can interact with water-soluble salts during inhalation and produce irritancy beyond that expected for the gas alone. When it was inhaled simultaneously with submicron sodium chloride aerosol, irritancy was augmented in proportion to the aerosol concentration, but this potentiation cannot be accounted for by a simple "carrier" effect of the aerosol. It appeared that the aerosol reacted with the formaldehyde to produce a product of a chemical transformation –perhaps methylene hydroxide. In addition to interactions with water-soluble particles, formaldehyde has been shown to interact with carbon-based particles to augment bacterial infectivity in a murine model. In this case, the potentiation appears to correlate with the surface carrying capacity of the inhaled particle. (Casarett & Doull's, 2001)

## 3.1 Bronchoconstriction via the Trigeminal Vagal Reflex

Formaldehyde is thought to act via sensory nerve fibers that signal through the trigeminal nerve to reflexsively induce bronchoconstriction through the vagus nerve. In guinea pigs, a 1 hour exposure to about 0.3 ppm of formaldehyde induces an increase in airflow resistance accompanied by a lesser decrease in compliance. Respiratory frequency and minute volume also decreased, but these changes do not become statistically significant until >10 ppm. The introduction of formaldehyde through a tracheal cannula to bypass nasal scrubbing greatly augments the irritant response, indicating that deep lung irritant receptors can also be activated by this vapor. (Casarett & Doull's, 2001)

9

CAST002010

Acute airway effects of formaldehyde were studied in BALB/c mice. Concentration and time-effect relationships of formaldehyde on the airways were investigated. With concentrations up to 4 ppm, formaldehyde showed mainly sensory irritation effects of the upper airways that decrease the respiratory rate from a trigeminal reflex. The no-effect level (NOEL) was about 0.3 ppm. This value is close to the human NOEL, which is about 0.08 ppm. The upper airway irritant, formaldehyde, showed the same types of respiratory effects in humans and in BALB/c mice. (Nielsen et al., 1999)

## 3.2 Bronchoconstriction via deregulation of S-nitrosoglutathione (GSNO) turnover

Asthma is one of the most common chronic inflammatory disorders of the airways of the lungs, affecting more than 300 million people all over the world. Nitric oxide (NO) is endogenously produced in mammalian airways by nitric oxide synthase (NOS) and is known to regulate many aspects of human asthma, including the modulation of airway and vascular smooth muscle tone and the inflammation. Asthmatic patients show an increased expression of inducible nitric oxide synthase (iNOS) in airway epithelial cells and an increased level of NO in exhaled air. (Batra et al., 2007)

Endogenous nitric oxide is an ubiquitous gaseous molecule that regulates many aspects of human airway biology including the modulation of airway and vascular smooth muscle tone. It is generated from the three different enzymes (nitric oxide synthases (NOS) -1, -2, and -3) which are all expressed in pulmonary cells. NOS-1 is localized primarily to neuronal structures, where NO is a mediator of the inhibitory Non-Adrenergic Non-Cholinergic System and NOS-3 is present in endothelial cells. While these enzymes are constitutively expressed, NOS-2 is an inducible enzyme independent of calcium and highly induced in inflammatory diseases such as allergic asthma, where NO may act beneficial or deleterious depending on the site of and amount of generation. (Fischer A, Folkerts G, et al. 2002) In the autonomic nervous system NO functions as a major non-adrenergic non-cholinergic (NANC) neurotransmitter. This NANC pathway plays a particularly important role in producing relaxation of smooth muscle in the cerebral circulation, the gastrointestinal, urogenital and respiratory tracts. (Bredt DS, 1999)

Conventionally, asthma is defined as involving both airway inflammation and airway smooth muscle hyper-responsiveness. Animal studies demonstrate that mice lacking an S-nitrosothiol reductase have allergen-induced airway inflammation but do not have airway hyper-responsiveness. These data are consistent with recent clinical evidence that: (i) S-nitrosothiol signaling is abnormal in human asthma, (ii) nitric oxide in exhaled air might be only a biomarker for the metabolism of more physiologically relevant nitrogen oxides and (iii) the biochemical response to airway inflammation is central to asthma pathophysiology. (Henderson and Gaston, 2005)

Thompson et al. (2008) report that recent evidence on pulmonary biology and the pharmacokinetics and toxicity of formaldehyde support the induction of airway hyperresponsiveness and asthma from formaldehyde inhalation exposure. Altered thiol biology from accelerated enzymatic reduction of the endogenous bronchodilator S-

nitrosoglutathione and pulmonary inflammation from involvement of Th2-mediated immune responses might serve as key events and cooperate in airway pathophysiology. Formaldehyde induces changes in nitric oxide (NO) disposition because enzymatic reduction of the endogenous bronchodilator S-nitrosoglutathione (GSNO) is dependent upon GSNO reductase (formally designated as alcohol dehydrogenase-3, ADH3), which also serves as the primary enzyme for cellular detoxification of formaldehyde. Formaldehyde influences ADH3-mediated GSNO catabolism. Data suggest that deregulation of GSNO turnover provides a plausible enzymatically based mechanism by which formaldehyde might exacerbate asthma and induce bronchoconstriction. (Thompson and Grafstrom, 2008)

### Section 4.0 Acute Symptoms caused by Formaldehyde Exposure and Associated Exposure Concentrations

The odor threshold for 50% of the people exposed to formaldehyde is between 0.06 mg/m$^3$ (0.049 ppm; 49 ppb) and 1.2 mg/m$^3$ (0.98 ppm). The eye irritation threshold is between 0.01 mg/m$^3$ (0.008 ppm; 8 ppb) and 1.9 mg/m$^3$ (1.55 ppm), and for throat irritation is between 0.1 mg/m$^3$ (0.081 ppm; 81 ppb) and 3.1 mg/m$^3$ 2.52 ppm. (Patty's Toxicology, 2001) The conversion factor: mg/m$^3$ = 1.23 x ppm (IARC 2004)

Formaldehyde exposure provokes pharyngeal irritation in occupational and environmental settings. Laryngitis has also been reported as a reaction of exposure to formaldehyde. Chronic exposure to formaldehyde was related to episodes of aphonia and pharyngeal irritation (laryngeal mucosa and vocal cords were swollen) that disappeared when occupants were away from work. (Patty's Toxicology, 2001)

In acute toxicity studies, human subjects experienced eye irritation at 0.5 ppm in an experimental chamber. Irritating effects in the upper respiratory tract begin at 0.1 ppm and become more common at 0.2 ppm. Symptoms in the lower airways such as cough, chest tightness, and wheeze are observed at higher levels (>0.5 ppm). Exposures to 2-3 ppm cause acute nose, throat, and eye irritation. (Patty's Toxicology, 2001)

Headache, nausea, vomiting, and diarrhea have been reported by people exposed to concentrations that range from 0.02 to 4.15 ppm in residential environments. Neurobehavioral effects, such as headache, dizziness, nausea, memory loss, and sleeping problems were also observed among histology technicians exposed to concentrations from 0.2 to 1.9 ppm. (Patty's Toxicology, 2001)

Prolonged exposure to low concentrations of the vapor can result in irritation of the eyes and inflammation of the eyelids, and sensitive persons might develop an allergic skin rash. At levels of 25-50 ppm, tissue damage may occur, but recovery tends to be rapid and complete after removal from exposure. Levels of 10 ppm cause lacrimation and can be tolerated for only a few minutes. Cases of bronchial asthma have been reported as a result of occupational exposure to formaldehyde. (Patty's Toxicology, 2001)

CAST002012

Values for inhalation levels as published in Sittig (1991) are as follows:  Irritation of the nose and throat can occur after an exposure of 0.25 ppm to 0.45 ppm.  Levels between 0.4 ppm and 0.8 ppm can give rise to coughing and wheezing, tightness of the chest and shortness of breath.  Sudden exposures to concentrations of 4 ppm may lead to irritation of lung and throat severe enough to give rise to bronchitis and laryngitis.  Breathing may be impaired at levels above 10 ppm and serious lung damage may occur at 50 ppm.  Exposure to airborne levels of formaldehyde of 0.4 ppm have brought on tearing and irritation. (Sittig, 1991)

The World Health Organization reports that the individual odor detection thresholds cover a wide concentration range.  For a group of 50 observers, Berglund et al (1987) showed that the 50-percentile detection threshold for formaldehyde odor was 145 ppb, the 10-percentile threshold was 20 ppb, and the 90-percentile threshold was 500 ppb.  (WHO, 1989)  The difference between odor and irritation concentration may be noticeable, but there is no evidence that there is a threshold at which odor is superseded by irritation.  However, for most inhaled odorous compounds, the trigeminal nerve has a higher threshold than the olfactory nerve (Monterieff, 1955).  When the formaldehyde concentration is increased and affects both the eyes and the nostrils, sensory irritation is first experienced in the eyes, then the odor is perceived, and finally nasal irritation occurs.  (WHO, 1989)

It has been shown that sensory irritation is the earliest human reaction to formaldehyde, both in exposure studies and from complaints about indoor environments.  Since differences in individual reactions to formaldehyde are large in both the normal population and in hyperreactive and sensitized persons, it is difficult to estimate a concentration guaranteed not to produce negative reactions in the general population.  (WHO, 1989)

It should be noted that the above mentioned acute exposure symptoms were determined in healthy adults of the general population and not in sensitive populations such as children, the elderly, or those with chronic illness.  A number of factors would appear to be involved in differential sensitivities of sensitive populations to xenobiotics.  See sections 13.1 and 13.2.

## Section 5.0    Histological Changes in Upper Respiratory Tract Mucosa

Numerous studies demonstrate  histological changes in the upper respiratory tract mucosa of both animals and humans.

### 5.1  Animal Studies

Holmstrom et al., 1989, studied histological changes in the nasal mucosa in rats after long-term exposure to formaldehyde and wood dust.  A pilot study was performed on four groups of Sprague-Dawley rats:  one group was exposed to formaldehyde only at 12.4 ppm.  One other group was exposed to wood dust and formaldehyde, the third to

12

only wood dust, and the fourth was a control.  After 104 weeks of exposure, the nose and lungs were examined histologically.  One well differentiated squamous cell carcinoma was found in the formaldehyde group.  Squamous cell metaplasia was found significantly more often among the formaldehyde-exposed rats.  On microscopic examination of the lungs, emphysema was more often found in the groups exposed to wood dust compared with the control group.  In the formaldehyde only group, two rats had emphysema.

Wilmer, 1987, reports on tritiated thymidine labeling of cells in the nasal epithelium of rats exposed to formaldehyde for 3 days to 4 weeks.  The tritiated thymidine labeling determined the rate of cell turnover in the respiratory epithelium of the nose in cells lining the nasal and maxillary turbinates, the septum and the lateral wall. The results showed that the interrupted exposure of rats to 10 or 20 ppm formaldehyde induced more pronounced nasal effects than uninterrupted exposure to 5 ppm or 10 ppm formaldehyde. The findings allow the conclusion that the exposure concentration rather than the total dose determine the severity of the cytotoxic effect.

Ionescu J, et al., 1978, describes experimental chronic obstructive lung disease in rabbits with bronchopulmonary changes induced by prolonged exposure to formaldehyde. The prolonged exposure to formaldehyde induces in the rabbit lung reactional and dystrophic changes involving the intrapulmonary bronchi, the bronchioli and the lung tissue.  These changes are represented by bronchial cell hyperplasia with hypermucigenesis, extrusion of bronchial cells, bronchiolar hypermucigenesis, parcellary squamous metaplasia or necrobiosis of epithelia, thickening of bronchial and bronchiolar walls by subepithelial cell accumulations, destruction of musculo-elastic structures with stenosis or ectasia.  The vascular reactions are hyperhaemic and proliferative with an obstructive and fibrous tendency.  The parenchymal lesions are atelectasias, intralobular emphysema, and cellular thickening of alveolar walls and interlobular areas.

Zwart A., Woutersen RA, et al., 1988, reports on the cytotoxic and adaptive effects in rat nasal epithelium after 3-day and 13-week exposure to low concentrations of formaldehyde vapour.  Wistar rats were exposed to 0, 0.3, 1, and 3 ppm formaldehyde vapor for 6 hours per day, five days per week during 3 days and 13 weeks, using in vivo [3H]thymidine labeling for cell proliferation studies , and light and electron microscopy for detecting morphological effects.  After 3 days of exposure a nearly log-linear relationship was found between cell turnover and exposure concentration reaching a 10-fold increase in the 3 ppm group, and suggesting challenge of the mucociliary and/or regenerative defence systems not only at 3 ppm but also at 0.3 and 1 ppm.  The most likely adaptive mechanism at this more posterior level of the nose seemed to be the mucociliary defence apparatus.

**5.2 Human Studies**

Edling et al., 1988, published studies on occupational exposure to formaldehyde and histopathological changes in the nasal mucosa.  The authors reported that  2 mm biopsies were performed on 75 men who worked in particle board processing plants or laminae plants.  Exposures of the men were in the range of  0.1-1.1 mg/m3 (81-894 ppb).  Only

13

three of the 75 men had a normal ciliated pseudostratified columnar epithelium. Fifty-nine men had metaplasia and six had dysplasia. Loss of cilia occurred as changes from the normal epithelium evolved to metaplasia.

Boysen et al., 1990, published a pilot study of nasal mucosa in workers exposed to formaldehyde. Nasal biopsies were performed from the anterior curvature of the middle turbinate of the nasal cavity that was judged to have the best air flow. Of 28 workers with rhinoscopical findings, 9 had hyperplastic nasal mucosa. Of 37 formaldehyde exposed workers, three had dysplasia. These workers had been exposed daily to formaldehyde at concentrations ranging from 0.5 to 2 ppm. Keratinizing stratified squamous epithelium was described in one formaldehyde exposed worker.

Holmstrom and Wilhelmsson, 1988, studied respiratory symptoms and pathophysiological effects of occupational exposure to formaldehyde alone and in combination with wood dust. Discomfort from both the upper and lower airways was more frequent in the exposed group than in the unexposed group. In the group exposed to formaldehyde alone, and with a history of nasal blocking, there was significant nasal mucosal swelling. The nasal mucociliary clearance was significantly delayed, and the sense of smell was significantly reduced in the exposed groups when they were compared with the referents. Spirometry showed a significantly decreased forced vital capacity in the exposed groups.

Ballenger, 1984, reports that if formaldehyde reacts as a hapten and produces toxicity by involvement of the immune mechanism the level of reactivity may be far below 0.05 ppm. Formaldehyde is considered to be a weak hapten. It is highly soluble in nasal fluids and so is efficiently removed by nasal inhalation before it reaches the nasopharynx. If it is absorbed onto a small particle it may be carried deeper into the lower respiratory tract. The cleansing nasal mucociliary flow rate is slowed in humans, particularly anteriorly, when exposed to concentrations of formaldehyde of 0.25-1.6 ppm. It is commonly agreed that a decrease in the mucociliary flow rate is consistent with inauguration of nasal disease.

## Section 6.0  ATSDR Minimal Risk Levels

According to the Agency for Toxic Substances and Disease Registry (ATSDR, July 1999), the respiratory tract, especially the upper respiratory tract, is a critical target of the toxicity of airborne formaldehyde. In the 1999 Toxicological Profile on Formaldehyde, ATSDR reports on acute controlled-exposure human studies, studies of humans exposed acutely or repeatedly under occupational or residential conditions, and on studies of animals exposed by inhalation for acute, intermediate, and chronic durations.

The toxicological profiles published by ATSDR include an examination, summary and interpretation of available toxicological information and epidemiologic evaluations of a hazardous substance. Minimal risk Levels (MRLs) are derived when reliable and sufficient data exist to identify the target organ(s) of effect or the most sensitive health

effect(s) for a specific duration for a given route of exposure. An MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse noncancer health effects over a specified duration of exposure. MRLs are based on noncancer health effects only and are not based on a consideration of cancer effects. (ATSDR, 1999)

MRLs are derived for acute (1-14 days), intermediate (15-364 days), and chronic (365 days and longer) durations and for the oral and inhalation routes of exposure. MRLs are generally based on the most sensitive chemical-induced end point considered to be of relevance to humans. Serious health effects (such as irreparable damage to the liver or kidneys, or birth defects) are not used as a basis for establishing MRLs. Most MRLs contain a degree of uncertainty because of the lack of precise toxicological information on the people who might be most sensitive to the effects of hazardous substances. These sensitive populations include infants, children, elderly, nutritionally or immunologically compromised individuals. ATSDR uses a conservative or protective approach to address this uncertainty consistent with the public health principle of prevention. Proposed MRLs undergo a rigorous review process: Health Effects/MRL Workgroup reviews within the Division of Toxicology, expert panel peer reviews, and agency wide MRL Workgroup reviews, with participation from other federal agencies and comments from the public. (ATSDR, 1999)

The acute inhalation MRL (1-14 days) for humans is 0.040 ppm (40 ppb). Nasal washings were performed in two groups, an occupationally exposed test group with skin hypersensitivity to formaldehyde and an unexposed control group. (Pazdrak K, et al., 1993) Both groups were non-smokers. Both groups were given placebo inhalation periods and both groups were without effects on nasal wash cellular contents or symptom scores. Both groups were then exposed to a two hour exposure of 0.4 ppm formaldehyde with subsequent evaluations conducted at 4 and 18 hours after completion of the 2-hour exposure periods. In both groups, placebo inhalation periods were without effects on nasal wash cellular contents and symptom score. During exposure to 0.4 ppm formaldehyde, both groups showed statistically significantly increased symptoms which included sneezing, rhinorrhea, mucosal edema, and itching eyes in both groups. Symptom scores remained elevated for 18 hours after the original two hour exposure. Following formaldehyde exposure in both groups, nasal washings revealed that eosinophil counts were elevated for the duration of the post-exposure evaluation and albumin levels increased briefly (10 minutes). No change in basophils numbers was noted. The authors concluded that the symptoms observed were the result of a non-specific, non-allergic process in response to low-level formaldehyde vapor exposure. Eosinophils may have protective properties by neutralizing histamine. However, no increase in basophil counts were noted. Eosinophils may also have damaging properties by liberating mediators that damage epithelial surfaces. (ATSDR, 1999)

The intermediate inhalation MRL (15-364 days) for humans is 0.03 ppm (30 ppb). Cyanomolgus monkeys were exposed to varying concentrations of formaldehyde from $0.19 \pm 0.02$, $0.98 \pm 0.08$ to $2.95 \pm 0.18$ ppm for 22 hours per day, 7 days per week for 26 weeks. (Rusch G, et al., 1983) Monkeys in the 2.95 ppm group exhibited increasing

CAST002016

hoarseness, nasal congestion and nasal discharge, especially during the last 13 weeks of the study. While some nasal symptoms were noted in the lower dose groups, they were observed to be inconsistent and were not substantiated histologically. A statistically significant increased incidence of squamous metaplasia and hyperplasia of the nasal epithelium was clearly observed in the 2.95 ppm group, but no significant increase was found in the lower dose groups. In determining the intermediate MRL, the exposure concentration was not adjusted to a continuous exposure basis based on evidence that concentration is more important than the product of concentration and duration of exposure in determining the severity of formaldehyde-induced epithelial damage in the upper respiratory tract. (ATSDR, 1999)

The chronic inhalation MRL (365 days and longer) for humans is 0.008 ppm (8 ppb). The chosen study (Holmstrom et al, 1989) examined histological changes in nasal tissue specimens from a group of 70 workers in a chemical plant that produced formaldehyde and formaldehyde resins for impregnation of paper, a group of 100 furniture factory workers working with particle board and glue components, and a non-exposed, control group of 36 office workers in the same village as the furniture factories. Estimates of personal breathing zone air concentrations ranged from 0.04 to 0.4 ppm for the chemical workers, from 0.16 to 0.4 ppm for the furniture workers, and from 0.07 to 0.13 ppm in the late summer for the office workers, with a year round medial of 0.07 ppm. The mean histological score for the chemical workers was statistically different from the control score. These histological changes consisted of loss of cilia, goblet cell hyperplasia, cuboidal and squamous cell metaplasia replacing columnar epithelium. The exposure concentration was not adjusted to a continuous exposure basis based on evidence that concentration is more important than the product of concentration and duration of exposure in determining the severity of formaldehyde-induced epithelial damage in the upper respiratory tract. Histological changes of nasal specimens was statistically significant when compared to the non-exposed control group. (ATSDR, 1999)

The Minimal Risk Level for chronic oral ingestion (365 days and longer) of formaldehyde is 0.2 mg/kg/day in humans. The Til et al, 1989 study was chosen by ATSDR for development of the chronic oral MRL. Animals were exposed to formaldehyde in their drinking water for 2 years. In high dose animals (82mg/kg/day), histopathological examination revealed gastric changes including papillary epithelial hyperplasia accompanied by hyperkeratosis and focal ulceration in the forestomach, and focal chronic atrophic gastritis, occasionally accompanied by ulceration and/or glandular hyperplasia in the glandular stomach. Histopathological examinations of the kidneys showed that the incidence and degree of renal papillary necrosis increased in week 105 in high-dose animals. (ATSDR, 1999)

## Section 7.0  Chronic Health Effects caused by Formaldehyde Exposure

### 7.1  Respiratory Tract Sensitization

Formaldehyde is a low-molecular weight compound that is extremely soluble in water and haptenates human proteins easily. Occupational exposure to formaldehyde has been

CAST002017

associated with the occurrence of asthma, although it has been difficult to demonstrate antibodies to formaldehyde in the affected individuals. (Casarett & Doull's, 2001)

Gu et al., 2008, reports that long-term exposure to gaseous formaldehyde promotes allergen-specific IgE-mediated immune responses in a murine model. The study illustrated that the threshold limit of formaldehyde, 0.08 ppm (as defined by the World Health Organization), did not cause ovalbumin-specific IgE inflammatory immune responses, but higher than threshold concentrations of formaldehyde gas result in both enhanced allergen-specific IgE responses and NI (Natural Killer)-cell activity in peripheral blood cells in a murine model. Thus, formaldehyde gas may be involved in promoting allergic inflammatory effects in subjects primed with specific allergens by NK-cell activation. These results indicate that even threshold concentrations of formaldehyde gas may play a regulatory role for "systemic" cell-mediated immune responses. It is conceivable that increased time indoors may enhance pre-existing allergic symptoms by concomitant exposure to volatile organic compounds and formaldehyde. The affordable limit for formaldehyde might be much lower than currently established levels in indoor environments. (Gu, 2008)

Nordman, et al. (1985) gave a total of 230 patients, who suffered from "asthma like" respiratory symptoms, a bronchial provocation test with formaldehyde. On the basis of the medical and occupational histories of the patients, the specific bronchial provocation test and other test results, 12 cases were considered to be caused by specific sensitization to formaldehyde. (WHO, 1989)

Burge, et al. (1985) reported tests on 15 formaldehyde-exposed workers with symptoms suggesting occupation-related asthma. Bronchial provocation tests with a mean formaldehyde concentration of 4.8 mg/m$^3$ (3.9 ppm) [no range given] showed 3 subjects with delayed bronchiospasm and 6 with an immediate reduction in forced expiratory volume in one second (FEV1). (WHO, 1989)

Eight cases of occupational asthma (3 smokers, 5 non-smokers) were reported among 28 members of the nursing staff at a haemodialysis unit where formalin was used to sterilize the artificial kidney machine (Hendrick and Lane, 1977). In 2 out of 5 subjects with histories of recurrent attacks of wheezing, inhalation provocation tests led to asthmatic attacks similar to those at work. (WHO, 1989)

Hendrick, et al. (1982) reinvestigated the nurses of the haemodialysis unit. One nurse had not worked with formaldehyde since 1976 and had had no further symptoms. Her 1981 test (15 minute exposure to 7.2 mg/m3 [5.85 ppm] formaldehyde did not provoke any asthmatic response. The other nurse had continued to work with formaldehyde, though under much improved conditions, and had continued to suffer mild intermittent attacks of asthma. Her test (5-minute exposure to 3.6 mg/m3 [2.93 ppm] formaldehyde) provoked a late asthmatic reaction similar to the one observed in 1975. (WHO, 1989)

Rumchev, et al. (2002) examined formaldehyde exposure in relation to asthma among young children (between 6 months and 3 years old) in a population-based control study

CAST002018

carried out in Perth, Western Australia, between 1997-1999. An association between exposure to formaldehyde and asthma in young children has been suggested. The study found seasonal differences in formaldehyde levels in the children's bedrooms and living rooms with significantly greater formaldehyde exposure during the summer period for the case and control subjects. The generalized estimating equation model showed that children exposed to formaldehyde levels of $\geq$ 60 µg/m3 (49 ppb) are at increased risk of having asthma. The results suggest that domestic exposure to formaldehyde increases the risk of childhood asthma.

Krzyzanowski, et al. (1990) studied the relation of chronic respiratory symptoms and pulmonary function to formaldehyde in homes of a sample of 298 children (6-15 years of age) and 613 adults. Significantly greater prevalence rates of asthma and chronic bronchitis were found in children from houses with HCHO levels 60-120 ppb than in those less exposed, especially in children also exposed to environmental tobacco smoke. In children, levels of peak expiratory flow rates (PEFR) decreased linearly with formaldehyde exposure, with the estimated decrease due to 60 ppb of formaldehyde equivalent 22% of PEFR level in nonexposed children. The effects in asthmatic children exposed to formaldehyde below 50 ppb were greater than in healthy ones. The effects in adults were less evident; decrements in PEFR due to formaldehyde over 40 ppb were seen only in the morning, and mainly in smokers.

Casset, et al., 2006, studied domestic exposure to low concentrations of formaldehyde and the effect on respiratory health. Potentiation of the response to allergens has been observed in animals and children. This effect has also been found on respiratory symptoms, with a 39% increase in the risk of asthma for a domiciliary exposure of more than 60 µg/m3 (49 ppb). In a study with asthmatics sensitized to house dust mite, the response to allergen provocation was increased following a 30 minute exposure to 100 µg/m3 (81 ppb) of formaldehyde. The data show that mild exposure to formaldehyde in the home is sufficient to provoke sensitization and also an aggravation of symptoms in patients with allergic asthma.

Norback, Bjornsson, Janson et al., 1995, studied 88 Swedes and found a significant relation between the presence of difficult nocturnal breathing and the concentrations of formaldehyde measured in the residences with an OR of 12.5 (95% CI 2.0-77.9)

Wantke, et al., 1996, studied sixty-two eight-year-old children attending three forms at a primary school. Children initially attended school in a frame construction with particleboard used extensively as paneling and later were transferred to a brick building for schooling. Indoor formaldehyde concentrations were measured in classrooms. In the frame construction with paneling, formaldehyde levels were 0.075 ppm and 0.069 ppm. Assessment of specific IgE to formaldehyde was done in all children. Children were transferred to a brick building and 3 months later specific IgE to formaldehyde in pupils showing initially elevated radioallergosorbent test (RAST) values reassessed. In all children symptoms were evaluated by questionnaire before and 3 months after changing school. RAST classes of $\geq$ 2 were found in three children, two of them attending the classroom with 0.075 ppm formaldehyde. Elevated RAST classes of $\geq$ 1.3 were found in

18

CAST002019

another 21 pupils. Thirty-eight pupils as well as 19 control children showed RAST classes in the normal range of ≤ 1.2. Headache, nose bleeding, rhinitis, fatigue, cough, dry nasal mucosa and burning eyes were found in the affected children. There was a good correlation between symptoms and the formaldehyde concentrations in the classrooms. However, elevated IgE levels to formaldehyde did not correlate with symptoms. Formaldehyde concentrations in the brick building school were 0.029 ppm , 0.023 ppm, and 0.026 ppm. After transfer to the brick school, specific IgE to formaldehyde decreased significantly (P < 0.002) as did the incidence of symptoms. The authors conclude that gaseous formaldehyde, besides its irritant action, leads to IgE-mediated sensitization. As children are more sensitive to toxic substances than adults, threshold levels for indoor formaldehyde should be reduced for children.

Franklin et al., 2000, report that exposure to domestic levels of formaldehyde has been associated with adverse respiratory symptoms in both adults and children. Exhaled nitric oxide was measured in 224 healthy children and formaldehyde levels were monitored in their homes. Exhaled nitric oxide levels were significantly elevated in children living in homes with average formaldehyde levels greater than 50 ppb. The results suggested that exposure to formaldehyde in homes may invoke a subclinical inflammatory response in the airways of healthy children.

Pati and Parida, 2005, report that environmental exposures in early life that affect immune maturation appear to be the key factors for the development of asthma. A population based case-control study was carried out in Orissa India on young children aged between 6 months and 3 years old. Results indicated that age, gender, family history of asthma, atopy and domestic exposure to indoor environmental factors were significant predictors of asthma early in life. The study found that indoor exposure to formaldehyde, volatile organic compounds, and house dust mite significantly increased the risk of having asthma.

Tavernier et al., 2006, studied asthmatic and non-asthmatic children and their indoor environments. The study has shown that there were very few differences in the indoor environments of English asthmatic and nonasthmatic children. However, once asthma has been established, the presence of endotoxin is positively associated with an asthmatic child's living room carpet reservoir dust.

Smedje and Norback, 2001, studied relationships between indoor pollutants and incidence of asthma diagnosis and self-reported allergy. Among children without a history of atopy, a new asthma diagnosis was more common at higher concentrations of formaldehyde and total moulds in the classroom air.

Erdei et al., 2003, examined the relationship between immune biomarkers and indoor air pollution cross-sectionally in school children 9-11 years of age who had immunologically related respiratory diseases and who resided in Hungarian cities. Numerous immune biomarkers were significantly elevated in these sensitive children, compared with normal children and several biomarker alterations in these children were

19

CAST002020

related to high concentrations of air pollutants in the home. Bacterial-specific IgGs were related significantly to formaldehyde concentrations.

In people with asthma and allergic sensitization to the dust mite Dermatophagoides pteronyssinus, inhalation of 100 $\mu$/m3 formaldehyde for 30 minutes caused a significant increase in bronchial responsiveness to the mite. ((Casset A, 2006; Dales, 2008)

Mi et al., 2006, studied current asthma and respiratory symptoms among pupils in Shanghai, China. Most urban schools in Asia are naturally ventilated buildings, often situated in areas with heavy ambient air pollution from industry or traffic. The classes are large, and window opening is the only way to remove indoor pollutants, but this results in increased exposure to outdoor pollution. The authors conclude that asthma symptoms among pupils in Shanghai can be influenced by lack of ventilation and outdoor air pollution from traffic. The indoor levels of formaldehyde were low when compared with the air quality guidelines of 100 $\mu$g/m3 (SHO, 1987), and not significantly associated with respiratory symptoms. The indoor mean concentration of formaldehyde was 9 $\mu$g/m3, similar to the outdoor level in Shanghai of 7-9 $\mu$g/m3 measured during winter conditions.

Garrett et al., 1998, measured formaldehyde levels in 80 houses in Victoria, Australia. The median indoor formaldehyde level was 15.8 $\mu$g/m3 (12.6 ppb), with a maximum of 139 $\mu$g/m3 (111 ppb). There was an association between formaldehyde exposure and atopy with an increase in bedroom formaldehyde levels of 10 $\mu$g/m3. More severe allergic sensitization was further demonstrated with increasing formaldehyde exposure. Among children suffering from respiratory symptoms, more frequent symptoms were noted in those exposed to higher formaldehyde levels. The authors conclude that low-level exposure to indoor formaldehyde may increase the risk of allergic sensitization to common aeroallergens in children.

Zhao et al., 2008, studied the associations between pupils' asthmatic symptoms and indoor and outdoor air pollution in schools, as well as selected home exposures, in a coal-burning city in north China. The authors concluded that indoor chemical air pollutants of mainly outdoor origin could be risk factors for pupils' respiratory symptoms at school, and home exposure to ETS and chemical emissions from new furniture could affect pupils' respiratory health. Zhao reports a multiple logistic model with adjustment for indoor air pollutants associated with asthmatic symptoms. For formaldehyde and cumulative asthma the Odds Ratio is 4.61 (1.09-19.5).

Smedje, 1997, studied the prevalence of current asthma among secondary pupils and its relationship to the school environment, as well as personal factors and domestic exposures. The authors concluded that the quality of the school environment is of importance and may affect asthmatic symptoms.

Smedje, 2001, studied relationships between indoor pollutants and incidence of asthma diagnosis and self-reported allergy. The incidence of asthma diagnosis was higher in pupils attending schools with more settled dust and more cat allergen in this

CAST002021

dust. Among children without a history of atopy, a new asthma diagnosis was more common at higher concentrations of formaldehyde and total moulds in the classroom air.

Olsen and Dossing, 1982, studied seven newly built day care centers in two boroughs to the north of Copenhagen at the end of 1978. Particle board was used for the indoor paneling in all these buildings. A disproportionately large number of sick days among the staff of mobile day care centers together with characteristic irritative symptoms from the mucous membranes attracted attention to the formaldehyde content in the particle board as a possible etiological factor. A significantly higher frequency of irritation of the eyes and upper respiratory tract, unnatural drowsiness, headache, menstrual irregularities and use of analgetics among 70 persons working in mobile day care centers compared to 34 persons in permanent control institutions chosen at random from the same residential areas. In the seven mobile day care centers the median formaldehyde concentration was 0.43 mg/m3 and the natural ventilation below 0.5 changes per hour, while the measurements in two permanent day care centers resembling the control institutions showed formaldehyde concentrations about 0.08 mg/m3 and a natural ventilation rate of 0.6-1.1 changes per hour.

Asthma has been defined as having three phenotypic characteristics: intermittent and reversible airway obstruction; increased airway responsiveness to contractile stimuli; and airway inflammation. Pulmonary inflammation is a hallmark of asthma and is directly related to asthma severity as a function of acute and chronic airflow obstruction. One potential mechanism of action for air toxics is through enhancement of airway inflammation. Inflammation in asthma, however, has diverse pathways, mirroring the complexity of the disease. Three general mechanisms of inflammation in asthma include immunoglobulin E (IgE)-mediated, neurogenic, and irritant induced.   (Delfino, 2002)

**7.2 Eczema**

The prevalence of asthma and allergic diseases (rhinitis and eczema) has increased in industrialized countries in the last two decades. In the same countries, there is tendency for the prevalence to be higher in urban than rural areas and to vary according to socio-economic status. Allergic disease results from a complex interaction between host genetics and environmental exposures. Since changes in host genetics occurring over so short a time scale is an unlikely explanation for the temporal trends in allergy prevalence, it is likely that the marked changes in environmental, life style and living conditions are known to have occurred in the last decades and are responsible for these differences. (Barreto et al., 2006)

Formaldehyde differs in its sensitizing profile from other allergens. A background of combined type I and type IV sensitivity has been proposed. Its protein binding to the skin may influence the test pattern. Formaldehyde is also a difficult allergen to test with, as the optimal test concentration/dose is close to the threshold of irritation. Careful optimization of the allergen dose in relation to the irritant dose is necessary. (Fischer et al., 1995)

21

CAST002022

Eberlein-Konig, 1998, reports on experiments in which the effect of short-term exposure to formaldehyde on patients with atopic eczema or control subjects are presented. The influence of formaldehyde on the epidermal barrier function and skin surface, transepidermal water loss (TEWL) and skin roughness were measured. In patients with atopic eczema, TEWL was significantly increased after exposure to formaldehyde. The study showed that short-term exposure to low concentrations of formaldehyde can induce skin surface changes, especially a disturbance of the epidermal barrier function. For formaldehyde exposure experiments, a concentration of $0.08 \pm 0.02$ ppm was used. (64 ppb to 96 ppb). Formaldehyde exposure induced a significant increase of TEWL in patients with atopic eczema but not in control subjects. The known irritant properties of formaldehyde may be the cause of this worsened epidermal barrier function. The results of this study indicate that exposure to even low concentrations of pollutants for a short period of time can influence skin surface parameters, especially the skin barrier function. It might very well be that exposure to pollutants at higher concentrations, for a longer period of time, or both may lead to clinical deterioration of atopic eczema.

A cross-sectional study examined the relationship between formaldehyde exposure and the prevalence of allergic disorders in Japan. (Matsunaga et al., 2008) Formaldehyde levels of 47 ppb or more were independently associated with an increased prevalence of atopic eczema (adjusted odds ration = 2.25 (95% CI 1.01-5.01). The positive association was more pronounced in women with a negative familial allergic history than in those with a positive familial allergic history.

Held et al., 1999, performed a retrospective study to evaluate the prevalence of positive, doubtfully positive, and irritant patch test reactions to cosmetics in consecutive eczema patients who visited a patch-test clinic in a 2-year period. A comparison of certain characteristics was made between the group of patients with positive reactions (A) and the control eczema population and between the group of patients with the doubtfully positive reactions (B) and the control eczema population (C). The Odds Ratio at the 95% Confidence Level for formaldehyde positive patients was 7.29 (2.65-20.05) for comparison of Group A versus C (control group). The Odds Ratio at the 95% Confidence Level for formaldehyde positive patients was 4.03 (1.6-10.05) for comparison of Group B versus C (control group).

Mirshahpanah and Maibach (2007) used previously generated data from multicenter studies European Environmental and Contact Dermatitis Research Group (EECDRG) and North American Contact Dermatitis Group (NACDG), to compare patch test positivity of random sample and eczema populations, attempting to ascertain how one might extrapolate frequency from an eczema group to a general population. Data analysis provides a ratio of eczema population: random sample population for each allergen and an overall ratio of all allergens 5:1 for actual data and 6:1 for population-based estimates (according to the MONICA and CE-DUR systems). If the positivity rate were the same in each population, the ratio would approximate 1. The individual allergen ratio for formaldehyde was 11.6. Odds ratio calculations (NACDG vs sample) for formaldehyde at the 95% Confidence Level were 13.0305 (8.9213, 19.0324) and the P value was 0.001.

22

The Odds ratio calculations (EECDRG vs sample) for formaldehyde at the 95% Confidence Level were 2.8984 (1.9560, 4.2949) and the $P$ value was 0.0001. The odds ratio is defined, in this case as the relative likelihood that the allergen in question will elicit an allergic reaction in the contrasting groups, i.e. NACDG versus random sample population.

Agner (1999) studied formaldehyde-sensitive patients and the effect of extensive information and exposure assessment of formaldehyde on the prognosis of eczema. There was a trend that severe eczema was found more often in patients still exposed to formaldehyde. Patients who "paid attention to their allergy" had statistically significantly ($P$ value less than 0.05) fewer eruptions than those who did not. Formaldehyde is probably the most ubiquitous of all known contact allergens. For patients who paid and who did not "pay attention" to their allergies a statistically significant difference was found between patients with no/mild eczema and patients with severe eczema. ($P < .05$)

Bruynzeel et al., 1984, reports that most shampoos contain low concentrations of formaldehyde as preservative. The low concentration and short contact with the skin are probable reasons why dermatological problems from shampooing are rare in the ordinary user. Even in hairdressers, with much more frequent contact, formaldehyde contact sensitivity is rare. Patch tests in one women with eruptions attributed to the use of a shampoo showed a 1+ positive reaction to formaldehyde after 72 hours (negative at 24 and 48 hours).

DMDM hydantoin (dimethyloldimethyl hydantoin) is a formaldehyde donor used as a preservative in cosmetic products at concentrations up to 1%. DMDM hydantoin is produced by reacting formaldehyde with DM hydantoin (dimethylol hydantoin). Aqueous solutions of DMDM hydantoin contain up to 2% of the free aldehyde in equilibrium with the hydantoin. The presence of DMDM hydantoin in cosmetics may cause adverse effects in patients pre-sensitized to formaldehyde. (de Groot et al., 1988)

Discoid or nummular eczema was first described in 1845. It is a clinical entity characterized by circular or oval plaques of eczema with a clearly defined border. It often overlaps with other clinical types of eczema, but has no specific histological features. (Fleming, 1997).

Formaldehyde is a common contact allergen. The prognosis of formaldehyde-sensitive patients is generally considered to be bad because of widespread exposure to formaldehyde. Eleven patients with contact dermatitis exhibiting eczema due to formaldehyde were evaluated for the status of eczema at follow-up. Persistent eczema was noted in four of the eleven patients at follow-up evaluation. (Flyvholm and Menne, 1992)

Hovding (1961) reports on contact eczema due to formaldehyde in resin finished textiles. Free formaldehyde in textiles for consumer use is undesirable because it will produce objectionable odors, and as a consequence of its considerable sensitizing properties, may cause dermatitis in the consumer.

CAST002024

Formaldehyde penetrates human and animal skin. If some amount of the molecule or its metabolites did not penetrate, allergic contact dermatitis could not occur. It is of great practical importance to know whether a given patient will cross-react to related to aldehydes. Sensitization to formaldehyde is reported in Guinea pig experiments. (Maibach, 1980)

Maurice et al., 1986, reports on anaphylactic shock caused by formaldehyde (F) in a patient undergoing long-term hemodialysis. The patient had presented with contact dermatitis caused by formaldehyde before anaphylaxis. Patients undergoing long-term hemodialysis are often exposed to formaldehyde, since it is used to sterilize adhesives, surgical devices, and dialyzers. A case report of Ig-E mediated anaphylaxis to formaldehyde is presented. Total serum IgE was very high at the time of the allergic reaction and declined rapidly within weeks as observed in some IgE mediated reactions in allergic individuals. The clinical case presented suggests strongly that the anaphylactic reaction was due to formaldehyde and mediated by an IgE mechanism. RAST to other products used in hemodialysis was negative. Prick tests and patch tests were positive with formaldehyde at concentrations that do not elicit a positive reaction in nonallergic individuals or subjects tolerating formaldehyde. The IgE antibodies detected by RAST appears to be specific for formaldehyde, since no significant nonspecific binding of the IgE to the F-HSA discs (human serum albumin) was noted and since HSA discs were tested against the patient's serum as another control.

Nedorost and Cooper (2001) report on the difficulty of distinguishing irritant from allergic contact dermatitis in patients with atopic dermatitis. The difficulty that may be related to the induction of autoreactive T cells responding to skin proteins following antigen release after skin injury in atopic dermatitis. Physical trauma or chemical injury to hyperpermeable skin releases intracellular proteins, including inflammatory mediators and autoantigenic proteins. Cytokines may activate cells present in the immediate milieu and contribute, along with the chemokines, to the attraction of additional immunocytes into the tissue. Depending on the stage of the lesion, the autoreactive T cells release type II (IL-4 and IL-5) or type I (interferon-$\gamma$) lymphokines and additional chemokines, further recruiting immunocytes capable of autoreactivity and amplifying skin inflammation (mast cells, eosinophils, and macrophages), resulting in a continuous propagation of dermatitis following injury. The irritant capacity of contact allergens, although of minimal import to normal skin, may be more significant and break threshold for inducing nonspecific inflammation in patients with atopic dermatitis, who have impaired barrier function of the stratum corneum that allows greater penetration of large molecules. Atopic patients are often repeatedly exposed to sensitizers through nonintact, eczematous skin, and this may explain the equality of sensitization of nonatopic and atopic subjects in occupations such as hairdressing. Delayed (7-day) patch test readings are especially important in atopic patients to distinguish allergy from irritancy and to evaluate for steroid allergy.

Pedersen (1980) reports on a case of occupational hand eczema from formaldehyde in price labels. The price labels were examined for content of formaldehyde and was

CAST002025

positive and measured to be 6 µg/label. Although the patient used a machine for labeling, she was in contact with the labels when she loaded the machine.

Rostenberg et al. (1952) presents a study of five patients with sensitivity to formaldehyde. The patient with an eczematous formaldehyde sensitivity had a marked specificity with respect to the sensitivity, whereas the person with an urticarial formaldehyde sensitivity did not.

Cronin (1991) reports that formaldehyde is a significant allergen in women with hand eczema.

Seheynius et al., 1993, reports that IgE antibodies in serum specific to formaldehyde were found in only two of the 15 patients with positive patch tests. These two had no clinical signs of atopy, and their contact sensitivity was relevant and strong, as shown by patch tests. Of the eight patients with atopic dermatitis, only three were positive on the repeat patch testing, and none of them had specific IgE antibodies. The authors also detected IgE positive cells in patients with very low serum IgE levels, although in low numbers. Double immunofluorescence staining experiments showed that IgE occurred on Langerhans' cells. The proportion of IgE-positive cells correlated to the level of serum IgE, but not to atopy. This study contrasts with the recent report of Ward et al, (1991) showing that IgE positive cells when found within both epidermis and dermis were indicative of atopy.

Takahashi et al., 2007, reports on a prospective study of clinical symptoms and skin test reactions in medical students exposed to formaldehyde gas. The occurrence of both allergic and non-allergic systemic complications and increased levels of immunoglobulin E (IgE) against formaldehyde in medical students during anatomy dissection courses have been noted in previous studies. In this study students with an episode of atopic dermatitis and allergic rhinitis were susceptible to formaldehyde exposure and developed mucocutaneous symptoms, probably due to the impaired barrier function and remodeling of the skin and mucosa.

Wuthrich et al. (2007) reports that there are two main subtypes of atopic eczema: the IgE-associated ("atopic eczema") and the non-IgE-associated type ("nonatopic eczema") with different prognosis concerning the development of respiratory diseases ("atopy march").

Delayed type (Type IV) hypersensitivity is commonly manifested in clinical practice as allergic eczematous contact dermatitis (AECD). This reaction can be transferred by lymphoid cells but not serum and parallels other T lymphocyte immune responses. (Weston, 1976)

Atopic dermatitis is a chronic inflammatory skin disease associated with elevated serum IgE levels and sensitization to a variety of inhalant, food and microbial allergens. (Leung, 1993)

CAST002026

Giwercman et al., 2008, report that hand eczema is a common disease with various risk factors of which atopic dermatitis is known to be one of the most important. Recently, two mutations in the gene coding for filaggrin, a protein important for the skin barrier, have repeatedly been shown to be associated with atopic dermatitis.

Brown and Irvine (2008) report that the discovery that null mutations in the filaggrin gene are associated with atopic eczema and represents the single most significant breakthrough in understanding the genetic basis of this complex disorder.

Investigations of atopic dermatits in human patients and animal models suggest that this disease is initiated, maintained and perpetuated by the actions of cytokines, chemokines, T cells, antigen-presenting cells and other inflammatory cells. There is also evidence of skin barrier defect and angiogenesis.

The manifestation of atopic eczema/dermatitis syndrome is believed to result from a complex interrelationship of environmental factors, pharmacological abnormalities, skin barrier defects, and immunological phenomena. (von Bubnoff et al., 2003)

### 7.3 Epistaxis

Wantke et al., 1996, studied forty-five medical students attending their first dissection course at the Institute of Anatomy, University of Vienna, Austria. The students dissected arms and legs preserved in 0.7% formaldehyde and 3.8% phenol, but not whole cadavers. Assessment of primarily irritant symptoms during the lessons revealed itch and paraesthesia of hands in 33/45 students (P<0.00005), headache in 15/45 students, burning eyes in 13/45 students (P<0.02), dizziness in 8/45 students (P<0.008), sneezing in 4/45 students, epistaxis in 2/45 students, and shortness of breath in 1/45 students.

Wantke et al., 2000, studied twenty-seven medical students who already had been dissecting for 4 weeks. These were some of the same students who were previously investigated in their first dissection course. This was their second dissecting course lasting for 10 weeks. Whole cadavers preserved in an aqueous perfusion fluid (0.7% formaldehyde, 4.0% phenol) were dissected. Itch and paresthesia of the hands (P<0.00001), dizziness (P<0.008), burning eyes (P<0.01), headache, sneezing, epistaxis, gingival bleeding, oral or pharyngeal itch, and shortness of breath were experienced.

Epistaxis can present in several ways and degrees of severity. Bleeding may be acute and come from the anterior or posterior part of the nasal septum, and is usually controlled by cautery to the bleeding point, by pressure from anterior or posterior packs, or a combination of the two. A more severe type of nasal bleeding requires ligation of the anterior ethmoid or carotid arteries or both. (Hanckel, and Carter, 1964)

Hanckel and Carter (1964) describe a case report of intermittent nosebleeds and anemia. The patient's history included a 12 year history of episodes of severe epistaxis prior to the removal of a tumor in the anterior wall of the left sphenoid. The pathologic diagnosis was neurogenic sarcoma of the sphenoid sinus. Recurrence of the bleeding

CAST002027

from the left side persisted and could not be controlled necessitating ligation of the left external carotid artery. Epistaxis continued and was severe enough to cause hemorrhage from her nose and death. An autopsy found that another tumor was present in the posterior wall of the sphenoid and diagnosed as a neurofibroma.

Neoplastic disease of the maxillary sinus may appear very similar to infection of the maxillary sinus. There may be an episode of acute infection due to the obstruction of normal drainage from the sinus by encroachment of the tumor mass on the ostium. The presentation of sinus pain and tenderness on palpation of the antral walls with loosening and tenderness of associated maxillary teeth are clinical findings. Obstruction of the nasal airway and the presence of a purulent and often blood stained nasal discharge are common. Unilateral epistaxis is one of the most important diagnostic physical signs of neoplastic development. The presentation of sinus symptoms with a unilateral blood-stained nasal discharge and radiographic and tomographic evidence of bone destruction of one or more of the walls of the antrum is virtually pathognomonic of malignant disease of the maxillary antrum. (Towers and McAndrew, 1975)

Among 191 patients with cancer of the nose and/or paranasal sinuses, 16 per cent had a history of epistaxis. In all these cases, however, it had consisted in recurrent minor bleeding or a blood-stained nasal secretion. None of the patients had been admitted as an emergency with severe epistaxis. Epistaxis may be an early sign of malignant tumours in the nose and/or paranasal sinuses, with or without extension to the nasopharynx. As a rule, it is in the form of recurrent minor bleeding or unilateral haemorrhagic discharge. In rare cases there will be more violent haemorrhage requiring emergency admission and treatment. (Vimpel, Felding, and Bonding, 1985)

The most common manifestations of frontal sinus malignancy, in 75% of patients, are forehead or medial upper eyelid swelling or pain. Orbital manifestations, such a diplopia or proptosis, occur in 27% to 48%, and epistaxis or nasal purulence in 20%. (Osguthorpe and Richardson, 2001)

Neoplasms of the paranasal sinuses and nasal cavity account for 3% to 4% of head and neck cancers. Most tumours are advanced at presentation, and the exact site of origin may be uncertain. Tumours may arise from any of six separate anatomic locations: maxillary sinus, ethmoid sinus, frontal sinus, sphenoid sinus, nasal cavity, or nasal vestibule. The usual clinical presentation of sinonasal tumours includes symptoms that are indistinguishable from inflammatory sinus disease, namely nasal airway obstruction, pain, and epistaxis. (Daele, Poorten, Rombaux, and Hamoir, 2005)

Intranasal pleomorphic adenomas generally arise in the nasal septal mucosa, even though the seromucosal glands are mainly located within the lateral nasal wall, in particular in the turbinates. A case report of a 34-year-old male, non-smoker, as reported by Sciandra, et al, 2008, presenting with an isolated episode of epistaxis from the right nasal cavity. He also complained of worsening of a right nasal obstruction which had been present for 10 years, frontal cephalagia, and anosmia. A nasal pleomorphic adenoma was diagnosed. It is generally known to be a slow-growing tumor and,

27

therefore, clinical symptoms appear after a long silent period.  Patients commonly present with gradual worsening of monolateral nasal obstruction and occasional epistaxis. (Sciandra, Dispenza, et al., 2008)

Chaiyasate et al., 2005, report on 55 patients with epistaxis admitted in Chiang Mai University Hospital between January 2001 and July 2004.  Eighteen percent of patients had more than one cause of epistaxis.  The most common cause of epistaxis was hypertension.  Epistaxis resulted from tumor in 18.2% of the patients.

Sinonasal cancers often  masquerade as chronic inflammatory conditions of the upper respiratory tract, and thus they may progress unrecognized and untreated.  Among the many presenting signs and symptoms, the most common were nasal obstruction (n-24 [88.9%] ), nasal discharge (n-24), epistaxis (n= 22 [81.5%] ), and buccal swelling (n=21 [77.8%] ).  The duration of symptoms ranged from 6 weeks to 3 years (mean: 7.2 mo). Ogunleye, Ijaduola, and Sandabe, 2008)

Sinonasal malignancy is a cause of otorhinolaryngologic morbidity and mortality in West Africa.  A 10-year retrospective review of cases with histologically diagnosed malignant sinonasal tumors in University College Hospital, Ibadan, Oyo State, Nigeria was carried out.  There were 82 cases.  Epistaxis, rhinorrhea and nasal blockage were seen in all patients.  Squamous cell carcinoma accounted for 69/75 (92%) of epithelial tumors, and malignant lymphoma accounted for 4/7 (57%) of nonepithelial tumors. (Fasunia, Lasisi, 2007)

Haraguchi et al., 1995, reports that sixty cases of primary malignant tumor of the nasal cavity treated between 1962 and 1993 were reviewed.  The most common symptom on presentation was nasal obstruction (66.7%), followed by epistaxis (55.0%).

Animal studies in dogs performed by Bissett et al, 2007, determined prevalence, clinical features, and causes of epistaxis in 176 dogs with epistaxis.  Local causes of epistaxis included nasal neoplasia (n-35), trauma (33), idiopathic rhinitis (20), and periapical abscess (2).   Results suggested that epistaxis was a common disorder in dogs and frequently regarded as an emergency.

### 7.4 Formaldehyde and vascular tissue necrosis and cytotoxicity

Shiomo (2008) reports that although application of gelatin-resorcin-formalin (GRF) glue for tear-oriented aortic repairs have been successfully used in Japan,  such use remains controversial because of concerns about the cytotoxicity of formaldehyde and tissue necrosis.  The use of much formaldehyde to aid the crosslinking process should be avoided for reasons of tissue toxicity.

Hata et al., 2007, reports that approximately 10% to 20%  of patients who underwent repair of acute type A aortic dissection using GRF glue developed aortic redissection, aortic pseudoaneurysm, and recurrence of aortic insufficiency and required a late reoperation (13-76 months after initial operation), suggesting a close relationship

CAST002029

between such late complications and the use of GRF glue. No late complications were observed in patients treated without GRF glue. The speculated causes of a late aortic pseudoaneurysm or redissection are either incorrect application of the GRF glue or toxic effects of the formalin. The toxicity of the formalin has also been supported histologically. In several reports, medial degeneration including disappearance of the nuclei in medial smooth muscle cells, hemosiderin deposition, and disruption of the medial elastic lamellae were observed, suggesting tissue necrosis. In the study, interruption of the intima and media with disappearance of the nuclei in smooth muscle cells, hyaline degeneration, and fibrinoid degeneration, which suggest tissue necrosis and a healing process of necrosis, were identified.

Izutani et al., 2006, reports that GRF glue might lead to aortic wall necrosis and cause aortic redissection. In case report, 34 months post-operatively late complications developed. The pathological findings of the aortic wall at the site of GRF glue application were necrosis and inflammation. There was almost disappearance of the intima and media in the aortic wall. There were elastic fiber and aggregation of macrophages in the necrotic aortic tissue.

Kazui and associates, 2001, have reported that the use of GRF glue for reapproximating the layers of the dissected aortic root is associated with a certain amount of risk of aortic wall necrosis. Patients with late complications from 5 months to 27 months following initial operation on the aorta were studied. Histopathology of the inner wall of the redissected aortic root at the site of the GRF glue application showed almost a complete disappearance of the nuclei of the medial smooth muscle cells and hemosiderin deposition on the false lumenal side of the media on hematoxylin and eosin staining. The medial elastic lamellae at the false lumenal side appeared disrupted on Elastica van Gieson staining. Focal disruption of the elastic lamellae was also observed on the inner side of the wall.

Kirsch, 2002, reports on aortic wall alterations eight years after the use of Gelatin-Resorcinol-Formalin Glue. The right coronary sinus appeared macroscopically necrotic and presented contained ruptures at two different sites. Samples taken from the aortic root showed a highly altered vascular wall. The media appeared nearly void of cells and was extremely thin at the level of the ruptures. A thick granulation tissue with numerous cells had developed on the luminal side of the aortic root. The topography of these lesions coincide with the area of GRF glue application.

**Section 8.0  Basic Understanding of Fungi and Mycotoxin and Spore formation as related to acute and chronic health effects.**

Fungi are eukaryotic, unicellular, or multicellular organisms that lack chlorophyll and are dependent upon external food sources. Fungi are ubiquitous in all environments and play a vital role in the Earth's ecology by decomposing organic matter. "Mold" is the common term for multicellular fungi that grow as a mat of intertwined microscopic filaments (hyphae). Exposure to molds and other fungi and their spores is unavoidable

CAST002030

except when the most stringent of air filtration, isolation, and environmental sanitation measures are observed, eg, in organ transplant isolation units. (ACOEM 2002)

Molds and other fungi may adversely affect human health through three processes: 1) allergy, 2) infection; and 3) toxicity. About 10% of the population has allergic antibodies to fungal antigens. Only about 5% of these would be expected to show clinical illness. Under normal and usual conditions, outdoor molds are generally more abundant and important in airway allergic disease than indoor molds. However, when there is a mold infestation of an indoor environment, clinical illness can result. Allergic responses are most commonly experienced as allergic asthma or allergic rhinitis ("hay fever"). A rare, but much more serious immune-related condition, hypersensitivity pneumonitis may follow exposure to very high concentrations of fungal (and other microbial) proteins. (ACOEM 2002)

There are pathogenic fungi that can infect normal and healthy individuals. However, most fungi generally are not pathogenic to healthy humans. These fungi are designated opportunistic fungi. Opportunistic in that these fungi do not normally invade the tissues of the body to cause disease. Persons with impaired immune function (cancer patients receiving chemotherapy, organ transplant patients receiving immunosuppressive drugs, AIDS patients, and patients with uncontrolled diabetes) are at significant risk for more severe opportunistic fungal infection. (ACOEM 2002)

Some species of molds are known to be capable of producing toxins, referred to as mycotoxins. Some of these mycotoxins have valuable clinical use, for example: penicillin, cyclosporine (reduce the immune response for organ transplantation). Mycotoxins are toxic organic compounds produced naturally by numerous fungi. They produce a wide range of acute and chronic systemic effects that cannot be attributed to fungal growth within the host. Serious veterinary and human mycotoxicoses have been documented following ingestion of foods heavily overgrown with molds or contaminated with mycotoxins. (ACOEM 2002) In industrial settings, inhalation exposure to high concentrations of dusts contaminated with mycotoxins and fungal spores and hyphae is associated with acute febrile illness and chronic diseases, including various cancers. Alavanja, et al, 1987; Olsen, et al., 1988; Rask-Andersen, et al., 1994; Riddle, 1974)

Hundreds of known or suspected mycotoxins have been isolated from various fungal cultures in the laboratory. Considered as one group, mycotoxins must be portrayed as structurally diverse complex organic compounds. Purified mycotoxins have not shown volatility which is probably due to their relatively high molecular weight. Consequently, inhalation exposure to mycotoxins is expected to occur through inhalation of airborne particulates containing mycotoxins, including dust and fungal components. Particles of various sizes can penetrate the upper and lower airways. Depth of penetration increases with decreasing particle size. Particles less than 5 microns tend to lodge in the alveolar portion of the lung with larger particles lodging in the conducting airways of the respiratory tree.

30

CAST002031

The structure and physiology of molds are pertinent to their capacity to illicit disease in humans and animals. The basic structure of fragile hyphae, reproductive spores that are distributed via the air, and chemical toxins present in both the hyphae and spores as well as released to the environment allows for easy contamination of humans and animals through inhalation, ingestion, and dermal pathways. (Etzel, 2002) Food, water, and air are the environmental media through which mycotoxin and fungal contamination can disseminate.

## Section 8.1  Inhalation Fever, Respiratory Symptoms from the Inhalation Pathway of Exposure to Mold

Mold dust exposure in the trimming departments of sawmills may cause inhalation fever as well as allergic alveolitis. When the dried contaminated wood is handled in the trimming department, the workers can be exposed to mold dust. It is well known that mold dust can cause allergic alveolitis as well as inhalation fever, also called febrile attacks, organic dust toxic syndrome, or toxic alveolitis. The frequency of inhalation fever was much higher in the wood trimmers than in the controls. (Rask-Andersen, 1994)

French maltworkers, who were inhaling dense clouds of the spores of Aspergillus fumigatus and Mucor mucedo rising from moldy barley being turned in the poorly ventilated and confined spaces of malt barns, developed a severe respiratory illness characterized by fever, breathlessness after work, a dry cough with little sputum, and loss of weight (Vallery Radot and Giroud, 1928). Riddle (1974) studied the prevalence of respiratory symptoms and sensitization by mold antigens among a group of maltworkers. The prevalence of allergic alveolitis, chronic respiratory symptoms, and sensitization by antigens from mold spores was investigated in 114 men employed at five maltings. Chronic respiratory symptoms were commoner among maltworkers than among the controls. More than half the maltworkers were found to have precipitating antibodies in their serum against antigens from mold spores of Aspergillus clavatus, Penicillium granulatum, Penicillium citrinum, or Rhizopus stolonifer. (Riddle, 1974)

Ruoppi et al., 2003, studied 16 adults living in moldy housing and complaining of chronic rhinitis. A comparison control population included sixteen healthy referents without any known mold exposure. In the housing with signs of moisture and mold, the concentrations of microorganisms were elevated, but were within the normal range of those of the reference buildings. The only positive skin reaction for molds was detected in one referent. No reactions were elicited in the nasal provocation tests with molds. Squamous metaplasia were detected in four biopsies and three cytograms of the cases but not in the nasal smears of the referents. The respiratory symptoms reported by occupants of moldy residences were not caused by mold allergy but were apparently related to nonspecific inflammation following irritation.

Simoni et al., 2005, reported on the relation between home mould and/or dampness exposure and respiratory disorders in a large sample of children and adolescents in Italy. The relation of rhino-conjunctivitis in children was expressed in the Odds Ratio of 1.46, 95% CI 1.17-1.82.

31

Gutarowska, et al., 2005, presented a study of mycological analysis of buildings in Lodz and evaluation of the role between filamentous fungi contaminated flats and inhabitants health (allergic airway diseases). The most frequent species isolated from examined rooms were: Penicillium, Cladosporium, Aspergillus, Acremoniu, and Alternaria. The most frequent symptoms reported by examined subjects were rhinitis (59.2%), dyspnea, and skin symptoms. Although the frequency of self-reported symptoms was high, the prevalence of atopy and allergic diseases seems to be similar to that found in the general population, but that statement must be confirmed by comparison of the control group.

Chronic rhinosinusitis (CRS) is one of the most common long-term illnesses in the United States. The etiology of CRS is unknown. Shin et al., 2004, investigated the hypothesis that abnormal immunologic responses to ubiquitous airborne fungi contribute to the pathogenesis of this disease. Patients with CRS show exaggerated humoral and cellular responses, both T(H)1 and T(H)2 types, to common airborne fungi, particularly Alternaria. The anomalous immune and inflammatory responses to ubiquitous fungi may explain the chronicity of airway inflammation in CRS.

Chronic rhinosinusitis (CRS) is an inflammatory disorder affecting the nose and paranasal sinuses. Although bacteria have long been implicated as pathogens in most forms of CRS, fungi may be implicated as pathogens in most forms of chronic rhinosinusitis, fungi may be responsible for some forms. Preliminary trials suggested that (CRS) signs and symptoms improve upon treatment with topical and oral antifungal agents, however, several double-blind, placebo-controlled trials demonstrated the contrary. In the absence of convincing immunologic data and evidence of clinical improvement upon therapy with antifungal agents, the case against fungi remains unproven. (Ebbens and Fokkens, 2008; Ebbens, Georgalas, Fokkens, 2009)

Apart from floods, there are 4 major sources of mould growth in residences: leaks in building fabric, condensation, unattended plumbing leaks and household mould. A recent meta-analysis of the health effects associated with dampness and mould reported pooled odds rations (OR of 1.70 (95% CI 1.44-2.00) for upper respiratory symptoms. Home dampness may be a proxy of mould growth; however, dampness may also be a marker for dust mites, endotoxins, and reduced ventilation, which could increase concentrations of indoor pollutants. The US Institute of Medicine's Committee on Damp Indoor Spaces and Health concluded that there was sufficient evidence of an association between dampness and health outcomes; however, causality had not been established. (Dales, et al., 2008)

Kolstead, et al., 2002, presents a systematic review of reports on health effects related to mold growth (or indicators of mold growth) in nonindustrial work sites. Numerous studies reported associations between health effects and viable molds (7-100 $CVU/m^3$; 10-86 $CVU/m^3$; 310 $CVU/m^3$; 63 $CVU/m^3$; 28-75 $CVU/m^3$; 577 $CVU/m^3$; 80-160 $CVU/m^3$; 300 $CVU/m^3$). Rhinitis related to mold exposure was reported in two studies: Koskinen et al., 1999 [1.89(1.15-3.11)] and Pirhonen et al., 1996 [1.69 (1.31-2.18)]. Other studies reporting nasal symptoms (dryness, irritation, congestion, discharge)

CAST002033

included: Ruotsalainen et al, 1995 [1.84 (0.65-5.18)]; Wan and Li, 1999 [0.94 (0.50-1.77)]; Wieslander et al., 1999 [13.0(3.4-86)]; Li et al., 1997 [1.52(1.02-2.26)]; Li et al., 1997 [1.98(1.19-3.29)]; Wan and Li, 1999 [2.36(0.77-7.22)]; Gyntelberg et al., 1994 [0.58 (p>0.05)]; Wan and Li, 1999 (0.9a6(0.82-1.11)].

Brooks, Spaul, and McCluskey, 2009, report a nonallergic mechanism seemed operative in their cases. The clinical characteristics of their subjects resembled the office worker reported by Hoffman et al. This individual showed work-related significant fall in peak expiratory flow and recovery within 1 hour after leaving the building. Methacholine reactivity improved within 2 to 3 months of leaving the building. The clinical presentation and course of their subjects (Brooks et al.) was similar to individuals reported with noneosinophilic occupational asthma. Some of the reported causative agents for noneosinophilic occupational asthma, such as burning plastics, floor cleaner welding fumes, and formaldehyde, are more accurately characterized as irritants. The data supports a nonallergic mechanism for the airway complaints described by the subjects investigated. Whether these cases represent examples of noneosinophilic asthma is conjectural.

### Section 8.2   Fungal Contamination of Homes and Buildings

Although mycotoxins are commonly associated with agricultural commodities, fungi may colonize other materials, which can become airborne. Air handling systems and various materials of homes and buildings may become contaminated with mycotoxin-producing molds. It is known that components of heating, ventilation, and air conditioning (HVAC) systems may, under certain conditions, be reservoirs of fungal and bacterial biomass. HVAC components that are documented sources of biomass include ductwork, humidifiers, air washers, porous insulation, and fan coil units. Burning wood chips for fuel in a home furnace was also shown to result in release of fungal propagules into air. (Hendry and Cole, 1993)

Enclosed spaces with a relatively low rate of air exchange, for example, heated homes, were shown to have a significantly higher air concentration of fungal particles than outdoor air. Analysis of debris from the air return duct, ceiling insulation, and ceiling material revealed the presence of several macrocyclic trichothecenes, including verrucorol, verrucarins, satratoxin H, and trichoverrins. Stachybotrys chartarum was shown to have heavily colonized the duct debris, which contained lint, carpet fibers, and ceiling material. (Hendry, 1993)

Indoor carpet can harbor a variety of fungi, some of which may produce mycotoxins under certain conditions such as routine dampness and/or high relative humidity. Release of respirable mycotoxin-containing particles may then possibly occur by routine activity, vacuuming, or carpet cleaning. Carpet is a sink or collector for a wide range of potential fungal substrates including soil, food spills, plant litter, other organic matter, and human and animal shedding particles (skin, hair, fur, etc.). (Hendry, 1993)

CAST002034

Products most vulnerable to mold attacks were water damaged, aged organic materials containing cellulose, such as wooden materials, jute, wallpaper, and cardboard. The fungal genera most frequently encountered were Penicillium, Aspergillus, Chaetomium, Ulocladium, Stachybotrys, and Cladosporium. Penicillium crysogenum, Aspergillus versicolor, and Stachybotrys chartarum were the most frequently occurring species. Under field conditions, several trichothecenes were detected in each of the three commonly used building materials heavily contaminated with S. chartarum. Under experimental conditions, four out of five isolates of S. chartarum produced satratoxin H and G when growing on new and old, very humid gypsum boards. Aspergillus versicolor produced the carcinogenic mycotoxin sterigmatocystin and 5-methoxysterigmatocystin under the same conditions.

In a study of the indoor environment on respiratory health in primary school children, a statistically significant association was found between damp stains and mold growth associated with chronic cough and small but significant impairments in lung function parameters.

Dales et al (1991) studied respiratory health effects of home dampness and molds among Canadian children. The study reports an association between the respiratory health of young children and home dampness and molds. Health indicators associated with the presence of dampness and mold include the following: cough, wheeze, wheeze with dyspnea, asthma, bronchitis, chest illness, upper respiratory symptoms, eye irritation, and nonrespiratory symptoms. The nonrespiratory symptoms included any one of the following occurring on at least three separate occasions in the 3 months prior to the survey: headaches, muscle aches, fever and chills, nausea, vomiting, or diarrhea.

In a publication in 1994, Dales et al. defined the primary exposure variables used to indicate the presence of home dampness and mold as follows:
- **Moisture:** "Within the past year...have you ever had wet or damp spots on surfaces inside your present home other than in the basement (for example, on walls, wallpaper, ceilings or carpets)?"
- **Visible mold:** "Have you ever had mold or mildew growing on any surface inside your present home? (for example, on walls, wallpaper, ceilings, carpets, shower curtain, etc.)...in the basement?...in the shower area(s)?...in other areas of your house...(within) the past year?
- **Flooding:** "Have you ever had a leak, flooding, or water damage in your basement...(within) the past year?"
- **Dampness/mold:** The presence of moisture, mold, or flooding as defined earlier with the exception that mold in the shower area was not included.

Brunekreef (1992) found similar associations between home dampness characterized by reports of damp stains or mold growth on indoor surfaces and symptoms. Symptoms associated were cough, phlegm, wheeze, asthma.

Burge, et al (1991), report a higher prevalence of work-related runny nose and flu-like symptoms, eye and throat symptoms, lethargy and headache in the diagnosis of sick

CAST002035

building syndrome. Questions on the survey included two or more episodes in a 12 month period of any of the following symptoms: dryness of the eyes; itching or watering of the eyes; blocked or stuffy nose; runny nose; dry throat; lethargy and/or tiredness; headache; flu-like illness (including aches in the limbs and/or fever); difficulty in breathing; and feeling of chest tightness.

Augur et al (1994) reported on patients suffering from a Chronic-Fatigue-like syndrome and repeated upper respiratory infections in relation to airborne molds. Their symptoms were alleviated after removal of the mold or relocation. Chronic fatigue syndrome was defined according to Holmes et al. [1988] and the case reports were as follows:

- Chronic fatigue-like syndrome in a family of three; less symptomatic after a stay outside the dwelling; completely disappeared after removal of extensive colonies of Penicillium brevicompactum from sub-basement.
- Family of four. Husband and 2-year-old infant were asymptomatic: wife and 8-year old-daughter had chronic fatigue syndrome and repeated upper airways infection. Penicillium frequentans was present in abnormally high concentrations in different areas of the house. After removal and rebuilding of the house, the two sick females regained a completely normal state of health.
- Family of two. Mother and son; chronic fatigue, repeated upper airways infections episodes and asthma (mother) in an apartment with considerable Trichoderma viride on the window frames. Moving out reduced symptomatology after 3 months.
- Family of two physicians, two children. Episodes of multiple upper airways infections were made less frequent after removal of colonies of Phoma species on window frame.
- Family of four. Chronic fatigue-like syndrome, with repeated upper respiratory airways infection, disappeared after 6 months in three members of the family and after 2 years in the mother after moving out of apartment where Penicillium cyclopium was growing.

Symptoms of hypersensitivity pneumonitis in three employees in an office building led to an investigation of their work environment by Arnow et al in 1978. Cases of hypersensitivity pneumonitis generally result from frequent occupational or avocational exposure to organic dusts or to aerosols from forced-air heating or cooling systems contaminated with microorganisms.

Hodgson et al (1985) studied pulmonary disease associated with cafeteria flooding. The two clinical cases presented with clinical symptoms compatible with hypersensitivity pneumonitis and included the following: cough, chest tightness, muscle aches, headaches, nausea, chills, fever, and fatigue that occurred during the work week but disappeared by Saturday afternoon only to reoccur by Monday afternoon. Arthralgias in one was so severe that she could walk only with difficulty.

Hodgson et al (1987) studied an outbreak of recurrent acute and chronic hypersensitivity penumonitis in office workers in Tennessee. Symptoms compatible with

CAST002036

acute hypersensitivity penumonitis were associated with manipulations on the central air handling system of an office building in a seven-story office building constructed during the 1930s in Tennessee. In each outbreak, a temporal relationship was observed between starting the heating, ventilation, and air-conditioning (HVAC) system and the onset of symptoms. About 40% of the 325 office workers in a seven-story building met the case definition of at least three symptoms (headaches, muscle aches, fever, chills, cough, or wheezing) and a time of onset after 11 am. Use of this time of onset helped to exclude individuals with pre-existing respiratory conditions that were unrelated to exposures in the building. In most affected individuals, these symptoms subsided by the following morning.

Hodgson et al, (1998) presented an outbreak of building-associated pulmonary disease from exposure to Stachybotrys chartarum and Aspergillus versicolor. Moisture-damaged interior surfaces in both buildings were contaminated with Stachybotrys chartarum, Aspergillis versicolor, and Penicillium species. Aspergillus species at concentrations of $10^1$ to $10^4/m^3$ dominated the indoor air under normal operating conditions. Bulk samples also revealed large quantities of Stachybotrys. Moisture problems included window and roof leaks and envelope seepage that began in 1987 and persisted through 1992. Fungating masses were identified in the ventilation ducts. A nested case-control study suggested emphysematous-like disease in individuals. No association was seen between IgE or IgG antibodies and the presence of disease. This outbreak represents a likely human response to inhaled fungal toxins in indoor environments. Moisture indoors represents a public health issue currently inadequately addressed by building, health, or housing codes.

Johanning et al (1996) studied office workers after exposure to fungal bio-aerosols, especially Stachybotrys atra (chartarum) and its toxigenic metabolites (satratoxins). Satratoxin H and spirocyclic lactones produced by S. atra were strongly associated with the following health problems: lower respiratory system symptoms, dermatological symptoms, eye symptoms, constitutional symptoms, chronic fatigue symptoms and several enumeration and function laboratory tests, mainly of the white blood cell system. The proportion of mature T-lymphocyte cells was lower in employees than in controls, particularly among those workers reporting a history of upper respiratory infections. Specific S. chartarum antibody tests (IgE and IgG) showed small differences from controls. It is concluded that prolonged and intense exposure to toxigenic S. charatarum and other atypical fungi was associated with reported disorders of the respiratory and central nervous systems, reported disorders of the mucous membranes and a few parameters pertaining to the cellular and humoral immune system, suggesting a possible immune competency dysfunction. Nikulin et al (1996) reported that persons handling Stachybotrys-contaminated fodder have suffered from cough, rhinitis, burning sensation in the mouth and nasal passages, and cutaneous irritation due to the toxin contact. Andersson, et al, 1997, reports that an analysis of toxins from indoor building materials heavily colonized by fungi and bacteria revealed that the cytotoxic and skin toxic effects were due to satratoxin. Malloy and Marr, 1997, report that S. atra causes upper respiratory problems, dermatitis, and malaise.

36

CAST002037

Ueno reports that the major trichothecenes possess common manifestations, such as dermal toxicity, hemorrhagic lesions, destruction of hematopoietic organs, and depression of immune responses.

Chemical analyses of a bulk sample of S. chartarum-contaminated sheetrock revealed the presence of a macrocyclic trichothecene, satratoxin H, which is a potent protein synthesis inhibitor. (Johanning, et al 1996)   Satratoxins belong to the macrocyclic trichothecene class of mycotoxins.  Over 100 trichothecenes with irritatory and immunosuppressive effects are known.  (Tuomi et al, 2000)  Unusual indoor air contamination with S. chartarum mycotoxins was thought to be responsible for several confirmed cases of extreme chronic fatigue syndrome in hospital workers.  Indoor air Stachybotrys exposure has been found to be associated with an exacerbation of asthma. (Johanning, et al 1996)

Between 1993 and 1998, 37 cases of pulmonary hemorrhage and hemosiderosis were identified in young infants in the vicinity of Cleveland, Ohio.  Twelve of the infants died. In November 1994, the Center for Disease Control and Prevention (CDC) began an investigation to determine the cause of the outbreak.  Thirty of the cases occurred within a contiguous nine zip code area in the eastern part of the metropolitan area.  The case-control study found an association with home water damage and the presence of the toxic fungus Stachybotrys chartarum and other fungi in indoor air.  This fungus was found in higher quantity in the air of the home environments of the affected infants than in the control homes.  Stachybotrys requires water-soaked cellulose to grow, and was found in homes where there had been water damage from flooding, plumbing leaks, or roof leaks involving wood or paper products (e.g., insulation, gypsum board, ceiling tile).  The spores of this fungus contain very potent mycotoxins capable of producing acute toxicosis.  Secondary stresses, e.g. environmental tobacco smoke, appear to be important triggers of overt hemorrhage.   The clinical spectrum of this disease varies from overt, life-threatening hemorrhage to very subtle initial symptoms such as nose bleeds and chest congestion.

The CDC recommended that water damage to property be cleaned up to prevent the growth of fungi.  Carpeting that has been soaked should be pulled up and thrown away. Soaked paper, cardboard, and cellulose products should also be discarded.  Chlorine bleach solutions should be used to wash down areas that have been soaked by flood waters.

Tuomi et al, 2000, performed the largest screen from indoor environments with respect to the number of mycotoxins and samples analyzed.  Mycotoxins were found in more than 40% of samples.  Many indoor environmental  exposures from building defects and moisture problems typically result in fluctuating inhalation doses over time.  This may well explain the variable human health responses as well as differences in immunological response.  It has been shown that Stachybotrys growth, levels of culturable fungal spores, toxin production, and airborne mycotoxin presence depend on environmental conditions (moisture content), substrate (cellulose content of building

CAST002038

materials), and other factors.  Moreover, the cytotoxicity of fungal building materials can be quite different within the same building location.  (Johanning, 1998)

Stachybotrys has been named one of the most harmful fungi in indoor environments and is regarded as an indicator organism for moisture problems that may cause serious health implications for occupants in affected buildings. (Raunio, et al. 2001)  S. atra is known to produce several macrocycyclic trichothecenes, including verrucarins B and J, roridin E, and satratoxins F, G, and H, and isosatratoxins F, G, and H.. (Sorenson et al, 1987; Brasel et al, 2005) Four out of five isolates of S. chartarum produced satratoxin H and G when growing on new and old, very humid gypsum boards.  (Gravesen et al, 1999) The conidia of S. atra contain trichothecene mycotoxins.  (Sorenson, et al, 1987) Additionally, satratoxin H and other trichothecenes can be come airborne on particulates smaller than conidia.  (Brasel, et al 2005)  Because the proliferation of S. chartarum contamination requires very high and somewhat constant moisture conditions, this fungus is not a particularly frequent contaminant in buildings.  However, it has been shown that as this fungus contaminates materials and constructions, the contamination is massive and S. chartarum highly dominates the fungal flora in the substrate. (Raunio, et al. 2001)

Several problems are encountered with the identification of Stachybotrys in buildings. Because no selective culture media for Stachybotrys are available and only less than 10% of the Stachybotrys spores present in the air are assumed to be viable, the cultivation method is not recommended for identification.  The present microscopic methods are not sufficiently advanced for identification of fungi at the genus or species level.  (Raunio, et al. 2001)  The half-life of important trichothecenes is several hours and individuals present for medical evaluations long after their acute Stachybotrys exposure. (Johanning, 1998) Furthermore, S. atra may produce mycotoxins in respirator filters in humid environments, jeopardizing the safety of the inspection protective equipment. (Pasanen, et. al., 1994)

## Section 9.0  Particulate Matter/Dust  (PM-10 and PM-2.5)

Particle pollution is a mixture of microscopic solids and liquid droplets suspended in air.  This pollution, also known as particulate matter, is made up of a number of components, including acids (such as nitrates and sulfates), organic chemicals, metals, soil or dust particles, and allergens (such as fragments of pollen or mold spores). (EPA,2003)

The size of particles is directly linked to their potential for causing health problems. Small particles less than 10 micrometers in diameter pose the greatest problems, because they can get deep into your lungs, and some may even get into your bloodstream. Exposure to such particles can affect both the lungs and heart.  Larger particles are of less concern, although they can irritate your eyes, nose, and throat.  (EPA,2003)

Small particles of concern include "fine particles" (such as those found in smoke and haze), which are 2.5 micrometers in diameter or less; and "coarse particles" (such as

38

those found in wind-blown dust), which have diameters between 2.5 and 10 micrometers. (EPA,2003)

People with heart or lung disease, older adults, and children are considered at greater risk from particles than other people, especially when they are physically active. Exercise and physical activity cause people to breathe faster and more deeply, and to take more particles into their lungs. People with heart or lung diseases, such as coronary artery disease, congestive heart failure, and asthma or chronic obstructive pulmonary disease (COPD), are at increased risk, because particles can aggravate these diseases. People with diabetes also may be at increased risk, possibly because they are more likely to have underlying cardiovascular disease. Older adults are at increased risk, possibly because they may have undiagnosed heart or lung disease or diabetes. Many studies show that when particle levels are high, older adults are more likely to be hospitalized, and some may die of aggravated heart or lung disease. (EPA,2003)

Children are likely at increased risk for several reasons. Their lungs are still developing; they spend more time at high activity levels; and they are more likely to have asthma or acute respiratory diseases, which can be aggravated when particle levels are high. Factors that increase the risk of heart attack, such as high blood pressure or elevated cholesterol levels, also may increase the risk from particles. (EPA,2003)

Long-term exposures, such as those experienced by people living for many years in areas with high particle levels, have been associated with problems such as reduced lung function and the development of chronic bronchitis, and even premature death. Short-term exposures to particles (hours or days) can aggravate lung disease, causing asthma attacks and acute bronchitis, and may also increase susceptibility to respiratory infections. In people with heart disease, short-term exposures have been linked to heart attacks and arrhythmias. In healthy children and adults, only temporary minor irritation from elevated particle levels may be experienced. (EPA,2003)

Symptoms from particle exposure include the following: irritation of the eyes, nose, and throat; coughing; phlegm; chest tightness; and shortness of breath. In those with lung disease, difficulty breathing as deeply or as vigorously as normal, coughing, chest discomfort, wheezing, shortness of breath, asthma attacks, and unusual fatigue may be experienced. In those with heart disease, particle exposure can cause serious problems in a short period of time—even heart attacks—with no warning signs. Symptoms such as chest pain or tightness, palpitations, shortness of breath, or unusual fatigue may result from elevated particle levels. (EPA,2003)

### 9.1 EPA Standards for Particulate Matter

In 1997, the EPA added two new PM-2.5 standards, set at 15 micrograms per cubic meter and 65 $\mu g/m^3$, respectively, for the annual and 24-hour standards. The PM-10 standard established in 1987 is 50$\mu g/m3$ (measured as an annual mean) and 150 $\mu g/m^3$ (measured as a daily concentration). In addition, the form of the 24-hour standard for PM-10 was changed in 1997. (EPA, 2002)

CAST002040

## 9.2  Toxic Responses of the Respiratory System

Exposure to toxicants via inhalation occurs in all phases of human activity.  Inhalation is the most important route of exposure in the workplace.  Industrial atmospheres contain many gases and particles capable of producing pulmonary damage or damage to other organ systems when inhaled.  (Casarett and Doull's, 1986)  Schwartz, Makepeace, and Dean (1933) considered air and dust important vehicles in the production of industrial radium intoxication.  Evans, writing in 1943, regarded inhalation of dust from radium paint at that time as an "even more important" mode of entry into the body than ingestion, and considered radium dust more toxic than ingested radium because a smaller fraction is excreted.  He noted that higher burden were often found among inspectors and instrument workers who removed small chips of dry radium paint than among dial painters.

## 9.3  Structure of the Respiratory Tract

The respiratory tract may be considered as having three major regions:  the nasopharyngeal, the tracheobronchial, and the pulmonary.  The nasopharynx begins with the anterior nares and extends back and down to the level of the larynx.  The nasal passages are lined with vascular mucous epithelium, which is characterized, except at the entrance, by ciliated columnar epithelium and scattered mucous glands.  The nasopharynx filters out large inhaled particles and is the region in which the relative humidity is increased and the temperature of the air is moderated.  (Casarett and Doull's, 1986, 1996, 2001, 2008)

The trachea, bronchi, and the bronchioles serve as conducting airways between the nasopharynx and alveoli, where gas exchange occurs.  The conducting airways are lined with ciliated epithelium and coated with a thin layer of mucus secreted by goblet cells and mucus-secreting cells.  The surface of the airways serves as a mucociliary escalator, moving particles from the deep lung to the oral cavities so they may be swallowed and excreted.  The branching patterns and physical dimensions of the airways are critical in determining the deposition of particles and the absorption of gases by the respiratory tract.  (Casarett and Doull's, 1986, 1996, 2001, 2008)

The acinus is the basic functional unit of the mammalian lung and is the primary location of gas exchange between the environment and blood.  Anatomically, the acini consist of the structures distal to and including the first-order respiratory bronchiole, which is the first bronchiole with alveoli.  The acini, of which there are about 200,000 in the adult human, include three or four orders of respiratory bronchioles, several orders of alveolar ducts and alveolar sacs, hundreds of alveoli and associated blood vessels, lymphatic tissues, supportive tissues, and nerve enervations.  (Casarett and Doull's, 1986, 1996, 2001, 2008)

CAST002041

## 9.4  Particle Deposition

The site of deposition of solid particles or droplets in the respiratory tract, along with their chemical makeup, is important. Particle size is usually the critical factor that determines the region of the respiratory tract in which a particle or an aerosol will be deposited. Deposition of particles on the surface of the lung and airways is brought about by a combination of lung anatomy and the patterns of airflow in the respiratory system. (Casarett and Doull's, 1996)

The site of deposition of particles in the respiratory tract is determined by a combination of the physical forces that remove particles from an airstream and the anatomy of the respiratory tract. The site of deposition affects (1) the severity of the consequences of tissue damage to the respiratory tract, (2) the degree of absorption of systemic toxicants, and (3) the clearance mechanisms available for the ultimate removal of the particles. (Casarett and Doull's, 1986)

Particles having an aerodynamic diameter of 5 to 30 μm are largely deposited in the nasopharyngeal region by impaction. Particles having an aerodynamic diameter of 1 to 5 μm are deposited in the tracheobronchial regions by sedimentation. The small particles, generally less than 1 μm, that have penetrated to the alveoli are deposited primarily by diffusion. Additional physiologic or pathologic factors may act to influence particle deposition. Chronic bronchitis, and bronchoconstriction from irritant materials, and cigarette smoking, would tend to increase particle deposition.  (Casarett and Doull's, 1986)

## 9.5  Particle Clearance

The clearance of deposited particles is an important aspect of lung defense. Rapid removal lessens the time available to cause damage to the pulmonary tissues or permit local absorption. The specific mechanisms available for the removal of particles from the respiratory tract vary with the site of the deposition. **It is important to emphasize that clearance of particles from the respiratory tract is not synonymous with clearance from the body.** Depending on the specific clearance mechanism used, particles are cleared to (1) the stomach and gastrointestinal tract, (2) the lymphatics and lymph nodes, where they may be dissolved and enter the venous circulation, or (3) the pulmonary vasculature. The only mechanisms by which the respiratory system can truly remove deposited particles from the body are coughing and blowing the nose. (Casarett and Doull's, 1996)

Nasal clearance refers to particles deposited in the nose. They are cleared by various mechanisms, depending on their site of deposition and solubility in mucus. The anterior portion of the nose is lined with relatively dry squamous epithelium, and so particles deposited there are removed by extrinsic actions such as wiping and blowing. The other regions of the nose are largely covered by a mucociliary epithelium that propels mucus toward the glottis, where it is swallowed. Particles that are soluble in mucus may dissolve and enter the epithelium and/or blood before they can be mechanically removed.

41

CAST002042

Uncertainties still remain about the clearance of particles that are deposited on olfactory regions or areas that are damaged by acute infection, chronic illnesses, or toxic injury. (Casarett and Doull's, 1996)

Tracheobronchial clearance mechanisms involve the mucociliary escalator, specifically, the pseudostratified ciliated columnar epithelium of the conducting airways. The mucus layer covering the tracheobronchial tree is moved upward by the beating of the surface cilia of the respiratory epithelium. This mucociliary escalator transports deposited particles and particle-laden macrophages upward to the oropharynx, where they are swallowed and pass through the GI tract. (Casarett and Doull's, 1996)

Minutes after particles are inhaled, they may be found in alveolar macrophages. Many alveolar macrophages are ultimately transported to the mucociliary escalator. It is possible that macrophages are carried to the bronchioles with the alveolar fluid that contributes to the fluid layer in the airways. Other particles may be sequestered in the lung for very long periods, often in macrophages located in the interstitium. (Casarett and Doull's, 1996)

### 9.6 Respiratory Tract Injury

Airborne agents can contact cells lining the respiratory tract from the nostrils to the gas-exchanging region. The sites of interaction of toxicants in the respiratory tract have important implications for evaluation of the risk to humans posed by inhalants. Certain gases and vapors stimulate nerve endings in the nose. The result is holding of the breath or changes in breathing patterns, to avoid or reduce further exposure. (Casarett and Doull's, 1996) Breath holding increases deposition of particles from sedimentation and diffusion. Exercise, where larger volumes are inhaled at higher velocities, will increase particle deposition in the large and smaller airways and alveoli. Quiet breathing in comparison will facilitate exhaling of some of the particles. (Casarett and Doull's, 1986) If continued exposure cannot be avoided, many acidic or alkaline irritants produce cell necrosis and increased permeability of the alveolar walls. The epithelial barrier in the alveolar zone, after a latency period of several hours, begins to leak, flooding the alveoli and producing a delayed pulmonary edema that is often fatal. (Casarett and Doull's, 1996)

### 9.7 Microscopic Morphology of Aspergillus/Penicillium/Fusarium species and spore size of Particulate Matter

Hyphae of Aspergillus species are hyaline, septate, and relatively broad (average diameter 5 μm, range 2.5 to 8 μm), as they are for all aspergilli, with parallel walls. Conidiophores are smooth walled, up to 300 μm in length and 3 to 8 μm (average 5 μm) in width. The vesicle, a swelling at the terminal end of the conidiophore, is flask shaped and is approximately 25 μm in diameter (range 20 to 30 μm). Uniseriate flask-shaped phialides bend upward from the upper half of the vesicle; each phialide bears a single chain of conidia. **The round phialoconidia (spores) are 2 to 3.5 μm in diameter.** (Howard et al.,1994)

CAST002043

Conidia of Penicillium spp. measure 3 x 5 μm. (de la Maza, 1997) The septate hyaline hyphae of Fusarium are approximately 4 μm in diameter and the microconidia approximately 8-10 μm in size (Fisher, 1998).

## Section 10.0 Fungal Analysis performed by EMLab P&K Project: 3070 Forest River; EML ID: 577890.

Quantitative spore counts revealed numerous species of fungi, including: Alternaria, Penicillium/Aspergillus, and Cladosporium. Total spores per $cm^2$ were as high as the following: 7,600 /$cm^2$ for Aspergillus; 180,000 /$cm^2$ for Fusarium; 180,000 /$cm^2$ for Cladosporium; 2,400 /$cm^2$ for Penicillium/Aspergillus types. The total Colony Forming Units per cubic meter for the interior ambient air is 390 CFU/$M^3$.

## Section 11.0 National Institute for Occupational Safety and Health (NIOSH)

In December 1976, DHHS (NIOSH) Publication No. 77-126 was published as a NIOSH Criteria for a Recommended Standard: Occupational Exposure to Formaldehyde. Input from the NIOSH staff, Review consultants on Formaldehyde, American Conference of Governmental Industrial Hygienists and the American Academy of Occupational Medicine was considered in the final production of this document.

In regards to Protective Clothing: **"Employees shall wear protective sleeves, aprons, jackets, trousers, and caps as needed to protect them from skin contact with formaldehyde. Protective garments shall be made of a material impervious to formaldehyde. In emergencies or other circumstances involving exposure to formaldehyde at high concentrations f vapor, mists, or dusts in the air, full body protection shall be worn. Emergency garments shall be of an impervious material, and shall fit snugly about the wrists, neck, waist, and ankles."** (NIOSH, 1976)

**"Respirators may be used for nonroutine operations, evacuation, or emergencies which may involve occasional brief exposures to formaldehyde at concentrations in excess of 1.2 mg/cu m (0.98 ppm)."** (NIOSH, 1976)

For formaldehyde concentrations less than or equal to 2.4 mg/cu m, a Chemical cartridge respirator and organic vapor cartridge and full-face mask or a Type C supplied-air respirator, demand type (negative pressure), and full-face mask is required when the ceiling concentration is exceeded. (NIOSH, 1976)

NIOSH reviews the literature and includes references to gaseous exposures from textiles and formalin. In a 1966 study of a clothing store, the California Department of Public Health reported airborne work zone concentrations of 0.9-3.3 ppm formaldehyde. The California Department of Public Health conducted another occupational health study in the same year at a textile garment factory where "perma-press" clothing was manufactured. The odor of formaldehyde was readily noticeable to the observers and was

43

accompanied by eye and upper respiratory tract irritation. Air sampling revealed airborne formaldehyde concentrations ranged from 0.9 to 2.7 ppm. (NIOSH, 1976)

NIOSH further cites an article by Porter (Acute respiratory distress following formalin inhalation. Lancet 1:603-604, 1975) who experienced acute respiratory distress after working with formalin. As a neurology resident, he spent 2 hours preparing brain specimens and inhaled high concentrations of formaldehyde gas. The previous week, he had been exposed to formaldehyde gas for 15 hours. (NIOSH, 1976)

Two skin hazards are associated with exposure to formaldehyde: primary irritation and allergic dermatitis. **Primary irritation has resulted from** direct skin contact with formaldehyde solutions, **and exposure to gaseous formaldehyde. Allergic dermatitis** has been produced by direct skin contact with formaldehyde solutions, the handling of formaldehyde-containing textiles, skin contact with formaldehy6de from formaldehyde-containing resins, **and exposure to gaseous formaldehyde.** (NIOSH, 1976)

There was no evidence of carcinogenicity of formaldehyde reported in this NIOSH Criteria document in 1976.

The NIOSH Pocket Guide to Chemical Hazards, June 1990, lists formaldehyde as a carcinogen. The REL is 16 ppb and the Ceiling is 100 ppb and must not be exceeded during any part of the workday. Respirator use is recommended at any detectable concentration. (NIOSH, 1990) These recommendations are still in effect.

In September 1995, NIOSH issued a new policy for use of respirators. Under the old policy, NIOSH recommended only the "most protective respirators" whenever exposure to carcinogens exceeded the REL or the analytic limit of detection. Under the new policy, NIOSH will recommend the complete range of respirators for carcinogens with quantitative RELs.

## Section 12.0  Occupational Safety and Health Administration (OSHA)

In 1978, OSHA regulated formaldehyde under the 1910.132 Personal Protective Equipment regulation under Table Z-2. The 8 hour TWA was 3 ppm with a ceiling of 5 ppm. Air contaminants were calculated as mixtures and computed as an Equivalent Exposure: $E_m = C_1 \div L_1 + C_2 \div L_2) + ...(C_n \div L_n)$ Where: $E_m$ is the equivalent exposure for the mixture; C is the concentration of a particular contaminant; L is the exposure limit for that contaminant, from tables Z-1, Z-2, or Z-3. The value of $E_m$ shall not exceed unity for the exposure combination to be within acceptable limits (OSHA 29CFR 1910, 1978).

Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of

CAST002045

causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.  (OSHA 29CFR 1910, 1978).

In correspondence to John F. Murray (8/7/1987), President of the Formaldehyde Institute, Inc. the Assistant Secretary of the United States Department of Labor, OSHA, John A. Pendergrass,  responds to Mr.Murray's letter regarding cancer warning labels for formaldehyde and products containing formaldehyde.  The Assistant Secretary of Labor responds:  **"Presently, there are several valid, positive studies indicating human carcinogenicity [of formaldehyde]".  "Accordingly label warnings under the Hazard Communication Standard and therefore is not, as you state, an ad hoc enforcement action by the Agency."  "In addition, enforcement of labeling requirements under the Hazard Communication Standard will not prejudge the pending rulemaking."**

OSHA Hazard Communication Standard 1910.1200 (1996) states as follows: **"The purpose of this section is to ensure that the hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees.  This transmittal of information is to be accomplished by means of comprehensive hazard communication programs, which are to include container labeling and other forms of warning, material safety data sheets and employee training."**

OSHA defines a health hazard in the 1910.1200 Standard as follows: **"Health hazard" means a chemical for which there is statistically significant evidence based on at least one study conducted in accordance with established scientific principles that acute or chronic health effects may occur in exposed employees.  The term "health Hazard" includes chemicals which are carcinogens, toxic or highly toxic agents, reproductive toxins, irritants, corrosives, sensitizers, hepatotoxins, nephrotoxins, neurotoxins, agents which act on the hematopoietic system, and agents which damage the lung skin, eyes, or mucous membranes."** (OSHA 1910.1200c; 1996 )

**"For health hazards, evidence which is statistically significant and which is based on at least one positive study conducted in accordance with established scientific principles is considered to be sufficient to establish a hazardous effect, if the results of the study meet the definitions of health hazards in this section."**  (OSHA 1910.1200(d)(2); 1996)

In 1987  OSHA published a reduction in the Permissible exposure Level (PEL) from 3 ppm to 1 ppm as an 8-hour time-weighted average.  The peak allowable exposure of 10 ppm (for up to 30 minutes) was revoked and the 5 ppm ceiling was reduced to the Short term exposure level (STEL) at 2 ppm as a 15-minute STEL.  This amended standard took effect on February 2, 1988.  (Fed Register #52:46168-312)

On February 21, 1989, correspondence from Thomas J. Shepich, Directorate of Compliance Programs of OSHA, to Leo Carey, Director of the Office of Field Programs and Roger Clark, Regional Administrator clarifies the Formaldehyde Standard

CAST002046

1910.1048(h)(1)(ii). "**The intent of this provision is for all employees who are in contact with irritating or sensitizing materials to have proper protective clothing and equipment in order to avoid irritant dermatitis and the serious problem of sensitization to formaldehyde.**"

He further states that: "**Dermatitis in the textile and apparel industries is well documented, and formaldehyde is a well known sensitizer. The nature of skin disorders caused by handling textiles may be irritant or allergic dermatitis. Once sensitized, however, and employee will probably continue to react to small concentrations of formaldehyde for years. Dermal sensitization can severely limit a worker's ability to pursue employment and disrupt the worker's personal life since formaldehyde use in small amounts is pervasive in consumer products. Sensitization is clearly a serious and material impairment of health.**" (Shepich, 1989)

The OSHA standard for formaldehyde 1910.1048, revised as of July 1, 1990, lists the Action level as 0.5 ppm formaldehyde. Table 1 lists the minimum requirements for respiratory protection against formaldehyde up to 10 ppm as: "**Full facepiece with cartridges or canisters specifically approved for protection against formaldehyde**". "**Respirators shall be used in the following circumstances: (g) (i) During the interval necessary to install or implement feasible engineering and work practice controls; (ii) In work operations, such as maintenance and repair activities or vessel cleaning, for which the employer establishes that engineering and work practice controls are not feasible; (iii) In work situations where feasible engineering and work practice controls are not yet sufficient to reduce exposure to or below the PELs; and (iv) in emergencies. "(h)((iv) The employer shall assure that no employee takes home equipment or clothing that is contaminated with formaldehyde.**"

"**For purposes of hazard communication, formaldehyde gas, all mixtures or solutions composed of greater than 0.1 percent formaldehyde, and materials capable of releasing formaldehyde into the air under any normal condition of use at concentrations reaching or exceeding 0.1 ppm (100 ppb) shall be considered a health hazard.**" (OSHA standard 1910.1048, 1990)

"**Carcinogenicity: Formaldehyde has the potential to cause cancer in humans. Repeated and prolonged exposure increases the risk. In humans, formaldehyde exposure has been associated with cancers of the lung, nasopharynx, and oropharynx, and nasal passages.**" (OSHA standard 1910.1048, 1990)

"**Mutagenicity: Formaldehyde is genotoxic in several *in vitro* test systems showing properties of both an initiator and a promoter.** (OSHA standard 1910.1048, 1990)

"**Ventilation is the most widely applied engineering control method for reducing the concentration of airborne substances in the breathing zones of workers. There are two distinct types of ventilation.**" "**Local Exhaust: Local exhaust ventilation is designed to capture airborne contaminants as near to the point of generation as**

CAST002047

possible." "General (Mechanical): General dilution ventilation involves continuous introduction of fresh air into the workroom to mix with the contaminated air and lower your breathing zone concentration of formaldehyde. Effectiveness depends on the number of air changes per hour." (OSHA standard 1910.1048, 1990)

In Appendix C to 1910.1048, the following is stated: "The occupational health hazards of formaldehyde are primarily due to its toxic effects after inhalation, after direct contact with the skin or eyes by formaldehyde in liquid or vapor form, and after ingestion." "Exposure to liquid formalin or formaldehyde vapor can provoke skin reactions in sensitized individuals even when airborne concentrations of formaldehyde are well below 1 ppm."

OSHA lowered the PEL for fomaldehyde from 1 ppm as an 8-hour time-weighted average to an 8-hour time-weighted average of 0.75 ppm on June 26, 1992. (OSHA Docket No. H-225D)

OSHA lists formaldehyde on its current list of substances that OSHA regulates as carcinogens or potential carcinogens. (OSHA correspondence, Richard E. Fairfax, Director of the Directorate of Enforcement Programs, 2003)

Current OSHA 1910.1048 lists the Action level of formaldehyde as 0.5 ppm calculated as an eight hour time-weighted average (TWA). The Permissible Exposure Limit (PEL) is as follows: "The employer shall assure that no employee is exposed to an airborne concentration of formaldehyde which exceeds 0.75 parts formaldehyde per million parts of air (0.75 ppm) as an 8-hour TWA." The Short Term Exposure Limit (STEL) is 2 ppm as a 15-minute STEL.

Current OSHA 1910.1048 Appendix C presents the toxicology of formaldehyde. "Formaldehyde can produce symptoms of bronchial asthma in humans. The mechanism may be either sensitization of the individual by exposure to formaldehyde or direct irritation by formaldehyde in persons with pre-existing asthma. Upper airway irritation is the most common respiratory effect reported by workers and can occur over a wide range of concentrations."

"Exposure to formaldehyde solutions can cause irritation of the skin and allergic contact dermatitis. These skin diseases and disorders can occur at levels well below those encountered by many formaldehyde workers. Symptoms include erythema, edema, and vesiculation or hives. Exposure to liquid formalin or formaldehyde vapor can provoke skin reactions in sensitized individuals even when airborne concentrations of formaldehyde are well below 1 ppm." (OSHA 1910.1048 Appendix C)

"Long term exposure to formaldehyde has been shown to be associated with an increased risk of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer in humans. Formaldehyde is a complete

CAST002048

**carcinogen and appears to exert an effect on at least two stages of the carcinogenic process.**" (OSHA 1910.1048 Appendix C; 2008)

In the 1989 final rulemaking of 428 substances, the Section VI preambles of the final rule making presents the General Principles of Toxicology and Dose Response considered in the rule making. Three noted toxicologists participated in the material in this section VI: Klaasen, Amdur, and Doull, 1986. Of note is the following concerning a chronic effect of a substances: "**Thus a chronic effect is said to occur: (1) if a toxic substance accumulates in the system of an exposed person or animal because the dose absorbed is greater than the body's ability to transform or eliminate the substance; (2) if it produces adverse effects that are not reversible; or (3) if it is administered in a manner that permits inadequate time for repair or recovery.**" (OSHA, 1989)

In the same document (OSHA, 1989 preamble) the use of NOELs, LOAELs, and safety factors to develop permissible exposure limits is discussed. "**Safety factors are usually chosen prospectively to address the uncertainties of interspecies extrapolation. Although safety factors as small as 2 and as large as 2000 have been used...the safety factor of 100 is used most commonly, at least for NOELs derived from chronic toxicity studies, and incorporates adjustments for interspecies variability (usually 10) and intrahuman variability (usually 10)...The resulting value is equivalent to a NOEL in humans (Tardiff and Rodricks 1987, pp. 391, 421).**"

"**Tardiff and Rodricks caution, however, that the use of safety factors has been questioned because these factors 'often create the impression that human population thresholds have been identified and that there is virtually no risk below that level of exposure'.**" ..."**NIOSH believes that safety factors are intended to reflect uncertainty in the available data. This comment echoes the observation made by Tardiff and Rodricks, i.e., that safety factors do not necessarily identify a human population threshold. NIOSH also endorsed the use of safety factors as a "pragmatic method" of developing standards (except when a nonthreshold process, such as the induction of cancer, is the outcome of concern).** (OSHA, 1989)

## Section 13.0  Carcinogenesis

Formaldehyde is carcinogenic to humans (Group 1) as classified by the International Agency for Research on Cancer, 2004. There is sufficient evidence in humans for the carcinogenicity of formaldehyde. There is sufficient evidence in experimental animals for the carcinogenicity of formaldehyde. (IARC, 2004)

Certain genetic mutations, such as those leading to cancer and some inherited disorders, are believed to occur without any threshold. In theory, the cancer causing mutation to the genetic material of the cell can be produced by any one molecule of certain chemicals. The no threshold model led to the development of the one hit theory of cancer risk, in which each molecule of a cancer-causing chemical has some finite

CAST002049

possibility of producing the mutation that leads to cancer. This risk is very small, since it is unlikely that any one molecule of a potentially cancer-causing agent will reach that one particular spot in a specific cell and result in the change that then eludes the body's defenses and leads to a clinical case of cancer. However, the risk is not zero. (Reference Manual on Scientific Evidence, Reference Guide on Toxicology, p407-408, Federal Judiciary Center, 2nd edition.)

The United States Environmental Protection Agency uses the No Threshold Level in the National Primary Drinking Water Regulations, Maximum Contaminant Level Goals (MCLG). The MCLG is the level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety and are non-enforceable public health goals. Examples of carcinogens with EPA designated zero concentrations in drinking water MCLGs include: benzene, benzo(a)pyrene, Dioxin, Pentachlorophenol, Polychlorinated biphenyls, radium 226, radium 228, Uranium, vinyl chloride. (EPA, 2009)

## 13.1   DNA Damage

Formaldehyde demonstrates positive effects in large number of in-vitro tests for genotoxicity, including bacterial mutation, DNA strand breaks, chromosomal aberrations and sister chromatid exchange. Studies in humans showed inconsistent results with regard to cytogenetic changes (micronuclei, chromosomal aberrations and sister chromatid exchange). The frequency of DNA-protein cross-links was found to be significantly higher in peripheral lymphocytes from exposed workers. (IARC, 2004)

**Formaldehyde also induces genetic damage at concentrations as low as 0.1 mM and inhibits DNA repair in bronchial cells.** Inhalation of formaldehyde has been shown to induce the formation of DNA-protein cross-links in nasal tissue from rats and monkeys, including decreased extractability of DNA from proteins, labeling studies and isolation of DNA by HPLC. The formation of DNA-protein cross-links is a non-linear function of formaldehyde concentration, described by an initial linear component with a shallow slope and a second linear component with a steeper slope that follows a significant decrease in survival of the cells and depletion of GSH. (IARC, 2004)

Formaldehyde inhalation causes formation of DNA-protein cross-links (DPX) in the nasal mucosa of Fischer 344 (F344) rats and rhesus monkeys. DNA- protein cross-links are considered to be part of the mechanism by which cytotoxic and carcinogenic effects of formaldehyde in laboratory animals are exerted. DNA protein cross-links data have been used as a measure of tissue dose in cancer risk assessments for formaldehyde. Anatomically accurate, computational fluid dynamics models of the nasal airways of F344 rats, rhesus monkeys, and humans were used to predict the regional flux of formaldehyde to the respiratory and olfactory mucosa. The relative levels of nasal mucosal DPX in rats, rhesus monkeys, and humans for a given inhaled concentration of formaldehyde were predicted by the model to vary with concentration. (Conolly, 2000)

Casanova (1994) demonstrated DNA-protein cross-links and cell replication at specific sites in the nose of F344 rats exposed subchronically to formaldehyde. Casanova

CAST002050