UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCT LIABILITY | * | SECTION "N-5" |
| LITIGATION | * | |
| | * | JUDGE ENGELHARDT |
| | * | |
| THIS DOCUMENT RELATES TO | * | MAG. JUDGE CHASEZ |
| *EARLINE CASTANEL, ET AL* | * | |
| *v.  RECREATION BY DESIGN, LLC* | * | |
| *ET AL*, *DOCKET NO. 09-3251* | * | |

*************************************************************************

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE*
TO EXCLUDE OPINIONS AND TESTIMONY OF ERVIN RITTER, P.E.

**NOW INTO COURT**, through undersigned counsel, comes defendant, Recreation By

Design, LLC ("RBD"), who offers the following memorandum in support of its Motion *in Limine*

to Exclude the Opinions and Testimony of Ervin Ritter, P.E.:

## BACKGROUND[1]

As part of plaintiff's efforts to address construction and design issues related to the Castanel

---

[1] As the Court and parties are familiar with the factual/procedural background of this matter, reference is made here to the general background as set forth in Recreation by Design, LLC's Memorandum in Support of Motion for Summary Judgment Regarding Prescription (Rec. Doc. 9722).

travel trailer,[2] plaintiff retained Ervin Ritter, P.E., who examined and tested the subject trailer on January 13th and 14th, 2010.[3]  Plaintiff intends to introduce at trial Ritter's expert opinions and testimony on the following topics: HVAC/heating system mechanical engineering; ventilation; air infiltration; inspection and testing of the subject FEMA trailer; and, indoor air quality and related trailer construction, design, and/or installation issues.[4]  Ritter intends to offer opinions and testimony regarding the design, installation, and condition of the HVAC system in the plaintiff's travel trailer, as well as the thermal dynamics of the travel trailer's construction.[5]

The bulk of Ritter's observations and opinions are the product of tests and measurements that he conducted during his inspection of the Castanel trailer.[6]  As far as his methodology, Ritter utilized a "borescope" to investigate the interior of the trailer's ductwork and a "Fluke IAQ meter" to take air velocity readings.[7]  Based on these air velocity readings, Ritter calculated air flow to estimate leakage rates.[8]  From his investigation and measurements, Ritter opines that the air conditioning system ductwork had major leakage, causing supply air to leak directly into the trailer's ceiling

---

[2] Throughout this memorandum, RBD refers to plaintiff's travel trailer as a "FEMA unit" and/or "Emergency Housing Unit" ("EHU") and/or "Temporary Housing Unit" ("THU") interchangeably.

[3] *See* Ritter's Expert Report, dated January 27, 2010, attached hereto as Exhibit "A," p. 11.

[4] *See* Plaintiff Earline Castanel's Designation of Expert Witnesses, dated February 1, 2010, attached hereto as Exhibit "B."

[5] Ex. A at pp. 8-10.

[6] *See id*. at pp. 11-17.

[7] Selected pages of the deposition transcript of Ervin Ritter, P.E. are attached hereto as Exhibit "C."  *See* Ex. C at pp. 57, 84.

[8] Ex. A at pp. 8-9.

cavity.[9]  Specifically, Ritter states that:

> The air flow was calculated by measuring the velocity of the air flow through a known duct size.  The calculation confirms that the leakage into the ceiling cavity from the supply ducts.  The air flow across the return air grille was measured and calculated which confirmed that there is leakage into the return air plenum.  The leakage into the return air plenum side of the air conditioning unit was 9.1 percent of the total capacity of the air conditioning unit fan.  The leakage from the supply ducts into the ceiling cavity was 51 percent of the total capacity of the air conditioning unit supply fan.[10]

It should be noted that both of these leakage percentages are premised entirely on the 325 CFM catalog capacity of the air conditioning unit supply fan.[11]

As a result of the alleged air leakage, Ritter states that the interior of the trailer would have been in a negative pressure condition with respect to the ceiling and wall cavities, and in a positive pressure condition with respect to the interior of the trailer when the air conditioning unit is in operation.[12]  He notes that the conditions in the wall and ceiling cavities will be neutral when the air conditioning system is off.[13]  In Ritter's opinion, the negative pressure condition, high outside summer time humidity levels, and supply air duct leakage into the trailer's cavities will cause elevated moisture and humidity levels.[14]  He states that these conditions will either cause condensation to occur in the trailer's wall and ceiling cavities, or, the absorption of water vapor into

---

[9] Ex. A at pp. 8-9, 11, 19.

[10] Ex. A at p. 8.

[11] Ex. C at pp. 53-54, 64-65, 160-164.

[12] Ex. A at p. 9.

[13] Ex. A at p. 9.

[14] Ex. A at p. 9.

the trailer's wood products.[15] Ritter opines that the aforementioned conditions would cause any contaminants in the building materials or in the wall and ceiling cavities to be drawn into the living space of the trailer.[16] He ultimately concludes that these findings indicate deficiencies in the trailer's design, as well as improper installation of the HVAC system, thereby evidencing non-compliance with duct construction and insulation standards or guidelines.[17]

As will be demonstrated below, Ritter's expert testimony in this case fails to satisfy the strictures of Federal Rule of Evidence 702 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[18] Ritter's opinions must be excluded because they are not the product of reliable scientific methodology. In addition, many of Ritter's opinions are outside the scope of his expertise. Finally, Ritter's opinions will not assist the jury to understand or determine a fact in issue. Even if Ritter's expert testimony *could* satisfy the threshold requirements of Rule 702 (which it cannot), his opinions should nevertheless be excluded under Federal Rule of Evidence 403 because they are duplicative, prejudicial to RBD, and will only serve to mislead and confuse the jury.

## ARGUMENT AND AUTHORITIES

## I.   ADMISSIBILITY REQUIREMENTS FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 gives a district court considerable discretion to admit or exclude

---

[15] Ex. A at p. 9.

[16] *Id.*

[17] Ex. A at pp. 8-9, 11-12, 18-22, 25.

[18] 509 US. 579, 598, 113 S.Ct.2786, 125 L.Ed.2d 469 (1993).

4

expert testimony.[19]  Rule 702 provides that an expert witness "qualified ... by knowledge, skill, experience, training, or education" may testify when scientific, technical, or other specialized knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue."[20] For expert testimony to be admissible, Rule 702 requires that: (1) the testimony be based on sufficient facts or data; (2) the testimony be the product of reliable principles and methods; and (3) the witness apply the principles and methods reliably to the facts of the case.[21]  Plaintiff, as proponent of the expert evidence, bears the burden of demonstrating its admissibility.[22]  Defendants do not have the burden of demonstrating its inadmissibility.[23]

In *Daubert*, the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper **at the outset** to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[24]  The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid.[25]  The goal is to exclude expert

---

[19] *See General Electric Co. v. Joiner*, 522 U.S. 136, 151 fn. 1, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

[20] Fed.R.Evid. 702.

[21]  Fed.R.Evid. 702.

[22] *See, e.g., Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002); *see also Daubert*, 509 U.S. at 592 n.10.

[23] *See Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 102 (D. Conn. 2006); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

[24] 509 US. 579, 598, 113 S.Ct.2786, 125 L.Ed.2d 469 (1993) (emphasis added); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony based on technical or specialized knowledge).

[25] *See Daubert*, 509 U.S. at 593.

5

testimony based merely on subjective belief or unsupported speculation.[26]  In addition, the party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[27]  To satisfy the relevancy requirement, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence or determine a fact in issue.[28]  This "helpfulness" standard of Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."[29]

It should be noted that *Daubert* carefully distinguishes between the threshold reliability inquiry that plaintiff must satisfy and the role of cross-examination.  As the Supreme Court stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. These conventional devices ... are the appropriate safeguards where the basis of scientific testimony **meets the standards** of Rule 702."[30]  As the highlighted language shows, plaintiff must first satisfy the burden of demonstrating that the proffered evidence is admissible.[31]  An expert's opinion, therefore, must be based on reliable methodology and "fit" the facts of the case before the opinion

---

[26] *Daubert*, 509 U.S. at 590.

[27] *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).

[28] *Daubert* at 591.

[29] *Daubert* at 591-92 (internal quotations omitted).

[30] *Daubert* at 595 (emphasis added).

[31] *See, e.g., McLendon v. Georgia Kaolin, Co.*, Inc., 841 F. Supp. 415, 418 (M.D. Ga 1994) ("these devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702").

may have the privilege of being assailed by cross-examination.[32]

Finally, even if Ritter's expert testimony could survive this Court's threshold scrutiny under Rule 702 (which it cannot), his opinions would nevertheless be subject to further review and preclusion under Rule 403.[33]   Rule 403 permits a district judge to exclude relevant evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[34]   As the *Daubert* court correctly noted, "[e]xpert evidence can be both powerful and quite misleading–because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses."[35]   To this end, an expert opinion's "lack of reliable support may render it more prejudicial than probative, making it inadmissible under [Rule] 403."[36]

## II.    RITTER'S OPINIONS AND TESTIMONY ARE INADMISSIBLE UNDER RULE 403 BECAUSE THEY ARE DUPLICATIVE

Ritter's proffered testimony is duplicative of other expert testimony in this case–as such, his opinions should be excluded under Rule 403.   RBD is mindful of this Court's prior rulings that "[m]ultiple opinions on the same subject will generally not be admitted, absent prior consent of the

---

[32] *See Porter v. Whitehall Labs.*, 791 F. Supp. 1335, 1345, 1345 n. 10 (S.D. Ind. 1992) (emphasis in original), *aff'd*, 9 F.3d 607 (7th Cir. 1993).

[33] *See, e.g., Daubert*, 509 U.S. at 595; *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996).

[34] Fed. R. Evid. 403.

[35] *Daubert*, 509 U.S. at 595; *accord Brock*, 94 F.3d at 226.

[36] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

Court based on a showing of compelling reasons."[37]  This Court has also previously cautioned plaintiff's counsel that "elicitation of the same opinions from different experts will result in admonishment before the jury, and exclusion of any such duplicative opinions."[38]

Although these rulings should pertain to duplicative testimony in the Castanel matter, out of an abundance of caution, RBD seeks to adopt, as if set forth herein, the arguments and defenses previously raised in this MDL by defendant Forest River, Inc. regarding the inadmissibility of duplicative testimony.  Specifically, RBD seeks to adopt the arguments and defenses raised in Forest River Inc.'s Motion to Limit the Testimony of Ervin L. Ritter (Rec. Doc. 11393), Forest River Inc.'s Motion to Exclude Expert Testimony of Paul J. LaGrange (Rec. Doc. 11380), and Forest River Inc.'s Motion to Limit the Testimony of Alexis Mallet (Rec. Doc. 11383), along with all supporting memoranda, as if copied herein.  To the extent that plaintiff's opinions in this case differ from those in previous bellwether trials, however, RBD offers the following arguments specific to plaintiff's expert testimony regarding the Castanel unit.

Despite this Court's prior rulings regarding duplicative testimony, plaintiff intends to offer the testimony of three expert witnesses–Mallet, LaGrange, and Ritter–who all comment in great detail on the HVAC system and temperature/humidity conditions within the Castanel unit.[39]  Specifically, plaintiff retained Ritter to examine the Castanel trailer's HVAC system, including aspects related to

---

[37] See Order dated July 7, 2009 (Rec. Doc. 2062); Order dated March 9, 2010 (Rec. Doc. 12639).

[38] See Order dated March 10, 2010 (Rec. Doc. 12735).

[39] RBD has filed separate Motions in Limine regarding the proffered testimony of LaGrange and Mallet in this case.

insulation, ventilation, and moisture intrusion.[40]  Plaintiff also retained expert LaGrange to examine the trailer's HVAC, and he was specifically tasked with performing a blower door test to assess the air leakage of thermal envelope, as well a duct blaster test to determine the rates of air leakage of supply and return duct work.  Finally, plaintiff's expert Mallet issued a written report incorporating the findings of both Ritter and LaGrange, *inter alia*, to reach a wide range of conclusions related to the design and construction of the Castanel unit's HVAC system.

Ritter's testimony is duplicative of both LaGrange and Mallet's testimony, particularly in regard to the calculation of duct leakage rates for the Castanel unit.  As such, Ritter's testimony should be excluded under Rule 403 and this Court's Order of July 7, 2009 (Rec. Doc. 2062), this Court's Order of March 9, 2010 (Rec. Doc. 12639), and this Court's Order of March 10, 2010 (Rec. Doc. 12735).  Should the Court permit Ritter to testify, however, RBD requests that the Court limit and/or exclude certain portions of his testimony in the manner described below.

## III.  RITTER'S TESTIMONY IS INADMISSIBLE UNDER RULE 702 BECAUSE IT IS NEITHER RELIABLE NOR RELEVANT

To determine the reliability of an expert's opinion, a district court may consider the following non-exclusive *Daubert* factors: (1) whether a "theory or technique ...can be (and has been) tested;" (2) whether the theory or technique "has been subjected to peer review and publication;" (3) whether the particular technique involved has a "known or potential rate of error;" (4) whether there are "standards controlling the technique's operation;" and (5) whether the theory or technique warrants "general acceptance" within a "relevant scientific community."[41]  These factors are not exhaustive

---

[40] *See generally* Ex. A.

[41] *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir.2004); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

or limiting, and a court may utilize them as it deems fit to tailor an examination of the reliability of expert testimony to the facts of each case.[42]  For example, a district court may also weigh "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out any other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case."[43]  While weighing these factors, the district court must continue to function as a gatekeeper who "separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge."[44]

Here, Ritter's opinions are not reliable because they are the product of unreliable analysis and methodology.  Ritter failed to adequately connect his various hypotheses to the facts of this case, and he did not rule out alternative explanations for his conclusions.  Ritter also posits on numerous topics that are outside the scope of his expertise.  Finally, Ritter's opinions are irrelevant because they will not assist the trier of fact to understand or determine a fact in issue.

### A.    Ritter's Opinions Are Not Based on Reliable Scientific Methodology

For every conclusion contained in an expert's proposed testimony, the court must also

---

[42] *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir.2004) ("not every Daubert factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant."); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed.Appx. 377, 381 (5th Cir.2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'" (citing *Kumho Tire*, 526 U.S. at 152)).

[43] *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir.2007) (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686-87 (8th Cir.2001)).

[44] *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir.2001).

determine if the methodology leading to that conclusion is sound.[45]  A court may appropriately exclude expert testimony where it finds that an expert has extrapolated data, and there is "too great an analytical gap between the data and the opinion proffered."[46]  Expert testimony should also be excluded where it is speculative or not amenable to scientific verification.[47]  As such, "[t]esting, which is actually performed, must be appropriate and must analytically prove the expert's hypothesis."[48]  District courts must ensure that the "factual basis, data, principles, methods, [and] their application" are sound.[49]  Here, Ritter's methodology does not analytically prove the hypotheses and conclusions in his expert report.

The bulk of Ritter's observations and opinions stem from tests that he conducted during his inspection of the HVAC system installed in the Castanel trailer.[50]  To support his theory that leakage in the air conditioning supply and return ducts systems "will cause problems which will affect the ability of the air conditioning unit to adequately cool and dehumidify the space," Ritter inspected and tested the air conditioning system ductwork to determine the rate of air leakage by calculating air

---

[45] *See Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996).

[46] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998).

[47] *Moore*, 151 F.3d at 273.

[48] *Presley v. Lakewood Engineering and Manufacturing Co.*, 553 F.3d 638, 646 (8th Cir.2009) (citing *Shuck v. CNH America, LLC*, 498 F.3d 868, 875 n. 3 (8th Cir.2007); *see also Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058-60 (8th Cir.2005) (holding expert testimony unreliable where the tests were inconsistent with the theory proffered).

[49] *See Kumho*, 526 U.S. at 149.

[50] Ex. A at pp. 11-17.

flow.[51]  As far as his methodology, Ritter utilized a "borescope" to investigate the interior of the trailer's ductwork and a "Fluke IAQ meter" to take air velocity readings.[52]  Based on these air velocity readings, Ritter calculated air flow to estimate leakage rates.[53]  He also recorded temperature and humidity levels for the interior and exterior of the trailer with data loggers.[54]  From his investigation and measurements, Ritter opined that the leakage will create a "negative pressure condition with respect to the wall and ceiling cavities" of the trailer, while air leakage into the ceiling cavity will cause that space to have a "positive pressure with respect to the interior of the trailer when the air conditioning unit is in operation."[55]  Ritter theorizes that these conditions will cause the occurrence of condensation in the trailer's wall and ceiling cavities, in addition to elevated moisture and humidity levels inside the trailer.[56]  He ultimately concludes that "any contaminants in the building materials or in the wall and ceiling cavities will be drawn into the living space of the trailer."[57]

One opinion given by Ritter involve his air flow test and related calculations to opine regarding duct leakage.  Although he attempts to do this, Ritter's methodology and analysis is quite questionable.  He summarized his methodology for these calculations as follows:

> The [air conditioning ] unit itself was operated in the fan only position, and I

---

[51] Ex. A at pp. 8-9.

[52] Selected pages of the deposition transcript of Ervin Ritter, P.E. are attached hereto as Exhibit "C."  *See* Ex. C at pp. 57, 84.

[53]  Ex. A at pp. 8-9.

[54] Ex. A at pp. 8-9.

[55] Ex. A at p. 9 (emphasis added).

[56] Ex. A at p. 9.

[57] Ex. A at p. 9.

measured airflows using a section of a 6-inch duct, and measured the velocities through it to calculate the airflow at each of the grilles, or air outlets. Measured the airflow using velocities across a fixed rectangular box to calculate the airflow into the return air.

We found that the unit, which has a cataloguing capacity of 325 CFM, was leaking approximately 51 percent into the cavity space, with the other 50 percent making its way into the living space. The return air side of it was 295 CFM roughly of the 325 going through the return air grille. The other 9 percent was coming from the ceiling cavity.[58]

Despite Ritter's apparent confidence in these calculations, he readily admitted that they were based

on pure speculation:

Q:  You said that the numbers you calculated regarding the airflow were based off 325 CFM cat capacity. That means catalog capacity?

A:  Catalog capacity, correct.

Q:  Is there any way to determine if the unit was actually producing 325 CFM at the time that you did the test?

A:  No.

Q:  So the numbers that you have calculated based on the airflow and the return air are based off the catalog rating of 325 CFM?

A:  That's correct.

Q:  And if the unit was producing less than that, that would have an impact on the calculations?

A:  That's correct.

Q:  I believe that you said that the return air that you did read as 295 CFM?

A:  That's correct.[59]

In fact, Ritter did not even include the measurements used to support his calculations in his report:

Q:  And then how did you calculate the 51 percent number that you gave me earlier regarding the supply air?

A:  By taking the cataloged information, 325 CFM from the manufacturer, and knowing the return, I calculated 295, that was within 9 percent. So I have good reason to believe that the manufacturer's catalog data is correct. My measurements of the flow from those outlets, ceiling outlets, were roughly half the airflow of that air-conditioning unit as cataloged.

---

[58] Ex. C at pp. 48-49.

[59] Ex. C at pp. 53-54 (emphasis added).

Q:      Do you have those numbers in your report?

A:      I don't believe I do have them.

Q:      Do you have those written down in some kind of notes or log you would have utilized?

A:      I will have to go back and find those.[60]

Ritter further testified that he does not normally do air flow testing and is not certified by the AABC:

Q:      Have you calculated airflow for–for work you have done, have you calculated airflow similar to the way that you did at the Castanel unit with the Fluke meter?

A:      I don't go out and actually do those tests on my projects.  I specify a third party, an independent testing organization, to do that and then I review.

Q:      What type of–is there a particular company that you use more than others for that type of testing?

A:      We use agencies certified by the AABC, the American Air Balance Council, or you have the National Environmental Balancing Council.  Those are the two that are the local firms here that carry certifications for it.

Q:      You are not AABC certified?

A:      No.[61]

When asked about the protocols he used to conduct these airflow calculations, Ritter stated that he did not use any:

Q:      On the tests that you did, and we went through them in depth earlier, the flow meter, or the Fluke meter, was there a particular protocol you were following for that?  Is there a written protocol by any society, ASHRAE, any entity?

A:      If I would go into some of my textbooks on balancing in ASHRAE, yes, there would be.

Q:      Were you following any one of those particular protocols as far as this test?

A:      No, I had not pulled those protocols out.[62]

Simply put, Ritter's conclusions pertaining to the trailer's air conditioning system and airflow calculations are based on speculation derived from flawed methodology.  In fact, his leakage rate of 51% is in stark contrast to the leakage rates calculated by plaintiff's expert, Paul LaGrange, who

---

[60] Ex. C at pp. 64-65.

[61] Ex. C at pp. 80-81.

[62] Ex. C at pp. 149-50.

14

calculated a 34% total duct leakage rate.[63]  Plaintiff's counsel attempted to rehabilitate the discrepancy between these calculations at LaGrange's deposition, further evidencing the unreliability of Ritter's methodology.[64]

Ritter was similarly unable to offer any conclusive evidence to support his theories regarding increased moisture and humidity levels and/or condensation occurring in the trailer's wall and ceiling cavities.  Despite his use of a borescope to investigate the interior of the HVAC system ductwork, Ritter did not see any evidence of condensation or moisture.[65]  He also stated that the testing conditions would not have permitted him to measure any changes in humidity levels:

> Q:  But since you didn't utilize the actual compressor, you were not able to test for any changes in humidity within the unit, correct?
>
> A:  On the day we were there, the air-conditioning unit would probably not have changed the indoor humidity very much because of the cold outside, and we would have been heating the inside, which we were doing.  Taking cold air and heating it drops the humidity, just typical psychrometric analysis.  I don't have a chart to show you how it works.[66]

Later, Ritter admitted that he could not prove the existence of condensation in the trailer based on the results of his testing:

> Q:  [...].  You said, "When the air-conditioning is in operation during the cooling season and when required during the heating season, the duct leakage will cause condensation to occur in the wall cavities and ceiling cavities.  Negative pressure condition" – **From the tests you did, you have no information regarding that there was actually condensation occurring in the wall cavities or ceiling cavities, correct?**

---

[63] Selected pages of the deposition transcript of Paul LaGrange, dated February 18, 2010, are hereby attached as Exhibit "D."  *See* Ex. D at p. 30.

[64] Ex. D at pp. 252-254.

[65] Ex. C at p. 103.

[66] Ex. C at pp. 142-143.

A:     **No.**[67]

Ritter's investigation and measurements, therefore, fail to analytically prove his various hypotheses concerning the effect of changes in humidity levels within plaintiff's trailer. Rather, his opinions are based on insufficient facts and data.

Further, Ritter's use of makeshift equipment to conduct his testing of air flow rates in the Castanel travel trailer can hardly be deemed "reliable" scientific methodology:

Q.    I was there when you were doing the inspection, and I know you have it in some photos -- I didn't print out a copy --but the methodology that you used in determining the airflow, both out of the ductwork and into the return air, that was with the -- I'm trying to think of the proper term. You made a device out of ductwork, I guess; is that correct?

A.    That's correct.

Q.    And that was the steel cylinder that you drilled some holes in, correct?

A.    That's correct.

Q.    And the other device you created on the spot was a white open-ended box out of some construction materials, I guess? [...]

A:    That's correct.

Q.    And it looked like a foam board with tape and stuff that you made and drilled holes into; is that correct?

A.    That's correct.[68]

       [...].

Q.    So you took five outlets and made measurements with your Fluke meter and ductwork extension at those five different locations, correct?

A.    That's correct.

Q.    And then you took the other device we talked about, the white foam box you built with the holes in it, and you used that to measure return air into the system, correct?

A.    That's correct.[69]

Ritter admitted that he used these homemade devices in conjunction with his Fluke IAQ meter to measure air velocity, even though the manufacturer does not address such methods in the instruction

---

[67] Ex. C at p. 104.

[68] Ex. C at pp. 54-55.

[69] Ex. C at p. 64.

manual:

> Q.     I take it you have an owner's manual for the Fluke meter?
> A.     That's correct.
> Q.     Does it have instructions on how to construct a separate set of ductwork like you did in order to use it to take readings in that manual?
> A.     Not for what I was doing.  What I was doing was basically extending the outlet as a section of duct and doing just what we were talking about, drilling a hole and taking a measurement.[70]

Ritter also confirmed the availability of other testing devices, which RBD contends are more appropriately tailored for the subject air flow readings:

> Q:     The meter that you talked about, is that designed for testing airflows in actual ductwork itself? [...].
> A:     Yes.
> Q:     Are there other devices that are designed for testing airflow in air-conditioning systems?
> A:     Yes.  There are actual flow hoods that have the meter build into it so that it will give you a direct reading.  And those are made by Alnor, TSI.  There are several manufacturers of those.
> Q:     Why didn't you use a flow hood when doing the flow readings on this THU?
> A:     I don't have one.[71]

Ritter's improvised approach to his test methodology is troubling, especially in light of his admission that he does not personally conduct this type of testing in his engineering practice.[72]  Despite his inexperience, Ritter did not follow or consult any professional testing protocol whatsoever.[73]  Because Ritter's testimony is not the product of reliable principles or methods, it should be excluded from evidence under Rule 702.

---

[70] Ex. C at p. 60.

[71] Ex. C at pp. 57-58.

[72] Ex. C at pp. 80-81.

[73] Ex. C at pp. 149-50.

17

Finally, the fact that Ritter's tests were conducted over two years after plaintiff stopped residing in the trailer renders the results unreliable. In *Williams v. Briggs Co.*, the Fifth Circuit upheld a district court's refusal to allow certain evidence regarding the alleged malfunction of a water heater because the plaintiff "did not sustain her burden of demonstrating that, at the time of the test, the water heater was in substantially the same condition as at the time of the accident."[74] Much like the case at hand, the plaintiff's expert [Dr. Forbes] did not conduct any testing of the water heater until more than two years after the accident.[75] The Fifth Circuit noted that "***[n]eedless to say, the passage of two years certainly contributed to the district court's concern over the reliability of the test***. Even Dr. Forbes was unable to provide any assurance to the district court that the conditions for his test were substantially similar to those at the time of the accident."[76]

Similarly, Ritter did not conduct any testing until over two years after plaintiff vacated her trailer:

> Q:   Again, to confirm something, the first time you saw the trailer that Ms. Castanel lived in was in January of 2010, correct?
> A:   That's correct.
> Q:   And you saw it in Lottie, Louisiana, right?
> A:   That's correct.
> Q:   And it was sitting in a field with lots of other trailers along with it, right? I mean, it may have been separated out, but it was in the same field as lots of others?
> A:   It was in a parking lot. [...].
> Q:   Okay. If we assume the trailer went directly from her home to Lottie, it would have been sitting in that field for roughly two and a half years before you saw it?
> A:   That's correct.[77]

---

[74] 62 F.3d 703, 707 (5th Cir.1995).

[75] *Id.*

[76] *Id.* at 708 (emphasis added).

[77] Ex. C at pp. 159-60.

18

Much like the *Williams* case, Ritter can offer no assurances to this Court that the subject trailer, particularly the operation of the HVAC, was in substantially the same condition as when plaintiff resided in it.  As such, Ritter's testimony is unreliable and inadmissible under Rule 702.

**B.      Ritter's Opinions will not Assist the Jury to Understand or Determine a Fact in Issue**

To meet the relevancy standard of Rule 702, the proposed expert's opinions must "assist the trier of fact to understand or determine a fact in issue."[78]  The fundamental inquiries for the jury in this case are: (1) what levels of formaldehyde existed in plaintiff's trailer during her occupancy of the unit, and (2) whether those levels caused plaintiff any injury.  Indeed, with respect to Ritter, this Court has already ruled that his "testimony must relate, in some material way, to the existence of formaldehyde in the unit.  In other words, any short-comings in the HVAC system are not relevant unless they somehow tend to prove or disprove the existence and/or level of formaldehyde present in the EHU."[79]  Ritter's opinions and testimony, however, do not provide any analysis that would aid the trier of fact in determining either of the two key issues in this lawsuit.  In fact, ***the word "formaldehyde" does not appear even one time in Ritter's expert report***.

In much the same way, Ritter's opinions and testimony regarding building codes are wholly irrelevant to the facts of this case.  This Court agrees, and has already ruled that:

> On the showing made, the Court is not in the least bit convinced that the building codes are relevant.  Even assuming that the codes are applicable, there seems to be little to no actual evidence that Defendants' failure to comply with such codes relates in any way to Plaintiff's grievance(s).  For this reason alone, the Court grants both of these motions now, such that no reference to building codes shall be admissible at

---

[78] *See* Order dated July 15, 2009, p. 4 (Rec. Doc. 2181) *(citing Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).

[79] *See* Order dated March 9, 2010, p. 2 (Rec. Doc. 12640).

trial.[80]

Although this Court's ruling should pertain to the same arguments regarding the inapplicability of building codes in the Castanel matter, out of an abundance of caution, RBD seeks to adopt, as if set forth herein, the arguments and defenses previously raised in this MDL by defendants Shaw Environmental, Inc. and Forest River, Inc. regarding the inapplicability of building codes and standards to travel trailers.  Specifically, RBD seeks to adopt the arguments and defenses raised in Shaw Environmental, Inc.'s Motion in Limine to Exclude References to Building Codes (Rec. Doc. 11414), Forest River, Inc.'s Motion in Limine to Exclude the Testimony of Ervin L. Ritter (Rec. Doc. 11393), and Forest River Inc.'s Motion to Exclude Certain Comments to the Jury (Rec. Doc. 11389), along with all supporting memoranda, as if copied herein.[81]

There is nothing in Ritter's expert report or deposition testimony that will assist the jury in determining either of the two key issues in this lawsuit.  As such, his opinions and testimony are subject to exclusion.  Because Ritter's opinions are completely irrelevant to the issues that will be presented to the trier of fact in this case, his testimony should be excluded from evidence under Rule 702, this Court's Order of March 3, 2010 (Rec. Doc. 12260), and this Court's Order of March 9, 2010 (Rec. Doc. 12640).

### C.     Ritter's Opinions on Alternative Design are Outside the Scope of his Expertise

Ritter's opinions regarding alternative designs for the subject trailer and/or the trailer's HVAC and ventilation systems should also be excluded because Ritter fails to engage in the requisite analysis

---

[80] *See* Order dated March 3, 2010, pp. 1-2 (Rec. Doc. 12260).

[81] The inapplicability of building codes to the Castanel trailer is also discussed further in RBD's Motion *in Limine* to Exclude References to Building Codes.

in both his written report and deposition testimony.  To prove the existence of an alternative design under the Louisiana Products Liability Act [82]("LPLA"), a plaintiff must: (1) identify a specific alternative design that existed and was capable of preventing his injury; and (2) perform the requisite risk-utility analysis.[83]  Evidence of an alternative design must be reasonably specific and not based on mere speculation.[84]

Here, Ritter's opinions and testimony regarding alternative designs for travel trailers and/or HVAC systems for travel trailers are purely speculative.  Ritter does not do cost estimates for HVAC's in travel trailers.[85]  From an engineering HVAC perspective, Ritter has not done any analysis on the feasibility of using foam insulation in a travel trailer.[86]  Finally, Ritter admitted that he was not even sure if the type of air conditioning unit or mechanical system he asserts should have been used in the plaintiff's EHU even exists:

> Q:  I think in order to positively pressurize the system, you would have to use a mechanical system.  Is that your opinion?
> A:  You would have to use a mechanical system or have Dometic design a unit with outside air capability on it.
> Q:  Whether it is a Dometic unit or a mechanical system, the whole idea is you are forcing outside air inside, correct?
> A:  That's correct.
> Q:  Do you know if that is a possibility for a travel trailer, if such a type unit exists?

---

[82] La.Rev.Stat. § 9:2800.56.

[83] *See Lacoste v. Pilgrim International*, 2009 WL 126847, *4 (E.D.La.) (citing *Krummel v. Bombardier Corp.*, 206 F.3d 548, 551 (5th Cir.2000); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 183 (5th Cir.1990).

[84] *See Lacoste*, 2009 WL at *4 (citing *Seither v. Winnebago Industries, Inc.*, 853 So.2d 37, 41 (La.App.2003)).

[85] Ex. C at pp. 140.

[86] Ex. C at pp. 141-42.

21

A:    It's the same unit you would use in a residential application, could be applied here.

Q:    But do you know if one exists in application?

A:    On travel trailers, no.[87]

Despite his complete lack of experience in this area, Ritter's report contains an entire section entitled "Deficiencies in Design," where he asserts that both the "construction of the trailer and the air condition system" are deficient.[88]   His report, however, fails to utilize the analysis required by the LPLA–Ritter does not show that his alternative method provides a specific means of preventing injury, nor does he perform the requisite risk-utility analysis.   As such, Ritter's opinions and testimony on alternative design should be excluded from evidence.

## IV.   CONCLUSION

For the foregoing reasons, Recreation By Design, LLC, respectfully requests that the Court grant this motion *in limine* and exclude the opinions and testimony of Ervin Ritter, P.E.

---

[87] Ex. C at pp. 139-40.

[88] Ex. A at pp. 18-22.

Respectfully submitted,

*/s/ Randall C. Mulcahy*
LYON H. GARRISON, Bar No. 19591
SCOTT P. YOUNT, Bar No. 22679
RANDALL C. MULCAHY, Bar No. 26436
DARRIN L. FORTE, Bar No. 26885
KELLY M. MORTON, Bar No. 30645
GARRISON, YOUNT, FORTE
& MULCAHY, L.L.C.
909 Poydras Street, Ste. 1800
New Orleans, LA 70112
Telephone: (504) 527-0680
Facsimile: (504) 527-0686
*Attorneys for defendant,*
*Recreation By Design, LLC*
Email: rmulcahy@garrisonyount.com

# CERTIFICATE OF SERVICE

I hereby certify that on April 16th, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of this electronic filing to all known counsel of record who are CM/ECF participants.

*/s/ Randall C. Mulcahy*
RANDALL C. MULCAHY, Bar No. 26436