

**First General Services of the South, Inc.**
**General Contractors**
*Building & Restoration Contractors - Insurance Repair Specialists -*
*Construction Specialists*
*Forensic Construction Specialists*

P. O. Box 80857, Lafayette, LA 70598-0857 - Phone: (337) 988-3556 - Fax: (337) 988-1264 - Email: firstgeneral@cox.net

**Inspection Report**

**of the**

**Earline Castanel FEMA Temporary Housing Unit**

**Recreation by Design**
**Lottie, Louisiana**
**January 25, 2010**

Re:   FEMA Trailer Formaldehyde Products Liability Litigation
United States District Court
Eastern District of Louisiana

Aldridge, et al. V. Gulf Stream            MDL No. 1873 Section N(5)
    Coach, Inc., et al.            Judge Engelhardt
No. 07-9228

Case Number 09-3251

Ms Earline Castanel

**SECTION I**

**PREAMBLE**

In accordance with the request by the attorneys for the FEMA Trailer Formaldehyde Products Liability Litigation Plaintiff's Steering Committee, this organization made onsite inspections, observations, testing and evaluations of the FEMA Recreation by Design Temporary Housing Unit occupied by Ms Earline Castanel. Our study included the following areas:

**CAST002322**

1.    The tires and axles;

2.    The steel framing system with our structural engineer;

3.    The barrier material between the steel framing and the wood framing of the floor system;

4.    The floor insulation;

5.    The structural members used for the floor system;

6.    Penetrations in the floor barrier system at the underside of the trailer and the methods used to seal those areas;

7.    Observation and review of the jacking and leveling procedures performed on the Recreation by Design unit by Shaw's consultants;

8.    Observations of the methods used to seal of the belly board or material at the perimeter of the Castanel THU (Temporary Housing Unit);

9.    A review of the floor sheeting;

10.   A review of the finished flooring materials;

11.   A review of the means and methods of attachment of the finished floor materials;

12.   A review of documents containing information on the framing material for the walls, ceiling and roof;

13.   A review of the finish materials for the interior and exterior of the walls, ceiling and roof;

14.   A review of documents containing information on all other materials, such as roof decking and blocking for walls and other areas;

15.   A review of all of the other components available for inspection.

**CAST002323**

      a. Note: our investigation was limited to visual inspections and non-destructive testing. We were not allowed to perform any destructive testing or observations;

16. A review of the materials, means and methods used to seal the openings and penetrations of the unit;

17. A review of the types of wall and ceiling insulation;

18. A review of all air, moisture and temperature barriers;

19. A review of the air conditioning mechanical and duct system;

20. A review of the heating system;

21. Observations of movement instrumentation installed on the THU including crack monitors, levels, and digital measuring devices on the I-beam frame and exterior of the unit by the consultants for Shaw Environmental.

      a. Note: the data from the jacking and blocking has not been made available to our team for review and evaluation as of the date of our reports. Once that data is made available to us, we reserve the right to augment our reports;

22. Observation and documentation of the envelope air leakage testing by LaGrange Consulting and First General Services of the South, Inc.;

23. Observation and documentation of the air conditioning duct leakage testing by LaGrange Consulting and First General Services of the South, Inc.;

24. Observations and photographic documentation of the air conditioning and unit inspection by consultants for the defendants;

25. Review of the plumbing, heating and air conditioning systems by our mechanical and environmental engineer;

CAST002324

26.   Photographic documentation of pertinent observations by First General Services;

27.   Written documentation of pertinent observations;

28.   Infrared thermographic imaging of the Castanel THU for the identification of temperature anomalies;

29.   A review of reports, testing, photographs and inspections by others;

30.   A review of all penetrations in the floors, walls, ceilings and roof of the unit;

31.   A review of the plumbing system;

32.   Identification of the heating and air conditioning systems;

33.   A review of the ventilation system;

34.   A review of the contents, built-in units and appliances

35.   Installation of temperature and relative humidity data loggers.   These monitoring devices were installed on the interior, and exterior of the unit;

36.   Direction of measurements taken of the Castanel THU for purposes of producing as-built plans of the unit;

37.   Review wood the materials and wood products audit performed by Dr. Stephen Smulski; and

38.   Observation and documentation of any certifying seals, stamps, labels or warning indications throughout the interior and exterior of the unit and owner's manual;

39.   Review of photographs and video recording by Ritter Consulting Engineers;

**CAST002325**

40.   Review of photographs by Charles David Moore with Freyou Moore and Associates, Engineers;

41.   Review of photographs by LaGrange Consulting;

42.   Review of photographs and video recording by Bombet Cashio numbered CAST000001 through CAST000015 and CAST000018 through CAST000254; and

43.   Review of photographs and video recordings by A. J. Valenti numbered CAST000016 and CAST000017.

**CAST002326**

## SECTION II

## INTRODUCTION

First General Services of the South, Inc. was requested to:

1. Perform limited non-destructive testing, observations, and documentation regarding the construction materials, means, methods, systems and quality utilized in the construction of the THU occupied my Ms Castanel;

2. To document the relationship and the functions between the all systems and components of the temporary housing unit;

3. To address the effects of air, moisture and temperature on the various components and the entire system of the Castanel THU;

4. To address any relationship between the construction of the Castanel Temporary Housing Unit and the introduction or transfer of any moisture, air, or thermal energy that can affect the off-gassing of contaminants within the wall and ceiling cavities and the interior living area of that unit;

5. To determine if there was any relationship between the jacking and blocking undertaken to place the Castanel THU on piers and the entry of air, moisture and thermal energy that caused deterioration to the THU or contributed to an increase in off-gassing from the wood components; and

6. To determine if the design and construction of the Castanel THU complied with all applicable codes and standards.

CAST002327

# SECTION III

# BACKGROUND INFORMATION

Following the passage of Hurricanes Katrina and Rita, hundreds of thousands of homes were severely damaged or destroyed as a result of either wind or flooding. These homes were unlivable for one reason or another and FEMA provided temporary housing for these displaced individuals and families.  Per information provided in a letter from the Office of the Governor of Louisiana, Department of Health, it was understood there would be a need for temporary housing in the state of Louisiana for up to five years.  One of the means utilized by FEMA to provide temporary housing was to contract with various manufacturers of recreational vehicles, park model trailers and manufactured homes (mobile homes) to provide housing for these displaced individuals.   Approximately 140,000 of these temporary housing units were eventually purchased.  It is unknown to this writer the quantity actually sent to the gulf coast of Louisiana and Mississippi.

There are special requirements established by HUD for the set-up and installation of manufactured housing (mobile homes).  Part of these special requirements is related to the installation of manufactured homes in flood hazard areas. Manufactured housing could not be readily utilized in these flood hazard areas without meeting these special HUD requirements for installation.[1]

A decision was made by state and federal officials to utilize recreational vehicles or travel trailers and park model trailers for temporary housing units as a means of bringing people back into the New Orleans area.  Once manufactured, these trailers were delivered to various pre-approved locations.  Contractors hired by FEMA then jacked up these units, set them up on concrete blocks, strapped and anchored them down to the ground, connected them to the permanent sewage, water, and electrical services converting them from recreational vehicles to housing units.  It is the understanding of this writer that the manufacturers of these temporary housing units did not have or provide any provisions, guidelines or specifications for jacking up and blocking these units off the ground.  .

It is reported that individuals occupying these temporary housing units began to experience health problems after moving into the temporary housing units. Complaints were filed regarding these health problems with FEMA and some of the manufacturers.  Subsequent to the reports of these health problems, testing of

---

1 See FEMA Manufactured Home Installation in Flood Hazard Areas (September 1985)

CAST002328

the temporary housing units was performed by various organizations including the Sierra Club and Lawrence Berkley Laboratory.

Our organization was requested to determine if the temporary housing unit manufactured by Recreation by Design and the means and methods utilized by the installation contractor, Shaw Environmental (here after noted as Shaw), contributed to the reported issues regarding indoor air quality.

Ms Earline Castanel occupied a home located at 2925 St. Peter St., New Orleans, Louisiana, 70117 prior to the passage of Hurricane Karina.  Ms Castanel was 75 years of age at that time in 2005.  She lived at that address her entire life and was living alone at that time.  She worked in New Orleans for 30 years as a housekeeper for the priest at a Catholic Church.

On the Saturday prior to the hurricane, Ms. Castanel was evacuated to Texas. After remaining in Texas for several months, she returned to New Orleans to take care of the repairs to her home.  She filed an application with FEMA for a temporary housing unit.  Her application was approved, and a FEMA temporary housing unit manufactured by Recreation by Design was provided to her.  The FEMA trailer was set up in the yard of a friend of Ms Castanel at 2261 Urquhart St, New Orleans.

A meeting was apparently set up on or about March 11, 2006 for the inspection of the trailer with Ms Castanel.  At that time, it appears the keys to the unit were given to her.  She stated she moved into the unit the following weekend.

After moving into her temporary housing unit, Ms Castanel stated she had the following issues and the repair issues were addressed by the maintenance personnel:

1.   Noted Issues

     According to Ms Castanel's deposition, the following events occurred:

     1.1.  AIR CONDITIONING UNIT

          a.   The air conditioning unit stopped working properly on at least three occasions.  The unit stopped working and/or began leaking water. Repair personnel were dispatched within a few days of each report for service.

CAST002329

## 1.2.   THE SCREEN DOOR

    a.   She called for maintenance regarding problems with her screen door. Maintenance personal was dispatched within a week to address the issue.

## 1.3.   HEALTH ISSUES

    a.   Ms Castanel does not recall if there were odors or any unusual smells in the house.

    b.   It is reported that she experienced problems with her sinuses, breathing, itching, skin and other issues within three months of moving into the unit.  She stated she obtained medical attention.

    c.   She would open the windows when the air conditioning unit would not work otherwise, she would keep the unit closed with the air conditioning on.

    d.   She would open and stand at the door when she experienced problems with her breathing.

    e.   There was no bathroom vent in the unit.

    f.   After she moved out of the unit, Ms Castanel states her health problems improved.

## 1.4.   THU SET-UP INSPECTION

Regarding the inspection of March 11, 2006, the following data was gathered:

    a.   The trailer was set up on cinder blocks.

    b.   The trailer was level when they inspected it on March 11, 2006;

    c.   After the trailer was set up in yard on Urquhart St., it was never moved for any reason until it was removed to the FEMA storage facility.

**CAST002330**

# SECTION IV

## PURPOSE AND SCOPE

Travel trailer, park models and manufactured houses were procured by FEMA for use as temporary housing for victims of Hurricanes Katrina and Rita.  As noted above, it was expected that these units would be utilized for up to five years.  The travel trailers and park models are traditionally and by definition designed and constructed for recreational, camping, travel and seasonal use.  FEMA issued a request to purchase units that would be modified and used to provide the temporary housing for victims of these catastrophes.  FEMA issued procurement specifications that provided a limited number of standards to the potential manufacturers with the written provisions that those standards were a minimum requirement.  These standards were not written to limit the seller in providing equal or better products than that listed.  FEMA provided some of the requirements to the manufacturers regarding the specifications; however, FEMA relied on those manufacturers and contractors to provide the expertise necessary to construct and install these units for their end use, long term temporary housing and not for recreation, travel, camping, or seasonal use.  In fact, the opposite requirements were imposed on the manufacturers and contractors and that was to provide units for extended living; that were disabled from movement by jacking them off of their tires; blocking them and anchoring them to the ground; and that the units relied on permanent connection to sewage, water and electricity for utility services.

Travel trailers and park models were to be converted for use as housing.  Sewage and water holding tanks were to be deleted and the waste disposal pipes and fresh water lines were to be connected directly to the city's sewer and water lines.  These temporary housing units were to be jacked up off of their tires and placed on concrete masonry units (concrete blocks).  The units were then to be strapped and anchored to the ground making them totally immoveable.  The living areas were to have residential refrigerators, residential commodes and a twenty gallon water heater.  The occupants were expected to utilize these units for up to five years.

The purpose of the inspections, testing and observations was to render opinions regarding the construction and installation methods utilized in the manufacture and set-up of the Earline Castanel temporary housing unit.  This was to determine to a degree of probability if the construction and/or the installation methods:
1. Met all applicable building codes and standards;
2. Caused or contributed to the introduction of air, moisture and thermal energy which in turn affected the indoor air quality within the unit.

CAST002331

The scope of our study to make those determinations included the following:

1.   A review of RVIA, RPTIA, International Building Codes, International Residential Codes, City of New Orleans Building Codes, NFPA and ANSI Codes and Standards;

2.   A review of FEMA Manufactured Home Installation in Flood Hazard Areas (September 1985)

3.   A study of the components, systems and construction methods utilized in the manufacture and installation of the housing unit combined with a series of tests;

4.   Observations and tests performed included the interaction between the various components of the housing unit and the affect the construction and installation methods had upon the components;

5.   Testing for air leakage of the unit's pressure envelope and vapor barrier;

6.   Testing for air conditioning duct air leakage;

7.   Calculations of the interior air exchange rates;

8.   Evaluations of temperature, air and moisture as it relates to the infiltration or exfiltration of those elements of the atmosphere and their effects on the various building components of the unit;

9.   Inspection of all accessible components of the housing unit;

10.   Detailed measurements of the unit;

11.   Production of as-built drawings from site measurements;

12.   Photographic documentation of pertinent observations;

13.   Video recording of pertinent observations;

14.   Written documentation of pertinent observations;

**CAST002332**

15. Interviews with Dr. Stephen Smulski, consulting wood scientist, to gather further data regarding the products utilized in the construction of the Castanel housing unit. To verify with him that our assessment of alternative products available for use as of the date of manufacture would have eliminated or significantly lowered formaldehyde emissions in the Castanel unit;

16. An interview with Ervin Ritter, P.E., mechanical and environmental engineer, to review notes, data and findings regarding our inspection of the FEMA unit;

17. An interview with William Scott, P.E., of W. D. Scott Consultants regarding the results of the formaldehyde tests performed in the Recreation by Design temporary housing units;

18. A review of notes from a deposition of Ms Earline Castanel, the former occupant;

19. An infrared thermographic survey of the Castanel unit to identify temperature anomalies;

20. Observations of any and all notices or labels on the interior and exterior of the unit;

21. Review of any notices in the owner's manual;

22. Review of notices from FEMA, Recreation by Design or Shaw regarding the possible presence of formaldehyde in the unit;

23. Observations of penetrations and sealants in the floor, wall, ceiling and roof systems of the unit;

24. Observations regarding the presence of moisture or water infiltration into or in the unit;

25. Assessment of conditions and source(s) of occurrence;

26. Preparation of this report to present the results of our findings and to render conclusions and statements of opinion as they relate in part to the following questions:

CAST002333

a.  The Recreation by Design travel trailer was converted into a Temporary Housing Unit (THU) per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.   Was the manufacturer required to conform to the building codes and standards applicable at the time of construction and installation and did they comply with these codes?

See Conclusion A.

b.   Did the Recreation by Design recreational vehicle comply with the RVIA or RPTIA industry codes and standards such as NFPA and ANSI?

See Conclusion B.

c.  Was the Recreation by Design Castanel THU constructed for use in various weather conditions per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005?

See Conclusion C.

d.  Did the construction means, methods and materials utilized by Recreation by Design contribute to the increase in off-gassing by failing to properly seal windows, doors, plumbing pipes, etc. as required by the FEMA procurement specifications?

See Conclusion D.

e.  Did the jacking and blocking by Shaw Environmental cause damage to the housing unit and what affect did it have on air, moisture and thermal energy infiltration into the wall, roof and floor system of the unit?

See Conclusion E.

f.  Did the quality of the workmanship during construction of the Castanel THU contribute to the increased rate of formaldehyde off-gassing in the walls, ceilings, floors, and interior of the Castanel housing unit?

**CAST002334**

See Conclusion F.

g. Did the quality of the design and labor workmanship regarding the construction and installation of the air conditioning ductwork in the Castanel housing unit contribute to the entry of any formaldehyde off-gassing that may have been present in the wall, ceiling and floor cavities?

See Conclusion G.

h. Are the vapor barriers or retarders of the Castanel THU placed in the recommended location for a building located in the hot, humid climate zone?

See Conclusion H.

i. What problems manifest when a vapor barrier or retarder is placed on the cold side of walls, ceilings or floors of a building located in the hot, humid climate zone?

See Conclusion I.

j. Was the Castanel THU constructed with formaldehyde emitting materials?

See Conclusion J.

k. Was ultra low or non-formaldehyde emitting building materials readily available at the time the Castanel THU was manufactured?

See Conclusion K.

l. Was the Recreation by Design THU occupied by Ms Castanel constructed utilizing superior quality workmanship?

See Conclusion L.

**CAST002335**

## SECTION V

## RESEARCH AND DATA REVIEWED

## RECREATION BY DESIGN DOCUMENTS

Recreation by Design provided a number of documents relating to this matter.  A review of the following documents sets a chronology of events and provides data regarding the FEMA trailer provided to Ms Earline Castanel:

1.  An invoice dated December 5, 2005 from Recreation by Design to Morgan Buildings and Spas, Inc.

    a.  The order number is 118041.

    b.  The product description is a 2006 33' Park Mod Morgan FH.

    c.  Model number is a 33 PM-HC.

    d.  The VIN is 5CZ200R2461125294.

    e.  The confirmation order identifies the following items:

        i.   The air condition is a ducted system, 15,200 BTU.

        ii.  The heating system is 3 electric baseboard units.

        iii. A handicap sticker was to be installed on the window next to the entry door and on the front of the trailer.

2.  A review of the Recreation by Design Information Sheet[2] indicates the following:

    a.  The unit is heated with three (3) electric baseboard heaters.

---

[2] Bate Stamp:  RBD Castanel 00001 (Recreation by Design, LLC (Plant #2) Information Sheet

CAST002336

    b. The air conditioning system is a Dometic Duo 15,000 BTU roof mounted unit.

    c. Please see Enclosure #9: Recreation by Design Information Sheets.

3. A review of the bill of materials from Recreation by Design list the following:

    a. These documents appear to list the materials used in the construction of the Castanel unit.

    b. These documents were used to help our team to assess the means and methods of construction of the unit. Actual verification could not be made because of limitations placed on the inspections.

    c. Please see Enclosure #9: Recreation by Design Information Sheets.

4. A review of the Floor Plan provided by Recreation by Design, Model 33 PM was made.
    a. The review initially assisted in identifying the unit and design we were to inspect.

    b. We utilized the drawings in preparation of our "as built" drawings.

    c. Please see Enclosure #13: Floor Plan-Model 33 PM Dated September 19, 2005.

5. The Certificate of Origin for the trailer was reviewed. It contained the following information:

    a. The date of origin is December 2, 2005.

    b. The year is a 2006 and the make is a Morgan.

    c. The gross vehicular weight rating is 7,000 pounds (GVWR).

    d. The model number is Model 33' PM FH.

    e. The VIN is #5CZ200R2461125294.

CAST002337

      f. The dimensions of the unit are 33' in length with the hitch and 8' in width.

6. Delivery Check In Sheet

      a. It appears that the Recreation by Design Elkhart, Indiana Plant #2 produced this unit.  The unit was delivered on December 7, 2005 to the GSA Depot, 2695 North Sherwood Forest Boulevard, Baton Rouge, Louisiana.

7. Recreation by Design Documents Bate Stamped #0001through #0045.

8. Recreation by Design Documents Bate Stamped #05174 through #05183.

9. Recreation by Design Documents Bate Stamped #05163 through #05173.

10. Recreation by Design Documents Bate Stamped #05184 through #05187.

11. Recreation by Design Documents Bate Stamped #0189 through #0250.

12. Recreation by Design Documents Bate Stamped #05188.

CAST002338

## SHAW DOCUMENTS

1. The Applicant Pending Inspection Report.

   a. The document indicates Ms Castanel applied for temporary housing sometime on or before November 11, 2005.

2. Access to the property to install the temporary housing unit was granted on November 27, 2005.

3. An undated City of New Orleans Building Permit Application Form.

4. Exhibit 7: Travel Trailer Installation

5. Site plan for the location of the travel trailer to be located at 2261 Urquhart St, New Orleans, Louisiana

6. FEMA Temporary Housing Ready for Occupancy Status Report dated March 11, 2006

7. An inspection was conducted on March 11, 2006 as indicated on the FEMA Temporary Housing Unit Inspection Report.  It was signed by Ms Earline Castanel.

   a. The document indicates there are no issues with the unit.

8. FEMA / Shaw Contract

   a. Section 2.9.1:  The contractor shall transport and install the mobile temporary structure to be ready to occupy in a safe and sanitary condition. [3]

   b. Section 2.9.2, Code Adherence:  The contractor is responsible for adherence to applicable local, state and federal building regulations and laws.   The contractor shall be responsible for meeting manufacturer recommended installation specifications.[4]  (Note: It is our  understanding  there  are  no  manufacturer's  "installation

---

[3] Bate Stamp:  Shaw – 000438 (Forest River File)
[4] Bate Stamp:  Shaw – 000439 (Forest River File)

specifications". The manufacturer does not have specifications for the jacking and blocking of this unit. )

    c. Section 2.10, Maintenance (Exhibit 10): The contractor shall resolve maintenance issues and needs relating to the structures. The contractor shall have the technical capabilities to make necessary repairs to the mobile / temporary structure as specified in each task order.[5]

9. The RFO Checklist.[6]

10. AShaw was responsible for site review and placement of the unit on the site.

11. All documents Bates Stamped Shaw Cast 0001 through 0018.

---

[5] Bate Stamp: Shaw – 000439 (Forest River File)
[6] Shaw Cast 0015

CAST002340

## FEMA DOCUMENTS

1. The Model Travel Trailer Procurement Specifications dated July 14, 2005 outlined by FEMA for the manufacture and purchase of travel trailers pages 1 – 8 were reviewed. The following requirements relate specifically to the issues regarding the Castanel unit:

   a. "Travel trailers being procured under this contract are for the purpose of providing temporary housing."

      i. According to the document, it establishes that this unit is to be used for residential housing. Temporary residential housing is regulated by the building codes in force at the time and governs the codes and standards by which this unit was to be constructed.

   b. "The units are subjected to continuous road travel, multiple installations and deactivations, and various weather conditions."

      i. The specification requires the manufacturer to construct a unit that is capable of multiple activations, deactivations and will be used for multiple applications in different climate conditions

         1. Note: The unit was constructed in Indiana and delivered to the Baton Rouge FEMA location and then sent to Urquhart St. in New Orleans. It appears this unit was activated only once and deactivated to the FEMA Lottie site only once.

      ii. This portion of the specifications will be a factor in our review of the construction means, methods, and materials for use in hot, humid climates.

      iii. The standard is not to be considered as restrictive and the manufacturer may provide equal or better units.

         1. Note: While the specifications set out the minimum standards to which this unit was to be constructed, there was nothing preventing Recreation by Design from identifying to FEMA alternative means and methods of

**CAST002341**

construction that would have allowed them to more fully comply with the specifications for long-term occupancy of their unit.

c. "The construction and outfitting standards identified minimum square footage of living space, floor plan configuration, finishes, furnishing and environmental living conditions necessary to provide emergency housing for disaster operations."

　　i. This portion of the standard requires the provider to furnish a unit to satisfy minimum environmental living conditions and again establishes the unit is to be used for housing.

d. "All exterior openings such as windows, doors, drain pipes, etc…will be caulked with a clear and non-hardening weatherproof sealant to prevent air and moisture penetration."

　　i. This section of the standard will also be used to gauge whether or not the construction method or material met this criteria.

e. "The delivery locations are subject to change due to circumstances or situations associated with disaster recovery efforts."

　　i. Once again, the specifications state that deliveries of the unit may be associated with no particular location and may require transferring the unit to any area of the country.  Construction means, methods and materials should accommodate multiple climate zones.

f. "The manufacturer shall design and construct all units under this contract with a superior grade quality of workmanship."

　　i. A superior level in design and construction will be the gauge we use in the assessment, review and comparison regarding the quality of workmanship, building materials, building standards or other construction requirements.

　　ii. A close examination will be made of what codes and standards were used, followed, available and applicable regarding the construction and installation of this housing unit in order to

CAST002342

comply with the FEMA superior grade of design and construction requirement.

2. CDC – FEMA Document, Formaldehyde Levels in FEMA Supplied Trailers.

3. Important Information for Travel Trailer Occupants.

4. FEMA documents Bates stamped FEMA 159-000001 through 000094.

5. FEMA documents Bates stamped FEMA 207-000001 through 000008.

6. FEMA documents Bates stamped FEMA 207-000009 through 000022.

CAST002343

## MISCELLANEOUS DOCUMENTS

1.  Review of FEMA Accessible One Bedroom Park Model (RP) Procurement Specifications dated April 25, 2006;

2.  Review of FEMA 10-000463, IAQ Screening Testing Procedures for FEMA Temporary Housing Units;

3.  Review of "FEMA to Introduce New Type of Manufactured Home," Release date: December 18, 2008, Release Number: 1791-343;

4.  Review of "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes and Park Models," Release date: April 11, 2008, Release Number: HQ-08-56;

5.  Review of "FEMA Awards Contracts For Low Emissions Travel Trailers," Release date: April 7, 2009, Release Number: HQ-09-034b;

6.  Review of ASHRAE 62 – Indoor Air Quality;

7.  Review of Installation Instructions for Dometic 595 Series QUICK COOL air conditioning unit;

8.  Review of Exhibit 7; Travel Trailer Installation;

9.  Review of ANSI A119.2 NFPA 1192, Standard on Recreational Vehicles, 2005 Edition;

10. Review of ANSI A119.4 NFPA 1194, Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition;

11. Review of complaints from occupants to FEMA;

12. Review of ASTM Designation E 1827 – 96 (Reapproved 2007) – Standard Test Methods for Determining Air-tightness of Buildings Using an Orifice Blower Door;

13. Review of ASTM Designation: E 779-03 – Standard Test Method for Determining Air Leakage Rate by Fan Pressurization;

CAST002344

14.    Review of ASTM Designation E 1186 – 03 – Standard Practices for Air Leakage Site Detection in Building Envelopes and Air Barrier Systems:

15.    Review of ASTM Designation E 1554 – 03 – Standard Test Methods for Determining External Air Leakage of Air Distribution Systems by Fan Pressurization;

16.    Review of International Standard 6781, Thermal insulation – Qualitative Detection of Thermal Irregularities in Building Envelopes – Infrared method;

17.    Review of Delivery Inspection Report;

18.    Review of photographs and video recording to First General Services of the South, Inc. of the Castanel THU taken by Scott Johnson;

19.    Review of photographs and video recording to First General Services of the South, Inc. of the Castanel THU taken by others;

20.    Review of the Transcript of the Testimony of Mary C. DeVany, MS, CSP, CHMM, Date taken:  October 7, 2008, in reference to FEMA Trailer Formaldehyde Products Liability Litigation;

21.    Review of "The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items – Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform U.S. House of Representatives July 19, 2007;

22.    Review of Table 3 – ATSDR Health Guidance Values for Formaldehyde Exposure (Reference 1.2) and Table 4 – Occupational Exposure Levels for Formaldehyde (Reference 9);

23.    Review of Indoor Air Quality Guideline No. 1 dated August 2004, "Formaldehyde in the Home;"

24.    A review of the HUD Manufactured Home Construction and Safety Standards Part 3280 Section 103:  Light and Ventilation, Subsections (b) (1) and (2).

**CAST002345**

25.   · A review of the HUD Manufactured Home Construction and Safety Standards Part 3280 Section 309:   Health Notice on Formaldehyde Emissions, regarding ventilation and high temperature and humidity effects on formaldehyde levels.

26.   Review of the Plaintiffs' Fact Sheet dated November 18, 2009;

27.   Review of miscellaneous formaldehyde documents;

28.   Review of Environmental Health's publication, "What You Should Know about Formaldehyde in Mobile Homes;"

29.   Review of photographs taken by Stephen Smulski, Ph.D.;

30.   Review of photographs taken by W. D. Scott and Associates;

31.   Review of photographs taken by Earline Castanel;

32.   Review of photographs taken by Charles David Moore, P.E. with Freyou, Moore and Associates;

33.   Review of photographs and a video recording taken by Ervin Ritter, P.E. with Ritter Consulting Engineers;

34.   Review of photographs taken by Scott Dailey with Ritter Consulting Engineers;

35.   Review of photographs and a video recording taken by Paul LaGrange with LaGrange Consulting;

36.   Review of Plans and Specifications from Recreation by Design;

37.   Review of Recreation by Design's Travel Trailers Owner's Manual;

38.   Review of "An Update and Revision of ATSDR's February 2007 Health Consultation:  Formaldehyde Sampling of FEMA Temporary – Housing Trailers, Baton Rouge, Louisiana, September – October, 2006, dated October 2007 by U. S. Department of Health and Human Services;

39.   A review of ATSDR documents Bates stamped ATSDR-000473 through

CAST002346

000487;

40. A review of Buyer's Guides on vinyl wallpaper;

41. Review of "The Use of Blower Door Data" by Max Sherman dated March 13, 1998;

42. Review of CDC's "Final Report on Formaldehyde Levels in FEMA – Supplied Travel Trailers, Park Models, and Mobil Homes" dated July 2, 2008;

43. Review of Composite Panel Association's Technical Bulletin, "VOC Emission Barrier Effects of Laminates, Overlays and Coatings for Particleboard, Medium Density Fiberboard (MDF) and Hardboard;"

44. Review of a report prepared by Charles David Moore, P.E. with Freyou, Moore and Associates;

45. Review of a report by LaGrange Consulting;

46. Review of a report by Stephen Mullet (travel trailer manufacturing consultant) dated August 20, 2008;

47. Review of a report by Ervin Ritter, P.E. with Ritter Consulting Engineers;

48. Review of a report by Dr. Stephen Smulski;

49. Review of Affidavit of Mary D. DeVany Concerning IN RE: FEMA Trailer Formaldehyde Products Liability Litigation, "Overview of Formaldehyde Exposure Standards; Toxicological Effects; Airborne Formaldehyde Sampling Strategy, Methodology and Selection Basis; Air Sampling Results; and Bibliography / References," dated August 2008;

50. Review of Analytical Communications March 1998 report, "Effect of relative humidity on the determination of formaldehyde with NIOSH 3500 method (chromatropic acid method);

51. Review of report, "Formaldehyde CAS number: 50-00-0;"

52. Review of report, "Formaldehyde Indoors," by Stephen Smulski;

CAST002347

53.   Review of report by Anne V. Baughman and Edward A. Arens, "Indoor Humidity and Human Health – Part 1:  Literature Review of Health Effects of Humidity – Influenced Indoor Air Pollutants;"

54.   Review of Exposure Assessment Solutions, Inc.'s Chapter 16: "Industrial Hygiene Exposure Assessment – Data Analysis and Interpretation;"

55.   Review Of "Interim Findings on Formaldehyde Levels in FEMA – Supplied Travel Trailers, Park Models, and Mobile Homes" from the CDC dated February 29, 2008;

56.   Review of an Affidavit of Marco Kaltofen, P.E. (Civil, Mass.) dated August 20, 2008;

57.   Review of Earnest Orlando Lawrence, Berkeley National Laboratory's "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report" dated November 2008;

58.   Review of 1991 NIST's MOIST program data;

59.   Review of 1993 ASHRAE study, "A Computer Analysis of Moisture Accumulation in the Walls of Manufactured Housing:"

60.   Review of February 1994 ASTM study, "Moisture Control in Buildings;"

61.   Review of January 1995 U.S. Department of Commerce Report, "Manufactured Housing Walls that Provide Satisfactory Moisture Performance in all Climates;"

62.   Review of 1999 ASTM book, <u>Water Problems in Building Exterior Walls: Evaluation, Prevention, and Repair</u>;

63.   Review of 2008 Manufactured Housing Research Alliance Study, "Moisture Problems in Manufactured Homes"

64.   Review of September 2003 MHRA publication, "Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates;"

65.   Review of CDC Summary of Lawrence Berkley National Laboratory

CAST002348

Final VOC Report and Interim VOC Report;

66.   Review of "Mechanisms of Formaldehyde Release from Bonded Wood Products" published by American Chemical Society, 1986;

67.   Review of the Florida Solar Energy Center Publication Number: FSEC-GP-212-01, "Moisture Problems in Manufactured Housing:  Probable Cause and Cures;"

68.   Review of "Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units" dated 12/13/07;

69.   Review of Formaldehyde Passive Monitoring Data – EMA Housing Units by W.D. Scott Group, Inc.;

70.   Review of test results by W.D. Scott Group, Inc.;

71.   Review of "Volatile Organic Compound Concentrations and Emission Rates Measured over One Year in a New Manufactured House" by Alfred T. Hodgson, Steven J. Nabinger and Andrew K. Persily;

72.   Review of "Wood Adhesives 2005" edited by Charles R. Frilhart dated November 2005;

73.   Review of FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005;

74.   Review of the Air Resources Board study, "Air Quality Modeling of Emissions from Composite Wood Products;"

75.   Review of the Air Resources Board's "Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated March 9, 2007;

76.   Review of the Air Resources Board's "Staff Report:  Initial Statement of Reasons for Rulemaking – Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

CAST002349

77.    Review of Air Resources Board's "Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Responses – Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007:

78.    Review of the following internet articles:

a.  http://www.rvbusiness.com/tag/tl-industries/

b.  http://www.chemicaldesigncorp.net/ClosedCellFoam.htm

c.  http://www.robertlordbuilders.com/press_releasr1.htm

d.  http://www.suburbanmanufacturing.com/  (RV Products)

79.    A review of the pamphlet by Bayseal CC for Residential Builders, "Insulation that Adds Value;"

80.    A review of Bayseal CC Division 7 – Thermal and Moisture Protection Closed-Cell Insulation Technical Data Sheet 06/10/08;

81.    A review of product data for various open and closed cell SPF insulations

82.    A review of a fax from Wyatt Rankin with SPI-Dallas dated May 19, 2009 regarding formaldehyde foams;

83.    A review of the International Building Code, 2000;

84.    A review of the International Residential Code, 2000;

85.    A review of The Building Code of the City of New Orleans, 2003;

86.    A review of the Ball State report;

87.    A review of Composite Panel Association Products Documents Regarding Low and Non-Formaldehyde Emitting Materials;

88.    A review of RADCO Test Report RAD-138, Interim Report on

CAST002350

Formaldehyde in Mobile Homes, revised July 20, 1978;

89.  RADCO Correspondence to Jordan Dentz with MHRA dated July 9, 2004;

90.  A review of the reports and depositions of Mark Polk in the FEMA formaldehyde litigation;

91.  A review of the reports and depositions of Thomas Fribley in the FEMA formaldehyde litigation;

92.  A review of the reports and depositions of John Osteraas in the FEMA formaldehyde litigation;

93.  A review of the reports and depositions of Damian Serauskas in the FEMA formaldehyde litigation;

94.  A review of the reports of Tony Watson in the FEMA formaldehyde litigation;

95.  A review of the reports and depositions of Donald Snell in the FEMA formaldehyde litigation;

96.  A review of the reports and depositions of Norman Nelson in the FEMA formaldehyde litigation;

97.  A review of an RV Business Article dated January 21, 2010 titled, "Park Owners Warned:  Beware of FEMA Trailers", regarding an advisory by Recreational Park Trailer Industry Association's Executive Director William Garpow;

    a.  Please see Enclosure #15 to this Report:  RV Business Article dated January 21, 2010.

98.  A review of a FEMA document from the FEMA Photo Library on FEMA ADA compliant trailers by Keith Riggs taken August 19, 2006;

CAST002351

    a. Please see Enclosure 16: FEMA Photo Library on FEMA ADA compliant trailers by Keith Riggs taken August 19, 2006;

99. A review of a publication by the United States Department of Agriculture, Handbook No. 640, titled "Fiberboard Manufacturing Practices in the United States" by Otto Suchsland and George E. Woodson;

100. Review of a report by the CDC dated December 10, 2009, "Evaluation of Mitigation Strategies for Reducing Formaldehyde Concentrations in Unoccupied Federal Emergency Management Agency-Owned Travel Trailers", by Michael G. Gressel and Lynn Wilder;

101. A review of the ANSI A119.5 Recreational Park Trailer Standard 2005 Edition;

102. HUD publication, "Durability by Design"

**CAST002352**

## SECTION VI

## RESULTS OF INSPECTIONS, OBSERVATIONS AND TESTING

Testing and inspections on the Earline Castanel FEMA THU commenced on January 4, 2010 and proceeded until completed on January 19, 2010. Testing and observations other than by non-destructive means were not permitted. Our ability to verify design and construction means, methods, degree of quality and compliance with specifications, codes and building standards were limited. In the course of our study and analysis, the interaction of air, temperature and moisture as they relate to the temporary housing unit were observed and/or tested. Various tests for envelope air leakage, air conditioning duct air leakage, and air exchange rates were performed. Infrared thermographic surveys were performed along with the recordation of pressure differentials, temperature and relative humidity readings.

Observation and testing assisted in identifying the relationship between the exterior and interior environments, the communications between the exterior and interior environments and the effect upon the components of the temporary housing unit.

Tests were performed regarding the affect jacking and placing the unit on piers had on the structure from air and moisture infiltration. Those test results are unavailable at the time of this report. A supplemental report may be issued after the jacking and blocking test results are made available.

The testing has provided data to assist us in identifying if there were transfer pathways for air, thermal energy and moisture to enter from the exterior of the THU into the wall, floor and ceiling cavities of the unit as well as the interior living space; what factors contributed to that transfer and its effect upon the various components of the unit; and were any of those factors a result of the failure of Recreation by Design or Shaw Environmental to follow the project specifications, building codes and standards. The pathways and means allowing any off-gassing of materials or micro-organisms to move into the living area were explored and identified. The causes for conditions favorable for the off-gassing of building materials in the walls, ceilings, floors and living area were identified.

OBSERVATIONS AND TESTS:

A.   Identification

  1. Observations:

       i. Identification of the Castanel trailer was made by reviewing the stamps and numbering on the trailer.

  2. Photographs:

       i. See enclosed Photographs A-1 through A-15.

B.   Interior Overview

  1. Observations:

       i. The initial interior overview revealed a relatively well kept living area.  There are some indications of:

            a. The appearance of a mold-like substance and water stains on the window frames;

            b. Rippled or detached vinyl covering on the panels were observed;

            c. Moisture indications on the floor at the area of the commode were noted;

            d. Separations in the batten strips.

            e. Apparent moisture penetration was noted on corroded fasteners on the interior walls.

CAST002354

    ii. Other than these items, the trailer appeared to be maintained and showed very little wear despite the occupation of the trailer by Mr. Castanel from March 2006 through August 21, 2007.

2. Photographs:

    i. Please see Photographs B-1 through B-63.

    ii. Please see Ritter Consulting Engineers Photographs #0004, 0005, 0008, 0009, 0010, 0011, 0012, 0023, 0024, 0025, 0032, 0033, 0034, and 0035.

3. Comments:

    i. The interior and exterior of the trailer was measured for the purposes of providing detailed drawings of the "as-built" condition of the unit.

    ii. Please see Enclosure #3, Plans and Details by FGS / RCE of the FEMA Castanel THU.

C.    Data Plate

1. Observations:

    i. The following information was collected from the data plate:

        a. Make and Year: 2006 Morgan,
        b. VIN: 5CZ200R2461125294,
        c. Type: 33'PN FH,
        d. Front and Rear Tire Sizes: 235/15

2. Photographs:

    i. Please see Photograph C1.

CAST002355

D.    Certification Tag

1. Observations:

i. No RVIA Certification Tag was observed on this unit.  The RVIA certification tag generally states that the manufacturer certifies compliance with standard for recreational vehicles ANSI NFPA 1192, electrical, plumbing, heating, and safety.

ii.    No RPTIA Certification Tag was observed on this unit.

iii.    Page 3, Bates number RBD 05191, of the Recreation By Design's Owner's Information Manual states that the unit was  constructed to comply with the requirements set forth by the Recreational Vehicle Industry Association, as well as other state and federal governing agencies.

a.  Photographs:

i.  Please see photograph D-1

b.  Codes, Standards, Tests or Engineering Assessments:

i.  Please see ANSI 119.2, NFPA 1192, Codes and Standards for Recreational Vehicles.
ii.  Please see ANSI A119.5, Codes and Standards for Recreational Park Trailers

c.  Comments:

i.  Photograph D-1 is an overview of the passenger side of the unit.  Typically, the certification tag is located by the entry door.  There are no tags by

the door or any other place on or in the unit that was observed by our team members.

ii. While the trailer manufacturer has not certified compliance with the ANSI 119.2, NFPA 1192, ANSI 119.5 nor the RPTIA codes and standards, page 3 in the Recreation by Design's Owner's Information Manual states that this trailer complies with the Recreational Vehicle Industry Association's standards as well as other state and federal governing agencies.

iii. The manufacturer's documents indicate this unit is a Park Model trailer 8' wide by 30' long.

iv. The manufacture's documents indicate the unit is a handicap unit.  The unit also has two ADA handicap symbols on the unit.

v. We will address further in this report the areas the manufacturer did not meet the compliance requirement of these codes.

vi. Additionally, it will be discussed further in the Report whether or not there or other codes and standards that applied to the construction and use of this unit as its use as temporary housing.

E.    Inspection Tags

1. Observations:

      i. We did not observe any indications of inspections or maintenance to this unit either at the front exterior end wall of the trailer or in any documents provided to us for review.

2. Photographs:

      i. Please see photographs E-1through E12.

3. Comments:

      i. There does not appear to be any inspection stickers or inspection indications were placed on the trailer by the maintenance contractors of inspections.  Ms Castanel lived in this unit from March, 2006 to August of 2007.  If the unit was routinely inspected and maintained, it is unknown what areas were inspected other than the three service calls to repair the air conditioner and the service call to repair the screen door as indicated by Ms Castanel's testimony.

F.    Tongue Jack

1. Observations:

      i. The 2000 lb. tongue jack on the front end of the trailer was utilized by the Shaw consultants to lift the trailer during their jacking and blocking procedures.

2. Photographs:

      i. Please see Photographs F-1

      ii. Please see Photographs and video recording by A.J Valenti.

3. Comments:

CAST002358

    i. It is unknown at this time why the trailer tongue jack was used in the jacking procedures by Shaw's consultants. We may opine later after reviewing their report.

G.    Scissor Jacks

    1. Observation:

        i. P C M S 24" scissor jacks were installed on the trailer for the purpose of stabilizing the unit.

    2. Photographs:

        i. Please see photographs G-1.

    3. Comments:

        i. There are no instructions either on the jacks or in the owner's manual regarding the use of these jacks. Other trailers inspected and owner's manuals reviewed gave at least limited directions on the use of these jacks.

H.    Tires

    1. Observations:

        i. The tires of the unit were observed. The tires are 15" in diameter.

        ii. The numbers on the tires do not match the numbers on the data plate. The tires on the trailer are not as wide as those called out on the data plate.

    2. Comments:

CAST002359

i.  It was observed that the tires and rims on the trailer were installed with 15" wheels.  The tires are Tow Master ST 205/75 15.  The number 15 indicates that they are 15" in diameter.

ii.  The tires on the data plate call for a 235/75 tire.

I.  Axles

1.  Observations:

i.  The underside of the chassis or steel frame was inspected for its connection to the axles.  The axles were connected to the frame with a series of U-clips and bolts and fasteners.  The axles are connected to suspension springs which allow the axles to move independently of one another.

2.  Photographs:

i.  Please see Ritter Consulting Engineers Photographs #8907 through #8912

ii.  Please see Freyou Moore photograph library by David Moore

3.  Comments:

i.  The axles are connected to the frame with a series of framing members and springs.  When jacking of the unit occurred, it is our understanding the axles were allowed to be suspended without jacks under the axles and with no blocking below the axles.  If jacking was to be performed, at a minimum, the axles should have been lifted at the same time the entire frame was lifted.  Performing the jacking and lifting with a unified hydraulic jacking system, lifting the entire unit and axles at the same time, would have taken weight off the frame and axles of

CAST002360

the trailer and alleviated some of the stress placed on the framing and components of the trailer.

J.    Chassis

1. Observations:

    i.  The chassis or steel frame of the trailer was inspected.  The frame was constructed with I-beams, angle iron, metal trusses and other miscellaneous metals.

    ii. The connection of the steel chassis to the wood frame structure of the trailer could not be inspected because of the limits of our inspection to non-destructive means and methods only.

2. Photographs:

    i.  Please see photographs by Scott Dailey in the Ritter Consulting Engineers bank of photographs #8757 through #8819 and video recordings

    ii. Please see photographs in the Freyou Moore Engineers bank of photographs by David Moore.

3. Codes, Standards, Tests or Engineering Assessments:

    i.  Please see Enclosure 2, Freyou, Moore and Associates' Report, Structural Conditions Assessment.

4. Comments:

    i.  The outrigger connections to the wood structure were connected at the end of a reduced angle iron outrigger.

CAST002361