i.  Please See ADAAG Standards

     ii.  Please See Ritter Consulting Engineer's Report

4. Comments:

      i.  As a part of the conversion of the travel trailer to temporary housing, the waste water system was connected to the city's sewer system tub / shower unit was composed of a tub with a shower surround.  The unit was not wheelchair accessible.

     ii.  The plumbing system was connected directly to the city's sewer system.  The vent pipe was installed externally on the driver's side wall of the unit.

    iii.  These steps along with placing the unit on piers, strapping the unit down to the ground, lifting the unit off the ground, providing a residential refrigerator and commode, and providing these units for long term occupancy,  converted the travel trailer to a temporary housing unit.

JJ.    Jacking, Blocking and Measurements - Shaw

1. Observations:

      i.  Our organization made observations of the jacking and blocking performed and measurements taken by consultants on behalf of Shaw.

2. Photographs:

      i.  Photographs and video recordings have been produced by others in exchange of photographic and video documentation.

3. Comments:

      i.  Comments regarding the jacking, blocking and measurements performed and taken by consultants for Shaw will be

CAST002402

supplemented once their reports have been produced and made available to our organization.

KK.   Wood Component Inspection

1.  Observations:

  i.  The wood walls, ceilings, floors, cabinets and other wood products, excluding the structure, were observed, and photographed for identification of formaldehyde emitting products.

2.  Photographs:

  i.  Please see all interior photographs.

3.  Codes, Standards, Testing or Engineering Assessments:

  i.  Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

4.  Comments:

  i.  Dr. Smulski identified the various wood components as formaldehyde emitting or non-formaldehyde emitting materials.

  ii.  Dr. Smulski produced his Report and filed it with this writer for his use and incorporation in the production of this Report.

  iii.  All formaldehyde emitting wood products are noted in Dr. Smulski's Report.

  iv.  As noted in Dr. Smulski's Report and the LBL Report, in addition to the items that emit formaldehyde gasses, the small size of the temporary housing unit contributed to the problems.

  v.  All building codes are designed for providing a safe, healthy, durable environment.

LL.   Envelope Air Leakage Test

CAST002403

1. Observations:

   i. The Castanel temporary housing unit was tested for envelope (walls, ceiling and floor) air leakage.  This test indicates the quantity of air that is leaking through the walls, ceilings and floor system and quantifies the amount of leakage.

   ii. Envelope air leakage tests and infrared thermographic imaging identified and quantified air leakage into the THU.

2. Photographs:

   i. Please see First General Services Infrared Thermographic Images.

   ii. Please see Enclosure #4:   LaGrange Consulting Inspection Report- Thermal Images.

3. Codes, Standards, Testing or Engineering Assessments:

   i. Please see Enclosure #4, LaGrange Consulting Inspection Report.

   ii. International Residential Code 2000: Section N1102.1.10-Air Leakage

   iii. RPTIA Standards ANSI A119.5:   Section 5.2.4-Resistace to Elements

4. Comments:

   i. Envelope air leakage tests and HVAC (heating, ventilating and air-conditioning) duct leakage tests were performed to assess and measure any air leakage in the walls, ceilings and floors of the unit.

   ii. Mr. Paul LaGrange with LaGrange Consulting, Inc. was engaged to perform the air leakage tests on the unit and

CAST002404

ductwork.

iii. The envelope of the building was first tested for air leakage. The building was depressurized. The natural air change per hour was documented at .28 ACH or a total envelope leakage of 28.9 square inches.

iv. According to the natural ACH calculations, the air exchange is 8.5 cfm.

v. This hot, moist air comes into contact with the untreated raw surfaces and edges of the formaldehyde emitting wood and wood products and also mixes with the colder air leaking from the return air duct allowing condensation to form in the ceiling cavity.

vi. According to the experts, formaldehyde off-gassing is doubled for each 12°F with the rise in temperature, humidity or both. This unfiltered, contaminated air filled with moisture and heat is transported into the living area of the trailer through cracks in the seams, around duct registers, light fixtures, and all other penetrations that are not sealed.

MM. Infrared Thermographic Survey – First General Services

1. Observations:

   i. Infrared thermographic imaging of the envelope revealed deficiencies in the heat and air barrier of the house.

2. Photographs:

   i. Please see Enclosure #2: First General Services Infrared Thermographic Images 1 through 36.

3. Codes, Standards, Testing or Engineering Assessments:

   i. Please see Enclosure 3, LaGrange Consulting Inspection Report.

      ii. Please see FEMA Model Travel Trailer Procurement Specifications

4. Comments:

      i. An infrared thermographic survey was performed on the interior of the building prior to the envelope air leakage tests and the air-conditioning duct leakage testing utilizing a Flir Infrared camera model BS20.

      ii. Not all areas were easily accessible to perform a survey. The survey was performed for the purposes of identifying temperature anomalies in the walls, ceiling and floor of the Castanel temporary housing unit. Air and moisture leaks would show as temperature differentials noted by the variations of color during the survey. A number of these anomalies were photographed using the Flir BS20 camera.

      iii. The indications are the thermal envelope is not designed and constructed to a level of superior quality. Heat and air are allowed to bypass the insulation and affect the walls, ceiling and floor areas.

NN.   Air Conditioning Duct Leakage Test

1. Observations:

      i. Testing verifies and quantifies the leakage of air from the air conditioning system supply duct.

2. Photographs:

      i. Please see photographs included in the report by LaGrange Consulting.

3. Codes, Standards, Testing or Engineering Assessments:

      i. Please see Enclosure #4, LaGrange Consulting Inspection Report.

  ii. Please see the Dometic Installation Instructions

  iii. NFPA 1192-05: Section 5.8.1-Air Conditioning Installation

  iv. International Residential Code 2000:   Section 1601.3.1-Duct Joints Seal

4. Comments:

  i. In conjunction with air leakage testing on the Castanel trailer, the ductwork for the air-conditioning system was also tested for leaking. The results for that test indicated the air-conditioning ductwork has leakage equal to 34% of the total output of the unit. 14% of the leakage is going to the exterior of the unit. The other 20% is leaking back into the building as unconditioned air.

  ii. More importantly, the air leakage to the exterior of the ceiling and wall cavities can create a negative pressure condition on the interior of the trailer. As the air from the ducts leak into the ceiling and wall cavities from the ductwork supplying the cold filtered air into the trailer, the return air portion of the air conditioner is drawing back into the air-conditioning unit the same quantity of air that it is producing.

  iii. With the air-conditioning duct leaking 14% of air outside of the trailer, the return air system can draw in or suck in air into the ceiling system of the trailer through these various unsealed cracks and joints into the inside of the building. This hot, humid contaminated air is unfiltered. This air intermingles with the wood and wood products that can emit formaldehyde gas and draws the off-gassing into the house.

  iv. The ducts for the air-conditioning system are not properly sealed. This is a workmanship issue. Had the ducts been properly installed and sealed at the factory, the duct leakage would not have occurred.

  v. In the hot, humid temperature zone in which New Orleans, Louisiana is located, temperatures are in the 90°F range for

CAST002407

most of the late spring through early autumn. This begins somewhere in May and continues through the months of June, July, August and September. Along with the rise in temperature, South Louisiana also experiences a significant rise in relative humidity. The higher the relative humidity, the more "muggy or sticky" the contents inside your home and body feel. Dropping temperatures from 100°F or more degrees on the interior of the trailer down to 70°F to 75°F which is the normal comfort level would take quite a number of hours to accomplish. While the cooling is not the issue and the number of hours it actually takes to cool is not the issue, the real issue is the air conditioning system is running for many hours sucking in the contaminated, hot, humid air from the exterior to the walls, floors and ceiling of the trailer.

vi.   As the temperature gets colder on the interior of the trailer, vapor pressure differentials become a factor. The colder, drier air will attract the hotter, wetter air from the exterior drawing it in towards the interior. The vapor pressure is assisting in the transportation of the hot, humid, contaminated air from the outside into the wall, ceiling and floor cavities and eventually into the interior of the trailer where the occupants are living. An example to explain how the wet, hot air of the exterior is driven into the colder, drier air on the interior of the trailer, we can use the example of a small amount of water spilled on the floor. If we take a dry sheet of paper towel and place it flat on the floor and just place one corner of the paper towel connecting with the spilled water, the water will be attracted to (absorbed into) the sheet of dry paper.

OO.   Indoor Air Quality Tests

1.   Observations:

i.   Indoor air quality tests were performed to identify the present levels of formaldehyde off-gassing in the Castanel trailer.

2.   Codes, Standards, Testing and Engineering Assessments:

i.   Please see Enclosure #6, W.D. Scott and Associates Report.

      ii. Please see FEMA Model Travel Trailer Procurement Specifications

3. Comments:

      i. Tests for formaldehyde emission levels were performed on January 4, 2010 and January 7, 2010 by W.D. Scott and Associates. The test results indicated the level of formaldehyde at 8.8 ppbv on January 4, 2010 and 48 ppbv on January 7, 2010.

      ii. The first test was performed without heat in the trailer. The second test was performed with heat on in the trailer.

PP.   Warning Labels

1. Observations:

      i. There were a number of labels provided on the interior and exterior of the unit and in the owner's manual.

      ii. On page 4 of The Owner's Information Manual states the R.V. is designed for short term camping and recreational use. It was not engineered to be used as a permanent dwelling.

      iii. There are no labels in the Castanel unit or in the Owner's Information Manual indicating formaldehyde containing materials were used in the construction of this unit.

2. Codes, Standards, Testing or Engineering Assessments:

      i. Please see Enclosure #7, Affidavit by Stephen Smulski, Ph.D.

      ii. International Residential Code 2000: 101.3 Purpose

      iii. RPTIA Standards ANSI A119.5: Section 1.1.1-Need for Standard

CAST002409

    iv.  New Orleans City Building Code 2003

3. Comments:

    i.  In Dr. Stephen Smulski's report, there is an in-depth analysis of the amount of wood product and formaldehyde containing products that are utilized in the design and construction of the Castanel housing unit.  Dr. Smulski goes into great detail regarding each and every wood product, wood containing product, or other formaldehyde containing products that are utilized in this housing unit.

    ii.  He opines the walls, ceiling, doors, cabinets, dining table, countertops, built-in seating and other furniture, and bed supports are all constructed from wood based composite products, particle board, medium density fiberboard and hardwood plywood that are all known to release formaldehyde gas after being placed in service.  He also observes and notes that the back side and edges of most of these items are exposed with no overlay to prevent infiltration of the formaldehyde emissions from entering into the living area of the trailer.

    iii.  He notes the location of the FEMA temporary housing unit's location in New Orleans, Louisiana and its exposure to the hot, humid climates of this region.  He states, "These are the exact conditions that maximize the release of formaldehyde from wood based composite panels including particle board, medium density fiberboard, and hardwood plywood."

    iv.  Because of the small size of the unit, the formaldehyde emissions are more concentrated in the temporary housing units than they would be in either a normal sized house or a commercial building.  The larger the building, the less the concentration of formaldehyde disbursement in the building by proportion.  The larger the house or the building, the less the formaldehyde that is in that building.

CAST002410

## SECTION VII

## ALTERNATIVE CONSTRUCTION METHODS

There were alternative materials available at the time the Castanel Unit was constructed that emitted no or little formaldehyde gas and could have been used in lieu of formaldehyde emitting materials.

This writer is aware through his own research that relative humidity and temperature affect formaldehyde off-gassing and mold growth. The higher the temperature and relative humidity rises, the higher the rate of formaldehyde off-gassing. To prevent or lessen formaldehyde, higher temperatures and relative humidity conditions from being a factor, he is aware of the following materials, means and methods in construction were commercially available at the time this unit was manufactured:

1.  Items such as hardboard paneling in lieu of hardwood paneling, OSB board using non-formaldehyde materials and other products using non-formaldehyde releasing materials were available at that time.

    a.  This information is available from Composite Panel Association publications.

    b.  This writer is familiar with the use of low or non-formaldehyde emitting products. Our organization performs repairs and reconstruction of damaged mobile homes. HUD requires the use of low formaldehyde emitting products in manufactured houses. When performing our repairs, we must adhere to the HUD code and use conforming products.

    c.  The alternative use of a hardboard paneling could have been used. Hardboard panels have been used in manufactured homes (mobile homes) for a number of years. This is not a new technology or is it new to the industry. This material could be used on both the walls and ceiling areas.

    d.  The cost of the wall and ceiling panels are unknown to this writer. They have not been produced by Recreation by Design. We have calculated the difference in the cost between a vinyl -covered hardwood panel and a

hardboard panel using retail pricing without the benefit of large quantity purchase discounts. Recreation by Design would more likely than not have purchased this material at wholesale prices with discounts for quantity purchases. The retail cost difference is a credit amount or cost savings of $88.25.

2. One type of product that was available when the Castanel house was built is an air seal barrier placed below the exterior skin of the exterior walls.

   a. This air barrier would have eliminated or severely reduced the amount of air and moisture penetration into the wall system. This moisture became available to raw materials that contained formaldehyde and contributed to an increase in off-gassing.

   b. The use of a "Tyvek" type product is a common practice utilized in the hot, humid temperature region of the country. This method of construction has been researched and written about in various books and publications for approximately twenty years. Virtually every habitable house or building constructed in this climate has a vapor barrier of some type installed to prevent moisture intrusion into the wall system.

   c. Recreation by Design more likely than not would have been able to purchase this material at wholesale prices with the benefit of quantity discounts.

   d. We do not have the means to obtain wholesale quantity discount prices. We utilized the retail cost of using this product without the benefit of quantity discounts. We have used Lafayette, La. labor rates at $45.93 per hour to install or $.09 per square foot. The retail cost of the Tyvek product installed is $152.53.

3. Higher density insulation could have been utilized within the thin wall system, such as foam insulation or an insulation board. This would have not only assisted in limiting the penetration of moisture from the exterior to the interior of the temporary housing unit but would have also helped to address the issues with condensation occurring as a result of dew point temperatures being reached in the wall and ceiling cavity.

CAST002412

a. The FEMA specifications required the construction of the THU for various climates. While the wall and ceiling insulation is inadequate for the climate in the hot humid regions of the country, it is also inadequate for the cold climates. The use of SPF insulation would have addressed this issue and provided the required insulation values for almost the entire continental United States.

b. The alternative method utilizing the replacement of the 1½" fiberglass unfaced insulation in the walls and ceiling with a closed cell spray foam polyurethane insulation would have addressed several issues. If we achieve an R-14 insulating value in the wall system and approximately R-18 in the ceiling system, we will prevent the materials in the wall system from reaching dew point. Each inch of closed cell SPF insulation has an approximate R-7 value. Two inches of closed cell SPF insulation would provide R-14 of insulation. The climate in this area requires an R-11.

c. At least as important as the R- value is the perm rating of the closed cell SPF insulation. The perm rating is 1 or less which means it is classified as a water and vapor barrier.

d. This would address several different problems. With the SPF closed cell insulation, the designer of the housing unit could achieve the R-14 value desired and have a vapor barrier installed in one function. As a precaution, we would want to also include the air and moisture barrier wrap around the perimeter of the exterior walls. This would then carry over the separation in the SPF insulation at the wall framing and prevent thermal shorting from occurring.

e. One added bonus to the use of the closed cell insulation is the additional strength this product adds to the framing system. The closed cell material attaches to the framing wall and also creates a solid unit within the cavity of the wall increasing the strength of the wall. This would help to address some of the concerns that the walls do not meet code requirements.

f. Addressing the ceiling cavity, we want to achieve somewhere around an R-18 value. Using 2 ½" of SPF insulation gives the 17 ½ to 18 R- value we are looking to accomplish. In addition to the metal type roof

sheeting, the SPF material would prevent any water or water vapor from transmitting from the exterior to the interior through the roof or attic system.

g. The additional benefits of added strength to the roof system would be applicable with the SPF material in the ceiling cavity.

h. The use of the SPF insulation material also has the benefit of sealing the areas of air leakage in the exterior surfaces of the wall system in conjunction with the Tyvek-type air barrier covering.

i. Recreation by Design would be able to purchase materials at wholesale prices with quantity discounts and use their own labor force to install the SPF insulation. We have also deducted the retail price of 1 ½" and 2 ½" unfaced insulation. The labor and material cost associated with the use of SPF insulation installed at retail cost for materials and Lafayette, La. labor cost is $408.03.

j. These are major benefits in using the closed cell SPF insulation material:

  i. We achieve the R- value necessary to prevent the dew point from being reached in the wall and ceiling cavities of the unit which in turn prevents the manifestation of condensation.

  ii. The air leaks in the envelope are sealed to prevent the passage or movement of hot, humid air from the exterior of the unit to the interior living space and filtering any contaminants.

  iii. The SPF insulation lowers the temperature and relative humidity in the walls and ceiling.

  iv. The SPF insulation adds strength to the structure assisting the structure as it pertains to wind loads as discussed by our engineer.

  v. The increase of R- value in the wall and ceiling systems will assist in retaining the cold air conditioned air in the living unit. The occupant would have a more comfortable temporary housing unit; a housing unit that has a lower cost of operation of air conditioning and heating; and a healthier safer environment for the family.

CAST002414

vi.   Another benefit of the usage of the spray foam insulation is it would seal the ducts in the attic and prevent air leakage from the ducts and adding to the R- value of the duct system thereby preventing condensation occurring around the ducts.

vii.   Closed – Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation gives the data for the use of this product.

4.   While this is not an alternative method of construction, it is one of absolute necessity in the prevention of negative air pressure occurring and drawing hot, humid unfiltered contaminated air into the living area of the Castanel house.  This item is simply for the Recreation by Design to have performed the work in which they were commissioned to do in a superior workmanlike manner according to the FEMA Procurement Specifications.  Simply having taken the time to properly install the air conditioning ductwork and insuring it was sealed air-tight would have lowered the amount of moisture and hot air available to reduce formaldehyde off-gassing.

The manufacturer either failed to properly train the installers of the air conditioning duct system and / or the manufacturer failed to properly supervise the workers installing the air conditioning duct system.  The manufacturer failed to not only fulfill the requirements of FEMA Procurement Specifications, Recreation by Design also failed to follow the air conditioner manufacturer's installations and the NFPA and ANSI codes and standards that apply to this unit.

5.   Positive pressure inside the unit pushing the hot, humid contaminated air away from the wall, ceiling and floor cavities would have helped to significantly reduce the possibility of the introduction of any vapors into the living area of the unit.

6.   The workmanship of the overall construction of the FEMA trailer could have also prevented many of the air leaks into this housing unit. The lack of superior workmanship and the failure to properly supervise the installation of the sealing of the envelope has produced pathways for the hot, humid, unfiltered air to penetrate into the living area.  Once again,

the requirements of the specifications for procurement regarding air and moisture sealing of the unit failed to be adhered to by the manufacturer.

7.   In addition to the above mentioned quality control methods, the manufacturer could have tested the ductwork for air leakage.

8.   A fresh air venting system could have been installed to the HVAC system. The air exchange rate would be increased by the use of that ventilating system.

9.   Use of better construction controls would have produced a higher quality unit.

10.  Obtaining information on jacking and blocking from the Recreation by Design regarding their recommendation or input would have been the appropriate step to take. The manufacturer may have given feedback as to the appropriateness of jacking and blocking their product.

11.  Performing calculations or jacking tests would have identified potential issues with that procedure.

**CAST002416**

# SECTION VIII

## DISCUSSION OF RESEARCH AND DATA REVIEWED

The numerous rounds of testing for formaldehyde in the FEMA trailers began after occupants began filing health complaints with FEMA. Occupants informed FEMA that they were having issues with strong odors, burning or irritated eyes, skin irritations, sinus problems and headaches shortly after occupying their homes or during the course of their occupancy.

Reports by Lawrence Berkley Laboratory, the National Center for Environmental Health, Dr. Stephen Smulski, the Sierra Club, HUD and other documents reviewed, give indication of the following:

a. Of the studies reviewed, persons interviewed, and test reports and data gleaned in preparation of our assessment, the following factors appear to be held in common:

   i. As temperature rises, the rate of release of formaldehyde increases.

   ii. As humidity rises, so does the release of formaldehyde.

   iii. Adequate ventilation is required to ex-filtrate formaldehyde released into the living area of the temporary housing units.

A review of the testimony of Mary DeVany before Congress gave indications that formaldehyde emissions double for every 12°F increase in temperature.

The FEMA temporary housing units were supposed to be constructed as per the minimum procurement specifications established by FEMA for Model Travel Trailers dated July 14, 2005.

The standards state that "the travel trailers being procured under this contract are for the purpose of providing temporary housing. The units are subjected to continuous road travel, multiple installation and deactivations, and various weather conditions. The standards shall not be considered restrictive in that the supplier may provide equal or better units considering that the competitive price and delivery requirement can be met."

CAST002417

The construction outfitting standards identify minimum square footage of living space, floor plan configuration, finishes, finishing and environmental living conditions necessary to provide emergency housing for disaster relief operations.   All exterior openings, such as windows, doors, drain pipes, etc…will be caulked with a clear, non-hardening waterproof sealant to prevent air and moisture penetration.

The units shall meet industry standards except where identified.

The specifications establish the minimum standards for emergency housing unit construction and outfitting to meet FEMA contract requirements.   "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."

## SECTION IX

## DISCUSSION OF CODES AND STANDARDS

There has been much discussion both in written reports and in depositions regarding which codes and standards are applicable to the manufacture, construction or set-up of the FEMA Temporary Housing Units purchased for the housing of victims from Hurricanes Katrina and Rita.  Certain documents and parties in the case at hand would lead us to believe the RVIA NFPA 1192-2005 Standard on Recreational Vehicles code would apply in this matter.  Other documents and parties would lead us to believe the ANSI A119.5 Recreational Park Trailer Standard 2005 Edition would apply.  Some documentation and application of emblems indicate the Americans with Disability Act (ADAAG) standards also apply to the Castanel housing unit.  There is language in the building codes, such as the New Orleans City Building Codes 2003, the International Building Code 2000, the International Residential Code 2000, ASHRAE Standards, ASCE Standards and other industry standards that would direct the use of these codes and standards to apply to the design, construction and installation of these FEMA THUs.  In this section of the Report, we will analyze the applicable codes and standards.

To address application of which codes and standards should be followed, we must first look to the intended use.  When designing, manufacturing or constructing a structure, the standard to be applied must begin with the intended use of the structure.  In this matter, the structure is a travel trailer or park model trailer.  To define the intended use, we must first look at the purpose or intended use of the travel trailer or park model trailer.  Appendix E, FEMA Model Travel Trailer Procurement Specifications Dated: July 14, 2005 should be the starting point of identifying the intended or end use of these units.

Under the General Section, page 1, the Specifications state, "Travel trailers being procured under this contract are for the purpose of providing temporary housing." These units are to be subjected to, among other things, continuous road travel and various weather conditions.  The Specifications go on to state the standards shall not be considered restrictive and are a minimum necessary to provide emergency housing. The end use of these units was not for recreation, camping, travel or seasonal use which partly defines a travel trailer or recreational park trailer.  Based on general knowledge, and information known to government officials and those involved in the recovery effort, these temporary housing units would probably be used for the Katrina and Rita victims for up to five years.  In his Report in FEMA

CAST002419

litigation, the Government's expert Michael K. Lindell, Ph. D., clearly spells out that FEMA and its predecessor had a long history of providing temporary housing to victims of natural disasters and that providing temporary housing for these victims for a year or more was not uncommon. Approximately half of the victims of the Florida hurricanes that devastated the Gulf Coast were still living in their travel trailers a year and a half later when Hurricane Katrina hit.

We need only look at the Recreation by Design's Owner's Information Manual on page 4 to note that the manufacturer informs the purchaser that the unit is designed for short-term camping and recreational use. This does not mean the manufacturer could not have engineered and constructed the unit for longer term use as required by the FEMA specifications, it just means that the manufacturer did not design and construct these units for long-term use.

Page 2 of the FEMA Specifications required that, "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship." To establish a superior grade quality of workmanship, there must be a standard to which the manufacturer has to compare its work. It has been implied that NFPA 1192-05 or the ANSI A119.5 standards are the gauge of the quality of workmanship. That position, at best, could only be applied to a very limited number of areas that are spelled out in those codes or standards. The majority of the construction specifications of these temporary housing units are not specifically spelled out in either of these codes or standards.

NFPA 1192-05 Standard on Recreational Vehicles, Section 1.3.2-Application, states that, "This standard shall not be applied as a stand-alone design specification or instruction manual." There are other criteria, codes and standards to be applied to these units that are not spelled out in this code.

ANSI A119.5 Recreation Park Trailer Standards 2005 Edition, Section 1-2.2 Limitations states, "this standard is not intended as a design specification or an instruction manual." This Standard is indicating other criteria, codes or standards are to be applied to these units.

It is clear that the FEMA Specifications and end use of the Castanel unit was for longer term full-time housing needs of hurricane victims and victims of future disasters. It is the opinion of this writer and our team that various building codes and standards apply to the design and construction of this temporary housing unit. Recreation by Design failed to fully comply with the following standards and codes:

CAST002420

A.   FEMA Model Travel Trailer Procurement Specifications Dated July 14, 2005

B.   NFPA 1192 Standard on Recreational Vehicles, 2005 Edition :
  a.  Section 1.3.2-Application

  b.  Section 3.3.3-Definition

  c.  Section4.1-Differing Standards

  d.  Section 5.8.1-Air Conditioning

  e.  Section 5.8.2.1-Air Conditioning Installation and Instructions

  f.  Section 7.1.6.4-Protective Requirements

  g.  Section 7.1.6.5-Protective Requirements

  h.  Section7.6.8.2-Other Vent Termination Requirements

  i.  Section A.1.-Explanatory Material

  j.  Section A1.3.1-Explanatory Material

  k.  Section A3.2.2-Authority Having Jurisdiction

C.   The Dometic Air Conditioning Unit Installation Instructions

D.   ANSI A119.5 Recreational Park Trailer Standard 2005 Edition

  a.  Section  1-1.1 Need for Standard

  b.  Section 1-2.1 Applicability

  c.  Section 1-2.2 Limitations

  d.  Section 1-2.3 Alternate materials, Equipment and Procedures

  e.  Section 1-3 Definitions:  Recreational Park Trailer

CAST002421

    f.  Section 5-1 General Construction Requirements

    g.  Section 5-2.4 Resistance to Elements

    h.  Section 5-2.5 Rodent Resistance

    i.  Section 5-3.6 Light and Ventilation

    j.  Section 5-3.6.1 Habitable Rooms

    k.  Section 5-3.6.2 Bathroom

E.    Americans with Disability Act (ADAAG) Standards

F.    ASHRAE 62.2-2004 Ventilation and Acceptable Indoor Air Quality in Low Rise Residential Buildings

G.    NFPA 90 B Standard for Installation of Warm Air Heating and Air Conditioning Systems

H.    The Manual if Steel Construction from the American Institute of Steel Construction

I.    The Timber Construction Manual from the American Institute of Timber Construction

J.    ASCE 7-05 Minimum Design Loads for Buildings and Other Structures

K.    The City of New Orleans Building Codes 2003

    a.  Section 101.2 Scope

    b.  Section 101.3 Intent

    c.  Section 107.2 Temporary Structures-Conformance

    d.  Chapter 4:  Prefabricated and Modular Buildings

e. Chapter 35

f. Chapter 36

L.     The International Residential Code 2000

a. Section R101.2 Scope

b. Section 101.3 Purpose

c. Section 105.8 Responsibility

d. Section R107. 2 Temporary Structure- Conformance

e. Section R202 Definitions:  Buildings, page 10

f. Section R202 Definitions:  Dwelling, page 12

g. Section R202 Definitions:  Dwelling Unit, page 12

h. Section R202 Definitions:  Habitable Space, page 14
i. Section R202 Definitions:  Label, page 15

j. Section R301.1 Design Criteria

k. Section R301.1.2 Engineered Design

l. Section R301.2 Climatic and Geographic Design Criteria

m. Section R301.2.1.1 Design Criteria

n. Section R703.1 Exterior Covering General

o. Section N1101.2 Energy Efficiency Compliance

p. Table N1101.2 Climate Zones

q. Section N1101.3 Materials and Equipment

r.   Section N1102.1 Thermal Performance Criteria

s.   Section N1102.1.1 Exterior Walls

t.   Table N1102.1 Minimum Thermal Performance

u.   Section N1102.1.2 Ceilings

v.   Section N1102.1.4 Floors

w.   Section N1102.1.10 Air Leakage

x.   Section N1103.3 Duct Insulation

y.   Section N1103.4 Duct Sealing

z.   Section M1601.3.1 Joints and Seams

aa. Section P2602.1 Waterproofing of Openings General

M.      HUD Publication "Durability By Design"

# SECTION X

# DISCUSSION OF RESULTS

As a result of observations made, components and systems reviewed, and testing performed of the THU, we have assessed there is enough information available to determine to a degree of probability or certainty whether or not the construction of the Castanel THU was made defective by the effects of, the assembly of the housing unit components, the air conditioning duct air leakage, the quality of workmanship employed, the use and placement of certain materials and failing to follow industry standards and codes.  The data presented in the body of this report supports the conclusions drawn and discussed in the "Conclusions" section below.

## SECTION XI

## CONCLUSIONS

Based upon observations, photographic documentation, our testing results, a review of documents provided to us, a review of testing data provided to us and other technical studies and reliance materials, the rendering of the following conclusions and statement of opinions are warranted regarding the Earline Castanel temporary housing unit:

A. The Recreation by Design unit was converted into a "temporary housing unit" (THU) per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005. Was the manufacturer required to conform to the building codes and standards applicable at the time of construction and installation?

Conclusion: Recreation by Design was required to follow at a minimum the FEMA specifications, the ANSI, NFPA, NEC and ASHRAE Standards. It is also our opinion the International Building Code, International Residential Code and the New Orleans Building Codes should have been followed along with other building standards outlined in this report.

B. Did the Recreation by Design comply with industry codes and standards such as NFPA, ANSI and state and local building codes?

Conclusion: No. Recreation by Design did not comply with the applicable codes and standards.

C. Was the Recreation by Design Castanel THU constructed for use in various weather conditions per the FEMA model travel trailer procurement specifications dated July 14, 2005?

Conclusion: The Castanel THU was not constructed for use in hot, humid climates nor cold climate conditions.

D. Did the Recreation by Design THU construction means, methods and materials utilized contribute to environmental living conditions that contributed to the increase of off-gassing by failing to properly seal windows, doors, plumbing pipes, etc. as required by the FEMA procurement specifications?

CAST002426

Conclusion:  Yes.  Recreation by Design did not construct a unit that would prevent water, air, heat and moisture from penetrating into the THU.

E. Did the jacking and blocking cause damage to the housing unit and what affect did it have on air and moisture infiltration into the wall, roof and floor system of the THU?

Conclusion:   Jacking and blocking caused the unit to flex creating openings around the windows allowing air, heat and moisture to enter the trailer.  We may opine further on this topic after test information is provided.

F. Did the quality of the workmanship during construction of the Castanel THU contribute to the increase of off-gassing in the walls, ceilings and floors and interior living area of the THU?

Conclusion:   Yes.  As noted in the report, less than superior quality workmanship caused moisture and air to have access to formaldehyde emitting materials.  The manufacturer failed to follow available standards.

G. Did the quality of workmanship of the air conditioning ductwork in the Castanel housing unit contribute to the entry of any formaldehyde off-gassing that may have been present in the wall, ceiling and floor cavities of the THU?

Conclusion:  Yes, the quality of workmanship caused the housing unit to operate under a negative air flow.  This sucked in hot moist air into the wall cavities, elements that increase formaldehyde off-gassing.

H. Are the vapor barriers of the Castanel THU placed in the recommended location for buildings located in the hot, humid climate zones?

Conclusion:  No. The vapor barrier on the wall is placed for frigid and cold climates – not humid climates.

I. What problems manifest when the vapor barrier of a building is placed on the cold side of walls, ceilings or floors of a building located in the hot, humid climate zone?

Conclusion:   Moisture is trapped, building materials deteriorate, mold

CAST002427

proliferates and formaldehyde off-gassing can increase.

J.  Was the Castanel THU constructed with formaldehyde emitting materials?

Conclusion:  Yes, per the documentation of Dr. Stephen Smulski.

K.  Were building materials that contained no or very low emitting formaldehyde readily available at the time the Castanel THU was manufactured?

Conclusion:  Yes.  We are aware of a number of products available and were ultra low or non-formaldehyde emitting products in 2005.

L.  Was the Recreation by Design THU occupied by Mr. Castanel constructed utilizing superior quality workmanship?

Conclusion:  No. The quality of workmanship documented is less than superior.  Some are as follows:

1.  Failure to seal the belly board;

2.  Failure to seal the penetrations;

3.  Failure to properly seal penetrations;

4.  Failure to install insulation properly;

5.  Failure to install the HVAC ducts properly;

6.  Failure to seal windows properly;

7.  Failure to insure jacking and blocking did not cause damage or openings in the envelope of the trailer; and

8.  Failure to properly maintain the trailer.

CAST002428

Conclusions drawn in this Report are based on observations and information available, known and declared at the date of the investigation and/or the time of the preparation of this report.  This Report is furnished as privileged and confidential to the addressee.  Release to any other company, concern or individual is solely the responsibility of the addressee.

With kindest regards,

Alexis Mallet, Jr., President

CAST002429

# SECTION XII

## ENCLOSURES

Enclosure 1:  FGS Digital Photographs
Enclosure 2:  FGS Infrared Thermographic Images
Enclosure 3:  Plans and Details by FGS / RCE of the FEMA CASTANEL THU
Enclosure 4:  LaGrange Consulting, L.L.C. Inspection Report
Enclosure 5:  Freyou, Moore and Associates - Structural Condition Assessment
Enclosure 6:  Report by W.D. Scott and Associates
Enclosure 7:  Affidavit of Stephen Smulski, Ph.D.
Enclosure 8:  Ritter Consulting Engineers' Report
Enclosure 9:  Recreation by Design Information Sheet
Enclosure 10:  HUD Part 3280.309-Health Notice on formaldehyde emissions
Enclosure 11:  Dometic Installation Instructions
Enclosure 12:  HUD Part 3280.103-Light and ventilation
Enclosure 13:  Recreation by Design Floor Plan-Model 33 PM Dated September 19, 2005
Enclosure 14: FEMA Model Travel Trailer Procurement Specifications Dated July 14, 2005
Enclosure 15:  RV Business Article Dated January 21, 2010
Enclosure 16:  FEMA Photo Library: Photograph by Keith Riggs-ADA FEMA Units
Enclosure 17: Resume' of Alexis Mallet, Jr.
Enclosure 18: List of Trial and Deposition Testimony
Enclosure 19: First General Services Fee Schedule

**CAST002430**