# Transcript of the Testimony of
# **Stephen Smulski, Ph.D.**

**Date taken: February 19, 2010**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)**

*****Note*****

All **electronic deposition & exhibit files** are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a **Username** and **Password**.

**Professional Shorthand Reporters, Inc.**

**Phone: 504-529-5255**
**Fax: 504-529-5257**
**Email: reporters@psrdocs.com**
**Internet: www.psrdocs.com**



is that something you looked at after the time you rendered your report?

A. I had not seen their final reports at the time I wrote my report. We had discussed things at the job site subsequent to that, but I had not seen their final reports.

Q. Had you seen any draft reports or e-mail correspondence regarding the content of what would be in their reports?

A. No.

Q. So at the time you rendered your report, January 9, 2010, is the date I have for your report, the date it was signed, this information was stuff you reviewed after that date; is that correct?

A. Their final reports, yes.

Q. Did you have conversations with all of these individuals prior to you rendering your report?

A. Not with all of them, but I have spoken with Ervin Ritter, Al Mallet, Dave Moore, Paul LeGrange, Bill Scott.

Q. When did you speak with these people? At the same time or different

occasions?

A. Some of them I spoke to at the job site, some of them I spoke to subsequent to that.

Q. What did you discuss with Bill Scott?

A. Just basically I needed his results to include as part of my report.

Q. I do see you have some information it looks like you obtained from Bill Scott in your report.

So you obtained that from Bill Scott prior to you rendering your report, correct?

A. Yes.

Q. How about Ervin Ritter?

A. I don't recall the content of the, I mean the specific things we talked about. His expertise was in the air-conditioning system and, obviously, we talked about that.

Q. And I know you said you don't remember specifics, but is there anything about the air-conditioning system you remember discussing with Mr. Ritter?

A. The thing that was most important

to me was that it was a recirculating system.

Q. Did you discuss anything regarding airflows or pressure differentials with Mr. Ritter?

A. I don't recall.

Q. How about Mr. LaGrange, what did you discuss with him?

A. Again, I contacted Paul to obtain the volume of the trailer and the air exchange rate so that I could incorporate them into my report.

Q. And that was done prior to your report being finalized?

A. Yes.

Q. And you spoke to Al Mallet. What did you speak to Mr. Mallet about?

A. We talked about the general construction of the trailer.

Q. And what do you mean by "general construction of the trailer"?

A. What are the component parts, how are they put together.

Q. Were you providing information more to him or was he providing information

to you?

A. I don't recall. It was simply a back-and-forth conversation.

Q. I see certain e-mails you have with some of these individuals, such as Paul LeGrange, where you are talking about the volume of the trailer and you included those materials in your additional folder here, correct?

A. Yes.

Q. Here is another set of handwritten notes dated January 13, 2010. Are those your notes from the inspection of the unit?

A. Yes, these are the field notes I made the day of the inspection.

Q. I would like to go ahead and make a copy of these and have them attached. We will go ahead and mark those as Smulski Exhibit 3.

I see a couple of sheets here that appear to be from William Scott regarding sampling data. Is that what that information is?

A. Yes. These are Mr. Scott's test results on the Castanel unit.

Q. And that's the information that you relied upon in your report?

A. I included it in my report, yes.

Q. I see here that we have a group of diagrams put together marked "Ritter Consulting Engineers, LTD," probably about seven or eight pages without counting them all.

Is this information you received from Ervin Ritter's office regarding the Castanel unit?

A. Yes, these are schematics that they put together based on their inspection of the unit.

Q. When did you receive those schematics?

A. I don't know. They are dated 1-18-2010, so it had to be that day or later.

Q. You received those prior to rendering your report?

A. I don't know. I don't remember.

Q. It is not something you included in your reliance materials as something you actively relied upon in rendering your

report, correct?

A. Not that I recall. They are background materials, instant reference materials for me if I need to know a specific detail about the trailer, that sort of thing.

Q. I'm going to mark this as Smulski Exhibit 4. It is schematics or diagrams from Ritter Consulting Engineers. It says, "FEMA-CASTANEL" on the legend, and it is 12 pages long.

And then the other schematic, is this one that you received from Mr. Ritter's office or do you remember receiving that particular schematic?

A. Yes. That came from one of Mr. Ritter's employees who was at the job site on the 13th.

Q. It was provided to you on the 13th?

A. That is my recollection, yes.

Q. That is one page, I will mark it as Smulski Exhibit 5. It's in color.

The calculation shows 200 feet of tile, 105 feet of carpet, 87 feet of carpet

River matter?

A. It would be -- is Fleetwood not represented on here?

Actually, there would be three then. You are right. The Fleetwood deposition that took place sometime in, I think, November -- October or November 2009; the Forest River deposition, which took place a couple of weeks ago, after I wrote this report; and then two weeks ago, I actually testified at trial in New Jersey.

Q. And what was that testimony?

A. I was asked to testify about engineered wood flooring. The case had been brought by an individual who had purchased a very expensive condominium and claimed he was a victim of bait and switch.

Q. Your testimony in that case was not related to formaldehyde?

A. No. It was simply did he get the wood floor that he thought he was getting.

Q. Outside of the cases we talked about earlier with the class certification, Gulf Stream, Fleetwood, Forest River and you said you have recently been retained in the

Keystone matter, are there any additional cases in which you have rendered an opinion regarding formaldehyde off-gassing from wood products?

A. No.

Q. I'm looking at your list of deposition testimony in other matters. None of those involve formaldehyde-related issues, correct?

A. Yes, that's true.

Q. Looking at your report dated January 29, 2010, if you would, briefly tell me about your training and education.

A. I have a bachelor of science in wood science and technology from the University of Massachusetts at Amherst, a master's degree in environmental and resource engineering from the State University of New York, and a Ph.D. in wood science and forest products from Virginia Tech at Blacksburg.

Q. In this case, you have been retained as a consulting wood scientist, correct?

A. Yes.

Q. Has anything changed in your education and training since your most recent testimony in the Forest River matter?

A. Not materially, no.

Q. Any additional certifications or seminars or anything you have been to where you received any additional certification since the Forest River matter?

A. No.

Q. Do you own any particular licenses regarding your wood science?

A. I do not. There is no license required in our profession.

Q. Is there any type of governing board for wood scientists?

A. There are two professional societies in the United States. One is called the Society of Wood Science and Technology. One of the things that that organization does is accredit schools, that is, colleges and universities that have wood science and technology programs. It also publishes a peer-reviewed journal called "Wood and Fiber Science."

There is a second professional

the deposition for Mrs. Castanel where she discussed moving out around March of 2007?

A. If it is there, I don't remember.

Q. Does Mrs. Castanel's date of occupancy that you have listed here have any impact on your report, whether it was a shorter or longer duration of time from what you have listed in your report?

MR. PINEDO:

Objection, form.

THE WITNESS:

No, because, in part, I am just presenting this as factual background. If you look at all the dates, it appears she was in the trailer for at least a year and perhaps for as long as 17 months, depending on what the actual move-in, move-out dates were.

EXAMINATION BY MR. MULCAHY:

Q. You are not a medical doctor, correct?

A. That's correct.

Q. And since your last deposition, you haven't had any training in the field of medicine, correct?

A. Some of the photos I have gone through, yes.

Q. I think I asked you before, you haven't spoken to Mrs. Castanel personally, have you?

MR. PINEDO:

Objection, form.

THE WITNESS:

That's correct, I have not.

EXAMINATION BY MR. MULCAHY:

Q. Your report dated January 29, 2010, this encompasses all of your opinions regarding your work in the Castanel matter; is that correct?

MR. PINEDO:

Objection, form.

THE WITNESS:

Yes, it provides my opinions as well as the factual and historic background regarding formaldehyde release from wood composite products.

EXAMINATION BY MR. MULCAHY:

Q. Other than obtaining the air exchange rate from Mr. LaGrange, did you perform any of your own calculations

regarding the air exchange rate?

A. No.

Q. Did you do any particular types of tests when you did the inspection of the Castanel unit?

A. I was not allowed to do anything that was determined to be a destructive test. So my inventory of the composite wood products used in the construction of that trailer is based on visual examination, which also included looking at things with a hand lens as well.

Q. As far as any moisture meters, you didn't utilize any type of equipment other that the visual lens to assist you in your inspection, correct?

A. Correct. Moisture meter would actually be a quasi-destructive test because of the pins that have to be inserted in the material.

Q. What were you asked to do in this case, the Castanel case?

A. My role was two parts. First was to make an inventory of the composite wood products that were used in constructing the

Q. Item 15, you talk about in looking over the Recreation by Design unit, that you did not see any stickers regarding the use of composite products in the unit, correct?

A. Composite wood products made with urea-formaldehyde adhesive that off-gas formaldehyde, yes. I found no stickers.

Q. You are not a warnings expert, are you?

A. No.

Q. Nor a human factors expert?

A. No.

Q. This is just an observation that you made during your visual inspection, correct?

A. It is and it is based on the fact that Recreation by Design had in its possession MSDS sheets from the manufacturers of composite wood products indicating they are made from urea-formaldehyde adhesive that off-gas urea-formaldehyde adhesive, and that information has not been passed along to ultimately the users of these trailers and, therefore, the users of these trailers

cannot make an informed decision about formaldehyde gas in the air because they are not aware of it.

Q. You have never written a warning for formaldehyde gas emissions, have you?

A. No, I haven't.

Q. Any warning regarding the use of formaldehyde products?

MR. PINEDO:

Objection, form.

THE WITNESS:

No, I haven't.

EXAMINATION BY MR. MULCAHY:

Q. So under Item 15, during the inspection of the unit, you did not see any sticker or warning, for lack of a better term, regarding formaldehyde products used in the Castanel unit, correct?

A. That's correct, I was not able to find one inside the unit.

Q. And you also read the owner's manual?

A. Yes.

Q. Are you aware of any regulation requiring formaldehyde notices in travel

trailers that were manufactured in 2005?

A. I'm not.

Q. In Item 17, you comment on the owner's manual, again, with the statement in the owner's manual that "Recreational vehicle has been designed for short-term camping and recreational use, it was not engineered to be used as a permanent dwelling."

What was your point for including that statement in your report?

A. Having followed natural disasters in the media and their aftermath, it is clear that when you have a natural disaster that displaces large numbers of people, such as hurricane, flood, earthquake, whatever it may be, that it routinely takes months, and in many cases, years to rebuild and reintroduce people into the area. It is common knowledge that as a result -- as a result of that, it is common knowledge that it takes years to rebuild.

And so in providing these travel trailers, Recreation by Design, FEMA and all of the other travel trailer manufacturers

had to know that people were not going to be living in these for short-term camping and recreational use, that they were going to be in these trailers for months and years and that these trailers were, in fact, temporary housing for them.

Q. Have you ever worked in the travel trailer business?

A. I have not.

Q. Have you ever manufactured a travel trailer home?

A. I have not.

Q. Have you ever worked for FEMA?

A. No.

Q. Have you ever worked for any organization responding to a natural disaster?

A. No.

Q. Have you ever done an analysis of how long people reside in temporary dwellings after natural disasters?

MR. PINEDO:

Objection, form.

THE WITNESS:

I have done no analysis, but

Q. Does a cooler temperature of 60 degrees reduce the amount of off-gassing of formaldehyde materials?

A. The relationship between temperature and off-gassing is that, as temperature increases, formaldehyde off-gassing increases and the relationship is exponential.

Q. Your comment that she spent 17 months in her trailer, though, that's just based upon your review of those documents we looked at earlier as to when you think she may have moved out of the unit, correct?

A. Yes. That is based on the March 2006 to August 2007.

MR. MULCAHY:

Why don't we take a break. We have been going about an hour and a half.

(Recess.)

EXAMINATION BY MR. MULCAHY:

Q. In Item 19, you talk about the air exchange rate that you said you obtained from Paul LeGrange, I think you said, correct?

A. Yes.

described as short-term camping and recreational use.

EXAMINATION BY MR. MULCAHY:

Q. As set forth in the owner's manual that you have quoted in Item 17?

A. Yes.

Q. Regarding Item 20, do you have any knowledge regarding if the Castanel unit had any twisting or bending of the frame?

A. I do not.

Q. Were you there for the jacking test?

A. No.

Q. Item 21, you're discussing the air quality inside the walls and ceiling cavities. Did you test the air quality of the walls and ceiling cavities in the Castanel unit?

MR. PINEDO:

Objection, form.

THE WITNESS:

I did no testing of air quality. What this paragraph is explaining are the building science principles by which air moves in and out of and inside of

structures.

EXAMINATION BY MR. MULCAHY:

Q. Have you ever made an in-wall and in-ceiling test before?

A. Have I done those? No.

Q. You said you reviewed the air quality test results of Bill Scott and Workplace Hygiene, correct?

A. Yes, Tony Watson.

Q. Tony Watson. It's your understanding that Bill Scott did not perform any in-wall or in-ceiling formaldehyde testing, correct?

A. Correct.

Q. Nor Tony Watson?

A. My understanding is they simply placed their devices in the interior of the living space.

Q. In Item 23, you discuss the CDC results in the reports of December 2007, January 2008, and you said it is likely that some of the other travel trailers were manufactured by Recreation by Design, talking about the term "others" in quotes.

You don't have any knowledge if

your action level?

A. It's not my action level. That is outside of my expertise. I'm simply citing what the Centers for Disease Control --

Q. But you said what you think of as an action level.

A. I am merely repeating what the Centers for Disease Control said.

Q. What did the Castanel unit test at?

A. Bill Scott, January 27, 2010, four years after the trailer was manufactured and lived in, measured it at 48 parts per billion.

I think the relevance and importance of that measurement is that the trailer is four years old at this point, it is unoccupied, so there is no contribution to that formaldehyde level from any of the possessions of the occupant or any of the activities of the occupant, and yet, it is still reading 48 parts per billion.

Q. And you have Bill Scott's temperature was 63 to 65 degrees with relative humidity of 70 to 77 percent,

correct?

A. Yes. And this is essentially the same readings that Tom Watson got.

Q. You understand that the unit had been heated up in order to get it to a warmer temperature based upon the environmental conditions that existed in January 2010?

MR. PINEDO:

Objection, form.

THE WITNESS:

I do. In looking at those numbers, those are typical living conditions, temperatures in the 60s.

EXAMINATION BY MR. MULCAHY:

Q. Did you review any Bureau Veritas data as part of your comments on the CDC results?

A. I'm sorry, I missed the first part of that question.

Q. Did you review any Bureau Veritas testing results, data?

A. No.

Q. You reviewed the CDC's, Bill Scott's testing results --

A. And Mr. Watson's.

Q. And Mr. Watson's. Have you reviewed the Bureau Veritas results at any time, not specifically as to the Castanel matter, but just any other time have you reviewed those results?

A. I recall seeing that name Bureau Veritas somewhere, but I have not reviewed the results produced by them, no.

Q. And the only ones you have taken upon yourself to review would have been the CDC results outside of the actual litigation, the trailers in litigation?

MR. PINEDO:

Objection, form.

EXAMINATION BY MR. MULCAHY:

Q. Or in this case, the Castanel unit?

A. I saw the results produced by the CDC in its report, Mr. Scott's results, Mr. Watson's results.

Q. And you mentioned that the Castanel unit was tested about four years after it was manufactured. You are not doing any calculation in your report to try

to estimate historic formaldehyde levels, are you?

A. No, I'm not.

Q. In Item 27, you talk about the Lawrence Berkeley National Laboratory measured formaldehyde results. You say that "Although they could not examine a RBD travel trailer, the four trailers examined were constructed of particleboard, medium density fiberboard and hardwood plywood in similar amounts as used in the Earline Castanel unit."

Do you know if those units had hardwood kitchen tables?

A. I don't. I don't recall. But it's in the Lawrence Berkeley report.

Q. Do you know if those units had hardwood kitchen chairs?

A. I don't.

Q. Do you know if those units had cabinet doors covered on all edges with some type of vinyl overlay?

A. I don't, but the details of each of those four trailers that the Berkeley lab examined are in the Berkeley lab report. I

"Alternative Resin Binders for Particleboard, Medium Density Fiberboard and Wheatboard" supports my position that these are what are now being touted as the "green" building materials. This particular document is written by the Global Health and Safety Initiative.

Q. Do you know when those types of materials became available in quantity?

A. Products made with phenol formaldehyde adhesive have been in use, widespread use since the 1950s. Isocyanate adhesives have been around for over 20 years. Melamine and formaldehyde adhesives have been around for 40 or 50 years. Soybean-based adhesives have been around about 20 years, but really, only used in commercial products for about the last ten.

So all of these alternative adhesives were in use at the time the Castanel trailer was manufactured, and there were companies producing hardwood, plywood, particleboard and medium density fiberboard with one or more of these adhesives at that time.

Q. And you have done research regarding companies that were producing those materials in 2005?

A. I have.

Q. Is that part of your reliance materials?

A. It is.

Q. Do you know in what quantities those companies were producing those materials in 2005?

A. I don't. But one of the manufacturers is Columbia Forest Products, which touts itself as the largest manufacturer of hardwood veneer and plywood in North America and has nine manufacturing plants.

Q. Did you contact Columbia Forest Products to inquire as to the availability of these types of materials back in 2005?

A. I didn't, but the document you are looking at right now shows that at least four of Columbia Forest Products' manufacturing plants in 2005, they were manufacturing hardwood plywood in 1/8th-inch thickness, which is the thickness used for

walls and ceilings in the travel trailers, with what are called no-added-urea-formaldehyde-formaldehyde adhesives.

Q. Correct, but you have not contacted them to find out what quantity of these types of materials were available, correct?

A. I haven't. My expectation is that --

Q. That's fine. You answered my question. Nor the cost?

A. I haven't.

MR. PINEDO:

Were you finished with your answer, Dr. Smulski?

THE WITNESS:

Yes.

EXAMINATION BY MR. MULCAHY:

Q. Do you know if any of these materials were utilized in travel trailer construction in 2005?

A. I do not.

Q. Did you research back any further than 2005 into the availability of these

2010?

A. I'm saying as of when these alternative adhesives began being used. In this case, 2005, and most of these go back long before 2005.

Q. Did you do any price analysis of those materials back in 2005?

A. No. I never deal with price in my profession. That is somebody else's area, not mine.

Q. I'm looking at an e-mail you provided as part of your reliance materials dated November 4, 2009. Your document number is 00274, or CAST-SMULSKI 274. Looks like a Chris Surak e-mailed you regarding a particular brand; is that correct?

MR. PINEDO:

I object to the extent this was covered in the last deposition.

THE WITNESS:

Right. I had contacted the Composite Panel Association, and Mr. Surak of the Composite Panel Association was trying to assist me in determining what actual products were available. He refers