UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCT LIABILITY | * | SECTION "N-5" |
| LITIGATION | * | |
| | * | JUDGE ENGELHARDT |
| | * | |
| THIS DOCUMENT RELATES TO | * | MAG. JUDGE CHASEZ |
| *EARLINE CASTANEL, ET AL* | * | |
| *v. RECREATION BY DESIGN, LLC* | * | |
| *ET AL, DOCKET NO. 09-3251* | * | |

*************************************************************************

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE*
TO EXCLUDE OPINIONS AND TESTIMONY OF PAUL LAGRANGE

**NOW INTO COURT,** through undersigned counsel, comes defendant, Recreation By

Design, LLC ("RBD"), who offers the following memorandum in support of its Motion *in*

*Limine* to Exclude the Opinions and Testimony of Paul LaGrange:

### BACKGROUND[1]

As part of plaintiff's efforts to address construction and design issues related to the

Castanel travel trailer[2], plaintiff's expert witness Al Mallet, Jr. of First General Services of

Lafayette, Louisiana, retained Paul LaGrange of LaGrange Consulting, LLC, who examined and

_____

[1] As the Court and parties are familiar with the factual/procedural background of this matter, reference is made here to the background as set forth in Recreation By Design, LLC's Memorandum in Support of Motion for Summary Judgment Regarding Prescription (Rec. Doc. 9722).

[2] Throughout this memorandum, RBD refers to plaintiff's trailer as a "FEMA unit" and/or "Emergency Housing Unit" (EHU) and/or "Temporary Housing Unit" ("THU") interchangeably.

tested the subject travel trailer[3] on January 15th, 2010.[4]  Specifically, LaGrange Consulting was hired by Mallet to perform the following services: 1) Perform blower door (building leakage) test; 2) Perform duct blaster (duct leakage) tests and inspect inside of duct work with a borescope; 3) Perform infrared thermal imaging scans of the THU; 4) Offer explanations of the interactions between the cooling systems and the cavities, attic, and crawlspace of the trailer; and 5) Summarize the findings.[5]

At the outset of his written report, LaGrange offers an "overview" of his test results and observations.[6]  He notes:

> According to the FEMA procurement document … this building was built "for the purpose of providing temporary housing" for its occupants.  The causes for the overall poor performance are interactive.  First, the cooling systems provided no fresh outdoor air intake to dilute the pollutants within the THU.  Secondly, the THU's thermal envelope was not well air sealed.  Thirdly the air and vapor barriers were located in the wrong location of the assemblies so air leaks allowed humidity, dust, and other contaminants into the THU living area, especially when the cooling system was running.  […].  The following outlines our test results and observations: 1) This building was ordered by FEMA and was not built to meet code; 2) The cooling system and duct work were inadequately designed and installed; 3) Air sealing was incomplete and allowed air leakage; and 4) Based on the infrared scans, insulation was not properly installed.[7]

As will be demonstrated below, LaGrange's proffered testimony in this case fails to satisfy the strictures of Federal Rule of Evidence 702 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[8]  LaGrange's opinions must be excluded because he is not qualified to

---

[3] Throughout this memorandum, RBD refers to plaintiff's travel trailer as a "FEMA unit" and/or "Emergency Housing Unit" ("EHU") and/or "Temporary Housing Unit" ("THU") interchangeably.
[4] *See* LaGrange's Expert Report, dated January, 2010, attached hereto as Exhibit "A" at p. 3.
[5] Ex. A at p. 3.
[6] Ex. A at p. 4.
[7] Ex. A at p. 4.
[8] 509 US. 579, 598, 113 S.Ct.2786, 125 L.Ed.2d 469 (1993).  For a more detailed review of relevant statutes and case law regarding the admissibility of expert testimony, please see RBD's Memorandum in Support of Defendant's Motion *in Limine* to Exclude Opinions and Testimony of Ervin Ritter, P.E.

testify regarding the issues for which he is offered.   Moreover, LaGrange's opinions are inadmissible because they are not the product of reliable scientific methodology.   Finally, LaGrange's opinions will not assist the jury to understand or determine a fact in issue.   Even if LaGrange's testimony *could* satisfy the threshold requirements of Rule 702 (which it cannot), his opinions should nevertheless be excluded under Federal Rule of Evidence 403 because they are duplicative, prejudicial to RBD, and will only serve to mislead and confuse the jury.

## ARGUMENT AND AUTHORITIES

## I.   ADMISSIBILITY REQUIREMENTS FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 gives a district court considerable discretion to admit or exclude expert testimony.[9]   Rule 702 provides that an expert witness "qualified … by knowledge, skill, experience, training, or education" may testify when scientific, technical, or other specialized knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue."[10]   For expert testimony to be admissible, Rule 702 requires that: (1) the testimony be based on sufficient facts or data; (2) the testimony be the product of reliable principles and methods; and (3) the witness apply the principles and methods reliably to the facts of the case.[11]   Plaintiff, as proponent of the expert evidence, bears the burden of demonstrating its admissibility.[12]   Defendants do not have the burden of demonstrating its inadmissibility.[13]

---

[9] *See General Electric Co. v. Joiner*, 522 U.S. 136, 151 fn. 1, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).
[10]  Fed.R.Evid. 702.
[11] *Id*.
[12] *See, e.g., Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002); *see also Daubert*, 509 U.S. at 592 n.10.
[13] *See Rieger v. Orlor, Inc.*, 427  F.Supp.2d  99, 102 (D. Conn. 2006); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

In *Daubert*, the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper at the outset to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[14]  The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's report is valid.[15]  The goal is to exclude expert testimony based merely on subjective belief or unsupported speculation.[16]  In addition, the party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[17]  To satisfy the relevancy requirement, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence or determine a fact in issue.[18]  This "helpfulness" standard of Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."[19]

Thus, trial courts must engage in a rigorous three-part analysis under Rule 702 to determine the admissibility of expert testimony and consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in

---

[14] 509 US. 579, 598, 113 S.Ct.2786, 125 L.Ed.2d 469 (1993) (emphasis added); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony based on technical or specialized knowledge).
[15] *See Daubert*, 509 U.S. at 593.
[16] *Id*. at 590.
[17] *See Moore*, 151 F.3d at 276.
[18] *Daubert* at 591.
[19] *Daubert* at 591-92 (internal quotations omitted).

issue.[20]   While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the court must take care not to conflate them.[21]

It should be noted that *Daubert* carefully distinguishes between the threshold reliability inquiry that plaintiff must satisfy and the role of cross-examination.  As the Supreme Court stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.  These conventional devices … are the appropriate safeguards where the basis of scientific testimony ***meets the standards*** of Rule 702."[22]   As the highlighted language shows, plaintiff must first satisfy the burden of demonstrating that the proffered evidence is admissible.[23]   A proposed expert witness, therefore, must first be sufficiently qualified to testify on the issues for which he is offered.[24]   Moreover, the expert's opinion must be based on reliable methodology and "fit" the facts of the case before the opinion may have the privilege of being assailed by cross-examination.[25]

Finally, even if LaGrange's proffered testimony *could* survive this Court's threshold scrutiny under Rule 702 (which it cannot), his opinions would nevertheless be subject to further review and preclusion under Rule 403.[26]   Rule 403 permits a district judge to exclude relevant

---

[20] *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589).

[21] *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003).

[22] *Daubert* at 595 (emphasis added).

[23] *See, e.g., McLendon v. Georgia Kaolin, Co., Inc.*, 841 F.Supp. 415, 418 (M.D. Ga. 1994) ("these devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702").

[24] *See Harcros*, 158 F.3d at 562 (citing *Daubert* at 589).

[25] *See Porter v. Whitehall Labs*, 791 F.Supp. 1335, 1345, 1345 n. 10 (S.D. Ind. 1992) (emphasis in original), *aff'd*, 9 F.3d 607 (7th Cir. 1993).

[26] *See, e.g., Daubert*, 509 U.S. at 595; *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996).

evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[27]   As the *Daubert* court correctly noted, "[e]xpert evidence can be both powerful and quite misleading—because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than lay witnesses."[28]   To this end, an expert opinion's "lack of reliable support may render it more prejudicial that probative, making it inadmissible under [Rule] 403."[29]

Here, LaGrange's methodology does not analytically prove the hypotheses and conclusions in his expert report.  Additionally, many of his opinions are far outside the scope of his expertise. LaGrange's opinions regarding air quality and the applicability of building codes to the Castanel unit are irrelevant to the ultimate issues to be decided in this case.  As such, his opinions should be excluded because they will not assist the jury to understand or determine a fact in issue.  Even if LaGrange's testimony *was* relevant, it should be excluded as duplicative, and more prejudicial than probative under Rule 403.

## II.   LAGRANGE'S OPINIONS ARE OUTSIDE THE SCOPE OF HIS EXPERTISE

A proposed expert witness must first be qualified to testify regarding the issue for which he is offered.[30]   Here, LaGrange styles himself as a "building performance consultant."[31] Although he does not hold a degree in that specialty, LaGrange offers numerous opinions related

---

[27] Fed. R. Evid. 403.
[28] *Daubert*, 509 U.S. at 595; *accord Brock*, 94 F.3d at 226.
[29] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).
[30] *See U.S. v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004).
[31] Selected pages of the deposition transcript of Paul LaGrange, dated February 18, 2010, are hereby attached as Exhibit "B."  *See* Ex. B at p. 30.

to the field of "building science."[32]   When asked to define these areas of expertise, LaGrange stated that:

> Building science is the study and the practice of the interactions of a building's assembly, for instance, how a floor is air sealed or insulated, the walls, how the windows are connected to the walls.  Same thing with the roof line and the ceiling line.   It also looks at the heating/cooling systems, lighting, domestic water heating, proper installation and insulation, those type of dynamics and how they affect each other.[33]

LaGrange is not an architect, engineer, certified industrial hygienist, or a toxicologist.[34]  He has never been a code enforcement officer for any jurisdiction, nor has he ever been a building inspector.[35] Moreover, LaGrange is not a "Certified Indoor Air Quality Specialist,"[36] and he has never designed or constructed a travel trailer[37] or an HVAC system for a travel trailer.[38]

## A. LaGrange's Opinions Regarding Health Effects are Outside the Scope of his Expertise

In spite of the fact that he is neither a physician nor an industrial hygienist, LaGrange makes numerous references in his written report and deposition testimony regarding the "air quality" of the subject unit and how it impacts human health.[39]   He even goes so far as to compare the subject trailer's thermal envelope and air barrier to "the human body"[40] and opines on the alleged adverse health effects that "contaminated air" can cause to humans: "[i]ndoor air can be full of contaminants such as cleaning chemicals fumes, dust, allergens, and moisture.

---

[32] Ex. B at pp. 30-31.
[33] Ex. B at pp. 60-61 (*sic*).
[34] Ex. B at p. 37.
[35] Ex. B at pp. 50, 52-53.
[36] Ex. B at p. 75.
[37] Ex. B at p. 88.
[38] Ex. B at pp. 62-63.
[39] *See, e.g.*, Ex. A at pp. 38, 55; *see also* Ex. B at pp. 16-17.
[40] Ex. A at p. 38 ("Just like the human body, it is not suitable to bring in air from every uncontrolled crack and crevice in the thermal envelope and air barrier.").

While some people may not be sensitive to these pollutants, the long term effects are not beneficial to our overall health."[41]   Even if the existence of these alleged "contaminants" were relevant to the issues in this lawsuit (which they are not),[42] LaGrange is in no way qualified under Rule 702 to offer opinions regarding health issues.

In his written report, LaGrange also includes a graphic chart to support his contentions that excessive moisture in the air is harmful to human health.[43]   The accompanying text notes that, "[n]umerous studies done by ASHRAE and other indoor air quality experts, suggest an optimum relative humidity (Rh) range of 45 to 55%.  Too much or too little moisture can cause a variety of health threats and illnesses."[44]   Accordingly, his opinion regarding health effects is well outside the scope of any topic that LaGrange might be qualified to discuss.  As such, LaGrange's testimony regarding health effects must be excluded under Rule 403.

**B. LaGrange's Opinions Regarding Engineering Principles are Outside the Scope of his Expertise**

A significant portion of LaGrange's deposition testimony was spent rehashing the opinions and testimony of Ervin L. Ritter, P.E.[45], presumably as an attempt by plaintiff's counsel to rehabilitate the discrepancy in their calculation of air leakage rates and Ritter's methodology.[46]  This testimony should be excluded because, as a non-engineer, LaGrange is not qualified to offer expert testimony regarding Ritter's tests or methodology.  Indeed, this fact was confirmed by Alexis Mallet, the so-called "coordinator" for plaintiff's construction/design expert

---

[41] Ex. A at p. 38.
[42] *See* § III(A), *infra*.
[43] Ex. A at p. 45.
[44] Ex. A at p. 45.
[45] RBD addresses the inadmissibility of Ritter's testimony in its Memorandum in Support of Defendant's Motion *in Limine* to Exclude the Opinions and Testimony of Ervin L. Ritter.
[46] *See* Ex. B at pp. 231-246, 252-258.

witnesses.  At his deposition, Mallet stated that "[a]nd because I am not allowed by licensing laws to perform calculations, engineering-type calculations, so where there is the potential for the need of that, I bring in Mr. Ritter or Mr. Moore or Mr. Hicks or one of my other engineers that I work with on metallurgy or soil or areas of that nature."[47]  This limitation, however, did not prevent LaGrange from opining as to Ritter's tests and methodology:

Q:    Did Ervin Ritter also do an analysis of air leakage?
A:    No, sir, he did not.
Q:    Did Ervin Ritter do an analysis of duct leakage?
A:    He did an analysis of airflow which you can interpret into duct leakage.
Q:    Did you do an analysis of duct leakage?
A:    I did.  Through the duct blaster.
Q:    Did you find that 51 percent of the air flowing through the system was leaking out of the ductwork?
A:    I did not, no, sir.  I found something less than that.
Q:    What did you find?
A:    Let me refer to my report.  Mine was in the mid 30's.  I got a total duct leakage of 34 percent of the machine's rated capacity as leakage.
Q:    And did Ervin Ritter's result—did his test show 51 percent of duct leakage?
A:    Yes, sir, it did.
Q:    How do you account for the difference between your test that showed 34 percent duct leakage and Ervin Ritter's test results which showed 51 percent duct leakage? […].
A:    They were measured at different pressures.  The duct blaster measures at a pressure of negative 25 Pascals and Ervin's pressures were measured at the actual static pressure that the fan created under its everyday normal use.
Q:    Which was what?
A:    I would presume it to be half an inch of static pressure, *but that's a presumption on my part* because that's what most air condition manufacturers state is the external static pressure is the half inch of water column.[48]

Although LaGrange lacks the requisite knowledge and qualifications to interpret Ritter's test results and methodology, plaintiff's counsel persisted with his attempt to rehabilitate Ritter's methods:

---

[47] Selected pages of the deposition transcript of Alexis Mallet, Jr., dated March 2, 2010, are attached hereto as Exhibit "C."  *See* Ex. C at p. 199 (emphasis added).
[48] Ex. B at pp. 252-254.

Q: Did that appear to you to be an issue prior to reading the deposition of Mr. Ritter the adequacy of those airflow testing procedures that he had employed?

A: No, sir.  I didn't see any issue with the way he measured the airflow nor the accuracy of the test.

Q: Did I ask you to look for an article that discussed the manner in which he did the airflow testing or would relate to using a bag or an extension to do an airflow test?

A: You did.  It was an article I read back in 2002 and I remembered the magazine.  I went back online and downloaded it yesterday.

Q: And was it put on a disc that you gave me this morning called "Paul LaGrange Additional Article 2-18-10?"

A: Yes, sir.  […].

Q: And the article that you have put on this disc, […], does that describe the methodology for using a garbage bag?

A: It does.

Q: And it uses the methodology of the garbage bag to determine the airflow on the supply side?

A: Supply and return side.  You can do it either way.

Q: But the basic concept of the garbage bag is functioning as an extension to the ductwork?

A: It functions as an extension to the ductwork but it's a known size so you can do all your calculations based on the cubic volume of that bag or the cubic volume of the device that Ervin created.[49]

[…]

Q: And explain for me briefly how Ervin Ritter did that.

A: He created a box and that was fit over the return section only of the machine in the ceiling and he extended that box down so he was able to measure the air as it was going into the box before it went into the piece of equipment. […].

Q: Do you likewise consider that an accurate method for measuring the airflow on the return side where the individual creates their own box to measure the airflow?

A: Yes, sir.  It's accurate.

Q: Is that something, the apparatus that Ervin Ritter used, is that analogous or does that relate in any way to the methodology that was mentioned in this additional article that you brought to us today on a disc?

A: It's similar in respect that we're trying to measure the amount of air that's being drawn into the machine.  What the article refers to is actually taking an inflated garbage bag of a known size and putting it up to the return where the air from the machine is actually being drawn into the air condition equipment while it's running and time how long it takes for all the air to be removed from that garbage bag into the system.

In the case what Ervin did was instead of having a garbage bag of known size, he actually took a device and actually extended the ductwork down lower where he

---

[49] Ex. B. at pp. 237-238, 240.

> could measure the amount of air that was going through that return duct as it was entering the machine, so the approach is similar, except for the fact that, you know, Ervin's was a little more advanced.[50]

Even if LaGrange had the requisite qualifications to opine on Ritter's test results and methodology, which is disputed, LaGrange readily admitted that he lacked specific information regarding Ritter's testing conditions:

> Q:    Mr. LaGrange, you talked about Ervin Ritter's deposition transcript that you recently read. Did you watch any video of Ervin Ritter doing his airflow testing in the Castanel unit?
> A:    No, sir, I did not.
> Q:    Did you look at any photos of Ervin Ritter doing his airflow testing in the Castanel unit?
> A:    No, sir.
> Q:    Do you happen to know the dimensions of the materials he used to extend the return air duct in order to do his airflow testing?
> A:    On the return side, no, sir, I'm not aware of that.
> Q:    Do you know if the materials he used to construct that device on the return air side matched up exactly with the size of the entry of the return air port or return air duct?
> A:    Ervin told me that the size and shape of the box was similar to the return and he was able to separate the return from the supply.
> Q:    So other than what you've gathered from Mr. Ritter telling you how he did it, you hadn't seen the box nor any photos or video of that box, correct?
> A:    That is correct, yes, sir.[51]

LaGrange was not designated to test airflow levels for this case—that task was assigned to licensed engineer Ervin Ritter.[52] Although LaGrange is admittedly unfamiliar with the specifics of Ritter's methodology, he nevertheless compared the fundamentals of that "methodology" to a garbage bag article disclosed at his deposition for the express purpose of rehabilitating Ritter's

---

[50] Ex. B at pp. 244-246. Further, RBD objects to the testimony provided by LaGrange as it was outside of his opinions in his report and introduced a last minute article to support this new opinion.
[51] Ex. B at pp. 271-272.
[52] Ex. B at p. 274.

testimony.  LaGrange's testimony on this topic is far outside the scope of his written report and expertise, and should be excluded under Rule 403.

## III.   LAGRANGE'S TESTIMONY IS INADMISSIBLE UNDER RULE 702 BECAUSE IT IS NEITHER RELIABLE NOR RELEVANT

To determine the reliability of an expert's opinion, a district court may consider the following non-exclusive *Daubert* factors: (1) whether a "theory or technique … can be (and has been) tested;" (2) whether the theory or technique "has been subjected to peer review and publication;" (3) whether the particular technique involved has a "known or potential rate of error;" (4) whether there are "standards controlling the technique's operation;" and (5) whether the theory or technique warrants "general acceptance" within a "relevant scientific community."[53]  These factors are not exhaustive or limiting, and a court may utilize them as it deems fit to tailor an examination of the reliability of expert testimony to the facts of each case.[54]  For example, a district court may also weigh "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out any other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case."[55]  While weighing these factors, the district court must continue to function as a gatekeeper who "separates expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge."[56]

---

[53] *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir.2004); *see also Kumho*, 526 U.S. at 147.

[54] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004) ("not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant."); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 Fed.Appx. 377, 381 (5th Cir.2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'" (citing *Kumho*, 526 U.S. at 152)).

[55] *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir.2007) (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686-87 (8th Cir.2001)).

[56] *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir.2001).

A trial judge's gatekeeping role is especially pronounced when the proffered witness lacks substantial academic qualifications.  Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly say that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"[57]  If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

## A.  LaGrange's Opinions are Based on Unreliable Methodology

For every conclusion contained in an expert's proposed testimony, the court must also determine if the methodology leading to that conclusion is sound.[58]  A court may appropriately exclude expert testimony where it finds that an expert has extrapolated data, and there is "too great an analytical gap between the data and the opinion proffered."[59]  Expert testimony should also be excluded where it is speculative or not amenable to scientific verification.[60]  As such, "[t]esting, which is actually performed, must be appropriate and must analytically prove the expert's hypothesis.[61]  District courts must ensure that the "factual basis, data, principles,

---

[57] Fed.R.Evid. 702 advisory committee's note (2000 amends.) (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough").

[58] *See Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996).

[59] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore*, 151 F.3d at 279.

[60] *Moore*, 151 F.3d at 273.

[61] *Presley v. Lakewood Engineering and Manufacturing Co.*, 553 F.3d 638, 646 (8th Cir.2009) (citing *Shuck v. CNH America, LLC*, 498 F.3d 868, 875 n. 3 (8th Cir.2007); *see also Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058-60 (8th Cir.2005) (holding expert testimony unreliable where the tests were inconsistent with the theory proffered).

methods, [and] their application" are sound.[62]   Here, LaGrange's methodology does not analytically prove the hypotheses and conclusions in his expert report.  As such, his opinions should be excluded because they will not assist the jury to understand or determine a fact in issue.

As part of his opinion on differential pressures, LaGrange opines that "there's an increase in temperature and moisture levels within the attic area inducing the additional off-gassing of the raw wood ceiling paneling."[63]   However, LaGrange admitted that he could not support this conclusion with any reliable data:

> Q: […].  Do you have any particular test results regarding that item regarding introducing the additional off-gassing of the raw wood ceiling panel?
> A: No, sir, I didn't conduct any of those tests.  However, there were other team members that had—well, that have in the past.  I'm not sure if they've done it on this particular trailer.
> Q: Did you test any moisture levels in the unit at all?
> A: No, sir, I did not.[64]

LaGrange also testified that he did not see any signs of moisture intrusion inside the unit's ductwork, even though he used a borescope.[65]   Similarly, LaGrange could not support his opinions regarding condensation within the trailer with any reliable data:

> Q: In your very last sentence of the second paragraph it says: "Condensation would occur between the metal skin of the outside wall skin and the insulation, not between the wood wall material and the insulation."  Are you describing that the condensation between— would be between the metal skin of the unit and the insulation and not between the insulation and the back side of the interior wall?
> A: That's correct.
> Q: Do you have any evidence regarding if there was any condensation between the metal skin and the insulation?
> A: No, sir, I don't.[66]

---

[62] *See Kumho*, 526 U.S. at 149.
[63] Ex. A at p. 30; Ex. B at p. 148.
[64] Ex. B at p. 148.
[65] Ex. B at p. 149.
[66] Ex. B at p. 218.

LaGrange fails to analytically prove his various hypotheses with actual data.  Because his conclusions do not reliably flow from his investigation or tests of the Castanel trailer, "there is simply too great a gap between the data and the opinion proffered" to sustain the admissibility of LaGrange's opinions under Rule 702.[67]

### B.  LaGrange's Opinions Regarding Air Quality will not Assist the Jury to Understand or Determine a Fact in Issue

To meet the relevancy standard of Rule 702, the proposed expert's opinions must "assist the trier of fact to understand or determine a fact in issue."[68] The fundamental inquiries for the jury in this case are: (1) what levels of formaldehyde existed in plaintiff's trailer during her occupancy of the unit, and (2) whether those levels caused her any injury.  Indeed, this Court has already ruled with respect to plaintiff's expert witness Ervin Ritter, P.E. that the proffered "testimony must relate, in some material way, to the existence of formaldehyde in the unit.  In other words, any short-comings in the HVAC system are not relevant unless they somehow tend to prove or disprove the existence and/or level of formaldehyde present in the EHU."[69]

As discussed previously, LaGrange performed two tests—the blower door and duct blaster tests—to determine the air leakage rates in various portions of the Castanel unit.  Based on these tests, he concluded that leaks in the unit contributed to "poor" indoor air quality within the trailer.[70]  Specifically, LaGrange concludes that:

> In this building, the problem with the ducts leaking is that the supply side of the system is leaking more than the return side.  This creates a slightly negative

---

[67] *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

[68] *See* Order dated July 15, 2009, p.4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).

[69] *See* Order dated March 9, 2010, p.2 (Rec. Doc. 12640).

[70] Ex. A at p. 11 ("For these reasons, it is very important for the building's performance and for the occupant's health ***not*** to have duct leaks.") (emphasis in original).

> pressure in the living area, but can generate contamination within the living space. The contamination comes from the dust, humidity, and other contaminants entering the living space. These contaminants are then pulled into the return and dispersed throughout the building using the supply ductwork. This is very bad for indoor air quality and moisture control.[71]

While LaGrange claims to connect duct leakage to the possibility of increased "contaminants," he does not link any of these conditions to increased levels of formaldehyde. Rather, the conclusions in LaGrange's written report regarding the existence of any VOC's in the trailer are based on pure speculation.

In the "Effects of Duct Leakage" section of his report, LaGrange states that: "This also makes certain rooms uncomfortably hot during the summer while pulling in humidity, dust, fiberglass, and VOC's, *if present*, from outside or from the attic to make up for the air that the machine is 'starving for.'"[72] Later, he concludes that:

> Based on the findings in this Report, during the time the THU was inhabited, the temperature and relative humidity levels were probably high. More probable than not, the air contained VOCs (including formaldehyde) from off-gassing of construction products. It was probable that the air contained high humidity and that mold growth may have occurred as a result of the high relative humidity. Based on the return air duct leakage and high humidity levels, the air likely contained such pollutants as dust mites and mold spores and other allergens because of the air leaks coming across the thermal envelope.[73]

This case is *not* about "mold" "dust" or "allergens"—it is about whether or not plaintiff was exposed to formaldehyde in her THU and suffered any injury as a result. Yet, LaGrange admitted that he did not conduct any of his ventilation analysis in the context of formaldehyde levels in the trailer:

> Q: Are you offering any opinions regarding the ventilation rate or ventilation condition of the travel trailer as it relates to the levels of formaldehyde in the unit?

---

[71] Ex. A at p. 39.
[72] Ex. A at p. 10 (emphasis added).
[73] Ex. A at p. 42.

A:  I did not take any measurements of formaldehyde ratings, no, sir.[74]

Simply put, LaGrange's testimony regarding the "probable" existence of VOC's and/or formaldehyde in the Castanel trailer is wholly speculative and unsupported by any reliable data.

Another unsupported principle relied on by LaGrange is his definition of "contaminated air," which appears to be inclusive of nearly every type of air present in the Gulf South:

Q:  What is your definition of contaminated air?
A:  Contaminated air can mean anything that is not desirable to breath or is latent with moisture.
Q:  From my understanding of your prior testimony you attribute outside air as being contaminated air, correct?
A:  As the outside air which is in our climate normally very moist and very humid and hot, as it enters the building it's certainly not healthy for the occupants and certainly not very good for overall building performance because it brings in lots of moisture and in some cases temperature.
Q:  As far as outside air entering a building, is that something you consider is contaminated air?
A:  Yes, sir.
Q:  And that's why it's coming through an open window or some other means into the home, correct?
A:  That's correct.  And this is specifically to our Gulf South climate.
Q:  So if you are in the middle of the desert, you wouldn't necessarily call outside air contaminated air?
A:  It wouldn't contain moisture.
Q:  How about dust?
A:  If it contained dust, then yes, it would be contaminated.  In my report I refer to an ASHRAE Standard that defines what's contaminated air.  If you want, I can find it for you.
Q:  Sure.  If that's in your report tell me where it's at.
A:  I'm going to have to find it.  […].  I don't know exactly where it's at.  I have to look for it.  I'm sorry.[75]

Indeed, the only reference to an ASHRAE standard in LaGrange's report is an indirect quotation of ASHRAE 62.2, defining "acceptable indoor air quality" as "air in which there are no known contaminants at harmful concentrations as determined by cognizant authorities and with which a

---

[74] Ex. B at p. 111.
[75] Ex. B at pp. 72-74.

substantial majority (80% or more) of the people exposed do not express dissatisfaction."[76] While this definition clearly requires analysis of relevant air samples, LaGrange summarily concludes in the very next sentence of his report that "[t]he air inside this THU was not acceptable because of the lack of ventilation within."[77]

Later, LaGrange admitted that humidity alone can render air "contaminated" under his definition:

Q: You discussed the introduction of contaminated air in your report, right?
A: I do.
Q: And in some cases by contaminated air you mean nothing more than humid air, right?
A: Yes, sir.
Q: I assume you would agree that we all breathe humid air when we walk outside, right?
A: We do.[78]

From LaGrange's extremely broad definition of what constitutes "contaminated air," it is not surprising that plaintiff did not bother to perform any air quality testing on the unit to verify Castanel's theory that the duct leakage and negative pressurization exacerbated VOC's in the unit.[79] Rather than base his conclusions on air quality data, LaGrange instead chooses to rely on speculation and assumptions based on alleged defects with the trailer's ventilation system. Because there is nothing in LaGrange's expert report or deposition testimony regarding air quality that will assist the jury in determining either of the two key issues in this lawsuit, his testimony should be excluded under Rule 702.

---

[76] Ex. A at p. 46, citing Dougan & Damiano at p.1.
[77] Ex. A at p. 46.
[78] Ex. B at p. 207.
[79] Ex. B at p. 75.

C. **LaGrange's Opinions Regarding Building Codes will not Assist the Jury to Understand or Determine a Fact in Issue**

RBD contends that plaintiff should not be permitted to offer any testimony asserting that (1) certain building codes applied to the Castanel trailer, or (2) that the Castanel trailer failed to comply with those codes, in that such testimony is wholly irrelevant to the ultimate issues that must be decided in the present case.  Indeed, this Court has already ruled that:

> On the showing made, the Court is not in the least bit convinced that the building codes are relevant.  Even assuming that the codes are applicable, there seems to be little to no actual evidence that Defendants' failure to comply with such codes relates in any way to Plaintiff's grievance(s).  For this reason alone, the Court grants both of these motions now, such that no reference to building codes shall be admissible at trial.[80]

Although this Court's ruling should pertain to the same arguments regarding non-applicability of building codes in the Castanel matter, out of an abundance of caution, RBD seeks to adopt, as if set forth herein, the arguments and defenses previously raised in this MDL by defendants Shaw Environmental, Inc. and Forest River, Inc. regarding the inapplicability of building codes and standards to travel trailers.  Specifically, RBD seeks to adopt the arguments and defenses raised in Shaw Environmental, Inc.'s Motion in Limine to Exclude References to Building Codes (Rec. Doc. 11414), Forest River, Inc.'s Motion in Limine to Exclude the Testimony of Ervin L. Ritter (Rec. Doc. 11393), and Forest River Inc.'s Motion to Exclude Certain Comments to the Jury (Rec. Doc. 11389), along with all supporting memoranda.[81]  RBD also offers the following arguments with respect to the specific conclusions contained in LaGrange's written report and deposition testimony for the case at hand.

---

[80] *See* Order dated March 3, 2010, pp. 1-2 (Rec. Doc. 12260).
[81] To the extent that plaintiff's conclusions regarding the applicability of building codes to the Castanel trailer differ from those in previous bellwether trials, however, a thorough analysis of this issue is the subject of a separate motion *in limine* filed by RBD.

LaGrange bases a significant portion of his conclusions on the Castanel unit's compliance, or lack thereof, with several inapplicable building codes.[82]  Because LaGrange's opinions are premised on building codes that do not apply to the Castanel trailer, his testimony should be excluded as irrelevant.  Throughout his report, LaGrange relies on definitions and principles from the International Residential Code of 2000 ("IRC") and the New Orleans Building Code of 2003.[83]  He uses these codes to define such key terms as "ventilation,"[84] "dwelling,"[85] "duct system,"[86] "label,"[87] "attic,"[88] "building,"[89] "building thermal envelope,"[90] and "dwelling unit."[91]  LaGrange also has an entire section in his written report entitled "IRC 2000 – Chapter 11 'Energy Efficiency' – Code Violations,"[92] and, in the "Discussion of Findings" section of his report, LaGrange notes that:

> The causes for the poor indoor air quality and presence of these contaminants are interactive in nature.  First, the cooling system provided no fresh air to dilute the pollutants in the building.  Secondly, the building was not air sealed well, so infiltration allowed humidity and dust and other impurities into the building regularly, especially when the cooling system was running.  Thirdly, the installation of the insulation is quite inadequate (as seen with the thermal images), making the wall and floor assemblies conducive to poor performance, which only increases the poor performance.  The vinyl covering on the wall & ceiling panels in the hot humid South can lend towards increased condensation and moisture build-up within the concealed cavities.  **Below is a detailed explanation of how these three phenomena worked together to create the performance and quality problems in this building** *and why this could have been prevented if the building codes and standards had been followed*.[93]

---

[82] Ex. B at p.33.
[83] Ex. B at pp. 13-14.
[84] Ex. A at pp. 4-5, 62.
[85] Ex. A at pp. 4-5, 60.
[86] Ex. A at pp. 10, 60.
[87] Ex. A at pp. 41, 61.
[88] Ex. A at p. 59.
[89] Ex. A at p. 59.
[90] Ex. A at p. 59.
[91] Ex. A at p. 60.
[92] Ex. A at pp. 40-42.
[93] Ex. A at pp. 42-43 (emphasis added).

It is evident that the bases for LaGrange's opinions are premised on irrelevant building codes and standards.

Even if these codes *were* applicable to travel trailers, which they are not, LaGrange uses them to support assumptions based on speculation:

> Even though the wall insulation was not inspected, it is safe to **assume** that the walls did not have R-11 insulation installed in them because they are only 1.5" thick and R-11 fiberglass batt insulation has an R-value of R-3.1 per inch.  All of the installed R-values for the building's walls, ceiling, and floors are lower than the minimum required R-values of the code.  ***Based on previous inspections of similar buildings, the R-value for the ceiling is estimated*** as 9.125 and the R-value for the floor is also estimated as 9.125.  There is no other data provided that stated otherwise.[94]

LaGrange makes these conclusions and admits that he relied on the IRC to come up with his suggested R-values for the travel trailer:

> Q:   Or do you know if there was an R-value in the FEMA specifications?
> A:   There's a two-sentence portion on page 1 of 8 of Appendix E.  This says: "The units shall meet industry standards except where identified."  And this unit – actually there's one sentence I'm referring to.  "Unit shall meet industry standards except where identified."  And that's reviewed on the remaining eight pages and I didn't see where R-value was specified.
> Q:   Did you review any industry standards?
> A:   Sure.  The industry standards is the building code. […].
> Q:   Right.  I'm just saying does it say anywhere—does it identify or define what the industry standards are as far as the building code that you're referring to?
> A:   No, it doesn't.
> Q:   And the building code you're referring to—you're talking about the New Orleans Building Code, correct?
> A:   I'm referring to the International Residential Code.
> Q:   The IRC?
> A:   IRC.  Since these units were intended to be used as temporary housing, that would be the building standard.[95]

---

[94] Ex. A at p. 40 (emphasis added).
[95] Ex. B at pp. 164-65.

Accordingly, LaGrange ignores the R-values set forth in standard industry practice for travel trailers and just opines that the R-value failed to meet the IRC adopted by the City of New Orleans.  This approach is not only biased, but also calls into question his overall opinion, which is based entirely on codes that do not apply to travel trailers.

IV.     **CONCLUSION**

There is nothing in LaGrange's expert report or deposition testimony that will assist the jury in determining either of the two key issues in this lawsuit.  As such, his opinions and testimony are subject to exclusion.  Because LaGrange's opinions are completely irrelevant to the issues that will be presented to the trier of fact in this case, his testimony should be excluded from evidence under Rule 702, this Court's Order of March 3, 2010 (Rec. Doc. 12260), and this Court's Order of March 9, 2010 (Rec. Doc. 12640).  For the foregoing reasons, Recreation By Design, LLC, respectfully requests that the Court grant this motion *in limine* and exclude the opinions and testimony of Paul LaGrange.

Respectfully submitted,


*/s/ Randall C. Mulcahy*
LYON H. GARRISON, Bar No. 19591
SCOTT P. YOUNT, Bar No. 22679
RANDALL C. MULCAHY, Bar No. 26436
DARRIN L. FORTE, Bar No. 26885
KELLY M. MORTON, Bar No. 30645
**GARRISON, YOUNT, FORTE**
**& MULCAHY, LLC**
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 527-0680
Facsimile: (504) 527-0686
*Attorneys for Recreation By Design, LLC*
Email: rmulcahy@garrisonyount.com


### CERTIFICATE OF SERVICE

I hereby certify that on April 16th, 2010, I electronically filed the foregoing with the

Clerk of court by using the CM/ECF system which will send a notice of this electronic filing to

all known counsel of record.


          */s/ Randall C. Mulcahy*
RANDALL C. MULCAHY, Bar No. 26436