# Transcript of the Testimony of
# **Paul LaGrange**

**Date taken: February 18, 2010**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)**

***Note**\**

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**



EXHIBIT

B

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 13

1    to the claims of Earline Castanel?

2         A.    I was asked to arrive at the Lottie

3    site on January 15th to perform a blower door

4    test for building leakage, duct blaster test for

5    duct leakage, inspect the ductwork that was

6    accessible, also perform some infrared thermal

7    imaging scans and then offer explanations of how

8    the items were interacting with each other

9    between the crawl space, the walls, the attic,

10   the air condition system, summarize my findings

11   in a narrative report and also discuss its

12   relation to the 2000 International Residential

13   Code and also the 2003 New Orleans Building

14   Code.

15        Q.    And I see that you're looking at the

16   first page or actually page 3 of your report,

17   first full page of your report, correct?

18        A.    Yes, sir.

19        Q.    I don't see anything in that list of

20   items there as far as 1, 2, 3, 4 and 5 about the

21   "offer explanation for building codes," is that

22   a separate task that you're referring to that's

23   not part of items 1 through 5?

24        A.    Yes, sir, it is.

25        Q.    And where is that in your report that

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 14

1    you were asked to offer an explanation regarding

2    building codes?

3         A.    I didn't actually make that statement

4    as much as throughout the report there are

5    definitions directly from the building code and

6    how it relates to this trailer.

7         Q.    Let's do a little housekeeping before

8    we get too much into your report.  Looking at

9    the Notice of Deposition of today's notice, do

10   you have that in front of you?

11        A.    Yes, sir, I do.

12        Q.    And that would be dated February

13   13th, 2010 on the second page?

14        A.    Yes, sir.

15        Q.    And as part of that notice attached

16   to it is an Exhibit A listing 31 items regarding

17   your materials or reliance materials and other

18   items to bring to today's deposition.  Have you

19   brought any additional items in response to

20   Exhibit A that were not part of your reliance

21   file that I received on disc?

22        A.    I did.

23        Q.    I received your reliance file on disc

24   that's labeled --

25        MR. PINEDO:

Page 16

1    copies of my field notes.

2        Q.    Okay.

3        A.    So we have copies of those for you

4    today.

5        Q.    Anything else?

6        A.    No, sir.

7    MR. PINEDO:

8             Let me say similar to what we had

9    with Mr. Ritter, his photos were not on his

10   reliance disc.  They were produced some ten days

11   afterward after the inspection that took place

12   where he took those photos, so those were not

13   included on his reliance discs.

14       MR. MULCAHY:

15            Sure.  And I have a copy of your

16   photos and I just don't have the numbers on

17   those today, but you took about two hundred

18   photos I believe while you were out there that

19   day, does that sound about right?

20       THE WITNESS:

21            Yes, sir.

22   BY MR. MULCAHY:

23       Q.    Did you also do -- you also had the

24   video regarding the smoke testing, correct?

25       A.    Yes, sir.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 17

1       Q.      Besides those photos and the video on

2    the smoke testing, did you have any other

3    photographs or videos that you would have taken

4    out there?

5       A.      No, sir.

6       Q.      And you said you had a copy of your

7    field notes with you; is that correct?

8       A.      I do.

9    MR. PINEDO:

10             Yes.  We made copies of the field

11   notes.  It was just discovered yesterday that

12   they were not included in the reliance

13   materials.  Oversight.

14   MR. MULCAHY:

15             These aren't Bates numbered?

16   MR. PINEDO:

17             They are not.  He has the originals

18   here with him today.  If you want to take a

19   break, we can get Bates numbers on them and

20   reproduce them with Bates numbers, or we can

21   just number them manually as we sit here.

22   BY MR. MULCAHY:

23      Q.      I'm looking at about 18 pages of

24   materials that were just handed to me that were

25   labeled your field notes, and are these a true

Page 30

```
1        Q.    What specialty do you hold yourself
2   out in?
3        A.    I'm sorry?
4        Q.    What specialty do you hold yourself
5   out as?
6        A.    A building performance consultant.
7        Q.    Is that a degree you've earned?
8        A.    It's not a degree here in Louisiana.
9   However, I do have as you read from my resume a
10  degree from University of New Orleans in finance
11  with a concentration in real estate, but over
12  the years since 1999 I've acquired a tremendous
13  amount of training that deals directly with
14  building science and building performance.
15       Q.    I read some of your testimony in the
16  Forest River matter where you talk about your
17  education and training.  Have you had any
18  additional courses or any additional training as
19  it relates to building science since October of
20  2009?
21       A.    No, sir, I have not.
22       Q.    By that you haven't gone to any
23  additional seminars or anything of that nature?
24       A.    Not that I've attended.  I have given
25  a few presentations but haven't attended any.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 31

1       Q.     You haven't received any additional

2   certificates, or anything of that nature since

3   October of 2009, correct?

4       A.     No, sir, I have not.

5       Q.     And building performance consultant,

6   there's no certifications from the State of

7   Louisiana for that?

8       A.     The State of Louisiana has a

9   certificate called an Energy Rater which is

10  along the lines of building science and building

11  performance.  I've been holding that

12  certification for I believe since 1999, maybe

13  2000.  In addition to that, I've gotten training

14  along those same lines of building science and

15  building performance from the Florida Solar

16  Energy Center in the State of Florida.  I did

17  that in 2008.

18      Q.     The one that you talked about with

19  Louisiana, which department?

20      A.     That would be through the Technology

21  Division of the Louisiana Department of Natural

22  Resources.

23      Q.     You have already referred to the

24  first page of a report that we were looking at

25  earlier and I'm trying to find a sign date on

Page 33

1    Buildings using an Orifice Blower Door; and then

2    Appendix J which is Ordinance from the City of

3    New Orleans which looks like it constitutes the

4    remainder of your appendix materials; is that

5    correct?

6        A.    That sounds right, yes, sir.

7        Q.    Is this Appendix J what you referred

8    to as the New Orleans Building Code?

9        A.    Yes, sir.

10       Q.    And this appendix that we called to

11   your reports, is this the primary reliance

12   materials that you utilized in rendering your

13   report?

14       A.    Yes, sir, they are.

15       Q.    We will go ahead and attach a copy --

16   let me ask you this: Did you sign your report

17   anywhere?  Am I missing a signature page?

18       A.    I don't believe that I did, no, sir.

19       Q.    So none of these pages have your

20   signature on it anywhere.  Do you know what date

21   you actually rendered this report?  I see it

22   says January of 2010, is that the particular

23   date that --

24       A.    I don't recall what date I turned it

25   in.  However, on the cover sheet where it says

Page 37

1    trailer?

2         A.    That's correct.

3         Q.    And you did this in your capacity as

4    a --

5         A.    Building performance consultant.

6         Q.    -- a building performance consultant?

7         A.    Yes, sir.

8         Q.    You're not an architect?

9         A.    No, sir, I'm not.

10        Q.    You're not an engineer?

11        A.    I'm not.

12        Q.    You're not a certified industrial

13   hygienist?

14        A.    No, sir, I'm not.

15        Q.    And you're not a toxicologist?

16        A.    No, sir.  However, none of those

17   items are required certifications for me to

18   perform the tests that I performed on the

19   Castanel trailer.

20        Q.    I understand.  I'm just covering your

21   training.  Under the second section of your

22   report I see you have an area called Overview of

23   Report.

24        A.    Yes, sir.  I see it.

25        Q.    And that's just an overview of your

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                    Paul LaGrange

Page 50

1       Q.    And with your positions with these

2   associations we just talked about, would that

3   have been a subject of any of these entities of

4   St. Tammany Home Builders Association, the

5   Louisiana Home Builders Association, the St.

6   Tammany Parish Government Building Code Council,

7   is that any type of issue that you all would

8   have addressed to those organizations?

9       A.    No, sir.

10      Q.    Have you ever been a code enforcement

11  officer for St. Tammany?

12      A.    I have not.

13      Q.    Any jurisdiction have you been a code

14  enforcement officer?

15      A.    A building inspector?

16      Q.    Or a building inspector?

17      A.    No, sir.  I'm sorry, I'm just trying

18  to clarify and understand your question.

19      Q.    That's fine.  You have never been a

20  building inspector in St. Tammany?

21      A.    No, sir.

22      Q.    Nor in New Orleans?

23      A.    No, sir.  However, I do serve on a

24  number of committees that review building codes

25  every three years to determine if certain

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255                    (504) 529-5255
New Orleans * Baton Rouge * Shreveport

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 52

```
1        Q.     And other than the utilization of
2   that e-mail that you've recently seen that is
3   it, correct?
4        A.     That is correct, yes, sir.
5        Q.     By the time you drafted this report
6   you had not seen these e-mails, correct?
7        A.     That's correct.
8        Q.     Just like the last deposition I left
9   my glasses so bear with me.  I see under your
10  professional experience for LaGrange Consulting,
11  one of the bullet points you have about midway
12  down it says: HVAC Design, Inspect for Code
13  Compliance and Performance as well as Indoor Air
14  Quality Systems.  When you say that, HVAC Design
15  and Inspect for Code Compliance, are you talking
16  about just your own personal business inspecting
17  units for code compliance; is that correct?
18       A.     That's correct.
19       Q.     You're not talking about doing it for
20  a governmental entity or any governmental body,
21  correct?
22       A.     That's correct.  One of the services
23  that LaGrange Consulting offers is obviously
24  diagnostic testing like we performed here on
25  this trailer, but also to look at overall
```

Page 53

```
 1    building performance for individuals or

 2    builders, and one of the services we offer is to

 3    inspect and determine if the heating/cooling

 4    system is performing as per the manufacturer's

 5    intent.

 6         Q.    Is the primarily bulk of your work in

 7    residential systems or would you say it's in

 8    office building type situations?

 9         A.    Primarily residential.

10         Q.    About what percent would you say is

11    residential?

12         A.    I would say 75/25, maybe 70/30.

13         Q.    Of those 70 percent that would be the

14    residential, how many of those are recirculating

15    air condition systems on a percentage basis do

16    you see?

17         MR. PINEDO:

18              Objection to form.

19         THE WITNESS:

20              Can you define recirculating air

21    conditions.

22    BY MR. MULCAHY:

23         Q.    Earlier you told me about the

24    mechanical ventilation in your report that you

25    didn't see on this particular travel trailer, so
```

Page 60

1      Q.    So outside of those few events and

2    the Verbena, Alabama '05/'06, that's the

3    training that you have as far as the HVAC

4    design; is that correct?

5      A.    That's correct.  Plus I've actually

6    offered HVAC design classes.

7      Q.    And where do you offer HVAC design

8    classes?

9      A.    Just wherever needed.  I've done it

10   for Louisiana Heat Pump Association.  I've done

11   it for Heat Pump Association chapters throughout

12   the state as well as at LSU.

13     Q.    You don't do it as far as a part of a

14   university or a technical college as far as

15   teach classes?

16     A.    I teach at the LSU AgCenter which is

17   a division of Louisiana School System,

18   University School System.

19     Q.    And what's your subject that you

20   teach at the AgCenter?

21     A.    It's a variety of topics that

22   primarily all deal with building science and

23   building performance.

24     Q.    When you say building science and

25   building performance, could you kind of define

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 61

1    that for me?

2        A.    Sure.  Building science is the study

3    and the practice of the interactions of a

4    building's assembly, for instance, how a floor

5    is air sealed or insulated, the walls, how the

6    windows are connected to the walls.  Same thing

7    with the roof line and the ceiling line.  It

8    also looks at the heating/cooling systems,

9    lighting, domestic water heating, proper

10   installation of insulation, those type of

11   dynamics as how they affect each other.

12       Q.    How often do you teach at the LSU

13   AgCenter?

14       A.    As-needed.  On average we're spending

15   between 20 and 25 hours a week.

16       Q.    20 and 25 hours?

17       A.    A week.

18       Q.    When you say "we," is that your

19   office?

20       A.    No, sir.  It's just me.  It's a team

21   of us that are outsourced that the LSU AgCenter

22   hires to perform these presentations.

23       Q.    Out of the 20 to 25 hours a week how

24   many hours are you there?

25       A.    Those are my hours.

Page 62

```
 1        Q.     Those are your hours?

 2        A.     Yes, sir.

 3        Q.     Is that something you are actively

 4   doing right now?

 5        A.     For the last two and a half years,

 6   yes, sir.  We are also starting to teach at

 7   LACAP which is the Louisiana Community Action

 8   Center on Weatherization.

 9        Q.     Are you compensated for your teaching

10   at LSU AgCenter?

11        A.     I am.

12        Q.     Do you teach as yourself at LSU

13   AgCenter or are you teaching on behalf of the

14   company LaGrange Consulting?

15        A.     I teach on behalf of LSU AgCenter.

16   I'm an employee.

17        Q.     You personally?

18        A.     Personally.

19        Q.     By that your business has not been

20   retained by the AgCenter but you have?

21        A.     That's correct, yes, sir.

22        Q.     Have you ever designed an HVAC system

23   in a travel trailer?

24        A.     No, sir, I have not.  Oh, I'm sorry,

25   I take that back.  I performed the manual J load
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 63

1    calculation for the Alexander/Wright travel

2    trailer.  I'm sorry, I forgot that one.

3        Q.    But to actually design and implement

4    an HVAC system in a travel trailer, you have

5    never done that, correct?

6        A.    No, I have not.

7        Q.    Do you own a travel trailer?

8        A.    No, sir, I don't.

9        Q.    Do you ever recreation in a travel

10   trailer?

11       A.    No.  But I would like to.

12       Q.    Are you still performing your radio

13   talk show that you have?

14       A.    Yes, sir.  On Saturdays.

15       Q.    Saturdays, that's the home

16   improvement show?

17       A.    Yes, sir.  Can I take a 20 second

18   break to grab another bottle of water?

19   MR. MULCAHY:

20            Sure.  Why don't we take a break.

21   MR. PINEDO:

22            Let's take a break.

23            (Whereupon, a break was taken).

24   BY MR. MULCAHY:

25       Q.    While I have these in my hand, I want

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                Paul LaGrange

Page 72

1    as well.

2         Q.    As far as these Energy Star documents

3    we're looking at here, airtightness is one of

4    the goals --

5         A.    That's correct.

6         Q.    -- of being Energy Star compliant?

7         A.    Yes, sir.  Also the building code

8    refers to the airtightness of the building and

9    how important it is to use the commentary

10   portion of the -- the IRC refers to the

11   importance of an airtight building.

12        Q.    And that's in the 2000 IRC?

13        A.    It is, yes, sir.

14        Q.    When you're talking about airtight

15   buildings you mentioned contaminated air, what

16   is your definition of contaminated air?

17        A.    I'm sorry, where are you referring

18   to?

19        Q.    Under "buildings need to be airtight"

20   about halfway down in the middle of the

21   paragraph you mention contaminated air.

22        A.    Yes, sir.

23        Q.    What is your definition of

24   contaminated air?

25        A.    Contaminated air can mean anything

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 73

1    that is not desirable to breathe or is latent

2    with moisture.

3         Q.    From my understanding of your prior

4    testimony you attribute outside air as being

5    contaminated air, correct?

6         A.    As the outside air which is in our

7    climate normally very moist and very humid and

8    hot, as it enters the building it's certainly

9    not healthy for the occupants and certainly not

10   very good for overall building performance

11   because it brings in lots of moisture and in

12   some cases temperature.

13        Q.    As far as outside air entering a

14   building, is that something you consider is

15   contaminated air?

16        A.    Yes, sir.

17        Q.    And that's why it's coming through an

18   open window or some other means into the home,

19   correct?

20        A.    That's correct.  And this is

21   specifically to our Gulf South climate.

22        Q.    So if you are in the middle of the

23   desert, you wouldn't necessarily call outside

24   air contaminated air?

25        A.    It wouldn't contain moisture.

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255                    (504) 529-5255
New Orleans * Baton Rouge * Shreveport

Page 74

```
 1        Q.    How about dust?

 2        A.     If it contained dust, then yes, it

 3   would be contaminated.  In my report I refer to

 4   an ASHRAE Standard that defines what's

 5   contaminated air.  If you want I can find it for

 6   you.

 7        Q.    Sure.  If that's in your report tell

 8   me where it's at.

 9        A.    I'm going to have to find it.

10        Q.    Earlier you mentioned that you relied

11   on IRC 2000 in rendering your report, is ASHRAE

12   one of the standards you utilized in your

13   report?

14        A.    ASHRAE 62.2 is one of the standards

15   we utilized in our report, yes, sir.

16        Q.    Is that different than the IRC?  Is

17   that a separate set of standards?

18        A.    ASHRAE is a set of standards and

19   guidelines and where the IRC refers to those

20   standards and guidelines developed by ASHRAE,

21   that's correct.

22        Q.    And you're going to find the

23   definition for me?

24        A.    I don't know exactly where it's at.

25   I have to look for it.  I'm sorry.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 75

1        Q.    We may find it as we peruse along.

2    By looking at the definition you gave earlier,

3    the International Residential Code definition of

4    ventilation mentions that part of that is

5    natural or mechanical process of supplying

6    conditioned or unconditioned air to, or removing

7    from any air space.

8        A.    A portion of outdoor air can be

9    contributed to natural air infiltration, that's

10   correct, as it's allowed and recognized through

11   the building code and also ASHRAE Standards, but

12   ASHRAE further defines, and this is the

13   definition I'm looking for, further defines

14   what's an acceptable or outdoor air source as,

15   and I'm paraphrasing here --

16       Q.    What page of the --

17       A.    I haven't found it yet.  That's why I

18   was paraphrasing, sorry.

19       Q.    Let's wait until we find it.  Are you

20   a Certified Indoor Air Quality Specialist?

21       A.    No, sir, I'm not.  However, in order

22   to perform the test I was hired to perform, it

23   wasn't necessary.

24       Q.    You didn't perform any air quality

25   testing on the testing of the unit, correct?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 88

1    along the I guess the baseboard of the wall; is

2    that correct?

3         A.    Yes, sir, that's correct.  There are

4    a number of ways that air could enter from

5    underneath the belly of that unit into the

6    subfloor assembly which we documented in some

7    photographs on page 20 and 21 reflecting some of

8    those pathways.

9         Q.    And you're showing like some piping

10   on page 21 --

11        A.    As well as --

12        Q.    -- and on page 20?

13        A.    As well as some breaches in the

14   fabric that was acting as the -- presumably it

15   was acting as the air barrier.

16        Q.    Do you know if that's designed to be

17   an airtight barrier, that fabric?

18        A.    I haven't been able to identify the

19   fabric or the purpose of the fabric, although it

20   would make sense from a manufacturer's

21   standpoint that that would be an air barrier.

22        Q.    You never designed or constructed a

23   travel trailer, correct?

24        A.    No, sir, I have not.

25        Q.    Then you comment on page 22 regarding

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 111

1    sir.

2        Q.    That's where you get the air exchange

3    about every 3.5 hours in the unit?

4        A.    Yes, sir.

5        Q.    Are you offering any opinions

6    regarding the ventilation rate or ventilation

7    condition of the travel trailer as it relates to

8    the levels of formaldehyde in the unit?

9        A.    I did not take any measurements of

10   formaldehyde ratings, no, sir.

11       Q.    All you were asked to do is just to

12   calculate this ventilation rate?

13       MR. PINEDO:

14            Objection to form.

15   BY MR. MULCAHY:

16       Q.    As far as this particular aspect

17   we're talking about the blower door, this

18   calculation?

19       A.    Yes, sir.

20       Q.    Is there any other way that you could

21   test the pressurization of the unit without

22   doing a blower door test?

23       MR. PINEDO:

24            Objection to form.

25       THE WITNESS:

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                     Paul LaGrange

Page 148

1   items there on page 30 that you have subheaded

2   or somewhat subheaded "the dynamics occurring

3   within the attic ceiling cavity are numerous"

4   and you list three points.  One of those you say

5   that: There's an increase in temperature and

6   moisture levels within the attic area inducing

7   the additional off-gassing of the raw wood

8   ceiling paneling."  Do you have any particular

9   test results regarding that item regarding

10   inducing the additional off-gassing of the raw

11   wood ceiling panel?

12         A.    No, sir, I didn't conduct any of

13   those tests.  However, there were other team

14   members that had -- well, that have in the past.

15   I'm not sure if they've done it on this

16   particular trailer.

17         Q.    Did you test any moisture levels in

18   the unit at all?

19         A.    No, sir, I did not.

20         Q.    Did you see any signs of leakage in

21   the unit?

22         A.    Like a roof leak?

23         Q.    Yeah.  I'm sorry, in the travel

24   trailer?

25         A.    There were some signs of moisture

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 149

1    issues in the travel trailer, yes.

2          Q.    And where was that?

3          A.    If I recall there was one in the

4    bathroom near the shower.  I think there was

5    another one near the refrigerator.

6          Q.    Did you take any photographs of that?

7          A.    I have to check.  I don't know.

8    They're not in my report I know that.

9          Q.    Did you see any issues regarding

10   moisture levels within the ductwork?

11         MR. PINEDO:

12              Objection to form.

13         THE WITNESS:

14              Were there signs of moisture

15   intrusion inside the ductwork, is that what

16   you're asking?

17   BY MR. MULCAHY:

18         Q.    Yes.

19         A.    No,sir, I didn't see any signs of

20   any.  That doesn't mean there weren't any.  I

21   just didn't see with the borescope.

22         Q.    And you did the borescope before you

23   did the duct blaster?

24         A.    Yes, sir.

25         Q.    You didn't do any borescope after the

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                Paul LaGrange

Page 164

1      A.     Can you give me that procurement.

2   I'm sorry, I have it here.

3      Q.     Or do you know if there was an

4   R-value in the FEMA specifications?

5      A.     There's a two-sentence portion on

6   page 1 of 8 of Appendix E.  This says: "The

7   units shall meet industry standards except where

8   identified."  And this unit -- actually there's

9   one sentence I'm referring to.  "Unit shall meet

10  industry standards except where identified."

11  And that's reviewed on the remaining eight pages

12  and I didn't see where R-value was specified.

13     Q.     Did you review any industry

14  standards?

15     A.     Sure.  The industry standards is the

16  building code.

17     Q.     This chapter that you are looking at,

18  the paragraph you're looking at, they're talking

19  about the industry standards being the building

20  code that you're referring to?

21     A.     Page 1 of 8 third paragraph first

22  sentence.

23     Q.     Right.  I'm just saying does it say

24  anywhere -- does it identify or define what the

25  industry standards are as far as the building

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 165

1      code that you're referring to?

2          A.    No, it doesn't.

3          Q.    And by the building code you're

4      referring to -- you're talking about the New

5      Orleans Building Code, correct?

6          A.    I'm referring to the International

7      Residential Code.

8          Q.    The IRC?

9          A.    IRC.  Since these units were intended

10     to be used as temporary housing, that would be

11     the building standard.

12         Q.    Did you take any temperatures inside

13     the attic or wall space when doing any of your

14     testing?

15         A.    No, sir, I did not.

16         Q.    You didn't do any mold spore tests in

17     this unit; is that correct?

18         A.    No, sir, I did not. I wasn't tasked

19     to do either one of those items.

20         Q.    Are you familiar with what the

21     building codes in the state of Mississippi are?

22     MR. PINEDO:

23              Objection to form.

24     THE WITNESS:

25              In some places I am, some

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 207

1    difference in pressure to determine what

2    direction that flow of energy would occur.

3        Q.    Specifically with respect to gaseous

4    contaminants, that would have to do with

5    diffusion pressure, right?

6        A.    Yes, sir.

7        Q.    You don't touch on diffusion pressure

8    anywhere in your report, right?

9        A.    No, sir, I do not.

10       Q.    You discussed the introduction of

11   contaminated air in your report, right?

12       A.    I do.

13       Q.    And in some cases by contaminated air

14   you mean nothing more than humid air, right?

15       A.    Yes, sir.

16       Q.    I assume you would agree that we all

17   breathe humid air when we walk outside, right?

18       A.    We do.

19       Q.    Let me ask you to look at the eighth

20   page of your report which is Exhibit 6 to this

21   deposition.

22       A.    Yes, sir.

23       Q.    The average wind speed over the

24   period you have shown in this chart March 2006

25   to August 2007 is 7.46 miles per hour, right?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 218

1    it a little bit differently, you may give me the

2    same answer, but as far as the lack of a better

3    phrase airtightness of the exterior shell to the

4    travel trailer, the siding, the ceiling,

5    everything, you don't have any readings

6    regarding the tightness of that particular

7    section of the travel trailer, correct?

8         MR. PINEDO:

9              Objection to form.

10        THE WITNESS:

11             I really can't answer it.

12   BY MR. MULCAHY:

13        Q.    Can the metal siding of the travel

14   trailer act as an air barrier, a vapor barrier?

15        A.    It can act as an air barrier

16   presuming that all the connections are made and

17   everything -- the seams and connections are

18   properly fastened and caulked.

19        Q.    And we talked earlier, you didn't

20   really do a detailed examination of the

21   exterior, correct?

22        A.    That's correct.

23        Q.    You mentioned something on page 14,

24   you have Being on the Wrong Side of Building

25   Science.

Page 231

```
 1    do outside the realm of litigation?

 2         A.    Yes, sir, it is.

 3         Q.    Did Ervin Ritter perform some airflow

 4    testing in this case, the Castanel case?

 5         A.    Yes, sir, he did.

 6         Q.    And did you become aware of that by

 7    virtue of reading his deposition and his report?

 8         A.    Actually he told me about the results

 9    of the airflow tests on that conference call on

10    January 18th between Al Mallet and myself.

11         Q.    And did you also review his

12    deposition where he discussed his airflow

13    testing?

14         A.    I did.

15         Q.    Are you familiar with the procedures

16    and manner for conducting airflow testing?

17         A.    I am, yes, sir.

18         Q.    Did he do airflow testing on the

19    supply side?

20         A.    He did.

21         Q.    Airflow testing on the supply side,

22    is that the air coming out of the vents once it

23    has been cooled if the air conditioner is

24    running?

25         A.    Yes, sir, it is.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                                          Paul LaGrange

Page 232

1       Q.     Did he also do airflow testing on the

2   return air side, that's where the air goes into

3   the air conditioning unit?

4       A.     Yes, sir.

5       Q.     When you're doing airflow testing on

6   an air conditioner unit such as was in Ms.

7   Castanel's travel trailer, is it necessary to

8   have the condenser of the air conditioner

9   functioning?

10      A.     No, sir, it's not.

11      Q.     Let's talk about the airflow testing

12  on the supply side.  That's the air coming out

13  of the registers.  Can you tell me how he did

14  those airflow tests based upon your discussion

15  with him and your review of his deposition?

16      A.     From my understanding Ervin created a

17  device that was a duct extension.  Since we

18  couldn't drill through the ceiling panels and

19  gain access to the equipment to measure static

20  pressures within the duct system or within the

21  air handler, the next thing that we could have

22  done was to extend the ductwork where we could

23  measure it, so he created a device that would

24  allow the air to come out of the supply grill

25  without affecting the static pressure of the

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255                                    (504) 529-5255
New Orleans * Baton Rouge * Shreveport

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 233

1    ductwork or the fan motor and measure the

2    velocity of air and the airflow coming from that

3    particular unit or from that particular

4    register.

5         Q.    In your experience as a building

6    performance expert, is that a reasonable way to

7    measure airflow on the supply side if you cannot

8    get access to the ductwork in the ceiling or

9    drill holes in it?

10        MR. KURTZ:

11             Objection to form.

12        THE WITNESS:

13             It is.  Actually the technology that

14   Ervin uses is very simple to an airflow hood,

15   which I happen to own one.  The problem is that

16   this particular unit the airflow is too large

17   for the trailer in order to properly measure

18   airflow.

19   BY MR. PINEDO:

20        Q.    Are you aware of anybody who

21   commercially makes an airflow hood of the

22   adequate size to do a supply side airflow test

23   such as Mr. Ritter conducted?

24        A.    No, sir, I'm not.

25        Q.    Since there is nobody that you are

Page 234

1    aware of that commercially manufactures an

2    airflow hood of sufficient size to conduct a

3    supply side airflow test such as Mr. Ritter did,

4    would you as an expert in building performance

5    consider it acceptable to make a duct extension

6    that he did and conduct the test as he did?

7         MR. MULCAHY:

8              Object to form.

9         THE WITNESS:

10             Yes, I am.  In fact, I've seen it

11   done before.

12   BY MR. PINEDO:

13        Q.    And when you have seen this type of

14   test done before where there's an extension for

15   the ductwork and a hole is drilled in it and a

16   manometer is put through it, is that something

17   that you have seen outside of the litigation

18   context?

19        A.    I have.

20        Q.    Do you consider it a method to

21   adequately measure the airflow when you make an

22   extension of the ductwork such as Mr. Ritter did

23   and to drill a hole in that ductwork and insert

24   a manometer?

25        A.    I do.  It's an accurate method of

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 235

1   measuring the amount of air that's coming out of

2   a particular duct.

3        Q.    Now, there's also a standard for

4   doing airflow testing where you can remove, for

5   example, the ceiling panels and drill a hole in

6   the ductwork; is that right?

7        A.    There is.

8        Q.    And in this case were to your

9   knowledge the plaintiffs' experts given

10  permission by Recreation by Design, the

11  manufacturer of this travel trailer, to remove

12  the ceiling panels and drill a hole in the

13  ductwork?

14       MR. MULCAHY:

15            Object to form.

16       THE WITNESS:

17            We were not.

18  BY MR. PINEDO:

19       Q.    Given that that permission was not

20  granted to the plaintiffs' experts in this case

21  to remove the ceiling panels and drill a hole in

22  the ductwork, do you consider it acceptable to

23  test the airflow from the supply side in the

24  manner in which Mr. Ritter did it in making an

25  extension to the ductwork and using a manometer?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 236

1       MR. MULCAHY:

2             Object to form.

3       THE WITNESS:

4             I do.  I've actually seen folks and

5       articles that instead of using the ductwork,

6       they're actually taking garbage bags knowing

7       that the capacity -- what the size and shape of

8       the garbage bag was, they would time to see how

9       long it would take to inflate that garbage bag

10      and that's how they would calculate the amount

11      of airflow coming out of that register.

12      BY MR. PINEDO:

13          Q.    And have you seen articles published

14      on that?

15          A.    I have.

16          Q.    Did you bring any of those articles

17      with you today?

18          A.    I did.

19          Q.    And when did you read Mr. Ritter's

20      deposition?

21          A.    Between Monday and Tuesday of this

22      week.

23          Q.    Did you do that at my request?

24          A.    I did.

25          Q.    Did it seem to you that the attorneys

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255          (504) 529-5255
New Orleans * Baton Rouge * Shreveport

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 237

1    for the defendants, Recreation by Design and

2    Shaw, were making an issue as to the manner in

3    which Ervin Ritter conducted his airflow

4    testing?

5         MR. MULCAHY:

6              Object to form.

7         THE WITNESS:

8              I did.

9    BY MR. PINEDO:

10        Q.   Did that appear to you to be an issue

11   prior to reading the deposition of Mr. Ritter

12   the adequacy of those airflow testing procedures

13   that he had employed?

14        A.   No, sir.  I didn't see any issue with

15   the way he measured the airflow nor the accuracy

16   of the test.

17        Q.   Did I ask you to look for an article

18   that discussed the manner in which he did the

19   airflow testing or would relate to using a bag

20   or an extension to do an airflow test?

21        A.   You did.  It was an article I read

22   back in 2002 and I remembered the magazine.  I

23   went back online and downloaded it yesterday.

24        Q.   And was it put on a disc that you

25   gave me this morning called "Paul LaGrange

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 238

1    Additional Article 2-18-10?"

2         A.    Yes, sir.

3         Q.    Let the record reflect I'm giving a

4    copy of this disc to -- one for the attorney for

5    Recreation by Design and one for Shaw.  Let me

6    ask you, Mr. LaGrange, did I ask you to be print

7    out that article?

8         A.    You did, yes, sir.

9         Q.    And were you able to do so with your

10   computer software?

11        A.    I was not.  There was a security lock

12   on the PDF.

13        Q.    And is that the reason that it was

14   put on a disc?

15        A.    Yes, sir.

16        Q.    But are you telling us that you were

17   familiar with this article prior to two or three

18   days ago when you read Mr. Ritter's deposition?

19        A.    Yes, sir, I was.

20        Q.    And I may have asked you this

21   question earlier and I apologize if I have: Do

22   you consider the method that Ervin Ritter used

23   for measuring airflow on the supply side to be

24   an accurate method?

25        MR. KURTZ:

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 239

1            Objection to form.

2       THE WITNESS:

3            Yes, sir, I do.

4   BY MR. PINEDO:

5       Q.   Do you consider his results from that

6   testing to be accurate?

7       MR. KURTZ:

8            Objection to form.

9       THE WITNESS:

10           I do.

11  BY MR. PINEDO:

12      Q.   Have you done similar testing

13  yourself in the past on measuring the airflow on

14  the supply side?

15      A.   I have.

16      Q.   If you were faced with a similar

17  circumstance where you could not gain access to

18  the ducts in the ceiling panel or you were not

19  given permission to drill holes in the ductwork

20  once those ceiling panels were removed, how

21  would you conduct a test to determine the

22  airflow on the supply side?

23      A.   The only way you could do it is

24  measure the amount of air that's coming directly

25  out of that register and you can do it as Ervin

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255                    (504) 529-5255
New Orleans * Baton Rouge * Shreveport

Page 240

```
 1    did is certainly an acceptable method, or you

 2    can go all the way down to the extreme of just

 3    creating -- as Ervin did creating that device if

 4    you wanted to use a garbage bag, if you knew the

 5    size of the garbage, you can time how long it

 6    takes to inflate that bag to determine the

 7    amount of airflow.

 8         Q.    And the article that you have put on

 9    this disc that's entitled "Paul LaGrange

10    Additional Article 2-18-10," does that describe

11    the methodology for using a garbage bag?

12         A.    It does.

13         Q.    And it uses the methodology of the

14    garbage bag to determine the airflow on the

15    supply side?

16         A.    Supply and return side.  You can do

17    it either way.

18         Q.    But the basic concept of the garbage

19    bag is functioning as an extension to the

20    ductwork?

21         A.    It functions as an extension to the

22    ductwork but it's a known size so you can do all

23    your calculations based on the cubic volume of

24    that bag or the cubic volume of the device that

25    Ervin created.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)          Paul LaGrange

Page 241

 1       Q.     With regard to the physics of air

 2    flowing through a duct and measuring it with a

 3    manometer, are the physics the same in measuring

 4    the airflow on an extension such as Mr. Ritter

 5    did the same?

 6       A.     What's particularly nice about the

 7    device that Ervin created was it doesn't change

 8    the static pressure or the velocity of air

 9    that's leaving the fan motor and traveling down

10    the ductwork and leaving the register, so you

11    don't decrease or create some form of a static

12    pressure or change the velocity.  It's certainly

13    an acceptable method and an accurate method of

14    reading the amount of CFM's of air that's coming

15    into that air register.

16       Q.     And is it your understanding the

17    methodology that Ervin Ritter used to make the

18    airflow on the supply side did not alter the

19    static pressure or velocity?

20       A.     Yes, sir.  That's my understanding.

21       Q.     Would you expect that the reading he

22    got for airflow supply would be the same with

23    the methodology he had used as if he were given

24    permission to remove the ceiling panels and

25    drill a hole in the ductwork in the ceiling

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                      Paul LaGrange

Page 242

1    after inserting a manometer?

2         MR. KURTZ:

3              Objection to form.

4         THE WITNESS:

5              Yes, sir, it would be the same.

6    BY MR. PINEDO:

7         Q.    And is that because there was no

8    change in the static pressure or velocity as you

9    understand the way he conducted the test?

10        A.    That's correct.

11        Q.    I had asked you a series of questions

12   with regard to Mr. Ritter's methodology for

13   airflow measurements on the supply side.  I have

14   some questions on the return side.  When we talk

15   about the return side, what are we talking about

16   with regard to an air conditioning system such

17   as the type that was on the Castanel travel

18   trailer?

19        A.    The return side is actually under a

20   negative pressure.  It's actually drawing in air

21   from the living space to bring it into the

22   equipment to properly remove temperature and

23   remove humidity presuming it's in a cooling

24   mode.

25        Q.    In layman's terms is this where the

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255          (504) 529-5255
New Orleans * Baton Rouge * Shreveport

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 243

1    air is going into the unit to be cooled?

2         A.    It is.

3         Q.    And is that something that is

4    typically done with the airflow vent hood?

5         A.    It is.

6         Q.    And specifically what I'm talking

7    about is measuring the airflow on the return

8    side is typically done with the airflow vent

9    hood?

10        A.    That's correct.

11        Q.    Do you own an airflow vent hood?

12        A.    I do.

13        Q.    Were you able to utilize your airflow

14   vent hood in measuring the return air supply on

15   this Castanel travel trailer air conditioning

16   unit?

17        A.    No, sir.  It's too large.

18        Q.    And is that the reason you did not

19   use your airflow vent hood for such a test?

20        A.    Yes, sir.

21        Q.    To your knowledge does anybody make

22   commercially or sell an airflow vent hood of

23   sufficient size to be used in testing the return

24   air on this Castanel unit?

25        A.    Not that I've seen.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 244

```
 1        Q.     Given the circumstances where no one

 2   sells or makes commercially available an airflow

 3   vent hood of proper size to measure a return

 4   airflow, you as a professional, an expert in

 5   building performance, what would you suggest as

 6   a means and method to determine the return

 7   airflow on a unit such as the Castanel travel

 8   trailer?

 9        A.     Well, the only way you really could

10   do it is to develop something that would extend

11   the duct and capture the amount of air that's

12   going towards the air condition system as it's

13   being drawn in, again without changing the

14   static pressure of the fan.

15        Q.     And is that something that Ervin

16   Ritter did?

17        A.     It was.

18        Q.     And explain for me briefly how Ervin

19   Ritter did that.

20        A.     He created a box and that was fit

21   over the return section only of the machine in

22   the ceiling and he extended that box down so he

23   was able to measure the air as it was going into

24   the box before it went into the piece of

25   equipment.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 245

1      Q.     Besides Mr. Ritter have you ever seen

2   anybody else create a similar box to measure the

3   airflow in a return system of an air

4   conditioner?

5      A.     I have.

6      Q.     Have you seen that done outside the

7   litigation context?

8      A.     Yes.  By a few heating and cooling

9   subcontractors.

10     Q.     Based upon your experience as a

11  building performance expert in your work in the

12  area for the last 10 to 11 years, do you

13  consider that an acceptable method for measuring

14  the airflow on the return side when a vent hood

15  is not available?

16     A.     Yes, sir, I do.

17     Q.     Do you likewise consider that an

18  accurate method for measuring the airflow on the

19  return side where the individual creates their

20  own box to measure the airflow?

21     A.     Yes, sir.  It's accurate.

22     Q.     Is that something, the apparatus that

23  Ervin Ritter used, is that analogous or does

24  that relate in any way to the methodology that

25  was mentioned in this additional article that

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 246

1    you brought to us today on a disc?

2        A.    It's similar in respect that we're

3    trying to measure the amount of air that's being

4    drawn into the machine.  What the article refers

5    to is actually taking an inflated garbage bag of

6    a known size and putting it up to the return

7    where the air from the machine is actually being

8    drawn into the air condition equipment while

9    it's running and time how long it takes for all

10   the air to be removed from that garbage bag into

11   the system.

12            In the case what Ervin did was

13   instead of having a garbage bag of known size,

14   he actually took a device and actually extended

15   the ductwork down lower where he could measure

16   the amount of air that was going through that

17   return duct as it was entering the machine, so

18   the approach is similar except the fact that,

19   you know, Ervin's was a little bit more

20   advanced.

21       Q.    You were asked earlier as to whether

22   or not you had designed a travel trailer in this

23   case.  Do you recollect that?

24       A.    I do.

25       Q.    You have not designed a travel

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 252

1    imaging in the summertime where the exterior or

2    the outside air was hotter than the interior air

3    of the trailer, would you expect to find similar

4    findings?

5         A.    I would.  And when we've tested the

6    trailers in the past in the summertime, we've

7    always turned the air condition on to create

8    that differential pressure between indoor and

9    outdoor temperatures.

10        Q.    There was a discussion of the air

11   leakage that you found while doing a blower door

12   test.  Do you recollect that?

13        A.    Yes, sir.

14        Q.    And how many cubic feet per minute

15   did you find was leaking out of this trailer

16   when you were doing your blower door test?

17        A.    When the blower door was set at a

18   negative 50 Pascals, we calculated and measured

19   297 to 298 CFM's of air leakage at a negative 50

20   Pascals.

21        Q.    Did Ervin Ritter also do an analysis

22   of air leakage?

23        A.    No, sir, he did not.

24        Q.    Did Ervin Ritter do an analysis of

25   duct leakage?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                Paul LaGrange

Page 253

1        A.    He did an analysis of airflow which

2    you can interpret into duct leakage.

3        Q.    Did you do an analysis of duct

4    leakage?

5        A.    I did.  Through the duct blaster.

6        Q.    Did you find that 51 percent of the

7    air flowing through the system was leaking out

8    of the ductwork?

9        A.    I did not, no, sir.  I found

10   something less than that.

11       Q.    What did you find?

12       A.    Let me refer to my report.  Mine was

13   in the mid 30's.  I got a total duct leakage of

14   34 percent of the machine's rated capacity as

15   leakage.

16       Q.    And did Ervin Ritter's result -- did

17   his test show 51 percent of duct leakage?

18       A.    Yes, sir, it did.

19       Q.    How do you account for the difference

20   between your test that showed 34 percent duct

21   leakage and Ervin Ritter's test results which

22   showed 51 percent duct leakage?

23       MR. KURTZ:

24            Objection to form.

25       THE WITNESS:

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 254

1              They were measured at different

2      pressures.  The duct blaster measures at a

3      pressure of negative 25 Pascals and Ervin's

4      pressures were measured at the actual static

5      pressure that that fan created under its

6      everyday normal use.

7      BY MR. PINEDO:

8          Q.    Which was what?

9          A.    I would presume it to be a half inch

10     of static pressure, but that's a presumption on

11     my part because that's what most air condition

12     manufacturers state is the external static

13     pressure is the half inch of water column.

14         Q.    And a one-half inch of static

15     pressure equates with how many Pascals?

16         A.    Approximately 120, 125 Pascals.

17         Q.    Are you aware of anybody in the

18     United States that manufactures an air

19     conditioning unit that operates on something

20     other than one-half an inch of water column?

21         A.    No, sir, I'm not.

22         Q.    The duct leakage test that you did by

23     virtue of using the duct blaster, did you do it

24     in accordance with ASTM Standards which call for

25     25 Pascals?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                        Paul LaGrange

Page 255

1       A.    Yes, sir, I did.  And also it goes

2   along the protocol that was established by the

3   manufacturer of the blower door and also ResNet,

4   our governing authority, Energy Raters.

5       Q.    But is it your testimony that the

6   actual negative Pascals that are more

7   representative of what would have occurred when

8   the air conditioning unit was operating in the

9   Castanel unit was something more on the line of

10  120 to 125 negative Pascals?

11      A.    That's correct.  Because that would

12  have been closer to the way the machine was

13  operating on a daily basis while it was in the

14  cooling mode.

15      Q.    So would the difference between your

16  test being done at 25 negative Pascals and the

17  test that Ervin Ritter did with the unit

18  operating, the air conditioning unit which would

19  have been approximately 120 to 125 negative

20  Pascals, would that account for the difference

21  in the duct leakage that you found and that

22  Ervin Ritter found?

23      A.    Yes, sir.

24      Q.    You had tested return and supply duct

25  leakage simultaneously; is that right?

Page 256

1      A.    That's correct.

2      Q.    Is that something you have done

3  outside the litigation context?

4      A.    Yes, sir.

5      Q.    Is that something that the ASTM

6  Standard allows for?

7      A.    One of the steps is it measures total

8  duct leakage and then as the ASTM Standard

9  progresses it asks you to separate return and

10  supply side.

11      Q.    Without disassembling the unit or

12  removing the ceiling panels, was there any way

13  to separate out the amount of duct leakage from

14  the return as opposed to the supply in this

15  Castanel unit?

16      A.    There isn't.

17      Q.    Do you consider it an acceptable

18  methodology and have you seen it used elsewhere

19  besides this case to jointly measure the duct

20  leakage for the return and supply side of an air

21  condition unit?

22      A.    Yes, sir, I have.

23      Q.    Are all fans on air conditions

24  typically rated to operate at a certain level?

25  Let me ask you a different question.  Was the

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 257

1    fan on this air conditioning unit rated to

2    operate at a certain level?

3        A.    It was.  It was rated to operate at

4    325 CFM's of air.

5        Q.    Did Ervin Ritter to your knowledge

6    evaluate at what level this fan was operating?

7        A.    He did.

8        Q.    And was that at 295 cubic feet per

9    minute?

10       A.    Yes, sir.

11       Q.    And is that generally considered in

12   the range of what is acceptable for operating

13   value as opposed to what is the rated value?

14       A.    Yes, sir.  That lot has determined on

15   what makes that fan meet that target of the

16   rated 325.  It could be duct design.  It could

17   be duct leakage.  There's some contributing

18   factors, so it's acceptable that it's within 10

19   to 12 percent of the rated label.

20       Q.    Is your understanding is 295 is that

21   roughly nine percent lower than 325 cubic feet

22   per minute?

23       A.    Yes, sir.

24       Q.    If you were evaluating a residential

25   structure would you recommend replacement of a

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                         Paul LaGrange

Page 258

1    fan if it was operating nine percent less than

2    its operating capacity?

3         A.    No, sir.

4         Q.    In your opinion was the fan unit

5    operating very close to its labeled rating?

6         A.    From the information that Ervin

7    presented to me, yes.

8         Q.    Now, you were asked earlier about in

9    your evaluation is it your opinion that there

10   was 60 cubic feet per minute of leakage in this

11   unit with the air conditioner running to the

12   outside.  Let me start over.  Do you have page

13   56 of your report in front of you?

14        A.    Yes, sir, I do.

15        Q.    Was it your opinion that the total

16   cooling duct leakage was 101 cubic feet per

17   minute with the air conditioner running?

18        A.    With the blower door running, yes,

19   that's correct.  I'm sorry, with the duct

20   blaster running, that's correct.

21        Q.    And the duct blaster, what is the

22   comparison of the volume of the air moving

23   through with the duct blaster as opposed to when

24   the air conditioner unit itself was operating?

25        A.    The duct blaster operates at a

Page 271

1    an examination to render your opinions in this

2    case?

3         A.    No, sir, it's not.

4         MR. PINEDO:

5              I pass the witness.

6    EXAMINATION BY MR. MULCAHY:

7         Q.    Mr. LaGrange, you talked about Ervin

8    Ritter's deposition transcript that you recently

9    read.  Did you watch any video of Ervin Ritter

10   doing his airflow testing in the Castanel unit?

11        A.    No, sir, I did not.

12        Q.    Did you look at any photos of Ervin

13   Ritter doing his airflow testing in the Castanel

14   unit?

15        A.    No, sir.

16        Q.    Do you happen to know the dimensions

17   of the materials he used to extend the return

18   air duct in order to do his airflow testing?

19        A.    On the return side, no, sir, I'm not

20   aware of that.

21        Q.    Do you know if the materials he used

22   to construct that device on the return air side

23   matched up exactly with the size of the entry of

24   the return air port or return air duct?

25        A.    Ervin told me that the size and the

Page 272

1    shape of the box was similar to the return and

2    he was able to separate the return from the

3    supply.

4        Q.    So other than what you've gathered

5    from Mr. Ritter telling you how he did it, you

6    hadn't seen the box nor any photos or video of

7    the box, correct?

8        A.    That is correct, yes, sir.

9        Q.    What is more accurate: Mr. Ritter's

10   airflow testing or the duct blaster testing you

11   performed?

12       A.    I think they are both accurate.  They

13   both reflect the amount of -- they both reflect

14   duct leakage, just at different pressure

15   amounts, pressure readings.

16       Q.    Could you have performed a duct

17   blaster test at 120, 125 Pascals?

18       A.    I could have, yes, sir.

19       Q.    That wasn't part of the ASTM though,

20   correct?

21       A.    No, sir, it's not.

22       Q.    Why does ASTM utilize 25 Pascals

23   instead of the higher Pascal rating if air

24   conditioners can perform at that level?

25       A.    I don't know.  It's been an industry

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Paul LaGrange

Page 274

1    would imagine also it has the ability to do rise

2    run temperature differences.

3         Q.    Do you have the capability to test

4    airflow levels with your company?

5         A.    I'm sorry, do I have the capability

6    of testing?

7         Q.    Airflow?

8         A.    I do, yes, sir.

9         Q.    And that's what you mentioned earlier

10   that you would normally use a flow hood?

11        A.    Airflow hood, yes, sir.

12        Q.    You were not tasked to do that on

13   this particular unit, correct?

14        A.    I was not, no.

15        Q.    You mentioned earlier about the

16   testing airflow, you were asked questions about

17   testing airflow and drilling holes into the

18   ductwork and inserting a meter into the ductwork

19   to test airflow, correct?

20        A.    Yes, sir.

21        Q.    And that's one of the methods that

22   one can use to test the airflow, correct?

23        A.    For transversing the air, yes, sir.

24        Q.    Are you aware if Recreation by Design

25   was ever asked that someone could drill a hole