**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCT LIABILITY | * | SECTION "N-5" |
| LITIGATION | * | |
| | * | JUDGE ENGELHARDT |
| | * | |
| THIS DOCUMENT RELATES TO | * | MAG. JUDGE CHASEZ |
| *EARLINE CASTANEL, ET AL* | * | |
| *v. RECREATION BY DESIGN, LLC* | * | |
| *ET AL, DOCKET NO. 09-3251* | * | |

*************************************************************************

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE***
**TO EXCLUDE OPINIONS AND TESTIMONY OF ALEXIS MALLET**

**NOW INTO COURT,** through undersigned counsel, comes defendant, Recreation By

Design, LLC ("RBD"), who offers the following memorandum in support of its Motion *in*

*Limine* to Exclude the Opinions and Testimony of Alexis Mallet:[1]

## BACKGROUND

As part of plaintiff's efforts to address construction and design issues related to the

Castanel travel trailer[2], plaintiff retained various experts to investigate and test the subject unit

---

[1] As the Court and parties are familiar with the factual/procedural background of this matter, reference is made here to the general background as set forth in Recreation By Design, LLC's Memorandum in Support of Motion for Summary Judgment Regarding Prescription (Rec. Doc. 9722).

[2] Throughout this memorandum, RBD refers to plaintiff's travel trailer as a "FEMA unit" and/or "Emergency Housing Unit" (EHU") and/or "Temporary Housing Unit" ("THU") interchangeably.

from January 4th through 19th, 2010.[3]  One of these proffered experts is Alexis "Al" Mallet, Jr. of First General Services of the South, Inc. ("First General Services"), a self-styled "construction specialist."[4]  This Court is undoubtedly familiar with Mr. Mallet, as he was retained as an expert witness in the Gulf Stream, Fleetwood, and Forest River bellwether cases.[5]  In that regard, RBD seeks to adopt, as if set forth herein, the arguments and defenses previously raised by those defendants in their prior motions to exclude Mallet's testimony (Rec. Docs. 2776, 6655, &11383, respectively).  To the extent that Mallet offers opinions specific to this case, RBD will address those separately herein.

For this case, Mallet states that he was asked to "inspect the travel trailer, to give an opinion regarding the means and methods of construction and the condition of construction, and if there were contaminants such as formaldehyde products—if there were products containing formaldehyde, and if there was off-gassing of those products, how does that off-gassing permeate or get into the living area of the travel trailer."[6]  Despite the highly technical nature of these assignments, it should be noted that Mallet is not an engineer[7] and he only holds a degree in prelaw political science.[8]  Although he maintains licenses in the fields of general contracting, residential construction, and real estate (dormant), as well as certifications in mold remediation and manufactured housing installation, the main focus of his work is as an insurance repair

---

[3] *See* Inspection Report (First General Services of the South, Inc.), attached hereto as Exhibit "A."  *See* Ex. A at p. 35.

[4] Selected pages of the deposition transcript of Alexis Mallet, Jr., dated March 2, 2010, are attached hereto as Exhibit "B."  *See* Ex. B at p. 60.  Mallet's attendance during this inspection/testing date range was sporadic, and his team of personnel actually commenced its own inspection of the Castanel unit on January 13th, 2010 (Ex. B at p. 23).

[5] *See* Ex. B at pp. 111-112.

[6] Ex. B at p. 48; *see also* pp. 50-60.

[7] Ex. B at p. 48.

[8] Selected pages of the deposition transcript of Alexis Mallet, Jr. in the Gulf Stream bellwether trial, dated July 17, 2009, are attached hereto as Exhibit "C."  *See* Ex. C at p. 22.

specialist for First General Services.[9]   Mallet is not an industrial hygienist or an air-quality specialist.[10]   Moreover, he has never designed or manufactured a travel trailer.[11]

For previous bellwether cases in this MDL, Mallet admitted that, with regard to plaintiff's other construction and design experts, he was "[…] just repeating and taking their position in how the building affected it."[12]   Similarly, in the Fleetwood bellwether, Mallet testified that "I basically lead the team, disseminate who is going to look at what, and have them to either—if there are calculations that will back up or that will tell me whether a position that we have taken is accurate or inaccurate."[13]   Here, Mallet confirmed that his primary role was to "coordinate all of the individuals in the data gathering phase and put the work together."[14]   It is evident from Mallet's written report and deposition testimony that he primarily relies on the opinions of Charles David Moore,[15] Ervin Ritter, P.E., Paul LaGrange, Dr. Stephen Smulski, and William Scott, P.E., as the sources for his observations and the bases of his conclusions.[16]

At the end of Mallet's 109 page written report, he finally offers twelve conclusions.[17] These conclusions, labeled A-L in the report, can be summarized by the following broad categories:

---

[9] Ex. C at pp. 25, 30.
[10] Ex. B at p. 59.
[11] Ex. B at p. 60.
[12] Ex. C at p. 126.
[13] Selected pages of the deposition transcript of Alexis Mallet, Jr. in the Fleetwood bellwether trial, dated October 28, 2009, are attached hereto as Exhibit "D."  *See* Ex. D at p. 89.
[14] Ex. B at pp. 15-16.
[15] Ex. A, Section I, p. 5.
[16] Ex. A, Section IV, p. 12; *see also* Section V, pp. 25-26; Section VI, pp. 34, 39-41, 47-55, 57, 59-61, 65, 67, 69, 78, 81-85, 88, 89; and Section VIII, p. 96; Ex. B at pp. 15-26, 33-35, 71-75, 84-85, 125-26, 129-30, 168-69, 176-81, 183-84, 188-90, 193-194, 197-200.  RBD has filed separate Motions *in Limine* with regard to Moore, Ritter, LaGrange, Smulski, and Scott.
[17] Ex. A, Section XI, pp. 105-108.

1. **Building Codes and Standards (A & B):** RBD was required to follow certain standards, including the International Building Code, International Residential Code, and New Orleans Building Code.  RBD did not comply with these codes and standards.

2. **General Construction Issues (C, J, L):** The Castanel unit was not constructed for use in hot, humid climates nor cold climate conditions, and the documented quality of workmanship is less than superior regarding sealants, installation of insulation and HVAC ducts, and trailer maintenance.  The Castanel unit was also constructed with formaldehyde emitting materials.

3. **Formaldehyde Off-Gassing (D, F, G):** The construction means, methods, and materials utilized in the trailer, combined with poor quality of workmanship, contributed to the off-gassing of formaldehyde.

4. **Jacking/Blocking (E):** Jacking and blocking caused the unit to flex, creating openings around the windows allowing air, heat and moisture to enter the trailer.

5. **Vapor Barriers (H & I):** The vapor barrier inside the unit was not placed in the recommended location for buildings located in hot, humid climates, which can cause trapped moisture, deterioration of building materials, mold proliferation, and increased off-gassing of formaldehyde.

6. **Alternative Building Materials (K):** Products that were ultra low or non-formaldehyde emitting were available for use in 2005.

RBD requests that the Court exclude Mallet's testimony in its entirety.  Should the Court permit him to testify, however, RBD requests that the Court limit and/or exclude certain portions of his testimony in the manner described below.

**ARGUMENT AND AUTHORITIES**

## I.    ADMISSIBILITY REQUIREMENTS FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 gives a district court considerable discretion to admit or exclude expert testimony.[18]   Rule 702 provides that an expert witness "qualified … by knowledge, skill, experience, training, or education" may testify when scientific, technical, or other specialized knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue."[19]   For expert testimony to be admissible, Rule 702 requires that: (1) the testimony be based on sufficient facts or data; (2) the testimony be the product of reliable principles and methods; and (3) the witness apply the principles and methods reliably to the facts of the case.[20]   Plaintiff, as proponent of the expert evidence, bears the burden of demonstrating its admissibility.[21]   Defendants do not have the burden of demonstrating its inadmissibility.[22]

In *Daubert*, the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper at the outset to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[23]   The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's report is valid.[24]   The goal is to exclude expert testimony based merely on subjective belief or unsupported speculation.[25]   In addition, the party offering the testimony bears the burden of establishing its reliability by a preponderance of the

---

[18] *See General Electric Co. v. Joiner*, 522 U.S. 136, 151 fn. 1, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

[19]  Fed.R.Evid. 702.  For a more detailed discussion of the applicable legal standards regarding the admissibility of expert testimony, please see RBD's Motion *in Limine* to Exclude the Opinions and Testimony of Ervin Ritter, P.E.

[20] *Id.*

[21] *See, e.g., Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002); *see also Daubert*, 509 U.S. at 592 n.10.

[22] *See Rieger v. Orlor, Inc.*, 427  F.Supp.2d  99, 102 (D. Conn. 2006); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

[23] 509 US. 579, 598, 113 S.Ct.2786, 125 L.Ed.2d 469 (1993) (emphasis added); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony based on technical or specialized knowledge).

[24] *See Daubert*, 509 U.S. at 593.

[25] *Id.* at 590.

evidence.[26]  To satisfy the relevancy requirement, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence or determine a fact in issue.[27]  This "helpfulness" standard of Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."[28]

Thus, trial courts must engage in a rigorous three-part analysis under Rule 702 to determine the admissibility of expert testimony, and consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[29]

Additionally, even if an expert's proffered testimony survives the threshold scrutiny under Rule 702, that expert's opinions are subject to further review and preclusion under Rule 403.[30]  Rule 403 permits a district judge to exclude relevant evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[31]  And, as the *Daubert* court correctly noted, "[e]xpert evidence can be both powerful and quite misleading—because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 … exercises more control over experts than lay

---

[26] *See Moore*, 151 F.3d at 276.
[27] *Daubert* at 591.
[28] *Daubert* at 591-92 (internal quotations omitted).
[29] *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589).
[30] *See, e.g., Daubert*, 509 U.S. at 595; *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996).
[31] Fed. R. Evid. 403.

witnesses."[32]   To this end, an expert opinion's "lack of reliable support may render it more prejudicial that probative, making it inadmissible under [Rule] 403."[33]

Here, Mallet's testimony should be excluded under Rules 403 and 702. First, Mallet's opinions are duplicative of those set forth in the expert reports of other expert witnesses that plaintiff intends to call at trial.  Second, Mallet's opinions are nothing more than assumptions based on unreliable methodology.  Finally, Mallet's opinions and testimony will not assist the jury to understand or determine a fact in issue.  Mallet's testimony, therefore, should be excluded in its entirety.

## II.    MALLET'S TESTIMONY IS DUPLICATIVE

RBD is mindful of this Court's prior rulings that "[m]ultiple opinions on the same subject will generally not be admitted, absent prior consent of the Court based on a showing of compelling reasons."[34]   With respect to Mallet, this court has already ruled that "[t]he Court notes, as a threshold matter, that many, if not most, of Mallet's opinions are set forth in the expert reports of other experts plaintiff intends to call at trial.  The Court agrees that these opinions are duplicative, and again cautions plaintiff that elicitation of the same opinions from different experts will result in admonishment before the jury, and **exclusion of any such duplicative opinions**."[35]   This Court went on to note that:

> Nonetheless, many of the opinions Mallet issues in this case are either inconclusive or irrelevant to the issues to be presented to the jury.  For instance, Mallet is not an expert in HVAC in particular, nor is he a wood products expert; he is not an expert in jacking of travel trailers and installation for use by an occupant.  Although Mallet does have a wide range of experience in building in general, these areas of expertise are potentially the subject of other experts at trial,

---

[32] *Daubert*, 509 U.S. at 595; *accord Brock*, 94 F.3d at 226.
[33] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).
[34] *See* Order dated July 7, 2009 (Rec. Doc. 2062); Order dated March 9, 2010 (Rec. Doc. 12639).
[35] *See* Order dated March 10, 2010 (Rec. Doc. 12735) (emphasis added).

and thus his opinions in this regard are excluded if offered by those other experts.[36]

Finally, this Court cautioned that "[a]t this juncture, the undersigned urges counsel for the plaintiff to reconsider the utility of Mallet's testimony, given that it will indeed be quite limited in scope, and will not be inclusive of any opinions offered by others of plaintiff's experts which the Court has indicated are permissible."[37]

Although this Court's ruling should pertain to duplicative testimony in the Castanel matter, out of an abundance of caution, RBD seeks to adopt, as if set forth herein, the arguments and defenses previously raised in this MDL by defendant Forest River, Inc. regarding the inadmissibility of duplicative testimony.  Specifically, RBD seeks to adopt the arguments and defenses raised in Forest River Inc.'s Motion to Exclude Expert Testimony of Paul J. LaGrange (Rec. Doc. 11380), Forest River Inc.'s Motion to Limit the Testimony of Alexis Mallet (Rec. Doc. 11383), and Forest River Inc.'s Motion to Limit the Testimony of Ervin L. Ritter (Rec. Doc. 11393), along with all supporting memoranda.  To the extent that plaintiff's opinions in this case differ from those in previous bellwether trials, however, RBD offers the following arguments specific to plaintiff's expert testimony regarding the Castanel unit.

Despite this Court's prior rulings regarding duplicative testimony, plaintiff intends to offer the testimony of three expert witnesses—Mallet, LaGrange, and Ritter—who all comment specifically on the HVAC system and temperature/humidity conditions within the Castanel unit. This overlap in subject matter is especially puzzling in light of the fact that Mallet himself was retained by plaintiff for the express purpose of assembling the trailer inspection team,

---

[36] (Rec. Doc. 12735, p. 2).
[37] (Rec. Doc. 12735, p. 2).

coordinating their tests and inspections, and drafting the majority of their testing protocols.[38]  He

describes what each expert was tasked with as follows:

> Q:  You hired Mr. Ritter to be your HVAC expert, correct?
> A:  On the mechanical system.
> Q:  On the mechanical system itself and on the operation of the mechanical system, right?
> A:  Yes, sir.
> Q:  I mean, he is a mechanical engineer, correct?
> A:  Mechanical and environmental.
> Q:  And you hired Mr. LaGrange to be your testing person as far as duct blaster, blower door and some thermal imaging, correct? […].
> A:  Right, he has those particular toys.
> Q:  And you hired Mr. Moore to be your civil engineer regarding structural-type issues, correct? […].
> A:  Yes.  And because I am not allowed by licensing laws to perform calculations, engineering-type calculations, so where there is the potential for the need of that, I bring in Mr. Ritter or Mr. Moore or Mr. Hicks or one of my other engineers that I work with on metallurgy or soil or areas of that nature.[39]

Thus, as a non-engineer, Mallet must expressly defer to licensed professionals like Ritter for

calculations and engineering opinions.[40]  Yet, Mallet agreed that he included the work of the

other members from his "personnel team" in his report:

> Q.  Looking at your billing records, from what you told me a little bit earlier, I take it you have had several conferences and meetings with Mr. Ritter, Mr. LaGrange and Mr. Moore, correct?
> A.  Yes.  Without looking at the record, I can tell you yes.
> Q.  Are your findings based upon your conferences with them encompassed in your reports? […]
> A.  Yes, sir.[41]

Just like the previous bellwether cases, Mallet reproduces the reports of Ritter and LaGrange to

provide a comprehensive analysis of the HVAC, ventilation, insulation, and air quality issues in

the Castanel unit.  As such, Mallet's incorporation of Ritter and LaGrange's findings into his

---

[38] Ex. B at pp. 15-16, 22-23.
[39] Ex. B at pp. 197-99.
[40] *See also* Ex. B at pp. 129-30.
[41] Ex. B at pp. 34-35.

own written report renders it is wholly duplicative with regard to those HVAC, ventilation, and insulation issues.

For example, Mallet hired LaGrange to perform blower door, envelope air leakage testing, duct leakage testing, and pressure differential testing.[42]  Although Mallet claims that his personal opinions regarding envelope and duct leakage are based on independent observation, it is unclear how he could have rendered his conclusions without relying on LaGrange's tests and data.  In fact, Mallet was not even physically present in the unit when these tests were conducted:

> Q. What did you hire Paul LaGrange to do?
> A. To perform blower door, envelope air leakage testing, duct leakage testing, pressure deferential testing.
> Q. Were you present in the unit when Mr. LaGrange performed that testing?
> A. No, sir.
> Q. As far as the actual testing methodology, though, to test for envelope air leakage, air-conditioning duct air leakage and air exchange rates, that would all have been done by Mr. LaGrange?
> A. Yes, sir.
> Q. And you did not personally do those tests?
> A. No, Sir.[43]

Because Mallet's report is duplicative of Ritter and LaGrange's testimony, it should be excluded under Rule 403 and this Court's Order of July 7, 2009 (Rec. Doc. 2062), this Court's Order of March 9, 2010 (Rec. Doc. 12639), and this Court's Order of March 10, 2010 (Rec. Doc. 12735). Should the Court permit Mallet to testify, however, RBD requests that the Court limit and/or exclude certain portions of his testimony in the manner described below.

## III.    MALLET'S TESTIMONY IS NEITHER RELIABLE NOR RELEVANT

For every conclusion contained in an expert's proposed testimony, the court must also determine if the methodology leading to that conclusion is sound.[44]  A court may appropriately exclude expert testimony where it finds that an expert has extrapolated data, and there is "too

---

[42] Ex. B at pp. 73-74.
[43] Ex. B at p. 73.
[44] *See Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996).

great an analytical gap between the data and the opinion proffered."[45]   Expert testimony should also be excluded where it is speculative or not amenable to scientific verification.[46]   As such, "[t]esting, which is actually performed, must be appropriate and must analytically prove the expert's hypothesis.[47]   District courts must ensure that the "factual basis, data, principles, methods, [and] their application" are sound.[48]   Here, Mallet's methodology does not analytically prove the hypotheses and conclusions in his expert report.   As such, his opinions should be excluded because they will not assist the jury to understand or determine a fact in issue.

To meet the relevancy standard of Rule 702, the proposed expert's opinions must "assist the trier of fact to understand or determine a fact in issue."[49] The fundamental inquiries for the jury in this case are: (1) what levels of formaldehyde existed in plaintiff's trailer during her occupancy of the unit, and (2) whether those levels caused her any injury.   Indeed, this Court has already ruled with respect to plaintiff's expert witness Ervin Ritter, P.E., who was specifically retained by Mallet, that his proffered "testimony must relate, in some material way, to the existence of formaldehyde in the unit.   In other words, any short-comings in the HVAC system are not relevant unless they somehow tend to prove or disprove the existence and/or level of formaldehyde present in the EHU."[50]   Here, the same principle should also apply to the opinions and testimony of plaintiff's expert witness Mallet.

---

[45] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore*, 151 F.3d at 279.

[46] *Moore*, 151 F.3d at 273.

[47] *Presley v. Lakewood Engineering and Manufacturing Co.*, 553 F.3d 638, 646 (8th Cir.2009) (citing *Shuck v. CNH America, LLC*, 498 F.3d 868, 875 n. 3 (8th Cir.2007); *see also Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058-60 (8th Cir.2005) (holding expert testimony unreliable where the tests were inconsistent with the theory proffered).

[48] *See Kumho*, 526 U.S. at 149.

[49] *See* Order dated July 15, 2009, p.4 (Rec. Doc. 2181) (citing *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003)).

[50] *See* Order dated March 9, 2010, p.2 (Rec. Doc. 12640).

**A.  Building Codes (Mallet's Conclusions A & B)**

RBD contends that plaintiff should not be permitted to offer any testimony asserting that (1) certain international and New Orleans building codes applied to the Castanel trailer, or (2) that the Castanel trailer failed to comply with those codes, in that such testimony is wholly irrelevant to the ultimate issues that must be decided in the present case.  Indeed, this Court has already ruled that:

> On the showing made, the Court is not in the least bit convinced that the building codes are relevant.  Even assuming that the codes are applicable, there seems to be little to no actual evidence that Defendants' failure to comply with such codes relates in any way to Plaintiff's grievance(s).  For this reason alone, the Court grants both of these motions now, such that no reference to building codes shall be admissible at trial.[51]

Although this Court's ruling should pertain to the same arguments regarding non-applicability of building codes in the Castanel matter, out of an abundance of caution, RBD seeks to adopt, as if set forth herein, the arguments and defenses previously raised in this MDL by defendants Shaw Environmental, Inc. and Forest River, Inc. regarding the inapplicability of building codes and standards to travel trailers.  Specifically, RBD seeks to adopt the arguments and defenses raised in Shaw Environmental, Inc.'s Motion in Limine to Exclude References to Building Codes (Rec. Doc. 11414), Forest River, Inc.'s Motion in Limine to Exclude the Testimony of Ervin L. Ritter (Rec. Doc. 11393), and Forest River Inc.'s Motion to Exclude Certain Comments to the Jury (Rec. Doc. 11389), along with all supporting memoranda.[52]  RBD also offers the following arguments with respect to the specific conclusions contained in Mallet's written report and deposition testimony for the case at hand.

---

[51] *See* Order dated March 3, 2010, pp. 1-2 (Rec. Doc. 12260).
[52] To the extent that plaintiff's conclusions regarding the applicability of building codes to the Castanel trailer differ from those in previous bellwether trials, however, a thorough analysis of this issue is the subject of a separate motion *in limine* to be filed by RBD.

In the first Conclusion A of his written report, Mallet opines that, "Recreation By Design was required to follow at a minimum the FEMA specifications, the ANSI, NFPA, NEC and ASHRAE Standards.   It is also our opinion the International Building Code ("IBC"), International Residential Code ("IRC") and the New Orleans Building Codes ("NOBC") should have been followed along with other building standards outlined in this report."[53]   Mallet's Conclusion B states that, "Recreation By Design did not comply with the applicable codes and standards."[54]   RBD asserts that any and all references to codes or standards outside of the ANSI and the NFPA should be excluded because Mallet has no basis whatsoever for his conclusions.

As a preliminary matter, Mallet should not be permitted to offer testimony on the applicability of building codes to travel trailers, as he admittedly failed to conduct any independent analysis or investigation into the issue.[55]   Rather, Mallet bases his conclusions on a single email exchange with Johnny Odom, the chief building inspector at the City of New Orleans, in January of 2010.[56]   Odom stated that the building code inspections normally conducted by the City were "suspended" and that FEMA was allowed to conduct its own inspections of the unit.[57]   This email was Mallet's first and last communication with the building inspector's office for the City of New Orleans, and he did not contact any other state agency regarding the applicability of building codes to travel trailers.[58]

Moreover, Mallet testified that he did not even know whether RBD ever received the FEMA procurement specifications prior to manufacturing the Castanel unit, and that he based his

---

[53] Ex. A at p. 105.
[54] Ex. A at p. 105.
[55] Ex. B at pp. 38-39.
[56] Ex. B at pp. 38-39.
[57] Selected pages of the deposition transcript of Alexis Mallet, Jr. in the Forest River bellwether trial, dated January 12, 2010, are attached hereto as Exhibit "E."  *See* Ex. E at pp. 20-21.
[58] Ex. B at pp. 38-39.

analysis on this issue solely on the fact that the units were purchased for disaster relief.[59]   And, Mallet testified in the Gulf Stream bellwether case that the ASHRAE standard is *not* specifically applicable to travel trailer HVAC systems.[60]   Even if that standard *did* apply to travel trailer (which it does not), RBD asserts that Mallet should not be permitted to opine on engineering standards such as ASHRAE (American Society of Heating, Refrigerating and Air Conditioning Engineers) or the NEC (National Electrical Code) because he is not an engineer.[61]   Mallet simply does not have the qualifications to discuss codes and standards.   In fact, Mallet testified in the Gulf Stream bellwether that he could not even state which ASHRAE standard would apply to air conditioning ductwork.[62]

Finally, just because Mallet believes that the IBC, IRC, and NOBC ***should*** have been followed, the application of a code is not a matter of opinion—the code is either applicable to travel trailers or it is not.   Plaintiff has not produced any evidence showing that the FEMA specifications required trailers to comply with the IBC, IRC, or the NOBC.   And, of critical importance, plaintiff has not shown that any alleged violation of those codes increased the concentration of formaldehyde within the Castanel unit.   As such, Mallet should not be permitted to testify on the "applicability" of these codes and standards to the Castanel trailer at trial.   Such testimony is irrelevant to the issues in this case, and would only mislead and confuse the jury.

**B.  General Construction Issues (Mallet's Conclusions C, J, & L)**

Although he lacks the requisite expertise to comment on workmanship and design of travel trailers or HVAC systems, Mallet's testimony touches on numerous "problems" with the construction of the Castanel unit.   Blaming these alleged deficiencies on "less than superior

---

[59] Ex. B at pp. 67-68.
[60] Ex. C at pp. 183-85.
[61] Ex. B at p. 48.
[62] Ex. C at pp. 183-85.

workmanship," Mallet discusses the quality of sealants, the installation of insulation and HVAC ducts, and the sufficiency of the trailer's design for hot, humid, or cold climate conditions.[63] Mallet's apparent goal with this testimony is to connect any alleged deficiencies with the trailer's construction and design to the introduction of contaminants into the trailer's living space.[64] However, his opinions are the product of unreliable methodology and will not assist the jury in reaching any conclusions in this case.

First, Mallet's conclusions are not supported by any data from testing that he actually performed, and his written report fails to specifically address how any alleged construction defects impacted the formaldehyde concentration within the unit during Castanel's occupancy:

Q:  What were your observations regarding the A/C system?
A:  That the duct system was installed, but not properly sealed.  That there were numerous penetrations in the duct system, staples penetrated and damaged the duct system.  That the duct system was not properly constructed.  That the duct system was made of materials that had less than an R7 value.  That the sealants used on the duct system penetrations were inadequate to prevent—inadequate or insufficient to prevent air and moisture movement outside the system.  And that the connection between the unit and the building was insufficient to prevent air leakage.  The complete loop was violated.
Q:  And that is an opinion you formed without doing any testing of the unit; is that correct?
A:  Just visual.
Q:  […].  Just tell me regarding your observation of this unit, where can we find that in your report?
A:  Let me see.  I need to put an index in these reports.
Q:  While you are looking, maybe you can answer this.  You said from your observations, you saw that the duct system was not properly sealed, numerous penetrations, system not properly constructed.  Did you make any quantification as to if there was any duct leakage?
A:  No.  That is why I had Mr. LaGrange there, just to do the quantification.
Q:  Mr. LaGrange did the quantification?
A:  Right.  We utilized his equipment to do that.

Moreover, Mallet admitted that his observations regarding the quality of workmanship for the Castanal trailer are premised on inspections that took place years after the plaintiff resided in it:

---

[63] Ex. A
[64] Ex. A, Section XI, pp. 105, 107 (Conclusions C, J, & L); *See also* Ex. B at pp. 71-72.

Q.  The Castanel unit sat empty in Lottie for about two and a half years prior to this inspection.  Does that sound about right?

A.  I believe from around November 1, 2007, until our inspection.

Q.  So two years and a couple of months?

A.  Yes, sir.  January 5, 2010.

Q.  Do you know if the unit was maintained at all by FEMA while it sat in Lottie?

A.  No, sir, I don't.

Q.  Would you expect the effects of temperature and humidity on any empty unit sitting out in an open field to be a factor in the condition of the unit when you inspect it two years later? […]

A.  There is a possibility.

Q.  I mean, certainly you would think that caulking would be subject to the heat and sun and temperature during that time frame, correct, exterior caulking?

A.  Yes, sir.

Q.  And interior-wise, if you have a unit just sitting there closed up for a couple of years, correct?

A.  Yes, sir.

Q.  And from a construction standpoint, wouldn't you expect that an empty building sitting out like that is going to have some degradation of it weather stripping and calking and sealants during that time frame?

A.  Yes, sir.

Q.  And that would have an effect on the interior, correct?

A.  Yes.

Q.  Allowing moisture and temperatures to build up in the walls of the unit, correct?

A.  Yes, sir.

Q.  In the actual interior of the unit?

A.  Yes, sir.

Q.  Other than having an inspection before the unit went out there, and from the time we saw it, we really don't know what changes took place with that unit during that two-year period, correct?

A.  That's correct.[65]

Finally, although Mallet did not bother to determine the cause of the trailer's roof deflection, he nevertheless felt it appropriate to use this unsubstantiated observation to support his contention that the trailer was constructed with "less than superior quality workmanship:"[66]

Q:  Referring you to page 65 of your report, sir.  You are addressing the roof, top of page 65, Roman numeral ii, "Close examination of the roof deck indicated a deflection which would allow water to accumulate."  Do you see that?

A:  Yes, sir.

Q:  Did you measure that deflection, how much of a deflection that was?

---

[65] Ex. B at pp. 80-82.
[66] Ex. A, Section XI, Conclusion L, at p. 107.

A: I did not, but it was—photographs show that it is a fair amount of deflection, and there is corrosion on the roof from water ponding on that roof over long periods of time.

Q: Do you have an opinion as to what caused that deflection?

A: It was just an observation.

Q: Just an observation?

A: I didn't opine as to the cause, just that it was what it was.[67]

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

Q: One of your conclusions on page 107 of your report is "Failure to properly maintain the trailer." Whose maintenance are you referring to there? L8 on page 107.

A: That was in relation to the water infiltration through the roof system and then that buckled area that held water.[68]

Mallet's deposition testimony confirms that his observations and conclusions regarding general construction issues are the product of unreliable methodology and assumptions—as such, his testimony should be excluded.

### C. Formaldehyde Off-Gassing (Mallet's Conclusions D, F, & G)

Mallet spends dozens of pages in his report discussing the alleged "poor quality" of construction means, methods, and materials utilized in the trailer.  In his "Conclusions" section, he asserts that RBD "did not construct a unit that would prevent water, air, heat and moisture from penetrating into the THU" (Conclusion D).[69]  Mallet opines that the "less than superior quality of workmanship" during construction of the Castanel THU "caused moisture and air to have access to formaldehyde emitting materials," thus contributing to the "increase of off-gassing in the walls, ceilings, floors, and interior living area of the THU" (Conclusion F).[70]  He also contends that the "quality of workmanship of the air conditioning duct work in the Castanel housing unit" caused the housing unit to operate under a negative flow, which "sucked in hot moist air into the wall cavities, elements that increase formaldehyde off-gassing" (Conclusion

---

[67] Ex. B at pp. 145-46.
[68] Ex. B at pp. 161-62.
[69] Ex. A, Section XI, at pp. 105-06.
[70] Ex. A, Section XI, at p. 106.

G).[71]   Mallet, however, fails to provide any factual analysis to support his conclusions that deficiencies in the trailer's construction contributed to elevated humidity and/or off-gassing of formaldehyde in the Castanel unit.

Mallet did not personally test the unit for the presence of formaldehyde, nor did he do any equations regarding the levels of formaldehyde.[72]   Rather, he exclusively deferred to other experts to conduct those measurements and calculations.   Mallet also readily conceded at his deposition that he never linked any alleged construction defects in the Castanel unit to a quantifiable increase in the rate of formaldehyde off-gassing in his written report:

> Q:   […].  [Y]ou don't have any information in your report as to whether the levels of off-gassing, or the off-gassing that you opine about increased the levels of formaldehyde in the interior of this unit by any specific amount; is that correct?
> A:   No, sir, we have no test results for that.
> Q:   You didn't have anyone run the unit or run the fan of the motor to test to see if there was any increase of formaldehyde levels in the interior of the unit, correct?
> A:   No, I did not do a testing of that.[73]

And, although Mallet's off-gassing theory is predicated on increased moisture and humidity levels,[74] he did not see fit to include that information in his report:

> Q:   Do you have any readings in your report regarding temperature and humidity levels in the Castanel unit while you were performing your inspection?
> A:   Do I have them in my report?
> Q:   Correct.
> A:   No.  When we were doing those tests, Mr. LaGrange took the temperature and relative humidity readings and I think Mr. Ritter – Scott Daly with Mr. Ritter's company took the temperature and relative humidity readings with data loggers.
> Q:   But you didn't personally think it was necessary to put those results in your report, correct?
> A:   No, because they were not material to the sections I dealt with.[75]

Simply put, Mallet has no data whatsoever to support his conclusions that the construction and design of the Castanel unit let to increased temperature or humidity levels and caused off-gassing

---

[71] Ex. A, Section XI, at p. 106.
[72] Ex. B at pp. 181-82.
[73] Ex. B at p. 185.
[74] Ex. B at pp. 212-13.
[75] Ex. B at pp. 199-200.

of formaldehyde.  Because he failed to conduct any tests whatsoever to support his contentions, Mallet offers no relevant evidence that would assist the jury in determining the facts at issue in this case.  Mallet's testimony is based on assumptions and improper methodology, and will only serve to confuse and mislead the jury with vague implications that the formaldehyde levels in the Castanel unit must have been problematic.  Accordingly, Mallet's testimony should be excluded.

### D.    Vapor Barriers (Mallet's Conclusions H & I)

Mallet states that the Castanel trailer was defective because the "vapor barriers" were not placed in the recommended location for buildings located in hot, humid climate zones (Conclusion H).[76]  He further asserts that because the vapor barrier on the trailer's wall was placed for "frigid and cold climates," this caused trapped moisture, deterioration of building materials, mold proliferation, and increased off-gassing of formaldehyde (Conclusion I).[77]  As previously discussed, *supra*, Mallet's various conclusions regarding the construction of the Castanel unit and any subsequent off-gassing of formaldehyde are duplicative and purely speculative.

And, in the *Wright* bellwether trial, this Court already took issue with Mallet's failure to support his vapor barrier conclusions with any real data:

> In fact, after reviewing the submissions of counsel, the only opinion which Mallet offers relates to the provision and functionality of the vapor barrier in the EHU.  Even this testimony, however, is undercut by the fact that Mallet testified that he did not observe any vapor damage between the wall board and vinyl covering, nor did he capture the depiction of any such moisture damage by way of photograph or other recordation.[78]

---

[76] Ex. A at p. 106.
[77] Ex. A at pp. 106-107.
[78] *See* Order dated March 10, 2010 (Rec. Doc. 12735, p. 2).

Just like the *Wright* case, Mallet could not or did not observe any "condensation" or vapor damage between the Castanel trailer's wall board and vinyl covering.[79]  In fact, Mallet admitted that he could not pinpoint the source of the only documented moisture intrusion in his report:

> Q:  In your report, I think you discussed this earlier, that by one of the windows, you may have seen some moisture on the, for lack of a better term, the sill or the ledge of the window, or evidence of moisture; is that correct?  […].
> A:  Yes, sir.
> Q:  You noted the appearance of "mold-like substance on window frames," correct?  That's on page 33, B.1.i.a.
> A:  Yes, sir.
> Q:  You don't know how long that particular mold-like substance had been on the windows, correct, the window frames?
> A:  No, sir, that was just an observation.
> Q:  And you don't know the cause of the water stains on those window frames? […].
> A:  It would only have to be through either water leaks or condensation.
> Q:  But you don't have any idea how a unit that has been sitting in a field for two years as to when that could have taken place, correct?
> A:  If it was condensation, probably prior to its arrival in Lottie.  If it was water infiltration, it could have been any time.
> Q:  Condensation, would that indicate to you some type of leak in the caulking around a window?
> A:  No, sir.
> Q:  What would that indicate to you?
> A:  Air passage, air movement with high moisture content infiltrating the envelope.
> Q:  Were you able to determine where that air infiltration was as to the windows?
> A:  Could have been anywhere.  The walls were not sealed.  The floor to the walls were not sealed.  The attic to ceiling was not sealed.  So it could have been emanating from anyplace, or originating from anyplace.[80]

Simply put, Mallet cannot attribute any damage in the Castanel unit to the alleged misplacement of the trailer's vapor barrier.  Accordingly, any and all opinions regarding vapor barriers should be excluded, as this testimony is duplicative of other experts and based upon blatant speculation.

### E.    Alternative Building Materials (Mallet's Conclusion K)

Mallet opines on the availability and use of ultra low or non-formaldehyde emitting products, and concludes that these "alternative materials" were available for use by RBD at the

---

[79] Ex. B at p. 257.
[80] Ex. B at pp. 261-63.

time the Castanel unit was manufactured in 2005 (Conclusion K).[81]  As a preliminary matter, this testimony should be excluded because Mallet has no expertise in the design or manufacture of travel trailers.[82]  The question of alternative building materials for travel trailers, therefore, is outside Mallet's area of expertise.  Indeed, Dr. Stephen Smulski is plaintiff's designated wood products expert—in that sense, Mallet's opinions regarding the use of alternative wood products is duplicative of Smulski's testimony and should be excluded as such.

Moreover, Mallet's alternative design testimony is insufficient under the Louisiana Products Liability Act ("LPLA").[83]  At his deposition, Mallet brought a "mockup" of his "alternative wall panel design" for travel trailers.[84]  He testified that the "alternative construction method that has appeared in my reports would be a nonformaldehyde-emitting material and one that restricted air flow and moisture flow from either in or out, and one that could meet almost every climate condition in the United States except for mountainous areas."[85]  Despite Mallet's apparent confidence in this theory, the LPLA requires more than just speculation about possible alternative designs.  Rather, the proponent of an alternative design theory must: (1) identify a specific alternative design that existed and was capable of preventing her injury; and (2) perform the requisite risk-utility analysis.[86]  Because Mallet cannot meet either of these required elements, his testimony must be excluded.

---

[81] Ex. A at pp. 107.

[82] Ex. B at p. 60.

[83] La. R.S.9:2800.51, et seq.

[84] See, e.g., Ex. B at pp. 214-254, 263-279.  Mallet also brought a second "mockup" to serve as evidence of a "typical wall section of a travel trailer."  Id. at p. 214.  RBD's objections to plaintiff's alternative design and use of these "mockups" are discussed in detail in Defendant's Motion to Strike Plaintiff's References to Alternative Design Methods and Related Demonstrative Exhibits.

[85] Ex. B at p. 220.

[86] See Lacoste v. Pilgrim International, 2009 WL 126847, *4 (E.D.La.) (citing Krummel v. Bombardier Corp., 206 F.3d 548, 551 (5th Cir.2000); Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 183 (5th Cir.1990).

In *Seither v. Winnebago Industries, Inc.*, the court found that the trial judge abused his discretion in failing to grant a directed verdict as to the alternative design issue.[87] In that case, there was no valid alternative design presented. The expert "presented merely a concept that was untested, unengineered, and not presented to the jury in any fashion more than mere speculation."[88] The court also noted that the plaintiffs failed to present a risk/utility analysis of the proposed alternative design, particularly since there was no examination of material prices or consideration of manufacturing labor expenses.[89] It should be noted that, while *Seither* does not directly address the admissibility of alternative design testimony directly, it is illustrative of the factors that must be satisfied for such testimony to provide relevant and helpful information to the trier of fact.

Just like *Seither*, Mallet has not presented a valid alternative design in this case. Rather, Mallet's proposed alternative design is nothing more than a concept **which has never been tested**. Mallet testified that he could not identify the type of adhesive used in his alternative design mockup,[90] nor could he name the manufacturer of the hardboard.[91] Mallet also admitted that he did not do any research on whether that hardboard material was utilized by travel trailer manufacturers for walls and ceilings in 2005.[92] In fact, he could not even state the baseline level used for a material to be classified as "non-formaldehyde-emitting."[93] Mallet readily admitted that the structural integrity of such materials for use in travel trailers was unknown,[94] that no

---

[87] 853 So.2d 37, 41 (La. App. 4 Cir. 2003).
[88] *Siether,* 853 So.2d at p. 40-41.
[89] *Siether,* 853 So.2d at p. 40-41.
[90] Ex. B at p. 219.
[91] Ex. B at pp. 222-24. It should be noted that the hardboard is referred to as "Masonite" throughout Mallet's deposition, but he admitted that this was only a "generic" term and that he was not certain of the manufacturer. *Id.*
[92] Ex. B at p. 225.
[93] Ex. B at p. 221.
[94] Ex. B at pp. 227-29.

"strength-weight" analysis[95] or flexibility tests[96] were conducted on the alternative materials, and that he had no test results regarding how the alternative unit would perform in repeat travel usage.[97] And, of critical importance, no formaldehyde testing or was done regarding the actual use of the alternative construction materials for plaintiff's proposed travel trailer design,[98] nor was that design tested for the effects of heat and humidity.[99]

Finally, Mallet's risk/utility analysis of the alternative materials and design was insufficient. Mallet did not conduct any type of study as to the quantities of his proposed hardboard material available for use in the travel trailer industry in 2005.[100] In fact, the data that Mallet relied on to conduct his risk/utility analysis was from the year 2000 because he was unable to locate the necessary information for 2005.[101] Mallet's failure to perform the requisite risk/utility analysis would deprive the jury of the opportunity to fully analyze the appropriateness of adopting his proposed alternative design. Thus, to the extent that Mallet's alternative design testimony is duplicative and fails to meet the requirements of the LPLA, his testimony should be excluded.

## IV.    CONCLUSION

For the foregoing reasons, Recreation By Design, LLC, respectfully requests that the Court grant this motion *in limine* and exclude the opinions and testimony of Alexis Mallet.

---

[95] Ex. B at pp. 231-232.
[96] Ex. B at p. 232.
[97] Ex. B at p. 234.
[98] Ex. B at p. 233.
[99] Ex. B at p 235.
[100] Ex. B at pp. 226-27.
[101] Ex. B at pp. 226-27.

Respectfully submitted,


/s/ Randall C. Mulcahy
LYON H. GARRISON, Bar No. 19591
SCOTT P. YOUNT, Bar No. 22679
RANDALL C. MULCAHY, Bar No. 26436
DARRIN L. FORTE, Bar No. 26885
KELLY M. MORTON, Bar No. 30645
**GARRISON, YOUNT, FORTE
& MULCAHY, LLC**
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 527-0680
Facsimile: (504) 527-0686
*Attorneys for Recreation By Design, LLC*
Email: rmulcahy@garrisonyount.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 16th, 2010, I electronically filed the foregoing with the

Clerk of court by using the CM/ECF system which will send a notice of this electronic filing to

all known counsel of record.


         /s/ Randall C. Mulcahy
RANDALL C. MULCAHY, Bar No. 26436