# Transcript of the Testimony of
# **Alexis Mallet, Jr.**

## Date taken: March 2, 2010

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)

### **\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   www.psrdocs.com**



EXHIBIT

B

tabbies

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 15

1       Q.   So as of the end of last week,

2   would this reflect all of the work that your

3   company has done in the Earline Castanel

4   matter?

5       A.   Yes, sir, except for the invoices

6   of our engineers and testing people.  They

7   are not in there because we have not been

8   invoiced yet.

9       Q.   You anticipated my question, like

10  you were doing a minute ago.  You don't have

11  the invoices of some of the consultants that

12  you relied upon as part of your report,

13  correct?

14      A.   I do not.

15      Q.   Whose invoices do you anticipate

16  receiving?

17      A.   David Moore, Freyou, Moore &

18  Associates; Ervin Ritter with Ritter

19  Consulting Engineers; Paul LaGrange with

20  LaGrange Consulting.

21           I think that is all.

22      Q.   Does Stephen Smulski bill through

23  your office?

24      A.   No, sir.

25      Q.   You told me David Moore, Ervin

Page 16

 1    Ritter and Paul LaGrange?

 2         A.   Yes, sir.

 3         Q.   I take it that would include any

 4    personnel and -- people in their businesses

 5    would be included on their invoices that

 6    they send to you; is that correct?

 7         A.   Yes, sir.

 8         Q.   It is my understanding from your

 9    past depositions that you coordinate the

10    services of these individuals in preparing

11    your expert report; is that correct?

12         MR. PINEDO:

13              Objection, form.

14         THE WITNESS:

15              I coordinate all of the

16    individuals in the data gathering phase and

17    put the work together.

18    EXAMINATION BY MR. MULCAHY:

19         Q.   They perform work at your request,

20    and they invoice you; is that correct?

21         A.   Yes, sir.

22         Q.   And then you invoice your total

23    amount, including whatever they bill you, to

24    the plaintiffs' counsel; is that correct?

25         A.   Yes, sir.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 17

1      Q.   And presently you do not have any

2   invoices from those three individuals?

3      A.   No, sir.

4      Q.   Do they bill you on a particular

5   cycle, or do they do it at the conclusion of

6   litigation?  How does that typically work?

7      A.   We usually bill when we are

8   running out of money.

9      Q.   Okay.

10      A.   The billing cycles are just

11   random, when we have time to put the bills

12   together and send them out.  There's no

13   particular order.

14      Q.   Your company, first general

15   services of the south -- and when I just

16   mention first general today, I will be

17   speaking of First General Services of the

18   South, Incorporated; is that understood?

19      A.   Yes, sir.

20      Q.   But First General has on its own,

21   without the assistance of David Moore, Ervin

22   Ritter or Paul LaGrange, billed $54,956,

23   correct?

24      A.   Yes.

25      Q.   So we are just a few dollars shy

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 18

1    of $55,000?

2         A.   Yes, sir.  Actually, we haven't

3    billed that.  We put that together at your

4    request.  It has not been sent in yet.

5         Q.   So that's why on the front it

6    says, "Not Reviewed, Not Final"?

7         A.   Correct.

8         Q.   This is an estimated invoice for

9    purposes of services you have performed

10   through February 27?

11        A.   That's correct.  It should be

12   accurate, but I did not get a chance to

13   review it before they printed it and I left

14   with it.

15        Q.   Looking at this invoice on page 2,

16   I see the first entry is December 10, 2009,

17   when you spoke with Magan at Lambert &

18   Nelson.  Is that the first time you were

19   contacted to perform work regarding the

20   Castanel unit?

21        A.   Probably.

22        Q.   Would your file materials --

23        A.   I'm sorry.

24             That sounds correct, yes.

25        Q.   Prior to that time, you don't

Page 19

1    believe you performed any work specifically

2    as it related to Earline Castanel's claims;

3    is that right?

4         A.   That's correct.  Right.

5         Q.   I am looking down several steps on

6    December 21, 2009, several entries.  It

7    says, "Expert Consultant-Civil Engineer,"

8    and you have an entry for an hour.  What is

9    that entry related to?

10        A.   Can I see it, please?

11        Q.   You don't have a copy?

12        A.   I don't have a copy.

13             Do you need a copy for this check,

14   or did they send it to you already?  A copy

15   of the invoice?

16        Q.   I'm not sure.  I just got an

17   e-mail from Linda's office on your fees for

18   today's deposition.  And I understand that

19   if we don't use the full time, we will get a

20   credit and refund for any overpayment we

21   made; is that correct?

22        A.   That's correct.

23        Q.   Is this for me to keep?

24        A.   Yes, sir.

25             Let me see --

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 20

1        Q.    We are looking at December 21, it

2   looks like there is an entry for

3   "Consulting, Civil Engineer."

4        A.    That may have been a conversation

5   that I had with David Moore.  It looks like

6   the only billing --

7        Q.    Would that have been around the

8   first time you were in contact with one of

9   the consulting personnel that we talked

10  about earlier regarding the Earline Castanel

11  matter?

12       A.    No.  It looks like maybe the

13  13th -- maybe to make it clearer, we were

14  gearing up to make an inspection on another

15  trailer, but the plaintiff, that fell to the

16  wayside.  So they were trying to line up

17  another trailer to have us inspect, and we

18  got the telephone call, can we inspect this,

19  I think between Christmas and New Year's.

20  And that is when I began calling everybody

21  to see, or sending e-mails out to find out

22  their availability to do that.

23       Q.    On the prior matter when you were

24  gearing up to do work on another trailer,

25  would that have been in the matter of "Kerry

Page 21

1    Smith versus Recreation by Design"?

2         A.   That name sounds familiar, but no,

3    it was Bell, B-E-L-L.

4         Q.   It wasn't a Recreation by Design

5    trailer, that you can remember?

6         A.   No, sir, it wasn't.  And they

7    just -- I don't know how they did it, but

8    they came up with another trailer to try to

9    fit in, but that didn't manifest for

10   whatever reason.

11        Q.   If I can look at your invoice

12   again.  I see during the week around

13   Christmas and New Year's, December 23

14   through the end of December, it looks like

15   you had several different contacts regarding

16   the protocol for the testing.  Does that

17   sound correct?

18        A.   Yes, sir.

19        Q.   I believe a lot of that, it looks

20   like it related to a smoke test that you

21   wanted to perform; is that correct?

22        A.   That's correct.  The question came

23   up as to smoke, was it toxic, what materials

24   we were using in the process.  I think

25   Mr. Miller was asking those questions in

Page 22

1    some e-mails.

2        Q.   How about an air quality test,

3    were there any discussions prior to doing

4    the inspection of the Castanel unit

5    regarding plaintiffs performing air-quality

6    testing?

7        A.   Yes.  I asked if we were going to

8    be doing air-quality testing at the trailer

9    because I needed to know when I was writing

10   the protocol whether I had to allow time in

11   the protocol for that to occur and when.

12       Q.   I remember receiving a protocol

13   around mid-December that involved

14   air-quality testing from the plaintiffs'

15   counsel.  Did you draft that protocol, or

16   would you have participated in the drafting

17   of that protocol?

18       MR. PINEDO:

19           Objection, form.

20       THE WITNESS:

21           I don't know what you received.

22   But from the beginning, I did most of the

23   drafting of the protocols.  But I don't know

24   if what you received is part of what I did

25   previously on another case and then modified

Page 23

```
 1    it to begin fitting it to this one.  I
 2    couldn't tell you.
 3    EXAMINATION BY MR. MULCAHY:
 4         Q.   Did you have any input on the
 5    air-quality testing protocol that had been
 6    performed in prior cases?
 7         MR. PINEDO:
 8              Objection, form.  We are offering
 9    him here today for the Castanel case as
10    opposed to the other cases.
11         THE WITNESS:
12              Only to the extent of placement in
13    the protocol, location in the protocol and
14    time required for those types of tests.  The
15    quantity of tests, who tested, I had no
16    input into.
17    EXAMINATION BY MR. MULCAHY:
18         Q.   For the Castanel matter, your team
19    of personnel, it looks like it started doing
20    its inspection on the Castanel unit, the
21    actual inspection, the plaintiffs'
22    inspection, on or about January 13; is that
23    right?
24         A.   That sounds correct, yes.
25         Q.   Prior to that time, were there any
```

Page 24

```
 1    discussions regarding not performing

 2    air-quality testing in the Castanel matter?

 3         A.   I don't recall having -- other

 4    than if I would have been questioning:  Are

 5    we doing it, and if so, when is it going to

 6    be done?  I don't recall any conversations

 7    regarding the air-quality testing.

 8         Q.   Air-quality testing during the

 9    week the plaintiffs inspected the unit,

10    January 13th through 15th or the end of that

11    week, was not performed during that time by

12    the plaintiffs, correct?

13         A.   I think that's correct.  I think

14    when they did it is when Tony Watson with --

15    is it Earth Sciences?  From North Carolina?

16         Q.   Correct.

17         A.   I think that's when they did the

18    testing simultaneously.

19         Q.   Tony Watson of Workplace Hygiene?

20         A.   That's it, yes.

21         Q.   Who did the testing on behalf of

22    plaintiffs, air-quality testing?  Would that

23    have been Bill Scott?

24         A.   I know Bill Scott was there on at

25    least one day, and I think there were other
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 25

1   people from his organization there on a

2   different day, if I remember correctly.  I

3   don't know their names.  I don't remember

4   them.

5        Q.   You don't coordinate with Bill

6   Scott as far as one of your consulting

7   personnel?  We talked about three earlier,

8   is Bill Scott one of those people that also

9   invoices through you?

10       A.   No, sir.

11       Q.   But you do speak to Bill Scott

12  regarding work he performs on a particular

13  unit; is that correct?

14       MR. PINEDO:

15            Objection, form.

16       THE WITNESS:

17            I speak to Bill Scott from time to

18  time, but not necessarily having anything to

19  do with what he is doing.  Sometimes it's

20  coordination and sometimes it's a question I

21  need to ask, or I may need to get some

22  feedback from him as to when something was

23  done, but nothing to do with the actual

24  air-quality testing, nothing to do with what

25  he is commissioned to do.

Page 26

1    EXAMINATION BY MR. MULCAHY:

2        Q.   You came out to the Castanel unit

3    at the time that the defense was performing

4    its inspections, the week of January 4; is

5    that correct?

6        A.   Yes, sir.

7        Q.   I am looking at your invoice, you

8    actually have January 4, it looks like you

9    traveled to Lottie and met with Dave

10   McClendon at Lottie, correct?

11       A.   Yes, sir.

12       Q.   Was that your first time to have

13   seen the Castanel unit?

14       A.   Yes, sir, in person.  I think I

15   received a photograph that FEMA produced

16   prior to that day, so that I knew what unit

17   I was supposed to be looking at.

18       Q.   I see that also around that time

19   you met with Mr. Pinedo regarding warning

20   labels, on January 7.  Does that sound

21   correct?

22       A.   I received a call from Mr. Pinedo

23   asking me to observe any warning labels, if

24   there were any warning labels, and what

25   warning labels were in the unit.

Page 33

 1    recall any e-mails from him.

 2              In general, I have had only casual

 3    conversations with Bill Scott on all of the

 4    cases.  He's kind of just -- it's kind of

 5    like dealing with Stephen Smulski --

 6    actually, I have had more conversation

 7    exchanges with Smulski than Bill Scott.

 8    Bill's mostly just casual conversation when

 9    we're out on-site, and sometimes we

10    coordinate on protocol.

11        Q.   Did you ever talk with Mr. Bill

12    Scott about if he thought his test results

13    were low formaldehyde readings on what he

14    obtained at the Castanel unit?

15        A.   If I thought they were low?

16    MR. PINEDO:

17              Objection, form.

18    EXAMINATION BY MR. MULCAHY:

19        Q.   If Mr. Scott opined or mentioned

20    to you that he thought they were low

21    readings?

22        A.   No, sir.

23        Q.   Did anyone ever pass along that

24    type of information to you?

25        A.   No, sir.

Page 34

1       Q.   Did you make a determination

2   regarding the readings that Bill Scott

3   received on formaldehyde levels?

4       A.   No, sir.  Other than there was the

5   presence of formaldehyde.

6       Q.   Did you talk to Mr. Smulski about

7   that?

8       A.   No.  About Bill Scott's findings?

9   Is that what you are asking?

10      Q.   Correct, yes.

11      A.   With Dr. Smulski?

12      Q.   Correct.

13      A.   No, sir.

14      Q.   With anyone else regarding

15  Mr. Scott's findings?

16           I'm asking a separate question.

17      A.   Right.  No, sir.  I only put that

18  in because I have had conversations with Dr.

19  Smulski.  I didn't know if you were relating

20  them to Mr. Scott or not.

21      Q.   We will mark your draft invoice as

22  Exhibit 2.

23           Looking at your billing records,

24  from what you told me a little bit earlier,

25  I take it you have had several conferences

Page 35

1    and meetings with Mr. Ritter, Mr. LaGrange

2    and Mr. Moore, correct?

3         A.   Yes.  Without looking at the

4    record, I can tell you yes.

5         Q.   Are your findings based upon your

6    conferences with them encompassed in your

7    reports?

8         MR. PINEDO:

9              Objection, form.

10        THE WITNESS:

11             Yes, sir.

12   EXAMINATION BY MR. MULCAHY:

13        Q.   Have you met with anyone else on

14   this case to discuss the Castanel unit, the

15   construction of the Castanel unit; have you

16   met with anyone else on this case besides

17   those three individuals as far as

18   consultants?

19        MR. PINEDO:

20             Objection, form.

21        THE WITNESS:

22             Not that I can think of.

23   EXAMINATION BY MR. MULCAHY:

24        Q.   You have had several conferences

25   with plaintiffs' counsel regarding the

Page 38

```
 1    sometime early in January; does that sound
 2    correct?
 3         A.   Yes.
 4         Q.   Since that exchange of e-mails,
 5    and I see that it was attached to a prior
 6    deposition of yours as Exhibit 3 in the
 7    Wright case, which is dated January 11, this
 8    e-mail, have you had any other e-mail
 9    exchanges with the building inspection
10    department of the City of New Orleans?
11         A.   No, sir.
12         Q.   Have you had any contact with
13    Mr. Odom outside of that e-mail?
14         A.   No, sir.
15         Q.   Any phone conferences?
16         A.   No, sir.
17         Q.   Have you spoken with anybody else
18    with the building inspector's office of the
19    City of New Orleans?
20         A.   No, sir.
21         Q.   So that one e-mail, that was your
22    last contact with the building inspector's
23    office for the City of New Orleans?
24         A.   Yes, sir.
25         Q.   How about any other state agency
```

Page 39

```
1    regarding applicability of building codes to

2    travel trailers?  Have you had any

3    correspondence or communications with any

4    entity that would have jurisdiction over

5    building codes with the State?

6         A.   No, sir.

7         Q.   I have a copy of your resumé, PSC

8    stamp, first page, 25314, and it goes

9    through 25321.

10              Is this the most recent version of

11   your resumé?

12        A.   I don't think so.

13        Q.   Do you believe you have a more

14   updated version than this?

15        A.   Yes, I think so.

16        Q.   What has changed on this resumé

17   that makes you think you have a more recent

18   version?

19        A.   Well, one thing is different, the

20   items in the list of "Seminar and Symposium

21   Speaker."

22        Q.   Do you know about what time this

23   resumé would have last been current?

24        A.   No, sir.

25        Q.   Do you have a current copy of your
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 48

1      Q.   Do you know if off-gassing of

2    formaldehyde emissions was a subject in that

3    conference?

4      A.   A subject in the -- no, sir.  No.

5      Q.   Other than updating your resumé to

6    move this general background section into

7    your resumé, updating conferences you

8    attended or have spoken at, are there any

9    other changes to your resumé that you can

10   think of?

11     A.   Not that I haven't already stated,

12   no, sir.

13     Q.   But your education and

14   certification from your prior deposition in

15   the Lyndon Wright matter would still be the

16   same; is that correct?  No additional

17   certifications?

18     A.   No, sir.

19     Q.   No additional education other than

20   seminars?  You have not gone to any formal

21   types of schools or received any

22   certificates or degrees; is that correct?

23     A.   No, sir.

24     Q.   I will attach your resumé with

25   your list of testimony in globo as

Page 50

1              You think it was just one

2    deposition that you read though?

3         A.   I'm pretty sure it was not two.

4         Q.   Now, as far as being a testifying

5    expert in the Chinese drywall litigation,

6    when were you designated as a testifying

7    expert, approximately?

8         A.   I don't know.

9         Q.   Who is the counsel who has

10   designated you as a testifying expert?

11        A.   Herman and Herman law firm.

12        Q.   Russ Herman?

13        A.   I think so.

14        Q.   What have you been asked to do as

15   a testifying expert in the Chinese drywall

16   litigation?

17        A.   To give a cost and protocol

18   analysis of the removal and replacement of

19   the drywall; what was damaged and what needs

20   to be done to rectify that.

21        Q.   Are you giving any opinions

22   regarding VOCs in that litigation?

23        A.   I haven't given any opinions yet.

24        Q.   Are you planning on giving any

25   opinions regarding VOCs in that litigation?

Page 51

1      MR. PINEDO:

2          Objection, form.

3      THE WITNESS:

4          I don't know what I will be asked.

5  EXAMINATION BY MR. MULCAHY:

6      Q.   Other than your work in the Wright

7  case and the deposition you have recently

8  given in that case, and what you are doing

9  in the Earline Castanel matter right now,

10  are you working on any other cases involving

11  travel trailers?

12      MR. PINEDO:

13          I will ask the witness to only

14  identify such cases where he has been

15  designated as an expert.

16      THE WITNESS:

17          I don't know if I have been

18  designated at this time.

19  EXAMINATION BY MR. MULCAHY:

20      Q.   Are the only two that you are

21  presently designated as a testifying expert

22  in the Wright matter and the Earline

23  Castanel matter, as we sit here today?

24      A.   Yes, sir.

25      Q.   You haven't inspected any other

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                    Alexis Mallet, Jr.

Page 52

1    units for litigation that is currently

2    pending other than the Wright matter and the

3    Castanel matter?

4         A.   I have.

5         Q.   What other units have you

6    inspected?

7         A.   A Springdale model unit.

8         Q.   Would that be involving Keystone?

9         A.   Keystone, yes, sir.

10        Q.   And that was just one unit?

11        A.   Yes, sir.

12        Q.   So for the matters where you have

13   inspected travel trailers in the FEMA

14   litigation that we know of, you did work in

15   the Gulf Stream matter, correct, the

16   Alexander matter?

17        A.   Yes, sir.

18        Q.   And you did work in the Fleetwood

19   case for the Dubuclets; is that correct?

20        A.   Yes.

21        Q.   And you are doing work in the

22   Wright case?

23        A.   Yes, sir.

24        Q.   Castanel?

25        A.   Yes, sir.

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 53

1         Q.    And you have looked at this
2    Keystone Springdale model?
3         A.    Yes, sir.
4         Q.    Are there any other units that you
5    have looked at and done a formal inspection
6    on besides those five models?
7         A.    Not for this litigation, no, sir.
8         Q.    Have you done any other travel
9    trailer inspections since July of 2009 that
10   were not related to this litigation?
11        A.    No, sir.
12        Q.    Let's flip to your expert report.
13   I have brought an extra copy of it.  It is
14   Bates stamped CAST 002322 through 002430; it
15   is 109 pages.
16            I will just ask if you would look
17   through that and tell me if that is a
18   complete copy of your expert report that you
19   have rendered in the Castanel matter.
20            I understand that you have a
21   supplemental -- I'm trying to think of how
22   you actually titled it.  You have a name on
23   it.  You have additional enclosures that
24   went along with that report besides the
25   full-body report, correct?

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 54

```
 1        A.   Yes, sir.

 2        Q.   But the 109 pages encompass all of

 3   your opinions as to the report; is that

 4   correct?

 5        A.   Yes.  You want me to verify that

 6   they are all here?  Is that what you're

 7   asking?

 8        Q.   I am asking if you can look

 9   through there and tell me if that is a

10   complete and accurate copy of your final

11   report in the Castanel matter.

12        MR. PINEDO:

13             Just to clarify something, he may

14   have been designated in the McGraw case,

15   which would be just recently.

16        MR. MULCAHY:

17             Actually, I did come across two

18   last night --

19        MR. PINEDO:

20             I don't think he knows the status,

21   but that just happened within the last 48

22   hours, 24 hours.  But he has been

23   designated.

24        THE WITNESS:

25             I'm not aware.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

                                                            Page 55

1    EXAMINATION BY MR. MULCAHY:

2         Q.    Other than looking at the one

3    Keystone unit that you talked about, you

4    have not looked at more than one Keystone

5    unit?

6         A.    No, sir.

7         Q.    Do you know which Keystone you

8    looked at, as far as the plaintiff?

9         A.    It's the McGraw exemplar trailer.

10        Q.    Exemplar?

11        A.    Yes, sir.

12        MR. PINEDO:

13             Mr. Mallet, were you aware that

14    you were designated within the last 24 hours

15    in McGraw?

16        THE WITNESS:

17             No, sir.  I was only asked to

18    produce a report and then that's all I have

19    heard.

20             That appears to be everything in

21    the body of the report.

22        MR. MULCAHY:

23             Just for the record, we are

24    marking the report that he just looked at

25    and identified as a complete copy of his

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 56

1    report as Exhibit 4, which is Bates stamped

2    CAST 2322 through CAST 2340, 109 pages.

3        MR. PINEDO:

4            Mr. Mulcahy, I would say it is not

5    a complete report without the attachments to

6    it, and I understand he has the attachments

7    with him today.

8    EXAMINATION BY MR. MULCAHY:

9        Q.   And your attachments, you have a

10   hard copy with you today?

11       A.   Yes, sir.

12       Q.   I understand that you have

13   enclosures to your report which consist of

14   several photos, correct?

15       A.   Yes, sir.

16       Q.   And a few other items; but as far

17   as the portion of your report that embodies

18   your opinions, that is encompassed within

19   that 109 pages?

20       A.   That is correct.

21       MR. PINEDO:

22           I described it as attachments;

23   they are, indeed, Enclosures 1 through 19,

24   and those were previously provided to

25   defense counsel.

Page 57

```
 1    EXAMINATION BY MR. MULCAHY:

 2         Q.   I think on page 109, it has

 3    "Enclosures," and it talks about digital

 4    photographs, images, and another 19 items,

 5    down to your fee schedule, correct?

 6         A.   Yes, sir.

 7         Q.   I have a copy of your enclosure

 8    disk, and we will attach that disk with your

 9    19 enclosures -- but the disk I have has 17

10    enclosures on it -- as a part of your expert

11    report.

12              Do you have a stack of your

13    enclosures here that would have all 19

14    enclosures?

15         A.   Right.  And this copy shows 19.

16         Q.   Right.  And I will ask, do you

17    have those enclosures with you that are

18    labeled 1 through 19?

19         A.   Yes.

20         Q.   Tell me what items -- items 18 and

21    19, list of trial and deposition testimony,

22    that is what we looked at previously with

23    your CV; is that correct?

24         A.   Yes.

25         Q.   And 19, First General Services'
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                Alexis Mallet, Jr.

Page 58

1    fee schedule.  I don't think I have seen a

2    copy of that, if you could hand me a copy of

3    that.

4              That is your current fee schedule?

5        A.   Yes, sir.

6        Q.   And you are currently billing $325

7    an hour for your litigation work?

8        A.   Yes, sir.

9        Q.   If you would flip back to

10   Enclosure 18.  Is that the deposition and

11   trial testimony that you have given?

12       A.   Yes.

13       Q.   All right.  I don't see those two

14   items on the disk that I have, a copy of

15   what was produced.  I will check to see if

16   that was on the disk, but if not, I want to

17   attach those along with the disk I have.

18              Those materials you are currently

19   looking at, those 19 exhibits, along with

20   your report, that constitutes your entire

21   report in this litigation, correct?

22       A.   Yes, sir.

23       Q.   What were you asked to do

24   regarding the Earline Castanel travel

25   trailer?

Page 59

1         A.    To inspect the travel trailer, to

2    give an opinion regarding the means and

3    methods of construction and the condition of

4    construction, and if there were contaminants

5    such as formaldehyde products -- if there

6    were products containing formaldehyde, and

7    if there was off-gassing of those products,

8    how does that off-gassing permeate or get

9    into the living area of the travel trailer.

10        Q.    You're not an environmental

11   engineer?

12        A.    No, sir.

13        Q.    And you're not an industrial

14   hygienist?

15        A.    No, sir.

16        Q.    You are not an air-quality

17   specialist?

18        A.    We do air-quality investigations.

19   I would not classify myself as a specialist

20   in identification with regard to the types

21   of contaminations, but in doing

22   investigations, we do that.

23        Q.    You were not retained to give an

24   opinion regarding formaldehyde levels in the

25   Castanel unit, correct?

Page 60

1      A.   No, sir.

2      Q.   You didn't do any formaldehyde

3    testing in the Castanel unit, correct?

4      A.   No, sir.

5      Q.   You never designed a travel

6    trailer; is that correct?

7      A.   Never designed?  No.

8      Q.   Have you ever constructed a travel

9    trailer?

10     A.   Not from scratch.  We have

11   restored, repaired many travel trailers over

12   the years.

13     Q.   You never manufactured a travel

14   trailer?

15     A.   No.  It is easier to manufacture

16   than it is to pull one apart and put it back

17   together.

18     Q.   How do you classify your

19   professional services?

20     MR. PINEDO:

21        Object to the extent this has

22   already been addressed in prior depositions.

23     THE WITNESS:

24        As a construction specialist.

25   EXAMINATION BY MR. MULCAHY:

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 67

1   purchase order between Morgan and Recreation

2   by Design?

3        A.   I reviewed something.  I don't

4   know if it was the invoice or the purchase

5   order.  I don't recall which one it was.

6        Q.   Is it your understanding that FEMA

7   purchased those units from Morgan?

8        A.   Yes.  Or through Morgan, yes.

9        Q.   I see on page 20 of your report,

10  under "FEMA Documents," that you discuss

11  model travel trailer procurement

12  specifications dated July 14, 2005, outlined

13  by FEMA.

14           You say, "These following problems

15  relate specifically to the issues regarding

16  the Castanel unit."

17           Do you have any knowledge if these

18  travel trailer procurement specifications

19  were ever utilized by Recreation by Design

20  in manufacturing the Castanel unit?

21       A.   No, sir, I don't.  Are you asking

22  me if they had those specifications?

23       Q.   Right.

24       A.   I don't know.

25       Q.   When you say, "The following

Page 68

```
 1    requirements relate specifically to the

 2    Castanel unit," do you have any basis for

 3    that statement?

 4         MR. PINEDO:

 5              Objection, form.

 6         THE WITNESS:

 7              The unit was purchased to be sold

 8    to FEMA for disaster -- temporary housing,

 9    and those were the standards that were --

10    the procurement specifications issued by

11    FEMA.

12    EXAMINATION BY MR. MULCAHY:

13         Q.   Do you have any knowledge if

14    Recreation by Design had these particular

15    specifications?

16         A.   No, sir, I don't.

17         Q.   And the language that you refer to

18    regarding the procurement of these units,

19    you have no knowledge if Recreation by

20    Design would have had that information in

21    front of them, correct?

22         A.   No, sir, I don't.  The only

23    information I had is that they were

24    purchased for disaster relief.

25         Q.   You rely upon the FEMA procurement
```

Page 71

```
 1        A.    Again, as i said earlier, to

 2   identify the construction means and methods

 3   that would -- or if there were any

 4   construction means, methods or design that

 5   would allow contaminants into the living

 6   area of the unit.  And if there were any --

 7   or what factors would have contributed to

 8   that.

 9        Q.    And those are factors regarding

10   what?

11        A.    That contributed to that, if it

12   occurred.  I mean, if there were pathways,

13   avenues.

14        Q.    For?

15        A.    The introduction of contaminants

16   into the living area of the unit.

17        Q.    Did you personally do any

18   inspection or testing of the

19   air-conditioning in the Castanel unit?

20        A.    Yes, sir.

21        Q.    What did you personally do?

22        A.    I first identified the type of

23   unit that was there, inspected the

24   installation of the unit, inspected the

25   return air and supply system.
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)          Alexis Mallet, Jr.

Page 72

1      Q.   Did you form any opinions from
2  your personal inspection of those items?
3      A.   Opinions?
4      Q.   Did you form any opinions that are
5  encompassed within your report regarding
6  that air-conditioning system from just your
7  personal inspection?
8      A.   Yes.
9      Q.   What were your opinions from your
10 personal inspection?
11     A.   That the air-conditioning duct
12 system was not sealed on either the supply
13 side or the return air side; that there was
14 damage to the ducts.
15     Q.   Where was the damage to the ducts?
16     A.   There were fasteners penetrating
17 the duct system.
18     Q.   Did you see that from your
19 personal inspection?
20     A.   Yes, sir.
21     Q.   And how did you see that?
22     A.   The borescope.
23     Q.   Did you personally do a borescope?
24     A.   I didn't have it in my hands.  I
25 took it out of the car, and I think Dalton

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 73

```
 1    Toups and Paul LaGrange were operating

 2    the -- running the camera.  But I was

 3    observing what was there and telling them

 4    what photographs to take.

 5         Q.   Now, Paul LaGrange, you consult

 6    with him to do certain testing, correct?

 7         A.   Yes, sir.

 8         Q.   What did you hire Paul LaGrange to

 9    do?

10         A.   To perform blower door, envelope

11    air leakage testing, duct leakage testing,

12    pressure deferential testing.

13         Q.   Were you present in the unit when

14    Mr. LaGrange performed that testing?

15         A.   No, sir.

16         Q.   Were you present at the site when

17    mr. LaGrange performed that testing?

18         A.   Yes, sir.

19         Q.   Where were you when he performed

20    this testing?

21         A.   In and out of my car.  I was

22    making observations of the exterior

23    envelope, giving directions of things that

24    we wanted to have sealed, water leakage from

25    the plumbing system, directing someone to
```

Page 74

1    reseal.

2        Q.   When you talk about water leakage,

3    you are talking related to the testing; is

4    that correct?

5        A.   Yes, sir.

6        Q.   As far as the actual testing

7    methodology, though, to test for envelope

8    air leakage, air-conditioning duct air

9    leakage and air exchange rates, that would

10   all have been done by Mr. LaGrange?

11       A.   Yes, sir.

12       Q.   And you did not personally do

13   those tests?

14       A.   No, sir.

15       Q.   Also, I see that you have --

16   talking about the effects of jacking on the

17   unit, it appears you did not personally do

18   any testing regarding jacking of the unit,

19   correct?

20       A.   No, sir.

21       Q.   What did you task Ervin Ritter to

22   do?

23       A.   To inspect the air-conditioning

24   system itself, the mechanical unit, to see

25   if there were any malfunctions that related

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                  Alexis Mallet, Jr.

Page 75

```
 1    to or that could be linked to any problems

 2    with the building.

 3         Q.    And Mr. Moore?

 4         A.    To review the structural system of

 5    the unit.

 6         Q.    Were you present when the unit was

 7    jacked?

 8         A.    I'm sorry?

 9         Q.    When Shaw performed the jacking of

10    the unit?

11         A.    Yes, sir.

12         Q.    Page 33 appears to begin where you

13    discuss your observations of the inspection;

14    is that correct?

15         A.    Yes, sir.

16         Q.    What was your overall impression

17    of the Castanel unit when you showed up?

18    MR. PINEDO:

19              Objection, form.

20    EXAMINATION BY MR. MULCAHY:

21         Q.    Of the condition of the unit?

22    MR. PINEDO:

23              Objection, form.

24    THE WITNESS:

25              The interior -- and I have to ask,
```

PROFESSIONAL SHORTHAND REPORTERS, INC  (800) 536-5255                    (504) 529-5255
New Orleans * Baton Rouge * Shreveport

Page 80

```
 1   detaching from the surface, but that it was

 2   being stretched apart, elongation.

 3       Q.    The Castanel unit sat empty in

 4   Lottie for about two and a half years prior

 5   to this inspection.  Does that sound about

 6   right?

 7       A.    I believe from around November 1,

 8   2007, until our inspection.

 9       Q.    So two years and a couple of

10   months?

11       A.    Yes, sir.  January 5, 2010.

12       Q.    Do you know if the unit was

13   maintained at all by FEMA while it sat in

14   Lottie?

15       A.    No, sir, I don't.

16       Q.    Would you expect the effects of

17   temperature and humidity on an empty unit

18   sitting out in an open field to be a factor

19   in the condition of the unit when you

20   inspect it two years later?

21       MR. PINEDO:

22           Objection, form.

23       THE WITNESS:

24           There is a possibility.

25   EXAMINATION BY MR. MULCAHY:
```

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 81

1          Q.   I mean, certainly you would think

2     that caulking would be subject to the heat

3     and sun and temperature during that time

4     frame, correct, exterior caulking?

5          A.   Yes, sir.

6          Q.   And interior-wise, if you have a

7     unit just sitting there closed up for a

8     couple of years, correct?

9          A.   Yes, sir.

10         Q.   And it will be subject to just

11    whatever the elements are around it during

12    that time frame?

13         A.   Yes, sir.

14         Q.   And from a construction

15    standpoint, wouldn't you expect that an

16    empty building sitting out like that is

17    going to have some degradation of its

18    weather stripping and calking and sealants

19    during that time frame?

20         A.   Yes, sir.

21         Q.   And that would have an effect on

22    the interior, correct?

23         A.   Yes.

24         Q.   Allowing moisture and temperatures

25    to build up in the walls of the unit,

Page 82

```
 1    correct?

 2         A.   Yes, sir.

 3         Q.   In the actual interior of the

 4    unit?

 5         A.   Yes, sir.

 6         Q.   Other than having an inspection

 7    before the unit went out there, and from the

 8    time we saw it, we really don't know what

 9    changes took place with that unit during

10    that two-year period, correct?

11         A.   I would say that is accurate.

12         Q.   I mean, we wouldn't know if a

13    particular leak commenced during that

14    two-year period, right?

15         A.   That's correct.

16         Q.   Or if a particular batten strip

17    separated during that two-year period?

18         A.   That's correct.

19         Q.   From Mrs. Castanel's deposition

20    testimony, she didn't discuss anything

21    regarding separation of batten strips, did

22    she?

23         A.   She did not.

24         Q.   She didn't discuss anything

25    regarding leaks other than her
```

Page 84

1    area, correct?

2        A.   Yes, sir.  I said that, and it was

3    not direct to the question.  You were asking

4    me about Mrs. Castanel, and I apologize.

5        Q.   Sure.  It appears somebody came

6    out and did some kind of maintenance

7    regarding a water issue at the door, from

8    those records, correct?

9        A.   Yes, sir.

10       Q.   But the only other information you

11   have regarding any kind of leak in the unit

12   while Mrs. Castanel was there is when she

13   talked about the air-conditioning unit when

14   it was not operating, correct?

15       MR. PINEDO:

16           Objection, form.

17       THE WITNESS:

18           Yes, sir.

19   EXAMINATION BY MR. MULCAHY:

20       Q.   Looking at your report, you had

21   measurements of the unit taken?

22       A.   Yes, sir.

23       Q.   We have deposed a few people now,

24   but I believe it was Mr. Moore saying he had

25   somebody to measure the whole unit; is that

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 85

1    correct?

2         A.    I did.

3         Q.    You did, okay.  And who did that?

4         A.    Scott Daly.

5         Q.    And he was affiliated with --

6         A.    I'm sorry.  Scott Daly and Dalton

7    Toups.  Scott is a draftsman and inspector

8    with Ritter Consulting, and Dalton Toups is

9    a supervisor for my company.

10        Q.    I don't have them in front of me

11   today, but you had some drawings prepared

12   regarding the unit and those measurements;

13   is that correct?

14        A.    Yes, sir.

15        Q.    Before we get too deep into this,

16   let's take a break.

17        (Off the record discussion.)

18        (Recess for lunch.)

19   EXAMINATION BY MR. BARRIOS:

20        Q.    Mr. Mallet, my name is Gerry

21   Barrios.  I represent Shaw Environmental in

22   this action.  I think we met at one of the

23   testings previously.

24        A.    Yes, sir.

25        Q.    Same rule as with Mr. Mulcahy.  If

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 111

1        A.    No, sir.

2        Q.    And I'm going to say "Exponent";

3   Mr. Osteraas works for Exponent.  Is that

4   all right?

5        A.    Sure.

6        Q.    And while Exponent and

7   Mr. Osteraas and whoever he had there with

8   him were there, were you sitting in your

9   truck?  Or where were you during the

10  sequence?

11       A.    I was both in and out of the

12  truck.

13       Q.    Did you take notes while you were

14  observing Exponent's testing?

15       A.    I think I took photographs.  I

16  don't remember if I took -- I would have to

17  look in my notes to see if I made any

18  written notes.

19       Q.    Now, did you perform your own

20  jacking and blocking sequence?

21       A.    No, sir, I did not.

22       Q.    And you did do so in connection

23  with the Wright case?

24       A.    Yes, sir.

25       Q.    Did you perform jacking and

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 112

1    blocking in the Alexander case, the Gulf

2    Stream case?

3         A.    No, sir.

4         Q.    Why didn't you perform any jacking

5    and blocking testing in connection with the

6    Castanel unit?

7         A.    We were not requested to do that.

8    It wasn't added to our protocol.

9         Q.    Did you think that it was, in

10   order to reach your conclusions, necessary

11   for you to perform your own jacking and

12   blocking tests?

13        A.    Based on the method of

14   construction and the materials used, and

15   after having performed that jacking and

16   blocking on the Wright unit, we anticipated

17   the same types of movements would have

18   occurred through the jacking and blocking of

19   the Castanel unit.

20        Q.    So you're telling me that data and

21   measurements you took on a completely

22   different unit, you just anticipated you

23   would get the same type of readings on the

24   Castanel unit?

25        MR. PINEDO:

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Alexis Mallet, Jr.

Page 125

1          THE WITNESS:

2              No, sir.

3      EXAMINATION BY MR. BARRIOS:

4          Q.   The next part of it is "allowing

5      air, heat and moisture to enter into the

6      trailer."

7              So what evidence of water

8      intrusion do you find that corresponds to

9      the bedroom window and the dining room

10     window?

11         MR. PINEDO:

12             Objection, form.

13         THE WITNESS:

14             I will answer that question in two

15     different parts.  One, there was moisture

16     damage underneath the bedroom window, but

17     what I am referring to here is moisture

18     vapor, not moisture in its liquid form.

19     Typically when I write moisture, it is

20     usually vapor.

21     EXAMINATION BY MR. BARRIOS:

22         Q.   Let me rephrase my question for

23     vapor.  What evidence do you have of

24     moisture vapor intrusion that corresponds to

25     the openings in the bedroom window and the

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)          Alexis Mallet, Jr.

Page 126

1    dining room window?

2        A.   Well, if we have air movement, we

3    will have moisture movement with the

4    relative humidity, and along with it, the

5    thermal energy movement.

6        Q.   And that is something you relied

7    on Mr. LaGrange for, his findings?

8        A.   And the testing, yes.

9        Q.   But in terms of the air, heat and

10   moisture entering the trailer, you can't

11   pinpoint that to when Shaw jacked and

12   blocked the trailer through its sub in

13   March 2006, can you?

14       A.   Can we say without a shadow of a

15   doubt?  No.

16       Q.   Now, the second sentence here, "We

17   may opine further on this topic after test

18   information is provided."

19            What test information were you

20   looking for there?

21       A.   The Exponent test results.

22       Q.   Their data from the tests?

23       A.   Yes, sir.

24       Q.   Have you received those?

25       A.   I got it last night.

Page 129

1        MR. PINEDO:

2            Objection, form.

3        THE WITNESS:

4            Not that I can think of, no.

5    EXAMINATION BY MR. BARRIOS:

6        Q.   Now, is the conclusion you give in

7    Conclusion E on page 106, is that in

8    reliance on Mr. Moore's conclusions and

9    findings?

10       A.   Did I rely on it?

11       Q.   Or is that the basis of your

12   conclusion, Mr. Moore's --

13       A.   No, it is not the basis.  I can't

14   say that nothing he said or gave me was not

15   considered or part of the basis, but for the

16   most part, it was independent of his

17   conclusions, his report.

18       Q.   Are you deferring to Mr. Moore on

19   structural issues?

20       A.   Yes.

21       Q.   What else do you --

22            Go ahead.  I'm sorry.

23       A.   Excuse me.

24            From the standpoint of

25   calculations, any actual engineering

Page 130

1    opinions, I will defer to him on his

2    calculations, yes.

3        Q.   Did you refer to Mr. Moore's

4    report or a draft of his report before

5    issuing your report?

6        A.   Yes.  I think it was the day we

7    were finalizing our report that I received

8    his report, which was the deadline date for

9    us turning it in.

10       Q.   Did you offer any suggestions to

11   Mr. Moore in connection with his report?

12       A.   No, I don't think I spoke with him

13   after I received his report.

14       Q.   That might answer my next question

15   to you.  Did Mr. Moore offer any suggestions

16   to you regarding your report?

17       A.   The only way I can answer that is

18   that we had conversations about the unit and

19   what was going on and so forth.  So to that

20   extent, I would have to say yes, we had

21   conversations and discussed the --

22       Q.   But in terms of finalizing your

23   report, did you have specific conversations

24   where he made suggestions on conclusions or

25   observations made in your report?

Page 145

1   inside of the window frames could have come

2   from that frost in the unit?

3        A.   No, sir.

4        Q.   Why not?

5        A.   Well, the damage was already there

6   or the oxidation was already there.  That

7   wouldn't have happened in a matter of hours

8   or days or even weeks.

9        Q.   Referring you to page 65 of your

10  report, sir.  You are addressing the roof,

11  top of page 65, Roman numeral ii, "Close

12  examination of the roof deck indicated a

13  deflection which would allow water to

14  accumulate."

15           Do you see that?

16       A.   Yes, sir.

17       Q.   Did you measure that deflection,

18  how much of a deflection that was?

19       A.   I did not, but it was --

20  photographs show that it is a fair amount of

21  deflection, and there is corrosion on the

22  roof from water ponding on that roof over

23  long periods of time.

24       Q.   Do you have an opinion as to what

25  caused that deflection?