# Structural Condition Assessment

## For

## FEMA Trailer
## Castanel/Recreation by Design
## Lottie, Louisiana

### Prepared for

### First General Services of the South

### January 29, 2010

### Prepared by:



**Freyou, Moore and Associates, Inc.**
*Civil Engineering & Land Surveying*

**Charles David Moore, PE, PLS**
1833 East Main Street
New Iberia, LA 70560

Phone: (337) 365-9535
FAX: (337) 367-8131

*STATE OF LOUISIANA*
CHARLES D. MOORE
License No. 24627
PROFESSIONAL ENGINEER
IN
CIVIL ENGINEERING

1/29/10

**EXHIBIT**
A
tabbies

**CAST002176**

1. INTRODUCTION

A visual inspection of a FEMA trailer in Lottie, Louisiana, was performed on January 13, 2010. This inspection was conducted to provide a structural condition assessment of the trailer for First General Services of the South as part of litigation proceedings. This litigation is entitled "FEMA Trailer Formaldehyde Product Liability Litigation" in the United States District Court, Eastern District of Louisiana, New Orleans Division. The case is under Judge Kurt D. Engelhardt. A second visit was made on January 19, 2010 to witness jacking testing of the trailer by the defendants. This report provides the details of the inspection and the conclusions and recommendations resulting from the visits.

    1.1. PURPOSE – The purpose of this structural condition assessment is to form a portion of litigation proceedings regarding the trailer. The intent of this assessment is to provide an evaluation of several characteristics of the structural capabilities of the trailer.

        1.1.1. This evaluation is to determine the current conditions including any deficiencies of the structural systems of the trailer. It includes an analysis of the performance of the structure, particularly as it relates to the use of the structure. Also included is an assessment of the serviceability of the structure for its intended use.

        1.1.2. Inherent in an evaluation of structures is a review of code compliance issues. The codes to be addressed include minimum building construction requirements as well as life safety requirements.

        1.1.3. The durability of the structure based upon the occupancy and/or function of the structure is also to be addressed. These durability issues relate to distress, failure or damage to the structural systems that may be caused by system or material failure, water intrusion, wind/storm forces, foundation problems, and environmental effects.

    1.2. SCOPE OF INVESTIGATION AND ASSESSMENT – The scope of work to be provided included visual observations; verification of physical size and characteristics of the structural systems present; and analysis of the structural systems and elements to assess their current condition and load carrying capabilities. Basic floor plans and elevations were prepared by others involved in the assessment of the trailer. Conditions at the time of the investigation were documented with the use of digital photography.

    No testing of the structural materials present has been performed to date. However, testing of the structural systems during jacking procedures was performed by the defendant.

    This investigation does not cover issues related to either electrical or mechanical systems in the building. These systems are being reviewed by qualified personnel as part of the overall assessment of the trailer.

2. DESCRIPTION OF STRUCTURE

Structural Condition Assessment
FEMA Trailer, Castanel/Recreation by Design, Lottie, Louisiana
January 29, 2010

CAST002177

2.1. GENERAL – The trailer is a recreational vehicle manufactured by Recreation by Design, LLC in December 2005. It is approximately 8'4½"x30'8" in plan dimension with an additional slide-out section measuring approximately 6'8⅝"x2'10". The manufacturer's tag on the trailer identifies it as vehicle ID number 5CZ200R2461125294.

Throughout this report, different areas of the trailer will be discussed. In order to describe the specific location of these different areas the following conventions will be used to orient the reader to the physical trailer. The tongue end of the unit will be referred to as the front of the trailer. The opposite end will then be referred to as the rear of the unit. The rear is the end where the brake lights and bumper are installed. The passenger's side of the trailer will refer to the long side of the unit where the entry door is located. The opposite long side, which only has windows (no door) and the slide-out section will be called the driver's side of the trailer.

The trailer is constructed with two longitudinal steel beams. These beams are connected with cross members of light gage steel "Z" sections and open web steel joists. The two beams are also connected to two 6" steel tube beams in a "V" configuration to form the tongue of the trailer. The longitudinal steel support beams are mounted on axles with a spring suspension system to carry the load during transport. These steel elements form the main frame of the trailer.

The slide out section of the trailer is supported on two slide rails that are 2½" square tubes. The tubes have toothed gear drive sections welded to the bottom to use in sliding the unit in and out. The tubes travel in larger tube sections mounted to the two main frame beams to support the cantilevered slide in the extended position.

The construction of the shell of the trailer was unable to be verified because destructive testing was not allowed on this trailer. However, it is assumed that the construction is similar to units previously tested and similar to typical recreational vehicles of this size based on our observations and measurements taken. This unit has a metal panel roof rather than a rubber roof material found on other units.

2.2. MISCELLANEOUS – Information noted on the exterior of the trailer included the weight ratings of the unit. These ratings are:

GVWR: 7000 lb
GAWR: (Each Axle – Front and Rear) 3500 lb Tires: 235/15
Cold Infl. Press.: 35 psi

The trailer steel frame is mounted on two axles with a spring suspension system to carry the load of the trailer during transport. The two axles were fitted with 15" tires. One of the tires on the passenger side of the trailer was completely flat and pulled away from the rim. During the defendant's testing, they tried to re-inflate this tire and were unable

to re-set the bead of the tire. The tires that were on the trailer were smaller than the size noted on the load rating. The tires installed on the trailer were ST205/75D15.

Scissors style jacks are mounted near the ends of each of the two main trailer beams except that there was no jack mounted at the front passenger corner. The front driver's side jack is mounted approximately 36" from the front of the trailer and two jacks are mounted approximately 19" from the rear of the trailer. The main beams are also fitted with tie-down tabs near the jack mounts. The tongue of the trailer is fitted with a jack.

2.3. HISTORY – Hurricane Katrina hit the Gulf Coast on August 28, 2005. Widespread flooding of the New Orleans, Louisiana area occurred in the days immediately following the landfall of the hurricane. As a result of the natural disaster, many people were left homeless. FEMA provided housing units that included travel trailers, park models, and mobile homes.

  2.3.1. This trailer was manufactured by Recreation by Design, LLC to be used as temporary housing for flood victims after Hurricane Katrina. The manufacturer's tag is marked with a manufacturing date of December 2005. It was sold to Morgan Buildings & Spas, Inc., in Garland, Texas. Paperwork from the manufacturer indicates that this unit is a "33' park model."

  2.3.2. The unit was shipped to the FEMA Staging Yard, located on Sherwood Forest Boulevard in Baton Rouge, Louisiana on December 7, 2005. The origin of the unit is listed as Elkhart, Indiana and was manufactured at the Recreation By Design, LLC, Plant #2. A Bill of Lading indicates that is was received in good condition and noted "No Driver Damage"

  2.3.3. At the time of writing this report, no detailed information as to the movements of this trailer from the FEMA Staging Yard was available.

  2.3.4. The trailer is now located in a FEMA storage facility in Lottie, Louisiana. The storage facility is located approximately 114 miles northwest of New Orleans.

3. COLLECTED DATA

  3.1. AVAILABLE DRAWINGS – Drawings utilized to formulate this assessment report included basic floor plan drawings from Recreation By Design, LLC. Also, basic floor plans, elevations, mechanical and electrical plans were produced from dimensions measured during the on-site investigation by others.

  3.2. PHOTOGRAPHS – Digital photography was used to document existing conditions. These photographs were taken by several members of the inspection and testing team. Due to the volume of photographs taken, they will not be reproduced in this report, except as noted.

3.3. TESTING DATA – Movements produced from various jacking procedures were measured by the defendant's primarily with a digital data acquisition unit. These measurements were not available at the time of producing this report.

3.4. TECHNICAL DOCUMENTS – Several documents were used in the preparation of this assessment. These documents include manufacturer's manuals and data.

Other technical documents utilized included general engineering reference manuals. These were "The Manual of Steel Construction" from the American Institute of Steel Construction, "The Timber Construction Manual" from the American Institute of Timber Construction, and "ASCE 7-05 – Minimum Design Loads for Buildings and Other Structures".

Code documents consulted include City of New Orleans Ordinance No. 11,625, M.C.S., The International Building Code (2000 edition), and The International Residential Code (2000 edition).

4.  DISCUSSION OF SITE VISIT

4.1. OVERVIEW – The on-site investigation of this temporary housing unit occurred on January 13, 2010 and January 19, 2010. This assessment focuses on the structural aspects of the trailer. Other personnel also were on-site on other days in January 2010 as part of the overall investigation of the unit to observe the existing condition of the mechanical and electrical features of the unit.

4.2. OBSERVATIONS AND THEIR SIGNIFICANCE

4.2.1. General, Exterior – This unit is currently in a FEMA storage lot located in Lottie, Louisiana, along with other similar travel trailer units. The unit had been moved to a location near the office building to allow access to the unit by the inspection team. It was sitting on its wheels with an attached jack stand supporting the unit at the tongue of the trailer. It was not leveled and blocked during the majority of this writer's inspection and testing visits. A portion of the testing involved jacking the unit up and blocking it. That testing will be discussed more thoroughly later in this report. The exterior of the unit appeared to be intact with no major structural damage visible during the initial visual inspection. However, a few problems with the exterior of the unit were observed and listed below.

The seams, seals, and caulk joints around the unit were inspected for integrity of the seal. This includes the sealant around the windows, door, lighting fixtures, and other penetrations of the outer skin. Throughout the structure, holes and/or separations of the sealants were noted. These holes represent failure in the primary defense from water intrusion into the building. (See photos, page 16 and top of page 17, for example)

Structural Condition Assessment
FEMA Trailer, Castanel/Recreation by Design, Lottie, Louisiana
January 29, 2010

Page 5

CAST002180

The roof of the trailer was constructed with metal panels instead of the rubber type of roof seen on other trailers. The joints between each panel were covered with a layer of sealant. However, many of the joints were not completely sealed all the way to the end. Several holes could also be seen in the sealant, which could be points of air and moisture penetration into the unit. (See photos, bottom of page 20 and top of page 21)

The metal roof panels appeared to be buckled down around the air conditioner unit. There was significant deflection in these panels, which appeared to be caused by the weight of the air conditioner. These panels also exhibited rusting on the passenger side of the trailer by the air conditioner. This rusting was caused by either condensation from the air conditioner, rain/dew collecting due to the panel deformation, or a combination of these effects. (See photos, page 19)

The corner trim pieces of the roof/wall joint did not appear to be properly sealed. These corners were folded over themselves and fastened with a single exposed fastener. There was no evidence that these areas had ever had sealant applied. (See photo, top of page 20)

The metal siding above the slide-out section had a couple of rips in the metal. These appear to be separations through the metal siding and have not been repaired or sealed to prevent any water and/or air intrusion. The corner trim pieces in this area also appear to be improperly fitted and inadequately sealed. (See photos, page 24)

The entry door was found to be inadequately sealed at the location of the handicap assist handle. Caulk is evident above and below the handle, but it stops before the handle connection (see photo, bottom of page 21). It appears that the handle assembly was installed before the caulking was applied, which left the gap in the sealant. This will allow moisture to enter the wall cavity.

The siding/metal roof junction at the front of the trailer appeared to have a significant bulge (see photos, page 23) caused by something in the roof section at that point. However, since the panels could not be removed, the cause of this bulge was not determined. This joint between the different panels could not be completely engaged to create a weather tight joint and was covered with a heavy application of sealant.

The front driver's side corner of the trailer appears to have separated, exposing panel fasteners (staples) and providing an additional point of air and moisture entry. (see photo, top of page 25)

The rubber seals and tape seals around the slide out section were deformed and did not appear to be fully functional in sealing the unit. Also, standing water was

observed on the top of the slide out section, unable to properly drain off of the structure. It was standing against the rubber seal to the unit, which can lead to moisture intrusion into the unit. (see photos, page 22)

4.2.2. General, Interior – The interior of the unit is also basically intact with no major structural damage noted during the visible observations. The structural members of the walls, ceiling and floor were not visible and could not be verified during the inspection.

The windows were not completely sealed from the underlying structure. A gap existed around the entire perimeter of each window where raw wood was observed without any type of covering or finish. (see photo, bottom of page 18) These unfinished areas allow for direct air communication between the interior of the trailer and the wall cavity. Water staining was evident in the corners of the windows.

An area of the vinyl covering on the ceiling was damaged above the kitchen cabinets on each side of the unit. This damage appears to have been done in the installation of the cabinets, exposing the underlying wood. (see photo, bottom of page 17)

Caulking installed at the interior sheeting joint covers appears to have separated, allowing free movement of air through the joint. (see photo, top of page 18) In other areas, joint covers/trim pieces appear to be pinched/damaged, exposing the staples used for fastening the wall sheets. These areas will also allow air movement through the joint. (see photos, bottom of page 25 and top of page 26)

4.2.3. Trailer Frame – The frame of the trailer is constructed with steel elements. The main load carrying members are 8" deep steel "I" beams. These beams have $2^5/_{16}$" flanges that are approximately 3/16" thick. There are two of these beams running the total length of the trailer. They are positioned approximately 5'8" apart. The beams are not identified in the manufacturer's drawings or other paperwork, but based on the dimensions measured in the field it appears that the longitudinal beams are M8x6.5.

The longitudinal beams have lateral bracing consisting of $3^3/_8$" "Z" shaped steel members and $7^5/_8$" open web steel truss members. All cross members can be classified as light gage steel and were spaced at approximately 4' apart.

The tongue of the trailer consisted of 6" tube steel sections that were connected to the longitudinal beams. The tongue tube sections were measured at 2" in width. The trailer was supported on 2 axles for transporting the unit.

The trailer was fitted with three scissor jacks located on the longitudinal beams near each corner of the unit except the front passenger side. There was a spot in that

location where a jack could have been mounted, but it was missing. The front jack was located approximately 36" from the front edge of the trailer. The rear jacks were mounted approximately 19" from the rear of the unit.

The bottom of the trailer was covered with a plastic sheathing between the steel and the wood members of the shell.

5. TEST PROGRAM – A series of tests were performed on the trailer during the on-site inspections by the defendants. A discussion of the results and analysis of these tests appears in section 6 of this report.

> 5.1. Jacking/Blocking Testing (Defendants) – The Defendants set up a series of tests for the process of jacking and blocking of the trailer. Their protocol included the use of truck scales, strain gauges, digital indictor, rail beam reference line, and crack gauges. The truck scales were intended to monitor loads at various locations and instances during the jacking process. However, these were only taken out for use after all of the jacking was complete and they found that one of the scales was broken and unusable. Therefore, no weights or trailer loads were measured.
>
> The strain gauges were mounted to the I-beams to measure the deformation or strain of the beam. Two sets were installed on the beam on the passenger side of the trailer. One set at the midpoint of the beam and one set near the wheel locations. A third set of strain gauges was mounted on the driver side trailer beam under the slide out unit.
>
> Two digital indicators were mounted diagonally across the inside of the door opening and across the outside of the slide out section to monitor movements during the jacking process. The rail beam reference line was substituted with 2 laser lights clamped to each of the main trailer beams. A tape measure was used to measure the deflection of each of the beams during the jacking process. The crack gauges were installed at the windows to monitor trailer response at these openings.

6. ANALYSIS

> 6.1. CODE CONFORMANCE – Building codes and other regulatory codes and standards are instituted to create minimum standards to which structures are constructed. These codes and standards are intended to protect the general public by providing a minimum standard of construction. The provisions of building codes are separated into categories based upon the use of the structure. Changes in the use of a structure require that the structure comply with the provisions of the code based upon the new use. This trailer's use was intended to be residential housing.
>
> The Building Code of the City of New Orleans, Louisiana was passed by the City Council of New Orleans. The building code in effect at the time of the Hurricane Katrina disaster and recovery efforts appears to be an ordinance passed on June 27, 2003

and became effective January 1, 2004.  The intent of the ordinance is explicitly stated in section 101.3:

> "The purpose of this code is to establish the minimum requirements to safeguard the public health, safety and general welfare through structural strength, means of egress facilities, stability, sanitation, adequate light and ventilation, energy conservation, and safety to life and property from fire and other hazards attributed to the built environment."

The scope of the building code is stated in section 101.2 as applying The International Building Code (IBC) (2000 edition) to the construction of every building or structure with the exception of one- and two- family dwellings, which shall comply with the International Residential Code (IRC).  Chapter 4 of the New Orleans building code also refers to prefabricated and modular buildings, which are defined as "structures transportable in one or more sections and which are built on a permanent chassis..."  Therefore, this trailer should comply with either IBC or IRC.

It has been argued that these trailers are strictly temporary housing and as such do not have to comply with the building code.  However, Section 107 of the New Orleans Building Code deals directly with Temporary Structures and Uses.   This section provides for the issuance of permits for temporary structures and also mandates compliance with the provisions of the code for structural strength, etc.  The International Residential Code has a similar provision for temporary structures in Section R107.

The structural strength provisions of the IRC give prescriptive methods of construction of wood frame structures using minimum lumber sizes and spacing.  The Code also allows for alternative methods, sizes, etc. if the designer provides an engineering analysis preserving the strength to certain levels.  To this end, the IRC and the IBC both provide for minimum design loads to be used in the engineering analysis.  The basic shell and frame construction of this trailer does not meet the prescriptive methods of construction given in the building codes.  Therefore, the structure must be designed to meet the minimum design loads presented in the codes.  This structure would require a minimum design live load of 30 pounds per square foot (psf) for sleeping areas and 40 psf for all other areas under both IBC and IRC building codes.

6.2. LOAD COMPUTATION ANALYSIS – The manufacturer's tag for the trailer indicated a GVWR of 7000 lb and a GAWR of 3500 lb for each axle with 235/15 tires at 35psi.  GVWR is an acronym for the Gross Vehicle Weight Rating and is defined as the maximum permissible weight of the vehicle when fully loaded.  It includes all weight at the trailer axle(s) and tongue or pin.  GAWR is an acronym for Gross Axle Weight Rating and is defined as the maximum weight a specific axle is designed to carry.  The GAWR is also predicated on the type of tires that are in use and the inflation pressure of those tires.  Since this trailer was fitted with smaller tires than the specified tires for the

GAWR, its axle rating should be discounted. However, this would only affect the unit's load rating during transport, since it was required to be blocked up on piers.

The load carrying capacity of the trailer frame beams was analyzed using steel properties of standard carbon steel complying with ASTM A-36. The load carrying capacity of the slide out support beams was analyzed using steel properties complying with ASTM A-500 Grade B. These ASTM specifications for steel are common for most structural steel shapes and tube sections readily available throughout the country. Analysis of the beams also assumed that the trailer was leveled and blocked in accordance with the FEMA contract documents, including the use of six (6) concrete block piers with three piers evenly spaced along each side. The documents reviewed do not contain any reference to additional supports for slide-out sections. Therefore, the slide-out section was analyzed as a cantilever unit supported on the main frame beams.

Using the manufacturer's tag showing a GVWR of 7000 lb, it was first assumed that the load is uniformly distributed to each of the two frame beams. This yields a load of 120.8 pounds per linear foot (lb/ft) of beam or approximately 28.8 pounds per square foot (psf). Being supported as outlined in the contractor's installation documents, the beams can safely support up to 374 lb/ft or 89 psf. A similar analysis of the slide-out support beams yields a safe carrying capacity of 303 lb/ft or 90 psf. Because the slide-out support beams are cantilevered utilizing the main support beams, it will impose additional loads on these beams. This cantilevered support will impose an additional 551 lbs of weight at each of the 2 support points of the closest main longitudinal beam. It will also impose an uplift load of approximately 148 lbs at each of the 2 support points of the opposite longitudinal beam. These additional loads superimposed on the uniformly distributed load calculated previously will not cause the beams to be in an overloaded condition.

As noted above, the minimum design live loads for residential use are designated to be 30 psf in sleeping areas and 40 psf in all other areas. Live loads are defined as "A load produced by the use and occupancy of the building or other structure that does not include construction or environmental loads, such as wind load, snow load, rain load, earthquake load, flood load, or dead load." The live load is in addition to dead loads which are defined to include the weight of all materials of construction incorporated into the structure. The dead load of this trailer is estimated to be approximately 10-15 psf.

As shown above, the trailers GVWR translates to approximately 28.8 psf, which is significantly less than the prescribed live loads required for residential structures. Taking the estimated dead load out of the GVWR yields an estimated 13.8-18.8 psf for the rated live load. This is substantially less than the prescribed live loads from the building code. However, when supported as outlined with 3 piers evenly spaced, the main frame beams and the slide out cantilevered beams would have an allowable capacity to support the code required live loads.

If the unit were not blocked in accordance with the contractor's installation guidelines, the above loading discussion would be significantly changed. For example, if the unit was only supported at the corners with no middle support pier or tires, the beam carrying capacity would be reduced to approximately 20 pounds per square foot. Using the ASCE 7 live loads as shown above, these beams would then be severely overloaded above the allowable carrying capacity. The consequences would be somewhat less if the middle pier were to be moved forward or backward creating uneven spaces between the piers. If the piers were placed with uneven spacing, the loading would be unbalanced and may cause one section of the supporting structure to become overloaded and deflect more than other sections of the trailer. The differential deflections in the supporting structure could cause the shell construction to warp and deflect causing air and/or water leaks through the deformations.

The contractor would be responsible for placing the unit on a uniformly stable ground support area. However, if the unit was located on soil, the piers would experience some settling and most likely experience differential settling. This differential settling would cause warping and racking of the frame causing air and/or water leaks through the deformations.

The blocking and anchoring procedures also present other problems with the trailer. These procedures only address the stability of the base trailer frame. In other words, the base trailer frame (steel under carriage of the unit) may be structurally sound, but the connections of the shell of the living unit also must be structurally sound to hold it to the steel frame. No information was available from the supplied documentation as to the method and means of attachment of the various structural components.

The wall construction differs from typical manufactured homes and other normal residential units. The wall studs in this unit are probably $1\frac{1}{2}$"x$1\frac{1}{8}$" (based upon documents from the manufacturer) whereas the wall studs in typical manufactured homes and other residential units would be nominal 2"x4" members at either 16" or 24" on center. The additional depth of normal construction members increases the capability of the walls to resist wind loading. Depending upon the lumber species used, the capacity of the trailer wall studs is approximately 4.1 - 6.2 psf. This compares to hurricane wind loads required for residential construction of approximately 30 psf.

6.3. JACKING/BLOCKING TEST (DEFENDANTS) – The data from the various instruments installed for the defendant's jacking and blocking tests were not provided for review. Their strain gages and the digital indicators were connected to a data acquisition unit and stored on the defendants experts' laptop computer. Therefore, a detailed analysis of their tests is not given here. However, the following observations concerning this work are given based upon witnessing the tests.

The first observation concerning this work is the sounds emanating from the unit. Upon applying pressure to the unit with their jacks, popping and cracking could be heard throughout the structure. These sounds were created by the movement of the various

components of the structure, particularly at their joints and connections. These sounds were obvious at the onset of the pressure from the jacks before there was any significant movement of the trailer.

Another observation made during the jacking process was that through several sections of the testing, the front tongue jack was actually supporting part of the trailer load. It does not appear that it should have been in contact with the ground during the testing. Since I have not seen the data, I cannot comment on the magnitude of the effect, but this item will certainly alter the results of the testing.

I reserve the right to revise this analysis of the Defendants' testing after receipt of the remaining data from their installed instruments.

6.4. JACKING – Jacking of the trailer would probably occur without the unit fully loaded (no passengers or other long term cargo). However, the jacks would cause a large differential in the loads applied to the beams if the process were done improperly. In addition to frame and door jamb deflections, other problems could also occur, including separations to the interior finishes (wall paneling, cabinet doors, etc). In addition to visible joint separations, joint seals and sealant could also be damaged that would not be visible. Damage to the joint seals would then allow air and moisture leaks. The installation documents are silent concerning the method to use to jack up the trailer onto the blocks. This allows the contractor on site to determine how to jack up the unit and place it on the blocks and could vary from one unit to another.

Various methods of jacking could be employed in the raising of a trailer. The preferred methods would be to employ jacks that could lift the structure utilizing the strength of the structure to keep it from significant torsion or twisting. For example, a unified hydraulic jacking system could be employed to maintain a constant pressure/lifting force on the entire unit. Screw jacks could also be used to lift the trailer in small increments with monitoring of the unit to prevent large differential movements in the structure.

7. CONCLUSIONS – Based upon my observations at the site, photographs submitted, technical documents, and testing performed, the trailer is inadequate in construction considering the use of this trailer for temporary residential occupancy. The structure cannot perform to air and water resistance needs under the loads for the intended use of residential occupancy.

The construction of the trailer does not meet the minimum requirements provided for in the Building Code for New Orleans. The code allows for a prescriptive construction method including size and spacing of wood structure or an alternate allowance for an engineered solution meeting minimum strength requirements. The structural members of this trailer are much smaller than the prescriptive methods in the Code. In addition, an engineering analysis of the shell structure revealed that it does not meet the minimum strength requirements.

It should be noted that the requirements from the building code for design loads of 30 – 40 psf are not intended to imply that the residence will actually be loaded with 30 – 40 pounds

Structural Condition Assessment
FEMA Trailer, Castanel/Recreation by Design, Lottie, Louisiana
January 29, 2010

Page 12

**CAST002187**

on every square foot of the residence. These requirements are derived from long term observations and research to provide for structural components that can provide adequate support for the variety of loads that can and will occur within a residence. At any given time one part of the structure may have no active loads when another part of the structure has a significant concentrated load (i.e. one corner of furniture being placed at a weak point in the structure).

There is also concern due to deflections in the trailer framing. The primary structure of a normal residential building is composed of elements that can withstand the deflections of normal loading and use. As noted above, the walls, ceilings, and floor structures are constructed with wood elements much smaller than those normally found in residential construction. Therefore, deflections caused by imposed loads can lead to problems with connections between elements, which will affect the performance of air and water resistant joints.

In addition, the lighter structural members of the walls, ceiling/roof, and floor will not withstand normal wind loading requirements for residential structures. While this unit did not need to withstand a large hurricane event while occupied, it did have to withstand smaller storms that consist of high winds and rain. The lighter structure, while strong enough to stand up to the winds experienced, cannot perform like normal residential construction by providing a rigid envelope of protection from the wind and rain. The lighter structure will deflect under normal storm events, which will cause additional problems with the performance of air and water resistant joints.

The blocking of the unit also leads to several questions regarding the performance of the trailer. However, nothing is known as to the original installation concerning methods and procedures or placement of blocks, etc. Any deviations from the blocking requirements would cause problems with the load carrying capacity of the trailer. Also, even though we were unable to analyze the structural capacity of the entire shell of the living unit, it is a concern that blocking and anchoring of the trailer frame would cause problems in the structure of the shell.

Due to these issues, the use of this trailer for long term residential occupancy cannot be expected to perform adequately. The structure cannot perform to normal air and water resistance requirements under these types of loading.

8. LIMITATIONS – This report is furnished for the exclusive and confidential use of the addressee. Release to any other company, concern or individual is solely the responsibility of the addressee. The opinions and conclusions drawn in this report are based upon observations and information available, known and declared at the date of the investigation and/or the time of the preparation of this report. No warranty is made to the accuracy of data provided by others in the preparation of this report. The right to amend and/or modify the conclusions contained in this report is reserved based upon any new information provided.

**Appendix A**

**Miscellaneous Photographs**



Overall view of the trailer (passenger side and front )



Overall view of the trailer (driver side and front – including the slide out)



Closeup of separated sealant at window frame (driver side of trailer)



Closeup of separated sealant at window frame (passenger side of trailer)



Separated trim and sealant at rear passenger corner of trailer



Damage to vinyl facing of ceiling above cabinets

Structural Condition Assessment                                        Page 17
FEMA Trailer, Castanel/Recreation by Design, Lottie, Louisiana
January 29, 2010

**CAST002192**



Separated sealant at ceiling joint covering



Typical gap in window frame – note exposed raw wood



Roof of trailer – note depressed buckled roof at A/C unit



Rusting roof panels at A/C unit



Closeup of roof corner trim



Roof panel sealant -- note exposed joint with no sealant at end



Roof panel sealant – showing holes in sealant



Gap in sealant at handle at entry door

Structural Condition Assessment                                        Page 21
FEMA Trailer, Castanel/Recreation by Design, Lottie, Louisiana
January 29, 2010

CAST002196



Damaged sealant at the slide out section



Damaged sealant at the slide out section



Bulging roof section at front of trailer



Sealant at bulging joint of roof panel and front wall panel



Tear in wall siding above slide out section



Tear in wall siding above slide out section

Structural Condition Assessment
FEMA Trailer, Castanel/Recreation by Design, Lottie, Louisiana
January 29, 2010

Page 24

CAST002199



Separated corner trim at front driver corner



Gap in trim at slide out – exposing wall cavity to interior of trailer



Damaged trim/exposed fasteners

**END OF APPENDIX A**