UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER FORMALDEHYDE
PRODUCTS LIABILITY LITIGATION

MDL NO. 1873

SECTION N(5)

JUDGE ENGELHARDT

MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:  All Cases

**<u>MEMORANDUM OF LAW IN SUPPORT OF THE JOINT MOTION OF THE
GOVERNMENT'S CONTRACTORS TO DISMISS THE THIRD AND FOURTH AMC</u>**

The Court is familiar with the events underlying this litigation.  As Hurricane Katrina approached, state and federal authorities recognized an urgent need to house thousands of Gulf Coast residents that the storm would render homeless.  The Federal Government ("the Government"), under its Stafford Act power, called on four government contractors to help furnish temporary emergency housing.  The Government issued specifications to its contractors for providing temporary emergency housing on Plaintiffs' lots rather than permanent shelters. After the Government's contractors finished that work, Plaintiffs named them as defendants in this suit.  Plaintiffs, however, may not sue the contractors without causing this Court to second-guess the Government's decision to set *aggressive disaster priorities* for installing thousands of units of *temporary* emergency housing *as expeditiously as possible* and to continue using its contractors' work with full knowledge of the potential hazards.

Subjecting contractors charged with executing the Government's will to state tort liability for performing their federal contract undermines the Government's protected discretion to supervise its contractors.  *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 511-12 (1988); *Guile v. United States*, 422 F.3d 221, 228-31 (5th Cir. 2005) (directing contractors "is inherently a

discretionary function"). The Supreme Court created a federal common law defense to thwart that effect when, as here, "the government has directed a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001).

Plaintiffs' own allegations, moreover, establish the "government contractor defense." Plaintiffs' pleadings show the Government issued reasonably precise specifications, accepted its contractors' work, and elected to continue using its contractors' work even after the contractors warned the Government about the precise risk that Plaintiffs complain of. Plaintiffs would like this Court to believe that the contractors had an obligation to assume responsibility for all necessary technical research into a jacking process or some other aspect of the work which the specifications might not have explained in exhaustive detail. However, Plaintiffs neither identify a section of the contract nor cite any federal acquisition regulation that imposes such an obligation. Plaintiffs cannot. The Government prohibited its contractors from performing such unauthorized work, and both it and the public would have baulked at the attendant delay.

Instead, the Government issued specifications it had used before. Those specifications directed the contractors to meet *aggressive disaster priorities* for installing thousands of units of *temporary* emergency housing purchased by the Government *as expeditiously as possible*. Later, as Plaintiffs contend, the Government *accepted* and *continued to use* the emergency housing *with full knowledge of the potential risk*. Thus, as a matter of law, Plaintiffs' own allegations establish the government contractor defense, and the defense bars Plaintiffs' claims entirely.

Separately, the Court should dismiss Plaintiffs' claims under Rule 12(b)(6). Plaintiffs' complaint falls short of establishing entitlement to relief. Plaintiffs' own facts provide far more likely explanations for the harms they complain of. As such, the Court should dismiss Plaintiffs' Third and Fourth AMC for failure to state a plausible claim for relief.

# I.     THE THIRD AND FOURTH AMC'S ALLEGATIONS:

Plaintiffs allege that the Government had actual knowledge of the risk of formaldehyde in the emergency housing. Rec. Doc. 4486 ¶¶ 173-82 (attached as Exhibit A). Plaintiffs claim that the emergency housing contained levels of formaldehyde that injured them. Ex. A ¶ 133. Plaintiffs make allegations specific to the Government's contractors in Counts 10 through 17. These Counts relate exclusively to work performed at the Government's direction, meaning the transportation, installation, inspection, site selection, maintenance, repair, refurbishment, restoration, de-installation, and removal of temporary emergency housing. Ex. A ¶¶ 293-342.

Plaintiffs' claims against the contractors fall into two categories:  activities the contractors *should not have* undertaken; and activities the contractors *should have* undertaken. In the first category, Plaintiffs identify allegedly tortious acts that Plaintiffs believe the contractors *should not have* performed even though the Government directed its contractors to do precisely that. *See, e.g.*, Ex. A ¶ 296 (Count 10:  elevating units "off their wheel base"); *id*. ¶ 302(b) (Count 11:  negligently ignored "the manufacturers' warnings" which prohibited taking "temporary housing units off the wheel base"); *id*. ¶ 309(b) (Count 12:  same); *id*. ¶ 333(b) (Count 16:  same); *id*. ¶ 340(b) (Count 17:  same); *id*. ¶ 312-22 (Count 13:  alleging the contractors should not have put "units on concrete blocks").

In the second category, Plaintiffs list tasks that Plaintiffs allege the Government *should have* tasked its contractors with performing but failed to do so. *See, e.g.*, *id*. ¶ 302(a) (Count 11: although intended as *temporary* emergency housing, Plaintiffs allege they suffered from defects related to using *temporary* housing "for long term occupancy"); *id*. ¶ 309(a) (Count 12:  same); *id*. ¶ 333(a) (Count 16:  same); *id*. ¶ 340(a) (Count 17:  same); *id*. ¶¶ 324-26 (Count 14:  alleging the contractors *should have* delivered information or warnings that the Government never tasked its contractors with providing); *id*. ¶ 328 (Count 15:  alleging that the contractors *should have*

undertaken unspecified and unauthorized non-contract work to ensure the Government-provided emergency housing "would be safe and free of any toxic dangers").

Critically, however, both categories of claims involve tasks that the Government, in its discretion, either included or elected not to include in its specifications. Plaintiffs never allege that the Government's contractors had authority to perform work not authorized in the contracts or federal acquisition regulations. Plaintiffs also never allege that the contractors deviated from any material specification. Instead, they claim the contractors were negligent for strictly adhering to the Government-issued specifications. Plaintiffs invite the Court to question the Government's failure to provide specifications that contained more detail or different tasks. Put another way, Plaintiffs attack the Government's specifications and the contractors' strict adherence to them. Thus, Plaintiffs' claims cannot overcome the government contractor defense, *Malesko*, 534 U.S. at 74 n.6, or show entitlement to relief, *Iqbal*, 129 S. Ct. at 1950-51.

## II.   **BACKGROUND FACTS**

As this Court has held, Hurricane Katrina severely tested the Government's capacity to provide for the public. Ex. B at 2-6[1] (attached as Exhibit B). Under extraordinary pressure to act, and at the direction of state and local authorities, the Government elected to place emergency housing on Plaintiffs' own lots. *See id.* at 4-6. The Government quickly selected temporary emergency housing that it deemed appropriate, *id.* at 20, and contracted to furnish the temporary housing to Plaintiffs, *id.* at 22, using "letter contracts," 48 C.F.R. § 16.603. The Government's use of this type of contract vehicle, what Plaintiffs call "No-Bid" contracts, underscores the

---

[1] The Court may properly consider orders and pleadings filed in this MDL and the contract upon which Plaintiffs' claims rely. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (court may consider exhibits attached to a motion to dismiss that the complaint references and that are central to the Plaintiffs' claims); *Xavier v. Belfor USA Group, Inc.*, Civ. A. Nos. 06-491, 06-7084, 2007 WL 4224320, *1-2 (E.D. La. Nov. 26, 2007) (court may take judicial notice of pleadings because they are matters of public record); *Nabors Drilling U.S.A. L.P. v. Twister Exploration, L.L.C.*, Civ. A. No. 01-2109, 2002 WL 287728, *1 (E.D. La. Feb. 26, 2002) ("the court may take into account matters of public record, orders, items appearing on the record of the case").

urgency of the Government's need.  Federal Acquisition Regulations, *id.* §§ 16.603-2(a), 16.603-3, let the Government use such contracts only if work must "start immediately."

### A.   THE GOVERNMENT DEFINED AND LIMITED ITS CONTRACTORS' SCOPE OF WORK IN THE UMBRELLA CONTRACT'S TASK ORDERS.

The Government drafted its Umbrella Contracts to vest it with unambiguous control over its contractors' work.  The contractors could not deviate from the specifications without the Government's deliberate "review and approval."  *See, e.g.*, Ex. C at 6 ¶ 42 (specifying that "requests for technical variances . . . shall be submitted, in writing, to the COTR [contracting officer's technical representative] and CO [contracting officer] for review and approval").  The Government reserved all rights for "Final inspection and acceptance."  *See, e.g.*, *id.* at 296.  Indeed, the contract let the Government exercise an unqualified "right to inspect and test all services."  48 C.F.R. § 52.246-5(c), (d).  If the Government determined that "the services performed d[id] not conform with contract requirements, the Government [could] require the Contractor to perform the services again . . . for no additional fee."  *Id.* § 52.246-5(d).  If the contractor failed to do so, the Government could terminate the contract unilaterally.  *See, e.g.*, Ex. C at 296 (incorporating 48 C.F.R. § 52.246-5); *id.* at 317 (incorporating § 52.243-2).

The Government issued "Task Orders" to identify the specific deliverable items or work that the Government required.  *See*, *e.g.*, Ex. C at 286.  The Government issued Task Orders for all of the work that Plaintiffs complain of.  *See*, *e.g.*, Ex. C at 66-70, 100-105.  The contractors could not perform any additional, unauthorized work.  Specifically, the contractors were "not authorized to make expenditures or incur obligations exceeding the amount obligated under individual task orders."  *See*, *e.g.*, *id.* at 286 (quoting 48 CFR 52.216-24).  The Government retained flexibility in spite of this limitation because the Government could issue Task Orders "at any time," *see*, *e.g.*, *id.* at  291, 303-304, "without negotiations," *see*, *e.g.*, *id.* at 303.  If an

agreement could not be reached, "the Government ha[d] the right to unilaterally issue the Task Order, and the Contractor [w]as required to perform."  *See*, *e.g.*, *id.* at 304.

1.   <strong><u>Installation Work Specified in the Task Orders:</u></strong>

The Government issued its specifications for installing emergency housing in Task Orders that incorporated the Umbrella Contract's exhibits.  *See, e.g.*, Ex. C at 66-69.  The Government directed its contractors "to meet aggressive disaster priorities" for installing thousands of units of temporary emergency housing "as expeditiously as possible."  *See*, *e.g.*, Ex. C at 68-69; *see also id.* at 288, 291 ¶ B.1, 294 ¶ C.1, 341-361.  The Government specified precisely how its contractors had to elevate emergency housing onto blocks.  *See, e.g.*, Ex. C at 383-384.  Exhibit Seven instructed that:

> Travel trailers shall be set-up on concrete piers and after the weigh [sic] of the travel trailer is transferred to the piers, if the unit is not leveled properly the contractor will reinstall the unit at no additional cost to the government.  The travel trailer set-up will also include a minimum of six piers (three on each side) evenly spaced.  The end piers should not be directly on the end of the unit, but approximately six inches off the edge of the unit.  The Contractor shall provide a base for each pier.  The base will be ¾"x24"x24" exterior grade plywood.  The piers will have at a minimum two solid cap blocks on the base and two solid cap blocks at the top of the piers.
>
> The space between the top of the pier's solid cap blocks and the bottom of the travel trailer I-beam frame shall not exceed seven inches (7").  Up to four inches (4") of this space may be filled with a solid concrete block laid parallel to the travel trailer steel I-beam frame.  Up to three inches (3") of this space may be filled with blocking timber and wedges laid perpendicular to the travel trailer steel I-beam.  No more than one inch (1") of this area shall be shimmed with wedges.
>
> After the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned and tightly shimmed with wooden wedges.  If the piers are not vertical at the time of final inspection, they shall be removed and reinstalled by the Contractor at no additional cost.  The Contractor will be responsible for all necessary re-leveling and reblocking of the travel trailer for a period of 90 days after final inspection.

*Id*.  These specifications were not new; the Government had used them before.  *See* Ex. B at 21.

6

### 2.      Maintenance Work Specified in the Task Orders:

The Government issued specifications for all maintenance work that Plaintiffs complain of, *see* Ex. C at 100-102; Ex. D at 639-40; Ex. E Part 2 at 6659-61, including periodic maintenance. *See, e.g.*, Ex. C at 349-350, 404-418. The Government controlled its contractors by, *inter alia*, requiring they make only COTR approved repairs, *see, e.g.*, *id.* 404-405 ¶ 1.c, restricting contact with manufacturers, *see, e.g.*, *id.* ¶ 1.f, requiring COTR approval for "unusual" maintenance, *see, e.g.*, *id.* ¶ 1.i, and strictly controlling repairs of more than $250, *id.* at 407.

Separately, the Government provided its contractors with explicit instructions for dealing with formaldehyde in the Government-provided emergency housing. The Government, in its discretion, "determined that venting units for a short time – 15 to 20 minutes – reduced formaldehyde below the regulatory level of concern." Rec. Doc. 2796-7, at 21 (attached as Exhibit F); Rec. Doc. 2796-8, ¶ 9 (attached as Exhibit G). The Government later verified that its remedy "was effective and reduced formaldehyde." Ex. F at 26; Ex. G ¶¶ 9-12.

The Government also issued specifications for responding to formaldehyde complaints. Ex. F at 21; Ex. G ¶¶ 13-18. The Government told its contractors to caution the occupant to:

> 1 - Attempt to maintain a temperature >75F inside the trailer to encourage off-gassing of the [formaldehyde]; 2 - Open as many windows as possible while maintaining the temperature in order to promote good ventilation; 3 - Ask the caller to keep us informed of the status of the problem; 4 - Keep FEMA advised.

Rec. Doc. 2796-9 at 2 (attached as Exhibit H); Ex. G ¶¶ 13-18. The Government instructed its contractors to refer any "ongoing concerns" directly to the Government. Ex. H at 2.

### B.      THE GOVERNMENT INSPECTED ITS CONTRACTORS' WORK BEFORE DECLARING THE HOUSING "READY FOR OCCUPANCY."

Plaintiffs allege that the Government tasked its contractors "with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the plaintiffs." Ex. A ¶ 162. In fact, the Government directed its contractor to perform a different kind of inspection. The

Government required that each contractor "[e]stablish procedures to ensure the quality of the work" and monitor "compliance with contract requirements." *See, e.g.*, Ex. C at 66, 69; Ex. D at 639; Ex. E Part 2 at 6659.  The Government made the contractors draft quality control plans, *see, e.g.*, Ex. C at 346, and explain their plans for inspecting "contract deliverables" and "all tasks," *see, e.g.*, Ex. C at 363.  The Government refused to accept its contractors' plans until after an appropriate back-and-forth "to plan and coordinate" the actual work.  *See, e.g.*, *id.* at 347.

The Government, however, retained an unqualified "right to inspect and test all services" performed.  48 C.F.R. § 52.246-5(c), (d).  If the Government determined that "the services performed d[id] not conform with contract requirements, the Government [could] require the Contractor to perform the services again . . . for no additional fee."  *Id.* § 52.246-5(d).  If the contractor failed to do so, the Government could terminate the contract unilaterally.  *See, e.g.*, Ex. C at 296 (incorporating 48 C.F.R. § 52.246-5); *id.* at 317 (incorporating § 52.243-2).  As public records show, the Government inspected its contractors' work using a Standard Form 90-13, a Temporary Housing Inspection Report ("SF 90-13").  Rec. Doc. 2796-13 (attached as Exhibit I); Rec. Doc. 2796-14 (attached as Exhibit J).  If the work met the Government's requirements, the Government declared an installed emergency housing unit "Ready for Occupancy."  Ex. I ¶ 4; Ex. J at 3 (Blocks 3 and 4).

### C.   EVEN AFTER LEARNING OF THE FORMALDEHYDE RISK, THE GOVERNMENT ACCEPTED AND USED ITS CONTRACTORS' WORK.

The Government's contractors warned of "a concern about material off-gassing (possibly formaldehyde)" on October 5, 2005.  Rec. Doc. 2796-15 (attached as Exhibit K); Ex. F at 21, 26.  However, as Plaintiffs allege, the Government "continued to supply the defective and dangerous housing units to the Plaintiffs" even after testing "reflected the presence of formaldehyde at twelve times the EPA's value."  Ex. A ¶¶ 177-79.  "The Federal Government also continued to

supply the defective and dangerous housing units to the Plaintiffs after March of 2006." *Id.* ¶ 177. Thus, according to Plaintiffs' own allegations, the Government knew of the potential for formaldehyde before any of the contracted-for work even began. *Id.* ¶¶ 173-82.

Notwithstanding that awareness of the risk, the Government elected to continue using its contractors' work. Ex. F at 26. The Government inspected the housing and decided existing formaldehyde warnings were acceptable. Ex. G ¶ 15; Rec. Doc. 2796-16 ¶ 9 (attached as Exhibit L); Rec. Doc. 2796-17 (attached as Exhibit M). The Government opted to create "methods to deal with" the risks. Ex. F at 26. The Government elected "to warn occupants that if they had concerns they should air out and vent their units." *Id.* at 21. Although it could have, the Government never modified its specifications, continued to inspect and approve its contractors' work, and continued to declare newly installed units Ready for Occupancy. *See, e.g.*, Ex. C at 296 (incorporating 48 C.F.R. § 52.246-5); *id.* at 317 (incorporating § 52.243-2).

## ARGUMENT

## III. PLAINTIFFS FAILED TO PLEAD FACTS THAT SHOW ANY *PLAUSIBLE* ENTITLEMENT TO RELIEF.

To avoid dismissal, Plaintiffs must show their Complaint includes factual allegations that state a plausible claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). This means Plaintiffs must show that they are "entitled to relief," Fed. R. Civ. P. 8(a)(2), both under the facts they have alleged and notwithstanding the contractors' affirmative showing of the applicability of the government contractor defense. *See id.*; *Jones v. Bock*, 549 U.S. 199, 215 (2007).

Pleadings which offer no more than conclusory allegations fall well short of that test. *Iqbal*, 129 S. Ct. at 1949-50. Plaintiffs' facts must advance their claims "across the line" from what might be conceivable to the distinct question of what is plausible. *Id.* at 1951. Factual allegations that appear *merely consistent with* a theory of recovery must be dismissed if "more

likely explanations" account for the same facts. *Id.* Such is the case here. Plaintiffs' facts show a far more likely explanation for their alleged damages. For example, Plaintiffs alleged that:

> [The] Government was conducting initial formaldehyde air sampling . . . as early as October 11, 2005 and as late as Jan. 17, 2006. The sampling results showed that **[1]** the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days, that **[2]** most levels exceeded the EPA recognized level at which acute health effects can manifest, and that **[3]** several exceeded the OSHA workplace maximum levels.

Ex. A ¶ 175; *see also* Ex. L ¶ 6 ("OSHA initiated testing of *new, unused trailers* . . . in October 2005 . . . [and] the initial test showed the *new, unoccupied units, had high levels of formaldehyde*.") (emphasis added). Plaintiffs also alleged that even if the contractors had performed no work, "trailer building materials continue to emit formaldehyde for four to five years." Ex. A ¶ 186 (citing "Union of Concerned Scientist" report). Thus, the emergency housing contained high levels of formaldehyde before any work ever began.

Relying entirely on conclusory allegations, Plaintiffs claim that jacking emergency housing made that pre-existing defect worse. Ex. A ¶ 157-59. Plaintiffs claim that elevating housing "off of its wheel base" could have "created stress and flexing" that led to "moisture intrusion." *Id*. However, Plaintiffs never offer any facts to show how taking the emergency housing off its wheels could have exacerbated the pre-existing defect more than any other event in the trailer's life. More importantly, Plaintiffs also never allege facts that show how the contractors could have complied with the Government-issued specifications without causing the precise harm they complain of. Indeed, they cannot. Under Plaintiffs' facts, any installation that left a trailer off its wheels would be negligent. *See id*. ¶¶ 296, 302(b), 309(b), 333(b), 340(b).

Plaintiffs' failure to offer facts that reconcile that inconsistency is dispositive. Plaintiffs' allegations fall well short of showing any entitlement to relief. At best, Plaintiffs' facts appear merely *consistent with* their theories. *Iqbal*, 129 S. Ct. at 1951-52. In fact, Plaintiffs' claims are

more likely explained by a plethora of events for which the contractors have no responsibility. The Government selected the emergency housing, and it contained formaldehyde *well before* any installation work began.  Even if the contractors had performed no work whatsoever, the emergency housing would have emitted formaldehyde for four to five years.  In addition, no matter how the contractors had performed the contract, the trailers would have ended up off their wheel base in precisely the very same allegedly dangerous condition that Plaintiffs complain of.[2]

## IV.   THE GOVERNMENT CONTRACTOR DEFENSE DISPLACES PLAINTIFFS' STATE LAW CLAIMS ENTIRELY.

The government contractor defense protects the Government's statutory immunity for the management of federal projects and contracts.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).  Even before *Boyle*, federal courts had long provided immunity for service contractors working under a Government mandate.  *See, e.g., Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940).  *Boyle*, however, created a three part test.  The defense applies when:

(1) The Government, in its discretion, approved reasonably precise specifications for the contractor's work;
(2) The contractor's work conformed to those specifications; and
(3) The contractor warned the Government of dangers associated with that work about which the contractor had actual knowledge but the Government did not.

*See Boyle*, 487 U.S. at 512.  The Court created this test to prevent federal courts from serving as a venue for "second-guessing" federal discretion, *id.* at 511-12, and to protect the United States from injuries caused by "pass through costs" or an inability to find willing contractors.  *Id.* at 507.  Either injury would undermine the United States' special interest in getting the

---

[2] Judge Weinstein, the noted jurist who presided over claims against government contractors in the Agent Orange cases, recently addressed this same issue as applied to government service contractors.  Judge Weinstein held that when the contractor had no responsibility for creating the allegedly dangerous condition, but merely worked with a product the Government put in its care, the "[c]laims against non-manufacturers are not 'plausible'" and lengthy "litigation with costly discovery . . . is not warranted."  *See In re Agent Orange*, MDL No. 381, 2009 WL 3242305, *2 (E.D.N.Y. Oct. 9, 2009).  The same holds here.  Since Plaintiffs' allegations offer a far more likely explanation for their alleged damages, Plaintiffs' claims fail to show any entitlement to relief.  *Iqbal*, 129 S. Ct. at 1949-50.

government's work done.  *Boyle*, 487 U.S. at 512.  That, in turn, would create a significant conflict between state and federal law.  *See In re Agent Orange*, 517 F.3d 76, 96 (2d Cir. 2008).

The Fifth Circuit has applied *Boyle's* defense to displace state law claims against the Government's contractors on many occasions.  *See Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir. 2001); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000); *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 336 (5th Cir. 1991); *Skyline Air Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977, 980 (5th Cir. 1990) (per curiam); *Smith v. Xerox Corp.*, 866 F.2d 135, 138-39 (5th Cir. 1989).  Lastly, contractors that provide either products or services to the United States may assert the defense.  *See, e.g.*, *In re Katrina*, 2008 WL 5234369, at *20 (E.D. La., Dec. 15, 2008).

## A.   THE GOVERNMENT APPROVED REASONABLY PRECISE SPECIFICATIONS FOR ITS CONTRACTORS' WORK.

### 1.   <u>Burden for the Government Contractor Defense's First Condition:</u>

Contractors establish the first condition by showing one or more of the following:  (1) the Government issued specifications that it developed its own, *Miller*, 275 F.3d at 420; (2) the Government substantively reviewed, evaluated, and approved specifications proposed by its contractor, *Kerstetter*, 210 F.3d at 438; or (3) the Government, in its discretion, either inspected, accepted, or made use of its contractors' work upon completion, *Miller*, 275 F.3d at 420; *Kerstetter*, 210 F.3d at 438 n.8; *In re Air Disaster*, 81 F.3d at 575.

### (a)   Plaintiffs May Not Artfully Plead Around the Defense.

Plaintiffs cannot artfully plead around the defense by claiming their losses arise from some narrow part of the work for which the specifications appear silent.  *See Miller*, 275 F.3d at 419; *Kerstetter*, 210 F.3d at 436; *see also In re Agent Orange*, 517 F.3d at 88-89.  As Justice Powell emphasized, "[t]he defense requires 'only that the government approve *reasonably* precise specifications.'"  *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir.

1989) (quoting *Smith*, 866 F.2d at 138) (Powell, J., by designation) (emphasis in original). Consequently, contractors may satisfy the first condition even if the Government-issued specifications lack "specifications regarding the defective feature." *In re Agent Orange*, 517 F.3d at 88-89 n.13 (rejecting plaintiffs' argument for defining the defect "too narrowly"); *Miller*, 275 F.3d at 420-21 (same); *Kerstetter*, 210 F.3d at 436 (same).

Plaintiffs also may not defeat the defense by mischaracterizing the contract, i.e., pointing to non-contract work they believe the contractors *should have* performed. *See In re Agent Orange*, 517 F.3d at 89; *cf. Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1476 (5th Cir. 1989) (finding a contractor liable for a defect in specifications the contractor developed when the contractor expressly agreed to accept "full responsibility for all necessary technical research").

### (b)    The Court must apply the defense to "contracted-for work."

The Court must apply the defense to "contracted-for work," meaning the work that the Government hired its contractor to perform.  Federal law <u>does not</u> make contractors responsible for detecting defects latent in the Government's specifications.  *See R.M. Hollingshead Corp. v. U.S.*, 111 F. Supp. 285, 286 (Ct. Cl. 1953) (holding contractors not liable for "a loss which is a direct result of faulty specifications"); *Kerstetter*, 210 F.2d at 436 (holding the defense applies in spite of latent defects).  Put another way, contractors have no obligation under federal law[3] to evaluate the soundness of Government-issued specifications.  *See, e.g., United States v. Spearin*, 248 U.S. 132, 137 (1918) (holding a contractor has no "duty of . . . determining, at his peril, whether the sewer specifically prescribed by the government would prove adequate"); *In re Katrina*, 2008 WL 5234369, at *2 (holding the contractor had no obligation to perform

---

[3] Even if state law might impose a different duty, "state law is not relevant to the interpretation of a federal contract." *Union Pacific R.R. Co. v. U.S.*, 591 F.3d 1311, 1315 (10th Cir. 2010); *see also Boyle*, 487 U.S. at 504; 14 Wright, Federal Practice and Procedure § 3657 n.30 (3d ed. 1998); *c.f. Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 801 (5th Cir. 1993) (holding that "the state law label on the claim(s) sought to be dismissed is irrelevant" and defense will apply if *Boyle's* three conditions are met); *accord Harduvel*, 878 F.2d at 1317.

engineering work not specifically required by the federal contract); *see also Agredano v. U.S. Customs*, 223 Fed. App'x. 558 (9th Cir. Feb. 23, 2007) (holding contractors "cannot be held liable for injuries third parties incur as a result of the contract's execution").

The defense applies even if the Government approved specifications without "fully appreciate[ing] the risks latent in" its specifications. *See, e.g.*, *Kerstetter v. Pac. Sci. Co.*, 1999 U.S. Dist. LEXIS 22536, *50 (S.D. Tex. May 26, 1999). Indeed, the defense is meant to insulate the contractor from state-law-tort claims that rest on "defects that neither the contractor nor the government considered." *Kerstetter*, 210 F.3d at 436; *see also Miller*, 275 F.3d at 422 n.5.

### (c)   Silence in the specifications for the contracted-for work is not dispositive—courts interpret "reasonably precise" broadly.

Mere silence in the approved specifications will not preclude application of the defense. *See Bailey*, 989 F.2d at 799, 801 n.15 (holding the defense may apply to a "defective feature about which the government's specifications are silent"). In such cases, the Court must determine whether the approved specifications should be regarded as *reasonably* precise. *See id.* The Court must make that determination in light of the contract's overall purpose. *See In re Katrina*, 2008 WL 5234369, at *2 (rejecting Plaintiffs' contention that the contractor had a duty to perform engineering work not authorized in the contract); *see also In re Agent Orange*, 517 F.3d at 89 (criticizing plaintiffs' narrow characterization of the defect to which the defense should apply for "misconceiv[ing] the nature of what the contracts in question were about").

Moreover, *Boyle's* admonition against second-guessing federal discretion favors reading the term "reasonably precise" broadly. The Court warned that "permitting 'second-guessing' of" the Government's discretion by way of "tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption." *Boyle*, 487 U.S. at 511. That exemption protects both "the exercise or performance or the failure to exercise or perform a discretionary

function." 28 U.S.C. § 2680(a). The defense could not function as intended if contractors incurred liability for the Government's failure to issue *precise* specifications. *Boyle*, 487 U.S. at 511. Making the defense available only when the Government specified every last detail would render the defense a nullity. *See In re Agent Orange*, 517 F.3d at 93; *cf. Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 703 (4th Cir. 1989) (holding that denying the defense for imperfect specifications "would render the government contractor defense illusory"). If courts required that much, "almost any exercise of governmental discretion could be overly parsed so as to focus on minute details of sub-decisions to the point that any relationship to policy would appear too attenuated." *See Baldassaro v. United States*, 64 F.3d 206, 211 (5th Cir. 1995).

Although it has scrutinized governmental approval closely, the Fifth Circuit consistently construes the term *reasonably precise* broadly. So long as the Government's approval constitutes more than a rubber stamp, the court regards the specifications as reasonably precise. *See Kerstetter*, 210 F.3d at 436-38 (upholding the defense even though the United States never "limited the discretion of the contractor to include a safer alternative design"); *Stout*, 933 F.2d at 335-36 (upholding the defense in spite of silence in the specifications based on approval of the overall design); *Skyline Air Serv., Inc.*, 916 F.2d at 979 (upholding the defense even though the contractor offered only general information about the approved specifications); *Smith*, 866 F.2d at 138-39 (upholding the defense based on approval of the *overall* specifications); *see also Gauthreaux v. U.S.*, 2009 WL 3366931, *5 (E.D. Va. Oct. 16, 2009) (holding "the government need not detail every single detail" if the Government approved "the *overall* design").

Accordingly, whenever a contractor followed specifications for the end product that the Government created on its own, courts must interpret those Government-issued specifications as reasonably precise. *Miller*, 275 F.3d at 419 (holding that since the Government-issued

specifications defined the "end-product" with specificity, the "specifications were more than reasonably precise"); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400-01 (5th Cir. 1998) (holding first condition met if the "government supplied the relevant specifications"); *see also Ackerson v. Bean Dredging LLC,* 589 F.3d 196, 206-207 (5th Cir. 2009) (holding contractor immune when "the actions causing the alleged harm were taken pursuant to contracts with the federal government"); *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963) (same).

> **(d)    If the Government knows of the potential hazard but elects to continue using its contractors work, the first condition is met.**

The rule that specifications issued by the Government must be regarded as reasonably precise has even greater force when the Government knows of the potential harm but elects to continue using its contractor's work. *See Kerstetter*, 210 F.2d at 438 n.8; *see also Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 950 (4th Cir. 1989) (upholding the defense when the United States "had become aware of the possible hazards" but chose to continue using the work).

In the seminal case of *Dowd v. Textron, Inc.*, for example, the United States learned of a defect in a certain helicopter but refused to order its contractor to take corrective action. 792 F.2d 409, 411 (4th Cir. 1986) (per curiam). Instead, the United States elected to continue using its contractor's work. *Id*. The district court affirmed the jury's verdict against the contractor. *Id*. On appeal, the Fourth Circuit reversed, holding the jury may not second-guess the United States' judgment and "[n]or was it within the power of the contractor to do so." *Id*. at 412. As the court forcefully explained, a "contractor is not in the position of the manufacture of consumer goods." *Id*. Even if the contractor had responsibility for developing the design, the contractor "cannot modify that design without United States approval. To uphold a verdict against the contractor under these circumstances would be to impose liability without responsibility." *Id*.

16

In *Kerstetter*, the Fifth Circuit adopted the *Dowd* Court's holding. *Kerstetter,* 210 F.2d at 438 n.8 (quoting *Dowd*, 792 F.2d at 412). The Plaintiffs argued that since the Government had not prevented the contractors from proposing a safer design, the contractors could have employed some safer alternative method. *Id*. at 437. The contractor rejected that categorization of the contract and responded that the United States not only approved and accepted the contractor's work, the United States knew of the risk and instructed its pilots on how to mitigate the potential harm. *Id*. at 437-38, 434. Quoting *Dowd*, the Fifth Circuit held that the reasonably precise standard will be met whenever the specifications address, in reasonable detail, the alleged defect. *Id*. at 438. That test is met as a matter of law if the United States knew of the alleged risk, implemented mitigation measures, and then continued to use the contractor's work. *Id*.

Similarly, in *Brinson v. Raytheon Co.*, the United States "was specifically aware of the design defect" and "issued a specific order mandating the remedy it deemed appropriate with respect to the known defect." 571 F.3d 1348, 1355 (11th Cir. 2009). The court held that when confronted with a potential harm, the United States "may make a discretionary decision concerning" whether and how it will have its contractors address the problem. *Id*. at 1253. The court declined "to 'second-guess' that judgment through a state law tort suit." *Id*.

## 2.     Here, the Government Approved Reasonably Precise Specifications.

The Government's specifications directed the Government's contractors to meet *aggressive disaster priorities* by installing thousands of units of temporary emergency housing *as expeditiously as possible*. *See, e.g.*, Ex. C at 68-69. The Government issued "detailed specifications" for blocking emergency housing. Rec. Doc. 4366 at 2 (attached as Exhibit N). Those specifications addressed, in reasonable detail, elevating the emergency housing onto blocks and had been used before. *See* Ex. B at 21. For example, the Government instructed that "[t]ravel trailers shall be set-up on concrete piers"; "the weigh [sic] of the travel trailer is

transferred to the piers"; "[a]fter the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned." *See, e.g.*, Ex. C at 383-84.

The Government-issued specifications also addressed its contractors' inspection and maintenance work. The Government told its contractors to "monitor and track progress and compliance with contract requirements," *see, e.g.*, Ex. C at 66, 68-69, but also gave government inspectors authority to impose additional requirements, *see, e.g.*, *id.* at 296 (incorporating 48 C.F.R. § 52.243-2). Likewise, the Government provided and approved reasonably precise specifications for all of the maintenance work about which Plaintiffs complain. *See, e.g.*, Ex. C at 100-102. The Government also provided "venting" specifications for mitigating the potential risks linked to formaldehyde, Ex. G ¶ 9, and instructed its contractors exactly how to address an emergency housing occupants' formaldehyde-related complaints, Ex. H at 2.

The Government-issued specifications and any additional ones that resulted from governmental inspections or the Government's decision to continue using its contractors' work after learning of the potential harm "clearly implicat[es] the Government's discretionary function." *In re Air Disaster*, 81 F.3d at 575; *see also Kerstetter*, 210 F.3d at 438 (use with knowledge of the defect proves the first condition); Ex. B at 44 (the Government's "action or inactions" related to issuing specifications for housing installations were protected discretionary functions); *see also Brinson*, 571 F.3d at 1355 (first condition met when "the government issued a specific order mandating the remedy it deemed appropriate with respect to the known defect"). Thus, as a matter of law, the Court must hold that the Government "approved" the specifications it issued, *Miller*, 275 F.3d at 419, those arising from governmental inspections, *Kerstetter*, 210 F. 3d at 436-38, and any linked to the Government's decision to continue using its contractors' work in spite of a known risk, *Kerstetter*, 210 F. 3d at 438; *see also Brinson*, 571 F.3d at 1353.

Plaintiffs may not refute this showing through artful pleading.  For example, Plaintiffs cannot refute the defense by mischaracterizing the contract.  *See In re Agent Orange*, 517 F.3d at 89.  The Government let its contractors perform only those tasks authorized in writing in the Task Orders.  *See, e.g.*, Ex. C at 286 (quoting 48 CFR 52.216-24).  Unlike the *Trevino* contractor, the Government never asked its contractors to "assume *full responsibility* for all necessary technical research."  865 F.2d at 1476.  The contractors here had no design obligations related to (or even close to) the alleged harm that Plaintiffs complain of.  *See* Ex. C at 66-70, 100-105.  "To uphold a verdict against the contractor[s] under these circumstances would be to impose liability without responsibility."  *Dowd*, 792 F.2d at 412.

Plaintiffs also cannot refute the defense by defining the alleged defect too narrowly.  The Court must apply the defense's conditions against a contracted-for task.  *See In re Agent Orange*, 517 F.3d at 89; *In re Katrina*, 2008 WL 5234369, at *2.  Plaintiffs' allegations permit no other course.  Plaintiffs alleged that "stress and flexing of temporary housing units' frames caused by [] 'blocking' them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures."  Ex. A ¶ 159.  Just as dioxin resulted solely from the *In re Agent Orange* contractor's performance of the specifications for the chemical component, Plaintiffs' allegations claim that the moisture intrusion resulted from performing the blocking specifications.  *Id*.  Thus, the Court must apply the defense to the contracted-for tasks, i.e., the blocking installation work.

Moreover, under the circumstances, the Government-issued specifications for that and all other work Plaintiffs challenge should be regarded as reasonably precise.  The specifications provided for Government control and supervision as well as addressed in reasonable detail the transfer of weight off of the wheels and onto blocks.  *See, e.g.*, Ex. C at 383-84.  If the

specifications appear abbreviated it is only because the Government elected to meet the urgent need for sheltering the thousands left homeless after the storm by setting up emergency housing as quickly as possible.  Rec. Doc. 196-12, ¶¶ 6-9 (attached as Exhibit O).  The Government "made a policy decision to" provide emergency housing "without first taking the time to develop new [ ] specifications."  Ex. B at 20.  If it had not, "many, if not most, disaster victims who returned . . . to rebuild would have had no place to live."  Ex. O ¶ 9.  Governmental delay of any sort could have put the lives of countless displaced residents at risk.

Both the Government and the public would have baulked if its contractors had paused to develop at Government expense a tort-suit-proof specific process for jacking, or any other aspect of the contracted-for work.  This Court recognized that point earlier when it held that if the Government had "insisted on imposing new formaldehyde standards that had never before been imposed . . . it would have been severely criticized for staring at hundreds of thousands of homeless people while brand new, empty housing units sat waiting to be occupied – but for a new FEMA technical requirement."  See Ex. B at 20 n.8.  The Government had used blocked trailers in the past, and no other option allowed Plaintiffs to live on their property.  *See* Rec. Doc. 10946-6 at 107 (attached as Exhibit P); Rec. Doc. 10946-10 at 207 (attached as Exhibit Q).

The Government would not have tolerated the delay associated with developing or requisitioning the "many different tools, machines and mechanisms" that might have been used.[4] Rec. Doc. 3205 at 9 (attached as Exhibit R).  Instead, the Government directed its contractor to meet *aggressive disaster priorities* by installing thousands of units of *temporary* emergency housing on blocks, in accordance with Exhibit Seven's specifications, *as expeditiously as possible*.  *See, e.g.*, Ex. C at 68.  Treating the Government-issued specifications as anything other

---

[4] In any case, Plaintiffs regard any installation which left the emergency housing off its wheel base and elevated on concrete blocks as negligent.  *See* Ex. A at ¶¶ 296, 302(b), 309(b), 333(b), 340(b).

than reasonably precise, and imposing civil liability on the Government's contractors merely for performing their contract, would run counter to *Boyle's* intent. *See Boyle*, 487 U.S. at 511-12. It would ignore the nature of the contract and let Plaintiffs second-guess the Government's statutorily protected discretion. *Id.* Thus, the Court must hold that the Plaintiffs' own pleadings show the Government approved reasonably precise specifications for its contractors' work.

**B. THE GOVERNMENT, IN ITS DISCRETION, DETERMINED THAT ITS CONTRACTORS' WORK CONFORMED TO SPECIFICATIONS.**

**1. Burden for the Government Contractor Defense's Second Condition:**

The contractors establish the defense's second condition by showing their work conformed with the Government-approved specifications for the contracted-for work that Plaintiffs complain of. *See Kerstetter*, 210 F.3d at 435-36; *see also In re Air Disaster*, 81 F.3d at 575 (holding irrelevant "general" contract terms calling "for such vagaries as a failsafe, simple or inexpensive" work). The Court must determine whether Plaintiffs' allegations arise from "nonconformance with" specifications or instead attack some perceived defect in the Government-issued specifications, e.g., the failure to provide a "specific process" for jacking. *See Kerstetter*, 210 F.3d at 435-36. This determination is critical. The government contractor defense bars claims that rest on defects in the specifications. *Kerstetter*, 210 F.3d at 435-36.

The Government's inspections, acceptance, and subsequent use of its contractors' work even after learning of a potential risk shows conclusively that the work conformed to the Government's specifications. *Miller*, 275 F.3d at 420 (acceptance proved the work conformed to specifications); *Kerstetter*, 210 F.3d at 435-36, 438 (use with knowledge of a potential defect satisfied the second condition); *In re Air Disaster*, 81 F.3d at 575 (second condition proven by acceptance and use); *Skyline Air Serv., Inc.*, 916 F.2d at 980 (second condition met by acceptance); *Smith*, 866 F.2d at 138-39 (same); *see also Brinson*, 571 F.3d at 1355.

2.   **The Contractors' Work Conformed to the Government-Issued Specifications.**

Plaintiffs' own pleadings establish the second condition. The Government, as Plaintiffs allege, accepted and continued using its contractors' work even after it had been warned of the formaldehyde-related risks. Ex. A ¶¶ 177-79 ("The Federal Government also continued to supply the *defective* and *dangerous* housing units to Plaintiffs after March of 2006.") (emphasis added). In fact, the Government continued using the emergency housing until July 2007. Ex. B at 34. Standing alone, evidence of the Government's continued use even after learning of the potential harm shows that the Government, in its discretion, decided that its contractors' work conformed to the specifications. *Miller*, 275 F.3d at 420; *In re Air Disaster*, 81 F.3d at 575.

Plaintiffs also conceded that, inasmuch as the contractors installed the emergency housing on concrete blocks, the contractors' work adhered to the specifications. *See* Ex. A ¶¶ 157-59. Indeed, Plaintiffs' allegations rest on that fact. Under each of Plaintiffs' several theories, any and all installation work which resulted in the weight of the trailers being "no longer supported by the wheels" was negligent. *See id.* ¶ 158. Read most generously, rather than allege any material deviation from the specifications, Plaintiffs allege instead that (1) the contractors should not have performed the assigned tasks; or that (2) the Government should have included extra precautions in its specifications. *See id.* A ¶ 302. However, neither type of allegation overcomes the fact that the Government accepted its contractors work, and continued using that work after learning of the same harm that Plaintiffs complain of.

That affirmative decision to continue using its contractors' work conclusively shows the defense's second condition because the Government had complete control over its contractors. *See, e.g.*, Ex. C at 296, 315-18, 391. The contractors had no discretion to deviate from the specifications without the Government's written approval. *See, e.g.*, *id.* at 6, 302. The

Government could even make its contractors correct deficiencies "after final inspection."  *See, e.g.*, *id.* at 391, 317.  The Government's absolute control presumptively satisfies the second condition.  *Kerstetter*, 210 F.3d at 435-36.  For that reason, finding against a "contractor under these circumstances would be to impose liability without responsibility."  792 F.2d at 411.

Plaintiffs create the specter of nonconformance by pretending the Government tasked its contractors with verifying that the housing was "safe and suitable for . . . long-term occupancy."  Ex. A ¶ 162.  In actuality, as this Court has recognized, the Government directed its contractors to review the installation of what the Government meant to be ***temporary*** emergency housing.  *See, e.g.*, *id.* Ex. C at 68; *see also* Ex. B at 20 (holding "housing assistance was meant to be *temporary*") (emphasis in original).  Plaintiffs may not thwart the record in support of the defense's second condition by feigning nonconformance with "long-term occupancy" specifications that exist nowhere in the contract.  *See Kerstetter*, 210 F.3d at 435-37.

### C.   THE CONTRACTORS WARNED THE GOVERNMENT ABOUT DANGERS ASSOCIATED WITH THE WORK ABOUT WHICH THEY HAD ACTUAL KNOWLEDGE BUT THE GOVERNMENT DID NOT.

#### 1.   Burden for the Government Contractor Defense's Third Condition:

The contractors may satisfy the defense's third condition in two ways.  First, the contractors may show they warned the Government of the relevant risks for which they had actual knowledge.  *See Kerstetter*, 210 F.3d at 436 (citing *Trevino*, 865 F.2d at 1487).  Alternatively, the contractors may meet the third condition by showing that the Government's knowledge of the relevant risks equaled or exceeded its contractors' knowledge.  *See Kerstetter*, 210 F.3d at 438, n.9; *In re Air Disaster*, 81 F.3d at 575 (same); *Stout*, 933 F.2d at 336-37 (same).

#### 2.   The Defense's Third Condition is Met.

Here, at least one of the contractors informed the Government of the precise risk that Plaintiffs complain of.   Ex. F at 26.  On October 5, 2005, a contractor warned the Government

of "a concern about material off-gassing (possibly formaldehyde)."  Ex. K at 2; Ex. B at 27-28.  That warning, standing alone, unequivocally satisfies the defense's third condition.  *See Kerstetter*, 210 F.3d at 436 (citing *Trevino*, 865 F.2d at 1487).

Additionally, as Plaintiffs allege, the Government knew of the claimed formaldehyde hazards at all times material to Plaintiffs' Complaint.  *See, e.g.*, Ex. A ¶ 206.  The Government even admitted that it had knowledge of a potential risk, Ex. F at 21, 26, and that it "took action to warn occupants," *id*. at 21.  The Government inspected emergency housing and found an acceptable "formaldehyde warning from the manufacturer."   Ex. G ¶ 15; Ex. L ¶ 9; Ex. M at 2.  The contractors had no duty to warn the Government of dangers about which the Government already knew.  *Kerstetter*, 210 F.3d at 438, n.9; *In re Air Disaster*, 81 F.3d at 575.

## V.    CONCLUSION

Plaintiffs have always maintained that the Government knew of the risk of formaldehyde.  Plaintiffs allege that in spite of that risk, the Government continued using its contractors' work.  The Government set *aggressive disaster priorities* for its contractors to install thousands of units of *temporary* emergency housing *as quickly as possible* and *in spite of any potential formaldehyde risks*.  Thus, Plaintiffs' own allegations establish the defense's three conditions for the precise harms they complain of, and the defense bars Plaintiffs' claims entirely.[5]

Alternatively, the Court should dismiss Plaintiffs' Third and Fourth AMC because Plaintiffs' own facts offer far more likely explanations for the injuries they complain of.  As such, Plaintiffs' facts fail to show any entitlement to relief, and their claims should be dismissed.

---

[5] To the extent that Plaintiffs' Third and Fourth AMC alleges damages arising from the Government's contractors failure to properly maintain the emergency housing, those claims should similarly be dismissed under the government contractor defense for the reasons stated herein as well as in prior pleadings by the Defendants, *see, e.g.*, Rec. Doc. 2796-2 at 7, 10, 17-23; and as previously ruled upon by this Court, *see, e.g.*, Ex. N at 2 n.2.

Respectfully submitted,

**FRILOT, L.L.C.**

*/s/ John J. Hainkel, III*
JOHN J. HAINKEL, III – (#18246)          3700 Energy Centre, 1100 Poydras St.
A. J. KROUSE – (#14426)                  New Orleans, Louisiana 70163
DAVID P. CURTIS – (#30880)               Tel: (504) 599-8000; Fax: (504) 599-8100
CAROLYN B. HENNESY – (#25089)            **Attorneys for Bechtel National, Inc.**
PETER R. TAFARO – (#28776)
ANDREW M. MAESTRI – (#30606)

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

*/s/ Gerardo R. Barrios*
ROY C. CHEATWOOD (#4010)                 No. 3 Sanctuary Boulevard, Suite 201
GERARDO R. BARRIOS (#21223)              Mandeville, Louisiana 70471
M. DAVID KURTZ (#23821)                  Tel: (985) 819-8400; Fax: (985) 819-8484
KAREN KALER WHITFIELD (#19350            **Attorneys for CH2M Hill Constructors,**
WADE M. BASS (#29081)                    **Inc.**

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

*/s/ M. David Kurtz*
ROY C. CHEATWOOD (#4010)                 201 St. Charles Avenue, Suite 3600
M. DAVID KURTZ (#23821)                  New Orleans, Louisiana 70170
KAREN KALER WHITFIELD (#19350)           Tel: (504) 566-5200; Fax:  (504) 636-4000
CATHERINE N. THIGPEN (#30001)            **Attorneys for Shaw Environmental, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was filed electronically using the CM/ECF system.  Notice of this filing will be forwarded to all known counsel by operation of the court's electronic filing system.  I also certify that I have emailed a copy of this filing to any non-CM/ECF participants on this the 19th day of April, 2010.

*/s/ John J. Hainkel, III*
JOHN J. HAINKEL, III