UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: FEMA TRAILER FORMALDEHYDE      MDL NO. 1873
PRODUCTS LIABILITY LITIGATION

                                                                               SECTION N(5)

                                                                               JUDGE ENGELHARDT

                                                                               MAGISTRATE CHASEZ

THIS DOCUMENT RELATES TO:  All Cases

-------------------------------------------------------------------------

# EXHIBIT R

**ORDER AND REASONS, SEPT. 10, 2009 (REC. DOC. 3205)**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: FEMA TRAILER      MDL NO. 07-1873
       FORMALDEHYDE PRODUCTS
       LIABILITY LITIGATION

SECTION "N" (5)

THIS DOCUMENT RELATES TO
Member Case No. 07-9228; *Aldridge,
et al. v. Gulf Stream Coach, Inc., et al.*

## ORDER AND REASONS

Before the Court is Fluor Enterprises, Inc.'s Motion for Summary Judgment Based on the Government Contractor Defense (Rec. Doc. 2802). After reviewing the memoranda of the parties and the applicable law, the Court grants in part and denies in part this motion.

**I.  BACKGROUND**

Bellwether plaintiffs Alana Alexander and her minor son, Christopher Cooper, are proceeding to trial against Gulf Stream Coach, Inc. ("Gulf Stream), the alleged manufacturer of the emergency housing unit ("EHU") in which they resided, and Fluor Enterprises, Inc. ("Fluor"), the Individual Assistance/Technical Assistance Contract ("IA/TAC") contractor who was hired by the Government to deliver, install, and provide maintenance on their EHU.

On July 12, 2005, the Federal Emergency Management Agency ("FEMA") awarded an IA/TAC contract to Fluor, requiring it to be prepared to provide general contractor services for disaster relief anywhere in the United States, pursuant to individual task orders to be issued later by

FEMA. (Exhibit 1 to Rec. Doc. 2802). This IA/TAC contract provided the general requirements for Fluor's anticipated work "at [v]arious disaster sites to be determined" by FEMA, with the condition that FEMA would prepare a specific Statement of Work ("SOW") for each individual task order it later issued. (Exhibit 1 to Rec. Doc. 2802; Declaration of Charles Whitaker, attached to Rec. Doc. 2802). The IA/TAC required Fluor to "provide the necessary personnel, materials, services, equipment, and facilities, and otherwise do all things necessary to provide temporary shelters and related services as described in the Scope of Work, Attachment A." (Exhibit 1 to Rec. Doc. 2802, p. FL-FCA-000001).

Pertinent to the issue of improper installation of the EHU, which is presently before the Court, is Exhibit 7 to the IA/TAC, relating to "Travel Trailer Installation." (See Exhibit 1 to Rec. Doc. 2802, p. FL-FCA-000113-122). Specific to Blocking and Leveling, Exhibit 7 provides:

> The Contractor shall clean away all grass roots, loose dirt, rocks or debris where at the base of the piers. Travel trailers shall be set-up on concrete piers and after the weigh [sic] of the travel trailer is transferred to the piers, if the unit is not leveled properly the contractor will reinstall the unit at no additional cost to the government. The travel trailer set-up will also include a minimum of six piers (three on each side) evenly spaced. The end piers should not be directly on the end of the unit, but approximately six inches off the edge of the unit. The Contractor shall provide a base for each pier. The base will be 3/4" x 24" x 24" exterior grade plywood. The piers will have at a minimum two solid cap blocks on the base and two sold cap blocks at the top of the piers.
>
> The space between the top of the pier's solid cap blocks and the bottom of the travel trailer I-beam frame shall not exceed seven inches (7"). Up to four inches (4") of this space may be filled with a solid concrete block laid parallel to the travel trailer steel I-beam frame. Up to three inches (3") of this space may be filled with blocking timber and wedges laid perpendicular to the travel trailer steel I-beam. No more than one inch (1") of this area shall be shimmed with wedges.
>
> After the weight of the travel trailer is transferred to the concrete piers, the piers must be vertically aligned and tightly shimmed with wooden wedges.

2

> If the piers are not vertical at the time of final inspection, they shall be removed and reinstalled by the Contractor at no additional cost. The Contractor will be responsible for all necessary re-leveling and re-blocking of the travel trailer for a period of 90 days after final inspection.

(Exhibit 1 to Rec. Doc. 2802, pp. FL-FCA-000113-114).

Plaintiffs assert claims against Fluor under the Louisiana Products Liability Act ("LPLA"), contending that Fluor's actions qualify it as a "manufacturer" under the LPLA. Specifically, Plaintiffs allege that Fluor's "blocking" of the EHU created stress and distortion that allowed increased moisture intrusion and formaldehyde exposure due to cracks and openings in the shell. (Member Case No. 09-2892, Rec. Doc. 1 ¶¶ 106-109). Alternatively, Plaintiffs allege state law negligence claims against Fluor[1], if and only if Fluor is not found to be a "manufacturer" under the LPLA. (Member Case No. 09-2892, Rec. Doc. 1 ¶¶ 110-116).

In this motion, Fluor requests summary judgment based on the government contractor defense, dismissing both the LPLA claims and the negligence claims asserted against it by Plaintiffs.

## II. LAW AND ANALYSIS

### A. Legal Standard - Motion for Summary Judgment

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir.

---

[1] These negligence claims against Fluor include the allegation that Fluor failed to properly "maintain" Plaintiffs' EHU. (See Member Case No. 09-2892, Rec. Doc. 1, ¶¶ 111-116). Fluor addresses the issue of maintenance on page 5 of its memorandum in support of this motion. (See Rec. Doc. 2802-2). Fluor cites to Exhibit 10 to the IA/TAC (Exhibit 1 to Rec. Doc. 2802, pp. FL-FCA-000135-149), which set forth with reasonable specificity Fluor's maintenance obligations under the contract, and asserts that its maintenance work conformed with FEMA's specifications. (See Exhibit 1 to Rec. Doc. 2802; Declaration of Charles Whitaker, attached to Rec. Doc. 2802, ¶ 5). Plaintiffs' opposition memoranda do not address their improper or negligent maintenance claims against Fluor. Accordingly, the Court finds that this aspect of Fluor's motion is unopposed and should be granted.

3

2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.*(citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

**B.     ANALYSIS**

In order for a contractor to claim the government contractor defense, "(1) the government must have approved 'reasonably precise' specifications; (2) the equipment must have conformed to those specifications; and (3) the supplier/contractor must have warned of those equipment dangers that were known to the supplier/contractor but not to the government." *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000), citing *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). This shield is derived from the government's immunity from suit where the performance of a discretionary function is at issue. *Kerstetter*, 210 F.3d at 435.

In the instant motion, Fluor asserts that, pursuant to the above-described Government contract with FEMA, it performed its work in compliance with "reasonably precise specifications" provided and mandated by the Government for installation of EHUs. Fluor further asserts that it had no actual knowledge not otherwise known to the Government about alleged formaldehyde dangers in the EHU. Fluor argues that there is no evidence that it deviated from the scope of work that it was mandated to do by the Government. Thus, Fluor claims to be entitled to immunity from Plaintiffs' state law tort claims under the government contractor defense.

Plaintiffs, on the other hand, argue that the government contractor defense does not apply to Fluor for three separate reasons: (1) the IA/TAC lacked specificity and left much discretion to Fluor with regard to the "jacking up" of the EHUs; (2) Fluor failed to comply with the remaining specifications enunciated in the IA/TAC; and (3) Fluor knew of the hazards of formaldehyde and failed to inform FEMA.

The Court concludes that the first element in the *Boyle* test, regarding the Government's

5

approval of "reasonably precise specifications," is not satisfied. While the Government gave Fluor detailed specifications on the EHU "blocking" procedure, one critically important aspect of that procedure that was left to the discretion of Fluor was the means and method for "jacking up" the EHUs (i.e., for lifting the EHU from the ground up onto concrete blocks). The fact that this was left to Fluor's discretion is admitted to by Fluor's corporate representative, Charles Whitaker:

> Q: Let me ask a different question. To your knowledge were there anything in the technical directions issued by the United State [sic] Government that governed the means or method by which Fluor and/or their contractor should use to elevate the travel trailers such that they could be put on blocks?
>
> A: Means and methods to elevate to put on blocks. No, I don't think that would be included there, no, sir.
>
> Q: And if the manner in which to elevate the travel trailers, put them on blocks, was not covered in the technical directions, or in the task orders, or in the performance work statement, then it was up to the discretion of Fluor and their subcontractors how to elevate the travel trailers, wasn't it?
>
> ...
>
> A: You've asked two questions there in one when you said it was up to Fluor and its subcontractors. FEMA didn't say specifically how to jack, if that's what you're asking. We instructed our subcontractors and our employees on the proper jacking methods mainly from a safety standpoint.
>
> Q: Let me ask a different question just so we're clear. The United States Government did not dictate to Fluor on the means and methods to be used to jack up travel trailers, did they?
>
> ...
>
> A: From what you're saying about means and method, no, I don't --- I don't think so. I mean, just like if you're saying would they tell a

6

>
> carpenter how to hold a hammer and how to drive a nail, no, they didn't tell us how to do that.
>
> Q: So the means and methods to elevate these travel trailers to put them on blocks was left up to the discretion of Fluor, wasn't it?
>
> ...
>
> A: Done to the discretion. Yeah, I would guess you could call it that.

(Exhibit A to Rec. Doc. 2889, pp. 85-87). In addition to Whitaker's testimony on this issue, another Fluor representative, David Methot, testified similarly:

> Q: Mr. Methot you now have read through 7 [sic] Exhibit 7 to the prime contract, which governs installing travel trailers, is that right?
>
> A: Yes.
>
> Q: There is no where in there that the United States dictates to Fluor the means and methods as to how to elevate the travel trailers such that they can be put on blocks is there?
>
> ...
>
> A: I saw no reference to -- to jacking up the trailer itself.
>
> ....
>
> Q: Your understanding, is that the FEMA wished Fluor to put these travel trailers on blocks, is that right?
>
> A: Yes.
>
> Q: However, FEMA did not dictate to Fluor as to how the travel trailers are to be elevated or the process to be use [sic] in elevating those travel trailers such that they can be put on blocks, did they?
>
> A: Not to my knowledge.
>
> Q: And you were in the position with regard to communicating information by the United States Government to Fluor on execution of their contract responsibilities, weren't you?

7

      A:      Yes.

      ...

      Q:      So it would have been up to the discretion of Fluor if the United States issued no direction to them on how to elevate or jack up these travel trailers, it would have been to the discretion of Fluor and there [sic] subcontractors, the way and manner in which to elevate these travel trailers, is that right?

      ...

      A:      Yes, generally that's probably true.

(Exhibit B to Rec. Doc. 2889, pp. 132-34). As Plaintiffs point out in their opposition memorandum, this issue is particularly important because Plaintiffs assert that the means and methods that were utilized by Fluor and/or its subcontractors for "jacking up" the EHUs were a "major cause in increasing formaldehyde exposure to Plaintiff." (Rec. Doc. 2889, p. 9). Indeed, Alexis Mallet, Jr., one of Plaintiffs' experts has opined:

> The temporary housing unit was placed on blocks during its installation on the Alexander's property. The instructions found on the scissor jacks of the trailer states that the weight of the unit should not be taken off the wheels. In jacking the unit and not sufficiently supporting the frame, the installation contractor created a condition conducive to the interior panels warping in the bedroom on the front and rear walls and in the bathroom. . .
>
> Fluor, the installation contractor, failed to give adequate directions to its employees of how to jack all of the corners and centers of the temporary housing unit. A review of Exhibit 7 failed to disclose and directions [sic] provided to the field people on how to jack up these units. *It appears the units were jacked up on the corners one or two at a time and then the blocking was placed to support those areas. This apparently placed unnecessary stress on the framing system that the unit was incapable of resisting. This caused the warping of the wall panels and the roof leak, increasing formaldehyde emissions.*

(Exhibit C to rec. Doc. 2889, pp. 97-98) (emphasis added).

      Fluor claims that the requirement that there be "reasonably precise specifications" does

8

not translate to "exactly" precise specifications. While the Court recognizes this, the problem here is that a crucial part of the blocking process was left entirely to the discretion of Fluor (i.e., how to raise the EHU off the ground onto the concrete blocks). Further, it is this specific process, obviously known and anticipated by both Fluor and the Government, that Plaintiffs assert caused or substantially contributed to the increased release of formaldehyde emissions. The Court notes that there are likely many different ways to go about lifting the EHU from the ground to the concrete blocks and many different tools, machines and mechanisms that can be utilized to accomplish this - some likely better than others.

In *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1486 (5th Cir. 1989), *cert. denied*, 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989)[2], the Fifth Circuit concluded that the first prong of the *Boyle* test was lacking where government specifications set only general performance standards for a submarine hangar diving chamber, and were "silent" on the precise location of the allegedly defective vent valve and safety devices. In *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 799 (5th Cir. 1993), the Fifth Circuit succinctly noted, "it is possible to have an allegedly defective feature about which the government specifications are silent." The *Bailey* Court went on to explain:

> *Boyle* makes clear that the requirements of "reasonably precise specifications" and conformity with them refer to the particular feature of the product claimed to be defective. 487 U.S. at 512, 108 S.Ct. at 2518

---

[2] While the Court agrees with Fluor that *Trevino* is factually dissimilar to this case as *Trevino* dealt with the government's delegation of "design discretion" to a contractor, the Court still finds the case instructive on the instant issue dealing with an allegedly improper installation procedure. Because the Government left Fluor with the ultimate discretion in raising the EHU onto the concrete blocks (and especially because it is this very procedure with which Plaintiffs take issue and claim to have caused or contributed to the harm they allegedly suffered, Fluor may not be entitled to claim immunity based on the government contractor defense. See 865 F.2d 1486. The Ninth Circuit reached a similar conclusion in *Snell v. Bell Helicopter Textron,* 107 F.3d 744 (9th Cir. 1997), where although evidence existed of significant government involvement, the evidence did not establish, as a matter of law, that the government exercised its discretion with respect to the design feature in question.

9

> (the first two conditions address "the design feature in question") . . .; see also *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1486 (5th Cir.1989) ( *Boyle* protects government contractors from liability only where "discretion over the design *feature* in question was exercised by the government") (emphasis added).

*Id.* at 799. Here, as Plaintiffs note, the "jacking up" or lifting of the EHU is an essential, primary procedure that required completion prior to placing the EHUs on the blocks. Thus, contrary to Fluor's assertions, it is not the degree of specificity that is missing from the procedure - it is the procedure itself - which is entirely left to the discretion of Fluor. *Boyle* only protects government contractors from liability when the "discretion over the design *feature* in question was exercised by the government." Clearly, such discretion over the very procedure that Plaintiffs claim to have caused or contributed to the release of formaldehyde emissions was left to Fluor - not the Government. Thus, Fluor has not shown that it is entitled as a matter of law to claim this defense.

Notably, as for Fluor's argument that the first prong of the *Boyle* test is automatically satisfied if FEMA uses a product long enough, the case law is clear that the use of the product must be pronounced (i.e., 20 years or more)[3]. There is simply no evidence presently before the Court to demonstrate that this proposition would apply to this particular case of alleged improper installation of an EHU. The Court recognizes that FEMA has had long-term experience with providing EHUs to disaster victims; however, the Court fails to see how this argument could

---

[3] See, for example, *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570 (5th Cir. 1996) (concluding that manufacturers of military aircraft were entitled to government contractor immunity defense in products liability action that arose out of fatal crash of aircraft because, inter alia, the military has used the aircraft for over 20 years without any significant problem, which supported conclusion that aircraft was built in accordance with military specifications); *Haltiwanger v. Unisys Corp.*, 949 F. Supp. 898, 904 (D.D.C. 1996) (concluding that first prong of *Boyle* test was satisfied because Postal Service has used a particular mail sorting machine consistently for more than 20 years without any problems or objections, which manifested "its substantive acceptance and approval of the basic design and its specific features").

possibly pertain to a process that was not specified by FEMA in a reasonably precise manner, was left to the discretion of the IA/TAC contractor, and for that reason, likely varied in the installation of one EHU to the next depending on the individual circumstances affecting installation.[4]

As noted herein, there are surely many different ways to go about lifting an EHU from the ground to the concrete blocks and many different machines and mechanisms that can be utilized to accomplish this. Some EHUs may have been set up on slanted driveways or uneven surfaces, possibly requiring a different lifting procedure. Some EHUs were likely lifted one corner or two corners at a time, while others may have been lifted up evenly and placed on the concrete blocks.[5] Because the Government left this procedure entirely to the discretion of Fluor, the government contractor defense seemingly is unavailable to Fluor with regard to Plaintiffs' claims of improper installation. Also, the Court encourages an appropriate motion by Plaintiffs dispositive of this defense at the conclusion of the evidence. Because the Court concludes that the first prong of the *Boyle* test fails, it does not reach whether the second and third prongs are met.

### III.   CONCLUSION

Considering the foregoing, **IT IS ORDERED** that **Fluor Enterprises, Inc.'s Motion for Summary Judgment Based on the Government Contractor Defense (Rec. Doc. 2802)** is **GRANTED IN PART and DENIED IN PART.** The motion is denied to the extent that, based

---

[4] Furthermore, there is no evidence that FEMA even saw this particular method of "jacking up" an EHU previously, over a course of time, and approved and/or accepted it.

[5] It is for these reasons that the Court finds Fluor's example of the carpenter driving a nail (See Rec. Doc. 3022, p. 5) misplaced. The lifting of an EHU cannot be deemed a trivial component of the EHU installation given its complexity and likelihood of variance from one installation to the next.

on the undisputed facts as presented by Fluor, Fluor has not demonstrated that, as a matter of law, it is entitled to claim the government contractor defense as to Plaintiffs' claims against it relating to the installation of the EHU. However, as set forth in footnote 1, the motion is granted as to Plaintiffs' maintenance claims against Fluor, and those claims are dismissed with prejudice.

    New Orleans, Louisiana, this 10th day of September, 2009.

                              **KURT D. ENGELHARDT**
                              **UNITED STATES DISTRICT JUDGE**