

**First General Services of the South, Inc.**
**General Contractors**

*Building & Restoration Contractors - Insurance Repair Specialists -*
*Construction Specialists*
*Forensic Construction Specialists*

P. O. Box 80857, Lafayette, LA 70598-0857 - Phone: (337) 988-3556 - Fax: (337) 988-1264 - Email: firstgeneral@cox.net

**Inspection Report**

**of the**

**Earline Castanel FEMA Temporary Housing Unit**

**Recreation by Design**
**Lottie, Louisiana**
**January 25, 2010**

Re:   FEMA Trailer Formaldehyde Products Liability Litigation
United States District Court
Eastern District of Louisiana

Aldridge, et al. V. Gulf Stream      MDL No. 1873 Section N(5)
    Coach, Inc., et al.      Judge Engelhardt
No. 07-9228

Case Number 09-3251

Ms Earline Castanel

**SECTION I**

**PREAMBLE**

In accordance with the request by the attorneys for the FEMA Trailer Formaldehyde Products Liability Litigation Plaintiff's Steering Committee, this organization made onsite inspections, observations, testing and evaluations of the FEMA Recreation by Design Temporary Housing Unit occupied by Ms Earline Castanel. Our study included the following areas:

CAST002322

1. The tires and axles;

2. The steel framing system with our structural engineer;

3. The barrier material between the steel framing and the wood framing of the floor system;

4. The floor insulation;

5. The structural members used for the floor system;

6. Penetrations in the floor barrier system at the underside of the trailer and the methods used to seal those areas;

7. Observation and review of the jacking and leveling procedures performed on the Recreation by Design unit by Shaw's consultants;

8. Observations of the methods used to seal of the belly board or material at the perimeter of the Castanel THU (Temporary Housing Unit);

9. A review of the floor sheeting;

10. A review of the finished flooring materials;

11. A review of the means and methods of attachment of the finished floor materials;

12. A review of documents containing information on the framing material for the walls, ceiling and roof;

13. A review of the finish materials for the interior and exterior of the walls, ceiling and roof;

14. A review of documents containing information on all other materials, such as roof decking and blocking for walls and other areas;

15. A review of all of the other components available for inspection.

CAST002323

a. Note: our investigation was limited to visual inspections and non-destructive testing. We were not allowed to perform any destructive testing or observations;

16. A review of the materials, means and methods used to seal the openings and penetrations of the unit;

17. A review of the types of wall and ceiling insulation;

18. A review of all air, moisture and temperature barriers;

19. A review of the air conditioning mechanical and duct system;

20. A review of the heating system;

21. Observations of movement instrumentation installed on the THU including crack monitors, levels, and digital measuring devices on the I-beam frame and exterior of the unit by the consultants for Shaw Environmental.

a. Note: the data from the jacking and blocking has not been made available to our team for review and evaluation as of the date of our reports. Once that data is made available to us, we reserve the right to augment our reports;

22. Observation and documentation of the envelope air leakage testing by LaGrange Consulting and First General Services of the South, Inc.;

23. Observation and documentation of the air conditioning duct leakage testing by LaGrange Consulting and First General Services of the South, Inc.;

24. Observations and photographic documentation of the air conditioning and unit inspection by consultants for the defendants;

25. Review of the plumbing, heating and air conditioning systems by our mechanical and environmental engineer;

CAST002324

26.     Photographic documentation of pertinent observations by First General Services;

27.     Written documentation of pertinent observations;

28.     Infrared thermographic imaging of the Castanel THU for the identification of temperature anomalies;

29.     A review of reports, testing, photographs and inspections by others;

30.     A review of all penetrations in the floors, walls, ceilings and roof of the unit;

31.     A review of the plumbing system;

32.     Identification of the heating and air conditioning systems;

33.     A review of the ventilation system;

34.     A review of the contents, built-in units and appliances

35.     Installation of temperature and relative humidity data loggers.  These monitoring devices were installed on the interior, and exterior of the unit;

36.     Direction of measurements taken of the Castanel THU for purposes of producing as-built plans of the unit;

37.     Review wood the materials and wood products audit performed by Dr. Stephen Smulski; and

38.     Observation and documentation of any certifying seals, stamps, labels or warning indications throughout the interior and exterior of the unit and owner's manual;

39.     Review of photographs and video recording by Ritter Consulting Engineers;

CAST002325

40.    Review of photographs by Charles David Moore with Freyou Moore and Associates, Engineers;

41.    Review of photographs by LaGrange Consulting;

42.    Review of photographs and video recording by Bombet Cashio numbered CAST000001 through CAST000015 and CAST000018 through CAST000254; and

43.    Review of photographs and video recordings by A. J. Valenti numbered CAST000016 and CAST000017.

CAST002326

# SECTION II

# INTRODUCTION

First General Services of the South, Inc. was requested to:

1. Perform limited non-destructive testing, observations, and documentation regarding the construction materials, means, methods, systems and quality utilized in the construction of the THU occupied my Ms Castanel;

2. To document the relationship and the functions between the all systems and components of the temporary housing unit;

3. To address the effects of air, moisture and temperature on the various components and the entire system of the Castanel THU;

4. To address any relationship between the construction of the Castanel Temporary Housing Unit and the introduction or transfer of any moisture, air, or thermal energy that can affect the off-gassing of contaminants within the wall and ceiling cavities and the interior living area of that unit;

5. To determine if there was any relationship between the jacking and blocking undertaken to place the Castanel THU on piers and the entry of air, moisture and thermal energy that caused deterioration to the THU or contributed to an increase in off-gassing from the wood components; and

6. To determine if the design and construction of the Castanel THU complied with all applicable codes and standards.

CAST002327

# SECTION III

# BACKGROUND INFORMATION

Following the passage of Hurricanes Katrina and Rita, hundreds of thousands of homes were severely damaged or destroyed as a result of either wind or flooding. These homes were unlivable for one reason or another and FEMA provided temporary housing for these displaced individuals and families. Per information provided in a letter from the Office of the Governor of Louisiana, Department of Health, it was understood there would be a need for temporary housing in the state of Louisiana for up to five years. One of the means utilized by FEMA to provide temporary housing was to contract with various manufacturers of recreational vehicles, park model trailers and manufactured homes (mobile homes) to provide housing for these displaced individuals. Approximately 140,000 of these temporary housing units were eventually purchased. It is unknown to this writer the quantity actually sent to the gulf coast of Louisiana and Mississippi.

There are special requirements established by HUD for the set-up and installation of manufactured housing (mobile homes). Part of these special requirements is related to the installation of manufactured homes in flood hazard areas. Manufactured housing could not be readily utilized in these flood hazard areas without meeting these special HUD requirements for installation.[1]

A decision was made by state and federal officials to utilize recreational vehicles or travel trailers and park model trailers for temporary housing units as a means of bringing people back into the New Orleans area. Once manufactured, these trailers were delivered to various pre-approved locations. Contractors hired by FEMA then jacked up these units, set them up on concrete blocks, strapped and anchored them down to the ground, connected them to the permanent sewage, water, and electrical services converting them from recreational vehicles to housing units. It is the understanding of this writer that the manufacturers of these temporary housing units did not have or provide any provisions, guidelines or specifications for jacking up and blocking these units off the ground. .

It is reported that individuals occupying these temporary housing units began to experience health problems after moving into the temporary housing units. Complaints were filed regarding these health problems with FEMA and some of the manufacturers. Subsequent to the reports of these health problems, testing of

---

1 See FEMA Manufactured Home Installation in Flood Hazard Areas (September 1985)

CAST002328

the temporary housing units was performed by various organizations including the Sierra Club and Lawrence Berkley Laboratory.

Our organization was requested to determine if the temporary housing unit manufactured by Recreation by Design and the means and methods utilized by the installation contractor, Shaw Environmental (here after noted as Shaw), contributed to the reported issues regarding indoor air quality.

Ms Earline Castanel occupied a home located at 2925 St. Peter St., New Orleans, Louisiana, 70117 prior to the passage of Hurricane Karina.  Ms Castanel was 75 years of age at that time in 2005.  She lived at that address her entire life and was living alone at that time.  She worked in New Orleans for 30 years as a housekeeper for the priest at a Catholic Church.

On the Saturday prior to the hurricane, Ms. Castanel was evacuated to Texas. After remaining in Texas for several months, she returned to New Orleans to take care of the repairs to her home.  She filed an application with FEMA for a temporary housing unit.  Her application was approved, and a FEMA temporary housing unit manufactured by Recreation by Design was provided to her.  The FEMA trailer was set up in the yard of a friend of Ms Castanel at 2261 Urquhart St, New Orleans.

A meeting was apparently set up on or about March 11, 2006 for the inspection of the trailer with Ms Castanel.  At that time, it appears the keys to the unit were given to her.  She stated she moved into the unit the following weekend.

After moving into her temporary housing unit, Ms Castanel stated she had the following issues and the repair issues were addressed by the maintenance personnel:

1.   Noted Issues

   According to Ms Castanel's deposition, the following events occurred:

   1.1.   AIR CONDITIONING UNIT

      a.   The air conditioning unit stopped working properly on at least three occasions.  The unit stopped working and/or began leaking water. Repair personnel were dispatched within a few days of each report for service.

**CAST002329**

## 1.2. THE SCREEN DOOR

a.  She called for maintenance regarding problems with her screen door. Maintenance personal was dispatched within a week to address the issue.

## 1.3. HEALTH ISSUES

a.  Ms Castanel does not recall if there were odors or any unusual smells in the house.

b.  It is reported that she experienced problems with her sinuses, breathing, itching, skin and other issues within three months of moving into the unit. She stated she obtained medical attention.

c.  She would open the windows when the air conditioning unit would not work otherwise, she would keep the unit closed with the air conditioning on.

d.  She would open and stand at the door when she experienced problems with her breathing.

e.  There was no bathroom vent in the unit.

f.  After she moved out of the unit, Ms Castanel states her health problems improved.

## 1.4. THU SET-UP INSPECTION

Regarding the inspection of March 11, 2006, the following data was gathered:

a.  The trailer was set up on cinder blocks.

b.  The trailer was level when they inspected it on March 11, 2006;

c.  After the trailer was set up in yard on Urquhart St., it was never moved for any reason until it was removed to the FEMA storage facility.

CAST002330

# SECTION IV

## PURPOSE AND SCOPE

Travel trailer, park models and manufactured houses were procured by FEMA for use as temporary housing for victims of Hurricanes Katrina and Rita. As noted above, it was expected that these units would be utilized for up to five years. The travel trailers and park models are traditionally and by definition designed and constructed for recreational, camping, travel and seasonal use. FEMA issued a request to purchase units that would be modified and used to provide the temporary housing for victims of these catastrophes. FEMA issued procurement specifications that provided a limited number of standards to the potential manufacturers with the written provisions that those standards were a minimum requirement. These standards were not written to limit the seller in providing equal or better products than that listed. FEMA provided some of the requirements to the manufacturers regarding the specifications; however, FEMA relied on those manufacturers and contractors to provide the expertise necessary to construct and install these units for their end use, long term temporary housing and not for recreation, travel, camping, or seasonal use. In fact, the opposite requirements were imposed on the manufacturers and contractors and that was to provide units for extended living; that were disabled from movement by jacking them off of their tires; blocking them and anchoring them to the ground; and that the units relied on permanent connection to sewage, water and electricity for utility services.

Travel trailers and park models were to be converted for use as housing. Sewage and water holding tanks were to be deleted and the waste disposal pipes and fresh water lines were to be connected directly to the city's sewer and water lines. These temporary housing units were to be jacked up off of their tires and placed on concrete masonry units (concrete blocks). The units were then to be strapped and anchored to the ground making them totally immoveable. The living areas were to have residential refrigerators, residential commodes and a twenty gallon water heater. The occupants were expected to utilize these units for up to five years.

The purpose of the inspections, testing and observations was to render opinions regarding the construction and installation methods utilized in the manufacture and set-up of the Earline Castanel temporary housing unit. This was to determine to a degree of probability if the construction and/or the installation methods:

1. Met all applicable building codes and standards;
2. Caused or contributed to the introduction of air, moisture and thermal energy which in turn affected the indoor air quality within the unit.

CAST002331

The scope of our study to make those determinations included the following:

1.  A review of RVIA, RPTIA, International Building Codes, International Residential Codes, City of New Orleans Building Codes, NFPA and ANSI Codes and Standards;

2.  A review of FEMA Manufactured Home Installation in Flood Hazard Areas (September 1985)

3.  A study of the components, systems and construction methods utilized in the manufacture and installation of the housing unit combined with a series of tests;

4.  Observations and tests performed included the interaction between the various components of the housing unit and the affect the construction and installation methods had upon the components;

5.  Testing for air leakage of the unit's pressure envelope and vapor barrier;

6.  Testing for air conditioning duct air leakage;

7.  Calculations of the interior air exchange rates;

8.  Evaluations of temperature, air and moisture as it relates to the infiltration or exfiltration of those elements of the atmosphere and their effects on the various building components of the unit;

9.  Inspection of all accessible components of the housing unit;

10. Detailed measurements of the unit;

11. Production of as-built drawings from site measurements;

12. Photographic documentation of pertinent observations;

13. Video recording of pertinent observations;

14. Written documentation of pertinent observations;

CAST002332

15. Interviews with Dr. Stephen Smulski, consulting wood scientist, to gather further data regarding the products utilized in the construction of the Castanel housing unit.   To verify with him that our assessment of alternative products available for use as of the date of manufacture would have eliminated or significantly lowered formaldehyde emissions in the Castanel unit;

16. An interview with Ervin Ritter, P.E., mechanical and environmental engineer, to review notes, data and findings regarding our inspection of the FEMA unit;

17. An interview with William Scott, P.E., of W. D. Scott Consultants regarding the results of the formaldehyde tests performed in the Recreation by Design temporary housing units;

18. A review of notes from a deposition of Ms Earline Castanel, the former occupant;

19. An infrared thermographic survey of the Castanel unit to identify temperature anomalies;

20. Observations of any and all notices or labels on the interior and exterior of the unit;

21. Review of any notices in the owner's manual;

22. Review of notices from FEMA, Recreation by Design or Shaw regarding the possible presence of formaldehyde in the unit;

23. Observations of penetrations and sealants in the floor, wall, ceiling and roof systems of the unit;

24. Observations regarding the presence of moisture or water infiltration into or in the unit;

25. Assessment of conditions and source(s) of occurrence;

26. Preparation of this report to present the results of our findings and to render conclusions and statements of opinion as they relate in part to the following questions:

CAST002333

a.  The Recreation by Design travel trailer was converted into a Temporary Housing Unit (THU) per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.   Was the manufacturer required to conform to the building codes and standards applicable at the time of construction and installation and did they comply with these codes?

See Conclusion A.

b.  Did the Recreation by Design recreational vehicle comply with the RVIA or RPTIA industry codes and standards such as NFPA and ANSI?

See Conclusion B.

c.  Was the Recreation by Design Castanel THU constructed for use in various weather conditions per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005?

See Conclusion C.

d.  Did the construction means, methods and materials utilized by Recreation by Design contribute to the increase in off-gassing by failing to properly seal windows, doors, plumbing pipes, etc. as required by the FEMA procurement specifications?

See Conclusion D.

e.  Did the jacking and blocking by Shaw Environmental cause damage to the housing unit and what affect did it have on air, moisture and thermal energy infiltration into the wall, roof and floor system of the unit?

See Conclusion E.

f.  Did the quality of the workmanship during construction of the Castanel THU contribute to the increased rate of formaldehyde off-gassing in the walls, ceilings, floors, and interior of the Castanel housing unit?

CAST002334

See Conclusion F.

g. Did the quality of the design and labor workmanship regarding the construction and installation of the air conditioning ductwork in the Castanel housing unit contribute to the entry of any formaldehyde off-gassing that may have been present in the wall, ceiling and floor cavities?

See Conclusion G.

h. Are the vapor barriers or retarders of the Castanel THU placed in the recommended location for a building located in the hot, humid climate zone?

See Conclusion H.

i. What problems manifest when a vapor barrier or retarder is placed on the cold side of walls, ceilings or floors of a building located in the hot, humid climate zone?

See Conclusion I.

j. Was the Castanel THU constructed with formaldehyde emitting materials?

See Conclusion J.

k. Was ultra low or non-formaldehyde emitting building materials readily available at the time the Castanel THU was manufactured?

See Conclusion K.

l. Was the Recreation by Design THU occupied by Ms Castanel constructed utilizing superior quality workmanship?

See Conclusion L.

**CAST002335**

# SECTION V

## RESEARCH AND DATA REVIEWED

## RECREATION BY DESIGN DOCUMENTS

Recreation by Design provided a number of documents relating to this matter.  A review of the following documents sets a chronology of events and provides data regarding the FEMA trailer provided to Ms Earline Castanel:

1. An invoice dated December 5, 2005 from Recreation by Design to Morgan Buildings and Spas, Inc.

   a.  The order number is 118041.

   b.  The product description is a 2006 33' Park Mod Morgan FH.

   c.  Model number is a 33 PM-HC.

   d.  The VIN is 5CZ200R2461125294.

   e.  The confirmation order identifies the following items:

      i.  The air condition is a ducted system, 15,200 BTU.

      ii.  The heating system is 3 electric baseboard units.

      iii.  A handicap sticker was to be installed on the window next to the entry door and on the front of the trailer.

2. A review of the Recreation by Design Information Sheet[2] indicates the following:

   a.  The unit is heated with three (3) electric baseboard heaters.

---

[2] Bate Stamp:  RBD Castanel 00001 (Recreation by Design, LLC (Plant #2)  Information Sheet

CAST002336

  b.  The air conditioning system is a Dometic Duo 15,000 BTU roof mounted unit.

  c.  Please see Enclosure #9: Recreation by Design Information Sheets.

3.  A review of the bill of materials from Recreation by Design list the following:

  a.  These documents appear to list the materials used in the construction of the Castanel unit.

  b.  These documents were used to help our team to assess the means and methods of construction of the unit. Actual verification could not be made because of limitations placed on the inspections.

  c.  Please see Enclosure #9: Recreation by Design Information Sheets.

4.  A review of the Floor Plan provided by Recreation by Design, Model 33 PM was made.

  a.  The review initially assisted in identifying the unit and design we were to inspect.

  b.  We utilized the drawings in preparation of our "as built" drawings.

  c.  Please see Enclosure #13: Floor Plan-Model 33 PM Dated September 19, 2005.

5.  The Certificate of Origin for the trailer was reviewed. It contained the following information:

  a.  The date of origin is December 2, 2005.

  b.  The year is a 2006 and the make is a Morgan.

  c.  The gross vehicular weight rating is 7,000 pounds (GVWR).

  d.  The model number is Model 33' PM FH.

  e.  The VIN is #5CZ200R2461125294.

CAST002337

    f. The dimensions of the unit are 33' in length with the hitch and 8' in width.

6. Delivery Check In Sheet

    a. It appears that the Recreation by Design Elkhart, Indiana Plant #2 produced this unit. The unit was delivered on December 7, 2005 to the GSA Depot, 2695 North Sherwood Forest Boulevard, Baton Rouge, Louisiana.

7. Recreation by Design Documents Bate Stamped #0001through #0045.

8. Recreation by Design Documents Bate Stamped #05174 through #05183.

9. Recreation by Design Documents Bate Stamped #05163 through #05173.

10. Recreation by Design Documents Bate Stamped #05184 through #05187.

11. Recreation by Design Documents Bate Stamped #0189 through #0250.

12. Recreation by Design Documents Bate Stamped #05188.

**CAST002338**

# SHAW DOCUMENTS

1. The Applicant Pending Inspection Report.

    a. The document indicates Ms Castanel applied for temporary housing sometime on or before November 11, 2005.

2. Access to the property to install the temporary housing unit was granted on November 27, 2005.

3. An undated City of New Orleans Building Permit Application Form.

4. Exhibit 7: Travel Trailer Installation

5. Site plan for the location of the travel trailer to be located at 2261 Urquhart St, New Orleans, Louisiana

6. FEMA Temporary Housing Ready for Occupancy Status Report dated March 11, 2006

7. An inspection was conducted on March 11, 2006 as indicated on the FEMA Temporary Housing Unit Inspection Report. It was signed by Ms Earline Castanel.

    a. The document indicates there are no issues with the unit.

8. FEMA / Shaw Contract

    a. Section 2.9.1: The contractor shall transport and install the mobile temporary structure to be ready to occupy in a safe and sanitary condition.[3]

    b. Section 2.9.2, Code Adherence: The contractor is responsible for adherence to applicable local, state and federal building regulations and laws. The contractor shall be responsible for meeting manufacturer recommended installation specifications.[4] (Note: It is our understanding there are no manufacturer's "installation

---

[3] Bate Stamp: Shaw – 000438 (Forest River File)
[4] Bate Stamp: Shaw – 000439 (Forest River File)

CAST002339

specifications". The manufacturer does not have specifications for the jacking and blocking of this unit. )

   c. Section 2.10, Maintenance (Exhibit 10): The contractor shall resolve maintenance issues and needs relating to the structures. The contractor shall have the technical capabilities to make necessary repairs to the mobile / temporary structure as specified in each task order.[5]

9. The RFO Checklist.[6]

10. AShaw was responsible for site review and placement of the unit on the site.

11. All documents Bates Stamped Shaw Cast 0001 through 0018.

---

[5] Bate Stamp: Shaw – 000439 (Forest River File)
[6] Shaw Cast 0015

CAST002340

# FEMA DOCUMENTS

1. The Model Travel Trailer Procurement Specifications dated July 14, 2005 outlined by FEMA for the manufacture and purchase of travel trailers pages 1 – 8 were reviewed. The following requirements relate specifically to the issues regarding the Castanel unit:

   a. "Travel trailers being procured under this contract are for the purpose of providing temporary housing."

      i. According to the document, it establishes that this unit is to be used for residential housing. Temporary residential housing is regulated by the building codes in force at the time and governs the codes and standards by which this unit was to be constructed.

   b. "The units are subjected to continuous road travel, multiple installations and deactivations, and various weather conditions."

      i. The specification requires the manufacturer to construct a unit that is capable of multiple activations, deactivations and will be used for multiple applications in different climate conditions

         1. Note: The unit was constructed in Indiana and delivered to the Baton Rouge FEMA location and then sent to Urquhart St. in New Orleans. It appears this unit was activated only once and deactivated to the FEMA Lottie site only once.

      ii. This portion of the specifications will be a factor in our review of the construction means, methods, and materials for use in hot, humid climates.

      iii. The standard is not to be considered as restrictive and the manufacturer may provide equal or better units.

         1. Note: While the specifications set out the minimum standards to which this unit was to be constructed, there was nothing preventing Recreation by Design from identifying to FEMA alternative means and methods of

CAST002341

construction that would have allowed them to more fully comply with the specifications for long-term occupancy of their unit.

c. "The construction and outfitting standards identified minimum square footage of living space, floor plan configuration, finishes, furnishing and environmental living conditions necessary to provide emergency housing for disaster operations."

   i. This portion of the standard requires the provider to furnish a unit to satisfy minimum environmental living conditions and again establishes the unit is to be used for housing.

d. "All exterior openings such as windows, doors, drain pipes, etc…will be caulked with a clear and non-hardening weatherproof sealant to prevent air and moisture penetration."

   i. This section of the standard will also be used to gauge whether or not the construction method or material met this criteria.

e. "The delivery locations are subject to change due to circumstances or situations associated with disaster recovery efforts."

   i. Once again, the specifications state that deliveries of the unit may be associated with no particular location and may require transferring the unit to any area of the country. Construction means, methods and materials should accommodate multiple climate zones.

f. "The manufacturer shall design and construct all units under this contract with a superior grade quality of workmanship."

   i. A superior level in design and construction will be the gauge we use in the assessment, review and comparison regarding the quality of workmanship, building materials, building standards or other construction requirements.

   ii. A close examination will be made of what codes and standards were used, followed, available and applicable regarding the construction and installation of this housing unit in order to

CAST002342

comply with the FEMA superior grade of design and construction requirement.

2. CDC – FEMA Document, Formaldehyde Levels in FEMA Supplied Trailers.

3. Important Information for Travel Trailer Occupants.

4. FEMA documents Bates stamped FEMA 159-000001 through 000094.

5. FEMA documents Bates stamped FEMA 207-000001 through 000008.

6. FEMA documents Bates stamped FEMA 207-000009 through 000022.

CAST002343

## MISCELLANEOUS DOCUMENTS

1. Review of FEMA Accessible One Bedroom Park Model (RP) Procurement Specifications dated April 25, 2006;

2. Review of FEMA 10-000463, IAQ Screening Testing Procedures for FEMA Temporary Housing Units;

3. Review of "FEMA to Introduce New Type of Manufactured Home," Release date: December 18, 2008, Release Number: 1791-343;

4. Review of "New FEMA Procurement Specifications Require Significantly Reduced Formaldehyde Levels In Mobile Homes and Park Models," Release date: April 11, 2008, Release Number: HQ-08-56;

5. Review of "FEMA Awards Contracts For Low Emissions Travel Trailers," Release date: April 7, 2009, Release Number: HQ-09-034b;

6. Review of ASHRAE 62 – Indoor Air Quality;

7. Review of Installation Instructions for Dometic 595 Series QUICK COOL air conditioning unit;

8. Review of Exhibit 7; Travel Trailer Installation;

9. Review of ANSI A119.2 NFPA 1192, Standard on Recreational Vehicles, 2005 Edition;

10. Review of ANSI A119.4 NFPA 1194, Standard on Recreational Vehicle Parks and Campgrounds, 2002 Edition;

11. Review of complaints from occupants to FEMA;

12. Review of ASTM Designation E 1827 – 96 (Reapproved 2007) – Standard Test Methods for Determining Air-tightness of Buildings Using an Orifice Blower Door;

13. Review of ASTM Designation: E 779-03 – Standard Test Method for Determining Air Leakage Rate by Fan Pressurization;

CAST002344

14. Review of ASTM Designation E 1186 – 03 – Standard Practices for Air Leakage Site Detection in Building Envelopes and Air Barrier Systems;

15. Review of ASTM Designation E 1554 – 03 – Standard Test Methods for Determining External Air Leakage of Air Distribution Systems by Fan Pressurization;

16. Review of International Standard 6781, Thermal insulation – Qualitative Detection of Thermal Irregularities in Building Envelopes – Infrared method;

17. Review of Delivery Inspection Report;

18. Review of photographs and video recording to First General Services of the South, Inc. of the Castanel THU taken by Scott Johnson;

19. Review of photographs and video recording to First General Services of the South, Inc. of the Castanel THU taken by others;

20. Review of the Transcript of the Testimony of Mary C. DeVany, MS, CSP, CHMM, Date taken: October 7, 2008, in reference to FEMA Trailer Formaldehyde Products Liability Litigation;

21. Review of "The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued to Hurricane Disaster Victims, and Recommended Action Items – Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform U.S. House of Representatives July 19, 2007;

22. Review of Table 3 – ATSDR Health Guidance Values for Formaldehyde Exposure (Reference 1.2) and Table 4 – Occupational Exposure Levels for Formaldehyde (Reference 9);

23. Review of Indoor Air Quality Guideline No. 1 dated August 2004, "Formaldehyde in the Home;"

24. A review of the HUD Manufactured Home Construction and Safety Standards Part 3280 Section 103: Light and Ventilation, Subsections (b) (1) and (2).

CAST002345

25.     A review of the HUD Manufactured Home Construction and Safety Standards Part 3280 Section 309:   Health Notice on Formaldehyde Emissions, regarding ventilation and high temperature and humidity effects on formaldehyde levels.

26.     Review of the Plaintiffs' Fact Sheet dated November 18, 2009;

27.     Review of miscellaneous formaldehyde documents;

28.     Review of Environmental Health's publication, "What You Should Know about Formaldehyde in Mobile Homes;"

29.     Review of photographs taken by Stephen Smulski, Ph.D.;

30.     Review of photographs taken by W. D. Scott and Associates;

31.     Review of photographs taken by Earline Castanel;

32.     Review of photographs taken by Charles David Moore, P.E. with Freyou, Moore and Associates;

33.     Review of photographs and a video recording taken by Ervin Ritter, P.E. with Ritter Consulting Engineers;

34.     Review of photographs taken by Scott Dailey with Ritter Consulting Engineers;

35.     Review of photographs and a video recording taken by Paul LaGrange with LaGrange Consulting;

36.     Review of Plans and Specifications from Recreation by Design;

37.     Review of Recreation by Design's Travel Trailers Owner's Manual;

38.     Review of "An Update and Revision of ATSDR's February 2007 Health Consultation:  Formaldehyde Sampling of FEMA Temporary – Housing Trailers, Baton Rouge, Louisiana, September – October, 2006, dated October 2007 by U. S. Department of Health and Human Services;

39.     A review of ATSDR documents Bates stamped ATSDR-000473 through

CAST002346

000487;

40.   A review of Buyer's Guides on vinyl wallpaper;

41.   Review of "The Use of Blower Door Data" by Max Sherman dated March 13, 1998;

42.   Review of CDC's "Final Report on Formaldehyde Levels in FEMA – Supplied Travel Trailers, Park Models, and Mobil Homes" dated July 2, 2008;

43.   Review of Composite Panel Association's Technical Bulletin, "VOC Emission Barrier Effects of Laminates, Overlays and Coatings for Particleboard, Medium Density Fiberboard (MDF) and Hardboard;"

44.   Review of a report prepared by Charles David Moore, P.E. with Freyou, Moore and Associates;

45.   Review of a report by LaGrange Consulting;

46.   Review of a report by Stephen Mullet (travel trailer manufacturing consultant) dated August 20, 2008;

47.   Review of a report by Ervin Ritter, P.E. with Ritter Consulting Engineers;

48.   Review of a report by Dr. Stephen Smulski;

49.   Review of Affidavit of Mary D. DeVany Concerning IN RE: FEMA Trailer Formaldehyde Products Liability Litigation, "Overview of Formaldehyde Exposure Standards; Toxicological Effects; Airborne Formaldehyde Sampling Strategy, Methodology and Selection Basis; Air Sampling Results; and Bibliography / References," dated August 2008;

50.   Review of Analytical Communications March 1998 report, "Effect of relative humidity on the determination of formaldehyde with NIOSH 3500 method (chromatropic acid method);

51.   Review of report, "Formaldehyde CAS number: 50-00-0;"

52.   Review of report, "Formaldehyde Indoors," by Stephen Smulski;

**CAST002347**

53. Review of report by Anne V. Baughman and Edward A. Arens, "Indoor Humidity and Human Health – Part 1: Literature Review of Health Effects of Humidity – Influenced Indoor Air Pollutants;"

54. Review of Exposure Assessment Solutions, Inc.'s Chapter 16: "Industrial Hygiene Exposure Assessment – Data Analysis and Interpretation;"

55. Review Of "Interim Findings on Formaldehyde Levels in FEMA – Supplied Travel Trailers, Park Models, and Mobile Homes" from the CDC dated February 29, 2008;

56. Review of an Affidavit of Marco Kaltofen, P.E. (Civil, Mass.) dated August 20, 2008;

57. Review of Earnest Orlando Lawrence, Berkeley National Laboratory's "Aldehyde and Other Volatile Organic Chemical Emissions in Four FEMA Temporary Housing Units – Final Report" dated November 2008;

58. Review of 1991 NIST's MOIST program data;

59. Review of 1993 ASHRAE study, "A Computer Analysis of Moisture Accumulation in the Walls of Manufactured Housing:"

60. Review of February 1994 ASTM study, "Moisture Control in Buildings;"

61. Review of January 1995 U.S. Department of Commerce Report, "Manufactured Housing Walls that Provide Satisfactory Moisture Performance in all Climates;"

62. Review of 1999 ASTM book, <u>Water Problems in Building Exterior Walls: Evaluation, Prevention, and Repair;</u>

63. Review of 2008 Manufactured Housing Research Alliance Study, "Moisture Problems in Manufactured Homes"

64. Review of September 2003 MHRA publication, "Minimizing Moisture Problems in Manufactured Homes Located in Hot, Humid Climates;"

65. Review of CDC Summary of Lawrence Berkley National Laboratory

CAST002348

Final VOC Report and Interim VOC Report;

66.  Review of "Mechanisms of Formaldehyde Release from Bonded Wood Products" published by American Chemical Society, 1986;

67.  Review of the Florida Solar Energy Center Publication Number: FSEC-GP-212-01, "Moisture Problems in Manufactured Housing:  Probable Cause and Cures;"

68.  Review of "Evaluation of Formaldehyde Levels in Occupied Federal Emergency Management Agency-Owned Temporary Housing Units" dated 12/13/07;

69.  Review of Formaldehyde Passive Monitoring Data – EMA Housing Units by W.D. Scott Group, Inc.;

70.  Review of test results by W.D. Scott Group, Inc.;

71.  Review of "Volatile Organic Compound Concentrations and Emission Rates Measured over One Year in a New Manufactured House" by Alfred T. Hodgson, Steven J. Nabinger and Andrew K. Persily;

72.  Review of "Wood Adhesives 2005" edited by Charles R. Frilhart dated November 2005;

73.  Review of FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005;

74.  Review of the Air Resources Board study, "Air Quality Modeling of Emissions from Composite Wood Products;"

75.  Review of the Air Resources Board's "Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated March 9, 2007;

76.  Review of the Air Resources Board's "Staff Report:  Initial Statement of Reasons for Rulemaking – Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007;

CAST002349

77. Review of Air Resources Board's "Final Statement of Reasons for Rulemaking Including Summary of Comments and Agency Responses – Public Hearing to Consider Adoption of the Proposed Airborne Toxic Control Measure to Reduce Formaldehyde Emissions From Composite Wood Products" dated April 26, 2007:

78. Review of the following internet articles:

   a. http://www.rvbusiness.com/tag/tl-industries/

   b. http://www.chemicaldesigncorp.net/ClosedCellFoam.htm

   c. http://www.robertlordbuilders.com/press_releasr1.htm

   d. http://www.suburbanmanufacturing.com/ (RV Products)

79. A review of the pamphlet by Bayseal CC for Residential Builders, "Insulation that Adds Value;"

80. A review of Bayseal CC Division 7 – Thermal and Moisture Protection Closed-Cell Insulation Technical Data Sheet 06/10/08;

81. A review of product data for various open and closed cell SPF insulations

82. A review of a fax from Wyatt Rankin with SPI-Dallas dated May 19, 2009 regarding formaldehyde foams;

83. A review of the International Building Code, 2000;

84. A review of the International Residential Code, 2000;

85. A review of The Building Code of the City of New Orleans, 2003;

86. A review of the Ball State report;

87. A review of Composite Panel Association Products Documents Regarding Low and Non-Formaldehyde Emitting Materials;

88. A review of RADCO Test Report RAD-138, Interim Report on

CAST002350

Formaldehyde in Mobile Homes, revised July 20, 1978;

89.   RADCO Correspondence to Jordan Dentz with MHRA dated July 9, 2004;

90.   A review of the reports and depositions of Mark Polk in the FEMA formaldehyde litigation;

91.   A review of the reports and depositions of Thomas Fribley in the FEMA formaldehyde litigation;

92.   A review of the reports and depositions of John Osteraas in the FEMA formaldehyde litigation;

93.   A review of the reports and depositions of Damian Serauskas in the FEMA formaldehyde litigation;

94.   A review of the reports of Tony Watson in the FEMA formaldehyde litigation;

95.   A review of the reports and depositions of Donald Snell in the FEMA formaldehyde litigation;

96.   A review of the reports and depositions of Norman Nelson in the FEMA formaldehyde litigation;

97.   A review of an RV Business Article dated January 21, 2010 titled, "Park Owners Warned:  Beware of FEMA Trailers", regarding an advisory by Recreational Park Trailer Industry Association's Executive Director William Garpow;

   a.   Please see Enclosure #15 to this Report:  RV Business Article dated January 21, 2010.

98.   A review of a FEMA document from the FEMA Photo Library on FEMA ADA compliant trailers by Keith Riggs taken August 19, 2006;

**CAST002351**

a. Please see Enclosure 16: FEMA Photo Library on FEMA ADA compliant trailers by Keith Riggs taken August 19, 2006;

99. A review of a publication by the United States Department of Agriculture, Handbook No. 640, titled "Fiberboard Manufacturing Practices in the United States" by Otto Suchsland and George E. Woodson;

100. Review of a report by the CDC dated December 10, 2009, "Evaluation of Mitigation Strategies for Reducing Formaldehyde Concentrations in Unoccupied Federal Emergency Management Agency-Owned Travel Trailers", by Michael G. Gressel and Lynn Wilder;

101. A review of the ANSI A119.5 Recreational Park Trailer Standard 2005 Edition;

102. HUD publication, "Durability by Design"

CAST002352

## SECTION VI

## RESULTS OF INSPECTIONS, OBSERVATIONS AND TESTING

Testing and inspections on the Earline Castanel FEMA THU commenced on January 4, 2010 and proceeded until completed on January 19, 2010. Testing and observations other than by non-destructive means were not permitted. Our ability to verify design and construction means, methods, degree of quality and compliance with specifications, codes and building standards were limited. In the course of our study and analysis, the interaction of air, temperature and moisture as they relate to the temporary housing unit were observed and/or tested. Various tests for envelope air leakage, air conditioning duct air leakage, and air exchange rates were performed. Infrared thermographic surveys were performed along with the recordation of pressure differentials, temperature and relative humidity readings.

Observation and testing assisted in identifying the relationship between the exterior and interior environments, the communications between the exterior and interior environments and the effect upon the components of the temporary housing unit.

Tests were performed regarding the affect jacking and placing the unit on piers had on the structure from air and moisture infiltration. Those test results are unavailable at the time of this report. A supplemental report may be issued after the jacking and blocking test results are made available.

The testing has provided data to assist us in identifying if there were transfer pathways for air, thermal energy and moisture to enter from the exterior of the THU into the wall, floor and ceiling cavities of the unit as well as the interior living space; what factors contributed to that transfer and its effect upon the various components of the unit; and were any of those factors a result of the failure of Recreation by Design or Shaw Environmental to follow the project specifications, building codes and standards. The pathways and means allowing any off-gassing of materials or micro-organisms to move into the living area were explored and identified. The causes for conditions favorable for the off-gassing of building materials in the walls, ceilings, floors and living area were identified.

**CAST002353**

OBSERVATIONS AND TESTS:

A.    Identification

    1.  Observations:

        i.  Identification of the Castanel trailer was made by reviewing the stamps and numbering on the trailer.

    2.  Photographs:

        i.  See enclosed Photographs A-1 through A-15.

B.    Interior Overview

    1.  Observations:

        i.  The initial interior overview revealed a relatively well kept living area.  There are some indications of:

            a.  The appearance of a mold-like substance and water stains on the window frames;

            b.  Rippled or detached vinyl covering on the panels were observed;

            c.  Moisture indications on the floor at the area of the commode were noted;

            d.  Separations in the batten strips.

            e.  Apparent moisture penetration was noted on corroded fasteners on the interior walls.

**CAST002354**

ii. Other than these items, the trailer appeared to be maintained and showed very little wear despite the occupation of the trailer by Mr. Castanel from March 2006 through August 21, 2007.

2. Photographs:

    i. Please see Photographs B-1 through B-63.

    ii. Please see Ritter Consulting Engineers Photographs #0004, 0005, 0008, 0009, 0010, 0011, 0012, 0023, 0024, 0025, 0032, 0033, 0034, and 0035.

3. Comments:

    i. The interior and exterior of the trailer was measured for the purposes of providing detailed drawings of the "as-built" condition of the unit.

    ii. Please see Enclosure #3, Plans and Details by FGS / RCE of the FEMA Castanel THU.

C.    Data Plate

1. Observations:

    i. The following information was collected from the data plate:

      a. Make and Year: 2006 Morgan,
      b. VIN: 5CZ200R2461125294,
      c. Type: 33'PN FH,
      d. Front and Rear Tire Sizes: 235/15

2. Photographs:

    i. Please see Photograph C1.

**CAST002355**

D.     Certification Tag

1. Observations:

    i. No RVIA Certification Tag was observed on this unit.  The RVIA certification tag generally states that the manufacturer certifies compliance with standard for recreational vehicles ANSI NFPA 1192, electrical, plumbing, heating, and safety.

    ii.    No RPTIA Certification Tag was observed on this unit.

    iii.   Page 3, Bates number RBD 05191, of the Recreation By Design's Owner's Information Manual states that the unit was  constructed to comply with the requirements set forth by the Recreational Vehicle Industry Association, as well as other state and federal governing agencies.

      a. Photographs:

        i. Please see photograph D-1

      b. Codes, Standards, Tests or Engineering Assessments:

        i. Please see ANSI 119.2, NFPA 1192, Codes and Standards for Recreational Vehicles.
        ii. Please see ANSI A119.5, Codes and Standards for Recreational Park Trailers

      c. Comments:

        i. Photograph D-1 is an overview of the passenger side of the unit.  Typically, the certification tag is located by the entry door.  There are no tags by

CAST002356

the door or any other place on or in the unit that was observed by our team members.

ii. While the trailer manufacturer has not certified compliance with the ANSI 119.2, NFPA 1192, ANSI 119.5 nor the RPTIA codes and standards, page 3 in the Recreation by Design's Owner's Information Manual states that this trailer complies with the Recreational Vehicle Industry Association's standards as well as other state and federal governing agencies.

iii. The manufacturer's documents indicate this unit is a Park Model trailer 8' wide by 30' long.

iv. The manufacture's documents indicate the unit is a handicap unit., The unit also has two ADA handicap symbols on the unit.

v. We will address further in this report the areas the manufacturer did not meet the compliance requirement of these codes.

vi. Additionally, it will be discussed further in the Report whether or not there or other codes and standards that applied to the construction and use of this unit as its use as temporary housing.

E.    Inspection Tags

1. Observations:

       i.  We did not observe any indications of inspections or maintenance to this unit either at the front exterior end wall of the trailer or in any documents provided to us for review.

2. Photographs:

       i.  Please see photographs E-1through E12.

3. Comments:

       i.  There does not appear to be any inspection stickers or inspection indications were placed on the trailer by the maintenance contractors of inspections.  Ms Castanel lived in this unit from March, 2006 to August of 2007.  If the unit was routinely inspected and maintained, it is unknown what areas were inspected other than the three service calls to repair the air conditioner and the service call to repair the screen door as indicated by Ms Castanel's testimony.

F.    Tongue Jack

1. Observations:

       i.  The 2000 lb. tongue jack on the front end of the trailer was utilized by the Shaw consultants to lift the trailer during their jacking and blocking procedures.

2. Photographs:

       i.  Please see Photographs F-1

      ii.  Please see Photographs and video recording by A.J Valenti.

3. Comments:

CAST002358

    i.  It is unknown at this time why the trailer tongue jack was used in the jacking procedures by Shaw's consultants.  We may opine later after reviewing their report.

G.     Scissor Jacks

    1.  Observation:

        i.  P C M S 24" scissor jacks were installed on the trailer for the purpose of stabilizing the unit.

    2.  Photographs:

        i.  Please see photographs G-1.

    3.  Comments:

        i.  There are no instructions either on the jacks or in the owner's manual regarding the use of these jacks.  Other trailers inspected and owner's manuals reviewed gave at least limited directions on the use of these jacks.

H.     Tires

    1.  Observations:

        i.  The tires of the unit were observed.  The tires are 15" in diameter.

        ii.  The numbers on the tires do not match the numbers on the data plate.  The tires on the trailer are not as wide as those called out on the data plate.

    2.  Comments:

**CAST002359**

i. It was observed that the tires and rims on the trailer were installed with 15" wheels. The tires are Tow Master ST 205/75 15. The number 15 indicates that they are 15" in diameter.

ii. The tires on the data plate call for a 235/75 tire.

I.     Axles

1. Observations:

i. The underside of the chassis or steel frame was inspected for its connection to the axles. The axles were connected to the frame with a series of U-clips and bolts and fasteners. The axles are connected to suspension springs which allow the axles to move independently of one another.

2. Photographs:

i. Please see Ritter Consulting Engineers Photographs #8907 through #8912

ii. Please see Freyou Moore photograph library by David Moore

3. Comments:

i. The axles are connected to the frame with a series of framing members and springs. When jacking of the unit occurred, it is our understanding the axles were allowed to be suspended without jacks under the axles and with no blocking below the axles. If jacking was to be performed, at a minimum, the axles should have been lifted at the same time the entire frame was lifted. Performing the jacking and lifting with a unified hydraulic jacking system, lifting the entire unit and axles at the same time, would have taken weight off the frame and axles of

**CAST002360**

the trailer and alleviated some of the stress placed on the framing and components of the trailer.

J.    Chassis

1. Observations:

    i.  The chassis or steel frame of the trailer was inspected.  The frame was constructed with I-beams, angle iron, metal trusses and other miscellaneous metals.

    ii. The connection of the steel chassis to the wood frame structure of the trailer could not be inspected because of the limits of our inspection to non-destructive means and methods only.

2. Photographs:

    i.  Please see photographs by Scott Dailey in the Ritter Consulting Engineers bank of photographs #8757 through #8819 and video recordings

    ii. Please see photographs in the Freyou Moore Engineers bank of photographs by David Moore.

3. Codes, Standards, Tests or Engineering Assessments:

    i.  Please see Enclosure 2, Freyou, Moore and Associates' Report, Structural Conditions Assessment.

4. Comments:

    i.  The outrigger connections to the wood structure were connected at the end of a reduced angle iron outrigger.

CAST002361

      ii.  From observations and data provided, the wall framing of the trailer appears to be 1 ½" x 1 1/8" vertical wood members placed 16" apart.

      iii.  The floor framing appears to be constructed with nominal 2" x 3" wood members joists with actual spacing unknown.

      iv.  According to the Freyou Moore Report, if the blocking was performed correctly, the floor framing system would have met the code requirements.

K.    Plastic Black Under Siding

  1.  Observations:

      i.  The underside of the temporary housing unit is protected with a vapor barrier between the steel chassis and the wood floor structure.

      ii.  Penetrations in the in the vapor barrier are not sealed.

      iii.  The edges of the vapor barrier are not sealed.

      iv.  Air is allowed to infiltrate the outside envelope of the unit.

      v.  FEMA standards require the unit to be sealed against air intrusion.

  2.  Photographs:

      i.  Please see photographs provided by Ritter Consulting Engineers #8768, 8780, 8785, 8844, 8905, 8906, 0109, 0129, -130, 0131, 0139, 0140, 0142.

  3.  Codes, Standards, Tests or Engineering Assessments:

CAST002362

    i. Please see FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

    ii. Please see International Residential Code, 2000, Section 1102.1.10-Air Leakage; the New Orleans City Building Code, 2003.

    iii. RPTIA Standards ANSI A119.5: Section 5.2.4-Resistace to Elements

4. Comments:

    i. In the FEMA procurement specifications, the temporary housing unit was to be constructed to prevent air and moisture infiltration. The construction and installation methods used by Recreation by Design did not meet the procurement specifications.

    ii. Electrical and plumbing penetrations were not sealed.

    iii. The perimeter of the vapor barrier was not sealed at the intersection with the wall framing and siding.

    iv. There were unsealed cuts in the vapor barrier. It is unknown when these cuts occurred. We cannot assess if the cuts existed prior to the delivery of the unit to Urquhart St., during the time Ms Castanel occupied the unit or subsequent to the removal of the unit from Urquhart St.

    v. Test performed indicates the air conditioning system ducts leak air. This causes the Castanel unit to operate in a negative air condition. When negative air pressure conditions exist in hot humid climates, unfiltered unconditioned hot, moist air is sucked into the walls, ceiling, floor and living areas. This

CAST002363

unfiltered air entering into the floor, walls and ceiling cavities elevates the heat and moisture in these areas. This contributes to the increase of formaldehyde off-gassing in those areas when formaldehyde containing materials are present.

vi. The FEMA specifications required the manufacturer to meet industry standards. Recreation by Design failed to meet the standards of the air conditioning manufacturer. The supply and return air ducts leaked in turn causing air and moisture leakage into the unit.

vii. Pressure differentials cause movement of air and moisture from the hot humid outside to the colder drier air on the interior. This air and moisture vapor transmittal occurs as a result of diffusion.

viii. Additionally, air flow forces heat and moisture through unsealed penetrations and openings in the walls and ceiling cavities of the home.

ix. In the winter months, the opposite occurs. The typically higher humidity on the interior of the building seeks to escape to the cooler, drier outside air in the winter months. Moisture can be forced into wall, floor and ceiling cavities. If the temperature differential is great enough, the moisture will condense on the colder surfaces.

L.    Aluminum Exterior Sheeting

1. Observations:

i. A review of the exterior sheeting or skin around the unit was performed. It is unknown if the lap joints are sealed.

    ii. The corner trims covering the intersections of the exterior siding was inspected. Deterioration and cracks in the sealant for the corner trims were observed.

2. Codes, Standards, Tests or Engineering Assessments:

    i. Please see the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

    ii. Please see the International Residential Code 2000, Section N1102.1.10 Air Leakage; and the New Orleans City Building Code 2003.

    iii. RPTIA Standards ANSI A119.5:  Section 5.2.4-Resistace to Elements

3. Comments:

    i. A review of the installation means and methods of the exterior aluminum wall sheeting was performed. The wall sheeting was rolled or crimped in a horizontal pattern. Panel joints were approximately 16"+ apart and ran from front to back and side to side.

    ii. Envelope leakage test indicated air was penetrating though openings in the siding. The siding was not sealed to prevent air and moisture penetration.

M.   Wall Trim-Exterior:  Corners, Roof to Wall, and Window/Doors/Vents and Other Penetrations

1. Observations:

    i. A close inspection of the exterior corners, the roof to wall connection, and the trim around the windows and entry door

CAST002365

was performed.   We observed the materials utilized to seal these areas were deteriorated or absent in a number of locations.

2. Photographs:
   i. Please see photographs M-1 through M-96.

3. Codes, Standards, Tests or Engineering Assessments:

   i. FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

   ii. International Residential 2000, Section N1102.1.10 Air Leakage; Section 703.1 Exterior Walls;

   iii. City of New Orleans Building Code 2003

   iv. HUD publication, "Durability by Design", Section 4.2.5;

   v. RPTIA Standards ANSI A119.5:   Section 5.2.4-Resistace to Elements

4. Comments:

   i. Moisture surveys and infrared thermographic surveys were conducted on the interior of the unit.  Indications of air, thermal energy and moisture infiltration were observed.  This led to a more in depth inspection of the sealed intersections on the exterior of the building as discussed above.

   ii. Sealant material was used at through-wall penetrations, roof and wall intersections and the corner sections.  It was noted during the exterior inspection that the only method of sealing penetrations or intersections was the use of caulking or sealant. The sealant material had hardened at a number of the areas inspected.

CAST002366

iii. The FEMA specifications call for a clear non-hardening water proof sealant to be used. The specification was not followed by the manufacturer.

iv. Caulking was used as the only defensive means to prevent water and air infiltration into the FEMA unit.

v. As indicated in the HUD publication, "Durability by Design," caulking should be used as a secondary means to prevent air and moisture penetration into a structure. There should be some other primary means of moisture and air penetration prevention at intersections and penetrations.

    a. The reason caulking or other like sealants should not be used for primary prevention of air and moisture penetration into structures is that any breach of the caulking or sealant material allows air and moisture through the opening. There is no primary flashing or material to prevent or manage that air and moisture infiltration from entering into the wall or ceiling cavity or the interior of the building.

    b. Holes or cracks can form either during the installation or as a result of the material degradation. It is not usually apparent that this has occurred. Deterioration or decay of building materials, a decrease of the R-value of the insulation, and indoor air quality issues become a problem usually long before the problem of infiltration is noted by the occupant.

vi. The sealant does not appear to have been installed with a backer rod or bond breaker. This creates a three point contact with the materials to be sealed. This installation method increases the opportunity for leakage.

CAST002367

N.    Wall penetrations-Interior and Exterior:  Lights, Pipes, Electrical, Etc.

1. Observations:

    i. The exterior wall penetrations were inspected.  Areas such as lights, pipes, electrical and other penetrations were examined utilizing infrared thermographic imaging and a smoke producing device.  Air leakage was documented.

    ii. Interior wall penetrations were inspected.  Areas such as lights, pipes, electrical and other penetrations were examined utilizing infrared thermographic imaging and a smoke producing device.  Air leakage was documented.

2. Photographs:

    i. Please see photographs in Section M for exterior.

    ii. Please see photographs N1 through N-6.

    iii. Please see Enclosure #4:  Photographs and video recording links contained within the La Grange Consulting Inspection Report pages 31through 34.

    iv. Please see Enclosure #2:  First General Services Infrared Thermographic Images #0001 through 00036.

3. Codes, Standards, Tests or Engineering Assessments:

    i. Please see the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005.

    ii. International Residential Code 2000, Section N1102.1.10;

CAST002368

    iii.  RPTIA Standards ANSI A119.5:   Section 5.2.4-Resistace to Elements

    iv.  Please see Enclosure #4, La Grange Consulting Inspection Report.

    v.  Please See Enclosure #8, Ritter Consulting Engineers Report.

4.  Comments:

    i.  Inspection of the exterior and interior areas of wall penetrations was performed.  Areas such as lights, access panels, electrical outlets, electrical connection box, water lines, and other penetrations were inspected.

    ii.  While a sealant was applied to the exterior of most of these items, some of these areas had air and possible water penetration through breaches in the sealant.

    iii.  Other areas, such as wiring penetrating through the walls allow for communication between the attic and floor spaces into the wall cavities and into the living space of the housing unit.

O.    Floor Penetrations

1.  Observations:

    i.  There are a number of areas of unsealed penetrations in the floor noted during the inspection.

    ii.  Floor penetrations are not properly sealed to meet the FEMA procurement specifications or the NFPA, ANSI or the Building Codes.

2.  Photographs:

CAST002369

   i.  Please see photographs O-1 through O-5.

   ii.  Please see Enclosure #4:   LaGrange Consulting Inspection Report.

   iii.  Please see Enclosure #8:  Ritter Consulting Engineers Report

3.  Codes, Standards, Tests or Engineering Assessments:

   i.  FEMA Model Travel Trailer Procurement Specifications

   ii.  NFPA Code 1192-05: Section 7.1.6.4-Protective Requirements

   iii.  International Residential Code 2000:  Section N1102.1.10 Air Leakage

   iv.  RPTIA Standards ANSI A119.5:   Section 5.2.4-Resistace to Elements

   v.  RPTIA Standards ANSI A119.5:    Section 5.2.5-Rodent Resistance

4.  Comments:

   i.  Penetrations through the floor of the unit were inspected. These penetrations through the floor were not sealed.  This allowed for the transfer of air and moisture between the underside of the unit into the floor cavity and into the interior living space.

   ii.  The specifications required all penetrations including piping to be sealed.

CAST002370

iii. Section 7.1.6.4, Protective Requirements, on page 27 of the code states that "all exterior openings around piping shall be sealed to prevent the entrance of rodents." As discussed in Section K: The Plastic Black Underlining, penetrations in the underside of the housing unit was not sealed and is a code violation.

P.   Windows: Air Leakage:

1. Observations:

i. An inspection was performed on the interior side of the window units. The rough framing of the windows was exposed.

ii. Air movement could be felt around the perimeter of the window.

2. Photographs:

i. Please see photographs P-1 through P-18.

ii. Please see Enclosure #4: LaGrange Consulting Inspection Report, video recording on YouTube page 17.

3. Codes, Standards, Tests or Engineering Assessments:

i. Please see FEMA Model Travel Trailer Procurement Specifications.

ii. Please see International Residential Code 2000: Section 1102.1.10 Air Leakage

iii. RPTIA Standards ANSI A119.5: Section 5.2.4-Resistace to Elements

CAST002371

iv. Please see Enclosure #4: LaGrange Consulting Inspection Report

v. Comments:

    a. During the interior inspection air infiltration around the windows could be felt.

    b. The windows are installed in a manner that exposes the rough framed opening exposed.

    c. Despite the exposed rough opening, air infiltration should not be experienced. Air is penetrating the into either the floor or wall cavities and is entering into the living space.

    d. Air is penetrating or bypassing the air barrier and pressure envelope of the living unit.

    e. During the jacking and blocking of the unit, it was noted the window units appeared to move. As others have also opined stated in the Wright litigation, detachment of the sealant material occurs as a result of deterioration or movement of the joint, breaking or tearing the seal between the window unit and the wall. Any air leakage around the window created conditions conducive to elevated relative humidity in the wall cavity especially in the hot, humid months.

Q. Floor Insulation

1. Observations:

    i. We were not allowed to remove the floor decking or the moisture barrier under the THU to inspect the floor cavity;

CAST002372

however, David Moore was able to measure the depth of the cavity through one on the unsealed penetrations in the underside vapor barrier. The floor cavity was approximately 2 ¾" in depth.

ii. Only an R-7, 1½" thick insulation was identified during a review of the material list provided by Recreation by Design. It is unknown if the unit was constructed utilizing a 1 ½" thick insulation or we were not provided the entire materials list.

2. Comments:

i. The floors were insulated with fiberglass roll material. The insulation thickness is unknown. If the insulation material does not fill the space between the joists or between the underside vapor barrier and the underside of the floor sheeting this creates conditions conducive to condensation forming and/or the increasing of relative humidity. The gaps in the insulation, insulation not fully fitted between framing members or insulation that does not fill the cavity, especially at the underside of the interior colder surfaces, creates conditions that allow for the air to reach the dew point in these areas and condense. This creates conditions conducive to mold growth and off-gassing.

R.   Floor Joist

1. Observations:

i. The floor joist system could not be observed. The floor joists were assessed to be 1 ½" x 2 ½" wood members.

2. Codes, Standards, Tests or Engineering Assessments:

CAST002373

      i. Please see Enclosure #5, Freyou, Moore and Associates – Structural Condition Assessment.

3. Comments:

      i. Dimensioned lumber is utilized for floor joists. The floor joists are 1 ½" x 2 ½" in dimension.

S.    Flooring-Vinyl

1. Observations:

      i. The vinyl flooring was raised by the pressure during the envelope air leakage testing.

2. Photographs:

      i. Please see Video Recording By Scott Johnson

3. Codes, Standards, Testing or Engineering Assessments:

      i. Please see Enclosure #4: LaGrange Consulting Inspection Report

      ii. RPTIA Standards ANSI A119.5: Section 5.2.4-Resistace to Elements

T.    Wall Insulation

1. Observations:

      i. Infrared thermographic imaging was used to identify areas in the wall insulation that are not cut, fitted or installed in a

CAST002374

manner that would prevent condensation from forming within the wall cavities of the unit.

ii. Infrared thermographic imaging was used to identify areas in the wall insulation that are not cut, fitted or installed in a manner that would prevent the movement of thermal energy into the wall cavity. This causes the rise of temperature in the wall cavity which in turn increases the rate of off-gassing in formaldehyde containing materials.

iii. The insulation in the walls of this unit is 1 ½" thick un-faced fiberglass batting. This material has an R-value of 7 or less. The low R- value of the insulation does not offer the necessary resistance to temperature movement within the walls that would prevent the formation of condensation.

2. Photographs:

   i. Please see Enclosure #2: First General Services Infrared Thermographic Images

   ii. Please see Enclosure #4: LaGrange Consulting Inspection Report, Thermographic Images.

3. Codes, Standards, Testing or Engineering Assessments:

   i. FEMA Model Travel Trailer Procurement Specifications

   ii. International Residential Code 2000:

      a. Section N1102.1 Building Envelope Thermal Performance;

      b. Section N1102.1.1-Building Envelope-Exterior Walls; and

CAST002375

       c.  Table N1102.1.1.

  iii.  Please see LaGrange Consulting, L.L.C. Inspection Report.

  iv.  Please See ASTM Publication, "Moisture Analysis in Building Envelopes", by Heinz R. Trechsel, 2001

4.  Comments:

    i.  Gaps between wood wall framing members and the insulation exist because the width of the insulation is not as wide as the wall frame member spacing.

    ii.  The voids and compressed insulation allow air and moisture movement into the wall cavities and to come in contact with colder interior wall surfaces. This creates conditions conducive for the presence of higher relative humidity and the formation of condensation.

  iii.  The roll insulation was identified as having an R-7 value. This is a low resistance value especially for the climate in southern Louisiana. The lower the "R" number the less resistance it has to prevent the movement of heat and cold though it. Typical wall systems in this climate require an R-11 value.

  iv.  Recreation by Design either did not consider or ignored the fact that condensation can occur in the walls, ceiling and possibly the floor systems of the Castanel house. There are studies dating back to the 1980s or earlier demonstrating condensation occurs in the cavities of a structure when air and surface temperatures reach the dew point.

CAST002376

v.  HUD has required the control and management of condensation in mobile homes from air and moisture infiltration into the cavities and envelopes since 1986.

vi.  While travel trailers do not fall under the manufactured housing code, it has been well established in the industry that the condition of low R values in hot humid climate areas creates conditions conducive to the formation of condensation and material deterioration.

vii.  Because the insulation in the wall cavities has such a low R-value (resistance to the temperature), this condition occurs in the cavities of the housing unit anytime during the year when conditions are favorable, in addition to the months of May, June, July, August or September in the New Orleans area. The manufacturer did not account for or address the probability of this occurrence.

viii.  It is not necessary for the relative humidity in the wall, floor and ceiling cavities to reach the dew point and for condensation to form for formaldehyde off-gassing to occur. Increase in formaldehyde off-gassing in wood products can occur when the relative humidity reaches 60-70% per Failure Criteria by Hannu Viitanen and Mikael Salonvaara.7

U.  Walls - Interior Wall Material and Vinyl Covered Finishes

1. Observations:

i.  The manufacturer has utilized an applied vinyl covering over the hardwood plywood sheathing on the wall and ceiling panels.

---

7 ASTM Publication, "Moisture Analysis in Building Envelopes", Chapter 4, Failure Criteria

CAST002377

    ii. According to information provided by Dr. Stephen Smulski in his report, the wall and ceiling panels are hardwood plywood containing formaldehyde.

2. Photographs:

    i. Please see photographs U-1 through U-6.

3. Codes, Standards, Testing and Engineering Assessments:

    i. Please see Enclosure #4, LaGrange Consulting Inspection Report.

    ii. Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

    iii. Please see Enclosure #10, Part 3280.309-Health Notice on Formaldehyde Emissions.

4. Comments:

    i. The problems associated with placing vinyl wall and ceiling coverings on the interior of all types of buildings in the hot, humid climates has been studied for many years and there are numerous publications on this subject. These types of wall coverings trap moisture inside the wall cavities and create moisture problems. In these temporary housing units, this leads to an increase in formaldehyde off-gassing.

    ii. The interior face of the wall panels is covered with a vinyl material. Vinyl materials usually have a lower ability to allow air and moisture vapor to filter through. This resistance is known as the perm rating of the material. Any material with a perm rating low enough will prevent (a vapor barrier) or slow (a vapor retarder) the passage of air and moisture vapor from the outside into the wall cavity or living area.

**CAST002378**

iii. To prevent air and moisture from entering a building cavity, a Tyvek type material should be installed on the warm side of the wall in the hot humid climate zone. If the vapor barrier or Tyvek type of material is placed on the cold side of the wall in this climate, moisture collection and condensation can be expected in the wall cavity. The drying process will be affected.

iv. Deterioration of the building materials will occur over time, microbial growth and other contaminants present will not dissipate into the outdoor atmosphere, especially when there are negative air pressure conditions that exist in the living space. Once the wall system allows air and moisture to enter, the vinyl surface of the wall and ceiling panels prevents or retards the moisture from passage through to the interior.

v. The moisture vapor collects on or absorbs into the back side of the vinyl covered wall and ceiling sheeting. This causes an increase in formaldehyde off-gassing. As the surfaces on the interior of the temporary housing unit gets colder, the relative humidity rises on or near the surface of the paneling in the wall and ceiling cavities. The higher the relative humidity the higher the rate of formaldehyde off-gassing.

vi. The manufacturer did not provide for the management of air, water and water vapor intrusion into the wall, ceiling and floor cavities. As a result, the lack of a management system causes conditions conducive to the increase in formaldehyde off-gassing.

V.   Ceilings

1. Observations:

CAST002379

    i. The ceilings throughout the house were vinyl covered hardwood paneling.

2. Photographs:

    i. Please see photograph V-1 through V-3.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

    ii. Please see Enclosure #4, LaGrange Consulting Inspection Report.

4. Comments:

    i. The problems associated with placing vinyl wall and ceiling coverings on the interior of all types of buildings in the hot, humid climates has been studied for many years and there are numerous publications on this subject. These types of wall coverings trap moisture inside the wall cavities and create moisture problems. In these temporary housing units, this leads to an increase in formaldehyde off-gassing.

    ii. Ceiling panels throughout the unit are hardwood paneling covered with vinyl material. The wood panel is a hardwood material and identified in Dr. Stephen Smulski's report as formaldehyde emitting materials.

    iii. As discussed in Section U, Walls, the same issues identified with the vinyl covered hardwood paneling also apply to the vinyl covered ceiling boards. Air and moisture are not allowed to permeate through the materials to dry out to the interior. Any elevated relative humidity levels or condensation that occurs in the ceiling cavity is trapped against or near the cold

CAST002380

surface of the ceiling panel.  This creates conditions conducive to formaldehyde off-gassing.

W.    Ceiling Penetrations

1.  Observations:

   i.  There were unsealed penetrations through the ceiling panels. Areas such as air conditioning duct penetrations, and other such penetrations were noted.

2.  Photographs:

   i.  Please see photographs W-1 through W-4.

   ii.  Please see Ritter Consulting Engineers Photographs #0054-0070.

3.  Codes, Standards, Testing or Engineering Assessments:

   i.  FEMA Model Travel Trailer Procurement Specifications

   ii.  Please see Enclosure 3, LaGrange Consulting Inspection Report.

   iii.  Please see Enclosure #8, Ritter Consulting Engineer's Report

   iv.  International Residential Code 2000:  Section N1102.1.10 Air Leakage

4.  Comments:

   i.  The numerous penetrations through the ceiling were not properly sealed to prevent air and moisture movement between the ceiling cavity and the interior air of the home.  The

CAST002381

construction makeup of the unit as discussed earlier allows for the transfer of air and moisture into walls, ceilings and cavities. This moisture will migrate from the warmer, moist ceiling cavity areas into the drier, cooler air within the living area of the home. Movement of any micro-organisms, contamination or formaldehyde gas into the living area then occurs.

X.    Ceiling Insulation

   1. Observations:

      i. Observations of the ceiling insulation material and installation methods were not allowed. It is unknown how Recreation by Design was able to install insulation in the area allowed in the ceiling cavity and maintain the required R-7 factor for the duct system. Compressed insulation, missing insulation, or a lack of insulation around the duct system raises the temperature in the ceiling cavity.

   2. Codes, Standards, Testing or Engineering Assessments:

      i. International Residential Code 2000: Section 1102.1.2-Ceilings and Table 1102.1

      ii. Please see Enclosure #4, LaGrange Consulting Inspection Report.

      iii. Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

      iv. Please see Enclosure #8, Ritter Consulting Engineers' report.

   3. Comments:

      i. The insulation installed in the ceiling system is an un-faced 2 ½" thick fiberglass roll insulation. The insulation noted on the

CAST002382

bill of materials is a 1 ½" thick material. The insulation cannot fill the voids between the framing members. The insulation has to be significantly compressed in a number of areas. It appears the insulation was installed prior to the installation of the metal roof. Once the roof deck was installed, the insulation was compressed between the roof and the roof truss. This rendered the insulating capacity of the material relatively ineffective at those locations. The consequence of this method of installation allowed for unnecessary heat transfer into the ceiling cavity. The high heat and humidity that are allowed into the ceiling cavity produces conditions conducive to an increase in formaldehyde off-gassing when the hot, humid air comes into contact with the colder ceiling panels. There is available cold air in the ceiling cavity to create conditions of high relative humidity and condensation. This will be discussed later in the report.

   ii. The methods of the insulation installation fall below the level of superior quality.

   iii. The thin insulation and low R- value allow the dew point to be reached easily in this area.

Y.    Roof Truss

  1. Observations:

    i. We could not access the roof framing material. According to the bill of materials provided, the ceiling and roof framing is constructed with roof truss.

  2. Comments:

    i. Air leakage from the supply duct and return air system creates air movement in the insulation of the ceiling cavity. The open

CAST002383

truss system allows for air to move from one section of the cavity to another.

    ii.  Air movement within insulation reduces the insulating value of the insulation. Insulation is dependent upon dead air space for its ability to resist thermal energy movement. When that dead air space is disturbed, the resistive value of the insulation is reduced or eliminated.

Z.    Roof

    1.  Observations:

        i.  The roof material is a galvanized thin gauge metal material very similar if not exactly the same material that was installed on mobile homes some years ago.

        ii.  Seams at the edges of the roof material were not completely sealed.

    2.  Photographs:

        i.  Please see photographs Z-1 through Z-8.

    3.  Codes, Standards, Testing or Engineering Assessments:

        i.  FEMA Model Travel Trailer Procurement Specifications

        ii.  International Residential Code 2000: Section 1101.1.10 Air Leakage

        iii.  RPTIA Standards ANSI A119.5: Section 5.2.4-Resistace to Elements

AA.    Roof Penetrations

**CAST002384**

1. Observations:

   i. The roof penetrations for the vent pipe indicated cracking.

   ii. The penetration through the roof for the air conditioning system could not be observed from the roof; however, the observations from the interior side indicated the area between the roof and the ceiling were not properly sealed.

   iii. The area around the air conditioner unit appears to hold water.

2. Photographs:

   i. Please see photographs AA-1 through AA-14.

3. Codes, Standards, Testing or Engineering Assessments:

   i. FEMA Model Travel Trailer Procurement Specifications

   ii. International Residential Code 2000:  1101.1.10 Air Leakage, P2606.1 Water proof openings

   iii. NFPA 1192-05: Section 7.1.6.3 Pipe Penetrations and Section 7.6.8.2 Vent Flashings

   iv. RPTIA Standards ANSI A119.5:  Section 5.2.4-Resistace to Elements

4. Comments:

   i. The observations of the roof penetrations indicate the sealant material was somewhat brittle.  The sealant appeared to have separations between layers.

    ii. The roof structure and decking around the air conditioning rooftop unit appeared to pond water. Close examination of the roof deck indicated a deflection which would allow water to accumulate around the opening of the air conditioning unit.

BB.    Roof Deck Deflections

    1. Observations:

        i. As noted in Section AA above, the metal roof deck showed deflections. Water entry around those deflections appeared to be possible.

        ii. The area of roof deflection is holding water and is causing corrosion.

    2. Photographs:

        i. Please see photographs in Section BB-1 through BB-6.

    3. Codes, Standards, Testing or Engineering Assessments:

        i. FEMA Model Travel Trailer Procurement Specifications

        ii. NFPA 1192-05: Section 5.8.1-Air Conditioning Installation

        iii. Please see Enclosure #5, Freyou Moore and Associates Structural Assessment Report

    4. Comments:

        i. The deflection around the air conditioning unit is indicative of roof deflection on other travel trailer observed. These areas of deflection will allow air and moisture infiltration into the ceiling cavity.

CAST002386

CC.   Appliances

    1. Observations:

        i. The stove vent is the only mechanical ventilation for the temporary housing unit.

    2. Codes, Standards, Testing or Engineering Assessments
        i. Please see RPTIA Codes, ANSI A119.5: Section 5-3.6 and 5-3.6.1, Light and Ventilation and Habitable Rooms.

    3. Photographs:

        i. Please see photographs CC-1 through CC-6.

    4. Comments:

        i. The stove hood vent is the only exhaust ventilator in the unit. There is no fresh air intake in the exhaust hood. Air exhausted from the house is not replaced with outside filtered air. If the ventilator is operating during cooking and the doors and windows are closed it can place the house in a negative pressure condition.

        ii. All of the building codes require ventilation in the bathroom areas.

DD.   Furnishings

    1. Observations:

        i. The bed platform bed with storage is constructed with formaldehyde containing materials.

    2. Codes, Standards, Testing or Engineering Assessments

CAST002387

      i.  Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

3.  Comments:

      i.  The various components of the unit were observed and investigated by Dr. Smulski. Various items were identified by Dr. Smulski as formaldehyde emitting materials. The locations and effects of these materials and the relationship to the housing unit are discussed in Dr. Smulski's report. The content materials added to the overall amount of materials in the trailer that contained formaldehyde.

EE.    Cabinets

1.  Observations:

      i.  The cabinets were constructed with 3/4" hardwood plywood, 1/8" Hardwood plywood, 5/8" MDF, 3/4" particle board and other formaldehyde containing materials.

2.  Codes, Standards, Testing or Engineering Assessments:

      i.  Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

3.  Comments:

      i.  The cabinets were inspected for measuring, photographing and identification of the various materials utilized in their construction. Dr. Smulski identified a number of the components that composed the cabinets as being materials that contained formaldehyde.

FF.    Heating System

1.  Observations:

CAST002388

      i. Observations of the heating system were performed. The heating system consisted of three electric baseboard heaters.

      ii. Only two of the three heaters operated.

2. Photographs:

      i. Please see photographs of the furnace: FF-1 through FF-8.

GG.   Air Conditioning and Duct System

1. Observations – Boroscope Inspection:

      i. A boroscope inspection was performed in air conditioning duct system. The boroscope with a small camera lens and a long extension allows us to view into typically inaccessible places and perform inspections. Photographic and video documentation were performed during that inspection.

      ii. Fastener penetrations and open joints in the duct system were observed.

      iii. The duct penetrations through the ceiling were made with aluminum tape.

      iv. The ceiling cover at the supply/return air unit was removed for inspection. The roof to ceiling penetration is not sealed completely. The section that is sealed has been sealed using an aluminum tape. Air leakage is occurring at this area.

2. Photographs:

      i. Please see photographs GG-1 through GG-14.

3. Codes, Standards, Testing and Engineering Assessments:

**CAST002389**

i.   Please see Enclosure #10: Dometic Installation Instructions

ii.  Please see NFPA 1192 and ANSI 119.2: Section 5.8.1 and Section 5.8.2.1-Air Conditioning

iii. Dometic Installation Instructions

iv.  International Residential Code 2000: Section 1103.3, Section 1103.4 Duct Sealing and Section M1601.3.1-Joints and Seams

v.   Please see Enclosure #8, Ritter Consulting Engineers' report.

vi.  Please see Enclosure #4, LaGrange Consulting Inspection Report.

4.  Comments:

i.  Observations: Physical Inspection

a.  Physical inspection of the duct penetration through the ceiling was performed. The penetration is bridged and sealed with unlabeled aluminum tape. The transition between the ducts and the ceiling is not insulated. This allows for condensation to occur within the ceiling and into the plywood at the duct penetration. Without a sufficient insulation around the duct and transition area, the hot, humid air in the attic will come into contact with the cold surface of the aluminum tape.

ii. Observations: Mechanical Unit-Interior

a.  The interior portion of the air conditioning unit was inspected. The ceiling cover and filter were removed for inspection. Access to the unit and ceiling cavity was available. The penetration between the roof and the

CAST002390

ceiling is only partially sealed with aluminum tape. The unsealed portion is allowing air to escape into the ceiling cavity. The return air is sucking hot humid unconditioned and contaminated air from the ceiling cavity and into the living area of the housing unit.

iii. Observations: Mechanical Unit-Exterior

a. The exterior portion of the air conditioning unit was inspected. The unit was identified as a Duo-Therm QUICK COOL high efficiency unit. The model number was 59516.531.

i. Please see photographs HH-14 through HH-15.

iv. Observations: Ceiling Duct System

a. The ducts are constructed of a thin foam board material and sealed with an aluminum tape. No markings identified the duct material or the tape sealant material for compliance with the applicable code or standard for use of those materials. The duct material has an R-1 rating. This material offers very little resistance to heat and cold.

b. Inspection of the air condition duct revealed the following:

i. The tape used to seal the joints was not fully adhered to the duct material. Air leakage was made possible through those penetrations.

ii. The air condition manufacturer requires an R-7 insulation material to encompass the duct system. Based on the construction of the ducts and ceiling cavity, it is not known how the manufacturer was able

to meet this requirement. If the ducts were insulated over the top side there is not enough area above the duct for a full thickness layer of insulation to encompass that area. If the insulation is placed between the trusses the areas of the truss are not insulated. The ductwork and roof truss compress the ceiling insulation to the bottom side of the roof sheeting. This renders the insulation ineffective. The remainder of the duct system on the sides and bottom are only partially insulated or not insulated fully and are exposed to the hot, humid air of the cavity.

v.  Observation: Dometic Duo-Therm A/C unit Manual:

a.  As is mentioned earlier in the report, the air-conditioning system installed in the Castanel trailer is a Dometic Duo-Therm 595 QUICK COOL. The installation instructions were downloaded from Dometic.

On the first page of the Dometic document, a warning stating, "This manual must be read and understood before installation, adjustment, service, or maintenance is performed. This unit must be installed by a qualified service technician. Modification of this product can be extremely hazardous and could result in personal injury or property damage."

Along the lines of this warning, further modifications that could fall into this warning category can be the failure to properly install the ductwork system. Failure to install the ducts properly can and does cause negative air pressure drawing in the hot, humid, contaminated air into the trailer. This condition was verified by LaGrange Consulting. Duct leakage test indicate the supply and return air ducts are leaking air.

In addition, drawing hot, moist air into wall, ceiling and floor cavities can cause corrosion of electrical

**CAST002392**

components. This condition can lead to electrical shorts and fires. As the humid air is drawn into walls, ceiling and floor cavities, it comes in contact with the metal components of electrical devices and appliances. The high moisture content of the air interacting with the metals of the electrical devices causes corrosion. This corrosion or rust then creates a pitting of the metal parts of the device. This pitting or eating away of the metal can cause arcing or a jumping of the electrical charge between the various metal components, it can raise the temperature of the metal components and the sparks created by the arcing and elevated temperatures can cause fires.[8]

b. Under Section 1C, page 2, the manufacturer states, "The ability of the air-conditioner to maintain the desired inside temperature depends on the heat gain of the R.V." One of the recommendations made by the manufacturer to reduce the heat gain is to keep windows and doors shut or minimizing usage.

The heat gain is a measurement of heat absorption and gain in temperature as a result of various conditions. The position of a housing unit or building in relation to the amount of exposure it has to the sun; the number and size of doors and windows; the types of doors and windows and their insulating value and their ability to resist heat and air penetration; the types walls, ceilings and floors and the thickness of those systems; and, the types of insulation and the thickness of insulation in the walls, ceiling and floor areas all are factors that affect heat gain.

The higher the thermal resistance values of the walls, ceilings and floors, the greater the ability to resist heat transferring from the outside to the inside of the trailer and the smaller the heat gain will be. The lower the heat

---

[8] "The Effects of Smoke & Moisture on Residential and Commercial Electrical Systems" by Alexis Mallet, Jr.

CAST002393

gain, the quicker and easier it is to cool the interior of the temporary housing unit.

As we will discuss shortly, the type of construction of the walls, ceiling and floor did not permit a low heat gain transfer. This also makes higher temperatures available to increase the off-gassing of formaldehyde.

c.   As noted earlier, the air-conditioning manufacturer recommends keeping the windows and doors closed and / or minimize their usage. FEMA advised residents to open windows and doors to reduce odor or formaldehyde levels in their housing units. These recommendations are in contradiction to the air conditioning manufacturer's recommendations. The problem is that opening windows introduces hot, humid, unfiltered air into the house in hot, humid climates.

d.   Under Section 1-D, Condensation, on page 2, the manufacturer has written, "**Note**: The manufacturer of this air-conditioner will not be responsible for damage caused by condensed moisture on ceilings or other surfaces. Air contains moisture and this moisture tends to condense on cold surfaces. When air enters the R.V., condensed moisture may appear on ceilings, windows, metal parts, etc. **The air-conditioner removes this moisture from the air during normal operations. Keeping doors and windows closed when the air conditioner is in operation will minimize condensed moisture on cold surfaces.**" (Emphasis added)

The importance of this statement as it relates to the issues at hand with this temporary housing unit is that in a short paragraph, it explains also what is occurring in the walls, ceilings and potentially floor cavities of the temporary housing unit. It states that "the air contains moisture and the moisture tends to condense on cold surfaces." High relative humidity and possible condensation is occurring in the walls, ceiling and floors because of the failure of the manufacturer to construct a unit that prevents

CAST002394

sufficient heat transfer from the exterior to the interior surfaces and the construction of the temporary housing unit is such that hot, moist air is being transferred (sucked in) from the outside atmosphere into the walls, ceilings and floor cavities. That hot, humid air then comes near or in contact to the unsealed back sides of the colder wall and ceiling panels and the high relative humidity and hot air increases the formaldehyde off-gassing. Conditions are also conducive for condensation to occur.

It further states in Section D, "The air-conditioner removes the moisture from the air during normal operations." Normal operation is not meant to include the transfer of hot, humid air from the exterior to the interior raising the heat gain that the unit must then address. The windows and doors should be closed when the air-conditioning system is in operation because opened windows and doors will cause the hot, humid air to come into the unit and cause condensation on the cold interior surfaces and increase the formaldehyde off-gassing.

When the doors and windows are closed and the walls, ceiling and floor are not sealed air tight, the outside air is drawn into wall, ceiling and floor cavities of the unit raising the temperature and relative humidity in these cavities and creating the conditions conducive to forming condensation inside these cavities behind the finished vinyl or plastic covering of the wall and ceiling panels.

e.  Once again on page 3 of the Dometic installation instructions, the manufacturer warns that improper installation may damage equipment, could endanger life, or cause serious injury and / or property damage.

We reiterate this because the air-conditioning system was not properly installed causing the air duct leakage. The manufacturer requires the ducts and their joints to be sealed to prevent condensation.

f.  Air distribution system:

CAST002395

i. On page 4 of the Dometic installation manual, directions regarding the air distribution system are given. They state as follows:

"The installer of this air-conditioner / heat pump system must design the air distribution for their particular application. Several requirements for this system **MUST** be met for the air-conditioner / heat pump to operate properly. These requirements are as follows:

1. The duct material must meet or exceed any agency or RVIA standard that may be in existence at the time of production.

2. All discharge air ducts must be properly insulated to prevent condensation from forming on their surfaces or adjacent surfaces during operation of the unit. This insulation must be R-7 minimum.

3. Ducts and their joints must be sealed to prevent condensation from forming on adjacent surfaces during operation of the unit."

There is a caution block on page 5. It states, "**CAUTION**. It is the responsibility of the installer of this unit system to insure the ductwork will not collapse or bend during or after the installation. Dometic Corporation will not be liable for roof, structural or ceiling damage due to improperly insulated, sealed or collapsed ductwork."

It is clear by the instructions given by Dometic that the joints and ducts must be sealed to prevent air leakage and condensation. It is also very clear that Dometic is informing the installer of the air-conditioning system that structural or ceiling damage from condensation due to improperly sealed ductwork is a distinct possibility.

CAST002396

This is directly on point with the information that we have provided regarding hot, humid air infiltration from the exterior into the wall and ceiling cavities and that the duct leakage has resulted in negative air pressure and that negative air pressure will suck in the hot, humid air from the exterior into the ceiling and wall cavities and that severe damage to the unit as well as potential harm to the occupants are a very distinct possibility.

g. Prevention of Air Leakage:

    i. Page 5 of the Dometic manual, Section 5 (B) (4) under Air Distribution System Installation instructs the installer to provide adequate support and prevent air from being drawn into the roof cavity. This coincides with our presentation that air infiltration will bring in hot, humid, contaminated, unfiltered air that is harmful to the building and the occupants.

vi. A review of the Standards on Recreational Vehicles produced by ANSI and NFPA was performed. The particular standards that govern the design, construction and operation of recreational vehicles under these organizations are ANSI A119.2 and NFPA 1192. The particular applicable edition in effect at the time of construction of the Castanel temporary housing unit would be the 2005 Edition if it were used as a recreational vehicle.

    i. Section 3.3.50 of the standard on page 8 gives the definition of recreational vehicles, camping trailers and travel trailers that are governed under this standard. The Castanel temporary housing unit does not fall within the definition of this standard. Note: This unit was NOT constructed for recreational, camping, travel or seasonal use.

    ii. Section 5.7.1, Supply System Ducts, directs the manufacturer to use durable construction that can be demonstrated to equally resist fire and deterioration. The call for ducts that are resistant to deterioration is once again

CAST002397

to prevent air leakage into non-air-conditioned spaces which cause negative air situations to occur which is conducive to potential deterioration to the building's components and unwanted contamination that may affect the occupants of the housing unit.

   iii.  Section 5.8.1, General Requirements - Air-Conditioning, can be found on page 20 of the Code. This portion of the Code requires every air-conditioning appliance or combustion air-conditioning and heating appliance to be installed in accordance with the terms of its listing and the manufacturer's instructions.

   iv.  Section 5.8.2.1, Installation of Air-Condition Appliances, reiterates the requirement to conform to the manufacturer's installation instructions.

It is a requirement of the Code to follow the installation instructions of the air-conditioning manufacturer. It has been well documented earlier in this Report that duct leakage and negative air pressure as a result of improper installation of the system not only fails to follow the instructions of the manufacturer of the air-conditioning system but is a Code violation.

HH.   Ventilation

  1.  Observations:  Bathroom and Kitchen Hood

     i.  Inspection of the bathroom revealed there is no exhaust ventilation system to exhaust odors and moisture from showering and bathing.

    ii.  The Owner's Manual discusses different types of vents available but did not install any type exhaust vent.

   iii.  The kitchen hood exhaust indicates there is no fresh air intake to make up the air exhausted from the ventilator.

CAST002398

iv. The methods of ventilation were reviewed.  The available methods were limited to a mechanical unit (kitchen hood) and passive air movement (window and door openings).

v. The air conditioning system does not have accommodations for fresh air intake.  Also noted during the inspection and testing is that air is infiltrating into the ceiling cavity from the return air duct and attic air is being sucked into the living area.  The penetration between the roof and ceiling is not properly sealed and insulated to prevent air movement into the conditioned air space of the house.

2. Codes, Standards, Testing or Engineering Assessments:

i. Please see NFPA 1192:  Sections 5.8.1 and 5.8.2.1.

ii. International Residential Code 2000:   Section R303.3 Ventilation

3. Codes, Standards, Testing or Engineering Assessments

i. Please see RPTIA Codes, ANSI A119.5:  Section 5-3.6 and 5-3.6.1, Light and Ventilation and Habitable Rooms.

ii. Part 3280.103 Light and Ventilation

iii. Please see Enclosure #4, LaGrange Consulting Inspection Report.

iv. Please see Enclosure #8:  Ritter Consulting Engineers Report

4. Comments:

i. Noted during the inspection is that air is infiltrating into the ceiling cavity.  The penetrations are not properly sealed and insulated to prevent air movement into the conditioned air space of the house.

**CAST002399**

ii. The different ways of ventilation available in this THU are by means of mechanical or passive methods.

iii. The mechanical method utilized is an exhaust fan in the kitchen. The fan operates only when manually engaged. Someone has to turn a switch on for them to operate. There is no automatic means installed to start the operations of the unit if ventilation is needed.

iv. As the hood exhaust fan removes air, it does not draw in air that can be filtered prior to it entering into the living space of the home. The air drawn into the house is unfiltered and moist.

v. The other method of ventilation (passive) is to open the windows and doors on an on-going basis to ventilate the contaminants, such as formaldehyde. This is not a desirable option in the months of May through September in this climate. The goal is to have the indoor air quality in a house that is cleaner and drier than the outside air.

vi. The question raised with using only windows and doors for ventilation is how often do they have to be opened and how long are they to be left open? There have been no documents produced of studies provided that has answered this question. Therefore, even if opening windows and doors for ventilation was a feasible alternative, no one told the occupant how long or how often to ventilate.

vii. The issue regarding the exfiltration of high indoor relative humidity and other contaminants, such as formaldehyde gases within the Castanel temporary housing unit is not limited to a matter of simply opening windows and doors for ventilation or the addition of a vent in the bathroom to introduce fresh air or expel the formaldehyde within the housing unit. There are issues with the air conditioning system that exacerbate the condition.

viii. As we have discussed, the air conditioning system is sucking air into the wall, ceiling and floor cavities and drawing

CAST002400

contaminants as well as formaldehyde into the living area. There is no system installed in this living area to remove the contaminants in the air and replace it with fresh filtered air.

ix. HUD does not allow for the infiltration or expelling of air through walls, ceilings or floor cavities in manufactured houses. The same science and reasoning applies to other housing units. The standard practice in the construction industry and the manufactured housing industry is to prevent the infiltration and expelling of air into wall, ceiling and floor cavities.

II.    Plumbing System and Fixtures

1. Observations:

i. The plumbing waste water system was connected directly to the city's sewer system.

ii. The water line was connected directly to the city's water system.

iii. The plumbing fixtures utilized in the travel trailer were a double kitchen sink and faucet, a lavatory with faucets, a commode and tub/shower combination

iv. The Castanel THU appears to be designated as a handicap unit.

v. The ADA symbol is attached to the front of the trailer and to the window next to the entrance door. The documents provided also appear to indicate the unit is a designated handicap unit.

vi. Observations of the plumbing fixtures reveal they are not ADA compliant.

2. Photographs:

i. Please see photographs II-1 through II-9.

3. Codes, Standards, Testing or Engineering Assessments:

CAST002401

    i.  Please See ADAAG Standards

    ii.  Please See Ritter Consulting Engineer's Report

4.  Comments:

    i.  As a part of the conversion of the travel trailer to temporary housing, the waste water system was connected to the city's sewer system tub / shower unit was composed of a tub with a shower surround.  The unit was not wheelchair accessible.

    ii.  The plumbing system was connected directly to the city's sewer system.  The vent pipe was installed externally on the driver's side wall of the unit.

    iii.  These steps along with placing the unit on piers, strapping the unit down to the ground, lifting the unit off the ground, providing a residential refrigerator and commode, and providing these units for long term occupancy,  converted the travel trailer to a temporary housing unit.

JJ.    Jacking, Blocking and Measurements - Shaw

1.  Observations:

    i.  Our organization made observations of the jacking and blocking performed and measurements taken by consultants on behalf of Shaw.

2.  Photographs:

    i.  Photographs and video recordings have been produced by others in exchange of photographic and video documentation.

3.  Comments:

    i.  Comments regarding the jacking, blocking and measurements performed and taken by consultants for Shaw will be

**CAST002402**

supplemented once their reports have been produced and made available to our organization.

KK.   Wood Component Inspection

1.   Observations:

   i.   The wood walls, ceilings, floors, cabinets and other wood products, excluding the structure, were observed, and photographed for identification of formaldehyde emitting products.

2.   Photographs:

   i.   Please see all interior photographs.

3.   Codes, Standards, Testing or Engineering Assessments:

   i.   Please see Enclosure #7, Affidavit of Stephen Smulski, Ph.D.

4.   Comments:

   i.   Dr. Smulski identified the various wood components as formaldehyde emitting or non-formaldehyde emitting materials.

   ii.  Dr. Smulski produced his Report and filed it with this writer for his use and incorporation in the production of this Report.

   iii. All formaldehyde emitting wood products are noted in Dr. Smulski's Report.

   iv.  As noted in Dr. Smulski's Report and the LBL Report, in addition to the items that emit formaldehyde gasses, the small size of the temporary housing unit contributed to the problems.

   v.   All building codes are designed for providing a safe, healthy, durable environment.

LL.   Envelope Air Leakage Test

CAST002403

1. Observations:

    i. The Castanel temporary housing unit was tested for envelope (walls, ceiling and floor) air leakage.  This test indicates the quantity of air that is leaking through the walls, ceilings and floor system and quantifies the amount of leakage.

    ii. Envelope air leakage tests and infrared thermographic imaging identified and quantified air leakage into the THU.

2. Photographs:

    i. Please see First General Services Infrared Thermographic Images.

    ii. Please see Enclosure #4:   LaGrange Consulting Inspection Report- Thermal Images.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure #4, LaGrange Consulting Inspection Report.

    ii. International Residential Code 2000: Section N1102.1.10-Air Leakage

    iii. RPTIA Standards ANSI A119.5:   Section 5.2.4-Resistace to Elements

4. Comments:

    i. Envelope air leakage tests and HVAC (heating, ventilating and air-conditioning) duct leakage tests were performed to assess and measure any air leakage in the walls, ceilings and floors of the unit.

    ii. Mr. Paul LaGrange with LaGrange Consulting, Inc. was engaged to perform the air leakage tests on the unit and

**CAST002404**

ductwork.

   iii. The envelope of the building was first tested for air leakage. The building was depressurized. The natural air change per hour was documented at .28 ACH or a total envelope leakage of 28.9 square inches.

   iv. According to the natural ACH calculations, the air exchange is 8.5 cfm.

   v. This hot, moist air comes into contact with the untreated raw surfaces and edges of the formaldehyde emitting wood and wood products and also mixes with the colder air leaking from the return air duct allowing condensation to form in the ceiling cavity.

   vi. According to the experts, formaldehyde off-gassing is doubled for each 12°F with the rise in temperature, humidity or both. This unfiltered, contaminated air filled with moisture and heat is transported into the living area of the trailer through cracks in the seams, around duct registers, light fixtures, and all other penetrations that are not sealed.

MM. Infrared Thermographic Survey – First General Services

  1. Observations:

    i. Infrared thermographic imaging of the envelope revealed deficiencies in the heat and air barrier of the house.

  2. Photographs:

    i. Please see Enclosure #2: First General Services Infrared Thermographic Images 1 through 36.

  3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure 3, LaGrange Consulting Inspection Report.

CAST002405

    ii. Please see FEMA Model Travel Trailer Procurement Specifications

4. Comments:

    i. An infrared thermographic survey was performed on the interior of the building prior to the envelope air leakage tests and the air-conditioning duct leakage testing utilizing a Flir Infrared camera model BS20.

    ii. Not all areas were easily accessible to perform a survey. The survey was performed for the purposes of identifying temperature anomalies in the walls, ceiling and floor of the Castanel temporary housing unit. Air and moisture leaks would show as temperature differentials noted by the variations of color during the survey. A number of these anomalies were photographed using the Flir BS20 camera.

    iii. The indications are the thermal envelope is not designed and constructed to a level of superior quality. Heat and air are allowed to bypass the insulation and affect the walls, ceiling and floor areas.

NN.  Air Conditioning Duct Leakage Test

1. Observations:

    i. Testing verifies and quantifies the leakage of air from the air conditioning system supply duct.

2. Photographs:

    i. Please see photographs included in the report by LaGrange Consulting.

3. Codes, Standards, Testing or Engineering Assessments:

    i. Please see Enclosure #4, LaGrange Consulting Inspection Report.

**CAST002406**

    ii.  Please see the Dometic Installation Instructions

    iii.  NFPA 1192-05: Section 5.8.1-Air Conditioning Installation

    iv.  International Residential Code 2000:   Section 1601.3.1-Duct Joints Seal

4.  Comments:

    i.  In conjunction with air leakage testing on the Castanel trailer, the ductwork for the air-conditioning system was also tested for leaking.  The results for that test indicated the air-conditioning ductwork has leakage equal to 34% of the total output of the unit.  14% of the leakage is going to the exterior of the unit. The other 20% is leaking back into the building as unconditioned air.

    ii.  More importantly, the air leakage to the exterior of the ceiling and wall cavities can create a negative pressure condition on the interior of the trailer.  As the air from the ducts leak into the ceiling and wall cavities from the ductwork supplying the cold filtered air into the trailer, the return air portion of the air conditioner is drawing back into the air-conditioning unit the same quantity of air that it is producing.

    iii.  With the air-conditioning duct leaking 14% of air outside of the trailer, the return air system can draw in or suck in air into the ceiling system of the trailer through these various unsealed cracks and joints into the inside of the building.  This hot, humid contaminated air is unfiltered.  This air intermingles with the wood and wood products that can emit formaldehyde gas and draws the off-gassing into the house.

    iv.  The ducts for the air-conditioning system are not properly sealed.  This is a workmanship issue.  Had the ducts been properly installed and sealed at the factory, the duct leakage would not have occurred.

    v.  In the hot, humid temperature zone in which New Orleans, Louisiana is located, temperatures are in the 90°F range for

CAST002407

most of the late spring through early autumn. This begins somewhere in May and continues through the months of June, July, August and September. Along with the rise in temperature, South Louisiana also experiences a significant rise in relative humidity. The higher the relative humidity, the more "muggy or sticky" the contents inside your home and body feel. Dropping temperatures from 100°F or more degrees on the interior of the trailer down to 70°F to 75°F which is the normal comfort level would take quite a number of hours to accomplish. While the cooling is not the issue and the number of hours it actually takes to cool is not the issue, the real issue is the air conditioning system is running for many hours sucking in the contaminated, hot, humid air from the exterior to the walls, floors and ceiling of the trailer.

vi. As the temperature gets colder on the interior of the trailer, vapor pressure differentials become a factor. The colder, drier air will attract the hotter, wetter air from the exterior drawing it in towards the interior. The vapor pressure is assisting in the transportation of the hot, humid, contaminated air from the outside into the wall, ceiling and floor cavities and eventually into the interior of the trailer where the occupants are living. An example to explain how the wet, hot air of the exterior is driven into the colder, drier air on the interior of the trailer, we can use the example of a small amount of water spilled on the floor. If we take a dry sheet of paper towel and place it flat on the floor and just place one corner of the paper towel connecting with the spilled water, the water will be attracted to (absorbed into) the sheet of dry paper.

OO.   Indoor Air Quality Tests

1. Observations:

   i. Indoor air quality tests were performed to identify the present levels of formaldehyde off-gassing in the Castanel trailer.

2. Codes, Standards, Testing and Engineering Assessments:

   i. Please see Enclosure #6, W.D. Scott and Associates Report.

**CAST002408**

      ii. Please see FEMA Model Travel Trailer Procurement Specifications

  3. Comments:

      i. Tests for formaldehyde emission levels were performed on January 4, 2010 and January 7, 2010 by W.D. Scott and Associates. The test results indicated the level of formaldehyde at 8.8 ppbv on January 4, 2010 and 48 ppbv on January 7, 2010.

      ii. The first test was performed without heat in the trailer. The second test was performed with heat on in the trailer.

PP.   Warning Labels

  1. Observations:

      i. There were a number of labels provided on the interior and exterior of the unit and in the owner's manual.

      ii. On page 4 of The Owner's Information Manual states the R.V. is designed for short term camping and recreational use. It was not engineered to be used as a permanent dwelling.

      iii. There are no labels in the Castanel unit or in the Owner's Information Manual indicating formaldehyde containing materials were used in the construction of this unit.

  2. Codes, Standards, Testing or Engineering Assessments:

      i. Please see Enclosure #7, Affidavit by Stephen Smulski, Ph.D.

      ii. International Residential Code 2000: 101.3 Purpose

      iii. RPTIA Standards ANSI A119.5: Section 1.1.1-Need for Standard

CAST002409

    iv.  New Orleans City Building Code 2003

3.  Comments:

     i.  In Dr. Stephen Smulski's report, there is an in-depth analysis of the amount of wood product and formaldehyde containing products that are utilized in the design and construction of the Castanel housing unit.   Dr. Smulski goes into great detail regarding each and every wood product, wood containing product, or other formaldehyde containing products that are utilized in this housing unit.

    ii.  He opines the walls, ceiling, doors, cabinets, dining table, countertops, built-in seating and other furniture, and bed supports are all constructed from wood based composite products, particle board, medium density fiberboard and hardwood plywood that are all known to release formaldehyde gas after being placed in service.  He also observes and notes that the back side and edges of most of these items are exposed with no overlay to prevent infiltration of the formaldehyde emissions from entering into the living area of the trailer.

   iii.  He notes the location of the FEMA temporary housing unit's location in New Orleans, Louisiana and its exposure to the hot, humid climates of this region.  He states, "These are the exact conditions that maximize the release of formaldehyde from wood based composite panels including particle board, medium density fiberboard, and hardwood plywood."

    iv.  Because of the small size of the unit, the formaldehyde emissions are more concentrated in the temporary housing units than they would be in either a normal sized house or a commercial building.   The larger the building, the less the concentration of formaldehyde disbursement in the building by proportion.   The larger the house or the building, the less the formaldehyde that is in that building.

**CAST002410**

# SECTION VII

## ALTERNATIVE CONSTRUCTION METHODS

There were alternative materials available at the time the Castanel Unit was constructed that emitted no or little formaldehyde gas and could have been used in lieu of formaldehyde emitting materials.

This writer is aware through his own research that relative humidity and temperature affect formaldehyde off-gassing and mold growth. The higher the temperature and relative humidity rises, the higher the rate of formaldehyde off-gassing. To prevent or lessen formaldehyde, higher temperatures and relative humidity conditions from being a factor, he is aware of the following materials, means and methods in construction were commercially available at the time this unit was manufactured:

1. Items such as hardboard paneling in lieu of hardwood paneling, OSB board using non-formaldehyde materials and other products using non-formaldehyde releasing materials were available at that time.

   a. This information is available from Composite Panel Association publications.

   b. This writer is familiar with the use of low or non-formaldehyde emitting products. Our organization performs repairs and reconstruction of damaged mobile homes. HUD requires the use of low formaldehyde emitting products in manufactured houses. When performing our repairs, we must adhere to the HUD code and use conforming products.

   c. The alternative use of a hardboard paneling could have been used. Hardboard panels have been used in manufactured homes (mobile homes) for a number of years. This is not a new technology or is it new to the industry. This material could be used on both the walls and ceiling areas.

   d. The cost of the wall and ceiling panels are unknown to this writer. They have not been produced by Recreation by Design. We have calculated the difference in the cost between a vinyl -covered hardwood panel and a

hardboard panel using retail pricing without the benefit of large quantity purchase discounts. Recreation by Design would more likely than not have purchased this material at wholesale prices with discounts for quantity purchases. The retail cost difference is a credit amount or cost savings of $88.25.

2. One type of product that was available when the Castanel house was built is an air seal barrier placed below the exterior skin of the exterior walls.

   a. This air barrier would have eliminated or severely reduced the amount of air and moisture penetration into the wall system. This moisture became available to raw materials that contained formaldehyde and contributed to an increase in off-gassing.

   b. The use of a "Tyvek" type product is a common practice utilized in the hot, humid temperature region of the country. This method of construction has been researched and written about in various books and publications for approximately twenty years. Virtually every habitable house or building constructed in this climate has a vapor barrier of some type installed to prevent moisture intrusion into the wall system.

   c. Recreation by Design more likely than not would have been able to purchase this material at wholesale prices with the benefit of quantity discounts.

   d. We do not have the means to obtain wholesale quantity discount prices. We utilized the retail cost of using this product without the benefit of quantity discounts. We have used Lafayette, La. labor rates at $45.93 per hour to install or $.09 per square foot. The retail cost of the Tyvek product installed is $152.53.

3. Higher density insulation could have been utilized within the thin wall system, such as foam insulation or an insulation board. This would have not only assisted in limiting the penetration of moisture from the exterior to the interior of the temporary housing unit but would have also helped to address the issues with condensation occurring as a result of dew point temperatures being reached in the wall and ceiling cavity.

**CAST002412**

a.  The FEMA specifications required the construction of the THU for various climates. While the wall and ceiling insulation is inadequate for the climate in the hot humid regions of the country, it is also inadequate for the cold climates. The use of SPF insulation would have addressed this issue and provided the required insulation values for almost the entire continental United States.

b.  The alternative method utilizing the replacement of the 1½" fiberglass unfaced insulation in the walls and ceiling with a closed cell spray foam polyurethane insulation would have addressed several issues. If we achieve an R-14 insulating value in the wall system and approximately R-18 in the ceiling system, we will prevent the materials in the wall system from reaching dew point. Each inch of closed cell SPF insulation has an approximate R-7 value. Two inches of closed cell SPF insulation would provide R-14of insulation. The climate in this area requires an R-11.

c.  At least as important as the R- value is the perm rating of the closed cell SPF insulation. The perm rating is 1 or less which means it is classified as a water and vapor barrier.

d.  This would address several different problems. With the SPF closed cell insulation, the designer of the housing unit could achieve the R-14 value desired and have a vapor barrier installed in one function. As a precaution, we would want to also include the air and moisture barrier wrap around the perimeter of the exterior walls. This would then carry over the separation in the SPF insulation at the wall framing and prevent thermal shorting from occurring.

e.  One added bonus to the use of the closed cell insulation is the additional strength this product adds to the framing system. The closed cell material attaches to the framing wall and also creates a solid unit within the cavity of the wall increasing the strength of the wall. This would help to address some of the concerns that the walls do not meet code requirements.

f.  Addressing the ceiling cavity, we want to achieve somewhere around an R-18 value. Using 2 ½" of SPF insulation gives the 17 ½ to 18 R- value we are looking to accomplish. In addition to the metal type roof

**CAST002413**

sheeting, the SPF material would prevent any water or water vapor from transmitting from the exterior to the interior through the roof or attic system.

g. The additional benefits of added strength to the roof system would be applicable with the SPF material in the ceiling cavity.

h. The use of the SPF insulation material also has the benefit of sealing the areas of air leakage in the exterior surfaces of the wall system in conjunction with the Tyvek-type air barrier covering.

i. Recreation by Design would be able to purchase materials at wholesale prices with quantity discounts and use their own labor force to install the SPF insulation. We have also deducted the retail price of 1 ½" and 2 ½" unfaced insulation. The labor and material cost associated with the use of SPF insulation installed at retail cost for materials and Lafayette, La. labor cost is $408.03.

j. These are major benefits in using the closed cell SPF insulation material:

   i. We achieve the R- value necessary to prevent the dew point from being reached in the wall and ceiling cavities of the unit which in turn prevents the manifestation of condensation.

   ii. The air leaks in the envelope are sealed to prevent the passage or movement of hot, humid air from the exterior of the unit to the interior living space and filtering any contaminants.

   iii. The SPF insulation lowers the temperature and relative humidity in the walls and ceiling.

   iv. The SPF insulation adds strength to the structure assisting the structure as it pertains to wind loads as discussed by our engineer.

   v. The increase of R- value in the wall and ceiling systems will assist in retaining the cold air conditioned air in the living unit. The occupant would have a more comfortable temporary housing unit; a housing unit that has a lower cost of operation of air conditioning and heating; and a healthier safer environment for the family.

CAST002414

vi.  Another benefit of the usage of the spray foam insulation is it would seal the ducts in the attic and prevent air leakage from the ducts and adding to the R- value of the duct system thereby preventing condensation occurring around the ducts.

vii.  Closed – Cell Spray Foam by Chemical Design, Robert Lord Builders and EnviroFoam Insulation gives the data for the use of this product.

4.  While this is not an alternative method of construction, it is one of absolute necessity in the prevention of negative air pressure occurring and drawing hot, humid unfiltered contaminated air into the living area of the Castanel house.  This item is simply for the Recreation by Design to have performed the work in which they were commissioned to do in a superior workmanlike manner according to the FEMA Procurement Specifications.  Simply having taken the time to properly install the air conditioning ductwork and insuring it was sealed air-tight would have lowered the amount of moisture and hot air available to reduce formaldehyde off-gassing.

The manufacturer either failed to properly train the installers of the air conditioning duct system and / or the manufacturer failed to properly supervise the workers installing the air conditioning duct system.  The manufacturer failed to not only fulfill the requirements of FEMA Procurement Specifications, Recreation by Design also failed to follow the air conditioner manufacturer's installations and the NFPA and ANSI codes and standards that apply to this unit.

5.  Positive pressure inside the unit pushing the hot, humid contaminated air away from the wall, ceiling and floor cavities would have helped to significantly reduce the possibility of the introduction of any vapors into the living area of the unit.

6.  The workmanship of the overall construction of the FEMA trailer could have also prevented many of the air leaks into this housing unit. The lack of superior workmanship and the failure to properly supervise the installation of the sealing of the envelope has produced pathways for the hot, humid, unfiltered air to penetrate into the living area.  Once again,

the requirements of the specifications for procurement regarding air and moisture sealing of the unit failed to be adhered to by the manufacturer.

7.   In addition to the above mentioned quality control methods, the manufacturer could have tested the ductwork for air leakage.

8.   A fresh air venting system could have been installed to the HVAC system.  The air exchange rate would be increased by the use of that ventilating system.

9.   Use of better construction controls would have produced a higher quality unit.

10.   Obtaining information on jacking and blocking from the Recreation by Design regarding their recommendation or input would have been the appropriate step to take.  The manufacturer may have given feedback as to the appropriateness of jacking and blocking their product.

11.    Performing calculations or jacking tests would have identified potential issues with that procedure.

CAST002416

## SECTION VIII

## DISCUSSION OF RESEARCH AND DATA REVIEWED

The numerous rounds of testing for formaldehyde in the FEMA trailers began after occupants began filing health complaints with FEMA. Occupants informed FEMA that they were having issues with strong odors, burning or irritated eyes, skin irritations, sinus problems and headaches shortly after occupying their homes or during the course of their occupancy.

Reports by Lawrence Berkley Laboratory, the National Center for Environmental Health, Dr. Stephen Smulski, the Sierra Club, HUD and other documents reviewed, give indication of the following:

a. Of the studies reviewed, persons interviewed, and test reports and data gleaned in preparation of our assessment, the following factors appear to be held in common:

    i. As temperature rises, the rate of release of formaldehyde increases.

    ii. As humidity rises, so does the release of formaldehyde.

    iii. Adequate ventilation is required to ex-filtrate formaldehyde released into the living area of the temporary housing units.

A review of the testimony of Mary DeVany before Congress gave indications that formaldehyde emissions double for every 12°F increase in temperature.

The FEMA temporary housing units were supposed to be constructed as per the minimum procurement specifications established by FEMA for Model Travel Trailers dated July 14, 2005.

The standards state that "the travel trailers being procured under this contract are for the purpose of providing temporary housing. The units are subjected to continuous road travel, multiple installation and deactivations, and various weather conditions. The standards shall not be considered restrictive in that the supplier may provide equal or better units considering that the competitive price and delivery requirement can be met."

CAST002417

The construction outfitting standards identify minimum square footage of living space, floor plan configuration, finishes, finishing and environmental living conditions necessary to provide emergency housing for disaster relief operations. All exterior openings, such as windows, doors, drain pipes, etc…will be caulked with a clear, non-hardening waterproof sealant to prevent air and moisture penetration.

The units shall meet industry standards except where identified.

The specifications establish the minimum standards for emergency housing unit construction and outfitting to meet FEMA contract requirements. "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."

CAST002418

## SECTION IX

## DISCUSSION OF CODES AND STANDARDS

There has been much discussion both in written reports and in depositions regarding which codes and standards are applicable to the manufacture, construction or set-up of the FEMA Temporary Housing Units purchased for the housing of victims from Hurricanes Katrina and Rita.  Certain documents and parties in the case at hand would lead us to believe the RVIA NFPA 1192-2005 Standard on Recreational Vehicles code would apply in this matter.  Other documents and parties would lead us to believe the ANSI A119.5 Recreational Park Trailer Standard 2005 Edition would apply.  Some documentation and application of emblems indicate the Americans with Disability Act (ADAAG) standards also apply to the Castanel housing unit.  There is language in the building codes, such as the New Orleans City Building Codes 2003, the International Building Code 2000, the International Residential Code 2000, ASHRAE Standards, ASCE Standards and other industry standards that would direct the use of these codes and standards to apply to the design, construction and installation of these FEMA THUs.  In this section of the Report, we will analyze the applicable codes and standards.

To address application of which codes and standards should be followed, we must first look to the intended use.  When designing, manufacturing or constructing a structure, the standard to be applied must begin with the intended use of the structure.  In this matter, the structure is a travel trailer or park model trailer.  To define the intended use, we must first look at the purpose or intended use of the travel trailer or park model trailer.  Appendix E, FEMA Model Travel Trailer Procurement Specifications Dated: July 14, 2005 should be the starting point of identifying the intended or end use of these units.

Under the General Section, page 1, the Specifications state, "Travel trailers being procured under this contract are for the purpose of providing temporary housing." These units are to be subjected to, among other things, continuous road travel and various weather conditions.  The Specifications go on to state the standards shall not be considered restrictive and are a minimum necessary to provide emergency housing. The end use of these units was not for recreation, camping, travel or seasonal use which partly defines a travel trailer or recreational park trailer.  Based on general knowledge, and information known to government officials and those involved in the recovery effort, these temporary housing units would probably be used for the Katrina and Rita victims for up to five years.  In his Report in FEMA

litigation, the Government's expert Michael K. Lindell, Ph. D., clearly spells out that FEMA and its predecessor had a long history of providing temporary housing to victims of natural disasters and that providing temporary housing for these victims for a year or more was not uncommon.  Approximately half of the victims of the Florida hurricanes that devastated the Gulf Coast were still living in their travel trailers a year and a half later when Hurricane Katrina hit.

We need only look at the Recreation by Design's Owner's Information Manual on page 4 to note that the manufacturer informs the purchaser that the unit is designed for short-term camping and recreational use.  This does not mean the manufacturer could not  have engineered and constructed the unit for longer term use as required by the FEMA specifications, it just means that the manufacturer did not design and construct these units for long-term use.

Page 2 of the FEMA Specifications required that, "The manufacturer shall design and construct all units under this contract within a superior grade quality of workmanship."  To establish a superior grade quality of workmanship, there must be a standard to which the manufacturer has to compare its work.  It has been implied that NFPA 1192-05 or the ANSI A119.5 standards are the gauge of the quality of workmanship.  That position, at best, could only be applied to a very limited number of areas that are spelled out in those codes or standards.  The majority of the construction specifications of these temporary housing units are not specifically spelled out in either of these codes or standards.

NFPA 1192-05 Standard on Recreational Vehicles, Section 1.3.2-Application, states that, "This standard shall not be applied as a stand-alone design specification or instruction manual."  There are other criteria, codes and standards to be applied to these units that are not spelled out in this code.

ANSI A119.5 Recreation Park Trailer Standards 2005 Edition, Section 1-2.2 Limitations states, "this standard is not intended as a design specification or an instruction manual."  This Standard is indicating other criteria, codes or standards are to be applied to these units.

It is clear that the FEMA Specifications and end use of the Castanel unit was for longer term full-time housing needs of hurricane victims and victims of future disasters.  It is the opinion of this writer and our team that various building codes and standards apply to the design and construction of this temporary housing unit. Recreation by Design failed to fully comply with the following standards and codes:

CAST002420

A.    FEMA Model Travel Trailer Procurement Specifications Dated July 14, 2005

B.    NFPA 1192 Standard on Recreational Vehicles, 2005 Edition :
a.  Section 1.3.2-Application

b.  Section 3.3.3-Definition

c.  Section4.1-Differing Standards

d.  Section 5.8.1-Air Conditioning

e.  Section 5.8.2.1-Air Conditioning Installation and Instructions

f.  Section 7.1.6.4-Protective Requirements

g.  Section 7.1.6.5-Protective Requirements

h.  Section7.6.8.2-Other Vent Termination Requirements

i.  Section A.1.-Explanatory Material

j.  Section A1.3.1-Explanatory Material

k.  Section A3.2.2-Authority Having Jurisdiction

C.    The Dometic Air Conditioning Unit Installation Instructions

D.    ANSI A119.5 Recreational Park Trailer Standard 2005 Edition

a.  Section  1-1.1 Need for Standard

b.  Section 1-2.1 Applicability

c.  Section 1-2.2 Limitations

d.  Section 1-2.3 Alternate materials, Equipment and Procedures

e.  Section 1-3 Definitions:  Recreational Park Trailer

**CAST002421**

  f. Section 5-1 General Construction Requirements

  g. Section 5-2.4 Resistance to Elements

  h. Section 5-2.5 Rodent Resistance

  i. Section 5-3.6 Light and Ventilation

  j. Section 5-3.6.1 Habitable Rooms

  k. Section 5-3.6.2 Bathroom

E. Americans with Disability Act (ADAAG) Standards

F. ASHRAE 62.2-2004 Ventilation and Acceptable Indoor Air Quality in Low Rise Residential Buildings

G. NFPA 90 B Standard for Installation of Warm Air Heating and Air Conditioning Systems

H. The Manual if Steel Construction from the American Institute of Steel Construction

I. The Timber Construction Manual from the American Institute of Timber Construction

J. ASCE 7-05 Minimum Design Loads for Buildings and Other Structures

K. The City of New Orleans Building Codes 2003

  a. Section 101.2 Scope

  b. Section 101.3 Intent

  c. Section 107.2 Temporary Structures-Conformance

  d. Chapter 4: Prefabricated and Modular Buildings

CAST002422

e.  Chapter 35

f.  Chapter 36

L.      The International Residential Code 2000

a.  Section R101.2 Scope

b.  Section 101.3 Purpose

c.  Section 105.8 Responsibility

d.  Section R107. 2 Temporary Structure- Conformance

e.  Section R202 Definitions:  Buildings, page 10

f.  Section R202 Definitions:  Dwelling, page 12

g.  Section R202 Definitions:  Dwelling Unit, page 12

h.  Section R202 Definitions:  Habitable Space, page 14
i.  Section R202 Definitions:  Label, page 15

j.  Section R301.1 Design Criteria

k.  Section R301.1.2 Engineered Design

l.  Section R301.2 Climatic and Geographic Design Criteria

m. Section R301.2.1.1 Design Criteria

n.  Section R703.1 Exterior Covering General

o.  Section N1101.2 Energy Efficiency Compliance

p.  Table N1101.2 Climate Zones

q.  Section N1101.3 Materials and Equipment

CAST002423

r.  Section N1102.1 Thermal Performance Criteria

s.  Section N1102.1.1 Exterior Walls

t.  Table N1102.1 Minimum Thermal Performance

u.  Section N1102.1.2 Ceilings

v.  Section N1102.1.4 Floors

w.  Section N1102.1.10 Air Leakage

x.  Section N1103.3 Duct Insulation

y.  Section N1103.4 Duct Sealing

z.  Section M1601.3.1 Joints and Seams

aa. Section P2602.1 Waterproofing of Openings General

M.    HUD Publication "Durability By Design"

# SECTION X

# DISCUSSION OF RESULTS

As a result of observations made, components and systems reviewed, and testing performed of the THU, we have assessed there is enough information available to determine to a degree of probability or certainty whether or not the construction of the Castanel THU was made defective by the effects of, the assembly of the housing unit components, the air conditioning duct air leakage, the quality of workmanship employed, the use and placement of certain materials and failing to follow industry standards and codes.  The data presented in the body of this report supports the conclusions drawn and discussed in the "Conclusions" section below.

**CAST002425**

# SECTION XI

# CONCLUSIONS

Based upon observations, photographic documentation, our testing results, a review of documents provided to us, a review of testing data provided to us and other technical studies and reliance materials, the rendering of the following conclusions and statement of opinions are warranted regarding the Earline Castanel temporary housing unit:

A. The Recreation by Design unit was converted into a "temporary housing unit" (THU) per the FEMA Model Travel Trailer Procurement Specifications dated July 14, 2005. Was the manufacturer required to conform to the building codes and standards applicable at the time of construction and installation?

Conclusion: Recreation by Design was required to follow at a minimum the FEMA specifications, the ANSI, NFPA, NEC and ASHRAE Standards. It is also our opinion the International Building Code, International Residential Code and the New Orleans Building Codes should have been followed along with other building standards outlined in this report.

B. Did the Recreation by Design comply with industry codes and standards such as NFPA, ANSI and state and local building codes?

Conclusion: No. Recreation by Design did not comply with the applicable codes and standards.

C. Was the Recreation by Design Castanel THU constructed for use in various weather conditions per the FEMA model travel trailer procurement specifications dated July 14, 2005?

Conclusion: The Castanel THU was not constructed for use in hot, humid climates nor cold climate conditions.

D. Did the Recreation by Design THU construction means, methods and materials utilized contribute to environmental living conditions that contributed to the increase of off-gassing by failing to properly seal windows, doors, plumbing pipes, etc. as required by the FEMA procurement specifications?

CAST002426

Conclusion: Yes. Recreation by Design did not construct a unit that would prevent water, air, heat and moisture from penetrating into the THU.

E. Did the jacking and blocking cause damage to the housing unit and what affect did it have on air and moisture infiltration into the wall, roof and floor system of the THU?

Conclusion: Jacking and blocking caused the unit to flex creating openings around the windows allowing air, heat and moisture to enter the trailer. We may opine further on this topic after test information is provided.

F. Did the quality of the workmanship during construction of the Castanel THU contribute to the increase of off-gassing in the walls, ceilings and floors and interior living area of the THU?

Conclusion: Yes. As noted in the report, less than superior quality workmanship caused moisture and air to have access to formaldehyde emitting materials. The manufacturer failed to follow available standards.

G. Did the quality of workmanship of the air conditioning ductwork in the Castanel housing unit contribute to the entry of any formaldehyde off-gassing that may have been present in the wall, ceiling and floor cavities of the THU?

Conclusion: Yes, the quality of workmanship caused the housing unit to operate under a negative air flow. This sucked in hot moist air into the wall cavities, elements that increase formaldehyde off-gassing.

H. Are the vapor barriers of the Castanel THU placed in the recommended location for buildings located in the hot, humid climate zones?

Conclusion: No. The vapor barrier on the wall is placed for frigid and cold climates – not humid climates.

I. What problems manifest when the vapor barrier of a building is placed on the cold side of walls, ceilings or floors of a building located in the hot, humid climate zone?

Conclusion: Moisture is trapped, building materials deteriorate, mold

CAST002427

proliferates and formaldehyde off-gassing can increase.

J.  Was the Castanel THU constructed with formaldehyde emitting materials?

Conclusion: Yes, per the documentation of Dr. Stephen Smulski.

K.  Were building materials that contained no or very low emitting formaldehyde readily available at the time the Castanel THU was manufactured?

Conclusion: Yes. We are aware of a number of products available and were ultra low or non-formaldehyde emitting products in 2005.

L.  Was the Recreation by Design THU occupied by Mr. Castanel constructed utilizing superior quality workmanship?

Conclusion: No. The quality of workmanship documented is less than superior. Some are as follows:

1.  Failure to seal the belly board;

2.  Failure to seal the penetrations;

3.  Failure to properly seal penetrations;

4.  Failure to install insulation properly;

5.  Failure to install the HVAC ducts properly;

6.  Failure to seal windows properly;

7.  Failure to insure jacking and blocking did not cause damage or openings in the envelope of the trailer; and

8.  Failure to properly maintain the trailer.

CAST002428

Conclusions drawn in this Report are based on observations and information available, known and declared at the date of the investigation and/or the time of the preparation of this report.  This Report is furnished as privileged and confidential to the addressee.  Release to any other company, concern or individual is solely the responsibility of the addressee.

With kindest regards,

Alexis Mallet, Jr., President

**CAST002429**

# SECTION XII

# ENCLOSURES

Enclosure 1:  FGS Digital Photographs
Enclosure 2:  FGS Infrared Thermographic Images
Enclosure 3:  Plans and Details by FGS / RCE of the FEMA CASTANEL THU
Enclosure 4:  LaGrange Consulting, L.L.C. Inspection Report
Enclosure 5:  Freyou, Moore and Associates - Structural Condition Assessment
Enclosure 6:  Report by W.D. Scott and Associates
Enclosure 7:  Affidavit of Stephen Smulski, Ph.D.
Enclosure 8:  Ritter Consulting Engineers' Report
Enclosure 9:  Recreation by Design Information Sheet
Enclosure 10:  HUD Part 3280.309-Health Notice on formaldehyde emissions
Enclosure 11:  Dometic Installation Instructions
Enclosure 12:  HUD Part 3280.103-Light and ventilation
Enclosure 13:  Recreation by Design Floor Plan-Model 33 PM Dated September 19, 2005
Enclosure 14:  FEMA Model Travel Trailer Procurement Specifications Dated July 14, 2005
Enclosure 15:  RV Business Article Dated January 21, 2010
Enclosure 16:  FEMA Photo Library: Photograph by Keith Riggs-ADA FEMA Units
Enclosure 17:  Resume' of Alexis Mallet, Jr.
Enclosure 18:  List of Trial and Deposition Testimony
Enclosure 19:  First General Services Fee Schedule

**CAST002430**