IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION** | **MDL No. 07-1873** |
| | **SECTION N(5)** |
| **THIS DOCUMENT RELATES TO:** | **JUDGE ENGLEHARDT** |
| *Earline Castanel, et al. v. Recreation by Design, LLC, et al., Docket No. 09-3251* | **MAGISTRATE CHASEZ** |

**PLAINTIFF'S RESPONSE TO DEFENDANT RECREATION BY DESIGN'S MOTION TO EXCLUDE EXPERT TESTIMONY OF EDWARD R. SHWERY, Ph.D.**

Plaintiff Earline Castanel ("Ms. Castanel") respectfully submits the following Response to Defendant Recreation by Design's ("RBD") Motion to Exclude Testimony of Edward H. Shwery, Ph.D (Document No. 13303-1).

**I.   STANDARD OF ADMISSIBILITY FOR EXPERT TESTIMONY.**

Defendant's Motion to Exclude is one to exclude evidence, specifically expert testimony. Therefore, the Federal Rules of Evidence should govern the Court's analysis of the motion.

FED. R. EVID. 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

FED. R. EVID. 402 provides:

All relevant evidence is admissible, except as otherwise provided by the

Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

FED. R. EVID. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The standard for admission of expert testimony is a liberal one. Expert testimony need only be based on a reliable and scientifically valid methodology that fits the facts of a case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993). The inquiry into the expert's testimony is "a flexible one" where the individual factors are neither exclusive nor dispositive. *See Id.* at 594-95. As such, this Court essentially considers whether the expert retains a broad range of knowledge, skills and training. *Id.*

In analyzing the reliability of proposed expert testimony, the role of the Court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999). While extensive academic and practical

expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony whose knowledge is based on experience. *See Smith v. Ford Motor Co.,* 215 F.3d 713 (7th Cir. 2000)(citing *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir.2000), *Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 590 (7th Cir. 2000); *Kumho,* 526 U.S. at 156 ("No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")

Though the role of the court may be to serve as a gatekeeper of admissible evidence, it is not intended to replace the adversary system. *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595. It is certainly not the trial Court's role to determine whether the expert's conclusions are actually correct. *Id.* at 595. So long as the testimony rests upon "good grounds" it should be tested by the adversary process -- competing expert testimony and active cross-examination — rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. *See Ruiz-Trioche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998) (citing *Daubert,* at 596).

The inquiry into an expert's testimony must be flexible. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 & n. 12 (1993). The party opposing the admission of the proffered evidence carries the burden to provide a valid reason for its exclusion. *See U.S. v. D.K.G. Appaloosas, Inc.*, 630 F.Supp. 11540, 1562

(E.D.Tex.1986), aff'd 829 F.2d 532 (5th Cir. 1987), cert. denied 485 U.S. 976.  Because RBD has failed to show a valid reason for the exclusion of Dr. Shwery's testimony, its Motion to Exclude should be denied.

**II.     SHWERY'S TESTIMONY IS ADMISSIBLE UNDER RULE 702.**

    **A.     SHWERY IS QUALIFIED TO TESTIFY.**

Though the usual first step in a Rule 702 inquire is to determine whether the expert is qualified, RBD has not challenged Shwery's qualifications as a basis for excluding Shwery's testimony.  Rather, RBD's motion is based on the premise that Shwery's opinions should be excluded for being unreliable and irrelevant.  Since RBD has not raised any issue with Shwery's qualification as an expert RBD should be deemed to agree that Shwery is qualified to testify by his knowledge, skill, experience, training and education to offer testimony in this case.  Moreover, as the Court is probably well aware, Shwery has been was admitted and testified as a fully qualified expert in other cases in numerous federal and Louisiana state courts.  *See* Shwery CV attached as Ex. A, pp. 13-14.

    **B.     SHWERY'S TESTIMONY IS RELEVANT.**

RBD argues that Dr. Shwery's testimony should be excluded for not being relevant.  RBD's specious assertions can be based only on its misunderstanding of "relevance" as applied to expert witnesses, its disingenuous mischaracterization of Dr. Shwery's testimony, and its erroneous representation of the facts of the case.

An expert's testimony satisfies the *Daubert* relevance standard if the reasoning or methodology can properly be applied to the facts in issue. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir.2007). Dr. Shwery will address the fact issues of Ms. Castanel's mental anguish, emotional distress and fear of cancer damages. *See* First Supplemental and Amended Complaint (Doc. 9401, para. 15). His methodology consists of background information reviews, clinical interviews, mental examination, and a battery of psychological tests administered to Ms. Castanel. *See* Shwery Transcript attached as Ex. B. Numerous courts, both federal and Louisiana state, have appointed Dr. Shwery to evaluation the same and related issues in both criminal and civil matters. *See* Ex. A, pp. 13-14. Because Dr. Shwery has properly used his reasoning and methodology to evaluate Ms. Castanel's mental anguish, an element of damages in this lawsuit, RBD cannot negate the relevance of his expert testimony. *Id.* RBD has thus failed to carry its burden to exclude Dr. Shwery's testimony, and its motion should therefore be denied. *See D.K.G. Appaloosas, Inc.*, 630 F.Supp. at 1562.

Ironically, the height of irrelevance is exhibited by RBD's argument on relevance. RBD inappropriately reasserts the argument it made it its motion for summary judgment on the medical causation of Ms. Castanel's physical injury (Doc. No. 13235). *See* RBD's Memorandum, pp. 5-6. Until the Court has actually ruled on the summary judgment motion, RBD's presupposition of what the ruling should be can have no consequence to this motion.

> i. **Ms. Castanel Has Produced Expert Medical Testimony to Show That the Exacerbation of Rhinosinusitis That Required Surgical Treatment is Causally Related to Formaldehyde Exposure.**

Ms. Castanel has produced the expert medical opinion of Lawrence G. Miller, M.D., M.P.H. that, "within a reasonable degree of medical probability, the exposure to formaldehyde emissions during Ms. Castanel's residence in the FEMA trailer significantly exacerbated Ms. Castanel's rhinosinusitis." Miller Affidavit, p. 6, attached as Ex. C. Being triple board certified and having an additional graduate degree in Environmental Health, Dr. Miller is unquestionably qualified to render such an opinion based on his review of scientific literature, Ms. Castanel's medical records, and his own physical examination.

As Dr. Miller has testified, acute and chronic exposure to formaldehyde is known to produce irritation in the eyes and upper respiratory tract. *See* Ex. C, p. 4. He has further testified that rhinosinusitis is clearly associated with formaldehyde exposure in humans. Ex. C, p. 5. Finally, it is his testimony that scientific data strongly supports the correlation between formaldehyde exposure in the development of rhinosinusitis in humans and that the cytotoxic effects of formaldehyde on the nasal and respiratory epithelium is well-described and widely accepted. *Id.*

Ms. Castanel underwent sinus surgery specifically to treat her ongoing rhinosinusitis condition which Dr. Miller has opined was significantly exacerbated by her exposure to formaldehyde during her residence in the FEMA trailer at issue. *See* Ex. C, p. 6.

Ms. Castanel's own testimony supports that her rhinosinusitis condition was exacerbated by something in the trailer. Ms. Castanel testified that after a few weeks of living in the trailer she began to feel a "change":

> Q:   When you lived in that FEMA unit, did you smell anything unusual?

> A: Well, when I first walked in, I didn't smell anything, but after I was in there for about three, four, five weeks, like that, that's when I started feeling a change in me.
>
> Q: Okay.
>
> A: I started getting all stuffy. I couldn't breathe like. All my nose would get so stopped up. I had to do like that (indicating), breathe through my mouth.

*See* Castanel Deposition, attached as Ex. D, p. 85, lines 24-25 through p. 86, lines 1-10.

Ms. Castanel also testified that her stuffiness started after three to four weeks in the trailer:

> Q: Okay. Now, when you were in the trailer for the three or four weeks before this, did you smell anything unusual?
>
> A: Well, when I first walked in, I didn't smell anything, you know. Well, it did smell like newness, like when you go in somewhere where it's new, like that, that's how it smelled, but after that, I started getting stopped up.
>
> Q: And that was three or four weeks later?
>
> A: Yes, I started getting stopped up. And since then, I really been stopped up and getting sick with my sinuses.
>
> Q: So from the time, three or four weeks you moved into the trailer until now, you have been stopped up; is that right?
>
> A: I have been stopped up and running back and forth to the doctor with my sinuses.

*See* Ex. D, p. 87, lines 9-25 through p. 88 lines 1-3.

In fact, plaintiff's surgery was scheduled for March 31, 2010 as a consequence of the plaintiff's ongoing medical treatment and follow up for upper respiratory system complaints. As established by Ms. Castanel's medical records, the date for the sinus

surgery was dictated by the examination of the plaintiff's sinuses, which began with plain film x-rays on December 28, 2009 ordered by her treating physician Dr. Gautreaux to investigate complaints of chest congestion and cough. *See* History / Physical Examination Report attached as Ex. E. That x-ray was interpreted to require further evaluation with CT. *See* Radiology Results of December 28, 2009, attached as Ex. F. Consequently, a CT maxiofacial without contrast [dye] was performed on February 22, 2010. *See* Radiology Results of February 22, 2010, attached as Ex. G. Surgery was scheduled as a result of the interpretation of the results of this study, which advised correlation with direct visual inspection. *See* Radiology Results of February 22, 2010, attached as Ex. G.

Dr. Miller has opined that Ms. Castanel's nasal surgery was causally related to formaldehyde exposure as follows:

> With regard to [the development of rhinosinusitis and changes in Ms. Castanel's respiratory mucosa], it is difficult to ascertain a specific cause of Ms. Castanel's rhinosinusitis since 2004. **The substantial reported increase in these symptoms during her occupancy of the trailer strongly supports a role for formaldehyde exposure. In view of Ms. Castanel's exposure to formaldehyde in the trailer and the clear association between formaldehyde and rhinosinusitis, it is highly likely that this exposure exacerbated this illness.** The natural history of rhinosinusitis symptoms associated with formaldehyde exposure is uncertain. While Ms. Castanel's have improved somewhat since leaving the trailer, the symptoms have persisted, and she describes them as more severe than prior to living in the trailer. **In view of the documented histological abnormalities in the upper airways associated with formaldehyde exposure, it is highly likely that symptoms of rhinosinusitis will persist for some time, perhaps indefinitely** (emphasis added).

*See* Ex. C, p. 6. In so testifying, Dr. Miller confirms that sinus surgery was made necessary, at least in large part, due to formaldehyde exposure, since it was pursued to

8

treat a worsening of Ms. Castanel's persistent condition. It is a long-accepted principle of tort law that a defendant takes the plaintiff as she comes, which in this case includes a preexisting history of rhinosinusitis and allergies in this case which Dr. Miller has opined actually made Ms. Castanel more susceptible to conditions known to result from formaldehyde exposure. *See* Ex. C, p. 6. Moreover, a preexisting history does not preclude any or all possibility that a plaintiff could experience additional symptomology. Here, RBD put the plaintiff in a small trailer that worsened her rhinosinusitis condition and likely caused it, in Dr. Miller's opinion, to become persistent, perhaps indefinitely. *Id.* According to Dr. Miller's testimony, this is not only an expected outcome, but the preexisting sinusitis and/or rhinosinusitis was likely worsened by Ms. Castanel's formaldehyde exposure and her history of allergies. *Id.*

> ii.   **Shwery's Opinions Do Relate Castanel's Anxiety Claims to Exacerbation of Rhinosinusitis and Fear of Cancer.**

After repeating the contention that the plaintiff has failed to coordinate general and specific causation testimony to support her claims, which the plaintiff denies for reasons already explained, RBD then argues that Shwery's testimony is irrelevant and should be excluded simply because Ms. Castanel suffered from anxiety for several years before residing in the trailer at issue.

Not only does RBD have to take the plaintiff as it found her on the issue of exacerbation of rhinosinusitis but also on the anxiety issues that Dr. Shwery's testimony addresses. As Dr. Shwery has testified, Ms. Castanel related her sinus problems to him as one of her ongoing problems:

> Q:   Did you specifically ask Ms. Castanel about sinus problems?

> A: Well, let's see. No, I asked her, I said, "What kind of problems are you having?" She said, "Well, I have a problem because I urinate two or three times a night and my doctor told me to stop drinking cold drinks at night." And I said, "Well, what else is going on with you?" And she said, "Oh, I have sinus problems."

*See* Shwery transcript attached as Ex. B, p. 56. She then made clear to Dr. Shwery that she related her sinus problems to her residence in the FEMA trailer:

> Q: Now, what other problems did Ms. Castanel mention to you?
>
> A: She mentioned sinus problems, and she said, "I got it real bad." I said, "Well, what kind of sinus problem?" She says, "I got it real bad in the trailer. The doctor put me under a heat lamp, checked my sinus, gave me a shot."
>
> I said, "Well, tell me more." She says, "Well, when the weather changes, it worries me." **I said, "What do you worry about?" She said, "Well, my sinus will get worse and I will get stopped up." She worries that her sinus will get worse.** I said, "Well, tell me more."
>
> **I hope I don't feel like I did in the trailer because I got stopped up and I couldn't breathe right."** And then she demonstrated shallow breathing. And I said, "Well, do you get any – has this happened any time since you have been in the trailer?" She says, "Well, not like when I was in there."
>
> I said, "Tell me more." She said, "I think about if it's going to happen again, the sinus blockage." She said, "Thank God, it hasn't gotten like that. When the weather changes, I worry about it." I said, "Well, how long do you worry?" She said, Oh, 10, 15 minutes and I say to myself, 'I hope it won't be like when I was in that trailer."
>
> She does some self-talking to try and help her get control over the distress. **And then I went through how often does it occur, and she said, "Well, a couple of times a month, but more often with weather changes." And the she said it had been two or three times in the past week.**
>
> **And then I had a note to myself that this sounds like a circumscribed problem around the issue of sinus and breathing.** And then she went on –

10

>          Do you want me to keep going?

*See* Ex. B, pp. 58-60 (emphasis added).

Though Ms. Castanel may have had a history of anxiety issues, that history in and of itself would not preclude the possibility of the creation of new anxiety issues in response to new stressors. Further, Dr. Shwery directly refuted the contention that Ms. Castanel's present anxiety should be attributed primarily to losses suffered as a result of Katrina:

> Q:  If somebody loses all their clothes and all their photographs and all those personal belongings that we gather and keep over the years, that can cause some stress?
>
> A:  Yes, especially at the time and in the immediate aftermath, and those stressors gradually started to decline as time went on and as they got treatment and as they restored some of their property and fixed their house and stuff.
>
>    Those stressors were especially acute after the hurricane, but like all of us living in this area, gradually they go down. I haven't seen anybody that's continuing to just be acutely or intensely suffering because of whatever from the hurricane.
>
> Q:  So that's a general statement. Is it your testimony that everybody who suffered some anxiety or stress as a result of Hurricane Katrina, losing property homes, personal property, that they just got better over time?
>
> A:  Well, as a general finding, the literature on crisis and crisis theory is that right after a crisis is when it's most intense, but people can't – human beings can't maintain the level of intensity. It has to resolve in some fashion or reduce in some fashion.

*See* Ex. B, pp. 48-49. Dr. Shwery then further clarified his opinion that the sinus and breathing issues were the <u>primary</u> stressor leading to Ms. Castanel's present anxiety condition:

> Q: Well, what about all the other stressor we talked about, the hurricane, the death of siblings, being forced out of her house, the evacuation do any of those other stressors have any impact on her mild anxiety?
>
> A: **Well, I think we've got two issues going there. One is the ongoing mild anxiety that has been prevalent in her life as a chronic condition.** It's kind of like they call her a nervous person, for example. And that has been managed with medication and reassurance.
>
> **What I'm identifying is a specific level of anxiety and distress that's more situational and circumscribed, and that's around the issues of sinus and breathing.**
>
> \* \* \*
>
> **But I'm finding that the primary stressor for her right now that's in her mind about this is the trouble breathing and the sinus problems.**

*See* Ex. B, pp. 127-128 (emphasis added).

Dr. Shwery has also reported that Ms. Castanel indicated fear of cancer as one of her private fears during his examination. *See* Psychological Examination Report of Dr. Shwery (CAST 002241) attached as Ex. H, p. 3. She also stated that she did not have sinus problems like she had been experiencing before living in the trailer, that she started getting so stopped up when she was in that trailer, and that "it makes me so nervous when I get stopped up like that." *Id.* Based on his record reviews, examinations, interviews, psychological testing, Dr. Shwery ultimately opined that Ms. Castanel's

> "anxiety and distress is apparently the result of having had breathing difficulties during her months in the trailer that led to panic and fears of suffocation and death. **Since living back in her home, the intensity, frequency, and duration of her anxieties diminished, but the increase in sinus problems have caused her anxieties to increase.** Her problems are slowly resolving, but it is prudent to offer a brief course of supportive psychotherapy in order to assist her in learning how to manage her anxieties more efficiently, to understand her medical and health issues and

12

>to offer reassurance to increase her coping skills. **Her recurrent fears are that her breathing problems have worsened as her sinus problems have increased. The panic she experience about suffocation and death in the trailer is being resurrected. Clearly there are psychological issues intertwined with her medical problems.**

*See* Ex. H, p. 8 (CAST 002246).

Subsequently, Dr. Shwery testified as to his belief that Ms. Castanel experiences anxiety from fear of cancer:

>Q: So, is Ms. Castanel having some anxiety as a result of not having sufficient knowledge about her medical issues?
>
>A: No, it's identified in the testing as part of her substructural personality functioning, that that's an issue with her. So counseling would be helpful for her.
>
>Also, she worries about things and she worries that she might have cancer, she worries that her sinus is going to get worse, she worries that she might suffocate from sinus and breathing problems.
>
>* * *

*See* Ex. B, p. 132.

Dr. Shwery's opinions address the mental anguish claims asserted by Ms. Castanel in her lawsuit. Courts throughout Louisiana have recognized Dr. Shwery's reasoning and methodology as both relevant and helpful when addressing similar psychological and emotional issues. Contrary to RBD's argument, Dr. Shwery clearly relates Ms. Castanel's anxiety claims to exacerbation of her rhinosinusitis and fear of cancer. Beacause RBD's claims that Dr. Shwery's testimony is irrelevant are thus completely untenable, its motion to exclude Dr. Shwery's testimony should be denied.

Finally, regarding the actual levels of formaldehyde to which Ms. Castanel may have been exposed, it is absurd for RBD to suggest that is possible for Dr. Miller, or any expert for that matter, to ascertain that knowledge. Formaldehyde levels were not sampled when Ms. Castanel actually lived in the trailer, and samples taken for this litigation, four years after Ms. Castenel lived in the trailer when it was new, cannot accurately reflect the levels that were present in 2006. It is also known that formaldehyde emissions vary with temperature, humidity and ventilation. *See* Ex. C, p. 4. There is no explanation of an accounting for any of these factors in the recent testing, which was done in the winter, minimizing any off-gassing. Further, this is exactly the scenario envisioned by this Court when plaintiffs were allowed to conduct testing to create a database to be used for statistical analysis.

It is known, however, that the plaintiff's long-time companion, Edwin Peter Ganier, and her two daughters have testified that they were able to smell formaldehyde in the trailer. Testimony elicited during the Wright trial established that the Centers for Disease Control ("CDC") and the Agency for Toxic Substances and Disease Registry ("ATSDR") have recognized an odor threshold for formaldehyde of 500-1,000 ppb. In other words, since a recognizable odor was present, the formaldehyde level in Ms. Castanel's trailer must have been at least 500 ppb.

Dr. Miller does address levels of formaldehyde that are considered harmful in his Affidavit. *See* Ex. C, p. 5. He also specifically testified as to the presence of a "completed exposure pathway" with Ms. Castanel, explaining that this indicates a strong likelihood that Ms. Castanel was exposed chronically to formaldehyde emissions in her FEMA trailer. *See* Ex. C, p. 6. As previously explained, Dr. Miller's testimony does link

14

the persistence and exacerbation of plaintiff's rhinosinusitis claim to formaldehyde exposure. RBD is simply misunderstands and misconstrues Dr. Miller's testimony.

The plaintiff in this case has come forward with qualified and sufficient medical expert testimony to establish a *prima facie* case of medical causation under the requirements of Louisiana law. For this reason, RBD's motion must be denied and the plaintiff's case must be allowed to move forward.

### iii. Shwery's Testimony Regarding Ms. Castanel's Fear of Cancer Is Reliable and Relevant.

It is well-established that admissibility of expert testimony depends upon three factors: 1) presenting an expert who is qualified to testify competently, 2) methodology being used by the expert that is reliable and 3) that the testimony proffered by the expert assists the trier of fact on the issue that is before it. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004).

As already explained in this Memorandum, Ms. Castanel has presented sufficient evidence to sustain her claim of exacerbation of rhinosinusitis and to causally relate it to formaldehyde exposure occurring while she resided in the FEMA travel trailer. As such, she has supported the occurrence of a "present injury" as well as her mental anguish claims regarding exacerbation of rhinosinusitis and fear of cancer. Dr. Shwery has given reliable and relevant testimony on these issues that must be admitted at the trial of this matter.

Shwery must not be excluded as an expert in this case because he is qualified by his knowledge, skill, experience, training and education to offer testimony to testify competently as a psychologist as he has in other cases in this litigation. Second, Shwery

15

has explained the methodology he used to assess Ms. Castanel's mental and emotional condition – and established through his report the findings obtained with each method and analyzing the contribution of each finding on Ms. Castanel's state of mind, thereby satisfying the requirement of reliability. Finally, by confirming that Ms. Castanel has experienced and continues to experience anxiety related to the exacerbation of her rhinosinusitis condition and fear of cancer as a result of residing in the FEMA trailer at issue, Shwery's testimony will assist the trier of fact in determining whether the plaintiff has sustained emotional damages as a result of her occupancy of the RBD travel trailer. As such, Shwery's testimony is admissible and must not be excluded from the trial of this matter.

### III.  CONCLUSION.

For the reasons set forth above, this Court must deny Recreation by Design, LLC's Motion to Exclude Expert Testimony of Edward Shwery, Ph.D. and issue an Order allowing his testimony to be presented at the trial of this matter.

Respectfully submitted,

FEMA TRAILER FORMALDEHYDE
PRODUCT LIABILITY LITIGATION

s/ Gerald E. Meunier
GERALD E. MEUNIER, # 9471
**PLAINTIFF'S' CO-LIAISON COUNSEL**
Gainsburg, Benjamin, David, Meunier & Warshauer, L.L.C
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
T: 504/522-2304
F. 504/528-9973
gmeunier@gainsben.com


s/ Justin I Woods
JUSTIN I WOODS, #24713
**PLAINTIFF'S' CO-LIAISON COUNSEL**
Gainsburg, Benjamin, David, Meunier & Warshauer, L.L.C
2800 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
T: 504/522-2304
F. 504/528-9973
jwoods@gainsben.com

**COURT-APPOINTED PLAINTIFFS' STEERING COMMITTEE**
ANTHONY BUZBEE, Texas # 24001820
RAUL BENCOMO, #2932
FRANK D'AMICO, #17519
MATT MORELAND, #24567
LINDA NELSON. #9938
MIKAL WATTS, Texas #20981820
DENNIS REICH, Texas #16739600


Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing on April _____, 2010.

                                              s/ Gerald E. Meunier
                                              GERALD E. MEUNIER, # 9471