UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

|  |  |  |
|---|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCT LIABILITY LITIGATION | * * * * * * * * | MDL NO. 1873<br><br>SECTION "N-5"<br><br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |
| THIS DOCUMENT RELATES TO:<br>*EARLINE CASTANEL, ET AL v.*<br>*RECREATION BY*<br>*DESIGN, LLC, SHAW*<br>*ENVIRONMENTAL, INC.,*<br>and *UNITED STATES OF AMERICA*<br>*THROUGH THE FEDERAL*<br>*EMERGENCY MANAGEMENT*<br>*AGENCY,* NO. 09-3251 | * * * * * * * * * * | |

**************************************************************************

**MEMORANDUM IN SUPPORT OF RECREATION BY DESIGN, LLC'S DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY OF PAUL HEWETT**

**MAY IT PLEASE THE COURT:**

**NOW INTO COURT,** through undersigned counsel, comes defendant Recreation By Design, LLC ("RBD"), who offers the following memorandum in support of its Daubert Motion to

to Exclude the Opinions and Testimony of Paul Hewett, Ph.D. ("Hewett")[1].

## I. FACTUAL BACKGROUND

The instant action stems from Plaintiff's alleged exposure to formaldehyde while residing in a Temporary Housing Unit ("THU") supplied by FEMA as emergency housing. Plaintiff retained Paul Hewett, Ph.D., a Certified Industrial Hygenist, to testify with respect to formaldehyde levels present in the plaintiff's RBD trailer during her period of occupancy based on various testing performed on trailers manufactured by RBD. In order to predict the formaldehyde levels during the time period that plaintiff resided in the THU, Hewett employs a statistical analysis in which he attempts to determine the decay rate of formalehyde over time so that he can extrapolate backward in time the levels of formaldehyde present in the trailer during the plaintiff's residency. Defendant shows that Hewett's analysis is fatally flawed and is not generally accepted in the scientific community, and therefore, that his report and testimony should be excluded.

## II. ADMISSIBILITY REQUIREMENTS FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 gives a district court considerable discretion to admit or exclude expert testimony.[2] Rule 702 provides that an expert witness "qualified ... by knowledge, skill, experience, training, or education" may testify when scientific, technical, or other specialized knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue."[3] For expert testimony to be admissible, Rule 702 requires that: (1) the testimony be based on

---

[1] As the Court and parties are familiar with the factual/procedural background of this matter, reference is made here to the background as set forth in Recreation by Design, LLC's Memorandum in Support of Motion for Summary Judgment Regarding Prescription (R. Doc. 9722).

[2] *See General Electric Co. v. Joiner*, 522 U.S. 136, 151 fn. 1, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

[3] Fed.R.Evid. 702.

2

sufficient facts or data; (2) the testimony be the product of reliable principles and methods; and (3) the witness apply the principles and methods reliably to the facts of the case.[4] Plaintiff, as proponent of the expert evidence, bears the burden of demonstrating its admissibility.[5] Defendants do not have the burden of demonstrating its inadmissibility.[6]

In *Daubert*, the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper *at the outset* to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[7] The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid.[8] The goal is to exclude expert testimony based merely on subjective belief or unsupported speculation.[9] In addition, the party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[10] To satisfy the relevancy requirement, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence or determine a fact in issue.[11] This "helpfulness" standard of Rule 702

---

[4] Fed.R.Evid. 702.

[5] *See, e.g., Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002); *see also Daubert*, 509 U.S. at 592 n.10.

[6] *See Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 102 (D. Conn. 2006); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 534 (W.D. Pa. 2003).

[7] 509 US. 579, 598, 113 S.Ct.2786, 125 L.Ed.2d 469 (1993) (emphasis added); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony based on technical or specialized knowledge).

[8] *See Daubert*, 509 U.S. at 593.

[9] *Daubert*, 509 U.S. at 590.

[10] *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).

[11] *Daubert* at 591.

3

"requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."[12]

It should be noted that *Daubert* carefully distinguishes between the threshold reliability inquiry that plaintiff must satisfy and the role of cross-examination. As the Supreme Court stated, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. These conventional devices ... are the appropriate safeguards where the basis of scientific testimony ***meets the standards*** of Rule 702."[13] As the highlighted language shows, plaintiff must first satisfy the burden of demonstrating that the proffered evidence is admissible.[14] An expert's opinion, therefore, must be based on reliable methodology and "fit" the facts of the case before the opinion may have the privilege of being assailed by cross-examination.[15]

Finally, even if Hewett's expert testimony could survive this Court's threshold scrutiny under Rule 702 (which it cannot), his opinions would nevertheless be subject to further review and preclusion under Rule 403.[16] Rule 403 permits a district judge to exclude relevant evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[17] As the *Daubert* court correctly noted, "[e]xpert evidence

---

[12] *Daubert* at 591-92 (internal quotations omitted).

[13] *Daubert* at 595 (emphasis added).

[14] *See, e.g., McLendon v. Georgia Kaolin, Co.*, Inc., 841 F. Supp. 415, 418 (M.D. Ga 1994) ("these devices are only sufficient safeguards where the scientific testimony meets the standards of Rule 702").

[15] *See Porter v. Whitehall Labs.*, 791 F. Supp. 1335, 1345, 1345 n. 10 (S.D. Ind. 1992) (emphasis in original), *aff'd*, 9 F.3d 607 (7th Cir. 1993).

[16] *See, e.g., Daubert*, 509 U.S. at 595; *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996).

[17] Fed. R. Evid. 403.

can be both powerful and quite misleading–because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses."[18]  To this end, an expert opinion's "lack of reliable support may render it more prejudicial than probative, making it inadmissible under [Rule] 403."[19]  Courts have routinely held that evidence of experiments and/or tests is inadmissible under Rule 403 when the tests were not conducted under "substantially similar" conditions to those existing at the time of the accident or occurrence.[20]  The burden is on the proponent of the evidence to demonstrate the similarity of the conditions as a foundation for admissibility.[21]  The goal of this requirement is to avoid confusing the jury, as jurors may be misled when they do not fully appreciate how variations in the surrounding conditions between the original occurrence and the staged event can alter the outcome.

### III.  ARGUMENTS AND AUTHORITIES

#### A.     Hewett did not use measurements taken from the plaintiff's trailer

In his report, Hewett uses formaldehyde levels obtained from trailers involved in this MDL litigation.  These levels were obtained by various occupational and environmental consulting firms, such as DeVany Industrial Consultants, Boston Chemical Data, Technical Environmental Services and W.D. Scott Group.[22]  However, Hewett did not rely upon the specific data obtained from the testing of the plaintiff's trailer to formulate an opinion regarding the levels in her trailer, as he admits

---

[18] *Daubert*, 509 U.S. at 595; *accord Brock*, 94 F.3d at 226.

[19] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

[20] *See, e.g., Williams v. Briggs Co.*, 62 F.3d 703, 707-08 (5th Cir.1995); *United States v. Gaskell*, 958 F.2d 1056, 1060 (11th Cir.1993) (citing *Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977).

[21] *See, e.g., Wallace v. General Motors Corp.*, 1997 WL 269498, at *1 (E.D.La.) (citing *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1402 (8th Cir. 1994)); *Gilbert v. Cosco Inc.*, 989 F.2d 399,402 (10th Cir.1993).

[22] *See* Exhibit 1, Affidavit of Paul Hewett.

5

there is nothing specific about her unit in his report .

> Q. Dr. Hewett, there is nothing specific about Ms. Castanel's unit in your report right?
> A. Correct.
> Q. You did not calculate any estimated exposures for formaldehyde concentrations that would have been present in her trailer at any point in time, right?
> A. I don't think that is correct, because the purpose - - the overall purpose is to evaluate the existing data that can be applied to units such as that occupied by Castanel.
> Q. But you did not perform a calculation of what level of formaldehyde concentration would have been present in her particular unit at a given time?
> A. In her specific unit?
> Q. Yes.
> A. On a specific day?
> Q. Yes, sir.
> A. No, I did not.[23]

As will be noted below, the levels at which formaldehyde levels decrease over time are determined not only by the age of the unit, but in large part, due to numerous other factors such as use, temperature, ventilation, etc. A person's particular use of a trailer including ventilation of the trailer, cooling or heating of the trailer and other factors have an impact on the potential formaldehyde levels in the trailer. In this particular case, not only did Hewett not use the results from the sampling of plaintiff's trailer in reaching his opinion, he did not even read plaintiff's deposition to determine if there were environmental factors regarding her particular use of the trailer which might effect the levels in the trailer during her use.

> Q. Dr. Hewett, I am Randy Mulcahy on behalf of Recreation by Design.
>    You haven't had any contact with Mrs. Castanel in connection with this litigation, have you?
> A. No.
> Q. Have you reviewed her deposition transcript at all?
> A. No, I think I was sent a PDF copy of that.
> Q. Have you read it?
> A. No, I have not. Well, her deposition is going to look like all the other depositions, with all the fancy pages and the court reporter information.

---

[23]*See* Exhibit 2, Deposition of Hewett pps. 112-113.

> Q. So the answer is "no"?
> A. No.
> Q. My question is pretty straightforward as far as, you don't know about how she utilized or used this particular travel trailer as far as her daily activities, correct?
> A. No, I do not.
> Q. As far as my understanding from earlier, you have not done any particular calculations as to Mrs. Castanel's unit as it relates to the opinions you have reached in your report, correct?
>
> MR. PINEDO:
> Objection form.
>
> THE WITNESS:
> Correct. The opinions and conclusions are directed at Recreation by Design's trailers in general, be they travel trailers in general or Morgan model travel trailers more specifically.[24]

Hewett's attempt to use data obtained from trailers, other than the plaintiff's, is not appropriate to determine the specific formaldehyde levels in the plaintiff's trailer. The plaintiff's trailer was inspected in early January 2010. Hewett submitted his report in late January 2010. There is no reason why Hewett could not have used the actual sampling results taken from plaintiff's trailer instead of the average results taken from a sampling of numerous trailers to reach his opinion. Simply put, the samples taken from the plaintiff's trailer would be the best evidence of formaldehyde levels therein, not an average level taken from other trailers. Accordingly, Hewett's report is irrelevant and should be excluded.

    B.    **Hewett's Methodology is Not Reliable**

Plaintiff resided in the THU from approximately March 2006 through August 2007. Hewett attempts to determine the formaldehyde levels in RBD's THUs (although not specifically plaintiff's THU) during the periods of occupancy by using a formula involving the decay rate of formaldehyde

---

[24]*Id*. at pps. 142-144.

over time. Other courts have excluded expert testimony on this identical issue.

In *Wallace v. Meadow Acres Manufactured Housing*[25], the Indiana Court of Appeals upheld the trial court's ruling excluding the plaintiff's expert from testifying as to estimated formaldehyde levels found using a extrapolation method. In that case plaintiff's expert, Dr. Thaddeus J. Godish, a professor at Ball State University in the Natural Resources and Environmental Management Department who had studied formaldehyde for twenty years, tested the air in the plaintiff's home by obtaining ambient air samples. He then attempted to determine what the formaldehyde levels would have been in the home five years earlier by a process of extrapolation. Dr. Godish based his calculations on the probability that the formaldehyde levels had decreased twice during that time period, this is known as the decay rate.

In *Wallace*, Dr. Godish testified that in order to extrapolate backward in time he utilized an estimated "half-life" or decay rate value for formaldehyde.[26] The half-life of formaldehyde is the initial time period that it takes for measured ambient air formaldehyde to decrease by one-half.[27] Dr. Godish estimated that formaldehyde has an initial estimated half life value of 21 months and a second half life value between two and four years.[28] Dr. Godish further admitted that half life is really a misnomer, and the concept of a decay rate is more accurate.[29]

In excluding his testimony, the court found that while Dr. Godish uses half-life or decay rate

---

[25] 730 N.E. 2d 809 (Ind. Ct. App. 2000).

[26] *Id*. at 816.

[27] *Id*.

[28] *Id*.

[29] *Id*.

8

values to arrive at his opinions, **he admitted that formaldehyde has no definite half-life or decay rate and that there are no scientific studies which establish a definite half-life or decay rate for formaldehyde.**[30] Dr. Godish further admitted that he was unable to identify any peer-reviewed articles or journal articles reporting an established half-life or definite decay rate for formaldehyde.[31] Lastly, Dr. Godish admitted that there is no recognized standard testing method for evaluating the alleged half-life or decay rate for formaldehyde.[32] Finally, the court noted that while the scientific community acknowledged that formaldehyde decays over time, the exact rate of decay is disputed and ultimately unknown.[33]

The court noted that the extrapolation method used by Dr. Godish relies on the questionable assumption that the rate of formaldehyde's decay has been properly calculated. The court held that since that assumption was not supported by any reliable scientific method or the reliable application of any valid theory, Dr. Godish's extrapolation procedure was unreliable and therefore excludable.[34]

The Court's analysis in *Wallace* is applicable to this matter. As in *Wallace*, plaintiff's expert in this matter, Hewett, attempts to determine the formaldehyde levels in RBD's trailers at the time of plaintiff's occupancy by taking an average current formaldehyde level obtained by sampling various trailers and applying a formula which attempts to calculate the decay of formaldehyde over time. As the Court held in *Wallace*, there is no recognized "standard" for evaluating the alleged half-

---

[30]*Id.*

[31]*Id.*

[32]*Id.* at 817.

[33]*Id.*

[34]*Id.* at 817-818.

9

life or decay rate for formaldehyde, nor has Hewett provided any basis to support this theory. The entire foundation of Hewett's opinion as to the formaldehyde levels in RBD's trailers during the time of plaintiff's occupancy is based on a formula whose main component is the half life or decay rate of formaldehyde.[35]  As there is no scientifically accepted standard which expresses the decay rate of formaldehyde, Hewett's formula is not scientifically sound, nor is it generally accepted in the scientific community.  Accordingly, Hewett's testimony and report should be excluded.

### C. Hewett's Reliance on the Versar Report is Misplaced

It is anticipated that plaintiff will argue that Hewett's decay rate methodology is based on a report prepared by Versar, Inc. for the U.S. Environmental Protection Agency in 1986.[36] However, Hewett's reliance on this report to calculate the decay rate for formaldehyde in a THU is misplaced as the conditions, data and other factors used to obtain the Versar "model" are different than the present situation.  Additionally, the Versar "model" is just that, a model; it is not a generally accepted standard in the scientific community. Thus, Hewett's attempt to create a formula to calculate the decay rate (a/k/a "half life") of formaldehyde in a THU based on the Versar model is not reliable and thus, not admissible.

Hewett produced a portion of the Versar report as part of the materials he relied on in arriving at his conclusions.[37]  It is important to note that Hewett did not provide a full copy of the Versar report, which appears to be some twenty two (22) pages long.  Rather, Hewett only provided the cover page and pages 17 through 22 of the report.  This is significant as defendants have not been

---

[35]See Exhibit 1, p. 14 and 41.

[36]Exhibit 1, p. 41.

[37]See Exhibit 3, Versar Report.

10

afforded the opportunity to review the report in its entirety to determine whether the report can be applied to the present situation. Notwithstanding this lack of disclosure, it is clear based on the few pages that were produced, that the Versar report was only intended as a model, was not intended for use in a situation such as this, and can not be applied to the facts of this case.

Based on the limited information provided in the few pages of the Versar report that was produced, it appears that Versar was attempting to determine the rate of decay of formaldehyde in mobile homes, which according to the age of the report, appear to have been manufactured in the late 1970s to early 1980s, nearly twenty five years before these THUs were manufactured. Aside from the obvious fact that the Versar report involved testing related to mobile homes (manufactured homes) rather than travel trailers, which by itself would exclude applicability to the present situation, Versar recognized that the age of the mobile homes impacted the ultimate results.

Versar **acknowledged that information on the long-term decay of formaldehyde emissions from wood products was not available**; thus, the decay curve function of the model was derived from monitoring data collected in mobile homes of various ages.[38] (This fact was again acknowledged by the *Wallace* Court fourteen years later, noting that there was no accepted rate of decay in formaldehyde which had been accepted by the scientific community.) Versar further recognized several limitations to this approach of deriving the decay curve from sampling taken of the mobile homes:

    A.    The monitoring data reflect concentrations due in part to sources other than pressed-wood products;

    B.    The pressed-wood products marketed today (1986) are manufactured using UF resin

---

[38] *Id.* at p. 22 paragraph 7.

>systems significantly different from those used to manufacture the wood products contained in the surveyed mobile homes;[39]

As noted by Versar, their model was affected by formaldehyde emissions from sources other than wood products. These other sources, which according to Versar may remain constant over time rather than decaying, include outdoor air, cigarettes, and emissions from gas appliances.[40] Additionally, Versar realized that their model curve was derived based on testing conducted on mobile homes with manufactured wood that differed significantly from wood that was used at the time of the report, 1986. Taken one step further, these THUs were manufactured nearly twenty five years after the mobile homes manufactured in Versar report. Hewett has not shown that the wood products used by Versar to derive their decay formula are substantially similar to the wood products being used today in the THUs. As acknowledged by Versar, this would obviously affect the decay rate curve. Likewise, Hewett admits he did not include a constant for factors such as background levels in his analysis.[41]

There are numerous other significant issues in the Versar report which indicate that Hewett's reliance on this report to derive his decay formula is misplaced and/or calls into serious question the reliability of this formula to meet the standards under *Daubert*.

The Versar report noted that home age determines approximately 35% of the formaldehyde level, while all other factors combined determine the other 65% of the variability.[42] As noted in

---

[39]*Id.* at p. 22 paragraph 7.

[40]*Id.* at p. 17.

[41]Exhibit 2, pps. 86-87.

[42]Exhibit 3 at p. 20.

Section A above, Hewett did not use the actual measurements from the plaintiff's home to determine the decay rate; rather, he used a median from all other homes. Considering that the age of the mobile home only accounted for 35% of the formaldehyde level, while other factors accounted for 65%, it was necessary for Hewett to use the actual measurements from the plaintiff's THU in order to obtain an accurate level. Plaintiff's particular use of the THU including running the air conditioner/ heater, cooking in the unit and venting the THU all would have an impact on the formaldehyde levels. Considering that Hewett did not use the measurements from plaintiff's THU, his attempt to extrapolate backward in time the formaldehyde levels in plaintiff's THU is critically flawed.

The Versar report also noted key disclaimers when using their "model." In order to determine the decay rate of formaldehyde emissions from wood products over time, the "steady state" indoor air concentration of formaldehyde must first be estimated.[43] This concentration is then decayed over time to reflect the decay of formaldehyde emissions.[44] Unfortunately, Hewett did not provide those portions of the Versar report which indicate how the "steady state" indoor air concentration was obtained, which is obviously significant as the decay rate is necessarily determined by this level of concentration. Thus, it is questionable whether the methods used to obtain the steady state indoor air concentration of formaldehyde in this case was substantially similar to those in the Versar report. Nevertheless, other portions of the Versar report indicate that the steady state concentrations were obtained by using the Matthews and HBF Steady-State Models. However, Versar notes that while both Matthews and HBF Steady-State Models "**have been reported to provide excellent predictions of formaldehyde concentrations** *in laboratory*

---

[43]*Id*. at p. 17.

[44]*Id*. at p. 17.

*experiments under near ideal air mixing conditions*, **neither has been validated for predicting concentrations in actual homes with occupants**."[45] Thus, according to Versar, the estimates they obtained to predict the indoor air concentration, which was later used to obtain the decay rate, *were used in laboratory experiments only* and have not been validated for predicting concentrations in actual homes with occupants.

Versar further noted that the initial steady-state concentrations can be estimated by the model only for those pressed-wood products for which appropriate emissions rate data are provided.[46] The emission rate data used for the model was limited to data collected at 23 degrees Celsius and 50 percent relative humidity using small dynamic test chambers. The report further noted that the tested products were collected during 1983 and thus, **may not be representative of current products**.[47]

Lastly, Versar noted that the effect of vapor barriers, such as paint or carpet over the pressed-wood products, were also not accounted for by the model.[48] Additionally, when calculating the initial indoor air concentrations, the model assumes a constant ventilation rate, temperature (23degrees Celsius) and relative humidity (50 percent) and ideal mixing factor.[49] Hewett did not consider many of these factors when arriving at his formula.

It is clear that the Versar report relied on information and data obtained from sources that are not applicable to the present situation. Additionally, the Versar report was considered a "model"

---

[45]*Id.* at p. 21, emphasis added.

[46]Id. at p. 21., emphasis added.

[47]*Id.* at p. 21.

[48]*Id.* at p. 22.

[49]*Id.* at p. 22.

based in part on concentration rates that were obtained from laboratory experiments, and which have not been validated for predicting concentrations in actual homes with occupants. Other data used included the emission rates for wood products as manufactured in 1983, some 27 years ago, as collected in a laboratory setting.  Lastly, Versar acknowledged that the long-term decay rate of formaldehyde emissions from wood products is unknown.  As recently as 2000, it was still acknowledged by the Court in *Wallace* that the exact rate that formaldehyde decays over time is unknown and disputed.

     In the present case, Hewett attempts to take this Versar model, modify it and then apply it to the present case in an attempt to calculate what the median formaldehyde levels would have been in RBD's trailers at the time of plaintiff's occupancy.  Aside from the fact that there are far too many differences and variables between the Versar study and the present situation to allow application of the Versar model, Hewett has failed to show that his method and the Versar model were ever tested, peer reviewed or generally accepted in the scientific community as a reliable means of obtaining the decay rate of formaldehyde.  In fact, Hewett's own "half-life" computation range vastly from 2.32 years to 11.5 years in occupied units for various manufacturers and .55 years to 2.35 years in unoccupied units.[50]  Likewise, even plaintiff's environmental engineer, William Scott, uses a different half life rate of seven months, which only highlights the uncertainty of the decay rate computation.[51]

     Lastly, even Versar acknowledged that part of its method to obtain the decay rate has NOT been validated for predicting concentrations in actual homes with occupants.

---

[50]*See* Exhibit 1, p. 48.

[51]Record 13307-2, p. 11

The entire basis of Hewett's opinion is based on speculation, inapplicable testing and data, and unverified methodology. Accordingly, Hewett's opinion and report should be excluded as they do not meet the standards under Daubert.

### D. Hewett should not be allowed to testify as to the Berge Equation

Hewett testified that the did not use the Berge equation in his calculations.[52] In the event that Hewett attempts to use the Berge Equation at trial, defendant objects to his testimony on this subject based on the fact that it was not included in his calculations and for the same reason that defendant sought to exclude its use based on the unreliable methodology as noted in its Memorandum to Exclude in Part the Testimony of William Scott.[53]

### IV. CONCLUSIONS

Accordingly, for the foregoing reasons RBD respectfully requests that this Honorable Court strike the testimony and report of Paul Hewett.

Respectfully submitted,

*/s/ Lyon H. Garrison*
LYON H. GARRISON, Bar No. 19591
SCOTT P. YOUNT, Bar No. 22679
RANDALL C. MULCAHY, Bar No. 26436
DARRIN L. FORTE, Bar No. 26885
KELLY M. MORTON, Bar No. 30645
GARRISON, YOUNT, FORTE
& MULCAHY, LLC
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 527-0680
Facsimile: (504) 527-0686
Attorneys for defendant,

---

[52]Exhibit 2, p. 92.

[53]*See* Record 13307-1.

                        Recreation By Design, LLC
                        Email: lgarrison@garrisonyount.com

## CERTIFICATE OF SERVICE

      I hereby certify that on April 23, 2010, I electronically filed the foregoing with the Clerk of court by using the CM/ECF system which will send a notice of this electronic filing to all known counsel of record.

                          */s/ Lyon H. Garrison*
                        LYON H. GARRISON, Bar No. 19591