# Exhibit "F"

# Transcript of the Testimony of
# Lawrence G. Miller, M.D., M.P.H.

Date taken: March 11, 2010

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

Case 2:07-md-01873-KDE-MBN   Document 13602-6   Filed 04/23/10   Page 3 of 7

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                Lawrence G. Miller, M.D., M.P.H.

## Page 1

```
                            Volume I
                            Pages 1 to 135
                            Exhibits 1 - 8
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
                NEW ORLEANS DIVISION
- - - - - - - - - - - - - - - -x
IN RE: FEMA TRAILER          :
       FORMALDEHYDE          :  MDL No. 1873
       PRODUCTS LIABILITY    :  Section: N(5)
       LITIGATION            :  Judge: Engelhardt
                             :  Mag: Chasez
EARLINE M. CASTANEL, ET AL., :
            Plaintiffs,      :
                             :
       vs.                   :  Docket No. 09-3251
                             :
RECREATION BY DESIGN, LLC,   :
ET AL.,                      :
            Defendants.      :
- - - - - - - - - - - - - - - -x
        DEPOSITION OF LAWRENCE G. MILLER, M.D.,
M.P.H., a witness called on behalf of the Defendant
Recreation By Design, LLC, TL Industries, Inc.,
Frontier RV, Inc., and Play-Mor Trailers, Inc.,
taken pursuant to the Federal Rules of Civil
Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Seegel, Lipshutz & Wilchins, LLP, 20 William Street,
Wellesley, Massachusetts, on Thursday, March 11,
2010, commencing at 9:18 a.m.
PRESENT:
    Reich & Binstock, LLP (by Jordan M. Torry, Esq.)
        4265 San Felipe, Suite 1000, Houston, TX
        77027      - and -
    (By Speakerphone)
    Reich & Binstock, LLP (by Dennis C. Reich, Esq.)
        4265 San Felipe, Suite 1000, Houston, TX
        77027, for the Plaintiffs.
    (Continued on Page 2)
```

## Page 2

```
 1   PRESENT (Continued):
 2   Garrison, Yount, Forte & Mulcahy, L.L.C.
         (by Lyon Garrison, Esq.)
 3       909 Poydras Street, Suite 1800, New
         Orleans, LA  70112, for Recreation By
 4       Design, LLC, TL Industries, Inc., Frontier
         RV, Inc., and Play-Mor Trailers, Inc.
 5
     (By Speakerphone)
 6   Baker Donelson (by Karen Whitfield, Esq.)
         201 St. Charles Avenue, Suite 3600, New
 7       Orleans, LA  70170, for CH2M Hill
         Constructors, Inc., and Shaw Environmental,
 8       Inc.
 9   (By Speakerphone)
     Middleberg, Riddle & Gianna (by Tanya Henkels
10       Fields, Esq.) 717 North Harwood, Dallas, TX
         75201, for Fluor Enterprises, Inc.
11
     (By Speakerphone)
12   Willingham, Fultz & Cougill (by Thomas L.
         Cougill, Esq.) Niels Esperson Building,
13       808 Travis, Suite 1608, Houston, TX  77002,
14       for Jayco, Inc., and Starcraft RV, Inc.
15
     (By Speakerphone)
16   Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
17       (by Kristopher M. Redmann, Esq.)
18       601 Poydras Street, Suite 2775, New
19       Orleans, LA  70130, for Liberty Mutual
20       Insurance Corporation.
21
22
23
24              * * * * *
```

## Page 3

```
 1              I N D E X
 2
     WITNESS       DIRECT  CROSS  REDIRECT  RECROSS
 3
     Lawrence G. Miller, M.D., M.P.H.
 4
     by Mr. Garrison    5
 5
 6
                      * * * *
 7
              E X H I B I T S
 8
     NO.      DESCRIPTION            PAGE
 9
10   1    Amended Re-Notice of Dr. Miller's   5
         deposition
11
     2    Lambert & Nelson CD, labeled "FEMA  11
12       Trailer Formaldehyde Products
         Liability Litigation,
13       Castanel/Recreation By Design, LLC,
         Trial 4, Medical Records, as of
14       December 17, 2009"

15   3    Lambert & Nelson CD labeled "In Re: 15
         FEMA Trailer Formaldehyde Products
16       Liability Litigation, Expert
         Reliance File, Lawrence Miller,
17       Bates CAST-MILLER-000001 through
         CAST-MILLER-002003, 2-25-10"
18   4    Lambert & Nelson CD labeled, "FEMA  15
         Trailer Formaldehyde Products
19       Liability Litigation,
         Castanel/Recreation By Design, Trial
20       4, Expert Reports, Etc., From
         Defendants, Recreation By Design and
21       Shaw"
22   5    Dr. Miller's handwritten notes re   17
         articles in reliance file, 14 pages
23
24
```

## Page 4

```
 1          E X H I B I T S, Continued
 2   NO.       DESCRIPTION           PAGE
 3   6    Mr. Garrison's version of Dr.       22
         Miller's report, "Affidavit of
 4       Lawrence G. Miller, M.D., M.P.H., In
         the Trial of Earline M. Castanel"
 5
 6   7    Dr. Miller's Curriculum Vitae       26

 7   8    Dr. Miller's version of his report, 87
         "Affidavit of Lawrence G. Miller,
         M.D., M.P.H. In the Trial of Earline
 8       M. Castanel"
 9
10                  * * * *
```

Case 2:07-md-01873-KDE-MBN   Document 13602-6   Filed 04/23/10   Page 4 of 7

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)    Lawrence G. Miller, M.D., M.P.H.

```
 1        PROCEEDINGS
 2      LAWRENCE G. MILLER, M.D., M.P.H.
 3   a witness called for examination by counsel for the
 4   Defendants Recreation By Design, LLC, TL Industries,
 5   Inc., Frontier RV, Inc., and Play-Mor Trailers,
 6   Inc., having been satisfactorily identified by the
 7   production of his driver's license and being first
 8   duly sworn by the Notary Public, was examined and
 9   testified as follows:
10           DIRECT EXAMINATION
11   BY MR. GARRISON:
12   Q.  Good morning, Doctor.  My name is Lyon
13   Garrison.  I represent a company called Recreation
14   By Design.
15       MR. GARRISON:  Usual stipulations?
16       MR. TORRY:  Yes.
17       MR. GARRISON:  This matter has been noticed
18   pursuant to the Federal Rules of Civil Procedure.
19   As Exhibit 1, I will attach the Amended Re-Notice of
20   Deposition.
21       (Document marked as Miller
22       Exhibit 1 for identification)
23   Q.  Let's proceed.  Thanks for being here
24   today, Doctor.
                                            Page 5
```

```
 1   A.  Thank you.
 2   Q.  I know you've given depositions before, so
 3   you're familiar with the format, correct?
 4   A.  I am.
 5   Q.  You have the right to read and sign.
 6   That's up to you.
 7   A.  I would do that.
 8   Q.  All right.  I know that in the course of
 9   your practice, you had occasion to see Ms. Earline
10   Castanel; is that correct?
11   A.  I did.
12   Q.  Do you have the Notice of Deposition that
13   we sent to you?
14   A.  I believe a copy of it is right here.
15   Q.  Do you see a list of items requesting
16   documents as part of that Notice?
17   A.  Yes.  It's on the Notice.
18   Q.  Do you have the documents that are
19   requested?
20   A.  Well, I have electronic versions.
21   Q.  Whatever you have is fine.  You don't have
22   to start a computer.  If you have a disk --
23   A.  I have some disks.
24   Q.  -- you can just describe for me what's on
                                            Page 6
```

```
 1   it.
 2   A.  Well, these are actually summaries prepared
 3   by Lambert & Nelson of all my reliance materials and
 4   of the various expert reports in this case.
 5   Q.  Well, let's take a look at it.  I would
 6   like to find out what's on the disks.  Do you have
 7   any kind of notes that reflect what's on the disks?
 8   A.  I do not.
 9   Q.  Do you have a computer with you?
10   A.  I do not.
11   Q.  I actually have a computer.  Are you
12   proficient with computers, as far as just putting in
13   these disks and finding out what's on there?
14   A.  Opening up a CD shouldn't be too hard.
15   Q.  All right.  Now, what I want to do is, I
16   want to identify what records are on these disks.
17   If you think you can do that without using the
18   computer, that's fine.
19   A.  I believe I can.
20   Q.  Because I'm familiar with most of the
21   records.  I just want to find out what you looked
22   at.
23   A.  I believe you are.
24   Q.  I think I'm familiar.  All right.  Let's
                                            Page 7
```

```
 1   start.
 2       MR. GARRISON:  And what we're going to do
 3   for purposes of exhibits, Ms. Court Reporter, I
 4   would like to just copy each disk, and that will be
 5   an exhibit.  And then we'll run through what's on
 6   the disk.
 7       Is that okay with everybody?
 8       MR. TORRY:  That's fine.
 9       MR. GARRISON:  The first disk I have, it's
10   entitled "Lambert & Nelson," with that firm's street
11   address and telephone number, and it's got,
12   "Castanel/Recreation By Design, Trial 4, Medical
13   Records as of December 17, 2009."
14   Q.  And, Doctor, is it your understanding that
15   this disk was prepared for you by the attorneys at
16   Lambert & Nelson?
17   A.  That's correct.
18   Q.  So the attorneys at Lambert & Nelson
19   decided what medical records you should look at?
20   A.  To my knowledge, it's all the medical
21   records I received.
22   Q.  But you didn't request any additional
23   records?
24   A.  Well, let me be clear.  Since I've seen Ms.
                                            Page 8
```

Case 2:07-md-01873-KDE-MBN   Document 13602-6   Filed 04/23/10   Page 5 of 7

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Lawrence G. Miller, M.D., M.P.H.

```
 1  firm does, but, quite honestly, I don't like to
 2  assume.  What is it that Mediphase does?
 3      A.  We invest in health care companies and try
 4  to support those companies to make them successful.
 5      Q.  And when you say invest, obviously that
 6  means you put money into health care companies; is
 7  that correct?
 8      A.  That's correct.
 9      Q.  Do you and your partner invest just your
10  own money, or do you solicit money from other
11  investors?
12      A.  This is primarily money from other
13  institutional investors.
14      Q.  So do you manage money from other
15  institutional investors?
16      A.  I guess "manage" is a pretty broad term,
17  but that's correct.
18      Q.  You give advice to institutional investors
19  as to what health care companies they should invest
20  in?
21      A.  We actually do the investing.
22      Q.  The actual trading?
23      A.  No, it's not trading, because these are
24  private companies.  So they're not traded.
                                              Page 29
```

```
 1      Q.  I see.  That's fair.  So you actually do
 2  the investing.  You go in and you make the
 3  investment and you finalize the investment; is that
 4  correct?
 5      A.  That's correct.
 6      Q.  Does your company, Mediphase, have any
 7  reporting requirements?
 8      A.  In terms of the Securities & Exchange
 9  Commission, you mean?
10      Q.  No.  And that's a good follow-up question.
11  In terms of reporting to its clients?
12      A.  We report to our investors, yes.
13      Q.  So your company, Mediphase, actually sends
14  out statements to its investors?
15      A.  We do.
16      Q.  So you have a staff that prepares these
17  statements and sends them out on a regular basis?
18      A.  That's correct.
19      Q.  Do you go out and solicit investors to
20  become involved in your ventures?
21      A.  Occasionally.
22      Q.  So you have a set group of investors that
23  you have invested for over, what, ten, eleven years?
24      A.  That's correct.
                                              Page 30
```

```
 1      Q.  And they just -- I guess they return to you
 2  if they like the results?
 3      A.  We hope so.
 4      Q.  Would this be a hedge fund?
 5      A.  No, it's not a hedge fund.
 6      Q.  Okay.  And I'm still just trying to grasp
 7  it.  So I have a better appreciation of what it is.
 8  Your involvement with Mediphase, it must be very
 9  demanding?
10      A.  It often is, yes.
11      Q.  How many hours a week do you work for
12  Mediphase at this point?
13      A.  You know, I don't count them.  Pretty much
14  all my time.
15      Q.  Ten years ago, was Mediphase taking all of
16  your time?
17      A.  A little bit less.  It's gotten busier over
18  the years.
19      Q.  Has your role with Mediphase changed since
20  you started in 1999?
21      A.  It has not.
22      Q.  When you make recommendations to ongoing or
23  regular institutional investors, would it be fair to
24  say you really have to spend a lot of time
                                              Page 31
```

```
 1  researching?
 2      A.  I think that's fair, yes.
 3      Q.  Do you do the actual research?
 4      A.  With others, yes.
 5      Q.  So you're part of the research team as
 6  well?
 7      A.  Correct.
 8      Q.  And you give investment advice?
 9      A.  That's correct.
10      Q.  Have you ever been sued relative to your
11  involvement with Mediphase?
12      A.  No.
13      Q.  When you were still seeing patients, up
14  until five years ago -- let's go from 1999 to 2005;
15  let's look at that time period -- what percentage of
16  your work was involved in seeing patients?
17      A.  A small percentage.  Probably no more than
18  10 percent.
19      Q.  Was there any specialty that you had?
20      A.  Internal medicine.
21      Q.  And did you treat particular types of
22  patients?
23      A.  No.  I think broadly within internal
24  medicine.
                                              Page 32
```

8 (Pages 29 to 32)

Case 2:07-md-01873-KDE-MBN   Document 13602-6   Filed 04/23/10   Page 6 of 7

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                Lawrence G. Miller, M.D., M.P.H.

1  for those conditions before moving into the FEMA
2  trailer?
3    A.  She did.
4    Q.  I need to take a step back, because we went
5  through your qualifications, and I wanted to ask you
6  about your expertise or training in the area of
7  psychological medicine or treating mental
8  conditions.  We've looked at your curriculum vitae,
9  and I'll look through it.  Is anything on this
10 curriculum vitae regarding the treatment of patients
11 for psychological issues?
12   A.  Part of -- that's a major part of internal
13 medicine.  Most of our patients have minds and
14 bodies, and we've got to treat the mind as well as
15 the body.
16   Q.  When you were still seeing patients, did
17 you treat patients for psychological problems?
18   A.  Absolutely.  I think every internist does.
19   Q.  Did you treat patients for psychological
20 problems when those problems were associated with
21 some physical ailments for which you were treating
22 the patient?
23   A.  That's often the case.
24   Q.  When you were seeing patients, did you see

Page 49

1  or treat patients that just had psychological
2  problems with no physical problems?
3    A.  That's not unusual; a patient whom you may
4  have seen for years comes in with more -- with a
5  psychological issue one day, and you treat that.
6    Q.  Tell me about your training in psychology
7  or psychiatry.
8    A.  Again, I'm not a psychiatrist, per se, but
9  again, in internal medicine, that's a significant
10 part of what you train in, is understanding
11 psychological illnesses and situations.
12   Q.  You were an intern from 1978 to 1979,
13 correct?
14   A.  Correct.
15   Q.  And that was in internal medicine?
16   A.  Correct.
17   Q.  And you were a resident from 1979 to 1981,
18 correct?
19   A.  Yes.
20   Q.  And that was in internal medicine?
21   A.  Yes.
22   Q.  Have you ever done a residency for
23 psychology or psychiatry?
24   A.  No.  There isn't a psychology residency for

Page 50

1  physicians, only psychiatry.
2    Q.  You're right.  A psychiatrist is an M.D.
3  Have you ever done an internship or residency for
4  psychiatry?
5    A.  I did not.
6    Q.  Have you ever undergone any training for
7  psychology?
8    A.  Again, as I mentioned, that's part of what
9  internists do and part of your training in internal
10 medicine.
11   Q.  So as an internist, you received some
12 specific training relative to psychology?
13   A.  Oh, yes.
14   Q.  What specifically did you receive in the
15 way of training?
16   A.  That's 30 years ago, so it's going to be a
17 little hard for me to give you a lot of detail.  But
18 certainly we -- in a typical -- as you know, we
19 train using case methodology.  So you would always
20 discuss the psychological issues that face patients.
21 We would meet with psychiatrists.  In fact -- I'm
22 starting to remember a little bit more.  I remember,
23 in one of our patient services, we had a
24 psychiatrist permanently attached to the team on our

Page 51

1  rounds, to help give us -- to help give additional
2  training in psychiatric issues.
3    Q.  So you actually had a psychologist --
4    A.  A psychiatrist.
5    Q.  -- a psychiatrist that was part of the
6  group in the residency and participated in the
7  treatment of patients in the rounds; is that
8  correct?
9    A.  That's correct.
10   Q.  So you actually had a psychiatrist to offer
11 that assistance, someone who specialized in that
12 area, correct?
13   A.  I still see him sometimes.
14   Q.  After your residency, did you ever receive
15 any type of certification in psychiatry?
16   A.  No.
17   Q.  After your residency, did you ever receive
18 any type of certification in psychology?
19   A.  No.
20   Q.  Have you ever attended any CLEs on
21 psychiatry?
22   A.  You mean CMEs.
23   Q.  Right.
24   A.  But, sure.  If I look at my CME history

Page 52

13 (Pages 49 to 52)

Case 2:07-md-01873-KDE-MBN   Document 13602-6   Filed 04/23/10   Page 7 of 7

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel) — Lawrence G. Miller, M.D., M.P.H.

**Page 53**

1  over the years, some of them deal with psychological
2  issues.
3      Q.  Have you ever received any type of
4  accreditation in treating patients on psychological
5  issues?
6      A.  I'm not aware there is such a thing.
7      Q.  When you had privileges at Massachusetts
8  General Hospital, did you ever treat any patients
9  for psychiatric issues?
10     A.  Just to be clear, I still have my
11 affiliation there.  And, yes, I treated -- again,
12 just to say it again, it's a major part of internal
13 medicine.
14     Q.  And you treated patients for psychiatric
15 issues when those patients didn't have physical
16 problems or physical complaints?
17     A.  Sure.  Again, if it's one of your patients,
18 you take care of them, regardless of what their
19 problem is.
20     Q.  Let's talk about your practice -- or seeing
21 patients.  I think that's a better way to put it.
22 When you were seeing patients, you said your
23 practice was in internal medicine?
24     A.  More -- recently, yes.  In the past it was

**Page 54**

1  more pulmonary disease, but more general more
2  recently.
3      Q.  Fair enough.  In the earlier years you saw
4  more patients for pulmonary disease?
5      A.  Correct.
6      Q.  And then in more recent years -- would that
7  be from 1990 to 2005?
8      A.  Somewhere in the 1990s.  I can't give you a
9  strict cut-off.
10     Q.  -- you've treated patients as an internal
11 medicine doctor?
12     A.  That's correct.
13     Q.  Have you ever been referred patients for
14 psychiatric treatments?
15     A.  I don't think I -- no, I wouldn't be
16 referred parents.  I'm not a psychiatrist.
17     Q.  I understand.  Do you administer
18 psychological testing when you see a patient?
19     A.  Not beyond very simple testing, like a
20 mental status exam, no.  I mean, formal
21 neuropsychological testing, no.
22     Q.  What's a mental status exam?  Tell me about
23 that.
24     A.  It's just something that you commonly do in

**Page 55**

1  a patient for whom you are concerned about either --
2  a neuropsychiatric problem, just to understand basic
3  issues.  Are they oriented?  Are they able to think
4  clearly?  What's their cognitive function?  Very
5  routine examination.
6      Q.  Very routine examination for all doctors,
7  correct?
8      A.  Well, certainly for internists.  I can't
9  speak for the other specialties.
10     Q.  Does that involve just talking with the
11 patient to make sure the patient gets it?
12     A.  It's a series of questions.  Sometimes you
13 ask them to draw things, write things.
14     Q.  How many questions?
15     A.  It varies.  There's a different -- there
16 are different levels.  There's a mini mental status,
17 which is usually around a dozen questions, and
18 there's a more complex, which is probably about
19 twice that many.
20     Q.  Did you ask Ms. Castanel questions as part
21 of her mental examination?
22     A.  I did not.
23     Q.  Did you ask Ms. Castanel to draw anything
24 as part of a mental examination?

**Page 56**

1      A.  I did not.
2      Q.  Did you administer any type of
3  psychological tests for Ms. Castanel?
4      A.  No.
5      Q.  Have you ever administered psychological
6  tests to your patients?
7      A.  To be clear, there are such things as
8  formal neuropsychological tests, which I mentioned a
9  minute ago I do not administer and have not
10 administered.
11     Q.  Would those psychological tests be
12 important in rendering a diagnosis regarding any
13 psychological or psychiatric problems?
14     A.  Not in common situations, no.  They are
15 used for very complex situations.
16     Q.  What do you mean, in common situations?
17     A.  Common illnesses, like anxiety, depression,
18 those aren't used.
19     Q.  Did you read Dr. Shwery's report in this
20 case?
21     A.  I did.
22     Q.  Did you notice his psychological testing
23 that he did for Ms. Castanel?
24     A.  I noticed that it was performed.