# Exhibit "G"

# Transcript of the Testimony of
# Lawrence G. Miller, M.D., M.P.H.

**Date taken: March 11, 2010**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)**

**\*\*Note\*\***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

Case 2:07-md-01873-KDE-MBN   Document 13602-7   Filed 04/23/10   Page 3 of 6

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)    Lawrence G. Miller, M.D., M.P.H.

```
                                    Volume I
                                    Pages 1 to 135
                                    Exhibits 1 - 8
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
                            NEW ORLEANS DIVISION
        - - - - - - - - - - - - - - -x
        IN RE: FEMA TRAILER           :
            FORMALDEHYDE              :  MDL No. 1873
            PRODUCTS LIABILITY        :  Section: N(5)
            LITIGATION                :  Judge: Engelhardt
                                      :  Mag: Chasez
        EARLINE M. CASTANEL, ET AL.,  :
                Plaintiffs,           :
                                      :
                 vs.                  :  Docket No. 09-3251
                                      :
        RECREATION BY DESIGN, LLC,    :
        ET AL.,                       :
                Defendants.           :
        - - - - - - - - - - - - - - -x
            DEPOSITION OF LAWRENCE G. MILLER, M.D.,
        M.P.H., a witness called on behalf of the Defendant
        Recreation By Design, LLC, TL Industries, Inc.,
        Frontier RV, Inc., and Play-Mor Trailers, Inc.,
        taken pursuant to the Federal Rules of Civil
        Procedure before Carol H. Kusinitz, Registered
        Professional Reporter and Notary Public in and for
        the Commonwealth of Massachusetts, at the Offices of
        Seegel, Lipshutz & Wilchins, LLP, 20 William Street,
        Wellesley, Massachusetts, on Thursday, March 11,
        2010, commencing at 9:18 a.m.
        PRESENT:
            Reich & Binstock, LLP (by Jordan M. Torry, Esq.)
                4265 San Felipe, Suite 1000, Houston, TX
                77027      - and -
            (By Speakerphone)
            Reich & Binstock, LLP (by Dennis C. Reich, Esq.)
                4265 San Felipe, Suite 1000, Houston, TX
                77027, for the Plaintiffs.
            (Continued on Page 2)
                                                        Page 1
```

```
 1    PRESENT (Continued):
 2      Garrison, Yount, Forte & Mulcahy, L.L.C.
            (by Lyon Garrison, Esq.)
 3          909 Poydras Street, Suite 1800, New
            Orleans, LA 70112, for Recreation By
 4          Design, LLC, TL Industries, Inc., Frontier
            RV, Inc., and Play-Mor Trailers, Inc.
 5
        (By Speakerphone)
 6      Baker Donelson (by Karen Whitfield, Esq.)
            201 St. Charles Avenue, Suite 3600, New
 7          Orleans, LA 70170, for CH2M Hill
            Constructors, Inc., and Shaw Environmental,
 8          Inc.
 9      (By Speakerphone)
        Middleberg, Riddle & Gianna (by Tanya Henkels
10          Fields, Esq.) 717 North Harwood, Dallas, TX
            75201, for Fluor Enterprises, Inc.
11
        (By Speakerphone)
12      Willingham, Fultz & Cougill (by Thomas L.
            Cougill, Esq.) Niels Esperson Building,
13          808 Travis, Suite 1608, Houston, TX 77002,
14          for Jayco, Inc., and Starcraft RV, Inc.
15
16      (By Speakerphone)
17      Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
18          (by Kristopher M. Redmann, Esq.)
19          601 Poydras Street, Suite 2775, New
20          Orleans, LA 70130, for Liberty Mutual
21          Insurance Corporation.
22
23
24             * * * * *
                                                        Page 2
```

```
 1                        I N D E X
 2    WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
 3    Lawrence G. Miller, M.D., M.P.H.
 4    by Mr. Garrison    5
 5
 6
 7                        * * * *
                          E X H I B I T S
 8
      NO.      DESCRIPTION                        PAGE
 9
      1   Amended Re-Notice of Dr. Miller's        5
10        deposition
11    2   Lambert & Nelson CD, labeled "FEMA      11
          Trailer Formaldehyde Products
12        Liability Litigation,
          Castanel/Recreation By Design, LLC,
13        Trial 4, Medical Records, as of
          December 17, 2009"
14
      3   Lambert & Nelson CD labeled "In Re:     15
15        FEMA Trailer Formaldehyde Products
          Liability Litigation, Expert
16        Reliance File, Lawrence Miller,
          Bates CAST-MILLER-000001 through
17        CAST-MILLER-002003, 2-25-10"
18    4   Lambert & Nelson CD labeled, "FEMA      15
          Trailer Formaldehyde Products
19        Liability Litigation,
          Castanel/Recreation By Design, Trial
20        4, Expert Reports, Etc., From
          Defendants, Recreation By Design and
21        Shaw"
22    5   Dr. Miller's handwritten notes re       17
          articles in reliance file, 14 pages
23
24
                                                        Page 3
```

```
 1             E X H I B I T S, Continued
 2    NO.        DESCRIPTION                      PAGE
 3    6   Mr. Garrison's version of Dr.            22
          Miller's report, "Affidavit of
 4        Lawrence G. Miller, M.D., M.P.H., In
          the Trial of Earline M. Castanel"
 5
      7   Dr. Miller's Curriculum Vitae            26
 6
 7    8   Dr. Miller's version of his report,      87
          "Affidavit of Lawrence G. Miller,
          M.D., M.P.H. In the Trial of Earline
 8        M. Castanel"
 9
10                        * * * *
11
...
24
                                                        Page 4
```

1 (Pages 1 to 4)

Case 2:07-md-01873-KDE-MBN   Document 13602-7   Filed 04/23/10   Page 4 of 6

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel) Lawrence G. Miller, M.D., M.P.H.

**Page 29**

1  firm does, but, quite honestly, I don't like to
2  assume. What is it that Mediphase does?
3     A.  We invest in health care companies and try
4  to support those companies to make them successful.
5     Q.  And when you say invest, obviously that
6  means you put money into health care companies; is
7  that correct?
8     A.  That's correct.
9     Q.  Do you and your partner invest just your
10 own money, or do you solicit money from other
11 investors?
12    A.  This is primarily money from other
13 institutional investors.
14    Q.  So do you manage money from other
15 institutional investors?
16    A.  I guess "manage" is a pretty broad term,
17 but that's correct.
18    Q.  You give advice to institutional investors
19 as to what health care companies they should invest
20 in?
21    A.  We actually do the investing.
22    Q.  The actual trading?
23    A.  No, it's not trading, because these are
24 private companies. So they're not traded.

**Page 30**

1     Q.  I see. That's fair. So you actually do
2  the investing. You go in and you make the
3  investment and you finalize the investment; is that
4  correct?
5     A.  That's correct.
6     Q.  Does your company, Mediphase, have any
7  reporting requirements?
8     A.  In terms of the Securities & Exchange
9  Commission, you mean?
10    Q.  No. And that's a good follow-up question.
11 In terms of reporting to its clients?
12    A.  We report to our investors, yes.
13    Q.  So your company, Mediphase, actually sends
14 out statements to its investors?
15    A.  We do.
16    Q.  So you have a staff that prepares these
17 statements and sends them out on a regular basis?
18    A.  That's correct.
19    Q.  Do you go out and solicit investors to
20 become involved in your ventures?
21    A.  Occasionally.
22    Q.  So you have a set group of investors that
23 you have invested for over, what, ten, eleven years?
24    A.  That's correct.

**Page 31**

1     Q.  And they just -- I guess they return to you
2  if they like the results?
3     A.  We hope so.
4     Q.  Would this be a hedge fund?
5     A.  No, it's not a hedge fund.
6     Q.  Okay. And I'm still just trying to grasp
7  it. So I have a better appreciation of what it is.
8  Your involvement with Mediphase, it must be very
9  demanding?
10    A.  It often is, yes.
11    Q.  How many hours a week do you work for
12 Mediphase at this point?
13    A.  You know, I don't count them. Pretty much
14 all my time.
15    Q.  Ten years ago, was Mediphase taking all of
16 your time?
17    A.  A little bit less. It's gotten busier over
18 the years.
19    Q.  Has your role with Mediphase changed since
20 you started in 1999?
21    A.  It has not.
22    Q.  When you make recommendations to ongoing or
23 regular institutional investors, would it be fair to
24 say you really have to spend a lot of time

**Page 32**

1  researching?
2     A.  I think that's fair, yes.
3     Q.  Do you do the actual research?
4     A.  With others, yes.
5     Q.  So you're part of the research team as
6  well?
7     A.  Correct.
8     Q.  And you give investment advice?
9     A.  That's correct.
10    Q.  Have you ever been sued relative to your
11 involvement with Mediphase?
12    A.  No.
13    Q.  When you were still seeing patients, up
14 until five years ago -- let's go from 1999 to 2005;
15 let's look at that time period -- what percentage of
16 your work was involved in seeing patients?
17    A.  A small percentage. Probably no more than
18 10 percent.
19    Q.  Was there any specialty that you had?
20    A.  Internal medicine.
21    Q.  And did you treat particular types of
22 patients?
23    A.  No. I think broadly within internal
24 medicine.

Case 2:07-md-01873-KDE-MBN   Document 13602-7   Filed 04/23/10   Page 5 of 6

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)    Lawrence G. Miller, M.D., M.P.H.

```
 1    A.  Generally, but we often participated in the
 2  treatment as well.  As you know, there are often
 3  multiple physicians treating a given patient.
 4    Q.  Sure.  And as an internist, a doctor in
 5  internal medicine, would it be fair to say that for
 6  patients with cancer, you maintain the treatment for
 7  the patient overall, while a patient with cancer
 8  would see an oncologist for the specific treatment
 9  of cancer?
10    A.  Well, it's a little more -- it depends on
11  the type of cancer.  It's a little more complicated
12  than that.  If it's a type of cancer where I have
13  substantial experience, then I'll often be an
14  important part of the treatment team.
15    Q.  With an oncologist?
16    A.  Almost always with an oncologist these
17  days, sometimes with a surgeon.  It depends on the
18  cancer.
19    Q.  If there can be a surgery to cut out the
20  cancer, then you might treat -- in the past you may
21  have treated a patient with some type of cancer with
22  a surgeon?
23    A.  Correct.
24    Q.  But you don't try and treat or heal people
                                              Page 37
```

```
 1  exposure?
 2    A.  Not to my knowledge.  But the vast majority
 3  of times, virtually always, patients come to you
 4  with the illness, and you don't know necessarily
 5  what the cause of the cancer was.  They just present
 6  with cancer.
 7    Q.  And my question was, have you ever treated
 8  a patient with cancer as a result of formaldehyde
 9  exposure?
10    A.  I have to tell you, I don't know the
11  answer.
12    Q.  As far as you know, you haven't treated any
13  patients who had cancer as a result of formaldehyde
14  exposure?
15    A.  I don't know that I have.  I can't give you
16  an answer one way or the other.
17    Q.  And I read in one of the depositions, since
18  the early '90s, 80 to 90 percent of your work has
19  been on the business side of medicine, correct?
20    A.  That's correct.
21    Q.  And for the last five years, 100 percent of
22  your work has been on the business side of medicine?
23    A.  Well, not quite.  I still do a little bit
24  of teaching, but the vast majority, yes.
                                              Page 39
```

```
 1  with cancer without an oncologist or a surgeon?
 2    A.  I would say that's generally correct, yes.
 3    Q.  You would defer to an oncologist regarding
 4  the treatment of cancer, correct?
 5        MR. TORRY:  Objection to the form.
 6    A.  Probably with regard to the exact choice of
 7  medications in general, yes.
 8    Q.  You would defer to an oncologist with
 9  respect to someone's propensities to contract
10  cancer?
11        MR. TORRY:  Same objection.
12    A.  No, I would disagree with you there.
13    Q.  You would feel comfortable talking about
14  the propensities of someone to get cancer?
15        MR. TORRY:  Same objection.
16    A.  I would, yes.
17    Q.  Over an oncologist who specifically treats
18  patients for cancer?
19        MR. TORRY:  Objection to form.
20    A.  It depends on the cancer.  There are some
21  cancers where I believe I have expertise and others
22  where I do not.
23    Q.  Have you ever treated a patient who had
24  some form of cancer related to formaldehyde
                                              Page 38
```

```
 1    Q.  Have you ever been excluded from testifying
 2  by a judge?
 3    A.  Not to my knowledge.
 4    Q.  Have you ever been offered as an expert in
 5  cancer in front of a court?
 6    A.  I don't believe so.  I believe I've been
 7  offered as an expert in pharmacology, in toxicology,
 8  in pulmonary disease, internal medicine.  Obviously
 9  within some of those specialties, for example,
10  cancers occur.
11    Q.  Let's go to your report.  It's marked as
12  Exhibit 6.  I want to talk generally about your
13  report, and then we'll go through the details, if
14  that's okay?
15    A.  That's fine.
16    Q.  And that way we'll set some parameters.
17  And I can't promise, but maybe we'll streamline
18  this.
19        As I read your report, you offered
20  opinions, several opinions, but your two opinions
21  regarding Ms. Castanel's condition or conditions
22  are, one, you indicated an exacerbation of
23  rhinosinusitis; is that right?
24    A.  Rhinosinusitis.
                                              Page 40
```

Case 2:07-md-01873-KDE-MBN   Document 13602-7   Filed 04/23/10   Page 6 of 6

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)  Lawrence G. Miller, M.D., M.P.H.

## Page 69

1  She began to cry twice spontaneously during the
2  discussion, both times when mentioning cancer. She
3  doesn't believe that her appetite or weight has
4  changed significantly, and she does not believe her
5  sleep habits have changed."
6      Q.  Those are two specific findings or
7  comments, right?
8      A.  Well, when you're concerned about a patient
9  who has anxiety or depression, it's one of the
10 things you want to ask about, how it's affected
11 their other important functions.
12     Q.  Ms. Castanel is sleeping well, and she's
13 maintaining her weight?
14     A.  Well, I didn't say she was sleeping well.
15 I said her sleep habits haven't changed.  That's a
16 little different.
17     Q.  Well, the worry about cancer or living in a
18 FEMA trailer have not affected her sleeping habits;
19 is that correct?
20     A.  That's correct.
21     Q.  Let me ask you this:  Is it common for
22 people in their 70s to think about cancer?
23     MR. TORRY:  Object to the form.
24     A.  I don't think I could give you an answer to

## Page 70

1  that question as stated.  I certainly haven't seen
2  any data about it one way or the other.
3      Q.  I'm asking about your experience when you
4  did treat patients.
5      A.  You certainly see patients who are
6  concerned, but I don't -- in my experience, it's by
7  no means a majority.
8      Q.  So you never found that, as people get
9  older, they become more concerned about ailments
10 such as cancer?
11     A.  I think they become more concerned about
12 illnesses in general, but I don't recall seeing -- I
13 wouldn't say that you see -- that they become really
14 fearful.
15     Q.  All right.  You talked about her appetite
16 and weight.  Ms. Castanel told you that she felt
17 fatigued since living in the trailer; is that
18 correct?
19     A.  That's correct.
20     Q.  Do you know if she ever felt fatigued
21 before living in the trailer?
22     A.  We talked about it, yes, but as I say in
23 the next sentence, she literally used the word she
24 felt she was "frisky," and that was exactly her

## Page 71

1  term.  But she felt that she, since that time, had
2  become more -- well, as it's stated here, more
3  general fatigue, and then she gets tired faster.
4      Q.  And you described fatigue as a symptom, and
5  I'm just trying to understand the description of
6  that symptom.  Is that like being tired, fatigued?
7      A.  That's what it is.
8      Q.  Next paragraph, "Ms. Castanel also reports
9  'sinus trouble,'" and you have that in quotes.  Is
10 that the way Ms. Castanel described it to you?
11     A.  Right.  That was the term she used.
12     Q.  And Ms. Castanel told you about her history
13 of sinus problems?
14     A.  Correct.
15     Q.  And this is all -- this paragraph, it's all
16 the history given by Ms. Castanel, correct?
17     A.  In fact, the way my report is organized is,
18 the beginning is all specifically given -- reported
19 by Ms. Castanel, and then I discuss the medical
20 records subsequently.
21     Q.  Right.  And I just wanted to point that out
22 in the deposition.
23     And just run through for us what Ms.
24 Castanel's history was as far as sinus trouble.

## Page 72

1      A.  As I say here, she had had -- she described
2  her sinus problems before moving to the trailer as
3  usually mild.  And she had taken medication.  She
4  didn't recall which specific medications at the
5  time.
6      And after moving to the trailer, she
7  described her sinus problems -- symptoms as more
8  severe.  She described her headaches as severe.  She
9  had associated facial pressure.  She couldn't
10 breathe through her nose.  Episodes lasted several
11 days.  She said, after leaving the trailer, she had
12 similar episodes, although not as severe, primarily
13 the nasal congestion and the headache.  She wasn't
14 sure how often she got them since leaving the
15 trailer, but she thought it was several times per
16 month.
17     Q.  And that was Ms. Castanel's history to you?
18     A.  That's correct.
19     Q.  And "Ms. Castanel has a long history of
20 hypertension."  That's unrelated to living in a
21 trailer, correct?
22     A.  Correct.
23     Q.  All right.  Well, let's run through the
24 rest of your report.  Let's go down to the bottom.