# Exhibit "A"

# Transcript of the Testimony of
# Videotaped Deposition of Ronald J. French, M.D.

**Date taken: April 15, 2010**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)**

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:  504-529-5255
Fax:  504-529-5257
Email:  reporters@psrdocs.com
Internet:  www.psrdocs.com

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 3 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)    Videotaped Deposition of Ronald J. French, M.D.

## Page 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA


IN RE:  FEMA TRAILER      *   MDL NO. 1873
FORMALDEHYDE PRODUCTS     *
LIABILITY LITIGATION      *   SECTION "N"(5)
                          *
This Document Relates     *   JUDGE ENGELHARDT
to:  Earline Castanel,    *
et al v. Recreation       *   MAG. CHASEZ
By Design, LLC, et al,    *
Docket No. 09-03251       *
                          *
* * * * * * * *


         Videotaped Deposition of RONALD J.
FRENCH, M.D., 6123 Marquette Place, New
Orleans, Louisiana 70118, taken in the
offices of Garrison, Yount, Forte & Mulcahy,
LLC, 909 Poydras Street, Suite 1800, New
Orleans, Louisiana 70112, on Thursday, the
15th day of April, 2010.

APPEARANCES:

     REICH & BINSTOCK, L.L.P.
     (By:  Dennis C. Reich, Esquire)
     4265 San Felipe
     Suite 1000
     Houston, Texas  77027
         (Attorneys for the Plaintiffs)

     GARRISON, YOUNT, FORTE & MULCAHY, L.L.C.
     (By:  Lyon H. Garrison, Esquire)
     909 Poydras Street
     Suite 1800
     New Orleans, Louisiana  70112
         (Attorneys for the Defendant,
              Recreation by Design, L.L.C.)
```

## Page 2

```
APPEARANCES (continued):

WILLINGHAM, FULTZ & COUGILL
(By: Thomas L. Cougill, Esquire)
808 Travis Street
Suite 1608
Houston, Texas 77002-5709
     (Attorneys for the Defendants,
        Jayco, Inc. and Starcraft RV,
        Inc.)
     (Via Telephone)

MIDDLEBERG, RIDDLE & GIANNA
(By: Tanya Henkels Fields, Esquire)
717 North Harwood
Suite 2400
Dallas, TX 75201
     (Attorneys for the Defendant, Fluor
        Enterprises, Inc.)
     (Via Telephone)

BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ, PC
(By: Karen K. Whitfield, Esquire)
201 St. Charles Avenue
Suite 3600
New Orleans, Louisiana 70170
     (Attorneys for the Defendant, Shaw
        Environmental, Inc.)
     (Via Telephone)

VIDEOGRAPHER:

Kym Hawkins - PSR, Inc.
Legal Video Specialist

REPORTED BY:
     LYNN DeROCHE SIMMONS, CCR
     Certified Court Reporter
```

## Page 3

                     INDEX

                                              Page

EXAMINATION BY MR. REICH ......... 5



                *   *   *   *



                  EXHIBIT INDEX

                                              Page

Exhibit 1
  (Notice of Oral and Video-Taped
   Deposition of Dr. Ronald J.
   French, M.D.)

Exhibit 2
  (Impression Letter of Ronald J.
   French, M.D.) ................ 27

Exhibit 3
  (3/31/10 Operative Report) ..... 83

Exhibit 4
  (DVD of CT scan) ............... 84

## Page 4

                  S T I P U L A T I O N

     It is stipulated and agreed by and
between counsel for the parties hereto that
the deposition of the aforementioned witness
is hereby being taken for all purposes
allowed under the Federal Rules of Civil
Procedure, in accordance with law, pursuant
to notice;
     That the formalities of reading and
signing are specifically not waived;
     That the formalities of filing,
sealing, and certification are specifically
waived;
     That all objections, save those as to
the form of the question and the
responsiveness of the answer, are hereby
reserved until such time as this deposition,
or any part thereof, may be used or sought
to be used in evidence.
                 *   *   *
     LYNN DeROCHE SIMMONS, CCR, Certified
Court Reporter, in and for the State of
Louisiana, officiated in administering the
oath to the witness.

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 4 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Videotaped Deposition of Ronald J. French, M.D.

**Page 5**

```
 1         PROCEEDINGS
 2    THE VIDEOGRAPHER:
 3         Today is the 15th day of April,
 4    2010.  The time is approximately 9:17 a.m.
 5    This is the videotaped deposition of Dr.
 6    Ronald J. French, taken at the offices of
 7    Garrison, Yount, Lormand, Forte & Mulcahy,
 8    located at 909 Poydras Street, Suite 1800,
 9    New Orleans, Louisiana 70112, for the case
10    entitled FEMA Trailer Formaldehyde Products
11    Liability Litigation.
12         Would counsel please identify
13    themselves and which party they represent.
14    MR. REICH:
15         Dennis Reich, counsel for the
16    plaintiffs and on behalf of the PSC.
17    MR. GARRISON:
18         Lyon Garrison, attorney for
19    Recreation by Design.
20    RONALD J. FRENCH, M.D.,
21    after having been first duly sworn by the
22    above-mentioned court reporter, did
23    testify as follows:
24    EXAMINATION BY MR. REICH:
25    Q.   Good morning, Dr. French.  My
```

**Page 6**

```
 1    name --
 2    A.   Morning.
 3    Q.   -- is Dennis Reich.  I'll try to be
 4    as brief as possible.  Hopefully we'll be
 5    through by at least noon or so today.
 6         Have you ever served as an expert
 7    witness in a litigation matter before?
 8    A.   I have.
 9    Q.   On approximately how many
10    occasions?
11    A.   I -- I can't give you a number.
12    Q.   Any rough estimate?
13    A.   Probably two dozen.
14    Q.   All right.  And have you ever
15    provided a deposition in connection with a
16    formaldehyde case?
17    A.   No.
18    Q.   Do you have any expertise with
19    respect to the chemical formaldehyde?
20    A.   No.
21    Q.   Have you studied any literature
22    concerning health effects associated with
23    formaldehyde exposure?
24    A.   I have studied some.
25    Q.   All right.  And can you identify
```

**Page 7**

```
 1    the literature that you have reviewed in
 2    preparation for the work that you've done in
 3    this matter?
 4    A.   Well, I have a suitcase full of
 5    different articles which I have perused, a
 6    list of which I think is available.
 7    Q.   And can you tell me how you
 8    obtained the articles?
 9    A.   Yes.  They were afforded me by Mr.
10    Garrison, his firm.
11    Q.   You didn't do any original
12    research, did you?
13    A.   I did not.
14    Q.   You did not get on to a computer
15    and use search terms and try to identify --
16    A.   I did not.
17    Q.   -- articles that dealt with
18    particular issues pertaining to
19    formaldehyde?
20    A.   I did not.
21    Q.   Okay.  Did you review what is
22    called the ATSDR toxicological profile?
23    A.   Yes.  I believe I did.
24    Q.   And did you review any of the
25    articles that had been identified by an
```

**Page 8**

```
 1    expert named Gerald McGwin dealing with
 2    formaldehyde and respiratory effects?
 3    A.   I don't recall.
 4    Q.   Did you review any articles that
 5    dealt with exacerbation of respiratory
 6    conditions by exposure to formaldehyde?
 7    A.   I don't recall.
 8    Q.   Did you review any articles that
 9    dealt with formaldehyde and the development
10    of rhinitis?
11    A.   I did.
12    Q.   Did you review any articles
13    involving the relationship between
14    formaldehyde exposure and sinusitis?
15    A.   I don't believe I ran across any.
16    Q.   Did you review any articles that
17    dealt with formaldehyde exposure and
18    rhinosinusitis?
19    A.   No.
20    Q.   Do you have any expertise in the
21    field of epidemiology?
22    A.   No.
23    Q.   Do you have any expertise in the
24    field of toxicology?
25    A.   No.
```

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 5 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)  Videotaped Deposition of Ronald J. French, M.D.

1   Q. But you've given depositions in the
2 past five years?
3   A. Yes.
4   Q. And would you say you've given
5 what? Ten? Twelve depositions?
6   A. I think I said -- I pulled the
7 number two dozen out of the sky. That's
8 been over 40 years.
9   Q. That's what I figured.
10  A. Yeah.
11  Q. But over the past five years, what
12 do you think the number of depositions might
13 have been?
14  A. A couple.
15  Q. All right. Have you worked with
16 Mr. Garrison or his firm in the past?
17  A. No, I haven't.
18  Q. And how is -- how were you referred
19 to him or how was he referred to you?
20  A. I have several sons in the city and
21 one of them -- and I can't remember which
22 son it is. One of them is an acquaintance
23 of one of his partners. It's either a son
24 who is a doctor or a son who is a lawyer,
25 but I can't remember which of the boys is

Page 25

1 friendly with his colleague.
2   Q. So you have lawyers and doctors in
3 your family?
4   A. I do.
5   Q. Well, good for you. Now, you go
6 through this interview process with Ms.
7 Castanel. Are you contemporaneously
8 dictating notes or do you completely
9 interview her and then sit down and record
10 your impressions?
11  A. I -- I usually take notes --
12  Q. Okay.
13  A. -- during the -- during the
14 interview, but I try to make that as sketchy
15 as possible because I think it interferes
16 with your attention to the -- to the patient
17 and to the course of the -- of the history
18 taking. And I -- I follow it up by writing
19 the -- the story, the patient's story out
20 longhand and then either dictate or -- or
21 type the report myself.
22  Q. Now, since you're not an
23 occupational medicine physician or
24 toxicologist, I assume you don't do a
25 traditional environmental exposure

Page 26

1 assessment type of interview; correct?
2   A. Correct.
3   Q. And did you basically do the type
4 of interview that you normally do when you
5 see patients who have an ear, nose and
6 throat problem?
7   A. I do.
8   Q. Did you put your notes into any
9 form other than the expert witness report
10 that's been furnished to me which is Exhibit
11 No. 2?
12  A. I'm sorry. Would you repeat the
13 question?
14  Q. Yeah. Did you take the notes that
15 you had prepared during the course of
16 interviewing Ms. Castanel and record them in
17 any format other than what I have in front
18 of me, Exhibit No. 2?
19  A. Well, I did -- I have my
20 handwritten notes that I -- that I took from
21 which I -- I compiled the report.
22  Q. Now, I note, for example, on the
23 second page of Exhibit No. 2 I see what
24 appears to be your signature, Ronald French;
25 correct?

Page 27

1   A. Correct.
2   Q. With a date February 1, 2010; true?
3   A. True.
4   Q. That was the date of the actual
5 visit?
6   A. I don't recall whether that was the
7 date of the visit or that was the date --
8 Yes, I think it was the date of the visit.
9   Q. And you have listed impression and
10 you note a number of impressions. Were
11 those the impressions prepared
12 contemporaneous with the interview of Ms.
13 Castanel?
14  A. Correct.
15  Q. And let's go through these
16 impressions. The first one you note is
17 history of recurrent respiratory infections.
18 Did you form that opinion based upon your
19 interview of Ms. Castanel or her medical
20 records or a combination?
21  A. A combination.
22  Q. All right. Had you completed the
23 review of the medical records before you saw
24 Ms. Castanel?
25  A. Most of them.

Page 28

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 6 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                    Videotaped Deposition of Ronald J. French, M.D.

1  Q. Had you read Dr. Gautreaux's
2  medical records before you met with --
3  A. Most of them.
4  Q. -- Ms. Castanel? All right.
5  Report of x-ray evidence of acute right
6  maxillary sinusitis. Which x-ray are you
7  referring to?
8  A. It was an Ochsner -- an x-ray taken
9  at Ochsner, plain radiographs.
10 Q. And do you recall the approximate
11 date of that x-ray?
12 A. I believe it was early in 2010,
13 maybe late in 2009.
14 Q. Was there a report that accompanied
15 the x-ray?
16 A. Yes, there was. I think the report
17 was in Dr. Gautreaux's and Dr. Bowers'
18 medical records. They were not ordered by
19 Dr. Gautreaux but he had access to the
20 report.
21 Q. Was the only abnormality in that
22 x-ray on the right side, the right maxillary
23 sinus?
24 A. The -- There was right maxillary
25 sinusitis with a -- I believe there was a

Page 29

1  suggestion of a trace of clouding of the
2  right frontal sinus.
3  Q. What about the sphenoid sinus? Was
4  that visible on the x-ray?
5  A. They did not mention that in my
6  memory, in my recollection, that there was
7  any evidence of disease of the sphenoid
8  sinus.
9  Q. Let's go to your next impression,
10 acute respiratory infection, epidemic, at
11 this examination. Was epidemic your word or
12 did it appear somewhere in the medical
13 records?
14 A. No. That's what I call it.
15 Q. Okay.
16 A. That's -- That is --
17 Q. How would you define it the way you
18 use it?
19 A. An epidemic acute respiratory
20 infection is a cold.
21 Q. Did she present to you with a cold
22 at that time?
23 A. She had a cold.
24 Q. And by a cold would that be a viral
25 infection?

Page 30

1  A. Yes.
2  Q. Would any cold qualify as an
3  epidemic?
4  A. Yes.
5  Q. Let's go to the next item, history
6  of hypertension, glaucoma, chronic
7  dermatitis. Is the hypertension based upon
8  her historical blood pressure readings?
9  A. Correct.
10 Q. And what were her typical blood
11 pressure readings?
12 A. I can't -- I can't recall.
13 Q. But they were typically elevated?
14 A. Well, they were typically not
15 elevated because she was on antihypertensive
16 medication because she had had episodes
17 where her blood pressure had been out of
18 control where she presented in the emergency
19 room for treatment of same.
20 Q. At the time that she saw you, did
21 she have hypertension?
22 A. No.
23 Q. Did she have any evidence of
24 glaucoma at the time that she saw you?
25 A. I didn't -- I didn't check her eyes

Page 31

1  for pressure. I have no facility for doing
2  that.
3  Q. Had she been treated for
4  glaucoma --
5  A. Yes.
6  Q. -- to your knowledge? And had that
7  treatment been successful?
8  A. Yes.
9  Q. And chronic dermatitis, did she
10 have chronic dermatitis at the time that she
11 saw you?
12 A. I saw no evidence of it, but I
13 didn't -- I'm not a dermatologist and I
14 didn't do a dermatologic examination.
15 Q. So you don't purport to have any
16 expertise with respect to whether
17 formaldehyde can cause any type of
18 dermatitis, do you?
19 A. No.
20 Q. All right. Let's go to the next
21 item, history of sinus condition related to
22 residing in FEMA trailer. Was that
23 statement based upon her responses to
24 questions that you --
25 A. Yes.

Page 32

8 (Pages 29 to 32)

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 7 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Videotaped Deposition of Ronald J. French, M.D.

Page 37

1  Q. Were your patients who lived in
2  FEMA trailers predominantly African-
3  Americans?
4     MR. GARRISON:
5         If you know.
6     THE WITNESS:
7         I don't know.
8  EXAMINATION BY MR. REICH:
9     Q. Have you seen any statistics
10 regarding demographics such as race,
11 ethnicity, sex, and age of persons who've
12 lived in FEMA trailers?
13    A. No, I haven't.
14    Q. When people told you they lived in
15 trailers, did you make distinctions between
16 like mobile homes, trailers, park models,
17 etc.?
18    A. No.
19    Q. Do you know the difference between
20 a travel trailer and a mobile home?
21    A. Yes.
22    Q. And what is your understanding of
23 the difference?
24    A. A travel trailer is a mobile pulled
25 behind another vehicle, and a mobile home is

Page 38

1  something that is hauled somewhere and
2  permanently fixed or temporarily permanently
3  fixed.
4     Q. And are you aware of any such
5  distinctions in terms of length of occupancy
6  of travel trailers versus mobile homes?
7     A. No.
8     Q. Do you know anything about
9  ventilation system differences between
10 mobile homes and travel trailers?
11    A. No.
12    Q. Did you review the Center for
13 Disease Control July 2008 study concerning
14 519 randomly-selected travel trailers and
15 the formaldehyde levels that were measured
16 in those trailers?
17    A. I don't recall.
18    Q. Do you know anything about the
19 average formaldehyde levels in travel
20 trailers based upon any governmental
21 studies?
22    MR. GARRISON:
23        Object to the form.
24    THE WITNESS:
25        I have -- I have seen studies of

Page 39

1  average levels of formaldehyde in trailers.
2  EXAMINATION BY MR. REICH:
3     Q. Have you seen any medical
4  literature referencing levels of
5  formaldehyde in travel trailers? By medical
6  literature I'm talking about articles that
7  appear in the peer-reviewed medical
8  journals.
9     A. I don't recall.
10    Q. All right. Did you determine
11 whether there was a higher incidence of
12 respiratory complaints among those patients
13 of yours who lived in travel trailers versus
14 those who were not in travel trailers?
15    A. Did I determine whether there was a
16 difference?
17    Q. Yes.
18    A. There was not.
19    Q. And how did you make that
20 determination?
21    A. Well, there was a -- a body of
22 publicity during the post-Katrina era when
23 it was claimed that chronic -- that there
24 were more frequent and more severe
25 respiratory infections. In fact, it was

Page 40

1  even given a name, the Katrina cough. So
2  being the person who saw all acute
3  respiratory infections, my partners and I,
4  we decided to do a study to see whether
5  there was an increase -- whether that was
6  true, there was an increase.
7         And this is not a peer-reviewed
8  study, but it's an opinion that was
9  engendered by discussing with the other
10 otolaryngologists -- the other
11 otolaryngologists in the community as well
12 as my partners. And I think we have the
13 largest ENT practice in Orleans and
14 Jefferson Parish. And we found there was no
15 difference in our patients in the
16 post-Katrina year than there was in the
17 pre-Katrina year. Now, I realize that
18 comprises all people, both in house trailers
19 and out of house trailers, but we saw no --
20 no change in incidence of respiratory
21 infections.
22    Q. Now, tell me how you went about
23 constructing this study.
24    A. It was -- it was purely clinical.
25 It was what we all thought was the rate of

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 8 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Videotaped Deposition of Ronald J. French, M.D.

1  illness that we saw as compared the previous
2  year, and it is -- as I say, it's not a
3  peer-reviewed study but it was our
4  impression that -- We all had the same
5  impression and that was that things were no
6  different.
7      Q.  Was the study circulated?
8      A.  No.
9      Q.  Was --
10     A.  It was circulated by mouth.  We
11 talked about it.
12     Q.  It wasn't put in writing?
13     A.  No.
14     Q.  Was any data compiled?
15     A.  No.
16     Q.  So there was no data concerning
17 what the incidence of upper respiratory
18 infections was pre-Katrina versus
19 post-Katrina; correct?
20     A.  Correct.
21     Q.  So --
22     MR. GARRISON:
23        And do you mean written data?
24     MR. REICH:
25        Just as I used the word data.
                                      Page 41

1  EXAMINATION BY MR. REICH:
2      Q.  By data I'm referring to the
3  compilation of statistical material.
4      A.  I understand.
5      Q.  All right.  So basically you and
6  colleagues got together and had a
7  discussion.  Was this a formal discussion?
8  In other words, was there a meeting with an
9  agenda and different topics had been
10 assigned to different doctors?
11     A.  No.  It was largely -- it was
12 largely my curiosity that engendered the
13 study and it was an informal clinical
14 opinion, an observation, a sense, a feeling,
15 and -- but it was corroborated.  I didn't --
16 Neither -- neither of my partners felt any
17 differently than I did in that there was no
18 change.
19     Q.  Did you talk to people outside of
20 your clinic?
21     A.  Yes.
22     Q.  All right.  And tell me which
23 doctors contributed to --
24     A.  I can't remember the --
25     Q.  -- the formation of --
                                      Page 42

1      A.  -- other doctors I spoke to.
2      Q.  -- this opinion.
3      A.  They are people I ran into, but
4  I -- because I was curious, I would ask
5  people casually over lunch in the doctors'
6  dining room and other places about that and
7  they -- they corroborated my own opinion.
8      Q.  And tell me how you would define
9  the Katrina cough or Katrina syndrome.  What
10 would qualify a patient as one that would
11 have a Katrina cough or this, quote --
12     A.  Well, I think there was --
13     Q.  -- unquote, Katrina syndrome?
14     A.  I'm sorry I didn't make myself
15 clear.  I think there was no such thing as
16 the Katrina cough or Katrina syndrome.  I
17 think anybody who coughed after Katrina in
18 the jargon of the populous became a Katrina
19 cough.  It was just a cough.
20     Q.  So when you talked to your
21 colleagues, did you ask them about the cough
22 specifically?  Did you ask them about
23 sinusitis, rhinitis?  How -- how did you --
24     A.  The whole --
25     Q.  How did you --
                                      Page 43

1      A.  The -- the --
2      Q.  -- set it up?
3      A.  Among my partners,
4  otolaryngologists --
5      Q.  Right.
6      A.  -- we talked about things we see in
7  our practice which are the results of acute
8  upper respiratory infections.  The cough may
9  be part of it, but I specifically would ask
10 other people about the cough, the Katrina
11 cough, since there was a lot about it in the
12 press and even the newsmen were mentioning
13 it.  Interestingly enough, they quit talking
14 about it after a while, but there was -- you
15 know, in the time of the storm and after the
16 storm, there -- a lot of urban myths were
17 hatched and a lot of those urban myths got
18 media coverage such as the toxic nature of
19 the floodwaters and, of course, it was
20 nothing but spillage from the lake and from
21 the skies, perfectly safe, but it was -- it
22 was -- I heard it mentioned on the
23 television that it was a corrosive, toxic
24 soup.  I had to laugh because I walked
25 through it and I -- with my shoes off and I
                                      Page 44

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 9 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Videotaped Deposition of Ronald J. French, M.D.

**Page 45**

1 didn't notice any change of my skin. I'm
2 sorry. That's an aside. But I wanted to
3 mention that to say that I think that there
4 were a lot of urban myths and the Katrina
5 cough is one of them.
6     Q.  Do you know if a travel trailer
7 that has levels of formaldehyde emitting at
8 or above a hundred parts per billion for a
9 one-year period of time presents a healthy
10 environment?
11     MR. GARRISON:
12         Object to the form.
13 EXAMINATION BY MR. REICH:
14     Q.  You can -- you can respond.
15     A.  The question is, is it a healthy
16 environment to be in a trailer that emits a
17 level of formaldehyde at -- at one part per
18 million?
19     Q.  At .1 PPM.
20     A.  One -- .1 --
21     Q.  .1 PPM.
22     A.  -- parts per million?
23     Q.  Or 100 --
24     A.  100 parts per billion?
25     Q.  -- per billion. Right.

**Page 46**

1     A.  The -- I don't know whether that's
2 healthy or unhealthy. It is below the level
3 that is considered toxic in the things that
4 I have read. I don't know how to answer
5 whether something is healthy or unhealthy.
6     Q.  All right. And you have not read
7 the children's health study done by Columbia
8 University?
9     A.  I'm glad you asked me that again
10 because on reflection I may have read
11 through it in the pile of things that I have
12 read, but I don't recall the details of that
13 but --
14     Q.  All right.
15     A.  -- I think I may have read it.
16     Q.  Okay. To your knowledge, was that
17 a controlled type of study?
18     A.  I can't remember.
19     Q.  Okay. To your knowledge, were
20 criteria established for the selection of
21 individuals to be included in the study?
22     A.  I don't recall.
23 MR. GARRISON:
24     And let me object. If you have any
25 more questions about that, I'll ask that you

**Page 47**

1 show the study to the doctor.
2 MR. REICH:
3     Well, I'm testing his knowledge of
4 the --
5 MR. GARRISON:
6     I understand. He's already --
7 MR. REICH:
8     -- study.
9 MR. GARRISON:
10     -- testified.
11 MR. REICH:
12     But I can ask the questions.
13 MR. GARRISON:
14     I understand.
15 EXAMINATION BY MR. REICH:
16     Q.  All right. Have you ever done any
17 type of study that's been published in a
18 peer-reviewed journal?
19     A.  Type of study.
20     Q.  Yes.
21     A.  No. I have -- I have published in
22 the medical literature, but they were --
23 none of them were studies.
24     Q.  What type of articles have you
25 published typically?

**Page 48**

1     A.  Reports on procedures, laser
2 surgery, medical emergency devices that I --
3 that I have created.
4     Q.  Yeah. I noticed, for example,
5 you're affiliated -- Is it with a laser
6 manufacturing company in Israel?
7     A.  I was.
8     Q.  Okay. And what was the nature of
9 that product?
10     A.  I was the initial investigator for
11 the use of the carbon dioxide laser in
12 surgery of the upper respiratory tract in
13 the early '70s and the laser we used was
14 made first by American Optical and then
15 Laser Industries of Tel Aviv came on --
16 in -- on to the field with a laser and they
17 hired me as a consultant to help them with
18 the configuration of that -- of that laser.
19     Q.  And was this one of the early
20 technologies that was used for like sinus
21 surgeries?
22     A.  No. It was used for surgery of the
23 upper respiratory tract, the vocal cords --
24     Q.  Oh, I see.
25     A.  -- tonsils, tongue lesions, that

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 10 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)   Videotaped Deposition of Ronald J. French, M.D.

**Page 49**

```
 1  sort of thing.
 2     Q.  Okay.  Let me go back to this
 3  informal study that you and your colleagues
 4  apparently did.  Did you ever put anything
 5  in writing at all concerning whether there
 6  were any differences between upper
 7  respiratory tract health effects pre and
 8  post-Katrina?
 9     A.  No.
10     Q.  Did you ever have a meeting
11  scheduled where you specifically discussed
12  this issue?  In other words, you --
13     A.  No.
14     Q.  -- set a meeting and set an agenda?
15     A.  No.
16     Q.  Do you know what a cross-sectional
17  study is, a public health type of study
18  where you look at a controlled population,
19  one that may not be exposed or influenced by
20  a certain factor and another group of people
21  that were ostensibly exposed or influenced
22  by a certain factor?
23     A.  Yes.  I understand that.  A
24  controlled study.
25     Q.  Right.  You didn't do anything like
```

**Page 50**

```
 1  that at all --
 2     A.  No.
 3     Q.  -- in connection with the opinions
 4  that you formed based upon your impressions
 5  or observations of patients?
 6     A.  No.  This was purely done in my --
 7  in my evaluation of what I saw one year as
 8  to what I had seen the previous year.
 9     Q.  And you would agree that that type
10  of observation wouldn't make it into a
11  peer-reviewed medical journal; correct?
12     A.  Correct.
13     Q.  All right.  Now, you don't deny
14  that formaldehyde exposure can cause upper
15  respiratory tract injury, do you?
16     MR. GARRISON:
17         Object to the form.
18     THE WITNESS:
19         Some levels of formaldehyde
20  exposure can certainly cause damage to the
21  upper respiratory tract.
22  EXAMINATION BY MR. REICH:
23     Q.  Are you aware of any patients who
24  came to you and said, "I was exposed to
25  formaldehyde on the job.  I developed
```

**Page 51**

```
 1  headaches.  I became nauseous.  I feel sick.
 2  Is there anything that you can do to treat
 3  me?"
 4     A.  I don't recall anybody coming with
 5  that complaint.
 6     Q.  Okay.  Has anyone ever come to you
 7  with a specific complaint that they had been
 8  exposed to formaldehyde and wanted some type
 9  of treatment?
10     A.  I don't remember anybody like that.
11     Q.  Would a person who experiences some
12  type of exposure to formaldehyde and
13  believes they have been injured be more
14  likely to go to a pulmonologist than perhaps
15  an ear, nose and throat doctor?
16     A.  I can't say where they would --
17  where they would go.  Based upon the damage
18  that can -- can occur from formaldehyde
19  inhalation, logically it would be to an
20  otolaryngologist because the damage would
21  tend to be the nasal mucosa where it's
22  breathed in, but where a patient would go, I
23  don't know.
24     Q.  Did you look at any of the studies
25  by authorities such as Holmstrom?  Let's
```

**Page 52**

```
 1  begin with Holmstrom.  Did you review any of
 2  his studies on formaldehyde?
 3     A.  I don't remember.
 4     Q.  Okay.  Those are studies that deal
 5  with cellular changes, metaplasia,
 6  dysplasia --
 7     A.  I did --
 8     Q.  -- hyperplasia?
 9     A.  I did read studies, and they could
10  have been his, about dysplasia, chronic
11  changes in the mucus membrane of the -- of
12  the lining of the nasal mucosa.  They may
13  have been his.  I don't recall the name.
14     Q.  Do you recall the levels of
15  exposure for any of those studies dealing
16  with the nasal mucosa and cellular changes
17  associated with the exposure?
18     A.  I don't recall.
19     Q.  Now, if somebody has a chronic
20  history of sinusitis, can that sinusitis be
21  aggravated by certain types of upper
22  respiratory irritants?
23     A.  Yes.
24     Q.  And can formaldehyde cause an
25  exacerbation of sinusitis?
```

13 (Pages 49 to 52)

Case 2:07-md-01873-KDE-MBN   Document 13603-2   Filed 04/23/10   Page 11 of 11

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)  Videotaped Deposition of Ronald J. French, M.D.

**Page 101**

    A.  -- or something?  The -- You know,
I'm not an expert on this but I have perused
a lot of articles with differing opinions,
and the question of the nasopharyngeal
carcinoma to me is in question as to whether
it's even a valid -- a valid risk as a cause
of nasopharyngeal carcinoma.  And I've also
seen studies that both report that
leukemia -- certain kinds of leukemia can be
a result of formaldehyde exposure and others
that -- that question those findings.  Now,
as far as to the relative risk of each, I
can't answer.
    Q.  Are you aware of any studies that
have criticized the classification of
formaldehyde as a naso -- as a probable or
known human nasopharyngeal cancer that have
been funded by any organization other than
the Formaldehyde Council?
    A.  I don't know.  No.
    Q.  You don't consider yourself to be a
psychologist, do you?
    A.  No, I don't.
    Q.  Or a psychiatrist?
    A.  No.

**Page 102**

    Q.  And you're not trained in
psychiatry, are you?
    A.  No.
    Q.  Number 11, I'm not sure exactly
what you mean but let me read it and then
we'll talk about it.  Any upper respiratory
conditions which may be discovered or
present after the period of trailer
occupancy cannot be attributable to the
suggested exposures during the period of
same.  Can you elaborate on that statement?
    A.  Yeah.  What I was saying was that
after she left the alleged exposure to
formaldehyde, that any -- that there would
be no residual from that at the levels to
which she was exposed that would affect any
future problems that she might have.  In
other words, I did not think that the
formaldehyde in her trailer had anything to
do with her subsequent acute respiratory
infections.
    Q.  And do you believe that her
subsequent acute respiratory infections
after she left the trailer were either
virally or bacterially caused?

**Page 103**

    A.  I believe so, yes, but I have
several reasons to base that on but I
mentioned them before.  They were mainly Dr.
Gautreaux's conclusions and her responses to
his -- his treatment.
    Q.  Do you know whether formaldehyde
can make a person more susceptible to
bacterial infection?
    A.  I -- I can only speculate using
common sense that anything that is at a high
enough concentration to produce a -- a
significant change to the mucus membranes of
the nose could lead to the development of a
secondary complication in the form of a
bacterial complication, but there's
certainly no evidence of anything like that
in Ms. Castanel.
    Q.  And when you say there is no
evidence in Ms. Castanel, is that because
you did not see anything either in her
history or based upon your physical
observations and findings that showed that
she had any observable injuries?
    A.  Initially that was what I based my
conclusion on, but since -- subsequently

**Page 104**

there has been something that has been
particularly persuasive.  It was after this
report was written and it's an histologic
evaluation of the tissue removed from her
sinuses at the time of Dr. Gautreaux's --
Dr. Gautreaux's operation on her on March
the 31st.  The mucus membranes, which are
the structures that we know formaldehyde can
produce changes in, did not evidence any of
the post-formaldehyde exposure changes that
have been described.
    Q.  Now, how long after she had moved
out of the trailer were those histologic
observations made?
    A.  It's been a couple of years.
    Q.  Right.  And wouldn't you expect the
healing process to occur if she did have
these histological conditions?
    A.  I would.
    Q.  All right.  Because the
histological conditions that you've talked
about occur to the epithelial layer;
correct?
    A.  Correct.
    Q.  Which is the outer layer of tissue?

26 (Pages 101 to 104)