# Transcript of the Testimony of
# Alexis Mallet, Jr.

**Date taken: March 2, 2010**

**In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)**

***Note***
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

## Professional Shorthand Reporters, Inc.
Phone:   504-529-5255
Fax:   504-529-5257
Email:   reporters@psrdocs.com
Internet:   www.psrdocs.com

Case 2:07-md-01873-KDE-MBN   Document 13604-5   Filed 04/23/10   Page 2 of 3

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                           Alexis Mallet, Jr.

```
 1       A.  Wall cavities, ceiling cavities,
 2   floor cavities.
 3       Q.  Okay.  Do you rely upon, anywhere
 4   in your report, the results of Mr. Ritter
 5   like you did with Mr. LaGrange?
 6           MR. PINEDO:
 7               Objection, form.
 8           THE WITNESS:
 9               Yes, sir.  Or, I don't know that I
10   relied upon it, but our opinions coincided
11   as to what conditions existed.
12   EXAMINATION BY MR. MULCAHY:
13       Q.  What opinions coincided with
14   Mr. Ritter's?
15       A.  As it goes to the ventilation,
16   that there was an absence of mechanical
17   ventilation and that the infiltration was
18   occurring through unfiltered areas.
19       Q.  You hired Mr. Ritter to be your
20   HVAC expert, correct?
21       A.  On the mechanical system.
22       Q.  On the mechanical system itself
23   and on the operation of the mechanical
24   system, right?
25       A.  Yes, sir.
                                         Page 197
```

```
 1       Q.  I mean, he is a mechanical
 2   engineer, correct?
 3       A.  Mechanical and environmental.
 4       Q.  And you hired Mr. LaGrange to be
 5   your testing person as far as duct blaster,
 6   blower door and some thermal imaging,
 7   correct?
 8           MR. PINEDO:
 9               Objection, form.
10           THE WITNESS:
11               Right, he has those particular
12   toys.
13   EXAMINATION BY MR. MULCAHY:
14       Q.  And you hired Mr. Moore to be your
15   civil engineer regarding structural-type
16   issues, correct?
17           MR. PINEDO:
18               Objection, asked and answered.
19           THE WITNESS:
20               Yes.  And because I am not allowed
21   by licensing laws to perform calculations,
22   engineering-type calculations, so where
23   there is the potential for the need of that,
24   I bring in Mr. Ritter or Mr. Moore or
25   Mr. Hicks or one of my other engineers that
                                         Page 198
```

```
 1   I work with on metallurgy or soil or areas
 2   of that nature.
 3   EXAMINATION BY MR. MULCAHY:
 4       Q.  Sure.  Are you aware that
 5   Mr. Ritter ran the air conditioner and the
 6   fan as part of his examination of the
 7   air-conditioning system?
 8       A.  I don't remember.  I wasn't there
 9   that day.  I mean, I don't remember if I was
10   told that.
11       Q.  Do you have any readings in your
12   report regarding temperature and humidity
13   levels in the Castanel unit while you were
14   performing your inspection?
15       A.  Do I have them in my report?
16       Q.  Correct.
17       A.  No.  When we were doing those
18   tests, Mr. LaGrange took the temperature and
19   relative humidity readings and I think
20   Mr. Ritter -- Scott Daly with Mr. Ritter's
21   company took the temperature and relative
22   humidity readings with data loggers.
23       Q.  But you didn't personally think it
24   was necessary to put those results in your
25   report, correct?
                                         Page 199
```

```
 1       A.  No, because they were not material
 2   to the sections I dealt with.
 3       Q.  You said earlier, when Mr. Barrios
 4   was asking you questions, that negative
 5   pressure is a violation of standards.  What
 6   standards would those be?
 7       A.  ASHRAE, and I think the indoor air
 8   quality standards.
 9       Q.  Do you know if ASHRAE specifically
10   defines travel trailers as ASHRAE applying
11   to travel trailers?
12       A.  I think it is a generic standard
13   for living areas or structures in general.
14       Q.  Well, speaking of standards, I see
15   you have a section in your report, and you
16   have referenced many different types of
17   regulations and standards, it appears.
18           Well, let's go to your
19   conclusions.  I think you put it more
20   concisely there.  Under your first
21   conclusion, A, page 105, you have
22   "Recreation by Design was required to follow
23   at a minimum the FEMA specifications, the
24   ANSI" -- and what ANSI are you referring to?
25       A.  Eleven -- 119.2 or 119.5.
                                         Page 200
```

Case 2:07-md-01873-KDE-MBN   Document 13604-5   Filed 04/23/10   Page 3 of 3

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Castanel)                                    Alexis Mallet, Jr.

1  recall any e-mails from him.
2         In general, I have had only casual
3  conversations with Bill Scott on all of the
4  cases. He's kind of just -- it's kind of
5  like dealing with Stephen Smulski --
6  actually, I have had more conversation
7  exchanges with Smulski than Bill Scott.
8  Bill's mostly just casual conversation when
9  we're out on-site, and sometimes we
10 coordinate on protocol.
11     Q.  Did you ever talk with Mr. Bill
12 Scott about if he thought his test results
13 were low formaldehyde readings on what he
14 obtained at the Castanel unit?
15     A.  If I thought they were low?
16     MR. PINEDO:
17         Objection, form.
18 EXAMINATION BY MR. MULCAHY:
19     Q.  If Mr. Scott opined or mentioned
20 to you that he thought they were low
21 readings?
22     A.  No, sir.
23     Q.  Did anyone ever pass along that
24 type of information to you?
25     A.  No, sir.
                                      Page 33

1     Q.  Did you make a determination
2  regarding the readings that Bill Scott
3  received on formaldehyde levels?
4     A.  No, sir. Other than there was the
5  presence of formaldehyde.
6     Q.  Did you talk to Mr. Smulski about
7  that?
8     A.  No. About Bill Scott's findings?
9  Is that what you are asking?
10    Q.  Correct, yes.
11    A.  With Dr. Smulski?
12    Q.  Correct.
13    A.  No, sir.
14    Q.  With anyone else regarding
15 Mr. Scott's findings?
16        I'm asking a separate question.
17    A.  Right. No, sir. I only put that
18 in because I have had conversations with Dr.
19 Smulski. I didn't know if you were relating
20 them to Mr. Scott or not.
21    Q.  We will mark your draft invoice as
22 Exhibit 2.
23        Looking at your billing records,
24 from what you told me a little bit earlier,
25 I take it you have had several conferences
                                      Page 34

1  and meetings with Mr. Ritter, Mr. LaGrange
2  and Mr. Moore, correct?
3     A.  Yes. Without looking at the
4  record, I can tell you yes.
5     Q.  Are your findings based upon your
6  conferences with them encompassed in your
7  reports?
8     MR. PINEDO:
9         Objection, form.
10    THE WITNESS:
11        Yes, sir.
12 EXAMINATION BY MR. MULCAHY:
13    Q.  Have you met with anyone else on
14 this case to discuss the Castanel unit, the
15 construction of the Castanel unit; have you
16 met with anyone else on this case besides
17 those three individuals as far as
18 consultants?
19    MR. PINEDO:
20        Objection, form.
21    THE WITNESS:
22        Not that I can think of.
23 EXAMINATION BY MR. MULCAHY:
24    Q.  You have had several conferences
25 with plaintiffs' counsel regarding the
                                      Page 35

1  Castanel Unit?
2     A.  Yes.
3     Q.  Who have you primarily been in
4  touch with regarding the Castanel unit?
5     A.  I think mostly Mrs. Nelson because
6  she was doing the coordination of the
7  inspections and the reports and the
8  observations.
9         And then other than the warning
10 labels, I think Mr. Pinedo, just recently,
11 when he found out he was the one who was
12 going to be present at the deposition, at my
13 deposition.
14    Q.  Did you review any documents prior
15 to today's deposition?
16    A.  Just what is in my file.
17    Q.  Anything new document-wise that
18 you looked at that would not be in your
19 normal file materials?
20    MR. PINEDO:
21        Objection, form.
22    THE WITNESS:
23        I don't know what you mean by
24 "normal file materials."
25 EXAMINATION BY MR. MULCAHY:
                                      Page 36

9 (Pages 33 to 36)