# Transcript of the Testimony of **Brian Boyle**

**Date:** February 5, 2010

**Case:** In Re: FEMA Trailer Formaldehyde Products Liability Litigation

Printed On: February 22, 2010



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

EXHIBIT

3

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

- - - - - - - - - - - - - x

in re:  FEMA TRAILER          : MDL Number

FORMALDEHYDE PRODUCTS          : 07-1873

LIABILITY LITIGATION.          : Section N(5)

- - - - - - - - - - - - - :

THIS DOCUMENT RELATES TO:      :

LYNDON WRIGHT,                 :

        Plaintiff,          : Number 09-2977

    vs.                       :

FOREST RIVER, INC., et al., :

        Defendants.          :

- - - - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF BRIAN BOYLE

Washington, D.C.

Friday, February 5, 2 010

REPORTED BY:

    SARA A. WICK, RPR, CRR

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

| Page 2 | Page 4 |
|---|---|
| 1   Videotaped deposition of BRIAN BOYLE, called for | 1  APPEARANCES (continued): |
| 2  examination pursuant to Notice of Deposition, on | 2      CHARLES R. PENOT, JR., ESQ. |
| 3  Friday, February 5, 2010, in Washington, D.C., at | 3      Middleberg Riddle & Gianna |
| 4  the offices of Baker Donelson Bearman Caldwell & | 4      717 North Harwood, Suite 2400 |
| 5  Berkowitz, PC, 555 11th Street Northwest, Suite 600, | 5      Dallas, Texas 75201 |
| 6  at 9:07 a.m., before SARA A. WICK, RPR, CRR, a | 6      214-220-6334 |
| 7  Notary Public within and for the District of | 7      cpenot@midrid.com |
| 8  Columbia, when were present on behalf of the | 8      On behalf of Defendant Fluor Enterprises |
| 9  respective parties: | 9 |
| 10     FRANK J. D'AMICO, JR., ESQ. (via telephone) | 10     JASON D. BONE, ESQ. |
| 11     The Law Offices of Frank J. D'Amico, Jr. | 11     Gieger, Laborde & Laperouse, L.L.C. |
| 12     622 Baronne Street, Second Floor | 12     701 Poydras Street, 48th Floor |
| 13     New Orleans, Louisiana 70113 | 13     New Orleans, Louisiana 70139 |
| 14     504-525-7272 | 14     504-654-1325 |
| 15     fdamicojr@damicolaw.net | 15     jbone@glllaw.com |
| 16     On behalf of Plaintiffs | 16     On behalf of Defendant Forest River |
| 17 | 17 |
| 18         -- continued -- | 18         -- continued -- |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |

| Page 3 | Page 5 |
|---|---|
| 1  APPEARANCES (continued): | 1  APPEARANCES (continued): |
| 2      M. DAVID KURTZ, ESQ. | 2      KRISTOPHER REDMANN, ESQ. (via telephone) |
| 3      Baker Donelson Bearman Caldwell & | 3      Lugenbuhl, Wheaton, Peck, Rankin & Hubbard |
| 4      Berkowitz, P.C. | 4      601 Poydras Street, Suite 2775 |
| 5      201 St. Charles Avenue, Suite 3600 | 5      New Orleans, Louisiana 70130 |
| 6      New Orleans, Louisiana 70170 | 6      504-568-1990 |
| 7      504-566-5259 | 7      kredmann@lawla.com |
| 8      dkurtz@bakerdonelson.com | 8      On behalf of Defendant Liberty Mutual |
| 9      On behalf of Defendant Shaw Environmental | 9      Insurance |
| 10 | 10 |
| 11     HENRY T. MILLER, ESQ. | 11     JOSEPH G. GLASS, ESQ. (via telephone) |
| 12     CHELSEA CONANAN, ESQ. | 12     Duplass, Zwain, Bourgeois, Pfister & |
| 13     United States Department of Justice | 13     Weinstock |
| 14     Civil Division | 14     3838 North Causeway Boulevard, Suite 2900 |
| 15     Environmental Torts | 15     Metairie, Louisiana 70002 |
| 16     1331 Pennsylvania Avenue Northwest | 16     504-832-3700 |
| 17     Washington, D.C. 20004 | 17     jglass@duplass.com |
| 18     202-616-4223 | 18     On behalf of Defendant Gulf Stream Coach |
| 19     henry.miller@usdoj.gov | 19 |
| 20     On behalf of Defendant United States | 20         -- continued -- |
| 21 | 21 |
| 22         -- continued -- | 22 |

2  (Pages 2 to 5)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

| Page 6 | Page 8 |
|---|---|
| 1  APPEARANCES (continued): | 1      P R O C E E D I N G S |
| 2      THOMAS L. COUGILL, ESQ. (via telephone) | 2      VIDEO OPERATOR:  This is the deposition of |
| 3      Willingham, Fultz & Cougill LLP | 3  Brian Boyle, in re, FEMA Trailer Formaldehyde |
| 4      808 Travis Street, Suite 1608 | 4  Products Liability Litigation, MDL Number 07-1873, |
| 5      Houston, Texas 77002 | 5  in the United States District Court, Eastern |
| 6      713-333-7600 | 6  District of Louisiana. |
| 7      tomc@willingham-law.com | 7      This deposition is being taken at Baker |
| 8      On behalf of Defendants Jayco and | 8  Donelson Bearman Caldwell & Berkowitz, PC, 555 11th |
| 9      Starcraft RV | 9  Street Northwest, Washington, D.C.  The time is |
| 10 | 10  approximately 9:07 a.m.  The date is February 5th, |
| 11      A. J. KROUSE, ESQ. (via telephone) | 11  2010.  The court reporter is Sara Wick, with the |
| 12      Frilot L.L.C. | 12  firm of Ace-Federal Reporters.  I am the video |
| 13      1100 Poydras Street, Suite 3700 | 13  operator, Larry Flowers, also representing -- |
| 14      New Orleans, Louisiana 70163 | 14      MR. D'AMICO:  Guys, I may get |
| 15      504-599-8016 | 15  disconnected.  I may have to dial back in.  So give |
| 16      akrouse@frilot.com | 16  me a second here. |
| 17      On behalf of Defendant Bechtel National | 17      MR. MILLER:  Keep going. |
| 18 | 18      VIDEO OPERATOR:  -- also representing |
| 19      -- continued -- | 19  Ace-Federal, 616 H Street Northwest, Suite 550, |
| 20 | 20  Washington, D.C. 20001. |
| 21 | 21      Will counsel identify themselves and who |
| 22 | 22  they represent. |

| Page 7 | Page 9 |
|---|---|
| 1  APPEARANCES (continued): | 1      MR. KURTZ:  David Kurtz for Shaw |
| 2      KELLY M. MORTON, ESQ. (via telephone) | 2  Environmental, Inc. |
| 3      Garrison, Yount, Forte & Mulcahy, L.L.C. | 3      MR. PENOT:  Charles Penot for Fluor |
| 4      909 Poydras Street, Suite 1800 | 4  Enterprises, Inc. |
| 5      New Orleans, Louisiana 70112 | 5      MR. BONE:  Jason Bone for Forest River, |
| 6      504-412-7131 | 6  Incorporated. |
| 7      kmorton@garrisonyount.com | 7      MR. MILLER:  Henry Miller and Chelsea |
| 8      On behalf of Defendants Recreation by | 8  Conanan for the United States Department of Justice |
| 9      Design, TL Industries, Frontier RV, | 9  for Defendant Unites States of America. |
| 10      Play'Mor Trailers, and Cruiser RV | 10      MR. PENOT:  And also present in the room |
| 11 | 11  with me is Al Whitaker of Fluor Enterprises, Inc. |
| 12  Also Present: Al Whitaker | 12      VIDEO OPERATOR:  Will the court reporter, |
| 13      Larry Flowers, Videographer | 13  please, swear in the witness. |
| 14 | 14  Whereupon, |
| 15 | 15      BRIAN BOYLE |
| 16 | 16  was called as a witness and, having first been duly |
| 17 | 17  sworn, was examined and testified as follows: |
| 18 | 18      EXAMINATION |
| 19 | 19  BY MR. KURTZ: |
| 20 | 20  Q   Good morning, Mr. Boyle. |
| 21 | 21  A   Good morning. |
| 22 | 22  Q   Again, we met earlier, but my name is Dave |

3 (Pages 6 to 9)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

Page 10

1  Kurtz. I represent Shaw.
2       Have you ever given a deposition before,
3  sir?
4       A  I have.
5       Q  You probably know the basics. The one
6  thing I want to emphasize is to try to make sure
7  that you and I are on the same page with regard to
8  questions. If I ever ask you a question that for
9  any reason you don't understand, if I ask a poor
10  one, anything like that, can you, please, just let
11  me know so I can try to rephrase it?
12       A  Yes, sir.
13       Q  And you have to say yes or no for the
14  court reporter. That's another one of the issues.
15       A  Yes.
16       Q  Mr. Boyle, what is your current position?
17       A  I'm a program specialist for FEMA
18  Individual Assistance.
19       Q  And what does a program specialist for
20  FEMA IA do?
21       A  Everything. I work in the housing
22  operations.

Page 11

1       Q  Okay. Is that -- is DHOPS a division of
2  housing operations?
3       A  Yes.
4       Q  One of the other things, if we could try
5  to make an effort to let me finish a question before
6  you begin to answer, that will help the development
7  of the transcript.
8       Mr. Boyle, I understand you worked in
9  DHOPS following Hurricane Katrina; is that right?
10       A  Yes.
11       Q  Okay. What is DHOPS?
12       A  Disaster housing operations.
13       Q  And what does DHOPS do after a disaster
14  like Katrina? What is its purpose?
15       MR. MILLER: Objection; foundation.
16       BY MR. KURTZ:
17       Q  What do you understand the purpose of
18  DHOPS to be after a disaster like Katrina?
19       MR. MILLER: Objection; foundation. Go
20  ahead.
21       BY MR. KURTZ:
22       Q  In general, you can answer unless

Page 12

1  Mr. Miller instructs you --
2       MR. D'AMICO: Okay, guys. I'm back. I
3  had technical difficulties.
4       MR. KURTZ: Okay. Thanks, Frank.
5       BY MR. KURTZ:
6       Q  I will ask the question again. To your
7  understanding, what does DHOPS do following a
8  disaster like Hurricane Katrina?
9       MR. MILLER: Objection; foundation. Go
10  ahead and answer.
11       THE WITNESS: Oh, okay, all right. What I
12  understand it to be is that when we are -- hit the
13  ground after a disaster and we go through the PPI
14  process, we find out individuals or applicants or
15  survivors that are in need of temporary housing, and
16  we do the planning and the execution of temporary
17  housing.
18       MR. D'AMICO: Wait. I can hardly hear the
19  witness. For some reason, the speakerphone is
20  breaking up.
21       MR. MILLER: Frank, this is the best we
22  can do. I'm sorry. The speakerphone is right next

Page 13

1  to the witness, and it's as close as it's going to
2  get. I think what you're getting is electronic --
3       MR. D'AMICO: I'm hearing every other
4  word.
5       MR. MILLER: I'm sorry. That's all we can
6  do.
7       MR. D'AMICO: No, that is not working.
8       MR. MILLER: Frank, I'm sorry, but where
9  we have the speakerphone is where it has to be
10  situated, or else, it interferes with the
11  videographer's ability to record.
12       MR. D'AMICO: I can hear you now. Is
13  there any way we can put a mic into him or --
14       MR. MILLER: No. He's got a mic on him,
15  and we've got the speakerphone, Frank. This is it.
16       And this is the problem when you guys are
17  appearing by telephone. This is the risk that you
18  take. I'm sorry.
19       And the problem we have here, Frank, is
20  everyone's got to move on with this deposition
21  because they're trying to get out of here because of
22  the snowstorm.

4 (Pages 10 to 13)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

Page 14

1      MR. D'AMICO:  I understand; I understand.
2      MR. MILLER:  And I'm really sorry.  And I
3  don't think there's going to be much at this
4  deposition that you're really going to be concerned
5  about, but it's a problem, and I've had this problem
6  when I've tried to call in, and it's just what we
7  get stuck with.
8      MR. D'AMICO:  Okay.  Well, if we can get
9  the phone as close to him as possible, because I
10  really am hearing every other word.
11      MR. MILLER:  This is as close as we can
12  get it without having feedback loop interference on
13  the videotape.
14      MR. D'AMICO:  I appreciate it, Henry.
15      MR. MILLER:  Sure.  I'm sorry, Frank.
16      BY MR. KURTZ:
17  Q   Mr. Boyle, before we had that digression,
18  I believe you mentioned what DHOPS did, and in your
19  answer, you referred to the PPI process.
20      Did I hear you correctly?
21  A   Yes, you did.
22  Q   And what is the PPI process?

Page 15

1  A   Preplacement interview.
2  Q   Okay.  What does that entail?
3  A   It entails the applicants talking with our
4  applicant services representatives, and that's when
5  they find out what their plans to move forward.
6  Q   Plans with regard to housing?
7  A   Yes.
8  Q   Mr. Boyle, following Hurricane Katrina,
9  you worked with DHOPS in New Orleans; right?
10  A   Yes.
11  Q   What did you do for DHOPS in New Orleans
12  after Hurricane Katrina?
13  A   I worked special projects.
14  Q   And what does that mean?
15  A   That means, you know, I've done some field
16  inspections.  I've done whatever special projects --
17  an example of special projects would be, you know,
18  the cruise ship depopulation, which we had
19  applicants staying on cruise ships down in New
20  Orleans, and when the cruise ships's contracts were
21  up, we needed to make sure that they had temporary
22  housing to move back in to.

Page 16

1  Q   Mr. Boyle, were there other examples
2  besides the cruise ship depopulation of special
3  projects that you worked on while with DHOPS in New
4  Orleans?
5  A   What do you want?  Another example of
6  special projects?
7  Q   Yes, sir.
8  A   Okay.  I handled some congressional
9  inquiries.
10  Q   Okay.  Any other examples of special
11  projects come to mind, Mr. Boyle?
12  A   No.
13  Q   Okay.  When did you arrive in the New
14  Orleans area following Hurricane Katrina?
15  A   In the New Orleans area, I came down to
16  New Orleans at the end of September.  I hit
17  Louisiana September 5th of 2005, in or abouts that
18  date.
19  Q   Where were you stationed at first, sir?
20  A   Working out of Baton Rouge -- well, Baton
21  Rouge, I guess.
22  Q   And then it's your recollection that by

Page 17

1  the end of September you were down in New Orleans?
2  A   If I recall.
3  Q   Okay.  How long did you stay in New
4  Orleans working with DHOPS?
5  A   I think I left around, I want to say, June
6  of '06, in or abouts.
7  Q   Okay.  And Mr. Boyle, while you were with
8  DHOPS, its principal mission following Hurricane
9  Katrina was what?
10      MR. MILLER:  Objection; foundation.
11      THE WITNESS:  Temporary housing units.
12      BY MR. KURTZ:
13  Q   Getting temporary housing units to
14  disaster victims who needed some place to live;
15  right?
16  A   Yes, sir.
17  Q   Mr. Boyle, I've seen on some of your
18  e-mails on your signature block a title "QA
19  contractor liaison."
20      Do you recall that, sir?
21  A   Yes.
22  Q   What does that mean, "QA contractor

5 (Pages 14 to 17)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

Page 18

1  liaison"?
2      A    Quality assurance is QA, and contractor
3  liaison, I was pretty much an interface with the
4  contractors.
5      Q    Can you describe that, sir?
6      A    That I was an interface -- I interfaced
7  with the contractors on some DHOPS operations.
8      Q    Okay.  And by "contractors," you're
9  referring to Shaw, CH2M-Hill, and Fluor; correct?
10     A    Yes, sir.
11     Q    Okay.  You were in the area field office
12  in New Orleans; right?
13     A    Yes, sir.
14     Q    So you did not -- there were other area
15  field offices around the Gulf South that responded
16  to Hurricane Katrina; right?
17     A    Yes.
18     Q    Okay.  But your role was limited to the
19  New Orleans area field office during the September
20  through June '06 time frame?
21     A    Yes, sir.
22         MR. MILLER:  Hold on.  Objection;

Page 19

1  mischaracterizes the witness's testimony.
2         BY MR. KURTZ:
3      Q    When you say "interface with the
4  contractors," Mr. Boyle, what are you referring to?
5  What sorts of dialogue would you have, generally
6  speaking, with the contractors?
7         MR. MILLER:  Objection; compound.  Go
8  ahead.
9         THE WITNESS:  Okay.  The interface would
10  be that, you know, I would work with the Fluor or
11  the Hill or the Shaw people that were doing the
12  operations for the DHOPS mission.
13         BY MR. KURTZ:
14     Q    If you could explain in a little more
15  detail, Mr. Boyle, and what I'm trying to get at is
16  would you ask them to do certain tasks, or would you
17  respond to questions that they had about the tasks
18  that they were performing, or just can you elaborate
19  a little bit on what that interaction entailed?
20         MR. MILLER:  Hold on.  Objection;
21  narrative, vague.  Go ahead.
22         THE WITNESS:  It would be more of a

Page 20

1  coordination role.  I would have dialogue with them.
2  I would not direct the contractors, because that
3  wasn't our role.  I would get some feedback on where
4  they were on some progress with some units and, you
5  know, sit in meetings with them.
6         BY MR. KURTZ:
7      Q    How frequently would you meet with the
8  contractors?
9         MR. MILLER:  Objection; vague, time.
10         THE WITNESS:  I would deal with them --
11  face-to-face meetings?
12         BY MR. KURTZ:
13     Q    Yes, sir.
14     A    Face-to-face meetings, we used to meet
15  with them on Saturdays.
16     Q    Okay.  During the time that you were in
17  DHOPS, did you coordinate by e-mail and telephone
18  with the contractors as well?
19     A    Yes.
20     Q    And did that generally occur daily?
21     A    Yes.
22         MR. MILLER:  And what I'm going to ask is,

Page 21

1  Mr. Boyle, give a little bit of pause between
2  Mr. Kurtz's questions and yours, because you're
3  going to be overlapping, and it will make it
4  difficult for the court reporter to catch it all and
5  difficult for me to interject an objection if
6  appropriate.
7         THE WITNESS:  Understood.
8         MR. MILLER:  Thank you.
9         BY MR. KURTZ:
10     Q    Mr. Boyle, you mentioned that you
11  conducted some field inspections; right?
12     A    Yes.
13     Q    Okay.  What sorts of field inspections did
14  you perform?
15     A    I would perform whatever was tasked to me.
16  Mainly, there were congressionals.  If they would
17  come in, then they would ask me to go out there and
18  make sure it's a good field -- a good site
19  assessment.
20     Q    Would you inspect the completed state of
21  an emergency housing unit?  Was that a part of the
22  inspections that you performed?

6  (Pages 18 to 21)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

| Page 122 | Page 124 |
|---|---|
| 1 relates to the federal ship housing project; is that | 1    Q   And who was the person who was generating |
| 2 correct? | 2 these spreadsheets and providing them to you? |
| 3    A   Yes. | 3    A   It was either Stan or Leo. Mostly Stan. |
| 4    Q   And that federal ship housing project, | 4 Stan was the one, I think, compiling it all, but I |
| 5 that related to the depopulation of the cruise ships | 5 think Leo and Stan worked hand in hand. And when |
| 6 which had been used for temporary emergency housing; | 6 Leo wasn't around, Stan would it; When Stan wasn't |
| 7 is that correct? | 7 around, Leo would do it. |
| 8    A   Yes. | 8    Q   And by "Stan," are you -- |
| 9    Q   What type of persons were housed on the | 9    A   Sorry. |
| 10 cruise ships, as a general matter? | 10    Q   -- referring to Stanley Larson? |
| 11    A   As a general matter, you know, if I recall | 11    A   Yes. |
| 12 correctly, I heard it was city employees. It was -- | 12    Q   By "Leo," are you referring to Leo |
| 13 well, essential personnel is what I thought it was | 13 Baughman? |
| 14 supposed to be for. | 14    A   Yes. |
| 15    Q   And what is your understanding of why it | 15    Q   Baughman is B-a-u-g-h-m-a-n? |
| 16 became necessary in February of '06 to depopulate | 16    A   Yes. |
| 17 the cruise ships? | 17    Q   Were both of these persons FEMA employees? |
| 18    A   I think it was the contract was up, and | 18    A   Yes. |
| 19 they needed to pull out. | 19    Q   Did you do anything on your own to |
| 20    Q   Now, the spreadsheets that are attached to | 20 investigate or assess the accuracy of the |
| 21 Exhibits 4, 5, 6, 7, and 8, did you have any | 21 information contained in the spreadsheets that are |
| 22 responsibility for the actual preparation of those | 22 attached as Exhibits 4 through 8? |

| Page 123 | Page 125 |
|---|---|
| 1 spreadsheets? | 1    A   No. |
| 2    A   No, sir. | 2    Q   Now, I want to refer you to what is |
| 3    Q   Did you have any responsibilities for | 3 Exhibit Number 9, and this is the one-page document |
| 4 investigating or assessing the accuracy of the | 4 which is assigned Bates number SHAW 013510, and it's |
| 5 information contained in those spreadsheets? | 5 an e-mail from yourself to six persons who were |
| 6    A   No, sir. | 6 representatives, I believe, for the government ITAC |
| 7    Q   What was your role regarding those | 7 contractors Fluor, CH2M-Hill, and Shaw; is that |
| 8 spreadsheets? | 8 correct? |
| 9    A   That I would get it and I would send it up | 9    A   IATAC. |
| 10 to the powers that be. | 10    Q   The phrase "IATAC," does that refer to |
| 11    Q   Any other responsibilities relating to | 11 individual assistance technical assistance |
| 12 those spreadsheets other than forwarding it on to | 12 contractors? |
| 13 the powers that be? | 13    A   That's how I understand it. |
| 14    A   No. | 14    Q   And we at the government like acronyms, |
| 15    Q   And when you refer to "the powers that | 15 and we take that phrase and we refer to it as IATAC; |
| 16 be," are those the persons who you addressed your | 16 is that correct? |
| 17 e-mails to forwarding the spreadsheets? | 17    A   IATAC, yes, sir. |
| 18    A   Yes. | 18    Q   This first e-mail, Exhibit Number 9, is |
| 19    Q   And so those persons would be identified | 19 addressed to these IATAC contractor persons, and it |
| 20 in those Exhibits 4, 5, 6, 7, and 8; is that | 20 cc's Larry Woodruff as well; is that right? |
| 21 correct? | 21    A   That's correct. |
| 22    A   Yes. | 22    Q   And you're asking on behalf of a safety |

32 (Pages 122 to 125)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

Page 126

1  office. Do you see that in that first sentence?
2     A   Yes.
3     Q   What is your understanding as you sit here
4  today of whose safety office you're referring to?
5     A   According to this, it's safety in D.C.,
6  according to this e-mail.
7     Q   And is that FEMA's safety office in D.C.?
8     A   I would think.
9     Q   Who gave you the instruction -- to the
10 best of your knowledge, who gave you the
11 instructions to forward this request to the IATAC
12 contractors?
13    A   Larry Woodruff.
14    Q   Is any information that you've put into
15 this e-mail to the IATAC contractors, is that
16 information that was provided to you by
17 Mr. Woodruff?
18    A   Yes.
19    Q   Did you independently go out at any point
20 in time in March to assess whether there was some
21 formaldehyde problem in travel trailers?
22    A   No.

Page 127

1     Q   Were you aware prior to Mr. Woodruff
2  asking you to send this e-mail that there might be
3  some issue with formaldehyde in travel trailers?
4     A   I don't recall.
5     Q   Now, based upon the information that
6  counsel for Shaw and counsel for Fluor showed you,
7  the following exhibits, did you receive a response
8  from each of these IATAC contractors, Fluor, Shaw,
9  and CH2M-Hill?
10    A   Based upon the information that was
11 provided to me today, yes.
12    Q   And I want to go through that in a little
13 bit more detail, and let me ask you and refer you to
14 Exhibit Number 10, which is Bates stamped SHAW
15 013563 through 568.
16        Does that document, Exhibit 10, constitute
17 Shaw's response to your request for information?
18    A   As I hold it here in my hands today, yes.
19    Q   And this was also cc'd to Larry Woodruff;
20 is that correct?
21    A   Yes.
22    Q   Do you know what actions were taken by

Page 128

1  Mr. Woodruff in response to this information, if
2  any?
3     A   No, I do not.
4     Q   Do you know whether, in fact, this was
5  actually forwarded on to the FEMA safety office?
6     A   No, I do not.
7     Q   Do you believe, given that Mr. Woodruff
8  informed you that it was the FEMA safety office that
9  was requesting this information, that it would have
10 been forwarded on to the safety office?
11        MR. D'AMICO:  Objection; calls for
12 speculation.
13        BY MR. MILLER:
14    Q   To the best of your knowledge, would this
15 have been forwarded on to the FEMA safety office?
16    A   Yes.
17    Q   Now, counsel for Shaw went through this
18 document that was attached to Exhibit 10, and the
19 document that is attached is standard operating
20 procedures, and it's dated February 1st, 2006; is
21 that correct?
22    A   Yes.

Page 129

1     Q   And it says that the objective -- in 1.0
2  on that first page, SHAW 013564, it has "objectives.
3  This standard operating procedure (SOP) describes
4  the procedure that yard quality control (QC)
5  inspectors will perform to ensure that FEMA travel
6  trailers (TTs) that are staged at the yard are ready
7  for occupancy (RFO) prior to dispatching them to
8  private sites."
9         So at least as of March 21st, 2006, Shaw
10 had disclosed to you what their QC practices were
11 for RFO at their staging areas prior to delivering
12 them to a private site; is that correct?
13    A   According to this document, yes.
14    Q   And if you look at section 4.0, it sets
15 forth the procedures for that; correct?
16    A   Yes.
17    Q   And if you go through the procedures, it
18 has a section 4.1.1, a section 4.1.2; is that right?
19    A   Yes.
20    Q   And section 4.1.2 on page SHAW 013565
21 says "the unit is systematically checked to ensure
22 everything is working properly"; is that correct?

33  (Pages 126 to 129)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

Page 130

1      A   Yes.
2           MR. D'AMICO: Object to the extent that it
3    calls for conclusions on the part of a witness who
4    didn't have anything to do with the generation of
5    this document and would be beyond the scope of his
6    knowledge.
7           BY MR. MILLER:
8      Q   This is the information that Shaw provided
9    to you in response to your request; isn't that
10   correct?
11     A   Yes.
12     Q   As a matter of fact, if we now turn to the
13   next page, SHAW 013566, if you go to the second
14   bullet point there, do you see that?
15     A   Yes, I do.
16     Q   It says "leave the door open on the
17   trailer to vent the air"; is that right?
18     A   Yes.
19     Q   So in the procedures that Shaw had in
20   place to make the units ready for occupancy, their
21   QC people were instructed to leave the door open on
22   the trailers to vent the air; is that right?

Page 131

1      A   From what I'm reading in this document,
2    yes.
3      Q   And that's what they told the government
4    in response to your e-mail request for information;
5    is that right?
6      A   According to this document, yes.
7      Q   And counsel for Shaw went through the next
8    page of Exhibit Number 10, SHAW 013567, the yard QC
9    checklist; is that right?
10     A   Yes.
11     Q   In fact, if you go down to number 39 on
12   that page, it again has a place to check that the QC
13   person would check after they did it; correct?
14     A   Yes.
15     Q   That says, again, "leave door open on
16   trailer to vent. Lock door open using door cradle
17   handle"; is that right?
18     A   Yes.
19     Q   And then there's a line there for the
20   inspector to sign off. That would be a Shaw
21   inspector that would sign off according to this
22   document; correct?

Page 132

1      A   According to the document, correct.
2      Q   So at least as of March 21st when we
3    received this, FEMA was aware that Shaw, at least
4    Shaw had represented to FEMA that they were opening
5    up and venting the units prior to delivering them to
6    a priority site for occupancy; is that right?
7      A   Yes.
8      Q   Now, I want to ask you to turn to Exhibit
9    Number 11, which is Bates stamped SHAW 013521
10   through 538. Do you have that in front of you?
11     A   Yes, sir.
12     Q   And again, the first two pages of this
13   document, Exhibit 11, is an e-mail -- the original
14   e-mail from yourself to the six ITAC representatives
15   requesting the information on formaldehyde; right?
16     A   The IATAC, yes.
17     Q   The IATAC. I keep messing that up, and I
18   apologize. And the second e-mail that follows up is
19   from a Mike Falino; is that right?
20     A   Yes.
21     Q   And that is the response from CH2M-Hill to
22   your request for information; is that right?

Page 133

1      A   According to the way this e-mail is laid
2    out, yes.
3      Q   And Mike Falino, when he sent this to you,
4    also sent this to Larry Woodruff, Guy Bonomo; is
5    that correct?
6      A   Yes.
7      Q   And those, you had indicated earlier, were
8    supervisors in the DHOPS program in Louisiana; is
9    that right?
10     A   Yes, sir.
11     Q   It also has an individual, Louis Narciso.
12   Do you see that?
13     A   Yes.
14     Q   Do you know who that is?
15     A   Louie was the lead inspector for
16   Plaquemines Parish, and that's where Hill did --
17   yeah, he was an inspector for FEMA.
18     Q   And so Mr. Falino not only responded to
19   you and sent it to yourself, but he also sent it to
20   three other representatives of FEMA; correct?
21     A   Yes.
22     Q   In fact, since Larry Woodruff was the

34  (Pages 130 to 133)

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

| Page 134 | Page 136 |
|---|---|
| 1  person who had requested you to send this e-mail, | 1  are the e-mails, is, in fact, that document? |
| 2  Larry Woodruff got this response as well? | 2     A   I can't answer that. |
| 3     A   Yes. | 3     Q   You don't know one way or the other? |
| 4     Q   Now, what CH2M-Hill reported through | 4     A   No; exactly. |
| 5  Michael Falino is that they are currently airing out | 5     Q   The reason I ask is that if you turn to |
| 6  the TTs, travel trailers; is that correct? | 6  page 3 of Exhibit 11, SHAW 013523, it shows |
| 7     A   Yes. | 7  copyright 2010 at the very bottom. |
| 8     Q   And then it says "by turning on the AC and | 8        Do you see that? |
| 9  exhaust fans in the bathroom, the smell would just | 9     A   Yes, I do. |
| 10  about in all cases clear up in 24-hour period or in | 10     Q   And in addition, if you turn to page 4 of |
| 11  most cases less than 24 hours." | 11  this manual, SHAW 013526, it shows in the bottom |
| 12        So CH2M-Hill was reporting to FEMA in | 12  left-hand corner "ver. 3.0" as opposed to "ver. 4," |
| 13  March 20, 2006, that they were airing out the travel | 13  which is in Mr. Bonomo's e-mail; is that correct? |
| 14  trailers prior to issuing them to occupants; is that | 14     A   That is correct. |
| 15  correct? | 15     Q   So there is at least some indication that |
| 16     A   Yes. | 16  this may not have been the document that was |
| 17     Q   And in addition, they go on to say "we | 17  attached to the e-mails? It's unclear whether this |
| 18  also advise the occupants during the monthly PMI." | 18  is the document? |
| 19  Do you know what "PMI" refers to? Preventive | 19     A   Yes, it's unclear. |
| 20  medical inspection? | 20     Q   And you just don't know one way or the |
| 21     A   Yeah, preventive maintenance inspections, | 21  other? |
| 22  yes. | 22     A   Exactly. |

| Page 135 | Page 137 |
|---|---|
| 1     Q   "We also advise the occupants during the | 1     Q   Now, I want to ask you to go to Exhibit |
| 2  monthly PMI and in the maintenance manual (see | 2  Number 12 now, and we're moving on to Fluor's |
| 3  attached) to ventilate the TT," travel trailer, "to | 3  response to your e-mail, and this is the document |
| 4  control the buildup of moisture which will also help | 4  which is not Bates stamped. And it's a three-page |
| 5  reduce the level of off-gassing chemicals." | 5  document, and if we turn to the second page, the |
| 6        So in other words, they were also | 6  first e-mail covers the second page, second and |
| 7  instructing the occupants to vent out the travel | 7  third page; is that correct? |
| 8  trailers, weren't they? | 8     A   The original e-mail? |
| 9     A   Yes. | 9     Q   Yes. |
| 10     Q   And that's what they told FEMA they were | 10        MR. D'AMICO:  Henry, what Bates are you |
| 11  doing in March of 2006; is that correct? | 11  referring to? |
| 12     A   Yes. | 12        MR. MILLER:  There is no Bates. This is |
| 13     Q   Now, this manual that is attached to this | 13  the document which Charlie used. |
| 14  document, Exhibit 11, I had some questions about | 14        MR. D'AMICO:  I'm sorry. Which document |
| 15  this. You may or may not be able to answer it. But | 15  is that? |
| 16  the e-mail at the top from Guy Bonomo that you're | 16        MR. MILLER:  Exhibit Number 12. |
| 17  not on refers to a maintenance manual ver. 4, | 17        MR. D'AMICO:  What's the title to it? |
| 18  dclj.doc. | 18        MR. MILLER:  It's a series of e-mails. |
| 19        Do you see that? | 19        MR. D'AMICO:  Okay. I don't know that I |
| 20     A   Yes, I do. | 20  have them. That's Fluor e-mails? Okay. I don't |
| 21     Q   Do you know whether the document that is | 21  have them. Go ahead, Henry. |
| 22  attached to the first two pages of Exhibit 11, which | 22        MR. MILLER:  I will describe it so that I |

Brian Boyle - February 5, 2010
In Re: FEMA Trailer Formaldehyde Products Lia bility Litigation

| Page 138 | Page 140 |
|---|---|
| 1 think you will know what it is. | 1  A  No. |
| 2       BY MR. MILLER: | 2  Q  Do you know whether or not they ever |
| 3  Q  The first e-mail on the second and third | 3 forwarded anything relating to that or its findings |
| 4 page, that is your e-mail that you issued to the | 4 to FEMA? |
| 5 three contractors requesting information on | 5  A  No. |
| 6 formaldehyde; correct? | 6  Q  We would have to ask someone else or |
| 7  A  Yes. | 7 someone at Fluor whether they did that? |
| 8  Q  And that's the original e-mail that you | 8  A  Yes. |
| 9 sent out that we discussed earlier; correct? | 9  Q  Now, it says in the next paragraph there |
| 10  A  Yes. | 10 that "Fluor has its employees open the doors |
| 11  Q  What we have now is Fluor's response to | 11 whenever they are working inside." |
| 12 that e-mail; correct? | 12       What did you understand that to mean? |
| 13  A  Yes. | 13  A  Meaning that when their maintenance people |
| 14  Q  And Fluor's response is set forth on page | 14 were out -- the way I took this, when their |
| 15 1 of Exhibit 12; correct? | 15 maintenance people were out there, they leave the |
| 16  A  Yes. | 16 door open while they're in there performing their |
| 17  Q  And that is from a Richard Belote, and | 17 maintenance. |
| 18 it's dated March 21st, 2006, at 6 p.m.; is that | 18  Q  And so at least there was some airing out |
| 19 correct? | 19 of the unit prior to its issuance to the occupants? |
| 20  A  Yes. | 20  A  That's how I would take it. |
| 21  Q  And Mr. Belote sent that response to | 21  Q  And this information, would you have |
| 22 yourself and Steven Miller; is that right? | 22 forwarded this on to Larry Woodruff? |

| Page 139 | Page 141 |
|---|---|
| 1  A  Yes. | 1  A  Yes. |
| 2  Q  And he also cc'd almost everyone else at | 2  Q  And why? |
| 3 Fluor? I'm being a little facetious, but basically, | 3  A  Because he asked me -- he was the one that |
| 4 there's a long list of about maybe 15, 20 persons at | 4 requested it in the beginning. |
| 5 Fluor who were cc'd as well; is that right? | 5  Q  So within one or two days of you issuing |
| 6  A  He's got his bases covered, correct. | 6 the request to the contractors who were working in |
| 7  Q  And what Mr. Belote informed you is "the | 7 Louisiana, you received responses from each of them; |
| 8 short time frame required for this response preclude | 8 is that correct? |
| 9 our normal hazard evaluation and analysis process. | 9  A  Yes. |
| 10 This process is being undertaken now to evaluate any | 10  Q  And to the best of your knowledge, that |
| 11 potential health hazard to Fluor employees and its | 11 information was forwarded on to Larry Woodruff and |
| 12 subcontractors." | 12 the FEMA safety office? |
| 13       So Fluor informed FEMA that it was now at | 13  A  To the best of my knowledge, it was |
| 14 that point in time performing a hazard evaluation | 14 forwarded on to Larry and the safety office -- well, |
| 15 and analysis; is that right? | 15 I can say to the best of my knowledge, I know it was |
| 16  A  That's what I'm reading in the e-mail, | 16 forwarded on to Larry. |
| 17 yes. | 17  Q  And given that Larry had indicated to you |
| 18  Q  Do you know whether or not they ever | 18 that this was the FEMA safety office requesting this |
| 19 completed that health analysis? | 19 information, do you think it's reasonable to expect |
| 20  A  No. | 20 it would have been forwarded to the safety office? |
| 21  Q  Do you know whether -- did you ever | 21  A  Yes. |
| 22 receive that health analysis? | 22  Q  Now, I want to turn to Exhibit Number 3, |

36  (Pages 138 to 141)