UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


*******************************************************************

IN RE:  FEMA TRAILER
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION
                          DOCKET MDL NO. 1873 "N"
                          NEW ORLEANS, LOUISIANA
                          TUESDAY, MARCH 16, 2010, 8:30 A.M.

THIS DOCUMENT RELATES TO:

   *FOREST RIVER INC., ET AL*,
   DOCKET NO. 09-2977

*******************************************************************


                    **DAY 2, MORNING SESSION**
                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
                    UNITED STATES DISTRICT JUDGE



APPEARANCES:


FOR LYNDON T. WRIGHT:   LAW OFFICES OF FRANK J. D'AMICO, JR.
                        BY:  FRANK J. D'AMICO, JR., ESQUIRE
                             AARON Z. AHLQUIST, ESQUIRE
                        622 BARONNE ST.
                        NEW ORLEANS, LA 70113


                        REICH & BINSTOCK
                        BY:  DENNIS C. REICH, ESQUIRE
                        4265 SAN FELIPE, SUITE 1000
                        HOUSTON, TX  77027


                        CHRIS PINEDO
                        ATTORNEY AT LAW
                        802 N. CARANCAHUA, SUITE 2250
                        CORPUS CHRISTI, TX  78470

1    APPEARANCES:   (CONTINUED)

2

3                                 NEXSEN PRUET
                                  BY:  PAUL A. DOMINICK, ESQUIRE
4                                 P.O. BOX 486
                                  CHARLESTON, SC 29402
5

6

7    FOR FOREST RIVER,
     INC.:                        GIEGER, LABORDE & LAPEROUSE
8                                 BY:  ERNEST P. GIEGER, JR., ESQUIRE
                                       JASON D. BONE, ESQUIRE
9                                      CARSON W. STRICKLAND, ESQUIRE
                                  701 POYDRAS STREET, SUITE 4800
10                                NEW ORLEANS, LA 70139

11

12   FOR SHAW ENVIRONMENTAL,
     INC.:                        BAKER DONELSON BEARMAN CALDWELL &
13                                BERKOWITZ
                                  BY:  M. DAVID KURTZ, ESQUIRE
14                                     ROY C. CHEATWOOD, ESQUIRE
                                       KAREN K. WHITFIELD, ESQUIRE
15                                201 ST. CHARLES AVENUE, SUITE 3600
                                  NEW ORLEANS, LA  70170
16

17

18   ALSO PRESENT:                DOUGLAS SCHMIDT, ESQUIRE
                                  DOUGLAS GAEDDERT
19

20
     OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RMR, CRR
21                                500 POYDRAS STREET, ROOM B406
                                  NEW ORLEANS, LA  70130
22                                (504) 589-7779

23   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
24

25

1                           **I N D E X**

2

3    Examinations                                    Page

4

5    **BOBBIE WRIGHT** (CONTINUED)........................... 294

6    CROSS-EXAMINATION BY MR. GIEGER (CONTINUED)........... 294

7    CROSS-EXAMINATION BY MR. CHEATWOOD.................... 301

8    REDIRECT EXAMINATION BY MR. REICH.................... 313

9    REDIRECT EXAMINATION BY MR. REICH.................... 313

10   **KENNETH LAUGHERY, PH.D.**............................. 316

11   VOIR DIRE EXAMINATION BY MR. PINEDO.................. 317

12   DIRECT EXAMINATION BY MR. PINEDO..................... 317

13   CROSS-EXAMINATION BY MR. GIEGER...................... 332

14   CROSS-EXAMINATION BY MR. KURTZ....................... 339

15   REDIRECT EXAMINATION BY MR. PINEDO.................. 340

16   **DR. CHRISTOPHER DEROSA** VIDEOTAPED DEPOSITION........... 349

17   PLAINTIFF'S PROFFER NUMBER 1......................... 412

18   **KENNETH LAUGHERY, PH.D.**............................. 412

19

20

21                        **E X H I B I T S**

22   Description                                     Page

23

24   PLAINTIFF'S PROFFERED EXHIBIT 1....................... 421

25

1                          P-R-O-C-E-E-D-I-N-G-S

2                        M O R N I N G   S E S S I O N

3                            MARCH 16, 2010

4                       (COURT CALLED TO ORDER)

5

6

7            THE DEPUTY CLERK:  All rise.

8            THE COURT:  Good morning.  You may be seated.

9                 Before we bring the jury in to start today's

10   testimony, I would like to take care of a couple of housekeeping

11   matters, pending matters.

12                One, there was a motion filed yesterday evening

13   regarding the deposition testimony of Christopher DeRosa, which

14   is Document No. 12904.  It was filed by the plaintiffs, and I

15   understand that that motion has been withdrawn, or you would like

16   to withdraw the motion, and if that's correct, I'll go ahead and

17   deny it as moot.

18                Is that correct, Counsel?

19            MR. D'AMICO:  Yes, Your Honor.

20            THE COURT:  So 12904 is denied as moot.

21                I also have a Motion in Limine, which, as per my

22   request, was filed yesterday evening by defendant Shaw to exclude

23   testimony of Paul Hewett, Ph.D.  I did receive the motion timely,

24   as of last night, and I also received the opposition last night

25   and have had the chance to review it.

1          And having done so, I'm going to deny that motion

2   largely for the reasons that I stated yesterday or concerns I

3   expressed yesterday which are recited in the plaintiff's

4   opposition as well.  The issue of using a statistical analysis

5   has been present in this case very early on.  I hesitate to use

6   the overused phrase "since day one," but early on, it was made

7   known that the plaintiffs in this case were going to use a

8   statistical analysis, and that statistical analysis would use

9   sampling and tests that were done on a wide variety of units over

10  a long period of time.

11          My understanding is that Mr. Hewett, or

12  Dr. Hewett -- I don't want to be disrespectful to him if he's a

13  doctor.  Some of these people I may be calling "Mr." when they

14  refer to be called "Dr."  But at any rate, my understanding is

15  that his analysis is based upon a variety of sampling from a

16  variety of sources, and the issue with regard to whether counsel

17  was present for that testing is certainly one that was apparent

18  when we discussed the statistical sampling that the plaintiffs

19  intended to employ.

20          Also, the Court had set deadlines for raising

21  *Daubert* attacks or attacks on methodology of experts.  The issue

22  was not raised then.  Dr. Hewett was deposed on or about

23  December the 9th, if I'm not mistaken, and his report was

24  submitted, I believe, in October of 2009.  The report for this

25  case was submitted October 2nd of 2009.  His deposition was taken

1  on or about December 2nd of 2009.

2          So there has been plenty of time to raise this

3  issue.  I'm not certain of the plaintiff's argument about

4  Dr. Hewett's attempts to do subsequent work that was the basis

5  for a supplemental opinion the Court has excluded, but I think at

6  this point, that's beside the point in terms of denying the

7  Motion in Limine.

8          So I'm going to deny the Motion in Limine that Shaw

9  has filed relative to Dr. Hewett's testimony.

10          Where is Ms. Wright?  There she is.

11          Ms. Wright, if you would come on up.  Maybe you can

12  make your way up here before the jury comes in.  You might have a

13  little more room here.

14          When Ms. Wright gets up here, before she sits down,

15  we can all rise for the jury to enter.

16          Counsel, I'll remind you to please be concise and

17  efficient in your questioning.  We have a lot of ground to cover

18  today, so we need to be very conscious of how long things take.

19  Let's try to be efficient.

20          Let's bring the jury in.

21          Good morning, ma'am.

22      THE WITNESS:  Good morning.

23      THE COURT SECURITY OFFICER:  All rise.

24      (WHEREUPON, at this point in the proceedings, the jury

25  panel enters the courtroom.)

1          THE COURT:  Good morning.  You may be seated.

2               First of all, let me thank all of the jurors for

3     being here on time and ready to proceed.  I've had some

4     additional conversations with the attorneys and I think we have a

5     road map of what we want to accomplish today.  I told you

6     yesterday that I thought the pace would pick up today, and from

7     what they have told me, I feel confident that that will be the

8     case.

9               When we left off yesterday, Mr. Gieger was

10    questioning Ms. Wright, so we're going to pick up with his

11    cross-examination, and then if Shaw has any additional questions,

12    we'll allow counsel for Shaw to ask questions, and we'll come

13    back with a redirect and then we'll take the next witness.

14               Mr. Gieger.

15               CROSS-EXAMINATION (Continued)

16    BY MR. GIEGER:

17    Q.   Morning, Mrs. Wright.

18    A.   Good morning.

19    Q.   I only have a few more questions.

20               So I understand from your testimony that after Katrina,

21    you moved to Houston and you've stayed there most of the time

22    post-Katrina, correct?  After Katrina, you stayed basically in

23    Houston?

24    A.   Yes.

25    Q.   But from time to time, you have come back to New Orleans,

1  correct?

2  A.   Yes.

3  Q.   And from time to time, you have, in fact, stayed in the

4  trailer where your son lived for a period of time, correct?

5  A.   Right.

6  Q.   Sometimes for a day or two, sometimes, like, for almost a

7  month, correct?

8  A.   Yeah, or longer, yeah.

9  Q.   Yes, ma'am.  Right?

10  A.   Right.

11  Q.   And during this time, I think one of them was during the

12  summer months, correct?

13  A.   Yes.

14  Q.   And during that time in the summer months, they ran the

15  air-conditioner, right?

16  A.   Right.

17  Q.   And I think you told us in deposition that you didn't fool

18  with the thermostat, but you knew the air-conditioner was on,

19  right?

20  A.   Yes.

21  Q.   And during the times of those summer months when the

22  air-conditioner was on, it ran just fine, right?

23  A.   When it was on, yeah, it ran fine.

24  Q.   It cooled the unit?

25  A.   Uh-huh (affirmative response).

1   Q.    You had no problems, right?

2   A.    No.  Not that I could tell.

3   Q.    But also, I think you told us that sometimes when you were

4   in the unit, they would open the windows to let fresh air in,

5   right?

6   A.    Right.

7   Q.    So there was ventilation, right?

8   A.    Uh-huh (affirmative response).

9   Q.    And the ventilation was good, it changed the air of the

10  unit, right?  There was air coming in the unit from the windows

11  because they were open?

12  A.    I suppose, yeah.

13  Q.    Mrs. Wright, I think you told us that your son told you

14  about some medical issues that he had while he was in the

15  trailer.  You talked to us about that yesterday, right, that he

16  told you he had some medical issues, problems?

17  A.    Yes.  Right.  Sinus.

18  Q.    Did you tell him that you thought he should go to the

19  doctor?

20  A.    Yeah, I told him to go to the doctor.

21  Q.    Did he ever come back and tell you the doctor said, "Yeah,

22  the trailer was making me sick" -- him sick?  Did he ever tell

23  you that?

24  A.    No.  No.

25  Q.    And at some point in time, you told Lyndon, "Hey, you ought

1  to just move out of that trailer," right?

2  A.   Not necessarily like that, no.

3  Q.   Didn't you say, "I told him, I said, 'You need to get out of

4  there'"?

5  A.   No, I don't think I said that.  I may have said that.  I

6  don't know.

7  Q.   Well, if you told us in your deposition when we asked you

8  did you make a recommendation to him, and you said, "I told him,

9  I said, 'You need to get out of there,'" does that sound like

10  what you told us before?

11  A.   Not really, no.

12        MR. GIEGER:  Judge, I can show her my highlighted copy

13  first if you'd wish me to do that.

14        THE COURT:  Show her page and line number.

15        THE WITNESS:  I don't remember saying that.

16        THE COURT:  One second, Mrs. Wright.  He's going to get

17  back to you on that question.

18           Advise counsel of the page and line, and then you

19  may show it to Ms. Wright, give her a chance to review it, and

20  then we can ask the next question.

21        MR. GIEGER:  Page and line is 102, line 13 to 102, line

22  22.

23           May I approach, Your Honor?

24        THE COURT:  Sure.

25                       EXAMINATION

 1  BY MR. GIEGER:

 2  Q.   Does that help you?  You can see it?

 3  A.   Uh-huh (affirmative response).

 4  Q.   Do you see where in your deposition you were asked the

 5  question, "So you actually made the recommendation to him when he

 6  complained about that?"  And your answer, "I told him, I said,

 7  'You need to get out of there.'"

 8           Does that refresh your recollection of that's what you

 9  told us in the deposition?

10  A.   No, this don't sound -- I don't know.  Do you have this

11  right here?  I don't know.

12  Q.   Do you remember being asked that question and giving me that

13  answer?

14  A.   Made a recommendation to get out of there.  No.  No, not at

15  all.

16           THE COURT:  We need to make certain that we can hear

17  you, Ms. Wright.  Have you had a chance to look at what

18  Mr. Gieger has shown you?

19           THE WITNESS:  I looked at this, but I don't -- "I told

20  him to get out of there."

21                              EXAMINATION

22  BY MR. GIEGER:

23  Q.   Is that what you told me during your deposition, ma'am?

24  Does that refresh your recollection that's what you told him?

25  A.   No.  "I told him to get out of there."  I don't ever

1  remember saying that, no.

2         MR. GIEGER:  I'll show it to the jury.

3         THE COURT:  You can put it up on the screen.

4         MR. GIEGER:  It is going to be Page 102, line 13 through

5  line 19.

6                         EXAMINATION

7  BY MR. GIEGER:

8  Q.   So this was my question:  "So you actually made a

9  recommendation to him when he complained about that?"  And your

10 answer, "I told him, I said, 'You need to get out of there.'"

11        That's what I just showed you.  That was your testimony

12 that you gave me in your deposition.

13        MR. REICH:  Can we have the entire sentence and the

14 entire answer read?

15        THE WITNESS:  Well, that's the whole thing because I

16 don't remember --

17        THE COURT:  I'm sorry.  Ms. Wright, one second.

18        Go ahead and read through the whole answer and then

19 you can go ahead and ask the question.

20                         EXAMINATION

21 BY MR. GIEGER:

22 Q.   "But I mean, that wasn't, like, every day, 'You need to get

23 out of there,' every day, 'You need to get out of there.'  It was

24 said and I guess he was trying to get out of there."

25        That's what your testimony was to me when we asked you

1  in the deposition, correct?

2  A.   Uh-huh (affirmative response).  Maybe I did tell him that,

3  but it wasn't, like, every day "Get out of there," no.  No.  I

4  really don't remember.

5  Q.   And your son moved out of the trailer in 2008, correct?

6  A.   Right.

7  Q.   Do you remember there being any damage to the door of that

8  unit?  There is only one door to get in and out?

9  A.   Uh-huh (affirmative response).

10  Q.   Do you remember there being any damage to that door?

11  A.   Damage?

12  Q.   Yes, ma'am.  Do you remember anything about a break-in?

13  A.   Yeah.  I think I was there when that happened.

14  Q.   And so you remember that the trailer -- there was damage to

15  the door because somebody actually tried to break into the unit,

16  correct?

17  A.   Yes.

18  Q.   It wasn't there when the unit was originally installed, the

19  damage to the door?

20  A.   No.

21       MR. GIEGER:  Thank you very much.

22            Your Honor, that's all the questions I have.

23       THE COURT:  Thank you.

24            Mr. Cheatwood.  We're always leaving Shaw out

25  already.

1                        CROSS-EXAMINATION

2    BY MR. CHEATWOOD:

3    Q.    Good morning, Ms. Wright.  My name is Roy Cheatwood and I

4    represent Shaw.  I'm going to ask you a few questions.  I'm going

5    to try not to go over what you've already been asked, but I may

6    ask you a few things.

7            As you recall and it's been stipulated, your son lived

8    in the unit from March of 2006 to July of 2008.

9            Do you remember that, ma'am?

10   A.    Yes.  Yes.

11   Q.    And it's been stipulated that Shaw maintained the unit for

12   less than three months, only up until June 1st, 2006.  So I'm

13   trying to get the time straight.

14           Now, the first time you saw this travel trailer was in

15   December of 2006, correct?

16   A.    Right.  Yes.

17   Q.    Okay.  And you visited the trailer on a number of occasions,

18   correct?

19   A.    Yes, I did.

20   Q.    And in fact, you lived there for about two months in the

21   summer of 2008, correct?

22   A.    Right.

23   Q.    Okay.  Now, do you remember yesterday up on the board, I

24   think it was one of your son's lawyers put up the rules for

25   living in the units?  Do you remember that?

1    A.    Yes.

2    Q.    Just to save time, at this point I'm not going to ask them,

3    but one of the rules was only you and your son who were listed

4    could live in the unit.

5          You saw that, right?

6    A.    That's right.

7    Q.    That's right?

8    A.    Uh-huh (affirmative response).

9    Q.    You don't know if anybody else lived in the unit, do you?

10   A.    Do I know if anybody -- no, I don't.

11   Q.    Okay.  I was going to ask you about the break-in, but you've

12   already testified about that.

13         I want to move to the water that you talked about a

14   little bit yesterday.

15         Do you remember that?

16   A.    Yes.

17   Q.    Okay.  Now, yesterday you said something like that you saw

18   water in the living room on the rug by the door, correct?

19   A.    Yes.

20   Q.    And you said you couldn't see the water coming in, but you

21   could see it on the rug by the door, right?

22   A.    Uh-huh (affirmative response).  I couldn't see it, but, you

23   know, the rug was wet.

24   Q.    Right.  But let me ask you this:  Do you remember that, in

25   fact, when you saw water was when you opened the door after it

1  rained and the water fell down on your head?

2  A.   You know, that's when it fell on me where I could see the

3  rain, but the rug was already wet.  So I assume the rain must

4  have come in under the door or something.

5  Q.   Well, but you're saying that.  Now, in your deposition, what

6  you said was when it was raining and you opened the door, water

7  would fall on your head, right?

8  A.   Yes.  Yes.

9  Q.   And, in fact, you don't remember rain coming in during a

10 rainstorm, do you?  You didn't see it?

11 A.   I didn't see it, but something wet the rug before the door

12 opened.

13 Q.   Right.  You didn't tell us that in your deposition, did you,

14 Ms. Wright?

15 A.   Maybe I did not.  Maybe I didn't remember that.

16 Q.   And in fact, what you said in your deposition was if you

17 opened the door after it rained, the water that collected on the

18 head of the door would drop down on you, correct?

19 A.   On your head, yes.

20        MR. REICH:  Your Honor, this is improper impeachment,

21 unless there is an opportunity for the witness to read the

22 potentially impeaching material.

23        THE COURT:  Let's just ask her the questions.  We don't

24 have to refer to the deposition unless her testimony in some way

25 departs from what she may have previously said, in which case

1   we'll show her the deposition, as Mr. Gieger did, so that she has

2   a chance to review it before she answers further.

3          MR. CHEATWOOD:  In fact, she just agreed she said that,

4   so that's why I didn't show her the deposition.

5          THE COURT:  I mean, you're asking her questions that,

6   "Oh, in your deposition, you said such and such."  Let's just ask

7   her -- she's here to answer questions today.

8                              EXAMINATION

9   BY MR. CHEATWOOD:

10  Q.   The other question I have for you is:  You did not observe

11  any daylight above the door when the door was shut, did you,

12  ma'am?

13  A.   Observe?  No, I didn't.

14  Q.   Now, I want to move just a bit to, you had some discussions

15  yesterday about a call you made to FEMA and the part where you

16  said that you told FEMA that you were calling because your son

17  said the trailer -- and I'm trying to say it right.  If I don't,

18  you correct me -- was messing with his sinuses.

19          Do you remember that?

20  A.   Right.

21  Q.   You never sent them a letter, did you, ma'am?

22  A.   No, I did not.

23  Q.   Now, You didn't even get to the trailer -- you didn't even

24  see it until after December of 2006, right?  Christmas of 2006

25  was the first time you saw it?

1    A.    Yes.  I think that was the first time.

2    Q.    Now, you never talked to any of the maintenance contractors

3    about the trailer and your son's sinuses, did you, ma'am?

4    A.    No.

5    Q.    You didn't call them, did you?

6    A.    No, I didn't.  Because he told it to me, but I mean, it

7    wasn't like he complained every day about it.  So, you know, I

8    just didn't mention it to anybody.

9    Q.    I understand.  And you never told anybody else other than

10   that one call to FEMA that you talked about yesterday, correct?

11   A.    Right.

12   Q.    Okay.  Now, you were present one time when one of the other

13   maintenance contractors inspected the trailer, correct?

14   A.    I think I was.

15   Q.    Yes, ma'am.  And you didn't say anything to them --

16   A.    No, I didn't.

17   Q.    -- about your son's health, did you?

18   A.    No, I didn't.

19   Q.    Was there any particular reason you didn't do that?  In

20   fact, you just didn't do it, right?

21   A.    No, I didn't think about it.  I didn't -- you know, because

22   it wasn't anything that he was complaining about all the time

23   where it just stuck in my mind.  So I didn't mention anything to

24   them.

25   Q.    You didn't say anything about it.

1          When you were inside the unit when you were visiting

2    your son, you never noticed any kind of rotten smell, did you,

3    ma'am?

4    A.   A rotten smell?

5    Q.   Right.

6    A.   No.

7    Q.   If you could pull up Exhibit 592, please, Page 12.  This has

8    been a stipulated exhibit.

9          Ms. Wright, do you see that, ma'am?

10   A.   Yes.

11   Q.   I'm going to suggest to you that this is a Crown Roofing

12   Preventative Maintenance form that you signed.

13         Would you look at the signature on the bottom of that

14   form, please, ma'am, where it says Bobbie Wright.

15   A.   Uh-huh (affirmative response).

16   Q.   That's your signature, isn't it, ma'am?

17   A.   Correct.

18   Q.   Correct?

19   A.   Yes, it is.  Yes, it is.

20   Q.   I'm sorry.  I didn't hear you.

21         And if you'll look on the left side starting at the top

22   where they have the lines, it says "pass."

23         Do you see that, ma'am?

24   A.   That says what?

25   Q.   The word "pass."  Right above all the checkmarks.

1    A.    Oh, oh, okay.

2    Q.    Now, look down, if you would, to the second line on that

3    pass -- highlight that for me, please, ma'am.

4          You see it says, "unit level/foundation supports/anchor

5    straps."

6          Do you see that, ma'am?

7    A.    Yes.

8    Q.    And the check is on "pass," isn't it?

9    A.    Uh-huh (affirmative response).

10   Q.    I'm sorry.  Was that a yes?

11   A.    Yes.  That's what it is.

12   Q.    If you look further down, you'll see one that says,

13   "exterior doors/locks/hardware."

14         Do you see that one, ma'am?

15   A.    Yes.

16   Q.    That one is marked "pass," too, isn't it?

17   A.    Yes.

18   Q.    And then all those are marked, and then you signed it, and

19   it looks to me like the technician with Crown Roofing named

20   Sidney Morgan signed it.  But that is your signature, correct?

21   A.    Right.  That is.

22   Q.    Now, this document indicates the trailer conditions passed

23   all the checks, doesn't it, ma'am?

24   A.    Yes.

25   Q.    And you wouldn't have signed it if you didn't agree with

1  that, would you?

2  A.   Well, I'll tell you just honestly, I don't think I just went

3  one by one and looked at any of this.

4  Q.   But isn't it true, Mrs. Wright, that you would not have

5  signed it if you didn't agree that it passed all the checks?

6          MR. REICH:  I'm going to object, Your Honor.  There has

7  been no basis to show she is knowledgeable about the content.

8          MR. CHEATWOOD:  Your Honor --

9          THE COURT:  Wait.  First of all, let him finish.

10          MR. CHEATWOOD:  I understand, sir, but that's a speaking

11  objection that I think is improper in front of the jury.

12          THE COURT:  Well, come on up.

13          (WHEREUPON, at this point in the proceedings, a

14  conference was held at the bench.)

15          MR. REICH:  The predicate has been laid with respect to

16  the use of the document that's being displayed before the jury.

17  There is a signature.  She hasn't been inquired -- she hasn't

18  been asked yet if that was her signature, and she hasn't been

19  asked if she recalls the document or anything about it at all.

20  It's been put in front of her.  Sure, it's a stipulated exhibit.

21  That doesn't mean that she's familiar with it.

22          THE COURT:  She testified that she signed it.  She

23  identified her signature.

24          MR. REICH:  She said that?

25          THE COURT:  Yes.  That's one of the first things

1    Mr. Cheatwood asked her.

2         MR. REICH:  All right.  I apologize.  There really has

3    been no predicate that she's familiar with the document and knows

4    what it's about or anything like that.

5         THE COURT:  If she signed it, Mr. Reich, she's going to

6    answer questions about it.  If she wants to say, "I signed it,

7    but I didn't know what I was signing," she's free to so testify.

8    But that's not what she just said.  So I'm going to let him ask

9    questions about it.

10              Overruled.

11              (WHEREUPON, at this point in the proceedings, the

12   bench conference was concluded.)

13                        EXAMINATION

14   BY MR. CHEATWOOD:

15   Q.   Ms. Wright, you wouldn't have signed the document if you

16   didn't agree that it had passed all the checks.  Would you agree?

17   A.   What I'm saying is, when I signed it, signing it, I guess

18   that means you agree with all that's on here.  But I'm not going

19   to say I read all of this and then signed it.

20   Q.   Okay.  You do agree by signing it, I guess that means you

21   agree --

22   A.   I guess that says that I agree, yeah, but I didn't read all

23   of this.

24   Q.   Now, Ms. Wright, your son wouldn't spend many hours a day in

25   the trailer when you were there, would he, ma'am?

1  A.   No, not really.

2  Q.   In fact, he was trying to stay out of the trailer.  He

3  wasn't in the trailer that much when you were there, was he?

4  A.   He was really working most of the time.

5  Q.   All right.  But even when he wasn't working, he would go

6  out, wouldn't he?

7  A.   He would go out sometimes, but not every day.  Sometimes, he

8  did.

9  Q.   Right.  But it was your view at the time that he was trying

10  to stay out of the trailer.  He wasn't in there that much,

11  correct?

12       THE COURT:  We can't hear you.  First, Ms. Wright, if

13  you would either get closer to the microphone or you can move it

14  closer to you if it's more comfortable, and then when you hear

15  his question, let him finish the question and then you can go

16  ahead and answer.

17       THE WITNESS:  Okay.

18                          EXAMINATION

19  BY MR. CHEATWOOD:

20  Q.   Correct?

21  A.   I'm sorry.  What was the question?

22  Q.   I'm sorry, let me say that again.  I said, it was your view

23  at the time that he was trying to stay out of the trailer.  He

24  wasn't spending that much time there when you were there; isn't

25  that right?

A.   Well, he spent time, but he did other things, too.

Q.   Okay.  And then let me ask this question:  Your son moved out of the trailer, correct, you knew that, in July, I think we've agreed, of 2008?

A.   Right.

Q.   He moved out because he wanted his own place; isn't that right?

A.   Yeah.

Q.   Where he could move around?

A.   You'll have to ask him that.

Q.   Well, let me ask you this again just to see:  Isn't it your belief that your son moved out of the trailer because he wanted his own place where he could move around?  Didn't you think that when he moved out?

A.   That he wanted to move around?

Q.   Yes, ma'am.  He wanted his own place where he could move around?

A.   He wanted his own place so he could get out of the trailer.

Q.   So you don't think it had anything to do with the fact that he wanted to move around; is that correct?

A.   I don't know what you mean by "he wanted to move around."

     MR. CHEATWOOD:  Your Honor, perhaps at this point what I ought to do is to show Ms. Wright her deposition.

     THE COURT:  Page and line.

     MR. CHEATWOOD:  Yes, sir, 203.

```
 1              THE COURT:  You may approach.
 2              MR. CHEATWOOD:  I'll show counsel.
 3              THE COURT:  Go ahead and approach her.  Give them page
 4  and line.
 5              MR. CHEATWOOD:  Yes, sir.  203, lines 16 through 21.
 6                   May I approach, Your Honor?
 7              THE COURT:  Yes.
 8              THE WITNESS:  Do I need to read this?
 9              MR. CHEATWOOD:  Yes, ma'am, you're going to need your
10  glasses.
11                            EXAMINATION
12  BY MR. CHEATWOOD:
13  Q.   Let me show you this right here.  This is Page 203, this is
14  line 16, this is the question you were asked:  "Did Lyndon ever
15  talk to you about why he was moving out of the travel trailer
16  into the place at Claiborne Avenue?"  That was the question.
17              Your answer was:  "Why?  He just wanted his own place,
18  you know, get his own place where he could move around, I guess."
19              Did I read your answer correctly?
20  A.   I suppose so, mister.  I really don't know.  I guess I did
21  say it at the time.
22  Q.   That's okay.  Thank you, ma'am.
23  A.   After thinking about it, a lot of that stuff could have been
24  different, but at the moment that's what I said, maybe.
25              JUROR:  Your Honor, I could barely hear.
```

1           THE COURT:  My fault, from the bench conference.

2           MR. CHEATWOOD:  Your Honor, I don't have any further

3    questions.

4              Ms. Wright, thank you, ma'am.

5           THE WITNESS:  You're welcome.

6           THE COURT:  Redirect?

7           MR. REICH:  Yes, Your Honor.

8              May I have Exhibit 592 placed back on the screen?

9                    REDIRECT EXAMINATION

10   BY MR. REICH:

11   Q.   Ms. Wright, you were asked some questions about this

12   particular exhibit that appears to be in checklist format.

13             Do you have any recollection of going through every

14   single item and determining whether everything was functioning,

15   such as interior electrical panel and fuses?  Would you be able

16   to tell whether the fuses in that trailer were working or not

17   working?

18   A.   No.

19   Q.   Would you know how to do that?

20   A.   No, I sure don't.

21   Q.   What about HVAC unit, thermostat and filter?  Do you know

22   anything about that type of equipment, whether it's functioning

23   or not?

24   A.   No, I don't.

25   Q.   Did somebody just ask you to sign off on a list --

1        MR. CHEATWOOD:  Your Honor, objection.  Leading.

2        THE COURT:  Let's not lead the witness.

3                          EXAMINATION

4   BY MR. REICH:

5   Q.   Do you recall the circumstances in which you signed off on

6   Exhibit 592, that checklist?

7   A.   I really can't think -- I don't know if these were already

8   checked off and I signed it or what happened.  I know I didn't

9   read all of that stuff.

10  Q.   Let's take a look at the signature again where it says

11  Bobbie Wright.  Is that your signature or was that your son

12  signing it for you?

13  A.   That looks like mine.

14  Q.   Are you pretty sure about that?  And what about the printed

15  name, Bobbie Wright?  Did you print that?

16  A.   It kind of looks like it.

17  Q.   But you really don't remember anything about this particular

18  document?

19  A.   I really don't remember signing this.  I really don't.

20  Q.   Let's now talk for a moment about the break-in.  Did that

21  break-in occur toward the time that Lyndon was about to move out

22  of the trailer in the summer of 2008?

23       MR. GIEGER:  Objection.  Leading, Judge.

24       THE COURT:  You can't lead the witness on direct or

25  redirect, so he's going to rephrase the question, ma'am.

```
1                            EXAMINATION
2    BY MR. REICH:
3    Q.    Do you recall approximately when in relationship to the time
4    that Lyndon moved out of the trailer that this break-in occurred?
5    A.    Wait.  Now, repeat that, please.
6    Q.    Do you recall approximately when this break-in occurred?
7    A.    Do you mean what year?
8    Q.    What year, or if you don't remember the year --
9    A.    It was '08, and I think Lyndon was moving out of the
10   trailer.  I was there, I was there, and we had moved some things
11   out, and we went back to see where somebody had pried the door
12   open.  It wasn't -- I don't know if you could lock it back or
13   not, but you could get in it with the lock.  It was, you know,
14   messed up.
15   Q.    Let me ask you about your observations concerning water
16   coming into the trailer.
17          Did the trailer ever become wet before the break-in
18   took place?
19   A.    Before the break-in took place?
20   Q.    For example --
21   A.    Yeah, water was coming in there.
22   Q.    Did Shaw Environmental ever specifically provide you with
23   any information or warnings about formaldehyde risks associated
24   with that particular trailer?
25   A.    Not to my knowledge, no.
```

1  Q.   What about the manufacturer, Forest River?  Did anyone from

2  the manufacturer or any of the representatives contact you and

3  tell you about formaldehyde risks --

4       MR. GIEGER:  Objection, Your Honor.  It's beyond --

5       THE COURT:  It's outside the scope of cross.  I'm going

6  to sustain the objection.

7            Any further questions?

8       MR. REICH:  No further questions, Your Honor.

9       THE COURT:  Thank you, Ms. Wright.  You may step down.

10  Thank you for your time.

11           The next witness, Counsel?

12       MR. PINEDO:  The plaintiff calls Kenneth Laughery, Ph.D.

13       THE COURT:  Dr. Laughery, if you'd come up here, please,

14  sir.  Remain standing until you take the oath.  And then you may

15  be seated.  Right behind this chair.

16       MR. PINEDO:  And, Your Honor, I am going to use the Elmo

17  here.  I don't know the how to turn this on.

18       THE DEPUTY CLERK:  Would you please raise your right

19  hand.  Do you solemnly swear that the testimony which you are

20  about to give will be the truth, the whole truth and nothing but

21  the truth, so help you God.

22       THE WITNESS:  I do.

23            **KENNETH LAUGHERY, Ph.D.**

24  was called as a witness and, after being first duly sworn by the

25  Clerk, was examined and testified on his oath as follows:

```
 1                THE WITNESS:  I do.

 2                THE DEPUTY CLERK:  Please state and spell your full name

 3   for the record.

 4                THE WITNESS:  It's Kenneth Ronald Laughery, and the last

 5   name is spelled L-A-U-G-H-E-R-Y.

 6                        VOIR DIRE EXAMINATION

 7   BY MR. PINEDO:

 8   Q.   Dr. Laughery, I am showing you Exhibit 303, which was

 9   admitted without any objection.

10            Is that a copy of your curriculum vitae?

11   A.   Yes.

12            MR. PINEDO:  Your Honor, the plaintiffs are offering

13   Dr. Kenneth Laughery as an expert in warnings.

14            MR. GIEGER:  No objection, Your Honor.

15            MR. CHEATWOOD:  No objection.

16                        DIRECT EXAMINATION

17   BY MR. PINEDO:

18   Q.   For the benefit of the jury, we'll just run through this

19   very rapidly so they have some kind of basis of understanding.

20            Does this curriculum vitae set forth your experience,

21   training and background?

22   A.   Yes.

23   Q.   And did you attend Carnegie-Mellon and get a degree in

24   metallurgical engineering?

25   A.   Yes.
```

1  Q.   And after that, did you get a degree in psychology in 1959?

2  A.   Yeah.  My graduate degree -- my Master's and Ph.D. are in

3  psychology.

4  Q.   And did you have any particular concentration in your

5  psychology studies?

6  A.   It was a fairly broad graduate education, although one of

7  the concentrations was what is known as human factors or

8  ergonomics.

9       MR. GIEGER:  Your Honor, I'm going to specifically

10 object.  This is beyond the orders of the Court.  We talked about

11 this this morning.

12          Can we approach, Your Honor?

13          THE COURT:  Yes.

14       (WHEREUPON, at this point in the proceedings, a

15 conference was held at the bench.)

16       MR. GIEGER:  Judge, I raised this this morning.  I

17 specifically brought this up with you this morning, Judge.  This

18 Court has ruled over and over and over that we will have no

19 testimony, whatsoever, about human factors.  And I specifically

20 told you, Judge, and said that I was concerned about this and

21 that these counsel knew they would never go into it and they

22 would instruct their witnesses accordingly.  And now I've just

23 heard human factors for the first time and you have repeatedly

24 said on human factors, we will have no testimony on it.

25          THE COURT:  I issued two orders with regard to this

1   witness, and I think I was pretty clear on human factors, not

2   only on this witness but on other witnesses in connection with

3   the Gulf Stream trial.  So I expect those orders to be abided by.

4           Now, you say he's an expert in warnings.  So what

5   is it -- remind me again what it is he's going to testify to

6   about warnings.

7           MR. PINEDO:  He's going to be testifying about the

8   warnings, when is a warning necessary.  I know where the line is,

9   that he can testify about his first opinion that was previously

10  stated, and that was, is a warning necessary.  He's not going to

11  be talking about adequacy.  And he's from the field of human

12  factors that warnings springs forth.  There is no degree, there

13  is no Ph.D. in warnings.  Warnings is a subset of human factors.

14  I'm just laying the predicate.

15          THE COURT:  First of all, one person argues for each

16  side.  Okay?  One person.  You're handling this.

17          MR. D'AMICO:  I'm sorry.

18          MR. PINEDO:  It's just a predicate, Your Honor.  There

19  is no Ph.D.

20          THE COURT:  I don't get this witness as being a very

21  long witness to testify.  It's a very narrow opinion that he's

22  offering, and I expect you to stick with it.  He mentioned human

23  factors as part of his experience, but he's not going to testify

24  as to the adequacy of the warning in this case or even anything

25  about the warning in this case except for a need to have a

1    warning.

2              MR. PINEDO:  Exactly.

3              THE COURT:  Are we clear on that?

4              MR. PINEDO:  I was just laying the predicate that

5    warnings was a subset.

6              THE COURT:  As long as we're clear.

7              MR. GIEGER:  Thank you, Your Honor.

8              (WHEREUPON, at this point in the proceedings, the bench

9    conference was concluded.)

10             MR. PINEDO:  May I proceed, Your Honor?

11             THE COURT:  Yes, please.

12                          EXAMINATION

13   BY MR. PINEDO:

14   Q.   Carrying on with Exhibit No. 303 that was admitted without

15   objection, have you taught some courses in the past with regard

16   to warnings?

17   A.   Yes.

18   Q.   And when we're looking at this page on your curriculum

19   vitae, does it set forth some of the positions that you've held

20   at universities regarding warnings?

21   A.   Not just regarding warnings.  I was a professor at the

22   universities.  Yes.

23   Q.   Can you tell us, just by referring to your curriculum vitae,

24   some of the courses or universities where you taught about

25   warnings?

1  A.   Well, I've been a professor at three universities.  When I

2  finished my Ph.D. in the early 1960s, in 1963, I joined the

3  faculty at the State University of New York in Buffalo where I

4  had a joint appointment between engineering and psychology.  And

5  I taught undergraduate and graduate courses there.

6          And then my second -- that was started in 1963.  In

7  1972, I moved to the University of Houston as a professor and

8  head of their psychology department.  I was there until 1984 when

9  I moved across town to Rice University.  I guess the story would

10 be Rice made me an offer I couldn't refuse, and I was a professor

11 there -- well, I still am officially.  I'm an emeritus professor.

12 I retired a few years ago, but I will have a lifetime emeritus

13 professor status.

14         So those are the three universities where I was a

15 professor during my career.

16         I taught graduate and undergraduate courses in

17 psychology.  I also taught a couple of courses in the engineering

18 school at Buffalo and at the University of Houston, and I've been

19 working in the field of warnings, safety communications for the

20 past 30 years.  So I've taught courses where that was a subject

21 matter or at least part of the subject matter of the courses at

22 those universities.

23 Q.   Thank you, Doctor.  Have you also written some papers

24 regarding warnings?

25 A.   Yes.

1  Q.   And I am showing you on your curriculum vitae a number of

2  articles.

3           Does this represent some of the articles that you have

4  written on warnings?

5  A.   Well, I've published a lot of stuff over almost 40 years,

6  plus 40 years of my academic career, and a lot of it has to do

7  with warnings.  I think, for example, in that curriculum vitae,

8  CV I'll refer to it, there is 140-something articles --

9  peer-reviewed, published articles, book chapters and so forth

10 that I've authored or coauthored, and some significant number of

11 those, probably two-thirds or three-fourths, during the past

12 30 years have addressed issues associated with warnings, safety

13 communications, again.

14 Q.   Well, let's move right along.  Can you give the jury a

15 definition, a layman's definition of what is a warning?

16 A.   Well, I mean, one way to think, I've been sort of mixing the

17 term here, "safety communication."  And you can think of a

18 warning as a safety communication that has a purpose of giving

19 people the information they need.  If it has to do with a

20 product, for example, giving people the information they need to

21 use the product safely.  And it may have to do with an

22 environment, some hazard in the environment.  And it would be,

23 again, giving people the information they need in order to

24 function safely in that environment.

25           So the purpose of a warning is to modify behavior,

1  human behavior, in order for it to result in a safe outcome.

2  Q.   What is an on-product warning?  You discuss that in your

3  report.

4  A.   Well, an on-product warning is kind of just what the term

5  implies.  It's a product that -- it's a warning that is on the

6  product.

7           MR. GIEGER:  Your Honor, I'm going to object to the

8  responsiveness of the question.  Judge, may we approach?

9           THE COURT:  Yes.

10          (WHEREUPON, at this point in the proceedings, a

11  conference was held at the bench.)

12          MR. GIEGER:  Judge, we're talking about on product.

13  This is the location of a warning, whether it's on where it

14  belongs.  Judge, this is exactly, exactly what I have talked

15  about, Judge.  And I am getting ready to ask this witness be

16  struck.

17          THE COURT:  I agree.

18          MR. GIEGER:  I'm going to ask this witness be struck.

19  They have violated the order.

20          THE COURT:  I think we're very much close to the edge of

21  what the Court ruled is precluded.  The testimony is -- and I

22  have the order right here.  Testimony is allowed only to the

23  extent of testimony about the need for a warning.  Not adequacy

24  of any such warning shall be admissible.

25               So we're not talking about where the warning

1    appears or what is in the warning.  We're talking about the need

2    for a warning on this product.  And, you know, I assume you've

3    explained to him the parameters of the testimony that he's going

4    to be offering.  It may be that you're asking a question that's

5    particular and he's answering in the general, but I can't allow

6    him to do that.  You're going to have to be specific and you're

7    going to guide him within the boundaries of what the Court has

8    ordered.

9           MR. PINEDO:  Yes, Your Honor.

10          MR. GIEGER:  Judge, he asked the question.  It wasn't

11   like the last time where it wasn't a response to a question, but

12   this was a specific question asked by counsel.  What is an

13   on-product warning?  Judge, that is directly in violation of this

14   court order.

15          THE COURT:  I think it's arguable, but I think it

16   certainly invites the witness to perhaps answer in a way that's

17   not consistent with the Court's ruling.

18          MR. PINEDO:  I haven't warned this witness that he is

19   not to testify about the adequacy of warnings.  I asked him for a

20   definition of what an on-product warning is.

21          MR. GIEGER:  That's the location, Judge.  We're talking

22   about the adequacy of whether or not there is a warning.  I mean,

23   Judge, that's the whole problem.

24          THE COURT:  I'm going to sustain the objection on this

25   question.  Let's get to the need for the warning on this product.

1          MR. GIEGER:  I'm going to have the question sustained on

2     the record.

3          MR. PINEDO:  I believe it is sustained on the record.

4          THE COURT:  I am sustaining it.  She's typing it right

5     now.

6          (WHEREUPON, at this point in the proceedings, the bench

7     conference was concluded.)

8          THE COURT:  Go ahead, Mr. Pinedo.

9          MR. PINEDO:  Thank you, Your Honor.

10                         EXAMINATION

11    BY MR. PINEDO:

12    Q.   As a warning expert, is there a process by which you look at

13    something and determine as to whether or not a warning is

14    necessary or needed?

15    A.   Sure.

16    Q.   Could you explain that to the ladies and gentlemen of the

17    jury.

18    A.   Generally you can think of it as there are four steps or

19    four considerations that one needs to take into account in

20    deciding whether or not there is a need for a warning.

21          One of them, of course, is, is there a hazard?  Is

22    there some safety problem associated with that product or that

23    environment?  But no -- at least I'm not in favor of warning

24    about problems that don't exist.  And we have formal

25    methodologies for assessing that hazard analysis and so on.

1          So the first question, of course, would be, is there a
2     safety issue?  Is there a hazard?
3          A second consideration in the human factors domain and
4     in the general field of safety comes under the label, is it open
5     and obvious?  Sometimes a product or an environment might be such
6     that the product, itself, communicates the nature of the hazard.
7          For example, I wouldn't suggest that you need to warn
8     somebody not to get their fingers in the rotating blades of a
9     chain saw.  You can look at that and know that that's a hazard.
10    That's an open and obvious hazard.  At other times, the hazards
11    are clearly not open and obvious.  You need to be told about it.
12         A third consideration has to do with user knowledge.
13    Sometimes -- does the user of the product bring with them
14    knowledge and understanding already obtained about that?  And
15    except for reminder functions, we don't need to warn about things
16    that are open and obvious.  We don't need to warn about things
17    that people already know, unless there is a need for a reminder,
18    like the buzzer in your automobile that reminds you -- my wife is
19    standing at the door in the morning telling me -- giving me some
20    instructions and I may be distracted and not fasten my seat belt,
21    I have a warning in my car that reminds me.
22         But except for that, if a hazard is open and obvious,
23    or if it's already known, there may not be a need to warn.
24         And the last thing, the fourth consideration is sort of
25    the capability of the user to carry out the function.  If in

1  order to use a product somebody needs to do something they are

2  not capable of doing, then a warning is not going to solve that

3  problem.  So that's a consideration.  Do I need to warn?  Does a

4  warning do any good?

5         So those are the four things.  Is there a hazard?  Is

6  it open and obvious?  Is it already known?  And can a warning

7  solve the problem?

8  Q.  And, Doctor, did you examine those four factors with regard

9  to formaldehyde?

10  A.  Yes.

11  Q.  Let's take a look at them.

12         First, is there a hazard associated with formaldehyde

13  vapors?

14         MR. GIEGER:  Objection, Your Honor.  Beyond the scope of

15  his expertise.  It goes beyond the scope of the order.

16         MR. PINEDO:  Your Honor, if I may --

17         THE COURT:  I think you need to lay a foundation as to

18  what his knowledge of that substance is.

19         MR. PINEDO:  Very good.

20                         EXAMINATION

21  BY MR. PINEDO:

22  Q.  In your work in this case, Dr. Laughery, did you review any

23  of the hazards associated with formaldehyde vapors?

24  A.  Yes.

25  Q.  And are you aware of any hazards associated with

1  formaldehyde vapors?

2  A.   My understanding -- and this is -- I'm not a toxicologist or

3  a medical doctor, so this is an assumption on my part.  But, yes,

4  it's my understanding, based on reviewing materials in this case,

5  that formaldehyde does, in fact, represent a hazard in the

6  trailer, in the Forest River trailer that was involved in this

7  case.  And again, that's an assumption on my part.

8  Q.   And what are the health hazards that you would be referring

9  to, the consequences?

10  A.   Well, the consequences again, as I understand them, are for

11  example, eye, nose and throat irritation, asthma symptoms,

12  shortness of breath, cancer.  Those are all consequences or

13  potential consequences associated with formaldehyde hazard in the

14  trailer.

15  Q.   Let's take a look at the second factor that you've

16  enumerated for the jury.  Open and obvious.  Did you examine

17  whether or not the risk of formaldehyde is open and obvious?

18  A.   Yes.

19  Q.   And please tell the jury about that.

20  A.   You can't see it.  You can't hear it.  It's an example of a

21  kind of hazard, a category of hazard.  In the warning scientific

22  literature, this would be referred to as a hidden hazard.  It's

23  just a phrase that gets used because it's not the kind of hazard,

24  like the moving blades of a chain saw or pinch points or, you

25  know, you don't want to get your hand under the rotating blade of

1   a lawnmower, things of that sort that are open and obvious

2   hazards.

3           Hazards associated with chemical products and those

4   kind of products are typically what we call hidden hazards.  And

5   the formaldehyde, again, you don't see it, you don't hear it, and

6   so on, then that puts it in a category of a not open and obvious

7   hazard.  And people need then to be told about it.  Is there a

8   need to be warned about it?

9   Q.   The third item that you mentioned to the jury was knowledge

10  of the hazard.  Did you examine that third factor with regard to

11  formaldehyde in travel trailers?

12  A.   Yes.

13  Q.   Please tell the jury about that.

14  A.   That's a kind of chemical that people typically aren't going

15  to know about, aren't going to bring with them knowledge.  It's

16  not a chemical.  It's not a potential hazard that we encounter,

17  that we learn as children, like our parents teach us some things

18  about electricity.  Well, I've already said it's not open and

19  obvious, but it's also then not a category of hazardous materials

20  that you could expect people to bring with them.  And certainly

21  it's true that Logan (sic) Wright, from the testimony that I had

22  an opportunity to read, was in that category.  He didn't know

23  about formaldehyde.

24  Q.   The fourth item that you had mentioned to the jury was

25  capability of the user.

1    Did you examine that item in the context of

2  formaldehyde in Lyndon Wright?

3  A.   Yes.

4  Q.   Please explain how that fourth item would play into this.

5  A.   Yeah.  Well, the fourth item has to do with, is there

6  something that one who is using the product, living in the

7  trailer in this case, can do to help address that hazard to help

8  reduce or eliminate the potential consequences that I kind of

9  identified or listed the things that can happen to you with

10  exposure, are there things that you can do?

11    And again, it's my understanding that there are some

12  things that have to do with ventilation in the trailer, the use

13  of the air-conditioning, you know, opening windows.

14    And one other possibility that needs to be kept in mind

15  is perhaps not using the product at all.  One may decide that the

16  product is too hazardous or that there are some alternative

17  places to live, but I'm just pointing out that that would be part

18  of the consideration as to whether or not it's within the

19  capability of the user to deal with the hazard.

20  Q.   And this methodology that you've talked about, is that

21  included in some of the articles and textbooks you've written

22  regarding warnings?

23  A.   Well, not just the ones I've read.  Yes, the answer to that

24  is yes.  And things that I've written, I've addressed that and

25  probably should.  But that's a widely accepted -- I'll

1    characterize it as strategy for making decisions as to whether or
2    not there is a need for a warning.
3    Q.   And do all four of these factors, as you have testified
4    about, need to be considered in conjunction?
5    A.   Yes.
6              MR. PINEDO:  Thank you.  I pass the witness.
7              THE COURT:  Thank you, Mr. Pinedo.
8                  Mr. Gieger?
9              MR. CHEATWOOD:  Your Honor, may we approach?
10             (WHEREUPON, at this point in the proceedings, a
11    conference was held at the bench.)
12             MR. CHEATWOOD:  I don't want to have to interrupt
13    anymore.  Judge, you ruled yesterday that you didn't want the
14    lawyers thanking you, particularly when you ruled against them,
15    and they are still doing it.  We've got to stop that.  And if
16    it's okay with you, the next time, what I would like to do --
17             THE COURT:  Why don't you stay at your tables and say it
18    out loud so everybody can hear it.
19             MR. CHEATWOOD:  I'm sorry.  But the point is, you've
20    already ruled on that and they did it the first time --
21             THE COURT:  They can still hear you.
22             MR. CHEATWOOD:  I'm sorry.  Is it all right next time if
23    I get up and say, "I object for him thanking you?"
24             THE COURT:  It's a common practice and it's unnecessary.
25    I didn't rule on it.  I just suggested it wasn't necessary.  It's

1  still not necessary.  Let's just -- we're wasting time on

2  foolishness.  Let's go.

3          (WHEREUPON, at this point in the proceedings, the bench

4  conference was concluded.)

5                    CROSS-EXAMINATION

6  BY MR. GIEGER:

7  Q.  Good morning, Dr. Laughery.

8  A.  Good morning.

9  Q.  We've met before, correct?

10  A.  I think so.

11  Q.  Dr. Laughery, you issued an expert report in this case,

12  correct.

13  A.  Yes.

14  Q.  And in connection with the expert report, you reviewed some

15  material, correct?

16  A.  I'm sorry.  I didn't hear you.

17  Q.  I'm sorry.  I go too fast.  I'll slow down.  I apologize.

18          In connection with that report, in connection with your

19  work in this case, you reviewed some material, correct?

20  A.  Yes.

21  Q.  And, in fact, the material you reviewed, you listed in your

22  report, correct?

23  A.  That's correct.

24  Q.  Okay.  And that's all the material you reviewed, correct?

25  A.  That's certainly all I'm sure I reviewed up until the time I

1  wrote my report.

2  Q.   Let me make myself perfectly clear, Dr. Laughery.  All I

3  want to talk about is this case, your report and the material

4  that you reviewed up until the time of your report.  Okay?

5  A.   Yes.

6  Q.   All right.  So that's a list of the materials that you

7  reviewed up until the time you wrote your report and formulated

8  your opinions in this case, correct?

9  A.   That's correct.

10 Q.   All right.  Now, you've testified a lot of times, right,

11 Dr. Laughery?

12 A.   Yes.

13 Q.   And so you know that part of your job when you testify is to

14 ask for all of the material that you think you're going to need

15 to give this jury your opinions, correct?

16 A.   Well, typically, sure.

17 Q.   Sure.  Okay.  Because you asked the lawyers, "Give me

18 everything I need," right?

19 A.   Yes.

20 Q.   Now, there wasn't any material that you requested that you

21 didn't receive, correct?

22 A.   Not that I recall.

23 Q.   Let me make sure -- I think the jury understands, you're not

24 a medical -- you're a doctor, you're a Ph.D., but you're not a

25 medical doctor, correct?

1    A.    That's correct.

2    Q.    You're not a toxicologist, correct?

3    A.    That's correct also.

4    Q.    And you're not an epidemiologist, correct?

5    A.    That's correct.

6    Q.    And you know that the plaintiffs are going to call a

7    toxicologist in this case, Dr. Williams, right?

8    A.    Well, I don't know that they are going to call Dr. Williams.

9    It doesn't surprise me that they are going to call a

10   toxicologist.

11   Q.    I looked at the materials.  You didn't review Dr. Williams's

12   report in this case, did you?  It's not listed in your report --

13   in your expert report of the material you reviewed in this case,

14   correct?

15   A.    I think that I did not review Williams's report in the

16   context of this case.

17   Q.    And you didn't review her position that she gave in this

18   case, correct?

19   A.    That's correct.

20   Q.    And did you review the testimony of any of the other

21   toxicologists that are retained by either side in this case?

22   A.    No, I don't think I've seen that.

23   Q.    What about the epidemiologist?  Have you reviewed any of

24   their depositions in connection with this case?

25   A.    No.

1   Q.   Have you reviewed any of the industrial hygienist

2   depositions who are experts in this case?  Did you read any of

3   that?

4   A.   No.

5   Q.   Now, do you know Mr. Gaeddert?

6   A.   No.

7   Q.   That's my client from Forest River.

8          Did you request any of the depositions of any of my

9   clients relative to their knowledge of formaldehyde?  Did you

10  request those depositions?

11  A.   I don't recall requesting that.

12  Q.   So the plaintiff lawyers in this case didn't provide you a

13  copy of the three depositions that Mr. Gaeddert gave in this

14  case, correct?

15  A.   That's correct.

16  Q.   And you didn't get a copy of any of the other Forest River

17  employees who talked about their knowledge of formaldehyde in the

18  industry relative to this trailer?

19  A.   That's correct.

20  Q.   That wasn't supplied to you by the plaintiff lawyers,

21  either, correct?

22  A.   That's right.

23  Q.   So you don't know anything about the knowledge of my client

24  relative to whether or not they received any complaints about

25  formaldehyde in any of the FEMA trailers that they built for,

1  let's say, the 2004 hurricane?

2  A.   That's true.

3  Q.   Now, let's talk about designing of warnings and their need.

4       Outside of the classroom and outside of your research,

5  you've never designed a warning for, let's say, an appliance,

6  like a blender or a toaster that a consumer would use.  You've

7  never designed such a warning, correct?

8  A.   I haven't designed warnings for what I would call consumer

9  products.  Yes, that's true.

10  Q.   And any consumer product, whether it be like a stove or a

11  refrigerator, you haven't designed any warning that this jury

12  could buy with a product, correct?

13  A.   That's been applied on the product?

14  Q.   No, no, no.  I'm sorry.  Let me rephrase my question.

15       You haven't designed a warning for a consumer product

16  that me or the lawyers over here or this jury could buy?

17  A.   That's true.  I'm just trying to be clear about the

18  distinction.  I've designed countless warnings in research for

19  consumer products and all kind of things.  But not for

20  application on actual product.  I've basically been a university

21  professor.  I do it in research context, not for corporations.

22  Q.   So that's what I said.  Not in your research.  I'm talking

23  about things that I could buy like a blender or a toaster or a

24  lawnmower or a microwave or a chain saw.  You haven't designed

25  any warnings like that for the consumers?

1   A.   That's correct.  I get requests to do that stuff, but I
2   basically have been a university professor and I don't do that
3   kind of consulting.
4   Q.   You've never been employed by a trailer manufacturer,
5   correct?
6   A.   That's true.
7   Q.   You've never written a warning for an owner's manual,
8   correct, for a consumer product that's a travel trailer?
9   A.   That's true.
10  Q.   Now, you've never written a warning that deals with the
11  issue of formaldehyde, have you?
12  A.   I don't recall.  This came up in my deposition.  I don't
13  recall in the research work that I've done over the last 30 years
14  preparing a warning for research purposes that dealt with
15  formaldehyde.  Similar kinds of hazards maybe, but not for
16  formaldehyde.  I certainly haven't done one for a trailer
17  manufacturer.  I've noted that.
18  Q.   And you haven't written out a warning that you can give to
19  this jury, correct?
20  A.   That's correct.
21  Q.   In the case?
22  A.   That's correct.
23  Q.   I'm not going to go through all of these, but you were asked
24  by Mr. Pinedo about your publications and your papers and your
25  symposiums, right?  You said you did a lot, right?

1   A.   No, I didn't say I did a lot.  I said there are 140

2   something over the course of my career, publications,

3   peer-reviewed publications and journals, book chapters and so

4   forth.  Whether you call that a lot or not --

5   Q.   Well, let me ask you this question:  You've written about

6   specific products like -- hold on.  I know you've written about

7   seat belts, right?

8   A.   Yes.  Seat belts in our vehicles.  I've done research on

9   that and published that.

10  Q.   You've written about, like, child safety seats, right?

11  A.   About what?

12  Q.   I think child safety seats.

13  A.   Yes.

14  Q.   You've written about mismatched -- 16, 16 and a half

15  mismatched cases on tiers?

16  A.   Well, in the context of research and research on warnings

17  for products, I've probably written a large number of kinds of

18  product examples.  Some of them have to do with vehicle, like

19  safety restraints, belts in automobiles and warnings, or the

20  label that's on our visor above the air bag with children and

21  rear-facing child seats.  I've done research on those and

22  published those things, for example.

23          So sure, it could be a large number of products on

24  research products.

25  Q.   Never written about travel trailers, have you?

1  A.   Not that I recall.

2  Q.   Never written about formaldehyde, have you?

3  A.   I don't recall doing so.

4       MR. PINEDO:  Your Honor, I was going to object that it

5  was asked and answered, Your Honor.

6       THE COURT:  I think we're getting a little repetitive.

7  I'll overrule.  Let's move on.

8       MR. GIEGER:  I think that was my last question,

9  Your Honor.  Let me just check my notes and I think we're done.

10      THE COURT:  Double check and we'll move on to

11 Mr. Cheatwood.

12      MR. GIEGER:  That's all the questions I have.

13           Thank you, Dr. Laughery.

14      THE COURT:  Mr. Kurtz, you're going to handle this

15 witness?

16      MR. KURTZ:  Yes, Your Honor.

17                     CROSS-EXAMINATION

18 BY MR. KURTZ:

19 Q.   Dr. Laughery, you would agree, would you not, that to be

20 expected to issue a warning, you would have to know that a

21 hazardous condition exists?

22 A.   Yes, if I understand your question, I mean, that was the

23 first consideration.  We're not in favor about warning about

24 hazards that don't exist.

25 Q.   And the person who you're expecting to make that warning has

1   to know the hazardous condition exists, right?

2   A.   Well, they have to determine, in fact, whether a hazardous

3   condition exists.  That's part of the design process of products

4   is a safety analysis, a hazard analysis.  There are formal

5   methodology, not just in my field, but in engineering, that's a

6   part of what engineers get educated about.

7   Q.   Dr. Laughery, you wouldn't expect someone who doesn't know

8   that a hazardous condition exists to issue a warning, would you?

9   A.   I wouldn't expect them to be able to issue a warning if they

10  don't know.

11              MR. KURTZ:  Thank you.

12              THE COURT:  Redirect?

13              MR. PINEDO:  Yes, Your Honor.

14                      REDIRECT EXAMINATION

15  BY MR. PINEDO:

16  Q.   Do you recollect defense counsel for Forest River asking you

17  if you had read the three depositions from Mr. Gaeddert --

18  A.   Yes.

19  Q.   -- taken in this case?

20  A.   Yes.

21  Q.   Would it surprise you to know that he's only been deposed

22  once in this case?

23  A.   I don't know whether I would be surprised.  I don't know how

24  many times he's been deposed.

25  Q.   Did I or anybody else on the plaintiff's team ask you to

1   write a warning on formaldehyde for travel trailers?

2   A.    No.

3   Q.    If we would have asked you, could you have written a warning

4   on formaldehyde in travel trailers?

5   A.    Yes.  I certainly could have drafted such a warning.

6   Q.    Now, do you typically provide an opportunity for the

7   opposing side, such as the defendants, Forest River and Shaw, to

8   take your deposition when you offer expert testimony on behalf of

9   the opposing side?

10  A.    Yeah.  Most of the cases that I work on, if they go that

11  far, I get deposed in.

12  Q.    Do you remember the attorney here for Forest River asking

13  you about your deposition in this case?

14  A.    Yeah.

15  Q.    The *Lyndon Wright* case.

16  A.    Yes.

17  Q.    Let me ask you:  And I want you to take a look at the jury.

18  Did the defendants in this case, the *Lyndon Wright* case, ever ask

19  for your deposition and conduct your deposition in this case?

20  A.    No.  As I recall, I gave some dates that I would be

21  available for, but they decided not to depose me.

22  Q.    Now, they had asked you about a toxicologist,

23  Dr. Patricia Williams; is that right?

24  A.    Yes.

25  Q.    Are you aware of her opinions based upon work in another

1  case?

2          MR. GIEGER:  Objection, Your Honor, it's beyond his

3  expert report.

4          MR. PINEDO:  Your Honor, they asked about --

5          THE COURT:  No, I think it's a fair question based on

6  the questions that were covered in cross, which related to his

7  familiarity with her report as well as her deposition testimony.

8  So it's got to be limited to what Mr. Gieger covered on redirect,

9  so we're not going to get any additional opinions, but it has to

10 be within the realm of what Mr. Gieger asked.  So I'm going to

11 say it's a fair question but we're going to have to be careful

12 here.

13         MR. PINEDO:  Yes, Your Honor.

14                       EXAMINATION

15 BY MR. PINEDO:

16 Q.  Are you aware of the opinions that Dr. Williams, the

17 toxicologist, has set forth regarding formaldehyde?

18 A.  Yes, I am.

19 Q.  Now, you also recollect that defense counsel for

20 Forest River asked you if you had set forth the items that you

21 had reviewed in your report.

22 A.  Yes.

23 Q.  And did you complete your report right around October 1,

24 2009?

25 A.  Yeah.  Actually, that is when it's dated, the first of

1  October of last year.

2  Q.   But defense counsel, when he made an issue that you didn't

3  see the Gaeddert deposition, he didn't tell the jury that the

4  Gaeddert deposition was taken on November --

5           THE COURT:  Wait.  You're asking him what --

6           MR. GIEGER:  I object, Your Honor.

7           THE COURT:  Let's move on.

8                         EXAMINATION

9  BY MR. PINEDO:

10 Q.   Let me ask a different question.

11          THE COURT:  We're not going to have lawyers testifying

12 when we have witnesses here.  Let's move on.

13                        EXAMINATION

14 BY MR. PINEDO:

15 Q.   Let me ask you, sir, if the Gaeddert deposition had indeed

16 been taken on November 5, 2009, would you have had an opportunity

17 to review it and include any findings about the Gaeddert

18 deposition in your report?

19 A.   No.

20 Q.   Why is that?

21 A.   It occurred after the report was done.

22 Q.   Let me ask you, Doctor, these principles you've talked

23 about, these four principles including open and obvious, are

24 those essentially universal in the field of warnings?

25 A.   Yeah, I mean, I thought I said that.  These are not just

1  principles that apply to my field, in psychology, human factors,

2  or ergonomics, but you find them in safety textbooks, in some

3  engineering textbooks.  These are general principles that cut

4  across a number of relevant disciplines.

5  Q.   You were asked if you had ever written a warning for travel

6  trailers.

7  A.   Yes.

8  Q.   And you've written a number of warnings on other products.

9  A.   A lot.

10  Q.   And those same four principles would apply to all products,

11  whether it be travel trailers or a power drill; is that right?

12  A.   Yeah.  I mean, there are principles not just to products,

13  like travel trailers and whatever it was you said, power drills,

14  but to environments as well.  I mean, electrical substations with

15  a wire fence around them will have a sign on them, and places

16  where there are water hazards with children and so forth.  So

17  environment hazards as well, these principles apply.  Do I need

18  to warn there?  Are there children in that area that shouldn't

19  be, and that's a basis for warnings.

20          MR. PINEDO:

21               No further questions, Your Honor.

22          THE COURT:  Thank you, sir.  You may step down.

23               All right.  Who is next?  Counsel, next witness.

24          MR. D'AMICO:  We would like to play the video deposition

25  of Dr. DeRosa.

```
 1            THE COURT:  Just in terms of planning for our morning
 2   break, about how long is his testimony?
 3            MR. D'AMICO:  It's a couple of hours.
 4            THE COURT:  Let's go ahead and get started.  We'll
 5   probably shut down.  We'll get about 20 minutes in and then we'll
 6   take a midmorning break and come back and finish up.
 7            MR. D'AMICO:  Judge, may we approach Your Honor while
 8   we're setting this up?
 9            THE COURT:  Okay.
10            MR. PINEDO:  Your Honor, they have just informed me they
11   have a slight glitch.  They just need two minutes to get the tape
12   running.
13            THE COURT:  That's down time.  Let's do what we have to
14   do, but two hours.
15            MR. PINEDO:  It might be closer to one hour and
16   14 minutes, Your Honor.
17            THE COURT:  That's a big difference.  I hope it is much
18   closer to an hour.
19            MR. D'AMICO:  I thought he said an hour and 50,
20   Your Honor.
21            MR. PINEDO:  I heard an hour and 15.  One of us is going
22   to be right.  The other is going to be wrong.
23            THE COURT:  Frank, would you go ask and make sure if
24   it's an hour and 14.  It's a big difference.  I would like to get
25   it done, certainly before lunch.  I was hoping we could even
```

1    knockout another witness.

2          MR. GIEGER:  I'm going to be quick.

3          THE COURT:  This one we have no way to shorten up.  It

4    is what it is.

5          MR. GIEGER:  They can take it out.

6          MR. PINEDO:  We could speed it up.

7          MR. D'AMICO:  It's 150.

8          THE COURT:  Let's go ahead and start it.  We'll probably

9    finish it by lunchtime, I would guess.

10          MR. PINEDO:  It would provide a nice break somewhere in

11    the middle.

12          THE COURT:  There is nothing worse than playing it now

13    at that length, than playing it after lunch at that length.

14    Let's go ahead and get it in now.  We're going to have time this

15    afternoon to do -- are you still calling Dyson?

16          MR. D'AMICO:  After lunch.

17          THE COURT:  You still have Hewett, Ritter and LaGrange

18    to call.

19          MR. D'AMICO:  LaGrange and Ritter are going to be like

20    this one, short.  Let me say, Judge, if we do 15-minute exams and

21    they do a 15-minute cross, I mean, that's what drags it out.

22    We're expecting their cross to be half the time of our direct.

23    And in this case we've seen -- the cross-examinations have been

24    as long or longer than our direct.  So it's hard for me to gauge

25    a time when the defendants take more time than I do.

```
 1              THE COURT:  That doesn't surprise me.  It depends on the
 2   expert.
 3              MR. GIEGER:  Right.
 4              MR. D'AMICO:  The thing is, I have no control over how
 5   long they go.
 6              THE COURT:  I've seen criminal cases where the direct is
 7   45 minutes and the cross is a day and a half.
 8              MR. PINEDO:  That is criminal, Your Honor.
 9              MR. D'AMICO:  I'm just saying --
10              THE COURT:  It is criminal in many respects.
11              MR. GIEGER:  It's a double entendre, Judge, maybe a
12   triple.
13              MR. D'AMICO:  You get my point.  It's hard for me to
14   gauge.
15              THE COURT:  We have to get these people in today.
16              MR. GIEGER:  We know the clip will end -- we'll give
17   them to you at the next break.  We can give you the specific
18   times.  It comes up on the clip report.
19              THE COURT:  Because I really want to cover these people
20   today.  Let's try to stick with the game plan, because once you
21   start getting back on one day, then the next day --
22              MR. PINEDO:  We're doing everything we can to keep us on
23   schedule.
24              MR. D'AMICO:  Again, I can't control how long they go on
25   cross.
```

 1          MR. GIEGER:  My cross was not that long, give me a

 2   break.

 3          THE COURT:  Let's play the tape.

 4          MR. GIEGER:  I'll try to give you those numbers, Judge.

 5   We can give it to you for everybody, Judge.  So you can actually

 6   go on the list and put those down.  That was our plan.

 7          THE COURT:  Okay.

 8               Let me explain to the Jury that we are going to

 9   play the first of our witness testimony that was taken on a

10   previous occasion, that will be played to you on the screen here

11   by way of a videotape or a disc.

12               You are to consider any deposition testimony, any

13   testimony that was taken prior to today that is played for you in

14   that fashion as if the testimony was taken here.  In other words,

15   don't discount it on the fact that the witness didn't come up

16   here and testify here in court.  The witness was sworn in on that

17   occasion, took the same oath that we give here, and the attorneys

18   were present.  And the testimony should be regarded just as if it

19   were given live here in court.

20               We're ready to go ahead and start.  Let's go ahead

21   and get this testimony.  We'll take a break around 10:00 a.m.,

22   which is in about 15 or 20 minutes, and then we'll come back and

23   finish the balance of that recorded testimony.

24               Do we have a problem?

25          MR. PINEDO:  15 seconds, Your Honor.  We have an

1    hourglass.

2              THE COURT:  Let's get it up.  If we can't, we'll move on

3    to another witness.

4              (WHEREUPON, at this point in the proceedings, the

5    videotaped deposition of Dr. Christopher DeRosa was played.)

6    Q.   Dr. DeRosa, you were asked by subpoena to bring certain

7    documents with you to this deposition; is that correct?

8    A.   That is correct.

9    Q.   Dr. DeRosa, did you attempt to put together and bring with

10   you those documents?

11   A.   I did, and I actually provided those prior to the deposition

12   today, to my attorney.

13   Q.   And you are here today represented by your own counsel,

14   correct?

15   A.   Yes, I am.

16   Q.   Have you had meetings with anyone other than your counsel in

17   order to prepare for this deposition?

18   A.   I have not.

19   Q.   And you and I have never met before, have we?

20   A.   Not to my knowledge.

21   Q.   What is your occupation?

22   A.   My occupation is as an environmental health scientist.

23   Q.   Are you currently employed?

24   A.   I am self-employed.

25   Q.   What is the extent of your formal education?

1  A.   Well, I've had a B.A. degree from Ohio Wesleyan University,

2  a Master's degree in Ecology from Miami University of Ohio, a

3  Doctorate degree from the same institution in Biology, and a

4  post-doctoral appointment at the University of Virginia in

5  Molecular Biology.

6  Q.   Would you summarize your employment history, starting with

7  the first employment following the conferral of your Ph.D.?

8  A.   That would be with the University of Virginia.  As I

9  mentioned, there is a post-doctoral appointment, and I had a

10  practicum.  I was appointed as assistant professor there for a

11  number of years, and then had an opportunity to join EPA in the

12  late '70s, early '80s, where I was employed as a staff scientist

13  and as a team leader.

14        Following that, I was employed by the University of

15  Maine in the early '80s, and then returned to EPA in

16  approximately 1984, where I was then branch chief, and following

17  that acting director of the Environmental Criteria and Assessment

18  Office, within the office of Research and Development in

19  Cincinnati, Ohio.

20        At that time, following the time I spent as acting

21  director, I came to CDC, ATSDR in '91.

22  Q.   Just so the jury understands, what do the initials CDC and

23  the initials ATSDR stand for?

24  A.   Centers for Disease Control and Prevention and the Agency

25  for Toxic Substances and Disease Registry.

1   Q.   And these are agencies of the Federal Government?

2   A.   They are, within the Department of Health and Human

3   Services.

4   Q.   What positions did you hold there?

5   A.   I was the Deputy Associate Administrator for Science,

6   initially.  I then became the acting Director for the Division of

7   Toxicology within ATSDR, which was later, following the

8   reorganization, the Division of Toxicology and Environmental

9   Medicine.  I held that position until October of 2007.

10  Q.   And was that your last position with ATSDR?

11  A.   No.  It was not.  Following my removal from the position, I

12  was reassigned as the Assistant Director for Toxicology and Risk

13  Analysis within the Office of the Director of the Agency for

14  Toxic Substances Disease Registry, and the National Center for

15  Environmental Health, which are both within the Centers for

16  Disease Control and Prevention, Health and Human Services.

17  Q.   And was that your last position with the Federal Government?

18  A.   It was.

19  Q.   When did that position end?

20  A.   I resigned my position effective June 17th of this year,

21  2009, although that's still subject of some discussion.

22  Q.   So you were the Director of the Division of Toxicological

23  and Environmental Medicine at ATSDR for how long?

24  A.   Roughly 16 years.

25  Q.   And what was your responsibility in that position?

1  A.   They were fairly broad responsibilities.  I oversaw a staff

2  of approximately 70 individuals, perhaps 10 onsite contractors,

3  and a budget of around $10 million annually in research and

4  development.

5       I represented the Department on the Executive Committee

6  of the National Toxicology Program, the agency, I should say.  I

7  also represented the Department on the National Response Team,

8  which is comprised of the 16 member agencies responsible for

9  responses to emergency events under the National Contingency

10 Plan.

11      Other responsibilities included representing the Agency

12 as a member of the Science Advisory Board for the International

13 Joint Commission.  I was also a member of the Steering Committee

14 on Risk Assessment for the World Health Organization, and

15 provided expertise in the broad areas of toxicology,

16 environmental medicine, including health education materials, and

17 the development of a series of documents addressing the public

18 health hazards posed by the chemicals most frequently encountered

19 at Superfund or National Priority List sites, and was responsible

20 for a range of scholarship activities, in concert with my staff

21 to establish the credibility of the Agency and the Division as an

22 authoritative resource in health information, on the impacts of

23 hazardous substances on human health.

24 Q.   Now, the ATSDR is a division of CDC?

25 A.   No.  Actually, it's one of eight independent agencies of the

1   Public Health Service.  It was the -- it is the primary agency

2   charged with implementing the health mandates of the

3   Comprehensive Emergency Response Compensation and Liability Act

4   of 1984, as amended by the Superfund Amendments and

5   Reauthorization Act of 1984.

6   Q.   Doctor, based on your education, training, and your work

7   experience, have you developed expertise with regard to the

8   health effects and exposure risks associated with toxic chemicals

9   and substances?

10  A.   Yes, I have.

11  Q.   What is the EPA bronze medal?

12  A.   It's a recognition given to employees that have been

13  identified as making perhaps above and beyond contributions to

14  the mission of the Agency.

15  Q.   Have you been the recipient of that medal?

16  A.   I have been.

17  Q.   On how many occasions?

18  A.   Four times.

19  Q.   Have you served on advisory committees for various federal

20  agencies?

21  A.   I have.

22  Q.   Which federal agencies?

23  A.   The National Institute for Environmental Health Sciences,

24  EPA.  I have DOD, DOE, NASA.  A number of different agencies that

25  have broad interest in the area of risk assessment and health

1   effects of chemicals commonly associated with human exposures in

2   the environment.

3   Q.   And you indicated that you served on a risk assessment

4   committee for the World Health Organization?

5   A.   Yes.  This was established as an outgrowth of the Rio Treaty

6   of 1993.  It was established in '94.  I served as a charter

7   member of that committee, and I still am a member of that

8   committee.

9   Q.   Have you consulted or worked with foreign countries in the

10  area of environmental health science?

11  A.   Yes.  I have consulted with the governments of the

12  Netherlands, South Africa, Vietnam, the Seychelles Republic in

13  the Indian Ocean, the Faroe Islands, part of the Kingdom of

14  Denmark.  England, China, India, Ecuador.  A number of different

15  countries.  I mean, it's just...

16  Q.   Okay.  What are the professional organizations or societies

17  that you belong to?

18  A.   Well, I'm an elected Fellow of the Collegium Ramazzini, one

19  of 180 individuals worldwide.

20  Q.   What is the Collegium Ramazzini?

21  A.   It is a organization that was founded in memory of

22  Bernadino Ramazzini, who is considered the father of occupational

23  environmental medicine in the 16th century, and is an

24  organization dedicated to serving as a conduit of reliable

25  information to the centers of social and political powers

1   within and throughout the world in the interest of promoting the

2   precautionary principle that it is better to prevent than cure.

3   Q.   What other professional organizations do you belong to?

4   A.   American College of Toxicology, American Association for the

5   Advancement of Science, Ecological Society of America.  Those are

6   some that come to mind.

7   Q.   Have you authored or coauthored any peer-reviewed

8   publications dealing with the human health effects and exposure

9   risks associated with toxic substances?

10  A.   Yes.  I have.

11  Q.   How many?

12  A.   It depends on how one counts, but roughly 200 peer-reviewed

13  journal articles.  Another number of peer-reviewed abstracts

14  published in the literature, as well as book chapters and several

15  texts.

16  Q.   Have you served on the editorial boards of any professional

17  journals?

18  A.   Yes.  Approximately 10 or more professional journals.

19  Q.   Does the ATSDR maintain a toxicological profile on various

20  toxic chemicals, and on formaldehyde in particular?

21  A.   Yes.

22  Q.   When you were at the ATSDR, were your opinions about the

23  potential health effects of formaldehyde articulated in the

24  Agency's toxicological profile on formaldehyde?

25  A.   The opinions proffered in the document represented a result

1  of a two-year effort to review the world's literature in the

2  broad areas of exposures to toxicology and epidemiology.  It was

3  peer-reviewed independently and also open to public comments.

4  Those comments are all part of a public record and formal

5  disposition of those comments is provided there.

6          My responsibility was to assume authority or

7  responsibility for the final signoff on all the toxicological

8  profiles since I became director in 1991.  It's a delegated

9  authority from the department to the administrator to the

10  assistant administrator, and then that was delegated to me.

11          So it was my responsibility to provide the final

12  approval of all the conclusions both qualitatively and

13  quantitatively presented in the documents generated by the

14  Division of Toxicology and Environmental Medicine.

15  Q.   Have you served, Dr. DeRosa, as an expert witness on behalf

16  of the Federal Government?

17  A.   Yes, I have.

18  Q.   How many times?

19  A.   Well, I believe formally, depending on what one considers to

20  be an expert witness, at least three times, four times.

21  Q.   And on those occasions, did you testify as an expert in the

22  field of environmental health science?

23  A.   I did.

24  Q.   When and how did you first become aware that FEMA was

25  providing travel trailers to citizens who had been displaced from

1  their homes as a result of Hurricanes Katrina and Rita in 2005?

2  A.   I think it was shortly thereafter I became aware of the news

3  reports that that was being done.

4  Q.   And when and how did you first become aware of concerns

5  being expressed about the level of formaldehyde in those

6  trailers?

7  A.   My sense was that that would be in late 2005, or early 2006,

8  but more than likely late 2005.   There was a number -- there were

9  a number of reports in the press regarding citizen complaints

10 about the trailers.

11 Q.   What, if anything, was ATSDR asked to do in connection with

12 those concerns?

13 A.   I was in my office one afternoon late in the evening, and I

14 was contacted by a representative of FEMA to review a Fact Sheet

15 that they had developed that was predicated upon a document that

16 we had developed addressing the health issues associated with

17 formaldehyde, and I, at his request, reviewed and provided

18 comment on that document.

19 Q.   Who was that FEMA official?

20 A.   That, I do not recall.

21 Q.   Can you give me your best recollection of the date on which

22 that contact was made?

23 A.   It was probably late spring of 2006.

24      THE COURT:  All right.  Let's go ahead and take our

25 midmorning break of about 10 minutes.  It's just about ten

1    o'clock.  Why don't we plan on starting at 10 minutes after

2    10:00.  If you all can be ready, we'll go ahead and resume with

3    this testimony at ten minutes after ten.  Thank you all.

4            THE COURT SECURITY OFFICER:  All rise.

5            (WHEREUPON, at this point in the proceedings, the jury

6    panel exits the courtroom.)

7            THE COURT:  I will see you-all in ten minutes.

8            (WHEREUPON, at this point in the proceedings, a brief

9    recess was taken.)

10           THE COURT SECURITY OFFICER:  All rise.

11           (WHEREUPON, at this point in the proceedings, the jury

12   panel enters the courtroom.)

13           THE COURT:  You may be seated.  Let's see if we can

14   finish up with the DeRosa testimony, certainly before lunch, I

15   would hope.

16           (WHEREUPON, at this point in the proceedings, the

17   videotaped deposition of Dr. DeRosa continued as follows:)

18   A.    It was from Region IV, which is the Region headquartered in

19   Georgia, Atlanta, Georgia, that comprised the Southeastern sector

20   of the United States.

21   Q.    Can you be any more specific than the late spring of 2006?

22   A.    No.  Shortly after that, we migrated to a new information

23   management system, and many documents were somehow lost.

24   Q.    Are you suggesting that there were on an earlier occasion

25   written documents reflecting that initial contact, but that they

1  are no longer available?

2  A.   Yes, I provided written comment to the individual.  I said

3  that the document was fine, as far as it went, but it failed to

4  mention any of the longer term health issues associated with

5  formaldehyde exposure.

6  Q.   So this was a so-called Fact Sheet that FEMA wanted you to

7  review?

8  A.   That's correct.

9  Q.   Tell me in your own words what your concerns about the Fact

10  Sheet were?

11  A.   My concerns were that it addressed the short-term health

12  effects of formaldehyde, and failed to mention the longer term

13  health issues associated with exposure to formaldehyde.

14  Q.   Now, when you use the terms long term and short term

15  exposure, what do you have in mind in terms of duration of time?

16  A.   Well, with respect to the Agency's own programs, acute or

17  short term exposure would be 1 to 14 days, and longer term

18  exposures would be from 15 days up to a year, and longer term

19  exposures would be through lifetime.

20  Q.   Well, when you say that's the Agency's reference for those

21  terms, from your experience working in the Federal Government,

22  would the definition of short term have a common across-the-board

23  definition among government scientists, or not?

24  A.   It probably would -- it probably varies greatly.  I know

25  that, for example, there was a cross-governmental committee

1  formed to develop acute exposure guidelines during the Clinton

2  Administration, and those were from, say, one hour to two hours

3  and three hours, and they were subdivided in various ways.

4           There are a number of different guidelines that have

5  been established both occupationally and otherwise to guide

6  limits of exposure, or to serve as screening levels for exposures

7  that might be substantive and of health concern.

8  Q.   Well, what's the longest calendar duration you've ever seen

9  referenced in your work for short term, quote, unquote, exposure?

10 A.   I would say the 14-day duration.

11 Q.   And the Fact Sheet that FEMA's representative asked you to

12 review in the spring of 2006, you say only referred to the

13 effects of a short term exposure to formaldehyde?

14 A.   Correct.

15 Q.   What effects do you remember the Fact Sheet referring to?

16 A.   Irritation of the eyes, mucosa, nasal mucosa, throat.

17 Q.   Did you know at the time you were asked to look at this Fact

18 Sheet anything about the duration of occupancy or residency for

19 these FEMA trailers?

20 A.   My assumption there would be that it was a matter of months

21 at that point.

22 Q.   But even looked at as trailer residency for a matter of

23 months, you felt that the Fact Sheet should refer to exposure

24 greater than short term exposure?

25 A.   I did.

1    Q.    Why is that?

2    A.    There are a number of reasons.  One is that as a matter of

3    Federal Government policy, there is no safe level of exposure to

4    a recognized carcinogen.  That's based on a theoretical term, and

5    it's a policy position.  It's not necessarily a scientific

6    position on my part, although, I understand the underlying reason

7    for that, and I accept the premise of that.

8    Q.    And is formaldehyde a recognized carcinogen?

9    A.    It is.

10   Q.    What other reasons were there for you to believe there

11   should be reference to more than short term exposure in the Fact

12   Sheet?

13   A.    Because formaldehyde is a recognized sensitizer, which

14   indicates that it may be associated with responses at

15   increasingly lower levels of exposures over time.  Individuals

16   become sensitized to the effect, and upon subsequent exposures

17   may be exhibiting symptoms at lower and lower levels.

18   Q.    Now, in addition to this contact you had with FEMA about the

19   Fact Sheet, did your division at ATSDR also become involved in

20   the evaluations of the possible levels of formaldehyde in the

21   FEMA trailers?

22   A.    They did.

23   Q.    Tell us how that began and what that consisted of.

24   A.    My understanding was that our staff were contacted by EPA.

25   I think it was Sam Coleman at EPA who requested that they be

1   involved with some ongoing discussions with FEMA regarding the
2   levels of formaldehyde in the trailers.
3   Q.    Did you understand that the discussions and evaluation in
4   those evaluative meetings after early June of 2006 dealt with
5   data being collected in unoccupied travel trailers?
6   A.    Yes.
7   Q.    At the time you understood that, did you know that there
8   were citizens in travel trailers that had been issued by FEMA?
9   A.    I did.
10  Q.    What was your understanding as to why unoccupied travel
11  trailers were being at that point evaluated for formaldehyde
12  levels?
13  A.    Occupied trailers would obviously be subject to a number of
14  confounding factors that could not be necessarily controlled for
15  in terms of lifestyle, in terms of how the trailers were being
16  ventilated by the occupants, and what they might be bringing in
17  to the trailers, so that looking at unoccupied trailers was a way
18  of perhaps getting around some of those issues.
19  Q.    Was it your recommendation to look at unoccupied trailers?
20  A.    No, it was not.
21  Q.    Do you know of any scientists within the ATSDR who made that
22  recommendation?
23  A.    No, not specifically.
24  Q.    And you're aware that there did come a time when CDC
25  conducted an analysis of occupied trailers, 519, in fact; you're

1  aware of that?

2  A.   Yes.

3  Q.   All right.  Let me make sure we understand your testimony.

4  You talked about ongoing discussions to evaluate levels of

5  formaldehyde in unoccupied trailers; correct?

6  A.   Mm-hmm.  (Affirmative response).

7  Q.   Now, that was specifically with respect to data that was

8  being collected in 96 unoccupied units; is that your

9  recollection?

10  A.   Yes.

11  Q.   That analysis of that data of formaldehyde levels in 96

12  unoccupied units resulted in a February '07 Health

13  Consultation Report?

14  A.   Yes, it did.

15  Q.   And your testimony that the FEMA attorney Rick Preston asked

16  that the analysis of the data be kept confidential?

17  A.   Yes.

18  Q.   And that in the Health Consultation Report itself, which

19  came out in February of '07, the discussion was limited to short

20  term exposure?

21  A.   Yes, it was.

22  Q.   If you refer to DeRosa Bates stamp 52 in your statement to

23  Congress, you reference that in early December of '06, two

24  members of ATSDR's Emergency Response Team were asked to provide

25  an evaluation of the EPA sampling data.

1           Now, this again refers to EPA's sampling of data within

2    96 unoccupied travel trailers --

3    A.    Yes.

4    Q.    -- is that correct?  Who were the two members of your

5    Division's Emergency Response Team who were asked to do that?

6    A.    It would be Joe Little and Scott Wright.  Scott Wright was

7    the person addressed by the letter from FEMA.

8    Q.    And when did you become aware for the first time that this

9    Health Consultation Report had been issued?

10   A.    It would be February 27th, 2007.

11   Q.    26 days later?

12   A.    Yes.

13   Q.    Were you surprised to see on February 27th, 2007, that the

14   Health Consultation had actually come out 26 days before?

15   A.    I recall distinctly that I returned from lunch on the 27th,

16   found this document on my desk.  I immediately picked it up,

17   looked at it, and was very concerned about its content.

18   Q.    What concerned you about its content?

19   A.    The fact that it was limited to short term exposures.  The

20   more troubling fact was that -- or just as troubling was that the

21   document issued by The International Agency for Research on

22   Carcinogens, which is a subgroup of WHO, was cited repeatedly

23   regarding exposure information, and the Agency was only named by

24   acronym IARC, and that the citation of the document by IARC was

25   not in the references, so that in no way did the word carcinogen

1   appear in the report, even though a document explicitly written

2   to address the carcinogenicity of formaldehyde was cited in the

3   report.   That, to me, was a troubling circumstance.

4   Q.   How was this Health Consultation Report to be utilized?

5           Again, based on your experience about how Health

6   Consultation Reports are used?

7   A.   My assumption that a consultation such as this would be to

8   provide health-based information to a sister Agency that perhaps

9   did not have a level of expertise in the area commensurate with

10  the need.

11  Q.   Give me an example of a sister Agency that might utilize a

12  report like this.

13  A.   Well, typically, we would provide reports such as this to

14  EPA, to state agencies, health agencies, environmental agencies,

15  other agencies such as Department of Defense, NASA, Department of

16  Energy.

17  Q.   And, in fact, in October of '07, a revised Health

18  Consultation Report did issue?

19  A.   Yes.

20  Q.   Eight months later?

21  A.   Yes.

22  Q.   Please refer to DEROSA-75, Bates stamped 75, and tell me if

23  you reviewed or ever saw this.

24  A.   I did see this letter.

25  Q.   And that was a letter requesting that CDC investigate the

1    formaldehyde issue?

2    A.    Yes.

3    Q.    And did you provide input for the scientific principles, or

4    material, in that response?

5    A.    I commented on the content, and I indicated that there was

6    still no mention of the longer term health effects made in the

7    response.

8    Q.    Does the discussion in Tab A state in the first full

9    paragraph that the Department of Health and Human Resources has

10   determined that formaldehyde may reasonably be anticipated to be

11   a human carcinogen based on limited evidence in humans and

12   sufficient evidence in lab animals?

13   A.    Yes, it does.

14   Q.    So you reviewed this Tab A attachment to the letter after it

15   was made an attachment for the letter?

16   A.    Right, yes.  The only thing I had reviewed prior to the

17   letter being sent out was the letter itself.

18   Q.    Do you, based on your knowledge and experience, agree with

19   the statements about formaldehyde, specifically the carcinogenic

20   nature of formaldehyde, in that paragraph under the caption

21   "Background of Formaldehyde"?

22   A.    In part, yes, I do.  In part, I do not, because IARC is not

23   cited in terms of its most recent conclusions regarding

24   formaldehyde, because it is now classified as a known carcinogen,

25   as opposed to probable.

1   Q.    IARC, again, stands for?

2   A.    The International Agency for Research on Carcinogens.

3   Q.    When did -- is that a government agency?

4   A.    That is a subdivision in Lyons, France, of the World Health

5   Organization.

6   Q.    And when did IARC classify formaldehyde as a known

7   carcinogen?

8   A.    I believe the original draft came out in 2004, and it was

9   final in 2005.

10  Q.    Looking again at Tab A in the table given for Adverse Health

11  Effects of Intermediate Exposure to Formaldehyde, do you see a

12  listing of health effects from inhalation?

13  A.    Yes, I do.

14  Q.    Do you, based on your knowledge and experience, agree with

15  the content of that table?

16  A.    It is customary for me to review such information, and in

17  the context of the statements made regarding cancer above, that

18  there is, by way of policy, as I mentioned earlier, no safe level

19  of exposure to a carcinogen irrespective of the time or duration

20  of exposure.

21        Based on insights regarding the mechanism of toxic

22  action of formaldehyde in the environmental health community,

23  it's quite conceivable that even a short term exposure to

24  elevated levels of formaldehyde may result in a carcinogenic

25  effect.

1  Q.   My question right now, though, is looking at Tab A in the

2  letter sent to Congress by Dr. Gerberding, which you have

3  reviewed after the fact, do you, based on your knowledge and

4  experience as an environmental health scientist, with specific

5  expertise as to formaldehyde, take issue with the scientific

6  accuracy of what is set forth in Tab A?

7  A.   The citation is from the National Research Council 1981.

8  That would indicate to me that it's approximately 30 years out of

9  date.

10        I would, before relying on that document, refer to more

11  recent literature, which I believe will point to -- would point

12  to, does point to some different exposure levels associated with

13  some of the effects noted.

14  Q.   Look at the paragraph after the table.  It states:

15  "Inhalation exposure of months to one year or longer is expected

16  to increase the incidence of symptoms of upper respiratory tract

17  and eye irritation."  And there is a reference, ATSDR 1999.

18        Do you see that?

19  A.   I'm --

20  Q.   It's the sentence that follows the box.

21  A.   Oh, yes, I see it.  Yes.

22  Q.   First, do you agree with the statement?  And second, can you

23  tell us what the ATSDR reference there is?

24  A.   I agree with that statement, and the reference is the

25  Agency's Toxicological Profile released in 1999.

1    Q.    In the paragraph that follows, it stated that:  Mobile homes

2    are a potential source of relatively high formaldehyde exposures

3    because they are typically constructed of large quantities of

4    particle board bonded with formaldehyde resins.  Mobile homes

5    also have lower outdoor air exchange rates than conventionally

6    built housing, which leads to an accumulation free formaldehyde

7    in living spaces.  And there is a reference to Stenton, 1994.

8            Based on your knowledge and experience about

9    formaldehyde, do you agree with the statements made there, and

10   can you tell us about the reference made to Stenton, 1994?

11   A.    I don't think there is any doubt that mobile homes are

12   significantly different than traditionally built homes.  There

13   are two factors that lead to that; not only the fact that

14   formaldehyde resins are used extensively, but the fact that they

15   are manufactured in closed facilities, and, therefore, are not

16   subject to the off-gassing that would occur during the

17   construction of the home.

18           Furthermore, and I pointed this out in my comments to

19   Sascha Fielding, the headspace, the volume of air above the

20   breathing zone, is much greater in conventionally built homes

21   than it is in mobile homes, and because of that, the levels would

22   tend to be higher as a function of that.

23   Q.    Do you believe, Dr. DeRosa, that one measured ppm level in a

24   living space where formaldehyde is known to be off-gassing can be

25   used to decide all health effects from formaldehyde exposure in a

1  living space suffered by a particular individual?

2  A.    Analytic data that are collected on any environment will

3  vary as a function of time, temperature, and ventilation, so I

4  would suggest that to have a reliable sense of what the levels

5  actually are, one should have a time course of sampling that

6  covers different points in the day, different points in the year,

7  and other environmental conditions, whether ventilation is being

8  used extensively, whether it's a closed -- a heating season type

9  of scenario, or whether it's a season in which the windows are

10  open and there is free exchange of air.

11  Q.    And what are the ATSDR health guidance values for

12  short-term, intermediate and long-term exposure to formaldehyde?

13  A.    For long-term exposure it's .008 parts per million, for

14  intermediate exposure it's .03 parts per million, and for acute

15  exposure it's .04 parts per million.

16  Q.    And, again, define long, intermediate and short-term as used

17  by those references.

18  A.    One to 14 days in the case of short-term or acute.  Longer

19  term or intermediate is greater than 14 days and up to 365 days.

20  And longer term is 365 days and beyond.

21  Q.    In the analysis of the 96 unoccupied units that was

22  performed, I think you said under the direction of Little and

23  Wright --

24  A.    Yes.

25  Q.    -- what was the reference value, the ppm value used?

1  A.    My recollection is it was .3 parts per million.

2  Q.    So not .04 for short term, not .03 for intermediate, not

3  .008 for long term, but .3 ppm was used for that study?

4  A.    For that evaluation, .3 parts per million was used.  It was

5  a value derived from a series of documents called Managing Hazard

6  Materials Incidents intended for first responders and healthcare

7  providers in emergency events.  It's a level at which sensitized

8  individuals would begin to exhibit symptoms upon entry and up to

9  three hours after entry into the trailer.

10  Q.    All right.  We were talking about the use of .3 ppm by

11  Little in the analysis of the EPA data from the 96 unoccupied

12  trailers.  And you know that according to Mr. Little, he picked

13  that because it was the lowest actual effect level that he could

14  find in the toxicological literature.  Are you aware of that?

15  A.    That's what he indicated in his testimony.

16  Q.    Do you agree with him that .3 ppm is the lowest actual

17  effect level found in the toxicological literature?

18  A.    No, I don't.

19  Q.    Why not?

20  A.    Because there is extensive documentation about effects

21  occurring below that level, including the underlying effect

22  levels associated with some of the health guidance values that I

23  mentioned to you earlier.

24  Q.    Do you agree that the potential or known real effects of

25  exposure to formaldehyde have got nothing to do with the MRL's

1  established by the ATSDR?

2  A.    I don't agree with that, no.

3  Q.    Why not?

4  A.    Because the uncertainty factors that are applied are based

5  on effect levels.  And the uncertainty factors are determined

6  based on a longstanding protocol of dividing by ten dating back

7  to the mid '50s, when first invoked by FDA.

8           It's not based on the fact that we have ten digits.

9  It's based on the fact that most biological phenomena are

10  logarithmically distributed, so that by dividing by ten you

11  encompass 95 percent of the variability of a given parameter.

12           And in the case of uncertainty factors, there are four

13  such values used, typically.  One is to extrapolate from an

14  adverse effect level to an effect level that's considered not to

15  be -- or construed not to be adverse in terms of its health

16  effect.  One is for extrapolating from a subchronic exposure to a

17  chronic exposure.  And there is the one that's used to

18  extrapolate from animals to humans, a factor of ten, on the

19  presumption that humans are most sensitive, and then another

20  factor of ten based on interindividual human variability.

21           So that's where I came to the point where they can

22  range typically from ten on up to a thousand.  Typically, if we

23  have a value of 10,000, we would not use that study if we felt

24  that that much of -- that large of an uncertainty factor were

25  needed.

1            But, again, this is -- these are predicated upon the

2    premise that you're accounting for known differences in

3    sensitivity based either on the duration, species of exposure,

4    type of effect, and interindividual human variability.

5    Q.   Mr. Little has explained that he didn't use the ATSDR

6    chronic MRL as a reference in his analysis of the EPA data

7    because he understood that MRL to be based on average exposure

8    time of about 10 years?

9    A.   Yes, that was an exposure study.  The workers were exposed

10   on average of 10.8 years.

11   Q.   So do you agree with Mr. Little that the chronic exposure

12   referenced in the MRL's is inapplicable in a case such as this

13   for analysis of the formaldehyde levels in these trailers?

14   A.   No, I don't.

15   Q.   Why not?  I mean, no one has lived in the trailers for 10

16   years, why isn't Little correct about that?

17   A.   Because it's tied to the concept of physiologic time.  A

18   lifetime study in rodents is considered to be two years, possibly

19   longer, depending on the protocol that's being used.

20           The lifetime exposure in humans is typically considered

21   to be 70 years; but, generally speaking, a two-year study in

22   rodents or other bioassays would be considered to be consistent

23   with a 70-year life expectancy.

24           Again, there are a lot of assumptions and issues of

25   science that are tied up in that, but it's the issue of

1    physiologic time and the fact that a 10-year exposure involving

2    workers, a two-year exposure or a one-year exposure or more would

3    be considered to be adequate for the purposes of a risk

4    assessment.

5    Q.    And a year or more exposures is considered chronic in

6    reference to the MRL levels?

7    A.    That's correct.

8    Q.    Mr. Little, in sworn testimony in reference to his analysis

9    of this EPA data, has testified that in terms of the cancer risk

10   associated with formaldehyde exposure, it involves, quote, many,

11   many years of exposure, close quote, and specifically ten,

12   20 years, and for that reason, he did not consider it applicable

13   here because people had not lived in these trailers that long.

14   What is your response to that?

15   A.    I think Mr. Little is confusing the latency period for most

16   cancers with the time required for exposure to elicit a

17   carcinogenic response.  With the exception of leukemias, a

18   latency period of 10 to 20 years is not unheard of and is

19   typical, in fact.

20          However, again, the prevailing policy of the federal

21   science policy of the federal government is that there is no safe

22   level of exposure to a carcinogen irrespective of the duration of

23   exposure.  This is based on the premise of a study done with

24   ionizing radiation in the late '70s and early '80s where they

25   exposed large numbers of rodents to doses of radiation and were

1    unable to find a dose at which a carcinogenic response was not

2    elicited.  It's called the Mega-Mouse study, for those who are

3    interested.

4              But at any rate, that has formed the backbone of

5    science policy within the U.S. federal government since that

6    time, and it's the premise of all cancer risk assessments done by

7    the federal government.

8    Q.   I want to refer you now, Dr. DeRosa, to Bates Number 92, and

9    in particular to your e-mail of July 25, '07, to Mike McGeehin

10   and others, including Frumkin and Sinks.

11   A.   Yes.

12   Q.   Was this e-mail -- and you refer in it to sampling data

13   provided by FEMA; is that, again, the data dealing with the 96

14   unoccupied units?

15   A.   That's correct.

16   Q.   And you state that you were asking what is being done to

17   properly inform the inhabitants about the health effects of

18   formaldehyde, correct?

19   A.   That's correct.

20   Q.   And you say, "I see no mention of reproductive developmental

21   hazards in materials distributed to the residents."

22   A.   Correct.

23   Q.   Now, what materials being distributed to residents were you

24   referring to?

25   A.    I just saw the -- some of the materials that I don't recall

1   exactly what they were.  I think they were FEMA flyers that I had

2   seen on e-mail or perhaps in other media.  I just don't recall

3   where I saw that.

4   Q.   But the material that you had looked at purporting to

5   communicate to residents in the units you felt failed to mention

6   all of the things that needed mentioning with respect to

7   formaldehyde risks?

8   A.   That's correct.

9   Q.   If you'd turn to the next Bates numbered page, 93 --

10  A.   Yes.

11  Q.   -- on July 24, you had done an e-mail blast to a number of

12  people in which you state that you were concerned that the

13  reported clinical signs are the harbinger of an impending public

14  health disaster?

15  A.   Right.

16  Q.   Why did you say that?

17  A.   Because kids were presenting with clinical signs of

18  formaldehyde toxicity.  They were being taken to hospitals.

19        MR. WEINSTOCK:  I'm sorry.

20        THE WITNESS:  They were being taken to hospitals with

21  asthmatic attacks and then being returned to the environment

22  which caused them.

23  Q.   And you felt more needed to be done to communicate to those

24  families, Dr. DeRosa?

25  A.   Yes, I did.

1   Q.   In this same e-mail of July 24 of '07 --

2   A.   I need to excuse myself.

3   Q.   Yes, sir.  You were about to --

4   A.   My concern here was multiplely dimensioned, had multiple

5   dimensions.  It was a concern for the kids and the parents, but

6   it was also a concern that an entire agency of healthcare

7   professionals could stand by and watch kids being taken to the

8   hospital with an asthmatic attack, which is the same as not being

9   able to breathe, bronchial constriction, they wheeze, they cough,

10  they can't get their breath.  And, you know, these people here

11  know that.  And how people could stand by and do the politically

12  expedient thing is beyond me.

13  Q.   The statement you then make in the same e-mail is you say,

14  "We know based on data provided to us that levels are up to 80

15  times higher than peak occupational limits and up to 300 times

16  higher than our guidance values."

17          Now, what exactly were you referring to there?

18  A.   Occupational limits set by NIOSH and our health guidance

19  values, the minimum risk levels that we were referencing earlier.

20  Q.   What is NIOSH?

21  A.   It's the National Institute of Occupational Safety and

22  Health.

23  Q.   And what are the levels established by NIOSH for -- NIOSH

24  for formaldehyde?

25  A.   My recollection is .012 is the recommend -- NIOSH

1  recommendation.

2  Q.   It's .01 --

3  A.   It's .012 or perhaps it is .016.  It may well be 0.16.

4  Q.   And that's ppm?

5  A.   That's correct.

6  Q.   But when you say here the data was 300 times higher than the

7  health guidance values, the health guidance values are the MRL's

8  of the ATSDR --

9  A.   Right.

10  Q.   -- we talked about?

11  A.   Yeah.

12  Q.   I just want to step back and I want to restrict my question

13  to the trailer response.  The only communication you ever had

14  with FEMA about formaldehyde in trailers was that conversation in

15  spring 2006?

16  A.   Right.  I believe it was a conversation that then was

17  followed by an e-mail, because I was waiting for the e-mail to

18  review it based on the phone call.

19  Q.   And my understanding is that no one has ever been able to

20  find any of those e-mails?

21  A.   No.

22  Q.   And all I'm saying is here as of December 4th, it appears

23  that you were aware that EPA had some concerns that FEMA might

24  not be properly interpreting the data that was generated from

25  this testing?

1  A.   Right.  They may not be properly interpreting the data,

2  right.

3  Q.   Now, if we go to what Mr. Little wrote to Mr. Frumkin and

4  cc'd you, if you turn to that first paragraph there, it says,

5  "Scott Wright and myself are currently awaiting to receive

6  sampling data from FEMA concerning formaldehyde in temporary

7  housing unit examples similar to those utilized by Hurricane

8  Katrina displaced persons.

9       "Rick Preston from FEMA's Office of General Counsel,

10  OGC, indicated last Thursday, November 30, that he would send by

11  Fed Ex a CD with the data to us.  At this moment, the data has

12  not been received but is expected sometime today, December 4th.

13       "We indicated to FEMA that once the data is received,

14  we would be able to provide a quick turnaround evaluation as is

15  standard protocol for evaluation of EPA data by the emergency

16  response program within the Division of Toxicology and

17  Environmental Medicine.

18       "A time frame of approximately 10 days or less was

19  discussed for our evaluation.  FEMA will use the ATSDR's

20  evaluation to effect their policy decision.  The ATSDR's

21  emergency response team's activities involving this issue have

22  been described in the program's weekly activity reports."

23       Do you see that?

24  A.   Yes, I do.

25  Q.   In his e-mail to Mr. Coleman, in the second full

1   paragraph -- or, actually, start with the first one, "Sam, have

2   you heard anything else from FEMA regarding the issue that

3   addresses interior air quality related to their trailers,

4   formaldehyde?  From the call it was clear they have a specific

5   interest in testing a random sample of the current trailers in

6   New Orleans, or at least those trailers that will come into the

7   area from the manufacturers.  Will they continue to seek

8   assistance from the Consumer Protection Agency or the

9   manufacturers?"

10          Were you aware, back in June or July, that -- what FEMA

11  was asking CDC and ATS -- and EPA to do?

12  A.   I was, just as it says, aware that they were interested in

13  doing some sampling.

14  Q.   Are you aware -- were you aware of what type of sampling,

15  how many units they were trying to sample?

16  A.   No.

17  Q.   Do you know whether FEMA was asking for occupied or

18  unoccupied units to be sampled?

19  A.   It says here that it's unclear as to what they were going to

20  do.

21  Q.   And you were aware that the ATSDR ER, that would have been

22  Joe Little and Scott Wright, had an opportunity to review the EPA

23  sampling plan?

24  A.   Yes.  That would be standard practice that is done in many

25  of these types of situations in consultation with EPA.  They

1  generally would have lead, and we would be involved at their

2  request.

3          So apparently there was an agreement by ATSDR and EPA

4  to go forward with the sampling, and it may be that they agreed

5  to do so based on the fact that it's now clear that they are

6  doing sampling on unoccupied trailers.

7          So there seems to be a bit of a flip-flop back and

8  forth between the two paragraphs because they are talking about

9  due to the large number of other formaldehyde sources from other

10  products in the home and individual life-style, but then they go

11  on in the next paragraph to say that they are looking at

12  unoccupied trailers.

13  Q.   And do you think that could have been the concern that if

14  you tested occupied, then you had the life-style or environmental

15  factors?

16  A.   It appears to me that in retrospect what happened is that as

17  a result of their iterative dialogue that they determined the

18  best way to deal with these other products in the home and

19  individual life-style was to look at unoccupied trailers.

20          So, again, that's -- that's sort of, again, an ongoing

21  deliberative process to try to arrive at what everyone thinks

22  they feel is an appropriate path forward.

23  Q.   Now, sir, what has been marked Exhibit Number 16 is an

24  e-mail from a Rich Nickel --

25  A.   Uh-huh (affirmative response).

1   Q.   -- dated February 2nd, 2007 --

2   A.   Right.

3   Q.   -- and you are cc'd on this, correct?

4   A.   Yes, I am.

5   Q.   If you go to the second page there it says, "On 2/1, ERT,"

6   what does ERT stand for?

7   A.   Emergency Response Team.

8   Q.   -- "Emergency Response Team finalized the formaldehyde

9   health consultation for the Federal Emergency Management Agency,

10  FEMA.  This consultation discusses the evaluation of EPA data

11  generated from sampling of FEMA manufactured homes during the

12  time period of September 19th to October 7th, 2006.  A total of

13  97 new, never occupied homes were tested at a location in the

14  greater New Orleans/Baton Rouge area.

15          "In summary, the opening of windows and vents was

16  effective in reducing formaldehyde concentrations below levels of

17  health concerns.  Running the heating, ventilation and air

18  conditioning systems did not provide adequate air exchanges to

19  adequately reduce the formaldehyde concentration."

20          And this was sent to you on February 2nd, 2007,

21  correct?

22  A.   That's correct.

23  Q.   -- levels of health concern?

24  A.   That's correct.

25  Q.   And that's what he told everybody on this large e-mail that

1  he circulated around ATSDR?

2  A.   Yes.

3  Q.   And it'd be reasonable, anybody who got this e-mail, it

4  would be reasonable to assume that if they saw this, they would

5  think if you opened the windows in the trailers, that would

6  reduce the formaldehyde levels below levels of health concerns?

7  A.   Yes.

8  Q.   Isn't that reasonable?

9  A.   Uh-huh (affirmative response).

10  Q.   Doc, I'm handing you a document which we've marked as

11  Exhibit Number 17, and it's an e-mail from, I think,

12  Dr. Allred --

13  A.   Uh-huh (affirmative response).

14  Q.   -- to Commander Little and Scott Wright, and also cc'd is

15  Mark Keim.  Do you see that?

16  A.   Yes.

17  Q.   And it says, "Joe and Scott" -- and it's dated -- what is it

18  dated there, January 8, 2007; is that right?

19  A.   Yes.

20  Q.   He says, "Joe and Scott, your consult looks good to me from

21  a content standpoint."

22        Do you know whether or not Dr. Allred reviewed the

23  draft report, the February 1st, 2007, report?

24  A.   From this it's evident that he did.  I didn't know that he

25  had other than what I know was that he took things back and

1   forth.

2   Q.   You've worked with Dr. Allred for a while, hadn't you?

3   A.   Yes.

4   Q.   And it would be standard, his standard operating practice,

5   given your understanding, to look at draft reports that come in?

6   A.   Yes.

7   Q.   You wouldn't find it unusual to find that if Scott and Joe

8   issued a report to him, that he would review it for content?

9   A.   No.  I wouldn't find that unusual.  I would find that to be

10  the appropriate thing to do.

11  Q.   Were you aware that on May 3rd, 2007, FEMA submitted to

12  ATSDR CDC a news release that they were going to issue relating

13  to formaldehyde in trailers?

14  A.   Not to my knowledge.

15  Q.   So you were not aware that FEMA requested ATSDR to review

16  the following statement:  "According to the Department of Health

17  and Human Services, Agency for Toxic Substances and Disease

18  Registry, ATSDR, the average concentration for formaldehyde per

19  day in the units using open window ventilation dropped below

20  0.3 ppm after four days of ventilation and remained low for the

21  rest of the test period.  Average per-day levels in the test

22  group of trailers using air conditioning only with one open

23  static vent in the bathroom remained above 0.3, 0.3 ppm for all

24  but two days of the test period.  The level for health concerns

25  for sensitive individuals was referenced by ATSDR at 0.3 ppm and

1  above."

2          Were you aware that FEMA passed that by CDC ATSDR in

3  May of 2007?

4  A.   No.

5  Q.   Sir, this is a document, that is, a paper that I think was

6  written by John Risher and yourself?

7  A.   Yes.

8  Q.   This article is entitled The Precision Uses and Limitations

9  of Public Health Guidance Values --

10 A.   Uh-huh (affirmative response).

11 Q.   -- is that right?

12 A.   Yes.

13 Q.   And health guidance values, that refers to MRL's, or minimum

14 risk levels, right?

15 A.   It includes those, yes.

16 Q.   What are RfDs?

17 A.   That's the EPA's analogous value to a minimal risk level.

18 It's a reference dose.

19 Q.   MRL's, what is that?

20 A.   That's minimal risk levels.

21 Q.   And ADI's?

22 A.   ADI's are acceptable daily intakes that were originally

23 coined by FDA and subsequently used by EPA but then changed to

24 referenced doses as opposed to ADI's for reasons that are

25 probably not worth talking about.

1           But they are all, you know, derived in the same fashion

2    by the identification of a toxicity threshold, such as a no

3    observed adverse effect level or low observed adverse effect

4    level divided by an uncertainty factor which is inversely

5    proportional to our confidence in the database; the higher the

6    confidence, the lower the uncertainty factor.

7    Q.   Let me read what you wrote here.  "Too often, however,

8    RfD's, RfC's, MRL's and ADI's are construed as rigid threshold

9    limits above which toxicity is likely to occur.  The truth,

10   however, is that these values actually represent levels of a

11   potential toxicant that are highly unlikely to represent any

12   threat to human health over a particular specified duration of

13   daily exposures.  The more frequently these levels are exceeded

14   and the greater the exceedance, the more likely some toxic

15   manifestation is to occur.

16           "These guidance/reference values are most definitely

17   not threshold values for the onset of toxicity in any exposed

18   population.  Health guidance values must be thought of in the

19   context of their intended role as mere screening or trigger

20   values in which they serve as a tool for assisting in the

21   determination of whether further evaluation of a given potential

22   exposure scenario is warranted."

23           That's what you wrote; is that correct?

24   A.   Yes.  That's what we wrote.  And I would point out, too,

25   that it probably should be stated at the time those values were

1   derived based on available information.

2   Q.    If you go to the next page of your paper, and if you go

3   about three-quarters of the way down, it starts, "These MRL's."

4   And it's the second full -- third full paragraph about halfway

5   through it.

6   A.    Yes.

7   Q.    It says -- you wrote there, "These MRL's," and that's

8   referring to the minimal risk levels --

9   A.    Uh-huh.

10  Q.    -- or what you were talking today, the health guidance

11  values that ATSDR issues; is that right?

12  A.    Yes.

13  Q.    "These MRL's are intended to be used by public health

14  officials trained in health risk assessment and only to identify

15  substances of concerns at hazardous waste or other sites of

16  environmental contamination.  Despite their occasional

17  misunderstanding and consequent misuse by well-meaning risk

18  assessors who view them as the panacea of health risk

19  determination, these values provide a scientifically sound basis

20  for decisions in that environmental health risk assessment

21  process."

22  A.    That's correct.

23  Q.    They are not a cause-effect, are they?

24  A.    There's no implication that they are a cause or an effect.

25  Q.    But I want to get back to something you said, not in

1  response to the .3 level of concern but something you said when

2  discussing MRL's.  You said there was no absolute threshold; is

3  that correct?  Not in terms of policy, but in terms of --

4  A.   For an individual, there is no absolute threshold for

5  individuals.  It's a population-based phenomenon.

6  Q.   Any single molecule of that carcinogen can cause cancer in

7  an individual?

8  A.   And, in fact, it can be argued and it has been used as an

9  illustration that one additional drop of water can send you into

10 osmotic shock and kill you.

11 Q.   And I appreciate -- I think you were agreeing with me, but

12 you didn't say yes before you added to it.  You would agree that

13 for certain individuals one molecule of a carcinogen can lead to

14 cancer, correct?

15 A.   Theoretically speaking, that's what I said.  Theoretically

16 speaking.

17 Q.   If we go to one of those sections at page 5 of the report,

18 118, Bates labeled two.  In the middle of the paragraph it says,

19 "Many products used every day around the house also contain

20 formaldehyde."  Is that accurate?

21 A.   Yes, it is.

22 Q.   Such as fingernail polish; is that accurate?

23 A.   Yes, it is.

24 Q.   Fingernail hardeners?

25 A.   Yes.

1    Q.    Antiseptics; is that accurate?

2    A.    Yes.

3    Q.    Medicines?

4    A.    These are all clearly stated points, and that's quite true.

5    Q.    Cosmetics?

6    A.    That's also true.

7    Q.    Dishwashing liquids?

8    A.    All these things are in some instances true.  I would --

9    Q.    Well, would fingernail polish off-gas formaldehyde?

10   A.    To a certain extent, it will, yes.  I cannot be in a room

11   when fingernail polish is being applied.

12   Q.    You personally can't be, right?

13   A.    Right.

14   Q.    Do cigarettes off-gas formaldehyde?

15   A.    Yes, they do.

16   Q.    Other tobacco products?

17   A.    When combusted, yeah.

18   Q.    So formaldehyde is a simple carbon, a one-molecule carbon?

19   A.    Its chemical formula is HCHO.

20   Q.    One carbon?

21   A.    One carbon.

22   Q.    There's a fair amount of formaldehyde in me right now, yes?

23   A.    It has a relatively short half-life in the body.  It is a

24   by-product of metabolism in very small amounts, relatively small

25   amounts.

1   Q.    2.5 parts per million formaldehyde in human blood?

2   A.    It would depend on the level of exposure to exogenous forms

3   of formaldehyde.

4   Q.    So it could be higher?

5   A.    It could be higher.  It could be lower.

6   Q.    Would you agree with the statement that it occurs naturally

7   in the blood?

8   A.    Yes.

9   Q.    Okay.  Here we go.  The incomplete combustion of hydrocarbon

10  fuels can contribute to the level of formaldehyde in outdoor air;

11  do you agree with that statement?

12  A.    Fuels.  There's a difference between a hydrocarbon and a

13  hydrocarbon-based fuel.

14  Q.    Fair enough.  Do you agree with the statement in the --

15  A.    Yes, I do.

16  Q.    -- 2007 report?

17  A.    Yes.

18  Q.    Urban air concentrations during heavy traffic or severe

19  inversions can range up to .08 ppm?

20  A.    Yes.  And that's the analogy I just made in terms of a hot

21  day in Atlanta along I-75.

22  Q.    80 parts per -- I'm sorry.  80 parts per billion?  .08

23  ppm --

24  A.    Yeah, that would --

25  Q.    -- is 80 parts per billion?

1  A.    That would be 80 parts per billion.

2  Q.    Next page, top of the first paragraph.  Halfway through the

3  paragraph it starts with, "Conventional homes."

4        "Conventional homes overall had a concentration of

5  formaldehyde ranging from less than .02 to .4 ppm."

6  A.    Yeah, that's a very dated reference.

7  Q.    It's the Hawthorne paper of 1985, correct?

8  A.    Right.

9  Q.    Would you agree that that's what Hawthorne found and that

10 was accurate at least in 1985, 1986?

11 A.    That's what they reported.

12 Q.    "Since the mid" -- the one you liked, "Since the mid-1980's,

13 plywood and particle board manufacturing methods have changed to

14 reduce formaldehyde emissions"; is that accurate?

15 A.    That's accurate.

16 Q.    Next sentence, "Home construction methods have also changed

17 to reduce the use of UFFI"; is that accurate?

18 A.    What's the acronym UFFI?

19 Q.    -- urea formaldehyde form insulation.  Is that accurate, or

20 do you not know?

21 A.    Yes, that's accurate.

22 Q.    "A study conducted of newly constructed and unoccupied

23 house" -- I assume it should be houses -- "found average indoor

24 concentration of formaldehyde to be .035 to .5 ppm."

25 A.    Actually it is singular, house.

1  Q.   Urban background from .0008 to .068 ppm; is that correct?

2  A.   Yes.

3  Q.   But you would disagree with the one on urban background?

4  A.   No.

5  Q.   I appreciate it.  Buildings in which smoking is not

6  permitted, as you said, the range was from non-detect to as high

7  as .22 parts per million?  220 parts per billion?

8  A.   I think we've established that, yes.

9  Q.   Buildings in which smoking is permitted from non-detect to

10 .6 ppm?

11 A.   That's correct.

12 Q.   Or 600 parts per billion?

13 A.   That also would be correct.

14 Q.   Almost, what, about 80 times higher than the chronic MRL?

15 A.   I would have to crunch the numbers there, if you've done

16 that.

17 Q.   Fair?

18 A.   -- okay.

19 Q.   It's a lot higher; agreed?

20 A.   It's higher.

21 Q.   The intermediate MRL is .03.  It's a lot higher -- .6 is a

22 lot higher than .03; correct?

23 A.   It's higher.

24 Q.   That one is only 20 times higher, right?

25 A.   Again, you continue to play this mental gymnastics with me.

1    I'm not going to do that.  Okay.  If you want to do math

2    exercises today, then that's your business.

3    Q.    Would you have concerns if it was above .008 parts per

4    billion -- parts per million?

5    A.    In an office setting?

6    Q.    Office setting, eight hours a day, over 65.

7    A.    Okay.

8    Q.    No breaks.

9    A.    Okay.  The MRL is intended for a lifetime of exposure,

10   24 hours a day, 7 days a week.  It's different than an

11   occupational exposure.  And you're asking me to compare apples

12   and oranges, and that is inappropriate.

13   Q.    I appreciate you giving me the information because you just

14   told me stuff I didn't understand.

15   A.    That's okay.  That's fine.  I'm happy to.

16   Q.    You're talking about a lifetime exposure, not just 366 days,

17   correct?

18   A.    It's for 366 days up to a lifetime of exposure.

19   Q.    And 24/7; is that correct?

20   A.    Yeah, that's correct.

21   Q.    When we say 24/7 we're talking about 24 hours a day, 7 days

22   week, 52 weeks a year, correct?

23   A.    Yes.

24   Q.    We're not talking about in and out of the trailer to go to

25   school, to go play ball, to run around the neighborhood with your

1  cat and your dog, right?

2  A.   And as you add those other caveats, are they running around

3  playing ball next to Interstate 75?  Okay.

4       So please remember when you ask these questions, the

5  answer has to be context specific.  And I'm not going to answer

6  questions that are general in nature regarding the level of

7  anything here that does not address the full range of factors

8  that need to be taken into account.

9  Q.   Because if they were running around down the street from

10  Interstate 75 or Interstate 10, they would be exposed to a fair

11  amount of formaldehyde from a source other than the trailer,

12  correct?

13  A.   Possibly so.  Depending on the time of year, time of day, it

14  would vary.

15  Q.   If we can flip to next page.  Here we have the ATSDR MRL's,

16  correct?

17  A.   Yes, that's correct.

18  Q.   And let's start with the first one.  Chronic is .008 ppm?

19  A.   Uh-huh (affirmative response).

20  Q.   Yes?

21  A.   Yes, that's correct.

22  Q.   And it says, "The chronic inhalation MRL was derived from a

23  human study."

24  A.   Yes.

25  Q.   "After 7.3 years exposure --

1  A.    Yes.

2  Q.    -- "the lowest observable adverse effect level, or LOAEL,

3  was .24 ppm, correct?

4  A.    That's what it says, yes.

5  Q.    Which caused lesions in nasal mucosa, correct?

6  A.    Yes.

7  Q.    And then it says, "Dividing by a safety factor of 30 yielded

8  the MRL .008," correct?

9  A.    Yes.

10  Q.    Okay.  Next one is the intermediate level, .03?

11  A.    Uh-huh (affirmative response).

12  Q.    "Intermediate inhalation MRL was derived from a monkey

13  study.  After exposure for 26 weeks, 7 days per week, 22 hours

14  per day, the no observable adverse effect level, NOAEL, was .98

15  ppm," correct?

16  A.    Yes.

17  Q.    "Divided by a safety factor of 30 yielded an MRL of .03"?

18  A.    Correct.

19  Q.    "The acute MRL of .04, the acute inhalation MRL, was derived

20  from a human study.  After a two-hour exposure, the LOAEL, again,

21  lowest observable adverse effect level, was .4 ppm, which caused

22  increased white blood cells in nasal" --

23  A.    Lavage.

24  Q.    -- "fluid accompanied by increased itching, sneezing and

25  congestion.  Dividing by a safety factor of 9 yielded the MRL of

1  04."

2  A.   Yes.

3  Q.   As we look at those three MRL's, the lowest observable

4  effect, that was found to be .24, correct?

5  A.   Yes.  Let's see.  Let me just check that.  Yes, that's

6  correct.

7  Q.   Would you agree that exposure to a level above the MRL does

8  not mean that adverse health effects will occur?

9  A.   For some individuals it will not make a difference, for

10  others it may make a profound difference.

11  Q.   Because for certain people one molecule is enough?

12  A.   No, because certain people are simply hypersensitive for any

13  number of possible reasons.  It could be their immune status, it

14  could be prior exposures, it could be other similar types of

15  exposures to chemicals having an irritant effect.

16       The immune system can be primed to respond at

17  increasingly lower levels by virtue of its memory capacity more

18  rapidly.

19       And these uncertainty factors are intended to identify

20  what would be a putative effect level in the event that we had

21  complete data on each of these areas of science, that is, whether

22  it's a chronic study, subchronic study, an adverse effect, or a

23  human study versus an animal study.  And sometimes there is a

24  modifying factor that's added for missing data sets.  That's not

25  the case here.

1  Q.   Did I understand you correctly that for some people they are

2  susceptible to injury even below the MRL?

3  A.   It's quite conceivable that they could be, yes.  The MRL is

4  defined, and the RfD similarly is defined, as an estimate that

5  may span an order of magnitude.  That means it could go either

6  direction.  So .008 could be .00008, or it could be .08, if it

7  spans an order of magnitude.

8  Q.   Because there are some people that might be injured at

9  .0008?  Yes?

10         MR. REICH:  ppm?

11         MR. WEINSTOCK:  ppm.

12  A.   .008 ppm may be an issue for some individuals, and it may be

13  that our estimate could be off either way by an order of

14  magnitude, that the variability with some of these estimates may

15  span an order of magnitude.  That's an acknowledgment of the

16  uncertainty in the scientific database.

17         And these are sometimes construed as artificially

18  precise numbers, and that's why talking about whether or not you

19  have a concern about this level or that level will cause me to

20  hesitate because I know the inherent plasticity of the database

21  and the assessments that will be done at different points in time

22  by different individuals looking at different scenarios.

23  Q.   Have you ever met with any of the plaintiff lawyers in this

24  case?

25  A.   Not to my knowledge.  I believe I received a phone call and

1    I referred them to my legal counsel.

2    Q.    When you address the concept of formaldehyde exposure, you

3    do not talk about cumulative dose, do you?

4    A.    No, you don't.

5    Q.    And why is that?

6    A.    Because it's readily -- as I mentioned earlier, its

7    half-life in the body is about one-and-a-half minutes.

8    Q.    Correct.  It's not a bioaccumulant; is that correct?

9    A.    Right.  That's correct.

10   Q.    All right.  And you're familiar with studies of individuals

11   who have been challenged with levels of formaldehyde as high as

12   three parts per million, and then their blood levels are studied

13   shortly thereafter and there's been no elevation of formaldehyde

14   in the bloodstream; is that correct?

15   A.    There may be a transient elevation.  It depends on how long

16   after the exposure the analysis was done.  Within one-and-a-half

17   minutes, half of it is going to be gone, and the point being that

18   the damage induced by formaldehyde is not based on its residency

19   time in the body but upon its intense reactivity with biologic

20   tissues which result in DNA damage and, therefore, an

21   accumulation of hits over time, irrespective of the level of

22   exposure.

23   Q.    You were talking about DNA cross-linking earlier today.  The

24   body -- the studies show that with respect to any damage that may

25   occur with respect to DNA cross-linking as a result of exposure

1   to gaseous formaldehyde, that within a matter of hours that DNA

2   cross-link is repaired; is that correct?

3   A.   Not necessarily.

4   Q.   I was just asking you if you were familiar with studies that

5   showed that exposure to gaseous formaldehyde in so far as any

6   sort of DNA cross-link exposure is concerned and any damage

7   caused or, quote, damage, whether or not that is not repaired

8   within a matter of hours?

9   A.   In some cases it may be, in others it may not be.  The

10  repair mechanisms within the body induced by -- lesions induced

11  by formaldehyde will vary from one individual to another, and the

12  degree to which the exposure is continuous versus an episodic

13  exposure will also have an effect.

14  Q.   Okay.  Are you aware of any exposures that show any DNA

15  cross-link damage as a result of exposure to gaseous formaldehyde

16  below levels of exposure of .2 ppm?

17  A.   I believe the Thrasher and Kilburn articles cite several

18  studies, but I would have to check.

19  Q.   Let's talk about that for just a moment.  So that we are

20  sure that we're talking about the same terminology here, when

21  you're talking about response and a sensitized response to

22  exposure to gaseous formaldehyde and an immunogenic response, are

23  you speaking about either an IgE, an IgG or IgM mediated

24  response?

25  A.   Those all may be involved.

1  Q.   All right.  Assume then that you're speaking of an IgE, an

2  IgG or an IgM mediated response to exposure to gaseous

3  formaldehyde.  Are you aware of a single study that has ever

4  found an antibody specific to such exposure?

5  A.   I'm not.

6  Q.   You've discussed earlier today that formaldehyde is a

7  recognized carcinogen.  The recognition comes from the 2004 press

8  release and later released by the International Agency for

9  Research on Cancer, correct?

10  A.   Well, precisely stated, it would be a recognized human

11  carcinogen.  By EPA it's classified as a probable human

12  carcinogen, and by the Department of Health and Human Services

13  it's reasonably anticipated to be a human carcinogen.

14  Q.   I see.  But in so far as being the general category of

15  "known" as opposed to "probable" or "likely" or whatever the

16  adverb might be that precedes the word "carcinogen," the only

17  agency that has come out and declared formaldehyde a carcinogen

18  is IARC; is that correct?

19  A.   The only agency that has come out and called it a known

20  human carcinogen is IARC.

21  Q.   Correct.  And that's only with respect to one form of

22  cancer, which is nasopharyngeal cancer; is that correct?

23  A.   That's primarily based on nasopharyngeal cancers, but it

24  also references leukemias, as well.

25  Q.   With respect to leukemia, and I can quote you the language,

1  it does not declare leukemia as a known human carcinogen, does

2  it?

3  A.    Leukemia is a disease, not a carcinogen.

4  Q.    Excuse me.  Formaldehyde is not declared in that 2004 press

5  release as a known human carcinogen causing leukemia, correct?

6  A.    The classification of known human carcinogen is based

7  primarily on nasopharyngeal cancer.  However, the weight of

8  evidence is always considered in those designations.  And, in

9  fact, I was, as I recall, at the consultation in Lyon when that

10 was discussed and it was reclassified.  If I'm not mistaken, I

11 was at that particular consultation.

12 Q.    With respect to the classification of formaldehyde insofar

13 as nasopharyngeal cancer is concerned, that IARC report is

14 predicated primarily on what paper, do you know?

15 A.    There were a number of studies, the occupational studies

16 that were conducted.

17 Q.    The NCI occupational study authored primarily in 2003 by

18 Hauptmann, correct?

19 A.    I believe that's correct.  Yes.

20 Q.    Have you read that paper?

21 A.    I believe I have.

22 Q.    Do you know the threshold where there was an excess of the

23 standard mortality ratio in excess of deaths on which the

24 Hauptmann report concludes that it is a human carcinogen?

25 A.    I believe there was a high exposure group versus a low

1  exposure group in the cohorts that were studied.  I do not recall

2  what the exposure ranges were in that study.

3  Q.   Would it surprise you to know that that exposure range was

4  in excess of four parts per million?

5  A.   No, it's typically the case that because of difficulty in

6  identifying toxic effects in chemicals that high dose levels are

7  used.  It's a maximum tolerated dose.  It's a long-standing

8  protocol based on the National Toxicology Bioassay Program and

9  also on the Bioassay Program of the Ramazani Institute in Italy

10  that you scale back from the maximum tolerated dose on a

11  logarithmic basis so that you have a dose span that is more

12  likely to illustrate the shape of the dose response function.

13  Q.   Are you aware of any exposure, chronic exposure in these

14  FEMA trailers in excess of four parts per million?

15  A.   I would have to go back and check.

16  Q.   As you sit here today, are you aware of any exposure,

17  chronic exposure of any occupant of any trailer in excess of four

18  parts per million?

19  A.   Again, I would have to go back and check.

20  Q.   Do you remember what the arithmetic mean of exposure within

21  the travel trailers and manufactured houses was in the July 2008

22  CDC report of the 519 trailers?

23  A.   I believe it was on the order of 150 -- well, I'm not going

24  to speculate.  I'm sorry.

25  Q.   If it were 0.078 ppm, would that be far below four parts per

1  million?

2  A.   Yes.

3  Q.   Let's just -- we'll break it down further.  Are you aware of

4  any reported exposure in any of those homes, regardless of how

5  short or regardless of how long, that exceeded four parts per

6  million?

7  A.   I don't believe so.

8  Q.   You were asked earlier this morning a question about an

9  e-mail that you had written that there were clinical signs and

10 that there was -- these clinical signs are a harbinger of a

11 public health disaster.

12          And as I recall your testimony, and I could be wrong,

13 you had reference to the amount of asthma being reported in the

14 children who were occupants of those homes.  Is that what your

15 reference was to?

16 A.   My reference was to children presenting with clinical signs

17 of formaldehyde toxicity, including bloody noses, coughing up

18 blood.  And that's not asthmatic response; bronchial constriction

19 is an asthmatic response.  So it was among a suite of symptoms

20 that were presented clinically.

21 Q.   Dr. DeRosa, earlier today you were -- you threw out the

22 general principle, as I understood it, that it is generally

23 recognized in toxicology in general that children and elderly are

24 more likely to respond to a toxin or to an irritant.

25          I'm certainly not quarreling with that general

1   principle of toxicology at all.  I just want to ask this

2   question.  Are you aware of any study of formaldehyde and

3   exposure of the elderly that shows that with respect to the

4   airborne formaldehyde that elderly are more susceptible to

5   gaseous concentrations of formaldehyde?

6   A.    I don't have a specific reference.

7   Q.    Would it be the same --

8   A.    If that's what you're asking for, I don't have that specific

9   reference, but it's --

10  Q.    The same with respect to children?

11  A.    No, I think there are specific references that -- but I

12  don't have those available to me at this juncture.

13  Q.    I understand what you've told us today that with respect to

14  health guidance values, that neither you nor the ATSDR consider

15  health guidance values to be cause and effect levels; is that

16  correct?

17  A.    Again, that would be dependent upon the individuals that are

18  involved.  There may be an effect at or below the minimal risk

19  level.  One cannot say.  But, generally speaking, it's

20  anticipated that for a given population, ruling out the other

21  variables of coexposure to other contaminants, prior exposures,

22  sensitization, that those values should be in a level that is

23  without an appreciable risk of a health effect for the specified

24  duration and relative exposure.

25  Q.    And they are not intended to be considered as representing a

1  threshold for toxicity; isn't that correct?

2  A.   That's correct.  And it should also be noted, neither are

3  NOAEL's or LOAEL's because those levels are a function of dose

4  spacing, and you may have identified a LOAEL at one level and you

5  would still have a LOAEL at still another level.

6           So you're really at the mercy of the spacing of the

7  study, the dose spacing of the study that's being conducted in

8  identifying a putative, quote, unquote, threshold.

9  Q.   Were you aware that in July 2007 FEMA changed its policy and

10  offered to move anyone in a trailer who wanted out into alternate

11  housing?

12  A.   I do recall that, yes.

13  Q.   You were asked a question a moment ago about certain types

14  of techniques that might be used to reduce formaldehyde levels in

15  the trailer.  One such method was to open the windows and perhaps

16  vents, so that was someone effective.

17           Do you recall whether the level was reduced below the

18  ATSDR minimum risk level for chronic exposures, the level of .008

19  ppm?

20  A.   No.  As I recall, the levels were reduced to between .1 and

21  .2 parts per million.

22  Q.   So would that be above the minimum risk level for chronic

23  exposures to formaldehyde?

24  A.   Yes, they are.

25  Q.   And can you explain to the ladies and gentlemen of the jury

1  how you, as a health professional, utilize the minimum risk

2  levels in your day-to-day work?

3  A.    Okay.  In my day-to-day work, I look at issues as they

4  present themselves, recognizing it's the dose that makes the

5  poison, a long accepted principle of toxicology.  And I look at

6  the weight of evidence and the degree of uncertainty associated

7  with the value.

8          I try to compare the conditions under which the value

9  was developed in terms of the experimental protocol and look at

10  the relevance of that exposure scenario to that of the one that

11  we're concerned about in terms of public health actions and

12  recommendations and work from that point forward.

13         It's a -- and the intent of the article that was

14  referenced earlier by Dr. Risher and myself was to illustrate

15  that these are not bright lines in the sand, and that needing to

16  recognize the limitations of application of those values.

17         Again, they are not action levels.  They are levels

18  that prompt further evaluation that could precipitate action

19  either above or below those levels.  A lot depends on the other

20  types of exposures that may be ongoing, the life-style factors

21  associated with the population, you know, whether we're dealing

22  with children that are -- exhibit pica-like behavior, where they

23  ingest large quantities of dirt, more so than my children did and

24  they did a pretty good job of doing that in their day.  And even

25  populations in southeast Georgia, for example, that ingest large

1    amounts of kaolin-containing clay.

2          In the case of Mercury, for example, inorganic mercury

3    in some Hispanic populations is used for ritualistic practices,

4    and it's sprinkled about in and around the religious icons and

5    associated with other cultural rituals.

6          And children are risk takers, and Mercury is a creative

7    hazard.  We had an issue with kids dipping their cigarettes into

8    metallic Mercury, the only metal that's liquid at room

9    temperature, and inhaling it.  And the colors were very

10   attractive until they began hemorrhaging blood.

11         So it is -- the populations are highly variable.  The

12   conditions under which they live are highly variable, and

13   particularly when you're dealing with some underserved

14   communities.  And, again, one has to be sensitive to aspects of

15   -- that are specific to certain cultures, and native American and

16   lower SES communities' consumption of subsistence fishing is a

17   common practice, and so there are elevated exposures of those

18   populations that one has to be aware of in looking at any

19   incremental exposure from other situations that arise.  So it's a

20   bit of art, and it's a bit of science mixed in.

21         But, again, in public health practice, it's the

22   precautionary principle that is the cornerstone of public health.

23   And that dates back to Bernardino Ramazzini saying, "It's better

24   to prevent than cure," to the fellow who took the handle off the

25   pumps during the epidemics in England.  Those are -- that's

1   low-hanging fruit compared to dealing with the consequences of

2   exposure.  And health education is one thing that can be used to

3   create effect because when people are provided with correct

4   information, they almost always make the right decision,

5   especially if it involves the health of their children or

6   themselves.

7           The bottom line is that I think as a society, we are

8   somewhat -- tend to be somewhat arrogant in what we think we

9   know.  I know for myself, I know less and less about more and

10  more every day, and I evidenced that here today.  I did not

11  prepare for this -- this testimony today.  I simply gathered

12  materials and I looked at them after the last tox profile I read

13  last night after -- well after midnight because I am engaged in

14  other activities now.  This is not my primary focus at this

15  juncture.  But I'm a pretty quick study when I've been through

16  these chemicals, and I've been through a range of these chemicals

17  on behalf of the Office of Science and Technology in the White

18  House ranging from mercury, to PCB's, to dioxin, and it worked on

19  behalf of the National Research Council and National Academy of

20  Sciences on a number of different chemicals.

21          And so I quickly come up to speed on the chemical at

22  hand, at issue, and it's the overall guiding principles of

23  science rather than the quantitation, rather than the specific

24  parameters of a given study.  It's based on what one takes from

25  the body of knowledge over time that is important.

1          The fact that not only is science generalizable from
2    one study to another study or to another circumstance, it's
3    generalizable from one chemical to another chemical based on
4    inferences drawn from structure activity, relationships, based on
5    our knowledge of the thermodynamic properties of chemicals as
6    they interact with biological surfaces that will allow us to
7    conduct many of these studies in a much more precise way in
8    cyberspace rather than in lab space.
9          The NTP bioassay considered the gold standard.  It was
10   a pretty messy situation.  I think physicists would be appalled.
11   As you get into the hard sciences, the life sciences become more
12   and more ambiguous.  But nevertheless, that is what we're tasked
13   with, providing answers in the absence of perfect information.
14   Q.   You just mentioned the NTP.  Is that the National Toxicology
15   Program?
16   A.   Yes, sir.
17   Q.   Did the National Toxicology Program make a determination
18   with respect to the carcinogenic classification of formaldehyde?
19   A.   Yes, it did.
20   Q.   And what was the classification?
21   A.   The classification was actually done by the NTP executive
22   committee, it's chaired by the National Toxicology Program.  The
23   executive committee is comprised of representatives from agencies
24   such as ATSDR.  I was a representative until about a year or two
25   ago, since about 1993.  And, you know, there is a very vigorous

1  review process.  There are a number of different subject matter

2  working groups that then forward their recommendations on up to

3  the executive committee, and then it's us -- for us to determine

4  whether we agree with a -- a recommended classification.

5           In the case of formaldehyde, it's currently listed as

6  reasonably anticipated to be a human carcinogen in the tenth

7  report on carcinogens that was released several years ago.  The

8  limitations of that study were taken into account that there was

9  one particular cohort of workers that really skewed the 2003

10 report.  That was not the case in the most recent evaluation, and

11 it wasn't just one group of workers that showed somewhat skewed

12 or high incidences of nasopharyngeal cancer.

13          So again, the point is that we've become more refined

14 and more focused in terms of the types of issues that are

15 addressed in these studies, as the limitations are brought to

16 bear and brought to light.  And that's the strength of the

17 scientific method is it's self-correcting by virtue of repeated

18 testing.

19          I did serve on the NTP review committee.  It was

20 already classified as reasonably anticipated.  I did participate

21 in the discussions around formaldehyde with IARC when it was

22 upgraded from -- we refer to it as upgraded, when it was

23 reclassified as a known human carcinogen.

24          THE COURT:  Is that it?  We'll go ahead and turn the

25 lights up here.  That's the completion of the testimony of

1    Chris DeRosa.  Is that correct, Counsel?

2         MR. D'AMICO:  Dr. DeRosa, yes.

3         THE COURT:  Dr. DeRosa, sure.  I've got about 10 minutes

4    before noon.  So let's go ahead and take our lunch break now.  We

5    will start up again -- why don't we start up again in one hour.

6    Ten minutes to 1:00, we'll start up again.

7              In the meantime, if you would, please, don't

8    discuss the case amongst yourselves.  As a reminder, please don't

9    discuss the case amongst yourselves during the lunch break.

10        THE COURT SECURITY OFFICER:  All rise.

11        (WHEREUPON, at this point in the proceedings, the jury

12   panel leaves the courtroom.)

13        THE COURT:  Counsel, is there anything we need to cover

14   on the record at this time?

15        MR. D'AMICO:  Yes, Your Honor.

16        THE COURT:  Why don't y'all be seated.

17        MR. PINEDO:  Your Honor, we would request the

18   opportunity to make an offer of proof of Dr. Laughery outside the

19   presence of the jury.  We are ready to proceed immediately.

20   Dr. Laughery is here in the back of the courtroom.

21        THE COURT:  That's fine.  When I finish business with

22   you all, you can go ahead and put it on the record while the

23   court reporter is here.  I don't need to be present for that.

24   Why don't you all approach about the issue we talked about this

25   morning before you do that.

1    Anything else we need to put on the record besides

2  that?

3    (WHEREUPON, at this point in the proceedings, there was

4  a conference held at the bench outside the presence of the court

5  reporter.)

6    THE COURT:  Ten minutes to 1:00 we'll resume and we'll

7  go ahead and do the proffer now and we'll pick up at 10 minutes

8  to 1:00.

9    (WHEREUPON, at this point in the proceedings,

10  Plaintiff's Proffer Number 1 commenced as follows:)

11                     EXAMINATION

12  BY MR. PINEDO:

13  Q.   Are you ready to proceed, Dr. Laughery?

14  A.   Yes.

15  Q.   Do you understand the procedure we have currently right now

16  is an offer of proof?

17  A.   Yes.

18  Q.   And you understand this is being given outside the presence

19  of the jury?

20  A.   Yes.

21  Q.   In your report, you talk about a warning system.  What is a

22  warning system?

23  A.   A warning system is essentially a collection or a

24  combination of methods.  In communication theory, it would be

25  called media for communicating safety information, for

1  communicating warning information.  It consists of everything

2  from on-product labels, to manuals, to package inserts, to verbal

3  exchanges that may occur, depending upon the product and the

4  circumstances in which it's used.

5  Q.   Well, let's talk about that in the context of on-product

6  warnings.

7          When is an on-product warning called for, based upon

8  your expertise, as a warnings expert?

9  A.   Now, as a general principle, it's always called for when

10 it's possible to be done, because there is ample amounts of

11 research that shows that that is the most likely component of a

12 warning system to be seen, to be detected, to be read, to be

13 understood.  And in short, it's your best chance of getting the

14 information to the consumer.

15 Q.   The other item you mentioned as a component of a warning

16 system is owners' manuals.  Please describe that for us.

17 A.   Well, owners' manuals are essentially documents that a

18 company products.  We get them with our automobiles, we get them

19 with appliances and so forth.

20         And owners' manuals typically serve -- we talk about

21 primary and secondary components of a warning system.  The

22 primary component is usually the on-product warning because

23 that's going to be there when it's needed, and that's an

24 important point.  If it's with the product, not in some file

25 somewhere or having gotten lost when the product was in use, but

1   an on-product label is with the product when needed.

2          An owner's manual is a secondary component of the

3   warning system.  That doesn't mean that it's not relevant and not

4   important, but it's secondary to the on-product label.

5          And one other thing that there has been a good deal now

6   of scientific evidence to show is that owners' manuals frequently

7   are not read cover to cover, particularly with major products,

8   where an owner's manual may be dozens or even hundreds of pages

9   long.  They instead serve as reference documents.

10         So that's -- depending upon the product, depending upon

11  the size of the owner's manual, it may serve different functions

12  as a component of the system.

13  Q.   The third item you had mentioned as part of a warning system

14  related to some type of verbal communication.

15         Can you please describe that for us.

16  A.   Yeah.  For some kinds of products, it is possible that there

17  may be an opportunity for a verbal interaction at the interface

18  of the product's delivery.

19         Probably the most common example of that that we're

20  familiar with is when somebody buys a new car at the dealership.

21  There may be opportunities to talk about safety characteristics

22  of the vehicle, the restraint system, we've got side air bags on

23  this vehicle and circumstances in which they are used to provide

24  safety information.  That can be a very important component of

25  the warning system -- and everything I'm saying about this is

1  well-documented in the scientific literature.  That may be a very

2  significant component of the warning system because at that

3  point, you have people's attention.  And that's an opportunity

4  then to communicate because you've got their attention.

5  Q.   Earlier today when I was questioning you, I asked you about

6  an on-product warning.  There was an objection and the Court

7  ruled on the objection.  But let me ask you now that you have

8  identified three elements of a warning system:  Do you believe

9  that second component that you talked about, an on-product

10 warning, would be necessary with regard to travel trailers such

11 as the Forest River travel trailer?

12 A.   Oh, yes.

13 Q.   And why is that, Dr. Laughery?  Based upon your some

14 40 years of experience in warnings, why is it your opinion that

15 an on-product warning would be necessary for a Forest River

16 travel trailer?

17      MR. GIEGER:  I object to the testimony both as to report

18 and scope.

19      THE WITNESS:  There are at least two or three reasons

20 why the on-product warning is necessary for a product like this.

21      One of the reasons is, as I said earlier about

22 on-product warning, it's the most likely to be seen, to be

23 examined, to be noticed, and so forth, and if it's labeled, to be

24 read, if it's visual, which is what we're talking about here.  So

25 that, of course, is a primary consideration.

1           A second is for a product like the trailer, the

2    owner's manual serves a limited function in the sense that I was

3    talking about earlier.  There is likelihood that it won't be read

4    or that it won't be read cover to cover.  The information may not

5    be available.

6           The third point I would make has to do, again, back

7    with the concept of the warning system.  And that is, these two

8    components can interact.  In other words -- and we often do this,

9    we put information in the on-product warning that directs

10   somebody to the secondary source, the owner's manual, and serves

11   as the motivating function then to examine that section of the

12   owner's manual, thus the on-product warning can serve to help

13   overcome that possibility or probability that the owner's manual

14   won't be read.

15                           EXAMINATION

16   BY MR. PINEDO:

17   Q.   Sir, in your report, did you make a recommendation that

18   there be an on-product warning for this particular travel trailer

19   with regard to formaldehyde?

20   A.   Yes.

21   Q.   The other item that you had mentioned is the owner's manual.

22   I'm going to show you what has been marked as Exhibit No. 561,

23   which has been previously admitted.

24           Sir, have you reviewed this owner's manual for the

25   Forest River travel trailers?

1   A.   Yes.

2   Q.   Did you also review the table of contents for this owner's

3   manual for Forest River travel trailers?

4   A.   Yes.

5   Q.   I'm turning now to Page 5 of the owner's manual.

6        Is that the Table of Contents for that owner's manual?

7   A.   Yes.

8   Q.   There is a section there entitled Identification and Safety.

9        Did you read that section?

10  A.   Yes.

11  Q.   Did that section contain anything on formaldehyde?

12  A.   No.  As best I can determine, the word "formaldehyde" didn't

13  appear at all in that safety section.

14  Q.   There's also a section entitled Care and Maintenance; is

15  that right?

16  A.   Yes.

17  Q.   Does that section say anything about formaldehyde?

18  A.   Yes, it does have -- I think it was on Page 77, as I recall,

19  it had -- it addressed formaldehyde.

20  Q.   And, sir, as an expert on warnings, where do you think it

21  would be more reasonably calculated to gain the attention of the

22  users of this travel trailer if there was a notice about

23  formaldehyde and its effects on human beings and health risks?

24  A.   Near the front of the manual in the section that deals with

25  safety.

1  Q.   I now turn to Page 77 of Exhibit No. 561, and you have that

2  in front of you?

3  A.   Yes.

4  Q.   Is that some kind of statement on formaldehyde?

5  A.   Yes.

6  Q.   Earlier today, you testified that one of the hazards, one of

7  the consequences that you're aware of with regard to formaldehyde

8  is the potential for cancer.

9        Is the word "cancer" contained in this health notice on

10  formaldehyde that is contained in the manual for Forest River?

11  A.   No.

12  Q.   In your opinion, to minimize the exposure to formaldehyde,

13  are you suggesting that a notice about these health risks,

14  including cancer, be included not only in the owner's manual, in

15  the Identification and Safety section as well as an on-product

16  warning?

17  A.   Yes.

18  Q.   You have reviewed testimony, and have you looked at some

19  pictures of this travel trailer?

20  A.   Yes.

21  Q.   Did you see anywhere any evidence that there was any notice

22  on product warning on this travel trailer that formaldehyde

23  exposure can result in cancer?

24  A.   No.

25  Q.   Did you see any evidence of an on-product warning on this

1  travel trailer that it informed people of the health risks
2  associated with exposure to formaldehyde?
3  A.    No.
4  Q.    The third element of a warning system that you mentioned is
5  some type of verbal instruction.
6            Did you see any indication there was any verbal
7  instruction with regard to the health risks of formaldehyde with
8  use or occupancy of this trailer?
9  A.    No.
10 Q.    In the context of this travel trailer and Lyndon Wright
11 living in it, who do you believe, as set forth in your opinion,
12 are the potential individuals or corporations that would have
13 been in a position to give some type of verbal instruction?
14 A.    That would have been Shaw, as I understand it.  They were
15 the ones who were responsible for the installation, delivery, and
16 had an opportunity to interface with the occupant.
17 Q.    And what are you suggesting --
18 A.    Mr. Wright.
19 Q.    Yes.  With regard to that verbal instruction or warning
20 based upon your experience of some 40 years in the field of
21 warnings, what type of warning or information would you suggest
22 that Shaw give to Lyndon Wright, and at what stage?
23 A.    Well, there again, I will answer in the context of a warning
24 system.  When the Shaw delivery person -- I'll refer to him that
25 way -- during this transition period, inspection and so forth, is

meeting with Mr. Wright and they did a walk-through, according to

the testimony that I saw, there was an opportunity to talk about

safety issues associated with the trailer, including a

formaldehyde issue, and that would have not only been an

opportunity to mention that or to say something about that, but

to direct his attention to the other components of the warning

system, that there is a label in here and if there is information

in the owner's manual, which I'm giving you, instead of handing

him a packet that wasn't open, there's information in the owner's

manual that you should review about the safety matters, including

the formaldehyde matter.

Q.   And did you see any indication that that occurred with the

case of Lyndon Wright?

A.   No.  The indication from the testimony that I saw was that

it did not occur.

Q.   Did you discuss these three aspects of a warning system in

your report?

A.   Yes.

Q.   If you had been allowed to testify to such in front of this

jury, would you have done so based upon the questions?

A.   Yes.

Q.   Is it your opinion that the warning system in this travel

trailer was adequate or inadequate with regard to the hazards

associated with formaldehyde exposure?

A.   It was clearly inadequate.

1         MR. PINEDO:  Nothing further.

2         MR. GIEGER:  For the record, defendant Forest River

3    objects to the proffer as being not only beyond the scope of the

4    order of the Court, the motions in limine, referenced to those

5    orders and beyond the content and substance and opinions

6    expressed by Dr. Laughery in his report in this case and the

7    materials reviewed in connection with those reports.

8         MR. KURTZ:  And Shaw joins in that objection.

9         MR. PINEDO:  For the purpose of this hearing, I would

10   mark as Exhibit 1 for this offer of proof, the report of

11   Dr. Laughery which sets forth his opinions, including that on a

12   warning system.

13        (WHEREUPON, at this point in the proceedings,

14   Plaintiff's Proffer Exhibit 1 was offered into evidence.)

15        MR. GIEGER:  For the record, this is not a hearing.

16   There is no judge present.  So this is not a hearing.  It's a

17   proffer.

18        MR. PINEDO:  It is a proffer and I just want the record

19   to be complete, especially to the extent the defense counsel has

20   said it's gone beyond the report.

21            (WHEREUPON, at this point in the proceedings, a

22   luncheon recess was taken.)

23                        *    *    *

24

25

REPORTER'S CERTIFICATE

    I, Cathy Pepper, Certified Realtime Reporter, Registered
Merit Reporter, Registered Professional Reporter, Certified Court
Reporter of the State of Louisiana, Official Court Reporter for
the United States District Court, Eastern District of Louisiana,
do hereby certify that the foregoing is a true and correct
transcript, to the best of my ability and understanding, from the
record of the proceedings in the above-entitled and numbered
matter.


                              *s/Cathy Pepper*
                              Cathy Pepper, CRR, RMR, CCR
                              Official Court Reporter
                              United States District Court

## $

**$10** [1] - 352:3

## '

**'06** [1] - 363:23
**'07** [5] - 363:12, 363:19, 365:17, 375:9, 377:1
**'08** [1] - 315:9
**'50s** [1] - 372:7
**'70s** [2] - 350:12, 374:24
**'80s** [3] - 350:12, 350:15, 374:24
**'91** [1] - 350:21
**'94** [1] - 354:6
**'You** [6] - 297:3, 297:9, 298:7, 299:10, 299:22, 299:23

## 0

**0.078** [1] - 402:25
**0.16** [1] - 378:3
**0.3** [4] - 384:20, 384:23, 384:25
**00008** [1] - 397:6
**0008** [2] - 392:1, 397:9
**008** [8] - 370:13, 371:3, 393:3, 394:18, 395:8, 397:6, 397:12, 405:18
**01** [1] - 378:2
**012** [2] - 377:25, 378:3
**016** [1] - 378:3
**02** [1] - 391:5
**03** [6] - 370:14, 371:2, 392:21, 392:22, 395:10, 395:17
**035** [1] - 391:24
**04** [4] - 370:15, 371:2, 395:19, 396:1
**068** [1] - 392:1
**08** [3] - 390:19, 390:22, 397:6
**09-2977** [1] - 288:9

## 1

**1** [6] - 342:23, 359:17, 405:20, 412:10, 421:10, 421:14
**1.........................** [1] -

290:24
**1.........................** [1] -
290:17
**10** [11] - 352:2, 355:18, 357:25, 358:1, 373:8, 373:15, 374:18, 379:18, 394:10, 411:3, 412:7
**10,000** [1] - 372:23
**10-year** [1] - 374:1
**10.8** [1] - 373:10
**1000** [1] - 288:21
**102** [3] - 297:21, 299:4
**10:00** [2] - 348:21, 358:2
**118** [1] - 388:18
**12** [1] - 306:7
**12904** [2] - 291:14, 291:20
**13** [2] - 297:21, 299:4
**14** [5] - 345:16, 345:24, 359:17, 370:18, 370:19
**14-day** [1] - 360:10
**140** [1] - 338:1
**140-something** [1] -
322:8
**15** [4] - 345:21, 348:22, 348:25, 359:18
**15-minute** [2] -
346:20, 346:21
**150** [2] - 346:7, 402:23
**16** [9] - 288:6, 291:3, 312:5, 312:14, 338:14, 351:24, 352:8, 381:23
**16th** [1] - 354:23
**17** [1] - 383:11
**17th** [1] - 351:20
**180** [1] - 354:19
**1873** [1] - 288:5
**19** [1] - 299:5
**1959** [1] - 318:1
**1960s** [1] - 321:2
**1963** [2] - 321:2, 321:6
**1972** [1] - 321:7
**1981** [1] - 368:7
**1984** [4] - 321:8, 350:16, 353:4, 353:5
**1985** [2] - 391:7, 391:10
**1986** [1] - 391:10
**1991** [1] - 356:8
**1993** [2] - 354:6, 409:25
**1994** [2] - 369:7, 369:10
**1999** [2] - 368:17, 368:25

**19th** [1] - 382:12
**1:00** [3] - 411:6, 412:6, 412:8
**1st** [2] - 301:12, 383:23

## 2

**2** [3] - 288:11, 399:16, 405:21
**2.5** [1] - 390:1
**2/1** [1] - 382:5
**20** [5] - 345:5, 348:22, 374:12, 374:18, 392:24
**200** [1] - 355:12
**2003** [2] - 401:17, 410:9
**2004** [4] - 336:1, 367:8, 400:7, 401:4
**2005** [4] - 357:1, 357:7, 357:8, 367:9
**2006** [12] - 301:8, 301:12, 301:15, 304:24, 357:7, 357:23, 358:21, 360:12, 362:4, 378:15, 382:12
**2007** [11] - 351:9, 364:10, 364:13, 382:1, 382:20, 383:18, 383:23, 384:11, 385:3, 390:16, 405:9
**2008** [6] - 300:5, 301:8, 301:21, 311:4, 314:22, 402:21
**2009** [6] - 292:24, 292:25, 293:1, 342:24, 343:16, 351:21
**201** [1] - 289:15
**2010** [2] - 288:6, 291:3
**203** [3] - 311:25, 312:5, 312:13
**21** [1] - 312:5
**22** [3] - 297:22, 392:7, 395:13
**220** [1] - 392:7
**2250** [1] - 288:24
**24** [6] - 376:11, 377:1, 393:10, 393:21, 395:3, 396:4
**24/7** [2] - 393:19, 393:21
**25** [1] - 375:9
**26** [3] - 364:11, 364:14, 395:13

**27th** [3] - 364:10, 364:13, 364:15
**294** [2] - 290:5, 290:6
**29402** [1] - 291:14
**2nd** [4] - 292:25, 293:1, 382:1, 382:20

## 3

**3** [6] - 371:1, 371:3, 371:4, 371:10, 371:16, 388:1
**30** [7] - 321:20, 322:12, 337:13, 368:8, 379:10, 395:7, 395:17
**300** [2] - 377:15, 378:6
**301** [1] - 290:7
**303** [2] - 317:8, 320:14
**313** [2] - 290:8, 290:9
**316** [1] - 290:10
**317** [2] - 290:11, 290:12
**332** [1] - 290:13
**339** [1] - 290:14
**340** [1] - 290:15
**349** [1] - 290:16
**3600** [1] - 289:15
**365** [2] - 370:19, 370:20
**366** [2] - 393:16, 393:18
**3rd** [1] - 384:11

## 4

**4** [2] - 391:5, 395:21
**40** [4] - 322:5, 322:6, 415:14, 419:20
**412** [2] - 290:17, 290:18
**421** [1] - 290:24
**4265** [1] - 288:21
**45** [1] - 347:7
**4800** [1] - 289:9
**486** [1] - 289:4
**4th** [2] - 378:22, 379:12

## 5

**5** [4] - 343:16, 388:17, 391:24, 417:5
**50** [1] - 345:19
**500** [1] - 289:21
**504** [1] - 289:22
**519** [2] - 362:25, 402:22

**52** [2] - 363:22, 393:22
**561** [2] - 416:22, 418:1
**589-7779** [1] - 289:22
**592** [3] - 306:7, 313:8, 314:6

## 6

**6** [2] - 392:10, 392:21
**600** [1] - 392:12
**622** [1] - 288:18
**65** [1] - 393:6

## 7

**7** [3] - 393:10, 393:21, 395:13
**7.3** [1] - 394:25
**70** [2] - 352:2, 373:21
**70-year** [1] - 373:23
**701** [1] - 289:9
**70113** [1] - 288:18
**70130** [1] - 289:21
**70139** [1] - 289:10
**70170** [1] - 289:10
**75** [3] - 365:22, 394:3, 394:10
**77** [2] - 417:18, 418:1
**77027** [1] - 288:21
**78470** [1] - 288:24
**7th** [1] - 382:12

## 8

**8** [1] - 383:18
**80** [6] - 377:14, 390:22, 390:25, 391:1, 392:14
**802** [1] - 288:24
**8:30** [1] - 288:6

## 9

**9** [1] - 395:25
**92** [1] - 375:8
**93** [1] - 376:9
**95** [1] - 372:11
**96** [6] - 363:8, 363:11, 364:2, 370:21, 371:11, 375:13
**97** [1] - 382:13
**98** [1] - 395:14
**9th** [1] - 292:23

# A

**a.m** [1] - 348:21
**A.M** [1] - 288:6
**AARON** [1] - 288:17
**abided** [1] - 319:3
**ability** [1] - 422:8
**able** [5] - 313:15,
340:9, 377:9,
378:19, 379:14
**above-entitled** [1] -
422:9
**absence** [1] - 409:13
**absolute** [2] - 388:2,
388:4
**abstracts** [1] - 355:13
**academic** [1] - 322:6
**Academy** [1] - 408:19
**accept** [1] - 361:7
**acceptable** [1] -
385:22
**accepted** [2] - 330:25,
406:5
**accompanied** [1] -
395:24
**accomplish** [1] -
294:5
**according** [3] -
371:12, 384:16,
420:1
**accordingly** [1] -
318:22
**account** [3] - 325:19,
394:8, 410:8
**accounting** [1] - 373:2
**accumulation** [2] -
369:6, 398:21
**accuracy** [1] - 368:6
**accurate** [9] - 388:20,
388:22, 389:1,
391:10, 391:14,
391:15, 391:17,
391:19, 391:21
**acknowledgment** [1] -
397:15
**acronym** [2] - 364:24,
391:18
**across-the-board** [1] -
359:22
**Act** [2] - 353:3, 353:5
**acting** [3] - 350:17,
350:20, 351:6
**action** [3] - 367:22,
406:17, 406:18
**actions** [1] - 406:11
**activities** [3] - 352:20,
379:21, 408:14
**activity** [2] - 379:22,
409:4

**actual** [3] - 336:20,
371:13, 371:16
**acute** [6] - 359:16,
360:1, 370:14,
370:18, 395:19
**add** [1] - 394:2
**added** [2] - 388:12,
396:24
**addition** [1] - 361:18
**additional** [4] - 294:4,
294:11, 342:9, 388:9
**address** [4] - 330:7,
365:2, 394:7, 398:2
**addressed** [6] -
322:12, 330:24,
359:11, 364:7,
410:15, 417:19
**addresses** [1] - 380:3
**addressing** [2] -
352:17, 357:16
**adequacy** [5] - 319:11,
319:24, 323:23,
324:19, 324:22
**adequate** [3] - 374:3,
382:18, 420:23
**adequately** [1] -
382:19
**ADI's** [4] - 385:21,
385:22, 385:24,
386:8
**Administration** [1] -
360:2
**Administrator** [1] -
351:5
**administrator** [2] -
356:9, 356:10
**admissible** [1] -
323:24
**admitted** [3] - 317:9,
320:14, 416:23
**Advancement** [1] -
355:5
**adverb** [1] - 400:16
**Adverse** [1] - 367:10
**adverse** [9] - 372:14,
372:15, 386:3,
395:2, 395:14,
395:21, 396:8,
396:22
**advise** [1] - 297:18
**Advisory** [1] - 352:12
**advisory** [1] - 353:19
**Africa** [1] - 354:12
**afternoon** [2] -
346:15, 357:13
**agencies** [11] - 351:1,
352:8, 352:25,
353:20, 353:22,
353:24, 365:14,
365:15, 409:23

**agency** [6] - 352:6,
353:1, 367:3, 377:6,
400:17, 400:19
**Agency** [14] - 350:24,
351:13, 352:11,
352:21, 353:14,
364:21, 364:23,
365:8, 365:11,
367:2, 380:8, 382:9,
384:17, 400:8
**Agency's** [4] - 355:24,
359:16, 359:20,
368:25
**ago** [4] - 321:12,
405:13, 409:25,
410:7
**agree** [26] - 307:25,
308:5, 309:16,
309:18, 309:20,
309:21, 309:22,
323:17, 339:19,
366:18, 367:14,
368:22, 368:24,
369:9, 371:16,
371:24, 372:2,
373:11, 388:12,
390:6, 390:11,
390:14, 391:9,
396:7, 410:4
**agreed** [4] - 304:3,
311:4, 381:4, 392:19
**agreeing** [1] - 388:11
**agreement** [1] - 381:3
**ahead** [17] - 291:16,
299:18, 299:19,
310:16, 312:3,
325:8, 345:4, 346:8,
346:14, 348:20,
357:24, 358:2,
410:24, 411:4,
411:22, 412:7
**AHLQUIST** [1] -
288:17
**air** [18] - 295:15,
295:18, 295:22,
296:4, 296:9,
296:10, 330:13,
338:20, 369:5,
369:19, 370:10,
380:3, 382:17,
382:18, 384:22,
390:10, 390:18,
414:22
**air-conditioner** [3] -
295:15, 295:18,
295:22
**air-conditioning** [1] -
330:13
**airborne** [1] - 404:4
**AL** [1] - 288:8

**allow** [3] - 294:12,
324:5, 409:6
**allowed** [2] - 323:22,
420:19
**Allred** [3] - 383:12,
383:22, 384:2
**almost** [4] - 295:6,
322:5, 392:14, 408:4
**ALSO** [1] - 289:18
**alternate** [1] - 405:10
**alternative** [1] -
330:16
**ambiguous** [1] -
409:12
**amended** [1] - 353:4
**Amendments** [1] -
353:4
**America** [1] - 355:5
**American** [1] - 355:4,
407:15
**amount** [3] - 389:22,
394:11, 403:13
**amounts** [4] - 389:24,
389:25, 407:1,
413:10
**ample** [1] - 413:10
**analogous** [1] -
385:17
**analogy** [1] - 390:20
**analysis** [16] - 292:4,
292:8, 292:15,
325:25, 340:4,
362:25, 363:11,
363:16, 370:21,
371:11, 373:6,
373:13, 374:8,
398:16
**Analysis** [1] - 351:13
**analytic** [1] - 370:2
**animal** [1] - 396:23
**animals** [2] - 366:12,
372:18
**annually** [1] - 352:3
**answer** [15] - 298:6,
298:13, 299:10,
299:14, 299:18,
304:7, 309:6,
310:16, 312:17,
312:19, 324:16,
330:23, 394:5,
419:23
**answered** [1] - 339:5
**answering** [1] - 324:5
**answers** [2] - 304:2,
409:13
**antibody** [1] - 400:4
**anticipated** [5] -
366:10, 400:13,
404:20, 410:6,
410:20

**antiseptics** [1] - 389:1
**apologize** [2] - 309:2,
332:17
**appalled** [1] - 409:10
**apparent** [1] - 292:17
**appear** [2] - 365:1,
417:13
**APPEARANCES** [2] -
288:15, 289:1
**apples** [1] - 393:11
**appliance** [1] - 336:5
**appliances** [1] -
413:19
**applicable** [1] -
374:12
**application** [2] -
336:20, 406:16
**applied** [3] - 336:13,
372:4, 389:11
**apply** [3] - 344:1,
344:10, 344:17
**appointed** [1] - 350:10
**appointment** [3] -
321:4, 350:4, 350:9
**appreciable** [1] -
404:23
**appreciate** [3] -
388:1, 392:5,
393:13
**approach** [9] - 297:23,
312:1, 312:3, 312:6,
318:12, 323:8,
331:9, 345:7, 411:24
**appropriate** [2] -
381:22, 384:10
**approval** [1] - 356:12
**area** [6] - 344:18,
353:25, 354:10,
365:9, 380:7, 382:14
**areas** [3] - 352:15,
356:2, 396:21
**arguable** [1] - 324:15
**argued** [1] - 388:8
**argues** [1] - 319:15
**argument** [1] - 293:3
**arise** [1] - 407:19
**arithmetic** [1] - 402:20
**arrive** [1] - 381:21
**arrogant** [1] - 408:8
**art** [1] - 407:20
**article** [2] - 385:8,
406:13
**articles** [7] - 322:2,
322:3, 322:8, 322:9,
330:21, 355:13,
399:17
**articulated** [1] -
355:23
**artificially** [1] - 397:17
**aspects** [2] - 407:14,

420:16
**assessing** [1] - 325:25
**Assessment** [2] -
350:17, 352:14
**assessment** [5] -
353:25, 354:3,
374:4, 387:14,
387:20
**assessments** [2] -
375:6, 397:21
**assessors** [1] - 387:18
**assistance** [1] - 380:8
**assistant** [2] - 350:10,
356:10
**Assistant** [1] - 351:12
**assisting** [1] - 386:20
**Associate** [1] - 351:5
**associated** [24] -
315:23, 322:12,
325:22, 327:12,
327:23, 327:25,
328:13, 329:3,
353:8, 354:1, 355:9,
357:16, 359:4,
359:13, 361:14,
368:12, 371:22,
374:10, 406:6,
406:21, 407:5,
419:2, 420:3, 420:24
**Association** [1] -
355:4
**assume** [6] - 303:3,
324:2, 356:6, 383:4,
391:23, 400:1
**assumption** [4] -
328:3, 328:7,
360:20, 365:7
**assumptions** [1] -
373:24
**asthma** [2] - 328:11,
403:13
**asthmatic** [4] -
376:21, 377:8,
403:18, 403:19
**AT** [1] - 288:23
**Atlanta** [2] - 358:19,
390:21
**ATS** [1] - 380:11
**ATSDR** [30] - 350:21,
350:23, 351:7,
351:10, 351:23,
352:24, 355:19,
355:22, 357:11,
361:19, 362:21,
368:17, 368:23,
370:11, 372:1,
373:5, 378:8,
380:21, 381:3,
383:1, 384:12,
384:15, 384:18,

384:25, 385:2,
387:11, 394:15,
404:14, 405:18,
409:24
**ATSDR's** [3] - 363:24,
379:19, 379:20
**attachment** [2] -
366:14, 366:15
**attack** [1] - 377:8
**attacks** [3] - 292:21,
376:21
**attempt** [1] - 349:9
**attempts** [1] - 293:4
**attend** [1] - 317:23
**attention** [4] - 415:3,
415:4, 417:21, 420:6
**ATTORNEY** [1] -
288:23
**attorney** [3] - 341:12,
349:12, 363:15
**attorneys** [2] - 294:4,
348:17
**attractive** [1] - 407:10
**authored** [3] - 322:10,
355:7, 401:17
**authoritative** [1] -
352:22
**authority** [2] - 356:6,
356:9
**automobile** [1] -
326:18
**automobiles** [2] -
338:19, 413:18
**available** [5] - 341:21,
359:1, 387:1,
404:12, 416:5
**Avenue** [1] - 312:16
**AVENUE** [1] - 289:15
**average** [5] - 373:7,
373:10, 384:18,
384:21, 391:23
**awaiting** [1] - 379:5
**aware** [8] - 327:25,
341:25, 342:16,
356:24, 357:2,
357:4, 362:24,
363:1, 364:8,
371:14, 378:23,
380:10, 380:12,
380:14, 380:21,
384:11, 384:15,
385:2, 399:14,
400:3, 402:13,
402:16, 403:3,
404:2, 405:9,
407:18, 418:7

# B

**B.A** [1] - 350:1
**B406** [1] - 289:21
**backbone** [1] - 375:4
**background** [3] -
317:21, 392:1, 392:3
**Background** [1] -
366:21
**bag** [1] - 338:20
**bags** [1] - 414:22
**BAKER** [1] - 289:12
**balance** [1] - 348:23
**ball** [2] - 393:25, 394:3
**barely** [1] - 312:25
**BARONNE** [1] -
288:18
**based** [39] - 292:15,
328:4, 341:25,
342:5, 353:6, 361:4,
365:5, 365:8,
366:11, 366:18,
367:14, 367:21,
368:3, 369:8, 372:4,
372:6, 372:8, 372:9,
372:20, 373:3,
373:7, 374:23,
377:14, 378:18,
381:5, 387:1, 388:5,
390:13, 398:18,
400:23, 401:6,
402:8, 408:24,
409:3, 409:4, 413:7,
415:13, 419:20,
420:20
**basis** [6] - 293:4,
308:7, 317:19,
344:19, 387:19,
402:11
**Bates** [5] - 363:22,
365:22, 375:8,
376:9, 388:18
**bathroom** [1] - 384:23
**bear** [1] - 410:16
**BEARMAN** [1] -
289:12
**became** [3] - 351:6,
356:8, 357:2
**become** [8] - 315:17,
356:24, 357:4,
361:16, 361:19,
364:8, 409:11,
410:13
**BEFORE** [1] - 288:12
**began** [2] - 361:23,
407:10
**begin** [1] - 371:8
**behalf** [4] - 341:8,
356:15, 408:17,

408:19
**behavior** [3] - 322:25,
323:1, 406:22
**behind** [1] - 316:15
**beings** [1] - 417:23
**belief** [1] - 311:12
**belong** [2] - 354:17,
355:3
**belongs** [1] - 323:14
**below** [10] - 371:21,
382:16, 383:6,
384:19, 397:2,
399:16, 402:25,
404:18, 405:17,
406:19
**belt** [1] - 326:20
**belts** [3] - 338:7,
338:8, 338:19
**bench** [10] - 308:14,
309:12, 313:1,
318:15, 320:8,
323:11, 325:6,
331:11, 332:3, 412:4
**benefit** [1] - 317:18
**BERKOWITZ** [1] -
289:13
**Bernadino** [1] -
354:22
**Bernardino** [1] -
407:23
**beside** [1] - 293:6
**best** [5] - 357:21,
381:18, 413:13,
417:12, 422:8
**better** [2] - 355:2,
407:23
**between** [4] - 321:4,
381:8, 390:12,
405:20
**beyond** [11] - 316:4,
318:10, 327:14,
327:15, 342:2,
353:13, 370:20,
377:12, 421:3,
421:5, 421:20
**big** [2] - 345:17,
345:24
**billion** [6] - 390:22,
390:25, 391:1,
392:7, 392:12, 393:4
**BINSTOCK** [1] -
288:20
**bioaccumulant** [1] -
398:8
**bioassay** [1] - 409:9
**Bioassay** [2] - 402:8,
402:9
**bioassays** [1] - 373:22
**biologic** [1] - 398:19
**biological** [2] - 372:9,

409:6
**Biology** [2] - 350:3,
350:5
**bit** [5] - 302:14,
304:14, 381:7,
407:20
**blade** [1] - 328:25
**blades** [2] - 326:8,
328:24
**blast** [1] - 376:11
**blender** [2] - 336:6,
336:23
**blood** [6] - 390:1,
390:7, 395:22,
398:12, 403:18,
407:10
**bloodstream** [1] -
398:14
**bloody** [1] - 403:17
**board** [4] - 301:23,
359:22, 369:4,
391:13
**Board** [1] - 352:12
**boards** [1] - 355:16
**Bobbie** [3] - 306:14,
314:11, 314:15
**BOBBIE** [1] - 290:5
**body** [6] - 389:23,
398:7, 398:19,
398:24, 399:10,
408:25
**bonded** [1] - 369:4
**BONE** [1] - 289:8
**book** [3] - 322:9,
338:3, 355:14
**bottom** [2] - 306:13,
408:7
**boundaries** [1] - 324:7
**BOX** [1] - 289:4
**box** [1] - 368:20
**branch** [1] - 350:16
**break** [19] - 300:12,
300:15, 302:11,
314:20, 314:21,
315:4, 315:6,
315:17, 315:19,
345:2, 345:6,
346:10, 347:17,
348:2, 348:21,
357:25, 403:3,
411:4, 411:9
**break-in** [8] - 300:12,
302:11, 314:20,
314:21, 315:4,
315:6, 315:17,
315:19
**breaks** [1] - 393:8
**breath** [2] - 328:12,
377:10
**breathe** [1] - 377:9

**breathing** [1] - 369:20
**brief** [1] - 358:8
**bright** [1] - 406:15
**bring** [7] - 291:9, 293:20, 326:13, 329:15, 329:20, 349:6, 349:9
**bringing** [1] - 362:16
**broad** [5] - 318:6, 352:1, 352:15, 353:25, 356:2
**bronchial** [2] - 377:9, 403:18
**bronze** [1] - 353:11
**brought** [3] - 318:17, 410:15, 410:16
**budget** [1] - 352:3
**Buffalo** [2] - 321:3, 321:18
**buildings** [2] - 392:5, 392:9
**built** [4] - 335:25, 369:6, 369:12, 369:20
**business** [2] - 393:2, 411:21
**buy** [3] - 336:12, 336:16, 336:23
**buys** [1] - 414:20
**buzzer** [1] - 326:18
**BY** [42] - 288:17, 288:20, 289:3, 289:8, 289:13, 289:23, 289:23, 290:6, 290:7, 290:8, 290:9, 290:11, 290:12, 290:13, 290:14, 290:15, 294:16, 298:1, 298:22, 299:7, 299:21, 301:2, 304:9, 309:14, 310:19, 312:12, 313:10, 314:4, 315:2, 317:7, 317:17, 320:13, 325:11, 327:21, 332:6, 339:18, 340:15, 342:15, 343:9, 343:14, 412:12, 416:16
**by-product** [1] - 389:24

**C**

**calculated** [1] - 417:21
**CALDWELL** [1] -

289:12
**calendar** [1] - 360:8
**CALLED** [1] - 291:4
**cancer** [15] - 328:12, 367:17, 374:9, 375:6, 388:6, 388:14, 400:22, 401:7, 401:13, 410:12, 418:8, 418:9, 418:14, 418:23
**Cancer** [1] - 400:9
**cancers** [2] - 374:16, 400:23
**cannot** [2] - 389:10, 404:19
**capability** [3] - 326:25, 329:25, 330:19
**capable** [1] - 327:2
**capacity** [1] - 396:17
**caption** [1] - 366:20
**car** [2] - 326:21, 414:20
**CARANCAHUA** [1] - 288:24
**carbon** [4] - 389:18, 389:20, 389:21
**carcinogen** [24] - 361:4, 361:8, 364:25, 366:11, 366:24, 367:7, 367:19, 374:22, 388:6, 388:13, 400:7, 400:11, 400:12, 400:13, 400:16, 400:17, 400:20, 401:1, 401:3, 401:5, 401:6, 401:24, 410:6, 410:23
**carcinogenic** [5] - 366:19, 367:24, 374:17, 375:1, 409:18
**carcinogenicity** [1] - 365:2
**Carcinogens** [2] - 364:22, 367:2
**carcinogens** [1] - 410:7
**care** [1] - 291:10
**Care** [1] - 417:14
**career** [3] - 321:15, 322:6, 338:2
**careful** [1] - 342:11
**Carnegie** [1] - 317:23
**Carnegie-Mellon** [1] - 317:23
**carry** [1] - 326:25
**carrying** [1] - 320:14

**CARSON** [1] - 289:9
**case** [48] - 292:5, 292:7, 292:25, 294:8, 303:25, 319:24, 319:25, 327:22, 328:4, 328:7, 330:7, 332:11, 332:19, 333:3, 333:8, 334:7, 334:12, 334:13, 334:16, 334:18, 334:21, 334:24, 335:2, 335:12, 335:14, 337:21, 340:19, 340:22, 341:13, 341:15, 341:18, 341:19, 342:1, 346:23, 370:18, 372:12, 373:12, 396:25, 397:24, 402:5, 407:2, 410:5, 410:10, 411:8, 411:9, 420:13, 421:6
**cases** [4] - 338:15, 341:10, 347:6, 399:9
**cat** [1] - 394:1
**category** [5] - 328:21, 329:6, 329:19, 329:22, 400:14
**CATHY** [1] - 289:20
**Cathy** [2] - 422:3, 422:14
**cause-effect** [1] - 387:23
**caused** [4] - 376:22, 395:5, 395:21, 399:7
**causing** [1] - 401:5
**caveats** [1] - 394:2
**cc'd** [3] - 379:4, 382:3, 383:14
**CCR** [2] - 289:20, 422:14
**CD** [1] - 379:11
**CDC** [9] - 350:21, 350:22, 352:24, 362:24, 365:25, 380:11, 384:12, 385:2, 402:22
**cells** [1] - 395:22
**Center** [1] - 351:14
**centers** [1] - 354:25
**Centers** [2] - 350:24, 351:15
**century** [1] - 354:23
**certain** [9] - 293:3, 298:16, 349:6, 388:13, 389:10, 396:11, 396:12, 405:13, 407:15

**certainly** [9] - 292:17, 324:16, 329:20, 332:25, 337:16, 341:5, 345:25, 358:14, 403:25
**CERTIFICATE** [1] - 422:1
**Certified** [2] - 422:3, 422:4
**certify** [1] - 422:7
**chain** [2] - 326:9, 328:24, 336:24
**chair** [1] - 316:15
**chaired** [1] - 409:22
**challenged** [1] - 398:11
**chance** [5] - 291:25, 297:19, 298:17, 304:2, 413:13
**changed** [5] - 296:9, 385:23, 391:13, 391:16, 405:9
**chapters** [3] - 322:9, 338:3, 355:14
**characteristics** [1] - 414:21
**characterize** [1] - 331:1
**charged** [1] - 353:2
**CHARLES** [1] - 289:15
**CHARLESTON** [1] - 289:4
**charter** [1] - 354:6
**Cheatwood** [4] - 300:24, 301:3, 309:1, 339:11
**CHEATWOOD** [21] - 289:14, 301:2, 304:3, 304:9, 308:8, 308:10, 309:14, 310:19, 311:22, 311:25, 312:2, 312:5, 312:9, 312:12, 313:2, 314:1, 317:15, 331:9, 331:12, 331:19, 331:22
**CHEATWOOD...........** ........ [1] - 290:7
**check** [7] - 307:8, 339:9, 339:10, 396:5, 399:18, 402:15, 402:19
**checked** [1] - 314:8
**checklist** [2] - 313:12, 314:6
**checkmarks** [1] - 306:25
**checks** [3] - 307:23, 308:5, 309:16

**chemical** [7] - 329:3, 329:14, 329:16, 389:19, 408:21, 409:3
**chemicals** [10] - 352:18, 353:8, 354:1, 355:20, 396:15, 402:6, 408:16, 408:20, 409:5
**chief** [1] - 350:16
**child** [3] - 338:10, 338:12, 338:21
**children** [12] - 329:17, 338:20, 344:16, 344:18, 403:14, 403:16, 403:23, 404:10, 406:22, 406:23, 407:6, 408:5
**China** [1] - 354:14
**Chris** [1] - 411:1
**CHRIS** [1] - 288:23
**CHRISTI** [1] - 288:24
**Christmas** [1] - 304:24
**CHRISTOPHER** [1] - 290:16
**Christopher** [2] - 291:13, 349:5
**chronic** [12] - 372:17, 373:6, 373:11, 374:5, 392:14, 394:18, 394:22, 396:22, 402:13, 402:17, 405:18, 405:22
**cigarettes** [2] - 389:14, 407:7
**Cincinnati** [1] - 350:19
**circulated** [1] - 383:1
**circumstance** [2] - 365:3, 409:2
**circumstances** [3] - 314:5, 413:4, 414:23
**citation** [2] - 364:24, 368:7
**cite** [1] - 399:17
**cited** [3] - 364:22, 365:2, 366:23
**citizen** [1] - 357:9
**citizens** [2] - 356:25, 362:8
**Claiborne** [1] - 312:16
**classification** [6] - 401:6, 401:12, 409:18, 409:20, 409:21, 410:4
**classified** [3] - 366:24, 400:11, 410:20
**classify** [1] - 367:6
**classroom** [1] - 336:4

clay [1] - 407:1
clear [7] - 319:1, 320:3, 320:6, 333:2, 336:17, 380:4, 381:5
clearly [3] - 326:11, 389:4, 420:25
Clerk [1] - 316:25
CLERK [3] - 291:7, 316:18, 317:2
client [2] - 335:7, 335:23
clients [1] - 335:9
clinical [5] - 376:13, 376:17, 403:9, 403:10, 403:16
clinically [1] - 403:20
Clinton [1] - 360:1
clip [2] - 347:16, 347:18
close [2] - 323:20, 374:11
closed [2] - 369:15, 370:8
closer [4] - 310:13, 310:14, 345:15, 345:18
coauthored [2] - 322:10, 355:7
coexposure [1] - 404:21
cohort [1] - 410:9
cohorts [1] - 402:1
coined [1] - 385:23
Coleman [2] - 361:25, 379:25
collected [4] - 303:17, 362:5, 363:8, 370:2
collection [1] - 412:23
College [1] - 355:4
Collegium [2] - 354:18, 354:20
colors [1] - 407:9
combination [1] - 412:24
combusted [1] - 389:17
combustion [1] - 390:9
comfortable [1] - 310:14
coming [5] - 296:10, 302:20, 303:9, 315:16, 315:21
Commander [1] - 383:14
commenced [1] - 412:10
commensurate [1] - 365:9
comment [2] - 357:18,
359:2
commented [1] - 366:5
comments [4] - 356:3, 356:4, 356:5, 369:18
Commission [1] - 352:13
committee [8] - 354:4, 354:7, 354:8, 359:25, 409:22, 409:23, 410:3, 410:19
Committee [2] - 352:5, 352:13
committees [1] - 353:19
common [4] - 331:24, 359:22, 407:17, 414:19
commonly [1] - 354:1
communicate [3] - 376:5, 376:23, 415:4
communicates [1] - 326:6
communicating [2] - 412:25, 413:1
communication [5] - 322:17, 322:18, 378:13, 412:24, 414:14
communications [2] - 321:19, 322:13
communities [1] - 407:14
communities' [1] - 407:16
community [1] - 367:22
company [1] - 413:18
compare [2] - 393:11, 406:8
compared [1] - 408:1
Compensation [1] - 353:3
complained [3] - 298:6, 299:9, 305:7
complaining [1] - 305:22
complaints [2] - 335:24, 357:9
complete [3] - 342:23, 396:21, 421:19
completion [1] - 410:25
component [8] - 413:11, 413:15, 413:22, 414:2, 414:12, 414:24, 415:2, 415:9
components [3] -
413:21, 416:8, 420:6
Comprehensive [1] - 353:3
comprised [3] - 352:8, 358:19, 409:23
COMPUTER [1] - 289:23
conceivable [2] - 367:23, 397:3
concentration [5] - 318:4, 382:19, 384:18, 391:4, 391:24
concentrations [4] - 318:7, 382:16, 390:18, 404:5
concept [3] - 373:17, 398:2, 416:7
concern [8] - 360:7, 377:4, 377:5, 377:6, 381:13, 382:23, 388:1, 397:19
concerned [7] - 318:20, 364:17, 364:18, 376:12, 399:6, 401:13, 406:11
concerning [2] - 315:15, 379:6
concerns [11] - 292:2, 357:4, 357:12, 359:9, 359:11, 378:23, 382:17, 383:6, 384:24, 387:15, 393:3
concert [1] - 352:20
concise [1] - 293:16
concluded [4] - 309:12, 320:9, 325:7, 332:4
concludes [1] - 401:24
conclusions [2] - 356:12, 366:23
condition [4] - 339:21, 340:1, 340:3, 340:8
conditioner [3] - 295:15, 295:18, 295:22
conditioning [3] - 330:13, 382:18, 384:22
conditions [4] - 307:22, 370:7, 406:8, 407:12
conduct [2] - 341:19, 409:7
conducted [4] - 362:25, 391:22, 401:16, 405:7
conduit [1] - 354:24
conference [10] - 308:14, 309:12, 313:1, 318:15, 320:9, 323:11, 325:7, 331:11, 332:4, 412:4
conferral [1] - 350:7
confidence [2] - 386:5, 386:6
confident [1] - 294:7
confidential [1] - 363:16
confounding [1] - 362:14
confusing [1] - 374:15
congestion [1] - 395:25
Congress [2] - 363:23, 368:2
conjunction [1] - 331:4
connection [7] - 319:2, 332:14, 332:18, 334:24, 357:11, 421:7
conscious [1] - 293:18
consequences [7] - 328:9, 328:10, 328:12, 328:13, 330:8, 408:1, 418:7
consequent [1] - 387:17
consider [3] - 348:12, 374:12, 404:14
consideration [7] - 326:3, 326:12, 326:24, 327:3, 330:18, 339:23, 415:25
considerations [1] - 325:19
considered [11] - 331:4, 354:22, 372:14, 373:18, 373:20, 373:22, 374:3, 374:5, 401:8, 404:25, 409:9
considers [1] - 356:19
consisted [1] - 361:23
consistent [2] - 324:17, 373:22
consists [1] - 413:1
constriction [2] - 377:9, 403:18
constructed [2] - 369:3, 391:22
construction [2] - 369:17, 391:16
construed [3] - 372:15, 386:8, 397:17
consult [1] - 383:20
consultation [6] - 365:7, 380:25, 382:9, 382:10, 401:9, 401:11
Consultation [7] - 363:13, 363:18, 364:9, 364:14, 365:4, 365:6, 365:18
consulted [2] - 354:9, 354:11
consulting [1] - 337:3
Consumer [1] - 380:8
consumer [7] - 336:6, 336:8, 336:10, 336:15, 336:19, 337:8, 413:14
consumers [1] - 336:25
consumption [1] - 407:16
contact [4] - 316:2, 357:22, 358:25, 361:18
contacted [2] - 357:14, 361:24
contain [2] - 388:19, 417:11
contained [2] - 418:9, 418:10
containing [1] - 407:1
contaminants [1] - 404:21
contamination [1] - 387:16
content [8] - 308:7, 364:17, 364:18, 366:5, 367:15, 383:21, 384:8, 421:5
contents [1] - 417:2
Contents [1] - 417:6
context [10] - 330:1, 334:16, 336:21, 338:16, 367:17, 386:19, 394:5, 413:5, 419:10, 419:23
Contingency [1] - 352:9
continue [2] - 380:7, 392:25
CONTINUED [1] - 289:1
continued [1] - 358:17
Continued [1] - 294:15
CONTINUED).............

[1] - 290:6
CONTINUED)............
.................. [1] - 290:5
continuous [1] -
399:12
contractors [3] -
305:2, 305:13, 352:2
contribute [1] -
390:10
contributions [1] -
353:13
Control [2] - 350:24,
351:16
control [2] - 347:4,
347:24
controlled [1] - 362:14
Conventional [1] -
391:3
conventional [1] -
391:4
conventionally [2] -
369:5, 369:20
conversation [2] -
378:14, 378:16
conversations [1] -
294:4
cooled [1] - 295:24
copy [4] - 297:12,
317:10, 335:13,
335:16
cornerstone [1] -
407:22
corporations [2] -
336:21, 419:12
CORPUS [1] - 288:24
correct [118] - 291:16,
291:18, 294:22,
295:1, 295:4, 295:7,
295:12, 300:1,
300:5, 300:16,
301:15, 301:18,
301:21, 302:18,
303:18, 304:18,
305:10, 305:13,
306:17, 306:18,
307:20, 310:11,
310:20, 311:3,
311:20, 332:9,
332:12, 332:15,
332:19, 332:22,
332:23, 332:24,
333:8, 333:9,
333:15, 333:21,
333:25, 334:1,
334:2, 334:3, 334:4,
334:5, 334:14,
334:18, 334:19,
335:14, 335:15,
335:19, 335:21,
336:7, 336:12,

337:1, 337:5, 337:8,
337:19, 337:20,
337:22, 349:7,
349:8, 349:14,
359:8, 360:14,
363:5, 364:4,
373:16, 374:7,
375:15, 375:18,
375:19, 375:22,
376:8, 378:5, 382:3,
382:21, 382:22,
382:24, 386:23,
387:22, 388:3,
388:14, 391:7,
392:1, 392:11,
392:13, 392:22,
393:17, 393:19,
393:20, 393:22,
394:12, 394:16,
394:17, 394:21,
395:3, 395:5, 395:8,
395:15, 395:18,
396:4, 396:6, 396:8,
398:9, 398:14,
399:2, 400:9,
400:18, 400:21,
400:22, 401:5,
401:18, 401:19,
404:16, 405:1,
405:2, 408:3, 411:1,
422:7
correcting [1] - 410:17
correctly [2] - 312:19,
397:1
cosmetics [1] - 389:5
cough [1] - 377:9
coughing [1] - 403:17
Council [2] - 368:7,
408:19
Counsel [4] - 291:18,
316:11, 379:9, 411:1
counsel [16] - 292:16,
293:16, 294:12,
297:18, 312:2,
318:21, 324:12,
340:16, 342:19,
343:2, 344:23,
349:13, 349:16,
398:1, 411:13,
421:19
countless [1] - 336:18
countries [2] - 354:9,
354:15
counts [1] - 355:12
couple [3] - 291:10,
321:17, 345:3
course [5] - 325:21,
326:1, 338:2, 370:5,
415:25
courses [7] - 320:15,

320:24, 321:5,
321:16, 321:17,
321:20, 321:21
Court [13] - 292:20,
293:5, 318:10,
318:18, 323:21,
324:7, 415:6, 421:4,
422:4, 422:5, 422:6,
422:15, 422:16
court [5] - 324:14,
348:16, 348:19,
411:23, 412:4
COURT [91] - 288:1,
289:20, 291:4,
291:8, 291:20,
293:23, 294:1,
297:14, 297:16,
297:24, 298:16,
299:3, 299:17,
300:23, 303:23,
304:5, 308:9,
308:12, 308:22,
308:25, 309:5,
310:12, 311:24,
312:1, 312:3, 312:7,
313:1, 313:6, 314:2,
314:24, 316:5,
316:9, 316:13,
318:13, 318:25,
319:15, 319:20,
320:3, 320:6,
320:11, 323:9,
323:17, 323:20,
324:15, 324:24,
325:4, 325:8,
327:17, 331:7,
331:17, 331:21,
331:24, 339:6,
339:10, 339:14,
340:12, 342:5,
343:5, 343:7,
343:11, 344:22,
345:1, 345:4, 345:9,
345:13, 345:17,
345:23, 346:3,
346:8, 346:12,
346:17, 347:1,
347:6, 347:10,
347:15, 347:19,
348:3, 348:7, 349:2,
357:24, 358:4,
358:7, 358:10,
358:13, 410:24,
411:3, 411:10,
411:13, 411:16,
411:21, 412:6
Court's [1] - 324:17
courtroom [5] -
293:25, 358:6,
358:12, 411:12,

411:20
cover [7] - 293:17,
347:19, 411:13,
414:7, 416:4
covered [2] - 342:6,
342:8
covers [1] - 370:6
create [1] - 408:3
creative [1] - 407:6
credibility [1] - 352:21
criminal [2] - 347:6,
347:8, 347:10
Criteria [1] - 350:17
CROSS [8] - 290:6,
290:7, 290:13,
290:14, 294:15,
301:1, 332:5, 339:17
cross [15] - 294:11,
316:5, 342:6,
346:21, 346:22,
346:23, 347:7,
347:25, 348:1,
359:25, 398:23,
398:25, 399:2,
399:6, 399:15
CROSS-
EXAMINATION [8] -
290:6, 290:7,
290:13, 290:14,
294:15, 301:1,
332:5, 339:17
cross-examination [1]
- 294:11
cross-examinations
[1] - 346:23
cross-governmental
[1] - 359:25
cross-link [3] - 399:2,
399:6, 399:15
cross-linking [2] -
398:23, 398:25
Crown [2] - 306:11,
307:19
CRR [2] - 289:20,
422:14
crunch [1] - 392:15
cultural [1] - 407:5
cultures [1] - 407:15
cumulative [1] - 398:3
cure [2] - 355:2,
407:24
current [1] - 380:5
curriculum [6] -
317:10, 317:20,
320:18, 320:23,
322:1, 322:7
customary [1] -
367:16
cut [1] - 344:3
CV [1] - 322:8

411:20
cyberspace [1] -
409:8

## D

D'AMICO [17] -
288:16, 288:17,
291:19, 319:17,
344:24, 345:3,
345:7, 345:19,
346:7, 346:16,
346:19, 347:4,
347:9, 347:13,
347:24, 411:2,
411:15
daily [2] - 385:22,
386:13
damage [11] - 300:7,
300:10, 300:11,
300:14, 300:19,
398:18, 398:20,
398:24, 399:6,
399:7, 399:15
data [24] - 362:5,
363:7, 363:11,
363:16, 363:25,
364:1, 370:2,
371:11, 373:6,
374:9, 375:12,
375:13, 377:14,
378:6, 378:24,
379:1, 379:6,
379:11, 379:13,
379:15, 382:10,
396:21, 396:24
database [3] - 386:5,
397:16, 397:20
date [2] - 357:21,
368:9
dated [5] - 342:25,
382:1, 383:17,
383:18, 391:6
dates [2] - 341:20,
407:23
dating [1] - 372:6
Daubert [1] - 292:21
DAVID [1] - 289:13
DAY [1] - 288:11
day-to-day [2] - 406:2,
406:3
daylight [1] - 304:11
days [16] - 359:17,
359:18, 364:11,
364:14, 370:18,
370:19, 370:20,
379:18, 384:20,
384:24, 393:10,
393:16, 393:18,
393:21, 395:13

**deadlines** [1] - 292:20
**deal** [3] - 330:19, 381:18, 414:5
**dealership** [1] - 414:20
**dealing** [5] - 355:8, 375:13, 406:21, 407:13, 408:1
**deals** [2] - 337:10, 417:24
**dealt** [2] - 337:14, 362:4
**deaths** [1] - 401:23
**December** [7] - 292:23, 293:1, 301:15, 304:24, 363:23, 378:22, 379:12
**decide** [2] - 330:15, 369:25
**decided** [1] - 341:21
**deciding** [1] - 325:20
**decision** [2] - 379:20, 408:4
**decisions** [2] - 331:1, 387:20
**declare** [1] - 401:1
**declared** [2] - 400:17, 401:4
**dedicated** [1] - 354:24
**defendant** [2] - 291:22, 421:2
**defendants** [3] - 341:7, 341:18, 346:25
**Defense** [1] - 365:15
**defense** [4] - 340:16, 342:19, 343:2, 421:19
**define** [1] - 370:16
**defined** [2] - 397:4
**definitely** [1] - 386:16
**definition** [5] - 322:15, 324:20, 359:22, 359:23
**degree** [9] - 317:23, 318:1, 318:2, 319:12, 350:1, 350:2, 350:3, 399:12, 406:6
**delegated** [2] - 356:8, 356:10
**deliberative** [1] - 381:21
**delivery** [3] - 414:18, 419:15, 419:24
**denied** [1] - 291:20
**Denmark** [1] - 354:14
**DENNIS** [1] - 288:20
**deny** [3] - 291:17,

292:1, 293:8
**denying** [1] - 293:6
**department** [2] - 321:8, 356:9
**Department** [8] - 351:2, 352:5, 352:7, 365:15, 366:9, 384:16, 400:12
**departs** [1] - 303:25
**dependent** [1] - 404:17
**depose** [1] - 341:21
**deposed** [4] - 292:22, 340:21, 340:24, 341:11
**deposition** [34] - 291:13, 292:25, 295:17, 297:7, 298:4, 298:9, 298:23, 299:12, 300:1, 303:5, 303:13, 303:16, 303:24, 304:1, 304:4, 304:6, 311:23, 337:12, 341:8, 341:13, 341:19, 342:7, 343:3, 343:4, 343:15, 343:18, 344:24, 348:12, 349:5, 349:7, 349:11, 349:17, 358:17
**DEPOSITION..........** [1] - 290:16
**depositions** [6] - 334:24, 335:2, 335:8, 335:10, 335:13, 340:17
**Deputy** [1] - 351:5
**DEPUTY** [3] - 291:7, 316:18, 317:2
**derived** [6] - 371:5, 386:1, 387:1, 394:22, 395:12, 395:19
**DEROSA** [1] - 290:16
**DeRosa** [16] - 291:13, 344:25, 349:5, 349:6, 349:9, 356:15, 358:14, 358:17, 363:22, 369:23, 375:8, 376:24, 403:21, 411:1, 411:2, 411:3
**DEROSA-75** [1] - 365:22
**describe** [2] - 413:16, 414:15
**described** [1] - 379:22

**Description** [1] - 290:22
**design** [1] - 340:3
**designations** [1] - 401:8
**designed** [7] - 336:5, 336:7, 336:8, 336:11, 336:15, 336:18, 336:24
**designing** [1] - 336:3
**desk** [1] - 364:16
**despite** [1] - 387:16
**detect** [2] - 392:6, 392:9
**detected** [1] - 413:12
**determination** [3] - 386:21, 387:19, 409:17
**determine** [4] - 325:13, 340:2, 410:3, 417:12
**determined** [3] - 366:10, 372:5, 381:17
**determining** [1] - 313:14
**develop** [1] - 360:1
**developed** [2] - 353:7, 357:15, 357:16, 406:9
**development** [2] - 352:4, 352:17
**Development** [1] - 350:18
**developmental** [1] - 375:20
**dialogue** [1] - 381:17
**difference** [5] - 345:17, 345:24, 390:12, 396:9, 396:10
**differences** [1] - 373:2
**different** [16] - 312:24, 343:10, 353:24, 354:14, 360:4, 368:12, 369:12, 370:6, 393:10, 397:21, 397:22, 408:20, 410:1, 414:11
**difficulty** [1] - 402:5
**digits** [1] - 372:8
**dimensioned** [1] - 377:4
**dimensions** [1] - 377:5
**dioxin** [1] - 408:18
**dipping** [1] - 407:7
**DIRE** [2] - 290:11, 317:6

**direct** [5] - 314:24, 346:22, 346:24, 347:6, 420:6
**DIRECT** [2] - 290:12, 317:16
**direction** [2] - 370:22, 397:6
**directly** [1] - 324:13
**director** [3] - 350:17, 350:21, 356:8
**Director** [4] - 351:6, 351:12, 351:13, 351:22
**directs** [1] - 416:9
**dirt** [1] - 406:23
**disagree** [1] - 392:3
**disaster** [2] - 376:14, 403:11
**disc** [1] - 348:11
**disciplines** [1] - 344:4
**discount** [1] - 348:15
**discuss** [4] - 323:2, 411:8, 411:9, 420:16
**discussed** [4] - 292:18, 379:19, 400:6, 401:10
**discusses** [1] - 382:10
**discussing** [1] - 388:2
**discussion** [3] - 351:21, 363:19, 366:8
**discussions** [5] - 304:14, 362:1, 362:3, 363:4, 410:21
**disease** [1] - 401:3
**Disease** [5] - 350:24, 350:25, 351:14, 351:16, 384:17
**dishwashing** [1] - 389:7
**displaced** [2] - 356:25, 379:8
**displayed** [1] - 308:16
**disposition** [1] - 356:5
**disrespectful** [1] - 292:12
**distinction** [1] - 336:18
**distinctly** [1] - 364:15
**distracted** [1] - 326:20
**distributed** [3] - 372:10, 375:21, 375:23
**District** [2] - 422:6, 422:16
**DISTRICT** [3] - 288:1, 288:1, 288:13
**divided** [2] - 386:4, 395:17
**Dividing** [1] - 395:7

**dividing** [3] - 372:6, 372:10, 395:25
**Division** [6] - 351:6, 351:8, 351:22, 352:21, 356:14, 379:16
**division** [2] - 352:24, 361:19
**Division's** [1] - 364:5
**DNA** [6] - 398:20, 398:23, 398:25, 399:1, 399:6, 399:14
**Doc** [1] - 383:10
**DOCKET** [2] - 288:5, 288:9
**Doctor** [4] - 321:23, 327:8, 343:22, 353:6
**doctor** [7] - 292:13, 296:19, 296:20, 296:21, 328:3, 333:24, 333:25
**doctoral** [2] - 350:4, 350:9
**Doctorate** [1] - 350:3
**document** [17] - 307:22, 308:16, 308:19, 309:3, 309:15, 314:18, 355:25, 357:15, 357:18, 359:3, 364:16, 364:21, 364:24, 365:1, 368:10, 383:10, 385:5
**Document** [1] - 291:14
**DOCUMENT** [1] - 288:7
**documentation** [1] - 371:20
**documented** [1] - 415:1
**documents** [9] - 349:7, 349:10, 352:17, 356:13, 358:23, 358:25, 371:5, 413:17, 414:9
**DOD** [1] - 353:24
**DOE** [1] - 353:24
**dog** [1] - 394:1
**domain** [1] - 326:3
**DOMINICK** [1] - 289:3
**done** [22] - 292:1, 292:9, 337:13, 337:16, 338:8, 338:21, 339:9, 343:21, 345:25, 357:3, 374:23, 375:6, 375:16, 376:11, 376:23,

380:24, 392:15, 397:21, 398:16, 409:21, 413:10, 420:20

**DONELSON** [1] - 289:12

**door** [17] - 300:7, 300:8, 300:10, 300:15, 300:19, 302:18, 302:21, 302:25, 303:4, 303:6, 303:11, 303:17, 303:18, 304:11, 315:11, 326:19

**doors/locks/ hardware** [1] - 307:13

**dose** [11] - 375:1, 385:18, 398:3, 402:6, 402:7, 402:10, 402:11, 402:12, 405:3, 405:7, 406:4

**doses** [2] - 374:25, 385:24

**double** [2] - 339:10, 347:11

**doubt** [1] - 369:11

**DOUGLAS** [2] - 289:18, 289:18

**down** [14] - 293:14, 303:1, 303:18, 307:2, 307:12, 316:9, 332:17, 344:22, 345:5, 345:13, 348:6, 387:3, 394:9, 403:3

**dozens** [1] - 414:8

**Dr** [44] - 292:12, 292:14, 292:22, 293:4, 293:9, 316:13, 317:8, 317:13, 327:22, 332:7, 332:11, 333:2, 333:11, 334:7, 334:8, 334:11, 339:13, 339:19, 340:7, 341:23, 342:16, 344:25, 349:5, 349:6, 349:9, 356:15, 358:17, 368:2, 369:23, 375:8, 376:24, 383:12, 383:22, 384:2, 403:21, 406:14, 411:2, 411:3, 411:18, 411:20, 412:13,

415:13, 421:6, 421:11

**DR** [1] - 290:16

**draft** [3] - 367:8, 383:23, 384:5

**drafted** [1] - 341:5

**drags** [1] - 346:21

**drawn** [1] - 409:4

**drill** [1] - 344:11

**drills** [1] - 344:13

**drop** [2] - 303:18, 388:9

**dropped** [1] - 384:19

**due** [1] - 381:9

**duly** [1] - 316:24

**duration** [9] - 359:15, 360:8, 360:10, 360:18, 367:19, 373:3, 374:22, 386:12, 404:24

**during** [15] - 295:11, 295:14, 295:21, 298:23, 303:9, 321:15, 322:11, 360:1, 369:16, 382:11, 390:18, 407:25, 411:9, 419:25

**Dyson** [1] - 346:15

---

## E

---

**e-mail** [14] - 375:9, 375:12, 376:2, 376:11, 377:1, 377:13, 378:17, 379:25, 381:24, 382:25, 383:3, 383:11, 403:9

**e-mails** [1] - 378:20

**early** [9] - 292:5, 292:6, 321:2, 350:12, 350:15, 357:7, 362:4, 363:23, 374:24

**EASTERN** [1] - 288:1

**Eastern** [1] - 422:6

**Ecological** [1] - 355:5

**Ecology** [1] - 350:2

**Ecuador** [1] - 354:14

**edge** [1] - 323:20

**editorial** [1] - 355:16

**educated** [1] - 340:6

**education** [2] - 318:6, 349:25, 352:16, 353:6, 408:2

**effect** [27] - 361:16, 367:25, 371:13, 371:17, 371:21,

372:5, 372:14, 372:16, 373:4, 379:20, 386:3, 387:23, 387:24, 395:2, 395:14, 395:21, 396:4, 396:15, 396:20, 396:22, 399:13, 404:15, 404:18, 404:23, 408:3

**effective** [3] - 351:20, 382:16, 405:16

**Effects** [1] - 367:11

**effects** [17] - 353:8, 354:1, 355:8, 355:23, 359:12, 360:13, 360:15, 366:6, 367:12, 368:13, 369:25, 371:20, 371:24, 375:17, 396:8, 402:6, 417:23

**efficient** [2] - 293:17, 293:19

**effort** [1] - 356:1

**eight** [3] - 352:25, 365:20, 393:6

**either** [8] - 310:13, 334:21, 335:21, 373:3, 397:5, 397:13, 399:23, 406:19

**elderly** [3] - 403:23, 404:3, 404:4

**elected** [1] - 354:18

**electrical** [2] - 313:15, 344:14

**electricity** [1] - 329:18

**element** [1] - 419:4

**elements** [1] - 415:8

**elevated** [2] - 367:24, 407:17

**elevation** [2] - 398:13, 398:15

**elicit** [1] - 374:16

**elicited** [1] - 375:2

**eliminate** [1] - 330:8

**Elmo** [1] - 316:16

**emergency** [4] - 352:9, 371:7, 379:15, 379:21

**Emergency** [6] - 353:3, 363:24, 364:5, 382:7, 382:8, 382:9

**emeritus** [2] - 321:11, 321:12

**emissions** [1] - 391:14

**employ** [1] - 292:19

**employed** [5] - 337:4, 349:23, 349:24, 350:12, 350:14

**employees** [2] - 335:17, 353:12

**employment** [2] - 350:6, 350:7

**encompass** [1] - 372:11

**encounter** [1] - 329:16

**encountered** [1] - 352:18

**end** [2] - 347:16, 351:19

**Energy** [1] - 365:16

**engaged** [1] - 408:13

**ENGELHARDT** [1] - 288:12

**engineering** [5] - 317:24, 321:4, 321:17, 340:5, 344:3

**engineers** [1] - 340:6

**England** [2] - 354:14, 407:25

**entendre** [1] - 347:11

**enter** [1] - 293:15

**enters** [2] - 293:25, 358:12

**entire** [2] - 299:13, 299:14, 377:6

**entitled** [4] - 385:8, 417:8, 417:14, 422:9

**entry** [2] - 371:8, 371:9

**enumerated** [1] - 328:16

**environment** [9] - 322:22, 322:24, 325:23, 326:5, 344:17, 354:2, 370:2, 376:21

**Environmental** [8] - 315:22, 350:17, 351:8, 351:15, 351:23, 353:23, 356:14, 379:17

**environmental** [12] - 349:22, 352:16, 354:10, 354:23, 356:22, 365:14, 367:22, 368:4, 370:7, 381:14, 387:16, 387:20

**ENVIRONMENTAL** [1] - 289:12

**environments** [1] - 344:14

**EPA** [20] - 350:11, 350:15, 353:11, 353:24, 361:24,

361:25, 363:25, 365:14, 371:11, 373:6, 374:9, 378:23, 379:15, 380:11, 380:22, 380:25, 381:3, 382:10, 385:23, 400:11

**EPA's** [2] - 364:1, 385:17

**epidemics** [1] - 407:25

**epidemiologist** [2] - 334:4, 334:23

**epidemiology** [1] - 356:2

**episodic** [1] - 399:12

**equipment** [1] - 313:22

**ER** [1] - 380:21

**ergonomics** [2] - 318:8, 344:2

**ERNEST** [1] - 289:8

**ERT** [2] - 382:5, 382:6

**especially** [2] - 408:5, 421:19

**ESQUIRE** [11] - 288:17, 288:17, 288:20, 289:3, 289:8, 289:8, 289:9, 289:13, 289:14, 289:14, 289:18

**essentially** [3] - 343:24, 412:23, 413:17

**establish** [1] - 352:21

**established** [6] - 354:5, 354:6, 360:5, 372:1, 377:23, 392:8

**estimate** [2] - 397:4, 397:13

**estimates** [1] - 397:14

**ET** [1] - 288:8

**evaluate** [1] - 363:4

**evaluated** [1] - 362:11

**evaluation** [11] - 362:3, 363:25, 371:4, 379:14, 379:15, 379:19, 379:20, 382:10, 386:21, 406:18, 410:10

**evaluations** [1] - 361:20

**evaluative** [1] - 362:4

**evening** [3] - 291:12, 291:22, 357:13

**event** [1] - 396:20

**events** [2] - 352:9, 371:7

**evidence** [8] - 366:11, 366:12, 401:8, 406:6, 414:6, 418:21, 418:25, 421:14
**evidenced** [1] - 408:10
**evident** [1] - 383:24
**Ex** [1] - 379:11
**exactly** [5] - 320:2, 323:14, 376:1, 377:17
**examination** [1] - 294:11
**EXAMINATION** [35] - 290:6, 290:7, 290:8, 290:9, 290:11, 290:12, 290:13, 290:14, 290:15, 294:15, 297:25, 298:21, 299:6, 299:20, 301:1, 304:8, 309:13, 310:18, 312:11, 313:9, 314:3, 315:1, 317:6, 317:16, 320:12, 325:10, 327:20, 332:5, 339:17, 340:14, 342:14, 343:8, 343:13, 412:11, 416:15
**examinations** [1] - 346:23
**Examinations** [1] - 290:3
**examine** [5] - 327:8, 328:16, 329:10, 330:1, 416:11
**examined** [2] - 316:25, 415:23
**example** [12] - 315:20, 322:7, 322:20, 326:7, 328:11, 328:20, 338:22, 359:25, 365:11, 406:25, 407:2, 414:19
**examples** [2] - 338:18, 379:7
**exams** [1] - 346:20
**exceedance** [1] - 386:14
**exceeded** [2] - 386:13, 403:5
**except** [3] - 319:25, 326:15, 326:22
**exception** [1] - 374:17
**excess** [5] - 401:22, 401:23, 402:4, 402:14, 402:17

**exchange** [2] - 369:5, 370:10
**exchanges** [2] - 382:18, 413:3
**exclude** [1] - 291:22
**excluded** [1] - 293:5
**excuse** [2] - 377:2, 401:4
**executive** [3] - 409:21, 409:23, 410:3
**Executive** [1] - 352:5
**exercises** [1] - 393:2
**EXHIBIT** [1] - 290:24
**Exhibit** [11] - 306:7, 313:8, 314:6, 317:8, 320:14, 381:23, 383:11, 416:22, 418:1, 421:10, 421:14
**exhibit** [5] - 306:8, 308:20, 313:12, 371:8, 406:22
**exhibiting** [1] - 361:17
**exist** [2] - 325:24, 339:24
**exists** [4] - 339:21, 340:1, 340:3, 340:8
**exits** [1] - 358:6
**exogenous** [1] - 390:2
**expect** [5] - 319:3, 319:22, 329:20, 340:7, 340:9
**expectancy** [1] - 373:23
**expected** [3] - 339:20, 368:15, 379:12
**expecting** [2] - 339:25, 346:22
**expedient** [1] - 377:12
**experience** [11] - 317:20, 319:23, 353:7, 359:21, 365:5, 366:18, 367:14, 368:4, 369:8, 415:14, 419:20
**experimental** [1] - 406:9
**expert** [14] - 317:13, 319:4, 325:12, 332:11, 332:14, 334:13, 341:8, 342:3, 347:2, 356:15, 356:20, 356:21, 413:8, 417:20
**expertise** [6] - 327:15, 352:15, 353:7, 365:9, 368:5, 413:8
**experts** [2] - 292:21,

335:2
**explain** [4] - 325:16, 330:4, 348:8, 405:25
**explained** [2] - 324:3, 373:5
**explicitly** [1] - 365:1
**exposed** [4] - 373:9, 374:25, 386:17, 394:10
**exposure** [85] - 330:10, 353:8, 355:8, 359:5, 359:13, 359:15, 359:17, 360:1, 360:6, 360:9, 360:13, 360:23, 360:24, 361:3, 361:11, 363:20, 364:23, 367:19, 367:20, 367:23, 368:12, 368:15, 369:25, 370:12, 370:13, 370:14, 370:15, 371:25, 372:16, 372:17, 373:3, 373:7, 373:9, 373:11, 373:20, 374:1, 374:2, 374:10, 374:11, 374:16, 374:22, 374:23, 386:22, 390:2, 393:9, 393:11, 393:16, 393:18, 394:25, 395:13, 395:20, 396:7, 398:2, 398:16, 398:22, 398:25, 399:5, 399:6, 399:12, 399:13, 399:15, 399:16, 399:22, 400:2, 400:4, 401:25, 402:1, 402:2, 402:3, 402:13, 402:16, 402:17, 402:20, 403:4, 404:3, 404:24, 406:10, 407:19, 408:2, 418:12, 418:23, 419:2, 420:24
**Exposure** [1] - 367:11
**exposures** [19] - 354:1, 356:2, 359:18, 359:19, 360:6, 361:15, 361:16, 364:19, 369:2, 374:5, 386:13, 396:14, 396:15, 399:14,

404:21, 405:18, 405:23, 406:20, 407:17
**expressed** [3] - 292:3, 357:5, 421:6
**extensive** [1] - 371:20
**extensively** [2] - 369:14, 370:8
**extent** [4] - 323:23, 349:25, 389:10, 421:19
**exterior** [1] - 307:13
**extrapolate** [2] - 372:13, 372:18
**extrapolating** [1] - 372:16
**eye** [2] - 328:11, 368:17
**eyes** [1] - 360:16

**F**

**facilities** [1] - 369:15
**facing** [1] - 338:21
**fact** [28] - 295:3, 301:20, 302:25, 303:9, 303:16, 304:3, 305:20, 310:2, 311:19, 328:5, 332:21, 340:2, 348:15, 362:25, 364:19, 364:20, 365:17, 368:3, 369:13, 369:14, 372:8, 372:9, 374:1, 374:19, 381:5, 388:8, 401:9, 409:1
**Fact** [2] - 357:14, 359:6, 359:9, 360:11, 360:15, 360:17, 360:23, 361:11, 361:19
**factor** [11] - 328:15, 329:10, 372:18, 372:20, 372:24, 386:4, 386:6, 395:7, 395:17, 395:25, 396:24
**factors** [21] - 318:7, 318:19, 318:23, 318:24, 319:1, 319:12, 319:13, 319:23, 326:3, 327:8, 331:3, 344:1, 362:14, 369:13, 372:4, 372:5, 372:12, 381:15, 394:7, 396:19, 406:20

**faculty** [1] - 321:3
**failed** [3] - 359:3, 359:12, 376:5
**fair** [6] - 342:5, 342:11, 389:22, 390:14, 392:17, 394:10
**fairly** [2] - 318:6, 352:1
**fall** [1] - 303:7
**familiar** [5] - 308:21, 309:3, 398:10, 399:4, 414:20
**familiarity** [1] - 342:7
**families** [1] - 376:24
**far** [5] - 341:11, 359:3, 399:5, 400:14, 402:25
**Faroe** [1] - 354:13
**fashion** [2] - 348:14, 386:1
**fast** [1] - 332:17
**fasten** [1] - 326:20
**father** [1] - 354:22
**fault** [1] - 313:1
**favor** [2] - 325:23, 339:23
**FDA** [2] - 372:7, 385:23
**February** [7] - 363:12, 363:19, 364:10, 364:13, 382:1, 382:20, 383:23
**Fed** [1] - 379:11
**Federal** [6] - 351:1, 351:17, 356:16, 359:21, 361:3, 382:9
**federal** [6] - 353:19, 353:22, 374:20, 374:21, 375:5, 375:7
**FELIPE** [1] - 288:21
**fell** [2] - 303:1, 303:2
**fellow** [1] - 407:24
**Fellow** [1] - 354:18
**felt** [4] - 360:23, 372:23, 376:5, 376:23
**FEMA** [33] - 288:4, 304:15, 304:16, 305:10, 335:25, 356:24, 357:14, 357:19, 359:6, 360:19, 361:18, 361:21, 362:1, 362:8, 363:15, 364:7, 375:13, 376:1, 378:14, 378:23, 379:6, 379:13, 379:19, 380:2, 380:10, 380:17, 382:10,

382:11, 384:11, 384:15, 385:2, 402:14, 405:9
**FEMA's** [2] - 360:11, 379:9
**fence** [1] - 344:15
**few** [4] - 294:19, 301:4, 301:6, 321:12
**field** [8] - 319:11, 321:19, 326:4, 340:5, 343:24, 344:1, 356:22, 419:20
**Fielding** [1] - 369:19
**file** [1] - 413:24
**filed** [4] - 291:12, 291:14, 291:22, 293:9
**filter** [1] - 313:21
**final** [3] - 356:7, 356:11, 367:9
**finalized** [1] - 382:8
**findings** [1] - 343:17
**fine** [5] - 295:22, 295:23, 359:3, 393:15, 411:21
**fingernail** [4] - 388:22, 388:24, 389:9, 389:11
**fingers** [1] - 326:8
**finish** [7] - 308:9, 310:15, 345:6, 346:9, 348:23, 358:14, 411:21
**finished** [1] - 321:2
**first** [30] - 294:2, 297:13, 301:14, 304:25, 305:1, 308:9, 308:25, 310:12, 316:24, 318:23, 319:9, 319:15, 326:1, 327:12, 331:20, 339:23, 342:25, 348:9, 350:7, 356:24, 357:4, 364:8, 366:8, 368:22, 371:6, 372:7, 379:4, 380:1, 391:2, 394:18
**fishing** [1] - 407:16
**flip** [2] - 381:7, 394:15
**flip-flop** [1] - 381:7
**flop** [1] - 381:7
**fluid** [1] - 395:24
**flyers** [1] - 376:1
**focus** [1] - 408:14
**focused** [1] - 410:14
**followed** [1] - 378:17
**following** [7] - 350:7,

350:14, 350:16, 350:20, 351:7, 351:11, 384:16
**follows** [5] - 316:25, 358:17, 368:20, 369:1, 412:10
**fool** [1] - 295:17
**foolishness** [1] - 332:2
**FOR** [3] - 288:16, 289:7, 289:12
**foregoing** [1] - 422:7
**foreign** [1] - 354:9
**Forest** [14] - 316:1, 328:6, 335:7, 335:16, 340:16, 341:7, 341:12, 342:20, 415:11, 415:15, 416:25, 417:3, 418:10, 421:2
**FOREST** [2] - 288:8, 289:7
**form** [4] - 306:12, 306:14, 391:19, 400:21
**formal** [4] - 325:24, 340:4, 349:25, 356:4
**FORMALDEHYDE** [1] - 288:4
**Formaldehyde** [2] - 366:21, 367:11
**formaldehyde** [126] - 315:23, 316:3, 327:9, 327:12, 327:23, 328:1, 328:5, 328:13, 328:17, 329:5, 329:11, 329:23, 330:2, 335:9, 335:17, 335:25, 337:11, 337:15, 337:16, 339:2, 341:1, 341:4, 342:17, 355:20, 355:23, 355:24, 357:5, 357:17, 359:5, 359:12, 359:13, 360:13, 361:8, 361:13, 361:20, 362:2, 362:11, 363:5, 363:11, 365:2, 366:1, 366:10, 366:19, 366:20, 366:24, 367:6, 367:22, 367:24, 368:5, 369:2, 369:4, 369:6, 369:9, 369:14, 369:24, 369:25, 370:12,

371:25, 373:13, 374:10, 375:18, 376:7, 376:18, 377:24, 378:14, 379:6, 380:4, 381:9, 382:8, 382:16, 382:19, 383:6, 384:13, 384:18, 388:20, 389:9, 389:14, 389:18, 389:22, 390:1, 390:3, 390:10, 391:5, 391:14, 391:19, 391:24, 394:11, 398:2, 398:11, 398:13, 398:18, 399:1, 399:5, 399:11, 399:15, 399:22, 400:3, 400:6, 400:17, 401:4, 401:12, 403:17, 404:2, 404:4, 404:5, 405:14, 405:23, 409:18, 410:5, 410:21, 416:19, 417:11, 417:12, 417:17, 417:19, 417:23, 418:4, 418:7, 418:10, 418:12, 418:22, 419:2, 419:7, 420:4, 420:11, 420:24
**formally** [1] - 356:19
**format** [1] - 313:12
**formed** [2] - 360:1, 375:4
**forms** [1] - 390:2
**formula** [1] - 389:19
**formulated** [1] - 333:7
**forth** [16] - 317:20, 319:12, 320:19, 322:9, 338:4, 342:17, 342:20, 344:16, 368:6, 381:8, 384:1, 413:19, 415:23, 419:11, 419:25, 421:11
**forward** [4] - 381:4, 381:22, 406:12, 410:2
**foundation** [1] - 327:17
**founded** [1] - 354:21
**four** [16] - 325:18, 325:19, 327:5, 327:8, 331:3, 343:23, 344:10, 353:18, 356:20,

372:12, 384:20, 402:4, 402:14, 402:17, 402:25, 403:5
**fourth** [4] - 326:24, 329:24, 330:4, 330:5
**fourths** [1] - 322:11
**frame** [1] - 379:18
**France** [1] - 367:4
**FRANK** [2] - 288:16, 288:17
**Frank** [1] - 345:23
**free** [3] - 309:7, 369:6, 370:10
**frequently** [3] - 352:18, 386:13, 414:6
**fresh** [1] - 296:4
**front** [5] - 308:11, 308:20, 417:24, 418:2, 420:19
**fruit** [1] - 408:1
**Frumkin** [2] - 375:10, 379:3
**fuel** [1] - 390:13
**fuels** [2] - 390:10, 390:12
**full** [6] - 317:2, 366:8, 379:25, 387:4, 394:7
**function** [8] - 322:24, 326:25, 369:22, 370:3, 402:12, 405:3, 416:2, 416:11
**functioning** [2] - 313:14, 313:22
**functions** [2] - 326:15, 414:11
**furthermore** [1] - 369:18
**fuses** [2] - 313:15, 313:16

## G

**Gaeddert** [7] - 335:5, 335:13, 340:17, 343:3, 343:4, 343:15, 343:17
**GAEDDERT** [1] - 289:18
**gain** [1] - 417:21
**game** [1] - 347:20
**gas** [2] - 389:9, 389:14
**gaseous** [6] - 399:1, 399:5, 399:15, 399:22, 400:2, 404:5
**gassing** [2] - 369:16, 369:24
**gathered** [1] - 408:11

**gauge** [2] - 346:24, 347:14
**general** [9] - 324:5, 326:4, 344:3, 394:6, 400:14, 403:22, 403:23, 403:25, 413:9
**General** [1] - 379:9
**generalizable** [2] - 409:1, 409:3
**generally** [5] - 325:18, 373:21, 381:1, 403:22, 404:19
**generated** [3] - 356:13, 378:24, 382:11
**gentlemen** [2] - 325:16, 405:25
**Georgia** [3] - 358:19, 406:25
**Gerberding** [1] - 368:2
**Gieger** [7] - 294:9, 294:14, 298:18, 304:1, 331:8, 342:8, 342:10
**GIEGER** [41] - 289:7, 289:8, 290:6, 294:16, 297:12, 297:21, 298:1, 298:22, 299:2, 299:4, 299:7, 299:21, 300:21, 314:23, 316:4, 317:14, 318:9, 318:16, 320:7, 323:7, 323:12, 323:18, 324:10, 324:21, 325:1, 327:14, 332:6, 339:8, 339:12, 342:2, 343:6, 346:2, 346:5, 347:3, 347:11, 347:16, 348:1, 348:4, 415:17, 421:2, 421:15
**GIEGER..................
..** [1] - 290:13
**given** [9] - 348:19, 353:12, 367:10, 372:11, 384:5, 386:21, 404:20, 408:24, 412:18
**glasses** [1] - 312:10
**glitch** [1] - 345:11
**God** [1] - 316:21
**gold** [1] - 409:9
**government** [5] - 359:23, 367:3, 374:21, 375:5, 375:7

**Government** [5] - 351:1, 351:17, 356:16, 359:21, 361:3
**governmental** [1] - 359:25
**governments** [1] - 354:11
**graduate** [4] - 318:2, 318:6, 321:5, 321:16
**greater** [5] - 360:24, 369:20, 370:19, 382:14, 386:14
**greatly** [1] - 359:24
**ground** [1] - 293:17
**group** [4] - 384:22, 401:25, 402:1, 410:11
**groups** [1] - 410:2
**guess** [8] - 299:24, 309:17, 309:20, 309:22, 312:18, 312:20, 321:9, 346:9
**guidance** [11] - 370:11, 371:22, 377:16, 377:18, 378:7, 385:13, 386:18, 387:10, 404:14, 404:15
**Guidance** [1] - 385:9
**guidance/reference** [1] - 386:16
**guide** [2] - 324:7, 360:5
**guidelines** [2] - 360:1, 360:4
**guiding** [1] - 408:22
**Gulf** [1] - 319:3
**gymnastics** [1] - 392:25

**H**

**half** [8] - 338:14, 346:22, 347:7, 389:23, 398:7, 398:16, 398:17
**half-life** [2] - 389:23, 398:7
**halfway** [2] - 387:4, 391:2
**hand** [3] - 316:19, 328:25, 408:22
**handing** [2] - 383:10, 420:8
**handle** [2] - 339:14, 407:24
**handling** [1] - 319:16
**hanging** [1] - 408:1

**happy** [1] - 393:15
**harbinger** [2] - 376:13, 403:10
**hard** [3] - 346:24, 347:13, 409:11
**hardeners** [1] - 388:24
**Hauptmann** [2] - 401:18, 401:24
**Hawthorne** [2] - 391:7, 391:9
**hazard** [23] - 322:22, 325:21, 325:25, 326:2, 326:6, 326:9, 326:10, 326:22, 327:5, 327:12, 328:5, 328:13, 328:21, 328:22, 328:23, 329:7, 329:10, 329:16, 330:7, 330:19, 340:4, 407:7
**Hazard** [1] - 371:5
**hazardous** [8] - 329:19, 330:16, 339:21, 340:1, 340:2, 340:8, 352:23, 387:15
**hazards** [15] - 326:10, 327:23, 327:25, 328:8, 329:2, 329:3, 329:4, 337:15, 339:24, 344:16, 344:17, 352:18, 375:21, 418:6, 420:23
**HCHO** [1] - 389:19
**head** [5] - 303:1, 303:7, 303:18, 303:19, 321:8
**headquartered** [1] - 358:18
**headspace** [1] - 369:19
**health** [63] - 305:17, 328:8, 349:22, 352:16, 352:18, 352:22, 352:23, 353:2, 353:8, 353:25, 354:10, 355:8, 355:23, 356:22, 357:16, 359:4, 359:11, 359:13, 360:7, 365:8, 365:14, 366:6, 367:12, 367:22, 368:4, 369:25, 370:11, 371:22, 372:15, 375:17, 376:14, 377:18, 378:7,

382:9, 382:17, 382:23, 383:6, 384:24, 385:13, 386:12, 386:18, 387:10, 387:13, 387:14, 387:18, 387:20, 396:8, 403:11, 404:14, 404:15, 404:23, 406:1, 406:11, 407:21, 407:22, 408:2, 408:5, 417:23, 418:9, 418:13, 419:1, 419:7
**Health** [21] - 351:2, 351:15, 351:16, 352:14, 353:1, 353:23, 354:4, 363:12, 363:18, 364:9, 364:14, 365:4, 365:5, 365:17, 366:9, 367:4, 367:10, 377:22, 384:16, 385:9, 400:12
**health-based** [1] - 365:8
**healthcare** [2] - 371:6, 377:6
**hear** [10] - 298:16, 306:20, 310:12, 310:14, 312:25, 328:20, 329:5, 331:18, 331:21, 332:16
**heard** [3] - 318:23, 345:21, 380:2
**HEARD** [1] - 288:12
**hearing** [3] - 421:9, 421:15, 421:16
**heating** [2] - 370:8, 382:17
**heavy** [1] - 390:18
**held** [7] - 308:14, 318:15, 320:19, 323:11, 331:11, 351:9, 412:4
**help** [5] - 298:2, 316:21, 330:7, 416:12
**hemorrhaging** [1] - 407:10
**hereby** [1] - 422:7
**hesitate** [2] - 292:5, 397:20
**Hewett** [5] - 291:23, 292:11, 292:12, 292:22, 346:17
**Hewett's** [2] - 293:4, 293:9

**hidden** [2] - 328:22, 329:4
**high** [6] - 369:2, 392:6, 398:11, 401:25, 402:6, 410:12
**higher** [14] - 369:22, 377:15, 377:16, 378:6, 386:5, 390:4, 390:5, 392:14, 392:19, 392:20, 392:21, 392:22, 392:23, 392:24
**highlight** [1] - 307:3
**highlighted** [1] - 297:12
**highly** [3] - 386:11, 407:11, 407:12
**Hispanic** [1] - 407:3
**history** [1] - 350:6
**hits** [1] - 398:21
**hmm** [1] - 363:6
**hold** [2] - 338:6, 351:4
**home** [3] - 369:17, 381:10, 381:18
**Home** [1] - 391:12
**homes** [13] - 357:1, 369:1, 369:4, 369:11, 369:12, 369:20, 369:21, 382:11, 382:13, 391:3, 391:4, 403:4, 403:14
**honestly** [1] - 308:2
**Honor** [46] - 291:19, 297:23, 300:22, 303:20, 308:6, 308:8, 311:22, 312:6, 312:25, 313:2, 313:7, 314:1, 316:4, 316:8, 316:16, 317:12, 317:14, 318:9, 318:12, 319:18, 320:7, 320:10, 323:7, 324:9, 325:9, 327:14, 327:16, 331:9, 339:4, 339:5, 339:9, 339:16, 340:13, 342:2, 342:4, 342:13, 343:6, 344:21, 345:7, 345:10, 345:16, 345:20, 347:8, 348:25, 411:15, 411:17
**HONORABLE** [1] - 288:12
**hope** [2] - 345:17, 358:15

**hoping** [1] - 345:25
**hospital** [1] - 377:8
**hospitals** [2] - 376:18, 376:20
**hot** [1] - 390:20
**hour** [8] - 345:15, 345:18, 345:19, 345:21, 345:24, 360:2, 395:20, 411:5
**hourglass** [1] - 349:1
**hours** [12] - 309:24, 345:3, 345:14, 360:2, 360:3, 371:9, 393:6, 393:10, 393:21, 395:13, 399:1, 399:8
**House** [1] - 408:18
**house** [3] - 388:19, 391:23, 391:25
**housekeeping** [1] - 291:10
**houses** [2] - 391:23, 402:21
**housing** [3] - 369:6, 379:7, 405:11
**Houston** [4] - 294:21, 294:23, 321:7, 321:18
**HOUSTON** [1] - 288:21
**Human** [5] - 351:2, 351:16, 366:9, 384:17, 400:12
**human** [33] - 318:7, 318:19, 318:23, 318:24, 319:1, 319:11, 319:13, 319:22, 323:1, 326:3, 344:1, 352:23, 354:1, 355:8, 366:11, 372:20, 373:4, 386:12, 390:1, 394:23, 395:20, 396:23, 400:10, 400:11, 400:13, 400:20, 401:1, 401:5, 401:6, 401:24, 410:6, 410:23, 417:23
**humans** [4] - 366:11, 372:18, 372:19, 373:20
**hundreds** [1] - 414:8
**Hurricane** [1] - 379:7
**hurricane** [1] - 336:1
**Hurricanes** [1] - 357:1
**HVAC** [1] - 313:21
**hydrocarbon** [3] - 390:9, 390:12,

390:13
**hydrocarbon-based** [1] - 390:13
**hygienist** [1] - 335:1
**hypersensitive** [1] - 396:12

## I

**I-75** [1] - 390:21
**IARC** [9] - 364:24, 366:22, 367:1, 367:6, 400:18, 400:20, 401:13, 410:21
**icons** [1] - 407:4
**identification** [1] - 386:2
**Identification** [2] - 417:8, 418:15
**identified** [5] - 308:23, 330:9, 353:13, 405:4, 415:8
**identify** [2] - 387:14, 396:19
**identifying** [2] - 402:6, 405:8
**IgE** [2] - 399:23, 400:1
**IgG** [2] - 399:23, 400:2
**IgM** [2] - 399:23, 400:2
**illustrate** [2] - 402:12, 406:14
**illustration** [1] - 388:9
**immediately** [2] - 364:16, 411:19
**immune** [2] - 396:13, 396:16
**immunogenic** [1] - 399:22
**impacts** [1] - 352:22
**impeaching** [1] - 303:22
**impeachment** [1] - 303:20
**impending** [1] - 376:13
**implementing** [1] - 353:2
**implication** [1] - 387:24
**implies** [1] - 323:5
**important** [4] - 408:25, 413:24, 414:4, 414:24
**improper** [2] - 303:20, 308:11
**IN** [1] - 288:4
**inadequate** [2] - 420:23, 420:25

**inapplicable** [1] - 373:12
**inappropriate** [1] - 393:12
**INC** [3] - 288:8, 289:7, 289:12
**incidence** [1] - 368:16
**incidences** [1] - 410:12
**Incidents** [1] - 371:6
**include** [1] - 343:17
**included** [3] - 330:21, 352:11, 418:14
**includes** [1] - 385:15
**including** [9] - 343:23, 352:16, 371:21, 375:10, 403:17, 418:14, 420:3, 420:10, 421:11
**incomplete** [1] - 390:9
**increase** [1] - 368:16
**increased** [2] - 395:22, 395:24
**increasingly** [2] - 361:15, 396:17
**incremental** [1] - 407:19
**indeed** [1] - 343:15
**independent** [1] - 352:25
**independently** [1] - 356:3
**India** [1] - 354:14
**Indian** [1] - 354:13
**indicate** [1] - 368:8
**indicated** [5] - 354:3, 366:5, 371:15, 379:10, 379:13
**indicates** [2] - 307:22, 361:14
**indication** [3] - 419:6, 420:12, 420:14
**individual** [7] - 359:2, 370:1, 381:10, 381:19, 388:4, 388:7, 399:11
**individuals** [13] - 352:2, 354:19, 361:15, 371:8, 384:25, 388:5, 388:13, 396:9, 397:12, 397:22, 398:10, 404:17, 419:12
**indoor** [1] - 391:23
**induced** [3] - 398:18, 399:10
**industrial** [1] - 335:1
**industry** [1] - 335:18
**inferences** [1] - 409:4

**inform** [1] - 375:17
**information** [23] - 315:23, 322:19, 322:20, 322:23, 352:22, 354:25, 358:22, 364:23, 365:8, 367:16, 387:1, 393:13, 408:4, 409:13, 412:25, 413:1, 413:14, 414:24, 416:4, 416:9, 419:21, 420:7, 420:9
**informed** [2] - 345:10, 419:1
**ingest** [2] - 406:23, 406:25
**inhabitants** [1] - 375:17
**inhalation** [5] - 367:12, 368:15, 394:22, 395:12, 395:19
**inhaling** [1] - 407:9
**inherent** [1] - 397:20
**initial** [1] - 358:25
**initials** [2] - 350:22, 350:23
**injured** [1] - 397:8
**injury** [1] - 397:2
**inorganic** [1] - 407:2
**input** [1] - 366:3
**inquired** [1] - 308:17
**inserts** [1] - 413:2
**inside** [1] - 306:1
**insights** [1] - 367:21
**insofar** [1] - 401:12
**inspected** [1] - 305:13
**inspection** [1] - 419:25
**installation** [1] - 419:15
**installed** [1] - 300:18
**instances** [1] - 389:8
**instead** [2] - 414:9, 420:8
**Institute** [3] - 353:23, 377:21, 402:9
**institution** [1] - 350:3
**instruct** [1] - 318:22
**instruction** [4] - 419:5, 419:7, 419:13, 419:19
**instructions** [1] - 326:20
**insulation** [1] - 391:19
**intakes** [1] - 385:22
**intended** [7] - 292:19, 371:6, 386:19, 387:13, 393:9,

396:19, 404:25
**intense** [1] - 398:19
**intent** [1] - 406:13
**interact** [2] - 409:6, 416:8
**interaction** [1] - 414:17
**interest** [3] - 353:25, 355:1, 380:5
**interested** [2] - 375:3, 380:12
**interface** [2] - 414:17, 419:16
**interindividual** [2] - 372:20, 373:4
**interior** [2] - 313:15, 380:3
**Intermediate** [1] - 367:11
**intermediate** [8] - 370:12, 370:14, 370:16, 370:19, 371:2, 392:21, 395:10, 395:12
**International** [4] - 352:12, 364:21, 367:2, 400:8
**interpreting** [2] - 378:24, 379:1
**interrupt** [1] - 331:12
**Interstate** [3] - 394:3, 394:10
**inversely** [1] - 386:4
**inversions** [1] - 390:19
**investigate** [1] - 365:25
**invites** [1] - 324:16
**invoked** [1] - 372:7
**involved** [6] - 328:6, 361:19, 362:1, 381:1, 399:25, 404:18
**involves** [2] - 374:10, 408:5
**involving** [2] - 374:1, 379:21
**ionizing** [1] - 374:24
**irrespective** [3] - 367:19, 374:22, 398:21
**irritant** [2] - 396:15, 403:24
**irritation** [3] - 328:11, 360:16, 368:17
**Islands** [1] - 354:13
**issue** [22] - 292:4, 292:16, 292:21, 293:3, 326:2, 337:11, 339:20,

340:8, 340:9, 343:2, 365:18, 366:1, 368:5, 373:25, 379:21, 380:2, 384:12, 397:12, 407:7, 408:22, 411:24, 420:4
**issued** [6] - 318:25, 332:11, 362:8, 364:9, 364:21, 384:8
**issues** [12] - 296:14, 296:16, 322:12, 357:16, 359:4, 359:13, 362:18, 373:24, 387:11, 406:3, 410:14, 420:3
**it'd** [1] - 383:3
**Italy** [1] - 402:9
**itching** [1] - 395:24
**item** [9] - 313:14, 329:9, 329:24, 330:1, 330:4, 330:5, 413:15, 414:13, 416:21
**items** [1] - 342:20
**iterative** [1] - 381:17
**itself** [3] - 326:6, 363:18, 366:17
**IV** [1] - 358:18

## J

**January** [1] - 383:18
**JASON** [1] - 289:8
**job** [2] - 333:13, 406:24
**Joe** [5] - 364:6, 380:22, 383:17, 383:20, 384:7
**John** [1] - 385:6
**join** [1] - 350:11
**joined** [1] - 321:2
**joins** [1] - 421:8
**Joint** [1] - 352:13
**joint** [1] - 321:4
**journal** [1] - 355:13
**journals** [3] - 338:3, 355:17, 355:18
**JR** [3] - 288:16, 288:17, 289:8
**judge** [8] - 297:12, 318:16, 323:12, 323:14, 324:10, 331:13, 345:7, 421:16
**Judge** [12] - 314:23, 318:17, 318:20, 323:8, 323:15, 324:13, 324:21,

324:23, 346:20, 347:11, 348:4, 348:5
**JUDGE** [1] - 288:13
**July** [8] - 301:8, 311:3, 375:9, 376:11, 377:1, 380:10, 402:21, 405:9
**juncture** [2] - 404:12, 408:15
**June** [4] - 301:12, 351:20, 362:4, 380:10
**JUROR** [1] - 312:25
**jurors** [1] - 294:2
**Jury** [1] - 348:8
**jury** [31] - 291:9, 293:12, 293:15, 293:20, 293:24, 299:2, 308:11, 308:16, 317:18, 322:14, 325:17, 328:16, 328:19, 329:9, 329:13, 329:24, 333:15, 333:23, 336:11, 336:16, 337:19, 341:17, 343:3, 350:22, 358:5, 358:11, 405:25, 411:11, 411:19, 412:19, 420:20
**JURY** [1] - 288:12
**just..** [1] - 354:15

## K

**kaolin** [1] - 407:1
**kaolin-containing** [1] - 407:1
**KAREN** [1] - 289:14
**Katrina** [5] - 294:20, 294:22, 357:1, 379:8
**keep** [1] - 347:22
**Keim** [1] - 383:15
**KENNETH** [3] - 290:10, 290:18, 316:23
**Kenneth** [3] - 316:12, 317:4, 317:13
**kept** [2] - 330:14, 363:16
**kids** [4] - 376:17, 377:5, 377:7, 407:7
**Kilburn** [1] - 399:17
**kill** [1] - 388:10
**kind** [12] - 306:2, 314:16, 317:19, 323:4, 328:21, 328:23, 329:4,

329:14, 330:8, 336:19, 337:3, 418:4
**kinds** [1] - 337:15, 338:17, 414:16
**Kingdom** [1] - 354:13
**knockout** [1] - 346:1
**knowledge** [18] - 315:25, 326:12, 326:14, 327:18, 329:9, 329:15, 335:9, 335:17, 335:23, 349:20, 366:18, 367:14, 368:3, 369:8, 384:14, 397:25, 408:25, 409:5
**knowledgeable** [1] - 308:7
**known** [15] - 292:7, 318:7, 326:23, 327:6, 366:24, 367:6, 369:24, 371:24, 373:2, 400:15, 400:19, 401:1, 401:5, 401:6, 410:23
**knows** [1] - 309:3
**KURT** [1] - 288:12
**Kurtz** [1] - 339:14
**KURTZ** [5] - 289:13, 339:16, 339:18, 340:11, 421:8
**KURTZ.....................
..** [1] - 290:14

## L

**L-A-U-G-H-E-R-Y** [1] - 317:5
**LA** [4] - 288:18, 289:10, 289:15, 289:21
**lab** [2] - 366:12, 409:8
**label** [5] - 326:4, 338:20, 414:1, 414:4, 420:7
**labeled** [2] - 388:18, 415:23
**labels** [1] - 413:2
**LABORDE** [1] - 289:7
**ladies** [2] - 325:16, 405:25
**LaGrange** [2] - 346:17, 346:19
**laid** [1] - 308:15
**language** [1] - 400:25
**LAPEROUSE** [1] - 289:7
**large** [9] - 338:17,

338:23, 369:3, 372:24, 374:25, 381:9, 382:25, 406:23, 406:25
**largely** [1] - 292:2
**last** [13] - 291:24, 317:4, 324:11, 326:24, 337:13, 339:8, 343:1, 351:10, 351:17, 379:10, 408:12, 408:13
**late** [7] - 350:12, 357:7, 357:8, 357:13, 357:23, 358:21, 374:24
**latency** [2] - 374:15, 374:18
**LAUGHERY** [3] - 290:10, 290:18, 316:23
**Laughery** [19] - 316:12, 316:13, 317:4, 317:8, 317:13, 327:22, 332:7, 332:11, 333:2, 333:11, 339:13, 339:19, 340:7, 411:18, 411:20, 412:13, 415:13, 421:6, 421:11
**lavage** [1] - 395:23
**LAW** [2] - 288:16, 288:23
**lawnmower** [2] - 329:1, 336:24
**lawyers** [8] - 301:24, 331:14, 333:17, 335:12, 335:20, 336:16, 343:11, 397:23
**lay** [1] - 327:17
**laying** [2] - 319:14, 320:4
**layman's** [1] - 322:15
**lead** [5] - 314:2, 314:24, 369:13, 381:1, 388:13
**leader** [1] - 350:13
**leading** [1] - 314:1
**Leading** [1] - 314:23
**leads** [1] - 369:6
**learn** [1] - 329:17
**least** [6] - 321:21, 325:23, 356:20, 380:6, 391:10, 415:19
**leaves** [1] - 411:12
**leaving** [1] - 300:24

left [2] - 294:9, 306:21
**legal** [1] - 398:1
**length** [2] - 346:13
**lesions** [2] - 395:5, 399:10
**less** [5] - 301:12, 379:18, 391:5, 408:9
**letter** [9] - 304:21, 364:7, 365:24, 365:25, 366:14, 366:15, 366:17, 368:2
**leukemia** [4] - 400:25, 401:1, 401:3, 401:5
**leukemias** [2] - 374:17, 400:24
**level** [37] - 357:5, 361:3, 365:9, 367:18, 369:23, 371:7, 371:13, 371:17, 371:21, 372:14, 374:22, 384:24, 385:17, 386:3, 386:4, 388:1, 390:2, 390:10, 394:6, 395:2, 395:10, 395:14, 395:21, 396:7, 396:20, 397:19, 398:21, 404:19, 404:22, 405:4, 405:5, 405:17, 405:18, 405:22
**level/foundation** [1] - 307:4
**levels** [42] - 360:6, 361:15, 361:17, 361:20, 362:2, 362:12, 363:4, 363:11, 367:24, 368:12, 369:21, 370:4, 371:22, 372:5, 373:13, 374:6, 377:14, 377:19, 377:23, 382:16, 382:23, 383:6, 384:21, 385:14, 385:20, 386:10, 386:13, 387:8, 396:17, 398:11, 398:12, 399:16, 402:6, 404:15, 405:3, 405:14, 405:20, 406:2, 406:17, 406:19
**Liability** [1] - 353:3
**LIABILITY** [1] - 288:5
**life** [8] - 373:23, 381:10, 381:14,

381:19, 389:23, 398:7, 406:20, 409:11
**life-style** [4] - 381:10, 381:14, 381:19, 406:20
**lifestyle** [1] - 362:15
**lifetime** [7] - 321:12, 359:19, 373:18, 373:20, 393:9, 393:16, 393:18
**light** [1] - 410:16
**lights** [1] - 410:25
**likelihood** [1] - 416:3
**likely** [8] - 357:8, 386:9, 386:14, 400:15, 402:12, 403:24, 413:11, 415:22
**Limine** [3] - 291:21, 293:7, 293:8
**limine** [1] - 421:4
**Limitations** [1] - 385:8
**limitations** [3] - 406:16, 410:8, 410:15
**limited** [5] - 342:8, 363:19, 364:19, 366:11, 416:2
**limits** [4] - 360:6, 377:15, 377:18, 386:9
**line** [13] - 297:14, 297:18, 297:21, 299:4, 299:5, 307:2, 311:24, 312:4, 312:14, 319:8, 408:7
**lines** [2] - 306:22, 312:5, 406:15
**link** [3] - 399:2, 399:6, 399:15
**linking** [2] - 398:23, 398:25
**liquid** [1] - 407:8
**liquids** [1] - 389:7
**List** [1] - 352:19
**list** [3] - 313:25, 333:6, 348:6
**listed** [5] - 302:3, 330:9, 332:21, 334:12, 410:5
**listing** [1] - 367:12
**literature** [7] - 328:22, 355:14, 356:1, 368:11, 371:14, 371:17, 415:1
**LITIGATION** [1] - 288:5
**live** [4] - 302:4, 330:17, 348:19,

407:12
**lived** [6] - 295:4, 301:7, 301:20, 302:9, 373:15, 374:13
**living** [7] - 301:25, 302:18, 330:6, 369:7, 369:24, 370:1, 419:11
**LOAEL** [4] - 395:2, 395:20, 405:4, 405:5
**LOAEL's** [1] - 405:3
**location** [3] - 323:13, 324:21, 382:13
**lock** [2] - 315:12, 315:13
**Logan** [1] - 329:21
**logarithmic** [1] - 402:11
**logarithmically** [1] - 372:10
**long-standing** [1] - 402:7
**long-term** [2] - 370:12, 370:13
**longest** [1] - 360:8
**longstanding** [1] - 372:6
**look** [20] - 298:17, 306:13, 306:21, 307:2, 307:12, 314:10, 325:12, 326:9, 327:11, 328:15, 341:17, 360:17, 362:19, 368:14, 381:19, 384:5, 396:3, 406:3, 406:5, 406:19
**looked** [8] - 298:19, 308:3, 334:11, 360:22, 364:17, 376:4, 408:12, 418:18
**looking** [7] - 320:18, 362:17, 367:10, 368:1, 381:11, 397:22, 407:18
**looks** [4] - 307:19, 314:13, 314:16, 383:20
**lost** [2] - 358:23, 413:25
**loud** [1] - 331:18
**Louisiana** [2] - 422:5, 422:6
**LOUISIANA** [2] - 288:1, 288:6
**low** [4] - 384:20, 386:3, 401:25, 408:1
**low-hanging** [1] -

408:1
**lower** [8] - 361:15, 361:17, 369:5, 386:6, 390:5, 396:17, 407:16
**lowest** [5] - 371:13, 371:16, 395:2, 395:21, 396:3
**lunch** [7] - 345:25, 346:13, 346:16, 358:14, 364:15, 411:4, 411:9
**luncheon** [1] - 421:22
**lunchtime** [1] - 346:9
**LYNDON** [1] - 288:16
**Lyndon** [1] - 296:25, 312:14, 314:21, 315:4, 315:9, 330:2, 341:15, 341:18, 419:10, 419:22, 420:13
**Lyon** [1] - 401:9
**Lyons** [1] - 367:4

### M

**ma'am** [24] - 293:21, 295:9, 298:23, 300:12, 301:9, 304:12, 304:21, 305:3, 305:15, 306:3, 306:9, 306:14, 306:16, 306:23, 307:3, 307:6, 307:14, 307:23, 309:25, 311:16, 312:9, 312:22, 313:4, 314:25
**magnitude** [4] - 397:5, 397:7, 397:14, 397:15
**mail** [14] - 375:9, 375:12, 376:2, 376:11, 377:1, 377:13, 378:17, 379:25, 381:24, 382:25, 383:3, 383:11, 403:9
**mails** [1] - 378:20
**Maine** [1] - 350:15
**maintain** [1] - 355:19
**maintained** [1] - 301:11
**maintenance** [2] - 305:2, 305:13
**Maintenance** [2] - 306:12, 417:14
**major** [1] - 414:7

**management** [1] - 358:23
**Management** [1] - 382:9
**Managing** [1] - 371:5
**mandates** [1] - 353:2
**manifestation** [1] - 386:15
**manual** [18] - 337:7, 414:2, 414:8, 414:11, 416:2, 416:10, 416:12, 416:13, 416:21, 416:24, 417:3, 417:5, 417:6, 417:24, 418:10, 418:14, 420:8, 420:10
**manuals** [5] - 413:2, 413:16, 413:17, 413:20, 414:6
**manufactured** [3] - 369:15, 382:11, 402:21
**manufacturer** [4] - 316:1, 316:2, 337:4, 337:17
**manufacturers** [2] - 380:7, 380:9
**manufacturing** [1] - 391:13
**map** [1] - 294:5
**MARCH** [2] - 288:6, 291:3
**March** [1] - 301:8
**mark** [1] - 421:10
**Mark** [1] - 383:15
**marked** [5] - 307:16, 307:18, 381:23, 383:10, 416:22
**Master's** [2] - 318:2, 350:2
**material** [1] - 303:22, 332:15, 332:19, 332:21, 332:24, 333:3, 333:14, 333:20, 334:13, 366:4, 376:4
**Materials** [1] - 371:6
**materials** [10] - 328:4, 329:19, 333:6, 334:11, 352:16, 375:21, 375:23, 375:25, 408:12, 421:7
**math** [1] - 393:1
**matter** [10] - 321:21, 360:20, 360:22, 361:2, 399:1, 399:8, 410:1, 420:11,

422:10
**matters** [3] - 291:11, 420:10
**maximum** [2] - 402:7, 402:10
**McGeehin** [1] - 375:9
**MDL** [1] - 288:5
**mean** [18] - 299:22, 304:5, 305:6, 308:21, 311:21, 315:7, 322:16, 324:22, 339:22, 343:25, 344:12, 344:14, 346:21, 354:15, 373:15, 396:8, 402:20, 414:3
**meaning** [1] - 387:17
**means** [3] - 309:18, 309:20, 397:5
**meantime** [1] - 411:7
**measured** [1] - 369:23
**MECHANICAL** [1] - 289:23
**mechanism** [1] - 367:21
**mechanisms** [1] - 399:10
**medal** [2] - 353:11, 353:15
**media** [2] - 376:2, 412:25
**mediated** [2] - 399:23, 400:2
**medical** [5] - 296:14, 296:16, 328:3, 333:24, 333:25
**Medicine** [4] - 351:9, 351:23, 356:14, 379:17
**medicine** [2] - 352:16, 354:23
**medicines** [1] - 389:3
**meeting** [1] - 420:1
**meetings** [2] - 349:16, 362:4
**Mega** [1] - 375:2
**Mega-Mouse** [1] - 375:2
**Mellon** [1] - 317:23
**member** [5] - 352:8, 352:12, 352:13, 354:7
**members** [2] - 363:24, 364:4
**memory** [2] - 354:21, 396:17
**mental** [1] - 392:25
**mention** [8] - 305:8, 305:23, 359:4, 359:12, 366:6,

375:20, 376:5, 420:5
**mentioned** [12] - 319:22, 329:9, 329:24, 350:9, 367:18, 371:23, 398:6, 409:14, 413:15, 414:13, 416:21, 419:4
**mentioning** [1] - 376:6
**Mercury** [3] - 407:2, 407:6, 407:8
**mercury** [2] - 407:2, 408:18
**mercy** [1] - 405:6
**mere** [1] - 386:19
**Merit** [1] - 422:4
**messed** [1] - 315:14
**messing** [1] - 304:18
**messy** [1] - 409:10
**met** [3] - 332:9, 349:19, 397:23
**metabolism** [1] - 389:24
**metal** [1] - 407:8
**metallic** [1] - 407:8
**metallurgical** [1] - 317:24
**method** [2] - 405:15, 410:17
**methodologies** [1] - 325:25
**methodology** [3] - 292:21, 330:20, 340:5
**methods** [3] - 391:13, 391:16, 412:24
**Miami** [1] - 350:2
**microphone** [1] - 310:13
**microwave** [1] - 336:24
**mid** [2] - 372:7, 391:12
**mid-1980's** [1] - 391:12
**middle** [2] - 346:11, 388:18
**midmorning** [2] - 345:6, 357:25
**midnight** [1] - 408:13
**might** [10] - 293:12, 326:5, 345:15, 360:7, 362:16, 365:11, 378:23, 397:8, 400:16, 405:14
**migrated** [1] - 358:22
**Mike** [1] - 375:9
**million** [16] - 352:3, 370:13, 370:14, 370:15, 371:1,

371:4, 390:1, 392:7, 393:4, 398:12, 402:4, 402:14, 402:18, 403:1, 403:6, 405:21
**mind** [4] - 305:23, 330:14, 355:6, 359:15
**mine** [1] - 314:13
**minimal** [4] - 385:17, 385:20, 387:8, 404:18
**minimize** [1] - 418:12
**minimum** [5] - 377:19, 385:13, 405:18, 405:22, 406:1
**minutes** [15] - 345:5, 345:11, 345:16, 347:7, 348:22, 357:25, 358:1, 358:3, 358:7, 398:7, 398:17, 411:3, 411:6, 412:6, 412:7
**mismatched** [2] - 338:14, 338:15
**missing** [1] - 396:24
**mission** [1] - 353:14
**mistaken** [2] - 292:23, 401:10
**mister** [1] - 312:20
**misunderstanding** [1] - 387:17
**misuse** [1] - 387:17
**mixed** [1] - 407:20
**mixing** [1] - 322:16
**mobile** [4] - 369:1, 369:4, 369:11, 369:21
**modify** [1] - 322:25
**modifying** [1] - 396:24
**Molecular** [1] - 350:5
**molecule** [4] - 388:6, 388:13, 389:18, 396:11
**moment** [5] - 312:24, 314:20, 379:11, 399:19, 405:13
**monkey** [1] - 395:12
**month** [1] - 295:7
**months** [9] - 295:12, 295:14, 295:21, 301:12, 301:20, 360:20, 360:23, 365:20, 368:15
**moot** [2] - 291:17, 291:20
**Morgan** [1] - 307:20
**MORNING** [1] - 288:11
**morning** [16] - 291:8, 293:21, 293:22,

294:1, 294:17, 294:18, 301:3, 318:11, 318:16, 318:17, 326:19, 332:7, 332:8, 345:1, 403:8, 411:25
**mortality** [1] - 401:23
**most** [13] - 294:21, 310:4, 341:10, 352:18, 366:23, 372:9, 372:19, 374:15, 386:16, 410:10, 413:11, 414:19, 415:22
**motion** [5] - 291:12, 291:15, 291:16, 291:23, 292:1
**Motion** [3] - 291:21, 293:7, 293:8
**motions** [1] - 421:4
**motivating** [1] - 416:11
**Mouse** [1] - 375:2
**move** [19] - 297:1, 302:13, 304:14, 310:13, 311:9, 311:13, 311:15, 311:16, 311:20, 311:21, 312:18, 314:21, 322:14, 339:7, 339:10, 343:7, 343:12, 349:2, 405:10
**moved** [10] - 294:21, 300:5, 311:2, 311:6, 311:12, 311:14, 315:4, 315:10, 321:7, 321:9
**moving** [3] - 312:15, 315:9, 328:24
**MR** [140] - 290:6, 290:7, 290:8, 290:9, 290:11, 290:12, 290:13, 290:14, 290:15, 291:19, 294:16, 297:12, 297:21, 298:1, 298:22, 299:2, 299:4, 299:7, 299:13, 299:21, 300:21, 301:2, 303:20, 304:3, 304:9, 308:6, 308:8, 308:10, 308:15, 308:24, 309:2, 309:14, 310:19, 311:22, 311:25, 312:2, 312:5, 312:9, 312:12, 313:2, 313:7, 313:10,

314:1, 314:4, 314:23, 315:2, 316:4, 316:8, 316:12, 316:16, 317:7, 317:12, 317:14, 317:15, 317:17, 318:9, 318:16, 319:7, 319:17, 319:18, 320:2, 320:4, 320:7, 320:10, 320:13, 323:7, 323:12, 323:18, 324:9, 324:10, 324:18, 324:21, 325:1, 325:3, 325:9, 325:11, 327:14, 327:16, 327:19, 327:21, 331:6, 331:9, 331:12, 331:19, 331:22, 332:6, 339:4, 339:8, 339:12, 339:16, 339:18, 340:11, 340:13, 340:15, 342:2, 342:4, 342:13, 342:15, 343:6, 343:9, 343:14, 344:20, 344:24, 345:3, 345:7, 345:10, 345:15, 345:19, 345:21, 346:2, 346:5, 346:6, 346:7, 346:10, 346:16, 346:19, 347:3, 347:4, 347:8, 347:9, 347:11, 347:13, 347:16, 347:22, 347:24, 348:1, 348:4, 348:25, 397:10, 411:2, 411:15, 411:17, 412:12, 415:17, 416:16, 421:1, 421:2, 421:8, 421:15, 421:18
**MRL** [16] - 373:6, 373:7, 374:6, 392:14, 392:21, 393:9, 394:22, 395:8, 395:12, 395:17, 395:19, 395:25, 396:7, 397:2, 397:3
**MRL's** [12] - 371:25, 373:12, 378:7, 385:13, 385:19, 386:8, 387:3, 387:7, 387:13, 388:2, 394:15, 396:3

**mucosa** [3] - 360:16, 395:5
**multiple** [1] - 377:4
**multiply** [1] - 377:4
**must** [2] - 303:3, 386:18

# N

**name** [4] - 301:3, 314:15, 317:2, 317:5
**named** [2] - 307:19, 364:23
**narrow** [1] - 319:21
**NASA** [2] - 353:24, 365:15
**nasal** [3] - 360:16, 395:5, 395:22
**nasopharyngeal** [5] - 400:22, 400:23, 401:7, 401:13, 410:12
**National** [14] - 351:14, 352:6, 352:7, 352:9, 352:19, 353:23, 368:7, 377:21, 402:8, 408:19, 409:14, 409:17, 409:22
**native** [1] - 407:15
**naturally** [1] - 390:6
**nature** [3] - 326:6, 366:20, 394:6
**NCI** [1] - 401:17
**near** [1] - 417:24
**necessarily** [4] - 297:2, 361:5, 362:14, 399:3
**necessary** [8] - 319:8, 319:10, 325:14, 331:25, 332:1, 415:10, 415:15, 415:20
**need** [41] - 293:18, 297:3, 297:9, 298:7, 298:16, 299:10, 299:22, 299:23, 312:8, 312:9, 319:25, 322:19, 322:20, 322:23, 323:23, 324:1, 324:25, 325:20, 326:7, 326:11, 326:15, 326:16, 326:17, 326:23, 327:3, 327:17, 329:7, 329:8, 331:2, 331:4, 333:14, 333:18, 336:3,

344:17, 345:11, 365:10, 377:2, 394:8, 411:13, 411:23, 412:1
**needed** [6] - 325:14, 372:25, 376:6, 376:23, 413:23, 414:1
**needing** [1] - 406:15
**needs** [3] - 325:19, 327:1, 330:14
**neighborhood** [1] - 393:25
**Netherlands** [1] - 354:12
**never** [14] - 304:21, 305:2, 305:9, 306:2, 318:21, 336:5, 336:7, 337:4, 337:7, 337:10, 338:25, 339:2, 349:19, 382:13
**nevertheless** [1] - 409:12
**New** [4] - 294:25, 321:3, 380:6, 382:14
**NEW** [5] - 288:6, 288:18, 289:10, 289:15, 289:21
**new** [3] - 358:22, 382:13, 414:20
**newly** [1] - 391:22
**news** [2] - 357:2, 384:12
**NEXSEN** [1] - 289:3
**next** [17] - 294:13, 297:20, 316:11, 331:16, 331:22, 344:23, 347:17, 347:21, 376:9, 381:11, 387:2, 391:2, 391:16, 394:3, 394:15, 395:10
**nice** [1] - 346:10
**Nickel** [1] - 381:24
**night** [3] - 291:24, 408:13
**NIOSH** [5] - 377:18, 377:20, 377:23, 377:25
**NO** [2] - 288:5, 288:9
**NOAEL** [1] - 395:14
**NOAEL's** [1] - 405:3
**non** [2] - 392:6, 392:9
**non-detect** [2] - 392:6, 392:9
**noon** [1] - 411:4
**nose** [1] - 328:11
**noses** [1] - 403:17

**noted** [3] - 337:17, 368:13, 405:2
**notes** [1] - 339:9
**nothing** [4] - 316:20, 346:12, 371:25, 421:1
**notice** [4] - 417:22, 418:9, 418:13, 418:21
**noticed** [2] - 306:2, 415:23
**November** [3] - 343:4, 343:16, 379:10
**NTP** [4] - 409:9, 409:14, 409:21, 410:19
**NUMBER** [1] - 290:17
**number** [23] - 297:14, 301:17, 322:1, 322:10, 338:17, 338:23, 344:4, 344:8, 350:11, 353:24, 354:14, 355:13, 357:8, 357:9, 360:4, 361:2, 362:13, 376:11, 381:9, 396:13, 401:15, 408:20, 410:1
**Number** [4] - 375:8, 381:23, 383:11, 412:10
**numbered** [2] - 376:9, 422:9
**numbers** [4] - 348:4, 374:25, 392:15, 397:18

**O**

**o'clock** [1] - 358:1
**oath** [3] - 316:14, 316:25, 348:17
**object** [7] - 308:6, 318:10, 323:7, 331:23, 339:4, 343:6, 415:17
**objection** [15] - 308:11, 314:1, 314:23, 316:4, 316:6, 317:9, 317:14, 317:15, 320:15, 324:24, 327:14, 342:2, 415:6, 415:7, 421:8
**objects** [1] - 421:3
**observable** [4] - 395:2, 395:14, 395:21, 396:3

**observations** [1] - 315:15
**observe** [2] - 304:10, 304:13
**observed** [2] - 386:3
**obtained** [1] - 326:14
**obvious** [12] - 326:5, 326:10, 326:11, 326:16, 326:22, 327:6, 328:16, 328:17, 329:1, 329:6, 329:19, 343:23
**obviously** [1] - 362:13
**occasion** [3] - 348:10, 348:17, 358:24
**occasional** [1] - 387:16
**occasions** [3] - 301:17, 353:17, 356:21
**occupancy** [2] - 360:18, 419:8
**occupant** [2] - 402:17, 419:16
**occupants** [2] - 362:16, 403:14
**occupation** [2] - 349:21, 349:22
**Occupational** [1] - 377:21
**occupational** [6] - 354:22, 377:15, 377:18, 393:11, 401:15, 401:17
**occupationally** [1] - 360:5
**occupied** [5] - 362:13, 362:25, 380:17, 381:14, 382:13
**occur** [8] - 314:21, 369:16, 386:9, 386:15, 396:8, 398:25, 413:3, 420:15
**occurred** [4] - 315:4, 315:6, 343:21, 420:12
**occurring** [1] - 371:21
**occurs** [1] - 390:6
**Ocean** [1] - 354:13
**October** [7] - 292:24, 292:25, 342:23, 343:1, 351:9, 365:17, 382:12
**OF** [3] - 288:1, 288:12, 288:16
**off-gas** [2] - 389:9, 389:14
**off-gassing** [2] -

369:16, 369:24
**offer** [5] - 321:10, 341:8, 411:18, 412:16, 421:10
**offered** [2] - 405:10, 421:14
**offering** [3] - 317:12, 319:22, 324:4
**Office** [4] - 350:18, 351:13, 379:9, 408:17
**office** [4] - 350:18, 357:13, 393:5, 393:6
**OFFICER** [4] - 293:23, 358:4, 358:10, 411:10
**OFFICES** [1] - 288:16
**official** [1] - 357:19
**OFFICIAL** [1] - 289:20
**Official** [2] - 422:5, 422:15
**officially** [1] - 321:11
**officials** [1] - 387:14
**often** [2] - 386:7, 416:8
**OGC** [1] - 379:10
**Ohio** [3] - 350:1, 350:2, 350:19
**on-product** [20] - 323:2, 323:4, 324:13, 324:20, 413:2, 413:5, 413:7, 413:22, 414:1, 414:4, 415:6, 415:9, 415:15, 415:20, 415:22, 416:9, 416:12, 416:18, 418:15, 418:25
**once** [3] - 340:22, 347:20, 379:13
**one** [85] - 291:12, 292:6, 292:17, 295:11, 297:16, 299:17, 300:8, 301:24, 302:3, 305:10, 305:12, 307:12, 307:14, 307:16, 308:3, 308:25, 318:6, 319:15, 319:16, 322:16, 325:19, 325:21, 330:6, 330:14, 330:15, 337:16, 345:15, 345:21, 346:3, 346:20, 347:21, 352:25, 354:18, 355:12, 356:19, 357:13, 360:2, 361:2, 368:15,

369:23, 370:5, 370:18, 372:13, 372:16, 372:17, 373:15, 374:2, 378:19, 380:1, 384:22, 388:9, 388:13, 388:17, 389:18, 389:20, 389:21, 391:12, 392:3, 392:24, 394:18, 395:10, 396:11, 398:7, 398:16, 399:11, 400:21, 404:19, 405:4, 405:15, 406:10, 407:14, 407:18, 408:2, 408:24, 409:2, 409:3, 410:9, 410:11, 411:5, 414:5, 415:21, 418:6
**one-and-a-half** [2] - 398:7, 398:16
**one-molecule** [1] - 389:18
**one-year** [1] - 374:2
**ones** [2] - 330:23, 419:15
**ongoing** [4] - 362:1, 363:4, 381:20, 406:20
**onset** [1] - 386:17
**onsite** [1] - 352:2
**open** [21] - 296:4, 296:11, 315:12, 326:4, 326:10, 326:11, 326:16, 326:22, 327:6, 328:16, 328:17, 329:1, 329:6, 329:18, 343:23, 356:3, 370:10, 384:19, 384:22, 405:14, 420:9
**opened** [5] - 302:25, 303:6, 303:12, 303:17, 383:5
**opening** [2] - 330:13, 382:15
**operating** [1] - 384:4
**opinion** [7] - 293:5, 319:9, 319:21, 415:14, 418:12, 419:11, 420:22
**opinions** [9] - 333:8, 333:15, 341:25, 342:9, 342:16, 355:22, 355:25, 421:5, 421:11
**opportunities** [1] -

414:21
**opportunity** [12] - 303:21, 329:22, 341:6, 343:16, 350:11, 380:22, 411:18, 414:17, 415:3, 419:16, 420:2, 420:5
**opposed** [3] - 366:25, 385:24, 400:15
**opposing** [2] - 341:7, 341:9
**opposition** [2] - 291:24, 292:4
**oranges** [1] - 393:12
**ORDER** [1] - 291:4
**order** [14] - 322:23, 323:1, 323:19, 323:22, 324:14, 327:1, 327:15, 349:17, 397:5, 397:7, 397:13, 397:15, 402:23, 421:4
**ordered** [1] - 324:8
**orders** [4] - 318:10, 318:25, 319:3, 421:5
**organization** [2] - 354:21, 354:24
**Organization** [3] - 352:14, 354:4, 367:5
**organizations** [2] - 354:16, 355:3
**original** [1] - 367:8
**originally** [2] - 300:18, 385:22
**ORLEANS** [5] - 288:6, 288:18, 289:10, 289:15, 289:21
**Orleans** [2] - 294:25, 380:6
**Orleans/Baton** [1] - 382:14
**osmotic** [1] - 388:10
**otherwise** [1] - 360:5
**ought** [2] - 296:25, 311:23
**outcome** [1] - 323:1
**outdoor** [2] - 369:5, 390:10
**outgrowth** [1] - 354:5
**outside** [6] - 316:5, 336:4, 411:8, 412:4, 412:18
**overall** [2] - 391:4, 408:22
**overcome** [1] - 416:13
**overrule** [1] - 339:7
**overruled** [1] - 309:10
**oversaw** [1] - 352:1

**overused** [1] - 292:6
**own** [9] - 311:6,
311:13, 311:16,
311:18, 312:17,
312:18, 349:13,
359:9, 359:16
**owner's** [16] - 337:7,
414:2, 414:8,
414:11, 416:2,
416:10, 416:12,
416:13, 416:21,
416:24, 417:2,
417:5, 417:6,
418:14, 420:8, 420:9
**owners'** [4] - 413:16,
413:17, 413:20,
414:6

## P

**P.O** [1] - 289:4
**pace** [1] - 294:6
**package** [1] - 413:2
**packet** [1] - 420:9
**Page** [8] - 290:3,
290:22, 299:4,
306:7, 312:13,
417:5, 417:18, 418:1
**page** [12] - 297:14,
297:18, 297:21,
311:24, 312:3,
320:18, 376:9,
382:5, 387:2,
388:17, 391:2,
394:15
**pages** [1] - 414:8
**panacea** [1] - 387:18
**panel** [5] - 293:25,
313:15, 358:6,
358:12, 411:12
**paper** [5] - 385:5,
387:2, 391:7,
401:14, 401:20
**papers** [2] - 321:23,
337:24
**paragraph** [11] -
366:9, 366:20,
368:14, 369:1,
379:4, 380:1,
381:11, 387:4,
388:18, 391:2, 391:3
**paragraphs** [1] - 381:8
**parameter** [1] - 372:11
**parameters** [2] -
324:3, 408:24
**parents** [2] - 329:17,
377:5
**part** [15] - 304:15,
319:23, 321:21,

328:3, 328:7,
330:17, 333:13,
340:3, 340:6,
354:13, 356:4,
361:6, 366:22,
414:13
**participate** [1] -
410:20
**particle** [2] - 369:4,
391:13
**particular** [13] -
305:19, 313:12,
314:17, 315:24,
318:4, 324:5,
355:20, 370:1,
375:9, 386:12,
401:11, 410:9,
416:18
**particularly** [3] -
331:14, 407:13,
414:7
**parts** [22] - 370:13,
370:14, 370:15,
371:1, 371:4, 390:1,
390:22, 390:25,
391:1, 392:7,
392:12, 393:3,
393:4, 398:12,
402:4, 402:14,
402:18, 402:25,
403:5, 405:21
**pass** [6] - 306:22,
306:25, 307:3,
307:8, 307:16, 331:6
**passed** [4] - 307:22,
308:5, 309:16, 385:2
**past** [3] - 320:15,
321:20, 322:11
**path** [1] - 381:22
**Patricia** [1] - 341:23
**Paul** [1] - 291:23
**PAUL** [1] - 289:3
**PCB's** [1] - 408:18
**peak** [1] - 377:15
**peer** [6] - 322:9,
338:3, 355:7,
355:12, 355:13,
356:3
**peer-reviewed** [6] -
322:9, 338:3, 355:7,
355:12, 355:13,
356:3
**pending** [1] - 291:11
**people** [20] - 292:13,
322:19, 322:20,
322:23, 326:17,
329:7, 329:14,
329:20, 347:15,
347:19, 374:13,
376:12, 377:10,

377:11, 396:11,
396:12, 397:1,
397:8, 408:3, 419:1
**people's** [1] - 415:3
**Pepper** [3] - 422:3,
422:13, 422:14
**PEPPER** [1] - 289:20
**per** [27] - 291:21,
370:13, 370:14,
370:15, 371:1,
371:4, 384:18,
384:21, 390:1,
390:22, 390:25,
391:1, 392:7,
392:12, 393:3,
393:4, 395:13,
395:14, 398:12,
402:4, 402:14,
402:18, 402:25,
403:5, 405:21
**per-day** [1] - 384:21
**percent** [1] - 372:11
**perfect** [1] - 409:13
**perfectly** [1] - 333:2
**performed** [1] -
370:22
**perhaps** [10] - 311:22,
324:16, 330:15,
352:2, 353:13,
362:18, 365:8,
376:2, 378:3, 405:15
**period** [8] - 292:10,
295:4, 374:15,
374:18, 382:12,
384:21, 384:24,
419:25
**permitted** [2] - 392:6,
392:9
**person** [5] - 319:15,
319:16, 339:25,
364:7, 419:24
**personally** [1] -
389:12
**persons** [1] - 379:8
**Ph.D** [9] - 291:23,
316:12, 316:23,
318:2, 319:13,
319:19, 321:2,
333:24, 350:7
**PH.D.......................**
**......** [2] - 290:10,
290:18
**phenomena** [1] -
372:9
**phenomenon** [1] -
388:5
**phone** [2] - 378:18,
397:25
**phrase** [2] - 292:6,
328:23

**physicists** [1] - 409:10
**physiologic** [2] -
373:17, 374:1
**pica** [1] - 406:22
**pica-like** [1] - 406:22
**pick** [3] - 294:6,
294:10, 412:7
**picked** [2] - 364:16,
371:12
**pictures** [1] - 418:19
**pinch** [1] - 293:6
**PINEDO** [44] - 288:23,
316:12, 316:16,
317:7, 317:12,
317:17, 319:7,
319:18, 320:2,
320:4, 320:10,
320:13, 324:9,
324:18, 325:3,
325:9, 325:11,
327:16, 327:19,
327:21, 331:6,
339:4, 340:13,
340:15, 342:4,
342:13, 342:15,
343:9, 343:14,
344:20, 345:10,
345:15, 345:21,
346:6, 346:10,
347:8, 347:22,
348:25, 411:17,
412:12, 416:16,
421:1, 421:9, 421:18
**Pinedo** [3] - 325:8,
331:7, 337:24
**PINEDO....................**
[1] - 290:11
**PINEDO....................**
[1] - 290:15
**PINEDO....................**
. [1] - 290:12
**place** [9] - 311:6,
311:13, 311:16,
311:18, 312:16,
312:17, 312:18,
315:18, 315:19
**placed** [1] - 313:8
**places** [2] - 330:17,
344:15
**plaintiff** [4] - 316:12,
335:12, 335:20,
397:23
**Plaintiff's** [2] - 412:10,
421:14
**plaintiff's** [3] - 292:3,
293:3, 340:25
**PLAINTIFF'S** [2] -
290:17, 290:24
**plaintiffs** [5] - 291:14,
292:7, 292:18,

317:12, 334:6
**Plan** [1] - 352:10
**plan** [4] - 347:20,
348:6, 358:1, 380:23
**planning** [1] - 345:1
**plasticity** [1] - 397:20
**play** [6] - 330:4,
344:24, 348:3,
348:9, 392:25,
393:25
**played** [3] - 348:10,
348:13, 349:5
**playing** [3] - 346:12,
346:13, 394:3
**plenty** [1] - 293:2
**plus** [1] - 322:6
**plywood** [1] - 391:13
**point** [39] - 293:6,
293:24, 296:25,
302:2, 308:13,
309:11, 311:22,
318:14, 320:8,
323:10, 325:6,
331:10, 331:19,
332:3, 347:13,
349:4, 358:5, 358:8,
358:11, 358:16,
360:21, 362:11,
368:11, 368:12,
372:21, 386:24,
398:17, 406:12,
410:13, 411:11,
412:3, 412:9,
413:24, 415:3,
416:6, 421:13,
421:21
**pointed** [1] - 369:18
**pointing** [1] - 330:17
**points** [5] - 328:24,
370:6, 389:4, 397:21
**poison** [1] - 406:5
**policy** [9] - 361:3,
361:5, 367:18,
374:20, 374:21,
375:5, 379:20,
388:3, 405:9
**polish** [3] - 388:22,
389:9, 389:11
**political** [1] - 354:25
**politically** [1] - 377:11
**population** [4] -
386:18, 388:5,
404:20, 406:21
**population-based** [1]
- 388:5
**populations** [4] -
406:25, 407:3,
407:11, 407:18
**posed** [1] - 352:18
**position** [11] - 334:17,

351:9, 351:10,
351:11, 351:17,
351:19, 351:20,
351:25, 361:5,
361:6, 419:13
**positions** [2] - 320:19,
351:4
**possibility** [2] -
330:14, 416:13
**possible** [4] - 361:20,
396:13, 413:10,
414:16
**possibly** [2] - 373:18,
394:13
**post** [3] - 294:22,
350:4, 350:9
**post-doctoral** [2] -
350:4, 350:9
**post-Katrina** [1] -
294:22
**potential** [10] - 328:13,
329:16, 330:8,
355:23, 369:2,
371:24, 386:11,
386:21, 418:8,
419:12
**potentially** [1] -
303:22
**power** [2] - 344:11,
344:13
**powers** [1] - 354:25
**POYDRAS** [2] - 289:9,
289:21
**ppm** [25] - 369:23,
370:25, 371:3,
371:10, 371:16,
378:4, 384:20,
384:23, 384:25,
390:19, 390:23,
391:5, 391:24,
392:1, 392:10,
394:18, 395:3,
395:15, 395:21,
397:10, 397:11,
397:12, 399:16,
402:25, 405:19
**practice** [5] - 331:24,
380:24, 384:4,
407:17, 407:21
**practices** [1] - 407:3
**practicum** [1] - 350:10
**precautionary** [2] -
355:2, 407:22
**precedes** [1] - 400:16
**precipitate** [1] -
406:18
**precise** [2] - 397:18,
409:7
**precisely** [1] - 400:10
**Precision** [1] - 385:8

**precluded** [1] - 323:21
**predicate** [5] - 308:15,
309:3, 319:14,
319:18, 320:4
**predicated** [3] -
357:15, 373:1,
401:14
**premise** [4] - 361:7,
373:2, 374:23, 375:6
**prepare** [2] - 349:17,
408:11
**preparing** [1] - 337:14
**presence** [3] - 411:19,
412:4, 412:18
**present** [7] - 292:5,
292:17, 305:12,
348:18, 406:4,
411:23, 421:16
**PRESENT** [1] - 289:18
**presented** [2] -
356:13, 403:20
**presenting** [2] -
376:17, 403:16
**press** [3] - 357:9,
400:7, 401:4
**Preston** [2] - 363:15,
379:9
**presumption** [1] -
372:19
**pretty** [5] - 314:14,
319:11, 406:24,
408:15, 409:10
**prevailing** [1] - 374:20
**prevent** [2] - 355:2,
407:24
**Preventative** [1] -
306:12
**Prevention** [2] -
350:24, 351:16
**previous** [1] - 348:10
**previously** [3] -
303:25, 319:9,
416:23
**pried** [1] - 315:11
**primarily** [4] - 400:23,
401:7, 401:14,
401:17
**primary** [5] - 353:1,
408:14, 413:21,
413:22, 415:25
**primed** [1] - 396:16
**principle** [6] - 355:2,
403:22, 404:1,
406:5, 407:22, 413:9
**principles** [9] -
343:22, 343:23,
344:1, 344:3,
344:10, 344:12,
344:17, 366:3,
408:22

**print** [1] - 314:15
**printed** [1] - 314:14
**Priority** [1] - 352:19
**probability** [1] -
416:13
**probable** [3] - 366:25,
400:11, 400:15
**problem** [5] - 324:23,
325:22, 327:3,
327:7, 348:24
**problems** [3] - 296:1,
296:16, 325:24
**procedure** [1] - 412:15
**proceed** [4] - 294:3,
320:10, 411:19,
412:13
**PROCEEDINGS** [3] -
288:12, 289:23,
291:1
**proceedings** [20] -
293:24, 308:13,
309:11, 318:14,
320:8, 323:10,
325:6, 331:10,
332:3, 349:4, 358:5,
358:8, 358:11,
358:16, 411:11,
412:3, 412:9,
421:13, 421:21,
422:9
**process** [5] - 325:12,
340:3, 381:21,
387:21, 410:1
**PRODUCED** [1] -
289:23
**product** [51] - 322:20,
322:21, 323:2,
323:4, 323:5, 323:6,
323:12, 324:2,
324:13, 324:20,
324:25, 325:22,
326:5, 326:6,
326:13, 327:1,
330:6, 330:15,
330:16, 336:10,
336:12, 336:13,
336:15, 336:20,
337:8, 338:18,
389:24, 413:2,
413:3, 413:5, 413:7,
413:22, 413:24,
413:25, 414:1,
414:4, 414:10,
415:6, 415:9,
415:15, 415:20,
415:22, 416:1,
416:9, 416:12,
416:18, 418:15,
418:22, 418:25
**product's** [1] - 414:18

**PRODUCTS** [1] -
288:4
**products** [19] - 329:3,
329:4, 336:9,
336:19, 338:6,
338:17, 338:23,
338:24, 340:3,
344:8, 344:10,
344:12, 381:10,
381:18, 388:19,
389:16, 413:18,
414:7, 414:16
**Professional** [1] -
422:4
**professional** [5] -
354:16, 355:3,
355:16, 355:18,
406:1
**professionals** [1] -
377:7
**professor** [10] -
320:21, 321:1,
321:7, 321:10,
321:11, 321:13,
321:15, 336:21,
337:2, 350:10
**proffer** [4] - 412:7,
421:3, 421:17,
421:18
**PROFFER** [1] - 290:17
**Proffer** [2] - 412:10,
421:14
**PROFFERED** [1] -
290:24
**proffered** [1] - 355:25
**Profile** [1] - 368:25
**profile** [3] - 355:19,
355:24, 408:12
**profiles** [1] - 356:8
**profound** [1] - 396:10
**Program** [6] - 352:6,
402:8, 402:9,
409:15, 409:17,
409:22
**program** [1] - 379:16
**program's** [1] - 379:22
**programs** [1] - 359:16
**promoting** [1] - 355:1
**prompt** [1] - 406:18
**proof** [3] - 411:18,
412:16, 421:10
**properly** [3] - 375:17,
378:24, 379:1
**properties** [1] - 409:5
**proportional** [1] -
386:5
**Protection** [1] - 380:8
**protocol** [5] - 372:6,
373:19, 379:15,
402:8, 406:9

**provide** [13] - 315:22,
335:12, 341:6,
346:10, 356:11,
363:24, 365:8,
365:13, 366:3,
379:14, 382:18,
387:19, 414:23
**provided** [8] - 349:11,
352:15, 356:5,
357:17, 359:2,
375:13, 377:14,
408:3
**providers** [1] - 371:7
**providing** [2] - 356:25,
409:13
**PRUET** [1] - 289:3
**psychology** [7] -
318:1, 318:3, 318:5,
321:4, 321:8,
321:17, 344:1
**Public** [2] - 353:1,
385:9
**public** [9] - 352:17,
356:3, 356:4,
376:13, 387:13,
403:11, 406:11,
407:21, 407:22
**publications** [4] -
337:24, 338:2,
338:3, 355:8
**published** [5] - 322:5,
322:9, 338:9,
338:22, 355:14
**pull** [2] - 306:7
**pumps** [1] - 407:25
**purporting** [1] - 376:4
**purpose** [3] - 322:18,
322:25, 421:9
**purposes** [2] - 337:14,
374:3
**put** [8] - 299:3,
301:24, 308:20,
348:6, 349:9,
411:22, 412:1, 416:9
**putative** [2] - 396:20,
405:8
**puts** [1] - 329:6

## Q

**qualitatively** [1] -
356:12
**quality** [1] - 380:3
**quantitation** [1] -
408:23
**quantitatively** [1] -
356:13
**quantities** [2] - 369:3,
406:23

**quarreling** [1] - 403:25
**quarters** [1] - 387:3
**questioning** [3] - 293:17, 294:10, 415:5
**questions** [20] - 294:11, 294:12, 294:19, 300:22, 301:4, 303:23, 304:5, 304:7, 309:6, 309:9, 313:3, 313:11, 316:7, 316:8, 339:12, 342:6, 344:21, 394:4, 394:6, 420:20
**quick** [3] - 346:2, 379:14, 408:15
**quickly** [1] - 408:21
**quite** [3] - 367:23, 389:4, 397:3
**quote** [6] - 360:9, 374:10, 374:11, 399:7, 400:25, 405:8

---

**R**

**radiation** [2] - 374:24, 374:25
**rain** [3] - 303:3, 303:9
**rained** [2] - 303:1, 303:17
**raining** [1] - 303:6
**rainstorm** [1] - 303:10
**raise** [2] - 293:2, 316:18
**raised** [2] - 292:22, 318:16
**raising** [1] - 292:20
**Ramazani** [1] - 402:9
**Ramazzini** [4] - 354:18, 354:20, 354:22, 407:23
**ran** [3] - 295:14, 295:22, 295:23
**random** [1] - 380:5
**range** [7] - 352:20, 372:22, 390:19, 392:6, 394:7, 402:3, 408:16
**ranges** [1] - 402:2
**ranging** [2] - 391:5, 408:18
**rapidly** [2] - 317:19, 396:18
**rate** [2] - 292:14, 375:4
**rates** [1] - 369:5
**rather** [3] - 408:23, 409:8

**ratio** [1] - 401:23
**RE** [1] - 288:4
**reactivity** [1] - 398:19
**read** [22] - 299:14, 299:18, 303:21, 309:19, 309:22, 312:8, 312:19, 314:9, 329:22, 330:23, 335:2, 340:17, 386:7, 401:20, 408:12, 413:12, 414:7, 415:24, 416:3, 416:4, 416:14, 417:9
**readily** [1] - 398:6
**ready** [6] - 294:3, 323:15, 348:20, 358:2, 411:19, 412:13
**real** [1] - 371:24
**really** [13] - 297:11, 300:4, 309:2, 310:1, 310:4, 312:20, 314:7, 314:17, 314:19, 347:19, 405:6, 410:9
**realm** [1] - 342:10
**Realtime** [1] - 422:3
**rear** [1] - 338:21
**rear-facing** [1] - 338:21
**reason** [3] - 305:19, 361:6, 374:12
**reasonable** [3] - 383:3, 383:4, 383:8
**reasonably** [5] - 366:10, 400:13, 410:6, 410:20, 417:21
**reasons** [7] - 292:2, 361:2, 361:10, 385:24, 396:13, 415:19, 415:21
**reassigned** [1] - 351:12
**Reauthorization** [1] - 353:5
**receive** [3] - 291:23, 333:21, 379:5
**received** [5] - 291:24, 335:24, 379:12, 379:13, 397:25
**recent** [3] - 366:23, 368:11, 410:10
**recess** [2] - 358:9, 421:22
**recipient** [1] - 353:15
**recited** [1] - 292:3
**reclassified** [2] - 401:10, 410:23

**recognition** [2] - 353:12, 400:7
**recognize** [1] - 406:16
**recognized** [6] - 361:4, 361:8, 361:13, 400:7, 400:10, 403:23
**recognizing** [1] - 406:4
**recollect** [2] - 340:16, 342:19
**recollection** [7] - 298:8, 298:24, 313:13, 357:21, 363:9, 371:1, 377:25
**recommend** [1] - 377:25
**recommendation** [8] - 297:8, 298:5, 298:14, 299:9, 362:19, 362:22, 378:1, 416:17
**recommendations** [2] - 406:12, 410:2
**recommended** [1] - 410:4
**record** [11] - 317:3, 325:2, 325:3, 356:4, 411:14, 411:22, 412:1, 421:2, 421:15, 421:18, 422:9
**recorded** [1] - 348:23
**RECORDED** [1] - 289:23
**redirect** [5] - 294:13, 313:6, 314:25, 340:12, 342:8
**REDIRECT** [5] - 290:8, 290:9, 290:15, 313:9, 340:14
**reduce** [6] - 330:8, 382:19, 383:6, 391:14, 391:17, 405:14
**reduced** [2] - 405:17, 405:20
**reducing** [1] - 382:16
**refer** [11] - 292:14, 303:24, 322:8, 360:23, 363:22, 365:22, 368:10, 375:8, 375:12, 410:22, 419:24
**reference** [20] - 359:20, 361:11, 363:23, 368:17, 368:23, 368:24, 369:7, 369:10, 370:25, 373:6,

374:6, 374:8, 385:18, 391:6, 403:13, 403:15, 403:16, 404:6, 404:9, 414:9
**referenced** [6] - 360:9, 373:12, 384:25, 385:24, 406:14, 421:4
**references** [4] - 364:25, 370:17, 400:24, 404:11
**referencing** [1] - 377:19
**referred** [3] - 328:22, 360:12, 398:1
**referring** [6] - 320:23, 328:8, 360:15, 375:24, 377:17, 387:8
**refers** [2] - 364:1, 385:13
**refined** [1] - 410:13
**reflecting** [1] - 358:25
**refresh** [2] - 298:8, 298:24
**refrigerator** [1] - 336:11
**refuse** [1] - 321:10
**regard** [12] - 292:16, 318:25, 320:15, 327:8, 329:10, 353:7, 415:10, 416:19, 418:7, 419:7, 419:19, 420:23
**regarded** [1] - 348:18
**regarding** [14] - 291:13, 320:20, 320:21, 321:24, 330:22, 342:17, 357:9, 362:1, 364:23, 366:23, 367:17, 367:21, 380:2, 394:6
**regardless** [2] - 403:4, 403:5
**Region** [2] - 358:18
**Registered** [2] - 422:3, 422:4
**Registry** [3] - 350:25, 351:14, 384:18
**REICH** [14] - 288:20, 288:20, 299:13, 303:20, 308:6, 308:15, 308:24, 309:2, 313:7, 313:10, 314:4, 315:2, 316:8, 397:10
**Reich** [1] - 309:5

**REICH.....................**
[2] - 290:8, 290:9
**related** [3] - 342:6, 380:3, 414:14
**RELATES** [1] - 288:7
**relating** [1] - 384:12
**relationship** [1] - 315:3
**relationships** [1] - 409:4
**relative** [5] - 293:9, 335:9, 335:18, 335:24, 404:24
**relatively** [3] - 369:2, 389:23, 389:24
**release** [2] - 384:12, 400:8, 401:5
**released** [3] - 368:25, 400:8, 410:7
**relevance** [1] - 406:10
**relevant** [2] - 344:4, 414:3
**reliable** [2] - 354:24, 370:4
**religious** [1] - 407:4
**relying** [1] - 368:10
**remain** [1] - 316:14
**remained** [2] - 384:20, 384:23
**remember** [24] - 297:15, 298:12, 299:1, 299:16, 300:4, 300:7, 300:10, 300:12, 300:14, 301:9, 301:23, 301:25, 302:15, 302:24, 303:9, 303:15, 304:19, 314:17, 314:19, 315:8, 341:12, 360:15, 394:4, 402:20
**remind** [2] - 293:16, 319:5
**reminder** [3] - 326:15, 326:17, 411:8
**reminds** [2] - 326:18, 326:21
**removal** [1] - 351:11
**reorganization** [1] - 351:8
**repair** [1] - 399:10
**repaired** [2] - 399:2, 399:7
**repeat** [1] - 315:5
**repeated** [1] - 410:17
**repeatedly** [2] - 318:23, 364:22
**repetitive** [1] - 339:6
**rephrase** [2] - 314:25,

336:14
**Report** [5] - 363:13, 363:18, 364:9, 365:4, 365:18
report [42] - 292:23, 292:24, 323:3, 332:11, 332:14, 332:18, 332:22, 333:1, 333:3, 333:4, 333:7, 334:12, 334:13, 334:15, 342:3, 342:7, 342:21, 342:23, 343:18, 343:21, 347:18, 365:1, 365:3, 365:12, 383:23, 384:8, 388:17, 390:16, 401:13, 401:24, 402:22, 410:7, 410:10, 412:21, 415:17, 416:17, 420:17, 421:6, 421:10, 421:20
reported [4] - 376:13, 391:11, 403:4, 403:13
reporter [2] - 411:23, 412:5
Reporter [6] - 422:3, 422:4, 422:5, 422:15
REPORTER [1] - 289:20
REPORTER'S [1] - 422:1
Reports [1] - 365:6
reports [6] - 357:3, 357:9, 365:13, 379:22, 384:5, 421:7
represent [5] - 301:4, 322:3, 328:5, 386:10, 386:11
representative [3] - 357:14, 360:11, 409:24
representatives [2] - 316:2, 409:23
represented [4] - 349:13, 352:5, 352:7, 355:25
representing [2] - 352:11, 404:25
reproductive [1] - 375:20
Republic [1] - 354:12
request [6] - 291:22, 335:8, 335:10, 357:17, 381:2, 411:17
requested [3] -

333:20, 361:25, 384:15
requesting [2] - 335:11, 365:25
requests [1] - 337:1
required [1] - 374:16
Research [6] - 350:18, 364:21, 367:2, 368:7, 400:9, 408:19
research [13] - 336:4, 336:18, 336:21, 336:22, 337:13, 337:14, 338:8, 338:16, 338:21, 338:24, 352:3, 413:11
residency [3] - 360:18, 360:22, 398:18
residents [3] - 375:21, 375:23, 376:5
resigned [1] - 351:20
resins [2] - 369:4, 369:14
resource [1] - 352:22
Resources [1] - 366:9
respect [13] - 308:15, 359:16, 363:7, 376:6, 398:24, 398:25, 400:21, 400:25, 401:12, 404:3, 404:10, 404:13, 409:18
respects [1] - 347:10
respiratory [1] - 368:16
respond [2] - 396:16, 403:24
responders [1] - 371:6
response [18] - 324:11, 366:4, 366:7, 374:14, 374:17, 375:1, 378:13, 379:16, 379:21, 388:1, 399:21, 399:22, 399:24, 400:2, 402:12, 403:18, 403:19
Response [6] - 352:7, 353:3, 363:24, 364:5, 382:7, 382:8
response) [16] - 295:25, 296:8, 298:3, 300:2, 300:9, 302:8, 302:22, 306:15, 307:9, 363:6, 381:25, 383:9, 383:13, 385:10, 394:19,

395:11
responses [2] - 352:9, 361:14
responsibilities [2] - 352:1, 352:11
responsibility [4] - 351:25, 356:6, 356:7, 356:11
responsible [3] - 352:8, 352:19, 419:15
responsiveness [1] - 323:8
rest [1] - 384:21
restraint [1] - 414:22
restraints [1] - 338:19
restrict [1] - 378:12
result [9] - 323:1, 355:25, 357:1, 367:24, 381:17, 398:20, 398:25, 399:15, 418:23
resulted [1] - 363:12
resume [2] - 358:2, 412:6
retained [1] - 334:21
retired [1] - 321:12
retrospect [1] - 381:16
returned [3] - 350:15, 364:15, 376:21
review [22] - 291:25, 297:19, 304:2, 327:22, 334:11, 334:15, 334:17, 334:20, 343:17, 356:1, 357:14, 359:7, 360:12, 367:16, 378:18, 380:22, 384:8, 384:15, 410:1, 410:19, 417:2, 420:10
reviewed [26] - 322:9, 332:14, 332:19, 332:21, 332:24, 332:25, 333:4, 333:7, 334:13, 334:23, 335:1, 338:3, 342:21, 355:7, 355:12, 355:13, 356:3, 357:17, 365:23, 366:14, 366:16, 368:3, 383:22, 416:24, 418:18, 421:7
reviewing [1] - 328:4
revised [1] - 365:17
RfC's [1] - 386:8
RfD [1] - 397:4

RfD's [1] - 386:8
RfDs [1] - 385:16
Rice [2] - 321:9, 321:10
Rich [1] - 381:24
Rick [2] - 363:15, 379:9
rigid [1] - 386:8
Rio [1] - 354:5
rise [6] - 291:7, 293:15, 293:23, 358:4, 358:10, 411:10
Risher [2] - 385:6, 406:14
risk [21] - 328:17, 353:25, 354:3, 374:3, 374:9, 375:6, 377:19, 385:14, 385:17, 385:20, 387:8, 387:14, 387:17, 387:18, 387:20, 404:18, 404:23, 405:18, 405:22, 406:1, 407:6
Risk [2] - 351:12, 352:14
risks [9] - 315:23, 316:3, 353:8, 355:9, 376:7, 417:23, 418:13, 419:1, 419:7
Rita [1] - 357:1
Ritter [2] - 346:17, 346:19
ritualistic [1] - 407:3
rituals [1] - 407:5
RIVER [2] - 288:8, 289:7
River [14] - 316:1, 328:6, 335:7, 335:16, 340:16, 341:7, 341:12, 342:20, 415:11, 415:15, 416:25, 417:3, 418:10, 421:2
RMR [2] - 289:20, 422:14
road [1] - 294:5
rodents [3] - 373:18, 373:22, 374:25
role [1] - 386:19
Ronald [1] - 317:4
Roofing [2] - 306:11, 307:19
room [4] - 293:13, 302:18, 389:10, 407:8
ROOM [1] - 289:21
rotating [2] - 326:8, 328:25

rotten [2] - 306:2, 306:4
Rouge [1] - 382:14
roughly [2] - 351:24, 355:12
ROY [1] - 289:14
Roy [1] - 301:3
rug [5] - 302:18, 302:21, 302:23, 303:3, 303:11
rule [1] - 331:25
ruled [6] - 318:18, 323:21, 331:13, 331:14, 331:20, 415:7
rules [2] - 301:24, 302:3
ruling [2] - 324:17, 404:20
run [2] - 317:18, 393:25
running [4] - 345:12, 382:17, 394:2, 394:9

**S**

s/Cathy [1] - 422:13
safe [4] - 323:1, 361:3, 367:18, 374:21
safely [2] - 322:21, 322:24
safety [22] - 321:19, 322:12, 322:17, 322:18, 325:22, 326:2, 326:4, 338:10, 338:12, 338:19, 340:4, 344:2, 395:7, 395:17, 395:25, 412:25, 414:21, 414:24, 417:13, 417:25, 420:3, 420:10
Safety [3] - 377:21, 417:8, 418:15
Sam [2] - 361:25, 380:1
sample [2] - 380:5, 380:15
sampled [1] - 380:18
sampling [14] - 292:9, 292:15, 292:18, 363:25, 364:1, 370:5, 375:12, 379:6, 380:13, 380:14, 380:23, 381:4, 381:6, 382:11
SAN [1] - 288:21
sand [1] - 406:15

**Sascha** [1] - 369:19
**save** [1] - 302:2
**saw** [14] - 301:14, 302:5, 302:17, 302:25, 304:25, 326:9, 328:24, 336:24, 365:23, 375:25, 376:3, 383:4, 420:2, 420:14
**SC** [1] - 289:4
**scale** [1] - 402:10
**scenario** [3] - 370:9, 386:22, 406:10
**scenarios** [1] - 397:22
**schedule** [1] - 347:23
**SCHMIDT** [1] - 289:18
**scholarship** [1] - 352:20
**school** [2] - 321:18, 393:25
**science** [9] - 354:10, 356:22, 373:25, 374:21, 375:5, 396:21, 407:20, 408:23, 409:1
**Science** [4] - 351:5, 352:12, 355:5, 408:17
**sciences** [2] - 409:11
**Sciences** [2] - 353:23, 408:20
**scientific** [8] - 328:21, 361:5, 366:3, 368:5, 397:16, 410:17, 414:6, 415:1
**scientifically** [1] - 387:19
**scientist** [3] - 349:22, 350:12, 368:4
**scientists** [2] - 359:23, 362:21
**scope** [5] - 316:5, 327:14, 327:15, 415:18, 421:3
**Scott** [8] - 364:6, 379:5, 380:22, 383:14, 383:17, 383:20, 384:7
**screen** [3] - 299:3, 313:8, 348:10
**screening** [2] - 360:6, 386:19
**season** [2] - 370:8, 370:9
**seat** [3] - 326:20, 338:7, 338:8
**seated** [5] - 291:8, 294:1, 316:15, 358:13, 411:16
**seats** [3] - 338:10,

338:12, 338:21
**second** [12] - 297:16, 299:17, 307:2, 321:6, 326:3, 328:15, 368:22, 379:25, 382:5, 387:4, 415:9, 416:1
**secondary** [4] - 413:21, 414:2, 414:4, 416:10
**seconds** [1] - 348:25
**section** [9] - 416:11, 417:8, 417:9, 417:11, 417:13, 417:14, 417:17, 417:24, 418:15
**sections** [1] - 388:17
**sector** [1] - 358:19
**SECURITY** [4] - 293:23, 358:4, 358:10, 411:10
**see** [36] - 298:2, 298:4, 302:20, 302:21, 302:22, 303:2, 303:10, 303:11, 304:24, 306:9, 306:23, 307:4, 307:6, 307:12, 307:14, 311:11, 315:11, 328:20, 329:5, 343:3, 358:7, 358:13, 364:13, 365:24, 367:11, 368:18, 368:21, 375:20, 379:23, 383:15, 396:5, 400:14, 418:21, 418:25, 419:6, 420:12
**seek** [1] - 380:7
**self** [2] - 349:24, 410:17
**self-correcting** [1] - 410:17
**self-employed** [1] - 349:24
**send** [2] - 379:10, 388:9
**sense** [3] - 357:7, 370:4, 416:2
**sensitive** [3] - 372:19, 384:25, 407:14
**sensitivity** [1] - 373:3
**sensitization** [1] - 404:22
**sensitized** [3] - 361:16, 371:7, 399:21
**sensitizer** [1] - 361:13
**sent** [4] - 304:21,

366:17, 368:2, 382:20
**sentence** [3] - 299:13, 368:20, 391:16
**September** [1] - 382:12
**series** [2] - 352:17, 371:5
**serve** [7] - 360:6, 386:20, 410:19, 413:20, 414:9, 414:11, 416:12
**served** [5] - 353:19, 354:3, 354:6, 355:16, 356:15
**serves** [2] - 416:2, 416:10
**Service** [1] - 353:1
**Services** [4] - 351:3, 351:16, 384:17, 400:12
**serving** [1] - 354:24
**SES** [1] - 407:16
**SESSION** [1] - 288:11
**set** [8] - 292:20, 317:20, 320:19, 342:17, 342:20, 368:6, 377:18, 419:11
**sets** [2] - 396:24, 421:11
**setting** [3] - 345:8, 393:5, 393:6
**several** [2] - 355:14, 399:17, 410:7
**severe** [1] - 390:18
**Seychelles** [1] - 354:12
**shall** [1] - 323:24
**shape** [1] - 402:12
**Shaw** [13] - 291:22, 293:8, 294:11, 294:12, 300:24, 301:4, 301:11, 315:22, 341:7, 419:14, 419:22, 419:24, 421:8
**SHAW** [1] - 289:12
**Sheet** [9] - 357:14, 359:6, 359:10, 360:11, 360:15, 360:18, 360:23, 361:12, 361:19
**shock** [1] - 388:10
**short** [19] - 346:20, 359:11, 359:14, 359:17, 359:22, 360:9, 360:13, 360:24, 361:11, 363:19, 364:19,

367:23, 370:12, 370:16, 370:18, 371:2, 389:23, 403:5, 413:13
**short-term** [4] - 359:11, 370:12, 370:16, 370:18
**shorten** [1] - 346:3
**shortly** [3] - 357:2, 358:22, 398:13
**shortness** [1] - 328:12
**show** [14] - 297:12, 297:14, 297:19, 299:2, 304:1, 304:4, 308:7, 311:23, 312:2, 312:13, 398:24, 399:14, 414:6, 416:22
**showed** [3] - 299:11, 399:5, 410:11
**showing** [2] - 317:8, 322:1
**shown** [1] - 298:18
**shows** [2] - 404:3, 413:11
**shut** [2] - 304:11, 345:5
**sic** [1] - 329:21
**sick** [2] - 296:22
**side** [6] - 306:21, 319:16, 334:21, 341:7, 341:9, 414:22
**Sidney** [1] - 307:20
**sign** [2] - 313:25, 344:15
**signature** [8] - 306:13, 306:16, 307:20, 308:17, 308:18, 308:23, 314:10, 314:11
**signed** [13] - 306:12, 307:18, 307:20, 307:25, 308:5, 308:22, 309:5, 309:6, 309:15, 309:17, 309:19, 314:5, 314:8
**significant** [2] - 322:10, 415:2
**significantly** [1] - 369:12
**signing** [5] - 309:7, 309:17, 309:20, 314:12, 314:19
**signoff** [1] - 356:7
**signs** [5] - 376:13, 376:17, 403:9, 403:10, 403:16
**similar** [3] - 337:15, 379:7, 396:14

**similarly** [1] - 397:4
**simple** [1] - 389:18
**simply** [2] - 396:12, 408:11
**single** [3] - 313:14, 388:6, 400:3
**singular** [1] - 391:25
**Sinks** [1] - 375:10
**sinus** [1] - 296:17
**sinuses** [2] - 304:18, 305:3
**sister** [2] - 365:8, 365:11
**sit** [1] - 402:16
**sites** [2] - 352:19, 387:15
**sits** [1] - 293:14
**situation** [1] - 409:10
**situations** [2] - 380:25, 407:19
**size** [1] - 414:11
**skewed** [2] - 410:9, 410:11
**slight** [1] - 345:11
**slow** [1] - 332:17
**small** [2] - 389:24
**smell** [2] - 306:2, 306:4
**smoking** [2] - 392:5, 392:9
**sneezing** [1] - 395:24
**so-called** [1] - 359:6
**social** [1] - 354:25
**societies** [1] - 354:16
**society** [2] - 408:7
**Society** [1] - 355:5
**solemnly** [1] - 316:19
**solve** [2] - 327:2, 327:7
**someone** [2] - 340:7, 405:16
**sometime** [1] - 379:12
**sometimes** [9] - 295:6, 296:3, 310:7, 326:5, 326:13, 396:23, 397:17
**somewhat** [2] - 408:8, 410:11
**somewhere** [2] - 346:10, 413:25
**son** [11] - 295:4, 296:13, 300:5, 301:7, 302:3, 304:16, 306:2, 309:24, 311:2, 311:12, 314:11
**son's** [3] - 301:24, 305:3, 305:17
**sorry** [14] - 299:17, 306:20, 307:10,

310:21, 310:22,
319:17, 331:19,
331:22, 332:16,
332:17, 336:14,
376:19, 390:22,
402:24
**sort** [5] - 322:16,
326:24, 329:1,
381:20, 399:6
**sound** [3] - 297:9,
298:10, 387:19
**source** [3] - 369:2,
394:11, 416:10
**sources** [2] - 292:16,
381:9
**South** [1] - 354:12
**southeast** [1] - 406:25
**Southeastern** [1] -
358:19
**space** [3] - 369:24,
370:1, 409:8
**spaces** [1] - 369:7
**spacing** [3] - 405:4,
405:6, 405:7
**span** [3] - 397:5,
397:15, 402:11
**spans** [1] - 397:7
**speaking** [7] - 308:10,
373:21, 388:15,
388:16, 399:23,
400:1, 404:19
**species** [1] - 373:3
**specific** [14] - 324:6,
324:12, 338:6,
347:17, 358:21,
368:4, 380:4, 394:5,
400:4, 404:6, 404:8,
404:11, 407:15,
408:23
**specifically** [8] -
315:22, 318:9,
318:17, 318:19,
362:23, 363:7,
366:19, 374:11
**specified** [2] - 386:12,
404:23
**speculate** [1] - 402:24
**speed** [2] - 346:6,
408:21
**spell** [1] - 317:2
**spelled** [1] - 317:5
**spend** [1] - 309:24
**spending** [1] - 310:24
**spent** [2] - 311:1,
350:20
**spring** [4] - 357:23,
358:21, 360:12,
378:15
**springs** [1] - 319:12
**sprinkled** [1] - 407:4

**ST** [2] - 288:18, 289:15
**staff** [4] - 350:12,
352:1, 352:20,
361:24
**stage** [1] - 419:22
**stamp** [1] - 363:22
**stamped** [1] - 365:22
**stand** [4] - 350:23,
377:7, 377:11, 382:6
**standard** [6] - 379:15,
380:24, 384:4,
401:23, 409:9
**standing** [3] - 316:14,
326:19, 402:7
**standpoint** [1] -
383:21
**stands** [1] - 367:1
**start** [9] - 291:9,
346:8, 347:21,
348:20, 380:1,
394:18, 411:5, 411:6
**started** [2] - 321:6,
345:4
**starting** [3] - 306:21,
350:6, 358:1
**starts** [2] - 387:3,
391:3
**State** [2] - 321:3,
422:5
**state** [5] - 317:2,
365:14, 366:8,
375:16, 376:12
**statement** [9] -
363:22, 368:22,
368:24, 377:13,
384:16, 390:6,
390:11, 390:14,
418:4
**statements** [3] -
366:19, 367:17,
369:9
**states** [1] - 368:14
**States** [3] - 358:20,
422:6, 422:16
**STATES** [2] - 288:1,
288:13
**static** [1] - 384:23
**statistical** [4] - 292:4,
292:8, 292:18
**status** [2] - 321:13,
396:13
**stay** [4] - 310:2,
310:10, 310:23,
331:17
**stayed** [3] - 294:21,
294:22, 295:3
**Steering** [1] - 352:13
**STENOGRAPHY** [1] -
289:23
**Stenton** [2] - 369:7,

369:10
**step** [3] - 316:9,
344:22, 378:12
**steps** [1] - 325:18
**stick** [2] - 319:22,
347:20
**still** [11] - 321:11,
331:15, 331:21,
332:1, 346:15,
346:17, 351:21,
354:7, 366:6, 405:5
**stipulated** [4] - 301:7,
301:11, 306:8,
308:20
**stop** [1] - 331:15
**story** [1] - 321:9
**stove** [1] - 336:10
**straight** [1] - 301:13
**straps** [1] - 307:5
**strategy** [1] - 331:1
**Stream** [1] - 319:3
**street** [1] - 394:9
**STREET** [2] - 289:9,
289:21
**strength** [1] - 410:16
**STRICKLAND** [1] -
289:9
**struck** [2] - 323:16,
323:18
**structure** [1] - 409:4
**stuck** [1] - 305:23
**studied** [2] - 398:12,
402:1
**studies** [9] - 318:5,
398:10, 398:24,
399:4, 399:18,
401:15, 409:7,
410:15
**study** [26] - 371:3,
372:23, 373:9,
373:18, 373:21,
374:23, 375:2,
391:22, 394:23,
395:13, 395:20,
396:22, 396:23,
400:3, 401:17,
402:2, 404:2, 405:7,
408:15, 408:24,
409:2, 410:8
**stuff** [5] - 312:23,
314:9, 322:5, 337:1,
393:14
**style** [4] - 381:10,
381:14, 381:19,
406:20
**subchronic** [2] -
372:16, 396:22
**subdivided** [1] - 360:3
**subdivision** [1] -
367:4

**subgroup** [1] - 364:22
**subject** [6] - 321:20,
321:21, 351:21,
362:13, 369:16,
410:1
**submitted** [3] -
292:24, 292:25,
384:11
**subpoena** [1] - 349:6
**subsequent** [2] -
293:4, 361:16
**subsequently** [1] -
385:23
**subset** [2] - 319:13,
320:5
**subsistence** [1] -
407:16
**substance** [2] -
327:18, 421:5
**Substances** [3] -
350:25, 351:14,
384:17
**substances** [4] -
352:23, 353:9,
355:9, 387:15
**substantive** [1] -
360:7
**substations** [1] -
344:14
**suffered** [1] - 370:1
**sufficient** [1] - 366:12
**suggest** [4] - 306:11,
326:7, 370:4, 419:21
**suggested** [1] -
331:25
**suggesting** [3] -
358:24, 418:13,
419:17
**SUITE** [4] - 288:21,
288:24, 289:9,
289:15
**suite** [1] - 403:19
**summarize** [1] - 350:6
**summary** [1] - 382:15
**summer** [5] - 295:12,
295:14, 295:21,
301:21, 314:22
**Superfund** [2] -
352:19, 353:4
**supplemental** [1] -
293:5
**supplied** [1] - 335:20
**supports/anchor** [1] -
307:4
**suppose** [2] - 296:12,
312:20
**surfaces** [1] - 409:6
**surprise** [4] - 334:9,
340:21, 347:1, 402:3
**surprised** [2] - 340:23,

364:13
**susceptible** [2] -
397:2, 404:4
**sustain** [2] - 316:6,
324:24
**sustained** [2] - 325:1,
325:3
**sustaining** [1] - 325:4
**swear** [1] - 316:19
**sworn** [3] - 316:24,
348:16, 374:8
**symposiums** [1] -
337:25
**symptoms** [5] -
328:11, 361:17,
368:16, 371:8,
403:19
**system** [22] - 358:23,
396:16, 412:21,
412:22, 412:23,
413:12, 413:16,
413:21, 414:3,
414:12, 414:13,
414:22, 414:25,
415:2, 415:8, 416:7,
419:4, 419:24,
420:7, 420:16,
420:22, 421:12
**systems** [1] - 382:18

## T

**Tab** [5] - 366:8,
366:14, 367:10,
368:1, 368:6
**Table** [1] - 417:6
**table** [4] - 367:10,
367:15, 368:14,
417:2
**tables** [1] - 331:17
**takers** [1] - 407:6
**tape** [2] - 345:11,
348:3
**tasked** [1] - 409:12
**taught** [6] - 320:15,
320:24, 321:5,
321:16, 321:17,
321:20
**teach** [1] - 329:17
**Team** [5] - 352:7,
363:24, 364:5,
382:7, 382:8
**team** [2] - 340:25,
350:13
**team's** [1] - 379:21
**technician** [1] -
307:19
**techniques** [1] -
405:14

**Technology** [1] - 408:17

**temperature** [2] - 370:3, 407:9

**temporary** [1] - 379:6

**ten** [12] - 357:25, 358:3, 358:7, 372:6, 372:8, 372:10, 372:18, 372:20, 372:22, 374:11, 411:6

**Ten** [1] - 412:6

**tend** [2] - 369:22, 408:8

**tenth** [1] - 410:6

**term** [29] - 322:17, 323:4, 359:4, 359:11, 359:12, 359:14, 359:17, 359:18, 359:22, 360:9, 360:13, 360:24, 361:4, 361:11, 363:20, 364:19, 366:6, 367:23, 370:12, 370:13, 370:16, 370:18, 370:19, 370:20, 371:2, 371:3

**terminology** [1] - 399:20

**terms** [16] - 293:6, 345:1, 359:14, 359:15, 359:21, 362:15, 366:23, 372:15, 374:9, 388:3, 390:20, 406:9, 406:11, 410:14

**test** [3] - 384:21, 384:24

**tested** [2] - 381:14, 382:13

**testified** [7] - 302:12, 308:22, 316:25, 331:3, 333:10, 374:9, 418:6

**testify** [10] - 309:7, 319:5, 319:9, 319:21, 319:23, 324:19, 333:13, 348:16, 356:21, 420:19

**testifying** [2] - 319:7, 343:11

**testimony** [40] - 291:10, 291:13, 291:23, 293:9, 294:20, 299:11, 299:25, 303:24, 316:19, 318:19,

318:24, 323:21, 323:22, 323:23, 324:3, 329:21, 334:20, 341:8, 342:7, 345:2, 348:9, 348:12, 348:13, 348:14, 348:18, 348:21, 348:23, 358:3, 358:14, 363:3, 363:15, 371:15, 374:8, 403:12, 408:11, 410:25, 415:17, 418:18, 420:2, 420:14

**testing** [4] - 292:17, 378:25, 380:5, 410:18

**tests** [1] - 292:9

**textbooks** [3] - 330:21, 344:2, 344:3

**texts** [1] - 355:15

**thanking** [2] - 331:14, 331:23

**THE** [104] - 288:12, 291:7, 291:8, 291:20, 293:22, 293:23, 294:1, 297:14, 297:15, 297:16, 297:24, 298:16, 298:19, 299:3, 299:15, 299:17, 300:23, 303:23, 304:5, 308:9, 308:12, 308:22, 308:25, 309:5, 310:12, 310:17, 311:24, 312:1, 312:3, 312:7, 312:8, 313:1, 313:5, 313:6, 314:2, 314:24, 316:5, 316:9, 316:13, 316:18, 316:22, 317:1, 317:2, 317:4, 318:13, 318:25, 319:15, 319:20, 320:3, 320:6, 320:11, 323:9, 323:17, 323:20, 324:15, 324:24, 325:4, 325:8, 327:17, 331:7, 331:17, 331:21, 331:24, 339:6, 339:10, 339:14, 340:12, 342:5, 343:5, 343:7, 343:11, 344:22, 345:1, 345:4, 345:9,

345:13, 345:17, 345:23, 346:3, 346:8, 346:12, 346:17, 347:1, 347:6, 347:10, 347:15, 347:19, 348:3, 348:7, 349:2, 357:24, 358:4, 358:7, 358:10, 358:13, 376:20, 410:24, 411:3, 411:10, 411:13, 411:16, 411:21, 412:6, 415:19

**themselves** [2] - 406:4, 408:6

**theoretical** [1] - 361:4

**theoretically** [2] - 388:15

**theory** [1] - 412:24

**there'** [1] - 297:4

**thereafter** [2] - 357:2, 398:13

**therefore** [2] - 369:15, 398:20

**thermodynamic** [1] - 409:5

**thermostat** [2] - 295:18, 313:21

**thinking** [1] - 312:23

**thinks** [1] - 381:21

**third** [7] - 326:12, 329:9, 329:10, 387:4, 414:13, 416:6, 419:4

**thirds** [1] - 322:11

**THIS** [1] - 288:7

**thousand** [1] - 372:22

**Thrasher** [1] - 399:17

**threat** [1] - 386:12

**three** [15] - 301:12, 321:1, 321:14, 322:11, 335:13, 340:17, 356:20, 360:3, 371:9, 387:3, 396:3, 398:12, 415:8, 415:19, 420:16

**three-fourths** [1] - 322:11

**three-quarters** [1] - 387:3

**threshold** [8] - 386:2, 386:8, 386:17, 388:2, 388:4, 401:22, 405:1, 405:8

**threw** [1] - 403:21

**throat** [2] - 328:11, 360:16

**throughout** [1] - 355:1

**Thursday** [1] - 379:10

**tied** [2] - 373:17, 373:25

**tiers** [1] - 338:15

**timely** [1] - 291:23

**tissues** [1] - 398:20

**TO** [2] - 288:7, 291:4

**toaster** [2] - 336:6, 336:23

**tobacco** [1] - 389:16

**today** [21] - 293:18, 294:5, 294:6, 304:7, 347:15, 347:20, 348:13, 349:12, 349:13, 379:12, 387:10, 393:2, 398:23, 400:6, 402:16, 403:21, 404:13, 408:10, 408:11, 415:5, 418:6

**today's** [1] - 291:9

**together** [1] - 349:9

**tolerated** [2] - 402:7, 402:10

**took** [5] - 315:18, 315:19, 348:17, 383:25, 407:24

**tool** [1] - 386:20

**top** [2] - 306:21, 391:2

**total** [1] - 382:12

**toward** [1] - 314:21

**town** [1] - 321:9

**tox** [1] - 408:12

**Toxic** [1] - 350:25, 351:14, 384:17

**toxic** [6] - 353:8, 355:9, 355:20, 367:21, 386:14, 402:6

**toxicant** [1] - 386:11

**toxicity** [6] - 376:18, 386:2, 386:9, 386:17, 403:17, 405:1

**Toxicological** [2] - 351:22, 368:25

**toxicological** [5] - 355:19, 355:24, 356:7, 371:14, 371:17

**toxicologist** [6] - 328:2, 334:2, 334:7, 334:10, 341:22, 342:17

**toxicologists** [1] - 334:21

**Toxicology** [11] - 351:7, 351:8, 351:12, 352:6, 355:4, 356:14,

379:16, 402:8, 409:14, 409:17, 409:22

**toxicology** [5] - 352:15, 356:2, 403:23, 404:1, 406:5

**toxin** [1] - 403:24

**tract** [1] - 368:16

**traditionally** [1] - 369:12

**traffic** [1] - 390:18

**TRAILER** [1] - 288:4

**trailer** [58] - 295:4, 296:15, 296:22, 297:1, 300:5, 300:14, 301:14, 301:17, 304:17, 304:23, 305:3, 305:13, 307:22, 309:25, 310:2, 310:3, 310:10, 310:23, 311:3, 311:12, 311:18, 312:15, 313:16, 314:22, 315:4, 315:10, 315:16, 315:17, 315:24, 328:6, 328:14, 330:7, 330:12, 335:18, 337:4, 337:8, 337:16, 360:22, 371:9, 378:13, 393:24, 394:11, 402:17, 405:10, 405:15, 415:11, 415:16, 416:1, 416:18, 417:22, 418:19, 418:22, 419:1, 419:8, 419:10, 420:3, 420:23

**trailers** [45] - 329:11, 335:25, 338:25, 341:1, 341:4, 344:6, 344:11, 344:13, 356:25, 357:6, 357:10, 360:19, 361:21, 362:2, 362:5, 362:8, 362:11, 362:13, 362:15, 362:17, 362:19, 362:25, 363:5, 364:2, 371:12, 373:13, 373:15, 374:13, 378:14, 380:3, 380:5, 381:6, 381:12, 381:19, 383:5, 384:13, 384:22, 402:14,

402:21, 402:22, 415:10, 416:25, 417:3
**trained** [1] - 387:14
**training** [2] - 317:21, 353:6
**transcript** [1] - 422:8
**TRANSCRIPT** [2] - 288:12, 289:23
**transient** [1] - 398:15
**transition** [1] - 419:25
**travel** [28] - 301:14, 312:15, 329:11, 337:8, 338:25, 341:1, 341:4, 344:5, 344:11, 344:13, 356:25, 362:5, 362:8, 362:10, 364:2, 402:21, 415:10, 415:11, 415:16, 416:18, 416:25, 417:3, 417:22, 418:19, 418:22, 419:1, 419:10, 420:22
**Treaty** [1] - 354:5
**trial** [1] - 319:3
**TRIAL** [1] - 288:12
**tried** [1] - 300:15
**trigger** [1] - 386:19
**triple** [1] - 347:12
**troubling** [3] - 364:20, 365:3
**true** [11] - 308:4, 329:21, 336:2, 336:9, 336:17, 337:6, 337:9, 389:4, 389:6, 389:8, 422:7
**truth** [4] - 316:20, 316:21, 386:9
**try** [6] - 293:19, 301:5, 347:20, 348:4, 381:21, 406:8
**trying** [8] - 299:24, 301:13, 304:17, 310:2, 310:9, 310:23, 336:17, 380:15
**TUESDAY** [1] - 288:6
**turn** [5] - 316:17, 376:9, 379:4, 410:24, 418:1
**turnaround** [1] - 379:14
**turning** [1] - 417:5
**two** [21] - 295:6, 301:20, 318:25, 322:11, 345:11, 345:14, 356:1, 360:2, 363:23,

364:4, 369:13, 373:18, 373:21, 374:2, 381:8, 384:24, 388:18, 395:20, 409:24, 415:19, 416:7
**two-hour** [1] - 395:20
**two-thirds** [1] - 322:11
**two-year** [3] - 356:1, 373:21, 374:2
**TX** [2] - 288:21, 288:24
**type** [8] - 313:22, 370:8, 373:4, 380:14, 414:14, 419:5, 419:13, 419:21
**types** [5] - 380:25, 396:14, 405:13, 406:20, 410:14
**typical** [1] - 374:19
**typically** [12] - 329:4, 329:14, 333:16, 341:6, 365:13, 369:3, 372:13, 372:22, 373:20, 402:5, 413:20
**typing** [1] - 325:4

## U

**U.S** [1] - 375:5
**UFFI** [2] - 391:17, 391:18
**unable** [1] - 375:1
**uncertainty** [9] - 372:4, 372:5, 372:12, 372:24, 386:4, 386:6, 396:19, 397:16, 406:6
**unclear** [1] - 380:19
**under** [8] - 303:4, 326:4, 328:25, 352:9, 366:20, 370:22, 406:8, 407:12
**undergraduate** [2] - 321:5, 321:16
**underlying** [2] - 361:6, 371:21
**underserved** [1] - 407:13
**understood** [4] - 362:7, 373:7, 403:22, 413:13
**unheard** [1] - 374:18
**unit** [15] - 295:24, 296:4, 296:10, 300:8, 300:15,

300:18, 301:8, 301:11, 302:4, 302:9, 306:1, 307:4, 313:21, 379:7
**UNITED** [2] - 288:1, 288:13
**United** [3] - 358:20, 422:6, 422:16
**units** [10] - 292:9, 301:25, 363:8, 363:12, 370:21, 375:14, 376:5, 380:15, 380:18, 384:19
**universal** [1] - 343:24
**universities** [6] - 320:20, 320:22, 320:24, 321:1, 321:14, 321:22
**university** [2] - 336:20, 337:2
**University** [9] - 321:3, 321:7, 321:9, 321:18, 350:1, 350:2, 350:4, 350:8, 350:14
**unless** [3] - 303:21, 303:24, 326:17
**unlikely** [1] - 386:11
**unnecessary** [1] - 331:24
**unoccupied** [16] - 362:5, 362:10, 362:17, 362:19, 363:5, 363:8, 363:12, 364:2, 370:21, 371:11, 375:14, 380:18, 381:6, 381:12, 381:19, 391:22
**unquote** [1] - 360:9, 405:8
**unusual** [2] - 384:7, 384:9
**up** [45] - 293:11, 293:12, 293:14, 294:6, 294:10, 299:3, 301:12, 301:23, 301:24, 306:7, 308:12, 315:14, 316:13, 318:17, 331:23, 332:25, 333:4, 333:7, 337:12, 345:6, 345:8, 346:3, 346:6, 347:18, 348:15, 349:2, 358:14, 359:18, 364:16, 370:19, 371:8, 372:22,

373:25, 377:14, 377:15, 390:19, 393:18, 403:17, 408:21, 410:2, 410:25, 411:5, 411:6, 412:7
**upgraded** [2] - 410:22
**upper** [1] - 368:16
**urban** [2] - 390:18, 392:3
**Urban** [1] - 392:1
**urea** [1] - 391:19
**user** [5] - 326:12, 326:13, 326:25, 329:25, 330:19
**users** [1] - 417:22
**Uses** [1] - 385:8
**utilize** [2] - 365:11, 406:1
**utilized** [2] - 365:4, 379:7

## V

**value** [7] - 370:25, 371:5, 372:23, 385:17, 406:7, 406:8
**Values** [1] - 385:9
**values** [20] - 370:11, 371:22, 372:13, 377:16, 377:19, 378:7, 385:13, 386:10, 386:16, 386:17, 386:18, 386:20, 386:25, 387:11, 387:19, 404:14, 404:15, 404:22, 406:16
**vapors** [3] - 327:13, 327:23, 328:1
**variability** [4] - 372:11, 372:20, 373:4, 397:14
**variable** [2] - 407:11, 407:12
**variables** [1] - 404:21
**varies** [1] - 359:24
**variety** [3] - 292:9, 292:15, 292:16
**various** [3] - 353:19, 355:19, 360:3
**vary** [3] - 370:3, 394:14, 399:11
**vehicle** [3] - 338:18, 414:22, 414:23
**vehicles** [1] - 338:8
**vent** [1] - 384:23
**ventilated** [1] - 362:16
**ventilation** [8] - 296:7,

296:9, 330:12, 370:3, 370:7, 382:17, 384:19, 384:20
**vents** [2] - 382:15, 405:16
**verbal** [7] - 413:2, 414:14, 414:17, 419:5, 419:6, 419:13, 419:19
**versus** [3] - 396:23, 399:12, 401:25
**video** [1] - 344:24
**videotape** [1] - 348:11
**VIDEOTAPED** [1] - 290:16
**videotaped** [2] - 349:5, 358:17
**Vietnam** [1] - 354:12
**view** [3] - 310:9, 310:22, 387:18
**vigorous** [1] - 409:25
**violated** [1] - 323:19
**violation** [1] - 324:13
**Virginia** [2] - 350:4, 350:8
**virtue** [2] - 396:17, 410:17
**visited** [1] - 301:17
**visiting** [1] - 306:1
**visor** [1] - 338:20
**visual** [1] - 415:24
**vitae** [5] - 317:10, 317:20, 320:19, 320:23, 322:1, 322:7
**VOIR** [2] - 290:11, 317:6
**volume** [1] - 369:19

## W

**wait** [3] - 308:9, 315:5, 343:5
**waiting** [1] - 378:17
**walk** [1] - 420:1
**walk-through** [1] - 420:1
**wants** [1] - 309:6
**warn** [4] - 326:7, 326:15, 326:16, 326:23, 327:3, 344:18
**warned** [2] - 324:18, 329:8
**warning** [82] - 319:8, 319:10, 319:24, 319:25, 320:1, 322:15, 322:18, 322:25, 323:2,

323:4, 323:5,
323:13, 323:23,
323:24, 323:25,
324:1, 324:2,
324:13, 324:20,
324:22, 324:25,
325:12, 325:13,
325:20, 325:23,
326:21, 327:2,
327:4, 327:6,
328:21, 331:2,
336:5, 336:7,
336:11, 336:15,
337:7, 337:10,
337:14, 337:18,
339:20, 339:23,
339:25, 340:8,
340:9, 341:1, 341:3,
341:5, 344:5,
412:21, 412:22,
412:23, 413:1,
413:7, 413:12,
413:15, 413:21,
413:22, 414:3,
414:13, 414:25,
415:2, 415:6, 415:8,
415:10, 415:15,
415:20, 415:22,
416:7, 416:9,
416:12, 416:18,
418:16, 418:22,
418:25, 419:4,
419:19, 419:21,
419:23, 420:6,
420:16, 420:22,
421:12
**warnings** [34] -
315:23, 317:13,
319:4, 319:6, 319:8,
319:12, 319:13,
320:5, 320:16,
320:20, 320:21,
320:25, 321:19,
321:24, 322:4,
322:7, 322:12,
324:19, 330:22,
336:3, 336:8,
336:18, 336:25,
338:16, 338:19,
343:24, 344:8,
344:19, 413:6,
413:8, 415:14,
417:20, 419:21
**warranted** [1] - 386:22
**waste** [1] - 387:15
**wasting** [1] - 332:1
**watch** [1] - 377:7
**water** [11] - 302:13,
302:18, 302:20,
302:25, 303:1,

303:6, 303:17,
315:15, 315:21,
344:16, 388:9
**ways** [1] - 360:3
**week** [3] - 393:10,
393:22, 395:13
**weekly** [1] - 379:22
**weeks** [2] - 393:22,
395:13
**weight** [2] - 401:7,
406:6
**WEINSTOCK** [2] -
376:19, 397:11
**welcome** [1] - 313:5
**well-documented** [1] -
415:1
**well-meaning** [1] -
387:17
**Wesleyan** [1] - 350:1
**wet** [4] - 302:23,
303:3, 303:11,
315:17
**whatsoever** [1] -
318:19
**wheeze** [1] - 377:9
**WHEREUPON** [19] -
293:24, 308:13,
309:11, 318:14,
320:8, 323:10,
325:6, 331:10,
332:3, 349:4, 358:5,
358:8, 358:11,
358:16, 411:11,
412:3, 412:9,
421:13, 421:21
**white** [1] - 395:22
**White** [1] - 408:17
**WHITFIELD** [1] -
289:14
**WHO** [1] - 364:22
**whole** [4] - 299:15,
299:18, 316:20,
324:23
**wide** [1] - 292:9
**widely** [1] - 330:25
**wife** [1] - 326:18
**Williams** [4] - 334:7,
334:8, 341:23,
342:16
**Williams's** [2] -
334:11, 334:15
**window** [1] - 384:19
**windows** [7] - 296:4,
296:10, 330:13,
370:9, 382:15,
383:5, 405:15
**wire** [1] - 344:15
**wish** [1] - 297:13
**withdraw** [1] - 291:16
**withdrawn** [1] -

291:15
**WITNESS** [12] -
293:22, 297:15,
298:19, 299:15,
310:17, 312:8,
313:5, 316:22,
317:1, 317:4,
376:20, 415:19
**witness** [24] - 294:13,
303:21, 314:2,
314:24, 316:11,
316:24, 319:1,
319:2, 319:20,
319:21, 323:15,
323:18, 324:16,
324:18, 331:6,
339:15, 344:23,
346:1, 348:9,
348:15, 348:16,
349:3, 356:15,
356:20
**witnesses** [3] -
318:22, 319:2,
343:12
**word** [5] - 306:25,
364:25, 400:16,
417:12, 418:9
**words** [3] - 348:14,
359:9, 416:8
**workers** [4] - 373:9,
374:2, 410:9, 410:11
**World** [3] - 352:14,
354:4, 367:4
**world** [1] - 355:1
**world's** [1] - 356:1
**worldwide** [1] -
354:19
**worse** [1] - 346:12
**worth** [1] - 385:25
**Wright** [39] - 293:10,
293:11, 293:14,
294:10, 294:17,
296:13, 297:16,
297:19, 298:17,
299:17, 301:3,
303:14, 306:9,
306:14, 308:4,
309:15, 309:24,
310:12, 311:23,
313:4, 313:11,
314:11, 314:15,
316:9, 329:21,
330:2, 341:15,
341:18, 364:6,
370:23, 379:5,
380:22, 383:14,
419:10, 419:18,
419:22, 420:1,
420:13
**WRIGHT** [2] - 288:16,

290:5
**write** [1] - 341:1
**written** [22] - 321:23,
322:4, 330:21,
330:24, 337:7,
337:10, 337:18,
338:5, 338:6,
338:10, 338:14,
338:17, 338:25,
339:2, 341:3, 344:5,
344:8, 358:25,
359:2, 365:1, 385:6,
403:9
**wrote** [7] - 333:1,
333:7, 379:3, 386:7,
386:23, 386:24,
387:7

## Y

**y'all** [1] - 411:16
**year** [16] - 315:7,
315:8, 343:1,
351:20, 356:1,
359:18, 368:15,
370:6, 373:21,
374:2, 374:5,
393:22, 394:13,
409:24
**years** [21] - 321:12,
321:20, 322:5,
322:6, 322:12,
337:13, 350:11,
351:24, 368:8,
373:8, 373:10,
373:16, 373:18,
373:21, 374:11,
374:12, 374:18,
394:25, 410:7,
415:14, 419:20
**yesterday** [13] -
291:12, 291:22,
292:2, 292:3, 294:6,
294:9, 296:15,
301:23, 302:14,
302:17, 304:15,
305:10, 331:13
**yielded** [3] - 395:7,
395:17, 395:25
**York** [1] - 321:3
**you-all** [1] - 358:7
**yourself** [1] - 385:6
**yourselves** [2] -
411:8, 411:9

## Z

**zone** [1] - 369:20