UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| IN RE: FEMA TRAILER | * | MDL NO. 1873 |
| FORMALDEHYDE | * | |
| PRODUCT LIABILITY | * | SECTION "N-5" |
| LITIGATION | * | |
| | * | JUDGE ENGELHARDT |
| | * | |
| THIS DOCUMENT RELATES TO | * | MAG. JUDGE CHASEZ |
| *EARLINE CASTANEL, ET AL* | * | |
| *v. RECREATION BY DESIGN, LLC* | * | |
| *ET AL, DOCKET NO. 09-3251* | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**DEFENDANT RECREATION BY DESIGN, LLC'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF DR. RONALD FRENCH**

**NOW INTO COURT,** through undersigned counsel, comes defendant, Recreation By Design, LLC ("RBD"), who offers the following memorandum in response to Plaintiff's Motion to Exclude the Testimony of Dr. Ronald French:[1]

**I.    DR. FRENCH IS QUALIFIED TO TESTIFY**

Dr. French is sufficiently qualified to offer a causation opinion as to the cause and/or exacerbation of Ms. Castanel's sinusitis/rhinitis. He is a board certified otolaryngologist (ear, nose and throat) and has over forty (40) years of clinical and surgical experience in that field.[2] Dr. French has also been an associate clinical professor of otolaryngology and head and neck

---

[1] Rec. Doc. 13603.
[2] Selected pages of the deposition transcript of Dr. Ronald French, dated April 15, 2010, are attached hereto as Exhibit "A." *See* Ex. A at pp. 10-11, 35-36; *see also* Ex. B to Rec. Doc. 13603 at p. 2.

1

surgery at Tulane University School of Medicine since 1989.[3] He has experience treating patients with injuries associated with chemical exposure, including "people who have been exposed to or potentially exposed to toxins from refinery positions in the petrochemical corridor around New Orleans."[4] Dr. French also has extensive experience treating patients with prolonged exposure to inhalants, such as "tobacco, asbestos, bagasse, etc."[5] Finally, Dr. French has published articles in medical literature on a variety of topics, including reports on procedures and laser surgery he performed, and medical emergency devices that he created.[6]

Plaintiff's stringent interpretation of an expert's qualifications under Rule 702 and *Daubert* is contrary to Fifth Circuit case law. In *Huss v. Gayden, M.D.*, a case cited throughout plaintiff's motion, the Fifth Circuit noted that "[t]he *Daubert* standards are flexible, and the most important question is not whether one party's expert is more qualified than the other's, but rather, whether an expert's testimony is reliable."[7] For the reasons discussed in § II, *infra*, Dr. French's testimony is indeed reliable. Moreover, plaintiff's contention that Dr. French's testimony should be excluded in its entirety is contrary to the Fifth Circuit's holding in *Huss*. As the court stated, "[R]ule 702 does not mandate that an expert be highly qualified in order to testify about a given issue."[8] Rather, any "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[9]

Plaintiff takes issue with the fact that Dr. French is "neither a toxicologist nor an occupational physician," and seemingly misconstrues the purpose for which his opinions were

---

[3] *See* Ex. A at pp. 11-12; *see also* Ex. B to Rec. Doc. 13603 at p. 1.
[4] Ex. A at p. 12.
[5] Ex. A at pp. 13-14.
[6] Ex. A at pp. 47-48.
[7] 571 F.3d 442, 455 (5th Cir.2009) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[8] 571 F.3d 442 at p. 452.
[9] *Huss*, 571 F.3d 442 at p. 452 (citing *Daubert*, 509 U.S. 579 at p. 596) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")).

elicited.[10] It is the plaintiff's burden to prove both general and specific causation in a products liability case, and RBD is not required to offer expert testimony proving a differential diagnosis for her alleged injuries.[11] Rather, Dr. French's testimony consists of differential etiology, the purpose of which is to rule out various causes/factors of plaintiff's complaints. The Fifth Circuit opined on this distinction as it relates to expert witness qualifications in *Huss*, holding that "[w]e do not think that Dr. Reddix needed to be specialized in cardiology or toxicology to act as a counterpoint to the Husses' experts."[12] Thus, Dr. French's particular field(s) of medical specialization should not be an impediment to the admission of his testimony.

This reasoning should also apply to plaintiff's argument that Dr. French is not qualified to testify regarding cancer.[13] Plaintiff's asserts that Dr. French should not be permitted to testify regarding Ms. Castanel's fear of cancer claim because he is not a psychologist or a psychiatrist.[14] Under that rationale, plaintiff's psychology expert witness should not be permitted to offer opinions regarding cancer because he/she is not an oncologist. Dr. French has ample experience in the diagnosis and treatment of cancer.[15] He has encountered and identified the "precursor conditions to nasopharyngeal cancer" throughout his clinical practice, and surgically treats various types of cancer.[16]

Dr. French testified that nasopharyngeal carcinoma is treated radiographically through the "cobalt treatment"—as such, his practice is to diagnose nasopharyngeal cancer and refer the

---

[10] Rec. Doc. 13603 at p. 2.
[11] *See, e.g., Knight v. Kirby Inland Marine Inc.*, 483 F.3d 347, 351 (5th Cir. 2007).
[12] *Huss*, 571 F.3d 442 at p. 455.
[13] Rec. Doc. 13603 at p. 5.
[14] Rec. Doc. 13603 at pp. 2, 5.
[15] Ex. A at pp. 93-98.
[16] Ex. A at pp. 70-71.

patient to a radiotherapist for the cobalt treatment.[17] His treatment of these patients continues throughout the progression of their disease:

Q: And your work stops at the diagnostic point?
A: Well, no. It doesn't stop—
Q: Oh.
A: --at the diagnostic point because only the otolaryngologist can follow the progression or regression or disappearance of the disease. Also, upper respiratory cancers such as the nasopharynx have a propensity to metastasize to the lymph nodes in the neck where we often operate on the necks of these patients. So the—the patient who we discover or diagnose a nasopharyngeal carcinoma we tend to continue with the treatment of along with the radiotherapist.[18]

Thus, Dr. French's opinion that plaintiff has no "rational basis" for her fear of contracting nasopharyngeal cancer stems from his reliable clinical judgment and over forty (40) years of experience in the diagnosis and treatment of such cases.[19] Dr. French has sufficient knowledge, skills, and training to offer testimony under Rule 702 and *Daubert*, and plaintiff's assertion that his is not qualified is wholly without merit.[20]

## II.  DR. FRENCH'S OPINIONS ARE RELIABLE

As discussed *supra*, a Rule 702 inquiry is a "flexible one" where the relevant factors are neither exclusive nor dispositive.[21] To meet the "reliability" prong of Rule 702, *Daubert* merely requires that an expert's opinion be based on more than "subjective belief or unsupported speculation."[22] Essentially, the expert must have "good grounds" for his or her belief.[23] Here, Dr. French's opinions are reliable bear numerous hallmarks of such reliability.[24] His causation opinions are consistent with the research on which he relies, and will assist the trier of fact to

---

[17] Ex. A at pp. 93-98.
[18] Ex. A at pp. 97-98.
[19] *See* Ex. B to Rec. Doc. 13603 at p. 2.
[20] *See, e.g.*, *Daubert*, 509 U.S. 579 at pp. 594-95.
[21] *Huss*, 571 F.3d 442 at p. 455 (citing *Daubert*, 509 U.S. 579 at p. 596).
[22] *See Daubert*, 509 U.S. 579 at p. 590.
[23] *See Daubert*, 509 U.S. 579 at p. 590.
[24] *See, e.g., Ancar v. Murphy Oil, U.S.A., Inc.*, 2007 WL 3270763, *2 (E.D. La. 2007); *In re Katrina Canal Breaches Consol. Litigation*, 2007 WL 3245438, *12 (E.D. La. 2007).

determine material issues in this case.[25] Finally, the arguments raised in plaintiff's motion are more appropriately asserted against Dr. French's credibility as a witness—not the admissibility of his testimony.[26]

Plaintiff complains that Dr. French's testimony is unreliable because "[t]he only scientific literature he reviewed on formaldehyde was provided by defense counsel."[27] This misrepresents the scope of Dr. French's preparation, in that the literature provided to him included the scientific literature relied upon by plaintiff's experts, as well as the written reports of those experts.[28] In actuality, Dr. French relied on all of the literature utilized by every expert in this case, including plaintiff's and defendant's. Plaintiff's counsel never requested a complete list of this literature, but need only consult the list of Dr. French's reliance materials to verify this fact. Further, plaintiff's counsel never bothered to inquire whether additional research was necessary.

In addition to all relevant scientific literature at issue in this case, Dr. French also reviewed the depositions of plaintiff's treating physicians, including Drs. Gautreaux, Bowers, and Smith,[29] as well as the original medical records for Ms. Castanel generated by these physicians.[30] Specifically, he reviewed plaintiff's medical records from 2002 to April 2010.[31] Dr. French also conducted a thorough one-on-one interview with Ms. Castanel prior to his physical examination of her,[32] from which he contemporaneously noted a number of impressions based on her medical history.[33] These first-hand impressions are included in Dr. French's

---

[25] *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).
[26] *Huss*, 571 F.3d 442 at p. 452 (citing *Daubert*, 509 U.S. 579 at p. 596).
[27] Rec. Doc. 13603 at p.2.
[28] Ex. A at pp. 14-16, 19-20, 21-22, 52,
[29] Ex. A at p. 10.
[30] Ex. A at p. 17.
[31] Ex. A at pp. 22-23;
[32] Ex. A at pp. 23-24.
[33] Ex. A at p. 28.

written report.[34] Finally, Dr. French conducted an extensive magnified endoscopic examination of Ms. Castanel's upper respiratory tract.[35]

Ultimately, Dr. French concludes that plaintiff's complaints were not caused by the FEMA trailer.[36] This opinion is corroborated by evidence showing that plaintiff's sinusitis and/or rhinitis existed both before and after she resided in the unit.[37] Dr. French considered the clinical notes and deposition testimony of plaintiff's treating physician, Dr. Gautreaux.[38] Those records indicate that plaintiff has continued to experience the same type of respiratory tract infections since vacating her trailer in 2007.[39]

Dr. French contends that the most important aspect in a causation determination is the physical examination of the patient and the clinical physician's subsequent findings.[40] Here, Dr. French relied upon approximately eight (8) years of these clinical findings, in addition to his own physical examination of Ms. Castanel, in rendering his opinions.[41] He also considered the findings from plaintiff's physical examinations in the context of studies he reviewed concerning formaldehyde exposure and dysplasia (chronic changes in the mucus membrane of the lining of the nasal mucosa).[42] Those studies indicate that the physical findings associated with formaldehyde exposure are distinguishable from those that occur from an infection due to a bacterial or viral sinusitis.[43] Accordingly, Dr. French opines that "the physical examination would differentiate what the etiology of one's respiratory reaction was from."[44]

---

[34] Ex. A at p. 28.
[35] Ex. A at p. 76,
[36] *See* Ex. B to Rec. Doc. 13603.
[37] Ex. A at pp. 32-33,
[38] Ex. A at pp. 57, 63.
[39] Ex. A at pp. 57, 62-63.
[40] Ex. A at pp. 67-68.
[41] Ex. A at pp. 17, 22-23.
[42] Ex. A at p. 52.
[43] Ex. A at pp. 67-70.
[44] Ex. A at p. 69.

6

Dr. French found no evidence of dysplasia ("chronic injury or damage) in Ms. Castanel consistent with exposure to formaldehyde in either his physical examination or any of the clinical findings from her treating physicians.[45] His review of the substantial medical documentation obtained from Dr. Gautreaux regarding plaintiff's recent elective surgical procedure was especially compelling.[46] According to Dr. French, the results of a histologic evaluation of tissue removed from plaintiff's sinuses during the procedure "did not evidence any of the post-formaldehyde exposure changes that have been described" in the relevant medical literature he consulted.[47] As such, he reasonably concluded that the levels of formaldehyde Ms. Castanel was allegedly exposed to in her FEMA trailer were simply too low to cause any subsequent injury to her upper respiratory tract.[48]

Dr. French's opinions on the level of formaldehyde exposure that Ms. Castanel might have experienced are also predicated on his review of relevant scientific literature regarding the odor threshold,[49] and corroborated by plaintiff's statements to both her ENT, and to Dr. French at her clinical interview, that she did not detect any odors in her trailer.[50] From his review of scientific literature, Dr. French places the odor threshold of formaldehyde at approximately .5 parts per million ("ppm"), or, 500 parts per billion ("ppb").[51] And, although he noted that there was a range of levels at which various individuals perceive the odor of formaldehyde, he was most impressed by the fact "that in almost all human beings, it's [formaldehyde] very easily smelled at a low concentration."[52] As such, he concludes that the levels at which formaldehyde can cause upper respiratory tract irritation are "very close to the level of the perceived smell,"

---

[45] Ex. A at p.73.
[46] Ex. A at pp. 103-04.
[47] Ex. A at pp. 103-04.
[48] Ex. A at p. 72.
[49] Ex. A at pp. 14-15.
[50] *See* Ex. B to Rec. Doc. 13603 at p. 3.
[51] Ex. A at pp. 14-15.
[52] Ex. A at p. 16.

7

approximately .5 ppm or 500 ppb,[53] and that formaldehyde exposure will not independently cause rhinitis at levels below the odor threshold.[54]

Finally, while plaintiff criticizes Dr. French's consultations with other treating physicians in his field because he did not conduct a "formal" study with an eye towards publication, RBD contends that his intellectual curiosity only adds credence to his expertise in differential etiology. Dr. French was in the unique position of treating approximately 150 patients per week in post-Katrina New Orleans, and, when faced with rampant media stories regarding "Katrina cough," he went to the only source of information available to him—his colleagues.[55] He compared his own personal experiences in treating patients with respiratory infections to the experiences of other clinical physicians in his field, which is neither unusual nor unorthodox.[56] Indeed, Dr. French in no way represents that his consultations with other physicians constitute a "formal" study:

Q: All right. Did you determine whether there was a higher incidence of respiratory complaints among those patients of yours who lived in travel trailers versus those who were not in travel trailers? […].
A: There was not.
Q: And how did you make that determination?
A: Well, there was a—a body of publicity during the post-Katrina era when it was claimed that chronic—that there were more frequent and more severe respiratory infections. In fact, it was even given a name, the Katrina cough. So being the person who saw all acute respiratory infections, my partners and I, we decided to do a study to see whether there was an increase—whether that was true […].

**And this is not a peer-reviewed study, but it's an opinion that was engendered by discussing with the other otolaryngologists […] in the community as well as my partners.** And I think we have the largest ENT practice in Orleans and Jefferson Parish. And we found there was no difference in our patients in the post-Katrina year that there was in the pre-Katrina year. Now, I realize that comprises all people, both in house trailers and out of house trailers, but we saw no—no change in incidence of respiratory infections.
Q: Now, tell me how you went about constructing this study.

---

[53] Ex. A at pp. 19-20.
[54] Ex. A at p. 53.
[55] Ex. A at pp. 33-34, 39-45.
[56] Ex. A at pp. 39-45.

A: **It was purely clinical.** It was what we all thought was the rate of illness that we saw as compared the previous year, and it is—as I say, it's not a peer-reviewed study but it was our impression that—We all had the same impression and that was that things were no different.[57]

And, while plaintiff characterizes these observations as "anecdotal," RBD avers that they speak directly to Dr. French's qualifications as an expert based on his substantial clinical experience and professional judgment, as well as his education and training.

### III. CONCLUSION

For the foregoing reasons, Recreation By Design, LLC, respectfully requests that the Court deny Plaintiff's Motion to Exclude the Testimony of Dr. Ronald French.

---

[57] Ex. A at pp. 40-41, 49-50.

Respectfully submitted,


*/s/ Lyon H. Garrison*
LYON H. GARRISON, Bar No. 19591
SCOTT P. YOUNT, Bar No. 22679
RANDALL C. MULCAHY, Bar No. 26436
DARRIN L. FORTE, Bar No. 26885
KELLY M. MORTON, Bar No. 30645
**GARRISON, YOUNT, FORTE**
**& MULCAHY, LLC**
909 Poydras Street, Suite 1800
New Orleans, Louisiana 70112
Telephone: (504) 527-0680
Facsimile: (504) 527-0686
*Attorneys for Recreation By Design, LLC*
Email: lgarrison@garrisonyount.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 30th, 2010, I electronically filed the foregoing with the Clerk of court by using the CM/ECF system which will send a notice of this electronic filing to all known counsel of record.

*/s/ Lyon H. Garrison*
LYON H. GARRISON, Bar No. 19591