# Exhibit "A"

# Transcript of the Testimony of
# **Videotaped Deposition of Albert Jarrell**

## Date taken: January 25, 2010

## In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)

### **Note**
All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:    www.psrdocs.com**

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  FEMA TRAILER          MDL NO. 1873
FORMALDEHYDE PRODUCTS         SECTION N(4)
LIABILITY LITIGATION          JUDGE ENGELHARDT
(This document relates
to "Lyndon Wright, et al.
v. Forest River, Inc.,
et al.")

* * *

VIDEOTAPED DEPOSITION OF ALBERT
JARRELL, 9718 WHEATON CIRCLE WEST, NEW
ORLEANS, LOUISIANA 70127, TAKEN AT THE
OFFICES OF FRANK D'AMICO, ATTORNEY AT LAW,
622 BARONNE STREET, NEW ORLEANS, LOUISIANA
70112, ON THE 25TH DAY OF JANUARY, 2010.

REPORTED BY:
   CATHY RENEE' POWELL, CCR
   PROFESSIONAL SHORTHAND REPORTERS
   (504)529-5255
VIDEOGRAPHER:
   MICHAEL BERGERON

**Page 2**

(504)529-5255

**Page 3**

1  APPEARANCES:
2
3  THE BUZBEE LAW FIRM
   (BY: J. SCOTT DANIELS, ESQUIRE)
   600 TRAVIS, SUITE 7300
4  HOUSTON, TEXAS  77002
5     (ATTORNEYS FOR ALBERT JARRELL)
6
   LAW OFFICES OF FRANK D'AMICO
7  (BY:  FRANK D'AMICO, ESQUIRE)
   622 BARONNE STREET
8  NEW ORLEANS, LOUISIANA  70112
9
10    (ATTORNEYS FOR LYNDON WRIGHT AND THE
      PLAINTIFFS' STEERING COMMITTEE)
11
   DUPLASS, ZWAIN, BOURGEOIS,
12    PFISTER & WEINSTOCK
   3838 NORTH CAUSEWAY BOULEVARD
13 SUITE 2900
   METAIRIE, LOUISIANA  70002
14    (Not Present)
15    (ATTORNEYS FOR DEFENDANTS
      GULF STREAM COACH, INC.)
16
17 U.S. DEPARTMENT OF JUSTICE
   (BY: ADAM DINNELL, ESQUIRE)
18 500 C STREET, SW
   WASHINGTON, D.C.  20472
19
      (ATTORNEYS FOR DEFENDANTS UNITED
20    STATES AND FEMA)
21
   GIEGER, LABORDE & LAPEROUSE
22 (BY: JASON BONE, ESQUIRE)
   701 POYDRAS STREET
23 SUITE 4800
   NEW ORLEANS, LOUISIANA  70139
24
      (ATTORNEYS FOR DEFENDANTS FOREST
25    RIVER)

**Page 4**

1  APPEARANCES CONTINUED:
2
3  HAILEY McNAMARA
   10725 PERKINS ROAD, SUITE 200
   BATON ROUGE, LOUISIANA  70810
4     (Not Present)
5     (ATTORNEYS FOR DEFENDANTS AMERICAN
      HOMESTAR CORPORATION)
6
7  JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE
8  201 ST. CHARLES AVENUE
   NEW ORLEANS, LOUISIANA  70170
9     (Not Present)
10    (ATTORNEYS FOR DEFENDANTS PILGRIM,
      KEYSTONE, MONACO, R-VISION, THOR
11    CALIFORNIA, KZRV, DS/
      CROSSROADS AND DUTCHMEN)
12
13 MIDDLEBERG, RIDDLE & GIANNA
   (BY:  CHARLES PENOT, ESQUIRE)
14 201 ST. CHARLES AVENUE
   NEW ORLEANS, LOUISIANA  70170
15    (Attended via telephone)
16    (ATTORNEYS FOR FLUOR ENTERPRISES,
      INC.)
17
18 NIELSEN LAW FIRM
   3838 NORTH CAUSEWAY BOULEVARD
19 SUITE 2850
   METAIRIE, LOUISIANA  70002
20    (Not Present)
21    (ATTORNEYS FOR DEFENDANTS
      SCOT BILT HOMES, INC.)
22
23
24
25

1 (Pages 1 to 4)

1  Q.  Do you have it here with you
2  today?
3  A.  Yes.
4  Q.  Would you please produce your
5  Louisiana driver's license, and I will mark
6  that as Exhibit 1 to the deposition.  The
7  court reporter will make a copy of it and,
8  obviously, return your original.
9  You have tendered to me a
10  Louisiana driver's license, license No.
11  1509066, expiration September 1, 2013,
12  bearing your name, at 9718 Wheaton Circle
13  West; is that correct?
14  A.  Correct.
15  Q.  In New Orleans, Louisiana.  Is
16  that your present address, sir?
17  A.  Yes, it is.
18  Q.  And your date of birth is
19  September 1, 1945?
20  A.  That's correct.
21  Q.  Are there any restrictions on this
22  license?
23  A.  Any?
24  Q.  Yes, sir.
25  A.  No.

Page 13

1  the 90 overpass.
2  A.  That would be Uptown.  I live in
3  the East.
4  Q.  Okay.  So is it fair to say then,
5  sir, you have no personal knowledge of the
6  condition of the travel trailer located at
7  2315 Seminole Lane?
8  A.  Yes, I don't know it.
9  Q.  Is it also fair to say that you
10  have no knowledge of Lyndon Wright's medical
11  conditions?
12  A.  Correct.  I don't know anything
13  about his medical.
14  Q.  Have you ever had a conversation
15  with Mr. Lyndon Wright?
16  A.  Never.
17  Q.  Have you had a conversation with
18  Mrs. Bobby Wright?
19  A.  Never.
20  Q.  Do you know who that person is?
21  A.  Don't know.
22  Q.  You mentioned that you have a
23  formaldehyde-related lawsuit.  Is that as a
24  result of residing in a travel trailer?
25  A.  Yes.  And also I worked in the

Page 15

1  Q.  Mr. Jarrell, although I have asked
2  opposing counsel, I don't know what
3  testimony you intend to give in this case.
4  Do you have an understanding of the
5  testimony that you are being offered to give
6  in this particular case?
7  A.  No.  I'm just here to answer some
8  questions.  I don't know what it's -- what
9  it's about.
10  Q.  Okay.  Do you have any knowledge
11  relating to Mr. Lyndon Wright or his
12  occupancy of a travel trailer after
13  Hurricane Katrina?
14  A.  Don't know him, never met him.  I
15  don't even know who he is or where he exists
16  at.
17  Q.  If I represent to you Mr. Wright's
18  prior residence was at 2315 Seminole Lane,
19  New Orleans, do you have any recollection of
20  having any involvement with that particular
21  address?
22  A.  No, I don't.  I don't even know
23  where Seminole Lane is.
24  Q.  It's in New Orleans, it's actually
25  a couple of blocks off Martin Luther King by

Page 14

1  trailers eight hours a day.  I was a
2  maintenance person.
3  Q.  Okay.  Do you know, in terms of --
4  were you issued a travel trailer by FEMA as
5  temporary housing?
6  A.  Yes.
7  Q.  Do you know who manufactured that
8  travel trailer?
9  A.  I was in an ADA trailer, Morgan,
10  manufactured by Fleetwood.
11  Q.  You mentioned that you also
12  maintained some trailers.  Who were you
13  working for at the time that you were
14  performing maintenance on travel trailers?
15  A.  First I worked for DEL-JEN.  From
16  DEL-JEN to C. Martin.
17  Q.  Okay.
18  A.  From C. Martin to B&I, which is
19  Brown & Isaac.
20  Q.  Anyone after Brown & Isaac for
21  whom you maintained travel trailers?
22  A.  No.
23  Q.  When did your work with DEL-JEN
24  begin?
25  A.  I'm not exactly sure.  I think it

Page 16

4  (Pages 13 to 16)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)          Videotaped Deposition of Albert Jarrell

1    was about March of 2006.
2         Q.   Was that the first time you had
3    had any involvement with the maintenance of
4    a travel trailer?
5         A.   Yes.
6         Q.   Other than working for DEL-JEN, C.
7    Martin and Brown & Isaac, did you ever in
8    your life have any other instance where you
9    worked in the maintenance or refurbishment
10   of travel trailers?
11        A.   No.
12        Q.   When did you transition from
13   DEL-JEN to C. Martin?
14        A.   Sometime that summer.
15        Q.   So in the summer of 2006?
16        A.   Yes, late summer, I think.  I'm
17   not sure.  I think it was in the late --
18   latter part of the summer.
19        Q.   Would that be between August and
20   September or July and August?
21        A.   I would say July and August.
22        Q.   When did you transition from C.
23   Martin to Brown & Isaac?
24        A.   I'm not sure about that.  If I
25   answer that, I'm going to be guessing.  I
                                        Page 17

1    at Brown & Isaac?
2         A.   Yes.
3         Q.   At DEL-JEN, what were your
4    responsibilities?
5         A.   I was a trailer maintenance
6    person.
7         Q.   And what were your duties
8    consisting of as a trailer maintenance
9    person?
10        A.   Repair, fix anything with a
11   trailer that is broken or needs to be
12   repaired or defective.
13        Q.   And when you went to -- was
14   there -- when you were at DEL-JEN, was there
15   a specific title that was given to you in
16   terms of trailer maintenance or were you
17   just classified as trailer maintenance
18   personnel?
19        A.   Maintenance personnel.
20        Q.   Did you work on staging yards or
21   did you work at the homesite in terms of the
22   maintenance that you were performing while
23   you were with DEL-JEN?
24        A.   I worked at a staging site, which
25   is Jazzland in New Orleans East, but I did
                                        Page 19

1    would say, let's see.  I'm trying -- I don't
2    remember exactly when I left from C. Martin
3    to Brown & Isaac.  I didn't stay at C.
4    Martin very long.  It was maybe two months.
5    Then I went to the other company.
6         Q.   If you transitioned from C. Martin
7    sometime between July and September, let's
8    say, and you only stayed there two months,
9    you would have been working for Brown &
10   Isaac prior to 2007, correct?
11        A.   Yes.
12        Q.   So if we said, for example,
13   December of 2006 that you went to work at
14   Brown & Isaac, would that be about accurate
15   in your recollection?
16        A.   I'm -- I'm not sure.  I went
17   there, but I'm sorry, I don't remember the
18   exact date I left one company to the other
19   company.
20        Q.   Do you remember, though, that you
21   only worked for C. Martin for two months?
22        A.   Two or three months.  It wasn't
23   long.  Two or three months.  It wasn't very
24   long.
25        Q.   By 2007, though, you were working
                                        Page 18

1    not go there to do maintenance.
2         Q.   What did you go to the Jazzland
3    staging yard to do?
4         A.   To remove existing refrigerators
5    from trailers that were parked there and put
6    them in trailers that the refrigerators were
7    broken to replace them.
8         Q.   Was that all that you did while
9    you were at DEL-JEN was replace --
10        A.   No.
11        Q.   -- good refrigerators with bad or,
12   excuse me, bad with good?
13        A.   No.  That was an assignment given
14   to me on two occasions.  My normal duties
15   were repair and maintenance of trailers in
16   the field, as we say, meaning at trailer
17   sites, and also individuals' homes.
18        Q.   Okay.  So your primary
19   responsibility at DEL-JEN was to maintain
20   units either at an individual's homesite or
21   at a trailer park?
22        A.   True.
23        Q.   And then on two separate
24   occasions, you were assigned to the staging
25   yard where you did this work replacing
                                        Page 20

PROFESSIONAL SHORTHAND REPORTERS, INC    (800) 536-5255
New Orleans * Baton Rouge * Shreveport                (504) 529-5255

1  refrigerators, correct?
2      A.  True.
3      Q.   Does your time at DEL-JEN, do you
4  have any documentation regarding your time
5  with DEL-JEN?
6      A.  No, I didn't keep anything.
7      Q.  Is DEL-JEN named in your lawsuit?
8      A.  Not to my knowledge.
9      Q.   Okay.  When you transitioned out
10  of DEL-JEN, you went to C. Martin; is that
11  correct?
12      A.  Yes.
13      Q.   And what was your job title with
14  C. Martin?
15      A.  My job title at C. Martin was
16  maintenance, but in that time period, I did
17  very little maintenance.  Mostly what I did
18  was gas pressurization tests and put PMIs on
19  trailers.
20      Q.   The PMI, for those of us who are
21  unfamiliar, is what as it related to your
22  time with C. Martin?
23      A.   Preventive maintenance inspection.
24      Q.   And what did the preventive
25  maintenance inspection consist of during

Page 21

1  a trailer to ensure that there wasn't no
2  leaks and dangers to the people who lived in
3  the trailers.
4      Q.  All right.  In terms of the PMI,
5  would you perform a complete PMI if the
6  individual was home during your time with C.
7  Martin, interior and exterior as well?
8      A.  Would I do a complete if the
9  person's home?
10      Q.  Yes.
11      A.  Yes, if that was my assignment
12  that day, that's what I did.
13      Q.   And was that particularly your
14  assignment in terms of the PMIs done at C.
15  Martin, which is to say, if the individual
16  occupant were home, you would do a PMI that
17  consisted of an exterior inspection as well
18  as an interior inspection?
19      A.  Yes.  But that question is -- it's
20  two parts to me.  It's not just one part.
21      Q.   And explain -- explain what you
22  mean by that.
23      A.  If I appeared at a person's
24  trailer to do a preventive maintenance
25  inspection and they granted me permission to

Page 23

1  your time with C. Martin?
2      A.   You had a checklist and you went
3  to a trailer, whether at a private home or
4  site -- group, lot, lots, whatever -- and
5  you did these inspections on this trailer to
6  make sure that everything with this trailer
7  was safe and in proper working order.
8  That's from front to rear, top to bottom,
9  even inside.
10          And also, in conjunction with
11  that, I had a special assignment to do gas
12  pressurization tests to make sure that there
13  were no gas leaks from the propane gas in
14  the trailer.
15      Q.  All right.  So in addition to the
16  PMI inspection you performed with C. Martin,
17  you also did some liquid propane or LP
18  testing of the gas systems of the trailers
19  you were evaluating?
20      A.  Yes.
21      Q.  Did you receive some special
22  certification to do the LP testing?
23      A.  I was precertified from DEL-JEN
24  through the State of Louisiana, being
25  qualified to do a gas pressurization test on

Page 22

1  come into the trailer, I went in and did the
2  inspection.
3          If they did not grant me
4  permission to come into the trailer, the
5  only thing I could do on my own would be the
6  exterior inspection.
7      Q.  Now, while with C. Martin, what
8  would the interior inspection of a --
9  consist of while you were performing a PMI?
10      A.  Everything in the trailer, meaning
11  interior, I don't remember exactly what was
12  on the checklist.  There's a checklist that
13  we use.
14          First, you had to -- I'm just
15  trying to remember -- all of the faucets,
16  all of your windows, all of your safety
17  items, such as smoke detectors and gas
18  detectors for propane gas had to be checked
19  to make sure they were functional and
20  working.
21          Your lighting system had to be
22  checked, your sewer system had to be
23  checked.  Your general walls and ceilings,
24  door frames.  The table that people ate off
25  of, the heating and cooling,

Page 24

6 (Pages 21 to 24)

1  Q.  Never?  You were describing an
2  inspection process.  What is your
3  familiarity, if any, from a firsthand
4  perspective with that initial inspection
5  process when the units were being received?
6  Do you have any firsthand knowledge about
7  that, is my question?
8  A.  The only knowledge I have about
9  that is when they were setting up my
10  trailer, I went by and I watched what
11  transpired.
12  Q.  Do you know which company did that
13  particular work?
14  A.  I do not remember.
15  Q.  And so the extent of your
16  knowledge regarding the installation and
17  inspection procedures for a travel trailer
18  relate solely to your travel trailer that
19  you were given by FEMA?
20  MR. D'AMICO:
21  Objection, form.
22  THE WITNESS:
23  My basic knowledge is what I saw
24  being done at my trailer where I lived and
25  what I saw being done at other people's

Page 69

1  finish any installation other than your
2  trailer?
3  A.  No.
4  Q.  Did you ever take part in the
5  installation of a trailer for anyone other
6  than yourself?
7  A.  I never installed my trailer.  I
8  saw it being set up and installed.
9  Q.  Okay.  Did you ever take -- take
10  part in that process for any other trailer?
11  A.  No.
12  Q.  While you were at the staging area
13  at Jazzland, do you know, other than DEL-JEN
14  employees, what other employees were
15  operating at that particular site?
16  A.  No.
17  Q.  Okay.  While you were at Jazzland,
18  did you observe the procedure for readying a
19  trailer to be transported to a homesite?
20  A.  No.
21  Q.  Were you aware of a green tag/red
22  tag procedure?
23  A.  No.
24  Q.  Okay.  Is it a fair statement
25  then, sir, that you couldn't offer any

Page 71

1  trailers.
2  EXAMINATION BY MR. BONE:
3  Q.  Okay.  On how many other
4  occasions, other than when you were being
5  leased in or they were readying your trailer
6  for occupancy, on how many other occasions
7  did you observe personally that process?
8  A.  I can't give you a definite number
9  on how many times I saw this, but if you
10  were in New Orleans at that time and you
11  were going down the street, everywhere you
12  turned, somebody was setting up a trailer.
13  Q.  You would agree with me there's a
14  difference between casually passing by and
15  seeing someone installing a trailer and
16  actually taking time to observe what they
17  were doing, correct?
18  A.  Yes, you couldn't -- I'll say
19  this:  If somebody is setting up a trailer
20  across the street from you and you're
21  looking at it, you see it from start to
22  finish.  If you're going down the street,
23  you see whatever they are doing at that
24  time.
25  Q.  Did you observe from start to

Page 70

1  testimony as to how a unit was prepared from
2  the time it was received from FEMA or
3  otherwise at that staging yard until the
4  time it was deployed to the homesite?
5  A.  That's correct.  I could not.
6  Q.  Was there a time that you became
7  aware of concerns regarding smells in any of
8  the units that you were performing PMIs on?
9  A.  Yes.
10  Q.  Okay.  And how did you first
11  become aware of that particular issue?
12  A.  When you walked inside the door.
13  Q.  Okay.  And how many trailers, in
14  the course of the work that you did with
15  these three companies, how many trailers did
16  you service?
17  A.  Thousands.
18  Q.  Thousands?
19  A.  (Witness nods head affirmatively.)
20  Q.  With respect to the odor issue --
21  when did you first become aware of that, was
22  it while you were working with DEL-JEN?
23  A.  No, before that.
24  Q.  Before that, how did you first
25  become aware of that issue?

Page 72

18  (Pages 69 to 72)

1    A.   When the trailer was set up at my
2  house, when you opened the door, you walked
3  in, when you walked in my trailer, you could
4  smell it.
5    Q.   And the smell that you smelled in
6  your particular trailer, what did that smell
7  like to you?
8    A.   It was something strong, pungent.
9  It smelled strong and pungent.
10   Q.   Did it remind you of anything?
11  Did it smell like anything that you could
12  relate it to?  An object you smelled before,
13  metal or salt or brine or something along
14  those lines?
15   A.   At that second and instant, no.
16  Afterthought, later on, yes.
17   Q.   And what did it smell like to you?
18   A.   Smelled like when you took out --
19  when you were in high school and you took
20  biology and the first time you dissect an
21  animal, which was the formaldehyde, that's
22  when it clicked.
23   Q.   And you thought back to your --
24  through your own life, to a biology lab in
25  high school, and that's where you

Page 73

1  recollected the smell?
2    A.   That's when I recollected the
3  smell, and the smell in the trailers was
4  stronger than when you open the container to
5  take out whatever animal you were going to
6  dissect.  It was way stronger than when you
7  opened that jar.  But it's just a different
8  odor.  You have got to realize, I graduated
9  in '63, so --
10   Q.   In terms of the trailer that you
11  received, you were actually already living
12  in your Fleetwood trailer before you began
13  working for DEL-JEN; is that correct?
14   A.   Yeah.
15   Q.   When you started working with
16  trailers and around trailers with DEL-JEN,
17  did you ever ask anyone about the smell that
18  you smelled in your own trailer?
19   A.   No.
20   Q.   Was there a particular reason you
21  didn't inquire into that if the smell was
22  very strong and pungent?
23   A.   Because it was general knowledge
24  that was spoken at that time, that the smell
25  you smelled in the trailers is just the glue

Page 74

1  that holds the wood together.  No one said
2  it was formaldehyde.
3    Q.   But you had a knowledge during
4  your time with DEL-JEN that that particular
5  smell was related to adhesives used to hold
6  the trailer together?
7  MR. D'AMICO:
8      Objection.  Object to the form.
9  EXAMINATION BY MR. BONE:
10   Q.   You can answer.
11   A.   Say the question again.
12   Q.   You had a knowledge while working
13  with DEL-JEN that the smell that you would
14  smell, the pungent smell that you described,
15  it was related to the adhesives used to
16  construct the trailer, correct?
17  MR. D'AMICO:
18      Object to form.  That's not what
19  he said.  He said it was the glue that held
20  the wood together.
21  EXAMINATION BY MR. BONE:
22   Q.   You can answer.
23   A.   I will tell you like this:  I was
24  informed at DEL-JEN when this subject would
25  come up in conversation that the smell you

Page 75

1  smelled in your trailer was the glue that
2  glues the particle board and the floor and
3  all of that together.  Glues the trailer
4  together.
5    Q.   All right.
6    A.   And on my own, later on, one day
7  it clicked, because some trailers were
8  stronger than others, and that's when it
9  clicked in my head that it was formaldehyde.
10   Q.   You said that some trailers had a
11  stronger smell than others?
12   A.   Uh-huh.
13   Q.   Did you ever correlate that with
14  the type of trailer?
15   A.   Not really.  The only thing I can
16  correlate that with was the sun, as to how
17  hot it was, as to how strong the smell
18  became in the trailer, no matter what
19  trailer you were in.  The more sunnier the
20  day, the hotter it was and the stronger the
21  odor was, the harder it was to stay inside
22  that trailer until nighttime came.
23   Q.   Did you, while working with
24  DEL-JEN, receive personally any complaints
25  from occupants or concerns from occupants

Page 76

19  (Pages  73  to  76)

1    A.  Yes.
2    Q.  Okay.  Now, you mentioned smoking
3  earlier.  Did you ever smoke while inside
4  somebody's trailer doing maintenance work?
5    A.  No.
6    Q.  But you would smoke during the
7  time period?  In other words, you would not
8  smoke inside the trailer while you were
9  doing maintenance, but you would smoke
10  cigarettes during the course of that day,
11  correct?
12    MR. D'AMICO:
13      Objection, relevance.
14  EXAMINATION BY MR. DINNELL:
15    Q.  That's correct?
16    A.  That's correct.
17      (Witness' cell phone rings.)
18      Sorry.  I'm trying to turn the
19  phone off.
20    (Discussion off the record.)
21  EXAMINATION BY MR. DINNELL:
22    Q.  Just to be clear, you worked for
23  DEL-JEN on trailers, right?
24    A.  (Witness nods head affirmatively.)
25    Q.  You worked for C. Martin on

Page 129

1  inside the trailer?
2    MR. DANIELS:
3      Objection, form.
4  EXAMINATION BY MR. DINNELL:
5    Q.  Go ahead.
6    A.  Reduce it?
7    Q.  Yes.
8    A.  To a degree.
9    Q.  Okay.  And when you would go
10  inside of other trailers, is it correct that
11  if it was cooler inside of the trailer,
12  there would be less of a smell inside the
13  trailer?
14    A.  You walk into a trailer on a hot
15  day, you don't have to wait to smell the
16  formaldehyde.  Your eyes start burning and
17  you choke.  On a real hot day.
18      On a day when -- in the evening,
19  the sun has set a couple of hours, it's not
20  as strong.  But your eyes will burn.
21    Q.  Would you ever go inside of
22  trailers that didn't have air-conditioning
23  running even though it was really hot
24  outside that day?
25    MR. D'AMICO:

Page 131

1  trailers and you worked for B&I on trailers,
2  right?
3    A.  Yes.
4    Q.  You lived in your own trailer that
5  was provided by FEMA, correct?
6    A.  Yes.
7    Q.  And you have retained an attorney
8  stemming from complaints about formaldehyde
9  in trailers based upon your time living in a
10  trailer, right?
11    A.  Yes.
12    Q.  From your experience in your own
13  trailer, you did notice a smell in the
14  trailer; is that right?
15    A.  Yes.
16    Q.  Did you notice that smell when you
17  first moved into the trailer?
18    MR. DANIELS:
19      Objection, form.
20  EXAMINATION BY MR. DINNELL:
21    Q.  Go ahead.
22    A.  Yes.
23    Q.  Based upon your experience in your
24  own trailer, when you would open the
25  bathroom vent, would that reduce the smell

Page 130

1      While he was working for one of
2  these employers?
3    MR. DINNELL:
4      Yes.
5    THE WITNESS:
6      In the summertime, the only time
7  your air conditioner didn't run is if it was
8  broke and I was coming to fix it, in the
9  summertime.
10      In the wintertime, we had heat.  I
11  don't think we had -- we had what you call
12  ambient temperature where you could lay in
13  the trailer and don't have the
14  air-conditioning on or the heat on or at
15  least the fan to circulate air.
16  EXAMINATION BY MR. DINNELL:
17    Q.  I believe you said, at least for
18  C. Martin and B&I, you did some PMI work,
19  correct?
20    A.  Correct.
21    Q.  And those were the preventive
22  maintenance inspections, correct?
23    A.  Yes.
24    Q.  And I believe you said those
25  preventive maintenance inspections would

Page 132

33 (Pages 129 to 132)

1   cover a lot of things inside a unit, right?
2       A.   Everything.
3       Q.   All aspects of the interior of the
4   unit.  And part of the reason that you were
5   doing that was to make sure that there
6   wasn't anything unsafe inside that unit,
7   right?
8       A.   Not just unsafe.  You went there
9   to inspect the trailer, to make sure that
10  everything worked in the trailer, as well as
11  safety for the convenience of the person
12  that lived there.  There's nothing unsafe
13  about a dripping faucet, there's nothing
14  unsafe about a leaky toilet or a leaky
15  showerhead.
16           There's something unsafe about the
17  table that you eat on, pedestal being
18  defective and the table leans over.  There's
19  something unsafe about sitting in the bench
20  seat in the trailer, when you lean back and
21  you fall over.  So you went for both
22  reasons.
23      Q.   So even if there were minor
24  problems that didn't come up to the level of
25  safety, that wouldn't be something that you

Page 133

1   would be looking for, correct?
2       A.   That's correct.
3       Q.   But, certainly, if there were
4   things that did implicate safety, those
5   would be things that you would record and
6   pay attention to during that PMI?
7       A.   I recorded both, safety and just
8   general, all-purpose living in the trailer.
9       Q.   Did you ever have an occasion
10  where a unit would fail the PMI inspection
11  because you found some sort of problem with
12  it?
13      A.   That's -- when you say "fail" --
14  fail, you go to a trailer -- I guess you
15  could say fail.  The trailer failed because
16  there was something wrong.  Whether the
17  light switch didn't work, fire detector
18  didn't work, leaking faucet.  If you
19  consider that as failed, you failed.
20      Q.   Maybe a better way to say it is
21  this.
22           There would be some trailers that
23  you go to for a PMI and that trailer would
24  pass everything on your list, right?
25      A.   Very -- no.  A new trailer can do

Page 134

1   that.  A trailer that's occupied, that
2   people live in, it's not going to do that.
3           What I'm saying is there is always
4   going to be something wrong in a trailer
5   because they're built so cheap.  Whether the
6   drawer won't close or the doors on the
7   cabinets don't work right or -- large people
8   sit in a seat and then you have problems.
9       Q.   And if there were any problems
10  during a PMI, you would record that on the
11  PMI form, right?
12      A.   I would.
13      Q.   On any of your PMIs, did you ever
14  write down that a unit had a particular
15  smell in it on your PMI form as a problem?
16      A.   Rarely.
17      Q.   Okay.  How many times?
18      A.   Not too many.  I didn't write down
19  when I walked in a trailer, "trailer smells
20  strong."
21           I didn't write that down because
22  if the person didn't complain about the
23  smell in the trailer -- what you're asking
24  me is a difficult thing to answer in a
25  correct way, what I consider a correct way.

Page 135

1   I worked for these people.
2           I don't know what's what.  I don't
3   want to open up Rapunzel's box (sic) here.
4   I want my job, I like my job, I like my pay.
5   If you ask me to go around and stir up a can
6   of worms, I'm sorry.  I wasn't going to do
7   that.
8       Q.   When you were doing maintenance
9   for those three companies that we talked
10  about, was the maintenance line open 24
11  hours a day, 7 days a week?
12      A.   You had a line that you can call
13  24 hours a day if you had a problem with the
14  trailer, and they would determine whether
15  it's an emergency and somebody would be
16  dispatched out at 3:00 in the morning or it
17  could wait until the next day.
18      Q.   And when people would call that
19  line and make some sort of complaint, was
20  that complaint recorded and documented by
21  the contractor?
22      A.   No matter what your complaint was,
23  when you called up that line, a work order
24  was generated with your complaint.  Someone
25  had to go out and address that complaint.

Page 136

34 (Pages 133 to 136)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)   Videotaped Deposition of Albert Jarrell

```
 1        Some things warranted an emergency
 2   action. Anything with gas or electricity
 3   requires emergency action within so many
 4   hours.
 5        And that's how they did it.
 6   MR. DINNELL:
 7        I will pass the witness. No
 8   further questions. Thanks, sir.
 9   MR. BONE:
10        I have a couple.
11   EXAMINATION BY MR. BONE:
12        Q.  I just wanted to ask one last
13   thing. Were you ever involved in any
14   testing of units for the presence of
15   formaldehyde?
16        A.  Never.
17   MR. BONE:
18        Go ahead, Frank.
19   EXAMINATION BY MR. D'AMICO:
20        Q.  Mr. Jarrell, my name is Frank
21   D'Amico. We met earlier today. I should
22   tell you that I represent a gentleman by the
23   name of Lyndon Wright in connection with
24   claims against Forest River, who is
25   represented by Mr. Bone, and Shaw, who is
```
                                            Page 137

```
 1   represented by Mr. Kurtz. We probably
 2   should have told you that earlier today.
 3        As I listen to your testimony, I
 4   take it that you, during your employment
 5   with DEL-JEN, B&I and C. Martin, had
 6   occasion to do maintenance on many trailers;
 7   is that correct?
 8        A.  Yes.
 9        Q.  Do you have an idea of how many
10   trailers you actually did maintenance on?
11        A.  Thousands.
12        Q.  Thousands?
13        A.  Over the course of my entire
14   tenure with the companies?
15        Q.  Yes.
16        A.  Yes.
17        Q.  How long was your tenure with the
18   course of those three companies, DEL-JEN, C.
19   Martin and B&I?
20        A.  March -- let's see. This thing
21   happened in 2005. August, I believe. From
22   March 2006 up -- is that 2006?
23        Katrina was in 2005, August, I
24   believe. I'm sorry, my memory fails me.
25        Q.  That's all right.
```
                                            Page 138

```
 1        A.  All right. From that March until
 2   six months before I could get a Social
 3   Security check.
 4        Q.  And do you remember
 5   approximately --
 6        A.  I turned 62 on September 1.
 7        Q.  Of 2009, 2008?
 8        A.  No. I think it was 2008, I think.
 9        Q.  So you worked March 2006 up until
10   sometime in 2008?
11        A.  Yes, I think.
12        Q.  And while doing maintenance on
13   these trailers, do I understand your
14   testimony to be that you smelled an odor in
15   virtually all of the trailers you did
16   maintenance work in, correct?
17   MR. BONE:
18        Object to the form.
19   MR. DANIELS:
20        You can answer.
21   THE WITNESS:
22        There is no trailer that you can
23   go in in the daytime, in the heat of the
24   day, and not smell something. Every last
25   one of them. No matter what brand, what
```
                                            Page 139

```
 1   model or what make.
 2   EXAMINATION BY MR. D'AMICO:
 3        Q.  All right. And as I understand
 4   your testimony, also, initially, you didn't
 5   know what to relate that odor to?
 6        A.  No, I didn't.
 7        Q.  And at some point later on, you
 8   came to identify the odor as formaldehyde?
 9        A.  Yes.
10        Q.  And as I further understand it,
11   you eventually resided in a FEMA trailer?
12        A.  Correct.
13        Q.  And you could smell that
14   formaldehyde odor emanating from your own
15   trailer that you were supplied by FEMA?
16        A.  Yes.
17        Q.  Okay. Did you also smell this
18   odor while doing maintenance work on Forest
19   River travel trailers?
20   MR. BONE:
21        Objection, asked and answered.
22   MR. DANIELS:
23        You can answer.
24   THE WITNESS:
25        Yes, I smelled it in the Forest
```
                                            Page 140

                                    35 (Pages 137 to 140)

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)          Videotaped Deposition of Albert Jarrell

1    River while -- whatever.
2    EXAMINATION BY MR. D'AMICO:
3        Q.   Are you sure of that?
4        A.   Yeah, on a couple of occasions I
5    could smell it.
6        Q.   All right.  And while doing
7    maintenance on these Forest River trailers
8    when you could smell this odor, did you also
9    have a similar experience of burning eyes?
10       MR. BONE:
11           Objection, you can answer.
12       MR. DANIELS:
13           You can answer.
14       THE WITNESS:
15           Yeah.  You could have your eyes
16   burning or, you know, a little stickiness in
17   the trailer.
18           There is a little more -- the heat
19   of the day determines the amount that it
20   affects you when you're in there.  How hot
21   it is determines how it hits you when you go
22   in there.  Like I say, you go in in the
23   evening and the sun is going down, it don't
24   hit you like that.  You go in the trailer
25   and it's 1:00, 2:00 in the day, you get hit
                                        Page 141

1    with it.  All of them.  No matter what
2    trailer it was, you're going to get it.
3    EXAMINATION BY MR. D'AMICO:
4        Q.   Thank you for clarifying that, I
5    appreciate it.
6            One other question:  Did you ever
7    have an occasion to enter into a travel
8    trailer where the fumes were so strong that
9    you had to leave?
10       A.   Yes.
11       Q.   Do you recall what manufacturer's
12   travel trailer that was?
13       A.   No, but I will tell you where it
14   was at.
15       Q.   Tell me about it, please.
16       A.   Jazzland.  Myself and a guy named
17   Glover.  We had -- we come out of them as
18   fast as we can, meaning this:  You cannot
19   take a refrigerator out of a trailer because
20   sometimes the doors are so small, you just
21   don't walk in and grab the refrigerator and
22   walk out with it.
23           The refrigerator is anchored to
24   the floor and is anchored to the wall.  You
25   got to go in there, free it, come outside
                                        Page 142

1    real quick.  Go back in there, pick it up,
2    walk to the front, hold it over the bench
3    seats, the tables, sit it down, go back
4    outside.
5            Go back in and hope it will come
6    through the door.  If it don't, you got to
7    take off the doors and then take it out the
8    door.
9            You could not stay in the trailer
10   to do the whole process, not even one
11   refrigerator, because the heat was too
12   intense sitting there in this day by day,
13   row by row.  And that's what happened.
14       MR. D'AMICO:
15           That's all the questions I have.
16   Thank you, Mr. Jarrell.
17       MR. DINNELL:
18           Can I ask one question?
19   EXAMINATION BY MR. DINNELL:
20       Q.   At Jazzland, that trailer you went
21   in, that was at a storage facility, right?
22       A.   Uh-huh.
23       Q.   And when you went there, the AC
24   wasn't running, was it?
25       A.   They had no power to the trailers
                                        Page 143

1    whatsoever.  No ventilation, no circulation.
2    There is no way of reducing what you face
3    when you go into a trailer at Jazzland.
4        MR. DINNELL:
5            Thank you.
6    EXAMINATION BY MR. KURTZ:
7        Q.   Mr. Jarrell, could you or did you,
8    in that circumstance at Jazzland, open the
9    doors and windows to let natural ventilation
10   occur?
11       A.   You can open the windows, but
12   there was no breeze.  I mean, the trailers
13   are parked side-by-side, like this, rows of
14   them, and then rows in front and rows in the
15   back except where you have access to go to
16   walk down a row, okay?
17           You don't have any wind blowing.
18   There's nothing, you know.  It's just hot.
19   There's no air blowing, I mean, it's in the
20   summer.
21       Q.   So how did you get the
22   refrigerator out?
23       A.   How did we get it out?  Just like
24   I told you.
25           Two of us go in there, get on the
                                        Page 144

                                36 (Pages 141 to 144)

PROFESSIONAL SHORTHAND REPORTERS, INC   (800) 536-5255
New Orleans * Baton Rouge * Shreveport                (504) 529-5255

In Re: FEMA Trailer Formaldehyde Products Liability Litigation (Wright)                    Videotaped Deposition of Albert Jarrell

1   ground, take out two screws.  I take two
2   screws up there and go outside.  Get a good
3   breath of fresh air, go back inside, walk a
4   little ways, run back outside.
5        Run back inside, pick it up, carry
6   it to the door, sit it down, because you
7   couldn't walk it -- the aisles were too
8   small to walk the trailer -- through the
9   aisles in most trailers.  Go back outside.
10       Go back inside and see if it will
11  come out the door.  Some will, some won't.
12  If it don't come out the door, take off the
13  doors, top and bottom, get a breath of air,
14  run back outside.
15       And when you tell somebody who is
16  over you about this, "Oh, that ain't
17  nothing.  That ain't going to hurt you."
18       And I believe that overexposure is
19  what hurt me.
20    Q.  Who did you talk to about that?
21    A.  I told Tommy.  You want to call
22  him?  I will give you his number.
23    Q.  So this is when you were working
24  for B&I?
25    A.  Yes.

Page 145

1
2
3
4        WITNESS' CERTIFICATE
5
6     I have read or have had the foregoing
7   testimony read to me and hereby certify that
8   it is a true and correct transcription of my
9   testimony with the exception of any attached
10  corrections or changes.
11
12
13
14
                _____
15                    RE
16  PLEASE INDICATE
17  ( ) NO CORRECTIONS
18  ( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED
19
20
21
22
23
24
25

Page 147

1     MR. KURTZ:
2        Okay.  I don't have anything
3   further.  Thank you.
4     THE VIDEOGRAPHER:
5        This concludes today's deposition;
6   it is 5:40.
7        (Which concluded the deposition.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 146

1
2
3        REPORTER'S CERTIFICATE
4
5     I, Cathy Renee' Powell, Certified
6   Court Reporter, do hereby certify that the
7   above-named witness, after having been first
8   duly sworn by me to testify to the truth,
9   did testify as hereinabove set forth;
10       That the testimony was reported by me
11  in shorthand and transcribed under my
12  personal direction and supervision, and is a
13  true and correct transcript, to the best of
14  my ability and understanding;
15       That I am not of counsel, not related
16  to counsel or parties hereto, and not in any
17  way interested in the outcome of this
18  matter.
19
20
21
22
                _____
23  CATHY RENEE' POWELL, CCR
    Certified Court Reporter
24
25

Page 148

37 (Pages 145 to 148)