```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ********************************************************************

 4   IN RE:  FEMA TRAILER
     FORMALDEHYDE PRODUCTS
 5   LIABILITY LITIGATION
                                   DOCKET MDL NO. 1873 "N"
 6                                 NEW ORLEANS, LOUISIANA
                                   MONDAY, MAY 24, 2010, 8:30 A.M.
 7

     THIS DOCUMENT RELATES TO:
 8
     DOCKET NO. 09-3251,
 9   EARLINE CASTANEL v
     RECREATION BY DESIGN, LLC
10
     ********************************************************************
11
                                  DAY 6
12                   TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
13                     UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16
     FOR PLAINTIFF:          WATTS GUERRA CRAFT
17                           BY:  MIKAL C. WATTS, ESQUIRE
                             FOUR DOMINION DRIVE
18                           BUILDING THREE, SUITE 100
                             SAN ANTONIO TX 78257
19

20                           CHRIS PINEDO
                             ATTORNEY AT LAW
21                           802 N. CARANCAHUA, SUITE 2250
                             CORPUS CHRISTI TX  78470
22

23                           REICH & BINSTOCK
                             BY:  DENNIS C. REICH, ESQUIRE
24                           4265 SAN FELIPE, SUITE 1000
                             HOUSTON TX  77027
25
```

1  APPEARANCES CONTINUED:

2

3  FOR DEFENDANT:          GARRISON YOUNT FORTE & MULCAHY
                          BY:   LYON H. GARRISON, ESQUIRE
4                               SCOTT P. YOUNT, ESQUIRE
                                RANDALL C. MULCAHY, ESQUIRE
5                         909 POYDRAS STREET, SUITE 1800
                          NEW ORLEANS LA  70112
6

7                         DUPLASS ZWAIN BOURGEOIS MORTON
                          PFISTER & WEINSTOCK
8                         BY:   ANDREW D. WEINSTOCK, ESQUIRE
                                JOSEPH G. GLASS, ESQUIRE
9                         THREE LAKEWAY CENTER
                          3838 N. CAUSEWAY BOULEVARD
10                        SUITE 2900
                          METAIRIE LA  70002
11

12

13  OFFICIAL COURT REPORTER:      CATHY PEPPER, CCR, RMR, CRR
                                  500 POYDRAS STREET, ROOM B406
14                                NEW ORLEANS LA  70130
                                  (504) 589-7779
15

16  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
    PRODUCED BY COMPUTER.

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    EXAMINATIONS                                      PAGE

4

5    CLOSING ARGUMENTS BY MR. WATTS........................1351

6    CLOSING ARGUMENTS BY MR. YOUNT........................1374

7    JURY INSTRUCTIONS.....................................1409

8    DELIBERATIONS.........................................1440

9    VERDICT...............................................1453

10

11

12                        **E X H I B I T S**

13   DESCRIPTION                                       PAGE

14

15   EXHIBIT 264, 274, 278, 279, 343, 349, 352, 353, 362,   1407

16   367, 368, 372, 374, 390, 403, 405, 413, 416, 443, 454,

17   455, 489, page 416, 498, 520, 521, 569, 583, 628,

18   selected pages, 858, 884, 1000, 1001, 1002, 1005,

19   1006, 1007, 1100, 1101, 1102, 1104, 1105, 1106, 1107...

20

21

22

23

24

25

1       **P-R-O-C-E-E-D-I-N-G-S**

2              MORNING SESSION

3        MONDAY, MAY 24, 2010, 8:30 A.M.

4              (COURT CALLED TO ORDER)

5

6

7        THE COURT SECURITY OFFICER:  All rise.

8             (WHEREUPON, at this point in the proceedings, the jury

9   panel enters the courtroom.)

10       THE COURT:  Good morning.  You may be seated.

11             Thank you all for being on time.  As I indicated on

12   Friday when we adjourned, we are now at the part of the trial

13   where the attorneys can make closing arguments to the jury.  Like

14   opening statements, closing arguments are not evidence in and of

15   themselves.

16             The purpose of closing arguments is for the

17   attorneys for each of the parties to explain to you what they

18   believe the evidence has shown in this case, the evidence, of

19   course, being the witness testimony and the exhibits that have

20   been introduced into evidence during the course of the trial last

21   week.

22             The attorneys are instructed to argue the evidence

23   in this case, and they can go ahead and give you what they

24   believe the evidence shows in order that you may use that

25   information and that argument during the course of your

1   deliberations.

2           We have, by prior agreement, established 45 minutes

3   total for each side to address you.  The plaintiff has advised me

4   that they will reserve five minutes for rebuttal.  So the rules

5   of the game here will be that I will keep track up here on my

6   trusty little stopwatch calendar clock, and Mr. Watts advises me

7   that he will reserve five minutes for rebuttal.  I will give him

8   a one-minute warning at 39 minutes.  After that, if he exceeds

9   40, that will be subtracted from the five minutes of rebuttal

10  time, but he'll get a one-minute heads up.

11          Then the counsel for the defendant, that would be

12  Mr. Yount, you're going to take care of this for the defendant?

13          MR. YOUNT:  Yes, Your Honor.

14          THE COURT:  The defendant will be afforded 45 minutes to

15  address you, and then the remainder of the time, up to five

16  minutes, will be reserved for rebuttal from Mr. Watts.

17          So that will be the procedure we follow here this

18  morning.  After that, we will take a short recess and then you'll

19  come back in the courtroom and I will charge the jury as to the

20  law and how to deliberate in this case, and then the case will be

21  given to you for a decision.

22          In the meantime, while we are doing closing

23  arguments, I have as a matter of policy a no-entry policy so that

24  we can all concentrate on what the attorneys say.  So I will ask

25  the Court Security Officer to secure the door once Mr. Watts

1  begins to speak.  If anyone here in the courtroom has a personal

2  matter that they need to handle and they need to leave the

3  courtroom, they will be allowed to leave, but there will be no

4  reentry into the courtroom until Mr. Watts finishes his

5  presentation, and then once Mr. Yount starts, we will also secure

6  the courtroom at that point and there will be no reentry or entry

7  during the course of Mr. Yount's presentation.

8          So those will be the rules.  If anyone who wants to

9  be here is not here, then they are going to have to wait outside

10  until after Mr. Watts is finished his presentation.

11          So please give these attorneys your attention and

12  let's go ahead and begin.

13          Mr. Watts, if you would take the podium, we'll go

14  ahead and start.

15          MR. WATTS:  Thank you, Your Honor.  May I proceed?

16          THE COURT:  Yes, please.

17                        CLOSING ARGUMENTS

18  MR. WATTS:

19          Ladies and gentlemen, before I begin my presentation to

20  you, I do want to thank you on behalf of Ms. Castanel for your

21  jury service.  You've been a very attentive jury.  I think I

22  speak on behalf of everybody, we thank you for your service.

23          Last Monday, I told you in my opening statement several

24  things that I thought we would prove.  Among those was, this is a

25  simple case.  You have a formaldehyde exposure, Earline Castanel

1  was exposed, and she was injured.  And I think that the evidence

2  has borne that out.  I told you that we would bring you a lot of

3  evidence to prove that, which we have done, including studies

4  that were reviewed by Dr. McGwin showing a causal relationship

5  between formaldehyde and the very respiratory symptoms that

6  Ms. Castanel has.

7          We talked about odor threshold.  I predicted for you

8  that the science would bear out that it was 500 parts per billion

9  and you have seen that.  We brought you multiple witnesses.  And

10  this green, yellow, red, the best way to know what the level was

11  at the time that she was in the trailer is these odor and

12  irritant thresholds as opposed to a test that was done four years

13  later after all the formaldehyde off-gassing has occurred, and

14  we've done that.

15          I told you that we would show you why Earline Castanel

16  was exposed, and in large part, it's due to a lack of policy at

17  Rec By Design to require low formaldehyde-emitting woods, and

18  you've seen that.

19          I told you that we would prove to you that Shaw, in this

20  case, their installation did not play a role, that they did

21  everything correctly and I think that you don't have any evidence

22  that shows otherwise.  There was a small air conditioning leak.

23  It was fixed within 24 hours, no more complaints until June 1st

24  of 2006, when their contract ended.

25          I told you that FEMA's response would be one that would

1   be full of activity that frankly, I think that they responded

2   very well, and we brought you ten different witnesses between the

3   parties that showed how FEMA responded to this unknown hazard to

4   them that was known by these manufacturers, these people at

5   Rec By Design.

6           I told you that I felt that the evidence would be that

7   Rec By Design bears the responsibility for Ms. Castanel's

8   injuries and that Shaw and FEMA do not.

9           And I told you that as a result of their fault, that the

10  damages that were caused were primarily in two categories, one

11  was an exacerbation of preexisting rhinosinusitis causing a

12  surgery that cost more than $27,000, and you've heard that proof

13  from Dr. Miller and Dr. Gautreaux.

14          I also told you that we would prove that she had a fear

15  of cancer and that the responsible scientific community, the

16  consensus is that formaldehyde is a Class 1 carcinogen, and I

17  think that that has been borne out by the evidence.

18          I told you that we would show you the history of how all

19  these governmental agencies determined that formaldehyde was

20  cancerous and we took you through that with the various

21  witnesses.

22          I told you that the government has concluded that

23  formaldehyde causes cancer and I think that you have seen that.

24          Now, here we are at the end of the case.  The Court,

25  after I'm done, is going to give you some jury instructions and a

1  verdict form.  We already know what that is, and so what I want

2  to do is take you through some of those instructions and those

3  questions that you're going to be asked to answer and to show you

4  how the evidence that we have provided you fits within the

5  questions that you're asked.

6          The judge is telling you that he's going to give you the

7  law, which he will.  But it's your job to apply that law to the

8  facts as you found them from the evidence in this case.  And

9  that's what we'll do right now.

10         What did the evidence show?  I think the evidence showed

11  several things:  Number one, you heard from these lawyers for

12  Rec By Design in their opening statement and they told you a

13  number of things that frankly, I don't think have been borne out

14  by the evidence, a number of these defenses.  They say, "You

15  know, there is a lot of formaldehyde in our food," and I told you

16  I thought that would be a red herring.  I think that after the

17  cross-examination of their expert witnesses, you will agree with

18  me that that is a red herring.

19         Dr. Phillip Cole, we talked about the example of the

20  difference between the width of this computer screen.  There is

21  10 million times more formaldehyde in the air than what is

22  bioavailable in your food.  It's the difference between going

23  across that computer screen and getting in your car and driving

24  from New Orleans to Los Angeles.  It's complete apples and

25  oranges.

1        Their expert, Dr. Robert James, admitted on the stand in

2   front you that comparing formaldehyde in food to that in the air

3   would be silly, it would be confusing, it would be misleading.

4   So not only was it a red herring, it's something that should not

5   be allowed to mislead you.

6        The defense also told you that we'll show that there is

7   a high formaldehyde level in outdoor air, and yet when you look

8   at the actual data -- and this is in Exhibit 628 -- there were

9   60,803 census tracts, air modelled, air tested.  The average was

10  .2, one-fifth of 1 part per billion is the average.  A medium

11  formaldehyde concentration of 2.5 parts per billion was found in

12  1,358 samples collected at 58 different locations.  I use the

13  example of Houston, Texas.  It has far more people than

14  New Orleans, just as many petrochemical plants along a port, 3.8

15  parts per billion.

16       And then we can bring it closer to home in Kenner,

17  Louisiana, we have an air sample, 3.63 parts per billion.  That

18  is your background formaldehyde level.

19       But when you compare it with what was in this trailer,

20  what do we see?  We know that when they tested it more than

21  four years after it was built, when substantially all the

22  formaldehyde had been off-gassed, it still had a formaldehyde

23  level of 50 parts per billion, 12 to 15 times the baseline.

24  If you accept the mathematical extrapolations from the database

25  that were done by the witnesses that you saw, it would be 80.1

1   parts per billion a year and a half to two and half years, again,

2   after most of the off-gassing has occurred, and you're talking 20

3   to 25 times the background level.

4        If you accept the odor threshold, the irritant

5   threshold, all you have to do is take 500, divide by 3.63, and

6   we're talking about hundreds of times the baseline formaldehyde

7   level.  This trailer had hundreds of times the baseline

8   formaldehyde level in it.

9        The defense says their test shows the level of

10  formaldehyde was low.  The problem is, is that test was done four

11  years later after all the off-gassing had occurred.  There was no

12  witness that told you anything else other than, "This is all

13  gone."

14       Their witness, our witnesses, all talked about this

15  off-gassing curve.  And so while a test four years old is

16  interesting, it's not particularly probative with respect to how

17  much formaldehyde was in the trailer while she was breathing it.

18       As Dr. James explained to you, each piece of wood only

19  had a finite amount of formaldehyde in it.  Off-gassing occurs at

20  a good rate at the beginning and then it slows down.  Eventually,

21  you have little to no formaldehyde left.  The MSDS sheet says

22  this, that emissions decrease through time as the board ages, and

23  so what they did is they tested aged boards where the

24  formaldehyde had already been breathed in by Ms. Castanel.

25       The real issue here, why is the experience that we've

1    had after Katrina so different?  Let me tell you why it's so

2    different:  FEMA has provided -- this is a stipulation -- has

3    provided travel trailers before, not near the numbers, 700 here,

4    300 there, but there has never been a problem in the Florida

5    hurricanes starting in 1992.

6           Why is that so?  Well, you can't just says because it's

7    hot and humid.  I mean, that's where hurricanes hit.  That's

8    happened before.  But FEMA got no complaints.  Why is that so?

9    Well, you could say there were more trailers.  143,000 of them

10   given after Katrina and Rita.  I don't think the numbers alone

11   explain the phenomenon except to this extent:  You saw how a

12   company that had never provided trailers to FEMA before ramped

13   up, built 2,600 of them in three months with not so much as a

14   written specification.  He says, "Hey, we used industry

15   standards," but when I press him on it, the evidence is clear

16   that they violated the industry standards.  They used wood that

17   hasn't been used since the HUD debacle in the 1980s.  It's still

18   being sold, but nobody is using it in these small travel

19   trailers, mobile homes, manufactured housing.  They used it.

20   It's Lauan regular.

21          That's why Katrina is different.  The material selection

22   by companies that had not done this before is different.  LFE

23   wood was not being, used and that explains why Katrina was

24   different.

25          One of the stipulations, because they have to stipulate

1  certain components, parts used contained urea formaldehyde and

2  urea formaldehyde resins.  I talked to their witness about the

3  concept of dose.  If you use Lauan regular, you have a high dose;

4  if you use Lauan LFE, low formaldehyde-emitting wood, you cut the

5  dose.  That's what they should have used.  They did not use that.

6  If you have regular formaldehyde-containing particleboard, you'll

7  have a higher dose than if you have LFE.  That is their witness,

8  Dr. James.

9        How do we know that they didn't use LFE?  Well, in

10  Exhibit 858, the HUD-proposed standard, when go in there, you're

11  going to find a provision in the back that says, "When you use

12  this LFE wood, you have to stamp it.  It has to be stamped."

13  Well, Randall Russ worked around this.  He said he had his hands

14  on it, he was right next to it.  He never not once saw that

15  stamp.

16        I went through with Dr. James, Rec By Design's billing

17  records.  It indicates they bought Lauan regular instead of LFE

18  wood.  There is the billing record.

19        Now, if you look right here, they bought 12,221 square

20  feet of this stuff, just in this billing record.  But look down

21  here on the lower left, if it was LFE, that should say "Lauan

22  LFE."  They bought regular Lauan that emits high quantities of

23  formaldehyde.

24        Now, what did that decision cause in terms of the scope

25  of the problem?  We know that these travel trailers were built

1   and people started being put into them in the spring, and by

2   June, we had 20 complaints.  But you learn from Dr. Wedner that

3   summers have significantly higher temperature than we have in the

4   spring.  He agreed that the amount of formaldehyde off-gas

5   doubles for every 12 degrees of temperature increase.  Why is

6   that important?  Use a hypothetical here.  Do you remember the

7   smell threshold, the eye blink threshold, the throat irritation

8   threshold, the burning eye threshold?  We went through all of

9   this.

10      Now, if you have somebody that moves into a trailer at

11  55 degrees and it's 400 parts per billion, you can't smell it

12  yet.  As the temperature goes up 12 degrees, the amount of

13  formaldehyde off-gassing doubles to 800 parts per billion.  As it

14  goes up 12 degrees to 79, it doubles again to 1,600 parts per

15  billion.  As it goes up to 91 degrees, it doubles again to 3,000

16  parts per billion.  That is why as the temperature rose and you

17  got into the deep summer of 2006, the first summer where these

18  trailers that did not use LFE were being used, you had an

19  explosion in the number of complaints.

20      Martin McNeese of FEMA, we received complaints of

21  formaldehyde.  We now knew that there was formaldehyde in these

22  units.  We became concerned about the levels of formaldehyde in

23  the trailers.

24      Joseph Little, we tested and saw high levels.  We

25  understood it to be a health threat.

1          David Garratt, FEMA got so many complaints, they had to

2    establish call centers in both the state of Mississippi and the

3    state of Louisiana.

4          Why did they get so many complaints?  Because of the

5    dose of exposure that these people were being subjected to as a

6    result of material selection decisions and heat and humidity in

7    the deep summer.

8          Now, we know four years afterwards, the level is

9    50 parts per billion.  We know two years afterwards, it was

10   81 parts per billion.  But what was it at when the people were

11   there living in the trailers?  Well, we've got the testimony from

12   Dr. Wedner, that the smell threshold is 500 parts per billion.

13         Well, Dr. Bowers testified that formaldehyde can cause

14   irritation of the nasal passages.  Albert Jarrell, who went in

15   Recreation By Design trailers, smelled a strong pungent smell

16   like when he was in high school dissecting a frog, formaldehyde.

17   Kim Castanel noticed this new smell.  It stayed for a while.

18   Sandra Davis, strong new trailer smell, lasted for a while.

19   Earline Castanel, after a few weeks when it starts heating up,

20   she noticed a smell.  The newness smell lasts for a while.  And

21   this is a lady with rhinosinusitis.  Clearly her smell threshold

22   is going to be much higher than your average person.

23         But then you ask the question, at what level does the

24   irritation occur?  Dr. Wedner says, and we agree, that you start

25   getting irritated eyes at 1,000 parts per billion.  Dr. James

1  agrees with Dr. Wedner that says he got these about right.

2  Gerald McGwin showed you the Lang study.  Objective eye

3  irritation by way of blink was noticed first at 5 parts per

4  million or 500 parts per billion with peaks of 1.

5       And so all of the different science, once you get to

6  about 1,000 parts per billion, you get things that Al Jarrell

7  said, "When I went into Rec By Design trailers, I got runny eyes

8  and coughing and air restriction."

9       Mark Polk, when people complained of irritated eyes and

10  odors, I told him, "That's the formaldehyde off-gassing."

11  Remember on the dealership lots?  The fact sheet that ATSDR put

12  out stated that formaldehyde causes irritation of the eyes,

13  mucosa, and throat.  And there you have the threshold level.  She

14  started feeling bad, eyes, nose, throat irritated.  Polk, it

15  irritates the eyes and throat.  It's very common in new RV's.

16  The throat irritation.  The level for throat irritation is 600

17  times higher than the outdoor level in Kenner, Louisiana.  It

18  causes respiratory irritation at 1 part per million or a thousand

19  parts per billion.  High levels of formaldehyde lead to

20  irritation and respiratory ailments.  It irritates the sinuses,

21  according to Dr. Bowers.

22       So where are we?  When you get to the Court's charge,

23  you're going to learn that there is basically two causes of

24  action that we have brought.  One is a design defect you, in your

25  choice of materials, used the wrong material as part of your

1  design of the trailer.  That's Question Number 1 that you're

2  going to be asked to answer.  Do you find that the Rec By Design

3  trailer occupied by Castanel was unreasonably dangerous in its

4  design?

5        Well, we know that Rec By Design, by admission,

6  designed, manufactured and sold this travel trailer.  We know

7  that Michael Guame, remember he was kind of the contract guy that

8  was running Plant Number 2?  He never heard anybody at Rec By

9  Design say, "Build with only low formaldehyde-emitting products."

10  He never even heard of it.

11        George Cornish, the plant manager, never heard the term

12  "LFE."  He doesn't know what LFE stands for.  He was not even

13  aware that LFE wood was being sold.  That's because they were

14  using Lauan regular.

15        Robert Wozniak, remember, he was the expert from

16  Fleetwood that did the tour of their plant.  He found no policy

17  by Rec By Design requiring that they use LFE wood products.

18  Now, how do you add all of that up?  The way you add it all up is

19  they were not using LFE and their own billing records show it.

20        Now, interestingly, Mr. Rush was on the stand two

21  different days.  I put him on as an adverse witness on the 17th

22  of May and he came on as their witness on the 20th of May.  And

23  we have all this typed up, we can check it, this kind of thing.

24  The bottom line is, on the 17th of May, this foot, industry

25  standard was low formaldehyde-emitting wood products.  Now, he

1    said, "I'm pretty sure I used it.  I don't know what it was at

2    the time."  By the 20th, "Hey, there is no industry standard

3    requiring LFE wood."  What's it going to be?  What's it going to

4    be?

5         He testified on the 17th he wasn't sure if the products

6    were LFE.  He testified in 2005, "I didn't know what LFE meant.

7    I wasn't aware that LFE products were even available."  Does that

8    sound like a man that knows that he was using LFE?  Come on.  He

9    admits there was nothing preventing him from using LFE in 2005,

10   even though he had never heard of it.

11        Well, the proof is in the pudding.  October 3rd, 2005,

12   they ordered 12,221 square feet.  This is one of many, but the

13   bottom line is, this is an example, Lauan regular.

14        Now, to be successful in a design defect case, we have

15   to prove the following:  One, there was an alternative design.

16   LFE was there, everybody agrees.  No formaldehyde-emitting wood

17   products were available in 2005, and we showed you those sales

18   lists from Dr. Smulski.  Al Mallet, there were no cost reasons

19   not to incorporate no formaldehyde-emitting products.  They were

20   commercially available, they were technologically feasible, they

21   were economically feasible all in 2005.  Randall Russ says, "I'm

22   not saying it wasn't feasible."

23        Number two, we have to prove that the injury was

24   proximately caused by the characteristic of the products.  Well,

25   what evidence do you have on that?  You have the studies that Dr.

1    McGwin took you through.  There is a causal relationship between

2    formaldehyde and respiratory problems.  You have Dr. Patricia

3    Williams that took you through the inside of the body and

4    explained why that is so.  She showed how and why formaldehyde

5    causes respiratory problems.

6            We have to show you that the injuries arose from a

7    reasonably-anticipated use.  Well, I think it was reasonably

8    anticipated to Mr. Rush that he knew these trailers were going to

9    Louisiana and Mississippi and Texas for use by FEMA in the

10   aftermath of the hurricane.  That's how it was used.  He

11   understood that there were people that may be medically

12   challenged.  This was a wheelchair-accessible unit.  People that

13   may stay in the trailer 16, 17 hours a day.  That's how it was

14   used.  The use of this trailer was a reasonably-anticipated use.

15           We have to show that there was actual damage to

16   Ms. Castanel and we have done that as well.  Part of that is the

17   Court is going to give you instruction on aggravation of

18   preexisting condition.  And that's we have here.  You have a

19   preexisting condition of rhinosinusitis and aggravation of it.

20   And you are to make an allowance in your verdict for the

21   aggravation.  That's the injury.

22           Dr. Miller testified her exposure to formaldehyde in the

23   travel trailer caused the exacerbation of rhinosinusitis.

24   Dr. Bowers has a record that you were taken through on July 20th

25   of 2006, that the sinus condition had gotten worse.  Dr. Hoang

1  knows that formaldehyde can possibly exacerbate allergies and is

2  a respiratory irritant.  Mental anguish is considered one of the

3  elements of damage from the standpoint of damages.  And we know

4  that she suffered that as well.

5       When you're looking as to whether there was a design

6  defect in this trailer, one of the things that you can consider,

7  according to the Court's charge, is if they provided a warning,

8  you can consider the effect that warning would have had on the

9  likelihood that the design of the product would cause plaintiff's

10 injuries.  But they didn't do a warning.

11      And so the answer to Question Number 1, do you find that

12 the Rec By Design trailer occupied by Castanel was unreasonably

13 dangerous in its design?  Absolutely yes.

14      On the 17th, you got testimony from the defendant that

15 LFE was the industry standard.  He takes it back on the 20th, and

16 we know they violated that industry standard and they produced an

17 unreasonably dangerous trailer as a result.  The answer to

18 Question Number 1 is yes.

19      The second cause of action is a failure to warn, and the

20 Court gives you some instructions about that.  We're claiming

21 that it was unreasonably dangerous because of inadequate warning

22 about its potential risks.  And so Question Number 2 asks you,

23 "Do you find that the Rec By Design trailer occupied by Castanel

24 was unreasonably dangerous because of an adequate warning about

25 the trailer was not provided?"  So you ask yourself the question,

1  was an adequate warning about the trailer and formaldehyde

2  dangers provided?  The answer is obvious, no.

3        Here we are.  Stipulation Number 16, he got the material

4  safety data sheets, which stated all of these different things.

5  We know it can cause nasal cancer.  We know it causes eye and

6  mucous membrane and respiratory tract irritation.  We know that

7  it can lead to irritation of the nose and throat as well as

8  respiratory disorders.  It causes nasopharyngeal cancer in

9  humans.  That warning came from the wood providers to

10 Rec By Design.  He knew it.  He had been getting them for six

11 years.  He provided that information to his own employees for

12 their safety, but he did not warn the customers in whom that

13 product's trailer would end up.

14       He didn't put a formaldehyde warning in the trailer,

15 even though one was provided to him in the MSDS.  He provided no

16 information from the MSDS to either Morgan or FEMA or the end

17 user.  That's a failure to warn, folks.  It doesn't get much

18 easier than having an MSDS that says, "Here is the warning you

19 ought to put on your product."  Photocopy it, slap it on the

20 wall, and you're warned, but they did not.

21       Their own people, Robert Wozniak, there was no warning

22 in the owner's manual.  Our expert, Kenneth Laughery, there was

23 no warning in the owner's manual.  There was no warning affixed

24 on the product.  There was no warning at all.

25 They stipulated, there was no warning.  Now, they tried, you

1  know, you can't warn about something you don't know about.  Well,
2  the problem is they had the MSDS's, so they can't claim
3  ignorance.  They have a duty to warn once that MSDS comes.
4  That's why the MSDS is required.  There were no labels posted in
5  the trailer about formaldehyde.
6          The answer to Question Number 2 is the easiest one.
7  It's the easiest question you've got.  There was no warning.  The
8  answer is yes.
9          Question Number 3, was there some change of condition?
10 In other words, do you find that unreasonably dangerous
11 conditions of the trailer existed at the time it left RBD's
12 control?  In other words, was there some change?  Did the
13 unreasonably dangerous condition exist when it left?  Was the
14 wood in there?  Did anybody change it up?  The answer is obvious,
15 there were no changes made.  It was the same trailer from the
16 time it left Rec By Design's possession until the time that
17 Earline Castanel moved in it.  And so the answer to Question
18 Number 3 is yes.
19         Question Number 4, do you find that Castanel sustained
20 injury to which Rec By Design substantially contributed as a
21 result of the unreasonably dangerous condition of the trailer?
22 The answer to this is going to be yes.
23         Dr. Wedner agreed that formaldehyde can cause rhinitis.
24 Dr. Gautreaux, he saw that the amount of pain was increasing,
25 that her problems had gotten worse, that in the realm of

1    sinusitis, her symptoms worsened.

2         The judge is going to give you an interesting

3    instruction with respect to this.  He says it was no longer a

4    medical problem, it was a problem requiring surgery.  But the

5    judge is going to instruct you that the testimony of a physician

6    who examines and treats an injured person is entitled to greater

7    weight than that of physician who only examined the injured

8    person once.

9         Now, this is the ENT that you go to when you're having

10   these kinds of problems.  With all due respect to Dr. Bowers who

11   is more of a general practitioner, when you have the sinus

12   problems, you go to a sinus doctor.  He's the one that saw her,

13   he's the one that testified that her situation got worse after

14   coming out of the trailer.  The answer to the Question Number 4

15   should be yes.

16        That takes you to Question Number 5, and the Court asks

17   you to allocate fault among Rec By Design, Earline Castanel,

18   Shaw, or the United States.

19        Now, I would submit to you that the answer here is that

20   they made the product, they put the formaldehyde in, they failed

21   to warn, they are entirely responsible.

22        I heard not one word how this could possibly be

23   Earline Castanel's fault.  The only testimony you have in this

24   case is sometime in the summer of 2007, she sees something on TV,

25   and so she gets out of the trailer.  That's exactly what she

1  would have done if they had warned her a year and a half before

2  or 17 months before.  This isn't Earline Castanel's fault.  This

3  is their fault for putting the wrong wood in and for failing to

4  warn about the hazard.

5       Now, the issue of Shaw, the only evidence you heard on

6  Shaw was Geoffrey Compeau.  I think the evidence was is that

7  under the contract, their duties stopped on June the 1st.  And so

8  the question is, did they do something wrong before June the 1st?

9  I've kind of got a chronology here.  But the bottom line, she

10 moves in on March 11th, they do the two contractually-obligated

11 monthly inspections, they catch the air conditioning leak.  They

12 fix it within a day.  There are no problems for two weeks after

13 that, and then their contract ends on June 1st.  So in this case,

14 I don't think that Shaw had anything to do with why we're here.

15      Now, these are all records that we obtained in the

16 course of this litigation.  It is true, we filed a lawsuit

17 against Shaw and FEMA.  We got to figure out with respect to each

18 particular trailer, what are the records?  With these records

19 that you have, though, in all honesty, I don't see what Shaw did

20 here.

21      United States, what we know in this case is that FEMA

22 was not involved in any of the design decisions that were made

23 with respect to this trailer, that Rec By Design never talked

24 with FEMA.  Instead, they made the design decisions themselves.

25 It was a unique product.  He designed it.  That FEMA relied upon

1  manufacturers to provide units that were safe and habitable and

2  met industry standards.  They relied upon a promise that was

3  broken.

4       FEMA, later on, learns that formaldehyde in the trailer

5  was causing problems for sensitive individuals.  After learning

6  about the problem, they kick it into gear and distribute all

7  sorts of brochures about the dangers of formaldehyde.  The FEMA

8  directive now is only to use travel trailers as a last resort.

9  But most importantly, you have an exhibit in evidence that's

10 Exhibit 498, those are the trailer specs by FEMA, and Mr. Rush

11 admits, "We didn't meet them."  Exhibit 498, those specs were not

12 met.

13      Despite the fact that Rec By Design didn't meet FEMA's

14 specs, once FEMA learned about it, they took it very seriously,

15 they got flyers out.  In 2007, when the upper management at FEMA

16 learns about the formaldehyde issue in the summer of 2007 from

17 the media, they learn that there is elevated levels of

18 formaldehyde, they put together safety notices designed to allow

19 people to move out of the trailers.  Those notices go out

20 July the 21st through 25th.

21      And, you know, to be fair, we're not exactly sure what

22 day she moves out of the trailer.  Maybe the reason she didn't

23 get it is she's already back in her house by then.  It was late

24 July, early August, it was kind of hazy for her.  But the bottom

25 line is, with respect to causation, she was moved out anyway, so

1    she was doing the very thing that those brochures would have told

2    her to do, which is a good thing.

3         But the bottom line is the FEMA people, they said these

4    people expressing the concerns had legitimate concerns.  It was a

5    high-priority mission.  That's how big the problem was.  They

6    initiated a swapping program.  I mean, imagine this:  If this was

7    not a defective product, why did your federal government say,

8    "We'll take the new trailer and give you a better old one"?  How

9    could that make any sense unless the new ones are defective?

10   These are the proposed answers with respect to Question Number 5.

11        Question Number 6 is damages.  Breaks up into four

12   parts, physical pain and suffering.

13        Dr. Wedner agrees that sinusitis is painful.  You have

14   testimony from Sandra Davis and Ms. Castanel, her condition got

15   worse when she moved in the trailer.  She felt bad.  You all have

16   to assess that.  And she testifies it was worse while in the

17   trailer, and I think it's pretty obvious why now.  So that's one

18   element.

19        The second element is mental anguish and emotional

20   distress.  This case is the only opportunity for this plaintiff

21   to recover damages for mental distress and mental anguish

22   associated with the fear of cancer.  Is it a legitimate fear.  We

23   know that formaldehyde is a recognized carcinogen.  We know that

24   there were papers early on supportive of the conclusion that

25   formaldehyde causes cancer.  We know that IARC, the general

1  consensus of the worldwide scientific community, has categorized

2  it is as a known human carcinogen and reiterated that

3  categorization last year.

4       There it is.  We know that inside of the monograph,

5  formaldehyde is carcinogenic to humans, a Group 1 carcinogen.

6  And we know why that happens.  Dr. Williams took you through all

7  of those slides to explain why.  I thought the best evidence that

8  you had as to why is where it binds.  It binds -- it's reactive.

9  It binds in the nose and in the nasopharyngeal area.  And that's

10 why you get cancers there.

11      And that's the worst picture of a nose that I've ever

12 seen, but it made a good point.  You don't get cancer down in the

13 throat because it binds up in the upper airway area.

14      And here, you see the monographs that are in evidence,

15 Exhibit 1006, the working group concluded that formaldehyde

16 causes nasopharyngeal cancer in humans.

17      The Group 1 classification in 2009 is also supported by

18 strong mechanistic evidence.  That's what Dr. Williams and

19 Dr. Wedner kind of took you through.  Dr. James, most scientists

20 agree that IARC is the consensus -- I say option, it should be

21 opinion -- of the world scientific community.

22      Sandra Davis testified that her mother has a fear of

23 cancer.  Dr. Bowers discussed one of the times when she discussed

24 that.  They say, "Hey, that deals with a mammogram."  We're not

25 saying that there aren't other things that aren't related.  But

1373

1  if you have that fear in the first place because of a mammogram

2  and you have subjected yourself unknowingly to 17 months of

3  exposure to formaldehyde, and then you learn it is a Class 1

4  carcinogen, that is a legitimate fear of cancer.

5       Past medical expenses, we put forth evidence about the

6  exacerbation of rhinosinusitis requiring surgery.  You've got the

7  cost of those surgeries in evidence.

8       Loss or impairment of life's pleasures for

9  Earline Castanel.  I think it is important to note that while the

10 defendants put forth evidence that she had depression and anxiety

11 problems before, you know, all of us do the best we can with the

12 condition that God put us in.  She was doing the best she can.

13 She was an honest historian.  She was a good person.  You did not

14 meet a doctor that did not like her.  But somebody that has a

15 history of depression and anxiety, the last thing that they need,

16 the last thing that they need is to be subjected to a Class 1

17 carcinogen in a trailer for 17 months.  That's what this case is

18 about.  That's what this defendant did to her.

19      We ask you for a verdict in her favor because the

20 evidence has overwhelmingly shown that she has met her case.

21 Thank you very much.

22      THE COURT:  Thank you, you Mr. Watts.  You have five

23 minutes for rebuttal.

24          Mr. Yount, if you want to take the podium.

25      MR. YOUNT:  Thank you, Your Honor.  May I proceed?

1            THE COURT:  Yes, please do.

2                       CLOSING ARGUMENTS

3   MR. YOUNT:

4            May it please the Court, counsel and members of the

5   jury.  First of all, I want to join Mikal Watts in thanking you

6   for your time and attention in this case and I want to thank you

7   on behalf of my co-counsel, Lyon Garrison, Randy Mulcahy and Andy

8   Weinstock.  But most importantly, I want to thank you on behalf

9   of my client, Randy Rush, and RBD, and his wife, Bonnie, who has

10  been here sitting through the whole trial.  Y'all have been a

11  very attentive jury.  You've taken some good notes, and that's

12  very much appreciated.

13           Now, this is the last time that RBD gets to say anything

14  to the jury, and so anything I say out here, my comments on the

15  evidence of what I believe that the evidence showed, Mr. Watts is

16  going to have another five minutes to come back and chop down

17  everything that I say.  So rest assured, I'm going to be a little

18  bit more careful when I give you my impressions of what the

19  evidence showed.

20           And remember, as the judge said at the beginning of this

21  trial and as the judge has reiterated before we gave our opening

22  presentations, and which he will do again, what the lawyers say

23  is not evidence.  The evidence is what you hear from that witness

24  stand and from the documents that you're going have an

25  opportunity to bring into the jury room.

1    I'm going to have to move pretty fast because we're

2    tight on time and we did have a lot of evidence here.

3    There is no dispute, nobody in this courtroom will

4    dispute that Hurricane Katrina was a great American tragedy.  All

5    of RBD's attorneys were living in New Orleans at the time of the

6    hurricane, and we can all appreciate what people in South

7    Louisiana went through.  Hurricane Katrina brought out the good

8    and the bad of many people in this area.

9    And the people of this area have a lot -- owe a lot of

10   gratitude and owe a great deal of gratitude to people like

11   Randy Rush who were in other parts of the country who stepped up

12   to the plate and tried to help out.

13   Randy Rush has been building travel trailers since he

14   was 14 years old.  You heard him twice testify.  He testified

15   that he started working for his father.  He was putting camper

16   tops on the back of pickup trucks.  Unfortunately, that business

17   failed due to the oil crunch in 1970s.

18   Randy went on to work for other companies, all in the

19   travel trailer business.  And he was pursuing his goal of

20   ultimately having his own family-run business just like his

21   father did.

22   Randy started Recreation By Design in 1999, and has led

23   the company to where it is today.  He's employed dozens of

24   people.  You've heard two of them testify in addition to Randy,

25   and I think that one thing even Mr. Watts will agree with is the

1    RBD people take pride in their travel trailers.  And why is that?

2    Because they build good ones.

3         RBD has built over 15,000 travel trailers since 1999.

4    15,000.  And before Katrina, guess what?  There has not been a

5    single complaint related to formaldehyde or air quality, not one.

6    They have people working in the plant at RBD.  Not a single

7    employee has ever complained about air quality or formaldehyde.

8    And these people are working with the wood all over the place,

9    they are cutting it.  There has not been a single complaint of

10   air quality of formaldehyde.

11        Now, RBD is a niche -- kind of has a niche role in the

12   travel trailer business.  They build custom trailers.  They build

13   travel trailers for people who use travel trailers a lot and they

14   want a particular style or design.

15        You also heard Mr. Rush testify that they build travel

16   trailers for Hollywood, for makeup and wardrobe trailers that are

17   used in shooting movies.  Again, Hollywood's elite, the most

18   pampered people on the face of the earth, and not a single

19   complaint of air quality or formaldehyde.

20        Now, when Mr. Watts called Randy Rush to the stand to

21   testify at the beginning of last week, he tried to embarrass him.

22   He tried to suggest that Mr. Rush doesn't know how to build a

23   travel trailer because he's not a licensed professional engineer.

24   He didn't go to enough school.  He's not as smart as the experts,

25   the hired guns that the plaintiffs brought before you.  That's a

1   red herring.  Randy has more than 40 years of on-the-job

2   training.  He knows how to build a travel trailer.  He is much

3   more qualified to build a travel trailer than the construction

4   expert who charged the plaintiff's attorneys $55,000 to tell them

5   what's wrong with this trailer, yet that guy has never built a

6   travel trailer and doesn't know how to build one.  Those people

7   will do anything that any attorney asks them to for a price.

8        Now, how does RBD build travel trailers?  You heard from

9   Randy Rush, you also heard from Michael Guame and George Cornish.

10  They told you that RBD complied with industry standards.  They

11  purchased their wood products from the leaders in the industry,

12  the same wood suppliers who supply the big boys in the travel

13  trailer industry.

14        Now, you heard Mr. Watts talk about in his closing

15  remarks about this Adorn invoice.  Kind of funny, you don't see

16  that invoice the whole trial.  He didn't ask Mr. Rush about it,

17  he didn't ask Cornish or Guame about that invoice in their

18  depositions.  The only person you heard him ask about that

19  invoice was on the very last day of trial, Robert James.  And

20  what did he say?  "I don't know anything about it, so I'm not

21  really sure that Adorn invoice has to do with this case."  But if

22  it had something significant to do with the case, you would think

23  he would have asked the man who built these travel trailers.

24        Now, RBD knew that the wood that it purchased was HUD

25  compliant, that it was industry standard.  The U.S. Government

1    had approved that type of wood for use in manufactured housing.

2    Really, what's the difference between manufactured housing and

3    travel trailers?

4         Now, just after Hurricane Katrina struck, Randy Rush

5    received a call from Morgan Building and Spas.  Morgan wanted to

6    know if RBD could build some handicapped-friendly travel trailers

7    for the people on the Gulf Coast.  Of course, as you heard him

8    testify, he agreed.  He started a new production facility and

9    shut down regular production.

10        Did Randy Rush and RBD cut corners when they built the

11   travel trailers for the people of the Gulf Coast?  Absolutely

12   not.  They used the exact same wood, the exact same wood that

13   Mr. Watts stands up here and tells you is no good.  They used the

14   exact same wood for these travel trailers for the people of the

15   Gulf Coast as they always have.

16        They put bigger doorways in the travel trailer to make

17   it easier for handicapped people to get around.  He added a

18   slide-out at the request of Morgan to make the trailers more

19   comfortable so they could put a couch.

20        He was up on the stand and told you how he put a bigger

21   refrigerator so that people could use that trailer as they would

22   a normal house.  He also testified that they put full-size sinks

23   instead of the typical smaller sinks because he cared about the

24   people he was building these travel trailers for.

25        Funny thing is, both plaintiff and her daughter who

1  actually showed up to testify agreed, the trailer was nice and

2  the trailer was comfortable.  In fact, they both told you that

3  the travel trailer was nice enough for them to spend Sunday

4  afternoons together as a family.

5       Now, why does all this stuff matter?  As Mr. Watts

6  pointed out, ultimately, you're going to have a jury verdict

7  form, and that's why we're all here, is to get a jury verdict

8  form filled out by you.  And the first question on that form is

9  going to be, does the trailer have a design defect?

10      Now, to prevail in a design defect claim, the plaintiff

11 lawyers must prove to you by a preponderance of the evidence that

12 the RBD travel trailer design for Ms. Castanel had a defective

13 design.  "Defective" means that there was something wrong with

14 it, something wrong with that trailer that made it unreasonably

15 dangerous.  Not that it's a perfect design.  We don't have to

16 build a perfect product.  It's not the Taj Mahal, but they have

17 to prove that it was not just that it was not perfect, but that

18 it was unreasonably dangerous.

19      They also have to prove, in order to prevail on this

20 claim as set forth in Question Number 1, that the plaintiff

21 sustained an injury as a result of this defective travel trailer.

22      As the Court will tell you and as what you can read in

23 the jury instructions -- and both Mr. Watts and I have talked

24 about jury instructions.  You're going to have them, you're going

25 to be able to bring them back in the jury room.  They must prove

1    to you -- they must proves this design defect through solid

2    evidence.  They cannot prove it through speculation or

3    possibility, and the jury instructions say that even unsupported

4    probability is not enough.

5              Now, what did the plaintiff's lawyer prove on this

6    claim?  Absolutely nothing.  Randy Rush testified that he used

7    industry standards, the very same ones that he used when he built

8    his custom trailers and high-end trailers.

9              Randy testified that the wood he bought was compliant

10   with federal HUD standards, standards promulgated by the federal

11   government, and while he candidly admitted that he was not

12   familiar with this acronym LFE, with this stamp that supposedly

13   goes on woods, he told you that he believed that the wood he was

14   buying emitted low amounts of formaldehyde.  Because this was the

15   same wood he has purchased consistently before 2005.  Again,

16   never a single complaint before Katrina.

17             And the test results, what do they show?  They confirm

18   that there was low formaldehyde in this trailer.  The actual test

19   results, 50 parts per billion, that's .050 parts per million;

20   20 parts per billion, that's .020 parts per million; and 9 parts

21   per billion, which is .009 parts per million.

22             You heard from Michael Guame and George Cornish.  They

23   testified that RBD trailers were built to industry standard.  And

24   why do they know this?  They've worked for numerous other trailer

25   manufacturers.  They can compare.  They knew that RBD did it

1    right.  Neither of these witnesses ever considered formaldehyde

2    to be a problem in the workplace or in use.  They were aware of

3    the MSDS, but they were also aware that there was no formaldehyde

4    problem.

5         Now, Mr. Watts talks about the MSDS, the material safety

6    data sheet.  There was not a single witness who stated that RBD

7    was aware of any problems with the way they were building their

8    travel trailers.  Their testimony was unanimous that there was no

9    complaint.  So what does Mr. Watts try to do?  He tries to trick

10   you.

11        Take a look at the MSDS, which is in evidence.  Take a

12   look at it.  What's the date on it?  The date is September 6,

13   2006.  This is the MSDS that he brought up to Mr. Rush and showed

14   it to him.  Why is that date so relevant?  Because this MSDS

15   sheet was received by Randy Rush nine months after RBD shipped

16   the travel trailer to the Gulf Coast.  This MSDS was received by

17   Randy Rush or was published six months after plaintiff moved into

18   the trailer.  And ultimately, this MSDS sheet tells RBD that wood

19   dust contains formaldehyde.

20        So don't be tricked by the lawyers.  Randy Rush

21   explained that while he was aware of this MSDS, he was not aware

22   that there was any risk in the workplace.  He would never put his

23   workers at risk.  He walked around the plant, so did Cornish and

24   Guame, and there were problems.  There was no safety hazard.

25        Now, you heard the testimony of Robert Wozniak.  This

1  was a video played by the plaintiffs.  Mr. Robert Wozniak is an

2  expert in the field of constructing travel trailers.  He

3  testified that he looked at the RBD travel trailer and that it

4  was built in accordance with industry standards in 2005.  It met

5  the industry standard.  He testified that all modern wood is low

6  in formaldehyde and that travel trailer companies were not

7  required to use wood with this LFE stamp back in 2005 when this

8  travel trailer was built.  Mr. Wozniak also said that the trailer

9  was safe, that Ms. Castanel's trailer was safe and does not

10  require a warning.

11        You also heard from some FEMA witnesses, David Garratt,

12  he testified by video on Friday.  He testified that FEMA was

13  ultimately responsible for providing safe trailers to the people

14  of the Gulf Coast.  He testified that FEMA expected that the

15  trailers were to meet industry standard.  This industry standard

16  theme is not RBD's theme.  That's what the federal government

17  wanted and that's what the federal government got from RBD.

18        You heard Kevin Souza and you heard Martin McNeese.

19  They both confirmed that FEMA demanded industry standards, and

20  that's what they got.

21        One of the plaintiff's experts was Stephen Smulski.  He

22  actually testified live.  He got up in front of you and suggested

23  several alternative designs, but they are not realistic.  None of

24  his theories has ever been tested.  None of his theories were

25  ever applied in a travel trailer.  He suggested using Masonite,

1    but you heard the testimony, Masonite warps and it makes a travel

2    trailer too heavy to travel.  Remember, this is a travel trailer

3    that's designed to go across the roads.  That's its function and

4    that's its purpose.

5         Now, Mr. Smulski also suggested using trailers made with

6    wood that contains isocyanide glue wood.  That's what he

7    testified to.  But when you heard the medical experts, even the

8    plaintiff's medical experts, they all said that isocyanide glue

9    is a much greater health risk than formaldehyde, even at the

10   super high levels that you simply don't get in a travel trailer.

11   That's not a good reasonable alternative, isocyanate glue.

12        But what else did Mr. Smulski say?  He thought

13   Randy Rush's practice of using vinyl coatings on the wood panels,

14   on the ceilings and on the walls of the travel trailer was a good

15   practice, because it reduced formaldehyde emissions by over

16   90 percent.

17        Lastly on this design issue, you heard from Alexis

18   Mallet.  He's the guy who billed almost $55,000 to come here and

19   testify for about four or five minutes.  He's never built a

20   travel trailer, but he's going to second guess everybody in the

21   industry.  He says Masonite would work, but it won't because

22   that's just not reality.  The reality is that's not a viable

23   alternative.

24        Now, plaintiff's second claim that they are going to try

25   to convince you on is a warnings claim.  In other words, the

1    plaintiff's lawyer is claiming that this trailer is defective

2    because it failed to provide an adequate warning to Ms. Castanel.

3    Again, as Mr. Watts points out, the parties have stipulated.

4    There was no warning sticker on this travel trailer.  However,

5    the owner's manual talks about ventilation over and over again.

6    All the witnesses have stated the best way to reduce formaldehyde

7    levels is to ventilate.

8              Take a look at Exhibit 274, it's in evidence.  That's

9    the owner's manual.  See how many times ventilation is mentioned

10   in there.

11             Does this trailer even need a warning on it?  You heard

12   from Dr. Laughery.  He came to testify here.  He was from Rice.

13   He was the one hired by the plaintiff's lawyer to discuss this

14   issue.  Dr. Laughery says that a warning is not required when

15   there is not a hazard.  Matter of fact, he recommends against

16   putting a warning on there when no hazard is present.  Of course,

17   you heard the testimony, there is no evidence that this trailer

18   was defective or dangerous in any way, so no warning was

19   required.

20             You heard Dr. Laughery talk about his three-way warning

21   system.  One of the things that should have happened was that

22   Shaw was supposed to have a face-to-face meeting with the

23   plaintiff, walk her through the trailer, go over the trailer

24   front to back and discuss the owner's manual with her.

25             Of course, the plaintiff testified that no such meeting

1 took place.  She testified that the Shaw representative gave her

2 the keys and drove off.  And she testified that the Shaw

3 representative didn't even discuss the owner's manual with her.

4 But at the end of the day, no warning was required because there

5 was no hazard.  Additionally, RBD didn't know of any potential

6 hazard and you can't warn about those things that you aren't

7 aware of.

8       You heard the testimony of the plaintiff's wood expert,

9 Mallet.  He testified wood stamped "LFE" was available and at the

10 same price as industry standard wood that was used by RBD.  Let

11 me ask you this:  If Randy Rush and RBD knew of a problem with

12 formaldehyde in the wood it was using, and it could get this LFE

13 stamped wood at the same price, why wouldn't they do it?  It's

14 pure fiction.  It's pure fiction.  There wasn't a problem.  RBD

15 didn't know of any problem; otherwise, they would have fixed it.

16       One thing that is not disputed on this warning issue is

17 that FEMA, soon after the Sierra Club started complaining about

18 New Orleans residents being in travel trailers, instituted a

19 three-phase warning plan to put information about formaldehyde in

20 the hands of trailer residents.  The reason that they did this is

21 because FEMA, as the ultimate sophisticated purchaser, had the

22 legal duty to do so.  FEMA sent out three separate flyers.  The

23 one here is the one from 2006.

24       Plaintiff denies receiving a flyer.  You're the ones who

25 ultimately have to decide whether she got it or not.

1          But you heard from Guy Bonomo and Travis Morris, they

2    both testified by video deposition.  They explained how FEMA went

3    door to door making sure that 100 percent of the trailer

4    occupants received the flyers.  Mr. Morris also testified that

5    they checked up on the checkers.

6          Mr. Morris also described the silver bullet.  He stated

7    that everyone knew about these flyers.  Why did everyone know

8    about them?  Because once you heard about formaldehyde, you could

9    pick up the phone, call FEMA, and get put into a house or you

10   could be put into a hotel.

11          Now, with respect to RBD's duty to warn, when it sold

12   its travel trailer to a sophisticated purchaser such as

13   Morgan Building and Spas or the U.S. Government, the Court will

14   charge you as follows:  The Court will tell you that under the

15   law, a party like RBD has no duty to warn when the person or

16   entity who is buying the project is a sophisticated purchaser.

17   The Court will charge you that a sophisticated purchaser is one

18   who, by experience and expertise, is aware of the possible

19   hazards associated with the use of a product, and who has an

20   obligation to inform end users of the potential health hazards.

21          That's the law that the Court is going to charge you.

22   You will have the jury instructions in the room with you, so

23   please take a look at them at Section 21, the sophisticated

24   purchaser section.

25          There is no doubt that the United States Government is

1  the most sophisticated purchaser in the world.  Morgan is
2  likewise a sophisticated purchaser.  And because these two
3  entities were the ones that RBD sold a trailer to, RBD has no
4  duty to warn under the law.
5       You heard David Garratt, FEMA's acting administrator.
6  He testified that FEMA travel trailers were the government's
7  responsibility.  It was the government's job, not RBD's job to
8  create the standards, rules and regulations to make trailers
9  safe.
10      What FEMA wanted from its trailer manufacturers and what
11  they got was trailers built to industry standards.  As such, when
12  you get to Question Number 2 on the jury verdict form, I submit
13  the law and the evidence leads to one conclusion, that the answer
14  must be no, that this trailer was not defective in its warnings
15  because of an inadequate warning.
16      Again, as we told you at the beginning of the case, the
17  plaintiff's attorneys have all these unproven theories which they
18  complain were supported by their hired guns, but when it comes
19  down to it, we're dealing with the real world, with real world
20  evidence, and this all has conclusively demonstrated that the RBD
21  travel trailer is not defective in its design and it's not
22  defective due to inadequate warning.
23      Now, in order for the plaintiff to prevail on either one
24  of these theories of liability under number one or two, the
25  plaintiff must prove that the plaintiff sustained injuries which

1  were related to these alleged defects.

2      But I trust that you will agree with me that the

3  testimony that you heard from the stand and the documents in

4  evidence overwhelmingly establish that Ms. Castanel sustained no

5  injuries from this travel trailer.  Nothing.  Because the

6  evidence put on by the plaintiff's lawyers is simply not

7  credible.

8      You heard from Dr. McGwin, Dr. McGwin is an

9  epidemiologist.  He stated that he reviewed the literature and

10  that about half of the studies he reviewed were not statistically

11  significant.

12      Now, Mr. Weinstock understands this a lot better than I

13  do, but I think what he got Dr. McGwin to ultimately say is, when

14  a study isn't statistically significant, that means it helps us.

15  It's in RBD's favor, not the plaintiff's.  So half of his studies

16  help us.

17      And, of course, Dr. McGwin conceded that only one of

18  these studies dealt with the issues in this case, sinus problems.

19  Of course, that's one of those studies that is not statistically

20  significant, if I can say that.

21      Nevertheless, Dr. McGwin, being paid by the plaintiff's

22  counsel, found that it was biologically plausible that a causal

23  connection maybe did exist.  But McGwin agreed that the gold

24  standard in terms of epidemiological evidence was an experimental

25  study and he had none while we did because all of the gold

1    standards supported RBD's position.

2         Interestingly, Dr. McGwin said that it would be

3    irresponsible science to disregard negative studies.  Of course

4    that brings us to our next witness, the next witness of the

5    plaintiff, Patricia Williams.  She's not a medical doctor and she

6    only recently became a licensed toxicologist.  She tried to

7    suggest to you that there were numerous studies, epidemiological

8    studies that supported the opinions she was paid to give.  Those

9    opinions that she was paid to give is that formaldehyde can

10   exacerbate long-standing rhinosinusitis.

11        I know you were listening carefully during her testimony

12   because it was complicated stuff, but Mr. Weinstock got a very

13   important concession out of her, again, out of all of the studies

14   she talked about, only one dealt with sinus problems.  And you

15   cannot base causation opinion on one study.  She agreed with

16   that.  One study does not make causation.

17        Patricia Williams also testified that formaldehyde is

18   toxic and that one molecule can kill a cell.  The reality is is

19   that Williams is an advocate.  She's an expert who thinks it is

20   perfectly fine to disregard negative studies as long as her

21   ultimate opinion supports the opinions of those who are paying

22   her.  She bases her opinion on one study and disregards ones that

23   don't help.  Reality suggests that her opinions should carry very

24   little weight when you all retire to the jury room him.

25        That brings us to plaintiff's star witness, Larry

1    Miller.  Dr. Miller does have a medical degree, but he's not a

2    real doctor.  He hasn't seen a patient in five years.  And in the

3    five years before that, he dedicated about 10 percent of his work

4    to doing what real doctors do, seeing patients.

5           As the Court told you during Dr. Miller's testimony, and

6    as you'll be charged again when the Court reads its jury charge,

7    you as the jury have every right to disregard all of his

8    testimony in its entirety.  And why wouldn't you?

9    On two occasions, as you heard from the witness stand, the

10   United States Court of Appeals for the Fifth Circuit, which is

11   the Court of Appeal that has appellate jurisdiction over this

12   case, has completely disregarded his opinions.

13          The Court of Appeal found that Dr. Miller's opinions are

14   not based upon good methodology.  They are based on flawed

15   methodology.  The Court found that his opinions -- that he holds

16   himself out in fields where he's not an expert, and that he gives

17   testimony that is not supported by the facts or by reality.

18          We went through those four opinions, and those opinions

19   have been received into evidence.  You can look at those when

20   you're in the jury room.  Look at the highlighted sections and

21   see what the courts across the United States say.

22          I was surprised to find out that in the *Lofgren* case,

23   which is an Arizona opinion that I showed highlights of it, that

24   Ms. Castanel's attorney, Dennis Reich, actually hired

25   Larry Miller in that case.

1    Dr. Miller doesn't treat patients and he's not

2    Ms. Castanel's treating physician.  I think you all agree with me

3    that Ms. Castanel wouldn't go to see a doctor like that, no one

4    would.

5    But there are several things that I think you will agree

6    are significant.  First, like Patricia Williams, Larry Miller was

7    not able to identify any studies where there was a causal link

8    found between formaldehyde exposure and the exacerbation of

9    rhinosinusitis.

10    There was only one study where that issue was ever

11    looked at, and you heard from our experts when they explained

12    that in that study levels anywhere in the ballpark of what we're

13    talking about cannot cause an exacerbation of rhinosinusitis.

14    Dr. Miller also showed you two other important things.

15    First he told you that when he performed his 15-minute exam

16    earlier this year, in this year, within three months, she was

17    fine.  Ms. Castanel was fine.  She had no objective symptoms.

18    Her sinuses were fine, her nose was fine.  Her physical exam was

19    completely normal.

20    Dr. Miller conceded that the best way to tell whether

21    someone who was exposed to a substance like formaldehyde has

22    caused a long-term health effect is to look at a biopsy or

23    pathology.  That's what he said.  He said that's the best way to

24    tell because that will show damage at the cell level.

25    Dr. Williams agreed.  She talked about a study where the

scientists who were evaluating patients actually used pathology
reports and biopsy reports to go and look at the cell level to
see whether people were damaged by exposure to formaldehyde.
The problem here for the plaintiffs is we have this biopsy.  We
have pathology.  Dr. Gautreaux told you about it.  After his
sinus surgery, he sent, like most doctors do, he sent the
pathology to the lab to get looked at.  And what did that
pathology report tell you?

        You heard from Dr. Wedner and you heard from
Dr. Gautreaux, it was completely clean.  The only thing on that
pathology report was typical inflammation that everybody says you
would expect in someone who has sinusitis.
I mentioned earlier that Dr. Miller is not the plaintiff's
treating physician.  He admitted as much.  And this is important
for a legal reason.

        When the Court reads the applicable law, he's going to
read the jury instruction on treating physicians, and that's
important.  Because the Court will instruct you that a treating
physician, like Dr. Bowers, Dr. Gautreaux, and Dr. Hoang, are
entitled to greater deference from the jury.  You don't have to
believe them, but the Court instructs you that their opinion
should be given greater weight than the hired-gun experts of the
plaintiff.

        Now, you heard from Dr. Bowers.  Unfortunately,
Dr. Bowers couldn't be here to testify presumably because he's

1   doing what regular doctors do, seeing patients.  And he just

2   couldn't be here.

3          But we read his deposition from the witness stand, and

4   one thing that is clear, even though it was not Dr. Bowers

5   reading the testimony, but you could hear from the words that

6   Dr. Bowers has a very close relationship with Ms. Castanel.

7   He takes her telephone calls when she calls.  He was able to

8   testify about his office visits with her without looking at his

9   charts.  He remembers her -- making a decision on a Friday

10  afternoon as to whether to call to tell her about her mammogram

11  results on a Friday or on Monday, whether that would worry

12  Ms. Castanel over the weekend.  He obviously cares a great deal

13  about his patients, including Ms. Castanel.

14         Dr. Bowers testified that he had treated the plaintiff

15  or nervousness, anxiety and depression for many, many years

16  before Hurricane Katrina struck.  He also treated Ms. Castanel

17  for her long-time sinus problems.

18         Dr. Bowers testified that he noticed no changes, no

19  changes in any of plaintiff's symptoms, not in her nervousness,

20  anxiety, depression, or sinuses over the years.  In fact,

21  Dr. Bowers flat-out told you that Ms. Castanel's sinus problems

22  did not change after Katrina.

23         It is important to note that Ms. Castanel never told

24  Dr. Bowers that she thought her FEMA trailer had a funny smell or

25  was causing her problems with her nose.  Never told him that.

1    But she seemed to tell him everything else.

2           But we know why this is.  The plaintiff didn't figure

3    out that she needed to talk about her travel trailer and any

4    smells in the travel trailer until she was selected as a

5    plaintiff, until the lawyers got involved.

6    Now, let's take a look at the charts.  There are a lot of them.

7    I'm going to go through them real quickly.

8           But we asked Dr. Gautreaux and Mr. Miller about these

9    charts, because Dr. Miller had read the records.  And look at

10   what it says.  She started treating with Dr. Gautreaux back in

11   1994 and she had a lot of visits.  Through '95, '96, '97, '98,

12   '99, 2000, 2002.  Fairly consistent medical treatment over the

13   years.  Dr. Gautreaux, Dr. Bowers.  And these are all treatment

14   for sinus issues.  We left off the ones that aren't related to

15   sinus.

16          Then we get to Hurricane Katrina, and again,

17   Ms. Castanel, she goes and seeks out a doctor in Houston, Texas,

18   where she had evacuated, Dr. Hoang, who you heard from, another

19   treating physician, and she continues to treat with him.  Pretty

20   consistent treatment.

21          Then in March 2006 she moves into her trailer.  And

22   again, generally consistent treatment.  No big spikes in

23   treatment.  Then guess what, she moves back into her home.  She

24   still continues to treat.

25          Then what happens?  The lawyer gets involved.  And

1   you'll see on the chart that's where you have a big spike.   In

2   2009, that's where Ms. Castanel's office visits, that's where she

3   got her exacerbation of rhinosinusitis when the lawyers got

4   involved.

5         That chart, which on board right now, that comes from

6   the medical records.   Those are in evidence, and I encourage you

7   to take a look at them and figure out for yourself whether

8   Ms. Castanel's exacerbation of her rhinosinusitis has anything to

9   do with this travel trailer.

10         Dr. Bowers and Dr. Gautreaux confirmed the plaintiff had

11   chronic sinusitis.   Dr. Gautreaux said that he had always wanted

12   to perform this surgery to help her relieve her chronic problems.

13   That's what he said on the witness stand.

14         Dr. Gautreaux testified that the surgery was minor and

15   went well.   He expects no further problems.   And again, even

16   Dr. Gautreaux conceded that he was never told by the plaintiff

17   that she had any problems related to her travel trailer or that

18   the travel trailer made her sick in any way.

19   Of course, this is because Ms. Castanel's problems were not

20   caused by formaldehyde.

21         Dr. Gautreaux and Dr. Bowers, neither of them testified

22   that formaldehyde or plaintiff's travel trailer caused her any

23   problems.   On the contrary, they both testified that they could

24   not relate any problems, including surgery, to Ms. Castanel's

25   living in the travel trailer.

1        This is because these experts don't sell their testimony
2   for $800 an hour.
3   Other than the treating physicians, specifically Dr. Bowers, what
4   credible medical testimony did you hear?
5   RBD hired an expert as well, Dr. James Wedner.  He came and
6   testified at the end of the trial on Friday.  He's an allergist
7   and an immunologist.  He examined Ms. Castanel.
8        And what did he conclude?  He explained that when a
9   substance is an irritant, that it causes problems when you're
10  being exposed; that when you remove the irritant, the problems
11  stop.
12        So you go into the trailer, if there is formaldehyde in
13  there, it's going to bother you, and when you walk out of a
14  travel trailer, a little bit of time passes and it gets better.
15  It's like an allergy.  You remove the source of the irritant and
16  the problems go away.
17        But the plaintiff's symptoms don't fit this pattern.
18  You saw it on the chart.  Her spike didn't come until two years
19  after she moved out of the trailer until she got hooked up with
20  her lawyers.
21        Earline Castanel said she didn't smell anything in her
22  trailer when she first moved in.  She said it was a couple of
23  weeks, three or four weeks after she moved into the trailer when
24  she smelled something.
25        The frequency in the office visits didn't spike when she

1    was living in that trailer.  It was long afterwards.

2    Plaintiff's sinuses, to the extent that they got worse, it

3    happened several years after she moved out of the travel trailer.

4           Now, in opening statements, Mr. Watts got up before you

5    and talked about the 800-pound gorilla.  In his words, he said

6    that that's the scariest part about this case is this fear of

7    cancer claim.

8           I ask you, what credible testimony did you hear about

9    that?  And the answer is none.  You have heard more about this

10   fear of cancer claim in closing statements than you did from any

11   of the witnesses on the witness stand.

12          You heard Dr. Miller, he testified that she had a fear

13   of cancer related to the trailer, but Dr. Miller, he's not a

14   psychologist.  He saw plaintiff once at the request of the

15   attorneys.

16          Of course, he did read Ms. Castanel's psychologist's

17   report.  He didn't remember the part where Ms. Castanel told her

18   psychologist that she had problems with dust and respiratory

19   irritation caused by working in a rectory because of some

20   construction work going on there.  He didn't remember that.

21          Now, you heard from Dr. Cole.  What did Dr. Cole say?

22   He is a leading expert in the field.  He served on the IARC

23   panels that the plaintiff's attorneys are so fond of.  He

24   testifies that IARC got it wrong in connection with formaldehyde

25   causing cancer.  He testified that being toxic does not make it

1    cancerous.  And he also testified that if Ms. Castanel has

2    anything to fear from a scientific standpoint regarding cancer,

3    it's more likely cigarette smoke.

4         Now, plaintiff never told Dr. Bowers, with whom she

5    confided, anything about her FEMA trailer, and she never

6    mentioned to Dr. Bowers anything about a fear of cancer related

7    to her travel trailer.

8         She did confide in him that she was afraid and was

9    fearful when she got a questionable mammogram and when she had

10   some polyps removed.  Those tests, of course, fortunately came

11   back negative and she never mentioned it again.  And it's agreed

12   by everybody here that polyps and a questionable mammogram have

13   nothing to do with formaldehyde or the travel trailer.

14        The reality is, I think you'll agree, that Ms. Castanel

15   has no fear of cancer due to living in this trailer.  She is

16   79 years old and she's in excellent health.  That's not disputed.

17   If she has fear of getting cancer, maybe it's because she had a

18   son who died of cancer a long time ago.  Maybe it's because she

19   had a mammogram that was questionable.  Maybe it's because she

20   had a polyp removed, or maybe it's because of cigarettes.

21        Kim Castanel, who's deposition was read, remembered her

22   mother smoking.  Kim Castanel was born in 1971.  Do the math.  I

23   wonder why Mr. Watts didn't call her to testify.

24   Let's be clear about one thing, Ms. Castanel does not have

25   cancer.  There is not a single witness who testified that she is

1    likely to get cancer.  And no credible witness has testified that

2    she is at an increased risk of cancer because she lived in that

3    travel trailer.

4        If God forbid Ms. Castanel were to develop cancer in

5    some 15 years from now when she's 95 years old or 100 years old,

6    if God forbid she develops cancer, and she wants to claim that

7    it's related to formaldehyde, she can simply file another

8    lawsuit.  That's set forth in the Court's jury charges.

9        The 800-pound gorilla that Mr. Watts described is pure

10   fiction like the rest of this case.  It's not based on reality.

11   Ms. Castanel has no claim for fear of cancer because of this

12   travel trailer.

13       Now, you've heard a lot about test results and levels.

14   And there are a lot of them.  And if one thing is crystal clear

15   is that there is no consensus as to what's applicable.

16   What the plaintiff does is ignore the actual test results and

17   argues that this travel trailer is dangerous because of

18   theoretical statistical predicted levels in the ATSDR, which is

19   .008 parts per million, or NIOSH, which is .016.

20       Now, Professor Hewett likes these standards because,

21   well, that's what the plaintiff's attorney told him to like.

22   These standards, by their definition, are not intended to

23   establish a regulatory level applicable to travel trailers.  The

24   NIOSH standard, as you heard, is the lowest reliably quantifiable

25   concentration.  In other words, that's as low as you can

1    accurately measure.

2         The ATSDR standard was not established as a standard to

3    be employed in the real world.  That standard itself states that

4    exposures above this level will not call -- will not cause harm.

5    Note that the plaintiff's lawyers never talked about the most

6    applicable standard, the HUD standard, which permits exposures of

7    .4 ppm or 400 parts per billion.  This is eight times more than

8    the actual test results in Ms. Castanel's trailer.

9    But who did talk about it?  The plaintiff's experts.

10   Dr. Laughery cited to the HUD standards and so did the other

11   credible experts.

12        Ultimately, plaintiff's whole case is about vague

13   testimony that the trailer smelled funny, and because of this,

14   they want to tell you that you must conclude that the

15   formaldehyde levels exceeded a safe level.  But that's not

16   science.  Dr. James refuted that theory.

17        He testified that people who are in litigation, they

18   have biases when they were asked to recall what they smelled.

19   Here we don't even know what she was smelling, if, in fact, she

20   was smelling anything in her travel trailer.

21        She never told her doctors that she smelled anything in

22   her travel trailer, at least her real doctors.  And she never had

23   any health problems.  Dr. James called that reporting bias when

24   he talked about it.  I call it a convenient memory.

25        Now, you heard from Commander Joe Little.  He testified

1  that formaldehyde is everywhere.  He said that modern homes can

2  exceed the .008 ppm limit.  He selected, Commander Little chose a

3  .3 ppm no action level.  This level is six times the levels

4  actually tested in Ms. Castanel's trailer and four times the

5  maximum predicted level by Dr. Hewett.

6         Now, Dr. Hewett, he put a chart on the board to try to

7  show you how the formaldehyde levels in the trailer compared to

8  the various standards.  Take a look at the chart.  These are the

9  levels for actual RBD travel trailers.  Not a single measured

10  level exceeds the HUD safety standard or the OSHA standard.  Not

11  a single one.

12         That's because this was a good travel trailer.

13  Don't get misled by the plaintiff's attempts to discredit the

14  actual results of RBD.  Plaintiff had her experts there as well

15  when we did our testing and their results were lower than ours.

16  That's why you didn't hear from them.

17         And even though temperature affects test results,

18  plaintiff made it clear that she kept her trailer so cold that

19  she had to wear a jacket.

20         The plaintiff's testimony was the most compelling about

21  what she experienced in the trailer.  She said that she smelled

22  nothing the first few weeks.  In fact, she stated she didn't

23  smell the new car smell until after living there for a few weeks.

24  The experts, even the plaintiff's experts, say that this doesn't

25  happen in the real world.  The smell doesn't go away.  It's worse

1    at first and then it goes down over time.

2          But the plaintiff and her daughter testified that they

3    had spent time in the trailer as a family, that the trailer was

4    comfortable.  This trailer simply isn't defective.

5    Plaintiff testified that she ventilated and kept the trailer

6    open.  She kept her windows open and bought a big box fan to

7    create air flow.

8          Importantly, the plaintiff never testified that she

9    experienced any eye problems.  The only person at this trial who

10   ever testified about eye irritation was Mikal Watts.  Not a

11   single witness, not the plaintiff, not any of her family members

12   testified that plaintiff had problems with her eyes.

13         The bottom line is this, the plaintiffs have put on a

14   case of fantastic fiction.  They cite inapplicable standards and

15   try to convince you that the plaintiff's trailer exceeded these

16   standards by hiring expert witnesses.  These witnesses simply are

17   not credible.  You cannot ignore the actual test results.

18   Reality suggests otherwise.

19         THE COURT:  One minute, Mr. Yount.

20         MR. YOUNT:  Thank you.

21         Now, one week ago today we spent the entire morning

22   selecting the jury.  One of the things that I think all of the

23   attorneys wanted when we were looking for a good jury was people

24   who were intelligent, who were good listeners, and most

25   importantly, had common sense.

1           When you retire to the jury room to deliberate,

2  please bring that common sense in there with you.  This plaintiff

3  sustained no injury from living in this travel trailer.  There is

4  no evidence to the contrary.

5           I, therefore, request on behalf of RBD that when

6  you go into the jury room you check no in response to questions

7  Number 1 and Number 2.  The evidence, I think, requires this

8  result.

9           Again, thank you very much for your time.  We look

10 forward to receiving a verdict in this case.  And, again, we

11 appreciate your attention and patience.

12      THE COURT:  Thank you, Mr. Yount.

13           Mr. Watts, you will have five minutes.  I'll give

14 you a one-minute warning as well.

15      MR. WATTS:  Thank you, Your Honor.

16           You know, Mr. Yount is a good lawyer.  But he's a

17 good lawyer who has a tough, tough job.  He can't change the

18 facts that his client built a travel trailer that violates the

19 industry standard.

20           And while he's a good lawyer, good enough to try to

21 scare you into some food trip from here all the way to

22 Los Angeles.  From LFE is the standard.  No, three days later

23 it's not the standard.  From formaldehyde is not cancerous.  This

24 is a lawyer that to do his job has to convince you that what his

25 white is black, what is black is white.  The emperor has his

1    invisible clothes on.  The reality is the emperor was naked.  The

2    naked truth is their own documents show that they violated the

3    industry standard.

4              They say they take pride in their trailers, but

5    they didn't read the MSDS.  Now I'm tricking him.  Why did I

6    spend 14 minutes, did you know this for six years, did you get

7    this for six years?  Yes, yes, yes, yes.

8              You're not taking pride in your product when you

9    don't even know what kind of woods you were buying.  And yet I'm

10   being blamed for taking a document that was on their exhibit list

11   and showing it to you that it was not LFE.

12             If it really was LFE, why couldn't they bring you a

13   single document in response.  You see all of this LFE, this is

14   just one that was a mistake.  They didn't bring you that because

15   their file cabinets do not convey the idea that it was not LFE.

16             Emperor has his invisible clothes on.  There is not

17   a single complaint in the workplace.  Well, that is because the

18   MSDS says you must wear personal protective equipment; you must

19   have ventilation; you must have respirators; you must have

20   gloves; you must have clothes.  That's why you don't have

21   complaints.  The emperor has his invisible clothes on.

22             We don't have to build a perfect trailer, not the

23   Taj Mahal.  I'm not even saying they had to have this expert

24   engineering department that they falsely claim to have had.  All

25   you have to do is meet the industry standard, and they did not.

1  They violated it and caused a public health disaster for people

2  like her.  The emperor has his invisible clothes on.

3          There was no hazard, and yet your government, CDC,

4  the ATSDR, FEMA has to put together a project, operation impact,

5  distribute tens of thousands of flyers offering to get people in

6  July 2007 out of these trailers.  These trailers were so bad

7  we're selling off the new ones to put people in the old ones, but

8  there was no hazard?  Folks, the emperor has his invisible

9  clothes on.

10          Sophisticated purchaser.  You know, what they are

11  trying to do is if they find out after it's left their control,

12  then they have a continuing duty to warn.  Well, the judge tells

13  you over on page 20 that that continuing duty to warn can be

14  vitiated if a sophisticated purchaser knows later.  Once FEMA

15  knew; FEMA warned.  But this is not designed to say that you

16  didn't have a duty to warn at the time you sold your product.

17          Sophisticated purchaser has nothing to do with

18  their duty.  They had that duty.  They had that duty at the time

19  they sold.  The emperor has his invisible clothes on.

20          Listen to not any of the experts, that's fine.

21  Mr. Hoang was interesting, Dr. Hoang.  He treated her before.

22  Dr. Bowers was interesting, but he's not the ENT.  The person you

23  go to is the ear, nose and throat doctor who told you that these

24  symptoms got worse after she stayed in the trailer.

25          How come she didn't tell the doctor?  Nobody knew.

1   There weren't signs in the trailer saying, "This is

2   formaldehyde."  In 2005, 2006, nobody knew.  That's the problem.

3                    And yet when the complaints exploded in the heat of

4   the late summer, as the off-gassing doubled every 12 degrees that

5   the temperature went up, that's when we all got to figure out

6   what they knew.

7                    THE COURT:  One minute.

8                    MR. WATTS:  Folks, if I'm making up the damages, why did

9   she have the surgery?  I didn't do that surgery.  I didn't

10  conduct the surgery.

11                    The 800-pound gorilla in the room is they sold 2600

12  travel trailers that were defective.  The 800-pound gorilla in

13  the room is they used bad woods, they know it and they are trying

14  to sell it to you that it was LFE.

15                    The 800-pound gorilla in the room is they violated

16  industry standards.  The 800-pound gorilla in the room is they

17  hurt people like Ms. Castanel.  It is time to correct that with a

18  just verdict.  It's time to correct that with a just verdict.

19                    I don't believe that any of you all believe that

20  I've spent the last five days up here tricking you.  After all,

21  I'm not one that just gave a closing argument without so much as

22  bringing up my food exhibit.  Who is tricking who here?

23                    THE COURT:  Time, Mr. Watts.

24                    MR. WATTS:  Thank you, Your Honor.

25                    THE COURT:  Thank you.

 1          We'll go ahead and take a short break.  It's about

 2   10 o'clock.  If you all can be ready at ten minutes after ten,

 3   we'll take a short restroom break, I'll come back and give you

 4   the instructions on how to deliberate and what law to apply.

 5          THE COURT SECURITY OFFICER:  All rise.

 6          (WHEREUPON, at this point in the proceedings, the jury

 7   panel leaves the courtroom.)

 8          THE COURT:  Counsel, we'll see you at ten minutes after

 9   ten.  You should have the final draft of the jury instructions

10   and the jury verdict form.  Please follow along when I read the

11   instructions, so that we can pick up on any corrections or typos

12   or anything of that sort.

13          Also, I understand there is an issue with regard to

14   two exhibits that need to be taken care of with Pam?

15          MR. WATTS:  I think that got resolved and all we need to

16   do is read the numbers in.

17          MR. MULCAHY:  I believe that's right, Your Honor.  We

18   just want to go back through the list that's been given to the

19   clerk so we can make sure they were read in properly.

20          THE COURT:  Do you want to go ahead and do that now?

21          MR. MULCAHY:  I think we can do that right now.

22          THE COURT:  Go ahead and put them on so we can take

23   advantage of the break as well.

24          MR. MULCAHY:  Yes, sir.  The exhibits that we're

25   introducing into evidence are Exhibit 264, 274, 278, 279, 343,

1  349, 352, 353, 362, 367, 368, 372, 374, 390, 403, 405, 413, 416,

2  443, 454, 455, 489, page 416, 498, 520, 521, 569, 583, 628, which

3  is some selected pages, 858, 884, Number 1000, 1001, 1002, 1005,

4  1006, 1007, 1100, 1101, 1102, 1104, 1105, 1106, 1107.

5          THE COURT:  Is that correct?

6          MR. PINEDO:  Yes, Your Honor.  Just for a clarification,

7  489 was a multiple-page exhibit and the only page that was

8  entered was 416.  But yes, Your Honor, that agrees with

9  plaintiffs.

10          THE COURT:  All right.  You also have the certifications

11  to sign.  If you have not already signed it, please do that

12  before we send all of that material in.

13          MR. MULCAHY:  Yes, Your Honor.  Thank you.

14          THE COURT:  Good, see you in a little bit.

15          (WHEREUPON, at this point in the proceedings, a brief

16  recess was taken.)

17          THE COURT SECURITY OFFICER:  All rise.

18          THE COURT:  You may be seated.  Ladies and gentlemen of

19  the jury, I had indicated to you that we would be at the point

20  where I would do what is called charging the jury, which is to

21  read instructions to the jury as to how you deliberate and what

22  law to apply and how to consider the evidence, and I am prepared

23  to do that at this time.

24          I will tell you that it's important to listen to

25  the instructions at this point.  I could give you each a copy of

1  what I'm going to cover, but you will get a copy of it as part of

2  your deliberations, so if you need to refer to any part of the

3  instructions, you will have a written copy of what I'm about to

4  tell you.  Right now, though, I prefer it if you would listen

5  carefully as we go through the jury instructions.

6           Members of the Jury, you have heard the evidence in

7  this case.  I will now instruct you on the law that you must

8  apply.  In any jury trial, there are, in effect, two judges:  I

9  am one of the judges, the other is you, the jury.  It is my duty

10 to preside over the trial and to determine what testimony and

11 other evidence is admissible under the law for your

12 consideration.  It is also my duty at the end of the trial to

13 instruct you on the law applicable to the case.  It is your duty

14 to follow the law as I shall state it to you.  You must apply the

15 law to the facts as you find them from the evidence in this case.

16 You are not to single out one instruction alone as stating the

17 law, but must consider the instructions as a whole.

18           The parties have agreed or stipulated to the

19 following, and those are stipulations of fact that I read to you

20 at the outset of the trial, but will cover them again:

21           Number 1, plaintiff, Earline Castanel, is a

22 resident of the Parish of Orleans, in the state of Louisiana.

23           2, FEMA provided a trailer with Vehicle

24 Identification Number 5CZ200R2461125294 to plaintiff,

25 Earline Castanel, following Hurricane Katrina.

1           This travel trailer was a 2006 model 33-foot PM-FH

2    handicap unit manufactured by defendant, Recreation By Design,

3    L.L.C., hereinafter referred to as RBD, in Elkhart, Indiana, on

4    or about December 2 of 2005, for use by FEMA as emergency

5    housing.

6           4, RBD sold approximately 2,600 travel trailers to

7    Morgan Buildings and Spas, Incorporated, hereinafter Morgan, for

8    provision to FEMA following Hurricanes Katrina and Rita.

9    Additional RBD travel trailers were also bought by FEMA from

10   other dealers/distributors.

11          Morgan sold the travel trailer assigned to

12   Ms. Castanel to FEMA for use as emergency housing.

13          6, certain component parts used by RBD in the

14   manufacture of this travel trailer contained urea formaldehyde

15   and/or urea formaldehyde resins.

16          7, the RBD travel trailer was shipped to the FEMA

17   staging area in Baton Rouge, Louisiana, where it was received and

18   inspected by FEMA on or about December 7, 2005.

19          8, the RBD travel trailer was picked up at the FEMA

20   staging area in Baton Rouge, Louisiana, and hauled by Shaw to its

21   Manhattan staging area prior to being delivered to 2261 Urquhart

22   Street, New Orleans, Louisiana.

23          9, the RBD travel trailer was delivered and

24   installed by Shaw's subcontractor at 2261 Urquhart Street,

25   New Orleans, Louisiana.

1          10, Earline Castanel resided in this RBD unit from

2    approximately March 2006 to approximately July or August of 2007,

3    or approximately 16 or 17 months.

4          11, this travel trailer occupied by Ms. Castanel

5    was a 33 PM handicap accessible model with a slideout feature.

6          12, FEMA has provided thousands of travel trailers

7    to displaced residents following natural disasters in the

8    United States since at least 1992, including displaced residents

9    from the Gulf Coast region.

10          13, FEMA provided approximately 143,000 emergency

11    housing units to families across the Gulf Coast in response to

12    Hurricanes Katrina and Rita.

13          14, the RBD owner information manual, which is

14    Document Number RBD05189 through RBD05250, for the trailer

15    contained no warning regarding formaldehyde.

16          15, there were no labels posted in the trailer

17    provided to Ms. Castanel warning about formaldehyde.

18          16, prior to Hurricane Katrina, RBD had material

19    safety data sheets, or MSDS, from composite wood providers which

20    state that certain composite wood products used by RBD in the

21    manufacture of travel trailers contained formaldehyde.

22          17, on January 4, 2010, through January 8, 2010, at

23    the FEMA storage facility at Lottie, Louisiana, the RBD trailer,

24    VIN Number 5CZ200R2461125294, was tested for formaldehyde by Tony

25    Watson of Workplace Hygiene on behalf of RBD.

1        18, the first test was performed on January 4,

2   2010, and the trailer was tested as it was found.  The level of

3   formaldehyde found in the trailer was 9 parts per billion or ppb,

4   or .009 parts per million, ppm.  This was a one-hour test.

5   During the test, the average temperature in the trailer was

6   44 degrees and the average relative humidity was 68 percent.

7        19, a second formaldehyde measurement was taken on

8   January 7, 2010.  This sample was taken after the trailer was

9   aired out with all the doors, windows and vents open for

10  24 hours, and then the unit was closed up and heaters turned on

11  for 46 hours.  This was a one-hour sample, and it resulted in a

12  formaldehyde level of 50 parts per billion, ppb, or .050 parts

13  per million, or ppm.  During the conditioning period, the high

14  temperature in the trailer was 75 degrees and the low temperature

15  was 54 degrees during the first 25 hours of conditioning, and the

16  high temp in the trailer was 81 degrees Farenheit and the low

17  temperature was 69 degrees Farenheit within the 21-hour period

18  prior to sampling.  During the sampling period, the average

19  temperature in the trailer was 66 degrees Fahrenheit and the

20  average relative humidity in the air was 67 percent.

21       20, a third formaldehyde measurement was taken

22  beginning on January 7th and continuing on through January 8th,

23  2010, by Workplace Hygiene.  This was a 24-hour sample that was

24  taken after the trailer was aired out with all the doors, windows

25  and vents open for 24 hours, and then the unit was closed up and

1    heaters turned on for 46 hours.  This 24-hour sample resulted in

2    a formaldehyde level of 20 parts per billion or ppb or .020 parts

3    per million, or ppm.  During the conditioning period, the high

4    temperature in the trailer was 75 degrees Farenheit and the low

5    temperature was 54 degrees Farenheit during the first 25 hours

6    of conditioning, and the high temperature in the trailer was 81

7    degrees Farenheit and the low temperature was 69 degrees

8    Farenheit within the 21-hour period prior to sampling.  During

9    the sampling period, the average temperature in the trailer was

10   59 degrees Farenheit and the average relative humidity in the

11   trailer was 57 percent.

12           21, weather data collected by

13   Dr. Lee Branscome, Ph.D., a certified meteorologist, attached to

14   his report dated January 21, 2010, is representative of the

15   weather conditions for the time frame included herein.

16           Those are the stipulations.  If there is publicity

17   or other discussion about this trial outside of this courtroom,

18   you must ignore it.  You must decide this case only from the

19   evidence presented in this trial.

20           A demonstrative exhibit is an illustration.  It is

21   a party's summary, charge, picture, video, or video graphic, or

22   model used to describe something involved in this trial.  If your

23   recollection of the evidence differs from the exhibit, rely on

24   your recollection.

25           During the course of the trial, you have heard

1   objections to evidence.   Sometimes these were argued out of the

2   hearing of the jury.   It is the duty of the attorney on each side

3   of a case to object when the other side offers testimony or other

4   evidence the attorney believes is not properly admissible.   You

5   should not draw any inference against or show any prejudice

6   against a lawyer or his client because of the making of an

7   objection.

8           Upon allowing testimony or other evidence to be

9   introduced over the objection of an attorney, the Court does not,

10  unless expressly stated, indicate any opinion as to the weight or

11  effect of such evidence.   As stated before, you are the sole

12  judges of the credibility of all witnesses and the weight and

13  effect of all evidence.

14          When the Court has sustained an objection to a

15  question addressed to a witness, the jury must disregard the

16  question entirely, and may draw no inference from the wording of

17  it or speculate as to what the witness would have said if

18  permitted to answer the question.

19          During the course of the trial, I may have

20  occasionally asked a question of a witness or admonished an

21  attorney or witness.   Do not assume that I hold any opinion on

22  the matters to which my question or questions may have related.

23  If you could possibly construe any remarks I have made during the

24  course of this trial as a comment on evidence, then I instruct

25  you to disregard any such comment, for you, as jurors, are the

1   sole judges of the facts in this case.

2           Also at times during the trial, I may have directed

3   that certain testimony or other evidence be stricken from the

4   record and have instructed you to disregard such evidence.  You

5   will not consider testimony that has been stricken and as to

6   which you have been so instructed in reaching your decision.

7   Your verdict must be based solely on the legally admissible

8   evidence and testimony.

9           Any notes that you have taken during this trial are

10  only aids to your memory.  If your memory differs from your

11  notes, you should rely on your memory and not on the notes.  The

12  notes are not evidence.  If you have not taken notes, you should

13  rely on your independent recollection of the evidence and should

14  not be unduly influenced by the notes of other jurors.  Notes are

15  not entitled to any greater weight than the recollection or

16  impression of each juror about the testimony.

17          In determining the weight to give to the testimony

18  of a witness, you should ask yourself whether there was evidence

19  tending to prove that the witness testified falsely about some

20  important fact, or whether there was evidence that at some other

21  time, the witness said or did something, or failed to say or do

22  something that was different from the testimony he or she gave at

23  trial.

24          When knowledge of a technical subject matter may be

25  helpful to the jury, a person who has special training or

1   experience in that technical field -- he or she is called an

2   expert witness -- is permitted to state his or her opinion on

3   those technical matters.  However, you are not required to accept

4   that opinion.  As with any other witness, it is up to you to

5   decide whether to rely upon it.

6            Certain testimony has been presented to you through

7   a videotaped deposition or a deposition read to you here in the

8   courtroom.  A deposition is the sworn, recorded answers to

9   questions asked a witness in advance of the trial.  Under some

10  circumstances, if a witness cannot be present to testify from the

11  witness stand, that witness's testimony may be presented, under

12  oath, in the form of a deposition.

13           Sometime before this trial, attorneys representing

14  the parties in this case questioned the witness under oath.  A

15  court reporter was present and recorded the testimony.  The

16  questions and answers have been played or read to you at trial.

17  This deposition testimony is entitled to the same consideration

18  and is to be judged by you as to credibility as if the witness

19  had been present and had testified from the witness stand in

20  court.

21           The testimony of a physician who examines and

22  treats an injured person is entitled to greater weight than that

23  of physicians who only examined the injured person once.

24           You must consider only the evidence in this case.

25  However, you may draw such reasonable inferences from the

testimony and exhibits as you feel are justified in the light of common experience.  You may make deductions and reach conclusions that reason and common sense lead you to make from the testimony and evidence.  The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if, after considering all the other evidence, you believe that single witness.

There are two types of evidence you may consider: One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, the proof of circumstances that tend to prove or disprove the existence or nonexistence of certain other facts.

The law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.  Do not let bias, prejudice, or sympathy play any part in your deliberations.  A corporation, the United States Government, its officers, and all other persons are equal before the law and must be treated as equals in a court of justice.

In this case, the plaintiff must prove every essential element of her claims by a preponderance of the evidence.  This is sometimes called the burden of proof.

A preponderance of the evidence means the greater weight and degree of credible evidence before you.  In other

1    words, a preponderance of the evidence just means that the amount

2    of evidence that persuades you that a claim or defense is more

3    likely so than not so.  In determining whether any fact has been

4    proved by a preponderance of the evidence in the case, you may,

5    unless otherwise instructed, consider the testimony of all

6    witnesses regardless of who may have called them and all exhibits

7    received in evidence, regardless of who may have produced them.

8              If the proof fails to establish any essential part

9    of the plaintiff's claims against the defendant by a

10   preponderance of the evidence, you should find for the defendant

11   as to that claim.

12             To be clear, plaintiff need prove her claims only

13   by a preponderance of the evidence.  The plaintiff need not

14   produce every possible witness, and she need not prove her case

15   beyond a reasonable doubt, as is necessary in a criminal

16   prosecution.  But speculation or mere possibility and even

17   unsupported probability is not sufficient to support a judgment

18   in her favor.

19             The mere fact that an incident happens or an injury

20   occurs does not raise a presumption that any party, person, or

21   entity was at fault.

22             Plaintiff, Earline Castanel, claims that

23   Recreation By Design, or RBD, is liable for her damages as the

24   manufacturer of the emergency housing unit, which we sometimes

25   have referred to as EHU, or travel trailer that she occupied.

1    The plaintiff claims these damages under the Louisiana Products

2    Liability Act, which I will refer to as the LPLA.

3            The LPLA provides the exclusive remedy against a

4    manufacturer for injuries or damages caused by an unreasonably

5    dangerous product.  There are two separate theories of liability

6    under the LPLA that are applicable to this case:

7            One, liability based on unreasonable dangerous

8    design, and two, liability based on inadequate warning, rendering

9    the product unreasonably dangerous.

10           With regard to liability based on unreasonably

11   dangerous design, in this case, the plaintiff claims that the

12   product manufactured by RBD was unreasonably dangerous in its

13   design.  In order to be successful, the plaintiff must prove by a

14   preponderance of the evidence that:

15           First, there was an alternative design for the

16   product that was capable of preventing the injuries and the

17   likelihood that the products design would cause the injuries, and

18   the seriousness of that injury outweighed the burden on the

19   defendant of using that alternative design and the adverse effect

20   of using that alternative design on the utility of the product.

21           Two, the injury which plaintiff suffered was

22   proximately caused by a characteristic of the product which made

23   it unreasonably dangerous and existed at the time the product

24   left the manufacturer's control or resulted from a reasonably

25   anticipated alteration of the product later.

1          Three, the injuries which plaintiff suffered arose

2    from a reasonably anticipated use of the product by the plaintiff

3    or some other person.

4          And four, there was actual damage to the person of

5    the plaintiff.

6          If you find that RBD has used reasonable care to

7    provide an adequate warning to the users of the product, then you

8    must consider the effect of that warning in deciding the

9    likelihood that the design of the product would cause plaintiff's

10   injuries.

11         Secondly, with regard to liability based on

12   inadequate warning, in this case, the plaintiff claims that the

13   product manufactured by RBD was unreasonably dangerous because of

14   an inadequate warning about its potential risks.  In order to be

15   successful, plaintiff must prove each of the four elements by a

16   preponderance of the evidence:

17         Those are first, at the time the product left RBD's

18   control, the product had a characteristic that might cause

19   damage, and RBD failed to use reasonable care to provide an

20   adequate warning of that characteristic and its danger to users

21   of the product.

22         Secondly, the injury which the plaintiff suffered

23   was proximately caused by a characteristic of the product which

24   made it unreasonably dangerous and existed at the time the

25   product left RBD's control or resulted from a reasonably

1    anticipated alteration of the product later.

2            Three, the injury which plaintiff suffered arose

3    from a reasonably anticipated use of the product by the plaintiff

4    or some other person.

5            Four, there was actual damage to the person of the

6    plaintiff.

7            Once the plaintiff proves that the lack of adequate

8    warning rendered the product unreasonably dangerous, there is a

9    presumption that had the manufacturer provided an adequate

10   warning, the user would have both read and heeded the warning.

11   This presumption may be rebutted by competent evidence.

12           A manufacturer who learns of a characteristic of a

13   product and its danger after it has left its control that may

14   cause injury, or who would have learned about it had it acted in

15   a reasonably prudent fashion, is liable for injury caused by its

16   subsequent failure to use reasonable care to provide an adequate

17   warning of such characteristic and its danger to users of the

18   product.

19           The LPLA provides specific definitions for certain

20   terms that are used in these instructions, which I will explain

21   to you now.

22           When I use the term "reasonably anticipated use," I

23   mean use of a product that the manufacturer should reasonably

24   expect of an ordinary person in similar circumstances.

25           When I use the term "adequate warning," I mean a

1   warning or instruction that would lead an ordinary user of a

2   product to contemplate the danger in using the product, and then

3   either to decline to use it or, if possible, to use it in such a

4   manner as to avoid the injury for which the claim is made.

5               When I use the term "reasonably anticipated

6   alteration of the product at a later time," I mean a change in

7   the product that the manufacturer should reasonably expect to be

8   made by an ordinary person in similar circumstances, or a change

9   arising from ordinary wear and tear.  I do not mean by that term,

10  one, failure of a person other than the manufacturer reasonably

11  to pass on a warning about the product provided by the

12  manufacturer to that person rather than to the actual user; or,

13  two, changes to the product or its operation because it does not

14  receive reasonable care and maintenance.  These are not

15  reasonably anticipated actions for which the defendant

16  manufacturer may be held responsible based on inadequate warning.

17              When I use the term "actual damage to the person of

18  the plaintiff" in connection with plaintiff's unreasonably

19  dangerous design claim and plaintiff's inadequate warning claim,

20  such damage may include mental as well as physical injury.

21              A manufacturer cannot be expected to design

22  products with component parts which will never wear out,

23  regardless of the nature of use or maintenance of the product.  A

24  manufacturer is entitled to anticipate that a consumer purchasing

25  its product will use reasonable care in maintaining it.

1          A manufacturer is not liable for the unreasonable

2    danger of a product due to its design if it proves that at the

3    time the product left its control, one, it did not know and, in

4    light of the reasonably available scientific and technical

5    knowledge then existing, could not have known of the design

6    characteristic or its danger that caused the injury or of the

7    alternative design identified by the plaintiff; or, two, the

8    alternative design identified by the plaintiff was not feasible

9    in light of the reasonably available scientific and technical

10   knowledge or the economic practically then existing.

11         There are certain circumstances, however, under

12   which a manufacturer does not have to provide an adequate warning

13   as described above.  A manufacturer does not have to provide such

14   a warning, when, one, the danger of the product is not beyond

15   that which would be contemplated by the ordinary user with the

16   ordinary knowledge common to the community as to the product's

17   characteristics; or, two, the user already knows or reasonably

18   should have expected to know the characteristic of the product

19   that may cause injury and the danger of that characteristic.

20         A manufacturer is not liable for the unreasonable

21   danger of a product due to inadequate warning if it proves that

22   at the time the product left its control it did not know and, in

23   light of the reasonably available scientific and technical

24   knowledge then existing, could not have known of the

25   characteristic of the product or its danger that caused the

1   injury.

2          In this case, RBD has asserted the sophisticated

3   purchaser defense in relation to the LPLA claims asserted against

4   it by the plaintiff, as RBD sold the subject EHU to Morgan

5   Buildings and Spas, which, in turn, told to the EHU to FEMA.

6   Whether a manufacturer has adequately discharged its duty to warn

7   to qualify for the sophisticated purchaser is a question for you,

8   the jury.

9          RBD asserts that FEMA and/or Morgan Buildings and

10  Spas is a sophisticated purchaser.  A sophisticated purchaser is

11  one who, by experience and expertise, is aware of the possible

12  hazards associated with the use of the product and who has an

13  obligation to inform end users of such potential health hazards.

14         It is the province of you, the jury, to decide what

15  measures, if any, RBD could have or should have taken to protect

16  or warn end users such as the plaintiff from any alleged product

17  deficiencies in the trailer it manufactured.

18         In certain instances a manufacturer or other

19  defendant is not liable for the entirety of the harm suffered by

20  a plaintiff if the harm is caused in part by the contributing

21  fault or negligence of another defendant, the plaintiff herself,

22  or a person or entity who is not a party to this case, who we

23  refer to as a nonparty.

24         This is an issue on which the defendant has the

25  burden of proof.  The defendant must prove this defense by a

 1   preponderance of the evidence.  If you conclude that the conduct

 2   of the defendant, the plaintiff, or a nonparty caused or

 3   contributed to the plaintiff's injuries, then you must assign

 4   percentages of fault to each one.

 5           Louisiana law requires that you divide the total

 6   responsibility for this incident among all those at fault.  You

 7   should do this by assigning percentages of fault to the various

 8   involved parties and/or nonparties which will total 100 percent.

 9   You are free to assign whatever percentage you feel is

10   appropriate.

11           If you determine that a reduction in a plaintiff's

12   recovery in this case will provide consumers generally with an

13   incentive to use a product carefully, without requiring an

14   exceptional sacrifice of other interests, you may assign a

15   percentage of fault to the plaintiff in the manner that I will

16   describe to you.

17           On the other hand, if you determine that a

18   reduction in plaintiff's recovery will not realistically serve to

19   promote careful product use by the consumer or would drastically

20   reduce the manufacturer's incentive to make a safer product, you

21   may decide not to assign a percentage of faith to a plaintiff.

22           In determining those percentages you may consider

23   both the nature of the fault or negligent conduct and the extent

24   of the causal relation between such fault or conduct and the

25   plaintiff's injuries.

1        When I say the nature of the fault or negligent

2   conduct, I mean that you may consider, one, whether the conduct

3   resulted from inadvertence or, rather, involved an awareness of

4   the danger involved; two, how great the risk created by the

5   conduct was; three, the importance of what was sought by the

6   conduct; four, the physical and mental capacities of the person,

7   either ordinary or perhaps superior or inferior; and, five, any

8   extenuating circumstances which might have required a party to

9   act in haste without proper thought.

10        When I say the extent of the causal relation

11  between the conduct and the injuries, I mean that you may

12  consider the extent to which the conduct contributed to the

13  happening of the accident and plaintiff's injuries.

14        The law requires you to determine whether FEMA's

15  and/or Shaw's conduct was negligent.  I will now instruct you as

16  to the law regarding negligence.

17        For FEMA's and/or Shaw's conduct to have been

18  negligent, each of the following four elements must be proven by

19  a preponderance of the evidence.

20        The first element that you must consider is whether

21  either was negligent in that it fell below the standard of care

22  that the law requires.  In other words, you must decide whether

23  either breached a duty it owed to the plaintiff to exercise the

24  degree of care that we might reasonably expect of an ordinarily

25  prudent person, party or entity under the same or similar

1  circumstances.

2          A party's conduct was below the expected standard

3  of care if it created an unreasonable risk of harm.  In

4  determining whether an unreasonable risk of harm has been

5  created, you may weigh the likelihood that an accident might have

6  occurred and the seriousness of that accident against the

7  important to society of what that party was doing, the

8  advisability of the manner in which it was done under the

9  circumstances, and the burden of taking precautions sufficient to

10  avoid an accident.

11          Reasonable and ordinary care can include prior

12  discovery of reasonably discoverable conditions that might be

13  unreasonably dangerous in remedying and/or warning of such

14  dangers.

15          The second element that you must consider is

16  whether FEMA's and/or Shaw's conduct, if negligent, was a cause,

17  in fact, of the loss, if any, suffered by the plaintiff.  In

18  other words, you must decide whether the conduct of either

19  actually caused the plaintiff's loss.

20          Determining this element is usually a but for

21  inquiry that tests whether the plaintiffs's loss probably would

22  not have occurred but for the conduct in question.  This does not

23  mean, however, that the law recognizes only one cause of any

24  injury consisting of only one factor or thing, or the conduct of

25  only one person or party.  On the contrary, many factors or

1  things may operate at the same time, either independently or

2  together, to cause injury or damage.

3          When there are concurrent causes of an injury which

4  nevertheless would have occurred in the absence of one of the

5  causes, the proper inquiry is whether the particular conduct in

6  question was a substantial factor in bringing about the injury.

7          The third element that you must consider is whether

8  FEMA's and/or Shaw's conduct, if negligent, was a legal cause of

9  any loss by plaintiff.  Conduct is a legal cause of a loss if the

10  loss was a direct result of the conduct in question, or, at the

11  time that conduct occurred, was a reasonably foreseeable

12  consequence of that conduct.  With this inquiry, you should

13  consider whether the loss in question is one which the duty owed

14  was designed to prevent.  There may be more than one legal cause

15  of plaintiff's loss, if any.

16          The fourth element that you must consider is

17  whether there was actual damage or loss to the plaintiff.  In

18  other words, plaintiff must show that she actually has suffered a

19  loss.

20          If it is contended that others' actions were

21  negligent, then the party making that contention has the burden

22  of proving the negligence of the plaintiff, the defendant, or a

23  nonparty.  If that negligence is proven, the amount of any

24  monetary relief for damages that plaintiff has suffered will be

25  reduced by the extent of that negligence.

1       To establish the negligence of a plaintiff, any

2  other defendant, or a nonparty, the party against whom the

3  negligence claim is asserted must establish the same elements

4  that I have just explained in the context of the conduct of

5  plaintiff, the other defendants, or a nonparty.  Specifically,

6  the party against whom the negligence claim is asserted must

7  establish that the conduct of the plaintiff or a nonparty was

8  negligent, and that the conduct was a cause, in fact, and a legal

9  cause of any damages or loss actually suffered by plaintiff.

10       If you find that plaintiff has proven her claims

11  against the defendant, you must assess the amount of damages, if

12  any, established by a preponderance of the evidence as full and

13  just compensation for the injuries suffered by the plaintiff

14  which you find to have been proximately caused by the acts of the

15  defendant, no more and no less.

16       You should not interpret the fact that I have given

17  instructions about plaintiff's damages as an indication in any

18  way that I believe that plaintiff should or should not win this

19  case.  It is your task first to decide whether the defendant is

20  liable.  I am instructing you on damages only so that you will

21  have guidance in the event that you decide that the defendant is

22  liable to the plaintiff and that the plaintiff is entitled to

23  recover money from the defendant.

24       If you find that plaintiff has proven her claim

25  against the defendant, you are not forced to assess an amount of

1    damages for each and every element of damage that plaintiff has

2    claimed.  If you find plaintiff is entitled to one element of

3    damages but not another, then you are only required to assess

4    damages for the element to which you believe that plaintiff is

5    entitled.

6         The law recognizes both general damages for the

7    pain and suffering which a plaintiff may have faced because of

8    this incident and specific damages, sometimes called special

9    damages, which are intended to reimburse a plaintiff for the

10   actual or anticipated out-of-pocket expenses which have been

11   incurred.

12        If you decide to award plaintiff special damages,

13   you should consider the evidence that has been offered on these

14   issues, and you may award sums of money for past medical

15   expenses.

16        I remind you that in the assessment of damages you

17   have wide discretion in terms of both the decision about any

18   award at all and the level of that award.  The fact that I have

19   instructed you on damages should not indicate to you that I

20   believe the plaintiff should or should not recover any damages in

21   this case.  This is entirely for you to decide.

22        If you find that plaintiff is liable -- I'm sorry,

23   if you find that defendant is liable to plaintiff, then you must

24   determine an amount that is fair compensation for all of

25   plaintiff's general damages.  These damages are also called

1  compensatory damages.

2          The purpose of compensatory damages is to make the

3  plaintiff whole, that is, to compensate the plaintiff for the

4  damage that the plaintiff has suffered.  Compensatory damages are

5  not limited to expenses that the plaintiff may have incurred

6  because of her injuries.  If Earline Castanel wins, she is

7  entitled to compensatory damages for physical injury and pain and

8  suffering, including mental anguish and anxiety and distress that

9  she suffered because of the defendants' conduct and/or action or

10  inactions.

11          You may award compensatory damages only for the

12  injuries that plaintiff proves were proximately caused by the

13  defendants' allegedly wrongful conduct.  The damages that you

14  award must be fairly compensation for all of plaintiff's damages,

15  no more and no less.  Compensatory damages are not allowed as a

16  punishment and cannot be imposed or increased to penalize the

17  defendant.

18          You should not award compensatory damages for

19  speculative injuries, but only for those injuries which plaintiff

20  has actually suffered or that plaintiff is reasonably likely to

21  suffer in the future.  If you decide to award compensatory

22  damages, you should be guided by dispassionate common sense.

23          Computing damages may be difficult, but you must

24  not let that difficult lead you to engage in arbitrary guesswork.

25  On the other hand, the law does not require that plaintiff prove

1    the amount of her losses with mathematical precision, but only

2    with as much definiteness and accuracy as the circumstances

3    permit.  You must use sound discretion in fixing an award of

4    damages, drawing reasonable inferences where you find them

5    appropriate from the facts and circumstances in evidence.

6              You should consider the following elements of

7    compensatory damages to the extent you find them to have been

8    proven by a preponderance of the evidence and proximately caused

9    by the defendants' acts.

10             If you find for plaintiff, she is entitled to

11   recover an amount that will fairly compensate her for any damages

12   she has suffered.  You may award damages for aggravation of an

13   existing disease or physical defect or activation of any such

14   latent condition resulting from physical injury to

15   Earline Castanel.

16             In your consideration of the items of damage, you

17   should bear in mind that under the law the one liable or

18   responsible for an accident must take the injured person as he

19   finds him or her and is responsible for all the natural and

20   probable consequences of its wrong, even though they are more

21   serious or harmful by reason of a preexisting condition, physical

22   defect, or weakness of injured person.

23             If the accident results in aggravation of a

24   previous condition of disability or of pain of the injured

25   person, the one responsible is liable for both -- is liable both

1  for the aggravation of the preexisting condition and for any new

2  injuries resulting from the accident.  However, plaintiff must

3  prove, first, the prior existing condition and, two, the extent

4  of the aggravation.

5          If you find that she would have faced this

6  aggravation of her condition whether this incident happened or

7  not, then she is not entitled to damages on that portion of her

8  claim since the defendant is not responsible for the normal and

9  natural results of her prior condition.

10          If you find that there was such an aggravation of a

11  prior existing condition, you should determine, if you can, what

12  portion of plaintiff's condition resulted from the aggravation

13  and make allowance in your verdict only for the aggravation.

14          You may award damages for any bodily injury that

15  plaintiff sustained and any pain and suffering, mental anguish

16  and loss of capacity for enjoyment of life that she experienced

17  in the past or will experience in the future as a result of the

18  injury.  No evidence of the value of intangible things, such as

19  mental or physical pain and suffering has been or need be

20  introduced.

21          You are not trying to determine value but an amount

22  that will fairly compensate plaintiff for the damages she has

23  suffered.  There is no exact standard for fixing the compensation

24  to be awarded for these elements of damage.  Any award that you

25  make should be fair in light of the evidence.

1           The law recognizes that a plaintiff may suffer
2   mental distress and anguish as a result of an incident as well as
3   physical pain and suffering.  You are permitted to consider such
4   consequences as a part of the general damages which you may
5   award.  By mental distress and anguish, I mean substantial worry
6   or concern, grief and the like.

7           Other than fear of cancer damages, a plaintiff may
8   not recover for damages that she does not presently have.  Other
9   damages for a particular disease are not recoverable unless and
10  until a disease is diagnosed.  This is true because if the
11  plaintiff develops cancer or another illness or disease at
12  another time, then she is entitled to bring another lawsuit
13  regarding that condition at a later date.  However, this case is
14  plaintiff's only opportunity to recover damages for mental
15  distress and anguish associated with fear of cancer.

16          A person who claims damages resulting from the
17  wrongful act of another has a duty under the law to use
18  reasonable diligence to mitigate, to avoid or minimize those
19  damages.

20          If you find the defendant is liable and plaintiff
21  has suffered damages, then defendant may not recover for any item
22  of damage which she could have avoided through reasonable effort.
23  If you find by a preponderance of the evidence that plaintiff
24  unreasonably failed to take advantage of an opportunity to lessen
25  her damages, you should deny plaintiff recovery for those damages

1   which she would have avoided had she taken advantage of the

2   opportunity.

3          You are the sole judge of whether plaintiff acted

4   reasonably in avoiding or minimizing her damages.  An injured

5   plaintiff may not sit idly by when presented with an opportunity

6   to reduce her damages; however, a plaintiff is not required to

7   exercise unreasonable efforts or incur unreasonable expenses in

8   mitigating the damages.  The defendant has the burden of proving

9   the damages which that plaintiff could have mitigated.

10         In deciding whether to reduce a plaintiff's damages

11   because of a failure to mitigate, you must weigh all of the

12   evidence in light of the particular circumstances of the case

13   using sound discretion in deciding whether the defendant has

14   satisfied its burden of proving that plaintiff's conduct was not

15   reasonable.

16         In deciding the damages to which plaintiff may be

17   entitled if she has otherwise proven her claim by a preponderance

18   of the evidence, you may not consider or award any attorney's

19   fees which plaintiff may be required to pay as a result of this

20   proceeding.

21         It is your sworn duty as jurors to discuss this

22   case with one another in an effort to reach agreement if you can

23   do so.  Each of you must decide the case for yourself, but only

24   after full consideration of the evidence with the other members

25   of the jury.

1        While you are discussing the case, do not hesitate

2   to re-examine your own opinion and change your mind if you became

3   convinced that you are wrong.  However, do not give up your

4   honest beliefs solely because the others think differently or

5   merely to finish the case.

6        Remember that in a very real way you are the

7   judges, judges of the facts.  Your only interest is to seek the

8   truth from the evidence in the case.

9        I am going to provide you a jury verdict form,

10  which there has been some reference to in the closing arguments

11  by both counsel.  I will read to you the jury verdict form at

12  this time.

13       It says at the top in the caption of the case,

14  United States District Court, Eastern District of Louisiana,

15  New Orleans -- Eastern District of Louisiana, *In re: FEMA Trailer*

16  *Formaldehyde Product Liability Litigation*.  This document is

17  related to *Castanel v Recreation By Design, LLC*, Member Case

18  #09-3251.

19       Jury verdict form, A, liability.  One, do you find

20  that the RBD trailer occupied by Castanel was unreasonably

21  dangerous in its design?  And there a blank for a yes and a blank

22  for a no.

23       Proceed to question two.

24       Two, do you find that the RBD trailer occupied by

25  Castanel was unreasonably dangerous because an adequate warning

1    about the trailer was not provided?  Blank for a yes, blank for a

2    no.

3                    If you answered either of question numbers one or

4    two yes, proceed to question number three.  If you answered both

5    of question numbers one and two no, please sign and date this

6    jury verdict form and advise the court security officer that you

7    have reached a verdict.

8                    Three, do you find that any unreasonably dangerous

9    condition of the trailer existed at the time it left RBD's

10   control?  Blank for yes and a blank for no.

11                   If you answered question number three yes, proceed

12   to part B, question number four.  If you answered question number

13   three no, please sign and date this jury verdict form and advise

14   the court security officer that you have reached a verdict.

15                   B, damages.  Question four, do you find that

16   Castanel sustained injury to which RBD substantially contributed

17   as a result of any unreasonably dangerous condition of the

18   trailer?  Blank for a yes and a blank for no.

19                   If you answered question number four yes, proceed

20   to part C, question number five.  If you answered question

21   number four no, please sign and date this jury verdict form and

22   advise the court security officer that you have reached a

23   verdict.

24                   C, allocation of fault/damages.  Question five,

25   please allocate on a percentage basis the degree of fault, if

1    any, which you attribute to each of the following parties and

2    nonparties.  All numerical percentages you enter in this question

3    should add up to a total of one hundred percent.

4            Defendant, Recreation By Design, L.L.C., with a

5    blank and a percentage sign.  Plaintiff, Earline Castanel, a

6    blank with a percentage sign.  Shaw Environmental, Incorporated,

7    a blank with a percentage sign.  United States or FEMA, with a

8    blank and a percentage sign.  And underneath that is 100 percent

9    total.

10           Proceed to question six.

11           Six, what amount of damages, if any, do you find

12   should be awarded with respect to each of the following claims.

13           Past, present and future physical pain and

14   suffering of Earline Castanel?  There is a blank with a dollar

15   sign.

16           Past, present, and future mental anguish and

17   emotional distress of Earline Castanel.  Another blank with a

18   dollar sign.

19           Past medical expenses for Earline Castanel, and a

20   blank with a dollar sign.

21           And loss of impairment of life's pleasures for

22   Earline Castanel.  And there is a blank that the jury sign.

23   There is also a blank for the date and a blank for the jury

24   foreperson, whomever that may be, to sign.

25           When you begin your deliberations, you should

1    select your foreperson and conduct your deliberations, and during

2    those deliberations you may take with you these instructions and

3    the exhibits that the Court has admitted into evidence.

4            During your deliberations you must not communicate

5    with or provide any information to anyone by any means about this

6    case.  You may not use any electronic device or media such as a

7    telephone, cell phone, Smart Phone, iPhone, BlackBerry or

8    computer, the Internet, any Internet service or any text or

9    instant messaging service or any Internet chat room, blog or web

10   site, such as Facebook, MySpace, LinkedIn, YouTube or Twitter to

11   communicate to anyone any information about this case or to

12   conduct any research about this case until I accept your verdict.

13           In fact, as a matter of course, if you do have cell

14   phones or any of those items that I mentioned, I would ask that

15   you please turn them in to the court security officer when you

16   commence your deliberations for safekeeping.

17           If you recess during your deliberations, follow all

18   of the instructions that I have given you concerning your conduct

19   during this trial.  After you have reached your unanimous

20   verdict, your foreperson must fill in your answers to the written

21   questions and sign and date the verdict form.  Return this charge

22   together with your written answers to the questions.  Unless I

23   direct you otherwise, do not reveal your answers until such time

24   as you are discharged.  You must never disclose to anyone, not

25   even to me, your numerical division on any question.

1         If you want to communicate with me at any time,

2    please give a written message to the court security officer, or

3    CSO, who will bring it to me.  I will then respond as promptly as

4    possible either in writing or by meeting with you here in the

5    courtroom.  I will always first show the attorneys your question

6    and my response before I answer your question.

7         After you have reached a verdict, you are not

8    required to talk with anyone about this case unless I order you

9    to do so.

10        You may now return to the jury room to conduct your

11   deliberations.

12        I will also advise you that as we get into the

13   lunch hour, you will be afforded the opportunity to have lunch

14   with us, and you must have lunch together today.  We have a place

15   for you to eat lunch during the course of your deliberations.

16        All right.  You may begin your deliberations.

17        THE DEPUTY CLERK:  All rise.

18        (WHEREUPON, at this point in the proceedings, the jury

19   panel leaves the courtroom for deliberations.)

20        THE COURT:  You may be seated.  Counsel, very quickly,

21   with regard to the jury instructions and the jury verdict form,

22   the first order of business, which I don't think anybody here

23   caught, and I didn't catch it until we read through the jury

24   verdict form, but both the instructions and the jury verdict form

25   have the case heading on it, and in the case heading -- well,

1    first of all, on the jury verdict form, the New Orleans division

2    is the division in the Eastern District, so we will take out

3    New Orleans Division, all right.  There is no other division.

4            Secondly, I think we need to take out In re:  FEMA

5    Trailer Formaldehyde Product Liability Litigation and, also, MDL

6    Number 1873.  I think on the jury verdict form when I started

7    reading it I realized that that should not be on there, so we'll

8    eliminate that.

9            All right.  On the jury instructions themselves,

10   page 3, I'm going to cover what I have, and then I'll give you

11   the opportunity to cover anything you have.  Page 3, the top of

12   the page, I think there is no S on component.  Am I correct on

13   that, or is that appropriate?  Certain component parts.  It says

14   certain components parts.

15           MR. YOUNT:  That's correct.

16           MR. WATTS:  Yes, Your Honor.

17           THE COURT:  Take the S out at the top line.  All right.

18   That's on page 3.

19           I have a dog ear here on page 9, but I don't have a

20   circle here.  Did any of you all make a note on page 9?  I read

21   through something that attracted my attention as being in need of

22   correction, but maybe I'm wrong.

23           I'll take another look at it when we adjourn.

24           Let's see, page 13, three lines from the bottom

25   should be unreasonably dangerous design; is that correct?  Third

1  line from the bottom, page 13?

2           MR. WATTS:  Yes.

3           MR. YOUNT:  Yes.

4           THE COURT:  Page 14, second line from the bottom, I

5  eliminated the word "the."  I think I read it correctly.  It

6  shouldn't be the RBD, it should be RBD.  Second line from the

7  bottom on 14.

8               Page 25 and 26, there is reference to other

9  defendants.  I don't think it's a significant error since we

10 explained to them who the nonparties are, and it has come out in

11 trial that at one time the nonparties were defendants so I don't

12 think it's a big deal, but does anybody feel like we need to

13 change anything on page 25?

14          MR. WATTS:  Would it be -- would it cause any harm to

15 take out "any other defendant."

16          THE COURT:  No.  I would suggest that.  That's why I

17 flagged it as technically we probably should.

18          MR. WATTS:  I would request that.

19          THE COURT:  So on page 25, the last full paragraph, we

20 need to put plaintiff, or a nonparty.

21          MR. WATTS:  And four lines down, the other defendants

22 needs to come out.

23          THE COURT:  Correct.

24          MR. WATTS:  And then seven or eight -- three lines from

25 the bottom.

1        THE COURT:  From the bottom.

2        MR. WATTS:  Yes, sir.

3        THE COURT:  Okay.  Good.  You got those on page 25.

4             And this is just, I guess, more of an edit.

5   Page 33, second line from the top, which the plaintiff.  I think

6   "that plaintiff" suggests that there perhaps is more than one.

7   It should be, which the plaintiff could have mitigated.

8             And that's all I have on the jury instructions.  On

9   the plaintiff's side, any other corrections?

10       MR. WATTS:  No, sir.

11       MR. MULCAHY:  Your Honor, at the bottom of page 29, you

12  corrected yourself when you were reading it, but it refers to

13  him --

14       THE COURT:  You can come on up.

15       MR. MULCAHY:  Just at the bottom of page 29, I think you

16  corrected it when you read it, but it refers to the plaintiff

17  as -- where it says, as he finds him, and you said, or her, in

18  case you want to put that in there.

19       THE COURT:  That's correct.  Yeah, I did say that.

20  That's on page 29.

21            Any other changes or corrections that need to be

22  made on the jury instructions before we finalize them and send

23  them into the jury room?  Anybody else?

24            Let's go ahead and make those changes both to the

25  instructions as well as the jury verdict form.

1        All right.  I mentioned to you all at the jury

2   charge conference that we would at this time hold the record open

3   for any objections to the jury instructions by way of inclusion

4   or exclusion, and I'm prepared to go ahead and hear those now.

5   Mr. Watts, if you want to begin.

6        MR. WATTS:  Your Honor, I apologize, on the jury verdict

7   form, and I don't think it's a big deal, but it seems like after

8   question one, two, three and four, you tell them, if you answer

9   no, please sign and date this jury verdict form and advise the

10  court security officer you've reached a verdict, and I just

11  wonder whether we ought to put something like that after question

12  number six?

13       THE COURT:  Six?  Yeah.

14       MR. WATTS:  In other words, after you've answered

15  questions five and six, please instruct the court security

16  officer --

17       THE COURT:  All right.  We can go ahead and add that

18  after six.

19           All right.  Objections on the instructions by way

20  of inclusion or exclusion?

21       MR. WATTS:  Yes, sir.  At this time come now the

22  plaintiffs and formally object to the inclusion of Shaw as a

23  potential responsible party for the reasons stated in the Rule 50

24  motion.  We would incorporate by reference the arguments made to

25  in the Rule 50 motion in this objection and request a ruling at

1  this time.

2        THE COURT:  Right.  I understand that.  And we did have

3  some extensive argument with regard to Shaw and its potential

4  responsibilities such that they could be included on the jury

5  verdict form and be included in the instructions.  We covered

6  that on Friday.  I do recall the arguments, and I will overrule

7  the objection.

8        MR. WATTS:  Thank you, Your Honor.

9        Secondly, with respect to the inclusion of FEMA on

10  the jury verdict form, we would object to any jury instructions

11  or the inclusion of FEMA on the jury verdict form as a potential

12  responsible party for the reason that, I believe, on Wednesday of

13  last week, the Court ruled that FEMA should be dismissed because

14  of the absence of gross negligence evidence.  We think that is

15  the law of the case, and that FEMA should not have been included

16  in the jury instructions or in the verdict form because there was

17  no evidence of gross neglect against FEMA whatsoever, and that,

18  in addition, nobody can recover against FEMA for mere negligence.

19        I made these arguments in a Rule 50 motion, as

20  well.  We would incorporate those arguments into these objections

21  and request a ruling at this time.

22        THE COURT:  Let me make clear because I think you -- I

23  understand what you're talking about, but I think you said the

24  Court's ruling was the absence of gross negligence.  The Court's

25  ruling pertained to the standard of care which would be imposed

1   on FEMA in order to assess liability against FEMA.  That ruling

2   was had in the context of the MDL and not specifically in this

3   case, but it is the law of the case.

4          Specifically, I did not hold that there is an

5   absence of gross negligence.  I merely held that FEMA could be

6   negligent or FEMA could be proven to be grossly negligent, but it

7   would only -- liability would only be imposed when gross

8   negligence was demonstrated by a preponderance of the evidence.

9   Be that as it may, I understand your argument.

10         I think that in this case there is negligent -- if

11  the jury so finds negligent conduct on behalf of FEMA, that would

12  be fault for which FEMA would enjoy immunity under state law and

13  under the particular statute that was involved in the court's

14  ruling.

15         The jury could possibly find negligence or gross

16  negligence.  Either way, I think that the blank on the jury

17  verdict form for the percentage assessment of fault could still

18  be -- could still feature a finding of negligence or gross

19  negligence.  In this case, FEMA is not a party, so it doesn't

20  matter whether it was negligence or gross negligence.  It's only

21  fault of FEMA.

22         MR. WATTS:  And, Judge, just so the record is clear, I

23  accept your clarification of what you ruled on last Wednesday and

24  meant to say it that way and didn't mean to mislead the Court as

25  to its own ruling.

 1          THE COURT:  No, that's fine.  No, I understand the

 2     point.  We did cover it Friday --

 3          MR. WATTS:  Yes, sir.

 4          THE COURT:  -- and I understand your point.

 5          MR. WATTS:  The last objection that we have is to the --

 6          THE COURT:  I just didn't want someone to take the

 7     transcript and --

 8          MR. WATTS:  Exactly.  And I'm sorry.

 9          THE COURT:  -- say that I held something that I haven't

10     yet held and may not hold.

11          MR. WATTS:  The last objection that we have is we object

12     to the inclusion of the sophisticated purchaser instruction on

13     page 19 and 20.  We believe that under the law the instruction

14     misstates the law from the standpoint of the sophisticated

15     purchaser defense is one that's available if they warned the

16     sophisticated purchaser and obviates the need of a warning to the

17     end user.

18          We don't believe the sophisticated purchaser

19     defense is appropriate in a case where there is no evidence of

20     warning the intermediary who is alleged to be the sophisticated

21     purchaser.  We would object to that inclusion in the charge at

22     this time and request a ruling.

23          THE COURT:  The Court will overrule that objection,

24     again for the reasons stated on Friday.  As I indicated in this

25     case, unlike the other two that we have tried, we actually have

1    two parties -- not properly speaking, two entities, technically

2    are nonparties, who would -- depending on how the evidence is

3    considered, could possibly be considered sophisticated

4    purchasers.  In this case, we have Morgan and, of course, the

5    government, which was involved in the sophisticated purchaser

6    doctrine in the first two trials.

7            MR. WATTS:  Yes, sir.  That concludes our objections.

8    We appreciate your rulings.

9            THE COURT:  Thank you, Mr. Watts.

10           Mr. Yount.

11           MR. YOUNT:  Thank you, Your Honor.  Your Honor, on

12   behalf of RBD, the first objection we have is to the jury verdict

13   form under Item Number 6.  We believe that separating separate

14   charges for past, present and future mental anguish and emotional

15   distress of Earline Castanel and then the separate one for loss

16   of impairment of life's pleasures is duplicative.  We would

17   submit that only one of those blanks should have been included on

18   the verdict form.  We'd object on that ground.

19           THE COURT:  I'll overrule the objection.

20           MR. WATTS:  Your Honor, we object as set forth in our

21   Rule 50 motion, as it was argued extensively, the failure of the

22   a court to include a jury charge under Louisiana Revised

23   Statute 9:2771, which is the contractor plans and specs defense

24   which was argued substantively last Friday.  We would object to

25   the failure of the court to include that charge, and the charge

1    that we would submit being read to the jury was contained in

2    RBD's proposed jury instructions at REC DOC NO. 14036.

3             THE COURT:  As long as you have that in the record, and

4    we did spend a lot of time on that one in particular on Friday

5    and spent a lot of time researching it and reviewing that and

6    carefully reading it, and I think I put my reasons on the record

7    Friday afternoon, so I'll overrule the objection.

8             Make sure that any instruction for both sides that

9    is not included, make sure that is in the record somewhere so

10   that you don't wind up revisiting this issue elsewhere and not

11   have a copy of the instruction to show the panel of three what

12   you intended to have in the jury instructions.

13            MR. WATTS:  I think on Friday you read the proposed

14   instruction that you were not going to --

15            THE COURT:  I did.  On that particular one, I did.

16            MR. WATTS:  Right.

17            THE COURT:  Now, that was the instruction as it was

18   written by me based on your submissions.  If your submission was

19   different than the instruction and your objection extends to what

20   you submitted, then you're going to need to make sure that's

21   included.

22            I read to you what I had reduced your submission to

23   and decided not to include, so what I read may not be the same

24   thing you initially submitted.

25            MR. YOUNT:  Thank you, Your Honor.  Our proposed jury

1    instructions were filed into the record, filed in PACER.

2              Our next objection, Your Honor, would be on page 16

3    of the jury instructions that you read to the court under the

4    section entitled, Number 2, liability based on an inadequate

5    warning.  Specifically -- I take that back.  That was an error on

6    my part, and I apologize to the Court.

7              On the sophisticated purchaser doctrine, RBD

8    objects to the failure of the Court to include the following

9    language which was submitted in RBD's proposed jury instructions,

10   again, at RECDOC14036.  The paragraph reads as follows,

11   "Therefore, if you find that, one, Recreation By Design is a

12   manufacturer, which is undisputed, and, two, Morgan Building and

13   Spas and the United States through FEMA is a sophisticated

14   purchaser of that Recreation By Design trailer, then you must

15   return your verdict in favor of Recreation By Design on the LPLA

16   claims based on inadequate warning."  This is found on page 19 of

17   our prior submission.

18             THE COURT:  I'll overrule that one.  I think the

19   instruction that we included certainly has the implication

20   that -- that's the net result of the jury finding by a

21   preponderance of the evidence that that defense is appropriate,

22   so I think that is surplus to what the Court gave.

23             MR. YOUNT:  Lastly, Your Honor, we would object to the

24   charge related to the loss of fear of cancer -- I mean, loss

25   of -- fear of cancer claim on the ground that there was no

1  evidence, as extensively argued in connection with our Rule 50

2  motions, absolutely no evidence.  Ms. Castanel did not testify

3  that she was afraid of developing cancer.  So from a factual

4  standpoint RBD believes that that charge should not have been

5  read to the jury.  I'll adopt the arguments previously made.

6          THE COURT:  And the Court will likewise overrule that

7  objection for the reasons stated by me.

8          MR. YOUNT:  And if I could have one brief second to

9  consult with counsel.

10             That's it, Your Honor.  Thank you very much.

11         THE COURT:  Does anybody have anything else that we need

12  to cover on the record at this time before we adjourn?  Nothing

13  else?

14         MR. DARNELL:  No, sir.

15         THE COURT:  All right, thank you all very much.  Very

16  good work on closing arguments.  I appreciate all of your time

17  and effort.

18             If you leave this area, meaning the courtroom and

19  the hallway right outside here, say, to the elevators, if you

20  leave this area please make certain that you have given contact

21  information for each side to either Pam, my courtroom deputy, or

22  give it to someone in chambers.  In the event there is a question

23  or, obviously, if is there a verdict, we need to be able to

24  contact you and summon you back here.

25             Obviously, if I get anything out of the jury room

1    by way of a question or anything, you'll be contacted; so, if you

2    do leave, don't go too far.

3                Are you all planning on at least for the time being

4    being in this area?

5         MR. DARNELL:  Yes, sir.  I think Mr. Dinnell and

6    Mr. Kurtz and I have -- and Andy have a conference with you in

7    your chambers with respect to another matter, so we'll be here

8    for a while.

9         MR. GARRISON:  Yes, sir, we're going to be in the area.

10   We might go a block or two away for lunch, if that's all right.

11        THE COURT:  As long as we have your cell phones.

12        MR. YOUNT:  Your Honor, one last question while we're on

13   the record getting more into jury selection.  Mr. Watts offered

14   into evidence the -- a certain number of jury questionnaires.  I

15   can't recall specifically.

16        MR. WATTS:  The first 25.

17        MR. YOUNT:  And are those, in fact received in evidence?

18        MR. WATTS:  Yes, they were delivered this morning.

19        THE COURT:  Well, let me ask you this.  We're about to

20   send in the exhibits to the jury room, so that should be made

21   part of the record but are not exhibits at trial.

22        MR. YOUNT:  That's what I meant, Your Honor.  I

23   misspoke, I apologize.

24        THE COURT:  That's fine.  As long as we have those in

25   the record.  Everybody has signed the certification?

1        MR. WATTS:  I haven't, but I will right now.

2        THE COURT:  Because we're about to send in the exhibits

3   once we get your signatures on there.  Make sure.  If you need to

4   double check it, now is the time to do it.

5             All right.  We will see you all as soon as we hear

6   something out of the jury room, white smoke.

7        (WHEREUPON, at this point in the proceedings, the Court

8   was in recess while the jury deliberates.)

9        THE DEPUTY CLERK:  All rise.

10        (WHEREUPON, at this point in the proceedings, the jury

11   panel enters the courtroom.)

12        THE COURT:  Ladies and gentlemen of the jury, it's my

13   understanding that you all have reached a verdict in this case;

14   is that correct?

15        THE FOREPERSON:  Yes.

16        THE COURT:  Mrs. Catalano, you were seated there

17   throughout the trial, but you're seated there now which typically

18   would indicate to me that you are the foreperson of the jury; is

19   that correct?

20        THE FOREPERSON:  Yes.

21        THE COURT:  And you have the verdict with you and the

22   envelope, I see?

23        THE FOREPERSON:  Yes.

24        THE COURT:  I'll ask the courtroom deputy to get that

25   from you.

1       The Court is in receipt of the jury's verdict.  I will

2  now read the jury's verdict.

3              A, liability, one, do you find that the RBD trailer

4  occupied by Castanel was unreasonably dangerous in design?

5  Answer, no.

6              Two, do you find that the RBD trailer occupied by

7  Castanel was unreasonably dangerous because an adequate warning

8  about the trailer was not provided?  No.

9              All other questions being unanswered, the jury

10  verdict form is dated and signed by Mrs. Catalano as the

11  foreperson of the jury.

12              Would anyone like to have the jury polled at this

13  point?

14         MR. GARRISON:  No, sir.

15         MR. WATTS:  No, sir.

16         THE COURT:  The Court will accept the jury's verdict,

17  and it will be the judgment of the Court.

18              I have a few things I would like to cover now that

19  you all have finished your jury service, and I'll try to be brief

20  because I know you all have been at this now for exactly a week,

21  starting last Monday.

22              It's essential to our system of justice that we

23  have people show up for jury service.  This case could have been

24  tried either in front of me or another judge or another

25  administrative type of person, but the result in any trial,

1    criminal or civil, is always the best when the case is heard

2    before citizens who come together.

3            You all did not know each other prior to your

4    experience on the jury here, did not know any of the attorneys in

5    this case, any of the parties in this case, didn't know me, and

6    yet you came here with open minds, filled out the questionnaires

7    that we asked you to fill out some weeks ago, and participated in

8    the jury selection process in order for us -- when I say "us," I

9    mean not only those of us in this room, but I mean the citizenry

10   of the country -- to be able to have a dispute heard and resolved

11   by fair-minded people who are able to listen to the evidence, and

12   we kept telling you that that the case has to be decided on the

13   evidence presented in the courtroom.

14           We also instructed you several times to put aside

15   any type of prejudice that you may have or bias or sympathy that

16   you may have for either party in this case, or for anyone else,

17   and put aside any other types of feelings that you may have and

18   focus on the evidence that was adduced at this trial by these

19   attorneys and by the parties.  And you all were able to do that,

20   and without your showing up for jury service and participating in

21   this process, we would not have been able to do that in this

22   case.

23           Jury service, maybe aside from your right to vote,

24   jury service is one of your greatest civil duties, civil

25   obligations that you have.  And when I hear people talk about

1    trying to get out of jury service, and I know none of you all

2    were thrilled late Monday morning when it seemed like you were

3    being picked for this jury, I could tell on your faces that none

4    of you all were jumping for joy and were thankful that you were

5    picked, and yet you were able to sit and focus on the evidence

6    during the course of the week and really put your nose to the

7    grindstone and try to understand.

8              We had a lot of science in this case, a lot of

9    people who are very familiar with the topics that were covered,

10   things that neither you nor I had a lot of experience with, but

11   you were able to sit and listen to all of the evidence and try to

12   understand it and listen to the attorneys respectfully as to

13   their positions and come to a conclusion in this case.  And it's

14   not so much the conclusion that you came to as the fact that you

15   participated in the case, you listened, and you came to a verdict

16   that you all could agree on.

17             And that's a wonderful thing, and without it you

18   would see scenes in this country like what you see on the news in

19   other countries where people resort to violence because they

20   don't have what we have here, which is a jury system.  People

21   don't appreciate that.

22             I know you won't get one from us soon because

23   you've done your duty here, when you do hear of someone in your

24   family, a relative, a friend or neighbor who says, Doggone it, I

25   got a summons to report for jury service, in state or federal

1    court, and they start complaining about it and start wondering

2    how they can get out of it, please remind them that it's

3    essential that they participate in jury service.

4         A lot of times I hear people complain about crime,

5    "Oh, the crime in the city is terrible," you know, they complain

6    about the way things are, and yet if they get picked to serve on

7    a jury, they feel like they are imposed upon, but this is the one

8    way that you can participate in the process.  In a criminal or

9    civil trial, this is the way that you can participate in the

10   process, to make sure that the court system works the way it's

11   supposed to and the way the public expects that it will be.  So

12   that's one thing.

13        The other thing is we want to hear from you about

14   your jury experience.  Were there things about the last week that

15   you liked or were there things about the last week when you were

16   with us that you did not like?  We know that that the parking is

17   not the best around here, that it's kind of a struggle.  The

18   courtroom is sometimes too cold, things like that, put that down,

19   but let us know if there was something we're doing right here, we

20   as a court are doing right here, let us know.  Is there something

21   that you particularly enjoyed about being on the jury?  Is there

22   something that you didn't like that you think we can change?

23   We're very open-minded about that here.

24        The judges on this Court and the folks who work on

25   the first floor in the jury administrator's office want to know

1    and we take very seriously any comments you may have about the

2    jury service.  You'll receive in the mail, I think in the mail or

3    perhaps when you leave today, you'll receive a questionnaire.  We

4    ask you to be as candid as possible and let us know.  If it's

5    something we can't do anything about, well, at least we know, and

6    we'll try to to make it be more comfortable.

7              If there is something that we can change, we

8    certainly would like to know about it.  We would like to have the

9    opportunity to change it for people who come after you and sit in

10   those chairs and hear cases after you, so it's very important for

11   you to be candid with us.

12             If it's something in the trial in particular, put

13   that down as well.  If it's something that you really don't feel

14   comfortable writing or submitting to the jury administrator's

15   office, if it's something you think I need to know, you can visit

16   with me today after you're released from your jury service.  I'll

17   be here.  You can come right up and I'll be happy to meet with

18   you, or if you would like to call me -- my number is in the

19   book -- you can call me and tell me whatever problems you think

20   we have, or on any other day, if you happen to be in neighborhood

21   and want to come by and tell me about a problem that you may have

22   had or something that I need to know, feel free to do that.

23   We're very open minded here about jury service, and we want to

24   make you as comfortable as possible when you serve on a jury in

25   this building.

1          We do appreciate that we're taking you away from

2    your normal, everyday job obligations and your families, and

3    we're sorry for that, but, again, it's very important that you

4    serve.

5          Another thing that I want to point out to you now

6    is that it should be obvious to you that, unlike television and

7    in the movies, people don't just file a lawsuit and then show up

8    in court and try the lawsuit.  We've all seen that happen on TV,

9    and it seems so simple.  It's obvious to me and it should be

10   obvious to you that a lot of preparation on behalf of the

11   attorneys and the parties in this case was put in to get this

12   case to trial.

13         And the fact that we tried this case in a total of

14   6 days from picking the jury all the way to this moment is really

15   a tribute to the attorneys in this case who have worked very hard

16   on their causes, but also they've worked very hard together with

17   each other in order to make a presentation here today, they've

18   worked very hard following the Court's orders to try to get the

19   case ready for trial, and I want to thank them in front of you

20   for the excellent work that was done on all sides of this case by

21   the attorneys and their staff people.  Some of their staffs have

22   been here throughout the trial and in and out of the courtroom,

23   but they have done a real yoman's job of getting this case to

24   trial.  It makes my job a lot easier when they are prepared such

25   as these attorneys were prepared.  It makes your job a lot easier

1    as jurors to be able to have a smoother presentation.  So I don't

2    want the day to end without me thanking them in front of you and

3    on your behalf for the excellent work that they have done on all

4    sides in this case.

5              I do have a final instruction here for you.  You

6    are not under any obligation to talk to anyone about your jury

7    service for any reason.  I'll read to you this notice which

8    you'll be provided, and then I'll expand on it a little bit.

9              It just says:  United States District Court,

10   Eastern District of Louisiana notice to jurors.  This is a

11   reminder that you have absolutely no obligation to discuss

12   anything about this case with any member of the press or anyone

13   else.  If you do not want to talk to the press and you are

14   contacted by them or a member of the press, I recommend that you

15   immediately and clearly advise the caller that you do not want to

16   discuss anything about the case with anyone.

17             If, after so advising a member of the press or

18   anyone else, you are further bothered or harassed by anyone

19   seeking a statement, please report that fact immediately to the

20   presiding judge -- as I indicated, my number is in the book --

21   who will take appropriate action.

22             This notice is also to remind you that if you

23   choose to discuss anything about your jury duty with anyone,

24   including the press, you are under no circumstances to discuss or

25   in any way disclose anything about the deliberative process or

1    the vote of any of your fellow jurors.

2              That basically means that whatever happened in the

3    jury room during deliberations is to remain in the jury room.

4    Even if you would like to tell someone, well, we considered this

5    issue and some felt this way and some felt that way, you're not

6    to disclose that.

7              Sometimes, and I don't know what the practice will

8    be here with regard to these attorneys, but sometimes after a

9    case, attorneys or their staff or even their client contacts

10   jurors to find out how the attorney performed, what did you like

11   about the attorney's presentation, how did certain witnesses

12   appeal to you or not appeal to you, things of that nature, things

13   that are of a critical nature that they can use in their practice

14   in the future.  And there is nothing unprofessional or untoward

15   about that practice.  They are free to contact you.

16             Again, it's entirely up to you whether you wish to

17   engage in that conversation or not.  If you tell them that you do

18   not wish to engage in the conversation, that will be the end of

19   it.  If you do decide to talk to them, you're free to give your

20   impressions about the trial and about your jury service, but do

21   not discuss anything about the jury's deliberations.

22             Is everybody clear on that?  Any questions about

23   that?  It's very important.

24             The only time you would ever have to disclose what

25   would happen in your deliberations is upon an order from me, and

1  that is very, very rare, and it's highly unlikely to happen, but

2  that would be the only circumstance, and please don't disclose

3  anything about it until that happens, which I don't foresee in

4  this case.

5          All right.  Again, I want to thank you all for your

6  attention the last week.  You all have really been focused, and

7  part of my job was to watch you all serve on the jury and make

8  sure everybody was paying attention and trying to keep up with

9  what we were doing here, so thank you again for your jury

10  service.

11          I think that you probably will have to return to

12  the jury administrator's office.  Is that right, Pam?

13          If you do have a notebook, a juror notebook, if you

14  have it with you, leave it on your chair.  If you left it in the

15  jury room, leave it in the jury room.  The Court will take

16  custody of those and destroy those.  Those are not available to

17  counsel or anyone else to review.  So your notes should stay in

18  the jury room, and we will pick those up as soon as you leave

19  today.

20          But the court security officer will escort you back

21  to the first floor, and you'll be given a certificate so you'll

22  have something to memorialize your service here with us.  Thank

23  you again very much for serving as a juror in this case.

24          THE DEPUTY CLERK:  All rise.

25          (WHEREUPON, at this point in the proceedings, the jury

1    panel leaves the courtroom.)

2            THE COURT:  You all may be seated.

3                    I'm going to give to the courtroom deputy the jury

4    verdict form.  If you would like copies of it, we can get that

5    for you.

6                    Counsel, is there anything that you would like to

7    cover on the record at this time outside of the presence of the

8    jury?

9            MR. WATTS:  Not for the plaintiffs.

10           MR. GARRISON:  No, sir.  Not for the defendants.  I

11   would like to thank the Court and its staff for everything they

12   did for us.

13           MR. WATTS:  Ditto.

14           THE COURT:  Thank you all.  Those of you who have

15   practiced in front me know, it's not I'm reluctant to, I just

16   don't make comments on superlative performances when I don't

17   think they are earned.  I guess I'm from the school of if you

18   can't say something nice about somebody, don't say anything at

19   all, so that's my practice here.  If it goes unmentioned before

20   the jury that the attorneys did a good job, it means that they

21   did an average or substandard job, and so my comments here today

22   were sincere regarding your performances in this case.

23                   We will consider all of the results of this case,

24   along with the previous two cases, actually, the previous three

25   case, the one that was not tried, and that was the *Fleetwood*

1    matter, if I'm not mistaken, the December bellwether which was

2    not tried, and try to put this result in context and go on from

3    here.

4              In terms of signing a judgment at this point, I

5    will ask Mr. Garrison, would you prepare a judgment at this

6    point?

7              MR. GARRISON:  Yes, sir.

8              THE COURT:  I'm not going to sign it right away, but in

9    terms of any posttrial motion practice, I guess we should go

10   ahead and sign the judgment so we can go ahead and trigger that

11   process, but go ahead and prepare a judgment and circulate it to

12   counsel before submitting it to the Court so that it may be

13   approved as to form.

14             MR. GARRISON:  Yes, sir.

15             THE COURT:  Thank you all again.  We will see you all

16   very soon, I'm sure.

17             THE DEPUTY CLERK:  All rise.

18             (WHEREUPON, at 2:45 p.m., the proceedings were

19   concluded.)

20                              *    *    *

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3    I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Registered Professional Reporter, Certified Court

5    Reporter of the State of Louisiana, Official Court Reporter for

6    the United States District Court, Eastern District of Louisiana,

7    do hereby certify that the foregoing is a true and correct

8    transcript, to the best of my ability and understanding, from the

9    record of the proceedings in the above-entitled and numbered

10   matter.

11

12

13                              *s/Cathy Pepper*

14                              Cathy Pepper, CRR, RMR, CCR

15                              Official Court Reporter

16                              United States District Court

17

18

19

20

21

22

23

24

25

## #

**#09-3251** [1] - 1436:18

## $

**$27,000** [1] - 1353:12
**$55,000** [2] - 1377:4, 1383:18
**$800** [1] - 1396:2

## '

**'95** [1] - 1394:11
**'96** [1] - 1394:11
**'97** [1] - 1394:11
**'98** [1] - 1394:11
**'99** [1] - 1394:12

## 0

**008** [2] - 1399:19, 1401:2
**009** [2] - 1380:21, 1412:4
**016** [1] - 1399:19
**020** [2] - 1380:20, 1413:2
**050** [2] - 1380:19, 1412:12
**09-3251** [1] - 1346:8

## 1

**1** [14] - 1353:16, 1355:10, 1361:4, 1361:18, 1362:1, 1365:11, 1365:18, 1372:5, 1372:17, 1373:3, 1373:16, 1379:20, 1403:7, 1409:21
**1,000** [2] - 1360:25, 1361:6
**1,358** [1] - 1355:12
**1,600** [1] - 1359:14
**10** [4] - 1354:21, 1390:3, 1407:2, 1411:1
**100** [5] - 1346:18, 1386:3, 1399:5, 1425:8, 1438:8
**1000** [3] - 1346:24, 1348:18, 1408:3
**1001** [2] - 1348:18, 1408:3

**1002** [2] - 1348:18, 1408:3
**1005** [2] - 1348:18, 1408:3
**1006** [3] - 1348:19, 1372:15, 1408:4
**1007** [2] - 1348:19, 1408:4
**11** [1] - 1411:4
**1100** [2] - 1348:19, 1408:4
**1101** [2] - 1348:19, 1408:4
**1102** [2] - 1348:19, 1408:4
**1104** [2] - 1348:19, 1408:4
**1105** [2] - 1348:19, 1408:4
**1106** [2] - 1348:19, 1408:4
**1107** [1] - 1408:4
**1107..** [1] - 1348:19
**11th** [1] - 1369:10
**12** [6] - 1355:23, 1359:5, 1359:12, 1359:14, 1406:4, 1411:6
**12,221** [1] - 1358:19, 1363:12
**13** [3] - 1411:10, 1441:24, 1442:1
**1351** [1] - 1348:5
**1374** [1] - 1348:6
**14** [5] - 1375:14, 1404:6, 1411:13, 1442:4, 1442:7
**14036** [1] - 1449:2
**1407** [1] - 1348:15
**1409** [1] - 1348:7
**143,000** [2] - 1357:9, 1411:10
**1440** [1] - 1348:8
**1453** [1] - 1348:9
**15** [3] - 1355:23, 1399:5, 1411:16
**15,000** [2] - 1376:3, 1376:4
**15-minute** [1] - 1391:15
**16** [5] - 1364:13, 1366:3, 1411:3, 1411:18, 1450:2
**17** [6] - 1364:13, 1369:2, 1373:2, 1373:17, 1411:3, 1411:22
**17th** [4] - 1362:21, 1362:24, 1363:5, 1365:14

**18** [1] - 1412:1
**1800** [1] - 1347:5
**1873** [2] - 1346:5, 1441:6
**19** [3] - 1412:7, 1447:13, 1450:16
**1970s** [1] - 1375:17
**1971** [1] - 1398:22
**1980s** [1] - 1357:17
**1992** [2] - 1357:5, 1411:8
**1994** [1] - 1394:11
**1999** [2] - 1375:22, 1376:3
**1st** [4] - 1352:23, 1369:7, 1369:8, 1369:13

## 2

**2** [9] - 1355:10, 1362:8, 1365:22, 1367:6, 1387:12, 1403:7, 1409:23, 1410:4, 1450:4
**2,600** [2] - 1357:13, 1410:6
**2.5** [1] - 1355:11
**20** [7] - 1356:2, 1359:2, 1380:20, 1405:13, 1412:21, 1413:2, 1447:13
**2000** [1] - 1394:12
**2002** [1] - 1394:12
**2005** [11] - 1363:6, 1363:9, 1363:11, 1363:17, 1363:21, 1380:15, 1382:4, 1382:7, 1406:2, 1410:4, 1410:18
**2006** [9] - 1352:24, 1359:17, 1364:25, 1381:13, 1385:23, 1394:21, 1406:2, 1410:1, 1411:2
**2007** [5] - 1368:24, 1370:15, 1370:16, 1405:6, 1411:2
**2009** [2] - 1372:17, 1395:2
**2010** [8] - 1346:6, 1349:3, 1411:22, 1412:2, 1412:8, 1412:23, 1413:14
**20th** [4] - 1362:22, 1363:2, 1364:24, 1365:15
**21** [3] - 1386:23, 1413:12, 1413:14

**21-hour** [2] - 1412:17, 1413:8
**21st** [1] - 1370:20
**2250** [1] - 1346:21
**2261** [2] - 1410:21, 1410:24
**24** [5] - 1346:6, 1349:3, 1352:23, 1412:10, 1412:25
**24-hour** [2] - 1412:23, 1413:1
**25** [8] - 1356:3, 1412:15, 1413:5, 1442:8, 1442:13, 1442:19, 1443:3, 1452:16
**25th** [1] - 1370:20
**26** [1] - 1442:8
**2600** [1] - 1406:11
**264** [2] - 1348:15, 1407:25
**274** [3] - 1348:15, 1384:8, 1407:25
**278** [2] - 1348:15, 1407:25
**279** [2] - 1348:15, 1407:25
**29** [3] - 1443:11, 1443:15, 1443:20
**2900** [1] - 1347:10
**2:45** [1] - 1464:18

## 3

**3** [6] - 1367:9, 1367:18, 1401:3, 1441:10, 1441:11, 1441:18
**3,000** [1] - 1359:15
**3.63** [2] - 1355:17, 1356:5
**3.8** [1] - 1355:14
**300** [1] - 1357:4
**33** [2] - 1411:5, 1443:5
**33-foot** [1] - 1410:1
**343** [2] - 1348:15, 1407:25
**349** [2] - 1348:15, 1408:1
**352** [2] - 1348:15, 1408:1
**353** [2] - 1348:15, 1408:1
**362** [2] - 1348:15, 1408:1
**367** [2] - 1348:16, 1408:1
**368** [2] - 1348:16, 1408:1

**372** [2] - 1348:16, 1408:1
**374** [2] - 1348:16, 1408:1
**3838** [1] - 1347:9
**39** [1] - 1350:8
**390** [2] - 1348:16, 1408:1
**3rd** [1] - 1363:11

## 4

**4** [6] - 1367:19, 1368:14, 1400:7, 1410:6, 1411:22, 1412:1
**40** [2] - 1350:9, 1377:1
**400** [2] - 1359:11, 1400:7
**403** [2] - 1348:16, 1408:1
**405** [2] - 1348:16, 1408:1
**413** [2] - 1348:16, 1408:1
**416** [5] - 1348:16, 1348:17, 1408:1, 1408:2, 1408:8
**4265** [1] - 1346:24
**44** [1] - 1412:6
**443** [2] - 1348:16, 1408:2
**45** [2] - 1350:2, 1350:14
**454** [2] - 1348:16, 1408:2
**455** [2] - 1348:17, 1408:2
**46** [2] - 1412:11, 1413:1
**489** [3] - 1348:17, 1408:2, 1408:7
**498** [4] - 1348:17, 1370:10, 1370:11, 1408:2

## 5

**5** [3] - 1361:3, 1368:16, 1371:10
**50** [9] - 1355:23, 1360:9, 1380:19, 1412:12, 1444:23, 1444:25, 1445:19, 1448:21, 1451:1
**500** [5] - 1347:13, 1352:8, 1356:5, 1360:12, 1361:4
**504** [1] - 1347:14

**520** [2] - 1348:17, 1408:2
**521** [2] - 1348:17, 1408:2
**54** [2] - 1412:15, 1413:5
**55** [1] - 1359:11
**569** [2] - 1348:17, 1408:2
**57** [1] - 1413:11
**58** [1] - 1355:12
**583** [2] - 1348:17, 1408:2
**589-7779** [1] - 1347:14
**59** [1] - 1413:10
**5CZ200R2461125294** [2] - 1409:24, 1411:24

## 6

**6** [6] - 1346:11, 1371:11, 1381:12, 1410:13, 1448:13, 1459:14
**60,803** [1] - 1355:9
**600** [1] - 1361:16
**628** [3] - 1348:17, 1355:8, 1408:2
**66** [1] - 1412:19
**67** [1] - 1412:20
**68** [1] - 1412:6
**69** [2] - 1412:17, 1413:7

## 7

**7** [3] - 1410:16, 1410:18, 1412:8
**700** [1] - 1357:3
**70002** [1] - 1347:10
**70112** [1] - 1347:5
**70130** [1] - 1347:14
**75** [2] - 1412:14, 1413:4
**77027** [1] - 1346:24
**78257** [1] - 1346:18
**78470** [1] - 1346:21
**79** [2] - 1359:14, 1398:16
**7th** [1] - 1412:22

## 8

**8** [2] - 1410:19, 1411:22
**80.1** [1] - 1355:25
**800** [1] - 1359:13

**800-pound** [6] - 1397:5, 1399:9, 1406:11, 1406:12, 1406:15, 1406:16
**802** [1] - 1346:21
**81** [3] - 1360:10, 1412:16, 1413:6
**858** [3] - 1348:18, 1358:10, 1408:3
**884** [2] - 1348:18, 1408:3
**8:30** [2] - 1346:6, 1399:3
**8th** [1] - 1412:22

## 9

**9** [5] - 1380:20, 1410:23, 1412:3, 1441:19, 1441:20
**90** [1] - 1383:16
**909** [1] - 1347:5
**91** [1] - 1359:15
**95** [1] - 1399:5
**9:2771** [1] - 1448:23

## A

**A.M** [2] - 1346:6, 1349:3
**ability** [1] - 1465:8
**able** [11] - 1379:25, 1391:7, 1393:7, 1451:23, 1455:10, 1455:11, 1455:19, 1455:21, 1456:5, 1456:11, 1460:1
**above-entitled** [1] - 1465:9
**absence** [4] - 1428:4, 1445:14, 1445:24, 1446:5
**absolutely** [5] - 1365:13, 1378:11, 1380:6, 1451:2, 1460:11
**accept** [6] - 1355:24, 1356:4, 1416:3, 1439:12, 1446:23, 1454:16
**accessible** [2] - 1364:12, 1411:5
**accident** [7] - 1426:13, 1427:5, 1427:6, 1427:10, 1432:18, 1432:23, 1433:2
**accordance** [1] - 1382:4

**according** [2] - 1361:21, 1365:7
**accuracy** [1] - 1432:2
**accurately** [1] - 1400:1
**acronym** [1] - 1380:12
**Act** [1] - 1419:2
**act** [2] - 1426:9, 1434:17
**acted** [2] - 1421:14, 1435:3
**acting** [1] - 1387:5
**action** [5] - 1361:24, 1365:19, 1401:3, 1431:9, 1460:21
**actions** [2] - 1422:15, 1428:20
**activation** [1] - 1432:13
**activity** [1] - 1353:1
**acts** [2] - 1429:14, 1432:9
**actual** [14] - 1355:8, 1364:15, 1380:18, 1399:16, 1400:8, 1401:9, 1401:14, 1402:17, 1420:4, 1421:5, 1422:12, 1422:17, 1428:17, 1430:10
**add** [4] - 1362:18, 1438:3, 1444:17
**added** [1] - 1378:17
**addition** [2] - 1375:24, 1445:18
**additional** [1] - 1410:9
**additionally** [1] - 1385:5
**address** [2] - 1350:3, 1350:15
**addressed** [1] - 1414:15
**adduced** [1] - 1455:18
**adequate** [12] - 1365:24, 1366:1, 1384:2, 1420:7, 1420:20, 1421:7, 1421:9, 1421:16, 1421:25, 1423:12, 1436:25, 1454:7
**adequately** [1] - 1424:6
**adjourn** [2] - 1441:23, 1451:12
**adjourned** [1] - 1349:12
**administrative** [1] - 1454:25
**administrator** [1] - 1387:5

**administrator's** [3] - 1457:25, 1458:14, 1462:12
**admissible** [3] - 1409:11, 1414:4, 1415:7
**admission** [1] - 1362:5
**admits** [2] - 1363:9, 1370:11
**admitted** [4] - 1355:1, 1380:11, 1392:14, 1439:3
**admonished** [1] - 1414:20
**adopt** [1] - 1451:5
**Adorn** [2] - 1377:15, 1377:21
**advance** [1] - 1416:9
**advantage** [3] - 1407:23, 1434:24, 1435:1
**adverse** [2] - 1362:21, 1419:19
**advisability** [1] - 1427:8
**advise** [6] - 1437:6, 1437:13, 1437:22, 1440:12, 1444:9, 1460:15
**advised** [1] - 1350:3
**advises** [1] - 1350:6
**advising** [1] - 1460:17
**advocate** [1] - 1389:19
**affects** [1] - 1401:17
**affixed** [1] - 1366:23
**afforded** [2] - 1350:14, 1440:13
**afraid** [2] - 1398:8, 1451:3
**aftermath** [1] - 1364:10
**afternoon** [2] - 1393:10, 1449:7
**afternoons** [1] - 1379:4
**afterwards** [3] - 1360:8, 1360:9, 1397:1
**aged** [1] - 1356:23
**agencies** [1] - 1353:19
**ages** [1] - 1356:22
**aggravation** [11] - 1364:17, 1364:19, 1364:21, 1432:12, 1432:23, 1433:1, 1433:4, 1433:6, 1433:10, 1433:12, 1433:13
**ago** [3] - 1398:18,

**administrator's** 1402:21, 1455:7
**agree** [9] - 1354:17, 1360:24, 1372:20, 1375:25, 1388:2, 1391:2, 1391:5, 1398:14, 1456:16
**agreed** [9] - 1359:4, 1367:23, 1378:8, 1379:1, 1388:23, 1389:15, 1391:25, 1398:11, 1409:18
**agreement** [2] - 1350:2, 1435:22
**agrees** [4] - 1361:1, 1363:16, 1371:13, 1408:8
**ahead** [12] - 1349:23, 1351:12, 1351:14, 1407:1, 1407:20, 1407:22, 1443:24, 1444:4, 1444:17, 1464:10, 1464:11
**aids** [1] - 1415:10
**ailments** [1] - 1361:20
**air** [15] - 1352:22, 1354:21, 1355:2, 1355:7, 1355:9, 1355:17, 1361:8, 1369:11, 1376:5, 1376:7, 1376:10, 1376:19, 1402:7, 1412:20
**aired** [2] - 1412:9, 1412:24
**airway** [1] - 1372:13
**AI** [2] - 1361:6, 1363:18
**Albert** [1] - 1360:14
**Alexis** [1] - 1383:17
**alleged** [3] - 1388:1, 1424:16, 1447:20
**allegedly** [1] - 1431:13
**allergies** [1] - 1365:1
**allergist** [1] - 1396:6
**allergy** [1] - 1396:15
**allocate** [2] - 1368:17, 1437:25
**allocation** [1] - 1437:24
**allow** [1] - 1370:18
**allowance** [2] - 1364:20, 1433:13
**allowed** [3] - 1351:3, 1355:5, 1431:15
**allowing** [1] - 1414:8
**almost** [1] - 1383:18
**alone** [2] - 1357:10, 1409:16
**alteration** [3] - 1419:25, 1421:1,

1422:6
**alternative** [9] - 1363:15, 1382:23, 1383:11, 1383:23, 1419:15, 1419:19, 1419:20, 1423:7, 1423:8
**American** [1] - 1375:4
**amount** [13] - 1356:19, 1359:4, 1359:12, 1367:24, 1418:1, 1428:23, 1429:11, 1429:25, 1430:24, 1432:1, 1432:11, 1433:21, 1438:11
**amounts** [1] - 1380:14
**ANDREW** [1] - 1347:8
**Andy** [2] - 1374:7, 1452:6
**Angeles** [2] - 1354:24, 1403:22
**anguish** [10] - 1365:2, 1371:19, 1371:21, 1431:8, 1433:15, 1434:2, 1434:5, 1434:15, 1438:16, 1448:14
**answer** [18] - 1354:3, 1362:2, 1365:11, 1365:17, 1366:2, 1367:6, 1367:8, 1367:14, 1367:17, 1367:22, 1368:14, 1368:19, 1387:13, 1397:9, 1414:18, 1440:6, 1444:8, 1454:5
**answered** [7] - 1437:3, 1437:4, 1437:11, 1437:12, 1437:19, 1437:20, 1444:14
**answers** [6] - 1371:10, 1416:8, 1416:16, 1439:20, 1439:22, 1439:23
**anticipate** [1] - 1422:24
**anticipated** [11] - 1364:7, 1364:8, 1364:14, 1419:25, 1420:2, 1421:1, 1421:3, 1421:22, 1422:5, 1422:15, 1430:10
**ANTONIO** [1] - 1346:18
**anxiety** [5] - 1373:10, 1373:15, 1393:15, 1393:20, 1431:8

**anyway** [1] - 1370:25
**apologize** [3] - 1444:6, 1450:6, 1452:23
**Appeal** [2] - 1390:11, 1390:13
**appeal** [1] - 1461:12
**Appeals** [1] - 1390:10
**APPEARANCES** [2] - 1346:15, 1347:1
**appellate** [1] - 1390:11
**apples** [1] - 1354:24
**applicable** [6] - 1392:16, 1399:15, 1399:23, 1400:6, 1409:13, 1419:6
**applied** [1] - 1382:25
**apply** [5] - 1354:7, 1407:4, 1408:22, 1409:8, 1409:14
**appreciate** [6] - 1375:6, 1403:11, 1448:8, 1451:16, 1456:21, 1459:1
**appreciated** [1] - 1374:12
**appropriate** [6] - 1425:10, 1432:5, 1441:13, 1447:19, 1450:21, 1460:21
**approved** [2] - 1378:1, 1464:13
**arbitrary** [1] - 1431:24
**area** [11] - 1372:9, 1372:13, 1375:8, 1375:9, 1410:17, 1410:20, 1410:21, 1451:18, 1451:20, 1452:4, 1452:9
**argue** [1] - 1349:22
**argued** [4] - 1414:1, 1448:21, 1448:24, 1451:1
**argues** [1] - 1399:17
**argument** [4] - 1349:25, 1406:21, 1445:3, 1446:9
**ARGUMENTS** [4] - 1348:5, 1348:6, 1351:17, 1374:2
**arguments** [11] - 1349:13, 1349:14, 1349:16, 1350:23, 1436:10, 1444:24, 1445:6, 1445:19, 1445:20, 1451:5, 1451:16
**arising** [1] - 1422:9
**Arizona** [1] - 1390:23

**arose** [3] - 1364:6, 1420:1, 1421:2
**aside** [3] - 1455:14, 1455:17, 1455:23
**asserted** [4] - 1424:2, 1424:3, 1429:3, 1429:6
**asserts** [1] - 1424:9
**assess** [5] - 1371:16, 1429:11, 1429:25, 1430:3, 1446:1
**assessment** [2] - 1430:16, 1446:17
**assign** [4] - 1425:3, 1425:9, 1425:14, 1425:21
**assigned** [1] - 1410:11
**assigning** [1] - 1425:7
**associated** [4] - 1371:22, 1386:19, 1424:12, 1434:15
**assume** [1] - 1414:21
**assured** [1] - 1374:17
**AT** [1] - 1346:20
**ATSDR** [4] - 1361:11, 1399:18, 1400:2, 1405:4
**attached** [1] - 1413:13
**attempts** [1] - 1401:13
**attention** [6] - 1351:11, 1374:6, 1403:11, 1441:21, 1462:6, 1462:8
**attentive** [2] - 1351:21, 1374:11
**attorney** [8] - 1377:7, 1390:24, 1399:21, 1414:2, 1414:4, 1414:9, 1414:21, 1441:10
**ATTORNEY** [1] - 1346:20
**attorney's** [2] - 1435:18, 1461:11
**attorneys** [23] - 1349:13, 1349:17, 1349:22, 1350:24, 1351:11, 1375:5, 1377:4, 1387:17, 1397:15, 1397:23, 1402:23, 1416:13, 1440:5, 1455:4, 1455:19, 1456:12, 1459:11, 1459:15, 1459:21, 1459:25, 1461:8, 1461:9, 1461:20
**attracted** [1] - 1441:21
**attribute** [1] - 1438:1

**August** [2] - 1370:24, 1411:2
**available** [9] - 1363:7, 1363:17, 1363:20, 1385:9, 1423:4, 1423:9, 1423:23, 1447:15, 1462:16
**average** [10] - 1355:9, 1355:10, 1360:22, 1412:5, 1412:6, 1412:18, 1412:20, 1413:9, 1413:10, 1463:21
**avoid** [3] - 1422:4, 1427:10, 1434:18
**avoided** [2] - 1434:22, 1435:1
**avoiding** [1] - 1435:4
**award** [14] - 1430:12, 1430:14, 1430:18, 1431:11, 1431:14, 1431:18, 1431:21, 1432:3, 1432:12, 1433:14, 1433:24, 1434:5, 1435:18
**awarded** [2] - 1433:24, 1438:12
**aware** [10] - 1362:13, 1363:7, 1381:2, 1381:3, 1381:7, 1381:21, 1385:7, 1386:18, 1424:11
**awareness** [1] - 1426:3

**B**

**B406** [1] - 1347:13
**background** [2] - 1355:18, 1356:3
**bad** [5] - 1361:14, 1371:15, 1375:8, 1405:6, 1406:13
**ballpark** [1] - 1391:12
**base** [1] - 1389:15
**based** [12] - 1390:14, 1399:10, 1415:7, 1419:7, 1419:8, 1419:10, 1420:11, 1422:16, 1449:18, 1450:4, 1450:16
**baseline** [3] - 1355:23, 1356:6, 1356:7
**bases** [1] - 1389:22
**basis** [1] - 1437:25
**Baton** [2] - 1410:17, 1410:20
**bear** [2] - 1352:8, 1432:17

**bears** [1] - 1353:7
**became** [3] - 1359:22, 1389:6, 1436:2
**BEFORE** [1] - 1346:12
**begin** [5] - 1351:12, 1351:19, 1438:25, 1440:16, 1444:5
**beginning** [5] - 1356:20, 1374:20, 1376:21, 1387:16, 1412:22
**begins** [1] - 1351:1
**behalf** [10] - 1351:20, 1351:22, 1374:7, 1374:8, 1403:5, 1411:25, 1446:11, 1448:12, 1459:10, 1460:3
**beliefs** [1] - 1436:4
**believes** [2] - 1414:4, 1451:4
**bellwether** [1] - 1464:1
**below** [2] - 1426:21, 1427:2
**best** [10] - 1352:10, 1372:7, 1373:11, 1373:12, 1384:6, 1391:20, 1391:23, 1455:1, 1457:17, 1465:8
**better** [3] - 1371:8, 1388:12, 1396:14
**between** [10] - 1352:5, 1353:2, 1354:20, 1354:22, 1364:1, 1378:2, 1391:8, 1417:14, 1425:24, 1426:11
**beyond** [2] - 1418:15, 1423:14
**bias** [3] - 1400:23, 1417:17, 1455:15
**biases** [1] - 1400:18
**big** [7] - 1371:5, 1377:12, 1394:22, 1395:1, 1402:6, 1442:12, 1444:7
**bigger** [2] - 1378:16, 1378:20
**billed** [1] - 1383:18
**billing** [4] - 1358:16, 1358:18, 1358:20, 1362:19
**billion** [25] - 1352:8, 1355:10, 1355:11, 1355:15, 1355:17, 1355:23, 1356:1, 1359:11, 1359:13, 1359:15, 1359:16,

1360:9, 1360:10, 1360:12, 1360:25, 1361:4, 1361:6, 1361:19, 1380:19, 1380:20, 1380:21, 1400:7, 1412:3, 1412:12, 1413:2

**binds** [4] - 1372:8, 1372:9, 1372:13

**BINSTOCK** [1] - 1346:23

**bioavailable** [1] - 1354:22

**biologically** [1] - 1388:22

**biopsy** [3] - 1391:22, 1392:2, 1392:4

**bit** [4] - 1374:18, 1396:14, 1408:14, 1460:8

**black** [2] - 1403:25

**BlackBerry** [1] - 1439:7

**blamed** [1] - 1404:10

**blank** [19] - 1436:21, 1437:1, 1437:10, 1437:18, 1438:5, 1438:6, 1438:7, 1438:8, 1438:14, 1438:17, 1438:20, 1438:22, 1438:23, 1446:16

**blanks** [1] - 1448:17

**blink** [2] - 1359:7, 1361:3

**block** [1] - 1452:10

**blog** [1] - 1439:9

**board** [3] - 1356:22, 1395:5, 1401:6

**boards** [1] - 1356:23

**bodily** [1] - 1433:14

**body** [1] - 1364:3

**Bonnie** [1] - 1374:9

**Bonomo** [1] - 1386:1

**book** [2] - 1458:19, 1460:20

**born** [1] - 1398:22

**borne** [3] - 1352:2, 1353:17, 1354:13

**bother** [1] - 1396:13

**bothered** [1] - 1460:18

**bottom** [14] - 1362:24, 1363:13, 1369:9, 1370:24, 1371:3, 1402:13, 1441:24, 1442:1, 1442:4, 1442:7, 1442:25, 1443:1, 1443:11, 1443:15

**bought** [6] - 1358:17,

1358:19, 1358:22, 1380:9, 1402:6, 1410:9

**BOULEVARD** [1] - 1347:9

**BOURGEOIS** [1] - 1347:7

**Bowers** [21] - 1360:13, 1361:21, 1364:24, 1368:10, 1372:23, 1392:19, 1392:24, 1392:25, 1393:4, 1393:6, 1393:14, 1393:18, 1393:21, 1393:24, 1394:13, 1395:10, 1395:21, 1396:3, 1398:4, 1398:6, 1405:22

**box** [1] - 1402:6

**boys** [1] - 1377:12

**Branscome** [1] - 1413:13

**breached** [1] - 1426:23

**break** [3] - 1407:1, 1407:3, 1407:23

**breaks** [1] - 1371:11

**breathed** [1] - 1356:24

**breathing** [1] - 1356:17

**brief** [3] - 1408:15, 1451:8, 1454:19

**bring** [3] - 1349:2, 1355:16, 1374:25, 1379:25, 1403:2, 1404:12, 1404:14, 1434:12, 1440:3

**bringing** [2] - 1406:22, 1428:6

**brings** [2] - 1389:4, 1389:25

**brochures** [2] - 1370:7, 1371:1

**broken** [1] - 1370:3

**brought** [6] - 1352:9, 1353:2, 1361:24, 1375:7, 1376:25, 1381:13

**Build** [1] - 1362:9

**build** [12] - 1376:2, 1376:12, 1376:15, 1376:22, 1377:2, 1377:3, 1377:6, 1377:8, 1378:6, 1379:16, 1404:22

**BUILDING** [1] - 1346:18

**building** [4] - 1375:13, 1378:24, 1381:7, 1458:25

**Building** [3] - 1378:5, 1386:13, 1450:12

**Buildings** [3] - 1410:7, 1424:5, 1424:9

**built** [14] - 1355:21, 1357:13, 1358:25, 1376:3, 1377:5, 1377:23, 1378:10, 1380:7, 1380:23, 1382:4, 1382:8, 1383:19, 1387:11, 1403:18

**bullet** [1] - 1386:6

**burden** [7] - 1417:23, 1419:18, 1424:25, 1427:9, 1428:21, 1435:8, 1435:14

**burning** [1] - 1359:8

**business** [5] - 1375:16, 1375:19, 1375:20, 1376:12, 1440:22

**buying** [3] - 1350:14, 1386:16, 1404:9

**BY** [9] - 1346:9, 1346:17, 1346:23, 1347:3, 1347:8, 1347:15, 1347:16, 1348:5, 1348:6

## C

**cabinets** [1] - 1404:15

**calendar** [1] - 1350:6

**CALLED** [1] - 1349:4

**caller** [1] - 1460:15

**camper** [1] - 1375:15

**cancer** [31] - 1353:15, 1353:23, 1366:5, 1366:8, 1371:22, 1371:25, 1372:12, 1372:16, 1372:23, 1373:4, 1397:7, 1397:10, 1397:13, 1397:25, 1398:2, 1398:6, 1398:15, 1398:17, 1398:18, 1398:25, 1399:1, 1399:2, 1399:4, 1399:6, 1399:11, 1434:7, 1434:11, 1434:15, 1450:24, 1450:25, 1451:3

**cancerous** [3] - 1353:20, 1398:1, 1403:23

**cancers** [1] - 1372:10

**candid** [2] - 1458:4, 1458:11

**candidly** [1] - 1380:11

**cannot** [7] - 1380:2, 1389:15, 1391:13, 1402:17, 1416:10, 1422:21, 1431:16

**capable** [1] - 1419:16

**capacities** [1] - 1426:6

**capacity** [1] - 1433:16

**caption** [1] - 1436:13

**car** [2] - 1354:23, 1401:23

**CARANCAHUA** [1] - 1346:21

**carcinogen** [6] - 1353:16, 1371:23, 1372:2, 1372:5, 1373:4, 1373:17

**carcinogenic** [1] - 1372:5

**care** [12] - 1350:12, 1407:14, 1420:6, 1420:19, 1421:16, 1422:14, 1422:25, 1426:21, 1426:24, 1427:3, 1427:11, 1445:25

**cared** [1] - 1378:23

**careful** [2] - 1374:18, 1425:19

**carefully** [4] - 1389:11, 1409:5, 1425:13, 1449:6

**cares** [1] - 1393:12

**carry** [1] - 1389:23

**case** [97] - 1349:18, 1349:23, 1350:20, 1351:25, 1352:20, 1353:24, 1354:8, 1363:14, 1368:24, 1369:13, 1369:21, 1371:20, 1373:17, 1373:20, 1374:6, 1377:21, 1377:22, 1387:16, 1388:18, 1390:12, 1390:22, 1390:25, 1397:6, 1399:10, 1400:12, 1402:14, 1403:10, 1409:7, 1409:13, 1409:15, 1413:18, 1414:3, 1415:1, 1416:14, 1416:24, 1417:21, 1418:4, 1418:14, 1419:6, 1419:11, 1420:12, 1424:2, 1424:22, 1425:12, 1429:19, 1430:21, 1434:13, 1435:12, 1435:22, 1435:23, 1436:1,

1436:5, 1436:8, 1436:13, 1439:6, 1439:11, 1439:12, 1440:8, 1440:25, 1443:18, 1445:15, 1446:3, 1446:10, 1446:19, 1447:19, 1447:25, 1448:4, 1453:13, 1454:23, 1455:1, 1455:5, 1455:12, 1455:16, 1455:22, 1456:8, 1456:13, 1456:15, 1459:11, 1459:12, 1459:13, 1459:15, 1459:19, 1459:20, 1459:23, 1460:4, 1460:12, 1460:16, 1461:9, 1462:4, 1462:23, 1463:22, 1463:23, 1463:25

**Case** [1] - 1436:17

**cases** [2] - 1458:10, 1463:24

**Castanel** [60] - 1351:20, 1351:25, 1352:6, 1352:15, 1356:24, 1360:17, 1360:19, 1362:3, 1364:16, 1365:12, 1365:23, 1367:17, 1367:19, 1368:17, 1371:14, 1373:9, 1379:12, 1384:2, 1388:4, 1391:3, 1391:17, 1393:6, 1393:12, 1393:13, 1393:16, 1393:23, 1394:17, 1396:7, 1396:21, 1397:17, 1398:1, 1398:14, 1398:21, 1398:22, 1398:24, 1399:4, 1399:11, 1406:17, 1409:21, 1409:25, 1410:12, 1411:1, 1411:4, 1411:17, 1418:22, 1431:6, 1432:15, 1436:17, 1436:20, 1436:25, 1437:16, 1438:5, 1438:14, 1438:17, 1438:19, 1438:22, 1448:15, 1451:2, 1454:4, 1454:7

**CASTANEL** [1] - 1346:9

**Castanel's** [14] - 1353:7, 1368:23, 1369:2, 1382:9,

1390:24, 1391:2, 1393:21, 1395:2, 1395:8, 1395:19, 1395:24, 1397:16, 1400:8, 1401:4
**Catalano** [2] - 1453:16, 1454:10
**catch** [2] - 1369:11, 1440:23
**categories** [1] - 1353:10
**categorization** [1] - 1372:3
**categorized** [1] - 1372:1
**CATHY** [1] - 1347:13
**Cathy** [2] - 1465:3, 1465:14
**caught** [1] - 1440:23
**causal** [6] - 1352:4, 1364:1, 1388:22, 1391:7, 1425:24, 1426:10
**causation** [3] - 1370:25, 1389:15, 1389:16
**caused** [20] - 1353:10, 1363:24, 1364:23, 1391:22, 1395:20, 1395:22, 1397:19, 1405:1, 1419:4, 1419:22, 1420:23, 1421:15, 1423:6, 1423:25, 1424:20, 1425:2, 1427:19, 1429:14, 1431:12, 1432:8
**causes** [13] - 1353:23, 1361:12, 1361:18, 1361:23, 1364:5, 1366:5, 1366:8, 1371:25, 1372:16, 1396:9, 1428:3, 1428:5, 1459:16
**CAUSEWAY** [1] - 1347:9
**causing** [4] - 1353:11, 1370:5, 1393:25, 1397:25
**CCR** [2] - 1347:13, 1465:14
**CDC** [1] - 1405:3
**ceilings** [1] - 1383:14
**cell** [6] - 1389:18, 1391:24, 1392:2, 1439:7, 1439:13, 1452:11
**census** [1] - 1355:9
**CENTER** [1] - 1347:9
**centers** [1] - 1360:2

**certain** [14] - 1358:1, 1410:13, 1411:20, 1415:3, 1416:6, 1417:13, 1421:19, 1423:11, 1424:18, 1441:13, 1441:14, 1451:20, 1452:14, 1461:11
**certainly** [2] - 1450:19, 1458:8
**certificate** [1] - 1462:21
**CERTIFICATE** [1] - 1465:1
**certification** [1] - 1452:25
**certifications** [1] - 1408:10
**certified** [1] - 1413:13
**Certified** [2] - 1465:3, 1465:4
**certify** [1] - 1465:7
**chair** [1] - 1462:14
**chairs** [1] - 1458:10
**challenged** [1] - 1364:12
**chambers** [2] - 1451:22, 1452:7
**change** [12] - 1367:9, 1367:12, 1367:14, 1393:22, 1403:17, 1422:6, 1422:8, 1436:2, 1442:13, 1457:22, 1458:7, 1458:9
**changes** [6] - 1367:15, 1393:18, 1393:19, 1422:13, 1443:21, 1443:24
**characteristic** [11] - 1363:24, 1419:22, 1420:18, 1420:20, 1420:23, 1421:12, 1421:17, 1423:6, 1423:18, 1423:19, 1423:25
**characteristics** [1] - 1423:17
**charge** [16] - 1350:19, 1361:22, 1365:7, 1386:14, 1386:17, 1386:21, 1390:6, 1413:21, 1439:21, 1444:2, 1447:21, 1448:22, 1448:25, 1450:24, 1451:4
**charged** [2] - 1377:4, 1390:6
**charges** [2] - 1399:8, 1448:14

**charging** [1] - 1408:20
**chart** [5] - 1395:1, 1395:5, 1396:18, 1401:6, 1401:8
**charts** [3] - 1393:9, 1394:6, 1394:9
**chat** [1] - 1439:9
**check** [3] - 1362:23, 1403:6, 1453:4
**checked** [1] - 1386:5
**checkers** [1] - 1386:5
**choice** [1] - 1361:25
**choose** [1] - 1460:23
**chop** [1] - 1374:16
**chose** [1] - 1401:2
**CHRIS** [1] - 1346:20
**CHRISTI** [1] - 1346:21
**chronic** [2] - 1395:11, 1395:12
**chronology** [1] - 1369:9
**cigarette** [1] - 1398:3
**cigarettes** [1] - 1398:20
**circle** [1] - 1441:20
**Circuit** [1] - 1390:10
**circulate** [1] - 1464:11
**circumstance** [1] - 1462:2
**circumstances** [12] - 1416:10, 1417:12, 1421:24, 1422:8, 1423:11, 1426:8, 1427:1, 1427:9, 1432:2, 1432:5, 1435:12, 1460:24
**circumstantial** [3] - 1417:11, 1417:15, 1417:17
**cite** [1] - 1402:14
**cited** [1] - 1400:10
**citizenry** [1] - 1455:9
**citizens** [1] - 1455:2
**city** [1] - 1457:5
**civil** [4] - 1455:1, 1455:24, 1457:9
**claim** [22] - 1367:2, 1379:10, 1379:20, 1380:6, 1383:24, 1383:25, 1397:7, 1397:10, 1399:6, 1399:11, 1404:24, 1418:2, 1418:11, 1422:4, 1422:19, 1429:3, 1429:6, 1429:24, 1433:8, 1435:17, 1450:25
**claimed** [1] - 1430:2
**claiming** [2] - 1365:20, 1384:1

**claims** [12] - 1417:22, 1418:9, 1418:12, 1418:22, 1419:1, 1419:11, 1420:12, 1424:3, 1429:10, 1434:16, 1438:12, 1450:16
**clarification** [2] - 1408:6, 1446:23
**Class** [3] - 1353:16, 1373:3, 1373:16
**classification** [1] - 1372:17
**clean** [1] - 1392:10
**clear** [9] - 1357:15, 1393:4, 1398:24, 1399:14, 1401:18, 1418:12, 1445:22, 1446:22, 1461:22
**clearly** [2] - 1360:21, 1460:15
**clerk** [1] - 1407:19
**CLERK** [4] - 1440:17, 1453:9, 1462:24, 1464:17
**client** [4] - 1374:9, 1403:18, 1414:6, 1461:9
**clock** [1] - 1350:6
**close** [1] - 1393:6
**closed** [2] - 1412:10, 1412:25
**closer** [1] - 1355:16
**CLOSING** [4] - 1348:5, 1348:6, 1351:17, 1374:2
**closing** [9] - 1349:13, 1349:14, 1349:16, 1350:22, 1377:14, 1397:10, 1406:21, 1436:10, 1451:16
**clothes** [7] - 1404:1, 1404:16, 1404:20, 1404:21, 1405:2, 1405:9, 1405:19
**Club** [1] - 1385:17
**co** [1] - 1374:7
**co-counsel** [1] - 1374:7
**Coast** [7] - 1378:7, 1378:11, 1378:15, 1381:16, 1382:14, 1411:9, 1411:11
**coatings** [1] - 1383:13
**cold** [2] - 1401:18, 1457:18
**Cole** [3] - 1354:19, 1397:21
**collected** [2] - 1355:12, 1413:12

**comfortable** [6] - 1378:19, 1379:2, 1402:4, 1458:6, 1458:14, 1458:24
**coming** [1] - 1368:14
**Commander** [2] - 1400:25, 1401:2
**commence** [1] - 1439:16
**comment** [2] - 1414:24, 1414:25
**comments** [4] - 1374:14, 1458:1, 1463:16, 1463:21
**commercially** [1] - 1363:20
**common** [7] - 1361:15, 1402:25, 1403:2, 1417:2, 1417:3, 1423:16, 1431:22
**communicate** [3] - 1439:4, 1439:11, 1440:1
**community** [4] - 1353:15, 1372:1, 1372:21, 1423:16
**companies** [3] - 1357:22, 1375:18, 1382:6
**company** [2] - 1357:12, 1375:23
**compare** [2] - 1355:19, 1380:25
**compared** [1] - 1401:7
**comparing** [1] - 1355:2
**Compeau** [1] - 1369:6
**compelling** [1] - 1401:20
**compensate** [3] - 1431:3, 1432:11, 1433:22
**compensation** [4] - 1429:13, 1430:24, 1431:14, 1433:23
**compensatory** [9] - 1431:1, 1431:2, 1431:4, 1431:7, 1431:11, 1431:15, 1431:18, 1431:21, 1432:7
**competent** [1] - 1421:11
**complain** [3] - 1387:18, 1457:4, 1457:5
**complained** [2] - 1361:9, 1376:7
**complaining** [2] -

1385:17, 1457:1
**complaint** [6] - 1376:5, 1376:9, 1376:19, 1380:16, 1381:9, 1404:17
**complaints** [9] - 1352:23, 1357:8, 1359:2, 1359:19, 1359:20, 1360:1, 1360:4, 1404:21, 1406:3
**complete** [1] - 1354:24
**completely** [3] - 1390:12, 1391:19, 1392:10
**compliant** [2] - 1377:25, 1380:9
**complicated** [1] - 1389:12
**complied** [1] - 1377:10
**component** [4] - 1410:13, 1422:22, 1441:12, 1441:13
**components** [2] - 1358:1, 1441:14
**composite** [2] - 1411:19, 1411:20
**COMPUTER** [1] - 1347:16
**computer** [3] - 1354:20, 1354:23, 1439:8
**computing** [1] - 1431:23
**conceded** [3] - 1388:17, 1391:20, 1395:16
**concentrate** [1] - 1350:24
**concentration** [2] - 1355:11, 1399:25
**concept** [1] - 1358:3
**concern** [1] - 1434:6
**concerned** [1] - 1359:22
**concerning** [1] - 1439:18
**concerns** [2] - 1371:4
**concession** [1] - 1389:13
**conclude** [3] - 1396:8, 1400:14, 1425:1
**concluded** [3] - 1353:22, 1372:15, 1464:19
**concludes** [1] - 1448:7
**conclusion** [4] -

1371:24, 1387:13, 1456:13, 1456:14
**conclusions** [1] - 1417:2
**conclusively** [1] - 1387:20
**concurrent** [1] - 1428:3
**condition** [20] - 1364:18, 1364:19, 1364:25, 1367:9, 1367:13, 1367:21, 1371:14, 1373:12, 1432:14, 1432:21, 1432:24, 1433:1, 1433:3, 1433:6, 1433:9, 1433:11, 1433:12, 1434:13, 1437:9, 1437:17
**conditioning** [6] - 1352:22, 1369:11, 1412:13, 1412:15, 1413:3, 1413:6
**conditions** [3] - 1367:11, 1413:15, 1427:12
**conduct** [34] - 1406:10, 1425:1, 1425:23, 1425:24, 1426:2, 1426:5, 1426:6, 1426:11, 1426:12, 1426:15, 1426:17, 1427:2, 1427:16, 1427:18, 1427:22, 1427:24, 1428:5, 1428:8, 1428:9, 1428:10, 1428:11, 1428:12, 1429:4, 1429:7, 1429:8, 1431:9, 1431:13, 1435:14, 1439:1, 1439:12, 1439:18, 1440:10, 1446:11
**conference** [2] - 1444:2, 1452:6
**confide** [1] - 1398:8
**confided** [1] - 1398:5
**confirm** [1] - 1380:17
**confirmed** [2] - 1382:19, 1395:10
**confusing** [1] - 1355:3
**connection** [4] - 1388:23, 1397:24, 1422:18, 1451:1
**consensus** [4] - 1353:16, 1372:1, 1372:20, 1399:15
**consequence** [1] - 1428:12

**consequences** [2] - 1432:20, 1434:4
**consider** [22] - 1365:6, 1365:8, 1408:22, 1409:17, 1415:5, 1416:24, 1417:9, 1418:5, 1420:8, 1425:22, 1426:2, 1426:12, 1426:20, 1427:15, 1428:7, 1428:13, 1428:16, 1430:13, 1432:6, 1434:3, 1435:18, 1463:23
**consideration** [4] - 1409:12, 1416:17, 1432:16, 1435:24
**considered** [5] - 1365:2, 1381:1, 1448:3, 1461:4
**considering** [1] - 1417:7
**consistent** [3] - 1394:12, 1394:20, 1394:22
**consistently** [1] - 1380:15
**consisting** [1] - 1427:24
**constructing** [1] - 1382:2
**construction** [2] - 1377:3, 1397:20
**construe** [1] - 1414:23
**consult** [1] - 1451:9
**consumer** [2] - 1422:24, 1425:19
**consumers** [1] - 1425:12
**contact** [3] - 1451:20, 1451:24, 1461:15
**contacted** [2] - 1452:1, 1460:14
**contacts** [1] - 1461:9
**contained** [5] - 1358:1, 1410:14, 1411:15, 1411:21, 1449:1
**containing** [1] - 1358:6
**contains** [2] - 1381:19, 1383:6
**contemplate** [1] - 1422:2
**contemplated** [1] - 1423:15
**contended** [1] - 1428:20
**contention** [1] - 1428:21

**context** [3] - 1429:4, 1446:2, 1464:2
**CONTINUED** [1] - 1347:1
**continues** [2] - 1394:19, 1394:24
**continuing** [3] - 1405:12, 1405:13, 1412:22
**contract** [4] - 1352:24, 1362:7, 1369:7, 1369:13
**contractor** [1] - 1448:23
**contractually** [1] - 1369:10
**contractually-obligated** [1] - 1369:10
**contrary** [4] - 1395:23, 1403:4, 1417:6, 1427:25
**contributed** [3] - 1367:20, 1425:3, 1426:12, 1437:16
**contributing** [1] - 1424:20
**control** [9] - 1367:12, 1405:11, 1419:24, 1420:18, 1420:25, 1421:13, 1423:3, 1423:22, 1437:10
**convenient** [1] - 1400:24
**conversation** [2] - 1461:17, 1461:18
**convey** [1] - 1404:15
**convince** [3] - 1383:25, 1402:15, 1403:24
**convinced** [1] - 1436:3
**copies** [1] - 1463:4
**copy** [4] - 1408:25, 1409:1, 1409:3, 1449:11
**corners** [1] - 1378:10
**Cornish** [5] - 1362:11, 1377:9, 1377:17, 1380:22, 1381:23
**corporation** [1] - 1417:18
**CORPUS** [1] - 1346:21
**correct** [17] - 1406:17, 1406:18, 1408:5, 1441:12, 1441:15, 1441:25, 1442:23, 1443:19, 1453:14, 1453:19, 1465:7
**corrected** [2] -

1443:12, 1443:16
**correction** [1] - 1441:22
**corrections** [3] - 1407:11, 1443:9, 1443:21
**correctly** [2] - 1352:21, 1442:5
**cost** [3] - 1353:12, 1363:18, 1373:7
**couch** [1] - 1378:19
**coughing** [1] - 1361:8
**counsel** [11] - 1350:11, 1374:4, 1374:7, 1388:22, 1407:8, 1436:11, 1440:20, 1451:9, 1462:17, 1463:6, 1464:12
**countries** [1] - 1456:19
**country** [3] - 1375:11, 1455:10, 1456:18
**couple** [1] - 1396:22
**course** [21] - 1349:19, 1349:20, 1349:25, 1351:7, 1369:16, 1378:7, 1384:16, 1384:25, 1388:17, 1388:19, 1389:3, 1395:19, 1397:16, 1398:10, 1413:25, 1414:19, 1414:24, 1439:13, 1440:15, 1448:4, 1456:6
**court** [18] - 1416:15, 1416:20, 1417:20, 1437:6, 1437:14, 1437:22, 1439:15, 1440:2, 1444:10, 1444:15, 1448:22, 1448:25, 1450:3, 1457:1, 1457:10, 1457:20, 1459:8, 1462:20
**Court** [45] - 1350:25, 1353:24, 1364:17, 1365:20, 1368:16, 1374:4, 1379:22, 1386:13, 1386:14, 1386:17, 1386:21, 1390:5, 1390:6, 1390:10, 1390:11, 1390:13, 1390:15, 1392:16, 1392:18, 1392:21, 1414:9, 1414:14, 1436:14, 1443:3, 1445:13, 1446:24, 1447:23, 1450:6, 1450:8,

1450:22, 1451:6, 1453:7, 1454:1, 1454:16, 1454:17, 1457:24, 1460:9, 1462:15, 1463:11, 1464:12, 1465:4, 1465:5, 1465:6, 1465:15, 1465:16

**COURT** [64] - 1346:1, 1347:13, 1349:4, 1349:7, 1349:10, 1350:14, 1351:16, 1373:22, 1374:1, 1402:19, 1403:12, 1406:7, 1406:23, 1406:25, 1407:5, 1407:8, 1407:20, 1407:22, 1408:5, 1408:10, 1408:14, 1408:17, 1408:18, 1440:20, 1441:17, 1442:4, 1442:16, 1442:19, 1442:23, 1443:1, 1443:3, 1443:14, 1443:19, 1444:13, 1444:17, 1445:2, 1445:22, 1447:1, 1447:4, 1447:6, 1447:9, 1447:23, 1448:9, 1448:19, 1449:3, 1449:15, 1449:17, 1450:18, 1451:6, 1451:11, 1451:15, 1452:11, 1452:19, 1452:24, 1453:2, 1453:12, 1453:16, 1453:21, 1453:24, 1454:16, 1463:2, 1463:14, 1464:8, 1464:15

**court's** [1] - 1446:13
**Court's** [6] - 1361:22, 1365:7, 1399:8, 1445:24, 1459:18
**courtroom** [21] - 1349:9, 1350:19, 1351:1, 1351:3, 1351:4, 1351:6, 1375:3, 1407:7, 1413:17, 1416:8, 1440:5, 1440:19, 1451:18, 1451:21, 1453:11, 1453:24, 1455:13, 1457:18, 1459:22, 1463:1, 1463:3
**courts** [1] - 1390:21
**cover** [8] - 1409:1, 1409:20, 1441:10,

1441:11, 1447:2, 1451:12, 1454:18, 1463:7
**covered** [2] - 1445:5, 1456:9
**CRAFT** [1] - 1346:16
**create** [2] - 1387:8, 1402:7
**created** [1] - 1426:4, 1427:3, 1427:5
**credibility** [2] - 1414:12, 1416:18
**credible** [7] - 1388:7, 1396:4, 1397:8, 1399:1, 1400:11, 1402:17, 1417:25
**crime** [1] - 1457:4, 1457:5
**criminal** [3] - 1418:15, 1455:1, 1457:8
**critical** [1] - 1461:13
**cross** [1] - 1354:17
**cross-examination** [1] - 1354:17
**CRR** [2] - 1347:13, 1465:14
**crunch** [1] - 1375:17
**crystal** [1] - 1399:14
**CSO** [1] - 1440:3
**curve** [1] - 1356:15
**custody** [1] - 1462:16
**custom** [2] - 1376:12, 1380:8
**customers** [1] - 1366:12
**cut** [2] - 1358:4, 1378:10
**cutting** [1] - 1376:9

## D

**damage** [15] - 1364:15, 1365:3, 1391:24, 1420:4, 1420:19, 1421:5, 1422:17, 1422:20, 1428:2, 1428:17, 1430:1, 1431:4, 1432:16, 1433:24, 1434:22
**damaged** [1] - 1392:3
**damages** [61] - 1353:10, 1365:3, 1371:11, 1371:21, 1406:8, 1418:23, 1419:1, 1419:4, 1428:24, 1429:9, 1429:11, 1429:17, 1429:20, 1430:1,

1430:3, 1430:4, 1430:6, 1430:8, 1430:9, 1430:12, 1430:16, 1430:19, 1430:20, 1430:25, 1431:1, 1431:2, 1431:4, 1431:7, 1431:11, 1431:13, 1431:14, 1431:15, 1431:18, 1431:22, 1431:23, 1432:4, 1432:7, 1432:11, 1432:12, 1433:7, 1433:14, 1433:22, 1434:4, 1434:7, 1434:8, 1434:9, 1434:14, 1434:16, 1434:19, 1434:21, 1434:25, 1435:4, 1435:6, 1435:8, 1435:9, 1435:10, 1435:16, 1437:15, 1438:11
**danger** [11] - 1420:20, 1421:13, 1421:17, 1422:2, 1423:2, 1423:6, 1423:14, 1423:19, 1423:21, 1423:25, 1426:4
**dangerous** [30] - 1362:3, 1365:13, 1365:17, 1365:21, 1365:24, 1367:10, 1367:13, 1367:21, 1379:15, 1379:18, 1384:18, 1399:17, 1419:5, 1419:7, 1419:9, 1419:11, 1419:12, 1419:23, 1420:13, 1420:24, 1421:8, 1422:19, 1427:13, 1436:21, 1436:25, 1437:8, 1437:17, 1441:25, 1454:4, 1454:7
**dangers** [3] - 1366:2, 1370:7, 1427:14
**DARNELL** [2] - 1451:14, 1452:5
**data** [5] - 1355:8, 1366:4, 1381:6, 1411:19, 1413:12
**database** [1] - 1355:24
**date** [10] - 1381:12, 1381:14, 1434:13, 1437:5, 1437:13, 1437:21, 1438:23, 1439:21, 1444:9
**dated** [2] - 1413:14, 1454:10

**daughter** [2] - 1378:25, 1402:2
**David** [3] - 1360:1, 1382:11, 1387:5
**Davis** [3] - 1360:18, 1371:14, 1372:22
**DAY** [1] - 1346:11
**days** [5] - 1362:21, 1403:22, 1406:20, 1459:14
**deal** [4] - 1375:10, 1393:12, 1442:12, 1444:7
**dealers/distributors** [1] - 1410:10
**dealership** [1] - 1361:11
**dealing** [1] - 1387:19
**deals** [1] - 1372:24
**dealt** [2] - 1388:18, 1389:14
**debacle** [1] - 1357:17
**December** [3] - 1410:4, 1410:18, 1464:1
**decide** [14] - 1385:25, 1413:18, 1416:5, 1424:14, 1425:21, 1426:22, 1427:18, 1429:19, 1429:21, 1430:12, 1430:21, 1431:21, 1435:23, 1461:19
**decided** [2] - 1449:23, 1455:12
**deciding** [4] - 1420:8, 1435:10, 1435:13, 1435:16
**decision** [5] - 1350:21, 1358:24, 1393:9, 1415:6, 1430:17
**decisions** [3] - 1360:6, 1369:22, 1369:24
**decline** [1] - 1422:3
**decrease** [1] - 1356:22
**dedicated** [1] - 1390:3
**deductions** [1] - 1417:2
**deep** [2] - 1359:17, 1360:7
**defect** [8] - 1361:24, 1363:14, 1365:6, 1379:9, 1379:10, 1380:1, 1432:13, 1432:22
**defective** [12] - 1371:7, 1371:9, 1379:12, 1379:13,

1379:21, 1384:1, 1384:18, 1387:14, 1387:21, 1387:22, 1402:4, 1406:12
**defects** [1] - 1388:1
**DEFENDANT** [1] - 1347:3
**defendant** [32] - 1350:11, 1350:12, 1350:14, 1365:14, 1373:18, 1410:2, 1418:9, 1418:10, 1419:19, 1422:15, 1424:19, 1424:21, 1424:24, 1424:25, 1425:2, 1428:22, 1429:2, 1429:11, 1429:15, 1429:19, 1429:21, 1429:23, 1429:25, 1430:23, 1434:17, 1433:8, 1434:20, 1434:21, 1435:8, 1435:13, 1438:4, 1442:15
**defendants** [6] - 1373:10, 1429:5, 1442:9, 1442:11, 1442:21, 1463:10
**defendants'** [3] - 1431:9, 1431:13, 1432:9
**defense** [9] - 1355:6, 1356:9, 1418:2, 1424:3, 1424:25, 1447:15, 1447:19, 1448:23, 1450:21
**defenses** [1] - 1354:14
**deference** [1] - 1392:20
**deficiencies** [1] - 1424:17
**definiteness** [1] - 1432:2
**definition** [1] - 1399:22
**definitions** [1] - 1421:19
**degree** [4] - 1390:1, 1417:25, 1426:24, 1437:25
**degrees** [17] - 1359:5, 1359:11, 1359:12, 1359:14, 1359:15, 1406:4, 1412:6, 1412:14, 1412:15, 1412:16, 1412:17, 1412:19, 1413:4, 1413:5, 1413:7, 1413:10
**deliberate** [4] -

1350:20, 1403:1, 1407:4, 1408:21
**deliberates** [1] - 1453:8
**deliberations** [16] - 1350:1, 1409:2, 1417:18, 1438:25, 1439:1, 1439:2, 1439:4, 1439:16, 1439:17, 1440:11, 1440:15, 1440:16, 1440:19, 1461:3, 1461:21, 1461:25
**DELIBERATIONS......**
**..............................**
**...** [1] - 1348:8
**deliberative** [1] - 1460:25
**delivered** [3] - 1410:21, 1410:23, 1452:18
**demanded** [1] - 1382:19
**demonstrated** [2] - 1387:20, 1446:8
**demonstrative** [1] - 1413:20
**denies** [1] - 1385:24
**Dennis** [1] - 1390:24
**DENNIS** [1] - 1346:23
**deny** [1] - 1434:25
**department** [1] - 1404:24
**deposition** [8] - 1386:2, 1393:3, 1398:21, 1416:7, 1416:8, 1416:12, 1416:17
**depositions** [1] - 1377:18
**depression** [4] - 1373:10, 1373:15, 1393:15, 1393:20
**deputy** [3] - 1451:21, 1453:24, 1463:3
**DEPUTY** [4] - 1440:17, 1453:9, 1462:24, 1464:17
**describe** [2] - 1413:22, 1425:16
**described** [3] - 1386:6, 1399:9, 1423:13
**DESCRIPTION** [1] - 1348:13
**design** [36] - 1361:24, 1362:1, 1362:4, 1363:14, 1363:15, 1365:5, 1365:9, 1365:13, 1369:22,

1369:24, 1376:14, 1379:9, 1379:10, 1379:12, 1379:13, 1379:15, 1380:1, 1383:17, 1387:21, 1419:8, 1419:11, 1419:13, 1419:15, 1419:17, 1419:19, 1419:20, 1420:9, 1422:19, 1422:21, 1423:2, 1423:5, 1423:7, 1423:8, 1436:21, 1441:25, 1454:4
**Design** [25] - 1352:17, 1353:5, 1353:7, 1354:12, 1360:15, 1361:7, 1362:2, 1362:5, 1362:9, 1362:17, 1365:12, 1365:23, 1366:10, 1367:20, 1368:17, 1369:23, 1370:13, 1375:22, 1410:2, 1418:23, 1436:17, 1438:4, 1450:11, 1450:14, 1450:15
**DESIGN** [1] - 1346:9
**Design's** [2] - 1358:16, 1367:16
**designed** [6] - 1362:6, 1369:25, 1370:18, 1383:3, 1405:15, 1428:14
**designs** [1] - 1382:23
**despite** [1] - 1370:13
**destroy** [1] - 1462:16
**determine** [7] - 1409:10, 1425:11, 1425:17, 1426:14, 1430:24, 1433:11, 1433:21
**determined** [1] - 1353:19
**determining** [5] - 1415:17, 1418:3, 1425:22, 1427:4, 1427:20
**develop** [1] - 1399:4
**developing** [1] - 1451:3
**develops** [2] - 1399:6, 1434:11
**device** [1] - 1439:6
**diagnosed** [1] - 1434:10
**died** [1] - 1398:18
**difference** [3] - 1354:20, 1354:22, 1378:2

**different** [12] - 1353:2, 1355:12, 1357:1, 1357:2, 1357:21, 1357:22, 1357:24, 1361:5, 1362:21, 1366:4, 1415:22, 1449:19
**differently** [1] - 1436:4
**differs** [2] - 1413:23, 1415:10
**difficult** [2] - 1431:23, 1431:24
**diligence** [1] - 1434:18
**Dinnell** [1] - 1452:5
**direct** [5] - 1417:10, 1417:14, 1417:16, 1428:10, 1439:23
**directed** [1] - 1415:2
**directive** [1] - 1370:8
**disability** [1] - 1432:24
**disaster** [1] - 1405:1
**disasters** [1] - 1411:7
**discharged** [2] - 1424:6, 1439:24
**disclose** [5] - 1439:24, 1460:25, 1461:6, 1461:24, 1462:2
**discoverable** [1] - 1427:12
**discovery** [1] - 1427:12
**discredit** [1] - 1401:13
**discretion** [3] - 1430:17, 1432:3, 1435:13
**discuss** [9] - 1384:13, 1384:24, 1385:3, 1435:21, 1460:11, 1460:16, 1460:23, 1460:24, 1461:21
**discussed** [2] - 1372:23
**discussing** [1] - 1436:1
**discussion** [1] - 1413:17
**disease** [4] - 1432:13, 1434:9, 1434:10, 1434:11
**dismissed** [1] - 1445:13
**disorders** [1] - 1366:8
**dispassionate** [1] - 1431:22
**displaced** [2] - 1411:7, 1411:8
**disprove** [1] - 1417:12
**dispute** [3] - 1375:3, 1375:4, 1455:10

**disputed** [2] - 1385:16, 1398:16
**disregard** [6] - 1389:3, 1389:20, 1390:7, 1414:15, 1414:25, 1415:4
**disregarded** [1] - 1390:12
**disregards** [1] - 1389:22
**dissecting** [1] - 1360:16
**distinction** [1] - 1417:14
**distress** [8] - 1371:20, 1371:21, 1431:8, 1434:2, 1434:5, 1434:15, 1438:17, 1448:15
**distribute** [2] - 1370:6, 1405:5
**District** [9] - 1436:14, 1436:15, 1441:2, 1460:9, 1460:10, 1465:6, 1465:16
**DISTRICT** [3] - 1346:1, 1346:1, 1346:13
**ditto** [1] - 1463:13
**divide** [2] - 1356:5, 1425:5
**Division** [1] - 1441:3
**division** [4] - 1439:25, 1441:1, 1441:2, 1441:3
**DOC** [1] - 1449:2
**DOCKET** [2] - 1346:5, 1346:8
**doctor** [8] - 1368:12, 1373:14, 1389:5, 1390:2, 1391:3, 1394:17, 1405:23, 1405:25
**doctors** [5] - 1390:4, 1392:6, 1393:1, 1400:21, 1400:22
**doctrine** [2] - 1448:6, 1450:7
**Document** [1] - 1411:14
**DOCUMENT** [1] - 1346:7
**document** [3] - 1404:10, 1404:13, 1436:16
**documents** [3] - 1374:24, 1388:3, 1404:2
**dog** [1] - 1441:19
**Doggone** [1] - 1456:24

**dollar** [3] - 1438:14, 1438:18, 1438:20
**DOMINION** [1] - 1346:17
**done** [14] - 1352:3, 1352:12, 1352:14, 1353:25, 1355:25, 1356:10, 1357:22, 1364:16, 1369:1, 1427:8, 1456:23, 1459:20, 1459:23, 1460:3
**door** [3] - 1350:25, 1386:3
**doors** [2] - 1412:9, 1412:24
**doorways** [1] - 1378:16
**dose** [3] - 1358:3, 1358:5, 1358:7, 1360:5
**double** [1] - 1453:4
**doubled** [1] - 1406:4
**doubles** [4] - 1359:5, 1359:13, 1359:14, 1359:15
**doubt** [2] - 1386:25, 1418:15
**down** [10] - 1356:20, 1358:20, 1372:12, 1374:16, 1378:9, 1387:19, 1402:1, 1442:21, 1457:18, 1458:13
**dozens** [1] - 1375:23
**Dr** [90] - 1352:4, 1353:13, 1354:19, 1355:1, 1356:18, 1358:8, 1358:16, 1359:2, 1360:12, 1360:13, 1360:24, 1360:25, 1361:1, 1361:21, 1363:18, 1363:25, 1364:2, 1364:22, 1364:24, 1364:25, 1367:23, 1367:24, 1368:10, 1371:13, 1372:6, 1372:18, 1372:19, 1372:23, 1384:12, 1384:14, 1384:20, 1388:8, 1388:13, 1388:17, 1388:21, 1389:2, 1390:1, 1390:5, 1390:13, 1391:1, 1391:14, 1391:20, 1391:25, 1392:5, 1392:9, 1392:10, 1392:13, 1392:19, 1392:24,

1392:25, 1393:4,
1393:6, 1393:14,
1393:18, 1393:21,
1393:24, 1394:8,
1394:9, 1394:10,
1394:13, 1394:18,
1395:10, 1395:11,
1395:14, 1395:16,
1395:21, 1396:3,
1396:5, 1397:12,
1397:13, 1397:21,
1398:4, 1398:6,
1400:10, 1400:16,
1400:23, 1401:5,
1401:6, 1405:21,
1405:22, 1413:13

**draft** [1] - 1407:9

**drastically** [1] -
1425:19

**draw** [3] - 1414:5,
1414:16, 1416:25

**drawing** [1] - 1432:4

**DRIVE** [1] - 1346:17

**driving** [1] - 1354:23

**drove** [1] - 1385:2

**due** [7] - 1352:16,
1368:10, 1375:17,
1387:22, 1398:15,
1423:2, 1423:21

**DUPLASS** [1] - 1347:7

**duplicative** [1] -
1448:16

**during** [24] - 1349:20,
1349:25, 1351:7,
1389:11, 1390:5,
1412:5, 1412:13,
1412:15, 1412:18,
1413:3, 1413:5,
1413:8, 1413:25,
1414:19, 1414:23,
1415:2, 1415:9,
1439:1, 1439:4,
1439:17, 1439:19,
1440:15, 1456:6,
1461:3

**dust** [2] - 1381:19,
1397:18

**duties** [2] - 1369:7,
1455:24

**duty** [22] - 1367:3,
1385:22, 1386:11,
1386:15, 1387:4,
1405:12, 1405:13,
1405:16, 1405:18,
1409:9, 1409:12,
1409:13, 1414:2,
1424:6, 1426:23,
1428:13, 1434:17,
1435:21, 1456:23,
1460:23

# E

**ear** [2] - 1405:23,
1441:19

**Earline** [21] - 1351:25,
1352:15, 1360:19,
1367:17, 1368:17,
1368:23, 1369:2,
1373:9, 1396:21,
1409:21, 1409:25,
1411:1, 1418:22,
1431:6, 1432:15,
1438:5, 1438:14,
1438:17, 1438:19,
1438:22, 1448:15

**EARLINE** [1] - 1346:9

**early** [2] - 1370:24,
1371:24

**earned** [1] - 1463:17

**earth** [1] - 1376:18

**easier** [4] - 1366:18,
1378:17, 1459:24,
1459:25

**easiest** [2] - 1367:6,
1367:7

**EASTERN** [1] - 1346:1

**Eastern** [5] - 1436:14,
1436:15, 1441:2,
1460:10, 1465:6

**eat** [1] - 1440:15

**economic** [1] -
1423:10

**economically** [1] -
1363:21

**edit** [1] - 1443:4

**effect** [7] - 1365:8,
1391:22, 1409:8,
1414:11, 1414:13,
1419:19, 1420:8

**effort** [3] - 1434:22,
1435:22, 1451:17

**efforts** [1] - 1435:7

**EHU** [3] - 1418:25,
1424:4, 1424:5

**eight** [2] - 1400:7,
1442:24

**either** [14] - 1366:16,
1387:23, 1422:3,
1426:7, 1426:21,
1426:23, 1427:18,
1428:1, 1437:3,
1440:4, 1446:16,
1451:21, 1454:24,
1455:16

**electronic** [1] - 1439:6

**element** [11] -
1371:18, 1371:19,
1417:22, 1426:20,
1427:15, 1427:20,

1428:7, 1428:16,
1430:1, 1430:2,
1430:4

**elements** [6] - 1365:3,
1420:15, 1426:18,
1429:3, 1432:6,
1433:24

**elevated** [1] - 1370:17

**elevators** [1] -
1451:19

**eliminate** [1] - 1441:8

**eliminated** [1] -
1442:5

**elite** [1] - 1376:17

**Elkhart** [1] - 1410:3

**elsewhere** [1] -
1449:10

**embarrass** [1] -
1376:21

**emergency** [4] -
1410:4, 1410:12,
1411:10, 1418:24

**emissions** [2] -
1356:22, 1383:15

**emits** [1] - 1358:22

**emitted** [1] - 1380:14

**emitting** [6] - 1352:17,
1358:4, 1362:9,
1362:25, 1363:16,
1363:19

**emotional** [3] -
1371:19, 1438:17,
1448:14

**emperor** [7] - 1403:25,
1404:1, 1404:16,
1404:21, 1405:2,
1405:8, 1405:19

**employed** [2] -
1375:23, 1400:3

**employee** [1] - 1376:7

**employees** [1] -
1366:11

**encourage** [1] -
1395:6

**end** [13] - 1353:24,
1366:13, 1366:16,
1380:8, 1385:4,
1386:20, 1396:6,
1409:12, 1424:13,
1424:16, 1447:17,
1460:2, 1461:18

**ended** [1] - 1352:24

**ends** [1] - 1369:13

**engage** [3] - 1431:24,
1461:17, 1461:18

**ENGELHARDT** [1] -
1346:12

**engineer** [1] - 1376:23

**engineering** [1] -
1404:24

**enjoy** [1] - 1446:12

**enjoyed** [1] - 1457:21

**enjoyment** [1] -
1433:16

**ENT** [2] - 1368:9,
1405:22

**enter** [1] - 1438:2

**entered** [1] - 1408:8

**enters** [2] - 1349:9,
1453:11

**entire** [1] - 1402:21

**entirely** [4] - 1368:21,
1414:16, 1430:21,
1461:16

**entirety** [2] - 1390:8,
1424:19

**entities** [2] - 1387:3,
1448:1

**entitled** [16] - 1368:6,
1392:20, 1415:15,
1416:17, 1416:22,
1422:24, 1429:22,
1430:2, 1430:5,
1431:7, 1432:10,
1433:7, 1434:12,
1435:17, 1450:4,
1465:9

**entity** [4] - 1386:16,
1418:21, 1424:22,
1426:25

**entry** [2] - 1350:23,
1351:6

**envelope** [1] - 1453:22

**Environmental** [1] -
1438:6

**epidemiological** [2] -
1388:24, 1389:7

**epidemiologist** [1] -
1388:9

**equal** [1] - 1417:19

**equals** [1] - 1417:20

**equipment** [1] -
1404:18

**error** [2] - 1442:9,
1450:5

**escort** [1] - 1462:20

**ESQUIRE** [7] -
1346:17, 1346:23,
1347:3, 1347:4,
1347:4, 1347:8,
1347:8

**essential** [4] -
1417:22, 1418:8,
1454:22, 1457:3

**establish** [7] - 1360:2,
1388:4, 1399:23,
1418:8, 1429:1,
1429:3, 1429:7

**established** [3] -
1350:2, 1400:2,

1429:12

**evacuated** [1] -
1394:18

**evaluating** [1] -
1392:1

**event** [2] - 1429:21,
1451:22

**eventually** [1] -
1356:20

**everyday** [1] - 1459:2

**everywhere** [1] -
1401:1

**evidence** [117] -
1349:14, 1349:18,
1349:20, 1349:22,
1349:24, 1352:1,
1352:3, 1352:21,
1353:6, 1353:17,
1354:4, 1354:8,
1354:10, 1354:14,
1357:15, 1363:25,
1369:5, 1369:6,
1370:9, 1372:7,
1372:14, 1372:18,
1373:5, 1373:7,
1373:10, 1373:20,
1374:15, 1374:19,
1374:23, 1375:2,
1379:11, 1380:2,
1381:11, 1384:8,
1384:17, 1387:13,
1387:20, 1388:4,
1388:6, 1388:24,
1390:19, 1395:6,
1403:4, 1403:7,
1407:25, 1408:22,
1409:6, 1409:11,
1409:15, 1413:19,
1413:23, 1414:1,
1414:4, 1414:8,
1414:11, 1414:13,
1414:24, 1415:3,
1415:4, 1415:8,
1415:12, 1415:13,
1415:18, 1415:20,
1416:24, 1417:4,
1417:7, 1417:9,
1417:10, 1417:11,
1417:15, 1417:16,
1417:23, 1417:24,
1417:25, 1418:1,
1418:2, 1418:4,
1418:7, 1418:10,
1418:13, 1419:14,
1420:16, 1421:11,
1425:1, 1426:19,
1429:12, 1430:13,
1432:5, 1432:8,
1433:18, 1433:25,
1434:23, 1435:12,

1435:18, 1435:24, 1436:8, 1439:3, 1445:14, 1445:17, 1446:8, 1447:19, 1448:2, 1450:21, 1451:1, 1451:2, 1452:14, 1452:17, 1455:11, 1455:13, 1455:18, 1456:5, 1456:11

**exacerbate** [2] - 1365:1, 1389:10

**exacerbation** [7] - 1353:11, 1364:23, 1373:6, 1391:8, 1391:13, 1395:3, 1395:8

**exact** [4] - 1378:12, 1378:14, 1433:23

**exactly** [4] - 1368:25, 1370:21, 1447:8, 1454:20

**exam** [2] - 1391:15, 1391:18

**examination** [1] - 1354:17

**EXAMINATIONS** [1] - 1348:3

**examine** [1] - 1436:2

**examined** [3] - 1368:7, 1396:7, 1416:23

**examines** [2] - 1368:6, 1416:21

**example** [3] - 1354:19, 1355:13, 1363:13

**exceed** [1] - 1401:2

**exceeded** [2] - 1400:15, 1402:15

**exceeds** [2] - 1350:8, 1401:10

**excellent** [3] - 1398:16, 1459:20, 1460:3

**except** [1] - 1357:11

**exceptional** [1] - 1425:14

**exclusion** [2] - 1444:4, 1444:20

**exclusive** [1] - 1419:3

**exercise** [2] - 1426:23, 1435:7

**EXHIBIT** [1] - 1348:15

**Exhibit** [7] - 1355:8, 1358:10, 1370:10, 1370:11, 1372:15, 1384:8, 1407:25

**exhibit** [6] - 1370:9, 1404:10, 1406:22, 1408:7, 1413:20,

1413:23

**exhibits** [9] - 1349:19, 1407:14, 1407:24, 1417:1, 1418:6, 1439:3, 1452:20, 1452:21, 1453:2

**exist** [2] - 1367:13, 1388:23

**existed** [4] - 1367:11, 1419:23, 1420:24, 1437:9

**existence** [1] - 1417:12

**existing** [6] - 1423:5, 1423:10, 1423:24, 1432:13, 1433:3, 1433:11

**expand** [1] - 1460:8

**expect** [4] - 1392:12, 1421:24, 1422:7, 1426:24

**expected** [4] - 1382:14, 1422:21, 1423:18, 1427:2

**expects** [2] - 1395:15, 1457:11

**expenses** [6] - 1373:5, 1430:10, 1430:15, 1431:5, 1435:7, 1438:19

**experience** [9] - 1356:25, 1386:18, 1416:1, 1417:2, 1424:11, 1433:17, 1455:4, 1456:10, 1457:14

**experienced** [3] - 1401:21, 1402:9, 1433:16

**experimental** [1] - 1388:24

**expert** [14] - 1354:17, 1355:1, 1362:15, 1366:22, 1377:4, 1382:2, 1385:8, 1389:19, 1390:16, 1396:5, 1397:22, 1402:16, 1404:23, 1416:2

**expertise** [2] - 1386:18, 1424:11

**experts** [13] - 1376:24, 1382:21, 1383:7, 1383:8, 1391:11, 1392:22, 1396:1, 1400:9, 1400:11, 1401:14, 1401:24, 1416:2

**explain** [4] - 1349:17, 1357:11, 1372:7,

1421:20

**explained** [8] - 1356:18, 1364:4, 1381:21, 1386:2, 1391:11, 1396:8, 1429:4, 1442:10

**explains** [1] - 1357:23

**exploded** [1] - 1406:3

**explosion** [1] - 1359:19

**exposed** [4] - 1352:1, 1352:16, 1391:21, 1396:10

**exposure** [6] - 1351:25, 1360:5, 1364:22, 1373:3, 1391:8, 1392:3

**exposures** [2] - 1400:4, 1400:6

**expressing** [1] - 1371:4

**expressly** [1] - 1414:10

**extends** [1] - 1449:19

**extensive** [1] - 1445:3

**extensively** [2] - 1448:21, 1451:1

**extent** [8] - 1357:11, 1397:2, 1425:23, 1426:10, 1426:12, 1428:25, 1432:7, 1433:3

**extenuating** [1] - 1426:8

**extrapolations** [1] - 1355:24

**eye** [6] - 1359:7, 1359:8, 1361:2, 1366:5, 1402:9, 1402:10

**eyes** [7] - 1360:25, 1361:7, 1361:9, 1361:12, 1361:14, 1361:15, 1402:12

**eyewitness** [1] - 1417:10


## F

**face** [3] - 1376:18, 1384:22

**face-to-face** [1] - 1384:22

**Facebook** [1] - 1439:10

**faced** [2] - 1430:7, 1433:5

**faces** [1] - 1456:3

**facility** [2] - 1378:8,

1411:23

**fact** [21] - 1361:11, 1370:13, 1379:2, 1384:15, 1393:20, 1400:19, 1401:22, 1409:19, 1415:20, 1417:5, 1418:3, 1418:19, 1427:17, 1429:8, 1429:16, 1430:18, 1439:13, 1452:17, 1456:14, 1459:13, 1460:19

**factor** [2] - 1427:24, 1428:6

**factors** [1] - 1427:25

**facts** [9] - 1354:8, 1390:17, 1403:18, 1409:15, 1415:1, 1417:13, 1417:16, 1432:5, 1436:7

**factual** [1] - 1451:3

**Fahrenheit** [1] - 1412:19

**failed** [6] - 1368:20, 1375:17, 1384:2, 1415:21, 1420:19, 1434:24

**failing** [1] - 1369:3

**fails** [1] - 1418:8

**failure** [8] - 1365:19, 1366:17, 1421:16, 1422:10, 1435:11, 1448:21, 1448:25, 1450:8

**fair** [4] - 1370:21, 1430:24, 1433:25, 1455:11

**fair-minded** [1] - 1455:11

**fairly** [4] - 1394:12, 1431:14, 1432:11, 1433:22

**faith** [1] - 1425:21

**falsely** [2] - 1404:24, 1415:19

**familiar** [2] - 1380:12, 1456:9

**families** [2] - 1411:11, 1459:2

**family** [5] - 1375:20, 1379:4, 1402:3, 1402:11, 1456:24

**family-run** [1] - 1375:20

**fan** [1] - 1402:6

**fantastic** [1] - 1402:14

**far** [2] - 1355:13, 1452:2

**Farenheit** [7] - 1412:16, 1412:17,

1413:4, 1413:5, 1413:7, 1413:8, 1413:10

**fashion** [1] - 1421:15

**fast** [1] - 1375:1

**father** [2] - 1375:15, 1375:21

**fault** [18] - 1353:9, 1368:17, 1368:23, 1369:2, 1369:3, 1418:21, 1424:21, 1425:4, 1425:6, 1425:7, 1425:15, 1425:23, 1425:24, 1426:1, 1437:25, 1446:12, 1446:17, 1446:21

**fault/damages** [1] - 1437:24

**favor** [4] - 1373:19, 1388:15, 1418:18, 1450:15

**fear** [18] - 1353:14, 1371:22, 1372:22, 1373:1, 1373:4, 1397:6, 1397:10, 1397:12, 1398:2, 1398:6, 1398:15, 1398:17, 1399:11, 1434:7, 1434:15, 1450:24, 1450:25

**fearful** [1] - 1398:9

**feasible** [4] - 1363:20, 1363:21, 1363:22, 1423:8

**feature** [2] - 1411:5, 1446:18

**federal** [6] - 1371:7, 1380:10, 1382:16, 1382:17, 1456:25

**feelings** [1] - 1455:17

**fees** [1] - 1435:19

**feet** [2] - 1358:20, 1363:12

**FELIPE** [1] - 1436:24

**fell** [1] - 1426:21

**fellow** [1] - 1461:1

**felt** [4] - 1353:6, 1371:15, 1461:5

**FEMA** [67] - 1346:4, 1353:3, 1353:8, 1357:2, 1357:8, 1357:12, 1359:20, 1360:1, 1364:9, 1366:16, 1369:17, 1369:21, 1369:24, 1369:25, 1370:4, 1370:7, 1370:10, 1370:14, 1370:15, 1371:3, 1382:11,

1382:12, 1382:14, 1382:19, 1385:17, 1385:21, 1385:22, 1386:2, 1386:9, 1387:6, 1387:10, 1393:24, 1398:5, 1405:4, 1405:14, 1405:15, 1409:23, 1410:4, 1410:8, 1410:9, 1410:12, 1410:16, 1410:18, 1410:19, 1411:6, 1411:10, 1411:23, 1424:5, 1424:9, 1436:15, 1438:7, 1441:4, 1445:9, 1445:11, 1445:13, 1445:15, 1445:17, 1445:18, 1446:1, 1446:5, 1446:6, 1446:11, 1446:12, 1446:19, 1446:21, 1450:13

**FEMA's** [7] - 1352:25, 1370:13, 1387:5, 1426:14, 1426:17, 1427:16, 1428:8

**few** [4] - 1360:19, 1401:22, 1401:23, 1454:18

**FH** [1] - 1410:1

**fiction** [4] - 1385:14, 1399:10, 1402:14

**field** [3] - 1382:2, 1397:22, 1416:1

**fields** [1] - 1390:16

**fifth** [1] - 1355:10

**Fifth** [1] - 1390:10

**figure** [4] - 1369:17, 1394:2, 1395:7, 1406:5

**file** [3] - 1399:7, 1404:15, 1459:7

**filed** [3] - 1369:16, 1450:1

**fill** [2] - 1439:20, 1455:7

**filled** [2] - 1379:8, 1455:6

**final** [2] - 1407:9, 1460:5

**finalize** [1] - 1443:22

**fine** [8] - 1389:20, 1391:17, 1391:18, 1405:20, 1447:1, 1452:24

**finish** [1] - 1436:5

**finished** [2] - 1351:10, 1454:19

**finishes** [1] - 1351:4

**finite** [1] - 1356:19

**first** [26] - 1359:17, 1361:3, 1373:1, 1374:5, 1379:8, 1391:6, 1391:15, 1396:22, 1401:22, 1402:1, 1412:1, 1412:15, 1413:5, 1419:15, 1420:17, 1426:20, 1429:19, 1433:3, 1440:5, 1440:22, 1441:1, 1448:6, 1448:12, 1452:16, 1457:25, 1462:21

**fit** [1] - 1396:17

**fits** [1] - 1354:4

**five** [5] - 1350:4, 1350:7, 1350:9, 1350:15, 1373:22, 1374:16, 1383:19, 1390:2, 1390:3, 1403:13, 1406:20, 1426:7, 1437:20, 1437:24, 1444:15

**fix** [1] - 1369:12

**fixed** [2] - 1352:23, 1385:15

**fixing** [2] - 1432:3, 1433:23

**flagged** [1] - 1442:17

**flat** [1] - 1393:21

**flat-out** [1] - 1393:21

**flawed** [1] - 1390:14

**Fleetwood** [2] - 1362:16, 1463:25

**floor** [2] - 1457:25, 1462:21

**Florida** [1] - 1357:4

**flow** [1] - 1402:7

**flyer** [1] - 1385:24

**flyers** [5] - 1370:15, 1385:22, 1386:4, 1386:7, 1405:5

**focus** [2] - 1455:18, 1456:5

**focused** [1] - 1462:6

**folks** [4] - 1366:17, 1405:8, 1406:8, 1457:24

**follow** [4] - 1350:17, 1407:10, 1409:14, 1439:17

**following** [11] - 1363:15, 1409:19, 1409:25, 1410:8, 1411:7, 1426:18, 1432:6, 1438:1, 1438:12, 1450:8, 1459:18

**follows** [2] - 1386:14, 1450:10

**fond** [1] - 1397:23

**food** [5] - 1354:15, 1354:22, 1355:2, 1403:21, 1406:22

**foot** [1] - 1362:24

**FOR** [2] - 1346:16, 1347:3

**forbid** [2] - 1399:4, 1399:6

**forced** [1] - 1429:25

**foregoing** [1] - 1465:7

**FOREPERSON** [3] - 1453:15, 1453:20, 1453:23

**foreperson** [5] - 1438:24, 1439:1, 1439:20, 1453:18, 1454:11

**foresee** [1] - 1462:3

**foreseeable** [1] - 1428:11

**form** [32] - 1354:1, 1379:7, 1379:8, 1387:12, 1407:10, 1416:12, 1436:9, 1436:11, 1436:19, 1437:6, 1437:13, 1437:21, 1439:21, 1440:21, 1440:24, 1441:1, 1441:6, 1443:25, 1444:7, 1444:9, 1445:5, 1445:10, 1445:11, 1445:16, 1446:17, 1448:13, 1448:18, 1454:10, 1463:4, 1464:13

**formaldehyde** [102] - 1351:25, 1352:5, 1352:13, 1352:17, 1353:16, 1353:19, 1353:23, 1354:15, 1354:21, 1355:2, 1355:7, 1355:11, 1355:18, 1355:22, 1356:6, 1356:8, 1356:10, 1356:17, 1356:19, 1356:21, 1356:24, 1358:1, 1358:2, 1358:4, 1358:6, 1358:23, 1359:4, 1359:13, 1359:21, 1359:22, 1360:13, 1360:16, 1361:10, 1361:12, 1361:19, 1362:9, 1362:25, 1363:16, 1363:19, 1364:2,

1364:4, 1364:22, 1365:1, 1366:1, 1366:14, 1367:5, 1367:23, 1368:20, 1370:4, 1370:7, 1370:16, 1370:18, 1371:23, 1371:25, 1372:5, 1372:15, 1373:3, 1376:5, 1376:7, 1376:10, 1376:19, 1380:14, 1380:18, 1381:1, 1381:3, 1381:19, 1382:6, 1383:9, 1383:15, 1384:6, 1385:12, 1385:19, 1386:8, 1389:9, 1389:17, 1391:8, 1391:21, 1392:3, 1395:20, 1395:22, 1396:12, 1397:24, 1398:13, 1399:7, 1400:15, 1401:1, 1401:7, 1403:23, 1406:2, 1410:14, 1410:15, 1411:15, 1411:17, 1411:21, 1411:24, 1412:3, 1412:7, 1412:12, 1412:21, 1413:2

**FORMALDEHYDE** [1] - 1346:4

**Formaldehyde** [2] - 1436:16, 1441:5

**formaldehyde-containing** [1] - 1358:6

**formaldehyde-emitting** [6] - 1352:17, 1358:4, 1362:9, 1362:25, 1363:16, 1363:19

**formally** [1] - 1444:22

**FORTE** [1] - 1347:3

**forth** [5] - 1373:5, 1373:10, 1379:20, 1399:8, 1448:20

**fortunately** [1] - 1398:10

**forward** [1] - 1403:10

**four** [21] - 1352:12, 1355:21, 1356:10, 1356:15, 1360:8, 1371:11, 1383:19, 1390:18, 1396:23, 1401:4, 1420:4, 1420:15, 1421:5, 1426:6, 1426:18, 1437:12, 1437:15, 1437:19, 1437:21,

1442:21, 1444:8

**FOUR** [1] - 1346:17

**fourth** [1] - 1428:16

**frame** [1] - 1413:15

**frankly** [2] - 1353:1, 1354:13

**free** [4] - 1425:9, 1458:22, 1461:15, 1461:19

**frequency** [1] - 1396:25

**Friday** [12] - 1349:12, 1382:12, 1393:9, 1393:11, 1396:6, 1445:6, 1447:2, 1447:24, 1448:24, 1449:4, 1449:7, 1449:13

**friend** [1] - 1456:24

**friendly** [1] - 1378:6

**frog** [1] - 1360:16

**front** [7] - 1355:2, 1382:22, 1384:24, 1454:24, 1459:19, 1460:2, 1463:15

**full** [5] - 1353:1, 1378:22, 1429:12, 1435:24, 1442:19

**full-size** [1] - 1378:22

**function** [1] - 1383:3

**funny** [4] - 1377:15, 1378:25, 1393:24, 1400:13

**future** [6] - 1431:21, 1433:17, 1438:13, 1438:16, 1448:14, 1461:14

## G

**game** [1] - 1350:5

**Garratt** [3] - 1360:1, 1382:11, 1387:5

**GARRISON** [7] - 1347:3, 1347:3, 1452:9, 1454:14, 1463:10, 1464:7, 1464:14

**Garrison** [2] - 1374:7, 1464:5

**gas** [1] - 1359:4

**gassed** [1] - 1355:22

**gassing** [8] - 1352:13, 1356:2, 1356:11, 1356:15, 1356:19, 1359:13, 1361:10, 1406:4

**Gautreaux** [13] - 1353:13, 1367:24,

1392:5, 1392:10, 1392:19, 1394:8, 1394:10, 1394:13, 1395:10, 1395:11, 1395:14, 1395:16, 1395:21
gear [1] - 1370:6
general [5] - 1368:11, 1371:25, 1430:6, 1430:25, 1434:4
generally [2] - 1394:22, 1425:12
gentlemen [3] - 1351:19, 1408:18, 1453:12
Geoffrey [1] - 1369:6
George [3] - 1362:11, 1377:9, 1380:22
Gerald [1] - 1361:2
given [8] - 1350:21, 1357:10, 1392:22, 1407:18, 1429:16, 1439:18, 1451:20, 1462:21
GLASS [1] - 1347:8
gloves [1] - 1404:20
glue [3] - 1383:6, 1383:8, 1383:11
goal [1] - 1375:19
God [3] - 1373:12, 1399:4, 1399:6
gold [2] - 1388:23, 1388:25
gorilla [1] - 1397:5, 1399:9, 1406:11, 1406:12, 1406:15, 1406:16
government [7] - 1353:22, 1371:7, 1380:11, 1382:16, 1382:17, 1405:3, 1448:5
Government [4] - 1377:25, 1386:13, 1386:25, 1417:19
government's [2] - 1387:6, 1387:7
governmental [1] - 1353:19
graphic [1] - 1413:21
gratitude [2] - 1375:10
great [4] - 1375:4, 1375:10, 1393:12, 1426:4
greater [8] - 1368:6, 1383:9, 1392:20, 1392:22, 1415:15, 1416:22, 1417:5, 1417:24
greatest [1] - 1455:24

green [1] - 1352:10
grief [1] - 1434:6
grindstone [1] - 1456:7
gross [8] - 1445:14, 1445:17, 1445:24, 1446:5, 1446:7, 1446:15, 1446:18, 1446:20
grossly [1] - 1446:6
ground [2] - 1448:18, 1450:25
Group [2] - 1372:5, 1372:17
group [1] - 1372:15
Guame [5] - 1362:7, 1377:9, 1377:17, 1380:22, 1381:24
GUERRA [1] - 1346:16
guess [6] - 1376:4, 1383:20, 1394:23, 1443:4, 1463:17, 1464:9
guesswork [1] - 1431:24
guidance [1] - 1429:21
guided [1] - 1431:22
Gulf [7] - 1378:7, 1378:11, 1378:15, 1381:16, 1382:14, 1411:9, 1411:11
gun [1] - 1392:22
guns [2] - 1376:25, 1387:18
Guy [1] - 1386:1
guy [3] - 1362:7, 1377:5, 1383:18

## H

habitable [1] - 1370:1
half [5] - 1356:1, 1369:1, 1388:10, 1388:15
hallway [1] - 1451:19
hand [2] - 1425:17, 1431:25
handicap [2] - 1410:2, 1411:5
handicapped [2] - 1378:6, 1378:17
handicapped-friendly [1] - 1378:6
handle [1] - 1351:2
hands [2] - 1358:13, 1385:20
happy [1] - 1458:17
harassed [1] -

1460:18
hard [3] - 1459:15, 1459:16, 1459:18
harm [6] - 1400:4, 1424:19, 1424:20, 1427:3, 1427:4, 1442:14
harmful [1] - 1432:21
haste [1] - 1426:9
hauled [1] - 1410:20
hazard [9] - 1353:3, 1369:4, 1381:24, 1384:15, 1384:16, 1385:5, 1385:6, 1405:3, 1405:8
hazards [4] - 1386:19, 1386:20, 1424:12, 1424:13
hazy [1] - 1370:24
heading [2] - 1440:25
heads [1] - 1350:10
health [8] - 1359:25, 1383:9, 1386:20, 1391:22, 1398:16, 1400:23, 1405:1, 1424:13
hear [12] - 1374:23, 1393:5, 1396:4, 1397:8, 1401:16, 1444:4, 1453:5, 1455:25, 1456:23, 1457:4, 1457:13, 1458:10
heard [49] - 1353:12, 1354:11, 1362:8, 1362:10, 1362:11, 1363:10, 1368:22, 1369:5, 1375:14, 1375:24, 1376:15, 1377:8, 1377:9, 1377:14, 1377:18, 1378:7, 1380:22, 1381:25, 1382:11, 1382:18, 1383:1, 1383:7, 1383:17, 1384:11, 1384:17, 1384:20, 1385:8, 1386:1, 1386:8, 1387:5, 1388:3, 1388:8, 1390:9, 1391:11, 1392:9, 1392:24, 1394:18, 1397:9, 1397:12, 1397:21, 1399:13, 1399:24, 1400:25, 1409:6, 1413:25, 1455:1, 1455:10
HEARD [1] - 1346:12
hearing [1] - 1414:2
heat [2] - 1360:6,

1406:3
heaters [2] - 1412:10, 1413:1
heating [1] - 1360:19
heavy [1] - 1383:2
heeded [1] - 1421:10
held [4] - 1422:16, 1446:5, 1447:9, 1447:10
help [4] - 1375:12, 1388:16, 1389:23, 1395:12
helpful [1] - 1415:25
helps [1] - 1388:14
hereby [1] - 1465:7
herein [1] - 1413:15
hereinafter [2] - 1410:3, 1410:7
herring [4] - 1354:16, 1354:18, 1355:4, 1377:1
herself [1] - 1424:21
hesitate [1] - 1436:1
Hewett [3] - 1399:20, 1401:5, 1401:6
high [13] - 1355:7, 1358:3, 1358:22, 1359:24, 1360:16, 1361:19, 1371:5, 1380:8, 1383:10, 1412:13, 1412:16, 1413:3, 1413:6
high-end [1] - 1380:8
high-priority [1] - 1371:5
higher [4] - 1358:7, 1359:3, 1360:22, 1361:17
highlighted [1] - 1390:20
highlights [1] - 1390:23
highly [1] - 1462:1
himself [1] - 1390:16
hired [6] - 1376:25, 1384:13, 1387:18, 1390:24, 1392:22, 1396:5
hired-gun [1] - 1392:22
hiring [1] - 1402:16
historian [1] - 1373:13
history [2] - 1353:18, 1373:15
hit [1] - 1357:7
Hoang [5] - 1364:25, 1392:19, 1394:18, 1405:21
hold [4] - 1414:21, 1444:2, 1446:4,

1447:10
holds [1] - 1390:15
Hollywood [1] - 1376:16
Hollywood's [1] - 1376:17
home [2] - 1355:16, 1394:23
homes [2] - 1357:19, 1401:1
honest [2] - 1373:13, 1436:4
honesty [1] - 1369:19
Honor [22] - 1350:13, 1351:15, 1373:25, 1403:15, 1406:24, 1407:17, 1408:6, 1408:8, 1408:13, 1441:16, 1443:11, 1444:6, 1445:8, 1448:11, 1448:20, 1449:25, 1450:2, 1450:23, 1451:10, 1452:12, 1452:22
HONORABLE [1] - 1346:12
hooked [1] - 1396:19
hot [1] - 1357:7
hotel [1] - 1386:10
hour [4] - 1396:2, 1412:4, 1412:11, 1440:13
hours [8] - 1352:23, 1364:13, 1412:10, 1412:11, 1412:15, 1412:25, 1413:1, 1413:5
house [2] - 1370:23, 1378:22, 1386:9
housing [7] - 1357:19, 1378:1, 1378:2, 1410:5, 1410:12, 1411:11, 1418:24
Houston [2] - 1355:13, 1394:17
HOUSTON [1] - 1346:24
HUD [2] - 1357:17, 1358:10, 1377:24, 1380:10, 1400:6, 1400:10, 1401:10
HUD-proposed [1] - 1358:10
human [1] - 1372:2
humans [3] - 1366:9, 1372:5, 1372:16
humid [1] - 1357:7
humidity [4] - 1360:6, 1412:6, 1412:20, 1413:10

hundred [1] - 1438:3
hundreds [2] - 1356:6,
1356:7
hurricane [2] -
1364:10, 1375:6
Hurricane [7] -
1375:4, 1375:7,
1378:4, 1393:16,
1394:16, 1409:25,
1411:18
Hurricanes [2] -
1410:8, 1411:12
hurricanes [2] -
1357:5, 1357:7
hurt [1] - 1406:17
Hygiene [2] - 1411:25,
1412:23
hypothetical [1] -
1359:6

**I**

IARC [4] - 1371:25,
1372:20, 1397:22,
1397:24
idea [1] - 1404:15
Identification [1] -
1409:24
identified [2] - 1423:7,
1423:8
identify [1] - 1391:7
idly [1] - 1435:5
ignorance [1] - 1367:3
ignore [3] - 1399:16,
1402:17, 1413:18
illness [1] - 1434:11
illustration [1] -
1413:20
imagine [1] - 1371:6
immediately [2] -
1460:15, 1460:19
immunity [1] -
1446:12
immunologist [1] -
1396:7
impact [1] - 1405:4
impairment [1] -
1373:8, 1438:21,
1448:16
implication [1] -
1450:19
importance [1] -
1426:5
important [13] -
1359:6, 1373:9,
1389:13, 1391:14,
1392:14, 1392:18,
1393:23, 1408:24,
1415:20, 1427:7,

1458:10, 1459:3,
1461:23
importantly [4] -
1370:9, 1374:8,
1402:8, 1402:25
imposed [4] -
1431:16, 1445:25,
1446:7, 1457:7
impression [1] -
1415:16
impressions [2] -
1374:18, 1461:20
IN [1] - 1346:4
inactions [1] -
1431:10
inadequate [11] -
1365:21, 1387:15,
1387:22, 1419:8,
1420:12, 1420:14,
1422:16, 1422:19,
1423:21, 1450:4,
1450:16
inadvertence [1] -
1426:3
inapplicable [1] -
1402:14
incentive [2] -
1425:13, 1425:20
incident [5] - 1418:19,
1425:6, 1430:8,
1433:6, 1434:2
include [6] - 1422:20,
1427:11, 1448:22,
1448:25, 1449:23,
1450:8
included [8] -
1413:15, 1445:4,
1445:5, 1445:15,
1448:17, 1449:9,
1449:21, 1450:19
including [6] - 1352:3,
1393:13, 1395:24,
1411:8, 1431:8,
1460:24
inclusion [7] - 1444:3,
1444:20, 1444:22,
1445:9, 1445:11,
1447:12, 1447:21
incorporate [3] -
1363:19, 1444:24,
1445:20
Incorporated [2] -
1410:7, 1438:6
increase [1] - 1359:5
increased [2] -
1399:2, 1431:16
increasing [1] -
1420:1
incur [1] - 1435:7
incurred [2] - 1430:11,

1431:5
independent [1] -
1415:13
independently [1] -
1428:1
Indiana [1] - 1410:3
indicate [3] - 1414:10,
1430:19, 1453:18
indicated [4] -
1349:11, 1408:19,
1447:24, 1460:20
indicates [1] -
1358:17
indication [1] -
1429:17
indirect [1] - 1417:11
individuals [1] -
1370:5
industry [25] -
1357:14, 1357:16,
1362:24, 1363:2,
1365:15, 1365:16,
1370:2, 1377:10,
1377:11, 1377:13,
1377:25, 1380:7,
1380:23, 1382:4,
1382:5, 1382:15,
1382:19, 1383:21,
1385:10, 1387:11,
1403:19, 1404:3,
1404:25, 1406:16
inference [2] - 1414:5,
1414:16
inferences [2] -
1416:25, 1432:4
inferior [1] - 1426:7
inflammation [1] -
1392:11
influenced [1] -
1415:14
inform [2] - 1386:20,
1424:13
information [8] -
1349:25, 1366:11,
1366:16, 1385:19,
1411:13, 1439:5,
1439:11, 1451:21
initiated [1] - 1371:6
injured [9] - 1352:1,
1368:6, 1368:7,
1416:22, 1416:23,
1432:18, 1432:22,
1432:24, 1435:4
injuries [20] - 1353:8,
1364:6, 1365:10,
1387:25, 1388:5,
1419:4, 1419:16,
1419:17, 1420:1,
1420:10, 1425:3,
1425:25, 1426:11,

1426:13, 1429:13,
1431:6, 1431:12,
1431:19, 1433:2
injury [26] - 1363:23,
1364:21, 1367:20,
1379:21, 1403:3,
1418:19, 1419:18,
1419:21, 1420:22,
1421:2, 1421:14,
1421:15, 1422:4,
1422:20, 1423:6,
1423:19, 1424:1,
1427:24, 1428:2,
1428:3, 1428:6,
1431:7, 1432:14,
1433:14, 1433:18,
1437:16
inquiry [3] - 1427:21,
1428:5, 1428:12
inside [2] - 1364:3,
1372:4
inspected [1] -
1410:18
inspections [1] -
1369:11
installation [1] -
1352:20
installed [1] - 1410:24
instances [1] -
1424:18
instant [1] - 1439:9
instead [3] - 1358:17,
1369:24, 1378:23
instituted [1] -
1385:18
instruct [7] - 1368:5,
1392:18, 1409:7,
1409:13, 1414:24,
1426:15, 1444:15
instructed [6] -
1349:22, 1415:4,
1415:6, 1418:5,
1430:19, 1455:14
instructing [1] -
1429:20
instruction [14] -
1364:17, 1368:3,
1392:17, 1409:16,
1422:1, 1447:12,
1447:13, 1449:8,
1449:11, 1449:14,
1449:17, 1449:19,
1450:19, 1460:5
instructions [35] -
1353:25, 1354:2,
1365:20, 1379:23,
1379:24, 1380:3,
1386:22, 1407:4,
1407:9, 1407:11,
1408:21, 1408:25,

1409:3, 1409:5,
1409:17, 1421:20,
1429:17, 1439:2,
1439:18, 1440:21,
1440:24, 1441:9,
1443:8, 1443:22,
1443:25, 1444:3,
1444:19, 1445:5,
1445:10, 1445:16,
1449:2, 1449:12,
1450:1, 1450:3,
1450:9
INSTRUCTIONS........
............................ [1]
- 1348:7
instructs [1] - 1392:21
intangible [1] -
1433:18
intelligent [1] -
1402:24
intended [3] -
1399:22, 1430:9,
1449:12
interest [1] - 1436:7
interesting [4] -
1356:16, 1368:2,
1405:21, 1405:22
interestingly [2] -
1362:20, 1389:2
interests [1] - 1425:14
intermediary [1] -
1447:20
Internet [3] - 1439:8,
1439:9
interpret [1] - 1429:16
introduced [3] -
1349:20, 1414:9,
1433:20
introducing [1] -
1407:25
invisible [6] - 1404:1,
1404:16, 1404:21,
1405:2, 1405:8,
1405:19
invoice [5] - 1377:15,
1377:16, 1377:17,
1377:19, 1377:21
involved [10] -
1369:22, 1394:5,
1394:25, 1395:4,
1413:22, 1425:8,
1426:3, 1426:4,
1426:13, 1448:5
iPhone [1] - 1439:7
irresponsible [1] -
1389:3
irritant [6] - 1352:12,
1356:4, 1365:2,
1396:9, 1396:10,
1396:15

**irritated** [3] - 1360:25, 1361:9, 1361:14
**irritates** [2] - 1361:15, 1361:20
**irritation** [13] - 1359:7, 1360:14, 1360:24, 1361:3, 1361:12, 1361:16, 1361:18, 1361:20, 1366:6, 1366:7, 1397:19, 1402:10
**isocyanate** [1] - 1383:11
**isocyanide** [2] - 1383:6, 1383:8
**issue** [11] - 1356:25, 1369:5, 1370:16, 1383:17, 1384:14, 1385:16, 1391:10, 1407:13, 1424:24, 1449:10, 1461:5
**issues** [3] - 1388:18, 1394:14, 1430:14
**item** [1] - 1434:21
**Item** [1] - 1448:13
**items** [2] - 1432:16, 1439:14
**itself** [1] - 1400:3

## J

**jacket** [1] - 1401:19
**James** [10] - 1355:1, 1356:18, 1358:8, 1358:16, 1360:25, 1372:19, 1377:19, 1396:5, 1400:16, 1400:23
**January** [7] - 1411:22, 1412:1, 1412:8, 1412:22, 1413:14
**Jarrell** [2] - 1360:14, 1361:6
**job** [13] - 1354:7, 1377:1, 1387:7, 1403:17, 1403:24, 1459:2, 1459:23, 1459:24, 1459:25, 1462:7, 1463:20, 1463:21
**Joe** [1] - 1400:25
**join** [1] - 1374:5
**Joseph** [1] - 1359:24
**JOSEPH** [1] - 1347:8
**joy** [1] - 1456:4
**JUDGE** [1] - 1346:13
**Judge** [1] - 1446:22
**judge** [9] - 1354:6, 1368:2, 1368:5,

1374:20, 1374:21, 1405:12, 1435:3, 1454:24, 1460:20
**judged** [1] - 1416:18
**judges** [7] - 1409:8, 1409:9, 1414:12, 1415:1, 1436:7, 1457:24
**judgment** [6] - 1418:17, 1454:17, 1464:4, 1464:5, 1464:10, 1464:11
**July** [5] - 1364:24, 1370:20, 1370:24, 1405:6, 1411:2
**jumping** [1] - 1456:4
**June** [5] - 1352:23, 1359:2, 1369:7, 1369:8, 1369:13
**jurisdiction** [1] - 1390:11
**juror** [3] - 1415:16, 1462:13, 1462:23
**jurors** [7] - 1414:25, 1415:14, 1435:21, 1460:1, 1460:10, 1461:1, 1461:10
**Jury** [1] - 1409:6
**jury** [136] - 1349:8, 1349:13, 1350:19, 1351:21, 1353:25, 1374:5, 1374:11, 1374:14, 1374:25, 1379:6, 1379:7, 1379:23, 1379:24, 1379:25, 1380:3, 1386:22, 1387:12, 1389:24, 1390:6, 1390:7, 1390:20, 1392:17, 1392:20, 1399:8, 1402:22, 1402:23, 1403:1, 1403:6, 1407:6, 1407:9, 1407:10, 1408:19, 1408:20, 1408:21, 1409:5, 1409:8, 1409:9, 1414:2, 1414:15, 1415:25, 1424:8, 1424:14, 1435:25, 1436:9, 1436:11, 1436:19, 1437:6, 1437:13, 1437:21, 1438:22, 1438:23, 1440:10, 1440:18, 1440:21, 1440:23, 1440:24, 1441:1, 1441:6, 1441:9, 1443:8, 1443:22, 1443:23, 1443:25,

1444:1, 1444:3, 1444:6, 1444:9, 1445:4, 1445:10, 1445:11, 1445:16, 1446:11, 1446:15, 1446:16, 1448:12, 1448:22, 1449:1, 1449:2, 1449:12, 1449:25, 1450:3, 1450:9, 1450:20, 1451:5, 1451:25, 1452:13, 1452:14, 1452:20, 1453:6, 1453:8, 1453:10, 1453:12, 1453:18, 1454:9, 1454:11, 1454:12, 1454:19, 1454:23, 1455:4, 1455:8, 1455:20, 1455:23, 1455:24, 1456:1, 1456:3, 1456:20, 1456:25, 1457:3, 1457:7, 1457:14, 1457:21, 1457:25, 1458:2, 1458:14, 1458:16, 1458:23, 1458:24, 1459:14, 1460:6, 1460:23, 1461:3, 1461:20, 1462:7, 1462:9, 1462:12, 1462:15, 1462:18, 1462:25, 1463:3, 1463:8, 1463:20
**JURY** [2] - 1346:12, 1348:7
**jury's** [4] - 1454:1, 1454:2, 1454:16, 1461:21
**justice** [2] - 1417:20, 1454:22
**justified** [1] - 1417:1

## K

**Katrina** [16] - 1357:1, 1357:10, 1357:21, 1357:23, 1375:4, 1375:7, 1376:4, 1378:4, 1380:16, 1393:16, 1393:22, 1394:16, 1409:25, 1410:8, 1411:12, 1411:18
**keep** [2] - 1350:5, 1462:8
**Kenner** [2] - 1355:16, 1361:17
**Kenneth** [1] - 1366:22
**kept** [4] - 1401:18,

1402:5, 1402:6, 1455:12
**Kevin** [1] - 1382:18
**keys** [1] - 1385:2
**kick** [1] - 1370:6
**kill** [1] - 1389:18
**Kim** [3] - 1360:17, 1398:21, 1398:22
**kind** [9] - 1362:7, 1362:23, 1369:9, 1370:24, 1372:19, 1376:11, 1377:15, 1404:9, 1457:17
**kinds** [1] - 1368:10
**knowledge** [5] - 1415:24, 1423:5, 1423:10, 1423:16, 1423:24
**known** [4] - 1353:4, 1372:2, 1423:5, 1423:24
**knows** [5] - 1363:8, 1365:1, 1377:2, 1405:14, 1423:17
**KURT** [1] - 1346:12
**Kurtz** [1] - 1452:6

## L

**L.L.C** [2] - 1410:3, 1438:4
**LA** [3] - 1347:5, 1347:10, 1347:14
**lab** [1] - 1392:7
**labels** [2] - 1367:4, 1411:16
**lack** [2] - 1352:16, 1421:7
**ladies** [3] - 1351:19, 1408:18, 1453:12
**lady** [1] - 1360:21
**LAKEWAY** [1] - 1347:9
**Lang** [1] - 1361:2
**language** [1] - 1450:9
**large** [1] - 1352:16
**Larry** [3] - 1389:25, 1390:25, 1391:6
**last** [21] - 1349:20, 1351:23, 1370:8, 1372:3, 1373:15, 1373:16, 1374:13, 1376:21, 1377:19, 1406:20, 1442:19, 1445:13, 1446:23, 1447:5, 1447:11, 1448:24, 1452:12, 1454:21, 1457:14, 1457:15, 1462:6

**lasted** [1] - 1360:18
**lastly** [2] - 1383:17, 1450:23
**lasts** [1] - 1360:20
**late** [3] - 1370:23, 1406:4, 1456:2
**latent** [1] - 1432:14
**Lauan** [8] - 1357:20, 1358:3, 1358:4, 1358:17, 1358:21, 1358:22, 1362:14, 1363:13
**Laughery** [5] - 1366:22, 1384:12, 1384:14, 1384:20, 1400:10
**LAW** [1] - 1346:20
**law** [33] - 1350:20, 1354:7, 1386:15, 1386:21, 1387:4, 1387:13, 1392:16, 1407:4, 1408:22, 1409:7, 1409:11, 1409:13, 1409:14, 1409:15, 1409:17, 1417:14, 1417:20, 1425:5, 1426:14, 1426:16, 1426:22, 1427:23, 1430:6, 1431:25, 1432:17, 1434:1, 1434:17, 1445:15, 1446:3, 1446:12, 1447:13, 1447:14
**lawsuit** [5] - 1369:16, 1399:8, 1434:12, 1459:7, 1459:8
**lawyer** [9] - 1380:5, 1384:1, 1384:13, 1394:25, 1403:16, 1403:17, 1403:20, 1403:24, 1414:6
**lawyers** [9] - 1354:11, 1374:22, 1379:11, 1381:20, 1388:6, 1394:5, 1395:3, 1396:20, 1400:5
**lead** [5] - 1361:19, 1366:7, 1417:3, 1422:1, 1431:24
**leaders** [1] - 1377:11
**leading** [1] - 1397:22
**leads** [1] - 1387:13
**leak** [2] - 1352:22, 1369:11
**learn** [4] - 1359:2, 1361:23, 1370:17, 1373:3
**learned** [2] - 1370:14, 1421:14

**learning** [1] - 1370:5
**learns** [3] - 1370:4, 1370:16, 1421:12
**least** [4] - 1400:22, 1411:8, 1452:3, 1458:5
**leave** [9] - 1351:2, 1351:3, 1451:18, 1451:20, 1452:2, 1458:3, 1462:14, 1462:15, 1462:18
**leaves** [1] - 1407:7, 1440:19, 1463:1
**led** [1] - 1375:22
**Lee** [1] - 1413:13
**left** [15] - 1356:21, 1358:21, 1367:11, 1367:13, 1367:16, 1394:14, 1405:11, 1419:24, 1420:17, 1420:25, 1421:13, 1423:3, 1423:22, 1437:9, 1462:14
**legal** [6] - 1385:22, 1392:15, 1428:8, 1428:9, 1428:14, 1429:8
**legally** [1] - 1415:7
**legitimate** [3] - 1371:4, 1371:22, 1373:4
**less** [2] - 1429:15, 1431:15
**lessen** [1] - 1434:24
**level** [26] - 1352:10, 1355:7, 1355:18, 1355:23, 1356:3, 1356:7, 1356:8, 1356:9, 1360:8, 1360:23, 1361:13, 1361:16, 1361:17, 1391:24, 1392:2, 1399:23, 1400:4, 1400:15, 1401:3, 1401:5, 1401:10, 1412:2, 1412:12, 1413:2, 1430:18
**levels** [13] - 1359:22, 1359:24, 1361:19, 1370:17, 1383:10, 1384:7, 1391:12, 1399:13, 1399:18, 1400:15, 1401:3, 1401:7, 1401:9
**LFE** [32] - 1357:22, 1358:4, 1358:7, 1358:9, 1358:12, 1358:17, 1358:21, 1358:22, 1359:18, 1362:12, 1362:13,

1362:17, 1362:19, 1363:3, 1363:6, 1363:7, 1363:8, 1363:9, 1363:16, 1365:15, 1380:12, 1382:7, 1385:9, 1385:12, 1403:22, 1404:11, 1404:12, 1404:13, 1404:15, 1406:14
**LIABILITY** [1] - 1346:5
**Liability** [3] - 1419:2, 1436:16, 1441:5
**liability** [11] - 1387:24, 1419:5, 1419:7, 1419:8, 1419:10, 1420:11, 1436:19, 1446:1, 1446:7, 1450:4, 1454:3
**liable** [13] - 1418:23, 1421:15, 1423:1, 1423:20, 1424:19, 1429:20, 1429:22, 1430:22, 1430:23, 1432:17, 1432:25, 1434:20
**licensed** [2] - 1376:23, 1389:6
**life** [1] - 1433:16
**life's** [3] - 1373:8, 1438:21, 1448:16
**light** [6] - 1417:1, 1423:4, 1423:9, 1423:23, 1433:25, 1435:12
**likelihood** [4] - 1365:9, 1419:17, 1420:9, 1427:5
**likely** [4] - 1398:3, 1399:1, 1418:3, 1431:20
**likewise** [2] - 1387:2, 1451:6
**limit** [1] - 1401:2
**limited** [1] - 1431:5
**line** [11] - 1362:24, 1363:13, 1369:9, 1370:25, 1371:3, 1402:13, 1441:17, 1442:1, 1442:4, 1442:6, 1443:5
**lines** [3] - 1441:24, 1442:21, 1442:24
**link** [1] - 1391:7
**LinkedIn** [1] - 1439:10
**list** [2] - 1404:10, 1407:18
**listen** [1] - 1405:20, 1408:24, 1409:4, 1455:11, 1456:11,

1456:12
**listened** [1] - 1456:15
**listeners** [1] - 1402:24
**listening** [1] - 1389:11
**lists** [1] - 1363:18
**literature** [1] - 1388:9
**LITIGATION** [1] - 1346:5
**litigation** [2] - 1369:16, 1400:17
**Litigation** [2] - 1436:16, 1441:5
**live** [1] - 1382:22
**lived** [1] - 1399:2
**living** [7] - 1360:11, 1375:5, 1395:25, 1397:1, 1398:15, 1401:23, 1403:3
**LLC** [2] - 1346:9, 1436:17
**locations** [1] - 1355:12
**Lofgren** [1] - 1390:22
**long-standing** [1] - 1389:10
**long-term** [1] - 1391:22
**long-time** [1] - 1393:17
**look** [17] - 1355:7, 1358:19, 1358:20, 1381:11, 1381:12, 1384:8, 1386:23, 1390:19, 1390:20, 1391:22, 1392:2, 1394:6, 1394:9, 1395:7, 1401:8, 1403:9, 1441:23
**looked** [3] - 1382:3, 1391:11, 1392:7
**looking** [3] - 1365:5, 1393:8, 1402:23
**Los** [2] - 1354:24, 1403:22
**loss** [17] - 1373:8, 1427:17, 1427:19, 1427:21, 1428:9, 1428:10, 1428:13, 1428:15, 1428:17, 1428:19, 1429:9, 1433:16, 1438:21, 1448:15, 1450:24
**losses** [1] - 1432:1
**Lottie** [1] - 1411:23
**Louisiana** [19] - 1355:17, 1360:3, 1361:17, 1364:9, 1375:7, 1409:22, 1410:17, 1410:20, 1410:22, 1410:25,

1411:23, 1419:1, 1425:5, 1436:14, 1436:15, 1448:22, 1460:10, 1465:5, 1465:6
**LOUISIANA** [2] - 1346:1, 1346:6
**low** [13] - 1352:17, 1356:10, 1358:4, 1362:9, 1362:25, 1380:14, 1380:18, 1382:5, 1399:25, 1412:14, 1412:16, 1413:4, 1413:7
**lower** [2] - 1358:21, 1401:15
**lowest** [1] - 1399:24
**LPLA** [6] - 1419:2, 1419:3, 1419:6, 1421:19, 1424:3, 1450:15
**lunch** [5] - 1440:13, 1440:14, 1440:15, 1452:10
**Lyon** [1] - 1374:7
**LYON** [1] - 1347:3

**M**

**Mahal** [2] - 1379:16, 1404:23
**mail** [2] - 1458:2
**maintaining** [1] - 1422:25
**maintenance** [2] - 1422:14, 1422:23
**makeup** [1] - 1376:16
**Mallet** [3] - 1363:18, 1383:18, 1385:9
**mammogram** [6] - 1372:24, 1373:1, 1393:10, 1398:9, 1398:12, 1398:19
**man** [2] - 1363:8, 1377:23
**management** [1] - 1370:15
**manager** [1] - 1362:11
**Manhattan** [1] - 1410:21
**manner** [3] - 1422:4, 1425:15, 1427:8
**manual** [7] - 1366:22, 1366:23, 1384:5, 1384:9, 1384:24, 1385:3, 1411:13
**manufacture** [2] - 1410:14, 1411:21
**manufactured** [8] -

1357:19, 1362:6, 1378:1, 1378:2, 1410:2, 1419:12, 1420:13, 1424:17
**manufacturer** [18] - 1418:24, 1419:4, 1421:9, 1421:12, 1421:23, 1422:7, 1422:10, 1422:12, 1422:16, 1422:21, 1422:24, 1423:1, 1423:12, 1423:13, 1423:20, 1424:6, 1424:18, 1450:12
**manufacturer's** [2] - 1419:24, 1425:20
**manufacturers** [4] - 1353:4, 1370:1, 1380:25, 1387:10
**March** [3] - 1369:10, 1394:21, 1411:2
**Mark** [1] - 1361:9
**Martin** [2] - 1359:20, 1382:18
**Masonite** [3] - 1382:25, 1383:1, 1383:21
**material** [7] - 1357:21, 1360:6, 1361:25, 1366:3, 1381:5, 1408:12, 1411:18
**materials** [1] - 1361:25
**math** [1] - 1398:22
**mathematical** [2] - 1355:24, 1432:1
**matter** [10] - 1350:23, 1351:2, 1379:5, 1384:15, 1415:24, 1439:13, 1446:20, 1452:7, 1464:1, 1465:10
**matters** [2] - 1414:22, 1416:3
**maximum** [1] - 1401:5
**MAY** [2] - 1346:6, 1349:3
**McGwin** [10] - 1352:4, 1361:2, 1364:1, 1388:8, 1388:13, 1388:17, 1388:21, 1388:23, 1389:2
**McNeese** [2] - 1359:20, 1382:18
**MDL** [3] - 1346:5, 1441:5, 1446:2
**mean** [14] - 1357:7, 1371:6, 1421:23, 1421:25, 1422:6, 1422:9, 1426:2,

1426:11, 1427:23, 1434:5, 1446:24, 1450:24, 1455:9
**meaning** [1] - 1451:18
**means** [7] - 1379:13, 1388:14, 1417:24, 1418:1, 1439:5, 1461:2, 1463:20
**meant** [3] - 1363:6, 1446:24, 1452:22
**meantime** [1] - 1350:22
**measure** [1] - 1400:1
**measured** [1] - 1401:9
**measurement** [2] - 1412:7, 1412:21
**measures** [1] - 1424:15
**MECHANICAL** [1] - 1347:15
**mechanistic** [1] - 1372:18
**media** [2] - 1370:17, 1439:6
**medical** [11] - 1368:4, 1373:5, 1383:7, 1383:8, 1389:5, 1390:1, 1394:12, 1395:6, 1396:4, 1430:14, 1438:19
**medically** [1] - 1364:11
**medium** [1] - 1355:10
**meet** [6] - 1370:11, 1370:13, 1373:14, 1382:15, 1404:25, 1458:17
**meeting** [3] - 1384:22, 1384:25, 1440:4
**member** [3] - 1460:12, 1460:14, 1460:17
**Member** [1] - 1436:17
**members** [4] - 1374:4, 1402:11, 1409:6, 1435:24
**membrane** [1] - 1366:6
**memorialize** [1] - 1462:22
**memory** [4] - 1400:24, 1415:10, 1415:11
**mental** [14] - 1365:2, 1371:19, 1371:21, 1422:20, 1426:6, 1431:8, 1433:15, 1433:19, 1434:2, 1434:5, 1434:14, 1438:16, 1448:14
**mentioned** [6] - 1384:9, 1392:13,

1398:6, 1398:11, 1439:14, 1444:1
**mere** [3] - 1418:16, 1418:19, 1445:18
**merely** [2] - 1436:5, 1446:5
**Merit** [1] - 1465:4
**message** [1] - 1440:2
**messaging** [1] - 1439:9
**met** [4] - 1370:2, 1370:12, 1373:20, 1382:4
**METAIRIE** [1] - 1347:10
**meteorologist** [1] - 1413:13
**methodology** [2] - 1390:14, 1390:15
**Michael** [3] - 1362:7, 1377:9, 1380:22
**might** [6] - 1420:18, 1426:8, 1426:24, 1427:5, 1427:12, 1452:10
**Mikal** [2] - 1374:5, 1402:10
**MIKAL** [1] - 1346:17
**Miller** [14] - 1353:13, 1364:22, 1390:1, 1390:25, 1391:1, 1391:6, 1391:14, 1391:20, 1392:13, 1394:8, 1394:9, 1397:12, 1397:13
**Miller's** [2] - 1390:5, 1390:13
**million** [10] - 1354:21, 1361:4, 1361:18, 1380:19, 1380:20, 1380:21, 1399:19, 1412:4, 1412:13, 1413:5
**mind** [2] - 1432:17, 1436:2
**minded** [3] - 1455:11, 1457:23, 1458:23
**minds** [1] - 1455:6
**minimize** [1] - 1434:18
**minimizing** [1] - 1435:4
**minor** [1] - 1395:14
**minute** [5] - 1350:8, 1350:10, 1402:19, 1403:14, 1406:7
**minutes** [14] - 1350:2, 1350:4, 1350:7, 1350:8, 1350:9, 1350:14, 1350:16, 1373:23, 1374:16,

1383:19, 1403:13, 1404:6, 1407:2, 1407:8
**mislead** [1] - 1355:5, 1446:24
**misleading** [1] - 1355:3
**misled** [1] - 1401:13
**mission** [1] - 1371:5
**Mississippi** [2] - 1360:2, 1363:9
**misspoke** [1] - 1452:23
**misstates** [1] - 1447:14
**mistake** [1] - 1404:14
**mistaken** [1] - 1464:1
**mitigate** [2] - 1434:18, 1435:11
**mitigated** [2] - 1435:9, 1443:7
**mitigating** [1] - 1435:8
**mobile** [1] - 1357:19
**model** [3] - 1410:1, 1411:5, 1413:22
**modelled** [1] - 1355:9
**modern** [2] - 1382:5, 1401:1
**molecule** [1] - 1389:18
**moment** [1] - 1459:14
**Monday** [4] - 1351:23, 1393:11, 1454:21, 1456:2
**MONDAY** [2] - 1346:6, 1349:3
**monetary** [1] - 1428:24
**money** [1] - 1429:23, 1430:14
**monograph** [1] - 1372:4
**monographs** [1] - 1372:14
**monthly** [1] - 1369:11
**months** [8] - 1357:13, 1369:2, 1373:2, 1373:17, 1381:15, 1381:17, 1391:16, 1411:3
**Morgan** [13] - 1366:16, 1378:5, 1378:18, 1386:13, 1387:1, 1410:7, 1410:11, 1424:4, 1424:9, 1448:4, 1450:12
**MORNING** [1] - 1349:2
**morning** [5] - 1349:10, 1350:18, 1402:21, 1452:18, 1456:2

**Morris** [3] - 1386:1, 1386:4, 1386:6
**MORTON** [1] - 1347:7
**most** [10] - 1356:2, 1370:9, 1372:19, 1374:8, 1376:17, 1387:1, 1392:6, 1400:5, 1401:20, 1402:24
**mother** [2] - 1372:22, 1398:22
**motion** [5] - 1444:24, 1444:25, 1445:19, 1448:21, 1464:9
**motions** [1] - 1451:2
**move** [2] - 1370:19, 1375:1
**moved** [8] - 1367:17, 1370:25, 1371:15, 1381:17, 1396:19, 1396:22, 1396:23, 1397:3
**moves** [5] - 1359:10, 1369:10, 1370:22, 1394:21, 1394:23
**movies** [2] - 1376:17, 1459:7
**MR** [61] - 1348:5, 1348:6, 1350:13, 1351:15, 1351:18, 1373:25, 1374:3, 1402:20, 1403:15, 1406:8, 1406:24, 1407:15, 1407:17, 1407:21, 1407:24, 1408:6, 1408:13, 1441:15, 1441:16, 1442:2, 1442:3, 1442:14, 1442:18, 1442:21, 1442:24, 1443:2, 1443:10, 1443:11, 1443:15, 1444:6, 1444:14, 1444:21, 1445:8, 1446:22, 1447:3, 1447:8, 1447:11, 1448:7, 1448:11, 1448:20, 1449:13, 1449:16, 1449:25, 1450:23, 1451:8, 1451:14, 1452:5, 1452:9, 1452:12, 1452:16, 1452:17, 1452:18, 1452:22, 1453:1, 1454:14, 1454:15, 1463:9, 1463:10, 1463:13, 1464:7, 1464:14
**MSDS** [17] - 1356:21, 1366:15, 1366:16,

1366:18, 1367:3, 1367:4, 1381:3, 1381:5, 1381:11, 1381:13, 1381:14, 1381:16, 1381:18, 1381:21, 1404:5, 1404:18, 1411:19
**MSDS's** [1] - 1367:2
**mucosa** [1] - 1361:13
**mucous** [1] - 1366:6
**MULCAHY** [8] - 1347:3, 1347:4, 1407:17, 1407:21, 1407:24, 1408:13, 1443:11, 1443:15
**Mulcahy** [1] - 1374:7
**multiple** [2] - 1352:9, 1408:7
**multiple-page** [1] - 1408:7
**must** [50] - 1379:11, 1379:25, 1380:1, 1387:14, 1387:25, 1400:14, 1404:18, 1404:19, 1404:20, 1409:7, 1409:14, 1409:17, 1413:18, 1414:15, 1415:7, 1416:24, 1417:20, 1417:21, 1419:13, 1420:8, 1420:15, 1424:25, 1425:3, 1426:18, 1426:20, 1426:22, 1427:15, 1427:18, 1428:7, 1428:16, 1428:18, 1429:3, 1429:6, 1429:11, 1430:23, 1431:14, 1431:23, 1432:3, 1432:18, 1433:2, 1435:11, 1435:23, 1439:4, 1439:20, 1439:24, 1440:14, 1450:14
**MySpace** [1] - 1439:10

## N

**naked** [2] - 1404:1, 1404:2
**nasal** [2] - 1360:14, 1366:5
**nasopharyngeal** [3] - 1366:8, 1372:9, 1372:16
**natural** [3] - 1411:7, 1432:19, 1433:9
**nature** [5] - 1422:23, 1425:23, 1426:1, 1461:12, 1461:13

**near** [1] - 1357:3
**necessary** [1] -
1418:15
**need** [24] - 1351:2,
1373:15, 1373:16,
1384:11, 1407:14,
1407:15, 1409:2,
1418:12, 1418:13,
1418:14, 1433:19,
1441:4, 1441:21,
1442:12, 1442:20,
1443:21, 1447:16,
1449:20, 1451:11,
1451:23, 1453:3,
1458:15, 1458:22
**needed** [1] - 1394:3
**needs** [1] - 1442:22
**negative** [3] - 1389:3,
1389:20, 1398:11
**neglect** [1] - 1445:17
**negligence** [19] -
1424:21, 1426:16,
1428:22, 1428:23,
1428:25, 1429:1,
1429:3, 1429:6,
1445:14, 1445:18,
1445:24, 1446:5,
1446:8, 1446:15,
1446:16, 1446:18,
1446:19, 1446:20
**negligent** [13] -
1425:23, 1426:1,
1426:15, 1426:18,
1426:21, 1427:16,
1428:8, 1428:21,
1429:8, 1446:6,
1446:10, 1446:11
**neighbor** [1] - 1456:24
**neighborhood** [1] -
1458:20
**nervousness** [2] -
1393:15, 1393:19
**net** [1] - 1450:20
**never** [24] - 1357:4,
1357:12, 1358:14,
1362:8, 1362:10,
1362:11, 1363:10,
1369:23, 1377:5,
1380:16, 1381:22,
1383:19, 1393:23,
1393:25, 1395:16,
1398:4, 1398:5,
1398:11, 1400:5,
1400:21, 1400:22,
1402:8, 1422:22,
1439:24
**nevertheless** [2] -
1388:21, 1428:4
**NEW** [3] - 1346:6,
1347:5, 1347:14

**new** [9] - 1360:17,
1360:18, 1361:15,
1371:8, 1371:9,
1378:8, 1401:23,
1405:7, 1433:1
**New** [9] - 1354:24,
1355:14, 1375:5,
1385:18, 1410:22,
1410:25, 1436:15,
1441:1, 1441:3
**newness** [1] - 1360:20
**news** [1] - 1456:18
**next** [4] - 1358:14,
1389:4, 1450:2
**nice** [3] - 1379:1,
1379:3, 1463:18
**niche** [2] - 1376:11
**nine** [1] - 1381:15
**NIOSH** [2] - 1399:19,
1399:24
**NO** [3] - 1346:5,
1346:8, 1449:2
**no-entry** [1] - 1350:23
**nobody** [5] - 1357:18,
1375:3, 1405:25,
1406:2, 1445:18
**none** [6] - 1382:23,
1382:24, 1388:25,
1397:9, 1456:1,
1456:3
**nonexistence** [1] -
1417:13
**nonparties** [5] -
1425:8, 1438:2,
1442:10, 1442:11,
1448:2
**nonparty** [7] -
1424:23, 1425:2,
1428:23, 1429:2,
1429:5, 1429:7,
1442:20
**normal** [4] - 1378:22,
1391:19, 1433:8,
1459:2
**nose** [8] - 1361:14,
1366:7, 1372:9,
1372:11, 1391:18,
1393:25, 1405:23,
1456:6
**note** [4] - 1373:9,
1393:23, 1400:5,
1441:20
**notebook** [2] -
1462:13
**notes** [6] - 1374:11,
1415:9, 1415:11,
1415:12, 1415:14,
1462:17
**nothing** [8] - 1363:9,
1380:6, 1388:5,

1398:13, 1401:22,
1405:17, 1451:12,
1461:14
**notice** [3] - 1460:7,
1460:10, 1460:22
**noticed** [4] - 1360:17,
1360:20, 1361:3,
1393:18
**notices** [2] - 1370:18,
1370:19
**Number** [28] -
1354:11, 1362:1,
1362:8, 1363:23,
1365:11, 1365:18,
1365:22, 1366:3,
1367:6, 1367:9,
1367:18, 1367:19,
1368:14, 1368:16,
1371:10, 1371:11,
1379:20, 1387:12,
1403:7, 1408:3,
1409:21, 1409:24,
1411:14, 1411:24,
1441:6, 1448:13,
1450:4
**number** [16] -
1354:13, 1354:14,
1359:19, 1387:24,
1417:5, 1437:4,
1437:11, 1437:12,
1437:19, 1437:20,
1437:21, 1444:12,
1452:14, 1458:18,
1460:20
**numbered** [1] - 1465:9
**numbers** [5] - 1357:3,
1357:10, 1407:16,
1437:3, 1437:5
**numerical** [2] -
1438:2, 1439:25
**numerous** [2] -
1380:24, 1389:7

## O

**o'clock** [1] - 1407:2
**oath** [2] - 1416:12,
1416:14
**object** [9] - 1414:3,
1444:22, 1445:10,
1447:11, 1447:21,
1448:18, 1448:20,
1448:24, 1450:23
**objection** [14] -
1414:7, 1414:9,
1414:14, 1444:25,
1445:7, 1447:5,
1447:11, 1447:23,
1448:12, 1448:19,
1449:7, 1449:19,

1450:2, 1451:7
**objections** [5] -
1414:1, 1444:3,
1444:19, 1445:20,
1448:7
**objective** [2] - 1361:2,
1391:17
**objects** [1] - 1450:8
**obligated** [1] -
1369:10
**obligation** [4] -
1386:20, 1424:13,
1460:6, 1460:11
**obligations** [2] -
1455:25, 1459:2
**obtained** [1] - 1369:15
**obviates** [1] - 1447:16
**obvious** [6] - 1366:2,
1367:14, 1371:17,
1459:6, 1459:9,
1459:10
**obviously** [3] -
1393:12, 1451:23,
1451:25
**occasionally** [1] -
1414:20
**occasions** [1] -
1390:9
**occupants** [1] -
1386:4
**occupied** [9] - 1362:3,
1365:12, 1365:23,
1411:4, 1418:25,
1436:20, 1436:24,
1454:4, 1454:6
**occur** [1] - 1360:24
**occurred** [7] -
1352:13, 1356:2,
1356:11, 1427:6,
1427:22, 1428:4,
1428:11
**occurs** [2] - 1356:19,
1418:20
**October** [1] - 1363:11
**odor** [3] - 1352:7,
1352:11, 1356:4
**odors** [1] - 1361:10
**OF** [2] - 1346:1,
1346:12
**off-gas** [1] - 1359:4
**off-gassed** [1] -
1355:22
**off-gassing** [8] -
1352:13, 1356:2,
1356:11, 1356:15,
1356:19, 1359:13,
1361:10, 1406:4
**offered** [2] - 1430:13,
1452:13
**offering** [1] - 1405:5

**offers** [1] - 1414:3
**office** [6] - 1393:8,
1395:2, 1396:25,
1457:25, 1458:15,
1462:12
**OFFICER** [3] - 1349:7,
1407:5, 1408:17
**officer** [8] - 1437:6,
1437:14, 1437:22,
1439:15, 1440:2,
1444:10, 1444:16,
1462:20
**Officer** [1] - 1350:25
**officers** [1] - 1417:19
**OFFICIAL** [1] -
1347:13
**Official** [2] - 1465:5,
1465:15
**oil** [1] - 1375:17
**old** [7] - 1356:15,
1371:8, 1375:14,
1398:16, 1399:5,
1405:7
**on-the-job** [1] -
1377:1
**once** [13] - 1350:25,
1351:5, 1358:14,
1361:5, 1367:3,
1368:8, 1370:14,
1386:8, 1397:14,
1405:14, 1416:23,
1421:7, 1453:3
**one** [97] - 1350:8,
1350:10, 1352:25,
1353:10, 1354:11,
1355:10, 1357:25,
1361:24, 1363:12,
1363:15, 1365:2,
1365:6, 1366:15,
1367:6, 1368:12,
1368:13, 1368:22,
1371:8, 1371:17,
1372:23, 1375:25,
1376:5, 1377:6,
1382:21, 1384:13,
1384:21, 1385:16,
1385:23, 1386:17,
1387:13, 1387:23,
1387:24, 1388:17,
1388:19, 1389:14,
1389:15, 1389:16,
1389:18, 1389:22,
1391:3, 1391:10,
1393:4, 1398:24,
1399:14, 1401:11,
1402:19, 1402:21,
1402:22, 1403:14,
1404:14, 1406:7,
1406:21, 1409:9,
1409:16, 1412:4,

1412:11, 1417:10, 1419:7, 1422:10, 1423:3, 1423:14, 1424:11, 1425:4, 1426:2, 1427:23, 1427:24, 1427:25, 1428:4, 1428:13, 1428:14, 1430:2, 1432:17, 1432:25, 1435:22, 1436:19, 1437:3, 1437:5, 1438:3, 1442:11, 1443:6, 1444:8, 1447:15, 1448:15, 1448:17, 1449:4, 1449:15, 1450:11, 1450:18, 1451:8, 1452:12, 1454:3, 1455:24, 1456:22, 1457:7, 1457:12, 1463:25
**one-fifth** [1] - 1355:10
**one-hour** [2] - 1412:4, 1412:11
**one-minute** [3] - 1350:8, 1350:10, 1403:14
**ones** [9] - 1371:9, 1376:2, 1380:7, 1385:24, 1387:3, 1389:22, 1394:14, 1405:7
**open** [8] - 1402:6, 1412:9, 1412:25, 1444:2, 1455:6, 1457:23, 1458:23
**open-minded** [1] - 1457:23
**opening** [5] - 1349:14, 1351:23, 1354:12, 1374:21, 1397:4
**operate** [1] - 1428:1
**operation** [2] - 1405:4, 1422:13
**opinion** [11] - 1372:21, 1389:15, 1389:21, 1389:22, 1390:23, 1392:21, 1414:10, 1414:21, 1416:2, 1416:4, 1436:2
**opinions** [9] - 1389:8, 1389:9, 1389:21, 1389:23, 1390:12, 1390:13, 1390:15, 1390:18
**opportunity** [9] - 1371:20, 1374:25, 1434:14, 1434:24, 1435:2, 1435:5,

1440:13, 1441:11, 1458:9
**opposed** [1] - 1352:12
**option** [1] - 1372:20
**oranges** [1] - 1354:25
**ORDER** [1] - 1349:4
**order** [11] - 1349:24, 1379:19, 1387:23, 1419:13, 1420:14, 1440:8, 1440:22, 1446:1, 1455:8, 1459:17, 1461:25
**ordered** [1] - 1363:12
**orders** [1] - 1459:18
**ordinarily** [1] - 1426:24
**ordinary** [8] - 1421:24, 1422:1, 1422:8, 1422:9, 1423:15, 1423:16, 1426:7, 1427:11
**ORLEANS** [3] - 1346:6, 1347:5, 1347:14
**Orleans** [10] - 1354:24, 1355:14, 1375:5, 1385:18, 1409:22, 1410:22, 1410:25, 1436:15, 1441:1, 1441:3
**OSHA** [1] - 1401:10
**others'** [1] - 1428:20
**otherwise** [6] - 1352:22, 1385:15, 1402:18, 1418:5, 1435:17, 1439:23
**ought** [2] - 1366:19, 1444:11
**out-of-pocket** [1] - 1430:10
**outdoor** [2] - 1355:7, 1361:17
**outset** [1] - 1409:20
**outside** [4] - 1351:9, 1413:17, 1451:19, 1463:7
**outweighed** [1] - 1419:18
**overrule** [6] - 1445:6, 1447:23, 1448:19, 1449:7, 1450:18, 1451:6
**overwhelmingly** [2] - 1373:20, 1388:4
**owe** [2] - 1375:9, 1375:10
**owed** [2] - 1426:23, 1428:13
**own** [7] - 1362:19, 1366:11, 1366:21,

1375:20, 1404:2, 1436:2, 1446:25
**owner** [1] - 1411:13
**owner's** [6] - 1366:22, 1366:23, 1384:5, 1384:9, 1384:24, 1385:3

### P

**p.m** [1] - 1464:18
**PACER** [1] - 1450:1
**PAGE** [2] - 1348:3, 1348:13
**page** [25] - 1348:17, 1405:13, 1408:2, 1408:7, 1441:10, 1441:11, 1441:12, 1441:18, 1441:19, 1441:20, 1441:24, 1442:1, 1442:4, 1442:8, 1442:13, 1442:19, 1443:3, 1443:5, 1443:11, 1443:15, 1443:20, 1447:13, 1450:2, 1450:16
**pages** [2] - 1348:18, 1408:3
**paid** [3] - 1388:21, 1389:8, 1389:9
**pain** [9] - 1367:24, 1371:12, 1430:7, 1431:7, 1432:24, 1433:15, 1433:19, 1434:3, 1438:13
**painful** [1] - 1371:13
**Pam** [3] - 1407:14, 1451:21, 1462:12
**pampered** [1] - 1376:18
**panel** [6] - 1349:9, 1407:7, 1440:19, 1449:11, 1453:11, 1463:1
**panels** [2] - 1383:13, 1397:23
**papers** [1] - 1371:24
**paragraph** [2] - 1442:19, 1450:10
**Parish** [1] - 1409:22
**parking** [1] - 1457:16
**part** [19] - 1349:12, 1352:16, 1355:10, 1361:18, 1361:25, 1364:16, 1397:6, 1397:17, 1409:1, 1409:2, 1417:18, 1418:8, 1424:20,

1434:4, 1437:12, 1437:20, 1450:6, 1452:21, 1462:7
**participate** [1] - 1457:3, 1457:8, 1457:9
**participated** [2] - 1455:7, 1456:15
**participating** [1] - 1455:20
**particleboard** [1] - 1358:6
**particular** [9] - 1369:18, 1376:14, 1428:5, 1434:9, 1435:12, 1446:13, 1449:4, 1449:15, 1458:12
**particularly** [2] - 1356:16, 1457:21
**parties** [11] - 1349:17, 1353:3, 1384:3, 1409:18, 1416:14, 1425:8, 1438:1, 1448:1, 1455:5, 1455:19, 1459:11
**parts** [39] - 1352:8, 1355:11, 1355:15, 1355:17, 1355:23, 1356:1, 1358:1, 1359:11, 1359:13, 1359:14, 1359:16, 1360:9, 1360:10, 1360:12, 1360:25, 1361:3, 1361:4, 1361:6, 1361:19, 1371:12, 1375:11, 1380:19, 1380:20, 1380:21, 1399:19, 1400:7, 1410:13, 1412:3, 1412:4, 1412:12, 1413:2, 1422:22, 1441:13, 1441:14
**party** [14] - 1386:15, 1418:20, 1424:22, 1426:8, 1426:25, 1427:7, 1427:25, 1428:21, 1429:2, 1429:6, 1444:23, 1445:12, 1446:19, 1455:16
**party's** [2] - 1413:21, 1427:2
**pass** [1] - 1422:11
**passages** [1] - 1360:14
**passes** [1] - 1396:14
**past** [7] - 1373:5, 1430:14, 1433:17,

1438:13, 1438:16, 1438:19, 1448:14
**pathology** [6] - 1391:23, 1392:1, 1392:5, 1392:7, 1392:8, 1392:11
**patience** [1] - 1403:11
**patient** [1] - 1390:2
**patients** [5] - 1390:4, 1391:1, 1392:1, 1393:1, 1393:13
**Patricia** [4] - 1364:2, 1389:5, 1389:17, 1391:6
**pattern** [1] - 1396:17
**pay** [1] - 1435:19
**paying** [2] - 1389:21, 1462:8
**peaks** [1] - 1361:4
**penalize** [1] - 1431:16
**people** [47] - 1353:4, 1355:13, 1359:1, 1360:5, 1360:10, 1361:9, 1364:11, 1364:12, 1366:21, 1370:19, 1371:3, 1371:4, 1375:6, 1375:8, 1375:9, 1375:10, 1375:24, 1376:1, 1376:6, 1376:8, 1376:13, 1376:18, 1377:6, 1378:7, 1378:11, 1378:14, 1378:17, 1378:21, 1378:24, 1382:13, 1392:3, 1400:17, 1402:23, 1405:1, 1405:5, 1405:7, 1406:17, 1454:23, 1455:11, 1455:25, 1456:9, 1456:19, 1456:20, 1457:4, 1458:9, 1459:7, 1459:21
**PEPPER** [1] - 1347:13
**Pepper** [2] - 1465:3, 1465:13, 1465:14
**per** [34] - 1352:8, 1355:10, 1355:11, 1355:15, 1355:17, 1355:23, 1356:1, 1359:11, 1359:13, 1359:14, 1359:16, 1360:9, 1360:10, 1360:12, 1360:25, 1361:3, 1361:4, 1361:6, 1361:18, 1361:19, 1380:19, 1380:20, 1380:21, 1399:19, 1400:7,

1412:3, 1412:4,
1412:12, 1412:13,
1413:2, 1413:3
**percent** [9] - 1383:16,
1386:3, 1390:3,
1412:6, 1412:20,
1413:11, 1425:8,
1438:3, 1438:8
**percentage** [9] -
1425:9, 1425:15,
1425:21, 1437:25,
1438:5, 1438:6,
1438:7, 1438:8,
1446:17
**percentages** [4] -
1425:4, 1425:7,
1425:22, 1438:2
**perfect** [4] - 1379:15,
1379:16, 1379:17,
1404:22
**perfectly** [1] - 1389:20
**perform** [1] - 1395:12
**performances** [2] -
1463:16, 1463:22
**performed** [3] -
1391:15, 1412:1,
1461:10
**perhaps** [3] - 1426:7,
1443:6, 1458:3
**period** [6] - 1412:13,
1412:17, 1412:18,
1413:3, 1413:8,
1413:9
**permit** [1] - 1432:3
**permits** [1] - 1400:6
**permitted** [3] -
1414:18, 1416:2,
1434:3
**person** [30] - 1360:22,
1368:6, 1368:8,
1373:13, 1377:18,
1386:15, 1402:9,
1405:22, 1415:25,
1416:22, 1416:23,
1418:20, 1420:3,
1420:4, 1421:4,
1421:5, 1421:24,
1422:8, 1422:10,
1422:12, 1422:17,
1424:22, 1426:6,
1426:25, 1427:25,
1432:18, 1432:22,
1432:25, 1434:16,
1454:25
**personal** [2] - 1351:1,
1404:18
**persons** [1] - 1417:19
**persuades** [1] -
1418:2
**pertained** [1] -

1445:25
**petrochemical** [1] -
1355:14
**PFISTER** [1] - 1347:7
**Ph.D** [1] - 1413:13
**phase** [1] - 1385:19
**phenomenon** [1] -
1357:11
**Phillip** [1] - 1354:19
**phone** [2] - 1386:9,
1439:7
**Phone** [1] - 1439:7
**phones** [2] - 1439:14,
1452:11
**photocopy** [1] -
1366:19
**physical** [11] -
1371:12, 1391:18,
1422:20, 1426:6,
1431:7, 1432:13,
1432:14, 1432:21,
1433:19, 1434:3,
1438:13
**physician** [7] - 1368:5,
1368:7, 1391:2,
1392:14, 1392:19,
1394:19, 1416:21
**physicians** [3] -
1392:17, 1396:3,
1416:23
**pick** [3] - 1386:9,
1407:11, 1462:18
**picked** [4] - 1410:19,
1456:3, 1456:5,
1457:6
**picking** [1] - 1459:14
**pickup** [1] - 1375:16
**picture** [2] - 1372:11,
1413:21
**piece** [1] - 1356:18
**PINEDO** [2] - 1346:20,
1408:6
**place** [4] - 1373:1,
1376:8, 1385:1,
1440:14
**plaintiff** [116] - 1350:3,
1371:20, 1378:25,
1379:10, 1379:20,
1381:17, 1384:23,
1384:25, 1385:24,
1387:23, 1387:25,
1389:5, 1392:23,
1393:14, 1394:2,
1394:5, 1395:10,
1395:16, 1397:14,
1398:4, 1399:16,
1401:14, 1401:18,
1402:2, 1402:5,
1402:8, 1402:11,
1402:12, 1403:2,

1409:21, 1409:24,
1417:21, 1418:12,
1418:13, 1418:22,
1419:1, 1419:11,
1419:13, 1419:21,
1420:1, 1420:2,
1420:5, 1420:12,
1420:15, 1420:22,
1421:2, 1421:3,
1421:6, 1421:7,
1422:18, 1423:7,
1423:8, 1424:4,
1424:16, 1424:20,
1424:21, 1425:2,
1425:15, 1425:21,
1426:23, 1427:17,
1428:9, 1428:17,
1428:18, 1428:22,
1428:24, 1429:1,
1429:5, 1429:7,
1429:9, 1429:10,
1429:13, 1429:18,
1429:22, 1429:24,
1430:1, 1430:2,
1430:4, 1430:7,
1430:9, 1430:12,
1430:20, 1430:22,
1430:23, 1431:3,
1431:4, 1431:5,
1431:12, 1431:19,
1431:20, 1431:25,
1432:10, 1433:2,
1433:15, 1433:22,
1434:1, 1434:7,
1434:11, 1434:20,
1434:23, 1434:25,
1435:3, 1435:5,
1435:6, 1435:9,
1435:16, 1435:19,
1438:5, 1442:20,
1443:5, 1443:6,
1443:7, 1443:16
**PLAINTIFF** [1] -
1346:16
**plaintiff's** [47] -
1365:9, 1377:4,
1380:5, 1382:21,
1383:8, 1383:24,
1384:1, 1384:13,
1385:8, 1387:17,
1388:6, 1388:15,
1388:21, 1389:25,
1392:13, 1393:19,
1395:22, 1396:17,
1397:2, 1397:23,
1399:21, 1400:5,
1400:9, 1400:12,
1401:13, 1401:20,
1401:24, 1402:15,
1418:9, 1420:9,
1422:18, 1422:19,

1425:3, 1425:11,
1425:18, 1425:25,
1426:13, 1427:19,
1428:15, 1429:17,
1430:25, 1431:14,
1433:12, 1434:14,
1435:10, 1435:14,
1443:9
**plaintiffs** [7] -
1376:25, 1382:1,
1392:4, 1402:13,
1408:9, 1444:22,
1463:9
**plaintiffs's** [1] -
1427:21
**plan** [1] - 1385:19
**planning** [1] - 1452:3
**plans** [1] - 1448:23
**Plant** [1] - 1362:8
**plant** [4] - 1362:11,
1362:16, 1376:6,
1381:23
**plants** [1] - 1355:14
**plate** [1] - 1375:12
**plausible** [1] -
1388:22
**play** [2] - 1352:20,
1417:17
**played** [2] - 1382:1,
1416:16
**pleasures** [3] -
1373:8, 1438:21,
1448:16
**PM** [2] - 1410:1,
1411:5
**PM-FH** [1] - 1410:1
**pocket** [1] - 1430:10
**podium** [2] - 1351:13,
1373:24
**point** [17] - 1349:8,
1351:6, 1372:12,
1407:6, 1408:15,
1408:19, 1408:25,
1440:18, 1447:2,
1447:4, 1453:7,
1453:10, 1454:13,
1459:5, 1462:25,
1464:4, 1464:6
**pointed** [1] - 1379:6
**points** [1] - 1384:3
**policy** [4] - 1350:23,
1352:16, 1362:16
**Polk** [2] - 1361:9,
1361:14
**polled** [1] - 1454:12
**polyp** [1] - 1398:20
**polyps** [2] - 1398:10,
1398:12
**port** [1] - 1355:14
**portion** [2] - 1433:7,

1433:12
**position** [1] - 1389:1
**positions** [1] -
1456:13
**possession** [1] -
1367:16
**possibility** [2] -
1380:3, 1418:16
**possible** [7] -
1386:18, 1418:14,
1422:3, 1424:11,
1440:4, 1458:4,
1458:24
**possibly** [5] - 1365:1,
1368:22, 1414:23,
1446:15, 1448:3
**posted** [2] - 1367:4,
1411:16
**posttrial** [1] - 1464:9
**potential** [8] -
1365:22, 1385:5,
1386:20, 1420:14,
1424:13, 1444:23,
1445:3, 1445:11
**POYDRAS** [2] -
1347:5, 1347:13
**ppb** [3] - 1412:3,
1412:12, 1413:2
**ppm** [6] - 1400:7,
1401:2, 1401:3,
1412:4, 1412:13,
1413:3
**practically** [1] -
1423:10
**practice** [7] - 1383:13,
1383:15, 1461:7,
1461:13, 1461:15,
1463:19, 1464:9
**practiced** [1] -
1463:15
**practitioner** [1] -
1368:11
**precautions** [1] -
1427:9
**precision** [1] - 1432:1
**predicted** [3] - 1352:7,
1399:18, 1401:5
**preexisting** [5] -
1353:11, 1364:18,
1364:19, 1432:21,
1433:1
**prefer** [1] - 1409:4
**prejudice** [3] - 1414:5,
1417:17, 1455:15
**preparation** [1] -
1459:10
**prepare** [2] - 1464:5,
1464:11
**prepared** [4] -
1408:22, 1444:4,

1459:24, 1459:25
**preponderance** [18] -
1379:11, 1417:16,
1417:22, 1417:24,
1418:1, 1418:4,
1418:10, 1418:13,
1419:14, 1420:16,
1425:1, 1426:19,
1429:12, 1432:8,
1434:23, 1435:17,
1446:8, 1450:21
**presence** [1] - 1463:7
**present** [7] - 1384:16,
1416:10, 1416:15,
1416:19, 1438:13,
1438:16, 1448:14
**presentation** [7] -
1351:5, 1351:7,
1351:10, 1351:19,
1459:17, 1460:1,
1461:11
**presentations** [1] -
1374:22
**presented** [5] -
1413:19, 1416:6,
1416:11, 1435:5,
1455:13
**presently** [1] - 1434:8
**preside** [1] - 1409:10
**presiding** [1] -
1460:20
**press** [6] - 1357:15,
1460:12, 1460:13,
1460:14, 1460:17,
1460:24
**presumably** [1] -
1392:25
**presumption** [3] -
1418:20, 1421:9,
1421:11
**pretty** [3] - 1363:1,
1371:17, 1375:1
**Pretty** [1] - 1394:19
**prevail** [3] - 1379:10,
1379:19, 1387:23
**prevent** [1] - 1428:14
**preventing** [2] -
1363:9, 1419:16
**previous** [3] -
1432:24, 1463:24
**previously** [1] -
1451:5
**price** [3] - 1377:7,
1385:10, 1385:13
**pride** [3] - 1376:1,
1404:4, 1404:8
**primarily** [1] - 1353:10
**priority** [1] - 1371:5
**probability** [2] -
1380:4, 1418:17

**probable** [1] - 1432:20
**probative** [1] -
1356:19
**problem** [16] -
1356:10, 1357:4,
1358:25, 1367:2,
1368:4, 1370:6,
1371:5, 1381:2,
1381:4, 1385:11,
1385:14, 1385:15,
1392:4, 1406:2,
1458:21
**problems** [29] -
1364:2, 1364:5,
1367:25, 1368:10,
1368:12, 1369:12,
1370:5, 1373:11,
1381:7, 1381:24,
1388:18, 1389:14,
1393:17, 1393:21,
1393:25, 1395:12,
1395:15, 1395:17,
1395:19, 1395:23,
1395:24, 1396:9,
1396:10, 1396:16,
1397:18, 1400:23,
1402:9, 1402:12,
1458:19
**procedure** [1] -
1350:17
**proceed** [7] - 1351:15,
1373:25, 1436:23,
1437:4, 1437:11,
1437:19, 1438:10
**proceeding** [1] -
1435:20
**proceedings** [9] -
1349:8, 1407:6,
1408:15, 1440:18,
1453:7, 1453:10,
1462:25, 1464:18,
1465:9
**PROCEEDINGS** [3] -
1346:12, 1347:15,
1349:1
**process** [6] - 1455:8,
1455:21, 1457:8,
1457:10, 1460:25,
1464:11
**produce** [1] - 1418:14
**PRODUCED** [1] -
1347:16
**produced** [2] -
1365:16, 1418:7
**Product** [2] - 1436:16,
1441:5
**product** [53] - 1365:9,
1366:19, 1366:24,
1368:20, 1369:25,
1371:7, 1379:16,

1386:19, 1404:8,
1405:16, 1419:5,
1419:9, 1419:12,
1419:16, 1419:20,
1419:22, 1419:23,
1419:25, 1420:2,
1420:7, 1420:9,
1420:13, 1420:17,
1420:18, 1420:21,
1420:23, 1420:25,
1421:1, 1421:3,
1421:8, 1421:13,
1421:18, 1421:23,
1422:2, 1422:6,
1422:7, 1422:11,
1422:13, 1422:23,
1422:25, 1423:2,
1423:3, 1423:14,
1423:18, 1423:21,
1423:22, 1423:25,
1424:12, 1424:16,
1425:13, 1425:19,
1425:20
**product's** [2] -
1366:13, 1423:16
**production** [2] -
1378:8, 1378:9
**products** [12] -
1362:9, 1362:17,
1362:25, 1363:5,
1363:7, 1363:17,
1363:19, 1363:24,
1377:11, 1411:20,
1419:17, 1422:22
**Products** [1] - 1419:1
**PRODUCTS** [1] -
1346:4
**professional** [1] -
1376:23
**Professional** [1] -
1465:4
**Professor** [1] -
1399:20
**program** [1] - 1371:6
**project** [2] - 1386:16,
1405:4
**promise** [1] - 1370:2
**promote** [1] - 1425:19
**promptly** [1] - 1440:3
**promulgated** [1] -
1380:10
**proof** [6] - 1353:12,
1363:11, 1417:11,
1417:23, 1418:8,
1424:25
**proper** [2] - 1426:9,
1428:5
**properly** [3] - 1407:19,
1414:4, 1448:1
**proposed** [6] -

1358:10, 1371:10,
1449:2, 1449:13,
1449:25, 1450:9
**prosecution** [1] -
1418:16
**protect** [1] - 1424:15
**protective** [1] -
1404:18
**prove** [24] - 1351:24,
1352:3, 1352:19,
1353:14, 1363:15,
1363:23, 1379:11,
1379:17, 1379:19,
1379:25, 1380:2,
1380:5, 1387:25,
1415:19, 1417:5,
1417:12, 1417:21,
1418:12, 1418:14,
1419:13, 1420:15,
1424:25, 1431:25,
1433:3
**proved** [1] - 1418:4
**proven** [7] - 1426:18,
1428:23, 1429:10,
1429:24, 1432:8,
1435:17, 1446:6
**proves** [5] - 1380:1,
1421:7, 1423:2,
1423:21, 1431:12
**provide** [10] - 1370:1,
1384:2, 1420:7,
1420:19, 1421:16,
1423:12, 1423:13,
1425:12, 1436:9,
1439:5
**provided** [19] -
1354:4, 1357:2,
1357:3, 1357:12,
1365:7, 1365:25,
1366:2, 1366:11,
1366:15, 1409:23,
1411:6, 1411:10,
1411:17, 1421:9,
1422:11, 1437:1,
1454:8, 1460:8
**providers** [2] - 1366:9,
1411:19
**provides** [2] - 1419:3,
1421:19
**providing** [1] -
1382:13
**province** [1] - 1424:14
**proving** [3] - 1428:22,
1435:8, 1435:14
**provision** [2] -
1358:11, 1410:8
**proximately** [6] -
1363:24, 1419:22,
1420:23, 1429:14,
1431:12, 1432:8

**prudent** [2] - 1421:15,
1426:25
**psychologist** [2] -
1397:14, 1397:18
**psychologist's** [1] -
1397:16
**public** [2] - 1405:1,
1457:11
**publicity** [1] - 1413:16
**published** [1] -
1381:17
**pudding** [1] - 1363:11
**pungent** [1] - 1360:15
**punishment** [1] -
1431:16
**purchased** [3] -
1377:11, 1377:24,
1380:15
**purchaser** [22] -
1385:21, 1386:12,
1386:16, 1386:17,
1386:24, 1387:1,
1387:2, 1405:10,
1405:14, 1405:17,
1424:3, 1424:7,
1424:10, 1447:12,
1447:15, 1447:16,
1447:18, 1447:21,
1448:5, 1450:7,
1450:14
**purchasers** [1] -
1448:4
**purchasing** [1] -
1422:24
**pure** [3] - 1385:14,
1399:9
**purpose** [3] - 1349:16,
1383:4, 1431:2
**pursuing** [1] - 1375:19
**put** [35] - 1359:1,
1361:11, 1362:21,
1366:14, 1366:19,
1368:20, 1370:18,
1373:5, 1373:10,
1373:12, 1378:16,
1378:19, 1378:20,
1378:22, 1381:22,
1385:19, 1386:9,
1386:10, 1388:6,
1401:6, 1402:13,
1405:4, 1405:7,
1407:22, 1442:20,
1443:18, 1444:11,
1449:6, 1455:14,
1455:17, 1456:6,
1457:18, 1458:12,
1459:11, 1464:2
**putting** [3] - 1369:3,
1375:15, 1384:16

## Q

**qualified** [1] - 1377:3
**qualify** [1] - 1424:7
**quality** [4] - 1376:5, 1376:7, 1376:10, 1376:19
**quantifiable** [1] - 1399:24
**quantities** [1] - 1358:22
**questionable** [3] - 1398:9, 1398:12, 1398:19
**questioned** [1] - 1416:14
**questionnaire** [1] - 1458:3
**questionnaires** [2] - 1452:14, 1455:6
**questions** [11] - 1354:3, 1354:5, 1403:6, 1414:22, 1416:9, 1416:16, 1439:21, 1439:22, 1444:15, 1454:9, 1461:22
**quickly** [2] - 1394:7, 1440:20

## R

**raise** [1] - 1418:20
**ramped** [1] - 1357:12
**RANDALL** [1] - 1347:4
**Randall** [2] - 1358:13, 1363:21
**Randy** [19] - 1374:7, 1374:9, 1375:11, 1375:13, 1375:18, 1375:22, 1375:24, 1376:20, 1377:1, 1377:9, 1378:4, 1378:10, 1380:6, 1380:9, 1381:15, 1381:17, 1381:20, 1383:13, 1385:11
**rare** [1] - 1462:1
**rate** [1] - 1356:20
**rather** [2] - 1422:12, 1426:3
**RBD** [63] - 1374:9, 1374:13, 1376:1, 1376:3, 1376:6, 1376:11, 1377:8, 1377:10, 1377:24, 1378:6, 1378:10, 1379:12, 1380:23, 1380:25, 1381:6,

1381:15, 1381:18, 1382:3, 1382:17, 1385:5, 1385:10, 1385:11, 1385:14, 1386:15, 1387:3, 1387:20, 1396:5, 1401:9, 1401:14, 1403:5, 1410:3, 1410:6, 1410:9, 1410:13, 1410:16, 1410:19, 1410:23, 1411:1, 1411:13, 1411:18, 1411:20, 1411:23, 1411:25, 1418:23, 1419:12, 1420:6, 1420:13, 1420:19, 1424:2, 1424:4, 1424:9, 1424:15, 1436:20, 1436:24, 1437:16, 1442:6, 1448:12, 1450:7, 1451:4, 1454:3, 1454:6
**RBD's** [12] - 1367:11, 1375:5, 1382:16, 1386:11, 1387:7, 1388:15, 1389:1, 1420:17, 1420:25, 1437:9, 1449:2, 1450:9
**RBD05189** [1] - 1411:14
**RBD05250** [1] - 1411:14
**RE** [1] - 1346:4
**re** [3] - 1436:2, 1436:15, 1441:4
**re-examine** [1] - 1436:2
**reach** [2] - 1417:2, 1435:22
**reached** [7] - 1437:7, 1437:14, 1437:22, 1439:19, 1440:7, 1444:10, 1453:13
**reaching** [1] - 1415:6
**reactive** [1] - 1372:8
**read** [28] - 1379:22, 1392:17, 1393:3, 1394:9, 1397:16, 1398:21, 1404:5, 1407:10, 1407:16, 1407:19, 1408:21, 1409:19, 1416:7, 1416:16, 1421:10, 1436:11, 1440:23, 1441:20, 1442:5, 1443:16, 1449:1, 1449:13, 1449:22, 1449:23, 1450:3,

1451:5, 1454:2, 1460:7
**reading** [4] - 1393:5, 1441:7, 1443:12, 1449:6
**reads** [3] - 1390:6, 1392:16, 1450:10
**ready** [2] - 1407:2, 1459:19
**real** [11] - 1356:25, 1387:19, 1390:2, 1390:4, 1394:7, 1400:3, 1400:22, 1401:25, 1436:6, 1459:23
**realistic** [1] - 1382:23
**realistically** [1] - 1425:18
**reality** [9] - 1383:22, 1389:18, 1389:23, 1390:17, 1398:14, 1399:10, 1402:18, 1404:1
**realized** [1] - 1441:7
**really** [7] - 1377:21, 1378:2, 1404:12, 1456:6, 1458:13, 1459:14, 1462:6
**realm** [1] - 1367:25
**Realtime** [1] - 1465:3
**reason** [7] - 1370:22, 1385:20, 1392:15, 1417:3, 1432:21, 1445:12, 1460:7
**reasonable** [13] - 1383:11, 1416:25, 1418:15, 1420:6, 1420:19, 1421:16, 1422:14, 1422:25, 1427:11, 1432:4, 1434:18, 1434:22, 1435:15
**reasonably** [23] - 1364:7, 1364:14, 1419:24, 1420:2, 1420:25, 1421:3, 1421:15, 1421:22, 1421:23, 1422:5, 1422:7, 1422:10, 1422:15, 1423:4, 1423:9, 1423:17, 1423:23, 1426:24, 1427:12, 1428:11, 1431:20, 1435:4
**reasonably-anticipated** [2] - 1364:7, 1364:14
**reasons** [3] - 1363:18, 1444:23, 1447:24, 1449:6, 1451:7

**rebuttal** [5] - 1350:4, 1350:7, 1350:9, 1350:16, 1373:23
**rebutted** [1] - 1421:11
**Rec** [18] - 1352:17, 1353:5, 1353:7, 1354:12, 1358:16, 1361:7, 1362:2, 1362:5, 1362:8, 1362:17, 1365:12, 1365:23, 1366:10, 1367:16, 1367:20, 1368:17, 1369:23, 1370:13
**REC** [1] - 1449:2
**RECDOC14036** [1] - 1450:10
**receipt** [1] - 1454:1
**receive** [3] - 1422:14, 1458:2, 1458:3
**received** [9] - 1359:20, 1378:5, 1381:15, 1381:16, 1386:4, 1390:19, 1410:17, 1418:7, 1452:17
**receiving** [2] - 1385:24, 1403:10
**recently** [1] - 1389:6
**recess** [4] - 1350:18, 1408:16, 1439:17, 1453:8
**recognized** [1] - 1371:23
**recognizes** [3] - 1427:23, 1430:6, 1434:1
**recollection** [4] - 1413:23, 1413:24, 1415:13, 1415:15
**recommend** [1] - 1460:14
**recommends** [1] - 1384:15
**record** [16] - 1358:18, 1358:20, 1364:24, 1415:4, 1444:2, 1446:22, 1449:3, 1449:6, 1449:9, 1450:1, 1451:12, 1452:13, 1452:21, 1452:25, 1463:7, 1465:9
**recorded** [2] - 1416:8, 1416:15
**RECORDED** [1] - 1347:15
**records** [7] - 1358:17, 1362:19, 1369:15, 1369:18, 1394:9, 1395:6

**recover** [8] - 1371:21, 1429:23, 1430:20, 1432:11, 1434:8, 1434:14, 1434:21, 1445:18
**recoverable** [1] - 1434:9
**recovery** [3] - 1425:12, 1425:18, 1434:25
**RECREATION** [1] - 1346:9
**Recreation** [9] - 1360:15, 1375:22, 1410:2, 1418:23, 1436:17, 1438:4, 1450:11, 1450:14, 1450:15
**rectory** [1] - 1397:19
**red** [5] - 1352:10, 1354:16, 1354:18, 1355:4, 1377:1
**reduce** [4] - 1384:6, 1425:20, 1435:6, 1435:10
**reduced** [3] - 1383:15, 1428:25, 1449:22
**reduction** [2] - 1425:11, 1425:18
**reentry** [2] - 1351:4, 1351:6
**refer** [3] - 1409:2, 1419:2, 1424:23
**reference** [3] - 1436:10, 1442:8, 1444:24
**referred** [2] - 1410:3, 1418:25
**refers** [2] - 1443:12, 1443:16
**refrigerator** [1] - 1378:21
**refuted** [1] - 1400:16
**regard** [6] - 1407:13, 1419:10, 1420:11, 1440:21, 1445:3, 1461:8
**regarding** [5] - 1398:2, 1411:15, 1426:16, 1434:13, 1463:22
**regardless** [3] - 1418:6, 1418:7, 1422:23
**region** [1] - 1411:9
**Registered** [2] - 1465:3, 1465:4
**regular** [9] - 1357:20, 1358:3, 1358:6, 1358:17, 1358:22,

1362:14, 1363:13, 1378:9, 1393:1
**regulations** [1] - 1387:8
**regulatory** [1] - 1399:23
**REICH** [2] - 1346:23, 1346:23
**Reich** [1] - 1390:24
**reimburse** [1] - 1430:9
**reiterated** [2] - 1372:2, 1374:21
**relate** [1] - 1395:24
**related** [11] - 1372:25, 1376:5, 1388:1, 1394:14, 1395:17, 1397:13, 1398:6, 1399:7, 1414:22, 1436:17, 1450:24
**RELATES** [1] - 1346:7
**relation** [3] - 1424:3, 1425:24, 1426:10
**relationship** [3] - 1352:4, 1364:1, 1393:6
**relative** [4] - 1412:6, 1412:20, 1413:10, 1456:24
**released** [1] - 1458:16
**relevant** [1] - 1381:14
**reliably** [1] - 1399:24
**relied** [2] - 1369:25, 1370:2
**relief** [1] - 1428:24
**relieve** [1] - 1395:12
**reluctant** [1] - 1463:15
**rely** [4] - 1413:23, 1415:11, 1415:13, 1416:5
**remain** [1] - 1461:3
**remainder** [1] - 1350:15
**remarks** [2] - 1377:15, 1414:23
**remedy** [1] - 1419:3
**remedying** [1] - 1427:13
**remember** [9] - 1359:6, 1361:11, 1362:7, 1362:15, 1374:20, 1383:2, 1397:17, 1397:20, 1436:6
**remembered** [1] - 1398:21
**remembers** [1] - 1393:9
**remind** [3] - 1430:16, 1457:2, 1460:22
**reminder** [1] - 1460:11

**remove** [2] - 1396:10, 1396:15
**removed** [2] - 1398:10, 1398:20
**rendered** [1] - 1421:8
**rendering** [1] - 1419:8
**report** [6] - 1392:8, 1392:11, 1397:17, 1413:14, 1456:25, 1460:19
**REPORTER** [1] - 1347:13
**Reporter** [6] - 1465:3, 1465:4, 1465:5, 1465:15
**reporter** [1] - 1416:15
**REPORTER'S** [1] - 1465:1
**reporting** [1] - 1400:23
**reports** [2] - 1392:2
**representative** [3] - 1385:1, 1385:3, 1413:14
**representing** [1] - 1416:13
**request** [7] - 1378:18, 1397:14, 1403:5, 1442:18, 1444:25, 1445:21, 1447:22
**require** [3] - 1352:17, 1382:10, 1431:25
**required** [11] - 1367:4, 1382:7, 1384:14, 1384:19, 1385:4, 1416:3, 1426:8, 1430:3, 1435:6, 1435:19, 1440:8
**requires** [5] - 1403:7, 1417:15, 1425:5, 1426:14, 1426:22
**requiring** [5] - 1362:17, 1363:3, 1368:4, 1373:6, 1425:13
**research** [1] - 1439:12
**researching** [1] - 1449:5
**reserve** [2] - 1350:4, 1350:7
**reserved** [1] - 1350:16
**resided** [1] - 1411:1
**resident** [1] - 1409:22
**residents** [4] - 1385:18, 1385:20, 1411:7, 1411:8
**resins** [2] - 1358:2, 1410:15
**resolved** [2] - 1407:15, 1455:10

**resort** [2] - 1370:8, 1456:19
**respect** [12] - 1356:16, 1368:3, 1368:10, 1369:17, 1369:23, 1370:25, 1371:10, 1386:11, 1438:12, 1445:9, 1452:7
**respectfully** [1] - 1456:12
**respirators** [1] - 1404:19
**respiratory** [9] - 1352:5, 1361:18, 1361:20, 1364:2, 1364:5, 1365:2, 1366:6, 1366:8, 1397:18
**respond** [1] - 1440:3
**responded** [2] - 1353:1, 1353:3
**response** [5] - 1352:25, 1403:6, 1404:13, 1411:11, 1440:6
**responsibilities** [1] - 1445:4
**responsibility** [3] - 1353:7, 1387:7, 1425:6
**responsible** [10] - 1353:15, 1368:21, 1382:13, 1422:16, 1432:18, 1432:19, 1432:25, 1433:8, 1444:23, 1445:12
**rest** [2] - 1374:17, 1399:10
**restriction** [1] - 1361:8
**restroom** [1] - 1407:3
**result** [14] - 1353:9, 1360:6, 1365:17, 1367:21, 1379:21, 1403:8, 1428:10, 1433:17, 1434:2, 1435:19, 1437:17, 1450:20, 1454:25, 1464:2
**resulted** [6] - 1412:11, 1413:1, 1419:24, 1420:25, 1426:3, 1433:12
**resulting** [3] - 1432:14, 1433:2, 1434:16
**results** [13] - 1380:17, 1380:19, 1393:11, 1399:13, 1399:16, 1400:8, 1401:14, 1401:15, 1401:17,

1402:17, 1432:23, 1433:9, 1463:23
**retire** [2] - 1389:24, 1403:1
**return** [4] - 1439:21, 1440:10, 1450:15, 1462:11
**reveal** [1] - 1439:23
**review** [1] - 1462:17
**reviewed** [3] - 1352:4, 1388:9, 1388:10
**reviewing** [1] - 1449:5
**Revised** [1] - 1448:22
**revisiting** [1] - 1449:10
**rhinitis** [1] - 1367:23
**rhinosinusitis** [10] - 1353:11, 1360:21, 1364:19, 1364:23, 1373:6, 1389:10, 1391:9, 1391:13, 1395:3, 1395:8
**Rice** [1] - 1384:12
**rise** [7] - 1349:7, 1407:5, 1408:17, 1440:17, 1453:9, 1462:24, 1464:17
**risk** [7] - 1381:22, 1381:23, 1383:9, 1399:2, 1426:4, 1427:3, 1427:4
**risks** [2] - 1365:22, 1420:14
**Rita** [3] - 1357:10, 1410:8, 1411:12
**RMR** [2] - 1347:13, 1465:14
**roads** [1] - 1383:3
**Robert** [6] - 1355:1, 1362:15, 1366:21, 1377:19, 1381:25, 1382:1
**role** [2] - 1352:20, 1376:11
**ROOM** [1] - 1347:13
**room** [23] - 1374:25, 1379:25, 1386:22, 1389:24, 1390:20, 1403:1, 1403:6, 1406:11, 1406:13, 1406:15, 1406:16, 1439:9, 1440:10, 1443:23, 1451:25, 1452:20, 1453:6, 1455:9, 1461:3, 1462:15, 1462:18
**rose** [1] - 1359:16
**Rouge** [2] - 1410:17, 1410:20
**Rule** [5] - 1444:23,

1444:25, 1445:19, 1448:21, 1451:1
**ruled** [2] - 1445:13, 1446:23
**rules** [3] - 1350:4, 1351:8, 1387:8
**ruling** [8] - 1444:25, 1445:21, 1445:24, 1445:25, 1446:1, 1446:14, 1446:25, 1447:22
**rulings** [1] - 1448:8
**run** [1] - 1375:20
**running** [1] - 1362:8
**runny** [1] - 1361:7
**Rush** [19] - 1362:20, 1364:8, 1370:10, 1374:9, 1375:11, 1375:13, 1376:15, 1376:20, 1376:22, 1377:9, 1377:16, 1378:4, 1378:10, 1380:6, 1381:13, 1381:15, 1381:17, 1381:20, 1385:11
**Rush's** [1] - 1383:13
**Russ** [2] - 1358:13, 1363:21
**RV's** [1] - 1361:15

### S

**s/Cathy** [1] - 1465:13
**sacrifice** [1] - 1425:14
**safe** [6] - 1370:1, 1382:9, 1382:13, 1387:9, 1400:15
**safekeeping** [1] - 1439:16
**safer** [1] - 1425:20
**safety** [7] - 1366:4, 1366:12, 1370:18, 1381:5, 1381:24, 1401:10, 1411:19
**sales** [1] - 1363:17
**sample** [5] - 1355:17, 1412:8, 1412:11, 1412:23, 1413:1
**samples** [1] - 1355:12
**sampling** [4] - 1412:18, 1413:8, 1413:9
**SAN** [2] - 1346:18, 1346:24
**Sandra** [3] - 1360:18, 1371:14, 1372:22
**satisfied** [1] - 1435:14
**saw** [8] - 1355:25, 1357:11, 1358:14,

1359:24, 1367:24, 1368:12, 1396:18, 1397:14

**scare** [1] - 1403:21
**scariest** [1] - 1397:6
**scenes** [1] - 1456:18
**school** [3] - 1360:16, 1376:24, 1463:17
**science** [5] - 1352:8, 1361:5, 1389:3, 1400:16, 1456:8
**scientific** [7] - 1353:15, 1372:1, 1372:21, 1398:2, 1423:4, 1423:9, 1423:23
**scientists** [2] - 1372:19, 1392:1
**scope** [1] - 1358:24
**SCOTT** [1] - 1347:4
**screen** [2] - 1354:20, 1354:23
**seated** [6] - 1349:10, 1408:18, 1440:20, 1453:16, 1453:17, 1463:2
**second** [10] - 1365:19, 1371:19, 1383:20, 1383:24, 1412:7, 1427:15, 1442:4, 1442:6, 1443:5, 1451:8
**secondly** [4] - 1420:11, 1420:22, 1441:4, 1445:9
**Section** [1] - 1386:23
**section** [2] - 1386:24, 1450:4
**sections** [1] - 1390:20
**secure** [2] - 1350:25, 1351:5
**security** [8] - 1437:6, 1437:14, 1437:22, 1439:15, 1440:2, 1444:10, 1444:15, 1462:20
**SECURITY** [3] - 1349:7, 1407:5, 1408:17
**Security** [1] - 1350:25
**see** [18] - 1355:20, 1369:19, 1372:14, 1377:15, 1384:9, 1390:21, 1391:3, 1392:3, 1395:1, 1404:13, 1407:8, 1408:14, 1441:24, 1453:5, 1453:22, 1456:18, 1464:15
**seeing** [2] - 1390:4,

1393:1
**seek** [1] - 1436:7
**seeking** [1] - 1460:19
**seeks** [1] - 1394:17
**sees** [1] - 1368:24
**select** [1] - 1439:1
**selected** [4] - 1348:18, 1394:4, 1401:2, 1408:3
**selecting** [1] - 1402:22
**selection** [4] - 1357:21, 1360:6, 1452:13, 1455:8
**sell** [2] - 1396:1, 1406:14
**selling** [1] - 1405:7
**send** [4] - 1408:12, 1443:22, 1452:20, 1453:2
**sense** [5] - 1371:9, 1402:25, 1403:2, 1417:3, 1431:22
**sensitive** [1] - 1370:5
**sent** [3] - 1385:22, 1392:6
**separate** [4] - 1385:22, 1419:5, 1448:13, 1448:15
**separating** [1] - 1448:13
**September** [1] - 1381:12
**serious** [1] - 1432:21
**seriously** [2] - 1370:14, 1458:1
**seriousness** [2] - 1419:18, 1427:6
**serve** [2] - 1425:18, 1457:6, 1458:24, 1462:17
**served** [1] - 1397:22
**service** [19] - 1351:21, 1351:22, 1439:8, 1439:9, 1454:19, 1454:23, 1455:20, 1455:23, 1455:24, 1456:1, 1456:25, 1457:3, 1458:2, 1458:16, 1458:23, 1460:7, 1461:20, 1462:10, 1462:22
**serving** [1] - 1462:23
**SESSION** [1] - 1349:2
**set** [3] - 1379:20, 1399:8, 1448:20
**seven** [1] - 1442:24
**several** [6] - 1351:23, 1354:11, 1382:23, 1391:5, 1397:3,

1455:14
**shall** [1] - 1409:14
**Shaw** [15] - 1352:19, 1353:8, 1368:18, 1369:5, 1369:6, 1369:14, 1369:17, 1369:19, 1384:22, 1385:1, 1385:2, 1410:20, 1438:6, 1444:22, 1445:3
**Shaw's** [5] - 1410:24, 1426:15, 1426:17, 1427:16, 1428:8
**sheet** [5] - 1356:21, 1361:11, 1381:6, 1381:15, 1381:18
**sheets** [2] - 1366:4, 1411:19
**shipped** [2] - 1381:15, 1410:16
**shooting** [1] - 1376:17
**short** [3] - 1350:18, 1407:1, 1407:3
**show** [18] - 1352:15, 1353:18, 1354:3, 1354:10, 1355:6, 1362:19, 1364:6, 1364:15, 1380:17, 1391:24, 1401:7, 1404:2, 1414:5, 1428:18, 1440:5, 1449:11, 1454:23, 1459:7
**showed** [11] - 1353:3, 1354:10, 1361:2, 1363:17, 1364:4, 1374:15, 1374:19, 1379:1, 1381:13, 1390:23, 1391:14
**showing** [3] - 1352:4, 1404:11, 1455:20
**shown** [2] - 1349:18, 1373:20
**shows** [3] - 1349:24, 1352:22, 1356:9
**shut** [1] - 1378:9
**sick** [1] - 1395:18
**side** [5] - 1350:3, 1414:2, 1414:3, 1443:9, 1451:21
**sides** [3] - 1449:8, 1459:20, 1460:4
**Sierra** [1] - 1385:17
**sign** [17] - 1408:11, 1437:5, 1437:13, 1437:21, 1438:5, 1438:6, 1438:7, 1438:8, 1438:15, 1438:18, 1438:20, 1438:22, 1438:24,

1439:21, 1444:9, 1464:8, 1464:10
**signatures** [1] - 1453:3
**signed** [3] - 1408:11, 1452:25, 1454:10
**significant** [6] - 1377:22, 1388:11, 1388:14, 1388:20, 1391:6, 1442:9
**significantly** [1] - 1359:3
**signing** [1] - 1464:4
**signs** [1] - 1406:1
**silly** [1] - 1355:3
**silver** [1] - 1386:6
**similar** [3] - 1421:24, 1422:8, 1426:25
**simple** [2] - 1351:25, 1459:9
**simply** [6] - 1383:10, 1388:6, 1399:7, 1402:4, 1402:16, 1417:15
**sincere** [1] - 1463:22
**single** [15] - 1376:5, 1376:6, 1376:9, 1376:18, 1380:16, 1381:6, 1398:25, 1401:9, 1401:11, 1402:11, 1404:13, 1404:17, 1409:16, 1417:4, 1417:7
**sinks** [2] - 1378:22, 1378:23
**sinus** [10] - 1364:25, 1368:11, 1368:12, 1388:18, 1389:14, 1392:6, 1393:17, 1393:21, 1394:14, 1394:15
**sinuses** [4] - 1361:20, 1391:18, 1393:20, 1397:2
**sinusitis** [4] - 1368:1, 1371:13, 1392:12, 1395:11
**sit** [4] - 1435:5, 1456:5, 1456:11, 1458:9
**site** [1] - 1439:10
**sitting** [1] - 1374:10
**situation** [1] - 1368:13
**six** [1] - 1366:10, 1381:17, 1401:3, 1404:6, 1404:7, 1438:10, 1438:11, 1444:12, 1444:13, 1444:15, 1444:18
**size** [1] - 1378:22

**slap** [1] - 1366:19
**slide** [1] - 1378:18
**slide-out** [1] - 1378:18
**slideout** [1] - 1411:5
**slides** [1] - 1372:7
**slows** [1] - 1356:20
**small** [2] - 1352:22, 1357:18
**smaller** [1] - 1378:23
**Smart** [1] - 1439:7
**smart** [1] - 1376:24
**smell** [14] - 1359:7, 1359:11, 1360:12, 1360:15, 1360:17, 1360:18, 1360:20, 1360:21, 1393:24, 1396:21, 1401:23, 1401:25
**smelled** [6] - 1360:15, 1396:24, 1400:13, 1400:18, 1400:21, 1401:21
**smelling** [2] - 1400:19, 1400:20
**smells** [1] - 1394:4
**smoke** [2] - 1398:3, 1453:6
**smoking** [1] - 1398:22
**smoother** [1] - 1460:1
**Smulski** [4] - 1363:18, 1382:21, 1383:5, 1383:12
**society** [1] - 1427:7
**sold** [11] - 1357:18, 1362:6, 1362:13, 1386:11, 1387:3, 1405:16, 1405:19, 1406:11, 1410:6, 1410:11, 1424:4
**sole** [3] - 1414:11, 1415:1, 1435:3
**solely** [2] - 1415:7, 1436:4
**solid** [1] - 1380:1
**someone** [6] - 1391:21, 1392:12, 1447:6, 1451:22, 1456:23, 1461:4
**sometime** [2] - 1368:24, 1416:13
**sometimes** [7] - 1414:1, 1417:23, 1418:24, 1430:8, 1457:18, 1461:7, 1461:8
**somewhere** [1] - 1449:9
**son** [1] - 1398:18
**soon** [5] - 1385:17, 1453:5, 1456:22,

1462:18, 1464:16
**sophisticated** [23] - 1385:21, 1386:12, 1386:16, 1386:17, 1386:23, 1387:1, 1387:2, 1405:10, 1405:14, 1405:17, 1424:2, 1424:7, 1424:10, 1447:12, 1447:14, 1447:16, 1447:18, 1447:20, 1448:3, 1448:5, 1450:7, 1450:13
**sorry** [3] - 1430:22, 1447:8, 1459:3
**sort** [1] - 1407:12
**sorts** [1] - 1370:7
**sought** [1] - 1426:5
**sound** [3] - 1363:8, 1432:3, 1435:13
**source** [1] - 1396:15
**South** [1] - 1375:6
**Souza** [1] - 1382:18
**Spas** [6] - 1378:5, 1386:13, 1410:7, 1424:5, 1424:10, 1450:13
**speaking** [1] - 1448:1
**special** [3] - 1415:25, 1430:8, 1430:12
**specific** [2] - 1421:19, 1430:8
**specifically** [6] - 1396:3, 1429:5, 1446:2, 1446:4, 1450:5, 1452:15
**specification** [1] - 1357:14
**specs** [4] - 1370:10, 1370:11, 1370:14, 1448:23
**speculate** [1] - 1414:17
**speculation** [2] - 1380:2, 1418:16
**speculative** [1] - 1431:19
**spend** [3] - 1379:3, 1404:6, 1449:4
**spent** [4] - 1402:3, 1402:21, 1406:20, 1449:5
**spike** [3] - 1395:1, 1396:18, 1396:25
**spikes** [1] - 1394:22
**spring** [2] - 1359:1, 1359:4
**square** [2] - 1358:19, 1363:12
**staff** [3] - 1459:21,

1461:9, 1463:11
**staffs** [1] - 1459:21
**staging** [3] - 1410:17, 1410:20, 1410:21
**stamp** [4] - 1358:12, 1358:15, 1380:12, 1382:7
**stamped** [3] - 1358:12, 1385:9, 1385:13
**stand** [12] - 1355:1, 1362:20, 1374:24, 1376:20, 1378:20, 1388:3, 1390:9, 1393:3, 1395:13, 1397:11, 1416:11, 1416:19
**standard** [2] - 1358:10, 1362:25, 1363:2, 1365:15, 1365:16, 1377:25, 1380:23, 1382:5, 1382:15, 1385:10, 1388:24, 1399:24, 1400:2, 1400:3, 1400:6, 1401:10, 1403:19, 1403:22, 1403:23, 1404:3, 1404:25, 1426:21, 1427:2, 1433:23, 1445:25
**standards** [19] - 1357:15, 1357:16, 1370:2, 1377:10, 1380:7, 1380:10, 1382:4, 1382:19, 1387:8, 1387:11, 1389:1, 1399:20, 1399:22, 1400:10, 1401:8, 1402:14, 1402:16, 1406:16
**standing** [1] - 1389:10
**standpoint** [4] - 1365:3, 1398:2, 1447:14, 1451:4
**stands** [2] - 1362:12, 1378:13
**star** [1] - 1389:25
**start** [4] - 1351:14, 1360:24, 1457:1
**started** [8] - 1359:1, 1361:14, 1375:15, 1375:22, 1378:8, 1385:17, 1394:10, 1441:6
**starting** [2] - 1357:5, 1454:21
**starts** [2] - 1351:5, 1360:19
**state** [8] - 1360:2,

1360:3, 1409:14, 1409:22, 1411:20, 1416:2, 1446:12, 1456:25
**State** [1] - 1465:5
**statement** [2] - 1351:23, 1354:12, 1460:19
**statements** [3] - 1349:14, 1397:4, 1397:10
**states** [1] - 1400:3
**States** [13] - 1368:18, 1369:21, 1386:25, 1390:10, 1390:21, 1411:8, 1417:18, 1436:14, 1438:7, 1450:13, 1460:9, 1465:6, 1465:16
**STATES** [2] - 1346:1, 1346:13
**stating** [1] - 1409:16
**statistical** [1] - 1399:18
**statistically** [3] - 1388:10, 1388:14, 1388:19
**Statute** [1] - 1448:23
**statute** [1] - 1446:13
**stay** [2] - 1364:13, 1462:17
**stayed** [2] - 1360:17, 1405:24
**STENOGRAPHY** [1] - 1347:15
**Stephen** [1] - 1382:21
**stepped** [1] - 1375:11
**sticker** [1] - 1384:4
**still** [5] - 1355:22, 1357:17, 1394:24, 1446:17, 1446:18
**stipulate** [1] - 1357:25
**stipulated** [3] - 1366:25, 1384:3, 1409:18
**stipulation** [2] - 1357:2, 1366:3
**stipulations** [3] - 1357:25, 1409:19, 1413:16
**stop** [1] - 1396:11
**stopped** [1] - 1369:7
**stopwatch** [1] - 1350:6
**storage** [1] - 1411:23
**STREET** [2] - 1347:5, 1347:13
**Street** [2] - 1410:22, 1410:24
**stricken** [2] - 1415:3,

1415:5
**strong** [3] - 1360:15, 1360:18, 1372:18
**struck** [2] - 1378:4, 1393:16
**struggle** [1] - 1457:17
**studies** [12] - 1352:3, 1363:25, 1388:10, 1388:15, 1388:18, 1388:19, 1389:3, 1389:7, 1389:8, 1389:13, 1389:20, 1391:7
**study** [9] - 1361:2, 1388:14, 1388:25, 1389:15, 1389:16, 1389:22, 1391:10, 1391:12, 1391:25
**stuff** [3] - 1358:20, 1379:5, 1389:12
**style** [1] - 1376:14
**subcontractor** [1] - 1410:24
**subject** [2] - 1415:24, 1424:4
**subjected** [3] - 1360:5, 1373:2, 1373:16
**submission** [3] - 1449:18, 1449:22, 1450:17
**submissions** [1] - 1449:18
**submit** [4] - 1368:19, 1387:12, 1448:17, 1449:1
**submitted** [3] - 1449:20, 1449:24, 1450:9
**submitting** [2] - 1458:14, 1464:12
**subsequent** [1] - 1421:16
**substance** [2] - 1391:21, 1396:9
**substandard** [1] - 1463:21
**substantial** [2] - 1428:6, 1434:5
**substantially** [3] - 1355:21, 1367:20, 1437:16
**substantively** [1] - 1448:24
**subtracted** [1] - 1350:9
**successful** [3] - 1363:14, 1419:13, 1420:15
**suffer** [2] - 1431:21,

1434:1
**suffered** [17] - 1365:4, 1419:21, 1420:1, 1420:22, 1421:2, 1424:19, 1427:17, 1428:18, 1428:24, 1429:9, 1429:13, 1431:4, 1431:9, 1431:20, 1432:12, 1433:23, 1434:21
**suffering** [7] - 1371:12, 1430:7, 1431:8, 1433:15, 1433:19, 1434:3, 1438:14
**sufficient** [3] - 1417:5, 1418:17, 1427:9
**suggest** [3] - 1376:22, 1389:7, 1442:16
**suggested** [3] - 1382:22, 1382:25, 1383:5
**suggests** [3] - 1389:23, 1402:18, 1443:6
**SUITE** [5] - 1346:18, 1346:21, 1346:24, 1347:5, 1347:10
**summary** [1] - 1413:21
**summer** [6] - 1359:17, 1360:7, 1368:24, 1370:16, 1406:4
**summers** [1] - 1359:3
**summon** [1] - 1451:24
**summons** [1] - 1456:25
**sums** [1] - 1430:14
**Sunday** [1] - 1379:3
**super** [1] - 1383:10
**superior** [1] - 1426:7
**superlative** [1] - 1463:16
**suppliers** [1] - 1377:12
**supply** [1] - 1377:12
**support** [1] - 1418:17
**supported** [5] - 1372:17, 1387:18, 1389:1, 1389:8, 1390:17
**supportive** [1] - 1371:24
**supports** [1] - 1389:21
**supposed** [2] - 1384:22, 1457:11
**supposedly** [1] - 1380:12
**surgeries** [1] - 1373:7
**surgery** [10] - 1353:12,

1368:4, 1373:6,
1392:6, 1395:12,
1395:14, 1395:24,
1406:9, 1406:10
**surplus** [1] - 1450:22
**surprised** [1] -
1390:22
**sustained** [8] -
1367:19, 1379:21,
1387:25, 1388:4,
1403:3, 1414:14,
1433:15, 1437:16
**swapping** [1] - 1371:6
**sworn** [2] - 1416:3,
1435:21
**sympathy** [2] -
1417:17, 1455:15
**symptoms** [6] -
1352:5, 1368:1,
1391:17, 1393:19,
1396:17, 1405:24
**system** [4] - 1384:21,
1454:22, 1456:20,
1457:10

## T

**Taj** [2] - 1379:16,
1404:23
**talks** [2] - 1381:5,
1384:5
**task** [1] - 1429:19
**tear** [1] - 1422:9
**technical** [6] -
1415:24, 1416:1,
1416:3, 1423:4,
1423:9, 1423:23
**technically** [2] -
1442:17, 1448:1
**technologically** [1] -
1363:20
**telephone** [2] -
1393:7, 1439:7
**television** [1] - 1459:6
**temp** [1] - 1412:16
**temperature** [16] -
1359:3, 1359:5,
1359:12, 1359:16,
1401:17, 1406:5,
1412:5, 1412:14,
1412:17, 1412:19,
1413:4, 1413:5,
1413:6, 1413:7,
1413:9
**ten** [5] - 1353:2,
1407:2, 1407:8,
1407:9
**tend** [1] - 1417:12
**tending** [1] - 1415:19

**tens** [1] - 1405:5
**term** [7] - 1362:11,
1391:22, 1421:22,
1421:25, 1422:5,
1422:9, 1422:17
**terms** [6] - 1358:24,
1388:24, 1421:20,
1430:17, 1464:4,
1464:9
**terrible** [1] - 1457:5
**test** [14] - 1352:12,
1356:9, 1356:10,
1356:15, 1380:17,
1380:18, 1399:13,
1399:16, 1400:8,
1401:17, 1402:17,
1412:1, 1412:4,
1412:5
**tested** [8] - 1355:9,
1355:20, 1356:23,
1359:24, 1382:24,
1401:4, 1411:24,
1412:2
**testified** [47] -
1360:13, 1363:5,
1363:6, 1364:22,
1368:13, 1372:22,
1375:14, 1378:22,
1380:6, 1380:9,
1380:23, 1382:3,
1382:5, 1382:12,
1382:14, 1382:22,
1383:7, 1384:25,
1385:1, 1385:2,
1385:9, 1386:2,
1386:4, 1387:6,
1389:17, 1393:14,
1393:18, 1395:14,
1395:21, 1395:23,
1396:6, 1397:12,
1397:25, 1398:1,
1398:25, 1399:1,
1400:17, 1400:25,
1402:2, 1402:5,
1402:8, 1402:10,
1402:12, 1415:19,
1416:19, 1417:6
**testifies** [2] - 1371:16,
1397:24
**testify** [13] - 1375:14,
1375:24, 1376:15,
1376:21, 1378:8,
1379:1, 1383:19,
1384:12, 1392:25,
1393:8, 1398:23,
1416:10, 1451:2
**testimony** [41] -
1349:19, 1360:11,
1365:14, 1368:5,
1368:23, 1371:14,

1381:8, 1381:25,
1383:1, 1384:17,
1385:8, 1388:3,
1389:11, 1390:5,
1390:8, 1390:17,
1393:5, 1396:1,
1396:4, 1397:8,
1400:13, 1401:20,
1409:10, 1414:3,
1414:8, 1415:3,
1415:5, 1415:8,
1415:16, 1415:17,
1415:22, 1416:6,
1416:11, 1416:15,
1416:17, 1416:21,
1417:1, 1417:3,
1417:4, 1417:10,
1418:5
**testing** [1] - 1401:15
**tests** [2] - 1398:10,
1427:21
**Texas** [3] - 1355:13,
1364:9, 1394:17
**text** [1] - 1439:8
**thankful** [1] - 1456:4
**thanking** [2] - 1374:5,
1460:2
**THE** [69] - 1346:12,
1349:7, 1349:10,
1350:14, 1351:16,
1373:22, 1374:1,
1402:19, 1403:12,
1406:7, 1406:23,
1406:25, 1407:5,
1407:8, 1407:20,
1407:22, 1408:5,
1408:10, 1408:14,
1408:17, 1408:18,
1440:17, 1440:20,
1441:17, 1442:4,
1442:16, 1442:19,
1442:23, 1443:1,
1443:3, 1443:14,
1443:19, 1444:13,
1444:17, 1445:2,
1445:22, 1447:1,
1447:4, 1447:6,
1447:9, 1447:23,
1448:9, 1448:19,
1449:3, 1449:15,
1449:17, 1450:18,
1451:6, 1451:11,
1451:15, 1452:11,
1452:19, 1452:24,
1453:2, 1453:9,
1453:12, 1453:15,
1453:16, 1453:20,
1453:21, 1453:23,
1453:24, 1454:16,
1462:24, 1463:2,

1463:14, 1464:8,
1464:15, 1464:17
**theme** [2] - 1382:16
**themselves** [3] -
1349:15, 1369:24,
1441:9
**theoretical** [1] -
1399:18
**theories** [5] - 1382:24,
1387:17, 1387:24,
1419:5
**theory** [1] - 1400:16
**Therefore** [1] -
1450:11
**therefore** [1] - 1403:5
**they've** [3] - 1380:24,
1459:16, 1459:17
**thinks** [1] - 1389:19
**third** [3] - 1412:21,
1428:7, 1441:25
**THIS** [1] - 1346:7
**thousand** [1] -
1361:18
**thousands** [2] -
1405:5, 1411:6
**threat** [1] - 1359:25
**three** [19] - 1357:13,
1384:20, 1385:19,
1385:22, 1391:16,
1396:23, 1403:22,
1420:1, 1421:2,
1426:5, 1437:4,
1437:8, 1437:11,
1437:13, 1441:24,
1442:24, 1444:8,
1449:11, 1463:24
**THREE** [2] - 1346:18,
1347:9
**three-phase** [1] -
1385:19
**three-way** [1] -
1384:20
**threshold** [10] -
1352:7, 1356:4,
1356:5, 1359:7,
1359:8, 1360:12,
1360:21, 1361:13
**thresholds** [1] -
1352:12
**thrilled** [1] - 1456:2
**throat** [9] - 1359:7,
1361:13, 1361:14,
1361:15, 1361:16,
1366:7, 1372:13,
1405:23
**throughout** [2] -
1453:17, 1459:22
**tight** [1] - 1375:2
**TO** [2] - 1346:7,
1349:4

**today** [8] - 1375:23,
1402:21, 1440:14,
1458:3, 1458:16,
1459:17, 1462:19,
1463:21
**together** [2] - 1370:18,
1379:4, 1405:4,
1428:2, 1439:22,
1440:14, 1455:2,
1459:16
**Tony** [1] - 1411:24
**took** [7] - 1353:20,
1364:1, 1364:3,
1370:14, 1372:6,
1372:19, 1385:1
**top** [4] - 1436:13,
1441:11, 1441:17,
1443:5
**topics** [1] - 1456:9
**tops** [1] - 1375:16
**total** [6] - 1350:3,
1425:5, 1425:8,
1438:3, 1438:9,
1459:13
**tough** [2] - 1403:17
**tour** [1] - 1362:16
**toxic** [2] - 1389:18,
1397:25
**toxicologist** [1] -
1389:6
**track** [1] - 1350:5
**tract** [1] - 1366:6
**tracts** [1] - 1355:9
**tragedy** [1] - 1375:4
**trailer** [158] - 1352:11,
1355:19, 1356:7,
1356:17, 1359:10,
1360:18, 1362:1,
1362:3, 1362:6,
1364:13, 1364:14,
1364:23, 1365:6,
1365:12, 1365:17,
1365:23, 1365:25,
1366:1, 1366:13,
1366:14, 1367:5,
1367:11, 1367:15,
1367:21, 1368:14,
1368:25, 1369:18,
1369:23, 1370:4,
1370:10, 1370:22,
1371:8, 1371:15,
1371:17, 1373:17,
1375:19, 1376:12,
1376:23, 1377:2,
1377:3, 1377:5,
1377:6, 1377:13,
1378:16, 1378:21,
1379:1, 1379:2,
1379:3, 1379:9,
1379:12, 1379:14,

1379:21, 1380:18, 1380:24, 1381:16, 1381:18, 1382:3, 1382:6, 1382:8, 1382:9, 1382:25, 1383:2, 1383:10, 1383:14, 1383:20, 1384:1, 1384:4, 1384:11, 1384:17, 1384:23, 1385:20, 1386:3, 1386:12, 1387:3, 1387:10, 1387:14, 1387:21, 1388:5, 1393:24, 1394:3, 1394:4, 1394:21, 1395:9, 1395:17, 1395:18, 1395:22, 1395:25, 1396:12, 1396:14, 1396:19, 1396:22, 1396:23, 1397:1, 1397:3, 1397:13, 1398:5, 1398:7, 1398:13, 1398:15, 1399:3, 1399:12, 1399:17, 1400:8, 1400:13, 1400:20, 1400:22, 1401:4, 1401:7, 1401:12, 1401:18, 1401:21, 1402:3, 1402:4, 1402:5, 1402:15, 1403:3, 1403:18, 1404:22, 1405:24, 1406:1, 1409:23, 1410:1, 1410:11, 1410:14, 1410:16, 1410:19, 1410:23, 1411:4, 1411:14, 1411:16, 1411:23, 1412:2, 1412:3, 1412:5, 1412:8, 1412:14, 1412:16, 1412:19, 1412:24, 1413:4, 1413:6, 1413:9, 1413:11, 1418:25, 1424:17, 1436:20, 1436:24, 1437:1, 1437:9, 1437:18, 1450:14, 1454:3, 1454:6, 1454:8
**Trailer** [2] - 1436:15, 1441:5
**TRAILER** [1] - 1346:4
**trailers** [51] - 1357:3, 1357:9, 1357:12, 1357:19, 1358:25, 1359:18, 1359:23, 1360:11, 1360:15, 1361:7, 1364:8,

1370:8, 1370:19, 1375:13, 1376:1, 1376:3, 1376:12, 1376:13, 1376:16, 1377:8, 1377:23, 1378:3, 1378:6, 1378:11, 1378:14, 1378:18, 1378:24, 1380:8, 1380:23, 1381:8, 1382:2, 1382:13, 1382:15, 1383:5, 1385:18, 1387:6, 1387:8, 1387:11, 1399:23, 1401:9, 1404:4, 1406:6, 1406:12, 1410:6, 1410:9, 1411:2, 1411:21
**training** [1] - 1377:2, 1415:25
**transcript** [2] - 1447:7, 1465:8
**TRANSCRIPT** [2] - 1346:12, 1347:15
**travel** [83] - 1357:3, 1357:18, 1358:25, 1362:6, 1364:23, 1370:8, 1375:13, 1375:19, 1376:1, 1376:3, 1376:12, 1376:13, 1376:15, 1376:23, 1377:2, 1377:3, 1377:6, 1377:8, 1377:12, 1377:23, 1378:3, 1378:6, 1378:11, 1378:14, 1378:16, 1378:24, 1379:3, 1379:12, 1379:21, 1381:8, 1381:16, 1382:2, 1382:3, 1382:6, 1382:8, 1382:25, 1383:1, 1383:2, 1383:10, 1383:14, 1383:20, 1384:4, 1385:18, 1386:12, 1387:6, 1387:21, 1388:5, 1394:3, 1394:4, 1395:9, 1395:17, 1395:18, 1395:22, 1395:25, 1396:14, 1397:3, 1398:7, 1398:13, 1399:3, 1399:12, 1399:17, 1399:23, 1400:20, 1400:22, 1401:9, 1401:12, 1403:3, 1403:18, 1406:12, 1410:1, 1410:6, 1410:9, 1410:11,

1410:14, 1410:16, 1410:19, 1410:23, 1411:4, 1411:6, 1411:21, 1418:25
**Travis** [1] - 1386:1
**treat** [3] - 1391:1, 1394:19, 1394:24
**treated** [4] - 1393:14, 1393:16, 1405:21, 1417:20
**treating** [7] - 1391:2, 1392:14, 1392:17, 1392:18, 1394:10, 1394:19, 1396:3
**treatment** [5] - 1394:12, 1394:13, 1394:20, 1394:22, 1394:23
**treats** [2] - 1368:6, 1416:22
**TRIAL** [1] - 1346:12
**trial** [37] - 1349:12, 1349:20, 1374:10, 1374:21, 1377:16, 1377:19, 1396:6, 1402:9, 1409:8, 1409:10, 1409:12, 1409:20, 1413:17, 1413:19, 1413:22, 1413:25, 1414:19, 1414:24, 1415:2, 1415:9, 1415:23, 1416:9, 1416:13, 1416:16, 1439:19, 1442:11, 1452:21, 1453:17, 1454:25, 1455:18, 1457:9, 1458:12, 1459:12, 1459:19, 1459:22, 1459:24, 1461:20
**trials** [1] - 1448:6
**tribute** [1] - 1459:15
**trick** [1] - 1381:9
**tricked** [1] - 1381:20
**tricking** [3] - 1404:5, 1406:20, 1406:22
**tried** [10] - 1366:25, 1375:12, 1376:21, 1376:22, 1389:6, 1447:25, 1454:24, 1459:13, 1463:25, 1464:2
**tries** [1] - 1381:9
**trigger** [1] - 1464:10
**trip** [1] - 1403:21
**trucks** [1] - 1375:16
**true** [3] - 1369:16, 1434:10, 1465:7
**trust** [1] - 1388:2
**trusty** [1] - 1350:6

**truth** [2] - 1404:2, 1436:8
**try** [12] - 1381:9, 1383:24, 1401:6, 1402:15, 1403:20, 1454:19, 1456:7, 1456:11, 1458:6, 1459:8, 1459:18, 1464:2
**trying** [5] - 1405:11, 1406:13, 1433:21, 1456:1, 1462:8
**turn** [2] - 1424:5, 1439:15
**turned** [2] - 1412:10, 1413:1
**TV** [2] - 1368:24, 1369:25
**twice** [1] - 1375:14
**Twitter** [1] - 1439:10
**two** [38] - 1353:10, 1356:1, 1360:9, 1361:23, 1362:20, 1363:23, 1369:10, 1369:12, 1375:24, 1387:2, 1387:24, 1390:9, 1391:14, 1396:18, 1407:14, 1409:8, 1417:9, 1419:5, 1419:8, 1419:21, 1422:13, 1423:7, 1423:17, 1426:4, 1433:3, 1436:23, 1436:24, 1437:4, 1437:5, 1444:8, 1447:25, 1448:1, 1448:6, 1450:12, 1452:10, 1454:6, 1463:24
**TX** [3] - 1346:18, 1346:21, 1346:24
**type** [3] - 1378:1, 1454:25, 1455:15
**typed** [1] - 1362:23
**types** [2] - 1417:9, 1455:17
**typical** [2] - 1378:23, 1392:11
**typically** [1] - 1453:17
**typos** [1] - 1407:11

## U

**U.S** [2] - 1377:25, 1386:13
**ultimate** [2] - 1385:21, 1389:21
**ultimately** [7] - 1375:20, 1379:6,

1381:18, 1382:13, 1385:25, 1388:13, 1400:12
**unanimous** [2] - 1381:8, 1439:19
**unanswered** [1] - 1454:9
**under** [23] - 1369:7, 1386:14, 1387:4, 1387:24, 1409:11, 1416:9, 1416:11, 1416:14, 1419:1, 1419:6, 1423:11, 1426:25, 1427:8, 1432:17, 1434:17, 1446:12, 1446:13, 1447:13, 1448:13, 1448:22, 1450:3, 1460:6, 1460:24
**underneath** [1] - 1438:8
**understood** [2] - 1359:25, 1364:11
**undisputed** [1] - 1450:12
**unduly** [1] - 1415:14
**unfortunately** [2] - 1375:16, 1392:24
**unique** [1] - 1369:25
**unit** [6] - 1364:12, 1410:2, 1411:1, 1412:10, 1412:25, 1418:24
**UNITED** [2] - 1346:1, 1346:13
**United** [13] - 1368:18, 1369:21, 1386:25, 1390:10, 1390:21, 1411:8, 1417:18, 1436:14, 1438:7, 1450:13, 1460:9, 1465:6, 1465:16
**units** [3] - 1359:22, 1370:1, 1411:11
**unknowingly** [1] - 1373:2
**unknown** [1] - 1353:3
**unless** [6] - 1371:9, 1414:10, 1418:5, 1434:9, 1439:22, 1440:8
**unlike** [2] - 1447:25, 1459:6
**unlikely** [1] - 1462:1
**unmentioned** [1] - 1463:19
**unprofessional** [1] - 1461:14
**unproven** [1] - 1387:17

**unreasonable** [7] - 1419:7, 1423:1, 1423:20, 1427:3, 1427:4, 1435:7

**unreasonably** [28] - 1362:3, 1365:12, 1365:17, 1365:21, 1365:24, 1367:10, 1367:13, 1367:21, 1379:14, 1379:18, 1419:4, 1419:9, 1419:10, 1419:12, 1419:23, 1420:13, 1420:24, 1421:8, 1422:18, 1427:13, 1434:24, 1436:20, 1436:25, 1437:8, 1437:17, 1441:25, 1454:4, 1454:7

**unsupported** [2] - 1380:3, 1418:17

**untoward** [1] - 1461:14

**up** [45] - 1350:5, 1350:10, 1350:15, 1357:13, 1359:12, 1359:14, 1359:15, 1360:19, 1362:18, 1362:23, 1366:13, 1367:14, 1371:11, 1372:13, 1375:11, 1378:13, 1378:20, 1379:1, 1381:13, 1382:22, 1386:5, 1386:9, 1396:19, 1397:4, 1406:5, 1406:8, 1406:20, 1406:22, 1407:11, 1410:19, 1412:10, 1412:25, 1416:4, 1436:3, 1438:3, 1443:14, 1449:10, 1454:23, 1455:20, 1458:17, 1459:7, 1461:16, 1462:8, 1462:18

**upper** [2] - 1370:15, 1372:13

**urea** [4] - 1358:1, 1358:2, 1410:14, 1410:15

**Urquhart** [2] - 1410:21, 1410:24

**user** [7] - 1366:17, 1421:10, 1422:1, 1422:12, 1423:15, 1423:17, 1447:17

**users** [6] - 1386:20, 1420:7, 1420:20, 1421:17, 1424:13,

1424:16

**utility** [1] - 1419:20

## V

**vague** [1] - 1400:12
**value** [2] - 1433:18, 1433:21
**various** [3] - 1353:20, 1401:8, 1425:7
**Vehicle** [1] - 1409:23
**ventilate** [1] - 1384:7
**ventilated** [1] - 1402:5
**ventilation** [3] - 1384:5, 1384:9, 1404:19
**vents** [2] - 1412:9, 1412:25
**verdict** [51] - 1354:1, 1364:20, 1373:19, 1379:6, 1379:7, 1387:12, 1403:10, 1406:18, 1407:10, 1415:7, 1433:13, 1436:9, 1436:11, 1436:19, 1437:6, 1437:7, 1437:13, 1437:14, 1437:21, 1437:23, 1439:12, 1439:20, 1439:21, 1440:7, 1440:21, 1440:24, 1441:1, 1441:6, 1443:25, 1444:6, 1444:9, 1444:10, 1445:5, 1445:10, 1445:11, 1445:16, 1446:17, 1448:12, 1448:18, 1450:15, 1451:23, 1453:13, 1453:21, 1454:1, 1454:2, 1454:10, 1454:16, 1456:15, 1463:4
**VERDICT..................
.............................** [1]
- 1348:9
**viable** [1] - 1383:22
**video** [5] - 1382:1, 1382:12, 1386:2, 1413:21
**videotaped** [1] - 1416:7
**VIN** [1] - 1411:24
**vinyl** [1] - 1383:13
**violated** [5] - 1357:16, 1365:16, 1404:2, 1405:1, 1406:15
**violates** [1] - 1403:18
**violence** [1] - 1456:19

**visit** [1] - 1458:15
**visits** [4] - 1393:8, 1394:11, 1395:2, 1396:25
**vitiated** [1] - 1405:14
**vote** [2] - 1455:23, 1461:1

## W

**wait** [1] - 1351:9
**walk** [2] - 1384:23, 1396:13
**walked** [1] - 1381:23
**wall** [1] - 1366:20
**walls** [1] - 1383:14
**wants** [2] - 1351:8, 1399:6
**wardrobe** [1] - 1376:16
**warn** [16] - 1365:19, 1366:12, 1366:17, 1367:1, 1367:3, 1368:21, 1369:4, 1385:6, 1386:11, 1386:15, 1387:4, 1405:12, 1405:13, 1405:16, 1424:6, 1424:16
**warned** [4] - 1366:20, 1369:1, 1405:15, 1447:15
**warning** [57] - 1350:8, 1365:7, 1365:8, 1365:10, 1365:21, 1365:24, 1366:1, 1366:9, 1366:14, 1366:18, 1366:21, 1366:23, 1366:24, 1366:25, 1367:7, 1382:10, 1384:2, 1384:4, 1384:11, 1384:14, 1384:16, 1384:18, 1384:20, 1385:4, 1385:16, 1385:19, 1387:15, 1387:22, 1403:14, 1411:15, 1411:17, 1419:8, 1420:7, 1420:8, 1420:12, 1420:14, 1420:20, 1421:8, 1421:10, 1421:17, 1421:25, 1422:1, 1422:11, 1422:16, 1422:19, 1423:12, 1423:14, 1423:21, 1427:13, 1436:25, 1447:16, 1447:20, 1450:5, 1450:16, 1454:7

**warnings** [2] - 1383:25, 1387:14
**warps** [1] - 1383:1
**watch** [1] - 1462:7
**Watson** [1] - 1411:25
**Watts** [7] - 1350:6, 1350:16, 1350:25, 1351:4, 1351:10, 1351:13, 1373:22, 1374:5, 1374:15, 1375:25, 1376:20, 1377:14, 1378:13, 1379:5, 1379:23, 1381:5, 1381:9, 1384:3, 1397:4, 1398:23, 1399:9, 1402:10, 1403:13, 1406:23, 1444:5, 1448:9, 1452:13
**WATTS** [35] - 1346:16, 1346:17, 1351:15, 1351:18, 1403:15, 1406:8, 1406:24, 1407:15, 1441:16, 1442:2, 1442:14, 1442:18, 1442:21, 1442:24, 1443:2, 1443:10, 1444:6, 1444:14, 1444:21, 1445:8, 1446:22, 1447:3, 1447:5, 1447:8, 1447:11, 1448:7, 1448:20, 1449:13, 1449:16, 1452:16, 1452:18, 1453:1, 1454:15, 1463:9, 1463:13
**WATTS......................
...** [1] - 1348:5
**weakness** [1] - 1432:22
**wear** [4] - 1401:19, 1404:18, 1422:9, 1422:22
**weather** [2] - 1413:12, 1413:15
**web** [1] - 1439:9
**Wedner** [9] - 1359:2, 1360:12, 1360:24, 1361:1, 1367:23, 1371:13, 1372:19, 1392:9, 1396:5
**Wednesday** [2] - 1445:12, 1446:23
**week** [9] - 1349:21, 1376:21, 1402:21, 1445:13, 1454:20, 1456:6, 1457:14, 1457:15, 1462:6
**weekend** [1] - 1393:12

**weeks** [7] - 1360:19, 1369:12, 1396:23, 1401:22, 1401:23, 1455:7
**weigh** [2] - 1427:5, 1435:11
**weight** [9] - 1368:7, 1389:24, 1392:22, 1414:10, 1414:12, 1415:15, 1415:17, 1416:22, 1417:25
**Weinstock** [3] - 1374:8, 1388:12, 1389:12
**WEINSTOCK** [2] - 1347:7, 1347:8
**whatsoever** [1] - 1445:17
**wheelchair** [1] - 1364:12
**wheelchair-accessible** [1] - 1364:12
**WHEREUPON** [8] - 1349:8, 1407:6, 1408:15, 1440:18, 1453:7, 1453:10, 1462:25, 1464:18
**white** [3] - 1403:25, 1453:6
**whole** [5] - 1374:10, 1377:16, 1400:12, 1409:17, 1431:3
**wide** [1] - 1430:17
**width** [1] - 1354:20
**wife** [1] - 1374:9
**Williams** [8] - 1364:3, 1372:6, 1372:18, 1389:5, 1389:17, 1389:19, 1391:6, 1391:25
**win** [1] - 1429:18
**wind** [1] - 1449:10
**windows** [3] - 1402:6, 1412:9, 1412:24
**wins** [1] - 1431:6
**wish** [2] - 1461:16, 1461:18
**witness** [37] - 1349:19, 1356:12, 1356:14, 1358:2, 1358:7, 1362:21, 1362:22, 1374:23, 1381:6, 1389:4, 1389:25, 1390:9, 1393:3, 1395:13, 1397:11, 1398:25, 1399:1, 1402:11, 1414:15, 1414:17, 1414:20, 1414:21,

1415:18, 1415:19, 1415:21, 1416:2, 1416:4, 1416:9, 1416:10, 1416:11, 1416:14, 1416:18, 1416:19, 1417:4, 1417:8, 1418:14

**witness's** [1] - 1416:11

**witnesses** [16] - 1352:9, 1353:2, 1353:21, 1354:17, 1355:25, 1356:14, 1381:1, 1382:11, 1384:6, 1397:11, 1402:16, 1414:12, 1417:6, 1418:6, 1461:11

**wonder** [2] - 1398:23, 1444:11

**wonderful** [1] - 1456:17

**wondering** [1] - 1457:1

**wood** [38] - 1356:18, 1357:16, 1357:23, 1358:4, 1358:12, 1358:18, 1362:13, 1362:17, 1362:25, 1363:3, 1363:16, 1366:9, 1367:14, 1369:3, 1376:8, 1377:11, 1377:12, 1377:24, 1378:1, 1378:12, 1378:14, 1380:9, 1380:13, 1380:15, 1381:18, 1382:5, 1382:7, 1383:6, 1383:13, 1385:8, 1385:9, 1385:10, 1385:12, 1385:13, 1411:19, 1411:20

**woods** [4] - 1352:17, 1380:13, 1404:9, 1406:13

**word** [2] - 1368:22, 1442:5

**wording** [1] - 1414:16

**words** [11] - 1367:10, 1367:12, 1383:25, 1393:5, 1397:5, 1399:25, 1418:1, 1426:22, 1427:18, 1428:18, 1444:14

**workers** [1] - 1381:23

**Workplace** [2] - 1411:25, 1412:23

**workplace** [3] - 1381:2, 1381:22,

1404:17

**works** [1] - 1457:10

**world** [6] - 1372:21, 1387:1, 1387:19, 1400:3, 1401:25

**worldwide** [1] - 1372:1

**worry** [2] - 1393:11, 1434:5

**worse** [8] - 1364:25, 1367:25, 1368:13, 1371:15, 1371:16, 1397:2, 1401:25, 1405:24

**worsened** [1] - 1368:1

**worst** [1] - 1372:11

**Wozniak** [5] - 1362:15, 1366:21, 1381:25, 1382:1, 1382:8

**writing** [2] - 1440:4, 1458:14

**written** [6] - 1357:14, 1409:3, 1439:20, 1439:22, 1440:2, 1449:18

**wrongful** [2] - 1431:13, 1434:17

## Y

**y'all** [1] - 1374:10

**year** [5] - 1356:1, 1369:1, 1372:3, 1391:16

**years** [23] - 1352:12, 1355:21, 1356:1, 1356:11, 1356:15, 1360:8, 1360:9, 1366:11, 1375:14, 1377:1, 1390:2, 1390:3, 1393:15, 1393:20, 1394:13, 1396:18, 1397:3, 1398:16, 1399:5, 1404:6, 1404:7

**yellow** [1] - 1352:10

**yoman's** [1] - 1459:23

**YOUNT** [15] - 1347:3, 1347:4, 1350:13, 1373:25, 1374:3, 1402:20, 1441:15, 1442:3, 1448:11, 1449:25, 1450:23, 1451:8, 1452:12, 1452:17, 1452:22

**Yount** [7] - 1350:12, 1351:5, 1373:24, 1402:19, 1403:12,

1403:16, 1448:10

**Yount's** [1] - 1351:7

**YOUNT.....................**
**..** [1] - 1348:6

**yourself** [6] - 1365:25, 1373:2, 1395:7, 1415:18, 1435:23, 1443:12

**YouTube** [1] - 1439:10

## Z

**ZWAIN** [1] - 1347:7