1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

2

3   ****************************************************************

4   IN RE:  FEMA TRAILER
    FORMALDEHYDE PRODUCTS
5   LIABILITY LITIGATION
                            DOCKET MDL NO. 1873 "N"
6                           NEW ORLEANS, LOUISIANA
                            MONDAY, MARCH 22, 2010, 8:30 A.M.
7

    THIS DOCUMENT RELATES TO:
8

       *FOREST RIVER INC., ET AL*,
9      DOCKET NO. 09-2977

10  ****************************************************************

11

12                        **DAY 6, MORNING SESSION**
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
13                     UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16

17  FOR LYNDON T. WRIGHT:   LAW OFFICES OF FRANK J. D'AMICO, JR.
                            BY:  FRANK J. D'AMICO, JR., ESQUIRE
                                 AARON Z. AHLQUIST, ESQUIRE
18                          622 BARONNE ST.
                            NEW ORLEANS, LA  70113
19

20                          REICH & BINSTOCK
                            BY:  DENNIS C. REICH, ESQUIRE
21                          4265 SAN FELIPE, SUITE 1000
                            HOUSTON, TX  77027
22

23                          CHRIS PINEDO
                            ATTORNEY AT LAW
24                          4550 JERICHO ROAD
                            CORPUS CHRISTI, TX  78413
25

1   APPEARANCES:   (CONTINUED)

2

3                               NEXSEN PRUET
                                BY:  PAUL A. DOMINICK, ESQUIRE
4                               P.O. BOX 486
                                CHARLESTON, SC  29402
5

6                               WATTS GUERRA CRAFT
                                BY:  MIKAL C. WATTS, ESQUIRE
7                               FOUR DOMINION DRIVE
                                BUILDING THREE, SUITE 100
8                               SAN ANTONIO, TX  78257

9

10  FOR FOREST RIVER,
    INC.:                       GIEGER, LABORDE & LAPEROUSE
11                              BY:  ERNEST P. GIEGER, JR., ESQUIRE
                                     JASON D. BONE, ESQUIRE
12                                   CARSON W. STRICKLAND, ESQUIRE
                                701 POYDRAS STREET, SUITE 4800
13                              NEW ORLEANS, LA  70139

14

15  FOR SHAW ENVIRONMENTAL,
    INC.:                       BAKER DONELSON BEARMAN CALDWELL &
16                              BERKOWITZ
                                BY:  M. DAVID KURTZ, ESQUIRE
17                                   ROY C. CHEATWOOD, ESQUIRE
                                     KAREN K. WHITFIELD, ESQUIRE
18                              201 ST. CHARLES AVENUE, SUITE 3600
                                NEW ORLEANS, LA  70170
19

20
    ALSO PRESENT:               DOUGLAS GAEDDERT
21

22
    OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RMR, CRR
23                               500 POYDRAS STREET, ROOM B406
                                 NEW ORLEANS, LA  70130
24                               (504) 589-7779
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
25  PRODUCED BY COMPUTER.

1541

# I N D E X

EXAMINATIONS                                                      PAGE

**DR. EDWARD SHWERY**.......................................1543

DIRECT EXAMINATION BY MR. REICH.........................1544

CROSS-EXAMINATION BY MR. BONE..........................1576

CROSS-EXAMINATION BY MR. CHEATWOOD.....................1589

REDIRECT EXAMINATION BY MR. REICH......................1596

**DR. JOHN THOMPSON**.......................................1604

DIRECT EXAMINATION BY MR. GIEGER.......................1605

CROSS-EXAMINATION BY MR. REICH.........................1639

REDIRECT EXAMINATION BY MR. GIEGER.....................1663

1       **P-R-O-C-E-E-D-I-N-G-S**

2       M O R N I N G   S E S S I O N

3       MONDAY, MARCH 22, 2010

4       (COURT CALLED TO ORDER)

5

6

7       (WHEREUPON, at this point in the proceedings, the jury

8   panel enters the courtroom.)

9       THE DEPUTY CLERK:  All rise.

10      THE COURT:  Good morning.  You may be seated.

11          First of all, thank you all, once again, for being

12  here and on time.  I met with the attorneys this morning to map

13  out our game plan here over the next few days, and hopefully we

14  will have saved a little time during the course of our -- they

15  are making their important decisions as to what we're going to do

16  this week.  We'll talk about that a little bit more as we go.

17          Let me go ahead and ask plaintiff's counsel, you

18  all have a witness you would like to call at this point?  Let's

19  go ahead and do that now.

20      MR. D'AMICO:  Yes, Your Honor.  The plaintiff will call

21  Dr. Ed Shwery.

22      THE COURT:  Dr. Ed Shwery.  Sir, if you would come

23  forward.  Stand behind this chair until you take the oath and

24  then you may be seated.

25          I understand this is an expert witness, Mr. Reich.

1        MR. REICH:  Yes, it is, Your Honor.

2        THE COURT:  And do you have a stipulation as to his

3   expertise?

4        MR. REICH:  Your Honor, Dr. Shwery is a clinical

5   psychologist.

6        THE COURT:  He's being tendered in the field of clinical

7   psychology?

8        MR. REICH:  Correct.

9        THE COURT:  Counsel?

10       MR. BONE:  No objection, Your Honor.

11       MR. CHEATWOOD:  No objection, Your Honor.

12       THE COURT:  The Court will therefore accept Dr. Shwery

13   as an expert in the field of clinical psychology.

14          Mr. Reich, I'll let you ask him a few questions

15   about his background, but let's get to his testimony regarding

16   this case.

17       MR. REICH:  Absolutely.

18       THE DEPUTY CLERK:  Would you please raise your right

19   hand.  Do you solemnly swear that the testimony which you are

20   about to give will be the truth, the whole truth and nothing but

21   the truth, so help you God.

22       THE WITNESS:  I do.

23                      **DR. EDWARD SHWERY**

24   was called as a witness and, after being first duly sworn by the

25   Clerk, was examined and testified on his oath as follows:

1            THE DEPUTY CLERK:  Please state and spell your full

2   name for the record.

3            THE WITNESS:  Edward Halie Shwery.

4            THE DEPUTY CLERK:  Spell the last name.

5            THE WITNESS:  S-H-W-E-R-Y.

6            MR. REICH:  May I proceed, Your Honor?

7            THE COURT:  Yes, please.

8                         DIRECT EXAMINATION

9   BY MR. REICH:

10  Q.    Good morning, Dr. Shwery.

11  A.    Good morning.

12  Q.    What is your profession?

13  A.    Clinical psychology.

14  Q.    How long have you been a clinical psychologist?

15  A.    36 years.

16  Q.    That's a while.  Could you explain to the ladies and

17  gentlemen what clinical psychology involves.

18  A.    Yes.  In the field of science, psychology is one of the

19  sciences, and in that field, there is a branch called clinical

20  psychology which deals with the diagnosis and treatment of

21  nervous and mental disorders.

22  Q.    May we display for the jury, the CV of Dr. Shwery,

23  Exhibit No. 350.

24            Is this your CV which reflects your background,

25  credentials, professional accomplishments?

1  A.    Yes.

2  Q.    Let's go through it very quickly.

3        Where did you obtain your Ph.D.?

4  A.    Texas Tech University.

5  Q.    And could you briefly explain your work history after you

6  obtained your Ph.D. in psychology.

7  A.    Yes.  I began working at the University of Alabama at the

8  psychology department, and then I also worked half time in a

9  children's center at the university that had some inpatients and

10 some outpatients of children with problems.

11       And early in my career, I practiced primarily what's

12 called pediatric psychology and child psychology.  Then I moved

13 to Ohio and I was on the staff of Pediatric Hospital where I saw

14 a lot of children with different kind of medical problems.

15       Then I moved to Metairie in 1984, I think it was, and

16 opened an office in Metairie.  And I've been in private practice

17 since then.

18 Q.    May we go to the next page, please.

19       And does the second page illustrate some of the

20 different types of work and positions that you've held over the

21 years?

22 A.    Yes.

23 Q.    And could you describe very briefly just some of the type of

24 consulting work that you have done.

25 A.    Yes.  I should probably describe my practice a little bit

1  more to make that make sense.

2          In general clinical psychology, you see a lot of adults

3  and children with different kinds of problems.  I have

4  specialized in two areas over the years, one is sexual abuse of

5  children, and the other is in chronic pain.  I see a lot of

6  people who have been injured and disabled and are in pain.

7          In connection with general clinical work or those two

8  specialties, I consult with a lot of different agencies and

9  organizations related to whatever, like the Catholic church for

10 problems with sexual abuse by priests.  I've consulted with the

11 federal government, with U.S. Attorneys' offices, just a long

12 list of people with whom I have consulted for whatever clinical

13 issues.

14 Q.  Have you been appointed by judges, either at the state,

15 federal or appellate court level to do psychological evaluations?

16 A.  Yes.  I have had, I guess, three-dozen or more judges.  And

17 sometimes the Court will have a situation where they have two

18 opposing opinions, and sometimes they will appoint somebody as a

19 third opinion or just be appointed by the Court to evaluate

20 somebody and give information to the Court.

21          So I've done that for state courts, federal courts, and

22 for the Fifth Circuit Court of Appeals here in New Orleans.

23 Q.  And if we may just briefly page through the balance of the

24 CV, you've done a number of workshops, speeches, presentations to

25 the public; is that correct?

1    A.    Yes.  Those are all workshops that I gave over the years.

2    Q.    And have you been affiliated with teaching at any

3    universities?

4    A.    Yes.

5    Q.    And can you describe that, please.

6    A.    University of Alabama, I taught in the psychology department

7    back in the middle 1970s.  I then taught at Ohio State

8    University, and then I have taught, oh, several years ago at the

9    dental school at LSU, LSU Medical School.  I've taught several

10   years ago at Tulane University Medical School.  I think that was

11   all of them.

12   Q.    In the case of Mr. Lyndon Wright -- let's start talking

13   about this case now -- what were you asked to do?

14   A.    Well, I was asked to see this man who had repeated -- or

15   reportedly had been living in a trailer, and there were some

16   questions about whether or not he had any psychological problems.

17   So my charge was to evaluate him and determine whether or not

18   there were any psychological problems; and if so, what are they

19   and what kind of treatment does he need.

20   Q.    Can you explain the circumstances in which you met

21   Mr. Wright and how you proceeded to evaluate him.

22   A.    Okay.  An appointment was scheduled in my office in July of

23   last year.  And he came and I saw him on two days for clinical

24   interviewing and the administration of a battery of psychological

25   tests.  And then I wrote a report.

1   Q.   In addition to the clinical interviewing which I will ask

2   you to discuss with the jury, did you administer certain kinds of

3   tests?

4   A.   I did.

5   Q.   And can you generally describe the kinds of tests that you,

6   as a psychologist, use for your evaluation?

7   A.   Okay.  When you do an examination of somebody, you read

8   whatever background information you have about what brought him

9   to your office in the first place, and then you conduct a

10  clinical interview that includes going over why they are there,

11  what kind of problems they have been having, their personal

12  history, other historical information.

13        And then based on that, you administer psychological

14  tests, if needed.  Sometimes the question may be very brief, and

15  you don't need to do testing, but often we do.

16        So we then select what tests we want to give that would

17  answer whatever questions are in the clinician's mind or to

18  confirm things or to rule out things.

19        Do you want me to describe the tests?

20  Q.   Now, the tests that you're referring to, were these actually

21  written tests, paper-and-pencil-type tests?

22  A.   They are.

23  Q.   Why don't we describe how a clinical psychologist such as

24  yourself uses tests to handle the evaluation of a client.

25  A.   Okay.  We have a long history of testing, over a hundred

1    years, actually more than that, where tests have been developed

2    through scientific procedures to answer questions.  Some of them

3    are for academic functioning in school, some of them might be for

4    a person's intelligence, their IQ level.  Some would be for

5    assessing the presence or absence of psychological problems.  And

6    I mean, we've got hundreds of tests we could give, test somebody

7    for a year if we wanted.

8            But usually you select a small battery that would focus

9    on the questions.  So usually in a clinical situation, whether or

10   not there is anxiety, depression, other kinds of psychological

11   difficulties.  And you look for different levels.  You want to

12   know what's going on consciously with the person, try to

13   understand what's going on under the surface, more unconscious,

14   more at a private conscious level that they don't often want to

15   talk about.

16           Testing gives you a lot of additional information, and

17   sometimes people will acknowledge things on the test that they

18   wouldn't tell the clinician initially.

19   Q.   Now, do these tests provide any additional objectivity?

20   A.   Well, the tests are objective.  They've been standardized.

21   They've been subjected to a lot of research before they ever get

22   published or used by psychologists.

23   Q.   Are these tests, in fact, used throughout the United States

24   and throughout the world?

25   A.   They are.

1    Q.    Now, if I may approach the easel, Your Honor.

2              THE COURT:  Yes.

3                              EXAMINATION

4    BY MR. REICH:

5    Q.    Could you just name the tests and I'll write them down?

6              THE WITNESS:  May I use my reports, Your Honor?

7              THE COURT:  Yes.

8              THE WITNESS:  Thank you.

9              THE COURT:  That's the report that's been provided to

10   counsel and shared?

11             MR. REICH:  Yes, Your Honor.

12             THE WITNESS:  Yes.

13                  Can I consult my raw test data as well?

14             THE COURT:  Has that been shared with counsel?

15             MR. REICH:  Yes, Your Honor.

16             THE COURT:  Yes.

17             THE WITNESS:  Okay.  What were you asking?

18                              EXAMINATION

19   BY MR. REICH:

20   Q.    I'm going to ask you first to identify the particular test.

21   Just name them, I'll write them down so we can go through them

22   quickly.

23   A.    Okay.  The first one is called the Beck, B-E-C-K, Anxiety

24   Inventory.  You can put BAI, if you wish.

25   Q.    Inventory?

1 A. Inventory, yeah.

2 Q. I'll abbreviate it.  Okay.

3    What's the second one?

4 A. Beck Depression Inventory, II.

5 Q. All right.  The third one?

6 A. The Incomplete Sentence Blank.

7 Q. All right.

8 A. Shipley, S-H-I-P-L-E-Y.

9 Q. Next one?

10 A. I'm going to give you the initials, MBMD.  That stands for

11 Millon Behavioral Medicine Diagnostic.

12 Q. The sixth one?

13 A. MMPI-2.  That's it.

14 Q. Now, Dr. Shwery, why don't we start with the first one.

15 Explain what the Beck Anxiety Inventory is and why you used it in

16 this particular case.

17 A. Okay.  This is a test that focuses on anxiety.  It's

18 probably one of the most widely used tests in America and in

19 several Latin American countries by psychologists.

20    Basically, it's a presentation of symptoms of anxiety,

21 and the person endorses them with four levels, whether it doesn't

22 occur or it is not a problem for them, mild, moderate, and

23 severe.  And those are scored and you get a level of anxiety at

24 the present time with the person.

25 Q. Did you, in fact, administer that test to Mr. Wright?

1  A.   Yes.

2  Q.   And what do the tests show?

3  A.   Well, I should clarify.  I saw him in July and did some

4  testing.  I saw him in September and did some more testing.

5       Do you want me to just talk about --

6  Q.   Let's talk about the July test results first.

7  A.   July.  Okay.  The score on the BAI, or the Beck Anxiety was

8  a score of 8 -- excuse me, a score of 9.  That's low.  That's

9  very mild, mild level of anxiety.  It's not a lot of anxiety.  It

10 was low.

11 Q.   And then you administered the test a second time, correct?

12 A.   Yes.

13 Q.   And the second date was what?

14 A.   That was on September 24, 2009.

15 Q.   And why did you give him the test the second time several

16 months later?

17 A.   Well, I had finished my examination in July, and I wrote a

18 report, and I thought that was it.  There are deadlines to

19 provide reports.  And then he called me in about the middle of

20 September and said he needed to come and see me.

21       So he came back, and it turned out there had been some

22 surgery on his -- a tumor on his tongue and some other things

23 that raised a lot of problems for him, and that's why he came

24 back.

25 Q.   Now, the first test you indicated provided a result of mild

1    anxiety.  What did the second Beck Anxiety Inventory test show?

2    A.    The second score was 36, which is in the severe range of

3    anxiety.

4    Q.    Now, let's talk about the second test, the Beck Depression

5    Inventory.

6              Why did you administer that test?

7    A.    Well, this man had a history of depression, first of all,

8    and he had some minimal elements of depression in the clinical

9    examination, so I administered that test.

10   Q.    What were the results of that test?

11   A.    Okay.  In July, the results were low.  It was a score of 8,

12   which is minimal.  It's really like within normal limits.

13   Q.    Now, you mentioned that there was some evidence of

14   historical depression.  How bad was the historical depression?

15   A.    Well, the description in the records was that he

16   periodically had depression, the doctor prescribed medication for

17   him, and the depression went down.  And when I explored that with

18   him, what his depression was like in past years, he said that he

19   would occasionally get low mood, feel down, and he would get

20   medication, and it would help.  And then he said he also started

21   to read a number of books, self-help books that helped him kind

22   of refocus on how to deal with periods of depression and

23   distress.

24   Q.    One of the doctors that Mr. Wright saw was a Dr. Field,

25   correct?

1  A.    Yes.

2  Q.    And he was, I believe, at the Uptown Nephrology Clinic?

3  A.    That's correct.

4  Q.    Did he prescribe a drug known as Effexor?

5  A.    He did.

6  Q.    Do you know for how long a period of time Mr. Wright was

7  taking Effexor?

8  A.    Well, he took it on and off at different points, starting in

9  about, I think, the year 2000, and I think it was -- he took it

10 for a few months, anywhere from two to six months, as I recall.

11        And then, as I recollect, he was re-prescribed that

12 medication, I think, in 2002 or 2004 or maybe both.

13 Periodically, he would go back to his doctor and he would say,

14 "You know, I'm feeling down or I'm feeling depressed," and the

15 doctor would say, "Well, go back on the Effexor."

16 Q.    Is Effexor a commonly-prescribed antidepressant?

17 A.    Well, I'm a psychologist, not a medical doctor.  I can

18 general knowledge, but I'm not qualified to --

19 Q.    But some of your patients have taken that particular drug or

20 have been prescribed that drug?

21 A.    It is common.  I don't know to what degree, but frequently

22 that's used.

23 Q.    Now, can you characterize the degree of functioning of

24 Mr. Wright during the time period between 2000 up until Katrina

25 in August 2005, toward the end of August 2005?

1            MR. BONE:  Objection, Your Honor.  Lack of foundation.

2            THE COURT:  Go ahead and see if you can rephrase it or

3    lay a foundation.

4                            EXAMINATION

5    BY MR. REICH:

6    Q.   How would you describe the way Mr. Wright was carrying on

7    living his life and going from day to day during that time

8    period?

9            MR. BONE:  Objection, Your Honor.  Same objection.

10            MR. REICH:  Based on the history --

11            THE COURT:  Go ahead and try to lay a foundation.  I

12    think he's right.  We don't have any evidence as to how this

13    witness would be privy to that.

14                            EXAMINATION

15    BY MR. REICH:

16    Q.   Did you obtain a history from Mr. Wright?

17    A.   I did.

18    Q.   And did you describe his past work history, for example?

19    A.   Yes.

20    Q.   And did you talk to him about his past life-style?

21    A.   Yes.

22    Q.   And did you acquire other information that was relevant to

23    you, as a clinical psychologist, to gauge his level of

24    functioning prior to Katrina, to get a sense of how he was doing?

25    A.   Yes.

1  Q.    All right.  And what did you generally conclude?

2  A.    Well, generally, he's a man who doesn't like to talk about

3  what's going on inside of him.  He tends to hold things in, and

4  he tends not to talk about problems and difficulties.

5        The primary way that he copes with everyday stresses

6  and difficulties and problems in life is through work and through

7  just blocking expression of feeling.  So he's what we call stoic.

8  He holds everything in.

9        He was doing -- I mean, work is a central thing in his

10  life.  He's working two jobs, two full-time jobs, and that's

11  basically the kind of person he is.  He seems to be forthright

12  and honest and hard working, but he's not psychologically

13  sophisticated, and he's not the kind of person that would examine

14  himself or introspect and then discuss it with others.

15  Q.    So looking back at the time period between 2000 and Katrina,

16  August 2005, how would you generally describe Mr. Wright's level

17  of depression, if any?

18  A.    Well, he described periods that were also in Dr. Field's

19  records where he would get down, he would get depressed, he would

20  go to the doctor, he would get medication, he would take that for

21  a few months and he would feel better.

22        He would also go out and buy books that were focused on

23  what we call generally self-help kind of things to try and figure

24  out how can I deal with these problems in life.

25        But basically, he was going to work every day and just

1  living his life.

2  Q.   Let's complete the tests and I'll try to do it fairly

3  quickly.

4        Incomplete sentences --

5  A.   Blank is the last word.

6  Q.   What is that about?

7  A.   That's a test where it's a part of a sentence, and the task

8  is for the individual to complete that sentence any way they

9  want.  That is rooted in the notion to try and understand what's

10  in the private conscious functioning of people.  It's based on an

11  ancient type of test of people giving word association or the

12  first thing that comes into your mind, and it gives the clinician

13  a picture of what's going on in the person's mind on a private,

14  conscious level.

15  Q.   The Shipley test?

16  A.   The Shipley is a screening instrument for intelligence and

17  abstract reasoning.  And the results on this test are, he has a

18  pretty good basic intelligence, but it's not been developed.  I

19  believe his score was 115, I think.  That would be, like, 100 is

20  average.  We've all heard about IQ, 100 is average.  His basic

21  intellectual ability is about 115, but his actual IQ is, like, at

22  103.

23        What that means is, he never developed it through

24  education and he never went on -- he started college but did not

25  complete it, and so his innate ability is better than what he

1    functions with.

2    Q.   So even though he's holding down two jobs, would it be your

3    opinion that because his innate abilities are higher than what

4    he's actually doing, there is somewhat of a gap between perhaps

5    his work level and where he potentially could perform at?

6    A.   Yeah.  That's true.

7    Q.   Let's go to the next test, MMPI-2.

8    A.   You want the MBMD?

9    Q.   I missed one.  MBMD.  What is that?

10   A.   That is a psychological test that focuses on the

11   relationship between psychological issues and medical-surgical

12   issues that people have.

13          We often use that for health psychology, behavioral

14   medicine kind of things.  If somebody is having some kind of

15   medical issue, it helps you to understand the interplay of

16   psychological issues.  Because medical difficulties and

17   psychological issues are so intertwined.  Stress can cause health

18   problems.  Health problems can cause psychological distress and

19   so on.

20          So that's what that test focuses on.  And it's normed

21   on normal individuals.  It's not based on people that have

22   psychological difficulties.  It's for medical and surgical

23   patients.

24          And do you want me to talk about what I found?

25   Q.   Sure.

1   A.   Okay.  Let's see.  First of all, there is a validity scale

2   on that that tells you that when the person took the test, it was

3   done properly and they were honest and forthright and it was

4   valid in terms of the administration.

5         All these tests have some validity issues and they have

6   to be validated and researched, but the validity scale tells you

7   that when they took it, they were being honest and forthright as

8   opposed to just randomly answering it, for example, or not

9   cooperating.

10  Q.   Let me stop you for a moment and ask you about validity

11  scales.  Not all of these tests have validity scales, do they?

12  A.   No.  Like I said, the validity scale is on the MBMD and

13  MMPI.  They all have validity findings in order to be published

14  and used.  They all are either valid or not valid.  But the

15  validity scale tells you about the administration, when they took

16  it.

17  Q.   And the MMPI-2, that's a pretty well-known test, isn't it?

18  A.   Do you want me to tell you what I found on the MBMD?

19  Q.   Oh, sure.  We haven't done that.

20  A.   I'm at your pleasure here, but...

21  Q.   Go ahead.

22  A.   First of all, there was no indication of exaggerating

23  symptoms or faking or what we call malingering.

24        The basic characteristics of this man are very much

25  what I talked about earlier.  He has a lot of private holding in

1  of things.  He doesn't talk about it.  He tends to respond to

2  stress in life by just denying problems, just -- they are not

3  there.  I'm okay.  That kind of thing.

4          When physical illness or medical problems start to

5  occur, when those kind of issues come up in this person's life,

6  he will block the expression of worry and concern and just try to

7  push it down.  As a result of that, he needs -- you have to do

8  more interviewing or more testing to figure out what's going on

9  inside of him.

10          In general, he -- well, the other important finding is,

11  whereas sometimes people will exaggerate what's going on in their

12  lives, the problems, he does the opposite, he minimizes and

13  downplays everything.  That's basically what I found.

14  Q.    And that was apparent from your review of the findings of

15  the fifth test, the Millon test?

16  A.    That's correct.  The MBMD.

17  Q.    Now, let's talk about MMPI-2.  Is that one of the more

18  well-known tests?

19  A.    Yes.  That's used in, I think the last count was 30 or 40

20  countries.  It's been used in this country.  Besides the Beck

21  Test, that's probably the other most widely-used psychological

22  test by clinical psychologists.

23          The MMPI was developed in the mid 1940s at the

24  University of Minnesota.  The initials stand for Minnesota

25  Multiphasic Personality Inventory.  And it was revised in the

1    late 20th century, I think about in the 1985 area.  And then now

2    there is even a different version that's being developed.

3         Basically, it's a test that focuses on personality

4    issues and psychopathology.  Psychopathology means psychological

5    problems.  And it has a whole host of scores.  I mean, I think

6    there is, like, 40 or 50 scores on that test.

7         And the first thing is, there are nine validity scale

8    tests to tell you that when the person took the test, were they

9    being honest, were they being forthright?  Were they just half

10   the time paying attention and half the time not?  Like some

11   teenagers, they just answer randomly.  And so on.

12        The test administration was valid.  So we've got good

13   validity.  And the findings are that there is no indication of

14   attempts to exaggerate symptoms or outright fake, and, in fact,

15   clear indication, he goes the opposite way on this test as well,

16   he minimizes everything.

17        When I administered this in July, the clinical scales

18   were very low.  There was not any indication of anxiety,

19   depression, personality problems.  Everything was within normal

20   limits, but they were kind of under the surface.  There were some

21   things that looked like they could develop.

22        And the testing indicated he was basically a quiet, shy

23   individual, and, again, withholds expression of problems and

24   worries.  There was some underlying issue of morbidity, some

25   thinking about death, which a lot of people think about that from

1   time to time.  But it was nothing at the level of clinical

2   significance.  Nothing that said he needed treatment.  It was all

3   kind of like there are some things here that could develop, but

4   are not at a significant level at this point.

5            So that's basically what I found on all of the testing.

6   Q.   I skipped over perhaps one or two tests.  The Incomplete

7   Sentence Blank, what did you find from that test?

8   A.   I already answered that.

9   Q.   All right.  And in addition to the testing that you have

10  performed here, did you do an interview or attempt to obtain a

11  comprehensive history?

12  A.   Yes.

13  Q.   All right.  Why don't you relate some of the salient points

14  to the jury with regard to the history that you took.

15  A.   Okay.  Now, this is all in July.  Okay?  July 17th, July 20,

16  2009.  He reported to me that he had been working two jobs.  He

17  had gone through Katrina.  His house had been damaged.  He lived

18  with his mother.  And then he came back to New Orleans in about

19  January, I think, of 2006 or December of 2009 (sic), a few months

20  after Katrina, and he returned to work.

21            He was then living in -- because he worked for the City

22  of New Orleans, he was entitled to live on a boat, I think it was

23  a cruise boat that they had for people.  And he lived on that

24  for, I think, about six months, as I recollect.

25            And then he moved into a FEMA trailer.  And he said he

1   was -- I remember him telling me he was pretty anxious to get

2   back because when I finished the exam, it made sense that going

3   back to work was a way for him to cope with difficulties.

4            And he said when he moved in the trailer after, I

5   guess, a couple of months, he started having some problems.  He

6   said he had coughing, blood in his mucous, headaches.  His eyes

7   were irritated.  He started having some rashes on the back of his

8   neck and his elbows.  And he had some trouble breathing.

9            And he said, "I started getting sick more often.  I

10  would go to the doctor.  He would give me medicine."  He was

11  taking more and more over-the-counter medication and waking up at

12  night.  He was generally having a variety of problems with

13  breathing and things like that.

14           Then we talked about a more -- a long-term history from

15  the time he was a little child, and he was about two or three

16  years old when hearing difficulties were diagnosed, and it turned

17  out that he had became deaf in, I think his right ear, and he was

18  prescribed a hearing aid in his left ear.  And then had some

19  speech therapy and things like that early in life to correct

20  that.

21           Then, let's see, as a youngster he said there wasn't

22  any kind of abuse in his life.  He said he was playful and

23  active.  And he was raised in a single-parent home with his

24  mother and his sister, and he saw his father on weekends.  His

25  parents were, I think, separated and possibly divorced at that

1    point.

2            He went through high school.  He said he was a good

3    student.  Graduated from high school, and then enrolled at

4    Southern University in New Orleans, and he went to school for

5    one semester, then later transferred to Delgado College and then

6    quit school and started working.  And he held different jobs.

7    And eventually, began working at the Hyatt corporation, worked

8    for the City of New Orleans, and he does work dealing with

9    air-conditioning and things like that in those jobs.

10           He was generally healthy in his life.  He had went to

11   the doctor for things, but, I mean, he didn't have any major

12   surgeries to speak of.

13           In his mid twenties, he had a brief exposure to

14   chlorine gas and I think it was from a pail that a top was off,

15   and he inhaled some gas, went to hospital, and I think after a

16   couple of days, that cleared up.  It was a brief exposure to

17   that.  He said he had no further problems with that.

18           Minimal things like he had a minor automobile accident.

19   He had physical therapy and that went away.

20           He started seeing his doctors at the -- what's called

21   the Uptown Nephrology Clinic.  I think Dr. Field was his doctor

22   and later Dr. Cruz.  And that's who he saw starting in about

23   2000.  And he described that he would go to the doctor when he

24   would get sick and the doctor would give him medicine and it

25   would take care of it.

1        And he had a number of ailments.  There was a concern
2   about bone density that his doctor had, that he was starting to
3   lose density in his bones.  You could have fractures and things
4   like that, I understand.  And he also had periodic treatment for
5   depression, and he had other ailments that were clear -- that had
6   been taken care of.
7        So as I mentioned earlier, he would go to the doctor
8   and he would take care of this stuff.
9        Then we talked about Katrina, what happened with
10  Katrina.  And he relocated -- lived on the Westbank briefly and
11  then he and his mother and some family went to Houston and that's
12  where his mother still lives.  And he came back, as I mentioned
13  earlier, and went back to work.
14       I found, as I mentioned earlier, that he had some mild
15  problems that he reported to me with breathing and things like
16  that, but he would generally get treatment and it would go away.
17       That's basically -- there is other historical
18  information.
19  Q.  Let's start talking about the trailer.  What did he tell you
20  about life in the trailer and any of -- his perception of his
21  experience in that trailer?
22       MR. BONE:  Your Honor, I think he just discussed that as
23  part of his salient points that he was discussing in the history
24  that he took.
25       THE COURT:  Anything else that he wants to add to it,

1    I'll allow him to answer, but I think he's been pretty complete

2    in his answer, so we don't need to go back through something that

3    you've already testified to, Doctor.

4              THE WITNESS:  Okay.

5                                  EXAMINATION

6    BY MR. REICH:

7    Q.   Any particular ailments or physical issues that you looked

8    at in connection with Mr. Wright living in the trailer?

9    A.   Well, as I said, he had some breathing difficulties.  He had

10   irritation of his eyes or allergic reactions and sinus kind of

11   things.  All of those sorts of things were the medical problems

12   he described.

13   Q.   Did he express any particular types of fears to you other

14   than the fear of death which you had mentioned earlier?  Any

15   anxieties or fears associated with anything that had to do with

16   the trailer?

17             MR. BONE:  Objection, Your Honor.  That was leading.

18             THE COURT:  No, I'm going to overrule it.

19             THE WITNESS:  Well, in that examination in July, there

20   weren't a lot of problems.  He said that he had these

21   difficulties, they worried him a little bit, but he kind of

22   pushed all of those worries down.  And he was functioning, you

23   know, not too badly.  I mean, he was -- nothing that I thought he

24   needed a lot of treatment for.  There were other problems that

25   came and went in his past, but he was -- you know, he was going

1    to work every day and was coping.

2    Q.   You saw him again in September.

3    A.   Yes.

4    Q.   Had things changed to any degree?

5    A.   Yes.

6    Q.   Can you explain what changed and why?

7    A.   Okay.  Because I saw him in connection with a lawsuit, I

8    knew there were deadlines.  I thought I was finished in July

9    because the deadline, I think, was late July, early August.

10        He called me and said that he wanted to come and see

11   me, and he was upset.  And I said, "Okay.  I can see you," but I

12   called the attorneys and I said, "I don't know if I can write

13   another report because the deadline is passed."  And they said,

14   "Well, it has been extended."

15        So I saw him and wrote another report.  I saw him on

16   September 23, 2009.

17        What had happened was that in late July, I guess a week

18   or two after I had seen him, his ear, nose and throat doctor had

19   discovered a tumor at the base of his tongue, and had tried to

20   excise it or remove it and had taken some samples for the

21   pathologist to look at.  And also, he had been diagnosed a couple

22   of months before I saw him in July with asthma.  That was the

23   first time in his life he had been diagnosed with that.

24        Well, these two issues collided and really crystallized

25   a lot of underlying things that I had seen earlier, but it kind

1  of -- he was now saying, you know, "I was exposed to

2  formaldehyde.  What was it doing to me?  What is it doing to me?

3  How come I have this tumor?"  And his doctor told -- he said that

4  his doctor had told him -- Dr. Spector had told him that he was

5  surprised that there was bleeding and blood in his mucous for, I

6  think, three years.

7          So he was worried about all of these things, and the

8  level of distress was significantly higher, and it appeared to me

9  that these worries about these health issues of the tumor, the

10  diagnosis of asthma, and the contemplating "was I exposed to a

11  toxin that can cause cancer for a couple of years," all of that

12  just crystallized a lot of worries.  He couldn't contain them

13  anymore, and they were just flowing out.

14          And so most of that session was spent calming him down,

15  trying to reduce his distress and his anxiety.

16  Q.   Have you reached a diagnosis for Mr. Wright based upon the

17  test data that you've acquired both in July of 2009 and then with

18  the readministration of certain tests in September as well as the

19  clinical history that you've taken?

20  A.   Yes.

21  Q.   And what diagnosis do you offer with respect to Mr. Wright?

22  A.   Well, the primary thing is an anxiety disorder that is

23  connected with breathing problems or pulmonary in nature.  And

24  there is also some depression.  But the primary thing is anxiety.

25  Q.   What is an anxiety disorder and what does it do to a person?

1  A.   Okay.  Well, anxiety is a commonly experienced phenomenon

2  for everybody.  It's a feeling state.  It's general arousal.  You

3  get anxious and distressed.  And it can interfere with clear

4  thinking, it can interfere with physical functioning.  Anxiety is

5  an arousal.  We've all experienced it at one time or another.

6          But with a clinical diagnosis, it has to reach a

7  certain threshold beyond which most people would experience, and

8  it has to persist, not just a momentary thing.

9  Q.   Is the diagnosis that you have rendered based upon

10 reasonable psychological probability?

11 A.   Yes.

12 Q.   And is the diagnosis a consequence in whole or in part from

13 the experience of living in the trailer?

14         MR. BONE:  Objection, Your Honor.  I don't believe

15 that's contained within his report.

16         MR. REICH:  It's implicit in the report, Your Honor.

17         THE COURT:  Why don't you all approach.  Bring the

18 report.

19         (WHEREUPON, at this point in the proceedings, a

20 conference was held at the bench.)

21         THE COURT:  I thought it was in the report.  I

22 understood the report to be inclusive of that question.  It

23 didn't surprise me that he asked it.  Now you made the objection,

24 so...

25         MR. REICH:  Your Honor, there are examples, I guess,

1  throughout the report, but I'm looking now at the September 24,

2  2009, report, the third complete paragraph, Page 3.

3             THE COURT:  I'm looking at Page 4.  Page 3?

4             MR. REICH:  Page 3 here.

5             THE COURT:  Not so loud.

6             MR. REICH:  "During the one year following his moving

7  out of the trailer in July 2008, he pondered any adverse effects

8  on his health from living in the trailer for over two years."

9             THE COURT:  I understood the question to be appropriate

10 based on my reading of the report, so I'm going to overrule it.

11            MR. CHEATWOOD:  Your Honor, if I may, it doesn't say

12 anything in the report that his anxiety is based on living in the

13 trailer.  What it says is that his anxiety is based on his

14 perceived pulmonary problems and it talks about his bone density

15 issues.  Never does that conclusion about living in the trailer

16 come out.  I agree that he can reference what he said about when

17 he was living in the trailer, but to make that causal connection

18 doesn't do it in the report.  Nowhere does he say -- and if you

19 look at his axis, he says -- which is on Page 4, what he says is

20 that his anxiety disorder is due to pulmonary problems.  It

21 doesn't say anything about the trailer.  And you recall he had

22 pulmonary problems both before and after the trailer.

23            So that's the significance of not allowing him to

24 make that causal connection because it's not in here.

25            THE COURT:  I think it's a close call, but I'm going to

1  let him go ahead and ask it and maybe the doctor's answer will be

2  along the lines you suggest, and I'll certainly let you

3  cross-examine him on it.  I think it's a close call and I think

4  it is within the reasonable reading of the report.

5        (WHEREUPON, at this point in the proceedings, the bench

6  conference was concluded.)

7        (WHEREUPON, at this point in the proceedings, there was

8  a conference held at the bench outside the presence of the court

9  reporter.)

10                 EXAMINATION

11  BY MR. REICH:

12  Q.   Do you recall the question?

13  A.   No.

14  Q.   We'll see if I do.

15        MR. REICH:  Your Honor, may I have the reporter read it

16  back?  I apologize for doing this.

17        THE COURT REPORTER:  "Question:  And is the diagnosis a

18  consequence in whole or in part from the experience of living in

19  the trailer?"

20        THE WITNESS:  Yes.  In part, yes.

21                 EXAMINATION

22  BY MR. REICH:

23  Q.   And can you explain or elaborate on your answer why the

24  trailer experience contributed to his anxiety?

25  A.   Okay.  I mentioned there were medical issues, but the other

1  thing is that he went -- he was really intense in that September

2  examination about was I cooking the formaldehyde, what was going

3  on in my mind?  I was living there for two years.  What was it

4  doing to me?  What has this formaldehyde done to me and what will

5  it do in the future?  Will it start to -- my body start breaking

6  down or will I be 45 or 50 and have all kinds of problems?  That

7  concern about future health issues was intense.  And he

8  attributed it to living in the trailer exposed to formaldehyde.

9  Q.    And is your response based upon reasonable psychological

10  probability or certainty?

11  A.    Yes.

12  Q.    Now, did you develop a diagnosis using what is known as *DSM*

13  criteria and the five axes?

14  A.    Yes.

15  Q.    And could you briefly explain that to the jury.  I don't

16  want to go into great depth about it, but can you explain the

17  different diagnoses that you rendered on these axes and how that

18  is used by psychologists.

19  A.    Okay.  Prior to 1980, about 1980, a clinician would just

20  give a diagnosis.  The person is depressed, they are anxious,

21  whatever.  Starting at about that point in time, the process of

22  diagnosing somebody was broken up into five elements so that it

23  allowed the clinician to give more information.  And the first --

24  we call them five axes.

25          Axis I is the actual diagnosis, like depression or

1    anxiety.

2          Axis II is whether or not there is a coexisting

3    personality disorder, not just personality problems, but at the

4    level of a personality disorder.

5          And then the third area is whether or not there are any

6    coexisting or existing medical issues within which that diagnosis

7    of depression, anxiety, whatever, occurs.

8          And the fourth axis is what kind of things are

9    affecting the person and how is this set of problems interfering

10   with their life?  Are they having social problems, academic,

11   work, marriage, whatever.

12         And then the last axis is a global adaptive

13   functioning.  There is a scale from zero to a hundred, and you

14   make a rating of how the person is doing at this time.

15         So it's all kind of a description of that individual

16   more than just they are depressed or they are anxious or

17   whatever.

18         And in my diagnosis in July -- let's see, in July, I

19   diagnosed him as having an anxiety disorder due to pulmonary

20   problems.  No coexisting personality disorder.  And I thought the

21   underlying medical issues at that point were the breathing

22   difficulties that we talked about.  And he had a problem with

23   bone density that his doctor was treating him for, concerned

24   about long-term effects.

25         And he was worried about long-term health, but the

 1    global adaptive functioning was a score of 62, which is pretty

 2    good.  That's, you know, some minor problems, but generally

 3    functioning pretty well, working and so on.

 4            When I re-examined him then in September, again, the

 5    same anxiety disorder.  I did see that depression had reoccurred

 6    and I diagnosed a depressive disorder.  Still no personality

 7    disorder.  The medical issues for this patient at that time were

 8    continuing breathing problems, the bone density, and ear, nose

 9    and throat kinds of problems, all based on history because I'm

10    not a physician, but based on the history.

11            The fourth axis, what was really worrying him was a

12    continued worry about long-term health that I mentioned.  And his

13    current global adaptive functioning had dropped down to 55 where

14    he was still working, but having a lot of difficulties.

15            That's basically what the diagnoses are.

16    Q.   Does Mr. Wright, in your opinion, still require therapy or

17    treatment as a consequence of his experiences in the trailer?

18    A.   Yes.

19    Q.   And what type of treatment would you recommend?

20    A.   Well, in July, I said it would be prudent to see him for

21    some counseling, whoever is doing that.  Consult with his medical

22    doctors.  Spread it out over a period of a couple of years.  But

23    basically about a year of counseling and consultation, and

24    probably another psychological evaluation at some point in the

25    future a year or two down the road just to make sure the

1  treatment plan is on track.

2         And then when I saw him in September and things had

3  gotten worse, I recommended more of that, a couple years of

4  treatment, and continued consultation with the medical doctors,

5  and some future reevaluations.

6         So I thought the amount of treatment needed went up

7  after September.

8  Q.   Are you familiar with the reasonable and customary costs of

9  the type of psychological therapy that you and others similarly

10 situated offer in New Orleans, Louisiana?

11 A.   Well, there is a range, yes.

12 Q.   And what is the range for the type of therapy services that

13 you provide or others who are --

14 A.   Well, of the psychologists that I know who are, you know,

15 25, 30 years of experience or more, charge anywhere from $200 to

16 $300 a session.  The people who are just starting out, you

17 probably could expect to pay anywhere from 100 to 150 or 80 to

18 150, something like that.

19 Q.   Did you calculate a cost of future treatment for Mr. Wright?

20 I'm talking about psychological therapy.

21 A.   Yes.

22 Q.   And what is the cost that you reached?

23 A.   Okay.  In July, I estimated the total cost, with all of the

24 consultation and the treatment and all of that, would probably be

25 about 24, $25,000.  And then in September, I estimated the whole

1   cost would probably end up being around 65 thousand by the time

2   it was all done.

3   Q.   And is the increased cost based upon the additional findings

4   that you made when you did further evaluations?

5   A.   Yes.  Because these things are going to trail out in the

6   future.

7   Q.   And do you believe that future treatment is reasonable and

8   necessary for the health and well-being of Mr. Wright?

9   A.   Oh, yes.

10          MR. REICH:  I pass the witness, Your Honor.

11          THE COURT:  Thank you.

12             Cross?

13          MR. BONE:  Yes, Your Honor.

14                         CROSS-EXAMINATION

15   BY MR. BONE:

16   Q.   Dr. Shwery, good morning.

17   A.   Good morning.

18   Q.   We met before when I took your deposition, sir; isn't that

19   right?

20   A.   Yes, I recall.

21   Q.   Now, you're not a doctor, as you said; is that right?

22   You're not a medical doctor?

23   A.   Not a physician.

24   Q.   Not a physician, correct?

25   A.   Yes.

1  Q.   And you cannot prescribe medication that would affect the

2  mood of Mr. Wright, correct?

3  A.   I cannot.

4  Q.   And you were not initially contacted by Mr. Wright, were

5  you?

6  A.   I'm sorry?

7  Q.   You were not initially contacted by Mr. Wright directly to

8  obtain your services?

9  A.   That's correct.  In July, I was called by an attorney.

10 Q.   And do you know which attorney called you?

11 A.   I believe it was Ms. Wallace, I think.  Cynthia Wallace.

12 Q.   Associated with these attorneys to my right, correct?

13 A.   I've never met half of them, but, yes.

14 Q.   Now, you've talked a little bit about history, and the

15 history that you get from a patient is important, isn't it?

16 A.   Sure.

17 Q.   And the history that you took from Lyndon Wright in July was

18 the only basis upon which you founded your opinions in July,

19 correct?

20 A.   Well, I had some background information before that.

21 Q.   You hadn't reviewed Dr. Field's records when you offered

22 your July report, had you, sir?

23 A.   Actually, I did have them.

24 Q.   Had you ever spoken with Dr. Field?

25 A.   I have not.

1   Q.   Now, Mr. Wright told you that he had never been impotent

2   before living in this travel trailer; isn't that true?

3   A.   Yes, he did say that.

4   Q.   And you know today that that is an incorrect statement?

5   A.   I do.

6   Q.   He had also told you that he had not had problems with

7   depression prior to living in this travel trailer; isn't that

8   correct?

9   A.   No, I think he said he had problems in 2002 or 2000 and he

10  was prescribed medication.

11  Q.   Were you present when Dr. Field testified?

12  A.   No.

13  Q.   I want you to assume, Doctor, that Dr. Field testified that

14  Mr. Wright had ongoing depression between the years of 2000 and

15  2005.  If Mr. Wright -- based upon what Mr. Wright represented to

16  you, is there any inaccuracies between the two?

17          MR. REICH:  Objection.  Mischaracterization of the

18  testimony of Dr. Field.

19          THE COURT:  I'm going to overrule.

20          THE WITNESS:  No, he told me he had been treated by

21  medication from Dr. Field.  So it was consistent.

22                          EXAMINATION

23  BY MR. BONE:

24  Q.   Now, you mentioned when you were asked by Mr. Reich that all

25  of these symptoms came on within the first couple of months of

1  him moving into the trailer?

2  A.   That's when he said they started.

3  Q.   All right.  And let's clarify that, because in your report

4  that's not exactly what you say, is it?

5  A.   Okay.  Let me look.  Is there a page you're looking at?

6  Q.   Yes, sir.  Let's look at your July report, Page 4, please.

7  A.   Okay.

8  Q.   And, in fact, what Mr. Reich told you was that he didn't

9  have problems with his eyes for the first two months that he

10  lived in this trailer; isn't that right?

11  A.   Let's see.  He said that after two months, he started having

12  difficulties.

13  Q.   Right.  And let's be clear -- you didn't distinguish this,

14  so I want to be clear.  He told you he didn't have problems with

15  any blood in his mucous until more than nine months after moving

16  into the trailer; isn't that correct?

17  A.   I think that's right.  I don't recall exactly the sequence

18  of his medical problems.  I understood more generally that it was

19  after a couple months, things started and eventually included

20  that long list that I gave.

21  Q.   Right.  And so if Mr. Wright had testified before this jury,

22  were you present when he testified?

23  A.   No.

24  Q.   If Mr. Wright testified before this jury that the first day

25  he walked into that trailer he had problems with his eyes, that's

1    inconsistent with what he told you; isn't that right?

2             MR. REICH:  Objection, Your Honor.

3             THE COURT:  I'm going to sustain.

4                              EXAMINATION

5    BY MR. BONE:

6    Q.   Now, when you first saw Mr. Wright in July, you administered

7    all of these tests, correct?

8    A.   That's correct.

9    Q.   And one of those tests or some of those tests when they are

10   administered, Mr. Wright is by himself taking the test, correct?

11   A.   He took them all by himself, each of them.

12   Q.   And for example, the BDI-2, which test was that?

13   A.   That's the Beck Depression Inventory.

14   Q.   And Mr. Wright was by himself when he took that test, right?

15   A.   He was.

16   Q.   And when he took that test, the results of that test relayed

17   that as of July 2009, he indicated that, "I have as much energy

18   as ever," correct?

19   A.   Let me look at the actual test.

20   Q.   Please do.

21   A.   Which number?  Are you on a particular number?

22   Q.   Yes, sir, I am on Number 15.

23   A.   Oh, yes, he endorsed that item.  "I have as much energy as

24   ever."

25   Q.   He said "I have not experienced any change in my sleeping

1    pattern"; is that correct?

2    A.    Correct.

3    Q.    "I have not experienced any change in my appetite," correct?

4    A.    Yes.

5    Q.    Number 20, "I am no more tired or fatigued than usual."

6    That's what he represented to you in July of 2009, correct?

7    A.    Absolutely correct.  Do you want me to explain that?

8    Q.    That's what he related to you, sir?

9    A.    Do you want me to explain the testing?

10           THE COURT:  Well, just go ahead.

11                         EXAMINATION

12   BY MR. BONE:

13   Q.    I believe you explained the testing with Mr. Reich.

14           THE COURT:  Just go ahead and answer his questions.  If

15   there are any questions on redirect, they will cover it.

16                         EXAMINATION

17   BY MR. BONE:

18   Q.    Now, when you first saw Mr. Wright in July of 2009, you

19   concluded that Mr. Wright had been psychologically healthy and

20   well-adjusted during the course of his life?

21   A.    In the main, yes.

22   Q.    And five years of being treated for depression which

23   preceded his stay in the trailer, you believe evidenced good

24   psychological health?

25           MR. REICH:  Objection.  Mischaracterization of the

1    testimony, Your Honor.

2           THE COURT:  Well, go ahead and rephrase it.  Go ahead

3    and rephrase it.  I'll sustain.

4                          EXAMINATION

5    BY MR. BONE:

6    Q.   Doctor, if he had been treated for depression over the

7    course of five years prior to living in this trailer, would that

8    suggest to you that he had good psychological health?

9           MR. REICH:  Same objection.

10          THE COURT:  I'll overrule.  I think that's a fair

11   question.

12          THE WITNESS:  Can I answer it?

13          THE COURT:  Yes.  Go ahead and answer.

14          THE WITNESS:  If he had been treated continuously and

15   was depressed continuously, that would be one thing, but to have

16   periodic instances of depression and get medication and it goes

17   down, he kept working, his life went on.  So in general, he

18   didn't get any mental health treatment.  He apparently didn't

19   need that.  But he took medication, he read self-help books and

20   tried to make his life better.  That's -- and you know, it's like

21   a lot of people have difficulties like that, but we wouldn't call

22   them mentally ill.  In the main, he's doing okay.

23                          EXAMINATION

24   BY MR. BONE:

25   Q.   Are you calling Mr. Wright mentally ill today?

1   A.   Well, it is -- anxiety is a feature of mental health or

2   mental illness problems, but it's a wide spectrum all the way

3   from brief adjustment difficulties to being totally disabled

4   mentally.  So in that spectrum, yes, I guess by definition,

5   although I wouldn't describe him as being mentally ill.  He has

6   some emotional problems and some anxiety, but it sounds more

7   sinister to say he's mentally ill.

8   Q.   And he had emotional problems before he lived in the

9   trailer, correct?

10  A.   Yes, he had recurrent periodic depression.

11  Q.   Now, you've mentioned these tests.  Some of these tests have

12  validity scales and some of those tests do not, correct?

13  A.   Correct.

14  Q.   And would you --

15        MR. REICH:  May I approach, Your Honor?

16        THE COURT:  Yes.

17                              EXAMINATION

18  BY MR. BONE:

19  Q.   And can you tell me, Dr. Shwery, which of these tests have

20  validity scales?

21  A.   Numbers 5 and 6.

22  Q.   So I'm going to put a V next to these for validity scales.

23        Now, when you first examined Mr. Wright in July, you

24  administered all of those tests, correct?

25  A.   I did.

1  Q.   When you evaluated Mr. Wright in September, you didn't

2  administer the tests that had validity scales, did you?

3  A.   No.

4  Q.   Now, you mentioned some things that had changed between the

5  time you saw Mr. Wright in July and the time you saw him in

6  September; is that correct?

7  A.   Yes.

8  Q.   And you mentioned that he had seen Dr. Spector, correct?

9  A.   I did.

10 Q.   But you didn't mention that he had come to see you testify

11 in court a week before he came to see you in September, correct?

12 A.   Correct.

13 Q.   And at the time you evaluated him, you didn't know that he

14 had come to watch you testify, correct?

15 A.   I did not.

16 Q.   And you testified in a case involving similar claims of

17 mental issues, correct?

18      MR. REICH:  I'm going to object, Your Honor.  I think

19 that's a mischaracterization of what transpired.  And there is

20 also an order from this Court on these kinds of issues.

21      THE COURT:  Counsel is going to abide by the order, I'm

22 sure.  I don't think the question runs a foul of that.  I don't

23 think it's an unfair question.  Obviously, the doctor can correct

24 it if the question is not -- he's asking him whether it's correct

25 or not.  So he can respond to that.

1        THE WITNESS:  That's correct.

2                        EXAMINATION

3    BY MR. BONE:

4    Q.   And when Mr. Wright came to see you in September, he never

5    told you about that experience, did he?

6    A.   No.

7    Q.   Now, one of the things that we've discussed was

8    Dr. Spector's treatment of Mr. Wright between your July visit and

9    September 2009 visit.  Did you ever talk to Dr. Spector before

10   issuing your report?

11   A.   I did not.

12   Q.   Did you review Dr. Spector's report?

13   A.   No.

14   Q.   Now --

15   A.   Excuse me.  I did later.

16   Q.   But not in issuing your report in this matter?

17   A.   After I did my report, correct.

18   Q.   Now, with respect to the treatment given by Dr. Spector, you

19   would defer to him on the causation of the medical issues,

20   correct?

21   A.   Oh, absolutely.  Of course.

22   Q.   Because you're not a physician.  You're not here saying that

23   any of these problems that Mr. Wright has described to you are

24   caused by exposure to formaldehyde, are you?

25   A.   Correct.

1  Q.   And I take it, then, Dr. Spector has never told you that any

2  of these problems are caused by exposure to formaldehyde, has he?

3  A.   I haven't talked to him.

4  Q.   Now, is it your testimony, Doctor, that the issues -- the

5  health issues that Mr. Wright has or has experienced are the

6  reason for his anxiety disorder?

7  A.   Yes.

8  Q.   And if those medical issues are not related to formaldehyde,

9  would you say that the need for medical treatment or psychiatric

10  treatment is also not related to exposure to formaldehyde?

11  A.   Well, I can't make the link physically or medically to

12  formaldehyde.  I'm not a medical doctor.  What I can tell you is

13  what's in his mind, that he worries about all of that.  That's

14  what's cooking in his mind.  It's related in his mind.

15  Q.   But just to be clear, the medical issues are what caused

16  Mr. Wright's anxiety, correct?

17  A.   Well, there were really four things.  Do you want me to --

18  Q.   Well, let's be clear.  What you told us was he told you you

19  had a diagnosis of asthma, correct?

20  A.   Correct.

21  Q.   And that actually predated your July visit; isn't that

22  correct?

23  A.   That's correct.

24  Q.   So he knew about the asthma when he came to see you in July

25  and had no significant psychological problem?

1    A.    That's absolutely correct.

2    Q.    And the only thing that transpired between the time you saw

3    him in July and the time you saw him in September was he had the

4    biopsy, correct?

5    A.    Yes.

6    Q.    And so that relates to the neuroma, correct?

7    A.    Yes.

8    Q.    And I want you to assume that there has been testimony in

9    this case, and the jury can consider the testimony.  If the

10   testimony were that the neuroma is not causally related to

11   formaldehyde, then the need for Mr. Wright's future psychiatric

12   treatment would not be related to exposure to formaldehyde?

13          MR. REICH:  Objection, Your Honor.  I believe that calls

14   for a legal conclusion.

15          THE COURT:  Well, I have some concerns about that

16   question as well.  I'm going to sustain it.  If you want to try

17   to rephrase, maybe you can do that.

18                            EXAMINATION

19   BY MR. BONE:

20   Q.    Doctor, if the medical issues are what's driving his need

21   for future care, in your opinion, if those medical issues are not

22   causally related to exposure to formaldehyde, then the need for

23   future psychological care would not be causally related to

24   exposure to formaldehyde?

25          MR. REICH:  Same objection, Your Honor.

1      THE COURT:  No, I think that's a fair question.  I

2  overrule it.

3      THE WITNESS:  As I said, I can't link it physically or

4  medically, but what's going on in this person's mind is that he

5  is worried that I lived in that trailer for two years.  I know

6  that it had high levels of formaldehyde.  It has caused me to

7  have this tumor on my tongue.  I was also diagnosed recently with

8  asthma.  I've had this bleeding.  What's going on?  And that's

9  what's causing him to have psychological problems and that's why

10  he needs treatment.  But his doctor told him it's not cancerous,

11  that tumor, but that didn't take the anxiety away.  I can't tell

12  you medically, but even if you tell a person, in this case they

13  did, "It's not cancer," that doesn't take away all of the

14  distress.  He's still worried about long-term health issues from

15  living in the trailer.

16                           EXAMINATION

17  BY MR. BONE:

18  Q.   And the long-term health issues are what's driving the

19  issue, correct?

20  A.   It's a collection of them, yes.

21  Q.   And so in answer to my question, if the medical evidence in

22  this case establishes that his alleged exposure to formaldehyde

23  did not cause any of his medical problems, is it your opinion

24  that the need for future care would not be related to exposure to

25  formaldehyde?

 1          MR. REICH:  Your Honor, I believe the question calls for

 2    a legal conclusion.

 3          THE COURT:  I'm going to let him answer it, if he can.

 4    I think he can answer.

 5          THE WITNESS:  Well, I think that's what's going to be

 6    decided here.  It beats me what's going to be decided.

 7               I can't tell you that there was formaldehyde, that

 8    it was at significant levels to cause a health risk.  He believes

 9    that.  That's what he's worried about.  But in terms of a

10    connection, that's for you folks to decide, not me.  He still

11    needs the treatment.  It still worries him.

12                              EXAMINATION

13    BY MR. BONE:

14    Q.   But the need for treatment, Doctor, is driven by the medical

15    issues, correct?

16    A.   Yeah.

17          MR. BONE:  That's it.  Thank you, Doctor.

18          THE COURT:  Mr. Cheatwood?

19                          CROSS-EXAMINATION

20    BY MR. CHEATWOOD:

21    Q.   Good morning, Dr. Shwery, I'm Roy Cheatwood.  Nice to see

22    you, sir.

23    A.   Good morning.

24    Q.   Doctor, just a couple of things.  And I shouldn't say that

25    because the judge might try to hold me to a couple of things.

1        I have a number of questions for you.

2    A.   I've heard that question many times.

3    Q.   And it's probably never been true.

4        One thing I want to talk to you about is when

5    Mr. Wright was giving you his history, that means you sit down

6    and he tells you things and you write them down and you have to

7    rely on what the patient tells you; is that correct?

8    A.   That's correct.

9    Q.   And he told you that after this lawsuit was filed?

10   A.   That's correct.

11   Q.   And, in fact, he was referred to you by his lawyers?

12   A.   He was.

13   Q.   Okay.  And you don't have any real way to verify all the

14   things he tells you, other than looking at documents from prior

15   records and those kinds of things?

16   A.   Yeah.  And we do other things like --

17   Q.   Yeah.  Like the validity test and those kind of things, but

18   I'm talking about the specific facts, you have to sort of accept

19   them from him?

20   A.   Yeah.  And they have to be consistent with the history from

21   other sources.

22   Q.   Right.  Now, there was some talk about what Mr. Wright told

23   you about his difficulties in the trailer initially, and I'm now

24   talking about in the first visit, correct?  I'm talking about the

25   first visit.

1  A.    The first visit, yes.  Okay.

2  Q.    Right.  Do you recall Mr. Wright telling you that his

3  initial difficulties in the trailer included difficulties with a

4  stale smell?

5  A.    Which page is that on?

6  Q.    I think that's on Page 3 of the first report, sir.

7  A.    All right.  Let me look.  I vaguely recall that he said

8  that.  Let's see.  You're at the bottom of the page?

9  Q.    I'm trying to find it myself.

10  A.    Oh, okay.

11          THE COURT:  The bottom of Page 3.

12          THE WITNESS:  The bottom of Page 3.

13          THE COURT:  Last line.

14          MR. CHEATWOOD:  That's it.  Thank you, Judge.

15                          EXAMINATION

16  BY MR. CHEATWOOD:

17  Q.    The stale smell in the trailer, right?

18  A.    He did.  He said that.

19  Q.    He didn't say it smelled like something had died in the

20  trailer, he said a smell, correct?

21  A.    That's correct.

22  Q.    Now, when Mr. Bone was questioning you, I think the question

23  was asked about the -- when he told you he developed the

24  depression after nine to twelve months in the trailer.  Do you

25  recall that?  And you weren't really sure.  I want to refer you

1  to Page 4 of that first report, and I think it's in the first

2  paragraph.

3  A.   Oh, it's in the second paragraph.

4  Q.   The first sentence in the second paragraph.

5  A.   Oh, yes.  Okay.  Yeah, he said after nine to twelve months

6  he started getting depressed.

7  Q.   Right.  I just wanted to make sure we had that.

8          Now, as a result of that first examination, his bone

9  density problems were occupying a larger focus in his worries and

10 distress, correct?

11 A.   Well, it was the one thing that I found in his history that

12 I thought he needed to keep going to his doctor for.  It wasn't

13 that -- it wasn't anything like the intensity of things I found

14 in September.  But I mentioned it because it was something from

15 the past and his doctor had been treating him.

16 Q.   But it was of particular concern to him in connection with

17 his concern and anxiety and distress, the bone density issues

18 correct, sir?

19 A.   That's correct.

20 Q.   And further, I think he told you that he was afraid he might

21 pick something up and his arm would break?

22 A.   Yes.  That's correct.  He did say that.

23 Q.   Right.  And, in fact, when you talked about what his issues

24 were, the problems, he even told you that he was concerned about

25 becoming disabled and dependent on others for his welfare?

1    A.    That's correct.

2    Q.    Right.  And this osteoporosis, if I've said that right, or

3    bone density issues, and the issue with the tumor were the two

4    things that were of primary concern to him; isn't that correct?

5    In the first visit, now, I'm talking about still.

6    A.    No.  The tumor came up in the second visit.

7    Q.    You know what, you're correct.  Thank you for correcting me,

8    Doctor.  And I'm sorry.

9          So it was the bone density problem, was one of the

10   major concerns as a result of the first -- as a result of the

11   first visit, and, in fact, you even recommended that if it

12   continues to get worse, he may have to see somebody for pain

13   management, correct, sir?

14   A.    Yes.

15   Q.    Okay.  Now, I'm not going to go through everything that

16   Mr. Bone did with you, sir, but is it correct in connection

17   with -- and I think it's the MBMD test, which is the -- how do

18   you say that, Millon?

19   A.    Millon.

20   Q.    Millon test.  One of those stress moderators indicated that

21   he was preoccupied with his physical symptoms and he tended to

22   overreact to real changes and to exaggerate minor ailments; is

23   that correct, sir?

24   A.    There was a tendency for that, but it was below, it was

25   subclinical.  It wasn't at an elevated level.

1   Q.   Right.  Mr. Wright also told you that he was concerned --

2   and I'll let you tell us in which report -- he was concerned

3   about the chemicals that he was exposed to at work, isn't that

4   correct?

5   A.   Yes, that came up in that second visit.

6   Q.   Right.  And he also was concerned enough in connection with

7   the chemicals that he was exposed to at work, he wondered what

8   kind of impact they may have on his future health, correct, sir?

9   A.   He did.

10  Q.   Would you please pull up Exhibit 0565 -- and just to give

11  you some time -- that's the exhibit that shows the warnings in

12  the trailer.  And my question is, focus in on the bottom warning,

13  if you would, please.  Do you read that?  "This vehicle, like

14  other vehicles, may contain small amounts of one or more

15  substances that are known to the State of California to cause

16  cancer, birth defects, or other reproductive harm."

17          I want you to assume, Doctor, that there is testimony

18  that this is a permanent marker on the wall in the trailer right

19  above the stove, such that anytime anybody used the stove, they

20  would be looking at this marker if they just looked at the wall.

21  A.   Yes.

22  Q.   Mr. Wright never told you that there was a warning in the

23  trailer, that the trailer contained small amounts of stuff,

24  substances that were known to the State of California to cause

25  cancer, did he, sir?

1            MR. REICH:  Objection, Your Honor.  This really goes far

2    afield.  The witness is not a human factors expert, not a

3    warnings expert, and I just don't see the relevancy with a

4    clinical psychologist on the stand talking about Mr. Wright's

5    mental health status and issues of that nature.

6            THE COURT:  I'm going to sustain.  If you want to try to

7    reword it, but --

8            MR. CHEATWOOD:  I'll reword it.

9            THE COURT:  -- I tend to agree with the plaintiff's

10   counsel.

11                              EXAMINATION

12   BY MR. CHEATWOOD:

13   Q.   I'm not trying to suggest anything about the nature of the

14   warning.  All I'm saying to you, sir, is, Mr. Wright never told

15   you that there was any kind of information in the trailer that

16   could indicate that the trailer was manufactured out of

17   substances that could cause cancer, did he, sir?

18   A.   No.  We didn't talk about that.

19   Q.   Right.  And he sure never told you that the fact that there

20   was -- that there was something in the trailer that indicated

21   that the trailer could cause cancer, had in any way impacted his

22   anxieties, did he, sir?

23   A.   He did not.

24           MR. CHEATWOOD:  I don't have any further questions.

25           THE COURT:  Thank you.  Redirect.

1       MR. REICH:  Thank you, Your Honor.  May I have that

2   exhibit, please, back on the screen, please.

3                       REDIRECT EXAMINATION

4   BY MR. REICH:

5   Q.   Take a look at the bottom warning, the one in red.  Do you

6   see anything about formaldehyde in that warning?

7   A.   No.

8   Q.   Do you see anything indicating that formaldehyde is a known

9   human carcinogen?

10  A.   No.

11  Q.   Do you see anything that talks about respiratory ailments

12  that may result from exposure to formaldehyde?

13  A.   No.

14  Q.   Do you see any warnings about people who have prior

15  allergies or sensitivities may experience worse effects from

16  formaldehyde?

17          MR. BONE:  Objection, Your Honor.

18          THE COURT:  I'm going to let him go ahead and answer it.

19          THE WITNESS:  No.

20                          EXAMINATION

21  BY MR. REICH:

22  Q.   You were asked some questions about the first interview by

23  Mr. Bone, Forest River's lawyer.  And the question, I believe,

24  dealt with whether you were informed at that first visit about

25  Mr. Wright's -- and he used the word impotency.  Do you recall

1  that question?

2  A.   Yes.

3  Q.   Does Mr. Wright, to your knowledge, have impotency?

4  A.   Not that I'm aware of.

5  Q.   Is there a difference between something called erectile

6  dysfunction, which all of these TV ads deal with today, you get

7  bombarded by, and impotency?

8  A.   Yes.  But you're getting into a medical issue.  I'm not

9  comfortable talking about things outside my field.

10 Q.   Okay.  Now, you were asked some questions about the

11 validation of these various test results.

12 A.   Okay.

13 Q.   And you wanted to give an explanation earlier but really

14 didn't have an opportunity with respect to one of the Beck tests.

15 A.   Oh, yeah.

16 Q.   If, for example, Mr. Wright was feeling energetic on the

17 morning or the afternoon that he was taking the test, is that

18 necessarily reflective of his level of energy while he was living

19 in the trailer?

20 A.   No.  What I wanted to say is that, this test and the

21 instructions are pretty clear.

22 Q.   Now, which test are you talking about?

23 A.   The BDI-II, the depression test.  Let me talk about both,

24 anxiety and depression.  The anxiety test, you ask the person,

25 how much have you been bothered by these symptoms in the past one

1  week, because we know that anxiety can come on fairly quickly.

2  And the depression test, you're asked to identify the statement

3  that best describes how you've been feeling the past two weeks.

4  And it focuses specifically on that range of time.

5          That's why it's different from the administration in

6  July and then went up in September.  Now, that's a valuable asset

7  in some tests, to be focused in time.

8  Q.   So is it true that certain tests that you administered will

9  really determine the way a person is feeling around the time that

10  they are taking the test and will not necessarily be valid in

11  reflecting how that person felt on a particular issue,

12  historically, going back some time?

13  A.   Well, that's right.  Some tests you want stable, like an IQ

14  test.  You would expect if you gave it at age 20, if you repeat

15  it at age 40, you get about the same results.  That's important

16  to have information that is stable and consistent.

17          But with some issues, like the presence of

18  psychological symptoms and problems, you want that to be more

19  restricted to a small amount of time, because presumably if the

20  person has problems and you treat them and then you retest them,

21  that it ought to go down.  So you want -- the element of time is

22  important for different reasons, and we have tests that do both.

23  Q.   In addition to having tests that do both, you also are a

24  trained clinician and know how to take a history, correct?

25  A.   Yes.

1   Q.   And you integrate both the information from the history and

2   the test data to get a profile, a psychological profile of the

3   patient that you're examining, true?

4   A.   Yes.  Like in this case, I knew there had been depression in

5   the past, and I wanted to know is there any now, and in July

6   there wasn't any.

7   Q.   Now, you were asked a question about bone density issue,

8   which you reported in your July report.  Take a look at page 10,

9   the first paragraph.  Do you see a reference to bone density?

10  A.   Yes.

11  Q.   Could you read the sentence that begins with the bone

12  density issues.

13          MR. BONE:  Your Honor, I believe if he asks him a

14  question it's appropriate, but simply reading from the report

15  is --

16          MR. REICH:  I'm responding to the particular language

17  that he was referencing.  There's another section in the report.

18  It's just one sentence, Your Honor.

19          THE COURT:  I'm going to overrule.

20          MR. REICH:  Go ahead.

21          THE WITNESS:  "Bone density issues are particularly of

22  concern, as well as the continued blood in his mucous when he

23  coughs."

24                          EXAMINATION

25  BY MR. REICH:

1  Q.    Thank you.  Now, with respect to breathing issues which you

2  talked about extensively, was there any testing that you did that

3  gave you insight above and beyond what Mr. Wright told you, about

4  how the breathing issues impacted his level of anxiety?

5  A.    Well, the MBMD would have some information on that, and in

6  an indirect fashion the MMPI, because it deals with the

7  interplay, both of them would have some dealing with the

8  interplay between medical and psychological issues.

9  Q.    In addition to the validity scales and the scores on those

10  validity scales, which you've already discussed with the ladies

11  and gentlemen of the jury, were you able to determine consistency

12  between what was reported by Mr. Wright and what you actually saw

13  in the medical records?

14  A.    I'm not sure I understand the question.

15  Q.    Did you determine that there was consistency historically

16  between what you reviewed, the records that had been generated

17  over the years by his doctors, and the history, the oral

18  information that he gave you?

19  A.    Oh, from the history, not from the testing.

20          THE COURT:  One second.

21          MR. BONE:  I'm going to object.  It's vague, because

22  he's not specified what issues he's discussing and I think he's

23  already testified.

24          THE COURT:  Do you want to go ahead and testify?

25          MR. REICH:  Yes.

1       EXAMINATION

2 BY MR. REICH:

3 Q. For example, with respect to sinus conditions, inflamed

4 turbinates, discharges from the nose, et cetera, can you describe

5 the consistency or lack thereof between what you were told by

6 Mr. Wright and your review of the historical medical records?

7 A. Yes, with only one or two exceptions, it was generally

8 pretty consistent, what I read in all of the records and what I

9 heard and got from him directly.

10 Q. So did overall you find that Mr. Wright provided you with a

11 good history and told the truth as best he could?

12 A. Oh, yeah.  Every source of information about his being

13 honest and forthright and truthful was that he was.

14    MR. REICH:  I pass the witness, Your Honor.

15    THE COURT:  Thank you.  It is almost ten after 10:00.

16 You may step down.  It's about 10 after 10:00.  Let's go ahead

17 and take a short break.  We'll start-up again at 10:20 and work

18 up until the lunchtime.

19    THE COURT SECURITY OFFICER:  All rise.

20    (WHEREUPON, at this point in the proceedings, the jury

21 panel leaves the courtroom.)

22    THE COURT:  The next witness is going to be?

23    MR. GIEGER:  Dr. Thompson.

24    THE COURT:  He is here and ready?

25    MR. GIEGER:  Yes, Your Honor.

1          THE COURT:  If he can be up here at 10:20, we can go

2   ahead and take his testimony.  Is it likely that we can get his

3   testimony completed before the lunch hour?

4          MR. GIEGER:  Oh, unless there is a long cross.  You

5   won't hear a long direct from me.

6          THE COURT:  All right.  So we actually --

7          MR. GIEGER:  I anticipate, depending on the cross, this

8   witness will clearly be gone by noon.

9          THE COURT:  Pushing my luck, we might actually be able

10  to start the videotape, possibly, before the next witness's,

11  videotape, Polk?

12         MR. GIEGER:  Again, Judge, depending on cross, yeah.

13         THE COURT:  Good.  All right.  Thanks.  We'll start at

14  10:20.

15         (WHEREUPON, at this point in the proceedings, a brief

16  recess was taken.)

17         THE COURT SECURITY OFFICER:  All rise.

18         THE COURT:  Come on.  We've got to get our jury in.

19         MR. GIEGER:  The only question, Judge, was I'm sure I

20  have direct, Mr. Cheatwood will follow my direct, their cross, I

21  have redirect and then Mr. Cheatwood has redirect?

22         THE COURT:  Well, is this your witness?

23         MR. GIEGER:  It is my witness.

24         THE COURT:  I would prefer to wind up with your

25  redirect.

1          MR. GIEGER:  These are his questions, Judge.

2          MR. CHEATWOOD:  That was my question.  It would be very

3    brief, obviously, if I need it at all, but I just need to know if

4    I'm going to get a chance to come back.

5          THE COURT:  I would rather not.  I would rather go once

6    around and back to the party who called for redirect, who would

7    be Mr. Gieger.

8          MR. CHEATWOOD:  I understand, Judge.  And I'm going to

9    take that your desire is your ruling.  Because if we're doing

10   druthers, I'd druther come back.

11         THE COURT:  Fortunately for me, that's the way it works,

12   at least in these quarters, not everywhere.

13         MR. CHEATWOOD:  That's why I said I thought that was

14   what you meant.

15         THE COURT:  Right.

16         MR. WATTS:  Article 3 --

17         MR. GIEGER:  And you are going to explain to the jury

18   what we're doing?

19         THE COURT:  I'm going to explain we're going out of

20   order, and that plaintiffs would have called Mr. Polk and played

21   his videotape, but that we've decided by agreement to take this

22   witness now and that we'll see the videotape after.

23         THE COURT SECURITY OFFICER:  All rise.

24         (WHEREUPON, at this point in the proceedings, the jury

25   panel enters the courtroom.)

1    THE COURT:  You may be seated.

2         We're going to go a little bit out of order here.

3    By agreement of counsel, we're going to go ahead and take

4    Dr. Thompson, who is being called by Forest River as a witness in

5    this case.  Plaintiffs had intended and will call by way of a

6    video deposition Mr. Polk, who we will get to next, but because

7    of a variety of considerations by agreement of counsel, we've

8    decided to go ahead and get Dr. Thompson's testimony now.

9         So, Mr. Gieger, this is Dr. John Thompson; is that

10   correct?

11        MR. GIEGER:  Yes, defendant Forest River will call

12   Dr. John Thompson.

13        THE COURT:  Let's go ahead and administer the oath and

14   get his testimony.

15        THE DEPUTY CLERK:  Please raise your right hand.  Do you

16   solemnly swear that the testimony which you are about to give

17   will be the truth, the whole truth and nothing but the truth, so

18   help you God?

19        THE WITNESS:  I do.

20        THE DEPUTY CLERK:  Thank you.  You may be seated.

21                      **DR. JOHN THOMPSON**

22   was called as a witness and, after being first duly sworn by the

23   Clerk, was examined and testified on his oath as follows:

24        MR. GIEGER:  And, Your Honor, Dr. Thompson is being

25   tendered to the Court in the field of psychiatry, forensic

1    psychiatry and addictive psychiatry, and I believe the

2    stipulation is --

3              MR. REICH:  There is no objection.

4              THE COURT:  We're all in agreement on that?

5              MR. CHEATWOOD:  No objection, Your Honor.

6              THE COURT:  Psychiatry, forensic psychiatry and --

7              MR. GIEGER:  -- addictive psychiatry.

8              THE WITNESS:  The term is actually addiction, for the

9    board, but that's okay.

10             THE COURT:  Thank you, Doctor.

11                        DIRECT EXAMINATION

12   BY MR. GIEGER:

13   Q.   Dr. Thompson, please introduce yourself to the jury.

14   A.   Hi.  My name is John Thompson, and I'm a psychiatrist.

15   Q.   Who retained you in this case?

16   A.   I was called by Mr. Strickland, who is one of the lawyers

17   from your law firm, and he asked me to evaluate Mr. Wright.

18   Q.   And what were you asked to do in connection with that

19   retention in this case?

20   A.   I was asked to do an evaluation of him or a psychiatric

21   evaluation of him to look at whether or not he had any

22   psychiatric diagnoses, what that might mean as far as his past

23   treatment, his present treatment, his previous treatment, and

24   whether or not that was in any way related to the conditions in

25   the trailer.

1  Q.   You were here this morning during trial, correct?

2  A.   Yes.

3  Q.   And I don't want to waste this jury's time, but can you

4  encapsulate for them what you believe are your qualifications

5  which would be important for them to know as it relates to the

6  opinions you're about to give in this case.

7  A.   Sure.  Well, basically, I mean, I have an undergraduate

8  degree in biology.  I went to medical school.  And then I went to

9  residency training.  My medical school was at the University of

10 Texas in Galveston, and then I went through residency training in

11 psychiatry at the University of Florida, where I did a

12 subspeciality in a field called forensic psychiatry, which just

13 has to do with when legal issues also interface with psychiatric

14 issues.

15       I am a medical doctor because I went to medical school,

16 so I do prescribe medications to patients on a regular basis, and

17 I evaluate people with depression and anxiety disorders all the

18 time.

19 Q.   You have certain board certifications, correct?

20 A.   Yes.  Whenever you complete either -- medical school, you

21 have a medical school graduation; but, if you specialize in a

22 certain area, you do what's called a board training to become

23 board eligible, which means you're ready to take a test, and then

24 the actual board exam is the test that they give.

25       In psychiatry, it's an oral exam and a written exam.

1    And then for the subqualifications of addiction psychiatry or

2    forensic psychiatry, it's a written examination.  So I've taken

3    all of them, passed them, and then recertified in addiction and

4    in forensics.

5    Q.    And this is your CV.  The areas we're talking about down

6    here is that you're board certified by taking those tests and

7    examinations in those fields, correct?

8    A.    Yes.

9    Q.    In psychiatry, forensic psychiatry, and addictive

10   psychiatry?

11   A.    Yes.

12   Q.    Can you briefly tell the jury the difference between a

13   clinical psychologist and a psychiatrist.

14   A.    Yeah.  A clinical psychologist usually goes to an

15   undergraduate, and then they apply to graduate school to apply

16   for their Ph.D.  In the process of graduate school, they'll take

17   various courses in psychology.

18            And once they get their graduate degree in psychology,

19   then they go on to do what's called a clinical rotation, or they

20   may do a year of internship and then some clinical rotations

21   where they see patients and treat patients on a regular basis.

22            A psychiatrist will go through medical school and

23   actually start seeing patients in medical school, so there is a

24   psychiatry component in medical school.

25            And then I did four years of residency, which is

1    basically four years of seeing patients, inpatients, outpatients,

2    VA patients, just about everybody you can think of that has a

3    psychiatric problem.

4           And then I continue to see patients in my subspecialty

5    or my specialty as I'm going forward.

6    Q.   Do you have a clinical practice today?

7    A.   Yes.

8    Q.   You see patients on a regular basis?

9    A.   Yes.

10   Q.   And you have an affiliation with Tulane?

11   A.   Yeah.  I'm a professor at Tulane, so I have a full-time

12   teaching position at Tulane.  And I teach medical students,

13   residents, and then forensic fellows in the subspecialty of

14   forensic psychiatry that I talked about before.

15   Q.   Tell the jury, what is forensic psychiatry?

16   A.   It just means the interface between psychiatry and the law.

17   So a judge could ask me to do an evaluation for someone's sanity

18   at the time of the offense, or whether or not they were competent

19   to stand trial or they had the capacity to understand what their

20   attorney is trying to help them with and what the legal issues

21   are.

22          Or, in a case like this where there is a civil issue, a

23   person may be saying, well, something happened to me and I've

24   been wronged by whatever happened to me, and I need -- and I have

25   psychiatric problems due to that.

1      And so we evaluate folks in that context, either by
2   attorneys that the person hires or by attorneys that are
3   defending the case, to try and look at what issues there are and
4   delineate those.
5   Q.   As it relates to forensic psychiatry, have you been hired
6   actually by judges from the Court to act as an expert witness --
7   A.   Yes.
8   Q.   -- as opposed to, like, lawyers like we are?
9   A.   Yes, many times.
10  Q.   Would that be state court and in federal court?
11  A.   State court and in federal court and in multiple states.
12  Q.   And have you been hired by the U.S. government, actually, as
13  an expert in forensic psychiatry?
14  A.   Yes, many times.
15  Q.   And do you just work for defendants when you come and
16  testify here at trial?
17  A.   No.  In civil litigation, there will be plaintiff attorneys
18  or attorneys similar to the ones that are representing Mr. Wright
19  that will call me and ask me to do an evaluation.  And, also,
20  defense attorneys call me and ask me to do an evaluation.
21  Q.   Could you tell the jury, were you recently called by a group
22  of plaintiff lawyers on an issue that's been in the news?
23  A.   The Chinese drywall, yes.  I was contacted by one of the --
24  one of the individuals that they hired to look for experts in
25  that particular case.

1  Q.   To represent -- or to assist the plaintiffs in that case,

2  correct?

3  A.   Yes, I had initial contact.  I haven't had subsequent

4  contact since the initial contact.

5  Q.   Dr. Thompson, would you outline for the jury the opinions

6  that you have reached after doing the work that you've done in

7  the case.  Succinctly tell them what are your opinions.

8  A.   Basically, I see Mr. Wright as an individual who had

9  episodes of depression prior to his time in the FEMA trailer.  I

10  think those episodes are well documented by Dr. Field, and I

11  believe that you've heard Dr. Field's testimony about that issue.

12       During that time frame, he was prescribed an

13  antidepressant medication called Effexor, which is one of the

14  more commonly prescribed medications for depressive symptoms.

15  His symptoms got better when he was prescribed the medication.

16  They got worse when he came off the medication or discontinued

17  the medication.

18       As he was in the trailer towards the end of the

19  trailer, he went to see Dr. Cruz and was given the same

20  medication again and responded well to that particular

21  medication.

22       By the time that I evaluated him in November of '09, he

23  had -- he had already seen the psychologist who had evaluated him

24  on two occasions that you heard testify this morning.  He was not

25  taking the medication, and he reported to me that he was not

1    taking it because he felt that he had adapted well to the

2    situation and did not need to take it anymore.

3            With reference to anxiety symptoms, I think the testing

4    that was performed initially on -- on him showed that at the

5    first evaluation where he saw Dr. Shwery, he was reporting a low

6    level of anxiety symptoms; although, he did report some.  Some of

7    the testing showed some anxiety below the surface, but really not

8    a whole lot of anxiety.

9            He went back to see Dr. Shwery after he witnessed him

10   testify, almost a week after he witnessed him testify, and he

11   reported to Dr. Shwery that the anxiety symptoms had increased.

12           By the time he saw me and we did similar tests, his

13   anxiety level had decreased from the second evaluation but hadn't

14   gotten back to the baseline that it was before.  So we saw the

15   level go up and then the level drop some during my evaluation,

16   which would make reasonable sense.

17           It's my opinion that his anxiety symptoms are primarily

18   driven by the litigation itself, that when he -- when he has to

19   learn about stuff that maybe he didn't pay attention to before in

20   reference to warnings or issues that come up about it, when he

21   has to talk to his attorneys, he reported to me when he had to

22   talk to his sister about it and there was a debate about whether

23   there was an issue or not related to the FEMA trailer, he became

24   anxious about that.

25           So the process of the litigation is driving his

1    anxiety, and it's my opinion that his anxiety will dissipate

2    rapidly after the litigation is over.

3            I imagine that he's going to have a higher level than

4    what he did when he first saw Dr. Shwery and maybe a lower level

5    than when he saw him the second time, but I think it will be

6    there throughout the litigation.

7            It's been my experience that people who have

8    preexisting psychiatric conditions or preexisting underlying

9    psychiatric conditions, those kinds of conditions can get worse

10   during litigation and improve pretty rapidly afterwards.

11           The third part, I think, that's important, and that

12   hasn't been mentioned today, is that Mr. Wright drinks alcohol on

13   a regular basis.  And at the time during the FEMA trailer, he was

14   drinking a lot of alcohol, so that he was drinking up to six

15   16-ounce beers at night.  He was staying up until two in the

16   morning, sometimes going to work the next day feeling the effects

17   of the alcohol that he had drank the night before.

18           And so when you're trying to parse out what makes sense

19   in relation to anxiety symptoms and depressive symptoms, you

20   always have to look at -- and one of the major rule-outs in the

21   *DSM-IV*, the manual that we talked about, before diagnosing people

22   is that you have to really look for those problems because they

23   can mimic depression, they can mimic anxiety.  And when you drink

24   alcohol and when you come off, you can have those kinds of

25   symptoms.  So that's what we call a confounding factor to the

1    symptoms that he's presenting.

2            So those are my basic opinions and the basic issues

3    that I looked at.

4    Q.    Those are your basic opinions.  Did you -- what's a

5    prognosis?

6    A.    Well, a prognosis is how somebody -- excuse me, I sometimes

7    talk with my hands.  I'm Thompson, but I've got a little Italian

8    in me.

9            The prognosis is how you're going to do in the future,

10   how is somebody going to do in future, what are they going to do

11   going forward.  And you can base that on lots of different

12   things, how they've done in the past.  From psychiatry we can

13   base it on how people responded in the past.

14           So he's responded to the medication Effexor in the

15   past, and it's likely he would respond to it in the future if he

16   took it, and that he would have a minimal amount of depressive

17   symptoms and/or anxiety symptoms since the medication really

18   treats both conditions.

19           So I think he has a good prognosis.  He's worked

20   through this whole process.  The records that I reviewed show

21   that he's continued to gain income through this process, so that

22   he's working and making more money over time.  He has been

23   involved in relationships on and off throughout the process.

24           And so I don't really see a major impact on his life or

25   going forward if he continues to, you know, to seek treatment and

1    take his medication that he was taking before this all started.

2    Q.    So from a future standpoint, one of the things is he has to

3    take the Effexor on a regular basis, correct?

4    A.    Yes.

5    Q.    All right.  And the Effexor that he has taken, have you

6    reviewed the medical records as it relates to how Mr. Wright made

7    decisions about taking that medication and how it had affected

8    him in the past?

9    A.    Yes.  I mean, he did take the medication when the doctor

10   prescribed it for a period of time until he felt better.  And

11   like we all often do, you know, when you've got an infection, you

12   take your antibiotic, it gets better, you stop taking the

13   antibiotic.  A lot of people will do that with antidepressant

14   medications, as well.  They'll feel better, and they'll stop

15   taking it.

16          But when you have two or three episodes, and it's

17   debatable from the record whether he had two episodes or three

18   episodes before he went into the trailer, but what we tell people

19   as psychiatrists is that you've had several episodes of

20   depression; if you want to function better going forward, it's

21   good to stay on the medication and stay it on it for a long

22   period of time.  And we find that people function better, they

23   work better, and they can think clearer when they do that.

24   Q.    Is that consistent with your understanding of what Dr. Field

25   had actually told him before he ever went into the trailer?

1  A.    Yes.

2  Q.    And you said prognosis going forward, staying on his

3  medication on a regular basis is something that's important.  Is

4  there something else that from a lifestyle standpoint is

5  important for his prognosis as well?

6  A.    Yeah.  I mean, he reported to me that he is still drinking

7  some alcohol, that he still drinks a couple, three beers a night

8  and then maybe more on the weekends.  And I think when you do

9  have those episodes of depression, it is helpful to abstain from

10 alcohol altogether.

11        Now, not everybody can do that, but decreasing the

12 amount of alcohol that he uses going forward will definitely

13 impact his long-term prognosis as far as depression is concerned.

14 And that's really a well-researched issue, and almost everybody

15 in addiction will make that recommendation to folks if they have

16 what we call comorbid or appearing at the same time problems.

17        So if you have depression plus alcohol, and you go see

18 a psychiatrist or a psychologist, almost all of them will

19 recommend, decrease the alcohol and treat the depression and you

20 usually do well.

21 Q.    And you would expect that if he followed that regimen of

22 going back on his Effexor medication on a regular basis like

23 Dr. Field recommended to him before he got in the trailer and

24 reducing his alcohol contact, his future would be what?

25 A.    That he would have an excellent prognosis.  I don't see why

1  he would need to be seeing someone any more than maybe quarterly

2  medication evaluations or bimonthly medication evaluations.  He

3  could get that done through a primary care doctor like Dr. Field;

4  or, if he wanted to be followed by a psychiatrist, he could be

5  followed by a psychiatrist and have those kinds of treatments

6  done.

7  Q.   And that prognosis for his future, is it any different than

8  the prognosis that you would have given to him had you seen him

9  before he had been in the trailer?

10  A.   No.

11  Q.   I want you to tell the jury now a little bit about -- they

12  understand your opinions, but they need to know how you got

13  there.  So, could you tell the jury a little bit about the work

14  you did in order to get to the location of making those -- to the

15  point of making those opinions?

16  A.   Sure.  Okay.  Well, first, I do like to review information

17  before evaluating an individual.  So I did get a box of records,

18  which are down here, and reviewed those prior to seeing

19  Mr. Wright for the first evaluation.

20       I had the benefit of having Dr. Shwery's first report

21  and Dr. Shwery's second report and looking at those, as well.

22  Q.   Maybe I should ask you this question so the jury will

23  understand it.  When did you see Mr. Wright?

24  A.   Oh, sure.  My first -- my evaluation with him, as I said

25  before, was in November of '09.  So it was about a month or so

1    after Dr. Shwery had seen him the second time.

2    Q.   So you saw him after Dr. Shwery had seen him the first and

3    second time?

4    A.   That's correct.

5    Q.   And you said you had medical records?

6    A.   Yes.

7    Q.   From?

8    A.   From most everybody that I can think of involved in the

9    case, so I had 45 different pieces of information.  Dr. Field,

10   Dr. Spector, Dr. Shwery.  I guess those are the main ones that I

11   need to know -- we need to talk about today, but most of the

12   medical records that were available.

13   Q.   I don't want to go through those 45 with the jury, but did

14   you also meet Mr. Wright and --

15   A.   I met him on the -- on the day, on November 5th in 2009, and

16   I spent two hours with him discussing his time before the FEMA

17   trailer, his time during the FEMA trailer, his past psychiatric

18   history, his past medical history, whether he was on any

19   medications, whether he was allergic to any medications, his

20   history growing up, issues that related to his family.

21        I did what we called a mental status examination during

22   that, just sort of a -- it's a psychological test that you do

23   verbally versus on paper, like the ones that we've discussed

24   before.

25        I had a psychologist who works with me administer some

1  of the same tests that Dr. Shwery had given to try and get an

2  idea of where he fell in those tests, and then I came to an

3  assessment based on that information.

4  Q.   So you took a verbal history from Mr. Wright, correct?

5  A.   Yes.

6  Q.   And we're going to talk a little bit.  You had tests

7  administered like the tests that we see listed up on the board?

8  A.   Not all of the same tests, but the Beck Anxiety Inventory,

9  the Beck Depression Inventory, and the MMPI-2 were administered

10  again.

11  Q.   Let's go back to the history that was given by Mr. Wright.

12  The information that you obtained during that history is

13  important, correct?

14  A.   Yes.

15  Q.   I want to focus now for the first time on the time that he

16  spent in the trailer and what information he provided to you.

17  A.   Okay.

18  Q.   As it relates to your opinions in this case, what

19  information did Mr. Wright provide to you at that point in time

20  that was important in making your final opinions that you gave to

21  the jury?

22  A.   Well, he reported that he had seen Dr. Fields starting in

23  2003 and 2004 for some depression.  He did not mention that it

24  had gone back as far as 2000.

25              He reported that, you know, he was presently not taking

1    his medication for that, that he had discontinued it.

2    Q.    Did he discontinue that voluntarily?

3    A.    Yes.  And I don't know if I can get to the exact quote, but

4    he said basically that he felt like he had "adapted" was the word

5    that he used past the point where he needed it.  So he felt like

6    at that point in time when I saw him that he didn't need the

7    medication because he was functioning better.

8    Q.    Would you look on page 10 in the middle after medication.  I

9    think that's what you're looking for.

10   A.    "I think I have adapted, and I don't think I need on it a

11   regular basis," is the quote that I wrote in my notes and put in

12   my report.

13   Q.    So when you were talking about -- to him about the time in

14   the trailer, did he emphasize anything about the trailer itself

15   as it relates to the opinions that you gave to the jury?

16   A.    Well, he related a couple things.  He did relate the

17   symptoms of him having some blood in his -- in the morning when

18   he would wake up.  And he said that after he brushed his teeth,

19   it wasn't there anymore.  He didn't really think it was that big

20   of a deal initially.

21         He also reported that, you know, the size of the

22   trailer or the space of the trailer affected him because it was a

23   pretty small environment.  Some of the issues that were going on

24   with the trailer bothered him with leaking and the usual thing

25   things that people had to do, I imagine, when they go through

1    dealing with trailers.

2            Certainly, the issues at that time around Katrina were

3    bothering him as well, the state that the city was in at the time

4    and the issues that they were doing, but he tended to go to work

5    to try to get away from some of those, as we've heard before.

6    Q.    As it relates to the trailer itself, was size of the trailer

7    an important issue?

8    A.    I did ask him about that because, you know, there is a whole

9    literature on when you cram people in small places or you put

10   them in small confined areas, they tend to get dressed over time

11   or they may experience anxiety symptoms over time.

12           So I did ask him about that, and he acknowledged that

13   the size of the trailer was something that had affected him, too,

14   and he didn't like being in it.

15   Q.    Did he say that there was any smell in the trailer that he

16   was concerned about?

17   A.    Not that I recall.  And he didn't report that or

18   difficulties with breathing or of that nature.  It was mostly his

19   sinuses and the feeling clogged up when he got up in the morning,

20   that he was -- and that he would see some blood tinge in his

21   sputum in the morning when he would wake up, and then that would

22   go away fairly quickly.

23           But he reported that -- that was his initial report.

24   He reported that after the neuroma was removed from his tongue,

25   that about four or five times he's had that where he woke up in

1  the morning with sputum, but it had pretty much gone away since

2  that had happened.

3  Q.   Did he ever tell you the trailer was making him sick?

4  A.   He did report that at some point.  He didn't say necessarily

5  the trailer was making him sick.  He said at some point later,

6  when he started reading about stuff and his -- either his lawyers

7  would bring him stuff to read or he would read his own stuff

8  about the trailer itself, that he started to ruminate and started

9  to think about, you know, is this going to be a problem for me at

10  some point in the future.

11       And I think that's probably the difference between the

12  first evaluation and the second evaluation, as you've heard this

13  morning, Dr. Shwery testify, is that he started looking into that

14  and focusing more of it, and he started having to deal with the

15  issues that come closer and closer to the trial, which is going

16  to be all about that.

17  Q.   Did he -- let's just now turn to the time -- did he give you

18  a history of his time after he left the trailer?

19  A.   Yes.  He talked about after he left the trailer that his

20  depression had started to lift.  He was also getting treatment

21  for it at that time, right around the time -- he went and saw

22  Dr. Cruz, I believe, in 2008, if I can recall correctly with the

23  records, and that his anxiety had started to lift.

24       He reported that he felt like he was in a more pleasant

25  environment, and that was part of it, and that he was feel less

1    depressed or less sad after he left.

2    Q.   Focusing now on the time after he left the trailer, did he

3    report to you that he attended a trial?

4    A.   Yes, he did.  In between the time -- the time of the two

5    evaluations by Dr. Shwery, that he had gone to a similar kind of

6    trial.  I don't know more details than that, other than that he

7    had gone in and had listened to Dr. Shwery testify for a period

8    of time.  So he had gone in -- it seemed like he had gone in for

9    that period time and then left.  He wasn't there the whole time.

10   He said he was there for a period of time.

11   Q.   Now, the jury has heard some testing -- some testimony about

12   numbers.  And you did some tests, as well, correct?

13   A.   Yes.

14   Q.   Tell the jury the significance of what those test numbers

15   have in your opinion as it relates to the numbers and the fact

16   that Mr. Wright attended a trial at a certain point in time.

17   A.   Sure.  Well, can I use this up there, or is that --

18           MR. REICH:  Objection, Your Honor, I don't see a

19   reference in the report to this line of testimony.

20           (WHEREUPON, at this point in the proceedings, there was

21   a conference held at the bench.)

22           THE COURT:  You're talking about him attending the

23   trial?

24           MR. GIEGER:  Yes.  Yes.  Confirming the above --

25           MR. REICH:  What page?

 1            THE COURT:  Page 14, middle of the page.

 2            MR. GIEGER:  Talks about confounding issues.

 3            THE COURT:  Yes.

 4            MR. GIEGER:  Right.

 5            THE COURT:  Yes.  It's the paragraph that starts with

 6   "confounding."  I think you're on the wrong page.

 7            MR. REICH:  14.

 8            MR. GIEGER:  14.

 9            MR. CHEATWOOD:  14.

10            MR. GIEGER:  It's down here.

11            THE COURT:  Have you instructed him not to mention that

12   it's a FEMA trailer?

13            MR. GIEGER:  Yes.

14            THE COURT:  I just asked if he had instructed the

15   witness not to mention that it is a FEMA trailer?

16            MR. REICH:  Yes, Your Honor.

17            THE COURT:  But it's in the report.

18                I'll overrule.

19            MR. GIEGER:  Judge, I told him not to talk about it.

20            (WHEREUPON, at this point in the proceedings, the

21   conference held at the bench concluded.)

22                          EXAMINATION

23   BY MR. GIEGER:

24   Q.   Dr. Thompson, I know you probably heard the question, but

25   I've probably forgotten it or somebody else has.  Can you tell

1    the jury as it relates to the test numbers, the scores, talked

2    about going up and down, how that relates to the fact that

3    Mr. Wright heard testimony at some point in time?

4    A.    Sure.  The test scores initially are nine and eight

5    respectively with Dr. Shwery's first evaluation, and then

6    subsequent to that time --

7    Q.    Doctor, if you need to go up to the board, that's fine, too.

8    A.    So he gave him the Beck Anxiety Inventory and then the Beck

9    Depression Inventory and all these on the first administration.

10   And then the second administration he gave the Beck Anxiety

11   Inventory and the Beck Depression Inventory and then didn't give

12   these other tests.

13         So if we're just going to focus on these, the Beck

14   Anxiety Inventory was a nine when he first gave it, and then

15   after -- a week after the testimony it goes up to a 36.  So it

16   goes from basically mild to no anxiety to what, on this

17   inventory, would be related to as severe anxiety.

18         And then the Beck Depression Inventory goes from

19   roughly an eight to mid twenties, so that went from mild or no

20   depression to moderate.  And then when I saw him a month later,

21   the Beck Anxiety Inventory is now down.

22   Q.    You administered that test?

23   A.    Yes.  I have a psychologist -- I administer the test, the

24   psychologist interprets it; but, any mental health professional

25   can interpret these because they're not -- they don't have all of

1  these validity scales in them.  They are very straightforward.

2  They ask simple questions, and you just go one, two, three, four.

3         So the Beck Anxiety Inventory when I administered it,

4  which was the third administration, was down to a 31 from 36.  So

5  it had gone up to 36 and dropped down, but it was still on the

6  border of moderate to severe anxiety, roughly in that range.

7         And then the Beck Depression Inventory went from an 8

8  to mid twenties and then was down to 17, which is much lower and

9  is probably mild, mild to moderate, roughly, for depression.  So

10 you saw those go up shortly after the testimony and then came

11 down.

12        But, you know, to be fair, also he did go to the doctor

13 then and get the tumor removed from his tongue in between those

14 two, as well.  So you saw that happening on those.

15        The MMPI that I administered when I saw him, my

16 psychologist interpreted it as relatively similar to the previous

17 MMPI in that he didn't elevate what we call clinical scales,

18 which are the ones that look at major depression and severe

19 anxiety and those kinds of things, but he had scales kind of

20 underneath the surface that would lead you to believe he was

21 worried about stuff.

22        I think we saw that on both of those tests, both the

23 first administration and the second administration.

24        So what I'm trying to get a point is that it goes up

25 and the peak is starting to come down.

1   Q.   What does that tell you about how litigation is a factor, in

2   your opinion, relative to both his anxiety and his depression?

3   A.   I think it has to do with not only, you know, the testing,

4   which gives you sort of a snapshot of how people are thinking,

5   but also what he's saying in his evaluation.  And that he's

6   saying that it does bother him when his attorneys call him and

7   remind him about stuff, and it does bother him when he has to

8   think about it because it reminds him more of, you know, the

9   issues that are going on in the trial itself, as well as, you

10  know, the issues that he's having to deal with.

11           So I think those things all play a role in how he

12  presents as an individual.  We try and take all of these things

13  into consideration.

14  Q.   Did he also report to you that he had had conversations with

15  family members about the litigation?

16  A.   Well, he related to me a particular conversation that he

17  with his sister where she was saying, well, this is not as big a

18  deal as you're making it.  And he said, well, you never know.

19  You know, it's like of like, you never know, it might be a bigger

20  deal.

21           So I think it's not that it's something that's

22  prevalent on his mind that he's thinking about all the time

23  outside of being in trial or having to deal with issues related

24  to the case, that he doesn't worry about that on a day-to-day

25  basis; but, if someone brings it up and talks to him and says

1  it's a possibility, then he might start worrying it.

2  Q.   Back to the litigation causing the anxiety and the

3  depression?

4  A.   Yes.

5  Q.   You talked about medical conditions.  You asked Mr. Wright

6  about his medical conditions, right?

7  A.   Yeah.  I have a section in the report where I do ask him

8  about medical conditions, because, you know, my first training is

9  as a physician, so I usually ask those kinds of questions.

10        So I have this kind of review of symptoms for medical

11  conditions that I'll go through.  Do you have any neurologic

12  problems, like headaches, you know, seizures, those kinds of

13  things?  Do you have medical conditions?  I'll ask him about

14  whether or not he's got pulmonary problems, digestive problems,

15  cardiac problems, those kinds of things.  And then I actually ask

16  the medications that he's taking for those particular problems,

17  and we'll get a history that way.

18  Q.   So you specifically asked about pulmonary problems?

19  A.   I did.

20  Q.   You met him in November of 2009?

21  A.   2009, yes.

22  Q.   Did he ever report to you as part of that history that he

23  had been diagnosed as having asthma?

24  A.   No, he didn't.

25  Q.   Did he bring up asthma as a concern at all?

1        MR. REICH:  Objection, leading, Your Honor.

2        THE COURT:  Yes, I'll sustain.

3        THE WITNESS:  He --

4                        EXAMINATION

5   BY MR. GIEGER:

6   Q.    I have to ask you another question.

7   A.    Sure, okay.

8   Q.    As it relates to his medical conditions, did he give you

9   any -- did he have any -- express to you any concern about any

10  pulmonary conditions?

11  A.    He expressed to me concerns about upper respiratory symptoms

12  that I talked to you about before, which were his throat and his

13  tongue and the sputum issue with the blood tinged in it, but he

14  did not say that he had asthma or wheezing or that he was taking

15  any medications for asthma or wheezing because I asked him about

16  not only respiratory problems, but also the medications.  And so,

17  if he would have brought up a medication that was commonly used

18  to treat asthma, I would have asked him about that.

19  Q.    You made inquiries about alcohol.

20  A.    Yes.

21  Q.    Why did you make that inquiry, and tell the jury why it's

22  important in the case?

23  A.    Well, I mean, in all of our training, both psychiatry and

24  psychology, we have to look at -- you know, there are certain

25  kinds of conditions that are we call them great imitators, or

1   they imitate lots of different kinds of conditions.  And one of

2   them is alcohol and substance use.

3            So if a person, you know, uses alcohol periodically

4   they may experience depression -- I mean, a decrease in their

5   anxiety when they first use it; but, if they start drinking every

6   day, we know that people like that will get depressed.

7            And so you want to rule that out when you're looking at

8   another kind of condition.  So when you look at depression as a

9   possible condition or anxiety as a possible condition, you always

10  want to look at alcohol and other substance abuse because it can

11  mimic those conditions.

12  Q.   You're not telling this jury that Ms. Wright is an

13  alcoholic?

14  A.   No.  He didn't endorse -- the only symptoms that he endorsed

15  that would lead me to think that he has a problem were that he at

16  one point in time felt that he needed to cut back on the amount

17  that he was using because he felt like he was drinking too much,

18  and that he, you know, felt guilty about it.  So there is a

19  couple of screening questions that he popped on or endorsed, and

20  so I asked him other questions about that.

21           He did not say that it was -- it was a problem for him

22  at work; although, some mornings he noted that when he went to

23  work, he was still feeling the aftereffects.  He was still able

24  to do his job, and there weren't any reports of that at his job.

25  And he hadn't had any DWIs or legal stuff.

1          So you have to have that to give him a diagnosis of
2    alcohol abuse.  In order for him to be alcohol dependent or what
3    people commonly refer to --
4          MR. REICH:  Objection, Your Honor, this is not within
5    his report, alcohol dependency.
6          THE COURT:  Let's just -- be that as it may, just answer
7    Mr. Gieger's question as specifically as you can.  I think you
8    kind of digressed, but go ahead and answer his question.  I think
9    you have.
10          THE WITNESS:  He didn't have any indications that he was
11    an alcoholic.
12                          EXAMINATION
13    BY MR. GIEGER:
14    Q.    I think you told the jury earlier that there were
15    confounding factors?
16    A.    Yes.
17    Q.    Is this a confounding factor?
18    A.    Yes.
19    Q.    Tell the jury what you mean by confounding factor.
20    A.    It just means that it's something else that you have to take
21    into consideration that may be of a causal nature to the
22    condition that the person has.
23    Q.    Testing, can you briefly tell the jury what testing did you
24    do and the relevancy about testing to your opinions in this case?
25    A.    I believe I explained that I administered the Beck Anxiety

1    Inventory, the Beck Depression Inventory and the MMPI-2.

2           The MMPI-2 because I wanted to take another look at the

3    validity scales.  He scored in what we call the valid range on

4    the validity scales of the MMPI-2, which meant that he didn't

5    overly endorse symptoms or under report symptoms to the point

6    that he made the test not valid, that it couldn't be interpreted.

7           So that's really what the validity scales are.  They're

8    trying to tell you his is a test that can be interpreted.  And I

9    believe you heard testimony on that.

10          And then Beck Anxiety and Beck Depression are to give

11   an idea of what I discussed with you before, where is the person

12   by their -- you know, in their own subjective, where are they in

13   their continuum of care, are they better or worse than what they

14   were before.  Because Beck Anxiety and Beck Depression are not

15   what we would call strictly objective tests.  Anybody can look at

16   the questions and subjectively manipulate the test by just

17   reading the questions and saying, oh, zero is not a high symptom,

18   four is a high symptom, I think I need a four versus a three,

19   where the MMPI is a much more objective test in that the person

20   can't tell what questions they are answering -- which categories

21   they fit into.  It's not easy to tell that these are depressive

22   symptoms I'm being asked about or these are anxiety symptoms.

23   Q.   And what's the importance in your opinion as it relates to

24   the MMPI tests that were done in this case?

25   A.   Well, I mean, I think they show that both when Dr. Shwery

1   saw him and then we saw him, that he didn't have the clinical

2   scale elevations that you would expect with someone with a severe

3   anxiety disorder or a severe depressive disorder, but they were

4   kind of below the surface.  You know, there were some things that

5   were present, but it didn't meet, you know, the criteria for

6   being clinically significant for major depression or clinically

7   significant for anxiety.

8   Q.    What is *DSM-IV*?

9   A.    It's a diagnostic manual that we use to -- you know, to try

10  and communicate as psychiatrists and psychologists back and forth

11  between each other, so we're talking on the same page.  And it's

12  also used in research purposes and is used to follow patients

13  from one point to another to see how they are doing.

14  Q.    Does the *DSM-IV* have a four-part criteria to determine

15  whether or not someone is a malinger?

16  A.    It has a four point -- four areas where we look at to make a

17  determination of whether or not someone may be malingering, so

18  they are called indicia of malingering or looking for those

19  particular issues.

20  Q.    What is a malinger?

21  A.    Someone who basically is not telling the truth in order to

22  gain some kind of a monetary award or to get out of some

23  unpleasant duty.  So someone who is -- like, if you're in the

24  military and you -- you know, you've all seen the *MASH* episodes

25  or whatever, Klinger is always trying to fake some kind of

1    psychiatric so he doesn't have to go to war, that kind of deal.

2    That's one version of malingering.

3              And then in any kind of a context like this, someone

4    could be saying either their symptoms are worse or saying that

5    they have symptoms that aren't there to try and get money out of

6    a situation.

7    Q.    You're not telling this jury that you diagnosed Mr. Wright

8    as a malingerer, correct?

9    A.    No, I'm not.

10   Q.    Well, why is it important in this case?

11   A.    Well, I mean, according to the *DSM-IV* and what we know in

12   clinical practice, that in these kinds of situations that some

13   people do exaggerate their symptoms, some people do make more of

14   their symptoms than they are in order to get financial

15   remuneration.  So it's important to look at it when we're doing

16   evaluations in this context.

17   Q.    Did you do it in this case?

18   A.    Yes.

19   Q.    From your work in this case, do you believe that Mr. Wright

20   has a valid fear of cancer?

21   A.    No, I do not, not one that is affecting him on a day-to-day

22   basis.

23              MR. BONE:  Objection, Your Honor.  I don't believe this

24   is in his report.  Is it?

25              THE COURT:  Come on up.

1           (WHEREUPON, at this point in the proceedings, there was
2     a conference held at the bench.)
3           THE COURT:  I'm looking at page 14 under causation.  I
4     think it's the paragraph starting with "with reference."  The
5     middle of the page, "With reference to Mr. Wright's anxiety
6     symptoms."
7           MR. GIEGER:  Uh-huh (affirmative response).
8           MR. REICH:  Doesn't it say, though -- the question was
9     do you think that Mr. Wright has a valid fear of cancer, and I
10    don't see that specific issue identified.  I think the sentence
11    reads, "I do not think that Mr. Wright legitimately believes that
12    he will develop cancer from his exposure to formaldehyde in the
13    FEMA trailer."  He's speculating as to Mr. Wright's state of
14    mind.  He is not expressing his own professional opinion as to
15    whether he believes he has a valid fear of cancer.
16          THE COURT:  Why don't you rephrase the question, but I
17    think this paragraph right here in the middle of the page is
18    pretty close, pretty close.
19          MR. REICH:  But no cigar.
20          THE COURT:  Well, I agree, because they made objections
21    when the plaintiff's experts were there, so we are going to be
22    rigid in terms of what is and is not asked.  So let's go ahead
23    and rephrase the question if you want to get the testimony out of
24    that paragraph.
25          MR. CHEATWOOD:  Excuse me.  I understand, but we did the

1   same thing with their expert, and it was close enough, it's my

2   recall.

3          THE COURT:  I understand that.  I understand that.

4   We're going to rephrase the question and get the testimony.

5          (WHEREUPON, at this point in the proceeding, the

6   conference held at the bench concluded.)

7                          EXAMINATION

8   BY MR. GIEGER:

9   Q.   Dr. Thompson, did Mr. Wright express to you in your

10   interviews with him anything about his beliefs relative to the

11   development of cancer?

12   A.   It was my impression from talking to him for the time that I

13   did that he -- that he had entertained the possibility of that he

14   may be exposed to something that could cause cancer, but did he

15   believe on a day-to-day basis that he was actually going to die

16   of cancer and have a fear that he was going to die of cancer,

17   it's my opinion that he did not have that on a day-to-day basis.

18   Q.   And I'm sorry but I asked you about the scores on

19   malingering and what malingering is, but I didn't ask you what

20   did you find, what did you find in relationship to Mr. Wright on

21   that subject?

22   A.   I'll go through those different aspects as briefly as I can.

23   When anyone presents in a medical/legal context like this, that's

24   one of the indicia.  So that's really not one that you put a ton

25   of stock in, but you have to least look at that issue when they

1    present in a medical/legal context.

2            If there is a marked discrepancy between their claimed

3    stress or disability and the objective findings, that's another

4    indicia.  Okay.

5            He reported worry in his -- on the Beck Anxiety

6    Inventory which appeared to be in excess of what I would expect

7    given the situation but may not be in uncommon for certain

8    individuals when they are going through this type of litigation.

9    So while it's one that I looked at, again, it's not really high

10   on the scale.

11           And with reference to Number 3, which has to do with

12   whether someone is compliant with treatment or being willing to

13   go through diagnostic testing, he was willing to go through

14   diagnostic testing.  The thing is that he hadn't been cooperative

15   with the ongoing taking of his medication.  And it's my opinion

16   if he did that he would experience a lot less anxiety and

17   depressive symptoms, but he's chose not to do that.

18           Number four would be whether or not he has a, quote,

19   like, criminal type personality or antisocial personality.  He

20   obviously doesn't have that.

21           So he had some indicia that lead us to want to look for

22   other stuff.  And I think you look at that on the testing.  The

23   testing, the MMPI which shows the validity scales did not show

24   that he was attempting to overly exaggerate symptoms such that

25   the test was not valid.

1          So those are the things I look at, the total picture,

2    not just what the *DSM-IV* says to look at but other things.  So

3    that's why I didn't say that he was malingering.

4    Q.   Finally, we talked about his Effexor.  Is that something

5    that you could prescribe for him?

6    A.   Yes.

7    Q.   And you would recommend that he take?

8    A.   Yes.  I mean, I'm not his treating physician but if he has

9    responded in the past to that medication and it's been effective

10   for him, then a medication like that or something similar.

11         You have to look at the medication that's worked for

12   him in the past would be one of the -- one of the indicators, but

13   you'd also want to make sure that he was comfortable with the

14   side effects.  If he wasn't comfortable with side effects of that

15   medication, there are 20 or so other antidepressant/antianxiety

16   medications that he could take.

17   Q.   You wouldn't prescribe it at a level any different than what

18   had been prescribed by Dr. Field before he entered the trailer,

19   correct?

20         MR. REICH:  Objection, Your Honor, this goes beyond the

21   scope of the report as to specific prescribing regimen.

22         THE COURT:  No, I have the report here, and I would

23   disagree.  If you would like to approach, we can talk about it,

24   but I think I see from our previous conversation at the bench, I

25   would overrule.

1    THE WITNESS:  The dose of Effexor varies from a dose of

2  150 to 300 milligrams, which is a common range for that

3  particular medication.  And he's taken that range of medication

4  before up to 250, if I recall from the records.  And it's my

5  opinion that he would respond to a dose between 150 and 250.

6                          EXAMINATION

7  BY MR. GIEGER:

8  Q.    And turning for a moment to page 10 of your report, looking

9  at the medications, one of those medications is an

10 over-the-counter medication for nasal congestion?

11 A.    Yes.

12 Q.    And what was that?

13 A.    Let's see.  No, I don't know that that's an over the

14 counter.  Nasonex is what you're -- yeah, Nasonex is not an

15 over-the-counter medication.  It's actually a medication that has

16 some steroidal components, and it's used for folks that have

17 allergies.  You spray it in your nose, and it works like similar

18 to a pill that would help with allergies, but it's a type of

19 thing that you could use for allergies.

20 Q.    And what is the -- what are the side effects of chronic

21 administration of that particular medication?

22 A.    We are warned that when we tell patients we're supposed to

23 tell them if you're going to use it for a longer period of time

24 than just seasonal allergies, so if they have allergies for

25 longer than a couple weeks or a month, if they are using Nasonex

1    on a regular basis and they notice some bleeding, they can have

2    it from that.

3    Q.   And, Doctor, you got paid for your services in this case,

4    correct?

5    A.   I did.

6    Q.   You billed me, and I paid you what amount of money?

7    A.   I'm sorry?

8    Q.   You billed me, and I paid you what amount of money?

9    A.   I don't know the exact amount.  It's a substantial amount of

10   money.

11   Q.   $23,000 sound about right?

12   A.   Somewhere around there, yes.

13          MR. GIEGER:  Thank you, Doctor, that's all the questions

14   I have.  I tender the witness.

15          THE COURT:  Mr. Cheatwood.

16          MR. CHEATWOOD:  Your Honor, Shaw has no questions.

17          THE COURT:  Thank you.  Mr. Reich.

18                        CROSS-EXAMINATION

19   BY MR. REICH:

20   Q.   Dr. Thompson, you have board certification in the field of

21   forensic psychiatry, true?

22   A.   Yes.

23   Q.   And the definition of forensic is?

24          THE COURT:  You might want to back up a little bit.

25          THE WITNESS:  I'm sorry, I didn't know if y'all could

1    hear that.  I'm hearing it.  Sorry.

2                Forensic psychiatry, as I said before, is the

3    interface between psychiatry and the law.  Okay.  So it's a --

4    it's a subspecialty that deals with people that are either in

5    treatment because they are involved in the law or they need

6    evaluations because they are involved with the law.  It's not for

7    dead people; although, sometimes we do do evaluations of people

8    who have committed suicide and we go back and try and figure out

9    why.

10               But, usually there is four different areas.  One

11   would be if the Legislature needs to talk about mentally ill

12   patients and what do you have to do to put them in the hospital,

13   what you have to do when they don't want to go in the hospital,

14   and what kinds of treatments you have to give them, that's one

15   part of it.

16               A judge may ask or a defense attorney in a criminal

17   case may ask you to evaluate someone to see, you know, can they

18   have the capacity to understand the Court process, and what were

19   they thinking at the time they committed the offense?  So those

20   are competency evaluations and sanity at the time of the offense

21   evaluations.

22               In medical malpractice sometimes we're asked to

23   testify about whether or not a doctor committed malpractice in a

24   particular field, so psychiatry would be in my field.

25               And then the fourth area is like we're dealing with

1  today, which could be a person has a civil wrong or what we

2  call -- what lawyers call a tort, you know, and they have -- they

3  think they have a civil wrong, and they should get money for it,

4  whether it's a car accident.  And those kinds of things sometimes

5  involve mental issues, and we're asked to evaluate people for

6  that.  So that's basically all it is.

7                            EXAMINATION

8  BY MR. REICH:

9  Q.   I believe my question was, what is the definition of

10  forensic.  Would a fair definition be law related?

11  A.   Law related is fine.

12  Q.   All right.

13  A.   Sorry for the long-winded answer.

14  Q.   Isn't it true that 50 percent of the income you earn is law

15  related?

16  A.   Yes.

17  Q.   And you are being paid for your testimony $650 per hour for

18  this, for the work in this case, true?

19  A.   For today, while I'm here.  It's 450 an hour to review

20  records and to interface with attorneys, but today it is 650 an

21  hour if I'm testifying.

22  Q.   And that's because you're under more stress?

23  A.   It's just we use standard fee sheets.  I'm in a range for

24  other people who have been similarly trained that I interface

25  with on a regular basis.  So it just depends on, you know, what

1   the rate is for a particular subspecialty, and we try and keep

2   that in a reasonable range compared to what other people do.

3   Q.   And you've never had a physician/patient relationship with

4   Mr. Wright, true?

5   A.   No, I've never treated him.

6   Q.   And did you only see him on one occasion?

7   A.   That's correct.

8   Q.   And excluding the testing that was conducted, how much time

9   did you actually spend face to face with him?

10  A.   Two hours.

11  Q.   So other than the test results, the opinions that you

12  derived today, for presentation today, came from a two-hour

13  interview --

14  A.   No.

15  Q.   -- other than the testing that you had done?

16  A.   Yes, there is -- I believe, in my report, I don't know if

17  the jury gets a copy of my report or not, but there are 45

18  different things that I relied on to come to my conclusion that

19  are outlined in my report.  Depositions of the other doctors that

20  you've heard testify here today, I reviewed before I reviewed

21  him -- before I interviewed him.  The interview itself.  The

22  testing that we did.  The testing that Dr. Shwery did.

23         I actually had my psychologist go back and look at that

24  testing to see, you know, her interpretation of his

25  interpretation.  So, between those things, yes.  And that's --

1  that's what I relied on.

2  Q.   And you relied on the lawyers to furnish you with

3  depositions and past medical records, correct?

4  A.   Yes.  That's routinely how it's done.

5  Q.   And do you remember when I took your deposition in this case

6  in January of this year, January of 2010, just a few months

7  ago --

8  A.   Yes.

9  Q.   -- I asked you if you had reviewed the records of Dr. Smith

10 where Dr. Smith had diagnosed Mr. Wright as an asthmatic?

11 A.   That's correct.  And I told you that I had not reviewed

12 those records to my knowledge.

13 Q.   In fact, you had not even been aware that Dr. Smith, an

14 expert hired by Forest River and Shaw, had diagnosed Mr. Wright

15 with asthma, true?

16 A.   That's true.

17 Q.   And let's talk for a moment about this five-part diagnostic

18 paradigm that is used by psychiatrists and psychologists.

19          MR. REICH:  If I may approach the easel, please.

20          THE COURT:  Yes.

21                         EXAMINATION

22 BY MR. REICH:

23 Q.   You're familiar with this five-axis scale.  Is there a term

24 that you use for it?

25 A.   It's called multi-axial diagnoses.

1    Q.    And the first axis would be major psychiatric disorders?

2    A.    Yes.  The categories would be anxiety disorders, depressive

3    disorders, psychotic disorders, and various others.  Substance

4    use disorders.

5    Q.    And you said anxiety would be included, correct?

6    A.    Yeah.  There is a whole host of different disorders among

7    each of those categories.  So among the major depressive

8    disorders are what we call the affective disorders, there's a lot

9    between -- in anxiety, there is four or five.  Under substance

10   abuse, obviously, there can be multiple.

11   Q.    The second one would be personality disorders; is that true?

12   A.    And/or mental retardation.  Developmental disabilities would

13   be the more appropriate term, or the more modern term.

14   Q.    The third one, would it be medical conditions or like

15   physiological symptoms?

16   A.    Yes.

17   Q.    And the medical conditions that would be relevant for the

18   diagnoses is those that would relate to a particular psychiatric

19   condition, true?

20   A.    Yes.

21   Q.    So, for example, if Mr. Wright has asthma, and asthma

22   contributes to anxiety, asthma could be identified under

23   Axis III, correct?

24   A.    Asthma could.

25   Q.    Let me ask the questions so we can just do it in a question

1    and answer order.

2         What about conditions such as blood in sputum?  If a

3    person is discharging blood from their mouth every morning for a

4    period of time, could that be contributory to anxiety and belong

5    under Axis III?

6         MR. GIEGER:  Object to the form of the question.  I

7    don't think there is any testimony about blood every morning.

8         THE COURT:  Well, the jury -- I'm going to overrule.

9    We've had testimony in this case, and the jury can evaluate; but,

10   I'm going to let him ask the question in a hypothetical fashion

11   and the jury can apply it to the facts of this case as they

12   recall the testimony.

13        THE WITNESS:  Blood in the sputum would not be a

14   diagnosis.  So if you said neuroma or history of neuroma, that

15   might be a diagnosis, but blood in sputum wouldn't.

16                              EXAMINATION

17   BY MR. REICH:

18   Q.   So blood in sputum is not a diagnosis, but perhaps blood --

19   A.   No, you're describing a symptom.

20   Q.   That's a symptom rather than a diagnosis.

21   A.   Right.  So for asthma, for instance, wheezing would be a

22   symptom of asthma, but it wouldn't necessarily -- wheezing

23   doesn't always mean asthma, it could mean something else.

24   Q.   What about, for example, a tumor or a neuroma, you're saying

25   that would be a diagnosis --

1  A.    That could, yes.

2  Q.    -- under Axis III.  And a tumor could contribute to anxiety,

3  correct?

4  A.    Yes.

5  Q.    What about rhinosinusitis, upper respiratory tract problems?

6  A.    That could be a diagnosis.

7  Q.    And rhinosinusitis could be contributory to anxiety

8  depending upon the circumstances?

9  A.    Depending on the severity it may be.

10  Q.    What about headaches?

11  A.    Plus or minus.  Some people would report that, some people

12  don't.

13  Q.    But, in general, physical symptomology that can be

14  identified as a diagnosis could qualify under Axis III in this

15  paradigm, true?

16  A.    It could.  Usually, we use the ones that the person is

17  describing maybe impacting on Axis I, but, you know, no, I don't

18  always include all of those.  Sometimes I remember to include all

19  of them, sometimes I don't.

20       My focus is usually on Axis I and Axis II, but Axis III

21  are conditions that can affect those other conditions, Axis I and

22  Axis II.

23  Q.    And would Axis III basically involve clinical diagnoses, not

24  subclinical ones, ones that a patient would not necessarily be

25  aware of?

1  A.   Yeah.  I mean, I don't really want to go into -- there's a

2  lot of debate about whether to include Axis III, how much to

3  include Axis III, what symptoms to include Axis III.  There's,

4  you know, treatises on that, so.

5  Q.   This is all contained within *DSM-IV*, which is the --

6  A.   That's correct.

7  Q.   -- the leading guideline for providing psychological and

8  psychiatric diagnoses, true?

9  A.   That's correct.

10 Q.   And it's a reference that you use in your daily practice,

11 true?

12 A.   It is.

13 Q.   All right.  And four, that would be something called

14 psychosocial stressors?

15 A.   Right.

16 Q.   And five is a global -- would assessment be a proper --

17 A.   Global assessment.  Global assessment of functioning is how

18 it is commonly referred to.

19 Q.   And this is really the standard methodology by which

20 psychologists and psychiatrists identify issues that are

21 pertinent to rendering a diagnosis, a psychological or

22 psychiatric diagnosis?

23 A.   It's how we communicate with each other and, also, how we go

24 about putting together a treatment plan to treat a particular

25 individual.  It's not perfect, but for the most part it works.

1           MR. REICH:  May I have the demonstrative exhibit which

2    unobjected to showing the Beck tests administered by Dr. Thompson

3    and by Dr. Shwery?

4           MR. GIEGER:  Whoa, whoa, whoa.

5           MR. REICH:  It's unobjected to.  Take it down for a

6    moment.  I thought you said it was unobjected to.

7               No objection?  There is no objection.

8           THE COURT:  What number is it so we can check and see?

9           MR. REICH:  It's demonstrative --

10          MR. GIEGER:  If counsel purports that those are the

11   dates and the numbers and the category and the doctor, I will

12   take him at his word, Judge.  That's fine.

13          THE COURT:  Counsel?

14          MR. CHEATWOOD:  I'm not sure I heard everything

15   Mr. Gieger said, Your Honor, but --

16          MR. GIEGER:  I'm taking him at his word.

17          MR. CHEATWOOD:  -- I don't object to the exhibit.  How

18   about that?

19          THE COURT:  All right.  We're ready to proceed.  Go

20   ahead, Mr. Reich.

21                          EXAMINATION

22   BY MR. REICH:

23   Q.   May we have it back up, please.

24          Dr. Thompson, you see we have the Beck Anxiety

25   Inventory testing results?

1  A.    Yes.

2  Q.    And the dates of administration, July 17th, September 23rd,

3  and November 5th of 2009.  And you will note that the first score

4  was a number nine, which is mild.  That was a Shwery test.

5  A.    Yes.

6  Q.    The second score, September 23, 2009, which his anxiety

7  score went up considerably to 36, correct?

8  A.    Yes.

9  Q.    Now, between July 17th and September 23rd, you're aware that

10  was when the issue of the tumor arose, that Dr. Spector

11  identified a tumor and told Mr. Wright about it?

12  A.    Yes.

13  Q.    And you reviewed medical records and saw that particular

14  medical entry, correct?

15  A.    Yes.

16  Q.    All right.  And you're also aware that there was an issue

17  about a diagnosis of asthma for Mr. Wright that occurred in an

18  interval in which Mr. Wright was informed about an asthmatic

19  condition which he was not aware that he had, true?

20            MR. GIEGER:  I --

21            MR. REICH:  You may answer the question.

22            THE WITNESS:  I wasn't aware at the time that I did my

23  evaluation.  Subsequent to that point I've heard that issue, yes.

24                          EXAMINATION

25  BY MR. REICH:

1  Q.   And are you also aware that additional research had been

2  done and there had been further publications concerning the

3  carcinogenicity of formaldehyde, particularly with respect to

4  leukemia?

5           MR. GIEGER:  Objection, Your Honor.

6           THE COURT:  Approach.

7           (WHEREUPON, at the point in the proceedings, there was a

8  conference held at the bench.)

9           MR. GIEGER:  I am close to calling for a mistrial.  I am

10  about two seconds away from asking for a mistrial.  How dare he

11  do that?  This was exactly the material that was excluded during

12  Williams' testimony, Judge.  Exactly.

13           MR. CHEATWOOD:  Hold on a second.  And there is nothing

14  in this guy's report or on Shwery's report about this.  All he's

15  trying to do, he could ask him everything in the world, but it

16  wasn't included.

17           MR. GIEGER:  And I want him admonished.  I want him

18  admonished, Your Honor.

19           MR. REICH:  Your Honor, Number one, Dr. Cole, one of

20  their experts, offers an opinion that formaldehyde does not cause

21  leukemia.  It's an expert they intend to call in their case in

22  chief.

23           Number two, Patricia Williams was allowed to

24  testify about cancer, and the Court excluded leukemia because of

25  her untimely supplementation, the lack of specificity in her --

1  in her report.

2          Number three, IARC and the National Toxicology

3  Program came out with new publications that specifically

4  addressed leukemia and heightened the concern about the risk of

5  cancer, because leukemia is a more pervasive type of cancer, a

6  nasopharyngeal cancer, there is a much higher incidence of it,

7  and therefore, the threat becomes greater.

8          So all of these reasons are absolutely relevant;

9  plus, it is fair game because on direct examination, Dr. Thompson

10  was asked about, in his opinion, whether Lyndon Wright, whether

11  he had an opinion about whether it was legitimate for

12  Lyndon Wright to have a fear of cancer, so this new research on

13  leukemia becomes relevant because there is a greater cancer

14  burden, greater cancer risk for formaldehyde after this period of

15  time.

16      THE COURT:  Wait a minute.  First of all, Lyndon Wright,

17  you did not show that Lyndon Wright was aware of these two new

18  studies.  So it's irrelevant unless he is aware of it and it is

19  causing anxiety to him.

20          The second thing that I'm very concerned about is

21  getting an opinion that has been excluded in this case by one

22  witness from another witness.

23      MR. GIEGER:  Right.

24      THE COURT:  All of the expert opinions that were going

25  to be offered by each side needed to be in the reports.  If I've

1  excluded them from being untimely or for any other reason, they

2  are excluded.

3          MR. GIEGER:  Judge.

4          MR. REICH:  Your Honor -- let me talk, let me talk.

5          THE COURT:  Wait a moment.  One second.  One second.  Go

6  ahead.

7          MR. GIEGER:  Judge, the only thing I have to reference

8  at this point in time, is remember, he made an objection to my

9  question on fear of cancer and made me reword it, and I only

10  asked him about what Lyndon Wright said.

11          MR. CHEATWOOD:  Furthermore, Judge, in connection with

12  his other opinion that he claims some expert is going to testify

13  to, we know what your rulings are, we can control what's going to

14  come out.  That doesn't make anything relevant.  There is no

15  evidence, and you've excluded that, with leukemia, and to ask

16  this witness that question is beyond the pale.

17          THE COURT:  He's not a general causation expert.

18          MR. REICH:  Dr. Cole, who was hired by the formaldehyde

19  counsel to rebut --

20          MR. CHEATWOOD:  Excuse me.  Who?

21          MR. REICH:  Dr. Cole, an expert retained by the

22  defendants, is an epidemiologist, offered an opinion that

23  formaldehyde does not present a risk of developing leukemia,

24  despite the fact that there have been new studies, several recent

25  ones, one in 2009 by Hauptmann, and another in 2009 by Zhang, and

1  a 2010 one by Zhang.  This stuff was thoroughly explored.  It's

2  going to become a part of their case in chief and to create the

3  impression that there is a minimal fear of cancer, a minimal fear

4  of cancer associated with either a minimal risk or a zero risk is

5  unfair, because the cancer burden has increased because of these

6  new findings on leukemia.

7       It's not a -- it's not a new issue.  And all of

8  this has been thoroughly discussed with Dr. Spector, with

9  Dr. Shwery.  They had communications with Mr. Wright about the

10  cancer risk issues, and therefore, I felt that the question was

11  fair game to overcome the impression that there is not a risk

12  because the nasopharyngeal risk is much much less than the

13  leukemogenic risk.

14       THE COURT:  Mr. Reich, I don't recall any of those

15  experts or Mr. Wright himself testifying about a fear of

16  leukemia.

17       MR. GIEGER:  Right.

18       THE COURT:  Leukemia is something that has come up in

19  connection with Dr. Williams, who has already testified, and the

20  Court ruled, and she testified accordingly.  If any other experts

21  are going to get up here and talk about leukemia, I don't see

22  where that's relevant.  That's not what he's got fear of, nor has

23  he ever been diagnosed with anything that's related to leukemia.

24       MR. GIEGER:  Right.

25       MR. REICH:  Yes, he hasn't been diagnosed with leukemia,

1    but the leukemogenic risk is greater than the nasopharyngeal risk

2    formaldehyde can cause.  Now, multiple different types of cancers

3    and there is some information even about it causing brain cancer.

4    There may have been some reference to the brain cancer issue in

5    this trial, but I wanted to put it in perspective for the risk

6    level.

7            THE COURT:  When I got a Motion in Limine to exclude

8    testimony of Dr. Williams regarding leukemia, clearly, when the

9    defendants urged me to make that ruling implicit in that is that

10   they would not have testimony to suggest that it would not cause

11   leukemia, because I sure would not exclude one expert and allow

12   the other side to elicit such testimony.

13           MR. REICH:  How do we deal with Dr. Cole then, who has

14   taken a very prominent position in speaking on behalf of the

15   formaldehyde industry, that leukemogenic risk is something

16   that -- he is a cancer epidemiologist --

17           THE COURT:  Cole hasn't testified yet.

18           MR. REICH:  We'll take that up then.

19           THE COURT:  Right.  And I'll advise counsel right now on

20   the record that if we're not going to talk about leukemia, which

21   is what defense counsel urged me to exclude with Dr. Williams,

22   we're not talking about leukemia and its relationship to

23   formaldehyde, period, in this case.  And nor has Mr. Wright been

24   diagnosed as having leukemia or leukemia-type symptoms, nor has

25   he expressed a fear of leukemia, as far as I'm concerned.

1        MR. REICH:  It's just one of the types of cancers.  I

2   understand the Court's --

3        MR. CHEATWOOD:  But I object to this man raising

4   leukemia after it's been ruled out.  Nobody said -- Dr. Williams

5   was ruled out, and then he asked the question --

6        THE COURT:  I'm sustaining the objection.  Let's get to

7   next question.

8        (WHEREUPON, at this point in the proceedings, the bench

9   conference concluded.)

10                          EXAMINATION

11  BY MR. REICH:

12  Q.   You would agree that the Beck anxiety inventory test

13  evaluates anxiety associated with a particular time frame

14  surrounding the administration of the test, true?

15  A.   That's what it's supposed to test, yes.

16  Q.   Right.  So it doesn't really test historical information,

17  this particular test.  In other words, going back several years

18  is not going to generally manifest itself in a score on this type

19  of test.

20  A.   If the person takes it as instructed, that's correct.

21  Q.   In fact, it has been your opinion, correct, that the

22  validity scales on the particular tests that have validity

23  scales, show that you were getting valid results from Mr. Wright,

24  true?

25  A.   That's correct.  But if I could, since we've got that up

1   there, my psychologist has it scored as a 31 rather than a 32,

2   just for clarification.  I believe I put that in my report.  It

3   could be 31 or 32, but that's what we have.

4   Q.   There is a fairly good degree of convergence between the 31,

5   the 32 and the 36.  They are both severe.  One test being

6   administered by Dr. Shwery and one by you, correct?

7   A.   Yes.  But I don't know about -- your first comment, I

8   wouldn't agree with.  The second one being administered by

9   Dr. Shwery and one being administered by me, yes.  They are both

10  in the severe.  One would be on the lower end of severe, and one

11  would be on the higher end.

12  Q.   Let's talk for a moment about alcohol.  Did you see

13  Dr. Smith's record, where he had a notation that Mr. Wright,

14  while he was living in the trailer, was drinking about two to

15  three beers per day?

16  A.   Yes.

17  Q.   Now, you told this jury that he was drinking six 16-ounce

18  beers while he was living in the trailer per day, true?

19  A.   Yes.

20  Q.   That would be, what, 96 ounces of beer?

21  A.   Yes.

22  Q.   Per day?

23  A.   Yes.

24  Q.   Would that -- do the math, I guess, there's 16 ounces in a

25  pound, and if you divide 96 by 16, you would say he's drinking

1   five pounds of beer per day?

2   A.   He was drinking roughly what would be equivalent to a

3   six-pack and a half of regular beers a day, yes.

4   Q.   And that would be five pounds of beer, if you were to

5   convert it into weight.  96 ounces divided by 16 ounces in a

6   pound.  It's a lot of beer, right?

7   A.   I don't really think that we look at beer as how much pounds

8   you're drinking.

9   Q.   I was asking you to do the conversion.  I know, but most

10   people don't.  Most people don't.

11   A.   They would probably be shocked to know how much they are

12   drinking.

13   Q.   The reason I'm asking you about that, because are you aware

14   that Mr. Wright weighs between 110 and 115 pounds?

15   A.   I am.  But believe me, in my experience, I've seen very

16   small guys drink way more beer than you believe they can drink

17   and bigger guys drink a lot less.  So it doesn't have to do with

18   the poundage of the individual.

19   Q.   So you would agree that Dr. Smith's notation of two to three

20   beers per day, and he acquired that information -- was it before

21   you did your interview?

22   A.   Which note and what date are you specifically referring to?

23   Q.   I'm just asking you, you said you were familiar with the two

24   to three beers per day notation in Dr. Smith's records.

25   A.   Well, again, I would like to look at that particular

1   notation.  I have other notations memorized.  I don't have that

2   one.  So if you have it, I would like to look at it.

3   Q.   Well, you're welcome to look at it and I'll provide it to

4   you, I guess, at an opportunity.  I don't have it right here, but

5   I'm sure your counsel does.  You're not disputing that Wright's

6   notations indicate -- and the jury will see it, because it's all

7   admitted into evidence -- that his notation indicates he was

8   drinking two to three beers per day while living in the trailer?

9   A.   I'm not going to dispute that's -- that's what Dr. Smith

10  wrote.  I do know, however, that his reports from the physicians

11  at the Uptown Nephrology Clinic was that he was drinking a

12  moderate amount of alcohol.  That the laboratory data at the

13  clinic showed that laboratory indicators, bloodwork, such as MCV,

14  was increasing during the time he was in the FEMA trailer, higher

15  than it was before.  That's a marker for alcohol intake.  His

16  report to me directly -- and I asked him specific questions about

17  it -- was that that was the level that he was drinking, because I

18  asked him, what is the level that you normally drink before and

19  after you're in the trailer versus what was the level you were

20  drinking in the trailer?  And that's his specific report to me.

21  Q.   Now, you would agree that an alcoholic is a person whose

22  judgment suffers.  There is an interference with an alcoholic's

23  judgment because of their beer consumption, true?

24  A.   It may be or it may not be.  Alcoholics present in a wide

25  variety of conditions.  Which are you talking about, alcohol

1   abuse, alcohol dependence or what exactly are you talking?  Since

2   you were using the *DSM-IV*, why don't we just stick with that, if

3   you can.

4   Q.    Let me ask the questions.  With respect to alcohol abuse, a

5   person who is in their mid to late thirties, they drink one to

6   two beers a day, let's say, a male, and the male weighs at least

7   150 pounds or so, would you consider that to be alcohol abuse?

8   A.    I wouldn't -- I would need more information.

9   Q.    Do you recall when I asked you that question and you gave an

10  answer under oath on January 8, 2010?  Let me show it to you,

11  sir.

12          THE COURT:  Page and line.

13          MR. REICH:  Yes, it is page 109, beginning line 8.  And

14  I'll read the question to you.  "With respect to alcohol abuse, a

15  person who is in their mid to late thirties, drinks one to two

16  beers a day, let's say, a male, and the male weighs at least

17  150 pounds or so, would you consider that to be alcohol abuse?"

18  And your answer, "No, as I said before, in order to give a

19  diagnosis of alcohol abuse, you would have to demonstrate when

20  they were consuming alcohol, they were doing something that

21  demonstrated poor judgment, and he did not describe that to me

22  and I didn't find that in the records."  And my next question

23  was, "So you found no evidence of poor judgment in the records

24  resulting from alcohol use by Mr. Wright, correct?"  Answer, and

25  you said "Yes."  True?

1   A.    Okay.   Yeah.   Now that you delineated all that, it makes

2   perfect sense.   So as I testified to before --

3              MR. REICH:   Your Honor, there is no question pending.

4              MR. GIEGER:   Can he finish, Judge?

5              THE COURT:   You directed him to the deposition

6   testimony.   Go ahead and let's stick with the deposition

7   testimony.   If you want to comment on that, you can.

8              THE WITNESS:   Sure.   With the deposition testimony, it's

9   consistent with the testimony I said before.   While he's

10  drinking, he did not report that he was getting into major

11  difficulties, other than showing up at work and still having some

12  of the effects of alcohol on board, but that wasn't impairing his

13  job, by his description.

14                              EXAMINATION

15  BY MR. REICH:

16  Q.    There was absolutely no evidence that you have seen that any

17  alleged alcohol use interfered with his work, true?

18  A.    Yes.

19  Q.    And he held two jobs.   He was working 16 hours a day for a

20  period of time, true?

21  A.    I think for the most part he's held one job.   At one point I

22  think he did hold two, though.

23  Q.    And when he held two jobs, he was working presumably

24  16 hours per day?

25  A.    That's correct.

1  Q.   Did you employ a psychologist to administer a battery of

2  psychological tests to Mr. Wright?

3  A.   Yes.

4  Q.   Did the psychologist perform those tests or did you do them

5  yourself?

6  A.   She -- she interpreted the tests.  I administered the tests,

7  so I sat down with him and gave him the pencil and paper that he

8  needed to fill it out.  That part's relatively easy to do.

9  Q.   Some of the tests that you administered were different than

10  those tests administered by Dr. Shwery, true?

11  A.   No, I gave the -- the similar tests to what he gave.  He

12  gave more than I gave.  So I gave the same tests he gave.  He

13  gave a couple more.

14  Q.   Which tests did Dr. Shwery administer that you did not give?

15  A.   He administered the two that he talked about, the Shipley

16  was one.

17  Q.   Flip it over so you can see.

18  A.   You can if you want.  I think I can remember it, but the

19  Shipley was one, the Millon was the other one that he

20  administered that were different.  So Number 4 and Number 5 on

21  that list.  And also, incomplete sentences, which is more of a

22  projective test.

23  Q.   Did you find Mr. Wright to be a good historian generally?

24  A.   For the most part, yes.  There were inconsistencies, but for

25  the most part, yes.

1   Q.   And you found him to be a person who appeared to provide you

2   with information that was given to you in a coherent, intelligent

3   fashion?

4   A.   For the most part, yes.  There were parts that differed and

5   I believe I delineated those in my report.

6   Q.   And he was cooperative and responsive?

7   A.   Yes.

8   Q.   And the testing that you administered demonstrated that he

9   had a valid profile, that he did not tend to overstate any of his

10  symptoms or understate them, true?

11  A.   That's how I would interpret it.

12  Q.   And would you agree that a malingerer is a person who

13  attempts to deceive another person for some secondary purpose,

14  such as monetary gain?

15  A.   That's correct.

16  Q.   And the MMPI did not demonstrate in any fashion that he was

17  exaggerating his symptoms, correct?

18  A.   I wouldn't say in any fashion.  The validity scales, the

19  scales were valid.

20  Q.   So you would agree that the readings of the MMPI's scales

21  demonstrated validity to the responses provided by Mr. Wright?

22  A.   He -- he gave a valid -- he gave valid responses in relation

23  to the scales of that particular test, yes.

24  Q.   And that was true for all of the tests that had validity

25  scales, true?

1  A.    Yes.  There were only two that have validity scales.   The

2  MBMD, which was given by Dr. Shwery, and then the MMPI-2, which

3  were given for both of us.

4  Q.    And the MBMD and the MMPI-2 both have validity scales that

5  can ferret out malingerers, true?

6  A.    It doesn't -- it doesn't ferret out malingerers.  What it

7  does is, it tells whether the person is over endorsing symptoms

8  or under endorsing symptoms.

9  Q.    And Mr. Wright did neither.  He didn't over endorse and he

10  didn't under endorse, correct?

11  A.    Yes.  I think I've said that several times.

12          MR. REICH:  I pass the witness.

13          THE COURT:  Brief redirect?

14          MR. GIEGER:  Yes, Your Honor, very quick.

15                          REDIRECT EXAMINATION

16  BY MR. GIEGER:

17  Q.    Doctor, you did not diagnose Mr. Wright as a malingerer,

18  correct?

19  A.    Yes.

20          MR. GIEGER:  May I approach, Your Honor?  If you'll look

21  at your report of John Thompson, and if you'll go to page 5.

22  BY MR. GIEGER:

23  Q.    As it relates to anxiety and asthma, right, did Mr. Wright,

24  when you came in and got all of his medical conditions, did he

25  express to you anything about asthma?

1   A.    No, he did not.

2   Q.    Did he give to you any information that he had any anxiety

3   as it relates to a medical condition associated with asthma?

4   A.    No, he did not.

5         MR. GIEGER:  Okay.  Now, if I can, Your Honor, may I

6   approach?

7         THE COURT:  Yes.

8                          EXAMINATION

9   BY MR. GIEGER:

10  Q.    I'm going to try to save some time.  I'm going to reference

11  you to page 5 of your report, specifically Number 16.  Okay.  And

12  you said you reviewed 45 things.  I just want to ask, tell the

13  jury, what's Number 16?

14  A.    It's an affidavit and report of Dr. Richard Spector, and a

15  deposition of Dr. Spector, dated 10/29.

16  Q.    You reviewed those materials?

17  A.    Yes.

18  Q.    And relied upon them to give your opinions in this case?

19  A.    Yes.

20        MR. GIEGER:  Judge, in lieu of him pulling out of the

21  box that affidavit, I have it here in front of me, if that's

22  okay, I could show the witness.

23        THE COURT:  Any objection?

24        MR. REICH:  No objection.

25        THE COURT:  Okay.

1           EXAMINATION

2  BY MR. GIEGER:

3  Q.   I'm going to -- this is Dr. Spector's affidavit, Number 16,

4  and I would like you to reference the two parts of Dr. Spector's

5  affidavit, but first, may I see it?  Okay.  As it relates to the

6  tumor, the neuroma, what did Dr. Spector say?

7  A.   I cannot attribute -- I cannot attribute this neuroma to the

8  alleged formaldehyde exposure.

9  Q.   And if you go to this portion of Dr. Spector's report, as he

10 relates to the blood in the mucous, blood in the sputum, what did

11 he say?

12 A.   I cannot identify any relationship between his exposure to

13 formaldehyde and his complaint of bloody mucous or ear drainage.

14 Q.   And is that relevant to your opinions in this case?

15 A.   Yes.

16 Q.   How?

17 A.   Well, I think it's important to know that the doctor who was

18 actually seeing him for that and discussing it with him, told him

19 that he didn't -- or at least has the opinion that formaldehyde

20 did not cause the primary symptom that he was describing, as far

21 as his physical symptoms, to me.

22         MR. GIEGER:  That's all the questions I have, Judge.

23         THE COURT:  Thank you, Doctor.  You can step down.  It's

24 10 minutes to 12:00.  So we're going to go ahead and take our

25 lunch break.  Why don't we plan on starting at one o'clock.  If

1   you all would be back at one o'clock, that would be great.

2   Please don't discuss the case amongst yourselves during the lunch

3   break.

4           THE COURT SECURITY OFFICER:  All rise for the jury.

5           (WHEREUPON, at this point in the proceedings, the jury

6   panel leaves the courtroom.)

7           THE COURT:  Counsel, after the break we will have --

8   we're doing the videotape next, is that Polk?

9           MR. GIEGER:  Yes, Your Honor.

10          THE COURT:  And then we would have -- and then who would

11  we have after that?

12          MR. GIEGER:  I will then call my corporate

13  representative, Your Honor.

14          THE COURT:  Right.  Mr. Gaeddert?

15          MR. GIEGER:  Since we're basically to that hour and a

16  half, was exactly the same amount of time of the depositions we

17  plan on playing later today.  So I'm still optimistic, depending

18  on cross, that we will, in fact, be through a set of depositions

19  and my corporate witness today.  So we will stay on track.

20          THE COURT:  Right.  That would be my goal and I think

21  that's what the schedule suggests that has been compiled up to

22  this point.  So assuming we can do that, we'll just pick up the

23  shorter depositions tomorrow, which should add up to about -- I

24  agree with you, about the same amount of time as Polk.

25          MR. GIEGER:  It's about five minutes difference, that's

1    it.

2           THE COURT:  Good.  We'll see you then -- at one o'clock

3    I'm going to cover with the jury the scheduling issue we

4    discussed this morning.  So we'll probably start a little after

5    1:00, but I'll go ahead and explain to them what we discussed

6    this morning.

7           MR. GIEGER:  Are you doing that in open court?

8           THE COURT:  I would rather do that when they are back

9    there.

10                              *    *    *

11

12                        REPORTER'S CERTIFICATE

13

14       I, Cathy Pepper, Certified Realtime Reporter, Registered

15   Merit Reporter, Registered Professional Reporter, Certified Court

16   Reporter of the State of Louisiana, Official Court Reporter for

17   the United States District Court, Eastern District of Louisiana,

18   do hereby certify that the foregoing is a true and correct

19   transcript, to the best of my ability and understanding, from the

20   record of the proceedings in the above-entitled and numbered

21   matter.

22

23                              *s/Cathy Pepper*
                                Cathy Pepper, CRR, RMR, CCR
24                              Official Court Reporter
                                United States District Court

25

## $

**$200** [1] - 1575:15
**$23,000** [1] - 1639:11
**$25,000** [1] - 1575:25
**$300** [1] - 1575:16
**$650** [1] - 1641:17

## '

**'09** [2] - 1610:22, 1616:25

## 0

**0565** [1] - 1594:10
**09-2977** [1] - 1539:9

## 1

**10** [5] - 1599:8, 1601:16, 1619:8, 1638:8, 1665:24
**10/29** [1] - 1664:15
**100** [4] - 1540:7, 1557:19, 1557:20, 1575:17
**1000** [1] - 1539:21
**103** [1] - 1557:22
**109** [1] - 1659:13
**10:00** [2] - 1601:15, 1601:16
**10:20** [3] - 1601:17, 1602:1, 1602:14
**110** [1] - 1657:14
**115** [3] - 1557:19, 1557:21, 1657:14
**12:00** [1] - 1665:24
**14** [5] - 1623:1, 1623:7, 1623:8, 1623:9, 1634:3
**15** [1] - 1580:22
**150** [6] - 1575:17, 1575:18, 1638:2, 1638:5, 1659:7, 1659:17
**1543** [1] - 1541:5
**1544** [1] - 1541:6
**1576** [1] - 1541:7
**1589** [1] - 1541:8
**1596** [1] - 1541:9
**16** [8] - 1656:24, 1656:25, 1657:5, 1660:19, 1660:24, 1664:11, 1664:13, 1665:3
**16-ounce** [2] -

1612:15, 1656:17
**1604** [1] - 1541:10
**1605** [1] - 1541:11
**1639** [1] - 1541:12
**1663** [1] - 1541:13
**17** [1] - 1625:8
**17th** [3] - 1562:15, 1649:2, 1649:9
**1873** [1] - 1539:5
**1940s** [1] - 1560:23
**1970s** [1] - 1547:7
**1980** [2] - 1572:19
**1984** [1] - 1545:15
**1985** [1] - 1561:1
**1:00** [1] - 1667:5

## 2

**20** [4] - 1562:15, 1581:5, 1598:14, 1637:15
**2000** [7] - 1554:9, 1554:24, 1556:15, 1564:23, 1578:9, 1578:14, 1618:24
**2002** [2] - 1554:12, 1578:9
**2003** [1] - 1618:23
**2004** [2] - 1554:12, 1618:23
**2005** [4] - 1554:25, 1556:16, 1578:15
**2006** [1] - 1562:19
**2008** [2] - 1570:7, 1621:22
**2009** [17] - 1552:14, 1562:16, 1562:19, 1567:16, 1568:17, 1570:2, 1580:17, 1581:6, 1581:18, 1585:9, 1617:15, 1627:20, 1627:21, 1649:3, 1649:6, 1652:25
**201** [1] - 1540:18
**2010** [5] - 1539:6, 1542:3, 1643:6, 1653:1, 1659:10
**20th** [1] - 1561:1
**22** [2] - 1539:6, 1542:3
**23** [2] - 1567:16, 1649:6
**23rd** [2] - 1649:2, 1649:9
**24** [3] - 1552:14, 1570:1, 1575:25
**25** [1] - 1575:9
**250** [2] - 1638:4, 1638:5

## 3

**3** [8] - 1570:2, 1570:3, 1570:4, 1591:6, 1591:11, 1591:12, 1603:16, 1636:11
**30** [2] - 1560:19, 1575:15
**300** [1] - 1638:2
**31** [4] - 1625:4, 1656:1, 1656:3, 1656:4
**32** [3] - 1656:1, 1656:3, 1656:5
**350** [1] - 1544:23
**36** [7] - 1544:15, 1553:2, 1624:15, 1625:4, 1625:5, 1649:7, 1656:5
**3600** [1] - 1540:18

## 4

**4** [5] - 1570:3, 1570:19, 1579:6, 1592:1, 1661:20
**40** [3] - 1560:19, 1561:6, 1598:15
**4265** [1] - 1539:21
**45** [5] - 1572:6, 1617:9, 1617:13, 1642:17, 1664:12
**450** [1] - 1641:19
**4459** [1] - 1540:4
**4550** [1] - 1539:24
**4800** [1] - 1540:12
**486** [1] - 1540:4

## 5

**5** [4] - 1583:21, 1661:20, 1663:21, 1664:11
**50** [3] - 1561:6, 1572:6, 1641:14
**500** [1] - 1540:23
**504** [1] - 1540:24
**55** [1] - 1574:13
**589-7779** [1] - 1540:24
**5th** [2] - 1617:15, 1649:3

## 6

**6** [2] - 1539:11, 1583:21

## 7

**701** [1] - 1540:12
**70113** [1] - 1539:18
**70130** [1] - 1540:23
**70139** [1] - 1540:13
**70170** [1] - 1540:18
**77027** [1] - 1539:21
**78257** [1] - 1540:8
**78413** [1] - 1539:24

## 8

**8** [5] - 1552:8, 1553:11, 1625:7, 1659:10, 1659:13
**80** [1] - 1575:17
**8:30** [1] - 1539:6

## 9

**9** [1] - 1552:8
**96** [3] - 1656:20, 1656:25, 1657:5

## A

**A.M** [1] - 1539:6
**AARON** [1] - 1539:17
**abbreviate** [1] - 1551:2
**abide** [1] - 1584:21
**abilities** [1] - 1558:3
**ability** [3] - 1557:21, 1557:25, 1667:19
**able** [3] - 1600:11, 1602:9, 1629:23
**above-entitled** [1] - 1667:20
**absence** [1] - 1549:5
**absolutely** [6] - 1543:17, 1581:7, 1585:21, 1587:1, 1651:8, 1660:16
**abstain** [1] - 1615:9
**abstract** [1] - 1557:17
**abuse** [12] - 1546:4, 1546:10, 1563:22, 1629:10, 1630:2, 1644:10, 1659:1, 1659:4, 1659:7, 1659:14, 1659:17,

## 3

**29402** [1] - 1540:4

## A

1659:19
**academic** [2] - 1549:3, 1573:10
**accept** [2] - 1543:12, 1590:18
**accident** [2] - 1564:18, 1641:4
**accomplishments** [1] - 1544:25
**according** [1] - 1633:11
**accordingly** [1] - 1653:20
**acknowledge** [1] - 1549:17
**acknowledged** [1] - 1620:12
**acquire** [1] - 1555:22
**acquired** [2] - 1568:17, 1657:20
**act** [1] - 1609:6
**active** [1] - 1563:23
**actual** [4] - 1557:21, 1572:25, 1580:19, 1606:24
**adapted** [3] - 1611:1, 1619:4, 1619:10
**adaptive** [3] - 1573:12, 1574:1, 1574:13
**add** [2] - 1565:25, 1666:23
**addiction** [4] - 1605:8, 1607:1, 1607:3, 1615:15
**addictive** [3] - 1605:1, 1605:7, 1607:9
**addition** [4] - 1548:1, 1562:9, 1598:23, 1600:9
**additional** [4] - 1549:16, 1549:19, 1576:3, 1650:1
**addressed** [1] - 1651:4
**adjusted** [1] - 1581:20
**adjustment** [1] - 1583:3
**administer** [10] - 1548:2, 1548:13, 1551:25, 1553:6, 1584:2, 1604:13, 1617:25, 1624:23, 1661:1, 1661:14
**administered** [23] - 1552:11, 1553:9, 1561:17, 1580:6, 1580:10, 1583:24, 1598:8, 1618:7, 1618:9, 1624:22, 1625:3, 1625:15,

1630:25, 1648:2,
1656:6, 1656:8,
1656:9, 1661:6,
1661:9, 1661:10,
1661:15, 1661:20,
1662:8
**administration** [13] -
1547:24, 1559:4,
1559:15, 1561:12,
1598:5, 1624:9,
1624:10, 1625:4,
1625:23, 1638:21,
1649:2, 1655:14
**admitted** [1] - 1658:7
**admonished** [2] -
1650:17, 1650:18
**ads** [1] - 1597:6
**adults** [1] - 1546:2
**adverse** [1] - 1570:7
**advise** [1] - 1654:19
**affect** [2] - 1577:1,
1646:21
**affected** [3] - 1614:7,
1619:22, 1620:13
**affecting** [2] - 1573:9,
1633:21
**affective** [1] - 1644:8
**affidavit** [4] - 1664:14,
1664:21, 1665:3,
1665:5
**affiliated** [1] - 1547:2
**affiliation** [1] -
1608:10
**afield** [1] - 1595:2
**afraid** [1] - 1592:20
**aftereffects** [1] -
1629:23
**afternoon** [1] -
1597:17
**afterwards** [1] -
1612:10
**age** [2] - 1598:14,
1598:15
**agencies** [1] - 1546:8
**ago** [3] - 1547:8,
1547:10, 1643:7
**agree** [10] - 1570:16,
1595:9, 1634:20,
1655:12, 1656:8,
1657:19, 1658:21,
1662:12, 1662:20,
1666:24
**agreement** [4] -
1603:21, 1604:3,
1604:7, 1605:4
**ahead** [26] - 1542:17,
1542:19, 1555:2,
1555:11, 1559:21,
1571:1, 1581:10,
1581:14, 1582:2,

1582:13, 1596:18,
1599:20, 1600:24,
1601:16, 1602:2,
1604:3, 1604:8,
1604:13, 1630:8,
1634:22, 1648:20,
1652:6, 1660:6,
1665:24, 1667:5
**AHLQUIST** [1] -
1539:17
**aid** [1] - 1563:18
**ailments** [5] - 1565:1,
1565:5, 1566:7,
1593:22, 1596:11
**air** [1] - 1564:9
**air-conditioning** [1] -
1564:9
**AL** [1] - 1539:8
**Alabama** [2] - 1545:7,
1547:6
**alcohol** [31] - 1612:12,
1612:14, 1612:17,
1612:24, 1615:7,
1615:10, 1615:12,
1615:17, 1615:19,
1615:24, 1628:19,
1629:2, 1629:3,
1629:10, 1630:2,
1630:5, 1656:12,
1658:12, 1658:15,
1658:25, 1659:1,
1659:4, 1659:7,
1659:14, 1659:17,
1659:19, 1659:20,
1659:24, 1660:12,
1660:17
**alcoholic** [3] -
1629:13, 1630:11,
1658:21
**alcoholic's** [1] -
1658:22
**alcoholics** [1] -
1658:24
**alleged** [3] - 1588:22,
1660:17, 1665:8
**allergic** [2] - 1566:10,
1617:19
**allergies** [6] -
1596:15, 1638:17,
1638:18, 1638:19,
1638:24
**allow** [2] - 1566:1,
1654:11
**allowed** [2] - 1572:23,
1650:23
**allowing** [1] - 1570:23
**almost** [4] - 1601:15,
1611:10, 1615:14,
1615:18
**ALSO** [1] - 1540:20

**altogether** [1] -
1615:10
**America** [1] - 1551:18
**American** [1] -
1551:19
**amount** [12] - 1575:6,
1598:19, 1613:16,
1615:12, 1629:16,
1639:6, 1639:8,
1639:9, 1658:12,
1666:16, 1666:24
**amounts** [2] -
1594:14, 1594:23
**ancient** [1] - 1557:11
**answer** [22] - 1548:17,
1549:2, 1561:11,
1566:1, 1566:2,
1571:1, 1571:23,
1581:14, 1582:12,
1582:13, 1588:21,
1589:3, 1589:4,
1596:18, 1630:6,
1630:8, 1641:13,
1645:1, 1649:21,
1659:10, 1659:18,
1659:24
**answered** [1] - 1562:8
**answering** [2] -
1559:8, 1631:20
**antibiotic** [2] -
1614:12, 1614:13
**anticipate** [1] - 1602:7
**antidepressant** [3] -
1554:16, 1610:13,
1614:13
**antidepressant/**
**antianxiety** [1] -
1637:15
**antisocial** [1] -
1636:19
**ANTONIO** [1] - 1540:8
**anxieties** [2] -
1566:15, 1595:22
**anxiety** [74] - 1549:10,
1551:17, 1551:20,
1551:23, 1552:9,
1553:1, 1553:3,
1561:18, 1568:15,
1568:22, 1568:24,
1568:25, 1569:1,
1569:4, 1570:12,
1570:13, 1570:20,
1571:24, 1573:1,
1573:7, 1573:19,
1574:5, 1583:1,
1583:6, 1586:6,
1586:16, 1588:11,
1592:17, 1597:24,
1598:1, 1600:4,
1606:17, 1611:3,

1611:6, 1611:7,
1611:8, 1611:11,
1611:13, 1611:17,
1612:1, 1612:19,
1612:23, 1613:17,
1620:11, 1621:23,
1624:16, 1624:17,
1625:6, 1625:19,
1626:2, 1627:2,
1629:5, 1629:9,
1631:22, 1632:3,
1632:7, 1634:5,
1636:16, 1644:2,
1644:5, 1644:9,
1644:22, 1645:4,
1646:2, 1646:7,
1649:6, 1651:19,
1655:12, 1655:13,
1663:23, 1664:2
**Anxiety** [15] - 1550:23,
1551:15, 1552:7,
1553:1, 1618:8,
1624:8, 1624:10,
1624:14, 1624:21,
1625:3, 1630:25,
1631:10, 1631:14,
1636:5, 1648:24
**anxious** [5] - 1563:1,
1569:3, 1572:20,
1573:16, 1611:24
**anytime** [1] - 1594:19
**apologize** [1] -
1571:16
**apparent** [1] - 1560:14
**Appeals** [1] - 1546:22
**APPEARANCES** [2] -
1539:15, 1540:1
**appeared** [3] - 1568:8,
1636:6, 1662:1
**appearing** [1] -
1615:16
**appellate** [1] -
1546:15
**appetite** [1] - 1581:3
**apply** [3] - 1607:15,
1645:11
**appoint** [1] - 1546:18
**appointed** [2] -
1546:14, 1546:19
**appointment** [1] -
1547:22
**approach** [8] - 1550:1,
1569:17, 1583:15,
1637:23, 1643:19,
1650:6, 1663:20,
1664:6
**appropriate** [3] -
1570:9, 1599:14,
1644:13
**area** [4] - 1561:1,

1573:5, 1606:22,
1640:25
**areas** [5] - 1546:4,
1607:5, 1620:10,
1632:16, 1640:10
**arm** [1] - 1592:21
**arose** [1] - 1649:10
**arousal** [2] - 1569:2,
1569:5
**article** [1] - 1603:16
**aspects** [1] - 1635:22
**assessing** [1] - 1549:5
**assessment** [4] -
1618:3, 1647:16,
1647:17
**asset** [1] - 1598:6
**assist** [1] - 1610:1
**associated** [5] -
1566:15, 1577:12,
1653:4, 1655:13,
1664:3
**association** [1] -
1557:11
**assume** [3] - 1578:13,
1587:8, 1594:17
**assuming** [1] -
1666:22
**asthma** [22] - 1567:22,
1568:10, 1586:19,
1586:24, 1588:8,
1627:23, 1627:25,
1628:14, 1628:15,
1628:18, 1643:15,
1644:21, 1644:22,
1644:24, 1645:21,
1645:22, 1645:23,
1649:17, 1663:23,
1663:25, 1664:3
**asthmatic** [2] -
1643:10, 1649:18
**AT** [1] - 1539:23
**attempt** [1] - 1562:10
**attempting** [1] -
1636:24
**attempts** [2] -
1561:14, 1662:13
**attended** [2] - 1622:3,
1622:16
**attending** [1] -
1622:22
**attention** [2] -
1561:10, 1611:19
**attorney** [4] - 1577:9,
1577:10, 1608:20,
1640:16
**ATTORNEY** [1] -
1539:23
**attorneys** [11] -
1542:12, 1567:12,
1577:12, 1609:2,

1609:17, 1609:18, 1609:20, 1611:21, 1626:6, 1641:20

**Attorneys'** [1] - 1546:11
**attribute** [2] - 1665:7
**attributed** [1] - 1572:8
**August** [4] - 1554:25, 1556:16, 1567:9
**automobile** [1] - 1564:18
**available** [1] - 1617:12
**AVENUE** [1] - 1540:18
**average** [2] - 1557:20
**award** [1] - 1632:22
**aware** [11] - 1597:4, 1643:13, 1646:25, 1649:9, 1649:16, 1649:19, 1649:22, 1650:1, 1651:17, 1651:18, 1657:13
**axes** [3] - 1572:13, 1572:17, 1572:24
**axial** [1] - 1643:25
**axis** [6] - 1570:19, 1573:8, 1573:12, 1574:11, 1643:23, 1644:1
**Axis** [16] - 1572:25, 1573:2, 1644:23, 1645:5, 1646:2, 1646:14, 1646:17, 1646:20, 1646:21, 1646:22, 1646:23, 1647:2, 1647:3

# B

**B406** [1] - 1540:23
**background** [4] - 1543:15, 1544:24, 1548:8, 1577:20
**bad** [1] - 1553:14
**badly** [1] - 1566:23
**BAI** [2] - 1550:24, 1552:7
**BAKER** [1] - 1540:15
**balance** [1] - 1546:23
**BARONNE** [1] - 1539:18
**base** [3] - 1567:19, 1613:11, 1613:13
**based** [15] - 1548:13, 1555:10, 1557:10, 1558:21, 1568:16, 1569:9, 1570:10, 1570:12, 1570:13, 1572:9, 1574:9, 1574:10, 1576:3,

1578:15, 1618:3
**baseline** [1] - 1611:14
**basic** [6] - 1557:18, 1557:20, 1559:24, 1613:2, 1613:4
**basis** [15] - 1577:18, 1606:16, 1607:21, 1608:8, 1612:13, 1614:3, 1615:3, 1615:22, 1619:11, 1626:25, 1633:22, 1635:15, 1635:17, 1639:1, 1641:25
**battery** [3] - 1547:24, 1549:8, 1661:1
**BDI** [1] - 1597:23
**BDI-2** [1] - 1580:12
**BDI-II** [1] - 1597:23
**BEARMAN** [1] - 1540:15
**beats** [1] - 1589:6
**became** [2] - 1563:17, 1611:23
**Beck** [30] - 1550:23, 1551:4, 1551:15, 1552:7, 1553:1, 1553:4, 1560:20, 1580:13, 1597:14, 1618:8, 1618:9, 1624:8, 1624:10, 1624:11, 1624:13, 1624:18, 1624:21, 1625:3, 1625:7, 1630:25, 1631:1, 1631:10, 1631:14, 1636:5, 1648:2, 1648:24, 1655:12
**BECK** [1] - 1550:23
**become** [2] - 1606:22, 1653:2
**becomes** [2] - 1651:7, 1651:13
**becoming** [1] - 1592:25
**beer** [7] - 1656:20, 1657:1, 1657:4, 1657:6, 1657:7, 1657:16, 1658:23
**beers** [10] - 1612:15, 1615:7, 1656:15, 1656:18, 1657:3, 1657:20, 1657:24, 1658:8, 1659:6, 1659:16
**BEFORE** [1] - 1539:12
**began** [2] - 1545:7, 1564:7
**beginning** [1] - 1659:13
**begins** [1] - 1599:11

**behalf** [1] - 1654:14
**behavioral** [1] - 1558:13
**Behavioral** [1] - 1551:11
**behind** [1] - 1542:23
**beliefs** [1] - 1635:10
**believes** [3] - 1589:8, 1634:11, 1634:15
**belong** [1] - 1645:4
**below** [3] - 1593:24, 1611:7, 1632:4
**bench** [10] - 1569:20, 1571:5, 1571:8, 1622:21, 1623:21, 1634:2, 1635:6, 1637:24, 1650:8, 1655:8
**benefit** [1] - 1616:20
**BERKOWITZ** [1] - 1540:16
**best** [3] - 1598:3, 1601:11, 1667:19
**better** [12] - 1556:21, 1557:25, 1582:20, 1610:15, 1614:10, 1614:12, 1614:14, 1614:20, 1614:22, 1614:23, 1619:7, 1631:13
**between** [29] - 1554:24, 1556:15, 1558:4, 1558:11, 1578:14, 1578:16, 1584:4, 1585:8, 1587:2, 1597:5, 1600:8, 1600:12, 1600:16, 1601:5, 1607:12, 1608:16, 1621:11, 1622:4, 1625:13, 1632:11, 1636:2, 1638:5, 1640:3, 1642:25, 1644:9, 1649:9, 1656:4, 1657:14, 1665:12
**beyond** [4] - 1569:7, 1600:3, 1637:20, 1652:16
**big** [2] - 1619:19, 1626:17
**bigger** [2] - 1626:19, 1657:17
**billed** [2] - 1639:6, 1639:8
**bimonthly** [1] - 1616:2
**BINSTOCK** [1] - 1539:20
**biology** [1] - 1606:8
**biopsy** [1] - 1587:4

**birth** [1] - 1594:16
**bit** [9] - 1542:16, 1545:25, 1566:21, 1577:14, 1604:2, 1616:11, 1616:13, 1618:6, 1639:24
**Blank** [1] - 1551:6, 1562:7
**blank** [1] - 1557:5
**bleeding** [3] - 1568:5, 1588:8, 1639:1
**block** [1] - 1560:6
**blocking** [1] - 1556:7
**blood** [16] - 1563:6, 1568:5, 1579:15, 1599:22, 1619:17, 1620:20, 1628:13, 1645:2, 1645:3, 1645:7, 1645:13, 1645:15, 1645:18, 1665:10
**bloodwork** [1] - 1658:13
**bloody** [1] - 1665:13
**board** [10] - 1605:9, 1606:19, 1606:22, 1606:23, 1606:24, 1607:6, 1618:7, 1624:7, 1639:20, 1660:12
**boat** [2] - 1562:22, 1562:23
**body** [1] - 1572:5
**bombarded** [1] - 1597:7
**bone** [15] - 1565:2, 1570:14, 1573:23, 1574:8, 1591:22, 1592:8, 1592:17, 1593:3, 1593:9, 1593:16, 1596:23, 1599:7, 1599:9, 1599:11, 1599:21
**BONE** [25] - 1540:11, 1543:10, 1555:1, 1555:9, 1565:22, 1566:17, 1569:14, 1576:13, 1576:15, 1578:23, 1580:5, 1581:12, 1581:17, 1582:5, 1582:24, 1583:18, 1585:3, 1587:19, 1588:17, 1589:13, 1589:17, 1596:17, 1599:13, 1600:21, 1633:23
**BONE........................** . [1] - 1541:7
**bones** [1] - 1565:3
**books** [4] - 1553:21,

1556:22, 1582:19
**border** [1] - 1625:6
**bother** [2] - 1626:6, 1626:7
**bothered** [2] - 1597:25, 1619:24
**bothering** [1] - 1620:3
**bottom** [5] - 1591:8, 1591:11, 1591:12, 1594:12, 1596:5
**BOX** [1] - 1540:4
**box** [2] - 1616:17, 1664:21
**brain** [2] - 1654:3, 1654:4
**branch** [1] - 1544:19
**break** [5] - 1592:21, 1601:17, 1665:25, 1666:3, 1666:7
**breaking** [1] - 1572:5
**breathing** [10] - 1563:8, 1563:13, 1565:15, 1566:9, 1568:23, 1573:21, 1574:8, 1600:1, 1600:4, 1620:18
**brief** [7] - 1548:14, 1564:13, 1564:16, 1583:3, 1602:15, 1603:3, 1663:13
**briefly** [8] - 1545:5, 1545:23, 1546:23, 1565:10, 1572:15, 1607:12, 1630:23, 1635:22
**bring** [3] - 1569:17, 1621:7, 1627:25
**brings** [1] - 1626:25
**broken** [1] - 1572:22
**brought** [2] - 1548:8, 1628:17
**brushed** [1] - 1619:18
**BUILDING** [1] - 1540:7
**burden** [2] - 1651:14, 1653:5
**but..** [1] - 1559:20
**buy** [1] - 1556:22
**BY** [60] - 1539:17, 1539:20, 1540:3, 1540:6, 1540:11, 1540:16, 1540:24, 1540:25, 1541:6, 1541:7, 1541:8, 1541:9, 1541:11, 1541:12, 1541:13, 1544:9, 1550:4, 1550:19, 1555:5, 1555:15, 1566:6, 1571:11, 1571:22, 1576:15, 1578:23,

1580:5, 1581:12, 1581:17, 1582:5, 1582:24, 1583:18, 1585:3, 1587:19, 1588:17, 1589:13, 1589:20, 1591:16, 1595:12, 1596:4, 1596:21, 1599:25, 1601:2, 1605:12, 1623:23, 1628:5, 1630:13, 1635:8, 1638:7, 1639:19, 1641:8, 1643:22, 1645:17, 1648:22, 1649:25, 1655:11, 1660:15, 1663:16, 1663:22, 1664:9, 1665:2

## C

calculate [1] - 1575:19
CALDWELL [1] - 1540:15
California [2] - 1594:15, 1594:24
CALLED [1] - 1542:4
calming [1] - 1568:14
cancer [29] - 1568:11, 1588:13, 1594:16, 1594:25, 1595:17, 1595:21, 1633:20, 1634:9, 1634:12, 1634:15, 1635:11, 1635:14, 1635:16, 1650:24, 1651:5, 1651:6, 1651:12, 1651:13, 1651:14, 1652:9, 1653:3, 1653:4, 1653:5, 1653:10, 1654:3, 1654:4, 1654:16
cancerous [1] - 1588:10
cancers [2] - 1654:2, 1655:1
cannot [5] - 1577:1, 1577:3, 1665:7, 1665:12
capacity [2] - 1608:19, 1640:18
car [1] - 1641:4
carcinogen [1] - 1596:9
carcinogenicity [1] - 1650:3
cardiac [1] - 1627:15
care [8] - 1564:25, 1565:6, 1565:8, 1587:21, 1587:23,

1588:24, 1616:3, 1631:13
career [1] - 1545:11
carrying [1] - 1555:6
CARSON [1] - 1540:12
case [40] - 1543:16, 1547:12, 1547:13, 1551:16, 1584:16, 1587:9, 1588:12, 1588:22, 1599:4, 1604:5, 1605:15, 1605:19, 1606:6, 1608:22, 1609:3, 1609:25, 1610:1, 1610:7, 1617:9, 1618:18, 1626:24, 1628:22, 1630:24, 1631:24, 1633:10, 1633:17, 1633:19, 1639:3, 1640:17, 1641:18, 1643:5, 1645:9, 1645:11, 1650:21, 1651:21, 1653:2, 1654:23, 1664:18, 1665:14, 1666:2
categories [3] - 1631:20, 1644:2, 1644:7
category [1] - 1648:11
Catholic [1] - 1546:9
Cathy [2] - 1667:14, 1667:23
CATHY [1] - 1540:22
causal [3] - 1570:17, 1570:24, 1630:21
causally [3] - 1587:10, 1587:22, 1587:23
causation [3] - 1585:19, 1634:3, 1652:17
caused [4] - 1585:24, 1586:2, 1586:15, 1588:6
causing [4] - 1588:9, 1627:2, 1651:19, 1654:3
CCR [2] - 1540:22, 1667:23
center [1] - 1545:9
central [1] - 1556:9
century [1] - 1561:1
certain [9] - 1548:2, 1568:18, 1569:7, 1598:8, 1606:19, 1606:22, 1622:16, 1628:24, 1636:7
certainly [1] - 1571:2, 1620:2
certainty [1] - 1572:10

CERTIFICATE [1] - 1667:12
certification [1] - 1639:20
certifications [1] - 1606:19
Certified [2] - 1667:14, 1667:15
certified [1] - 1607:6
certify [1] - 1667:18
cetera [1] - 1601:4
chair [1] - 1542:23
chance [1] - 1603:4
change [2] - 1580:25, 1581:3
changed [3] - 1567:4, 1567:6, 1584:4
changes [1] - 1593:22
characteristics [1] - 1559:24
characterize [1] - 1554:23
charge [2] - 1547:17, 1575:15
CHARLES [1] - 1540:18
CHARLESTON [1] - 1540:4
Cheatwood [5] - 1589:18, 1589:21, 1602:20, 1602:21, 1639:15
CHEATWOOD [22] - 1540:17, 1543:11, 1570:11, 1589:20, 1591:14, 1591:16, 1595:8, 1595:12, 1595:24, 1603:2, 1603:8, 1603:13, 1605:5, 1623:9, 1634:25, 1639:16, 1648:14, 1648:17, 1650:13, 1652:11, 1652:20, 1655:3
CHEATWOOD.......... ......... [1] - 1541:8
check [1] - 1648:8
chemicals [2] - 1594:3, 1594:7
chief [2] - 1650:22, 1653:2
child [2] - 1545:12, 1563:15
children [4] - 1545:10, 1545:14, 1546:3, 1546:5
children's [1] - 1545:9
Chinese [1] - 1609:23
chlorine [1] - 1564:14
chose [1] - 1636:17

CHRIS [1] - 1539:23
CHRISTI [1] - 1539:24
chronic [2] - 1546:5, 1638:20
church [1] - 1546:9
cigar [1] - 1634:19
Circuit [1] - 1546:22
circumstances [2] - 1547:20, 1646:8
city [1] - 1620:3
City [2] - 1562:21, 1564:8
civil [4] - 1608:22, 1609:17, 1641:1, 1641:3
claimed [1] - 1636:2
claims [2] - 1584:16, 1652:12
clarification [1] - 1656:2
clarify [2] - 1552:3, 1579:3
clear [8] - 1561:15, 1565:5, 1569:3, 1579:13, 1579:14, 1586:15, 1586:18, 1597:21
cleared [1] - 1564:16
clearer [1] - 1614:23
clearly [2] - 1602:8, 1645:8
CLERK [6] - 1542:9, 1543:18, 1544:1, 1544:4, 1604:15, 1604:20
Clerk [2] - 1543:25, 1604:23
client [1] - 1548:24
Clinic [3] - 1554:2, 1564:21, 1658:11
clinic [1] - 1658:13
clinical [32] - 1543:4, 1543:6, 1543:13, 1544:13, 1544:14, 1544:17, 1544:19, 1546:2, 1546:7, 1546:12, 1547:23, 1548:1, 1548:10, 1548:23, 1549:9, 1553:8, 1555:23, 1560:22, 1561:17, 1562:1, 1568:19, 1569:6, 1595:4, 1607:13, 1607:14, 1607:19, 1607:20, 1608:6, 1625:17, 1632:1, 1633:12, 1646:23
clinically [2] - 1632:6
clinician [5] - 1549:18,

1557:12, 1572:19, 1572:23, 1598:24
clinician's [1] - 1548:17
clogged [1] - 1620:19
close [6] - 1570:25, 1571:3, 1634:18, 1635:1, 1650:9
closer [2] - 1621:15
coexisting [3] - 1573:2, 1573:6, 1573:20
coherent [1] - 1662:2
Cole [4] - 1650:19, 1652:18, 1652:21, 1654:13
cole [1] - 1654:17
collection [1] - 1588:20
college [1] - 1557:24
College [1] - 1564:5
collided [1] - 1567:24
comfortable [3] - 1597:9, 1637:13, 1637:14
comment [2] - 1656:7, 1660:7
committed [3] - 1640:8, 1640:19, 1640:23
common [2] - 1554:21, 1638:2
commonly [6] - 1554:16, 1569:1, 1610:14, 1628:17, 1630:3, 1647:18
commonly-prescribed [1] - 1554:16
communicate [2] - 1632:10, 1647:23
communications [1] - 1653:9
comorbid [1] - 1615:16
compared [1] - 1642:2
competency [1] - 1640:20
competent [1] - 1608:18
compiled [1] - 1666:21
complaint [1] - 1665:13
complete [6] - 1557:2, 1557:8, 1557:25, 1566:1, 1570:2, 1606:20
completed [1] - 1602:3

**compliant** [1] - 1636:12
**component** [1] - 1607:24
**components** [1] - 1638:16
**comprehensive** [1] - 1562:11
**COMPUTER** [1] - 1540:25
**concern** [10] - 1560:6, 1565:1, 1572:7, 1592:16, 1592:17, 1593:4, 1599:22, 1627:25, 1628:9, 1651:4
**concerned** [9] - 1573:23, 1592:24, 1594:1, 1594:2, 1594:6, 1615:13, 1620:16, 1651:20, 1654:25
**concerning** [1] - 1650:2
**concerns** [3] - 1587:15, 1593:10, 1628:11
**conclude** [1] - 1556:1
**concluded** [5] - 1571:6, 1581:19, 1623:21, 1635:6, 1655:9
**conclusion** [4] - 1570:15, 1587:14, 1589:2, 1642:18
**condition** [7] - 1629:8, 1629:9, 1630:22, 1644:19, 1649:19, 1664:3
**conditioning** [1] - 1564:9
**conditions** [23] - 1601:3, 1605:24, 1612:8, 1612:9, 1613:18, 1627:5, 1627:6, 1627:8, 1627:11, 1627:13, 1628:8, 1628:10, 1628:25, 1629:1, 1629:11, 1644:14, 1644:17, 1645:2, 1646:21, 1658:25, 1663:24
**conduct** [1] - 1548:9
**conducted** [1] - 1642:8
**conference** [9] - 1569:20, 1571:6, 1571:8, 1622:21, 1623:21, 1634:2,

1635:6, 1650:8, 1655:9
**confined** [1] - 1620:10
**confirm** [1] - 1548:18
**confirming** [1] - 1622:24
**confounding** [6] - 1612:25, 1623:2, 1623:6, 1630:15, 1630:17, 1630:19
**congestion** [1] - 1638:10
**connected** [1] - 1568:23
**connection** [12] - 1546:7, 1566:8, 1567:7, 1570:17, 1570:24, 1589:10, 1592:16, 1593:16, 1594:6, 1605:18, 1652:11, 1653:19
**conscious** [3] - 1549:14, 1557:10, 1557:14
**consciously** [1] - 1549:12
**consequence** [3] - 1569:12, 1571:18, 1574:17
**consider** [3] - 1587:9, 1659:7, 1659:17
**considerably** [1] - 1649:7
**consideration** [2] - 1626:13, 1630:21
**considerations** [1] - 1604:7
**consistency** [3] - 1600:11, 1600:15, 1601:5
**consistent** [6] - 1578:21, 1590:20, 1598:16, 1601:8, 1614:24, 1660:9
**consult** [3] - 1546:8, 1550:13, 1574:21
**consultation** [3] - 1574:23, 1575:4, 1575:24
**consulted** [2] - 1546:10, 1546:12
**consulting** [1] - 1545:24
**consuming** [1] - 1659:20
**consumption** [1] - 1658:23
**contact** [4] - 1610:3, 1610:4, 1615:24
**contacted** [3] -

1577:4, 1577:7, 1609:23
**contain** [2] - 1568:12, 1594:14
**contained** [3] - 1569:15, 1594:23, 1647:5
**contemplating** [1] - 1568:10
**context** [5] - 1609:1, 1633:3, 1633:16, 1635:23, 1636:1
**continue** [1] - 1608:4
**CONTINUED** [1] - 1540:1
**continued** [4] - 1574:12, 1575:4, 1599:22, 1613:21
**continues** [2] - 1593:12, 1613:25
**continuing** [1] - 1574:8
**continuously** [2] - 1582:14, 1582:15
**continuum** [1] - 1631:13
**contribute** [1] - 1646:2
**contributed** [1] - 1571:24
**contributes** [1] - 1644:22
**contributory** [2] - 1645:4, 1646:7
**control** [1] - 1652:13
**convergence** [1] - 1656:4
**conversation** [2] - 1626:16, 1637:24
**conversations** [1] - 1626:14
**conversion** [1] - 1657:9
**convert** [1] - 1657:5
**cooking** [2] - 1572:2, 1586:14
**cooperating** [1] - 1559:9
**cooperative** [2] - 1636:14, 1662:6
**cope** [1] - 1563:3
**copes** [1] - 1556:5
**coping** [1] - 1567:1
**copy** [1] - 1642:17
**corporate** [2] - 1666:12, 1666:19
**corporation** [1] - 1539:18
**CORPUS** [1] - 1539:24
**correct** [102] - 1543:8,

1546:25, 1552:11, 1553:25, 1554:3, 1560:16, 1563:19, 1576:24, 1577:2, 1577:9, 1577:12, 1577:19, 1578:8, 1579:16, 1580:7, 1580:8, 1580:10, 1580:18, 1581:1, 1581:2, 1581:3, 1581:6, 1581:7, 1583:9, 1583:12, 1583:13, 1583:24, 1584:6, 1584:8, 1584:11, 1584:12, 1584:14, 1584:17, 1584:23, 1584:24, 1585:1, 1585:17, 1585:20, 1585:25, 1586:16, 1586:19, 1586:20, 1586:22, 1586:23, 1587:1, 1587:4, 1587:6, 1588:19, 1589:15, 1590:7, 1590:8, 1590:10, 1590:24, 1591:20, 1591:21, 1592:10, 1592:18, 1592:19, 1592:22, 1593:1, 1593:4, 1593:7, 1593:13, 1593:16, 1593:23, 1594:4, 1594:8, 1598:24, 1604:10, 1606:1, 1606:19, 1607:7, 1610:2, 1614:3, 1617:4, 1618:4, 1618:13, 1622:12, 1633:8, 1637:19, 1639:4, 1642:7, 1643:3, 1643:11, 1644:5, 1644:23, 1646:3, 1647:6, 1647:9, 1649:7, 1649:14, 1655:20, 1655:21, 1655:25, 1656:6, 1659:24, 1660:25, 1662:15, 1662:17, 1663:10, 1663:18, 1667:18
**correcting** [1] - 1593:7
**correctly** [1] - 1621:22
**cost** [5] - 1575:19, 1575:22, 1575:23, 1576:1, 1576:3
**costs** [1] - 1575:8
**coughing** [1] - 1563:6
**coughs** [1] - 1599:23
**counsel** [15] -

1542:17, 1543:9, 1550:10, 1550:14, 1584:21, 1595:10, 1604:3, 1604:7, 1648:10, 1648:13, 1652:19, 1654:19, 1654:21, 1658:5, 1666:7
**counseling** [2] - 1574:21, 1574:23
**count** [1] - 1560:19
**counter** [4] - 1563:11, 1638:10, 1638:14, 1638:15
**countries** [2] - 1551:19, 1560:20
**country** [1] - 1560:20
**couple** [15] - 1563:5, 1564:16, 1567:21, 1568:11, 1574:22, 1575:3, 1578:25, 1579:19, 1589:24, 1589:25, 1615:7, 1619:16, 1629:19, 1638:25, 1661:13
**course** [4] - 1542:14, 1581:20, 1582:7, 1585:21
**courses** [1] - 1607:17
**court** [8] - 1546:15, 1571:8, 1584:11, 1609:10, 1609:11, 1667:7
**Court** [16] - 1543:12, 1546:17, 1546:19, 1546:20, 1546:22, 1584:20, 1604:25, 1609:6, 1640:18, 1650:24, 1653:20, 1667:15, 1667:16, 1667:17, 1667:24, 1667:24
**COURT** [119] - 1539:1, 1540:22, 1542:4, 1542:10, 1542:22, 1543:2, 1543:6, 1543:9, 1543:12, 1544:7, 1550:2, 1550:7, 1550:9, 1550:14, 1550:16, 1555:2, 1555:11, 1565:25, 1566:18, 1569:17, 1569:21, 1570:3, 1570:5, 1570:9, 1570:25, 1571:17, 1576:11, 1578:19, 1580:3, 1581:10, 1581:14, 1582:2, 1582:10, 1582:13, 1583:16,

1584:21, 1587:15, 1588:1, 1589:3, 1589:18, 1591:11, 1591:13, 1595:6, 1595:9, 1595:25, 1596:18, 1599:19, 1600:20, 1600:24, 1601:15, 1601:19, 1601:22, 1601:24, 1602:1, 1602:6, 1602:9, 1602:13, 1602:17, 1602:18, 1602:22, 1602:24, 1603:5, 1603:11, 1603:15, 1603:19, 1603:23, 1604:1, 1604:13, 1605:4, 1605:6, 1605:10, 1622:22, 1623:1, 1623:3, 1623:5, 1623:11, 1623:14, 1623:17, 1628:2, 1630:6, 1633:25, 1634:3, 1634:16, 1634:20, 1635:3, 1637:22, 1639:15, 1639:17, 1639:24, 1643:20, 1645:8, 1648:8, 1648:13, 1648:19, 1650:6, 1651:16, 1651:24, 1652:5, 1652:17, 1653:14, 1653:18, 1654:7, 1654:17, 1654:19, 1655:6, 1659:12, 1660:5, 1663:13, 1664:7, 1664:23, 1664:25, 1665:23, 1666:4, 1666:7, 1666:10, 1666:14, 1666:20, 1667:2, 1667:8
Court's [1] - 1655:2
courtroom [4] - 1542:8, 1601:21, 1603:25, 1666:6
courts [2] - 1546:21
cover [2] - 1581:15, 1667:3
CRAFT [1] - 1540:6
cram [1] - 1620:9
create [1] - 1653:2
credentials [1] - 1544:25
criminal [2] - 1636:19, 1640:16
criteria [3] - 1572:13, 1632:5, 1632:14
CROSS [6] - 1541:7, 1541:8, 1541:12,

1576:14, 1589:19, 1639:18
cross [7] - 1571:3, 1576:12, 1602:4, 1602:7, 1602:12, 1602:20, 1666:18
CROSS-EXAMINATION [6] - 1541:7, 1541:8, 1541:12, 1576:14, 1589:19, 1639:18
cross-examine [1] - 1571:3
CRR [2] - 1540:22, 1667:23
cruise [1] - 1562:23
Cruz [3] - 1564:22, 1610:19, 1621:22
crystallized [1] - 1567:24, 1568:12
current [1] - 1574:13
customary [1] - 1575:8
cut [1] - 1629:16
CV [4] - 1544:22, 1544:24, 1546:24, 1607:5
Cynthia [1] - 1577:11

D

D'AMICO [3] - 1539:16, 1539:17, 1542:20
daily [1] - 1647:10
damaged [1] - 1562:17
dare [1] - 1650:10
data [4] - 1550:13, 1568:17, 1599:2, 1658:12
date [2] - 1552:13, 1657:22
dated [1] - 1664:15
dates [2] - 1648:11, 1649:2
DAVID [1] - 1540:16
DAY [1] - 1539:11
day-to-day [4] - 1626:24, 1633:21, 1635:15, 1635:17
days [3] - 1542:13, 1547:23, 1564:16
dead [1] - 1640:7
deadline [2] - 1567:9, 1567:13
deadlines [2] - 1552:18, 1567:8
deaf [1] - 1563:17

deal [11] - 1553:22, 1556:24, 1597:6, 1619:20, 1621:14, 1626:10, 1626:18, 1626:20, 1626:23, 1633:1, 1654:13
dealing [4] - 1564:8, 1600:7, 1620:1, 1640:25
deals [3] - 1544:20, 1600:6, 1640:4
dealt [1] - 1596:24
death [2] - 1561:25, 1566:14
debatable [1] - 1614:17
debate [2] - 1611:22, 1647:2
deceive [1] - 1662:13
December [1] - 1562:19
decide [1] - 1589:10
decided [4] - 1589:6, 1603:21, 1604:8
decisions [2] - 1542:15, 1614:7
decrease [2] - 1615:19, 1629:4
decreased [1] - 1611:13
decreasing [1] - 1615:11
defects [1] - 1594:16
defendant [1] - 1604:11
defendants [3] - 1609:15, 1652:22, 1654:9
defending [1] - 1609:3
defense [3] - 1609:20, 1640:16, 1654:21
defer [1] - 1585:19
definitely [1] - 1615:12
definition [4] - 1583:4, 1639:23, 1641:9, 1641:10
degree [6] - 1554:21, 1554:23, 1567:4, 1606:8, 1607:18, 1656:4
Delgado [1] - 1564:5
delineate [1] - 1609:4
delineated [2] - 1660:1, 1662:5
demonstrate [2] - 1659:19, 1662:16
demonstrated [3] - 1659:21, 1662:8, 1662:21

demonstrative [2] - 1648:1, 1648:9
DENNIS [1] - 1539:20
density [13] - 1565:2, 1565:3, 1570:14, 1573:23, 1574:8, 1592:9, 1592:17, 1593:3, 1593:9, 1599:7, 1599:9, 1599:12, 1599:21
dental [1] - 1547:9
denying [1] - 1560:2
department [2] - 1545:8, 1547:6
dependence [1] - 1659:1
dependency [1] - 1630:5
dependent [2] - 1592:25, 1630:2
deposition [7] - 1576:18, 1604:6, 1643:5, 1660:5, 1660:6, 1660:8, 1664:15
depositions [5] - 1642:19, 1643:3, 1666:16, 1666:18, 1666:23
depressed [8] - 1554:14, 1556:19, 1572:20, 1573:16, 1582:15, 1592:6, 1622:1, 1629:6
depression [45] - 1549:10, 1553:7, 1553:8, 1553:14, 1553:16, 1553:17, 1553:18, 1553:22, 1556:17, 1561:19, 1565:5, 1568:24, 1572:25, 1573:7, 1574:5, 1578:7, 1578:14, 1581:22, 1582:6, 1582:16, 1583:10, 1591:24, 1597:23, 1597:24, 1598:2, 1599:4, 1606:17, 1610:9, 1612:23, 1614:20, 1615:9, 1615:13, 1615:17, 1615:19, 1618:23, 1621:20, 1624:20, 1625:9, 1625:18, 1626:2, 1627:3, 1629:4, 1629:8, 1632:6
Depression [11] - 1551:4, 1553:4, 1580:13, 1618:9,

1624:9, 1624:11, 1624:18, 1625:7, 1631:1, 1631:10, 1631:14
depressive [9] - 1574:6, 1610:14, 1612:19, 1613:16, 1631:21, 1632:3, 1636:17, 1644:2, 1644:7
depth [1] - 1572:16
DEPUTY [6] - 1542:9, 1543:18, 1544:1, 1544:4, 1604:15, 1604:20
derived [1] - 1642:12
describe [12] - 1545:23, 1545:25, 1547:5, 1548:5, 1548:19, 1548:23, 1555:6, 1555:18, 1556:16, 1583:5, 1601:4, 1659:21
described [4] - 1556:18, 1564:23, 1566:12, 1585:23
describes [1] - 1598:3
describing [3] - 1645:19, 1646:17, 1665:20
description [3] - 1553:15, 1573:15, 1660:13
desire [1] - 1603:9
despite [1] - 1652:24
details [1] - 1622:6
determination [1] - 1632:17
determine [5] - 1547:17, 1598:9, 1600:11, 1600:15, 1632:14
develop [4] - 1561:21, 1562:3, 1572:12, 1634:12
developed [6] - 1549:1, 1557:18, 1557:23, 1560:23, 1561:2, 1591:23
developing [1] - 1652:23
development [1] - 1635:11
developmental [1] - 1644:12
diagnose [1] - 1663:17
diagnosed [13] - 1563:16, 1567:21, 1567:23, 1573:19,

1574:6, 1588:7,
1627:23, 1633:7,
1643:10, 1643:14,
1653:23, 1653:25,
1654:24
**diagnoses** [7] -
1572:17, 1574:15,
1605:22, 1643:25,
1644:18, 1646:23,
1647:8
**diagnosing** [2] -
1572:22, 1612:21
**diagnosis** [26] -
1544:20, 1568:10,
1568:16, 1568:21,
1569:6, 1569:9,
1569:12, 1571:17,
1572:12, 1572:20,
1572:25, 1573:6,
1573:18, 1586:19,
1630:1, 1645:14,
1645:15, 1645:18,
1645:20, 1645:25,
1646:6, 1646:14,
1647:21, 1647:22,
1649:17, 1659:19
**Diagnostic** [1] -
1551:11
**diagnostic** [4] -
1632:9, 1636:13,
1636:14, 1643:17
**die** [2] - 1635:15,
1635:16
**died** [1] - 1591:19
**differed** [1] - 1662:4
**difference** [4] -
1597:5, 1607:12,
1621:11, 1666:25
**different** [23] -
1545:14, 1545:20,
1546:3, 1546:8,
1549:11, 1554:8,
1561:2, 1564:6,
1572:17, 1598:5,
1598:22, 1613:11,
1616:7, 1617:9,
1629:1, 1635:22,
1637:17, 1640:10,
1642:18, 1644:6,
1654:2, 1661:9,
1661:20
**difficulties** [19] -
1549:11, 1556:4,
1556:6, 1558:16,
1558:22, 1563:3,
1563:16, 1566:9,
1566:21, 1573:22,
1574:14, 1579:12,
1582:21, 1583:3,
1590:23, 1591:3,

1620:18, 1660:11
**digestive** [1] - 1627:14
**digressed** [1] - 1630:8
**DIRECT** [4] - 1541:6,
1541:11, 1544:8,
1605:11
**direct** [4] - 1602:5,
1602:20, 1651:9
**directed** [1] - 1660:5
**directly** [3] - 1577:7,
1601:9, 1658:16
**disabilities** [1] -
1644:12
**disability** [1] - 1636:3
**disabled** [3] - 1546:6,
1583:3, 1592:25
**disagree** [1] - 1637:23
**discharges** [1] -
1601:4
**discharging** [1] -
1645:3
**discontinue** [1] -
1619:2
**discontinued** [2] -
1610:16, 1619:1
**discovered** [1] -
1567:19
**discrepancy** [1] -
1636:2
**discuss** [3] - 1548:2,
1556:14, 1666:2
**discussed** [8] -
1565:22, 1585:7,
1600:10, 1617:23,
1631:11, 1653:8,
1667:4, 1667:5
**discussing** [4] -
1565:23, 1600:22,
1617:16, 1665:18
**disorder** [13] -
1568:22, 1568:25,
1570:20, 1573:3,
1573:4, 1573:19,
1573:20, 1574:5,
1574:6, 1574:7,
1586:6, 1632:3
**disorders** [11] -
1544:21, 1606:17,
1644:1, 1644:2,
1644:3, 1644:4,
1644:6, 1644:8,
1644:11
**display** [1] - 1544:22
**dispute** [1] - 1658:9
**disputing** [1] - 1658:5
**dissipate** [1] - 1612:1
**distinguish** [1] -
1579:13
**distress** [7] - 1553:23,
1558:18, 1568:8,

1568:15, 1588:14,
1592:10, 1592:17
**distressed** [1] -
1569:3
**DISTRICT** [3] - 1539:1,
1539:1, 1539:13
**District** [3] - 1667:17,
1667:24
**divide** [1] - 1656:25
**divided** [1] - 1657:5
**divorced** [1] - 1563:25
**DOCKET** [2] - 1539:5,
1539:9
**Doctor** [15] - 1566:3,
1578:13, 1582:6,
1586:4, 1587:20,
1589:14, 1589:17,
1589:24, 1593:8,
1594:17, 1605:10,
1624:7, 1639:3,
1639:13, 1665:23
**doctor** [31] - 1553:16,
1554:13, 1554:15,
1554:17, 1556:20,
1563:10, 1564:11,
1564:21, 1564:23,
1564:24, 1565:2,
1565:7, 1567:18,
1568:3, 1568:4,
1573:23, 1576:21,
1576:22, 1584:23,
1586:12, 1588:10,
1592:12, 1592:15,
1606:15, 1614:9,
1616:3, 1625:12,
1640:23, 1648:11,
1663:17, 1665:17
**doctor's** [1] - 1571:1
**doctors** [6] - 1553:24,
1564:20, 1574:22,
1575:4, 1600:17,
1642:19
**DOCUMENT** [1] -
1539:7
**documented** [1] -
1610:10
**documents** [1] -
1590:14
**DOMINICK** [1] -
1540:3
**DOMINION** [1] -
1540:7
**done** [15] - 1545:24,
1546:21, 1546:24,
1559:3, 1559:19,
1572:4, 1576:2,
1610:6, 1613:12,
1616:3, 1616:6,
1631:24, 1642:15,
1643:4, 1650:2

**DONELSON** [1] -
1540:15
**dose** [3] - 1638:1,
1638:5
**DOUGLAS** [1] -
1540:20
**down** [31] - 1550:5,
1550:21, 1553:17,
1553:19, 1554:14,
1556:19, 1558:2,
1560:7, 1566:22,
1568:14, 1572:6,
1574:13, 1574:25,
1582:17, 1590:5,
1590:6, 1598:21,
1601:16, 1607:5,
1616:18, 1623:10,
1624:2, 1624:21,
1625:4, 1625:5,
1625:8, 1625:11,
1625:25, 1648:5,
1661:7, 1665:23
**downplays** [1] -
1560:13
**dozen** [1] - 1546:16
**DR** [4] - 1541:5,
1541:10, 1543:23,
1604:21
**Dr** [98] - 1542:21,
1542:22, 1543:4,
1543:12, 1544:10,
1544:22, 1551:14,
1553:24, 1556:18,
1564:21, 1564:22,
1568:4, 1576:16,
1577:21, 1577:24,
1578:11, 1578:13,
1578:18, 1578:21,
1583:19, 1584:8,
1585:8, 1585:9,
1585:12, 1585:18,
1586:1, 1589:21,
1601:23, 1604:4,
1604:8, 1604:9,
1604:12, 1604:24,
1605:13, 1610:5,
1610:10, 1610:11,
1610:19, 1611:5,
1611:9, 1611:11,
1612:4, 1614:24,
1615:23, 1616:3,
1616:20, 1616:21,
1617:1, 1617:2,
1617:9, 1617:10,
1618:1, 1618:22,
1621:13, 1621:22,
1622:5, 1622:7,
1623:24, 1624:5,
1631:25, 1635:9,
1637:18, 1639:20,

1642:22, 1643:9,
1643:10, 1643:13,
1648:2, 1648:3,
1648:24, 1649:10,
1650:19, 1651:9,
1652:18, 1652:21,
1653:8, 1653:9,
1653:19, 1654:8,
1654:13, 1654:21,
1655:4, 1656:6,
1656:9, 1656:13,
1657:19, 1657:24,
1658:9, 1661:10,
1661:14, 1663:2,
1664:14, 1664:15,
1665:3, 1665:4,
1665:6, 1665:9
**drainage** [1] - 1665:13
**drank** [1] - 1612:17
**dressed** [1] - 1620:10
**drink** [6] - 1612:23,
1657:16, 1657:17,
1658:18, 1659:5
**drinking** [16] -
1612:14, 1615:6,
1629:5, 1629:17,
1656:14, 1656:17,
1656:25, 1657:2,
1657:8, 1657:12,
1658:8, 1658:11,
1658:17, 1658:20,
1660:10
**drinks** [3] - 1612:12,
1615:7, 1659:15
**DRIVE** [1] - 1540:7
**driven** [2] - 1589:14,
1611:18
**driving** [3] - 1587:20,
1588:18, 1611:25
**drop** [1] - 1611:15
**dropped** [2] - 1574:13,
1625:5
**drug** [3] - 1554:4,
1554:19, 1554:20
**druther** [1] - 1603:10
**druthers** [1] - 1603:10
**drywall** [1] - 1609:23
**DSM** [8] - 1572:12,
1612:21, 1632:8,
1632:14, 1633:11,
1637:2, 1647:5,
1659:2
**DSM-IV** [7] - 1612:21,
1632:8, 1632:14,
1633:11, 1637:2,
1647:5, 1659:2
**due** [3] - 1570:20,
1573:19, 1608:25
**duly** [2] - 1543:24,
1604:22

**during** [16] - 1542:14, 1554:24, 1555:7, 1570:6, 1581:20, 1606:1, 1610:12, 1611:15, 1612:10, 1612:13, 1617:17, 1617:21, 1618:12, 1650:11, 1658:14, 1666:2
**duty** [1] - 1632:23
**DWIs** [1] - 1629:25
**dysfunction** [1] - 1597:6

## E

**ear** [5] - 1563:17, 1563:18, 1567:18, 1574:8, 1665:13
**early** [3] - 1545:11, 1563:19, 1567:9
**earn** [1] - 1641:14
**easel** [2] - 1550:1, 1643:19
**Eastern** [1] - 1667:17
**EASTERN** [1] - 1539:1
**easy** [2] - 1631:21, 1661:8
**Ed** [2] - 1542:21, 1542:22
**education** [1] - 1557:24
**EDWARD** [2] - 1541:5, 1543:23
**Edward** [1] - 1544:3
**effective** [1] - 1637:9
**effects** [8] - 1570:7, 1573:24, 1596:15, 1612:16, 1637:14, 1638:20, 1660:12
**Effexor** [11] - 1554:4, 1554:7, 1554:15, 1554:16, 1610:13, 1613:14, 1614:3, 1614:5, 1615:22, 1637:4, 1638:1
**eight** [2] - 1624:4, 1624:19
**either** [8] - 1546:14, 1559:14, 1606:20, 1609:1, 1621:6, 1633:4, 1640:4, 1653:4
**elaborate** [1] - 1571:23
**elbows** [1] - 1563:8
**element** [1] - 1598:21
**elements** [2] - 1553:8, 1572:22

**elevate** [1] - 1625:17
**elevated** [1] - 1593:25
**elevations** [1] - 1632:2
**elicit** [1] - 1654:12
**eligible** [1] - 1606:23
**emotional** [2] - 1583:6, 1583:8
**emphasize** [1] - 1619:14
**employ** [1] - 1661:1
**encapsulate** [1] - 1606:4
**end** [5] - 1554:25, 1576:1, 1610:18, 1656:10, 1656:11
**endorse** [4] - 1629:14, 1631:5, 1663:9, 1663:10
**endorsed** [3] - 1580:23, 1629:14, 1629:19
**endorses** [1] - 1551:21
**endorsing** [2] - 1663:7, 1663:8
**energetic** [1] - 1597:16
**energy** [3] - 1580:17, 1580:23, 1597:18
**ENGELHARDT** [1] - 1539:12
**enrolled** [1] - 1564:3
**entered** [1] - 1637:18
**enters** [1] - 1542:8, 1603:25
**entertained** [1] - 1635:13
**entitled** [2] - 1562:22, 1667:20
**entry** [1] - 1649:14
**environment** [2] - 1619:23, 1621:25
**ENVIRONMENTAL** [1] - 1540:15
**epidemiologist** [2] - 1652:22, 1654:16
**episodes** [8] - 1610:9, 1610:10, 1614:16, 1614:17, 1614:18, 1614:19, 1615:9, 1632:24
**equivalent** [1] - 1657:2
**erectile** [1] - 1597:5
**ERNEST** [1] - 1540:11
**ESQUIRE** [11] - 1539:17, 1539:17, 1539:20, 1540:3, 1540:6, 1540:11, 1540:11, 1540:12,

1540:16, 1540:17, 1540:17
**establishes** [1] - 1588:22
**estimated** [2] - 1575:23, 1575:25
**ET** [1] - 1539:8
**et** [1] - 1601:4
**evaluate** [9] - 1546:19, 1547:17, 1547:21, 1605:17, 1606:17, 1609:1, 1640:17, 1641:5, 1645:9
**evaluated** [4] - 1584:1, 1584:13, 1610:22, 1610:23
**evaluates** [1] - 1655:13
**evaluating** [1] - 1616:17
**evaluation** [18] - 1548:6, 1548:24, 1574:24, 1605:20, 1605:21, 1608:17, 1609:19, 1609:20, 1611:5, 1611:13, 1611:15, 1616:19, 1616:24, 1621:12, 1624:5, 1626:5, 1649:23
**evaluations** [10] - 1546:15, 1576:4, 1616:2, 1622:5, 1633:16, 1640:6, 1640:7, 1640:20, 1640:21
**eventually** [2] - 1564:7, 1579:19
**everyday** [1] - 1556:5
**everywhere** [1] - 1603:12
**evidence** [7] - 1553:13, 1555:12, 1588:21, 1652:15, 1658:7, 1659:23, 1660:16
**evidenced** [1] - 1581:23
**exact** [2] - 1619:3, 1639:9
**exactly** [6] - 1579:4, 1579:17, 1650:11, 1650:12, 1659:1, 1666:16
**exaggerate** [5] - 1560:11, 1561:14, 1593:22, 1633:13, 1636:24
**exaggerating** [2] - 1559:22, 1662:17

**exam** [4] - 1563:2, 1606:24, 1606:25
**EXAMINATION** [51] - 1541:6, 1541:7, 1541:8, 1541:9, 1541:11, 1541:12, 1541:13, 1544:8, 1550:3, 1550:18, 1555:4, 1555:14, 1566:5, 1571:10, 1571:21, 1576:14, 1578:22, 1580:4, 1581:11, 1581:16, 1582:4, 1582:23, 1583:17, 1585:2, 1587:18, 1588:16, 1589:12, 1589:19, 1591:15, 1595:11, 1596:3, 1596:20, 1599:24, 1601:1, 1605:11, 1623:22, 1628:4, 1630:12, 1635:7, 1638:6, 1639:18, 1641:7, 1643:21, 1645:16, 1648:21, 1649:24, 1655:10, 1660:14, 1663:15, 1664:8, 1665:1
**examination** [9] - 1548:7, 1552:17, 1553:9, 1566:19, 1572:2, 1592:8, 1607:2, 1617:21, 1651:9
**examinations** [1] - 1607:7
**EXAMINATIONS** [1] - 1541:3
**examine** [2] - 1556:13, 1571:3
**examined** [4] - 1543:25, 1574:4, 1583:23, 1604:23
**examining** [1] - 1599:3
**example** [7] - 1555:18, 1559:8, 1580:12, 1597:16, 1601:3, 1644:21, 1645:24
**examples** [1] - 1569:25
**excellent** [1] - 1615:25
**exceptions** [1] - 1601:7
**excess** [1] - 1636:6
**excise** [1] - 1567:20
**exclude** [3] - 1654:7, 1654:11, 1654:21
**excluded** [6] -

1650:11, 1650:24, 1651:21, 1652:1, 1652:2, 1652:15
**excluding** [1] - 1642:8
**excuse** [5] - 1552:8, 1585:15, 1613:6, 1634:25, 1652:20
**Exhibit** [2] - 1544:23, 1594:10
**exhibit** [4] - 1594:11, 1596:2, 1648:1, 1648:17
**existing** [1] - 1573:6
**expect** [5] - 1575:17, 1598:14, 1615:21, 1632:2, 1636:6
**experience** [13] - 1565:21, 1569:7, 1569:13, 1571:18, 1571:24, 1575:15, 1585:5, 1596:15, 1612:7, 1620:11, 1629:4, 1636:16, 1657:15
**experienced** [5] - 1569:1, 1569:5, 1580:25, 1581:3, 1586:5
**experiences** [1] - 1574:17
**expert** [14] - 1542:25, 1543:13, 1595:2, 1595:3, 1609:6, 1609:13, 1635:1, 1643:14, 1650:20, 1651:24, 1652:12, 1652:17, 1652:21, 1654:11
**expertise** [1] - 1543:3
**experts** [5] - 1609:24, 1634:21, 1650:20, 1653:15, 1653:20
**explain** [13] - 1544:16, 1545:5, 1547:20, 1551:15, 1567:6, 1571:23, 1572:15, 1572:16, 1581:7, 1581:9, 1603:17, 1603:19, 1667:5
**explained** [2] - 1581:13, 1630:25
**explanation** [1] - 1597:13
**explored** [2] - 1553:17, 1653:1
**exposed** [6] - 1568:1, 1568:10, 1572:8, 1594:3, 1594:7, 1635:14
**exposure** [14] -

1564:13, 1564:16,
1585:24, 1586:2,
1586:10, 1587:12,
1587:22, 1587:24,
1588:22, 1588:24,
1596:12, 1634:12,
1665:8, 1665:12
**express** [4] - 1566:13,
1628:9, 1635:9,
1663:25
**expressed** [2] -
1628:11, 1654:25
**expressing** [1] -
1634:14
**expression** [3] -
1556:7, 1560:6,
1561:23
**extended** [1] -
1567:14
**extensively** [1] -
1600:2
**eyes** [4] - 1563:6,
1566:10, 1579:9,
1579:25

**F**

**face** [2] - 1642:9
**fact** [14] - 1549:23,
1551:25, 1561:14,
1579:8, 1590:11,
1592:23, 1593:11,
1595:19, 1622:15,
1624:2, 1643:13,
1652:24, 1655:21,
1666:18
**factor** [4] - 1612:25,
1626:1, 1630:17,
1630:19
**factors** [2] - 1595:2,
1630:15
**facts** [2] - 1590:18,
1645:11
**fair** [6] - 1582:10,
1588:1, 1625:12,
1641:10, 1651:9,
1653:11
**fairly** [4] - 1557:2,
1598:1, 1620:22,
1656:4
**fake** [2] - 1561:14,
1632:25
**faking** [1] - 1559:23
**familiar** [3] - 1575:8,
1643:23, 1657:23
**family** [3] - 1565:11,
1617:20, 1626:15
**far** [6] - 1595:1,
1605:22, 1615:13,

1618:24, 1654:25,
1665:20
**fashion** [5] - 1600:6,
1645:10, 1662:3,
1662:16, 1662:18
**father** [1] - 1563:24
**fatigued** [1] - 1581:5
**fear** [12] - 1566:14,
1633:20, 1634:9,
1634:15, 1635:16,
1651:12, 1652:9,
1653:3, 1653:15,
1653:22, 1654:25
**fears** [2] - 1566:13,
1566:15
**feature** [1] - 1583:1
**federal** [5] - 1546:11,
1546:15, 1546:21,
1609:10, 1609:11
**fee** [1] - 1641:23
**FELIPE** [1] - 1539:21
**fell** [1] - 1618:2
**fellows** [1] - 1608:13
**felt** [10] - 1598:11,
1611:1, 1614:10,
1619:4, 1619:5,
1621:24, 1629:16,
1629:17, 1629:18,
1653:10
**FEMA** [11] - 1539:4,
1562:25, 1610:9,
1611:23, 1612:13,
1617:16, 1617:17,
1623:12, 1623:15,
1634:13, 1658:14
**ferret** [2] - 1663:5,
1663:6
**few** [18] - 1542:13,
1543:14, 1554:10,
1556:21, 1562:19,
1643:6
**Field** [13] - 1553:24,
1564:21, 1577:24,
1578:11, 1578:13,
1578:18, 1578:21,
1610:10, 1614:24,
1615:23, 1616:3,
1617:9, 1637:18
**field** [10] - 1543:6,
1543:13, 1544:18,
1544:19, 1597:9,
1604:25, 1606:12,
1639:20, 1640:24
**Field's** [3] - 1556:18,
1577:21, 1610:11
**fields** [2] - 1607:7,
1618:22
**Fifth** [1] - 1546:22
**fifth** [1] - 1560:15
**figure** [3] - 1556:23,

1560:8, 1640:8
**filed** [1] - 1590:9
**fill** [1] - 1661:8
**final** [1] - 1618:20
**finally** [1] - 1637:4
**financial** [1] - 1633:14
**findings** [6] - 1559:13,
1560:14, 1561:13,
1576:3, 1636:3,
1653:6
**fine** [3] - 1624:7,
1641:11, 1648:12
**finish** [1] - 1660:4
**finished** [3] - 1552:17,
1563:2, 1567:8
**firm** [1] - 1605:17
**first** [56] - 1542:11,
1543:24, 1548:9,
1550:20, 1550:23,
1551:14, 1552:6,
1552:25, 1553:7,
1557:12, 1559:1,
1559:22, 1561:7,
1567:23, 1572:23,
1578:25, 1579:9,
1579:24, 1580:6,
1581:18, 1583:23,
1590:24, 1590:25,
1591:1, 1591:6,
1592:1, 1592:4,
1592:8, 1593:5,
1593:10, 1593:11,
1596:22, 1596:24,
1599:9, 1604:22,
1611:5, 1612:4,
1616:16, 1616:19,
1616:20, 1616:24,
1617:2, 1618:15,
1621:12, 1624:5,
1624:9, 1624:14,
1625:23, 1627:8,
1629:5, 1644:1,
1649:3, 1651:16,
1656:7, 1665:5
**fit** [1] - 1631:21
**five** [13] - 1572:13,
1572:22, 1572:24,
1581:22, 1582:7,
1620:25, 1643:17,
1643:23, 1644:9,
1647:16, 1657:1,
1657:4, 1666:25
**five-axis** [1] - 1643:23
**five-part** [1] - 1643:17
**flip** [1] - 1661:17
**Florida** [1] - 1606:11
**flowing** [1] - 1568:13
**focus** [6] - 1549:8,
1592:9, 1594:12,
1618:15, 1624:13,

1646:20
**focused** [2] - 1556:22,
1598:7
**focuses** [5] - 1551:17,
1558:10, 1558:20,
1561:3, 1598:4
**focusing** [2] -
1621:14, 1622:2
**folks** [4] - 1589:10,
1609:1, 1615:15,
1638:16
**follow** [2] - 1602:20,
1632:12
**followed** [3] -
1615:21, 1616:4,
1616:5
**following** [1] - 1570:6
**follows** [2] - 1543:25,
1604:23
**FOR** [3] - 1539:16,
1540:10, 1540:15
**foregoing** [1] -
1667:18
**forensic** [14] -
1604:25, 1605:6,
1606:12, 1607:2,
1607:9, 1608:13,
1608:14, 1608:15,
1609:5, 1609:13,
1639:21, 1639:23,
1640:2, 1641:10
**forensics** [1] - 1607:4
**FOREST** [2] - 1539:8,
1540:10
**Forest** [4] - 1596:23,
1604:4, 1604:11,
1643:14
**forgotten** [1] -
1623:25
**form** [1] - 1645:6
**formaldehyde** [33] -
1568:2, 1572:2,
1572:4, 1572:8,
1585:24, 1586:2,
1586:8, 1586:10,
1586:12, 1587:11,
1587:12, 1587:22,
1587:24, 1588:6,
1588:22, 1588:25,
1589:7, 1596:6,
1596:8, 1596:12,
1596:16, 1634:12,
1650:3, 1650:20,
1651:14, 1652:18,
1652:23, 1654:2,
1654:15, 1654:23,
1665:8, 1665:13,
1665:19
**FORMALDEHYDE** [1]
- 1539:4

**forth** [1] - 1632:10
**forthright** [5] -
1556:11, 1559:3,
1559:7, 1561:9,
1601:13
**fortunately** [1] -
1603:11
**forward** [7] - 1542:23,
1608:5, 1613:11,
1613:25, 1614:20,
1615:2, 1615:12
**foul** [1] - 1584:22
**foundation** [3] -
1555:1, 1555:3,
1555:11
**founded** [1] - 1577:18
**four** [15] - 1551:21,
1586:17, 1607:25,
1608:1, 1620:25,
1625:2, 1631:18,
1632:14, 1632:16,
1636:18, 1640:10,
1644:9, 1647:13
**FOUR** [1] - 1540:7
**four-part** [1] - 1632:14
**fourth** [3] - 1573:8,
1574:11, 1640:25
**fractures** [1] - 1565:3
**frame** [2] - 1610:12,
1655:13
**FRANK** [2] - 1539:16,
1539:17
**frequently** [1] -
1554:21
**front** [1] - 1664:21
**full** [3] - 1544:1,
1556:10, 1608:11
**full-time** [2] - 1556:10,
1608:11
**function** [2] - 1614:20,
1614:22
**functioning** [12] -
1549:3, 1554:23,
1555:24, 1557:10,
1566:22, 1569:4,
1573:13, 1574:1,
1574:3, 1574:13,
1619:7, 1647:17
**functions** [1] - 1558:1
**furnish** [1] - 1643:2
**furthermore** [1] -
1652:11
**future** [19] - 1572:5,
1572:7, 1574:25,
1575:5, 1575:19,
1576:6, 1576:7,
1587:11, 1587:21,
1587:23, 1588:24,
1594:8, 1613:9,
1613:10, 1613:15,

1614:2, 1615:24, 1616:7, 1621:10

**G**

**GAEDDERT** [1] - 1540:20
**Gaeddert** [1] - 1666:14
**gain** [3] - 1613:21, 1632:22, 1662:12
**Galveston** [1] - 1606:10
**game** [3] - 1542:13, 1651:9, 1653:11
**gap** [1] - 1558:4
**gas** [2] - 1564:14, 1564:15
**gauge** [1] - 1555:23
**general** [8] - 1546:2, 1546:7, 1554:18, 1560:10, 1569:2, 1582:17, 1646:13, 1652:17
**generally** [13] - 1548:5, 1556:1, 1556:2, 1556:16, 1556:23, 1563:12, 1564:10, 1565:16, 1574:2, 1579:18, 1601:7, 1655:18, 1661:23
**generated** [1] - 1600:16
**gentlemen** [2] - 1544:17, 1600:11
**GIEGER** [57] - 1540:10, 1540:11, 1601:23, 1601:25, 1602:4, 1602:7, 1602:12, 1602:19, 1602:23, 1603:1, 1603:17, 1604:11, 1604:24, 1605:7, 1605:12, 1622:24, 1623:2, 1623:4, 1623:8, 1623:10, 1623:13, 1623:19, 1623:23, 1628:5, 1630:13, 1634:7, 1635:8, 1638:7, 1639:13, 1645:6, 1648:4, 1648:10, 1648:16, 1649:20, 1650:5, 1650:9, 1650:17, 1653:12, 1652:3, 1652:7, 1653:17, 1653:24, 1660:4, 1663:14, 1663:16, 1663:20,

1663:22, 1664:5, 1664:9, 1664:20, 1665:2, 1665:22, 1666:9, 1666:12, 1666:15, 1666:25, 1667:7
**Gieger** [3] - 1603:7, 1604:9, 1648:15
**Gieger's** [1] - 1630:7
**GIEGER...................**
  [1] - 1541:13
**GIEGER...................**
  . [1] - 1541:11
**given** [9] - 1585:18, 1610:19, 1616:8, 1618:1, 1618:11, 1636:7, 1662:2, 1663:2, 1663:3
**global** [6] - 1573:12, 1574:1, 1574:13, 1647:16, 1647:17
**goal** [1] - 1666:20
**God** [2] - 1543:21, 1604:18
**government** [2] - 1546:11, 1609:12
**graduate** [3] - 1607:15, 1607:16, 1607:18
**graduated** [1] - 1564:3
**graduation** [1] - 1606:21
**great** [3] - 1572:16, 1628:25, 1666:1
**greater** [4] - 1651:7, 1651:13, 1651:14, 1654:1
**group** [1] - 1609:21
**growing** [1] - 1617:20
**GUERRA** [1] - 1540:6
**guess** [8] - 1546:16, 1563:5, 1567:17, 1569:25, 1583:4, 1617:10, 1656:24, 1658:4
**guideline** [1] - 1647:7
**guilty** [1] - 1629:18
**guys** [2] - 1657:16, 1657:17

**H**

**half** [6] - 1545:8, 1561:9, 1561:10, 1577:13, 1657:3, 1666:16
**Halie** [1] - 1544:3
**hand** [2] - 1543:19, 1604:15

**handle** [1] - 1548:24
**hands** [1] - 1613:7
**hard** [1] - 1556:12
**harm** [1] - 1594:16
**Hauptmann** [1] - 1652:25
**headaches** [3] - 1563:6, 1627:12, 1646:10
**health** [20] - 1558:13, 1558:17, 1558:18, 1568:9, 1570:8, 1572:7, 1573:25, 1574:12, 1576:8, 1581:24, 1582:8, 1582:18, 1583:1, 1586:5, 1588:14, 1588:18, 1589:8, 1594:8, 1595:5, 1624:24
**healthy** [2] - 1564:10, 1581:19
**hear** [2] - 1602:5, 1640:1
**HEARD** [1] - 1539:12
**heard** [14] - 1557:20, 1590:2, 1601:9, 1610:11, 1610:24, 1620:5, 1621:12, 1622:11, 1623:24, 1624:3, 1631:9, 1642:20, 1648:14, 1649:23
**hearing** [3] - 1563:16, 1563:18, 1640:1
**heightened** [1] - 1651:4
**held** [12] - 1545:20, 1564:6, 1569:20, 1571:8, 1622:21, 1623:21, 1634:2, 1635:6, 1650:8, 1660:19, 1660:21, 1660:23
**help** [3] - 1543:21, 1553:20, 1553:21, 1556:23, 1582:19, 1604:18, 1608:20, 1638:18
**helped** [1] - 1553:21
**helpful** [1] - 1615:9
**helps** [1] - 1558:15
**hereby** [1] - 1667:18
**hi** [1] - 1605:14
**high** [6] - 1564:2, 1564:3, 1588:6, 1631:17, 1631:18, 1636:9
**higher** [6] - 1558:3, 1568:8, 1612:3,

1651:6, 1656:11, 1658:14
**himself** [5] - 1556:14, 1580:10, 1580:11, 1580:14, 1653:15
**hired** [5] - 1609:5, 1609:12, 1609:24, 1643:14, 1652:18
**hires** [1] - 1609:2
**historian** [1] - 1661:23
**historical** [6] - 1548:12, 1553:14, 1565:17, 1601:6, 1655:16
**historically** [2] - 1598:12, 1600:15
**history** [35] - 1545:5, 1548:12, 1548:25, 1553:7, 1555:10, 1555:16, 1555:18, 1562:11, 1562:14, 1563:14, 1565:23, 1568:19, 1574:9, 1574:10, 1577:14, 1577:15, 1577:17, 1590:5, 1590:20, 1592:11, 1598:24, 1599:1, 1600:17, 1600:19, 1601:11, 1617:18, 1617:20, 1618:4, 1618:11, 1618:12, 1621:18, 1627:17, 1627:22, 1645:14
**hold** [4] - 1556:3, 1589:25, 1650:13, 1660:22
**holding** [2] - 1558:2, 1559:25
**holds** [1] - 1556:8
**home** [1] - 1563:23
**honest** [5] - 1556:12, 1559:3, 1559:7, 1561:9, 1601:13
**Honor** [55] - 1542:20, 1543:1, 1543:4, 1543:10, 1543:11, 1544:6, 1550:1, 1550:6, 1550:11, 1550:15, 1555:1, 1555:9, 1565:22, 1566:17, 1569:14, 1569:16, 1569:25, 1570:11, 1571:15, 1576:10, 1576:13, 1580:2, 1582:1, 1583:15, 1584:18, 1587:13, 1587:25, 1589:1, 1595:1, 1596:1, 1596:17,

1599:13, 1599:18, 1601:14, 1601:25, 1604:24, 1605:5, 1622:18, 1623:16, 1628:1, 1630:4, 1633:23, 1637:20, 1639:16, 1648:15, 1650:5, 1650:18, 1650:19, 1652:4, 1660:3, 1663:14, 1663:20, 1664:5, 1666:9, 1666:13
**HONORABLE** [1] - 1539:12
**hopefully** [1] - 1542:13
**hospital** [3] - 1564:15, 1640:12, 1640:13
**Hospital** [1] - 1545:13
**host** [2] - 1561:5, 1644:6
**hour** [6] - 1602:3, 1641:17, 1641:19, 1641:21, 1642:12, 1666:15
**hours** [4] - 1617:16, 1642:10, 1660:19, 1660:24
**house** [1] - 1562:17
**HOUSTON** [1] - 1539:21
**Houston** [1] - 1565:11
**human** [2] - 1595:2, 1596:9
**hundred** [2] - 1548:25, 1573:13
**hundreds** [1] - 1549:6
**Hyatt** [1] - 1564:7
**hypothetical** [1] - 1645:10

**I**

**IARC** [1] - 1651:2
**idea** [2] - 1618:2, 1631:11
**identified** [4] - 1634:10, 1644:22, 1646:14, 1649:11
**identify** [4] - 1550:20, 1598:2, 1647:20, 1665:12
**II** [5] - 1551:4, 1573:2, 1597:23, 1646:20, 1646:22
**III** [9] - 1644:23, 1645:5, 1646:2, 1646:14, 1646:20, 1646:23, 1647:2,

1647:3

**ill** [5] - 1582:22, 1582:25, 1583:5, 1583:7, 1640:11

**illness** [2] - 1560:4, 1583:2

**illustrate** [1] - 1545:19

**imagine** [2] - 1612:3, 1619:25

**imitate** [1] - 1629:1

**imitators** [1] - 1628:25

**impact** [3] - 1594:8, 1613:24, 1615:13

**impacted** [2] - 1595:21, 1600:4

**impacting** [1] - 1646:17

**impairing** [1] - 1660:12

**implicit** [2] - 1569:16, 1654:9

**importance** [1] - 1631:23

**important** [16] - 1542:15, 1560:10, 1577:15, 1598:15, 1598:22, 1606:5, 1612:11, 1615:3, 1615:5, 1618:13, 1618:20, 1620:7, 1628:22, 1633:10, 1633:15, 1665:17

**impotency** [3] - 1596:25, 1597:3, 1597:7

**impotent** [1] - 1578:1

**impression** [3] - 1635:12, 1653:3, 1653:11

**improve** [1] - 1612:10

**IN** [1] - 1539:4

**inaccuracies** [1] - 1578:16

**INC** [3] - 1539:8, 1540:10, 1540:15

**incidence** [1] - 1651:6

**include** [5] - 1646:18, 1647:2, 1647:3

**included** [4] - 1579:19, 1591:3, 1644:5, 1650:16

**includes** [1] - 1548:10

**inclusive** [1] - 1569:22

**income** [2] - 1613:21, 1641:14

**Incomplete** [2] - 1551:6, 1562:6

**incomplete** [2] - 1557:4, 1661:21

**inconsistencies** [1] -

1661:24

**inconsistent** [1] - 1580:1

**incorrect** [1] - 1578:4

**increased** [3] - 1576:3, 1611:11, 1653:5

**increasing** [1] - 1658:14

**indicate** [2] - 1595:16, 1658:6

**indicated** [5] - 1552:25, 1561:22, 1580:17, 1593:20, 1595:20

**indicates** [1] - 1658:7

**indicating** [1] - 1596:8

**indication** [4] - 1559:22, 1561:13, 1561:15, 1561:18

**indications** [1] - 1630:10

**indicators** [2] - 1637:12, 1658:13

**indicia** [4] - 1632:18, 1635:24, 1636:4, 1636:21

**indirect** [1] - 1600:6

**individual** [8] - 1557:8, 1561:23, 1573:15, 1610:8, 1616:17, 1626:12, 1647:25, 1657:18

**individuals** [3] - 1558:21, 1609:24, 1636:8

**industry** [1] - 1654:15

**infection** [1] - 1614:11

**inflamed** [1] - 1601:3

**information** [26] - 1546:20, 1548:8, 1548:12, 1549:16, 1555:22, 1565:18, 1572:23, 1577:20, 1595:15, 1598:16, 1599:1, 1600:5, 1600:18, 1601:12, 1616:16, 1617:9, 1618:3, 1618:12, 1618:16, 1618:19, 1654:3, 1655:16, 1657:20, 1659:8, 1662:2, 1664:2

**informed** [2] - 1596:24, 1649:18

**inhaled** [1] - 1564:15

**initial** [4] - 1591:3, 1610:3, 1610:4, 1620:23

**initials** [1] - 1551:10,

1560:24

**injured** [1] - 1546:6

**innate** [2] - 1557:25, 1558:3

**inpatients** [2] - 1545:9, 1608:1

**inquiries** [1] - 1628:19

**inquiry** [1] - 1628:21

**inside** [2] - 1556:3, 1560:9

**insight** [1] - 1600:3

**instance** [1] - 1645:21

**instances** [1] - 1582:16

**instructed** [3] - 1623:11, 1623:14, 1655:20

**instructions** [1] - 1597:21

**instrument** [1] - 1557:16

**intake** [1] - 1658:15

**integrate** [1] - 1599:1

**intellectual** [1] - 1557:21

**intelligence** [3] - 1549:4, 1557:16, 1557:18

**intelligent** [1] - 1662:2

**intend** [1] - 1650:21

**intended** [1] - 1604:5

**intense** [2] - 1572:1, 1572:7

**intensity** [1] - 1592:13

**interface** [5] - 1606:13, 1608:16, 1640:3, 1641:20, 1641:24

**interfere** [1] - 1569:3, 1569:4

**interfered** [1] - 1660:17

**interference** [1] - 1658:22

**interfering** [1] - 1573:9

**internship** [1] - 1607:20

**interplay** [3] - 1558:15, 1600:7, 1600:8

**interpret** [2] - 1624:25, 1662:11

**interpretation** [2] - 1642:24, 1642:25

**interpreted** [4] - 1625:16, 1631:6, 1631:8, 1661:6

**interprets** [1] - 1624:24

intertwined [1] - 1558:17

**interval** [1] - 1649:18

**interview** [6] - 1548:10, 1562:10, 1596:22, 1642:13, 1642:21, 1657:21

**interviewed** [1] - 1642:21

**interviewing** [3] - 1547:24, 1548:1, 1560:8

**interviews** [1] - 1635:10

**introduce** [1] - 1605:13

**introspect** [1] - 1556:14

**Inventory** [22] - 1550:24, 1551:4, 1551:15, 1553:1, 1553:5, 1560:25, 1580:13, 1618:8, 1618:9, 1624:8, 1624:9, 1624:11, 1624:14, 1624:18, 1624:21, 1625:3, 1625:7, 1631:1, 1636:6, 1648:25

**inventory** [4] - 1550:25, 1551:1, 1624:17, 1655:12

**involve** [2] - 1641:5, 1646:23

**involved** [4] - 1613:23, 1617:8, 1640:5, 1640:6

**involves** [1] - 1544:17

**involving** [1] - 1584:16

**IQ** [4] - 1549:4, 1557:20, 1557:21, 1598:13

**irrelevant** [1] - 1651:18

**irritated** [1] - 1563:7

**irritation** [1] - 1566:10

**issue** [22] - 1558:15, 1561:24, 1588:19, 1593:3, 1597:8, 1598:11, 1599:7, 1608:22, 1609:22, 1610:11, 1611:23, 1615:14, 1620:7, 1628:13, 1634:10, 1635:25, 1649:10, 1649:16, 1649:23, 1653:7, 1654:4, 1667:3

**issues** [59] - 1546:13,

1558:11, 1558:12, 1558:16, 1558:17, 1559:5, 1560:5, 1561:4, 1566:7, 1567:24, 1568:9, 1570:15, 1571:25, 1572:7, 1573:6, 1573:21, 1574:7, 1584:17, 1584:20, 1585:19, 1586:4, 1586:5, 1586:8, 1586:15, 1587:20, 1587:21, 1588:14, 1588:18, 1589:15, 1592:17, 1592:23, 1593:3, 1595:5, 1598:17, 1599:12, 1599:21, 1600:1, 1600:4, 1600:8, 1600:22, 1606:13, 1606:14, 1608:20, 1609:3, 1611:20, 1613:2, 1617:20, 1619:23, 1620:2, 1620:4, 1621:15, 1623:2, 1626:9, 1626:10, 1626:23, 1632:19, 1641:5, 1647:20, 1653:10

**issuing** [2] - 1585:10, 1585:16

**Italian** [1] - 1613:7

**item** [1] - 1580:23

**itself** [7] - 1611:18, 1619:14, 1620:6, 1621:8, 1626:9, 1642:21, 1655:18

**IV** [7] - 1612:21, 1632:8, 1632:14, 1633:11, 1637:2, 1647:5, 1659:2

## J

**January** [4] - 1562:19, 1643:6, 1659:10

**JASON** [1] - 1540:11

**JERICHO** [1] - 1539:24

**job** [4] - 1629:24, 1660:13, 1660:21

**jobs** [8] - 1556:10, 1558:2, 1562:16, 1564:6, 1564:9, 1660:19, 1660:23

**John** [4] - 1604:9, 1604:12, 1605:14, 1663:21

**JOHN** [2] - 1541:10, 1604:21

**JR** [3] - 1539:16, 1539:17, 1540:11
**judge** [6] - 1589:25, 1608:17, 1623:19, 1640:16, 1652:3, 1652:7
**JUDGE** [1] - 1539:13
**Judge** [11] - 1591:14, 1602:12, 1602:19, 1603:1, 1603:8, 1648:12, 1650:12, 1652:11, 1660:4, 1664:20, 1665:22
**judges** [3] - 1546:14, 1546:16, 1609:6
**judgment** [4] - 1658:22, 1658:23, 1659:21, 1659:23
**July** [41] - 1547:22, 1552:3, 1552:6, 1552:7, 1552:17, 1553:11, 1561:17, 1562:15, 1566:19, 1567:8, 1567:9, 1567:17, 1567:22, 1568:17, 1570:7, 1573:18, 1574:20, 1575:23, 1577:9, 1577:17, 1577:18, 1577:22, 1579:6, 1580:6, 1580:17, 1581:6, 1581:18, 1583:23, 1584:5, 1585:8, 1586:21, 1586:24, 1587:3, 1598:6, 1599:5, 1599:8, 1649:2, 1649:9
**jury** [43] - 1542:7, 1544:22, 1548:2, 1562:14, 1572:15, 1579:21, 1579:24, 1587:9, 1600:11, 1601:20, 1602:18, 1603:17, 1603:24, 1605:13, 1607:12, 1608:15, 1609:21, 1610:5, 1616:11, 1616:13, 1616:22, 1617:13, 1618:21, 1619:15, 1622:11, 1622:14, 1624:1, 1628:21, 1629:12, 1630:14, 1630:19, 1630:23, 1633:7, 1642:17, 1645:8, 1645:9, 1645:11, 1656:17, 1658:6, 1664:13, 1666:4, 1666:5, 1667:3

**JURY** [1] - 1539:12
**jury's** [1] - 1606:3

**K**

**KAREN** [1] - 1540:17
**Katrina** [8] - 1554:24, 1555:24, 1556:15, 1562:17, 1562:20, 1565:9, 1565:10, 1620:2
**keep** [2] - 1592:12, 1642:1
**kept** [1] - 1582:17
**kind** [32] - 1545:14, 1547:19, 1548:11, 1553:21, 1556:11, 1556:13, 1556:23, 1558:14, 1560:3, 1560:5, 1561:20, 1562:3, 1563:22, 1566:10, 1566:21, 1567:25, 1573:8, 1573:15, 1590:17, 1594:8, 1595:15, 1622:5, 1625:19, 1627:10, 1629:8, 1630:8, 1632:4, 1632:22, 1632:25, 1633:1, 1633:3
**kinds** [20] - 1546:3, 1548:2, 1548:5, 1549:10, 1572:6, 1574:9, 1584:20, 1590:15, 1612:9, 1612:24, 1616:5, 1625:19, 1627:9, 1627:12, 1627:15, 1628:25, 1629:1, 1633:12, 1640:14, 1641:4
**Klinger** [1] - 1632:25
**knowledge** [3] - 1554:18, 1597:3, 1643:12
**known** [7] - 1554:4, 1559:17, 1560:18, 1572:12, 1594:15, 1594:24, 1596:8
**KURT** [1] - 1539:12
**KURTZ** [1] - 1540:16

**L**

**LA** [4] - 1539:18, 1540:13, 1540:18, 1540:23
**laboratory** [2] - 1658:12, 1658:13

**LABORDE** [1] - 1540:10
**lack** [3] - 1555:1, 1601:5, 1650:25
**ladies** [2] - 1544:16, 1600:10
**language** [1] - 1599:16
**LAPEROUSE** [1] - 1540:10
**larger** [1] - 1592:9
**last** [6] - 1544:4, 1547:23, 1557:5, 1560:19, 1573:12, 1591:13
**late** [5] - 1561:1, 1567:9, 1567:17, 1659:5, 1659:15
**Latin** [1] - 1551:19
**LAW** [2] - 1539:16, 1539:23
**law** [8] - 1605:17, 1608:16, 1640:3, 1640:5, 1640:6, 1641:10, 1641:11, 1641:14
**lawsuit** [2] - 1567:7, 1590:9
**lawyer** [1] - 1596:23
**lawyers** [7] - 1590:11, 1605:16, 1609:8, 1609:22, 1621:6, 1641:2, 1643:2
**lay** [2] - 1555:3, 1555:11
**lead** [3] - 1625:20, 1629:15, 1636:21
**leading** [3] - 1566:17, 1628:1, 1647:7
**leaking** [1] - 1619:24
**learn** [1] - 1611:19
**least** [5] - 1603:12, 1635:25, 1659:6, 1659:16, 1665:19
**leaves** [2] - 1601:21, 1666:6
**left** [6] - 1563:18, 1621:18, 1621:19, 1622:1, 1622:2, 1622:9
**legal** [5] - 1587:14, 1589:2, 1606:13, 1608:20, 1629:25
**Legislature** [1] - 1640:11
**legitimate** [1] - 1651:11
**legitimately** [1] - 1634:11
**less** [5] - 1621:25,

1622:1, 1636:16, 1653:12, 1657:17
**Leukemia** [1] - 1653:18
**leukemia** [21] - 1650:4, 1650:21, 1650:24, 1651:4, 1651:5, 1651:13, 1652:15, 1652:23, 1653:6, 1653:16, 1653:21, 1653:23, 1653:25, 1654:8, 1654:11, 1654:20, 1654:22, 1654:24, 1654:25, 1655:4
**leukemia-type** [1] - 1654:24
**leukemogenic** [3] - 1653:13, 1654:1, 1654:15
**level** [27] - 1546:15, 1549:4, 1549:14, 1551:23, 1552:9, 1555:23, 1556:16, 1557:14, 1558:5, 1562:1, 1562:4, 1568:8, 1573:4, 1593:25, 1597:18, 1600:4, 1611:6, 1611:13, 1611:15, 1612:3, 1612:4, 1637:17, 1654:6, 1658:17, 1658:18, 1658:19
**levels** [4] - 1549:11, 1551:21, 1588:6, 1589:8
**LIABILITY** [1] - 1539:5
**lieu** [1] - 1664:20
**life** [18] - 1555:7, 1555:20, 1556:6, 1556:10, 1556:24, 1557:1, 1560:2, 1560:5, 1563:19, 1563:22, 1564:10, 1565:20, 1567:23, 1573:10, 1581:20, 1582:17, 1582:20, 1613:24
**life-style** [1] - 1555:20
**lifestyle** [1] - 1615:4
**lift** [2] - 1621:20, 1621:23
**likely** [2] - 1602:2, 1613:15
**Limine** [1] - 1654:7
**limits** [2] - 1553:12, 1561:20
**line** [4] - 1591:13, 1622:19, 1659:12,

1659:13
**lines** [1] - 1571:2
**link** [2] - 1586:11, 1588:3
**list** [3] - 1546:12, 1579:20, 1661:21
**listed** [1] - 1618:7
**listened** [1] - 1622:7
**literature** [1] - 1620:9
**LITIGATION** [1] - 1539:5
**litigation** [10] - 1609:17, 1611:18, 1611:25, 1612:2, 1612:6, 1612:10, 1626:1, 1626:15, 1627:2, 1636:8
**live** [1] - 1562:22
**lived** [6] - 1562:17, 1562:23, 1565:10, 1579:10, 1583:8, 1588:5
**lives** [2] - 1560:12, 1565:12
**living** [21] - 1547:15, 1555:7, 1557:1, 1562:21, 1566:8, 1569:13, 1570:8, 1570:12, 1570:15, 1570:17, 1571:18, 1572:3, 1572:8, 1578:2, 1578:7, 1582:7, 1588:15, 1597:18, 1656:14, 1656:18, 1658:8
**location** [1] - 1616:14
**long-term** [7] - 1563:14, 1573:24, 1573:25, 1574:12, 1588:14, 1588:18, 1615:13
**long-winded** [1] - 1641:13
**look** [35] - 1549:11, 1567:21, 1570:19, 1579:5, 1579:6, 1580:19, 1591:7, 1596:5, 1599:8, 1605:21, 1609:3, 1609:24, 1612:20, 1612:22, 1619:8, 1625:18, 1628:24, 1629:8, 1629:10, 1631:2, 1631:15, 1632:16, 1633:15, 1635:25, 1636:21, 1636:22, 1637:1, 1637:2, 1637:11, 1642:23, 1657:7, 1657:25, 1658:2,

1658:3, 1663:20
**looked** [5] - 1561:21,
1566:7, 1594:20,
1613:3, 1636:9
**looking** [13] - 1556:15,
1570:1, 1570:3,
1579:5, 1590:14,
1594:20, 1616:21,
1619:9, 1621:13,
1629:7, 1632:18,
1634:3, 1638:8
**lose** [1] - 1565:3
**loud** [1] - 1570:5
**Louisiana** [3] -
1575:10, 1667:16,
1667:17
**LOUISIANA** [2] -
1539:1, 1539:6
**low** [6] - 1552:8,
1552:10, 1553:11,
1553:19, 1561:18,
1611:5
**lower** [3] - 1612:4,
1625:8, 1656:10
**LSU** [2] - 1547:9
**luck** [1] - 1602:9
**lunch** [3] - 1602:3,
1665:25, 1666:2
**lunchtime** [1] -
1601:18
**LYNDON** [1] - 1539:16
**Lyndon** [7] - 1547:12,
1577:17, 1651:10,
1651:12, 1651:16,
1651:17, 1652:10

**M**

**main** [3] - 1581:21,
1582:22, 1617:10
**major** [9] - 1564:11,
1593:10, 1612:20,
1613:24, 1625:18,
1632:6, 1644:1,
1644:7, 1660:10
**male** [4] - 1659:6,
1659:16
**malinger** [2] -
1632:15, 1632:20
**malingerer** [3] -
1633:8, 1662:12,
1663:17
**malingerers** [2] -
1663:5, 1663:6
**malingering** [7] -
1559:23, 1632:17,
1632:18, 1633:2,
1635:19, 1637:3
**malpractice** [2] -

1640:22, 1640:23
**man** [5] - 1547:14,
1553:7, 1556:2,
1559:24, 1655:3
**management** [1] -
1593:13
**manifest** [1] - 1655:18
**manipulate** [1] -
1631:16
**manual** [2] - 1612:21,
1632:9
**manufactured** [1] -
1595:16
**map** [1] - 1542:12
**MARCH** [2] - 1539:6,
1542:3
**marked** [1] - 1636:2
**marker** [3] - 1594:18,
1594:20, 1658:15
**marriage** [1] - 1573:11
**MASH** [1] - 1632:24
**material** [1] - 1650:11
**materials** [1] -
1664:16
**math** [1] - 1656:24
**matter** [2] - 1585:16,
1667:21
**MBMD** [10] - 1551:10,
1558:8, 1558:9,
1559:12, 1559:18,
1560:16, 1593:17,
1600:5, 1663:2,
1663:4
**MCV** [1] - 1658:13
**MDL** [1] - 1539:5
**mean** [18] - 1549:6,
1556:9, 1561:5,
1564:11, 1566:23,
1605:22, 1606:7,
1614:9, 1615:6,
1628:23, 1629:4,
1630:19, 1631:25,
1633:11, 1637:8,
1645:23, 1647:1
**means** [6] - 1557:23,
1561:4, 1590:5,
1606:23, 1608:16,
1630:20
**meant** [2] - 1603:14,
1631:4
**MECHANICAL** [1] -
1540:24
**Medical** [2] - 1547:9,
1547:10
**medical** [58] -
1545:14, 1554:17,
1558:11, 1558:15,
1558:16, 1558:22,
1560:4, 1566:11,
1571:25, 1573:6,

1573:21, 1574:7,
1574:21, 1575:4,
1576:22, 1579:18,
1585:19, 1586:8,
1586:9, 1586:12,
1586:15, 1587:20,
1587:21, 1588:21,
1588:23, 1589:14,
1597:8, 1600:8,
1600:13, 1601:6,
1606:8, 1606:9,
1606:15, 1606:20,
1606:21, 1607:22,
1607:23, 1607:24,
1608:12, 1614:6,
1617:5, 1617:12,
1617:18, 1627:5,
1627:6, 1627:8,
1627:10, 1627:13,
1628:8, 1640:22,
1643:3, 1644:14,
1644:17, 1649:13,
1649:14, 1663:24,
1664:3
**medical-surgical** [1] -
1558:11
**medical/legal** [2] -
1635:23, 1636:1
**medically** [3] -
1586:11, 1588:4,
1588:12
**medication** [42] -
1553:16, 1553:20,
1554:12, 1556:20,
1563:11, 1577:1,
1578:10, 1578:21,
1582:16, 1582:19,
1610:13, 1610:15,
1610:16, 1610:17,
1610:20, 1610:21,
1610:25, 1613:14,
1613:17, 1614:1,
1614:7, 1614:9,
1614:21, 1615:3,
1615:22, 1616:2,
1619:1, 1619:7,
1619:8, 1628:17,
1636:15, 1637:9,
1637:10, 1637:11,
1637:15, 1638:3,
1638:10, 1638:15,
1638:21
**medications** [11] -
1606:16, 1610:14,
1614:14, 1617:19,
1627:16, 1628:15,
1628:16, 1637:16,
1638:9
**Medicine** [1] - 1551:11
**medicine** [3] -

1558:14, 1563:10,
1564:24
**meet** [2] - 1617:14,
1632:5
**members** [1] -
1626:15
**memorized** [1] -
1658:1
**mental** [10] - 1544:21,
1582:18, 1583:1,
1583:2, 1584:17,
1595:5, 1617:21,
1624:24, 1641:5,
1644:12
**mentally** [6] - 1582:22,
1582:25, 1583:4,
1583:5, 1583:7,
1640:11
**mention** [4] - 1584:10,
1618:23, 1623:11,
1623:15
**mentioned** [13] -
1553:13, 1565:7,
1565:12, 1565:14,
1566:14, 1571:25,
1574:12, 1578:24,
1583:11, 1584:4,
1584:8, 1592:14,
1612:12
**Merit** [1] - 1667:15
**met** [6] - 1542:12,
1547:20, 1576:18,
1577:13, 1617:15,
1627:20
**Metairie** [2] - 1545:15,
1545:16
**methodology** [1] -
1647:19
**mid** [6] - 1560:23,
1564:13, 1624:19,
1625:8, 1659:5,
1659:15
**middle** [6] - 1547:7,
1552:19, 1619:8,
1623:1, 1634:5,
1634:17
**might** [9] - 1549:3,
1589:25, 1592:20,
1602:9, 1605:22,
1626:19, 1627:1,
1639:24, 1645:15
**MIKAL** [1] - 1540:6
**mild** [10] - 1551:22,
1552:9, 1552:25,
1565:14, 1624:16,
1624:19, 1625:9,
1649:4
**military** [1] - 1632:24
**milligrams** [1] -
1638:2

**millon** [1] - 1593:19
**Millon** [5] - 1551:11,
1560:15, 1593:18,
1593:20, 1661:19
**mimic** [3] - 1612:23,
1629:11
**mind** [10] - 1548:17,
1557:12, 1557:13,
1572:3, 1586:13,
1586:14, 1588:4,
1626:22, 1634:14
**minimal** [7] - 1553:8,
1553:12, 1564:18,
1613:16, 1653:3,
1653:4
**minimizes** [2] -
1560:12, 1561:16
**Minnesota** [2] -
1560:24
**minor** [3] - 1564:18,
1574:2, 1593:22
**minus** [1] - 1646:11
**minute** [1] - 1651:16
**minutes** [2] - 1665:24,
1666:25
**mischaracterization**
[3] - 1578:17,
1581:25, 1584:19
**missed** [1] - 1558:9
**mistrial** [2] - 1650:9,
1650:10
**MMPI** [9] - 1559:13,
1560:23, 1600:6,
1625:15, 1625:17,
1631:19, 1631:24,
1636:23, 1662:16
**MMPI's** [1] - 1662:20
**MMPI-2** [10] - 1551:13,
1558:7, 1559:17,
1560:17, 1618:9,
1631:1, 1631:2,
1631:4, 1663:2,
1663:4
**moderate** [5] -
1551:22, 1624:20,
1625:6, 1625:9,
1658:12
**moderators** [1] -
1593:20
**modern** [1] - 1644:13
**moment** [6] - 1559:10,
1638:8, 1643:17,
1648:6, 1652:5,
1656:12
**momentary** [1] -
1569:8
**MONDAY** [2] - 1539:6,
1542:3
**monetary** [2] -
1632:22, 1662:14

**money** [6] - 1613:22, 1633:5, 1639:6, 1639:8, 1639:10, 1641:3

**month** [3] - 1616:25, 1624:20, 1638:25

**months** [16] - 1552:16, 1554:10, 1556:21, 1562:19, 1562:24, 1563:5, 1567:22, 1578:25, 1579:9, 1579:11, 1579:15, 1579:19, 1591:24, 1592:5, 1643:6

**mood** [2] - 1553:19, 1577:2

**morbidity** [1] - 1561:24

**morning** [21] - 1542:10, 1542:12, 1544:10, 1544:11, 1576:16, 1576:17, 1589:21, 1589:23, 1597:17, 1606:1, 1610:24, 1612:16, 1619:17, 1620:19, 1620:21, 1621:1, 1621:13, 1645:3, 1645:7, 1667:4, 1667:6

**MORNING** [1] - 1539:11

**mornings** [1] - 1629:22

**most** [13] - 1551:18, 1560:21, 1568:14, 1569:7, 1617:8, 1617:11, 1647:25, 1657:9, 1657:10, 1660:21, 1661:24, 1661:25, 1662:4

**mostly** [1] - 1620:18

**mother** [4] - 1562:18, 1563:24, 1565:11, 1565:12

**Motion** [1] - 1654:7

**mouth** [1] - 1645:3

**moved** [4] - 1545:12, 1545:15, 1562:25, 1563:4

**moving** [3] - 1570:6, 1579:1, 1579:15

**MR** [185] - 1541:6, 1541:7, 1541:8, 1541:9, 1541:11, 1541:12, 1541:13, 1542:20, 1543:1, 1543:4, 1543:8, 1543:10, 1543:11, 1543:17, 1544:6,

1544:9, 1550:4, 1550:11, 1550:15, 1550:19, 1555:1, 1555:5, 1555:9, 1555:10, 1555:15, 1565:22, 1566:6, 1566:17, 1569:14, 1569:16, 1569:25, 1570:4, 1570:6, 1570:11, 1571:11, 1571:15, 1571:22, 1576:10, 1576:13, 1576:15, 1578:17, 1578:23, 1580:2, 1580:5, 1581:12, 1581:17, 1581:25, 1582:5, 1582:9, 1582:24, 1583:15, 1583:18, 1584:18, 1585:3, 1587:13, 1587:19, 1587:25, 1588:17, 1589:1, 1589:13, 1589:17, 1589:20, 1591:14, 1591:16, 1595:1, 1595:8, 1595:12, 1595:24, 1596:1, 1596:4, 1596:17, 1596:21, 1599:13, 1599:16, 1599:20, 1599:25, 1600:21, 1600:25, 1601:2, 1601:14, 1601:23, 1601:25, 1602:4, 1602:7, 1602:12, 1602:19, 1602:23, 1603:1, 1603:2, 1603:8, 1603:13, 1603:16, 1603:17, 1604:11, 1604:24, 1605:3, 1605:5, 1605:7, 1605:12, 1622:18, 1622:24, 1622:25, 1623:2, 1623:4, 1623:7, 1623:8, 1623:9, 1623:10, 1623:13, 1623:16, 1623:19, 1623:23, 1628:1, 1628:5, 1630:4, 1630:13, 1633:23, 1634:7, 1634:8, 1634:19, 1634:25, 1635:8, 1637:20, 1638:7, 1639:13, 1639:16, 1639:19, 1641:8, 1643:19, 1643:22, 1645:6, 1645:17, 1648:1, 1648:4, 1648:5, 1648:9, 1648:10,

1648:14, 1648:16, 1648:17, 1648:22, 1649:20, 1649:21, 1649:25, 1650:5, 1650:9, 1650:13, 1650:17, 1650:19, 1651:23, 1652:3, 1652:4, 1652:7, 1652:11, 1652:18, 1652:20, 1652:21, 1653:17, 1653:24, 1653:25, 1654:13, 1654:18, 1655:1, 1655:3, 1655:11, 1659:13, 1660:3, 1660:4, 1660:15, 1663:12, 1663:14, 1663:16, 1663:20, 1663:22, 1664:5, 1664:9, 1664:20, 1664:24, 1665:2, 1665:22, 1666:9, 1666:12, 1666:15, 1666:25, 1667:7

**mucous** [6] - 1563:6, 1568:5, 1579:15, 1599:22, 1665:10, 1665:13

**multi** [1] - 1643:25

**multi-axial** [1] - 1643:25

**Multiphasic** [1] - 1560:25

**multiple** [3] - 1609:11, 1644:10, 1654:2

## N

**name** [5] - 1544:2, 1544:4, 1550:5, 1550:21, 1605:14

**nasal** [1] - 1638:10

**Nasonex** [3] - 1638:14, 1638:25

**nasopharyngeal** [3] - 1651:6, 1653:12, 1654:1

**National** [1] - 1651:2

**nature** [5] - 1568:23, 1595:5, 1595:13, 1620:18, 1630:21

**necessarily** [5] - 1597:18, 1598:10, 1621:4, 1645:22, 1646:24

**necessary** [1] - 1576:8

**neck** [1] - 1563:8

**need** [24] - 1547:19, 1548:15, 1566:2, 1582:19, 1586:9,

1587:11, 1587:20, 1587:22, 1588:24, 1589:14, 1603:3, 1608:24, 1611:2, 1616:1, 1616:12, 1617:11, 1619:6, 1619:10, 1624:7, 1631:18, 1640:5, 1659:8

**needed** [10] - 1548:14, 1552:20, 1562:2, 1566:24, 1575:6, 1592:12, 1619:5, 1629:16, 1651:25, 1661:8

**needs** [4] - 1560:7, 1588:10, 1589:11, 1640:11

**Nephrology** [3] - 1554:2, 1564:21, 1658:11

**nervous** [1] - 1544:21

**neurologic** [1] - 1627:11

**neuroma** [8] - 1587:6, 1587:10, 1620:24, 1645:14, 1645:24, 1665:6, 1665:7

**never** [15] - 1557:23, 1557:24, 1570:15, 1577:13, 1578:1, 1585:4, 1586:1, 1590:3, 1594:22, 1595:14, 1595:19, 1626:18, 1626:19, 1642:3, 1642:5

**new** [6] - 1651:3, 1651:12, 1651:17, 1652:24, 1653:6, 1653:7

**New** [6] - 1546:22, 1562:18, 1562:22, 1564:4, 1564:8, 1575:10

**NEW** [5] - 1539:6, 1539:18, 1540:13, 1540:18, 1540:23

**news** [1] - 1609:22

**NEXSEN** [1] - 1540:3

**next** [12] - 1542:13, 1545:18, 1551:9, 1558:7, 1583:22, 1601:22, 1602:10, 1604:6, 1612:16, 1655:7, 1659:22, 1666:8

**nice** [1] - 1589:21

**night** [4] - 1563:12, 1612:15, 1612:17, 1615:7

**nine** [7] - 1561:7, 1579:15, 1591:24, 1592:5, 1624:4, 1624:14, 1649:4

**NO** [2] - 1539:5, 1539:9

**nobody** [1] - 1655:4

**noon** [1] - 1602:8

**normal** [3] - 1553:12, 1558:21, 1561:19

**normally** [1] - 1658:18

**normed** [1] - 1558:20

**nose** [4] - 1567:18, 1574:8, 1601:4, 1638:17

**notation** [5] - 1656:13, 1657:19, 1657:24, 1658:1, 1658:7

**notations** [2] - 1658:1, 1658:6

**note** [2] - 1649:3, 1657:22

**noted** [1] - 1629:22

**notes** [1] - 1619:11

**nothing** [6] - 1543:20, 1562:1, 1562:2, 1566:23, 1604:17, 1650:13

**notice** [1] - 1639:1

**notion** [1] - 1557:9

**November** [5] - 1610:22, 1616:25, 1617:15, 1627:20, 1649:3

**nowhere** [1] - 1570:18

**number** [8] - 1546:24, 1553:21, 1565:1, 1580:21, 1590:1, 1648:8, 1649:4

**Number** [12] - 1580:22, 1581:5, 1636:11, 1636:18, 1650:19, 1650:23, 1651:2, 1661:20, 1664:11, 1664:13, 1665:3

**numbered** [1] - 1667:20

**numbers** [5] - 1622:12, 1622:14, 1622:15, 1624:1, 1648:11

**Numbers** [1] - 1583:21

## O

**o'clock** [3] - 1665:25, 1666:1, 1667:2

**oath** [5] - 1542:23,

1543:25, 1604:13, 1604:23, 1659:10
**object** [5] - 1584:18, 1600:21, 1645:6, 1648:17, 1655:3
**objection** [30] - 1543:10, 1543:11, 1555:1, 1555:9, 1566:17, 1569:14, 1569:23, 1578:17, 1580:2, 1581:25, 1582:9, 1587:13, 1587:25, 1595:1, 1596:17, 1605:3, 1605:5, 1622:18, 1628:1, 1630:4, 1633:23, 1637:20, 1648:7, 1650:5, 1652:8, 1655:6, 1664:23, 1664:24
**objections** [1] - 1634:20
**objective** [4] - 1549:20, 1631:15, 1631:19, 1636:3
**objectivity** [1] - 1549:19
**obtain** [4] - 1545:3, 1555:16, 1562:10, 1577:8
**obtained** [2] - 1545:6, 1618:12
**obviously** [4] - 1584:23, 1603:3, 1636:20, 1644:10
**occasion** [1] - 1642:6
**occasionally** [1] - 1553:19
**occasions** [1] - 1610:24
**occupying** [1] - 1592:9
**occur** [2] - 1551:22, 1560:5
**occurred** [1] - 1649:17
**occurs** [1] - 1573:7
**OF** [3] - 1539:1, 1539:12, 1539:16
**offense** [3] - 1608:18, 1640:19, 1640:20
**offer** [2] - 1568:21, 1575:10
**offered** [3] - 1577:21, 1651:25, 1652:22
**offers** [1] - 1650:20
**office** [3] - 1545:16, 1547:22, 1548:9
**OFFICER** [4] - 1601:19, 1602:17, 1603:23, 1666:4

**offices** [1] - 1546:11
**OFFICES** [1] - 1539:16
**Official** [2] - 1667:16, 1667:24
**OFFICIAL** [1] - 1540:22
**often** [5] - 1548:15, 1549:14, 1558:13, 1563:9, 1614:11
**Ohio** [2] - 1545:13, 1547:7
**old** [1] - 1563:16
**once** [3] - 1542:11, 1603:5, 1607:18
**one** [79] - 1544:18, 1546:4, 1550:23, 1551:3, 1551:5, 1551:9, 1551:12, 1551:14, 1551:18, 1553:24, 1558:9, 1560:17, 1562:6, 1564:5, 1569:5, 1570:6, 1580:9, 1582:15, 1585:7, 1590:4, 1592:11, 1593:9, 1593:20, 1594:14, 1596:5, 1597:14, 1597:25, 1599:18, 1600:20, 1601:7, 1605:16, 1609:23, 1609:24, 1610:13, 1612:20, 1614:2, 1625:2, 1629:1, 1629:16, 1632:13, 1633:2, 1633:21, 1635:24, 1636:9, 1637:12, 1638:9, 1640:10, 1640:14, 1642:6, 1644:11, 1644:14, 1650:19, 1651:21, 1652:5, 1652:25, 1653:1, 1654:11, 1655:1, 1656:5, 1656:6, 1656:8, 1656:9, 1656:10, 1658:2, 1659:5, 1659:15, 1660:21, 1661:16, 1661:19, 1665:25, 1666:1, 1667:2
**ones** [8] - 1609:18, 1617:10, 1617:23, 1625:18, 1646:16, 1646:24, 1652:25
**ongoing** [1] - 1578:14, 1636:15
**open** [1] - 1667:7
**opened** [1] - 1545:16

**opinion** [22] - 1546:19, 1558:3, 1574:16, 1587:21, 1588:23, 1611:17, 1612:1, 1622:15, 1626:2, 1631:23, 1634:14, 1635:17, 1636:15, 1638:5, 1650:20, 1651:10, 1651:11, 1651:21, 1652:12, 1652:22, 1655:21, 1665:19
**opinions** [17] - 1546:18, 1577:18, 1606:6, 1610:5, 1610:7, 1613:2, 1613:4, 1616:12, 1616:15, 1618:18, 1618:20, 1619:15, 1630:24, 1642:11, 1651:24, 1664:18, 1665:14
**opportunity** [1] - 1597:14, 1658:4
**opposed** [2] - 1559:8, 1609:8
**opposing** [1] - 1546:18
**opposite** [2] - 1560:12, 1561:15
**optimistic** [1] - 1666:17
**oral** [2] - 1600:17, 1606:25
**ORDER** [1] - 1542:4
**order** [11] - 1559:13, 1584:20, 1584:21, 1603:20, 1604:2, 1616:14, 1630:2, 1632:21, 1633:14, 1645:1, 1659:18
**organizations** [1] - 1546:23
**ORLEANS** [5] - 1539:6, 1539:18, 1540:13, 1540:18, 1540:23
**Orleans** [6] - 1546:22, 1562:18, 1562:22, 1564:4, 1564:8, 1575:10
**osteoporosis** [1] - 1593:2
**ought** [1] - 1598:21
**ounces** [4] - 1656:20, 1656:24, 1657:5
**outline** [1] - 1610:5
**outlined** [1] - 1642:19
**outpatients** [2] - 1545:10, 1608:1

**outright** [1] - 1561:14
**outs** [1] - 1612:20
**outside** [3] - 1571:8, 1597:9, 1626:23
**over-the-counter** [3] - 1563:11, 1638:10, 1638:15
**overall** [1] - 1601:10
**overcome** [1] - 1653:11
**overly** [2] - 1631:5, 1636:24
**overreact** [1] - 1593:22
**overrule** [9] - 1566:18, 1570:10, 1578:19, 1582:10, 1588:2, 1599:19, 1623:18, 1637:25, 1645:8
**overstate** [1] - 1662:9
**own** [3] - 1621:7, 1631:12, 1634:14

**P**

**P.O** [1] - 1540:4
**pack** [1] - 1657:3
**Page** [8] - 1570:2, 1570:3, 1570:19, 1579:6, 1591:6, 1591:11, 1591:12, 1592:1
**PAGE** [1] - 1541:3
**page** [23] - 1545:18, 1545:19, 1546:23, 1570:3, 1570:4, 1579:5, 1591:5, 1591:8, 1599:8, 1619:8, 1622:25, 1623:1, 1623:6, 1632:11, 1634:3, 1634:5, 1634:17, 1638:8, 1659:12, 1659:13, 1663:21, 1664:11
**paid** [4] - 1639:3, 1639:6, 1639:8, 1641:17
**pail** [1] - 1564:14
**pain** [3] - 1546:5, 1546:6, 1593:12
**pale** [1] - 1652:16
**panel** [4] - 1542:8, 1601:21, 1603:25, 1666:6
**paper** [2] - 1548:21, 1617:23, 1661:7
**paper-and-pencil-type** [1] - 1548:21

**paradigm** [2] - 1643:18, 1646:15
**paragraph** [9] - 1570:2, 1592:2, 1592:3, 1592:4, 1599:9, 1623:5, 1634:4, 1634:17, 1634:24
**parent** [1] - 1563:23
**parents** [1] - 1563:25
**parse** [1] - 1612:18
**part** [17] - 1557:7, 1565:23, 1569:12, 1571:18, 1571:20, 1612:11, 1621:25, 1627:22, 1632:14, 1640:15, 1643:17, 1647:25, 1653:2, 1660:21, 1661:24, 1661:25, 1662:4
**part's** [1] - 1661:8
**particular** [26] - 1550:20, 1551:16, 1554:19, 1566:7, 1566:13, 1580:21, 1592:16, 1598:11, 1599:16, 1609:25, 1610:20, 1626:16, 1627:16, 1632:19, 1638:3, 1638:21, 1640:24, 1642:1, 1644:18, 1647:24, 1649:13, 1655:13, 1655:17, 1655:22, 1657:25, 1662:23
**particularly** [2] - 1599:21, 1650:3
**parts** [2] - 1662:4, 1665:4
**party** [1] - 1603:6
**pass** [3] - 1576:10, 1601:14, 1663:12
**passed** [2] - 1567:13, 1607:3
**past** [19] - 1553:18, 1555:18, 1555:20, 1566:25, 1592:15, 1597:25, 1598:3, 1599:5, 1605:22, 1613:12, 1613:13, 1613:15, 1614:8, 1617:17, 1617:18, 1619:5, 1637:9, 1637:12, 1643:3
**pathologist** [1] - 1567:21
**patient** [5] - 1574:7, 1577:15, 1590:7, 1599:3, 1646:24
**patients** [13] -

1554:19, 1558:23, 1606:16, 1607:21, 1607:23, 1608:1, 1608:2, 1608:4, 1608:8, 1632:12, 1638:22, 1640:12
**Patricia** [1] - 1650:23
**pattern** [1] - 1581:1
**PAUL** [1] - 1540:3
**pay** [2] - 1575:17, 1611:19
**paying** [1] - 1561:10
**peak** [1] - 1625:25
**pediatric** [1] - 1545:12
**Pediatric** [1] - 1545:13
**pencil** [2] - 1548:21, 1661:7
**pending** [1] - 1660:3
**people** [38] - 1546:6, 1546:12, 1549:17, 1557:10, 1557:11, 1558:12, 1558:21, 1560:11, 1561:25, 1562:23, 1569:7, 1575:16, 1582:21, 1596:14, 1606:17, 1612:7, 1612:21, 1613:13, 1614:13, 1614:18, 1614:22, 1619:25, 1620:9, 1626:4, 1629:6, 1630:3, 1633:13, 1640:4, 1640:7, 1641:5, 1641:24, 1642:2, 1646:11, 1657:10
**Pepper** [3] - 1667:14, 1667:23, 1667:23
**PEPPER** [1] - 1540:22
**per** [9] - 1641:17, 1656:15, 1656:18, 1656:22, 1657:1, 1657:20, 1657:24, 1658:8, 1660:24
**perceived** [1] - 1570:14
**percent** [1] - 1641:14
**perception** [1] - 1565:20
**perfect** [2] - 1647:25, 1660:2
**perform** [2] - 1558:5, 1661:4
**performed** [2] - 1562:10, 1611:4
**perhaps** [3] - 1558:4, 1562:6, 1645:18
**period** [15] - 1554:6, 1554:24, 1555:8, 1556:15, 1574:22,

1614:10, 1614:22, 1622:7, 1622:9, 1622:10, 1638:23, 1645:4, 1651:14, 1654:23, 1660:20
**periodic** [3] - 1565:4, 1582:16, 1583:10
**periodically** [3] - 1553:16, 1554:13, 1629:3
**periods** [2] - 1553:22, 1556:18
**permanent** [1] - 1594:18
**persist** [1] - 1569:8
**person** [33] - 1549:12, 1551:21, 1551:24, 1556:11, 1556:13, 1559:2, 1561:8, 1568:25, 1572:20, 1573:9, 1573:14, 1588:12, 1597:24, 1598:9, 1598:11, 1598:20, 1608:23, 1609:2, 1629:3, 1630:22, 1631:11, 1631:19, 1641:1, 1645:3, 1646:16, 1655:20, 1658:21, 1659:5, 1659:15, 1662:1, 1662:12, 1662:13, 1663:7
**person's** [4] - 1549:4, 1557:13, 1560:5, 1588:4
**personal** [1] - 1548:11
**Personality** [1] - 1560:25
**personality** [10] - 1561:3, 1561:19, 1573:3, 1573:4, 1573:20, 1574:6, 1636:19, 1644:11
**perspective** [1] - 1654:5
**pertinent** [1] - 1647:21
**pervasive** [1] - 1651:5
**Ph.D** [3] - 1545:3, 1545:6, 1607:16
**phenomenon** [1] - 1569:1
**physical** [7] - 1560:4, 1564:19, 1566:7, 1569:4, 1593:21, 1613:2, 1665:21
**physically** [2] - 1586:11, 1588:3
**physician** [6] - 1574:10, 1576:23, 1576:24, 1585:22,

1627:9, 1637:8
**physician/patient** [1] - 1642:3
**physicians** [1] - 1658:10
**physiological** [1] - 1644:15
**pick** [2] - 1592:21, 1666:22
**picture** [2] - 1557:13, 1637:1
**pieces** [1] - 1617:9
**pill** [1] - 1638:18
**PINEDO** [1] - 1539:23
**place** [1] - 1548:9
**places** [1] - 1620:9
**plaintiff** [3] - 1542:20, 1609:17, 1609:22
**plaintiff's** [2] - 1542:17, 1595:9, 1634:21
**plaintiffs** [3] - 1603:20, 1604:5, 1610:1
**plan** [5] - 1542:13, 1575:1, 1647:24, 1665:25, 1666:17
**play** [1] - 1626:11
**played** [1] - 1603:20
**playful** [1] - 1563:22
**playing** [1] - 1666:17
**pleasant** [1] - 1621:24
**pleasure** [1] - 1559:20
**plus** [3] - 1615:17, 1646:11, 1651:9
**point** [38] - 1542:7, 1542:18, 1562:4, 1564:1, 1569:19, 1571:5, 1571:7, 1572:21, 1573:21, 1574:24, 1601:20, 1602:15, 1603:24, 1616:15, 1618:19, 1619:5, 1619:6, 1621:4, 1621:5, 1621:10, 1622:16, 1622:20, 1623:20, 1624:3, 1625:24, 1629:16, 1631:5, 1632:13, 1632:16, 1634:1, 1635:5, 1649:23, 1650:7, 1652:8, 1655:8, 1660:21, 1666:5, 1666:22
**points** [3] - 1554:8, 1562:13, 1565:23
**Polk** [5] - 1602:11, 1603:20, 1604:6, 1666:8, 1666:24

**pondered** [1] - 1570:7
**poor** [2] - 1659:21, 1659:23
**popped** [1] - 1629:19
**portion** [1] - 1665:9
**position** [2] - 1608:12, 1654:14
**positions** [1] - 1545:20
**possibility** [2] - 1627:1, 1635:13
**possible** [2] - 1629:9
**possibly** [2] - 1563:25, 1602:10
**potentially** [1] - 1558:5
**pound** [2] - 1656:25, 1657:6
**poundage** [1] - 1657:18
**pounds** [6] - 1657:1, 1657:4, 1657:7, 1657:14, 1659:7, 1659:17
**POYDRAS** [2] - 1540:12, 1540:23
**practice** [5] - 1545:16, 1545:25, 1608:6, 1633:12, 1647:10
**practiced** [1] - 1545:11
**preceded** [1] - 1581:23
**predated** [1] - 1586:21
**preexisting** [2] - 1612:8
**prefer** [1] - 1602:24
**preoccupied** [1] - 1593:21
**prescribe** [5] - 1554:4, 1577:1, 1606:16, 1637:5, 1637:17
**prescribed** [11] - 1553:16, 1554:11, 1554:16, 1554:20, 1563:18, 1578:10, 1610:12, 1610:14, 1610:15, 1614:10, 1637:18
**prescribing** [1] - 1637:21
**presence** [3] - 1549:5, 1571:8, 1598:17
**PRESENT** [1] - 1540:20
**present** [8] - 1551:24, 1578:11, 1579:22, 1605:23, 1632:5, 1636:1, 1652:23, 1658:24

**presentation** [2] - 1551:20, 1642:12
**presentations** [1] - 1546:24
**presenting** [1] - 1613:1
**presently** [1] - 1618:25
**presents** [2] - 1626:12, 1635:23
**presumably** [2] - 1598:19, 1660:23
**pretty** [13] - 1557:18, 1559:17, 1563:1, 1566:1, 1574:1, 1574:3, 1597:21, 1601:8, 1612:10, 1619:23, 1621:1, 1634:18
**prevalent** [1] - 1626:22
**previous** [3] - 1605:23, 1625:16, 1637:24
**priests** [1] - 1546:10
**primarily** [2] - 1545:11, 1611:17
**primary** [6] - 1556:5, 1568:22, 1568:24, 1593:4, 1616:3, 1665:20
**private** [5] - 1545:16, 1549:14, 1557:10, 1557:13, 1559:25
**privy** [1] - 1555:13
**probability** [2] - 1569:10, 1572:10
**problem** [8] - 1551:22, 1573:22, 1586:25, 1593:9, 1608:3, 1621:9, 1629:15, 1629:21
**problems** [67] - 1545:10, 1545:14, 1546:3, 1546:10, 1547:16, 1547:18, 1548:11, 1549:5, 1552:23, 1556:4, 1556:6, 1556:24, 1558:18, 1560:2, 1560:4, 1560:12, 1561:5, 1561:19, 1561:23, 1563:5, 1563:12, 1564:17, 1565:15, 1566:11, 1566:20, 1566:24, 1568:23, 1570:14, 1570:20, 1570:22, 1572:6, 1573:3, 1573:9, 1573:10,

1573:20, 1574:2,
1574:8, 1574:9,
1578:6, 1578:9,
1579:9, 1579:14,
1579:18, 1579:25,
1583:2, 1583:6,
1583:8, 1585:23,
1586:2, 1588:9,
1588:23, 1592:9,
1592:24, 1598:18,
1598:20, 1608:25,
1612:22, 1615:16,
1627:12, 1627:14,
1627:15, 1627:16,
1627:18, 1628:16,
1646:5
**procedures** [1] -
1549:2
**proceed** [2] - 1544:6,
1648:19
**proceeded** [1] -
1547:21
**proceeding** [1] -
1635:5
**PROCEEDINGS** [3] -
1539:12, 1540:24,
1542:1
**proceedings** [14] -
1542:7, 1569:19,
1571:5, 1571:7,
1601:20, 1602:15,
1603:24, 1622:20,
1623:20, 1634:1,
1650:7, 1655:8,
1666:5, 1667:20
**process** [7] - 1572:21,
1607:16, 1611:25,
1613:20, 1613:21,
1613:23, 1640:18
**PRODUCED** [1] -
1540:25
**PRODUCTS** [1] -
1539:4
**profession** [1] -
1544:12
**Professional** [1] -
1667:15
**professional** [3] -
1544:25, 1624:24,
1634:14
**professor** [1] -
1608:11
**profile** [3] - 1599:2,
1662:9
**prognosis** [10] -
1613:5, 1613:6,
1613:9, 1613:19,
1615:2, 1615:5,
1615:13, 1615:25,
1616:7, 1616:8

**Program** [1] - 1651:3
**projective** [1] -
1661:22
**prominent** [1] -
1654:14
**proper** [1] - 1647:16
**properly** [1] - 1559:3
**provide** [6] - 1549:19,
1552:19, 1575:13,
1618:19, 1658:3,
1662:1
**provided** [5] - 1550:9,
1552:25, 1601:10,
1618:16, 1662:21
**providing** [1] - 1647:7
**prudent** [1] - 1574:20
**PRUET** [1] - 1540:3
**psychiatric** [15] -
1586:9, 1587:11,
1605:20, 1605:22,
1606:13, 1608:3,
1608:25, 1612:8,
1612:9, 1617:17,
1633:1, 1644:1,
1644:18, 1647:8,
1647:22
**psychiatrist** [6] -
1605:14, 1607:13,
1607:22, 1615:18,
1616:4, 1616:5
**psychiatrists** [4] -
1614:19, 1632:10,
1643:18, 1647:20
**psychiatry** [26] -
1604:25, 1605:1,
1605:6, 1605:7,
1606:11, 1606:12,
1606:25, 1607:1,
1607:2, 1607:9,
1607:10, 1607:24,
1608:14, 1608:15,
1608:16, 1609:5,
1609:13, 1613:12,
1628:23, 1639:21,
1640:2, 1640:3,
1640:24
**psychological** [32] -
1546:15, 1547:16,
1547:18, 1547:24,
1548:13, 1549:5,
1549:10, 1558:10,
1558:11, 1558:16,
1558:17, 1558:18,
1558:22, 1560:21,
1561:4, 1569:10,
1572:9, 1574:24,
1575:9, 1575:20,
1581:24, 1582:8,
1586:25, 1587:23,
1588:9, 1598:18,

1599:2, 1600:8,
1617:22, 1647:7,
1647:21, 1661:2
**psychologically** [2] -
1556:12, 1581:19
**psychologist** [19] -
1543:5, 1544:14,
1548:6, 1548:23,
1554:17, 1555:23,
1595:4, 1607:13,
1607:14, 1610:23,
1615:18, 1617:25,
1624:23, 1624:24,
1625:16, 1642:23,
1656:1, 1661:1,
1661:4
**psychologists** [8] -
1549:22, 1551:19,
1560:22, 1572:18,
1575:14, 1632:10,
1643:18, 1647:20
**psychology** [16] -
1543:7, 1543:13,
1544:13, 1544:17,
1544:18, 1544:20,
1545:6, 1545:8,
1545:12, 1546:2,
1547:6, 1558:13,
1607:17, 1607:18,
1628:24
**psychopathology** [2]
- 1561:4
**psychosocial** [1] -
1647:14
**psychotic** [1] - 1644:3
**public** [1] - 1546:25
**publications** [2] -
1650:2, 1651:3
**published** [2] -
1549:22, 1559:13
**pull** [1] - 1594:10
**pulling** [1] - 1664:20
**pulmonary** [8] -
1568:23, 1570:14,
1570:20, 1570:22,
1573:19, 1627:14,
1627:18, 1628:10
**purports** [1] - 1648:10
**purpose** [1] - 1662:13
**purposes** [1] -
1632:12
**push** [1] - 1560:7
**pushed** [1] - 1566:22
**pushing** [1] - 1602:9
**put** [8] - 1550:24,
1583:22, 1619:11,
1620:9, 1635:24,
1640:12, 1654:5,
1656:2
**putting** [1] - 1647:24

## Q

**qualifications** [1] -
1606:4
**qualified** [1] - 1554:18
**qualify** [1] - 1646:14
**quarterly** [1] - 1616:1
**quarters** [1] - 1603:12
**questioning** [1] -
1591:22
**questions** [25] -
1543:14, 1547:16,
1548:17, 1549:2,
1549:9, 1581:14,
1581:15, 1590:1,
1595:24, 1596:22,
1597:10, 1603:1,
1625:2, 1627:9,
1629:19, 1629:20,
1631:16, 1631:17,
1631:20, 1639:13,
1639:16, 1644:25,
1658:16, 1659:4,
1665:22
**quick** [1] - 1663:14
**quickly** [5] - 1545:2,
1550:22, 1557:3,
1598:1, 1620:22
**quiet** [1] - 1561:22
**quit** [1] - 1564:6
**quote** [3] - 1619:3,
1619:11, 1636:18

## R

**raise** [2] - 1543:18,
1604:15
**raised** [2] - 1552:23,
1563:23
**raising** [1] - 1655:3
**randomly** [2] - 1559:8,
1561:11
**range** [10] - 1553:2,
1575:11, 1575:12,
1598:4, 1625:6,
1631:3, 1638:2,
1638:3, 1641:23,
1642:2
**rapidly** [2] - 1612:2,
1612:10
**rashes** [1] - 1563:7
**rate** [1] - 1642:1
**rather** [5] - 1603:5,
1645:20, 1656:1,
1667:8
**rating** [1] - 1573:14
**raw** [1] - 1550:13
**RE** [1] - 1539:4

**re** [2] - 1554:11,
1574:4
**re-examined** [1] -
1574:4
**re-prescribed** [1] -
1554:11
**reach** [1] - 1569:6
**reached** [3] - 1568:16,
1575:22, 1610:6
**reactions** [1] -
1566:10
**read** [10] - 1548:7,
1553:21, 1571:15,
1582:19, 1594:13,
1599:11, 1601:8,
1621:7, 1659:14
**reading** [5] - 1570:10,
1571:4, 1599:14,
1621:6, 1631:17
**readings** [1] - 1662:20
**readministration** [1] -
1568:18
**reads** [1] - 1634:11
**ready** [3] - 1601:24,
1606:23, 1648:19
**real** [2] - 1590:13,
1593:22
**really** [2] - 1553:12,
1567:24, 1572:1,
1574:11, 1586:17,
1591:25, 1595:1,
1597:13, 1598:9,
1611:7, 1612:22,
1613:17, 1613:24,
1615:14, 1619:19,
1631:7, 1635:24,
1636:9, 1647:1,
1647:19, 1655:16,
1657:7
**Realtime** [1] - 1667:14
**reason** [3] - 1586:6,
1652:1, 1657:13
**reasonable** [7] -
1569:10, 1571:4,
1572:9, 1575:8,
1576:7, 1611:16,
1642:2
**reasoning** [1] -
1557:17
**reasons** [2] - 1598:22,
1651:8
**rebut** [1] - 1652:19
**recent** [1] - 1652:24
**recently** [2] - 1588:7,
1609:21
**recertified** [1] - 1607:3
**recess** [1] - 1602:16
**recollect** [1] -
1554:11, 1562:24
**recommend** [3] -

1574:19, 1615:19, 1637:7
**recommendation** [1] - 1615:15
**recommended** [3] - 1575:3, 1593:11, 1615:23
**record** [5] - 1544:2, 1614:17, 1654:20, 1656:13, 1667:20
**RECORDED** [1] - 1540:24
**records** [23] - 1553:15, 1556:19, 1577:21, 1590:15, 1600:13, 1600:16, 1601:6, 1601:8, 1613:20, 1614:6, 1616:17, 1617:5, 1617:12, 1621:23, 1638:4, 1641:20, 1643:3, 1643:9, 1643:12, 1649:13, 1657:24, 1659:22, 1659:23
**recurrent** [1] - 1583:10
**red** [1] - 1596:5
**redirect** [7] - 1581:15, 1595:25, 1602:21, 1602:25, 1603:6, 1663:13
**REDIRECT** [4] - 1541:9, 1541:13, 1596:3, 1663:15
**reduce** [1] - 1568:15
**reducing** [1] - 1615:24
**reevaluations** [1] - 1575:5
**refer** [2] - 1591:25, 1630:3
**reference** [13] - 1570:16, 1599:9, 1611:3, 1611:20, 1622:19, 1634:4, 1634:5, 1636:11, 1647:10, 1652:7, 1654:4, 1664:10, 1665:4
**referencing** [1] - 1599:17
**referred** [2] - 1590:11, 1647:18
**referring** [2] - 1548:20, 1657:22
**reflecting** [1] - 1598:11
**reflective** [1] - 1597:18
**reflects** [1] - 1544:24

**refocus** [1] - 1553:22
**regard** [1] - 1562:14
**regarding** [2] - 1543:15, 1654:8
**regimen** [2] - 1615:21, 1637:21
**Registered** [2] - 1667:14, 1667:15
**regular** [11] - 1606:16, 1607:21, 1608:8, 1612:13, 1614:3, 1615:3, 1615:22, 1619:11, 1639:1, 1641:25, 1657:3
**REICH** [78] - 1539:20, 1539:20, 1543:1, 1543:4, 1543:8, 1543:17, 1544:6, 1544:9, 1550:4, 1550:11, 1550:15, 1550:19, 1555:5, 1555:10, 1555:15, 1566:6, 1569:16, 1569:25, 1570:4, 1570:6, 1571:11, 1571:15, 1571:22, 1576:10, 1578:17, 1580:2, 1581:25, 1582:9, 1583:15, 1584:18, 1587:13, 1587:25, 1589:1, 1595:1, 1596:1, 1596:4, 1596:21, 1599:16, 1599:20, 1599:25, 1600:25, 1601:2, 1601:14, 1605:3, 1622:18, 1622:25, 1623:7, 1623:16, 1628:1, 1630:4, 1634:8, 1634:19, 1637:20, 1639:19, 1641:8, 1643:19, 1643:22, 1645:17, 1648:1, 1648:5, 1648:9, 1648:22, 1649:21, 1649:25, 1650:19, 1652:4, 1652:18, 1652:21, 1653:25, 1654:13, 1654:18, 1655:1, 1655:11, 1659:13, 1660:3, 1660:15, 1663:12, 1664:24
**Reich** [8] - 1542:25, 1543:14, 1578:24, 1579:8, 1581:13, 1639:17, 1648:20, 1653:14
REICH......................

[1] - 1541:9
REICH......................
[1] - 1541:6
**REICH......................**
. [1] - 1541:12
**relate** [3] - 1562:13, 1619:16, 1644:18
**related** [21] - 1546:9, 1581:8, 1586:8, 1586:10, 1586:14, 1587:10, 1587:12, 1587:22, 1587:23, 1588:24, 1605:24, 1611:23, 1617:20, 1619:16, 1624:17, 1626:16, 1626:23, 1641:10, 1641:11, 1641:15, 1653:23
**RELATES** [1] - 1539:7
**relates** [16] - 1587:6, 1606:5, 1609:5, 1614:6, 1618:18, 1619:15, 1620:6, 1622:15, 1624:1, 1624:2, 1628:8, 1631:23, 1663:23, 1664:3, 1665:5, 1665:10
**relation** [2] - 1612:19, 1662:22
**relationship** [5] - 1558:11, 1635:20, 1642:3, 1654:22, 1665:12
**relationships** [1] - 1613:23
**relative** [2] - 1626:2, 1635:10
**relatively** [2] - 1625:16, 1661:8
**relayed** [1] - 1580:16
**relevancy** [2] - 1595:3, 1630:24
**relevant** [7] - 1555:22, 1644:17, 1651:8, 1651:13, 1652:14, 1653:22, 1665:14
**relied** [4] - 1642:18, 1643:1, 1643:2, 1664:18
**relocated** [1] - 1565:10
**rely** [1] - 1590:7
**remember** [5] - 1563:1, 1643:5, 1646:18, 1652:8, 1661:18
**remind** [1] - 1626:7
**reminds** [1] - 1626:8
**remove** [1] - 1567:20

**removed** [2] - 1620:24, 1625:13
**remuneration** [1] - 1633:15
**rendered** [2] - 1569:9, 1572:17
**rendering** [1] - 1647:21
**reoccurred** [1] - 1574:5
**repeat** [1] - 1598:14
**repeated** [1] - 1547:14
**rephrase** [7] - 1555:2, 1582:2, 1582:3, 1587:17, 1634:16, 1634:23, 1635:4
**report** [64] - 1547:25, 1550:9, 1552:18, 1567:13, 1567:15, 1569:15, 1569:16, 1569:18, 1569:21, 1569:22, 1570:1, 1570:2, 1570:10, 1570:12, 1570:18, 1571:4, 1577:22, 1579:3, 1579:6, 1585:10, 1585:12, 1585:16, 1585:17, 1591:6, 1592:1, 1594:2, 1599:8, 1599:14, 1599:17, 1611:6, 1616:20, 1616:21, 1619:12, 1620:17, 1620:23, 1621:4, 1622:3, 1622:19, 1623:17, 1626:14, 1627:7, 1627:22, 1630:5, 1631:5, 1633:24, 1637:21, 1637:22, 1638:8, 1642:16, 1642:17, 1642:19, 1646:11, 1650:14, 1651:1, 1656:2, 1658:16, 1658:20, 1660:10, 1662:5, 1663:21, 1664:11, 1664:14, 1665:9
**reported** [15] - 1562:16, 1565:15, 1599:8, 1600:12, 1610:25, 1611:11, 1611:21, 1615:6, 1618:22, 1618:25, 1619:21, 1620:23, 1620:24, 1621:24, 1636:5
**reportedly** [1] - 1547:15
**Reporter** [6] -

1667:14, 1667:15, 1667:16, 1667:24
**reporter** [2] - 1571:9, 1571:15
**REPORTER** [2] - 1540:22, 1571:17
**REPORTER'S** [1] - 1667:12
**reporting** [1] - 1611:5
**reports** [5] - 1550:6, 1552:19, 1629:24, 1651:25, 1658:10
**represent** [1] - 1610:1
**representative** [1] - 1666:13
**represented** [2] - 1578:15, 1581:6
**representing** [1] - 1609:18
**reproductive** [1] - 1594:16
**require** [1] - 1574:16
**research** [4] - 1549:21, 1632:12, 1650:1, 1651:12
**researched** [2] - 1559:6, 1615:14
**residency** [3] - 1606:9, 1606:10, 1607:25
**residents** [1] - 1608:13
**respect** [8] - 1568:21, 1585:18, 1597:14, 1600:1, 1601:3, 1650:3, 1659:4, 1659:14
**respectively** [1] - 1624:5
**respiratory** [4] - 1596:11, 1628:11, 1628:16, 1646:5
**respond** [4] - 1560:1, 1584:25, 1613:15, 1638:5
**responded** [4] - 1610:20, 1613:13, 1613:14, 1637:9
**responding** [1] - 1599:16
**response** [1] - 1572:9
**response)** [1] - 1634:7
**responses** [2] - 1662:21, 1662:22
**responsive** [1] - 1662:6
**restricted** [1] - 1598:19
**result** [6] - 1552:25, 1560:7, 1592:8,

1593:10, 1596:12
**resulting** [1] - 1659:24
**results** [10] - 1552:6, 1553:10, 1553:11, 1557:17, 1580:16, 1597:11, 1598:15, 1642:11, 1648:25, 1655:23
**retained** [2] - 1605:15, 1652:21
**retardation** [1] - 1644:12
**retention** [1] - 1605:19
**retest** [1] - 1598:20
**returned** [1] - 1562:20
**review** [6] - 1560:14, 1585:12, 1601:6, 1616:16, 1627:10, 1641:19
**reviewed** [12] - 1577:21, 1600:16, 1613:20, 1614:6, 1616:18, 1642:20, 1643:9, 1643:11, 1649:13, 1664:12, 1664:16
**revised** [1] - 1560:25
**reword** [3] - 1595:7, 1595:8, 1652:9
**rhinosinusitis** [2] - 1646:5, 1646:7
**Richard** [1] - 1664:14
**rigid** [1] - 1634:22
**rise** [5] - 1542:9, 1601:19, 1602:17, 1603:23, 1666:4
**risk** [14] - 1589:8, 1651:4, 1651:14, 1652:23, 1653:4, 1653:10, 1653:11, 1653:12, 1653:13, 1654:1, 1654:5, 1654:15
**River** [3] - 1604:4, 1604:11, 1643:14
**RIVER** [2] - 1539:8, 1540:10
**River's** [1] - 1596:23
**RMR** [2] - 1540:22, 1667:23
**road** [1] - 1574:25
**ROAD** [1] - 1539:24
**role** [1] - 1626:11
**ROOM** [1] - 1540:23
**rooted** [1] - 1557:9
**rotation** [1] - 1607:19
**rotations** [1] - 1607:20
**roughly** [4] - 1624:19, 1625:6, 1625:9, 1657:2

**routinely** [1] - 1643:4
**Roy** [1] - 1589:21
**ROY** [1] - 1540:17
**rule** [3] - 1548:18, 1612:20, 1629:7
**rule-outs** [1] - 1612:20
**ruled** [3] - 1653:20, 1655:4, 1655:5
**ruling** [2] - 1603:9, 1654:9
**rulings** [1] - 1652:13
**ruminate** [1] - 1621:8
**runs** [1] - 1584:22

## S

**S-H-I-P-L-E-Y** [1] - 1551:8
**S-H-W-E-R-Y** [1] - 1544:5
**s/Cathy** [1] - 1667:23
**sad** [1] - 1622:1
**salient** [2] - 1562:13, 1565:23
**samples** [1] - 1567:20
**SAN** [2] - 1539:21, 1540:8
**sanity** [2] - 1608:17, 1540:20
**sat** [1] - 1661:7
**save** [1] - 1664:10
**saved** [1] - 1542:14
**saw** [36] - 1545:13, 1547:23, 1552:3, 1552:4, 1553:24, 1563:24, 1564:22, 1567:2, 1567:7, 1567:15, 1567:22, 1575:2, 1580:6, 1581:18, 1584:5, 1587:2, 1587:3, 1600:12, 1611:5, 1611:12, 1611:14, 1612:4, 1612:5, 1617:2, 1619:6, 1621:21, 1624:20, 1625:10, 1625:14, 1625:15, 1625:22, 1632:1, 1649:13
**SC** [1] - 1540:4
**scale** [9] - 1559:1, 1559:6, 1559:12, 1559:15, 1561:7, 1573:13, 1632:2, 1636:10, 1643:23
**scales** [25] - 1559:11, 1561:17, 1583:12, 1583:20, 1583:22, 1584:2, 1600:9,

1600:10, 1625:1, 1625:17, 1625:19, 1631:3, 1631:4, 1631:7, 1636:23, 1655:22, 1655:23, 1662:18, 1662:19, 1662:20, 1662:23, 1662:25, 1663:1, 1663:4
**schedule** [1] - 1666:21
**scheduled** [1] - 1547:22
**scheduling** [1] - 1667:3
**school** [16] - 1547:9, 1549:3, 1564:2, 1564:3, 1564:4, 1564:6, 1606:8, 1606:9, 1606:15, 1606:20, 1606:21, 1607:15, 1607:16, 1607:22, 1607:23, 1607:24
**School** [2] - 1547:9, 1547:10
**science** [1] - 1544:18
**sciences** [1] - 1544:19
**scientific** [1] - 1549:2
**scope** [1] - 1637:21
**score** [11] - 1552:7, 1552:8, 1553:2, 1553:11, 1557:19, 1574:1, 1649:3, 1649:6, 1649:7, 1655:18
**scored** [3] - 1551:23, 1631:3, 1656:1
**scores** [6] - 1561:5, 1561:6, 1600:9, 1624:1, 1624:4, 1635:18
**screen** [1] - 1596:2
**screening** [2] - 1557:16, 1629:19
**seasonal** [1] - 1638:24
**seated** [4] - 1542:10, 1542:24, 1604:1, 1604:20
**second** [28] - 1545:19, 1551:3, 1552:11, 1552:13, 1552:15, 1553:1, 1553:2, 1553:4, 1592:3, 1592:4, 1593:6, 1594:5, 1600:20, 1611:13, 1612:5, 1616:21, 1617:1, 1617:3, 1621:12, 1624:10, 1625:23,

1644:11, 1649:6, 1650:13, 1651:20, 1652:5, 1656:8
**secondary** [1] - 1662:13
**seconds** [1] - 1650:10
**section** [2] - 1599:17, 1627:7
**SECURITY** [4] - 1601:19, 1602:17, 1603:23, 1666:4
**see** [56] - 1546:2, 1546:5, 1547:14, 1552:20, 1555:2, 1559:1, 1563:21, 1567:10, 1567:11, 1571:14, 1573:18, 1574:5, 1574:20, 1579:11, 1584:10, 1584:11, 1585:4, 1586:24, 1589:21, 1591:8, 1593:12, 1595:3, 1596:6, 1596:8, 1596:11, 1596:14, 1599:9, 1603:22, 1607:21, 1608:4, 1608:8, 1610:8, 1610:19, 1611:9, 1613:24, 1615:17, 1615:25, 1616:23, 1618:7, 1620:20, 1622:18, 1632:13, 1634:10, 1637:24, 1638:13, 1640:17, 1642:6, 1642:24, 1648:8, 1648:24, 1653:21, 1656:12, 1658:6, 1661:17, 1665:5, 1667:2
**seeing** [6] - 1564:20, 1607:23, 1608:1, 1616:1, 1616:18, 1665:18
**seek** [1] - 1613:25
**seizures** [1] - 1627:12
**select** [2] - 1548:16, 1549:8
**self** [1] - 1553:21, 1556:23, 1582:19
**self-help** [3] - 1553:21, 1556:23, 1582:19
**semester** [1] - 1564:5
**sense** [6] - 1546:1, 1555:24, 1563:2, 1611:16, 1612:18, 1660:2
**sensitivities** [1] - 1596:15

**Sentence** [2] - 1551:6, 1562:7
**sentence** [6] - 1557:7, 1557:8, 1592:4, 1599:11, 1599:18, 1634:10
**sentences** [2] - 1557:4, 1661:21
**separated** [1] - 1563:25
**September** [23] - 1552:4, 1552:14, 1552:20, 1567:2, 1567:16, 1568:18, 1570:1, 1572:1, 1574:4, 1575:2, 1575:7, 1575:25, 1584:1, 1584:6, 1584:11, 1585:4, 1585:9, 1587:3, 1592:14, 1598:6, 1649:2, 1649:6, 1649:9
**sequence** [1] - 1579:17
**services** [3] - 1575:12, 1577:8, 1639:3
**SESSION** [1] - 1539:11
**session** [2] - 1568:14, 1575:16
**set** [2] - 1573:9, 1666:18
**several** [8] - 1547:8, 1547:9, 1551:19, 1552:15, 1614:19, 1652:24, 1655:17, 1663:11
**severe** [10] - 1551:23, 1553:2, 1624:17, 1625:6, 1625:18, 1632:2, 1632:3, 1656:5, 1656:10
**severity** [1] - 1646:9
**sexual** [2] - 1546:4, 1546:10
**shared** [2] - 1550:10, 1550:14
**SHAW** [1] - 1540:15
**Shaw** [2] - 1639:16, 1643:14
**sheets** [1] - 1641:23
**Shipley** [5] - 1551:8, 1557:15, 1557:16, 1661:15, 1661:19
**shocked** [1] - 1657:11
**short** [1] - 1601:17
**shorter** [1] - 1666:23
**shortly** [1] - 1625:10
**show** [9] - 1552:2,

1553:1, 1613:20, 1631:25, 1636:23, 1651:17, 1655:23, 1659:10, 1664:22
**showed** [3] - 1611:4, 1611:7, 1658:13
**showing** [2] - 1648:2, 1660:11
**shows** [1] - 1594:11, 1636:23
**Shwery** [32] - 1542:21, 1542:22, 1543:4, 1543:12, 1544:3, 1544:10, 1544:22, 1551:14, 1576:16, 1583:19, 1589:21, 1611:5, 1611:9, 1611:11, 1612:4, 1617:1, 1617:2, 1617:10, 1618:1, 1621:13, 1622:5, 1622:7, 1631:25, 1642:22, 1648:3, 1649:4, 1653:9, 1656:6, 1656:9, 1661:10, 1661:14, 1663:2
**SHWERY** [1] - 1543:23
**Shwery's** [4] - 1616:20, 1616:21, 1624:5, 1650:14
**SHWERY.................. ................** [1] - 1541:5
**shy** [1] - 1561:22
**sic** [1] - 1562:19
**sick** [4] - 1563:9, 1564:24, 1621:3, 1621:5
**side** [5] - 1637:14, 1638:20, 1651:25, 1654:12
**significance** [3] - 1562:2, 1570:23, 1622:14
**significant** [5] - 1562:4, 1586:25, 1589:8, 1632:6, 1632:7
**significantly** [1] - 1568:8
**similar** [8] - 1584:16, 1609:18, 1611:12, 1622:5, 1625:16, 1637:10, 1638:17, 1661:11
**similarly** [2] - 1575:9, 1641:24
**simple** [1] - 1625:2

**simply** [1] - 1599:14
**single** [1] - 1563:23
**single-parent** [1] - 1563:23
**sinister** [1] - 1583:7
**sinus** [2] - 1566:10, 1601:3
**sinuses** [1] - 1620:19
**sister** [3] - 1563:24, 1611:22, 1626:17
**sit** [1] - 1590:5
**situated** [1] - 1575:10
**situation** [5] - 1546:17, 1549:9, 1611:2, 1633:6, 1636:7
**situations** [1] - 1633:12
**six** [5] - 1554:10, 1562:24, 1612:14, 1656:17, 1657:3
**six-pack** [1] - 1657:3
**sixth** [1] - 1551:12
**size** [3] - 1619:21, 1620:6, 1620:13
**skipped** [1] - 1620:19
**sleeping** [1] - 1580:25
**small** [8] - 1589:8, 1594:14, 1594:23, 1598:19, 1619:23, 1620:9, 1620:10, 1657:16
**smell** [4] - 1591:4, 1591:17, 1591:20, 1620:15
**smelled** [1] - 1591:19
**Smith** [4] - 1643:9, 1643:10, 1643:13, 1658:9
**Smith's** [3] - 1656:13, 1657:19, 1657:24
**snapshot** [1] - 1626:4
**so..** [1] - 1569:24
**social** [1] - 1573:10
**solemnly** [2] - 1543:19, 1604:16
**someone** [10] - 1616:1, 1626:25, 1632:2, 1632:15, 1632:17, 1632:21, 1632:23, 1633:3, 1636:12, 1640:17
**sometimes** [1] - 1546:17, 1546:18, 1548:14, 1549:17, 1560:11, 1612:16, 1613:6, 1640:7, 1640:22, 1641:4, 1646:18, 1646:19
**somewhat** [1] -

1558:4
**somewhere** [1] - 1639:12
**sophisticated** [1] - 1556:13
**sorry** [7] - 1577:6, 1593:8, 1635:18, 1639:7, 1639:25, 1640:1, 1641:13
**sort** [3] - 1590:18, 1617:22, 1626:4
**sorts** [1] - 1566:11
**sound** [1] - 1639:11
**sounds** [1] - 1583:6
**source** [1] - 1601:12
**sources** [1] - 1590:21
**Southern** [1] - 1564:4
**space** [1] - 1619:22
**speaking** [1] - 1654:14
**specialize** [1] - 1606:21
**specialized** [1] - 1546:4
**specialties** [1] - 1546:8
**specialty** [1] - 1608:5
**specific** [5] - 1590:18, 1634:10, 1637:21, 1658:16, 1658:20
**specifically** [6] - 1598:4, 1627:18, 1630:7, 1651:3, 1657:22, 1664:11
**specificity** [1] - 1650:25
**specified** [1] - 1600:22
**Spector** [11] - 1568:4, 1584:8, 1585:9, 1585:18, 1586:1, 1617:10, 1649:10, 1653:8, 1664:14, 1664:15, 1665:6
**Spector's** [5] - 1585:8, 1585:12, 1665:3, 1665:4, 1665:9
**spectrum** [2] - 1583:2, 1583:4
**speculating** [1] - 1634:13
**speech** [1] - 1563:19
**speeches** [1] - 1546:24
**spell** [2] - 1544:1, 1544:9
**spend** [1] - 1642:9
**spent** [3] - 1546:14, 1617:16, 1618:16
**spoken** [1] - 1577:24

**spray** [1] - 1638:17
**spread** [1] - 1574:22
**sputum** [8] - 1620:21, 1621:1, 1628:13, 1645:2, 1645:13, 1645:15, 1645:18, 1665:10
**ST** [2] - 1539:18, 1540:18
**stable** [2] - 1598:13, 1598:16
**staff** [1] - 1545:13
**stale** [2] - 1591:4, 1591:17
**stand** [4] - 1542:23, 1560:24, 1595:4, 1608:19
**standard** [2] - 1641:23, 1647:19
**standardized** [1] - 1549:20
**standpoint** [2] - 1614:2, 1615:4
**stands** [1] - 1551:10
**start** [13] - 1547:12, 1551:14, 1560:4, 1565:19, 1572:5, 1601:17, 1602:10, 1602:13, 1607:23, 1627:1, 1629:5, 1667:4
**start-up** [1] - 1601:17
**started** [19] - 1553:20, 1557:24, 1563:5, 1563:7, 1563:9, 1564:6, 1564:20, 1579:2, 1579:11, 1579:19, 1592:6, 1614:1, 1621:6, 1621:8, 1621:13, 1621:14, 1621:20, 1621:23
**starting** [9] - 1554:8, 1564:22, 1565:2, 1572:21, 1575:16, 1618:22, 1625:25, 1634:4, 1665:25
**starts** [1] - 1623:5
**state** [8] - 1544:1, 1546:14, 1546:21, 1569:2, 1609:10, 1609:11, 1620:3, 1634:13
**State** [4] - 1547:7, 1594:15, 1594:24, 1667:16
**statement** [2] - 1578:4, 1598:2
**states** [1] - 1609:11
**STATES** [2] - 1539:1,

1539:13
**States** [3] - 1549:23, 1667:17, 1667:24
**status** [2] - 1595:5, 1617:21
**stay** [4] - 1581:23, 1614:21, 1666:19
**staying** [2] - 1612:15, 1615:2
**STENOGRAPHY** [1] - 1540:24
**step** [2] - 1601:16, 1665:23
**steroidal** [1] - 1638:16
**stick** [2] - 1659:2, 1660:6
**still** [15] - 1565:12, 1574:6, 1574:14, 1574:16, 1588:14, 1589:10, 1589:11, 1593:5, 1615:6, 1615:7, 1625:5, 1629:23, 1660:11, 1666:17
**stipulation** [2] - 1543:2, 1605:2
**stock** [1] - 1635:25
**stoic** [1] - 1556:7
**stop** [3] - 1559:10, 1614:12, 1614:14
**stove** [2] - 1594:19
**straightforward** [1] - 1625:1
**STREET** [2] - 1540:12, 1540:23
**stress** [5] - 1558:17, 1560:2, 1593:20, 1636:3, 1641:22
**stresses** [1] - 1556:5
**stressors** [1] - 1647:14
**Strickland** [1] - 1605:16
**STRICKLAND** [1] - 1540:12
**strictly** [1] - 1631:15
**student** [1] - 1564:3
**students** [1] - 1608:12
**studies** [2] - 1651:18, 1652:24
**stuff** [11] - 1565:8, 1594:23, 1611:19, 1621:6, 1621:7, 1625:21, 1626:7, 1629:25, 1636:22, 1653:1
**style** [1] - 1555:20
**subclinical** [2] - 1593:25, 1646:24
**subject** [1] - 1635:21

**subjected** [1] - 1549:21

**subjective** [1] - 1631:12

**subjectively** [1] - 1631:16

**subqualifications** [1] - 1607:1

**subsequent** [3] - 1610:3, 1624:6, 1649:23

**subspeciality** [1] - 1606:12

**subspecialty** [4] - 1608:4, 1608:13, 1640:4, 1642:1

**substance** [4] - 1629:2, 1629:10, 1644:3, 1644:9

**substances** [3] - 1594:15, 1594:24, 1595:17

**substantial** [1] - 1639:9

**succinctly** [1] - 1610:7

**suffers** [1] - 1658:22

**suggest** [4] - 1571:2, 1582:8, 1595:13, 1654:10

**suggests** [1] - 1666:21

**suicide** [1] - 1640:8

**SUITE** [4] - 1539:21, 1540:7, 1540:12, 1540:18

**supplementation** [1] - 1650:25

**supposed** [2] - 1638:22, 1655:15

**surface** [5] - 1549:13, 1561:20, 1611:7, 1625:20, 1632:4

**surgeries** [1] - 1564:12

**surgery** [1] - 1552:22

**surgical** [2] - 1558:11, 1558:22

**surprise** [1] - 1569:23

**surprised** [1] - 1568:5

**surrounding** [1] - 1655:14

**sustain** [5] - 1580:3, 1582:3, 1587:16, 1595:6, 1628:2

**sustaining** [1] - 1655:6

**swear** [2] - 1543:19, 1604:16

**sworn** [2] - 1543:24, 1604:22

**symptom** [6] - 1631:17, 1631:18, 1645:19, 1645:20, 1645:22, 1665:20

**symptomology** [1] - 1646:13

**symptoms** [43] - 1551:20, 1559:23, 1561:14, 1578:25, 1593:21, 1597:25, 1598:18, 1610:14, 1610:15, 1611:3, 1611:6, 1611:11, 1611:17, 1612:19, 1612:25, 1613:1, 1613:17, 1619:17, 1620:11, 1627:10, 1628:11, 1629:14, 1631:5, 1631:22, 1633:4, 1633:5, 1633:13, 1633:14, 1634:6, 1636:17, 1636:24, 1644:15, 1647:3, 1654:24, 1662:10, 1662:17, 1663:7, 1663:8, 1665:21

## T

**talks** [4] - 1570:14, 1596:11, 1623:2, 1626:25

**task** [1] - 1557:7

**taught** [4] - 1547:6, 1547:7, 1547:8, 1547:9

**teach** [1] - 1608:12

**teaching** [2] - 1547:2, 1608:12

**Tech** [1] - 1545:4

**teenagers** [1] - 1561:11

**teeth** [1] - 1619:18

**ten** [1] - 1601:15

**tend** [3] - 1595:9, 1620:10, 1662:9

**tended** [2] - 1593:21, 1620:4

**tendency** [1] - 1593:24

**tender** [1] - 1639:14

**tendered** [2] - 1543:6, 1604:25

**tends** [3] - 1556:3, 1556:4, 1560:1

**term** [11] - 1563:14, 1573:24, 1573:25, 1574:12, 1588:14,

1588:18, 1605:8, 1615:13, 1643:23, 1644:13

**terms** [3] - 1559:4, 1589:9, 1634:22

**Test** [1] - 1560:21

**test** [77] - 1549:6, 1549:17, 1550:13, 1550:20, 1551:17, 1551:25, 1552:6, 1552:11, 1552:15, 1552:25, 1553:1, 1553:4, 1553:6, 1553:9, 1553:10, 1557:7, 1557:11, 1557:15, 1557:17, 1558:7, 1558:10, 1558:20, 1559:2, 1559:17, 1560:15, 1560:22, 1561:3, 1561:6, 1561:8, 1561:12, 1561:15, 1562:7, 1568:17, 1580:10, 1580:12, 1580:14, 1580:16, 1580:19, 1590:17, 1593:17, 1593:20, 1597:11, 1597:17, 1597:20, 1597:22, 1597:23, 1597:24, 1598:2, 1598:10, 1598:14, 1599:2, 1606:23, 1606:24, 1617:22, 1622:14, 1624:1, 1624:4, 1624:22, 1624:23, 1631:6, 1631:8, 1631:16, 1631:19, 1636:25, 1642:11, 1649:4, 1655:12, 1655:14, 1655:15, 1655:16, 1655:17, 1655:19, 1656:5, 1661:22, 1662:23

**testified** [14] - 1543:25, 1566:3, 1578:11, 1578:13, 1579:21, 1579:22, 1579:24, 1584:16, 1600:23, 1604:23, 1653:19, 1653:20, 1654:17, 1660:2

**testify** [13] - 1584:10, 1584:14, 1600:24, 1609:16, 1610:24, 1611:10, 1621:13, 1622:7, 1640:23, 1642:20, 1650:24, 1652:12

**testifying** [2] -

1641:21, 1653:15

**testimony** [35] - 1543:15, 1543:19, 1578:18, 1582:1, 1586:4, 1587:8, 1587:9, 1587:10, 1594:17, 1602:2, 1602:3, 1604:8, 1604:14, 1604:16, 1610:11, 1622:11, 1622:19, 1624:3, 1624:15, 1625:10, 1631:9, 1634:23, 1635:4, 1641:17, 1645:7, 1645:9, 1645:12, 1650:12, 1654:8, 1654:10, 1654:12, 1660:6, 1660:7, 1660:8, 1660:9

**testing** [31] - 1548:15, 1548:25, 1549:16, 1552:4, 1560:8, 1561:22, 1562:5, 1562:9, 1581:9, 1581:13, 1600:2, 1600:19, 1611:3, 1611:7, 1622:11, 1626:3, 1630:23, 1630:24, 1636:13, 1636:14, 1636:22, 1636:23, 1642:8, 1642:15, 1642:22, 1642:24, 1648:25, 1662:8

**tests** [64] - 1547:25, 1548:3, 1548:5, 1548:14, 1548:16, 1548:19, 1548:20, 1548:21, 1548:24, 1549:1, 1549:6, 1549:19, 1549:20, 1549:23, 1550:5, 1551:18, 1552:2, 1557:2, 1559:5, 1559:11, 1560:18, 1561:8, 1562:6, 1568:18, 1580:7, 1580:9, 1583:11, 1583:12, 1583:19, 1583:24, 1584:2, 1597:14, 1598:7, 1598:8, 1598:13, 1598:22, 1598:23, 1607:6, 1611:12, 1618:1, 1618:2, 1618:6, 1618:7, 1618:8, 1622:12, 1624:12, 1625:22, 1631:15, 1631:24, 1648:2, 1655:22,

1661:2, 1661:4, 1661:6, 1661:9, 1661:10, 1661:11, 1661:12, 1661:14, 1662:24

**Texas** [2] - 1545:4, 1606:10

**THE** [151] - 1539:12, 1542:9, 1542:10, 1542:22, 1543:2, 1543:6, 1543:9, 1543:12, 1543:18, 1543:22, 1544:1, 1544:3, 1544:4, 1544:5, 1544:7, 1550:2, 1550:6, 1550:7, 1550:8, 1550:9, 1550:12, 1550:14, 1550:16, 1550:17, 1555:2, 1555:11, 1565:25, 1566:4, 1566:18, 1566:19, 1569:17, 1569:21, 1570:3, 1570:5, 1570:9, 1570:25, 1571:17, 1571:20, 1576:11, 1578:19, 1578:20, 1580:3, 1581:10, 1581:14, 1582:2, 1582:10, 1582:12, 1582:13, 1582:14, 1583:16, 1584:21, 1585:1, 1587:15, 1588:1, 1588:3, 1589:3, 1589:5, 1589:18, 1591:11, 1591:12, 1591:13, 1595:6, 1595:9, 1595:25, 1596:18, 1596:19, 1599:19, 1599:21, 1600:20, 1600:24, 1601:15, 1601:19, 1601:22, 1601:24, 1602:1, 1602:6, 1602:9, 1602:13, 1602:17, 1602:18, 1602:22, 1602:24, 1603:5, 1603:11, 1603:15, 1603:19, 1603:23, 1604:1, 1604:13, 1604:15, 1604:19, 1604:20, 1605:4, 1605:6, 1605:8, 1605:10, 1622:22, 1623:1, 1623:3, 1623:5, 1623:11, 1623:14, 1623:17, 1628:2, 1628:3, 1630:6, 1630:10,

1633:25, 1634:3,
1634:16, 1634:20,
1635:3, 1637:22,
1638:1, 1639:15,
1639:17, 1639:24,
1639:25, 1643:20,
1645:8, 1645:13,
1648:8, 1648:13,
1648:19, 1649:22,
1650:6, 1651:16,
1651:24, 1652:5,
1652:17, 1653:14,
1653:18, 1654:7,
1654:17, 1654:19,
1655:6, 1659:12,
1660:5, 1660:8,
1663:13, 1664:7,
1664:23, 1664:25,
1665:23, 1666:4,
1666:7, 1666:10,
1666:14, 1666:20,
1667:2, 1667:8

**therapy** [6] - 1563:19,
1564:19, 1574:16,
1575:9, 1575:12,
1575:20

**therefore** [3] -
1543:12, 1651:7,
1653:10

**thereof** [1] - 1601:5

**they've** [3] - 1549:20,
1549:21, 1613:12

**thinking** [5] - 1561:25,
1569:4, 1626:4,
1626:22, 1640:19

**third** [7] - 1546:19,
1551:5, 1570:2,
1573:5, 1612:11,
1625:4, 1644:14

**thirties** [2] - 1659:5,
1659:15

**THIS** [1] - 1539:7

**THOMPSON** [1] -
1604:21

**Thompson** [16] -
1601:23, 1604:4,
1604:9, 1604:12,
1604:24, 1605:13,
1605:14, 1610:5,
1613:7, 1623:24,
1635:9, 1639:20,
1648:2, 1648:24,
1651:9, 1663:21

**Thompson's** [1] -
1604:8

**THOMPSON**..............
....................... [1] -
1541:10

**thoroughly** [2] -
1653:1, 1653:8

**thousand** [1] - 1576:1
**threat** [1] - 1651:7
**THREE** [1] - 1540:7
**three** [13] - 1546:16,
1563:15, 1568:6,
1614:16, 1614:17,
1615:7, 1625:2,
1631:18, 1651:2,
1656:15, 1657:19,
1657:24, 1658:8

**three-dozen** [1] -
1546:16

**threshold** [1] - 1569:7
**throat** [3] - 1567:18,
1574:9, 1628:12

**throughout** [5] -
1549:23, 1549:24,
1570:1, 1612:6,
1613:23

**tinge** [1] - 1620:20
**tinged** [1] - 1628:13
**tired** [1] - 1581:5
**TO** [2] - 1539:7,
1542:4

**today** [14] - 1578:4,
1582:25, 1597:6,
1608:6, 1612:12,
1617:11, 1641:1,
1641:19, 1641:20,
1642:12, 1642:20,
1666:17, 1666:19

**together** [1] - 1647:24
**tomorrow** [1] -
1666:23

**ton** [1] - 1635:24
**tongue** [6] - 1552:22,
1567:19, 1588:7,
1620:24, 1625:13,
1628:13

**took** [17] - 1554:8,
1554:9, 1559:2,
1559:7, 1559:15,
1561:8, 1562:14,
1565:24, 1576:18,
1577:17, 1580:11,
1580:14, 1580:16,
1582:19, 1613:16,
1618:4, 1643:5

**top** [1] - 1564:14
**tort** [1] - 1641:2
**total** [2] - 1575:23,
1637:1

**totally** [1] - 1583:3
**toward** [1] - 1554:25
**towards** [1] - 1610:18
**Toxicology** [1] -
1651:2

**toxin** [1] - 1568:11
**track** [2] - 1575:1,
1666:19

**tract** [1] - 1646:5
**trail** [1] - 1576:5
**trailer** [83] - 1547:15,
1562:25, 1563:4,
1565:19, 1565:20,
1565:21, 1566:8,
1566:16, 1569:13,
1570:7, 1570:8,
1570:13, 1570:15,
1570:17, 1570:21,
1570:22, 1571:19,
1571:24, 1572:8,
1574:17, 1578:2,
1578:7, 1579:1,
1579:10, 1579:16,
1579:25, 1581:23,
1582:7, 1583:9,
1588:5, 1588:15,
1590:23, 1591:3,
1591:17, 1591:20,
1591:24, 1594:12,
1594:18, 1594:23,
1595:15, 1595:16,
1595:20, 1595:21,
1597:19, 1605:25,
1610:9, 1610:18,
1610:19, 1611:23,
1612:13, 1614:18,
1614:25, 1615:23,
1616:9, 1617:17,
1618:16, 1619:14,
1619:22, 1619:24,
1620:6, 1620:13,
1620:15, 1621:3,
1621:5, 1621:8,
1621:18, 1621:19,
1622:2, 1623:12,
1623:15, 1634:13,
1637:18, 1656:14,
1656:18, 1658:8,
1658:14, 1658:19,
1658:20

**TRAILER** [1] - 1539:4
**trailers** [1] - 1620:1
**trained** [2] - 1598:24,
1641:24

**training** [5] - 1606:9,
1606:10, 1606:22,
1627:8, 1628:23

**TRANSCRIPT** [2] -
1539:12, 1540:24

**transcript** [1] -
1667:19

**transferred** [1] -
1564:5

**transpired** [2] -
1584:19, 1587:2

**travel** [2] - 1578:2,
1578:7

**treat** [5] - 1598:20,

1607:21, 1615:19,
1628:18, 1647:24

**treated** [5] - 1578:20,
1581:22, 1582:6,
1582:14, 1642:5

**treating** [3] - 1573:23,
1592:15, 1637:8

**treatises** [1] - 1647:4
**treatment** [31] -
1544:20, 1547:19,
1562:2, 1565:4,
1565:16, 1566:24,
1574:17, 1574:19,
1575:1, 1575:4,
1575:6, 1575:19,
1575:24, 1576:7,
1582:18, 1585:8,
1585:18, 1586:9,
1586:10, 1587:12,
1588:10, 1589:11,
1589:14, 1605:23,
1613:25, 1621:20,
1636:12, 1640:5,
1647:24

**treatments** [2] -
1616:5, 1640:14

**treats** [1] - 1613:18
**TRIAL** [1] - 1539:12
**trial** [11] - 1606:1,
1608:19, 1609:16,
1621:15, 1622:3,
1622:6, 1622:16,
1622:23, 1626:9,
1626:23, 1654:5

**tried** [2] - 1567:19,
1582:20

**trouble** [1] - 1563:8
**true** [30] - 1558:6,
1578:2, 1590:3,
1598:8, 1599:3,
1639:21, 1641:14,
1641:18, 1642:4,
1643:15, 1643:16,
1644:11, 1644:19,
1646:15, 1647:8,
1647:11, 1649:19,
1655:14, 1655:24,
1656:18, 1658:23,
1659:25, 1660:17,
1660:20, 1661:10,
1662:10, 1662:24,
1662:25, 1663:5,
1667:18

**truth** [8] - 1543:20,
1543:21, 1601:11,
1604:17, 1632:21

**truthful** [1] - 1601:13
**try** [18] - 1549:12,
1555:11, 1556:23,
1557:2, 1557:9,

1560:6, 1587:16,
1589:25, 1595:6,
1609:3, 1618:1,
1620:5, 1626:12,
1632:9, 1633:5,
1640:8, 1642:1,
1664:10

**trying** [9] - 1568:15,
1591:9, 1595:13,
1608:20, 1612:18,
1625:24, 1631:8,
1632:25, 1650:15

**Tulane** [4] - 1547:10,
1608:10, 1608:11,
1608:12

**tumor** [14] - 1552:22,
1567:19, 1568:3,
1568:9, 1588:7,
1588:11, 1593:3,
1593:6, 1625:13,
1645:24, 1646:2,
1649:10, 1649:11,
1665:6

**turbinates** [1] - 1601:4
**turn** [1] - 1621:17
**turned** [2] - 1552:21,
1563:16

**turning** [1] - 1638:8
**TV** [1] - 1597:6
**twelve** [2] - 1591:24,
1592:5

**twenties** [3] - 1564:13,
1624:19, 1625:8

**two** [48] - 1546:4,
1546:7, 1546:17,
1547:23, 1554:10,
1556:10, 1558:2,
1562:6, 1562:16,
1563:15, 1567:18,
1567:24, 1570:8,
1572:3, 1574:25,
1578:16, 1579:9,
1579:11, 1588:5,
1593:3, 1598:3,
1601:7, 1610:24,
1612:15, 1614:16,
1614:17, 1617:16,
1622:4, 1625:2,
1625:14, 1642:10,
1642:12, 1650:10,
1650:23, 1651:17,
1656:14, 1657:19,
1657:23, 1658:8,
1659:6, 1659:15,
1660:19, 1660:22,
1660:23, 1661:15,
1663:1, 1665:4

**two-hour** [1] - 1642:12
**TX** [3] - 1539:21,
1539:24, 1540:8

**type** [12] - 1545:23, 1548:21, 1557:11, 1574:19, 1575:9, 1575:12, 1636:8, 1636:19, 1638:18, 1651:5, 1654:24, 1655:18

**types** [4] - 1545:20, 1566:13, 1654:2, 1655:1

## U

**U.S** [2] - 1546:11, 1609:12

**uncommon** [1] - 1636:7

**unconscious** [1] - 1549:13

**under** [13] - 1549:13, 1561:20, 1631:5, 1634:3, 1641:22, 1644:9, 1644:22, 1645:5, 1646:2, 1646:14, 1659:10, 1663:8, 1663:10

**undergraduate** [2] - 1606:7, 1607:15

**underlying** [4] - 1561:24, 1567:25, 1573:21, 1612:8

**underneath** [1] - 1625:20

**understate** [1] - 1662:10

**understood** [3] - 1569:22, 1570:9, 1579:18

**unfair** [2] - 1584:23, 1653:5

**UNITED** [2] - 1539:1, 1539:13

**United** [3] - 1549:23, 1667:17, 1667:24

**universities** [1] - 1547:3

**University** [9] - 1545:4, 1545:7, 1547:6, 1547:8, 1547:10, 1560:24, 1564:4, 1606:9, 1606:11

**university** [1] - 1545:9

**unless** [2] - 1602:4, 1651:18

**unobjected** [3] - 1648:2, 1648:5, 1648:6

**unpleasant** [1] -

1632:23

**untimely** [2] - 1650:25, 1652:1

**up** [50] - 1554:24, 1560:5, 1563:11, 1564:16, 1572:22, 1575:6, 1576:1, 1592:21, 1593:6, 1594:5, 1594:10, 1598:6, 1601:17, 1601:18, 1602:1, 1602:24, 1611:15, 1611:20, 1612:14, 1612:15, 1617:20, 1618:7, 1619:18, 1620:19, 1620:21, 1620:25, 1622:17, 1624:2, 1624:7, 1624:15, 1625:5, 1625:10, 1625:24, 1626:25, 1627:25, 1628:17, 1633:25, 1638:4, 1639:24, 1648:23, 1649:7, 1653:18, 1653:21, 1654:18, 1655:25, 1660:11, 1666:21, 1666:22, 1666:23

**upper** [2] - 1628:11, 1646:5

**upset** [1] - 1567:11

**Uptown** [3] - 1554:2, 1564:21, 1658:11

**urged** [2] - 1654:9, 1654:21

**uses** [3] - 1548:24, 1615:12, 1629:3

**usual** [2] - 1581:5, 1619:24

## V

**VA** [1] - 1608:2

**vague** [1] - 1600:21

**vaguely** [1] - 1591:7

**valid** [16] - 1559:4, 1559:14, 1561:12, 1598:10, 1631:3, 1631:6, 1633:20, 1634:9, 1634:15, 1636:25, 1655:23, 1662:9, 1662:19, 1662:22

**validated** [1] - 1559:6

**validation** [1] - 1597:11

**validity** [29] - 1559:1, 1559:5, 1559:6, 1559:10, 1559:11, 1559:12, 1559:13,

1559:15, 1561:7, 1561:13, 1583:12, 1583:20, 1583:22, 1584:2, 1590:17, 1600:9, 1600:10, 1625:1, 1631:3, 1631:4, 1631:7, 1636:23, 1655:22, 1662:18, 1662:21, 1662:24, 1663:1, 1663:4

**valuable** [1] - 1598:6

**varies** [1] - 1638:1

**variety** [3] - 1563:12, 1604:7, 1658:25

**various** [3] - 1597:11, 1607:17, 1644:3

**vehicle** [1] - 1594:13

**vehicles** [1] - 1594:14

**verbal** [1] - 1618:4

**verbally** [1] - 1617:23

**verify** [1] - 1590:13

**version** [2] - 1561:2, 1633:2

**versus** [3] - 1617:23, 1631:18, 1658:19

**video** [1] - 1604:6

**videotape** [5] - 1602:10, 1602:11, 1603:21, 1603:22, 1666:8

**visit** [11] - 1585:8, 1585:9, 1586:21, 1590:24, 1590:25, 1591:1, 1593:5, 1593:6, 1593:11, 1594:5, 1596:24

**voluntarily** [1] - 1619:2

## W

**wait** [2] - 1651:16, 1652:5

**wake** [1] - 1619:18, 1620:21

**waking** [1] - 1563:11

**walked** [1] - 1579:25

**wall** [2] - 1594:18, 1594:20

**Wallace** [2] - 1577:11

**wants** [1] - 1565:25

**war** [1] - 1633:1

**warned** [1] - 1638:22

**warning** [5] - 1594:12, 1594:22, 1595:14, 1596:5, 1596:6

**warnings** [4] - 1594:11, 1595:3,

1596:14, 1611:20

**waste** [1] - 1606:3

**watch** [1] - 1584:14

**WATTS** [3] - 1540:6, 1540:6, 1603:16

**week** [6] - 1542:16, 1567:17, 1584:11, 1598:1, 1611:10, 1624:15

**weekends** [2] - 1563:24, 1615:8

**weeks** [2] - 1598:3, 1638:25

**weighs** [3] - 1657:14, 1659:6, 1659:16

**weight** [1] - 1657:5

**welcome** [1] - 1658:3

**welfare** [1] - 1592:25

**well-adjusted** [1] - 1581:20

**well-being** [1] - 1576:8

**well-known** [2] - 1559:17, 1560:18

**well-researched** [1] - 1615:14

**Westbank** [1] - 1565:10

**wheezing** [4] - 1628:14, 1628:15, 1645:21, 1645:22

**whereas** [1] - 1560:11

**WHEREUPON** [14] - 1542:7, 1569:19, 1571:5, 1571:7, 1601:20, 1602:15, 1603:24, 1622:20, 1623:20, 1634:1, 1635:5, 1650:7, 1655:8, 1666:5

**WHITFIELD** [1] - 1540:17

**whoa** [3] - 1648:4

**whole** [11] - 1543:20, 1561:5, 1569:12, 1571:18, 1575:25, 1604:17, 1611:8, 1613:20, 1620:8, 1622:9, 1644:6

**wide** [2] - 1583:2, 1658:24

**widely** [1] - 1551:18, 1560:21

**widely-used** [1] - 1560:21

**Williams** [5] - 1650:23, 1653:19, 1654:8, 1654:21, 1655:4

**Williams'** [1] - 1650:12

**willing** [2] - 1636:12, 1636:13

**wind** [1] - 1602:24

**winded** [1] - 1641:13

**wish** [1] - 1550:24

**withholds** [1] - 1561:23

**WITNESS** [28] - 1543:22, 1544:3, 1544:5, 1550:6, 1550:8, 1550:12, 1550:17, 1566:4, 1566:19, 1571:20, 1578:20, 1582:12, 1582:14, 1585:1, 1588:3, 1589:5, 1591:12, 1596:19, 1599:21, 1604:19, 1605:8, 1628:3, 1630:10, 1638:1, 1639:25, 1645:13, 1649:22, 1660:8

**witness** [23] - 1542:18, 1542:25, 1543:24, 1555:13, 1576:10, 1595:2, 1601:14, 1601:22, 1602:8, 1602:22, 1602:23, 1603:22, 1604:4, 1604:22, 1609:6, 1623:15, 1639:14, 1651:22, 1652:16, 1663:12, 1664:22, 1666:19

**witness's** [1] - 1602:10

**witnessed** [2] - 1611:9, 1611:10

**woke** [1] - 1620:25

**wondered** [1] - 1594:7

**word** [6] - 1557:5, 1557:11, 1596:25, 1619:4, 1648:12, 1648:16

**words** [1] - 1655:17

**works** [4] - 1603:11, 1617:25, 1638:17, 1647:25

**workshops** [2] - 1546:24, 1547:1

**world** [2] - 1549:24, 1650:15

**worried** [7] - 1566:21, 1568:7, 1573:25, 1588:5, 1588:14, 1589:9, 1625:21

**worries** [7] - 1561:24, 1566:22, 1568:9, 1568:12, 1586:13, 1589:11, 1592:9

**worry** [4] - 1560:6, 1574:12, 1626:24, 1636:5
**worrying** [2] - 1574:11, 1627:1
**worse** [7] - 1575:3, 1593:12, 1596:15, 1610:16, 1612:9, 1631:13, 1633:4
**wright** [1] - 1580:6
**WRIGHT** [1] - 1539:16
**Wright** [94] - 1547:12, 1547:21, 1551:25, 1553:24, 1554:6, 1554:24, 1555:6, 1555:16, 1566:8, 1568:16, 1568:21, 1574:16, 1575:19, 1576:8, 1577:2, 1577:4, 1577:7, 1577:17, 1578:1, 1578:14, 1578:15, 1579:21, 1579:24, 1580:10, 1580:14, 1581:18, 1581:19, 1582:25, 1583:23, 1584:1, 1584:5, 1585:4, 1585:8, 1585:23, 1586:5, 1590:5, 1590:22, 1591:2, 1594:1, 1594:22, 1595:14, 1597:3, 1597:16, 1600:3, 1600:12, 1601:6, 1601:10, 1605:17, 1609:18, 1610:8, 1612:12, 1614:6, 1616:19, 1616:23, 1617:14, 1618:4, 1618:11, 1618:19, 1622:16, 1624:3, 1627:5, 1629:12, 1633:7, 1633:19, 1634:9, 1634:11, 1635:9, 1635:20, 1642:4, 1643:10, 1643:14, 1644:21, 1649:11, 1649:17, 1649:18, 1651:10, 1651:12, 1651:16, 1651:17, 1652:10, 1653:9, 1653:15, 1654:23, 1655:23, 1656:13, 1657:14, 1659:24, 1661:2, 1661:23, 1662:21, 1663:9, 1663:17, 1663:23
**Wright's** [8] - 1556:16, 1586:16, 1587:11, 1595:4, 1596:25, 1634:5, 1634:13, 1658:5
**write** [4] - 1550:5, 1550:21, 1567:12, 1590:6
**written** [3] - 1548:21, 1606:25, 1607:2
**wronged** [1] - 1608:24
**wrote** [5] - 1547:25, 1552:17, 1567:15, 1619:11, 1658:10

## Y

**y'all** [1] - 1639:25
**year** [8] - 1547:23, 1549:7, 1554:9, 1570:6, 1574:23, 1574:25, 1607:20, 1643:6
**years** [24] - 1544:15, 1545:21, 1546:4, 1547:1, 1547:8, 1547:10, 1549:1, 1553:18, 1563:16, 1568:6, 1568:11, 1570:8, 1572:3, 1574:22, 1575:3, 1575:15, 1578:14, 1581:22, 1582:7, 1588:5, 1600:17, 1607:25, 1608:1, 1655:17
**youngster** [1] - 1563:21
**yourself** [3] - 1548:24, 1605:13, 1661:5
**yourselves** [1] - 1666:2

## Z

**zero** [3] - 1573:13, 1631:17, 1653:4
**Zhang** [2] - 1652:25, 1653:1