```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3   ********************************************************

 4   IN RE:  FEMA TRAILER
     FORMALDEHYDE PRODUCTS
 5   LIABILITY LITIGATION
                              DOCKET MDL NO. 1873 "N"
 6                            NEW ORLEANS, LOUISIANA
                              MONDAY, MARCH 29, 2010, 8:30 A.M.
 7
     THIS DOCUMENT RELATES TO:
 8
        FOREST RIVER INC., ET AL,
 9      DOCKET NO. 09-2977

10   ********************************************************

11
                            DAY 10
12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16

17   FOR LYNDON T. WRIGHT:   LAW OFFICES OF FRANK J. D'AMICO, JR.
                             BY:  FRANK J. D'AMICO, JR., ESQUIRE
18                                AARON Z. AHLQUIST, ESQUIRE
                             622 BARONNE ST.
19                           NEW ORLEANS, LA  70113

20                           REICH & BINSTOCK
                             BY:  DENNIS C. REICH, ESQUIRE
21                           4265 SAN FELIPE, SUITE 1000
                             HOUSTON, TX  77027
22

23                           CHRIS PINEDO
                             ATTORNEY AT LAW
24                           4550 JERICHO ROAD
                             CORPUS CHRISTI, TX  78413
25
```

1    APPEARANCES:   (CONTINUED)

2

3                                 NEXSEN PRUET
                                  BY:  PAUL A. DOMINICK, ESQUIRE
4                                 P.O. BOX 486
                                  CHARLESTON, SC   29402
5

6                                 WATTS GUERRA CRAFT
                                  BY:  MIKAL C. WATTS, ESQUIRE
7                                 FOUR DOMINION DRIVE
                                  BUILDING THREE, SUITE 100
8                                 SAN ANTONIO, TX   78257

9

10   FOR FOREST RIVER,
     INC.:                        GIEGER, LABORDE & LAPEROUSE
11                                BY:  ERNEST P. GIEGER, JR., ESQUIRE
                                       JASON D. BONE, ESQUIRE
12                                     CARSON W. STRICKLAND, ESQUIRE
                                  701 POYDRAS STREET, SUITE 4800
13                                NEW ORLEANS, LA   70139

14

15   FOR SHAW ENVIRONMENTAL,
     INC.:                        BAKER DONELSON BEARMAN CALDWELL &
16                                BERKOWITZ
                                  BY:  M. DAVID KURTZ, ESQUIRE
17                                     ROY C. CHEATWOOD, ESQUIRE
                                       KAREN K. WHITFIELD, ESQUIRE
18                                201 ST. CHARLES AVENUE, SUITE 3600
                                  NEW ORLEANS, LA   70170
19

20   ALSO PRESENT:                DOUGLAS GAEDDERT
21

22
     OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RMR, CRR
23                                500 POYDRAS STREET, ROOM B406
                                  NEW ORLEANS, LA   70130
24                                (504) 589-7779
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
25   PRODUCED BY COMPUTER.

1                        **I N D E X**

2

3    EXAMINATIONS                                    PAGE

4

5    CLOSING ARGUMENTS BY MR. D'AMICO......................2587

6    CLOSING ARGUMENTS BY MR. REICH.......................2600

7    FURTHER CLOSING ARGUMENTS BY MR. D'AMICO.............2611

8    CLOSING ARGUMENTS BY MR. GEIGER......................2614

9    CLOSING ARGUMENTS BY MR. CHEATWOOD...................2640

10   REBUTTAL CLOSING ARGUMENTS BY MR. D'AMICO............2653

11   JURY INSTRUCTIONS....................................2663

12   JURY DELIBERATES.....................................2705

13   VERDICT.............................................2717

14

15

16

17

18

19

20

21

22

23

24

25

1              **P-R-O-C-E-E-D-I-N-G-S**

2              MONDAY, MARCH 29, 2010

3              M O R N I N G   S E S S I O N

4              (COURT CALLED TO ORDER)

5

6

7         THE COURT SECURITY OFFICER:  All rise.

8         (WHEREUPON, at this point in the proceedings, the jury

9   panel enters the courtroom.)

10        THE DEPUTY CLERK:  Remain standing.

11        THE COURT:  You may be seated.

12     Good morning.  First of all, thank you, again, to the jury

13   for being here on time and ready.  Hopefully you've had some rest

14   and are ready to go here this morning.  I know the attorneys in

15   the case are.

16     We are going to -- I think I mentioned to you last Thursday

17   that we're going to have an hour closing argument from each side.

18   Plaintiff's counsel will have up to 15 minutes they can reserve

19   for rebuttal, so they'll have a total of an hour.  Defendants

20   will have a total of an hour between the two of them, which I

21   understand is going to be split 40 minutes for Forest River's

22   counsel and 20 minutes for Shaw's counsel.

23        MR. GIEGER:  Correct, Your Honor.

24        THE COURT:  I'm going to give a one-minute warning at

25   44 minutes to whomever -- Mr. D'Amico, are you handling the

 1   initial?

 2          MR. D'AMICO:  Yes, Your Honor.

 3          THE COURT:  I'll give you a one-minute warning at 44,

 4   and then you can continue on.  And whatever time you go in excess

 5   of 45 will be subtracted from rebuttal, so be mindful of that.

 6       I will also give a 39-minute warning, Mr. Gieger.  Would you

 7   prefer that -- I know what Mr. Cheatwood is going to say.  Would

 8   you prefer that I shut you off at 40 or --

 9          MR. GIEGER:  I would like to go for an hour and a half,

10   Your Honor, but I'm sure Mr. Cheatwood would like his 20.

11          MR. CHEATWOOD:  Yes, Your Honor.

12          THE COURT:  I will tell you at 40 minutes that your time

13   is up.  And likewise for Mr. Cheatwood, I will give him at

14   19 minutes a one-minute warning and then close it at 20.

15       And then likewise we get to the 60th minute on the

16   plaintiff's side.  And when I say your time is up, that means

17   finish your sentence, not do another two paragraphs.

18       The other thing that we're going to do, I would like to do

19   the closing arguments straight through, which will take,

20   obviously, a period of two hours to do.  If we do have -- at the

21   end of the plaintiff's initial closing argument, if anyone has

22   the need to take a break, I'll check with you and see, and if you

23   do, we can take a short break.  If not, I'd like to go ahead and

24   go through, and then we'll take a break before we charge you, I

25   give you the jury instructions.  So let's go ahead and proceed in

1    that fashion.

2        I will also ask the marshal to close the door and not allow

3    anyone to enter during the course of closing arguments.  If

4    anyone needs to be excused, anyone in the audience portion needs

5    to be excused, you will be allowed to leave the courtroom, but

6    you will not be allowed reentry until we reach -- in between the

7    closing arguments in order to minimize distractions.

8        So that will be the policy, and no one else is to enter once

9    Mr. D'Amico begins speaking.  No one else will enter until he

10   sits down and Mr. Gieger starts, and then no one else will enter

11   until we finish closing arguments.  So if you all would give

12   these attorneys your attention, I know they would appreciate it.

13       The last thing that I'll tell you before they begin to speak

14   is to be mindful that closing arguments, like opening statements,

15   are not evidence.  The evidence in this case are the testimony

16   from the witnesses that you heard over the last two weeks and any

17   documents or other materials that have been introduced into

18   evidence.

19       So argument is just that.  It's the opportunity for the

20   attorneys to explain to you what they believe the evidence in

21   this case shows.  So keep that in mind.  It's their chance to

22   address you and tell you about their belief in what the evidence

23   shows.

24       All right, I have my handy stopwatch timer up here.

25   Mr. D'Amico.  I'll ask counsel to use the podium unless using an

1    exhibit, but please try to use the podium.

2         Mr. D'Amico, you may begin when you're ready.

3         MR. GIEGER:  Good morning, Your Honor.  Good morning,

4    ladies and gentlemen of the Jury.  On behalf of Lyndon Wright and

5    the rest of the trial team, we want to thank you for your

6    attendance and your participation in this trial.  Without you our

7    civil justice system wouldn't work the way we know it.

8         What I would like to do this morning is spend 20 minutes

9    outlining for you the liability aspects of the case, and then I'm

10   going to ask my colleague, Mr. Dennis Reich, to address the

11   causation of medical damages.

12                           CLOSING ARGUMENTS

13   BY MR. D'AMICO:

14              What did we learn in this trial?  We learned that

15   Katrina was probably the worst natural disaster in our country's

16   history.  FEMA, in anticipation of these natural disasters, set

17   up a procurement specification, and we heard testimony about this

18   specification.  And this was the August 12, 2004, FEMA

19   specification.  If we could spend a few minutes and just look at

20   it.

21        What was FEMA relying on?  FEMA relied on Forest River in

22   this case to construct a travel trailer capable of providing safe

23   accommodations for displaced residents.  It says, "The standards

24   shall not be considered restrictive.  The supplier, Forest River,

25   may provide equal or better units.  The manufacturer shall design

1   and construct all units under this contract within a superior

2   grade quality of workmanship." And you heard that they wanted

3   residential appliances, commodes and other things to house these

4   displaced residents.

5       Now, how long were they going to be displaced? Well, what

6   we do know is the Louisiana Office of Public Health had said,

7   "Since Hurricane Katrina has passed, FEMA and other agencies or

8   private industries are desiring to set up temporary housing. It

9   is understood that temporary may mean up to five years." Five

10  years.

11      So what was FEMA's role in this? If we look at what Kevin

12  Souza -- some of you may remember Kevin Souza. He testified by

13  deposition. He was a supervisory program manager. And what did

14  he tell us? That FEMA was relying on the manufacturer's, in this

15  case, Forest River's, expertise to provide units that were safe

16  and habitable.

17      What else did we hear? We heard testimony from David

18  Porter. And you heard Forest River talk about David Porter. He

19  was a FEMA inspector. Forest River showed Mr. Porter one

20  prototype unit that had already been constructed. He didn't go

21  through it piece by piece and watch the construction process or

22  oversee it. In fact, what we heard is FEMA was not in the

23  construction business at all. FEMA relied on the manufacturers

24  to design and construct this unit.

25      Nothing about formaldehyde was ever discussed with David

1    Porter.  Forest River's own expert, Norm Nelson, testified that

2    you would have to take the walls off the unit to see any

3    construction defects, to see if the insulation was missing, to

4    see if the nails weren't properly nailed.

5        What else did we hear about FEMA's role in this?  We heard

6    from David Garrett.  David Garrett was the FEMA deputy

7    administrator, probably one of the most critical witnesses to

8    testify on behalf of FEMA.  And what did he tell us?  FEMA was

9    relying on Shaw to carry out the mission statement of providing

10   safe housing.  FEMA was relying on the manufacturers to provide

11   safe housing.

12       He made some very interesting comments, and I hope you

13   caught it.  I hope you took some notes.  He said, "FEMA does not

14   have the manpower or the capacity to deliver and install these

15   travel trailers.  FEMA, with a lack of manpower and capacity to

16   provide housing in the wake of Katrina's natural disaster, relied

17   on Shaw to haul and install the travel trailers and to advise

18   them on how to accomplish the tasks.  FEMA also relied on Shaw to

19   advise them how to install the trailers in a proper manner.

20       But he went further.  We heard from FEMA in these series of

21   e-mails, and what does it tell us?  It tells us that FEMA was

22   relying on the contractors who signed off on the mission

23   statement to provide safe and sanitary housing to advise FEMA

24   when they had learned of the problems with formaldehyde in the

25   yards.  What are you going to do?  How are you going to handle

1   this problem?  It was Shaw's responsibility as we saw.

2        What else did we hear?  They didn't get a response from Shaw

3   right away.  The other contractors advised them on what they were

4   going to do, how they were going to handle the problem, but Shaw

5   didn't.

6        And then finally, the next day, here we go, here is our

7   process of airing out the trailers.  We write up on the

8   checklist, we leave the trailer doors open for a day.  But what

9   did we hear in this case?  Lyndon's trailer was delivered to the

10  Florida yard on November 20th of 2005, and was shipped out the

11  next day.

12       We also heard from Commander Joseph Little.  He worked for

13  the ATSDR.  He was an emergency operations person working at the

14  ATSDR as an environmental health specialist.  And you heard his

15  testimony and you heard him talk about the risks associated with

16  formaldehyde.

17       He said that FEMA recognized the problem and asked ATSDR to

18  investigate.  They were tasked with evaluating sample data

19  collected regarding the health effects of formaldehyde.  And we

20  heard about what the CDC did in testing the 519 travel trailers

21  and the levels that they found.  Now, that's in evidence.  You

22  can look and ask for that.

23       We also heard from Commander Little that formaldehyde

24  toxicity has an odor threshold of five hundred parts per billion

25  to a thousand parts per billion.  Now, why is that significant?

1    That means if you can smell it, it has to be at least five
2    hundred to a thousand parts per billion, and everyone admits at
3    five hundred to a thousand parts per billion it's causing harm.
4    It's a toxin.  It's a poison.  It's not food.  It's pollution by
5    any other name.
6        We heard further from David Garrett that FEMA never intended
7    to use travel trailers but had no choice if New Orleans was going
8    to be rebuilt.  New Orleans was in a flood zone.  They couldn't
9    use mobile homes.  There was limited space.  And they realized
10   that they had to put units at the residence so that people could
11   come back and rebuild.
12       What he told us was very interesting.  He said, "We needed a
13   unit that was built and designated for long-term habitation, like
14   a mobile home but small enough to fit on the person's property,"
15   in this case, Lyndon's property.
16       What did FEMA do when they found out about this problem?
17   FEMA immediately began testing to address the concerns.  They
18   were concerned about the formaldehyde problem in the units, and
19   they were concerned about a protocol that the haulers and
20   installers were using.  And you saw evidence of that.
21       What else did FEMA do?  Well, we heard from Martin McNeese
22   that FEMA wanted to provide information that the travel trailers
23   had formaldehyde in them.  Did we hear Shaw do that?
24       We also heard from Guy Benomo, the FEMA temporary director.
25   And what did he tell us?  "Distribution of flyers by FEMA was

1   made necessary," and he called this a very serious situation.

2   FEMA's intent was to warn the residents once they learned of the

3   problem.

4        Now, that tells us several things.  That tells us that FEMA

5   was not a manufacturer, and FEMA did not know this formaldehyde

6   problem was going to exist because what did they ask for?  They

7   asked the manufacturer to design and construct a unit capable of

8   housing the residents.

9        But what else did FEMA do?  We heard from Stanley Larson, by

10  video, in only six days FEMA delivered well over 40,000 flyers to

11  the travel trailer occupants.  That's what FEMA did.  FEMA acted

12  responsibly.  FEMA was trying to provide safe, sanitary housing,

13  and they relied on the manufacturers and the IA/TAC contractors

14  to provide the technical assistance they needed.

15       Now, why is Forest River here?  Forest River is here because

16  their product was unreasonably dangerous and not fit for its

17  intended purpose.  What you're going to hear about is that in

18  order to recover, the plaintiff has to show that it was an

19  unreasonably dangerous condition in composition, design or

20  unreasonably dangerous because of a lack of warning.

21       Now, Lyndon's trailer was unreasonably dangerous in

22  construction because it was built like any other travel trailer.

23  You heard it, the same assembly line, the same materials.

24  Forest River did not once take into account the mission statement

25  that people would be living in these units day in and day out.

1    Lyndon's trailer was unreasonably dangerous in construction
2    because Forest River failed to follow the instructions on the air
3    conditioning system.  And we heard from several witnesses about
4    that.
5    They deviated from the performance standards.  When NACS
6    ordered the FEMA trailers, when they asked for the 35,000
7    trailers of Forest River, and they were only provided 5,000, they
8    told them that a trailer is only supposed to be used as a
9    recreational vehicle.  Forest River said, "We don't build
10   products that are intended to be permanent residences.  We build
11   these units with the expectation that they are intended to be
12   used as temporary housing."  Well, what did that mean?  What did
13   that mean to Forest River, and what did that mean to the
14   residents?
15   Forest River wasn't building what FEMA had spec'd.
16   Forest River was building what they had always built, and that's
17   why it was unreasonably dangerous.  We see on the owner's manual
18   that the recreational vehicle was not meant for short-term use,
19   so Forest River had an obligation to design it differently.
20   We also see the travel trailers being procured under this
21   contract for the purpose of providing housing, housing.  "The
22   standards shall not be considered restrictive in that the
23   supplier, Forest River, may use equal or better units considering
24   the competitive price and that delivery requirements can be met."
25   We asked them, do you make a cheaper trailer?  They told us

1   the only cheaper trailer they made was a 19-foot variety.   They

2   didn't have anything cheaper in a 32-foot variety.

3         This was a stick and tin model, their base model that they

4   expected people to live in for years.   They made a better travel

5   trailer with better insulation that would help guard against

6   moisture and buildup, that would facilitate the off-gassing of

7   the wood products, but we also heard that every component, the

8   vinyl, the carpet, virtually everything in this emitted

9   formaldehyde in this little small space with a closed air

10  conditioning system.

11        So what did we find out about the air conditioning system?

12  We found out that the RIVA requires travel trailers to comply

13  with the recommendations and the installation specifics.   We

14  found that Forest River used a very thin, half-inch Styrofoam

15  insulation which didn't meet the R-7 as Ervin Ritter told you

16  about.

17        We also found that the system failed in the ductwork.   There

18  were leaks, and it created a negative air situation in the attic

19  space, the little crawl space, that sucked the formaldehyde from

20  inside the trailer and inside the wall space and dumped it into

21  the living space.

22        It was the responsibility of the installer, Forest River, to

23  ensure that the ductwork wouldn't collapse.   And we showed you

24  the photographs and we spent time with Paul Lagrange and Ervin

25  Ritter explaining to you how the ductwork was deficient.

1    Formaldehyde, you see, built up in the walls and the ceiling
2    cavities and was pushed back into the living space.  The
3    contaminated air from this ceiling space then recirculated
4    through the trailer.  This was a closed system.  It was not a
5    mechanically ventilated system.  It only recirculated the stale
6    air.  The only way to get fresh air in the trailer was for the
7    occupant to open the windows and door.
8        Now, there was an alternative design capable of preventing
9    the injuries that Lyndon was going to suffer.  We heard from
10   several people that the age and number of the
11   formaldehyde-emitting wood composite products used to construct
12   the trailer and the volume of air, the small volume of air.  We
13   heard this from Mr. Polk, who talked about it being a very tiny
14   closed space and how it was common in the industry to experience
15   these odors in the trailers when they were new.  It's
16   irrefutable.  Forest River knew and Forest River didn't design a
17   trailer that was capable of meeting the needs that FEMA
18   requested.
19       Now, we heard from Stephen Smulski about the release of
20   formaldehyde gas in the trailer.  And he told you how there were
21   alternative designs and alternative wood products around since
22   the '20s.  In fact, he told us that the interior door utilized
23   one of the products he was talking about.  Forest River could
24   have very easily utilized products that did not emit formaldehyde
25   gas or emitted so little gas that it wouldn't have made a

1  difference.

2      We also heard about the manufacturing defects in the

3  insulation, in the fact that it was not the insulation that would

4  have been required to house people for long-term.  We saw that

5  there were heat infiltration and gaps in the insulation, and we

6  could see that this was not a superior grade quality that FEMA

7  expected.

8      Now, why is Shaw in the case?  Well, we heard a lot about

9  it, and we heard mostly from Dr. Compeau, but FEMA relied on

10  Shaw's expertise in engineering, design and construction.  Shaw

11  had the experience and told FEMA that they could carry out the

12  mission statement of providing safe, secure and sanitary housing.

13  Now, I ask you, did they do that?  Did they follow through on

14  what they promised?

15      The instructions to Shaw was that Shaw's contract with FEMA

16  required that they procure feasible sites for the temporary

17  housing units.  They were required to follow the specifications,

18  and we showed you the photographs.  And we asked them, if it's

19  not evenly spaced, does that comply with the specification?  If

20  you don't have a 24-by-24 plywood base, does that comply?

21      Why was that significant?  Because Shaw's faulty

22  installation caused the trailer to shift, caused the door not to

23  close, caused the windows to leak and cause more off-gassing

24  because water and particle board and water and these glues

25  releases the product.

1    Now, Shaw knew this.  Shaw knew the chemicals were emitted

2  in their forwarding yards.  Shaw did not tell Lyndon Wright about

3  this.  Shaw didn't tell anyone about this.  In fact, it wasn't

4  until FEMA -- if we can go to the next slide -- you see here at

5  39, "Leave the door open to vent," this is proof that Shaw knew

6  of the problem before the trailers were going to get there, and

7  Shaw took no steps to warn the residents.  In fact, Dr. Compeau

8  said it wasn't necessary to even give them an owner's manual.

9    Lyndon's trailer was installed on November 21st, and the

10  soil under his house was under six feet of water.  They did no

11  soil testing.  They did nothing to see if it was suitable to

12  house this trailer.

13    John Osteraas, an expert for the defense, said that, "Soil

14  settlement is inevitable; it's been known since the time of the

15  pyramids," but yet they didn't follow the trailer specifications.

16  Or, I should say, the subcontractor who was working for Shaw that

17  Shaw was responsible for.  As we heard, Shaw subbed out 80 to

18  90 percent of this work.

19    We talked about the shoddy construction, and we showed you

20  this as an element of superior grade construction.  Shaw failed

21  to warn Lyndon of the formaldehyde problem.  And we showed them

22  on line 10 of the ready-for-occupancy checklist, give them the

23  appliance package.  Do you know why that was?  So that people

24  didn't blow themselves up with these propane stoves.  But do you

25  see any mention of formaldehyde?  Do you see any mention of an

1    owner's manual?

2         Shaw made mention to you that they were a team player, but

3    what was the evidence?  When the problems came out about

4    formaldehyde and the news struck, they dumped it on their partner

5    to deal with.

6         Let's talk about Lyndon Wright a minute.  We heard the word

7    "stoic."  Everybody called him stoic.  Lyndon was a man who

8    didn't like to talk about his problems.  He was a hard worker.

9    In fact, as I told you at opening, he stayed in his car a week to

10   come back, lived in his car for a week until he could get on the

11   cruise ship, worked two jobs.

12        The defense doctor, Dr. Smith, said that he liked Lyndon,

13   said he was a good historian, truthful.  Dr. Field said he was a

14   good patient who always made his appointments.  He seemed honest.

15   He didn't have any reason to question his sincerity.

16        Nobody said that they didn't believe Lyndon was telling the

17   truth, there was no evidence put on by the defendants that he

18   isn't telling the truth, and you'd have to believe he was a liar

19   not to award damages for him in this case.

20        Now, what did Lyndon tell you?  He was grateful to have a

21   place to stay when they set his trailer up.  He noticed the smell

22   right away, and when he asked the Shaw subcontractor, "What's

23   that smell," he was told, "You're one of the lucky ones; you got

24   a new one.  That's the new trailer smell.  No big deal."  He

25   didn't tell him that's formaldehyde gas, and if you can smell it,

1   it's at harmful levels.  If it's burning your eyes, it's going to

2   cause you damage.  Didn't hear anything about that.

3       You heard that Lyndon liked to keep it hot, and you heard

4   that Lyndon did everything he could to air the trailer out.  And

5   I would submit to you that Lyndon was innocent in this.  Lyndon

6   was never told, was never given the decency of being informed of

7   what he was being exposed to, and Lyndon took every step that he

8   could to ensure his own safety.

9       He never received a manual, and he was never told that

10  formaldehyde was in this trailer.  And we heard there were no

11  decals or no warnings, nothing inside the trailer to alert him to

12  its presence.

13      Lyndon is hurt.  And you're going to hear about that now

14  from my colleague, who is going to tell you all about the medical

15  evidence in this case; but, what we saw is Lyndon, before he had

16  seen anybody or known anything about formaldehyde, started

17  spitting up blood and went to see his physician who referred him

18  to Dr. Worley, who diagnosed the epistaxis.  That's the blood

19  that he was spitting up.

20      The evidence is that if you can smell it you're being

21  exposed to levels that can cause injury.  The odor threshold is

22  five hundred to a thousand parts per billion, and the ATSDR talks

23  about that.

24      At this time I'd like my colleague to tell you more about

25  the medical damages that Lyndon suffered.

1                        CLOSING ARGUMENTS

2    BY MR. REICH:

3              May it please this Honorable Court, ladies and

4    gentlemen, the crucial question that you will have to decide in

5    this case is was Mr. Lyndon Wright hurt and to what extent?  I

6    submit to you that the evidence is overwhelming that he was hurt

7    because of the conduct of these defendants because of their

8    inactions and their failure to do the things that they should

9    have done as outlined by Mr. D'Amico.

10             You see on the board to your right the scales of

11   justice.  Now, we are involved in a civil proceeding where the

12   burden of proof is by the preponderance of the evidence, or the

13   greater weight of the credible and believable evidence, unlike a

14   criminal prosecution, and some of you may have participated in

15   criminal proceedings where the burden of proof is beyond a

16   reasonable doubt and the scales of justice have to tip like that.

17             But here, if the plain is broken ever so slightly on a

18   particular issue that a party is attempting to prove, that proof

19   is sufficient.  But the evidence here is remarkably strong.  And

20   it's strong not only because of the witnesses that we presented,

21   Lyndon's doctors and the experts that were retained by Lyndon,

22   but also because of what was actually said by the defense in this

23   case.

24             Let's talk for a moment about the chemical that we have been

25   dealing with, formaldehyde.  Formaldehyde, as you've heard, is

1  ever present in the environment, but it's important not to

2  confuse the inhaled gas with the type of formaldehyde which

3  chemically is the same as what would be in the inhaled gas that

4  you might find in shrimp or in cosmetics or in petroleum

5  products.

6      In inhaled gas the formaldehyde becomes available.  It can

7  be inhaled.  It can be breathed.  It can enter into the

8  bloodstream.  Whereas, you heard, even from one of the

9  defendants' own experts, Dr. James, that when formaldehyde is in

10  food, it's locked up.  It's bound.  It doesn't become available

11  for the system to process and to create the toxic impact that the

12  inhaled gas does.

13      Formaldehyde is a powerful respiratory irritant.  It can

14  cause damage to the lungs at levels that are quite low, at a

15  hundred parts per billion and in sensitive individuals at even

16  lower levels.

17      Formaldehyde is one of the few toxins known as a "known

18  human carcinogen," a grade one carcinogen as classified by the

19  premier organization that classifies substances in terms of their

20  carcinogenic potential, and that is IARC, the International

21  Agency for Research on Cancer.

22      Fortunately, Mr. Wright doesn't have cancer.  However, he is

23  at risk.  For three years, he was bleeding from the throat.  He

24  had a condition known as "epistaxis."  You heard from Dr.

25  Spector.  Dr. Spector was trying to investigate the cause of the

1    epistaxis.  Never really determined what caused it.  He did an

2    operation and he discovered a tumor and was only able to remove

3    part of the tumor.  Fortunately, it was nonmalignant, but it was

4    in a very, very unusual location.

5        You will recall the testimony of Dr. Williams, certified by

6    the American Board of Toxicology.  It is documented in the

7    literature that a lot of the nasal malignancies are masked as a

8    sort of chronic sinusitis.  Mr. Wright had chronic sinusitis.

9    Chronic sinusitis is a serious condition that involves an

10   inflammation of the nasal cavity and the paranasal area as well.

11       And this masked condition can go on for years.  There was a

12   particular study that showed in a hundred percent of persons who

13   had the epistaxis and the chronic sinusitis, that is, the

14   bleeding, that was a precursor, a warning sign for the

15   development of nasopharyngeal cancer, a cancer that has been

16   clearly shown to be causally related to the exposure to

17   formaldehyde.

18       Ladies and gentlemen of the Jury, can you imagine the

19   fright, the fear, the concern, the terror this man must feel.

20   Although he is stoic -- he holds everything in, and a lot of men

21   do that; it's not really good to do it but we all do it -- can

22   you imagine what he must go through on a day-to-day basis knowing

23   that he still has a little piece of that tumor in his throat,

24   having stewed in formaldehyde gas for 28 months, eight to

25   12 hours per day.

1    I'd like to talk now a little bit about the evidence that we

2  presented, and we'll begin with one of the defense experts.

3  You'll recall Dr. Smith.  He was a pulmonologist that was hired

4  by Forest River.  And what did he tell you?  Well, he provided a

5  final diagnosis of rhinitis, conjunctivitis and headaches from an

6  irritating substance while living in the travel trailer from

7  March 2006 to July of 2008.  Can you imagine what that substance

8  may have been?

9    He also testified, and I recall this very distinctly, that

10  rhinosinusitis was secondary to formaldehyde exposure.  Now, and

11  Mr. Gieger, on his examination of Dr. Smith -- and you'll recall

12  we called Dr. Smith in our case.  We didn't wait for the

13  defendants to put him on because he established the causal

14  connection between formaldehyde exposure and rhinosinusitis, as

15  well as asthma.  So we put him on in our case.

16    Dr. Smith, when he was asked by Mr. Gieger a question to the

17  effect, isn't it true, Dr. Smith, that formaldehyde didn't cause

18  the rhinosinusitis, he said, oh, yeah.  And what did Mr. D'Amico

19  do?  He went right up to the witness stand with that deposition

20  with the sworn testimony and confronted him and said, Sir, do you

21  recall when I took your deposition and you stated that in your

22  final report rhinosinusitis was secondary to formaldehyde

23  exposure, secondary -- this doctor talked -- for cause.  The

24  formaldehyde caused the rhinosinusitis.  Certainly, it can

25  exacerbate rhinosinusitis, as well.

1       Formaldehyde is a very powerful chemical, and that's why it

2   is the subject of all sorts of regulations.  You've heard a lot

3   of testimony about different regulatory agencies and the

4   benchmarks and standards that they have set, and also you've

5   heard a lot of testimony about different public health

6   organizations that have set standards.

7       Let's talk about them for a moment.  And I'll begin at the

8   bottom of the PowerPoint.

9       ATSDR, Agency for Toxic Substances and Disease Registry,

10  which is part of the Centers for Disease Control, which is part

11  of the Department of Public Health and Human Services, .008 ppm

12  or 8 ppb.  That is the level that is generally applicable to the

13  population, not to a workforce but to a population, which

14  includes the sick, the elderly, and the young.

15      You heard testimony from Dr. DeRosa, for example, the former

16  director of the environmental medicine and toxicology program at

17  the ATSDR.  He told you that the exposure levels were

18  substantially in excess of the guidance benchmarks.  In fact, he

19  told you that the levels were up to 80 times higher than peak

20  occupational limits and up to 300 times higher than guidance

21  values and that the levels that the persons living in the

22  trailers were exposed to for periods of months up to a year will

23  cause respiratory problems.

24      He further told you that a .3 ppm or 300 parts per billion

25  risk level for the trailer residence was indefensible.  That

1    number came from the medical management guidelines of the ATSDR

2    and was only applicable to first responders, emergency workers

3    who had to clean up a spill, and it was only applicable to the

4    first three hours of exposure.  After that, the applicable

5    standard is an 8 parts per billion level.

6        Dr. Miller was the gentleman who came down to New Orleans

7    more than 20 years ago, and he founded the Occupational and

8    Environmental Health Clinic at LSU and treated persons who had

9    suffered adverse health effects from exposure to chemicals.

10       Dr. Miller was the one who did what is known as the

11   "differential diagnosis."  He looked at all of the factors that

12   can account for rhinosinusitis and concluded that the most likely

13   cause of a rhinosinusitis was exposure to the formaldehyde by

14   Lyndon during the period of time that he lived in the trailer.

15       He also told you, and he based his testimony upon reasonable

16   medical probability, that the formaldehyde caused lower tract

17   respiratory injury, it caused asthma.  And we all know that

18   asthma is a life-long condition and rarely do people overcome it.

19       You heard from Dr. Charles Field.  Charles Field treated

20   Lyndon from 2000 until 2006.  He was one of the most

21   knowledgeable physicians about the health of this gentleman.

22       What did he tell you?  He said that there was a period of

23   time where Lyndon was going through some down period in his life,

24   and he prescribed Effexor, and that was only for a relatively

25   short period of time from July 2000 until January of 2001.  And

1   Lyndon, after he was feeling okay, took himself off the Effexor.

2   And Dr. Field said, even though it may be against medical advice,

3   he said a lot of his patients do, and he saw no problem with

4   that.

5        In 2004 and 2005, Dr. Field testified -- and you'll see in

6   his medical records, if you care to look at them; he was from the

7   Uptown Nephrology Clinic -- he had no asthma symptoms or

8   breathing problems, no problem with alcohol.  His energy good and

9   his weight was stable.  He wasn't smoking, and he was a good

10  patient.

11       Mr. D'Amico told you a little bit about the odor threshold,

12  but the bottom line is that you can have a lot of effects,

13  adverse health effects at levels below the point where you're

14  going to smell it, at levels below 500 parts per billion.  And

15  these effects can include cellular damage, which Dr. Williams

16  explained in great detail, as well as genetic injury that can

17  cause cancer.

18       Dr. Shwery.  Dr. Shwery was a very fine psychologist who

19  took a real interest in Mr. Wright.  He told you that Mr. Wright

20  has severe anxiety, and he does have mild depression, and he

21  recommended that he has continuing therapy.  And we will ask you

22  to award damages to compensate Mr. Wright so that he can have

23  future therapy, and I believe the number was about $65,000.

24       It was interesting that some examinations were administered

25  by Dr. Shwery, and these were tests that actually had something

1    called "validity scales."  And the validity scales demonstrated

2    without question that Mr. Wright was not a malingerer.  He didn't

3    exaggerate his symptoms.  He tended to understate them, if

4    anything.  He had a valid profile.

5         And we also heard from a defense-retained expert.  You'll

6    recall Dr. Thompson.  He was the gentleman who is a forensic

7    psychiatrist.  I asked Dr. Thompson, forensic, does that mean

8    having something to do with law?  And he said, yes, that's a fair

9    definition.  He charged $650 an hour.

10        And he found that Lyndon did have severe anxiety, did have

11   mild depression, so there was definitely a convergence between

12   the diagnosis from Dr. Thompson and Dr. Shwery.  The difference

13   is Dr. Thompson tried to blame all of Lyndon's problems on the

14   fact that he had brought a lawsuit, that he was having anxiety

15   litigation, despite the fact that all of Dr. Thompson's, and he

16   administered tests with validity scales such as the MMPI-2, that

17   test showed that there was zero evidence of exaggeration or

18   malingering, and it was further demonstrated that Mr. Wright was

19   not an alcoholic.

20        I asked Dr. Thompson, Did you see Dr. Smith's records which

21   indicated that he drank two to three beers per night when he was

22   living in the trailer?  He said yes, and then later he tried to

23   change his testimony.  He said he wanted to see the records.

24        The bottom line is, Dr. Thompson said there was no evidence

25   of interference with his judgment or with his job performance

1    because of alcohol.  So on the one hand you have Dr. Thompson

2    trying to insinuate that Mr. Wright is a malingerer and one who

3    uses excessive alcohol; on the other hand, all of his testing and

4    his overall testimony contradicts what he was trying to

5    insinuate.

6        Dr. James.  James is one of the defense experts who never

7    came upon a chemical that he didn't like.  He's testified for the

8    pharmaceutical industry, the petrochemical industry.  He's been a

9    consultant for asbestos manufacturers.  He never testified that

10   anyone who came to court with an injury claim was, in fact,

11   injured.

12       He never was involved in formaldehyde research until this

13   case.  He's gotten no grants for formaldehyde, no courses, no

14   publications, no writings, no studies listed on his CV, and no

15   professional presentations.

16       So we did learn, though, from Dr. James, that you can't

17   compare apples and oranges; and, that goes back to what I talked

18   about earlier, you can't look at the formaldehyde in shrimp and

19   compare it to formaldehyde that a person inhales.

20       We also established, for example, that ambient levels --

21   over 60,000 census tracts were evaluated.  It's all on the ATSDR

22   tox profile which is in evidence, if you care to look at it.

23   Average level, .2, .2 ppb, parts per billion, extraordinarily low

24   levels.

25       Lemus study.  You heard about the Lemus study.  It's

1    interesting, 26 percent of the 53 homes, there were no detections

2    of formaldehyde.  These were homes in southern Louisiana.

3         Also, it has some very revealing information.  The Lemus

4    study is in evidence.  You can read it if you desire.  Irritant

5    effects can occur at a hundred to three hundred ppb, sensitive

6    individuals as low as 30 parts per billion.  Concentrations

7    greater than a hundred ppb, corrective action should be taken.

8    10 to 20 percent of the U.S. population, including asthmatics,

9    may have hyperreactive airways that make them more susceptible to

10   the effects of formaldehyde.

11        Finally, we can go to, I guess, Dr. Williams.  Now,

12   Dr. Williams is a brilliant scientist.  She provided you with

13   great information concerning the cancer risks.  I won't go into

14   detail.  We can go through a few of the slides.  Then we can

15   continue on.

16        You'll see the statistical evidence establishing that

17   nasopharyngeal cancer is a cancer associated and caused by

18   formaldehyde.  She explained to you how DNA damage can occur from

19   formaldehyde exposure and explained the process by which cell

20   division can occur producing defects and clones and ultimately a

21   cancerous cell.

22        One thing I do want to talk to you about very, very briefly,

23   and that is the smoking issue.  The defendants may try to show

24   you a slide claiming that the rhinosinusitis and perhaps asthma

25   were in some way contributed to or caused by environmental

 1   tobacco smoke.  There is no proof of that.  You've heard from

 2   Mrs. Wright.  She never smoked in the trailer.

 3        Lyndon had a clear CAT scan in 2002.  He didn't have any

 4   problems other than seasonal allergies up through 2005.  Smoking

 5   is a red herring.  And, furthermore, Dr. Williams, when asked how

 6   much formaldehyde is emitted from a cigarette said she didn't

 7   know, but the defendants may try to show you a chart that says

 8   214,000 parts per billion.  That is blatantly untrue.  She said

 9   she didn't know.  The collective mind of the Jury --

10        MR. GIEGER:  Well, I'm going to object to that,

11   Your Honor.

12        MR. REICH:  -- is far superior --

13        THE COURT:  Wait, we have an objection.

14        MR. GIEGER:  Misstatement of testimony.  We covered

15   this --

16        THE COURT:  I'm going to instruct the jury that your

17   recollection of the testimony is what you will consider when you

18   deliberate.  So, as I said, the argument of counsel is just that,

19   it's argument.  If your recollection of someone's testimony is

20   different than what any counsel says here in closing argument,

21   your recollection controls.

22        Go ahead, Mr. Reich.

23        MR. REICH:  Thank you for your time.  I've overextended

24   myself.  You've been a great jury.  I appreciate it.

25        THE COURT:  Mr. D'Amico.

1                          FURTHER CLOSING ARGUMENTS

2     BY MR. D'AMICO:

3                    So what did we hear?  We heard that FEMA wanted a

4     mobile home but needed a smaller unit that could be set up on the

5     resident's property.

6                    Where was the doctor to say that Lyndon isn't hurt?

7     You didn't hear that witness because he didn't appear at this

8     trial.  Lyndon was made ill while he was residing in this travel

9     trailer.  The defendants want you to believe that he's just the

10    victim of bad luck; however, Lyndon was the victim of the

11    defendants' negligence.  Lyndon is credible.  Everybody told you

12    that they believed what he was saying, that he was injured, that

13    he was made ill while living in this trailer.

14       Now, there are some documents you're going to want to see.

15    And if you want to look at the FEMA specification, that's

16    Exhibit 580.  What temporary means is Exhibit 517.

17       And the ATSDR, if you don't know who to believe between the

18    contest with the experts, look at what our government says about

19    formaldehyde.  This is an exhibit, Exhibit 663, and this is our

20    government's official pronouncement of what formaldehyde can do

21    and at what levels.

22       Now, we heard, and you're going to hear a stipulation, that

23    there were readings in the trailer of 95 to 130 parts per

24    billion.  The testimony of Paul Hewett, if he did his

25    extrapolation back three years earlier, it was likely in the

1    260 parts per billion range.  And we know if he was smelling it

2    and it was burning his eyes, when he first got in it had to be

3    around five hundred.

4        So now I would like to direct your attention to the verdict

5    form because this is what you're here about.  This is what your

6    business is, and this is what you're going to be asked to do.

7        I submit to you that Forest River produced this product in

8    an unreasonably dangerous condition because of its construction.

9    You check off "yes" if that's what you believe.  I submit to you

10   the evidence is overwhelming.

11       My colleague told you the burden in a civil trial is a

12   tilting of the scales.

13            THE COURT:  One minute.

14            MR. D'AMICO:  We do not have to prove beyond a

15   reasonable doubt as you would in a criminal case.  Nobody is

16   going to jail here.  We just need to prove to your satisfaction

17   more probably than not.

18       The next question, do you find the Forest River travel

19   trailer occupied by Mr. Wright was unreasonably dangerous in

20   design?  I submit to you the answer is "yes."

21       Do you find that the Forest River trailer occupied by

22   Mr. Wright was unreasonably dangerous because of an inadequate

23   warning?  Well, he got no warning, so you have to say "yes."

24       Do you find that a reasonably dangerous condition of the

25   trailer existed at the time it left Forest River's control?

1   There's been no evidence that anyone altered this trailer, so you
2   would answer "yes."

3       Do you find that Lyndon Wright sustained injury to which
4   Forest River substantially contributed to as a result of this
5   unreasonably dangerous condition?  I submit to you that the
6   answer is "yes."

7       Now, let's talk about Shaw.  Do you find that Shaw was
8   negligent in some regard?  We gave you ample evidence of how they
9   deviated from the specifications, so the answer should be "yes."

10      Do you find that Lyndon Wright sustained injury to which
11  Shaw substantially contributed as a result of their negligence
12  during the time that they had the maintenance?  This is their
13  failure to warn Lyndon that what he was smelling was
14  formaldehyde.  The overwhelming proof is that they did not tell
15  him what he was smelling was formaldehyde, so the answer should
16  be "yes."

17      You're next going to be asked to allocate fault.  I would
18  submit to you that the fault should be equally allocated between
19  the two defendants, Forest River and Shaw, at 50 percent each.
20  There has been no evidence that Lyndon Wright did anything to
21  contribute to his own injuries, and there has been no evidence
22  that FEMA did anything wrong.  All they did was act reasonably
23  once they found out about the problem.

24      Now, we get to damages.  The evidence presented to you from
25  the only treater who could talk about the issues that Lyndon

1   couldn't talk about himself came from Dr. Ed Shwery, and he told

2   you that Lyndon needed some psychiatric help.

3       Dr. Thompson said he needed it.  He said he was depressed

4   while he was in there and he started drinking.  He even admits

5   that Lyndon needs some attention.  That figure was $65,000.

6       The other figures for his pain and suffering, his emotional

7   distress, and any loss of life's pleasures we leave to you.  You

8   are the judges of the fact.  You are the ones who decide what is

9   an appropriate figure.

10      I would like to reserve some time for rebuttal, Your Honor.

11          THE COURT:  You have 13 minutes remaining.

12          MR. D'AMICO:  Thank you, Judge.

13          MR. GIEGER:  Your Honor, if I could have just two

14  minutes to set up.

15          THE COURT:  While Mr. Gieger is setting up, if you would

16  like to stand at your spot, you may do so.  And we'll hear from

17  Mr. Gieger.

18                       CLOSING ARGUMENTS

19  BY MR. GEIGER:

20              Good morning, ladies and gentlemen.  A little over

21  a two-week trial, and the truth of the matter is that this trial

22  is going to boil down to a four-page document.  Mr. D'Amico just

23  showed it to you, and generally I don't go over this document

24  until the end of my presentation; but, in this case, I'm going to

25  do it first.  First because I think it's an important document

1    for you to know; second of all is I've got a lot to tell you and

2    I'm not sure I'm going to finish in 40 minutes.  It's an

3    important document.  Let's look at it first.

4              And that's the jury verdict form.  Mr. D'Amico just

5    showed it to you, but this is a question that you're going to be

6    asked:  Do find the Forest River trailer occupied by

7    Lyndon Wright was unreasonably dangerous in its construction and

8    composition?

9        Unreasonably dangerous is the keyword because the plaintiffs

10   have the burden of proof to tell -- to show to you that this

11   trailer was unreasonably dangerous, unreasonably dangerous in its

12   construction.  And I'm going to contend to you that the evidence

13   in this case is that it's not.

14       Unreasonably dangerous in its design?  I'm going to contend

15   to you that the evidence is no, and that you should mark the form

16   accordingly.

17       And finally, is it unreasonably dangerous because of a

18   warning?  If you answer those three questions "no," ladies and

19   gentlemen, you are finished as far as it's concerned with

20   Forest River.  You've answered the question that the plaintiffs

21   have failed in their burden of proof to prove that this product

22   was unreasonably dangerous.

23       And since I may not get there, ladies and gentlemen, I want

24   you to remember the testimony of Mr. Gaeddert.  Mr. Gaeddert

25   testified that the trailers that were sent out by FEMA -- I meant

1   by Forest River for FEMA were the same as all of the other

2   trailers that they had been manufacturing for over a decade.

3   Over a decade they had been supplying them to their customers, to

4   their friends, to their families.  Those are the same trailers

5   they'd been sending to the South without complaint.

6          And you know what he told you was the only difference that

7   he could remember when they started building the FEMA trailers?

8   The only difference was, it was like he remembered at 9/11, is

9   that the people who were employed at Forest River believed that

10  they were doing something special, that they were building --

11  this was part of their FEMA hurricane relief.  And they built

12  those trailers knowing that they were going to go down in

13  conformity with the federal government specifications, and they

14  were going to be temporary housing for those people who were

15  displaced because of this hurricane.

16         And what you've heard, ladies and gentlemen, is all of these

17  lawyers here, from Louisiana and Texas and South Carolina, come

18  to tell that you the employees of Forest River were unreasonable

19  because they built an unreasonably dangerous product.

20         The truth of the matter is, ladies and gentlemen, that even

21  if you find -- you also have to find that if you get past three,

22  that that unreasonable dangerous condition existed at the time

23  that it left control.  And there has been a lot of testimony

24  about things that have happened to that Forest River trailer

25  after it left Forest River's control, but that's what the law is.

1   The judge will give you the law, and it has to be unreasonably

2   dangerous at the time it left Forest River's control.  And,

3   finally, it has to be something about that trailer that

4   substantially contributed to that unreasonable condition.

5        Ladies and gentlemen, I told you when I started -- I did my

6   opening, there is two sides to every story, and you agreed with

7   me.  And let's talk about --

8        Your Honor, may I approach?

9        THE COURT:  Yes.

10        MR. GIEGER:  Let's talk about two sides to the other

11   story.  You remember this?  This is an exhibit that I -- it was

12   the first thing I did with Mr. Wright.  Remember?  And I simply

13   said, let's talk about your employment.

14        And you remember when I said, "For 2006, you worked 12 hours

15   a day, 7 days a week?"  Do you remember that?  And Mr. Wright

16   said, "No, that's not what I said."  And I had to bring up his

17   deposition and show him, Mr. Wright, exactly what you told me,

18   12 hours a day, 7 days a week.

19        Once I did that, I didn't get any arguments about 2007 and

20   2008, where he worked eight hours a day, five days a week at the

21   Hyatt, and eight hours a day five days a week at the City of

22   New Orleans.

23        So why is all of that important?  Ladies and gentlemen, use

24   your common sense.  The plaintiffs are contending that Mr. Wright

25   was exposed to formaldehyde in the trailer that caused his

1  injury.  This evidence alone confirms what his mom told you here

2  at trial, that Lyndon Wright spent very little time in the

3  trailer.  If he is in work, and he clearly admits that he's

4  working all of this time, Lyndon Wright had very little time to

5  spend in the trailer.  When he wasn't working, he had some social

6  life.  The truth of the matter is very little time was he in the

7  trailer.

8       We talked a little bit about Mr. Wright's tax returns at the

9  same time.  Why?  Because in his tax returns, Mr. Wright told

10  you, I don't have any other jobs, but he made a deduction for

11  10,000 business miles in 2007.

12       Approach, Your Honor?

13            THE COURT:  Yes.

14            MR. GIEGER:  Why does it make a difference?  Again,

15  2007, if he's working this hard, and he's making a deduction on

16  his tax return for 10,000 miles, he sure can't be in the trailer.

17       The same is true for 2008.  He says he's working at the

18  trailer.  I don't know how he makes this deduction because he's

19  an employee of the Hyatt, he's an employee of the City of

20  New Orleans, and he's not -- doesn't have an independent

21  business; but, if he's traveling around, he certainly can't be in

22  the trailer.

23       And finally, his tax returns.  Mr. Wright told you that he

24  has no children.  He has no dependents.  No one, in fact, is

25  financially responsible.  And he told you in 2008, he told you in

1    2007, 2006, 2005, 2004, 2003, and in 2002, he took deductions for

2    people, children and others, on his tax returns.

3         Why is it important?  Because the judge, when he reads the

4    charge to you, is going to talk to you about whether or not the

5    credibility of a person is determined by you.  And it's

6    Mr. Wright's credibility often about what went on in this case

7    that you're going to have to make a determination in this case.

8         Also in evidence is Mr. Wright's fact sheet that he said he

9    would -- he swore under perjury.  Why is that important?  Because

10   those are the levels of his income.  And why is that important?

11   Just like that document and just like that board, if -- use your

12   common sense.  If Mr. Wright was exposed to formaldehyde that was

13   causing him such mental or physical problems, look how much he

14   was working.  Look how much he was making.

15        Did you see one piece of evidence that said he couldn't go

16   to work, he couldn't be employed, he couldn't do his job?  Not a

17   single piece of evidence.  And I guarantee you if the plaintiffs

18   had such evidence they would have showed it to you.

19        Now, let's turn to the medical history of Mr. Wright.

20   Clearly, before this event, you heard the testimony of Dr. Field.

21   He said his medical records -- remember, Dr. Field sees him only

22   up until the end of 2005, before Lyndon Wright ever gets into the

23   trailer -- always -- depression, always feeling tired and down,

24   scoliosis, viral syndrome, osteoporosis, sexual dysfunction,

25   erectile dysfunction, eye discharge, seasonal allergies, which is

1    a big part of this case, asthenia, he has a loss of sensation of

2    tingling in his face and arms, high blood pressure, wheezing, and

3    drugs -- again, important in this case -- Effexor, cyproheptadine

4    and Viagra and Cialis, all for his medical conditions before this

5    happened.

6         If you look at the medical records, you'd see that he was

7    taking Effexor because his mood was not good.  When he went off

8    the Effexor, his mood was not good.  This is a before.  Tingling

9    feeling in his hands in 2002.  That he had sexual dysfunction in

10   2003.  That he had mild wheezing, talked to you about by

11   Dr. Smith, in 2003, a clear sign that he had had preexisting

12   occult asthma.  And that he had eye problems before, all before

13   this -- his time in the trailer.

14        Now, let's talk a little bit about some of the witnesses who

15   actually testified in this case.  Dr. Richard Spector called by

16   the plaintiffs, he was plaintiff's treating physician.  He was

17   actually a -- he was actually an expert hired by the plaintiff

18   lawyers.  If you remember right, not only was he hired by the

19   plaintiff lawyer, he was also a lawyer as well as a doctor.

20        Dr. Spector testified that -- and he knew the burden of

21   proof.  He's a lawyer.  That's why we asked him the question, can

22   you say -- and you'll hear the law from the judge -- was a

23   condition that Mr. Wright suffered caused by his exposure to

24   formaldehyde.  And what did he say?  "I need to look at two

25   things.  I'm going to look at the anterior curvature of the

1    middle turbinate."  He wanted to look at the sinuses, right?  And

2    what did he find?  He testified they were normal.  There were no

3    changes.

4          What else did he talk about?  He talked about the

5    pseudostratified ciliated columnar epithelial cells.  I've had a

6    hard time with that.  I've been really trying to work on it.  But

7    what did he say?  You know it's going to be the other side of the

8    story, again.  He said had that that smear was normal.

9          Ladies and gentlemen, we're talking about Lyndon Wright.  No

10   one else.  And you know what's interesting, they talk about

11   Dr. Williams.  You remember Dr. Williams.  I asked her a question

12   about your son is a lawyer and represents plaintiffs like these

13   plaintiffs who do formaldehyde litigation, and she agreed.  But

14   what she said was -- and we could sit here and talk a long time

15   about dose and how much, but she clearly said that those cells

16   right there are what would be the indicia of an injury

17   potentially having occurred.  It doesn't say it causes cancer,

18   but that's what you look at.

19         And you know what happened today and happened at trial is

20   that they don't want to talk about other side.  Not until

21   Mr. Bone asked Mr. Spector about this nasal smear, a smear done

22   on 7/29/09, long after he had gotten out of the trailer, long

23   before he could have been exposed to anything that's associated

24   with a Forest River trailer.  And, ladies and gentlemen, what did

25   he say?  They didn't even talk about it again today.

1    The smear showed numerous ciliated columnar epithelial cells

2    consistent with respiratory epithelial cells, and these show no

3    significant atypia.  They were normal.  That's the other side of

4    the story.

5    When Dr. Spector got on the stand and today, they don't want

6    to talk about the other side of the story.  Dr. Williams said

7    that's what you would see.  There is the evidence.  It doesn't

8    lie.  There is the evidence in front of you.  Dr. Williams didn't

9    talk about it, and they didn't talk about it either.

10   Q.   What was Dr. Spector's conclusion?  That the formaldehyde

11   exposure didn't cause -- that's the burden of proof the plaintiff

12   has -- it didn't cause the neuroma, right?  That's the thing in

13   the back of his tongue.  He specifically said it didn't cause the

14   bloody mucous.  That's what he was looking for.  Did not cause

15   it.

16   And he says exacerbation of rhinosinusitis I'll talk about

17   in a second, but Dr. Miller, the expert they hired from Boston,

18   specifically called Dr. Spector and said, that's what I'm going

19   to say, it's going to be an exacerbation of rhinosinusitis.

20   Let's talk about a second what that really is.  Exacerbation of

21   rhinosinusitis is that he's got a stuffy nose, right?  He's got a

22   stuffy nose.

23   But what did Dr. Spector say?  He told Dr. Spector, I can't

24   agree with that.  I don't concur with your diagnosis that the

25   formaldehyde caused an exacerbation of rhinosinusitis.  In fact,

1   Dr. Spector said there were no medical conditions that he

2   associated with formaldehyde.

3        You heard them talk about possibilities, could have.  That's

4   not the law.  The judge is going to tell you he must -- the

5   plaintiff's burden of proof is they have to prove more probably

6   than not that this was a cause.  They want to talk about it could

7   have and it might have.  The question is did it for the

8   plaintiff -- for Mr. Wright, and the plaintiffs don't have a

9   doctor they called that said that.

10       Now, Dr. James, let's talk a second about Dr. James.  He has

11  30 years experience as a toxicologist.  He's routinely hired by

12  the federal government.  But what's important in this case and

13  Mr. Watts said, you're hired by all these people, but in this

14  case, in this case, Dr. James was not hired by Forest River, not

15  hired by Shaw, not hired by the Forest River lawyers, not hired

16  by the Shaw lawyers.  None of the defense people hired Dr. James.

17       And what did he come in and say, that there is, again, no

18  evidence of cellular change in Lyndon Wright's nasal mucosa.

19  That's what Dr. Williams wanted to talk about, changes in his

20  nasal mucosa.  And what did he say?  No evidence of a change.  No

21  exposure to formaldehyde sufficient to cause injury, irritation

22  or exacerbation of asthma.  That's what he said.  An expert not

23  hired by me, not hired by the defendants, that's what he came in

24  to tell this jury.

25       Now, he also talked to you about the ATSDR minimal risk

1    level.  And what did he say?  I told you that during my opening,

2    and I told you that it's important, that the ATSDR minimum risk

3    level, exposure to a level above the MRL does not mean that

4    adverse health effects will occur.  That's what it says.  Just

5    because it's above the 06, the .0008 and .0016 doesn't mean that

6    it's adverse health effects.

7        Let's talk about for a second Dr. Miller.  You remember

8    Dr. Miller.  Dr. Miller, if you remember, I asked him -- because

9    we got into a debate over objections about reasonable medical

10   certainty -- what is your diagnosis of Mr. Wright in this case?

11   Tell me to a reasonable degree of medical certainty.

12       And what did he say?  Only the exacerbation of

13   rhinosinusitis.  But, remember, he came in and he said, I

14   contacted Dr. Spector about my opinion that they had me come in

15   and give you.  And what did he say?  Dr. Spector said I can't

16   concur on that diagnosis.  Even that one opinion, I don't agree.

17       What do we know about Dr. Miller?  Remember, I asked

18   Dr. Miller, I said, Dr. Miller, your methodology, has it been

19   questioned in the past?  And, in fact, it was questioned when he

20   was at Harvard Medical School.  I read to you the report from the

21   Harvard Medical School where they talked about Dr. Miller's

22   methodology and they rejected a paper that he had done and

23   censored him while he was in med school.

24       We talked about court limitation of his expert opinion.  The

25   Court -- in fact, the Eastern District court said that his

1   methodology was suspect.

2        And, finally, Dr. Miller admitted to me that he actually had

3   to withdraw a scientific paper because the methodology was

4   incorrect.  I asked him, Did you submit it and then have to

5   withdraw it?  He couldn't remember it.  I took a deposition where

6   he finally admitted it.  And what subject was it on?  Asthma.

7   Right?

8        And, you know, the plaintiffs -- again, let's talk about the

9   other side of the story.  What did Dr. Miller rely on?  He relied

10  on two CAT scans, right?  A 2002 CAT scan where he said the

11  sinuses were clear and they were unchanged.  Remember?  And then

12  he relied on a 2009 CAT scan, excuse me, where he said, oh, the

13  sinuses were -- showed problems.  And he said, that's my

14  methodology, 2002 clear, 2009 bad, must have been caused by the

15  trailer.

16       You know, what he forgot to tell you was that I brought up

17  this 2008 scan.  Remember, Dr. Miller was on the stand, and I

18  said, "What about the 2008 scan?  Did you look at it?"  His

19  response was, "I don't know anything about a 2008 scan."  And

20  what did the 2008 scan show?  That on 5/8/2008, two months before

21  Mr. Wright left the trailer, over almost two years since he had

22  been in it, what did it show you?  The sinuses are unremarkable.

23  Oops, methodology changed again.  He forgot to look at all of the

24  evidence.

25       And the truth of the matter is, if you use his methodology

1  that would be proof that formaldehyde or whatever was existing in

2  the trailer or anything else in his environment didn't cause an

3  aggravation of his sinusitis.

4      And interestingly enough, who are the two radiologists from

5  Touro?  The same radiologist who read the 2008, 2009.  Why aren't

6  you getting both sides of the story?  Dr. Miller didn't, and

7  that's what he based his evidence -- he based his opinion on a

8  2002 and a 2008 CAT scan.

9      Dr. Worley, let's talk about Dr. Worley's records.  The

10  plaintiffs wanted to talk to you about his chronic sinusitis in

11  October 2007, but what they didn't want to talk to you about

12  until we asked them the question is, what about the rest, what

13  about the other side of the story?

14      The other side of the story is November 16, 2007, less than

15  a month later, his sinusitis has resolved.  And we talked about

16  Nasonex spray.  I missed it before, but what you have to

17  understand and remember, when it comes to blood in the nose, you

18  heard it from Dr. Smith and others, that the truth of the matter

19  is that taking medications for your nose can cause blood in your

20  sinuses.

21      Now -- oh, I'm running behind.  Dr. Cruz, medical records.

22  Again, why is this important?  Because Dr. Cruz clearly tells you

23  that on 4/1/08, others at work -- I'm sorry, what Mr. Wright told

24  Dr. Cruz in 4 of '08 was that, "Others at work have similar

25  complaints."  Others at work have similar complaints.

1      Let's talk about Dr. Smith.  Yes, he is our expert called in

2  the plaintiff's case.  35 years of experience with patients here

3  at East Jefferson Hospital.  He reviewed Lyndon Wright's medical

4  records, his tests and lab report.  And the first two questions I

5  asked him, ladies and gentlemen, the first two questions I asked

6  was, "Was the asthma that Mr. Wright had caused by formaldehyde

7  while living in the trailer?"  He said no.  "Was his asthma

8  exacerbated by formaldehyde while living in the trailer?"  No.

9      That's the evidence that you got during plaintiff's case as

10  it relates to Mr. Wright and this trailer.  Didn't cause his

11  asthma, didn't exacerbate his asthma.  And they certainly put no

12  physician in to talk about it being caused by his asthma.

13      What he has is occult asthma.  He explained to you people

14  who have asthma or are asthmatics have occult asthma.  They are

15  undiagnosed.  And he sees those kind of patients every day in his

16  practice here at East Jefferson Hospital.

17      He also talked to you about medications.  Why are those

18  medications important?  He talked about two things,

19  cyproheptadine and the Viagra and Cialis.  Why are those

20  important to your consideration?  Cyproheptadine he was taking

21  because he wanted a weight gaining drug.  He wasn't taking it as

22  an antihistamine.

23      But at the end of 2005, when he went from Dr. Field to

24  Dr. Cruz, Dr. Cruz wasn't crazy about that idea, about giving him

25  an antihistamine to control or help his weight.  So the records

1    show that he -- and Dr. Smith told you he went on -- he was

2    taking less cyproheptadine.

3        Why does that make a difference?  Mr. Wright clearly has

4    seasonal allergies.  Why is that important?  Because if you quit

5    taking as much of an antihistamine, you're going to react.

6    You're going to have a runny nose, watery eyes, because you're --

7    that's what you take when you have a cold.  An antihistamine

8    dries you up.  And he was taking less antihistamine in 2006

9    because Dr. Smith told you he looked at the medical records.

10        Why is Viagra and Cialis important?  Because he talked about

11   him taking it on an intermittent basis.  Clearly, this is

12   something I never knew before I got into this case, is -- and he

13   told you, Dr. Smith told you that, what, that you have in your

14   sinuses erectile tissue.  I thought that was unusual but that's

15   part of your body.  You have erectile tissues in your sinuses,

16   and if you go on and off that kind of medication, erectile

17   dysfunction medication, it can affect your sinuses.

18        Now, let's talk a little bit about Mr. Wright's other

19   medical history.  Interestingly enough, 12/14/05, after he comes

20   back to New Orleans, before he ever goes in the trailer, he's

21   making complaints of numbness in his arms.  On 7/05, Mr. Wright

22   is making complaints that he is feeling changes in his body.  And

23   we clearly know that Mr. Wright has had a substantial medical

24   history.

25        The plaintiffs wanted to talk to you about his first office

1   visit, but they don't tell you the other side of the story.

2   What's his next office visit to Dr. Cruz show?  No cough, no

3   wheezing, goopy eyes.  And what does he say?  Seasonal allergies.

4   Seasonal allergies was the diagnosis by his treating physician,

5   and an acute bacterial conjunctivitis.  Not caused by

6   formaldehyde.  He had a bacteria, not formaldehyde, that was

7   causing his eye problems.

8       And finally, interestingly enough, when you look at

9   Dr. Cruz's notes, what do we see?  That on 8/15/08, Mr. Wright

10  saw a lawyer.  He wanted a letter, wanted to know what Cruz had

11  treated him for since 2006 and the possibility of being affected

12  by formaldehyde.

13      What do we see?  This letter written on August 21st, 2008,

14  it talks about the symptoms, the same symptoms that Dr. Field

15  told you about he was treating him before he ever got in the

16  trailer.  And what's missing from it?  There is no connection to

17  formaldehyde.  They asked his treating physicians to tell you,

18  what was he treated for and was there a connection with

19  formaldehyde, and that's missing from that letter.

20      Let's talk a little bit about other exposures.  Workplace

21  exposures.  There was a big talk about -- Kenny Smith talked

22  about there being other irritant effects while he was in the

23  trailer.  Remember, and I asked Dr. Smith this, you're giving me

24  a history, right?  This is the history that plaintiff gave you

25  about other -- that he was irritated while he was in the trailer.

1   He did not, he did not say that that irritating substance that

2   caused those problems was formaldehyde.

3       What other irritating exposures did Mr. Wright have before

4   he was ever in the trailer?  He talked about in 1997 the chlorine

5   exposure where he had dead lung fibers.

6       He also talked about his city employment, which, remember,

7   he comes back to the city in October, right, of 2005, and he

8   handles chemicals.  I had to talk with Mr. Wright to get him to

9   agree with me, but, in fact, Bio-Treat, Coolite and, most

10  importantly, air filters.  His job, starting in October of 2005,

11  was to change the air filters in the Civil District Court, one of

12  the oldest buildings here.  How do I know?  I worked there.  I

13  started working there when I was a young lawyer.  He was changing

14  the air filters there post-Katrina.

15      Home exposures.  Smoking.  The evidence will be that

16  Mr. Wright's mother smoked a pack a day for the first 27 years of

17  his life.  His fiancé smoked two packs a day since 2001, when she

18  first met Wright.  You'll have to make the determination of how

19  much exposure he had to that smoke, but clearly that's another

20  exposure that he had.

21      And, finally, interestingly enough, he talked about the

22  dumpsters that were across from his house.  There is his house on

23  2315 Seminole Lane, and that's what's across the street.

24  Mr. Wright had construction dumpsters sitting across from his

25  house in 2006, 2007, and 2008, and he admitted that there was

1   construction debris from New Orleans areas going to that location

2   all of those years.

3        Fear of cancer.  Ms. Marsh testified, who is his fiancé,

4   that they first talked about a fear of cancer in the fall of

5   2009.  That was their discussion about cancer.  It was a general

6   concern, no specific medical causation -- medical condition was

7   discussed.  And she specifically said, the last words -- last

8   question I asked her, "Was his concern about a fear of cancer

9   just a general concern or was it associated with the trailer?"

10  And she said, "Not with the trailer, a general concern."

11       Mental health.  Dr. Field.  He said he was -- he had

12  depression since he was diagnosed in 2002.  He prescribed

13  Effexor.  He discontinued that medication against medical advice,

14  Mr. Wright.  And in September of 2005, in his records he talks

15  about the fact that he needs to go back on Effexor again.

16       Dr. Shwery.  Interesting his first office visit was

17  July 17th of 2009.  2009.  And what did he say?  He said he

18  really had no depression then, on his first visit.

19       Then the biopsy was done by Dr. Spector on July 29th, 2009,

20  and Mr. Wright said he had a concern, as we all might.  But what

21  did you find?  That after he got the biopsy result back, he was

22  fine.  Must have been fine because as far as Mr. Wright is

23  concerned, he had three office visits with Dr. Spector, all on

24  the 3rd, 8th and 9th, and he missed all those appointments.  He

25  was told -- he had a concern about the biopsy, he was told it's

1   fine, and then his reaction was he missed his next medical

2   appointments.

3       Then, from a historical standpoint, Lyndon Wright came to a

4   court and specifically, on one day, observed Dr. Shwery's

5   testimony with his lawyers to listen to Dr. Shwery, a

6   psychologist, testify.  And he testified about the effects of

7   formaldehyde on a mental condition.  And what happens, an office

8   visit of September 23rd, suddenly, after he hears Dr. Shwery

9   testify, all of a sudden his anxiety increases.

10      Dr. Thompson.  He had anxiety.  He said his anxiety is

11  litigation induced, unrelated to his health concern, and that it

12  will be resolved post litigation.

13      Depression, preexisted Katrina, existed between 2000 and

14  2008, yes.  Why, because of Mr. Wright's increased alcohol

15  consumption.  Lyndon Wright told Dr. Thompson he was consuming

16  96 ounces of beer every night, and he was staying up to 2 o'clock

17  in the morning and that he had an intermittent use of -- taking

18  of Effexor.  It was his choice to intermittently use his Effexor.

19      What was his prognosis?  His prognosis was that in the

20  future, Mr. Wright would be fine if he consistently used the

21  Effexor as previously prescribed and he would limit his alcohol

22  consumption.

23      I need to move on to the trailer.  And I'm going to do -- I

24  apologize, I'm going to try to do this quick.  What the

25  plaintiffs want you to believe is that because he smelled

1   something that that meant it was formaldehyde.  Two things, one,

2   just because he smelled something doesn't mean it was

3   formaldehyde, and how long did it last.

4       Nicole Dison, his best friend, in May of 2006 says, what,

5   two months after you moved into the trailer, she didn't smell any

6   odor, and she stayed in there for a month.  His mother was there

7   in '07 and '08, and she didn't smell any odor.  Right?  His

8   sister was there in 2007, and she smelled no odor.  And his

9   fiancé was there intermittently between 2006 and 2008, and she

10  smelled no odor.

11      What did Mr. Wright tell you?  In his deposition he told us

12  it was a new car smell.  Right?  For the first time when he came

13  to court, he described it as something like in a funeral home,

14  but clearly said it was gone in a few weeks.  Why is the smell

15  important?  Because they continue that that means that there is a

16  high level of formaldehyde.

17      But, what's the evidence in this case?  The evidence in this

18  case is that the doors and windows in the case were, what did

19  Nicole Dison say, she said they were both always open.  What did

20  Bobbie Wright say?  They were always cracked.  Michelle Wright

21  said they were always cracked.  And Tyshon Marsh said they were

22  both always open.  And Lyndon said from time to time they were

23  both open.

24      Why is that important?  Because if there was any

25  formaldehyde in that trailer, clearly, when they opened the

1   windows, and that's when they were there, there was an air
2   exchange, and it was gone.
3        What's the testimony about air exchange in the case?  Time
4   to completely replace the air inside the unit, as little as
5   12 minutes.  When you open the windows and doors, you have a
6   complete air exchange, so whatever is in there is gone, and
7   45 minutes if you're running the air conditioner.  Why is all
8   that important?  Because you've seen testimony about ventilation.
9        Shaw talks leaving the doors and windows open to ventilate
10  it.  The Forest River owner manual talks about ventilation
11  reduces formaldehyde.  In 2006, the federal government said in
12  their first brochure that they sent out to give to everybody,
13  increased ventilation will reduce your level of exposure to
14  formaldehyde.
15       Now, let's talk a little bit, again, about flyers because
16  there are important.  Lyndon Wright says the 2007 flyer, and
17  that's this one, sent out to everybody, he never got.  That's
18  what he said.  But what's the testimony in this case?  Travis
19  Morris said specifically, "I delivered that flyer right there to
20  Mr. Wright's address.  No doubt about it."  Showed you the
21  records.  He delivered it.
22       Interesting enough, Ms. Marsh, in her testimony, said she
23  saw a formaldehyde warning.  I'm not telling you she said she saw
24  that warning, but she said she saw a formaldehyde warning in his
25  trailer.

1      What did Mr. Polk say?  Mr. Polk said he photographed the

2   FEMA formaldehyde warning in Mr. Wright's trailer.  Mr. Polk is

3   not someone hired by Forest River.  He's someone hired by the

4   government.

5      And what do those photographs show?  Taped to the wall of

6   the trailer, Mr. Wright admitted that this was the vacancy

7   notice.  This was the notice to vacate his -- that trailer.  He

8   said, I, Mr. Wright, taped that notice to the side of the wall.

9   That's on one side of the door.

10     But what's on the other side of the door right here taped to

11  the wall?  Those three documents are the 2007 flyer, the

12  maintenance number to call, and a flyer from the lawyer.

13  Mr. Wright said, I didn't do that.  Taped one side.  Didn't tape

14  the other.  I didn't get this.  But what Lyndon Wright fully said

15  is if I had gotten that warning, I would have moved out quick,

16  and that's in 2007.

17     Let's talk about the Forest River owner's manual.

18  Jeff Burian told you that it's always in a white package, and it

19  always has keys.  Mr. Gaeddert says, yeah, in that white envelope

20  with his keys is the certificate of origin.  Why is that

21  important?  Because that's what we need to get paid.  That's how

22  we know it goes with the trailer and gets delivered.  Right?

23     Brian Boyle said that Shaw makes an effort to make sure that

24  everyone gets an owner's manual.  And what did Mr. Wright say?  I

25  got the white manual -- I'm sorry, I got the white package.  He

1    clearly admits he got the package.  What he says is he didn't

2    look in it, and certainly it could have had an owner's manual.

3    The Shaw document says, "Have the applicant sign the lease and

4    give them the keys."

5         We know he has the white manual -- I'm sorry, the white

6    package.  The question is, did he or should he have looked in

7    that manual?  Because in that owner's manual what is there, that

8    statement of formaldehyde warning, those -- that warning that's

9    right there.

10        I read that warning to Mr. Wright during his deposition, and

11   it took me a long time, over objections, and finally the judge

12   says, I think the jury got it.  And why?  Is because

13   Lyndon Wright said that if he had read that warning when he had

14   gotten the trailer in April of 2006, he would have taken an

15   immediate action to move out of trailer.  That's what he said.

16   It took me a long time to finally get it out, because that's what

17   he told me in deposition, if he had gotten that warning he would

18   have moved out of the trailer.

19        Lyndon Wright said, "The trailer is making me sick," but

20   there is no records in any medical file, there is no records in

21   the IA file, there is no records in the IA file that either

22   Bobbie Wright or Lyndon made a contact about making him sick.

23   Who cares about formaldehyde?  He says, "The trailer is making me

24   sick," and he makes no phone call.

25        And there is no record in the contract files that either

1    Lyndon or Bobbie called the contractor or any contractor saying

2    that, "This trailer makes me sick."  We certainly know that

3    Mrs. Wright is able to write letters.  She wrote letters about

4    her son.  She even faxed letters to the son.  I asked her whether

5    or not she had a fax number.  Why is it important?  Because she

6    said one of her -- she wrote letters but never wrote that there

7    was a problem with the trailer making my son sick.  And was she

8    contacted about it?  She said, "I called."  That was my major way

9    of calling.

10       I read the deposition.  That was Faye Green.  That's the IA

11   file.  And what do we find?  That in February of 2008, there was

12   a contact made and no health concerns.  And there is the phone

13   call right there.

14       Now, interesting enough, Mr. Wright says, "This trailer is

15   making me sick," but he let his best friend stay in there

16   starting in May 2005 -- '6, he let his mother stay in there, he

17   let his sister stay in there, he let his fiancé come and go from

18   there, too.  He also let Vanessa Johnson in 2008.  She was

19   pregnant and had two children.  He said, "This trailer is making

20   me sick," but he's letting all of these people who are his

21   friends, his mother, his relatives, his girlfriend, all stay in

22   the trailer that he tells you now was making him sick.

23       Formaldehyde is an everyday product.  It is a naturally

24   occurring substance, and it is found in cigarettes.  Yes, there

25   are all of these products.  And they said, well, remember, they

 1  are talking about off-gassing of formaldehyde from wood.  All of

 2  these products off-gas formaldehyde as well.

 3      Don't you believe, ladies and gentlemen, if there were

 4  complaints about formaldehyde at Forest River products you would

 5  have seen that evidence?  You would have either seen a witness or

 6  a document up there, but there are none.  There are none from the

 7  800 units we built for the 2004 hurricane.  There are none from

 8  the maintenance contractors or anyone else from the 2004

 9  hurricane, none from Lyndon Wright's unit and none from

10  Bobbie Wright or -- or the unit during his occupancy.

11      Numbers.  I told you numbers were going to be important in

12  this case.  Now, the plaintiff didn't really want to talk much

13  about numbers, but you're going to see the stipulation about

14  testing.  But, understand that the plaintiff's testing was done

15  with the windows closed and the doors closed and sealed up for

16  three days, no air conditioning, no humidity.  The defendants'

17  test was done when it was ventilated and air conditioned.

18      Why does that make a difference?  Two sides to the story.

19  Mr. D'Amico wanted to talk about 93 and 130, but he doesn't want

20  to talk to you about what the rest of the stipulation does; and,

21  that is, the humidity and temperature, you have got to correct

22  those sealed up units to these numbers.  And trust me, ladies and

23  gentlemen, there is nothing wrong with these numbers as long as

24  you get them where they are corrected for temperature.

25      But why -- let me tell you what test is more important is

1    what you need to know is that those first tests were done in

2    Melville in 2009 in an open field.  And what happens in this

3    stipulation is that this vent cap and this door were damaged at

4    another point in time after Mr. Wright left it, left the unit.

5    Why is that important?  It's like leaving your car with the sun

6    roof out in a field for a year.  That's what this trailer was.

7         And water got into the trailer.  Why that important?

8    Because their whole argument is that humidity and temperature

9    makes a difference and that humidity will cause formaldehyde

10   levels to rise.  What you need to look at is at the 2008 test

11   done at the plaintiff's home site two months after he left.  And,

12   again, I don't want to talk about the final number, but the final

13   number is 19 parts per billion.  That's stipulated.  There is no

14   argument to that.

15        Why is that important?  I showed you this photograph in my

16   opening.  It's Commander Little.  He was the emergency response

17   coordinator for ATSDR.  He's a registered environmental health

18   specialist.  And what did he say?  That the 300 parts per billion

19   equals the threshold limit.  And what is the threshold limit?

20   The lowest level of a chemical that has been --

21             THE COURT:  One minute.

22             MR. GIEGER:  -- shown to cause a real effect.

23        Ladies and gentlemen, I wish I could go -- go to 81, please.

24        Without going through all of the other documents about the

25   trailer, let me show you this.  The evidence in this case is

1    clearly that if there was high humidity and there was a problem

2    with temperature that there is nothing from the photographs while

3    it was still in Melville that shows -- you don't see any damage

4    that you would see normally from humidity.  And, trust me, the

5    evidence is from all of these witnesses that the air conditioner

6    worked just fine in those units.

7        And that's a picture of Lyndon Wright.  I would suggest to

8    you, ladies and gentlemen, that as I went through in the

9    beginning, that the answers to the first three questions about

10   whether or not this is unreasonably dangerous, the answer to

11   those questions is "no."  But should you go past that, our

12   contention is that the evidence is that Mr. Wright, whatever he

13   suffers from today, is not substantially associated with

14   formaldehyde that was in the trailer.

15           THE COURT:  All right.

16           MR. GIEGER:  Thank you, Your Honor.

17           THE COURT:  Can I ask someone to please move this a

18   little bit over.

19                        CLOSING ARGUMENTS

20   BY MR. CHEATWOOD:

21               Your Honor, ladies and gentlemen, like Mr. Gieger

22   I'm going to show you something first just in case I don't get to

23   it.  And what I'm going to show you is the questions on the

24   verdict form about Shaw Environmental.

25       The first one is did you find that Shaw was negligent in

1   regard to its actions or inactions concerning the hauling or

2   installing of Lyndon Wright's trailer?  I'm going to suggest to

3   you as I go through, the answer to that is "no."

4       There are all kinds of instructions on this form.  I don't

5   think you'll get past that; but, if you do, the next question is

6   do you find that Mr. Wright sustained injury to which Shaw

7   substantially contributed, as a result of the negligence of Shaw

8   in its actions or inactions concerning the hauling or installing

9   of the trailer occupied by Mr. Wright?  Again, I suggest if you

10  get there, the answer is "no."

11      I want to adopt Mr. Gieger's arguments, and I'm not --

12  you'll be relieved to know I'm not going to go back through all

13  of that.  And I'm particularly not going to go back through the

14  medical because I couldn't even say all of those words, frankly,

15  if I wanted to.

16      The fact of the matter is -- and I want to make one comment.

17  You saw the scales of justice up there, I think, that Mr. Reich

18  showed you.  What he didn't tell you was -- he said, just have to

19  get it up a little bit, but they start at zero, all the way down

20  touching the table as far as it can go.  So they have got to get

21  it all the way up until it gets close and then get over before

22  they get to you.

23      I spent the better part of this last weekend driving to

24  north Georgia to a funeral for a 90-year-old aunt of mine.  And I

25  had plenty of time to think about her and, frankly, to think

1    about this case.

2        When we got there the church was packed; and, as you know,

3    when you're 90 years old, most of your contemporaries have

4    already passed away.

5        As a part of the service, family members and congregation

6    members got up and talked about this lady for a long time.  And I

7    wondered, what had somebody done with their life to affect so

8    many people at that age, and I concluded on the way back that

9    what she had done is in her life she always tried to do the right

10   thing.  And your job as a part of this process we have been

11   through for two weeks, frankly, is to do the right thing.  That's

12   how this process works.

13       Now, not the right thing as the plaintiffs would have you do

14   it, not even the right thing that Mr. Gieger would have or even

15   what I would have, but what you in your heart and your mind

16   believe is the right thing, that's what you have to do based on

17   the evidence that you've heard, the documents you've seen and the

18   law as the judge -- as the judge will give it to you.

19       Now, I want to correct one thing that I believe Mr. Wright

20   said.  He said the critical question is whether or not Lyndon

21   Wright was hurt.  You'd have to answer that.  I don't believe

22   that's the critical question at all.  The first question is, and

23   I'm going to talk about Shaw, did Shaw do anything wrong, like I

24   asked you before, and then, secondly, did either defendant do

25   anything to injure Mr. Wright?

1    Did Shaw do its job?  I asked you that question in opening.

2    There is remarkably strong evidence that clearly Shaw did its

3    job.  Shaw contracted with FEMA.  You saw the trailer.  There is

4    nothing the matter with this trailer.  It was installed properly,

5    and you saw all kinds of evidence about that.

6    You don't have to take my word for it.  Brian Boyle was the

7    FEMA representative who was in charge of all the inspections.  He

8    first inspected, then he was in charge of inspectors.  And who

9    better than FEMA, who did four inspections on this trailer, to

10   say whether or not Shaw did its job?

11   You'll recall, in fact, that they kept records of those

12   inspections because they wanted to get Mr. Wright off the cruise

13   ship and into temporary housing.  Each of those inspections

14   showed that, in fact, this trailer was properly installed, not

15   once, not twice, but four times.  And had it not been properly

16   installed, Mr. Boyle testified FEMA would have brought Shaw back

17   out to properly install it.

18   But, as you know, FEMA wasn't the only one to inspect this

19   trailer.  Lyndon Wright was at the trailer on the lease-in on

20   February 13th, and Mr. Wright signed off on an inspection of the

21   trailer .  And if you'll recall, I drew on Mr. Gieger's chart and

22   showed you a number of the inspections.

23   Prior to the lease-in, Shaw also inspected the trailer.

24   Shaw's inspection showed there were no problems with the trailer.

25   Now, the MDCs, if you will recall, are the maintenance

1    contractors.  Shaw was the maintenance contractor until the first

2    of June in 2006.  Mr. D'Amico told you that 50 percent of any

3    liability, which I submit you shouldn't find at all, ought to go

4    on Shaw.  Shaw had the responsibility of this trailer from

5    February until June 1st, 2006.  Mr. Wright stayed in the trailer

6    the rest of the time, and you'll recall that he testified that he

7    thought whoever came out there was either FEMA or Shaw.  Well, it

8    wasn't Shaw after June 1st, 2006.

9        And these are the various inspection reports.  This is

10   another one that Mr. Wright signed.  So despite the fact he

11   complained about being able to see through a hole in the door,

12   Mr. Wright is still signing documents in 2008, in March and

13   April, saying there is nothing the matter with the trailer.

14       His mother signs documents indicating there is nothing the

15   matter with the trailer.  And, as Mr. Gieger said, no one called

16   up and complained about the trailer except in two instances, and

17   you heard the testimony, there was an electrical breaker box that

18   was, in fact, repaired, and there was a furnace that was

19   repaired.  That's it.

20       But these aren't all the inspections of that trailer either.

21   You heard Dr. Osteraas.  Now, John, as you recall, had the hair

22   that I call the "Einstein haircut."  He was one of the last

23   witnesses we had.  He inspected the trailer in Melville.  He took

24   hundreds of pictures of the trailer, and the only damage that he

25   saw was the damage Mr. Gieger talked about, the lack of the vent

1    cap in the bathroom.  He also talked about the way the trailer

2    was installed on blocks, that that doesn't cause any damage; in

3    fact, this travel trailer is designed to go over the road at high

4    speeds.

5        Further, he talked about their theory that somehow putting

6    this trailer on the piers -- and you remember seeing a bunch of

7    times the fact that the one picture we could see had a pier that

8    wasn't six inches from the front.  You heard the testimony it's

9    because there were things built under the bottom of the trailer.

10   People who do real work, and I have some in my lifetime before

11   this, frankly, know that things aren't always the way they are on

12   diagrams.  You've got to figure out how to do it and get it done,

13   and that's what happened.

14       And, in fact, Dr. Osteraas said that by doing that, by

15   putting the pier back, it actually gave the trailer more support

16   than it would have had if it were up in the front.

17       There was no installation damage to this trailer.  There

18   were forms when it was delivered that indicated there were no

19   problems.  There was forms -- and the one on the right here is

20   the form that shows it was accepted after FEMA moved it to a new

21   maintenance contractor in June.

22       After June, Shaw had no involvement with this trailer, after

23   June 1st.  Whatever happened after that wasn't a Shaw issue.

24       Now, you've heard a lot of testimony about the fact, well,

25   there was a leak in the door.  And that's correct.  If there was

1    a leak in the door, Mr. Wright testified it was late '06 or early

2    '07.  We were out by June.  But -- and if you'll recall, the

3    contract provided that we were responsible for leveling for

4    90 days thereafter.  There would be no reason for a completely

5    unrelated maintenance contractor, MDC, to find that this trailer

6    was level if it wasn't, because if they found it wasn't, somebody

7    would have to come out and level it and get paid for it.  That

8    wasn't Shaw.  That was someone else.  Every single one of these

9    monthly reports, from the first one to the last one, indicate the

10   trailer was level, and there is no testimony that the trailer

11   wasn't level.

12        Now, you'll recall, Mr. Moore was the plaintiff's expert.

13   Moore claimed the door was bent during installation.  You

14   remember the picture they showed?  There you go.  And it has the

15   -- and I'm talking about the one on the left.  And he was asked,

16   oh, it looks -- the door is bent.  It's closed.

17        And then Mr. Kurtz showed him this picture that shows the

18   door handle, and it shows the flag, and it shows the mark.  And

19   when you look back at the door, you can't see any of those, so

20   clearly the door was open.  And so the story changed.

21        Moore claimed there were no pads used, but, in fact, when we

22   showed -- Mr. Kurtz showed him pictures of the bottom of the

23   piers, you could see a pad.  Now, I'll grant you it wasn't the

24   most clear thing, but you can see an ABS pad on the bottom of the

25   pier.  Dr. Osteraas also showed how the pier -- this is where he

1   showed how the pier alignment helped it.

2       And there was another claim by the doctor that that left

3   corner in the front drooped.  And I submit to you that

4   Dr. Osteraas, first of all, denied that it drooped; and, then,

5   secondly, Dr. Osteraas said the way the pier was placed was a

6   better -- more structurally sound in any event.

7       I need to move along so if I get too fast I'm sorry because,

8   as we all know, the Judge likes the time to go fast.

9       Let's talk a bit about what Mr. Wright says.  Mr. Wright

10  said the trailer shifted out of level.  Who said the trailer was

11  level?  Who contradicted Mr. Wright?  FEMA; Shaw; C. Martin, that

12  was the next maintenance contractor; AME, the next maintenance

13  contractor; Crown Roofing; Tyshon Marsh; Nicole Dison.

14  Mr. Wright himself said nothing rolled around on the floors of

15  the trailer.  And Bobbie Wright.

16      Let's talk about some of the issues about the leak over the

17  door.  Mr. Wright said he saw the leak over the door in late '06

18  or early '07, way after we were there.  Never called maintenance.

19  If you had a leak where you could see the sky coming through your

20  door when it was closed, and you were going to call about an air

21  conditioner or call about an electrical problem, why wouldn't you

22  call about the leak over the door?  And as Dr. Osteraas said, if,

23  in fact, the problem was the level, that could have been easily

24  fixed by knocking on the shims.

25      Mr. Gieger went through the odors, but very quickly.  Who

1    did not detect odors?  Bobbie Wright, Michelle Wright, Tyshon

2    Marsh, Nicole Dison, Lucretia Johnson or Vanessa Johnson.  And

3    not just the new smell, but the dead animal smell.  Somebody

4    would have smelled that if it would have been there.

5         The trailer was installed correctly.  It was actually

6    inspected over a dozen times by different people.  Was Shaw

7    negligent in installing the trailer?  No.

8         There was no damage before it got to Melville.

9         I think Mr. Gieger talked very, very well about the medical

10   causation, but, real quickly, what I want to talk to you about is

11   the issue as to whether Shaw was negligent or caused Mr. Wright

12   any problems.

13        These were the alleged issues he had as a result of the

14   trailer.  Mr. Gieger showed you he had at least the first two

15   before he ever got in the trailer.  But do you think that the

16   fact that there might not have been -- that's their argument --

17   an ABS pad under the pier caused all these things?  Of course

18   not.  Do you think that the fact the pier was back where

19   Dr. Osteraas said that it gave more structure to the trailer

20   caused any of these things?  Of course not.  And because of this,

21   when you're asked whether Shaw caused his injuries, I'm going to

22   submit to you the answer was no.

23        Briefly, the owner's manual.  You heard Mr. Gieger.  The

24   owner's manual was in the white package.  There is no check mark

25   about an owner's manual because FEMA is the one who had the

 1   contract with Shaw and told Shaw what to do.  Shaw's policy was,

 2   leave it all there, and leave it in the trailer if it's there.

 3        Now, the real question is Mr. Wright said, "I got the

 4   package," and initially he said he didn't know what happened to

 5   it, but you'll recall when I had him on cross-examination, he

 6   agreed he may have thrown it away.  He never looked at it.  The

 7   question -- and I submit to you he had one, but the question is,

 8   would it have made any difference anyway?

 9        Now, let's talk about warnings for a second.  You remember

10   Mr. Compeau testifying.  Mr. Compeau had no knowledge of

11   formaldehyde in the trailer.  FEMA didn't require that Shaw do

12   any work or do anything about formaldehyde.  Keep in mind, Shaw

13   didn't decide to use travel trailers, didn't pick out this

14   trailer, didn't decide to put this travel trailer on

15   Lyndon Wright's property, didn't design, build it or put any

16   formaldehyde in the trailer.  All Shaw did was haul it out and

17   install it on piers and maintain it until June 1st, 2006.

18        Now, Mr. D'Amico tells you Shaw aired out the trailers and

19   therefore somehow they knew something.  Not at all.  If you get

20   smoke in your house in the kitchen, and unfortunately I do that

21   more often than not when I'm trying to cook something, I open the

22   doors, I open the windows, I turn on the exhaust fan and I turn

23   on the air conditioner.  It's not that I think the smoke is

24   dangerous, it's that I don't want my wife to think I burned

25   something when she was gone.  Letting the smell out doesn't mean

1  it's dangerous.

2      And you heard, in fact, when FEMA, with all this alphabet

3  group of agencies it has to do all of this environmental testing,

4  when they finished, what did they say?  The trailers are safe as

5  long as you ventilate them.  What did Mr. Wright testify to?  The

6  first day when the Shaw fellow gave him the keys, the Shaw

7  subcontractor, he told him, if the smell bothers you, ventilate

8  the trailer.

9      Mr. D'Amico is really, really proud of these e-mails.  And

10  he keeps talking about Shaw was late.  The fact is if you see the

11  e-mails, that one is dated March 20th, and what they're asking

12  Shaw about is airing out the trailers.  That's why Shaw responded

13  that way.

14      Now, that's the FEMA e-mail.  What's the date of the Shaw

15  e-mail?  The next day.  And the other one goes out at 9:14 a.m.,

16  and this one is about 10:41 a.m.  And if I'm counting right,

17  that's just a little bit over 24 hours.  That's no delay, and

18  nothing is late.

19      And Shaw wasn't the expert in formaldehyde.  FEMA and all of

20  that alphabet group of federal agencies are the experts in

21  formaldehyde.  He was warned about formaldehyde.  He got two

22  warnings, one of them they didn't keep the record of, the other

23  one did.

24      Tyshon Marsh saw the warning in his trailer.  She testified

25  to it.  And you saw it, too, because it was taped to the wall.

1   Interestingly, when you saw those things, that exit, the yellow

2   one that said when he had to leave was taped by duct tape.  What

3   were the others taped by?  Duct tape.  He knew.

4       Now, would it make any difference anyway?  Remember this

5   warning?  This is the one that makes the difference to me.  This

6   warning wasn't enough to make him move out.  Mr. Wright claims he

7   wasn't worried about cancer, you remember, because he was in

8   Louisiana.  And this one said, the State of California.  This one

9   didn't make him move out, but he says if he knew about

10  formaldehyde, he would be out in a flash.  That doesn't pass the

11  smell test of believability.

12      A lot of people are afraid of cancer, but nothing about his

13  fear of cancer came from anything Shaw did.  FEMA's mission was

14  to get people in those trailers.  Forest River's mission was to

15  maker trailers as fast as they could to help people get in them.

16  Shaw's mission was to haul them and install them so they were

17  available for people to move into as quick as they could.

18      Now, what would we have warned him about at Shaw?  Can you

19  image what would have happened if Shaw started issuing warnings

20  to people in all of these trailers before FEMA completed their

21  work about what the actual warning should have been?  It would

22  have been unrest and maybe even panic.  It didn't make any sense.

23  It was FEMA's responsibility, not Shaw's.  Further, you heard all

24  these doctors and experts and toxicologists, they can't even

25  agree what the right thing is.

1        Now, the Judge is going to instruct you about the government

2  contractor defense.  Shaw was a government contractor.  If we

3  follow reasonably precise specifications -- and I submit to you

4  you saw the evidence about that, and that our work conformed, it

5  was accepted over 12 times, then -- and that we didn't have any

6  duty to warn FEMA about something FEMA didn't know about, clearly

7  they knew about formaldehyde because that first e-mail came from

8  them, then we get the government contractor defense and then you

9  find there is no negligence.

10        Was Shaw negligent in our job, doing our job?  No.  Not

11  Mr. Compeau, not the people that worked for him, and not the

12  contractors.

13        Now --

14            THE COURT:  One minute.

15            MR. CHEATWOOD:  Thank you, Judge.

16        I appreciate your attention, but I want to wrap up with a

17  couple of thoughts.  After hearing the evidence it's your duty to

18  decide the case upon the evidence.  You heard about the pride of

19  everybody involved in this process and helping get people back to

20  their homes in New Orleans.  It's frankly offensive to suggest

21  that Shaw didn't care about the people in those homes.  It wasn't

22  their expertise or responsibility.

23        It's been suggested to you that you put 50 percent

24  responsibility on Shaw.  I'm going to suggest to you that number

25  is zero.  Shaw didn't do anything.  Shaw's people did a good job.

1     When you retire to deliberate, you're going to be asked

2  those two questions.  Was Shaw negligent?  I submit that that's

3  no.  Did Shaw do anything to injure Mr. Wright?  I submit to you

4  that's no.

5     I know you're going to do the right thing as you see it, and

6  that's what you're supposed to do.  Thank you for your time and

7  your attention.

8          THE COURT:  All right.  Thank you.

9          MR. D'AMICO:  May I have a minute to set up, or do you

10  want to take a break?

11          THE COURT:  No, let's go ahead and set up.

12     If you need to stand at your seat while Mr. D'Amico is doing

13  that, that's fine, but we'll go ahead and hear his rebuttal.

14     And you have about -- a little over 13 minutes, 13 minutes

15  and some change.  I will give you a one-minute warning, and then

16  we'll stop when we reach that point.  And then we'll take a

17  break, a recess break.

18                    CLOSING ARGUMENTS

19  BY MR. D'AMICO:

20          Oftentimes when I'm in a trial like this I wonder

21  if I'm trying the same case as the defendants.  Shaw, you just

22  heard, is claiming a government contractor defense.  Well, I

23  submit to you they're only able to get that government contractor

24  defense if they followed the specifications.

25     If you look at the photographs, they want you to believe

1    them and not your lying eyes.  Do you see a 24-by-24

2    three-quarter-inch plywood base underneath there?  It's not

3    there.  But they want you to believe it is.  And when they talk

4    about ABS plastic, ABS plastic was barely larger than the size of

5    the columns themselves.

6         Now, Shaw is liable 50 percent because they had the best

7    opportunity to warn Lyndon of what he was truly being exposed to.

8    I asked Dr. Compeau, "Did you have a procedure to ensure that the

9    occupants got the owner's manuals?"  He said no.  He said, "It

10   really wasn't necessary.  In my estimation, it wasn't practically

11   necessary."  That's the real answer, and that's what you need to

12   take back and deliberate on.

13        We heard from Edith Young at RCG, and she said not in the

14   entire time that they had been installing travel trailers had

15   they ever releveled one.  Did you hear any evidence from Shaw in

16   the 20,000 travel trailers that they installed that they ever

17   releveled one?  Do you know why you didn't?  Because it was on

18   their nickel.  They didn't get paid to relevel it, so they didn't

19   do it.

20        You know, it's important to render the right verdict but for

21   the right reasons.  Does Lyndon Wright seem like somebody who

22   wants something for nothing?  A guy who works two jobs, who

23   supports his girlfriend.  The worst thing they can say about him

24   is he claimed his girlfriend and her two children as a dependent.

25   Well, if they're living with him, and he's supporting them, and

1    he gives that information to his accountant, are you going to

2    hold that against Lyndon?

3         You need to use your common sense in determining whether or

4    not we have tilted the scales in our favor.  We don't want you to

5    walk away from it.  We want you to go with your gut.  Ask

6    yourself did Lyndon Wright have asthma before he moved into the

7    trailer?  They want you to believe it's some kind of occult

8    asthma, this mysterious asthma that nobody can diagnose except

9    their paid doctor who says, it was there but nobody knew about

10   it.

11        Did he have chronic rhinosinusitis?  His doctor said he had

12   seasonal allergies.  And when he went to the doctor and told him

13   about the problems, he didn't tell him about formaldehyde because

14   he didn't know about formaldehyde because Shaw didn't warn him

15   and because Forest River didn't warn him either.

16        Now, they want to talk about this packet.  Well, I asked

17   Doug Gaeddert about the packet.  He had no way of verifying what

18   NECS did with that packet that went to their drivers.  There is

19   no proof that the owner's manual was in that unit.  In fact, when

20   it went to Melville at the FEMA storage yard, it wasn't found.

21   And there is an affidavit in evidence to show what was found, and

22   the owner's manual certainly wasn't one of them.

23        Now, why would Lyndon Wright lie about not receiving this

24   FEMA warning that we told you about?  When he told you he found

25   the eviction notice taped to the outside of his trailer, what did

1  he do?  He peeled it off the outside and stuck it on the wall so

2  he could have the date so he knew when he had to move out.

3     If he had gotten the notice in the summer of '08, the final

4  notice, after the CDC study came out wherein the CDC said, get

5  everybody out of here; these levels are this high three years

6  after they were manufactured.  They want to blame everything on

7  FEMA and say FEMA was the expert.  FEMA didn't know how to make a

8  trailer, and FEMA relied on Forest River and the other

9  manufacturers to manufacture the trailers, for their mission

10 statement, to provide safe, sanitary housing.  That's the facts

11 and those are the evidence that you heard.

12     Now, you've heard a lot of medical evidence, but the simple

13 question is was Lyndon hurt after he lived in this trailer?  Is

14 there any doctor who says he had epistaxis or spitting up blood

15 before he lived in the trailer?  Did anyone diagnose him with

16 asthma before he lived in the trailer?

17     I ask you, please, to look at Dr. Worley's notes because he

18 does say he treated him, it got better, and a few weeks later --

19 but Lyndon said two weeks later the bleeding was back.  It never

20 went away.  He lived with it for years.  A simple warning would

21 have let him know what he was being exposed to, but, no, he

22 didn't have the -- no one had the decency to do that.

23     Now, Mr. Gieger would have you believe that it's okay for

24 Forest River to build one of their standard, base model units and

25 have people live in it for two years or longer when they tell you

1    in the owner's manual, this is an RV, it's not intended to be

2    lived in as a permanent dwelling, and to do so voids the

3    warranty.  There are reasons for that.

4         Now, the expert, Mr. Polk, that you heard him talk about, we

5    played that video for you, that expert hired by FEMA, he told you

6    when he was in the RV industry, what did he instruct his

7    employees to do?  He told his salespeople, open the door, make it

8    more friendly so that the customers will want to buy one of these

9    things.

10        It's indisputable the travel trailers were manufactured with

11   vinyl that emitted formaldehyde, carpets that emitted

12   formaldehyde, and wood products that emitted formaldehyde.  And

13   we have proof.  The CDC took measurements, and we took

14   measurements.  They took measurements four years later when it

15   was sitting out in Melville, almost four years after it was

16   manufactured.  And what were the levels?  130 parts per billion,

17   four years later.

18        Now, they want you to believe if you open the doors and

19   windows, that just goes away.  But almost four years later, it

20   was still off-gassing formaldehyde.  And that's what Mr. Polk

21   said.  He said, I didn't have a problem with a used unit coming

22   back three or four years old with the odor, but all of the new

23   units had the odor.

24        Now, they want you to believe that they were opening these

25   units up because they had smoke in them.  A unit that was

1   manufactured the week before and delivered on the 20th and

2   shipped out on the 21st, who was smoking in that new unit?  Is

3   that why they had it on the checklist?  Don't throw away your

4   common sense.  That doesn't make any sense.  They knew there was

5   a problem, and they failed to take action.

6        FEMA, on the other hand, did the responsible thing and did

7   the testing.  And when the CDC results came out, what did they

8   do?  In the summer of 2008, they evacuated everyone.  They said,

9   get out of here.  It's a dangerous situation.

10       And you heard the FEMA representatives say they are not

11  going to use another one of these travel trailers unless they use

12  their FEMA spec because now they know about the problem; but, who

13  was in the position to build the correct unit?  Who was in the

14  position to do, as Garrett said, build us a mobile home but build

15  it the size of a travel trailer, so we can bring it to

16  New Orleans and rebuild the city?  They didn't have the space for

17  mobile homes in New Orleans, and they had a flood zone so they

18  couldn't put mobile homes in New Orleans.  Travel trailers are

19  regulated by the Department of Transportation and Development, so

20  the HUD regulations didn't apply.

21       If this unit -- if you determine this unit was unreasonably

22  dangerous, and in Louisiana we have a reasonable man standard,

23  that's what that means.  It doesn't mean greater than dangerous,

24  it means you as reasonable people, as reasonable men and ladies

25  of the jury, decide that this unit posed a danger that is

1   unreasonably dangerous.  That's what it means.

2       Forest River was very proud to tell you that they built

3   their trailer just like they built every other trailer, but did

4   they tell you they sent anybody down to check on how they were

5   performing?  Did they tell you that they called anybody to see

6   how they were being installed?  Did they -- what did they tell

7   you?  We didn't even know they were going to put them up on

8   pillars.  They are not intended to be put up on piers.  It's a

9   travel trailer.  It's meant to hold the weight at the wheels.

10      Now, why did we go through this exercise with Shaw and try

11  to explain to you why they are not a government contractor

12  defense eligible?  Because they didn't follow the specs and

13  because they were charged with the responsibility of aiding FEMA

14  and warning FEMA when problems came up and how to deal with the

15  problems.  The e-mails proved the point.

16      It's hard to get this in in 13 minutes, but I'll have to

17  cover the high points if I can.

18      The defendants want you to believe that Lyndon is looking

19  for something for nothing.  The defendants want you to believe

20  that he had this epistaxis and he had this tumor before he moved

21  into the trailer.  The defendants want you to believe that Lyndon

22  wasn't made ill, but all of the evidence shows he was.

23      Sure, Lyndon told his mother he thought the trailer was

24  making him sick, but when she called and didn't get a response

25  and he didn't get an answer, he believed there was nothing to it.

1   They couldn't let me stay in this trailer if, in fact, I'm being
2   exposed to something that's going to hurt me.  But who told him?
3   It wasn't until FEMA did the testing years later that the
4   information came out about the formaldehyde problems.  The
5   manufacturer didn't warn and the manufacturer didn't build the
6   product to the specifications FEMA wanted.
7        The nasal smear, you heard something about that.
8   Dr. Spector said that a smear of the nose is not the same thing
9   as a biopsy.  A biopsy would show the kind of permanent changes
10  that they are talking about.  He said he would expect a year
11  later for the nasal epithelium to heal on the outside.
12       Dr. Spector didn't say that the tumor wasn't caused from
13  formaldehyde exposure.  He said, I'm not an expert in toxicology,
14  and I will defer to those who are more skilled than me in this
15  field.  And who did he defer to?  Dr. Lawrence Miller, a
16  Harvard-educated medical doctor, and Dr. Patricia Williams, one
17  of the few board certified toxicologists who came to testify.
18       And she told you that in a hundred percent of the cases
19  where there is epistaxis -- where there are nasal cancers,
20  rather, there is epistaxis, in that study she told you about.
21  Dr. Spector did say, however, when he did his research, he found
22  some products that were related to the neuromas like Lyndon had,
23  but he said, "I'm not the guy to make the diagnosis.  This is
24  beyond my capabilities," so he deferred.
25       The 2008 CAT scan, if we'd had time we would have gone into

1   that again, but time didn't permit, but Dr. Spector and

2   Dr. Miller both covered it.  Dr. Miller said, if you're doing a

3   CAT scan of the brain, if somebody comes into an emergency room

4   and has right-sided weakness, you're not looking in their nose.

5   You're doing a CAT scan of the brain to see if they are having a

6   stroke.  It's a different protocol.  You don't even visualize the

7   sinuses.

8         The 2008 scan is not relevant to the issue of how Lyndon's

9   sinuses were.  We know how his sinuses are because the 2009 scan

10  shows all five of the sinuses have permanent changes.  What, did

11  that just mysteriously happen?

12        Lyndon had epistaxis in '06.  Nicole Dison said she saw it.

13  He had it in '07.  Dr. Worley documented it in his notes.  He had

14  it in '09 when he saw Dr. Spector.  It didn't just go away.  When

15  it was treated, it would come and go, but it never stopped.

16             THE COURT:  You have about a minute.

17             MR. D'AMICO:  Please look at the Worley Exhibit 541 for

18  proof.  Don't take my word for it or these other lawyers.  Look

19  at the photographs and believe what you're seeing is true.  They

20  can say that there is the proper specifications that those blocks

21  are properly spaced, but I ask you to look at the photographs and

22  see.

23        Now, why would Lyndon lie about the door not closing?  It

24  makes no sense.  Anybody who went in the trailer could see the

25  sunlight coming through.

1        I ask you, is Lyndon the kind of guy that you believe is a

2    liar?  You, the jury, are going to decide these facts.  You're

3    going to decide whether or not he had asthma before he moved in

4    this trailer.  You're going to decide whether or not he had

5    rhinosinusitis before he moved into this trailer, and you're

6    going to decide whether or not he's got a chronic problem now.

7    You are the judges, you need to do that work and realize that the

8    evidence we put forward is the best evidence we had.

9            THE COURT:  Time, Mr. D'Amico.

10            MR. D'AMICO:  Thank you, Your Honor.

11            THE COURT:  We're going to go ahead and take a short

12    recess.  If you could be ready at 11 o'clock to come back in.

13    The next part of the case will be the jury instructions and

14    charges which I'm going to give you at 11 o'clock.  And then

15    you'll be allowed to deliberate.

16            THE COURT SECURITY OFFICER:  All rise.

17            (WHEREUPON, at this point in the proceedings, the jury

18    panel leaves the courtroom.)

19            THE COURT:  Counsel, if you all would be seated.  All of

20    you have had a chance to review the jury instructions and verdict

21    form, I take it?  You have done that?  You've had a few days now

22    to look those over.  Are there any typos or anything else other

23    than things you're going to object to after we charge the jury?

24    Anything else that we need to talk about on the jury charge?

25        Everybody is familiar with everything in there?  You should

 1   be by this time because we have been around on it several times

 2   over the last week.

 3        Let's see.  Is there anything else we need to put on the

 4   record at this point?

 5            MR. GIEGER:  We're going to reserve our objections until

 6   after the jury goes out.

 7            THE COURT:  After I charge the jury and send them in to

 8   deliberate, then we will make a record of any objections to

 9   charges that are included that you don't think should be included

10   and charges that have been excluded that you think should have

11   been included.

12        I'm going to read to the jury the jury instructions.  I'll

13   ask you all to follow along because invariably there may be a

14   word or a typo or something like that, and I'll cover that with

15   you after we send them out.  But we'll go through them with the

16   jury, so please follow along.  Likewise on the verdict form.

17        All right.  11 o'clock.

18            THE DEPUTY CLERK:  All rise.

19            (WHEREUPON, at this point in the proceedings, a brief

20   recess was taken.)

21            THE DEPUTY CLERK:  All rise.  Would you bring the jury

22   in.

23            (WHEREUPON, at this point in the proceedings, the jury

24   panel enters the courtroom.)

25                            JURY INSTRUCTIONS

1          THE COURT:  You may be seated.  As I told you before the
2    break, I am going to give you what we call the "jury
3    instructions" or the "jury charges."  You will be provided in
4    your deliberations with all exhibits that have been used in this
5    trial for you to refer to, should you choose to look at them.
6    You will also be given a copy of these instructions, of what I'm
7    going to read to you here.

8          Rather than me pass this out to you now, I would prefer it
9    if you would listen to it rather than follow word for word on the
10   page.  But if you would like to refer to any instructions that I
11   give to you, you will have the chance to review them in print as
12   part of your deliberations should you choose to do that.

13         Listen very carefully.  I'll also ask the marshal to please
14   not allow entry during the course of the jury charges.

15         Members of the Jury, you have heard the evidence in this
16   case.  I will now instruct you on the law that you must apply.
17   In any jury trial there is, in effect, two judges.  I am one of
18   the judges; the other is you, the jury.  It is my duty to preside
19   over the trial and to determine what testimony and other evidence
20   is admissible under the law for your consideration.  It is also
21   my duty at the end of the trial to instruct you on the law
22   applicable to the case.  It is your duty to follow the law as I
23   shall state it to you.

24         You must apply that law to the facts as you find them from
25   the evidence in this case.  You are not to single out one

1    instruction alone as stating the law, but must consider the

2    instructions as a whole.

3        The stipulations of fact I read to you at the outset of the

4    trial, I'm going to review them with you, again.  The parties

5    have agreed or stipulated to the following:  1, plaintiff,

6    Lyndon Wright, is a resident of the Parish of Orleans and the

7    State of Louisiana.

8        2, FEMA has provided thousands of travel trailers to

9    displaced residents following natural disasters in the

10   United States since 1992, including displaced residents from the

11   Gulf Coast region.

12       3, FEMA provided approximately 143,000 emergency housing

13   units to families across the Gulf Coast in response to Hurricanes

14   Katrina and Rita.

15       4, Forest River manufactured and provided approximately

16   5,000 travel trailers to FEMA through North American Catastrophe

17   Services, sometimes referred to as "NACS," following

18   Hurricane Katrina.

19       5, the travel trailer at issue in this litigation was an SMT

20   32 BHLE model manufactured by Forest River in Rialto, California,

21   on or about November 14, 2005, for use by FEMA as emergency

22   housing for displaced residents of the Hurricanes Katrina and/or

23   Rita.

24       6, the Forest River travel trailer at question in this

25   litigation was manufactured using only low formaldehyde-emitting,

1   or LFE, products.

2       7, the travel trailer ultimately provided to Lyndon Wright

3   was ordered from Forest River by NACS on or about September 8,

4   2005, and was shipped on or about November 16, 2005, pursuant to

5   a master sales agreement between Forest River and NACS.

6       8, NACS sold this travel trailer to FEMA for use as

7   emergency housing.

8       9, this trailer arrived at the FEMA staging yard in

9   Baton Rouge, Louisiana, on or about November 19, 2005.

10      10, FEMA provided this trailer bearing FEMA identification

11  number, or VIN, 4X4TSMHSC008992 to plaintiff's mother,

12  Ms. Bobbie Wright.

13      11, the travel trailer was 29 feet, 8 inches long without

14  the hitch and 8 feet in width.

15      12, the parties have conducted formaldehyde air sampling

16  inside this unit.  The initial formaldehyde sampling taken via

17  passive dosimetry on October 1, 2008, by W. D. Scott Group was

18  taken with an average interior temperature of approximately

19  85.3 degrees Farenheit, an average relative humidity of 32.9

20  percent and formaldehyde concentration of .048 parts per million,

21  ppm, or 48 parts per billion, ppb.

22      13, when applying the Berge equation to the October 2008

23  sampling taken by the W. D. Scott Group, correcting the

24  temperature calculation to 70 degrees Farenheit, the sampling

25  corrects from 48 ppb to 19 ppb.

14, a one-hour active formaldehyde sample was taken on August 8, 2009, by W. D. Scott Group of the same unit, and, pursuant to plaintiff's testing protocol called for the unit to be closed and sealed for 72 hours prior to the sample collection, and found an indoor formaldehyde concentration of .095 ppm, or 95 ppb, with an average interior temperature of 81.9 degrees Fahrenheit and an average interior relative humidity of 86.6 percent.

15, a 24-hour passive dosimetry was taken by W. D. Scott Group of the same unit and pursuant to the same plaintiff testing protocol on August 8th and 9th, 2009, which found an indoor formaldehyde concentration of .130 ppm or 130 ppb, at an average interior temperature of 84.9 degrees Fahrenheit and an average interior relative humidity of 77.1 percent.

16, when applying the Berge equation to the August 8th and 9th, 2009, sampling taken by the W. D. Scott Group, correcting the temperature calculation to 70 degrees Farenheit, the August 8th, 2009, one-hour active sampling are corrected from 95 ppb to 46 ppb and the 24-hour passive dosimetry sampling corrects from 130 ppb to 53 ppb.

17, a one-hour active formaldehyde sample was also taken by Workplace Hygiene on August 8, 2009, contemporaneously with the sample taken by the W. D. Scott Group, and .097 ppm or 97 ppb under the same environmental conditions.

18, pursuant to the defendants' testing protocol, the

1 trailer was ventilated for 29.5 hours and then air conditioned

2 with the HVAC system set at 72 degrees Fahrenheit for 48 hours

3 prior to the sampling.

4     19, Workplace Hygiene collected a one-hour active

5 formaldehyde sample on August 13, 2009, pursuant to the

6 defendants' testing protocol and detected an indoor formaldehyde

7 concentration of .035 ppm or 35 ppb.

8     20, Workplace Hygiene collected a 24-hour passive dosimetry

9 sample on August 13th and 14, 2009, of the same unit pursuant to

10 the defendants' testing protocol and detected indoor formaldehyde

11 concentrations of .044 ppm, or 44 ppb.

12     21, certain component parts used by Forest River in the

13 manufacture of the travel trailer contained urea formaldehyde

14 and/or urea formaldehyde resins.

15     22, FEMA tasked Shaw with delivering, installing and making

16 the trailer FEMA assigned to Bobbie Wright ready for occupancy.

17     23, on September 30, 2005, FEMA and Shaw executed an

18 individual assistance/technical assistance contract, or sometimes

19 referred to as IA/TAC, under which Shaw would provide certain

20 services for disaster relief anywhere in the United States

21 pursuant to an individual task order issued by FEMA.

22     24, in response to Hurricane Katrina, FEMA issued task order

23 15 to Shaw to provide, among other things, hauling, installation

24 and maintenance services to further FEMA's mission of providing

25 emergency housing solution for citizens displaced by the

1  hurricane.

2      25, Shaw's contract with FEMA requires specifications for

3  travel trailer installation including requirements for delivery,

4  blocking and leveling, anchoring and straps, utilities, hookups,

5  including sewer, water and electrical, steps, winterization,

6  handicap ramps or platform steps and numerous other minor tasks

7  to make the trailers ready for occupancy.

8      26, FEMA directed Shaw to install the travel trailers on

9  concrete piers constructed in a precise fashion as set forth in

10  Exhibit 7, entitled Travel Trailer Installation to the

11  Performance Work Statement of the IA/TAC.

12      27, these detailed specifications were drafted by FEMA and

13  provided to Shaw by FEMA.  FEMA also provided Shaw a pier diagram

14  prepared by the U.S. Army Corps of Engineers.

15      28, the Wright trailer was picked up at the staging yard in

16  Baton Rouge and taken to Shaw's staging yard in Harvey,

17  Louisiana.  From there it was delivered and installed at

18  2315 Seminole Lane, New Orleans, Louisiana, on or about

19  November 21, 2005, by RCG Enterprises, Inc., one of Shaw's

20  subcontractors.

21      29, RCG Enterprises, Incorporated, held a license to install

22  mobile homes in Louisiana.

23      30, due to the difficulties that Entergy experienced in

24  restoring electrical power to the area where the trailer was

25  located, the trailer could not be powered up and made ready for

1    occupancy until February 11, 2006.

2        31, Shaw inspected every travel trailer installed by its

3    subcontractors to ensure that FEMA requirements were met.

4        32, Shaw separately inspected or had one of its

5    subcontractors inspect every trailer installation during the

6    ready for occupancy, or RFO, process and, again, during the

7    lease-in process, this time with the occupant present.

8        33, on February 12, 2006, Shaw inspected the trailer and

9    confirmed that it was properly blocked on concrete piers,

10   anchored with the required straps, connected to all utilities,

11   that is, sewer, water and electricity, and outfitted with propane

12   tanks, battery and steps.

13       34, on February 13, 2006, plaintiff conducted a walk-through

14   inspection of the trailer with one of Shaw's subcontractors.

15   Plaintiff signed off on the trailer and was leased-in on

16   February 13, 2006.

17       35, after lease-in, plaintiff remained on the cruise ship

18   where he had been living until sometime in March 2006, at which

19   point he moved to the trailer.

20       36, Lyndon Wright resided in this Forest River unit from

21   approximately March 2006 to approximately July 2008.

22       37, after plaintiff moved into the trailer, Shaw maintained

23   it for less than three months until June 1, 2006, when C. Martin

24   Company assumed maintenance responsibility.

25       38, during the period of Shaw's maintenance, Shaw conducted

monthly inspections of the trailer in April 2006 and May of 2006. No problems with the trailer were noted during those inspections.

39, at the time Shaw turned over maintenance responsibilities, a representative of C. Martin Company signed a preventative maintenance form indicating that no maintenance issue existed with regard to the trailer as of June 1, 2006.

40, plaintiff first noticed a leak in the trailer in 2007.

41, plaintiff continued to live in the trailer for two more years after Shaw's maintenance responsibility for the trailer ended.

42, Shaw conducted no formaldehyde testing of any travel trailers during its contract with FEMA for Hurricanes Katrina and Rita.

43, on March 20th and 21st, 2006, Shaw was contacted by FEMA regarding formaldehyde and the process of airing out emergency housing units, to which Shaw responded on March 21, 2006, to FEMA by providing a standard operating procedure which indicated that the unit doors were left open to ventilate in the Shaw staging yards.

44, sometime after plaintiff moved out of the trailer in July 2008, the trailer was deactivated and hauled by a third party, not Shaw, to Melville, Louisiana, where it was hauled off road and sat in a field until August 2009, when it was inspected by the plaintiff's experts in this case.

45, FEMA did not maintain the trailer at all once it was

1   located in the FEMA storage yard in Melville, Louisiana.

2       46, at all times the travel trailer was located at

3   plaintiff's residence at 2315 Seminole Lane, New Orleans,

4   Louisiana, a vent cap was present on the roof of the travel

5   trailer.

6       47, at all times the travel trailer bearing -- was located

7   at the FEMA storage site in Melville, Louisiana, the roof vent

8   cap over the bathroom area was missing.

9       48, any and all moisture damage observed in the bathroom

10  area of the Wright unit during the August and September 2009

11  testing was the result of bulk water intrusion caused by the

12  missing vent cap.

13      49, the weather data collected by Dr. Lee Branscome, Ph.D.,

14  a certified meteorologist attached to his report dated July 9,

15  2009, is representative of the weather conditions at 2315

16  Seminole Lane in New Orleans, Louisiana, and Melville, Louisiana,

17  at all time periods relevant to the travel trailer's actual

18  location.

19      If there is -- those are the stipulations.

20      If there is publicity or other discussion about this trial

21  outside of this courtroom, you must ignore it.  You must decide

22  this case only from the evidence presented at this trial.

23      A demonstrative exhibit is an illustration.  It is a party's

24  summary charge, picture, video, or videographic or model used to

25  describe something involved in this trial.  If your recollection

1   of the evidence differs from the demonstrative exhibit, rely on

2   your recollection.

3       During the course of the trial, you have heard objections to

4   evidence.  Sometimes these were argued outside of the hearing of

5   the jury.  It is the duty of the attorney on each side of the

6   case to object when the other side offers testimony or other

7   evidence the attorney believes is not properly admissible.  You

8   should not draw any inference against or show any prejudice

9   against a lawyer or his client because of the making of an

10  objection.

11      Upon allowing testimony or other evidence to be introduced

12  over the objection of an attorney, the Court does not, unless

13  expressly stated, indicate any opinion as to the weight or effect

14  of such evidence.  As stated before, you are the sole judges of

15  the credibility of all witnesses and the weight and effect of all

16  evidence.

17      When the Court has sustained an objection to a question

18  addressed to a witness, the jury must disregard the question

19  entirely and may draw no inference from the wording of it or

20  speculate as to what the witness would have said if permitted to

21  answer the question.

22      During the course of the trial, I may have occasionally

23  asked a question of a witness or admonished an attorney or

24  witness.  Do not assume that I hold any opinion on the matters to

25  which my question or questions may have related.  If you could

1     possibly construe any remarks I may have made during the course

2     of this trial as a comment on evidence, then I instruct you to

3     disregard any such comment, for you, as jurors, are the sole

4     judges of the facts in this case.

5         Also, at times during the trial, I may have directed that

6     certain testimony or other evidence be stricken from the record

7     and have instructed you to disregard such evidence.  You will not

8     consider testimony that has been stricken and as to which you

9     have been so instructed in reaching your decision.  Your verdict

10     must be based solely on legally admissible evidence and

11     testimony.

12         Any notes that you have taken during this trial are only

13     aids to your memory.  If your memory differs from your notes, you

14     should rely on your memory and not on the notes.  The notes are

15     not evidence.  If you have not taken notes, you should rely on

16     your independent recollection of the evidence and should not be

17     unduly influenced by the notes of other jurors.  Notes are not

18     entitled to any greater weight than the recollection or

19     impression of each juror about the testimony.

20         In determining the weight to give the testimony of a witness

21     you should ask yourself if there was evidence tending to prove

22     that the witness testified falsely about some important fact or

23     whether there was some evidence that at some other time the

24     witness said or did something or failed to say or do something

25     that was different from the testimony that he gave at trial.

1    When knowledge of a technical subject matter may be helpful

2 to a jury, a person who has special training or experience in

3 that technical field, he or she is called an expert witness, is

4 permitted to state his or her opinion on those technical matters;

5 however, you are not required to accept that opinion.  As with

6 any other witness, it is up to you to decide whether to rely upon

7 it.

8    Certain testimony has been presented to you through a

9 videotaped deposition or a deposition read to you here in the

10 courtroom.  A deposition is the sworn, recorded answers to

11 questions asked of a witness in advance of the trial.  Under some

12 circumstances if a witness cannot be present to testify from the

13 witness stand, that witness' testimony may be presented under

14 oath in the form of a deposition.  Sometime before this trial,

15 attorneys representing the parties in the case questioned this

16 witness under oath.  A court reporter was present and recorded

17 the testimony.  The questions and answers have been played or

18 read to you at trial.

19    This deposition testimony is entitled to the same

20 consideration and is to be judged by you as to credibility as if

21 the witness had been present and had testified from the witness

22 stand in court.

23    The testimony of a physician who examines and treats an

24 injured person is entitled to greater weight than that of

25 physicians who only examined the injured person once.

1      You must consider only the evidence in this case; however,

2   you may draw such reasonable inferences from the testimony and

3   exhibits as you feel are justified in the light of common

4   experience.  You may make deductions and reach conclusions that

5   reason and common sense lead you to make from the testimony and

6   evidence.

7      The testimony of a single witness may be sufficient to prove

8   any fact, even if a greater number of witnesses may have

9   testified to the contrary if, after considering all the other

10  evidence, you believe that single witness.

11     There are two types of evidence you may consider.  One is

12  direct evidence, such as testimony of an eyewitness.  The other

13  is indirect or circumstantial evidence, the proof of

14  circumstances that tend to prove or disprove the existence or

15  nonexistence of certain other facts.

16     The law makes no distinction between direct and

17  circumstantial evidence but simply requires that you find the

18  facts from a preponderance of all the evidence, both direct and

19  circumstantial.

20     Do not let bias, prejudice, or sympathy play any part in

21  your deliberations.  A corporation, the United States Government,

22  its officers, and all other persons are equal before the law and

23  must be treated as equals in a court of justice.

24     In this case, the plaintiff must prove every essential

25  element of his claims by a preponderance of the evidence.  This

1   is sometimes called the "burden of proof."  A preponderance of

2   the evidence means the greater weight and degree of credible

3   evidence before you.  In other words, a preponderance of the

4   evidence just means the amount of evidence that persuades you

5   that a claim or defense is more likely so than not so.

6        In determining whether any fact has been proved by a

7   preponderance of the evidence in the case, you may, unless

8   otherwise instructed, consider the testimony of all witnesses

9   regardless of who may have called them and all exhibits received

10  in evidence regardless of who may have produced them.

11       If the proof fails to establish any essential part of the

12  plaintiff's claims against each defendant by a preponderance of

13  the evidence, you should find for that defendant as to that

14  claim.

15       To be clear, plaintiff need prove his claims only by a

16  preponderance of the evidence.  Plaintiff need not produce every

17  possible witness, and he need not prove his case beyond a

18  reasonable doubt as is necessary in a criminal prosecution, but

19  speculation or mere possibility, even unsupported probability, is

20  not sufficient to support a judgment in his favor.  The mere fact

21  an incident happens or an injury occurs does not raise a

22  presumption that any party, person or entity was at fault.

23       All right.  With regard to the product liability claims

24  insofar as defendant Forest River is concerned, plaintiff

25  Lyndon Wright claims that Forest River is liable for his damages

1    as the manufacturer of the emergency housing unit, which we

2    sometimes have referred to as an "EHU" or a "travel trailer,"

3    that he occupied.  Plaintiff claims these damages under the

4    Louisiana Products Liability Act, which I will hereafter refer to

5    as the "LPLA."  Specifically, plaintiff is not suing

6    Shaw Environmental under the LPLA.

7         The LPLA provides the exclusive remedy against a

8    manufacturer for injuries or damages caused by an unreasonably

9    dangerous product.  There are three separate theories of

10   liability under the LPLA that are applicable to this case:  One,

11   liability based on unreasonably dangerous construction or

12   composition; two, liability based on unreasonably dangerous

13   design; and, three, liability based on inadequate warning,

14   rendering the product unreasonably dangerous.

15        With regard to the first, in this case, plaintiff claims

16   that the product manufactured by Forest River was unreasonably

17   dangerous in construction or composition.  In order to be

18   successful, plaintiff must prove by a preponderance of the

19   evidence that, one, the product in question deviated in a

20   material way from the manufacturer's specifications or

21   performance standards for the product, or from otherwise

22   identical products manufactured by Forest River.

23        Two, the injury which plaintiff suffered was proximately

24   caused by a characteristic of the product which made it

25   unreasonably dangerous and existed at the time the product left

1   Forest River's control.

2       Three, the injury which plaintiff suffered arose from a

3   reasonably anticipated use of the product by the plaintiff or

4   some other person.

5       And, four, there was actual damage to the person of the

6   plaintiff.  Actual damage to the person of the plaintiff may

7   include mental as well as physical injury.

8       Secondly, in this case, plaintiff claims that the product

9   manufactured by Forest River was unreasonably dangerous in its

10  design.  In order to be successful on this claim, plaintiff must

11  prove by a preponderance of the evidence that, first, there was

12  an alternative design for the product that was capable of

13  preventing the injuries, and the likelihood that the product's

14  design would cause the injuries, and the seriousness of that

15  injury outweighed the burden on the defendant of using that

16  alternative design and the adverse effect of using that

17  alternative design on the utility of the product.

18      Secondly, that the injury which plaintiff suffered was

19  proximately caused by a characteristic of the product which made

20  it unreasonably dangerous and existed at the time the product

21  left the manufacturer's control or resulted from a reasonably

22  anticipated alteration of the product later.

23      Third, that the injuries which plaintiff suffered arose from

24  a reasonably anticipated use of the product by the plaintiff or

25  some other person.

1        And, fourth, that there was actual damage to the person of

2    the plaintiff, and actual damage to the person of the plaintiff

3    may include mental as well as physical injury.

4        If you find that Forest River has used reasonable care to

5    provide an adequate warning to the users of the product, you must

6    consider the effect of that warning in deciding the likelihood

7    that the design of the product would cause plaintiff's injuries.

8        With regard to the third LPLA claim, in this case plaintiff

9    claims that the product manufactured by Forest River was

10   unreasonably dangerous because of an inadequate warning about its

11   potential risks.  In order to be successful, plaintiff must prove

12   each of these four elements by a preponderance of the evidence.

13       First, at the time the product left Forest River's control,

14   the product had a characteristic that might cause damage that

15   Forest River failed to use the reasonable care to provide an

16   adequate warning of that characteristic and its danger to users

17   of the product.

18       Secondly, that the injury which the plaintiff suffered was

19   proximately caused by a characteristic of the product which made

20   it unreasonably dangerous and existed at the time the product

21   left Forest River's control or resulted from a reasonably

22   anticipated alteration of the product later.

23       Third, the injury which plaintiff suffered arose from a

24   reasonably anticipated use of the product by the plaintiff or

25   some other person.

1    And, fourth, that there was actual damage to the person of

2  the plaintiff.  Actual damage to the person of the plaintiff may

3  include mental as well as physical injury.

4    Once a plaintiff proves that the lack of adequate warning

5  rendered the product unreasonably dangerous, there is a

6  presumption that had the manufacturer provided an adequate

7  warning, the user would have both read and heeded the warning.

8  This presumption may be rebutted by competent evidence.

9    A manufacturer who learns of a characteristic of a product

10  and its danger after it has left its control that may cause

11  injury or one who has learned or -- I'm sorry, or one who would

12  have learned about it had it acted in a reasonably prudent

13  fashion is liable for injury caused by its subsequent failure to

14  use reasonable care in order to provide adequate warning of such

15  characteristic and its danger to users of the product.

16    The LPLA provides specific definitions for certain terms

17  that are used in these instructions which I will explain to you

18  now.  When you use the term "reasonably anticipated use," I mean

19  use of a product that the manufacturer should reasonably expect

20  of an ordinary person in similar circumstances.

21    When I use the term "adequate warning," I mean a warning or

22  instruction that would lead a normal user of a product to

23  contemplate a danger in using the product and then either in

24  declining to use it or to use it in such a manner as to avoid the

25  injury for which the claim is made.

1    When I use the term "reasonably anticipated alteration of

2    the product at a later time," I mean a change in the product that

3    the manufacturer should reasonably expect to be made by an

4    ordinary person in similar circumstances or a change arising from

5    ordinary wear and tear.  I do not mean by that term, one, the

6    failure of a person, other than the manufacturer, reasonably to

7    pass on a warning about the product provided by the manufacturer

8    to that person rather than to the actual user; or, two, changes

9    to the product or its operation because it does not receive

10   reasonable care and maintenance.  These are not reasonably

11   anticipated actions for which the manufacturer may be held

12   responsible based on an inadequate warning.

13       There are certain circumstances, however, under which a

14   manufacturer does not have to provide an adequate warning as

15   described above.  A manufacturer does not have to provide such a

16   warning when, first, the danger of the product is not beyond that

17   which would be contemplated by the ordinary user with the

18   ordinary knowledge common to the community as to the product's

19   characteristics; or, two, the user already knows or reasonably

20   should be expected to know of the characteristic of the product

21   that may cause injury and the danger of that characteristic.

22       A manufacturer is not liable for the unreasonable danger of

23   a product due to inadequate warning if it proves that at the time

24   the product left its control, it did not know and, in light of

25   reasonably available scientific and technical knowledge then

existing, could not have known of the characteristic of the product or its danger that caused the injury.

A manufacturer cannot be expected to design products with component parts which will never wear out regardless of the nature of use or maintenance of the product.  A manufacturer is entitled to anticipate that a consumer purchasing its product will use reasonable care in maintaining it.

A manufacturer is not liable for the unreasonable danger of a product due to its design if it proves that at the time the product left its control, one, it did not know and, in light of the reasonably available scientific and technical knowledge then existing, could not have known of the design characteristic or its danger that caused the injury or of the alternative design identified by the plaintiff; or, two, the alternative design identified by the plaintiff was not feasible in light of the reasonably available scientific and technical knowledge or the economic practicality then existing.

In this case, Forest River has asserted the sophisticated purchaser defense in relation to the LPLA claims asserted against it by plaintiff.  Whether a manufacturer has adequately discharged its duty to warn to qualify for the sophisticated purchaser defense is a question for you, the jury.

Forest River asserts that FEMA is a sophisticated purchaser. A sophisticated purchaser is one who, by experience and expertise, is aware of the possible hazards associated with the

1    use of the product and has an obligation to inform end users of

2    such potential health hazards.  It is the province of you, the

3    jury, to decide what measures, if any, Forest River could have or

4    should have taken to protect or warn end users such as the

5    plaintiff from any alleged product deficiencies in the trailer it

6    manufactured.

7        All right.  With regard to the negligence claims, the

8    plaintiff has asserted a claim of negligence against Shaw.  It

9    should be noted that this negligence claim does not relate or

10   apply to Forest River.  Specifically, plaintiff has alleged that

11   Shaw negligently caused damage to plaintiff in failing to act

12   reasonably in the installation of his trailer.  Plaintiff is not

13   asserting a negligence claim against Shaw with respect to

14   maintenance of the trailer aside from installation.

15       For a plaintiff to recover damages from a party on a claim

16   of negligence he must prove each of the following four elements

17   by a preponderance of the evidence:

18       The first element that you must consider is whether a

19   party's conduct was negligent in that it fell below the standard

20   of care that the law requires.  In other words, you must decide

21   whether a party breached a duty it owed to the plaintiff to

22   exercise the degree of care that we might reasonably expect of an

23   ordinarily prudent person, party or entity under the same or

24   similar circumstances.

25       A party's conduct is below the expected standard of care if

1    it created an unreasonable risk of harm.  In determining whether

2    an unreasonable risk of harm has been created, you may weigh the

3    likelihood that an accident might have occurred and the

4    seriousness of that accident against the importance to society of

5    what that party was doing, the advisability of the manner in

6    which it was done under the circumstances, and the burden of

7    taking precautions sufficiently to avoid an accident.

8         Reasonable and ordinary care can include prior discovery of

9    reasonably discoverable conditions that might be unreasonably

10   dangerous and remedying and/or warning of such dangers.  The

11   second element that you must consider is whether a party's

12   conduct, if negligent, was a cause in fact of the loss, if any,

13   suffered by the plaintiff.  In other words, you must decide

14   whether a party's conduct actually caused the plaintiff's loss.

15        Determining this element is usually a "but for" inquiry that

16   tests whether the plaintiff's loss probably would not have

17   occurred but for the conduct in question.  This does not mean,

18   however, that the law recognizes only one cause of any injury

19   consisting of only one factor or thing or the conduct of only one

20   person or party.

21        On the contrary, many factors or things may operate at the

22   same time, either independently or together, to cause injury or

23   damage.  When there are concurrent causes of an injury which

24   nevertheless would have occurred in the absence of one of the

25   causes, the proper inquiry is whether the particular conduct in

1    question was a substantial factor in bringing about the injury.

2        The third element that you must consider is whether the

3    defendant's conduct, if negligent, was a legal cause of any loss

4    by the plaintiff.  Conduct is a legal cause of a loss if the loss

5    was a direct result of the conduct in question or if, at the time

6    that the conduct occurred, was a reasonably foreseeable

7    consequence of that conduct.

8        With this inquiry you should consider whether the loss in

9    question is one which the duty owed was designed to prevent.

10   There may be more than one legal cause of plaintiff's loss, if

11   any.

12       The fourth element you must consider is whether there was

13   actual damage or loss to the plaintiff.  In other words,

14   plaintiff must show that he actually has suffered a loss.

15       If the defendant against whom a negligence claim is asserted

16   contends that others' actions were negligent, then that party has

17   the burden of proving the negligence of the plaintiff, one or all

18   of the other defendants or a nonparty.  If that negligence is

19   proven, the amount of any monetary relief for damages that

20   plaintiff has suffered will be reduced by the extent of that

21   negligence.

22       To establish the negligence of a plaintiff, any other

23   defendant, or a nonparty, the party against whom the negligence

24   claim is asserted must establish the same elements that I have

25   just explained in the context of the conduct of plaintiff, the

1   other defendants, or a nonparty.  Specifically, the party against

2   whom the negligence claim is asserted must establish that the

3   conduct of plaintiff, the other defendant, or a nonparty was

4   negligent, and that the conduct was a cause in fact and a legal

5   cause of any damages or loss actually suffered by the plaintiff.

6       In certain instances a manufacturer or other defendant is

7   not liable for the entirety of the harm suffered by a plaintiff

8   if the harm is caused in part by the contributing fault or

9   negligence of another defendant, the plaintiff himself, or a

10  person or entity who is not a party to this case.  I've been

11  referring to that as a "nonparty."

12      This is an issue on which the defendant has the burden of

13  proof.  The defendant must prove this defense by a preponderance

14  of the evidence.  If you conclude that the conduct of the

15  defendants, the plaintiff, or a nonparty caused or contributed to

16  the plaintiff's injuries, then you must assign percentages of

17  fault to each one.

18      Louisiana law requires that you divide the total

19  responsibility for this incident among all those at fault.  You

20  should do this by assigning percentages of fault to the various

21  involved parties and nonparties which will total 100 percent.

22  You are free to assign whatever percentage you feel is

23  appropriate.

24      If you determine that a reduction in a plaintiff's recovery

25  in this case will provide consumers generally with an incentive

1   to use a product carefully without requiring an exceptional

2   sacrifice of other interest, you may assign a percentage of fault

3   for the plaintiff in this manner that I will describe to you.

4          On the other hand, if you determine that a reduction in

5   plaintiff's recovery will not realistically serve to promote

6   careful product use by the consumer or would drastically reduce

7   the manufacturer's incentive to make a safer product, you may

8   decide not to assign a percentage of fault to a plaintiff.

9          In determining those percentages, you may consider both the

10  nature of the fault or negligent conduct and the extent of the

11  causal relation between such fault or conduct and plaintiff's

12  injuries.  When I say the "nature of the fault or negligent

13  conduct," I mean that you may consider, one, whether the conduct

14  resulted from inadvertence or, rather, involved an awareness of

15  the danger involved; two, how great the risk created by the

16  conduct was; three, the importance of what was sought by the

17  conduct; four, the physical and mental capacities of the person

18  either ordinary or perhaps superior or inferior; and, five, any

19  extenuating circumstances which might have required a party to

20  act in haste without proper thought.

21         When I say the "extent of the causal relationship between

22  the conduct and the injuries," I mean that you may consider the

23  extent to which the conduct contributed to the happening of the

24  accident and plaintiff's injuries.

25         Forest River and Shaw each assert that it is a government

1  contractor that performed its work according to and in compliance

2  with specifications approved and mandated by FEMA.  They each

3  have the burden of proving that each is a government contractor.

4      In this regard, I instruct you that Forest River cannot be

5  liable under the LPLA based on defective design of the trailer

6  where, first, the federal government approves reasonably precise

7  specifications on the design of the trailer; secondly,

8  Forest River's product conforms to those specifications; and,

9  third, Forest River's conduct warns the government -- I'm sorry,

10  Forest River's product warns the government at the time of the

11  first sale of the product of product dangers that were known to

12  Forest River but not known to the government.

13      If you find that each of these three elements is satisfied,

14  then you must return a verdict in favor of Forest River on

15  plaintiff's LPLA claims against it.

16      As for Shaw, I instruct you that Shaw cannot be liable for

17  any negligence of the installation of the trailer where, one, the

18  federal government approves reasonably precise specifications on

19  the installation of the trailer; two, Shaw's installation work

20  conforms to those specifications; and, three, Shaw is unaware of

21  reasons not known to the government why the work product required

22  by the installation specifications is unsafe or unreasonable.

23      If you find that each of these three elements is satisfied,

24  then you must return a verdict in favor of Shaw on plaintiff's

25  negligence claims against it.

1    The government need not prepare the specifications to be

2  considered to have approved them as long as the government

3  provides a substantive review or evaluation of Forest River's

4  and/or Shaw's plans.  Evidence of continuous back and forth

5  between Forest River and the government and/or Shaw and the

6  government, such as proof that Forest River and the government

7  and/or Shaw and the government worked closely together on the

8  development of a product from its planning stages through its

9  full production, generally is sufficient.  The specifications

10  need not address the specific defect alleged.  The government

11  need only evaluate the design feature in question.

12    The government's issuance of a form or report indicating

13  acceptance of the product and/or conformity with all required

14  specifications is evidence that Forest River's product and/or

15  Shaw's work met the government's requirements.  This condition

16  also may be satisfied by showing that the government supervised

17  and controlled Forest River's and/or Shaw's implementation of

18  approved specifications or that the government inspected,

19  accepted and complete -- as complete -- let me back up -- that

20  the government inspected, accepted as complete or used

21  Forest River's product and/or Shaw's work.

22    Forest River and/or Shaw satisfies the government contractor

23  defense's third condition if either one proves that it knew of no

24  reasons not known to the government why the application of the

25  approved specifications were unsafe or unreasonable.

1    The government contractor defense does not require

2  Forest River and/or Shaw to warn the government of defects about

3  which it should have reasonably known.  Rather, a government

4  contractor is only responsible for warning the government of

5  dangers about which it has actual knowledge.  The third condition

6  tests only whether the contractor knew of the dangers not known

7  to the government.

8    A contractor who performed work pursuant to plans and

9  specifications provided by another party cannot be held liable to

10  any person injured as a result of that work unless the contractor

11  had a justifiable reason to believe that following the plans and

12  specifications would create a hazardous condition.  Therefore, if

13  you find that Forest River and/or Shaw is a contractor that

14  performed its work in accordance with the plans and/or

15  specifications furnished to it by the government, then you must

16  return a verdict in favor of Forest River and/or Shaw.

17    The law requires you to determine whether FEMA's conduct was

18  negligent.  I have already instructed you as to the law regarding

19  negligence in the negligence liability instruction which I've

20  given you.

21    If you find that plaintiff has proven its claims against

22  either of the defendants, you must assess the amount of damages,

23  if any, established by a preponderance of the evidence as full

24  and just compensation for the injuries suffered by plaintiff

25  which you find to have been proximately caused by the acts of the

1    defendants, no more and no less.

2         You should not interpret the fact that I have given

3    instructions about the plaintiff's damages as an indication in

4    any way that I believe that plaintiff should or should not win

5    this case.  It is your task first to decide whether the

6    defendants are liable.  I am instructing you on damages only so

7    that you will have guidance in the event that you decide that the

8    defendants are liable to the plaintiff and that the plaintiff is

9    entitled to recover money from one or both of the defendants.

10        If you find that plaintiff has proven his claim against the

11   defendants, you are not forced to assess an amount of damages for

12   each and every element of damage that plaintiff has claimed.  If

13   you find plaintiff is entitled to one element of damages but not

14   another, then you are only required to assess damages for the

15   element to which you believe that plaintiff is entitled.

16        Lyndon Wright may not recover damages directly related to

17   his neuroma and bloody sputum.  Such conditions may be considered

18   only for Mr. Wright's claim for fear of cancer.

19        The law recognizes both general damages for the pain and

20   suffering which a plaintiff may have faced because of this

21   incident and specific damages, sometimes called "special

22   damages," which are intended to reimburse a plaintiff for the

23   actual or anticipated out-of-pocket expenses which have been

24   incurred to date or will be incurred in the future.

25        If you decide to award plaintiff special damages, you should

1  consider the evidence that has been offered to these issues, and
2  you may award sums of money for his future medical expenses.  I
3  remind you that in the assessment of damages you have wide
4  discretion in terms of both the decision about any award at all
5  and the level of the award.

6      The fact that I have instructed you on damages should not
7  indicate to you that I believe plaintiff should or should not
8  recover any damages in this case.  This is entirely for you to
9  decide.

10      If you find that either or both defendants are liable to
11  plaintiff, then you must determine an amount that is fair
12  compensation for all of plaintiff's general damages.  These
13  damages are also called "compensatory damages."  The purpose of
14  compensatory damages is to make the plaintiff whole, that is, to
15  compensate the plaintiff for the damage that the plaintiff has
16  suffered.

17      Compensatory damages are not limited to expenses that the
18  plaintiff may have incurred because of his injuries.  If
19  Lyndon Wright wins, he is entitled to compensatory damages for
20  physical injury and pain and suffering, including mental anguish
21  and anxiety and distress that he suffered because of the
22  defendants' conduct and/or action or inactions.

23      You may award compensatory damages only for injuries that
24  plaintiff proves were proximately caused by the defendants'
25  allegedly wrongful conduct.  The damages that you award must be

1   fair compensation for all of plaintiff's damages, no more and no

2   less.

3        Compensatory damages are not allowed as a punishment and

4   cannot be imposed or increased to penalize either defendant.  You

5   should not award compensatory damages for speculative injuries

6   but only for those injuries which plaintiff has actually suffered

7   or that plaintiff is reasonably likely to suffer in the future.

8        If you decide to award compensatory damages, you should be

9   guided by dispassionate common sense.  Computing damages may be

10  difficult but you must not let that difficulty lead you to engage

11  in arbitrary guesswork.

12       On the other hand, the law does not require that the

13  plaintiff prove the amount of his losses with mathematical

14  precision, but only with as much definiteness and accuracy as the

15  circumstances permit.  You must use sound discretion in fixing an

16  award of damages, drawing reasonable inferences where you find

17  them appropriate from the facts and circumstances in evidence.

18       You should consider the following elements of compensatory

19  damages to the extent that you find them to have been proven by a

20  preponderance of the evidence and proximately caused by the

21  defendants' acts.

22       A, damages accrued.  If you find for plaintiff, he is

23  entitled to recover an amount that will fairly compensate him for

24  any damages that he has suffered to date.

25       B, calculation of future damages.  If you find that

plaintiff is reasonably certain to suffer damages in the future from his injuries, then you should award him the amount you believe would fairly compensate him for such future damages.  In calculating future damages you should consider the Standard Table of Mortality as compiled by the United States Bureau of the Census or other recognized mortality table.

C, reduction of future damages to present value.  An award of future damages necessarily requires that payment be made now for a loss that plaintiff will not actually suffer until some future date.  If you should find that plaintiff is entitled to future damages then you must determine the present worth in dollars of such future damages.

If you make an award for future medical expenses, you must reduce it to present value by considering the interest that the plaintiff could earn on the amount of the award if he made a relatively risk-free investment.

The reason why you must make this reduction is because an award of an amount representing future medical expenses is more valuable to the plaintiff if he receives it today than if he had received it -- than if he received it in the future when he would otherwise have incurred it.  It is more valuable because the plaintiff could earn interest on it between the time of the date of the award and the date he would have incurred the expense.  Thus, you must adjust the amount of any award for future medical expenses by the amount of interest that plaintiff can earn on

1   that amount in the future; however, you must not make any

2   adjustment to present value for any damages you may award for

3   future pain and suffering or future mental anguish.

4        In determining any award that you may make for future

5   medical expenses, you should consider the evidence and the

6   opinions of expert witnesses to decide the reasonable value or

7   expense of medical and hospital care and treatment which will be

8   reasonable and necessary for the plaintiff's condition.

9        You may award damages for aggravation of an existing disease

10  or physical defect or activation of any such latent condition

11  resulting from physical injury to Lyndon Wright.

12       In your consideration of the items of damage, you should

13  bear in mind that under the law, the one liable or responsible

14  for an accident must take the injured person as he finds him and

15  is responsible for all the natural and probable consequences of

16  its wrong, even though they are more serious or harmful by reason

17  of a preexisting condition, physical defect, or weakness of the

18  injured person.

19       If the accident results in aggravation of a previous

20  condition of disability or of pain of the injured person, the one

21  responsible is liable both for the aggravation of the preexisting

22  condition and for any new injuries resulting from the accident.

23  However, plaintiff must prove, one, the prior existing condition,

24  and, two, the extent of the aggravation.  If you find that he

25  would have faced this aggravation of his condition whether this

1    incident happened or not, then he is not entitled to damages on

2    that portion of his claim since the defendants are not

3    responsible for the normal and natural results of his prior

4    condition.

5        If you find that there was such an aggravation of a prior

6    existing condition, you should determine, if you can, what

7    portion of plaintiff's condition resulted from the aggravation

8    and make allowance in your verdict only for the aggravation.

9        You may award damages for any bodily injury that plaintiff

10   sustained and any pain or suffering, mental anguish and loss of

11   capacity for enjoyment of life that he experienced in the past or

12   will experience in the future as a result of the injury.

13       No evidence of the value of intangible things such as mental

14   and physical pain and suffering has been or need be introduced.

15   You are not trying to determine value but an amount that will

16   fairly compensate plaintiff for the damages he has suffered.

17       There is no exact standard of fixing the compensation to be

18   awarded for these elements of damage.  Any award that you make

19   should be fair in light of the evidence.

20       The law recognizes that a plaintiff may suffer mental

21   distress as well as physical pain and suffering.  You are

22   permitted to consider such consequences as a part of the general

23   damages which you may award.  By mental distress and anguish I

24   mean substantial worry or concern, grief and the like.

25       Other than fear of cancer damages, a plaintiff may not

1   recover for damages that he does not presently have.  Other

2   damages for a particular disease are not recoverable unless and

3   until a disease is diagnosed.  This is true because if the

4   plaintiff develops cancer or another illness or disease at

5   another time, then he is entitled to bring another action

6   regarding that condition at a later date.

7       A person who claims damages resulting from the wrongful act

8   of another has a duty under the law to use reasonable diligence

9   to mitigate to avoid or minimize his damages.  If you find either

10  or both the defendants are liable and plaintiff has suffered

11  damages, then plaintiff may not recover for any item of damage

12  which he could have avoided through reasonable effort.  If you

13  find by a preponderance of the evidence that plaintiff

14  unreasonably failed to take advantage of an opportunity to lessen

15  his damages, you should deny plaintiff recovery for those damages

16  which he would have avoided had he taken advantage of

17  opportunity.

18      You are the sole judge of whether plaintiff acted reasonably

19  in avoiding or minimizing his damages.  An injured plaintiff may

20  not sit idly by when presented with an opportunity to minimize

21  his damages.  However, a plaintiff is not required to exercise

22  unreasonable efforts or incur unreasonable expenses in mitigating

23  the damages.

24      The defendants have the burden of proving the damages that

25  the plaintiff would have mitigated or could have mitigated.  In

1    deciding whether to reduce the plaintiff's damages because of a

2    failure to mitigate, you must weigh all of the evidence in light

3    of the continuing circumstances of the case, using sound

4    discretion in deciding whether the defendants have satisfied

5    their burden of proving that plaintiff's conduct was not

6    reasonable.

7         In deciding the damages to which plaintiff is entitled if he

8    has otherwise proven his claim by a preponderance of the

9    evidence, you must not consider or award any attorney's fees

10   which plaintiff may be required to pay as a result of this

11   proceeding.

12        It is your sworn duty as jurors to discuss the case with

13   each other to reach an agreement if you can do so.  Each of you

14   must decide the case for yourself, but only after full

15   consideration of the evidence with the other members of the jury.

16   While you are discussing the case, do not hesitate to re-examine

17   your own opinion and change your mind if you became convinced

18   that you are wrong; however, do not give up your honest beliefs

19   solely because the others feel differently or merely to finish

20   the case.  Remember that in a very real way, you are the

21   judges -- judges of the facts.  Your only interest is to seek the

22   truth from the evidence in the case.

23        Select your foreperson and conduct your deliberations.

24   During your deliberations you may take with you the instructions

25   which I have just covered with you and the exhibits that the

1    Court has admitted into evidence.

2         During your deliberations you must not communicate with or

3    provide any information to anyone by any means about this case.

4    You may not use any electronic device or media, such as a

5    telephone, cell phone, Smart Phone by iPhone, BlackBerry, or

6    computer, the Internet, any Internet service or any text or

7    instant messaging service or any Internet chatroom, blog or web

8    site such as Facebook, MySpace, LinkedIn, YouTube or Twitter to

9    communicate to anyone any information about this case or to

10   conduct any research about this case until I accept your verdict.

11        In fact, in that regard, if any of you do have cell phones

12   or anything such as that in the jury room, the courtroom deputy

13   will collect those from you and they will be provided to you

14   either during the break, if you have a break, or at the end of

15   your deliberations.

16        If you recess during your deliberations, follow all of the

17   instructions that I have given you concerning your conduct during

18   this trial.  After you have reached your unanimous verdict, your

19   foreperson must fill in your answers to the written questions and

20   sign and date the verdict form.  You will return the charge

21   together with your written answers to the questions.

22        Unless I direct you otherwise, do not reveal your answers

23   until such time as you are discharged.  You must never disclose

24   to anyone, not even to me, your numerical division on any

25   question.  So if you do send a note, if you have need to send a

1    note out, you should not put on there any numerical division you

2    may have regarding any issue in this case.

3        If you want to communicate with me at any time, please give

4    a written message to the court security officer, or CSO, who will

5    bring it to me.  I will then respond as promptly as possible

6    either in writing or by meeting with you here in the courtroom.

7    I will always first show the attorneys your question and my

8    response before I answer your question.

9        Let me cover with you the jury verdict form which I believe

10   counsel put on the screen during the course of the closing

11   arguments.  And I want you to listen carefully because these

12   questions are to be considered one by one.  And there are some

13   instructions after each question which may sound confusing when I

14   read them to you, but when you follow -- when you answer each

15   question as part of your deliberations, simply read the

16   instruction underneath that question and do as it instructs.

17       The jury verdict form has the case heading at the top, which

18   I won't repeat here.

19       A, Forest River.  1, do you find that the Forest River

20   trailer occupied by Lyndon Wright, sometimes referred to as

21   "Wright," was unreasonably dangerous in its construction or

22   composition?  Yes or no.  Proceed to Question 2.

23       2, do you find that the Forest River trailer occupied by

24   Wright was unreasonably dangerous in its design?  Yes or no.

25   Proceed to Question 3.

1    3, do you find that the Forest River trailer occupied by

2  Wright is unreasonably dangerous because of an adequate warning

3  -- or because an adequate warning about the trailer was not

4  provided?  Yes or no.

5    If you answered any of Question Numbers 1, 2, or 3 "yes,"

6  proceed to Question 4.  If you answered each and all of Questions

7  Number 1, 2, and 3 "no," proceed to part B, Question 6.

8    4, do you find that any unreasonably dangerous condition of

9  the trailer existed at the time it left Forest River's control?

10  Yes or no.

11    If you answered Question Number 4 "yes," proceed to Question

12  Number 5.  If you answered Number 4 "no," proceed to part B,

13  Question 6.

14    5, do you find that Wright sustained injury to which

15  Forest River substantially contributed as a result of any

16  unreasonably dangerous condition of the trailer?  Yes or no.

17  Proceed to Part B, Question Number 6.

18    B, Shaw Environmental, Inc.  6, do you find that Shaw was

19  negligent in regard to its actions or inactions concerning the

20  hauling and/or installation of the trailer occupied by Wright?

21  Yes or no.

22    If you answered Question Number 6 "yes," proceed to Question

23  Number 7.  If you answered "no," to Question Number 6, but "yes"

24  to any of Question Numbers 1, 2 or 3 and "yes" to Question Number

25  5, proceed directly to Question Number 8 without regard to the

1   parenthetical instructions between Part C and Question Number 8.

2       If you answered "no" to each and all of Questions Number 1

3   through 3 and 6, please sign and date this jury verdict form and

4   advise the court security officer that you have reached a

5   verdict.

6       7, do you find that Wright sustained an injury to which Shaw

7   substantially contributed as a result of the negligence of Shaw

8   in its actions or inactions concerning the hauling and/or

9   installation of the trailer occupied by Wright?  Yes or no.

10      Proceed to Part C below.

11      C, allocation of fault/damages.  If you answered both

12  Question Number 5 and 7 "no," do not answer any more questions.

13  Please sign and date this jury verdict form and advise the court

14  security officer that you have reached a verdict.  Otherwise,

15  proceed to Question Number 8.

16      8, please allocate on a percentage basis the degree of

17  fault, if any, which you attribute to each of the following

18  parties and nonparties.  Please be careful to enter zero or leave

19  blank where you have found no fault on the part of a party in

20  your previous answers.  All numerical percentages you enter in

21  this question should add up to a total of 100 percent.

22      The Defendant, Forest River, Incorporated, there is a blank

23  with a percentage sign after it.  If you answered "no" to all of

24  Question Numbers 1, 2 and 3, or if you answered "no" to Question

25  Numbers 4 or 5, you must put a zero in this blank.

1     Defendant, Shaw Environmental, Incorporated, and there is a

2  blank with a percentage sign.  If you answered "no" to Question

3  Number 6 or 7, you must put a zero in this blank.

4     Plaintiff, Lyndon Wright, and there is a blank with a

5  percentage sign.  United States, through FEMA, and there is a

6  blank with a percentage sign.  Person or entity other than

7  Defendants, FEMA, or Wright, maintenance and deactivation

8  contractors, or MDCs is what that refers to, and there is a blank

9  with a percentage sign and a 100 percent total.

10     Proceed to Question 9.

11     What amount of damages, if any, do you find should be

12  awarded with respect to each of the following claims:

13     Past, present, and future physical pain and suffering of

14  Lyndon Wright?  There is a blank with a dollar sign.

15     Past, present and future mental anguish and emotional

16  distress of Lyndon Wright?  A blank with a dollar sign.

17     Future medical expenses of Lyndon Wright?  A blank with a

18  dollar sign.

19     And loss for impairment of life's pleasures for

20  Lyndon Wright?  And a blank with a dollar sign.

21     A date, a line to put the date and the line for the jury

22  foreperson to sign.

23     Now, that is the jury verdict form which you will be given.

24     After you have reached a verdict, you are not required to

25  talk with anyone about the case unless and until I order you to

1    do so.  You may now retire to the jury room to conduct your

2    deliberations.

3         I believe you have already ordered out for lunch, which

4    should be here in about a half hour, so you may go ahead and

5    commence your deliberations.  If you do need to take a break,

6    please advise the CSO that you would like to take a break.  And I

7    thank you, again, for your attention not only today but over the

8    last two weeks since you were chosen to sit on this jury.  Okay.

9              THE COURT SECURITY OFFICER:  All rise.

10             (WHEREUPON, at this point in the proceedings, the jury

11   panel leaves the courtroom for deliberations.)

12             THE COURT:  Counsel, if you would be seated.  A couple

13   of things real quick on the jury instructions that I marked.  As

14   I said, you'll always notice something.

15        This is the annotated version.  Do you all have -- is the

16   page the same, Amanda?

17             THE CLERK:  It's not the same.

18             THE COURT:  Take out the annotated version, if you

19   would.  On page 20, there is a typo on the -- one, two, three,

20   four -- seventh line from the top of the page, unreasonable

21   dangerous design is a Y instead of a D.  We're going to make that

22   correction before we send the instructions in.

23        On page 23, under Number 2, right below the middle of the

24   page, the word "each" should be deleted.  And I think I deleted

25   it when I read it, so we'll take the word, where it says "which

1   each plaintiff suffered," so "each" needs to be deleted.

2       With regard to page 34, the last line of the second to last

3   paragraph, that should be a percentage of fault to "the

4   plaintiff" instead of "a plaintiff."

5       Page 36, under Number 3, the top half of the page, it should

6   be, "Forest River warns the government," not "Forest River's

7   product."  I think I read that one correctly, or I might have

8   gone back and read it after I read it once.

9       Page 40, under the "consider damages only if necessary," I

10  think I said by way of correction, "against either," I said

11  "either or each," but the sentence currently says, "against the

12  defendants," and it should be "each or either of the defendants."

13          MR. GIEGER:  I think you said "either of."

14          MR. D'AMICO:  You did.  You said "either."

15          THE COURT:  Right.  But it doesn't say that on here, so

16  we need to make that correction.

17      Likewise, five lines down, "the acts of the defendants."

18  They need to be considered singularly rather than collectively.

19      And, again, third line up from the bottom of the text,

20  "whether the defendants," it should say, "whether either or both

21  defendants are liable."

22      I have a circle on page 52, let me see -- I think I'm okay.

23  Page 52, I must have drawn a circle because I was thinking to get

24  their cell phones.  It's not a correction.  It's a mental note

25  that hit the page.

1    Are there any other revisions or corrections on the

2  instructions that I have read to the jury?  We're not talking

3  about your substantive objections.  Anything that I missed during

4  the course of reading that needs to be corrected on this written

5  form?

6         MR. GIEGER:  On page 48 you said, "another action

7  regarding that condition" instead of "lawsuit."

8         THE COURT:  I said "action" instead of "lawsuit."

9         MR. GIEGER:  I don't think it makes any difference.

10         THE COURT:  Anybody else?

11         MR. CHEATWOOD:  Your Honor, I just note that on page 44

12  in connection with the calculation of damages, you made mention

13  of the standard table of mortality.  To my knowledge, they don't

14  have access to that, but --

15         THE COURT:  Was that not part of the stipulated

16  exhibits?

17         MR. CHEATWOOD:  No, sir, I don't think so.

18         THE COURT:  Well, we'll see if they send out a question.

19  If they send out a question saying, please send in the standard

20  table of mortality, then we'll find one and send it in.

21  Typically that's an instruction that's relative to an economist's

22  testimony, which in this case we don't have.

23         MR. CHEATWOOD:  Right.

24         THE COURT:  So I guess none of us, including me, in

25  reading the standard instruction made a deletion in that regard,

1    but, like I said, I don't think it's harmful to the instruction

2    that we had given to them relative to the damage calculations.

3    So I suggest we just go ahead and leave it.  Since I've already

4    read it to them we go ahead and leave it in, and if they want it,

5    of course, we'll have to agree to something to send.

6           MS. WHITFIELD:  On page 10 of the stipulated facts,

7    Number 47, I think is there a word "bearing" in there that should

8    not be.

9           THE COURT:  47?

10          MS. WHITFIELD:  Yes.

11          THE COURT:  Yes.  The word "bearing" should be deleted.

12          MR. CHEATWOOD:  I believe it should be "bearing VIN

13   number."

14          THE COURT:  Since we've already read it, let's just go

15   ahead and just take out the word "bearing."  I think they know

16   which one we're talking about by now.

17          MS. WHITFIELD:  I think so.

18          THE COURT:  I think I read through that one.

19      It's a stipulation.  If y'all want to stipulate to that

20   extra word it's fine with me.  We'll take that out on page 10.

21      Anything else?  Does anybody have any other corrections

22   because we're going to make these and send these in?

23      Okay.  What about on the jury verdict form?  I didn't see

24   any problems with it in terms of typos or things of that nature?

25      Can you go ahead and make these.

1      Why don't we go ahead and put on the record any objections

2  to the inclusion or exclusion of jury charges.  If plaintiffs

3  would like to begin.  This is both jury charges as well as the

4  verdict form.

5      I would also note for the record that I'm not positive of

6  what you all are about to say, but I think everything that we're

7  going to cover here has been the subject of prior discussion at

8  the jury charge conference and actually discussed probably on

9  more than one occasion over the last two weeks.

10     All right.  Mr. D'Amico.

11     MR. D'AMICO:  Yes, Your Honor.  You are correct.  You

12  are reading my mind like someone was reading yours the other day.

13     We reurge our objection to the government contractor

14  defense.  We believe that our motion for a directed verdict

15  should have been granted, obviously.

16     Also, we reurge our objection to the jury verdict form.  We

17  had presented our own jury verdict form, and the Court chose the

18  defendants', so we reurge that objection at this time.

19     THE COURT:  Well, I think that the verdict form we used,

20  first of all, was based originally on one that was perfected

21  during the *Alexander* matter.  We did try to reconcile, and this

22  one is different from that one in ways that I think are dictated

23  by this particular case.  But we did get competing jury verdict

24  forms, and I thought we had tried to reconcile them; but, be that

25  as it may, we decided to go with the form in its current

 1    condition.

 2            MR. D'AMICO:  Obviously.  To the extent that you didn't

 3    choose our version, we object for the record.

 4            THE COURT:  Thank you, Mr. D'Amico.

 5            MR. D'AMICO:  You're welcome.  Thank you, Your Honor.

 6            THE COURT:  Mr. Gieger.

 7            MR. GIEGER:  Your Honor, for the record we will --

 8    Forest River will reurge all of its prior objections to the

 9    charge made at the charge conference, but specifically as it

10    relates to the proposed jury instruction Number 1 on causation.

11    I'm not sure that the independent and intervening cause language

12    was sufficient by the Court and, therefore, make that notation.

13        Also, the second alternative causation argument, I know the

14    Court believes that both of those languages are incorporated into

15    the charge.  I'm not sure that it was sufficient.

16        I do note that the defendant Forest River requested a

17    landlord liability charge because there is liability under the

18    Code of Civil Procedure for landlord liability.  The Court made a

19    decision not to include that charge.  I think that is an error

20    and note it here.

21        Also, there was a request for an open and obvious danger.  I

22    understand the Court's position relative to that and

23    formaldehyde.  I think it's goes beyond just formaldehyde.

24        Also, the Court included in its charge a portion dealing

25    with the continuous duty to warn charge.  I don't believe in this

1   case there is any evidence that would support a continuing duty

2   to warn charge as relates to the knowledge of Forest River in

3   this case.  Thanks.

4           THE COURT:  Thank you, Mr. Gieger.

5       Let me also point out, as Mr. Kurz is coming up, that we had

6   a discussion on Thursday regarding the motion practice which

7   directly impacted the inclusion or exclusion of certain charges.

8   The Court had ordered some additional briefing on that, which

9   counsel has provided, and on Friday, the Court issued a short

10  order covering those topics such that the consequence would be

11  either the inclusion or exclusion of certain instructions.  So,

12  for the record, I would refer also to the order that was entered

13  on Friday, the 26th.

14          MR. GIEGER:  As well as the arguments made by counsel in

15  memoranda?

16          THE COURT:  Yes.

17          MR. GIEGER:  Thank you.

18          THE COURT:  Well, my purpose in saying that is that

19  you're correct, we did discuss many of these issues in the charge

20  conference, but we were not on the record.

21          MR. GIEGER:  Yes, Your Honor.

22          THE COURT:  So the fact that we're putting it on the

23  record now, I think, preserves your objections, such as they are.

24  And the fact that the Court has included or excluded them,

25  really, implicit in that, in the charge that I read to the jury,

1    is my ruling on whether or not such a charge should have been

2    excluded or included.

3         MR. GIEGER:  And my purpose of bringing it forward,

4    Judge, I think at this point in time, although it's already in

5    the record as a motion practice before the charge is read, I know

6    it's preserved, so I just wanted to make it again now.

7         THE COURT:  Right, right.

8         MR. GIEGER:  Thank you, Your Honor.

9         THE COURT:  Yes, Mr. Kurtz.

10        MR. KURTZ:  Thank you, Your Honor.  We're also going to

11   adopt the prior discussions in connection with the involuntary

12   dismissal motions, as well as the prior briefing relating to the

13   inclusion or exclusion of jury charges and the verdict form

14   that's all submitted in the record.

15        But, at this time we want -- Shaw wants to specifically

16   object to the failure to instruct the jury about the independent

17   contractor defense, which, of course, was part of our discussions

18   the other day with regard to an involuntary dismissal.  That

19   issue also appears on the jury verdict form.  We object to the

20   deletion of subcontractors from the other parties section.

21   Shaw's record submissions on those topics are Record

22   Document 12401 and are Record Document 12398.

23        Shaw also objects to the failure to list the government

24   contractor defense on the verdict form itself as an immunity.  We

25   believe that that is the appropriate place for it, and again we

1  refer to Record Document 12398.

2        And, finally, we object to the failure to charge the jury on

3  the defensive prescription as set forth in Record Document 12660.

4  Thank you.

5              MR. GIEGER:  May I approach, Your Honor?

6              THE COURT:  Yes.

7              MR. GIEGER:  Judge, I just want to make sure the record

8  is clear.  I'm not sure that Forest River made a Rule 50 motion

9  at the close of its case.  I certainly know we made one at the

10  close of the plaintiff's case, but I, right at this moment,

11  because of the way we closed on Thursday, don't remember making

12  that same Rule 50 argument then.  I may be wrong, but in case I

13  am wrong --

14              THE COURT:  On which issue?

15              MR. GIEGER:  On all of those burden of proof issues that

16  were made by -- I know we made them at the close of the

17  plaintiff's case, but I don't have a recollection -- did we all

18  make them at the close --

19              MR. D'AMICO:  He did.

20              MR. GIEGER:  Never mind, Judge.  I'm just preserving.

21  I'm just making sure.

22              MR. D'AMICO:  I just wanted to make sure I'm not living

23  in the *Twilight Zone* because I thought I argued against that in

24  the close of the trial.

25              MR. GIEGER:  I'm not an appellate lawyer, Judge.  I am

1  just making sure I did it right.

2          THE COURT:  That's my recollection as well.  The record

3  is what it is.

4          MR. GIEGER:  I will take the senility argument as being

5  the oldest.  Thank you, Your Honor.

6          THE COURT:  Is there anything else we need to put on the

7  record while Cathy still has the record open here?  Anything

8  else?

9      I am, again, going to thank you all, and I will in front of

10  the jury when the case is over with, but to thank you all for all

11  of your hard work and preparation in this case.  You all, to a

12  person, did a very excellent, thorough job in presenting this

13  case to the jury.  Your arguments today, I thought, were very

14  much up to the standard that one could expect with the three-day

15  interval in between.  It was obvious that you had put a lot of

16  time into it.  I think they were very clear and concise and to

17  the point, so I really appreciate that.  I think it was worth the

18  break time that we had.  It showed, and I think the jury was also

19  very attentive in that regard today.  So thank you all for your

20  work leading up to trial and also over the last two weeks.

21      If you're going to leave this area, by that I mean like here

22  or out in the hallway, if you're going to leave that area, please

23  give your phone numbers, your contact information to Pam.  In

24  case there is a question, in case there is a verdict, we need to

25  be able to summon you very quickly.

1        If you're going to be in the attorney conference center over

2   in the other building, let us know that that's where you are that

3   we can get ahold of you.  If you leave the building complex to go

4   to lunch, let us know that as well so that we can get ahold of

5   you quickly.  Other than that, I guess we'll wait and see.

6            MR. GIEGER:  Judge, there are a couple of pieces of

7   evidence that are here, that we used for closing that need to go

8   back to the jury.

9            THE COURT:  Pam has got it covered.  All right.  Thank

10  you all, and we will see you all soon.

11           THE DEPUTY CLERK:  All rise.

12      Mr. Gieger, did you want to put that on the record about the

13  questionnaires?

14           THE COURT:  I thought we had that all worked out.

15           MR. GIEGER:  I think they are still looking for three.

16           THE COURT:  I think we covered it on the record.  We

17  just need to get three more questionnaires.

18           MR. GIEGER:  That ones that were missing.  We did 1

19  through 28.  Questionnaires 11, 12 and 13 are missing out of that

20  box.

21           THE COURT:  We can get that.  We can get that.  Let's

22  see, maybe Amanda can print them.  You're talking about the juror

23  questionnaires?

24           MR. GIEGER:  Yes.  They had the 1 through 28.  They were

25  missing -- 11, 12 and 13, I think, were the ones that didn't show

1   up, and those are not in the box.  If she's going to bring those

2   in, they have to put those in.

3         THE COURT:  We'll try to get those printed up and bring

4   them to you.

5         (WHEREUPON, at this point in the proceedings, the Court

6   was in recess while the jury deliberates.)

7                    *   *   *

1              **P-R-O-C-E-E-D-I-N-G-S**

2                 MONDAY, MARCH 29, 2010

3              A F T E R N O O N   S E S S I O N

4                 (COURT CALLED TO ORDER)

5

6

7         THE DEPUTY CLERK:  All rise.

8         (WHEREUPON, at this point in the proceedings, the jury

9   panel enters the courtroom.)

10        THE COURT:  You may be seated.

11                        VERDICT

12        THE COURT:  Mr. Jowers, I take it since you're in the

13   first seat here you're the foreman of the jury?

14        MR. JOWERS:  Yes, sir.

15        THE COURT:  I understand the jury has reached its

16   verdict; is that correct?

17        MR. JOWERS:  We have.

18        THE COURT:  Would you hand that to the courtroom deputy?

19   I'll go ahead and read through the jury verdict form.

20   Coffee.

21     A, Forest River, Incorporated.  1, do you find that the

22   Forest River trailer occupied by Lyndon Wright was unreasonably

23   dangerous in its construction or composition?  No.

24     2, do you find that the Forest River trailer occupied by

25   Wright was unreasonably dangerous in its design?  No.

1    3, do you find that the Forest River trailer occupied by

2  Wright was unreasonably dangerous because an inadequate --

3  because an adequate warning about the trailer was not provided?

4  No.

5    B, Shaw Environmental.  6, do you find that Shaw was

6  negligent in regard to its actions or inactions concerning the

7  hauling and/or installing of the trailer occupied by Wright?  No.

8    The jury verdict form is signed and dated by the foreman of

9  the jury, who is Mr. Jowers.

10    Is there any desire to poll the jury at this point, Counsel?

11        MR. D'AMICO:  Yes, Your Honor.

12        THE COURT:  Okay.

13        THE DEPUTY CLERK:  Mr. Jowers, is this your verdict?

14        MR. JOWERS:  Yes.

15        THE DEPUTY CLERK:  Ms. Svoboda, is this your verdict,

16  ma'am?

17        MS. SVOBODA:  Yes.

18        THE DEPUTY CLERK:  Mr. Domingue, is this your verdict?

19        MR. DOMINGUE:  Yes.

20        THE DEPUTY CLERK:  Ms. Hunt, is this your verdict?

21        MS. HUNT:  Yes.

22        THE DEPUTY CLERK:  Ms. Arceneaux, is this your verdict?

23        MS. ARCENEAUX:  Yes.

24        THE DEPUTY CLERK:  Ms. Bermudez, is this your verdict?

25        MS. BERMUDEZ:  Yes.

```
 1              THE DEPUTY CLERK:  Mr. Keeley, is this your verdict?

 2              MR. KEELEY:  Yes.

 3              THE DEPUTY CLERK:  Mr. Coleman, is this your verdict?

 4              MR. COLEMAN:  Yes.

 5              THE COURT:  All right.  We're not going to enter the

 6    judgment just yet on it, but the Court will accept the jury's

 7    verdict in this case as the verdict of the Court.

 8         I want to say a few words to you before we release you from

 9    your jury service about several different things.  I hope I don't

10    leave anything out.

11         First of all, thank you all for your attention and your

12    patience and your cooperation over the last two weeks.  When you

13    all were chosen two weeks ago today, you showed up here at the

14    courthouse, didn't know each other, maybe had never been on a

15    jury before, certainly had never been, perhaps, in a case of this

16    sort before, and I know that it's difficult.

17         I oftentimes tell lawyers that what they should do is

18    imagine being taken out of their workplace and being sent to

19    maybe your workplace to watch you for two weeks without being

20    able to ask a question, you know, to try to understand concepts

21    and things that maybe, as lay people, we're not used to

22    hearing -- ppm, ppb, things like that -- that I maybe don't deal

23    with every day and that maybe you don't deal with, but you're

24    brought here for two weeks to hear a lot of information, a lot

25    of, lot of information that is really compressed into a two-week
```

1  period, so I really admire the fact that you all can come here

2  and try to pay attention.

3      I can tell you all, part of my job as a judge is to watch

4  the jury to make sure nobody is dozing off or make sure everybody

5  is attentive and trying to pay attention and try to do the work,

6  the very difficult work of being a juror, particularly in a case

7  like this that does have a lot of science to it.  So thank you

8  all very much for your attention and your hard work.

9      Every one of you all were on time every day, and after every

10 break, and I really do appreciate that, and you've been very

11 cooperative in that regard.  So on behalf of the Court, as well

12 as counsel and the parties, we do appreciate your efforts in this

13 case.

14     The other thing that I want to point out to you is that it

15 should be obvious by sitting through this case that, unlike

16 movies and television, lawyers don't just come to court.  They

17 don't just file a lawsuit or get a client in a criminal case and

18 show up in court.  It's a lot, a lot of work that's done by

19 attorneys in this case, and I'm a big fan of attorneys and

20 attorneys who are prepared and do good work, and I get a chance

21 to see a lot of it here in this building.

22     There is a lot of work that goes in and a lot of effort and

23 a lot of thought and a lot of preparation that goes in to any

24 case that is tried and put together well.  I told the attorneys

25 after you all left to begin your deliberations that I thought

1    they did a terrific job in this case, and I'll reiterate that in

2    front of you.  I thought all of the attorneys involved in this

3    case worked well together.  They worked well in putting together

4    their presentations in a way that they were hoping and thought

5    that you could understand it.

6        This is complicated work to do because of the science.  As I

7    mentioned, a lot of times they may know what each other are

8    talking about because they work on this case for many, many

9    months, but to come in here and explain the case to you or to me

10   or somebody who has not been there every day doing the

11   depositions and exchanging the documents, it's a difficult task

12   that they had in this case, and they discharged their

13   professional responsibilities, I think, very commendably in this

14   case, so I really want to point that out and thank them for their

15   excellent work that they did in this case on all sides.

16       Of course, in every case, one side is disappointed with the

17   result and one side is happy.  They have some cases where both

18   sides are unhappy with the result.  So, notwithstanding that, it

19   really is commendable that the attorneys could come to court and

20   put on a case as well as these attorneys have and to have you go

21   back and look at the evidence and render a verdict in this case.

22       On a grander scale, I also want to thank you all for being

23   jurors.  Aside from voting, serving on a jury is the most

24   important civic responsibility you have, and there are a lot of

25   reasons for that.  And you turn on your evening news and you see

1   other countries where there is a lot of strife and a lot of

2   discontentment and people having to take the law into their own

3   hands.  And we don't have a lot of that here primarily because we

4   have juries, we have opportunities for people to come to court

5   and get a dispute resolved not by some bureaucrat or by somebody

6   who nobody knows anything about; rather, we come in and we have

7   folks from everyday life -- none of you all knew each other

8   before you got picked for this jury -- to come in and listen to

9   the evidence and talk about the case amongst yourselves and to

10   see what you think about all of this.

11       In criminal cases, we don't have somebody accused of a crime

12   and then have, like I say, some bureaucrat or somebody who is not

13   responsive hear the case and decide on guilt or innocence.  We

14   have juries to come in and hear the case.  If you haven't

15   appreciated the beauty of that process, hopefully now you have

16   been able to get a better feel for that.

17       I always regret when I hear people say, doggone it, I got a

18   summons for jury service.  I have things to do.  I don't have

19   time.  What can I do or say to get out of jury service?  It

20   always bothers me when I hear that because you hear people talk

21   about why things are the way they are?  Why do we have crime?

22   Why do we have this, that or the other?  Yet, when we ask people

23   to give up, donate their time such as you've done the last two

24   weeks, a lot of people don't want to do that.

25       We depend on folks like you all to come in and to hear

1    disputes, both civil and criminal, and to decide them, and

2    without that maybe we would have more lawlessness in this

3    country.  We depend on the jury system as the lifeblood of not

4    just the federal court but all courts.  So, really, if you do

5    have a neighbor or friend or relative or somebody who gets a jury

6    summons and they complain about it, look, we know that you have

7    other things going on, you have maybe children to look after or a

8    sick parent, we know the parking is not the best here, but,

9    still, please encourage them to participate.

10        It's essential to our system that people respond to jury

11   summonses and that they participate in the process.  And if

12   you're not chosen for the jury, like I told the group that we had

13   here two weeks ago that didn't get picked, you've at least given

14   the attorneys a chance to make a decision about who should be on

15   the jury.  So please try to encourage others that serving on a

16   jury is something that's necessary and something that should be

17   taken very seriously because we do depend on you.

18        In that regard, also, we want your feedback.  You will

19   receive a questionnaire from the jury administrator downstairs

20   probably in the next two weeks.  Please be candid.  If there is

21   something you liked about your two-week stay here, tell us.  If

22   there is something you didn't like about it -- again, the room is

23   too cold, the parking is not the best, anything like that, all

24   the way up to maybe more substantive -- we really want your

25   comments.  We want to know what it is we as a court are doing

1   right and what it is we could do to make things better for people
2   who come after you and serve as jurors.

3       If there is something on your mind that you're not
4   comfortable putting in that questionnaire that you think I need
5   to know, you can visit with me today after we discharge you, or
6   you can give me a call.  The number is in the book.  We would
7   like to hear from you about your jury service if there is
8   something you like or dislike.

9       Hopefully, you've been comfortable while you're here.  We
10  try to make it as less burdensome as possible.  I've tried to be
11  respectful of your time.  When I tell you we do things at certain
12  times, I take that very seriously, and I think that's our court's
13  obligations to jurors is to be respectful of your time because
14  you are busy and you have other things going on in your lives.
15  Please be candid and let us know what your experience as a juror
16  has been here.

17       A few more things that I want to point out to you.  With
18  regard to any responsibilities you have after you're discharged,
19  number one, you are not obligated to talk to anyone about your
20  jury service -- about anything about jury service.  If anyone
21  contacts you, you can politely tell them that you choose not to
22  discuss it.  That's up to you.

23       On the other hand, if you would like to talk about what you
24  saw here and what your jury service has been like, you may do so,
25  but that's entirely up to you.  It's your choice.  You may do so

1   with one exception, and that is, you are not to discuss with

2   anyone what transpired in your deliberations.  Within the four

3   walls of the jury room, what was said, what was done, how you

4   came to your decision is really a very sacrosanct process.  So

5   you are not to discuss your deliberations with anyone unless you

6   are ordered by the Court to disclose that, and you'll know if

7   that happens.

8       If anyone tells you, "Oh, the Court said it's okay," that

9   doesn't count.  It has to come from me, and I will let you know

10  directly in the unlikely event that that becomes necessary.  It

11  would be very, very rare.  So don't accept it from anyone else

12  that the judge said it's okay for you to tell me how Mr. So and

13  So thought or how Ms. So and So -- what she said.  It's got to

14  come directly from me, and if you don't hear from me about it,

15  you're not to disclose anything that you discussed during your

16  deliberations.

17      Sometimes the attorneys like to talk to jurors after a case

18  about their performance, about their case, about a witness'

19  performance, and I can't order them not to contact you.  You may

20  get contacted by attorneys in the case or someone who may want to

21  ask you about what you thought about the trial.  Again, it's up

22  to you.  If you choose not to discuss with them at all, just

23  politely tell them.  If they persist, contact me and I'll take

24  care of it.  If you would like to talk to them, I'm sure they

25  would appreciate feedback.  You may answer the questions they ask

1   with the exception that I just gave you.

2       I do have a notice here that you'll be receiving here, and

3   I'll read it to you, which it's along the lines of what I just

4   said.

5       "This is a reminder that you have absolutely no obligation

6   to discuss anything about this case with any member of the press

7   or anyone else.  If you do not want to talk to the press and you

8   are contacted by them, I recommend that you immediately and

9   clearly advise the caller that you do not want to discuss

10  anything about the case with anyone.

11      "If, after so advising a member of the press or anyone else,

12  you are further bothered or harassed by anyone seeking a

13  statement, please report that fact immediately to the presiding

14  judge, who will take appropriate action.

15      "This notice is also to remind you that if you choose to

16  discuss anything about your jury duty with anyone, including the

17  press, you are under no circumstances to discuss or in any way

18  disclose anything about the deliberative process or the vote of

19  any of your fellow jurors."

20      Okay.  I think you get a copy of this upon your discharge

21  from jury service.  You'll also get a certificate from the jury

22  administrator's office that recognizes your service here, so that

23  will be forthcoming as well.

24      Counsel, is there anything else that we would like to cover

25  in front of the jury?

1          MR. GIEGER:  No, Your Honor.

2          THE COURT:  Counsel?

3      With that we will -- Cesyle, do they have to go back

4  downstairs before they leave today?

5          THE DEPUTY CLERK:  No, not really.  They can give

6  everything to me.

7          THE COURT:  Again, thank you for your patience and for

8  your consideration and attention.  With that, we'll go ahead and

9  release you from your jury service.  The CSO will show you back

10  to the jury room.

11          THE COURT SECURITY OFFICER:  All rise.

12          (WHEREUPON, at this point in the proceedings, the jury

13  panel leaves the courtroom.)

14          THE COURT:  Counsel, if you all will be seated.  I have

15  the jury verdict form here.  We can get it copied for you.  Like

16  I said, it's kind of got a coffee stain on it or some kind of

17  soft drink stain on it.  Is there anything that we need to cover

18  before we close out the record?

19          MR. GIEGER:  Judge, do you want motions about making the

20  jury verdict the judgment of the Court now or at some later point

21  in time, Judge?

22          THE COURT:  Why don't you go ahead and file the motion

23  for that.  I still have the motions pending in the previous

24  matter, the *Alexander* matter, and I'm certainly going to get to

25  those soon.

 1      So why don't you go ahead and do that.  Talk to the other

 2  side.  If you do prepare a judgment, make sure, of course, you

 3  circulate it so they can approve it as to form.

 4          MR. GIEGER:  I assume the Court is not looking for a

 5  deadline to have that immediately.  Like, you don't need it

 6  tomorrow, right, Judge?

 7          THE COURT:  Well, if this were a stand-alone case I

 8  would give you seven days to do it; but, seeing how this is one

 9  of several in the MDL, there is a little less urgency.  Since

10  this is really -- technically, it's the third bellwether, but

11  it's the second one that we've tried, so there is a little less

12  urgency insofar as where we are in the MDL in the grand galaxy of

13  cases that we have here, so I won't give you a deadline to do

14  that.

15          MR. GIEGER:  I want to make sure I stay within your

16  parameters, Judge, and I will certainly consult with the other

17  parties before we present something to the Court.

18          THE COURT:  Let's do that.  Anything else to cover on

19  the record, Counsel?

20      All right.  Well, we'll go ahead and close it out.  Again,

21  thank you all very much, and we will, I'm sure, talk where we are

22  in the MDL.

23      This, like the first case, is one of many battles that are

24  fought in the MDL, and we'll have to put this one in context

25  along with the first one and the ones that are upcoming, so we'll

1   go from here.  Thank you all.

2           (WHEREUPON, at 3:22 p.m. the proceedings were

3   concluded.)

4                           *    *    *

5

6

7                      REPORTER'S CERTIFICATE

8

9       I, Cathy Pepper, Certified Realtime Reporter, Registered

10  Merit Reporter, Registered Professional Reporter, Certified Court

11  Reporter of the State of Louisiana, Official Court Reporter for

12  the United States District Court, Eastern District of Louisiana,

13  do hereby certify that the foregoing is a true and correct

14  transcript, to the best of my ability and understanding, from the

15  record of the proceedings in the above-entitled and numbered

16  matter.

17

18

19                          *s/Cathy Pepper*

20                          Cathy Pepper, CRR, RMR, CCR

21                          Official Court Reporter

22                          United States District Court

23

24

25

## $

**$65,000** [2] - 2606:23, 2614:5
**$650** [1] - 2607:9

## '

**'06** [3] - 2646:1, 2647:17, 2661:12
**'07** [4] - 2633:7, 2646:2, 2647:18, 2661:13
**'08** [3] - 2626:24, 2633:7, 2656:3
**'09** [1] - 2661:14
**'20s** [1] - 2595:22

## 0

**0008** [1] - 2624:5
**0016** [1] - 2624:5
**008** [1] - 2604:11
**035** [1] - 2668:7
**044** [1] - 2668:11
**048** [1] - 2666:20
**06** [1] - 2624:5
**09-2977** [1] - 2581:9
**095** [1] - 2667:5
**097** [1] - 2667:23

## 1

**1** [14] - 2665:5, 2666:17, 2670:23, 2671:6, 2701:19, 2702:5, 2702:7, 2702:24, 2703:2, 2703:24, 2710:10, 2715:18, 2715:24, 2717:21
**10** [6] - 2581:11, 2597:22, 2609:8, 2666:10, 2708:6, 2708:20
**10,000** [2] - 2618:11, 2618:16
**100** [4] - 2582:7, 2687:21, 2703:21, 2704:9
**1000** [1] - 2581:21
**10:41** [1] - 2650:16
**11** [7] - 2662:12, 2662:14, 2663:17, 2666:13, 2670:1, 2715:19, 2715:25
**12** [10] - 2587:18,

2602:25, 2617:14, 2617:18, 2634:5, 2652:5, 2666:15, 2670:8, 2715:19, 2715:25
**12/14/05** [1] - 2628:19
**12398** [2] - 2712:22, 2713:1
**12401** [1] - 2712:22
**12660** [1] - 2713:3
**13** [10] - 2614:11, 2653:14, 2659:16, 2666:22, 2668:5, 2670:13, 2670:16, 2715:19, 2715:25
**130** [1] - 2611:23, 2638:19, 2657:16, 2667:12, 2667:20
**13th** [2] - 2643:20, 2668:9
**14** [3] - 2665:21, 2667:1, 2668:9
**143,000** [1] - 2665:12
**15** [3] - 2584:18, 2667:9, 2668:23
**16** [3] - 2626:14, 2666:4, 2667:15
**17** [1] - 2667:21
**17th** [1] - 2631:17
**18** [1] - 2667:25
**1873** [1] - 2581:5
**19** [5] - 2585:14, 2639:13, 2666:9, 2666:25, 2668:4
**19-foot** [1] - 2594:1
**1992** [1] - 2665:10
**1997** [1] - 2630:4
**1st** [4] - 2644:5, 2644:8, 2645:23, 2649:17

## 2

**2** [12] - 2608:23, 2632:16, 2665:8, 2701:22, 2701:23, 2702:5, 2702:7, 2702:24, 2703:24, 2705:23, 2717:24
**20** [8] - 2584:22, 2585:10, 2585:14, 2587:8, 2605:7, 2609:8, 2668:8, 2705:19
**20,000** [1] - 2654:16
**2000** [3] - 2605:20, 2605:25, 2632:13
**2001** [2] - 2605:25, 2630:17

**2002** [7] - 2610:3, 2619:1, 2620:9, 2625:10, 2625:14, 2626:8, 2631:12
**2003** [3] - 2619:1, 2620:10, 2620:11
**2004** [5] - 2587:18, 2606:5, 2619:1, 2638:7, 2638:8
**2005** [16] - 2590:10, 2606:5, 2610:4, 2619:1, 2619:22, 2627:23, 2630:7, 2630:10, 2631:14, 2637:16, 2665:21, 2666:4, 2666:9, 2668:17, 2669:19
**2006** [27] - 2617:3, 2605:20, 2617:14, 2619:1, 2628:8, 2629:11, 2630:5, 2633:4, 2633:9, 2634:11, 2636:14, 2644:2, 2644:5, 2644:8, 2649:17, 2670:1, 2670:8, 2670:13, 2670:16, 2670:18, 2670:21, 2670:23, 2671:1, 2671:6, 2671:14, 2671:16
**2007** [12] - 2617:19, 2618:11, 2618:15, 2619:1, 2626:11, 2626:14, 2630:25, 2633:8, 2634:16, 2635:11, 2635:16, 2671:7
**2008** [25] - 2603:7, 2617:20, 2618:17, 2618:25, 2625:17, 2625:18, 2625:19, 2625:20, 2626:5, 2626:8, 2629:13, 2630:25, 2632:14, 2633:9, 2637:11, 2637:18, 2639:10, 2644:12, 2658:8, 2660:25, 2661:8, 2666:17, 2666:22, 2670:21, 2671:21
**2009** [19] - 2625:12, 2625:14, 2626:5, 2631:5, 2631:17, 2631:19, 2639:2, 2661:9, 2667:2, 2667:11, 2667:16, 2667:18, 2667:22, 2668:5, 2668:9, 2671:23, 2672:10,

2672:15
**201** [1] - 2582:18
**2010** [3] - 2581:6, 2584:2, 2717:2
**20th** [4] - 2590:10, 2650:11, 2658:1, 2671:14
**21** [3] - 2668:12, 2669:19, 2671:16
**214,000** [1] - 2610:8
**21st** [4] - 2597:9, 2629:13, 2658:2, 2671:14
**22** [1] - 2668:15
**23** [2] - 2668:17, 2705:23
**2315** [4] - 2630:23, 2669:18, 2672:3, 2672:15
**23rd** [1] - 2632:8
**24** [2] - 2650:17, 2668:22
**24-by-24** [2] - 2596:20, 2654:1
**24-hour** [3] - 2667:9, 2667:19, 2668:8
**25** [1] - 2669:2
**2587** [1] - 2583:5
**26** [2] - 2609:1, 2669:8
**260** [1] - 2612:1
**2600** [1] - 2583:6
**2611** [1] - 2583:7
**2614** [1] - 2583:8
**2640** [1] - 2583:9
**2653** [1] - 2583:10
**2663** [1] - 2583:11
**26th** [1] - 2711:13
**27** [2] - 2630:16, 2669:12
**2705** [1] - 2583:12
**2717** [1] - 2583:13
**28** [4] - 2602:24, 2669:15, 2715:19, 2715:24
**29** [5] - 2581:6, 2584:2, 2666:13, 2669:21, 2717:2
**29.5** [1] - 2668:1
**29402** [1] - 2582:4
**29th** [1] - 2631:19

## 3

**3** [11] - 2604:24, 2665:12, 2701:25, 2702:1, 2702:5, 2702:7, 2702:24, 2703:3, 2703:24, 2706:5, 2718:1

**30** [4] - 2609:6, 2623:11, 2668:17, 2669:23
**300** [3] - 2604:20, 2604:24, 2639:18
**31** [1] - 2670:2
**32** [2] - 2665:20, 2670:4
**32-foot** [1] - 2594:2
**32.9** [1] - 2666:19
**33** [1] - 2670:8
**34** [2] - 2670:13, 2706:2
**35** [3] - 2627:2, 2668:7, 2670:17
**35,000** [1] - 2593:6
**36** [2] - 2670:20, 2706:5
**3600** [1] - 2582:18
**37** [1] - 2670:22
**38** [1] - 2670:25
**39** [2] - 2597:5, 2671:3
**39-minute** [1] - 2585:6
**3:22** [1] - 2729:2
**3rd** [1] - 2631:24

## 4

**4** [7] - 2626:24, 2665:15, 2702:6, 2702:8, 2702:11, 2702:12, 2703:25
**4/1/08** [1] - 2626:23
**40** [6] - 2584:21, 2585:8, 2585:12, 2615:2, 2671:7, 2706:9
**40,000** [1] - 2592:10
**41** [1] - 2671:8
**42** [1] - 2671:11
**4265** [1] - 2581:21
**43** [1] - 2671:14
**44** [5] - 2584:25, 2585:3, 2668:11, 2671:20, 2707:11
**45** [3] - 2585:5, 2634:7, 2671:25
**4550** [1] - 2581:24
**46** [2] - 2667:19, 2672:2
**47** [3] - 2672:6, 2708:7, 2708:9
**48** [5] - 2666:21, 2666:25, 2668:2, 2672:9, 2707:6
**4800** [1] - 2582:12
**486** [1] - 2582:4
**49** [1] - 2672:13
**4X4TSMHSC008992**

[1] - 2666:11

**5**

**5** [6] - 2665:19, 2702:12, 2702:14, 2702:25, 2703:12, 2703:25
**5,000** [2] - 2593:7, 2665:16
**5/8/2008** [1] - 2625:20
**50** [6] - 2613:19, 2644:2, 2652:23, 2654:6, 2713:8, 2713:12
**500** [2] - 2582:23, 2606:14
**504** [1] - 2582:24
**517** [1] - 2611:16
**519** [1] - 2590:20
**52** [2] - 2706:22, 2706:23
**53** [2] - 2609:1, 2667:20
**541** [1] - 2661:17
**580** [1] - 2611:16
**589-7779** [1] - 2582:24

**6**

**6** [11] - 2637:16, 2665:24, 2702:7, 2702:13, 2702:17, 2702:18, 2702:22, 2702:23, 2703:3, 2704:3, 2718:5
**60,000** [1] - 2608:21
**60th** [1] - 2585:15
**622** [1] - 2581:18
**663** [1] - 2611:19

**7**

**7** [8] - 2617:15, 2617:18, 2666:2, 2669:10, 2702:23, 2703:6, 2703:12, 2704:3
**7/05** [1] - 2628:21
**7/29/09** [1] - 2621:22
**70** [2] - 2666:24, 2667:17
**701** [1] - 2582:12
**70113** [1] - 2581:18
**70130** [1] - 2582:23
**70139** [1] - 2582:13
**70170** [1] - 2582:18
**72** [2] - 2667:4, 2668:2

**77.1** [2] - 2667:14
**77027** [1] - 2581:21
**78257** [1] - 2582:8
**78413** [1] - 2581:24

**8**

**8** [12] - 2604:12, 2605:5, 2666:3, 2666:6, 2666:13, 2666:14, 2667:2, 2667:22, 2702:25, 2703:1, 2703:15, 2703:16
**8/15/08** [1] - 2629:9
**80** [2] - 2597:17, 2604:19
**800** [1] - 2638:7
**81** [1] - 2639:23
**81.9** [1] - 2667:6
**84.9** [1] - 2667:13
**85.3** [1] - 2666:19
**86.6** [1] - 2667:8
**8:30** [1] - 2581:6
**8th** [4] - 2631:24, 2667:11, 2667:15, 2667:18

**9**

**9** [3] - 2666:8, 2672:14, 2704:10
**9/11** [1] - 2616:8
**90** [3] - 2597:18, 2642:3, 2646:4
**90-year-old** [1] - 2641:24
**93** [1] - 2638:19
**95** [3] - 2611:23, 2667:5, 2667:18
**96** [1] - 2632:16
**97** [1] - 2667:23
**9:14** [1] - 2650:15
**9th** [3] - 2631:24, 2667:11, 2667:16

**A**

**A.M** [1] - 2581:6
**a.m** [2] - 2650:15, 2650:16
**AARON** [1] - 2581:17
**ability** [1] - 2729:14
**able** [7] - 2602:2, 2637:3, 2644:11, 2653:23, 2714:25, 2719:20, 2722:16
**above-entitled** [1] -

2729:15
**ABS** [4] - 2646:24, 2648:17, 2654:4
**absence** [1] - 2685:24
**absolutely** [1] - 2726:5
**accept** [4] - 2675:5, 2700:10, 2719:6, 2725:11
**acceptance** [1] - 2690:13
**accepted** [4] - 2645:20, 2652:5, 2690:19, 2690:20
**access** [1] - 2707:14
**accident** [7] - 2685:3, 2685:4, 2685:7, 2688:24, 2696:14, 2696:19, 2696:22
**accommodations** [1] - 2587:23
**accomplish** [1] - 2589:18
**accordance** [1] - 2691:14
**according** [1] - 2689:1
**accordingly** [1] - 2615:16
**account** [2] - 2592:24, 2605:12
**accountant** [1] - 2655:1
**accrued** [1] - 2694:22
**accuracy** [1] - 2694:14
**accused** [1] - 2722:11
**Act** [1] - 2678:4
**act** [4] - 2613:22, 2684:11, 2688:20, 2698:7
**acted** [3] - 2592:11, 2681:12, 2698:18
**action** [8] - 2609:7, 2636:15, 2658:5, 2693:22, 2698:5, 2707:6, 2707:8, 2726:14
**actions** [7] - 2641:1, 2641:8, 2682:11, 2686:16, 2702:19, 2703:8, 2718:6
**activation** [1] - 2696:10
**active** [4] - 2667:1, 2667:18, 2667:21, 2668:4
**acts** [3] - 2691:25, 2694:21, 2706:17
**actual** [5] - 2651:21, 2672:17, 2679:5, 2679:6, 2680:1,

2680:2, 2681:1, 2681:2, 2682:8, 2686:13, 2691:5, 2692:23
**acute** [1] - 2629:5
**add** [1] - 2703:21
**additional** [1] - 2711:8
**address** [5] - 2586:22, 2587:10, 2591:17, 2634:20, 2690:10
**addressed** [1] - 2673:18
**adequate** [10] - 2680:5, 2680:16, 2681:4, 2681:6, 2681:14, 2681:21, 2682:14, 2702:2, 2702:3, 2718:3
**adequately** [1] - 2683:20
**adjust** [1] - 2695:24
**adjustment** [1] - 2696:2
**administered** [2] - 2606:24, 2607:16
**administrator** [2] - 2589:7, 2723:19
**administrator's** [1] - 2726:22
**admire** [1] - 2720:1
**admissible** [3] - 2664:20, 2673:7, 2674:10
**admits** [4] - 2591:2, 2614:4, 2618:3, 2636:1
**admitted** [5] - 2625:2, 2625:6, 2630:25, 2635:6, 2700:1
**admonished** [1] - 2673:23
**adopt** [2] - 2641:11, 2712:11
**advance** [1] - 2675:11
**advantage** [2] - 2698:14, 2698:16
**adverse** [5] - 2605:9, 2606:13, 2624:4, 2624:6, 2679:16
**advice** [2] - 2606:2, 2631:13
**advisability** [1] - 2685:5
**advise** [7] - 2589:17, 2589:19, 2589:23, 2703:4, 2703:13, 2705:6, 2726:9
**advised** [1] - 2590:3
**advising** [1] - 2726:11
**affect** [2] - 2628:17,

2642:7
**affected** [1] - 2629:11
**affidavit** [1] - 2655:21
**afraid** [1] - 2651:12
**age** [2] - 2595:10, 2642:8
**agencies** [4] - 2588:7, 2604:3, 2650:3, 2650:20
**Agency** [2] - 2601:21, 2604:9
**aggravation** [9] - 2626:3, 2696:9, 2696:19, 2696:21, 2696:24, 2696:25, 2697:5, 2697:7, 2697:8
**ago** [3] - 2605:7, 2719:13, 2723:13
**agree** [5] - 2622:24, 2624:16, 2630:9, 2651:25, 2708:5
**agreed** [4] - 2617:6, 2621:13, 2649:6, 2665:5
**agreement** [2] - 2666:5, 2699:13
**ahead** [17] - 2585:23, 2585:25, 2610:22, 2653:11, 2653:13, 2662:11, 2705:4, 2708:3, 2708:4, 2708:15, 2708:25, 2709:1, 2717:19, 2727:8, 2727:22, 2728:1, 2728:20
**AHLQUIST** [1] - 2581:17
**ahold** [2] - 2715:3, 2715:4
**aiding** [1] - 2659:13
**aids** [1] - 2674:13
**air** [25] - 2593:2, 2594:9, 2594:11, 2594:18, 2595:3, 2595:6, 2595:12, 2599:4, 2630:10, 2630:11, 2630:14, 2634:1, 2634:3, 2634:4, 2634:6, 2634:7, 2638:16, 2638:17, 2640:5, 2647:20, 2649:23, 2666:15, 2668:1
**aired** [1] - 2649:18
**airing** [3] - 2590:7, 2650:12, 2671:15
**airways** [1] - 2609:9
**AL** [1] - 2581:8
**alcohol** [5] - 2606:8,

2608:1, 2608:3, 2632:14, 2632:21
**alcoholic** [1] - 2607:19
**alert** [1] - 2599:11
**Alexander** [2] - 2709:21, 2727:24
**alignment** [1] - 2647:1
**alleged** [4] - 2648:13, 2684:5, 2684:10, 2690:10
**allegedly** [1] - 2693:25
**allergies** [6] - 2610:4, 2619:25, 2628:4, 2629:3, 2629:4, 2655:12
**allocate** [2] - 2613:17, 2703:16
**allocated** [1] - 2613:18
**allocation** [1] - 2703:11
**allow** [2] - 2586:2, 2664:14
**allowance** [1] - 2697:8
**allowed** [4] - 2586:5, 2586:6, 2662:15, 2694:3
**allowing** [1] - 2673:11
**almost** [3] - 2625:21, 2657:15, 2657:19
**alone** [3] - 2618:1, 2665:1, 2728:7
**alphabet** [2] - 2650:2, 2650:20
**ALSO** [1] - 2582:20
**alteration** [3] - 2679:22, 2680:22, 2682:1
**altered** [1] - 2613:1
**alternative** [9] - 2595:8, 2595:21, 2679:12, 2679:16, 2679:17, 2683:13, 2683:14, 2710:13
**Amanda** [2] - 2705:16, 2715:22
**ambient** [1] - 2608:20
**AME** [1] - 2647:12
**American** [2] - 2602:6, 2665:16
**amount** [15] - 2677:4, 2686:19, 2691:22, 2692:11, 2693:11, 2694:13, 2694:23, 2695:2, 2695:15, 2695:18, 2695:24, 2695:25, 2696:1, 2697:15, 2704:11
**ample** [1] - 2613:8

**anchored** [1] - 2670:10
**anchoring** [1] - 2669:4
**anguish** [5] - 2693:20, 2696:3, 2697:10, 2697:23, 2704:15
**animal** [1] - 2648:3
**annotated** [2] - 2705:15, 2705:18
**answer** [18] - 2612:20, 2613:2, 2613:6, 2613:9, 2613:15, 2615:18, 2640:10, 2641:3, 2641:10, 2642:21, 2648:22, 2654:11, 2659:25, 2673:21, 2701:8, 2701:14, 2703:12, 2725:25
**answered** [12] - 2615:20, 2702:5, 2702:6, 2702:11, 2702:12, 2702:22, 2702:23, 2703:2, 2703:11, 2703:23, 2703:24, 2704:2
**answers** [7] - 2640:9, 2675:10, 2675:17, 2700:19, 2700:21, 2700:22, 2703:20
**anterior** [1] - 2620:25
**anticipate** [1] - 2683:6
**anticipated** [9] - 2679:3, 2679:22, 2679:24, 2680:22, 2680:24, 2681:18, 2682:1, 2682:11, 2692:23
**anticipation** [1] - 2587:16
**antihistamine** [5] - 2627:22, 2627:25, 2628:5, 2628:7, 2628:8
**ANTONIO** [1] - 2582:8
**anxiety** [7] - 2606:20, 2607:10, 2607:14, 2632:9, 2632:10, 2693:21
**anyway** [2] - 2649:8, 2651:4
**apologize** [1] - 2632:24
**appear** [1] - 2611:7
**APPEARANCES** [2] - 2581:15, 2582:1
**appellate** [1] - 2581:25
**apples** [1] - 2608:17
**appliance** [1] -

2597:23
**appliances** [1] - 2588:3
**applicable** [6] - 2604:12, 2605:2, 2605:3, 2605:4, 2664:22, 2678:10
**applicant** [1] - 2636:3
**application** [1] - 2690:24
**apply** [4] - 2658:20, 2664:16, 2664:24, 2684:10
**applying** [2] - 2666:22, 2667:15
**appointments** [3] - 2598:14, 2631:24, 2632:2
**appreciate** [7] - 2586:12, 2610:24, 2652:16, 2714:17, 2720:10, 2720:12, 2725:25
**appreciated** [1] - 2722:15
**approach** [3] - 2617:8, 2618:12, 2713:5
**appropriate** [5] - 2614:9, 2687:23, 2694:17, 2712:25, 2726:14
**approve** [1] - 2728:3
**approved** [4] - 2689:2, 2690:2, 2690:18, 2690:25
**approves** [2] - 2689:6, 2689:18
**April** [3] - 2636:14, 2644:13, 2671:1
**arbitrary** [1] - 2694:11
**Arceneaux** [1] - 2718:22
**ARCENEAUX** [1] - 2718:23
**area** [6] - 2602:10, 2669:24, 2672:8, 2672:10, 2714:21, 2714:22
**areas** [1] - 2631:1
**argued** [2] - 2673:4, 2713:23
**argument** [12] - 2584:17, 2585:21, 2586:19, 2610:18, 2610:19, 2610:20, 2639:8, 2639:14, 2648:16, 2710:13, 2713:12, 2714:4
**arguments** [10] - 2585:19, 2586:3,

2586:7, 2586:11, 2586:14, 2617:19, 2641:11, 2701:11, 2711:14, 2714:13
**ARGUMENTS** [12] - 2583:5, 2583:6, 2583:7, 2583:8, 2583:9, 2583:10, 2587:12, 2600:1, 2611:1, 2614:18, 2640:19, 2653:18
**arising** [2] - 2682:4
**arms** [2] - 2620:2, 2628:21
**Army** [1] - 2669:14
**arose** [3] - 2679:2, 2679:23, 2680:23
**arrived** [1] - 2666:8
**asbestos** [1] - 2608:9
**aside** [2] - 2684:14, 2721:23
**aspects** [1] - 2587:9
**assembly** [1] - 2592:23
**assert** [1] - 2688:25
**asserted** [6] - 2683:18, 2683:19, 2684:8, 2686:15, 2686:24, 2687:2
**asserting** [1] - 2684:13
**asserts** [1] - 2683:23
**assess** [3] - 2691:22, 2692:11, 2692:14
**assessment** [1] - 2693:3
**assign** [4] - 2687:16, 2687:22, 2688:2, 2688:8
**assigned** [1] - 2668:16
**assigning** [1] - 2687:20
**assistance** [2] - 2592:14, 2668:18
**assistance/technical** [1] - 2668:18
**associated** [7] - 2590:15, 2609:17, 2621:23, 2623:2, 2631:9, 2640:13, 2683:25
**assume** [2] - 2673:24, 2728:4
**assumed** [1] - 2670:24
**asthenia** [1] - 2620:1
**asthma** [21] - 2603:15, 2605:17, 2605:18, 2606:7, 2609:24, 2620:12, 2623:22,

2625:6, 2627:6, 2627:7, 2627:11, 2627:12, 2627:13, 2627:14, 2655:6, 2655:8, 2656:16, 2662:3
**asthmatics** [2] - 2609:8, 2627:14
**AT** [1] - 2581:23
**ATSDR** [12] - 2590:13, 2590:14, 2590:17, 2599:22, 2604:9, 2604:17, 2605:1, 2608:21, 2611:17, 2623:25, 2624:2, 2639:17
**attached** [1] - 2672:14
**attempting** [1] - 2600:18
**attendance** [1] - 2587:6
**attention** [11] - 2586:12, 2612:4, 2614:5, 2652:16, 2653:7, 2705:7, 2719:11, 2720:2, 2720:5, 2720:8, 2727:8
**attentive** [2] - 2714:19, 2720:5
**attic** [1] - 2594:18
**attorney** [5] - 2673:5, 2673:7, 2673:12, 2673:23, 2715:1
**ATTORNEY** [1] - 2581:23
**attorney's** [1] - 2699:9
**attorneys** [15] - 2584:14, 2586:12, 2586:20, 2675:15, 2701:7, 2720:19, 2720:20, 2720:24, 2721:2, 2721:19, 2721:20, 2723:14, 2725:17, 2725:20
**attribute** [1] - 2703:17
**atypia** [1] - 2622:3
**audience** [1] - 2586:4
**August** [11] - 2587:18, 2629:13, 2667:2, 2667:11, 2667:15, 2667:18, 2667:22, 2668:5, 2668:9, 2671:23, 2672:10
**aunt** [1] - 2641:24
**available** [6] - 2601:6, 2601:10, 2651:17, 2682:25, 2683:11, 2683:16
**AVENUE** [1] - 2582:18

**average** [7] - 2608:23, 2666:18, 2666:19, 2667:6, 2667:7, 2667:12, 2667:13
**avoid** [3] - 2681:24, 2685:7, 2698:9
**avoided** [2] - 2698:12, 2698:16
**avoiding** [1] - 2698:19
**award** [25] - 2598:19, 2606:22, 2692:25, 2693:2, 2693:4, 2693:5, 2693:23, 2693:25, 2694:5, 2694:8, 2694:16, 2695:2, 2695:7, 2695:13, 2695:15, 2695:18, 2695:23, 2695:24, 2696:2, 2696:4, 2696:9, 2697:9, 2697:18, 2697:23, 2699:9
**awarded** [2] - 2697:18, 2704:12
**aware** [1] - 2683:25
**awareness** [1] - 2688:14

## B

**B406** [1] - 2582:23
**bacteria** [1] - 2629:6
**bacterial** [1] - 2629:5
**bad** [2] - 2611:10, 2625:14
**BAKER** [1] - 2582:15
**barely** [1] - 2654:4
**BARONNE** [1] - 2581:18
**base** [4] - 2594:3, 2596:20, 2654:2, 2656:24
**based** [11] - 2605:15, 2626:7, 2642:16, 2674:10, 2678:11, 2678:12, 2678:13, 2682:12, 2689:5, 2709:20
**basis** [3] - 2602:22, 2628:11, 2703:16
**bathroom** [3] - 2645:1, 2672:8, 2672:9
**Baton** [2] - 2666:9, 2669:16
**battery** [1] - 2670:12
**battles** [1] - 2728:23
**bear** [1] - 2696:13
**bearing** [6] - 2666:10,

2672:6, 2708:7, 2708:11, 2708:12, 2708:15
**BEARMAN** [1] - 2582:15
**beauty** [1] - 2722:15
**became** [1] - 2699:17
**become** [1] - 2601:10
**becomes** [2] - 2601:6, 2725:10
**beer** [1] - 2632:16
**beers** [1] - 2607:21
**BEFORE** [1] - 2581:12
**began** [1] - 2591:17
**begin** [6] - 2586:13, 2587:2, 2603:2, 2604:7, 2709:3, 2720:25
**beginning** [1] - 2640:9
**begins** [1] - 2586:9
**behalf** [3] - 2587:4, 2589:8, 2720:11
**behind** [1] - 2626:21
**belief** [1] - 2586:22
**beliefs** [1] - 2699:18
**believability** [1] - 2651:11
**believable** [1] - 2600:13
**believes** [2] - 2673:7, 2710:14
**bellwether** [1] - 2728:10
**below** [6] - 2606:13, 2606:14, 2684:19, 2684:25, 2703:10, 2705:23
**benchmarks** [2] - 2604:4, 2604:18
**Benomo** [1] - 2591:24
**bent** [2] - 2646:13, 2646:16
**Berge** [2] - 2666:22, 2667:15
**BERKOWITZ** [1] - 2582:16
**Bermudez** [1] - 2718:24
**BERMUDEZ** [1] - 2718:25
**best** [7] - 2633:4, 2637:15, 2654:6, 2662:8, 2723:8, 2723:23, 2729:14
**better** [10] - 2587:25, 2593:23, 2594:4, 2594:5, 2641:23, 2643:9, 2647:6, 2656:18, 2722:16, 2724:1

**between** [16] - 2584:20, 2586:6, 2603:14, 2607:11, 2611:17, 2613:18, 2632:13, 2633:9, 2666:5, 2676:16, 2688:11, 2688:21, 2690:5, 2695:22, 2703:1, 2714:15
**beyond** [6] - 2600:15, 2612:14, 2660:24, 2677:17, 2682:16, 2710:23
**BHLE** [1] - 2665:20
**bias** [1] - 2676:20
**big** [4] - 2598:24, 2620:1, 2629:21, 2720:19
**billion** [18] - 2590:24, 2590:25, 2591:2, 2591:3, 2599:22, 2601:15, 2604:24, 2605:5, 2606:14, 2608:23, 2609:6, 2610:8, 2611:24, 2612:1, 2639:13, 2639:18, 2657:16, 2666:21
**BINSTOCK** [1] - 2581:20
**Bio** [1] - 2630:9
**Bio-Treat** [1] - 2630:9
**biopsy** [5] - 2631:19, 2631:21, 2631:25, 2660:9
**bit** [11] - 2603:1, 2606:11, 2618:8, 2620:14, 2628:18, 2629:20, 2634:15, 2640:18, 2641:19, 2647:9, 2650:17
**BlackBerry** [1] - 2700:5
**blame** [2] - 2607:13, 2656:6
**blank** [12] - 2703:19, 2703:22, 2703:25, 2704:2, 2704:3, 2704:4, 2704:6, 2704:8, 2704:14, 2704:16, 2704:17, 2704:20
**blatantly** [1] - 2610:8
**bleeding** [3] - 2601:23, 2602:14, 2656:19
**blocked** [1] - 2670:9
**blocking** [1] - 2669:4
**blocks** [2] - 2645:2, 2661:20

**blog** [1] - 2700:7
**blood** [6] - 2599:17, 2599:18, 2620:2, 2626:17, 2626:19, 2656:14
**bloodstream** [1] - 2601:8
**bloody** [2] - 2622:14, 2692:17
**blow** [1] - 2597:24
**board** [2] - 2596:24, 2600:10, 2619:11, 2660:17
**Board** [1] - 2602:6
**Bobbie** [8] - 2633:20, 2636:22, 2637:1, 2638:10, 2647:15, 2648:1, 2666:12, 2668:16
**bodily** [1] - 2697:9
**body** [2] - 2628:15, 2628:22
**boil** [1] - 2614:22
**BONE** [1] - 2582:11
**bone** [1] - 2621:21
**book** [1] - 2724:6
**Boston** [1] - 2622:17
**bothered** [1] - 2726:12
**bothers** [2] - 2650:7, 2722:20
**bottom** [7] - 2604:8, 2606:12, 2607:24, 2645:9, 2646:22, 2646:24, 2706:19
**bound** [1] - 2601:10
**box** [3] - 2644:17, 2715:20, 2716:1
**BOX** [1] - 2582:4
**Boyle** [3] - 2635:23, 2643:6, 2643:16
**brain** [2] - 2661:3, 2661:5
**Branscome** [1] - 2672:13
**breached** [1] - 2684:21
**break** [13] - 2585:22, 2585:23, 2585:24, 2653:10, 2653:17, 2664:2, 2700:14, 2705:5, 2705:6, 2714:18, 2720:10
**breaker** [1] - 2644:17
**breathed** [1] - 2601:7
**breathing** [1] - 2606:8
**Brian** [2] - 2635:23, 2643:6
**brief** [1] - 2663:19
**briefing** [2] - 2711:8, 2712:12

**blog** [1] - 2700:7
**briefly** [2] - 2609:22, 2648:23
**brilliant** [1] - 2609:12
**bring** [7] - 2617:16, 2658:15, 2663:21, 2698:5, 2701:5, 2716:1, 2716:3
**bringing** [2] - 2686:1, 2712:3
**brochure** [1] - 2634:12
**broken** [1] - 2600:17
**brought** [4] - 2607:14, 2625:16, 2643:16, 2719:24
**build** [8] - 2593:9, 2593:10, 2649:15, 2656:24, 2658:13, 2658:14, 2660:5
**BUILDING** [1] - 2582:7
**building** [7] - 2593:15, 2593:16, 2616:7, 2616:10, 2715:2, 2715:3, 2720:21
**buildings** [1] - 2630:12
**buildup** [1] - 2594:6
**built** [10] - 2591:13, 2592:22, 2593:16, 2595:1, 2616:11, 2616:19, 2638:7, 2645:9, 2659:2, 2659:3
**bulk** [1] - 2672:11
**bunch** [1] - 2645:6
**burden** [17] - 2600:12, 2600:15, 2612:11, 2615:10, 2615:21, 2620:20, 2622:11, 2623:5, 2677:1, 2679:15, 2685:6, 2686:17, 2687:12, 2689:3, 2698:24, 2699:5, 2713:15
**burdensome** [1] - 2724:10
**Bureau** [1] - 2695:5
**bureaucrat** [2] - 2722:5, 2722:12
**Burian** [1] - 2635:18
**burned** [1] - 2649:24
**burning** [2] - 2599:1, 2612:2
**business** [4] - 2588:23, 2612:6, 2618:11, 2618:21
**busy** [1] - 2724:14
**buy** [1] - 2657:8
**BY** [20] - 2581:17, 2581:20, 2582:3, 2582:6, 2582:11,

2582:16, 2582:24, 2582:25, 2583:5, 2583:6, 2583:7, 2583:8, 2583:9, 2583:10, 2587:13, 2600:2, 2611:2, 2614:19, 2640:20, 2653:19

## C

calculating [1] - 2695:4
calculation [4] - 2666:24, 2667:17, 2694:25, 2707:12
calculations [1] - 2708:2
CALDWELL [1] - 2582:15
California [2] - 2651:8, 2665:20
CALLED [2] - 2584:4, 2717:4
caller [1] - 2726:9
Cancer [1] - 2601:21
cancer [18] - 2601:22, 2602:15, 2606:17, 2609:13, 2609:17, 2621:17, 2631:3, 2631:4, 2631:5, 2631:8, 2651:7, 2651:12, 2651:13, 2692:18, 2697:25, 2698:4
cancerous [1] - 2609:21
cancers [1] - 2660:19
candid [2] - 2723:20, 2724:15
cannot [6] - 2675:12, 2683:3, 2689:4, 2689:16, 2691:9, 2694:4
cap [5] - 2639:3, 2645:1, 2672:4, 2672:8, 2672:12
capabilities [1] - 2660:24
capable [5] - 2587:22, 2592:7, 2595:8, 2595:17, 2679:12
capacities [1] - 2688:17
capacity [3] - 2589:14, 2589:15, 2697:11
car [4] - 2598:9, 2598:10, 2633:12, 2639:5

carcinogen [2] - 2601:18
carcinogenic [1] - 2601:20
care [14] - 2606:6, 2608:22, 2652:21, 2680:4, 2680:15, 2681:14, 2682:10, 2683:7, 2684:20, 2684:22, 2684:25, 2685:8, 2696:7, 2725:24
careful [2] - 2688:6, 2703:18
carefully [3] - 2664:13, 2688:1, 2701:11
cares [1] - 2636:23
Carolina [1] - 2616:17
carpet [1] - 2594:8
carpets [1] - 2657:11
carry [2] - 2589:9, 2596:11
CARSON [1] - 2582:12
case [117] - 2584:15, 2586:15, 2586:21, 2587:9, 2587:22, 2588:15, 2590:9, 2591:15, 2596:8, 2598:19, 2599:15, 2600:5, 2600:23, 2603:12, 2603:15, 2608:13, 2612:15, 2614:24, 2615:13, 2619:6, 2619:7, 2620:1, 2620:3, 2620:15, 2623:12, 2623:14, 2624:10, 2627:2, 2627:9, 2628:12, 2633:17, 2633:18, 2634:3, 2634:18, 2638:12, 2639:25, 2640:22, 2642:1, 2652:18, 2653:21, 2662:13, 2664:16, 2664:22, 2664:25, 2671:24, 2672:22, 2673:6, 2674:4, 2675:15, 2676:1, 2676:24, 2677:7, 2677:17, 2678:10, 2678:15, 2679:8, 2680:8, 2683:18, 2687:10, 2687:25, 2692:5, 2693:8, 2699:3, 2699:12, 2699:14, 2699:16, 2699:20, 2699:22, 2700:3, 2700:9, 2700:10,

2701:2, 2701:17, 2704:25, 2707:22, 2709:23, 2711:1, 2711:3, 2713:9, 2713:10, 2713:12, 2713:17, 2714:10, 2714:11, 2714:13, 2714:24, 2719:7, 2719:15, 2720:6, 2720:13, 2720:15, 2720:17, 2720:19, 2720:24, 2721:1, 2721:3, 2721:8, 2721:9, 2721:12, 2721:14, 2721:15, 2721:16, 2721:20, 2721:21, 2722:9, 2722:13, 2722:14, 2725:17, 2725:18, 2725:20, 2726:6, 2726:10, 2728:7, 2728:23
cases [4] - 2660:18, 2721:17, 2722:11, 2728:13
CAT [8] - 2610:3, 2625:10, 2625:12, 2626:8, 2660:25, 2661:3, 2661:5
Catastrophe [1] - 2665:16
CATHY [1] - 2582:22
Cathy [3] - 2714:7, 2729:9, 2729:20
caught [1] - 2589:13
causal [3] - 2603:13, 2688:11, 2688:21
causally [1] - 2602:16
causation [5] - 2587:11, 2631:6, 2648:10, 2710:10, 2710:13
caused [37] - 2596:22, 2596:23, 2602:1, 2603:24, 2605:16, 2605:17, 2609:17, 2609:25, 2617:25, 2620:23, 2622:25, 2625:14, 2627:6, 2627:12, 2629:15, 2630:2, 2648:11, 2648:17, 2648:20, 2648:21, 2660:12, 2672:11, 2678:8, 2678:24, 2679:19, 2680:19, 2681:13, 2683:2, 2683:13, 2684:11, 2685:14, 2687:8, 2687:15, 2691:25, 2693:24,

2694:20
causes [3] - 2621:17, 2685:23, 2685:25
causing [3] - 2591:3, 2619:13, 2629:7
cavities [1] - 2595:2
cavity [1] - 2602:10
CCR [2] - 2582:22, 2729:20
CDC [5] - 2590:20, 2656:4, 2657:13, 2658:7
ceiling [2] - 2595:1, 2595:3
cell [5] - 2609:19, 2609:21, 2700:5, 2700:11, 2706:24
cells [4] - 2621:5, 2621:15, 2622:1, 2622:2
cellular [2] - 2606:15, 2623:18
censored [1] - 2624:23
Census [1] - 2695:6
census [1] - 2608:21
center [1] - 2715:1
Centers [1] - 2604:10
certain [12] - 2668:12, 2668:19, 2674:6, 2675:8, 2676:15, 2681:16, 2682:13, 2687:6, 2695:1, 2711:7, 2711:11, 2724:11
certainly [10] - 2603:24, 2618:21, 2627:11, 2636:2, 2637:2, 2655:22, 2713:9, 2719:15, 2727:24, 2728:16
certainty [2] - 2624:10, 2624:11
CERTIFICATE [1] - 2729:7
certificate [2] - 2635:20, 2726:21
certified [3] - 2602:5, 2660:17, 2672:14
Certified [2] - 2729:9, 2729:10
certify [1] - 2729:13
Cesyle [1] - 2727:3
chance [5] - 2586:21, 2662:20, 2664:11, 2720:20, 2723:14
change [8] - 2607:23, 2623:18, 2623:20, 2630:11, 2653:15, 2682:2, 2682:4,

2699:17
changed [2] - 2625:23, 2646:20
changes [6] - 2621:3, 2623:19, 2628:22, 2660:9, 2661:10, 2682:8
changing [1] - 2630:13
characteristic [11] - 2678:24, 2679:19, 2680:14, 2680:16, 2680:19, 2681:9, 2681:15, 2682:20, 2682:21, 2683:1, 2683:12
characteristics [1] - 2682:19
charge [23] - 2585:24, 2619:4, 2643:7, 2643:8, 2662:23, 2662:24, 2663:7, 2672:24, 2700:20, 2709:8, 2710:9, 2710:15, 2710:17, 2710:19, 2710:24, 2710:25, 2711:2, 2711:19, 2711:25, 2712:1, 2712:5, 2713:2
charged [2] - 2607:9, 2659:13
charges [9] - 2662:14, 2663:9, 2663:10, 2664:3, 2664:14, 2709:2, 2709:3, 2711:7, 2712:13
CHARLES [1] - 2582:18
Charles [2] - 2605:19
CHARLESTON [1] - 2582:4
chart [2] - 2610:7, 2643:21
chatroom [1] - 2700:7
cheaper [3] - 2593:25, 2594:1, 2594:2
Cheatwood [3] - 2585:7, 2585:10, 2585:13
CHEATWOOD [8] - 2582:17, 2585:11, 2640:20, 2652:15, 2707:11, 2707:17, 2707:23, 2708:12
CHEATWOOD........... ......... [1] - 2583:9
check [4] - 2585:22, 2612:9, 2648:24, 2659:4

**checklist** [3] - 2590:8, 2597:22, 2658:3
**chemical** [4] - 2600:24, 2604:1, 2608:7, 2639:20
**chemically** [1] - 2601:3
**chemicals** [3] - 2597:1, 2605:9, 2630:8
**children** [5] - 2618:24, 2619:2, 2637:19, 2654:24, 2723:7
**chlorine** [1] - 2630:4
**choice** [3] - 2591:7, 2632:18, 2724:25
**choose** [6] - 2664:5, 2664:12, 2710:3, 2724:21, 2725:22, 2726:15
**chose** [1] - 2709:17
**chosen** [3] - 2705:8, 2719:13, 2723:12
**CHRIS** [1] - 2581:23
**CHRISTI** [1] - 2581:24
**chronic** [7] - 2602:8, 2602:9, 2602:13, 2626:10, 2655:11, 2662:6
**church** [1] - 2642:2
**Cialis** [3] - 2620:4, 2627:19, 2628:10
**cigarette** [1] - 2610:6
**cigarettes** [1] - 2637:24
**ciliated** [2] - 2621:5, 2622:1
**circle** [2] - 2706:22, 2706:23
**circulate** [1] - 2728:3
**circumstances** [12] - 2675:12, 2676:14, 2681:20, 2682:4, 2682:13, 2684:24, 2685:6, 2688:19, 2694:15, 2694:17, 2699:3, 2726:17
**circumstantial** [3] - 2676:13, 2676:17, 2676:19
**citizens** [1] - 2668:25
**city** [3] - 2630:6, 2630:7, 2658:16
**City** [2] - 2617:21, 2618:19
**civic** [1] - 2721:24
**civil** [4] - 2587:7, 2600:11, 2612:11, 2723:1
**Civil** [2] - 2630:11,

2710:18
**claim** [18] - 2608:10, 2647:2, 2677:5, 2677:14, 2679:10, 2680:8, 2681:25, 2684:8, 2684:9, 2684:13, 2684:15, 2686:15, 2686:24, 2687:2, 2692:10, 2692:18, 2697:2, 2699:8
**claimed** [4] - 2646:13, 2646:21, 2654:24, 2692:12
**claiming** [2] - 2609:24, 2653:22
**claims** [17] - 2651:6, 2676:25, 2677:12, 2677:15, 2677:23, 2677:25, 2678:3, 2678:15, 2679:8, 2680:9, 2683:19, 2684:7, 2689:15, 2689:25, 2691:21, 2698:7, 2704:12
**classified** [1] - 2601:18
**classifies** [1] - 2601:19
**clean** [1] - 2605:3
**clear** [8] - 2610:3, 2620:11, 2625:11, 2625:14, 2646:24, 2677:15, 2713:8, 2714:16
**clearly** [17] - 2602:16, 2618:3, 2619:20, 2621:15, 2626:22, 2628:3, 2628:11, 2628:23, 2630:19, 2633:14, 2633:25, 2636:1, 2640:1, 2643:2, 2646:20, 2652:6, 2726:9
**CLERK** [15] - 2584:10, 2663:18, 2663:21, 2705:17, 2715:11, 2717:7, 2718:13, 2718:15, 2718:18, 2718:20, 2718:22, 2718:24, 2719:1, 2719:3, 2727:5
**client** [2] - 2673:9, 2720:17
**Clinic** [2] - 2605:8, 2606:7
**clones** [1] - 2609:20
**close** [5] - 2585:14, 2586:2, 2596:23, 2641:21, 2713:9,

2713:10, 2713:16, 2713:18, 2713:24, 2727:18, 2728:20
**closed** [9] - 2594:9, 2595:4, 2595:14, 2638:15, 2646:16, 2647:20, 2667:4, 2713:11
**closely** [1] - 2690:7
**CLOSING** [12] - 2583:5, 2583:6, 2583:7, 2583:8, 2583:9, 2583:10, 2587:12, 2600:1, 2611:1, 2614:18, 2640:19, 2653:18
**closing** [11] - 2584:17, 2585:19, 2585:21, 2586:3, 2586:7, 2586:11, 2586:14, 2610:20, 2661:23, 2701:10, 2715:7
**Coast** [2] - 2665:11, 2665:13
**Code** [1] - 2710:18
**Coffee** [1] - 2717:20
**coffee** [1] - 2727:16
**cold** [2] - 2628:7, 2723:23
**Coleman** [1] - 2719:3
**COLEMAN** [1] - 2719:4
**collapse** [1] - 2594:23
**colleague** [4] - 2587:10, 2599:14, 2599:24, 2612:11
**collect** [1] - 2700:13
**collected** [4] - 2590:19, 2668:4, 2668:8, 2672:13
**collection** [1] - 2667:4
**collective** [1] - 2610:9
**collectively** [1] - 2706:18
**columnar** [2] - 2621:5, 2622:1
**columns** [1] - 2654:5
**comfortable** [2] - 2724:4, 2724:9
**coming** [4] - 2647:19, 2657:21, 2661:25, 2711:5
**Commander** [2] - 2590:12, 2590:23, 2639:16
**commence** [1] - 2705:5
**commendable** [1] - 2721:19
**commendably** [1] -

2721:13
**comment** [3] - 2641:16, 2674:2, 2674:3
**comments** [2] - 2589:12, 2723:25
**commodes** [1] - 2588:3
**common** [9] - 2595:14, 2617:24, 2619:12, 2655:3, 2658:4, 2676:3, 2676:5, 2682:18, 2694:9
**communicate** [3] - 2700:2, 2700:9, 2701:3
**community** [1] - 2682:18
**Company** [2] - 2670:24, 2671:4
**compare** [2] - 2608:17, 2608:19
**Compeau** [6] - 2596:9, 2597:7, 2649:10, 2652:11, 2654:8
**compensate** [5] - 2606:22, 2693:15, 2694:23, 2695:3, 2697:16
**compensation** [4] - 2691:24, 2693:12, 2694:1, 2697:17
**compensatory** [9] - 2693:13, 2693:14, 2693:17, 2693:19, 2693:23, 2694:3, 2694:5, 2694:8, 2694:18
**competent** [1] - 2681:8
**competing** [1] - 2709:23
**competitive** [1] - 2593:24
**compiled** [1] - 2695:5
**complain** [1] - 2723:6
**complained** [2] - 2644:11, 2644:16
**complaint** [1] - 2616:5
**complaints** [5] - 2626:25, 2628:21, 2628:22, 2638:4
**complete** [4] - 2634:6, 2690:19, 2690:20
**completed** [1] - 2651:20
**completely** [2] - 2634:4, 2646:4
**complex** [1] - 2715:3

2721:13
**compliance** [1] - 2689:1
**complicated** [1] - 2721:6
**comply** [3] - 2594:12, 2596:19, 2596:20
**component** [3] - 2594:7, 2668:12, 2683:4
**composite** [1] - 2595:11
**composition** [6] - 2592:19, 2615:8, 2678:12, 2678:17, 2701:22, 2717:23
**compressed** [1] - 2719:25
**computer** [1] - 2700:6
**COMPUTER** [1] - 2582:25
**computing** [1] - 2694:9
**concentration** [4] - 2666:20, 2667:5, 2667:12, 2668:7
**concentrations** [2] - 2609:6, 2668:11
**concepts** [1] - 2719:20
**concern** [9] - 2602:19, 2631:6, 2631:8, 2631:9, 2631:10, 2631:20, 2631:25, 2632:11, 2697:24
**concerned** [5] - 2591:18, 2591:19, 2615:19, 2631:23, 2677:24
**concerning** [7] - 2609:13, 2641:1, 2641:8, 2700:17, 2702:19, 2703:8, 2718:6
**concerns** [2] - 2591:17, 2637:12
**concise** [1] - 2714:16
**conclude** [1] - 2687:14
**concluded** [3] - 2605:12, 2642:8, 2729:3
**conclusion** [1] - 2622:10
**conclusions** [1] - 2676:4
**concrete** [2] - 2669:9, 2670:9
**concur** [2] - 2622:24, 2624:16
**concurrent** [1] -

2685:23
**condition** [32] -
2592:19, 2601:24,
2602:9, 2602:11,
2605:18, 2612:8,
2612:24, 2613:5,
2616:22, 2617:4,
2620:23, 2631:6,
2632:7, 2690:15,
2690:23, 2691:5,
2691:12, 2696:8,
2696:10, 2696:17,
2696:20, 2696:22,
2696:23, 2696:25,
2697:4, 2697:6,
2697:7, 2698:6,
2702:8, 2702:16,
2707:7, 2710:1
**conditioned** [2] -
2638:17, 2668:1
**conditioner** [4] -
2634:7, 2640:5,
2647:21, 2649:23
**conditioning** [4] -
2593:3, 2594:10,
2594:11, 2638:16
**conditions** [6] -
2620:4, 2623:1,
2667:24, 2672:15,
2685:9, 2692:17
**conduct** [34] - 2600:7,
2684:19, 2684:25,
2685:12, 2685:14,
2685:17, 2685:19,
2685:25, 2686:3,
2686:4, 2686:5,
2686:6, 2686:7,
2686:25, 2687:3,
2687:4, 2687:14,
2688:10, 2688:11,
2688:13, 2688:16,
2688:17, 2688:22,
2688:23, 2689:9,
2691:17, 2693:22,
2693:25, 2699:5,
2699:23, 2700:10,
2700:17, 2705:1
**conducted** [4] -
2666:15, 2670:13,
2670:25, 2671:11
**conference** [4] -
2709:8, 2710:9,
2711:20, 2715:1
**confirmed** [1] - 2670:9
**confirms** [1] - 2618:1
**conformed** [1] -
2652:4
**conformity** [2] -
2616:13, 2690:13
**conforms** [2] - 2689:8,

2689:20
**confronted** [1] -
2603:20
**confuse** [1] - 2601:2
**confusing** [1] -
2701:13
**congregation** [1] -
2642:5
**conjunctivitis** [2] -
2603:5, 2629:5
**connected** [1] -
2670:10
**connection** [5] -
2603:14, 2629:16,
2629:18, 2707:12,
2712:11
**consequence** [2] -
2686:7, 2711:10
**consequences** [2] -
2696:15, 2697:22
**consider** [22] -
2610:17, 2665:1,
2674:8, 2676:1,
2676:11, 2677:8,
2680:6, 2684:18,
2685:11, 2686:2,
2686:8, 2686:12,
2688:9, 2688:13,
2688:22, 2693:1,
2694:18, 2695:4,
2696:5, 2697:22,
2699:9, 2706:9
**consideration** [6] -
2627:20, 2664:20,
2675:20, 2696:12,
2699:15, 2727:8
**considered** [6] -
2587:24, 2593:22,
2690:2, 2692:17,
2701:12, 2706:18
**considering** [3] -
2593:23, 2676:9,
2695:14
**consistent** [1] -
2622:2
**consistently** [1] -
2632:20
**consisting** [1] -
2685:19
**construct** [5] -
2587:22, 2588:1,
2588:24, 2592:7,
2595:11
**constructed** [2] -
2588:20, 2669:9
**construction** [17] -
2588:21, 2588:23,
2589:3, 2592:22,
2593:1, 2596:10,
2597:19, 2597:20,

2612:8, 2615:7,
2615:12, 2630:24,
2631:1, 2678:11,
2678:17, 2701:21,
2717:23
**construe** [1] - 2674:1
**consult** [1] - 2728:16
**consultant** [1] -
2608:9
**consumer** [2] -
2683:6, 2688:6
**consumers** [1] -
2687:25
**consuming** [1] -
2632:15
**consumption** [2] -
2632:15, 2632:22
**contact** [5] - 2636:22,
2637:12, 2714:23,
2725:19, 2725:23
**contacted** [5] -
2624:14, 2637:8,
2671:14, 2725:20,
2726:8
**contacts** [1] - 2724:21
**contained** [1] -
2668:13
**contaminated** [1] -
2595:3
**contemplate** [1] -
2681:23
**contemplated** [1] -
2682:17
**contemporaneously**
[1] - 2667:22
**contemporaries** [1] -
2642:3
**contend** [2] - 2615:12,
2615:14
**contending** [1] -
2617:24
**contends** [1] -
2686:16
**contention** [1] -
2640:12
**contest** [1] - 2611:18
**context** [2] - 2686:25,
2728:24
**continue** [3] - 2585:4,
2609:15, 2633:15
**continued** [1] - 2671:8
**CONTINUED** [1] -
2582:1
**continuing** [3] -
2606:21, 2699:3,
2711:1
**continuous** [2] -
2690:4, 2710:25
**contract** [9] - 2588:1,
2593:21, 2596:15,

2636:25, 2646:3,
2649:1, 2668:18,
2669:2, 2671:12
**contracted** [1] -
2643:3
**contractor** [25] -
2637:1, 2644:1,
2645:21, 2646:5,
2647:12, 2647:13,
2652:2, 2652:8,
2653:22, 2653:23,
2659:11, 2689:1,
2689:3, 2690:22,
2691:1, 2691:4,
2691:6, 2691:8,
2691:10, 2691:13,
2709:13, 2712:17,
2712:24
**contractors** [7] -
2589:22, 2590:3,
2592:13, 2638:8,
2644:1, 2652:12,
2704:8
**contradicted** [1] -
2647:11
**contradicts** [1] -
2608:4
**contrary** [2] - 2676:9,
2685:21
**contribute** [1] -
2613:21
**contributed** [9] -
2609:25, 2613:4,
2613:11, 2617:4,
2641:7, 2687:15,
2688:23, 2702:15,
2703:7
**contributing** [1] -
2687:8
**Control** [1] - 2604:10
**control** [13] - 2612:25,
2616:23, 2616:25,
2617:2, 2627:25,
2679:1, 2679:21,
2680:13, 2680:21,
2681:10, 2682:24,
2683:10, 2702:9
**controlled** [1] -
2690:17
**controls** [1] - 2610:21
**convergence** [1] -
2607:11
**convinced** [1] -
2699:17
**cook** [1] - 2649:21
**Coolite** [1] - 2630:9
**cooperation** [1] -
2719:12
**cooperative** [1] -
2720:11

**coordinator** [1] -
2639:17
**copied** [1] - 2727:15
**copy** [2] - 2664:6,
2726:20
**corner** [1] - 2647:3
**corporation** [1] -
2676:21
**Corps** - 2669:14
**CORPUS** [1] - 2581:24
**correct** [9] - 2584:23,
2638:21, 2642:19,
2645:25, 2658:13,
2709:11, 2711:19,
2717:16, 2729:13
**corrected** [3] -
2638:24, 2667:18,
2707:4
**correcting** [2] -
2666:23, 2667:16
**correction** [4] -
2705:22, 2706:10,
2706:16, 2706:24
**corrections** [2] -
2707:1, 2708:21
**corrective** [1] - 2609:7
**correctly** [2] - 2648:5,
2706:7
**corrects** [2] - 2666:25,
2667:19
**cosmetics** [1] - 2601:4
**cough** [1] - 2629:2
**Counsel** [2] - 2718:10,
2728:19
**counsel** [15] -
2584:18, 2584:22,
2586:25, 2610:18,
2610:20, 2662:19,
2701:10, 2705:12,
2711:9, 2711:14,
2720:12, 2726:24,
2727:2, 2727:14
**count** [1] - 2725:9
**counting** [1] - 2650:16
**countries** [1] - 2722:1
**country** [1] - 2723:3
**country's** [1] -
2587:15
**couple** [3] - 2652:17,
2705:12, 2715:6
**course** [13] - 2586:3,
2648:17, 2648:20,
2664:14, 2673:3,
2673:22, 2674:1,
2701:10, 2707:4,
2708:5, 2712:17,
2721:16, 2728:2
**courses** [1] - 2608:13
**COURT** [74] - 2581:1,
2582:22, 2584:4,

court's [1] - 2724:12
courthouse [1] - 2719:14
courtroom [12] - 2584:9, 2586:5, 2662:18, 2663:24, 2672:21, 2675:10, 2700:12, 2701:6, 2705:11, 2717:9, 2717:18, 2727:13
courts [1] - 2723:4
cover [7] - 2659:17, 2663:14, 2707:9, 2709:7, 2726:24, 2727:17, 2728:18
covered [5] - 2610:14, 2661:2, 2699:25, 2715:9, 2715:16
covering [1] - 2711:10
cracked [2] - 2633:20, 2633:21
CRAFT [1] - 2582:6
crawl [1] - 2594:19
crazy [1] - 2627:24
create [2] - 2601:11, 2691:12
created [4] - 2594:18, 2685:1, 2685:2, 2688:15
credibility [4] - 2619:5, 2619:6, 2673:15, 2675:20
credible [3] - 2600:13, 2611:11, 2677:2
crime [2] - 2722:11, 2722:21
criminal [7] - 2600:14, 2600:15, 2612:15, 2677:18, 2720:17, 2722:11, 2723:1
critical [3] - 2589:7, 2642:20, 2642:22
cross [1] - 2649:5
cross-examination [1] - 2649:5
Crown [1] - 2647:13
CRR [2] - 2582:22, 2729:20
crucial [1] - 2600:4
cruise [3] - 2598:11, 2643:12, 2670:17
Cruz [7] - 2626:21, 2626:22, 2626:24, 2627:24, 2629:2, 2629:10
Cruz's [1] - 2629:9
CSO [3] - 2701:4, 2705:6, 2727:9
current [1] - 2709:25
curvature [1] -

2620:25
customers [2] - 2616:3, 2657:8
CV [1] - 2608:14
cyproheptadine [4] - 2620:3, 2627:19, 2627:20, 2628:2

## D

D'Amico [18] - 2584:25, 2586:9, 2586:25, 2587:2, 2600:9, 2603:18, 2606:11, 2610:25, 2614:22, 2615:4, 2638:19, 2644:2, 2649:18, 2650:9, 2653:12, 2662:9, 2709:10, 2710:4
D'AMICO [18] - 2581:16, 2581:17, 2585:2, 2587:13, 2611:2, 2612:14, 2614:12, 2653:9, 2653:19, 2661:17, 2662:10, 2706:14, 2709:11, 2710:2, 2710:5, 2713:19, 2713:22, 2718:11
D'AMICO............. [1] - 2583:10
D'AMICO............. [1] 2583:7
D'AMICO.................. ... [1] - 2583:5
damage [27] - 2599:2, 2601:14, 2606:15, 2609:18, 2640:3, 2644:24, 2644:25, 2645:2, 2645:17, 2648:8, 2672:9, 2679:5, 2679:6, 2680:1, 2680:2, 2680:14, 2681:1, 2681:2, 2684:11, 2685:23, 2686:13, 2692:12, 2693:15, 2696:12, 2697:18, 2698:11, 2708:2
damaged [1] - 2639:3
damages [73] - 2587:11, 2598:19, 2599:25, 2606:22, 2613:24, 2677:25, 2678:3, 2678:8, 2684:15, 2686:19, 2687:5, 2691:22, 2692:3, 2692:6, 2692:11, 2692:13,

2692:14, 2692:16, 2692:19, 2692:21, 2692:22, 2692:25, 2693:3, 2693:6, 2693:8, 2693:12, 2693:13, 2693:14, 2693:17, 2693:19, 2693:23, 2693:25, 2694:1, 2694:3, 2694:5, 2694:8, 2694:9, 2694:16, 2694:19, 2694:22, 2694:24, 2694:25, 2695:1, 2695:3, 2695:4, 2695:7, 2695:8, 2695:11, 2695:12, 2696:2, 2696:9, 2697:1, 2697:9, 2697:16, 2697:23, 2697:25, 2698:1, 2698:2, 2698:7, 2698:9, 2698:11, 2698:15, 2698:19, 2698:21, 2698:23, 2698:24, 2699:1, 2699:7, 2704:11, 2706:9, 2707:12
danger [13] - 2658:25, 2680:16, 2681:10, 2681:15, 2681:23, 2682:16, 2682:21, 2682:22, 2683:2, 2683:8, 2683:13, 2688:15, 2710:21
dangerous [49] - 2592:16, 2592:19, 2592:20, 2592:21, 2593:1, 2593:17, 2612:8, 2612:19, 2612:22, 2612:24, 2613:5, 2615:7, 2615:9, 2615:11, 2615:14, 2615:17, 2615:22, 2616:19, 2616:22, 2617:2, 2640:10, 2649:24, 2650:1, 2658:9, 2658:22, 2658:23, 2659:1, 2678:9, 2678:11, 2678:12, 2678:14, 2678:17, 2678:25, 2679:9, 2679:20, 2680:10, 2680:20, 2681:5, 2685:10, 2701:21, 2701:24, 2702:2, 2702:8, 2702:16, 2705:21, 2717:23, 2717:25, 2718:2
dangers [4] - 2685:10,

2689:11, 2691:5, 2691:6
data [2] - 2590:18, 2672:13
date [13] - 2650:14, 2656:2, 2662:24, 2694:24, 2695:10, 2695:22, 2695:23, 2698:6, 2700:20, 2703:3, 2703:13, 2704:21
dated [3] - 2650:11, 2672:14, 2718:8
David [6] - 2588:17, 2588:18, 2588:25, 2589:6, 2591:6
DAVID [1] - 2582:16
DAY [1] - 2581:11
day-to-day [1] - 2602:22
days [9] - 2592:10, 2617:15, 2617:18, 2617:20, 2617:21, 2638:16, 2646:4, 2662:21, 2728:8
deactivated [1] - 2671:21
deactivation [1] - 2704:7
dead [2] - 2630:5, 2648:3
deadline [2] - 2728:5, 2728:13
deal [5] - 2598:5, 2598:24, 2659:14, 2719:22, 2719:23
dealing [2] - 2600:25, 2710:24
debate [1] - 2624:9
debris [1] - 2631:1
decade [2] - 2616:2, 2616:3
decals [1] - 2649:5
decency [2] - 2599:6, 2656:22
decide [25] - 2600:4, 2614:8, 2649:13, 2649:14, 2652:18, 2658:25, 2662:2, 2662:3, 2662:4, 2662:6, 2672:21, 2675:6, 2684:3, 2684:20, 2685:13, 2688:8, 2692:5, 2692:7, 2692:25, 2693:9, 2694:8, 2696:6, 2699:14, 2722:13, 2723:1
decided [1] - 2709:25
deciding [4] - 2680:6,

2584:7, 2584:11, 2584:24, 2585:3, 2585:12, 2610:13, 2610:16, 2610:25, 2612:13, 2614:11, 2614:15, 2617:9, 2618:13, 2639:21, 2640:15, 2640:17, 2652:14, 2653:8, 2653:11, 2661:16, 2662:9, 2662:11, 2662:16, 2662:19, 2663:7, 2664:1, 2705:9, 2705:12, 2705:18, 2706:15, 2707:8, 2707:10, 2707:15, 2707:18, 2707:24, 2708:9, 2708:11, 2708:14, 2708:18, 2709:19, 2710:4, 2710:6, 2711:4, 2711:16, 2711:18, 2711:22, 2712:7, 2712:9, 2713:6, 2713:14, 2714:2, 2714:6, 2715:9, 2715:14, 2715:16, 2715:21, 2716:3, 2717:4, 2717:10, 2717:12, 2717:15, 2717:18, 2718:12, 2719:5, 2727:2, 2727:7, 2727:11, 2727:14, 2727:22, 2728:7, 2728:18
Court [28] - 2600:3, 2624:25, 2630:11, 2673:12, 2673:17, 2700:1, 2709:17, 2710:12, 2710:14, 2710:18, 2710:24, 2711:8, 2711:9, 2711:24, 2716:5, 2719:6, 2719:7, 2720:11, 2725:6, 2725:8, 2727:20, 2728:4, 2728:17, 2729:10, 2729:11, 2729:12, 2729:21, 2729:22
court [17] - 2608:10, 2624:24, 2624:25, 2632:4, 2633:13, 2675:16, 2675:22, 2676:23, 2701:4, 2703:4, 2703:13, 2720:16, 2720:18, 2721:19, 2722:4, 2723:4, 2723:25
Court's [1] - 2710:22

2699:1, 2699:4, 2699:7

**decision** [5] - 2674:9, 2693:4, 2710:19, 2723:14, 2725:4

**declining** [1] - 2681:24

**deduction** [3] - 2618:10, 2618:15, 2618:18

**deductions** [2] - 2619:1, 2676:4

**defect** [3] - 2690:10, 2696:10, 2696:17

**defective** [1] - 2689:5

**defects** [4] - 2589:3, 2596:2, 2609:20, 2691:2

**defendant** [15] - 2642:24, 2677:12, 2677:13, 2677:24, 2679:15, 2686:15, 2686:23, 2687:3, 2687:6, 2687:9, 2687:12, 2687:13, 2694:4, 2704:1, 2710:16

**Defendant** [1] - 2703:22

**defendant's** [1] - 2686:3

**defendants** [32] - 2584:19, 2598:17, 2600:7, 2603:13, 2609:23, 2610:7, 2611:9, 2613:19, 2623:23, 2653:21, 2659:18, 2659:19, 2659:21, 2686:18, 2687:1, 2687:15, 2691:22, 2692:1, 2692:6, 2692:8, 2692:9, 2692:11, 2693:10, 2697:2, 2698:10, 2698:24, 2699:4, 2706:12, 2706:17, 2706:20, 2706:21

**Defendants** [1] - 2704:7

**defendants'** [10] - 2601:9, 2611:11, 2638:16, 2667:25, 2668:6, 2668:10, 2693:22, 2693:24, 2694:21, 2709:18

**defense** [20] - 2597:13, 2598:12, 2600:22, 2603:2, 2607:5, 2608:6,

2623:16, 2652:2, 2652:8, 2653:22, 2653:24, 2659:12, 2677:5, 2683:19, 2683:22, 2687:13, 2691:1, 2709:14, 2712:17, 2712:24

**defense's** [1] - 2690:23

**defense-retained** [1] - 2607:5

**defensive** [1] - 2713:3

**defer** [2] - 2660:14, 2660:15

**deferred** [1] - 2660:24

**deficiencies** [1] - 2684:5

**deficient** [1] - 2594:25

**definitely** [1] - 2607:11

**definiteness** [1] - 2694:14

**definition** [1] - 2607:9

**definitions** [1] - 2681:16

**degree** [4] - 2624:11, 2677:2, 2684:22, 2703:16

**degrees** [6] - 2666:19, 2666:24, 2667:6, 2667:13, 2667:17, 2668:2

**delay** [1] - 2650:17

**deleted** [4] - 2705:24, 2706:1, 2708:11

**deletion** [2] - 2707:25, 2712:20

**deliberate** [5] - 2610:18, 2653:1, 2654:12, 2662:15, 2663:8

**deliberates** [1] - 2716:6

**DELIBERATES..........
...............................** [1] - 2583:12

**deliberations** [16] - 2664:4, 2664:12, 2676:21, 2699:23, 2699:24, 2700:2, 2700:15, 2700:16, 2701:15, 2705:2, 2705:5, 2705:11, 2720:25, 2725:2, 2725:5, 2725:16

**deliberative** [1] - 2726:18

**deliver** [1] - 2589:14

**delivered** [8] - 2590:9, 2592:10, 2634:19,

2634:21, 2635:22, 2645:18, 2658:1, 2669:17

**delivering** [1] - 2668:15

**delivery** [2] - 2593:24, 2669:3

**demonstrated** [2] - 2607:1, 2607:18

**demonstrative** [2] - 2672:23, 2673:1

**denied** [1] - 2647:4

**Dennis** [1] - 2587:10

**DENNIS** [1] - 2581:20

**deny** [1] - 2698:15

**Department** [2] - 2604:11, 2658:19

**dependent** [1] - 2654:24

**dependents** [1] - 2618:24

**deposition** [14] - 2588:13, 2603:19, 2603:21, 2617:17, 2625:5, 2633:11, 2636:10, 2636:17, 2637:10, 2675:9, 2675:10, 2675:14, 2675:19

**depositions** [1] - 2721:11

**depressed** [1] - 2614:3

**depression** [6] - 2606:20, 2607:11, 2619:23, 2631:12, 2631:18, 2632:13

**deputy** [3] - 2589:6, 2700:12, 2717:18

**DEPUTY** [14] - 2584:10, 2663:18, 2663:21, 2715:11, 2717:7, 2718:13, 2718:15, 2718:18, 2718:20, 2718:22, 2718:24, 2719:1, 2719:3, 2727:5

**DeRosa** [1] - 2604:15

**describe** [2] - 2672:25, 2688:3

**described** [2] - 2633:13, 2682:15

**design** [29] - 2587:25, 2588:24, 2592:7, 2592:19, 2593:19, 2595:8, 2595:16, 2596:10, 2612:20, 2615:14, 2649:15, 2678:13, 2679:10, 2679:12, 2679:14,

2679:16, 2679:17, 2680:7, 2683:3, 2683:9, 2683:12, 2683:13, 2683:14, 2689:5, 2689:7, 2690:11, 2701:24, 2705:21, 2717:25

**designated** [1] - 2591:13

**designed** [2] - 2645:3, 2686:9

**designs** [1] - 2595:21

**desire** [2] - 2609:4, 2718:10

**desiring** [1] - 2588:8

**despite** [2] - 2607:15, 2644:10

**detail** [2] - 2606:16, 2609:14

**detailed** [1] - 2669:12

**detect** [1] - 2648:1

**detected** [2] - 2668:6, 2668:10

**detections** [1] - 2609:1

**determination** [2] - 2619:7, 2630:18

**determine** [9] - 2658:21, 2664:19, 2687:24, 2688:4, 2691:17, 2693:11, 2695:11, 2697:6, 2697:15

**determined** [2] - 2602:1, 2619:5

**determining** [7] - 2655:3, 2674:20, 2677:6, 2685:1, 2685:15, 2688:9, 2696:4

**Development** [1] - 2658:19

**development** [2] - 2602:15, 2690:8

**develops** [1] - 2698:4

**deviated** [3] - 2593:5, 2613:9, 2678:19

**device** [1] - 2700:4

**diagnose** [2] - 2655:8, 2656:15

**diagnosed** [3] - 2599:18, 2631:12, 2698:3

**diagnosis** [8] - 2603:5, 2605:11, 2607:12, 2622:24, 2624:10, 2624:16, 2629:4, 2660:23

**diagram** [1] - 2669:13

**diagrams** [1] -

2645:12

**dictated** [1] - 2709:22

**difference** [12] - 2596:1, 2607:12, 2616:6, 2616:8, 2618:14, 2628:3, 2638:18, 2639:9, 2649:8, 2651:4, 2651:5, 2707:9

**different** [8] - 2604:3, 2604:5, 2610:20, 2648:6, 2661:6, 2674:25, 2709:22, 2719:9

**differential** [1] - 2605:11

**differently** [2] - 2593:19, 2699:19

**differs** [2] - 2673:1, 2674:13

**difficult** [4] - 2694:10, 2719:16, 2720:6, 2721:11

**difficulties** [1] - 2669:23

**difficulty** [1] - 2694:10

**diligence** [1] - 2698:8

**direct** [6] - 2612:4, 2676:12, 2676:16, 2676:18, 2686:5, 2700:22

**directed** [3] - 2669:8, 2674:5, 2709:14

**directly** [5] - 2692:16, 2702:25, 2711:7, 2725:10, 2725:14

**director** [2] - 2591:24, 2604:16

**disability** [1] - 2696:20

**disappointed** [1] - 2721:16

**disaster** [3] - 2587:15, 2589:16, 2668:20

**disasters** [2] - 2587:16, 2665:9

**discharge** [3] - 2619:25, 2724:5, 2726:20

**discharged** [4] - 2683:21, 2700:23, 2721:12, 2724:18

**disclose** [4] - 2700:23, 2725:6, 2725:15, 2726:18

**discontentment** [1] - 2722:2

**discontinued** [1] - 2631:13

**discoverable** [1] - 2685:9

**discovered** [1] - 2602:2

**discovery** [1] - 2685:8

**discretion** [3] - 2693:4, 2694:15, 2699:4

**discuss** [10] - 2699:12, 2711:19, 2724:22, 2725:1, 2725:5, 2725:22, 2726:6, 2726:9, 2726:16, 2726:17

**discussed** [4] - 2588:25, 2631:7, 2709:8, 2725:15

**discussing** [1] - 2699:16

**discussion** [4] - 2631:5, 2672:20, 2709:7, 2711:6

**discussions** [2] - 2712:11, 2712:17

**disease** [4] - 2696:9, 2698:2, 2698:3, 2698:4

**Disease** [2] - 2604:9, 2604:10

**dislike** [1] - 2724:8

**dismissal** [2] - 2712:12, 2712:18

**Dison** [5] - 2633:4, 2633:19, 2647:13, 2648:2, 2661:12

**dispassionate** [1] - 2694:9

**displaced** [8] - 2587:23, 2588:4, 2588:5, 2616:15, 2665:9, 2665:10, 2665:22, 2668:25

**disprove** [1] - 2676:14

**dispute** [1] - 2722:5

**disputes** [1] - 2723:1

**disregard** [3] - 2673:18, 2674:3, 2674:7

**distinction** [1] - 2676:16

**distinctly** [1] - 2603:9

**distractions** [1] - 2586:7

**distress** [5] - 2614:7, 2693:21, 2697:21, 2697:23, 2704:16

**distribution** [1] - 2591:25

**District** [5] - 2624:25, 2630:11, 2729:12, 2729:22

**DISTRICT** [3] - 2581:1,

2581:1, 2581:13

**divide** [1] - 2687:18

**division** [3] - 2609:20, 2700:24, 2701:1

**DNA** [1] - 2609:18

**DOCKET** [2] - 2581:5, 2581:9

**doctor** [11] - 2598:12, 2603:23, 2611:6, 2620:19, 2623:9, 2647:2, 2655:9, 2655:11, 2655:12, 2656:14, 2660:16

**doctors** [2] - 2600:21, 2651:24

**Document** [4] - 2712:22, 2713:1, 2713:3

**DOCUMENT** [1] - 2581:7

**document** [7] - 2614:22, 2614:23, 2614:25, 2615:3, 2619:11, 2636:3, 2638:6

**documented** [2] - 2602:6, 2661:13

**documents** [8] - 2586:17, 2611:14, 2635:11, 2639:24, 2642:17, 2644:12, 2644:14, 2721:11

**doggone** [1] - 2722:17

**dollar** [4] - 2704:14, 2704:16, 2704:18, 2704:20

**dollars** [1] - 2695:12

**Domingue** [1] - 2718:18

**DOMINGUE** [1] - 2718:19

**DOMINICK** [1] - 2582:3

**DOMINION** [1] - 2582:7

**donate** [1] - 2722:23

**done** [16] - 2600:9, 2621:21, 2624:22, 2631:19, 2638:14, 2638:17, 2639:1, 2639:11, 2642:7, 2642:9, 2645:12, 2662:21, 2685:6, 2720:18, 2722:23, 2725:3

**DONELSON** [1] - 2582:15

**door** [22] - 2586:2, 2595:7, 2595:22, 2596:22, 2597:5,

2635:9, 2635:10, 2639:3, 2644:11, 2645:25, 2646:1, 2646:13, 2646:16, 2646:18, 2646:19, 2646:20, 2647:17, 2647:20, 2647:22, 2657:7, 2661:23

**doors** [8] - 2590:8, 2633:18, 2634:5, 2634:9, 2638:15, 2649:22, 2657:18, 2671:18

**dose** [1] - 2621:15

**dosimetry** [4] - 2666:17, 2667:9, 2667:19, 2668:8

**doubt** [4] - 2600:16, 2612:15, 2634:20, 2677:18

**Doug** [1] - 2655:17

**DOUGLAS** [1] - 2582:20

**down** [9] - 2586:10, 2605:6, 2605:23, 2614:22, 2616:12, 2619:23, 2641:19, 2659:4, 2706:17

**downstairs** [2] - 2723:19, 2727:4

**dozen** [1] - 2648:6

**dozing** [1] - 2720:4

**Dr** [121] - 2596:9, 2597:7, 2598:12, 2598:13, 2599:18, 2601:9, 2601:24, 2601:25, 2602:5, 2603:3, 2603:11, 2603:12, 2603:16, 2603:17, 2604:15, 2605:6, 2605:10, 2605:19, 2606:2, 2606:5, 2606:15, 2606:18, 2606:25, 2607:6, 2607:7, 2607:12, 2607:13, 2607:15, 2607:20, 2607:24, 2608:1, 2608:6, 2608:16, 2609:11, 2609:12, 2610:5, 2614:1, 2614:3, 2619:20, 2619:21, 2620:11, 2620:15, 2620:20, 2621:11, 2622:5, 2622:6, 2622:8, 2622:10, 2622:17, 2622:18, 2622:23, 2623:1, 2623:10, 2623:14, 2623:16,

2623:19, 2624:7, 2624:8, 2624:14, 2624:15, 2624:17, 2624:18, 2624:21, 2625:2, 2625:9, 2625:17, 2626:6, 2626:9, 2626:18, 2626:21, 2626:22, 2626:24, 2627:1, 2627:23, 2627:24, 2628:1, 2628:9, 2628:13, 2629:2, 2629:9, 2629:14, 2629:23, 2631:11, 2631:16, 2631:19, 2631:23, 2632:4, 2632:5, 2632:8, 2632:10, 2632:15, 2644:21, 2645:14, 2646:25, 2647:4, 2647:5, 2647:22, 2648:19, 2654:8, 2656:17, 2660:8, 2660:12, 2660:15, 2660:16, 2660:21, 2661:1, 2661:2, 2661:13, 2661:14, 2672:13

**drafted** [1] - 2669:12

**drank** [1] - 2607:21

**drastically** [1] - 2688:6

**draw** [3] - 2673:8, 2673:19, 2676:2

**drawing** [1] - 2694:16

**drawn** [1] - 2706:23

**drew** [1] - 2643:21

**dries** [1] - 2628:8

**drink** [1] - 2727:17

**drinking** [1] - 2614:4

**DRIVE** [1] - 2582:7

**drivers** [1] - 2655:18

**driving** [1] - 2641:23

**drooped** [2] - 2647:3, 2647:4

**drug** [1] - 2627:21

**drugs** [1] - 2620:3

**duct** [2] - 2651:2, 2651:3

**ductwork** [3] - 2594:17, 2594:23, 2594:25

**due** [3] - 2669:23, 2682:23, 2683:9

**dumped** [2] - 2594:20, 2598:4

**dumpsters** [2] - 2630:22, 2630:24

**during** [29] - 2586:3, 2605:14, 2613:12,

2624:1, 2627:9, 2636:10, 2638:10, 2646:13, 2664:14, 2670:5, 2670:6, 2670:25, 2671:2, 2671:12, 2672:10, 2673:3, 2673:22, 2674:1, 2674:5, 2674:12, 2699:24, 2700:2, 2700:14, 2700:16, 2700:17, 2701:10, 2707:3, 2709:21, 2725:15

**duty** [14] - 2652:6, 2652:17, 2664:18, 2664:21, 2664:22, 2673:5, 2683:21, 2684:21, 2686:9, 2698:8, 2699:12, 2710:25, 2711:1, 2726:16

**dwelling** [1] - 2657:2

**dysfunction** [4] - 2619:24, 2619:25, 2620:9, 2628:17

## E

**e-mail** [3] - 2650:14, 2650:15, 2652:7

**e-mails** [4] - 2589:21, 2650:9, 2650:11, 2659:15

**early** [2] - 2646:1, 2647:18

**earn** [3] - 2695:15, 2695:22, 2695:25

**easily** [2] - 2595:24, 2647:23

**East** [2] - 2627:3, 2627:16

**EASTERN** [1] - 2581:1

**Eastern** [2] - 2624:25, 2729:12

**economic** [1] - 2683:17

**economist's** [1] - 2707:21

**Ed** [1] - 2614:1

**Edith** [1] - 2654:13

**educated** [1] - 2660:16

**effect** [7] - 2603:17, 2639:22, 2664:17, 2673:13, 2673:15, 2679:16, 2680:6

**effects** [11] - 2590:19, 2605:9, 2606:12, 2606:13, 2606:15,

2609:5, 2609:10, 2624:4, 2624:6, 2629:22, 2632:6
**Effexor** [10] - 2605:24, 2606:1, 2620:3, 2620:7, 2620:8, 2631:13, 2631:15, 2632:18, 2632:21
**effort** [3] - 2635:23, 2698:12, 2720:22
**efforts** [2] - 2698:22, 2720:12
**EHU** [1] - 2678:2
**eight** [3] - 2602:24, 2617:20, 2617:21
**Einstein** [1] - 2644:22
**either** [25] - 2622:9, 2636:21, 2636:25, 2638:5, 2642:24, 2644:7, 2644:20, 2655:15, 2681:23, 2685:22, 2688:18, 2690:23, 2691:22, 2693:10, 2694:4, 2701:6, 2706:10, 2706:11, 2706:12, 2706:13, 2706:14, 2706:20, 2711:11
**elderly** [1] - 2604:14
**electrical** [4] - 2644:17, 2647:21, 2669:5, 2669:24
**electricity** [1] - 2670:11
**electronic** [1] - 2700:4
**element** [10] - 2597:20, 2676:25, 2684:18, 2685:11, 2685:15, 2686:2, 2686:12, 2692:12, 2692:13, 2692:15
**elements** [7] - 2680:12, 2684:16, 2686:24, 2689:13, 2689:23, 2694:18, 2697:18
**eligible** [1] - 2659:12
**emergency** [10] - 2590:13, 2605:2, 2639:16, 2661:3, 2665:12, 2665:21, 2666:7, 2668:25, 2671:15, 2678:1
**emit** [1] - 2595:24
**emitted** [7] - 2594:8, 2595:25, 2597:1, 2610:6, 2657:11, 2657:12
**emitting** [2] - 2595:11,

2665:25
**emotional** [2] - 2614:6, 2704:15
**employed** [2] - 2616:9, 2619:16
**employee** [2] - 2618:19
**employees** [2] - 2616:18, 2657:7
**employment** [2] - 2617:13, 2630:6
**encourage** [2] - 2723:9, 2723:15
**end** [8] - 2585:21, 2614:24, 2619:22, 2627:23, 2664:21, 2684:1, 2684:4, 2700:14
**ended** [1] - 2671:10
**energy** [1] - 2606:8
**engage** [1] - 2694:10
**ENGELHARDT** [1] - 2581:12
**engineering** [1] - 2596:10
**Engineers** [1] - 2669:14
**enjoyment** [1] - 2697:11
**ensure** [4] - 2594:23, 2599:8, 2654:8, 2670:3
**enter** [8] - 2586:3, 2586:8, 2586:9, 2586:10, 2601:7, 2703:18, 2703:20, 2719:5
**entered** [1] - 2711:12
**Entergy** [1] - 2669:23
**Enterprises** [2] - 2669:19, 2669:21
**enters** [3] - 2584:9, 2663:24, 2717:9
**entire** [1] - 2654:14
**entirely** [3] - 2673:19, 2693:8, 2724:25
**entirety** [1] - 2687:7
**entitled** [15] - 2669:10, 2674:18, 2675:19, 2675:24, 2683:6, 2692:9, 2692:13, 2692:15, 2693:19, 2694:23, 2695:10, 2697:1, 2698:5, 2699:7, 2729:15
**entity** [4] - 2677:22, 2684:23, 2687:10, 2704:6
**entry** [1] - 2664:14
**envelope** [1] - 2635:19

**environment** [2] - 2601:1, 2626:2
**environmental** [6] - 2590:14, 2604:16, 2609:25, 2639:17, 2650:3, 2667:24
**Environmental** [6] - 2605:8, 2640:24, 2678:6, 2702:18, 2704:1, 2718:5
**ENVIRONMENTAL** [1] - 2582:15
**epistaxis** [9] - 2599:18, 2601:24, 2602:1, 2602:13, 2656:14, 2659:20, 2660:19, 2660:20, 2661:12
**epithelial** [3] - 2621:5, 2622:1, 2622:2
**epithelium** [1] - 2660:11
**equal** [3] - 2587:25, 2593:23, 2676:22
**equally** [1] - 2613:18
**equals** [2] - 2639:19, 2676:23
**equation** [2] - 2666:22, 2667:15
**erectile** [4] - 2619:25, 2628:14, 2628:15, 2628:16
**ERNEST** [1] - 2582:11
**error** [1] - 2710:19
**Ervin** [2] - 2594:15, 2594:24
**ESQUIRE** [11] - 2581:17, 2581:17, 2581:20, 2582:3, 2582:6, 2582:11, 2582:11, 2582:12, 2582:16, 2582:17, 2582:17
**essential** [3] - 2676:24, 2677:11, 2723:10
**establish** [4] - 2677:11, 2686:22, 2686:24, 2687:2
**established** [3] - 2603:13, 2608:20, 2691:23
**establishing** [1] - 2609:16
**estimation** [1] - 2654:10
**ET** [1] - 2581:8
**evacuated** [1] - 2658:8
**evaluate** [1] - 2690:11
**evaluated** [1] -

2608:21
**evaluating** [1] - 2590:18
**evaluation** [1] - 2690:3
**evening** [1] - 2721:25
**evenly** [1] - 2596:19
**event** [4] - 2619:20, 2647:6, 2692:7, 2725:10
**everyday** [2] - 2637:23, 2722:7
**eviction** [1] - 2655:25
**evidence** [121] - 2586:15, 2586:18, 2586:20, 2586:22, 2590:21, 2591:20, 2598:3, 2598:17, 2599:15, 2599:20, 2600:6, 2600:12, 2600:13, 2600:19, 2603:1, 2607:17, 2607:24, 2608:22, 2609:4, 2609:16, 2612:10, 2613:1, 2613:8, 2613:20, 2613:21, 2613:24, 2615:12, 2615:15, 2618:1, 2619:8, 2619:15, 2619:17, 2619:18, 2622:7, 2622:8, 2623:18, 2623:20, 2625:24, 2626:7, 2627:9, 2630:15, 2633:17, 2638:5, 2639:25, 2640:5, 2640:12, 2642:17, 2643:2, 2643:5, 2652:4, 2652:17, 2652:18, 2654:15, 2655:21, 2656:11, 2656:12, 2659:22, 2662:8, 2664:15, 2664:19, 2664:25, 2672:22, 2673:1, 2673:4, 2673:7, 2673:11, 2673:14, 2673:16, 2674:2, 2674:6, 2674:7, 2674:10, 2674:15, 2674:16, 2674:21, 2674:23, 2676:1, 2676:6, 2676:10, 2676:11, 2676:12, 2676:13, 2676:17, 2676:18, 2676:25, 2677:2, 2677:3, 2677:4, 2677:7, 2677:10, 2677:13, 2677:16,

2678:19, 2679:11, 2680:12, 2681:8, 2684:17, 2687:14, 2690:4, 2690:14, 2691:23, 2693:1, 2694:17, 2694:20, 2696:5, 2697:13, 2697:19, 2698:13, 2699:2, 2699:9, 2699:15, 2699:22, 2700:1, 2711:1, 2715:7, 2721:21, 2722:9
**exacerbate** [2] - 2603:25, 2627:11
**exacerbated** [1] - 2627:8
**exacerbation** [6] - 2622:16, 2622:19, 2622:20, 2622:25, 2623:22, 2624:12
**exact** [1] - 2697:17
**exactly** [1] - 2617:17
**exaggerate** [1] - 2607:3
**exaggeration** [1] - 2607:17
**examination** [2] - 2603:11, 2649:5
**EXAMINATIONS** [1] - 2583:3
**examinations** [1] - 2606:24
**examine** [1] - 2699:16
**examined** [1] - 2675:25
**examines** [1] - 2675:23
**example** [2] - 2604:15, 2608:20
**excellent** [2] - 2714:12, 2721:15
**except** [2] - 2644:16, 2655:8
**exception** [2] - 2725:1, 2726:1
**exceptional** [1] - 2688:1
**excess** [2] - 2585:4, 2604:18
**excessive** [1] - 2608:3
**exchange** [3] - 2634:2, 2634:3, 2634:6
**exchanging** [1] - 2721:11
**excluded** [3] - 2663:10, 2711:24, 2712:2
**exclusion** [4] -

2709:2, 2711:7, 2711:11, 2712:13
**exclusive** [1] - 2678:7
**excuse** [1] - 2625:12
**excused** [2] - 2586:4, 2586:5
**executed** [1] - 2668:17
**exercise** [3] - 2659:10, 2684:22, 2698:21
**exhaust** [1] - 2649:22
**Exhibit** [5] - 2611:16, 2611:19, 2661:17, 2669:10
**exhibit** [5] - 2587:1, 2611:19, 2617:11, 2672:23, 2673:1
**exhibits** [5] - 2664:4, 2676:3, 2677:9, 2699:25, 2707:16
**exist** [1] - 2592:6
**existed** [8] - 2612:25, 2616:22, 2632:13, 2671:6, 2678:25, 2679:20, 2680:20, 2702:9
**existence** [1] - 2676:14
**existing** [7] - 2626:1, 2683:1, 2683:12, 2683:17, 2696:9, 2696:23, 2697:6
**exit** [1] - 2651:1
**expect** [5] - 2660:10, 2681:19, 2682:3, 2684:22, 2714:14
**expectation** [1] - 2593:11
**expected** [5] - 2594:4, 2596:7, 2682:20, 2683:3, 2684:25
**expense** [2] - 2695:23, 2696:7
**expenses** [9] - 2692:23, 2693:2, 2693:17, 2695:13, 2695:18, 2695:25, 2696:5, 2698:22, 2704:17
**experience** [9] - 2595:14, 2596:11, 2623:11, 2627:2, 2675:2, 2676:4, 2683:24, 2697:12, 2724:15
**experienced** [2] - 2669:23, 2697:11
**expert** [16] - 2589:1, 2597:13, 2607:5, 2620:17, 2622:17, 2623:22, 2624:24,

2627:1, 2646:12, 2650:19, 2656:7, 2657:4, 2657:5, 2660:13, 2675:3, 2696:6
**expertise** [4] - 2588:15, 2596:10, 2652:22, 2683:25
**experts** [8] - 2600:21, 2601:9, 2603:2, 2608:6, 2611:18, 2650:20, 2651:24, 2671:24
**explain** [4] - 2586:20, 2659:11, 2681:17, 2721:9
**explained** [5] - 2606:16, 2609:18, 2609:19, 2627:13, 2686:25
**explaining** [1] - 2594:25
**exposed** [9] - 2599:7, 2599:21, 2604:22, 2617:25, 2619:12, 2621:23, 2654:7, 2656:21, 2660:2
**exposure** [18] - 2602:16, 2603:10, 2603:14, 2603:23, 2604:17, 2605:4, 2605:9, 2605:13, 2609:19, 2620:23, 2622:11, 2623:21, 2624:3, 2630:5, 2630:19, 2630:20, 2634:13, 2660:13
**exposures** [4] - 2629:20, 2629:21, 2630:3, 2630:15
**expressly** [1] - 2673:13
**extent** [8] - 2600:5, 2686:20, 2688:10, 2688:21, 2688:23, 2694:19, 2696:24, 2710:2
**extenuating** [1] - 2688:19
**extra** [1] - 2708:20
**extraordinarily** [1] - 2608:23
**extrapolation** [1] - 2611:25
**eye** [3] - 2619:25, 2620:12, 2629:7
**eyes** [5] - 2599:1, 2612:2, 2628:6, 2629:3, 2654:1
**eyewitness** [1] -

2676:12

---

## F

---

**face** [1] - 2620:2
**Facebook** [1] - 2700:8
**faced** [2] - 2692:20, 2696:25
**facilitate** [1] - 2594:6
**fact** [49] - 2588:22, 2595:22, 2596:3, 2597:3, 2597:7, 2598:9, 2604:18, 2607:14, 2607:15, 2608:10, 2614:8, 2618:24, 2619:8, 2622:25, 2624:19, 2624:25, 2630:9, 2631:15, 2641:16, 2643:11, 2643:14, 2644:10, 2644:18, 2645:3, 2645:7, 2645:14, 2645:24, 2646:21, 2647:23, 2648:16, 2648:18, 2650:2, 2650:10, 2655:19, 2660:1, 2665:3, 2674:22, 2676:8, 2677:6, 2677:20, 2685:12, 2687:4, 2692:2, 2693:6, 2700:11, 2711:22, 2711:24, 2720:1, 2726:13
**factor** [2] - 2685:19, 2686:1
**factors** [2] - 2605:11, 2685:21
**facts** [9] - 2656:10, 2662:2, 2664:24, 2674:4, 2676:15, 2676:18, 2694:17, 2699:21, 2708:6
**Fahrenheit** [3] - 2667:7, 2667:13, 2668:2
**failed** [8] - 2593:2, 2594:17, 2597:20, 2615:21, 2658:5, 2674:24, 2680:15, 2698:14
**failing** [1] - 2684:11
**fails** [1] - 2677:11
**failure** [8] - 2600:8, 2613:13, 2681:13, 2682:6, 2699:2, 2712:16, 2712:23, 2713:2
**fair** [4] - 2607:8, 2693:11, 2694:1,

2697:19
**fairly** [3] - 2694:23, 2695:3, 2697:16
**fall** [1] - 2631:4
**falsely** [1] - 2674:22
**familiar** [1] - 2662:25
**families** [2] - 2616:4, 2665:13
**family** [1] - 2642:5
**fan** [2] - 2649:22, 2720:19
**far** [4] - 2610:12, 2615:19, 2631:22, 2641:20
**Farenheit** [3] - 2666:19, 2666:24, 2667:17
**fashion** [3] - 2586:1, 2669:9, 2681:13
**fast** [3] - 2647:7, 2647:8, 2651:15
**fault** [15] - 2613:17, 2613:18, 2677:22, 2687:8, 2687:17, 2687:19, 2687:20, 2688:2, 2688:8, 2688:10, 2688:11, 2688:12, 2703:17, 2703:19, 2706:3
**fault/damages** [1] - 2703:11
**faulty** [1] - 2596:21
**favor** [5] - 2655:4, 2677:20, 2689:14, 2689:24, 2691:16
**fax** [1] - 2637:5
**faxed** [1] - 2637:4
**Faye** [1] - 2637:10
**fear** [7] - 2602:19, 2631:3, 2631:4, 2631:8, 2651:13, 2692:18, 2697:25
**feasible** [2] - 2596:16, 2683:15
**feature** [1] - 2690:11
**February** [7] - 2637:11, 2643:20, 2644:5, 2670:1, 2670:8, 2670:13, 2670:16
**federal** [7] - 2616:13, 2623:12, 2634:11, 2650:20, 2689:6, 2689:18, 2723:4
**feedback** [2] - 2723:18, 2725:25
**fees** [1] - 2699:9
**feet** [3] - 2597:10, 2666:13, 2666:14
**FELIPE** [1] - 2581:21

**fell** [1] - 2684:19
**fellow** [2] - 2650:6, 2726:19
**FEMA** [110] - 2581:4, 2587:16, 2587:18, 2587:21, 2588:7, 2588:14, 2588:19, 2588:22, 2588:23, 2589:6, 2589:8, 2589:10, 2589:13, 2589:15, 2589:18, 2589:20, 2589:21, 2589:23, 2590:17, 2591:6, 2591:16, 2591:17, 2591:21, 2591:22, 2591:24, 2591:25, 2592:4, 2592:5, 2592:9, 2592:10, 2592:11, 2592:12, 2593:6, 2593:15, 2595:17, 2596:6, 2596:9, 2596:11, 2596:15, 2597:4, 2611:3, 2611:15, 2613:22, 2615:25, 2616:1, 2616:7, 2616:11, 2635:2, 2643:3, 2643:7, 2643:9, 2643:16, 2643:18, 2644:7, 2645:20, 2647:11, 2648:25, 2649:11, 2650:2, 2650:14, 2650:19, 2651:20, 2652:6, 2655:20, 2655:24, 2656:7, 2656:8, 2657:5, 2658:6, 2658:10, 2658:12, 2659:13, 2659:14, 2660:3, 2660:6, 2665:8, 2665:12, 2665:16, 2665:21, 2666:6, 2666:8, 2666:10, 2668:15, 2668:16, 2668:17, 2668:21, 2668:22, 2669:2, 2669:8, 2669:12, 2669:13, 2670:3, 2671:12, 2671:14, 2671:16, 2671:25, 2672:1, 2672:7, 2683:23, 2689:2, 2704:5, 2704:7
**FEMA's** [7] - 2588:11, 2589:5, 2592:2, 2651:13, 2651:23, 2668:24, 2691:17
**few** [9] - 2587:19,

2601:17, 2609:14, 2633:14, 2656:18, 2660:17, 2662:21, 2719:8, 2724:17

**fiancé** [4] - 2630:17, 2631:3, 2633:9, 2637:17

**fibers** [1] - 2630:5

**Field** [10] - 2598:13, 2605:19, 2606:2, 2606:5, 2619:20, 2619:21, 2627:23, 2629:14, 2631:11

**field** [5] - 2639:2, 2639:6, 2660:15, 2671:23, 2675:3

**figure** [3] - 2614:5, 2614:9, 2645:12

**figures** [1] - 2614:6

**file** [6] - 2636:20, 2636:21, 2637:11, 2720:17, 2727:22

**files** [1] - 2636:25

**fill** [1] - 2700:19

**filters** [3] - 2630:10, 2630:11, 2630:14

**final** [5] - 2603:5, 2603:22, 2639:12, 2656:3

**finally** [12] - 2590:6, 2609:11, 2615:17, 2617:3, 2618:23, 2625:2, 2625:6, 2629:8, 2630:21, 2636:11, 2636:16, 2713:2

**financially** [1] - 2618:25

**fine** [8] - 2606:18, 2631:22, 2632:1, 2632:20, 2640:6, 2653:13, 2708:20

**finish** [4] - 2585:17, 2586:11, 2615:2, 2699:19

**finished** [2] - 2615:19, 2650:4

**first** [45] - 2584:12, 2605:2, 2605:4, 2612:2, 2614:25, 2615:3, 2617:12, 2627:4, 2627:5, 2628:25, 2630:16, 2630:18, 2631:4, 2631:16, 2631:18, 2633:12, 2634:12, 2639:1, 2640:9, 2640:22, 2640:25, 2642:22, 2643:8, 2644:1, 2646:9,

2647:4, 2648:14, 2650:6, 2652:7, 2671:7, 2678:15, 2679:11, 2680:13, 2682:16, 2684:18, 2689:6, 2689:11, 2692:5, 2701:7, 2709:20, 2717:13, 2719:11, 2728:23, 2728:25

**fit** [2] - 2591:14, 2592:16

**five** [12] - 2588:9, 2590:24, 2591:1, 2591:3, 2599:22, 2612:3, 2617:20, 2617:21, 2661:10, 2688:18, 2706:17

**fixed** [1] - 2647:24

**fixing** [2] - 2694:15, 2697:17

**flag** [1] - 2646:18

**flash** [1] - 2651:10

**flood** [2] - 2591:8, 2658:17

**floors** [1] - 2647:14

**Florida** [1] - 2590:10

**flyer** [4] - 2634:16, 2634:19, 2635:11, 2635:12

**flyers** [3] - 2591:25, 2592:10, 2634:15

**folks** [2] - 2722:7, 2722:25

**follow** [12] - 2593:2, 2596:13, 2596:17, 2597:15, 2652:3, 2659:12, 2663:13, 2663:16, 2664:9, 2664:22, 2700:16, 2701:14

**followed** [1] - 2653:24

**following** [8] - 2665:5, 2665:9, 2665:17, 2684:16, 2691:11, 2694:18, 2703:17, 2704:12

**food** [2] - 2591:4, 2601:10

**FOR** [3] - 2581:16, 2582:10, 2582:15

**forced** [1] - 2692:11

**foregoing** [1] - 2729:13

**foreman** [2] - 2717:13, 2718:8

**forensic** [2] - 2607:6, 2607:7

**foreperson** [3] - 2699:23, 2700:19,

2704:22

**foreseeable** [1] - 2686:6

**Forest** [106] - 2584:21, 2587:21, 2587:24, 2588:15, 2588:18, 2588:19, 2589:1, 2592:15, 2592:24, 2593:2, 2593:7, 2593:9, 2593:13, 2593:15, 2593:16, 2593:19, 2593:23, 2594:14, 2594:22, 2595:16, 2595:23, 2603:4, 2612:7, 2612:18, 2612:21, 2612:25, 2613:4, 2613:19, 2615:6, 2615:20, 2616:1, 2616:9, 2616:18, 2616:24, 2616:25, 2617:2, 2621:24, 2623:14, 2623:15, 2634:10, 2635:3, 2635:17, 2638:4, 2651:14, 2655:15, 2656:8, 2656:24, 2659:2, 2665:15, 2665:20, 2665:24, 2666:3, 2666:5, 2668:12, 2670:20, 2677:24, 2677:25, 2678:16, 2678:22, 2679:1, 2679:9, 2680:4, 2680:9, 2680:13, 2680:15, 2680:21, 2683:18, 2683:23, 2684:3, 2684:10, 2688:25, 2689:4, 2689:8, 2689:9, 2689:10, 2689:12, 2689:14, 2690:3, 2690:5, 2690:6, 2690:14, 2690:17, 2690:21, 2690:22, 2691:2, 2691:13, 2691:16, 2701:19, 2701:23, 2702:1, 2702:9, 2702:15, 2703:22, 2706:6, 2710:8, 2710:16, 2711:2, 2713:8, 2717:21, 2717:22, 2717:24, 2718:1

**FOREST** [2] - 2581:8, 2582:10

**forgot** [2] - 2625:16, 2625:23

**form** [31] - 2612:5,

2615:4, 2615:15, 2640:24, 2641:4, 2645:20, 2662:21, 2663:16, 2671:5, 2675:14, 2690:12, 2700:20, 2701:9, 2701:17, 2703:3, 2703:13, 2704:23, 2707:5, 2708:23, 2709:4, 2709:16, 2709:17, 2709:19, 2709:25, 2712:13, 2712:19, 2712:24, 2717:19, 2718:8, 2727:15, 2728:3

**formaldehyde** [118] - 2588:25, 2589:24, 2590:16, 2590:19, 2590:23, 2591:18, 2591:23, 2592:5, 2594:9, 2594:19, 2595:1, 2595:11, 2595:20, 2595:24, 2597:21, 2597:25, 2598:4, 2598:25, 2599:10, 2599:16, 2600:25, 2601:2, 2601:6, 2601:9, 2601:13, 2601:17, 2602:17, 2602:24, 2603:10, 2603:14, 2603:17, 2603:22, 2603:24, 2604:1, 2605:13, 2605:16, 2608:12, 2608:13, 2608:18, 2608:19, 2609:2, 2609:10, 2609:18, 2609:19, 2610:6, 2611:19, 2611:20, 2613:14, 2613:15, 2617:25, 2619:12, 2620:24, 2621:13, 2622:10, 2622:25, 2623:2, 2623:21, 2626:1, 2627:6, 2627:8, 2629:6, 2629:12, 2629:17, 2629:19, 2630:2, 2632:7, 2633:1, 2633:3, 2633:16, 2633:25, 2634:11, 2634:14, 2634:23, 2634:24, 2635:2, 2636:8, 2636:23, 2637:23, 2638:1, 2638:2, 2638:4, 2639:9, 2640:14, 2649:11, 2649:12, 2649:16, 2650:19, 2650:21, 2651:10, 2652:7,

2655:13, 2655:14, 2657:11, 2657:12, 2657:20, 2660:4, 2660:13, 2665:25, 2666:15, 2666:16, 2666:20, 2667:1, 2667:5, 2667:12, 2667:21, 2668:5, 2668:6, 2668:10, 2668:13, 2668:14, 2671:11, 2671:15, 2710:23

**FORMALDEHYDE** [1] - 2581:4

**formaldehyde-emitting** [2] - 2595:11, 2665:25

**former** [1] - 2604:15

**forms** [3] - 2645:18, 2645:19, 2709:24

**forth** [3] - 2669:9, 2690:4, 2713:3

**forthcoming** [1] - 2726:23

**fortunately** [2] - 2601:22, 2602:3

**forward** [2] - 2662:8, 2712:3

**forwarding** [1] - 2597:2

**fought** [1] - 2728:24

**founded** [1] - 2605:7

**FOUR** [1] - 2582:7

**four** [14] - 2614:22, 2643:9, 2643:15, 2657:14, 2657:15, 2657:17, 2657:19, 2657:22, 2679:5, 2680:12, 2684:16, 2688:17, 2705:20, 2725:2

**four-page** [1] - 2614:22

**fourth** [3] - 2680:1, 2681:1, 2686:12

**FRANK** [2] - 2581:16, 2581:17

**frankly** [5] - 2641:14, 2641:25, 2642:11, 2645:11, 2652:20

**free** [2] - 2687:22, 2695:16

**fresh** [1] - 2595:6

**Friday** [2] - 2711:9, 2711:13

**friend** [3] - 2633:4, 2637:15, 2723:5

**friendly** [1] - 2657:8

**friends** [3] - 2616:4, 2637:21

**fright** [1] - 2602:19
**front** [7] - 2622:8, 2645:8, 2645:16, 2647:3, 2714:9, 2721:2, 2726:25
**full** [3] - 2690:9, 2691:23, 2699:14
**fully** [1] - 2635:14
**funeral** [2] - 2633:13, 2641:24
**furnace** [1] - 2644:18
**furnished** [1] - 2691:15
**FURTHER** [2] - 2583:7, 2611:1
**furthermore** [1] - 2610:5
**future** [26] - 2606:23, 2632:20, 2692:24, 2693:2, 2694:7, 2694:25, 2695:1, 2695:3, 2695:4, 2695:7, 2695:8, 2695:10, 2695:11, 2695:18, 2695:20, 2695:24, 2696:1, 2696:3, 2696:4, 2697:12, 2704:13, 2704:15, 2704:17

### G

**Gaeddert** [4] - 2615:24, 2635:19, 2655:17
**GAEDDERT** [1] - 2582:20
**gaining** [1] - 2627:21
**galaxy** [1] - 2728:12
**gaps** [1] - 2596:5
**Garrett** [4] - 2589:6, 2591:6, 2658:14
**gas** [10] - 2595:20, 2595:25, 2598:25, 2601:2, 2601:3, 2601:6, 2601:12, 2602:24, 2638:2
**gassing** [4] - 2594:6, 2596:23, 2638:1, 2657:20
**GEIGER** [1] - 2614:19
**GEIGER....................
.. [1] - 2583:8
**general** [6] - 2631:5, 2631:9, 2631:10, 2692:19, 2693:12, 2697:22
**generally** [4] -

2604:12, 2614:23, 2687:25, 2690:9
**genetic** [1] - 2606:16
**gentleman** [3] - 2605:6, 2605:21, 2607:6
**gentlemen** [18] - 2587:4, 2600:4, 2602:18, 2614:20, 2615:19, 2615:23, 2616:16, 2616:20, 2617:5, 2617:23, 2621:9, 2621:24, 2627:5, 2638:3, 2638:23, 2639:23, 2640:8, 2640:11
**Georgia** [1] - 2641:24
**Gieger** [38] - 2585:6, 2586:10, 2603:11, 2603:16, 2614:15, 2614:17, 2640:21, 2642:14, 2644:15, 2644:25, 2647:25, 2648:9, 2648:14, 2648:23, 2656:23, 2710:6, 2711:4, 2715:12
**GIEGER** [36] - 2582:10, 2582:11, 2584:23, 2585:9, 2587:3, 2610:10, 2610:14, 2614:13, 2617:10, 2618:14, 2639:22, 2640:16, 2663:5, 2706:13, 2707:6, 2707:9, 2710:7, 2711:14, 2711:17, 2711:21, 2712:3, 2712:8, 2713:5, 2713:7, 2713:15, 2713:20, 2713:25, 2714:4, 2715:6, 2715:15, 2715:18, 2715:24, 2727:1, 2727:19, 2728:4, 2728:15
**Gieger's** [2] - 2641:11, 2643:21
**girlfriend** [3] - 2637:21, 2654:23, 2654:24
**given** [8] - 2599:6, 2664:6, 2691:20, 2692:2, 2700:17, 2704:23, 2708:2, 2723:13
**glues** [1] - 2596:24
**goopy** [1] - 2629:3
**Government** [1] - 2676:21

**government** [40] - 2611:18, 2616:13, 2623:12, 2634:11, 2635:4, 2652:1, 2652:2, 2652:8, 2653:22, 2653:23, 2659:11, 2688:25, 2689:3, 2689:6, 2689:9, 2689:10, 2689:12, 2689:18, 2689:21, 2690:1, 2690:2, 2690:5, 2690:6, 2690:7, 2690:10, 2690:16, 2690:18, 2690:20, 2690:22, 2690:24, 2691:1, 2691:2, 2691:3, 2691:4, 2691:7, 2691:15, 2706:6, 2709:13, 2712:23
**government's** [3] - 2611:20, 2690:12, 2690:15
**grade** [4] - 2588:2, 2596:6, 2597:20, 2601:18
**grand** [1] - 2728:12
**grander** [1] - 2721:22
**grant** [1] - 2646:23
**granted** [1] - 2709:15
**grants** [1] - 2608:13
**grateful** [1] - 2598:20
**great** [4] - 2606:16, 2609:13, 2610:24, 2688:15
**greater** [7] - 2600:13, 2609:7, 2658:23, 2674:18, 2675:24, 2676:8, 2677:2
**Green** [1] - 2637:10
**grief** [1] - 2697:24
**Group** [6] - 2666:17, 2666:23, 2667:2, 2667:10, 2667:16, 2667:23
**group** [3] - 2650:3, 2650:20, 2723:12
**guarantee** [1] - 2619:17
**guard** [1] - 2594:5
**GUERRA** [1] - 2582:6
**guess** [3] - 2609:11, 2707:24, 2715:5
**guesswork** [1] - 2694:11
**guidance** [3] - 2604:18, 2604:20, 2692:7
**guided** [1] - 2694:9

**guidelines** [1] - 2605:1
**guilt** [1] - 2722:13
**Gulf** [2] - 2665:11, 2665:13
**gut** [1] - 2655:5
**guy** [3] - 2654:22, 2660:23, 2662:1
**Guy** [1] - 2591:24

### H

**habitable** [1] - 2588:16
**habitation** [1] - 2591:13
**hair** [1] - 2644:21
**haircut** [1] - 2644:22
**half** [4] - 2585:9, 2594:14, 2705:4, 2706:5
**half-inch** [1] - 2594:14
**hallway** [1] - 2714:22
**hand** [7] - 2608:1, 2608:3, 2658:6, 2688:4, 2694:12, 2717:18, 2724:23
**handicap** [1] - 2669:6
**handle** [3] - 2589:25, 2590:4, 2646:18
**handles** [1] - 2630:8
**handling** [1] - 2584:25
**hands** [2] - 2620:9, 2722:3
**handy** [1] - 2586:24
**happy** [1] - 2721:17
**harassed** [1] - 2726:12
**hard** [6] - 2598:8, 2618:15, 2621:6, 2659:16, 2714:11, 2720:8
**harm** [5] - 2591:3, 2685:1, 2685:2, 2687:7, 2687:8
**harmful** [2] - 2599:1, 2696:16, 2708:1
**Harvard** [2] - 2624:20, 2624:21, 2660:16
**Harvard-educated** [1] - 2660:16
**Harvey** [1] - 2669:16
**haste** [1] - 2688:20
**haul** [3] - 2589:17, 2649:16, 2651:16
**hauled** [2] - 2671:21, 2671:22
**haulers** [1] - 2591:19
**hauling** [6] - 2641:1,

2641:8, 2668:23, 2702:20, 2703:8, 2718:7
**hazardous** [1] - 2691:12
**hazards** [2] - 2683:25, 2684:2
**headaches** [1] - 2603:5
**heading** [1] - 2701:17
**heal** [1] - 2660:11
**health** [13] - 2590:14, 2590:19, 2604:5, 2605:9, 2605:21, 2606:13, 2624:4, 2624:6, 2631:11, 2632:11, 2637:12, 2639:17, 2684:2
**Health** [3] - 2588:6, 2604:11, 2605:8
**hear** [24] - 2588:17, 2589:5, 2590:2, 2590:9, 2591:23, 2592:17, 2599:2, 2599:13, 2611:3, 2611:7, 2611:22, 2614:16, 2620:22, 2653:13, 2654:15, 2719:24, 2722:13, 2722:14, 2722:17, 2722:20, 2722:25, 2724:7, 2725:14
**heard** [65] - 2586:16, 2587:17, 2588:2, 2588:17, 2588:18, 2588:22, 2589:5, 2589:20, 2590:12, 2590:14, 2590:15, 2590:20, 2590:23, 2591:6, 2591:21, 2591:24, 2592:9, 2592:23, 2593:3, 2594:7, 2595:9, 2595:13, 2595:19, 2596:2, 2596:8, 2596:9, 2597:17, 2598:6, 2599:3, 2599:10, 2600:25, 2601:8, 2601:24, 2604:2, 2604:5, 2604:15, 2605:19, 2607:5, 2608:25, 2610:1, 2611:3, 2611:22, 2616:16, 2619:20, 2623:3, 2626:18, 2642:17, 2644:17, 2644:21, 2645:8, 2645:24, 2648:23, 2650:2, 2651:23, 2652:18,

2653:22, 2654:13, 2656:11, 2656:12, 2657:4, 2658:10, 2660:7, 2664:15, 2673:3

**HEARD** [1] - 2581:12

**hearing** [3] - 2652:17, 2673:4, 2719:22

**hears** [1] - 2632:8

**heart** [1] - 2642:15

**heat** [1] - 2596:5

**heeded** [1] - 2681:7

**held** [3] - 2669:21, 2682:11, 2691:9

**help** [4] - 2594:5, 2614:2, 2627:25, 2651:15

**helped** [1] - 2647:1

**helpful** [1] - 2675:1

**helping** [1] - 2652:19

**hereafter** [1] - 2678:4

**hereby** [1] - 2729:13

**herring** [1] - 2610:5

**hesitate** [1] - 2699:16

**Hewett** [1] - 2611:24

**high** [6] - 2620:2, 2633:16, 2640:1, 2645:3, 2656:5, 2659:17

**higher** [2] - 2604:19, 2604:20

**himself** [4] - 2606:1, 2614:1, 2647:14, 2687:9

**hired** [16] - 2603:3, 2620:17, 2620:18, 2622:17, 2623:11, 2623:13, 2623:14, 2623:15, 2623:16, 2623:23, 2635:3, 2657:5

**historian** [1] - 2598:13

**historical** [1] - 2632:3

**history** [6] - 2587:16, 2619:19, 2628:19, 2628:24, 2629:24

**hit** [1] - 2706:25

**hitch** [1] - 2666:14

**hold** [3] - 2655:2, 2659:9, 2673:24

**holds** [1] - 2602:20

**hole** [1] - 2644:11

**home** [6] - 2591:14, 2611:4, 2630:15, 2633:13, 2639:11, 2658:14

**homes** [8] - 2591:9, 2609:1, 2609:2, 2652:20, 2652:21, 2658:17, 2658:18,

2669:22

**honest** [2] - 2598:14, 2699:18

**Honor** [24] - 2584:23, 2585:2, 2585:10, 2585:11, 2587:3, 2610:11, 2614:10, 2614:13, 2617:8, 2618:12, 2640:16, 2640:21, 2662:10, 2707:11, 2709:11, 2710:5, 2710:7, 2711:21, 2712:8, 2712:10, 2713:5, 2714:5, 2718:11, 2727:1

**Honorable** [1] - 2600:3

**HONORABLE** [1] - 2581:12

**hookups** [1] - 2669:4

**hope** [3] - 2589:12, 2719:3, 2719:9

**hopefully** [3] - 2584:13, 2722:15, 2724:9

**hoping** [1] - 2721:4

**hospital** [1] - 2696:7

**Hospital** [2] - 2627:3, 2627:16

**hot** [1] - 2599:3

**hour** [10] - 2584:17, 2584:19, 2584:20, 2585:9, 2607:9, 2667:1, 2667:18, 2667:21, 2668:4, 2705:4

**hours** [11] - 2585:20, 2602:25, 2605:4, 2617:14, 2617:18, 2617:20, 2617:21, 2650:17, 2667:4, 2668:1, 2668:2

**house** [8] - 2588:3, 2596:4, 2597:10, 2597:12, 2630:22, 2630:25, 2649:20

**housing** [21] - 2588:8, 2589:10, 2589:11, 2589:16, 2589:23, 2592:8, 2592:12, 2593:12, 2593:21, 2596:12, 2596:17, 2616:14, 2643:13, 2656:10, 2665:12, 2665:22, 2666:7, 2668:25, 2671:16, 2678:1

**HOUSTON** [1] - 2581:21

**HUD** [1] - 2658:20

**human** [1] - 2601:18

**Human** [1] - 2604:11

**humidity** [9] - 2638:16, 2638:21, 2639:8, 2639:9, 2640:1, 2640:4, 2666:19, 2667:7, 2667:14

**hundred** [11] - 2590:24, 2591:2, 2591:3, 2599:22, 2601:15, 2602:12, 2609:5, 2609:7, 2612:3, 2660:18

**hundreds** [1] - 2644:24

**hunt** [1] - 2718:20

**HUNT** [1] - 2718:21

**Hurricane** [3] - 2588:7, 2665:18, 2668:22

**hurricane** [5] - 2616:11, 2616:15, 2638:7, 2638:9, 2669:1

**Hurricanes** [3] - 2665:13, 2665:22, 2671:12

**hurt** [7] - 2599:13, 2600:5, 2600:6, 2611:6, 2642:21, 2656:13, 2660:2

**HVAC** [1] - 2668:2

**Hyatt** [2] - 2617:21, 2618:19

**Hygiene** [3] - 2667:22, 2668:4, 2668:8

**hyperreactive** [1] - 2609:9

**I**

**IA** [3] - 2636:21, 2637:10

**IA/TAC** [3] - 2592:13, 2668:19, 2669:11

**IARC** [1] - 2601:20

**idea** [1] - 2627:24

**identical** [1] - 2678:22

**identification** [1] - 2666:10

**identified** [2] - 2683:14, 2683:15

**idly** [1] - 2698:20

**ignore** [1] - 2672:21

**ill** [3] - 2611:8, 2611:13, 2659:22

**illness** [1] - 2698:4

**illustration** [1] - 2672:23

**image** [1] - 2651:19

**imagine** [4] - 2602:18, 2602:22, 2603:7, 2719:18

**immediate** [1] - 2636:15

**immediately** [4] - 2591:17, 2726:8, 2726:13, 2728:5

**immunity** [1] - 2712:24

**impact** [1] - 2601:11

**impacted** [1] - 2711:7

**impairment** [1] - 2704:19

**implementation** [1] - 2690:17

**implicit** [1] - 2711:25

**importance** [2] - 2685:4, 2688:16

**important** [29] - 2601:1, 2614:25, 2615:3, 2617:23, 2619:3, 2619:9, 2619:10, 2620:3, 2623:12, 2624:2, 2626:22, 2627:18, 2627:20, 2628:4, 2628:10, 2633:15, 2633:24, 2634:8, 2634:16, 2635:21, 2637:5, 2638:11, 2638:25, 2639:5, 2639:7, 2639:15, 2654:20, 2674:22, 2721:24

**importantly** [1] - 2630:10

**imposed** [1] - 2694:4

**impression** [1] - 2674:19

**IN** [1] - 2581:4

**inactions** [7] - 2600:8, 2641:1, 2641:8, 2693:22, 2702:19, 2703:8, 2718:6

**inadequate** [6] - 2612:2, 2678:13, 2680:10, 2682:12, 2682:23, 2718:2

**inadvertence** [1] - 2688:14

**Inc** [2] - 2669:19, 2702:18

**INC** [3] - 2581:8, 2582:10, 2582:15

**incentive** [2] - 2687:25, 2688:7

**inch** [2] - 2594:14, 2654:2

**inches** [2] - 2645:8, 2666:13

**incident** [4] - 2677:21, 2687:19, 2692:21, 2697:1

**include** [6] - 2606:15, 2679:7, 2680:3, 2681:3, 2685:8, 2710:19

**included** [6] - 2663:9, 2663:11, 2710:24, 2711:24, 2712:2

**includes** [1] - 2604:14

**including** [7] - 2609:8, 2665:10, 2669:3, 2669:5, 2693:20, 2707:24, 2726:16

**inclusion** [4] - 2709:2, 2711:7, 2711:11, 2712:13

**income** [1] - 2619:10

**Incorporated** [4] - 2669:21, 2703:22, 2704:1, 2717:21

**incorporated** [1] - 2710:14

**incorrect** [1] - 2625:4

**increased** [3] - 2632:14, 2634:13, 2694:4

**increases** [1] - 2632:9

**incur** [1] - 2698:22

**incurred** [5] - 2692:24, 2693:18, 2695:21, 2695:23

**indefensible** [1] - 2604:25

**independent** [4] - 2618:20, 2674:16, 2710:11, 2712:16

**independently** [1] - 2685:22

**indicate** [3] - 2646:9, 2673:13, 2693:7

**indicated** [3] - 2607:21, 2645:18, 2671:17

**indicating** [3] - 2644:14, 2671:5, 2690:12

**indication** [1] - 2692:3

**indicia** [1] - 2621:16

**indirect** [1] - 2676:13

**indisputable** [1] - 2657:10

**individual** [2] - 2668:18, 2668:21

**individuals** [2] -

2601:15, 2609:6
**indoor** [4] - 2667:5,
2667:11, 2668:6,
2668:10
**induced** [1] - 2632:11
**industries** [1] - 2588:8
**industry** [4] - 2595:14,
2608:8, 2657:6
**inevitable** [1] -
2597:14
**inference** [2] - 2673:8,
2673:19
**inferences** [2] -
2676:2, 2694:16
**inferior** [1] - 2688:18
**infiltration** [1] -
2596:5
**inflammation** [1] -
2602:10
**influenced** [1] -
2674:17
**inform** [1] - 2684:1
**information** [11] -
2591:22, 2609:3,
2609:13, 2655:1,
2660:4, 2700:3,
2700:9, 2714:23,
2719:24, 2719:25
**informed** [1] - 2599:6
**inhaled** [5] - 2601:2,
2601:3, 2601:6,
2601:7, 2601:12
**inhales** [1] - 2608:19
**initial** [3] - 2585:1,
2585:21, 2666:16
**injure** [2] - 2642:25,
2653:3
**injured** [9] - 2608:11,
2611:12, 2675:24,
2675:25, 2691:10,
2696:14, 2696:18,
2696:20, 2698:19
**injuries** [19] - 2595:9,
2613:21, 2648:21,
2678:8, 2679:13,
2679:14, 2679:23,
2680:7, 2687:16,
2688:12, 2688:22,
2688:24, 2691:24,
2693:18, 2693:23,
2694:5, 2694:6,
2695:2, 2696:22
**injury** [36] - 2599:21,
2605:17, 2606:16,
2608:10, 2613:3,
2613:10, 2618:1,
2621:16, 2623:21,
2641:6, 2677:21,
2678:23, 2679:2,
2679:7, 2679:15,

2679:18, 2680:3,
2680:18, 2680:23,
2681:3, 2681:11,
2681:13, 2681:25,
2682:21, 2683:2,
2683:13, 2685:18,
2685:22, 2685:23,
2686:1, 2693:20,
2696:11, 2697:9,
2697:12, 2702:14,
2703:6
**innocence** [1] -
2722:13
**innocent** [1] - 2599:5
**inquiry** [3] - 2685:15,
2685:25, 2686:8
**inside** [5] - 2594:20,
2599:11, 2634:4,
2666:16
**insinuate** [2] - 2608:2,
2608:5
**insofar** [2] - 2677:24,
2728:12
**inspect** [2] - 2643:18,
2670:5
**inspected** [10] -
2643:8, 2643:23,
2644:23, 2648:6,
2670:2, 2670:4,
2670:8, 2671:23,
2690:18, 2690:20
**inspection** [4] -
2643:20, 2643:24,
2644:9, 2670:14
**inspections** [5] -
2643:7, 2643:9,
2643:12, 2643:13,
2643:22, 2644:20,
2671:1, 2671:2
**inspector** [1] -
2588:19
**inspectors** [1] -
2643:8
**install** [8] - 2589:14,
2589:17, 2589:19,
2643:17, 2649:17,
2651:16, 2669:8,
2669:21
**installation** [15] -
2594:13, 2596:22,
2645:17, 2646:13,
2668:23, 2669:3,
2670:5, 2684:12,
2684:14, 2689:17,
2689:19, 2689:22,
2702:20, 2703:9
**Installation** [1] -
2669:10
**installed** [10] - 2597:9,
2643:4, 2643:14,

2643:16, 2645:2,
2648:5, 2654:16,
2659:6, 2669:17,
2670:2
**installer** [1] - 2594:22
**installers** [1] -
2591:20
**installing** [6] - 2641:2,
2641:8, 2648:7,
2654:14, 2668:15,
2718:7
**instances** [2] -
2644:16, 2687:6
**instant** [1] - 2700:7
**instead** [4] - 2705:21,
2706:4, 2707:7,
2707:8
**instruct** [9] - 2610:16,
2652:1, 2657:6,
2664:16, 2664:21,
2674:2, 2689:4,
2689:16, 2712:16
**instructed** [5] -
2674:7, 2674:9,
2677:8, 2691:18,
2693:6
**instructing** [1] -
2692:6
**instruction** [8] -
2665:1, 2681:22,
2691:19, 2701:16,
2707:21, 2707:25,
2708:1, 2710:10
**instructions** [21] -
2585:25, 2593:2,
2596:15, 2641:4,
2662:13, 2662:20,
2663:12, 2664:3,
2664:6, 2664:10,
2665:2, 2681:17,
2692:3, 2699:24,
2700:17, 2701:13,
2703:1, 2705:13,
2705:22, 2707:2,
2711:11
**INSTRUCTIONS** [1] -
2663:25
**INSTRUCTIONS........
.............................** [1]
- 2583:11
**instructs** [1] - 2701:16
**insulation** [6] -
2589:3, 2594:5,
2594:15, 2596:3,
2596:5
**intangible** [1] -
2697:13
**intended** [7] - 2591:6,
2592:17, 2593:10,
2593:11, 2657:1,

2659:8, 2692:22
**intent** [1] - 2592:2
**interest** [6] - 2606:19,
2688:2, 2695:14,
2695:22, 2695:25,
2699:21
**interesting** [8] -
2589:12, 2591:12,
2606:24, 2609:1,
2621:10, 2631:16,
2634:22, 2637:14
**interestingly** [5] -
2626:4, 2628:19,
2629:8, 2630:21,
2651:1
**interference** [1] -
2607:25
**interior** [6] - 2595:22,
2666:18, 2667:6,
2667:7, 2667:13,
2667:14
**intermittent** [2] -
2628:11, 2632:17
**intermittently** [2] -
2632:18, 2633:9
**International** [1] -
2601:20
**Internet** [3] - 2700:6,
2700:7
**interpret** [1] - 2692:2
**interval** [1] - 2714:15
**intervening** [1] -
2710:11
**introduced** [3] -
2586:17, 2673:11,
2697:14
**intrusion** [1] - 2672:11
**invariably** [1] -
2663:13
**investigate** [2] -
2590:18, 2601:25
**investment** [1] -
2695:16
**involuntary** [2] -
2712:11, 2712:18
**involved** [9] - 2600:11,
2608:12, 2652:19,
2672:25, 2687:21,
2688:14, 2688:15,
2721:2
**involvement** [1] -
2645:22
**involves** [1] - 2602:9
**iPhone** [1] - 2700:5
**irrefutable** [1] -
2595:16
**irritant** [3] - 2601:13,
2609:4, 2629:22
**irritated** [1] - 2629:25
**irritating** [1] - 2603:6,

2630:1, 2630:3
**irritation** [1] - 2623:21
**issuance** [1] - 2690:12
**issue** [11] - 2600:18,
2609:23, 2645:23,
2648:11, 2661:8,
2665:19, 2671:6,
2687:12, 2701:2,
2712:19, 2713:14
**issued** [3] - 2668:21,
2668:22, 2711:9
**issues** [6] - 2613:25,
2647:16, 2648:13,
2693:1, 2711:19,
2713:15
**issuing** [1] - 2651:19
**item** [1] - 2698:11
**items** [1] - 2696:12
**itself** [1] - 2712:24

## J

**jail** [1] - 2612:16
**James** [8] - 2601:9,
2608:6, 2608:16,
2623:10, 2623:14,
2623:16
**January** [1] - 2605:25
**JASON** [1] - 2582:11
**Jeff** [1] - 2635:18
**Jefferson** [2] - 2627:3,
2627:16
**JERICHO** [1] -
2581:24
**job** [13] - 2607:25,
2619:16, 2630:10,
2642:10, 2643:1,
2643:3, 2643:10,
2652:10, 2652:25,
2714:12, 2720:3,
2721:1
**jobs** [3] - 2598:11,
2618:10, 2654:22
**John** [2] - 2597:13,
2644:21
**Johnson** [3] -
2637:18, 2648:2
**Joseph** [1] - 2590:12
**Jowers** [3] - 2717:12,
2718:9, 2718:13
**JOWERS** [3] -
2717:14, 2717:17,
2718:14
**JR** [3] - 2581:16,
2581:17, 2582:11
**Judge** [10] - 2614:12,
2647:8, 2652:1,
2652:15, 2712:4,
2713:20, 2713:25,

2727:21, 2728:6,
2728:16
**judge** [14] - 2617:1,
2619:3, 2620:22,
2623:4, 2636:11,
2642:18, 2698:18,
2713:7, 2715:6,
2720:3, 2725:12,
2726:14, 2727:19
**JUDGE** [1] - 2581:13
**judged** [1] - 2675:20
**judges** [8] - 2614:8,
2662:7, 2664:17,
2664:18, 2673:14,
2674:4, 2699:21
**judgment** [5] -
2607:25, 2677:20,
2719:6, 2727:20,
2728:2
**July** [7] - 2603:7,
2605:25, 2631:17,
2631:19, 2670:21,
2671:21, 2672:14
**June** [10] - 2644:2,
2644:5, 2644:8,
2645:21, 2645:22,
2645:23, 2646:2,
2649:17, 2670:23,
2671:6
**juries** [2] - 2722:4,
2722:14
**juror** [4] - 2674:19,
2715:22, 2720:6,
2724:15
**jurors** [8] - 2674:3,
2674:17, 2699:12,
2721:23, 2724:2,
2724:13, 2725:17,
2726:19
**jury** [98] - 2584:8,
2584:12, 2585:25,
2610:16, 2610:24,
2615:4, 2623:24,
2636:12, 2658:25,
2662:2, 2662:13,
2662:17, 2662:20,
2662:23, 2662:24,
2663:6, 2663:7,
2663:12, 2663:16,
2663:21, 2663:23,
2664:2, 2664:3,
2664:14, 2664:17,
2664:18, 2673:5,
2673:18, 2675:2,
2683:22, 2684:3,
2699:15, 2700:12,
2701:9, 2701:17,
2703:3, 2703:13,
2704:21, 2704:23,
2705:1, 2705:8,

2705:10, 2705:13,
2707:2, 2708:23,
2709:2, 2709:3,
2709:8, 2709:16,
2709:17, 2709:23,
2710:10, 2711:25,
2712:13, 2712:16,
2712:19, 2713:2,
2714:10, 2714:13,
2714:18, 2715:8,
2716:6, 2717:8,
2717:13, 2717:15,
2717:19, 2718:8,
2718:9, 2718:10,
2719:9, 2719:15,
2720:4, 2721:23,
2722:8, 2722:18,
2722:19, 2723:3,
2723:5, 2723:10,
2723:12, 2723:15,
2723:16, 2723:19,
2724:7, 2724:20,
2724:24, 2725:3,
2726:16, 2726:21,
2726:25, 2727:9,
2727:10, 2727:12,
2727:15, 2727:20
**JURY** [4] - 2581:12,
2583:11, 2583:12,
2663:25
**Jury** [4] - 2587:4,
2602:18, 2610:9,
2664:15
**jury's** [1] - 2719:6
**justice** [5] - 2587:7,
2600:11, 2600:16,
2641:17, 2676:23
**justifiable** [1] -
2691:11
**justified** [1] - 2676:3

## K

**KAREN** [1] - 2582:17
**Katrina** [9] - 2587:15,
2588:7, 2630:14,
2632:13, 2665:14,
2665:18, 2665:22,
2668:22, 2671:12
**Katrina's** [1] - 2589:16
**Keeley** [1] - 2719:1
**KEELEY** [1] - 2719:2
**keep** [4] - 2586:21,
2599:3, 2649:12,
2650:22
**keeps** [1] - 2650:10
**Kenny** [1] - 2629:21
**kept** [1] - 2643:11
**Kevin** [2] - 2588:11,
2588:12

**keys** [4] - 2635:19,
2635:20, 2636:4,
2650:6
**keyword** [1] - 2615:9
**kind** [7] - 2627:15,
2628:16, 2655:7,
2660:9, 2662:1,
2727:16
**kinds** [2] - 2641:4,
2643:5
**kitchen** [1] - 2649:20
**knocking** [1] -
2647:24
**knowing** [2] -
2602:22, 2616:12
**knowledge** [9] -
2649:10, 2675:1,
2682:18, 2682:25,
2683:11, 2683:16,
2691:5, 2707:13,
2711:2
**knowledgeable** [1] -
2605:21
**known** [14] - 2597:14,
2599:16, 2601:17,
2601:24, 2605:10,
2683:1, 2683:12,
2689:11, 2689:12,
2689:21, 2690:24,
2691:3, 2691:6
**knows** [2] - 2682:19,
2722:6
**KURT** [1] - 2581:12
**KURTZ** [2] - 2582:16,
2712:10
**Kurtz** [3] - 2646:17,
2646:22, 2712:9
**Kurz** [1] - 2711:5

## L

**LA** [4] - 2581:18,
2582:13, 2582:18,
2582:23
**lab** [1] - 2627:4
**LABORDE** [1] -
2582:10
**lack** [4] - 2589:15,
2592:20, 2644:25,
2681:4
**ladies** [19] - 2587:4,
2600:3, 2602:18,
2614:20, 2615:18,
2615:23, 2616:16,
2616:20, 2617:5,
2617:23, 2621:9,
2621:24, 2627:5,
2638:3, 2638:22,
2639:23, 2640:8,

2640:21, 2658:24
**lady** [1] - 2642:6
**Lagrange** [1] -
2594:24
**landlord** [2] - 2710:17,
2710:18
**Lane** [4] - 2630:23,
2669:18, 2672:3,
2672:16
**language** [1] -
2710:11
**languages** [1] -
2710:14
**LAPEROUSE** [1] -
2582:10
**larger** [1] - 2654:4
**Larson** [1] - 2592:9
**last** [17] - 2584:16,
2586:13, 2586:16,
2631:7, 2633:3,
2641:23, 2644:22,
2646:9, 2663:2,
2705:8, 2706:2,
2709:9, 2714:20,
2719:12, 2722:23
**late** [4] - 2646:1,
2647:17, 2650:10,
2650:18
**latent** [1] - 2696:10
**LAW** [2] - 2581:16,
2581:23
**law** [25] - 2607:8,
2616:25, 2617:1,
2620:22, 2623:4,
2642:18, 2664:16,
2664:20, 2664:21,
2664:22, 2664:24,
2665:1, 2676:16,
2676:22, 2684:20,
2685:18, 2687:18,
2691:17, 2691:18,
2692:19, 2694:12,
2696:13, 2697:20,
2698:8, 2722:2
**lawlessness** [1] -
2723:2
**Lawrence** [1] -
2660:15
**lawsuit** [4] - 2607:14,
2707:7, 2707:8,
2720:17
**lawyer** [9] - 2620:19,
2620:21, 2621:12,
2629:10, 2630:13,
2635:12, 2673:9,
2713:25
**lawyers** [8] - 2616:17,
2620:18, 2623:15,
2623:16, 2632:5,
2661:18, 2719:17,

2720:16
**lay** [1] - 2719:21
**lead** [3] - 2676:5,
2681:22, 2694:10
**leading** [1] - 2714:20
**leak** [8] - 2596:23,
2645:25, 2646:1,
2647:16, 2647:17,
2647:19, 2647:22,
2671:7
**leaks** [1] - 2594:18
**learn** [2] - 2587:14,
2608:16
**learned** [6] - 2587:14,
2589:24, 2592:2,
2681:11, 2681:12
**learns** [1] - 2681:9
**lease** [5] - 2636:3,
2643:19, 2643:23,
2670:7, 2670:17
**lease-in** [4] - 2643:19,
2643:23, 2670:7,
2670:17
**leased** [1] - 2670:15
**leased-in** [1] -
2670:15
**least** [3] - 2591:1,
2648:14, 2723:13
**Leave** [1] - 2597:5
**leave** [14] - 2586:5,
2590:8, 2614:7,
2649:2, 2651:2,
2703:18, 2708:3,
2708:4, 2714:21,
2714:22, 2715:3,
2719:10, 2727:4
**leaves** [3] - 2662:18,
2705:11, 2727:13
**leaving** [2] - 2634:9,
2639:5
**Lee** [1] - 2672:13
**left** [20] - 2612:25,
2616:23, 2616:25,
2617:2, 2625:21,
2639:4, 2639:11,
2646:15, 2647:2,
2671:18, 2678:25,
2679:21, 2680:13,
2680:21, 2681:10,
2682:24, 2683:10,
2702:9, 2720:25
**legal** [4] - 2686:3,
2686:4, 2686:10,
2687:4
**legally** [1] - 2674:10
**Lemus** [1] - 2608:25,
2609:3
**less** [9] - 2626:14,
2628:2, 2628:8,
2670:23, 2692:1,

2694:2, 2724:10, 2728:9, 2728:11
**lessen** [1] - 2698:14
**letter** [3] - 2629:10, 2629:13, 2629:19
**letters** [4] - 2637:3, 2637:4, 2637:6
**letting** [2] - 2637:20, 2649:25
**level** [18] - 2604:12, 2604:25, 2605:5, 2608:23, 2624:1, 2624:3, 2633:16, 2634:13, 2639:20, 2646:6, 2646:7, 2646:10, 2646:11, 2647:10, 2647:11, 2647:23, 2693:5
**leveling** [2] - 2646:3, 2669:4
**levels** [17] - 2590:21, 2599:1, 2599:21, 2601:14, 2601:16, 2604:17, 2604:19, 2604:21, 2606:13, 2606:14, 2608:20, 2608:24, 2611:21, 2619:10, 2639:10, 2656:5, 2657:16
**LFE** [1] - 2666:1
**liability** [11] - 2587:9, 2644:3, 2677:23, 2678:10, 2678:11, 2678:12, 2678:13, 2691:19, 2710:17, 2710:18
**LIABILITY** [1] - 2581:5
**Liability** [1] - 2678:4
**liable** [16] - 2654:6, 2677:25, 2681:13, 2682:22, 2683:8, 2687:7, 2689:5, 2689:16, 2691:9, 2692:6, 2692:8, 2693:10, 2696:13, 2696:21, 2698:10, 2706:21
**liar** [2] - 2598:18, 2662:2
**license** [1] - 2669:21
**lie** [3] - 2622:8, 2655:23, 2661:23
**life** [8] - 2605:18, 2605:23, 2618:6, 2630:17, 2642:7, 2642:9, 2697:11, 2722:7
**life's** [2] - 2614:7, 2704:19
**life-long** [1] - 2605:18

**lifeblood** [1] - 2723:3
**lifetime** [1] - 2645:10
**light** [6] - 2676:3, 2682:24, 2683:10, 2683:15, 2697:19, 2699:2
**likelihood** [3] - 2679:13, 2680:6, 2685:3
**likely** [4] - 2605:12, 2611:25, 2677:5, 2694:7
**likewise** [4] - 2585:13, 2585:15, 2663:16, 2706:17
**limit** [3] - 2632:21, 2639:19
**limitation** [1] - 2624:24
**limited** [2] - 2591:9, 2693:17
**limits** [1] - 2604:20
**line** [9] - 2592:23, 2597:22, 2606:12, 2607:24, 2704:21, 2705:20, 2706:2, 2706:19
**lines** [2] - 2706:17, 2726:3
**LinkedIn** [1] - 2700:8
**list** [1] - 2712:23
**listed** [1] - 2608:14
**listen** [5] - 2632:5, 2664:9, 2664:13, 2701:11, 2722:8
**literature** [1] - 2602:7
**litigation** [6] - 2607:15, 2621:13, 2632:11, 2632:12, 2665:19, 2665:25
**LITIGATION** [1] - 2581:5
**live** [3] - 2594:4, 2656:25, 2671:8
**lived** [7] - 2598:10, 2605:14, 2656:13, 2656:15, 2656:16, 2656:20, 2657:2
**lives** [1] - 2724:14
**living** [12] - 2592:25, 2594:21, 2595:2, 2603:6, 2604:21, 2607:22, 2611:13, 2627:7, 2627:8, 2654:25, 2670:18, 2713:22
**located** [4] - 2669:25, 2672:1, 2672:2, 2672:6
**location** [3] - 2602:4,

2631:1, 2672:18
**locked** [1] - 2601:10
**long-term** [2] - 2591:13, 2596:4
**look** [32] - 2587:19, 2588:11, 2590:22, 2606:6, 2608:18, 2608:22, 2611:15, 2611:18, 2615:3, 2619:13, 2619:14, 2620:6, 2620:24, 2620:25, 2621:1, 2621:18, 2625:16, 2625:23, 2629:8, 2636:2, 2639:10, 2646:19, 2653:25, 2656:17, 2661:17, 2661:18, 2661:21, 2662:22, 2664:5, 2721:21, 2723:6, 2723:7
**looked** [4] - 2605:11, 2628:9, 2636:6, 2649:6
**looking** [5] - 2622:14, 2659:18, 2661:4, 2715:15, 2728:4
**looks** [1] - 2646:16
**loss** [16] - 2614:7, 2620:1, 2685:12, 2685:14, 2685:16, 2686:3, 2686:4, 2686:8, 2686:10, 2686:13, 2686:14, 2687:5, 2695:9, 2697:10, 2704:19
**losses** [1] - 2694:13
**LOUISIANA** [2] - 2581:1, 2581:6
**Louisiana** [20] - 2588:6, 2609:2, 2616:17, 2651:8, 2658:22, 2665:7, 2666:9, 2669:17, 2669:18, 2669:22, 2671:22, 2672:1, 2672:4, 2672:7, 2672:16, 2678:4, 2687:18, 2729:11, 2729:12
**low** [4] - 2601:14, 2608:23, 2609:6, 2665:25
**lower** [2] - 2601:16, 2605:16
**lowest** [1] - 2639:20
**LPLA** [9] - 2678:5, 2678:6, 2678:7, 2678:10, 2680:8, 2681:16, 2683:19,

2689:5, 2689:15
**LSU** [1] - 2605:8
**luck** [1] - 2611:10
**lucky** [1] - 2598:23
**Lucretia** [1] - 2648:2
**lunch** [2] - 2705:3, 2715:4
**lung** [1] - 2630:5
**lungs** [1] - 2601:14
**lying** [1] - 2654:1
**Lyndon** [86] - 2587:4, 2595:9, 2597:2, 2597:21, 2598:6, 2598:7, 2598:12, 2598:16, 2598:20, 2599:3, 2599:4, 2599:5, 2599:7, 2599:13, 2599:15, 2599:25, 2600:5, 2600:21, 2605:14, 2605:20, 2605:23, 2606:1, 2607:10, 2610:3, 2611:6, 2611:8, 2611:10, 2611:11, 2613:3, 2613:10, 2613:13, 2613:20, 2613:25, 2614:2, 2614:5, 2615:7, 2618:2, 2618:4, 2619:22, 2621:9, 2623:18, 2627:3, 2632:3, 2632:15, 2633:22, 2634:16, 2635:14, 2636:13, 2636:19, 2636:22, 2637:1, 2638:9, 2640:7, 2641:2, 2642:20, 2643:19, 2649:15, 2654:7, 2654:21, 2655:2, 2655:6, 2655:23, 2656:13, 2656:19, 2659:18, 2659:21, 2659:23, 2660:22, 2661:12, 2661:23, 2662:1, 2665:6, 2666:2, 2670:20, 2677:25, 2692:16, 2693:19, 2696:11, 2701:20, 2704:4, 2704:14, 2704:16, 2704:17, 2704:20, 2717:22
**LYNDON** [1] - 2581:16
**Lyndon's** [8] - 2590:9, 2591:15, 2592:21, 2593:1, 2597:9, 2600:21, 2607:13, 2661:8

**M**

**ma'am** [1] - 2718:16
**mail** [3] - 2650:14, 2650:15, 2652:7
**mails** [4] - 2589:21, 2650:9, 2650:11, 2659:15
**maintain** [2] - 2649:17, 2671:25
**maintained** [1] - 2670:22
**maintaining** [1] - 2683:7
**maintenance** [21] - 2613:12, 2635:12, 2638:8, 2643:25, 2644:1, 2645:21, 2646:5, 2647:12, 2647:18, 2668:24, 2670:24, 2670:25, 2671:3, 2671:5, 2671:9, 2682:10, 2683:5, 2684:14, 2704:7
**major** [1] - 2637:8
**maker** [1] - 2651:15
**malignancies** [1] - 2602:7
**malingerer** [2] - 2607:2, 2608:2
**malingering** [1] - 2607:18
**man** [3] - 2598:7, 2602:19, 2658:22
**management** [1] - 2605:1
**manager** [1] - 2588:13
**mandated** [1] - 2689:2
**manner** [4] - 2589:19, 2681:24, 2685:5, 2688:3
**manpower** [2] - 2589:14, 2589:15
**manual** [18] - 2593:17, 2597:8, 2598:1, 2599:9, 2634:10, 2635:17, 2635:24, 2635:25, 2636:2, 2636:5, 2636:7, 2648:23, 2648:24, 2655:20, 2655:19, 2655:22, 2657:1
**manuals** [1] - 2654:9
**manufacture** [2] - 2656:9, 2668:13
**manufactured** [12] - 2656:6, 2657:10, 2657:16, 2658:1,

2665:15, 2665:20, 2665:25, 2678:16, 2678:22, 2679:9, 2680:9, 2684:6
**manufacturer** [22] - 2587:25, 2592:5, 2592:7, 2660:5, 2678:1, 2678:8, 2681:6, 2681:9, 2681:19, 2682:3, 2682:6, 2682:7, 2682:11, 2682:14, 2682:15, 2682:22, 2683:3, 2683:5, 2683:8, 2683:20, 2687:6
**manufacturer's** [4] - 2588:14, 2678:20, 2679:21, 2688:7
**manufacturers** [5] - 2588:23, 2589:10, 2592:13, 2608:9, 2656:9
**manufacturing** [2] - 2596:2, 2616:2
**MARCH** [3] - 2581:6, 2584:2, 2717:2
**March** [7] - 2603:7, 2644:12, 2650:11, 2670:18, 2670:21, 2671:14, 2671:16
**mark** [3] - 2615:15, 2646:18, 2648:24
**marked** [1] - 2705:13
**Marsh** [4] - 2633:21, 2647:13, 2648:2, 2650:24
**marsh** [2] - 2631:3, 2634:22
**marshal** [2] - 2586:2, 2664:13
**Martin** [4] - 2591:21, 2647:11, 2670:23, 2671:4
**masked** [2] - 2602:7, 2602:11
**master** [1] - 2666:5
**material** [1] - 2678:20
**materials** [2] - 2586:17, 2592:23
**mathematical** [1] - 2694:13
**matter** [14] - 2614:21, 2616:20, 2618:6, 2625:25, 2626:18, 2641:16, 2643:4, 2644:13, 2644:15, 2675:1, 2709:21, 2727:24, 2729:16
**matters** [2] - 2673:24,

2675:4
**McNeese** [1] - 2591:21
**MDC** [1] - 2646:5
**MDCs** [2] - 2643:25, 2704:8
**MDL** [5] - 2581:5, 2728:9, 2728:12, 2728:22, 2728:24
**mean** [19] - 2588:9, 2593:12, 2593:13, 2607:7, 2624:3, 2624:5, 2633:2, 2649:25, 2658:23, 2681:18, 2681:21, 2682:2, 2682:5, 2685:17, 2688:13, 2688:22, 2697:24, 2714:21
**means** [10] - 2585:16, 2591:1, 2611:16, 2633:15, 2658:23, 2658:24, 2659:1, 2677:2, 2677:4, 2700:3
**meant** [4] - 2593:18, 2615:25, 2633:1, 2659:9
**measurements** [3] - 2657:13, 2657:14
**measures** [1] - 2684:3
**MECHANICAL** [1] - 2582:24
**mechanically** [1] - 2595:5
**med** [1] - 2624:23
**media** [1] - 2700:4
**Medical** [2] - 2624:20, 2624:21
**medical** [35] - 2587:11, 2599:14, 2599:25, 2605:1, 2605:16, 2606:2, 2606:6, 2619:19, 2619:21, 2620:4, 2620:6, 2623:1, 2624:9, 2624:11, 2626:21, 2627:3, 2628:9, 2628:19, 2628:23, 2631:6, 2631:13, 2632:1, 2636:20, 2641:14, 2648:9, 2656:12, 2660:16, 2693:2, 2695:13, 2695:18, 2695:24, 2696:5, 2696:7, 2704:17
**medication** [3] - 2628:16, 2628:17, 2631:13
**medications** [3] -

2626:19, 2627:17, 2627:18
**medicine** [1] - 2604:16
**meet** [1] - 2594:15
**meeting** [2] - 2595:17, 2701:6
**Melville** [10] - 2639:2, 2640:3, 2644:23, 2648:8, 2655:20, 2657:15, 2671:22, 2672:1, 2672:7, 2672:16
**member** [2] - 2726:6, 2726:11
**Members** [1] - 2664:15
**members** [3] - 2642:5, 2642:6, 2699:15
**memoranda** [1] - 2711:15
**memory** [3] - 2674:13, 2674:14
**men** [2] - 2602:20, 2658:24
**mental** [15] - 2619:13, 2631:11, 2632:7, 2679:7, 2680:3, 2681:3, 2688:17, 2693:20, 2696:3, 2697:10, 2697:13, 2697:20, 2697:23, 2704:15, 2706:24
**mention** [4] - 2597:25, 2598:2, 2707:12
**mentioned** [2] - 2584:16, 2721:7
**mere** [2] - 2677:19, 2677:20
**merely** [1] - 2699:19
**Merit** [1] - 2729:10
**message** [1] - 2701:4
**messaging** [1] - 2700:7
**met** [4] - 2593:24, 2630:18, 2670:3, 2690:15
**meteorologist** [1] - 2672:14
**methodology** [7] - 2624:18, 2624:22, 2625:1, 2625:3, 2625:14, 2625:23, 2625:25
**Michelle** [2] - 2633:20, 2648:1
**middle** [2] - 2621:1, 2705:23
**might** [10] - 2601:4, 2623:7, 2631:20,

2648:16, 2680:14, 2684:22, 2685:3, 2685:9, 2688:19, 2706:7
**MIKAL** [1] - 2582:6
**mild** [3] - 2606:20, 2607:11, 2620:10
**miles** [2] - 2618:11, 2618:16
**Miller** [15] - 2605:6, 2605:10, 2622:17, 2624:7, 2624:8, 2624:17, 2624:18, 2625:2, 2625:9, 2625:17, 2626:6, 2660:15, 2661:2
**miller** [1] - 2624:18
**Miller's** [1] - 2624:21
**million** [1] - 2666:20
**mind** [9] - 2586:21, 2610:9, 2642:15, 2649:12, 2696:13, 2699:17, 2709:12, 2713:20, 2724:3
**mindful** [2] - 2585:5, 2586:14
**mine** [1] - 2641:24
**minimal** [1] - 2623:25
**minimize** [3] - 2586:7, 2698:9, 2698:20
**minimizing** [1] - 2698:19
**minimum** [1] - 2624:2
**minor** [1] - 2669:6
**minute** [11] - 2584:24, 2585:3, 2585:14, 2585:15, 2598:6, 2612:13, 2639:21, 2652:14, 2653:9, 2653:15, 2661:16
**minutes** [16] - 2584:18, 2584:21, 2584:22, 2584:25, 2585:12, 2585:14, 2587:8, 2587:19, 2614:11, 2614:14, 2615:2, 2634:5, 2634:7, 2653:14, 2659:16
**missed** [4] - 2626:16, 2631:24, 2632:1, 2707:3
**missing** [8] - 2589:3, 2629:16, 2629:19, 2672:8, 2672:12, 2715:18, 2715:19, 2715:25
**mission** [9] - 2589:9, 2589:22, 2592:24, 2596:12, 2651:13,

2651:14, 2651:16, 2656:9, 2668:24
**misstatement** [1] - 2610:14
**mitigate** [2] - 2698:9, 2699:2
**mitigated** [2] - 2698:25
**mitigating** [1] - 2698:22
**MMPI-2** [1] - 2607:16
**mobile** [7] - 2591:9, 2591:14, 2611:4, 2658:14, 2658:17, 2658:18, 2669:22
**model** [5] - 2594:3, 2656:24, 2665:20, 2672:24
**moisture** [2] - 2594:6, 2672:9
**mom** [1] - 2618:1
**moment** [3] - 2600:24, 2604:7, 2713:10
**MONDAY** [3] - 2581:6, 2584:2, 2717:2
**monetary** [1] - 2686:19
**money** [2] - 2692:9, 2693:2
**month** [2] - 2626:15, 2633:6
**monthly** [2] - 2646:9, 2671:1
**months** [7] - 2602:24, 2604:22, 2625:20, 2633:5, 2639:11, 2670:23, 2721:9
**mood** [2] - 2620:7, 2620:8
**Moore** [3] - 2646:12, 2646:13, 2646:21
**morning** [7] - 2584:12, 2584:14, 2587:3, 2587:8, 2614:20, 2632:17
**Morris** [1] - 2634:19
**Mortality** [1] - 2695:5
**mortality** [3] - 2695:6, 2707:13, 2707:20
**most** [7] - 2589:7, 2605:12, 2605:20, 2630:9, 2642:3, 2646:24, 2721:23
**mostly** [1] - 2596:9
**mother** [7] - 2630:16, 2633:6, 2637:16, 2637:21, 2644:14, 2659:23, 2666:11
**motion** [5] - 2709:14, 2711:6, 2712:5,

mucous [1] - 2622:14
**motions** [3] - 2712:12, 2727:19, 2727:23
**move** [8] - 2632:23, 2636:15, 2640:17, 2647:7, 2651:6, 2651:9, 2651:17, 2656:2
**moved** [11] - 2633:5, 2635:15, 2636:18, 2645:20, 2655:6, 2659:20, 2662:3, 2662:5, 2670:19, 2670:22, 2671:20
**movies** [1] - 2720:16
**MR** [74] - 2583:5, 2583:6, 2583:7, 2583:8, 2583:9, 2583:10, 2584:23, 2585:2, 2585:9, 2585:11, 2587:3, 2587:13, 2600:2, 2610:10, 2610:12, 2610:14, 2610:23, 2611:2, 2612:14, 2614:12, 2614:13, 2614:19, 2617:10, 2618:14, 2639:22, 2640:16, 2640:20, 2652:15, 2653:9, 2653:19, 2661:17, 2662:10, 2663:5, 2706:13, 2706:14, 2707:6, 2707:9, 2707:11, 2707:17, 2707:23, 2708:12, 2709:11, 2710:2, 2710:5, 2710:7, 2711:14, 2711:17, 2711:21, 2712:3, 2712:8, 2712:10, 2713:5, 2713:7, 2713:15, 2713:19, 2713:20, 2713:22, 2713:25, 2714:4, 2715:6, 2715:15, 2715:18, 2715:24, 2717:14, 2717:17, 2718:11, 2718:14, 2718:19, 2719:2, 2719:4, 2727:1, 2727:19, 2728:4, 2728:15
**MRL** [1] - 2624:3
**MS** [7] - 2708:6, 2708:10, 2708:17, 2718:17, 2718:21, 2718:23, 2718:25
**mucosa** [2] - 2623:18, 2623:20

**mucous** [1] - 2622:14
**must** [55] - 2602:19, 2602:22, 2623:4, 2625:14, 2631:22, 2664:16, 2664:24, 2665:1, 2672:21, 2673:18, 2674:10, 2676:1, 2676:23, 2676:24, 2678:18, 2679:10, 2680:5, 2680:11, 2684:16, 2684:18, 2684:20, 2685:11, 2685:13, 2686:2, 2686:12, 2686:14, 2686:24, 2687:2, 2687:13, 2687:16, 2689:14, 2689:24, 2691:15, 2691:22, 2693:11, 2693:25, 2694:10, 2694:15, 2695:11, 2695:13, 2695:17, 2695:24, 2696:1, 2696:14, 2696:23, 2699:2, 2699:9, 2699:14, 2700:2, 2700:19, 2700:23, 2703:25, 2704:3, 2706:23
**MySpace** [1] - 2700:8
**mysterious** [1] - 2655:8
**mysteriously** [1] - 2661:11

# N

**NACS** [5] - 2593:5, 2665:17, 2666:3, 2666:5, 2666:6
**nailed** [1] - 2589:4
**nails** [1] - 2589:4
**name** [1] - 2591:5
**nasal** [8] - 2602:7, 2602:10, 2621:21, 2623:18, 2623:20, 2660:7, 2660:11, 2660:19
**Nasonex** [1] - 2626:16
**nasopharyngeal** [2] - 2602:15, 2609:17
**natural** [6] - 2587:15, 2587:16, 2589:16, 2665:9, 2696:15, 2697:3
**naturally** [1] - 2637:23
**nature** [4] - 2683:5, 2688:10, 2688:12, 2708:24
**necessarily** [1] -

2695:8
**necessary** [9] - 2592:1, 2597:8, 2654:10, 2654:11, 2677:18, 2696:8, 2706:9, 2723:16, 2725:10
**NECS** [1] - 2655:18
**need** [32] - 2585:22, 2612:16, 2620:24, 2632:23, 2635:21, 2639:1, 2639:10, 2647:7, 2653:12, 2654:11, 2655:3, 2662:7, 2662:24, 2663:3, 2677:15, 2677:16, 2677:17, 2690:1, 2690:10, 2690:11, 2697:14, 2700:25, 2705:5, 2706:16, 2706:18, 2714:6, 2714:24, 2715:7, 2715:17, 2724:4, 2727:17, 2728:5
**needed** [5] - 2591:12, 2592:14, 2611:4, 2614:2, 2614:3
**needs** [7] - 2586:4, 2595:17, 2614:5, 2631:15, 2706:1, 2707:4
**negative** [1] - 2594:18
**negligence** [22] - 2611:11, 2613:11, 2641:7, 2652:9, 2684:7, 2684:8, 2684:9, 2684:13, 2684:16, 2686:15, 2686:17, 2686:18, 2686:21, 2686:22, 2686:23, 2687:2, 2687:9, 2689:17, 2689:25, 2691:19, 2703:7
**negligent** [16] - 2613:8, 2640:25, 2648:7, 2648:11, 2652:10, 2653:2, 2684:19, 2685:12, 2686:3, 2686:16, 2687:4, 2688:10, 2688:12, 2691:18, 2702:19, 2718:6
**negligently** [1] - 2684:11
**neighbor** [1] - 2723:5
**Nelson** [1] - 2589:1
**Nephrology** [1] - 2606:7

**neuroma** [2] - 2622:12, 2692:17
**neuromas** [1] - 2660:22
**never** [22] - 2591:6, 2599:6, 2599:9, 2602:1, 2608:6, 2608:9, 2608:12, 2610:2, 2628:12, 2634:17, 2637:6, 2647:18, 2649:6, 2656:19, 2661:15, 2683:4, 2700:23, 2713:20, 2719:14, 2719:15
**nevertheless** [1] - 2685:24
**NEW** [5] - 2581:6, 2581:18, 2582:13, 2582:18, 2582:23
**new** [9] - 2595:15, 2598:24, 2633:12, 2645:20, 2648:3, 2657:22, 2658:2, 2696:22
**New** [14] - 2591:7, 2591:8, 2605:6, 2617:22, 2618:20, 2628:20, 2631:1, 2652:20, 2658:16, 2658:17, 2658:18, 2669:18, 2672:3, 2672:16
**news** [2] - 2598:4, 2721:25
**NEXSEN** [1] - 2582:3
**next** [13] - 2590:6, 2590:11, 2597:4, 2612:18, 2613:17, 2629:2, 2632:1, 2641:5, 2647:12, 2650:15, 2662:13, 2723:20
**nickel** [1] - 2654:18
**Nicole** [5] - 2633:4, 2633:19, 2647:13, 2648:2, 2661:12
**night** [2] - 2607:21, 2632:16
**NO** [2] - 2581:5, 2581:9
**nobody** [6] - 2598:16, 2612:15, 2655:8, 2655:9, 2720:4, 2722:6
**none** [8] - 2623:16, 2638:6, 2638:7, 2638:9, 2707:24, 2722:7
**nonexistence** [1] -

2676:15
**nonmalignant** [1] - 2602:3
**nonparties** [2] - 2687:21, 2703:18
**nonparty** [6] - 2686:18, 2686:23, 2687:1, 2687:3, 2687:11, 2687:15
**Norm** [1] - 2589:1
**normal** [6] - 2621:2, 2621:8, 2622:3, 2681:22, 2697:3
**normally** [1] - 2640:4
**North** [1] - 2665:16
**north** [1] - 2641:24
**nose** [7] - 2622:21, 2622:22, 2626:17, 2626:19, 2628:6, 2660:8, 2661:4
**notation** [1] - 2710:12
**note** [7] - 2700:25, 2701:1, 2706:24, 2707:11, 2709:5, 2710:16, 2710:20
**noted** [2] - 2671:2, 2684:9
**notes** [11] - 2589:13, 2629:9, 2656:17, 2661:13, 2674:12, 2674:13, 2674:14, 2674:15, 2674:17
**nothing** [14] - 2588:25, 2597:11, 2599:11, 2638:23, 2640:2, 2643:4, 2644:13, 2644:14, 2647:14, 2650:18, 2651:12, 2654:22, 2659:19, 2659:25
**notice** [9] - 2635:7, 2635:8, 2655:25, 2656:3, 2656:4, 2705:14, 2726:2, 2726:15
**noticed** [2] - 2598:21, 2671:7
**notwithstanding** [1] - 2721:18
**November** [7] - 2590:10, 2597:9, 2626:14, 2665:21, 2666:4, 2666:9, 2669:19
**Number** [19] - 2702:7, 2702:11, 2702:12, 2702:17, 2702:22, 2702:23, 2702:24, 2702:25, 2703:1, 2703:2, 2703:12,

2703:15, 2704:3, 2705:23, 2706:5, 2708:7, 2710:10
**number** [14] - 2595:10, 2605:1, 2606:23, 2635:12, 2637:5, 2639:12, 2639:13, 2643:22, 2652:24, 2666:11, 2676:8, 2708:13, 2724:6, 2724:19
**numbered** [1] - 2729:15
**Numbers** [4] - 2702:5, 2702:24, 2703:24, 2703:25
**numbers** [6] - 2638:11, 2638:13, 2638:22, 2638:23, 2714:23
**numbness** [1] - 2628:21
**numerical** [3] - 2700:24, 2701:1, 2703:20
**numerous** [2] - 2622:1, 2669:6

## O

**o'clock** [4] - 2632:16, 2662:12, 2662:14, 2663:17
**oath** [2] - 2675:14, 2675:16
**object** [7] - 2610:10, 2662:23, 2673:6, 2710:3, 2712:16, 2712:19, 2713:2
**objection** [7] - 2610:13, 2673:10, 2673:12, 2673:17, 2709:13, 2709:16, 2709:18
**objections** [9] - 2624:9, 2636:11, 2663:5, 2663:8, 2673:3, 2707:3, 2709:1, 2710:8, 2711:23
**objects** [1] - 2712:23
**obligated** [1] - 2724:19
**obligation** [3] - 2593:19, 2684:1, 2726:5
**obligations** [1] - 2724:13
**observed** [2] - 2632:4,

2672:9
**obvious** [3] - 2710:21, 2714:15, 2720:15
**obviously** [3] - 2585:20, 2709:15, 2710:2
**occasion** [1] - 2709:9
**occasionally** [1] - 2673:22
**occult** [4] - 2620:12, 2627:13, 2627:14, 2655:7
**occupancy** [6] - 2597:22, 2638:10, 2668:16, 2669:7, 2670:1, 2670:6
**occupant** [2] - 2595:7, 2670:7
**occupants** [2] - 2592:11, 2654:9
**Occupational** [1] - 2605:7
**occupational** [1] - 2604:20
**occupied** [14] - 2612:19, 2612:21, 2615:6, 2641:9, 2678:3, 2701:20, 2701:23, 2702:1, 2702:20, 2703:9, 2717:22, 2717:24, 2718:1, 2718:7
**occur** [4] - 2609:5, 2609:18, 2609:20, 2624:4
**occurred** [5] - 2621:17, 2685:3, 2685:17, 2685:24, 2686:6
**occurring** [1] - 2637:24
**occurs** [1] - 2677:21
**October** [5] - 2626:11, 2630:7, 2630:10, 2666:17, 2666:22
**odor** [9] - 2590:24, 2599:21, 2606:11, 2633:6, 2633:7, 2633:8, 2633:10, 2657:22, 2657:23
**odors** [3] - 2595:15, 2647:25, 2648:1
**OF** [3] - 2581:1, 2581:12, 2581:16
**off-gas** [1] - 2638:2
**off-gassing** [4] - 2594:6, 2596:23, 2638:1, 2657:20
**offensive** [1] - 2652:20

**offered** [1] - 2693:1
**offers** [1] - 2673:6
**Office** [1] - 2588:6
**office** [6] - 2628:25, 2629:2, 2631:16, 2631:23, 2632:7, 2726:22
**officer** [3] - 2701:4, 2703:4, 2703:14
**OFFICER** [4] - 2584:7, 2662:16, 2705:9, 2727:11
**officers** [1] - 2676:22
**OFFICES** [1] - 2581:16
**Official** [2] - 2729:11, 2729:21
**official** [1] - 2611:20
**OFFICIAL** [1] - 2582:22
**often** [2] - 2619:6, 2649:21
**oftentimes** [2] - 2653:20, 2719:17
**old** [2] - 2642:3, 2657:22
**oldest** [2] - 2630:12, 2714:5
**once** [10] - 2586:8, 2592:2, 2592:24, 2613:23, 2617:19, 2643:15, 2671:25, 2675:25, 2681:4, 2706:8
**One** [1] - 2639:21
**one** [123] - 2584:24, 2585:3, 2585:14, 2586:8, 2586:9, 2586:10, 2588:19, 2589:7, 2595:23, 2598:23, 2598:24, 2601:8, 2601:17, 2601:18, 2603:2, 2605:10, 2605:20, 2608:1, 2608:2, 2608:6, 2609:22, 2612:13, 2618:24, 2619:15, 2621:10, 2624:16, 2630:11, 2632:4, 2633:1, 2634:17, 2635:9, 2635:13, 2637:6, 2640:25, 2641:16, 2642:19, 2643:18, 2644:10, 2644:15, 2644:22, 2645:7, 2645:19, 2646:8, 2646:9, 2646:15, 2648:25, 2649:7, 2650:11, 2650:15,

2650:16, 2650:22, 2650:23, 2651:2, 2651:5, 2651:8, 2652:14, 2653:15, 2654:15, 2654:17, 2655:22, 2656:22, 2656:24, 2657:8, 2658:11, 2660:16, 2664:17, 2664:25, 2667:1, 2667:18, 2667:21, 2668:4, 2669:19, 2670:4, 2670:14, 2676:11, 2678:10, 2678:19, 2681:11, 2682:5, 2683:10, 2683:24, 2685:18, 2685:19, 2685:24, 2686:9, 2686:10, 2686:17, 2687:17, 2688:13, 2689:17, 2690:23, 2692:9, 2692:13, 2696:13, 2696:20, 2696:23, 2701:12, 2705:19, 2706:7, 2707:20, 2708:16, 2708:18, 2709:9, 2709:20, 2709:22, 2713:9, 2714:14, 2720:9, 2721:16, 2721:17, 2724:19, 2725:1, 2728:8, 2728:11, 2728:23, 2728:24, 2728:25
**one-hour** [4] - 2667:1, 2667:18, 2667:21, 2668:4
**one-minute** [4] - 2584:24, 2585:3, 2585:14, 2653:15
**ones** [5] - 2598:23, 2614:8, 2715:18, 2715:25, 2728:25
**oops** [1] - 2625:23
**open** [17] - 2590:8, 2595:7, 2597:5, 2633:19, 2633:22, 2633:23, 2634:5, 2634:9, 2639:2, 2646:20, 2649:21, 2649:22, 2657:7, 2657:18, 2671:18, 2710:21, 2714:7
**opened** [1] - 2633:25
**opening** [7] - 2586:14, 2598:9, 2617:6, 2624:1, 2639:16, 2643:1, 2657:24
**operate** [1] - 2685:21
**operating** [1] -

2671:17
**operation** [2] - 2602:2, 2682:9
**operations** [1] - 2590:13
**opinion** [9] - 2624:14, 2624:16, 2624:24, 2626:7, 2673:13, 2673:24, 2675:4, 2675:5, 2699:17
**opinions** [1] - 2696:6
**opportunities** [1] - 2722:4
**opportunity** [5] - 2586:19, 2654:7, 2698:14, 2698:17, 2698:20
**oranges** [1] - 2608:17
**ORDER** [2] - 2584:4, 2717:4
**order** [12] - 2586:7, 2592:18, 2668:21, 2668:22, 2678:17, 2679:10, 2680:11, 2681:14, 2704:25, 2711:10, 2711:12, 2725:19
**ordered** [5] - 2593:6, 2666:3, 2705:3, 2711:8, 2725:6
**ordinarily** [1] - 2684:23
**ordinary** [7] - 2681:20, 2682:4, 2682:5, 2682:17, 2682:18, 2685:8, 2688:18
**organization** [1] - 2601:19
**organizations** [1] - 2604:6
**origin** [1] - 2635:20
**originally** [1] - 2709:20
**ORLEANS** [5] - 2581:6, 2581:18, 2582:13, 2582:18, 2582:23
**Orleans** [15] - 2591:7, 2591:8, 2605:6, 2617:22, 2618:20, 2628:20, 2631:1, 2652:20, 2658:16, 2658:17, 2658:18, 2665:6, 2669:18, 2672:3, 2672:16
**osteoporosis** [1] - 2619:24
**Osteraas** [8] - 2597:13, 2644:21, 2645:14, 2646:25,

2647:4, 2647:5, 2647:22, 2648:19
**others'** [1] - 2686:16
**otherwise** [6] - 2677:8, 2678:21, 2695:21, 2699:8, 2700:22, 2703:14
**ought** [1] - 2644:3
**ounces** [1] - 2632:16
**out-of-pocket** [1] - 2692:23
**outfitted** [1] - 2670:11
**outlined** [1] - 2600:9
**outlining** [1] - 2587:9
**outset** [1] - 2665:3
**outside** [5] - 2655:25, 2656:1, 2660:11, 2672:21, 2673:4
**outweighed** [1] - 2679:15
**overall** [1] - 2608:4
**overcome** [1] - 2605:18
**overextended** [1] - 2610:23
**oversee** [1] - 2588:22
**overwhelming** [3] - 2600:6, 2612:10, 2613:14
**owed** [2] - 2684:21, 2686:9
**own** [7] - 2589:1, 2599:8, 2601:9, 2613:21, 2699:17, 2709:17, 2722:2
**owner** [1] - 2634:10
**owner's** [14] - 2593:17, 2597:8, 2598:1, 2635:17, 2635:24, 2636:2, 2636:7, 2648:23, 2648:24, 2648:25, 2654:9, 2655:19, 2655:22, 2657:1

**P**

**p.m** [1] - 2729:2
**P.O** [1] - 2582:4
**pack** [1] - 2630:16
**package** [7] - 2597:23, 2635:18, 2635:25, 2636:1, 2636:6, 2648:24, 2649:4
**packed** [1] - 2642:2
**packet** [3] - 2655:16, 2655:17, 2655:18
**packs** [1] - 2630:17
**pad** [3] - 2646:23,

2646:24, 2648:17
**pads** [1] - 2646:21
**page** [18] - 2614:22, 2664:10, 2705:16, 2705:19, 2705:20, 2705:23, 2705:24, 2706:2, 2706:5, 2706:9, 2706:22, 2706:23, 2706:25, 2707:6, 2707:11, 2708:6, 2708:20
**PAGE** [1] - 2583:3
**paid** [4] - 2635:21, 2646:7, 2654:18, 2655:9
**pain** [9] - 2614:6, 2692:19, 2693:20, 2696:3, 2696:20, 2697:10, 2697:14, 2697:21, 2704:13
**Pam** [2] - 2714:23, 2715:9
**panel** [6] - 2584:9, 2662:18, 2663:24, 2705:11, 2717:9, 2727:13
**panic** [1] - 2651:22
**paper** [2] - 2624:22, 2625:3
**paragraph** [1] - 2706:3
**paragraphs** [1] - 2585:17
**parameters** [1] - 2728:16
**paranasal** [1] - 2602:10
**parent** [1] - 2723:8
**parenthetical** [1] - 2703:1
**Parish** [1] - 2665:6
**parking** [2] - 2723:8, 2723:23
**part** [22] - 2602:3, 2604:10, 2616:11, 2620:1, 2628:15, 2641:23, 2642:5, 2642:10, 2662:13, 2664:12, 2676:20, 2677:11, 2687:8, 2697:22, 2701:15, 2702:7, 2702:12, 2703:19, 2707:15, 2712:17, 2720:3
**Part** [3] - 2702:17, 2703:1, 2703:10
**participate** [2] - 2723:9, 2723:11
**participated** [1] - 2600:14
**participation** [1] -

2587:6
**particle** [1] - 2596:24
**particular** [5] - 2600:18, 2602:12, 2685:25, 2698:2, 2709:23
**particularly** [2] - 2641:13, 2720:16
**parties** [8] - 2665:4, 2666:15, 2675:15, 2687:21, 2703:18, 2712:20, 2720:12, 2728:17
**partner** [1] - 2598:4
**parts** [21] - 2590:24, 2590:25, 2591:2, 2591:3, 2599:22, 2601:15, 2604:24, 2605:6, 2606:14, 2608:23, 2609:6, 2610:8, 2611:23, 2612:1, 2639:13, 2639:18, 2657:16, 2666:20, 2666:21, 2668:12, 2683:4
**party** [15] - 2600:18, 2671:22, 2677:22, 2684:15, 2684:21, 2684:23, 2685:5, 2685:20, 2686:16, 2686:23, 2687:1, 2687:10, 2688:19, 2691:9, 2703:19
**party's** [5] - 2672:23, 2684:19, 2684:25, 2685:11, 2685:14
**pass** [3] - 2651:10, 2664:8, 2682:7
**passed** [2] - 2588:7, 2642:4
**passive** [4] - 2666:17, 2667:9, 2667:19, 2668:8
**past** [7] - 2616:21, 2624:19, 2640:11, 2641:5, 2697:11, 2704:13, 2704:15
**patience** [2] - 2719:12, 2727:7
**patient** [2] - 2598:14, 2606:10
**patients** [3] - 2606:3, 2627:2, 2627:15
**Patricia** [1] - 2660:16
**Paul** [2] - 2594:24, 2611:24
**PAUL** [1] - 2582:3
**pay** [3] - 2699:10, 2720:2, 2720:5
**payment** [1] - 2695:8

**peak** [1] - 2604:19
**peeled** [1] - 2656:1
**penalize** [1] - 2694:4
**pending** [1] - 2727:23
**people** [37] - 2591:10, 2592:25, 2594:4, 2595:10, 2596:4, 2597:23, 2605:18, 2616:9, 2616:14, 2619:2, 2623:13, 2623:16, 2627:13, 2637:20, 2642:8, 2645:10, 2648:6, 2651:12, 2651:14, 2651:15, 2651:17, 2651:20, 2652:11, 2652:19, 2652:21, 2652:25, 2656:25, 2658:24, 2719:21, 2722:2, 2722:4, 2722:17, 2722:20, 2722:22, 2722:24, 2723:10, 2724:1
**PEPPER** [1] - 2582:22
**Pepper** [3] - 2729:9, 2729:19, 2729:20
**per** [21] - 2590:24, 2590:25, 2591:2, 2591:3, 2599:22, 2601:15, 2602:25, 2604:24, 2605:5, 2606:14, 2607:21, 2608:23, 2609:6, 2610:8, 2611:23, 2612:1, 2639:13, 2639:18, 2657:16, 2666:20, 2666:21
**percent** [15] - 2597:18, 2602:12, 2609:1, 2609:8, 2613:19, 2644:2, 2652:23, 2654:6, 2660:18, 2666:20, 2667:8, 2667:14, 2687:21, 2703:21, 2704:9
**percentage** [10] - 2687:22, 2688:2, 2688:8, 2703:16, 2703:23, 2704:2, 2704:5, 2704:6, 2704:9, 2706:3
**percentages** [4] - 2687:16, 2687:20, 2688:9, 2703:20
**perfected** [1] - 2709:20
**Performance** [1] - 2669:11
**performance** [5] - 2593:5, 2607:25,

2678:21, 2725:18, 2725:19
**performed** [3] - 2689:1, 2691:8, 2691:14
**performing** [1] - 2659:5
**perhaps** [3] - 2609:24, 2688:18, 2719:15
**period** [7] - 2585:20, 2605:14, 2605:22, 2605:23, 2605:25, 2670:25, 2720:1
**periods** [2] - 2604:22, 2672:17
**perjury** [1] - 2619:9
**permanent** [4] - 2593:10, 2657:2, 2660:9, 2661:10
**permit** [2] - 2661:1, 2694:15
**permitted** [3] - 2673:20, 2675:4, 2697:22
**persist** [1] - 2725:23
**person** [31] - 2590:13, 2608:19, 2619:5, 2675:2, 2675:24, 2675:25, 2677:22, 2679:4, 2679:5, 2679:6, 2679:25, 2680:1, 2680:2, 2680:25, 2681:1, 2681:2, 2681:20, 2682:4, 2682:6, 2682:8, 2684:23, 2685:20, 2687:10, 2688:17, 2691:10, 2696:14, 2696:18, 2696:20, 2698:7, 2704:6, 2714:12
**person's** [1] - 2591:14
**persons** [4] - 2602:12, 2604:21, 2605:8, 2676:22
**persuades** [1] - 2677:4
**petrochemical** [1] - 2608:8
**petroleum** [1] - 2601:4
**Ph.D** [1] - 2672:13
**pharmaceutical** [1] - 2608:8
**Phone** [1] - 2700:5
**phone** [4] - 2636:24, 2637:12, 2700:5, 2714:23
**phones** [2] - 2700:11, 2706:24
**photograph** [1] -

2639:15
**photographed** [1] - 2635:1
**photographs** [7] - 2594:24, 2596:18, 2635:5, 2640:2, 2653:25, 2661:19, 2661:21
**physical** [12] - 2619:13, 2679:7, 2680:3, 2681:3, 2688:17, 2693:20, 2696:10, 2696:11, 2696:17, 2697:14, 2697:21, 2704:13
**physician** [5] - 2599:17, 2620:16, 2627:12, 2629:4, 2675:23
**physicians** [3] - 2605:21, 2629:17, 2675:25
**pick** [1] - 2649:13
**picked** [3] - 2669:15, 2722:8, 2723:13
**picture** [5] - 2640:7, 2645:7, 2646:14, 2646:17, 2672:24
**pictures** [2] - 2644:24, 2646:22
**piece** [5] - 2588:21, 2602:23, 2619:15, 2619:17
**pieces** [1] - 2715:6
**pier** [9] - 2645:7, 2645:15, 2646:25, 2647:1, 2647:5, 2648:17, 2648:18, 2669:13
**piers** [6] - 2645:6, 2646:23, 2649:17, 2659:8, 2669:9, 2670:9
**pillars** [1] - 2659:8
**PINEDO** [1] - 2581:23
**place** [2] - 2598:21, 2712:25
**placed** [1] - 2647:5
**plain** [1] - 2600:17
**plaintiff** [119] - 2592:18, 2620:17, 2620:19, 2622:11, 2623:8, 2629:24, 2638:12, 2665:5, 2667:10, 2670:13, 2670:15, 2670:17, 2670:22, 2671:7, 2671:8, 2671:20, 2676:24, 2677:15, 2677:16, 2677:24,

2678:3, 2678:5, 2678:15, 2678:18, 2678:23, 2679:2, 2679:3, 2679:6, 2679:8, 2679:10, 2679:18, 2679:23, 2679:24, 2680:2, 2680:8, 2680:11, 2680:18, 2680:23, 2680:24, 2681:2, 2681:4, 2683:14, 2683:15, 2683:20, 2684:5, 2684:8, 2684:10, 2684:11, 2684:12, 2684:15, 2684:21, 2685:13, 2686:4, 2686:13, 2686:14, 2686:17, 2686:20, 2686:22, 2686:25, 2687:3, 2687:5, 2687:7, 2687:9, 2687:15, 2688:3, 2688:8, 2691:21, 2691:24, 2692:4, 2692:8, 2692:10, 2692:12, 2692:13, 2692:15, 2692:20, 2692:22, 2692:25, 2693:7, 2693:11, 2693:14, 2693:15, 2693:18, 2693:24, 2694:6, 2694:7, 2694:13, 2694:22, 2695:1, 2695:9, 2695:10, 2695:15, 2695:19, 2695:22, 2695:25, 2696:23, 2697:9, 2697:16, 2697:20, 2697:25, 2698:4, 2698:10, 2698:11, 2698:13, 2698:15, 2698:18, 2698:19, 2698:21, 2698:25, 2699:7, 2699:10, 2704:4, 2706:1, 2706:4
**plaintiff's** [35] - 2584:18, 2585:16, 2585:21, 2620:16, 2623:5, 2627:2, 2627:9, 2638:14, 2639:11, 2646:12, 2666:11, 2667:3, 2671:24, 2672:3, 2677:12, 2680:7, 2685:14, 2685:16, 2686:10, 2687:16, 2687:24, 2688:5, 2688:11, 2688:24, 2689:15, 2689:24,

2692:3, 2693:12, 2694:1, 2696:8, 2697:7, 2699:1, 2699:5, 2713:10, 2713:17
**plaintiffs** [14] - 2615:9, 2615:20, 2617:24, 2619:17, 2620:16, 2621:12, 2621:13, 2623:8, 2625:8, 2626:10, 2628:25, 2632:25, 2642:13, 2709:2
**planning** [1] - 2690:8
**plans** [4] - 2690:4, 2691:8, 2691:11, 2691:14
**plastic** [2] - 2654:4
**platform** [1] - 2669:6
**play** [1] - 2676:20
**played** [2] - 2657:5, 2675:17
**player** [1] - 2598:2
**pleasures** [2] - 2614:7, 2704:19
**plenty** [1] - 2641:25
**plywood** [2] - 2596:20, 2654:2
**pocket** [1] - 2692:23
**podium** [2] - 2586:25, 2587:1
**point** [22] - 2584:8, 2606:13, 2639:4, 2653:16, 2659:15, 2662:17, 2663:4, 2663:19, 2663:23, 2670:19, 2705:10, 2711:5, 2712:4, 2714:17, 2716:5, 2717:8, 2718:10, 2720:14, 2721:14, 2724:17, 2727:12, 2728:17
**points** [1] - 2659:17
**poison** [1] - 2591:4
**policy** [2] - 2586:8, 2649:1
**politely** [2] - 2724:21, 2725:23
**Polk** [6] - 2595:13, 2635:1, 2635:2, 2657:4, 2657:20
**poll** [1] - 2718:10
**pollution** [1] - 2591:4
**population** [3] - 2604:13, 2609:8
**Porter** [3] - 2588:18, 2589:1
**porter** [1] - 2588:19
**portion** [4] - 2586:4,

2697:2, 2697:7, 2710:24
**posed** [1] - 2658:25
**position** [3] - 2658:13, 2658:14, 2710:22
**positive** [1] - 2709:5
**possibilities** [1] - 2623:3
**possibility** [2] - 2629:11, 2677:19
**possible** [4] - 2677:17, 2683:25, 2701:5, 2724:10
**possibly** [1] - 2674:1
**post** [2] - 2630:14, 2632:12
**post-Katrina** [1] - 2630:14
**potential** [3] - 2601:20, 2680:11, 2684:2
**potentially** [1] - 2621:17
**power** [1] - 2669:24
**powered** [1] - 2669:25
**powerful** [2] - 2601:13, 2604:1
**PowerPoint** [1] - 2604:8
**POYDRAS** [2] - 2582:12, 2582:23
**ppb** [17] - 2604:12, 2608:23, 2609:5, 2609:7, 2666:21, 2666:25, 2667:6, 2667:12, 2667:19, 2667:20, 2667:23, 2668:7, 2668:11, 2719:22
**ppm** [9] - 2604:11, 2604:24, 2666:21, 2667:5, 2667:12, 2667:23, 2668:7, 2668:11, 2719:22
**practicality** [1] - 2683:17
**practically** [1] - 2654:10
**practice** [3] - 2627:16, 2711:6, 2712:5
**precautions** [1] - 2685:7
**precise** [4] - 2652:3, 2669:9, 2689:6, 2689:18
**precision** [1] - 2694:14
**precursor** [1] - 2602:14
**preexisted** [1] -

2632:13
**preexisting** [3] - 2620:11, 2696:17, 2696:21
**prefer** [3] - 2585:7, 2585:8, 2664:8
**pregnant** [1] - 2637:19
**prejudice** [2] - 2673:8, 2676:20
**premier** [1] - 2601:19
**preparation** [2] - 2714:11, 2720:23
**prepare** [2] - 2690:1, 2728:2
**prepared** [2] - 2669:14, 2720:20
**preponderance** [17] - 2600:12, 2676:18, 2676:25, 2677:1, 2677:3, 2677:7, 2677:12, 2677:16, 2678:18, 2679:11, 2680:12, 2684:17, 2687:13, 2691:23, 2694:20, 2698:13, 2699:8
**prescribed** [3] - 2605:24, 2631:12, 2632:21
**prescription** [1] - 2713:3
**presence** [1] - 2599:12
**PRESENT** [1] - 2582:20
**present** [13] - 2601:1, 2670:7, 2672:4, 2675:12, 2675:16, 2675:21, 2695:7, 2695:11, 2695:14, 2696:2, 2704:13, 2704:15, 2728:17
**presentation** [1] - 2614:24
**presentations** [2] - 2608:15, 2721:4
**presented** [8] - 2600:20, 2603:2, 2613:24, 2672:22, 2675:8, 2675:13, 2698:20, 2709:17
**presenting** [1] - 2714:12
**presently** [1] - 2698:1
**preserved** [1] - 2712:6
**preserves** [1] - 2711:23
**preserving** [1] - 2713:20
**preside** [1] - 2664:18

**presiding** [1] -
2726:13
**press** [4] - 2726:6,
2726:7, 2726:11,
2726:17
**pressure** [1] - 2620:2
**presumption** [3] -
2677:22, 2681:6,
2681:8
**prevent** [1] - 2686:9
**preventative** [1] -
2671:5
**preventing** [2] -
2595:8, 2679:13
**previous** [3] -
2696:19, 2703:20,
2727:23
**previously** [1] -
2632:21
**price** [1] - 2593:24
**pride** [1] - 2652:18
**primarily** [1] - 2722:3
**print** [2] - 2664:11,
2715:22
**printed** [1] - 2716:3
**private** [1] - 2588:8
**probability** [2] -
2605:16, 2677:19
**probable** [1] - 2696:15
**problem** [20] - 2590:1,
2590:4, 2590:17,
2591:16, 2591:18,
2592:3, 2592:6,
2597:6, 2597:21,
2606:3, 2606:8,
2613:23, 2637:7,
2640:1, 2647:21,
2647:23, 2657:21,
2658:5, 2658:12,
2662:6
**problems** [21] -
2589:24, 2598:3,
2598:8, 2604:23,
2606:8, 2607:13,
2610:4, 2619:13,
2620:12, 2625:13,
2629:7, 2630:2,
2643:24, 2645:19,
2648:12, 2655:13,
2659:14, 2659:15,
2660:4, 2671:2,
2708:24
**procedure** [2] -
2654:8, 2671:17
**Procedure** [1] -
2710:18
**proceed** [13] -
2585:25, 2701:22,
2701:25, 2702:6,
2702:7, 2702:11,

2702:12, 2702:17,
2702:22, 2702:25,
2703:10, 2703:15,
2704:10
**proceeding** [2] -
2600:11, 2699:11
**PROCEEDINGS** [4] -
2581:12, 2582:24,
2584:1, 2717:1
**proceedings** [11] -
2584:8, 2600:15,
2662:17, 2663:19,
2663:23, 2705:10,
2716:5, 2717:8,
2727:12, 2729:2,
2729:15
**process** [14] -
2588:21, 2590:7,
2601:11, 2609:19,
2642:10, 2642:12,
2670:6, 2670:6,
2670:7, 2671:15,
2722:15, 2723:11,
2725:4, 2726:18
**procure** [1] - 2596:16
**procured** [1] - 2593:20
**procurement** [1] -
2587:17
**produce** [1] - 2677:16
**produced** [2] - 2612:7,
2677:10
**PRODUCED** [1] -
2582:25
**producing** [1] -
2609:20
**product** [67] -
2592:16, 2596:25,
2612:7, 2615:21,
2616:19, 2637:23,
2660:6, 2677:23,
2678:9, 2678:14,
2678:16, 2678:19,
2678:21, 2678:24,
2678:25, 2679:3,
2679:8, 2679:12,
2679:17, 2679:19,
2679:20, 2679:22,
2679:24, 2680:5,
2680:7, 2680:9,
2680:13, 2680:14,
2680:17, 2680:19,
2680:20, 2680:22,
2680:24, 2681:5,
2681:9, 2681:15,
2681:19, 2681:22,
2681:23, 2682:2,
2682:7, 2682:9,
2682:16, 2682:20,
2682:23, 2682:24,
2683:2, 2683:5,

2683:6, 2683:9,
2683:10, 2684:1,
2684:5, 2688:1,
2688:6, 2688:7,
2689:8, 2689:10,
2689:11, 2689:21,
2690:8, 2690:13,
2690:14, 2690:21,
2706:7
**product's** [2] -
2679:13, 2682:18
**production** [1] -
2690:9
**Products** [1] - 2678:4
**PRODUCTS** [1] -
2581:4
**products** [15] -
2593:10, 2594:7,
2595:11, 2595:21,
2595:23, 2595:24,
2601:5, 2637:25,
2638:2, 2638:4,
2657:12, 2660:22,
2666:1, 2678:22,
2683:3
**professional** [2] -
2608:15, 2721:13
**Professional** [1] -
2729:10
**profile** [2] - 2607:4,
2607:6
**prognosis** [2] -
2632:19
**program** [2] - 2588:13,
2604:16
**promised** [1] -
2596:14
**promote** [1] - 2688:5
**promptly** [1] - 2701:5
**pronouncement** [1] -
2611:20
**proof** [21] - 2597:5,
2600:12, 2600:15,
2600:18, 2610:1,
2613:14, 2615:10,
2615:21, 2620:21,
2622:11, 2623:5,
2626:1, 2655:19,
2657:13, 2661:18,
2676:13, 2677:1,
2677:11, 2687:13,
2690:6, 2713:15
**propane** [2] - 2597:24,
2670:11
**proper** [4] - 2589:19,
2661:20, 2685:25,
2688:20
**properly** [8] - 2589:4,
2643:4, 2643:14,
2643:15, 2643:17,

2661:21, 2670:9,
2673:7
**property** [4] - 2591:14,
2591:15, 2611:5,
2649:15
**proposed** [1] -
2710:10
**prosecution** [2] -
2600:14, 2677:18
**protect** [1] - 2684:4
**protocol** [7] - 2591:19,
2661:6, 2667:3,
2667:11, 2667:25,
2668:6, 2668:10
**prototype** [1] -
2588:20
**proud** [2] - 2650:9,
2659:2
**prove** [18] - 2600:18,
2612:14, 2612:16,
2615:21, 2623:5,
2674:21, 2676:7,
2676:14, 2676:24,
2677:15, 2677:17,
2678:18, 2679:11,
2680:11, 2684:16,
2687:13, 2694:13,
2696:23
**proved** [2] - 2659:15,
2677:6
**proven** [5] - 2686:19,
2691:21, 2692:10,
2694:19, 2699:8
**proves** [5] - 2681:4,
2682:23, 2683:9,
2690:23, 2693:24
**provide** [18] - 2587:25,
2588:15, 2589:10,
2589:16, 2589:23,
2591:22, 2592:12,
2592:14, 2656:10,
2668:19, 2668:23,
2680:5, 2680:15,
2681:14, 2682:14,
2682:15, 2687:25,
2700:3
**provided** [19] -
2593:7, 2603:4,
2609:12, 2646:3,
2664:3, 2665:8,
2665:12, 2665:15,
2666:2, 2666:10,
2669:13, 2681:6,
2682:7, 2691:9,
2700:13, 2702:4,
2711:9, 2718:3
**provides** [3] - 2678:7,
2681:16, 2690:3
**providing** [6] -
2587:22, 2589:9,

2593:21, 2596:12,
2668:24, 2671:17
**province** [1] - 2684:2
**proving** [4] - 2686:17,
2689:3, 2698:24,
2699:5
**proximately** [6] -
2678:23, 2679:19,
2680:19, 2691:25,
2693:24, 2694:20
**prudent** [2] - 2681:12,
2684:23
**PRUET** [1] - 2582:3
**pseudostratified** [1] -
2621:5
**psychiatric** [1] -
2614:2
**psychiatrist** [1] -
2607:7
**psychologist** [2] -
2606:18, 2632:6
**Public** [2] - 2588:6,
2604:11
**public** [1] - 2604:5
**publications** [1] -
2608:14
**publicity** [1] - 2672:20
**pulmonologist** [1] -
2603:3
**punishment** [1] -
2694:3
**purchaser** [4] -
2683:19, 2683:22,
2683:23, 2683:24
**purchasing** [1] -
2683:6
**purpose** [5] - 2592:17,
2593:21, 2693:13,
2711:18, 2712:3
**pursuant** [8] - 2666:4,
2667:3, 2667:10,
2667:25, 2668:5,
2668:9, 2668:21,
2691:8
**pushed** [1] - 2595:2
**put** [26] - 2591:10,
2598:17, 2603:13,
2603:15, 2627:11,
2649:14, 2649:15,
2652:23, 2658:18,
2659:7, 2659:8,
2662:8, 2663:3,
2701:1, 2701:10,
2703:25, 2704:3,
2704:21, 2709:1,
2714:6, 2714:15,
2715:12, 2716:2,
2720:24, 2721:20,
2728:24
**putting** [5] - 2645:5,

2645:15, 2711:22, 2721:3, 2724:4
**pyramids** [1] - 2597:15

## Q

**qualify** [1] - 2683:21
**quality** [2] - 2588:2, 2596:6
**quarter** [1] - 2654:2
**questioned** [3] - 2624:19, 2675:15
**questionnaire** [2] - 2723:19, 2724:4
**questionnaires** [4] - 2715:13, 2715:17, 2715:19, 2715:23
**questions** [15] - 2615:18, 2627:4, 2627:5, 2640:9, 2640:11, 2640:23, 2653:2, 2673:25, 2675:11, 2675:17, 2700:19, 2700:21, 2701:12, 2703:12, 2725:25
**Questions** [2] - 2702:6, 2703:2
**quick** [4] - 2632:24, 2635:15, 2651:17, 2705:13
**quickly** [4] - 2647:25, 2648:10, 2714:25, 2715:5
**quit** [1] - 2628:4
**quite** [1] - 2601:14

## R

**R-7** [1] - 2594:15
**radiologist** [1] - 2626:5
**radiologists** [1] - 2626:4
**raise** [1] - 2677:21
**ramps** [1] - 2669:6
**range** [1] - 2612:1
**rare** [1] - 2725:11
**rarely** [1] - 2605:18
**rather** [8] - 2660:20, 2664:8, 2664:9, 2682:8, 2688:14, 2691:3, 2706:18, 2722:6
**RCG** [3] - 2654:13, 2669:19, 2669:21
**RE** [1] - 2581:4
**re** [1] - 2699:16

**re-examine** [1] - 2699:16
**reach** [4] - 2586:6, 2653:16, 2676:4, 2699:13
**reached** [5] - 2700:18, 2703:4, 2703:14, 2704:24, 2717:15
**reaching** [1] - 2674:9
**react** [1] - 2628:5
**reaction** [1] - 2632:1
**read** [26] - 2609:4, 2624:20, 2626:5, 2636:10, 2636:13, 2637:10, 2663:12, 2664:7, 2665:3, 2675:9, 2675:18, 2681:7, 2701:14, 2701:15, 2705:25, 2706:7, 2706:8, 2707:2, 2708:4, 2708:14, 2708:18, 2711:25, 2712:5, 2717:19, 2726:3
**reading** [4] - 2707:4, 2707:25, 2709:12
**readings** [1] - 2611:23
**reads** [1] - 2619:3
**ready** [9] - 2584:13, 2584:14, 2587:2, 2597:22, 2662:12, 2668:16, 2669:7, 2669:25, 2670:6
**ready-for-occupancy** [1] - 2597:22
**real** [8] - 2606:19, 2639:22, 2645:10, 2648:10, 2649:3, 2654:11, 2699:20, 2705:13
**realistically** [1] - 2688:5
**realize** [1] - 2662:7
**realized** [1] - 2591:9
**really** [21] - 2602:1, 2602:21, 2621:6, 2622:20, 2631:18, 2638:12, 2650:9, 2654:10, 2711:25, 2714:17, 2719:25, 2720:1, 2720:10, 2721:14, 2721:19, 2723:4, 2723:24, 2725:4, 2727:5, 2728:10
**Realtime** [1] - 2729:9
**reason** [6] - 2598:15, 2646:4, 2676:5, 2691:11, 2695:17, 2696:16

**reasonable** [22] - 2600:16, 2605:15, 2612:15, 2624:9, 2624:11, 2658:22, 2658:24, 2676:2, 2677:18, 2680:4, 2680:15, 2681:14, 2682:10, 2683:7, 2685:8, 2694:16, 2696:6, 2696:8, 2698:8, 2698:12, 2699:6
**reasonably** [29] - 2612:24, 2613:22, 2652:3, 2679:3, 2679:21, 2679:24, 2680:21, 2680:24, 2681:12, 2681:18, 2681:19, 2682:1, 2682:3, 2682:6, 2682:10, 2682:19, 2682:25, 2683:11, 2683:16, 2684:12, 2684:22, 2685:9, 2686:6, 2689:6, 2689:18, 2691:3, 2694:7, 2695:1, 2698:18
**reasons** [5] - 2654:21, 2657:3, 2689:21, 2690:24, 2721:25
**rebuild** [2] - 2591:11, 2658:16
**rebuilt** [1] - 2591:8
**REBUTTAL** [1] - 2583:10
**rebuttal** [4] - 2584:19, 2585:5, 2614:10, 2653:13
**rebutted** [1] - 2681:8
**receive** [2] - 2682:9, 2723:19
**received** [4] - 2599:9, 2677:9, 2695:20
**receives** [1] - 2695:19
**receiving** [2] - 2655:23, 2726:2
**recess** [5] - 2653:17, 2662:12, 2663:20, 2700:16, 2716:6
**recirculated** [2] - 2595:3, 2595:5
**recognized** [2] - 2590:17, 2695:6
**recognizes** [4] - 2685:18, 2692:19, 2697:20, 2726:22
**recollection** [9] - 2610:17, 2610:19, 2610:21, 2672:25,

2673:2, 2674:16, 2674:18, 2713:17, 2714:2
**recommend** [1] - 2726:8
**recommendations** [1] - 2594:13
**recommended** [1] - 2606:21
**reconcile** [2] - 2709:21, 2709:24
**record** [24] - 2636:25, 2650:22, 2663:4, 2663:8, 2674:6, 2709:1, 2709:5, 2710:3, 2710:7, 2711:12, 2711:20, 2711:23, 2712:5, 2712:14, 2712:21, 2713:7, 2714:2, 2714:7, 2715:12, 2715:16, 2727:18, 2728:19, 2729:15
**Record** [4] - 2712:21, 2712:22, 2713:1, 2713:3
**recorded** [2] - 2675:10, 2675:16
**RECORDED** [1] - 2582:24
**records** [16] - 2606:6, 2607:20, 2607:23, 2619:21, 2620:6, 2626:9, 2626:21, 2627:4, 2627:25, 2628:9, 2631:14, 2634:21, 2636:20, 2636:21, 2643:11
**recover** [8] - 2592:18, 2684:15, 2692:9, 2692:16, 2693:8, 2694:23, 2698:1, 2698:11
**recoverable** [1] - 2698:2
**recovery** [3] - 2687:24, 2688:5, 2698:15
**recreational** [2] - 2593:9, 2593:18
**red** [1] - 2610:5
**reduce** [4] - 2634:13, 2688:6, 2695:14, 2699:1
**reduced** [1] - 2686:20
**reduces** [1] - 2634:11
**reduction** [4] - 2687:24, 2688:4, 2695:7, 2695:17
**reentry** [1] - 2586:6

**refer** [5] - 2664:5, 2664:10, 2678:4, 2711:12, 2713:1
**referred** [5] - 2599:17, 2665:17, 2668:19, 2678:2, 2701:20
**referring** [1] - 2687:11
**refers** [1] - 2704:8
**regard** [19] - 2613:8, 2641:1, 2671:6, 2677:23, 2678:15, 2680:8, 2684:7, 2689:4, 2700:11, 2702:19, 2702:25, 2706:2, 2707:25, 2712:18, 2714:19, 2718:6, 2720:11, 2723:18, 2724:18
**regarding** [7] - 2590:19, 2671:15, 2691:18, 2698:6, 2701:2, 2707:7, 2711:6
**regardless** [3] - 2677:9, 2677:10, 2683:4
**region** [1] - 2665:11
**registered** [1] - 2639:17
**Registered** [2] - 2729:9, 2729:10
**Registry** [1] - 2604:9
**regret** [1] - 2722:17
**regulated** [1] - 2658:19
**regulations** [2] - 2604:2, 2658:20
**regulatory** [1] - 2604:3
**Reich** [3] - 2587:10, 2610:22, 2641:17
**REICH** [5] - 2581:20, 2581:20, 2600:2, 2610:12, 2610:23
**REICH.....................**
**.** [1] - 2583:6
**reimburse** [1] - 2692:22
**reiterate** [1] - 2721:1
**rejected** [1] - 2624:22
**relate** [1] - 2684:9
**related** [4] - 2602:16, 2660:22, 2673:25, 2692:16
**relates** [3] - 2627:10, 2710:10, 2711:2
**RELATES** [1] - 2581:7
**relating** [1] - 2712:12
**relation** [2] - 2683:19, 2688:11
**relationship** [1] -

2688:21
**relative** [7] - 2666:19, 2667:7, 2667:14, 2707:21, 2708:2, 2710:22, 2723:5
**relatively** [2] - 2605:24, 2695:16
**relatives** [1] - 2637:21
**release** [3] - 2595:19, 2719:8, 2727:9
**releases** [1] - 2596:25
**relevant** [2] - 2661:8, 2672:17
**relevel** [1] - 2654:18
**releveled** [2] - 2654:15, 2654:17
**relied** [9] - 2587:21, 2588:23, 2589:16, 2589:18, 2592:13, 2596:9, 2625:9, 2625:12, 2656:8
**relief** [3] - 2616:11, 2668:20, 2686:19
**relieved** [1] - 2641:12
**rely** [5] - 2625:9, 2673:1, 2674:14, 2674:15, 2675:6
**relying** [5] - 2587:21, 2588:14, 2589:9, 2589:10, 2589:22
**remain** [1] - 2584:10
**remained** [1] - 2670:17
**remaining** [1] - 2614:11
**remarkably** [2] - 2600:19, 2643:2
**remarks** [1] - 2674:1
**remedy** [1] - 2678:7
**remedying** [1] - 2685:10
**remember** [28] - 2588:12, 2615:24, 2616:7, 2617:11, 2617:12, 2617:14, 2617:15, 2619:21, 2620:18, 2621:11, 2624:7, 2624:8, 2624:13, 2624:17, 2625:5, 2625:11, 2625:17, 2626:17, 2629:23, 2630:6, 2637:25, 2645:6, 2646:14, 2649:9, 2651:4, 2651:7, 2699:20, 2713:11
**remembered** [1] - 2616:8
**remind** [2] - 2693:3, 2726:15

**reminder** [1] - 2726:5
**remove** [1] - 2602:2
**render** [2] - 2654:20, 2721:21
**rendered** [1] - 2681:5
**rendering** [1] - 2678:14
**repaired** [2] - 2644:18, 2644:19
**repeat** [1] - 2701:18
**replace** [1] - 2634:4
**report** [6] - 2603:22, 2624:20, 2627:4, 2672:14, 2690:12, 2726:13
**REPORTER** [1] - 2582:22
**Reporter** [6] - 2729:9, 2729:10, 2729:11, 2729:21
**reporter** [1] - 2675:16
**REPORTER'S** [1] - 2729:7
**reports** [2] - 2644:9, 2646:9
**representative** [3] - 2643:7, 2671:4, 2672:15
**representatives** [1] - 2658:10
**representing** [2] - 2675:15, 2695:18
**represents** [1] - 2621:12
**request** [1] - 2710:21
**requested** [2] - 2595:18, 2710:16
**require** [3] - 2649:11, 2691:1, 2694:12
**required** [12] - 2596:4, 2596:16, 2596:17, 2670:10, 2675:5, 2688:19, 2689:21, 2690:13, 2692:14, 2698:21, 2699:10, 2704:24
**requirements** [4] - 2593:24, 2669:3, 2670:3, 2690:15
**requires** [7] - 2594:12, 2669:2, 2676:17, 2684:20, 2687:18, 2691:17, 2695:8
**requiring** [1] - 2688:1
**Research** [1] - 2601:21
**research** [3] - 2608:12, 2660:21, 2700:10
**reserve** [3] - 2584:18,

2614:10, 2663:5
**resided** [1] - 2670:20
**residence** [3] - 2591:10, 2604:25, 2672:3
**residences** [1] - 2593:10
**resident** [1] - 2665:6
**resident's** [1] - 2611:5
**residential** [1] - 2588:3
**residents** [9] - 2587:23, 2588:4, 2592:2, 2592:8, 2593:14, 2597:7, 2665:9, 2665:10, 2665:22
**residing** [1] - 2611:8
**resins** [1] - 2668:14
**resolved** [3] - 2626:15, 2632:12, 2722:5
**respect** [2] - 2684:13, 2704:12
**respectful** [2] - 2724:11, 2724:13
**respiratory** [4] - 2601:13, 2604:23, 2605:17, 2622:2
**respond** [2] - 2701:5, 2723:10
**responded** [2] - 2650:12, 2671:16
**responders** [1] - 2605:2
**response** [7] - 2590:2, 2625:19, 2639:16, 2659:24, 2665:13, 2668:22, 2701:8
**responsibilities** [3] - 2671:4, 2721:13, 2724:18
**responsibility** [11] - 2590:1, 2594:22, 2644:4, 2651:23, 2652:22, 2652:24, 2659:13, 2670:24, 2671:9, 2687:19, 2721:24
**responsible** [10] - 2597:17, 2618:25, 2646:3, 2658:6, 2682:12, 2691:4, 2696:13, 2696:15, 2696:21, 2697:3
**responsibly** [1] - 2592:12
**responsive** [1] - 2722:13
**rest** [5] - 2584:13,

2587:5, 2626:12, 2638:20, 2644:6
**restoring** [1] - 2669:24
**restrictive** [2] - 2587:24, 2593:22
**result** [14] - 2613:4, 2613:11, 2631:21, 2641:7, 2648:13, 2672:11, 2686:5, 2691:10, 2697:12, 2699:10, 2702:15, 2703:7, 2721:17, 2721:18
**resulted** [4] - 2679:21, 2680:21, 2688:14, 2697:7
**resulting** [3] - 2696:11, 2696:22, 2698:7
**results** [3] - 2658:7, 2696:19, 2697:3
**retained** [2] - 2600:21, 2607:5
**retire** [2] - 2653:1, 2705:1
**return** [5] - 2618:16, 2689:14, 2689:24, 2691:16, 2700:20
**returns** [4] - 2618:8, 2618:9, 2618:23, 2619:2
**reurge** [4] - 2709:13, 2709:16, 2709:18, 2710:8
**reveal** [1] - 2700:22
**revealing** [1] - 2609:3
**review** [4] - 2662:20, 2664:11, 2665:4, 2690:3
**reviewed** [1] - 2627:3
**revisions** [1] - 2707:1
**RFO** [1] - 2670:6
**rhinitis** [1] - 2603:5
**rhinosinusitis** [16] - 2603:10, 2603:14, 2603:18, 2603:22, 2603:24, 2603:25, 2605:12, 2605:13, 2609:24, 2622:16, 2622:19, 2622:21, 2622:25, 2624:13, 2655:11, 2662:5
**Rialto** [1] - 2665:20
**Richard** [1] - 2620:15
**right-sided** [1] - 2661:4
**rise** [9] - 2584:7, 2639:10, 2662:16, 2663:18, 2663:21, 2705:9, 2715:11,

2717:7, 2727:11
**risk** [8] - 2601:23, 2604:25, 2623:25, 2624:2, 2685:1, 2685:2, 2688:15, 2695:16
**risk-free** [1] - 2695:16
**risks** [3] - 2590:15, 2609:13, 2680:11
**Rita** [3] - 2665:14, 2665:23, 2671:13
**Ritter** [2] - 2594:15, 2594:25
**RIVA** [1] - 2594:12
**RIVER** [2] - 2581:8, 2582:10
**River** [87] - 2587:21, 2587:24, 2588:18, 2588:19, 2592:15, 2592:24, 2593:2, 2593:7, 2593:9, 2593:13, 2593:15, 2593:16, 2593:19, 2593:23, 2594:14, 2594:22, 2595:16, 2595:23, 2603:4, 2612:7, 2612:18, 2612:21, 2613:4, 2613:19, 2615:6, 2615:20, 2616:1, 2616:9, 2616:18, 2616:24, 2621:24, 2623:14, 2623:15, 2634:10, 2635:3, 2635:17, 2638:4, 2655:15, 2656:8, 2656:24, 2659:2, 2665:15, 2665:20, 2665:24, 2666:3, 2666:5, 2668:12, 2670:20, 2677:24, 2677:25, 2678:16, 2678:22, 2679:9, 2680:4, 2680:9, 2680:15, 2683:18, 2683:23, 2684:3, 2684:10, 2688:25, 2689:4, 2689:12, 2689:14, 2690:5, 2690:6, 2690:22, 2691:2, 2691:13, 2691:16, 2701:19, 2701:23, 2702:1, 2702:15, 2703:22, 2706:6, 2710:8, 2710:16, 2711:2, 2713:8, 2717:21, 2717:22, 2717:24, 2718:1
**River's** [19] - 2584:21,

2588:15, 2589:1,
2612:23, 2616:25,
2617:2, 2651:14,
2679:1, 2680:13,
2680:21, 2689:8,
2689:9, 2689:10,
2690:3, 2690:14,
2690:17, 2690:21,
2702:9, 2706:6
**RMR** [2] - 2582:22,
2729:20
**ROAD** [1] - 2581:24
**road** [2] - 2645:3,
2671:23
**role** [2] - 2588:11,
2589:5
**rolled** [1] - 2647:14
**roof** [3] - 2639:6,
2672:4, 2672:7
**Roofing** [1] - 2647:13
**ROOM** [1] - 2582:23
**room** [6] - 2661:3,
2700:12, 2705:1,
2723:22, 2725:3,
2727:10
**Rouge** [2] - 2666:9,
2669:16
**routinely** [1] - 2623:11
**ROY** [1] - 2582:17
**Rule** [2] - 2713:8,
2713:12
**ruling** [1] - 2712:1
**running** [2] - 2626:21,
2634:7
**runny** [1] - 2628:6
**RV** [2] - 2657:1,
2657:6

**S**

**s/Cathy** [1] - 2729:19
**sacrifice** [1] - 2688:2
**sacrosanct** [1] -
2725:4
**safe** [9] - 2587:22,
2588:15, 2589:10,
2589:11, 2589:23,
2592:12, 2596:12,
2650:4, 2656:10
**safer** [1] - 2688:7
**safety** [1] - 2599:8
**sale** [1] - 2689:11
**sales** [1] - 2666:5
**salespeople** [1] -
2657:7
**sample** [7] - 2590:18,
2667:1, 2667:4,
2667:21, 2667:23,
2668:5, 2668:9

**sampling** [8] -
2666:15, 2666:16,
2666:23, 2666:24,
2667:16, 2667:18,
2667:19, 2668:3
**SAN** [2] - 2581:21,
2582:8
**sanitary** [4] - 2589:23,
2592:12, 2596:12,
2656:10
**sat** [1] - 2671:23
**satisfaction** [1] -
2612:16
**satisfied** [4] -
2689:13, 2689:23,
2690:16, 2699:4
**satisfies** [1] - 2690:22
**saw** [21] - 2590:1,
2591:20, 2596:4,
2599:15, 2606:3,
2629:10, 2634:23,
2634:24, 2641:17,
2643:3, 2643:5,
2644:25, 2647:17,
2650:24, 2650:25,
2651:1, 2652:4,
2661:12, 2661:14,
2724:24
**SC** [1] - 2582:4
**scale** [1] - 2721:22
**scales** [8] - 2600:10,
2600:16, 2607:1,
2607:16, 2612:12,
2641:17, 2655:4
**scan** [13] - 2610:3,
2625:10, 2625:12,
2625:17, 2625:18,
2625:19, 2625:20,
2626:8, 2660:25,
2661:3, 2661:5,
2661:8, 2661:9
**scans** [1] - 2625:10
**School** [2] - 2624:20,
2624:21
**school** [1] - 2624:23
**science** [2] - 2720:7,
2721:6
**scientific** [4] - 2625:3,
2682:25, 2683:11,
2683:16
**scientist** [1] - 2609:12
**scoliosis** [1] - 2619:24
**Scott** [6] - 2666:17,
2666:23, 2667:2,
2667:9, 2667:16,
2667:23
**screen** [1] - 2701:10
**sealed** [3] - 2638:15,
2638:22, 2667:4
**seasonal** [6] - 2610:4,

2619:25, 2628:4,
2629:3, 2629:4,
2655:12
**seat** [2] - 2653:12,
2717:13
**seated** [6] - 2584:11,
2662:19, 2664:1,
2705:12, 2717:10,
2727:14
**second** [10] - 2615:1,
2622:17, 2622:20,
2623:10, 2624:7,
2649:9, 2685:11,
2706:2, 2710:13,
2728:11
**secondary** [3] -
2603:10, 2603:22,
2603:23
**secondly** [6] -
2642:24, 2647:5,
2679:8, 2679:18,
2680:18, 2689:7
**section** [1] - 2712:20
**secure** [1] - 2596:12
**SECURITY** [4] -
2584:7, 2662:16,
2705:9, 2727:11
**security** [3] - 2701:4,
2703:4, 2703:14
**see** [50] - 2585:22,
2589:2, 2589:3,
2589:4, 2593:17,
2593:20, 2595:1,
2596:6, 2597:4,
2597:11, 2597:25,
2599:17, 2600:10,
2606:5, 2607:20,
2607:23, 2609:16,
2611:14, 2619:15,
2620:6, 2622:7,
2629:9, 2629:13,
2638:13, 2640:3,
2640:4, 2644:11,
2645:7, 2646:19,
2646:23, 2646:24,
2647:19, 2650:10,
2653:5, 2654:1,
2659:5, 2661:5,
2661:22, 2661:24,
2663:3, 2706:22,
2707:18, 2708:23,
2715:5, 2715:10,
2715:22, 2720:21,
2721:25, 2722:10
**seeing** [3] - 2645:6,
2661:19, 2728:8
**seek** [1] - 2699:21
**seeking** [1] - 2726:12
**seem** [1] - 2654:21
**sees** [2] - 2619:21,

2627:15
**select** [1] - 2699:23
**Seminole** [4] -
2630:23, 2669:18,
2672:3, 2672:16
**send** [1] - 2663:7,
2663:15, 2700:25,
2705:22, 2707:18,
2707:19, 2707:20,
2708:5, 2708:22
**sending** [1] - 2616:5
**senility** [1] - 2714:4
**sensation** [1] - 2620:1
**sense** [9] - 2617:24,
2619:12, 2651:22,
2655:3, 2658:4,
2661:24, 2676:5,
2694:9
**sensitive** [2] -
2601:15, 2609:5
**sent** [5] - 2615:25,
2634:12, 2634:17,
2659:4, 2719:18
**sentence** [2] -
2585:17, 2706:11
**separate** [1] - 2678:9
**separately** [1] -
2670:4
**September** [5] -
2631:14, 2632:8,
2666:3, 2668:17,
2672:10
**series** [1] - 2589:20
**serious** [3] - 2592:1,
2602:9, 2696:16
**seriously** [2] -
2723:17, 2724:12
**seriousness** [2] -
2679:14, 2685:4
**serve** [2] - 2688:5,
2724:2
**service** [13] - 2642:5,
2700:6, 2700:7,
2719:9, 2722:18,
2722:19, 2724:7,
2724:20, 2724:24,
2726:21, 2726:22,
2727:9
**services** [2] - 2668:20,
2668:24
**Services** [2] -
2604:11, 2665:17
**serving** [2] - 2721:23,
2723:15
**set** [12] - 2587:16,
2588:8, 2598:21,
2604:4, 2604:6,
2611:4, 2614:14,
2653:9, 2653:11,
2668:2, 2669:9,

2713:3
**setting** [1] - 2614:15
**settlement** [1] -
2597:14
**seven** [1] - 2728:8
**seventh** [1] - 2705:20
**several** [6] - 2592:4,
2593:3, 2595:10,
2663:1, 2719:9,
2728:9
**severe** [2] - 2606:20,
2607:10
**sewer** [2] - 2669:5,
2670:11
**sexual** [2] - 2619:24,
2620:9
**shall** [4] - 2587:24,
2587:25, 2593:22,
2664:23
**SHAW** [1] - 2582:15
**Shaw** [124] - 2589:9,
2589:17, 2589:18,
2590:2, 2590:4,
2591:23, 2596:8,
2596:10, 2596:15,
2597:1, 2597:2,
2597:3, 2597:5,
2597:7, 2597:16,
2597:17, 2597:20,
2598:2, 2598:22,
2613:7, 2613:11,
2613:19, 2623:15,
2623:16, 2634:9,
2635:23, 2636:3,
2640:24, 2640:25,
2641:6, 2641:7,
2642:23, 2643:1,
2643:2, 2643:3,
2643:10, 2643:16,
2643:23, 2644:1,
2644:4, 2644:7,
2644:8, 2645:22,
2645:23, 2646:8,
2647:11, 2648:6,
2648:11, 2648:21,
2649:1, 2649:11,
2649:12, 2649:16,
2649:18, 2650:6,
2650:10, 2650:12,
2650:14, 2650:19,
2651:13, 2651:18,
2651:19, 2652:2,
2652:10, 2652:21,
2652:24, 2652:25,
2653:2, 2653:3,
2653:21, 2654:6,
2654:15, 2655:14,
2659:10, 2668:15,
2668:17, 2668:19,
2668:23, 2669:8,

2669:13, 2670:2, 2670:4, 2670:8, 2670:22, 2670:25, 2671:3, 2671:11, 2671:14, 2671:16, 2671:18, 2671:22, 2678:6, 2684:8, 2684:11, 2684:13, 2688:25, 2689:16, 2689:20, 2689:24, 2690:5, 2690:7, 2690:22, 2691:2, 2691:13, 2691:16, 2702:18, 2703:6, 2703:7, 2704:1, 2712:15, 2712:23, 2718:5

**Shaw's** [22] - 2584:22, 2590:1, 2596:10, 2596:15, 2596:21, 2643:24, 2649:1, 2651:16, 2651:23, 2652:25, 2669:2, 2669:16, 2669:19, 2670:14, 2670:25, 2671:9, 2689:19, 2690:4, 2690:15, 2690:17, 2690:21, 2712:21

**sheet** [1] - 2619:8

**shift** [1] - 2596:22

**shifted** [1] - 2647:10

**shims** [1] - 2647:24

**ship** [3] - 2598:11, 2643:13, 2670:17

**shipped** [3] - 2590:10, 2658:2, 2666:4

**shoddy** [1] - 2597:19

**short** [5] - 2585:23, 2593:18, 2605:25, 2662:11, 2711:9

**short-term** [1] - 2593:18

**show** [22] - 2592:18, 2609:23, 2610:7, 2615:10, 2617:17, 2622:2, 2625:20, 2625:22, 2628:1, 2629:2, 2635:5, 2639:25, 2640:22, 2640:23, 2655:21, 2660:9, 2673:8, 2686:14, 2701:7, 2715:25, 2720:18, 2727:9

**showed** [27] - 2588:19, 2594:23, 2596:18, 2597:19, 2597:21, 2602:12, 2607:17, 2614:23,

2615:5, 2619:18, 2622:1, 2625:13, 2634:20, 2639:15, 2641:18, 2643:14, 2643:22, 2643:24, 2646:14, 2646:17, 2646:22, 2646:25, 2647:1, 2648:14, 2714:18, 2719:13

**showing** [1] - 2690:16

**shown** [2] - 2602:16, 2639:22

**shows** [9] - 2586:21, 2586:23, 2640:3, 2645:20, 2646:17, 2646:18, 2659:22, 2661:10

**shrimp** [2] - 2601:4, 2608:18

**shut** [1] - 2585:8

**Shwery** [8] - 2606:18, 2606:25, 2607:12, 2614:1, 2631:16, 2632:5, 2632:8

**Shwery's** [1] - 2632:4

**sick** [11] - 2604:14, 2636:19, 2636:22, 2636:24, 2637:2, 2637:7, 2637:15, 2637:20, 2637:22, 2659:24, 2723:8

**side** [19] - 2584:17, 2585:16, 2621:7, 2621:20, 2622:3, 2622:6, 2625:9, 2626:13, 2626:14, 2629:1, 2635:8, 2635:9, 2635:10, 2635:13, 2673:5, 2673:6, 2721:16, 2721:17, 2728:2

**sided** [1] - 2661:4

**sides** [6] - 2617:6, 2617:10, 2626:6, 2638:18, 2721:15, 2721:18

**sign** [16] - 2602:14, 2620:11, 2636:3, 2700:20, 2703:3, 2703:13, 2703:23, 2704:2, 2704:5, 2704:6, 2704:9, 2704:14, 2704:16, 2704:18, 2704:20, 2704:22

**signed** [6] - 2589:22, 2643:20, 2644:10, 2670:15, 2671:4, 2718:8

**significant** [3] -

2590:25, 2596:21, 2622:3

**signing** [1] - 2644:12

**signs** [1] - 2644:14

**similar** [5] - 2626:24, 2626:25, 2681:20, 2682:4, 2684:24

**simple** [2] - 2656:12, 2656:20

**simply** [3] - 2617:12, 2676:17, 2701:15

**sincerity** [1] - 2598:15

**single** [5] - 2619:17, 2646:8, 2664:25, 2676:7, 2676:10

**singularly** [1] - 2706:18

**sinuses** [12] - 2621:1, 2625:11, 2625:13, 2625:22, 2626:20, 2628:14, 2628:15, 2628:17, 2661:7, 2661:9, 2661:10

**sinusitis** [7] - 2602:8, 2602:9, 2602:13, 2626:3, 2626:10, 2626:15

**sister** [2] - 2633:8, 2637:17

**sit** [3] - 2621:14, 2698:20, 2705:8

**site** [3] - 2639:11, 2672:7, 2700:8

**sites** [1] - 2596:16

**sits** [1] - 2586:10

**sitting** [3] - 2630:24, 2657:15, 2720:15

**situation** [3] - 2592:1, 2594:18, 2658:9

**six** [3] - 2592:10, 2597:10, 2645:8

**size** [2] - 2654:4, 2658:15

**skilled** [1] - 2660:14

**sky** [1] - 2647:19

**slide** [2] - 2597:4, 2609:24

**slides** [1] - 2609:14

**slightly** [1] - 2600:17

**small** [3] - 2591:14, 2594:9, 2595:12

**smaller** [1] - 2611:4

**Smart** [1] - 2700:5

**smear** [6] - 2621:8, 2621:21, 2622:1, 2660:7, 2660:8

**smell** [16] - 2591:1, 2598:21, 2598:23, 2598:24, 2598:25, 2599:20, 2606:14,

2633:5, 2633:7, 2633:12, 2633:14, 2648:3, 2649:25, 2650:7, 2651:11

**smelled** [5] - 2632:25, 2633:2, 2633:8, 2633:10, 2648:4

**smelling** [3] - 2612:1, 2613:13, 2613:15

**Smith** [14] - 2598:12, 2603:3, 2603:11, 2603:12, 2603:16, 2603:17, 2620:11, 2626:18, 2627:1, 2628:1, 2628:9, 2628:13, 2629:21, 2629:23

**Smith's** [1] - 2607:20

**smoke** [5] - 2610:1, 2630:19, 2649:20, 2649:23, 2657:25

**smoked** [3] - 2610:2, 2630:16, 2630:17

**smoking** [5] - 2606:9, 2609:23, 2610:4, 2630:15, 2658:2

**SMT** [1] - 2665:19

**Smulski** [1] - 2595:19

**social** [1] - 2618:5

**society** [1] - 2685:4

**soft** [1] - 2727:17

**soil** [2] - 2597:10, 2597:11

**Soil** [1] - 2597:13

**sold** [1] - 2666:6

**sole** [3] - 2673:14, 2674:3, 2698:18

**solely** [2] - 2674:10, 2699:19

**solution** [1] - 2668:25

**someone** [6] - 2635:3, 2640:17, 2646:8, 2709:12, 2725:20

**sometime** [3] - 2670:18, 2671:20, 2675:14

**sometimes** [8] - 2665:17, 2668:18, 2673:4, 2677:1, 2678:2, 2692:21, 2701:20, 2725:17

**son** [4] - 2621:12, 2637:4, 2637:7

**soon** [2] - 2715:10, 2727:25

**sophisticated** [4] - 2683:18, 2683:21, 2683:23, 2683:24

**sorry** [6] - 2626:23, 2635:25, 2636:5,

2647:7, 2681:11, 2689:9

**sort** [2] - 2602:8, 2719:16

**sorts** [1] - 2604:2

**sought** [1] - 2688:16

**sound** [4] - 2647:6, 2694:15, 2699:3, 2701:13

**South** [2] - 2616:5, 2616:17

**southern** [1] - 2609:2

**Souza** [2] - 2588:12

**space** [10] - 2591:9, 2594:9, 2594:19, 2594:20, 2594:21, 2595:2, 2595:3, 2595:14, 2658:16

**spaced** [2] - 2596:19, 2661:21

**speaking** [1] - 2586:9

**spec** [1] - 2658:12

**spec'd** [1] - 2593:15

**special** [4] - 2616:10, 2675:2, 2692:21, 2692:25

**specialist** [2] - 2590:14, 2639:18

**specific** [4] - 2631:6, 2681:16, 2690:10, 2692:21

**specifically** [10] - 2622:13, 2622:18, 2631:7, 2632:4, 2634:19, 2678:5, 2684:10, 2687:1, 2710:9, 2712:15

**specification** [5] - 2587:17, 2587:18, 2587:19, 2596:19, 2611:15

**specifications** [25] - 2596:17, 2597:15, 2613:9, 2616:13, 2652:3, 2653:24, 2660:6, 2661:20, 2669:2, 2669:12, 2678:20, 2689:2, 2689:7, 2689:8, 2689:18, 2689:20, 2689:22, 2690:1, 2690:9, 2690:14, 2690:18, 2690:25, 2691:9, 2691:12, 2691:15

**specifics** [1] - 2594:13

**specs** [1] - 2659:12

**Spector** [19] - 2601:25, 2620:15, 2620:20, 2621:21,

2622:5, 2622:18, 2622:23, 2623:1, 2624:14, 2624:15, 2631:19, 2631:23, 2660:8, 2660:12, 2660:21, 2661:1, 2661:14

**Spector's** [1] - 2622:10

**speculate** [1] - 2673:20

**speculation** [1] - 2677:19

**speculative** [1] - 2694:5

**speeds** [1] - 2645:4

**spend** [3] - 2587:8, 2587:19, 2618:5

**spent** [3] - 2594:24, 2618:2, 2641:23

**spill** [1] - 2605:3

**spitting** [3] - 2599:17, 2599:19, 2656:14

**split** [1] - 2584:21

**spot** [1] - 2614:16

**spray** [1] - 2626:16

**sputum** [1] - 2692:17

**ST** [2] - 2581:18, 2582:18

**stable** [1] - 2606:9

**stages** [1] - 2690:8

**staging** [4] - 2666:8, 2669:15, 2669:16, 2671:18

**stain** [2] - 2727:16, 2727:17

**stale** [1] - 2595:5

**stand** [8] - 2603:19, 2614:16, 2622:5, 2625:17, 2653:12, 2675:13, 2675:22, 2728:7

**stand-alone** [1] - 2728:7

**Standard** [1] - 2695:4

**standard** [11] - 2605:5, 2656:24, 2658:22, 2671:17, 2684:19, 2684:25, 2697:17, 2707:13, 2707:19, 2707:25, 2714:14

**standards** [6] - 2587:23, 2593:5, 2593:22, 2604:4, 2604:6, 2678:21

**standing** [1] - 2584:10

**standpoint** [1] - 2632:3

**Stanley** [1] - 2592:9

**start** [1] - 2641:19

**started** [6] - 2599:16, 2614:4, 2616:7, 2617:5, 2630:13, 2651:19

**starting** [2] - 2630:10, 2637:16

**starts** [1] - 2586:10

**State** [3] - 2651:8, 2665:7, 2729:11

**state** [2] - 2664:23, 2675:4

**Statement** [1] - 2669:11

**statement** [7] - 2589:9, 2589:23, 2592:24, 2596:12, 2636:8, 2656:10, 2726:13

**statements** [1] - 2586:14

**STATES** [2] - 2581:1, 2581:13

**States** [7] - 2665:10, 2668:20, 2676:21, 2695:5, 2704:5, 2729:12, 2729:22

**stating** [1] - 2665:1

**statistical** [1] - 2609:16

**stay** [3] - 2598:21, 2637:15, 2637:16, 2637:17, 2637:21, 2660:1, 2723:21, 2728:15

**stayed** [3] - 2598:9, 2633:6, 2644:5

**staying** [1] - 2632:16

**STENOGRAPHY** [1] - 2582:24

**step** [1] - 2599:7

**Stephen** [1] - 2595:19

**steps** [4] - 2597:7, 2669:5, 2669:6, 2670:12

**stewed** [1] - 2602:24

**stick** [1] - 2594:3

**still** [3] - 2602:23, 2640:3, 2644:12, 2657:20, 2714:7, 2715:15, 2723:9, 2727:23

**stipulate** [1] - 2708:19

**stipulated** [4] - 2639:13, 2665:5, 2707:15, 2708:6

**stipulation** [5] - 2611:22, 2638:13, 2638:20, 2639:3, 2708:19

**stipulations** [2] - 2665:3, 2672:19

**stoic** [3] - 2598:7, 2602:20

**stop** [1] - 2653:16

**stopped** [1] - 2661:15

**stopwatch** [1] - 2586:24

**storage** [3] - 2655:20, 2672:1, 2672:7

**story** [12] - 2617:6, 2617:11, 2621:8, 2622:4, 2622:6, 2625:9, 2626:6, 2626:13, 2626:14, 2629:1, 2638:18, 2646:20

**stoves** [1] - 2597:24

**straight** [1] - 2585:19

**straps** [2] - 2669:4, 2670:10

**STREET** [2] - 2582:12, 2582:23

**street** [1] - 2630:23

**stricken** [2] - 2674:6, 2674:8

**STRICKLAND** [1] - 2582:12

**strife** [1] - 2722:1

**stroke** [1] - 2661:6

**strong** [3] - 2600:19, 2600:20, 2643:2

**struck** [1] - 2598:4

**structurally** [1] - 2647:6

**structure** [1] - 2648:19

**stuck** [1] - 2656:1

**studies** [1] - 2608:14

**study** [6] - 2602:12, 2608:25, 2609:4, 2656:4, 2660:20

**stuffy** [2] - 2622:21, 2622:22

**Styrofoam** [1] - 2594:14

**subbed** [1] - 2597:17

**subcontractor** [3] - 2597:16, 2598:22, 2650:7

**subcontractors** [5] - 2669:20, 2670:3, 2670:5, 2670:14, 2712:20

**subject** [4] - 2604:2, 2625:6, 2675:1, 2709:7

**submissions** [1] - 2712:21

**submit** [16] - 2599:5, 2600:6, 2612:7,

2612:9, 2612:20, 2613:5, 2613:18, 2625:4, 2644:3, 2647:3, 2648:22, 2649:7, 2652:3, 2653:2, 2653:3, 2653:23

**submitted** [1] - 2712:14

**subsequent** [1] - 2681:13

**substance** [4] - 2603:6, 2603:7, 2630:1, 2637:24

**substances** [1] - 2601:19

**Substances** [1] - 2604:9

**substantial** [3] - 2628:23, 2686:1, 2697:24

**substantially** [8] - 2604:18, 2613:4, 2613:11, 2617:4, 2640:13, 2641:7, 2702:15, 2703:7

**substantive** [3] - 2690:3, 2707:3, 2723:24

**subtracted** [1] - 2585:5

**successful** [3] - 2678:18, 2679:10, 2680:11

**sucked** [1] - 2594:19

**sudden** [1] - 2632:9

**suddenly** [1] - 2632:8

**suffer** [5] - 2595:9, 2694:7, 2695:1, 2695:9, 2697:20

**suffered** [22] - 2599:25, 2605:9, 2620:23, 2678:23, 2679:2, 2679:18, 2679:23, 2680:18, 2680:23, 2685:13, 2686:14, 2686:20, 2687:5, 2687:7, 2691:24, 2693:16, 2693:21, 2694:6, 2694:24, 2697:16, 2698:10, 2706:1

**suffering** [8] - 2614:6, 2692:20, 2693:20, 2696:3, 2697:10, 2697:14, 2697:21, 2704:13

**suffers** [1] - 2640:13

**sufficient** [7] - 2600:19, 2623:21,

2676:7, 2677:20, 2690:9, 2710:12, 2710:15

**sufficiently** [1] - 2685:7

**suggest** [6] - 2640:7, 2641:2, 2641:9, 2652:20, 2652:24, 2708:3

**suggested** [1] - 2652:23

**suing** [1] - 2678:5

**suitable** [1] - 2597:11

**SUITE** [4] - 2581:21, 2582:7, 2582:12, 2582:18

**summary** [1] - 2672:24

**summer** [2] - 2656:3, 2658:8

**summon** [1] - 2714:25

**summons** [2] - 2722:18, 2723:6

**summonses** [1] - 2723:11

**sums** [1] - 2693:2

**sun** [1] - 2639:5

**sunlight** [1] - 2661:25

**superior** [5] - 2588:1, 2596:6, 2597:20, 2610:12, 2688:18

**supervised** [1] - 2690:16

**supervisory** [1] - 2588:13

**supplier** [2] - 2587:24, 2593:23

**supplying** [1] - 2616:3

**support** [3] - 2645:15, 2677:20, 2711:1

**supporting** [1] - 2654:25

**supports** [1] - 2654:23

**supposed** [2] - 2593:8, 2653:6

**susceptible** [1] - 2609:9

**suspect** [1] - 2625:1

**sustained** [7] - 2613:3, 2613:10, 2641:6, 2673:17, 2697:10, 2702:14, 2703:6

**Svoboda** [1] - 2718:15

**SVOBODA** [1] - 2718:17

**swore** [1] - 2619:9

**sworn** [3] - 2603:20, 2675:10, 2699:12

**sympathy** [1] -

2676:20
**symptoms** [4] -
2606:7, 2607:3,
2629:14
**syndrome** [1] -
2619:24
**system** [11] - 2587:7,
2593:3, 2594:10,
2594:11, 2594:17,
2595:4, 2595:5,
2601:11, 2668:2,
2723:3, 2723:10

# T

**table** [4] - 2641:20,
2695:6, 2707:13,
2707:20
**Table** [1] - 2695:4
**talks** [5] - 2599:22,
2629:14, 2631:14,
2634:9, 2634:10
**tanks** [1] - 2670:12
**tape** [3] - 2635:13,
2651:2, 2651:3
**taped** [8] - 2635:5,
2635:8, 2635:10,
2635:13, 2650:25,
2651:2, 2651:3,
2655:25
**task** [4] - 2668:21,
2668:22, 2692:5,
2721:11
**tasked** [2] - 2590:18,
2668:15
**tasks** [2] - 2589:18,
2669:6
**tax** [5] - 2618:8,
2618:9, 2618:16,
2618:23, 2619:2
**team** [2] - 2587:5,
2598:2
**tear** [1] - 2682:5
**technical** [7] -
2592:14, 2675:1,
2675:3, 2675:4,
2682:25, 2683:11,
2683:16
**technically** [1] -
2728:10
**telephone** [1] - 2700:5
**television** [1] -
2720:16
**temperature** [9] -
2638:21, 2638:24,
2639:8, 2640:2,
2666:18, 2666:24,
2667:6, 2667:13,
2667:17

**temporary** [8] -
2588:8, 2588:9,
2591:24, 2593:12,
2596:16, 2611:16,
2616:14, 2643:13
**tend** [1] - 2676:14
**tended** [1] - 2607:3
**tending** [1] - 2674:21
**term** [7] - 2591:13,
2593:18, 2596:4,
2681:18, 2681:21,
2682:1, 2682:5
**terms** [4] - 2601:19,
2681:16, 2693:4,
2708:24
**terrific** [1] - 2721:1
**terror** [1] - 2602:19
**test** [5] - 2607:17,
2638:17, 2638:25,
2639:10, 2651:11
**testified** [19] -
2588:12, 2589:1,
2603:9, 2606:5,
2608:7, 2608:9,
2615:25, 2620:15,
2620:20, 2621:2,
2631:3, 2632:6,
2643:16, 2644:6,
2646:1, 2650:24,
2674:22, 2675:21,
2676:9
**testify** [6] - 2589:8,
2632:6, 2632:9,
2650:5, 2660:17,
2675:12
**testifying** [1] -
2649:10
**testimony** [48] -
2586:15, 2587:17,
2588:17, 2590:15,
2602:5, 2603:20,
2604:3, 2604:5,
2604:15, 2605:15,
2607:23, 2608:4,
2610:14, 2610:17,
2610:19, 2611:24,
2615:24, 2616:23,
2619:20, 2632:5,
2634:3, 2634:8,
2634:18, 2634:22,
2644:17, 2645:8,
2645:24, 2646:10,
2664:19, 2673:6,
2673:11, 2674:6,
2674:8, 2674:11,
2674:19, 2674:20,
2674:25, 2675:8,
2675:13, 2675:17,
2675:19, 2675:23,
2676:2, 2676:5,

2676:7, 2676:12,
2677:8, 2707:22
**testing** [16] - 2590:20,
2591:17, 2597:11,
2608:3, 2638:14,
2650:3, 2658:7,
2660:3, 2667:3,
2667:10, 2667:25,
2668:6, 2668:10,
2671:11, 2672:11
**tests** [6] - 2606:25,
2607:16, 2627:4,
2639:1, 2685:16,
2691:6
**Texas** [1] - 2616:17
**text** [2] - 2700:6,
2706:19
**THE** [86] - 2581:12,
2584:7, 2584:10,
2584:11, 2584:24,
2585:3, 2585:12,
2610:13, 2610:16,
2610:25, 2612:13,
2614:11, 2614:15,
2617:9, 2618:13,
2639:21, 2640:15,
2640:17, 2652:14,
2653:8, 2653:11,
2661:16, 2662:9,
2662:11, 2662:16,
2662:19, 2663:7,
2663:18, 2663:21,
2664:1, 2705:9,
2705:12, 2705:17,
2705:18, 2706:15,
2707:8, 2707:10,
2707:15, 2707:18,
2707:24, 2708:9,
2708:11, 2708:14,
2708:18, 2709:19,
2710:4, 2710:6,
2711:4, 2711:16,
2711:18, 2711:22,
2712:7, 2712:9,
2713:6, 2713:14,
2714:2, 2714:6,
2715:9, 2715:11,
2715:14, 2715:16,
2715:21, 2716:3,
2717:7, 2717:10,
2717:12, 2717:15,
2717:18, 2718:12,
2718:13, 2718:15,
2718:18, 2718:20,
2718:22, 2718:24,
2719:1, 2719:3,
2719:5, 2727:2,
2727:5, 2727:7,
2727:11, 2727:14,
2727:22, 2728:7,

2728:18
**themselves** [2] -
2597:24, 2654:5
**theories** [1] - 2678:9
**theory** [1] - 2645:5
**therapy** [2] - 2606:21,
2606:23
**thereafter** [1] - 2646:4
**therefore** [3] -
2649:19, 2691:12,
2710:12
**thin** [1] - 2594:14
**thinking** [1] - 2706:23
**third** [10] - 2671:21,
2679:23, 2680:8,
2680:23, 2686:2,
2689:9, 2690:23,
2691:5, 2706:19,
2728:10
**THIS** [1] - 2581:7
**Thompson** [10] -
2607:6, 2607:7,
2607:12, 2607:13,
2607:20, 2607:24,
2608:1, 2614:3,
2632:10, 2632:15
**Thompson's** [1] -
2607:15
**thorough** [1] -
2714:12
**thoughts** [1] - 2652:17
**thousand** [4] -
2590:25, 2591:2,
2591:3, 2599:22
**thousands** [1] -
2665:8
**THREE** [1] - 2582:7
**three** [26] - 2601:23,
2605:4, 2607:21,
2609:5, 2611:25,
2615:18, 2616:21,
2631:23, 2635:11,
2638:16, 2640:9,
2654:2, 2656:5,
2657:22, 2670:23,
2678:9, 2678:13,
2679:2, 2688:16,
2689:13, 2689:20,
2689:23, 2705:19,
2714:14, 2715:15,
2715:17
**three-day** [1] -
2714:14
**three-quarter-inch** [1]
- 2654:2
**threshold** [5] -
2590:24, 2599:21,
2606:11, 2639:19
**throat** [2] - 2601:23,
2602:23

**throw** [1] - 2658:3
**thrown** [1] - 2649:6
**Thursday** [3] -
2584:16, 2711:6,
2713:11
**tilted** [1] - 2655:4
**tilting** [1] - 2612:12
**timer** [1] - 2586:24
**tin** [1] - 2594:3
**tingling** [2] - 2620:2,
2620:8
**tiny** [1] - 2595:13
**tip** [1] - 2600:16
**tired** [1] - 2619:23
**tissue** [1] - 2628:14
**tissues** [1] - 2628:15
**TO** [3] - 2581:7,
2584:4, 2717:4
**tobacco** [1] - 2610:1
**today** [11] - 2621:19,
2621:25, 2622:5,
2640:13, 2695:19,
2705:7, 2714:13,
2714:19, 2719:13,
2724:5, 2727:4
**together** [6] - 2685:22,
2690:7, 2700:21,
2720:24, 2721:3
**tomorrow** [1] - 2728:6
**tongue** [1] - 2622:13
**took** [14] - 2589:13,
2597:7, 2599:7,
2603:21, 2606:1,
2606:19, 2619:1,
2625:5, 2636:11,
2636:16, 2644:23,
2657:13, 2657:14
**top** [3] - 2701:17,
2705:20, 2706:5
**topics** [2] - 2711:10,
2712:21
**total** [6] - 2584:19,
2584:20, 2687:18,
2687:21, 2703:21,
2704:9
**touching** [1] - 2641:20
**Touro** [1] - 2626:5
**tox** [1] - 2608:22
**toxic** [1] - 2601:11
**Toxic** [1] - 2604:9
**toxicity** [1] - 2590:24
**toxicologist** [1] -
2623:11
**toxicologists** [2] -
2651:24, 2660:17
**toxicology** [2] -
2604:16, 2660:13
**Toxicology** [1] -
2602:6
**toxin** [1] - 2591:4

**toxins** [1] - 2601:17
**tract** [1] - 2605:16
**tracts** [1] - 2608:21
**TRAILER** [1] - 2581:4
**Trailer** [1] - 2669:10
**trailer** [202] - 2587:22,
2590:8, 2590:9,
2592:11, 2592:21,
2592:22, 2593:1,
2593:8, 2593:25,
2594:1, 2594:5,
2594:20, 2595:4,
2595:6, 2595:12,
2595:17, 2595:20,
2596:22, 2597:9,
2597:12, 2597:15,
2598:21, 2598:24,
2599:4, 2599:10,
2599:11, 2603:6,
2604:25, 2605:14,
2607:22, 2610:2,
2611:9, 2611:13,
2611:23, 2612:19,
2612:21, 2612:25,
2613:1, 2615:6,
2615:11, 2616:24,
2617:3, 2617:25,
2618:3, 2618:5,
2618:7, 2618:16,
2618:18, 2618:22,
2619:23, 2620:13,
2621:22, 2621:24,
2625:15, 2625:21,
2626:2, 2627:7,
2627:8, 2627:10,
2628:20, 2629:16,
2629:23, 2629:25,
2630:4, 2631:9,
2631:10, 2632:23,
2633:5, 2633:25,
2634:25, 2635:2,
2635:6, 2635:7,
2635:22, 2636:14,
2636:15, 2636:18,
2636:19, 2636:23,
2637:2, 2637:7,
2637:14, 2637:19,
2637:22, 2639:6,
2639:7, 2639:25,
2640:14, 2641:2,
2641:9, 2643:3,
2643:4, 2643:9,
2643:14, 2643:19,
2643:21, 2643:23,
2643:24, 2644:4,
2644:5, 2644:13,
2644:15, 2644:16,
2644:20, 2644:23,
2644:24, 2645:1,
2645:3, 2645:6,

2645:9, 2645:15,
2645:17, 2645:22,
2646:5, 2646:10,
2647:10, 2647:15,
2648:5, 2648:7,
2648:14, 2648:15,
2648:19, 2649:2,
2649:11, 2649:14,
2649:16, 2650:8,
2650:24, 2655:7,
2655:25, 2656:8,
2656:13, 2656:15,
2656:16, 2658:15,
2659:3, 2659:9,
2659:21, 2659:23,
2660:1, 2661:24,
2662:4, 2662:5,
2665:19, 2665:24,
2666:2, 2666:6,
2666:8, 2666:10,
2666:13, 2668:1,
2668:13, 2668:16,
2669:3, 2669:15,
2669:24, 2669:25,
2670:2, 2670:5,
2670:8, 2670:14,
2670:15, 2670:19,
2670:22, 2671:1,
2671:2, 2671:6,
2671:7, 2671:8,
2671:9, 2671:20,
2671:21, 2671:25,
2672:2, 2672:5,
2672:6, 2678:2,
2684:5, 2684:12,
2684:14, 2689:5,
2689:7, 2689:17,
2689:19, 2701:20,
2701:23, 2702:1,
2702:3, 2702:9,
2702:16, 2702:20,
2703:9, 2717:22,
2717:24, 2718:1,
2718:3, 2718:7
**trailer's** [1] - 2672:17
**trailers** [37] - 2589:15,
2589:17, 2589:19,
2590:7, 2590:20,
2591:7, 2591:22,
2593:6, 2593:7,
2593:20, 2594:12,
2595:15, 2597:6,
2604:22, 2615:25,
2616:2, 2616:4,
2616:7, 2616:12,
2649:13, 2649:18,
2650:4, 2650:12,
2651:14, 2651:15,
2651:20, 2654:14,
2654:16, 2656:9,
2657:10, 2658:11,

2658:18, 2665:8,
2665:16, 2669:7,
2669:8, 2671:12
**training** [1] - 2675:2
**TRANSCRIPT** [2] -
2581:12, 2582:24
**transcript** [1] -
2729:14
**transpired** [1] - 2725:2
**Transportation** [1] -
2658:19
**travel** [41] - 2587:22,
2589:15, 2589:17,
2590:20, 2591:7,
2591:22, 2592:11,
2592:22, 2593:20,
2594:4, 2594:12,
2603:6, 2611:8,
2612:18, 2645:3,
2649:13, 2649:14,
2654:14, 2654:16,
2657:10, 2658:11,
2658:15, 2658:18,
2659:9, 2665:8,
2665:16, 2665:19,
2665:24, 2666:2,
2666:6, 2666:13,
2668:13, 2669:3,
2669:8, 2670:2,
2671:11, 2672:2,
2672:4, 2672:6,
2672:17, 2678:2
**Travel** [1] - 2669:10
**traveling** [1] - 2618:21
**Travis** [1] - 2634:18
**Treat** [1] - 2630:9
**treated** [7] - 2605:8,
2605:19, 2629:11,
2629:18, 2656:18,
2661:15, 2676:23
**treater** [1] - 2613:25
**treating** [4] - 2620:16,
2629:4, 2629:15,
2629:17
**treatment** [1] - 2696:7
**treats** [1] - 2675:23
**TRIAL** [1] - 2581:12
**trial** [31] - 2587:5,
2587:6, 2587:14,
2611:8, 2612:11,
2614:21, 2618:2,
2621:19, 2653:20,
2664:5, 2664:17,
2664:19, 2664:21,
2665:4, 2672:20,
2672:22, 2672:25,
2673:3, 2673:22,
2674:2, 2674:5,
2674:12, 2674:25,
2675:11, 2675:14,

2675:18, 2700:18,
2713:24, 2714:20,
2725:21
**tried** [7] - 2607:13,
2607:22, 2642:9,
2709:24, 2720:24,
2724:10, 2728:11
**true** [5] - 2603:17,
2618:17, 2661:19,
2698:3, 2729:13
**truly** [1] - 2654:17
**trust** [2] - 2638:22,
2640:4
**truth** [8] - 2598:17,
2598:18, 2614:21,
2616:20, 2618:6,
2625:25, 2626:18,
2699:22
**truthful** [1] - 2598:13
**try** [12] - 2587:1,
2609:23, 2610:7,
2632:24, 2659:10,
2709:21, 2716:3,
2719:20, 2720:2,
2720:5, 2723:15,
2724:10
**trying** [9] - 2592:12,
2601:25, 2608:2,
2608:4, 2621:6,
2649:21, 2653:21,
2697:15, 2720:5
**tumor** [5] - 2602:2,
2602:3, 2602:23,
2659:20, 2660:12
**turbinate** [1] - 2621:1
**turn** [4] - 2619:19,
2649:22, 2721:25
**turned** [1] - 2671:3
**twice** [1] - 2643:15
**Twilight** [1] - 2713:23
**Twitter** [1] - 2700:8
**two** [58] - 2584:20,
2585:17, 2585:20,
2586:16, 2598:11,
2607:21, 2613:19,
2614:13, 2614:21,
2617:6, 2617:10,
2620:24, 2625:10,
2625:20, 2625:21,
2626:4, 2627:4,
2627:5, 2627:18,
2630:17, 2633:1,
2633:5, 2637:19,
2638:18, 2639:11,
2642:11, 2644:16,
2648:14, 2650:21,
2653:2, 2654:22,
2654:24, 2656:19,
2656:25, 2664:17,
2671:8, 2676:11,

2678:12, 2678:23,
2682:8, 2682:19,
2683:14, 2688:15,
2689:19, 2696:24,
2705:8, 2705:19,
2709:9, 2714:20,
2719:12, 2719:13,
2719:19, 2719:24,
2719:25, 2722:23,
2723:13, 2723:20,
2723:21
**two-week** [3] -
2614:21, 2719:25,
2723:21
**TX** [3] - 2581:21,
2581:24, 2582:8
**type** [1] - 2601:2
**types** [1] - 2676:11
**typically** [1] - 2707:21
**typo** [2] - 2663:14,
2705:19
**typos** [2] - 2662:22,
2708:24
**Tyshon** [4] - 2633:21,
2647:13, 2648:1,
2650:24

**U**

**U.S** [2] - 2609:8,
2669:14
**ultimately** [2] -
2609:20, 2666:2
**unanimous** [1] -
2700:18
**unaware** [1] - 2689:20
**unchanged** [1] -
2625:11
**under** [27] - 2588:1,
2593:20, 2597:10,
2619:9, 2645:9,
2648:17, 2664:20,
2667:24, 2668:19,
2675:11, 2675:13,
2675:16, 2678:3,
2678:6, 2678:10,
2682:13, 2684:23,
2685:6, 2689:5,
2696:13, 2698:8,
2705:23, 2706:5,
2706:9, 2710:17,
2726:17
**underneath** [2] -
2654:2, 2701:16
**understate** [1] -
2607:3
**understood** [1] -
2588:9
**undiagnosed** [1] -

2627:15
**unduly** [1] - 2674:17
**unfortunately** [1] -
2649:20
**unhappy** [1] - 2721:18
**unit** [27] - 2588:20,
2588:24, 2589:2,
2591:13, 2592:7,
2611:4, 2634:4,
2638:9, 2638:10,
2639:4, 2655:19,
2657:21, 2657:25,
2658:2, 2658:13,
2658:21, 2658:25,
2666:16, 2667:2,
2667:3, 2667:10,
2668:9, 2670:20,
2671:18, 2672:10,
2678:1
**United** [7] - 2665:10,
2668:20, 2676:21,
2695:5, 2704:5,
2729:12, 2729:22
**UNITED** [2] - 2581:1,
2581:13
**units** [17] - 2587:25,
2588:1, 2588:15,
2591:10, 2591:18,
2592:25, 2593:11,
2593:23, 2596:17,
2638:7, 2638:22,
2640:6, 2656:24,
2657:23, 2657:25,
2665:13, 2671:16
**unless** [9] - 2586:25,
2658:11, 2673:12,
2677:7, 2691:10,
2698:2, 2700:22,
2704:25, 2725:5
**unlike** [2] - 2600:13,
2720:15
**unlikely** [1] - 2725:10
**unreasonable** [12] -
2616:18, 2616:22,
2617:4, 2682:22,
2683:8, 2685:1,
2685:2, 2689:22,
2690:25, 2698:22,
2705:20
**unreasonably** [43] -
2592:16, 2592:19,
2592:20, 2592:21,
2593:1, 2593:17,
2612:8, 2612:19,
2612:22, 2613:5,
2615:7, 2615:9,
2615:11, 2615:14,
2615:17, 2615:22,
2616:19, 2617:1,
2640:10, 2658:21,

2659:1, 2678:8,
2678:11, 2678:12,
2678:14, 2678:16,
2678:25, 2679:9,
2679:20, 2680:10,
2680:20, 2681:5,
2685:9, 2698:14,
2701:21, 2701:24,
2702:2, 2702:8,
2702:16, 2717:22,
2717:25, 2718:2
**unrelated** [2] -
2632:11, 2646:5
**unremarkable** [1] -
2625:22
**unrest** [1] - 2651:22
**unsafe** [2] - 2689:22,
2690:25
**unsupported** [1] -
2677:19
**untrue** [1] - 2610:8
**unusual** [2] - 2602:4,
2628:14
**up** [64] - 2584:18,
2585:13, 2585:16,
2586:24, 2587:17,
2588:8, 2588:9,
2590:7, 2595:1,
2597:24, 2598:21,
2599:17, 2599:19,
2601:10, 2603:19,
2604:19, 2604:20,
2604:22, 2605:3,
2610:4, 2611:4,
2614:14, 2614:15,
2617:16, 2619:22,
2625:16, 2628:8,
2632:16, 2638:6,
2638:15, 2638:22,
2641:17, 2641:19,
2641:21, 2642:6,
2644:16, 2645:16,
2652:16, 2653:9,
2653:11, 2656:14,
2657:25, 2659:7,
2659:8, 2659:14,
2669:15, 2669:25,
2675:6, 2690:19,
2699:18, 2703:21,
2706:19, 2711:5,
2714:14, 2714:20,
2716:1, 2716:3,
2719:13, 2720:18,
2722:23, 2723:24,
2724:22, 2724:25,
2725:21
**upcoming** [1] -
2728:25
**Uptown** [1] - 2606:7
**urea** [2] - 2668:13,

2668:14
**urgency** [2] - 2728:9,
2728:12
**user** [5] - 2681:7,
2681:22, 2682:8,
2682:17, 2682:19
**users** [5] - 2680:5,
2680:16, 2681:15,
2684:1, 2684:4
**uses** [1] - 2608:3
**utilities** [2] - 2669:4,
2670:10
**utility** [1] - 2679:17
**utilized** [2] - 2595:22,
2595:24

## V

**vacancy** [1] - 2635:6
**vacate** [1] - 2635:7
**valid** [1] - 2607:4
**validity** [3] - 2607:1,
2607:16
**valuable** [2] - 2695:19,
2695:21
**value** [6] - 2695:7,
2695:14, 2696:2,
2696:6, 2697:13,
2697:15
**values** [1] - 2604:21
**Vanessa** [2] - 2637:18,
2648:2
**variety** [2] - 2594:1,
2594:2
**various** [2] - 2644:9,
2687:20
**vehicle** [2] - 2593:9,
2593:18
**vent** [6] - 2597:5,
2639:3, 2644:25,
2672:4, 2672:7,
2672:12
**ventilate** [4] - 2634:9,
2650:5, 2650:7,
2671:18
**ventilated** [3] -
2595:5, 2638:17,
2668:1
**ventilation** [3] -
2634:8, 2634:10,
2634:13
**verdict** [49] - 2612:4,
2615:4, 2640:24,
2654:20, 2662:20,
2663:16, 2674:9,
2689:14, 2689:24,
2691:16, 2697:8,
2700:10, 2700:18,
2700:20, 2701:9,

2701:17, 2703:3,
2703:5, 2703:13,
2703:14, 2704:23,
2704:24, 2708:23,
2709:4, 2709:14,
2709:16, 2709:17,
2709:19, 2709:23,
2712:13, 2712:19,
2712:24, 2714:24,
2717:16, 2717:19,
2718:8, 2718:13,
2718:15, 2718:18,
2718:20, 2718:22,
2718:24, 2719:1,
2719:3, 2719:7,
2721:21, 2727:15,
2727:20
**VERDICT** [1] -
2717:11
**VERDICT**..................
........................... [1]
- 2583:13
**verifying** [1] - 2655:17
**version** [3] - 2705:15,
2705:18, 2710:3
**via** [1] - 2666:16
**Viagra** [3] - 2620:4,
2627:19, 2628:10
**victim** [2] - 2611:10
**video** [3] - 2592:10,
2657:5, 2672:24
**videographic** [1] -
2672:24
**videotaped** [1] -
2675:9
**VIN** [2] - 2666:11,
2708:12
**vinyl** [2] - 2594:8,
2657:11
**viral** [1] - 2619:24
**virtually** [1] - 2594:8
**visit** [6] - 2629:1,
2629:2, 2631:16,
2631:18, 2632:8,
2724:5
**visits** [1] - 2631:23
**visualize** [1] - 2661:6
**voids** [1] - 2657:2
**volume** [2] - 2595:12
**vote** [1] - 2726:18
**voting** [1] - 2721:23

## W

**wait** [3] - 2603:12,
2610:13, 2715:5
**wake** [1] - 2589:16
**walk** [2] - 2655:5,
2670:13

**walk-through** [1] -
2670:13
**wall** [6] - 2594:20,
2635:5, 2635:8,
2635:11, 2650:25,
2656:1
**walls** [3] - 2589:2,
2595:1, 2725:3
**wants** [2] - 2654:22,
2712:15
**warn** [14] - 2592:2,
2597:7, 2597:21,
2613:13, 2652:6,
2654:7, 2655:14,
2655:15, 2660:5,
2683:21, 2684:4,
2691:2, 2710:25,
2711:2
**warned** [2] - 2650:21,
2651:18
**warning** [48] -
2584:24, 2585:3,
2585:6, 2585:14,
2592:20, 2602:14,
2612:23, 2615:18,
2634:23, 2634:24,
2635:2, 2635:15,
2636:8, 2636:10,
2636:13, 2636:17,
2650:24, 2651:5,
2651:6, 2651:21,
2653:15, 2655:24,
2656:20, 2659:14,
2678:13, 2680:5,
2680:6, 2680:10,
2680:16, 2681:4,
2681:7, 2681:14,
2681:21, 2682:7,
2682:12, 2682:14,
2682:16, 2682:23,
2685:10, 2691:4,
2702:2, 2702:3,
2718:3
**warnings** [4] -
2599:11, 2649:9,
2650:22, 2651:19
**warns** [3] - 2689:9,
2689:10, 2706:6
**warranty** [1] - 2657:3
**watch** [3] - 2588:21,
2719:19, 2720:3
**water** [7] - 2596:24,
2597:10, 2639:7,
2669:5, 2670:11,
2672:11
**watery** [1] - 2628:6
**Watts** [1] - 2623:13
**WATTS** [2] - 2582:6,
2582:6
**ways** [1] - 2709:22

**weakness** [2] - 2661:4, 2696:17
**wear** [2] - 2682:5, 2683:4
**weather** [2] - 2672:13, 2672:15
**web** [1] - 2700:7
**week** [1] - 2598:9, 2598:10, 2614:21, 2617:15, 2617:18, 2617:20, 2617:21, 2658:1, 2663:2, 2719:25, 2723:21
**weekend** [1] - 2641:23
**weeks** [15] - 2586:16, 2633:14, 2642:11, 2656:18, 2656:19, 2705:8, 2709:9, 2714:20, 2719:12, 2719:13, 2719:19, 2719:24, 2722:24, 2723:13, 2723:20
**weigh** [2] - 2685:2, 2699:2
**weight** [11] - 2600:13, 2606:9, 2627:21, 2627:25, 2659:9, 2673:13, 2673:15, 2674:18, 2674:20, 2675:24, 2677:2
**welcome** [1] - 2710:5
**wheels** [1] - 2659:9
**wheezing** [3] - 2620:2, 2620:10, 2629:3
**whereas** [1] - 2601:8
**wherein** [1] - 2656:4
**WHEREUPON** [9] - 2584:8, 2662:17, 2663:19, 2663:23, 2705:10, 2716:5, 2717:8, 2727:12, 2729:2
**white** [7] - 2635:18, 2635:19, 2635:25, 2636:5, 2648:24
**WHITFIELD** [4] - 2582:17, 2708:6, 2708:10, 2708:17
**whole** [3] - 2639:8, 2665:2, 2693:14
**wide** [1] - 2693:3
**width** [1] - 2666:14
**wife** [1] - 2649:24
**Williams** [11] - 2602:5, 2606:15, 2609:11, 2609:12, 2610:5, 2621:11, 2622:6, 2622:8, 2623:19, 2660:16
**win** [1] - 2692:4

**windows** [9] - 2595:7, 2596:23, 2633:18, 2634:1, 2634:5, 2634:9, 2638:15, 2649:22, 2657:19
**wins** [1] - 2693:19
**winterization** [1] - 2669:5
**wish** [1] - 2639:23
**withdraw** [2] - 2625:3, 2625:5
**witness** [21] - 2603:19, 2611:7, 2638:5, 2673:18, 2673:20, 2673:23, 2673:24, 2674:20, 2674:22, 2674:24, 2675:3, 2675:6, 2675:11, 2675:12, 2675:13, 2675:16, 2675:21, 2676:7, 2676:10, 2677:17
**witness'** [2] - 2675:13, 2725:18
**witnesses** [11] - 2586:16, 2589:7, 2593:3, 2600:20, 2620:14, 2640:5, 2644:23, 2673:15, 2676:8, 2677:8, 2696:6
**wonder** [1] - 2653:20
**wondered** [1] - 2642:7
**wood** [5] - 2594:7, 2595:11, 2595:21, 2638:1, 2657:12
**word** [12] - 2598:6, 2643:6, 2661:18, 2663:14, 2664:9, 2705:24, 2705:25, 2708:7, 2708:11, 2708:15, 2708:20
**wording** [1] - 2673:19
**words** [7] - 2631:7, 2641:14, 2677:3, 2684:20, 2685:13, 2686:13, 2719:8
**worker** [1] - 2598:8
**workers** [1] - 2605:2
**workforce** [1] - 2604:13
**workmanship** [1] - 2588:2
**Workplace** [3] - 2667:22, 2668:4, 2668:8
**workplace** [3] - 2629:20, 2719:18, 2719:19
**works** [2] - 2642:12,

2654:22
**Worley** [4] - 2599:18, 2626:9, 2661:13, 2661:17
**Worley's** [2] - 2626:9, 2656:17
**worried** [1] - 2651:7
**worry** [1] - 2697:24
**worst** [2] - 2587:15, 2654:23
**worth** [2] - 2695:11, 2714:17
**wrap** [1] - 2652:16
**WRIGHT** [1] - 2581:16
**Wright** [128] - 2587:4, 2597:2, 2598:6, 2600:5, 2601:22, 2602:8, 2606:19, 2606:22, 2607:2, 2607:18, 2608:2, 2610:2, 2612:19, 2612:22, 2613:3, 2613:10, 2613:20, 2615:7, 2617:12, 2617:15, 2617:17, 2617:24, 2618:2, 2618:4, 2618:9, 2618:23, 2619:12, 2619:19, 2619:22, 2620:23, 2621:9, 2623:8, 2624:10, 2625:21, 2626:23, 2627:6, 2627:10, 2628:3, 2628:21, 2628:23, 2629:9, 2630:3, 2630:8, 2630:18, 2630:24, 2631:14, 2631:20, 2631:22, 2632:3, 2632:15, 2632:20, 2633:11, 2633:20, 2634:16, 2635:6, 2635:8, 2635:13, 2635:14, 2635:24, 2636:10, 2636:13, 2636:19, 2636:22, 2637:3, 2637:14, 2638:10, 2639:4, 2640:7, 2640:12, 2641:6, 2641:9, 2642:19, 2642:21, 2642:25, 2643:12, 2643:19, 2643:20, 2644:5, 2644:10, 2644:12, 2646:1, 2647:9, 2647:11, 2647:14, 2647:15, 2647:17, 2648:1, 2648:11, 2649:3, 2650:5, 2651:6,

2653:3, 2654:21, 2655:6, 2655:23, 2655:6, 2666:2, 2666:12, 2668:16, 2669:15, 2670:20, 2672:10, 2677:25, 2692:16, 2693:19, 2696:11, 2701:20, 2701:21, 2701:24, 2702:2, 2702:14, 2702:20, 2703:6, 2703:9, 2704:4, 2704:7, 2704:14, 2704:16, 2704:17, 2704:20, 2717:22, 2717:25, 2718:2, 2718:7
**Wright's** [14] - 2618:8, 2619:6, 2619:8, 2623:18, 2627:3, 2628:18, 2630:16, 2632:14, 2634:20, 2635:2, 2638:9, 2641:2, 2649:15, 2692:18
**write** [2] - 2590:7, 2637:3
**writing** [1] - 2701:6
**writings** [1] - 2608:14
**written** [5] - 2629:13, 2700:19, 2700:21, 2701:4, 2707:4
**wrongful** [2] - 2693:25, 2698:7
**wrote** [3] - 2637:3, 2637:6

**Y**

**y'all** [1] - 2708:19
**yard** [6] - 2590:10, 2655:20, 2666:8, 2669:15, 2669:16, 2672:1
**yards** [3] - 2589:25, 2597:2, 2671:19
**year** [3] - 2604:22, 2639:6, 2660:10
**years** [23] - 2588:9, 2588:10, 2594:4, 2601:23, 2602:11, 2605:7, 2611:25, 2623:11, 2625:21, 2627:2, 2630:16, 2631:2, 2642:3, 2656:5, 2656:20, 2656:25, 2657:14, 2657:15, 2657:17, 2657:19, 2657:22, 2660:3, 2671:9

**yellow** [1] - 2651:1
**Young** [1] - 2654:13
**young** [2] - 2604:14, 2630:13
**yourself** [3] - 2655:6, 2674:21, 2699:14
**yourselves** [1] - 2722:9
**YouTube** [1] - 2700:8

**Z**

**zero** [6] - 2607:17, 2641:19, 2652:25, 2703:18, 2703:25, 2704:3
**zone** [2] - 2591:8, 2658:17
**Zone** [1] - 2713:23