1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  FEMA TRAILER          *    Docket MDL 1873 "N"
     FORMALDEHYDE PRODUCTS         *
6    LIABILITY LITIGATION          *    New Orleans, Louisiana
                                   *
7    THIS DOCUMENT IS RELATED TO:  *    September 14, 2009
                                   *
8    CHARLIE AGE, ET AL V          *    12:45 P.M.
     GULF STREAM COACH, INC.,      *
9    ET AL, DOCKET NO. 09-2892;    *
     ALANA ALEXANDER, INDIVIDUALLY *
10   AND ON BEHALF OF              *
     CHRISTOPHER COOPER            *
11   * * * * * * * * * * * * * * * *

12                          DAY 1
                       AFTERNOON SESSION
13            JURY TRIAL PROCEEDINGS BEFORE THE
                 HONORABLE KURT D. ENGELHARDT
14               UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16

17   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer
18                              BY:  GERALD E. MEUNIER, ESQ.
                                1100 Poydras Street
19                              Suite 2800
                                New Orleans, Louisiana 70163
20

21                              The Buzbee Law Firm
                                BY:  ANTHONY G. BUZBEE, ESQ.
22                              JP Morgan Chase Tower
                                600 Travis, Suite 7300
23                              Houston, Texas  77002

24

25

1   <u>APPEARANCES</u>:

2   For the Plaintiffs:          Watts Guerrs Craft
                                 BY:  MIKAL C. WATTS, ESQ.
3                                Four Dominion Drive
                                 Building Three, Suite 100
4                                San Antonio, Texas  78257

5
                                 Hilliard Munoz Guerra
6                                BY:  ROBERT C. HILLIARD, ESQ.
                                 710 S. Shoreline Boulevard #500
7                                Corpus Christi, Texas  78401

8
                                 CHRIS PINEDO, ESQ.
9                                Attorney at Law
                                 802 North Carancahua
10                               Suite 2250
                                 Corpus Christi, Texas  78470
11

12  For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                   & Morton
13                               BY:  ANDREW D. WEINSTOCK, ESQ.
                                 BY:  JOSEPH G. GLASS, ESQ.
14                               3838 N. Causeway Blvd.
                                 Suite 2900
15                               Metairie, Louisiana 70002

16
                                 Scandurro & Layrisson
17                               BY:  TIMOTHY SCANDURRO, ESQ.
                                 607 St. Charles Avenue
18                               New Orleans, Louisiana  70130

19
    For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                               BY:  CHARLES R. PENOT, JR., ESQ.
                                 BY:  RICHARD A. SHERBURNE, ESQ.
21                               BY:  SONIA MALLETT, ESQ.
                                 717 North Harwood
22                               Dallas, Texas  75201

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1  APPEARANCES:

2
   Official Court Reporter:      Jodi Simcox, RMR, FCRR
3                                500 Poydras Street
                                 Room HB-406
4                                New Orleans, Louisiana 70130
                                 (504) 589-7780
5

6

7

8  Proceedings recorded by mechanical stenography, transcript

9  produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                        <u>Page</u>

3
OPENING STATEMENTS
4       Anthony Buzbee, Esq.                             140
        Andrew Weinstock, Esq.                           155
5       Charles Penot, Esq.                              168

6   ERIKA ALEXANDER
        Direct Examination                               174
7       Cross-Examination                                192
        Cross-Examination                                204
8       Redirect Examination                             206

9   GERALD MCGWIN
        Direct Examination                               211
10      Cross-Examination                                241
        Redirect Examination                             256
11
    CHRISTOPHER DEROSA
12      Examination                                      265

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **AFTERNOON SESSION**

2                    **(September 14, 2009)**

3                        * * * * *

4           **THE DEPUTY CLERK:**  All rise.

5           (WHEREUPON, the following proceedings were held at

6      the bench.)

7           **THE COURT:**  I need to be clear on the Batson

8      challenge ruling.  First of all, with regard to the first three

9      peremptories exercised by the defendant, I specifically found

10     that there were race neutral reasons for the exercise of those

11     challenges.  As to the fifth challenge that was exercised, the

12     defendants on their own motion withdrew that challenge.

13               As to the fourth, which was Mr. Franklin who we

14     questioned up here, I think that it's arguable whether or not

15     sufficient race neutral reasons were stated with regard to

16     Mr. Franklin.  And in an abundance of caution, I granted the

17     motion insofar as Mr. Franklin was concerned.

18               However, because of the reasons stated by the

19     defendants, I felt it prudent in fashioning a remedy to afford

20     options to the defendant and also to satisfy the Batson

21     challenge; thus I included two additional African American

22     jurors with whom the defendant could choose to exercise a

23     challenge.

24               In other words, the defendants got a net plus

25     one peremptory in the deal.  And I say the "deal," it wasn't a

1   deal that you-all agreed to.  It's a remedy that I fashioned.

2   So the defendants got a plus one peremptory challenge.

3          (WHEREUPON, the following proceedings were held in

4   open court.)

5          **THE COURT:**  Could we have some quiet, please.  Please

6   be seated and please be quiet.  If you need to talk, go

7   outside.

8          (WHEREUPON, the following proceedings were held at

9   the bench.)

10         **THE COURT:**  The defendants -- the net was that

11  Mr. Franklin's challenge was utilized as the fourth challenge.

12         I gave the defendants two other jurors in

13  addition to Mr. Franklin to choose from, and they were given an

14  additional peremptory challenge, and they were limited in their

15  use to one of the other jurors that had already been selected.

16  My feeling in doing that was that it was an appropriate remedy

17  and we'd wind up with nine fair-minded jurors to hear this

18  case.

19         All right.  The other reason in my thinking, is

20  that this is a bellwether trial, and that fact has been

21  significant for me during the course of trial preparation.  And

22  to have a jury that is of arguable composition to hear a

23  bellwether trial would result in a verdict that would not be

24  considered a serious verdict by any of the parties, or

25  whichever party, I should say, was on the wrong end of that

1  verdict.

2              So I think that the remedy that I fashioned is a

3  fair and equitable one.  To the extent that I need to rule on

4  the record on the Batson motion, I'm granting it in part and

5  denying it in part insofar as the jurors whom I've identified

6  as to the defendant's challenges 4 and 5.

7              I don't know how much clearer that makes it, but

8  I felt the need to go ahead and expand on what I put on the

9  record before so that whichever of you decides you want this

10 issue reviewed by the Court of Appeal, they would have the

11 benefit of my thinking with regard to the motion.

12             Plaintiffs have maintained their objection for

13 the sake of preserving it for appeal, and I understand that.  I

14 appreciate the efforts of the defendant to try to work through

15 it in withdrawing the challenge to No. 5 --

16        **MR. WATTS:**  The fifth challenge.

17        **THE COURT:**  The fifth challenge.  I think that I've

18 reached a solution that is a fair and equitable one, and that

19 addresses the concerns that are outlined in the Supreme Court

20 in Batson, and the cases that follow Batson.

21             All right.  Having said that, I have been

22 advised that after all of that, Ms. Rachel Morris has

23 transportation problems and is indicating that she will not be

24 able to be on this jury.  I have not spoken with her.  I intend

25 to visit with her about it.

1           We cannot put anybody else on this jury.  I told

2    you-all that we were picking nine and we would going with nine,

3    none would be alternates, but if we lost any, we would go with

4    fewer than nine.  I will visit with her and I will keep you

5    posted.  Hopefully, after I have a discussion with her, she

6    will be able to arrange transportation and serve.  If she does

7    not, we will go with a jury of eight.  Okay.  All right.

8           **MR. GLASS:**  What number is she, Judge?

9           **THE COURT:**  No. 9.  She was D-5 before.  D-5 was

10   withdrawn.  All we can do is all we can do.  We questioned

11   everybody in here, both on the questionnaire and orally,

12   several times about problems serving on this jury.

13          So I can't help you-all and I can't help her on

14   that.  So let's see what she can do.  I will strongly encourage

15   her to arrange transportation when I do visit with her.  But

16   what she does and what she is able to do, we'll see.

17          All right.  Let's go.

18          (WHEREUPON, the following proceedings were held in

19   open court.)

20          **MR. BUZBEE:**  Your Honor, are you going to invoke 615

21   before opening, the sequestered witnesses?  Can they sit in

22   through the opening or --

23          **THE COURT:**  I would rather only them for the

24   testimony.

25          **MR. BUZBEE:**  So you want them out now?

 1          **THE COURT:**  Yes.  If there are any witnesses here --

 2     anyone who's going to be a witness, if they could step outside,

 3     please.

 4          (WHEREUPON, the jury entered the courtroom.)

 5          **THE COURT:**  You may be seated.  All right.  Ladies

 6     and gentlemen of the jury, we told you you would come back and

 7     hear opening statements, and that's exactly what you are going

 8     to hear shortly.

 9          Let me ask counsel, let us have a stipulation

10     with regard to exhibits to which there's no objection.

11     Counsel, would you like to go ahead and take the laboring oar

12     on that?

13          **MR. HILLIARD:**  May I approach, Judge?

14          **THE COURT:**  Yes.  What we're doing now is we're going

15     to introduce exhibits just by number.  This won't mean anything

16     to you right now, because you're just going to hear a bunch of

17     numbers.  You will see these exhibits, and they won't need to

18     be introduced at that time.  So this will save us some time.

19     Go ahead.

20          **MR. HILLIARD:**  Your Honor, may it please the Court,

21     by agreement, plaintiffs, Fluor and Gulf Stream move for the

22     admission of the following exhibits:  2, 6 through 14, 16

23     through 27, 35, 41, 42 --

24          **THE COURT:**  Wait.  Slow down just a little bit.  41,

25     42.

1           **MR. HILLIARD:**  Yes, sir.  44, 46, 48, 50 through 53,
2    57 through 59, 98, 101 through 104, 107, 108, 110-A, 111-A,
3    119, 124, 144 through 151, 155, 156, 159, 160 through 163, 165,
4    184 through 187, 192, 193, 204, 232, 233, 264, 282, 283, 304,
5    305.1, 305.2, 305.3, 310, 323-A, 324, 326, 329, 332, 333, 336,
6    338, 341, 345, 354, 348, 374, 375, 387, 389, 398, 400, 402
7    through 412, 417, 421, 423 through 425, 436 through 438, 440,
8    444, 449, 450, 459, 462, 465, 467, 468, 470 through 472, 475,
9    477, 484, 486, 490, 492 through 495, 497, 500, 501 through 503,
10   507.
11          Your Honor, the following exhibit numbers were
12   objected to and overruled, and Fluor has asked that that be
13   noted.  And the following exhibits are admitted after Fluor's
14   objections were overruled:  422, 426 through 434, 447, 448, 453
15   through 456, 460, 461, 466, 469 and 492.
16          There's one caveat, Your Honor.  There were two
17   exhibit numbers that were not admitted -- excuse me -- not
18   agreed to, and those were 374 and 375, and I called them out as
19   agreed to.  They are not, 374 --
20          **THE COURT:**  Which ones?
21          **MR. HILLIARD:**  374 and 375.
22          **THE COURT:**  Okay.  Are not to be admitted now?
23          **MR. HILLIARD:**  Not by agreement.
24          **THE COURT:**  Okay.
25          **MR. HILLIARD:**  Thank you, Your Honor.

1          **THE COURT:**  Is that correct, Counsel?  We do have a

2   stipulation as to all these enumerated exhibits?  All counsel?

3          **MR. PENOT:**  Your Honor, there's an issue on 387, 389,

4   and 421, but I doubt they're going to be of any use this

5   afternoon.  And maybe we'll work through it this afternoon, if

6   that's acceptable.

7          **THE COURT:**  Well, we're admitting them now.  If

8   they're objected to, we're going to pull them off the pile

9   here.  What are they now?

10         **MR. PENOT:**  387, 389, and 421.

11         **THE COURT:**  Counsel, I asked you-all to do this at

12  the pretrial conference so that all of this would be covered

13  such that we would not have this type of disagreement upon the

14  entry of this into evidence.  So here we go.

15             Anything else?  Do we have a stipulation as to

16  all others?

17         **UNIDENTIFIED SPEAKER:**  We have three exhibits that

18  were read, Judge, that did not appear on the list.

19         **MR. WEINSTOCK:**  Those are agreed to, Your Honor.

20         **THE COURT:**  All right.  So ordered.  Those are

21  admitted into evidence.

22             Ladies and gentlemen of the jury, you will see

23  these exhibits during the course of the trial, perhaps, but

24  they are now admitted into evidence.

25             Now, I'm also going to read to you a list of

1   stipulated facts.  These facts have been agreed to by the

2   parties and their attorneys as facts that are true.  You need

3   not have any further evidence in order to accept these facts as

4   true, and all counsel are advised that they need not introduce

5   any other evidence to support any of these facts.  These facts

6   are established.

7               No. 1 -- by the way, you'll be given a copy of

8   this at the time of deliberation.

9               No. 1, FEMA has provided thousands of travel

10  trailers to displaced residents following natural disasters in

11  the United States since 1992, including displaced residents

12  from the Gulf Coast region.

13              No. 2, FEMA provided approximately 143,000

14  emergency housing units to families across the Gulf Coast in

15  response to Hurricanes Katrina and Rita.

16              No. 3, FEMA provided plaintiff, Alana Alexander,

17  and her minor son a travel trailer with identification

18  No. 1N61GTR2551021783.

19              No. 4, this travel trailer was manufactured by

20  defendant Gulf Stream Coach, Inc., on or about December the

21  13th, 2004.

22              No. 5, Gulf Stream Coach sold the travel trailer

23  to Best Buy RV on or about December 13th, 2004.

24              No. 6, Gulf Stream travel trailers in 2004 were

25  made with composite wood products, such as plywood,

1    particleboard and fiberboard that contained formaldehyde.

2                    No. 7, Fluor Enterprises, Inc., had a contract

3    with the government to install travel trailers after Hurricanes

4    Katrina and Rita including the travel trailer occupied by

5    Ms. Alexander and her family.

6                    No. 8, in February of 2006, the Gulf Stream

7    trailer was set up at 4415 Dale Street by a subcontractor of

8    one of Fluor's subcontractors.  Ms. Alexander and her family

9    moved into the trailer on May 26th, 2006.

10                   No. 9, on January 28th-29th, 2008, the Gulf

11   Stream trailer which had been occupied by Alana Alexander and

12   her family was tested for formaldehyde.  The average

13   temperature inside the trailer at this time was 71.8 degrees

14   Fahrenheit.  The average indoor humidity was 47 percent, and

15   the level of formaldehyde was 0.050 ppm, or parts per million.

16                   10, Gulf Stream provided no written or oral

17   warnings directly to Alana Alexander or her family regarding

18   the subject of formaldehyde in the travel trailer which they

19   occupied.

20                   11, Christopher Cooper was diagnosed with asthma

21   at age three in 1999.

22                   And No. 12, Alana Alexander has never seen a

23   doctor for formaldehyde-related injuries.

24                   These stipulations are signed by all trial

25   counsel.

1           All right.  Let's get on to our opening

2   statements.  By prior instruction from the Court, the

3   plaintiffs were afford 25 minutes and the defendants were

4   awarded a total of 30 minutes, which they have divided up 20

5   minutes to Gulf Stream and 10 minutes to Fluor.

6           So if you would give counsel your attention, we

7   will go ahead and begin.  I will be the official timekeeper.

8   Counsel, you will get a one-minute warning, and then I'll cut

9   you off when your time expires.  And as I told you before the

10  lunch hour, there is no penalty for finishing before your

11  allotted time.

12          Go ahead, Mr. Buzbee.

13      **MR. BUZBEE:**  May it please the Court.  Ladies and

14  gentlemen, what you don't know can hurt you.  This case is

15  about this family.  Chris Cooper and his mother Alana Alexander

16  lived in a Gulf Stream trailer for 19 months after their home

17  was damaged in Hurricane Katrina.  In that 19 months, this

18  child was exposed to more than 50 times the formaldehyde levels

19  that have been determined safe by the United States Government,

20  and that's what this case is about.

21          You didn't get a chance to really meet Coop.  We

22  call him Coop, Chris Cooper.  He's 12 years old.  He's sitting

23  there by his mother, Alana.  She's the school disciplinarian.

24  She's the person in school who if there's a problem kid, they

25  go to her and she fixes the child, or at least tries to.  He's

 1   a seventh grader.  His sister is Erika.  She's going to be our

 2   first witness.

 3                    He's a bass saxophone player.  And he plays

 4   football, he plays basketball.  He wants to design computer

 5   games when he grows up.  He's a very smart young man, and he's

 6   got big dreams.  But what he's also got, as you'll find out, is

 7   asthma that was made worse because he lived in this defendant's

 8   trailer.

 9                    And you're also going to find out that my

10   PowerPoint's not working.

11                    You know, at the end of this case, you're going

12   to have to decide what that trailer -- living in that trailer

13   for 19 months with levels more than 50 times what is considered

14   safe -- I think my battery's out -- and one of things you're

15   going to have to look at is testimony from a certified legal --

16   or medical specialist who said that Chris already has changes

17   in his nose from living 19 months in that formaldehyde-filled

18   trailer.

19                    And you're also going to find out that this

20   young man with all of his dreams and aspirations has a 17 times

21   more chance, 17 more bullets in the gun, if you will, to get

22   cancer.  I believe this is the most important case that will be

23   tried in Louisiana this year.  It's the formaldehyde trailer

24   case.  What you don't know can hurt you.

25                    Let's talk about formaldehyde real quick.  You

 1  heard of the MSDS.  Formaldehyde is a poison.  It's been found

 2  to be a known carcinogen, meaning it causes cancer.  The EPA

 3  says it's a probable carcinogen, meaning it causes cancer.

 4              The short-term effects, by that I mean, let's

 5  say you go and you get exposed to formaldehyde.  It causes

 6  burning in your eyes and nose, burning throat and nosebleeds,

 7  skin rashes, eczema.  It causes headaches, inability to sleep.

 8  And it's especially problematic for asthmatics, because there's

 9  no dispute in the case that this young man had asthma long

10  before he moved into the trailer.  What you're going to learn

11  and what we will prove to you in the case is that asthma was

12  made much worse because he was in the trailer.

13              Now, the more important thing I want you to

14  focus on with regards to formaldehyde is that it can cause

15  nasal cancer.  That's going to be very important in this case.

16  Because at the end of the case we're going to asking you for

17  monitoring of this young man because he already has the changes

18  in his nose that are pointing in that direction.

19              You're going to find out that formaldehyde at

20  .5 -- and I'm going to write this down, because you're going to

21  hear in this case a lot of ppm's, or parts per million, and a

22  lot of scientists say that .5 parts per million is what they

23  call the odor threshold, meaning there has to be at least .5

24  parts per million in the air for most folks to even smell

25  formaldehyde.

 1          So if it's below that, you may be affected, you
 2   are being exposed, but you won't even know it.
 3          And you're also going to find out about
 4   formaldehyde is that it dulls your sense of smell.  So you'll
 5   smell it -- it's called -- there's fancy words for it, but
 6   olfactory fatigue, they call it, meaning the more you smell it,
 7   the more difficult it is for you to smell it.  The more you're
 8   exposed, the less you realize it.
 9          Carl, this thing isn't working.  This just ain't
10   working.
11          And you're going to also learn that the more
12   you're exposed to formaldehyde, the more sensitive you become
13   to it.  And you're also going to learn that it also affects
14   your immune system.  But, again, remember, we're not talking
15   about the burning of the eyes and the nosebleeds and the
16   headaches.  What we're talking about here is chronic exposure,
17   one year or more.  This young man and his family were exposed
18   for 19 months.
19          You know what they say about technology?  It
20   really can slow you down.  It's supposed to make things easier.
21   But what does it really do?  It makes things a lot harder.
22   Carl, I'm just going to tell you to change the slide.  That's
23   okay, Carl.
24          Now the, Agency for Toxic Substances and Disease
25   Registry -- remember this, I'm going to prove to you in this

1  case, ladies and gentlemen, I will prove that the gold

2  standard, the safe level, is .008 parts per million.  I ask

3  you, respectfully, remember that number.  Every reading, every

4  test, every time you hear a number, I ask you, compare it to

5  the gold standard, because that is the number that the Agency

6  for Toxic Substances and Disease Registry says anything above

7  that, you got a problem, especially for kids, especially for

8  older people, especially for asthmatics.

9           Next slide.  I want to take back -- I know it

10  seems like just yesterday, but it's a long time ago, Hurricane

11  Katrina, August 29th of 2005.  It damaged Alana and Coop's

12  home.  They evacuated, they went to Florida, and they stayed

13  there quite a while with relatives.

14           Next slide, please.  You're going to find out

15  while this family was in Florida, trailers were being deployed

16  to Louisiana, Mississippi, and all parts of the Gulf South.

17  And you're going to find out that almost as soon as the first

18  trailer hit the ground in Louisiana, formaldehyde was already

19  an issue.  In the spring of 2006, the first confirmed complaint

20  came in to this defendant, Gulf Stream, the maker of this

21  trailer.

22           And the complaint was, there's a strong odor in

23  this trailer and it burns my eyes.  Do you remember the odor

24  threshold?  .5.  That means that trailer was more than 40 times

25  what was safe.  Next slide, please, Carl.

1           Because of the furor -- and you probably
2   remember it, the furor in the press about formaldehyde, the
3   president of the Gulf Stream, unsolicited, on his own, without
4   being asked, he sends an e-mail to someone within the
5   government just to tell them, hey, we use LFE.  Now, that's
6   another term that we want to remember, LFE.  Remember that, low
7   formaldehyde emitting.  The way I like to call it and the way
8   I've come to understand is that's the good stuff.  That's the
9   good stuff.
10          If it's LFE, it means it has little to no
11  formaldehyde in it.  If it's non-LFE, that's the bad stuff.
12  You're going to learn that even though Dan Shea, the president
13  of the Gulf Stream Coach, the maker of this trailer, told the
14  government we use LFE, by that point, he already had a sneaking
15  suspicion that that wasn't true, because they, at that point,
16  had already suspected that they had not used the kind of woods
17  that they tell everybody they use.
18          You see, you're going to learn that they have
19  the policy at Gulf Stream, and they're going to proudly talk
20  about it, "Hey, we use LFE.  We use the good stuff."  We do
21  that because it's an important policy.  It's a safety policy,
22  but it's an unwritten policy.  It's not important enough to
23  write down.  But Mr. Shea, on March 17th, told FEMA and the
24  government, "We use LFE."
25          Next slide, please, Carl.

1          Now, as you can imagine, FEMA was as busy as a

2    one-armed paperhanger.  They had to provide more than 140,000

3    trailers to people who had lost their homes, like the

4    Alexanders, people who were displaced all over the Gulf South

5    and even far points north.

6          But FEMA says, "Look, this needs to be fixed

7    today."  Because you will learn in this case that FEMA was

8    relying upon Gulf Stream, the expert, the manufacturer of the

9    trailer.

10         Next slide, Carl.

11         And, in fact, FEMA said to Gulf Stream, "Look,

12   does your field staff have the capability to put this issue to

13   bed?"  In other words, "Hey, this is an issue, what can you do

14   about it?  You made these trailers, what can you do about it?"

15   And Gulf Stream's president, Dan Shea, says, "Look, I promise I

16   will send a person down to Baton Rouge on Friday to test some

17   of the units."

18         Next slide.

19         At the same time this was going on, the

20   complaints continue to roll in.  As you know how it is around

21   here in March, and April, and May, and June, it gets hotter and

22   hotter.  And what you'll learn about formaldehyde is that the

23   hotter it gets, the worse the off-gassing becomes.  Makes

24   sense, doesn't it?  The more humid, the more wet, the more hot,

25   the more off-gassing.  So as the testing was supposedly going

147

 1    to be going on, the complaints continue to roll in.

 2                    And here's this one example where somebody said,

 3    "Please, please, help me.  I've tried everything.  I've opened

 4    the windows, I've opened the doors, I've turned on the air

 5    conditioner.  I've done everything.  Nothing works."

 6                    Next slide, Carl.

 7                    Gulf Stream sent its vice president to Baton

 8    Rouge.  And they tested four trailers, four Gulf Stream

 9    trailers.  Look at the results.  They learned in March and

10    April of '06, more than two months before this family ever

11    moved into a Gulf Stream trailer, that the levels in those

12    trailers that they tested were 500 times what is considered

13    safe by the United States government.  That's not my test.

14    You're going to learn, those are Gulf Stream tests.  Gulf

15    Stream's own people performed those tests.

16                    Next slide, Carl.

17                    Right about the same time, even though Gulf

18    Stream had received complaints, even though they had done

19    testing, with their public relations specialist, they issue a

20    press release in April of 2006 where they told the American

21    public, which was picked up on CNN and every other news outlet,

22    "We are not aware of any complaints."  But, of course, they

23    knew about many complaints.

24                    Next slide, Carl.

25                    Around the same time, FEMA is still trying to

 1    get a handle on this problem, and based on what Gulf Stream is

 2    telling FEMA, FEMA tells the American public, "We've evaluated

 3    the trailers and we're confident there is no ongoing risk."

 4                    Next slide, Carl.

 5                    Right about that time, right around that time,

 6    the trailer that this family moved into was installed right in

 7    front of their house that was damaged.  And you're going to

 8    learn that the installation of these trailers -- I'm trying to

 9    think of a polite way to put this -- these trailers are not

10    built, you'll learn, I will prove, are not built very sturdily.

11    Let's just say it as nice as we can.

12                    The installation is key.  If you don't install

13    it properly, you damage it.  If you damage it, you create water

14    leaks.  If water leaks occur, humidity and water intrusion

15    occurs, formaldehyde increases.

16                    Fluor did not make the trailer, but Fluor's

17    subcontractors installed this trailer.  And just looking at the

18    trailer, I will prove to you and the other lawyers here

19    representing this family will prove to you that just looking at

20    how it was installed proves that Fluor did not do what it was

21    supposed to do with regard to installing that trailer properly.

22                    Next slide.

23                    In fact, you're going to learn that there's a

24    jack that comes along with that trailer and jack itself says,

25    don't jack this thing up off the wheels, be careful how you

```
 1   jack it up, because you can torque it and damage the frame.
 2   And when you damage the frame, water intrusion, leaks, doors
 3   don't close, et cetera.  That's exactly what happened with this
 4   family's trailer.
 5                   Next slide.
 6                   In fact, you're going to see the installation
 7   instructions that Fluor came up with.  And their own
 8   instructions, you will learn, say, "Don't jack the trailer up
 9   off its wheels."  Because what you do, the trailer's designed
10   to rest on the axles.  And when you jack it up off of the
11   axles, you put all kinds of stressors on the trailer that
12   causes it duct leaks, water intrusion, which, in turn, creates
13   more formaldehyde off-gassing.
14                   Next slide.
15                   You know, the very interesting part of this case
16   is it's just not Fluor improperly jacking or failing to
17   supervise and choose a competent subcontractor to install this
18   trailer, but it's also Fluor's own employees were complaining
19   about burning eyes, runny noses, were coughing because of the
20   formaldehyde they were being exposed to in the installation.
21                   They did their own tests.  Fluor tested before
22   this family ever moved into this trailer, and Fluor's own tests
23   were more than 500 times what the U.S. Government considers
24   safe.
25                   Next slide.
```

1          Before this family moved in in May of 2006,

2    you're going to find out that not only had Gulf Stream

3    tested -- they had not only tested a sampling of their own

4    trailers, they had even went down and changed out some woods.

5    It wasn't just that they were wondering what was going on, they

6    knew exactly what to do.  They went out and changed out woods

7    in some of the trailers to try to fix the problem.

8          They had test results that were 500 times the

9    government standard.  They had already learned, because Dan

10   Shea and their director of purchasing were walking through one

11   of the plants, and they learned that, hey, there's pallets of

12   wood that don't say LFE.  They instead say "regular."  We're

13   putting regular wood in trailers even though our policy is --

14   our safety policy is to put LFE in.

15         I will prove to you that LFE policy that was

16   unwritten at Gulf Stream was not effective; and that not only

17   were they putting non-LFE wood in 2006 trailers that were being

18   made at the time of the storm or right after the storm, but

19   they were doing the same thing in 2004 when this trailer was

20   made.

21         You see, we're going to find out, because these

22   two defendants are going to remind you and all of us, that this

23   particular trailer wasn't made right after the storm.  It was

24   actually made in 2004, as you heard the judge say, to respond

25   to storms in Florida.

 1                   So it was sent to Florida and it was stored.

 2   And it was stored here, and it was stored there, and you'll

 3   hear all about that.  But the most important thing to remember,

 4   I'll submit to you, is that when this family moved in, that

 5   trailer was brand spanking new.  What I mean by that is it had

 6   never been lived in.  It had been moved around, but it had

 7   never been move lived in.

 8                   And what you're going to learn is off-gassing of

 9   formaldehyde, a brand new trailer -- let's say all other things

10   being equal, a brand new trailer is going to have the most

11   off-gassing because you're using brand-new pressed wood with a

12   bunch of glue in it with formaldehyde coming out of it.  The

13   older a trailer gets, the more it off-gases.  And so common

14   sense would dictate, of course, that the older the trailer is,

15   the less off-gassing there would be.

16                   So what you're going to have to determine in

17   this case is how the devil is it that this trailer had such a

18   high level three years after it was made.  That's when it was

19   finally tested, three years after it was made.  And we're going

20   to bring an expert to show you that from what it was when it

21   was tested, which it was tested about a month after they moved

22   out, you can predict on sound science what it was at the time

23   of manufacturing, and then you can also know what this young

24   man was exposed to during the 19 months he lived in the

25   trailer.

1           Gulf Stream knew all of these things.  And you
2    will learn, because I'm going to show you the owner's manual,
3    that there ain't one thing in there about formaldehyde.  Not a
4    peep.  They did not warn.  They did not warn.
5           Next slide.
6           They moved in on May 26th of 2007.  That's a
7    picture of the trailer.  It had to be moved in one time,
8    because at this point the house had already been -- they
9    basically had to demolish the house.  They thought they could
10   save it at first, but they basically had to demolish it.  This
11   is kind of what it looked like when they were living in it.
12   But this picture was taken after they moved out.
13          Next slide.  Here's Chris, Alana's birthday, in
14   the trailer.  Next slide.  There's Chris sitting at the table
15   at the birthday party.  Next slide.  You're going to learn that
16   when the family moved in, that there was a crack in the wall.
17   Now, you're thinking, Tony, who cares about that?  Why is that
18   important?  That's just bad construction.
19          We're going to prove to you the reason that
20   crack was there when they moved in, is because remember how we
21   talked about improperly torquing it when it's installed?
22   That's what happened.  It was jacked up such that when it
23   torqued, it cracked the wall.  And you're going to learn that
24   in those walls is where the formaldehyde lives.
25          And because of the humidity on the outside and

 1    the heat exchange, that what happens is the formaldehyde
 2    sitting in the wall is drawn into the trailer.  So if there's
 3    cracks in the walls, you increase the formaldehyde exposure.
 4                    Next slide.  This is -- next slide.
 5                    You're going to find out that when Alana moved
 6    into that trailer in May of '06, she had no idea about
 7    formaldehyde.  You're going to learn that they smelled the
 8    smell and they were told, "Oh, just air it out, it will go
 9    away."  You're going to learn that what they were not told is
10    that if you're smelling it, you're up at .5 parts per million
11    and that you can continue to be exposed even when you don't
12    smell it.
13                    Next slide.  This trailer was tested, as I said,
14    a month after this family moved out.  At that time, three years
15    after it was made, it was at .05, and I will prove to you what
16    the levels were during the time they were in the trailer,
17    because it's going to be 40 to 60 times what is safe.
18                    Next slide.  At the end of case, the question's
19    going to be:  Who put the formaldehyde in the trailer?  Gulf
20    Stream.  And who made it worse?  Fluor.
21                    Next slide, please.  Next slide, please.  We're
22    running out of time, and I'm not going to be able to give the
23    judge his time back like he wanted.
24                    You're going to learn that Fluor's subcontractor
25    improperly jacked and blocked the trailer.  Keep going, please,

 1   Carl.  We've got to move on.  We're running out of time.

 2                   Now, let me talk a little bit about what I

 3   anticipate you're going to hear from the other side.

 4   Formaldehyde is everywhere.  Formaldehyde in shrimp is 47 parts

 5   per million.  Formaldehyde in a glass of beer is X parts per

 6   million.  Formaldehyde in a glass of scotch is this parts per

 7   million.

 8                   In this trial, I want you to remember what these

 9   two defendants tell you about shrimp, and beer, and milk, where

10   they try to convince you that the trailer couldn't be dangerous

11   because there's 50 times more formaldehyde in milk or in

12   shrimp.  Keep that in mind, because at some point in this

13   trial, we're going to test their theory.  We're going to test

14   their theory about what they say formaldehyde, where it is and

15   how much is in the air and other things that we eat on a daily

16   basis.

17                   They're going to try to confuse you, I believe,

18   on what the proper standard is, and I'm going to ask you:  Each

19   time you hear a standard, go back to the gold standard, .008

20   parts per million.  They're going to say they built the trailer

21   to specs.

22                   **THE COURT:**  One minute, Mr. Buzbee.

23                   **MR. BUZBEE:**  Well, I'm going to prove to you that

24   that's not true.  That they did not follow the specs.  They're

25   going to say the levels were unsafe, the testing was bad.  And

 1   finally, they'll come to and I'm sure they'll spend a lot time,
 2   they'll say, "Well, this young man, he plays football, he can't
 3   be hurt," or, "He wasn't exposed to an unsafe level."
 4              I ask you to rely on this young man's treating
 5   doctor and consider the gold standard.  And at the end of this
 6   case, I'm going to ask you to return a verdict in favor of this
 7   family and against the manufacturer of the trailer, Gulf
 8   Stream, and the company that installed it, Fluor.
 9              What you don't know can hurt you, and this case
10   proves that 100 times over.  I look forward to putting on this
11   case to you along with my co-counsel.  Thank you.
12         **THE COURT:**  Thank you, Mr. Buzbee.  Mr. Weinstock.
13         **MR. WEINSTOCK:**  My turn.  Andy Weinstock, ladies and
14   gentlemen of the jury.  Good afternoon.  Welcome back from
15   lunch.  I have the privilege to represent Gulf Stream Coach in
16   this litigation.  I'll be trying this case with my good friend,
17   Tim Scanduro, and my law partner, Joe Glass.
18              Who is Gulf Stream Coach.  Gulf Stream Coach is
19   a family-owned business.  It's owned by three brothers, Jim,
20   Brian, and Dan Shea.  They inherited the company from their
21   father, who founded it.  And you're going to hear -- and you've
22   heard some of it -- character assassination about these
23   gentlemen.
24              At the end of the day, we're going to ask you to
25   consider the evidence on these two plaintiffs and this trailer.

 1   not who's a good guy and who's a bad guy.  I will tell you:

 2   The guys I work for are good guys.  But if they were the best

 3   guys, they could throw six touchdown passes in a game and lead

 4   the Saints to victory, I don't want you to decide the case

 5   based on that.  I want you to decide the case based on the

 6   evidence on these two plaintiffs and this trailer.

 7                     So what is this case about?  You've heard it

 8   already.  The plaintiffs tested this trailer and they got the

 9   number 0.050.  You're going to hear that from me all throughout

10   the trial.  And I will tell you this:  It's a fantastic number

11   for the defendants.  Fantastic.  They're going to bring two,

12   three, maybe four witnesses to try to convince you that the

13   levels were actually higher, because this is not the gold

14   standard, not even close.

15                     Their case -- well, let's talk about the

16   plaintiffs first.  I told you a little bit about the trailer.

17   Let's talk about the plaintiffs.  It's a stipulated fact, Alana

18   Alexander has never seen a doctor for any complaint related to

19   formaldehyde.  The judge has already read it to you, or

20   Mr. Meunier.  Christopher Cooper certainly does have asthma.

21   That's also a stipulated fact.  He's had it since he was three

22   years old.  He has it today.  You will hear testimony, probably

23   today, that his asthma is actually better today than it was

24   before Katrina.

25                     We're going to try this case on the facts, the

 1    reality.  You're going to hear a lot of theory from the
 2    plaintiffs, but we're going to stick to the facts and the
 3    reality.  What's their first theory?  As I told you, the .050
 4    doesn't mean .050.  The unit must have been higher, the levels
 5    must have been higher.  What's the reality?  The reality is
 6    this unit was tested about a month after they moved out.  All
 7    of the experts, plaintiffs' and defendant's, will say the same
 8    thing:  The way to lower levels of formaldehyde, even if
 9    they're already low, to get them even lower, is to open doors
10    and open windows.  Everybody will say that.
11              When this unit was tested, it had been closed up
12    for 30 days by Mrs. Alexander because she had moved out.  So
13    that level probably represents more of a high watermark than a
14    low watermark of the temperature inside.
15              Again, another stipulated fact was room
16    temperature, 72 degrees.  That's the temperature they lived
17    at -- or about the temperature they lived at.  That's what you
18    want it tested at, not 100 degrees in an open field after it
19    was abandoned, like some of their experts are going to talk
20    about testing other units.  We want to talk about testing the
21    Alexander unit.
22              What's one of their other arguments, one of
23    their other theories?  Well, the Alexanders -- you've got to
24    base this on when the unit was closed up, the levels would have
25    risen.  They did me a big favor.  I hope some of you caught it.

1  They showed a picture of Chris Cooper at his birthday.  The

2  window was open.  Every day Mrs. Alexander opened the windows

3  after she moved in.  Every day right after she moved in, she

4  opened the windows, she opened the doors, she opened the bath

5  vent.  And guess what else, often she turned on the air

6  conditioner.  This is how you get formaldehyde out.  This is

7  how you get levels down.

8            Next, theory, oh, Gulf Stream did not warn

9  anybody about the problem.  What's the reality?  The reality is

10 that Jim Shea and Dan Shea met with FEMA in April of 2006.

11 They met with them and gave them all the information they had

12 on how to best ventilate a unit.  This is a month before the

13 Alexanders moved into the unit.

14            What's the next theory?  That Gulf Stream hid

15 from FEMA there was formaldehyde in the wood in the trailers.

16 FEMA has been purchasing travel trailers from Gulf Stream since

17 1992 for emergency use for various hurricanes, fires, all kinds

18 of things.  There was not a complaint documented by FEMA, not

19 by Gulf Stream, by FEMA, until 1996.  He showed you a

20 complaint.  He surely did.

21            The complaints that came from -- and you'll hear

22 this throughout the course of the testimony -- had to do with

23 some of the units, and a handful of the units, that were built

24 in 2005 and 2006.  They were not about 2004 units, like the

25 Alexander unit, and that's key.  It's a stipulated fact in this

 1    case that the Alexander unit was built in 2004.

 2                    So they're going to show you a ton of evidence

 3    about what happened to units built the Katrina year.  Listen

 4    carefully to the evidence about this trailer that was built in

 5    2004.  And, in fact, as far as who knew what, in 2005, in the

 6    fall, one of FEMA's contractors asked OSHA to come out and test

 7    for formaldehyde, and they did.  FEMA was aware of this

 8    testing.  FEMA knew more about what was going on than Gulf

 9    Stream did.

10                    Next theory, and this is the big one,

11    Mr. Buzbee's gold standard, .050 is too high because it exceeds

12    the NIOSH rule and the ATSDR, MLD, .008.  And he told you he

13    was going to -- he promised he was going to show you this was

14    the gold standard.  I'm handed a note there was -- there were

15    no complaints until 2006.  If I accidently said 1996, I

16    apologize.  I do that.

17                    Well, first of all, what is the real standard?

18    Those are just recommended levels.  What are the standards out

19    there?  There are two of them.  One's for occupational by OSHA,

20    we don't consider that terribly relevant here because these

21    people were not working, but the occupational standard is .75.

22    The Alexander unit was 15 times lower than that.

23                    Let's get to a true regulatory standard that's a

24    whole lot closer to home, how about HUD standards on mobile

25    homes?  A lot like travel trailers, only bigger.  HUD shoots

1  for a target ambient air goal of .4.  The Alexander unit was

2  eight times lower than what HUD was shooting for.

3             Where does the ATSDR MRL come from?  Well,

4  first, NIOSH MRL, it's really kind of a joke, that's just the

5  lowest level they think you can actually test formaldehyde at,

6  and that's .016.  That's twice as high as this number.  NIOSH

7  doesn't even think you can measure reasonably at that number.

8  ATSDR MRL, .008, this is what it says right after they write

9  that, because you're going to hear it from me so many times

10  you're going to be sick of hearing it:  "Exposure to a level

11  above the MRL does not mean adverse health effects will occur."

12  I didn't write it, ATSDR did.

13             This afternoon they're going to play a tape for

14  you from Dr. Chris DeRosa from the ATSDR.  I asked him

15  pointblank:  "This chronic level, this .008, is that based upon

16  a 24-hour-a-day, seven-day-a-week exposure?"

17             "Yes, it is."

18             They are citing to you the wrong standard.  Even

19  when they pick the ATSDR MRL, they picked the wrong one.  CDC,

20  which runs ATSDR, came out, and they were asked to come out and

21  look at these travel trailers that were all throughout

22  Louisiana.  They selected a .3 level of no concern, six times

23  above where the Alexander unit was tested.  If this was such a

24  good number for them, they would not trot witness after witness

25  up here to say, "No, no, it must have been higher before,"

1    trust me.

2                    Why is it important?  Well, what you're going to

3    hear is, and what every expert will tell you is, dose makes the

4    poison.  Two aspirin will cure a headache; 200 aspirin will

5    kill you.  In fact, if you drink too much water, that will kill

6    you.  .050 is like two aspirin.  And the reason I say that is

7    because your body needs formaldehyde to function.  It's part of

8    normal human metabolism.  We all have about 2.5 parts per

9    million formaldehyde in us right now if we were to test

10   ourselves.

11                   It's their next theory, even this .050 is much

12   too high.  Well, again, we're going to go for reality.  In

13   1998, Tulane tested 53 regular houses, not mobile homes, not

14   travel trailers, in South Louisiana.  The average level was .3.

15   If there's something wrong with this travel trailer at .050,

16   six times lower than that, we're going to have to start

17   knocking down a lot of houses down here.

18                   He is right about one thing, Mr. Buzbee -- if I

19   can get another exhibit -- formaldehyde is everywhere, right

20   now -- and I apologize for this because I'm breathing on you.

21   We all have it in human breath.  You can see it up here.  Let's

22   see.  This is the trailer; office building as high as .2;

23   libraries goes up to .7, for any students in the house;

24   clothing stores, 3.3.  My personal favorite right here, when

25   you fry a fish, more than 100 times higher than the levels

 1    found in the Alexander trailer.  It's also in foods.

 2                    You can go to the next one.

 3                    He told you I was going to tell you about this.

 4    He's absolutely right.  It's in shrimp, way up here.  This one

 5    bothers me a little bit, at 100 times a level than the

 6    Alexander's trailer, it's in beer.  It's in football season

 7    right now.  I'm probably in big trouble.

 8                    The next theory they have, they're going to show

 9    you in their opinion that turning on the air conditioning, and

10    he told you a little of it, actually sucks formaldehyde into

11    the unit.  That call it negative pressure.  That's a good

12    theory, and they're going to trot a couple of guys in here to

13    try to back it up.  What's the reality?  FEMA tested 96 travel

14    trailers, closed the doors, closed the windows, closed the

15    vents, turned on the air conditioning, 60 percent reduction in

16    the levels of formaldehyde.  That's the reality.

17                    Theory, they're going to tell you, "Oh, Gulf

18    Stream bought a bunch of wood from Adorn and this wood was all

19    not LFE.  Well, first of all, although it certainly is our

20    policy to buy LFE, it's not required.  It's not the law.  It's

21    just a step that Gulf Stream takes to go the extra mile.

22                    But you will find that Adorn did not supply

23    wood -- they'll put on a couple of witnesses -- Adorn did not

24    supply wood for the 2004 units.  Absolutely, positively, there

25    was a huge dispute with Adorn 2005, 2006, and they're going to

1    make a big deal because one of the Gulf Stream guys took a

2    recorded statement from one of the Adorn guys where he got him

3    to admit that and they've got huge issues with that.  It's got

4    nothing to do with this case.  It has nothing to do with the

5    units built in 2002.  Did Gulf Stream buy wood from Adorn in

6    2004?  Absolutely.  Did it go into their FEMA trailers?  No.

7                    Next one, and you've heard it already,

8    formaldehyde causes cancer.  Oh, they went on and on about it.

9    Let's talk about the reality.  IARC is the only agency, the

10   International Agency for Research and Cancer, located in

11   France, is the only agency that has called formaldehyde a known

12   human carcinogen.  And that's only for a very, very rare type

13   of cancer called nasopharyngeal cancer.  It's based on one --

14   primarily based on one study of ten plants and at one plant

15   they found that an excess of nasopharyngeal cancer.  When they

16   went back and looked at the data, they found that several of

17   these individuals had exposure to other things also that caused

18   nasopharyngeal cancer.

19                   Even so, the plaintiffs are going to put on

20   Dr. Gerald McGwin, and Dr. McGwin will tell you that at the

21   levels we see in these trailers -- he can't say more probably

22   than not that nasopharyngeal cancer is related to formaldehyde

23   exposure.  Because even that one paper requires an exposure in

24   excess of 4,000 parts per billion, 80 times higher than the

25   Alexander trailer.

1          Theory, they're going to tell you, "Well, Alana

2    Alexander, when she first moved in, she had eye and nose

3    irritation for a few weeks.  Reality, she has never seen a

4    doctor for a formaldehyde-related injury.  It's a stipulated

5    fact, number one.  Two, I asked her to be examined by

6    Dr. Wedner.  She told Dr. Wedner, I'm just here to bring my

7    son.  I'm not here to be examined.  There's nothing wrong with

8    me.  Dr. Wedner went ahead and did the examination and agrees,

9    there's nothing wrong with her.

10          Next theory, and you heard it, Chris Cooper's

11   asthma was aggravated by exposure to formaldehyde.  Put up

12   slide 4.  The reality, Chris Cooper's asthma is exactly the

13   same as it was, or better, than before Hurricane Katrina.

14   Also, we're going to have epidemiological discussion on

15   epidemiological papers, but all will agree that it's never been

16   proven that formaldehyde exposure causes cancer, and it's not

17   been proven that it exacerbates or exaggerates asthma.

18          We're going to show you studies, where -- and

19   these were done some years ago, you could never get somebody to

20   agree to do them today -- but asthma was asthma then, and

21   pulmonary function was pulmonary function then, too, where

22   people volunteered to be exposed to formaldehyde, and they

23   found in three of these studies there was no difference in the

24   response between asthmatics and non-asthmatics exposed to

25   formaldehyde at much higher levels than in the Cooper/Alexander

1    trailer.

2              They're going to tell you, hey, while he was in

3    the trailer, it was a lot worse.  Well, I don't think that's

4    the case, and the evidence won't show that, but if it is,

5    what's the real explanation for Chris Cooper's asthma issues?

6    Dr. Barnes would call it -- that's his treating doctor -- the

7    gold standard -- her gold standard, you've got to stay on

8    steroid medication to treat asthma.  You don't want asthma to

9    be suboptimally treated.  Even it it's not bothering you, you

10   still have to take your steroid medication to maintain it.

11   You've got to follow your doctor's instructions.

12             For whatever reason, Alana Alexander took Chris

13   Cooper off of steroid medication for asthma for over two years,

14   dating back to before the storm, dating back to March of 2005.

15   Almost two and a half years without steroid medication.  How do

16   I know this is a problem?  Well, Dr. Karin Pacheco told me, and

17   she's going to sort of tell you, because she's coming here, not

18   live, but by video.  Who's Dr. Karin Pacheco?  Dr. Karin

19   Pacheco is at National Jewish Health, one of the top lung

20   specialty places in the world, pulmonary facilities.  The

21   plaintiffs flew Mr. Cooper up to see Dr. Pacheco.  And what did

22   Dr. Pacheco have to say?  I'm going to read it to you, so I

23   don't get it wrong, kind of in quotes.

24             "Nonetheless, the patient's test results

25   document moderately severe bronchial hyper-responsiveness --

1   asthma -- as well as a component of fixed air flow obstruction.

2   This likely reflects a long history of asthma that has been

3   suboptimally treated."

4                   They flew him to Denver.  They got Dr. Pacheco

5   to evaluate him.  We're going to present that testimony.

6   That's the reality.

7                   Theory, their last theory, this case is about

8   too much formaldehyde.  Reality, this case is about money, and

9   I'm going to show you how very quickly.  Chris Cooper --

10  Hurricane Katrina hits Louisiana.  He goes down to Florida to

11  enroll in school.  His mom tells the nurse there, asthma

12  triggered by changes in the weather.  This is a very consistent

13  theme.  He comes back to New Orleans, they move into the

14  trailer, and you can see the shaded portion.  And about a month

15  in -- two weeks in, she fills out another form, seasonal

16  asthma.

17                  Time goes on.  He goes to see Dr. Barnes, not

18  for asthma problems, for sinusitis.  This is while he's in the

19  trailer over a year and a half there.  "I need more asthma

20  medication."

21                  It doesn't mention he's having an asthma problem

22  while he's in the trailer.  December 4th, 2007, right before he

23  moves out of the trailer, he's been in the trailer 19 months,

24  he has an asthma attack.  Do you want to guess what caused it?

25  A big drop in the weather.  The weather went from the 70s --

 1  it's New Orleans, it's December -- it went from the 70s to the
 2  40s and he had an asthma attack.  How consistent, asthma
 3  triggered by changes in the weather.
 4            They tell the doctor at the emergency room his
 5  last episode of wheezing, his last episode of asthma, was a
 6  year ago.  That blue area is the time he had been in the
 7  trailer, no asthma attacks.
 8            Now, they hire a lawyer for this case, February
 9  of 2008,m for this case, formaldehyde exposure.  That's on
10  February 15th, 2008.  On April 17th he goes to see his doctor,
11  Dr. Barnes.  For asthma?  Absolutely not.  For conjunctivitis.
12  They've made a claim, they've hired a lawyer, and they're still
13  not telling their doctor they've got an asthma problem related
14  to formaldehyde in the trailer.
15            But it gets better, March 30th of 2009, this
16  year, Mrs. Alexander fills out a form for the school, asthma
17  triggers, she checks off the weather, not formaldehyde.  It's
18  got nothing to do with formaldehyde.  But things changed,
19  ladies and gentlemen.  Seven days later, Chris Cooper was
20  chosen to be the trial plaintiff in this case for September
21  14th.
22            **THE COURT:**  One minute, Mr. Weinstock.
23            **MR. WEINSTOCK:**  Perfect.
24            Chris Cooper was chosen to be the trial
25  plaintiff in this case seven days after saying, "I have

1  seasonal asthma triggered by the weather."  There's 18

2  plaintiffs in the Age case, he's one of the first to go to

3  trial.

4         They go back to Dr. Barnes three weeks later.

5  April 24th, 2009, of this year, is the first time they've ever

6  mentioned formaldehyde to any doctor, and the first time they

7  mention to a doctor, "We've had worse asthma while we were in

8  the trailer or from the trailer."  That, ladies and gentlemen,

9  is the reality of this case.  This chart right here.

10         Thank you.

11         **THE COURT:**  All right.  Thank you, Mr. Weinstock.

12  Mr. Penot, you have ten minutes.

13         **MR. PENOT:**  May it please the Court.  Ladies and

14  gentlemen, I've never sat where you sat, but I'm trying to

15  think if I were sitting there, what would I want to ask, and

16  one thing I'd want to know is who's my client, what does my

17  client do.

18         Fluor is an expert at managing some of the

19  largest, most complex, nastiest, hardest, biggest projects in

20  the world.  Mr. Buzbee said FEMA was as busy as a one-armed

21  paperhanger down here after Katrina trying to put in 140,000

22  trailers.  That's the kind of job people turn to Fluor for.

23  They've built oil refineries, chemical plants, mines.  They've

24  rebuilt bridges, roads in war-torn countries.  One of the first

25  contractors to get electricity back up on the grid in countries

1    that have been ravaged by war.

2                    And for those of us who lived it, we know that

3    what was happening down here was much like there had been a

4    war.  So FEMA turned to a company -- there's only a few that

5    can do it -- they turned to a company like Fluor.

6                    Fluor had -- when most of us were going the

7    other way, Fluor had 20 people coming down to Baton Rouge the

8    day before Katrina -- or the Saturday before Katrina.  Within

9    72 hours, they had 500 people here.  Within 30 days, they had a

10   thousand people here and peaked at about 4,500 people, trying

11   to get people back closer to their homes and into trailers.

12                    By noon of the Tuesday after Katrina -- do you

13   remember Katrina struck in the morning time, August 29th, on a

14   Monday morning?  By noon the next Tuesday, Fluor had a

15   helicopter in the air.  FEMA couldn't do it.  FEMA tried and

16   couldn't get the helicopter in the air.  Fluor did it, had

17   three helicopters here and fixed-wing aircraft.

18                    The other thing I'd want to know if I was

19   sitting where you are is what is it that Fluor did in this

20   case?  Well, it hauled and installed.  That's what they call

21   it, and that's what you'll hear my people describe it as.

22   Their job, at least -- they did a number of things to help FEMA

23   down here rebuild.  But as it relates to this case, they hauled

24   and installed.  That was their job.

25                    FEMA said, "Fluor, we have decided we want to

1    use travel trailers -- FEMA decided this -- we want to use

2    travel trailers to get people closer to their homes so that

3    they can get on with their lives and rebuild their lives and

4    rebuild the economy down here.  People need to get home and get

5    to work.  The way we can do that is with travel trailers."

6                 "You, Fluor, we're going to buy them -- FEMA's

7    going to buy them -- you, Fluor, we're going to tell you, come

8    to our yard, pick it up and bring it to Ms. Alexander's house,"

9    and that's what Fluor did.  However, Fluor's a manager.  They

10   call it construction management.  So it didn't actually do the

11   hauling and installing.  Just like FEMA turned to Fluor to

12   manage what FEMA's job was, Fluor knows how to hire experts,

13   and they did hire experts.

14               You're going to hear about MLU Services, who had

15   worked for Fluor -- excuse me -- worked for FEMA before in the

16   2004 hurricane season in Florida, doing precisely this, hauling

17   and installing travel trailers.

18               You're going to hear about Dan Lemieux's Mobile

19   Home Service, a licensed mobile home installer from Florida.  A

20   guy who's been doing it for 20, 30 years, his company, his

21   family business.  Fluor hired the experts.  FEMA hired Fluor as

22   an expert manager.  Fluor turned around and hired expert

23   haulers and installers.

24               If I were you, the next thing I'd want to know

25   is, well, what is it that they claim you did wrong?  Well, you

1   heard what Mr. Buzbee said.  He said if you're not careful the

2   way you install the trailers, you rack the frame, that cracks

3   things, that lets water in, it lets mold grow, and that

4   enhances formaldehyde off-gassing, they call it.  Okay.

5               What evidence is he going to bring you to show

6   you that that's what we did?  Okay?  Let's talk about what it

7   is, first of all, clearly that we know that Fluor didn't do.

8   Fluor didn't design the trailers, didn't build the trailers,

9   didn't select the building materials, didn't choose to house

10  people in travel trailers after Katrina, and Fluor certainly

11  didn't put the formaldehyde in the trailers.

12              What did Fluor do?  It hauled and installed.  It

13  hauled and installed through subcontractors, through

14  independent subcontractors.  Important to have an independent

15  contractor do it.  You know why?  Because it's their job, it's

16  their money and their livelihood on the line, and so they have

17  an incentive to do it right.

18              Did Fluor do its job?  Did Fluor do its job?

19  That's something I would want to ask me, my clients.  Yes,

20  Fluor did its job.  It's job was to haul and install.  FEMA

21  told it how to haul and install.  They said when you're done,

22  we want to see the trailers sitting just so, and Fluor hired

23  the expert to do that.

24              Now, how do you know that, though?  How do you

25  know that we did our job, particularly as it relates to

1    Ms. Alexander's trailer?  You're going to hear that Fluor
2    didn't just trust these independent contractors to do it right,
3    Fluor had 100 percent quality inspection, meaning quality
4    control inspection, meaning it wouldn't pay the contractor.  It
5    wouldn't pay MLU or Don Lemieux's Mobile Home Service until it,
6    Fluor, sent an inspector out there and checked it.
7                 I'm going to bring a fellow who signed the very
8    form for Ms. Alexander's trailer, and he's going to have signed
9    off that it was ready for occupancy.  So what do plaintiffs
10   bring to you to say that we didn't do our job?  Well,
11   Mr. Buzbee says, you can look at it and tell.  You know what
12   I'm going to bring you?  I'm going to bring you the people who
13   had their boots in the dirt, the guys who jacked it up.  When
14   the Lemieuxes come in here, you listen carefully to what they
15   say.
16                 Mr. Buzbee wasn't there, and the experts that
17   he's going to bring in here, they weren't there.  In fact,
18   you're going to find out that that trailer had that long life
19   that Mr. Buzbee told you, went traveling all over the
20   Southeast, these fellows he's going to bring in, these
21   engineers who looked at it, they looked at it in May of 2009, a
22   couple of months ago.
23                 I'm going to bring you people who were there
24   doing it when it was real-time, live.  What are we going to ask
25   you to do?  What am I going to ask you to do?  What is my

1    client going to ask you to do at the close of this case?  Very

2    simple question:  Did we do our job?  Did Fluor do its job?

3    And it's job was to haul and install.

4              Who is my client, that's the first question;

5    right?  Who is my client?  You're going to learn a little bit

6    about my client.  I'm proud to represent this client.  You're

7    going to learn about Dwight Durham, who couldn't be with us

8    here today because he's in Libya building infrastructure.

9    You're going to learn that he spent 20 years in the U.S. Army

10   Corps of Engineers because you're going to see his video

11   deposition.  He was there when Andrew -- do you remember

12   Andrew -- struck Florida in 1992.  He was experienced in this

13   kind of operation.

14             You're going to meet that fellow right there, Al

15   Whitaker, sitting right next to me.  You're going to find that

16   when most of us were going north on that Saturday and Sunday,

17   Al left his family, who were not in harm's way, came down here,

18   and stayed here, missed some rotations home to get the job

19   done.  That's what Fluor does.  And you'll find out that at the

20   end of that project, he got a very special commendation from a

21   very special person.  Listen for that.

22             **THE COURT:**  One minute, Mr. Penot.

23             **MR. PENOT:**  Haul and install, that was our job.

24   That's what FEMA hired us to do, that's what Fluor did.  And

25   I'm going to ask you at the end of this trial the simple

1   question:  Did Fluor do its job?  All right.

2           Thank you.

3           **THE COURT:**  All right.  Thank you, Mr. Penot.  Let's

4   go ahead, and the next part of the trial, as I told you earlier

5   this morning, ladies and gentlemen of the jury, is that we

6   would begin to take testimony.

7           Mr. Buzbee, the first thing I'm going to ask you

8   to do is to move this thing out of the way, because it's

9   blocking my line of sight.

10          **MR. BUZBEE:**  Very well.

11          **THE COURT:**  The second thing I'm going to ask you to

12  do is to call a witness.

13          **MR. BUZBEE:**  Yes, sir.  The plaintiff calls Erika

14  Alexander.

15          **THE COURT:**  Erika Alexander.

16          (WHEREUPON, **ERIKA ALEXANDER**, having been duly sworn,

17  testified as follows.)

18          **THE DEPUTY CLERK:**  Please state your full name and

19  correct spelling for the record.

20                    **DIRECT EXAMINATION**

21  BY MR. BUZBEE

22  **Q.**   Erika, would you introduce yourself to the ladies and

23  gentlemen of the jury, please.

24          **THE DEPUTY CLERK:**  Wait.  First she needs to state

25  and spell her name for the record.

```
 1              THE WITNESS:  I'm 15 years old and --
 2              THE COURT:  I think she just did that, but let's, for
 3    the record, have her state her full name and address for the
 4    record, and spell your name, please.
 5              THE WITNESS:  E-R-I-K-A, M-O-N-I-Q-U-E,
 6    A-L-E-X-A-N-D-E-R.
 7              THE COURT:  All right.
 8    BY MR. BUZBEE
 9    Q.   Erika, are you nervous?
10    A.   Yes.
11    Q.   You've never been in something like this before?
12    A.   No.
13    Q.   But you're missing school?
14    A.   Yes.
15    Q.   Could you tell the ladies and gentlemen how old you are?
16    A.   Fifteen.
17    Q.   Now, just briefly, because the judge wants us to move
18    quickly, tell the ladies and gentlemen what you like to do and
19    about your family.
20    A.   I like to read.  I like to listen to music, and I like to
21    hang out with my friends.
22    Q.   I'm sorry.  Go ahead.  Keep going.
23    A.   I like to watch movies.
24    Q.   And the ladies and gentlemen are going to get to meet your
25    mother, Alana, but can you tell them about her?
```

1  **A.**   My mom, she's independent.  She teaches us values, right

2  from wrong.  She likes to play with us, but she knows when to

3  be serious and when to be mommy.

4  **Q.**   How about your little brother, Coop?

5  **A.**   Christopher, he's just a normal 12-year-old little

6  brother.  He likes to mess with me, but he knows when to mess

7  with me and when to leave me alone.

8  **Q.**   All right.  Now, your mother has taught you the importance

9  of working hard?

10  **A.**   Yes.

11  **Q.**   Okay.

12        **THE COURT:**  Ms. Alexander, would you pull that

13  microphone a little bit closer to your mouth there?  There you

14  go.  So we can all hear you.  All right.

15  **BY MR. BUZBEE**

16  **Q.**   Let's talk a little bit about Chris, and I want to take

17  you back to before Hurricane Katrina, about how he was, since

18  you were with him almost every single day, as far as his

19  asthma.

20        How often did he use his inhaler before the

21  hurricane?

22  **A.**   He didn't use it very often.

23  **Q.**   Did his asthma, at least as you saw him, affect him and

24  the kind of things he liked to do?

25  **A.**   Not really.  He knew when his chest started getting tight

1   or he started wheezing, he knew he had to sit down and take his

2   inhaler.

3   Q.   What kind of stuff would you see him do back before the

4   hurricane?

5   A.   He would run around and be a boy.

6   Q.   Would you say back before the hurricane, and I mean before

7   you-all moved into that trailer, how often, at least from what

8   you saw, did he use that inhaler?

9   A.   Not often.

10  Q.   Now, let's talk about the hurricane real briefly, and I

11  know there was a lot of things that happened to you and your

12  family.  You were living in New Orleans.  Where were you

13  living?

14  A.   Dale Street.

15  Q.   What kind of house were you living in?

16  A.   It was a house my mom grew up in that my grandfather

17  built.

18  Q.   And who were your neighbors?

19  A.   My neighbors?

20  Q.   Yes, ma'am.

21  A.   We had a lady living on the corner.  They had the

22  barbershop that my grandfather owned.  And down the street was

23  my mom's best friend and her kids that we grew up with.

24  Q.   So your granddad lived right next door?

25  A.   No.  He owned the barbershop right next door.

1  **Q.**   At that time what was your mom -- what kind of work was
2  she doing?
3  **A.**   She was a disciplinarian.
4  **Q.**   And you and Chris were in school?
5  **A.**   Yes.
6  **Q.**   And when the hurricane came, I understand that you guys
7  went to a lot of different places, Superdome, et cetera, but
8  you ended up in Florida?
9  **A.**   Yes.
10 **Q.**   Why did you-all go to Florida?
11 **A.**   Because we had family in Florida.  We had uncles that
12 lived there.
13 **Q.**   And where did you-all stay in Florida?
14 **A.**   When we first got there, we stayed with my Uncle Dwayne,
15 but then we got an apartment and we got -- close to the schools
16 Chris and I were going to at the time.  And then near the end
17 of our stay in Florida, we went back and lived with our Uncle
18 Dwayne.
19 **Q.**   Now, did you have the opportunity while you-all were in
20 Florida, before you came back to New Orleans, to see Chris
21 every day?
22 **A.**   Yes.
23 **Q.**   Did you notice that he was using his inhaler or having
24 more problems than normal with his asthma?
25 **A.**   No.

1    **Q.**    Okay.  Now, do you remember when you guys came back to
2    New Orleans?
3    **A.**    Yes.
4    **Q.**    Okay.  Somewhere around May of '06; does that sound right?
5    **A.**    Yeah.  We came back after we finished school in Florida.
6    **Q.**    Were you excited to come back?
7    **A.**    Yes.
8    **Q.**    Why is that?
9    **A.**    Because Florida wasn't home.
10   **Q.**    Okay.  Now, when you got back to New Orleans, where did
11   you-all live?
12   **A.**    When we got back, we stayed in the trailer.
13   **Q.**    So the trailer was already there in front of your house
14   when you got back?
15   **A.**    Yes.
16   **Q.**    You weren't there when it was actually installed?
17   **A.**    No.
18   **Q.**    Now, the ladies and gentlemen of the jury I'm sure have
19   seen thousands of these things on the side of the road and at
20   various places, but could you tell them what it was like for
21   you living inside one of these trailers?
22   **A.**    It was small because there was three people, and it was
23   hot because it was aluminum, and it had that funky smell.
24   **Q.**    All right.  And tell us -- now, that's important to us,
25   the funky smell.  When was the first time you smelled this,

1    what you're calling, a funky smell?

2    A.   When we first got there.

3    Q.   Can you help us understand a little more about what that

4    smell was like for you?

5    A.   I can't really describe it, but when you smelled it, your

6    nose would burn, and it would burn your eyes too.

7    Q.   Okay.  And you smelled that just as soon as you guys came

8    back from Florida and moved into that trailer?

9    A.   Yes.

10   Q.   Was there anything you could do to make it better?

11   A.   Not really.  We tried opening the windows and doors and

12   everything to air it out.  But whenever we would close it up

13   for, like, a long period of time, like when we went to school,

14   the smell would be back.

15   Q.   So even though you would open the windows and doors and it

16   would make it better, it would still come back?

17   A.   Yes.

18   Q.   Now, you-all came back.  Your mom was back to working; is

19   that right?

20   A.   Yes.

21   Q.   And you and Coop were back in school?

22   A.   Yes.

23   Q.   So is it true that every day you-all would go to school

24   and your mom would go to work, you would lock up the trailer?

25   A.   Yes.

1  **Q.**   And are you telling this jury that every single time you

2  came back from school or wherever you were, you would have that

3  same sensation that you just described?

4  **A.**   Yes.

5  **Q.**   Now, did it cause you any problems?

6  **A.**   I had nosebleeds.

7  **Q.**   Now, didn't you wonder what the devil was going on or why

8  you were having this issue?

9  **A.**   Yeah.

10  **Q.**   Did you ask your mom?

11  **A.**   Yeah.

12  **Q.**   What did she know?

13  **A.**   She didn't know what was the smell, she didn't know what

14  was going on.

15  **Q.**   Did you-all do everything you-all could to try to

16  alleviate or try to fix that?

17  **A.**   Yes.

18  **Q.**   Now, tell the ladies and gentlemen the general area of

19  New Orleans you-all lived.

20  **A.**   We lived in the east, off of Chef Highway.

21  **Q.**   Is that the kind of area that you can sleep, or at least

22  you, personally, feel comfortable sleeping with the windows and

23  doors open?

24  **A.**   Yeah.  Because my mom grew up with the people that lived

25  on that street, so she knew all the people down there, and she

 1   trusted the people here.

 2   **Q.**   But did you-all actually sleep with the windows and doors

 3   open?

 4   **A.**   No, because it was New Orleans, so it was hot.

 5   **Q.**   Did you-all try to run the air conditioner at night?

 6   **A.**   Yes.

 7   **Q.**   Did that air conditioner, when you were living in that

 8   trailer, did it cool it -- did it quickly cool it down, or how

 9   long did it take it to get it to where it was comfortable in

10   there?

11   **A.**   It took it a while, because the air conditioner would come

12   on, but then it would, like, click off a couple of seconds

13   after it would come on.  And then it would come back on and

14   then it kept clicking off for about five minutes, and then it

15   would stay on for a short period of time, and then it would

16   come back on.

17   **Q.**   Now, you-all -- I've already told the ladies and gentlemen

18   of the jury that you and Coop and your mama were in that

19   trailer for about 19 months; is that right?

20   **A.**   About.

21   **Q.**   Now, do you remember the first day you went into that

22   trailer?

23   **A.**   No.

24   **Q.**   Do you remember around the time you went into that

25   trailer?

1  A.   Yeah.  Because when we came back, my grandma gave my mama

2  the key for the trailer, and we went in and we looked around

3  and we smelled the smell, we knew that it was hot, so we had to

4  air it out.

5  Q.   Okay.  Now, was there anything unusual about any of the

6  walls inside that trailer the first time you went into it?

7  A.   Yeah.  When we first went in, the wall in my mama's room

8  was popped out.

9  Q.   Now, what do you mean when you say "popped out"?

10  A.   You could see the insulation.

11        MR. BUZBEE:  Your Honor, may I approach the witness?

12        THE COURT:  Yes.

13  BY MR. BUZBEE

14  Q.   Erika, I'm showing you a series of pictures here.  They're

15  marked as Plaintiff's Exhibit -- or Exhibit 323, and

16  specifically I'm showing you the second page of 323.  Do you

17  recognize that picture?

18  A.   Yes.

19  Q.   Does this picture -- which is PSC-26117-27; correct?

20  A.   Yes.

21  Q.   Does this picture fairly and accurately represent the way

22  that trailer wall looked the first time you went into that

23  trailer?

24  A.   Yeah, except they didn't have the tape and the staples in

25  it, but, yes.

1   **Q.**   So tell me where that tape came from.

2   **A.**   My mom put the tape on there to try and see if it would

3   hold the wall down.

4   **Q.**   What about the staple?

5   **A.**   The same thing.  She put the staples in to see if it would

6   hold the wall down.

7   **Q.**   So instead of someone who was supposed to maintain the

8   trailer fixing that, your mama tried to tape it and then tried

9   to staple it?

10  **A.**   Yes.

11          **MR. BUZBEE:**  Your Honor, we offer the second page of

12  323.

13          **THE COURT:**  Is that 323-B?

14          **MR. BUZBEE:**  It doesn't even say "B".

15          **THE COURT:**  323-A is in evidence.

16          **MR. BUZBEE:**  It just says 323.

17          **MR. WEINSTOCK:**  May I see it?

18          **MR. BUZBEE:**  Yes.

19          **THE COURT:**  Why would we offer 323-A, when...

20          **MR. BUZBEE:**  Beats me.  I don't know.

21          **MR. WEINSTOCK:**  Fine with me.

22          **THE COURT:**  All right.  That's fine.

23          **MR. BUZBEE:**  I'm sorry.

24          **THE COURT:**  Counsel, what you can do is to -- if you

25  want to put these exhibits on this projector here, it will show

 1    up on the screen, and that way the witness can see on the

 2    screen without having to approach each time, and the jury can

 3    see it in the jury box as well as up on the big screen.

 4              **MR. BUZBEE:**  323-B.

 5              **THE COURT:**  Okay.

 6    **BY MR. BUZBEE**

 7    **Q.**   Now, Erika, and I don't want to belabor this point,

 8    because I think we all get it, but is that the way the wall in

 9    your mom's room looked when you-all moved in?

10    **A.**   Yes.

11    **Q.**   Now, you told me you-all would open the doors, you would

12    open the windows.  Did you-all try to do anything else to try

13    to deal with that smell that was bothering you?

14    **A.**   Air freshener.  My mama tried to buy air freshener to see

15    if it would work.

16    **Q.**   Did you-all try to run the air conditioner?

17    **A.**   Yes.

18    **Q.**   How did that help?

19    **A.**   It just pushed the smell around.

20    **Q.**   So it just circulated the stuff that was making the

21    problem?

22    **A.**   Yes.

23    **Q.**   Now, over that 19 months that you-all were in that

24    trailer, did it get any better?

25    **A.**   No.

1   **Q.**   Did it seem like at least it wasn't as bad as the first

2   day you moved in?

3   **A.**   It wasn't as bad as the first day we moved in, but the

4   smell didn't go away.

5   **Q.**   Now, when you-all were in that trailer, did you have the

6   opportunity to see your brother almost on a daily basis?

7   **A.**   Yes.

8   **Q.**   What did you see those fumes were doing to him?

9              **MR. WEINSTOCK:**  Objection, Your Honor.

10             **MR. BUZBEE:**  Hold up.  If they object, we have to

11  stop.

12             **MR. WEINSTOCK:**  Object to the form, "What those fumes

13  were doing to him?"

14             **THE COURT:**  Why don't you be more specific and

15  rephrase the question.  I sustain the objection.

16             **MR. BUZBEE:**  Yes, sir.

17  **BY MR. BUZBEE**

18  **Q.**   What kind of issues did you observe personally Chris was

19  having inside the trailer?

20  **A.**   His nose and his eyes were runny, and he'd have to carry

21  around tissues and handkerchiefs and stuff because of it.

22  **Q.**   Now, would that -- even after you-all aired it out and the

23  smell went away, was he still having those kinds of issues?

24  **A.**   Yes.

25  **Q.**   So he was having the issues even though you couldn't smell

1   it?

2   **A.**   Yes.

3   **Q.**   Now, I don't think you were in here, but we had this

4   discussion with the ladies and gentlemen of the jury about

5   frying fish.  Do you like fried fish?

6   **A.**   Of course.

7   **Q.**   Okay.  So do I.  Did you-all eat fish often?

8   **A.**   No.  Because this was such a small trailer and whenever

9   you make something with a lot of smoke, the fire -- the smoke

10   detector would go off.

11   **Q.**   So because of the smoke detector, that kind of put the

12   squelch on cooking fish in that trailer?

13   **A.**   Yes.

14   **Q.**   And I understand from your mama that you-all would try to

15   have fish every Friday.

16   **A.**   Yes.

17   **Q.**   Where would you-all have your fish?

18   **A.**   By my grandma's.

19   **Q.**   Where was she --

20   **A.**   At the time they were living next door in my grandpa's

21   barbershop.

22   **Q.**   So there wasn't a lot of fish frying going on in the

23   trailer?

24   **A.**   No.

25   **Q.**   Now, what about -- we talked about the crack in the wall.

1  What other kind of issues did you personally see that that

2  trailer had?

3  A.   Over the light fixture in my mama's room over her bed

4  there was a leak.  The floor when you first came into the door,

5  it had sunk in.

6  Q.   Let me stop -- I hate to interrupt you, Erika, but what do

7  you mean "it sunk in"?  What are you talking about?

8  A.   Like when you would step on it, it would, like, go down.

9  Q.   So it's kind of just warped where it would just go down

10 when you would touch it with your foot?

11 A.   Yeah.

12 Q.   Okay.  Now, how -- what temperature did you guys try to

13 keep the trailer at when you-all were in it?

14 A.   Like 75.

15 Q.   Was that difficult to do with that air conditioner in the

16 summer?

17 A.   Yes.

18 Q.   Now, were you ever personally around when your mom tried

19 to get people out there to fix these issues?

20 A.   Yes.  Because she called on a frequent basis to get the

21 people to come out, and they'd either say they'd have somebody

22 there in a certain amount of days or a certain amount of time

23 and somebody -- sometimes they would never come.

24 Q.   Did they ever fix the wall?

25 A.   No.

1  **Q.**   Did they ever completely fix the leak?

2  **A.**   No.

3  **Q.**   Did they ever fix the mold?

4  **A.**   No.

5  **Q.**   Did they ever fix the place where it would sink in when

6  you would just walk in?

7  **A.**   No.

8  **Q.**   Was that the way it was when you-all finally left in

9  December of '07?

10  **A.**   Yes.

11  **Q.**   Now, you realize the case -- this case is about

12  formaldehyde?

13  **A.**   Yes.

14  **Q.**   When was the first time that you, yourself, Erika, learned

15  about formaldehyde and related it to what you-all had been

16  smelling?

17  **A.**   I had heard about it on the news when they were talking

18  about how FEMA trailers -- had a smell in FEMA trailers.

19          **MR. WEINSTOCK:**  Objection, Your Honor.  That's

20  calling for hearsay.

21          **THE COURT:**  Well, I think she's answered the question

22  by simply saying she heard about it from a news outlet.  So

23  let's try to be efficient and move on.

24          **MR. BUZBEE:**  I will, your Honor.

25

1  **BY MR. BUZBEE**

2  **Q.**   I'm really more concerned about not how you heard about

3  it, Erika, but the time frame.  Was it at or near the time you

4  and your mama and Coop got out of the trailer?

5  **A.**   It was near the time that we were about to get out of the

6  trailer.

7  **Q.**   Now, other than your mom, can you think of anyone else who

8  had the opportunity to see your brother more often than you?

9  **A.**   My grandmother and my mom's best friend, who lived down

10 the street.

11 **Q.**   So would you say that of all the people that see this

12 young man every day, it would be your mom, and then who would

13 be second?

14 **A.**   My grandma.

15 **Q.**   And then who would be third?

16 **A.**   Ms. Donna.

17 **Q.**   And then you?

18 **A.**   No, me, then Ms. Donna.

19 **Q.**   Would you please tell the ladies and gentlemen of the jury

20 whether when he was living in that trailer, based on what you

21 saw, he was having more inhaling issues and difficulties

22 breathing than he had had before?

23 **A.**   Yes, he did.  Because he had a lot of runny noses, runny

24 eyes.  He would -- like, his nose would be clogged up and he'd

25 breathe weird, so he'd have to breathe through his mouth and

1     stuff like that.

2   **Q.**   You-all left that trailer in December of '07.  Where did

3     you go?

4   **A.**   My Auntie Marie's house.

5   **Q.**   You had to live with your aunt for a while?

6   **A.**   Yes.

7   **Q.**   Can you just tell us where you-all are living now?

8   **A.**   Our new house that we just got a couple weeks ago.

9   **Q.**   I bet you're glad to be there, aren't you?

10  **A.**   Yes.

11          **MR. BUZBEE:**  Your Honor, with that, we'd pass the

12    witness.

13          **THE COURT:**  All right.  Mr. Weinstock.  Just to let

14    the jury know that the procedure that we will follow, almost

15    always, with certain very limited exceptions, would be that the

16    party who calls the witness will conduct the direct

17    examination, which Mr. Buzbee just did, of each of the

18    witnesses called.

19          Then there will be an opportunity for the other

20    two attorneys to conduct cross-examination of that witness, and

21    then there will be an opportunity for redirect, in which case,

22    for instance for this witness, Mr. Buzbee will be the last

23    person to question this witness.  That will be limited to what

24    was covered on cross-examination.

25          So, Mr. Weinstock, if you would like to go ahead

1   and begin with the cross, then we'll have Mr. Penot ask a few

2   questions, and then Mr. Buzbee, and then we'll let

3   Ms. Alexander step down.  Go ahead, Mr. Weinstock.

4                        **CROSS-EXAMINATION**

5   **BY MR. WEINSTOCK**

6   **Q.**   Good afternoon, Ms. Alexander.

7   **A.**   Good afternoon.

8   **Q.**   Prior to the hurricane, you would kind of pay a lot of

9   attention to your brother's asthma, because if he had an

10  attack, all of you would have to go to the emergency room;

11  right?

12  **A.**   Yes.

13  **Q.**   So that's something you tended to notice; right?

14  **A.**   Yes.

15  **Q.**   And before the hurricane, if he ran around for too long,

16  he'd have an asthma attack; correct?

17  **A.**   Not necessarily.  He would just, like, start wheezing, and

18  he'd have to sit down for a while until his wheezing stopped,

19  and he'd have to take two puffs of his inhaler.

20  **Q.**   And that would prevent him from doing things like playing

21  tag and playing football.  He couldn't keep up and he'd have to

22  stop; correct?

23  **A.**   For a period of time, yes.

24  **Q.**   Just like his cousin; correct?

25  **A.**   Yes.

1  **Q.**   Before the storm, before Katrina, they couldn't keep up

2  because if he ran too long, he'd have an asthma attack;

3  correct?

4  **A.**   Yes.

5  **Q.**   And you would make sure that that didn't happen because

6  you didn't want to go to the emergency room; right?

7  **A.**   Yes.

8  **Q.**   Also, before the storm, changes in the weather tended to

9  trigger asthma attacks in your brother; correct?

10  **A.**   Yes.

11  **Q.**   Before the storm, your mom had a breathing machine called

12  a nebulizer; right?

13  **A.**   Yes.

14  **Q.**   And do you remember the medication, the Pulmicort, she

15  would put in it?

16  **A.**   I remember seeing it, but I didn't know the name of them.

17  **Q.**   He also had the inhaler, you were talking about, the

18  albuterol, ProAir; does that ring a bell?

19  **A.**   I knew it was albuterol.  I don't know about ProAir.

20  **Q.**   The thing he'd take a puff on was albuterol; right?

21  **A.**   Yes.

22  **Q.**   He didn't use the nebulizer very often; right?

23  **A.**   No.

24  **Q.**   Do you know that was steroid medication that was in that

25  nebulizer?

1  **A.**   No, I didn't know that.

2  **Q.**   But you know that he didn't use that very much?

3  **A.**   No.

4  **Q.**   All he used was the little albuterol pump; correct?

5  **A.**   Yes.

6  **Q.**   Before Katrina, he had allergies?

7  **A.**   Not that I can recall.

8  **Q.**   Do you remember giving a deposition about a month ago in

9  this case?

10 **A.**   Yes.

11 **Q.**   Do you remember being asked about that?

12 **A.**   No.

13         **MR. WEINSTOCK:**  Can you pull up Page 28, Lines 5

14 through 8.

15         **THE COURT:**  One second while we're stopped.  I

16 previously --

17         **MR. MEUNIER:**  I thought we were not going to show the

18 text.

19         **MR. WEINSTOCK:**  We're not.

20         **THE COURT:**  One second.  Turn that off for a second.

21         **MR. WEINSTOCK:**  Turn that off.

22         **THE COURT:**  Come on up.

23         While we're paused here, I understand that some

24 of the members of the jury had not brought in the notebooks

25 that the Court provided.  By us bringing them out, we're not

 1  suggesting that you should or should not take notes.  They're

 2  simply for your convenience if you'd like to take notes.  As I

 3  previously indicated, during the break or at the end of day,

 4  just leave them on your chairs.

 5              (WHEREUPON, the following proceedings were held at

 6  the bench.)

 7              **MR. MEUNIER:**  I thought you said that you didn't want

 8  transcripts shown with the video because it would give the jury

 9  the idea that they were going to have transcripts available to

10  them.

11              **MR. WEINSTOCK:**  No, that was on opening and

12  demonstratives.

13              **THE COURT:**  We have about 15 people talking.

14              **MR. MEUNIER:**  I'm just looking for clarification,

15  Judge.

16              **THE COURT:**  The way I'd like to do this, and I don't

17  mind you putting it on the screen, what I would typically have

18  you do is show it to her, without showing it to everybody, and

19  tell her, read this page and line, and let her read it, and

20  then ask her, does that refresh your recollection.

21              **MR. WEINSTOCK:**  I'm happy to do it that way.

22              **THE COURT:**  Everybody's going to have a chance to do

23  that.  That way we won't waste time --

24              **MR. WEINSTOCK:**  Actually, it would go faster --

25              **MR. BUZBEE:**  But playing the deposition is --

 1          **THE COURT:**  I think you have to refresh her memory
 2  first.
 3          **MR. WEINSTOCK:**  I'm happy to do that, Judge.
 4          **MR. MEUNIER:**  You don't get to play it until she
 5  says --
 6          **MR. BUZBEE:**  Correct.
 7          **THE COURT:**  He asked her the question and she gave an
 8  inconsistent answer, so he can use it now to refresh.
 9          **MR. WEINSTOCK:**  And if not, then --
10          **THE COURT:**  Right.
11          (WHEREUPON, the following proceedings were held in
12  open court.)
13          **MR. WEINSTOCK:**  May I approach?
14          **THE COURT:**  Yes.  As soon as the court reporter's set
15  up, you may do so.
16          **MR. WEINSTOCK:**  May I approach?
17          **THE COURT:**  Yes.
18  BY MR. WEINSTOCK
19  Q.   If you would read Lines 5 through 8 to yourself, the
20  question and answer.
21          **THE COURT:**  Okay.
22  BY MR. WEINSTOCK
23  Q.   Does that refresh your recollection as to whether Chris
24  had allergies before the hurricane?
25  A.   Yes.

```
 1  Q.   Your deposition was taken just over two months ago?
 2  A.   I think so.
 3  Q.   And you had forgotten that between now and then?
 4  A.   Yes.
 5  Q.   Okay.  In fact, you knew that pollen and dust would cause
 6  his allergies to act up; isn't that right?
 7  A.   Yes.
 8  Q.   Do you remember if Chris flew out to National Jewish
 9  Health in Denver?
10  A.   Yes.
11  Q.   Did you get to go?
12  A.   No.
13  Q.   And you know they tested him for allergies?
14  A.   Yes.
15  Q.   And you know that, just like you knew, dust and pollen
16  would cause his allergies to react; right?
17  A.   Uh-huh, yes.
18  Q.   You annoy that now; correct?
19  A.   Yes.
20  Q.   And you knew it then?
21  A.   Yes.
22  Q.   And, in fact, dust sometimes triggered his asthma, didn't
23  it?
24  A.   I think so.
25  Q.   Before the storm, before Katrina, Chris took Claritin for
```

1    his allergies?

2    **A.**   I think.  I'm not sure.

3              **MR. WEINSTOCK:**  May I approach, Your Honor?

4              **THE COURT:**  Yes.

5    BY MR. WEINSTOCK

6    **Q.**   Does that refresh your recollection as to whether Chris

7    took Claritin before the hurricane?

8    **A.**   Yes.

9    **Q.**   In fact, I didn't ask that.  You volunteered it, didn't

10   you?

11   **A.**   Yes.

12   **Q.**   Did his allergies acted up in Florida when you-all were

13   there in 2005?

14   **A.**   Yeah.

15   **Q.**   You moved into the trailer in May of 2006?

16   **A.**   Yes.

17   **Q.**   And I think you've told us about the smell; correct?

18   **A.**   Yes.

19   **Q.**   Your mom opened the windows, opened the doors, and opened

20   the hatch in the bathroom; correct?

21   **A.**   Yes.

22   **Q.**   And that hatch pretty much stayed open unless it was

23   raining; correct?

24   **A.**   Yes.

25   **Q.**   Often she opened the windows if there was just a breeze;

1  right?

2  **A.**   Yes.

3  **Q.**   Most of the time, you kept the doors and windows open and

4  you only put the AC on when you slept; correct?

5  **A.**   Yes.

6  **Q.**   Except, that is, those times when you had all the doors,

7  all the windows open, the bath vent open, the stove vent open

8  and the air conditioning on; correct?

9  **A.**   We didn't have a vent on the stove.

10  **Q.**   You didn't have a stove vent that your mother turned on

11  when she cooked?

12  **A.**   Oh, yeah, we had that one.

13  **Q.**   And every time she cooked, she turned on that stove vent?

14  **A.**   Yes.

15  **Q.**   Even in the summer, you would leave that door open?

16  **A.**   Yes.

17  **Q.**   And let that trailer ventilate; correct?

18  **A.**   Yes.

19  **Q.**   Even if you weren't in it, if you were outside playing,

20  you'd leave that door open?

21  **A.**   No.

22  **Q.**   In the summer when you were outside the trailer playing?

23  **A.**   If it was just me and my brother outside playing and my

24  mama was inside, yeah, we'd leave the door open.  But if all

25  three of us were outside the trailer, we wouldn't leave the

1    door open.

2    **Q.**   But then you'd open the windows?

3    **A.**   Yes.

4    **Q.**   Your mother put the thermostat at 75; correct?

5    **A.**   Yes.

6    **Q.**   You liked it colder.  You'd drop it down to 70; isn't that

7    correct?

8    **A.**   Yes.

9    **Q.**   Your grandmother -- your grandfather's barbershop was

10   right next door to your trailer; right?

11   **A.**   Yes.

12   **Q.**   And by the time you got back to New Orleans, had he

13   reopened that?

14   **A.**   Had he reopened that?

15   **Q.**   Had he reopened the barbershop?

16   **A.**   Yes.

17   **Q.**   So if you left the windows open when you-all were at

18   school, it was no big deal because your grandfather was right

19   next door; right?

20   **A.**   Yes.

21   **Q.**   And that's what your grandmother told you to do, to

22   ventilate the trailer; right?

23   **A.**   Yes.

24   **Q.**   Did I understand correctly that there was a leak in the

25   trailer over your mother's bed?

1  A.   Yes.
2  Q.   And she called FEMA maintenance, and they just looked at
3  it and didn't fix it?
4  A.   Yes.
5  Q.   There were holes in the bottom of the trailer where mice
6  came in?
7  A.   Yeah.  It wasn't really -- yeah, because they were around
8  the plumbing pipes, and the holes are too big.
9  Q.   Right.  So the hole would be like this and maybe the pipe
10  would be like this, and there would be a gap; right?
11  A.   Yes.
12  Q.   So your mom stuck steel wool in that gap?
13  A.   Yes.
14  Q.   And she maybe put a little foam in that gap to close it
15  up?
16  A.   Yes.
17  Q.   But before that, you were having a real problem with mice
18  in the trailer; right?
19  A.   Yes.
20  Q.   Let's go back to the asthma after you're in the trailer.
21  Now, it's December of 2007.  Do you remember Chris had to go to
22  the emergency room?
23  A.   I don't remember him going to the emergency room.
24  Q.   I'm sorry?
25  A.   I don't remember him going to the emergency room.

1    **Q.**   You don't remember him going to the emergency room at all
2    while you were in the trailer; is that what you're saying?
3    **A.**   I'm not saying that I don't remember him going at all.  I
4    don't remember him going at that specific time.
5    **Q.**   You don't remember the specific month that he went --
6    **A.**   Yes.
7    **Q.**   But you do remember going to Children's Hospital?
8    **A.**   Yes.
9    **Q.**   Same as before the storm, Chris had an asthma attack, you
10   had to go too; correct?
11   **A.**   Yes.
12   **Q.**   Do you remember it had gotten a lot colder that day?
13   **A.**   Yes.  It was colder in December than it usually was.
14   **Q.**   Were you there when your mother told the nurse that Chris
15   hadn't had an asthma attack in a year?
16   **A.**   Yes.
17   **Q.**   That's exactly what she said; right?
18   **A.**   Yeah.
19   **Q.**   Dr. Barnes ultimately put Chris on what you called
20   stronger medication; right?
21   **A.**   Uh-huh.
22   **Q.**   Yes?
23   **A.**   Yes.
24   **Q.**   And by stronger medication, you now understand that's
25   steroid medication; correct?

203

```
 1   A.   Yes.
 2   Q.   Not just a little albuterol puffer, but the real strong
 3   steroid medication to maintain his asthma; right?
 4   A.   He started taking a little purple thing.
 5   Q.   And he's doing a lot better, isn't he?
 6   A.   Yes.  He doesn't have to take -- all he really take is the
 7   Claritin.
 8   Q.   Now that he's on the stronger medication, he's having less
 9   problems than he did even before Katrina; isn't that right?
10   A.   Yes.
11   Q.   I think we asked you -- strike that.
12            The only thing that you know that Chris is afraid of
13   was going downstairs at your aunt's house by himself; right?
14   A.   Yes.
15   Q.   He never expressed to you fears of dying or anything like
16   that; right?
17   A.   No.
18   Q.   In fact, you would suggest he's actually too jolly or too
19   happy; right?
20   A.   Yeah.
21   Q.   Like he was injected with pixie stick dust?
22   A.   Yes.
23   Q.   Exact same thing as your mom, right, too happy, too jolly?
24   A.   Yes.
25   Q.   And when you were in the trailer, your mother's health did
```

```
 1   not get worse; right?
 2   A.   She had colds more frequently than she did before we got
 3   in the trailer.
 4   Q.   But her overall --
 5   A.   Overall, that's about it.
 6   Q.   Right.  The three of you were in a small trailer, she
 7   might have gotten a cold more frequently, but her overall
 8   health did not change; correct?
 9   A.   Yes.
10            MR. WEINSTOCK:  Thank you.  No further questions.
11            THE COURT:  Thank you.  Mr. Penot.
12                       CROSS-EXAMINATION
13   BY MR. PENOT
14   Q.   Good afternoon, Ms. Alexander.
15   A.   Good afternoon.
16   Q.   I'm Charlie Penot.  We haven't met, but I just have a few
17   questions for you.
18            When you first saw the trailer when you and Chris and
19   your mom moved in, you were with your grandmother.  The four of
20   you walked through the trailer; is that right?
21   A.   Yes.
22   Q.   And you said you recall that wall being popped out, but
23   didn't see any other problems with any of the paneling in the
24   trailer, did you?  When you first moved in.
25   A.   What's the paneling?
```

1   **Q.**   The wall, like the thing that you saw popped out in your

2   mom's bedroom.

3   **A.**   No.

4   **Q.**   And all the doors closed just fine at the time; right?

5   They were working?

6   **A.**   Yeah.

7   **Q.**   And the way you described that, the wall that was popped

8   out, you described it as like a speed bump, do you remember

9   that, in your deposition?

10  **A.**   Yes.

11  **Q.**   It was attached at the top up by the ceiling and down at

12  the bottom, but it was just kind of bulging in the middle; is

13  that right?

14  **A.**   Yes.

15  **Q.**   You were also with your mom when a lady came by after you

16  had been there a couple of days to kind of show you around the

17  trailer and show you how to work the stove and show your mom

18  that kind of stuff?

19  **A.**   Yes.

20  **Q.**   And your mom told that lady about the wall in the bedroom;

21  isn't that right?

22  **A.**   Yes.

23  **Q.**   And the lady told your mom to call maintenance for it to

24  get it fixed; is that right?

25  **A.**   Yeah, and she also told her to put the gray tape on it.

 1   **Q.**   And she also told her to put the tape on it; is that what
 2   you said?
 3   **A.**   Yes, until maintenance would come.
 4   **Q.**   But to call maintenance?
 5   **A.**   Yes.
 6   **Q.**   Now, you mentioned about a leak over your mom's bed.  You
 7   guys lived there from about May of 2006, late May, until
 8   December '07; right?
 9   **A.**   Yes.
10   **Q.**   And that leak didn't develop until about -- about the
11   midway point of the time that you were living there; is that
12   right?
13   **A.**   Yeah.
14            **MR. PENOT:**  Thanks a lot, Ms. Alexander.
15            **THE COURT:**  Thank you.  Any redirect?
16            **MR. BUZBEE:**  Yes, sir.
17                         **REDIRECT EXAMINATION**
18   BY MR. BUZBEE
19   **Q.**   You know, I didn't ask you, Erika, how old are you?
20            **THE COURT:**  Now, wait.  This isn't a chance to go
21   back and ask something new.  I'll let you ask her her age.  But
22   let's not go back to anything new that wasn't covered --
23            **MR. BUZBEE:**  No, we're not.  I shouldn't have even
24   prefaced it that way.
25

1    **BY MR. BUZBEE**

2    **Q.**   Go ahead.  How old are you?

3    **A.**   Fifteen.

4    **Q.**   Now, how old were you back when these things this lawyer

5    was asking you about, about eleven or 12?

6    **A.**   Yeah, about.

7    **Q.**   Let me make sure I understand this:  How many windows were

8    there?

9    **A.**   They had the one in the back by me, they had the two in

10   the living room/dining room/kitchen.  They had one in my mama's

11   room.  So that's four.

12   **Q.**   Four windows?

13   **A.**   Yes.

14   **Q.**   And how many doors?

15   **A.**   One.

16   **Q.**   And how many vents?

17   **A.**   They had the vent over the stove and the vent in the

18   bathroom.

19   **Q.**   So four windows, one door, and one vent, and maybe two if

20   it's -- somebody's cooking?

21   **A.**   Yes.

22   **Q.**   And with all of these things on, you still could smell

23   that smell?

24   **A.**   Yes.

25   **Q.**   And he still, Chris, was still having those issues?

1  A.   Yes.

2  Q.   Now, how many times did you have those nosebleeds while

3  you were in that trailer?

4  A.   I don't really know a certain number, but I know sometimes

5  I'd wake up with, like, dried blood on my nose or my

6  pillowcase.

7           MR. BUZBEE:  Pass the witness, Your Honor.

8           THE COURT:  All right.  Thank you.  You can step

9  down.  I appreciate your time.  This witness is free to go.

10  Please don't discuss your testimony with anyone else who you

11  think might be a witness in this case.

12           THE WITNESS:  Okay.

13           THE COURT:  Counsel.

14           THE WITNESS:  Your Honor, would it be okay if we let

15  them go back to school?

16           THE COURT:  Certainly.  All right.  We have another

17  witness that we can cover before we take a mid-afternoon break.

18           MR. WATTS:  When do you want the break?

19           THE COURT:  Probably in about a half hour, 45

20  minutes.

21           MR. WATTS:  I think I can get direct done.

22           THE COURT:  Who is next?

23           MR. WATTS:  Gerald McGwin.

24           THE COURT:  Let's go ahead and do that.  Gerald

25  McGwin.

1          **MR. WATTS:**  Your Honor, we'd call Gerald McGwin.

2          **THE COURT:**  Mr. McGwin, please come up here and

3     remain standing until you take the oath.  Where is he?

4          **MR. WATTS:**  He's outside.

5          (WHEREUPON, **GERALD MCGWIN**, having been duly sworn,

6     testified as follows.)

7          **THE DEPUTY CLERK:**  Please state your full name and

8     correct spelling for the record.

9          **THE COURT:**  Before we go into this, this is an expert

10    witness?

11         **MR. WATTS:**  It is, Your Honor.

12         **THE COURT:**  Do we have a stipulation with regard to

13    his expertise?

14         **MR. WEINSTOCK:**  If they offer it, you'll get a

15    stipulation.

16         **THE COURT:**  What is his area of expertise the

17    plaintiffs intend?

18         **MR. WATTS:**  Epidemiology.

19         **MR. WEINSTOCK:**  So stipulated, Your Honor.

20         **THE COURT:**  All right.  Let me explain to the jury

21    that typically when a witness has particularized, specialized

22    knowledge that would be helpful to us, we let that witness

23    testify, and the procedure's a little bit different.  That

24    witness is known as an expert witness.  And in this case,

25    Dr. McGwin is here and serving as an expert witness.  His

```
1   expertise is the field of epidemiology, if I understood
2   correctly.
3                 Now, usually, or oftentimes, when the plaintiff
4   or another party calls an expert witness, we have to first
5   qualify that person as an expert, which means that the person
6   calling can ask questions to establish their expertise, and
7   then the other side gets an opportunity to cross-examine that
8   witness, and then the Court makes a decision as to whether the
9   testimony that the witness has is going to be admitted as an
10  expert.  In other words, the Court's going to accept the
11  witness as an expert.
12                In this instance, however, counsel for each of
13  the defendants has agreed and so stipulated that this
14  gentleman, Dr. McGwin, is an expert, so we're going to
15  fast-forward to what testimony he has to offer about this
16  particular case.  So he's an expert in the field of
17  epidemiology, and let's go ahead and find out what he has to
18  testify about in this case.
19          MR. WATTS:  Excellent.
20          THE DEPUTY CLERK:  State and spell your full name for
21  the record.
22          THE WITNESS:  Gerald McGwin, Jr., G-E-R-A-L-D,
23  M-C-G-W-I-N, J-R.
24
25
```

1                          **DIRECT EXAMINATION**

2   **BY MR. WATTS**

3   **Q.**   Good afternoon, Dr. McGwin.  You are not a medical doctor;

4   is that right?

5   **A.**   No, sir.

6   **Q.**   But when you get a Ph.D., the rest of us have to call you

7   doctor; is that right?

8   **A.**   You don't have to call me doctor.

9   **Q.**   I put up a copy of your résumé, and I'm going to fly

10   through this in light of the stipulation.  If you could just

11   explain for the members of the jury what you are a doctor in.

12   **A.**   My doctorate is in the field of epidemiology, which is the

13   study of the distribution to a determinate of diseases not

14   population.  Basically, we're the people that tell you that

15   butter is good for you and the next day butter is bad for you.

16   **Q.**   What is your present title?

17   **A.**   I'm the vice chair and I'm a professor in the department

18   of epidemiology at the University of Alabama at Birmingham.

19   **Q.**   And you live in Birmingham, Alabama?

20   **A.**   Yes, sir.

21   **Q.**   And just real quickly, are you married?

22   **A.**   Yes, sir.

23   **Q.**   Do you have kids?

24   **A.**   Yes, sir.

25   **Q.**   How long have you been an epidemiologist?

1    **A.**    I received my Ph.D. in epidemiology in 1998.

2    **Q.**    And as we look at your curriculum vitae, did you get your

3    Bachelor of Science from the University of Vermont?

4    **A.**    Yes, sir.

5    **Q.**    Did you study at the Harvard University's -- did you get a

6    Master of Science in health and social behavior?

7    **A.**    Yes, sir.

8    **Q.**    And then a doctorate of Philosophy in epidemiology from

9    the University of Alabama at Birmingham?

10    **A.**    Yes, sir.

11    **Q.**    Is that where you work now?

12    **A.**    Yes, sir.

13    **Q.**    Go to Page 2.  How long have you worked at the University

14    of Alabama in Birmingham in the field of epidemiology?

15    **A.**    I've been a professor in the department since the time --

16    pardon me -- I joined the faculty at the time I graduated in

17    1998.

18    **Q.**    You saw that all sides just agreed that you're an expert,

19    so you passed the muster there.  When you're a professor,

20    though, is there a process of passing muster so that you're

21    guaranteed to get to stay for a while?

22    **A.**    Yes, sir.

23    **Q.**    Are you a tenured professor of epidemiology at the

24    University of Alabama Birmingham?

25    **A.**    Yes, sir.

1    Q.    When I think of the University of Alabama, I think of

2    Rolltide, which is, I guess, a dangerous thing to say in LSU

3    territory.  But you're at Birmingham.  Explain for us the

4    difference in where you're at versus the main campus system.

5    A.    Yes, sir.  The University of Alabama is actually known as

6    the University of Alabama system.  And the main campus, which

7    most people are familiar with the Rolltide part of the

8    university, some would argue the most important part of the

9    university, is in Tuscaloosa.  The University of Alabama at

10   Birmingham is often known as the medical part of the campus.

11   Q.    And you work at the medical part of the campus in

12   Birmingham?

13   A.    Yes, sir.

14   Q.    I notice on Page 3 it says you got a visiting

15   professorship at the Harvard School of Public Health in the

16   injury control research center.  What did you do that?

17   A.    Often with a visiting professorship, a university, or a

18   college or a university will ask you to come, spend a few days,

19   lecture to their students, lecture to their faculty, and I was

20   invited to do that in 2002, it appears.

21   Q.    Okay.  And the University of California, Davis, you were

22   visiting a professor in the department of public health

23   science, division of epidemiology; is that right?

24   A.    Yes, sir.

25   Q.    Are these various places where you've gone and taught

1    students as a visiting professor?

2    **A.**    Students and/or faculty.

3    **Q.**    And I hate to diminish your achievements.  You've got a

4    long résumé here, but we're trying to fly through this, and

5    you've passed muster, as we put it, so I'm going to skip over a

6    lot of this.

7              In terms of teaching experience since 1999, have you

8    been a professor of epidemiology at the University of Alabama,

9    Birmingham?

10   **A.**    Yes, sir.

11   **Q.**    And have you taught analyses of case control studies,

12   among other things?

13   **A.**    Yes, sir.

14   **Q.**    Do you teach master's level students that are trying to

15   get their master's in epidemiology?

16   **A.**    Yes, sir.

17   **Q.**    Have you taught the analysis of cohort studies?

18   **A.**    Yes, sir.

19   **Q.**    The introduction of health and human disease?

20   **A.**    Yes, sir.

21   **Q.**    In addition to teaching as a professor of epidemiology at

22   the University of Alabama, Birmingham, have you published a

23   great deal of work?

24   **A.**    Yes, sir.

25   **Q.**    And, again, trying to save time, not to diminish what

1    you've accomplished, but if we start at Page 7 on your résumé,

2    you've listed an article 1997 by McGwin, Roseman, Owsley,

3    Epidemiology and the Internet letter.  It says Epidemiology

4    1997, 84 at 4635.  <u>Epidemiology</u>, is that some sort of a

5    published journal?

6    A.   Yes, sir.

7    Q.   Was this article published in 1997?

8    A.   Yes, sir.

9    Q.   It's Volume 8, Part 4, at Page 465?

10   A.   Yes, sir.

11   Q.   And, again, I think if I went through each one of your

12   publications, the judge would shoot me.  They go on for a

13   while; right?  And they're numbered in your CV that's in the

14   record; is that right?

15   A.   Yes, sir.

16   Q.   And just to save time, let me skip over -- if we get to

17   Page 34, the last publication is listed as No. 209; is that

18   right?

19   A.   That is correct.

20   Q.   And that's been published in 2009; is that right?

21   A.   Yes, sir.

22   Q.   And then you've got a number of publications that are in

23   press; is that right?

24   A.   Yes, sir.

25   Q.   And there are 14 of them in press.  When a publication is

1    in press, does it have to go through a process known as a peer

2    review process?

3    A.    All published manuscripts generally go through a peer

4    review process.

5    Q.    Look at the jury and explain to them what a peer review

6    process is from the standpoint of publications.

7    A.    When we do research, we like to publish it in medical

8    journals, The Journal of the American Medical Association, The

9    New England Journal of Medicine, are some that you may be

10   familiar with.

11        You just don't get to submit it and they print it for

12   us.  It has to pass muster.  So when we submit our work to one

13   of these journals, it gets sent to our colleagues.  Our

14   colleagues usually pick it apart quite extensively, tell us

15   what we've done wrong, and ask us to either revise the work or

16   they decide that based on the material, it's really not

17   appropriate for their audience.

18        The journal readership is very specific many times,

19   specific to, for example, ophthalmology, which is eye disease,

20   and you would want to submit work to people who are going to

21   read that type of journal.  Ultimately, the reviewers decide

22   whether that gets published in this journal or not.

23   Q.    Now, Dr. McGwin, can you tell the ladies and gentlemen of

24   the jury -- we've seen you've published 290-something times.

25   Do you do a great deal of research in your university work?

1  A.    Oh, yes, sir.

2  Q.    Are you involved in litigation a whole bunch?

3  A.    Not a lot.  This is the first time I've actually testified

4  in front of a jury with all these people here.

5  Q.    Okay.  Let's get to what it is that got you here in front

6  of the jury for the first time.  Did I call you in April of

7  this year and ask you if you could do an epidemiological

8  evaluation on the relationship between formaldehyde and asthma

9  in children?

10  A.    I'll take your word that that was -- it was April when we

11  first spoke, and I believe the content of our conversation was

12  largely around the existing literature.  And I believe we came

13  to a conclusion that what would really help in this case was

14  something called a meta-analysis.

15  Q.    Okay.

16  A.    I don't believe that you came to me suggesting such a

17  study.

18  Q.    All right.  If you could -- if there are ten different

19  epidemiological studies on a given surgery, can you tell the

20  jury what a meta-analysis does to those ten different studies?

21  A.    Yes, sir.  Epidemiology is doing medical research using

22  populations of individuals.  We don't have enough resources or

23  time to find everybody in the country that has asthma.  We

24  don't have enough time or money to find everybody that has

25  glaucoma.  So what we do is we take samples of individuals, and

1   those samples of individuals end up as individual studies and

2   they may end up in the literature.

3            And many times those studies maybe weren't quite as

4   big as they need to be.  They have 500 people and they really

5   needed to have a thousand people.  As these studies accumulate

6   in the literature, it's often useful to aggregate them

7   together.  And when we aggregate those studies together and

8   pool all of the results and step back and look at them in the

9   aggregate, we have what is known as a meta-analysis.

10  Q.    Now, you mentioned something that said a given study may

11  have had 500 people and it needed a thousand.  As an

12  epidemiologist, why does a given study need a thousand versus

13  500?  Why isn't 500 okay?

14  A.    It comes down to statistics.  When we're interested in a

15  topic, whatever the case may be, in this specific case asthma

16  and formaldehyde exposure, we can use statistics to tell us how

17  many study subjects we need to evaluate.

18           And the reason that's important is we don't want to

19  waste our time and certainly anybody else's time or money.  And

20  so we perform what are known as power calculations.  These

21  power calculations tell us, based on what we know about

22  formaldehyde and asthma, that if there is a true relationship,

23  we need X number of individuals in our study to find it if it's

24  truly there.

25  Q.    Okay.  And in going through these different studies that

1    have been published that we're about to talk to the jury about,

2    are some of the studies not sufficiently powered by themselves

3    to answer such a question?

4    A.    Power is a difficult concept to use in that regard.  Power

5    is something that we plan for in the beginning, and we plan on

6    it based on the best information that we have.  That

7    information isn't always accurate.  So many of these studies in

8    retrospect may be what we call "underpowered".  That does not

9    necessarily mean the investigator should be faulted for not

10   enrolling enough subjects originally.

11   Q.    Now, if we were in state court instead of federal court, I

12   would take this quarter over there and start flipping it in

13   front of the jury, but I don't want to do that.  If I flipped a

14   quarter 100 times, can you, as an epidemiologist or a

15   mathematician, tell me how many times it's going to come up

16   heads and how many times tails?

17   A.    I think common sense would tell us it would come up head

18   approximately 50 percent of the time.

19   Q.    But what if I did it 100 times and it came up 51 heads and

20   49 tails, does that mean that I've got a mis-weighted nickel or

21   is something else going on here?

22   A.    No.  Due to random variation, you would expect, actually,

23   it could come up perhaps 49 times heads at any given attempt

24   flipping a coin 100 times.

25   Q.    Now, other than having a good haircut, you look like a guy

1    that's been stuck in a math lab for a while.  Tell us using

2    regular people what random variation means.  Is that what the

3    rest of us call "chance"?

4    A.   Yes.

5    Q.   Are there statistical tests that tell you whether or not

6    differences in numbers between two different populations is the

7    result of chance as opposed to something really going on that

8    explains the difference?

9    A.   Yes.  Most of the field of statistics is involved

10   evaluating chance.

11   Q.   Okay.  You've told the jury what "power" means.  Tell them

12   what "statistical significance" means.

13   A.   As I mentioned previously, when we do our research, we

14   never have an entire population of individuals.  We take

15   samples.  And those samples are meant to represent some larger

16   population, the county that we're presently in, the United

17   States, the world.

18          And because we're drawing these smaller samples from

19   a larger population, we want to be sure that what we're

20   observing is real and not due to chance, and statistics provide

21   us an opportunity to do that.  It says that is what we've

22   observed sitting here in front of us different than what we

23   would expect to see.

24   Q.   Okay.  And in order to determine statistical significance,

25   are there given tests that you-all do to data in order to tell

221

1    you whether something is statistically significant as opposed

2    to differences happening by chance?

3    A.    Yes, sir.

4    Q.    What are some of these tests?

5    A.    The names of tests specifically?

6    Q.    Sure.

7    A.    There's a t-test, there's a Cox square test, there's a

8    Wilcoxson test.  Do you want me to keep --

9    Q.    I'll tell you what, why don't we try to short-circuit this

10   with the idea if I or counsel wanted to cross-examine you about

11   that, we could bring out a bunch of books on statistics and

12   they'll be in there; is that right?

13   A.    I believe I had very lengthy statistics conversations with

14   several of the gentlemen in the room.

15   Q.    Let's go on to something different, then, and that is

16   we've talked about power, we've talked about statistical

17   significance, and Cox square's and t-test, and I don't want to

18   go there.  Can you tell the jury what a confidence interval is?

19   A.    Yes, sir.  As I mentioned, even going back to this notion

20   of sampling, when we collect data and we make decisions about

21   what the mean level of formaldehyde is, or what the mean blood

22   pressure is, there's some variation there.  You can think of it

23   as a batting average, and that mean that we come up with is

24   measured with a certain amount of error.

25              The error is related to the fact that our measurement

222

 1    tools, our ability to measure blood pressure, or cholesterol,

 2    or formaldehyde, is associated with a certain amount of

 3    variability.  And the confidence interval tells us, generally,

 4    as the name suggests, how much confidence we have when we give

 5    those measurements.

 6            If you've ever heard on the television or seen in the

 7    USA Today seems to be fond of reporting data, and usually at

 8    the bottom of the figure you see plus or minus three or plus or

 9    minus ten.  That is, in a rough way, an element of confidence.

10    It tells you that the mean, the average, is ten, but it could

11    be as low as seven, and it could be as high as 13.

12    Q.   So here, locally if someone were to go run a poll about

13    this senate race and senator David Vitter is leading his

14    democratic opponent 51 percent plus to 42 percent plus or minus

15    2 or 3 percent, is that plus or minus the confidence interval?

16    A.   It's markedly equivocal.  The confidence interval has a

17    very specific statistical meaning that you may or may not want

18    me to put everybody to sleep over.

19    Q.   All right.  Now, in this case, did you try to go in and

20    find every article that ever existed with respect to

21    formaldehyde and occupational asthma, for example?

22    A.   While I'm familiar with that literature, my objective here

23    was focused on asthma and formaldehyde exposure in children.

24    Q.   All right.  We've got a young man that just had to leave

25    his own trial because his lawyer is making him go to school.  I

1   think he was born on December the 18th of 1996.  Did you even

2   know that when you were doing this work?

3   **A.**   No, sir.

4   **Q.**   But we'll call him a 12 1/2-year-old.  Did you attempt to

5   go out and research the literature for the epidemiological work

6   that was done with respect to children that were exposed to

7   asthma -- I mean to formaldehyde?

8   **A.**   Yes, sir.

9   **Q.**   All right.  And how did you go about doing that,

10   generally?

11   **A.**   In doing our research, any research that we do, it's

12   important for us to look at what other people have done.  It

13   doesn't make a lot of sense for us to spend our time,

14   potentially even the government's money, doing research where

15   it's not necessarily needed.

16          And one of the ways that we do this is we a tool

17   called PubNet.  It's an electronic resource that lists all of

18   the biomedical published peer-reviewed biomedical literature

19   going back several decades at least.  And to find the

20   literature regarding asthma and formaldehyde in children, I

21   used this tool called PubNet.

22   **Q.**   And did you search through several hundred articles to try

23   to find stuff that was specific to kids?

24   **A.**   Usually, when you do these researches, you after a while

25   get fairly good at it.  However, one's research ability is

1   limited by what's actual appearing in the journals.  So

2   oftentimes you poll many more articles than are actually

3   relevant for what it is that you are doing research on.

4          So in this case, we probably polled maybe 30, 50

5   articles and ultimately found maybe 20 that were directly on

6   point that were directly relevant to the topic.

7   **Q.**   Now, before we get into these articles, can you tell the

8   members of the jury what the difference is between a study and

9   a review article?

10  **A.**   Yes, sir.  A review article is where an individual, such

11  as myself, might go and read all of the literature and provide

12  some summary of it.  And I would make an assessment that the

13  majority of the research says that there's an association

14  between A and B, and I might provide some assessment that the

15  studies were generally good or the studies were generally bad.

16  That's generally considered a literature review.  You can think

17  of it as a book report.

18         What we did in the context of this particular work

19  was, as mentioned, a meta-analysis, and we went beyond just

20  that book report, just that literature review.  We actually

21  took the results from the studies that we were interested in

22  and combined the results together to provide us, as I was

23  talking about, a single study, an aggregate study, that had

24  much more -- many more people in it, it has much more

25  statistical power than any one study might have by itself.

1   Q.   Okay.  If we took what's going on in this courtroom and I

2   wrote an article that says formaldehyde causes asthma in kids

3   and Andy writes one that says, no, it doesn't, and somebody

4   came in and reviewed our work, is that where you stopped, or

5   did you draw the data itself that was gathered from the

6   underlying studies?

7   A.   In this particular case, we didn't have the ability to

8   actually get the raw data.  What we were able to do was get the

9   published results, and, as I'm sure will be shown, they show

10  tables of data, and you can go in and extract those tables of

11  data and basically combine them together.

12  Q.   So we're looking at table 1, which is for the record

13  Exhibit 305.1, which is in evidence already.  This has a list

14  of, let's see -- 1, 2, 3, 4, 5, 6, 7, 8, 9 -- 10, or so

15  studies; is that right?

16  A.   I believe it's nine studies, and one study is listed

17  twice, because it looked at two different aspects of the issue.

18  Q.   So nine or ten studies.  Did you create this table 1?

19  A.   Yes, sir.

20  Q.   And just real briefly, it says "source."  Is the first

21  name in the published article --

22  A.   That would be the last name of the first author.

23  Q.   And then 1990 is the year of publication?

24  A.   Yes, sir.

25  Q.   The setting, is that the country where the study was done?

1  A.   Yes, sir.

2  Q.   Design, it says "cross-sectional", "cohort", "case

3  control".  You can tell us what differences is on all those; is

4  that right?

5  A.   Yes, sir.

6  Q.   Let me address that with you real quick.  If somebody's

7  taking a medication, you mentioned cholesterol, if somebody

8  wants to take Crestor, or something like that, the drug

9  companies do clinical studies beforehand to see what will

10  happen before you take Crestor; right?

11  A.   They generally do a specific type of study called a study

12  called a randomized clinical trial.

13  Q.   Are you allowed to do randomized clinical trials by

14  ingesting people full of formaldehyde?

15  A.   I would be very suspicious that would be able to do

16  something like that.

17  Q.   Well, you if got a Class 1 carcinogen, are there ethical

18  restrictions against doing clinical studies?

19  A.   Yes.

20  Q.   So you have to look at different kinds of studies?

21  A.   Yes, sir.

22  Q.   Tell the jury what a cohort study is.

23  A.   A cohort study, as the name suggests, is a study design

24  where we would take a group of individuals, perhaps everybody

25  in this room, for example, and we would take some measurement

1  on them, everybody's blood pressure, perhaps their cholesterol,

2  maybe even something as simple as their height and weight, and

3  then we would come back a year from now and we would evaluate

4  some sort of health outcome, perhaps whether people have

5  glaucoma or whether they have hypertension.  And we would

6  attempt to link those measurements that we took today to those

7  health outcomes that we measure a year from now.

8  Q.   And just real briefly, what's a cross-sectional study?

9  A.   A cross-sectional study, if we continue with that same

10  example of using the individuals in this room, I would not only

11  take those measurements of your cholesterol, perhaps your blood

12  pressure, your height and weight, but instead of waiting for a

13  year from now to kind out about glaucoma or diabetes, or

14  whatever I was interested in, I would also ask you today

15  whether you have those conditions.

16          So we're measuring the risk factors in the disease at

17  the same point in time.

18  Q.   And then we have as the definition whether it's

19  self-reported or diagnosed, exposure whether it occurred at

20  home or at school, and then formaldehyde levels.  Did you

21  create these formaldehyde levels, or did we get those from the

22  articles?

23  A.   Those are what appeared in the articles.

24  Q.   Then you've got NO.(Asthma).  The first one, for example,

25  Kryzanowski, it says 298(47).  What does that mean?

1    A.    It would mean that the study had 298 participants total,

2    47 of whom had asthma.

3    Q.    And then OR, what's OR?

4    A.    Odds ratio.

5    Q.    95th percentile CI.  What's CI?

6    A.    Confidence interval.

7    Q.    Per 10, and then it looks like an "M," but it's a squiggly

8    "M".  What's that?

9    A.    Micro.

10   Q.    What's 10 micro "G"?  What's "G"?

11   A.    Gram.

12   Q.    10 per microgram, slash M to the 3rd.

13   A.    Meter cubed.

14   Q.    Okay.  Ten per microgram meter cubed?

15   A.    Yes, sir.

16   Q.    And then you say whether it's adjusted or not; correct?

17   A.    Yes, sir.

18   Q.    Now, I want to put up Exhibit 305.2.  This has Garrett

19   from '99, Rumchev from 2002, Mi from 2006, Smedje from '97 and

20   2001, and Zhao from 2008, and Krzyzanowski from 1990.  Why are

21   there less studies in this one than there were in the previous

22   exhibit, 305.1?

23   A.    If we look at this table here, we see that there are

24   several studies -- what's the best place to look -- if you look

25   under the odds ratio column, you'll see that there are two

```
 1   studies listed for which there's no numbers there.
 2   Q.   Tavernier and Pati?
 3   A.   That is correct.
 4   Q.   And you've got a not applicable under --
 5   A.   That's correct.
 6   Q.   So did you use those in your meta-analysis?
 7   A.   No, sir.  Because those particular studies didn't provide
 8   us the necessary data to do that combining that we talked
 9   about, they had to be set aside from the quantitative part.
10            MR. WATTS:  Your Honor, may I approach the witness?
11            THE COURT:  Yes.
12   BY MR. WATTS
13   Q.   I noticed you were outside during the opening statements.
14   Is that right?
15   A.   Yes, sir.
16   Q.   Mr. Buzbee and counsel are having some sort of debate
17   about what the gold standard is on the level.  Are you here to
18   talk about which is the best level, whether it's .050 or .008
19   or point this or point that?
20   A.   No, sir.
21   Q.   But using this data that you have gathered, are you able
22   to tell us what the odds ratio for getting asthma is as you
23   increase your exposure to formaldehyde?
24   A.   If I could correct what you said a little bit.  What I
25   could tell you is not necessarily the odds ratio for getting
```

1   asthma, I could tell you what the odds would be.

2   Q.   Okay.  And like I said, I'm not stuck in the math lab, so

3   fix me whenever I mess something up like that.

4   A.   Yes, sir.

5   Q.   But the bottom line is that using the data that we got

6   from these studies, can you tell us what the odds of getting

7   asthma is depending upon what the different level of

8   formaldehyde exposure is in these studies?

9   A.   Yeah.  That's the advantage of combining results from a

10  number of different studies.  Could you put the other table --

11  is that possible?  The advantage of combining the results of

12  individual studies is that the study that you do, the study

13  that I do, the study that this gentleman does, is, again, done

14  in different populations, and they may have fairly narrow

15  exposure ranges of formaldehyde.

16          Yet by combining the results, we get a much larger

17  window of formaldehyde exposure, and therefore, we get to make

18  better estimates as to what the increased risk for asthma might

19  be.

20  Q.   Okay.  Now, I want to put up a chart that you made that I

21  marked as Exhibit 305.3.  Can you see that okay, Doctor?

22  A.   Yes.

23  Q.   Now, here's my question:  Using Exhibit 305.3, you've got

24  a long -- is this the Y axis or the X axis?

25  A.   That would be the X axis.

1   **Q.**   So sideways is X axis and tallways is Y axis; right?

2   **A.**   Yes, sir.

3   **Q.**   Along the X axis you have on 0 to 9, 10 to 19, you're

4   going up to 10 every time all the way to 130 through 139.  Tell

5   us what that is.

6   **A.**   Those are formaldehyde measurements in micrograms per

7   meter cubed.

8   **Q.**   Now, micrograms per meter cubed and right below that

9   you've got another set of numbers that says ppm.  Tell us what

10  that is.

11  **A.**   Parts per million.

12  **Q.**   And from the standpoint of the Y axis, the odds ratio, we

13  start at 0.00 and it goes to 1.00, 2.000, and it goes on up to

14  8.  What are we looking at there?

15  **A.**   The odds ratio is the measure of association.  It tells us

16  how much more likely something is to happen, given that you

17  have a particular risk factor, a particular exposure, relative

18  to that event not happening.

19          So if our odds ratio is 1, and you can see the dashed

20  line along there, if the ratio of two odds is equal, then

21  you're no more likely to get something than not.  If the odds

22  ratio is greater than 1, then it indicates that whatever that

23  risk factor is, it's more likely to occur; and if the odds

24  ratio is less than 1, it indicates that it's less likely to

25  occur.

1          So 1.0 is our benchmark.  It's our reference point.

2    Above that point, what we're looking at is considered a risk

3    factor.  Below that point is what would be considered

4    protective.

5               **MR. WATTS:**  May I approach the witness, Your Honor?

6               **THE COURT:**  Yes.

7    BY MR. WATTS

8    Q.   This concept of OR, or odds ratio, I want to see if we can

9    use an example here.  We have two different populations, one

10   above my line and one below the line, and let's just put ten

11   people in each population, to use a nice round number.  And

12   folks with an X through them have got asthma.

13              **THE COURT:**  Can you see that, Dr. McGwin?

14              **THE WITNESS:**  Yes, sir.  Can you?

15              **THE COURT:**  Barely.  Barely.  But it's more important

16   that you see.

17   BY MR. WATTS

18   Q.   And above the line we've got six folks with asthma and

19   below the line we've got three.  Let's say one of them is

20   exposed to formaldehyde at a certain level and the other one is

21   exposed at a different level.  Does the fact that six in one

22   population have something and three in the other tell you

23   something about what the odds ratio is between the two?

24   A.   Yes.

25   Q.   Explain that.

1    **A.**    Can I correct a little bit of what you --

2    **Q.**    Pull me into the math lab.

3    **A.**    Right church, wrong pew.  If we take above the line to be

4    our individuals with asthma, our cases, and we take below the

5    line to be our individuals without asthma, our controls, this

6    is a particular type of study called a case control study.

7    What we're interested in is are the cases, are the individuals

8    who have the disease, asthma, any more or less likely to have

9    been exposed to formaldehyde.

10           So in this case here, I would represent your X's to

11   be exposed or unexposed.

12   **Q.**    Okay.

13   **A.**    And in this scenario, the odds, that is the ratio of the

14   likelihood of being exposed, is higher among the cases than in

15   the controls.  Therefore, our odds ratio would be above 1.

16   **Q.**    Okay.  So if we have six here and three here, you just

17   divide the two and I have an odds ratio of 2.0?  Or am I making

18   it too simple again?

19   **A.**    You're making it a little bit too simple, but you're still

20   pretty close.

21   **Q.**    All right.  Now, when something has an odds ratio of 2, is

22   that a doubling of the risk?

23   **A.**    In epidemiology, we use the word "risk" probably a little

24   bit more specifically than you are in this instance here.

25   **Q.**    Okay.

1    A.    It represents a doubling of the association.

2    Q.    Okay.  Now, in terms of the a doubling of the association,

3    we have a dotted red line going right across 2.0; is that

4    right?

5    A.    Yes, sir.

6    Q.    And then as we look at the level of formaldehyde exposure

7    from these different studies, the first line you got is ATSDR.

8    That's down there at that 0.008; is that right?

9    A.    Yes, sir.

10   Q.    And, again, you're not here to say which standard ought to

11   be used.  You haven't done all that research; fair?

12   A.    That's correct.

13   Q.    But if you have formaldehyde exposure of 0.008, can you,

14   looking at the odds ratios from these different studies, tell

15   me what the odds ratio is of that relative to no formaldehyde?

16   A.    1.15.

17   Q.    And it's over there on the left; is that right?

18   A.    That's correct.

19   Q.    If you -- it a says NIOSH, 19.7 micrograms per cubic meter

20   right above 0.016 parts per million.  Do you see that?

21   A.    Yes, sir.

22   Q.    Can you tell me if you are exposed at the level of the

23   NIOSH limit of 0.016 parts per million, what the odds ratio is

24   of getting asthma as a child at that level of formaldehyde

25   exposure?

1   **A.**   The odds ratio is 1.33.

2   **Q.**   Now, again, there was a stipulation that was read into the

3   record.  You weren't in here, but let me just represent to you

4   that it says that there was a test that was done for

5   formaldehyde on January the 28th and 29th of 2008.  The average

6   temperature inside the trailer was 71.8 degrees Fahrenheit.

7   The average indoor humidity was 47 percent.  The level of

8   formaldehyde was 0.050 parts per million.  Do you see that?

9   **A.**   Yes, sir.

10  **Q.**   Again, you're not here to talk about that legitimacy or

11  lack of it in that test; right?

12  **A.**   No, sir.

13  **Q.**   But if you have exposure at 0.05 parts per million, you

14  have a line here that tells us what the odds ratio is of a

15  child having asthma at that level of formaldehyde exposure; is

16  that right?

17  **A.**   That's correct.

18  **Q.**   And what is the odds ratio at -- of a child having asthma

19  at that level of exposure?

20  **A.**   2.43.

21  **Q.**   Okay.  If we went up somewhere like 0.08, you could

22  determine what the odds ratio is if somebody's exposed at 0.08;

23  is that right?

24  **A.**   Yes, sir.

25          **MR. WATTS:**  May I approach, Your Honor?

1          **THE COURT:**  Yes, sir.  Mr. Watts, how much longer do

2   you have with this witness?

3          **MR. WATTS:**  Five minutes.

4   BY MR. WATTS

5   **Q.**   Can you tell me what the odds ratio is at 0.008 parts per

6   million?

7   **A.**   4.16.

8   **Q.**   And if you take that all the way up to 0.1 parts per

9   million and we see this slope rising right here, can you tell

10  me what the odds ratio is of a child having asthma if they're

11  exposed at 0.1 parts per million?

12  **A.**   I believe it's 7.10.

13         **MR. WATTS:**  I didn't put the arrow up.

14         **THE COURT:**  Well, you can use your touch screen

15  there.

16         **MR. WATTS:**  It shocked me when it appeared, Judge.

17         **THE COURT:**  I was trying to point where your marker

18  was because I can't see the red dots.  Let me see if I know how

19  to erase this thing.

20         **MR. WATTS:**  Stipulate, I don't know how to use this

21  thing.  All right.

22  BY MR. WATTS

23  **Q.**   If you're at 0.1 parts per million exposure, what's the

24  odds ratio of a child having asthma?

25  **A.**   I believe it's 7.1.

1    Q.    So when you have an odds ratio of 7.1, what does that tell

2    us if the odds ratio is 7.1, if you're exposed at .1 parts per

3    million, in terms of the prevalence of children with asthma at

4    that as opposed to lower levels?

5    A.    It would be approximately seven times higher.

6    Q.    So if you have, using this statistical sampling, a bunch

7    of kids that are exposed at 0.1 parts per million, is the

8    prevalence of them having asthma seven times higher than if

9    you're not exposed to formaldehyde?

10   A.    It would be approximately seven times higher, yes, sir.

11   Q.    All right.  Now, you have each of these studies that you

12   used; is that right?

13   A.    Yes, sir.

14   Q.    It is fair, is it not, that some of them are underpowered?

15   A.    Likely so.

16   Q.    Some of them have mislabeled tables; is that right?

17   A.    Yes, sir.

18   Q.    Some of them have ambiguities that you had to call the

19   authors and figure out exactly what they meant when they

20   presented the data?

21   A.    I e-mailed them, not called them, but I take your point.

22   Q.    But the bottom line is:  Did each of the studies that are

23   referenced in 305.2 that you presented the data for, did they

24   each provide data with respect to, A, what the level of

25   formaldehyde exposure was?

1  A.   Yes, sir.

2  Q.   And, B, what the increase in odds ratio is for each

3  increase in formaldehyde exposure per 10 micrograms per cubic

4  meter increase in formaldehyde?

5  A.   They provided us the data so that we could make that

6  assessment.

7  Q.   And did you combine all that data so that you could tell

8  the jury as you increase exposure levels by 10 micrograms per

9  cubic meter, this is what happens to the odds ratio of children

10  having asthma?

11  A.   Yes, sir.

12  Q.   And with all of this done, do you have an opinion to a

13  reasonable degree of epidemiological probability as to whether

14  these pooled results provide evidence of an association between

15  exposure to formaldehyde and asthma in children?

16       MR. WEINSTOCK:  Your Honor, we're going to object at

17  this time, because I believe the opinion is prevalence of

18  asthma.  Mr. Cooper already has asthma, so it's completely

19  irrelevant.

20       THE COURT:  Well, as I understand his testimony, it

21  relates to general causation as opposed to specific causation,

22  so I'll note the objection, but I'll overrule it.

23       MR. WEINSTOCK:  Your Honor, if I could have ten

24  seconds to respond?  General causation to the wrong thing,

25  prevalence, which already have, not exacerbation.

1          THE COURT:  I'll let you cross-examine him on that

2     point.

3          MR. WEINSTOCK:  Thank you.

4     BY MR. WATTS

5     Q.   You understand there's a lot of witnesses coming in this

6     case, and you're just one of them; right?

7     A.   Yes, sir.

8     Q.   So let me get back to your opinion, and then we'll talk

9     about what other people are going to say later.

10          With respect to the question that I asked:  Do you

11    have an opinion to a reasonable degree of epidemiological

12    probability as to whether the pooled data from these studies

13    demonstrate an association between childhood asthma and

14    exposure of increasing levels of formaldehyde?

15    A.   Yes, I do.

16    Q.   What is that opinion, sir?

17    A.   I believe that, based on the results of the published

18    literature to date, there's a significant relationship between

19    increasing levels of formaldehyde exposure and an increased

20    prevalence of asthma.

21          MR. WATTS:  Those are all my questions.

22          THE COURT:  Thank you.  We're going to go ahead and

23    take about a ten-minute break.  We'll start again at 3:25.

24    Counsel, if you-all would approach, please.

25          (WHEREUPON, the Court took a recess.)

1      THE DEPUTY CLERK:  All rise.

2          (WHEREUPON, the following proceedings were held at

3  the bench.)

4          MR. BUZBEE:  I don't want everybody to turn and look

5  at him right now, but there's a man in the red shirt who is

6  married to one the jurors and I don't know how you feel about

7  that, but, obviously, potentially somebody who would pick up

8  lawyer talk and witness talk and et cetera.  He's in the back

9  row.  He's married to the lady on the far right on the first

10  row of the jury.  I don't know how you want to deal with that.

11         THE COURT:  Well, I'm going to give an instruction.

12  It's an open courtroom.

13         MR. BUZBEE:  Yes.

14         THE COURT:  Anybody's entitled to come and observe.

15  I'm going to give an instruction at the end of the day that

16  they are not to discuss the case with anyone including their

17  spouses.  Now, what people do when they go home and whether

18  they follow my order s, let's hope they follow the orders.

19         MR. MEUNIER:  But we need to be careful about that

20  guy.

21         MR. PENOT:  Can you tell me who it is?

22         (WHEREUPON, the jury entered the courtroom.)

23         THE COURT:  Yes.  May be seated.

24

25

1            **CROSS-EXAMINATION**

2   BY MR. WEINSTOCK

3   Q.    Good afternoon, Dr. McGwin, we've met before.  I think,

4   unfortunately, you and I are the only ones that find this stuff

5   interesting, but let's plow through it as quickly as possible.

6   A.    Yes, sir.

7   Q.    Doctor, what is the definition of asthma?

8   A.    Asthma?

9   Q.    Asthma.

10  A.    It's the narrowing of the airway or a constriction.

11  Q.    Are you familiar with any other definitions?

12  A.    I'm sure there are many other definitions.

13  Q.    In fact, you'd almost be willing to state that of the

14  seven or eight papers you've selected, you'd probably have five

15  or six different definitions of asthma; correct?

16  A.    Yes.

17  Q.    And you covered some of this, but if you could, by way of

18  background for what I'm going to ask you, these are what we

19  call cross-sectional studies; correct?

20  A.    The majority, yes, sir.

21  Q.    And cross-sectional studies are studies that look for

22  prevalence at the same time it looks for exposure; correct?

23  A.    Generally, yes, sir.

24  Q.    So it's really hard to say, the exposure caused the

25  disease because you only found them at the same time?

1    **A.**   Well, as epidemiologists we would generally in any one

2    study never say.

3    **Q.**   You would never say it because you don't know which came

4    first, the exposure or the illness?

5    **A.**   Well, no.  Epidemiology isn't necessarily about

6    establishing the cause of a disease.  It's about establishing

7    patterns of exposure and disease relationships.

8    **Q.**   And you would not show a causation relationship from a

9    cross-sectional study because you can't -- you don't have that

10   temporal context of before and after?

11   **A.**   It would be difficult.

12   **Q.**   It's not something you were trying to do?  That's not what

13   you were trying to accomplish?

14   **A.**   To establish a causal relationship?

15   **Q.**   Correct.

16   **A.**   No, sir.

17   **Q.**   You were just showing, when we study these people and we

18   find that they're exposed to some -- that there is exposure to

19   formaldehyde, we also find there is -- some of them have

20   asthma, there's prevalence?

21   **A.**   Roughly, yes.

22   **Q.**   In this case, and I know you're not giving a specific

23   causation opinion, but Chris Cooper, a stipulated fact, already

24   had asthma, you weren't studying whether -- the papers you

25   referred to exacerbated -- could exacerbate that asthma;

1    correct?

2    **A.**    No.  There's literature on that topic, but ours was

3    focused on the occurrence of asthma.

4    **Q.**    Not what you were hired to do?  You were not hired to find

5    out or to look at the epidemiological literature and see if

6    exposure to formaldehyde exacerbates asthma; correct?

7    **A.**    That's correct.

8    **Q.**    In fact, you put up a list of studies, or Mr. Watts did,

9    that you reviewed and the list was much larger than those that

10   you put in your meta-analysis; correct?

11   **A.**    That's correct.  I believe we started with 18 studies that

12   appeared to fit our criteria.

13   **Q.**    And I believe at your deposition you were nice enough to

14   give me this handy dandy chart on all those studies that you

15   looked at.

16   **A.**    Oh, that's where it went.

17   **Q.**    Now you make me feel bad.  I do have the original attached

18   to the deposition.  And specifically what I want to ask you

19   about is:  There are a few studies on here that commented on

20   exacerbation type issues, aren't there?

21   **A.**    Yes, sir.

22   **Q.**    You chose not to rely on those because they were not --

23   that was not part your task; correct?

24   **A.**    That's correct.

25   **Q.**    But you did review them?

1    A.    Yes, sir.

2    Q.    And, for example, when you reviewed the Tavernier -- which

3    I called Tavernier, but I'm wrong -- the Tavernier paper, we

4    found there was no association between asthma -- I'm sorry --

5    formaldehyde exposure and asthma at two different locations;

6    correct?

7    A.    I'd have to review the papers.

8    Q.    Well --

9    A.    Can you put it up on the --

10   Q.    Yeah.  I shrunk it so it's going to be really small.

11   A.    Oh, goodness.

12   Q.    Sorry about that.

13            THE COURT:  Can you see that on the screen?

14   BY MR. WEINSTOCK

15   Q.    Tavernier -- going by.  All right.  Tavernier, no

16   association between formaldehyde levels in two locations and

17   asthma; correct?

18   A.    Yes, sir.

19   Q.    Okay.  But I should have gone down here.  This is

20   Franklin, for example:  "Children living in homes with higher

21   formaldehyde levels had higher ENO levels, inflammatory

22   response marker, no association between formaldehyde levels and

23   pulmonary function tests"; correct?

24   A.    Push it up a little bit.  Yes, sir.

25   Q.    Okay.  That's what I really want to talk to you about for

 1   a moment.  What are pulmonary function tests?

 2   A.   Generally, they are tests that evaluate how good your lung

 3   function is, how well you breathe.

 4   Q.   And that, if you're measuring it, can be an indicator that

 5   asthma has been affected, we're not performing as well on

 6   pulmonary function?

 7   A.   I'm not a clinician.  I'm not a medical doctor, so it

 8   would be difficult for me to speak coherently about what

 9   pulmonary function test would or would not indicate clinically.

10   Q.   What is IGE mediated asthma?

11   A.   I believe IGE mediated asthma is a particular type of

12   antibody reaction.

13   Q.   You're not really familiar with the mechanics of how IGE

14   mediated asthma works, are you?

15   A.   No, sir.

16   Q.   You do understand, though, in the papers you reviewed they

17   were studying different mechanisms regarding asthma; correct?

18   For example, some looked at ENO; correct?

19   A.   Well, again, we're making distinction between the papers

20   we decided to include in our work and the ones that didn't fit

21   our criteria.  And I believe you're primarily referring to the

22   ones that appear at the bottom of our list that we set aside

23   because they weren't focused on asthma prevalence.

24   Q.   Things like the Wantke paper; correct?

25   A.   I believe that was one of them, yes, sir.

1    **Q.**    You don't know -- are you aware that two doctors will

2    testify that Chris Cooper does not have IGE mediated asthma?

3    **A.**    I'm not aware of that, no, sir.

4    **Q.**    In terms of Chris Cooper's case though, it would to me

5    make those papers fairly irrelevant if we're studying IGE

6    mediated asthma if Chris Cooper clearly does not have that.

7    But you still have it included in your opinion, to some extent,

8    because you were looking for prevalence?

9    **A.**    Well, again, that list that you have there represents a

10   list of papers that we identified as speaking to the issue of

11   formaldehyde exposure and asthma.  So saying that they are at

12   the basis of my opinion isn't exactly correct because they

13   didn't migrate to the level of formaldehyde and prevalence.

14   They're in the list for the sake of completeness.

15   **Q.**    You did -- and one study I do want to ask you about very

16   briefly, you actually e-mailed one of the authors, Dr. Smedgje?

17   **A.**    Smedgje, yes, sir.

18   **Q.**    And you e-mailed that author regarding -- tell me what was

19   your question.

20   **A.**    If we -- and I believe you and I did this -- we looked at

21   one of her paper's -- she published two papers on the topic,

22   one in 1997 and one in 2001.  In one of the papers -- I want to

23   say it was the 1997 paper -- there was a table of results and

24   the -- unfortunately, the specific result I was interested in,

25   it didn't tell us what the units were.

1          You heard myself and Mr. Watts talk about micrograms

2    per meter cubed, that information wasn't apparent in the paper

3    and I sent her an e-mail and asked her if she could shed some

4    light on what was missing.

5    Q.   And she did shed some light on that, didn't she?

6    A.   Yes.  She was very helpful.

7    Q.   She also told you -- because they found very low levels of

8    formaldehyde in her work; correct?

9    A.   That's correct.

10   Q.   And she told you, among other things:  Anyone who has

11   studied indoor concentrations of formaldehyde, less than 10

12   micrograms per cubic meter is very low and one may doubt that

13   it would have any causal effect"; correct?

14   A.   That's correct.  That's what they said.

15   Q.   And 10 micrograms per cubic meter, that's just above 8

16   parts per billion, isn't it?

17   A.   Yes.

18   Q.   So she certainly was not referring to 8 parts per billion

19   as a gold standard where somebody would get hurt.  In fact, to

20   the contrary, she says one is very low and one would doubt it

21   would have any causal effect; correct?

22   A.   That's what she said, yes, sir.

23   Q.   If we can put up your -- if I can put up your chart.  I

24   want the jury to be clear what we're looking at on this chart.

25   If I can put it... what you found is represented by the

1   non-shaded area; right?

2   A.    No, sir.

3   Q.    Go ahead.  The range of observed exposure levels.  This is

4   the data you took out of the papers; correct?

5   A.    Can I explain a little bit?

6   Q.    Absolutely?

7   A.    When we did our meta-analysis, we arrived at a single

8   number that we then used to say, well, if an individual has an

9   exposure level of 60 micrograms per meter cubed, this is what

10  their risk would be.  And we wanted to limit our inferences.

11  We wanted to limit the conclusions that we drew from the data

12  to only the range of formaldehyde that had actually been

13  observed in those studies.

14          And so the gray area -- or rather the white area on

15  the left represents the range of the formaldehyde exposures in

16  the papers that we looked at.  The figure continues to the

17  right to also show what happens to the association, but

18  acknowledging that no study has actually had exposure levels in

19  the gray area.

20  Q.    And I appreciate your clearing that up.  What we're saying

21  is you don't have any studies in here, correct, with these

22  numbers?

23  A.    Not just me, the entire literature.

24  Q.    The entire world's literature doesn't have it.  What you

25  have are papers in here and based on a measure of risk per 10

 1   micrograms per cubic meter, you've extrapolated it up on this

 2   trend; correct?

 3   A.   That's correct.

 4   Q.   But we've not seen this in the literature, we just have

 5   used the data from the low end to draw the chart to the high

 6   end; correct?

 7   A.   That's correct.

 8   Q.   And that's why, because you're not trying to trick anybody

 9   you shaded this area in gray; correct?

10   A.   Trying to be as fair as possible.

11   Q.   And if we can go back and talk about odds ratios for a

12   moment.  An odds ratio below three is weak; correct?

13   A.   That's debatable.

14   Q.   Have you ever told me that an odds ratio from one to three

15   is weak?

16   A.   I have a feeling I have.

17   Q.   Does that sound like something you might say?

18   A.   Yes, sir.

19   Q.   Did you ever tell me -- well, not me, actually, somebody

20   else -- did you ever tell somebody else that an odds ratio of

21   1.25 is not statistically significant?

22   A.   It would be very difficult to tell from a single odds

23   ratio whether something is statistically significant.

24   Q.   Without the p-value?

25   A.   Without the p-value.  You could get a hint of it, as you

1  and I have discussed in the past by the confidence interval.

2  **Q.**   If we could turn to -- well, no, strike that.

3         Experimental studies are the gold standard of

4  epidemiology?

5  **A.**   Yes, sir.

6  **Q.**   You told me that one too?

7  **A.**   I hesitate because we generally don't refer to them as

8  "experimental studies", it makes people uncomfortable when you

9  have human subjects in studies and you refer to them as an

10  experiment.

11  **Q.**   And you and I discussed three such studies at your

12  deposition; correct?

13  **A.**   We did.

14  **Q.**   And they were older studies.  Unfortunately, I don't

15  think -- I think the Frigas-Reed study -- actually, that was

16  from '84, but the other two, the Hugo and the Polish study --

17  that I won't try to mispronounce -- those were most recent.

18  **A.**   I believe early 2000 was the most recent one.

19  **Q.**   And I think we came to the conclusion or the agreement

20  that at least according to the papers when these asthmatics and

21  non-asthmatics were subjected to formaldehyde, there was no

22  difference in how they reacted?

23  **A.**   I believe we did come to that conclusion.

24  **Q.**   When you came here today I asked you to review or take a

25  quick look at the Franklin paper, which you were nice enough to

1  do.  First, the Franklin 2000 paper is actually a paper that's

2  in your meta-analysis, isn't it?

3  A.   That's correct.

4  Q.   And this is the Franklin 2007 paper, and if I can have

5  that pulled up and I zoom in on the summary.  That ain't

6  working.  Okay.  We'll just talk, you and I, and hopefully the

7  jury can follow along with our words instead of necessarily

8  reading along with us.

9       On Page 83 -- I'm sorry -- on Page 283 of this

10  study -- I don't know the Bates labeled page.  Here it is.

11  There we go.  "The role of formaldehyde in lower respiratory

12  symptoms is asthma controversial.  Formaldehyde has been

13  considered a potential agent for occupational asthma, though

14  the incidence of formaldehyde-induced asthma seems to be rare."

15  Is that correct?

16  A.   That's what it says.

17  Q.   If we could go to -- go down to the next -- there we go.

18  Here we go:  "However, since the early 1990s, there have been a

19  number of studies that have reported associations between

20  formaldehyde concentration in homes and schools with asthma,

21  asthma severity, allergy, and airway inflammation in children.

22  The data is still limited and not all studies have reported

23  adverse impacts of domestic formaldehyde exposure."  Correct?

24  A.   That's correct.  That's what it says.

25  Q.   What kind of paper would you call this?

1  **A.**    I would describe this as a literature review.

2  **Q.**    And unlike your meta-analysis, what Franklin tried to do

3  was look at the world's literature, probably many of the same

4  articles you did, and he came to these conclusions; correct?

5  **A.**    I would characterize this attempt as a little bit broader

6  than ours.  And we can get a sense of this from the title where

7  the focus is on indoor air quality, which if you read the paper

8  you see that he focuses on a variety of indoor contaminants,

9  but one of which is formaldehyde.  Our work was specific to

10  formaldehyde.

11         So, you know, same -- same general intent.

12  **Q.**    Doctor, I have a few --

13         **MR. WEINSTOCK:**  You can take this down and if you

14  would go ahead and find the Arch paper and we'll get to that in

15  a minute.

16  **BY MR. WEINSTOCK**

17  **Q.**    Very quickly, you had given some opinions on cancer

18  previously.  Would you agree, as we sit here today, the levels

19  people were exposed to formaldehyde exposed to from the FEMA

20  trailers, the range of 3 parts per billion to 590 parts per

21  billion, you cannot say more probably than not that there's an

22  association to nasopharyngeal cancer at those levels?

23  **A.**    I didn't bring any of my materials related to cancer.  I

24  thought we were talking about asthma today.

25  **Q.**    They tricked you, Doc.

1  **A.**    That happens quite frequently.

2          **MR. WEINSTOCK:**  If I can approach the witness, Your

3  Honor.

4          **THE COURT:**  Yes, sir.

5              Question?

6  **BY MR. WEINSTOCK**

7  **Q.**    Doctor, does that refresh your recollection?

8  **A.**    Yes.  It appears to be a conversation you and I had

9  regarding this topic.

10 **Q.**    Maybe the second or third time we've had it.  But as we

11 sit here today, at the levels people were exposed to in the

12 FEMA trailers, and I think I brought it up to as high as 590

13 parts per billion, which is what we saw in the CDC test or ten

14 times higher than we see in the Alexander/Cooper trailer, you

15 cannot say more probably than not that formaldehyde exposure is

16 associated with nasopharyngeal cancer; correct?

17 **A.**    I would.  But I would make it clear that that can't be

18 said because the data doesn't really exist to make those sort

19 of inferences.

20         The occupational literature, which is what, I

21 believe, we were largely talking about at the time, doesn't

22 give us the benefit, the richness of the data, that we've seen

23 here in this case.  The occupational literature generally

24 doesn't afford us actual formaldehyde exposure levels.  So the

25 fact that we can't say more probably than not, doesn't

1   necessarily mean that it's not true.  It just means we don't

2   have the data to make those inferences.

3   Q.   Exactly.  There are some things we just don't know yet, we

4   don't have enough data.  You, as an expert epidemiologist, do

5   not have enough data to say that nasopharyngeal cancer is

6   associated with or caused by formaldehyde exposure at levels of

7   590 parts per billion; correct?

8   A.   At that specific level, no.

9   Q.   And, in fact, we have talked about the Hauptmann paper,

10  which shows that the level -- and it's a controversial paper --

11  but there's levels where they found it -- they found that peak

12  exposures were needed of 4,000 parts per billion; correct?

13  A.   I don't remember the paper specifically, but if we had

14  that conversation, I would say that generally agree that you're

15  accurate.

16  Q.   And you wouldn't dispute it.

17       And you are aware that IARC's classification of

18  formaldehyde as a known carcinogen was primarily based on the

19  Hauptmann paper?

20  A.   I've heard that, yes, sir.

21  Q.   And you've testified to that; correct?

22  A.   Yes, sir.

23  Q.   Just one more topic.  Oh, I'm sorry.  Before I leave

24  cancer:  And there are no other cancers that you're in a

25  position to say are related to formaldehyde exposure levels?

 1   We just don't have enough data; correct?

 2   **A.**    That's correct.  I mean, there have been a number of

 3   studies, largely occupational, that have looked at a variety of

 4   different types of cancer and formaldehyde.  The most

 5   consistent relationships are with nasopharyngeal cancer,

 6   basically nasal cancer.  There's literature on other types of

 7   cancers, but the literature is much less consistent.

 8   **Q.**    And, therefore, as you sit here, you're not going to say

 9   more probably than not that there's an association?

10   **A.**    I actually don't like your use of the term --

11   **Q.**    You hate that word.  I'm sorry.  I forgot.  More probably

12   than not that there's a cause and effect?

13   **A.**    That's correct.

14   **Q.**    Okay.  If we can just quickly go to the two volunteer

15   studies for non-asthmatics, just for regular irritation that

16   you cited in your report of last year.  First, the Arch paper.

17   Do you remember the Arch paper?  If you can blow up the

18   abstract.  Did Arch find that, essentially, we need 1.0 parts

19   per million to see a consistent sensory impact from

20   formaldehyde?

21   **A.**    I believe in this study that was the lowest level at which

22   it was observed.

23   **Q.**    Or 20 times higher than .050?

24   **A.**    That's correct.

25   **Q.**    And you're better at math than I am, so you got to answer

 1   those.

 2   **A.**   Well, you've demonstrated that.

 3          **MR. WEINSTOCK:**   With that, I will conclude my

 4   cross-examination.

 5          **THE COURT:**   Thank you, Mr. Weinstock.   Mr. Penot, any

 6   questions?

 7          **MR. PENOT:**   Your Honor, we have no questions for this

 8   witness.

 9          **THE COURT:**   All right.   Thank you.   Redirect?

10          **MR. WATTS:**   Yes.   Can we put the Arch paper back up

11   for a second?

12                          **REDIRECT EXAMINATION**

13   BY MR. WATTS

14   **Q.**   Just so that we're clear:   The Arch paper is talking about

15   inducing tumors in the respiratory tract; right?   "Objectives

16   to critical health effects of formaldehyde exposure include

17   sensory irritation with the potential to induce tumors in the

18   upper respiratory tract"?

19   **A.**   Yes, sir.

20   **Q.**   So when counsel says it takes 1 part per million, that's

21   what it takes to produce tumors according to Arch; is that

22   right?

23   **A.**   That's correct.

24   **Q.**   Okay.   Let's go to a different issue.   You can take that

25   down.   Let me just go backwards since it's most recent.

1    Counsel asked you about IARC.  What is IARC?

2    **A.**    International Agency for the Regulation...

3    **Q.**    For the Research of Cancer?

4    **A.**    Yeah, research of cancer.

5    **Q.**    Okay.  Did the International Agency for the Research of

6    Cancer conclude that formaldehyde is a probable carcinogen?

7    **A.**    Yes, sir.

8    **Q.**    Did they conclude that formaldehyde causes nasopharyngeal

9    cancer?

10   **A.**    I believe they did, yes, sir.

11   **Q.**    And counsel's talked about how his expert that he's going

12   to bring has reevaluated the data.  Even after their

13   reevaluation of the data, does IARC still publish a monograph

14   saying that formaldehyde is a probable carcinogen?

15   **A.**    I was not aware that he had an expert that had reevaluated

16   the data, but I realize that's an issue of debate, sure.

17   **Q.**    But my specific question is:  Nobody from IARC has said,

18   "Andy's right, we pulled out our conclusion that formaldehyde

19   is a possible carcinogen"?

20   **A.**    I haven't seen anything to that effect.

21   **Q.**    In fact, I think they call it a known carcinogen?

22   **A.**    Yes, sir.

23   **Q.**    And they still call it that even after Andy's reevaluation

24   of their work?

25   **A.**    The last time I saw any literature, it was still

1  classified as a known carcinogen.

2  **Q.**   He talked to you real briefly about four papers,

3  Tavernier.  Let me put this on the screen just for a second.

4  Tavernier writes that:  "Indoor pollutants, including

5  formaldehyde, were investigated, STATA, univariate and

6  multivariate analyses were used to compare the indoor

7  environments of children.  The results:  The levels endotoxins,

8  there's an adjusted odds ratio of 1.88, with a 95 percentile

9  confidence interval, 1.11 to 3.18 with a p-value of .018; is

10  that right?

11  **A.**   Yes, sir.

12  **Q.**   And those were all independent predictive factors of

13  asthma, according to Tavernier; is that right?

14  **A.**   Yes, sir.

15  **Q.**   Now, the reason you didn't include Tavernier in your

16  meta-analysis is does Tavernier say what the level of

17  formaldehyde is in the paper?

18  **A.**   No, sir.

19  **Q.**   Okay.  And so when you're being asked to tell somebody

20  what the increase in odds ratio is per 10 micrograms per cubic

21  meter increase, you can't exactly include something that

22  doesn't include the level of formaldehyde?

23  **A.**   That's correct.  In their tables they simply categorized

24  them into percentiles, and when we contacted the authors, as we

25  did with Dr. Smedgje, the individual who had conducted the

1    analyses was no longer with Dr. Tavernier's group anymore and

2    an attempt to track them down, didn't produce the data that we

3    needed.

4    **Q.**   Andy's finding me something he used.  Next, he asked you

5    about Dr.Smedgje.  Do you remember that?

6    **A.**   Yes, sir.

7    **Q.**   When she wrote you back, you asked her, "Are you

8    expressing these differences in 1 microgram or 10 microgram

9    differences; is that right?

10   **A.**   Yes, sir.

11   **Q.**   And she writes you back an e-mail that was marked as

12   Exhibit 6 to your deposition.

13          **MR. WATTS:**  I'm putting it up because Andy and I

14   talked about this would be okay, Judge.

15   **BY MR. WATTS**

16   **Q.**   You wrote an e-mail to make sure that the unit change of

17   exposure, you wanted to know what it was, is that right, and

18   she confirms it's per 1 microgram per cubic meter increase; is

19   that right?

20   **A.**   Yes, sir.

21   **Q.**   Now, down here, Andy asked you about anybody who studies

22   indoor environments knows that a concentration of formaldehyde

23   less than 10 micrograms per cubic meter is very low and one may

24   doubt that it may have any causal effect.  Do you see that?

25   **A.**   Yes, sir.

1   **Q.**   Would that be a reason that the ATSDR says this is what

2   the level should be because you're safe below it?

3   **A.**   I'm not sure I'm comfortable rendering an opinion as to

4   what the ATSDR would say.

5   **Q.**   All right.  But the ATSDR line is actually right down here

6   at 10 micrograms per cubic meter; is that right?

7   **A.**   Yes, sir.

8   **Q.**   Okay.  So Dr. Smedgje writes:  "If you're below 10

9   micrograms per cubic meter, that's not much formaldehyde and

10  there's no causal effect; is that right?

11  **A.**   That's what she said.

12  **Q.**   Now, that is at a level that was five times lower than

13  what was tested in January of 2008; is that right?

14  **A.**   That's correct.

15  **Q.**   Okay.  And Dr. Smedgje in her paper writes:  "Current

16  asthma was more frequent among pupils exposed to higher levels

17  of formaldehyde," and that, "Asthmatic symptoms were more

18  common among subjects living in homes with higher levels of

19  formaldehyde."  Is that right?

20  **A.**   Yes, sir.

21  **Q.**   Is what she writes in her paper consistent with what you

22  saw across the literature?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  Counsel next asked you about this white versus gray

25  and I think you explained it very clear for him, but Mr. Buzbee

1    talked in his opening statement about FEMA -- well, more

2    importantly Gulf Stream and Fluor both doing tests that were at

3    different levels, and you weren't here for where they would

4    fall in, whether they're in the white area or the gray area;

5    right?

6    A.    No, sir.

7    Q.    But the bottom line is that the gray levels is levels of

8    formaldehyde that are so high they're not even seen in the

9    literature?

10   A.    That would be one assumption.

11   Q.    He asked you about three studies, Frigas, Reed, Hugo and

12   the Polish study.  None of those involved children?

13   A.    Not to my knowledge.

14   Q.    Those were occupational studies that he was

15   cross-examining you about?

16   A.    I believe one of the studies was the medical students.

17   Q.    Which are adults?

18   A.    Adults, yes, sir.

19   Q.    But in terms of the students, you have analyzed and

20   presented the data with respect to all of the literature out

21   there that you could find dealing with the prevalence of asthma

22   among children and different levels of formaldehyde; is that

23   right?

24   A.    That's right.  We've exclusively focused on children.

25   Q.    Counsel asked you about the Franklin paper and asked you

1   to look at it.  Do you have a copy of it?

2   **A.**   Yes, sir.

3           **MR. WATTS:**  May I approach, Your Honor?

4           **THE COURT:**  Yes, sir.

5   **BY MR. WATTS**

6   **Q.**   May I borrow your copy?

7   **A.**   Sure.

8   **Q.**   In the conclusion of this paper that counsel asked you

9   about, did he write:  "The evidence for the adverse effects of

10  air toxins, such as VOCs and formaldehyde is growing"?

11  **A.**   Yes, sir.

12  **Q.**   And that's the conclusion -- among the conclusions that

13  Franklin wrote about; is that right?

14  **A.**   Yes, sir.

15  **Q.**   Last issue, back to cancer.  You mentioned that the

16  literature, I think you said, quote, "The most consistent

17  relationships are between formaldehyde and nasopharyngeal

18  cancer".

19  **A.**   I believe that sounds like something I would have said.

20  **Q.**   All right.  Again, you're here to talk about asthma, but

21  with respect to nasopharyngeal cancer, is that the cancer that

22  the literature most consistently ties to formaldehyde exposure?

23  **A.**   Yes, sir.

24          **MR. WATTS:**  All right.  Those are all my questions.

25          **THE COURT:**  All right.  Thank you.  You can step

 1  down, Doctor.  Thank you for your time.

 2          **MR. WATTS:**  Your Honor, at this time the plaintiffs

 3  call Dr. Christopher DeRosa by and through his videotaped

 4  deposition.

 5          **THE COURT:**  Okay.  Where will that put us time-wise?

 6          **MR. BUZBEE:**  Your Honor, that tape is one hour and 25

 7  minutes.

 8          **MR. WEINSTOCK:**  It will take us past 5:00, Your

 9  Honor.

10          **THE COURT:**  It's about 4:00 right now.

11          **MR. WATTS:**  We can play the direct and quit, or -- I

12  think we've got about 42 minutes and it's about 4:10 right now,

13  and then the cross is another 40 minutes.

14          **THE COURT:**  Let me ask, it's been a long day already

15  for the folks in the jury box:  If this takes an hour and 25

16  minutes, that will put us around 5:25.  Now, I had indicated

17  that at 5:00, we'd quit.

18              We can play the first part and then come back

19  and hear the second part.  Is there any preference?  Can I have

20  thumbs up/thumbs down?  Do you want to hear the first part and

21  then come back tomorrow for the second part?  Or do you want to

22  go ahead and go until 5:25 and hear the entire -- go all the

23  way through?  Okay.  Does anybody have a problem with going to

24  5:25?

25          **THE JUROR:**  I do.

1           THE COURT:  You do?  Do you have to be somewhere?

2           THE JUROR:  I have a meeting that I have to go to.

3           THE COURT:  All right.  Let's go ahead and play the

4    first part and then we'll pick up tomorrow, because I had said

5    5:00, so...

6           MR. WATTS:  Can we dim the lights, please, Your

7    Honor?

8           THE COURT:  Yes.  Let's go ahead and dim -- why don't

9    we dim the ones on the ceiling, Pam?

10          Let me explain to the jury the procedure.  Wait.

11   Let me explain to the jury that the procedure that we follow

12   for videotaped testimony, these are people who would be

13   testifying here live, but for one reason or another, not the

14   result of anything that either parties, or attorneys, or the

15   Court, they cannot be here.

16          So on a prior occasion, they were sworn to give

17   truthful testimony and all counsel were present to question

18   them and the procedure was the same as we would use here if

19   they were to walk into the courtroom and take the witness stand

20   and testify here.  So you are to regard their testimony the

21   same as if the person appeared here live and testified.

22          MR. MEUNIER:  Your Honor, on that point, the

23   videotape doesn't actually show the witness taking the oath,

24   but I'm sure we'll all stipulate he took the oath.  His name is

25   Dr. Chris DeRosa.

1      **THE COURT:**  Correct.  Dr. Chris DeRosa and he has

2    been sworn in and his testimony will be presented right now.

3          (WHEREUPON, the videotaped deposition of **Christopher**

4    **DeRosa** was played as follows.)

5                              EXAMINATION

6    BY MR. MEUNIER

7    Q.   Good morning, Dr. DeRosa.  My name is Gerry Meunier.  I

8    represent the plaintiffs in this matter.  This deposition is

9    being noticed and taken for all purposes, including use at

10   trial.  And I will mark as DeRosa No. 1, the notice of the oral

11   and videotaped deposition of Christopher DeRosa.

12          And you are here today represented by your own

13   counsel; correct?

14   A.   Yes, I am.

15   Q.   Have you had meetings with anyone other than your counsel

16   in order to prepare for this deposition?

17   A.   I have not.

18   Q.   And you and I have never met before, have we?

19   A.   Not to my knowledge.

20   Q.   What is your occupation?

21   A.   My occupation is as an environmental health scientist.

22   Q.   Are you currently employed?

23   A.   I am self-employed.

24   Q.   What is the extent of your formal education?

25   A.   Well, I've had a BA degree from the Ohio Wesleyan

1  University, a master's degree in ecology from Miami University

2  of Ohio, a doctoral degree from the same institution in

3  biology, and a post-doctoral appointment at the University of

4  Virginia in molecular biology.

5  **Q.**   Would you summarize your employment history, starting with

6  the first employment following the conferral of your Ph.D.?

7  **A.**   That would be with the University of Virginia, as I

8  mentioned, as a post-doctoral appointment.  Then I had a

9  practicum.  I was appointed as an assistant professor there for

10  a number of years.  And then had an opportunity to join EPA in

11  the late '70s, early '80s, where I was employed as a staff

12  scientist and as a team leader.

13          Following that, I was employed by the University of

14  Maine in the early '80s.  And then returned EPA in

15  approximately 1984 where I was then branch chief, and following

16  that, acting director of the environmental criteria and

17  assessment office within the office of research and development

18  in Cincinnati, Ohio.

19          At that time, following the time spent as acting

20  director, I came to CDC, ATSDR in '91.

21  **Q.**   Just so the jury understands what are the initials CDC and

22  ATSDR stand for?

23  **A.**   Centers for Disease Control and Prevention and the Agency

24  for Toxic Substances and Disease Registry.

25  **Q.**   And these are agencies of the federal government?

 1  **A.**   They are, within the Department of Health and Human

 2  Services.

 3  **Q.**   What positions did you hold there?

 4  **A.**   I was the deputy associate administrator for science

 5  initially.  I then became the acting director for the division

 6  of toxicology within ATSDR, which was later following the

 7  reorganization, the division of toxicology and environmental

 8  medicine.  I held that position until October of 2007.

 9  **Q.**   And was that your last position with ATSDR?

10  **A.**   No, it was not.  Following my removal from the position as

11  the director, I was reassigned as the assistant director for

12  toxicology and risk analysis within the office of the director

13  of the Agency for Toxic Substances Disease Registry and the

14  National Center for Environmental Health, which are both within

15  the Centers for Disease Control and Prevention, Health and

16  Human Services.

17  **Q.**   And was that your last position with the federal

18  government?

19  **A.**   It was.

20  **Q.**   When did that position end?

21  **A.**   I resigned my position effective June 17th of this year,

22  2009, although that's still the subject of some discussion.

23  **Q.**   So you were the director of the division of toxicological

24  and environmental medicine at ATSDR for how long?

25  **A.**   Roughly 16 years.

1  **Q.**   And what was your responsibility in that position?

2  **A.**   They were fairly broad responsibilities.  I oversaw a

3  staff of approximately 70 individuals, perhaps 10 on-site

4  contractors, and a budget of around $10 million annually in

5  research and development.  I represented the department on the

6  executive committee of the national toxicology program, the

7  agency, I should say.

8            I also represented the department on the national

9  response team, which is comprised of the 16 member agencies

10 responsible for responses to emergency events under the

11 National Contingency Plan.  Other responsibilities included

12 representing the agency as a member of the science advisory

13 board for the international joint commission.

14           I was also a member of the steering committee on risk

15 assessment for the World Health Organization and provided

16 expertise in the broad areas of toxicology, environmental

17 medicine, including health education materials, and the

18 development of a series of documents addressing the public

19 health hazards posed by the chemicals most frequently

20 encountered at Superfund or national priority list sites, and

21 was responsible for a range of scholarship activities in

22 concert with my staff to establish the credibility of the

23 agency and the division as an authoritative resource in health

24 information on the impacts of hazardous substances on human

25 health.

1  **Q.**    Now, the ATSDR is a division of CDC?

2  **A.**    No.  Actually, it's one of eight independent agencies of

3  the public health service.  It was the -- it is the primary

4  agency charged with implementing the health mandates of the

5  Comprehensive Emergency Response Compensation and Liability Act

6  of 1984 as amended by the Superfund Amendments and

7  Reauthorization Act of 1984.

8  **Q.**    Well, how would you distinguish between the missions and

9  purposes of the ATSDR and the CDC?

10  **A.**    The CDC is a broadly structured organization generally

11  associated with programs in disease prevention, including

12  immunization, including vessel sanitation.  There's a large

13  program dealing with AIDS.  There is also an intervention

14  program, generally addressing the broad spectrum of the public

15  health issues confronted by the U.S. public.

16  **Q.**    I notice in the material that you had brought in response

17  to the subpoena this document, which has a heading, division of

18  toxicology and environmental Medicine, and then under it the

19  word "vision" and some language after that.  Do you recognize

20  that document that was in your materials?

21  **A.**    Yes.  This was a function when I joined the division, I

22  convened an all-hands retreat.  And we were charged by our then

23  administrator, Barry Johnson, with developing an

24  internationally recognized program of excellence in toxicology.

25  And I determined that the only way to do that is to pursue

1    excellence.

2          And because leading scientists is like herding cats

3    in some respects, but if one develops a record of recognized

4    excellence, and it's linked to the legislative mandates of the

5    agency as outlined here, in the areas of assessment, and

6    dissemination of information based on credible science, and to

7    do that in the interest of public service, that that will

8    eventually develop that followership.

9    Q.   So does that document more or less state what you

10   understood to be the mission of your division of toxicological

11   and environmental medicine within ATSDR?

12   A.   This was a part of the strategic plan that we developed.

13   The actual mission of the division mirrors this to a large

14   extent, but in some more explicit detail.

15   Q.   So summarizing what the mission statement there is, tell

16   us what that document says in its core principles.  Tell us in

17   your own words what the document says and says about the vision

18   of that division?

19   A.   I think, simply stated, is to follow where the science

20   leads and recognize what we know, what we don't know, try to

21   address the latter to the best we can, and then to do that in

22   the interest of getting the information out to the general

23   public so that they can make informed decisions about their

24   health.

25   Q.   What is the EPA bronze medal?

1    **A.**    It's a recognition given to employees that have been

2    identified as making perhaps above and beyond contributions to

3    the mission of the agency.

4    **Q.**    Have you been the recipient of that medal?

5    **A.**    I have been.

6    **Q.**    On how many occasions?

7    **A.**    Four times.

8    **Q.**    Have you served on advisory committees for various federal

9    agencies?

10   **A.**    I have.

11   **Q.**    Which federal agencies?

12   **A.**    The National Institute for Environmental Health Sciences,

13   EPA.  I have:  DOD, DOE, NASA.  A number of different agencies

14   that have broad interest in the area of risk assessment and

15   health effects of chemicals commonly associated with human

16   exposures in the environment.

17   **Q.**    And you indicated that you served on a risk assessment

18   committee for the World Health Organization?

19   **A.**    Yes.  This was established as an outgrowth of the Rio

20   Treaty of 1993.  It was established in '94.  I served as a

21   charter member of that committee, and I still am a member of

22   that committee.

23   **Q.**    Have you consulted or worked with foreign countries in the

24   area of environmental health science?

25   **A.**    Yes.  I have consulted with the governments of the

1    Netherlands, South Africa, Vietnam, the Seychelles Republic in

2    the Indian ocean.  The Faroe Islands, part of the kingdom of

3    Denmark, England, China, India, Ecuador.  A number of different

4    countries.  I mean, it's just...

5    **Q.**    What are the professional organizations or societies that

6    you belong to?

7    **A.**    Well, I'm an elected fellow of the collegium Ramazzini,

8    one of 180 individuals worldwide.

9    **Q.**    What is the collegium Ramazzini?

10   **A.**    It is an organization that was founded in memory of

11   Bernardino Ramizzini, who is considered the father of

12   occupational environmental medicine in the 16th century, and is

13   an organization dedicated to serving as a conduit of reliable

14   information to the centers of social and political powers

15   within and throughout the world in the interest of promoting

16   the precautionary principle that it is better to prevent than

17   cure.

18   **Q.**    What other professional organizations do you belong to?

19   **A.**    American College of Toxicology.  American Association for

20   the Advancement of Science, Ecological Society of America.

21   Those are some that come do mind.

22   **Q.**    Have you authored or co-authored any peer-reviewed

23   publications dealing with the human health effects and exposure

24   risks associated with toxic substances?

25   **A.**    Yes, I have.

1    **Q.**    How many?

2    **A.**    It depends on how one counts, but roughly 200

3    peer-reviewed journal articles.  Another number of

4    peer-reviewed abstracts published in literature, as well as

5    book chapters and several texts.

6    **Q.**    Have you served on the editorial boards of any

7    professional journals?

8    **A.**    Yes, approximately 10 or more professional journals.

9    **Q.**    And when and how did you first become aware of concerns

10   being expressed about the level of formaldehyde in those

11   trailers?

12   **A.**    My sense was that that would be in late 2005 or early

13   2006, but more than likely late 2005.  There was a number --

14   there were a number of reports in the press regarding citizen

15   complaints about the trailers.

16   **Q.**    What, if anything, was ATSDR asked to do in connection

17   with those concerns?

18   **A.**    I was in my office one afternoon late in the evening.  I

19   was contacted by a representative of FEMA to review a fact

20   sheet that they had developed that was predicated upon a

21   document that we had developed addressing the health issues

22   associated with formaldehyde, and I, at his request, reviewed

23   and provided comment on that document.

24   **Q.**    Who was that FEMA official?

25   **A.**    That, I do not recall.

1  **Q.**   Can you give me your best recollection of the date on

2  which that contact was made?

3  **A.**   It was probably late spring of 2006.  It was from Region

4  IV, which is the region headquartered in Georgia -- Atlanta,

5  Georgia, that comprised the southeastern sector of the United

6  States.

7  **Q.**   When, to the best of your recollection, did these biweekly

8  conference calls begin?

9  **A.**   That would be in June -- early June of 2006.

10  **Q.**   Were you a participant in those calls?

11  **A.**   No, I was not.

12  **Q.**   Explain how it came to be that you were not a participant?

13  **A.**   Well, it was common practice for us to have ongoing

14  consultations with EPA and other federal agencies involved in

15  situations of this nature, providing advice on sampling plans,

16  interpretation of analytic data and that type of thing.

17       These were routine types of discussions that were

18  held with these groups to perhaps get a collective

19  understanding of what the health issues might be, and what the

20  environmental sampling data meant, and how best to obtain that

21  environmental sampling data.

22  **Q.**   Did you understand that the discussions and evaluation in

23  those evaluative meetings after early June of '06 dealt with

24  data being collected in unoccupied travel trailers?

25  **A.**   Yes.

1   Q.   At the time you understood that, did you know that there
2   were citizens in travel trailers that had been issued by FEMA?
3   A.   I did.
4   Q.   What was your understanding as to why unoccupied travel
5   trailers were being at that point evaluated for formaldehyde
6   levels?
7   A.   Occupied trailers would obviously be subject to a number
8   of confounding factors that could not be necessarily controlled
9   for in terms of lifestyle, in terms of how the trailers were
10  being ventilated by the occupants and what they might be
11  bringing into the trailers.  So that looking at unoccupied
12  trailers was a way of perhaps getting around some of those
13  issues.
14  Q.   Was it your recommendation to look at unoccupied trailers?
15  A.   No, it was not.
16  Q.   Do you know of any scientist within the ATSDR who made
17  that recommendation?
18  A.   No, not specifically.
19  Q.   And you're aware that there did come a time when CDC
20  conducted an analysis of occupied trailers, 519, in fact;
21  you're aware of that?
22  A.   Yes.
23  Q.   Rick Preston is an attorney --
24  A.   Yes.
25  Q.   -- with FEMA?

276

1  A.    Yes.

2  Q.    Or was at that time?

3  A.    Yes.

4  Q.    And what in that communication from him represented a

5  request to restrict evaluation to short term exposure?

6  A.    It was actually in that particular piece of

7  correspondence.  I don't recall exactly what time frame he was

8  referring to.  It was in that piece of correspondence that he

9  directed the staff not to share their information with any

10 third-party without first speaking with him.

11        It was in the meeting of the consultation that was

12 released to FEMA on February 1st that I saw in the introductory

13 paragraph that at the specific request of FEMA, we had

14 restricted this evaluation to short term exposures only.

15 Q.    All right.  Let me make sure we understand your testimony.

16 You talked about ongoing discussions to evaluate levels of

17 formaldehyde in unoccupied trailers; correct?

18 A.    Uh-huh.

19 Q.    Now, that was specifically with respect to data that was

20 being collected in 96 unoccupied units; is that your

21 recollection?

22 A.    Yes.

23 Q.    That analysis of that data of formaldehyde levels in 96

24 unoccupied units resulted in a February '07 health consultation

25 report?

1   A.   Yes, it did.

2   Q.   And your testimony is that the FEMA attorney, Rick

3   Preston, asked that the analysis of the data be kept

4   confidential?

5   A.   Yes.

6   Q.   You reference that in early December of '06 two members of

7   ATSDR's emergency response team were asked to provide an

8   evaluation of the EPA sampling data.  Now, this again refers to

9   EPA sampling of data within 96 unoccupied travel trailers --

10  A.   Yes.

11  Q.   -- is that correct?

12       Who were the two members of your division's emergency

13  response team who were asked to do that?

14  A.   It would be Joe Little and Scott Wright.  Scott Wright was

15  the person addressed by the letter from FEMA.

16  Q.   You were not aware of that letter at the time it was

17  written to Mr. Wright, were you?

18  A.   No, I was not.

19  Q.   Given your position at that time in the federal government

20  as a scientist, would you expect -- would you have expected to

21  be informed about the analysis that was taking place between

22  December and February '07, December '06 and February '07, and

23  would you have expected to have some idea of what was going to

24  be published in the health consultation before it was

25  published?

1    A.    My awareness of the ongoing discussions with FEMA began in

2    June of '06.  It was part of a series of weekly reports that I

3    have -- had instituted in the late '90s to be sent around to

4    all senior managers on a weekly basis, so that they would be

5    aware of any developing or pending circumstances that might

6    require their staff's involvement, depending on the magnitude

7    of the issue.

8              I generally assumed, and I think correctly so, that

9    if things were in that report that needed my personal

10   attention, that they would be brought to me through the

11   management chain, through the team lead and the branch chief

12   responsible for oversight of the two staff people that were

13   developing the report.

14   Q.    But pursuant to Rick Preston's directive that the data be

15   kept confidential, you were not informed?

16   A.    The branch chief was not informed.  I was not informed.

17   Q.    Explain, if you can, Dr. DeRosa, why a letter from a

18   FEMA -- I'm sorry -- from an ATSDR scientist expressing

19   concerns about the misleading nature of a health consultation

20   report would be sent to a FEMA attorney as opposed to, for

21   example, a FEMA health official?

22   A.    As far as the letter goes, it was addressed to the

23   attorney because the original consultation had been sent to

24   Mr. Preston, and so the follow-up was also sent to Mr. Preston.

25   Q.    In your years of service in the federal government, can

1   you think of any other occasion involving a public health

2   issue, or crisis, or concern where an attorney for a government

3   agency has taken the contact position on something like this

4   health consultation report?

5   A.   I don't recall a specific example.  But by way of general

6   practice, it was always my position that if we were dealing

7   with any legal personnel of another agency, we would contact

8   our office of general counsel, whether it be an agency or

9   whether it would be a private firm, or whomever, we were always

10   very cautious in that regard.

11   Q.   I want to refer you to the document that's Bates numbered

12   DEROSA-76, which appears to be an e-mail to you from Sascha

13   Fielding?

14   A.   Yes.

15   Q.   She's at CDC?

16   A.   She is.  She references that they had had a meeting

17   regarding a response that had been drafted to Mr. Taylor, and

18   that Mike Allred asked that I review it -- asked for me to take

19   a look at the response to verify or correct the science issues

20   discussed.

21   Q.   And did you provide input for the scientific principles or

22   material in that response?

23   A.   I commented on the content and I indicated that there was

24   still no mention of the longer term health effects made in the

25   response.

1  **Q.**   And tab A, which is Bates numbered 79, do you recognize
2  that?
3  **A.**   Yes.
4  **Q.**   Dr. Gerberding in her letter references scientific-related
5  information about formaldehyde at tab A.  So was this tab A
6  part of her letter?
7  **A.**   It was.
8  **Q.**   And is this tab setting forth information that you
9  provided advice and input about?
10  **A.**   I don't believe I reviewed the tab.
11  **Q.**   Does the discussion in tab A state in the first full
12  paragraph that the Department of Health Human Resources is
13  determined that formaldehyde may reasonably be anticipated to
14  be a human carcinogen based on limited evidence in humans and
15  sufficient evidence in lab animals?
16  **A.**   Yes, it does.  I didn't review the tab at the time the
17  letter was drafted.  I reviewed it thereafter.
18  **Q.**   So you reviewed this tab A attachment to the letter after
19  it was made an attachment for the letter?
20  **A.**   Right.  Yes.  The only thing I had reviewed prior to the
21  letter being sent out was the letter itself.
22  **Q.**   Do you, based on your knowledge and experience, agree with
23  the statements about formaldehyde, specifically the
24  carcinogenic nature of formaldehyde, in that paragraph under
25  the caption "background of formaldehyde"?

1   **A.**    In part, yes, I do.  In part, I do not, because IARC is

2   not cited in terms of its most recent conclusions regarding

3   formaldehyde, because it is now classified as a known

4   carcinogen as opposed to probable.

5   **Q.**    IARC again stands for?

6   **A.**    The International Agency for Research on Carcinogens.

7   **Q.**    When did -- is that a government agency?

8   **A.**    That is a subdivision in Lyons, France, of the World

9   Health Organization.

10  **Q.**    And when did IARC classify formaldehyde as a known

11  carcinogen?

12  **A.**    I believe the original draft came out in 2004, and it was

13  final in 2005.

14  **Q.**    Looking again at tab A in the table given for adverse

15  health effects of intermediate exposure to formaldehyde, do you

16  see a listing of health effects from inhalation?

17  **A.**    Yes, I do.

18  **Q.**    Do you, based on your knowledge and experience, agree with

19  the content of that table?

20  **A.**    It is customary for me to review such information, and in

21  the context of the statements made regarding cancer above, that

22  there is by way of policy, as I mentioned earlier, no safe

23  level of exposure to a carcinogen irrespective of the time or

24  duration of exposure.

25           Based on insights regarding the mechanism of toxic

1    action of formaldehyde in the environmental health community,

2    it's quite conceivable that even a short term exposure to

3    elevated levels of formaldehyde may result in a carcinogenic

4    effect.

5    **Q.**    Yes, sir.  I was referring, though, to the Table 1 that

6    sets forth reported adverse effects from the inhalation

7    formaldehyde, separate and apart from the carcinogenic nature

8    of the chemical.  And my question was:  Based on your knowledge

9    and experience, and your review of this, do you concur with

10   what is set forth in that figure dealing with exposure levels

11   and reported adverse effects?

12   **A.**    During the deliberations and discussions regarding the

13   health issues associated with formaldehyde, I made it clear

14   that there was a growing body of information that there could

15   be reproductive developmental outcomes associated with exposure

16   to formaldehyde.

17            Again, this is based on more recent understandings,

18   insights, regarding the mechanism of action about stem cells

19   circulating through the nasopharyngeal passages, that although

20   formaldehyde only has a half-life of about a minute to a minute

21   and a half in the body, that it is so highly reactive that it

22   can cause cross-links within the DNA strands, methylation of

23   the DNA strands, that then become permanent within that stem

24   cell, which can then be transported to the fetus.

25            And that is the basis on which most theories of not

1   only the reproductive developmental effects of formaldehyde is

2   based, but also the leukemia sometimes reported as a result of

3   exposure to formaldehyde.

4   **Q.**   And that statement that you've just given, Doctor, is

5   based upon your years of experience and as well as your

6   education and training in the field of environmental health

7   science; correct?

8   **A.**   Yes.  And also the fact that as the issue became

9   increasingly evident, I attempted to review the literature that

10  was available.  I provided to my counsel the article by

11  Thrasher and Kilburn, which was an authoritative review of the

12  extant literature at the time, and a statement regarding the

13  mechanism of action that I just relayed to you.

14  **Q.**   When, then, you reviewed this tab A, although you

15  indicated you may not have reviewed it in advance of it being

16  sent with this letter to you, you did review it at some point

17  in time; correct?

18  **A.**   Yes, I did.

19  **Q.**   And, Doctor, I understand and appreciate your concern

20  about the formaldehyde risks with respect to cancer as well as

21  reproductive health.  My question right now, though, is:

22  Looking at tab A and the letter sent by Dr. Gerberding, which

23  you have reviewed after the fact, do you, based on your

24  knowledge and experience as an environmental health scientist

25  with specific expertise as to formaldehyde, take issue with the

1   scientific accuracy with what is set forth in tab A?

2   **A.**   The citation is from the National Research Council, 1981,

3   that would indicate to me that it's approximately 30 years out

4   of date.

5        I would, before relying on that document, refer to

6   more recent literature, which I believe will point to -- would

7   point to, does point to, some different exposure levels

8   associated with some of the effects noted.

9   **Q.**   Look at the paragraph after the table.  It states:

10  "Inhalation exposure of months to one year or longer is

11  expected to increase the incidence of symptoms of upper

12  respiratory tract and eye irritation and there's a reference,

13  ATSDR 1999.  Do you see that?

14  **A.**   I'm --

15  **Q.**   It's the section that follows the box?

16  **A.**   Oh, yes, I see it.  Yes.

17  **Q.**   First, do you agree with the statement; and, second, can

18  you tell us what the ATSDR reference there is?

19  **A.**   I agree with that statement and the reference is the

20  agency's toxicological profile released in 1999.

21  **Q.**   In the paragraph that follows, it stated that:  "Mobile

22  homes are a potential source of relatively high formaldehyde

23  exposures because they are typically constructed of large

24  quantities of particle board bonded with formaldehyde resins.

25  Mobile homes also have lower outdoor air exchange rates than

 1   conventionally built housing, which leads to an accumulation of
 2   free formaldehyde in living spaces.
 3        Based on your knowledge and experience about
 4   formaldehyde, do you agree with the statements made there and
 5   can you tell us about the reference to Stenton, 1994?
 6   A.   I don't think there's any doubt that mobile homes are
 7   significantly different than traditionally built homes.  There
 8   are two factors that lead to that, not only the fact that
 9   formaldehyde resins are used extensively, but the fact that
10   they are manufactured in closed facilities, and, therefore, are
11   not subject to the off-gassing that would occur during the
12   construction of a home.
13        Furthermore, and I pointed this out in my comments to
14   Sascha Fielding, the headspace, the volume of air above the
15   breathing zone, is much greater in conventionally built homes
16   than it is in mobile homes and because of that, the levels
17   would tend to be higher as a function of that.
18   Q.   And it then says:  "Although formaldehyde levels in new
19   trailers may remain above the threshold for symptoms in
20   sensitized people for as long as three years, non-sensitized
21   people are unlikely to experience anything other than transient
22   irritation.  Do you agree with that statement?
23   A.   No, I don't.
24   Q.   Why not?
25   A.   Because people who are previously non-sensitized can

1    become sensitized by repeated exposure to gases such as

2    formaldehyde.  Further, it's not clear that transient

3    irritation would be the only effect, based on my earlier

4    comments regarding reproductive and development effects as well

5    as cancer.

6    Q.   And then the final statement about that study of the 96

7    unoccupied trailers is that the long term health effects of

8    formaldehyde exposure cannot be determined from this analysis.

9    Would you agree with that?

10   A.   I would say that this analysis did not address long term

11   health effects.  But I certainly think that one would be able

12   to draw scientifically robust inferences from the information

13   regarding longer term health effects.

14   Q.   Okay.  That's fine.  Do you believe, Dr. DeRosa, that one

15   measured ppm level in a living space where formaldehyde is

16   known to be off-gassing can be used to decide all health

17   effects from formaldehyde exposure in that living space

18   suffered by a particular individual?

19   A.   Analytic data that are collected on any environment will

20   vary as a function of time, temperature, and ventilation, so

21   that I would suggest that to have a reliable sense of what the

22   levels actually are, one should have a time course of sampling

23   that covers different points in the day, different points in

24   the year, and other environmental conditions, whether

25   ventilation is being used extensively, whether it's a closed --

1    a heating season type of scenario, or whether it's a season in

2    which the windows are open and there is free exchange of air.

3    Q.   And what are the ATSDR health guidance values for short

4    term intermediate and long term exposure to formaldehyde?

5    A.   For long term exposure it's .008 parts per million; for

6    intermediate exposure it's .03 parts per million; and for acute

7    exposure, it's .04 parts per million.

8    Q.   And, again, define long, intermediate and short term as

9    used by those references?

10   A.   1 to 14 days in the case of short term or acute; longer

11   term or intermediate is greater than 14 days and up to 365

12   days; and longer term is 365 days and beyond.

13   Q.   Do you agree with him that .3 ppm is the lowest actual

14   effect level found in the toxicological literature?

15   A.   No, I do not.

16   Q.   Why not?

17   A.   Because there is extensive documentation about effects

18   occurring below that level, including the underlying effect

19   levels associated with some of the health guidance values that

20   I have mentioned to you earlier.

21           By way of a background, I was with EPA during which

22   time I was responsible for the development of the risk

23   assessment guidelines both for non-cancer endpoints and for

24   chemical mixtures.

25           As part of that, the identification of uncertainty

1  factors and relying rationale constituted a primary focus of my

2  professional background and, in fact, I was the person who made

3  the final determinations as to whether uncertainty factors were

4  or were not applied appropriately by our interagency work group

5  that developed such guidance values.

6        The values you've referenced were 9 to 30.  There

7  were two values of 9 used for the acute and intermediate, I

8  believe, and then 30 for the longer term.  I would have to

9  verify that, but there were two values of 9, one of 30.  Those

10 are relatively low uncertainty factors.  Typically, uncertainty

11 factors range from 10 to 1,000 in some instances, depending on

12 the robustness of the database on which they are based.

13        To say that these were unreasonable is very

14 speculative.  I think I would cite our experience with lead in

15 children as an example.  The standard for lead in children has

16 gone from 50 -- 50 micrograms per deciliter down to now 10, and

17 some think it should be at 3 or lower because there is no

18 threshold that has been identified with certainty.

19        So what we know and what we don't know is

20 relentlessly circumscribed by evolving insights into science,

21 and to say that something is fully protective or is not

22 protective, is treacherous territory.

23 Q.  So you agree with Mr. Little that the chronic exposure

24 reference in the MRLs is inapplicable in a case such as this

25 for analysis of the formaldehyde levels?

1   **A.**   No, I don't.

2   **Q.**   Why not?  I mean, no one has lived in the trailers for 10

3   years, why isn't Little correct about that?

4   **A.**   Because it's tied to the concept of physiologic time.  A

5   lifetime study in rodents is considered to be two years,

6   possibly longer, depending on the protocol that's being used.

7   The lifetime exposure in humans is typically considered to be

8   70 years.  But, generally speaking, a two-year study in rodents

9   or other bioassays would be considered to be consistent with a

10  70-year life expectancy.

11          Again, there are a lot of assumptions and issues of

12  science that are tied up in that.  But it's the issue of

13  physiologic time and the fact that a ten-year exposure

14  involving workers, a 12-year exposure, or a one-year exposure

15  or more would be considered to be adequate for purposes of a

16  risk assessment.

17  **Q.**   And a year or more exposure is considered chronic in

18  reference to the MRL levels?

19  **A.**   That's correct.

20  **Q.**   Mr. Little in sworn testimony in reference to his analysis

21  of this EPA data has testified that in terms of cancer risk

22  associated with formaldehyde exposure it involves, quote:

23  "Many, many years of exposure," close quote, and specifically

24  10, 20 years.  And for that reason, he did not consider that

25  applicable here because people did not live in these trailers

 1  for that long.  What is your response to that?

 2  **A.**   I think Mr. Little is confusing the latency period for

 3  most cancers with the time required for exposure to elicit the

 4  carcinogenic response.  With the exception of leukemias, a

 5  latency period of 10 to 20 years is not unheard of and is

 6  typical, in fact.

 7            However, again, the prevailing policy of -- the

 8  federal science policy of the federal government is that there

 9  is no safe level of exposure to a carcinogen, irrespective of

10  the duration of exposure.

11            This is based on the premise of a study done with

12  ionizing radiation in the late '70s and early '80s where they

13  exposed large numbers of rodents to doses of radiation and were

14  unable to find a dose at which a carcinogenic response was not

15  elicited.  It's called a Mega-Mouse study, for those who are

16  interested.

17            But at any rate, that has formed the backbone of

18  science policy within the U.S. federal government since that

19  time.  And it's the premise of all cancer risk assessments done

20  by the federal government.

21  **Q.**   If you'd turn to the next Bates numbered page, 93.

22  **A.**   Yes.

23  **Q.**   On July 24 you had done an e-mail blast to a number of

24  people in which you state that you were concerned that the

25  reported clinical signs of a harbinger of an impending public

1   health disaster?

2   **A.**   Correct.

3   **Q.**   Why did you say that?

4   **A.**   Because kids were presenting with clinical signs of

5   formaldehyde toxicity.  They were they were being taken to

6   hospitals.

7              **MR. WEINSTOCK:**  I'm sorry?

8              **THE WITNESS:**  They were being taken to hospitals with

9   asthmatic attacks, and then being returned to the environment

10  which caused them.

11  **BY MR. MEUNIER**

12  **Q.**   And you felt more needed to be done to communicate to

13  those families, Dr. DeRosa?

14  **A.**   Yes, I did.

15  **Q.**   In this same e-mail of July 24, '07?

16  **A.**   I need to excuse myself.

17  **Q.**   Yes, sir.  You were about to --

18  **A.**   My concern here was multiply dimensioned -- had multiple

19  dimensions.  It was a concern for the kids and the parents, but

20  it was also a concern that an entire agency of health care

21  professionals could stand by and watch kids being taken to the

22  hospital with an asthmatic attack, which is the same as not

23  being able to breathe, bronchial constriction, they wheeze,

24  they cough, they can't get their breath.

25              And, you know, these people here know that.  And how

292

1    people could stand by and do the politically expedient thing is

2    beyond me.

3              MR. WATTS:  That's a good stopping point.

4              THE COURT:  Is this the end of direct examination?

5              MR. MEUNIER:  It looks like they merged it.

6              THE COURT:  How much time do we have left on this?

7              MR. BUZBEE:  About 25 minutes.

8              THE COURT:  All right.  It's almost 5:00, so we'll go

9    ahead and stop here.

10                   Ladies and gentlemen of the jury, we're going if

11   pick up tomorrow.  Does anybody have a problem with 8:30 as the

12   starting time?  All right.  If you would be here no later than

13   a few minutes before 8:30 in the jury room.  When you get here,

14   go directly to the jury room.  There will be coffee and soft

15   drinks and maybe even something to eat.  But get here well

16   before 8:30 so that we know that you're ready.  And my

17   commitment to you is that at 8:30 sharp, we will come into the

18   courtroom.  We will finish up with this videotaped deposition

19   and we'll get into some more testimony.

20                   In the meantime, I previously advised you, and I

21   will instruct you again, please, do not discuss this case with

22   anyone, including spouses, family members, friends, neighbors,

23   anyone else who you may run into between the time you leave the

24   jury room and the time you get to the jury room tomorrow,

25   please do not discuss the testimony in this case or anything

1  else about the case.

2          It's very, very important that you follow that

3  instruction.  I will repeat it many times over again to the

4  point where you get tired of hearing it.  But this case is only

5  decided upon the evidence adduced in this court, the witnesses

6  and the documentation and not anything else that you may have

7  seen, or heard, or what someone told you.

8          If there is anything that comes on television or

9  in a newspaper, please immediately divert your attention from

10  that for the same reason.  It's important that you understand

11  the evidence here in the courtroom and not what somebody else

12  says about this case.  So please abide by that.  When you get

13  in the building, go straight to the jury room; and if there are

14  people in the hallway and they don't acknowledge you, don't

15  worry about that because they're probably associated in some

16  way with this trial or are interested in this trial.  Please do

17  not try to talk to them.

18          If, by chance, an exchange occurs, I need to

19  know about it.  This is very, very important for you to follow

20  these instructions very, very carefully.  All right.  We're

21  going to go ahead and break for the night.  Please have a good

22  evening and we'll see you first thing in the morning.

23          **THE DEPUTY CLERK:**  All rise for the jury.

24          (WHEREUPON, the jury exited the courtroom.)

25          **THE COURT:**  All right.  Counsel, be seated.  Is there

 1   anything that we need to put on the record right now until the
 2   hearing at 6:00?
 3           **MR. BUZBEE:**  No, sir.
 4           **THE COURT:**  And we are having Patricia Williams at
 5   6:00 this evening.
 6           **MR. MEUNIER:**  Yes, Your Honor.  We could perhaps
 7   limit the exercise in her case.  We have decided that it won't
 8   be necessary to present her causal opinion as to asthma.
 9   However, we still would like to present her general causation
10   opinion on cancer.  Now, this still raises the methodology
11   issue that you still want to explore with her and I'm prepared
12   to present that briefly.  She comes here at 6:00.
13           **THE COURT:**  Mr. Weinstock, it was your motion.
14           **MR. WEINSTOCK:**  That would be fine for them -- I
15   mean, I think, truthfully, the bigger problem is her
16   methodology on cancer anyway.
17           **MR. MEUNIER:**  Do you want to withdraw your motion?
18           **MR. WEINSTOCK:**  No.
19           **THE COURT:**  The procedure that I would like to follow
20   is that since we have read her report, all counsel is familiar
21   with her report, I would like her to go ahead and get sworn in
22   and go directly into the cross-examination that Mr. Weinstock
23   would conduct relative to the motion.  Okay.  In other words,
24   you're going to question her about the issues raised in the
25   motion, then Mr. Meunier or whoever on your side --

1          **MR. MEUNIER:**  Yes, I'll have some questions.

2          **THE COURT:**  -- can go ahead and redirect her.  I

3     think the direct examination we assume is going to be that that

4     was contained in the report.  The opinion that was set forth in

5     the report.

6          **MR. MEUNIER:**  Well, not necessarily because

7     methodology is the issue and while methodology may have been

8     laid out to some extent in the report, Andy's motion goes to

9     the methodology that led to the opinions in the report.

10             So she does have an explanation to offer you,

11    Judge, on the methodology.  That's the focus of this hearing.

12         **THE COURT:**  Would you like to get into that first?

13         **MR. MEUNIER:**  I would.  I think it would make more

14    sense to let her present her methodology and then let Andy go

15    ahead and make his...

16         **THE COURT:**  That's fine.  Before we close off the

17    record, please remember tomorrow to be as efficient as you can

18    possibly be with these witnesses.  Because we have got a list

19    up here, and I'm checking off as we go and I'm going to be

20    checking a lot, but we've got to be more efficient with these

21    witnesses.

22             Let's get them on and get them off and move to

23    the next one.  We've got a lot of ground to cover.  We've had a

24    little bit of delay this morning because the jury pool was late

25    coming up and then, of course, we had the other issue after the

1   jury was selected.  But I think we can certainly reclaim that

2   time and I'll depend on you-all to see that that happens.

3            (WHEREUPON, the proceedings were concluded.)

4                           *****

5                        **CERTIFICATE**

6            I, Jodi Simcox, RMR, FCRR, Official Court Reporter

7   for the United States District Court, Eastern District of

8   Louisiana, do hereby certify that the foregoing is a true and

9   correct transcript, to the best of my ability and

10  understanding, from the record of the proceedings in the

11  above-entitled and numbered matter.

12

13

14                         _S/ Jodi Simcox, RMR, FCRR_
                           Jodi Simcox, RMR, FCRR
15                         Official Court Reporter

16

17

18

19

20

21

22

23

24

25

                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA