1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  FEMA TRAILER         *    Docket MDL 1873 "N"
        FORMALDEHYDE PRODUCTS        *
6   LIABILITY LITIGATION         *    New Orleans, Louisiana
                                 *
7   THIS DOCUMENT IS RELATED TO: *    September 15, 2009
                                 *
8   CHARLIE AGE, ET AL V         *    12:40 P.M.
        GULF STREAM COACH, INC.,     *
9   ET AL, DOCKET NO. 09-2892;   *
        ALANA ALEXANDER, INDIVIDUALLY *
10  AND ON BEHALF OF             *
        CHRISTOPHER COOPER           *
11  * * * * * * * * * * * * * * * *

12                              DAY 2
                         AFTERNOON SESSION
13            JURY TRIAL PROCEEDINGS BEFORE THE
                   HONORABLE KURT D. ENGELHARDT
14                 UNITED STATES DISTRICT JUDGE

15
        APPEARANCES:
16

17  For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                      Meunier & Warshauer
18                               BY:  GERALD E. MEUNIER, ESQ.
                                 1100 Poydras Street
19                               Suite 2800
                                 New Orleans, Louisiana 70163
20

21                               The Buzbee Law Firm
                                 BY:  ANTHONY G. BUZBEE, ESQ.
22                               JP Morgan Chase Tower
                                 600 Travis, Suite 7300
23                               Houston, Texas  77002

24

25

```
 1   APPEARANCES:

 2   For the Plaintiffs:          Watts Guerra Craft
                                  BY:  MIKAL C. WATTS, ESQ.
 3                                Four Dominion Drive
                                  Building Three, Suite 100
 4                                San Antonio, Texas  78257

 5
                                  Hilliard Munoz Guerra
 6                                BY:  ROBERT C. HILLIARD, ESQ.
                                  710 S. Shoreline Boulevard #500
 7                                Corpus Christi, Texas  78401

 8
                                  CHRIS PINEDO, ESQ.
 9                                Attorney at Law
                                  802 North Carancahua
10                                Suite 2250
                                  Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                    & Morton
13                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  BY:  JOSEPH G. GLASS, ESQ.
14                                3838 N. Causeway Blvd.
                                  Suite 2900
15                                Metairie, Louisiana 70002

16
                                  Scandurro & Layrisson
17                                BY:  TIMOTHY SCANDURRO, ESQ.
                                  607 St. Charles Avenue
18                                New Orleans, Louisiana  70130

19
     For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                                BY:  CHARLES R. PENOT, JR., ESQ.
                                  BY:  RICHARD A. SHERBURNE, ESQ.
21                                BY:  SONIA MALLETT, ESQ.
                                  717 North Harwood
22                                Dallas, Texas  75201

23

24

25
```

1   <u>APPEARANCES</u>:

2

3   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                  500 Poydras Street
                                  Room HB-406
4                                 New Orleans, Louisiana 70130
                                  (504) 589-7780
5

6

7

8   Proceedings recorded by mechanical stenography, transcript

9   produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>I N D E X</u>

2                                                          <u>Page</u>

3

   JAMES F. SHEA
4       Videotaped deposition                             141

5  DONALD SHAFFER
        Direct Examination                                211
6       Cross-Examination                                 215
        Redirect Examination                              216
7

   ALAN DAVIS
8       Direct Examination                                217
        Cross-Examination                                 223
9       Redirect Examination                              229

10 SCOTT BAILEY
        Deposition Read                                   231
11

   SCOTT PULLIN
12      Cross-Examination                                 246
        Direct Examination                                297
13      Cross-Examination                                 317
        Recross-Examination                               327
14      Redirect Examination                              335

15

16

17

18

19

20

21

22

23

24

25

1            **AFTERNOON SESSION**

2            **(September 15, 2009)**

3                  * * * * *

4        **THE DEPUTY CLERK:** All rise.

5        (WHEREUPON, the jury entered the courtroom.)

6        **MR. WATTS:** I just want to let you know that I've

7   told Charlie and Andy we're going to pull up David Moore and

8   try to put him on tomorrow afternoon. And I'll send you a new

9   list. I just wanted to let you know we're going to put an

10  expert on.

11       **THE COURT:** You may be seated.

12            We were in the middle of watching the videotaped

13  testimony of Mr. Jim Shea. Are we prepared to proceed with the

14  balance of that testimony?

15       **MR. WATTS:** Yes, sir. I think now we have the 2009

16  deposition that you wanted us to play. I think it's an hour an

17  26 minutes.

18       **THE COURT:** Right. Okay. Well, let's go ahead and

19  do that and see where we wind up. Because we've got to get it

20  all in, so let's go ahead and --

21       **MR. WATTS:** Yes, sir.

22       **THE COURT:** -- do it now.

23            I hope all of you had a nice lunch.

24            It's always better to have a live witness, but

25  sometimes that's just not possible, so...

1      **MR. WATTS:**  Can we have an admonishment against

2   snoring, Your Honor?

3      **THE COURT:**  Mr. Weinstock, are you okay with

4   Mr. Shea's testimony?

5      **MR. WEINSTOCK:**  Yes, sir.

6      **THE COURT:**  At this time, Jim Shea's testimony --

7      **MR. WEINSTOCK:**  The first hour he's watched.  He's

8   going to watch the remaining --

9      **MR. WATTS:**  He's watching the second hour while we

10  watch the first.

11     **THE COURT:**  Okay.  All right.  Let's go ahead and

12  begin.

13     (WHEREUPON, the videotaped deposition of **JAMES F.**

14  **SHEA** was played.)

15  **BY MR. WATTS**

16  **Q.**   All right, sir.  What is your name?

17  **A.**   My name as a James F. Shea.

18  **Q.**   And I took your deposition before?

19  **A.**   Yes, you have.

20  **Q.**   And you recall last time we were talking that there was

21  this issue about LFE versus reg wood used in some of your

22  trailers.  Do you remember talking about that?

23  **A.**   Yes, we did.

24  **Q.**   Now, you told me that when your brother, Dan, who is

25  sitting here in the room 20 feet from you, was going through

1   one the factories that he noticed that some of the wood that

2   was being used to build your trailers, he noticed that it was

3   reg wood.  Do you recall telling me that?

4   A.   Yes.

5   Q.   Have you had an opportunity now to go back to the

6   particular plant at which that trailer was manufactured to

7   determine whether the component parts, specifically the wood

8   that was used in that trailer, was indeed LFE wood?

9   A.   I think as I explained in my last deposition, that we

10  really have no idea as a manufacturer of recreational vehicles

11  whether an individual piece of wood or a grouping of wood meets

12  the LFE characteristics.  We really just don't.

13          We have historically relied on our vendors to provide

14  us with wood that is -- meets our specification, wood product.

15  And specifically we're talking about hardwood plywood, I

16  believe, in this instance.

17  Q.   Right.  So when we talk about subflooring, we're talking

18  about the wood that's placed on the actual frame?

19  A.   Yeah.  That's placed on the wood framing, yes.

20  Q.   And that's typically, at least in the documents I've seen,

21  specifically in the documents from your company, that's

22  referred to as subflooring; right?

23  A.   That would be a reasonable way to term that.

24  Q.   And on top of the subflooring you can place vinyl or

25  carpet or even other wood?

1    A.    Correct.

2    Q.    And so let's drill down on this subflooring.  Who are the

3    vendors that provide subflooring in the time -- to your company

4    in the time frame of late 2004, early 2005?

5    A.    It would have been Georgia-Pacific Corporation,

6    Weyerhaeuser Corporation, and Hambro Corporation.  It's

7    possible that we made some minor acquisitions of products to

8    fill in a supply hitch at some point, but those are the people

9    that we would typically purchase subflooring from.

10   Q.    And when the subflooring is purchased, is that done

11   company-wide or factory by factory?

12   A.    It's done factory by factory.

13   Q.    And was there any specification with regard to the

14   subflooring regarding formaldehyde?

15   A.    The subflooring that we -- it was our policy to utilize

16   was product that met the HUD requirements for formaldehyde

17   emissions.

18   Q.    And where is that policy written?

19   A.    This is a policy that we've had since the early '90s.

20   Q.    I heard you say that, but where is it written?

21   A.    You know, I can't say that we have a specific document

22   that I can point to at this time.  It's been such a

23   long-standing policy and is very well known in the industry,

24   and we made the decision to do that, like I said, in the early

25   '90s.  But, I don't have a document that I can point to

1    relative to that policy.  But it was a well-known policy in the

2    industry, and I've never heard any of our vendors question

3    that.

4    Q.   Can you point me to one document that references or lists

5    some sort of internal policy at your company that requires HUD

6    standards on your subflooring?

7    A.   Well, certainly in our last deposition we went through

8    documents that referenced the requirements on the POs that

9    we -- that the vendor provide product that met those HUD

10   emissions requirements.  And we've seen those.

11   Q.   Remember we talked --

12   A.   You've showed those to me.  You have them.  And so there's

13   many references on POs issued to those HUD requirements,

14   referencing those HUD requirements or code requirements.

15   Q.   Didn't you tell me last time we were together that it's

16   not on every PO, that you've seen POs where that HUD

17   requirement is not listed anywhere?

18   A.   There are some POs, depending on the circumstance, that

19   might not have that HUD requirement reinforcing our policy on

20   the PO.  But as I say, that policy was like steel in the

21   industry.  Our vendors absolutely knew it, knew what our policy

22   was.

23        It had been invoked -- or in force for so long, I

24   can't point to the document that put it in force, but it was

25   very well known, very much our course of doing business, and

1    there's been no vendor that I've seen question that or heard of

2    questioning that policy.

3    Q.   So just so I'm clear, there are some purchase orders that

4    you've seen for subflooring that do not have the HUD

5    requirement on them; isn't that right?

6    A.   They don't necessarily have the reinforcing of our policy

7    in language that's on the PO.

8    Q.   And you have no --

9    A.   There are some like that, right.

10   Q.   And you can point me to no written policy or no

11   documentation sent to any vendor with that policy written out

12   and spelled out, can you?

13   A.   This policy has been so long-standing and so well known

14   and so well promulgated amongst our supplier base, it just --

15   it wouldn't be necessary for me to have that document or

16   whatever notices that we gave to our vendors at that time in

17   the early '90s, which is 15, 16 years ago.

18   Q.   So your answer is no?

19   A.   No, I cannot give you a document that shows when we

20   invoked at the time that policy.

21   Q.   And you rely on the vendors that you say know the policy

22   to provide you subflooring that meets the HUD requirements;

23   correct?

24   A.   Yes, we do.

25   Q.   Okay.  All right.  I want to move past subflooring quickly

1    and move to the wood used in the walls of the trailer.  What

2    sorts of wood is used that make up the walls of the trailers?

3    As I'm standing in the trailer and looking at the walls, what

4    is it?

5    A.    It's a hardwood plywood.

6    Q.    Is that what is commonly referred to as lauan?

7    A.    Many people refer to it as a lauan.

8    Q.    Does your policy also apply to the -- as far as LFE or the

9    formaldehyde, apply to the decorative hardwood panels?

10   A.    Yes.  The policy that we instituted in the early '90s also

11   apply to hardwood plywood panels.

12   Q.    And have you made any determination as to whether these

13   particular vendors that may have provided these decorative

14   hardwood panels to Plant 57 actually provided component parts

15   that fit within your policy?

16   A.    As I say, we rely on our vendors to provide products that

17   meet the HUD requirement, emission requirement.

18   Q.    Are you telling me there's nothing that you guys, whether

19   it be company-wide or Plant 57, can do to make sure that the

20   vendors are following your policy?

21   A.    What we would have to do in that -- would have had to have

22   done in that case is we would have had to do large chamber

23   confirmatory testing on every panel.

24   Q.    Well, can't you just read the labels on the panels that

25   are provided?

1    **A.**   Well, they place the labeling on.  I mean, you're still

2    having to depend on what the vendor does, what the vendor

3    represents.  You're dependent on the vendor unless, unless you

4    were to take each panel and subject it to a large chamber test

5    to verify, because that's the testing protocol that's used in

6    the HUD regulation.

7              You asked me how do we know, how can we know

8    absolutely without having to rely on what the vendor represents

9    and tells us.  That's the only way that I can think of.

10   **Q.**   Could you look at the actual paperwork that comes along

11   with the panels?

12   **A.**    But that's the vendor paperwork.  If the vendor isn't

13   going to give us what we order, isn't going to observe our

14   policy, it doesn't really matter what's on the paper.

15   **Q.**   Right.  But what if --

16   **A.**   They could represent anything on the paper.

17   **Q.**   So it would be your belief that the cost difference

18   between low emitting decorative hardwood panels and just

19   regular hardwood panels would be about 5 to 10 percent?

20   **A.**   Yes.

21   **Q.**   Okay.  Did Adorn provide decorative hardwood panels to

22   Plant 57 back in 2004?

23   **A.**   They may have.

24   **Q.**   When your purchasing manager at Plant 57 receives a

25   shipment of Adorn decorative hardwood paneling, does he or she

1  look at the documentation that accompanies the shipment to
2  determine whether it is, in fact, LFE pursuant to your policy?
3  **A.**   Our purchasing agents, you know, occasionally review
4  documentation if it's brought to their attention, you know.
5  Can I say that absolutely they review every invoice and compare
6  it to every PO, no.
7  **Q.**   And he didn't look at the wood and say, Oh, it says "reg,"
8  but I don't believe that label because I know sometimes they
9  mislabel.  Instead he raised the issue, and you guys did an
10 investigation and determined that 5 to 10 percent, as best you
11 could tell, of your wood that was put in the trailers was not,
12 in fact, HUD-certified; right?
13 **A.**   Yes.  I do recall expressing to you the fact that Dan Shea
14 was walking through Plant 57 and saw some product marked "reg,"
15 and that did occur, yes.
16 **Q.**   So that means --
17 **A.**   And he questioned what that meant.
18 **Q.**   Right.  And that means your receiver, whoever this person
19 is -- hopefully we'll find out who this person is at some
20 point -- so you don't train your receivers and inform them of
21 this policy you say has been in existence since the mid '90s?
22 **A.**   What we train our receivers to do is look at the PO and go
23 through the information and see that it's the product that we
24 ordered from the vendor with the proper parts number and so
25 forth.  Do we train them to try to look for -- did we train

1   them to try to look for LE, LFE, non-LFE, all these product

2   designators, no, I can't say that we did.  I'm not sure that we

3   could have.  It was kind of a moving target.

4   Q.   So you're saying that there was no way for you as a

5   company to train your receivers on this policy that required

6   HUD-certified wood products in your trailers?

7   A.   What was important is that our vendors knew what our

8   policy was.  And as I've explained to you, there's no way that

9   the receiver can know.  Whatever letters there may be

10  attenuated with a PO or an invoice or anything else, there's no

11  way that a receiver can know.

12  Q.   There's no way, impossible for them to know?

13  A.   Right.

14  Q.   -- the delivery tickets that these receivers supposedly

15  look at that has the description of what's being delivered?

16  A.   I've never seen the designation of the term 'reg' until

17  after this became an issue in March 2006.

18  Q.   Now, what is Exhibit 3?

19  A.   It looks to me like an invoice from Adorn Corporation.

20  Q.   And in this process of receiving the shipment, when would

21  this document be presented to your company?

22  A.   It would be presented to the company subsequent to the

23  shipment.

24  Q.   Okay.  And who would that document be presented to?

25  A.   It would go to our accounts payable department.

1    Q.    And do you see any designation on that document as to

2    whether what was provided was either reg or LFE product?

3    A.    There's a designation here that says "Reg", "Lauan, Reg,

4    Stone Horizon, 2.7-millimeter, 8 feet."

5    Q.    Okay.  What product is that?  Is that the decorative

6    hardwood panels that go inside the trailer?

7    A.    Correct.

8    Q.    That's what's used on the walls?

9    A.    That product was used on walls.

10   Q.    Okay.  So we know that at least with regard to that

11   particular shipment that has to do with that particular invoice

12   that the product provided was not LFE, don't we?

13   A.    I don't know.

14   Q.    Right.  You don't read that to see that it's reg?

15   A.    The manufacturer uses a designation called "reg."  They've

16   told us subsequent to this that that means that it was not --

17   did not meet the HUD requirement for emissions.

18   Q.    Okay.  So you know now, as you sit here, that at least

19   with regard to Adorn, which is one of your vendors, that the

20   designation of 'reg' means the product provided does not meet

21   the HUD requirements; true?

22   A.    That's what they claim here.

23   Q.    Adorn is a long-term vendor of your company, aren't they?

24   A.    Correct.

25   Q.    Adorn, you told me, possibly provided the decorative

1  hardwood paneling that went into the Alexander trailer when it
2  was built in December of 2004?
3  **A.**   Possibly, yes.
4  **Q.**   Adorn very clearly puts on their invoice what sort of
5  product they are providing, at least with regard to the HUD
6  requirements; true?
7  **A.**   It wouldn't have been clear to me at the time, you know,
8  in 2004.
9  **Q.**   Right.
10 **A.**   Because I had no idea what reg meant, never saw it before,
11 and I've never seen it used by any other vendor, the term
12 "reg."  It's their own term.
13 **Q.**   Is it possible then that Adorn was providing reg products
14 to your company from as far back -- for 20-some-odd years?
15 **A.**   You know, as I've pointed out to you in the past, we rely
16 on our vendors' representations and their systems and their
17 certifications on the products we receive.  So when you present
18 possibilities to me, I suppose anything is possible but --
19 because, as I said to you, the only way to know absolutely the
20 nature of a panel and how it performs relative to the HUD
21 requirement is to perform a large chamber test, ASTM test.
22 **Q.**   Let's look at Exhibit 6.  Now, that is a -- what is
23 Exhibit 6?
24 **A.**   That is a picking list by order, they call it.
25 **Q.**   What does that mean?

```
1   A.   I think there's some variation in the documents that
2   vendors send with shipments.
3   Q.   So it's a document that accompanies the shipment?
4   A.   Correct.
5   Q.   Kind of like a packing slip?
6   A.   Correct.
7   Q.   It's something that a receiver is supposed to look at and
8   make sure that it matches -- what was received matches the
9   purchase order; yes?
10  A.   Correct.
11  Q.   Now, do you see a designation on the packing slip or
12  packing list for Wood Bridge with regard to whether the product
13  is LFE or not LFE?
14  A.   There's a columnar designation of LFE.
15  Q.   You mean a column, just a column that says 'LFE'?
16  A.   Yeah.  That's what columnar means.
17  Q.   When you say "columnar," you mean that there's a column, a
18  heading that says 'LFE'; is that right?
19  A.   Correct.
20  Q.   And is that column marked in any way as to whether the
21  product being provided was LFE or not?
22  A.   It's not marked that I can tell.
23  Q.   So in other words, anybody with common sense who is aware
24  of this unwritten policy that's existed since the '90s would be
25  able to look at this picking list and know that what's being
```

1   provided is not LFE; true?

2   A.   I can't say that.  I mean, I really can't.  I don't know

3   what that column means.

4   Q.   Now, I'm just trying to figure out, you said those are

5   your primary suppliers of decorative hardwood paneling.

6   Certainly the universe of the companies that would be providing

7   that type of product back in '04 would be one of these six --

8   would be within these six.  How hard is it really to figure out

9   how they designate their product as to whether it's

10  HUD-certified or not?  That doesn't seem to be very difficult

11  to do?

12  A.   Well, all I can tell you is there's lots of -- there was

13  lots of variation in that.

14  Q.   I mean, that's six phone calls.  You pick up the phone,

15  you call each one of these people, and you say, Look, I just

16  want to be sure that you understand my policy and I understand

17  how you mark your product.  How hard would that be?

18  A.   Well, you know, I don't know how you can characterize how

19  hard, how difficult.  I know that because of questions like we

20  receive from people like you on this subject, we tried -- we've

21  tried to get everybody on more similar designators in their

22  paperwork since that time.

23  Q.   I'm not talking about FEMA specs.  I'm talking about

24  within your company.  You have specifications of your trailers,

25  do you not; the way you build your trailers, the way they're

1   supposed to be built, don't you?

2   **A.**   Correct.

3   **Q.**   And they're supposed to be built with HUD-certified wood

4   products; true?

5   **A.**   We specify that the products that our vendors sell to us,

6   those kinds of wood products should meet the HUD requirements

7   for formaldehyde emissions.

8   **Q.**   And that's this policy that is incorporated into the way

9   you build your product, is it not?

10  **A.**   Right.

11  **Q.**   So if you have put into the marketplace a trailer that was

12  not built pursuant to your policy, then that was just a mistake

13  on someone's part?

14  **A.**   If we had panels -- if a product was built with panels

15  that didn't meet HUD requirements, then the vendor didn't give

16  us what we specified.

17  **Q.**   Right.  And the trailer was not built pursuant to this

18  company-wide policy?

19  **A.**   Correct.

20  **Q.**   And if you did not do that, that is, if some trailer

21  rolled off the assembly line that was sold or ultimately used

22  by an end user like the Alexanders and it had wood products

23  that were not HUD-certified, that would be contrary to your

24  policy; true or not?

25  **A.**   Correct.

1  **Q.**   That would be a product that somewhere in the line some

2  sort of mistake was made with regard to the component; true or

3  not?

4  **A.**   Correct.

5  **Q.**   Now, we've talked about the decorative hardwood panels.

6  We've talked about the flooring, the subflooring.  I want to

7  talk to you now about the roof underlayment.  Do you understand

8  what that term means?

9  **A.**   Yes.

10  **Q.**   Tell me what it means because I have no clue.

11  **A.**   It's the surface directly below the rubber roofing

12  material that is the final surface applied to the roof.

13  It's -- that part of the roof that's exposed to the elements is

14  the rubber roof.  Directly below that is the surface that

15  you're speaking of, the underlayment.

16  **Q.**   Okay.  What sort of panel would that be, more just --

17  **A.**   That would be a hardwood plywood panel.

18  **Q.**   Lauan?

19  **A.**   Lauan was the generic.

20  **Q.**   Okay.  So when we talk about the roof underlayment, we're

21  talking about wood that is, if you're standing in the trailer,

22  above the lauan, but it's, like, in the middle between the

23  actual outside of the trailer and the actual roof you see when

24  you look up inside the trailer?

25  **A.**   Correct.

1  Q.   Okay.  Now, do you know whether the roof underlayment that

2  was provided was HUD-certified?

3  A.   I don't know exactly how much of the underlayment that we

4  received was HUD-certified or -- well, that met the emissions

5  requirements of the HUD standard.  I know that it was expressed

6  to me by vendors that supplied that, that not all of it was.

7  Q.   Now, as far as roof underlayment is concerned, did those

8  vendors change in 2005?  Did you buy that particular product

9  from different vendors?

10 A.   I'm not positive about that.  I mean, as far as between

11 2004 and 2005, I'm pretty confident that Weyerhaeuser was

12 represented in both periods.

13 Q.   Okay.  So when we look at all the documents that surround

14 the building of a trailer -- and I've seen a lot of them, and

15 there are more that I'm sure I'll see soon -- where it talks

16 about the measurements, it has pictures, it shows somebody

17 actually building a trailer, all that, there's nothing in any

18 of those documents that actually specifies that you will use

19 wood products that are HUD-certified; is that right?

20 A.   In those documents we would characterize the components as

21 quarter-inch plywood, 4 by 8, or it would be more the

22 dimensionality of the product.

23 Q.   It wouldn't be the quality of the product, the quality of

24 the wood used?

25 A.   It might say overlay grade or underlay grade or something

1   like that.

2   **Q.**   But it wouldn't say LFE or HUD-certified?

3   **A.**   Not to my knowledge, no.

4   **Q.**   Should it?

5   **A.**   I think that it would be helpful at this point.

6   **Q.**   In the process of building one of these trailers,

7   specifically the type of trailer that Miss Alexander was living

8   in, in this manufacturing process, how many inspections would

9   be done of the finished product?

10  **A.**   Of the finished product?

11  **Q.**   Uh-huh.

12  **A.**   Well, there's a final, final inspection that's done, and

13  there's some inspections that are done related to the systems

14  of the unit at that time.  But that's kind of an end point in

15  the production.

16  **Q.**   There are inspections done throughout the process, I take

17  it?

18  **A.**   Correct.

19  **Q.**   In any of those -- in any of those processes are there --

20  is there any reference or requirement that someone look to make

21  sure that the wood being used is, in fact, HUD-certified wood?

22  **A.**   There's no particular, as I said before, LFE inspection or

23  anything like that, no.

24  **Q.**   Right.  And we're going to get to the e-mail that your

25  brother sent when he -- was going to provide some information

 1   to the government about the components that you use in your

 2   trailers; true?

 3   **A.**   That was the intent of this e-mail, it would appear to me.

 4   **Q.**   Right.  Tell us what he told the government.  It's only

 5   four or five sentences.

 6   **A.**   "I want to advise you of Gulf Stream's use of low

 7   formaldehyde emitting materials in our Cavalier travel

 8   trailers.  To my knowledge there is no requirement in the RV

 9   industry for use of low formaldehyde emitting materials.  Where

10   possible our company uses material that meets the HUD

11   specification of low formaldehyde emissions for manufactured

12   housing.

13           "1.  We use LE lauan for all our interior paneling.

14   These panels meet HUD requirements for low formaldehyde

15   emissions.

16           "We use a low emission floor decking which meet HUD

17   requirements for low formaldehyde emissions.

18           "Our bed tops and dinette base are either LE lauan or

19   MDF which meet HUD requirements for low formaldehyde emissions.

20           "Our cabinet doors are wrapped MDF which also meet

21   the HUD requirement."

22   **Q.**   So you would agree with me that when your brother told the

23   government that you use LFE products, that that wasn't exactly

24   accurate?

25   **A.**   I think to the best of his belief and knowledge, he tried

1   to characterize his understanding.

2   **Q.**   So because of your involvement, that is, your sister

3   company's involvement, Fairmont Homes, and specifically you as

4   president of one of the divisions of that company, you were

5   telling me that's why you instituted this Gulf Stream policy of

6   using --

7   **A.**   Yeah.  And I think at a certain point in time we said,

8   Hey, it makes sense to use this product everywhere.

9   **Q.**   In your experience, what can cause the wall to crack or

10  the decorative hardwood paneling to come off the wall as it has

11  done?

12  **A.**   It could be an impact.

13  **Q.**   Go ahead.

14  **A.**   Could be an impact.

15  **Q.**   Anything else?

16  **A.**   It could be subjecting the trailer to stresses that it

17  wasn't designed for.

18  **Q.**   Such as what?

19  **A.**   Running it off-road.

20  **Q.**   Okay.  Anything else?

21  **A.**   Those are the two things that would come to my mind.

22  **Q.**   Now, are your trailers designed to be jacked up onto

23  blocks?

24  **A.**   We don't provide any designs relative to jacking up on

25  blocks other than we did have designs for blocking to railroad

1  cars at times.

2  **Q.**   Okay.  You realize, of course, that when this particular

3  trailer was installed, a company called Fluor went out and

4  jacked the trailer up and placed it on blocks.  Are you aware

5  of that?

6  **A.**   I'm aware that Fluor was a contractor and did those kinds

7  of -- kind of work.  I don't know about this unit relative to

8  that.

9  **Q.**   If the trailer is installed improperly, that is, if it's

10  jacked improperly, in your experience would that cause the

11  walls to crack?

12  **A.**   It's possible.

13  **Q.**   Okay.  Do you provide, as a company, any instructions or

14  specifications or recommendations as to how a trailer should be

15  placed upon blocks?

16  **A.**   Not to my knowledge.

17  **Q.**   Now, you realized that the trailers you were selling FEMA,

18  whether it be the ones sold in '04 or '05, you realized, of

19  course, they were going to be placed up on blocks; right?

20  **A.**   We provide stabilization jacks --

21  **Q.**   I hear what you're saying.

22  **A.**   -- for the purpose of supporting the unit when it's in

23  place.

24  **Q.**   But did you realize that these trailers, the ones used in

25  Florida and the ones used, for instance, in response to

1    Katrina, did you realize they were being placed up on blocks;

2    that is, wheels leaving the ground?

3    **A.**   I was in the hurricane zone subsequent to our providing

4    these units, and I did see some on blocks.

5    **Q.**   So after March of 2006 when you were in the New Orleans

6    area, you became aware that these trailers were being placed on

7    blocks where the wheels were off the ground?

8    **A.**   I saw some trailers like that.

9    **Q.**   Does your company provide any guidance, any

10   specifications, any recommendations as to how to install a

11   trailer in that regard?

12   **A.**   Not to my knowledge.

13   **Q.**   Okay.  The jacks, but the intent of the trailer itself.

14   Is it designed to be used in such a way, whether it be some

15   sort of blocking, to where the wheels are off the ground?

16   **A.**   We don't provide any kind of engineering documentation

17   that I know of for such blocking.

18   **Q.**   So if either FEMA or Fluor were to take your trailer, FEMA

19   purchases our trailer, delivers it to a displaced resident, and

20   jacks it off the ground such that the wheels are no longer

21   touching the ground, you would say that that would be a use

22   that would be contrary to the way it was designed?

23   **A.**   I wouldn't characterize it that which.

24   **Q.**   How would you characterize it?

25   **A.**   I would say that we don't provide engineering

1   documentation for blocking the units in place other than we

2   provide the stabilization jacks.  We don't provide that, but,

3   you know, it's possible that someone could have a practice that

4   was perfectly acceptable.

5   **Q.**   Would you expect that they would have an engineer look at

6   that so they could make sure that the way they were installing

7   the trailer, that is, taking the wheels off the ground and

8   putting the trailer on blocks, would you expect them to have an

9   engineer look at that?

10  **A.**   I would expect that they had someone with technical

11  experience perform that and evaluate it.

12  **Q.**   I've handed you what I've marked as Exhibit 9, which is a

13  warning that's found on one of the jacks that accompanies

14  trailers that Gulf Stream manufactures.  Have you seen that

15  warning before?

16  **A.**   I've seen it.

17  **Q.**   The warning that's provided, at least the one that you're

18  holding in your hand, that would be guidance provided to

19  someone who intended to jack up the trailer; correct?

20  **A.**   Correct.

21  **Q.**   In fact, it's a warning.  Read the first sentence for me?

22  **A.**   "Do not use this Scissor Jack to lift excessive weight or

23  lift tires off of the ground.  Vehicle frame and door jamb

24  damage may result."

25  **Q.**   In other words, according to the guidance that's provided

163

 1   on the jack, you're not supposed to jack the trailer up such

 2   that the tires leave the ground; isn't that right?

 3   A.   Correct.  That's how I would read it.

 4   Q.   If you jack the trailer up such that the wheels leave the

 5   ground, you could cause frame damage, makes your door not close

 6   properly, it could crack your walls, it could do various things

 7   to your trailer, couldn't it?

 8   A.   It says that, "Vehicle frame damage and door jamb damage

 9   may result."

10   Q.   And you know what that means, don't you?

11   A.   It means that, "Vehicle frame and door jamb damage may

12   result."

13   Q.   Well, does that mean that the --

14   A.   I don't know what it necessarily says about paneling.

15   Q.   Does that not mean that your trailer is not designed to be

16   installed such that the wheels are off the ground?

17   A.   Well, it says not to use the jack to deploy the trailer in

18   such a way.

19   Q.   Uh-huh.  It also says do not jack it such that the wheels

20   leave the ground, or did I just read that wrong?

21   A.   It says don't use the scissor jack.

22   Q.   Oh, so your saying that you could use any other kind of

23   jack to jack it up such that the wheels can leave the ground?

24   A.   I'm not saying that you could do anything.  I'm just

25   saying what it says here is that using the scissor jack may

164

1   result in these vehicle frame or door jamb damage.

2   Q.   Is there something particular about the scissor jack that

3   causes damage but some other jack would not cause the same

4   damage, or do you even know?

5   A.   Well, the scissor jack is located -- you know, I don't

6   know much about jacking travel trailers really.  I know that

7   where you place a jack is important.  If you place it here, it

8   could be a problem; place it here and it's not a problem.  Jack

9   up a car, you can do it wrong, specific area where you jack up

10  a car.

11         So the nature of the jack, the placement of the jack,

12  there's all kinds of issues there.  I suppose someone could

13  look at it technically and determine jack placements and other

14  things that maybe not have the result of this scissor jack.  I

15  don't know.  I don't know for certain.

16  Q.   And this particular trailer we're talking about here, the

17  one manufactured in December of '04 that the Alexander family

18  lived in, was a FEMA spec trailer, was it not?

19  A.   Yes.

20  Q.   Okay.  So --

21  A.   As I understand it, yes.

22  Q.   And on that particular trailer your company would have

23  been required to follow the FEMA specifications?

24  A.   Correct.

25  Q.   Did your company follow the FEMA specifications on that

1   particular trailer?

2   **A.**   It's my belief that we did, yes.

3   **Q.**   And how do you know that?

4   **A.**   Well, we had a set of specifications that was provided to

5   us, and that's how we built the particular type of trailers

6   that the dealers bought purposely to provide to FEMA.

7   **Q.**   Now, FEMA told you that you could provide -- or the specs

8   make clear that you can provide trailers that are of equal to

9   or better quality than specified; isn't that right?

10  **A.**   Correct.

11  **Q.**   In other words, the FEMA specs are a minimum standard;

12  isn't that true?

13  **A.**   That's correct.  That verbiage is on the specs that I've

14  read.

15  **Q.**   The FEMA specs required trailers of a superior grade and

16  quality of workmanship; isn't that true?

17  **A.**   That's -- I recall that language.

18  **Q.**   What does that mean to you?

19  **A.**   That it's not inferior, it's superior.

20  **Q.**   Tell me what you think those words mean since you were the

21  individual or your company actually made these trailers?

22  **A.**   Superior would be better than -- perhaps better than,

23  quote, some average consideration.

24  **Q.**   Better than average?  Better than average, that's what you

25  think superior means?

1   **A.**   That's how I would construe the term.

2   **Q.**   And you believe your trailer was superior?

3   **A.**   I think that our unit conformed to the spec.  And as far

4   as I know, there was never any indication but that FEMA thought

5   that it did too.

6   **Q.**   Really?

7   **A.**   Yes.

8   **Q.**   And tell me why you say that.

9   **A.**   Because it's been expressed by FEMA that they were well

10  pleased with our units.

11  **Q.**   Tell me when that was expressed to you?

12  **A.**   Well, I know that it was expressed to us, documented to us

13  at -- I've seen documents in 2006.

14  **Q.**   Did your company tell FEMA to air the trailers out to the

15  extent they had any issues with the formaldehyde smell?

16  **A.**   We provided ventilation instructions to FEMA.

17  **Q.**   I didn't ask you that.  I'm asking you, did you instruct

18  FEMA to, quote, air the trailers out?

19  **A.**   We instructed FEMA how to ventilate the units.  We gave

20  them ventilation instructions.

21  **Q.**   What instructions were those?

22  **A.**   How to deploy the standard ventilation devices in the

23  unit.

24  **Q.**   What are those?

25  **A.**   Large awning windows, vent fans.  There's three different

1    vent fans in the unit.

2    Q.   So you told them to turn on the fans and open the windows?

3    A.   We told them -- we advised them how to use those

4    standardized components for ventilation, yeah.

5    Q.   Right.  That you called it deployed, but what you mean is

6    open the windows and turn on the fans; right?  There was

7    nothing else to it, was there?

8    A.   There was various fans that are supplied with the units,

9    and we advised them how to use those most effectively.  It was

10   more than just turn them on, as I recall.

11   Q.   Well, tell me what --

12   A.   We told them how to do it.  Well, I don't recall

13   specifically what our technicians came up with, but it was more

14   than just open the windows and turn on the fans.

15   Q.   Can you tell me anything else additional other than what

16   you just said, in plain English, open the windows --

17   A.   I think we told them the combination of the things that

18   was the most effective.

19   Q.   Which are...

20   A.   Which fans to use and how to use them.

21   Q.   There's only two fans; right?

22   A.   I think there was three fans, as I recall.

23   Q.   Okay.  Three fans?

24   A.   Yeah.  But air flow in the unit is better if you use the

25   fans in a certain way.  As I recall, that's what our

1   technicians provided to them.

2   **Q.**   So it was the sequencing of the fans that was important?

3   **A.**   I think you could characterize it as what fans to leave

4   running when the unit wasn't in use and what would be most

5   effective, you know, to ventilate it coming back from a period

6   of not residing in the trailer.

7   **Q.**   Okay.  So there's some sort of formula that exists to

8   reduce the exposure in the trailer that you provided to FEMA?

9   **A.**   A protocol.

10   **Q.**   Is that part of your specs that you -- or recommendations?

11   **A.**   It wasn't part of one of our specs.  It was in answer to

12   concerns expressed.

13   **Q.**   Okay.  So there's nothing in the manual or in the

14   specifications of the trailer that talks about this, quote,

15   protocol --

16   **A.**   No.

17   **Q.**   -- to prevent formaldehyde exposure?  No?

18   **A.**   The protocol was to best ventilate the units with the

19   standard equipment.  That's what we provided to them.

20   **Q.**   And the protocol included opening the windows?

21   **A.**   That's one of the things.

22   **Q.**   Okay.  And turning on the air conditioner full blast?

23   **A.**   That's one of the things.

24   **Q.**   And turning on particular fans within the unit?

25   **A.**   Correct.

1   **Q.**   You wanted the resident of the trailer to sit in the

2   trailer with the windows open but the air conditioner going

3   full blast?  That was your protocol?

4   **A.**   You know, you have to address the fact that people may not

5   be able to leave the windows open when they're not residing in

6   the trailer, and there was various things that were taken into

7   account in terms of how they might use it and so forth.  And

8   I'm sure it's in a document you could find.

9   **Q.**   Uh-huh.  But when I find this e-mail that you're calling a

10  protocol, that would be -- it would be your view that would be

11  the manufacturer's recommendation to deal with formaldehyde

12  exposure?

13  **A.**   It was our recommendation on how to ventilate the trailer

14  and optimize indoor air quality.

15  **Q.**   Now, you guys began to receive complaints about indoor air

16  quality in your trailers that were deployed in response to

17  Katrina when?

18  **A.**   Well, it first came to our attention, management's

19  attention, in mid March of 2006.

20  **Q.**   You know, previously when you told me that you don't know

21  the actual protocol for airing out a trailer, who is the person

22  I need to ask about that, this, quote, what you call a

23  protocol?

24  **A.**   Well, I think Scott Pullin could give you some pretty good

25  instructions on that and feedback on that.

1    Q.   Now, let's talk about Scott Pullin.  You said he is a vice

2    president of -- what did you call him, his title?

3    A.   Technical.

4    Q.   But basically he's the guy with the technical expertise

5    within Gulf Stream?

6    A.   Yes.  He has a lot of product and field technical

7    expertise relative to the recreational vehicles.

8    Q.   Okay.  His advice with regard to this, quote, new smell

9    was air out the unit and leave the AC running.  That was his

10   technical advice; right?

11   A.   Uh-huh.

12   Q.   Yes?

13   A.   Correct.

14   Q.   You would agree with me, would you not, that opening your

15   windows and turning on the air conditioner, that's not any

16   technical advice.  That's just basic, Hey, air out your trailer

17   by opening your windows and turning on the air; right?

18   A.   I didn't say it was technical advice.  You asked me what

19   Mr. Pullin's position was.

20   Q.   Uh-huh, right.  So it's not technical advice?

21   A.   I don't consider that to be highly technical advice.

22   Q.   And you realize that opening the windows and turning on

23   the air conditioner doesn't change the rate of off-gassing of

24   formaldehyde inside your trailer; right?

25   A.   The most important thing to maintaining good indoor air

1   quality of any type is proper and reasonable ventilation.

2   **Q.**   Well --

3   **A.**   You can't close up a unit and have good indoor air quality

4   in any kind of structure.

5   **Q.**   That's why you should design the structure to have good

6   indoor air quality; right?

7   **A.**   As I said, indoor air quality is dependent on the air

8   changes and ventilation of the unit.

9   **Q.**   Air exchange in the unit; isn't that right?

10  **A.**   Dependent on various aspects and the ventilation of the

11  unit is important.

12  **Q.**   Right.  And that's why the unit should be designed for

13  proper air exchange and ventilation to maintain good indoor air

14  quality; isn't that true?

15  **A.**   The unit should be designed with ventilation equipment

16  that allows you to ventilate the unit.

17  **Q.**   Generally the manufacturers include a notice that the

18  units have formaldehyde.  That's not true with regard to your

19  company, is it?

20  **A.**   We didn't provide a notice.

21  **Q.**   You didn't have any reference to formaldehyde whatsoever

22  in your user's manual, did you?

23  **A.**   No, we didn't.

24  **Q.**   You do now; right?

25  **A.**   We did place verbiage in our user's manual concerning

1    formaldehyde.

2    **Q.**    Recently?

3    **A.**    In the last several years.

4    **Q.**    Since you've been sued?

5    **A.**    Since this became an issue and a controversy.

6    **Q.**    Weren't there problems with indoor air quality with FEMA

7    trailers manufactured by your company in the past, prior to

8    2006?

9    **A.**    Like I said, we had no -- the research we did concerning

10   our FEMA production in the past, we could not find any

11   complaints related to indoor air quality.

12   **Q.**    You would agree that as the temperatures rise that the new

13   smell will get worse?

14   **A.**    When you increase temperatures, you increase the

15   likelihood that you'll have more indoor air contaminants in the

16   air.

17   **Q.**    Including formaldehyde?

18   **A.**    Correct.

19   **Q.**    And you told this, I'm sure, or you provided that

20   information to the government either prior to or after selling

21   them trailers?

22   **A.**    We had discourt on that -- discourse on that fact after

23   this became an issue in March.

24   **Q.**    Did you provide that information to the government prior

25   to selling them trailers, say, in 2004?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1  A.    No.

2  Q.    How about in 2005?

3  A.    No.

4  Q.    Now, Gulf Stream is well aware that there was some level

5  of formaldehyde in its trailers that it was selling FEMA; true?

6  A.    Yes.  Every wood product gives off formaldehyde.

7  Q.    Right.  And Gulf Stream was well aware prior to 2006 that

8  temperature and humidity would affect the exposure levels of

9  formaldehyde in the trailer; right?

10  A.    Temperature and humidity affect indoor air pollutants or

11  contaminants or whatever in trailers, including formaldehyde.

12  Q.    This was information that you guys had in your possession

13  before the Alexander trailer was ever sold to the government;

14  isn't that right?

15  A.    We are familiar with formaldehyde.

16  Q.    How many complaints did you receive up until May 27th of

17  2006?  Did you receive more in May, more than the less than six

18  you talked about?

19  A.    My recollection is we received five during that period.

20  Q.    Okay.  So as time went on you were receiving more and more

21  complaints; true?

22  A.    As time went by between March and May, and that May period

23  you just referred to, we did receive more complaints.  I don't

24  know what -- how you would construe the rate of complaints.

25  Q.    What was the name of the public relations outfit that you

1   guys retained?

2   **A.**   We retained a public relations outfit named -- I'm sure

3   it's in the record.  There's been so many law firms and so

4   forth involved, it's sometimes hard to remember all the

5   different names.  We retained one that was in Washington, and

6   the name just escapes me a little bit.

7   **Q.**   You were involved in the public statements that were

8   crafted?

9   **A.**   I was involved in them, yeah.

10   **Q.**   You were intimately involved in them; in fact, you

11   approved them, didn't you?

12   **A.**   I had input.  I didn't necessarily -- I wasn't the only

13   person that had input or approval.

14   **Q.**   Well, you were the head cheese; you're the top guy; you're

15   the guy that if a statement says something untrue, you could

16   stop it from going out?

17   **A.**   Right.  But, you know, as the head cheese you want to

18   listen to your experts and your attorneys and try to do the

19   right thing.

20   **Q.**   You approved a statement on April 27th of 2006:  "We are

21   not aware of any complaints of illness from our many customers

22   of Cavalier travel trailers over the years, including travel

23   trailers provided under our contracts with FEMA."

24           You approved that statement you, didn't you?

25   **A.**   I'm speaking for the company, and that's the company's

1    statement.

2    **Q.**   And that statement was a flat out lie, wasn't it?

3    **A.**   I don't believe that was a lie, no.

4    **Q.**   Because you admitted already that you've had complaints,

5    approximately less than six, up to that point; isn't that

6    right?

7    **A.**   Well -- and I was speaking about that period of time prior

8    to this issue becoming a controversy in March of 2006.   I

9    wasn't speaking about the time after March of 2006.   I wasn't

10   speaking about those intermediary times.   I was speaking about

11   our since 1992 history.

12   **Q.**   And you approved the release of a statement that said on

13   April 27th of '06 that you guys had had no complaints, and by

14   that point you had had complaints, and that's fact; isn't it?

15   **A.**   Well, the fact is that the first -- this whole issue

16   became -- or whole controversy became an issue on March 16th of

17   2006.

18   **Q.**   Okay.  Your statement was released after that?

19   **A.**   Correct.

20   **Q.**   To the press?

21   **A.**   Absolutely.

22   **Q.**   Picked up by CNN?

23   **A.**   Press all would have read that statement; right?  CNN

24   would have read that statement; right?  Correct?  Is that what

25   you're saying?  That's what you're inferring; correct?

1           So on March 16th, 2006, there was a news story by a

2     local television station in Bay St. Louis.  It involved a

3     customer -- or not a customer but a resident named Paul

4     Stewart.  Now, Paul Stewart resided in a Gulf Stream unit.

5     That story was picked up by CNN, the other cable news networks,

6     the broadcast networks.  It was on the Internet.  When you went

7     into the Internet and wanted to know about FEMA and

8     formaldehyde, that story came up.

9           So there's no way that in any way we would be trying

10    to obfuscate that widely promulgated knowledge in the public

11    sphere and contend that that complaint didn't exist there, even

12    though that complaint didn't come in to us.  It was -- went in

13    to FEMA.  There's no way that we would try to obfuscate that

14    from FEMA, the government.  It would take a ten-year-old about

15    three minutes nowadays to find that story on the Internet.

16          So it's clear that we were not referencing the period

17    after that story was widely promulgated in the public sphere.

18    We were talking about our history of supplying trailers for the

19    use by FEMA since 1992.

20    Q.    That took a long time to explain a very simple statement,

21    didn't it?  Why didn't you just tell in your public statement

22    so everybody would know, You know what, yeah, we're getting

23    some complaints; we're looking into them, we're concerned,

24    instead of pretending like you hadn't had any complaints?

25    A.    We were not pretending that we didn't have any complaints.

1    We were talking about our history, which I think is very
2    important.  And you've asked me questions about our history.
3    You must think it's important too.
4    **Q.**    I think it's real important.
5    **A.**    So I think I gave you a very explicit, very good answer to
6    the question as to what the phraseology meant there and what
7    any reasonable and prudent person would think that phraseology
8    meant if they had any interest or knowledge about this issue at
9    that time.
10   **Q.**    You expected that the statement released to the press
11   would be read or picked up or consumed by people living in your
12   trailers; right?
13   **A.**    I really wasn't thinking about, you know, where the
14   information was ultimately going to go.  I knew it was going to
15   go into the public sphere.  You know, like I say, we were
16   delineating our experience there over the years, and that's the
17   only intent.
18   **Q.**    You had had, I guess, more than a dozen complaints
19   regarding indoor air quality with your Gulf Stream trailers
20   used by FEMA prior to Ms. Alexander taking possession of her
21   trailer; true?
22   **A.**    Well, I'm not -- could you give me the date when she took
23   her trailer?
24   **Q.**    The production line, Plant 57 that built the trailer that
25   the Alexander family was living in --

1    A.    Yes.

2    Q.    -- did that production line exist prior to 2004?

3    A.    Yes.

4    Q.    How long prior?

5    A.    Those individuals could tell you how long, but I can tell

6    you it did exist before 2004.

7    Q.    So that wasn't a production line specifically created to

8    deal with FEMA trailer orders?

9    A.    No.

10   Q.    Okay.  Is that a production line that built trailers other

11   than FEMA spec trailers?

12   A.    Yes.

13   Q.    Let's go back to your statement that Gulf Stream released

14   in April of 2006.  Would you agree with me that that's a very

15   misleading statement?

16   A.    No.

17   Q.    Would you agree with me that that statement took you more

18   than five minutes to explain to me?

19   A.    I really wasn't timing it.  It took me more than one

20   sentence.

21   Q.    Would you agree with me that you could have said, We

22   acknowledge that we've had several complaints.  We're looking

23   into the matter.  We don't know the source or why this issue

24   has arisen?  You could have said that; right?

25   A.    Well, we had a particular idea or concept that we were

1  trying to express there, and --

2  **Q.**   Yes, you did?

3  **A.**   -- that's what we expressed.  That's what we intended to

4  express.  What I could have or should have done at different

5  times has got nothing to do with what we were trying to express

6  there.  We were trying to express the fact that we had had a --

7  had not been a history in our production of FEMA travel

8  trailers, we had not had this issue in the past prior to this

9  occurrence in March.  That's what we were trying to express.

10 **Q.**   Very, very important that whatever statement was provided

11 to the public be absolutely truthful; isn't that right?

12 **A.**   That's true.

13 **Q.**   Tell me about the firm that you retained to do destructive

14 testing, Progressive Engineering.

15 **A.**   I don't think -- Progressive Engineering is a engineering

16 testing inspection firm in Goshen, Indiana.

17 **Q.**   When you hired Progressive Engineering to do some work for

18 your company, what did you hire them to do?

19 **A.**   We had some material, some Adorn material, and we asked

20 them to submit it to the kind of testing that would be required

21 by the HUD standard.

22 **Q.**   So you had them test some interior decorative -- the stuff

23 that's used on the walls?

24 **A.**   Correct.

25 **Q.**   Let's just talk about what Progressive Engineering did and

1   what they told you and what you learned.

2   **A.**   Well, Progressive Engineering subjected the material to a

3   testing protocol and ultimately gave us some results.

4   **Q.**   What were those results, Mr. Shea?

5   **A.**   They were some numerical results that related to a

6   desiccator test that they did.

7   **Q.**   What was the results -- what was the result that you got?

8   What did you learn?

9   **A.**   We learned that they didn't have the capacity to do a

10  large chamber test, which is the type of test that's utilized

11  in the HUD regulation.

12  **Q.**   So what was the result of the test?

13  **A.**   They gave us some numbers in -- oh, what would you

14  describe it as, a unit of measure that we didn't recognize.

15  **Q.**   What was that unit of measure?

16  **A.**   I think it was mu milligrams per liter or something like

17  that.

18  **Q.**   And what did they tell you that meant?

19  **A.**   They really weren't -- didn't tell us it really meant

20  anything.

21  **Q.**   What did you conclude from the test that Progressive

22  Engineering did on your behalf?

23  **A.**   I concluded that, contrary to our understanding, they did

24  not have the capacity to do a large chamber test.

25  **Q.**   You concluded the test was worthless?

1    A.    Correct.

2    Q.    You concluded the test was a waste of money?

3    A.    Yeah.  You could characterize it that way.

4    Q.    You demanded your money back?

5    A.    Well, we didn't demand our money back, as I recall.

6    Q.    And when you got the results, you realized that the

7    formaldehyde component or the wood that they tested had

8    elevated levels of formaldehyde; isn't that true?

9    A.    No.

10   Q.    You did not learn that?

11   A.    No.

12   Q.    Your testimony would be that those test results did not

13   show elevated levels of formaldehyde in the two samples?

14   A.    Well, my contention would be those results couldn't --

15   didn't allow you to draw any conclusion about the results,

16   whether they were high or whether they were low or in between.

17   Q.    And is that what Progressive Engineering said, that you

18   can't draw a conclusion, or did they, in fact, say those two

19   samples have elevated levels of formaldehyde that do not meet

20   HUD requirements?

21   A.    I don't recall them ever saying that.

22   Q.    Let me ask you again:  Did you receive a written report

23   from Progressive Engineering?

24   A.    There was a written report that had values and numbers on

25   it, yes.

182

1  **Q.**   Did you read it?

2  **A.**   I remember reading the report, yes.

3  **Q.**   Did you consult with any other scientists or engineers

4  other than the people from Progressive Engineering when you

5  were perusing and reading the report?

6  **A.**   I -- you know, we had various conversations with

7  scientists during that time period.  We were trying to educate

8  ourselves on the whole issue.  I'm sure I had other

9  conversations with other scientists during that period.

10  **Q.**   You were unhappy with the results of the test, weren't

11  you?

12  **A.**   I was unhappy that they didn't give us what we thought we

13  were going to get, which was a large chamber test which would

14  have some kind of meaningful values.

15  **Q.**   So you disregarded the results of that test; is that true?

16  **A.**   Correct.

17  **Q.**   And that's why you didn't share that test with FEMA?

18  **A.**   The test had no value.

19  **Q.**   I'm asking again:  Because you disregarded the results of

20  the test as being unscientific, you did not share the results

21  with FEMA; is that true?

22  **A.**   Right.  We didn't share the results with anybody.

23  **Q.**   Right.  I know.  You certainly didn't share it with the

24  people that lived in the trailers?

25  **A.**   It had no meaning.

1   **Q.**   Right.  You did not share --

2   **A.**   No significance that we could see.

3   **Q.**   You did not share the results of that test with any

4   trailer residents, did you?

5   **A.**   Correct.  Like I said, we didn't share those results with

6   anybody because we thought they were meaningless.

7   **Q.**   But you talked about the results of those tests was Adorn,

8   didn't you?

9   **A.**   I don't recall talking to Adorn about them.

10  **Q.**   Are you sure?

11  **A.**   Me, personally?

12  **Q.**   Anyone in your company, sir.

13  **A.**   Yeah.  We may have.  I just don't recall.

14  **Q.**   And Adorn told you, Well, of course the stuff we provided

15  you was not HUD-certified; that's not what you ordered.  Isn't

16  that true?

17  **A.**   I don't think that's true, no.

18  **Q.**   I mean, you've had discussions with Adorn, and they've

19  made it quite clear to you that there was no mistake, that they

20  provided you exactly what you ordered; isn't that true?

21  **A.**   We've had discussions with their sales rep that said they

22  made a mistake proximate to that time.

23  **Q.**   Let me make sure I understand because this may become

24  important.  Your testimony is that Adorn admitted that they had

25  made a mistake when they provided you non-HUD-certified wood?

1   **A.**    Their sales rep said they made a mistake.  That's what

2   they told our Jeff Zumbrun.  They didn't tell it to me, they

3   told it to our Jeff Zumbrun.

4   **Q.**    What would have prevented you from doing the same type of

5   random sampling you're doing now to make sure in 2004 and 2005

6   that these vendors were providing you what you believed to be

7   HUD-certified wood products were, in fact, HUD-certified wood

8   products?  What stopped you from doing that then?

9   **A.**    We could have done some testing, but I don't think it

10  would have ensured anything.

11  **Q.**    You could have done random testing of just random samples

12  from various vendors who were providing you wood products to go

13  into your trailers, couldn't you?

14  **A.**    We could have done some random testing, but it wouldn't

15  have ensured.  We still have to rely on the vendors.

16  **Q.**    Your brother told FEMA that when this issue arose, this

17  formaldehyde issue with trailer residents, that you guys would

18  go do some testing; isn't that right?

19  **A.**    Yes.

20  **Q.**    In fact, you're calling what was done a screening; isn't

21  that right?

22  **A.**    Correct.

23  **Q.**    And we had this long discussion last time we were together

24  again about words and the difference, at least in your mind,

25  between a screening and a test; right?

1  **A.**   Yes, we did.

2  **Q.**   And it's your position, as the chairman -- you want to be

3  very precise with your words; true?

4  **A.**   Try to be.

5  **Q.**   Yes.  And so to be perfectly clear, what you guys did,

6  that is, what employees of Gulf Stream did, were not tests,

7  they were screens -- screenings?

8  **A.**   Correct.

9  **Q.**   They were not scientifically valid?

10  **A.**   Correct.

11  **Q.**   Obviously your brother, Dan Shea, who is sitting right

12  over there, was not -- at least at the time he told FEMA that

13  the test was going to be done, that's not, in fact, what was

14  done?

15  **A.**   He didn't do scientific testing, no.

16  **Q.**   He wasn't accurate when he told FEMA that he was going to

17  do some testing?

18  **A.**   Correct.

19  **Q.**   The results of this testing or what you call screening

20  were never shared with FEMA?

21  **A.**   No, we did not share results.  They did not -- no, we did

22  not.

23  **Q.**   And you did not share the results with the trailer

24  residents, did you?

25  **A.**   We did not share any screening results with trailer

1   residents.

2   **Q.**   And you didn't even share the results with the residents

3   who were in the trailers you screened, did you?

4   **A.**   We didn't share any screening results with the people that

5   the unit was deployed in, was used in.

6   **Q.**   Let's make sure we're all clear:  The people in whose

7   trailer that you guys screened, you didn't even bother to tell

8   them what the result was, did you?

9   **A.**   We didn't give any screening information to residents.

10  **Q.**   So I guess my question is:  Once you knew that you could

11  not -- it did not have the capacity to do what you considered

12  to be a test and once you knew the Formaldemeter 400 was

13  nothing more, at least according to you, and we'll talk about

14  what everyone else says, but was nothing more than a screening

15  device, why bother even sending Mr. Pullin down there with this

16  thing to take these readings?

17  **A.**   You know, we were interested in understanding what the --

18  how the ventilation aspects of the trailer functioned in the

19  real world in terms of improving indoor air quality generally,

20  and we were interested in looking at some special ventilation

21  devices for the benefit of sensitive people that could be

22  installed on the units.

23          And so we were trying to better position ourselves to

24  give good information to FEMA, and that was our primary

25  purpose.

1   **Q.**   And how hard would it have been for you -- if you were

2   unhappy with the Formaldemeter 400, you obviously were unhappy

3   with the results that you got; correct?

4   **A.**   We were able to, I think, quite well determine the best

5   way to recommend the trailers be ventilated.  We were able to

6   utilize some -- or see what the performance was of some

7   optional equipment.

8   **Q.**   What optional equipment?

9   **A.**   Well, one of them was the piece of equipment called the

10   Fantastic vent.

11   **Q.**   Is that something that comes along with your trailer as an

12   accessory?

13   **A.**   No.  It would be an option.  As I said, we were looking at

14   items that we could offer for sensitive people that, you know,

15   if they were returning to their unit and they wanted to quickly

16   clear their unit, it could be even more rapid than the normal

17   ventilation -- mechanical ventilation in the unit.

18   **Q.**   So Mr. Pullin, when he went down to Louisiana, he used

19   this optional fan you're talking about?

20   **A.**   Yeah.  He did some studies related to that, yes.

21   **Q.**   This fan that you're talking about was something you

22   offered to the government, and you intended to sell it to the

23   government; right?

24   **A.**   We didn't have a plan of sale or marketing to the

25   government of the Fantastic Fan.  What we were trying to

1  position ourselves to do was if we had somebody that was a

2  complainant that might be helped by it, you know, we were going

3  to offer our services to the government to try to resolve the

4  complaint with the complainant, and that may have involved the

5  use of a Fantastic Fan.

6  **Q.**   We were talking about this screening that was done.  You

7  sent down Mr. Pullin to do the screening, but you don't think

8  the screening was valid because it wasn't scientific; is that

9  correct?

10  **A.**   The screening was valid for our purposes, which was to

11  measure changes in indoor air quality in the units, while

12  utilizing the standard ventilation equipment or the optional

13  ventilation equipment.

14  **Q.**   Who came up with the protocol for this screening that was

15  done?

16  **A.**   Scott Pullin.

17  **Q.**   Right.  You also had him test unoccupied trailers or

18  screen unoccupied trailers?

19  **A.**   He screened unoccupied trailer, yes.

20  **Q.**   What conclusion, if any, did you draw from that screening?

21  **A.**   Well, you know, he reported to us on how the ventilation

22  aspects of the units, how they performed and so forth.

23  **Q.**   Did the results from his screening exceed the .75 OSHA

24  standard that you believe is applicable or has some relevance?

25  **A.**   Some of the screening numbers that I saw exceeded .75

```
 1   ppm --
 2   Q.   And I'm assuming you --
 3   A.   -- as measured by the Formaldemeter.
 4   Q.   I'm assuming you informed the government of that fact?
 5   A.   No.
 6   Q.   Did you inform the government of the testing you did with
 7   the occupied trailers?
 8   A.   We advised the government that we had some informal
 9   testing results in the letter and where they fell relative
10   to -- relative to the OSHA standard, and we said we could share
11   the results with them.
12   Q.   So with regard to the occupied trailers, you told the
13   government, Look, we've done some informal -- let's see what
14   you called it.  You called it testing, or I guess Phillip
15   Sarvari called it testing, but you would argue with him about
16   whether it was a test or not?
17   A.   Well, he said informal testing, screening, I guess.
18   Q.   And you know I'm talking about the May 11th, 2006
19   letter --
20   A.   Yes.
21   Q.   -- that was sent to the director of operations of FEMA?
22   A.   Yes.
23   Q.   And in that letter he calls what you guys did or what
24   Mr. Pullin did informal testing; correct?
25   A.   Yes.
```

1   **Q.**   And he mentioned that, well, in the occupied trailers, the

2   indoor ambient air falls below the OSHA standard; correct?

3   **A.**   Yes.

4   **Q.**   But he did not say, number one, But this is not a real

5   test; it's not scientific and it's not valid, did he?

6   **A.**   He said it was informal testing.

7   **Q.**   Did Mr. Pullin wear a mask when he conducted this

8   screening?

9   **A.**   I don't know.

10   **Q.**   Did he wear any kind of -- any kind of device that would

11   protect him?

12   **A.**   I don't know that.

13   **Q.**   Did you talk to him about what he experienced when he was

14   conducting this testing as far as if he experienced any

15   symptoms?

16   **A.**   I recall him saying that at some times that he had

17   sensations in his eyes.

18   **Q.**   Sensations in his eyes.  You mean his eyes were burning?

19   **A.**   I think he said watering, or that he could, you know,

20   sense it in his eyes sometimes.

21   **Q.**   Okay.  So the gentleman that you sent down to Louisiana to

22   do this informal testing, when he came back, he told you that

23   at some points he had sensations in his eyes?

24   **A.**   That's my recollection, yes.

25   **Q.**   Did you explore that issue with him?

1   A.   Not really.  No, we didn't.

2   Q.   Didn't make you think that there was a real problem with

3   your trailers?

4   A.   No.

5   Q.   Is that right?

6   A.   That's -- that's correct.  His testing didn't make me

7   think that we had -- well, I don't know how you characterize

8   "real problem".  I mean, his testing, I guess, revealed what I

9   would probably expect it to reveal, you know.

10  Q.   So when you got the results of his testing, you as the

11  chairman didn't see the need to do anything to protect the

12  residents in the trailers?

13  A.   Well, we went to FEMA.  We met with them in Washington.

14  We offered to assist in any way we could.  We offered to work

15  with them on any complaints that they had.  They asked for

16  input on an informational pamphlet that they were putting

17  together.  We always told FEMA we were ready, willing, and able

18  to assist any person, addressing any concerns.  So, yeah, we

19  took actions.

20  Q.   Yeah.  That's that letter of May 11 where you told them

21  you stand ready, willing, and able it assist?

22  A.   Yeah.  We had reiterated that.  We reiterated that a

23  number of times.

24  Q.   But that was in the May 11th letter?

25  A.   It was in other letters or other communications.

1  **Q.**   And this was the letter that took you guys six weeks to

2  write because there were some many drafts going back and forth?

3  **A.**   I don't know that it took us six weeks to write it.  I

4  don't recall it taking us six weeks to write it.

5  **Q.**   You wanted to be very careful about what you put in

6  writing to the government at this point as of May of 2006?

7  **A.**   Well, you know, there was a lot of things we were

8  learning, and there was a lot of things occurring in the

9  environment, and -- but I don't remember it taking six weeks to

10  write a letter.  I mean, part of that letter was a follow-up to

11  a meeting that we had with them in April.  So I can't say it

12  was six weeks to write a letter.  I mean, we didn't meet with

13  them until late April, as I recall.  When we were there, we met

14  Ms. Lee.

15  **Q.**   Did you expect that FEMA had the expertise to handle the

16  problem to the extent there was one?

17  **A.**   I look at FEMA as the federal government, and I felt the

18  federal government likely had the expertise.

19  **Q.**   So you felt confident that FEMA, or certainly since they

20  were part of the government, they would be able to handle the

21  issue?

22  **A.**   Handle the issue, you mean do testing?

23  **Q.**   Or whatever needed to be done.

24  **A.**   We were advised by the federal government what we should

25  and what we shouldn't do, and we obeyed the federal government

1   and, yes, I felt that they had the resources to deal with the

2   issue.

3   Q.   You learned at some point that the units were not being

4   used for temporary housing, didn't you?

5   A.   I learned at some point which units; 2004 units, 2005

6   units?

7   Q.   Either one.  Ms. Alexander was in a 2004 --

8   A.   Well, the 2005 units were -- and the FEMA units, yes, they

9   were used for extended periods, I think longer than what would

10   be the historical norm for use.  That would be my judgment.

11   Q.   So at some point you realized that the trailers

12   manufactured by your company and used by FEMA for displaced

13   residents were being used for extended periods of time?

14   A.   Well, I don't know what extended periods of time means.  I

15   know that there was a lot of concern amongst the residents and

16   the politicians in New Orleans about the length of time that

17   people weren't getting permanent housing.  I know there was a

18   lot of press on that.

19   Q.   Well, extended periods of time is language used in your

20   own manual, so if you don't know what it means, how is anyone

21   else going to know what it means?

22   A.   Well, you know, if you want to try to review and try to

23   make differentials between extended periods of time, permanent

24   housing, temporary housing, I'm just not sure that I can do

25   that.  They're imprecise phraseology.  So I can't really draw

1    conclusions or make comments on them.

2    **Q.**    Well, you certainly can comment as to what kind of trailer

3    you were providing pursuant to these FEMA specs, can't you?

4    You said it's supposed to be temporary housing; right?

5    **A.**    For temporary housing purposes.

6    **Q.**    Okay.  What does that mean?

7    **A.**    To me, I don't know that it's a defined term that I've

8    seen anywhere.  You want my opinion what it means?

9    **Q.**    Well, it's your company that's supposed to be fulfilling

10   the specs.  You claimed you fulfilled the specs, so obviously

11   you must have some understanding of temporary housing means.

12   **A.**    We didn't weigh in on what temporary housing was.  This is

13   the purpose that they stated for the units.

14   **Q.**    Okay.  What does it mean?

15   **A.**    To me it means providing housing that people would live in

16   for a period of weeks or months.

17   **Q.**    Now, when you learned that these residents were, in fact,

18   in these trailers in excess of a year, tell me what you did to

19   provide input to the government to stop this.  In other words,

20   at some point you learned that these people were still in the

21   trailers after a year; true?

22   **A.**    Correct.

23   **Q.**    Okay.  And you've already told me you would not recommend

24   that; right?

25   **A.**    Correct.

1  Q.   So tell me what you did to warn the government or warn the

2  people in the trailers that that was not something that you

3  would recommend as the chairman of the company.

4  A.   Well, I didn't make any overtures to anybody in the

5  government about the problem that they had with finding

6  permanent housing and getting people out of trailers that I

7  recall.

8         I mean, I think me, as well as anyone in the American

9  public, wished that these people could be placed in permanent

10  housing.  But I think the government was getting a lot of

11  inputs from Congress and so forth.  I guess I didn't think that

12  they needed my commentary on that.

13  Q.   Well, you realize, of course, that FEMA was relying on the

14  expertise of Gulf Stream as to the use of the trailers?

15  A.   I don't know that.

16  Q.   You don't know that FEMA considered Gulf Stream the expert

17  on the product that it produced and put into the market?

18  A.   I don't think that they relied on us as the experts for

19  the use of the product.

20  Q.   Let's assume -- and I think we finally agreed on this, at

21  least me and Mr. Weinstock have -- that Ms. Alexander moved

22  into her FEMA-provided Gulf Stream trailer either May 26th or

23  27th, 2006.  All right?

24  A.   I just don't know.

25  Q.   Well, just assume that's true because I'm not going to

1    lie.

2    A.    I'm sure the record will show when it was.

3    Q.    Yeah.  Well, let's assume that it's true.  By May 27th or

4    26th of 2006, you had already done testing of some of the

5    lauan; right?

6    A.    We had submitted some samples for product testing.

7    Q.    You had already done some informal testing of the ambient

8    air quality of both occupied and unoccupied trailers; right?

9    A.    Yes.  We had done some screening.

10   Q.    You had fielded several complaints from residents who were

11   having issues with regard to exposure to what they believed to

12   be formaldehyde; correct?

13   A.    I don't know what they believed it to be, but we had

14   complaints on -- that could be ascribed to formaldehyde.

15   Q.    You had already talked to one of your own employees who

16   told you that when he went into some of these trailers, he had,

17   quote, sensation in his eyes; right?

18   A.    Correct.

19   Q.    And you had already released a public statement that was

20   picked up by CNN and various news outlets regarding

21   formaldehyde in the production of your trailers; correct?

22   A.    Yeah, we did release a statement to CNN.

23   Q.    You made no effort whatsoever to inform Ms. Alexander or

24   people like Ms. Alexander of the potential issue, did you?

25   A.    We were in contact with the people that purchased the

1    units from us.  We made it clear and I think the record shows

2    our willingness to assist with any residents that had a

3    problem, a sensitivity, a complaint.  That would have included

4    Ms. Alexander, so -- if we had known about Ms. Alexander.  But

5    certainly our offer to generally assist and do whatever we

6    could do to address people with complaints, I mean, we had made

7    that overture certainly by the time that she had moved in, if

8    that was May 26th or 27th.

9    Q.    You mean to FEMA you made that overture?

10   A.    Yes.

11   Q.    Tell me what prevented you from releasing a public

12   statement that, Here's the issue, folks; there's formaldehyde

13   in the trailers, we know that some of our component part

14   manufacturers provided us materials that we thought was LFE,

15   but wasn't; some of you may have sensitivity; here's what you

16   can do?  What prevented you?  FEMA didn't tell you you couldn't

17   do that?

18   A.    Well, I think FEMA already had a pamphlet that gave all

19   that information.

20   Q.    By May of '06?

21   A.    Yes.  That's my understanding.

22   Q.    Okay.  Let me make sure I understand.

23   A.    We met with them in April, and they already had the

24   pamphlet.  They asked us for some input.  We gave them some

25   input.  I don't know if they changed their pamphlet or not, but

1    that's what they told us in mid-April.

2    **Q.**   So you believe that Ms. Alexander would have received a

3    pamphlet in mid-April?

4    **A.**   Well, I don't know when they started.  Sometime in that

5    time frame they started, as I understand it -- this is what

6    they told us -- utilizing an informational pamphlet for the

7    benefit of residents.

8    **Q.**   You did everything you could as the chairman of Gulf

9    Stream to make sure that the people who were using your

10   trailers were not exposed to formaldehyde?

11   **A.**   I couldn't -- formaldehyde is everywhere, so I couldn't

12   make that representation to anybody.

13   **Q.**   You did everything you could as the chairman of Gulf

14   Stream to make sure that people with special sensitivities to

15   formaldehyde weren't exposed to elevated levels in your

16   trailers?

17   **A.**   I think we reiterated numerous times our willingness to

18   assist with people with special sensitivities and made contacts

19   with FEMA relative to that and suggested courses of action or

20   equipment or whatever that they look at.

21   **Q.**   So you feel like you did all the right things?  In other

22   words, there's nothing, looking back on it, which --

23   **A.**   I feel that we did, you know, the right things in a

24   fast-moving environment where there's a lot that we didn't

25   know.  And it's easy to look back and so forth, but I think we

1   did the right things.

2          I mean, we were ready, willing, and able and, I

3   think, put that forth many times right from the beginning.

4   Q.   And had FEMA allowed you to participate or to be involved

5   in whatever's going to happen, what would you have done

6   differently other than what FEMA did?

7   A.   Well, like I told you earlier, I think that we would have

8   been able to help them with some additional ventilation

9   alternatives and equipment to try to help people with these

10  sensitivities.

11  Q.   So you believe, had it been your choice, that people with

12  special sensitivities, you would have provided this Fantastic

13  Vent Fan; is that right?

14  A.   Well, I think that's one of the things that we could have

15  done, depending on their use.  Some people would use the unit

16  in one way, some people in another.  That would be one

17  alternative.

18  Q.   What other alternatives, had you been the person who made

19  the decisions, would you have done?

20  A.   We made some suggestions on other kinds of filtration

21  devices and so forth that came to our attention that could have

22  been helpful.

23  Q.   Like what?

24  A.   There was a device called an IQAir that I think we

25  suggested to FEMA.

1    **Q.**    But they did not take that suggestion?

2    **A.**    Not to my knowledge.

3    **Q.**    Had you ever provided installation instructions to those

4    companies?  I know you don't remember who they are, but have

5    you ever provided installation instructions?

6    **A.**    I don't believe we've ever provided installation

7    instructions to the contractors.

8    **Q.**    Could happen because somebody jacked up one corner at a

9    time and put it on blocks?  Jacked up one corner without

10   jacking up the other one at the same time, you can bend the

11   frame, can't you?

12   **A.**    Like we talked about earlier, jacking something, whether

13   it's a car, jacking it improperly can cause damage.

14   **Q.**    And damage of the frame can lead to a lot of problems in

15   the trailer, can't it?

16   **A.**    Yes.  If you damage the frame, it can have other impacts.

17   **Q.**    It can make the ducts not seal properly, allow water to

18   intrude into the unit at the windows and doors; isn't that

19   right?

20   **A.**    Well, unreasonable stresses put into a unit can create all

21   kinds of problems potentially.

22   **Q.**    I understand.  But one of the issues you're here to talk

23   about is installation, at least to the extent you know.  And if

24   you don't know, I'll ask Scott Pullin, perhaps.  But would you

25   agree with me that if someone damaged the frame due to improper

1    installation, they distort the frame, that that can cause

2    windows not to seal properly?

3    A.    It could.

4    Q.    Doors not to seal properly?

5    A.    It could.

6    Q.    Leaks in the ceiling?

7    A.    It could.

8    Q.    Ducts to unseal?

9    A.    Possible.

10   Q.    And allow water to enter the unit?

11   A.    It's possible.

12   Q.    Water not only enter the unit in the ceiling, but also in

13   the floor?

14   A.    All that is possible if you damage the unit or impact the

15   unit hard enough to do substantive damage to the frame.

16   Q.    That's why it's very important that the individual or

17   entity that's doing the installation knows what they're doing

18   such that they don't damage or distort the frame; true

19   statement?

20   A.    I think it's important that frames are not damaged or

21   distorted of the units when they're installed.

22   Q.    And you know, of course, that if the pressed wood or

23   particle board in the trailer gets wet, that affects the amount

24   of formaldehyde that off-gases; isn't that true?

25   A.    I think that it's commonly held that increases in moisture

 1   or humidity can lead to increases in ambient indoor -- or air

 2   products like formaldehyde.

 3   Q.   And you believe -- because you have faith in your people

 4   and your quality control mechanisms, you believe that the

 5   trailer that was provided to Ms. Alexander was not in the

 6   condition I just described when it left the possession of Gulf

 7   Stream; is that true?

 8   A.   That's true.

 9   Q.   You believe that if that trailer got to that condition, as

10   I've described, it was because of some other actions of some

11   other people?

12   A.   That's -- that would be my --

13   Q.   Let's talk about -- quickly let's talk about the FEMA

14   specs.  Gulf Stream already had, or at least had begun,

15   contractual discussions with FEMA before Hurricane Katrina ever

16   made landfall; is that right?

17   A.   Yes.

18   Q.   The specifications just give you a four-page list of the

19   features that FEMA is looking for in the Gulf Stream unit; is

20   that fair?

21   A.   Correct.

22   Q.   It says, again, travel trailers are procured for the

23   purpose of providing temporary housing, which we've talked

24   about.  The units are subjected to continuous road travel,

25   multiple installations and deactivations and various weather

1    conditions.

2            Okay?  Multiple installations and deactivations could

3    be referring to the unit being used over the course of years;

4    is that fair?

5    A.    Correct.

6    Q.    So while one person may be in the unit for six months, it

7    could be installed again, deactivated, and used by another

8    person for six months?

9    A.    Correct.

10   Q.    And these units were built with that in mind in the

11   specifications; is that right?

12   A.    Correct.

13   Q.    And the specification said, again, subjected to continuous

14   road travel.  Is road travel something that would put stress on

15   the travel trailer frame?

16   A.    Road travel is going to create what you could term stress

17   on a frame.

18   Q.    Does Gulf Stream prohibit blocking of units?

19   A.    I don't think there's any prohibition in our documentation

20   on blocking of units.

21   Q.    Now, as you sit here today, would you still say that the

22   units that you provided to FEMA both in 2004, 2005, and 2006,

23   met or exceeded the industry standards that were in place at

24   those time periods?

25   A.    Yes.

1  **Q.**   And still, as you said, Gulf Stream believes that it made
2  safe products for FEMA pursuant to those contracts; is that
3  right?
4  **A.**   Yes.
5  **Q.**   And you would stand behind those products to the present
6  day?
7  **A.**   Yes.
8  **Q.**   I guess similarly, Gulf Stream never told FEMA that its
9  products were unsafe; is that right?
10  **A.**   Correct.
11  **Q.**   And that's because Gulf Stream felt that its products were
12  safe?
13  **A.**   That's correct.
14  **Q.**   For people that -- you said you weren't aware of people
15  that used Gulf Stream travel trailers on a full-time basis?
16  **A.**   Well, I'm aware that it's common in the RV industry for
17  people to be called full-timers, but I can't give you an
18  example of a customer or people I know that do so.
19  **Q.**   Would your Gulf Stream travel trailers still be safe for
20  people to use in that way?
21  **A.**   Well, if they had taken reasonable care of it, yes, I
22  would say they could use it for full-time use.
23  **Q.**   Because earlier you said, you know, obviously you probably
24  wouldn't want to live in a unit by choice for two years, three
25  years because it's a small space and that would probably be

1    disagreeable.  But if they took proper care of the unit, would

2    it be safe to use for multiple years even?

3    A.    I wouldn't see why that it would be unsafe to live in a

4    unit for multiple years.

5    Q.    Now, when Gulf Stream was responding to air quality issues

6    or complaints, Gulf Stream recommended ventilation as the way

7    to solve those complaints; is that right?

8    A.    We recommended ventilation as an approach to addressing

9    complaints.

10   Q.    As the approach; right?

11   A.    Well, certainly maintaining a lower temperature and

12   humidity in a unit too.

13   Q.    Let's take a look at GULF2831, Exhibit 28.  Did Dan Shea

14   or anyone at Gulf Stream ever tell FEMA or the Department of

15   Homeland Security that its materials may not have been low

16   formaldehyde emitting materials?

17   A.    Yes, it's my understanding we did.

18   Q.    Who made that communication?

19   A.    Well, my understanding is Dan Shea made the communication.

20   Q.    And who made that communication?

21   A.    Dan Shea.

22   Q.    Do you know who he made that communication to?

23   A.    I believe it was Steve Miller.

24   Q.    Do you have an understanding of how that communication was

25   made if it occurred?

1  A.    It was made on a verbal basis.

2  Q.    And then:  'During our meeting, you requested that we

3  provide some information that FEMA could add to the tri-fold

4  that you provide to the occupants of the trailers'; right?

5  A.    Correct.

6  Q.    And that information is attached to this letter; right?

7  A.    Correct.

8  Q.    We get to GS455, Page 2 of the letter, and this is where

9  Gulf Stream says:  'Our informal testing has indicated that

10 formaldehyde levels of indoor ambient air of occupied trailers

11 fall below, for instance, the OSHA standard of .75 parts per

12 million'; right?

13 A.    Correct.

14 Q.    And as you talked about earlier, Gulf Stream did not

15 provide those results to FEMA; right?

16 A.    We offered to provide the test results to FEMA.

17 Q.    Right.  And that goes on in the next --

18 A.    They never requested it.

19 Q.    Would it be important to you -- for you to know if the

20 trailer, after it was manufactured in December of 2004, sat in

21 storage in southern Florida until the fall of 2005 when it was

22 brought to New Orleans?  Would it be important for you to know

23 how it was maintained during that period of time?

24 A.    It would be helpful.

25 Q.    It might help you --

1  A.    To make a judgment.

2  Q.    Sure.  Because maintenance, as Mr. Buzbee covered with

3  you, is important; correct?  Of a travel trailer?

4  A.    Maintenance is important.  How it's stored is important.

5  Q.    Would it have been important for you to know how it was

6  transported from Florida to the New Orleans area?

7  A.    It could be helpful.

8  Q.    Well, and you mentioned, I believe, in response to other

9  questions of Mr. Buzbee that indeed stresses occur in travel on

10 a travel trailer that can affect the frame; is that right?

11 A.    Stresses occur that can affect the frame.  Some stresses

12 occur that the frame is capable of handling.  Some

13 exceptionally adverse stresses, it wouldn't be able to handle.

14 Q.    So the frames, particularly the frames that were used on

15 Ms. Alexander's trailer, that is, one manufactured in 2004 for

16 FEMA, is designed to withstand a certain amount of stress?

17 A.    Yes, yes.

18 Q.    Would it -- continuing with these

19 would-it-be-important-to-you questions, would it be important

20 for you to know that the trailer had been delivered to an

21 industrial site for four or five months and the industrial

22 site, chemical plant owner had possession of it, would it be

23 important for you to know how they installed it and how they

24 maintained it?

25 A.    I think any knowledge on the history of the unit and how

1   it was stored and how it was maintained and how it was
2   transported would be helpful in determining potential adverse
3   condition of the unit later.
4   Q.   So it would certainly be important for you to know that
5   after she moved out in December of 2007, it was transported by
6   someone to a field in Lottie, Louisiana, outside of Baton
7   Rouge, Louisiana, and had sat there for -- what would that
8   be -- a year and a half almost, a year and four or five months,
9   before Mr. Buzbee and his folks got a chance to see it and
10   observe those conditions he was talking about?
11  A.   Well, you know, different storage sites are more
12  problematical than other storage sites.  I'm not familiar
13  exactly with that storage site.  If something is pulled over an
14  undeveloped lot and subject to, you know, going into holes and
15  ruts, these units are intended for off-road use.  So I don't
16  know really what a field means.  That sounds different than a
17  paved parking lot.  So that could be -- could be -- a more
18  adverse storage situation than others.
19  Q.   Okay.  So it would be one thing if it were in a paved
20  parking lot.  It would be another thing if it were out in the
21  middle of what as agricultural land, you know, a ranch which
22  cattle were kept on at some point and was totally unimproved?
23  A.   Right.  That could be problematical.
24  Q.   Now, if you, with your experience in the manufacture of
25  travel trailers like Ms. Alexander's trailer, observed a

1  trailer that had -- let's say it had some of the conditions

2  that Mr. Buzbee describes, would you be able to tell exactly

3  when in this four- or five-year history that I just went

4  through with you, exactly when the distortion of that frame

5  occurred?

6  **A.**    If the frame was distorted, you know, you'd have to have a

7  really strict chain of custody to have any kind of hope of

8  knowing, and even then it would be pretty difficult.

9  **Q.**    It would be a wild guess, wouldn't it?

10  **A.**    Right.  Correct.

11  **Q.**    If I wanted to know as between you or Mr. Scott Pullin who

12  would be the best source of information about the jacking of

13  trailers and the stresses on them in doing so and blocking them

14  and how to block them, who would be the best source of that

15  information for me?

16  **A.**    Between the two of us, Scott would be.  He's -- most of

17  his job is spent in the field, so he's observed a lot of things

18  firsthand.

19            **THE COURT:**  Is that it?

20            **MR. BUZBEE:**  That's it.

21            **THE COURT:**  All right.  Let's turn the lights on.

22            Okay.  Do you have a witness that would be very

23  brief?

24            **MR. BUZBEE:**  Very short.  I've got Don Shaffer that

25  will be very short.

```
 1            MR. MEUNIER:  Your Honor --
 2            MR. WATTS:  Your Honor --
 3            MR. MEUNIER:  -- there were a couple of cuts from the
 4   defendants that were inadvertently left out.  We'd like them to
 5   read them now, if they'd like, so the jury can hear that in
 6   conjunction with --
 7            MR. WATTS:  The video was too short, Your Honor.
 8            MR. MEUNIER:  It's like a question and answer --
 9            THE COURT:  Well, whoever gave the time on the video
10   needs to learn how to count because they said it was an hour
11   and 24 minutes, and I've got it at an hour and 50 minutes, and
12   you're telling me that that's not the whole thing.
13            MR. MEUNIER:  I'm told that there are two brief
14   exchanges that counsel had told me that were inadvertently left
15   out.  And we said that they could do it now and they could read
16   it --
17            THE COURT:  Would you like to present that,
18   Mr. Weinstock, orally, or would you prefer to do a clip of that
19   and play it later?
20            MR. BUZBEE:  It's very short.
21            MR. WEINSTOCK:  Your Honor, actually, I think it was
22   covered by Mr. Donele's questions later on in the deposition,
23   so it's really not that --
24            THE COURT:  Well, if you want to go ahead and read it
25   now while we're on this witness...
```

1      **MR. WEINSTOCK:**  I think the jury's had enough.

2      **THE COURT:**  Okay.

3            All right.  Let's go ahead and get Mr. Shaffer

4   in and take his testimony and then maybe we can take a

5   mid-afternoon break.

6            (WHEREUPON, **DONALD SHAFFER**, having been duly sworn,

7   testified as follows.)

8      **THE DEPUTY CLERK:**  Please state your full name and

9   correct spelling for the record.

10     **THE WITNESS:**  My name is Donald Shaffer,

11  S-H-A-F-F-E-R; Donald, D-O-N-A-L-D.  I live at 52884 Hollyhock

12  Road, South Bend, Indiana.

13     **MR. WATTS:**  May I proceed, Your Honor?

14     **THE COURT:**  You may proceed.

15                    **DIRECT EXAMINATION**

16  BY MR. WATTS

17  **Q.**   Mr. Shaffer, my name is Michael Watts.  You and I have

18  never met before; is that right?

19  **A.**   Right.

20  **Q.**   We thought you were going on after a break, and we've not

21  said two words to each other; is that right?

22  **A.**   Yeah.

23  **Q.**   Okay.  Let me get a little background information on you.

24  First of all, you are a person who used to work at Gulf

25  Stream's fabrication facility; is that right?

```
 1   A.    That's correct.

 2   Q.    When did you work at Gulf Stream?

 3   A.    From 2000 to 2005.

 4   Q.    Okay.  And did you work at Gulf Stream during December of

 5   2004?

 6   A.    Yes.

 7   Q.    What job did you work at Gulf Stream?

 8   A.    My job title was alignments.

 9   Q.    Alignments?

10   A.    Yes.

11   Q.    Tell me what that means.

12   A.    Well, actually, it was in the motor division that I did

13   alignments every morning.  And then my job was so little to do,

14   they had me do other things supplying help to other plants.

15   Q.    Okay.  And what other things did you do?

16   A.    I delivered materials to other plants, actually, and did

17   shortages on the units that were out in the field.

18   Q.    Okay.  Did you work with the wood that was provided for

19   the fabricators of trailers?

20   A.    Yes, I did.

21   Q.    What did it smell like?

22   A.    As close as I could tell, it would be like a really toxic

23   smell.  I would really compare it to, like -- oh, I can't think

24   of the name of what I would really say.  But it just was

25   unpleasant to smell.
```

1   **Q.**   Toxic and unpleasant?

2   **A.**   Toxic and unpleasant.

3   **Q.**   And in December of 2004, did you work with FEMA trailers?

4   **A.**   Yes, I did.

5   **Q.**   And did those FEMA trailers have this toxic and unpleasant

6   smell?

7   **A.**   Yeah, as soon as you walked in one.

8   **Q.**   Tell the jury, when you walked into these completed FEMA

9   trailers, what you sensed, what you faced when you went in.

10   **A.**   When you walked into the unit, it hit you like a -- you

11   know, right in your face.  And usually I'd just put a rag over

12   my face and then walk in and open all the windows and turn on

13   the air conditioning.  And then leave it immediately and let it

14   air out.

15   **Q.**   When Gulf Stream had those trailers leave its

16   manufacturing plant, did the front door handle come with a rag

17   on it so that people could put a rag over their face when they

18   moved into their new trailer?

19   **A.**   No, no.

20   **Q.**   You mentioned you worked with wood.

21           Were you aware of a policy stated to employees that

22   you-all were supposed to only take in low formaldehyde emitting

23   woods?

24   **A.**   I never seen any kind of labels or warnings.

25   **Q.**   Did you ever get a memo from management saying, Hey, we

1  only take in LFE woods?

2  **A.**   No, I never...

3  **Q.**   Did any of the wood that you worked with in the December

4  of 2004 time frame have a stamp that said "LFE" on it?

5  **A.**   As far as I know, I never seen one.

6  **Q.**   Okay.  When you walked into these trailers and had to put

7  a rag over your face because of this toxic, unpleasant smell,

8  did you complain about that to your supervisor?

9  **A.**   I mentioned it to my supervisor.  And they said, Let it

10  air out before you go inside to work in it.

11  **Q.**   Did this work?

12  **A.**   Not really.  I mean, you just did it.  If you didn't do

13  it, you got fired.

14  **Q.**   Mr. Shaffer, how did you find the lawyers involved in this

15  case?  How did we get put together?

16  **A.**   Actually, my cousin informed me that it was in the paper.

17  **Q.**   Okay.  And you responded to that advertisement we put in

18  the paper?

19  **A.**   Yes, I did.

20  **Q.**   And did you visit with representatives for the plaintiffs

21  and tell us exactly what you've told us here today?

22  **A.**   Exactly.  I read the paper and seen it.  And we all met at

23  my cousin's house.  And they wanted to know what kind of

24  medical problems I was having since I worked there.

25  **Q.**   Okay.  And I don't want to talk to you about your medical

1    problems, and I know you've got some things to say about that,

2    but we just need to talk about what you experienced there.

3              Bottom line is, after you told us what you

4    experienced there at the plant, we asked you if you would come

5    testify at trial; is that right?

6    A.    Right.

7    Q.    And we agreed to pay for your travel to get down here and

8    back; is that right?

9    A.    That's true.

10   Q.    But nobody's promised you anything by way of compensation

11   or anything like that?

12   A.    No.  I don't expect none.

13   Q.    And with respect to the things that you have told the jury

14   with respect to LFE and what you experienced when you walked

15   into these FEMA trailers, has what you told the jury been the

16   God's honest truth?

17   A.    Yes, it is.

18   Q.    All right.

19             MR. WATTS:  Those are all my questions.

20             Thank you.

21             THE COURT:  All right.  Cross?

22                        CROSS-EXAMINATION

23   BY MR. WEINSTOCK

24   Q.    Mr. Shaffer, Andy Weinstock.  I just have a few questions

25   for you.

1          I sent an investigator to come talk to you, didn't I?
2  A little lady, pink car?
3  **A.**   You might have talked to my brother.  You didn't talk to
4  me.
5  **Q.**   You screamed at her to get off your property?
6  **A.**   That wasn't me.  That was my brother.
7  **Q.**   Oh, your brother screamed at her to get off -- did your
8  brother work at Gulf Stream Coach?
9  **A.**   He worked there, but not at that time.
10 **Q.**   You-all don't have fond memories of the place, I take it?
11 **A.**   Well, it was a good place to work for me.  For my brother
12 it wasn't very pleasant.
13         **MR. WEINSTOCK:**  That's all the questions I have.
14              Thank you.
15         **THE COURT:**  No questions from Fluor?
16         **MR. PENOT:**  No questions from Fluor, Your Honor.
17                     **REDIRECT EXAMINATION**
18 BY MR. WATTS
19 **Q.**   Just one question:  Is your brother testifying or are you?
20 **A.**   Just me.  My brother's at home.
21         **MR. WATTS:**  Thank you.
22         **THE COURT:**  All right.  Thank you, sir.  You may step
23 down.  Please don't discuss with anyone your testimony who
24 might be a witness in this trial.
25              All right.  Mr. Watts, I take it -- maybe I

```
 1    should ask:  Do we have another witness that would be as brief
 2    as this testimony?
 3            MR. BUZBEE:  I think we do, Your Honor.
 4            THE COURT:  All right.  Well, why don't we go ahead
 5    and take them too, and then we'll take our break.
 6            MR. BUZBEE:  We call Alan Davis.
 7            THE COURT:  Mr. Davis, if you'd come up here, sir.
 8    You can make your way through here.  When you get to this chair
 9    up here, remain standing until you take the oath, and then you
10    may be seated.
11            MR. BUZBEE:  Your Honor, I need to talk to Mr. Davis
12    real quick.
13            (WHEREUPON, ALAN DAVIS, having been duly sworn,
14    testified as follows.)
15            THE DEPUTY CLERK:  Please state your full name and
16    correct spelling for the record.
17            THE WITNESS:  My name is Alan Robert Davis, A-L-A-N,
18    R-O-B-E-R-T, D-A-V-I-S.
19            MR. BUZBEE:  May I proceed, Your Honor?
20            THE COURT:  Yes.
21                         DIRECT EXAMINATION
22    BY MR. BUZBEE
23    Q.   Sir, what is your name, if you could introduce yourself to
24    the jury, please?
25    A.   My name is Alan Davis.
```

1  Q.   Where do you live?

2  A.   My full name is Alan Robert Davis.

3  Q.   Okay.  Where do you live?

4  A.   I reside at 6706 East 650 North, Rolling Prairie, Indiana

5  46371.

6  Q.   In your lifetime, sir, have you worked for Gulf Stream?

7  A.   Yes, sir.

8  Q.   When did you work for them?

9  A.   I've worked for them several times.  My last present time

10  was from 2003 to 2005.

11  Q.   Did you also work for the sister company, Fairmont Homes?

12  A.   Yes, sir.

13  Q.   When you worked for Fairmont Homes, did the wood that

14  would be used at Fairmont Homes also be shared with Gulf

15  Stream?

16  A.   All the woods for the company was delivered by the same

17  company at the same time.

18  Q.   Okay.  So a wood may be delivered to Fairmont, but it

19  might be used with Gulf Stream?

20  A.   Yes, sir.

21  Q.   And is it fair to say Gulf Stream builds the travel

22  trailers and Fairmont builds the mobile homes?

23  A.   Yes, sir.

24  Q.   What did you do for Fairmont?

25  A.   Fairmont, I worked in the floor department.  I started the

1   project out.  It started from the floor, and worked its way out

2   the building, a finished product, a whole home in one day.

3   **Q.**   And what did you do for Gulf Stream?

4   **A.**   Gulf Stream, I started out in the fifth wheel travel

5   trailers building the slideout side walls.  And then I went

6   from there over to the service department, and I was a service

7   tech for the rest of my remainder of my time there.

8   **Q.**   Were you a service tech in the time frame of 2005?

9   **A.**   Yes, sir.

10  **Q.**   Were you a service tech when trailers were deployed --

11  FEMA trailers, in response to disasters?

12  **A.**   Yes, sir.

13  **Q.**   Were you called out to the field to respond to issues with

14  these FEMA travel trailers?

15  **A.**   I was -- traveled down to Arkansas with a fellow service

16  tech and delivered products for these trailers.  And it was

17  called shortages; when a unit went out, sometimes it didn't

18  have all the products, so we would add the product, and then it

19  would be done.

20  **Q.**   There's been testimony in this case that before 2006 and

21  Hurricane Katrina, there had never been an issue with

22  formaldehyde and Gulf Stream and FEMA trailers; is that true?

23  **A.**   Say that again?

24  **Q.**   I'm sorry.  I spoke too fast.

25          You weren't here, but there's been at least one

1    witness that says before 2006 and Hurricane Katrina, At Gulf

2    Stream we never had a problem with formaldehyde.

3            Is that a true statement?

4    A.   That is not a true statement.

5    Q.   Isn't it true that when you were called out to Arkansas,

6    for instance, to deal with issues with FEMA trailers, that

7    there was a formaldehyde issue?

8            MR. WEINSTOCK:  Objection, Your Honor, leading.

9            THE COURT:  Well, yeah, it's absolutely leading.  I

10   think we also need some type of time frame.  I don't know to

11   what extent -- well, I'm going to sustain the objection.  See

12   if you can rephrase it and give it some type of context with a

13   time frame.

14           MR. BUZBEE:  Very well, Your Honor.

15   BY MR. BUZBEE

16   Q.   When were you called to respond to issues with FEMA

17   trailers in Arkansas?

18   A.   It had to be --

19           THE COURT:  Wait.  I don't think he's -- I don't

20   think that cures the objection.  I don't think he's answered

21   that question just yet.

22   BY MR. BUZBEE

23   Q.   Okay.  Were you ever called out to deal with an issue with

24   FEMA trailers?

25   A.   Yes, sir.

1  **Q.**   When was that?

2  **A.**   It was either in November or October of 2004 that -- when

3  they deployed the units ordered.

4  **Q.**   And where did you go out to deal with these FEMA units?

5  **A.**   I can't think of the name of the town, but it was -- they

6  had their area down in Arkansas that would disburse the units

7  out to where it was needed.

8  **Q.**   And what were you called out to Arkansas to do?

9  **A.**   To install water heaters that were shorted.

10 **Q.**   Meaning they failed to put the water heaters in the units?

11 **A.**   At the time, they did not have them, yes.

12 **Q.**   And what, if anything -- or strike that.

13          What issue, if any, was there with formaldehyde when

14 you were in Arkansas?

15 **A.**   You couldn't get into them because the smell was so strong

16 when you would open them up.  We would open up -- we'd walk

17 rows to open them up so that we could get into them later, and

18 let them air out for at least an hour.

19 **Q.**   And tell me -- if you could, please, describe for the

20 ladies and gentlemen of the jury how this smell you're talking

21 about would affect you when you would walk into one of these

22 trailers back in 2004?

23 **A.**   As soon as you would open up that door, the smell would

24 hit you in your face, your eyes would water, your throat would

25 start burning, you would want to get in there quickly to open

1    up the windows and the vents.  And if it was so lucky to have

2    an air conditioner, we would turn the air conditioner on, if we

3    had electricity, to air them out, even with all the windows

4    open.

5    **Q.**    Now, when you would come back in an hour, would the smell

6    still be there?

7    **A.**    Yes.

8    **Q.**    Was it at least a little better so you could do the work

9    that needed to be done?

10   **A.**    Tolerable.

11   **Q.**    Would you -- now, how many trailers have you -- when you

12   worked at Gulf Stream, were you involved with, whether it be

13   working with the woods or technician type work?

14   **A.**    I dealt with several types of trailers and motor homes and

15   the housing.  I was in all aspects of the company.  I've been

16   in many areas for them.

17   **Q.**    Now, with regard specifically to the FEMA trailers, would

18   you ever sleep in one for the night?

19   **A.**    No, sir.

20   **Q.**    Why not?

21   **A.**    The smell, you could never get rid of it.  Working with

22   the wood products that I worked with, I would have nose bleeds

23   and sore throats for weeks on end.

24             **MR. WEINSTOCK:**  Objection, Your Honor.

25             **THE COURT:**  I'll sustain the objection.

```
 1                    Just answer the question that you're asked.
 2               THE WITNESS:  Yes, sir.
 3   BY MR. BUZBEE:
 4   Q.   And when you were working with the woods, did you ever see
 5   the designation LFE on any wood?
 6   A.   No, sir.
 7   Q.   And are you aware of any policy, while you worked at Gulf
 8   Stream, that Gulf Stream had a LFE-only policy?
 9   A.   Not to my knowledge, sir.
10               MR. BUZBEE:  Pass the witness, Your Honor.
11               THE COURT:  All right.
12                         CROSS-EXAMINATION
13   BY MR. WEINSTOCK:
14   Q.   Just so I'm clear -- I'm sorry.  Andy Weinstock.
15               Just so I'm clear, sir.  The Arkansas station you
16   went to, that was like a FEMA deployment area; correct?
17   A.   Yes, sir.
18   Q.   And you told us that was in 2004.  But actually that was
19   in 2005; correct?
20   A.   I don't know the date right offhand, but I thought it was
21   in 2004 because I --
22   Q.   I'm sorry.  Are you done?
23   A.   Yes.
24   Q.   Before the hurricanes struck Florida in 2004, including
25   Hurricane Ivan, the deployment station was in Florida; correct?
```

```
 1   A.    That's correct, sir.

 2   Q.    And in 2005, there were units deployed to Arkansas;

 3   correct?

 4   A.    Yes, sir.

 5   Q.    Now, we've cleared that up.

 6         You were in an area where there were nobody living in

 7   the units; they were just getting them ready for people to live

 8   in; correct?

 9   A.    Well, that was a staging area, sir.

10   Q.    Staging area.  That's what we call it.

11         So you were not dealing with people that were in the

12   trailers?

13   A.    Not yet, sir.

14   Q.    Okay.  So you never talked to the people that were in the

15   trailers?

16   A.    I never talked to anybody.

17   Q.    So when Mr. Buzbee suggested that somebody in the trailer

18   complained to you, that's not exactly what you were trying to

19   convey?

20   A.    He would never ask me that, sir.

21   Q.    He asked you that somebody had suggested there were no

22   complaints in 2006.  Yes?  Do you remember that question?

23   A.    Yes, sir.

24   Q.    Okay.  And then you said, No, there were complaints in

25   November/December 2005?
```

1  **A.**   I thought he was talking about when I was a service tech,
2  sir.
3  **Q.**   He was talking about your complaints, not residents' s
4  complaints; right?
5           Maybe you complained to somebody, but the --
6  **A.**   Yes, sir.
7  **Q.**   -- residents had not complained?
8           My statement's correct?
9  **A.**   Yes, I complained.
10 **Q.**   As we sit here now, you're not telling this jury that some
11 resident complained to you back in 2005; correct?
12 **A.**   Not on a FEMA home.
13 **Q.**   Now, you said you also worked at Fairmont; right?
14 **A.**   Yes, sir.
15 **Q.**   And the wood was the same; correct?
16 **A.**   It was delivered by the same company, sir.
17 **Q.**   And so the smell was the same?
18 **A.**   Yes, sir.
19 **Q.**   So whether it was -- and Fairmont built what kind of
20 units?
21 **A.**   Modular homes.
22 **Q.**   Modular homes.  Regulated by the HUD code; right?
23 **A.**   Yes, sir.
24 **Q.**   So the wood that they were putting in these modular homes
25 from the same suppliers that complied with the HUD code smelled

1    exactly like the FEMA units?

2    A.   Yes, sir.

3    Q.   So FEMA wasn't getting the bad stuff, right, or the

4    different stuff?  It was all the same to you; correct?

5    A.   As far as I know, the wood was, sir.

6    Q.   When you actually worked in manufacturing, you worked on

7    fifth wheels; right?

8    A.   Yes, sir.

9    Q.   And those are not FEMA units; right?

10   A.   That's correct, sir.

11   Q.   You never actually worked in the manufacture of the FEMA

12   units; is that correct?

13   A.   No, sir.

14   Q.   Do you smoke, sir?

15   A.   No, sir.

16   Q.   Have you ever smoked?

17   A.   Yes, sir.

18   Q.   How often did you smoke?

19   A.   When I did smoke, it was a pack a day.

20   Q.   And did that make your nose bleed?

21   A.   No, sir.

22   Q.   Give you a headache?

23   A.   No, sir.

24   Q.   Make your eyes water?

25   A.   No, sir.

1   **Q.**   Did you ever smoke in your car?

2   **A.**   Yes, sir.

3   **Q.**   With the windows closed?  It's kind of cold in Indiana.

4   **A.**   Yes, sir.

5   **Q.**   And just in the time you were in your car lighting up a

6   cigarette, did it make your eyes water?

7   **A.**   No, sir.

8   **Q.**   Did it make your nose bleed?

9   **A.**   Not that I know or, sir.

10  **Q.**   When did you leave Gulf Stream?

11  **A.**   2005, sir.

12  **Q.**   Why did you leave Gulf Stream?

13  **A.**   I beat up a person that I was working with.

14  **Q.**   Who did you beat up?

15  **A.**   I don't know his name.

16  **Q.**   Why did you beat him up?

17  **A.**   After he pushed me, I proceeded to beat him up.

18  **Q.**   And then they fired you, not him; or both of you-all?

19  **A.**   They kept him because I was making more money.  He was

20  only making $10 an hour.

21  **Q.**   Where do you work now?

22  **A.**   I do not.

23  **Q.**   When was the last time you worked?

24  **A.**   It's been a year now, since the economy is so bad up

25  there.

1   Q.   Where was that?

2   A.   That was at NIBCO.

3   Q.   What do they do?

4   A.   That's a machine shop.

5   Q.   Did you ever work at any other RV companies?

6   A.   Yes, sir.

7   Q.   Who else have you worked for?

8   A.   Copeland.

9   Q.   Anybody else?

10  A.   No, sir.  Not in RV.

11  Q.   Manufactured housing, anything else?

12  A.   No.

13  Q.   What do you mean the economy's so bad up there?

14  A.   Where I work at, most of the work is around the steel

15  area.  And since I don't live over in Elkhart County, and I'm

16  closer to Chicago, and everything revolves around steel.  And

17  most of the work I did for the company was re-machining parts

18  for the steel business.

19  Q.   Have you tried to get back in with any of the RV

20  companies?

21  A.   Yes, sir.

22  Q.   How is that going?

23  A.   I put in over 50 applications.  And I don't know if I'm

24  blackballed since working at Gulf Stream.

25  Q.   Not a whole lot of them are hiring, huh?

1    **A.**   There's not that much work right now.

2              **MR. WEINSTOCK:**  Thank you, sir.

3              **THE COURT:**  Any questions?

4              **MR. PENOT:**  No, Your Honor.

5              **THE COURT:**  All right.  Redirect?

6                          **REDIRECT EXAMINATION**

7    BY MR. BUZBEE

8    **Q.**   So you have smoked with your windows up in the car?

9    **A.**   Yes, sir.

10   **Q.**   And it didn't cause any of those kind of problems --

11   **A.**   No, sir.

12   **Q.**   -- that you had when you would go into a FEMA trailer?

13   **A.**   No, sir.

14   **Q.**   The only difference between you and a resident is that you

15   didn't have to sleep in the FEMA trailer?

16   **A.**   That's correct, sir.

17   **Q.**   But you did complain about that smell?

18   **A.**   Asked what it was, and was never told.

19             **MR. BUZBEE:**  Pass the witness, Your Honor.

20             **THE COURT:**  All right.  Thank you, sir.  You can step

21   down, please.  Don't discuss your testimony with anybody that

22   might be a witness in this trail.

23             **THE WITNESS:**  Yes, sir.

24             **THE COURT:**  All right.  It's about 10 minutes to

25   3:00.  Why don't we take about a ten-minute break.  We'll come

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

 1   back at five minutes after 3:00.

 2                (WHEREUPON, the jury exited the courtroom.)

 3                (WHEREUPON, the Court took a recess.)

 4                        **(OFF THE RECORD)**

 5        **THE DEPUTY CLERK:**  All rise.

 6                (WHEREUPON, the jury entered the courtroom.)

 7        **THE COURT:**  All right.  You may be seated.

 8                All right.  Mr. Watts or Mr. Buzbee, your next

 9   witness.

10        **MR. WATTS:**  Your Honor, at this time we call Scott

11   Bailey by and through his deposition.  This one was not

12   videotaped to my knowledge, so we're going to have Mr. Buzbee

13   play the witness and I'll read the questions, if that's

14   acceptable.

15        **THE COURT:**  Okay.  Let me explain to the jury, in

16   case it's not already apparent.

17                Mr. Buzbee, you can come on up here.

18                This is also a witness who, for whatever reason,

19   is unable to be here today.  And by prior agreement between the

20   parties and the Court, this witness' testimony -- this is a

21   gentleman by the name of Scott Bailey -- his testimony was

22   previously taken, under oath, with counsel present, just as if

23   he would appear here today if he were here live.

24                A transcript was made of that testimony, and it

25   will be read to you today with Mr. Buzbee playing the starring

 1   role of Mr. Bailey, so for the next few minutes you'll have to
 2   pretend that Mr. Buzbee is in fact Mr. Bailey.  The questions
 3   that are being read to you -- are we going to have two
 4   different people read questions, or are you just going to
 5   present --
 6           **MR. WATTS:**  I'll just read them all.  I think they've
 7   given us their cuts and I'll just read them.
 8           **THE COURT:**  All right.  The questions that are
 9   presented to you, as with the videotapes, may have been asked
10   by any one of the attorneys that were present at the time of
11   the deposition.
12              So let's go ahead and present his testimony and
13   find out what Mr. Bailey knows about all this, and then we'll
14   move on to another witness.
15           **MR. WATTS:**  Thank you, Your Honor.
16           **THE COURT:**  Go ahead, Mr. Watts.
17              He's already been sworn in.  Mr. Bailey's
18   already been sworn in.
19              (WHEREUPON, the videotaped deposition of **SCOTT BAILEY**
20   was played.)
21   **BY MR. BUZBEE**
22   **Q.**   What is your name, sir?
23   **A.**   Scott Bailey.
24   **Q.**   Okay.  And who do you work for?
25   **A.**   Patrick Industries.

1    **Q.**   How long have you worked for them?

2    **A.**   Patrick Industries purchased the company I used to work

3    for, which is Adorn.  So I've worked with Patrick for about a

4    year and a half now.

5    **Q.**   How long did you work for Adorn, sir?

6    **A.**   About ten years.

7    **Q.**   And what did you do for Adorn?

8    **A.**   Sales.

9    **Q.**   Did you sell wood products to companies like Gulf Stream?

10   **A.**   Yes.

11   **Q.**   Do you know a fellow by the name of Jeff Zumbrun?

12   **A.**   Yes.

13   **Q.**   Who is he?

14   **A.**   The director of purchasing for Gulf Stream towables.

15   **Q.**   Do you remember at some point he asked you to come to his

16   office in 2007 to talk to you?

17   **A.**   No.

18   **Q.**   Were you aware that at some point you were having a

19   conversation with him in his office and he was recording it?

20   **A.**   Absolutely not.

21   **Q.**   Okay.  Did, at some point, you become aware that Gulf

22   Stream had an LFE-only policy?

23   **A.**   Yes.

24   **Q.**   For their wood products?

25   **A.**   Yes.

1   **Q.**   When did you become aware of that fact?

2   **A.**   No idea.  It became a law at some point by the RVIA, and

3   that's when I was aware of it.

4   **Q.**   So is it fair to say that whenever the RVIA adopted that

5   policy, that's when you became aware that this was Gulf

6   Stream's policy?

7   **A.**   That's correct.

8   **Q.**   And if you were going to try to pinpoint when it was that

9   you learned that Gulf Stream had that policy, that's how you

10  would do so?

11  **A.**   Yes.

12  **Q.**   And just so that we're all clear, because I don't think

13  you'll be at this trial, the first time you learned that Gulf

14  Stream had any sort of low formaldehyde wood policy was

15  whenever the RVIA adopted that policy?

16  **A.**   Correct.

17  **Q.**   Do you ever remember Gulf Stream ever sending you any

18  documentations, writing, letter, whatnot, informing you that

19  when you were selling them wood products, to only sell them low

20  formaldehyde wood products?

21  **A.**   No, I don't.

22  **Q.**   Have you ever seen such a writing where Gulf Stream

23  informed you of any low formaldehyde emitting policy?

24  **A.**   I have not.

25  **Q.**   Are you familiar with the phrase or the term 'reg' as it's

1    used in selling of wood to trailer companies?

2    **A.**    It's an abbreviation for "regular," yes.

3    **Q.**    And so is this term "reg," back when it was used,

4    something that you knew about through just selling of wood

5    products to trailer manufacturers?

6    **A.**    Yes.

7    **Q.**    Is that commonly -- at least back when it was used, was

8    that a term that was fairly common in your business?

9    **A.**    Yes.

10   **Q.**    Had anyone that you can recall asked you, any of your

11   customers say, What does that mean?

12   **A.**    Only if they were brand new to the industry.

13   **Q.**    It's the kind of term, at least from your perspective, you

14   would expect anyone who purchases wood to know?

15   **A.**    Correct.

16   **Q.**    And here's why I'm asking:  I've seen invoices and packing

17   slips where that term is used; and I've seen them where that

18   term is not used.

19          If that term is not used, does that mean the wood is

20   not reg, or could it still be reg?

21   **A.**    It would either say "regular" or "reg," or it would say

22   "LFE".  I would actually be surprised if it didn't say

23   anything.  But if it did not say anything, it would be regular.

24   **Q.**    So if it doesn't say "LFE," it's most likely regular?

25   **A.**    Correct.

1   **Q.**   Now, take me through how the purchasing process works.

2   Say Gulf Stream contacted Adorn back when you worked for Adorn.

3   How would that process work?

4   **A.**   In terms of how they would put an order in?

5   **Q.**   Yes, sir, that's what I'm asking.

6   **A.**   Most likely they would type up a purchase order, and then

7   just fax it over to Adorn.  And then we would fill the order

8   based on what is on the packing slip or based on what's on the

9   purchase order.

10  **Q.**   And is it true that -- again, I'm referring you to the

11  time frame when you did business with Gulf Stream when you

12  worked at Adorn.  Okay?

13  **A.**   Sure.

14  **Q.**   During that time frame, did Gulf Stream, that you recall,

15  ever specify that they wanted LFE wood?

16  **A.**   Is there a time frame that you're asking about?

17  **Q.**   Yeah.  I'm talking about before you learned of this policy

18  with RVIA.

19  **A.**   What I remember, no.  They were happy to get whatever they

20  could get.

21  **Q.**   So you can't remember anybody, any purchasing agent, any

22  purchasing manager, ever saying, Hey, make sure this particular

23  wood is LFE?

24  **A.**   Correct.

25  **Q.**   They simply either would order by part number or they

1   would just order by description?

2   **A.**   Yes.

3   **Q.**   And they were happy with whatever they could get?

4   **A.**   Yes.

5   **Q.**   And until you learned that the RVIA had adopted the LFE

6   policy, you sent them whatever they ordered?

7   **A.**   Yes.

8   **Q.**   If they didn't specify LFE, you didn't give them LFE?

9   **A.**   Correct.

10  **Q.**   They said 8-foot, 2.7 millimeters, and I want this color,

11  and they didn't specify LFE, then you gave them reg?

12  **A.**   Most likely, yes.

13  **Q.**   And on the invoices and the purchase orders, if LFE

14  doesn't appear, then we can assume that the product you sent

15  them was reg?

16  **A.**   That's correct.

17  **Q.**   Do you ever recall a time when you admitted to Mr. Zumbrun

18  or anyone from Gulf Stream that you had made a mistake and cent

19  them the wrong kind of wood?

20  **A.**   I don't recall, no.

21  **Q.**   Do you ever recall a time when you kind of fell on the

22  sword and said, Yes, I knew that Gulf Stream, you guys wanted

23  LFE wood, but we just made a mistake on our end and we're

24  sorry?

25  **A.**   I don't, no.

1   **Q.**   Now, when you listen to that tape -- and I know it's
2   difficult to listen to -- did you hear in there anywhere where
3   you admitted that you knew about a policy and that you made a
4   mistake?
5   **A.**   No, I don't recall.
6   **Q.**   When's the last time you listened to that recording that
7   Mr. Zumbrun secretly did?
8   **A.**   I listened to it maybe two weeks to maybe a week and a
9   half ago.
10  **Q.**   Do you recall, to the extent that you could hear it, you
11  ever admitting that you had made a mistake and that you were
12  fully aware of Gulf Stream's policy that they wanted only LFE
13  wood?
14  **A.**   No.  Like you said, it wasn't very clear, and I did not
15  hear that.
16  **Q.**   And you certainly can never remember ever making such an
17  admission to Gulf Stream?
18  **A.**   Right.
19          **MR. WATTS:**  Okay.  Switching lawyers here.
20  **BY MR. WEINSTOCK**
21  **Q.**   Mr. Bailey, my name is Randy Weinstock, and I do have
22  questions for you.
23          In front of you, you should have some invoices,
24  purchase orders, and packing slips between Gulf Stream and
25  Adorn.  And I'm specifically referring to, if we could start

1  with Bates Number 6069, 6070, and 6071, and 6072.

2          First look at 6072.  Do you have that in front of

3  you?

4  A.   Okay.

5  Q.   This is a purchase order.

6          Is this your understanding of a purchase order from

7  Gulf Stream to Adorn?

8  A.   Well, 6072, that's actually a division of Gulf Stream

9  called JEJ Molding.

10 Q.   Correct.  So it's a division of Gulf Stream to Adorn;

11 correct?

12 A.   Correct.

13 Q.   Going back to 6072, do you see where it says:  'All

14 products must be applicable to the HUD requirements for

15 housing'?

16 A.   Okay.

17 Q.   All right.  If you receive such a purchase order, that

18 means to you that the product must be LFE; correct?

19 A.   Well, the problem is -- I mean, yes, that's correct.

20 Q.   If you receive such a purchase order, you would have sent

21 Gulf Stream such product, or JEJ Molding?

22 A.   Yeah, if we -- yes.

23          **MR. WATTS:**  Go to page 18, Tony.

24          **MR. BUZBEE:**  Yes.

25

1  BY MR. WEINSTOCK

2  Q.   Sir, if I represent to you that these are all the

3  purchases from Gulf Stream or any entity or subsidiary or

4  sister company of Gulf Stream to Adorn in 2004 that we've just

5  gone through, you would agree with me that Adorn did not send

6  any regular wood to Gulf Stream in 2004; is that correct?

7  A.   I have no idea.

8  Q.   Well, if you accept my representation that this is the

9  entirety of the purchase orders and invoices.

10 A.   Absolutely.

11 Q.   Everything we just went through, there's not a single

12 purchase order or invoice for regular wood product in 2004;

13 correct?

14 A.   That's correct.

15 Q.   On this recorded statement -- and I will agree with you,

16 it's extremely poor quality -- but was that your voice on the

17 recorded statement?

18 A.   Yes.

19 Q.   And whatever you said -- we don't need to go over it

20 again -- but would you agree that whatever's on there is on

21 there?

22 A.   Yes.

23 Q.   At any point you listen to it, does it appear to you that

24 somebody dubbed in something different from you or said

25 something different for you?

1  A.   Not that I would know, no.  It didn't sound like it.

2  Q.   Did you hear anything on that tape or that recording that

3  you thought was inaccurate?

4  A.   No.

5  Q.   And my question is, since this conversation took place

6  some time ago, would your memory as to what Gulf Stream's LFE

7  or lack of LFE policy was been better at the time of this

8  recordation than it is today?

9  A.   Yes.

10          MR. WATTS:  And now we have Mr. Buzbee coming back

11  and asking questions.

12  BY MR. BUZBEE

13  Q.   Sir, do you know whether Mr. Weinstock provided you all of

14  the purchase orders and invoices from Gulf Stream or any Gulf

15  Stream entity to Adorn in 2004?

16  A.   I do not, no.

17  Q.   Gulf Stream was a customer of Adorn for at least ten

18  years; is that true?

19  A.   Yes.

20  Q.   Gulf Stream purchased a lot of different wood products; is

21  that right?

22  A.   Correct.

23  Q.   Do you ever recall a year where Gulf Stream didn't

24  purchase any wood products?

25  A.   No.

1   **Q.**   As far as you recall, they purchased wood products every

2   single year; is that right?

3   **A.**   That's correct.

4   **Q.**   They were one of your big customers; were they not?

5   **A.**   Yes.

6   **Q.**   Would you agree with me that if someone were to say, if

7   Gulf Stream didn't buy any wood from Adorn in 2004, that you

8   would disagree with that?

9   **A.**   I would be surprised, yes.

10  **Q.**   Because your recollection that they absolutely purchased

11  wood from Adorn in 2004; is that right?

12  **A.**   Seems like likely.  I hate to -- most likely, yes.

13  **Q.**   Now, just so I'm clear:  If the invoice or the packing

14  slip doesn't reference formaldehyde at all, that is, if that

15  doesn't say LFE, you would take that to mean that it was

16  regular and not LFE; is that right?

17  **A.**   Absolutely.  If has to specify LFE, or they get regular.

18  **Q.**   And is it possible that there were times when Gulf Stream,

19  on their purchase order, may have had some language about

20  HUD-certified products, but you would still send them regular

21  wood?

22  **A.**   Only if they would approve it.

23  **Q.**   Okay.  So just because something is stamped on their

24  purchase order, that doesn't necessarily mean that you did not

25  send them reg wood, does it?

1  **A.**   Right.  That -- we would communicate that.  We would

2  backorder them.  And if they said, We have to have some

3  material, we would tell them what we had available, and they

4  would have to approve it.

5  **Q.**   If I were to tell you that in the fall of 2007, the

6  RVIA -- and what does RVIA mean?

7  **A.**   Recreational Vehicle Association, something like that.

8  **Q.**   If I were to tell you that in the fall of 2007, the RVIA

9  adopted a policy where their membership should use LFE woods,

10  would that be the time frame in which you learned that Gulf

11  Stream had such a policy?

12  **A.**   I don't recall.

13  **Q.**   Previously you told me that you thought it was when the

14  RVIA adopted that policy; right?

15  **A.**   Right.

16  **Q.**   I just looked that up and I found out that that was not in

17  the fall of 2007.

18  **A.**   Okay.  That would be about right, then.

19  **Q.**   Sir, is it fair to say that when you're talking to your

20  customers, you're trying to keep them happy?

21  **A.**   Yes.

22  **Q.**   And sometimes you may just kind of roll with it; that is,

23  they may say stuff to you that you really don't need to

24  challenge, and you might just agree with it to avoid a conflict

25  and keep them happy?

1    A.   Yes.

2    Q.   In other words, if we listen to that tape, it's clear that

3    you were having a conversation and you're doing your best to

4    keep one of your big customers happy; is that right?

5    A.   Yeah.  Jeff was a personal friend of mine.  And yes, you

6    know, you just roll through a conversation, correct.

7            MR. WATTS:  If you'll go to page 25.

8    BY MR. BUZBEE

9    Q.   Was it clear when you listened to that recording and when

10   you actually participated in that conversation, that he was in

11   a mode where he was trying to cover himself?

12   A.   Not necessarily.  I interpreted the conversation as he was

13   looking forward to more contracts through FEMA, and wanted to

14   make sure that Adorn was positioned to have the wood available

15   to him.

16           MR. WATTS:  And now we have more questions by Mr.

17   Weinstock.

18   BY MR. WEINSTOCK

19   Q.   Mr. Bailey, did you ever tell Mr. Zumbrun that it was a

20   mistake on you-all's part, and that you-all being Adorn, not to

21   get LFE?

22   A.   I really don't remember that.

23   Q.   Did you hear yourself saying that in the conversation?

24   A.   I guess.  I don't remember if I said a mistake, or maybe a

25   misunderstanding or something.

244

1   **Q.**   You don't dispute that that's what you said?

2   **A.**   Correct.

3   **Q.**   Okay.  Mr. Buzbee asked you before if he thought you would

4   send wood products to Gulf Stream every year for the last ten

5   years.  Do you remember that?

6   **A.**   Yes.

7   **Q.**   Have you looked back to see whether in fact you-all

8   shipped wood products to Gulf Stream in 2004?

9   **A.**   I personally did not.

10  **Q.**   Do you recall shipping wood products to Gulf Stream in

11  2004?

12  **A.**   I really don't remember.

13          **MR. WATTS:**  Back to Mr. Buzbee on page 29.

14  **BY MR. BUZBEE**

15  **Q.**   In other words, you're not going to directly challenge

16  your customer and say you never said that.  Instead, what you

17  might do is just say, Well, it must have been a communication

18  error?

19  **A.**   Correct.

20  **Q.**   And that's the words you used in the tape, isn't it?

21  **A.**   Yes.

22  **Q.**   And that's what you meant, isn't it?

23  **A.**   Yes.

24          **MR. WATTS:**  That concludes the offer of Scott Bailey,

25  Your Honor.

1            **THE COURT:**  All right.

2                   Okay.  Who's next?  Mr. Eddie Abbott; isn't that

3    correct?

4            **MR. BUZBEE:**  Yes, sir.

5            **THE COURT:**  Okay.

6            **MR. BUZBEE:**  Your Honor, we have --

7            **MR. WATTS:**  Can we approach?

8            **THE COURT:**  Yes.

9            (WHEREUPON, the following proceedings were held at

10   the bench.)

11           **MR. WATTS:**  They -- this was listed for them and they

12   didn't have a chance to look at it.

13           **MR. WEINSTOCK:**  We've been looking at this, the Shea

14   testimony.

15           **THE COURT:**  Can -- is there any way we can play it?

16           **MR. WATTS:**  We'll pull them first and you can look at

17   the video.

18           **THE COURT:**  Okay.

19           **MR. WATTS:**  And then we'll do the video next.

20           **THE COURT:**  Okay.

21           (WHEREUPON, the following proceedings were held in

22   open court.)

23           **THE COURT:**  Okay.  We're going to change the order a

24   little bit.

25                   Mr. Scott Pullin.

1          **MR. BUZBEE:**  Your Honor, the plaintiffs call Scott

2    Pullin.

3          **THE COURT:**  All right.  Mr. Pullin?

4               Mr. Pullin, if you would come up here, sir.

5    When you get to this chair up here, please remain standing

6    until you take the oath, and then you may be seated.

7          **THE WITNESS:**  Yes, sir.

8    **(WHEREUPON, SCOTT PULLIN, having been duly sworn, testified as**

9                        **follows.)**

10         **THE DEPUTY CLERK:**  Please state and spell your full

11   name for the record.

12         **THE WITNESS:**  Scott Pullin, S-C-O-T-T, P-U-L-L-I-N.

13         **MR. BUZBEE:**  May I proceed, Your Honor?

14         **THE COURT:**  Yes.

15                     **CROSS-EXAMINATION**

16   BY MR. BUZBEE

17   **Q.**   Your name is Scott Pullin; correct?

18   **A.**   That's correct.

19   **Q.**   And you are the vice president of operations of Gulf

20   Stream Coach; isn't that true?

21   **A.**   That's true.

22   **Q.**   And Gulf Stream is the company that manufactured the

23   trailer in this case that this family was living in?

24   **A.**   Yes.

25         **MR. BUZBEE:**  May I approach the witness, Your Honor?

1           **THE COURT:**  Yes.

2   BY MR. BUZBEE

3   Q.    I'm showing you what has been marked as 123.

4           Have you seen that document before?

5   A.    No, sir.

6   Q.    Have you ever seen the label that appears on the woods

7   that come into Gulf Stream before the wood is placed in the

8   trailer?

9   A.    Not that I recall, no.

10  Q.    Would it surprise you, sir, to know that the label that

11  are on the woods that Gulf Stream receives says on it that the

12  woods cause cancer, the formaldehyde in the woods cause cancer?

13  A.    I'm not aware of that.

14  Q.    So this is the first time you've ever learned that?

15  A.    That's the first time I've ever seen that, yes.

16  Q.    But what we know for sure is --

17          **MR. BUZBEE:**  Carl, can you pull up for me Exhibit 23?

18  BY MR. BUZBEE

19  Q.    -- is that regardless of what the woods say that go into

20  the trailer, Gulf Stream's manual, at least as it existed in

21  2004, didn't even mention the word "formaldehyde," did it?

22  A.    Not that I'm aware of.

23  Q.    But it does now, doesn't it?

24  A.    It does.

25  Q.    Now, Gulf Stream sold over 50,000 trailers to the

248

1  government right after Katrina hit; isn't that true?

2  **A.**   That's correct.

3  **Q.**   But Gulf Stream -- or the government also used trailers

4  that had been previously sold to the government; isn't that

5  right?

6  **A.**   As I understand it, yes, sir.

7  **Q.**   And, for instance, in 2004, Gulf Stream had sold, through

8  dealers, trailers to the United States government; isn't that

9  right?

10  **A.**   That's correct.

11  **Q.**   And that's -- it was one of those trailers that this

12  family was living in; true?

13  **A.**   As I understand it, yes.

14  **Q.**   Now, what was your role in the response to Hurricane

15  Katrina?  Within Gulf Stream, I mean.

16  **A.**   As a support member for some of the contractors, worked

17  with CH2M Hill, Fluor, made a couple trips down to Baton Rouge

18  to investigate some issues that had come up and surfaced, and

19  just generally a support.

20  **Q.**   And you remember that sometime in the spring of 2006, less

21  than about three months the trailers had been sent down to

22  Louisiana, that complaints started to come in; isn't that

23  right?

24  **A.**   I'm aware of a complaint came in in March, yes.

25  **Q.**   That was March the 10th of 2006?

1  **A.**   That's correct.

2          **MR. BUZBEE:**  Your Honor, at this time I want to offer

3  the first complaint that we have record of, Exhibit 70, which

4  is one of complaints that this witness is aware of.

5          **MR. SCANDURRO:**  Your Honor -- I'm sorry -- our

6  objection is going to be to foundation unless it can be shown

7  it's a 2004 trailer.

8          **THE COURT:**  Wait.  I think we're getting a little bit

9  ahead of ourselves.

10             Have you shown it to him?

11          **MR. BUZBEE:**  And I'll tell you what I was trying to

12  do --

13          **THE COURT:**  No, no, don't tell us what you're trying

14  to do in front of the jury because you may not be able to do

15  what you're trying to do.

16          **MR. BUZBEE:**  Right.  I understand.  I was trying to

17  short-circuit going and showing him each one of these.  That's

18  what I was trying to do.  But it looks like they have a more

19  global objection.  And if we get over that, probably all these

20  complaints can come in.

21          **THE COURT:**  The objection at this point relates to

22  foundation.  So do you want to try to cure that?

23          **MR. SCANDURRO:**  That's correct.  And I would agree,

24  we don't need to go through this every time.

25          **THE COURT:**  Sure.

1      **MR. SCANDURRO:**  Because all these documents are the
2  same category.
3           **THE COURT:**  Okay.  Thank you.
4                Why don't you go ahead and try to cure the
5  objection.
6                And if there's still an objection, you can make
7  it again.
8           **MR. BUZBEE:**  May I approach?
9           **THE COURT:**  Yes, sir.
10 **BY MR. BUZBEE**
11 **Q.**   I'm showing you what's been marked as Exhibit 70.
12           Have you seen this document before?
13 **A.**   I have.
14 **Q.**   Is this one of the complaints that you, as a vice
15 president of Gulf Stream, became aware of in the spring of
16 2006?
17 **A.**   I did.
18 **Q.**   You became aware of it before the Alexander family ever
19 moved into a Gulf Stream trailer; is that true?
20 **A.**   This is dated 3/10.  I don't recall the date that the
21 Alexanders moved in.
22 **Q.**   They moved in in May of 2006.
23 **A.**   Okay.
24 **Q.**   So this complaint came in more than two months before this
25 family ever moved in; is that right?

1   **A.**   If that date -- that May date is correct, that's true.

2            **MR. BUZBEE:**  Your Honor, we offer Exhibit 70.

3            **MR. SCANDURRO:**  Same objection, Your Honor.  It

4   hasn't been established that it was a 2004 trailer.

5            **THE COURT:**  The complaint -- the underlying complaint

6   about the trailer, is that your...

7            **MR. SCANDURRO:**  Yes, sir.

8            **THE COURT:**  Do we know that?  Can you --

9            **MR. BUZBEE:**  We don't know that.  But what we do know

10  is about the continuing duty to warn, Your Honor.

11           **MR. SCANDURRO:**  He can ask the question if the

12  witness knows, Your Honor.

13           **THE COURT:**  Well, that's the question I just asked:

14  Do we know that?

15           **MR. SCANDURRO:**  Yes, sir.

16  **BY MR. BUZBEE**

17  **Q.**   Mr. Pullin, do you know what the manufacture date of the

18  trailer is that's being complained about in Exhibit 7?

19  **A.**   It would be a 2005/2006 trailer.

20  **Q.**   Now, is it true, sir, that the --

21           **MR. BUZBEE:**  Your Honor, we've already established

22  that --

23           **THE COURT:**  Let me see that.

24           **MR. BUZBEE:**  Sure.

25           **THE COURT:**  That's one thing I haven't seen yet is

252

 1    the document itself.

 2            **MR. BUZBEE:**  It's Exhibit 70, the one we were talking

 3    about earlier.

 4            **THE COURT:**  And the objection is to this document

 5    going into evidence?

 6            **MR. SCANDURRO:**  Yes, Your Honor.

 7            **THE COURT:**  It seems to me the point is to establish

 8    that he received a complaint.  We've already gotten that

 9    testimony that he did receive a complaint.  There's nothing in

10    this document, and the witness has no recollection, that this

11    particular complaint relates to a trailer such as the one

12    that's at issue in this case.

13            And we've already established through a variety

14    of briefings the 2004 versus 2005, 2006.  So I'll sustain the

15    objection.  I think the fact, as I understand it, is that he

16    received a complaint.  He was aware of a complaint in March of

17    2006.  So let's move on from there.

18            **MR. BUZBEE:**  May I be heard on that, Your Honor?

19            **THE COURT:**  Come on up.  Come on and approach.

20            (WHEREUPON, the following proceedings were held at

21    the bench.)

22            **THE COURT:**  Isn't the point they received a complaint

23    before these people moved into their trailer?

24            **MR. BUZBEE:**  No, that is a point, but recall, Your

25    Honor, that one complaint may not be sufficient to raise the

1   requirement to warn.  You have to have the nature and the

2   substance of complaints to raise the duty to warn that they

3   know that we have a problem -- a post-production problem that

4   they claim they didn't know about.

5          THE COURT:  But hasn't it been made clear to the jury

6   that the complaint which related to odor, quote, formaldehyde,

7   complaining about odor, eyes burning type thing?

8          MR. SCANDURRO:  Yes, we have a few responses.  One,

9   it's cumulative; two, this is a 2004 trailer.  And if the

10  witness is asked a foundation question globally, and he hasn't

11  laid the foundation that none of these are 2004 complaints, and

12  so that's why we're making the objection.

13             And they've heard plenty of evidence as far as

14  what happened in March of 2006.  And he wants to ask the

15  witness, did he receive complaints, and how many, and what were

16  the general nature?

17         THE COURT:  That's what I thought the point of this

18  was.

19         MR. SCANDURRO:  But he wants to get into the details

20  of individual things that were said to people who called up;

21  not Ms. Alexander, not said to FEMA.  All that please-help-me

22  stuff.

23         THE COURT:  If the argument is a continuing duty to

24  warn, or a knowledge of Gulf Stream that there were problems,

25  and that Gulf Stream should have done something pursuant to a

254

1  continuing duty to warn, why can't we just establish such as we
2  already have, that he received a complaint?

3                You can ask the next question:  What is the
4  nature of the complaint?  He's going to say odor, or eyes
5  burning, or whatever, fumes in the trailer.

6                Why do we have to get into this particular
7  trailer?  This isn't even the same -- the manufacturing of the
8  trailer -- it's pretty clear to me on the pretrial motion that
9  the manufacturing of the trailers was different in terms of --
10 and you've even established that they were checking procedures
11 on things after 2005.  There's a FEMA contract after 2005.

12               Why would we want to talk about this particular
13 trailer, other than to say that he received a complaint, and it
14 was formaldehyde-related -- it was odor-related?

15               I think you can ask about this one and the
16 others until the cows come home.  We've already got evidence of
17 those.  Why do you want to put in that evidence?

18          MR. BUZBEE:  Because they're going to say that they
19 received a few complaints, and I'm not going to be able to
20 establish the quantity and quality of complaints.

21          THE COURT:  Yes, you can.  And I think you can go
22 into what we went through with Mr. Shea, but he can say that he
23 went down to Baton Rouge and testified.  That's what I
24 understood his testimony was going to be.  He and another
25 gentleman, Mr. Keel, I think it was, went down with a

1    Formaldemeter and walked around these trailers and made a
2    report back to Mr. Shea, which Mr. Shea has already testified
3    about.

4              **MR. SCANDURRO:**  Are these e-mails?

5              **MR. BUZBEE:**  No.

6              **UNIDENTIFIED SPEAKER:**  If he's an officer and we're
7    trying to establish the level of information that would trigger
8    a rigorous and a vigorous duty to warn, why wouldn't his
9    awareness of these complains be relevant?

10             **THE COURT:**  It is.  The question is -- documents --
11   right now, we're talking about the admission of a document.
12   But I think you're right.  It's a bigger issue.  I think he can
13   talk about the number of complaints he got, the nature of those
14   complaints, and what he did in response to them.

15             **MR. BUZBEE:**  That's what we want to do.

16             **THE COURT:**  Do we need to go through all of these
17   documents?

18             **MR. BUZBEE:**  I actually -- I specifically just pulled
19   a few.

20             **THE COURT:**  Because this testimony is already out
21   without the benefit these documents.

22             **MR. SCANDURRO:**  Here's the issue, Your Honor, that so
23   many of these responses are like putting baking soda out in
24   addition to ventilation.  That's what he wants to do, is get
25   into that.  It's to individuals who called in, not

1    Ms. Alexander, and that was never communicated to FEMA.

2                    So, to me, what's relevant is, what did he tell

3    FEMA as a result?

4            **THE COURT:**  I think what's relevant is what he did in

5    response to the complaints.  But I don't see putting these into

6    evidence.

7            **MR. BUZBEE:**  So I can ask about them, but not put

8    them into evidence?

9            **THE COURT:**  I don't think you should spend a lot of

10   time on it.  Ask him what did he get, what were the nature of

11   the complaints, did people say that their eyes were burning.

12           **MR. BUZBEE:**  I know.  We could have already been

13   through it.

14           **THE COURT:**  We have had umpteen witnesses already

15   talking about people's eyes burning.  Let's quantify them and

16   let's talk about what he did.  He went to Baton Rouge with the

17   formaldehyde meter in hand, he and Mr. Keel, and they did

18   whatever they do, and went back and told Mr. Shea whatever they

19   told Mr. Shea.  I don't think we need to be introducing all of

20   these, if that's the objection.

21           **MR. BUZBEE:**  Okay.  So it's sustained?

22           **THE COURT:**  Yes.  Sustained.  Get into it with his

23   testimony.

24                   (WHEREUPON, the following proceedings were held in

25   open court.)

1  BY MR. BUZBEE

2  Q.   All right.  Sir, the very first complaint you received was

3  in March 10th of 2006?

4  A.   Yes.

5  Q.   In response to that complaint, what did you do?

6  A.   It's documented -- excuse me -- it's documented on that

7  particular complaint.

8        MR. BUZBEE:  That's my -- that's the problem, Your

9  Honor.

10  A.   We would have told the customers to ventilate the trailer,

11  open the doors, run the air conditioner.  And if they had any

12  further questions, call us back.

13  BY MR. BUZBEE

14  Q.   You also knew that as the temperatures elevated in the

15  south, the -- what you were telling people was a new smell

16  would get worse; isn't that right?

17  A.   It may.

18  Q.   Why would a new smell get worse over time as the trailer

19  got older?

20  A.   I don't know that I said it would get worse.  I said it

21  would dissipate as time elapsed.

22  Q.   You had said that the new smell, this smell is going to

23  get worse as the temperatures keep going up as the summer

24  progresses; isn't that right?

25  A.   No.  I think I said it will increase the amount of odor as

 1    the temperatures and humidities go up, but decreases in

 2    duration over time.

 3    **Q.**   So you knew that the hotter it got, the more this -- what

 4    you were calling a new smell, the more it would be there;

 5    right?

 6    **A.**   And, therefore, the ventilation requirements, yes.

 7    **Q.**   Are those ventilation requirements set forth in the

 8    owner's manual?

 9    **A.**   No.  We handle them on an individual basis as I received a

10    call.  This was the first call we had ever received with

11    complaints about any odors.

12    **Q.**   You received another complaint in March 21st of 2006; is

13    that right?

14    **A.**   Without the document in front of me, I can't tell you the

15    date.  But I would say that we received a few complaints, yes.

16    **Q.**   And the complaint was that the person's eyes were burning

17    and they were getting headaches every day; is that right?

18    **A.**   I can't answer that without knowing which documents you're

19    referring to.  We documented each one.

20            **THE COURT:**  Go ahead and show it to him.  Refresh his

21    memory with it.

22            **MR. BUZBEE:**  Yes, sir.

23    **BY MR. BUZBEE**

24    **Q.**   I'm showing you Exhibit 69, a March 21st e-mail from you

25    to the president of the company, Dan Shea; is that correct?

1    **A.**   Yes.

2    **Q.**   And the complaint was, is that this person's eyes were

3    burning and they were getting headaches every day; is that

4    right?

5    **A.**   That's correct.

6    **Q.**   And they said they tried many things, but nothing seemed

7    to work; is that right?

8    **A.**   That's what that says.

9    **Q.**   And they said, Please, please help me; is that true?

10    **A.**   And we did.

11    **Q.**   And when you learned that, it was at that point that you

12    sent out a press release and informed everybody that was

13    getting a Gulf Stream trailer that they would have the same

14    problem?

15          **MR. SCANDURRO:**  Objection, foundation, Your Honor.

16          **THE COURT:**  Yes, I'm going to sustain the objection.

17    **BY MR. BUZBEE**

18    **Q.**   I mean, the fact of the matter is, when you received that

19    complaint, you didn't provide any information to any other

20    resident about the issue, did you?

21    **A.**   No.  This is the second complaint.  We're trying to

22    collect some information and details about what's going on.

23    **Q.**   Now, let's talk about some of the things you did in

24    response to the multiple complaints.  I'm not going to go

25    through them all.  We're going to try to short-circuit this.

1      You advised residents to wash the walls down with

2  soap and water, didn't you?

3  A.   That was some feedback that I had gotten from one

4  individual that I talked with in one of my visits down to

5  New Orleans, that they'd had some success.  They moved into the

6  trailer, had been in it about 30 days.  And I asked him if he

7  had had any trouble with the trailer, if he had any irritations

8  or unusual odors.

9      He said that they did when they first moved into it,

10  that he and wife would wash the walls down with just soap and

11  water, and it had dissipated, and they were very comfortable in

12  the trailer.

13  Q.   That's one of the trailers you tested, isn't it?

14  A.   Yes, sir.

15  Q.   We'll get back to that.

16      You told the residents to open the windows and vents;

17  isn't that true?

18  A.   I did.  And also to run the air conditioner.

19  Q.   With the windows and vents open?

20  A.   To ventilate the trailer.  You can do it in a variety of

21  different ways.

22  Q.   Gulf Stream also changed out some woods for residents;

23  isn't that right?

24  A.   On the first complaint, Mr. Burrow (phonetic) there, we

25  did, yes.

1   **Q.**   And Dan Shea wanted that done; he wanted either or Burl

2   Keel, who works for you, to go down to Louisiana and change out

3   some woods; is that right?

4   **A.**   We wanted to go out and visit with Mr. Burrow to make sure

5   that we understood how he was using the trailer, whether it was

6   a permanent basis, whether he was using it as a camp, whether

7   he was living part time in the trailer.  And just to evaluate

8   the conditions of where he was at.

9   **Q.**   Mr. Pullin, all I asked you was, you -- Mr. Keel went out

10  and changed out some woods, didn't he?

11  **A.**   We also offered to put in an extra vent.

12          **THE COURT:**  Wait.  Try to listen carefully to the

13  question and answer just the question.

14          **THE WITNESS:**  He did change some woods, yes, sir.

15              I'm sorry.

16  **BY MR. BUZBEE**

17  **Q.**   He took wood and went to the little bench seats and took

18  out the lauan and replaced it with a different kind of wood,

19  didn't he?

20  **A.**   That's correct.

21  **Q.**   And he went to the big bed that was the support, and took

22  out the lauan and replaced it with a different kind of wood,

23  didn't he?

24  **A.**   I believe he did.

25  **Q.**   And that solved the problem, didn't it?

1   A.   Mr. Burrow never called back, yes.

2   Q.   So you knew at that point, in March of 2006, that changing

3   out the woods would fix the problems, didn't you?

4   A.   Not necessarily.

5   Q.   But it fixed that resident's problem, didn't it?

6   A.   He continued to live in the trailer and ventilate it, yes.

7   Q.   You didn't know what the cure-all would be for fixing the

8   formaldehyde problem, did you?

9   A.   I did not.

10  Q.   But one significant improvement you knew about would be to

11  use a different kind of wood; isn't that right?

12  A.   That's one of several, yes.

13  Q.   You told residents that the smell would go away in two to

14  three months, didn't you?

15  A.   On occasion, yes.

16  Q.   You advised residents to set baking soda out in their

17  trailer, didn't you?

18  A.   We were collecting information.  And anything that was

19  volunteered to us that seemed to work for people, we just

20  shared.

21  Q.   Let me ask you again:  You told residents, in response to

22  their complaints, to set baking soda out in their trailer,

23  didn't you?

24  A.   I don't know that I personally did that, no.

25  Q.   Gulf Stream told residents to set both baking soda out in

1   their trailers, didn't they?

2   **A.**   This there's instance I can recall, yeah.

3   **Q.**   Gulf Stream even told some residents to put coffee beans

4   on the table so they would smell coffee instead of the

5   formaldehyde, didn't they?

6   **A.**   There's one instance that I can recall that, yes.

7   **Q.**   You know of at least one complaint where the resident was

8   complaining of nose bleeds, don't you?

9   **A.**   I don't recall that.

10   **Q.**   You don't recall that one?

11   **A.**   I'm not sure I recall that one.

12   **Q.**   Exhibit 93?

13          **MR. SCANDURRO:**   Same objection, Your Honor.

14          **THE COURT:**   This is an exhibit that's not in

15   evidence, 93?

16          **MR. BUZBEE:**   Correct.

17          **THE COURT:**   All right.   You can show it to the

18   witness.

19          **MR. BUZBEE:**   May I approach?

20          **THE COURT:**   Is this the same type of exhibit that we

21   discussed up here?

22          **MR. BUZBEE:**   It is.

23             Hold it up for a minute, Carl.

24          **THE COURT:**   Why don't you use it to refresh his

25   memory, and let's see if he can answer the questions, in which

 1   case the ruling would be the same.

 2              **MR. BUZBEE:**  Roger that.

 3              **THE COURT:**  Let him use it to refresh his

 4   recollection rather than you reading it.  You can ask him

 5   questions about it now that he's got it in front of him.  He

 6   can look at it and answer it.

 7   **BY MR. BUZBEE**

 8   **Q.**   I'm showing you Exhibit 93.  Can you take a moment, sir,

 9   and review that, and see if that refreshes your recollection as

10   to whether some residents were complaining of nose bleeds?

11   **A.**   This e-mail is a --

12              **MR. BUZBEE:**  Your Honor, I object.  That's not my

13   question.

14   **A.**   It says, yeah -- yes, it was his wife that experienced a

15   nose bleed.

16   **BY MR. BUZBEE**

17   **Q.**   Okay.  Somebody -- you knew, as a vice president of this

18   company, that a resident was complaining of nose bleeds; isn't

19   that right?

20   **A.**   I do.  I just didn't recall that particular e-mail.

21   **Q.**   And you compared the smell, like we said, to a new car

22   smell?

23   **A.**   Yes.

24   **Q.**   New car smells usually go away, don't they?

25   **A.**   They certainly do.

1   Q.   But you know far a fact that you have complaints of people

2   in the trailers for four, five, or six months where this, what

3   you call a new car smell, didn't go away; isn't that right?

4   A.   Not knowing circumstances, that's true.

5   Q.   And we're going to talk about this testing you did because

6   Dan Shea told you.  But one thing we know far a fact is that

7   all these people are complaining, you didn't go out and test

8   their trailers, did you?

9   A.   No.

10  Q.   You dealt with people who contacted you; you did not

11  proactively go out and give information about the formaldehyde

12  issue, did you?

13  A.   That's correct.

14  Q.   Now, we've already heard some of this, so I'm going to

15  hopefully go through it quickly.

16          Dan Shea told you to go down to Louisiana and test

17  trailers for formaldehyde; is that correct?

18  A.   Yes.

19  Q.   You-all did that because you learned of some concerns

20  regarding formaldehyde in the trailers; isn't that true?

21  A.   We started receiving complaints, yes.

22  Q.   The testing that you did was what you had -- you called a

23  collaborative effort between you and the president, Dan Shea;

24  isn't that right?

25  A.   We collaborated on it, yes.

1   Q.   And you did this testing in March or April of 2006; right?
2   A.   March and April, yes.
3   Q.   And you tested both occupied and unoccupied trailers?
4   A.   Yes.
5   Q.   You took a Formaldemeter with you?
6   A.   I did.
7   Q.   Dan Shea, the president, gave it to you?
8   A.   That's correct.
9   Q.   And you, of course, now how to read a manual?
10  A.   I do.
11  Q.   And you've had experience over the years reading manuals
12  and following directions?
13  A.   I do.
14  Q.   And you read the portions of the manual that tell you how
15  to use the Formaldemeter, didn't you?
16  A.   As best I can recall, yes.
17  Q.   And you followed that manual, didn't you?
18  A.   As best I can recall.
19  Q.   And you understood the basic principle of how to use the
20  Formaldemeter, didn't you?
21  A.   Yes.
22  Q.   And you calibrated the unit prior to testing, didn't you?
23  A.   I did not.
24  Q.   Have you ever testified differently?
25  A.   Not that I'm aware of.

1    Q.   Well, are you aware of your deposition that you gave on

2    June 2nd of 2009?

3    A.   I am.

4              MR. BUZBEE:  May I approach the witness, Your Honor?

5              THE COURT:  Yes.  Page and line.

6    BY MR. BUZBEE

7    Q.   Referring to page 17, lines 13 through 15.  I'm going to

8    read this, sir, and you tell me if I read it correctly.

9              "Question:  Certainly, at some point, you calibrated

10   the unit before you started testing?"

11             "If that was performed properly, yes."

12             Did I read that correctly?

13   A.   The machine was calibrated when we received it, but we

14   didn't calibrated it after we received it.

15             MR. SCANDURRO:  Your Honor --

16   A.   But not previous to the first test.

17             MR. SCANDURRO:  -- I'd request that lines 2 through 8

18   be read as well to put it into context.

19             THE COURT:  Well, it would be nice if we could do

20   that now.  But I'll certainly let you do that on -- well,

21   you'll actually go on direct when you take this witness since

22   he's actually a Gulf Stream employee, so I'll let you cover

23   that.  Unless Mr. Buzbee has a problem --

24             MR. BUZBEE:  I don't mind letting him read that now.

25             THE COURT:  -- right now --

1          **MR. SCANDURRO:**  No, I don't have a problem with that.

2          **THE COURT:**  If you're getting into it now, why don't

3     we just read the whole thing now?

4          **MR. BUZBEE:**  All right.  Reading from Page 17,

5     Line 2:  "Are you telling me you didn't calibrate the unit at

6     all?

7               "No.  I don't know that it was done as routinely

8     as suggested in the manual.

9               "Okay.  So you did calibrate it.  You just

10    didn't" --

11              And then you interrupted me and you said:

12    "Periodically there was after we were into it for a while."

13              Is that what you wanted me to read?

14         **MR. SCANDURRO:**  Yes, sir.

15    **BY MR. BUZBEE**

16    **Q.**   So the unit was calibrated before you started your

17    testing, wasn't it?

18    **A.**   As I understand, yes.

19    **Q.**   You did the testing as best as you could?

20    **A.**   Tried to, yes.

21    **Q.**   And we already heard a long deposition from the chairman

22    of this company that you're the most technical guy in the

23    company.

24              Would you agree with that?

25    **A.**   I don't -- that's a nice compliment.  I don't know if

1  that's true or not.

2  **Q.**   You randomly chose people to test; isn't that right?

3  **A.**   Those that I saw available, yes.

4  **Q.**   I mean, what it was is that you were just driving.  And

5  when you saw somebody outside, you stopped and did the test;

6  isn't that true?

7  **A.**   I visited with them, and then I'd ask them permission to

8  do the test, yes.

9  **Q.**   You didn't canvass the neighborhood, did you?

10 **A.**   No.

11 **Q.**   You didn't canvass the neighborhood and go trailer by

12 trailer to make sure you got a good sampling, did you?

13 **A.**   No.

14 **Q.**   If anybody said that, that's foolishness, isn't it?

15          **MR. SCANDURRO:**  Objection, Your Honor.

16          **THE COURT:**  I'll sustain it.

17 **BY MR. BUZBEE**

18 **Q.**   Sometimes you conducted the interview -- because when you

19 went to test, you would talk to the resident before you would

20 go inside and test; isn't that right?

21 **A.**   Sure.

22 **Q.**   Sometimes that test you did and the interview, you would

23 be able to do a couple of tests within ten minutes of each

24 other; isn't that true?

25 **A.**   That's true.

1  **Q.**   And the reason for that is because you were in a hurry,

2  weren't you?

3  **A.**   Not necessarily, no.

4  **Q.**   Well, isn't it true that you did the testing fast because

5  you wanted to be the devil out of there by the dark?

6  **A.**   That's a comment I made to you that I wasn't out after

7  dark.  It would make no sense to be out after dark.

8  **Q.**   All right.  What you said was:  "The reason I was doing,

9  Tony, these things so quickly is because I did not want to be

10 there when the sun went down."

11         Isn't that true?

12         **MR. SCANDURRO:**  Objection, Your Honor.  Relevance.

13         **MR. BUZBEE:**  If you'll let me, I'll tell you why it's

14 relevant, Your Honor.

15         **THE COURT:**  Why don't you come up here and tell me

16 before --

17         **MR. BUZBEE:**  Yes, sir.

18         **THE COURT:**  -- we tell everybody?

19         **MR. BUZBEE:**  Yes, sir.

20         **THE COURT:**  And then I'll decide that and then we'll

21 go on from there.

22         **MR. BUZBEE:**  Roger that.

23         (WHEREUPON, the following proceedings were held at

24 the bench.)

25         **MR. SCANDURRO:**  What he said in his deposition on

1    this point was he didn't know the neighborhood, he didn't want

2    to be out after dark.  And then a line of questioning went on

3    about, well, can't you see why the residents would want to lock

4    up at night as well?  And he said he had a gun.

5              **MR. BUZBEE:**  I didn't mention a gun.

6              **THE COURT:**  I remembered that from Burl Keel's

7    testimony.

8              **MR. BUZBEE:**  I won't mention the gun.  I just want to

9    say he told the residents to open their doors and windows while

10   they slept, but he wanted, himself, out of there before

11   nightfall.

12             **MR. SCANDURRO:**  It's prejudicial and it's irrelevant.

13             **MR. BUZBEE:**  Well, it's true, though.

14             **MR. SCANDURRO:**  He can ask the Alexanders, and they

15   have already, what were their window opening habits at night.

16   What somebody else did in east New Orleans is totally

17   irrelevant to this case.

18             **THE COURT:**  Let's move on from this.  We've already

19   established that he got out before nightfall, and he wasn't

20   there to see if the people locked up their units at night or

21   whether they closed their windows at night.

22             **MR. BUZBEE:**  Right.  And all I'm going to ask him is:

23   Did you advise the residents to open the windows and doors at

24   night.

25             **THE COURT:**  Well, he advised them to open their doors

 1    any time they were there.  I mean, I think that's implicit.

 2              **MR. SCANDURRO:**  But we have testimony from the actual

 3    person of what she did.  Why do we need to get into all of

 4    this?

 5              **THE COURT:**  All right.  I just think it's the tempest

 6    in a teapot.  Let's move on.  Ask him about ventilating, and

 7    that's it.

 8              (WHEREUPON, the following proceedings were held in

 9    open court.)

10    **BY MR. BUZBEE**

11    **Q.**   It's true, is it not, Mr. Pullin, that you advised

12    residents to open their windows and doors if they problem with

13    formaldehyde?

14    **A.**   I did.  And to run their air conditioner.

15    **Q.**   Let's take a look real quickly at your test results.

16              **MR. BUZBEE:**  If I can approach, Your Honor?

17              **THE COURT:**  Yes.

18    **BY MR. BUZBEE**

19    **Q.**   Sir, I'm showing you what's been marked as 339 and 335.

20              Could you take a moment to identify those for me?

21    **A.**   Which one would you like first?

22    **Q.**   Just either one.  Just make sure we know what we're

23    dealing with here.

24              Is 339 the test results that you did of occupied

25    trailers in March and April of 2006?

1  **A.**   These are unoccupied, so far.  That's an occupied trailer
2  there.
3  **Q.**   Okay.
4  **A.**   That's an occupied trailer.  That would be an occupied
5  trailer.  That's an occupied trailer.  That, too, is an
6  occupied trailer.  That one is occupied.
7            **THE COURT:**  You may want to pull that microphone
8  closer so he can...
9            **THE WITNESS:**  Sorry.
10            **THE COURT:**  No problem.
11            **THE WITNESS:**  The last one was occupied.  This one
12  was also occupied.
13  **BY MR. BUZBEE**
14  **Q.**   Okay.  I don't want to interrupt you really, but you're
15  saying "this" and "that."
16            Can you just tell me, this is the entirety of the
17  testing you did, whether it be occupied or unoccupied?
18  **A.**   It appears to be, yes.
19  **Q.**   Okay.  And we're talking about Exhibit 339?
20  **A.**   Yes.
21  **Q.**   And this is a record of the testing that you did in
22  response to Dan Shea telling you to go to Louisiana to test?
23  **A.**   That's correct.
24            **MR. BUZBEE:**  Your Honor, we offer Exhibit 339.
25            **THE COURT:**  Any objection?

1          **MR. SCANDURRO:**  Same foundation objection, 2004/2005.

2          **THE COURT:**  And these were taken in what time period

3    again?

4          **MR. SCANDURRO:**  2006, Your Honor.

5               But the objection is as to the date of the units

6    that were --

7          **THE COURT:**  Well, I understand that.  But isn't the

8    issue...

9          **MR. BUZBEE:**  Warning, yes.

10         **THE COURT:**  There's testimony already regarding what

11   was done in the time period prior to the occupation of the unit

12   at issue in this case.  So, therefore, the issue would be

13   knowledge of Gulf Stream or its agents relative to these types

14   of complaints and any type of investigation.

15              So I think the objection's overruled.

16         **MR. SCANDURRO:**  Thank you.

17         **MR. BUZBEE:**  Is that document admitted, sir?

18         **THE COURT:**  Yes.  339, was that the number?

19         **MR. BUZBEE:**  Yes, sir.

20   BY MR. BUZBEE

21   **Q.**   Now, you were able to make a --

22              Let me see if I can use this.  I don't think I've

23   ever used one of these before.

24              Looking at Page 2 of Exhibit 339.  Now, when you went

25   down and tested, you tested the outside level of the air as

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    well as the level of the air inside the trailer; is that right?

2    A.   As I recall, yes.

3    Q.   And you also recorded how hot it was and what the humidity

4    was; true?

5    A.   That's correct.

6    Q.   Now, take a look at the second page.  And I think we're

7    looking at it now.  This is one of the test results; right?

8    A.   Yes.

9    Q.   And it tells us when the test occurred?

10   A.   That's correct.

11   Q.   1:25 p.m.?

12   A.   Yes.

13   Q.   Okay.  And it tells us what the condition is of the

14   trailer at the time of testing, doesn't it?  As far as what

15   windows and doors were open?

16   A.   That's correct.

17   Q.   And so is it fair to say that on this first trailer that

18   you tested, that the bedroom window, the sofa window and the

19   dinette window were open?

20   A.   That's correct.

21   Q.   The bunk window -- what do you call that?  Bunk window?

22   A.   Yes, sir.

23   Q.   It was open?

24   A.   Yes, sir.

25   Q.   And the entry door was open?

1    A.    That's correct.

2    Q.    And the level that you found in that trailer was .4; is

3    that right?

4    A.    Yes.

5    Q.    Since this is in evidence, let's just skip over to the --

6    let's see -- third, fourth, fifth -- sixth page.

7              MR. SCANDURRO:  Objection, Your Honor.  He's skipping

8    over all the lower readings.

9              THE COURT:  Well, we can get into that on direct.

10             MR. BUZBEE:  Come on, what is that?

11                  I don't know what that is, Your Honor.  That's

12   not proper.

13             THE COURT:  We're going to get into that when he gets

14   to ask questions.

15             MR. BUZBEE:  That's elementary stuff.

16   BY MR. BUZBEE

17   Q.    Okay.  Let's take a look -- the issue here you understand,

18   as the vice president, is notice.  You understand that; right?

19   A.    Yes.

20   Q.    The issue is whether this jury believes that you had

21   sufficient information to warn all of these residents that were

22   living in your trailers.  You realize that?

23   A.    I do.

24   Q.    So let's look at the information you were armed with two

25   months before this family moved in, okay?

1    A.    That's fine.

2    Q.    Okay.  So let's take a look at this other test.

3          You tested the outside reading at 11:30 a.m. and it

4    was zero; correct?

5    A.    Yes, sir.

6    Q.    You tested inside the trailer and it's .54; correct?

7    A.    That's correct.

8    Q.    And you did that with two windows open?

9    A.    As I observed the unit when I first approached it, yes.

10   Q.    You did that with the air conditioning on?

11   A.    Yes, sir.

12   Q.    So the air conditioning was on, two windows were open, it

13   wasn't even the hottest part of the day yet, and your reading

14   was .54 parts per million?

15   A.    That's what it's recording, yes.

16   Q.    Did you tell Dan Shea that?

17   A.    I did.

18   Q.    Did you let Dan Shea know that you had this reading in one

19   of the trailers that you had sold to the government that

20   ultimately ended up for one of these displaced residents?

21   A.    I shared all the information I collected with Dan.

22   Q.    Let's go to four pages over.  It would be GULFSTREAM-1578.

23   I've just got a few questions about this one.

24         Would this be an occupied or unoccupied trailer?

25   A.    It's an occupied trailer.

1  Q.   All right.  Now, what the ladies and gentlemen of the

2  jury, if they're interested in this, so I don't waste all their

3  time here, if they want to figure out when they're looking at

4  this when they're deliberating whether the trailer was occupied

5  or unoccupied, how can they figure that out from your test

6  results?

7  A.   I would make observation notes that would be posted at the

8  bottom of the sheet.

9  Q.   Well, I don't see any here that tells -- do these notes

10 tell us that you've had some discussions with the resident?  Is

11 that what you mean?  Where it says "Notes" at the bottom of

12 this particular page?

13 A.   Yes.  I wouldn't have known when they moved into it unless

14 they volunteered that.

15 Q.   Okay.

16 A.   And they had:  "Burning, two trailers."  One with furnace

17 at the door; the other was on the opposite side.  A lady

18 noticed...

19 Q.   "Scratched," question mark, "AC on."

20 A.   "Scratched."  And I'm not sure what that is, "AC on."

21 Q.   So basically, if they want to know whether it was occupied

22 or unoccupied, look at the bottom; if there's notes there, that

23 means it was occupied?

24 A.   Yes.

25 Q.   Okay.  Let's take a look at this one.

1          You did this test at noon with the air conditioning

2   running; right?

3   A.   That's correct.

4   Q.   The inside temperature of the trailer at the time of your

5   test was 78 degrees?

6   A.   That's correct.

7   Q.   That was comfortable inside there?

8   A.   As far as I know, yes.

9   Q.   Okay.  It tells the relative humidity of 40 percent.  The

10  outside temperature was 90 degrees.  Right?

11  A.   That's correct.

12  Q.   The outside recording of formaldehyde in the air was zero;

13  right?

14  A.   That's correct.

15  Q.   And you got a reading of .55 parts per million?

16  A.   That's correct.

17  Q.   Next page.  Is this an occupied or unoccupied trailer on

18  the next page?

19          At the bottom I see some notes.  It says:  "One

20  wired; the other not."

21          Does that mean it's an occupied trailer?

22  A.   I would only have gotten that information by talking with

23  the owner, yes.

24  Q.   Okay.  The outside reading is zero?

25  A.   Yes.

```
1   Q.   The inside reading is 61 -- or .61 parts per million?
2   A.   That's correct.
3   Q.   The air conditioning's on at the time of the test?
4   A.   It is.
5   Q.   It's 12:30 in the day?
6   A.   That's correct.
7   Q.   It's 90 degrees outside?
8   A.   It is.
9   Q.   Can you help me find -- and I can -- let me see.
10           MR. BUZBEE:  If I can approach the witness, Your
11   Honor?
12           THE COURT:  Yes.
13   BY MR. BUZBEE
14   Q.   Can you help me find, Mr. Pullin, because I want to just
15   kind of contrast, the unoccupied trailers of Exhibit 339?  Just
16   look at them quickly so we can discuss them and move quickly to
17   another topic.
18           Is it possible 336 are the actual unoccupied
19   trailers, the ones to your right?
20   A.   335, you mean?
21   Q.   Yes, sir.
22   A.   Yes.
23   Q.   Okay.  That's what I thought.
24           So just so the jury knows, if they care to look at
25   this, Exhibit 339 -- and we're not going to go through every
```

1  single page -- that's all occupied trailers?

2  A.   That's correct.

3  Q.   And 335, if you could just identify that for me.  That is

4  the testing you did of the unoccupied trailers?

5  A.   In Baton Rouge, yes.

6           MR. BUZBEE:  Your Honor, we offer Exhibit 335.

7           MR. SCANDURRO:  No objection, Your Honor.

8           THE COURT:  All right.  So ordered.  335 is admitted.

9  BY MR. BUZBEE

10 Q.   Now, when you did the unoccupied trailers, by that you

11 mean they're just sitting somewhere in the distribution point?

12 A.   They're in the holding yard in Baton Rouge, yes.

13 Q.   And they're all just lined up.  And I know the ladies and

14 gentlemen probably saw some of these distribution points.  Just

15 a ton of trailers there; right?

16 A.   They're packed in Baton Rouge, yes.

17 Q.   All right.

18           MR. BUZBEE:  Carl, could you pull up the first page

19 of Exhibit 335?

20 BY MR. BUZBEE

21 Q.   Now, we're looking at a Gulf Stream trailer that you and

22 Burl Keel tested on April 22nd of 2006, about a month and a few

23 days before the Alexander family moved into their trailer; am I

24 right?

25 A.   If their move-in date was May, that would be correct.

282

1   **Q.**   And you tested this trailer throughout the day, did you
2   not?
3   **A.**   We did.
4   **Q.**   This trailer was built at Plant 57, wasn't it?
5   **A.**   That's correct.
6   **Q.**   This trailer was built at the same plant that built
7   Ms. Alexander's trailer; isn't that right?
8   **A.**   In 2006.
9   **Q.**   Now, you tested at 11:50, 2:00, 5:00 and 6:50; right?
10  **A.**   That's correct.
11  **Q.**   And at 2:00, which I guess would pretty much represent the
12  hottest part of the day; right?
13  **A.**   Generally.  2:00 to 4:00.
14  **Q.**   You got a reading of .72?
15  **A.**   That's correct.
16  **Q.**   Now, was this the trailer that you had this burning in
17  your eyes?
18  **A.**   I don't know.
19  **Q.**   Well, somebody said you had a sensation in your eyes.  I'm
20  going to assume that was a eye watering, some kind of problem
21  like that?
22  **A.**   Right.
23  **Q.**   So was it this testing you had that problem, or was it the
24  occupied testing?
25  **A.**   No, it was in Baton Rouge.  But I don't know that it was

1   in our trailers.  We looked at several trailers.

2   **Q.**   So you're telling the ladies and gentlemen of the jury

3   that when you went inside this Gulf Stream trailer with a

4   reading of .72, that you didn't have any burning in your eyes?

5   **A.**   I don't recall making any particular notes on which

6   trailer I was in when I experienced that.

7   **Q.**   Now, let's turn to the third page of this document,

8   Exhibit 335.

9           This is another Gulf Stream trailer manufactured at a

10  different plant; correct?

11  **A.**   That's correct.

12  **Q.**   And again, we see that the levels -- as the day wears on

13  the, levels get higher and higher; isn't that true?

14  **A.**   They do.

15  **Q.**   And the highest peak of this particular trailer gets up to

16  .71; is that right?

17  **A.**   That's correct.

18  **Q.**   That's parts per million you're recording, is it not?

19  **A.**   Yes.

20  **Q.**   And you only tested two unoccupied Gulf Stream trailers;

21  is that right?

22  **A.**   That's correct.

23  **Q.**   Are you sure about that?

24  **A.**   Unoccupied Gulf Stream trailers at that time, yes.

25  **Q.**   Did you ever go back and do any other testing of Gulf

 1    Stream trailers that were unoccupied?

 2    A.   I think later on we did look at things that were back at

 3    the factory and whatnot, yes, looking at ventilation

 4    techniques.

 5    Q.   And you discussed them with Dan Shea, didn't you?

 6    A.   I did.

 7    Q.   And Dan Shea, at that point, raised issues about the test

 8    results, didn't he?

 9    A.   I don't know that he raised issues.  We discussed them.

10    Q.   Well, you told me in your deposition he raised issues.  Am

11    I wrong on that?

12    A.   I don't know if that's the wording that I used in my

13    deposition.  If I said issues, then that may have been a poor

14    choice of words.

15         We discussed the results of that at that meeting.

16    Q.   It was only after talking to Dan Shea that that's when you

17    believed your results may not have been accurate; right?

18    A.   We didn't know what we were getting.

19    Q.   It was only after talking to Dan Shea that you believed

20    your results may not have been accurate; am I right?

21    A.   I don't know how to answer that, sir.

22    Q.   You answered in your deposition, you said, "Right."

23    A.   If I said yes in the deposition, at that time we talked

24    about the results, yes.

25    Q.   Before you spoke to Dan Shea, you thought you had done the

1    testing by the letter; isn't that right?

2    **A.**    Sure.

3    **Q.**    But after you spoke to the president, he started trying to

4    raise some doubts in your mind, didn't he?

5    **A.**    He did.

6    **Q.**    It was after -- after you did this testing, that's when

7    Mr. Shea started calling this a screening; isn't that true?

8    **A.**    I don't know exactly at what point the screening was

9    referred to.  Sampling, screening.

10   **Q.**    You were never instructed by Mr. Shea, whether it be Dan

11   Shea or Jim Shea, to go back down to Louisiana or Mississippi

12   and do any further testing, were you?

13   **A.**    No.

14   **Q.**    And you don't know of anyone being hired to go down there

15   and do testing, do you?

16   **A.**    Not that I'm aware of.

17   **Q.**    Let's talk about -- the jury's heard about this so-called

18   LFE policy.

19            Now, you say there was a policy in place at Gulf

20   Stream in 2004 to use only LFE woods in travel trailers?

21   **A.**    As far as I know, yes.

22   **Q.**    Well, what does that mean?  You're a vice president.  Was

23   there or was there not a policy in place?

24   **A.**    I would say yes.

25   **Q.**    That policy is important because it deals with safety;

286

```
 1   isn't that right?
 2   A.   That's correct.
 3   Q.   It's a safety policy, isn't it?
 4   A.   Yes.
 5   Q.   That means it should be followed for safety reasons; isn't
 6   that right?
 7   A.   Yes.
 8   Q.   But that policy isn't in writing, is it?
 9   A.   It's not in writing.  It's on our purchase orders, but
10   it's not a policy written in the procedures manual?
11   Q.   And management doesn't always enforce that policy either,
12   do they?
13   A.   Not to my knowledge is it not enforced.
14   Q.   Well, one thing you know for a fact is that at least one
15   plant superintendent had never even heard about the policy;
16   right?
17   A.   And I would maybe expect that from Burl, yes.
18   Q.   So we know -- the jury's going to get to meet Burl because
19   I thought he was a really honest fellow.  You know for a
20   fact -- he works for you, doesn't he?
21   A.   He works for Gulf Stream.
22   Q.   And he's actually a report to you, is he not?
23   A.   Not directly.
24   Q.   But you task him with things to do periodically, do you
25   not?
```

1    **A.**   I do.

2    **Q.**   He used to be a superintendent of one of the plants,

3    didn't he?

4    **A.**   That's correct.

5    **Q.**   And you know that when I asked him about this policy, he

6    had never heard of it; isn't that right?

7    **A.**   That's what I recall, yes.

8    **Q.**   So, obviously, somebody somewhere didn't tell Burl Keel

9    about the policy; right?

10   **A.**   Possibly.

11   **Q.**   Now, would you agree with me that you guys at Gulf Stream,

12   you shouldn't be building a trailer that people are going to

13   live in that could expose them to something that could cause

14   them long-term damage; right?

15   **A.**   No one expects that.

16   **Q.**   Let's talk about the installation of trailers, Mr. Pullin.

17          When you were down in Louisiana, you saw that some of

18   these trailers had been jacked up and blocked where the wheels

19   were hanging off the ground; right?

20   **A.**   In some applications, yes.

21   **Q.**   Now, you have experience in installing mobile homes, don't

22   you?

23   **A.**   I've done a couple, yes.

24   **Q.**   You consider yourself a mechanical guy?

25   **A.**   I do.

288

1   **Q.**   You feel that, based on your own experience, you're

2   qualified to install trailers?

3   **A.**   I would think that I should be able to, yes.

4   **Q.**   You know that when you install a trailer, you have to

5   distribute the weight evenly and take it up evenly at the same

6   time; correct?

7   **A.**   That's correct.

8   **Q.**   Because if you jack the trailer improperly, you can put

9   forces on the structure?

10  **A.**   If it's improperly jacked, yes, it can compromise the

11  structure.

12  **Q.**   It could open up the aluminum siding; isn't that right?

13  **A.**   Could.

14  **Q.**   It could affect the seals on the roof?

15  **A.**   Yes.

16  **Q.**   It could affect the seals on the windows?

17  **A.**   Yes.

18  **Q.**   It could cause leaks?

19  **A.**   It could.

20  **Q.**   It could cause the wall panels to come loose?

21  **A.**   It could.

22  **Q.**   Improper jacking and blocking could compromise a unit;

23  true statement?

24  **A.**   Yes.  Yes.

25  **Q.**   In fact, when you were doing your testing of these

1  occupied units, you saw one of the wall panels had popped,

2  didn't you?

3  **A.**   I did.

4  **Q.**   Now, I want to go back to woods.  Because one of issues in

5  this case, as you probably know at this point, is where did

6  those woods come from that went into Ms. Alexander's trailer.

7  Okay?

8  **A.**   Okay.

9  **Q.**   Sometimes the woods that -- Gulf Stream has a sister

10  company called Fairmont Homes?

11  **A.**   That's correct.

12  **Q.**   And that's a mobile home company?

13  **A.**   Manufactured housing, yes.

14  **Q.**   Would that be like -- in east Texas we call those mobile

15  homes or trailers.

16  **A.**   Well, manufactured housing would take on mobile homes,

17  sectionals, double-wides --

18  **Q.**   Double-wides.

19  **A.**   -- things of that nature.

20  **Q.**   And that's Fairmont?

21  **A.**   Yes.

22  **Q.**   And then Gulf Stream Coach does either the drivable travel

23  trailers or the towable travel trailers?

24  **A.**   The recreational vehicles, yes.

25  **Q.**   Now, sometimes the woods that you're buying for Fairmont

 1  are also used on the Gulf Stream side of the business?

 2  A.    That's correct.  We share a common cabinet shop.

 3  Q.    In fact, you may order some woods for Fairmont Homes that

 4  are used on the Gulf Stream side of business?

 5  A.    That's true.

 6  Q.    And when we're talking about woods -- and I know the jury

 7  knows this already -- we're talking about cabinets?

 8  A.    Yes.

 9  Q.    Walls?

10  A.    Wall paneling.

11  Q.    Boards that support the mattresses?

12  A.    Yes.

13  Q.    Like the kind that you-all changed out?

14  A.    Yes.

15  Q.    Okay.  Boards that support the cushions when you sit by

16  the window?

17  A.    Yes.

18  Q.    Like the kind you changed out?

19  A.    Yes.

20  Q.    And you bring that wood in volumes.  And there's really a

21  lot of overlap between the companies on what wood is used?

22  A.    That's true.

23            MR. BUZBEE:  May I approach the witness, Your Honor?

24            THE COURT:  Yes.

25                Mr. Buzbee, how much longer do you have with

 1  this witness?

 2          **MR. BUZBEE:**  Two minutes.

 3          **MR. WEINSTOCK:**  Your Honor, just to be clear, he's

 4  about to show him a document that we still object to.

 5          **MR. BUZBEE:**  Sir --

 6          **THE COURT:**  Why don't you show it to him.  And when

 7  you offer it, I'll hear the objection from Mr. Weinstock.

 8          **MR. BUZBEE:**  I just don't have an exhibit number.

 9  That's my problem.  I can't figure out...

10  **BY MR. BUZBEE**

11  Q.   Let me show you a document.  And we're not offering it

12  yet, but it's Bates stamp GULF6702, and it says "Fairmont

13  Homes, Inc., material" at the top.

14          Tell me if you recognize that.

15  A.   I don't think I've ever seen that.

16  Q.   You've never seen that before?

17  A.   I don't think so.

18  Q.   Nobody showed that to you?

19  A.   I don't recall seeing this, no.

20  Q.   Do you recall whether you saw that particular document?

21  Do you recall the policy that's set forth in the document?

22  A.   Let me finish reading it, if you don't mind.

23  Q.   Okay.

24          **MR. WEINSTOCK:**  Judge, while he's reading that, can

25  we approach?

 1          **THE COURT:**  Yes.

 2          (WHEREUPON, the following proceedings were held at

 3  the bench.)

 4          **MR. SCANDURRO:**  He's never seen it.  I don't know

 5  that asking him to comment on it is appropriate.

 6          **THE COURT:**  He's not going to comment on the document

 7  because he's never seen it.  The question was about something

 8  cited in the document.  If he reads the document and it

 9  refreshes his memory about a policy or something, then I think

10  that's fine.

11          I'm concerned about finishing this witness by

12  5:00.  It's 4:15 right now.

13          **MR. SCANDURRO:**  Charlie's got questions for him.

14          **MR. PENOT:**  I'll only be 15 minutes.

15          **THE COURT:**  But then how long are you going to be?

16          **MR. SCANDURRO:**  15, 20 minutes.  Not long.

17          **THE COURT:**  Because then we're going to go back and

18  do recross, and then I'm going to let you redirect if he's

19  somebody you're going to put on your case in chief, then you

20  get the chance to redirect him after they recross.

21          **UNIDENTIFIED SPEAKER:**  Do you want him to go next,

22  Charlie?

23          **THE COURT:**  Do you want to do it that way?  Charlie,

24  you get one shot at it.

25          Why don't you-all go next.  You go next,

 1  Charlie, and then back to Tony, and then we'll let you wrap it
 2  up.  Okay?
 3          (WHEREUPON, the following proceedings were held in
 4  open court.)
 5  **BY MR. BUZBEE**
 6  **Q.**   All right.  Sir, I'm sorry.  I was showing you the
 7  document to make it clear.
 8          Exhibit 372 is the exact same document, is it not?
 9  **A.**   Yes.
10  **Q.**   This was a document given to me by the Gulf Stream
11  lawyers.  Let me ask you if there was a policy at Gulf Stream
12  that says that Fairmont Homes does not comply with Gulf
13  Stream's higher standards for woods?
14  **A.**   What's your question?
15  **Q.**   Is that policy in place at Gulf Stream or Fairmont Homes?
16  **A.**   Well, I would say that Gulf Stream doesn't use anything
17  that's noncompliant.  I don't know where that came from or when
18  it was written.
19  **Q.**   Let me ask you again.  I'm asking about Fairmont Homes.
20          Do you remember you said they share woods?  Remember?
21  **A.**   In some instances, yes.
22  **Q.**   And that's why I'm asking you this.  Because if Gulf
23  Stream is using Fairmont Homes' woods, and Fairmont Homes has
24  no standards whatsoever about what they buy, and they'll buy
25  anything they can find, that's why it would be important, would

 1   it?
 2   **A.**   Right, you have to qualify the wood.
 3   **Q.**   Okay.  Now --
 4              **THE COURT:**  Is there an objection?
 5              **MR. SCANDURRO:**  Yes, Your Honor.  The witness doesn't
 6   work at Fairmont Homes.  And I think, again, we need to lay
 7   that foundation if we're going to ask him about Fairmont.
 8              **MR. BUZBEE:**  May we approach, Your Honor, real
 9   quickly?
10              **THE COURT:**  Yes.
11              (WHEREUPON, the following proceedings were held at
12   the bench.)
13              **THE COURT:**  I thought the objection was complete to
14   the wording in the transcript.
15              **MR. BUZBEE:**  Your Honor, can I just say this?  This
16   document -- do you remember the e-discovery issue?
17              **THE COURT:**  Yes, I do.
18              **MR. BUZBEE:**  It went on for three months.  Three
19   months.
20              **THE COURT:**  Uh-huh.  This is the document that we had
21   the motion that on that --
22              **MR. BUZBEE:**  For the first time ever, they gave us
23   this document.  I've established how relevant it is.  You
24   overruled their objection to it.
25              **THE COURT:**  I did.

1          **MR. BUZBEE:**  And here we are, they're still playing
2     the same game and it is absolutely relevant --
3          **THE COURT:**  Lay a foundation for it.  I think the
4     objection is that he didn't work for Fairmont, and I don't know
5     whether he's a witness who has seen this document.  This is the
6     same one that they showed him a little while ago -- is this the
7     same one that you showed him --
8          **MR. SCANDURRO:**  It's the one we were just up here on.
9          **THE COURT:**  If he hasn't seen it before, then he's y
10    not the witness to use it on.  You can ask him questions about
11    the policy generally.  If he knows what was going on at
12    Fairmont, and how that policy --
13         **MR. BUZBEE:**  Right, right.  But you see what they
14    did, though?  I mean, I want to make that clear on the record.
15         **THE COURT:**  You can use it.  It's admissible with the
16    proper witness.  But I'm not going to introduce it with a
17    witness who's never seen it before.
18         **MR. BUZBEE:**  I absolutely respect that.
19         **THE COURT:**  I have overruled their objection.  They
20    were trying to exclude it entirely.
21         **MR. BUZBEE:**  And keep in mind that it came off of
22    somebody's computer, that we never got -- because we never knew
23    this person, et cetera.
24         **THE COURT:**  I understand that.
25         **MR. BUZBEE:**  I just want make that clear.

 1          THE COURT:  I can't make a it-came-off-the-computer

 2   exception to the admissibility because the witness has never

 3   seen it before, but in this case you can go ahead and admit it.

 4          MR. BUZBEE:  I just think it's dirty pool the way

 5   they did that.

 6          MR. WEINSTOCK:  We'll stipulate that it's in

 7   evidence.

 8          (WHEREUPON, the following proceedings were held in

 9   open court.)

10   BY MR. BUZBEE

11   Q.   Mr. Pullin, if there is a policy at Fairmont to use

12   non-LFE woods, but Gulf Stream uses Fairmont's woods, then it's

13   possible that non-LFE woods are going into Gulf Stream

14   trailers; isn't that true?

15          MR. SCANDURRO:  Speculation, Your Honor.  Objection.

16          THE COURT:  If he knows.

17   A.   You would have to define the wood product.

18   BY MR. BUZBEE

19   Q.   So you don't know?

20   A.   I don't know.

21          MR. BUZBEE:  Pass the witness, Your Honor.

22          THE COURT:  All right.

23             Mr. Scandurro?

24          MR. SCANDURRO:  Can we have 335?

25          THE COURT:  Pull up 335.

1                        **DIRECT EXAMINATION**

2    **BY MR. SCANDURRO**

3    **Q.**   Mr. Pullin, I just wanted to clear up a couple of things

4    from your examination earlier.  Exhibit 335, which you were

5    shown --

6               **MR. SCANDURRO:**  May I approach, Your Honor?

7               **THE COURT:**  Yes.

8    **BY MR. SCANDURRO**

9    **Q.**   -- you were asked by Mr. Buzbee about this exhibit, and I

10   believe you identified two travel trailers in Exhibit 335 that

11   were Gulf Stream models; is that correct?

12   **A.**   That's correct.

13   **Q.**   All right.  Are there also other travel trailers by other

14   manufacturers that are included in Exhibit 335?

15   **A.**   Yes, there is.

16   **Q.**   Can you identify for the record, if you would, which page

17   numbers, using this number, involved non-Gulf Stream travel

18   trailers?

19   **A.**   1812, 1817, 1818, 1820, 1824, a partial on 1628, and all

20   of 1629, and all of 1630.

21   **Q.**   Okay.  What are the numbers in the lower right-hand

22   corner, for the record, that are Gulf Stream travel trailers?

23   **A.**   1811, and 1815.  There would also be a partial on the

24   handwritten --

25   **Q.**   Let me ask it this way --

1   A.   -- 1627.

2   Q.   If we look at the numbers 1817, 1818, 1820, and 1824,

3   those are not Gulf Stream travel trailers; correct?

4   A.   Just let me verify.

5        Yes.

6   Q.   Okay.  So when the jury sees 1.22, 2.01, 1.89, 2.04, and

7   4.48 parts per million that you recorded with the

8   Formaldemeter, those are not Gulf Stream travel trailers?

9   A.   That's correct.

10  Q.   And if I recall correctly, the highest number we saw on

11  the screen at the hottest part of the day was .71; correct --

12  A.   As I recall, yes.

13  Q.   -- for Gulf Stream?

14       I'm not going to go through all of the occupied

15  readings, the low ones or the ones you were asked about

16  earlier.

17       But can you say that all of the readings that you

18  took with this Formaldemeter device were below .75, which is

19  the OSHA standard for American workers?

20  A.   Yes.

21  Q.   When you went into these trailers in St. Bernard Parish,

22  you went in with the invitation of the owners?

23  A.   Absolutely.

24  Q.   Did they see what you were doing?  Did you ask permission?

25  A.   Yes.

1    **Q.**   Did any of them express any complaints that they had that

2    you thought might be related to formaldehyde?

3    **A.**   Not related to formaldehyde, no.

4    **Q.**   Other complaints?

5    **A.**   Yes.

6    **Q.**   Like?

7    **A.**   Cabinet door fell off, my sofa was too soft, fire

8    extinguisher was knocked off the wall, things of that nature.

9    **Q.**   But none that you attributed to formaldehyde?

10   **A.**   No.

11   **Q.**   There was one document in that set that I wanted to show

12   you.  This is one you were asked about earlier.  At the bottom

13   it says -- I see the word "burning" under "Notes."

14          Do you see that?

15   **A.**   Yes, I do.

16   **Q.**   What does that word "burning" mean, from your recollection

17   of that interview?

18   **A.**   This particular resident had two trailers for the family,

19   and they were fixtured in there on the property with the doors

20   facing each other, and they shared a common causeway, or a step

21   well situation.  And the contractor had placed a step in such a

22   way that it was burning on one of the support posts for the

23   porch.

24   **Q.**   So when you say "burning," that has nothing to do with

25   burning eyes or burning nose?

1  A.   No.

2  Q.   These trailers that you looked at in St. Bernard Parish in

3  March or March/April of 2006, were all of those trailers

4  2005/2006 trailers?

5  A.   Yes.

6  Q.   None of them were 2004?

7  A.   Not that I'm aware of, no.

8  Q.   And you've gone back and looked?  Had somebody look at

9  that, or looked at it yourself?

10  A.   I did.

11  Q.   And what about the unoccupied trailers that you looked at

12  in Baton Rouge, the two we just talked about.  Were those 2004

13  trailers, or were those 2005/2006 trailers?

14  A.   2005/2006.

15  Q.   Same question on some of the complaints that were phoned

16  in up to Indiana that Mr. Buzbee asked you about.

17       Have you determined whether those complaints related

18  to 2004 or 2005/2006 trailers?

19  A.   They were 2005/2006.

20  Q.   So you didn't get any complaints about 2004 trailers

21  either in person from people when you came down to St. Bernard

22  Parish, or in Indiana?

23  A.   No.

24  Q.   There was a reference to multiple complaints.  And Counsel

25  went through a couple of them with you.

1        How many trailers did Gulf Stream sell?  Now, I'm
2   talking about 2005 and 2006 now.  Do you recall how many
3   trailers Gulf Stream sold to the government?
4   A.    It was 50,000.
5   Q.    Do you recall how many complaints that you got in Indiana
6   in that March/April/May time frame relative to that those
7   50,000 trailers of people complaining about symptoms that might
8   be related formaldehyde, according to your understanding?
9   A.    There was eight.
10  Q.    How many trailers did Gulf Stream sell to FEMA for the
11  victims of the 2004 hurricanes in Florida?
12  A.    It was right around 7,000.
13  Q.    Did you go down to Florida for that hurricane response at
14  all?
15  A.    No, I did not.
16  Q.    You've been to Florida before, though?
17  A.    Oh, yes.
18  Q.    It gets pretty hot and humid down there?
19  A.    Exactly.
20  Q.    Did you get any complaints at Gulf Stream from the Florida
21  hurricane victims who were in your 2004 travel trailers?
22  A.    No, sir.
23  Q.    In fact, how long have you been selling travel trailers to
24  FEMA?
25  A.    A long time.  '92.

1   **Q.**    Hurricane Andrew?

2   **A.**    In West Virginia there was a hurricane that we took care

3   of some stuff on the east coast.  I don't know if that was pre-

4   or post-'92.

5   **Q.**    You've covered 204.

6          And 1992 to 2004, did you have any formaldehyde

7   complaints, that you're aware of, from residents of temporary

8   emergency housing units that you sold to FEMA?

9   **A.**    No.

10  **Q.**    What did you do when you got this information that Counsel

11  asked you about, and you came down and you did this testing

12  with this device, what did you do with it when you got back to

13  Indiana?

14  **A.**    I sat down and shared the information that was collected

15  with Mr. Shea, Dan Shea.

16  **Q.**    Do you know what happened to the information afterwards?

17  **A.**    He communicated with FEMA.

18  **Q.**    Okay.  Let me show you an exhibit that's been marked and

19  is in evidence, I believe, as Exhibit 46.

20          Do you recognize this letter, Mr. Pullin, as a letter

21  written by Gulf Stream to FEMA?

22  **A.**    I do.

23  **Q.**    Do you see there in the second paragraph the highlighted

24  language, it says:  "During our recent visit to Washington, we

25  discussed how best to address any potential concerns about

1   indoor air quality by occupants of travel trailers, disaster

2   relief units"?

3   A.   Yes, sir.

4   Q.   And further down, the letter says:  "During our meeting,

5   you requested we provide some information that FEMA could add

6   to the trifold that you provide to occupants of the trailers.

7   Accordingly, please see the enclosed ventilation information."

8          Do you see that?

9   A.   Yes, sir.

10  Q.   Now, did you understand or was it reported to you that

11  FEMA was giving out a trifold to travel trailer occupants at

12  this time relating to formaldehyde?

13  A.   I knew that that was in discussion, yes.

14  Q.   And this is in -- this is before, if we accept -- and I

15  think Mr. Buzbee was accurate on the date that Ms. Alexander

16  moved in.

17         This letter was sent to FEMA before she moved in;

18  correct?

19  A.   Yes, sir.

20  Q.   And if we look at the second page of Exhibit 46, in the

21  first paragraph on the top it says:  "Our informal testing has

22  indicated that formaldehyde levels of indoor ambient air of

23  occupied trailers fall below, for instance, the OSHA standard

24  of .75 parts per million."

25         Do you see that?

1    A.    Yes, sir.

2    Q.    And is that accurate based on the test that you did?

3    A.    It is.

4    Q.    The next sentence says:  "We are willing to share these

5    informal test results with you."  Right?

6    A.    That's correct.

7    Q.    Do you know if FEMA ever asked you for those results?

8    A.    Not to me, no, personally.

9    Q.    Do you know whether or not FEMA was already doing its own

10   testing at this particular point in time?

11   A.    I don't know for sure the date that they started.

12   Q.    But you know they did start?

13   A.    Yes.

14   Q.    The last paragraph says:  "If FEMA receives any

15   complaints, we would appreciate hearing from you as soon as

16   possible so we can work with you to address any follow-up that

17   FEMA believes may be appropriate.  If you desire to provide an

18   additional ventilation alternative, which, when installed,

19   could provide a flow of outside air into the trailer, there is

20   a product called the Fantastic Vent.  We can provide further

21   information," et cetera.

22          Do you see that?

23   A.    Yes, sir.

24   Q.    Describe for the ladies and gentlemen of the jury what the

25   Fantastic Vent is.

1  **A.**   It's a 14-by-14 powered fan that has a very high velocity

2  fan motor in it and blade combination that's able to, I

3  believe, exchange 1300 cubic feet of air per minute.

4  **Q.**   Is that something that comes on a standard travel trailer,

5  or is it an optional accessory?

6  **A.**   It would be an option.

7  **Q.**   Do you know what the FEMA specs said about optional

8  accessories?

9  **A.**   No options.

10 **Q.**   No optional accessories?

11 **A.**   That's right.

12 **Q.**   Were you wanting to sell these fans to FEMA, or were you

13 wanting -- what was your purpose at the company?

14 **A.**   We wanted to take care of any concerns or complaints that

15 customers had issued, and we were offering those fans as a

16 resolution.

17 **Q.**   If I turn to the next page, is that the ventilation

18 information that Gulf Stream sent to FEMA a couple of weeks

19 before Ms. Alexander moved into her trailer?

20 **A.**   It is.

21 **Q.**   And I see formaldehyde is mentioned in the second

22 paragraph, correct, and in the first one?

23 **A.**   Correct.

24 **Q.**   And you give ventilation instructions there?

25 **A.**   Yes.

1   **Q.**   And you're telling FEMA in the fourth paragraph about high
2   indoor temperatures and humidity; correct?
3   **A.**   That's correct.
4   **Q.**   And in the second to the last one that's highlighted,
5   you're advising that people should consider leaving the roof
6   vent open and the bath fan on and the range hood running if
7   they leave the trailer?
8   **A.**   Yes, sir.
9   **Q.**   Is this consistent with the general advice you would have
10  given anybody who would have called up there?
11  **A.**   Yes.
12  **Q.**   The last page is an important health notice.  Do you see
13  that?
14  **A.**   I do.
15  **Q.**   We won't go through all of this.
16          But was this also sent to FEMA by Gulf Stream?
17  **A.**   Yes, sir.
18  **Q.**   Prior to Ms. Alexander moving into her travel trailer?
19  **A.**   That's correct.
20  **Q.**   You were asked some questions about calibration of this
21  device.
22          Tell the ladies and gentlemen of the jury what a
23  Formaldemeter is.  What did it look like?
24  **A.**   It's approximately 4-by-8 inches, electronic meter.  It's
25  like the size of a TV remote that you activate a switch, it

1  draws an air sample, evaluates it, and brings up a digital

2  recording of what it thinks the formaldehyde level is at that

3  point.

4  Q.   How long does it take when you operate it to get that

5  reading?

6  A.   I believe it's about a minute for it to draw its sample

7  and then give the result.

8  Q.   What is it drawing it through?  Is it a little tube?

9  A.   Just an air in-take tube at the top, yes.

10  Q.   So when you went in there, you would just hold it in one

11  spot, or where would you --

12  A.   I would generally try -- after I talked with the folks, I

13  would go into the trailer and ask them permission, and draw a

14  sample from around the center of the trailer, at the

15  dinette/sofa/kitchen area, right in the center of the vehicle.

16  Q.   And you were asked some questions about issues that came

17  up later when you spoke to Mr. Shea.

18          What is your understanding of the limitations of that

19  device, if you have any?

20  A.   It's a sampling device, and it has to be calibrated on a

21  routine -- there is some direction as far as the different

22  calibrations, and periods of time, and the cause and effect of

23  heat and temperature on the equipment itself.

24  Q.   Okay.  And did it have something called a phenol filter?

25  A.   We later found out that there was a phenol filter that was

1  to be used in conjunction with the machine, yes.

2  **Q.**  And did you use it during your sampling?

3  **A.**  Not during that first sampling, no.

4  **Q.**  Do you know what the impact may have been?

5  **A.**  We just collected samples.  We didn't know if there was

6  any validity to them or, you know -- at that point we weren't

7  trained in using them, so it was just a random sampling to see

8  what was going on with the trailers in Louisiana, and draw

9  those few samples.

10  **Q.**  And in any event, you offered it to FEMA, for whatever it

11  was worth?

12  **A.**  Correct.

13  **Q.**  And I take it you don't know whether FEMA passed on that

14  information to Ms. Alexander in May of 2006?

15  **A.**  I don't.

16  **Q.**  I'm going to show you a document -- we're going to switch

17  gears a little bit and show you a document that's been already

18  admitted in evidence as Exhibit 26.  And this is the sale

19  documents regarding the sale of this travel trailer by Gulf

20  Stream in 2004.  And I'm going to show you a page in here and

21  ask if you can identify this for me.

22  **A.**  I can.

23  **Q.**  What is that?

24  **A.**  That's what I refer to as a D and D report, a driver and

25  dealer acceptance form.

1    **Q.**    And explain the purpose of it.

2    **A.**    Each vehicle that's transported or shipped from Gulf

3    Stream would have one of these forms accompanying it, so that

4    on delivery it can be evaluated, inspected, and signed for by

5    the receiving dealer.  Notations of any type of shortages or

6    damages would be listed at that time.

7    **Q.**    So it says there, as we look sort of in the -- right where

8    my finger is, above my finger, "Dealer instructions"?

9    **A.**    Yes.

10   **Q.**    And it says:  "Check the unit for damage immediately and

11   verify that all invoiced items are present in the unit"?

12   **A.**    That's correct.

13   **Q.**    And we see no driver damage, as we go down?

14   **A.**    Yes, sir.

15   **Q.**    And then can you confirm that according to this document,

16   there's a dealer signature from a representative of FEMA dated

17   December 15th, '04?

18   **A.**    He used that signature line, and the dealer's signature

19   line, yes, as a FEMA rep.

20   **Q.**    Are you familiar with the process FEMA would go through

21   with its government red tape in inspecting these things when

22   they were delivered?

23   **A.**    No, sir.

24   **Q.**    Is there any indication of any damage on Ms. Alexander's

25   trailer that you see on that form?

1    A.    No.

2    Q.    To your knowledge, did Gulf Stream ever see this travel

3    trailer again once it left your facility?

4    A.    Not to my knowledge.

5    Q.    Did you guys put an owner's manual in every single travel

6    trailer that you sold in 2004 to FEMA?

7    A.    We did.

8    Q.    And in 2005 and '6?

9    A.    Yes, sir.

10   Q.    I'm going to show you a copy of the owner's manual,

11   actually out of the Alexander travel trailer.

12         Do you recognize that as the cover page of your

13   manual in 2004?

14   A.    Yes.

15   Q.    And you see either Ms. Alexander or someone has written

16   "FEMA" with a number right there?

17   A.    That's correct.

18   Q.    Is it your understanding FEMA had a maintenance line that

19   people could call if they had issues with their trailers?

20   A.    I'm not sure of the routing of that, whether it was FEMA

21   or through the contractor that set the trailer.  But there was

22   a service contract or a service agreement of some sort, and

23   FEMA access.

24   Q.    Let me show you a document that's in your manual.

25         Can you tell the ladies and gentlemen of the jury

1  what this is?

2  **A.**   It's a recommended maintenance schedule for the trailer or

3  the recreational vehicle.

4  **Q.**   Okay.  And what does it say -- for example, how often are

5  you supposed to inspect the roof ceiling?  Is it every six

6  months I see there?

7  **A.**   Yes.

8  **Q.**   About halfway down?

9  **A.**   Yes, uh-huh.

10  **Q.**   And the side wall sealants every six months?

11  **A.**   Yes, twice a year.

12  **Q.**   And the window sealant actually monthly?

13  **A.**   It should be looked at monthly.

14  **Q.**   Explain why that's important.

15  **A.**   Well, you don't want to compromise seal.  And water

16  intrusion, obviously, entering in is not a good thing.  So you

17  want to maintain your seals on a regular basis.  And because of

18  different atmospheres, locations of where the trailers are at,

19  if they're in the desert, the seals are going to bake

20  differently than they are in northern climates, so they can

21  deteriorate over a period of time.

22  **Q.**   I'm going to show you another, Page 23862 in your manual.

23  The second highlighted section there talks about keeping from

24  storing your vehicle in grassy areas for long periods of time.

25  Do you see that?

1    A.    Yes, sir.

2    Q.    Explain why it is that you would give that recommendation

3    in your manual.

4    A.    The last sentence basically explains it: stagnant, moist

5    air developed under the coach will speed up the corrosion

6    process.  And we'd like to see the units stored, on a permanent

7    situation, concrete, or asphalt, or nongrassy, where you don't

8    have high humidity, high grass growth, and moisture that would

9    collect in that.

10   Q.    We're going to hear maybe in a day or two from some

11   experts who are going to come in who looked at this travel

12   trailer in May of 2009 in Lottie, Louisiana, in a field.

13          If I tell you that the trailer went to Lottie in

14   February of 2008, and sat up there for about 15 months before

15   these gentlemen could look at it, would you expect to see any

16   deterioration in that traveler trailer?

17   A.    Yes.  I've been to Lottie and I saw deterioration.

18   They're just stored there; they're just simply parked.

19   Q.    Is any of the routine maintenance and inspection, to your

20   knowledge, that we looked at in your manual being done on these

21   travel trailers?

22   A.    I saw no evidence of any maintenance being done.  Doors

23   open, windows open, things of that nature.

24   Q.    There was some testimony earlier in the case from

25   Ms. Erika Alexander about a soft spot in the floor of this

1   travel trailer right by the door when you came in.

2   **A.**   Okay.

3   **Q.**   Is that something you're familiar with in your travel

4   trailers from time to time?

5   **A.**   I've seen that before, yes.

6   **Q.**   And what is the cause of that?

7   **A.**   Generally, the door's been left open.  Either the door's

8   open, the screen door's closed, and it takes on moisture.  Or

9   someone forgets to close the door, and it rains.  That's just

10   an entry point for, you know, water.

11   **Q.**   But it could be an indication of someone leaving the door

12   open and just having the screen shut?

13   **A.**   Right.

14   **Q.**   There's going to be some questions about your air

15   conditioning system.  It hadn't been talked about too much, but

16   it will be.

17          Tell the ladies and gentlemen of the jury how you

18   interact with your air conditioning system suppliers at the

19   plant.

20   **A.**   We have two main suppliers that basically come in to our

21   facility on a routine basis to inspect our installation and

22   make sure it's in compliance with their recommendations.

23          If they find anything that's irregular, they would

24   make a recommendation to modify that installation.  But it's

25   done on a routine basis.

1    Q.    And that was true in 2004?

2    A.    It's been true since we started the business, yes.

3    Q.    And if I tell you a company called DIMETIC -- I don't know

4    how to pronounce it -- put in this air conditioning system,

5    that's one of the companies who would come to your facility?

6    A.    DIMETIC supplied us with the roof air conditioning unit.

7    We did the installation onto the roof after the coach was

8    built, yes.

9    Q.    And did they also review your duct work, your insulation

10   in the ceiling?

11   A.    Yes.

12   Q.    What is your insulation -- the R-value of your insulation

13   in your ceiling?

14   A.    Just the fiberglass batch itself is an R7.  That's a very

15   complicated procedure to get all of the R-values, just because

16   you have air envelopes inside the coach, outside the coach, in

17   the cavity.  The wood value on the decking, on the upper

18   decking, under the rubber membrane.  And also the studs --

19   Q.    Not to stop you.

20              It's at least 7?

21   A.    It's at least 7.

22   Q.    And there may also be some testimony from some of these

23   experts about where you had your vapor barrier on the travel

24   trailer, and that there was some problem with it.

25              To your knowledge, are all the FEMA trailers that

1   you've sold to FEMA since 1992, did they all have the vapor

2   barrier in the same place?

3   **A.**   They're all built alike.

4   **Q.**   And is that -- the use of the vinyl inside the wall, the

5   vinyl-back lauan, is that standard in the travel trailer

6   industry?

7   **A.**   For as long as I can remember.

8   **Q.**   Do you know of any travel trailer manufacturers who put

9   the vapor barrier on the outside of the stud walls?

10  **A.**   Not at this time, I don't.

11  **Q.**   We've heard from some of your former employees here today

12  about issues and things that they had with Gulf Stream and

13  working in the plants.

14           How many employees did you have in 2004, roughly.

15           **MR. BUZBEE:**  Objection, Your Honor.  We could have

16  brought a lot of employees, and we weren't -- this is improper.

17           **THE COURT:**  I'm going to overrule it.  I think he can

18  answer that.

19  **BY MR. SCANDURRO**

20  **Q.**   How many employees did you have?

21  **A.**   I recall globally in Gulf Stream around 1500.

22  **Q.**   Is it just generally fair to say that you have some happy

23  campers and some unhappy campers, like anyplace?

24  **A.**   As employees?

25  **Q.**   Yes, sir.

316

1   A.   Yes.

2   Q.   And sometimes you have to fire somebody for getting in a

3   fistfight, for example?

4   A.   That's not tolerated.

5   Q.   And they might not be too happy about it?

6   A.   Exactly.

7   Q.   You were asked some questions about people who knew or

8   didn't know about your policy of buying wood.

9        Who is it at Gulf Stream that actually buys the wood

10  from your wood vendors?  What do you call that person's title?

11  A.   It falls under the auspice of the director of purchasing.

12  Q.   Does the director of purchasing know the policy?

13  A.   Yes.

14  Q.   And that's the person responsible for actually buying wood

15  that meets the policy?

16  A.   Oh, he has purchasing agents that report to him.  He knows

17  the policy, and they also know the policy.

18  Q.   Is it necessary for a plant superintendent who's building

19  the trailer to know that policy?

20  A.   No.

21       MR. SCANDURRO:  I ran a little over 15 minutes, Your

22  Honor, but thanks.

23       THE COURT:  All right.  Mr. Penot?

24

25

1                            CROSS-EXAMINATION

2    BY MR. PENOT

3    Q.    Good afternoon, Mr. Pullin.

4    A.    Good afternoon.

5    Q.    My name is Charles Penot.  We met at your deposition --

6    A.    Yes.

7    Q.    -- a couple of months ago; is that right?

8    A.    Yes.

9    Q.    I believe you mentioned that your role for Gulf Stream,

10   particularly during the Hurricane Katrina/Rita response time

11   was to deal somewhat with or interface with CH2M Hill and

12   Fluor; is that correct?

13   A.    That's correct.

14   Q.    And you may have said to deal with complaints; did I

15   understand that correctly?

16   A.    Well, I can qualify that.

17   Q.    Oh, okay.  It didn't have anything to do formaldehyde

18   complaints?

19   A.    No, sir.

20   Q.    What was it about?  Construction issues?

21   A.    Trying to assist the contractors that were receiving these

22   vast number of trailers.  And they had people that didn't

23   understand how water heaters worked, or possibly how to PDI a

24   unit, predeliver it, get it ready to go, if they ran into any

25   problems.

```
 1              I put a crew together and we went down and spent some
 2    time with both of the contractors to make sure that they were
 3    comfortable with what they were getting, and understood that we
 4    were their contact if they had any question on parts, damaged
 5    trailers that may be received, how they could get parts.  And
 6    just a support group.
 7    Q.   The travel trailer of the sort that Ms. Alexander lived
 8    in, it has a spring suspension; is that correct?
 9    A.   Yes.
10    Q.   And the reason it has a spring suspension is it's meant to
11    be pulled down the highway?
12    A.   That's correct.
13    Q.   At highway speeds?
14    A.   Yes, sir.
15    Q.   You told Mr. Buzbee that you believe that you are
16    qualified to talk about installing travel trailers, in part
17    because you've had some experience installing mobile homes; is
18    that correct?
19    A.   Well, throughout my experience in the RV industry and
20    installing mobile homes, yes.
21    Q.   And why don't you tell the jury a little bit about your RV
22    industry experience, particularly with respect to the issue of
23    constructing structures or constructing things like the shell
24    of a travel trailer or an RV on a chassis.
25              When did you first start doing that?
```

1  A.   I started in the RV industry in 1971.  I worked about 13

2  years with Champion Home Builders in a recreational vehicle

3  division that did motorized vehicles.  And then I assisted the

4  engineers with prototyping their first bus -- transit bus.

5          I then went to work for Gulf Stream in '83, I believe

6  it was.  And we put a team of guys together, and we built the

7  first motorized product that Gulf Stream ever built.  And we

8  had a travel trailer line going at the same time.

9          And I stayed with them for five years, and left for a

10  short period of time.  Went to another RV manufacturer, where I

11  got some experience in a lamination plant.  And then back to

12  Gulf Stream to convert their facilities over to the new

13  processes.

14  Q.   And all of that experience involved building some sort of

15  structure on top of a chassis that was going to be pulled down

16  the road, or be driven down the road?

17  A.   Whether it be a trailer or a motorized product, yes, there

18  was a lot of frame work.

19  Q.   Mr. Buzbee asked you a few moments ago about whether

20  improper jacking of a trailer could do a number of things:

21  could damage the aluminum siding, could cause problems with the

22  roof, could cause problems with leaks.

23          Do you recall that line of questioning?

24  A.   I do.

25  Q.   And you said it's possible; correct?

1    A.    If it's severe enough, yes.

2    Q.    And, in fact, you've told me that the type of improper

3    jacking would have to be extreme to do that to Gulf Stream's --

4    to cause those sorts of problems to Gulf Stream's travel

5    trailers of the sort that Ms. Alexander lived in; is that

6    correct?

7    A.    That's correct.

8              MR. PENOT:   With Your Honor's permission, I'd like

9    to --

10             THE COURT:   Sure.

11             MR. PENOT:   -- use the trailer model.

12                  May I approach the witness, Your Honor?

13   BY MR. PENOT

14   Q.    I didn't have enough toy trucks when I was a kid,

15   Mr. Pullin, so I've asked somebody to try to talk create a

16   make-believe creation of the Gulf Stream travel trailer.

17                  Does that roughly look like the type of travel

18   trailer that was sold to FEMA?

19   A.    I would say that's a pretty good job.

20   Q.    Well, I'm glad.  I'll tell my model maker that.

21   A.    It doesn't have all the vents and things that you would

22   see on the roof, but it does exemplify the entry door and the

23   windows and the axle location.

24   Q.    Okay.  We talked a little bit at your deposition about

25   what you thought would be acceptable ways to jack a trailer and

```
 1   put it on blocks.
 2   A.   Yes, sir.
 3   Q.   Let me back up.  In fact, when you came down to Louisiana
 4   after Hurricane Katrina to do some of the testing that you
 5   talked about, you saw a number of these travel trailers
 6   installed?
 7   A.   I did.
 8   Q.   And you saw them installed on concrete block piers; is
 9   that correct?
10   A.   Yes, sir.
11   Q.   And I believe you told Mr. Buzbee you saw some with the
12   wheels off the ground?
13   A.   Yes.
14   Q.   And the installations you saw caused you no concern?
15   A.   No.
16   Q.   Gulf Stream never said to FEMA, We see that you're putting
17   these travel trailers up on blocks.  We don't think that's a
18   good use of our product; you shouldn't do that?
19   A.   No, we never said that.
20
21   A.   No, we never said that.
22   Q.   Never said that to Fluor?
23   A.   No.
24   Q.   Obviously, to get them on the blocks, there had to be some
25   jacking of the trailers; is that a fair statement?
```

1  A.   True.

2  Q.   And, in fact, what would be value -- what is the value, if

3  any, of putting these travel trailers on blocks?

4  A.   They are a -- obviously, you said they're meant to go down

5  the road.  They're short-term.  They hook onto a truck, you

6  pull them to a campsite and you camp in them.  But if it's a

7  longer duration, you would want to block the frame to take it

8  off of its active suspension so that it doesn't rock and bounce

9  when you're walking through it or that the shower would drain

10  or the kitchen sink would drain or the refrigerator would work,

11  because those things wouldn't work well if you're way out of

12  kilter.

13  Q.   And we talked a little bit at your deposition about what,

14  based on your experience in building structures like this on

15  chassis would be in your view an acceptable way to jack a

16  travel trailer such as this.  Do you recall that testimony?

17  A.   Yes, sir.

18  Q.   And one way you told me, I believe, was if someone used

19  two jacks at, I'm going to call it the front end, where this

20  tongue jack is.

21  A.   Where the hitch is at.

22  Q.   That's where the hitch is, okay.  You told me one

23  acceptable way would be if the installers used two jacks --

24  A.   That's correct.

25  Q.   Let's -- before we go there, let's turn this thing over.

1   The trailer was constructed with two 6-inch I-beams that run

2   the entire length of the trailer; is that correct?

3   **A.**   That's correct.

4   **Q.**   In your view, you said it would be acceptable if an

5   installer put two hydraulic jacks on those I-beams somewhere

6   near the front, and jacked up the front and blocked it, and

7   then came to the back and did the same thing; is that correct?

8   **A.**   As long as it's brought up uniformly, it's fine.

9   **Q.**   Meaning -- by "uniformly," you mean naturally at some

10  point the front would be higher than the back, but you mean the

11  two jacks on each side?

12  **A.**   Not causing any twist as you bring the unit up.  You

13  wouldn't want to jack the left front corner up and then come

14  back and try to jack the right rear corner up.

15  **Q.**   And even there, it would depend on how high you jacked it;

16  is that a fair statement?

17  **A.**   Right.  For the safety of the installers, they would want

18  it take it incrementally as they would go up.

19  **Q.**   Now, what if an installer did the following, what if an

20  installer -- and it might be better if I did a table to do this

21  part of it.

22  **A.**   Can you set it across here?

23  **Q.**   We can try to set it across here.  I'm not sure if the

24  wheels are going to work.  Now, suppose an installer took a

25  hydraulic jack -- why don't you explain to the jury what a

1    hydraulic jack is.

2    A.    It's a lifting device that's done with a series of

3    cylinders and oil that with a cantilever you can pump the

4    platform, the jack, to elevate it at any level.

5    Q.    In your view, would it be a problem with a travel trailer

6    like this, like Ms. Alexander's that Gulf Stream built, if an

7    installer put a hydraulic jack right behind the axles on the

8    I-beam and say another hydraulic jack about the same distance

9    back from the front -- what did you call this?

10   A.    The tongue.

11   Q.    The tongue on the I-beam in the front and jacked in this

12   fashion, jacked to the side, blocked on one side, and went back

13   to the other side and jacked this way and blocked?

14   A.    That's correct.

15   Q.    Do you see any problem with that method of jacking the

16   trailer?

17   A.    No.  As long as it's incrementally brought up, you can do

18   that.  And I recall seeing a series -- depending on the

19   topography of where the trailer was at, but three or four

20   blocks was generally all that was needed to get the active

21   suspension off of the trailer.

22   Q.    Thank you.

23           THE COURT:  Mr. Penot, I don't mean to cut you off,

24   but we're approaching the 5:00 hour.  I would like to finish

25   with this witness before we leave for the day if it takes an

1  extra few minutes.  We need to get back to Mr. Buzbee and then

2  Mr. Scandurro, so...

3          **MR. PENOT:**  Two or three minutes.

4          **THE COURT:**  Sure.

5  **BY MR. PENOT**

6  **Q.**   I believe you mentioned to Mr. Buzbee that when you were

7  down testing in St. Bernard Parish, you saw a unit with a wall

8  popped out.  Do you recall that?

9  **A.**   I did.

10 **Q.**   You do not know which contractor did that installation, do

11 you?  Or do you?

12 **A.**   No, I don't.  Now, when you say a wall popped out, it was

13 a loose beam on a panel where they meet the two by two studs in

14 the side wall, and the mechanical fasteners that stapled that

15 interior paneling had missed the stud and, basically, allowed

16 it to come loose.

17 **Q.**   Is that a common problem or is that something that you

18 would see typically -- not typically, but every so often in a

19 trailer?

20 **A.**   Well, it's not something that you want to see.  But in

21 high volumes, it would be anticipated that a plant that's

22 building 100 a day and the guys are going pretty quick, and

23 these pneumatic guns, they can get a little crooked, and tired,

24 and depending on the day, they may not hit the stud.

25 **Q.**   Finally, Mr. Pullin, neither you, nor, to your knowledge,

1  Gulf Stream shared with Fluor any of the results of the testing

2  that Gulf Stream did of trailers; is that correct?

3  A.   I'm sorry.  Can you repeat that?

4  Q.   You never shared with Fluor the testing?

5  A.   No, not to my knowledge.

6  Q.   Nor the material testing that had taken place; correct?

7  A.   No, no.

8  Q.   Nor the fact that Gulf Stream had received some complaints

9  about odors or burning eyes or what not in trailers?

10  A.   No, we didn't.

11  Q.   And, finally, you never shared with Fluor the fact that

12  Mr. Keel had come down and changed out some wood in one of the

13  trailers?

14  A.   Not to my knowledge, no.

15          MR. PENOT:  Thank you, Mr. Pullin.

16          THE COURT:  Let's go ahead and take Mr. Buzbee.

17  Since this witness was going to be called on Gulf Stream's case

18  in chief on the defense portion, we will allow Mr. Scandurro to

19  redirect after Mr. Buzbee's testimony since he's only going to

20  testify once.

21          MR. BUZBEE:  Yes, sir.

22          THE COURT:  Go ahead.

23          MR. BUZBEE:  Thank you, Judge.  I'm going to go fast

24  because I know everybody wants to go home.

25

1                        **RECROSS-EXAMINATION**

2   **BY MR. BUZBEE**

3   **Q.**   You weren't here, sir, but during my opening statement,

4   and I've already been mocked for saying it, but I called .008

5   parts per million the gold standard, that's the ATSDR standard.

6   Are you familiar with?

7   **A.**   No, I can't say that I am.

8   **Q.**   But you are familiar with the OSHA standard because you

9   told your lawyer about it; right?

10  **A.**   Yes.

11  **Q.**   So the OSHA standard --

12          **THE COURT:**  Well, I don't know if he can see you're

13  writing.

14          **MR. BUZBEE:**  I'm going to flip it.  I'm going to go

15  fast, Your Honor.

16  **BY MR. BUZBEE**

17  **Q.**   That's the standard you talked to Mr. Scandurro about, the

18  .75 parts per million; true?

19  **A.**   That's true.

20  **Q.**   Now, did you know that the other Gulf Stream lawyer,

21  Mr. Weinstock, said that's not terribly relevant at all?

22  **A.**   I wouldn't know that.

23  **Q.**   Yeah.  Well, that's what he said in opening statement.  He

24  said the OSHA standard is not terribly relevant.  So let's talk

25  about the one that is relevant.  What other standard are you

 1   familiar with?

 2   **A.**   I'm not.

 3   **Q.**   I thought you told me in your deposition you were familiar

 4   with the HUD target standard?

 5   **A.**   I'm sorry, the HUD.

 6   **Q.**   I remembered that.

 7   **A.**   Yeah.

 8   **Q.**   .4 parts per million?

 9   **A.**   That's true.

10   **Q.**   That's the HUD standard that Mr. Weinstock told this jury,

11   "Tony's using the wrong standard.  The real standard is .4

12   parts per million."  You're familiar with that standard?

13   **A.**   I am.

14          **MR. BUZBEE:**  Carl, would you pull up 335.

15   **BY MR. BUZBEE**

16   **Q.**   The two trailers that you tested, sir, occupied, and you

17   know I don't agree with your standard, but let's take the

18   standard that your lawyer talked about, all right?

19   **A.**   That's fine.

20   **Q.**   Two of the four readings that you took exceeded the HUD

21   standard; isn't that right?

22   **A.**   It is what it is, yes.

23   **Q.**   One of them was almost twice the HUD standard, wasn't it?

24   **A.**   Yes.

25          **MR. BUZBEE:**  Carl, the third page, please.

1  BY MR. BUZBEE
2  Q.   Three of the four readings of the other trailer you tested
3  exceeded the HUD standard; isn't that right?
4  A.   Yes.
5  Q.   And all of the other readings exceeded what I call the
6  gold standard; true?
7  A.   If that's what you say is the gold standard, I would say,
8  yes, those numbers would exceed that.
9  Q.   Now, you said the contractor in one of trailers, the
10 burning issue, the contractor had installed the trailers too
11 close together and caused some kind of burning.  Is that what
12 you said?
13 A.   No.  I said that they had installed them on this
14 customer's property with the doors facing each other.  She had
15 a large family and the kids stayed in one trailer and the
16 adults stayed in the other and there was a common stairway that
17 the contractor had fabricated that would allow access to both
18 trailers, so you didn't have to come down downstairs to go
19 over -- to get over to the next trailer.
20 Q.   What's the burning thing then?
21 A.   Well, the post -- or it was an aluminized treated post and
22 a deck, basically, with a set of stairs on it and they had
23 positioned that in such a way that it was in close proximity of
24 the furnace exhaust vent, and there was some charring on that
25 post.  That was communicated back to the contractors that they

1   had to be cognizant of where they were placing their steps.

2   **Q.**   So the contractors put them too close together?

3   **A.**   Not that the trailers were too close together.  They had

4   to be cognizant of where they were setting their porches so

5   that they didn't interfere with the exhaust gases of the

6   furnace.

7   **Q.**   You went over with Mr. Scandurro the information that Gulf

8   Stream suggested should be given to the residents.  Do you

9   remember that?

10  **A.**   Yes.

11          **MR. BUZBEE:**  It's Exhibit 46, Page 3, Carl.  Can you

12  make it a little bigger, Carl?

13  **BY MR. BUZBEE**

14  **Q.**   The information that Gulf Stream suggested to be provided

15  to the residents doesn't say one thing up top, side, or bottom

16  about cancer, does it?

17  **A.**   No, sir.

18  **Q.**   It doesn't even mention the big "C" word, does it?

19  **A.**   No, sir.

20  **Q.**   Now, let's look at the HUD required notice.  Your company

21  also included that on that letter; right?

22          **MR. BUZBEE:**  Next page, Carl.

23  **BY MR. BUZBEE**

24  **Q.**   Now, the HUD notice make itself clear in this last

25  sentence of the first paragraph that there may, in fact, be

1    possible long-term effects of exposure of formaldehyde; isn't

2    that right?

3    A.   That's true.

4    Q.   But that's not information that Gulf Stream recommended

5    that FEMA provide, is it?

6    A.   It was part of the package that was provided to FEMA, as I

7    understand it, yes.

8    Q.   No, no.  Read the letter, sir.  Without wasting a lot of

9    time, Gulf Stream recommended that Page 3 be provided, not

10   Page 4?

11   A.   It was all supplied to FEMA.

12   Q.   Did you just tell this jury that this Fantastic -- first

13   off, this Fantastic Vent are you saying that's an accessory to

14   these trailers?

15   A.   It's an accessory in the RV industry and an accessory to

16   these trailers, yes.  It was not ordered with the Fantastic

17   Vent.

18   Q.   Do you guys like those vents?

19   A.   No.

20   Q.   So you would have to go buy them?

21   A.   Sure.

22   Q.   So it's not an accessory that somebody could call you up

23   and order, is it?  If you wanted them, you would have to go buy

24   them somewhere?

25   A.   I would have guy them from vendor, a supplier, yes.

1    There's only one vendor that manufactures those fans, but, yes.

2              **THE COURT:**  Mr. Buzbee, I think there's some

3    confusion here.  Maybe I'm the only one confused.  When say you

4    have to go buy them, do you mean he has to go them on behalf of

5    the company, or do you mean "you" as in you as a person

6    occupying at EHU?  I think he may be answering in a different

7    term.

8              **MR. BUZBEE:**  I apologize.  I'm trying to go fast.

9              **THE COURT:**  I understand.  Let's clarify it.

10   **BY MR. BUZBEE**

11   **Q.**   When I say "you," I mean Gulf Stream.

12   **A.**   Gulf Stream would purchase that from a vendor.

13   **Q.**   Correct.  That's what I thought.  You're not telling this

14   jury that you offered those for free to FEMA, are you?

15   **A.**   We had no intentions of charging anyone for them, no.

16   **Q.**   Let me make sure, because this is going to be important,

17   because I know what FEMA says.  Are you telling this jury that

18   you guys, in order to fix this formaldehyde problem that you

19   had, that you offered to give FEMA these free fans?

20             **MR. SCANDURRO:**  Your Honor, I'm going to object to

21   this side bar about, "I know what FEMA says."

22             **THE COURT:**  Yes.

23             **MR. BUZBEE:**  I'll rephrase.

24             **THE COURT:**  Let keep the editorial comments out of

25   it.  Just ask him what he knows.  The issue with him on the

1  stand isn't what you know, the issue is what he knows and what

2  he can tell the jury.

3          **MR. BUZBEE:**  I understand.

4          **THE COURT:**  So let's not refer to anything else that

5  anybody else knows.  Let's find out what this gentleman knows.

6  **BY MR. BUZBEE**

7  **Q.**  Are you saying that Gulf Stream was going to give those

8  fans away for free to 50,000 people?

9  **A.**  No.

10 **Q.**  Are you saying that Gulf Stream offered 50,000 fans to

11 FEMA?

12 **A.**  No, I didn't say that.

13 **Q.**  Are you aware that the reason FEMA did not take that

14 option is because of costs?

15 **A.**  I'm not privy to that information.

16 **Q.**  Do you know what your boss, Jim Shea, said in his

17 deposition when I specifically asked him whether those would be

18 given for free?

19         **THE COURT:**  You're asking him what somebody else said

20 in his deposition, forget it.  Let's go.

21         **MR. WEINSTOCK:**  He was properly sequestered.

22         **THE COURT:**  If you don't have any questions, then I'm

23 going to shut it down.

24         **MR. BUZBEE:**  I understand.

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    **BY MR. BUZBEE**

2    **Q.**    How much do those Fantastic Fans cost each?

3    **A.**    I'd be guessing.  They're a little more expensive than the

4    active fans that are installed in the units in the bathroom.

5    **Q.**    You don't know?

6    **A.**    They may be $30.

7    **Q.**    So you believe that $30 would have alleviated this

8    formaldehyde problem?

9    **A.**    From what we saw, it greatly improved the air circulation

10   in the trailer.  And we offered those fans to be installed on

11   the complaints that we received, in the eight complaints that I

12   received, and Mr. Wade Breaux was one of them, and he refused

13   to let us install it.  He said, "No, that's fine.  I'm fine

14   with the trailer."

15   **Q.**    After you changed out his wood?

16   **A.**    He was fine.

17   **Q.**    After you changed out his wood?

18   **A.**    That's correct.

19           **MR. BUZBEE:**  Pass the witness.

20           **THE COURT:**  Mr. Scandurro, any further questions and

21   then we'll wrap it up.  This would, of course, be limited to

22   where what Mr. Buzbee just asked.

23           **MR. SCANDURRO:**  One or two questions.

24           **THE COURT:**  Sure.

25

1                    **REDIRECT EXAMINATION**

2    **BY MR. SCANDURRO**

3    **Q.**   Was the purpose of the Fantastic Fans offered to meet the

4    concerns of sensitive people who were having a problem --

5    **A.**   As I understand it, any complaints regarding that, we

6    would address by offering this fan.

7    **Q.**   And FEMA didn't order that fan with the units?

8    **A.**   No.  There was no options on the trailer.

9    **Q.**   You were asked about -- I'm not going to find it, but you

10   were asked about a couple of these readings that were over .4.

11   You recognize those as being in unoccupied trailers in Baton

12   Rouge?

13   **A.**   Yes.

14   **Q.**   People weren't living in those?

15   **A.**   No.

16   **Q.**   And you weren't given this information, but

17   Mrs. Alexander's unit, it's a stipulated fact, tested at .050

18   parts per million.  And, I think, you said the HUD standard you

19   were familiar with, Mr. Buzbee asked you about, was .4, or

20   eight times as high as Ms. Alexander's?

21   **A.**   That's as I understand it.

22           **MR. SCANDURRO:**  No further questions, Your Honor.

23           **THE COURT:**  All right.  Thank you, sir.  You can step

24   down.  Thank you for your time.  Please don't discuss your

25   testimony with anyone that may be a witness in the trial.

 1          THE WITNESS:  Thank you very much.

 2          THE COURT:  We're going to wrap up for today.  I want

 3  to thank the jury for their attention during the day.  Today

 4  we've covered a lot of ground.  We will try to move very

 5  quickly tomorrow.  If we can all be here ready at 8:30

 6  tomorrow, we will follow a very similar schedule and, as I've

 7  indicated, try to cover a lot of witnesses tomorrow.

 8          I think we're keeping a pretty good schedule so

 9  far.  Please don't discuss -- I'll tell you again, you know

10  what I'm going to say -- please don't discuss anything about

11  the testimony that you've heard today, or the case, or anything

12  else until we have received all of the evidence in this case

13  and the case is given to you to deliberate after I give you the

14  instructions on the law.  It's very important that you abide by

15  that, and I hope that you have no problems.

16          I know sometimes it's difficult if your family

17  wants to know where you've been all day and you've been doing.

18  You'll have plenty of time to discuss that with them at a later

19  time.  But please try to abide by that.  Please be on time

20  tomorrow and we'll get started -- we'll respect your time and

21  get started at the time I said, 8:30.

22          Thank you-all again.

23          THE DEPUTY CLERK:  All rise for the jury.

24          (WHEREUPON, the jury exited the courtroom.)

25          THE COURT:  All right.  You can be seated.  Anything

1   we need to cover on the record before we close the record for

2   the day?

3            **UNIDENTIFIED SPEAKER:**  One thing, Your Honor.  On

4   Exhibit 335 that we admitted, I think the one that was admitted

5   has a confidential stamp that wasn't supposed to be on the

6   bottom of that exhibit.

7            **THE COURT:**  335, you want to substitute an exhibit

8   that does not have a stamp on it?

9            **UNIDENTIFIED SPEAKER:**  Correct.

10           **MR. GLASS:**  I think we actually submitted it, and

11   that's the one, and --

12           **MR. BUZBEE:**  No problem on that.

13           **THE COURT:**  Let's go ahead and do that and make sure

14   that the court record has the correct copy.

15           **MR. PENOT:**  Your Honor, with respect to three

16   witnesses on the plaintiff's list tomorrow, Mr. Keith --

17           **THE COURT:**  I'm going to get to that in a minute.

18   Anything else on the record?

19           **MR. BUZBEE:**  I just want to note for the record I

20   think they've opened the door to the number of claims in this

21   case and I intend to raise that tomorrow in court.

22           **THE COURT:**  Well, why don't we raise it right now.

23           **MR WATTS:**  You can't prove up the negative amount of

24   claims and not open the door to the number of claims.

25           **THE COURT:**  Tell me how they opened the door on it.

1          **MR. BUZBEE:**  You cannot tell a jury that we've had no

2     complaints while at the same time we know for a fact that prior

3     to this lady moving into the trailer there was already a

4     lawsuit filed on behalf of thousands of people.

5               So it leaves an incredibly misleading impression

6     in the mind of jury that unfair for the plaintiff, I believe,

7     respectfully, sir, that they would be able to say the absence

8     of the complaints without us telling that there are, in fact,

9     thousands of them.

10         **THE COURT:**  And you're referring to the passage in

11    Mr. Pullin's testimony regarding how many units were sold

12    versus how many complaints; is that --

13         **MR. BUZBEE:**  That's exactly what I'm referring to,

14    yes, sir.  They opened the door to that.  I figured they would

15    and that's what they did.

16         **MR. MEUNIER:**  Your Honor, Tim asked, "How many

17    units?"  He said, "Gulf Stream sold 50,000 units."  And then

18    Tim asked, "How many complaints did Gulf Stream receive?"  He

19    said, "Eight."

20         **MR. SCANDURRO:**  Your Honor, he put in the 50,000

21    units first, not us.  He got the 50,000 units in in 2005.  And

22    then he said on his direct that there were multiple complaints.

23    He read a couple and then he made the statement that there were

24    multiple complaints and left hanging out there that there was

25    some huge number of complaints.

1    **MR. WEINSTOCK:**  You asked him to quantify it at the
2  bench.

3    **THE COURT:**  The number of complaints at that point in
4  time was the purpose --

5    **MR. WEINSTOCK:**  Correct.

6    **THE COURT:**  -- the time that the exhibits were
7  compiled, those exhibits were relative to complaints received,
8  I want to say in the March 2006 time frame.  He used the
9  exhibits to refresh the witness' recollection regarding those
10 particular complaints.  So at that point he had received eight
11 complaints.

12   **MR. SCANDURRO:**  Yes, Your Honor.  I think the
13 question was very narrow in terms of time scope.  It was like
14 March, April, May.

15   **THE COURT:**  Well, that was my understanding.  But
16 then we got into testimony regarding how many units were sold,
17 which Mr. Buzbee, I think, had asked first.

18   **MR. MEUNIER:**  I think the Hilliard case, though, the
19 first class action had been filed by then.

20   **THE COURT:**  It was filed, I want to say, in February
21 or March of 2006.

22   **MR. MEUNIER:**  That's what I'm talking about, the same
23 period of time.

24   **MR. SCANDURRO:**  It was May the 18th, I believe.

25   **THE COURT:**  We can double-check that.  If somebody

1    has that handy.

2          **MR. MEUNIER:**  They've got the jury believing that

3    eight people are complaining when, in fact, thousands have

4    filed in trial.

5          **MR. WEINSTOCK:**  Hold it, hold it, hold it.  Hilliard

6    filed with a handful, with what, three people, a handful of

7    people, and the class was ultimately dismissed, his class,

8    procedurally.  So to say that thousands of people, that never

9    came to fruition until later.

10         **MR. MEUNIER:**  We can find out how many people were --

11         **THE COURT:**  It has to be taken in context.

12         **MR. WEINSTOCK:**  Your Honor, I'm happy to stipulate

13   what date the Hilliard case was filed and they can tell that to

14   the jury that a lawsuit had been filed before Mrs. Alexander

15   moved into the unit.  That's not disputed.

16         **MR. SCANDURRO:**  We do have depo cuts coming in with

17   the government case on the amount of complaints that they had

18   at a given point in time, so I guess we need to get this hashed

19   out.

20         **THE COURT:**  Well, this witness' knowledge, though,

21   was limited to the eight complaints.  I mean, that's what

22   you-all asked him, and that's what he testified to, that

23   insofar as he was concerned, based upon his personal firsthand

24   knowledge, he was aware of, I think he said eight complaints.

25               So I'm not so sure that -- I mean, if we're

 1   talking about what his knowledge was at a given point in time,

 2   that's what he testified to.  Maybe we're talking about apples

 3   and oranges.  I don't know.  I want to make sure I understand

 4   the argument.

 5            **MR. BUZBEE:**  If I may, Your Honor, just from our

 6   side, and then we'll let the sleeping dog get some rest.

 7            **THE COURT:**  Well, he has to wake up again, though,

 8   and he might be kind of hungry.  So tell me about it now.

 9            **MR. BUZBEE:**  What he was asked was:

10                 "How many complaints had you had?"

11                 "Eight."

12                 "And you guys sold 50,000 trailers and you

13   received only eight complaints?"

14                 And I'm willing to limit this, as I think is

15   proper, to May 27th of 2006.  But the record is clear that the

16   lawsuit had been filed --

17            **THE COURT:**  The lawsuit was filed -- I've been

18   advised by a very reliable source -- that Hilliard was filed on

19   May 18th of 2006.

20            **MR. BUZBEE:**  There you go.

21            **MR. SCANDURRO:**  Am I the source, Your Honor, or you

22   got it up there?

23            **THE COURT:**  No, I got it from somebody who would know

24   very well.

25            **MR. SCANDURRO:**  I was afraid with that buildup, it

1   wouldn't.

2           **MR WATTS:**  The source is blushing, Your Honor.

3           **MR. BUZBEE:**  So we know at that time however many

4   people were that complaint had, in fact, made complaints and

5   I'm kept from talking about them, but yet they give the jury

6   the impression that this is all we had.

7                   Again, it goes back to, remember, the quantity

8   and quality of the complaints given rise to the duty to warn.

9           **MR. SCANDURRO:**  Your Honor, it was filed on May 18th.

10  If we're going if get this esoteric, when was it served?  You

11  know it wasn't served on May the 18th.  She's in the trailer

12  eight days later.

13          **THE COURT:**  What other witness's testimony is this

14  going to come up on?

15          **MR. BUZBEE:**  Liz Gainere, perhaps, the corporate rep.

16          **MR. SCANDURRO:**  The person not on the witness list.

17          **THE COURT:**  Yeah, the person who's not on the witness

18  list, so I'm not so sure you're going to have her.  What other

19  witnesses are going to testify to this?

20          **UNIDENTIFIED SPEAKER:**  Well, these are depo cuts, but

21  there's FEMA designated testimony about 70 or 80 complaints or

22  something in the middle of 2006, you know, which was elicited

23  relative to what response was appropriate and how many people

24  were complaining.  I mean, let's face it, they want to create

25  in conflagration problem that we had.

1          And I think if you're talking about a duty to

2   warn, I think it is what you knew and when you knew it

3   certainly is relevant, and we've gone all over that today in

4   all the witness testimony that we've heard.

5          **THE COURT:**  I kind of view this as this witness',

6   like I said, personal firsthand knowledge.  That's what he

7   said.

8          **MR. BUZBEE:**  Judge --

9          **THE COURT:**  That's what he remembers.  If you've got

10  other witnesses who are going to testify that they knew about

11  another 50,000, then as of that point in time, then we'll get

12  to the issue then.

13         **MR WATTS:**  If I could just throw in one thing,

14  counsel just said partially something that's true, what was

15  known at that point in time is relevant to the duty to warn.

16  We've also got design defect complaints.  And the Fifth Circuit

17  is very clear, starting with *Soden v. Freightliner* and its

18  progeny.  I could bring you 15 cases from the Fifth Circuit

19  talking about the admissibility of other instances, other

20  complaints on the issue of design -- on the issue of defect.

21         So while I'm not disagreeing with what anybody

22  said that that point in time is relevant to the duty to warn.

23  We're not confined to the duty to warn.

24         **MR. MEUNIER:**  And I don't think the duty stops when

25  she moves into the trailer in May of '06.  She stays in the

 1   trailer through December of '07.  You know, this is a slippery

 2   slope we got here.

 3           THE COURT:  Well, I think that's what the purpose --

 4   this witness testified to communications between him and others

 5   on behalf of Gulf Stream.  And, of course, we included that in

 6   the testimony of Mr. Shea of communication in 2006 and even

 7   thereafter.

 8           MR. MEUNIER:  I'm just saying the unfair impression

 9   left, Judge, is that the entire time this lady's in the unit

10   when we're saying she should have been told something, this guy

11   says, we made 50,000 of these things and only eight people

12   complained --

13           MR. WEINSTOCK:  That's not what he said.  It's a

14   different --

15           MR. MEUNIER:  -- what's the big deal?

16           THE COURT:  I don't think that's what he said.  We

17   talked about his awareness when he went to Baton Rouge when he

18   came down and he testified to tests that he conducted using the

19   little meter, and that's what you-all asked him about,

20   Mr. Buzbee pulled out the exhibits, there was an objection, I

21   overruled it, exhibits were introduced, and that's the extent

22   of this witness' knowledge.

23           MR. MEUNIER:  The question was:  "How many did Gulf

24   Stream make?"

25                   "50,000."

1              **THE COURT:**  He knew that.

2              **MR. MEUNIER:**  "How many complaints did Gulf Stream

3    get?"

4                     "Eight."

5              **THE COURT:**  He knew that.

6              **MR. MEUNIER:**  So the jury is left with the impression

7    that the only thing Gulf Stream knows about are eight people.

8              **THE COURT:**  Do you want him to testify about stuff he

9    doesn't have personal firsthand knowledge of.  He was asked a

10   question and he answered it.  Did you want him to say, "Well,

11   gee, I'm aware of eight, but by hearsay --

12                     You know, you-all are talking about stuff you

13   know.  He's testified to what he knew at a given point in time.

14   That was the question and he answered the question.

15             **MR WATTS:**  Judge, I think what this is, is, as I

16   understand it, there's a motion in limine that's been granted

17   against the number of complaints, and independent of whether

18   this gentleman stopped --

19             **THE COURT:**  No, I don't think we've breached that.

20   I'm going to overrule what the plaintiffs are arguing here.

21   I'm going on overrule it.  I don't think we've encroached on

22   that with this witness.  I don't think we have.  I'm not

23   convinced by your argument.

24             **MR. MEUNIER:**  I wasn't suggesting we go back to him,

25   Judge.  I was just saying the door has been opened.

1          **THE COURT:**  But I have asked already a few minutes
2    ago of what other witnesses we have and I haven't gotten a
3    straight answer.  All I've gotten is your argument.  And none
4    of you-all are going to take the stand, despite your desire to
5    do so.
6          **MR. MEUNIER:**  Tim said cuts are coming in on numbers
7    of complaints.  It's coming, it's not just --
8          **MR. WEINSTOCK:**  It's FEMA.
9          **MR. SCANDURRO:**  It's FEMA.  I'm raising that just to
10   let everybody know.  I mean, everybody's seen the cuts.  That
11   that's the other place that I know of --
12         **THE COURT:**  If the witness is asked at a given point
13   in time about how many complaints they received at that point
14   in time, then their recollection might well be, since they're
15   not inside Mr. Pullin's mind, their recollection might be
16   different than what Mr. Pullin knew.
17         **MR WATTS:**  So we can leave those cuts in?
18         **THE COURT:**  Whose deposition am I supposed to have
19   looked at where I'm supposed to have ruled on it?  Because I
20   don't recall that, and I still have three more to go through
21   tonight.
22         **MR WATTS:**  Why don't we do this, Judge:  Why don't
23   you go through those depositions, we'll bring you the
24   information where we think it's going to come up.  It's not
25   going to come up tomorrow.

1          **THE COURT:**  All right.  Show me where it's going to

2     come up where it's going to be an issue.  Because I don't think

3     we've in any way breached what the Court held, pretrial, with

4     this witness.

5          **MR. SCANDURRO:**  My recollection, Your Honor, is there

6     are internal FEMA documents that may or may not be exhibits

7     that talk about number of complaints that FEMA had received.

8          **THE COURT:**  And those have not come up yet.

9          **MR. SCANDURRO:**  No.  I think that's the nature of

10    the --

11         **MR WATTS:**  We'll come back, we'll bring you cases in

12    where we think it ought to come up.  That's fair.

13         **THE COURT:**  Anything else on the record?

14         **MR. PENOT:**  Your Honor, with respect, I did want my

15    point put on the record, because what it has to do with is I'd

16    like to make a motion in limine to exclude -- to preclude the

17    plaintiffs from calling the Allens and Mr. Blanchard.  They

18    were to be by deposition, so it was in my objections.  But when

19    they switched them to live, I told them one of them had to be

20    live if he was going to come, but I had an objection.

21              The objection is this, Your Honor:  These are

22    installers, sub of a sub, never touched Ms. Alexander's

23    trailer.  Your Honor has said the case is about Ms. Alexander's

24    trailer.  We know who did his Alexander's trailer.  I'm going

25    to have him here.  In fact, they've got one of those guys on

1  their list tomorrow, although, I'm anxious to see if he's here.

2             But the Allens and Mr. Blanchard --

3        **THE COURT:**  Did they do any work for Gulf Stream --

4  on Gulf Stream trailers?

5        **MR. PENOT:**  I have no idea.  I would expect.

6        **MR. MEUNIER:**  He said he thinks he did, yeah.

7        **THE COURT:**  But if they're installing other people's

8  trailers --

9        **MR. HILLIARD:**  Your Honor, this was a direct motion

10  that you entered an order and reasons on.

11        **MR. PENOT:**  Not on my point.  Not on my point.

12        **MR. HILLIARD:**  Well, what the Court said, though, is

13  they'll be allowed to testify -- well, they're going to talk

14  about training by Fluor, number one.

15        **MR. PENOT:**  Again, what's the issue in this case?

16  Ms. Alexander's trailer.  So the issue of training has to do

17  the with people who installed Ms. Alexander's trailer, or are

18  we going to try the MDL?

19        **MR. GLASS:**  Judge, I'd just point out on Blanchard

20  specifically in his deposition testimony, he was actually last

21  employed by the subcontractor before the Alexander unit was

22  even installed.  So he ended his employment in March of 2006.

23  So even if you wanted to go into his training and everything

24  else, it would be for a period of time that didn't encompass

25  the time that Ms. Alexander went into her trailer when it was

1    installed.

2         **THE COURT:**  You can call him, but you can object to

3    them when specific questions come up.  If they have nothing to

4    offer then it's going to be a very short appearance here.  If

5    they haven't worked on the trailer, if they haven't worked on a

6    Gulf Stream trailer, they may be good for some limited

7    testimony, but they may not be worth calling.

8              If we have the people who did the actual

9    installation, wouldn't those be with the best witnesses with

10   regard to what instructions they were given?

11        **MR. HILLIARD:**  Right.

12        **THE COURT:**  These people are going to be so limited

13   that they're probably going to be on the stand for perhaps five

14   questions and that's it --

15        **MR. BUZBEE:**  Probably so.

16        **THE COURT:**  -- if that.  So we'll have to see.  There

17   was no motion to exclude them.  There was a motion directed to

18   their testimony and I've ruled on it.  If you bring them, we'll

19   hear what they have to say, they object, and if I sustain the

20   objection then I guess they'll step down.

21        **MR. PENOT:**  Well, with respect, Your Honor, I'm

22   making the motion now.

23        **THE COURT:**  I understand that and I'm ruling on it.

24        **MR. PENOT:**  Well, I didn't hear a ruling on it, Your

25   Honor.

 1          **THE COURT:**  Let's go off the record.

 2                  **(OFF THE RECORD)**

 3                      **\*\*\*\*\***

 4                    <u>**CERTIFICATE**</u>

 5          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

 6   for the United States District Court, Eastern District of

 7   Louisiana, do hereby certify that the foregoing is a true and

 8   correct transcript, to the best of my ability and

 9   understanding, from the record of the proceedings in the

10   above-entitled and numbered matter.

11

12

13                    ___S/ Jodi Simcox, RMR, FCRR___
                      Jodi Simcox, RMR, FCRR
14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25