1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  FEMA TRAILER          *    Docket MDL 1873 "N"
     FORMALDEHYDE PRODUCTS         *
6    LIABILITY LITIGATION          *    New Orleans, Louisiana
                                   *
7    THIS DOCUMENT IS RELATED TO:  *    September 16, 2009
                                   *
8    CHARLIE AGE, ET AL V          *    1:15 P.M.
     GULF STREAM COACH, INC.,      *
9    ET AL, DOCKET NO. 09-2892;    *
     ALANA ALEXANDER, INDIVIDUALLY *
10   AND ON BEHALF OF              *
     CHRISTOPHER COOPER            *
11   * * * * * * * * * * * * * * * *

12                         DAY 3
                     AFTERNOON SESSION
13          JURY TRIAL PROCEEDINGS BEFORE THE
                HONORABLE KURT D. ENGELHARDT
14             UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16

17   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                   Meunier & Warshauer
18                              BY:  GERALD E. MEUNIER, ESQ.
                                1100 Poydras Street
19                              Suite 2800
                                New Orleans, Louisiana 70163
20

21                              The Buzbee Law Firm
                                BY:  ANTHONY G. BUZBEE, ESQ.
22                              JP Morgan Chase Tower
                                600 Travis, Suite 7300
23                              Houston, Texas  77002

24

25

           JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES</u>:

2    For the Plaintiffs:          Watts Guerra Craft
                                  BY:  MIKAL C. WATTS, ESQ.
3                                 Four Dominion Drive
                                  Building Three, Suite 100
4                                 San Antonio, Texas  78257

5
                                  Hilliard Munoz Guerra
6                                 BY:  ROBERT C. HILLIARD, ESQ.
                                  710 S. Shoreline Boulevard #500
7                                 Corpus Christi, Texas  78401

8
                                  CHRIS PINEDO, ESQ.
9                                 Attorney at Law
                                  802 North Carancahua
10                                Suite 2250
                                  Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                    & Morton
13                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  BY:  JOSEPH G. GLASS, ESQ.
14                                3838 N. Causeway Blvd.
                                  Suite 2900
15                                Metairie, Louisiana 70002

16
                                  Scandurro & Layrisson
17                                BY:  TIMOTHY SCANDURRO, ESQ.
                                  607 St. Charles Avenue
18                                New Orleans, Louisiana  70130

19
     For Fluor Enterprises:      Middleberg, Riddle & Gianna
20                                BY:  CHARLES R. PENOT, JR., ESQ.
                                  BY:  RICHARD A. SHERBURNE, ESQ.
21                                BY:  SONIA MALLETT, ESQ.
                                  717 North Harwood
22                                Dallas, Texas  75201

23

24

25

1    <u>APPEARANCES</u>:

2

3    Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                     500 Poydras Street
                                     Room HB-406
4                                    New Orleans, Louisiana 70130
                                     (504) 589-7780
5

6

7

8    Proceedings recorded by mechanical stenography, transcript

9    produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

Page

AL WHITAKER
        Cross-Examination                        183
        Cross-Examination                        186

ROBERT ENGLAND DUCKWORTH
        Direct Examination                       190
        Cross-Examination                        197
        Cross-Examination                        217

TRAVIS ALLEN
        Direct Examination                       221
        Cross-Examination                        239
        Redirect Examination                     241

HEATH ALLEN
        Direct Examination                       242
        Cross-Examination                        252
        Redirect Examination                     257

DARYL WINSTON LEMIEUX
        Direct Examination                       260
        Cross-Examination                        282
        Cross-Examination                        283

ANGELA TAYLOR BAKSH
        Direct Examination                       287
        Cross-Examination                        291

SHIRLEY ALEXANDER
        Direct Examination                       295
        Cross-Examination                        306
        Cross-Examination                        318
        Redirect Examination                     329

RICHARD WAYNE SOBER
        Videotaped deposition                    336

1                     **<u>AFTERNOON SESSION</u>**

2                     **(September 16, 2009)**

3                           * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          (WHEREUPON, the jury entered the courtroom.)

6          **THE COURT:**  All right.  As you were.

7               I have been advised by the attorneys that

8    Mr. Penot, who is representing Fluor, who this gentleman is

9    with, is going to reserve his right to question this gentleman

10   as part of Fluor's case-in-chief.

11              Is that correct?

12         **MR. PENOT:**  That's correct, Your Honor.

13         **THE COURT:**  So at this juncture, you will pass on

14   questioning him at all right now and bring him back to the

15   stand when Fluor can present its case-in-chief?

16         **MR. PENOT:**  That is correct, Your Honor.

17         **THE COURT:**  Okay, good.  And I'm also given to

18   understand a very important detail of that will be, the word

19   that was told to me, a "time-saver".

20         **MR. PENOT:**  A big time-saver, Your Honor.

21         **THE COURT:**  Are we all in agreement on that?

22         **MR WATTS:**  We're all happy with the arrangement,

23   Judge, and agreement.

24         **THE COURT:**  Well, I'm in favor of it, too.

25         **MR. PENOT:**  It saves time today.

1          **THE COURT:**  Well, I'm hoping it will be a time-saver

2   in the long run, too.

3          **MR WATTS:**  We think it will.

4          **MR. PENOT:**  I do too, Your Honor.

5          **THE COURT:**  All right.  And that's his prerogative,

6   so we're going to allow Mr. Penot to do that since that's his

7   client represented testifying.

8                Now, we were going to have -- Mr. Scandurro on

9   behalf of Gulf Stream, you would like to ask this witness some

10  questions at this point?

11         **MR. SCANDURRO:**  Just a very few.

12         **THE COURT:**  Sure.  We'll go ahead and have you.  And

13  then if there's anything else that Mr. Hilliard would like to

14  cover relative to your questions, we'll let him do that.  And

15  to be clear, when Mr. Penot puts Mr. Whitaker back on the stand

16  as far as Flour's case-in-chief, he will then be subject to

17  cross-examination, as we typically would do any witness

18  follow-up at that point.

19         **MR WATTS:**  Yes, sir.

20         **THE COURT:**  Okay.  Go ahead, Mr. Scandurro.

21         (WHEREUPON, **Al Whitaker**, having been previously duly

22  sworn, testified as follows.)

23                       **CROSS-EXAMINATION**

24  BY MR. SCANDURRO

25  **Q.**   Mr. Whitaker, good afternoon.  I just had a few questions

1    for you to follow up on something you said.

2            You mentioned a Brian Boyle, with FEMA, contacting

3    Fluor in March of 2006; is that right?

4    A.    Yes, sir.

5    Q.    And he contacted you about the formaldehyde issue in

6    trailers?

7    A.    Yes.  When you say "you," Fluor, yes.

8    Q.    Fluor, yes, sir.

9            And Fluor responded?

10   A.    Yes, sir.

11   Q.    All right.  Did Fluor -- what did Fluor do in response?

12   A.    Well, we responded directly to Brian's question.  But in

13   government contracting, you're only supposed to take directions

14   from certain people, you know, the contracting officer and the

15   contracting officer's technical representative.  So as well as

16   responding to Brian, we also responded to the COTR, Contracting

17   Officer's Technical Representative, to get direction from him

18   as to what he wanted us to do.  Because Brian's questions

19   implied he wanted us to do some studies and so forth, so we had

20   to make sure we could do that with our COTR.  And the COTR

21   basically came back and said, No further action required.  But

22   --

23   Q.    I'm sorry to interrupt you.

24           You basically asked FEMA, What do you want us to do

25   about this formaldehyde issue?

1   A.   Yes, sir.

2   Q.   And FEMA came back to you and said no further action was

3   required?

4   A.   That's correct.

5   Q.   Were you willing to test trailers at that point, in March

6   of 2006, if FEMA had asked you to?

7   A.   Yes.  We had offered background studies, if you will.  We

8   did as part of our overall risk assessment.  For any job, we do

9   a risk -- we gave them that information, and we offered to do

10  additional testing if they wanted, as well as work on them with

11  communications of plans, since we installed or were responsible

12  for most of the parishes in the state.

13  Q.   But FEMA told you they didn't need any help from you?

14  A.   That's correct.  They said --

15  Q.   I'm sorry.

16  A.   I'm sorry.

17        They said that they were taking care of that.  And if

18  they needed our assistance, they would let us know.

19  Q.   And they were going to pursue a communications strategy?

20  That was going to be their response?

21  A.   Yes.  That wasn't part of that conversation with the COTR.

22  In subsequent conversations with FEMA, we were told that they

23  were developing a communications strategy, and they didn't need

24  our assistance at the time.

25  Q.   And all this took place in March of 2006, the initial

1  contact with FEMA, two months before Ms. Alexander moved into
2  her trailer?
3  A.   Yes, sir.
4         MR. SCANDURRO:  Thank you, Your Honor.  That's all.
5         THE COURT:  Thank you.
6             Mr. Hilliard?
7         MR. HILLIARD:  Thank you, Judge.
8                    CROSS-EXAMINATION
9  BY MR. HILLIARD
10 Q.   After the FEMA COTR told you in March -- actually,
11 March 21st of 2006, they informed you no further action need be
12 taken; is that right?
13 A.   I think it was the 21st.  It may have been the 22nd.  But,
14 yes, the COTR said no further action was required.
15        MR. HILLIARD:  May I approach, judge?
16        THE COURT:  Yes.
17 BY MR. HILLIARD
18 Q.   Just to refresh your memory --
19        THE COURT:  Wait.  I don't know if we're all supposed
20 to be hearing this, but you got a little --
21        THE WITNESS:  I'm sorry.
22        THE COURT:  Let's get the question first, and then
23 we'll let you...
24 BY MR. HILLIARD
25 Q.   To refresh your memory, sir, on March 21st, 2006, quote,

```
 1   COTR informs that no further action needs to be taken.
 2   A.    Yes, sir.  And the request was made on 3/21; the response
 3   was actually 3/22.
 4   Q.    So the next day.
 5              So that means that as soon as he tells you that, you
 6   don't have to do any more testing?
 7   A.    We didn't do any testing.  We offered to test, but we were
 8   told we didn't need to do any.
 9   Q.    Can you tell the jury what 430 is, if we can highlight the
10   top part?
11   A.    Yes, sir.  That's a --
12   Q.    What is that?
13   A.    -- a form to record testing results.
14   Q.    And did you report testing results of formaldehyde testing
15   done in trailers?
16   A.    Yes, sir.
17   Q.    What's the date there?
18   A.    May 24th.
19   Q.    Which is after the date that COTR told you to stand down?
20   A.    No, sir.  That's not the way to characterize it.  He
21   didn't tell us to stand down.  He said no further action
22   required on that issue.  This is a different issue.
23   Q.    This is testing formaldehyde in trailers; right?
24   A.    Yes, sir.
25   Q.    But it's different than the formaldehyde issue that you
```

1    spoke to the COTR about?

2    A.    Yes, sir.  This is in response to the thing we talked

3    about a minute ago with Mr. Hopkins, who is one of our

4    employees, who reported that he felt he was exposed to

5    formaldehyde in one of the trailers on, I think, the 21st of

6    May.

7          We went out and did testing, which is our obligation,

8    and actually a requirement to do so under OSHA when a worker

9    brings up a complaint -- or that he was exposed.  So we did a

10   sampling event of the trailers he worked in, and then tried to

11   replicate the situation he was in going into the trailer and

12   being closed up.  We went to the staging yard and sampled some

13   units in the staging yard that had been closed up also.

14   Q.    So once the government told you no further action was

15   required, you went and tested because of Mr. Hopkins, and you

16   got test results.

17         Did you turn those test results over to the

18   government?

19   A.    Yes, sir, I think so.

20   Q.    Were you told by the government specifically not to give

21   any information to any of your customers who went into the

22   trailer?

23   A.    Well, two different points in time, March 21st/22nd time

24   frame --

25   Q.    Right.

1  **A.**   -- we were told that they were developing their
2  communications plan, so it would not be appropriate for us to
3  go communicate with the occupants, since FEMA would be doing
4  that.  And we wouldn't want to be inconsistent with their
5  communications plan.
6        This event in May was for an occupational safety
7  issue with one worker.  So what would we -- I'm sorry.  I'm not
8  supposed to ask you questions.
9  **Q.**   Well, you can.  But then I answer them, and then we get...
10 **A.**   I'm sorry.
11       **THE COURT:**  Good job.  Please don't.
12       **MR. HILLIARD:**  Pass the witness, please.
13       **THE COURT:**  Please don't.  Just answer it and wait
14 for the next question.
15           That's it?
16       **MR. HILLIARD:**  Yes, sir.
17       **THE COURT:**  Okay, good.
18           Sir, you can step down.  I know you've been here
19 during the proceedings, but there's an indication that you're
20 going to return to the stand later, at which time you'll be
21 reminded that you're still under oath.  You may step down.
22       **THE WITNESS:**  Yes, sir.  Thank you.
23       **THE COURT:**  And I would also ask counsel to be
24 mindful that even though Mr. Whitaker is going to be returned
25 to the stand later in these proceedings, it's not an

 1   opportunity to plow any ground that's been plowed here in the

 2   last couple of hours, nor to cross any bridges that have

 3   already been burned.

 4                  So let's move on to the next witness.

 5              **MR. HILLIARD:**  Your Honor, we'd call Robert Duckworth

 6   to the stand.

 7              **THE COURT:**  Mr. Duckworth, Robert Duckworth.

 8                  Mr. Duckworth, if you'd come up here, sir.  If

 9   you'll just stand right behind this chair, at which time you'll

10   take the oath, and then you can have a seat.

11              **THE WITNESS:**  Yes, sir.

12              (WHEREUPON, **ROBERT DUCKWORTH**, having been duly sworn,

13   testified as follows.)

14              **THE DEPUTY CLERK:**  Please state your full name and

15   correct spelling for the record.

16              **THE WITNESS:**  My name is Robert England Duckworth,

17   R-O-B-E-R-T, E-N-G-L-A-N-D, D-U-C-K-W-O-R-T-H.

18              **THE COURT:**  All right.  Mr. Hilliard?

19              **MR. HILLIARD:**  Thank you, Judge.

20                         **DIRECT EXAMINATION**

21   BY MR. HILLIARD

22   **Q.**   Good afternoon, Mr. Duckworth.  I'm Bob Hilliard.

23         How are you?

24   **A.**   I'm fine, thank you.

25   **Q.**   You work for Fluor?

1   **A.**    I work for Fluor, yes.

2   **Q.**    What do you do for Fluor?

3   **A.**    I am a senior health safety environmental manager.

4   **Q.**    At some point in the past did you become involved in doing

5   some investigation as to levels of formaldehyde in travel

6   trailers?

7   **A.**    Yes, we did.

8   **Q.**    Can you explain to the jury what you did and why you did

9   it?

10  **A.**    Um --

11  **Q.**    I'm sorry to interrupt.  Can you give us a time frame,

12  too, please?

13  **A.**    We started, really, an investigation into travel trailers

14  in about May 2006 when we had an employee come to us who felt

15  that they had a potential of some concern.  He worked --

16  family -- as I recall, his wife -- he was not feeling well

17  during the day.  He worked somewhere else in the area and had

18  been exposed to galvanized welding fumes.  And welding fumes,

19  there's a sickness that you can get that will delay on into --

20  it's kind of medical-based.  But it's generally well known in

21  the welding industry.

22           So it almost had like flu-like symptoms.

23           **THE COURT:**  Let's concentrate on the question that

24  he's asking.

25           **THE WITNESS:**  Okay.

1  **A.**   Well, that is what precipitated it.  He brought forward a

2  concern and thought -- he had an issue with formaldehyde.  He

3  was going in and out.  He was a quality inspector going in and

4  out of trailers.  And said, Could this be formaldehyde?

5  **BY MR. HILLIARD**

6  **Q.**   Uh-huh.

7  **A.**   So to answer your question, we directed our industrial

8  hygienist, Patrick Logue, to go out and check surveys and

9  actually do dragger, which is a testing of a tube, and actually

10  take concentration samples of trailers.  Came back, got those

11  numbers --

12         **THE COURT:**  I think we're getting way ahead of

13  ourselves.

14         **THE WITNESS:**  Okay.  Well, all right, sure.

15         **THE COURT:**  Listen to his question carefully and

16  answer it as precisely and directly as you can, and then he'll

17  ask you another question.

18         **THE WITNESS:**  All right.

19  **BY MR. HILLIARD**

20  **Q.**   When you did your testing, what were the test results that

21  you obtained in regards to the formaldehyde levels in the

22  trailers, the ranges?

23  **A.**   I believe the test tubes, as I recall from the test

24  sheets, that we tested between less than half a part up to five

25  parts, was the range.  And to that, we tested less than half a

```
 1   part.  And then in one case, I think one trailer we tested 2.0
 2   parts per million.
 3   Q.   Parts per million.  2.0 parts per million in one trailer?
 4   A.   In one single trailer, a one-time incident.
 5   Q.   All right.  And then .5 parts per million in how many
 6   trailers?
 7   A.   I'd have to look at the test -- his test sheets.
 8            SPEAKERB:  May I approach, Judge?
 9            THE WITNESS:  Yes.
10   BY MR. HILLIARD
11   Q.   I'm going to hand you what's been admitted as 429 and 430.
12   And please tell me if you need anything else other than that to
13   answer the question.
14   A.   No, I don't need anything else.
15   Q.   Okay.  The question is:  Can you tell us the levels of
16   formaldehyde found in those trailers at the points in time that
17   they were tested?
18   A.   Yes.  On the 23rd of May, we had one trailer less than or
19   equal to 0.5, one at 0.5, one at less than or equal to 0.2, one
20   at less than 0.5, and one at 2.0.
21            So we actually had one qualified at 0.5, one at 0. --
22   2.0, and three of them at less than a number, but not
23   exceeding.  It didn't even register on the device, so it could
24   have been zero.
25   Q.   Did you do any additional testing other than the ones that
```

1  you just gave us the results of?

2  **A.**   We did on another day, on another location, another area,

3  taking into account for temperature, humidity, and those type

4  of things.

5  **Q.**   Can you share with us those results, briefly?

6  **A.**   Certainly.  We tested five trailers, and one was at 0.5

7  ppm, one was less than or equal to 0.5, less than or equal to

8  0.2, one at 0.5, and one at not detectable.

9  **Q.**   And did you share those results with the federal

10  government through its agency, FEMA?

11  **A.**   Only through our records retention.

12  **Q.**   All right.  This gentleman right here, Mr. Whitaker, just

13  testified right before you got in that those results went to

14  FEMA.

15        Is that true?

16  **A.**   Through our records retention, yes.

17  **Q.**   Well, does that mean you just retain it for their review

18  if they wanted to review it, or you sent it to them?

19  **A.**   We -- these -- I don't recall of any official transmission

20  that I directed for the industrial hygienist to turn this over.

21  We did a closeout report, and I believe we submitted Mr. Lobe's

22  closeout summary that capsulizes this.  And this report really

23  was the basis for -- let me get the gentleman's name.

24  **Q.**   Mr. Hopkins?

25  **A.**   Yeah, Michael Hopkins who brought forward, really, an

 1    illness type issue.  So we really dealt with that this to

 2    determine, did Mr. Hopkins have a workplace illness exposure.

 3    We determined that, and credentialized it as, we don't believe

 4    so.  And that's in our writeup report.

 5              So, really, this information really went to that

 6    medical log.  We don't share medical logs with FEMA.

 7    **Q.**   So it did not go to FEMA?

 8    **A.**   Not through the medical logs.

 9    **Q.**   Got it.  If you determine through those test results that

10    there is a public health concern because of the levels that you

11    found, even though you're testing for Mr. Hopkins specifically,

12    what steps do you take to assure that the public safety is

13    addressed?

14    **A.**   We would remove the personal identifiers to the person

15    involved, and we would flag that information up through our

16    client and on over.

17    **Q.**   And you understand that formaldehyde is a known human

18    carcinogen?

19    **A.**   Yes.

20    **Q.**   And do you agree with the proposition that no level of a

21    known human carcinogen is a safe level?

22    **A.**   No, I do not agree with that.

23    **Q.**   So you think there are safe levels of known human

24    carcinogens?

25              Let me be more specific.  Do you think there are safe

1   levels of known human carcinogens in travel trailers?

2   **A.**   I don't believe I have the foundation basis to answer

3   that.

4   **Q.**   Well, you had the foundational basis to answer that you

5   believed that no level is unsafe, the premise question.  So now

6   I'm just taking you to the next step and saying, Can you tell

7   these folks that you believe that there is a safe level of a

8   known human carcinogen, formaldehyde, in travel trailers; yes

9   or no?

10          **MR. PENOT:**  Objection, your Honor.  He just said that

11  he doesn't have the foundational qualification to talk about

12  that.  And we're going to get back into just arguing between

13  Mr. Hilliard and my witnesses.

14          **THE COURT:**  Now, I think the predicate makes it a

15  fair question.  If he cannot answer it, or if he believes he

16  does not have the foundational basis to answer it, I'll allow

17  him the opportunity to say that.  But he's asked it a different

18  way, and I think once he answers it here, we'll move on, if he

19  can answer it.

20  **A.**   We reviewed the EPA air quality standards information --

21  and this is my foundation for my basis -- and Patrick Lobe's

22  report of information; to which the medical and the scientific

23  community all disagree on the levels of safe levels for

24  formaldehyde; to which we made a good-faith determination that

25  Mr. Hopkins here did not have any type of workplace exposure to

1    that.

2              So any level less than this is, in my opinion, a safe

3    level.

**BY MR. HILLIARD**

4

5    **Q.**  So the answer to my question is, you believe there is a

6    safe level of a known human carcinogen inside a travel trailer

7    where folks lived?

8    **A.**  Yes.

9              **MR. HILLIARD:**  Pass the witness.

10             **THE COURT:**  All right.  Mr. Scandurro?

11             **MR. SCANDURRO:**  No questions, Your Honor.

12             **THE COURT:**  All right.  Mr. Penot?

13                         **CROSS-EXAMINATION**

14   **BY MR. PENOT**

15   **Q.**  Mr. Duckworth, would you tell the jury about your

16   educational background?

17   **A.**  I have a Bachelor's of Science in management and

18   leadership.  I have a professional licenses in firefighting,

19   emergency medical technician, hazardous waste response,

20   HAZMAT-level technician, utility systems, wastewater discharges

21   from EPA, licensed to operate plants, chemical discharges into

22   the environment.

23   **Q.**  Did you receive any special commendations recently?

24   **A.**  Actually, in -- earlier this year I was awarded Fluor's

25   Silver Cross for rescuing four teenagers that had crashed into

1    an auto accident.  And just recently here in June, I was

2    awarded Safety Hero of the Year by the SafetyXChange

3    organization.

4    Q.    Could you explain, just very quickly, what's the

5    SafetyXChange organization?

6    A.    SafetyXChange organization is a 15,000-member

7    international community of safety professionals around the

8    world.  It's a clearinghouse of workplace safety information,

9    best practices, tips, current issues, those type things.  They

10   speak to all levels of health, safety, environment within -- in

11   the workplace.

12   Q.    Now, you've answered some questions of Mr. Hilliard about

13   the events of May 2006, and an event or notification that was

14   received from an employee, Mr. Hopkins.

15         Are you familiar with any inquiries that came to the

16   safety department or the health/safety/environmental department

17   on the project, the Katrina response project, before that?

18   A.    Well, yes, in, I believe it was March 20th, we had a

19   request that came forward -- came to me from my direct manager,

20   Richard Belote, that was generated from FEMA asking what we

21   were doing with regards to formaldehyde and possibly airing out

22   trailers.

23   Q.    Before -- let's tell the jury some questions they may

24   have.  I failed to do this.

25         What was your role on Fluor's FEMA Hurricane

1   Katrina/Rita response effort?

2   A.   I was the senior site safety manager.  That was my title

3   for Fluor.  I had approximately 35 safety professionals that

4   worked for me across the 39,000 square miles of Louisiana, to

5   which we installed our trailers, including our strike teams,

6   our survey teams.  I also had an industrial hygiene, and also

7   helped assist the environmental staff.

8   Q.   You mentioned a Mr. Richard Belote.  Who is Mr. Belote?

9   A.   Mr. Belote was the safety and health program director.

10  Q.   And you reported to Mr. Belote --

11  A.   I reported to Mr. Belote, and I was his deputy, and I was

12  his designee when he was out of town.

13  Q.   And you also mentioned a Mr. Patrick Logue, an industrial

14  hygienist.  Just quickly tell the jury who Mr. Patrick Logue

15  is.

16  A.   Patrick Logue is a local Louisiana resident.  He came to

17  us.  He had worked in the chemical industry here in the area.

18  He lived around the Gonzales/Baton Rouge area.  He was retired.

19  And he was a qualified industrial hygienist.  And from time to

20  time -- well, I don't want to say from time to time -- we

21  initially had deployed another industrial hygienist, a

22  gentleman by the name of Craig Claremont, when we first

23  responded down to deal with all the industrial hygiene health

24  type issues we had.

25           And as we went along, we decided that we needed to

1  have someone to look at all the broad industrial hygiene

2  issues.  And so we went out and recruited Mr. Logue to come

3  work for us.

4  Q.   Okay.  And did you supervise Mr. Logue's work on the

5  project?

6  A.   I did supervise Mr. Logue's work.

7  Q.   If I wanted to have Mr. Logue here today, would I be able

8  to do that?

9  A.   It would be difficult.  Mr. Logue had a stroke last year

10  and is recovering from that.  His physical health is coming

11  back.  He had some trouble with short-term memory loss and some

12  word formations.  But I'm ready to bring him back to work as

13  soon as he's good to go.

14  Q.   But did you review his work?  Did he submit his work to

15  you on the project?

16  A.   Yes, he did.

17  Q.   Now, you mentioned in March 20th, or sometime in March,

18  there had been this inquiry sent to you from your boss,

19  Mr. Belote, but that had come from FEMA; correct?

20  A.   Yes.  And, to me, with a group of people.

21  Q.   Okay.  Before that point in time, before that

22  communication comes to you in March 2006, were you a

23  participant in any regular meetings concerning safety with

24  respect to the Katrina/Rita response efforts?

25  A.   Yes.  We would have a weekly phone call with the OSHA --

1     it was actually OSHA, federal OSHA Alliance from FEMA, to which

2     ourselves and the other contractors in the area participated,

3     and also the Army Corps of Engineers.

4     **Q.**    And this was the contractors operating in Louisiana?

5     **A.**    Yes.  Just the New Orleans, Louisiana, district, area.

6     **Q.**    And an OSHA representative?

7     **A.**    Yes.

8     **Q.**    And a FEMA representative?

9     **A.**    Yes.

10    **Q.**    So these are safety people from those organizations;

11    correct?

12    **A.**    Yes.  This is their dedicated safety team.

13    **Q.**    Did you attend those meetings regularly?

14    **A.**    We did, as time permitted.  We attended by teleconference,

15    and that was how it was set up.

16    **Q.**    Prior to this March 20th communication that you've

17    described for us, had there been any communications from OSHA

18    or FEMA in those weekly or biweekly meetings, whatever they

19    were, concerning formaldehyde or concerns about formaldehyde in

20    travel trailers?

21    **A.**    No.

22             **MR. PENOT:**  Jane, 492, 2664.  I think it's admitted.

23    This is among the things that had been ruled on in pretrial.

24    It's the e-mail.

25             Please -- I'm sorry -- go to Page 26665 of 492,

 1    please.
 2                    And please -- let's see.  I don't know whether
 3    to look at the big one or the little one here.  Let's see.  If
 4    you could narrow in on that bottom e-mail from Brian Boyle.
 5    Scroll up slightly, please.
 6    **BY MR. PENOT**
 7    **Q.**   Is this the e-mail to which you were referring,
 8    Mr. Duckworth, in March of 2006?
 9    **A.**   Yes, it is.
10    **Q.**   And Brian Boyle, associate to DHS, he's with the
11    Department of Homeland Security; is that correct?
12    **A.**   Yes, that is correct.
13    **Q.**   Okay.  And Jay Moylan was with Fluor; correct?
14    **A.**   Yes.  He was our Fluor contact.
15    **Q.**   Todd Novak, another recipient, is with Fluor; correct?
16    **A.**   That's correct.
17    **Q.**   And the other two or three recipients are with Shaw and
18    CH2M Hill; is that correct?
19    **A.**   That would be correct.
20    **Q.**   And they were also contractors doing similar kind of work
21    in the Katrina/Rita effort in Louisiana?
22    **A.**   That's right.  We were all trying to put people into
23    homes.
24    **Q.**   So it reads:  "Gentlemen, our safety office needs to know
25    from each contractor the process of airing out of all travel

1    trailers and mobile homes to handle the existence of

2    formaldehyde inside the units, and what you are doing to handle

3    this.  Please e-mail your response for combatting this problem

4    so Larry can pass this on to Safety in D.C.  Thank you for your

5    attention to this.  And I'll wait to here from each of you, and

6    send it on to Larry."

7              Did I read that right?

8    A.   Yes, you did.

9    Q.   What did Fluor do when it received this communication?

10   A.   Well, what we did in the industrial hygiene group, when

11   this came to Mr. Belote, we started to see what possible

12   concerns there could be with formaldehyde, and we undertook a

13   general study to it.

14   Q.   Let's go up on this same e-mail.  It went to Jay Moylan at

15   -- let's see.  The e-mail comes in at 9:00 in the morning --

16   9:13 in the morning on March 20; correct?

17             The next e-mail in this chain is from Jay Moylan at

18   9:27; is that right?

19   A.   Yes.

20   Q.   And he sends it on to a whole host of folks, other Fluor

21   folks; correct?  And he says:  "Rusty, I understand from Phil

22   that this has been encountered on some level.  How prevalent is

23   this issue?  Do we air out the trailers when it is encountered,

24   or do we air out all trailers received for a period of time?"

25             Did I read that correctly?

1  **A.**   Yes, you did.

2  **Q.**   All right.  Let's go on up the e-mail chains, please.  A

3  little further.  I think we need to go to the prior page.

4           We are now to -- can you scroll just slightly up?

5  Oh, no, excuse me.  So it's 10:00.  It's 45 minutes later;

6  correct?

7  **A.**   Yes.

8  **Q.**   And who is Mr. Robert Bukowski?

9  **A.**   Robert Bukowski was really one of our district area

10  managers for the Orleans Parish.

11  **Q.**   He's one of the operations guys.  Is that a fair

12  statement?

13  **A.**   Yes, he's one of the operations managers.

14  **Q.**   He's running, getting the trailers where they got to go?

15  **A.**   Yes.  He's the buck-stops-here guy.

16  **Q.**   All right.  10:00, he sends it on to Raleigh Long.  Who's

17  Raleigh Long?

18  **A.**   Raleigh Long was my lead safety manager for the Orleans

19  and St. Bernard Parish.

20  **Q.**   Okay.  And he asks Raleigh to look into it and offer any

21  contributions that he can; is that right?

22  **A.**   That is correct.

23  **Q.**   Let's go on up the e-mail.  Excuse me.  Down slightly for

24  one minute, right where we were.  And let's see.

25           Richard Belote is copied on there; correct?

1    **A.**    And he copied to Richard Belote.

2    **Q.**    The head of health, environmental, and safety on the

3    project?

4    **A.**    Yes.

5    **Q.**    So at 10:00 a.m. on March 20th, the head of health,

6    safety, and environmental, 45 minutes later, has this e-mail;

7    is that a fair statement?

8    **A.**    It's in his e-mail file, yes.

9    **Q.**    All right.  Let's go up.

10            Now, Mr. -- this is a hard e-mail to read.  But do

11   you know -- well, this e-mail is from Mr. Belote to a host of

12   Fluor folks; is that a fair statement?

13   **A.**    That is correct.

14   **Q.**    Okay.  And he says:  "This is a problem that needs to be

15   run to ground and dealt with by our industrial hygienist."

16            Is that correct?

17   **A.**    That is correct.

18   **Q.**    And that would be Mr. Patrick Logue?

19   **A.**    That is correct.

20   **Q.**    And you're copied on this e-mail?

21   **A.**    That's correct.

22   **Q.**    And you got Mr. Logue on the job?

23   **A.**    That's right.

24   **Q.**    He asks a hosted of questions, doesn't he?  He says:  "Who

25   identified this as a problem?  How did they determine it to be

1     a problem?  Is there a specific safety alert which documented

2     results, or is this speculation?  Is this a potential problem

3     affecting employees, or residents, or both?  Have any studies

4     been done on the trailers that 'airing them out' solves the

5     problem?  Has the manufacturer given us any indication of a

6     potential problem in the owner's manuals?  Is there any

7     other" --

8              He's got a lot of questions here, a lot of things to

9     look into; correct?

10    A.    Absolutely correct.

11    Q.    And did you and Mr. Logue pop to it and look at those

12    questions?

13    A.    Yes, we did.

14    Q.    We'll just go through a few of them here.

15             MR. PENOT:  Would you please, Jane, turn to 490, 492,

16    26634.

17    BY MR. PENOT

18    Q.    And this is from Patrick Logue to Mr. Belote and yourself;

19    correct?

20    A.    Yes, that's correct.

21    Q.    And who is Mr. Chuck Berger?

22    A.    Chuck Berger was our environmental scientist and manager

23    on the project.

24    Q.    So that first e-mail came in about 9:15 in the morning,

25    didn't it?

1   A.   That's correct.

2   Q.   And your industrial hygienist had a report in your inbox

3   by that afternoon, didn't he?

4   A.   Correct.

5   Q.   Richard Duck, here's everything you ever wanted to know

6   about formaldehyde.  "Patrick, P.S., They changed the OSHA PEL

7   from the time-weighted average -- they changed the OSHA PEL,

8   time-weighted average, .75 parts per million."

9            And you're going to have to help me with the "ST."

10   You taught me that, but I forgot.

11   A.   Yeah, that's the OSHA, Occupational Safety & Health

12   Administration, permissible exposure limit, time-weighted

13   average, 0.75 parts per million.  And then short term.  And at

14   2 parts per million.

15   Q.   So, in other words, the OSHA standard was at 2 parts per

16   million.  That was some form of acceptable exposure in an

17   occupational setting?

18   A.   Yes, short term.

19   Q.   Okay.  And he says:  "Formaldehyde chemical background or

20   document attached."

21            MR. PENOT:  Let's go to the next page, please.

22   BY MR. PENOT

23   Q.   And this is the work that Mr. Logue pulled together in a

24   half a day's time; is that correct?

25   A.   Yes.

1  **Q.**   It goes on for some -- well, electronic stuff is great.

2  But when you don't have the paper, you can't answer this

3  question.  It goes on for some --

4          **MR. PENOT:**  Please just scroll through the next six

5  pages, or whatever the rest of this document is.

6  **BY MR. PENOT**

7  **Q.**   And he passed all this information along to you too; is

8  that correct?

9  **A.**   Yes, and Mr. Berger.

10 **Q.**   Did we tell the jury who Mr. Berger is?

11 **A.**   Yes, but I'll repeat it.  He was our environmental

12 scientist.

13         **MR. PENOT:**  Please go to 492, Bates number 27761.

14         **MR. HILLIARD:**  Charlie, what exhibit are we leaving

15 right now?

16         **MR. PENOT:**  Yeah, I'm sorry.  It's a number of

17 e-mails in this single document.  I apologize.

18         **THE COURT:**  Is this an admitted exhibit --

19         **MR. PENOT:**  It is, Your Honor.

20         **THE COURT:**  -- in globo?

21         **MR. PENOT:**  It is.

22         **THE COURT:**  All right.

23         **MR. PENOT:**  Please go to 27762.  Please blow up the

24 top e-mail.

25

1  **BY MR. PENOT**

2  **Q.**   Do you know who Mike -- oh, excuse me.  Sorry.  This is

3  from -- it's the wrong e-mail.  I apologize.  It's from another

4  contractor.

5         Did Mr. Belote respond to Mr. Boyle?

6  **A.**   Yes, we did.

7         **MR. PENOT:**  Again, 492, 2662, please, Jane.

8  **BY MR. PENOT**

9  **Q.**   And just very quickly at the top, this is from Mr. Belote

10  to Mr. Boyle; correct?

11  **A.**   Yes, that is correct.

12  **Q.**   And "Subject:  Formaldehyde."  And let's look at the body

13  of the e-mail.  "Short time frame required for this response."

14         Is that what you referred to as the whole effort of

15  responding to Katrina and Rita?

16  **A.**   Yes.

17  **Q.**   Response:  "Concludes our normal hazard evaluation

18  analysis process.  This process is being undertaken now to

19  evaluate any potential health hazards to Fluor, its employees,

20  and its subs.  Fluor's employees open doors whenever they are

21  working.  It's Fluor's understanding these trailers and mobile

22  homes come to us ready to occupy, and no 'official' airing out

23  is required.

24         "To the best of my knowledge, we have had no

25  information provided to us by FEMA, or FEMA safety, as to any

1    hazards to employees or occupants relative to formaldehyde in

2    the trailers and mobile homes."

3            Did I read that right?

4    A.   Yes, you did.

5    Q.   Did Mr. Logue also produce some sort of memorandum summing

6    up this research that he had just done on March 20th?

7    A.   Yes, he did.

8            **MR. PENOT:**  492, Jane.  Oh, is it the same document?

9    I'm sorry.  27620.

10   **BY MR. PENOT**

11   Q.   And is this the transmittal of Mr. Logue to you and

12   Mr. Belote again of the memorandum he did summarizing his work?

13   A.   Yes, it is.  That is correct.

14   Q.   Okay.

15           **MR. PENOT:**  Next page, Jane, please.

16   **BY MR. PENOT**

17   Q.   Is this the memorandum summarizing his work?

18   A.   Yes, that is -- that's the document.

19   Q.   We can read quite a bit of the work that was done here,

20   and I know His Honor will not permit me to do that.  But let's

21   move down quickly here to the bottom of this e-mail.

22           "Steps to reduce."  This is Mr. Logue's conclusion

23   after doing a couple day's work on the research available, an

24   industrial hygienist, on this subject; is that a fair

25   statement?

1   A.    That's correct, supported by Mr. Berger.

2   Q.    Mr. Logue and Mr. Berger worked on this?

3   A.    Yes.  They went out and -- they actually went out and

4   inspected several types of mobile homes, travel trailers.  The

5   body of literature that we had, put it together.  This is the

6   summary document for file among the other studies that we did.

7   Q.    "Steps to reduce build-up concentration.  The reduction of

8   formaldehyde vapors or off-gassing in the temporary housing

9   units can be accomplished in the following ways:  Increase

10  ventilation, particularly after bringing new sources of

11  formaldehyde into the home, such as boxed furniture.

12          "Once they are located on-site and the power is

13  connected, then they should use air conditioning and

14  dehumidifiers to maintain moderate temp and reduce humidity

15  levels.

16          "The rate at which formaldehyde is released is

17  accelerated by heat, and may also depend somewhat on humidity.

18  Therefore, the use of dehumidifiers and air conditioning to

19  control humidity and to maintain a moderate temperature can

20  help reduce formaldehyde emissions."

21          Is that correct?  Did I read that right?

22  A.    Yes.

23  Q.    Is this information passed on to FEMA?

24  A.    Can you go back to the top of the e-mail?  I believe we

25  sent this up the line.

1  Q.   Was it your job to communicate with FEMA on this project?

2  A.   No.  It was -- we actually communicated that -- that

3  actually went to -- we got to see where Richard would have sent

4  that.  Only when I acted in his behalf did I communicate

5  directly to the counterparts.  It went to our core star

6  records, our records retention.  We talked about it in general

7  terms.

8           But Richard really provided that summary information

9  to where we were.  And that's the one that we just read.  And

10  that was our communication back to FEMA.

11  Q.   Okay.

12           MR. PENOT:  469, Jane, please.  28205.

13  BY MR. PENOT

14  Q.   Before we get do that -- excuse me.

15           After that flurry of activity, March 20th, 21st,

16  22nd, did -- what's the next thing you remember on the project

17  with respect to formaldehyde or issues concerning formaldehyde?

18  A.   Yeah.  We -- we had a request that came to us either out

19  of the Orleans group and it involved the SUNO and MUNO travel

20  trailer installations where we had a request to provide some

21  information to residents that had some concerns about

22  formaldehyde.

23  Q.   Okay.

24           MR. PENOT:  And, Jane, 469, go to 2896, please.

25

1  BY MR. PENOT

2  Q.   So these are residents now expressing some concern to

3  Fluor; is that correct?

4  A.   Well, it didn't come to -- it went to Fluor.  We assisted

5  FEMA in responding back the information to the residents.  FEMA

6  looked to us to help be the experts.

7  Q.   So residents raised some questions about formaldehyde to

8  FEMA.  And in this instance, in April, FEMA turned to Fluor and

9  said, Can you help me give the residents some information; is

10  that correct?

11  A.   Well, yes.  Yes, that's correct.  Rather than giving them

12  a website, we went out and put the information together so they

13  could give it to the residents.

14  Q.   All right.  Let's look at the bottom of 28296.

15        MR. PENOT:  28296, Jane, when you get a minute.

16  That's 94, you got two more to go.

17           Okay.  Would you blow up the bottom e-mail,

18  please?  Could you show us the address lines first, please,

19  Jane?

20  BY MR. PENOT

21  Q.   This is from someone at SUNO, Southern University of New

22  Orleans; correct?

23  A.   That's correct.

24  Q.   Was there a trailer parked that Fluor had built there?

25  A.   Yes.

1    **Q.**   And Barbara Russel, it says @Fluor.com.  But who is

2    Barbara Russel?  Explain that to the jury, please.

3    **A.**   Barbara Russel was one of our interface points with FEMA

4    to help us coordinate and communicate information.  We had

5    people operating on different levels through the organization,

6    and Barbara was one of the interfaces between us and FEMA and

7    with regards, actually, to resolving a lot of the concerns.

8    **Q.**   Was Ms. Russel a FEMA employee?

9    **A.**   Yes.

10   **Q.**   In fact, do you know what position she had held at FEMA,

11   prior to leaving the agency?

12   **A.**   Yes, she had held several significant positions.  And we

13   brought her in because of her previous expertise.

14   **Q.**   She was something of a consultant to Fluor?

15   **A.**   Yes.

16   **Q.**   During the Katrina response, though, do you know, if you

17   know -- you may not -- I'm not sure if you know this or not.

18   What role did she hold -- play?  Do you know specifically?

19   **A.**   I don't know who her employer was.  You know, I always

20   felt that she was a direct FEMA employee.

21   **Q.**   Okay.

22           **MR. PENOT:**  We'll tie that up, Your Honor.

23   **BY MR. PENOT**

24   **Q.**   But this is an e-mail from someone at UNO -- or Southern

25   University of New Orleans to Barbara Russel:  "Barbara, some

1  residents are concerned about the warning labels which are on

2  the windows of their trailers.  'Warning, this trailer contains

3  chemicals that was researched by the state of California.  May

4  cause cancer, birth defects, to some harm to reproductive

5  systems.  Please advise.'"

6          **MR. PENOT:**  Please go up on the e-mail.

7  **BY MR. PENOT**

8  **Q.**   Barbara sends this to Steven Deblasio.  That's the

9  Homeland Security person; correct?

10 **A.**   That's correct.

11 **Q.**   But Mr. Bukowski, that's the fellow we talked about before

12 which was running the New Orleans operation; right?

13 **A.**   Man in charge.

14 **Q.**   Okay.  Man in charge.

15         Then he gets this is e-mail, and what does he do?

16         **MR. PENOT:**  Please scroll up.  Go back a page,

17 please.

18 **BY MR. PENOT**

19 **Q.**   He sends it to Chuck Berger -- we've talked about him

20 before -- and others.

21         And does this eventually get back up to you and to

22 Mr. Logue?

23 **A.**   Yes, it does.

24 **Q.**   Okay.  And what did Mr. Logue do?

25 **A.**   Mr. Logue actually put together a information packet to

1  help break down and explain the information, such that it would

2  help explain the warning label and what that meant.

3           **MR. PENOT:**  Jane, please go to 469, 28131.  469,

4  Bates number 28131.

5           Excuse me.  A little technical difficulty here.

6           492, Jane.  Let's try 492.

7           I apologize, Your Honor.  Sometimes it works;

8  sometimes it doesn't.

9  **BY MR. PENOT**

10 **Q.**   Did Mr. Logue do research and provide it to Barbara Russel

11 to provide this e-mail?

12 **A.**   Yes, we did.  I believe that we produced a 16-page

13 document and talked about the EPA indoor air quality standards

14 that went through the formaldehyde.  And I believe it also

15 talked -- also had some information -- there you are --

16 Department of Housing and Urban Development.  And he gave

17 formaldehyde details.  I believe it's about a 16-page document.

18           We included the two links.  And then we also produced

19 that information in the handouts to where it could be passed

20 along to the residents.

21 **Q.**   Finally, just one final point.  When Mr. Hopkins came

22 forward with that concern that Mr. Hilliard had asked you

23 about, and that testing was done, the testing was done at two

24 sites; is that correct?

25 **A.**   Yes, two independent sites.

1  **Q.**   And was Mr. Hopkins permitted to witness and observe the
2  testing?

3  **A.**   Yes, he did, at the first site.  We went, actually, to his
4  workplace.  And that's normally how we would investigate a
5  concern.

6           **MR. PENOT:**  Could you pull up 466, Jane?  258 --
7  excuse me -- 25282.  466, 25282.  Go to the bottom, please.

8  **BY MR. PENOT**

9  **Q.**   Both Mr. Hopkins and Rhett Jeansonne observed the
10  monitoring; is that correct?

11  **A.**   That's correct.

12  **Q.**   To your knowledge, did Mr. Hopkins ever file any claims or
13  complaints or Workers' Comp claims as a result of this exposure
14  and concerns that he had on the job?

15  **A.**   No.  The issue was resolved.

16           **MR. PENOT:**  Thank you, Mr. Duckworth.

17             I pass the witness.

18           **THE COURT:**  Okay.  Mr. Hilliard?

19           **MR. HILLIARD:**  Thank you, Judge.

20                        **CROSS-EXAMINATION**

21  **BY MR. HILLIARD**

22  **Q.**   One document that I wanted to talk to you about that
23  Charlie brought is one where the six questions were asked in a
24  row.  Do you remember that?

25  **A.**   Yes, I do.

1   Q.   One of the questions is:  "Have any studies been done on
2   the trailers that 'airing' them out solves the problem?"
3          You and I can agree that outgassing of formaldehyde
4   in travel trailers is a problem, number one?
5   A.   Yes.
6   Q.   And airing out those travel trailers because of the
7   outgassing does not solve the problem, does it?
8   A.   The -- the -- I don't understand.  The problem of -- it
9   would not remove zero -- take it to zero formaldehyde.
10  Q.   Right.  And the reason you say that is because what
11  outgassing means is once you shut the trailer up, or the
12  trailer heats up, the formaldehyde outgassing continues and
13  actually increases?
14  A.   It does anywhere formaldehyde is present.  In my home,
15  your home, in the travel trailer -- or, I mean, in the mobile
16  home I lived in.
17  Q.   So what that means is all that airing it out does is it
18  slows the problem, maybe, delays the problem; but as soon as
19  the windows are shut or the air conditioner's turned on and the
20  air stays within the trailer, the problem is still there?
21  A.   Formaldehyde is still present.
22  Q.   Right.  Because -- this is gas that comes out from the
23  wood inside of this trailer or this chamber; right?
24  A.   It comes from all the products that contain formaldehyde.
25  Q.   And please assume what happens during a summer day in

219

```
 1   Louisiana is it gets hot.  You agree with that; correct?
 2   A.   It does get hot.
 3   Q.   These folks come home from a full day of school and work,
 4   they go into their trailer, and even as they are airing out the
 5   trailer, they are exposed to whatever levels of formaldehyde is
 6   in there while that formaldehyde is trying to escape.  You
 7   agree with that; right?
 8   A.   I would -- yeah, I generally agree, sure.  Yeah.  You walk
 9   in, whatever's present is present.
10   Q.   And even if you're airing it out, you're still exposed to
11   whatever's in there while it's trying to go out; right?
12   A.   Yeah, formaldehyde's present in the air.
13   Q.   And as soon as the trailer windows are shut and the door
14   is shut, the formaldehyde starts to build and starts to crawl
15   back into the air?  Just a fact about how outgassing occurs;
16   correct?
17   A.   Well, you have your other controls, whether you're running
18   your air conditioning, keeping it in place, the amount of
19   off-gassing that occurred prior.  It's not a straight
20   connection.
21   Q.   Right.  All the things you try to do.  But the thing is,
22   you cannot solve the problem by airing out the trailer?
23   A.   I believe that's what all the studies have said.
24   Q.   To be --
25   A.   I agree, yeah.
```

 1   **Q.**   You agree; right?

 2   **A.**   I -- I -- you know, it's not going to take it to zero, no.

 3   You're not going to have zero formaldehyde by airing out a

 4   trailer.

 5            **MR. HILLIARD:**  Pass the witness, Judge.

 6            **THE COURT:**  Mr. Penot, is this witness free to go?

 7   You have him listed on your case-in-chief.  Do you have any

 8   further questions?

 9            **MR. PENOT:**  No.  No further questions.

10            **MR WATTS:**  Judge, can we approach?

11            **THE COURT:**  Yes, sir.

12            Thank you.  You may step down.  Don't discuss

13   your testimony.

14            (WHEREUPON, the following proceedings were held at

15   the bench.)

16            **MR WATTS:**  That went longer than I was expecting.

17            Here's what I suggest we do:  I told them what I

18   was going to go along, but I kind of want to scramble because

19   we have some guys that out here that I want to get on and off.

20   I'm going to skip the videos for now and then we'll hold the

21   videos and see where we --

22            **MR. WEINSTOCK:**  Oh, okay.

23            **MR WATTS:**  No.  What I'd like to do is the Allens,

24   Blanchard, and then come up and get Lemieux and Baksh, so we

25   get all live --

1          **THE COURT:**  So you're going to do Allen and Blanchard

2    now --

3          **MR WATTS:**  No, we're going to do -- we're going to do

4    the Allens first, and then Lemieux, and Blanchard, and we'll

5    hold the expert.  I'm just trying to get all these live guys

6    that are under subpoena out of here.

7          **THE COURT:**  All right.

8          (WHEREUPON, the following proceedings were held in

9    open court.)

10         **MR WATTS:**  With that understanding that we just

11   discussed, at this time the plaintiffs would call Travis Allen

12   to the stand.

13         **THE COURT:**  All right.  Travis Allen.

14            Mr. Allen, if you would please come up to the

15   chair here and remain standing until you take the oath.

16         (WHEREUPON, **TRAVIS ALLEN**, having been duly sworn,

17   testified as follows.)

18         **THE DEPUTY CLERK:**  Please state your full name and

19   correct spelling for the record.

20         **THE WITNESS:**  Travis Allen, T-R-A-V-I-S, A-L-L-E-N.

21         **THE COURT:**  All right.  Mr. Meunier?

22                      **DIRECT EXAMINATION**

23   **BY MR. MEUNIER**

24   **Q.**   Good afternoon, Travis.  My name is Gary Meunier and I

25   represent plaintiffs.

1           You and I have never met before; right?

2   **A.**   No, sir.

3   **Q.**   Have you met with other lawyers to get ready for your

4   trial appearance?

5   **A.**   I met with -- oh, I can't recall his name.

6   **Q.**   The lawyer for Fluor?

7   **A.**   No, sir.

8   **Q.**   Do you recognize the lawyer in the room?

9           **MR. PENOT:**  We are missing a lawyer, who is handling

10  this witness in fact.

11          **THE WITNESS:**  The lady walking into the room.

12  **BY MR. MEUNIER**

13  **Q.**   And that lady introduced herself.  She represents Fluor?

14  **A.**   Yes.

15  **Q.**   And you've met with her?

16  **A.**   Yes.

17  **Q.**   And that's the only lawyer you've met with prior to your

18  testimony today?

19  **A.**   And this man right here.

20          **MR. MEUNIER:**  Mr. Scandurro?

21          **MR. SCANDURRO:**  You mean in the hallway, Your Honor?

22          **THE WITNESS:**  No, I'm talking about way before.

23          **MR. SCANDURRO:**  His deposition was taken, Your Honor,

24  just for the record, and we met at his deposition.

25          **MR WATTS:**  Back to the witness.

```
 1              THE COURT:  Is that what you were asking about?
 2              MR. MEUNIER:  No, I wasn't.  I was asking about
 3    getting ready for this testimony today.
 4              THE COURT:  Let's be clear about it because I think
 5    he's thinking, as anyone would, about in general.
 6    BY MR. MEUNIER
 7    Q.   Did you meet with any other lawyers besides Fluor's lawyer
 8    to get ready for your testimony?
 9    A.   No, sir.
10    Q.   How are you currently employed, Travis?
11    A.   I'm a student.
12    Q.   Between January '06 --
13    A.   Yes, sir.
14    Q.   -- and August '06, you and your brother, Heath, worked for
15    Paul "Gator" Blanchard; true?
16    A.   Yes, sir.
17    Q.   Gator hired you and Paul to help him haul and install FEMA
18    trailers after Hurricane Katrina; right?
19    A.   Yes, sir.
20    Q.   Gator was a subcontractor of Fluor?
21    A.   I'm not sure.  I can't be positive about that.
22    Q.   Well, you told us in your deposition you were, quote,
23    pretty sure?
24    A.   I'm pretty sure, but I'm not positive.
25    Q.   Okay.  Pretty sure is good enough.
```

```
 1            And you're pretty sure that Gator was a subcontractor
 2   of Fluor?
 3   A.   Yes, sir.
 4   Q.   Okay.  And the last time you were asked about this at your
 5   deposition about a month and a half ago, you said Gator today
 6   is working for a state senator's office in Baton Rouge?
 7   A.   Yes, sir.
 8   Q.   Do you know how Gator got that subcontractor with Fluor to
 9   haul FEMA trailers?
10   A.   No, sir.
11   Q.   Now, for most of the hauling and the installing work that
12   you did, it was a three-man crew: you, your brother Heath, and
13   Gator?
14   A.   Yes, sir.
15   Q.   I think you said at the very end of that seven- or
16   eight-month period, a father/son team out of Centerville,
17   Mississippi, showed up to help?
18   A.   Yes, sir.  But they were on a completely different team.
19   Q.   So it was just your crew handling trailers alone?
20   A.   Yes, sir.
21   Q.   Three men?
22   A.   Yes, sir.
23   Q.   And using Gator's truck, you went to a staging area out in
24   New Orleans East, I think you said it was a Jazzland --
25   A.   Yes, sir.
```

1    **Q.**    -- and you picked up the trailers there?

2    **A.**    Yes, sir.

3    **Q.**    You would tow one at a time, using Gator's truck, to a

4    residential site?

5    **A.**    Yes, sir.

6    **Q.**    You never took them to a trailer park.  It was always one

7    trailer to a home site; right?

8    **A.**    Yes, sir.

9    **Q.**    And once there, you would jack up the trailer, put it on

10   blocks, run plumbing, and build the steps and porches?

11   **A.**    Yes, sir.

12   **Q.**    You didn't do any electrical work?

13   **A.**    No, sir.

14   **Q.**    And these were 20- to 30-foot-long trailers?

15   **A.**    Yes, sir.

16   **Q.**    And you don't remember the names of the manufacturers?

17   **A.**    No, sir.

18   **Q.**    Now, I want to talk for a moment about the trailer hauling

19   and installing experience of your crew, Gator's crew, before

20   this work under subcontract with Fluor.

21           Now, you can't be sure, but based on what you know,

22   you don't think Gator had any prior work experience hauling or

23   installing travel trailers; isn't that true?

24   **A.**    Correct.

25   **Q.**    And your brother Heath, you know this for sure, definitely

 1  had no prior --

 2          **MS. MALLETT:**  Judge, I'm going to object to the

 3  leading nature of all of these questions of the witness.

 4          **MR. MEUNIER:**  Judge, he's adverse.

 5          **THE COURT:**  I was waiting for that objection.

 6              How is he an adverse witness?

 7          **MS. MALLETT:**  How is he adverse?

 8          **THE COURT:**  He's not -- excuse me.

 9          **MS. MALLETT:**  I'm sorry, Judge.

10          **THE COURT:**  How is he adverse if he's not an employee

11  of Fluor?  He's not an employee of the party.

12          **MR. MEUNIER:**  Well, Your Honor, he's associated with

13  the subcontract work.  And the hauling and installing is one of

14  the theories of plaintiffs' case.

15          **THE COURT:**  He's a subcontractor once removed.  I

16  don't think he's adverse.  I don't think you can call him under

17  the rule that allows leading questions.  He doesn't seem

18  adverse to me.  And by status he's not adverse.

19          **MR. MEUNIER:**  Your Honor, may we approach on this?

20          **THE COURT:**  Well, I would rather you just move on to

21  the next question.

22  **BY MR. MEUNIER**

23  **Q.**   Did your brother Heath have any prior work experience

24  hauling or installing trailers?

25  **A.**   No, sir.

1   **Q.**   And what was your prior work experience hauling and
2   installing travel trailers, Travis?
3   **A.**   I worked for a company called McCant Mobile Home.  I
4   didn't have any direct experience installing the trailers.  I
5   was just a helper, you know, going to get blocks, pick up
6   anchors and whatnot.
7   **Q.**   That's when you were 17?
8   **A.**   Yes, sir.
9   **Q.**   Summer job?
10  **A.**   Yes, sir.
11  **Q.**   And those were double-wides?
12  **A.**   I never set up a double-wide.  They were all single-wides.
13  **Q.**   And what was your job?
14  **A.**   What was my job?  Just a helper.
15  **Q.**   You sat in the vehicle when the hauling was taking place?
16  **A.**   Yes, sir.
17  **Q.**   Looked out the window to make sure it didn't hit anything?
18  **A.**   Yes, sir.
19  **Q.**   Once you got to the site, did you ever do anything to
20  actually install a unit?
21  **A.**   I drove some anchors a few times.
22  **Q.**   But never did anything to hoist a unit --
23  **A.**   No, sir.
24  **Q.**   -- in that summer job when you were 17?
25  **A.**   No, sir.

1    Q.    And that's the full extent of your prior work experience

2    hauling and installing trailers?

3    A.    Yes, sir.

4    Q.    Travis, did Fluor ever require or offer to your crew any

5    formal training or instruction on how to safely hoist and

6    install a travel trailer?

7    A.    No, sir, not me personally.

8    Q.    To your knowledge to anyone, did anyone else in your crew

9    receive formal training or instruction?

10   A.    Not to my knowledge.

11   Q.    Did you or anyone in this Gator crew ever attend, or were

12   any of you required to attend, a single class or instructional

13   session with Fluor on how to properly hoist, block, or install

14   a travel trailer?

15   A.    No, sir.

16   Q.    Did Fluor ever provide a written procedure, protocol, or

17   set of steps to follow in installing or hoisting a travel

18   trailer?

19   A.    If they did, I didn't see it.

20   Q.    Did Fluor ever provide any engineering guidelines or

21   drawings for the proper hoisting of a travel trailer?

22   A.    No, sir.

23   Q.    Did you ever attend, or were you ever asked to attend, or

24   was anyone in your crew ever asked to attend a safety meeting

25   with Fluor dealing with the subject of hauling and installing

1  trailers?

2  **A.**   Not to my knowledge.

3  **Q.**   Were you ever provided any safety equipment, respiratory

4  masks, hard hats, anything like that, by Fluor?

5  **A.**   No, sir.

6  **Q.**   Now, let's talk about what you did with your crew when you

7  proceeded to haul and install.  The first thing you'd do is go

8  to the staging area and pick up a trailer?

9  **A.**   Yes, sir.

10 **Q.**   Once you hauled it to the site, tell the jury what you

11 would do to hoist the trailer.

12 **A.**   We would -- they would have an orange rectangle shape on

13 the ground, and that's where they would want you to, you know,

14 get the trailer inside of that.

15        **MS. MALLETT:**  Your Honor, I'm going to have to object

16 to this line of questioning.  This is not the Alexander

17 trailer.  There is no foundation that this crew moved the

18 Alexander trailer.

19        **THE COURT:**  I think that we have witnesses in this

20 case that will testify as to the Alexander trailer.  I'm not --

21 I don't see the relevance of how any other trailer was

22 installed in this case other than the general instructions,

23 which -- or lack thereof, which you've just covered with this

24 witness.

25              I don't see any relevance to having him explain

1    how he or his crew set up other trailers at this point beyond

2    the scope of instructions that Fluor allegedly gave or didn't

3    give.

4              MR. MEUNIER:  Your Honor, may I just cover one point?

5    I'll be very brief about it.  Because it's a consequence of the

6    lack of training.

7              THE COURT:  Well, I'm going to sustain the objection.

8    Now, if you've got another question that covers a point that's

9    relevant, then take a shot at it.  But I don't want to sit and

10   listen to how other trailers were set up when we have the very

11   witnesses who set up the trailer at issue in this case.  I

12   think he's testified -- I understand the relevance of what he's

13   testified to up to this point.

14             MR. MEUNIER:  Okay, Judge.  May I just approach the

15   witness?

16             THE COURT:  Take another shot at it and see.

17   BY MR. MEUNIER

18   Q.   Travis, I'm showing you a model of a travel trailer that

19   we've been using.

20             Were there times when your crew jacked or hoisted the

21   trailer on the long side first?

22             MS. MALLETT:  Your Honor --

23             THE COURT:  Let him ask the question.  And then,

24   Mr. Allen, you wait until she makes the objection.  Okay?  So

25   he's going to ask you a question, and I'm going to hear the

1  objection, and then you can either answer it or not, depending

2  on what happens.  Listen to the question.

3  **BY MR. MEUNIER**

4  **Q.**  Were there times when your crew hoisted the travel trailer

5  on the long side first?

6  **A.**  No, sir.

7          **MS. MALLETT:**  Objection, Your Honor.

8          **THE COURT:**  Wait for the objection.

9              I'm going to sustain the objection.  How he did

10 it in particular really isn't relevant when we do have the very

11 people who installed the Alexander trailer here.  I mean, he

12 could tell us how he did it 100 times over, and it's not going

13 to be any more relevant than if he did 200 trailers; it

14 wouldn't make any difference compared to what was done with

15 this trailer.

16         **MR. MEUNIER:**  I'll move on, Your Honor.

17 **BY MR. MEUNIER**

18 **Q.**  Travis, after your crew finished hoisting the trailers and

19 putting them on blocks, you had to wait for an inspector to

20 come; is that true?

21 **A.**  Yes.

22         **MS. MALLETT:**  Your Honor, I'm going to object to this

23 entire line of questioning.  The Lemieuxs are here and they're

24 on the plaintiff's witness list and they intend to testify.

25         **THE COURT:**  I'm going to overrule this because I

232

1  think this relates to the procedure that was in common practice

2  with regard to verifying how the units were installed.

3            You can answer that.

4  A.   Yes, sir.

5  BY MR. MEUNIER

6  Q.   Would one inspector come out, Travis?

7  A.   Yes, sir.

8  Q.   And that inspector was with a contractor, as far as you

9  know?

10  A.   Yes, sir.

11  Q.   How long would the inspector typically stay at the site?

12  A.   Oh, it would -- if we had got something wrong, then he

13  would stay longer.  But usually it probably wouldn't take no

14  more than 30 minutes.

15  Q.   Did the inspector, on any of the occasions that you were

16  involved in, ever ask a single question of the crew about how

17  the trailer had been jacked up?

18  A.   No, sir.

19  Q.   In fact, did the inspector ever ask the crew any questions

20  about what had been done while the inspector was not there?

21  A.   Not that I can recall.

22  Q.   To your knowledge, did Fluor, or anyone from Fluor, ever

23  watch, supervise, or check after the fact on how your crew

24  hoisted travel trailers?

25  A.   No, sir.

1  **Q.**   Finally, Travis, I want to ask you about your experience
2  on entering the trailers.
3          There were times when you would go inside these
4  trailers?
5          **THE COURT:**  We need to establish that we're talking
6  about Gulf Stream trailers here.  Because he may have set up
7  trailers manufactured by any number of other manufacturers.
8  **BY MR. MEUNIER**
9  **Q.**   Travis, you don't remember the names of the manufacturers
10 of the trailers?
11 **A.**   No, sir.
12 **Q.**   I think you said that you knew the models, and that some
13 of the models had something-Stream?
14 **A.**   No, sir.
15 **Q.**   You don't remember saying that in your deposition?
16 **A.**   No.  That was a model of trailer that I was talking about.
17 **Q.**   Right.  But did you see the words, something-Stream on the
18 trailer?
19 **A.**   Yes, sir.  I believe it was called a Jet Stream.
20 **Q.**   And what was the other model that you recall?
21 **A.**   Cavalier.
22         **MR. MEUNIER:**  Judge, he doesn't remember the names of
23 the manufacturers.
24         **THE COURT:**  That's why I raised it.  Because, again,
25 he may have installed other manufacturers' trailers which are

1    clearly not relevant to this case either.

2            **MR. MEUNIER:**  I'm told that Cavaliers are Gulf Stream

3    trailers.

4            **MR. WEINSTOCK:**  There's a Cavalier Gulf Stream

5    trailer, but there's also a manufacturer named Cavalier.

6            **MR. MEUNIER:**  May I ask this question?

7            **THE COURT:**  I think you've asked him whether or not

8    he knew -- well, if you haven't, why don't we just ask him

9    whether he installed any trailers that he knew to be

10   manufactured by Gulf Stream?

11   **BY MR. MEUNIER**

12   **Q.**   Travis, do you know the names of the manufacturers of any

13   of the units you installed?

14   **A.**   No, sir.

15   **Q.**   You just saw model names on the trailers?

16   **A.**   Yes, sir.

17   **Q.**   A vast majority were Cavalier?

18   **A.**   Pretty much.

19           **MR. MEUNIER:**  Judge, Cavalier is a Gulf Stream travel

20   trailer.

21           **THE COURT:**  But is it not true what Mr. Weinstock

22   said, that there is a manufacturer named Cavalier that is not

23   Gulf Stream?

24           **MR WATTS:**  No, that's not right.

25           **THE COURT:**  Is that not true?  Can we not establish

1   that or come to an agreement?  I mean, my goodness, we ought to

2   be able to stipulate to that.

3                   Cavalier is Gulf Stream and Gulf Stream is

4   Cavalier, and I don't know --

5                   Cavalier is mobile homes only.

6           MR. MEUNIER:  Cavalier is a mobile home manufacturer.

7   Can I show him a Cavalier?

8           THE COURT:  Yes, why don't you show him a picture and

9   see if he recognizes the picture?  Good idea.

10          MR. WEINSTOCK:  Your Honor, we would ask, since

11  it's -- that we're talking about 2004 Cavaliers, not 2005

12  Cavaliers.

13          THE COURT:  We're talking about 2004.

14  BY MR. MEUNIER

15  Q.   My question is:  Does that resemble the Cavalier travel

16  trailers that your crew installed?

17  A.   I can't recall.  I thought the name was written bigger.

18          THE COURT:  I'll sustain the objection.  I just don't

19  know -- to the extent there is an objection, I'd sustain it

20  because he's not sure.  Maybe it was my objection, but I don't

21  think he can testify to it, and I think we ought to go in

22  another direction.

23          MR. PENOT:  Now's the time to object.

24          MR. BUZBEE:  You-all go ahead and object.

25          MR. MEUNIER:  Your Honor, we had a ruling about being

1   able to ask him certain things.  And I think specifically it
2   was the area I'm about to go into, so...
3           **THE COURT:**  Okay.  Well, it's subject to the ruling.
4   Let's go ahead and ask --
5           **MR. MEUNIER:**  All right.  Well, my question, Judge,
6   was going to be about his experience when he entered trailers,
7   and that was, I thought, the subject of your --
8           **THE COURT:**  The Court gave some parameters with
9   regard to that, and I know you'll abide by them.
10          **MR. MEUNIER:**  Yes, yes.
11  **BY MR. MEUNIER**
12  **Q.**   So tell us, Travis, what, if any, physical sensations you
13  experienced when you would enter these travel trailers?
14          **MR. SCANDURRO:**  Same objection, Your Honor, to
15  foundation.
16          **THE COURT:**  Well, I'll sustain it because I don't
17  think he's testified that he's done that.
18  **BY MR. MEUNIER**
19  **Q.**   Well, did you enter the travel trailers?
20  **A.**   Yes, sir.
21  **Q.**   Why and under what circumstances did you enter them?
22  **A.**   You had to get the jack -- jacking wrench and tools out
23  from under the bed.
24  **Q.**   Let me just explain this.  There were jacks set up at the
25  four corners that are part of the trailer?

1  A.   Yes, sir.

2  Q.   But there were handles for the jacks that you had to get

3  from inside the trailer?

4  A.   Yes, sir.

5  Q.   And that's why you went into the trailer?

6       MS. MALLETT:  Your Honor, I'm going to --

7  A.   Yes, sir.

8       MS. MALLETT:  -- object to this line of questioning.

9  Are we talking about the Alexander trailer here, or are we

10 talking about just any trailer here?

11      THE COURT:  It seems like we're talking about some

12 other trailer.  Because I think it's been established that he

13 did not and has nothing to do with the Alexander trailer.

14      MR. MEUNIER:  That's true, Your Honor.

15      THE COURT:  So I think we're close to being done with

16 this witness.

17      MR. MEUNIER:  I think that's my cue.

18      THE COURT:  I think you've done a good job of finding

19 out all he knows that might be helpful in this case, perhaps.

20      MR. MEUNIER:  I appreciate that, Judge.

21           Could we approach the bench, though?

22      THE COURT:  Sure.

23           (WHEREUPON, the following proceedings were held at

24 the bench.)

25      MR. MEUNIER:  This is why I'm just a little confused,

1   because I thought we had motion practice on this guy.  And my

2   notes from your ruling, Document 3093, September 8th:  He

3   cannot testify about his physical reaction to odor or medical

4   conditions.  He can testify that on entering the EHU, he

5   noticed a strong odor and was told to ventilate.  He can

6   testify about instructions and setup."

7                    So I'm finished with that.  So I'm about to ask

8   him --

9            THE COURT:  I'll tell you:  My problem with him is he

10  doesn't know -- I'm not certain that he knows what units he's

11  in.  I mean, Gulf Stream --

12           MR. MEUNIER:  Well, he doesn't know the

13  manufacturers.

14           THE COURT:  And when he came up short on that, I

15  think he short-circuits pursuing other questions that might

16  otherwise be fair game.  Now, if the next guy comes in and

17  says, that was a Gulf Stream trailer I went in...

18           MR. MEUNIER:  I'm going to quit.  I'm going to quit.

19  I'm going to quit.

20           THE COURT:  I think we've spent more time on this guy

21  than --

22           MR. MEUNIER:  I'm being told that he's that --

23           THE COURT:  Let's bring in another one and see how we

24  do with him.

25                    (WHEREUPON, the following proceedings were held in

1   open court.)

2   **THE COURT:**  Any other questions?  What about from

3   Gulf Stream, Mr. Scandurro.

4   **MR. SCANDURRO:**  No, Your Honor.

5   **CROSS-EXAMINATION**

6   **BY MS. MALLETT**

7   **Q.**   Mr. Allen, we did meet at a deposition, did we not?

8   **A.**   Yes, ma'am.

9   **Q.**   And your involvement in this particular -- how your name

10  came to be known within this particular litigation was from the

11  plaintiff's attorney, was it not?  A Mr. Pena?

12  **A.**   Yes, ma'am.

13  **Q.**   Now, isn't it true that you were paid by Mr. Gerald

14  Blanchard to do the work that you did?

15  **A.**   Yes, ma'am.

16  **MR. MEUNIER:**  Your Honor, is counsel for Fluor going

17  to be allowed to lead the witness?

18  **THE COURT:**  Nope.

19  **MR. MEUNIER:**  I object to leading.

20  **THE COURT:**  And I'll sustain the objection.

21  **BY MS. MALLETT**

22  **Q.**   So Mr. Blanchard told you how to hook up the trailers?

23  **A.**   Yes.

24  **Q.**   Did all of the trailers that you and Mr. Blanchard set up,

25  or the crew that you were working with with Mr. Blanchard, did

1    they pass inspection?

2    **A.**    We all got them signed off and passed inspection.

3    **Q.**    You did not handle any of the paperwork, did you, on the

4    trailers that you set up with Mr. Blanchard's crew; correct?

5    **A.**    No, ma'am.

6    **Q.**    So your paycheck came from Mr. Blanchard; correct?

7    **A.**    Yes, ma'am.

8    **Q.**    It didn't come from Fluor?

9    **A.**    No, ma'am.

10         **MR. MEUNIER:**   Your Honor, I object to leading the

11    witness.

12         **THE COURT:**   Yes.   It's still leading.   Just ask him a

13    question and let him answer it.

14    **BY MS. MALLETT**

15    **Q.**    Do you know who Mr. Blanchard was paid by?

16    **A.**    No, ma'am.

17    **Q.**    Now, did you believe that you had enough information to be

18    able to set up the trailers when you were working with

19    Mr. Blanchard?

20    **A.**    Yes, ma'am.

21    **Q.**    And if you didn't have enough information, who would you

22    ask while you were working on the trailers?

23    **A.**    Well, we never had a situation where we didn't know what

24    to do.

25         **MS. MALLETT:**   That's all the questions I have, Your

1    Honor.

2              **THE COURT:**  All right.  Thank you.

3                   Redirect?  Or recross, as the case may be?

4    Redirect, plaintiff's witness.

5                        **REDIRECT EXAMINATION**

6    **BY MR. MEUNIER**

7    **Q.**   Counsel just asked you if you thought you had enough

8    information in setting up the trailers.

9              Travis, did the word "formaldehyde" ever come up in

10   any conversations within your crew?

11   **A.**   No, sir.

12   **Q.**   And I believe I used the word "hoists," and I'm told that

13   we've been using the word "jackups."  Let me just clear that

14   up.

15             When we say you hoisted trailers, that means you

16   jacked them up?

17   **A.**   Yes, sir.

18             **MR. MEUNIER:**  Thank you, sir.

19             **THE COURT:**  Thank you, sir.  You may step down.

20   Please don't discuss your testimony with anyone in this case

21   until the case is over.

22                   All right.  Who's next?

23             **MR WATTS:**  Heath Allen, Your Honor.

24             **THE COURT:**  Heath Allen.

25                   All right.  Mr. Heath Allen, come on up.

1          (WHEREUPON, **HEATH ALLEN**, having been duly sworn,

2   testified as follows.)

3          **THE DEPUTY CLERK:**  Please state your full name and

4   correct spelling for the record.

5          **THE WITNESS:**  Heath Allen, H-E-A-T-H, A-L-L-E-N.

6                      **DIRECT EXAMINATION**

7   **BY MR WATTS**

8   **Q.**   Mr. Allen, my name is Michael Watts.  We've never met

9   before; is that right?

10  **A.**   No, sir.

11  **Q.**   Before we get to the issue of the day, I've got to ask the

12  question:  Is there an LSU game tonight?  Or is this a

13  week-long deal?

14  **A.**   I think everything I own has got purple and --

15  **Q.**   There you go.

16          **THE COURT:**  There's nothing wrong with that.

17  **Q.**   In uniform all week.

18          Your brother just testified.  I'm going to be real

19  short with you.  I think we have a general idea of what was

20  going on out there.  But let me get some background information

21  on you.

22          As I understand, you graduated from high school in

23  1998?

24  **A.**   Yes, sir.

25  **Q.**   So in 2006, you would have been 25, 26?

```
 1   A.    I can't -- I'm not good at math.
 2   Q.    How old are you now?
 3   A.    30.
 4   Q.    Take four years off, okay, we're good to go.
 5         At the time that you were hired, your boss' name was
 6   Gator?
 7   A.    Yes, sir.  Paul Blanchard, but we called him Gator.
 8   Q.    At the time that you were hired by Gator, I think it was
 9   in January of 2006?
10   A.    Yes, sir, somewhere around there.
11   Q.    And you were hired to haul and install trailers; is that
12   right?
13   A.    Right.
14   Q.    When you were hired to haul and install trailers, had you
15   ever hauled and set up a trailer before?
16   A.    No, sir.
17   Q.    In terms of Gator, did you ever have any Fluor
18   representatives there around Gater telling you how to do that?
19   A.    No, sir.  The only thing we were shown was an example
20   trailer, and that was pretty much it.
21   Q.    I think you said in your deposition you were shown one
22   time a trailer that was already jacked up, and said, This is
23   how we want it.  Look at it.
24   A.    Yes, sir.
25   Q.    But in terms of how to jack it up, nobody gave you any
```

1  training on that?

2  **A.**   No, sir.

3  **Q.**   Nobody gave you any documents saying, Here's --

4       **MS. MALLETT:**  Your Honor, I'm going to object to the

5  leading nature of the questions.

6       **MR WATTS:**  Guilty.  Let me try again.

7       **THE COURT:**  Stop leading.

8  **BY MR WATTS**

9  **Q.**   Did anybody give you any documents saying, These are the

10 steps we want you to follow when you're jacking up the trailer?

11 **A.**   No, sir.

12 **Q.**   Did anybody give you any written materials at all with

13 respect to step-by-step, This is how we want you to do this?

14 **A.**   Not that I recall.

15 **Q.**   All right.  Good enough.

16      Now, I want to talk to you a little bit about Fluor

17 inspectors.  After you-all would get a trailer --

18      **MS. MALLETT:**  Your Honor, I'm going to object to the

19 leading nature of the question.

20      **MR WATTS:**  I haven't asked a question yet.

21      **THE COURT:**  He hasn't asked a question yet.

22      **MR WATTS:**  Can I finish the question?

23      **MS. MALLETT:**  Sure.  And then I'll jump in.

24      **MR WATTS:**  Well, maybe you won't.  Maybe it won't be

25 leading.

1   BY MR WATTS

2   Q.   Here's my question:  After you-all would install a

3   trailer, were there inspectors that came out there?

4   A.   Yes, sir.

5   Q.   And did they work for Fluor?

6   A.   Yes, sir.

7   Q.   Now, as I understand it, you did this between January and

8   September?

9   A.   Somewhere around in there, yes, sir.

10  Q.   And you averaged two to four a day?

11  A.   Two to four.  Around about a way, yes, sir.

12  Q.   So call it three?

13  A.   I'd say three, yes, sir.

14  Q.   And worked five days a week?

15  A.   Five days a week.

16  Q.   So that's 15 trailers a week?

17  A.   Yes, sir.  Somewhere around there, give or less each week.

18  In the range, yeah.

19  Q.   Four and a half weeks a month for seven or eight months,

20  4- or 500 trailers?

21  A.   I wouldn't call it that many.  I mean, you had a lot of

22  rain and stuff like that.

23  Q.   Fair enough.  Okay.

24       Hundreds though; right?

25  A.   Yeah.

1    **Q.**    In the hundreds of inspectors that came out with Fluor,

2    did you ever have a Fluor inspector come out and reject your

3    work?

4    **A.**    No, we never had a rejection, that I recall.

5    **Q.**    Now, your brother testified that the vast majority --

6             **MR WATTS:**  May I approach, Your Honor?

7             **THE COURT:**  Yes.

8    BY MR WATTS

9    **Q.**    -- the vast majority of the trailers that you-all set up

10   were Cavaliers?  Do you recall that?

11   **A.**    I didn't recall the name brand.  I just know they were

12   just the white FEMA trailers.  I mean, they had some -- when we

13   first got down there, they were not -- you know, like the basic

14   FEMA trailer.  It was nicer trailers, but --

15   **Q.**    And I think in your deposition you said you recognized the

16   Cavalier name; is that right?

17   **A.**    I didn't ever say their name.  I said there's a white FEMA

18   trailer.  I didn't ever, you know, until later find out that it

19   was a Cavalier.

20   **Q.**    Let me ask you -- let me just pull it out for you real

21   quick.

22   **A.**    That I recall.

23            **MR. WEINSTOCK:**  Page, Counsel.

24            **MR WATTS:**  Yes, I'm getting there.

25

247

1   BY MR WATTS

2   Q.   On Page 119 -- the Cavalier name sounds familiar to you;

3   is that right?

4   A.   Yeah, it sounded familiar.

5   Q.   If your brother said the vast majority of what you

6   installed were Cavalier, would you disagree with him?

7   A.   No, I wouldn't disagree with him.

8   Q.   Now, I've got a picture, Exhibit 334, that's a picture of

9   one of those Cavalier trailers; correct?

10  A.   Yes, sir.

11  Q.   Does that look like the trailers that you installed?

12  A.   Yes, sir.

13         MR WATTS:   I think 334 is already in evidence.   Let

14  me put it up on the screen real quick.

15  BY MR WATTS

16  Q.   When you installed those trailers, your brother was

17  telling us there's a jack or something inside that you had to

18  go get?

19  A.   There was crane jacks for the side jacks.

20  Q.   So you-all went inside the trailers?

21  A.   Yes.

22  Q.   And in the vast majority of those trailers, when you went

23  inside, would you go inside through that side door right here?

24  A.   Yes, sir.

25  Q.   And when you went inside through that side door of those

```
 1   Cavalier trailers, did you have any problems with your eyes?
 2   A.   We'd get a burning sensation in our eyes.
 3   Q.   Would your eyes start watering?
 4   A.   Yes.
 5   Q.   Would you testify it was hard to breathe?
 6   A.   Yes, sir.
 7        And got nose bleeds.
 8   Q.   You got nose bleeds?
 9   A.   I got one.
10   Q.   You saw a doctor, Dr. Charlie Daniels, about getting sick?
11            THE COURT:  Wait --
12            MS. MALLETT:  Objection, Your Honor.
13            THE COURT:  I think the Court has ruled on that.
14            MR WATTS:  Let me move on, Judge, I'm sorry.
15            THE COURT:  We're not here to try.
16            MR WATTS:  I got you.  It's something I meant to take
17   out.  I apologize.
18   BY MR WATTS
19   Q.   Put aside the document for a second.
20        Your boss was Gater Blanchard; is that right?
21            THE COURT:  Is that Number 334?  Are we on Number
22   334?
23            MR WATTS:  Yes.  Photograph?
24            THE COURT:  Yes.
25            MR WATTS:  You have that as admitted.
```

1              THE DEPUTY CLERK:  No.

2              MR WATTS:  Oh, you don't have that as admitted?  I

3    apologize.

4              THE COURT:  Any objection to 334?

5              MR WATTS:  No objection.  And with my apologies, I

6    assumed the pictures were in.  I'm sorry.

7    BY MR WATTS

8    Q.   Okay.  You mentioned that when you went into these

9    trailers, you had our eyes running, you had a nose bleed, you

10   had a hard time breathing; right?

11   A.   Yes.

12   Q.   You talked to your boss about that; isn't that right?

13   A.   Yes.

14   Q.   That was Gater Blanchard; is that right?

15   A.   Yes, sir.

16   Q.   You saw him getting nose bleeds as well when he went in

17   these trailers?

18             MS. MALLETT:  Objection, Your Honor.

19             THE COURT:  Wait.  You're leading again.  I don't

20   know how many times I have to rule on that.

21             MR WATTS:  And I'm going to plead guilty again, and

22   try to do better, Judge.  I'm trying to hurry and I apologize.

23             THE COURT:  Okay.

24   BY MR WATTS

25   Q.   Did you observe Gator Blanchard get nose bleeds when he

1    walked in one of those trailers?

2              **MS. MALLETT:**  Your Honor, this is the subject of your

3    motion in limine that you ruled on.

4              **THE COURT:**  Now we're talking about someone else?

5              **MR WATTS:**  I'm asking what he observed --

6              **THE COURT:**  I'm sustaining the objection both to the

7    extent that it's leading and with regard to the substance of

8    the question.

9    **BY MR WATTS**

10   **Q.**   Did you watch when your brother went in?

11   **A.**   Yes, sir.

12   **Q.**   What did you observe when your brother went in terms of

13   his eyes?

14   **A.**   I mean, everybody's eyes watered.

15   **Q.**   When the Fluor inspectors showed up to inspect your work,

16   did you talk to them about your experience of what happened

17   when you went in these trailers?

18   **A.**   Yes.

19   **Q.**   And did you tell them about the smell?

20   **A.**   Yes.

21   **Q.**   Did you tell them that you couldn't stay in there?

22   **A.**   No, we didn't say we couldn't stay in there.

23             **THE COURT:**  You're leading the witness again.

24             **MR WATTS:**  I'm sorry.

25             **THE COURT:**  Ask a question -- ask it again -- ask a

1  question that is not suggestive of an answer.

2  BY MR WATTS

3  Q.   What did you tell him, sir?

4  A.   About what?

5  Q.   About whether you could stay in the trailer?

6  A.   We just told him that our eyes were burning and stuff like

7  that when we would go into these trailers.  And then we finally

8  just started airing them out before we'd go in there.

9  Q.   When you were talking about the inspectors --

10        MR WATTS:  May I approach, Your Honor?

11        THE COURT:  Yes.

12  BY MR WATTS

13  Q.   Let me have you read from Page 48, Lines 17 through 25.

14        MR. SCANDURRO:  Your Honor, is there a question on

15  the table?

16        MR WATTS:  I'm not reading out loud.  I'm just

17  showing him to refresh his recollection on the last question.

18        MR. WEINSTOCK:  I'm sorry, what page?

19        MR WATTS:  Page 48, Lines 17 through 25.

20  BY MR WATTS

21  Q.   Does that refresh your recollection as to whether you told

22  the inspectors whether you could stay in there or not?

23  A.   We couldn't stay in there.  And we'd tell them that,

24  but -- I mean, we started airing them out after that.  I

25  mean...

1    **Q.**    Sure.

2            **MR WATTS:**  Those are all my questions.  Thank you.

3            **THE COURT:**  Counsel, any Gulf Stream questions,

4    Mr. Scandurro.

5            **MR. SCANDURRO:**  I was going to see if she wanted to

6    go first.

7            **THE COURT:**  Okay.  Well, I'd rather go ahead and

8    follow this order.

9            **MR. SCANDURRO:**  Okay.

10                       **CROSS-EXAMINATION**

11   **BY MR. SCANDURRO**

12   **Q.**    Mr. Allen, good afternoon.

13   **A.**    How are you doing?

14   **Q.**    I've got a few questions for you.

15           **MR. SCANDURRO:**  Your Honor, I feel like I have to ask

16   one question about the nose bleeds since it was brought out on

17   direct.

18   **BY MR. SCANDURRO**

19   **Q.**    You had one nose bleed during the eight months that you

20   worked there?

21   **A.**    Yes, sir.

22   **Q.**    And you started, I believe you said in January?

23   **A.**    Yes, sir.

24   **Q.**    And this was sometime after a number of months?

25   **A.**    Right.  When it started getting hot in the summer months.

1  Q.   And you understand nose bleeds can be caused by all kinds
2  of things?
3          MR WATTS:  Objection.  Leading.
4          MR. SCANDURRO:  Your Honor, the suggestion was put
5  out there.
6          MR WATTS:  And I'm not arguing about the content of
7  the question.  It's the goose and gander rule --
8          THE COURT:  It was improperly leading when it was
9  first asked.  I guess the only way to cure that is to allow him
10 to improperly lead the second time it's asked.  So we're even.
11 And nobody ought to be leading on a question that was precluded
12 by pretrial motion practice, anyway, so let's get on with it.
13 BY MR. SCANDURRO
14 Q.   When your eyes watered that you mentioned when you went in
15 these trailers, I think you told me at your deposition that it
16 was very hot?
17 A.   Yes, sir.
18 Q.   How hot did it get inside those trailers when your eyes
19 burned?
20 A.   I figured it would be over 100 degrees.  I never had a
21 thermometer or nothing.
22 Q.   But over 100 degrees, as you recall?
23 A.   That's what I thought.  It felt like it.
24 Q.   Is it possible that you thought it was maybe as much as
25 140 degrees?

1   **A.**   It could have been.

2   **Q.**   Very hot?

3   **A.**   It depends on which summer month.  You know, summer

4   months, it gets hot.  And they were sitting on concrete when we

5   would pick them up.

6   **Q.**   But pretty much all of them, you thought, were over

7   100 degrees --

8   **A.**   Yes.

9   **Q.**   -- when you had the sensation in your eyes?

10  **A.**   That's right.

11  **Q.**   There was no electricity?

12  **A.**   No electricity.

13  **Q.**   No ventilation when you walked in?

14  **A.**   No, sir.

15  **Q.**   Were you guys often the first ones to walk into that

16  trailer?

17  **A.**   Besides them throwing in a -- what's it called?  A goody

18  bag at the gate, they would just open the door and throw it in

19  there.  But besides that, that was the first time, I reckon, we

20  were the first ones in there.

21  **Q.**   And by goody bag, they would open the door and throw in

22  what?

23  **A.**   Like a mop and a trash can full of sheets and stuff like

24  that.

25  **Q.**   So as far as you were aware, until you guys walked into

255

1  it, it hadn't been opened up since it left the factory?

2  **A.**   As far as I was aware.

3  **Q.**   And these trailers where you had this experience in your

4  eyes, these were all brand-new trailers, or were they old

5  trailers?

6  **A.**   It was my recollection they were brand new.

7  **Q.**   There weren't any 2004 trailers that you remember working

8  on in 2006?

9  **A.**   Not that I know of.

10 **Q.**   You did go into these travel trailers at other times of

11 the year not in the middle of summer; correct?  You went in the

12 spring, the fall?

13 **A.**   Yes, sir.

14 **Q.**   When it was 75 degrees inside the trailer, did you ever

15 have any problems at all with your nose or your eyes?

16 **A.**   No, sir.

17 **Q.**   I think you said on the ones that were really hot, over

18 100 degrees, would you air them out?

19 **A.**   Yes, sir.  Well, as soon as we got used to putting them

20 together and stuff like that, we would go ahead, when we'd

21 first get there, to open it up and air it out while we were

22 blocking it and stuff.

23 **Q.**   And then would you go back in when you would finish

24 blocking?

25 **A.**   Yes, sir.

1   **Q.**   Would that be about 45 minutes or an hour later?

2   **A.**   45 minutes to an hour, yes, sir.

3   **Q.**   And then you had no problems when you went in?

4   **A.**   No, sir.

5   **Q.**   How long did the inspection take when the Fluor inspector

6   would show up after your work?  How long would they spend

7   inside that trailer?

8   **A.**   It varied.  Anywhere from 25, 45 minutes, anywhere around

9   in there, you know.

10  **Q.**   So it wasn't just a run-through inspection; it was more

11  detailed?

12  **A.**   They would look at stuff.  And, like, if we found

13  something, like some trim missing, you know, just from moving

14  around, we'd let them know about it, and stuff like that.  A

15  mini blind might be broke, and we'd let them know stuff like

16  that.

17  **Q.**   And you watched these inspectors go through the trailers?

18  **A.**   Well, most of the time it was Paul.  Paul did all the

19  paperwork, so he would be in there most of the time doing it.

20  but we were in there -- I was in there some.

21  **Q.**   Was it your experience that if the inspectors noticed any

22  problems in these trailers, they would mark them down?

23  **A.**   Yes, sir.

24  **Q.**   When you talked about airing out these trailers when it

25  was 140 degrees inside, did somebody give you that instruction

1   and training?

2   **A.**   No, sir.

3   **Q.**   Was it just common sense?

4   **A.**   Common sense.

5   **Q.**   And it took care of the problem?

6   **A.**   Yes, sir.

7           **MR. SCANDURRO:**  Thank you.

8           **THE COURT:**  Thank you, Mr. Scandurro.

9           **MS. MALLETT:**  We have no questions, Your Honor.

10          **THE COURT:**  All right.  Redirect?

11          **MR WATTS:**  Just a couple, Your Honor.  Thank you.

12                        **REDIRECT EXAMINATION**

13  BY MR WATTS

14  **Q.**   You mentioned to counsel that when you first started, it

15  wasn't that hot.  That was in January; right?

16  **A.**   Right.

17  **Q.**   In the month of January in New Orleans, not the hottest

18  time of the year?

19  **A.**   Right.

20  **Q.**   But as the spring ends and summer starts, did it get

21  hotter?

22  **A.**   Towards the summer months it was getting hotter.

23  **Q.**   By May it's hot here?

24  **A.**   Yeah, pretty much say so.

25  **Q.**   June, it's hot; right?

1   A.   Right.

2   Q.   July, hot?

3   A.   Right.

4           **MR. SCANDURRO:**  Your Honor, we'll stipulate that it's

5   hot from May through September, most days.

6   **BY MR WATTS**

7   Q.   So since we have a stipulation that it was hot from May

8   through September, that was the time when, when you went into

9   these trailers, you had all these problems you talked to us

10  about?

11  A.   Right.

12  Q.   So if somebody moved into one of those trailers on

13  May 27th, they would move in the same four months that you say

14  it's hot?

15  A.   If they moved in in May, yeah, I would say they moved in a

16  hot month.

17  Q.   Hottest time of the year?

18  A.   Oh, no, August is the hottest time here.

19  Q.   Now, one last issue:  How many times did you get nose

20  bleeds?

21  A.   I got them once.

22          **MR WATTS:**  May I approach?

23          **THE COURT:**  Yes.

24  **BY MR WATTS**

25  Q.   Reading from Page 31, Lines 21 and 22.

 1          Does this refresh your recollection?

 2          THE COURT:  Let's get a question.

 3          MR WATTS:  I'm sorry.

 4  BY MR WATTS

 5  Q.   So having read your deposition at that, how many times did

 6  you get nose bleeds?

 7  A.   A couple of times.  Once or twice.  I mean, it wasn't

 8  every day, you know, nothing like that.

 9  Q.   Sure.

10          MR WATTS:  Thank you.

11          THE COURT:  All right.  Thank you.  You can step

12  down, sir.  Thank you for your time.  Don't discuss your

13  testimony with anybody until the trial is over.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Next?

16          MR. HILLIARD:  Your Honor, we would call Daryl

17  Lemieux to the stand.

18          THE COURT:  Daryl Lemieux.

19          We'll try to take our break around -- maybe

20  after this witness.

21          Mr. Lemieux, if you'd come forward, please.

22  Just make your way up here to this chair and remain standing

23  until you take the oath, and then you can be seated.  Right up

24  here.

25          (WHEREUPON, **DARYL WINSTON LEMIEUX**, having been duly

```
 1   sworn, testified as follows.)
 2            THE DEPUTY CLERK:  Please state your full name and
 3   correct spelling for the record.
 4            THE WITNESS:  Daryl Winston Lemieux.
 5            MR. HILLIARD:  May I proceed, Your Honor?
 6            THE COURT:  Yes.
 7            MR. HILLIARD:  Thank you.
 8            THE DEPUTY CLERK:  Can you spell it, please?
 9            MR. HILLIARD:  I'm sorry, ma'am.
10            THE WITNESS:  First name, D-A-R-Y-L; middle,
11   W-I-N-S-T-O-N; last, L-E-M-I-E-U-X.
12            THE COURT:  Now you can proceed.
13            MR. HILLIARD:  Thank you.  Sorry about that.
14            THE COURT:  That's all right.
15                       DIRECT EXAMINATION
16   BY MR. HILLIARD
17   Q.   Mr. Lemieux, I'm Bob Hilliard.  We've met twice before,
18   haven't we?
19   A.   Correct.
20   Q.   I've set in front of you the three documents that you and
21   I have discussed numerous times.
22            Do you see them in front of you right now?
23   A.   Yes.
24   Q.   As I understand it, Mr. Lemieux, you set up the Alexander
25   trailer on Dale Street?
```

1  **A.**   As far as the signature on the work order, apparently I

2  did.

3  **Q.**   All right.  And you took a training class from Fluor

4  before you started hauling and installing trailers for them;

5  right?

6  **A.**   Yeah.  The MLER, that's correct.

7  **Q.**   That's right.

8         **MR. HILLIARD:**  And it's pretty big, but it seems to

9  be missing.  I'm looking for it.  We have a trailer.

10         **THE COURT:**  Right there.

11         **MR. HILLIARD:**  Here it is.

12  **BY MR. HILLIARD**

13  **Q.**   Would you describe for these folks how you jack a trailer

14  when you install it?

15  **A.**   To start with, when you unhook it from your -- it all

16  depends, too, as far as where you got, what side you jack, is

17  the lay of the land.  I mean, every situation's different.

18  Going on the slope of the land, where you jack it and how you

19  jack it.

20  **Q.**   Okay.

21  **A.**   But most of the time, you'll level it long ways.  When you

22  get it level long ways, that's without any block under it,

23  you'll go to your high side, relieve the pressure.  If it's not

24  on a 90-degree slope.  If it is, then you have to bring it up

25  before you can relieve the pressure off of the tires.

1  Q.    So you --
2  A.    So what I'm trying to show you is you're going to level it
3  long ways with your scissor jack without any block under the
4  unit.  Then I'm going to come to the high side, if it's on a
5  pretty level surface, like this one was.
6           MR. HILLIARD:  Your Honor, with your permission, may
7  he step down and let me hold this --
8           THE COURT:  Okay.  Why don't we do that?  Whatever
9  works for him to be able to demonstrate it.
10               Would it be easier for you to step down and
11 demonstrate that?
12           THE WITNESS:  Yes.
13           THE COURT:  All right.  Let's do that.  That way
14 everybody can see it.  And if you all need to move here...
15           MR. PENOT:  Your Honor, could I move to the front to
16 be able to see?
17           THE COURT:  Yes.
18 BY MR. HILLIARD
19 Q.    All right.  Please continue, sir.
20 A.    Like this on your truck.
21           THE COURT:  You have to talk loud enough for
22 everybody to hear you.
23           THE WITNESS:  Okay.  I'll speak up.
24 A.    This is your tongue jack.  You're going to level it long
25 ways without any block under the unit.  You don't have any

1    block behind the tires.

2            You're going to come to your high side, whichever

3    side is the high side, if it's not leaning at this angle.  If

4    it's a slope like this, you go to the high side, relieve the

5    pressure off of your tires.

6    **BY MR. HILLIARD**

7    **Q.**   What does that mean?  Does that mean deflate the tires?

8    **A.**   No.  That takes the pressure off of your tires, picks it

9    up to where you --

10   **Q.**   I see.

11   **A.**   -- you don't have any shake.  What I'm saying, you're

12   going to get the pressure off of this and set the unit on your

13   block.  And then you're going to tighten your piers on this

14   side of the unit.

15           And you bring your hydraulic jack on this side, on

16   your low side, and you're going to jack it up until it falls

17   level, and then you're going to tighten them.  And that's all

18   that consists of blocking a travel trailer.

19   **Q.**   So the jacking occurs from side to side?

20   **A.**   That's correct.

21   **Q.**   And when you jack from side to side, how high do you jack

22   on one side before you go around to the other side to jack?

23   **A.**   In the situation of this unit here, probably two inches.

24   But like I said, it all depends on the slope of the land.

25   **Q.**   Okay.  This morning when we were talking, did you say

1    sometimes two to four inches?

2    **A.**   Oh, yeah, on a level -- if you're on level ground, you can

3    jack it up to four inches.  I mean, you don't want to

4    teeter-tot it.  You want to get the unit leaning like this, and

5    go to the other side and jack it.

6          So your transit determines on how high you got to set

7    it for your plumbing to follow.

8    **Q.**   Now, when you took -- you took a training course from

9    Fluor?

10   **A.**   Yeah.  They got a basic model set up showing the way they

11   wanted it blocked.

12   **Q.**   And did they show you to jack it from side to side?

13   **A.**   Oh, no.  They had a unit set up on the yard.  But, I mean,

14   common sense, I mean, it's the only way you can level

15   something, is to jack it up.

16   **Q.**   If Fluor had told you that they wanted to have you jack it

17   up only from end to end, and never from side to side, since you

18   were working for Fluor, would you have followed that direction?

19   **A.**   No.  You can't -- you've got to jack it side to side to

20   level it.

21   **Q.**   So regardless of -- so you can't jack it up on one --

22   **A.**   Yeah.  I mean, to level it parallel.  But, I mean,

23   perpendicular, you've got to jack it, you know...

24   **Q.**   I got you.

25          So assuming where this trailer was going on Dale

1   Street is on a driveway?

2   **A.**   Correct.

3   **Q.**   Right?

4   **A.**   Correct.

5   **Q.**   Do you need side-to-side leveling?

6   **A.**   Yes.  I mean, you have to jack it up regardless if it's -

7   the property is perfectly level.  I mean, if you don't, then

8   you're going to have shake.  You're going to have shake in the

9   unit.  The unit will be level, but there's still pressure on

10  the tires.  Y'all know what I'm saying?

11  **Q.**   Got you.

12  **A.**   You're still going to have shake.

13          **MR. HILLIARD:**  So probably the best thing to do, with

14  the Court's permission.  We're done with this model, Judge.

15          **THE COURT:**  Sure, why don't you come back over here.

16          **MR. HILLIARD:**  I'm going to put this on the screen

17  and you can see it right there and I'll ask you some questions.

18  **BY MR. HILLIARD**

19  **Q.**   Did you get a pretty good picture on your screen of that?

20  **A.**   Yes.

21  **Q.**   Do you see how that is put on a driveway?

22  **A.**   Yes, sir.

23  **Q.**   Okay.  So if that is the surface that this trailer is

24  getting installed onto, does that type of surface, just from

25  the picture, if you can tell, need side-to-side jacking

```
 1   somewhat?
 2   A.   Yes.  Every unit I set, I relieve the pressure of the tire
 3   to make the unit stable.  I mean, you don't have to do that.  I
 4   mean, you're going to have a shake in it if you don't.  But I
 5   want the unit to be stable.
 6   Q.   So when you say you relieve the tires -- the pressure off
 7   the tires, what you're talking about is putting something under
 8   where the tires are so the tires are not what the trailer's
 9   sitting on in relation to the ground?
10   A.   Correct, correct.  That's the blocking.  I use the block
11   to...
12   Q.   Okay.  I got it.
13            There's three documents that you and I have talked
14   about a couple times; right?
15   A.   Correct.
16   Q.   And every time you look at them, you tell me -- what do
17   you tell me when you look at these documents?  What's your
18   response to them, generally?
19   A.   In what -- in the comment section?
20   Q.   Well, let's start with the first document that has your
21   son's signature on it.  Can we go to that one?
22   A.   Yes, I got it.
23   Q.   All right.  So to give -- and excuse me for a minute.  But
24   to give some perspective, let's walk through what these three
25   are generally.  The first one we're looking at now is when you
```

1   picked up the unit from the staging yard?

2   **A.**   Right.

3   **Q.**   And we will talk about that in just a minute.  But the

4   middle document -- and the first document is signed by your

5   son.

6           The middle document, what is that?  That you signed.

7   **A.**   This is showing that it's ready for occupancy, the RFO,

8   from where I went in and inspected the unit, and the inspector

9   also signed off.

10  **Q.**   All right.  And then the third document is what?

11  **A.**   Okay.  This is where Dan went back out with an inspector

12  also.

13  **Q.**   All right.  So those are the three documents that

14  completely are the universe of you, your brother, and your son,

15  dealing with this unit?

16  **A.**   That's correct.

17  **Q.**   Let's go back to document No. 1.

18          **THE DEPUTY CLERK:**  What's the exhibit number?

19          **MR. HILLIARD:**  What is the exhibit number?

20              412.  And in that exhibit it's 004614.

21              So Carl, let's go to the top one third, and

22  highlight that, please.

23  **BY MR. HILLIARD**

24  **Q.**   Who is generally the person filling out this document?

25  **A.**   The people with the staging yard.

1  **Q.**   The Fluor inspector?

2  **A.**   It would be Fluor, FEMA.  I'm not -- whoever's responsible

3  for signing the units out.

4  **Q.**   Okay.

5  **A.**   I mean, at the time -- it's been so long ago, I don't

6  remember.

7          **MR. HILLIARD:**  Let's go down halfway to the right on

8  "comments," please.  Zoom in on that.

9  **BY MR. HILLIARD**

10 **Q.**   Now, under "comments" on the first document it says:

11 "Need starter kit, wall in bedroom."

12         Do you see that?

13 **A.**   Right.

14 **Q.**   All right.  Please assume that when Alana Alexander moved

15 into her trailer, she found that the wall in her bedroom was

16 popped, snapped or misaligned somehow.

17         If that was how it existed when it was in the yard,

18 is this where it would be described?

19 **A.**   At the time -- it says, "need starter kit," and it's got

20 "wall in bedroom."

21 **Q.**   Right.

22 **A.**   "Wall in bedroom," what that means, I have no idea.

23 **Q.**   No, I know you don't.

24 **A.**   Right.

25 **Q.**   But I'm saying, if the wall in the bedroom as a fact is

1    popped, the panel's popped, and you're signing out on the unit,

2    is that where it would be --

3    A.    That's correct.

4    Q.    -- described?

5    A.    Yes, that's correct.

6    Q.    And why is it described that way when you're picking up

7    the unit from the yard?

8    A.    To protect -- to protect us.

9    Q.    What do you mean by that?

10   A.    If there's any damages to a unit -- I mean, this unit

11   here, from what I've been told, was not a new unit.  It had

12   been transported all over the world.  And if there's any

13   damages to the unit, it has to be noted.

14          I don't do that.  FEMA, Fluor, whoever, writes that

15   on the invoice, and we sign the bottom.

16   Q.    Uh-huh.  Even though -- who told you it had been

17   transported all over the world?

18   A.    I -- I've talked to so many people, I'm not sure.

19   Q.    Was it one of the lawyers who called you today on your

20   cell phone?

21   A.    Oh, I've talked to a lot of people.

22   Q.    Was it the lawyer that stopped you outside of the

23   courthouse when you were walking in today?

24   A.    I'm not sure.

25   Q.    You're not sure if the lawyer that stopped you walking

1   in --

2   A.   I spoke to several different people concerning this

3   matter.  I mean, several.  I've been up since 6:00 this

4   morning, and I've been talking to lawyers until 11:00.  And I

5   got home at 11:30 last night, and they wanted to come meet me

6   at my room, then.  So I don't know names.

7   Q.   We're blending together, is what you're saying?

8   A.   Right, right.  I'm not going to sit here and say -- tell

9   you a lie because I'm --

10  Q.   No, no, that's fine.  That's fair enough.  But I beat you

11  up about three hours?

12  A.   Right.

13  Q.   So back to it, then.  But before I get off that point, do

14  you see where it says "condition of furnishings, interior and

15  exterior," where "new" is circled, on the screen?  The "N"?  Do

16  you see that?

17  A.   Repeat that one more time.

18  Q.   I'm just asking you whether you see the part of the

19  document that is circled where it indicates that this trailer

20  was new?

21  A.   New, right.  Yes, I do.

22  Q.   But you have information that it's been all over the

23  world; right?

24  A.   (Witness nods head.)

25  Q.   And your experience, since we're on that subject, if

1   you're putting in a trailer that's been all over the world and

2   has traveled on the road all over the Gulf Coast, it's got some

3   wear and tear; right?

4   **A.**   Exactly.

5   **Q.**   So if it has wear and tear, you know, as an experienced

6   installer, that you have to be even more careful with it

7   because it's already kind of beat up?

8   **A.**   Correct.

9   **Q.**   So if it's a new travel trailer that comes straight from

10  Gulf Stream and you're setting it up, it still has some youth,

11  if you know what I mean --

12  **A.**   Right.

13  **Q.**   But at this point --

14          **MR. PENOT:**  Your Honor, objection, leading.  Can we

15  swear in Mr. Hilliard?

16          **THE COURT:**  Oh, yes.

17          **MR. PENOT:**  I've let him go a long time.

18  **BY MR. HILLIARD**

19  **Q.**   Briefly explain to the jury the difference between a

20  trailer that -- in your experience, a trailer that has some age

21  and some wear, and a brand-new trailer, in regards to the need

22  to more carefully set it up?

23  **A.**   Well, I mean, as far as -- I mean, the structure of your

24  metal.  I mean, bowing.  And that's with anything; a new car

25  and a used car.  You're going to have wear and tear on a used

 1  car versus a new car.  And you shop.  Same thing with a travel
 2  trailer.
 3  Q.   And as far as you're personally concerned, you're simply
 4  taking the trailer that they give you?
 5  A.   Correct.
 6  Q.   Do you have the authority to say that, We're rejecting
 7  this trailer?
 8  A.   Do not.
 9  Q.   Would you go down to the signature of Daren Lemieux,
10  please?
11  A.   Okay.  I got it.
12  Q.   And you see it on the screen too?
13  A.   Yes.
14  Q.   Now, that, in your view, does not seem to be your son's
15  signature, does it?
16  A.   It doesn't look like it to me.  It does not look like it.
17  Q.   And you generally know your son's signature; is that
18  right?
19  A.   I hadn't seen him write in three or four years.  But, I
20  mean, that looks a little neater than what I would think.
21  Q.   So if it's not your son that signs the --
22  A.   I'm not saying that it's not his.  I'm saying it don't
23  look like it.  I mean, I'm not a hundred percent.
24  Q.   Right.  But please listen to my question.
25          I'm saying, if it's not your son that signs it, do

```
 1   you know who would have signed it --
 2   A.   I have no idea.
 3   Q.   Okay.  Do you know who would have put his name there on
 4   his behalf?
 5   A.   No, I do not.
 6   Q.   Do you and your brother and your son sign each other's
 7   names from time to time?
 8   A.   No.
 9   Q.   Sir?
10   A.   No.
11        You can look at my signature and my brother's
12   signature and this signature, and there's no comparison.
13   Q.   All right.  Let's go to the second page where you sign it.
14        MR. HILLIARD:  Can we go back to the first page just
15   for just a second and zoom in on the cursive writing of Daryl
16   Lemieux, please?
17             A little more zoom in just on the bottom
18   signature.  There you go.
19   BY MR. HILLIARD
20   Q.   Right there where Daryl signs, it says actually the
21   occupant's signature.  See that?
22   A.   That's Daren.  She got Daren's signature here.
23   Q.   Correct.
24        But it seems that the form wants the occupant to
25   sign; not the installer?
```

1          **MR. PENOT:**  Objection, Your Honor.  How does he know
2    what the form wants?  I don't understand that.
3                Is this the guy to talk about what the forms are
4    meant to be or say and do?
5          **THE COURT:**  Well, the form says what it says.
6    Whether or not he --
7          **MR. HILLIARD:**  Judge, we're moving along --
8          **THE COURT:**  I'll go ahead and sustain the objection.
9    If you can lay a foundation that he can answer it.  The form
10   says what it says.
11   **BY MR. HILLIARD**
12   **Q.**   All right.  What does the form say, sir?
13   **A.**   I don't have my glasses with me.  I can't hardly read the
14   bottom of it.
15         **MR. PENOT:**  I'll stipulate that the form --
16         **THE WITNESS:**  Wrong size print.  I mean, he's got his
17   signature on top of it.
18   **BY MR. HILLIARD**
19   **Q.**   Right underneath your son's signature it says "occupant
20   signature"?
21   **A.**   Right.
22   **Q.**   Your son was not going to be the occupant, was he?
23   **A.**   No.
24         **MR. HILLIARD:**  Let's go to the second page, please.
25

1   **BY MR. HILLIARD**

2   **Q.**   Now, this second page is the "ready for occupancy QC/QA

3   acceptance checklist."

4           Now, what are you supposed to do with this sheet in

5   regards to your responsibility, Mr. Lemieux, as the contractor?

6   **A.**   Check all the items out.  And if there's a problem with

7   it, you put it in the "remark" section.

8   **Q.**   So did the wall in the bedroom that was busted out when

9   you-all picked it up get fixed before you set it up?

10  **A.**   Apparently so.  If it hadn't have been fixed, it would've

11  never have been signed off.  I mean, it went through several

12  different hands.  I mean, a lot of paperwork.  If there was a

13  problem with the wall, it would have been noted on the

14  paperwork.

15  **Q.**   When you say "apparently so," that means that, in all

16  fairness, you have no actual memory of this trailer --

17  **A.**   No, I don't.

18  **Q.**   -- on the street?

19  **A.**   No, I sure don't.

20  **Q.**   You know how you set up trailers generally, and you know

21  these documents reflect that you had your boots in the dirt on

22  Dale Street?

23  **A.**   Uh-huh.

24  **Q.**   All right.  Now, when you said "apparently so," who's

25  responsible for fixing the wall in the bedroom if it's busted

1    when you pick up the trailer from the staging yard?  If you
2    know.
3    A.   It has to be fixed.  I mean, I'm not real sure.  I know
4    that it has to be fixed before the inspector will sign off on
5    it.
6    Q.   All right.  So let's go back to your sheet briefly.
7            So you checked all of those off.  And then on the
8    bottom, you signed that sheet; right?  Is that your signature?
9    A.   Yeah, that's my signature.
10   Q.   Did you also write in the name of Alana Alexander?  Is
11   that your handwriting?
12   A.   No, I didn't write that.
13   Q.   What part of this bottom column did you write, if you can
14   tell?
15   A.   Where it's got "contractor, QC" and my signature.
16   Q.   Uh-huh.
17           And the date?
18   A.   And the date.
19   Q.   That's it.
20           Generally, in your experience, who would fill in the
21   rest of that information?
22   A.   Yeah, this has to be filled out by me.  This has to be
23   filled out by me and the inspector, for the QC inspector to
24   sign off on it.
25   Q.   All right.  Third page, sir.

1              Now, this is a "ready for occupancy QC/QA acceptance

2    checklist."  They go through blocking and leveling, anchors and

3    strapping, sewer line installation, water line, direct wiring,

4    and miscellaneous.  Do you see all that?  The QA inspector,

5    which is not you; right?  You're not the QA inspector?

6    A.   No.

7    Q.   Okay.  Go down to -- and the contractor, QC, is Dan -- Don

8    Lemieux?

9    A.   Dan.

10   Q.   Dan?  Who's that?

11   A.   Dan?

12   Q.   Yes.

13   A.   That's my brother.

14   Q.   Now, you set this up; right?

15   A.   Yes.

16   Q.   And --

17   A.   I mean, by the paperwork, I did.  I don't remember it.

18   Q.   Right.

19              But if you're setting it up, then it is you that

20   would generally sign this last sheet; right?

21   A.   Well, no.  The one paper that I was supposed to sign, I

22   signed and had signed off.  And that's his responsibility, to

23   come behind us with the inspector to go over everything and

24   sign off.

25              I had to refresh that with him.  I talked to him this

1   morning about that.

2   **Q.**   So when you and I talked before, you were confused.

3   **A.**   I worked with several different companies.  All the

4   companies had different procedures.  I mean, this has been

5   years ago.

6   **Q.**   Right.

7   **A.**   I mean, but the company I work for right now is totally

8   different than this.  Very mind-boggling and confusing.

9   **Q.**   Generally, you're a two-man crew?

10  **A.**   Correct.

11  **Q.**   And if you're jacking up this trailer, how does a two-man

12  crew do it in relation to each other?  What are the

13  responsibilities of each in relation to each other regarding

14  jacking?

15  **A.**   Well, I mean, you level your pads.  This situation here,

16  you don't level them.  It's on a concrete slab.  And, I mean,

17  you've got to site your block.  Your block has to be positioned

18  the right way.  And then you jack the unit up, as I showed you

19  earlier in the diagram.

20  **Q.**   From side to side?

21  **A.**   Right.  So it's already level longways.  Once you take it

22  off the truck, it's leveled longways.  Go to your high side,

23  take your pressure off of your tires, and tighten your block up

24  on it.  Then you go to your low said and tighten that side.  It

25  takes about 20 minutes to do it.

1    **Q.**    And for each trailer, how much were you paid?

2    **A.**    I'd be afraid to say.  I'm not real sure.  I could do some

3    checking and find out.

4    **Q.**    Who did you get your paycheck from?

5    **A.**    From Dan, my brother.

6    **Q.**    What's the name of his company?

7    **A.**    Dan's Mobile Home Service.

8    **Q.**    Dan's Mobile Home Service does not have a license in

9    Louisiana to install mobile homes, does it?

10   **A.**    You're not required to have a license and set up camp on a

11   travel trailer.  It's not considered a mobile home.

12   **Q.**    Be that as it may, my question is:  Dan's Mobile Home

13   Service does not have a license to install mobile homes in

14   Louisiana, does it?

15   **A.**    We set mobile homes in Louisiana under a license.  I don't

16   know if it's his or not.

17   **Q.**    I'm only asking about --

18   **A.**    I'm not sure.

19   **Q.**    You don't know?

20   **A.**    I don't know.  I know in Florida, he has a Florida

21   license.  Louisiana, I'm not sure.

22   **Q.**    I'll ask him when he comes.

23   **A.**    Yeah.  That's what I was fixing to say.

24            **THE COURT:**  Me too.

25            **THE WITNESS:**  We can all draw our own conclusions.

1          **MR. HILLIARD:**  One last area, Your Honor, and then
2   I'll pass this witness.
3               411, Carl, please.
4   BY MR. HILLIARD
5   **Q.**   Have you ever seen this document in your training of how
6   to jack trailers by Fluor?  And you took a -- let me start
7   over.
8               When you started to haul trailers for Fluor, were you
9   ever shown this document?
10  **A.**   We went over several things.  I mean, I don't remember it.
11  **Q.**   It's called proper jacking techniques, toolbox training?
12  **A.**   Right.
13  **Q.**   And do you see where it says No. 7?
14  **A.**   Uh-huh.
15  **Q.**   "Work from end-to-end, never side-to-side."
16              To your recollection, Mr. Lemieux, did anyone from
17  Fluor ever show you this document or tell you that's how you
18  should do it?
19  **A.**   No.  But, I mean, that's the way you level a trailer.  You
20  don't jack on the end.  You're not going to jack on the middle.
21  You're going to put your jack behind the tire to level it
22  sideways.  That's on the end of the unit.
23  **Q.**   It's end-to-end, not side-to-side; right?
24  **A.**   Right.  I mean, it's on the end of the I-beam.  There's no
25  way to jack it end-to-end.  It's the center of the -- do you

1  want me to show you here on your -- there's no way to jack it

2  end-to-end.  You don't have an I-beam there.

3          You're saying jack it end-to-end.  Here's your I-beam

4  here, where you jack and block.

5          You don't have a beam here.  All you have is a

6  bumper.  So there's no way to jack it here.

7  **Q.**  What is this right here?

8  **A.**  That's not no I-beam.  There's no I-beam there.

9  **Q.**  This here.

10 **A.**  That's a facial plate.  That's a decorator plate.

11 **Q.**  No beam?

12 **A.**  No beam.

13         **MR. HILLIARD:**  I hope you get more sleep tonight.

14         **THE WITNESS:**  Oh, I do too.

15         **MR. HILLIARD:**  Thank you, sir.

16         **THE COURT:**  Any Gulf Stream questions?

17         **THE WITNESS:**  Do you need these?

18         **THE COURT:**  No, no, you have to stay a little bit

19 longer.

20         **THE WITNESS:**  What?

21         **THE COURT:**  We've got a few more questions.

22         **THE WITNESS:**  Oh, I thought that was it.

23         **THE COURT:**  These people that have been pestering you

24 are not ready to let you go yet.  We have a couple of more

25 questions.  And then you'll be done.

1          **THE WITNESS:**  Okay.

2                      **CROSS-EXAMINATION**

3    **BY SPEAKERU**

4    **Q.**   I'll be brief.

5          Mr. Lemieux, in response to the questions that you

6    just had from Mr. Hilliard, you do not remember each unit you

7    put in; correct?

8    **A.**   No.

9    **Q.**   So you don't specifically remember placing a unit at 4415

10   Dale Street?

11   **A.**   I do not.

12   **Q.**   And all you remember is basically what you told us about

13   the three documents that were put in as Exhibit 412?

14   **A.**   Correct.

15   **Q.**   And you answered truthfully all the questions that

16   Mr. Hilliard asked you?

17   **A.**   Yes, I did.

18   **Q.**   That was your cue to tell me I can't handle the truth.  I

19   only get a few minutes up here, so you have to work with me.

20          **SPEAKERU:**  All right, sir.  That's all the questions

21   I have.

22          **THE COURT:**  All right.  Mr. Penot.  And then

23   Mr. Hilliard is going to get another chance to ask you a few

24   questions and then you can step down.

25

1                         CROSS-EXAMINATION
2    BY MR. PENOT
3    Q.   Mr. Lemieux, my name is Charlie Penot.  I represent Fluor
4    Enterprises.  Now, of all those lawyers you've been chatting
5    with since 6:00 this morning, you've never set eyes on me, have
6    you?
7    A.   No, I haven't.
8              MR. HILLIARD:  He sleeps late.
9    BY MR. PENOT
10   Q.   Does Mr. Hilliard know how to deal with a travel trailer?
11   Would you leave one like this?
12             Dan's Mobile Home Service, how long has it been in
13   business?
14   A.   I've been doing this 30 years.  In fact, I put him in
15   business.
16   Q.   How old are you, sir?
17   A.   How long has be been -- I'm 44 years old.  I started doing
18   it when I was 14.
19   Q.   Did your dad do it before you?
20   A.   Oh, yeah.  Still does it.
21   Q.   And how old is Dan?
22   A.   Dan's 37.
23   Q.   Now, Dan's got a license in Florida to install mobile
24   homes; is that right?
25   A.   That's correct.

1  Q.   Are they a lot less careful about mobile homes in Florida
2  than they are in Louisiana, as far as you know?
3  A.   I don't know.
4  Q.   When you were installing trailers and mobile homes down
5  here after Katrina, a two-man crew, you told Mr. Hilliard;
6  right?
7  A.   Right.
8  Q.   How many jacks would you carry?
9  A.   I had five or six -- I keep five or six jacks on my truck
10 at all times.  I set mobile homes and modulars and all that
11 before I come down, so I just brought all my equipment with me.
12 It only takes one jack.
13 Q.   So when you were installing travel trailers, you had six
14 or seven hydraulic jacks at your disposal?
15 A.   That's correct.
16 Q.   Now, did I understand, when you were doing your
17 demonstration for Mr. Hilliard there on that model, what was
18 the term you used?  You said relieve the pressure?  Did I get
19 that right, relieve the pressure?
20 A.   Off of your -- off of your springs.  You have a spring.
21 Q.   All right.
22 A.   If you leave the pressure down on the tire, I don't care
23 how many blocks you put under it, I mean, you're going to have
24 a shake in it.  You have to get the pressure up off the spring.
25 You've got to relieve the pressure.

1   **Q.**   My model's really nice, I like it, but it doesn't have a
2   suspension on it, does it?
3   **A.**   Right, it doesn't.
4   **Q.**   But the real trailers, there was a spring suspension here
5   because it's designed to be hauled down the highway?
6   **A.**   That's correct.  With equalizers on it.
7   **Q.**   So one thing you want to do when you're installing and
8   leveling is you need to take the spring out so when people are
9   walking around in it, it's not bouncing around; right?
10  **A.**   Right, not shaking.  Correct.
11  **Q.**   You don't have to go very high to do that; right?  You
12  don't even have to lift the wheels off the ground, do you?
13  **A.**   No, you don't; just relieve the pressure.
14  **Q.**   Particularly if you're on a level spot like a driveway?
15  **A.**   Correct.
16          **MR. HILLIARD:**  Excuse me.
17          **MR. PENOT:**  Yeah, you're right.  Guilty.  Guilty as
18  charged.  I'll try not to lead.
19          **THE COURT:**  Let's try to finish up.
20          **MR. PENOT:**  Thank you, Mr. Lemieux.
21          **THE COURT:**  Mr. Hilliard, any further questions for
22  Mr. Lemieux?
23          **MR. HILLIARD:**  I do not, Judge.
24              Thank you, Mr. Lemieux.
25          **THE COURT:**  Thank you, Mr. Lemieux.

 1                THE WITNESS:  That's it?

 2                THE COURT:  Now, you can step down.  Don't discuss

 3      your testimony with anybody who may be a witness.

 4                THE WITNESS:  Okay.

 5                THE COURT:  At this time, why don't we take our

 6      mid-afternoon break.  I've got 3:20 here.  If you-all can be

 7      ready at 3:35, we will come back and finish up for the day.

 8                THE DEPUTY CLERK:  All rise.

 9                (WHEREUPON, the jury exited the courtroom.)

10                      **(OFF THE RECORD)**

11                THE DEPUTY CLERK:  All rise.

12                (WHEREUPON, the jury entered the courtroom.)

13                THE COURT:  You may be seated.  This is the next

14      witness.

15                MR. HILLIARD:  Yes.  Your Honor, we would call Angie

16      Baksh to the stand.

17                (WHEREUPON, **Angela Taylor Baksh**, having been duly

18      sworn, testified as follows.)

19                THE DEPUTY CLERK:  Please state your full name and

20      correct spelling for the record.

21                THE WITNESS:  Angela Taylor Baksh.

22                THE DEPUTY CLERK:  Could you spell it.

23                THE WITNESS:  A-N-G-E-L-A, T-A-Y-L-O-R, B-A-K-S-H.

24                THE COURT:  Go ahead and proceed.

25                MR. HILLIARD:  Thank you, Your Honor.

1                        **DIRECT EXAMINATION**

2     **BY MR. HILLIARD**

3     **Q.**   Would you introduce yourself to the jury, please.

4     **A.**   Angela Baksh.

5     **Q.**   Ms. Baksh, were you the Fluor inspector on the trailer

6     that ultimately made it to Dale Street that the Alexander's

7     lived in?

8     **A.**   Yes.

9               **MR. HILLIARD:**  May I approach, Your Honor?

10              **THE COURT:**  Yes.

11    **BY MR. HILLIARD**

12    **Q.**   This document which indicates that the Alexander trailer

13    went to Dale Street has a signature which is your name; right?

14    **A.**   Yes.

15    **Q.**   All right.  So you were the inspector for this trailer as

16    it left the yard to go to Dale Street?

17    **A.**   Yes.

18              **MR. HILLIARD:**  Carl, can you pull up --

19    **BY MR. HILLIARD:**

20    **Q.**   This is a -- Angie, I apologize.  We've been here for a

21    couple of days and we're still getting used to technology.  You

22    just walked in, let me give you help with some bearings.

23              The big screen is what the jury is looking at.

24    They're also looking at screens in front of them.  You have the

25    document right in front of you, if you want to pick it up.  I'm

1    going to highlight portions of the screen to talk to you about
2    specifics of that document that has your name on it.  Okay?
3    **A.**   Uh-huh.
4    **Q.**   All right.  First, as an inspector for Fluor, what do you
5    do with a trailer like the Alexander's?
6    **A.**   Inspect it, what's on this list.
7    **Q.**   Now, I notice on comment 9 --
8          **MR. HILLIARD:**  Can you zoom in on comment 9?
9    **BY MR. HILLIARD**
10   **Q.**   It says:  "Wall in bedroom."  Please assume that the
11   evidence in this case is that the wall in the master bedroom of
12   that trailer was popped out, the panel was popped out.  Who's
13   handwriting is on comment 9, if you know?
14   **A.**   Mine is on "need starter kit."  There's like two of us
15   working together on some of these things, so I don't really
16   know.
17   **Q.**   All right.  So your handwriting is "need starter kit," but
18   your handwriting is not "wall in bedroom"?
19   **A.**   No.
20   **Q.**   All right.  But let me ask you this:  If there is a wall
21   in the bedroom that's popped out, who's supposed to fix it
22   before it leaves the ground?  Whose responsibility is it to fix
23   that issue?
24   **A.**   I really don't know.
25   **Q.**   Well, not specific by name, but do you know if -- okay.

1    I'll rephrase it.

2              As between FEMA and Fluor, if the issue exists before

3    the trailer leaves the staging ground, whose folks come to fix

4    it?

5    **A.**   I really don't know.

6    **Q.**   Okay.

7    **A.**   Because of between --

8    **Q.**   Can you scoot to the microphone a little closer?

9    **A.**   I'm going to be honest, I really don't know.

10   **Q.**   Do you know if it is supposed to be fixed, regardless of

11   who does it, once the issue is identified and documented?

12   **A.**   Yes.

13             **MR. HILLIARD:**  All right.  Carl, would you come down

14   to the signature and date at the bottom?

15   **BY MR. HILLIARD:**

16   **Q.**   This says, No. 13, "Representative acknowledge condition

17   as described above."  Do you see that?

18   **A.**   Yes.

19             **MR. HILLIARD:**  And, Carl, can you highlight the

20   signature and date of the contractor, please.

21   **BY MR. HILLIARD**

22   **Q.**   Did you write that signature?

23   **A.**   No.

24   **Q.**   That is not your signature, is it?

25   **A.**   No, that's not my signature.

1   **Q.**   Someone else wrote your name in that spot?

2   **A.**   Yes.

3   **Q.**   From time to time, as a Fluor inspector, you're aware that

4   inspectors sign other inspector's names, aren't you?

5   **A.**   Yes.

6   **Q.**   And the reason is?

7   **A.**   Because there's like two of us working together.

8   **Q.**   Okay.  And are you busy?

9   **A.**   Yes.

10  **Q.**   Do you know who signed your name?

11  **A.**   No.

12  **Q.**   Did you give whoever signed your name your permission to

13  sign your name?

14  **A.**   No.

15  **Q.**   And it seems like the purpose of this -- and at the time,

16  if you were an inspector, did you have someone that was over

17  you at Fluor?

18  **A.**   Yes.

19  **Q.**   And was the practice of signing each other's names

20  something that happened frequently?

21  **A.**   Well, when we was in a hurry when we was trying to get the

22  trailers out.

23  **Q.**   Something your supervisor was aware of?

24  **A.**   Yes.

25          **MR. HILLIARD:**  Pass the witness, Judge.

1          **THE COURT:**  All right.  Mr. Glass, are you going to

2   handle this?

3          **MR. GLASS:**  One second, Your Honor.

4          **MR. PENOT:**  Just a very, very few, Your Honor.

5          **THE COURT:**  No, I'm still waiting to see what

6   Mr. Glass is going to do.

7          **MR. PENOT:**  I'm sorry, Your Honor.  I misunderstood.

8          **THE COURT:**  Come on, guys, let's go.

9          **MR. GLASS:**  No questions, Your Honor.

10         **MR. HILLIARD:**  It was worth the wait.

11                          **CROSS-EXAMINATION**

12  BY MR. PENOT

13  **Q.**   Is it Ms. Baksh or Boshk (phonetic)?

14  **A.**   Baksh.

15  **Q.**   I'm not sure I've got it, but forgive me if I'm

16  mispronouncing it.  People mispronounce mine all at time.  It's

17  kind of like the wine, Penot.

18         Ms. Baksh, we've never met before; is that correct?

19  **A.**   Right.

20  **Q.**   Mr. Hilliard showed you one inspection form.  Did you in

21  your -- how many trailers do you think you inspected out there

22  when you were working for Fluor post-Katrina?

23  **A.**   A lot.

24  **Q.**   So you clearly can't remember any one trailer; correct?

25  **A.**   No.

1   **Q.**   Was this issue of -- was there an issue with sometimes
2   wall paneling popping out?  Was that something you saw
3   frequently?
4   **A.**   Yes.  Not frequently, but whenever they was out.
5   **Q.**   And if a wall was out, that would be the -- I'm sorry.
6   Let me try again.
7          If a wall was popped out, where on the form that
8   Mr. Hilliard just showed you --
9          **MR. PENOT:**  Let's put up 468 FLUOR, please.
10  **BY MR. PENOT:**
11  **Q.**   Suppose there was a problem with a wall in a trailer you
12  were inspecting.  Where would you, as an inspector, note that?
13  Would it be in that box?
14  **A.**   Yes.
15  **Q.**   The box that says, "wall in bedroom"; correct?
16  **A.**   Yes.
17  **Q.**   Is it fair to say that if an inspection form says "wall in
18  bedroom," there's something not perfect about the wall in the
19  bedroom?
20  **A.**   Yes.
21  **Q.**   Do you recall your in deposition a colleague of mine
22  showed you some of your other forms where you had noted "wall
23  in bedroom"?  Do you recall that?  Or similar language.
24  **A.**   That's the only one I've seen with wall in bedroom.  The
25  other one had a whole -- whole slats that needed to be changed.

1 **Q.**   Okay.  Let's just --

2 **A.**   You know, on the document.

3 **Q.**   I'm sorry.  I didn't mean to interrupt you.  Are you

4 finished?

5 **A.**   Uh-huh.

6 　　　　**MR. PENOT:**  Okay.  Jane, how about 4685.  Could

7 you -- bottom third, say, blow up.

8 **BY MR. PENOT**

9 **Q.**   "Wall loose over sink in bedroom," is that what that says?

10 **A.**   Yes.

11 **Q.**   Does that look like your signature or your handwriting?

12 **A.**   Yes.  Yes.

13 　　　　**MR. PENOT:**  4686, bottom third again.

14 **BY MR. PENOT**

15 **Q.**   "Wall loose in bedroom," is that your handwriting?

16 **A.**   No, that's not my handwriting.

17 **Q.**   Let's -- is that your signature to the bottom left of

18 that?  Does that look like your signature to you?  Do you need

19 it blown up?

20 **A.**   I can't really see that one.

21 　　　　**MR. PENOT:**  Okay.  Let's go to 4687.

22 **BY MR. PENOT:**

23 **Q.**   That comment box "bedroom wall loose," is that what that

24 says?

25 **A.**   Yes.

1  **Q.**   Does that look like your handwriting?

2  **A.**   I can't really see that good, but I guess.

3  **Q.**   I'm sorry.  You're not sure?  It's just not a good enough

4  quality copy?

5  **A.**   It's not on here.

6          **MR. PENOT:**  Okay.  Thank you for your time,

7  Ms. Baksh.

8          **THE COURT:**  All right.  Any redirect?

9          **MR. HILLIARD:**  No redirect.

10         **THE COURT:**  All right.  Thank you, ma'am.  You can

11  step down.  Please don't discuss your testimony with anybody

12  that might be a witness in the trial.

13         **THE WITNESS:**  Okay.

14         **THE COURT:**  Okay.  Who's next?

15         **MR. BUZBEE:**  Shirley Alexander, Your Honor.

16         **THE COURT:**  Shirley Alexander.  All right.

17  Ms. Alexander, if you would make your way up here, please.  And

18  you're going to be right up here by me.  When you get up here,

19  remain standing.  Just remain standing when you get to this

20  chair right here.  Be careful on that step.  You'll take the

21  oath and then you can be seated.

22         (WHEREUPON, **Shirley Alexander**, having been duly

23  sworn, testified as follows.)

24         **THE DEPUTY CLERK:**  Please state your name for the

25  record.

1          **THE WITNESS:**  My name is Shirley Alexander -- excuse
2     me.  My name is Shirley Alexander.
3                         **DIRECT EXAMINATION**
4     BY MR. BUZBEE
5     **Q.**   Mrs. Alexander, is this your daughter, Alana?
6     **A.**   Yes, it is.
7     **Q.**   If you don't mind me asking -- if you don't want to tell
8     me, that's okay -- how old are you, Miss?
9     **A.**   79.
10    **Q.**   Are you still married?
11    **A.**   Yes.
12    **Q.**   Is your husband still alive?
13    **A.**   Yes, he is.
14    **Q.**   What is his name?
15    **A.**   Louis Alexander.
16    **Q.**   Where do you live, Mrs. Alexander?
17    **A.**   I live at 4415 Reynes Street .
18    **Q.**   How long have you and your husband been married?
19    **A.**   58 years.
20    **Q.**   Wow.  What's your husband do?
21    **A.**   My husband is a retired plaster contractor, and he's also
22    a barber.
23    **Q.**   And he still cuts hair?
24    **A.**   Yes, he does.
25    **Q.**   Now, we've already established that you're the mother of

```
 1   Alana and the grandmother of Christopher?
 2   A.    Yes.
 3   Q.    And how many kids do you have, Miss?
 4   A.    Eight.  One is deceased.  I have seven, but I'm the mother
 5   of eight.
 6   Q.    And how many grandkids?
 7   A.    Yes, I have ten grandkids.
 8   Q.    And how about great-grandkids?
 9   A.    I have five.
10   Q.    Now, before the storm, where did you live?
11   A.    4415 Reynes -- I'm sorry.  4758 Ray Avenue.
12   Q.    And before the storm, did you live next to your daughter,
13   Alana?  Next door?
14   A.    Yes, before the -- no, after the storm.  Before the storm,
15   I lived at 4758 Ray Avenue.
16   Q.    Okay.
17   A.    After the storm we were living in my husband's barbershop
18   which is next to Alana, and that's 4423 Reynes Street -- Dale
19   Street.
20   Q.    Okay.  After Hurricane Katrina, you and your husband were
21   living in the barbershop?
22   A.    Right.
23   Q.    And that was right next door to where Alana had lived?
24   A.    Right.
25   Q.    And you and your husband, as I understand it, actually
```

1  owned the house that Alana and Erika and Christopher were

2  living in before the storm?

3  A.   Yes, we did.

4  Q.   Could you tell us what kind of damage that home received,

5  just briefly?

6  A.   Well, that home received, I think -- I think they said

7  about five or six feet of water in it.

8  Q.   And you had time before the storm to spend a lot of time

9  with Christopher; is that right?

10  A.   Yes, I did.

11  Q.   And so when, and you weren't here, but when Erika was

12  here, your granddaughter, she said that other than your

13  daughter, Alana, you probably spent as much time with

14  Christopher as anybody; is that right?

15  A.   Yes, because Alana was working and I had to watch him

16  until it was time to go to school.

17  Q.   Now, after Katrina, when you and your husband moved back

18  into the barbershop, Alana -- where was Alana and Christopher

19  and Erika?

20  A.   They were still in Florida.

21  Q.   And the reason I'm asking you, and I'm sure you realize,

22  is that you were actually at the barbershop on the day that

23  these folks came out and installed Alana's trailer?

24  A.   Yes.

25  Q.   And did you see them install the trailer?

1  **A.**   I didn't see them actually install the trailer.  When I

2  came out, this trailer was -- I heard a lot of noise, and when

3  I came out they had put the trailer in the driveway.

4  **Q.**   So by the time you came outside from the barbershop, which

5  is right next door, you were able to see -- the trailer was in

6  place, but you actually saw them doing the jacking?

7  **A.**   Yes, I did.

8  **Q.**   Could you --

9          **MR. BUZBEE:**  May I approach the witness, Your Honor?

10         **THE COURT:**  Yes.

11 **BY MR. BUZBEE:**

12 **Q.**   Mrs. Alexander, I'm showing you a picture.  Do you

13 recognize that picture, ma'am?

14 **A.**   Yes, I do.

15 **Q.**   It's marked as Trial Exhibit 326.  Does this picture

16 fairly and accurately represent not only your barbershop but

17 the trailer as it was set up in front of your old house?

18 **A.**   Yes.

19         **MR. BUZBEE:**  Your Honor, we offer 326.

20         **THE COURT:**  I've got 326 on my list as having been

21 admitted.

22         **MR. BUZBEE:**  Is it?

23         **MR. GLASS:**  It is, Your Honor.

24         **MR. BUZBEE:**  Okay.  I'm sorry I wasted your time.

25         **THE COURT:**  That's all right.  Go ahead.

1  **BY MR. BUZBEE:**

2  **Q.**   Mrs. Alexander, can you look at that screen in front of

3  you, ma'am.  Now, is it true that the barbershop we're talking

4  about is where my pen is?

5  **A.**   Right.

6  **Q.**   Okay.  So that -- that was the barbershop, but after the

7  storm, you and your husband moved there?

8  **A.**   Yes.

9  **Q.**   And Alana's trailer is right next door?

10  **A.**   Correct.

11  **Q.**   And you were standing somewhere in the area of this ramp

12  when these men were installing the trailer?  Or where were you

13  standing?

14  **A.**   I came out my door and I was standing on the porch.

15  **Q.**   Where I have my pen now?

16  **A.**   Yeah.

17  **Q.**   All right.  Could you tell the ladies and gentlemen of the

18  jury how those -- how many men was it that came out to put that

19  trailer there?

20  **A.**   Well, I saw two.

21  **Q.**   Okay.  Could you describe how they jacked up that trailer?

22  **A.**   Well, like I said, the trailer was there when I -- you

23  know, when I came outside.

24  **Q.**   Right.

25  **A.**   And I didn't see a lot of the -- how they, you know,

1    actually put the trailer there.  When I came out, I did see

2    them under the trailer putting the blocks under the trailer.

3    Q.    Okay.  And do you remember, Mrs. Alexander, how they did

4    that?  And by that I mean -- we've got this handy model here.

5            MR. BUZBEE:  May I approach, Your Honor?

6            THE COURT:  Yes.

7            MR. BUZBEE:  It's kind of heavy.  It was made very

8    well.

9    BY MR. BUZBEE:

10   Q.    Now, what I'm trying to figure out, Mrs. Alexander, is

11   whether it was jacked up -- and when I say "jacked," I mean

12   blocked from front to front, or side to side, or corner to

13   corner.  Do you know the answer to that question?

14   A.    From corner to corner.

15   Q.    So you're telling me, when they were jacking it and

16   putting the blocks under it, they were doing it from one

17   corner; right?

18   A.    Uh-huh.

19   Q.    And where would they go after they did one corner?

20   A.    Well, they put it under this corner.

21   Q.    Okay.  You're pointing to the back corner?

22   A.    Is that the back of the trailer?

23   Q.    Yeah.  I'm going to call that the back because that's the

24   tongue.

25   A.    Oh, okay.  Well, that's where they started off, on this

1   side here.

2   **Q.**   This side?

3   **A.**   Yes, sir.

4   **Q.**   The side closest to you?

5   **A.**   And then they went to the other side.

6   **Q.**   The very opposite corner?

7   **A.**   The opposite corner.

8   **Q.**   Then where did they go?

9   **A.**   Then they came back and did the corner on this side.

10  **Q.**   So you're saying it's like an X?

11  **A.**   Yes, something like an X.  Because he did it that way, and

12  then he came and put it this way, and then he went back and

13  ended it on that side.

14  **Q.**   And your testimony -- and you remember this clearly?

15  **A.**   I do.

16  **Q.**   No doubt in your mind?

17  **A.**   No doubt in my mind.

18  **Q.**   And you would call it corner to corner?

19  **A.**   Corner to corner.  That's what I saw.

20  **Q.**   Okay.  Let's switch gears, Mrs. Alexander, because I

21  know -- and I just met you this morning -- I know you were

22  pretty nervous about being here.

23  **A.**   I am very nervous about this.

24  **Q.**   Okay.  Let's see if we can go right to the other area I

25  want to talk to you about.  Now, we all know Chris has asthma,

1  and he's had it since he was a little boy.

2  A.   Yes.

3  Q.   And nobody's saying that he just all of a sudden got

4  asthma because of the trailer?

5  A.   No.

6  Q.   Okay.  But you know how his asthma was before the trailer

7  and then also how it was in the trailer?

8  A.   Uh-huh.

9  Q.   Is that true?

10  A.   Yes.

11  Q.   How do you know that?

12  A.   Because before the trailer -- before he was in the

13  trailer, I was with him just about every day because I had to

14  mind him because Alana was working.  And then after the

15  trailer, I would see him, you know, going back and forth since

16  I was next door to him at that time and so I would see him.

17  Q.   So before the trailer, would he sometimes spend time at

18  your house because Alana was at work?

19  A.   Yes.

20  Q.   And then once they moved the trailer in, the trailer was

21  put there and you had moved next door, you would see him every

22  day?

23  A.   I would see him back and forth, yes.

24  Q.   What, if anything, Mrs. Alexander, did you notice about

25  his condition that may have changed once he moved into the

1  trailer?

2  **A.**   Well, I did notice after he had moved in the trailer, he

3  would be puffy, his eyes -- he was always rubbing his eyes and

4  his nose, and sometimes he would -- he would just sleep a lot.

5  He slept more after he moved in the trailer than he did before.

6  But that's what he was, he was...

7  **Q.**   Did you yourself, Mrs. Alexander, ever go inside that

8  trailer?

9  **A.**   Yes, I did.

10  **Q.**   Do you remember anything unusual about that trailer when

11  you went inside?

12  **A.**   When you walked into the trailer, you -- you had a funny

13  odor, and then it would kind of like burn your eyes a little

14  bit., you know.  And that's the way it was when you went in the

15  trailer.

16  **Q.**   And how often did you go in there?

17  **A.**   Well, sometimes I go in there -- probably maybe once a

18  week or something.  Because, see, we was so close to each

19  other, we just used to talk over the fence most of the time.

20  **Q.**   Now, had you ever smelled that smell before, that smell

21  you would smell in the trailer?

22  **A.**   No, I had never smelled that before.

23  **Q.**   Did you know what it was, Mrs. Alexander?

24  **A.**   No, I didn't.

25  **Q.**   And you said it burned your eyes?

1  A.    Yes, it did.

2  Q.    Now, when you would go into the trailer and it would burn

3  your eyes, would that be when the trailer had the windows open?

4          MR. WEINSTOCK:  Objection, Your Honor.  He's leading.

5          THE COURT:  Yes, that was a leading question.

6          MR. WEINSTOCK:  I mean, on the background stuff, I

7  let it go.

8          THE COURT:  Right.

9  BY MR. BUZBEE:

10 Q.    Now, you know, of course, sometimes -- or often Alana

11 would have the windows open?

12 A.    Right.

13 Q.    And during those times, did you ever go into the trailer?

14 A.    Sometimes.  But, you know, like I said, we used to do a

15 lot of talking.  I didn't go in there that often -- you know,

16 every day like that.

17 Q.    But certainly you were in there at times when the window

18 was opened; right?

19 A.    Oh, yes, yes.

20 Q.    And you still smelled the smell?

21 A.    Yes.

22 Q.    And it still burned your eyes?

23 A.    Yes.

24 Q.    Now, when you were there, would Alana always run the air

25 conditioning?

1          Let me ask it this way.  That's a dumb question on my
2    part.
3          Were you ever at the trailer when Alana would run the
4    air conditioning?
5    A.   Yes.
6    Q.   When she would run the air conditioning, would she run it
7    with the windows open?
8    A.   Well, most likely, yeah, because sometime in the
9    summertime, you know, she would have it on on low, but --
10   Q.   With the windows open?
11   A.   With the windows, uh-huh.
12   Q.   Okay.  And during those times, did you still smell that
13   smell?
14   A.   Well, when you first went in, you know, you would smell
15   it.
16   Q.   And you would kind of get used to it?
17   A.   I imagine so, yes.
18   Q.   What do you know, if anything, about what Alana would try
19   to do to eliminate that smell?  Do you know of anything she
20   tried to do?
21   A.   Well, she would spray the house with, you know, with
22   Febreze and all of this stuff, but it didn't really help that
23   much.
24   Q.   Now, did you ever go over to Alana's trailer for a fish
25   fry?

1  **A.**   No.
2  **Q.**   If you-all were going to fry fish, where would you-all do
3  that?
4  **A.**   Alana didn't fry fish very often because Christopher
5  didn't eat fried fish.  She would bake stuff all the time.
6  **Q.**   He doesn't even like fried fish, does he?
7  **A.**   He doesn't like too much anything baked -- I mean, fried.
8  He just liked baked stuff.
9  **Q.**   Now, you love your daughter very much?
10  **A.**   Very much.
11  **Q.**   And you told me when I met you this morning in the
12  elevator she was your baby?
13  **A.**   She is.
14  **Q.**   And obviously you love your grandkids?
15  **A.**   Yes, I do.
16  **Q.**   But you wouldn't lie for them, would you?
17  **A.**   No.
18         **MR. BUZBEE:**  Your Honor, I pass the witness.
19         **THE COURT:**  All right.  Mr. Weinstock, cross?
20                        **CROSS-EXAMINATION**
21  BY MR. WEINSTOCK:
22  **Q.**   Mrs. Alexander, my name is Andy Weinstock.  I think we're
23  going to be fairly brief, but we are going to bounce around
24  about a few key issues.
25         First of all, 4415 Dale Street and the barbershop

 1  next door, that's in sort of an industrial area; correct?

 2  A.   What do you mean "industrial area?"  No, it's in a

 3  residential area.

 4  Q.   It's three blocks off of Chef Menteur Highway; correct?

 5  A.   Yes.

 6  Q.   Three blocks from I-10; correct?

 7  A.   Yes.

 8  Q.   Right on the other side of Chef is the rail yard; correct?

 9  A.   Oh, that's what you're talking about.  I thought you were

10  talk about --

11  Q.   I'm trying to make it clear.  I'm not suggesting you were

12  tricking me or anything like that.

13  A.   All right.

14  Q.   And then on the other side you have the Industrial Canal;

15  right?

16  A.   Yes.

17  Q.   And all of that is within the area of three, four, five

18  blocks of 4415 Dale Street; correct?

19  A.   Yes, it is.

20  Q.   And one more, we've got the Lakefront Airport a few miles

21  away and those fancy private jets flying over?

22  A.   Right.

23  Q.   And you call it the "millionaire's airport"?

24  A.   Right.

25  Q.   I think you answered Mr. Buzbee's question that Alana

1  almost always had the doors open, windows open, and still would
2  even run the air conditioner in the summer without condition;
3  correct?
4  A.   Right.
5  Q.   And you were in her trailer as much as once or twice a
6  week; right?
7  A.   About once, uh-huh.
8  Q.   And you didn't run out of there when you noticed the
9  smell, you'd often sit down and watch a TV show with her,
10  wouldn't you?
11  A.   No.  I never sat down in Alana's house and watched a TV
12  show.  We just talked a little bit and then I would come out,
13  because mostly when I went by Alana's it was for something
14  special and I went in and came right out.
15  Q.   Would you ever stay in there as much as an hour?
16  A.   No.  I have never really been that in that trailer a whole
17  lot.
18          MR. WEINSTOCK:  May I approach the witness, Your
19  Honor?
20          THE COURT:  Yes.
21          MR. WEINSTOCK:  Page 118, Lines 4 through 9.
22  BY MR. WEINSTOCK:
23  Q.   Do you read well enough?
24  A.   Yeah, I can read.
25  Q.   Because my eyes are going.  I might have to borrow your

1    glasses.
2    **A.**   Well, the only time we would stay in there like that is if
3    we had a birthday party -- I mean, a little birthday thing
4    going on.
5    **Q.**   Well, ma'am, did you say on some occasions you'd stay an
6    hour, sometimes a half an hour?
7    **A.**   Yeah.
8          **MR. WEINSTOCK:**  Where is that good-looking photo you
9    had?
10   **BY MR. WEINSTOCK:**
11   **Q.**   Which one is the pecan tree that you-all planted when your
12   daughter was young, this one or this one?
13   **A.**   The one in the back.
14   **Q.**   And that's the pecan tree that was just behind the house
15   at 4415 Dale?
16   **A.**   Yes.
17   **Q.**   And ultimately this house was torn down; correct?
18   **A.**   Yes.
19   **Q.**   And I think we now have a picture -- or we've had a
20   picture floating around of what it looked like once the house
21   was down.  But the tree stayed; correct?
22   **A.**   Yes.
23   **Q.**   Is it correct that before the storm Christopher Cooper
24   would have asthma attacks when the weather changed or when he
25   ran around too much?

1  A.   Yes.

2  Q.   And his asthma flared up, in your mind, pre-storm and

3  post-storm just about the same; right?

4  A.   After the storm he's flared up a little more, but he did

5  have flare-ups before the storm.

6  Q.   Before the storm and after the storm when he would run

7  around and just exert himself, he'd get flare-ups a little bit;

8  right?

9  A.   Yes.

10 Q.   He maybe ran around a little more before the storm?

11 A.   He ran around a little more before the storm.

12 Q.   If it flared up before the -- I'm sorry -- after the

13 storm, as he was older and he was able to go out by himself he

14 would just run around a little bit more than he had when he was

15 younger?

16 A.   Well, when he was younger, he would be inside most of the

17 time.

18 Q.   Exactly.  Is it correct that Christopher did not associate

19 any of the smell in the trailer with his allergy problems?

20 A.   Oh, I couldn't answer that.  I don't know what Christopher

21 was feeling.

22 Q.   And he certainly never told you that any of his allergy

23 problems were aggravated or caused by the smell in the trailer;

24 right?

25 A.   No.  He didn't walk up to me and say, "Grandma, this is

1   coming from the trailer," if that's what you're talking about.

2   Q.   And he didn't say, "Grandma, you know, my eyes are

3   watering, I think it's the smell.  Grandma this smell is

4   bothering me."  Nothing like that; correct?

5   A.   He didn't have to tell me that because I could see that.

6   Q.   You're not aware of any new medications he took while

7   living in the trailer; correct?

8   A.   I don't know.  I know she took him to the doctor a couple

9   of times and I know they gave him albuterol.

10  Q.   It's the same albuterol he was on before the storm; right?

11  A.   I would imagine so.  I don't really know all about -- you

12  know, things about albuterol.

13  Q.   And before the storm, he had a breathing machine; right?

14  Did you know that?  What they call a nebulizer?

15  A.   That little thing --

16  Q.   Not the little puffer, but a machine that put a mist in

17  his face.

18  A.   No.

19  Q.   You don't know anything about that?

20  A.   He didn't have any of that at my house.  He just had a

21  little puffer.

22  Q.   You never saw him use the breathing machine?

23  A.   No, I never saw him use the breathing machine.

24  Q.   The breathing machine with the steroid medication, you

25  never saw him use it?

1   **A.**   No.

2   **Q.**   All right.  You never saw rashes on Christopher?

3   **A.**   I never paid attention.

4   **Q.**   You've never seen Christopher with a bloody nose; correct?

5   **A.**   No.  I've never seen that.

6   **Q.**   Your daughter had no health complaints after the storm;

7   correct?  Alana had no health complaints after the storm; isn't

8   that correct?

9   **A.**   What you mean with Christopher?

10  **Q.**   No, herself.

11  **A.**   If she did, I don't know.

12  **Q.**   You're not aware of --

13  **A.**   I wasn't in the house with her all the time.

14  **Q.**   You weren't in the house with her.  She was next door, but

15  you were never aware of any health complaints with your

16  daughter who was living ten feet away; correct?

17  **A.**   Well, the only thing she told me was she had headaches and

18  different things like that.  But she was never in the hospital.

19  **Q.**   She never complained of her health after the storm;

20  correct?

21  **A.**   Yes, she did.  Headaches.  I'm saying she never really

22  went to the hospital or anything like that.  I didn't really

23  pay no attention.

24  **Q.**   Did you meet with somebody earlier today?

25  **A.**   Hmm?

1   **Q.**   Did you talk to any lawyers earlier today?

2   **A.**   Did I talk to anybody today?

3   **Q.**   Today, yesterday, in the last week, any lawyers?

4   **A.**   Yes, I talked to somebody named Peter.

5   **Q.**   Peter Taafe?

6   **A.**   Yes.

7   **Q.**   A good-looking guy?

8   **A.**   Yes.

9   **Q.**   Much better looking than me?

10  **A.**   Yes.

11          **MR WATTS:**  He asked for it, Your Honor.

12          **MR. WEINSTOCK:**  Oh, I don't doubt it.

13              I'm sorry.  Page 99, Lines 12 through 15.

14          **MR. BUZBEE:**  What page?

15          **MR. WEINSTOCK:**  99, Lines 12 through 15.

16  BY MR. WEINSTOCK:

17  **Q.**   That guy; right?

18  **A.**   Yeah, that's him.

19  **Q.**   You would much rather go out with this guy, wouldn't you?

20          Ma'am, does that refresh your recollection that you

21  were not aware that your daughter had any health problems after

22  the storm?

23  **A.**   Yeah, health problems, headaches.

24  **Q.**   When your daughter and your grandkids were living in the

25  trailer, they would leave around 7:00, 7:30 in the morning and

1    not come back until after dark; is that right?

2    A.    That's right.

3    Q.    So they weren't in the trailer 24 hours a day, 7 days a

4    week; is that correct?

5    A.    No.

6    Q.    So if somebody -- never mind.

7              In fact, even when they were in the trailer, Chris

8    was over at the barbershop three or four times a week?

9    A.    No.  He would come over sometimes and watch television

10   when they didn't have cable and he'd come over and watch the

11   television sometimes.

12   Q.    And let's be clear:  You weren't living there with just

13   your husband.  One of your other daughters was living there;

14   right?

15   A.    Yeah.  When she came back from Florida, she stayed in the

16   barbershop with us.

17   Q.    And she had her two children with her?

18   A.    Her two children with her.

19   Q.    And it was way more fun for Chris to be over there with

20   his cousins, wasn't it?

21   A.    Oh, they're grown because they -- they not children, no,

22   Debra's children, because they're 23, 22.

23   Q.    You know I asked -- I think I started this by asking you

24   this:  "Wasn't he over at the barbershop three or four times a

25   week?"  And what was answer?

1  **A.**   My answer was, yes, sometimes he would come over three or

2  four times a week to watch the TV.

3  **Q.**   Is it correct that, basically, even though you-all lived

4  next door to each other, you cooked for you and your husband in

5  your house and Alana cooked for her family in her house?

6  **A.**   That's right.

7  **Q.**   She didn't come over to your house to do the cooking;

8  right?

9  **A.**   No.

10  **Q.**   And if your granddaughter, Erika, suggested that that's

11  where she did a lot of the cooking, she was just mistaken;

12  isn't that correct?

13  **A.**   Yes.

14  **Q.**   Now, Alana cooked at least five nights a week; isn't that

15  right?

16  **A.**   Sometime they went to McDonald's and stuff like that.

17  **Q.**   They won't eat fried food and they'll eat McDonald's?

18  **A.**   Well, they ate hamburgers.  You know, you get the -- what

19  they call the broiled hamburgers or stuff like that.

20  **Q.**   And when Alana cooked, she would open the doors, windows

21  have the AC on and the vent on; right?

22  **A.**   In the summertime, yes.  But I don't know that they did

23  that in the wintertime.

24  **Q.**   You would describe Chris as a very happy child, wouldn't

25  you?

316

1   A.   Yes, he is.

2   Q.   Am I correct that sometime in 2007, before Alana moved out

3   of the trailer, you moved back into your house?

4   A.   Yes.  I moved in the house at 4415 Reynes Street because

5   my house at 4758 Ray Avenue is still being worked on.

6   Q.   I apologize.  You moved into a permanent house out of the

7   barbershop?

8   A.   Out of the barbershop.

9   Q.   While Alana was still in the trailer; right?

10  A.   Right.

11  Q.   And there was nothing to prevent Alana from moving into

12  the barbershop, was there?

13  A.   Yes.  Because there was -- that was where my other

14  daughter as living.

15  Q.   Your other daughter who lived and with you and your

16  husband; correct?

17  A.   In the barbershop.  You see, when we moved out of the

18  barbershop, my daughter and her two sons stayed in the

19  barbershop.

20  Q.   Let's be clear:  After the storm -- is it Donna, your

21  daughter?  Which daughter was it that came from --

22  A.   Debra.

23  Q.   Debra.  I'm sorry.  Debra came back with her two kids.

24  You, Debra's two grown kids, Debra and your husband all lived

25  in the barbershop; correct?

1   **A.**   Right.

2   **Q.**   And then you and your husband moved out; correct?

3   **A.**   Right.

4   **Q.**   And Alana -- nothing would have stopped Alana and her kids

5   from moving in there if the trailer was so bad; right?

6   **A.**   Yes.

7   **Q.**   What?

8   **A.**   She had her children in the trailer.  She didn't have to

9   move in the --

10  **Q.**   Exactly.  She had the trailer, she didn't have to move

11  out; right?

12  **A.**   No.  She didn't have to move in the house if she was in

13  the trailer.

14  **Q.**   And, in fact, the reason she moved out of the trailer in

15  December of 2007 is because FEMA came to take the trailer;

16  correct?

17  **A.**   That's right.

18  **Q.**   She did not want to move out at that time; correct?  FEMA

19  took the trailer?

20  **A.**   Yes.

21          **MR. WEINSTOCK:**  Thank you.

22          **THE COURT:**  Mr. Penot?  Oh, I'm sorry.

23          **MR. SHERBURNE:**  I'm sorry, Your Honor, you get a

24  different person.

25

1                        **CROSS-EXAMINATION**

2     **BY MR. SHERBURNE**

3     **Q.**   Good afternoon, Ms. Alexander.  My name is Richard

4     Sherburne.  Is this the first time you have testified as a

5     witness?

6     **A.**   Yes, it is.

7     **Q.**   It's a strange way to be meeting all these people, isn't

8     it?

9     **A.**   I've never been in courtroom.

10    **Q.**   Now, I don't have too many things I want to talk to you

11    about, but I do have a couple of things.  When the trailer was

12    installed, while it was being installed, did you stay on the

13    front porch the whole time it was being installed?

14    **A.**   No.

15    **Q.**   Okay.  How long did it take for that installation process?

16    **A.**   I really don't know.

17    **Q.**   I understand.  How many times did you go back in and out

18    of your house while it was being installed?  Do you know that?

19    **A.**   I stood out on the porch and watched them and then I went

20    inside, and then I didn't come out anymore --

21    **Q.**   Okay.

22    **A.**   -- until they were finished.

23    **Q.**   Okay.  Do you know about how long you were in the house

24    while they were still working before they finished?

25    **A.**   No.

1    **Q.**   Okay.  When you first came out, after you heard all the
2    commotion, was the trailer already off its wheels at that
3    point?  Was it already lifted up?
4    **A.**   No.  The trailer was -- like I said, they had put it on
5    the driveway and the wheels was on the ground.
6            **MR. SHERBURNE:**  Your Honor, may I approach the
7    witness?
8            **THE COURT:**  Sure.
9    **BY MR. SHERBURNE**
10   **Q.**   Ms. Alexander, you remember being deposed, don't you?
11   **A.**   Uh-huh.
12   **Q.**   Okay.  I'm going to ask you to look right here.  Do you
13   see where it says -- this is Page 58, Line 15, and I'm asking
14   if the witness will read it.
15   **A.**   (COMPLIES.)
16   **Q.**   Ms. Alexander, now that you've read that, do you recall
17   the tires being off the ground just a little bit when you first
18   came out of your house?
19   **A.**   I'm trying to think.  When I came out of the house, they
20   were off -- they were on the ground.  They were on the ground.
21   **Q.**   They were on the ground when you first came out of the
22   house?
23   **A.**   Uh-huh.
24   **Q.**   So if you previously testified that they were off the
25   ground a little bit when you first came out of the house --

1   A.   The more I -- you see --

2          MR. BUZBEE:  Your Honor, I object to this.  This is

3   the -- under the rule of optional completeness, he knows on

4   very next page she says exactly what she's saying.  He did not

5   show her that, and that's improper.

6          THE COURT:  If we're going to on refer to the

7   deposition passage, let's let her review all of what you intend

8   to ask her on this topic.  Go ahead and show it to her, let her

9   review it, and then we can ask her questions about it.

10          MR. SHERBURNE:  Yes, Your Honor.  May I approach the

11   witness again, Your Honor?

12          THE COURT:  Yes.  And page and line so that counsel

13   can...

14          MR. SHERBURNE:  Page 59, 1 through 17.

15   BY MR. SHERBURNE

16   Q.   Ms. Alexander, would you read this page here starting at

17   Line 1, down to Line 17.  Read all of it to yourself, please.

18   A.   (COMPLIES.)

19   Q.   Would you like to read anything else, Ms. Alexander?

20   A.   (SHAKES HEAD.)

21   Q.   Now that you've read this, Ms. Alexander, does that

22   refresh your recollection?

23   A.   Yes.

24   Q.   Okay.  I'll ask you again:  When you first came out and

25   saw the trailer, were the tires off the ground at that point?

1   A.   They -- they -- when I first came out -- you see, when you
2   asked me about were they off the ground, you know, I was under
3   the impression you were asking me was the trailer on, you know,
4   on the ground.  And when I came out, the wheels were there.
5   They were on the ground.  They was stabilizing the wheels, I
6   guess, to keep from rolling it.  And then they were putting
7   the -- the props, you know, under the trailer.
8        But I -- you see, when I -- I had no idea I was going
9   to have to come and say all of this and do all of this, so I
10  really wasn't paying attention to every little detail that was
11  done with that trailer.
12  Q.   Yes, ma'am.  I understand that.
13  A.   And then a couple of years ago and all of this stuff.  But
14  to my recollection, when they rolled that -- put that trailer
15  there, that trailer was on the ground.
16  Q.   Okay.  Ma'am, I'm going to ask you to look at the screen
17  in front of you.  Can you see that picture, ma'am?
18  A.   Yes.
19  Q.   Would it work better if I just brought the picture up to
20  you?
21  A.   No, I can see it.
22  Q.   You can see it.  Okay.  When you're standing on that
23  porch -- and you said you were standing right there on that
24  porch where my finger is; correct?
25  A.   Uh-huh.

1   **Q.**   What is that toward the side of the house underneath the

2   barber pole?  This brown object right here in the picture?

3   **A.**   Move your finger.

4   **Q.**   Yes, ma'am.

5   **A.**   This, on the porch, you're talking about?

6   **Q.**   Yes, ma'am.

7   **A.**   That's sort of a swing porch.

8   **Q.**   A swing chair?

9   **A.**   Yeah, uh-huh.

10  **Q.**   And I know that this picture isn't very sharp, but between

11  your porch and the trailer are there some shrubs and a crepe

12  myrtle tree?

13  **A.**   Yeah, that's a ligustrum shrub there.

14  **Q.**   And those shrubs and that tree were there on

15  February 17th, 2006, when the trailer was installed?

16  **A.**   Yeah.  They was there ever since the house was there.

17  **Q.**   And you didn't pay a lot of attention to the details of

18  how this trailer was being installed, did you?

19  **A.**   No.  Because, like I said, when I came outside, the

20  trailer was there.

21  **Q.**   I understand.  Ms. Alexander, when, as you described for

22  Mr. Buzbee, they were going from one corner to the other corner

23  of the trailer, were they going to adjust the corner and level

24  it so that they got it even and got it straight?

25  **A.**   Yes, I'm assuming that's what they were doing.

1   **Q.**   So that was the process of leveling the trailer?

2   **A.**   Uh-huh.

3   **Q.**   You didn't get down and see how much they were moving it

4   in that process, did you?

5   **A.**   No, I sure didn't.

6   **Q.**   And when they originally were lifting the trailer, did you

7   see that process?

8   **A.**   What -- what's the question?

9   **Q.**   When you first saw the trailer, were there any concrete

10  blocks underneath it at that point?

11  **A.**   No.

12  **Q.**   And did you see them lift one side of the trailer and then

13  lift the other side?

14  **A.**   They -- well, I guess they did a little to put it under --

15  to put the -- the props and things under it.

16  **Q.**   And, ma'am, when you were standing on your porch -- again,

17  where my finger is --

18  **A.**   Uh-huh.

19  **Q.**   -- you couldn't see what those men were doing on the other

20  side of the trailer?

21  **A.**   No, I sure couldn't.

22  **Q.**   You just assumed?

23  **A.**   I assumed that's what they were doing, because they did it

24  on one side and I just assumed that they were doing the same

25  thing on the other.

1   **Q.**   Ma'am, do you remember being deposed and Mr. Pena, a
2   lawyer for the plaintiffs, being there?
3   **A.**   I didn't understand your question.
4   **Q.**   Do you remember, when you were deposed, meeting Mr. Pena,
5   a lawyer for the plaintiffs?
6   **A.**   I still don't understand what you're saying.
7   **Q.**   Okay.  Do you remember the lawyers that were present when
8   you were deposed, when you were asked questions under oath?
9   **A.**   Oh, I remember two lawyers, yes.
10   **Q.**   And was one of them a lawyer for your daughter?
11   **A.**   Yes.
12   **Q.**   Okay.  And you remember meeting him?
13   **A.**   Yes.
14   **Q.**   Was his name Mr. Pena?
15   **A.**   I remember meeting a Ray, I think.  His name is Pena?
16   **Q.**   Yes, ma'am, Ray Pena.
17   **A.**   Well, yes, I do remember meeting him.
18          **MR. SHERBURNE:**  May I approach the witness, Your
19   Honor?
20          **THE COURT:**  Yes.
21   BY MR. SHERBURNE
22   **Q.**   I'm going to ask you to read --
23          **MR. SHERBURNE:**  This is Page 189, Your Honor, Lines
24   13 through 24.
25          **MR. BUZBEE:**  What did you ask her to look at?

 1              **MR. SHERBURNE:**  189.  I believe that's 189.  I
 2   managed to punch a hole through part of it.
 3   **BY MR. SHERBURNE**
 4   **Q.**   Did you have a chance to read that, ma'am?
 5   **A.**   Yes.
 6   **Q.**   Does that refresh your memory of telling Mr. Pena that
 7   they lifted the trailer up from one side -- they worked one
 8   side and then they worked the other side, is the way they
 9   worked it?
10   **A.**   What I told him was they worked the front side and then
11   they went around the back and did the back side.
12   **Q.**   Okay.
13   **A.**   And then they came back and did the other part on the
14   front side.  And then they went around the trailer and they did
15   the other side.  Now, I couldn't see what they were doing on
16   the other side, but I did see what they did on this side.
17   **Q.**   Okay, ma'am.  And I wanted to make real sure, if you'll
18   look at the picture:  Where I'm pointing with my finger right
19   now is what you're referring to as the front side, and this
20   would be the back side?
21              **MR. BUZBEE:**  Your Honor, when I look at that, I don't
22   know what he's talking about.  That's very confusing and vague.
23              **THE COURT:**  Well, he's indicating on the exhibit, I
24   believe.  Let's make sure that we're talking about the same
25   thing.  As long as the witness can understand what he's

1  pointing to -- and, of course, on the screen here it's

2  reflecting a mark when he's touching it.  Or isn't it?

3            **MR. SHERBURNE:**  No, your Honor.  That, for some

4  reason, is showing up on that screen.  Now, I can...

5            **MR. BUZBEE:**  My problem, Your Honor, is it's a

6  two-dimensional picture, and he's trying to give a depth, I

7  guess.

8            **THE COURT:**  Right.  Well, we've got to make sure that

9  what he's talking about is the same thing as the witness.

10           **MR. SHERBURNE:**  I believe I can clear it up, Your

11  Honor.

12           **THE COURT:**  Okay.

13 **BY MR. SHERBURNE**

14 **Q.**   Ms. Alexander, when you refer to the front side of the

15 trailer, is that where the door that you enter the trailer in

16 is?

17 **A.**   When they first told me about the trailer, I asked, "What

18 do you all consider the front of the trailer or the back of the

19 trailer since the door is in the middle of the trailer?"  And I

20 didn't know just which one -- you know, where the trailer was

21 like this, with the door being in the middle, I don't know what

22 the trailer people called the front of trailer or the back of

23 the trailer.

24           But what I saw, it was -- the other part of the

25 trailer that I considered the -- when I was looking at it, like

1  this, I considered this the front of the trailer, and where

2  the -- and this part being the back of the trailer.  That's my

3  recollection of how the trailer -- you know, what it was.

4  **Q.**   Okay.

5  **A.**   Now, what are you saying about --

6  **Q.**   I'm going to ask you a simple question again.  Did you

7  tell Mr. Pena when you were under oath previously that they

8  worked one side and then they worked the other side, is the way

9  they worked it?

10  **A.**   They worked this side, and then they went around and then

11  they worked the other side.

12  **Q.**   Thank you, ma'am.  That's what I was trying to get to.

13  Maybe I didn't do a very good job of it.

14  **A.**   That's what I was saying.

15  **Q.**   Mrs. Alexander, if you would look one more time at that

16  picture in front of you, it shows a house behind and to the

17  right of the trailer, does it not?

18  **A.**   Yes, it does.

19  **Q.**   And was that house demolished while that trailer was

20  there?

21  **A.**   Yes.  They had to move the trailer.

22  **Q.**   Do you know who moved the trailer?

23  **A.**   I really don't.  Because by the time they moved the

24  trailer, I had moved around the corner, and I didn't know

25  anything about who moved the trailer, where they put it or

1   anything like that.

2   **Q.**   Did you see the trailer moved?

3   **A.**   I didn't see it moved, but I saw it was moved when I went

4   around the corner.

5   **Q.**   And was the trailer later put back in the driveway?

6   **A.**   Yes, it was.

7           **MR. SHERBURNE:**   Could I have 334, please.

8   **BY MR. SHERBURNE**

9   **Q.**   Ms. Alexander, the picture that's on the screen now, which

10  is Exhibit 334, does that show the trailer after the house was

11  demolished?

12  **A.**   Yes.

13  **Q.**   And that picture would have been taken after the trailer

14  was removed, while the house was being demolished, and then put

15  back after the house was demolished?

16  **A.**   I wasn't there, so I didn't know -- I didn't see all of

17  that.  But this is the picture of the trailer after the house

18  was removed.  And they did move the trailer to remove the

19  house, so I'm assuming that that's the picture.

20  **Q.**   And you don't know who did that remove and reinstall?

21  **A.**   I really don't know because I was not there.

22          **MR. SHERBURNE:**   Thank you, Your Honor.  That's all

23  the questions that I have for this witness.

24          **THE COURT:**   All right.  Any redirect?

25          **MR. BUZBEE:**   Very brief, Your Honor.

 1                    **REDIRECT EXAMINATION**

 2   **BY MR. BUZBEE:**

 3   **Q.**   I think we all got it, Mrs. Alexander, but when you say

 4   side to side, we're talking about one corner, another corner,

 5   one corner, another corner?

 6   **A.**   That's what I saw.

 7   **Q.**   And I told you that the front was where the tongue was --

 8   **A.**   Yes.

 9   **Q.**   -- right?

10          Okay.  So we call that diagonal.  That's what you

11   said in your deposition several times; right?

12   **A.**   Right.

13   **Q.**   And that's still what you're saying now?

14   **A.**   Correct.

15   **Q.**   Now, I don't know why, but you were shown a portion of

16   your deposition about whether your daughter Alana had problems

17   while in the trailer?  Do you remember that, when the Gulf

18   Stream lawyer showed you that?

19   **A.**   Uh-huh.

20   **Q.**   Can you see this portion of your deposition?

21          **MR. WEINSTOCK:**  Objection, Your Honor.  This is

22   completely inappropriate.  Do you mind taking it down, first,

23   until we discuss it.

24          **THE COURT:**  Let's direct her attention to the

25   deposition testimony, let her review it.  She's already seen

1  the deposition several times.  Let's ask her a question.  Go

2  ahead and show her the passage you want to refresh her

3  recollection with and let's ask her a question about it.

4         MR. BUZBEE:  Yes, sir.

5         MR. WEINSTOCK:  Your Honor, can we approach?

6         (WHEREUPON, the following proceedings were held at

7  the bench.)

8         MR. WEINSTOCK:  Your Honor, it's completely

9  inappropriate to show her this prior consistent testimony, and

10  that's exactly what he's trying to do.

11         MR. BUZBEE:  You know what he did --

12         THE COURT:  What's the question that she's answered

13  that you want to show her her testimony?

14         MR. BUZBEE:  He impeached this witness with a portion

15  of the depo and didn't show her the other portion where she

16  said that her daughter had headaches.  He impeached her.

17         MR. WEINSTOCK:  She said she had headaches.

18         MR. BUZBEE:  Yeah.  But you impeached her with

19  inconsistent --

20         MR. WEINSTOCK:  She didn't --

21         MR. BUZBEE:  But you impeached her with her own

22  deposition --

23         MR. WEINSTOCK:  She said she had headaches.

24         MR. BUZBEE:  -- and didn't show her this other thing.

25  He impeached her.  He walked up and said --

1           MR. WEINSTOCK:  Look at Page 90.

2           MR. BUZBEE:  -- in your deposition you didn't say --

3     but he didn't show her this page.  That's improper.  And I'm

4     entitled now since they --

5           THE COURT:  Why doesn't you just ask her?

6           MR. BUZBEE:  I tried to, but he objected to me.

7           THE COURT:  Just ask her that --

8           MR. WEINSTOCK:  My question was --

9           THE COURT:  -- and then -- if you don't have a

10    question -- you only use the deposition if there's a question

11    on the table and she doesn't remember or she gives a prior

12    inconsistent statement.  Why don't you just ask her.

13          MR. BUZBEE:  Your Honor, I think I'm entitled to show

14    a prior consistent statement why she cannot impeach herself.

15          MR. MEUNIER:  Can he say that in her deposition that

16    she talked about it at least without providing her with it

17    because Andy, here, only questioned in the deposition that she

18    had --

19          MR. WEINSTOCK:  She made her statement.  She --

20          THE COURT:  Ask her the question about the headaches

21    and then you can ask her whether that was what she testified to

22    previously in her deposition.  I can't see showing her the

23    deposition, there's no question on the table.

24          MR. WEINSTOCK:  I object to him putting it up on the

25    screen without even asking.

 1          MR. BUZBEE:  That's fine.  But I didn't object at the
 2    time because I knew it was improper.
 3          MR. WEINSTOCK:  She said something different.
 4          THE COURT:  All right.  Let's just go ahead and ask
 5    her the question.
 6          (WHEREUPON, the following proceedings were held in
 7    open court.)
 8    BY MR. BUZBEE:
 9    Q.  Mrs. Alexander, isn't it true that your daughter Alana had
10    headaches while she was living in the trailer that she told you
11    about?
12    A.  Yes.
13    Q.  And isn't that what you told the lawyers, specifically the
14    lawyers for Gulf Stream, in your deposition?
15    A.  That's what she told me.
16    Q.  And, finally, the reason that trailer was moved is because
17    Alana called and told them to come get it; isn't that right?
18          MR. WEINSTOCK:  Objection, Your Honor.  Leading.
19          THE COURT:  I'm sorry, Mrs. Alexander, hold on a
20    second.  It is a leading question.
21          MR. BUZBEE:  I'll rephrase.
22    BY MR. BUZBEE:
23    Q.  At some point Alana, Chris and Erika moved out of the
24    trailer?
25    A.  Yeah, because they moved with my other daughter.

 1  **Q.**   And you know that the reason -- do you know why the
 2  trailer was moved?
 3  **A.**   Yes.
 4  **Q.**   Tell me why.
 5  **A.**   Because she moved out and went by my other daughter, and
 6  there was nobody in the trailer.
 7  **Q.**   And then that's when FEMA came and got it?
 8  **A.**   Yeah.
 9  **Q.**   It wasn't that FEMA forced her out of the trailer, was it?
10  **A.**   Oh, no.
11  **Q.**   It's that she wanted to get out of the trailer?
12  **A.**   Yes.  She --
13          **THE COURT:**  Now, you're leading her again.
14          **MR. BUZBEE:**  I'm sorry.  But it was just so
15  improper --
16          **THE COURT:**  Well, let's just let Ms. Alexander answer
17  your question, and then we'll be done.
18          **MR. BUZBEE:**  Yes, sir.
19          **THE COURT:**  Let her answer the question.
20          **THE WITNESS:**  Can I explain something here?
21          **MR. BUZBEE:**  That's up to the judge.
22          **THE COURT:**  Go back to the question that was asked,
23  and you can explain your answer, yes.  But let's go back to the
24  question that was asked.
25

1  **BY MR. BUZBEE:**

2  **Q.**   FEMA didn't force your daughter out of that trailer, did

3  they?

4  **A.**   No.  No, no, no.  She -- my daughter -- you see, my other

5  daughter came from New York and she has a house.  It's in the

6  Big Willows.  And when she came back, Alana and them moved out

7  of the trailer and went and moved with her.  And then she

8  called and told them to come and take the trailer because she

9  was no longer in the trailer.

10         But she was not like forced out from FEMA, because

11  she called FEMA to tell FEMA to come and get the trailer

12  because she had moved.  And she moved with my other daughter.

13         **MR. BUZBEE:**  Ma'am.  Thank you for coming and doing

14  this.  I pass the witness.

15         **MR. WEINSTOCK:**  Judge, can I have some brief recross

16  on that last point.  It's directly contrary to the deposition.

17         **THE COURT:**  But we already crossed -- no.  We can't

18  keep going back and forth.

19         Thank you, Ms. Alexander.  You may step down,

20  ma'am.

21         **THE WITNESS:**  Thank you, Judge.

22         **THE COURT:**  Thank you for your time.

23         Next.

24         **MR WATTS:**  The videotape of Richard Sober.

25         **THE COURT:**  I've got about 4:35.  Do we have time to

```
 1   watch the videotape of this witness?
 2              MR WATTS:  It's 48 minutes.
 3              THE COURT:  Well --
 4              MR WATTS:  That went longer than --
 5              THE COURT:  That's going to put us up to 5:30.  Do we
 6   have a witness that's shorter on videotape, do we have someone
 7   else on hand?
 8              MR. GLASS:  No, Mr. Durham is 32.
 9              MR WATTS:  That's the one we canceled.
10              THE COURT:  You're not putting Mr. Durham on?
11              MR WATTS:  Do you want to play it until 5:00?
12              THE COURT:  Let's play it until 5:00, and then we'll
13   pick it up tomorrow.  I hate to waste time, but unless there's
14   a prevailing thought amongst the jury that they want to stay
15   until the end of tape.  Do you-all want to break at 5:00 or do
16   you want to -- it's going to take until about 5:30.  We can
17   play half and come back.
18              THE JUROR:  I need to cut my grass.
19              THE COURT:  All right.  I've already told the jury
20   that we were going to try to break at 5:00 every day, so unless
21   I have a contrary thought from the entirety of the jury, we
22   will break at 5:00.
23              MR WATTS:  We'll cut it at 5:00.
24              THE COURT:  All right.  Let's play it up to 5:00, and
25   then we'll pick it up tomorrow morning and watch the balance of
```

 1  it.

 2          **MR WATTS:**  Okay.

 3          **THE COURT:**  And we are not having Mr. Durham,

 4  Mr. Watts; is that right?

 5          **MR WATTS:**  That's right.  Okay.

 6          (WHEREUPON, the videotaped deposition of **Richard**

 7  **Wayne Sober** was played.)

 8  **Q.**   Sir, could you please state your name.

 9  **A.**   Richard Wayne Sober.

10  **Q.**   How are your currently employed?

11  **A.**   With Fluor Corporation as a contracts manager.  I was

12  involved with Hurricane Katrina probably two days prior to that

13  hurricane hitting land.

14  **Q.**   And the hurricane hit land on or about September -- or

15  August 29th, 2005; isn't that right?

16  **A.**   Yes.

17  **Q.**   So the hurricane hit land August 29th, 2005, so you would

18  have gotten involved sometime around August 27th, 2005; is that

19  right?

20  **A.**   That's correct.

21  **Q.**   And what was your position with Fluor on August 27th,

22  2005?

23  **A.**   I was the government contract administrator for FEMA.

24  **Q.**   You're aware there's IA-TAC contract for Fluor to provide

25  assistance to FEMA with regard to disasters?

1    A.    Yes.

2    Q.    What involvement did you have with that?

3    A.    I was working as the government contract administrator to

4    help get that contract set up.

5    Q.    For what term?

6    A.    When it first began in, I believe it was, June or July.  I

7    flew to Florida to work with FEMA to start what Fluor needed to

8    get involved in to get that contract.

9    Q.    You assisted Fluor in doing what needed to be -- doing

10   what needed to be done to get that contract in place; is that

11   what you're telling us?

12   A.    Yes.

13   Q.    And what needed to be done to get that contract in place?

14   A.    We needed to get on the ground in Florida, talk with FEMA

15   representatives in Orlando, Florida, and they gave us an

16   opportunity to show FEMA that we could handle a disaster.  And

17   there was three of us that flew to Orlando.  And then they put

18   us on a plane to Pensacola, Florida, for Hurricane Dennis, so

19   that we could go there and show them that we could handle a

20   disaster and get everything moving.

21   Q.    And so what did Fluor do for FEMA with regard to Hurricane

22   Dennis?

23   A.    The three of us flew to Pensacola, Florida, started

24   working with some people that were already on the ground there.

25   One individual was actually a Fluor representative from a

1 contract we had for public assistance with FEMA.  This contract

2 that I referred to earlier was for individual assistance.  They

3 call it IA.

4          And so we met with them.  We met with some FEMA

5 representatives.  We started putting a plan together on how we

6 would get some properties and some housing in place for people

7 that were without homes after the hurricane.

8 **Q.**   During that effort with regard to Hurricane Dennis, was

9 FEMA placing people in travel trailers and mobile homes?

10 **A.**   After I left Pensacola, yes.

11 **Q.**   So you were there probably less than a month, but sometime

12 after you left, FEMA started placing people in travel trailers

13 or mobile homes after Hurricane Dennis?

14 **A.**   Yes.

15 **Q.**   Do you have any idea as to how many people were housed in

16 travel trailers or mobile homes after Hurricane Dennis?

17 **A.**   No.

18 **Q.**   At that time when you were there, did Fluor, or any of

19 their employees, or you, yourself, make any recommendations as

20 to what type of temporary housing or what type of structures

21 displaced people should be put in after Hurricane Dennis?

22 **A.**   No, not to my recollection.

23 **Q.**   What else did you do with regard to disaster relief in

24 2005?

25 **A.**   We -- to prepare ourselves for future disasters, prior to

 1   them hitting, we went out and put requests for proposals out on

 2   the streets to find and place contracts with individual

 3   haul-and-install firms, what we refer to as BOA contracts,

 4   basic ordering agreements, where the contract -- the basic

 5   ordering agreement is a zero value.

 6            And then, when -- if and when a disaster hits, you

 7   already have a contractor in place, you've already negotiated

 8   any rates, and they can just hit the ground running.

 9   Q.   So the BOA contracts had rates in them, but there was no

10   work specifically authorized until some type of event occurred;

11   is that right?

12   A.   That's correct.

13   Q.   And you said you put out requests for proposals -- did you

14   say on the street or with individuals?  What's the --

15   A.   With individuals.  Companies that we researched ourselves

16   and some that was recommended by FEMA that they had used in the

17   past.  And, also, there was a Fluor representative that worked

18   on the FEMA PA contract.  "Leonard" is all I remember of his

19   name.  And he had seen some contractors around that supported

20   FEMA that he thought might be worth putting on a bid list.

21   Q.   And PA, you mean public assistance contracts?

22   A.   Yes.

23   Q.   Which is separate than what we're talking about here after

24   Hurricane Katrina because that was an individual assistance and

25   technical assistance contract; is that right?

1   A.    Individual assistance, yes.

2   Q.    And how would you distinguish between a public assistance

3   contract and an individual assistance contract?

4   A.    Public assistance would be more infrastructure,

5   engineering, things like that.  And individual assistance would

6   be more setting up living areas for displaced people.

7   Q.    And Fluor has the expertise, the engineers, and the

8   architects and designers and construction managers that

9   qualifies them to offer both individual assistance contracts

10  and public assistance contracts in those types of scenarios

11  that you've discussed; is that right?

12  A.    Well, they have the qualified engineers for public

13  assistance, yes.

14  Q.    Do they have the qualified engineers that are necessary

15  for individual assistance contracts, such as disaster relief

16  and placing people in housing?

17  A.    I would believe they do.  They have a lot of very well

18  educated individuals.  But the contracts I put together for

19  Fluor for individual assistance, to my knowledge, didn't

20  require any engineering.

21  Q.    But you were involved in the process of selecting and

22  looking for subcontractors who would be able and standing by to

23  render assistance to Fluor in the event there was some type of

24  disaster where FEMA requested Fluor's assistance; is that

25  right?

1  **A.**    Yes.  As the subcontracts manager.

2  **Q.**    You were the subcontracts manager.  Describe for me what

3  are the duties of a subcontracts manager?

4  **A.**    Issue requests for proposals, negotiate contracts.  The

5  people that support me actually did this, but I was hands-on,

6  so I had my hands in it also.

7  **Q.**    Issue requests for proposal and negotiating contracts.

8  What else?

9  **A.**    Award contracts, administer contracts and pay invoices.

10  **Q.**    Now, as I understand it, there were several avenues that

11  were pursued to look for subcontractors.  One was certain names

12  were forwarded by FEMA of people they had used in the past.

13  There was somebody at Fluor who had been involved in public

14  assistance contracts who had an idea of names or entities to

15  use, and there was also some type of research or examination

16  that people in your office did to look for subcontractors; is

17  that fair enough?

18  **A.**    Yes.

19  **Q.**    Are there any other avenues that were used to make that

20  initial search for subcontractors?

21  **A.**    We did prequalification forms.

22  **Q.**    Prequalification forms, wasn't that a secondary step

23  after -- I guess you would call it the initial name-gathering

24  process had occurred?

25  **A.**    No.

1  **Q.**   Did people working for you send out prequalification forms

2  to certain entities or individuals?

3  **A.**   Yes.

4  **Q.**   And how was it decided as to who to send those

5  prequalification forms to?

6  **A.**   The contractors and/or individuals that were recommended

7  to us by FEMA, or by Leonard, who worked for the Fluor PA side

8  of the contract, and whatever research we did.  And I don't

9  recall how many names would have been added to that list by our

10 own research, if any.  But that is our normal practice.

11 **Q.**   When you say research that you did or the people working

12 for you did, what kind of research are you talking about?

13 **A.**   We would go out on the Internet and look for contractors

14 in a certain region or area that do the type of work that we're

15 looking for.  And we could call them and talk with them and see

16 if they would fill out a prequalification form to be added to

17 the bidders list.

18         We also get a lot of recommended contractors from

19 other departments within Fluor that have worked with various

20 people before.

21 **Q.**   All right.  So it seems like now we have a fifth element

22 that was examined, just doing -- receiving recommendations for

23 other people in Fluor who had used subcontractors; is that

24 right?

25 **A.**   Just as a normal practice.

1    **Q.**    That's a normal practice within Fluor when you need

2    subcontractors to kind of cast about within the organization

3    and say, who has used this type of subcontractor, or do you

4    have any recommendations for subcontractors in this area or

5    field; is that right?

6    **A.**    No.

7    **Q.**    Explain that to me, what you're referring to when you say

8    "within the normal course of normal practice"?

9    **A.**    If -- if I'm working with construction management to set

10   up a contract, I may ask them.  Only a person that would have

11   the know, I would ask if they know of any contractors in a

12   particular area that we could contact.

13          But the only -- if someone would actually have the

14   information that I'm looking for, or I would expect they would

15   have the information I'm looking for.  It's not sent out to all

16   of Fluor, no.

17   **Q.**    So I see a distinction you are making now is a search that

18   occurred within Fluor where people working for you or your

19   department got on the Internet and purposefully went out and

20   looked for subcontractors who might be in the field that you

21   needed.

22          And in addition to that, if you knew of a

23   construction manager that you thought would know of a

24   subcontractor, you, yourself, would call that construction

25   manager and see who he might recommend; is that right?

**A.**   Only if he's a part of the project.  There are so many managers within Fluor, I -- if I'm not working directly with them, I would not go out looking for someone, no.

**Q.**   And what kind of contractors was Fluor looking for?

**A.**   We were looking for individuals that could haul trailers and have licenses to haul trailers and the experience.

**Q.**   So even before the disaster struck, Fluor knew that travel trailers were going to be used to house people; isn't that right?

**A.**   The entire FEMA contract is based on -- IA contract, excuse me, is based on Fluor providing -- well, actually, I want to correct that -- finding subcontractors to haul and install full-sized mobile homes, travel trailers.  Because FEMA decides who lives in which unit, depending on the size of their family.

So to be prepared for a disaster that has not happened yet, we went out to find contractors who could do any and all of those things.

**Q.**   And I think we're talking about the same terminology, but it's not exactly, perhaps, meshing.

Assume for me that Exhibit 3 here is the individual assistance -- technical assistance contract that Fluor entered with FEMA in 2005.

**A.**   Okay.

**Q.**   And that particular contract talks about installation of

1    mobile homes, travel trailers and park models.  Are you with
2    me?
3    **A.**   Yes.
4    **Q.**   And so your testimony is that, based upon the contract, as
5    you understand it, that Fluor entered with FEMA, they already
6    knew ahead of time that at least these three things were going
7    to required, looking for subcontractors who could haul and
8    install mobile homes, contractors who could haul and install
9    travel trailers, and contractors who could haul and install
10   park models?
11   **A.**   That's correct.
12   **Q.**   Would it be fair to say that there was several stages
13   within the process of looking for the subcontractors?
14   **A.**   Yes.
15   **Q.**   And would you consider the first stage as name-gathering
16   or procuring recommendations or just making a list?  Would you
17   in some way characterize stage one like that?
18   **A.**   In some cases that would be stage two.  Because we would
19   send out prequalification forms just to find out who was
20   qualified to do that particular type of work, as a normal
21   function.
22   **Q.**   Let's break this down in stages so I can understand a
23   little bit better.  What would you call stage one of that
24   process of looking for subcontractors to haul and install park
25   models, mobile homes and travel trailers?

1   A.   Learn the scope of work that you want them to perform.

2   Q.   And you would learn the scope of work by going through the

3   contract documents that were between Fluor and FEMA; is that

4   right?

5   A.   Yes.

6   Q.   Anything else that you would do to learn the scope of

7   work?

8   A.   In general, no.

9   Q.   Okay.  Then what was stage two to the process once you and

10  the folks working for you had a familiarity with the scope of

11  work that was going to be required under the contract?

12  A.   To gather names of contractors in various regions, to

13  issue requests for proposals, two.

14  Q.   And what would be the next stage, stage three?

15  A.   Send requests for proposal packages to the ones that were

16  qualified per the prequalification form.

17  Q.   So the prequalification form, that would be part of stage

18  two, making sure that they passed whatever was necessary on the

19  prequalification form?

20  A.   Yes.

21  Q.   And what was entailed to pass that stage of

22  prequalification before Fluor went ahead and sent out requests

23  for a proposal?

24  A.   I don't recall every item on the prequalification form,

25  but, in general it is what type of work do you do, how long

1   have you done it, can you give us -- provide us with some

2   former clients that we could use as a reference.  I believe

3   there's even a question on there about financial capabilities.

4          **MR. HILLIARD:**  Judge, we're going to stop it right

5   there, it's 5:00, and pick it up in the morning.

6          **THE COURT:**  How much more do we have left on this?

7          **MR. HILLIARD:**  Carl?

8          **MR WATTS:**  It was 48 minutes, and I think we played

9   about half of it.

10          **THE COURT:**  All right.  So the first thing tomorrow,

11   we'll go ahead and watch the rest of this.

12          **MR WATTS:**  Yes, sir.

13          **THE COURT:**  And then we'll have some more witnesses.

14              Ladies and gentlemen of the jury, we are going

15   to go ahead and break for the day.  Thank you for not only your

16   attention during the course of the day when you've been in

17   court, but also for being very prompt in being here at the

18   times that we've asked you to be here.  You've given us the

19   opportunity to cover a lot of ground today, and we'll try to do

20   the same tomorrow.

21              Let's plan again on 8:30 with the two breaks

22   that we take in the mid-morning and mid-afternoon and the lunch

23   break, and we'll try to shoot for 5:00 or thereabouts tomorrow.

24              I'll remind you again, as I do every day, please

25   do not discuss the case with anyone, including family, friends,

1   anyone at home, certainly anyone around here.  And do not

2   discuss the case amongst yourselves until you've heard all of

3   the evidence and the arguments of counsel and the instructions

4   of the Court on how to deliberate and on the substantive law.

5   If you would be very careful in following those instructions.

6                   We'll go ahead and let you go for the day.

7   Thank you.

8              **THE DEPUTY CLERK:**  All rise for the jury.

9              (WHEREUPON, the jury exited the courtroom.)

10             **THE COURT:**  All right.  Counsel, you may be seated.

11                  Is there anything that we need to put on the

12  record before we close the record for today?

13             **MR WATTS:**  No, sir.

14             **MR. HILLIARD:**  I don't think so.

15             **THE COURT:**  Anything?

16             **MR. BUZBEE:**  No.

17             **THE COURT:**  All right.  Let's -- Mr. Penot and

18  Mr. Weinstock, your group?  Nobody has anything to put on the

19  record?

20             **MR. PENOT:**  I don't think what I have we need to put

21  on the record, but I have something that I'd like to talk to

22  Your Honor about.

23             **THE COURT:**  Why don't we talk about it tomorrow.  We

24  still have the rest of this tape.  We have the expert,

25  Mr. Moore, will be here tomorrow.  Will he be the next one up

349

1  after tape?

2          **MR. HILLIARD:**  He will.

3          **THE COURT:**  We also had listed on your schedule,

4  Mr. Shea, Dan Shea.

5          **MR WATTS:**  Yes, sir.  And Andy's team and my team,

6  we've cut that way down.  I don't know what the time is, but we

7  just gave the cut instruction.

8          **MR. PENOT:**  Well, Mr. Penot's team had some stuff in

9  there, too.

10          Oh, I'm sorry, Dan Shea.  I think I didn't

11  have -- I'm happy for you guys to forget me.

12          **MR. BUZBEE:**  You're forgotten.

13          **MR WATTS:**  I think we've got a deal.  We've slashed

14  and burned pretty hard.

15          **THE COURT:**  We have Mr. Ritter, who is going to be an

16  expert, and Mr. Mallet and Dr. Shwery.

17          Are you going to get all of that covered?

18          **MR. PENOT:**  Your Honor, I didn't realize that we were

19  doing this on the record.

20          **THE COURT:**  We should be off the record.

21                    **(OFF THE RECORD)**

22

23

24

25

1                              *****

2                          **CERTIFICATE**

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4   for the United States District Court, Eastern District of

5   Louisiana, do hereby certify that the foregoing is a true and

6   correct transcript, to the best of my ability and

7   understanding, from the record of the proceedings in the

8   above-entitled and numbered matter.

9

10                              S/ Jodi Simcox, RMR, FCRR

11                              Jodi Simcox, RMR, FCRR
                                Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA