1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  FEMA TRAILER          *   Docket MDL 1873 "N"
     FORMALDEHYDE PRODUCTS         *
6    LIABILITY LITIGATION          *   New Orleans, Louisiana
                                   *
7    THIS DOCUMENT IS RELATED TO:  *   September 17, 2009
                                   *
8    CHARLIE AGE, ET AL V          *   1:00 P.M.
     GULF STREAM COACH, INC.,      *
9    ET AL, DOCKET NO. 09-2892;    *
     ALANA ALEXANDER, INDIVIDUALLY *
10   AND ON BEHALF OF              *
     CHRISTOPHER COOPER            *
11   * * * * * * * * * * * * * * * *

12                       DAY 4
                    AFTERNOON SESSION
13        JURY TRIAL PROCEEDINGS BEFORE THE
              HONORABLE KURT D. ENGELHARDT
14            UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16

17   For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                   Meunier & Warshauer
18                              BY:  GERALD E. MEUNIER, ESQ.
                                1100 Poydras Street
19                              Suite 2800
                                New Orleans, Louisiana 70163
20

21                              The Buzbee Law Firm
                                BY:  ANTHONY G. BUZBEE, ESQ.
22                              JP Morgan Chase Tower
                                600 Travis, Suite 7300
23                              Houston, Texas  77002

24

25

```
 1   APPEARANCES:

 2   For the Plaintiffs:          Watts Guerra Craft
                                  BY:  MIKAL C. WATTS, ESQ.
 3                                Four Dominion Drive
                                  Building Three, Suite 100
 4                                San Antonio, Texas  78257

 5
                                  Hilliard Munoz Guerra
 6                                BY:  ROBERT C. HILLIARD, ESQ.
                                  710 S. Shoreline Boulevard #500
 7                                Corpus Christi, Texas  78401

 8
                                  CHRIS PINEDO, ESQ.
 9                                Attorney at Law
                                  802 North Carancahua
10                                Suite 2250
                                  Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                    & Morton
13                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  BY:  JOSEPH G. GLASS, ESQ.
14                                3838 N. Causeway Blvd.
                                  Suite 2900
15                                Metairie, Louisiana 70002

16
                                  Scandurro & Layrisson
17                                BY:  TIMOTHY SCANDURRO, ESQ.
                                  607 St. Charles Avenue
18                                New Orleans, Louisiana  70130

19
     For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                                BY:  CHARLES R. PENOT, JR., ESQ.
                                  BY:  RICHARD A. SHERBURNE, ESQ.
21                                BY:  SONIA MALLETT, ESQ.
                                  717 North Harwood
22                                Dallas, Texas  75201

23

24

25
```

1    <u>APPEARANCES</u>:

2

3    Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                      500 Poydras Street
                                      Room HB-406
4                                     New Orleans, Louisiana 70130
                                      (504) 589-7780
5

6

7

8    Proceedings recorded by mechanical stenography, transcript

9    produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                          Page

3

ERVIN RITTER

4        Direct Examination                          131
         Cross-Examination                           157
5        Cross-Examination                           177
         Redirect Examination                        179

6

DANIEL G. SHEA

7        Videotaped deposition                       183
         Examination                                 183

8

ALEXIS MALLET, JR.

9        Direct Examination                          222
         Cross-Examination                           262
10       Redirect Examination                        278

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1                          **AFTERNOON SESSION**

2                          **(September 17, 2009)**

3                              * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          (WHEREUPON, the jury entered the courtroom.)

6          **THE COURT:**  You may be seated.

7          **MR WATTS:**  Thank you, Your Honor.  At this time the

8   plaintiffs call Ervin Ritter to the stand.

9          (WHEREUPON, **ERVIN RITTER**, having been duly sworn,

10  testified as follows.)

11         **MR WATTS:**  Your Honor, before we begin with the

12  witness, I've conferred with counsel, Mr. Scandurro and the

13  counsel for Fluor.  We hereby offer without objection

14  Exhibit 316, his CV; Exhibit 323.2, which is a photograph;

15  323.3, which is --

16         **THE COURT:**  Let me make sure I get these down.  316.

17  All right.

18         **MR WATTS:**  323.2.

19         **THE COURT:**  323.2.

20         **MR WATTS:**  323.3.  Those are both a single

21  photograph.  And then 325 is Mr. Ritter's photos themselves.

22  And by permission -- or by agreement we're going to utilize,

23  but not admit 321.1, which is a single thermographic image, and

24  316.3, which is a Dometic installation and construction manual.

25         **THE COURT:**  Is that correct, Counsel?

1        MR. SCANDURRO:  That is correct, Your Honor.

2        THE DEPUTY CLERK:  Please state and spell your full

3   name for the record.

4        THE WITNESS:  Ervin Lee Ritter, Jr.

5        THE DEPUTY CLERK:  Spell it, please.

6        THE WITNESS:  Spelled E-R-V-I-N, L-E-E, R-I-T-T-E-R,

7   Jr., J-R.

8        THE COURT:  All right.

9        THE WITNESS:  Counsel, you can proceed.

10                  **DIRECT EXAMINATION**

11   BY MR WATTS

12   Q.   Mr. Ritter, are you a professional engineer?

13   A.   Yes, I am.

14        MR WATTS:  Your Honor, we tender him as a

15   professional engineer on the subjects of HVAC systems.

16        THE COURT:  Any objections?

17        MR. SCANDURRO:  Stipulate, Your Honor.

18        MR. SHERBURNE:  Stipulate, Your Honor.

19        THE COURT:  The Court will therefore accept Mr.

20   Ritter as an expert in the field of?

21        MR WATTS:  Mechanical engineering and HVAC systems.

22        THE COURT:  All right.

23   BY MR WATTS

24   Q.   Let's start off with the obvious question that follows

25   from that:  HVAC, H-V-A-C, what does that be stand for?

1   A.    Heating, ventilation and air conditioning.

2   Q.    Now, before we get into your opinions -- may I have the

3   ELMO please -- I've got to ask you a question that goes to the

4   heart of your credibility as a witness.

5         I want you to assume that we had three jurors

6   yesterday with purple shirts on.  You're a graduate of the

7   University of Louisiana of Lafayette, and there's a football

8   game on Saturday.  Is that right?

9   A.    There is.

10  Q.    Now, in some attempt to rescue your credibility, you've

11  done some teaching at LSU; is that right?

12  A.    Yes, I have.

13  Q.    All right.  Let's leave that alone, then.

14        You're a registered professional engineer in the

15  state of Louisiana and about 12 others; is that right?

16  A.    That's correct.

17  Q.    You're a member of the American Society of Heating,

18  Refrigerating and Air Conditioning Engineers?

19  A.    Yes, I am.

20  Q.    The Louisiana Engineering Society?

21  A.    That is correct.

22  Q.    The American -- or the Association of Energy Engineers?

23  A.    That is correct.

24  Q.    The International Building Code Conference?

25  A.    That's correct.

```
 1   Q.   All right.  I'm going to quit and we're going to get
 2   straight to the meat of the matter, if that's all right.
 3            Background.  Are you a married man?
 4   A.   Yes, I am.
 5   Q.   What's your wife's name?
 6   A.   Katherine.
 7   Q.   Do you have children?
 8   A.   Three children.
 9   Q.   And grandkids?
10   A.   One grandchild.
11   Q.   All right.  Now, I want to talk to you about three or four
12   things.  First is your methodology.
13            Did our side retain you to analyze the HVAC system on
14   the Alexander trailer?
15   A.   I was retained to analyze it.
16   Q.   And as part of that, did you go out together with a number
17   of these other experts that are going to be here today and
18   tomorrow and inspect the trailer in May of 2009?
19   A.   Yes, we did.
20   Q.   Did you photograph the trailer in May of 2009?
21   A.   Yes, I did photograph it.
22   Q.   And we have just put into evidence just the little sheets,
23   but these are all the different photographs that you took, and
24   they start at 001, continue throughout the trailer, and go to
25   127.
```

1          Do you see that, sir?

2  **A.**    That is correct.

3  **Q.**    Okay.  And those are your photographs; is that right?

4  **A.**    Those are my photographs.

5  **Q.**    In addition to photographing the trailer, were certain

6  measurements taken by the group of you out there?

7  **A.**    Yes, there were.

8  **Q.**    All right.  And we'll talk about that in a little while.

9  I don't want to talk to you about any testing out there.  I

10  want to talk to you about measurements.  Okay?

11  **A.**    Okay.

12  **Q.**    Let me just start with where we're going.

13          Did you reach a conclusion as to whether there was a

14  negative pressure condition that existed on the inside of the

15  Alexander trailer relative to the outside?

16  **A.**    Yes, I did.

17  **Q.**    What, first of all, is a negative pressure condition?

18  **A.**    When the air pressure inside is lower than the air

19  pressure outside, so that you have an air flow flowing from

20  outside of the structure to the inside of the structure,

21  through the windows, through the walls, through any means that

22  air can go through the structure, and you feel it whenever you

23  open a door.  If you feel a rush of air following you into a

24  building, it's negative.

25          If you open a door as you're going into a building

1    and you feel a rush of cold air in the summertime coming out,
2    that building is positive.  That's a very easy, obvious way
3    that you see it.
4    **Q.**    Okay.  Are there other ways to determine as to whether a
5    negative air condition exists, or negative pressure condition
6    exists?
7    **A.**    Yes, there are other ways.  You could use a manometer to
8    measure.
9    **Q.**    Let me just kind of make a list here just real briefly.
10   And you mentioned a manometer.  How do you spell manometer?
11   **A.**    M-A-N-O-M-E-T-E-R.
12   **Q.**    And when you-all were out there, did you measure the
13   negative pressure condition using a manometer?
14   **A.**    Yes.
15              **MR. WEINSTOCK:**  Objection, Your Honor.  May we
16   approach?
17              **THE COURT:**  Yes.
18              (WHEREUPON, the following proceedings were held at
19   the bench.)
20              **MR. SCANDURRO:**  That's a part of the duct blaster
21   test, the manometer.  That's how you measure negative air
22   pressure.  You're not going to introduce any of the duct
23   blaster --
24              **MR WATTS:**  No.  This is before the duct blaster test,
25   and we're not going there.  This is a measurement that's taken

1  with a manometer.  The duct blaster is completely separate.

2          **THE COURT:**  Is this the conversation we had before?

3          **MR WATTS:**  No, sir.

4          **MR. SCANDURRO:**  No, sir.  This is a different issue.

5          **MR WATTS:**  This is just a measurement, the SMACNA

6  test --

7          **THE COURT:**  And this is not done while the duct

8  blaster test was being conducted?

9          **MR. SCANDURRO:**  Could you lay the foundation as to

10  whether it was done before or after LeGrange's test?

11          **MR WATTS:**  He's going to say before, but do you want

12  me to --

13          **MR. SCANDURRO:**  I want to --

14          **MR WATTS:**  I asked him the question before, and I'll

15  represent to the Court that the witness will testify that it's

16  before.

17          **MR. SCANDURRO:**  Well, I'm going to have to ask him

18  some questions about the test, too, Your Honor.  I don't want

19  to open the door to anything.

20          **THE COURT:**  Well, that's what I'm saying.

21          **MR WATTS:**  I'm not going to ask him for the results.

22          **THE COURT:**  Don't ask him about any test that was

23  conducted during --

24          **MR WATTS:**  I'll move it along.

25          **MR. SCANDURRO:**  They blowed the door open --

1          **THE COURT:**  Yes.

2              (WHEREUPON, the following proceedings were held in

3     open court.)

4     **BY MR WATTS**

5     **Q.**    The manometer measurement, did it show a 3 to 5 pascal

6     negative pressure reading?

7     **A.**    Yes, it did.

8     **Q.**    What is a pascal?

9     **A.**    It's a measurement of pressure, consists of working in a

10    very small range.  We're talking about a unit of measure that

11    measures at these small pressure differentials.  Whereas PSI,

12    we talk about that like with our high pressures.  Where we get

13    to the difference in pressures at this range, we're going to go

14    into pascals.  It is a metric measurement.  I could give you

15    the definition.

16    **Q.**    I think that's close enough.

17    **A.**    I would like to keep it simple, though.

18    **Q.**    Okay.  Let me ask you another thing.  When determining

19    whether a negative pressure condition exists, can you look

20    around and see whether there's air leaks?

21    **A.**    You'll see certain evidence of air leaks as you are going

22    into a structure.

23    **Q.**    And did you see evidence of an air leak that would be

24    evidence of a negative pressure condition?

25    **A.**    Yes.

1   **Q.**   Okay.  And where was the air leak that you observed?

2   **A.**   I saw evidence of air leakage that was causing negative

3   air pressure around the ceilings.  We were operating the air

4   conditioning system so that we were having a leaky duct system,

5   and that leaky air was leaking into the cavity of the airspace,

6   and it has to make its way back from that cavity by either

7   finding a hole in the ceiling or the walls, or going through

8   the exterior wall, but coming back in through the door.

9   **Q.**   Okay.

10  **A.**   So the negative pressure was caused by the duct leakage.

11  **Q.**   What's a converter?

12  **A.**   A converter -- and I believe we talked about the inverter

13  converter.  All these travel trailers have a means of being

14  able to convert 12-volts to 120-volts.  So it's actually an

15  electrical or electronic converter that takes 12-volt DC

16  current and converts it to 120-volt AC current so that you can

17  use it for your appliances whenever you're in a location where

18  you don't have AC power.

19  **Q.**   Okay.  And with my apologies that I'm at trial without a

20  good color printer, so we're using these instead of full

21  versions that are in a computer somewhere.  Is there a box

22  right at the tip of my pen, that's kind of hard to see, but you

23  can see it in the lower left-hand corner of photograph 111?

24  **A.**   That box right there that you're showing is very difficult

25  to see.  But that photograph is right below the closet, and

1    that is the location of the inverter converter.

2    **Q.**    A little more light here, you can see it there?

3    **A.**    Correct.

4    **Q.**    In 112?

5            I've got one more.  Photograph 113 has probably got

6    the most light; is that right?

7    **A.**    That is correct.

8    **Q.**    In the lower left-hand corner, is that a converter?

9    **A.**    That is the converter inverter, as we talked about.

10   **Q.**    Was there an air leak that you could observe around the

11   converter inverter?

12   **A.**    There is.  As I was looking at the inverter converter at

13   the gap around the cabinetry that it fit into, I could see

14   daylight to the outside under the trailer.

15   **Q.**    Now, not meaning to be pejorative, but so what?  What does

16   the fact that you can see daylight tell you about whether

17   there's an air leak?

18   **A.**    Well, that right there tells me that there is a break in

19   the envelope -- the sealed envelope.  You want to keep it

20   sealed so that you don't have the infiltration of outside air

21   coming in.  The air that's going to migrate through that

22   opening, or any other opening, is going to bring with it the

23   humidity from outside.

24           That humidity, once we bring it inside, is going to

25   add humidity inside, and it's going to add the opportunity to

 1    have condensation forming inside.  And we have -- we notice

 2    that with condensation forming on the air conditioning unit.

 3    Q.   And we'll get to that condensation in a second.

 4            Can you tell the members of the jury what a

 5    thermogram is as we look at 323.1?

 6    A.   A thermogram, this is a means of seeing an invisible

 7    light, infrared, or what is called near infrared.  But it's

 8    infrared light.  And every object is going to give off an

 9    infrared in different ranges.

10            But keeping it simple:  Here, we can tell that

11    there's temperature differences in our structure.  The white,

12    the lightest area -- and it's right where the ceiling of the

13    walls come together.  And the brighter the light is the more

14    heat that is being emanated from those spots.  And that heat is

15    being emanated because of a lack of insulation there.

16            You can see some of the structures in the wall, the

17    studs, and the overhead bow trusses.  The darker area that you

18    see in the upper left corner is, as it looks like a little bit

19    of a plume, is an indication that there's a probable -- and I

20    say "probable" because I wasn't able to pull that section of

21    ceiling down and determine -- but it's probable that there is

22    an air leak of cold air leaking into the ceiling, causing that

23    area to become a lot colder -- a lot cooler than the rest of

24    the structure.

25    Q.   Now, in addition to the thermogram, can we just use good

1   old-fashioned pictures?

2   **A.**   This is a picture of the condensation that it's forming on

3   the ceiling cover of the air conditioning units.  That is air

4   that's leaking cold air.  And this is the return air grill

5   side.  So it really should be more like room temperature, but

6   it is actually supply air that is leaking into that area of the

7   unit and making the face of that grill colder, to cause the

8   condensation.

9   **Q.**   Let me show you another photograph.  The condensation in

10  the grill, for the record it's photograph 323.2, as we look

11  323.3, explain for the jury what that is demonstrating or

12  illustrating.

13  **A.**   That's off to the side.  And you can see that there's

14  condensation on the ceiling also, indicating that right at the

15  points where the supply ducts are connecting to the supply

16  plenum of the air conditioning unit, there's obviously a leak

17  of undetermined volume of air leaking, but there is enough air

18  leaking out that it is cooling the ceiling down to the point

19  that you're getting condensation on the interior surface.

20         That same condition of condensation is probable on

21  the other side.  If you have it on one side, you could have it

22  in the cavity side also.

23  **Q.**   Now, Mr. Ritter, as we look at one, two, three, four and

24  five, are these all independent bases that support your

25  conclusion that there was a negative pressure condition inside

1  of this trailer?

2  **A.**    Yes, those all support it.

3  **Q.**    Now, you mentioned one other thing that I want to throw

4  out there just real quick, and then I want to talk to you about

5  each of these just for a second.

6           You talked to the jury about when you walk in a door,

7  you can feel -- and we can surely feel it when we walk into

8  this courtroom, this freezer that we're working in -- does that

9  tell you, as an experienced mechanical engineer with expertise

10 in HVAC, just right off whether or not you've got a positive

11 air pressure condition or a negative air pressure condition?

12 **A.**    When I walk into a room and I feel the air motion leaving

13 the room, I know that room is positive with respect to, say, in

14 this case, as you used the example of the vestibule or the

15 corridor outside, air flow is flowing out, so that we've got a

16 positive pressure.  And the air leakage that is going to try to

17 leak from inside out through light switches, electrical

18 outlets, it's going to push out.

19           That drier air is going to be pushing dry air into

20 the cavity spaces, and it helps to keep it dry in those cavity

21 spaces.

22 **Q.**    Now, I want to address just one of these issues with you.

23 Counsel was kind enough to allow me to use this document which

24 we've marked as Exhibit 316.3.  It says Dometic.  What is this?

25 **A.**    That is the installation manual for the air conditioning

1    unit that is on this travel trailer.

2    **Q.**   Now, to be clear, while in litigation, you get the

3    installation manual for the air conditioner.  Did this come

4    with the trailer?

5    **A.**   No, it did not.

6    **Q.**   This isn't something that Alana Alexander would have seen?

7    **A.**   No, she did not.

8    **Q.**   Now, when we talk about the photographs of this

9    condensation, like what we see in 323.2, does Dometic talk

10   about condensation in areas on the ceilings and surfaces like

11   what you described for us?

12   **A.**   Their manual does give warnings about condensation, what

13   can cause condensation, and so on.

14   **Q.**   Let me put up two of those paragraphs just real quick.

15   We're on the bottom of Page 2 on Exhibit 316.3.

16           And does the Dometic air conditioning installation

17   instruction say:  "Note, the manufacturer of this air

18   conditioner will not be responsible for damage caused by

19   condensed moisture on ceilings or other surfaces.  Air contains

20   moisture, and this moisture tends to condense on cold surfaces.

21   When air enters the RV, condensed moisture may appear on the

22   ceiling, windows, metal parts, et cetera.  The air conditioner

23   removes this moisture from the air during normal operations.

24   Keeping doors and windows closed when this air conditioner is

25   in operation will minimize condensed moisture on cold

1   surfaces."

2   A.   That's correct.

3   Q.   Now, you haven't been here for the whole trial.  You were

4   here some yesterday; is that right?

5   A.   Oh, no, no, sir.  Today is my first day here.

6   Q.   Just today.  You and I met for the first time last night;

7   is that right?

8   A.   That's correct.

9   Q.   If somebody's being instructed to air out a trailer by

10  turning on the air conditioner and open the doors, is that an

11  instruction that is against what Dometic is saying to do with

12  this air conditioner?

13  A.   That is directly in conflict with their recommendation.

14  Q.   And if somebody is being instructed, air out your trailer,

15  turn on the air conditioner, open the doors, is that the kind

16  of situation that's going to result in the condensation around

17  the vent that Dometic says you don't want?

18  A.   Yes, it will.

19  Q.   Let me just show you one other paragraph on this, and then

20  we'll get off of this.  Page 6, Section 4:  "Air distribution

21  system sizing and design."

22       Does Dometic say that the ducts in their joints must

23  be sealed to prevent condensation from forming on adjacent

24  surfaces during the operation of the air conditioner/heat pump?

25  A.   That is correct.

1   **Q.**   And if the ducts are not sealed as Dometic says you need

2   to, will you get a situation like what is photographed in

3   323.2?

4   **A.**   You will get a situation just like that one and the other

5   photo you showed.

6   **Q.**   All right.  Based on all the evidence that we've just

7   discussed, did you reach a conclusion as to whether there were

8   duct leaks in this trailer?

9   **A.**   Yes, I did.

10   **Q.**   And what is that conclusion, sir?

11   **A.**   That the supply air conditioning ducts are leaking, and

12   that they are causing the negative pressure because the leaks

13   are occurring in the ceiling cavity, and that air must make its

14   way back by some of the air going outside to the exterior of

15   the trailer, and then coming back in through any means that it

16   can, such as around the inverter converter every time the door

17   opens, through the metal paneling elsewhere, and then coming

18   back through a wall outlet, and so on.

19   **Q.**   All right.  Three quick questions on that issue:  Does

20   duct leakage induce more moisture into the trailer?

21   **A.**   During the summertime months, our high humidity months, it

22   will induce a higher humidity and moisture level.

23   **Q.**   And when you induce the higher humidity and moisture,

24   we've had a lot of other experts talk to us about formaldehyde

25   off-gassing.  There's other experts who can talk about that.

1          But your conclusion, and where it ought to stop, is

2    that the condition of this HVAC induces moisture and humidity;

3    is that true?

4    A.   It's going to introduce the moisture and humidity in that

5    air that's traveling in.  If it's in the cavity, and making its

6    way back through the wall directly, through an outlet, switch

7    plate, or whatever, whatever contaminants are in that air are

8    coming with it.

9    Q.   All right.

10          MR WATTS:  May I approach, Your Honor?

11          THE COURT:  Yes.

12   BY MR WATTS

13   Q.   All right.  So we've talked about this negative pressure

14   condition.  I've already asked the question:  So what?  Now I

15   want to talk to you about why that matters.  Are there

16   different kinds of air conditioning systems?

17   A.   Yes, there are.

18   Q.   The thing I keep thinking about is in some of these new

19   cars, you go to your air conditioner and you can see different

20   buttons that you can push?

21   A.   Correct.

22   Q.   Some of them have an arrow that goes into the car from the

23   outside?  Do you know what I'm talking about?

24   A.   Yes.

25   Q.   And then some of them have kind of a half a circle that

1   makes it sounds like the air starts in the car, and then goes

2   back?

3   **A.**   It says recirculate.

4   **Q.**   It says what?

5   **A.**   It says recirculate.

6   **Q.**   Recirculating.  Okay.  And we're not talking about a car

7   case here.  But if you're driving down the road at 60 miles an

8   hour and you do that one-sided arrow, are you getting fresh air

9   in?

10  **A.**   You're having fresh air forced in through the vents.

11  **Q.**   Which is usually a good thing?

12  **A.**   It's a good thing.  You're getting fresh air.

13  **Q.**   But if you're parked at a stop light behind a diesel

14  truck, you might not want to be breathing all that diesel, so

15  you might want to recirculate your cleaner air from inside?

16  **A.**   That is correct.

17  **Q.**   Now, with respect to this air conditioner, this trailer,

18  is it a recirculating air system or a fresh air induction

19  system from the outside?

20  **A.**   This air conditioning system, as designed by Dometic, is a

21  recirculating system.  There is not any provision for them to

22  bring in outside ventilation air through the air conditioning

23  unit.

24  **Q.**   Okay.  Now, to be fair to Gulf Stream, is there anything

25  wrong with a recirculated air system if you don't have negative

1   air pressure?

2   **A.**   With the negative air pressure, you're going to enhance --

3   you're going to have -- let me start over.

4          With the recirculating air, you're moving the same

5   air, you're breathing it over and over.  So you, as a person,

6   contaminate that air.

7          With the negative air pressure, any contaminants from

8   outside can also come in, be it particles, be it gases, be it

9   humidity, moisture, they're coming in with it and adding to

10  your contaminants.

11         With the ventilation option on it, or forced air

12  option -- there are many, many different types -- you have the

13  means of bringing in some fresh air, filter it, cool it,

14  dehumidify it, and add it to the space that you're in.

15         That is not the case with the Dometic units that's on

16  this trailer.

17  **Q.**   Okay.  But, again, you're not claiming that this system is

18  defective just because it's recirculating, or anything like

19  that?

20  **A.**   No, I'm not.

21  **Q.**   In fact, there were a lot of mobile homes back in the day

22  that used recirculating air systems; right?

23  **A.**   Exactly.

24  **Q.**   More recently, most of them have this fresh air induction;

25  is that right?

1   A.    Everything is going to that type of system.

2   Q.    Okay.  But understanding that difference, the

3   recirculating air system, if we look at your air conditioner

4   knob, that's the one where -- I'm going to get laughed at for

5   drawing a car that's horrible -- but that's the one where the

6   arrow does something like this on your button; right?

7   A.    That is correct.

8   Q.    All right.  Now, if you have a recirculating air system

9   and you have negative air pressure in your trailer, what

10  happens when your fan in the air conditioner is moving air

11  around?

12  A.    That fan is going to be pulling air from the space to its

13  total volume, so whatever its capacity is, blowing it through

14  the air conditioning coil to cool the dehumidifier.  That air

15  then goes into the duct system.  From what I've seen, the duct

16  system is leaking, so we're losing a portion of that

17  conditioned air, cold air, into the cavity space.

18          The remaining air is making itself into the cavity

19  space, but it's not all of the air that went through the unit.

20  So the air that was lost into the cavity space must find its

21  way back.  That is what creates the negative pressure inside,

22  because you don't have all of the air back in it.

23  Q.    Okay.

24  A.    So your cavity is where you've got your conditioned air.

25  That cavity becomes positive with respect to the interior.  So

1   that air is going to force its way back through any means it
2   can.
3   Q.   Now, again, we've got a lot of experts that are going to
4   talk about formaldehyde specifically.  But if you have, from
5   composite, formaldehyde, it's off-gassing into the air.  So
6   you've got air with formaldehyde in it.
7             Do you understand where I'm going?
8   A.   Yes, I do.
9   Q.   With the recirculating air system and negative air
10  pressure or a negative pressure condition, is there an avenue,
11  using the HVAC system, to get that formaldehyde out of the
12  trailer?
13  A.   Yes, you have.  Anything that is causing a contaminant, be
14  it the formaldehyde gas, be it whatever, microbial, whatever.
15  It doesn't matter.  If it's in that cavity space, and that air
16  is making its way back into your home, it's coming with the air
17  to add those contaminants to the air that you're going to be
18  breathing.
19  Q.   All right.  So if you get home from school or from work
20  and -- to use somebody's example -- it's 140 degrees -- not
21  really, but it feels like it -- and you flip on the air
22  conditioner, is the air conditioner going to cool the air and
23  the formaldehyde?
24  A.   It is going to cool the air.  The leaking air that's
25  leaking into the cavity is going to tend to cool that cavity

151

1   down.  And anything that's in there will be mixing with it, and

2   those gases are going to come back inside.

3   **Q.**   All right.  So instead of breathing hot air with

4   formaldehyde, you're breathing cold air with formaldehyde?

5   **A.**   That would be correct.

6   **Q.**   All right.  Now, you've heard of Newton's Laws and equal

7   and opposite forces and all this good stuff; is that right?

8   **A.**   That's correct.

9   **Q.**   Are there certain HVAC laws or mechanical engineering laws

10  with respect to air being pumped in and air coming out?

11  **A.**   Well, when it comes to the unit, whatever the capacity

12  that unit is, and that unit is a 325 CFM, cubic feet per minute

13  of air, but let's say it's 100 units of air, for simplicity.

14  **Q.**   All right.  100 units of air.

15  **A.**   And that's going through.  And 20 units of air leak into

16  the cavity space and 80 units go into the living space, that

17  unit is going to pull 100 units, just because you put 80 back

18  in, it doesn't decrease; it's looking for 100 units.

19           So that 80 units that you put in, and then it's going

20  to pull another 20 units from outside, whatever means it can,

21  to total up to 100 units, to go through the fan, leak the 20

22  units into the cavity, put 80 units back.  That is a constant

23  cycle of cooling the interior space, you're cooling your cavity

24  wall, you're going to find some point that any moisture in that

25  cavity up there may be condensating too to get it cooler more.

1   **Q.**   Stop there for a second.

2         You're talking about moisture in the cavity.  Where's

3   the cavity that we're talking about?

4   **A.**   The ceiling cavity.

5   **Q.**   Okay.  The ceiling cavity.

6         In other words, above where that condensation was,

7   but inside the roof?

8   **A.**   That is correct.

9   **Q.**   And, for example, did you provide this to the lawyers,

10  kind of a schematic diagram, if you will?

11  **A.**   I did.

12  **Q.**   And did you also do one with respect to the wall section?

13  **A.**   I also did that sketch.

14  **Q.**   All right.  Now, let's start with the roof section one,

15  which is 316.1.  If you could, let me give you this laser, and

16  why don't you point out to the jury what you're trying to

17  describe there.

18  **A.**   Okay.  What I'm trying to describe here is, we have our

19  roof membrane, the rubber membrane.  And then we have the

20  insulation in here.  And then we have the ceiling.

21        These lines represent temperatures.  As we take the

22  temperature from outside -- and let's say it's 115-degrees on

23  the roof, and some of these roofs can get hotter -- and it

24  comes in through here, this is about what happens to the

25  temperature as it changes through the insulation.

1        Now, at some point we have a point that we call a dew

2  point.  That's where condensation forms.  We know -- I'll give

3  you an example of what a dew point is.  Those of us that wear

4  glasses, and we walk outside of this building on a day like

5  today, what happens to our glasses?  They fog up.  Our glasses

6  are cold enough they're below dew point and we get a fog on

7  them.  The condensation on a glass of iced tea is because the

8  surface is below a dew point.

9        So when we get to some point in here, if we've got

10 air leaking in here, we're going to hit that dew point.  And

11 any air that's moving in here that's got moisture is going to

12 start condensing inside that wall cavity.

13 **Q.**   Okay.  If it condenses, why is that a bad thing?

14 **A.**   When it condenses, that gives you the opportunity for

15 microbial growth.  It gives you an opportunity for the wood

16 materials to absorb that moisture.  You can have wood rot.  You

17 can have any number of things.

18        Going into the off-gassing, from what I've heard,

19 that also promotes --

20        **MR. SCANDURRO:**  Excuse me, Your Honor.  From what

21 he's heard from the off-gas --

22        **MR WATTS:**  I'll tell you what, we got off --

23        **THE COURT:**  Okay.  Stick with the question that he

24 asks, and answer it.

25

1  BY MR WATTS

2  **Q.**   Let me stop you there, because I think you answered it,

3  but we've got other experts that are going to do off-gassing,

4  so let me --

5         There is evidence in this case that relates to

6  off-gassing when you get insulation wet; fair?

7  **A.**   That's correct.

8  **Q.**   Okay.  We'll talk to somebody else about that.  But that's

9  one of the things you can get; fair?

10  **A.**   That is fair.

11  **Q.**   When you get insulation wet, is that a good thing or a bad

12  thing?

13  **A.**   When you get insulation wet, you then take this line and

14  you make it come over quickly.  Because the wet insulation

15  doesn't have any air in it.  Air is actually your insulator.

16  The fiberglass keeps the air stable; no motion.  But when you

17  get it wet, it collapses, and heat travels right straight

18  through it.

19         You know that whenever you get an article of clothing

20  wet, you have -- you can feel a quicker temperature difference.

21  It no longer protects you from cold or the heat or whichever.

22  **Q.**   Let me use an example.  We've been joking about the

23  jurors' shirts for football and everything.  Let's say our

24  Saints fan over there goes up to Philadelphia, and a Philly fan

25  throws a beer on his T-shirt and it gets wet.

1        Does that affect the insulation capacity of that
2   shirt?
3   A.   Yes, it does.
4   Q.   Is than an overly simplistic example, or is that the same
5   thing that happens when your insulation gets wet?
6   A.   That's a very, very good parallel right there.  It changes
7   his attitude a little bit.
8   Q.   Can't trust those Philly fans?
9   A.   No.
10  Q.   We've talked about negative air pressure condition, and
11  the condensation that can result.  We've talked about the
12  recirculating air system taking the air and formaldehyde and
13  pumping it back in the system.  I want to just kind of tie this
14  together for a second.
15       With respect to the HVAC system that was there, the
16  recirculating air system, how do you know that there was a
17  negative pressure condition back in 2006 and 2007 when the
18  Alexanders lived there?  I mean, these gentlemen have been
19  saying, hey, it got shipped off to the graveyard and maybe it
20  got damaged then.
21       Did you see any evidence of significant external
22  trauma that would cause this?
23  A.   The area where the ductwork, which is above the ceiling,
24  the ceiling didn't show any signs of damage.  The ductwork was
25  up there.  It's inside the bow trusses.  So you would have had

1    to have some really major physical damage to the roof or to the

2    interior.

3    **Q.**   Was there any evidence that there was this kind of

4    mechanism of damage that would have damaged the ductwork while

5    they're driving it to Lottie and to the graveyard?

6    **A.**   No, there was not.

7    **Q.**   Speaking of that condition, when you-all first turned the

8    air conditioner on, did it go on like that?

9    **A.**   It started right up.

10   **Q.**   Was there anything about the condition of that air

11   conditioner and the ductwork that told you that there was

12   mechanical damage caused by some transportation issue that

13   would explain all this?

14   **A.**   No, there was not.

15   **Q.**   All right.  Do you have an opinion, to a reasonable degree

16   of engineering probability, as to whether duct leaks existed at

17   the time the Alexanders were in the trailer?

18   **A.**   It is my opinion that those ducts did leak at the time

19   they were living there.

20   **Q.**   And because those ducts were leaking, do you have an

21   opinion to a reasonable degree of engineering probability as to

22   whether a negative air pressure condition existed inside their

23   trailer when the Alexanders lived in the trailer?

24   **A.**   It is my opinion that it is negative.

25   **Q.**   And do you have an opinion, with this negative air

1  pressure condition inside a trailer with a recirculating air

2  conditioner, whether that would cause moisture buildup in the

3  trailer?

4  **A.**   It's my opinion that that moisture and any other

5  contaminants will be migrating into the trailer.

6  **Q.**   And in addition to the off-gassing issue, that somebody

7  else will talk about with that moisture buildup, do you have an

8  opinion as to whether that will soak your insulation such that

9  it won't insulate the heat as well?

10  **A.**   You will have that condition where that will occur.

11  **Q.**   And per the same CFMs, do you get a higher heat when you

12  have wet insulation?

13  **A.**   Correct.  You have a higher heat loss or higher heat gain

14  through that material.

15  **Q.**   So because you have a negative air pressure condition in a

16  recirculating air system, you get more moisture and more heat?

17  **A.**   That is correct.

18          **MR WATTS:**  Sir, those are all my questions.

19              Thank you, Your Honor.

20          **THE COURT:**  All right.  Cross?  Mr. Scandurro?

21          **MR. SCANDURRO:**  Yes, Your Honor.

22                      **CROSS-EXAMINATION**

23  BY MR. SCANDURRO

24  **Q.**   Mr. Ritter, good afternoon.  I'll wait until you get your

25  water.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1       The good news is you're a ULL guy.  I went to Tulane,
2   so the LSU people probably don't like me either.  But I married
3   an LSU girl.
4   A.   We're looking forward to playing you-all again, too.
5   Q.   Everybody does.
6          **THE COURT:**  Your wife is obviously your better half.
7          **MR. SCANDURRO:**  Absolutely, Your Honor.  You won't
8   get any argument about that.
9   **BY MR. SCANDURRO**
10  Q.   Sir, you've never actually designed a travel trailer, have
11  you?
12  A.   Not a travel trailer, no.
13  Q.   And you've never designed an HVAC system on a travel
14  trailer?
15  A.   No, I have not.
16  Q.   And you've never built a travel trailer, obviously?
17  A.   No, I haven't.
18  Q.   And you never saw the insulation in the ceiling cavity of
19  the Alexander travel trailer, did you?
20  A.   We weren't allowed to open it up.
21  Q.   Did you see the insulation in the ceiling cavity, sir?
22  Yes or no?
23  A.   No, I did not.
24  Q.   And you didn't see the ductwork either?
25  A.   No, I did not.

159

1   **Q.**   So your conclusion that the ductwork was leaking is based

2   on that psychedelic picture we saw, plus the condensation

3   picture we saw; is that correct?

4   **A.**   That is correct.

5   **Q.**   And I take it you couldn't see the ductwork, you also

6   couldn't see the connection between the ductwork and the air

7   conditioner by that vent on that photo we looked at?

8   **A.**   No, I could not.

9   **Q.**   And there are devices, sir, aren't there, where you could

10  have tested the moisture in the wall or ceiling cavities?  The

11  moisture content?

12          **MR WATTS:**  May we approach, Your Honor?

13          **THE COURT:**  Yes.

14          (WHEREUPON, the following proceedings were held at

15  the bench.)

16          **MR WATTS:**  Here's my problem.  And I'm not up here

17  screaming and yelling, he just opened the door.  My witness

18  just looked at me terrified, like, do I have to answer this,

19  and that's what I'm concerned about.  Because I don't want him

20  getting blamed for opening the door because it's a question of

21  raising concerns about.

22          **MR. SCANDURRO:**  Here's the question:  You did no

23  moisture testing?  Why can't I ask that?

24          **THE COURT:**  But whether he did it because he didn't

25  want to do it, or whether he did it because it was prohibited

```
 1   are two different things.  Now, you-all filed a motion to ask
 2   me to curtail what was going on out there, and I granted it
 3   based on your arguments.
 4               And I don't want to hang this guy high because
 5   of something he didn't do because of my ruling based on your
 6   motion.
 7               MR WATTS:  Can I suggest what I think is fair?  How
 8   about something:  Because of -- how about:  Because of rulings
 9   by the Court, no sides were allowed to do this testing?
10               MR. SCANDURRO:  I'll move on, Judge.
11               THE COURT:  It's got to be predicated so that that it
12   doesn't look like he didn't do it because he didn't want to do
13   it.
14               MR. SCANDURRO:  Okay.
15               THE COURT:  And that's the impression that you're
16   gonna leave if you keep asking --
17               MR. SCANDURRO:  I understand.
18               (WHEREUPON, the following proceedings were held in
19   open court.)
20               THE COURT:  Go ahead, Mr. Scandurro.
21   BY MR. SCANDURRO
22   Q.   Sir, is it your opinion that the -- that this air
23   conditioning system was not installed as the manufacturer
24   recommended it be installed?
25   A.   That is my opinion of that.
```

1    **Q.**   And that's because of the duct leak that you referenced?

2    **A.**   The duct leakage and other references that they have in

3    their manual.

4              **MR. SCANDURRO:**   Can I see that photograph that was...

5    **BY MR. SCANDURRO**

6    **Q.**   I've put back up there the photograph marked 323.2.

7    That's the condensation you saw right -- that's right

8    underneath the air conditioner --

9    **A.**   That's on the bottom faceplate.

10   **Q.**   So this trailer, as far as you know, has been sitting out

11   in this field in Lottie for 14, 15 months?

12   **A.**   For a considerable amount of time.

13   **Q.**   And to your knowledge, no one has run the air conditioner

14   during that time period?

15   **A.**   That is correct.

16   **Q.**   So you guys come out and you crank up the AC; right?

17   **A.**   That's correct.

18   **Q.**   And the air is like, what, 55 degrees, the cool air that's

19   running through that system?

20   **A.**   That is -- that's going to be a function of whatever

21   temperature comes across and whatever that unit's capable of

22   lowering it, probably about 15 degrees below the ambient in

23   there.  So did you say 85 degrees?

24   **Q.**   I said 55.

25   **A.**   No, but interior temperature.

162

1   **Q.**   I was talking about the air conditioning --

2   **A.**   It may or may not do 55 degrees right there.

3   **Q.**   Can we agree it's a lot colder, the condition there, than

4   the air that's in the trailer?

5   **A.**   I can agree with you that it would probably be about

6   15 degrees colder than the air in the trailer.

7   **Q.**   You've had the experience of sitting in a restaurant and

8   getting dripped on by an air conditioning vent, haven't you?

9   **A.**   Yes, I have.

10   **Q.**   You're from South Louisiana, aren't you?  That's not

11   unusual?

12   **A.**   No, it is not.

13   **Q.**   Did you take, or did anyone who was with you take, any

14   humidity measurements, humidity measurements, while you were in

15   that trailer taking these photographs?

16   **A.**   There were data loggers recording.

17   **Q.**   Do you recall what the humidity was on the interior of the

18   trailer around the time this photograph was taken?

19   **A.**   I do not.

20          **MR WATTS:**  May I approach, Your Honor?

21          **THE COURT:**  Yes.

22          (WHEREUPON, the following proceedings were held at

23   the bench.)

24          **MR. SCANDURRO:**  I'm just going to ask him about the

25   humidity at the time he took the picture.  It's not a test.

1    It's a negative during the test.  It would be grossly unfair

2    for me not to be able to show why those drops are there.  So I

3    want to ask --

4            **MR WATTS:**  Judge, can I just throw out something?  It

5    occurs to me -- and again, I'm not trying to be disrespectful

6    to the Court or its rulings, but what's the harm of letting him

7    open the door and let's talk about it?

8            **THE COURT:**  Well, that's what I'm asking right now.

9    It looks like we're about to do that.

10           **MR WATTS:**  It doesn't diminish the ruling of the

11   Court.  We've all honored your deal.  We're getting to the

12   point where we're trying a fictional case without the blower

13   air testing and the other thing.  And, again, I don't mean to

14   suggest that we're -- we're not up here making an offer of

15   proof or anything like that.

16           **MR. SCANDURRO:**  That's why I wanted to get your

17   feeling on it before I asked the question.  That's why I came

18   up here.  I don't want to open that door.

19           **MR WATTS:**  I think it would acceptable to open it up.

20           **THE COURT:**  But if you ask him that question, the

21   jury will understand that a test was going on and I think

22   they're free, at least with this witness, to talk about that

23   test.  So is Mr. Weinstock on board with that -- I mean Fluor,

24   they're on board with this?

25           **MR. SHERBURNE:**  That's fine, Judge.

1          **THE COURT:**  Oh, I'm sorry.  I didn't see you there.

2          **MR. SHERBURNE:**  I was here, and I don't mind him

3    answering the question.

4          **THE COURT:**  Good.  Then let's do it.

5          (WHEREUPON, the following proceedings were held in

6    open court.)

7    **BY MR. SCANDURRO**

8    **Q.**   Bottom line is, you don't know what the humidity was at

9    that particular point in time when you took that picture?

10   **A.**   I don't know the exact humidity measurement.  The data

11   loggers don't give you a readout.  You download it later.  And

12   I'll be quite honest, I don't recall it.

13   **Q.**   Yes, sir.

14          And you've read the Gulf Stream owner's manual,

15   haven't you?

16   **A.**   I've gone through it, yes, sir.

17   **Q.**   Do you recall that it has some language in there about

18   condensation?

19   **A.**   Most of them do have the language in them.

20   **Q.**   I'm going to show you what's been previously entered into

21   evidence as Exhibit 23.  Do you see that section on the

22   left-hand side there, sir?

23   **A.**   Yes.

24   **Q.**   And I'm reading the first highlighted section.  It says:

25   "The normal activities of even a small number of occupants in

1   the relatively small volume of a modern recreational vehicle,

2   with its tight construction, will lead to rapid saturation of

3   the air inside the vehicle, and the appearance of visible

4   moisture, especially during cold weather."

5           And then it talks about the effect of human beings

6   inside this fairly small space in terms of humidity.  And in

7   the second paragraph it says:  "It may also condense in the

8   walls or ceiling and appear as stains on paneling."

9           Do you see that?

10  A.   I see that.

11  Q.   You didn't note any stains on paneling, did you?

12  A.   Not on paneling, I don't remember.  But there was some

13  staining in the front bedroom on the ceiling.

14  Q.   That's where the roof leak was; right?

15  A.   Yes.

16  Q.   We'll talk about that in a minute.

17          But the owner's manual talks about condensation

18  possibilities in this little space, doesn't it?

19  A.   It does.

20  Q.   And wouldn't you also agree that when you're running the

21  air conditioner in a space like that, when it's been sitting

22  out in a field, again, that's not something you would not

23  expect to see, that condensation in that location by the air

24  conditioner?

25  A.   If that were tight construction, it would dehumidify that

1  air.  You wouldn't have to -- it would remove that
2  condensation, and it would dry up that condensation also.
3  Q.   But you didn't take any other photos after this of that
4  particular area, did you?
5  A.   We spent several hours in there, and it never did dry that
6  unit out.
7  Q.   But you didn't take any other photographs later of that,
8  did you?
9  A.   No, we did not.
10 Q.   Have you read the FEMA specifications on this unit, sir?
11 A.   I've gone through those specifications.
12 Q.   Do you recall that they actually reference a warranty on
13 the air conditioning system?
14 A.   I don't recall what they referenced exactly.
15 Q.   I'm going to show you the FEMA specifications, which is --
16 has been previously admitted.  It's document No. 165,
17 Exhibit 165.  It's a little hard to see.  Maybe we could pull
18 up 165.  Go to the last page, second to the last page.  Back
19 one.  Thank you.
20       If you could blow up the bottom where it says
21 "warranty."  You can see in that warranty paragraph, can't you,
22 sir, that there is a warranty on the AC system referenced in
23 the FEMA specs there?
24 A.   Correct.
25 Q.   Did you -- are you aware of the fact that about 7,000 of

1    these travel trailers were sold to FEMA in 2004?

2    **A.**    I don't know how many were sold.

3    **Q.**    You know it was a lot?

4    **A.**    A lot.

5    **Q.**    Have you done an investigation with FEMA as to how many

6    warranty claims, or issues, or problems FEMA had with these air

7    conditioning systems?

8    **A.**    No, I did not.  That was not part of the scope here.

9    **Q.**    Don't you think that would be important to know, sir, what

10   FEMA's experience has been with the Gulf Stream Dometic air

11   conditioner?

12   **A.**    The unit itself was working.

13   **Q.**    Did you -- you actually -- how did you get ahold of that

14   Dometic manual that we looked at, the Dometic air conditioning

15   manual Mr. Watts showed you?

16   **A.**    How did I get ahold of it?  Take the model number of the

17   unit when we made our inspection, did the research online, and

18   downloaded for that specific model.

19   **Q.**    Didn't you -- didn't you call Dometic?

20   **A.**    I did call Dometic.

21   **Q.**    And you asked them to send you a copy of that manual that

22   we looked at?

23   **A.**    Yes.

24   **Q.**    So you didn't download it; you called them?

25   **A.**    I called them.  And I downloaded what they sent to me in

1   an e-mail.

2   **Q.**   Did you talk to them about their experience with Gulf

3   Stream?

4   **A.**   No, I did not.

5   **Q.**   Is there a reason why you didn't?

6   **A.**   My only reason was I was interested in their manual,

7   not -- not their relationship with Gulf Stream.

8   **Q.**   Are you aware of the fact that as a supplier --

9          **MR WATTS:**  Objection, Your Honor.

10  **BY MR. SCANDURRO**

11  **Q.**   -- of thousands and thousands --

12         **MR WATTS:**  Excuse me, Your Honor.

13         **THE COURT:**  Let him finish the question, and then

14  we'll hear it.

15  **BY MR. SCANDURRO**

16  **Q.**   -- of thousands and thousands of these air conditioners --

17         **THE COURT:**  Why don't you-all come on up?

18         (WHEREUPON, the following proceedings were held at

19  the bench.)

20         **MR WATTS:**  Judge, if the law of the case that

21  cross-examination can be, are you aware of the fact,

22  blah-blah-blah-blah, I can do it all day long.  I can be worse

23  than anybody.

24         **THE COURT:**  I know, I know.

25         **MR. SCANDURRO:**  Here's what I'll ask him.  Here's

1   what I thought would be a good thing:  If the manufacturer of

2   the air conditioning system, they went to the plant.

3           **THE COURT:**  Why don't you ask him if that would be a

4   good thing.  What I didn't want to have -- are you aware of

5   blank-blank-blank.  And then the witness has nothing to say

6   but, no, in which case the statement's out there, and there's

7   no proof except that counsel has said it, and you're not the

8   only one, or the first one, to try that in this case.

9           **MR WATTS:**  And the Court did you take favor because

10  I'll do it all day long if you let me.

11          (WHEREUPON, the following proceedings were held in

12  open court.)

13  **BY MR. SCANDURRO**

14  **Q.**   Mr. Ritter, as an engineer, would you consider it a

15  prudent practice for Gulf Stream to have the manufacturer of

16  this air conditioning unit come to its plant in Indiana on a

17  regular basis and watch them install the air conditioning unit

18  as a quality control measure?

19  **A.**   If I were Gulf Stream, I would like to have it done.  But

20  did they do it, I couldn't --

21  **Q.**   Well, sir --

22  **A.**   -- I'm not sure --

23  **Q.**   Please assume there's been testimony in the case by

24  Mr. Pullin of Gulf Stream that that was done.  You would agree

25  that's a prudent practice by Gulf Stream?

1   A.   That would be a prudent practice, yes.

2   Q.   Now, let's talk about the roof leak.  You did see a roof

3   leak, didn't you, when you went out there and looked at the

4   trailer?

5   A.   I didn't see a roof leak.  I saw a stain on the ceiling.

6   It was not raining when we went out there.

7   Q.   Did you see evidence of a roof leak on the bed underneath

8   that ceiling?

9   A.   I was looking at the ceiling.  I can't tell you that I --

10   I took note of any stain on the bed.

11   Q.   There was a young lady who testified here to start off the

12   trial, Ms. Erika Alexander, who said that the roof leaked after

13   a number of months when they were in the trailer.  I want you

14   to assume that.  And that FEMA never fixed that.  Okay?

15        Isn't an active roof leak a more likely source of

16   moisture on the insulation in the ceiling and wall cavities

17   than the duct leakage you've talked about?

18   A.   The roof leak adding moisture to the insulation, along

19   with the leakage of the ductwork, only compounds the problem of

20   moisture migration.

21   Q.   Is this the one we looked at that you said showed what you

22   thought was duct leakage?

23   A.   That is correct.

24   Q.   And what is -- is that the bright line or the purple line?

25   A.   That would be the purple line.

1  **Q.**   Does that look like a stud to you, sir, where the purple
2  line is?
3  **A.**   It looks like it could be a stud.  But there's something
4  making it colder.  Why is that right there colder than the
5  other light pink lines that you see?
6  **Q.**   Is that a wall or a ceiling right there?  Is that a
7  ceiling joist or a wall stud or a --
8  **A.**   The way you have it turned there, it would appear to be a
9  wall.
10  **Q.**   Well, do you know?
11  **A.**   Seeing how the picture and the --
12  **Q.**   Would you like me to turn it a different way for you?
13  **A.**   Now, I'm seeing there a wall -- two walls at the corner,
14  and the ceiling.
15  **Q.**   So the ceiling's on top.  We have it oriented properly?
16  **A.**   The ceiling's on top, that is correct.
17  **Q.**   And what did you say your interpretation of the yellow
18  line was?
19  **A.**   The bright yellow, or almost white, line, that is where
20  the ceiling and wall come together --
21  **Q.**   And there's no insulation there; right?
22  **A.**   There's no insulation, correct.
23  **Q.**   So you would expect that to be brighter than the areas
24  around it?
25  **A.**   To some point.  But you can see where it goes very thin

1  where there is no -- like where there would be studs there, do

2  you see where -- about, oh, a third of the way from the right,

3  where the brightness is minimal, that is what I would expect to

4  see all along there.

5          THE COURT:  I think your screen may be a touch

6  screen.

7          THE WITNESS:  Oh, I can touch it?

8          THE COURT:  Yeah.

9          THE WITNESS:  I didn't realize it.

10          THE COURT:  I may have touched the wrong spot.

11          THE WITNESS:  No, Judge, you're exactly right.  Right

12  there.  That is what I would expect would be normal for the

13  construction.  And as you move down here, that area right here

14  and here is showing where the insulation is not quite as tight

15  to the connection points of ceiling to wall.

16  **BY MR. SCANDURRO**

17  **Q.**   Okay.  And you were asked -- you were asked whether or not

18  there were any stresses -- do you recall that question? -- on

19  this particular travel trailer when it was sitting out on that

20  field all that time?

21  **A.**   You say "stresses".

22  **Q.**   Unusual stresses that might have impacted the air

23  conditioning system or any of the joints or anything?

24  **A.**   That unit was sitting out there on relatively level land.

25  It was not rutted or anything right around it.  It was in a

1   pretty good location.

2   **Q.**   Okay.  And it got out there in about February of 2008;

3   correct?

4   **A.**   Say again?  I'm sorry?

5   **Q.**   February of '08 is when it was delivered to Lottie?

6   **A.**   Okay.

7   **Q.**   Okay.  And you guys saw it in May of '09?

8   **A.**   That is correct.

9   **Q.**   Where is Lottie exactly?  Isn't it about 20, 30 miles west

10  of Baton Rouge?

11  **A.**   It's about five miles from Livonia.

12  **Q.**   In relation to Baton Rouge.

13  **A.**   Okay.  It's about 25 miles west of Baton Rouge.

14  **Q.**   I do everything from Buras.  It's a long way from Buras to

15  everywhere.

16          It is west of Baton Rouge, isn't it?

17  **A.**   It is about 25, maybe 30 miles west of Baton Rouge.

18  **Q.**   Sir, do you know of any maintenance that was done on that

19  travel trailer out there when it was sitting in that field for

20  that year and three months?

21  **A.**   I have no knowledge of any maintenance that was done to

22  that trailer.

23  **Q.**   But you are from Louisiana, and you do remember Hurricane

24  Gustav going through that area, don't you?

25  **A.**   Yes, I do.

```
 1   Q.    That was in September of 2008?
 2   A.    That is correct.
 3   Q.    Do you remember it beat up Baton Rouge pretty bad?  They
 4   had 90-mile-an-hour gusts there, a lot of trees down?
 5   A.    That is correct.
 6   Q.    And the eye of the storm was actually closer to Lottie
 7   where Gustav went through, because Lottie was west of Baton
 8   Rouge; correct?
 9   A.    The eye pretty much went over Carencro, Louisiana, where
10   my son lives, just north Lafayette.  But we didn't receive
11   nearly the damage that Baton Rouge received.
12   Q.    Because it was on the east side?
13   A.    It was on the east side.
14   Q.    As was Lottie?
15   A.    As was Lottie.
16   Q.    Isn't it at least possible, since we always hear that when
17   a hurricane comes through you shouldn't be in a travel trailer,
18   that in addition to the lack of maintenance, that the stresses
19   from that hurricane could have had an effect on the roof and
20   the side walls of that unit and allowed water penetration?
21   A.    Without knowing the wind speeds and everything of the
22   storm -- because you're already some 35, 40 miles from the
23   Gulf, and the storm's decreasing -- I don't know --
24   Q.    So you can't answer that question?
25   A.    I can't answer your question.  That would take an area of
```

 1  expertise that I'm not there yet.  I'm the air conditioning
 2  guy.
 3  Q.   Yes, sir.  You're the HVAC guy.  I've got one you can fix
 4  when we're done.
 5          Did you find or do you fault FEMA for a lack of
 6  preventative maintenance on this trailer?
 7  A.   Sir, I could fault FEMA for a lot of things.  But here
 8  again, I think you're getting into an area away from what I was
 9  looking at that I don't know if I deserve to give you --
10  Q.   Here's what I'm asking:  Didn't you take notes that
11  mentioned the preventative maintenance, and that there had been
12  no preventative maintenance done?  Do you recall taking those
13  notes in connection --
14  A.   I have those notes, yes.
15  Q.   And you know FEMA owned that travel trailer?
16  A.   That is correct.
17  Q.   And was the landlord.  And their job was to come out and
18  fix that roof if it leaked?
19  A.   That is correct.
20  Q.   Now, is it -- is it your theory that when you run the air
21  conditioner in this travel trailer, that it can drive the
22  formaldehyde levels up from when you walk in that door the
23  first time?  Isn't that kind of what you're trying to tell this
24  jury?
25  A.   I'm trying to tell this jury that there's negative air

1    pressure.  And many contaminants that are in that cavity is

2    going to come with it.  And if you have a gas that's in that

3    cavity, be it whatever, that air flow is going to bring it in

4    there.

5    **Q.**   Are you aware --

6    **A.**   Now, I'm not qualified to tell you about what is going to

7    be the levels.  I don't know formaldehyde.  I know air

8    conditioning units.  I know negative and positive pressures in

9    buildings.

10   **Q.**   Okay.  So you're not aware of any studies that show that

11   running the air conditioner drives the formaldehyde levels up?

12   **A.**   I've seen those studies, but I don't have experience with

13   it to be able to expound on it.

14   **Q.**   That they drive it up?

15   **A.**   I've seen studies.  I don't -- I'm looking at the air

16   conditioning system.  I would like to stay away from

17   formaldehyde.  I am not an expert in that area.

18   **Q.**   And you're not an expert in the impact of the HVAC system

19   on the release of formaldehyde; right?

20   **A.**   No.  I don't do that every day.

21            **MR. SCANDURRO:**  Pass the witness, Your Honor.

22            Excuse me, one second.  One more, Your Honor,

23   thank you.

24            **THE COURT:**  All right.  Go ahead.

25

1    **BY MR. SCANDURRO**

2    **Q.**   Do you have any knowledge of Ms. Alexander's ventilation

3    practices while she lived in the unit?

4    **A.**   I've seen -- I've seen that she would cook in there and

5    operate systems.  But exactly how she did it, I don't --

6    **Q.**   What about the bath vent?  Aren't you aware that she left

7    the bath vent open most of the time?

8    **A.**   No, I'm not aware of that.

9    **Q.**   Wouldn't that defeat the negative pressure condition if

10   she left the vent open all the time?

11   **A.**   If it were -- when it's opened, yes.  When it's closed,

12   no.

13              **MR. SCANDURRO:**  Thank you very much.

14              **THE COURT:**  All right.  Any questions from Fluor?

15              **MR. SHERBURNE:**  Yes, Your Honor.

16              **THE COURT:**  Mr. Sherburne.

17                        **CROSS-EXAMINATION**

18   **BY MR. SHERBURNE**

19   **Q.**   Mr. Ritter, I want to make sure I understand what you're

20   telling us.  You believe that with this recirculating system

21   running, it created negative pressure inside the trailer?

22   **A.**   That is correct.

23   **Q.**   And the basis of your belief that it created negative

24   pressure inside the trailer is because you believed the ducts

25   were leaking?

1  **A.**    That is correct.

2  **Q.**    And you believe the ducts were leaking because of that

3  pretty orange picture and the condensation you saw on the

4  grill?

5  **A.**    That is correct.

6  **Q.**    And you saw the condensation on the grill after it had

7  been sitting in the field in Lottie for 18 months with no

8  maintenance?

9  **A.**    That's correct.  And add to that the measurement of the

10  pressure differentials with the manometer.

11  **Q.**    Okay.  We'll get there in a second.  And as far as you

12  know, that was the first time in 18 months the air conditioner

13  in that unit had been run?

14  **A.**    That is correct.

15  **Q.**    And that pretty orange picture was taken after it had been

16  sitting in the field in Lottie for 18 months with no

17  maintenance?

18  **A.**    That is correct.

19  **Q.**    With field mice and snakes and birds and whatever could

20  get in there crawling in there?

21  **A.**    There's a possibility of that, yes.

22              **MR. SHERBURNE:**  Thank you, sir.

23              **THE COURT:**  All right.  Redirect?

24              **MR WATTS:**  Thank you, Your Honor.

25                      May I approach?

1          THE COURT:  Yes, sir.

2                  REDIRECT EXAMINATION

3    BY MR WATTS

4    Q.   Lottie, Louisiana.  I know exactly where it is because I

5    got a ticket on the way out to go see this trailer.

6    A.   I bet it was in Livonia too.

7    Q.   Some sign that said slow down hid itself from me, I guess.

8             I want to give the jury a picture of what we have out

9    there.  It is somebody's ranch or farm with thousands of these

10   trailers; fair?

11   A.   That is correct.

12   Q.   They are stored one after the other in rows that go on, it

13   seems like as far as the eye can see; is that right?

14   A.   That is correct.

15   Q.   In terms of the Alexander trailer when you went there, it

16   was stored right next to other trailers that were on both sides

17   of it?

18   A.   It was sandwiched within two to three feet of trailers.

19   Q.   And when you were doing your inspection, you could walk

20   along the length on the left and the right side?

21   A.   That's right.

22   Q.   About how much space was separating the right side of the

23   Alexander trailer with the left side of the one next to it?

24   A.   Two people couldn't pass each other.

25   Q.   So they're literally stacked up like dominoes for a long

1   way?

2   **A.**   That is correct.

3   **Q.**   Now, if Hurricane Gustav was so fearsome that it was going

4   to cause all this damage, did you see any evidence on either

5   the left side or the right side of the trailer that its sister

6   trailer right next to it got pushed into it because there was

7   this massive hurricane?

8   **A.**   No, I did not.

9   **Q.**   Do you see any evidence whatsoever of any tree limbs, or

10  anything like that, that fell on these trailers that were

11  insulated from the wind by being stacked up so close to each

12  other?

13  **A.**   No, I did not.

14          **MR. SCANDURRO:**  Your Honor, I'd ask Mr. Watts not to

15  be a meteorologist, please.

16          **THE COURT:**  My greater concern is the one expressed

17  earlier of not making statements, and then getting the witness

18  to agree or disagree, particularly if it's something he doesn't

19  know himself.  Because then you're putting the information out

20  there.

21          So let's just ask him questions.

22  **BY MR WATTS**

23  **Q.**   You lived in the area where Hurricane Gustav happened?

24  **A.**   That is correct.

25  **Q.**   Did you go out and inspect this trailer where it's

1  presently at?

2  **A.**   Yes, I did.

3  **Q.**   And did you see any evidence whatsoever of any impact

4  damage from a hurricane or anything else?

5  **A.**   No, I did not.

6  **Q.**   Counsel asked you about you saw this insulation after it

7  had been stored out there for a year and three months.

8         If Alana Alexander testifies that she saw

9  condensation around that vent when she turned the AC on, would

10  that be consistent with the negative air condition?

11  **A.**   Yes, it would be.

12  **Q.**   The restaurant example, we've all been leaked on -- let's

13  use this air conditioner as an example.  Can you tell right

14  now, just looking around, whether the air that is freezing us

15  all is coming from the outside, or is it recirculated air?

16  **A.**   For this building, the design for a commercial building,

17  according to the ATSDR standards would call for recirculating a

18  certain amount of air, and a certain percentage of outside air

19  coming through the air conditioning unit to replace and flush

20  out and ventilate.

21  **Q.**   Is that in contrast to the system that we have there,

22  which doesn't pull anything from the outside?

23  **A.**   It is.

24  **Q.**   Counsel asked you about this warranty on the AC system.

25  Are you claiming there's a thing wrong with this air

1  conditioner?

2  **A.**   I'm not claiming there's nothing wrong with the unit.  I'm

3  saying that when we started the unit up, it ran.  And there was

4  no reason to believe there was a warranty problem with the

5  unit.

6  **Q.**   Okay.  The air conditioning system itself is not the

7  problem?

8  **A.**   That is correct.

9  **Q.**   The air conditioner works?

10  **A.**   The air conditioner works.

11  **Q.**   But do the ducts leak?

12  **A.**   The ducts leak, and there's no recirculation.  There's no

13  provisions for outside air to come in through that unit.

14  **Q.**   And when the ducts leak and there's no provision for

15  outside air to come in, does that elevate moisture and

16  temperature?

17  **A.**   That's going to elevate the moisture, and then you have a

18  negative pressure.

19  **Q.**   And if you elevate the moisture and temperature, we can

20  rely upon some other witness to tell us what the consequence of

21  that is.  That's where you stop?

22  **A.**   That's where I want to stop.

23          **MR WATTS:**  That's where I'm going to stop too.  Thank

24  you.

25          **THE COURT:**  Thank you sir.  You may step down.

1          **THE WITNESS:**  Thank you, Your Honor.

2          **THE COURT:**  All right.  You're free to leave, sir.

3          **MR WATTS:**  We call Dan Shea by -- through his

4    videotaped deposition.

5          **THE COURT:**  Videotaped deposition of Dan Shea.

6          **MR WATTS:**  Which I am proud to say has been cut from

7    3 hours and 10 minutes to 52 minutes.

8          **THE COURT:**  Okay.

9          **MR WATTS:**  54 minutes, he says.

10         **THE COURT:**  54?  Okay.  We'll watch this and then

11   we'll go ahead and take a break.  So that should bring us right

12   up to around 3:00 then.

13         (WHEREUPON, the videotaped deposition of **Daniel G.**

14   **Shea** was played.)

15                          **EXAMINATION**

16   **Q.**   What is your name, sir?

17   **A.**   Daniel G. Shea.

18   **Q.**   What is your position within Gulf Stream Coach?

19   **A.**   I am a co-president of Gulf Stream Coach.

20   **Q.**   What particular division are you president of?

21   **A.**   I'm president of the towable division.

22   **Q.**   Who do you report to?

23   **A.**   I report to Jim Shea and the board of directors.

24   **Q.**   Who are the board of directors?

25   **A.**   The board of directors of Gulf Stream Coach are James

1   Shea, Brian Shea, and Dan Shea.

2   **Q.**   Back in 2004, Gulf Stream Coach manufactured 7,000

3   trailers that ultimately were sold through dealers to FEMA?

4   **A.**   Yes, I -- I believe that's correct.  Gulf Stream had an

5   order for 7,000 over the course of that four months.

6   **Q.**   7,000 trailers in a four-month period in four plants.  Is

7   that a -- is that usual in your company, to be able to build

8   that many trailers in that short a time frame?

9   **A.**   It was something that -- it would have been the first time

10  that we had done so many travel trailers in that period of

11  time.

12  **Q.**   Do you know what a packing slip is, in general?

13  **A.**   It would be something that would come with the -- I'm not

14  sure how all the exact paperwork works when we receive

15  something.

16  **Q.**   You're not?  You don't know that?

17  **A.**   No.  I don't know the various products and what paperwork

18  might come and what the procedures are.  I'm not familiar with

19  all that.

20  **Q.**   Let me show you what a packing slip is.  GULFSTREAM 4044,

21  your Exhibit 1 to your deposition.  What does it say at the

22  top?

23  **A.**   It says, "packing slip."

24  **Q.**   Okay.  Do you see at the bottom somebody has stamped,

25  "received"?

1    A.    Yes, I do.

2    Q.    So would you put two and two together and understand that

3    that was a document that comes along with a shipment and

4    somebody from Gulf Stream, quote, received it?

5    A.    That would appear to be, in this case, that this -- you

6    know, I can't say for sure that this came along with a product,

7    but I'd have no reason to -- to question that.

8    Q.    Right.  And do you see the rest of the description of the

9    product being delivered?

10   A.    Yes, I do.

11   Q.    Read it to us.  Read the first one.

12   A.    It says, "lauan."

13   Q.    What is "lauan"?

14   A.    It's hard -- like a hardwood plywood.

15   Q.    Used for what?

16   A.    It's used for interior panelings.

17   Q.    In trailers?

18   A.    Yes.

19   Q.    It's used in FEMA trailers?

20   A.    Yes.

21   Q.    Okay.  Keep -- keep on with the description.

22   A.    It says "reg."

23   Q.    What's that mean?

24   A.    Well, it's my understanding now that that "reg" means that

25   the material wasn't necessarily certified to the HUD standard.

1   **Q.**   Now, if that particular product that's described in
2   Exhibit 1 to your deposition -- if that type of product went
3   into one of your trailers that was sold to the United States
4   Government, that would be contrary to your low formaldehyde
5   emitting policy; isn't that true?
6   **A.**   We had a policy to buy LFE products and products that met
7   the HUD -- HUD emission level for those products.  We did have
8   a policy for that.
9          I'm not sure, when I look at this invoice -- like I
10  say, you know, I see the term "reg," that I've become familiar
11  with over the last couple years that Adorn uses.  And I'm not
12  sure whether, when it says "reg," whether that product would
13  have been below the HUD emission requirement.
14         It is my understanding that it's not necessary --
15  it's not certified to be below that level.  But whether it is
16  or not, I would not know.
17  **Q.**   Your policy is to use -- is to specify HUD-certified wood
18  components.  Isn't that the policy?
19  **A.**   Policies that meet the HUD product emissions requirements.
20  **Q.**   Right.  And if that wood that's described in Exhibit 1 did
21  not meet the HUD requirements, then obviously your policy was
22  violated; true?
23  **A.**   If this did not meet the HUD requirement, it would not be
24  within what we -- our policy would have requested or required.
25  **Q.**   And whose fault would that be?

1    **A.**    Whose fault would it be?

2    **Q.**    Whose mistake was it?

3    **A.**    Well, the vendor in this case, Adorn, was well aware of

4    our LFE policy.

5    **Q.**    So it was Adorn's fault?

6    **A.**    If the material would not meet the LFE requirement, it

7    would be Adorn's fault.

8    **Q.**    And your testimony is, is that for the first time ever you

9    learned what that designation "reg" means in March of 2006?

10   **A.**    I had learned sometime in March or April of 2006 that

11   Adorn has this term "reg" that meant that the product didn't

12   necessarily meet the HUD requirement.

13   **Q.**    How did you learn that?

14   **A.**    I was at one of our manufacturing facilities, and I was

15   walking down the line with our production manager, Jeff

16   Zumbrun.

17   **Q.**    Which plant?

18   **A.**    That would have been our Plant 57 -- or, I'm sorry, it

19   would have been Plant 75, in Etna Green.  And we were walking

20   through that plant, and it was just toward the end of building

21   the FEMA units, and we were looking at starting our fifth-wheel

22   production in there.

23           And as that meeting was done, I started looking at

24   all the different wood products with Jeff and --

25   **Q.**    Jeff Zumbrun?

1    **A.**    With Jeff Zumbrun.  And we looked at a number of the wood

2    products that were in the plant, and we were reading the -- the

3    labels --

4    **Q.**    Why?

5    **A.**    -- on the side.

6           This -- this was either a week or a week and a half

7    after this concern had come up.

8    **Q.**    After you had gotten complaints of people being exposed to

9    formaldehyde in these trailers you had sold to the government?

10   **A.**    It was -- I believe there was a news report with

11   Mr. Stewart the week before.  And we were in the plant, and I

12   was asking -- we were looking at all the wood products.  And we

13   had walked the line and looked at a number of the different

14   labels that were on the wood products, and there were several

15   different manufactures of these products that we had wood there

16   for.  And I was trying to look at the labels to see what the

17   labels had said relative to this.

18          And some companies, it would say "LFE" on the label.

19   Some might not say LFE, but somewhere it might say, "This meets

20   the HUD requirement."

21   **Q.**    All right.

22   **A.**    Others, there was nothing in the label that said one way

23   or the other.  But there was a part number, and in that part

24   number it had an "LE."  So -- and then we ran across this one

25   from Adorn, and we really didn't see one thing -- one way or

1    the other whether it was LE or LFE.

2            And I asked Jeff what he knew about this, and he

3    wasn't sure.

4    **Q.**   He was the purchasing manager for the --

5    **A.**   He was the purchasing manager.  And this term "reg" he

6    wasn't familiar with.

7    **Q.**   Uh-huh.

8    **A.**   And we looked at it, and then he contacted Adorn and later

9    reported back to me that this "reg" meant that it didn't

10   necessarily meet that HUD emission requirement.

11   **Q.**   And that's how you learned what "reg" means?

12   **A.**   Yes.

13   **Q.**   You just so happened to be -- you had in the back of your

14   mind this news story where somebody was complaining, or

15   alleging formaldehyde exposure.  So you're walking through the

16   plant looking at the wood to see if you could figure out what

17   was going on?

18   **A.**   Yeah.

19   **Q.**   And you saw this term "reg," and you didn't know what it

20   meant.

21   **A.**   Uh-huh.

22   **Q.**   And the purchasing manager for the entire Gulf Stream

23   towables didn't know what it meant; right?

24   **A.**   That's my recollection.

25   **Q.**   He was unsure; right?

1   A.   That's my recollection, yes.

2   Q.   And prior to that time, no one had actually looked at the

3   labels just to confirm that, in fact, you were receiving LFE

4   woods; is that what you're telling me?

5   A.   I don't think I said that.

6   Q.   Well, had, prior to that time, anyone bothered to even

7   look at the labels to make sure that you were following your

8   own policy?

9   A.   I -- I'm not sure of that.

10   Q.   What did he learn from Adorn?

11   A.   He had learned that they had made a mistake on this, and

12   that -- he had advised me that 5 percent of the product came

13   from Adorn.  And that -- I had been told by Jeff this concept

14   that he had talked to several people and that, number one, was

15   that the majority of the industry used this product that was

16   not LFE; that there were only a few companies that used, at

17   that time, products that were LFE, and that we were one of the

18   few -- one of a few companies that required this LFE.

19          And that -- also, he advised me that he had been told

20   that, just because something isn't necessarily -- isn't

21   necessarily stamped that it's LFE, it may be LFE.  There's

22   situations where a mill will run LFE and put -- not necessarily

23   put the LFE stamp on it.

24   Q.   What else did you learn from Adorn through Jeff?

25   A.   That's what I recall right now.

1   **Q.**   Okay.  Now, did you determine that other wood products

2   from other vendors were also not HUD certified?

3   **A.**   Yes, that did come up.  That did come up later.

4   **Q.**   Who did that?

5   **A.**   I think Jim had those conversations.

6   **Q.**   Jim Shea?

7   **A.**   Yeah.

8   **Q.**   Your brother?

9   **A.**   Yeah.

10  **Q.**   What did he learn?

11  **A.**   He learned from Samling and Weyerhaeuser that there was

12  some product that, it was my understanding, that was certified

13  to the HUD standard and some that was not certified to the HUD

14  standard.

15  **Q.**   In what percentages?

16  **A.**   You know, I don't recall the specific percentages.

17  **Q.**   Approximate?

18  **A.**   I think it was probably two-thirds or more -- or wait a

19  minute.  I would -- my recollection is that it was probably

20  approximately a third had -- they were indicating to us -- were

21  HUD certified, and about two-thirds, perhaps, were not.

22  **Q.**   Okay.  And Weyerhaeuser and Samling, you said?

23  **A.**   Yes.

24  **Q.**   They provided the roof underlayment?

25  **A.**   Yes.

1  **Q.**  Did they provide any decorative hardwood plywood panels on

2  the inside?

3  **A.**  Not to my knowledge.

4  **Q.**  Did they provide any of the subflooring?

5  **A.**  Samling I don't think did.  I'm pretty sure they didn't.

6  I know that -- again, of course, we're talking 2005, now, not

7  2004, right?

8  **Q.**  Correct.

9  **A.**  That's -- all these conversations we've been having were

10  2005.

11  **Q.**  You realize that you've sent letters to the United States

12  Government affirming the types of products you use in your

13  trailers?

14  **A.**  We've sent letters to the government.

15  **Q.**  Show me the letter where you told the government that

16  15 percent of the products you put from Adorn into your

17  trailers were not HUD certified.

18  **A.**  I did have a conversation with Steve Miller --

19  **Q.**  I didn't ask that.

20  **A.**  -- regarding that.

21  **Q.**  When?

22  **A.**  In -- it would have been April or May of 2007.

23  **Q.**  After you were sued?

24  **A.**  It was -- it would have been after we had done this

25  further look into the amount of material that came from various

1   companies.

2   **Q.**   Can you tell me any -- show me any letter where you sent

3   to correct your prior letters and e-mails?

4   **A.**   No.  It was a discussion we had had.

5   **Q.**   Now, who within your company would know the exact

6   percentage of roof underlayment that was put in these 2005

7   trailers that was not HUD certified?

8   **A.**   You know, I'm not sure.  I think that -- as far as what

9   Weyerhaeuser and Samling provided us, they would probably be

10  the best to ask.  And I'm not sure what other materials -- what

11  other companies may have supplied roof decking in addition to

12  Weyerhaeuser and Samling.

13  **Q.**   Can you point me to a letter where you told the government

14  that two-thirds -- at least with regard to those two suppliers,

15  two-thirds of the product they supplied were not HUD certified?

16  **A.**   Like I say, that was something that was discovered in

17  August or September of 2007, and I'm not familiar with a

18  letter.

19  **Q.**   So you didn't write a letter?

20  **A.**   No.

21  **Q.**   You never told FEMA that -- that these trailers should not

22  be lived in for more than a year, did you?

23  **A.**   Prior to 2004?

24  **Q.**   Or any time.

25  **A.**   Well, prior to 2004, we had very little contact directly

1   with FEMA.  They primarily worked with our contractors.

2            But I don't -- I am not aware of any discussions with

3   our people as to how long people would live in the trailers.

4   **Q.**   You -- you -- you have not told FEMA, "Hey, I

5   recommended" -- I'm talking about -- when I say "you," I mean

6   Gulf Stream.

7   **A.**   Uh-huh.

8   **Q.**   Gulf Stream hasn't told FEMA, "We do not recommend someone

9   living in our trailer more than a year," have you?

10  **A.**   No.

11  **Q.**   When you provided the trailer, either through Best Buy in

12  2004, or directly to FEMA in 2005, you did not warn or advise

13  FEMA that residents should not stay in them longer than a year,

14  did you?

15  **A.**   No, we did not.

16  **Q.**   And sitting here today, you don't think there's a problem

17  with staying in the trailer longer than a year, do you?

18  **A.**   No, I -- I do not.  You know, certainly, the number of

19  people -- the fewer the people would be better in a limited

20  space.  But to my knowledge, there wouldn't be a problem,

21  certainly, with one or two.  The fewer the better, as far as

22  staying a longer time in a trailer.

23  **Q.**   Who would have placed this warning on the jack?

24  **A.**   I don't have any way to know that.

25  **Q.**   So you're saying that that warning on the jack was either

```
 1    sold to Gulf Stream in that way --
 2  A.    Uh-huh.
 3  Q.    -- with a warning on it already?  Yes?
 4  A.    That would -- I said I -- I don't believe that we would
 5  have put it on there.  It would have either come in from the
 6  jack supplier with that warning on there, or it could have been
 7  added sometime after it left Gulf Stream's possession.
 8  Q.    Well, who would have put the -- you said that, and I heard
 9  you say that.  But who would be placing a warning on the jack,
10  or do you --
11  A.    You know, I don't know.
12  Q.    But you've seen these --
13  A.    I --
14  Q.    You've seen these warnings before?
15  A.    I have seen warnings on jacks.  I don't recall seeing this
16  one.  I don't know if this has been blown up or how big this
17  warning is.  But my recollection is they are generally
18  something small.  I'm not sure -- I don't recall what the
19  verbiage is.  I'm not sure the last time I read one.  But
20  usually you wouldn't see something this large on a jack that's
21  fairly small.
22  Q.    I don't see well, and I thought maybe the witness wouldn't
23  see well, so I had it blown up.  But --
24  A.    Oh, okay.
25  Q.    -- can you read that first paragraph for me?
```

1  A.   Yes.  It says:  "Do not use the scissor jack to lift
2  excessive weight or lift tires off of the ground.  Vehicle
3  frame and doorjamb damage may result."
4  Q.   Now, has anyone at Gulf Stream done any analysis, that
5  you're aware of, that revealed that if you jack the trailer up
6  off of its wheels that you could have problems with the frame?
7  A.   I'm not aware of that.
8  Q.   But it is -- as a general statement, distortion of the
9  frame is not good for the trailer?
10  A.   I -- I would agree with that.
11  Q.   It can cause doors not to close properly?
12  A.   I would say that's a possibility.
13  Q.   It could cause floors to buckle?
14  A.   Again, depending on how much damaged the frame was and how
15  bad it was.
16  Q.   Yes.  And you could say that on everything.  But I'm just
17  saying, as a general statement, it could cause floors to
18  buckle?
19  A.   It could.
20  Q.   It could cause windows not to seal properly?
21  A.   Possibly.
22  Q.   It could cause ducts to leak?
23  A.   The air ducts?
24  Q.   Uh-huh.
25  A.   You know, again, depending on how much damage was done

1  and -- possibly.

2  **Q.**   It could cause water -- it could cause water intrusion.

3  It could --

4  **A.**   Again, depending on how much damage was done, possibly.

5  **Q.**   Exhibit 3 is a document Bates stamped FL-FCA-66.  And it's

6  an attachment A, dealing with the installation of temporary

7  mobile structures.

8         Now, sir, under Paragraph 2.9.1, I've highlighted a

9  note.  Can you read that to us and tell me if you were ever --

10  your company was ever consulted?

11  **A.**   Okay.  You wanted me to read 2.9, No. 1, just the

12  highlighted part?

13  **Q.**   Just the highlighted part.

14  **A.**   It says:  "Note:  The exhibits that are provided are an

15  example of installation requirements.  Manufacturer

16  recommendations should be followed whenever possible."

17  **Q.**   Okay.  Now, did anyone from Fluor come to you, Gulf

18  Stream, and ask for your manufacturer's recommendations as to

19  the proper way to jack or block a trailer?

20  **A.**   Not to my knowledge.

21  **Q.**   Okay.  Let me see this document.

22         2.9.2:  "The contractor shall be responsible for

23  meeting manufacturer-recommended installation specifications."

24  It certainly wouldn't have been something you could have just

25  off-the-cuff provided.  You would have had to do a detailed

1  analysis?

2  A.   I would say that we would have needed quite a bit of

3  information to be able to make a recommendation with all the

4  variations that I discussed.

5  Q.   Look at -- this is a drawing from Fluor Corporation, Bates

6  stamp 1438, which is Page 2 of Exhibit 3.

7       The highlighted portion there, can you read that to

8  me?  And then I want to ask you about it.

9  A.   You're talking about all three of these highlighted?

10 Q.   Yes, please.

11 A.   "Travel trailer tires must remain inflated and in contact

12 with the ground.  Blocks may be placed under the tires to

13 maintain ground contact."

14 Q.   Okay.  Now, did you realize that that -- first of all, did

15 you provide that guidance -- Gulf Stream provide that guidance

16 to Fluor?

17 A.   No, not to my knowledge.

18 Q.   Obviously, if I were to tell you that Ms. Alexander's

19 trailer was installed such that the wheels were just hanging

20 there, would you agree with me that that would be contrary to

21 the statement you just read?

22 A.   Yes.  This says that the tires should maintain ground

23 contact.

24 Q.   All right.  Let me show you Exhibit 4, GULFSTREAM 4466.

25 This is an e-mail you sent on March 17th of 2006, after you

1   were aware that there was some issue or some complaints being

2   made about inner ambient air quality in your trailers.

3           Do you remember sending that e-mail to Mr. Miller?

4   **A.**   Yes, I do.

5   **Q.**   Now, did you already admit to me, so we can move on, that

6   that e-mail is not true?

7   **A.**   It is what I was told by our purchasing people to be true

8   when I sent it.

9   **Q.**   But you realize it's not true now?

10  **A.**   Well, later, we learned that the material, some of this

11  lauan panel, may or may not meet the HUD standard.

12  **Q.**   This is where you told Mr. Miller that Gulf Stream is one

13  of the leaders in reducing formaldehyde emission in

14  recreational vehicles.

15  **A.**   Uh-huh.

16  **Q.**   Right?

17  **A.**   Yes.

18  **Q.**   And now you will admit that this e-mail is not true, won't

19  you?

20  **A.**   It's my understanding at this point, three-some years

21  later, that one of the four categories here there would be some

22  question as to 15 percent of that material and as to whether it

23  met the HUD requirement or not.

24  **Q.**   So today you would not send that same e-mail, would you?

25  **A.**   No, I would not.

1  **Q.**   Why did Steve Miller -- I mean, obviously you were talking

2  to Steve Miller; right?

3  **A.**   Yes.

4  **Q.**   Did you ask him to keep you updated as to what's going on?

5  **A.**   I told Steve that we would like to help in any way that we

6  can with complaints on any issue, formaldehyde or whatever

7  their concerns were, and that we were a very responsive

8  company, and that we knew FEMA had a big task and that we would

9  be willing to do whatever we could to assist them.

10 **Q.**   Uh-huh.  If someone within FEMA said that, "We need to

11 take a proactive approach.  The implications are much too large

12 to not take immediate steps to assure the safety of our units."

13         Was that -- did you agree with that statement?

14 **A.**   Can I see that?

15 **Q.**   Do you agree with that?  Or at the time did you agree that

16 that -- with that proactive approach?

17 **A.**   Well, I think we certainly had a proactive approach with

18 FEMA on any issue that was out there, including this issue.  We

19 had contacted FEMA and advised them that we would like to

20 assist any customers that had complaints, and we would like to

21 do what we could to assist FEMA in resolving an occupant's

22 complaint.

23 **Q.**   All right.  As you're doing that -- we talked about this

24 e-mail you sent to Stephen Miller talking about how you used LE

25 materials.  Do you remember that?

```
 1    A.    Uh-huh.
 2    Q.    And Stephen Miller's response was, "Can you test these --
 3    these trailers?"
 4    A.    Uh-huh.
 5    Q.    Right?
 6    A.    Uh-huh.
 7    Q.    I need you to answer verbally.  His response was, "Could
 8    you test these trailers?"  Correct?
 9    A.    His response is right here; right?
10    Q.    Yes.
11    A.    He says, "Does your field staff have the capability to put
12    this to bed?"
13    Q.    Right.  What did you understand him to mean when he asked
14    you that?
15    A.    "Does your field staff have the capability to put this to
16    bed?"  I guess I thought it was a question.  He was asking if
17    our field staff could test the trailers.
18    Q.    Okay.  And you told him that you were going to send
19    someone down Friday to test trailers, didn't you?
20    A.    Yes, that's my recollection.
21    Q.    And that's in Exhibit 8, which is GULFSTREAM 4472.  On
22    March 21st, you told Stephen Miller, who was your contact from
23    FEMA, that you were going to send somebody down to test
24    trailers on Friday, didn't you?
25    A.    Yes.
```

1    **Q.**   Now, you didn't do that, did you?

2    **A.**   No.  Like we had talked earlier, that was -- I didn't have

3    an understanding of what would be involved in doing a test at

4    the time.  I was a little naive to think that we could send

5    someone down there with three days' notice to do a formaldehyde

6    test; that's something that's very complicated.

7              And we thought we had obtained one of these correct

8    read formaldehyde instruments to do that on short notice, and

9    that didn't turn out to be the case.

10             And it's my recollection that I talked to Steve

11   Miller later in the week and advised him that our guy wasn't

12   going to be able to be down there on Friday.

13   **Q.**   Show me the e-mail where you showed him that -- that,

14   "Well, we just don't have the capability to do a test."

15   **A.**   Most of my contacts with Steve were by cell phone, so...

16   **Q.**   I didn't ask that.  Show me the e-mail.

17   **A.**   I don't -- I don't know of an e-mail.

18   **Q.**   Okay.  So you told him, in response to his e-mail, "Can

19   you put this bed?" you said, "We're going to send somebody down

20   Friday to test the units."  But there's never an e-mail that

21   says, "We're not going to be able to test the units," as far as

22   you know?

23   **A.**   As far as I know, yes.

24   **Q.**   When did you obtain the Formaldemeter 400?

25   **A.**   It's my recollection that it would have been late the

1   following week, probably.  The 29th or -- 28th, 29th, 30th,

2   sometime that following week, in March.

3   **Q.**   That's when you rented the Formaldemeter?

4   **A.**   Yes.

5   **Q.**   How many did you rent?

6   **A.**   We rented one.

7   **Q.**   Okay.  And when you rented it, did you read the

8   instructions?

9   **A.**   I don't recall reading the instructions.

10  **Q.**   Did -- did you tell Scott Pullin to read the instructions?

11  **A.**   I don't know that I specifically told Scott Pullin to read

12  the instructions.

13  **Q.**   Did he, once -- at some point when he received -- when you

14  guys received the Formaldemeter 400, did you determine that you

15  could not do a test?

16  **A.**   It was our understanding that this is a screening tool.

17  And as far as a test, Scott was going to go down to Baton Rouge

18  and talk to residents and see if there were concerns and try to

19  gather as much information as we could.

20         Whether you would call that a test -- you know,

21  obviously, now, knowing what a formaldehyde test involves, I

22  would say no, that wasn't a test.

23  **Q.**   Once you had obtained the Formaldemeter 400 --

24  **A.**   Uh-huh.

25  **Q.**   -- did you realize that you could not do a, quote, test?

 1   A.   I'm not certain.  We got this device and we were trying to

 2   learn as much as we could about formaldehyde and complaints

 3   that we might have.  And we sent Scott down there to talk to

 4   people and see what he could learn about formaldehyde.

 5   Q.   So you had the Formaldemeter 400 before Scott actually got

 6   on a plane and went down to Louisiana?

 7   A.   It's my recollection he took it down with him.

 8   Q.   Now, when you received Scott's results -- Scott Pullin's

 9   results from his screening --

10   A.   Uh-huh.

11   Q.   -- or informal testing --

12   A.   Uh-huh.

13   Q.   -- you've called it that, too, have you not, your company?

14   A.   I think we called the whole process informal testing.

15   Q.   Yeah.  It's been called screening and informal testing,

16   what Scott did in that spring of 2006; true?

17   A.   Uh-huh.

18   Q.   True?

19   A.   Yes.

20   Q.   On March 21st, 2006, again, Mr. Miller forwarded you a

21   series of e-mails.

22          We've already marked this as Exhibit 5.  One

23   interesting portion of this document is an e-mail from a woman

24   named Mary Martinet.  She's a lawyer?

25   A.   Uh-huh.

```
 1   Q.   He was forwarding you e-mails that were between lawyers
 2   and others within FEMA; isn't that true?
 3   A.   If Mary Martinet is the lawyer, that would be true.
 4   Q.   Well, it says, "field attorney."  Do you see that at the
 5   bottom of the page?  Her title is field attorney.
 6   A.   Uh-huh.
 7   Q.   Yes?
 8   A.   Yes.
 9   Q.   So Mr. Miller was forwarding you internal communications
10   between FEMA and FEMA's lawyers; right?
11   A.   Yes, apparently.  I don't know if he was -- you know, like
12   I say, you get an e-mail and you don't necessarily look back at
13   all the 20-some history of it.
14   Q.   Right.
15   A.   I don't recall if I read that at the time or not.
16   Q.   Yes.  Look where your finger is there.  What does she say?
17   A.   "Dave, haven't we had these kinds of problems in the past?
18   Aren't there instructions to air out the units before
19   occupancy?"
20   Q.   Can you help me answer both of those questions?  Hadn't
21   there been problems with this issue in the past?
22   A.   Not to -- not to my knowledge in travel trailers.
23   Q.   And the second question about airing out the unit before
24   it's occupied, is that an instruction that Gulf Stream would
25   provide to FEMA or anyone who purchases a trailer?
```

1   A.   Well, I believe in some meetings we had with some people

2   at FEMA, we were told that the contractors were airing out --

3   Q.   When?

4   A.   -- units before occupants moved in.

5   Q.   When were you told this?

6   A.   In April or May of 2006.

7   Q.   So after this issue had arisen?

8   A.   Correct.

9   Q.   It wasn't part of the instructions that went along with

10  the unit?

11  A.   Not from our company.

12  Q.   It wasn't something your company told FEMA when it sold

13  the trailers?

14  A.   No, not to my knowledge.

15  Q.   Do you remember how many complaints you received once this

16  issue arose in the spring of '06?

17  A.   Yes.  I recall some of the occupants.

18  Q.   Can you give me a number?

19  A.   I think there was one or two in March.  It would be one or

20  two in April.  Of course, we were very proactive --

21  Q.   Of course.

22  A.   -- in trying to find out if there were people.  As a

23  matter of fact, we had called FEMA at one point, I think I had

24  mentioned, and asked, "Hey, is there anybody that you know of

25  in one of our trailers that we could provide assistance to?"

1  **Q.**   Go ahead.

2  **A.**   And despite that -- and we at one point even asked them to

3  go ahead and call occupants that they thought might have a

4  concern in one of our trailers and have them call us.

5          But as far as the number of complaints, it was

6  either -- my recollection was it was either one or two in March

7  and one or two in April, and then one, two, or three in May,

8  maybe.

9  **Q.**   Did your company -- these people that were calling in with

10  questions or concerns, did anyone from your company tell them,

11  "Well, just so you know, 15 percent of the wood products that

12  went into some of these trailers could have not been HUD

13  certified."

14          Did you pass that along to them?

15  **A.**   A lot of these calls we were getting may or may not have

16  been a FEMA unit, may or may not have been a unit built -- you

17  know, could have been a unit built in '02, '03, or '04.  But to

18  my knowledge, that was not discussed.

19  **Q.**   Okay.  So the answer would be no, that information was not

20  passed along?

21  **A.**   That's correct.

22  **Q.**   For Exhibit No. 4, why, on March 17th, 2006, did you write

23  this e-mail to Stephen Miller telling him that Gulf Stream

24  Coach used a low formaldehyde emitting material -- that you

25  wanted to advise him that Gulf Stream Coach uses low

1  formaldehyde emitting material in your Cavalier travel --
2  travel trailer?
3  A.   Well, this was something that had come up that morning on
4  the -- the news.  Well, let's see, what was it?  There was a
5  news story about it.  And it was really the -- my
6  recollection -- the first I had heard of a formaldehyde
7  complaint.
8         There was that odor complaint over here from the week
9  earlier, but this is really the first time I recall a
10 formaldehyde sort of a complaint.
11        And I had immediately talked to our purchasing people
12 that buy our wood products.  And they informed me that all the
13 products did meet this HUD level.  And, as a matter of fact,
14 one of the purchasing managers came back and told me that he
15 had talked to a supplier, and we were one of the few companies
16 in the industry that bought products that met this LFE
17 requirement.
18 Q.   And when you wrote this e-mail, you believed that all the
19 materials that were going into the models that you were
20 providing to FEMA had low emission material?
21 A.   Yes, I did.  Yes, I did.
22 Q.   And it wasn't until shortly after that that you learned
23 that, perhaps, that may not have been accurate?
24 A.   Yeah.  It was the next week sometime.  We had determined
25 that -- or come up with 5 -- 5 percent was this material that

1    the rest of the industry used rather than the LFE that it was

2    our policy to buy, and that we weren't certain whether that

3    5 percent maybe -- perhaps still met the emission requirement,

4    even though it wasn't certified to it.

5    **Q.**   Now, you say that you called up Stephen Miller and you

6    told him of your error; is that correct?

7    **A.**   No, it was a -- I actually had met with him in person.

8    **Q.**   And when did you tell him?  When did that meeting take

9    place?

10   **A.**   I think it was either April or May of 2007.  It was

11   shortly after there were more media -- more media activity on

12   this.

13          And at that point we went back and we double-checked

14   everything else.  We got confirmatory letters from our

15   suppliers.  We tried to look back into this again.  And it was

16   at that point that we saw that this Adorn material might be as

17   much as 15 of that product.

18          And I had a meeting and advised Steve Miller that

19   some of the products that we had received were not -- were

20   possibly not, to our knowledge, HUD-certified products.

21   **Q.**   And when you were representing and selling this unit to

22   FEMA, you thought it was a safe unit; isn't that right?

23   **A.**   Yes.

24   **Q.**   And as you sit here today, you still believe it's a safe

25   unit; isn't that correct?

210

1    A.    Yeah.  Yes.

2    Q.    And nothing that you have heard from any of the

3    complaints, this lawsuit, leads you to believe differently;

4    isn't that correct?

5    A.    That's correct.

6    Q.    The last sentence in that second paragraph, "Although not

7    required for travel trailers, our company goes the extra step

8    to specify low formaldehyde emission building materials from

9    our suppliers"; is that correct?

10   A.    Yes.

11   Q.    The next paragraph says, "Trace levels of formaldehyde are

12   also released from smoking, cooking, and the use of numerous

13   household consumer products."

14         It goes on to say, "However, formaldehyde levels

15   quickly dissipate when the space is ventilated under normal

16   occupancy conditions by simply opening windows, vents, or

17   doors.  The normal use of exhaust fans and air conditioners

18   also reduces formaldehyde levels."

19         Do you see that?

20   A.    Yes.

21   Q.    That's what you were recommending to FEMA that it should

22   tell the occupants of travel trailers who had concerns about

23   formaldehyde or complained; isn't that correct?

24   A.    Yes.  It's the basic information, yes.

25   Q.    And that's what, in fact, you thought was the appropriate

1    response?

2    A.    Yes.

3    Q.    In fact, that's what ATSDR says is the appropriate

4    response --

5    A.    Yes.

6    Q.    -- to formaldehyde, doesn't it?

7    A.    Yes.

8    Q.    That's what EPA says is the appropriate response, correct?

9    A.    Yes.

10   Q.    The RVIA Association, that's what they say; is that

11   correct?

12   A.    Yes.  That's my understanding.

13   Q.    In fact, that's what everybody says is the appropriate

14   response if you have concerns about formaldehyde in indoor air;

15   isn't that right?

16   A.    Yes.

17   Q.    Now, I want to go back to Exhibit No. 21, again.

18            In that last paragraph there, "We have confirmed with

19   the respected Gulf Stream Coach physician, Dr. Brobson Lutz,

20   who directed -- Lutz, L-U-T-Z -- who directed the New Orleans

21   Department of Health for 13 years.  Dr. Lutz has treated many

22   affected by Hurricane Katrina, including those living in travel

23   trailers, and found no evidence of health effects from the FEMA

24   travel trailers."

25            Do you see that?

212

1   A.    Yes.

2   Q.    Did you consult with him, your public relations firm

3   consult with him, or your counsel consult with him?

4   A.    I believe that he was somebody that our counsel was

5   familiar with.  And -- I'm not sure.  I -- I can't recall

6   whether I had talked to him or my brother Jim had talked to

7   him.

8   Q.    Well, let me ask you this:  What did he tell you?

9   A.    He had told us that he had a practice down in that area,

10  that he had -- that he saw occupants on a daily basis, people

11  that lived in FEMA trailers, and that he didn't have people

12  complaining to him about odors in the trailers, and it wasn't a

13  concern that he was getting, and that he had talked to many of

14  these occupants.

15  Q.    Now, you have talked a lot today, and so has plaintiffs'

16  counsel, about FEMA-spec'd trailers.  Do you remember that?

17  A.    Yes.

18  Q.    Are these the specs that you're referring to?

19  A.    Yes, they are.

20  Q.    If you go to the third paragraph on that page it says,

21  "The units shall meet industry standards except where

22  identified." Do you see that?

23  A.    Yes.

24  Q.    These standards that FEMA issued had nothing -- made no

25  mention about formaldehyde; isn't that correct?

1   A.   Yes, that's correct.

2   Q.   And in this case, for you, your standard was that you used

3   low emission materials; correct?

4   A.   That was our policy.

5   Q.   The Fantastic Fan.  Have you heard of that?

6   A.   Yes, I have.

7   Q.   Did you offer to retrofit all of the FEMA units provided

8   with Fantastic Fans?

9   A.   No, we did not.

10  Q.   What units were you offering to provide Fantastic Fans

11  for, if any?

12  A.   Well, we had had a contact with Sid Melton, I think that I

13  had mentioned earlier.  He was this person that had this list

14  of overall people that had complained of odors.  And it was

15  ultimately determined that -- I think it was 7 of 35 or 36 of

16  those with -- for people in Gulf Stream travel trailers.

17          And we indicated to him that we wanted to be able to

18  assist those people.

19          And he said, well, for privacy reasons, he really

20  couldn't give us their name and number.  But we told him, "Hey,

21  we would like to send someone to their trailer and install a

22  Fantastic Fan and see if that would take care of their

23  concern."

24  Q.   And what happened was, FEMA said, "We're not going to let

25  you contact them directly.  We will tell them about you, and if

214

1   they want, they can contact you for the Fantastic Fan."

2   **A.**   Correct.

3   **Q.**   Did they ever contact you and ask to you retrofit the

4   units with Fantastic Fans?

5   **A.**   The customers?

6   **Q.**   Yes.

7   **A.**   Or the occupants?

8   **Q.**   Yes.

9   **A.**   They had left a message for these people, or contacted

10  these people, and we received at least three calls.

11          One turned out that it wasn't one of our units.  They

12  had called back and said they had made a mistake, by calling us

13  by mistake.

14          There were two other people that had called from -- I

15  believe Sid Melton said his people called them.  And it turned

16  out that one of the calls, the lady really had a problem with

17  her sewer, and it was a sewer smell that she had.  And the

18  other occupant was calling because she was concerned that they

19  were going to it take her trailer or move it somewhere else.

20          So really, as it turned out, we didn't have an

21  opportunity to offer -- we really didn't have a complaint on

22  formaldehyde from any of these people, so we didn't have an

23  opportunity to provide a Fantastic Fan.

24  **Q.**   Now, you told me, certainly by July of 2007, Gulf Stream

25  was well aware that some of its products that were used in some

1   of these trailers that were sold to the government, that some

2   of the products were not LFE; right?  Or could have not been

3   LFE, I think is what you said.

4   A.    Yes.

5   Q.    And by July of 2007, that number had creeped up to

6   15 percent; isn't that true?

7   A.    By July of 2007, yes, approximately 15 percent.

8   Q.    And that 15 percent number doesn't even include the

9   two-thirds of the products that you bought from Samling or

10  Weyerhaeuser, does it?

11  A.    No, I don't think we knew about that in July of 2007.

12  Q.    Now, you sat here when your brother told me that it was

13  absolutely imperative that your company be truthful to the

14  press.  Do you remember that?

15  A.    Yeah.  I do believe I remember that.

16  Q.    Look at Exhibit 33, Gulf Stream 4580, from a fellow by the

17  name of the Scott Lidy.  Do you know who that is?

18  A.    Scott Lidy?

19  Q.    Uh-huh.  Or Steve Lidy?

20  A.    Steve Lidy.  Yes, I know who that is.

21  Q.    Tell me who it is.

22  A.    He is a person in our -- that was in our marketing

23  department.

24  Q.    Okay.  He sent you an e-mail on July 19th, 2007.  Do you

25  remember receiving that e-mail?

```
 1   A.    Okay.  What's the question now?
 2   Q.    Do you remember receiving that e-mail?
 3   A.    You know, not specifically.  And I really don't remember
 4   this -- seeing this bottom -- I really don't -- I remember
 5   receiving an occasional e-mail from Steve Lidy at the time, but
 6   I don't remember this specific one.
 7   Q.    You say he's in marketing?
 8   A.    Yeah.
 9   Q.    Marketing for Gulf Stream Coach?
10   A.    Yes.
11   Q.    Marketing in the towable division?
12   A.    Yes.
13   Q.    Okay.  Did you tell him not to lie to the press?
14   A.    He normally wouldn't be involved in this.
15   Q.    You read his --
16   A.    I --
17   Q.    Go ahead.
18   A.    So...
19   Q.    When you read his e-mail, what he -- what he had told the
20   press, did you correct him or admonish him and tell him to call
21   them back and give them the truth, not -- and not lie?
22   A.    No.  I just read it right now.
23   Q.    Okay.  So you're saying that -- but you --
24   A.    I don't recall, and I -- I'm not really familiar.  You're
25   saying that the Madison Courier is the press?
```

```
 1   Q.   That's a newspaper, yes, sir.
 2   A.   A paper?  Okay.
 3   Q.   But if you had received that, you certainly -- you
 4   certainly would have corrected him on the spot, would you not?
 5   A.   I told her -- I -- I'm not exactly sure what he's
 6   responding to.  I told her we are ahead of the curve, and for
 7   years we had been using LF building products that met or
 8   exceeded the manufactured housing standards.
 9           I'm not really certain of the time frame or what he's
10   talking about there.
11   Q.   Well, he's dealing with a press call.  I'm going to ask
12   you the question again so we can all go home.
13           I know you don't remember receiving this, even though
14   it's addressed to you, even though it's self-explanatory that
15   he's --
16   A.   I may have -- I may have read it.  I don't recall reading
17   it.  Sometimes I may only look at the top part.  I -- I don't
18   recall reading this in 2007.  I may have, but I -- I don't
19   recall right now.
20   Q.   But if you had read it, you certainly would have corrected
21   him and told him, "Look, make sure you provide accurate
22   information to the press"; right?
23   A.   You know, I'm not sure what Steve Lidy knew regarding this
24   or -- or not.  He was -- Steve Lidy was a guy that created
25   brochures.  He was a guy that would do marketing pieces.  He
```

1   really was not involved in the FEMA response.

2   **Q.**   So you would have had someone correct his misstatements;

3   maybe not him, but someone else?

4   **A.**   I'm not sure if it's a misstatement or not.

5             **MR WATTS:**   Judge, that concludes the cut.

6             **THE COURT:**   All right.  And we are going to go ahead

7   and take our break at this time.  If we could go ahead and turn

8   the lights up, we'll go ahead and take our mid-afternoon break

9   of about ten minutes.

10            **MR. WEINSTOCK:**   I'm sorry, Your Honor.  We would like

11  to offer Exhibit 1, which is the 2005--

12            **THE COURT:**   Okay.  Wait.  Wait, one second.  One

13  second.

14                  Mr. Weinstock?

15            **MR. WEINSTOCK:**   We'd like to offer Exhibit 1 to Dan

16  Shea's deposition, which was an Adorn 2001 packing slip that

17  was referenced in the --

18            **THE COURT:**   What number is that here?  That's

19  Exhibit 1 to his deposition.  What are we labeling it here?

20            **MR. WEINSTOCK:**   512.

21            **THE COURT:**   512?  All right.

22            **MR WATTS:**   No objection.

23            **THE COURT:**   All right.  512 --

24            **MR. WEINSTOCK:**   2005, I'm sorry.

25            **THE COURT:**   I'm sorry, say it again.

1          **MR. WEINSTOCK:**  It's October 13th, 2005.

2          **THE COURT:**  All right.  And that will be 512, which

3   is now admitted into evidence.  Any other exhibits from that

4   testimony?

5          **MR. WEINSTOCK:**  No, sir.

6          **THE COURT:**  All right.  Let's go ahead and take our

7   mid-afternoon break.  If you-all could be ready at 3:20, we'll

8   come back and finish for the day.

9          **THE DEPUTY CLERK:**  All rise.

10         (WHEREUPON, the jury exited the courtroom.)

11         **THE DEPUTY CLERK:**  All rise.

12         (WHEREUPON, the jury entered the courtroom.)

13         **THE COURT:**  You may be seated.  Except for you, sir.

14   Come up here and remain standing until you take the oath and

15   then you may proceed.

16         **THE WITNESS:**  Yes, sir.

17         **THE COURT:**  The next witness, his name is?

18         **MR WATTS:**  His name is Al Mallet.

19         (WHEREUPON, **Alexis Mallet, Jr.**, having been duly

20   sworn, testified as follows.)

21         **THE DEPUTY CLERK:**  State your full name and spell

22   your full name for the record.

23         **THE WITNESS:**  Alexis Mallet, Jr. -- Alexis Mallet,

24   Jr., A-L-E-X-I-S, M-A-L-L-E-T.

25         **THE COURT:**  That's pronounced Mallet in Louisiana.

 1              THE WITNESS:  Only if you're south of I-10.

 2              THE COURT:  We also had a stipulation regarding some

 3      documents.

 4              MR. BUZBEE:  Yes, we did.

 5              THE COURT:  Do you want to do that now before we

 6      start questioning this witness?

 7              MR. BUZBEE:  Yes, Your Honor.  To avoid having

 8      another witness up there and to save time for everyone

 9      concerned, the defendant and the plaintiffs have agreed to

10      stipulate to the admission of Exhibits 132, 136, 137, 138.

11              THE COURT:  Okay.

12              MR. BUZBEE:  139.

13              THE COURT:  Let's get that right.  132...

14              MR. PENOT:  Nobody asked me, but that's fine.

15              THE COURT:  Well, I thought you-all had consulted

16      with Mr. Penot.  Don't leave him out.

17              MR. PENOT:  Oh.  I'm sorry.

18              THE COURT:  132...

19              MR. BUZBEE:  Yes, sir, 132, 136, 137, 139.

20              THE DEPUTY CLERK:  I thought you said 138.

21              MR. BUZBEE:  No, 139 -- oh, there was 138.

22              THE COURT:  Is that it?

23              MR. BUZBEE:  No, that's not it.  Then there are a few

24      others, Your Honor, that you've allowed me, instead of wasting

25      time with the witness to just quickly publish so the jury can

 1   see them.

 2           **THE COURT:**  All right.  Give me the number and put

 3   them on the on screen, and we'll take it off and we'll pull up

 4   the next one.

 5           **MR. BUZBEE:**  43.

 6           **THE COURT:**  43.

 7           **MR. BUZBEE:**  Can you bring that up at the top,

 8   please.

 9           **THE COURT:**  All right.

10           **MR. BUZBEE:**  42.

11           **THE COURT:**  42 is another e-mail.  All right.

12           **MR. BUZBEE:**  I've got the shakes.  Pay no attention

13   to that.

14           **THE COURT:**  All right.

15           **MR. BUZBEE:**  45.  I couldn't have been a doctor.

16   This makes me very nervous.

17           **THE COURT:**  What was the number of that last one?

18           **MR. BUZBEE:**  That was 45.

19           **THE COURT:**  Okay.

20           **MR. BUZBEE:**  366.

21           **THE COURT:**  366?

22           **MR. BUZBEE:**  Yes, sir.

23           **THE COURT:**  All right.

24           **MR. BUZBEE:**  Here's the second page of it, which the

25   jury has already seen.

1              THE COURT:  All right.

2              MR. BUZBEE:  63.  It's another copy of the same

3    thing, Your Honor.

4              THE COURT:  Okay.

5              MR. BUZBEE:  And then finally 369.

6                   Can you bring that up for me, Carl, that third

7    paragraph?

8              THE COURT:  All right.  Let's get on with Mr. Mallet.

9                   Those are admitted.

10                        DIRECT EXAMINATION

11   BY MR. BUZBEE:

12   Q.   Would you please introduce yourself to the ladies and

13   gentlemen of the jury, please?

14   A.   Yes.  My name is Al Mallet from Lafayette, Louisiana.

15   Q.   Al, what do you do for a living, sir?

16   A.   I'm general contractor and construction consultant.

17   Q.   We've been sitting through a lot of video depositions, but

18   I'd like to move this as quickly as we can.  But before we can

19   talk about what your opinions are about this trailer, we have

20   to go through your background.

21                   Could you tell us what your education is?

22   A.   I have a bachelor's degree from the University of

23   Louisiana, in political science, pre-law.

24   Q.   Okay.  So you're here to talk about trailers, but your

25   degree is in political science?

1    A.    That's correct.

2    Q.    What other kind of education, if any, do you have then?

3    A.    I've had education outside of that.  While in college and

4    before, I worked for my father who is in the construction

5    business, my grandfather.  The first time they put me on a roof

6    was when I was 6 years old after Hurricane Audrey.  I worked

7    for an industrial supply and engineer company during my college

8    years and went into my own construction business my senior year

9    of college.

10         I've been in the construction business for 35 years.

11   We work for -- or in conjunction with a number of insurance

12   companies because of our construction background and our

13   knowledge in construction to identify defects and failures,

14   causes of problems relating to insurance claims.

15         And because of that relationship with the insurance

16   companies, I've attended numerous classes, seminars,

17   conferences over the years and received certifications in a

18   number of areas relating to insurance-type claims in

19   construction-related matters.

20   Q.    Now, do you hold any licenses?

21   A.    Yes.  I'm -- I hold a general contractor's license with

22   the state of Louisiana.

23   Q.    What does that mean you can do?

24   A.    I basically can deal with any type of structure, any type

25   of building within the state of Louisiana and some of the

 1   reciprocating states in the United States.  I did hold licenses

 2   in other states years ago when we did work in California and

 3   Texas and so forth.

 4   **Q.**   What other licenses do you have, if any?

 5   **A.**   I have a residential construction license.

 6   **Q.**   What others?

 7           **MR. SCANDURRO:**  Your Honor, I'm sorry to interrupt,

 8   but if the tender is going to be in general contracting, we'll

 9   stipulate.

10           **THE COURT:**  What field is to be tendered?

11           **MR. BUZBEE:**  General construction, estimating,

12   failure analysis and construction.

13           **THE COURT:**  Let me get it down.  General

14   construction, estimating...

15           **MR. BUZBEE:**  Failure analysis.

16           **THE COURT:**  Failure analysis.

17           **MR. BUZBEE:**  Construction or design failure, and

18   just -- I know Mr. Penot's standing on his feet.  He's not

19   going to talk anything about the jack and the blocking.

20           **MR. PENOT:**  I don't know what else to stand on, but

21   I'll sit down.

22           **THE COURT:**  I was thinking the same thing.

23           **MR. BUZBEE:**  Well, you could stand on my neck.

24           **THE COURT:**  Or you could stand on your principles.

25   All right.  Do we have a stipulation on his expertise, or would

1   you like to voir dire the witness?

2           **MR. SCANDURRO:**  Only on the design analysis.

3           **THE COURT:**  Construction or design failure?

4           **MR. SCANDURRO:**  Design failure.  I'd just like to ask

5   him a couple of questions then.

6           **MR. BUZBEE:**  Can I continue to lay the foundation?

7           **THE COURT:**  Continue to lay the foundation, and then

8   we'll let Mr. Scandurro question as to whatever concerns he has

9   qualifying the witness.  And assuming the witness passes muster

10  on at least some of these grounds, if not all of them, then

11  we'll proceed to his opinions in this case.

12  **BY MR. BUZBEE**

13  **Q.**  Mr. Mallet, why don't we just cut to the chase.

14          When you say design failure -- or let me --

15  construction or design failure and you have expertise in that,

16  tell us about that.

17  **A.**  Yes.  We are oftentimes called in by insurance companies,

18  architects, engineers to assist them in determining the cause

19  of problems with buildings because most of what we do now,

20  since maybe 1985, is take buildings, structures, mobile homes,

21  travel trailers -- we take them apart, we put them back

22  together.

23          We deal with problems.  We deal with water problems,

24  problems from windstorms, fires, floods, mold, remediation

25  issues.  And to be able to identify whether it is a covered

1    loss under an insurance policy or if it's something that's

2    caused from a problem with the design or the construction of

3    the building that's causing that problem, we go in and make

4    those determinations:  The way the roof lines were designed,

5    did it cause entrapment of the water?  Were the way the windows

6    were designed allow moisture or air to infiltrate?

7              We have to know what the causes are to be able to

8    accurately identify what the reasons are behind the loss so the

9    insurance company can decide whether or not there's coverage

10   for those issues.

11             **MR. SCANDURRO:**  Your Honor, we can short-circuit this

12   if we could have one second, and then I'm sure I'll stipulate.

13             **MR. BUZBEE:**  I wasn't finished, but if we could

14   short-circuit, I'm all for that.

15             (WHEREUPON, the following proceedings were held at

16   the bench.)

17             **MR. SCANDURRO:**  The only concern I had was that you

18   had struck his opinion relative to the alternative design of

19   the travel trailer.  It's probably not where he's going --

20             **MR. BUZBEE:**  He's not going to say anything about

21   that.

22             **MR. SCANDURRO:**  Well, then that's okay.

23             **THE COURT:**  So you will go ahead and accept him?

24             **MR. SCANDURRO:**  Yes.

25             **MR. PENOT:**  There's one opinion, Mr. Watts, I don't

1   want put in, and that's his opinion No. 11 that says that the

2   leak in the roof was not repaired properly.

3           **MR. BUZBEE:**  Well, I guess, you can ask him about it.

4           **THE COURT:**  Go ahead and cover it if it's otherwise a

5   permissible opinion.

6           **MR. PENOT:**  Well, and what is there -- his, whatever,

7   expertise, he can --

8           **MR. BUZBEE:**  Yeah, that's within his expertise.

9           (WHEREUPON, the following proceedings were held in

10  open court.)

11          **MR. BUZBEE:**  Okay.  Your Honor, we'll tender this

12  witness pursuant to 702 as an expert in the areas that we just

13  talked about.

14          **THE COURT:**  Mr. Scandurro, I understand, in light of

15  our question and answer here at the bench, you have no

16  objection to him being qualified in the areas offered.

17          **MR. SCANDURRO:**  No objection, Your Honor.

18          **THE COURT:**  The court therefore will accept

19  Mr. Mallet as an expert in the field of general construction,

20  estimating, failure analysis and construction or design

21  failure.

22          **MR. BUZBEE:**  Thank you, Your Honor.

23          **THE COURT:**  Go ahead, Mr. Buzbee.  You can proceed.

24  **BY MR. BUZBEE**

25  **Q.**   Now, Mr. Mallet, your résumé is about eight pages long,

1    and I'm not going to spend a lot of time on it because you've

2    already been found to be an expert in this court.

3            But if the jury wants to look at it, it's going to

4    be -- it's 312 a -- you can see the front page of it.  I hope

5    you can.  Make sure you see that.

6            Is Exhibit 312 a true and correct copy of your

7    résumé?

8    A.   Yes, sir, it is.

9            **MR. BUZBEE:**  We'd offer 312.

10           **THE COURT:**  Any objection?

11           **MR. SCANDURRO:**  No objection, Your Honor.

12           **THE COURT:**  So ordered.  312 is admitted.

13   **BY MR. BUZBEE**

14   **Q.**   So if the jury wants to see all eight pages of everything

15   you've done in our life, they can look at Exhibit 312.

16           Let's hit the high points so we can move to what

17   you're here to talk about.  I'm trying to figure out how a

18   general contractor knows anything of that's of any relevance

19   to -- let's start off with just mobile homes, for instance.

20           Do you have experience in mobile homes?

21   **A.**   Yes.  We are called upon on a regular basis to identify

22   problems, code violations, manufacturing defects, moisture

23   problems, windstorm problems with mobile homes, manufactured

24   homes.  It is a part of our business, and a fair amount of what

25   our consulting work centers around is -- centers around is the

1    identification of problems with mobile homes.

2    **Q.**   And how many times have you been called on to do that with

3    regard to mobile homes?

4    **A.**   Hundreds of times.  I couldn't tell you over the years,

5    but it's significant.

6    **Q.**   Okay.  Now, a mobile home or what -- in East Texas we call

7    that a trailer.  In fact, I used to live in one, what we call a

8    trailer.

9         But that's actually -- the technical term is mobile

10   home?

11   **A.**   The formal term now is manufactured housing.

12   **Q.**   Okay.  And that's different, though, than a travel

13   trailer?

14   **A.**   Yes, it is.

15   **Q.**   Okay.  Tell us what the difference is and then help us

16   understand how your experience, if any, helps you render

17   opinions in this case.

18   **A.**   The difference is basically most mobile homes now have an

19   attic system where travel trailers don't, so to speak.  The

20   ventilation system is different in a mobile home than it is in

21   a travel trailer.

22        The requirements from the materials are spelled out

23   in the code under the HUD Code 3280.  Some materials are used

24   differently in mobile homes, such as sheetrock for walls and

25   ceilings, that are not used in travel trailers, although there

1    are some similarities in some of the types of panels.

2              The wall thicknesses are different.  Mobile home wall

3    thicknesses are deeper, have more depth than a travel trailer,

4    as well as the flooring system, the floor joists.

5              But from there, the rest of the construction and

6    design is pretty similar between the two.

7    Q.   Okay.  Obviously, the mobile home's bigger than a travel

8    trailer?

9    A.   It's larger, has more volume in both width, height and

10   length.

11   Q.   And more headroom?

12   A.   More headroom.  It's taller.

13   Q.   Now, I know some of the ladies or gentlemen on the jury

14   know what a two by two is versus a two by four.  We've already

15   heard that travel trailers, they use two by twos.

16             What are mobile home's using?

17   A.   Most of them are using two by fours in the wall system.

18   Q.   So just as a general comparison, a mobile home is more

19   sturdy?

20   A.   Yes.

21   Q.   You've talked about they use different materials.  Is

22   there any differences with regard to insulation?

23   A.   Insulation thickness in mobile homes is different than

24   travel trailers.  Because of the narrow -- or the lack of depth

25   in the walls of a travel trailer, typically only about an inch

1    and a half thick of insulation is placed in the walls.  Two or

2    two and a half inches of thickness of insulation is placed in

3    the ceilings.

4            In mobile homes you will typically have regular

5    residential insulation such as three, three and a half inch

6    thick insulation in the walls and six to nine to 12 inches of

7    insulation in the ceilings.

8    Q.   Now, did you -- you talked about insulation and the

9    thickness of the walls.  Does that have to do -- or does it

10   have to do with the vapor barrier?  Or have you heard that

11   term?

12   A.   It is in conjunction with the vapor barrier, but

13   oftentimes the vapor barriers are separate and apart from the

14   insulation, although it can be part of the insulation.

15   Q.   The vapor barrier in a mobile home, is it the same as in a

16   travel trailer?

17   A.   They used to be.  They're now placing the vapor barriers

18   for mobile homes placed in the mainly in hot, humid climates --

19   usually the Gulf Coast and Atlantic coast climates -- on the

20   outside of the structure rather than on the interior of the

21   structure.

22   Q.   Okay.  Let's figure out, then, how we -- we found out what

23   your experience is.  Have you had experience specifically with

24   travel trailers?

25   A.   Yes.

1  **Q.**    What experience?

2  **A.**    Part of the insurance claims that we handle have been, in

3  the past, travel trailers that have been damaged through some

4  event, such as trees and tree limbs falling on them, fires,

5  automobile accidents, where they're either -- something's hit

6  them or they've been run into something, some water event that

7  caused water damage to the travel trailer.

8  **Q.**    How often, Al, have you had to do that?

9  **A.**    We've probably had somewheres near just under 100 claims

10  of that sort.  Also, I worked with a friend of mine in an RV

11  dealership for about a year, just a little over a year,

12  overseeing operations, including the service department there

13  and problems with the service on travel trailers.

14  **Q.**    Okay.  Now, my office contacted you sometime ago to ask

15  you to bring in your expertise to evaluate this trailer; is

16  that right?

17  **A.**    Yes, sir.

18  **Q.**    Okay.  And you have spent a lot of time and energy doing

19  that?

20  **A.**    Yes, sir.

21  **Q.**    I want to talk to you about some of the things you did so

22  you could come here in this big, cold courtroom and render

23  opinions.  How did you start out your task?

24  **A.**    First, we inspected the exterior of the mobile home -- the

25  travel trailer, photographed the walls, inspected the

1    underside, the vapor barrier under the trailer, the axles,

2    steel frame, tires, trailer hitch, propane system, the

3    underside vapor barrier.

4            Then we examined the skin, identified the

5    penetrations through the exterior aluminum skin of the travel

6    trailer.  Then we examined the seal materials that seal the

7    windows, the doors, the joints between the roof and the walls,

8    at the corners.

9            And then we inspected the roof system, the membrane

10   and the inner sections of the membrane -- roof membrane in the

11   wall systems, air conditioning system.  Then we went to the

12   interior and began our analysis of the construction means and

13   methods of the interior: the floor, walls, ceilings, air

14   conditioning, heating, contents.

15   Q.   And when I met you for the first time -- and first off, to

16   find out what your background was as to whether you could do

17   this, would you agree that the overall question I wanted to

18   know, because I don't know much about travel trailers, is

19   whether this travel trailer was built to superior quality?

20   A.   Yes, sir.

21   Q.   And is that really -- I mean, you're going to talk about

22   two or three things.  We're going to hopefully do it quickly.

23   But that's the overall question is what you're looking at.

24   A.   The quality of workmanship, that's correct.

25   Q.   Now, the reason -- were you familiar with the specs, that

1   is, what FEMA told this company or how FEMA told this company

2   to operate?  That is, how -- what kind of travel trailer they

3   wanted.

4   A.   Yes, sir.

5   Q.   And what did FEMA -- at least from the specs, what was the

6   specification with regard to quality?

7          MR. SCANDURRO:  I'm going to object based on your

8   pretrial ruling with respect to this issue.  I don't know if

9   you want me to approach.

10          THE COURT:  Why don't you approach.

11          (WHEREUPON, the following proceedings were held at

12   the bench.)

13          THE COURT:  I'm looking for it right now.

14          MR. SCANDURRO:  It's No. 13.  He expressed an -- what

15   he's going to argue is that Gulf Stream breached a warranty to

16   FEMA.

17          MR. BUZBEE:  No, I'm not.

18          MR. SCANDURRO:  Only that opinion has been excluded.

19          MR. BUZBEE:  No, no.  I'm talking -- all I'm asking

20   is whether this travel trailer was of superior quality, that's

21   it.

22          MR. SCANDURRO:  I mean, that's the language of the

23   opinion.

24          THE COURT:  Let me find my ruling here real quick.

25   I've got so many of them in here.  You guys put me to work.

1              MR. BUZBEE:  We didn't, Your Honor.  We didn't file

2    any of those, as you may recall.

3              THE COURT:  I know.  I meant you guys.  That's okay.

4    That's what I'm here for.  These are in order --

5              MR. BUZBEE:  Here you go.

6              THE COURT:  What is it, 13?

7              MR. SCANDURRO:  13 is the opinion.  You see what

8    happened was you struck the plaintiff's claims for breach of

9    warranty.

10             THE COURT:  Right.

11             MR. SCANDURRO:  His opinion is that we breached a

12   warranty to FEMA and her.

13             MR. BUZBEE:  No.

14             THE COURT:  What is the question that you're asking

15   him about?

16             MR. BUZBEE:  I'm asking him whether the -- the

17   overall question you're here to answer is whether the trailer

18   was of superior quality, which you did not exclude.  I'm not

19   going to mention a warranty.

20             MR. SCANDURRO:  He's admitting it to FEMA that the

21   manufacturer has expressed a warranty -- is warranted to the

22   purchaser and --

23             THE COURT:  But we already had testimony about --

24             MR. BUZBEE:  The quality.

25             THE COURT:  -- meeting the specifications or better

1   or superior.  Didn't we have a couple of them?

2           **MR. BUZBEE:**  It was --

3           **THE COURT:**  Yeah, we've already had a couple of

4   witnesses.  We had the engineer guy from the factory who was

5   asked about what that meant.

6           **MR. BUZBEE:**  They want to put this on the jury form

7   so they can get immunity with it.  I know he can't says there's

8   a warranty and they breached it.  He doesn't even know that.

9           **MR. SCANDURRO:**  Well, he put it in his report.  As

10  long as he doesn't say that.

11          **THE COURT:**  This ruling is to warranty and use of the

12  word "warranty" and getting him to testify about a warranty.  I

13  don't think the question calls for that, so I'll overrule.

14          (WHEREUPON, the following proceedings were held in

15  open court.)

16  **BY MR. BUZBEE**

17  **Q.**   Okay.  Mr. Mallet, you were just asked to look to see

18  whether this travel trailer, based on many, many, many you've

19  looked at, was, in fact, of superior quality?

20  **A.**   Yes.

21  **Q.**   And you went out and actually looked at Ms. Alexander's

22  travel trailer?

23  **A.**   Yes, sir.

24  **Q.**   And did you review the FEMA specs?

25  **A.**   Yes, sir.

1   **Q.**   Let's take a look at Exhibit 165, and the jury's heard

2   about it several times.  I want to point out a couple of

3   things.

4            The trailers being provided were supposed to be equal

5   or better than units -- or they can provide equal or better

6   units considering the competitive price and delivery

7   requirements; is that right?

8   **A.**   Yes, sir.

9   **Q.**   Can you see the highlighted portion?  What does that mean

10  to you as somebody who's done this for years?

11  **A.**   In the first paragraph?

12  **Q.**   No, the highlighted portion in the second paragraph.

13  **A.**   The second?

14  **Q.**   Yes, sir.

15  **A.**   The requirements were to seal all of the exterior

16  penetrations in the travel trailer to prevent air and moisture

17  penetration.  That's typically placed for two reasons, one to

18  protect the materials that the structure's -- on which the

19  structure's built, and then to prevent the air and moisture

20  movement typically for indoor air quality issues.

21  **Q.**   And the specs specifically talk about road travel and

22  installation.  What do the specs say about that?

23  **A.**   That the unit's are subjected to continuous road travel,

24  multiple installations and deactivations in various weather

25  conditions.

1   **Q.**   So it was contemplated by FEMA that these trailers would

2   be on the road for miles and miles and that they would be

3   activated and deactivated at least according to the specs?

4   **A.**   That's correct.  It would appear that these trailers were

5   to be designed for multiple uses.

6   **Q.**   Now, it's a -- it's already been stipulated by the parties

7   that -- about the wood inside this particular travel trailer

8   had formaldehyde.  And you're not here to talk about

9   formaldehyde or whether this trailer had that or not, are you?

10  **A.**   No, sir.

11  **Q.**   And we've already heard from Mr. Ritter about the HVAC

12  system, so you're not really here to talk about that?

13  **A.**   Not the mechanical part, correct.

14  **Q.**   But could you tell us just generally, in this particular

15  trailer, since you went out and looked at it, what types of

16  wood it had in it?

17  **A.**   It was vinyl-covered lauan paneling, and it was

18  particleboard floor subflooring.  There was wood cabinetry,

19  wood framing.  The furniture was made out of plywood and wood

20  pieces.  There was very little plastic on the building at all

21  on the interior.  The vast majority of everything that was

22  inside the building was of a wood component.

23  **Q.**   Do you remember how many square feet that trailer was?

24  **A.**   I think it's about 228 square feet.

25  **Q.**   And when you're inside that trailer, are you literally

1  surrounded by wood?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  You told me they didn't use -- they used little to

4  no plastics?

5  **A.**   Correct.  The only plastics I can recall is the bathtub,

6  maybe the tub surround, the countertop to the kitchen cabinets

7  and the countertop for the table.

8  **Q.**   You mentioned a couple different kind of woods, and I know

9  some of the folks on jury know this already, but, lauan, what

10  is that?

11  **A.**   It's a wood product made in south -- it comes from

12  Southeast Asia.  It's a plywood, and they use -- it's a

13  mahogany wood substitute.  It's made with several layers of

14  wood strips and glued together.

15  **Q.**   Okay.  And we got -- and we've got a man by the name of

16  Dr. Smulski who will tell us more about that, but let's just

17  speak generally about what you saw.

18       The lauan, you said, was where in the trailer?

19  **A.**   On the walls that I could see.  It was on the walls.

20  **Q.**   And I know we've heard about a couple of walls being

21  cracked.  Were you able to actually look to see how thick that

22  lauan was?

23  **A.**   Yes.  It was less than an eighth of an inch.  Probably

24  about 5 millimeters, something of that nature.

25  **Q.**   What other kinds of woods besides -- are -- I don't know

1    if we call lauan wood pressed wood.

2              What other kind of woods other than lauan?

3    A.   In the trailer?

4    Q.   Yes, sir.

5    A.   Well, as I just mentioned, there was particleboard --

6    Q.   And I think --

7    A.   -- lauan.

8    Q.   I think we know what that is, but just tell us what

9    particleboard is.

10   A.   Particleboard is basically sawdust and glue.

11   Q.   I think, when we see it tomorrow with Dr. Smulski, we'll

12   all recognize it.

13             What other kinds of wood?

14   A.   I believe there was OSB board placed under the master bed

15   mattress.

16   Q.   What is that?

17   A.   Oriented strand board.  It's -- instead of wood/sawdust,

18   it's woodchips that are glued together and pressed together

19   with glue.

20   Q.   So we've got lauan, which is kind of like using the word

21   "frisbee".  It's from Southeast Asia or a certain part of Asia,

22   plywood, and then there's thicker plywood used in there was

23   well?

24   A.   Yes, sir.

25   Q.   Where was that plywood used?

1   **A.**    That was on the bed to support the mattresses.

2   **Q.**    Did you take a look at those woods very closely?

3   **A.**    Yes, sir.

4   **Q.**    As best you could?

5   **A.**    Yes, sir.

6   **Q.**    We'll come back to that.

7           Now, you took pictures when you went to the Alexander

8   trailer and inspected it?

9   **A.**    Yes, sir.

10  **Q.**    And these are pictures from your report.  Picture 27,

11  there's a stamp that says RVIA.  But let's look at 28.  That's

12  the front door, is it not?

13  **A.**    Yes, sir.

14  **Q.**    Now, you realize -- I mean, there's been a lot of

15  testimony that this trailer went all over the country and it

16  was in a field and so forth.

17  **A.**    Yes, sir.

18  **Q.**    Did you consider all that?

19  **A.**    Yes, sir.

20  **Q.**    Okay.  Let's talk about kind of -- when we were out in the

21  hallway and I asked you -- you know, we talked about what your

22  testimony would be, based on your opinion.  I kind of asked you

23  to kind of do a top -- not a top-ten list, but a top-five list.

24  Do you remember?

25  **A.**    Yes, sir.

1   **Q.**   So we could move quickly.  Let's go through it.

2         What are some of the problems, from your expertise,

3   that you saw with this trailer when you inspected it?

4   **A.**   The bottom board that seals the underside of the trailer

5   had penetrations.

6   **Q.**   When you say "bottom board," what do you mean by that?

7   **A.**   The term, I think, Gulf Stream uses is "belly board".

8   It's the vapor barrier at the bottom side of the travel

9   trailer.  It's placed there to prevent moisture from

10  penetrating upwards and to seal the bottom, keep rodents out.

11  **Q.**   And is this your hand there doing this?  Or who's doing

12  this?

13  **A.**   That is one of the other inspectors while I photographed.

14  He was lifting on the belly board because we suspected there

15  was water retained in the belly board.  And as he lifted the

16  belly board, water started coming out the edge of the vapor

17  barrier.

18  **Q.**   Now, this -- you've heard a little bit about how these

19  floors are constructed.  His fingers are on -- what is it,

20  rubber?  What is that?

21  **A.**   Well, it's sort of a plastic type of material.

22  **Q.**   Okay.

23  **A.**   It's like a Visqueen.

24  **Q.**   What's the purpose of it?

25  **A.**   To seal the bottom of the board to prevent moisture from

1   penetrating from the ground up into the trailer.

2   **Q.**   Now, can I see water coming out of that?

3   **A.**   Yes, sir.

4   **Q.**   How much water came out?

5   **A.**   A significant amount.  There was quite a bit of water in

6   the belly board in a number of areas under the trailer.

7   **Q.**   Okay.  And so was it drooping or anything?

8   **A.**   Yes.  There was -- it was pocketing.  It was sagging

9   underneath the trailer.  I think we have a video of that -- of

10  exactly how much it was sagging.

11  **Q.**   Well, what's the significance of that, if any?  I mean, it

12  was a bunch of water collected underneath that plastic or

13  whatever it is.  So what?

14  **A.**   Well, the water collecting on the top of the belly board

15  is telling me that water is coming in either from the roof or

16  the wall system of the trailer, and it's collecting in the

17  belly board.  It's collecting in the insulation that is just

18  above that Visqueen layer, that vapor barrier layer.

19  **Q.**   Okay.

20  **A.**   We know that the material was -- was a good water barrier

21  because it wasn't leaking out of the barrier.  It was being

22  retained in the barrier.

23  **Q.**   Okay.  Now, are you saying that -- do you know where the

24  leak would have been to get the water all the way to the

25  bottom?

1   **A.**   It could have been in any number of areas.  It could have

2   come from condensation.  It could have come from a roof leak.

3   The roof leaks were not apparent while we were there

4   inspecting.

5   **Q.**   Well, if it leaked in the roof, it would have to come

6   through the living area, or is that not right?

7   **A.**   It could have come through the wall system.

8   **Q.**   So you're saying it could be leaking but the resident

9   would never see all this water?

10  **A.**   Correct.

11  **Q.**   How?  Help me to understand that.

12  **A.**   Well, if you have a roof leak, especially in a flat roof,

13  and it absorbs into the insulation above the ceiling, the

14  ceiling has a vapor barrier on it so it can't come through the

15  ceiling.  It's going to go into the area of least resistance or

16  the area that --

17           **MR. BUZBEE:**  May I approach, Your Honor?

18           **THE COURT:**  Yes.

19           **THE WITNESS:**  -- the travel trailer is leaning in

20  that direction and go into the wall system.

21  **BY MR. BUZBEE**

22  **Q.**   Okay.  So there could be leaks on this thing that the

23  resident never even knew about?

24  **A.**   Yes.  For instance, this roof is, basically, a flat roof

25  system and --

 1          **MR. BUZBEE:**  Your Honor, may the witness step down to
 2   help me understand.
 3          **THE COURT:**  Yes.  You can go ahead and step down.
 4               Can you-all see this?  You need it moved to see
 5   it, Counsel.
 6   **BY MR. BUZBEE**
 7   Q.   Real quickly draw for me and help me understand the
 8   concept we're talking about.
 9          **THE COURT:**  That's better.
10   **BY MR. BUZBEE**
11   Q.   You're talking about how the roof could leak, but the
12   resident wouldn't know it and it would pool on the bottom.
13   A.   You get a roof leak.
14   Q.   You need to speak up, Al, please, so everybody --
15          **THE COURT:**  One second.  Let's give you this here and
16   that way we can all hear you.
17          **THE WITNESS:**  I'm sorry, Your Honor.  You get a roof
18   leak, and you'd have insulation above the ceiling.  And on the
19   bottom of the ceiling there's a vapor barrier that doesn't
20   allow moisture to penetrate other than through maybe a light
21   fixture or around an air conditioning duct that's cut into the
22   ceiling.  That water will come into the ceiling, saturate into
23   the insulation and eventually find its way down the walls into
24   the belly board because there's -- The way that the
25   construction is.

 1          It can't go up because the vapor -- there's

 2   another vapor barrier on the roof and the roof membrane.  It

 3   can't go down through the ceiling because of the vapor barrier

 4   on the ceiling.  It can't go through the face of the wall

 5   panels inside the trailer because it has a vapor barrier --

 6   water barrier on it.

 7          So it comes down into the insulation or along

 8   the studs into the wall and collects in the belly board down in

 9   here.

10   **BY MR. BUZBEE**

11   **Q.**   Okay.

12   **A.**   And it can't get out here because this is another vapor

13   barrier.

14   **Q.**   Okay.  I got it.  Okay.  Thank you.  You can take your

15   seat, sir.  So this -- I'll take that, Al.

16          So this water that you found collected in this -- at

17   the bottom here, to you -- told you that there was water

18   intrusion in that trailer?

19   **A.**   Yes, sir.

20   **Q.**   All right.  Let's talk about what other issue you saw or

21   any other issues you saw.

22   **A.**   The penetrations at the bottom around the plumbing, pipes,

23   and electrical penetrations were sealed, but not well sealed.

24   I later found out through the deposition of Ms. Alexander that

25   she placed -- she was having problems with mice in the house,

1   went under the travel trailer, put steel wool around the

2   penetrations -- the plumbing pipe penetrations and drain lines,

3   then put an expansive foam, something like grate stuff, that

4   would foam in and hold the steel wool in place, and then put

5   duct tape on top of that to seal the holes through the belly

6   board.

7   Q.   Okay.  Same significance as -- as the water in the belly

8   board?

9   A.   Well, yes, it allows for moisture to enter into the

10  envelope of the trailer without a barrier, and it also allows

11  for rodents or insects to come into the unit.

12  Q.   Okay.  What other issues, if any, did you find when you

13  went out and inspected the trailer?

14  A.   I saw condensation forming on the ceilings when we ran the

15  air conditioning system.

16  Q.   And the jury, I think, has probably heard enough about

17  that.  We've talked about that.  What else did you see?

18  A.   I saw some paneling that was popped off the walls in the

19  bedroom, in the bathroom, and also some bowed walls on the

20  opposite side -- or the entry door side of bedroom, on the

21  entry door side of the kitchen.

22  Q.   Let's take a look at Picture 202 or 201.  Is this a fair

23  representation of what you mean when you saw the walls popping

24  out like that?

25  A.   Yes, sir.

1   **Q.**   Okay.  Here's another picture, just so the jury can put it
2   in perspective.  Do you remember where that picture is in the
3   trailer?
4   **A.**   Yes, sir.  That's in the bedroom.  It is on the driver's
5   side -- driver's side of the bedroom near the -- I guess the
6   living room area.
7   **Q.**   Is it true that that wall popped out all the way from the
8   top almost all the way to the floor?
9   **A.**   Yes, sir.  It was from top to bottom.
10  **Q.**   So were you able to pull that back and look in there?
11  **A.**   Yes, sir.
12  **Q.**   Okay.  We'll talk about that in a minute.  What other
13  issues other than the wall panels, several had popped loose.
14  We talked about the water that was collecting underneath, and
15  we talked about that she had to plug up some holes to keep
16  rodents out.
17            What other issues?
18  **A.**   The walls were bowed on the opposite side in the bedroom.
19  **Q.**   Okay.  I think I may have a picture of that, Al.  Would
20  this be one that you're referring to?
21  **A.**   Yes, sir.
22  **Q.**   What does that picture show?
23  **A.**   This picture is the wall between the entry door from the
24  exterior to the wall of the bedroom.  I have some other
25  pictures that show the -- we placed a carpenter's level against

1   that wall.

2   **Q.**   Okay.  Maybe I have it here.

3   **A.**   Yes.

4   **Q.**   Okay.  What are you doing there?

5   **A.**   One of my technicians is holding a carpenter's level

6   against the wall to indicate the bowing in the wall system

7   between the door -- the entry door and the bedroom wall.

8   **Q.**   Okay.  I don't want to be rude, but so what?  The wall's

9   bowed.  What does that mean?

10  **A.**   Well, the wall is in some sort of stress mode.

11  **Q.**   Okay.  We've already heard about kind of how these things

12  are constructed.  There's basically a box built on top of a

13  metal chassis; right?

14  **A.**   Yes, sir.

15  **Q.**   Okay.  And it looks like one of the walls -- one of the

16  walls on this box is bowed in?

17  **A.**   Correct.

18  **Q.**   Okay.  You realize now that you inspected this in 2009,

19  the trailer's almost five years old?

20  **A.**   Yes, sir.

21  **Q.**   Well, did you take that into consideration?

22  **A.**   Yes, sir.  This is what happens under conditions when the

23  unit is not properly leveled and put in a -- and put in a bind.

24  **Q.**   What other issues, if any, did you see?

25  **A.**   That was the wall on the side of the --

1  **Q.**   I see some tape there next to the door.  What is that all

2  about?

3  **A.**   That's duct tape like that which was placed on the

4  paneling in the bedroom, the door frame, the casing was popping

5  off the walls on the dining room kitchen side and this is all

6  just in a small area.  We call it dining room and living room,

7  but it's just an eight by, probably, ten area -- ten-foot area.

8  **Q.**   You could go to the dining rooming room to the living room

9  with about two steps?

10  **A.**   Yes, sir.

11  **Q.**   Okay.

12  **A.**   Correct.  And the casings were popping off the wall, so we

13  placed the carpenter's level against that exterior wall on the

14  opposite side and the walls were bowed on that side also.

15  **Q.**   Okay.  Here's another picture.  Is that more the same?

16  **A.**   Yes, sir.  That's the first picture that we looked at in

17  the living room area.

18  **Q.**   All right.  Now, you took a picture of, it looks like, the

19  bench seating next to the window?

20  **A.**   Yes, sir.

21  **Q.**   Why did you take that picture?

22  **A.**   The walls indicated water leakage in that area.  The wall

23  below the window was leaking, apparently leaking because the

24  paneling was soft.  There was deterioration there.

25  **Q.**   Okay.  You also took a picture of the entryway.  What

1  issue did you see there, if anything?

2  A.    The floors at the entry, as soon as you stepped into the

3  temporary housing unit was very soft.  Someone put the tape

4  during our inspection so that everybody would be aware that

5  that was very soft.  And one other person almost went through

6  the floor in that area.  That's indicative of the water

7  infiltration deteriorating the subflooring.

8  Q.    Well, now, wait a minute, because somebody -- somebody

9  suggested, at least, that, well, we told her to leave her door

10 open so she left her door open and that's what that is.  Did

11 you look at that?

12 A.    Yes, sir.

13 Q.    Well, is that what caused that?

14 A.    No, sir.

15 Q.    Why do you say that?

16 A.    This is water that's penetrating around the outside edge

17 of the vinyl floors and penetrating into the subflooring and

18 deteriorating that subflooring.

19 Q.    So this ain't water coming in the door?

20 A.    Through the door frame, maybe, but not necessarily the

21 door itself.

22 Q.    I see.  Okay.  What other issues, if any, did you see?  I

23 got a picture here.  I'm not sure why you took that one.

24 A.    That is -- that's the area behind the sofa on the driver's

25 side of the exterior walls.  There was soft spots there also.

1  That was fasteners that evidently were in the wall at one time,

2  but there was mold-like material on the surface of the wall

3  there.

4  **Q.**  Is that a hole in the wall right there?

5  **A.**  That's a hole, yes, sir.

6  **Q.**  Here's another picture.  Is that the bathroom?

7  **A.**  Yes, sir.  That's, again, the driver's side of the

8  bathroom where the panel popped off the wall.  That's behind

9  the toilet area.

10  **Q.**  These were taken in May of '09, the trailer was built in

11  December of '04.  How old would the trailer be at this point?

12  **A.**  It would have been just over four and a half years old.

13  **Q.**  All right.  Now, what does this term, at least -- you've

14  been in the construction business for a long, long time, what

15  does the term "superior quality" mean?

16  **A.**  "Superior quality" means a level of expertise with the

17  people who are performing their duties that you would not

18  expect to have out of level, out of plumb, out of square, open

19  unsealed areas in a -- in anything that's being constructed, at

20  least in our construction field.

21  **Q.**  Well, wait a minute.  This thing is over four years old?

22  **A.**  Yes, sir.

23  **Q.**  Well, maybe -- what significance does the fact that it's

24  over four years old have to do with it?

25  **A.**  Well, once again the trailer specifications from FEMA

1    stated that a superior quality workmanship was expected.  A

2    trailer four years old, I would have expected to see less

3    issues with the trailer, based on my experience with trailers

4    in the service department and my own travel trailer, for a

5    four-year-old trailer.

6    **Q.**   I want to talk to you -- and we're going to come back to

7    that point, and we're almost done.  You mentioned this term

8    "vapor barrier".  Do you recall that?

9    **A.**   Yes.

10   **Q.**   Now, would an animation assist you in explaining that

11   concept to the jury?

12   **A.**   It would.

13           **MR. BUZBEE:**  Your Honor, we're going to use the

14   animation that we previously disclosed, it's about two minutes,

15   for the jury, if we could.

16           **THE COURT:**  Counsel, you've already reviewed this, I

17   assume?  Pursuant to the Court's instruction?  Am I correct?

18           **MR. BUZBEE:**  The two-minute thing from opening

19   statement.

20           **THE COURT:**  Wait.  One second.  One second.  Counsel,

21   I asked:  Have you-all already reviewed this pursuant to the

22   Court's pretrial instruction?

23           **MR. SCANDURRO:**  We reviewed and objected to it being

24   used in opening statement.

25           **THE COURT:**  Well, I think I have ruled on that, have

254

```
 1   I not?
 2            MR. BUZBEE:  Yes, sir.
 3            MR. SCANDURRO:  I don't know.
 4            MR. BUZBEE:  Yes, sir, you overruled that.
 5            THE COURT:  Well, the opening statements have come
 6   and gone.
 7            MR. SCANDURRO:  It wasn't used then.
 8            MR. PENOT:  Fluor's reviewed it.  If it's the one
 9   we've had --
10            MR. BUZBEE:  It's the one we've had for a long time.
11            MR. PENOT:  Yes, Fluor has no objection.
12            THE COURT:  We still have an objection to it.  Come
13   forward.
14            (WHEREUPON, the following proceedings were held at
15   the bench.)
16            MR. SCANDURRO:  The witness' opinions have excluded
17   relative to the formaldehyde.  It's okay if he's going to talk
18   about general construction.  As I recall the video, and I saw
19   it --
20            THE COURT:  Well, I haven't seen it because --
21            MR. SCANDURRO:  -- what happens is at the end -- the
22   first part of it's okay.  But at the end they have this
23   depiction of formaldehyde vapors of little arrows coming out of
24   all the penetration and everything.  And I don't think that's
25   within his area of expertise to talk about that.  So...
```

1          **THE COURT:**  Is that at the end?

2          **MR. BUZBEE:**  It's not -- it's two minutes.  And all

3   it is, is first it shows how the thing's constructed, the two

4   by twos, all these terms he talked about.  And then it talks

5   about letting the witness talk about the negative --

6          **THE COURT:**  Okay.  Well, I'm talking about the

7   formaldehyde part that Tim's talking about.

8          **MR. TAAFE:**  If I could, my animater did this.  And

9   we've got multiple witnesses that can prove this up on the

10  stand tomorrow.  And counsel is correct, what this gentleman is

11  going to talk about is the interchangeable systems --

12         **MR. MEUNIER:**  I'll represent to you that the

13  witnesses tomorrow are going to come up with the consequence.

14  I think that if it's played it once --

15         **UNIDENTIFIED SPEAKER:**  Does it even have to say

16  "formaldehyde"?

17         **MR. BUZBEE:**  No, and I won't --

18         **UNIDENTIFIED SPEAKER:**  I know but it doesn't say

19  "formaldehyde".

20         **MR. SCANDURRO:**  There's a visual showing of the

21  direction of air movement --

22         **UNIDENTIFIED SPEAKER:**  Which says "formaldehyde".

23         **MR. BUZBEE:**  What I'll do is I'll show how it's put

24  together, skip the part that says "formaldehyde" and got to the

25  part -- this is ridiculous, but go to the part where the wind

256

1  was sucked in.  That's all we're getting at.

2          THE COURT:  We already had our AC man talk about the

3  circulation of everything in the air, including hypothetically,

4  at least at this point formaldehyde.  So I don't really see

5  what the point is of -- I mean, that's the theory of the case.

6          MR. BUZBEE:  Right, exactly.

7          THE COURT:  So...

8          MR. BUZBEE:  It's two minutes.  It's really short.

9          MR. SCANDURRO:  As long as he doesn't stop it there

10  and...

11          THE COURT:  That's a different objection.  He's going

12  to play it.  He's not going to stop it.

13          MR. BUZBEE:  Should I stop it and skip where it says

14  "formaldehyde".

15          THE COURT:  No, play it.  Let it play.

16          MR. WEINSTOCK:  I'm sorry.  I apologize, Your Honor.

17  Peter's animation doesn't have a screen door, which this unit

18  clearly has.

19          THE COURT:  Well, why don't you point that out on

20  cross.

21          (WHEREUPON, the following proceedings were held at

22  the bench.)

23          THE COURT:  All right.  Let's go.

24  BY MR. BUZBEE

25  Q.  Al, of course I got a two-minute animation.

1          **MR. BUZBEE:**  And I may, Carl, if you don't mind, I

2    may stop you at a couple of points so Mr. Mallet can answer a

3    few questions.

4          **THE COURT:**  Wait.  I thought we were playing it all

5    the way through.

6          **MR. BUZBEE:**  We will.  Okay.  That's fine.

7          **THE COURT:**  Play it all the way through and then ask

8    your questions.

9          **MR. BUZBEE:**  Roger that.  Yes, sir.

10          **THE COURT:**  We can all see it and then come back to

11   it.

12          **MR. BUZBEE:**  Okay, Carl.  Let's take a look at the

13   animation.

14          (WHEREUPON, the video animation was played.)

15   **BY MR. BUZBEE**

16   **Q.**   Okay.  It should have been put to music.  Now, we saw very

17   quickly, Al, how this thing was constructed.  You've told us

18   generally where all the wood is in the trailer.  I want to

19   drill down on, if I could, this idea of this space in the

20   walls.  What is that space?

21   **A.**   The space between the studs and between the paneling on

22   the interior.

23          **MR. BUZBEE:**  May I approach, Your Honor?

24          **THE COURT:**  Yes.

25          **THE WITNESS:**  And the -- sorry.

1   **BY MR. BUZBEE**

2   **Q.**   I wonder if you can see this, Al.  Can you see that?

3   **A.**   Yes.

4   **Q.**   If I'm standing in this trailer and I touch the wall, what

5   am I touching?

6   **A.**   You're touching the vinyl face of the wall paneling, the

7   interior wall paneling.

8   **Q.**   So there's a thin coat of vinyl that's covering the lauan?

9   **A.**   Yes, sir.

10  **Q.**   Okay.  If I'm standing outside the trailer, I think it's

11  pretty obvious, but what am I touching?

12  **A.**   That is an aluminum -- they call it aluminum skins, but

13  they're aluminum panelings that cover the exterior.

14  **Q.**   And tell us what is in this space that we just saw in the

15  animation, the space between the thin vinyl and the lauan and

16  the skin on the outside?

17  **A.**   That's the two by two wall frames and insulation is placed

18  in between unfinished -- fiberglass insulation is placed in

19  between the two by two wall studs.

20  **Q.**   And when the water is pooling or collecting on the ceiling

21  or in this space on ceiling is running down to collect on -- in

22  the subflooring, is it running down the walls, or is it

23  dripping, or do you even know?

24  **A.**   Well, we don't know because we only had one panel that we

25  were able to view behind, but that typically can go down the

1   walls in either liquid form or in vapor form.

2   **Q.**   Okay.  And you worked with Mr. Ritter with regard to

3   his -- him doing the analysis with the HVAC ask him?

4   **A.**   Yes.

5   **Q.**   And you recall that he told us that because of the

6   negative pressure, whatever is in these chambers is being

7   sucked into the trailer?

8   **A.**   That's correct.  The trailer's under negative pressure.

9   **Q.**   And is there also a chamber topside?

10  **A.**   Yes, there is.

11  **Q.**   And is there also a chamber on the -- what we used to call

12  the deck -- on the floor?

13  **A.**   Yes, there is.  There's vinyl -- vinyl flooring -- vinyl

14  sheet flooring on the top of the floor and then underneath the

15  floor is the vapor barrier and the belly board.

16  **Q.**   Is there plywood there too?

17  **A.**   No.  There's only the particleboard underneath the vinyl

18  floor.

19  **Q.**   I see.  Okay.  So the potential is all of the woods on all

20  four sides could be wet?

21  **A.**   Or to be exposed to moisture vapor, water vapor, yes.

22  **Q.**   And then whatever gas is formed and sucked into the

23  trailer?

24  **A.**   Through the negative air condition of the air conditioning

25  duct system leakage.

1   Q.   In your expert opinion, having looked at many, many, many

2   travel trailers, many mobile homes, having built homes,

3   repaired homes for more than 30 years, was this trailer, the

4   Alexander trailer, which was specifically made for FEMA to be

5   of superior quality, was it of superior quality?

6   A.   No, sir, not with the penetrations that it had.

7   Q.   And then, finally, you've had an opportunity -- you've,

8   over the years, looked at woods of all types?

9   A.   Yes, sir.

10  Q.   Were you able to look, as best you could, at the woods in

11  this trailer?

12  A.   There were several areas we could view the woods, the

13  panel that popped off the wall in the master bedroom, the

14  underside of the countertops, the inside of the cabinets, the

15  wood decks for the bunk beds and the wood decks for the master

16  bedroom, the underside of the master bed decking, the captain

17  compartment below that.  I think the underside of the tabletop.

18  Q.   You were able to see the raw side of the woods?

19  A.   Yes, sir.

20  Q.   And by "raw side" what do you mean?

21  A.   That is an unsealed, uncovered wood material.

22  Q.   You can see the raw side by crawling up and looking under

23  the sink?

24  A.   Yes, sir.

25  Q.   Opening up the drawers?

1    **A.**    Yes, sir.

2    **Q.**    Pulling up the mattress?

3    **A.**    Yes, sir.

4    **Q.**    And even pulling back that wall panel that's popped?

5    **A.**    Pulling back the wall panel, yes.

6    **Q.**    You did all of that?

7    **A.**    Yes, sir.

8    **Q.**    In fact, we have a picture of you guys pulling back this

9    wall panel?

10   **A.**    Yes, sir.

11   **Q.**    And you're -- right?

12   **A.**    Most of my wood inspection was done with Dr. Smulski was

13   he was documenting the panels or the woods and components of

14   the building.

15   **Q.**    Were you able to pull back that particular wall panel,

16   both topside and bottom?

17   **A.**    Yes, sir.

18   **Q.**    Were you able to look at the entire back of that wall

19   panel?

20   **A.**    For most of the paneling, not all of it.

21   **Q.**    Did you see a HUD certified or LFE stamp on that panel?

22   **A.**    I didn't see any stamps.

23            **MR. BUZBEE:**  Pass the witness.

24            **THE COURT:**  All right.  Mr. Scandurro.

25

1                          **CROSS-EXAMINATION**

2    **BY MR. SCANDURRO**

3    **Q.**   Mr. Mallet, good afternoon.

4    **A.**   Good afternoon.

5    **Q.**   You're not -- you don't consider yourself an expert in the

6    design or construction of travel trailers, do you?

7    **A.**   No, sir.  I don't design, I don't construct them.  I take

8    them apart and repair them, refurbish them.

9    **Q.**   Yes, sir.  When you went to Lottie, you were there for --

10   was it one day or one day and a part of another day?

11   **A.**   I was there on the 6th of May from 4:00 to 7:00 and then

12   the 7th of May from 9:00 to 5:00.

13   **Q.**   So one full day and three hours of another day?

14   **A.**   Yes, sir.

15   **Q.**   What did you charge for your services in this case?

16   **A.**   $250 an hour.

17   **Q.**   How much total, sir, did you charge?

18   **A.**   I don't know what the total is to date.

19   **Q.**   Do you recall telling us that as of July 2009 it was

20   $109,000?

21   **A.**   That's correct.  That's for myself, an electrical

22   engineer, mechanical and environmental engineer, structural

23   engineer, a fume technician and my -- my moisture technician.

24   **Q.**   Is the mechanical engineer, Mr. Ritter?

25   **A.**   Yes, sir.

 1  **Q.**   Didn't Mr. Ritter submit his own bill?

 2  **A.**   No, sir, that came from my organization.

 3  **Q.**   How much is it total now; do you know?

 4  **A.**   No, sir, I don't.

 5  **Q.**   Now, the jury's heard a lot of -- there's a chart over

 6  there on the travels of the travel trailer and everywhere that

 7  it went.  You're aware of the fact that it left Indiana in

 8  December of '04 and went to Florida; correct?

 9  **A.**   Yes, sir.

10  **Q.**   And there's an exhibit in evidence as Exhibit No. 26.

11  You've looked at all of these documents, haven't you, sir, the

12  various inspections that were done on this trailer along the

13  way?

14  **A.**   I think I've seen them all.

15  **Q.**   And you recognize that one as the FEMA inspector's

16  signature on the initial delivery to Punta Gorda, Florida?

17  **A.**   Yes, sir.

18  **Q.**   And you don't see any damage or issues at all indicated on

19  that, do you?

20  **A.**   No, sir.

21  **Q.**   In fact, you've seen all the subsequent ones since then.

22  It went to Georgia; correct?

23  **A.**   Yes, sir.

24  **Q.**   And then from Georgia, I believe, to Baton Rouge?

25  **A.**   Yes, sir.

264

1   **Q.**   And then it left Baton Rouge for a while and it came back

2   to Baton Rouge.  And then went to Taft, Louisiana, to the Dow

3   Chemical Plant and then, finally, down to Six Flags; right?

4   **A.**   I'm not sure about coming back to Baton Rouge in between

5   there.  I know it went from Hahnville to St. Rose.  I don't

6   know if it went back to Baton Rouge in between that.  I didn't

7   see that document.

8   **Q.**   This is Exhibit 25.  This is the inspection of the unit

9   when it was set up at the Alexander residence.  Do you

10  recognize that, sir?

11          **MR. PENOT:**  Objection.  Mischaracterizes the

12  evidence.

13          **THE WITNESS:**  That's correct.  I'm sorry, Judge.

14  **BY MR. SCANDURRO**

15  **Q.**   Six Flags?

16  **A.**   Yes, sir.

17  **Q.**   And do you see where it says "wall in bedroom" there?

18  **A.**   Yes, sir.

19  **Q.**   Is that the only damage noted on that particular form?

20  **A.**   Well, it doesn't say "damage".  It says "comment" and it

21  says "needs starter kit", "wall in bedroom".  It doesn't

22  indicate damage.  It just says "wall in bedroom".

23  **Q.**   Do you know what that means?  During the course of your

24  investigation, have you figured out what that means?

25  **A.**   No, sir.

265

1   **Q.**   And then finally we have Exhibit 161.  Do you recognize

2   that one as the inspection document when it showed up in Lottie

3   in February of 2008?

4   **A.**   Yes, sir.

5   **Q.**   And the damage is noted -- or the floor in front of the

6   doorway was soft, which you've talked about; correct?

7   **A.**   Yes, sir.

8   **Q.**   And the carpet was stained?

9   **A.**   Yes, sir.

10   **Q.**   Any other damage that you're aware of that was documented

11   in these inspection field reports except what we've looked at?

12   **A.**   No, sir.  The only pertinent information that I've

13   gathered from the inspection reports was the report after the

14   trailer left the Sherwood Forest, Baton Rouge location to the

15   Six Flags location.  When that report was filled out, there was

16   no damage noted in that unit.

17   **Q.**   So you think whatever that -- whatever damage occurred,

18   occurred sometime after it got to Six Flags?  Or on the way to

19   Six Flags?  Or you just don't know?

20   **A.**   What damage is that, sir?

21   **Q.**   Whatever damage the reference was to the wall.

22   **A.**   No, sir, that was prior to Six Flags.  That was when it

23   went to the Sherwood Forest location.  But when it left Six

24   Flags, there was no damage noted on the certificate.

25   **Q.**   And the only other damage other than that that we've seen

1    on these reports is the soft floor that we just looked at and

2    the carpet stain; correct?

3    **A.**    That's correct.  That would have been the time between the

4    setup in New Orleans for Ms. Alexander and the return of that

5    unit to the FEMA yard in Lottie.

6    **Q.**    Let me ask you about the insulation in the walls that we

7    talked about.  First of all, the little square --

8              **MR. SCANDURRO:**  May I approach, Your Honor?

9              **THE COURT:**  Yes.

10   **BY MR. SCANDURRO**

11   **Q.**    If this is the bedroom -- you were asked questions about

12   rain coming in through a roof leak here and then coming down

13   the sides; is that right?

14   **A.**    Yes, sir.

15   **Q.**    And you said because it can't penetrate the vapor barrier,

16   the vinyl here?

17   **A.**    Except at the walls, and the air conditioning registers,

18   and maybe at the cable TV element.  I think there was one near

19   the ceiling or at the ceiling.

20   **Q.**    You read Ms. Alexander's deposition, didn't you, sir?  You

21   said that.

22   **A.**    Yes, sir.

23   **Q.**    Didn't you note that she said that her bed was soaked

24   underneath that roof leak?

25   **A.**    That's correct.

1    **Q.**    Soaked all the way through to the floor; right?

2    **A.**    That's correct.

3    **Q.**    Isn't that the most likely source of all of this water

4    that you found at the bottom of this travel trailer if it was

5    that kind of a roof leak?

6    **A.**    Not necessarily, no, sir.  And the reason I say that is

7    that travel trailer sat in the lot in Lottie I think from

8    February 2008 through May of 2009 when I inspected it.  When I

9    inspected it, it would have been 15 months sitting in that lot

10   through numerous rainstorms.  When I performed my moisture

11   survey and my infrared thermographic survey, there was no

12   indications of water in that ceiling.

13   **Q.**    Numerous rainstorms and at least one hurricane; right?

14   **A.**    And at least one hurricane.

15   **Q.**    You recall preparing a report in this case, don't you,

16   sir?

17   **A.**    Yes, sir.

18   **Q.**    Do you have your report with you, sir?

19   **A.**    Yes, sir.

20   **Q.**    Could you turn to Page 33.  Could you read what you said

21   about the roof there, sir, under letter F?

22   **A.**    F:  "As noted earlier in the report, the roof inspected

23   separation in the ceiling material and on the perimeter of the

24   roof was noted.  Water was apparently penetrating into the roof

25   and wall systems from some of these separations."

 1          "One of the potential moisture problems with this
 2    temporary housing unit was persistent leak in bedroom.  One of
 3    the areas of separation in the roof ceiling material is along
 4    the outer edge of the bed."
 5    Q.    Okay.  So when you saw the travel trailer, you saw both
 6    evidence of a persistent leak in the bedroom and a ceiling
 7    separation above that area of the roof?
 8    A.    That's correct.
 9    Q.    But you still don't think that the roof leak is a more
10    likely source of that water that we saw collected in the bottom
11    of that unit?
12    A.    Well, you only had read part of my report -- or had me
13    read part of the report.  The rest of the report in another
14    section talks about the more likely source of the water would
15    have been the condensation based on my thermographic survey of
16    the ceiling and wall systems in the bedroom.
17    Q.    And above that you say:  "The water apparently is
18    collecting in the underbelly as a result of leaks in the
19    envelope and condensation in the wall and roof systems."  Are
20    leaks in the envelope something different from the roof leaks?
21    A.    Yes.
22    Q.    Do you know of any preventative maintenance that was done
23    by FEMA while this thing was sitting out there in Lottie?
24    A.    I'm not sure who did -- oh, I'm sorry.  Lottie?
25    Q.    In Lottie, yes, sir.

1   A.   No, sir, I'm not.

2   Q.   In fact, the only maintenance you're aware of, I'm

3   presuming, is the effort to fix the roof leak one time by

4   FEMA's contractors?

5   A.   That's correct.  And I think they stated -- or

6   Ms. Alexander stated that they didn't think they found the leak

7   because it wasn't obvious where it was coming in from.  That

8   was sort of an indication that they couldn't find an area of

9   penetration in the roof system itself.

10  Q.   So for $110,000, though, I'm assuming you did a thorough

11  check and a thorough search for any evidence of FEMA

12  inspections that you could find and in the course from 2004

13  until we sit here today, you came across one site visit that

14  you could identify by FEMA's contractor, or by FEMA, to come

15  out and try to fix that roof leak?

16  A.   That was the documents that were provided to me out of

17  about 20 or 30,000 documents that I reviewed.

18  Q.   That's the only one that you could find?

19  A.   That's the only one I found.

20  Q.   Now, you said you owned a travel trailer?

21  A.   Yes, sir.

22  Q.   And it was in better shape than this one?

23  A.   Considerably.

24  Q.   You took care of it, though, didn't you?

25  A.   Yes.

1   Q.   Maintained it?

2   A.   Well, I used it, so did my crews.

3   Q.   Checked it, made sure it was in good repair?

4   A.   We did very little repair to it, but, yes.

5   Q.   You talked about a vapor barrier earlier.  Did you mention

6   that that was some issue here with condensation in the walls;

7   do you recall?

8   A.   Yes, sir.

9   Q.   And are you saying that all FEMA trailers that have the

10  vinyl wrapped lauan where it is on this FEMA trailer and the

11  others that you've seen have a problem with the vapor barrier

12  location?

13  A.   All buildings in the hot, humid regions of the country

14  with vapor barriers on the interior side, the cold side,

15  creates a problem and is conducive to condensation.

16  Q.   But you've seen that a lot, haven't you, over the course

17  of your years?

18  A.   Yes, I have.

19  Q.   It's a standard HUD manufactured home location for that

20  vapor barrier back in 2004?

21  A.   On the interior?

22  Q.   Yes, sir.

23  A.   Yes, sir.  It's been the subject of a number of lawsuits,

24  that's correct.

25  Q.   So you're saying that that location, where it is -- by the

1  way, have you seen any other travel trailers -- FEMA travel

2  trailers that have the vapor barrier somewhere else other than

3  where this one is?

4  **A.**   No, sir.

5  **Q.**   They're all like this; right?

6  **A.**   I can't say all of them.  I've only inspected two trailers

7  that we were allowed access to the wall cavity.

8  **Q.**   Do you feel like you know enough about the industry to say

9  that as of 2004, the location where the vapor barrier is on

10  this travel trailer was an industry standard location?

11 **A.**   Yes, that would have been an industry standard.

12 **Q.**   You just feel like it was not appropriate to have it there

13 in this climate; correct?

14 **A.**   It is not appropriate based on all of the testing that's

15 been performed from -- from the '70s through -- last study I

16 saw was in 2003 or 2004, some of them done by the manufactured

17 housing industry itself regarding the location of the vapor

18 barriers.

19 **Q.**   So it's appropriate in other parts of the country, by not

20 on the Gulf Coast as far as you're concerned?

21 **A.**   No.  As far as the research shows, it is inappropriate to

22 be on the inside of the wall system, as opposed to the northern

23 climates, the cold climates, or the frigid climates, that the

24 moisture problem in those areas are on the inside of the

25 buildings.

1   Q.    So in other areas of the country, having it where it is in

2   this travel trailer and in all other industry-standard travel

3   trailers is appropriate?

4   A.    In the other two climate zones, yes, sir.

5   Q.    And isn't it also required by HUD to have it where it is

6   here in those other climate zones?

7   A.    Actually -- in the other climate zones, yes, sir.  Not in

8   this climate zone.

9   Q.    Now, do you think FEMA should have two separate sets of

10  travel trailers that they can deploy, one to the Gulf Coast and

11  one to flood this is Iowa and West Virginia or wherever else it

12  might go?

13  A.    Actually, there are wall systems that can be used in any

14  climate zone.

15  Q.    Do you think FEMA should spec those wall systems in all of

16  its emergency housing unit travel trailers?

17  A.    Actually, they did.  They said in the specifications that

18  the units were supposed to be constructed for different

19  climates.

20  Q.    It said they would be used in multiple climate areas?

21  A.    Multiple climate areas.

22  Q.    But as far as you know, every single travel trailer that

23  you've seen is built just like this one is as far as where the

24  vapor barrier goes?

25  A.    That is correct.  It doesn't make it correct, but that's

1    correct.

2    **Q.**    It just makes it industry standard?

3    **A.**    That's correct.  Not that it's correct, it's just an

4    industry standard.

5    **Q.**    I gotcha.  I gotcha.  You mentioned bowed walls that you

6    saw when you went to Lottie?

7    **A.**    Yes, sir, and documented.

8    **Q.**    And, of course, we didn't see any bowed walls mentioned in

9    any of those inspection reports; correct?

10   **A.**    Whose inspection reports?

11   **Q.**    The ones we looked at, Lottie, Punta Gorda, Florida.  We

12   didn't see a reference to bowed walls?

13   **A.**    No, sir, that's correct.  However, your experts also

14   didn't make any mention of any water damage when they inspected

15   it and there's water damage to some wall panels also.

16   **Q.**    Well, but the roof leak was documented by Mrs. Alexander

17   and FEMA, wasn't it?  I mean, that we know.

18   **A.**    There was a water leak documented by Mrs. Alexander and

19   FEMA.  Whether it's a roof leak is still of contention.

20   Because as I mentioned, the 15 months that trailer set in that

21   open field in Lottie, Louisiana, when I inspected it with my

22   moisture meters and my infrared camera there was no moisture

23   picked in the ceiling or wall system.

24   **Q.**    So you would agree that's a heck of a superior quality

25   roof to withstand that having that old leak in it; right?

1   A.   Actually --

2         MR. SCANDURRO:   I'll withdraw that question, Your

3   Honor.

4         MR. BUZBEE:   I think he gets to answer that question,

5   Your Honor.   That's not how it works.

6         THE COURT:   That was not a question.

7         MR. BUZBEE:   Yeah, that's a statement unless he gets

8   to answer it.   That's improper.

9         MR. SCANDURRO:   He can answer it.   He can answer it.

10  BY MR. SCANDURRO

11  Q.   Wouldn't you expect to see if it had an active roof leak

12  in that location some penetration in through the ceiling?

13  A.   Yes, sir, and that's exactly my point.   If there was a

14  penetration not roof ceiling, in the roof membrane, you would

15  see it on the ceiling or in the walls with the infrared camera

16  or the moisture meters.   Whether I could see it with my naked

17  eye or not, that camera is so sensitive, it would pick it up.

18        But the fact is after 15 months of being in that

19  field, if it had a roof leak, I would still be able to pick it

20  up with that infrared camera.

21  Q.   So you think there was no roof leak in that FEMA trailer

22  when you went out there?

23  A.   Well, that's correct.

24  Q.   Okay.

25  A.   And Ms. Alexander only had two occasions that I recall

275

1    that she reported roof leaks and she lived in that unit from

2    May 26th or 27th of 2007 through December the 29th of -- I'm

3    sorry, May 26th or 27th of 2006 to December the 29th of 2007,

4    and only had two occasions of roof leaks.

5    Q.   Just to close the loop on that:  No roof leak in that

6    travel when you saw it as far as you're concerned?

7    A.   Over of that bedroom, that's correct.

8    Q.   And you looked at the light fixture too?

9    A.   That's correct.

10   Q.   Didn't see any evidence of water in it?

11   A.   No, I saw evidence of water.  It doesn't mean it was a

12   roof leak.

13   Q.   Okay.

14   A.   As a matter of fact, the documentation from the research

15   shows that dealing with condensation issues, you're more likely

16   than not to think it's a roof leak because it can leak in just

17   like water -- just like a roof leak.

18   Q.   And come through and soak the whole bed and soak straight

19   down to the floor?

20   A.   If it continues to drip, that's correct.

21   Q.   You mentioned the window over the dinette?

22   A.   Yes, sir.

23   Q.   This is a picture that came up in opening statement.  You

24   see on the right-hand side there, Mr. Cooper right there, you

25   see the open window there?

1  **A.**   Yes, sir.

2  **Q.**   You don't see anything wrong with that wall, do you?

3  **A.**   No, sir, I don't.  But then again I didn't see anything

4  wrong with it when I inspected it either.  My camera and my

5  moisture meter picked up the problem.  When I pushed against

6  it, that wall was soft.

7  **Q.**   Can you tell if that wall is soft there, sir?

8  **A.**   I can't tell much with the birthday cake in the way.

9  That's where the softness was.

10            **MR. SCANDURRO:**  Thank you, sir.

11            **THE COURT:**  All right.  Mr. Penot.

12  **BY MR. SCANDURRO**

13  **Q.**   Good afternoon, Mr. Mallet.

14  **A.**   Hello, Mr. Penot.  How are you doing today?

15  **Q.**   We met at your deposition; correct?

16  **A.**   Yes, sir.

17  **Q.**   Just a few areas.  You've done some talking about the

18  penetrations through the skin of the trailer and through the

19  belly board.  You have no evidence that those penetrations were

20  made by Fluor; is that correct?

21  **A.**   No, sir, I do not.

22  **Q.**   You also rendered a written report in this matter.  I

23  believe Mr. Scandurro asked you about that; correct?

24  **A.**   Yes, sir.

25  **Q.**   And as part of that report...

1   A.   If I could add to the answer to your last question.

2           THE COURT:  Wait.  Is this pertinent to the question?

3           THE WITNESS:  Yes, sir, the last question.

4           THE COURT:  All right.

5           THE WITNESS:  The penetrations appeared to have been

6   factory made penetrations.

7   BY MR. SCANDURRO

8   Q.   Do you recall rendering as one of your opinions in your

9   written report the following:  "And you are talking about one

10  known roof leak that was never effectively repaired by the

11  installation/maintenance company and buckling of the wall

12  panels in the bathroom."

13          "According to Ms. Alexander, the repair personnel

14  sent out to address her roof leak issues reported to her that

15  they did not believe their efforts repaired the leak.  In fact,

16  the leak was not repaired and it was reported to this writer --

17  meaning you -- that water leaked inside the temporary housing

18  unit each time it rained."

19          Does that sound familiar as one of your conclusions

20  from your report?

21  A.   That's correct.  Except it was one other time that it

22  rained.

23  Q.   Right.  Lack of effective repair; correct?

24  A.   That's correct.  Because of the statements Ms. Alexander

25  made regarding their comment to her.

1  **Q.**   Finally, Mr. Mallet, you have owned a travel trailer
2  yourself for something like 12 years?
3  **A.**   Yes, sir.
4  **Q.**   And during that time you've had flat tires on that travel
5  trailer; correct?
6  **A.**   Yes, sir, once.
7  **Q.**   Once.  And you didn't change it yourself, but you called
8  someone else out to do it?
9  **A.**   Yes.
10  **Q.**   But you watched them do it?
11  **A.**   Yes.
12  **Q.**   And they used one jack right near the connection of where
13  the axle meets the frame members?
14  **A.**   Frame, yes, sir.
15  **Q.**   Yes.  And they jacked right there right near that wheel
16  and axle and they jacked it up until at least one of those
17  wheels came off the ground, correct, sir?
18  **A.**   Until the wheel with the flat in it.  It was off the
19  ground about three quarters of an inch.
20           **MR. PENOT:**  Thank you, sir.
21           **THE COURT:**  Thank you.  Redirect?
22           **MR. BUZBEE:**  Yes, sir.  Thank you.
23                    **REDIRECT EXAMINATION**
24  BY MR. BUZBEE
25  **Q.**   How long was that report?  Because I had to go through it,

1  just to let the ladies and gentlemen know how long the report

2  was.

3  A.   Without photographs, without attachments, it was 101

4  pages.

5  Q.   Single-spaced?

6  A.   Single-spaced.

7  Q.   You've looked at this thing topside and bottom, didn't

8  you?

9  A.   Yes, sir, including reviewing, as I said, somewhere

10  between 20 and 30,000 documents, numerous meetings with my

11  engineers, reviewing photographs, meeting with attorneys.

12  Q.   Okay.  This vapor barrier that he asked you about just

13  then.  This negative pressure is sucking this -- this vapor

14  that's building up is sucking it through the lauan into the

15  space; is that right?

16  A.   No, sir.

17  Q.   All right.  How does it work?

18  A.   The vapor barrier works sort of -- if I could use the

19  analogy of driving a car coming to a stoplight, the light turn

20  red and the policeman pulls up right behind you, and it doesn't

21  turn green, and it doesn't turn green, you're getting under a

22  lot of pressure because there's a policeman behind you.

23  Q.   I'm really sweating at this point I can assure you.

24  A.   And you can't go far.  When the moisture comes through

25  that wall and hits that vapor barrier, the moisture comes

1   through the wall and hits that vapor barrier, that's like the

2   wallpaper on the inside of the wall panel.  It can't go through

3   that red light.  And there's pressure behind it -- there's

4   vapor pressure behind it pushing against it, that's the

5   policeman behind your car.

6          It has to move.  And the only way it can move is like

7   in Louisiana where you can turn right on red, you just go

8   around the vapor barrier and you find -- it finds the path of

9   least resistance, the receptacles, and light outlets in the

10  walls, the seams between the panels, the joints between the

11  ceiling and the wall panels, the joints between the floor and

12  wall panels, any penetration in the wall, then it comes through

13  to the interior air of the -- of the housing unit.

14  Q.   So this stuff is, as it heats up, as this gas is building

15  up, and then it finds a crack to escape inside because of the

16  negative pressure?

17  A.   Because of the negative pressure, yes.  If it wouldn't be

18  for the negative possession, you would probably evacuate to the

19  outside because that would be the path of least resistance.

20  But because of the sucking effect of that duct leaking, causing

21  the air conditioning system to have to make up that air that

22  it's losing, it's sucking that air from the outside in or from

23  the outer cavity in.

24  Q.   Okay.  He asked you about your -- both of them asked you

25  about your travel trailer.  Is it 12 years old?

1   A.   Yes, sir.

2   Q.   Do your eyes burn when you go into it?

3   A.   No, sir.

4   Q.   Is it falling apart like this thing is?

5   A.   No, sir.

6   Q.   Are the walls buckling and falling off?

7   A.   No, sir.

8   Q.   Can you walk in there without falling through a hole in

9   the floor?

10  A.   Yes, sir.  I actually -- when we were doing Katrina relief

11  in New Orleans, my crews lived in that travel trailer here for

12  some nine months or so.

13  Q.   The federal government was promised and paid for a trailer

14  of superior quality.  Was this trailer of superior quality?

15           MR. SCANDURRO:  Objection, Your Honor.  I didn't

16  cover that, and he's already asked that question.  I think I

17  know the witness' opinion and so does the jury.

18           THE COURT:  I think we covered this on direct, but it

19  was not covered on cross.  So I think you're plowing ground

20  that's already been plowed and hasn't been covered on cross.

21  I'll sustain the objection.

22           MR. BUZBEE:  I appreciate you.  Nice meeting you,

23  sir.

24           THE WITNESS:  Thank you.

25           THE COURT:  All right.  Mr. Mallet, thank you very.

1    You can step down.

2                    **THE WITNESS:**  Thank you, Your Honor.

3                    **THE COURT:**  It's about eight minutes before 5:00, so

4    we'll go ahead and break for today.  Thank you-all for your

5    attention today.  Please don't discuss anything about the case

6    with anyone before you come back tomorrow into the courtroom.

7    It's very important that you follow that instruction.

8                    I know I've said is several times, but I always

9    like to remind you that you're not to discuss the case with

10   anyone, including amongst yourselves, until the case is given

11   to you for deliberation, which the attorneys tell me we're on

12   schedule, that that will be one day next week.

13                   Thank you-all.  Have a good evening.

14                   **THE DEPUTY CLERK:**  All rise.

15                   (WHEREUPON, the jury exited the courtroom.)

16                   **THE COURT:**  Counsel, is there anything we need o

17   cover on the record before we break for the day or before we go

18   off the record?

19                   **MR WATTS:**  No, sir.

20                   **THE COURT:**  Anything at all to put on the record?

21                   **MR WATTS:**  No, sir.

22                   **THE COURT:**  Well, let's go ahead and close the record

23   for the day.

24                   (WHEREUPON, the proceedings were concluded.)

25                                *****

1                           **<u>CERTIFICATE</u>**

2              I, Jodi Simcox, RMR, FCRR, Official Court Reporter

3    for the United States District Court, Eastern District of

4    Louisiana, do hereby certify that the foregoing is a true and

5    correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled and numbered matter.

8

9

10                              _S/ Jodi Simcox, RMR, FCRR_
                                Jodi Simcox, RMR, FCRR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25