1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  FEMA TRAILER          *    Docket MDL 1873 "N"
    FORMALDEHYDE PRODUCTS         *
6   LIABILITY LITIGATION          *    New Orleans, Louisiana
                                  *
7   THIS DOCUMENT IS RELATED TO:  *    September 18, 2009
                                  *
8   CHARLIE AGE, ET AL V          *    12:40 P.M.
    GULF STREAM COACH, INC.,      *
9   ET AL, DOCKET NO. 09-2892;    *
    ALANA ALEXANDER, INDIVIDUALLY *
10  AND ON BEHALF OF              *
    CHRISTOPHER COOPER            *
11  * * * * * * * * * * * * * * * *

12                       DAY 5
                    AFTERNOON SESSION
13         JURY TRIAL PROCEEDINGS BEFORE THE
               HONORABLE KURT D. ENGELHARDT
14            UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16

17  For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                 Meunier & Warshauer
18                             BY:  GERALD E. MEUNIER, ESQ.
                               1100 Poydras Street
19                             Suite 2800
                               New Orleans, Louisiana 70163
20

21                             The Buzbee Law Firm
                               BY:  ANTHONY G. BUZBEE, ESQ.
22                             JP Morgan Chase Tower
                               600 Travis, Suite 7300
23                             Houston, Texas  77002

24

25

        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES</u>:

2    For the Plaintiffs:          Watts Guerra Craft
                                  BY:  MIKAL C. WATTS, ESQ.
3                                 Four Dominion Drive
                                  Building Three, Suite 100
4                                 San Antonio, Texas  78257

5
                                  Hilliard Munoz Guerra
6                                 BY:  ROBERT C. HILLIARD, ESQ.
                                  710 S. Shoreline Boulevard #500
7                                 Corpus Christi, Texas  78401

8
                                  CHRIS PINEDO, ESQ.
9                                 Attorney at Law
                                  802 North Carancahua
10                                Suite 2250
                                  Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                    & Morton
13                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  BY:  JOSEPH G. GLASS, ESQ.
14                                3838 N. Causeway Blvd.
                                  Suite 2900
15                                Metairie, Louisiana 70002

16
                                  Scandurro & Layrisson
17                                BY:  TIMOTHY SCANDURRO, ESQ.
                                  607 St. Charles Avenue
18                                New Orleans, Louisiana  70130

19
     For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                                BY:  CHARLES R. PENOT, JR., ESQ.
                                  BY:  RICHARD A. SHERBURNE, ESQ.
21                                BY:  SONIA MALLETT, ESQ.
                                  717 North Harwood
22                                Dallas, Texas  75201

23

24

25

                JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

1   <u>APPEARANCES</u>:

2

3   Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
                                    Room HB-406
4                                   New Orleans, Louisiana 70130
                                    (504) 589-7780
5

6

7

8   Proceedings recorded by mechanical stenography, transcript

9   produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                        Page

3

MARCO KALTOFEN
4       Direct Examination                            118
        Cross-Examination                             144
5       Redirect Examination                          159

6  KARIN PACHECO
        Videotaped Deposition                         168

7
   PAUL HEWETT
8       Direct Examination                            215
        Cross-Examination                             252
9       Cross-Examination                             267
        Redirect Examination                          271

10
   PROFFER                                             280
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

               JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA

1                         **AFTERNOON SESSION**

2                       **(September 18, 2009)**

3                              * * * * *

4         **THE DEPUTY CLERK:**  All rise.

5         (WHEREUPON, the jury entered the courtroom.)

6         **THE COURT:**  You all may be seated.  Let me just

7    discuss one thing with the attorneys.

8                         **(OFF THE RECORD)**

9         **THE COURT:**  Let's go ahead and get started, then.  We

10   have covered a lot of ground and hopefully today -- I don't

11   want to commit the lawyers to this -- but we may be able to get

12   out a few minutes early today.

13              So if you would stand up, please.

14              And who is this gentleman?

15        **MR. HILLIARD:**  Well, with that in mind, Judge, no

16   further questions.

17        **THE COURT:**  I don't want to put the pressure on, but

18   they may be able to get a lot done before 5:00 and get out a

19   little bit before 5:00.

20        **MR. HILLIARD:**  Your Honor, may I introduce Marco

21   Kaltofen.

22        **THE COURT:**  Marco Kaltofen, good afternoon.  Let's go

23   ahead and administer the oath and see what he has to say.

24              (WHEREUPON, **Marco Kaltofen**, having been duly sworn,

25   testified as follows.)

1          **THE DEPUTY CLERK:**  Thank you.  You may be seated.

2   And please state and spell your full name for the record.

3          **THE WITNESS:**  My name is Marco Paul Johann Kaltofen,

4   M-A-R-C-O, P-A-U-L, J-O-H-A-N-N, K-A-L-T-O-F-E-N.

5          **THE COURT:**  All right.  You may proceed.

6          **MR. HILLIARD:**  Thank you.

7                    **DIRECT EXAMINATION**

8   BY MR. HILLIARD

9   Q.   Good afternoon, Mr. Kaltofen.

10  A.   Good afternoon.

11  Q.   Would you, even though you said your name for the record,

12  introduce yourself to the jury, tell them where you're from and

13  what you do?

14  A.   Good afternoon.  My name is Marco Paul Johann Kaltofen.

15  I'm an engineer.  I'm from Massachusetts.

16          **MR. HILLIARD:**  Judge, we would tender Mr. Kaltofen as

17  a registered professional engineer with an accredited

18  concentration in chemistry from Boston University.  We are not

19  tendering him as a chemist.

20          **MR. WEINSTOCK:**  Stipulated to, Your Honor.

21          **THE COURT:**  So stipulated?

22          **MR. SHERBURNE:**  Yes, Your Honor.

23          **THE COURT:**  All right.  The Court will therefore

24  accept him in the designated field, and you may question him

25  about this case.

 1          **MR. HILLIARD:**  Thank you.

 2   **BY MR. HILLIARD**

 3   **Q.**   Mr. Kaltofen, it's good to see you again.  I saw you

 4   yesterday for the first time in a long time; isn't that right?

 5   **A.**   Yes.

 6   **Q.**   But there -- many, many years ago, we have had a

 7   professional relationship in other cases?

 8   **A.**   We did.

 9   **Q.**   I would like you to briefly tell the jury what company you

10   have and the parameters of what your company is called to do

11   from time to time.

12   **A.**   My company is called Boston Chemical Data Corporation.

13   I'm an engineer in private practice.  I have a couple of

14   assistants who work with me, Strong Bear and Jim Stiles.  Most

15   of our work involves doing testing for different organizations

16   and also for a lot of law firms, mostly plaintiffs' law firms.

17          I've been doing environmental testing and have been,

18   in the past, a laboratory director for about 25, 27 years.  And

19   most of my work is related to looking at toxic chemicals or

20   nuclear materials that have been released into the environment.

21          So it's, for the most part, going into people's

22   homes, being outdoors, doing a lot of field work.  I don't do a

23   lot of academic work, although I recently got a master's degree

24   in environmental engineering from Worcester Polytechnic

25   Institute, and I'm doing some research work and doing some

1   writing there.

2   **Q.**   In regards to that and in being out in the field after

3   Hurricane Katrina hit, did you provide any professional

4   services in this area, and if so, what were they?

5   **A.**   Well, I came down here about a week after Katrina.  I had

6   been working in the area with a local law firm on another case.

7   And after the hurricane, I came down as a volunteer and did

8   some work on mapping oil slicks and oil spills.

9   **Q.**   I'm sorry.  Did you say "mapping"?

10  **A.**   Mapping, where are they?  Things were in a bit of an

11  uproar.

12  **Q.**   All right.

13  **A.**   So it was just a matter of getting a first look at some

14  spots and looking at some of the damage.

15          I was actually asked to do that professionally at the

16  Murphy oil spill.  Murphy Oil USA had lost some of their

17  product because of the hurricane.  And that was in the area

18  known as Chalmette, St. Bernard's Parish, east of New Orleans.

19          I spent about half a year doing testing and provided

20  some reports and expert testimony in that case.

21  **Q.**   Once you became involved in this case, Marco, what were

22  you asked to do and how did you do the things that you were

23  asked?

24  **A.**   It's pretty straightforward.  I was asked to look at plans

25  for how sampling would be conducted.  There had been some

1    people who had been doing testing of some of the different FEMA

2    trailers and mobile homes, and they were developing a protocol,

3    a method for how you would go about doing your sampling and

4    testing.

5              And I helped develop that and find laboratories that

6    would be appropriate, helped decide on what kinds of testing

7    method would be used.

8              And then I also worked out in the field, visited a

9    lot of these trailers -- some were occupied, most of them were

10   unoccupied -- do some of the field sampling, and then just

11   arranging all of the data we got from the different

12   organizations, whether it was our own testing or other experts

13   working for plaintiffs or government agencies, and put that all

14   together in one database, and then also try to consider some of

15   the environmental factors.

16             Formaldehyde release is affected by temperature,

17   humidity, things people have already heard about today --

18             MR. WEINSTOCK:  Your Honor --

19             THE WITNESS:  -- and try and find some information

20   about --

21             THE COURT:  One second, sir.

22             THE WITNESS:  -- that relationship.

23             MR. WEINSTOCK:  I'm, of course, a fan of not leading

24   a witness, but we do need a question every now and again.

25             THE COURT:  Yeah.  Let's do this:  Listen very

1  carefully to the question and go ahead and answer just the

2  question you're asked.  If you need to briefly explain your

3  answer, you can.  But it's going to be especially important on

4  cross to listen to the question and answer the question, rather

5  than -- you know, I know there's other information you want to

6  say, but you've got to answer the question, and then we'll move

7  on to the next question.

8          **THE WITNESS:**  Yes, sir.

9          **MR. HILLIARD:**  That was more my fault, Judge.  I was

10  trying to get through some preliminary stuff.

11          **THE COURT:**  Yeah, I understand.

12          **MR. HILLIARD:**  I will be more careful.

13          **THE COURT:**  I understand.

14  **BY MR. HILLIARD**

15  **Q.**  As an engineer -- not as a chemist, but as an engineer,

16  what is the working understanding and knowledge that you have

17  of formaldehyde as a chemical?

18  **A.**  Well, for me, it becomes more about real things.  As an

19  engineer, I think what sets us apart is trying to take basic

20  science and put it in the context of things that we see in

21  everyday life.

22          So for me, as an engineer, it's a matter of looking

23  at how formaldehyde is fundamentally going to behave and how I

24  should best be trying to measure it, if I want to get an idea

25  of what's out there.

1    **Q.**   Okay.  I want to show you a few things on the ELMO and

2    then talk to you about Alana Alexander and the formaldehyde in

3    her trailer.

4            I wrote this down.  You understand that Alana and

5    Chris and Erika moved in May of 2006?

6    **A.**   Yes.

7    **Q.**   And they stayed in their trailer until December 27th,

8    2007?

9    **A.**   Yes.

10   **Q.**   And then a month after they left, their trailer was

11   tested; is that right?

12   **A.**   Yes.

13   **Q.**   Now, you weren't in the courtroom in the beginning, but

14   His Honor read to the jury some stipulations that we had, both

15   sides agreed to, and those stipulations were that those test

16   results for the Alexander trailer, taken in January of 2008,

17   the temperature at the time of the testing was 71.8 degrees,

18   the humidity was 47 percent, and the formaldehyde levels were

19   .050 parts per million.

20           Have you been made aware of that information before

21   today?

22   **A.**   Yes.

23   **Q.**   Okay.  By the way, what is the odor threshold for

24   formaldehyde?

25   **A.**   Well, there are variable articles about it.  Probably

1    between about half a part per million and one part per million.
2    **Q.**   Let me ask you this before I go away from this:  So if you
3    got .50 parts per million in January of 2008, right after they
4    move out, as an engineer, is there a way to -- and using
5    whatever information has been made available to you -- is there
6    a way, scientifically, to back up that number to get this 5.0
7    parts per million in January and start looking at the times of
8    the year that had different temperatures and perhaps different
9    humidities, hotter times of the year closer to the beginning of
10   May 2006, during the 19 months that they were in the trailer?
11            Is there a way to do that?
12   **A.**   There are a couple of different ways you could try and do
13   this.  One is to do an exact calculation.  There are a lot of
14   ways that the amount of formaldehyde in the trailer changes,
15   based upon other things that are happening.
16            When it's warmer, more formaldehyde is released.
17   When it's more humid, more formaldehyde is released.  If you
18   increase ventilation, the formaldehyde concentration goes down.
19   As the trailer gets older, you're weighing how much
20   formaldehyde you're losing from the materials it's made of.  On
21   the other hand, the trailer does get progressively more damaged
22   on average as it gets older, and you might actually be
23   releasing more formaldehyde because of that damage, water
24   intrusion, or breakage, or exposing components that weren't
25   exposed before.

1         There are a lot of different variables you could
2    check and then you could exactly calculate, if you knew all
3    those answers, what the number was.
4         The second method is more like what was actually
5    done, and that is, we know some general rules that formaldehyde
6    always follows.
7    Q.   May I stop you, and as you set out those rules, I'll jot
8    them down.  How many are there?
9    A.   I'll try and just stick to the most important ones.
10   Q.   Thank you.
11   A.   You can stop me if you have to.
12   Q.   I'll stop you when I get to the bottom.
13   A.   The most important ones are going to be the temperature
14   and the humidity.  The warmer it gets, the more formaldehyde is
15   being released.  The higher the humidity, the more formaldehyde
16   is being released.
17   Q.   And as you take that .50 parts per million, which was the
18   test results of her trailer the month after she moved out, and
19   you start to back up to try to give this jury an idea of what
20   the levels may have been during the time she lived there, at
21   any point during those 19 months did you consider test results
22   of Gulf Stream trailers done by the CDC?
23   A.   I did.  And just to finish the sentence on the previous
24   question, if I could.
25   Q.   Sure.

1   A.   Another issue is the age of the trailer.  In general, as

2   you start to emit formaldehyde, there's less formaldehyde

3   material left behind.  So your reservoir, your source of

4   formaldehyde, is slowly going away.  You would expect a new

5   trailer to have more formaldehyde than an older one, if

6   everything else is the same.

7            So by looking at the -- the date that I had here, I

8   know that the earlier concentrations, where it's going to be

9   warmer for the rest of the year compared to late December,

10  where humidity is going to be generally higher, and where the

11  trailer was newer, the earlier concentrations were probably

12  higher.

13           So that .50 ppm value is actually fairly

14  conservative.  It's a floor.  It's really the lowest number you

15  could have had in the previous time.

16  Q.   And --

17  A.   I haven't forgotten the CDC data.  I was just pausing.

18  Q.   Well, I have, because I want to go back to what you

19  were -- I want -- I want a little more information in regards

20  to this.

21           If you have -- January, even, in New Orleans is a lot

22  cooler than September, August, and October in New Orleans.

23  A.   Yes.

24  Q.   What is it about formaldehyde, as a chemical, that causes

25  it to react to heat, first, and then after that, humidity?

1   A.   Well, as an environmental engineer, what you're interested

2   in is what happens to chemicals in the environment.  And a lot

3   of different things happen at once when it gets warmer.  The

4   reaction rate goes up.  That means how quickly does any

5   chemical reaction, say formaldehyde forming, from a composite

6   wood.  That reaction happens faster, so you've got more

7   formaldehyde that's actually available that can escape.

8            The other thing that happens is diffusion, which is

9   how these chemical vapors move through the wood and move

10  through the air.  It gets faster when the temperature goes up.

11           So you've got two different things that are making

12  the formaldehyde go into the air faster as that temperature

13  goes up.

14  Q.   Okay.  And we'll let the CDC data just build in

15  anticipation for one moment, while we're...

16           I'm going to ask you a question about something that

17  has come up in this trial over and over, and I'm going to call

18  it Gulf Stream's solution.

19           Please assume that these nice folks to my left for

20  the last four days has heard Gulf Stream's attorney say plenty

21  of times over and over, "open the windows, open the doors,

22  ventilate," okay?

23           Gulf Stream's solution to the formaldehyde that

24  smelled, if there is formaldehyde, is, "open the windows, open

25  the doors, ventilate."  Please assume that.

 1          What I want you to do, if -- if this is Gulf Stream's

 2  solution, what I want you to do is, if you have two trailers,

 3  Mr. Kaltofen, this trailer, windows are closed, doors closed,

 4  AC is on.

 5          There's one piece of information that I want to add

 6  to that board.  Let me show it to you.

 7          This is something that shows the relative humidity by

 8  month in New Orleans in the morning and in the afternoon.

 9          Can you kind of see how that works?

10  A.   Yes.

11  Q.   All right.  Basically in the morning, months even all the

12  way through December, you've got humidity that is anywhere from

13  91 percent down to 85 percent, then it drops a little lower in

14  the afternoon; right?

15  A.   Yes.

16  Q.   A relatively high humidity place to live, New Orleans?

17  A.   Yes.

18  Q.   And --

19  A.   I've been here enough.  I'd agree.

20  Q.   Everybody knows.  Right.

21          So let's say in Gulf Stream's solution, the question

22  I have is:  In this trailer scenario you have the windows

23  closed, the doors closed, and the AC on.  And you have the

24  humidity on the outside, let's say 80 percent, and the

25  temperature of, say, 80 to 85.  And you've got the AC running.

1            If the windows are closed and the doors are closed
2    and the AC on -- and the AC is on, there is -- and there is
3    formaldehyde inside this trailer -- can you all see this? --
4    and there is formaldehyde inside this trailer, the formaldehyde
5    will not be vented out, will it?
6    A.   Well, all the trailers have a certain natural ventilation
7    rate even when they're closed --
8    Q.   Right.
9    A.   -- a certain number of air exchanges per hour.  The Murphy
10   test actually went into that.  But aside from that, the
11   formaldehyde is going to tend to build up.
12   Q.   And stay where it is?
13   A.   Yes.
14   Q.   What the AC unit will do is just, as Erika Alexander said,
15   just push it around?
16   A.   I'm told by the other experts that it was a recirculating
17   air conditioner.
18   Q.   But one thing that is not happening is this humidity and
19   the temperature is not getting inside the trailer; right?
20   A.   The humidity and temperature are staying outside.
21   Q.   So let's go to -- I'm going to put an arrow here.  Gulf
22   Stream's solution, which is open the windows, open the door and
23   ventilate.  And you still have the same humidity and
24   temperature.
25            So the formaldehyde that is already in the air in

1  this trailer, if you open the doors and windows, will it all go
2  away?  Will it all be pushed out?
3  A.   Well, if you open the windows and you open the doors, you
4  will increase the ventilation rate.  And if everything else
5  stays the same, the concentration would tend to go down.
6  Q.   Okay.  But what also happens when you open the doors and
7  you open the windows in regards to the outside humidity and the
8  outside temperature and whether or not it can get inside the
9  trailer, and how does that affect formaldehyde out-gassing?
10  A.   Well, that's the -- and scientists do this a lot.  They
11  start a sentence by saying, "If everything else is the same,"
12  well, then, this would happen.
13          And, of course, it's never always everything else is
14  the same in real life.  So if it's hot outside and you're
15  trying to keep it cold inside, you're going to be raising the
16  temperature some.  And if it's very damp outside, you're going
17  to be bringing some of that humidity inside the trailer, so you
18  have a tradeoff happening.  There are -- there are other
19  tradeoffs, but those are the key ones.
20  Q.   And the two -- the top two things that affect formaldehyde
21  out-gassing, that we already talked about, is temperature and
22  humidity.
23          So if we have Gulf Stream's solution that you open
24  the windows and you open the doors to ventilate, you are also
25  creating temperature and humidity inside the trailer, which are

1    the two things that cause -- the two things that do what?  I'm

2    not going to put words in your mouth.

3    A.    Well, they just make it more complex.  It's not open and

4    shut, or -- no pun intended -- it's not completely cut and dry

5    that opening the windows and opening the doors are going to

6    necessarily only reduce the concentration.

7    Q.    Right.

8    A.    But depending on what the differences are between inside

9    and outside air, you might have some effects go the other way.

10   Q.    Mr. Kaltofen, if you have a trailer that has high humidity

11   inside of it and a high temperature inside of it because you're

12   ventilating, will that high humidity and high temperature

13   increase the out-gassing of the formaldehyde in the particle

14   boards?

15   A.    Oh, as soon as it gets warmer and as soon as the humidity

16   goes up, you're going to get more out-gassing of formaldehyde.

17   Q.    Do you know what a Catch-22 is?

18   A.    I've heard of it.

19   Q.    So the Catch-22 -- and correct me if I'm wrong -- is that

20   if you keep everything closed, the formaldehyde that's already

21   out-gassed stays in.  If you open everything up, you let in

22   humidity and temperature which creates new formaldehyde

23   out-gassing?

24   A.    I -- I understand --

25   Q.    Do you agree with it simply as a concept?

1    A.   I -- I would say, as a concept.  It does become complex,

2    just opening windows and doors, because you have to ask the

3    question of, are you raising the temperature by opening the

4    windows and opening the doors compared to what it was before?

5    Are you raising the humidity?

6    Q.   So if the testimony from Alana Alexander is they get home

7    from a hot day, they ventilate, and as they are ventilating,

8    the humidity and the temperature inside the trailer rise, and

9    they turn on the AC, as well.  And then when it's bedtime they

10   shut up the trailer, shut down -- shut up the windows and close

11   the door and go to bed.

12        The temperature and humidity that came into the

13   trailer during the ventilation at the end of the day after they

14   got home, as it's floating around the trailer inside, from an

15   engineering standpoint with some understanding of chemistry,

16   how does the higher temperature and the higher humidity

17   interact with the formaldehyde-filled fiberboard?

18   A.   Well, I prefer to put it in more basic terms.  Heat and

19   humidity are the factors that cause formaldehyde to be

20   released.  The more heat and humidity you bring in, or the more

21   heat and humidity you trap, then the greater the formaldehyde

22   concentration is going to tend to be.

23   Q.   The report that you considered is already in evidence.

24        MR. HILLIARD:  147, Your Honor.

25

1  **BY MR. HILLIARD**

2  **Q.**   It is called "the final report on formaldehyde levels in

3  FEMA-supplied trailers, park models and mobile homes, from the

4  CDC and prevention, July 2nd, 2008."

5         You've looked at that and you've used some of the

6  test results done by the CDC in forming your opinions?

7  **A.**   I did.

8  **Q.**   Let's go through a few preliminary matters about this.

9         On the first page, can you read that to the jury,

10  please?

11  **A.**   "In this study, travel trailers had significantly higher

12  average formaldehyde levels than did park models and mobile

13  homes.  A higher proportion of travel trailers than park models

14  and mobile homes also had formaldehyde levels that were greater

15  and equal or equal to 100 parts per billion, and greater and

16  equal to 300 parts per billion.

17         "In multivariate analysis, factors such as

18  temperature, relative humidity, trailer type and brand, open

19  windows, doors, and scuttles, and presence of mold greater or

20  equal to one square foot were significantly associated with

21  formaldehyde levels."

22  **Q.**   Okay.  And I want -- I want you to explain to the jury, in

23  your experience, what this statement means:  "Factors such as

24  temperature, relative humidity, trailer type and brand, open

25  windows, doors, and scuttles, and presence of mold were

 1  significantly associated with formaldehyde levels."

 2  **A.**    All right.  Well, we've talked about temperature and

 3  humidity.

 4           Trailer type and brand, where that came into play for

 5  the CDC report was that the amount of formaldehyde you had in

 6  the trailer depended on who made it, so that some had higher

 7  levels on average and some had lower levels.

 8           And the CDC noted that they were statistically

 9  significant, meaning it was probably more than just random

10  chance that some people were building trailers that had more

11  formaldehyde release and some people were building trailers

12  that had less.

13           Open windows, doors, and scuttles, we get back to

14  the -- you increase ventilation, and all other things being the

15  same, you tend to reduce formaldehyde levels.

16           And also the presence of mold, I'm not a biologist of

17  any kind, but often mold is correlated.  You see mold where you

18  tend to see water damage.  In a lot of --

19           **MR. WEINSTOCK:**  Objection, Your Honor.  May we

20  approach?

21           **THE COURT:**  Yes.

22           **MR. HILLIARD:**  We withdraw the question.  Let's skip

23  through the mold.

24           **THE COURT:**  All right.  You withdraw the objection?

25           **MR. WEINSTOCK:**  That -- that was the basis of it.  He

1    said he's going to move on, so...

2              THE COURT:  Oh, okay.

3              MR. HILLIARD:  I'll move on, Judge.

4              THE COURT:  Okay.

5    BY MR. HILLIARD

6    Q.   So, again -- and this isn't belaboring the point, because

7    it goes to the heart of it.  And that is, the ventilation that

8    you were speaking of only ventilates the formaldehyde that has

9    already escaped and is floating around in the air for folks to

10   breathe?

11   A.   Yeah, that's the effect.

12   Q.   Right.  It doesn't stop the formaldehyde that is in --

13   that is about to out-gas in the next minute, in the next five

14   minutes, or the next ten minutes?

15   A.   Well, it might actually very slightly increase diffusion

16   of the formaldehyde out of the wood product, but it's probably

17   not important.

18   Q.   The CDC also has the definitions of the trailers used by

19   FEMA.  Let's focus on the travel trailer definition.

20              Could you read that, please?

21   A.   "Travel trailers are wheel-mounted trailers designed to

22   provide temporary living quarters during periods of recreation,

23   camping, or travel.  Travel trailers generally have size

24   limits, such as 8 feet wide and 40 feet long, for an area less

25   than 320 square feet.

1      "Travel trailers generally are considered vehicles
2  rather than structures, and are regulated by state
3  transportation authorities rather than by housing authorities.
4      "Travel trailers have been used principally for
5  short-term housing needs.  They are placed on private sites
6  while a homeowner's permanent residence is repaired, or in
7  group configurations primarily to support displaced renters."
8  Q.   Okay.  CDC, on Page 5, speaks about regulation and
9  standards of formaldehyde levels.  Could you read the
10  highlighted portion, please?
11  A.   Could you just adjust that?  I'm missing some of it.
12  Thank you.  Got it.
13      "No federal regulation or standard exists for
14  formaldehyde levels in residential settings.  Occupational
15  levels are not appropriate to apply to residential settings for
16  a variety of reasons.
17      "For example, residential populations include
18  children and elderly persons and, thus, are more diverse than
19  occupational populations and possibly more susceptible to
20  illness from exposure because of preexisting health conditions.
21      "Exposure times and circumstances in homes can vary
22  substantially from those in occupational settings."
23  Q.   The summary of that is -- do you understand what Coop's
24  preexisting health condition was when he moved into this
25  trailer?

1   A.   No.  I -- I'm -- I'm not -- I'm not going to give medical

2   testimony today.  A lot of that medical stuff is over my head.

3   Q.   All right.  So the jury has heard some evidence that --

4   without getting into it -- Alana's son had a preexisting health

5   condition when they moved into the trailer.  Did you know that?

6   A.   I'd seen the medical records, but I really can't interpret

7   them professionally.

8   Q.   All right.  Well, without interpreting them, just as to

9   this statement, it seems that that issue, as well as issues

10  that the elderly may have, prevents the -- prevents a federal

11  regulation as to levels.

12  A.   Well, again, I'm -- I'm not a toxicologist.  But as an

13  engineer, I've had the opportunity to work with ATSDR very

14  directly in helping design studies that were specific to some

15  sites I worked on.  And I understand some of the generalities

16  that they questioned me about, in terms of exposure and

17  patterns and -- and the population.

18  Q.   Let me interrupt you there.  I don't know if he's -- if

19  his chair is creaking or not, but I really don't want to turn

20  you into a toxicologist, and I appreciate your reluctance.

21  A.   Oh, good.

22  Q.   I want to -- I want to stay to the core of what you're

23  here to talk about.

24         Let's go to the nine conclusions reached by the CDC.

25  Can you go through those for us, please?

1   A.   Yes.

2          "In many trailers tested, formaldehyde levels were

3   higher than typical U.S. indoor levels.

4          "The average level of formaldehyde in all trailers

5   was 77 parts per billion, and many trailers had higher levels,

6   in the range of 3 parts per billion to 590 parts per billion.

7   These are higher than U.S. background levels, and occupant

8   health could be affected at the levels recorded in many

9   trailers.

10          "These measured levels probably underrepresent

11   occupant exposures in the early months of occupation, and even

12   the average exposure over time the trailers were occupied

13   because formaldehyde levels tend to be higher in

14   newly-constructed trailers and during warm weather.

15          "Higher indoor temperatures and RH were associated

16   with higher formaldehyde levels in this study, independent of

17   the trailer type or brand.

18          "Formaldehyde levels varied by trailer type, but all

19   types tested had some levels greater or equal to 100 parts per

20   billion, at which health -- excuse me -- acute health effects

21   can occur in sensitive persons.

22          "Travel trailers had significantly higher average

23   formaldehyde levels than park models or mobile homes.  Travel

24   trailers also had higher proportions of trailers with

25   formaldehyde levels greater or equal to 100 and greater or

 1    equal to 300 parts per billion than park models or mobile

 2    homes.

 3            "Because some types and brands had lower average

 4    formaldehyde levels, trailers might be able to be manufactured

 5    or used in ways that reduce levels.  Additional studies are

 6    under way to address this possibility.

 7            "Factors such as temperature, RH, closed windows,

 8    doors, and scuttles, and the presence of mold at greater than

 9    or equal to one square foot were associated with increased

10    formaldehyde levels in the trailers.  These were not assessed

11    with respect to any specific type of trailer.

12            "Only 71 percent of the trailers sampled had a

13    working smoke detector.  Education is needed about the need for

14    smoke detectors in the trailers, and testing to ensure they

15    function correctly."

16    Q.    So No. 3, where it says, "These measured levels probably

17    underrepresent occupant exposure in the early months, even --

18    and even the average exposure over time the trailers were

19    occupied because formaldehyde levels tend to be higher in

20    newly-constructed trailers during the warm weather," as an

21    engineer, do you agree with that?

22    A.    Well, in particular with this statement, because they were

23    measuring occupied trailers versus occupied trailers, meaning

24    that they actually had people in there living as they normally

25    did, except that they were asked not to smoke, it makes a very

1    good correlation to what's in the scientific literature, and it

2    fits everything else that has been reported about the effect of

3    temperature and humidity.

4    **Q.**   Okay.  I want to talk to you for a minute about No. 5:

5    "Formaldehyde levels varied by trailer type."

6            In other words, they tested different types of

7    trailers, not just Gulf Stream.

8    **A.**   Yes.

9    **Q.**   And levels of those trailers, some were higher, some were

10   lower?

11   **A.**   Yes.

12   **Q.**   Now, this seems to say that all of the types tested had

13   some levels greater than 100 parts per billion.

14   **A.**   Yes.

15   **Q.**   All right.  That means that there was no trailer that did

16   not test positive for formaldehyde, at least at that level?

17   **A.**   There was no trailer manufacturer who didn't test positive

18   at that level --

19   **Q.**   All right.

20   **A.**   -- at least once.

21   **Q.**   So at that level, the lowest level that they found in

22   every single trailer that they tested, there is a recognition

23   that acute health effects can occur --

24           **MR. WEINSTOCK:**  Objection, Your Honor.  He is not a

25   medical expert.

1          **THE COURT:**  Yes.  I think the witness has already

2     clearly delineated where his expertise lies and where it

3     doesn't.  So let's try to stick to questions that fall within

4     his area of expertise.  So I'll sustain the objection.

5          **MR. HILLIARD:**  All right.

6     **BY MR. HILLIARD**

7     **Q.**   Do you know if the CDC, in coming up with conclusion

8     No. 5, had its own qualified medical experts that were able to

9     reach these conclusions?

10    **A.**   I can only speak for my professional experience as an

11    engineer.

12         **MR. WEINSTOCK:**  Objection, Your Honor.

13    **BY MR. HILLIARD**

14    **Q.**   No, no, no.  I'm asking you if you know whether the CDC,

15    through this study, had their own medical doctors and other

16    qualified experts that would allow them to come up with this

17    conclusion No. 5.

18    **A.**   That is consistent with all my experience in working with

19    ATSDR.

20    **Q.**   Thank you very much.

21         The recommendation of the CDC, after they reached

22    their conclusions -- do you see where it says, "On the basis of

23    observations and previous scientific literature, priority

24    should be given as follows:  B, especially vulnerable persons,

25    children, the elderly, and those with chronic diseases"?

 1              **MR. WEINSTOCK:**  Objection, Your Honor.

 2              **THE COURT:**  Well, he hasn't asked a question yet.  He

 3   directed him to look at something.  And I hope he's not going

 4   to ask a question that calls for this witness to give some type

 5   of medical opinion or medical-related opinion.  But he hasn't

 6   asked it, so let's see what Mr. Hilliard has to say.

 7   **BY MR. HILLIARD**

 8   **Q.**   With that encouragement, my question is going to be:  Your

 9   same experience with the CDC leads you to believe that that

10   conclusion would be based on qualified experts that were at the

11   CDC, including medical doctors and others, who would know who

12   needed to be looked after the quickest; is that right?

13   **A.**   Same answer:  It's consistent with my experience that they

14   have their own medical and toxicological staff and resources

15   that they use to make that decision.

16   **Q.**   Got it.  One of the conclusions that you reached in your

17   report -- and this is the basis for some opinions you've

18   already given, but I want to spend a little time with it.

19              You said, "Formaldehyde released inside the travel

20   trailers increased by a factor of 2.3 times with a 10-degree

21   Celsius rise in temperature.  The increase was a factor of 3.5

22   times for medium-density fiberboard."

23              Can you explain what you mean by that?

24   **A.**   Actually, I believe that is from a discussion of some

25   specific materials that are used in travel trailers as opposed

1    to a specific travel trailer.  And in the references I provided

2    with my files, a lot of people have done research on taking

3    different types of formaldehyde containing -- or off-gassing

4    products -- and measuring the rate at which they off-gas at

5    different temperatures, different humidities, different

6    combinations of that.

7    Q.    All right.

8              MR. WEINSTOCK:  Your Honor, can we approach briefly?

9              THE COURT:  Yes.

10             (WHEREUPON, the following proceedings were held at

11   the bench.)

12             MR. WEINSTOCK:  I believe the ruling was he could say

13   what he just said, but he had to acknowledge it was a chamber

14   test done by other people, not him.

15             THE COURT:  Yes.  Go ahead and clarify that.

16             MR. HILLIARD:  There's a sentence in that record that

17   is --

18             THE COURT:  Well, I think I stated it in the record

19   order.  I don't think I instructed him to bring in out.  But,

20   clearly, that's part and parcel of it.

21             (WHEREUPON, the following proceedings were held in

22   open court.)

23   BY MR. HILLIARD

24   Q.    Mr. Kaltofen, we've gone over this -- and I want to ask

25   you this final question, and that is:  It seems, with all of

```
 1    the stuff that you have reviewed and all of the information
 2    that this jury has heard, the top two elements that will cause
 3    formaldehyde out-gassing in the travel trailers, including the
 4    one that the Alexanders were in, are what?
 5  A.   I'm going to try and interpret your question, and check in
 6    with me if I've got this wrong.
 7  Q.   I will.
 8  A.   We could pick a lot of different things that are important
 9    for the whole process, someone trying to make the trailer,
10    someone who had to put the composite wood in it, all this
11    other...
12         What you're asking is:  What are the two key
13    variables, once you've done all that, that would have an effect
14    on how much formaldehyde was being released?
15  Q.   Correct.
16  A.   Okay.  That would be temperature and humidity.
17  Q.   All right.
18         MR. HILLIARD:  Thank you, Marco.
19             That's all I have, Judge.  I pass the witness.
20         THE COURT:  All right.  Mr. Weinstock?
21                    CROSS-EXAMINATION
22  BY MR. WEINSTOCK
23  Q.   Was the -- I'm sorry.  We've met before, Mr. Kaltofen.
24    And they tell me I was raising my voice, so when I -- if I get
25    a little out of hand, tell me to calm down.  All right?
```

1   A.   Good afternoon, Mr. Weinstock.  How are you?

2   Q.   The Zhang study was a large chamber test study?

3   A.   I believe it was.  I would have to go back and look for

4   the size of the chamber.

5   Q.   And so the jury understands that, a large chamber test is

6   a meth- -- is a method we use -- you can use to make sure two

7   labs are kind of on the same page; correct?

8           I -- I'm sorry.  I -- I'm confusing studies.  First,

9   tell them what a large chamber test is.

10  A.   A large chamber test, it's that it's big enough you can

11  take a big piece of material that you want to test for

12  formaldehyde out-gassing, or any other gas, really.  You put it

13  in, control the condition, and see how much is coming out.

14  Q.   Then there are calculations, like the Birch calculation,

15  where you can do these different large chamber tests, and it

16  will tell you, kind of, if both labs are on the same page;

17  right?

18  A.   I haven't done the Birch calculation.

19  Q.   I understand that, and we're not going any further into

20  it.  But am I correct?

21  A.   To that extent.  I haven't actually done it myself, yes.

22  Q.   I think we -- we've talked about a lot of things, and

23  we've talked about way more things than this in your

24  deposition.  But, essentially, in essence, your opinion is

25  this:  That heat and humidity drive generation of formaldehyde

1    from composite wood, and ventilation dissipates that -- that

2    formaldehyde; correct?

3    A.    You're just a little overbroad.  There are other things

4    happening that make the formaldehyde come out.  But just in

5    general, temperature goes up, humidity goes up, formaldehyde

6    goes up; ventilation rate goes up, in general, it goes down.

7    Q.    Right.  And that is, in fact, what the CDC found when they

8    tested 96 units in the fall of '06.  You can --

9    A.    Could you put that whole graphic up there?

10   Q.    I'm going to get her to do it in a way we can all -- I

11   don't fool with this thing.  I mess it up every time.

12   A.    I still can't see it all.

13   Q.    Got it?

14   A.    Okay.  Thank you.

15   Q.    Now -- and we just talked about this with the other --

16   with the other witness, so we're not going to spend a whole lot

17   of time on it.  But I did want to clarify something.

18          The testing started on the 19th of September;

19   correct?

20   A.    Yes.

21   Q.    Okay.  Now, we went through it, and I think you were

22   sitting here, so we don't have to belabor the protocol.  But

23   ventilation got us here in three weeks; right?

24   A.    Are you looking at method A or method B?

25   Q.    That would be method B.

 1   **A.**   Method B.  I understand.
 2   **Q.**   Okay.  Now, my original question was:  Did method B
 3   ventilation get us -- decrease the concentration by 90 percent?
 4   And -- yes, it did?
 5   **A.**   Well, I haven't -- I haven't done the -- I'm looking at
 6   the -- the numbers.
 7            If I look at method A, method A is just turning on
 8   the air conditioning --
 9   **Q.**   Yeah, but I want to talk about --
10   **A.**   -- if I remember this correctly.
11   **Q.**   -- method B, first.
12   **A.**   Oh, okay.  Sorry.
13   **Q.**   Method B -- I'm sorry.
14            Method B starts at 1,200; right?
15   **A.**   Yes.
16   **Q.**   We can agree by October 7th it ends below 100?
17   **A.**   And it's somewhere below 100 after October 7th.
18   **Q.**   So we're clearly down even more than 90 percent; correct?
19   **A.**   And just -- method B is when we have the windows and doors
20   open that whole time.
21   **Q.**   Windows and doors open the whole time, it drops by more
22   than 90 percent; right?
23   **A.**   It does, yes, for these trailers.
24   **Q.**   For these 96 trailers?
25   **A.**   Yes.

1   **Q.**   That's all this was intended to test was these 96

2   trailers; correct?

3   **A.**   I understand.

4   **Q.**   All right.  But we were already down here in six days;

5   right?  Still below 100?

6   **A.**   That was that data point for the sixth day, although --

7   but go on.

8   **Q.**   Okay.  It fluctuated after that.  But within six days we

9   can agree it's down probably under 100 from 12- -- from over

10   1,200, over 90 percent; correct?

11   **A.**   Well, you're asking -- it gets to be a little complex.

12   But, yes, it actually fluctuates before that too.

13   **Q.**   And after --

14   **A.**   It fluctuates afterward.  And I honestly don't know if

15   that's related to any temperature change, because I don't know

16   the weather for those days.

17   **Q.**   We don't.  We just --

18   **A.**   Yeah.

19   **Q.**   All we -- all we have is the data -- the graph and the

20   data before us.

21   **A.**   So to answer your question, since you're asking if on the

22   25th of September it went down to that level because of the

23   ventilation, I would have to answer I don't know, because I

24   don't know the temperature that day.

25   **Q.**   But you would also have to answer, as an expert, that you

1   would probably think it had to do with the ventilation, even if

2   there were other factors at work?

3   A.   I think we agree on the ventilation part.

4   Q.   And let's talk about the air conditioning, because it was

5   suggested that somehow this was going to take three weeks to

6   happen, earlier.  But within six days, the air conditioning --

7   well, let's go -- give me eight days -- we're down from over

8   1,200 to a data point of 400; right?

9   A.   Well, you use that qualifier, given the air conditioning,

10  again.  Again, keep in mind that we understand that the

11  temperature has a huge effect, and we don't know the

12  temperature and humidity that was outside at that time.

13          And, likewise, if I look at the September 21st to

14  September 22nd data, I can't say that the air conditioner made

15  that go up.  I mean, that's -- that's not quite there, so we

16  get to the complexity of the -- of the graphic.

17  Q.   There are other factors at work?

18  A.   But certainly what I discussed before was that, in

19  general, temperature goes down, ventilation goes up, you're

20  going to reduce concentrations.

21          You might just be asking me too much specifically

22  about this one graph.

23  Q.   It might be.  But the suggestion was ventilation would

24  actually make this -- the levels go up.  And I'm pretty sure I

25  heard you disagree with that, but I just wanted to confirm

1   that.

2   **A.**   Well, actually, like with this graph, as you and I have

3   been doing now, sometimes it's more complex than that, so we

4   have tradeoffs.

5         When we have the ideal situation of completely closed

6   versus completely open we have that tradeoff of, well, how hot

7   was it outside when you opened those windows?  How much

8   humidity was there outside?  If you're bringing in outside air

9   and it's hotter and more humid than the air that you have

10  inside, which happens to be the case in New Orleans most of the

11  time in the summer, if you've air conditioned the space, if you

12  open the window, you're letting the hot air in.

13        So, again, like with this graph, it's just not that

14  simple.  That's what my testimony was.

15  **Q.**   It's not that simple.  It's certainly not -- the minute

16  you open the doors and windows, the formaldehyde levels go up.

17  You didn't say that; correct?

18  **A.**   No.  I don't think anyone did.

19  **Q.**   Okay.  I think somebody did, but it wasn't you.

20        There is a way to do a regression analysis with math

21  modeling; correct?

22  **A.**   Yes.

23  **Q.**   You did not do that in this case; correct?

24  **A.**   No, I didn't.  I wasn't asked, and I didn't perform any

25  regression analysis.

1  **Q.**   One of the things I noticed you mentioned on the -- the
2  other CDC report was that --
3  **A.**   Are you talking about the 519 trailers?
4  **Q.**   The 519.  Was that different -- apparently, different
5  manufacturer's models tested differently.
6  **A.**   Just quoting from their document, yes.
7  **Q.**   So you just -- you don't know -- you didn't study it for
8  that purpose?
9  **A.**   No, I -- I don't understand your question.  I studied it
10  to learn what they had done.
11  **Q.**   You would agree that the component -- that they may have
12  used different component parts; correct?
13  **A.**   You mean the manufacturers?
14  **Q.**   The manufacturers.
15  **A.**   I would expect that.  It would be unusual if they all used
16  the same material.
17  **Q.**   It would be a bizarre coincidence; correct?  Strike that.
18          So the manufacturers are using different materials
19  and, therefore, you're going to get different generation
20  levels; yes?
21  **A.**   I wouldn't necessarily connect the two so readily.  There
22  might be other issues.  It might be how the material was
23  manufactured, how long it sat on the dock, what happens to
24  materials in transit.  There are a lot of different variables.
25  I wouldn't assign it to just material manufacturers.

```
 1  Q.   Let's say --
 2  A.   It might be the whole --
 3  Q.   I'm sorry.  I didn't mean to interrupt you.
 4  A.   I'm sorry.  I do that all the time to you, too, I know, so
 5  I apologize too.
 6            There might be a difference in how they actually
 7  process these materials that has an impact on it.
 8  Q.   How about this:  All other things being equal, if two
 9  different manufacturers have different result levels in the CDC
10  testing, one of those -- one of the reasons why might be they
11  used different materials; correct?
12  A.   Well, this is what happens when lawyers and engineers try
13  to be scientists.  If you're holding that all other things
14  being equal, I don't understand what's changing in your
15  question.  Could you rephrase that?
16  Q.   Just the wood products that two different manufacturers
17  use.
18  A.   Oh, okay.  So if they use different wood products --
19  Q.   Yes.
20  A.   -- and everything else is the same --
21  Q.   Correct.
22  A.   -- would I expect to see different -- right?
23  Q.   That --
24  A.   Yes.
25  Q.   That certainly could be why the CDC found different
```

1    manufacturers had different levels?

2    A.   Well, there is a difference.  You might be going too far

3    in saying that.

4    Q.   I might be.

5    A.   There could be other reasons related to the manufacturing

6    of the units beyond the actual material.

7    Q.   There could be.  But that could also be one?

8    A.   I -- I would expect it to be one.

9    Q.   I mean, we -- we don't know everything about these 519

10   trailers.  In fact, we probably know less than we don't know.

11   There's a lot of information we don't have; right?

12   A.   I guess the idea of the design of the study is that you

13   hope to capture the most important ones.  You can't capture

14   them all.

15   Q.   So if, for example, one manufacturer made all its product

16   with HUD-compliant and low-emitting wood products and another

17   manufacturer made its products with product that was not

18   low-emitting or HUD-compliant, all other things being equal, we

19   would expect the one with low-emitting and HUD-compliant wood

20   to be lower?

21   A.   Well, you know, earlier in the day you used the quote,

22   "The wood doesn't know."  I'm going to use the quote, "The

23   testing doesn't know" whether you used HUD-compliant or not.

24   It just tells you how much formaldehyde was in the trailer.

25            So from my experience, I know how much was in the

1   trailer, I know what the levels were, I know how they varied,

2   and I didn't know whether the wood was HUD-compliant or not.  I

3   don't really even know all the HUD regulations.

4            So the levels are what they are without regard to

5   HUD-compliant wood or not.

6   **Q.**   I understand that.  But the levels may -- may -- the

7   levels are what they are, but we're trying to get as to what

8   makes one trailer one level and one trailer another.

9            And I'm asking you to assume that we have two

10  trailers, one with all LFE, or HUD-compliant wood, one with

11  non-HUD-compliant wood, non-LFE.  All other things being equal,

12  we would expect the first trailer to have a lower result;

13  correct?

14  **A.**   Well, there are two things wrong with the question.  You

15  know, one, you're asking me about HUD compliance.  I'm an

16  environmental engineer, not a regulatory expert.  That's why.

17           And the other is, you know, we have a certain set of

18  scientific principles that tell us how much formaldehyde is

19  going to be released, and they include all the different

20  temperature and other parameters, and those are going to

21  predominate.

22  **Q.**   Those were the things that were supposed to be equal,

23  though.  You can't put those back into the equation.

24           Now, look, it's real simple.  How about this:  Forget

25  about HUD compliant, forget about LFE, forget about all that.

1  A.   Well, you're going to have to --

2  Q.   Whoa, whoa, whoa.  My turn.

3       We have one trailer made with wood that has

4  lower-emitting wood.  We have got another trailer made with

5  wood that has higher-emitting wood.  All other things being

6  equal, the first trailer is going to have a lower level of

7  formaldehyde; yes?

8  A.   I'm just going to talk about the part that I know.  If you

9  emit less formaldehyde, the formaldehyde concentration is going

10 to be lower.

11 Q.   And part --

12 A.   If everything else is equal.

13 Q.   Okay.  If everything else is equal.

14      Part of the equation is how much formaldehyde does a

15 specific piece or type of wood generate; right?  That's part of

16 the equation?

17 A.   There has to be a release.  The formaldehyde has to come

18 from something.

19 Q.   We talked about the age of a trailer.  You would agree

20 with me that a year is a significant amount of time in terms of

21 age related to formaldehyde generation?

22 A.   You made this motion --

23 Q.   Well, that's the slope of the generation.

24 A.   -- that a year is enough for it to start going down.

25      Well, actually, what I -- I said was you've got a

```
 1    couple of things happening.  One is, after a year, your -- your
 2    source, your reservoir of formaldehyde, is starting to decline.
 3    Some of the formaldehyde is actually being released.
 4              Keep in mind, though, that the amount of formaldehyde
 5    that a trailer could emit over its lifetime actually could be
 6    fairly large compared to what you lose in a year, and depending
 7    on what other things happen to the trailer.  If there are
 8    events or changes in how it's used or if it becomes damaged,
 9    you might find there are other forces at work that make the
10    formaldehyde go up too.
11              So you're going to get that answer of, it depends.
12    Q.   When we spoke at your deposition we agreed that, in terms
13    of age, there's basically three stages; yes?
14    A.   Yes.
15    Q.   Okay.  The first would be a steep dropoff stage?
16    A.   That's right.
17    Q.   The second would be a -- a linear -- what did we call it,
18    a linear decrease?
19    A.   Yes.
20    Q.   And the third would be a plateau?
21    A.   That we --
22    Q.   Which I think was mine, that you accepted.
23    A.   We transitioned to a plateau.
24    Q.   We transitioned to a plateau.
25              And as we said, a year alone is a significant period
```

1  of time, yes, in terms of this curve; correct?

2  A.   Well, you get out of that immediate release stage.

3  Q.   You are not familiar with Mrs. Alexander's ventilation

4  practices; correct?

5  A.   Only generally.

6  Q.   It was not part of your opinion?

7  A.   I didn't render an opinion about it.  I was just aware of

8  it.

9  Q.   Right.  It was not something you were asked to evaluate?

10  A.   Her -- her behavior in the trailer?

11  Q.   How she ventilated -- how she chose to ventilate or not

12  ventilate the trailer.

13  A.   Well, actually, I was told that Ms. Alexander left her

14  windows open part of the time and then closed them other times.

15  Q.   Is that in your report?

16  A.   No.  I said it wasn't in my report.  I was told about

17  that.

18  Q.   You were told about that after issuing your report?

19  A.   I don't know if it was before or after, but I was

20  definitely aware of it.

21  Q.   It was after her deposition; correct?

22  A.   That would make sense.

23  Q.   Which was after you issued your report; correct?

24  A.   I don't think I have the date of her deposition, but it

25  makes sense.

1  **Q.**  I can get it for you.  It's in June.

2  **A.**  No, I -- I believe you.

3  **Q.**  June 28th.  And your report was issued May 19th?

4  **A.**  Yes, sir.

5  **Q.**  So it would be difficult for you to have factored

6  something in that did not take place yet; yes?

7  **A.**  Well, she had her windows open when she had them open.

8  **Q.**  Right.

9      Hypothetically, if we took a trailer that had been

10  closed for an entire month and tested it with a one-hour test,

11  opened the doors, opened the windows, let it air out for, say,

12  24 hours, and the temperature is the same, the humidity is the

13  same, tested it again for an hour, would you expect the levels

14  to go up or down?

15  **A.**  Hypothetically?

16  **Q.**  Hypothetically.

17  **A.**  Because it's definitely not a real case.  I would think

18  that with more ventilation you would have formaldehyde levels

19  go down.

20      **MR. WEINSTOCK:**  Thanks a lot, Mr. Kaltofen.

21      **THE COURT:**  Thank you.

22      Mr. Sherburne?

23      **MR. SHERBURNE:**  Fluor has no questions of this

24  witness, Your Honor.

25      **THE COURT:**  Thank you.

1          **MR. HILLIARD:**  Just a quick follow-up, Judge.

2          **THE COURT:**  Sure.

3                          **REDIRECT EXAMINATION**

4    BY MR. HILLIARD

5    **Q.**   So the eight days that it takes this formaldehyde to be

6    aired out while ventilating, Mr. Kaltofen, do you know whether

7    Chris Cooper can hold his breath for eight days?

8    **A.**   I do.  I know that's a medical opinion, but I would say

9    no.

10   **Q.**   All right.  In regards to the levels of formaldehyde --

11         **MR. WEINSTOCK:**  I don't think I went into this

12   portion of the CDC report, Your Honor.

13         **THE COURT:**  Well, I think he's asking questions,

14   though, as I understand it, as follow-ups to this particular

15   graph.

16         **MR. WEINSTOCK:**  I know what's in his hand.

17         **MR. HILLIARD:**  Can we approach?

18         **THE COURT:**  I don't, so... I don't want to talk about

19   something that's going to happen in the future.

20         **MR. HILLIARD:**  Keep up, Your Honor.

21         **THE COURT:**  Yes, sir, you may approach.

22         (WHEREUPON, the following proceedings were held at

23   the bench.)

24         **MR. WEINSTOCK:**  Judge, I object to the Gulf Stream

25   results from the CDC test because it was not gone into on

 1   direct.

 2           **MR. HILLIARD:**  Judge, what he went into were the

 3   different levels of different trailers and the testing.  He

 4   directly went into that.  I was --

 5           **MR. WEINSTOCK:**  I did not refer to his chart.

 6           **MR. HILLIARD:**  I'm sorry.  We don't have a history,

 7   so we get along.

 8           **MR. WEINSTOCK:**  I try to get along with everybody.

 9           **THE COURT:**  Wait.

10           **MR. WEINSTOCK:**  The objection is this:  He's about to

11   go through the results on the Gulf Stream units.  I didn't even

12   discuss it.  I discussed two hypothetical trailers.

13           **MR. HILLIARD:**  No, he talked --

14           **MR. WEINSTOCK:**  I discussed at page -- I did not

15   discuss the chart at all.  I didn't go into which --

16           **THE COURT:**  The fact that you didn't discuss the

17   chart does not mean that this chart is not relevant to

18   redirect.  What I'm trying to figure out -- and I'm looking at

19   this chart.  You guys have argued and looked at this for a lot

20   longer than I have.

21                Tell me, what does this have to do with what he

22   covered on that chart?

23           **MR. HILLIARD:**  And let me preface it, I was

24   specifically looking to see if he opened the door to this on

25   redirect.  And he spoke to Marco about the different results of

```
 1  the levels in those test results.
 2          MR. WEINSTOCK:  I absolutely did not.  I asked him
 3  about the paragraph you asked about.
 4          MR. HILLIARD:  No.
 5          MR. WEINSTOCK:  I did not ask about any specific test
 6  levels.  No numbers were mentioned at any point.
 7          MR. HILLIARD:  I agree with that.  However, you
 8  talked about the test results of different manufacturers for
 9  formaldehyde.
10          THE COURT:  Well, you did touch upon that.
11          MR. MEUNIER:  Judge, he also said we don't know
12  anything about the types of these trailers.
13          MR. WEINSTOCK:  That's not what I said.  You're
14  mischaracterizing my question.
15          MR. HILLIARD:  Well, he went in -- opened the door on
16  this.  And I agree with Andy, that he didn't go into the
17  specific levels.  If that's enough to keep it out, then it
18  stays out.  But he opened the door to this.
19          THE COURT:  What do you want to show on this?
20          MR. HILLIARD:  I want to show that Gulf Stream had
21  the highest test results of all the other trailers.
22          MR. WEINSTOCK:  I discussed that manufacturers had
23  different --
24          MR. HILLIARD:  No.  I know what the direct was, and I
25  listened carefully to the cross, Judge.  The door was opened as
```

 1  to this chart.

 2        **MR. BUZBEE:**  We can block out the levels, Judge.

 3        **THE COURT:**  I think -- what was it you just said,

 4  Tony?

 5        **MR. BUZBEE:**  I said the levels -- we can block out

 6  the levels.  But he -- he raised this issue about some are

 7  higher than others, and he opened the door.  And I sat there

 8  and I heard him open it.  And I took that chart and I handed it

 9  to Bob.  There's no doubt about that.  So if they have a

10  problem with the levels, we can block them out.

11        **THE COURT:**  Why don't you block out the levels, and

12  I'll let him go ahead and ask him about it.

13        **MR. HILLIARD:**  So what I'm supposed to block out is

14  the parts about the --

15        **THE COURT:**  Well, I know Tony's mentioned --

16        **MR. HILLIARD:**  Tony's wrong about that.  Well, Tony's

17  wrong about that, Judge.

18        **THE COURT:**  Well, he -- he's not here to defend

19  himself, and you're on his team...

20        **MR. HILLIARD:**  Let me take that back.

21            So what I was telling the Judge, Tony, is that

22  the levels are relevant in regards to the highest range, 590 is

23  the highest, by far, of anyone, and that's from Gulf Stream.

24        **MR. BUZBEE:**  Is there a number -- so that would put

25  Gulf Stream at the top?

1          **THE COURT:**  Is Gulf Stream at the top of this because
2   of a testing level or simply --
3          **MR. BUZBEE:**  Yes.  They're ahead of everyone because
4   of --
5          **MR. WEINSTOCK:**  No, they're not, because Pilgrim's
6   right here.  Pilgrim's higher.  Right.
7          **MR. MEUNIER:**  Well, you can ask him if --
8          **THE COURT:**  Do you need to put this up there to ask
9   him questions about what --
10          **MR. HILLIARD:**  I can refer to it.
11          **THE COURT:**  Can you get him to refer to it without
12   putting it up on the screen?
13          **MR. HILLIARD:**  I can show him.
14          **THE COURT:**  But try to limit -- the redirect has to
15   be limited to the point that Andy raised.  So I don't know how
16   far you can go with this, but...
17          **MR. WEINSTOCK:**  Let me say -- the last thing is,
18   Judge, I never suggested that Gulf Stream was anywhere in this
19   range.  I just said different manufacturers had different
20   results.
21          **THE COURT:**  Yeah.  But I think that opens the door
22   somewhat to this about --
23          **MR. HILLIARD:**  I'll be careful.  And I'm not
24   attributing anything to you, Andy, but I won't go into details.
25          **THE COURT:**  The highest level of what?

1          **MR. HILLIARD:**  The highest level -- the highest --

2          **THE COURT:**  Let's be clear on what this says now,

3     because --

4          **MR. BUZBEE:**  There's another chart that ranks them.

5          **THE COURT:**  What's the point you want to make with

6     this chart?  The sooner you show it to the witness --

7          **MR. BUZBEE:**  It's going to be three questions.

8          **THE COURT:**  Like Tony just said, three questions.

9          **MR. HILLIARD:**  In looking at this, all of the travel

10    trailer manufacturers had tests; who had the highest test

11    results of all the travel trailers.

12         **THE COURT:**  But the highest test results in what

13    respect?  Which column?  Which one, columnar range --

14         **MR. HILLIARD:**  In the range column, if the test

15    results from all the trailers are from 3 to 590.

16         **THE COURT:**  Who had the lowest?

17         **MR. HILLIARD:**  Yeah.  I'll ask him that instead.

18         **THE COURT:**  Ask him both.

19         **MR. WEINSTOCK:**  You are -- see, that's the thing.  I

20    didn't ask him specific levels.  If he's going to do that, I

21    want to go back and ask him afterwards.

22         **MR. MEUNIER:**  He's going --

23         **THE COURT:**  Well, then, Andy's going to say, "I need

24    to ask another question about that."

25         **MR. MEUNIER:**  Well, then, he can recross then.

1          THE COURT:  Well --

2          MR. HILLIARD:  Well, I have an idea.  He read --

3          MR. WEINSTOCK:  That's where I got it from.  He read

4    the sentence about --

5          MR. HILLIARD:  Here's my suggestion:  Mr. Kaltofen,

6    when all of them were tested, the range of the tests were 3

7    parts per billion to 590; what was the lowest by Gulf Stream,

8    3; what was the highest, 590.

9          MR. WEINSTOCK:  I have no problem with that.

10          MR. HILLIARD:  Is that fair?

11          THE COURT:  Thank you-all.  Thank you both.

12          (WHEREUPON, the following proceedings were held in

13    open court.)

14          MR. HILLIARD:  May I proceed, Judge?

15          THE COURT:  Yes, please.

16          MR. HILLIARD:  May I approach, Your Honor?

17          THE COURT:  Yes.

18  BY MR. HILLIARD

19  Q.   Mr. Kaltofen, this is a very specific question based on a

20  bench conference, and I want to ask you very directly and

21  specifically:  Do you recognize table 3 as being the test

22  results of every trailer manufacturer for the levels of --

23          And that's not the table that we're looking at now, I

24  apologize.  We're getting the exhibit.  Thanks.

25  A.   This is the trailer test results by manufacturer for the

1  519 trailers that the CDC studied back in the winter of
2  2007/2008.

3  **Q.**    Okay.  And the range that they found, what was the range
4  of the formaldehyde in parts per billion found in all of the
5  trailers?

6  **A.**    The range in parts per billion -- keep in mind that the
7  part per billion is a thousand times more than a part per
8  million -- was 3 to 590 parts per billion.

9  **Q.**    All right.  So the lowest was 3?

10 **A.**    The lowest was 3.

11 **Q.**    All right.

12 **A.**    That would be .003 parts per million.

13 **Q.**    And the highest was?

14 **A.**    590 parts per billion, or .59 parts per million.

15 **Q.**    And does Gulf Stream get two blue ribbons?  They have the
16 lowest; right?

17 **A.**    Yes.

18 **Q.**    But they also have the very highest?

19 **A.**    Yes.  Their trailer's the highest.

20 **Q.**    I'm sorry?

21 **A.**    Their trailer was the highest one.

22 **Q.**    Of all those tested?

23 **A.**    Yes.

24             **MR. HILLIARD:**  Pass the witness, Judge.

25             **THE COURT:**  Well, actually, that was redirect, so...

1          **MR. HILLIARD:**  I pass him to the Court.

2          **THE COURT:**  All right.  You can step down.  Thank you

3     for your time.

4          **MR WATTS:**  Your Honor, at this time with agreement

5     from counsel, we're going to play Karen Pacheco, who was a

6     witness that Andy was going to call.  We've got a little gap in

7     time, so we'd like to do at this time.

8          **THE COURT:**  All right.  Well, let me go ahead and

9     explain to the jury that this next witness, I understand, is

10    Dr. Karen Pacheco -- is that correct?

11         **MR WATTS:**  Yes, sir.

12         **THE COURT:**  -- who Gulf Stream was going to call as

13    part of their case in chief and in the interest of saving some

14    time counsel have agreed and rearranged the schedule such that

15    we can hear that witness now because it fits in this time

16    space.

17              So let's go ahead and listen to this testimony

18    and then we'll take our mid-afternoon break and then I think we

19    have one other witness after that.

20         **MR WATTS:**  We do, sir.

21         **THE COURT:**  Two?

22         **MR WATTS:**  No, we have one.

23         **THE COURT:**  All right.  Let's go ahead.

24         **MR WATTS:**  And this has got both sides' cuts in it so

25    it's just one video.  I think it's an hour and ten minutes long

1   for scheduling.

2           **THE COURT:**  Let's go ahead and do that and then that

3   will bring us up to around 3:00.

4           **MR. WEINSTOCK:**  And I think the expert witness will

5   be brief, not short.

6           **THE COURT:**  Okay.

7           (WHEREUPON, the videotaped deposition of **Karin**

8   **Pacheco** was played.)

9   **Q.**  Would you state your full name for the record?

10  **A.**  Yes, it's Karin Ann Pacheco.

11  **Q.**  How did you come to be involved in this litigation?

12  **A.**  As I understand it, the attorneys representing Christopher

13  contacted National Jewish and asked that someone evaluate his

14  medical condition.  And so our clinical director, Dr. Rose,

15  asked me to do so.  So the patient was scheduled.  Dr. Rose

16  looked over his -- some of his medical records and prescheduled

17  some tests, simply based on his history, so that we would be

18  able to fit everything in during his stay here.

19          I then saw him in the company of his mother; took a

20  history; ordered some tests -- or confirmed some tests;

21  reviewed his medical records; and then sat down with them when

22  the testing was completed to go over the results and make

23  recommendations for treatment.

24  **Q.**  Okay.  And so he came out here to Denver; is that correct?

25  **A.**  Yes.

1    Q.    With his mom?

2    A.    Yes.

3    Q.    And we're here at the National Jewish Medical Center?

4    A.    Well, it seems to change names periodically.  So most

5    recently it was the National Jewish Medical and Research

6    Center.  It's now called National Jewish Health, but it is the

7    same institution.

8    Q.    And what is National Jewish Health?

9    A.    It is really a medical and research center that

10   specializes in the evaluation and treatment of patients with

11   respiratory and immune disorders.  We are part of the

12   University of Colorado School of Medicine.

13   Q.    What is your specialty in?

14   A.    I am board certified in internal medicine, allergy and

15   immunology, and occupational medicine.

16   Q.    Well, let me ask you:  Did you review medical records

17   before he came up, or after he came up, or simultaneously when

18   he came up?

19   A.    After he came up.

20   Q.    If we can go through your report, it's probably the

21   easiest way to do it, at least where to start.  It says here

22   that he was diagnosed with asthma at the age of three; correct?

23   A.    Yes.  That's what his mother told me.

24   Q.    Okay.  And he was born in 1996?

25   A.    Yes.

 1   Q.   August 29th, 2005, probably doesn't mean much to you, but

 2   in New Orleans it's kind of a big day.  And that's a date of

 3   reference I will use throughout the course of this deposition.

 4         Can we agree that at the time he was diagnosed with

 5   asthma, that was before August 29th, 2005?

 6   A.   Yes.

 7   Q.   Okay.  When he was three, he was hospitalized for

 8   pneumonia?

 9   A.   Yes, it was two or three.

10   Q.   Okay.

11   A.   Again, often what I do, just as an aside, take a history

12   and then look at the medical records to see if they corroborate

13   the history as sort of an external check.

14   Q.   And was he hospitalized again for pneumonia at age five?

15   A.   Yes.

16   Q.   Okay.  We said that he was diagnosed with asthma and it

17   says here that he was treated with albuterol; is that right?

18   A.   Yes.

19   Q.   And how often did he use the albuterol?

20   A.   Well, his mother said that he used the medications daily

21   for about two weeks after his initial discharge, which then was

22   decreased to about once a week, and then simply on an as-needed

23   basis.  This was after the first hospitalization.

24   Q.   Did he report that weather seemed to be a factor in

25   triggering his asthma?

1    A.    No.  I asked about seasonality.  He reported that he

2    tended to be worse in the fall and the spring, and also

3    somewhat worse -- worse in cold weather.

4    Q.    I guess this is -- let me -- let me read the sentence

5    I'm -- I'm talking about and you can put it in context with the

6    time.  It says here:  "His symptoms seemed to improve and he

7    used albuterol perhaps for or five times a month and was

8    typically seen in the emergency room twice a year in the fall

9    and in the spring.  Do you see where it says that?

10   A.    Yes.

11   Q.    Okay.  Do you know when in the course of his life that

12   that history matches?

13   A.    That relates to really the time between he was four or

14   five, after a second hospitalization, to before Hurricane

15   Katrina, which would be August 29th, 2005.

16   Q.    Okay.  Now, on the next page, he -- or he and his mom gave

17   you a history of moving into the trailer; correct?

18   A.    When they returned from Florida?

19   Q.    Correct.

20   A.    Yes.

21   Q.    Initially, there was a strong chemical odor in the

22   trailer, they reported?

23   A.    That's what they said.

24   Q.    But that lasted only about two weeks?

25   A.    Yes.

1  **Q.**   And if she testified, or if she reported that she had
2  ventilated the trailer for at least -- for at least an hour
3  each day by opening the doors and windows and running the
4  exhaust fan, that would tend to remove some of the irritant;
5  correct?
6  **A.**   Yes.
7  **Q.**   Did I understand correctly that the patient reported to
8  you, when you saw him, that he was using Claritin on a daily
9  basis?  And that would be the third full paragraph.
10 **A.**   Yes.  When they had moved into the trailer, the patient's
11 mother reported that her son used the albuterol inhaler more
12 frequently and that he took Claritin on a daily basis; whereas,
13 before, he had taken it really on an as-needed basis but
14 infrequently during the week.
15 **Q.**   When you said "as-needed," you were talking about the
16 albuterol?
17 **A.**   And also the Claritin.
18 **Q.**   He did report to you that, when you saw him, he had -- he
19 had not taken the Claritin -- he had taken it once in the last
20 four days; is that correct?
21 **A.**   I don't recall exactly when the last time had been that he
22 had taken the Clarinex when I saw him.
23 **Q.**   When you saw him, he was not of taking it daily anymore;
24 is that correct?
25 **A.**   He said that, after moving out of the trailer, his

1   symptoms gradually subsided and he used the Claritin about
2   every other day rather than on a daily basis.  That's what he
3   told me.
4   Q.   One of the forms you had the -- Mrs. Alexander and
5   Mr. Cooper fill out was a pretest questionnaire for his
6   bronchial challenge?
7   A.   Right.  That was done by the respiratory technician.
8   Q.   It is Bates No. 337.  Take a look at that and tell me if
9   I'm misreading that.  It appears to suggest:  In the last four
10  days, he's taken one Claritin -- or Clarinex; and he had used
11  his albuterol two puffs in the last 4 days.  Is that right?
12  A.   Yes, that's what that says.
13  Q.   And that was -- well, strike that.
14  A.   He was requested to not take his Claritin four days before
15  the skin testing, because it would interfere with the skin
16  testing.  He was also requested not use his albuterol inhaler,
17  certainly, for at least 24 hours before pulmonary function
18  test, because they would interfere with the baseline
19  evaluation.
20  Q.   While in the trailer -- I'm going back to Page 2 of 9, in
21  Paragraph 2, did she report -- did Mrs. Alexander report to you
22  that his use of albuterol increased to twice weekly?
23  A.   Yes.
24  Q.   He reported to you that he had a -- he had previously had
25  a rash; correct?

1    A.    The rash behind his knees?

2    Q.    Behind his knees.

3    A.    Yes, that his mother said that he developed that while

4    residing in the trailer.

5    Q.    That was not present when you saw him; is that correct?

6    A.    No, it was not.

7    Q.    Okay.  There's -- obviously, we're here because these

8    cases are about formaldehyde.  It's my understanding, and

9    correct me if I'm wrong, that dermatitis or eczema that's

10   related to formaldehyde is when the formaldehyde's in liquid

11   form, not gaseous form; am I correct?

12   A.    Not -- not necessarily.  And, you know, this is a -- this

13   is complicated.  A rash behind both knees is a typical place

14   for atopic dermatitis which is related to sort of the state of

15   allergy.

16           On the other hand, it could also be a contact

17   dermatitis because if he sits on something that has

18   formaldehyde, then he may develop a -- a direct sensitization

19   in a contact dermatitis.  So I -- I don't know enough about the

20   rash to say what kind it was.

21   Q.    And you don't know enough about the level of formaldehyde

22   or the content of formaldehyde and the hypothetical thing he

23   might have sat on; correct?

24   A.    Right.  Although, you don't have to know that in order to

25   make a connection between the two.  The nature of the rash

1  would be helpful.  Not seeing it, I can't really say.

2  **Q.**   So if I'm understanding you correctly, as we sit here

3  today, because you couldn't -- you did not observe the rash,

4  you cannot say what it was or was not related to?

5  **A.**   Correct.

6  **Q.**   Although, there certainly -- because it was behind both

7  knees, there certainly is a suggestion it would be atopic?

8  **A.**   Not necessarily.  The rash also did seem to get better out

9  of the trailer, which would suggest that it was exposures in

10  the trailer that may have caused the rash.  That remains a

11  question mark.

12  **Q.**   What is the significance of that?

13  **A.**   It's interesting.  Most people's air flow, or spirometry,

14  has diurnal variation.  Everyone's air flow is lowest in the

15  morning and highest in the afternoon.  People with asthma have

16  the same circadian rhythm, it's just exaggerated.

17          Typically, we think that your FEV1, your expiratory

18  volume in one second, has to fall by 20 percent in order to

19  wake somebody up with asthma symptoms.  So it is a question

20  designed to elicit, you know, how bad the asthma was, because

21  people with bad asthma will wake up at night with it.

22  **Q.**   They'll wake up gasping?

23  **A.**   Or coughing, more likely.

24  **Q.**   Was it your understanding that Chris Cooper never

25  complained of waking up during the night, while living in the

 1  trailer, gasping or coughing?

 2  A.   I didn't say that he never did, but he didn't report them

 3  on a routine basis.

 4  Q.   He went to see the doctor in October of 2007, you have

 5  here, for conjunctivitis?

 6  A.   Yes.

 7  Q.   And was that your understanding that was the primary

 8  reason why he went to see the doctor?

 9  A.   Well, that was my understanding for the visit in October.

10  Q.   Right.  That's what I was asking about, October 2007?

11  A.   Yes.

12  Q.   After moving out of the trailer, he moved into, not a new

13  house, but a house that had been rebuilt; is that correct?

14  A.   Yes.

15  Q.   Had approximately 5 feet of flooding?

16  A.   That's what he told me, yes.

17  Q.   And the first floor had to be rebuilt or redone?

18  A.   Yes.

19  Q.   New furniture?

20  A.   To my understanding, yes.

21  Q.   The walls were painted?

22  A.   Yes.

23  Q.   New cabinets?

24  A.   All I can say, it was completely redone, so I don't -- I

25  didn't ask those details.

1   Q.   You would presume, if somebody moved into a house with new

2   cabinets, and hypothetically new hardwood floors, and newly

3   painted walls that there would be a component of formaldehyde

4   in that dwelling, would there not?

5   A.   There could be.

6   Q.   If there were pressboard cabinets, you would expect that

7   the kitchen would have formaldehyde in it; is that correct?

8   A.   Again, initially, yes.  But on the other hand, they didn't

9   report the kind of irritant symptoms that are associated with

10  formaldehyde when they moved into this newly redone house.

11  Q.   And what you just said is accurate.  They didn't report it

12  to you; correct?

13  A.   Yes.

14  Q.   You didn't live with them in the trailer; correct?

15  A.   No.

16  Q.   My statement's correct?

17  A.   That I didn't live with them in the trailer?

18  Q.   Right.

19  A.   Yes, that would be.

20  Q.   You never visited them in the trailer?

21  A.   No.

22  Q.   You never visited them in their new house?  My statement's

23  correct?

24  A.   Yes.

25  Q.   So you have to base it on what they tell you.  You

1   didn't -- you don't have firsthand knowledge of this; correct?

2   A.   That's correct.  Although, to a certain extent, their

3   history corroborates what we know about exposure to

4   formaldehyde and that they developed acute irritant symptoms

5   when they moved in.  Their symptoms got better when they moved

6   out.  If these were people who were inventing their symptoms, I

7   would expect them to tell me that they were bad and remained

8   bad even after moving out, and they didn't say that.

9   Q.   Did Chris report to you that he would find it irritating

10  when mother cooked in the trailer?

11  A.   No, he didn't tell me that.

12  Q.   If that is correct, is -- is carbon an irritant?

13  A.   The answer is, it depends what the cooking stove was.  If

14  it was electrical, then that would not produce carbon dioxide

15  or carbon monoxide, or nitrogen dioxide.  If it was gas, yes,

16  it can produce some nitrogen dioxide that might be an irritant.

17  Q.   If he told you -- well, if he testified, hypothetically,

18  that he found when his mother was cooked in the trailer that it

19  was irritating and he would often have to go outside, that

20  would seem logical to you and you would have no reason to

21  disagree with that; is that correct?

22  A.   Again, some patients with asthma find that cooking odors

23  trigger their symptoms, so I would want to know why he left.

24  Q.   Can we go back a page?  Second to the last paragraph, last

25  sentence:  "His mother notes that his symptoms have gradually

```
 1    subsided over time... he has reduced his use of albuterol to
 2    perhaps twice a month and Claritin to every other day"?
 3  A.   Yes.
 4  Q.   You noted his father was an asthmatic?
 5  A.   That's what he told me.
 6  Q.   Is that significant in any way?
 7  A.   Yes.  Asthma and allergies are often inherited.
 8  Q.   And he reported that he would have a wheezing and cough in
 9    cold air, or she did?
10  A.   Yes.
11  Q.   In the -- I'm sorry.  You -- you did a physical
12    examination, including his eyes; correct?
13  A.   Yes.
14  Q.   It says, "showed normal conjunctivae," or I'm
15    mispronouncing that I'm sure, "and lids."
16  A.   Yes.
17  Q.   What is conjunctivae?
18  A.   Conjunctivae.
19  Q.   There you go.  That's how I pronounced it.
20  A.   All right.  Is the -- the area of the eyes, separate from
21    the -- the -- the iris, the colored area of the eyes.  There
22    are blood vessels below the surface, they can become injected
23    in red.  But in this case, they were normal.
24  Q.   Did you find dark lower lids?
25  A.   If you're referring to allergic shiners, I don't recall.
```

1  **Q.**   I'm referring to dark lower lids.  I don't -- it's from

2  another doctor's report.  You did not report that; is that

3  correct?

4  **A.**   No, I did not.

5  **Q.**   We know he was allergic to dust mites; is that correct?

6  **A.**   Yes.

7  **Q.**   I know they had a bit of a -- a mouse problem in the

8  trailer.

9  **A.**   Oh, I didn't know that.

10  **Q.**   What -- what allergies would that be a problem -- would

11  that relate to?

12  **A.**   Well, you can develop allergies to mouse allergen.

13  **Q.**   He also had a pecan allergy?

14  **A.**   Well, he was allergic to the pollen from, sort of, hickory

15  and pecan trees.

16  **Q.**   Were you aware that there was a pecan tree in his yard?

17  **A.**   No.  But it doesn't matter.  I mean, pollen will

18  disseminate over a wide area, so that a local exposure may be

19  as important as a more distant exposure.

20  **Q.**   But if I'm understanding you correctly, being allergic to

21  pecan trees, he was going to get that pollen one way or

22  another?

23  **A.**   Right, in the spring.

24  **Q.**   In the spring.  And that would be consistent his sinusitis

25  in the spring?

1  **A.**   Right, with his seasonal symptoms that were worse in the

2  spring.

3  **Q.**   Yes.  I'm right.  You reviewed his medical records

4  beginning with 12/14/01?

5  **A.**   Yes.

6  **Q.**   He reported wheezing or -- or the records reported

7  wheezing on weather change; correct?

8  **A.**   Yes.  Well, emergency room visits twice a year, usually

9  with weather changes.

10 **Q.**   He was seen in May 2003, for wheezing in the emergency

11 room; is that correct?

12 **A.**   Yes.

13 **Q.**   He was seen on 12/4/07; is that correct?

14 **A.**   Yes.

15 **Q.**   At that time he had no rhinitis, or whatever that word is

16 you used instead?

17 **A.**   Rhinorrhea report is really a runny nose, and that's how

18 they described it in the records.  So he had a cough, but not a

19 runny nose.

20 **Q.**   Was the cough attributed to the asthma attack that he had?

21 **A.**   Yes.

22 **Q.**   That sent him to the emergency room?

23 **A.**   Yes.

24 **Q.**   But he did not have the runny nose or the -- the boggy

25 nasal turbinates that he had previously had, at least it wasn't

1    reported at that time?

2    **A.**    If wasn't reported.  The physical exam was notable for

3    decreased breath sounds and faint wheezing and I can't recall

4    if they commented on his nasal exam or not.

5    **Q.**    I'm going to hand you Page 258, Children's Hospital record

6    from 12/4/07.  And if you look at box No. 5, does not appear

7    they checked the nose; but on the other hand it might mean

8    something to you it doesn't mean to me.

9    **A.**    Yes.  This is signed by the physician, so I assume this is

10   his physical exam.  And they don't comment on the nose, one way

11   or the other.

12   **Q.**    We'll go ahead and attach that as Exhibit 5.  It was at

13   that visit that either Chris Cooper or his mother reported that

14   he had not had a wheeze in about a year; is that right?

15   **A.**    Yes.

16   **Q.**    He was then seen on April 17th, 2008; correct?

17   **A.**    Yes.

18   **Q.**    For allergic conjunctivitis?

19   **A.**    Yes.

20   **Q.**    What is allergic conjunctivitis?

21   **A.**    An inflammation of the eyes, and usually manifests by

22   injection-reddened blood vessel, swelling, clear drainage.

23   **Q.**    Would that be different from an irritant conjunctivitis?

24   **A.**    Sometimes it can be hard to tell the two apart.

25   **Q.**    He was then seen on June 2nd, 2008, at the emergency room?

```
 1   A.    Yes.
 2   Q.    Because he had run out of asthma medication, among other
 3   things?
 4   A.    Yes.
 5   Q.    You also reviewed the April 24th, 2009 evaluation of
 6   Dr. Janet Barnes?
 7   A.    Yes.
 8   Q.    And it indicates that he was treated for asthma and
 9   sinusitis before Hurricane Katrina; correct?
10   A.    Yes.
11   Q.    He had previously been -- been prescribed albuterol and
12   Clarinex?
13   A.    Yes.
14   Q.    Her diagnosis was rhinosinusitis, conjunctivitis and
15   allergic asthma by history?
16   A.    Yes.
17   Q.    And formaldehyde exposure?
18   A.    Yes.
19   Q.    And you state here:  "Although allergies to formaldehyde
20   have been reported, they are rare"; correct?
21   A.    Yes.
22   Q.    In anything in your workup, did it indicate that he had an
23   allergy -- an allergic response to formaldehyde?
24   A.    Other than the skin rash behind his knees, no.  He didn't
25   really describe allergic symptoms -- which we would
```

1    characterize by itching, sneezing -- to formaldehyde.  He

2    didn't report those in the trailer.  They were more

3    irritant-type symptoms.

4    **Q.**   And as we sit here today, you're not diagnosing him with

5    IgE-mediated asthma as a result of formaldehyde exposure;

6    correct?

7    **A.**   No.

8    **Q.**   My statement's correct?

9    **A.**   Yes.

10   **Q.**   You had PFTs from him?

11   **A.**   Yes.

12   **Q.**   What are PFTs?

13   **A.**   Pulmonary function tests.  They are performed in a body

14   box.  They measure airflow, lung volumes, and diffusion

15   capacity.

16   **Q.**   What is diffusion capacity?

17   **A.**   It measures the ability of a gas to diffuse from the lungs

18   into the bloodstream.

19   **Q.**   Was his diffusion capacity normal?

20   **A.**   Yes.

21   **Q.**   What was his residual volume?

22   **A.**   Was 216 percent predicted.

23   **Q.**   What is the significance of that?

24   **A.**   Residual volume measures the volume of air that's left in

25   the chest when the patient is told to breathe everything out.

1  It is often elevated in asthma because asthma is a disease of

2  air trapping.  So because of inflammation in the lungs, the

3  patient can't breathe everything out, and the residual volume

4  is elevated.

5  Q.   And he's had evidence of air trapping on x-ray for years;

6  correct?

7  A.   I don't know.  Certainly his chest x-ray in 2001 was

8  already showing hyperinflation.  But I -- I would have to look

9  specifically at some of the other chest x-rays to comment

10 whether or not other ones showed hyperinflation.

11 Q.   What is a methacholine challenge?

12 A.   It's a test, considered the gold standard, to diagnose

13 asthma.

14 Q.   What is actually physically done?

15 A.   Methacholine will trigger asthma in most asthmatics.  The

16 patient inhales increasing dozes of methacholine; and after

17 each one, the FEV1 is measured.  And the test is stopped at the

18 dose that causes a 20 percent fall in the FEV1.  It's called

19 the PC20 which is the provocative concentration that causes the

20 FEV1 to fall by 20 percent.

21       So doses less than or equal to 4 milligrams per ML

22 are considered positive for asthma; doses greater than

23 25 milligrams per ML are considered negative for asthma; and

24 the -- the area between the two is sort of a gray area where

25 the may, in fact, have asthma.

1   **Q.**   He had a positive methacholine challenge; correct?

2   **A.**   His is positive for a severe bronchial

3   hyper-responsiveness.

4   **Q.**   And it's your understanding this was the first

5   methacholine challenge he ever had; correct?

6   **A.**   To my understanding, yes.

7   **Q.**   But it was also your understanding that he must have had

8   significant asthma before the storm because he had been given a

9   nebulizer; is that correct?

10  **A.**   He had a history of asthma before the storm, yes.

11  **Q.**   Well, there's a history of asthma, and there's a history

12  of asthma, you know.  There's some early wheezers that might

13  grow out of it.  But his seemed a bit more significant than

14  that; isn't that correct?

15  **A.**   Yes, it did seem to persist more.

16  **Q.**   And it was treated with more significant medication;

17  correct?

18  **A.**   Yes.  Although, you know, I don't have a very good record

19  for what his day-to-day medications were before Katrina.

20  **Q.**   But you can't say that he would have performed any better

21  or worse on the methacholine challenge before Katrina; is that

22  correct?

23  **A.**   I don't know.

24  **Q.**   Can anybody tell that looking at the methacholine

25  challenge result?

1    **A.**    At one point in time, you can't really extrapolate to

2    previous ones unless you have more complete medical records.

3    **Q.**    Based on all the medical records we have here, to suggest

4    that his methacholine challenge would have been different on

5    August 28th, 2005, is just not something you would ever be

6    prepared to do; is that correct?

7    **A.**    You know, if you're talking about specifically about his

8    methacholine reactivity, I don't have that information.  The

9    information that I have really relates to frequency of

10   medication use before and after Katrina.

11   **Q.**    I -- I just want to focus on the methacholine challenge

12   right now.

13   **A.**    But becomes -- it becomes impossible to say.  I don't know

14   what it would have been.

15   **Q.**    And we will -- we're going to get to that.  I want to get

16   to the specifics of the methacholine challenge.  You would have

17   to be a crank to say you know that that methacholine challenge

18   would have been different on August 28th, 2005, based on the

19   records you have here; correct?

20   **A.**    Yeah.  I've never heard anybody state it quite that way.

21   Perhaps a better way of stating it could be that I'm -- I'm not

22   prepared to say that it -- or speculate what his methacholine

23   challenge might have been before Hurricane Katrina.

24   **Q.**    And you're not prepared to accept that anybody else can,

25   either, based on your evaluation and the records we see here;

1   correct?

2   A.   Again, there's an absence of data before.

3   Q.   But I mean, Doctor, there's nobody better situated than

4   you, who has examined him, who has reviewed these records,

5   based on what you saw and what you have, nobody can -- can say

6   that his methacholine challenge would have been different on

7   August 28th, 2005; isn't that correct?

8   A.   If you're simply talking about the methacholine challenge

9   and not using it as a way to refer to the severity of his

10  asthma, if you're simply talking about the methacholine

11  challenge, I have an absence of data to be able to say that it

12  was different or not.  That's all I can say.

13  Q.   But if this is all the data, then any other doctor would

14  have the same absence of data; correct?

15  A.   I would assume so.

16  Q.   All right.  You did a laryn- --

17  A.   Laryngoscopy.

18  Q.   Laryngoscopy.  What is that?

19  A.   A laryngoscope is a very narrow tube with a light at the

20  end that enables you to visualize the vocal cords during

21  breathing and speaking.

22  Q.   What did you see when you looked down Chris Cooper's

23  throat?

24  A.   Vocal cords in general come together to speak and should

25  remain open when you breathe in and out.  If they come together

1  when you're trying to breathe in or not, it will cause the

2  patient to feel a great deal of shortness of breath.  So vocal

3  cord dysfunction can be another cause of shortness of breath.

4  **Q.**   Is it related to his asthma?

5  **A.**   It can be.

6  **Q.**   How?

7  **A.**   It's a good question.  The -- but there are many different

8  flavors of vocal cord dysfunction.  We have described a group

9  of patients in whom, following an acute high-dose irritant

10 exposure, they then developed irritant-triggered vocal cord

11 dysfunction.

12         But vocal cord dysfunction can also be related to

13 asthma in a way that we can't explain very well at this time.

14 **Q.**   And what is it in the methacholine that would have

15 elicited a vocal cord dysfunction?

16 **A.**   I don't know.  Nobody knows.

17 **Q.**   Is methacholine an irritant?

18 **A.**   It's related to acetylcholine.  It is -- can be a

19 neurotransmitter.  It causes bronchospasms in people with

20 asthma.

21 **Q.**   But it is an irritant?

22 **A.**   You know, I'm not entirely sure what you mean by

23 "irritant".

24 **Q.**   Is formaldehyde an irritant?

25 **A.**   It can be.  It has irritant properties that trigger

1   irritant-related symptoms.  In that sense, I would say no

2   methacholine is not an irritant.

3   Q.   Has he ever reported vocal cord dysfunction to anybody?

4   A.   Well, most people don't know they have vocal cord

5   dysfunction.

6   Q.   Same thing as a methacholine challenge, we have no idea

7   what a laryngoscope would have looked like on August 28th,

8   2005?

9   A.   We don't know.

10  Q.   Did you see any permanent epithelial damage?

11  A.   You -- you don't actually visualize the epithelium on the

12  CAT scan.

13  Q.   How would you see the epithelium?  Laryngoscopy?

14  A.   Probably on biopsy.

15  Q.   Can you do it without a biopsy?

16  A.   Chronic asthma can cause what's called "airway

17  remodeling".

18  Q.   Which you've described; yes?

19  A.   Which I -- I think he had.  That is related to hypertrophy

20  of the base of the membrane, you know, smooth muscle

21  hyperplasia.  There can be damage to the airway's epithelium.

22  So that indirectly one could say he probably has epithelial

23  scarring.  But if you really want to say epithelial scarring,

24  then you need a piece of tissue.

25  Q.   So if he has epithelial scarring, it's the result, in your

1  mind, of his long-term asthma?

2  **A.**   I -- I don't think I could say.

3  **Q.**   "Nonetheless, the patient's test results document

4  moderately severe bronchial hyperresponsiveness as well as a

5  component of the fixed airflow obstruction.  This likely

6  reflects a long history of asthma that has been suboptimally

7  treated."  Is that correct?

8  **A.**   Yes.

9  **Q.**   Do you still believe that today?

10  **A.**   Yes, I do.

11  **Q.**   Skip a sentence.  Then you state:  "chronic untreated

12  asthma can lead to airways remodeling and scarring with fixed

13  airflow obstruction that no longer completely reverses with

14  inhaled bronchodilator."  Is that correct?

15  **A.**   Yes.

16  **Q.**   So that you believe he had airway remodeling and scarring

17  based on suboptimally treated asthma?

18  **A.**   In part, yes.

19  **Q.**   Would what would a pulmonary function test flow loop look

20  like if somebody had vocal cord dysfunction?

21  **A.**   Typically, classically, the -- the expiratory loop

22  looks -- has a fairly normal --

23  **Q.**   Go slower.  Which loop?

24  **A.**   Okay.  So -- I don't -- I don't -- we have PFTs, so let

25  me -- somewhere.  Okay.  I don't know what Bates number yours

```
1    are.  The one after that.  After that.  After that.  No.  Yes.
2    So if you look at this there an X axis and a Y axis.  The Y
3    axis measures rate of flow.  The X axis measures volume.
4    Q.   Okay.
5    A.   So the upper portion this curve -- I feel sorry for the
6    audience who can't see it, but we'll show it; right?
7              So you see with exhalation the rate of flow goes up
8    and then it gradually tapers off and the lung volumes go down.
9    Q.   Okay.
10   A.   The below the X axis, you see another curve which is the
11   inspiratory loop as the patient takes a breath in and the lung
12   volumes go back to their baseline.  So you have -- you have
13   this continuous loop when you exhale and inhale --
14   Q.   Okay.
15   A.   -- right?  Classic vocal cord dysfunction shows a normal
16   expiratory loop; but the inspiratory loop, instead of looking
17   like a circle, it sort of -- can be very flat and very
18   irregular.  It's vocal cords are closing in part to get the
19   nice flow rate that you would normally get.
20   Q.   So this pulmonary function test --
21   A.   Looks normal.
22   Q.   -- does not look like somebody with vocal cord
23   dysfunction?
24   A.   No, it does not.
25   Q.   Despite the limited previous medical record, the patient's
```

 1   asthma as a young child must have been moderately severe and

 2   that he was maintained on -- nebul- -- nebulized Pulmicort as

 3   well as nebulized albuterol; is that correct?

 4   A.   Yes.

 5   Q.   Page 7 under "discussion," last line of the second full

 6   paragraph:  "Given the lack of medical records, I cannot form

 7   an opinion as to whether the patient's current asthma is

 8   substantially aggravated compared to his asthma earlier in

 9   life."  Is that statement correct?

10   A.   I guess it -- it is correct in -- in the sense that I

11   don't know yet if it's been substantially aggravated.  And part

12   of that will relate to the natural history of the disease.

13   Q.   Doctor, so as we sit here today, you cannot say more

14   probably than not that Chris Cooper's asthma is any different

15   today than it was on August 28th, 2005; correct?

16   A.   Not yet, no.

17   Q.   My statement's correct, but you would add to it "not yet";

18   is that right?

19   A.   Yes.  I would want to see how his asthma falls out in the

20   next couple of years.  Yes, meaning the -- the exposures that

21   were measured in January of 2008 would have been substantially

22   lower than ones that might have been detected in May of 2006 or

23   before.

24   Q.   It could have been that way, certainly; yes?

25   A.   I beg your pardon?

1   **Q.**   That certainly could be accurate.  But you also said that
2   if it had been closed up for a time before testing, .050 might
3   rest a high test result; correct?
4   **A.**   It's possible.  Although, I made an error saying that it
5   had been closed off for a year and a half, when really it
6   appears to have been about a month.
7   **Q.**   But even in that one month, fully closed up, you could --
8   you could anticipate that that level may be higher than when
9   they were living in it, if, hypothetically, they ventilated it
10  for at least an hour a day; is that correct?
11  **A.**   It's possible.
12  **Q.**   Well, I -- I want to go a little bit beyond "possible," if
13  that's all right with you.  You're an occupational medicine
14  doctor.  You would expect under those two scenarios that
15  closing it up for a month and then coming in without
16  ventilation and testing it, accept that as my hypothetical,
17  versus living in it and ventilating it for an hour a day, you
18  would expect the living-in portion and the ventilation to be
19  lower than the closed-in portion, would you not?
20  **A.**   Yes, I would.  Although, again, I don't know how much
21  lower it would have been.
22  **Q.**   But an MRL is not a LOAEL?
23  **A.**   No.
24  **Q.**   It's not -- what's a LOAEL, Doctor?
25  **A.**   "Lowest observable effect level."

1    **Q.**    It's not a NOAEL --

2    **A.**    "Lowest observable adverse effect level."

3    **Q.**    It's not at NOAEL, is it?

4    **A.**    No.

5    **Q.**    What's a NOAEL, doctor?

6    **A.**    "No observable adverse effect level."  Well, usually those

7    are related to cancer endpoints.

8    **Q.**    You said previously that "he," that Chris Cooper did not

9    have formaldehyde-related, IgE-mediated asthma; correct?

10   **A.**    To my knowledge, no, he did not.

11   **Q.**    Here's the part I want to ask you about:  "Removal of the

12   resident from housing unit and the formaldehyde should result

13   in a lessening of asthma symptoms and a return of pre-existing

14   disease to baseline"?

15   **A.**    I agree that removal of the resident from the housing unit

16   and the formaldehyde should result in a lessening of asthma

17   symptoms and return of the preexisting disease to baseline,

18   with formaldehyde acting purely as an irritant and, again,

19   depending on the level of exposure.

20   **Q.**    On Page 308, which I will attach as Exhibit 11, it was

21   indicated that he had allergies; correct?

22   **A.**    Well, this question says:  "Does your child have nasal

23   allergies?  Yes.  "if yes, when?"  Spring and fall.  "Does your

24   child have eye symptoms from allergies?"  Yes.  "If yes," then

25   in the spring and the fall, they answered.

1   **Q.**   And then below that, he had a two-year-old pillow and a

2   two-year-old mattress that were made out of Polyfil?

3   **A.**   Yes.

4   **Q.**   Will that collect dust mites at all?

5   **A.**   It can.

6   **Q.**   Should an asthmatic allergic to dust mites change their

7   pillow more often than every two years?

8   **A.**   Usually, we ask them to use these sort of barrier casings

9   for the pillows, to sort of separate the child from the -- the

10   dust mites.

11          I didn't have any skin test records, so I don't know

12   if the patient knew that he was allergic to dust mites prior to

13   his visit here.  So I can't comment that he has old pillows, if

14   he didn't know he was allergic to dust mites.

15   **Q.**   Well, and we know he has a two-year-old pillow; correct?

16   **A.**   Well, that's what they say in this questionnaire, yes.

17   **Q.**   And we know he has an allergy to dust mites; is that

18   correct?

19   **A.**   Yes.

20   **Q.**   And that's not a good combination; is that correct?

21   **A.**   Yes.

22   **Q.**   Okay.

23   **A.**   On the other hand, I would not expect his symptoms to

24   change if he's using the same pillow.  And they did change when

25   he left the trailer.

1   Q.   They got better?

2   A.   Right.

3   Q.   And continued to get better; correct?

4   A.   Somewhat, yes.

5   Q.   On the next page, is it correct that he did not have

6   anxiety or depression?

7   A.   That's correct.  The mother answered no to anxiety, ADD,

8   et cetera.

9   Q.   And depression; correct?

10  A.   Yes.

11  Q.   I'm going to hand you Dr. Barnes' notes from April 24th,

12  2009, at least the first page of it, Bates label 384.  Does she

13  indicate in that history that he, that Chris Cooper, had a

14  history of asthma and sinusitis prior to Katrina?

15  A.   Yes.

16  Q.   Does she indicate that there was significant improvement

17  after moving out of the trailer on Page 385?

18  A.   Yes.  It says his attacks of shortness of breath and the

19  wheezing progressively decreased.

20  Q.   Doctor, are you familiar with the Frigas-Reed studies that

21  were done at the Mayo Clinic?  Study?

22        Are you familiar with that study?

23  A.   No, but I'm looking at it right now.

24  Q.   Is -- reviewing this study, is it correct that no patient

25  had a significantly greater decrease in the forced expiratory

1   volume in one second after exposure to formaldehyde and then

2   exposure to air; in no case were they able to substantiate the

3   exposure to formaldehyde at levels as high as 3 parts per

4   million was causing or aggravating asthmatic symptoms?

5   **A.**   There are a few pieces of information in this report.  The

6   first is that only 3 out of the 13 patients actually underwent

7   the methacholine challenge; and two of them were negative, so

8   they didn't have asthma.  The third one was positive.

9           Three of the cases didn't get a methacholine

10  challenge because they gave a history of asthma and they had

11  pulmonary obstruction with pulmonary function tests done.  We

12  don't know if they were reversible.  The rest, the remaining

13  five, had, quote, "convincing histories of asthma."  And two

14  were not tested because of time constraints.

15          So, number one, we don't really know if all 13

16  patients, indeed, had asthma, indeed, had reversible airflow

17  obstruction that would be aggravated by the formaldehyde.

18          Secondly, they were considering whether or not

19  formaldehyde acted as -- as an allergen or as an irritant.  So

20  in a group of patients, one of only whom we really know has

21  asthma, they did not develop bronchoconstriction at a dose of 3

22  parts per million for 20 minutes.

23          So the conclusions from the this study are -- are

24  limited because the patient population was not homogeneous, and

25  the exposure was also relatively low.

1   **Q.**   The exposure was low?

2   **A.**   It was 3 parts per million for 20 minutes.

3   **Q.**   You consider 3 parts per million to be a fairly low

4   exposure, don't you, doctor?

5   **A.**   It was a limited exposure, yes.

6   **Q.**   This is the Grant Uba study.  Are you familiar with this

7   study?

8   **A.**   No, but I know some of the authors on here.  That's

9   interesting.  Okay.

10  **Q.**   Does this study test 103 medical students exposing them to

11  formaldehyde over a seven-month period?

12  **A.**   Well, these were first-year medical students who were

13  doing their anatomy rotation.  So they weren't exposed -- in

14  the laboratory they were exposed as part of their studies.

15  **Q.**   And did they find that as a result of those exposures,

16  which were generally less than 1 part per million, with peak

17  exposure less than 5 part per million, that the 12 asthmatics

18  in the group were no more likely to have symptoms of

19  respiratory irritations or changes in pulmonary function than

20  those without such a history?

21  **A.**   Yes.  Although, they did find an association of eye, nose

22  and throat irritation associated with exposure.

23  **Q.**   Sure.  At those levels, you'd expect that, wouldn't you,

24  Doctor?

25  **A.**   Yes.

1    **Q.**    Okay.  Did they state that the findings of exposure to

2    formaldehyde vapor at levels commonly encountered in

3    occupational and residential settings do not commonly cause

4    significant bronchoconstriction even among subjects with

5    preexisting asthma?

6    **A.**    Yes, I -- I would agree with that.

7    **Q.**    Doctor, I assume you have been qualified to testify as an

8    expert in court before; is that correct?

9    **A.**    Yes.

10   **Q.**    Have you ever been not qualified?  Has your testimony ever

11   been excluded?

12   **A.**    No.

13   **Q.**    The Horvath study, are you familiar with this study,

14   Doctor?  And take your time in reviewing it.

15   **A.**    Okay.

16   **Q.**    This study followed 109 workers over ten years -- I'm

17   sorry -- a mean exposure of ten years?

18   **A.**    Okay, yes.

19   **Q.**    I apologize.

20   **A.**    Yes.  It was a cross-sectional study.

21   **Q.**    And after that mean exposure of ten years, there was no

22   evidence of formaldehyde-produced permanent respiratory

23   impairment?

24   **A.**    In -- again, this was really a cross-sectional study.

25   They were studied at one point in time.  Although, they

 1  estimated what their mean exposures had been over ten years,
 2  they did detect statistically significant changes in airflow in
 3  those who were exposed; but did not find within the measured
 4  levels that there were long-term differences in airflow.
 5  Q.   So there was no permanent injury.  That was their finding;
 6  correct?
 7  A.   Well, permanent injury is a little bit broad.  They didn't
 8  find a dose response within the range of these exposures and
 9  lung function decrements.
10  Q.   That's an excellent point.  What is dose -- what do we
11  mean by "dose response," Doctor?
12  A.   It is the association between a level of exposure and the
13  size of the response.
14  Q.   It's also referred to a biological gradient?
15  A.   Can be.  Again, it is easy to think of the dose response
16  as linear.  You get more, you're worse.  That's not always the
17  case.  Sometimes there is a threshold effect.  Sometimes, you
18  know, short-term, high-level exposure and then low-level
19  exposure may average out to a low-level exposure, but the high
20  level at the beginning may have a significant effect.
21  Q.   A peak exposure could have a significant effect; correct?
22  A.   Yes.
23  Q.   Especially if you're dealing within an airway irritant
24  like formaldehyde that needs to overwhelm the defenses to get
25  to the target organ; correct?

1  A.    Yes.

2  Q.    And would you, as a medical doctor and somebody who's

3  involved in occupational medicine, expect that the formaldehyde

4  level that Christopher Cooper was exposed to when he moved into

5  this trailer in May of 2006 was higher than .05 parts per

6  million?

7  A.    Yes.  And I said that; right?  The trailer has had an

8  opportunity to off-gas for over a year and a half, and it's

9  possible that the level of formaldehyde sampled in -- that

10 should have been January of 2008 -- is substantially lower than

11 the one that might have been detected in May -- in May of 2006.

12 And these data really support that statement.

13 Q.    In your history that you took from Christopher Cooper, did

14 you talk to Christopher Cooper and his mother, Alana Alexander?

15 A.    Yes, I did.

16 Q.    The history you got, was it generally consistent between

17 what they both told you?

18 A.    It was -- more importantly, it was consistent with some of

19 the other medical records, which is something I routinely do.

20 I write down almost verbatim what the patient and his or her

21 family tells me, but then I go back and look at the medical

22 record to make sure that they correspond.

23 Q.    Did you think in any way that Christopher Cooper or Alana

24 Alexander were exaggerating or overstating any of his symptoms

25 with regard to asthma, or exacerbations or aggravations of

1   asthma while he was living in the travel trailer?

2   A.   No.  In fact, I had to specifically ask these questions:

3   "What exactly were your symptoms?"  You know, "How much did you

4   use your medications?" in -- in order to get a better sense.

5   If anything, they -- they, I think, underestimated their

6   symptoms.

7   Q.   Do you have an understanding, based upon the medical

8   records and the interview that you conducted with Christopher

9   Cooper and Alana Alexander as to what kind of status his asthma

10  was prior to moving into the trailer?

11  A.   My understanding was that it was moderate/severe when he

12  was younger; it had gotten better in the few years prior to

13  Hurricane Katrina.

14  Q.   And then what happened after he moved into the FEMA

15  trailer?

16  A.   He developed a lot more symptoms and used more medication

17  for these symptoms than he had prior.

18  Q.   Do you have a medical opinion based upon reasonable

19  medical probability what was the primary causal factor for this

20  aggravation of asthma symptoms that Christopher Cooper

21  experienced while he was living in the FEMA travel trailer?

22  A.   Well, I -- I considered two exposures, based on the

23  history.  And one was formaldehyde, because they were

24  concerned; and the other was mold, because they described water

25  dripping down through the ceiling fixtures and visible mold in

1    the trailer.

2              Because of those two exposures, that's why I ordered

3    skin testing, because I wanted to see was he, in fact, allergic

4    to common indoor molds, number one; number two, you know, I

5    considered the nature of his symptoms, were they allergic

6    sounding?  And those, typically, we look for things like

7    sneezing, itching, hives?  Or were they more irritant sounding?

8              So on the basis of the fact that his mold skin

9    activities were negative, he didn't really have allergic

10   symptoms in the trailer.  He had irritant symptoms.  He had

11   burning eyes, burning nose, burning throat, cough.  In my

12   opinion, his symptoms were due to formaldehyde, and not due to

13   mold.

14   Q.   Let's talk about that in a little bit more detail.  Is it

15   your opinion that his symptoms of burning eyes was related to

16   formaldehyde exposure while he was living in the FEMA travel

17   trailer?

18   A.   Yes.  That -- that's been well documented in the medical

19   literature.

20   Q.   Is it your opinion that the throat discomfort he was

21   experiencing was due to the formaldehyde exposure that he

22   experienced while he was living in the FEMA travel trailer?

23   A.   Yes.

24   Q.   Is it your opinion that his respiratory symptoms, the

25   aggravation of his respiratory symptoms related to asthma was

1   due to the formaldehyde exposure that he experienced while he

2   was in the FEMA travel trailer?

3   **A.**   Yes, I do.

4   **Q.**   Is that consistent with your understanding of the medical

5   literature related to formaldehyde exposure?

6   **A.**   Yes.  It's consistent because the levels that were

7   measured there are similar to levels that have been measured in

8   different occupational settings.  The symptoms he described

9   were similar to those symptoms that have been described by

10  workers in an occupational setting.

11          And so really the exposure and the symptom history

12  corresponded in a way that I would not expect the family to

13  invent or exaggerate.

14  **Q.**   Is it your opinion that dust mites were not the primary

15  cause of the aggravation of his asthma-related symptoms and

16  respiratory symptoms while he was living in the FEMA travel

17  trailer?

18  **A.**   So it's not my opinion that dust mites were the reason for

19  his asthma aggravation.  And, I think, again, the constellation

20  of symptoms, the temporal relationship, the -- the

21  correspondence to what's known in the medical literature, his

22  symptoms were related to formaldehyde.

23  **Q.**   Is it fair to say that your opinion that formaldehyde can

24  affect asthma-related symptoms, that's just not your opinion,

25  but it's also held and reported in the medical literature?

1    A.    Yes.

2    Q.    And so are your opinions with regard to formaldehyde can

3    either cause or exacerbate asthma symptoms, is it related not

4    just to the medical literature, but also to your own clinical

5    experience?

6    A.    Yes.

7    Q.    In the medical literature and in your field as a doctor,

8    is it widely accepted that formaldehyde is an irritant to the

9    human body?

10   A.    Yes, it is.

11   Q.    Are you, in any way, to make a determination as to where

12   Christopher Cooper stands on the natural progression?

13   A.    He stands on the threshold of puberty.

14   Q.    In your workup on Christopher Cooper, you did an allergy

15   test?

16   A.    Yes.

17   Q.    Did you notice anything with regard to a hickory or pecan

18   allergy?

19   A.    Yes.  He had a positive skin test to this particular tree

20   and then also to dust mites.

21   Q.    And when would he be more exposed to hickory or pecan

22   allergens in the calendar year?

23   A.    In the spring.  Trees pollinate, typically, in the spring.

24   Q.    So if he had an asthma attack in December of -- of a

25   particular year, would you tend to that think that that was

1    something related to hickory or pecan?

2    **A.**    Yes.

3    **Q.**    Now, Exhibit 16, you were asked about that study

4    yesterday; is that right?

5    **A.**    Yes.

6    **Q.**    You were asked about that study by the Gulf Stream

7    attorney; right?

8    **A.**    Yes.

9    **Q.**    All right.  When we look at these particular studies isn't

10   it true that the exposure that they had for formaldehyde was

11   only 20 minutes long?

12   **A.**    Yes, the challenge was for 20 minutes.

13   **Q.**    And in this particular study, they didn't notice any

14   significant decrement in respiratory function after people were

15   exposed to formaldehyde; is that right?

16   **A.**    Yes, in the concentrations that they used.

17   **Q.**    Let me ask you:  Is it your understanding that Christopher

18   Cooper was exposed to formaldehyde a lot longer than 20

19   minutes?

20   **A.**    Yes.

21   **Q.**    In fact, he was exposed to formaldehyde for about a year

22   and a half?

23   **A.**    Yes.

24   **Q.**    Now, after yesterday's deposition, did you meet with

25   Mr. Pinedo again?

1   A.   Yes.

2   Q.   Yesterday or today?

3   A.   Well, briefly yesterday, when I asked him some questions

4   about formaldehyde levels that had been measured in new

5   trailers, since I didn't have that information.  And then we

6   met this morning when he provided me with some of that

7   information.

8   Q.   Sticking with yesterday, you met with him immediately

9   after the deposition?

10  A.   Yes.

11  Q.   Okay.  Here at National Jewish again?

12  A.   Yes.

13  Q.   How long?

14  A.   Probably 10 minutes.

15  Q.   Okay.  And what was the subject of that conversation for

16  those 10 minutes?

17  A.   What I just said, which was, a measurement of levels of

18  formaldehyde in newly constructed trailers and in other

19  trailers.

20  Q.   Okay.  So you asked him for any measurements that were out

21  there in new trailers or newly constructed trailers?

22  A.   Yes.

23  Q.   And then he came back today and provided you with that

24  report that we've marked as Exhibit 20; correct?

25  A.   Yes.

1   Q.   I want to just circle back for one minute.  We had talked
2   about your ten-minute meeting with Mr. Pinedo last night, and
3   you said you met with him again this morning; correct?
4   A.   Yes.
5   Q.   How long was that meeting?
6   A.   It was about 45 minutes to an hour, something like that.
7   Q.   Okay.  And what did you discuss with him this morning?
8   A.   We looked at these articles.
9   Q.   All right.  So you said that you went over those articles
10  with him over the course of those 45 minutes; correct?
11  A.   Yes.
12  Q.   Now, what time did you start meeting with him?
13  A.   About 10 to 9:00.
14  Q.   And then you met with him up until we started the
15  deposition today, which was around 10:00; correct?
16  A.   Close enough, yes, sir.
17  Q.   There was a notation in the medical records, that
18  Mr. Cooper was seen in Children's Hospital for coughing fits on
19  December 4th, 2007.  Do you remember that?
20  A.   Yes.
21  Q.   Okay.  Did you do any research into whether or not there
22  were any significant temperature changes from hot weather to
23  cold weather around that time period?
24  A.   In December?
25  Q.   Yes.

1  A.    No.  There are epidemiologic studies looking at patterns

2  of emergency room visits.  In fact, there was a study that was

3  probably about 30 years old that we reviewed when I was a

4  fellow in allergy, showing that at some point with change in

5  weather, sort of September, October, November, there -- there

6  appears to be a peak in emergency room visits.  That was found

7  sort of across the board, and New Orleans was one of the

8  places.

9         So there does appear to be a fall sort of peak, but

10  it happens before December.

11  Q.    Okay.  It's reported in Mr. Cooper's medical records that

12  his asthma does have a component that stems from a change --

13  changes in temperature; is that correct?

14  A.    The history that I got was that cold air will trigger his

15  asthma.

16  Q.    And as per the Children's Hospital medical record at that

17  visit the patient reported that his last episode of wheeze was

18  about a year ago?

19  A.    Yes.

20  Q.    And you recorded that in your own...

21  A.    Yes.

22  Q.    And what I've marked as Exhibit 29 is an attorney

23  agreement from your file and there's a line in there that I

24  believe reflects what you just said, that part of your

25  assignment was to provide appropriate medical treatment for

1    Christopher Cooper; is that right?

2    A.    Yes.  We actually have a policy to not -- to not be expert

3    witnesses in cases where we have not seen the patient and where

4    we cannot see and treat the patient for all the relevant

5    medical diagnoses, whether or not they're related to the

6    exposure.

7    Q.    And before you are offered any opinions regarding

8    Christopher Cooper, it certainly would have been important for

9    you to examine Christopher Cooper; is that fair?

10   A.    Yes.

11   Q.    All right.  And why is that important to examine the

12   patient before forming those opinions?

13   A.    Because that's almost the entire basis of -- of medical

14   care.

15   Q.    Okay.

16   A.    And perhaps one of the things that I like very much about

17   medicine is that it can't -- it can't be outsourced.  You have

18   to see the patient.

19   Q.    So you would have to actually see the patient to reach any

20   opinions, as opposed to just looking at medical records;

21   correct?

22   A.    Well, in my estimation, yes.  I -- I would want and have

23   to see the patient, and not just review medical records to

24   formulate my opinions.

25   Q.    And in assessing the severity of someone's asthma, can

1  nighttime awakenings be a key indicator of severity?

2  **A.**    They can be, yes.

3  **Q.**    Is it correct, and I believe you may have spoken about

4  this yesterday, but is it correct that asthma can be

5  exacerbated by rhinovirus?

6  **A.**    Yes, it can be.

7  **Q.**    What is rhinovirus?

8  **A.**    The common cold.

9  **Q.**    Is it correct that rhinovirus can be more common when

10  people are staying in very close proximity to one another?

11  Does that allow for a greater exchange of germs and viruses?

12  **A.**    Yes.  Although, typically rhinovirus peaks in the fall and

13  winter for that reason.

14  **Q.**    Because people are spending more time indoors?

15  **A.**    Yes.  And -- yes, and children are spending more time with

16  other children indoors.

17  **Q.**    Can the observation of boggy nasal turbinates result from

18  the suboptimal treatment of asthma?

19  **A.**    No.

20  **Q.**    Could it result from a sinus infection?

21  **A.**    Classically, the specific description of boggy pale nasal

22  turbinates reflects allergies.

23  **Q.**    When you were speaking with Mr. Pinedo earlier today and

24  I -- I think I knew what you meant, but I want to make sure

25  because it's all typed down and it perhaps will look a little

1    different on paper -- I -- I think you responded affirmatively

2    when you were asked if his asthma, that is Chris' asthma, got

3    better when he was out of the trailer and worse when he was in

4    the trailer.

5            And do you have the belief that his asthma was better

6    before he was living in the trailer, that is before the

7    hurricane, and got better when he moved out of the trailer

8    after December 2007?

9    **A.**   Yes.

10   **Q.**   And that is what is the basis of the statement that his

11   asthma was better when he was out of the trailer and worse when

12   he was in the trailer?

13   **A.**   Yes.

14   **Q.**   And would it be fair to say that particularly your

15   testimony earlier today, that if Chris Cooper had an event of

16   atopic dermatitis in October of 2007 that you would have

17   expected, given his age, that he would have had earlier atopic

18   dermatitis events?

19   **A.**   That's exactly right.  Given the natural history of his

20   disease and how young he was when it manifested, I would have

21   expected that he had evidence of atopic dermatitis earlier

22   to -- before the hurricane.

23   **Q.**   And you are aware that Dr. Barnes' records of her

24   treatment of Chris Cooper before the hurricane were destroyed

25   by the hurricane?

1  A.   Yes.

2  Q.   Are you familiar with what an Iconic Breeze power fan is?

3  A.   Yes.

4  Q.   Have you ever treated any patients that reported in an

5  interview that they had those in the home?

6  A.   I can't recall.

7  Q.   Did -- do you recall whether Chris Cooper or his mother

8  mentioned that they had one in the trailer?

9  A.   I -- I don't believe they mentioned that, no.

10 Q.   Do you have any knowledge that such a fan could exacerbate

11 the effect of any allergen exposures in a person?

12 A.   Those kinds of air cleaners can emit ozone which can

13 aggravate asthma.

14 Q.   So if a fan like that was being used in the trailer, it

15 could have aggravated Chris Cooper's asthma?

16 A.   It's possible.

17           MR WATTS:  Judge, I think that's the conclusion of

18 the tape.

19           THE COURT:  All right.  Well that gets us right up to

20 3:00.  So why don't we go ahead and take a very short break.

21 And we have --

22           MR WATTS:  Paul Hewett.

23           THE COURT:  -- who are we going to see next.

24           MR WATTS:  Paul Hewett.

25           THE COURT:  And then that will be it for today;

 1 | right?

 2 | **MR WATTS:**  Yes, sir.

 3 | **THE COURT:**  Okay.  Good.

 4 | **THE DEPUTY CLERK:**  All rise.

 5 | (WHEREUPON, the jury exited the courtroom.)

 6 | **THE DEPUTY CLERK:**  All rise.

 7 | **THE COURT:**  You may be seated.  And the next witness,

 8 | Mr. Watts, is going to be?

 9 | **MR WATTS:**  Dr. Paul Hewett.

10 | **THE COURT:**  Dr. Paul Hewett.  I'll ask you to stand

11 | up again, Dr. Hewett.

12 | (WHEREUPON, **Paul Hewett**, having been duly sworn,

13 | testified as follows.)

14 | **THE DEPUTY CLERK:**  Please state your full name and

15 | correct spelling for the record.

16 | **THE WITNESS:**  My name is Paul Hewett, P-A-U-L,

17 | H-E-W-E-T -- H-E-W-E-T-T -- excuse me.  I have no middle

18 | initial, my parents could not afford one.

19 | **DIRECT EXAMINATION**

20 | BY MR WATTS

21 | **Q.**  All right.  Dr. Hewett, tell the members of the jury your

22 | name and what you do.

23 | **A.**  Well, again, Paul Hewett.  I am a professional industrial

24 | hygienist or occupational hygienist.  We go by both terms.  My

25 | training is in the recognition, evaluation in control of

1   occupational exposures, that is exposures to toxic chemicals

2   and particulars that one that might encounter in workplaces, be

3   they general industry, chemical industry, or my specialty

4   actually when I was working for the federal government was in

5   mining, below ground, above ground and surface mining.

6           **MR WATTS:**  Your Honor, I've conferred with counsel,

7   we offer as Exhibit 300, his curriculum vitae and the 20 pages

8   of charts and tables that were produced with his report.

9           **MR. WEINSTOCK:**  No objection, with the understanding

10  that they're going to use the charts that are applicable.

11          **MR WATTS:**  Fine.

12          **MR. WEINSTOCK:**  I'll tell you what, once it goes in,

13  it goes. in.

14          **THE COURT:**  Well, you-all know what you're talking

15  about here, because I'm not quite sure what -- if you-all have

16  come to an agreement on that.

17          **MR WATTS:**  I think we have.

18          **MR. WEINSTOCK:**  I think we've come to an agreement

19  for cross -- for this examination, but we might have to pull

20  some pieces out of that before it goes into --

21          **THE COURT:**  What number is this?

22          **MR WATTS:**  It's Exhibit 300.  I put both the CV and

23  the charts that were with his report.

24          **THE COURT:**  Okay.  So that's Exhibit 300.  And now

25  the area of expertise that he's going to testify?

1          **MR WATTS:**  Which offer him on the field of

2   retrospective exposure assessment and statistics as they relate

3   to industrial hygiene.

4          **THE COURT:**  All right.  Counsel, do we have a

5   stipulation?

6          **MR. SHERBURNE:**  Yes, Your Honor.

7          **MR. WEINSTOCK:**  Yes, yes, we can stipulate, Your

8   Honor.

9          **THE COURT:**  All right.  The court will accept him

10  accordingly.

11         **MR WATTS:**  Excellent.

12  **BY MR WATTS**

13  **Q.**   With that understanding, I want to blow through your

14  curriculum vitae, no offense but it's Friday afternoon.  I've

15  got LSU shirts on, people are ready for football, and we've got

16  to get you out of here, okay?

17         Dr. Hewett, you've got a Ph.D., a master's and a

18  bachelor's of science, and your Ph.D. is in industrial hygiene;

19  right?

20  **A.**   Correct.

21  **Q.**   You're a certified industrial hygienist?

22  **A.**   Correct.

23  **Q.**   When you got out of high school, did you go into the

24  United States Army?

25  **A.**   Yes.

1    **Q.**    After you got back from the Army did you get a bachelor's
2    and master's and work for NIOSH?
3    **A.**    Yes.  I went to school on the G.I. Bill.  Upon graduating
4    with a master's in industrial hygiene, I joined the National
5    Institute for Occupational Safety and Health.
6    **Q.**    How long did you work for NIOSH?
7    **A.**    For 25 years, from 1978 to 2003.
8    **Q.**    And while you were with NIOSH, did you participate in
9    retrospective exposure assessments?
10   **A.**    I participated as an industrial hygienist assisting in the
11   collection of occupational exposure data.
12   **Q.**    All right.  And while you were there, you got the NIOSH
13   Alice Hamilton award; is that correct?
14   **A.**    Yes, sir.
15   **Q.**    Tell the jury what that is just real briefly.
16   **A.**    Well, the Alice Hamilton award is given to researchers --
17   NIOSH researchers, that is, that a committee finds has produced
18   an exemplary piece of work in the past year.  There's four
19   types of awards.  And in 1996, I won an award for a chapter I
20   wrote on interpreting -- using and interpreting occupational
21   exposure limits.
22   **Q.**    One more thing on your CV then we can get to the crux of
23   it.  You won the Edward J. Baier Technical Achievement Award
24   from the American Industrial Hygiene Association; is that
25   right?

1   A.    Yes, sir.

2   Q.    What did you win that award for?

3   A.    Well, for the past ten or so years, I've been working on

4   applying on Bayesian statistics.  There's two types of

5   statistics.  There's classical or frequent statistics and

6   there's Bayesian statistics.

7           I've been working on applying Bayesian statistics to

8   the analysis and interpretation of occupational exposure data.

9   And without going into it, because I know we don't have much

10  time, but Bayesian statistics is that branch of statistics that

11  allows you quantify professional judgment and enter into the

12  analysis of the data and the interpretation of the data.

13          And in occupational hygiene, we have so little data

14  for most of our exposure scenarios that we find we are often

15  making decisions using professional judgment or factoring that

16  in.  Now we can do it mathematically and quantitively.  And I

17  was given an award for that body of work.

18  Q.    Okay.  And when we talk about what industrial hygiene is,

19  just explain that to the jury very briefly.

20  A.    Well, industrial hygiene is the practice of anticipating,

21  recognizing, evaluating and controlling exposures.  So

22  recognizing that you have an issue, that you may have an issue,

23  measuring the exposures in the workplace and then determining

24  if exposures are too high relative to exposure limits developed

25  by the government and other organizations, then recommending

1    suitable controls for lowering and mitigating or maybe even
2    eliminating exposures.
3              **MR WATTS:**  May I approach the witness, Your Honor?
4              **THE COURT:**  Yes.
5    **BY MR WATTS**
6    **Q.**    Tell the ladies and gentlemen of the jury what a
7    retrospective exposure assessment is?
8    **A.**    Well there's two types of exposure assessment.  There's
9    normal exposure assessment or prospective exposure assessment
10   where we're trying to determine are exposures currently in
11   control or not in control and, if not, do something, for
12   purposes of predicting future exposures.  That's what most
13   companies are involved in when they do exposure assessments on
14   a normal basis.
15             In a situation where you're trying to estimate
16   exposures for scenarios that occurred in the past, you have to
17   adopt various mechanisms for generating estimates of exposure.
18   One would be to gather data that has been collected by other
19   organizations, government organizations, or academic
20   organizations, look in the literature, look and see what's been
21   published.
22             You could collect data from similar types of jobs in
23   similar workplaces, or you could even develop physical chemical
24   models using chemical engineering principles to predict what an
25   exposure would have been given particular scenarios.

1          The gold standard in retrospective exposure

2    assessment is to find data in some way, shape or form from the

3    actual workers or similar workers doing the same work or

4    similar work in similar types of workplaces, and we do that and

5    have done that in NIOSH quite frequently.

6          For example, in the last part of my career at NIOSH,

7    we were doing a mortality study on diesel particulate, did the

8    mortality study having lung cancer as an end point.  And one of

9    the goals was to estimate exposures back for 10, 20, 30 years

10   to diesel particulate.  So to do that, we went out and we

11   measured exposures in similar workplaces or line-type

12   environments.

13         So I think that -- I hope that covered it.

14   Q.   I think it gets us there.  Let's get out of the general to

15   the specific.  Did our side contact you and ask you to perform

16   a retrospective exposure assessment of sorts based upon

17   formaldehyde measurements that had been taken in a large number

18   of these FEMA trailers?

19   A.   Well, the initial contact had a different focus, but

20   ultimately the goal was to do a retrospective exposure

21   assessment to estimate exposures at past points in time since

22   we, obviously, cannot go back in time and measure exposures for

23   any particular individual.

24   Q.   All right.

25         MR. WEINSTOCK:  Can we just approach, Judge, very

1   quickly.  There's no question on the table.

2            (WHEREUPON, the following proceedings were held at

3   the bench.)

4            **MR. WEINSTOCK:**  One thing I'm a little worried about

5   he's never testified before.  He has said in this case that

6   there was tremendous data, they would do a bang-up regression

7   analysis, which I think he has done for the *Fleetwood*

8   bellwether trial.

9            **MR WATTS:**  No, he's not going to do that.

10           **MR. WEINSTOCK:**  And he has not done it here.  So, you

11  know, here he's got his drafts and his charts --

12           **MR WATTS:**  That's all we're going to --

13           **MR. WEINSTOCK:**  -- but I don't want him delving into

14  anything that isn't really relative.

15           **THE COURT:**  You'll just have to carefully word the

16  questions so that he's directed to a specific...

17           **MR WATTS:**  Right.  Sure.  And he answered

18  specifically --

19           **MR. WEINSTOCK:**  He gave a global answer and we're not

20  going there.

21           **THE COURT:**  Let me ask you this:  I looked at my

22  ruling on your *Daubert* motion during the break.  Is there going

23  to be any need for me at all to give the type of instruction

24  that I suggested in the ruling might be curative?

25           **MR WATTS:**  What was that suggestion?

1        **THE COURT:**  That had to do with the use of the

2    different levels of formaldehyde and the what ultimately --

3        **MR WATTS:**  Oh.  You told me to cover that and I'm

4    going to cover it in my questioning.  I know what you're

5    talking about.

6        **MR. WEINSTOCK:**  Yes.

7        **MR WATTS:**  Well, Judge, what I'm going to do is I

8    don't think that it's appropriate for the Court to say that it

9    doesn't establish liability, but you've instructed me to

10   specifically have him say he's not saying that, and I'm going

11   to do that.

12        **THE COURT:**  Why don't we -- if you do that then there

13   may be no need for --

14        **MR WATTS:**  I will do it.

15        **THE COURT:**  -- and that will be fine with me.

16        (WHEREUPON, the following proceedings were held in

17   open court.)

18   **BY MR WATTS**

19   **Q.**   Okay.  Let's get from the general to the specific.  Has

20   there been thousands of these FEMA trailers tested for

21   formaldehyde level?

22   **A.**   Over all the manufacturers tested, yes.

23   **Q.**   Is there -- all those tests results, have they been put

24   into a database?

25   **A.**   Yes, sir, they have.

1   **Q.**   And does that database have thousands upon thousands of
2   fields of data and test results?
3   **A.**   Well, it has thousands of test results.  It has, I think,
4   less than 100 fields, that is variables for each record or each
5   test.
6   **Q.**   All right.
7           **MR WATTS:**   Now, Your Honor, I'm going to put up a
8   summary of those fields.  We're not going to put this into
9   evidence, but I've talked to Andy about this just so we can
10  zoom through this.
11  **BY MR WATTS**
12  **Q.**   What do I have up on the screen here?
13  **A.**   Well, you have a -- a list of the variables that are in
14  the database that I was provided.
15  **Q.**   Okay.  And in that database, is there a lot of information
16  that will allow you to figure out, A, the FEMA bar code, the
17  manufacturer, the type of trailer, this kind of stuff?
18  **A.**   Yes, sir, that information is there.  Not always complete
19  for every measurement, but for the vast majority of the
20  measurements, we have the manufacturer, model, VIN number, bar
21  code, so on and so forth.
22  **Q.**   Okay.  Second question:  Inside of manufacturer and model,
23  we can figure out the date or the month of the original
24  manufacture of the unit; right?
25  **A.**   If it's in the database.

1    **Q.**   And we can see in the database when tests were done;
2    right?
3    **A.**   Yes, sir.
4    **Q.**   And the formaldehyde level that was recorded in those
5    tests; right?
6    **A.**   Yes.
7    **Q.**   There's other stuff, but that's the basic stuff that we're
8    going to talk about here today; is that right?
9    **A.**   Right.
10   **Q.**   And we can also look in the fields and figure out the
11   source or who did the testing that's in the database; correct?
12   **A.**   Right.  The source of the measurement.
13   **Q.**   All right.  Now, did I ask you sometime in May to do some
14   analyses with respect to the portions of the test done on Gulf
15   Stream trailers?
16   **A.**   Yes, sir, you did.
17   **Q.**   And of the thousands upon thousands of measurements across
18   manufacturers, can you tell the members of the jury how many
19   data sets or how many test results do we have for Gulf Stream
20   trailers?
21   **A.**   Well, we were -- I extracted from the database 1,191
22   records that were identified as being Gulf Stream trailers.
23   **Q.**   Okay.  Now, the database came to you in an Microsoft Excel
24   format?
25   **A.**   It came to me as a Excel spreadsheet, correct.

1    Q.    And when you have 1,191 test results, just as a matter

2    of -- I don't know -- chance, did some of them just not have

3    the data that you needed?

4    A.    That is correct, a few of them did not.

5    Q.    And did you have to eliminate a couple of the 1,191 just

6    because it didn't have all the data filled in?

7    A.    There were four that were missing concentration; and

8    without the concentration, all the other information for that

9    record are useless.

10   Q.    And then you had two so-called "non-detects"; is that

11   right?

12   A.    Then we had two non-detects.

13   Q.    Okay.  So did you subtract --

14   A.    Excuse me.  Those were non-detects because they were

15   blanks.  A blank is not a sampled measurement, so therefore it

16   should not be analyzed.

17   Q.    So of the 1,191 you were sent, did you utilize 1,185?

18   A.    Yes.

19   Q.    And then did I ask you that in addition to looking at Gulf

20   Stream trailers generally, I really wanted to know about Gulf

21   Stream Cavalier trailers, like what the Alexanders had?

22   A.    Right.

23   Q.    Now, how many Gulf Stream Cavalier test results are in the

24   database?

25   A.    Well, we have out of the 1,185 remaining measurements, 876

1   of them were collected in a Gulf Stream Cavalier travel

2   trailer.

3   **Q.**   Okay.  So we have 876 Gulf Stream Cavaliers where we know

4   when the tests were done and what the test levels were?

5   **A.**   Correct.

6   **Q.**   Okay.  In terms of the amount of data that an industrial

7   hygienist would have in doing one of these retrospective

8   exposure assessments, what's your view about the strength or

9   robustness of the data that we have in this database?

10  **A.**   Well, just in terms of sheer numbers, 1,185 measurements

11  for a single-exposure scenario is a rich, large data set, and

12  that's from my experience as an industrial hygienist doing --

13  having analyzed a good many corporate industrial -- or

14  corporate databases on occupational exposures.

15  **Q.**   Okay.  Now, once you get the data with respect to 1,185

16  Gulf Stream trailers and 876 Gulf Stream Cavaliers, what do you

17  do with that Excel file when it's sent to you?

18  **A.**   Well, the first thing I do is familiarize myself with the

19  database that has been sent to me.  I know that there's

20  particular fields in that database that are going to hold

21  information that are going to be very important in my analysis.

22          For example, date of sample collection is important.

23  So I have to look at that field, the entire column of data and

24  make sure that every value in that is a date.  So you can sort

25  it from high to low, low to high, you can look for, you know,

1    odd numbers.

2            The same thing regarding the concentration column.

3    Well, I want everything in that concentration column to be an

4    actual number.  And then sometimes there alphanumerics in

5    there, such as an "ND" standing for "non-detect," or an "NA"

6    standing for "not applicable," or just empty cells, meaning

7    there's no concentration measurement there at all.

8            So I have to try to cleanup the database, eliminate

9    the blatantly incorrect information and records before I

10   proceed to analysis.

11   Q.   This database, did it have the formaldehyde levels in

12   parts per million?

13   A.   Yes, it did.

14   Q.   Okay.  And I think you were telling me while we were

15   getting ready for this, that in part of the cleanup you saw one

16   field that said 231.

17   A.   Well, that was actually an earlier analysis, because this

18   wasn't the first time I looked at part of your database.  And

19   there was one in there that says 231.  Well, it was not 231

20   parts per million.  Upon further inspection, it was 231 parts

21   per billion and easily corrected and changed to parts per

22   million.

23   Q.   So you get the data and you clean it up to make sure that

24   everything's correct and you don't have any other errors like

25   that?

1    A.    Yes, sir.

2    Q.    Okay.  After you get the data and check the data for this

3    kind of cleanup, what do you do with it?

4    A.    Well, the first thing I then do is graph the data, display

5    the data.  I do a lot of training.  I don't want to go into it

6    in any detail, but I do a considerable amount of training every

7    year.  I've done about four courses this year.  And every time

8    I train people I say, "The first thing you do is look at the

9    data."

10           Now, that means, generate graphs, histograms, time

11   series plots, log probability plots.  Some of these are graphs

12   that we use in occupational hygiene to help us determine that,

13   for example, a particular distributional model best fits the

14   data rather than any other distributional model.

15           So the first thing I did was look at the data through

16   graphs and time series plots.

17   Q.    So you did graphs, you did time series plots.  Did you

18   segregate the date by the source of who collected it?

19   A.    Exactly.  There were a number of data sources, so I broke

20   it out by the eight different data sources.  So that

21   somebody -- my job is to take the data and deliver it into a

22   form that others can look at and interpret it.

23           I do all the hard work and then they can interpret

24   it.  So I now want to show the data side-by-side by data

25   source.

1   **Q.**   Now, in fairness, you're kind of the data guy, but you
2   weren't out there collecting the stuff; right?
3   **A.**   No, I do not collect.
4   **Q.**   All right.  You weren't taking the actual measurements;
5   right?
6   **A.**   No, I did not.
7   **Q.**   When the formaldehyde was collected, it was shipped off to
8   various labs for quantification testing; right?
9   **A.**   Correct.
10  **Q.**   You didn't do any of that?
11  **A.**   No.
12  **Q.**   In terms of the validity of this or that, you don't have
13  any opinions you're giving here today with respect to that; is
14  that right?
15  **A.**   Well, I'm not quite sure exactly what that's getting to,
16  but I took the data that was sent to me and took it at face
17  value and analyzed it.
18  **Q.**   There was a Mr. Kaltofen that was here that said part of
19  his job was to set up the ability to create this database and
20  to get the labs lined up and stuff like that.  That was more
21  his role, not yours; fair?
22  **A.**   Correct.
23  **Q.**   Now, after you get the data and you develop these graphs,
24  these histograms and everything like that, were you asked to
25  compare the data against a given metric by which you could

1    compare the data?

2    **A.**    Yes.  I was asked to compare the data to two values, two

3    limits --

4    **Q.**    Okay.  Well, hold on.  What were the two limits?

5    **A.**    One was the ATSDR limit of 0.008 parts per million for

6    exposures that exceed one year.

7    **Q.**    Okay.  And the second?

8    **A.**    The second was the National Institute for Occupational

9    Safety and Health, the NIOSH limit, it's an occupational limit,

10   of 0.016 parts per million.

11   **Q.**    All right.  Now, let's put the cards on the table, so Andy

12   doesn't have to do the big cross about the experts you met

13   with.  I asked you to compare the data against those two

14   limits; correct?

15   **A.**    That is correct.

16   **Q.**    You're not telling this jury that if it's above .008 or

17   .016 that the jury should assess liability or not; right?

18   **A.**    No, I am not.

19   **Q.**    What the standard is -- is -- if they want to apply it,

20   it's up to them, not to you; fair?

21   **A.**    Well, you have to have a line in the sand and a limit to

22   compare the data.

23   **Q.**    The mathematical limit?

24   **A.**    For mathematical purposes.

25   **Q.**    That's where you stop; right?

 1  A.   That's where I stop.

 2  Q.   Fair enough.  Now, let's talk about some of these graphs

 3  and tables, and, again, with the understanding that it's 3:40

 4  in the afternoon.  I want to zip through these as quick as we

 5  can.  But whenever you need to explain them, let me know.

 6  A.   I understand that, but I have no place to go.

 7           MR WATTS:  May I approach, Your Honor?

 8           THE COURT:  Yes.

 9  BY MR WATTS

10  Q.   All right.  I'm going to give you this so that you can

11  utilize it and just push that button.  All right.  The first

12  chart we've got up -- and just so that we're clear:  These were

13  all produced with your report in this case; right?

14  A.   Correct.

15  Q.   Nothing's been changed?

16  A.   Nothing's been changed.

17  Q.   Let me draw this out just a bit.  And then you've got a

18  page number on the bottom right-hand corner of each of these;

19  is that right?

20  A.   Right.

21  Q.   Now, what are we looking at on Page No. 1?

22  A.   Well, this is a histogram.  There's three main charts that

23  we use in industrial hygiene for visualizing the data before we

24  proceed to calculating statistics.

25  Q.   I but one's a histogram?

 1    A.    One of them is a histogram.

 2    Q.    Okay.  What's the second one?

 3    A.    The other is a time series plot; and the third one is a

 4    log probability plot.  I did not include log probability plots

 5    in this report, although I did generate those.

 6    Q.    Okay.  We've got histogram up there.  What's this X axis

 7    real quick?

 8    A.    The X axis is in terms of formaldehyde concentration where

 9    the units are parts per million.  And I want you to notice that

10    this is a logarithmic axis.  This is not a linear axis.

11            Now, I look at this and I recognize how it's to be

12    interpreted just intuitively because I've been dealing with it

13    for years, and years, and years.  But I think I need to spend a

14    little time on this.

15    Q.    All right.

16    A.    So this is in orders of magnitude.  We go from .001 to

17    .010 to .10 to 1 to 10.  So everything is increasing by a

18    factor of ten.

19    Q.    Okay.

20    A.    And so -- well, I have all of the measurements, all of

21    1,185 shown in this graph, and it's a histogram.  And on the Y

22    axis, we have count, the number of measurements at a particular

23    concentration.

24            For example, if we look at one part per million, we

25    have a bar.  And it's telling us that if come up here at the

```
 1  top of the bar, move over that there was maybe, I would guess,
 2  about 70 or so measurements that were right around 1 part per
 3  million.  On the right-hand side we have proportion per bar.
 4  For that same bar, if we move over to the right-hand side,
 5  we're going to see that we're at about .07, which means that
 6  about 7 percent of the data were right around 1 part per
 7  million.
 8          And then the other -- go ahead.
 9  Q.  This right side deal is not parts per million.  We've been
10  talking a lot about .05.  This has nothing to do with that --
11  A.  That's --
12  Q.  -- that's --
13  A.  That's the proportion or fraction of the overall data set
14  that are contained in each bar.
15  Q.  You were going to tell me one other thing.
16  A.  Well, we have the two vertical lines.  They are set at
17  exactly .008 and .016.
18  Q.  Okay.  So this gives you the numbers of tests that are to
19  the right of those two lines?
20  A.  That is correct.
21  Q.  Let's keep going.  Did you do the same thing with respect
22  to the Gulf Stream Cavalier model specifically, the 876?
23  A.  Yes.
24  Q.  Okay.
25  A.  I, extracted only the Cavalier model trailers and
```

1  generated a histogram, which you can see if virtually identical
2  to the previous histogram.
3  Q.   So Page 1 is the 1,185 for all Gulf Streams; Page 2 is the
4  histogram for 876, the Cavaliers?
5  A.   Correct.
6  Q.   Now, just generically, or generally, do the vast majority
7  of the tests that are in the database on Gulf Stream Cavalier
8  trailers exceed the ATSDR level?
9  A.   One can see that with the graph, which is the purpose of
10  the graph.  The vast majority exceed actually both the levels
11  that we've talked about.
12  Q.   All right.  Let's go to Page 3.  Is this what's known as a
13  time series chart?
14  A.   Well, this is a box-whisker plot, but it's arranged as
15  time series chart, yes, sir.
16  Q.   What is a box-whisker plot?  You didn't make that up, did
17  you?
18  A.   No, I did not.
19  Q.   Okay.
20  A.   Okay.  Well, I'm going to give you another chart after
21  this that shows us the actual data points.  But a box-whisker
22  plot is a standard graphing devise used by statisticians.  And
23  on the X axis, we have year and month samples.  So, for
24  example, I think this starts out at 2006.04, which would be
25  April; and ends at 2008.04, so that would be April of '04.  I

 1  don't think I have exactly every month in there.

 2          So this is giving us an indication of the central

 3  tendency and range of the values.  Now, how this works we have

 4  a central box.  Let's just pick -- what year is this?  That's

 5  2008, ninth month.  We have a box, and then we have a center

 6  bar in that box.

 7          The center bar in the box-whisker plot represents the

 8  median.  That is 50 percent of the data that were collected

 9  were observed to be above that value and 50 percent below.

10  Q.    Okay.

11  A.    Now, the box itself covers 50 percent of the data.  So

12  there's 25 percent in the top half of the box, 25 percent in

13  the bottom half, the whole box covers 50 percent.

14          That leaves 25 percent of the data above the box, 25

15  percent below.  So you can rapidly look at the box and say,

16  well, here's the central value.  That's a central tendency,

17  50 percent above, 50 percent below, 50 percent that are covered

18  by the box.

19          So it gives us a quick idea regarding the location of

20  the data.

21  Q.    Okay.  All right.

22  A.    Oh, and you can also see that on some months we had very

23  little data and on other months we had more data.  For example,

24  on this month there was a single data point, that's why we only

25  have the bar.

1    **Q.**    All right.  Let's keep going.

2    **A.**    I love these plots, I hesitate to move so rapidly.

3    **Q.**    I'm sorry.  Slide 4?

4    **A.**    Okay.  This is a symmetrical dot density plot.  But it's

5    exactly the same thing in a sense, because we have the same X

6    axis, we have the same Y axis, which is the -- I forgot to

7    mention -- this is our formaldehyde axis in parts per

8    million -- and we have the order of magnitude gradations here,

9    .001 to .01 to .1 to 1 to 10.  So everything's by an order of

10   magnitude.  We're moving up.

11           Now, we have the horizontal lines set at .008 and

12   .016.  Now, for each month I'm showing you the actual

13   measurements collected.  For example, let's look at -- what was

14   that?  That was month 2007 '06, we have a single data point.

15   And, yet, in 2007 '08, many measurements were collected.  And

16   what we see sometimes it's doubled up, indicating there's two

17   measurements collected that have the same magnitude.

18           So to get the magnitude of the measurements, we go to

19   the left axis.  The number of dots tell us how many

20   measurements.  So we go get quantity of the measurements and

21   the magnitude of the measurements from this chart.

22   **Q.**    Now, when you do retrospective exposure analysis, you're

23   trying to get data that will allow someone to determine what

24   the level might have been at a particular point in time when

25   you don't have that data?

1    **A.**   Yeah.  Well, these charts are telling us what the levels
2    were in trailers that were measured at particular points in
3    time, similar trailers.
4    **Q.**   But because you're trying to use the data to give you an
5    idea of what measurements may have been at sometime where you
6    don't have data, the Alexander tests that we know was
7    stipulated to in January 2008 is not in the data set?
8    **A.**   No, no.  The Alexander data are not in the data set.
9    **Q.**   And we know that, for example, at, I think it was
10   January 2008, there was a .05 reading, there should be a dot
11   right there if the Alexander dot was included and there's not
12   on purpose?
13   **A.**   That is correct.
14   **Q.**   All right.  Now, how does No. 4 differ from No. 5?
15   **A.**   Well, No. 4 is exactly the same as the previous graph
16   which was -- well, it was No. 3, except it is focused on the
17   Cavalier data only.  And you can see that the graph is
18   virtually identical to the previous graph where we looked all
19   of the -- entire data set.
20   **Q.**   And then 6 is Cavalier only?
21   **A.**   Right.  These data points were collected from
22   Cavalier-only trailers.
23   **Q.**   Okay.  So basically the difference between 5 and 6 is this
24   is this box-whisker thing?
25   **A.**   Yes, sir.

1  **Q.**   And this is -- what do we call this?

2  **A.**   Symmetric dot density plot.  And all of these in the

3  caption, they start off with the name, box-whisker or symmetric

4  dot density plot.

5  **Q.**   All right.  So what we can see is by the month of the year

6  how many tests were done and where they ended up; is that

7  right?

8  **A.**   That is correct.

9  **Q.**   Okay.  And, for example, we've got this big circle right

10  here, we go down, that's done in the summer of 2008; is that

11  right?

12  **A.**   Right.  That's indicating that a lot of measurements, here

13  we -- they were all centered -- collected in the summer of

14  2008, but there's a large data set or a large number of

15  measurements collected that month and many of them were at

16  particular exposure levels, and fewer of them went to lower

17  exposure levels, giving us this kind of odd shape that I've

18  likened to the floating space station in the Star Wars, the --

19  what was that -- the Empire Strikes Back.

20  **Q.**   It's good, but it's not that good.

21  **A.**   It's not that good.

22  **Q.**   All right.  Let's keep going.  All right.  Now, here's my

23  question:  You've got data coming in from different folks that

24  extracted it; is that right?

25  **A.**   Yes, sir.

1   **Q.**   Did you analyze the data by data source?

2   **A.**   Yes, I did.

3   **Q.**   And why is it important to do that?

4   **A.**   Well, because I don't want to look at the data in

5   aggregate.  And it could be different sources of data tell you

6   different stories.  And that's what data analysis is about, is

7   determining the story that the data are trying to tell.

8   **Q.**   In terms of the source of the data, we have Boston

9   Chemical over here; is that right?

10  **A.**   Yes, sir.

11  **Q.**   DeVany Industrial Consultants here; is that right?

12  **A.**   Yes.

13  **Q.**   Andy and Bob kind of went around and around about FEMA CDC

14  testing.  The CDC did some testing on --

15  **A.**   Yes, sir, we have their data.

16  **Q.**   A number of folks collected the data while there were

17  occupants in the trailers; is that right?

18  **A.**   Yes.

19  **Q.**   The Sierra Club went out and did some work and did some

20  testing?

21  **A.**   That's correct.

22  **Q.**   What is TES?

23  **A.**   TES, I understand stands for Technical Environmental

24  Services.

25  **Q.**   And the Texas Parks and Wildlife even took a single test?

1    A.    They have a data set.  Only one measurement out of that
2    data set was specific to Gulf Stream.
3    Q.    Okay.  And then W. D. Scott Group.  Is that Mr. Scott who
4    did the --
5    A.    Bill Scott, that's another consultancy.
6    Q.    Yeah.  Okay.  Now, with respect to these data sources,
7    were you able to plot for each of them the data of when they
8    took the sample and what the levels were?
9    A.    Right.  The previous graphs show all the data for each of
10   the data sources so you can compare them from data source to
11   data source.  And now I wanted to look at each data set from
12   each data source and look at them over time.  So this is an
13   individual data source time series plot.
14   Q.    Okay.  That's for the Boston Chemical data?
15   A.    Right.  So you see the measurements were collected on
16   certain months.  And actually there's only three months
17   represented in that data set.
18   Q.    All right.  And so as we look at Page 8, that would be the
19   data set that Mr. Kaltofen's group took?
20   A.    Correct.
21   Q.    And then we go to Page 9 and we see the data that was done
22   by DeVany Industrial Consultants?
23   A.    That's correct.
24   Q.    And then 10, we see the data that was taken by the Centers
25   for Disease Control?

1    A.    Right.

2    Q.    11, was occupant data; is that right?

3    A.    Correct.

4    Q.    12 was data from the Sierra Club?

5    A.    Correct.

6    Q.    13 was data from TES?

7    A.    Right.

8    Q.    14 you said that the Texas Parks and Wildlife did some

9    testing, but it turns out only one of them was on a Gulf

10   Stream?

11   A.    And there she is.

12   Q.    Okay.  15 is from Bill Scott's group?

13   A.    Yes, sir.

14   Q.    All right.  Now, 8 through 15, did you segregate the data

15   in the same tabular format so that the jury could look at these

16   sources and say, "Hey, so and so's got different data than

17   somebody else?"

18   A.    Well, the purpose was so that people could -- anybody

19   could visually compare the different data sets, look when they

20   were collected, look at the magnitude of the measurements, the

21   number of measurements, and how all of them relate to the two

22   limits that have been given to me.

23   Q.    Okay.  And when we look at all this, the bottom line is,

24   is that you can look and see what the levels were depending on

25   who took the data; is that right?

1   **A.**    The bottom line is, yes, if I've gone my job correctly,

2   one could visually determine a great deal from these graphs.

3   **Q.**    And these graphs all appear to be about the same line

4   except for this one right here which appears to be a little

5   higher; is that right?

6   **A.**    Yes.  There's a -- I think -- from my point of view as a

7   professional data analyst, so to speak, plus industrial

8   hygienist, the data sets are remarkably consistent from data

9   source to data source with the exception of the DeVany data.

10  **Q.**    And that was taken during the summer?

11  **A.**    And that was taken in unoccupied trailers during the

12  summer.

13  **Q.**    Okay.  And, again, with the exception of that, unoccupied

14  trailers during the summer, do all the other sources look

15  pretty similar?

16  **A.**    Well, visually, they look similar.

17  **Q.**    Now, in addition to all these tables, did you -- or all

18  these graphs, did you prepare a table that shows what the data

19  demonstrates?

20  **A.**    Well, I think you anticipated I did.  Yes, I did.

21  **Q.**    Page 16 of Exhibit 300 is table 1 and 2.  And as we look

22  at table 1, what does it show?

23  **A.**    Well, the first one -- when you start calculating the

24  statistics, you've got past the graph and you're comfortable

25  that the data represent what you want them -- or expect them to

1    represent, then you calculate statistics.  And we divide our

2    statistics up into -- there's descriptive statistics and

3    compliance statistics.

4            Now, these are standard descriptive statistics that

5    virtually any statistician or data analyst would calculate for

6    any particular data set.  So we have the data source, the eight

7    different data sources on the left, we have a column that

8    represents the number of measurements collected by each data

9    source, and then we have the total down below.

10           We have the minimum value that was observed in that

11   data set, the maximum value, the median, which is that

12   50th percentile, you recall, from the box-whisker plots.  So

13   this going to be the actual value of that middle bar in the

14   box-whisker plot.

15   **Q.**   Okay.

16   **A.**   And we have more.

17   **Q.**   Go.

18   **A.**   Okay.  I didn't know how anxious you were.

19           We have normal statistics and log normal statistics.

20   Now, normal statistics, most of us are familiar with your

21   arithmetic mean and standard deviation.  The mean is simply all

22   of the values.

23           For example, 37 Boston chemical values, we sum those

24   values, divide the sum by the sample size and that gives us the

25   mean.  We also have a formula for calculating a measure of

 1   variability or dispersion in the data, how variable are the
 2   data, and that's the standard deviation.
 3          The other type of statistics that are almost always
 4   calculated with occupational and environmental data, and here
 5   we have environmental data, are log normal statistics.  And
 6   this is the geometric mean, GM, and GSD stands for geometric
 7   standard deviations.
 8          And I do apologize, you have something of an
 9   industrial hygiene data analyst nerd, such as myself, to truly
10   appreciate geometric means and GSDs.  But it's simply another
11   way to characterize the data set.
12          And I'm actually making use of these statistics later
13   on in the next set of graphs in a calculation of the -- in
14   estimation of the true arithmetic mean of each of these data
15   sets.  And I did this for both the full data set in table 1 and
16   Cavalier-only data set in table 2.
17   Q.   Let's go to 17.  17 is kind of the nut of the matter;
18   right?
19   A.   Yes, sir.
20   Q.   In terms of the data?
21   A.   Yes, sir.
22   Q.   Again, as we look at 17, table 3 on the top is for all the
23   Gulf Stream and table 4 is for the Cavalier specifically; is
24   that right?
25   A.   That's correct.

1    **Q.**   I'll tell you what, instead of doing this twice, I want

2    you to focus on table 4.  This is the data on 876 Gulf Stream

3    Cavalier trailers; right?

4    **A.**   Correct.

5    **Q.**   All right.  Now, on the first column, we've got the source

6    and that's the eight different sources of who took the

7    measurements; right?

8    **A.**   Right.

9    **Q.**   On the second column we've got an "N".  Is that the number

10   of trailers tested?

11   **A.**   The number of trailers from a -- specific to each data

12   source.

13   **Q.**   All right.  The third column says "percentage greater than

14   0.0078 ppm ATSDR limit"?

15   **A.**   That is simply the number of measurements that actually

16   were greater than that particular limit.

17   **Q.**   And with respect to the 876 Gulf Stream Cavalier trailers

18   that have been tested, do 98.9 percent of those tests exceed

19   the ATSDR limit?

20   **A.**   Taken in aggregate, 98.9 did exceed the limit.

21   **Q.**   The next column is percentage greater than 0.016 parts per

22   million, NIOSH limit.  Do 98.1 percent of the 876 Gulf Stream

23   Cavalier trailers that have been tested exceed the NIOSH limit?

24   **A.**   Yes, they do.

25   **Q.**   And then we've got this normal statistics and log normal

1   statistics.  Is this all these tests --

2   **A.**   What I'm trying to do here is estimate the mean exposure

3   of the Cavalier travel trailers by data source.

4   **Q.**   Stop there for a second.  Mean is if you got 50 data, or

5   tests, you got 25 above, and 25 below, that's the one in the

6   middle right there?

7   **A.**   Well, it can be if they're symmetrically distributed.

8   That's -- what you've described more appropriately is the

9   median.

10   **Q.**   What's the mean?

11   **A.**   The mean would be the average value.

12   **Q.**   Average, okay.  So the average is right here.  And the

13   average results for the 876 Gulf Stream Cavalier trailers that

14   were tested is 0.4489 parts per million?

15   **A.**   That is correct.

16   **Q.**   Okay.  So that would be 448.9 pars per billion?

17   **A.**   That is correct.  Although I have to say to be absolutely

18   pristine about this --

19   **Q.**   Please.

20   **A.**   -- I don't think we have that many significant digits.  I

21   carried out to the fourth decimal place simply to show the

22   comparisons between the data.  I think there's probably only

23   three significant digits that are warranted here.  So I would

24   say .449.

25   **Q.**   Okay.  Now --

1          **MR WATTS:**  Your Honor, may we approach?

2          **THE COURT:**  Yes.

3          (WHEREUPON, the following proceedings were held at

4    the bench.)

5          **MR WATTS:**  The last three are the data that reflect

6    the year that the trailer was manufactured, the age of the

7    trailer, and the mean exposures, and then the level versus the

8    age of THU.

9          What I propose to do is this:  I read the

10   deposition where the guy answers, "Oh, this is common sense

11   that it's going to degrade over that."  I don't think the

12   quantification of the degradation over time is common sense.  I

13   don't think the data should be excluded and I don't propose to

14   ask him any opinions about it.

15         But I do think we ought to be able to put the

16   data up because it's important from the standpoint that to

17   allow the jury to reach a conclusion from the data, but I'm not

18   going to ask him to do it but.  I'm going to instruct him,

19   don't give me opinion one about it, but I want to show the

20   data.

21         **MR. WEINSTOCK:**  We object to it.  We had a motion in

22   limine and, Judge, I'm sure you ruled the way you ruled, but I

23   mean, he's got four data points in his 2003.  He says -- even

24   he would say that is not scientific.  And he said, in his

25   deposition, you should remove those, and remove 2003, but

1    they're on this chart.

2         **THE COURT:**  If he said it was common sense, can't he

3    just testify to it being common sense without --

4         **MR. WEINSTOCK:**  Everybody agrees --

5         **MR WATTS:**  Here's the deal.  I mean I've got a Ph.D.

6    industrial hygienist, that a lawyer -- you know, I mean, the

7    guy's never testified in trial before.  If he says something is

8    common sense, it shouldn't wipe out the good work on this

9    matter.

10         I respect the Court's opinion that when somebody

11   says something is common sense, you don't need an opinion.  I'm

12   not asking for an opinion.  But just because I've got a rookie

13   testifier that says something is common sense doesn't mean my

14   data should be excluded and that's all I'm saying.

15         **THE COURT:**  What I'm saying is that you don't need

16   the data if his testimony -- and I almost didn't grant that

17   one, but the questions were so clear it wasn't -- and I even

18   distinguished between common sense being -- common sense and

19   then a theory that -- that would support a notion, a common

20   sense notion, versus something that truly is not subject to

21   experts, but rather is common sense.

22         Can't we just ask him:  "Isn't it common

23   sense -- you don't want to lead him, but -- "common sense would

24   dictate what about formaldehyde?" and let him answer that

25   without --

1          His testimony was that we didn't need this.

2          **MR WATTS:**  No, Judge, it's not.  The testimony was --

3   Judge, listen, the testimony is, is that we don't need his

4   conclusion because it's common sense, that's not what I'm

5   trying to get in.  I could care less what his conclusion is.  I

6   care about what the data says and I want to be able to talk to

7   the jury in closing about the data, not with respect to getting

8   an opinion -- getting an expert to give me a 702 opinion.

9          **THE COURT:**  But this data is offered to support an

10  opinion which has been excluded because he, himself, testified

11  it was common sense.

12         **MR WATTS:**  It's not offered to support a conclusion

13  because I'm never going to ask the question.

14         **THE COURT:**  I know.  But then why do you introduce

15  the data?

16         **MR WATTS:**  Because the data is there and it's

17  important that others can rely upon it.

18         **THE COURT:**  I've already ruled on it.  We're

19  revisiting a *Daubert* issue that was put before me, and briefed,

20  and I've ruled on it, and I'm not convinced that I should do

21  anything other than what I've done already in the pretrial

22  motion.

23         **MR WATTS:**  Okay.  What I would propose then is that

24  you allow me to put 18, 19, and 20 into the record for the

25  Court's record as an offer of proof.

1          **THE COURT:**  In the court record --

2          **MR WATTS:**  Yes, sir.

3          **THE COURT:**  -- as a proffer?

4          **MR WATTS:**  Yes, sir.

5          **THE COURT:**  Oh, yeah.  Sure.  Why don't you do that

6    when we send the jury out.

7          **MR WATTS:**  Yeah.  And when we send the jury out, I'll

8    clarify that Exhibit 300 with slides 1 through 17.

9          **THE COURT:**  Okay.

10         (WHEREUPON, the following proceedings were held in

11   open court.)

12   **BY MR WATTS**

13   **Q.**   Now, with respect to all of these histograms, dot matrixes

14   that we've gone through, slides 1 through 17 of Exhibit 300,

15   does Page 4 allow the jury to see what the number of tests

16   were, the levels of the tests, and which months those levels

17   were achieved?

18   **A.**   Yes, it does.

19   **Q.**   Okay.  And Page 6 allows them to determine that with

20   respect to the 876 Gulf Stream Cavalier trailers, like what

21   Mrs. Alexander had?

22   **A.**   Yes.

23   **Q.**   And then Page 7 allows them to segregate that by source?

24   **A.**   Correct.

25   **Q.**   And then, finally, if we go to Page 17, we can look at

1  table 4 and determine the percentage of the tests that are

2  above ATSDR, the percentage of the tests above NIOSH, and the

3  average values that were obtained from these 876 Gulf Stream

4  Cavalier trailers?

5  **A.**    In addition to the average value for each data source.

6  **Q.**    Right.  And so the 876 Gulf Stream Cavalier trailers that

7  were tested have an average value of 448.9 parts per billion or

8  .4489?

9  **A.**    Right, across all of the data sources.

10 **Q.**    All right, sir.

11          **MR WATTS:**  Those are all my questions.  Thank you.

12          **THE COURT:**  All right.  Thank you, Mr. Watts.

13 Mr. Weinstock?

14          **MR. WEINSTOCK:**  I will never be mercifully brief late

15 on Friday afternoon.

16                          **CROSS-EXAMINATION**

17 BY MR. WEINSTOCK

18 **Q.**    Something you said, and it jumps out at you, is that Mary

19 DeVany's numbers are just different than everybody else's;

20 correct?

21 **A.**    They are.

22 **Q.**    And Mary DeVany didn't just have different numbers, she

23 had a lot of them?

24 **A.**    That's correct.

25 **Q.**    She had almost half the pool of numbers; correct?

1   **A.**   That's less than half.

2   **Q.**   Close to half?

3   **A.**   Close to half.

4   **Q.**   Well, let me say this:  You've got a data set and you

5   culled out the Gulf Stream units; correct?

6   **A.**   Yes, sir.

7   **Q.**   But the original data set you got, she was right at half;

8   right?  Over 5,000 test results from 11,000?

9   **A.**   Of that, I don't know.

10  **Q.**   And Mary DeVany had seemingly a different way of doing

11  this than everybody else, huh?

12  **A.**   I don't know if I'd characterize it as that, that

13  diminishes what she did.

14  **Q.**   Yes, it does.  Mary DeVany chose to test units by

15  sealing -- not sealing them -- closing them up, she tested, I

16  believe, in July and August of 2008, temperatures which she

17  failed to record many times that range into three digits --

18       **MR WATTS:**  Excuse me, Your Honor.  I don't think Andy

19  giving a speech about what he doesn't like about DeVany is the

20  way to go.  He needs to ask questions.

21       **THE COURT:**  Yeah.  Let's not -- let's ask him what he

22  knows --

23       **MR. WEINSTOCK:**  Fair enough.

24       **THE COURT:**  -- but let's not testify.

25

1  BY MR. WEINSTOCK

2  Q.   Are you aware of Mary DeVany's protocols?

3  A.   Yes.

4  Q.   Now that you're aware of it, does Mary DeVany's protocol

5  involve ventilating the units before she tested?

6  A.   Are we talking about -- well, I think we need to be more

7  specific.  I'm aware Mary DeVany had a protocol.  I have

8  glanced through most of her protocol.  You're implying she had

9  a specific protocol that sounds to be separate from the one I

10  reviewed that was used for these particular trailers.

11  Q.   Her numbers were a lot different than everybody else's

12  weren't they?

13  A.   Oh, yes.

14  Q.   And when you did your tests, your average, that all went

15  in?

16  A.   To the aggregate.

17  Q.   Sure.

18  A.   But I also split out, as you see in those tables, by each

19  data source.

20  Q.   That's correct.  But you did not separate it by

21  temperature, did you?

22  A.   No.

23  Q.   You did not separate it by humidity, did you?

24  A.   No.

25  Q.   You did not separate it by occupied versus unoccupied, did

1  you?

2  **A.**   Well, that's implied in some -- in some of the data

3  sources.

4  **Q.**   It's implied, but you didn't do it, did you?

5  **A.**   No, I did not.

6  **Q.**   Now, when you did your -- well, let's go back and go a

7  little history lesson.  We had one today, let's get another

8  one.  You were hired, what, on May -- or you were asked to do

9  this on May 11th; correct?

10  **A.**   I was asked to start work on the analysis of the Gulf

11  Stream data on, I think, May 11th.  That was a Monday, as I

12  recall.

13  **Q.**   That was -- maybe it was May 12th -- maybe not.  Okay.

14  Whatever day of the week it was.  And you were called by

15  Mr. Watts?

16  **A.**   Correct.

17  **Q.**   And the lovely Ms. Nelson.  And they told you to use --

18  they gave you the data set.  In fact, Jennifer Minden, I think,

19  gave you the data set; correct?

20  **A.**   Quite frankly, at this point, having looked at so many of

21  these data sets, I can't remember if Jennifer sent it to me as

22  an attachment or if I downloaded it myself.  My impression is

23  my recollection's somewhat fuzzy is that, yes, she sent it to

24  me.

25  **Q.**   And Jennifer works for the lovely Ms. Nelson?

1   A.   Yes.

2   Q.   And you had a week to analyze this data; correct?

3   A.   Yes, I did.

4   Q.   And you verified none of it; correct?

5   A.   I'm sorry?

6   Q.   You had no time to verify any of it; correct?

7   A.   Well, I had no time to verify the data in -- well, explain

8   what you mean by "verify".

9   Q.   Well, what do you mean by verifying data?

10  A.   Well, I think your implication was is that I did not

11  verify each and every data point, or measurement, or statement,

12  or value in the entire data set, no, I did not.  Verify in the

13  sense that I checked to see that each value was correct.  To do

14  that, I'd have to go back to all of the reports and all of the

15  records, and as a data analyst, I simply don't have time to do

16  that nor was I asked to.

17  Q.   You did a quick and dirty analysis; correct?

18  A.   I described it in my deposition as quick and dirty since I

19  only had a week to do it.

20  Q.   Right.  You could have done, as you said, a "bang-up

21  analysis" on the effect of temperature on these levels;

22  correct?

23  A.   Yes.  I described that in my deposition as I wish I could

24  have done a bang-up analysis.  I am learning rapidly to

25  moderate my phraseology.

1  **Q.**   But you didn't do a bang-up analysis because you didn't

2  have the time; correct?

3  **A.**   Not at that time, no.

4  **Q.**   If we can get back in our time capsule and take some

5  measurements of things, you would go back -- you would ask for

6  time to do the proper temperature regression analysis, wouldn't

7  you?

8  **A.**   You mean as CDC did it.

9  **Q.**   And when we take -- when we take a -- an average, or a

10  mean, or if we want a median, 50 percent above, 50 percent

11  below, you have to accept -- you're accepting all the data

12  points even if you segregate them by tester; right?

13  **A.**   Yes.

14  **Q.**   You're not throwing any out; correct?

15  **A.**   Yes.

16  **Q.**   So, for example, if you were going with occupied testing,

17  each occupant uses a travel trailer in a different way; right?

18  **A.**   I would expect so.

19  **Q.**   You would expect so.  And there are things that they might

20  do that would make the levels in that trailer go down, like

21  open windows, and open doors?

22  **A.**   Right.  There's things they could do that would make the

23  temperatures fluctuate.  I'm not going to say that everything

24  they would do makes the temperatures go down.

25  **Q.**   Let me make it simple.  Let me make it really simple:  You

1   can get a test result with point -- with 3 parts per billion

2   and a test result with 97 parts per billion.  When you put them

3   together and average them, the average is 50 parts per billion;

4   correct?  The mean?  Yes?

5   A.   That was .3 and .7, right.

6   Q.   No, no, .3 and .97 -- .03 and .097, the average would be

7   .050; right?

8   A.   Oh, right, right.

9   Q.   But the one that's .03 is still .03 regardless if there's

10  others out there that average higher; correct?

11  A.   Yes.

12  Q.   The average is made up of all the data points you showed

13  us.  This little guy down here counts the same as this guy up

14  here; right.

15  A.   Well, he contributes one unit to the entire analysis.

16  Q.   They both do?

17  A.   They both do.

18  Q.   And when you average them together, they might come up in

19  the middle?

20  A.   That's the nature of the average.

21  Q.   And when -- not that it went into your mix, because you

22  pulled this one out specifically, but if a unit tested at .050,

23  it would be in here at .050, it would be one data point you

24  used?

25  A.   Right.

 1   **Q.**   I guess its brothers and sisters may be higher or lower,
 2   but it's .050; right?
 3   **A.**   Right.
 4   **Q.**   So, I guess, maybe what you're looking at is, did it have
 5   more brothers and sisters that were higher or more brothers and
 6   sisters that were lower, but that doesn't change what it was;
 7   correct?
 8   **A.**   No.  The average is the -- is simply the mean of the data
 9   that were observed.
10   **Q.**   And you didn't attempt to do any kind of analysis on how
11   occupancy affects the levels in trailers; right?
12   **A.**   Well, not on a models or a regression analysis where one
13   of the variants -- the variables was occupied versus
14   unoccupied.  Although, that does fall out of the data because
15   some of the data sets represent measurements solely from
16   occupants, other represent data, such as the DeVany data, that
17   represents trailers that were unoccupied.
18          For example, the CDC FEMA -- or the FEMA CDC data
19   said all those measurements came from occupied trailers, W. D.
20   Scott as well, most of Boston Chemical.  Occupants by
21   definition, those measurements came from occupied trailers.
22   The Sierra Club measurements came from occupied trailers.  I
23   don't see that it's that huge of a leap to go -- to figure out
24   which data sets represent occupied versus unoccupied trailers.
25   **Q.**   As to which data set occupies which trailers, you have

1    calculated the mean and the median for those data sets?

2    A.    For all of the data sets.

3    Q.    But being a .050 in a data set that has a mean of .11,

4    doesn't change the fact that the .050 is still .050?

5    A.    No.

6    Q.    And the fact that the individual that might have been in

7    that .050 had different ventilation practices that caused the

8    .050 to be .050, that's not factored in in any way in your

9    analysis?

10   A.    That was not factored into that May report.

11   Q.    That's not what you were asked to do?

12   A.    No, not specifically.

13   Q.    You are a certified industrial hygienist; is that correct?

14   A.    Yes.

15   Q.    You work with standards; correct?

16   A.    Yes.

17   Q.    But nobody asked you what standard you would use in this

18   situation, did they?

19   A.    Nobody specifically asked me that.

20   Q.    They gave you the standard they wanted you to analyze;

21   correct?

22   A.    They gave me the metric against which to compare the

23   measurements.

24   Q.    And nobody's ever asked you your opinion on whether that's

25   a good or a bad one?

261

1   **A.**   I'm trying to think if anybody has asked me my opinion.

2   **Q.**   Well, let me rephrase it.  Nobody on my side of the case

3   has asked you whether it was a good one or a bad one?

4   **A.**   No.  I don't think anybody on your side of the case has

5   dared ask me.

6   **Q.**   You did an analysis or not?  You haven't looked at this at

7   all?

8   **A.**   Pardon?

9   **Q.**   You haven't looked at what standard should apply at all;

10  correct?

11  **A.**   I have not looked at all the possible limits out there

12  since they all seem to already to be encapsuled in all of the

13  writings and all of the publications that have been presented

14  to me.  And I don't disagree that the values that they picked

15  as metrics are inappropriate -- or I don't think they're

16  inappropriate.

17          Because I, as an industrial hygienist, if it were up

18  to me to pick a metric, would pick something similar.

19  **Q.**   Did I ask you for what you picked?

20          **MR. WEINSTOCK:**  Your Honor, can we approach the

21  bench?

22          **THE COURT:**  Yes.

23          (WHEREUPON, the following proceedings were held at

24  the bench.)

25          **MR. WEINSTOCK:**  I specifically did not ask him and

 1 | then he blurts it out.

 2 |          **MR WATTS:**  That wasn't a blurt-out.

 3 |          **MR. MEUNIER:**  Judge, this was a classic opening of

 4 | the door.  I'm sorry.

 5 |          **MR. WEINSTOCK:**  I said, and I'm not -- nobody's asked

 6 | you, so then he says what he would give.

 7 |          **MR. MEUNIER:**  You challenged him because he wasn't

 8 | asked.  You challenged him because he wasn't asked.

 9 |          **THE COURT:**  I think the answer was within the scope

10 | of the question.

11 |          **MR. WEINSTOCK:**  But then I need the limiting

12 | instruction because now it's out of the box.

13 |          **MR. MEUNIER:**  It's not out of the box.

14 |          **MR. WEINSTOCK:**  Oh, yes, read the in limine order.

15 |          **MR WATTS:**  You can't bait him into it --

16 |          **MR. WEINSTOCK:**  I didn't.

17 |          **THE COURT:**  He hasn't --

18 |          **MR. WEINSTOCK:**  He baited me, "Nobody dared asked

19 | me."

20 |          **THE COURT:**  I don't think he has said that there were

21 | limits that were given to him and you got him to admit that

22 | there was a limit that was given to him.

23 |          **MR WATTS:**  Why don't you just move on, Andy?

24 |          **THE COURT:**  He said that the limits that were given

25 | to him were not inappropriate, I think were his words.

1          **MR. WEINSTOCK:**  He said he would pick one similar at

2     the end, and that's way beyond his report, it's way beyond his

3     opinion.

4          **MR. BUZBEE:**  You shouldn't have asked him that

5     then --

6          **MR. WEINSTOCK:**  I didn't ask -- I specifically asked

7     him not to give it to me.

8          **MR WATTS:**  Judge, you can't bait a witness like that

9     and --

10         **MR. BUZBEE:**  That's totally improper.

11         **THE COURT:**  I think the witness answered the question

12    and the answer of that was within the scope of the question.

13    As far as a limiting instruction, I don't know if you want to

14    try to -- I thought when Mr. Watts had left it after direct was

15    where it needed to be as described in the pretrial ruling.

16         **MR WATTS:**  I followed your ruling to the letter.

17         **THE COURT:**  I thought that's where they wound up.

18         **MR. MEUNIER:**  You went further and you just shouldn't

19    have gone further --

20         **MR. WEINSTOCK:**  Okay.  Guys, one lawyer at a time.

21         **THE COURT:**  Well, wait.  Yes.  Let's stick with one.

22    Mr. Watts is handling this witness.  And, by the way, that is

23    the way we've got to do it, is whoever is assigned to the

24    witness is going to be the one that's going to object and the

25    one that's going to come up here and argue the point.  So let's

1    stick with one on each side.

2              I don't think that your question that -- I think

3    he answered the question that was asked of him.  I don't think

4    he exceeded the scope of what the question called for.  Now,

5    did he go too far beyond the scope of what I ruled?  Maybe so.

6    But I don't think that the question was one that clearly he

7    exceeded when he tried to answer.  So you're stuck with his

8    answer now.  The question is what to do about it.

9         **MR WATTS:**  Here's my thought on what to do about it:

10   I don't think it would be appropriate especially given the fact

11   that on direct I followed the letter of your ruling, to the

12   letter, and even approached when I wanted to follow-up on that.

13   That's number one.

14             And I think that Andy's request for a Court

15   instruction at this time is completely inappropriate because

16   it's only going to construe that you're calling him down.

17   There's two ways to fix this:  Andy can forget about it and go

18   on and I will agree not to bring it up on my redirect, which I

19   think is the best way to do it.

20             And the second way to do it is Andy can sit back

21   down and you said that Mr. Watts and the lovely Ms. Nelson gave

22   you these and then that's where -- and you didn't a ruling

23   about that -- and then you stop there.

24             But now the problem is, is he just got in an

25   argument with a witness who's never testified before.  My

 1    thought is, is that he ought to let it go and I'll agree not to

 2    bring it up on redirect.

 3             THE COURT:  I'm going to leave that up to Andy.  Do

 4    you want to continue to try to -- I think you've already asked

 5    him where the number came from that he used in his analysis and

 6    it came from counsel.

 7                  Do you want to try to reestablish that?  I mean,

 8    he's already said what he's said; and, like I said, I don't

 9    think it was an unfair answer to the question that was asked.

10    He was not going there.  In response to where -- you

11    established he got the number from counsel.

12             MR WATTS:  If you leave it alone, I'll leave it

13    alone, and I think that's the easiest way to handle it.

14             THE COURT:  If you want to try to bring out the fact

15    that this was not the legal standard, but rather was a standard

16    that -- I mean -- you don't want to step in it and track it

17    around the house, that's the problem.

18             MR WATTS:  I think the best way to do it is to leave

19    it alone and I'll stay away from it, too, Andy.

20             THE COURT:  The only limiting instruction that I

21    contemplated in the pretrial motion is that there are various

22    standards that were employed -- and they already -- the jury

23    already knows that, there's ATSDR, there's HUD.  They're

24    probably familiar now with three or four different standards

25    and who knows what they're thinking about --

1        **MR. WEINSTOCK:**  Can I just ask him this without

2   opening the door:  Mr. Watts specifically asked you to evaluate

3   these two standards?  Certainly I could have asked you to

4   evaluate against the HUD or the OSHA standard and you could

5   have done that equally as well.

6        **MR WATTS:**  That's a graceful way out of it.

7        **MR. MEUNIER:**  But the answer's going to say that, I

8   wouldn't agree with it, see, that's the problem.

9        **THE COURT:**  He's going to take his chance with it.

10       (WHEREUPON, the following proceedings were held in

11   open court.)

12   **BY MR. WEINSTOCK**

13   **Q.**   I'm almost done, and I know everybody's ready.

14       Mr. Watts and Ms. Nelson asked you to compare the

15   data set against the ATSDR MRL and the NIOSH REL, and that's

16   what you did?

17   **A.**   That's correct.

18   **Q.**   You drew two lines on each of your graphs?

19   **A.**   That's correct.

20   **Q.**   And if I had asked you to compare the data set to the HUD

21   target ambient air goal of .4 or the OSHA regulatory limit of

22   .75, you could have drawn those two lines as well; correct?

23   **A.**   Well, the data don't change, the lines would.

24   **Q.**   It's just -- it's who asked you to draw the line and where

25   they put them; right?

 1  **A.**   Well, it's not only the lines.  It's to what you compare

 2  the lower and upper confidence limits on your statistics as

 3  well?

 4          **MR. WEINSTOCK:**  Thank you, sir.

 5          **THE COURT:**  Thank you.  Anything from Fluor for this

 6  witness?

 7          **MR. SHERBURNE:**  Yes, Your Honor.

 8                    **CROSS-EXAMINATION**

 9  BY MR. SHERBURNE

10  **Q.**   Doctor, what I've put up on the ELMO is the chart No. 3.

11  And there's some phraseology in there that I'd like to ask you

12  about and I'm going to try this -- I don't know if I'm very

13  good at it.  Hot dog I got it there the first time.

14          Do you see that word "exposures," Doctor?

15  **A.**   Yes.

16  **Q.**   I'm going to talk to you about a little phraseology there

17  because you use that word "exposures" and if I told you that

18  you used it in almost every one of these charts except the

19  first two, would that surprise you?

20  **A.**   Well, it does surprise me now since I think I had intended

21  to change that word to "concentration".

22  **Q.**   Well, Doctor, that's what I want to talk about, is what

23  you thought about changing that word to.  Do you remember

24  having a discussion previously regarding the use of the word

25  "exposure" in your report and in these charts?

1   A.   Yes, it came up in my deposition.

2   Q.   And you acknowledged, I believe, that, in fact, none of

3   the data points, none of those measurements are an actual

4   exposure to an actual person.  Those are just measurements of a

5   level at a certain point in a certain trailer on a certain day?

6   A.   I don't think that's quite an accurate characterization of

7   what I stated in my deposition.

8           MR. SHERBURNE:  May I approach the witness, Your

9   Honor?

10          THE COURT:  Yes, sir.

11          MR. SHERBURNE:  It's Page 148 and 149.

12          THE WITNESS:  May I have a second to...

13  BY MR. SHERBURNE

14  Q.   Certainly, take a much time as you want to.

15  A.   I know there's additional text because we had a long

16  discussion on this.

17  Q.   More than once?

18  A.   More than once.

19  Q.   I'd be happy to get you any more pages you want to look

20  at.

21  A.   Well, could you get me the several before and the several

22  after?

23  Q.   Yes, sir.

24          MR. SHERBURNE:  Thank you, Andy.

25

BY MR. SHERBURNE

Q.   I've got the whole thing.  It's a little bit smaller.
Sorry about that.

A.   I'm trying to find a phrase where I said they represent an
estimate of exposure.  A measure of exposure versus an estimate
of exposure and I wanted to make sure that I...

     Well, we certainly had a -- shall I just go ahead?

Q.   Yes, sir.  Please.

A.   We had a long discussion in my deposition regarding the
use of the word "exposure," and I was sensitized to the
considerations of the defense in this issue.  As an industrial
hygienist, we're always talking about occupational exposure.

     And we measure occupational exposure almost
invariably by putting a sampling device on an individual, and
that device sticks with that individual as the individual moves
through the workplace and does whatever is involved in a day's
worth of work.

     So you're measuring the exposure of an individual
within the person's breathing zone.  Now, these measurements
were not that type of a measurement.  These were measurements
that were placed at a specific location in these trailers,
usually it was four feet off the floor, I think, in the
bedroom, or the living room, or something like that.

     So these sampling devices were not placed on
individuals.  And so I was sensitized to the notion that I had

1    incorrectly characterized these as personal exposures, when, in

2    fact, they represented mostly exposure measurements or

3    concentrations.

4            But I also somewhere in the deposition and very close

5    to all those pages stated that these represent estimates of

6    exposure because these are concentrations in the trailers to

7    which the people would be exposed when they're in the trailer.

8            So we had this discussion.  And what I should have

9    done in preparing these figures --

10           **THE COURT:**  Wait.

11           **THE WITNESS:**  I'm sorry.

12           **MR. SHERBURNE:**  Actually, Judge, he was about --

13           **THE COURT:**  Is this part of the discussion that

14   you're asking him about or is he telling us more --

15           **MR. SHERBURNE:**  Yes, sir, that's part of the

16   discussion, and I think I know what he's going to say.

17           **THE WITNESS:**  Okay.  What I should have done was --

18           **THE COURT:**  Go ahead.  Go ahead.

19           **THE WITNESS:**  I should have corrected all of these

20   figures and it just simply escaped -- I forgot to do it -- and

21   replace the word "exposure" with the word "concentration".

22   **BY MR. SHERBURNE**

23   **Q.**   Well, Doctor, now that you've said that, let me ask you a

24   different question.  Do you remember at your deposition saying

25   that you thought you should do a research and replace on

1  "exposure" and replace it with "measurement"?

2  A.   I most likely did say that.

3  Q.   Let me ask you another question, Doctor, on a related

4  subject.  I'm showing you the -- the dot went away.  I'm

5  learning how to use this stuff.

6         Doctor, insofar as the DeVany samples, the DeVany

7  measurements are concerned, those would, in fact, truly be

8  measurements because there was no one living in those trailers,

9  was there?

10  A.   Not at the time.  Those were mostly unoccupied -- the vast

11  majority were unoccupied trailers.

12  Q.   So insofar as the DeVany measurement results, truly, those

13  are not exposure results, those are measurement results?

14  A.   Well, those are measurement results, but they're showing

15  what they show.

16  Q.   Yeah.  Certainly.  Absolutely, Doctor.  Never said

17  anything else.

18         MR. SHERBURNE:  Thank you.  That's all the questions

19  I have.

20         THE COURT:  All right.  Thank you.  Redirect?

21         MR WATTS:  Sure.

22               REDIRECT EXAMINATION

23  BY MR WATTS

24  Q.   Okay.  So everywhere it says "exposure" it ought to say

25  "measurement"?

1  A.   Or "concentration".

2  Q.   Fair enough.  Okay.  I want to talk to you about Andy's

3  questions.  He had a lot of questions about Dr. DeVany, who is

4  the person who tested in the summer; is that right?

5  A.   Yes.

6  Q.   If you go back to Page 10, you can see by the different

7  sources, for example, CDC, those dots are primarily in

8  December 2007 and January 2008; right?

9  A.   That is correct.  That's when they collected their

10  measurements.

11  Q.   The TES measurements were primarily done between October

12  of 2007 and March of 2008; is that right?

13  A.   That's right.

14  Q.   So one of the reasons you did this is that you can tell by

15  time of the year of the measurement where all the dots are;

16  right?

17  A.   That's correct.

18  Q.   And the fact of the matter is DeVany's dots are primarily

19  between May of 2008 and September of 2008, taken right smack in

20  the middle of the summer; correct?

21  A.   That is correct.

22  Q.   All right.  And so in terms of the data, is it true that

23  the dots taken in the summer are higher than the dots taken in

24  the winter?

25  A.   That seems to be the case.

1   **Q.**   And the stipulated level more than three years and a month

2   after this thing was made taken in the dead of winter in

3   January of 2008 for the Alexander's trailer, that's in the

4   middle of the winter?

5   **A.**   That is correct.

6   **Q.**   But they lived in the trailer in the summer as well?

7   **A.**   I would expect that they did.

8   **Q.**   All right.  So part of this retrospective exposure

9   assessment is you can take data on similar trailers that were

10  done in the summer, it shows what it shows; right?

11  **A.**   Right.

12  **Q.**   All right.  Now --

13         **MR WATTS:**  May I approach, Your Honor?

14         **THE COURT:**  Yes.

15  **BY MR WATTS**

16  **Q.**   Andy asked you -- here's a calculator.  You may need it.

17  You got one.

18  **A.**   That's okay.  I brought my own.  Who would have guessed?

19  **Q.**   By the way, I promise not to do this to you, because I

20  told one of my witnesses that he had trapped in a math lab, but

21  if we open up that deal, you've got a pocket protector, don't

22  you?

23  **A.**   No, I do not.

24  **Q.**   Oh.  You had yesterday, though, didn't you?

25         All right.  Here's my question:  We've got all the

1  different data for all the different sources; right?

2  **A.**   Yes.

3  **Q.**   And if Andy doesn't like Ms. DeVany's sources, we can go

4  look at all the others as well; right?

5  **A.**   That's why I broke it out this way.

6  **Q.**   Now, if we look at Boston Chemical, what was their average

7  for the Gulf Stream Cavaliers?

8       **MR. WEINSTOCK:**  Your Honor, we can stay here all

9  afternoon and do this.  I did not go into anything specific

10 besides Ms. DeVany.

11      **MR WATTS:**  Actually, we're showing the distinction

12 that's left if you take DeVany out.

13      **THE COURT:**  Yes.  I think that I'm going to give you

14 a few questions on this, but we're not going to go back into

15 this document again and cover what could have be on direct,

16 just enough to cover the idea that was covered on cross

17 relative to the DeVany statistics.

18      **MR WATTS:**  Right.

19      **THE COURT:**  So I'll give you a couple of -- two or

20 three questions on it.

21 **BY MR WATTS**

22 **Q.**   I'll tell you what, take out every -- take out DeVany and

23 every source left, every source left, number one, is the

24 average measurement multiple times of .05?

25 **A.**   Correct.

1   **Q.**   Take out DeVany, just use the other sources, is the

2   average measurement from the other sources between 15 and 46

3   times the ATSDR standard?

4   **A.**   It sounds like you've already done the calculation.  Do

5   you want me to?

6   **Q.**   All you've got to do is take those divide it by .008,

7   right, and you can figure out how many times the ATSDR

8   standard; right?

9   **A.**   Right.

10  **Q.**   And then if you wanted to see the average measurement for

11  all the other sources other than DeVany, it's between 8 and 23

12  times the NIOSH standard on average?

13  **A.**   That's probably correct.

14  **Q.**   And you would do that by taking those mean numbers and

15  dividing by .016; right?

16  **A.**   Correct.

17  **Q.**   So whether Andy likes DeVany or not, all of the other

18  sources, every different way you cut the numbers, do Gulf

19  Stream Cavalier formaldehyde test levels show many multiples of

20  out of the ATSDR than NIOSH?

21  **A.**    Well, that is, indeed, correct.  I mean, that's why I

22  broke this out in terms of different graphs for different the

23  data providers, different rows on all the various tables.  Some

24  of the data sources may not be as high quality or as relevant

25  as other data sources, but they're there, all to be considered,

1   and the thing is they're telling the same story.

2   **Q.**   And some of the data sources may be more relevant because

3   they were taken in the summer; is that right?

4   **A.**   Yes, sir.

5               **MR WATTS:**  Your Honor, may I approach the bench?

6               **THE COURT:**  Yes.

7               (WHEREUPON, the following proceedings were held at

8   the bench.)

9               **MR. WEINSTOCK:**  What door did I open now?

10               **MR WATTS:**  Oh, no, you didn't.  Here's what I'd like

11   to do:  I'd like to say that's all the questions in front of

12   the jury, subject to the offer that I wanted to make and just

13   real briefly, while he's here, make the offer on slides 18,

14   19 --

15               **THE COURT:**  That's fine.  Just go ahead and conclude

16   for the day.

17               **MR WATTS:**  Fair enough.

18               **THE COURT:**  Don't say, "subject to proffer".

19               **MR WATTS:**  No, no.

20               **THE COURT:**  Just say you're finished, we'll send them

21   out, we'll cover what we have to cover and he can stick around

22   and you can put on the --

23               **MR WATTS:**  That's good.  Okay.

24               (WHEREUPON, the following proceedings were held in

25   open court.)

1      **MR WATTS:**  Your Honor, those are all my questions.
2  Thank you, sir.
3      **THE COURT:**  All right.  Thank you, sir, you can step
4  down, but don't leave.  That's going to conclude our
5  presentation of evidence for today, that's my understanding,
6  and it's 4:30.  So we finished a half hour sooner.  We were
7  trying to get a little bit earlier than that, but we finished a
8  half hour sooner.
9          Let me also, again, remind you-all -- well,
10  first of all, let me thank you-all for your attention this
11  week.  I know it's a busy week and a lot of new things that
12  maybe on Monday morning you didn't anticipate you would be --
13  you would be seeing and hearing.  But I want to thank you for
14  your attention during the week and also ask you to, please, be
15  prompt on time next week.  We will start at 8:30 on Monday.
16          Now, between now and then -- and you know what
17  I'm about to say -- between now and then you've got tonight and
18  you've got two days off, and you're probably going to be around
19  maybe some family or friends, some of you may be at tailgate
20  parties or watching the Saint's game together with friends.
21  And they're going to say, "What did you do this week?" or, "So
22  what's all that case about that I understand you got picked for
23  a jury?"
24          Please, do not tell them anything about the
25  case; and, perhaps, even more importantly, if they know what

1   case you happen to be sitting on, please do not listen to what

2   they have to say about the case.  Because the big difference

3   between you and them is that you are here to hear the evidence

4   and they will not have heard any of the evidence.

5                So if anybody you talk to knows anything about

6   this case or any of the issues in this case, it's important

7   that you promptly tell them that you're not allowed to discuss

8   it; and if they continue to want to express an opinion or tell

9   you something about this particular issue or any of these

10  issues, please excuse yourself from their presence.

11               It's very important that you do that.  Because

12  you took an oath and you owe it to these parties and these

13  attorneys to decide this case on the evidence that we hear in

14  these four walls and not based on what somebody else tells you,

15  or what they heard, or what they thought they heard.

16               So you're going to have to be very, very careful

17  over the next couple of days, because we do have a few more

18  days.  The attorneys tell me that we are on a course to finish

19  this case next week, perhaps even before Friday of next week.

20  So they're going to work hard over the weekend to try to

21  streamline their presentation and get you all the information

22  you need to decide the case.

23               When I send you out to deliberate, you will have

24  the benefit of all of the evidence, including next week's

25  witnesses, as well as the closing arguments that the attorneys

1  are going to make, and my instructions to you on the law, and

2  you need all of that before you come to any conclusions on this

3  case.

4         So it's very important that you continue to keep

5  an open mind over the weekend and that you be here promptly on

6  Monday so that we can pick up with the evidence and get this

7  case to you as soon as possible so that you-all can decide

8  issues that are going to be presented to you.

9         So let's go ahead and break for the day.  I hope

10  all of you-all have a nice weekend.

11         **THE DEPUTY CLERK:**  All rise.

12         (WHEREUPON, the jury exited the courtroom.)

13         **THE COURT:**  All right.  Anything else that we need to

14  cover on the record at this time?

15         **MR WATTS:**  Yes, sir.  We would like to put Dr. Hewett

16  back on the stand real briefly and make an offer of proof.

17         **THE COURT:**  Okay.  Why don't you do that after we

18  conclude -- we'll go ahead and keep the record open for that

19  purpose.  But if no one has anything else to put on the record,

20  right now, we can go off the record.

21         And under the lineup for mortgage is going it

22  include on the plaintiff's side, we intend to.

23         Ms. Alexander; Dr. Barnes, Dr. Kornberg, Dr.

24  Mayer, and Christopher cooper.

25                     **(OFF THE RECORD)**

1      **THE COURT:**  All right.  I need some quiet in here.

2    He's going to make a proffer of evidence.  So those of you who

3    don't need to be here for that, you can either quiet done, or

4    you can go ahead and leave, or if you want to watch it, then go

5    ahead and have a seat.

6      **MR WATTS:**  Your Honor, may I proceed with my proffer

7    of evidence?

8      **THE COURT:**  Yes.

9                    <u>**PROFFER NO. 1**</u>

10   **BY MR WATTS**

11   **Q.**   Dr. Hewett, the Court has excluded slides 18, 19 and 20.

12   So what we're doing here is I'm asking you questions and

13   answers about what your testimony would have been do about it

14   so that we can make what is called a proffer, okay?

15   **A.**   All right.

16   **Q.**   What is your name, please?

17   **A.**   Paul Hewett.

18   **Q.**   Okay.  Continuing on, in addition to the 17 slides that

19   went into evidence in Exhibit 300, did you also prepare slides

20   18, 19 and 20?

21   **A.**   Yes, I did.

22   **Q.**   In slide 18 would you show the Court what this -- what

23   this represents just real briefly?

24   **A.**   Well, briefly this represents the DeVany data for which

25   there was the year of manufacture information and I simply

1  plotted the data by year of manufacture.

2  **Q.**   Okay.  And slide 19, what does this table show?

3  **A.**   Slide 19 shows the mean exposure for each of the clusters

4  of data that you saw in the previous graph by year.

5  **Q.**   Okay.  And on slide 19, for trailers that are two years

6  old manufactured in 2006 was the mean exposure 1.3625 parts per

7  million?

8  **A.**   That's, I'd say, 1.363.

9  **Q.**   All right.  And there was 106 --

10  **A.**   There were 106 data points.

11  **Q.**   For the year of manufacture 2005, where the age of the

12  trailer was three years at the time of testing, was mean

13  exposure 1.1630?

14  **A.**   Correct.

15  **Q.**   And was there 131 tests?

16  **A.**   Yes, they were.

17  **Q.**   For the year of manufacture, 2004, where the age of the

18  trailer was four years, was the mean exposure 0.6993?

19  **A.**   Correct.

20  **Q.**   Parts per million?  Yes?

21  **A.**   Yes.

22  **Q.**   Okay.  And there were 87 test results?

23  **A.**   Yes.

24  **Q.**   And, finally, for year manufacture, 2003, where the age of

25  the trailers was five years old, was the mean exposure 0.1730?

1  **A.**    Correct.

2  **Q.**    And were there four tests?

3  **A.**    Yes.

4  **Q.**    Okay.  And then, finally, what is slide No. 20?

5  **A.**    Slide No. 20 represents exactly the same exposure

6  measurements but now plotted by the -- a more accurate age.

7  The previous slides, the age was calculated just simply by year

8  of the exposure.  But since we had month of exposure, we could

9  get to a more precise age and we're representing the

10  measurements as a function of age of the unit at the time of

11  testing.

12  **Q.**    Okay.  And in slide No. 20 there is a diagonal line that

13  goes from a higher number on the left side and down to a lower

14  number on the right side.  What does that line represent?

15  **A.**    Well, that represents a linear regression of the logs of

16  the values, that is the log of the amount of high concentration

17  versus the log of the age.

18  **Q.**    Okay.  And does this slide show that the levels of

19  formaldehyde measured in these trailers starts higher with

20  newer trailers and goes down as the trailers age?

21  **A.**    Well, since the line goes from high to low as we move

22  through age, there's a negative slope of the line indicating

23  that as the trailer ages, the exposure is lowered.

24  **Q.**    Based on slides 18, 19 and 20, do you have an opinion as

25  to whether the level of formaldehyde measured in trailers goes

1    down as they age?

2    **A.**    The data, the analysis, the statistics, the graphs, all

3    show that as the unit ages, the exposures tend to be lower.

4    **Q.**    Okay.

5                **MR WATTS:**  That concludes our offer of proof, Your

6    Honor.  At this time we would request a ruling and we would ask

7    the Court to permit us to bring Dr. Hewett back on Monday

8    morning and to testify as to the matters that have been just

9    tendered in the offer of proof.

10               (WHEREUPON, the proceedings were concluded.)

11                               *****

12                             **CERTIFICATE**

13               I, Jodi Simcox, RMR, FCRR, Official Court Reporter

14    for the United States District Court, Eastern District of

15    Louisiana, do hereby certify that the foregoing is a true and

16    correct transcript, to the best of my ability and

17    understanding, from the record of the proceedings in the

18    above-entitled and numbered matter.

19

20

21                   S/ Jodi Simcox, RMR, FCRR
                      Jodi Simcox, RMR, FCRR
22                    Official Court Reporter

23

24

25