1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  FEMA TRAILER          *    Docket MDL 1873 "N"
    FORMALDEHYDE PRODUCTS         *
6   LIABILITY LITIGATION          *    New Orleans, Louisiana
                                  *
7   THIS DOCUMENT IS RELATED TO:  *    September 21, 2009
                                  *
8   CHARLIE AGE, ET AL V          *    1:15 P.M.
    GULF STREAM COACH, INC.,      *
9   ET AL, DOCKET NO. 09-2892;    *
    ALANA ALEXANDER, INDIVIDUALLY *
10  AND ON BEHALF OF              *
    CHRISTOPHER COOPER            *
11  * * * * * * * * * * * * * * * *

12                             DAY 6
                         AFTERNOON SESSION
13            JURY TRIAL PROCEEDINGS BEFORE THE
                   HONORABLE KURT D. ENGELHARDT
14               UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16

17  For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                   Meunier & Warshauer
18                               BY:  GERALD E. MEUNIER, ESQ.
                                 1100 Poydras Street
19                               Suite 2800
                                 New Orleans, Louisiana 70163
20

21                               The Buzbee Law Firm
                                 BY:  ANTHONY G. BUZBEE, ESQ.
22                               JP Morgan Chase Tower
                                 600 Travis, Suite 7300
23                               Houston, Texas  77002

24

25


            JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

 1   <u>APPEARANCES</u>:

 2   For the Plaintiffs:          Watts Guerra Craft
                                  BY:  MIKAL C. WATTS, ESQ.
 3                                Four Dominion Drive
                                  Building Three, Suite 100
 4                                San Antonio, Texas  78257

 5
                                  Hilliard Munoz Guerra
 6                                BY:  ROBERT C. HILLIARD, ESQ.
                                  710 S. Shoreline Boulevard #500
 7                                Corpus Christi, Texas  78401

 8
                                  CHRIS PINEDO, ESQ.
 9                                Attorney at Law
                                  802 North Carancahua
10                                Suite 2250
                                  Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                    & Morton
13                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  BY:  JOSEPH G. GLASS, ESQ.
14                                3838 N. Causeway Blvd.
                                  Suite 2900
15                                Metairie, Louisiana 70002

16
                                  Scandurro & Layrisson
17                                BY:  TIMOTHY SCANDURRO, ESQ.
                                  607 St. Charles Avenue
18                                New Orleans, Louisiana  70130

19
     For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                                BY:  CHARLES R. PENOT, JR., ESQ.
                                  BY:  RICHARD A. SHERBURNE, ESQ.
21                                BY:  SONIA MALLETT, ESQ.
                                  717 North Harwood
22                                Dallas, Texas  75201

23

24

25

              JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES</u>:

2

3    Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                      500 Poydras Street
                                      Room HB-406

4                                     New Orleans, Louisiana 70130
                                      (504) 589-7780

5

6

7

8    Proceedings recorded by mechanical stenography, transcript

9    produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2                                                      Page

3

JANET BARNES
4        Cross-Examination                        189
         Redirect Examination                     212
5
THOMAS H. MAYOR
6        Direct Examination                       229
         Cross-Examination                        234
7        Redirect Examination                     238

8   ALANA M. ALEXANDER
         Direct Examination                       239
9        Cross-Examination                        287
         Cross-Examination                        323
10       Redirect Examination                     331

11  CHRISTOPHER COOPER
         Direct Examination                       337
12       Cross-Examination                        339
         Redirect Examination                     341

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **AFTERNOON SESSION**

2                          **(September 21, 2009)**

3                                \* \* \* \* \*

4              **THE DEPUTY CLERK:**  All rise.

5              (WHEREUPON, the jury entered the courtroom.)

6              **THE COURT:**  All right.  You may be seated.

7                   Dr. Barnes, you're still under oath.

8                   Why don't we go ahead and proceed then with the

9    cross-examination?

10                  (WHEREUPON, **Janet Barnes**, having been previoulsy duly

11   sworn, testified as follows.)

12                          **CROSS-EXAMINATION**

13   BY MR. WEINSTOCK

14   **Q.**   Good afternoon, Dr. Barnes. Andy Weinstock.  We met at

15   your deposition.  Nice to see you again.

16                  If we can take up something that Mr. Buzbee brought

17   up, and something that you actually explained to me.  It's a

18   myth to think that people grow out of childhood asthma;

19   correct?

20   **A.**   Yes.

21              **THE COURT:**  You have to speak into the microphone.

22              **THE WITNESS:**  Yes.

23   BY MR. WEINSTOCK

24   **Q.**   And I think some of this was covered -- I'll try to be

25   quick about it.  You lost your records in the storm,

1   pre-Katrina records, on Chris Cooper; correct?

2   **A.**   Yes.

3   **Q.**   You had the University Hospital records by the time you

4   rendered your opinion; correct?

5   **A.**   No.

6   **Q.**   No?  Okay.

7           Did you have the Children's Hospital records by the

8   time you rendered your opinion?

9   **A.**   Yes.

10  **Q.**   And your opinions primarily rely on your memory of him and

11  your conversations with his mom?

12  **A.**   Yes.  The past medical history does.

13  **Q.**   And you did not review Dr. Pacheco's report or medical

14  records she worked off of before formulating your opinions;

15  correct?

16  **A.**   That's correct.

17  **Q.**   You first diagnosed Chris Cooper with asthma at the age of

18  three and prescribed a nebulizer?

19  **A.**   No.  He was diagnosed when he came to me.

20  **Q.**   You first confirmed that diagnosis when he was three years

21  old; correct?

22  **A.**   Yes.

23  **Q.**   And you prescribed the nebulizer; correct?

24  **A.**   Yes.

25  **Q.**   And beginning in 2001 -- well, strike that.

1          At any time did you review the Walgreens prescription
2    records?
3    A.   No.
4    Q.   No one asked you to do that?
5    A.   No.
6    Q.   So when you testified on direct examination about what
7    medications he might have been on at various times, that was
8    primarily based on your conversations with Mrs. Alexander and
9    your own recollection; correct?
10   A.   Yes.
11   Q.   Are you aware that in 2005, after speaking with his
12   mother, that he had to go to the emergency room in February for
13   an asthma attack, pre-Hurricane Katrina?
14   A.   No.
15   Q.   After -- after that event, you prescribed some medications
16   for him.  Since you don't have your records, I'd like to go
17   ahead and show you the Walgreens records, which have your name
18   on the prescription.
19          In March of '05, before the hurricane, you prescribed
20   Pulmicort?
21   A.   Where is that?  Okay.
22   Q.   Let's start again:  Pulmicort?
23   A.   Okay.  The March 24th, '05, yes.
24   Q.   Correct.
25          Singulair?

1   A.   Yes.

2   Q.   Albuterol?

3   A.   Yes.

4   Q.   Clarinex Reditabs?

5   A.   Yes.

6   Q.   What are Clarinex Reditabs?

7   A.   They're for sinus.  They're issued for sinus.

8   Q.   Are they specifically designed for children?

9   A.   Yes.

10  Q.   And this is pre-storm you prescribed Clarinex Reditabs for

11  him; correct?

12  A.   Yes.

13  Q.   I think we discussed this already, but the Pulmicort was

14  administered through a breathing machine called a nebulizer;

15  correct?

16  A.   Yes.

17  Q.   And just before the hurricane, he was back in June when he

18  needed Clarinex syrup; correct?

19  A.   Yes.

20  Q.   And what is Clarinex syrup, Doctor?

21  A.   A different form of the Clarinex Reditabs.

22  Q.   Again, an antihistamine for sinuses?

23  A.   Yes.

24  Q.   We've had a lot of gold standards in this case.  But as I

25  understand, your gold standard for treating childhood

1  asthmatics is to prescribe a steroid treatment for maintenance

2  and albuterol for use as an emergency backup medicine; is that

3  correct?

4  A.   Yes.

5  Q.   And it was your understanding that he was actually using

6  Pulmicort right up until the time of the storm; correct?

7  A.   Yes.

8  Q.   And I think you told us on direct that the appropriate use

9  was to use Pulmicort once a day; right?

10  A.   Yes.  At that time.

11  Q.   Right.  Now, in speaking with Mrs. Alexander, did she ever

12  indicate to you that she only used the nebulizer for Pulmicort

13  once a year before the storm?

14  A.   No.

15  Q.   And that's not the history you have; correct?

16  A.   That's correct.

17  Q.   You're aware that she lost the nebulizer in the storm, the

18  breathing machine?

19  A.   Yes.

20  Q.   Now while in Florida, first, she filled a prescription for

21  albuterol in October of 2005.  She told you that; correct?

22  A.   Yes.

23  Q.   And that was based on one of your prescriptions; right?

24  A.   Yes.

25  Q.   Because when you -- as you said before, because she was

1    compliant, you would give her refills?

2    A.    Yes.

3    Q.    So when we see on the Walgreens records, four, for

4    example, that means she can have four refills?

5    A.    Yes.

6    Q.    But every time she goes to buy it, that's another entry;

7    correct -- strike that.

8          You don't know anything about the Walgreens records,

9    do you?

10   A.    No.

11   Q.    Okay.  She goes to Florida.  She fills the prescription

12   for albuterol in October of '07.  And now she's apparently out

13   of albuterol by December 18th, 199- -- oh, that's his birthday.

14   That's my bad.

15         He goes to see the doctor on December 19th, 2005.  It

16   says he needs albuterol; correct?

17   A.    I've never seen these records, so give me a chance to --

18   where are you talking about?

19   Q.    If you look on the big board, I've got a yellow arrow on

20   it.

21   A.    Okay.  So where are you, "history of present illness"?

22   Q.    Yes.

23   A.    "Patient here for checkup"?

24   Q.    "Patient's words," correct.

25   A.    "Patient also has asthma, needs prescription for it and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1   prescription for albuterol."

2   Q.   Right.

3   A.   "This 9-year-old presents with a complaint of asthma/onset

4   of asthma.  It's been variable and has been occurring in an

5   intermittently pattern for months, and the core system is

6   current.  The asthma is described as moderate."

7   Q.   Okay.  That is the doctor who not only prescribed the

8   albuterol, but because she did not have a nebulizer, prescribed

9   the Advair; correct?

10  A.   I don't know.  Because I don't know -- I didn't get the

11  doctor's name.  And this is my first time seeing this report,

12  so I don't -- I don't know.

13  Q.   Does Advair require a nebulizer to administer it?

14  A.   No.

15  Q.   It's a disk you breathe through; correct?

16  A.   Yes.

17  Q.   And Mrs. Alexander did tell you that because of the

18  warning on the Advair she decided she did not want her son

19  using it; correct?

20  A.   Yes.

21  Q.   Now she doesn't have the nebulizer, and he's not taking

22  the Advair; right?

23  A.   Yes.

24  Q.   So until she comes to see you in October of 2007, you're

25  not aware of any way she has to get steroid medication;

1    correct?

2    A.    I assume she went back to that same doctor, or to a

3    doctor.

4    Q.    So maybe she went back -- the only speculation you have

5    for this is maybe she went back to a doctor in Florida?

6    A.    Yes.  When talking to her later, she had four inhalers.

7    Q.    No, no, no.  She had --

8    A.    When I wrote my report, I wasn't aware of any more.

9    Q.    She had four albuterol inhalers?

10   A.    Yes.

11   Q.    Let's be clear:  The doctor in Florida gives her a

12   prescription for Advair, which she chooses not to use because

13   of the warnings.

14   A.    Right.

15   Q.    And she doesn't have her nebulizer, so she can't use --

16   even if she had a prescription for Pulmicort from you, she has

17   no way to administer it.

18           So as you sit here today, you have no personal

19   knowledge that she had any access to steroid medication from

20   the moment she lost that albuterol -- that nebulizer until she

21   sees you again in October of 2007; correct?

22   A.    Only what she's told me.

23   Q.    Only what she's told you.  And she didn't tell you that

24   she got steroids from anybody else; correct?

25   A.    Correct.

1  **Q.**   And to confirm, still in Florida, she fills out a student

2  health questionnaire for the school.  "Last hospitalized for

3  asthma February 2005," before the storm; correct?

4  **A.**   Yes.

5  **Q.**   Now he comes -- they come into your office in October of

6  2007.  And at that time they came in for sinusitis and for a

7  refill of asthma medication; correct?

8  **A.**   Correct.

9  **Q.**   And you ordered blood work; correct?

10  **A.**   Yes.

11  **Q.**   Why did you order blood work?

12  **A.**   That's standard for me.  I do it for every new patient and

13  every patient who came back -- that were my previous patients

14  that I hadn't seen.

15  **Q.**   You hadn't seen him in three years.  It seemed like a good

16  idea; right?  Part of your standard practice?

17  **A.**   Yes.

18  **Q.**   But you didn't order pulmonary function tests, did you?

19  **A.**   No.  That's not something I usually do.  I leave that up

20  to the experts.

21  **Q.**   You didn't refer him to a pulmonologist, did you?

22  **A.**   No, I did not.  No.  Because I didn't get that type of

23  history, and it's not uncommon not to.

24  **Q.**   Well, the only thing you got about asthma was, "needs some

25  more albuterol"; correct?

1  A.   Yes.

2  Q.   And at this point he had been living in the trailer for 17

3  months; correct?  May of '06 through October of '07?

4  A.   At least.

5  Q.   You would -- and by that point, he had been off Pulmicort

6  since he filled the prescription in March of '05; correct?

7  A.   To my knowledge.

8  Q.   To your knowledge.  And you would agree that patients with

9  asthma, if not treated properly, can have micro damage from

10  suboptimal treatment; correct?

11  A.   They can.

12  Q.   And a patient who is not taking their medications every

13  day can actually make their asthma worse; correct?

14  A.   It depends on their classification.

15  Q.   A patient who is not taking their asthma every day can

16  definitely have permanent damage and make their asthma worse;

17  correct?

18  A.   I didn't write that.  It depends on which treatment.  You

19  don't take albuterol every day.

20  Q.   Of course not.  If you don't take your steroid medication,

21  your maintenance medication, Janet Barnes' gold standard every

22  day --

23  A.   You should take that every day.

24  Q.   And if you don't, you could definitely have permanent

25  damage and make your asthma worse?

1   A.   You definitely can do that.

2   Q.   Also, if you do not take your steroid medication for

3   asthma every day, it can cause mucosal thickening; correct?

4   A.   It can.

5   Q.   Did you read Dr. Karin Pacheco's report?

6   A.   A portion of it.  It was so big.

7   Q.   Did you read where she diagnosed suboptimally treated

8   asthma?

9   A.   Uh-huh.

10  Q.   You would agree that the only way to cause permanent

11  epithel- -- to diagnose permanent epithelial damage is by

12  biopsy; correct?

13  A.   Yes.

14  Q.   Asthma attacks can be triggered by a change in the

15  weather?

16  A.   They can be triggered by a change in the weather and other

17  things, allergens, infections, irritants.

18  Q.   In Chris Cooper's case you're aware that on a number of

19  occasions his asthma has been described as changing with --

20  being brought on by changes in the weather?

21  A.   Yes, where you showed it to me on the application to the

22  school.

23  Q.   I've got a half dozen places, if you'd like to see them.

24  A.   Okay.

25  Q.   You know he went in the emergency room on December 4th,

1    2007; correct?

2    A.    Yes.

3    Q.    On a change in the weather, he had been up coughing and

4    kept taking his albuterol; correct?  Isn't that the history you

5    got?

6    A.    The history I got?  Let me see.

7            I only have that he went to the emergency room for an

8    uncontrolled asthma attack, and that he had repeatedly been

9    using his albuterol inhaler.

10   Q.    And that's what you told us on direct, isn't it?

11   Sometimes when you have an asthma attack, or you feel one

12   coming on and you keep using the albuterol inhaler, it can

13   actually trigger an attack; correct?

14   A.    It can.

15   Q.    And this is the record that you have from the emergency

16   room.  You have this record; correct?

17   A.    I'm looking for it.  Give me a minute.  Okay.

18   Q.    "He came in with a history of asthma, complaints of chest

19   tightness and cough since last night.  Last episode of wheezing

20   was a year ago"; correct?

21   A.    That's what that record said.

22   Q.    And that's what she told you happened?

23   A.    No.

24   Q.    At the emergency room they gave him a prescription -- or

25   they gave him Prednisone; correct?

1   A.   Yes.

2   Q.   Prednisone is a steroid; correct?

3   A.   Yes.  And they gave it to him for four days only.  They

4   had the option to give him an inhaler or tell him to use it

5   twice a day -- once or twice a day.

6   Q.   And they also prescribed Singulair?

7   A.   No.  He had five refills.  I had already given him -- I

8   had already given him a prescription with five refills.

9   Q.   You're absolutely right.  The Singulair was prescribed by

10  you.  He refilled his Singulair December 2007?

11  A.   Yes.

12  Q.   About that time he moved out of the trailer?

13  A.   Within the month is my understanding.

14  Q.   Um --

15  A.   Within the month, meaning December/January, within that

16  time frame.

17  Q.   And at that point his attacks of shortness of breath and

18  wheezing progressively decreased; correct?

19  A.   I saw him in April 2008.  So he was treated by the

20  emergency room doctor.  He didn't come back to me.  I couldn't

21  say they decreased per -- well, according to my records, they

22  decreased, but they didn't go away.

23  Q.   Right.  But they decreased --

24  A.   Right.

25  Q.   Okay.  And you're aware that in February of 2008 they

1   retained a lawyer for this litigation?

2   **A.**   No.

3   **Q.**   They came back to see you in April of 2008?

4   **A.**   Yes.

5   **Q.**   And at that time the complaints were allergic

6   conjunctivitis in the eyes; correct?

7   **A.**   Yes.

8   **Q.**   Not a mention of asthma?

9   **A.**   No.

10  **Q.**   Not a mention of formaldehyde in a FEMA trailer?

11  **A.**   No.

12  **Q.**   Not a mention of needing more albuterol?

13  **A.**   No.

14  **Q.**   The topic just didn't come up; right?

15  **A.**   No.

16  **Q.**   On March 30th, 19- -- I'm sorry -- 2009, did

17  Mrs. Alexander tell you, in the history she gave you, that

18  Chris Cooper has asthma triggered to changes in the weather?

19  **A.**   I didn't -- I didn't talk to her on March 30th, 2009.

20  **Q.**   I'm aware of that.  She filled out a form for her school.

21  Did she ever tell you she filled out that form?

22  **A.**   No.  She filled it out on March 30th?

23  **Q.**   Yes.

24  **A.**   Okay.

25  **Q.**   Would you like to see it?

1    A.   Yes.  I haven't seen it before.

2    Q.   Asthma, weather.  Okay?

3    A.   Wait a minute.  I'm still reading that.

4    Q.   Take your time.  Okay?

5            Now, you were aware that just seven days later Chris

6    Cooper's case was set up as this trial date; correct?

7    A.   I don't know when it was set up.

8    Q.   But that's about the time you started getting calls from

9    Chris Cooper's lawyers; correct?

10   A.   About that time.

11   Q.   And then on April 24th, 2009, Mrs. Alexander came to see

12   you; correct?

13   A.   Yes.

14   Q.   And now she gave you a much more complete history; right?

15   A.   Yes.

16   Q.   And part of that history was that Chris Cooper's asthma

17   did not do as well when he was living in a FEMA trailer;

18   correct?

19   A.   She also told me she was doing better in Florida than she

20   was doing here.

21   Q.   Please answer my question:  She told you that Chris

22   Cooper's asthma did not do as well when he was in the FEMA

23   trailer; correct?

24   A.   Say again?

25   Q.   She told you that Chris Cooper's asthma was not doing as

1  well and was doing poorly when he was living in a FEMA trailer;

2  correct?

3  A.   Yes.

4  Q.   And that is the first time you were aware she ever lived

5  in a FEMA trailer?

6  A.   Yes.

7  Q.   And that is the first time you were ever aware that he was

8  having any kind of problem with his asthma since before the

9  storm?

10 A.   No, that's not true.  If she needed a refill on the

11 albuterol inhaler it was because she had been using it -- if

12 she needed a refill on his albuterol inhaler, that was because

13 she was using it.  And so I gave him my standard of care, put

14 him on the inhaler, and put him on Singulair, and gave him a

15 refill on albuterol.

16 Q.   Sure.  But other than asking for more medication, they

17 never told you that he was having a problem with his asthma,

18 not in October of '07, not in April of '08 after they hired a

19 lawyer, did they?

20 A.   She told me that he was using his albuterol inhaler more

21 often.

22 Q.   Where is that in your notes?

23 A.   It's not in my notes.  But it stands to reason; and if she

24 needed a refill, the patient was using it.

25 Q.   And so your understanding that Chris Cooper's asthma was

1   worse when he was in the trailer than outside the trailer was

2   based on the history you were given by his mother; correct?

3   **A.**   Yes.

4   **Q.**   And if that history is wrong, your statement is wrong;

5   correct?

6   **A.**   No.  I go with what my patients give me.

7   **Q.**   And that's what you told me in your deposition.  You told

8   me the history's never wrong; right?

9   **A.**   I didn't say they're never wrong.  I said they're

10   patients, and I have to believe what they tell me.

11                **MR. WEINSTOCK:**  May I approach, Your Honor?

12                **THE COURT:**  Yes, sir.

13   BY MR. WEINSTOCK

14   **Q.**   Page 182, Lines 12 through 15, if you could read that.

15   **A.**   Yeah.  I said: "No, the history is not wrong.  The

16   history is never wrong.  When a mother steps into my office and

17   she tells me about what's going on with her child, I have to

18   believe that this mother is -- she is the caregiver that is

19   truly observing her child.  She observed him enough that she

20   was willing to read the warning on a particular medicine and

21   not give it to her child."

22   **Q.**   So again I ask:  Is it correct the history you got is not

23   wrong?  The history you get is never wrong; isn't that right?

24   **A.**   The history that I write in my notes is the history that I

25   get from my parents, and I believe what they say.

1  **Q.**   Even if --

2  **A.**   Until otherwise proven.

3  **Q.**   Sure.

4         And if an 11-year-old asthmatic was in a trailer for

5  a year and went to the emergency room and said he did not have

6  a wheeze for a year, you would not associate that wheeze with

7  being in the trailer; correct?

8  **A.**   That's not the history that I got.  They didn't tell me

9  that.

10 **Q.**   I know they didn't.

11 **A.**   The mother didn't tell me that.

12 **Q.**   Hypothetically, if an 11-year-old comes into your

13 office -- an 11-year-old asthmatic -- and tells you they have

14 not had wheezing in the year, you would not associate that

15 asthma condition with being in that trailer, would you, during

16 the past year?  Not Chris Cooper, a hypothetical patient.

17 **A.**   I wouldn't -- at that time I didn't know he was in a

18 trailer.

19 **Q.**   I'm --

20 **A.**   And so I wouldn't -- that would depend on where they were.

21 I mean, I wouldn't have asked -- I mean, I didn't know that.  I

22 couldn't assume that, hypothetically, that I would assume that

23 they came from a trailer when they may not be in a trailer.

24 Unless they tell me, I would not assume it.

25 **Q.**   Let me be very clear:  Assume for me that an unknown

1  Mr. Smith, unknown 11-year-old asthmatic, had been living in a

2  trailer for a year, walks into the emergency room and says they

3  have not had an episode of wheeze in a year, you would not

4  associate that wheeze with the trailer, would you?

5  A.   It depends if they tell you.  That physician may not have

6  known any more than I knew.  Unless she told them she was in a

7  trailer for a year, you wouldn't think of a trailer unless you

8  knew they were there.

9        You never said that -- I can't -- the patient came

10  into the office or into the emergency room and said, "I've been

11  living in a trailer for a year, but I haven't wheezed in a

12  year."  You didn't say that.  You said he came into the

13  emergency room and said, "I have not wheezed for a year," and

14  you would not assume that it was from the trailer.

15        No, you would not, because you did not know they were

16  in the trailer.

17  Q.   I believe that answered my question.  If we can turn to

18  his sinusitis.

19        Is it correct that he suffered from that before and

20  after Hurricane Katrina?

21  A.   Yes.

22  Q.   Prior to the storm he was having boggy nasal turbinates

23  and postnasal drainage, and you prescribed the Reditabs as a

24  result?

25  A.   Pre-Katrina or post?

1  **Q.**   Pre.

2  **A.**   I don't have my records to confirm nasal bogginess.   I

3  give Clarinex or Claritin or Zyrtec if they have postnasal

4  drainage.  It doesn't necessarily mean if they have boggy nasal

5  turbinates, I still give it.

6  **Q.**   He was having postnasal drainage before the storm?

7  **A.**   Yes.

8  **Q.**   You prescribed Claritin before the storm?

9  **A.**   Yes.

10  **Q.**   You don't remember what his turbinates looked like before

11  the storm?

12  **A.**   No, and I don't have his records.

13  **Q.**   You never told Dr. Kornberg that you could remember what

14  Chris Cooper's turbinates looked like pre- and post-storm,

15  could you, the difference?

16  **A.**   I don't remember that.

17  **Q.**   Since you couldn't tell us what they looked like

18  pre-storm, you certainly wouldn't have told somebody else,

19  would you?

20  **A.**   I don't remember telling him.  I don't remember seeing

21  boggy nasal turbinates in Chris Cooper before the storm.

22  **Q.**   You don't remember one way or the other, do you?

23  **A.**   I don't remember seeing them at all.

24  **Q.**   And you don't remember not seeing them?

25  **A.**   No.

1  **Q.**   You can't tell from memory one way or the other; correct?

2  **A.**   I don't remember seeing them, and more than likely they

3  were not there.  I usually -- if they were there and a big

4  problem, I would have remembered something about them.

5          **MR. WEINSTOCK:**  May I approach, Your Honor?

6          **THE COURT:**  Yes.

7  **BY MR. WEINSTOCK**

8  **Q.**   Why don't you go ahead and read it.  I'll read it for the

9  jury.

10 **A.**   Okay.

11 **Q.**   Does that refresh your recollection as to whether you can

12 remember if Chris Cooper had boggy nasal turbinates before the

13 storm?

14 **A.**   I don't remember him having them.

15 **Q.**   And you don't remember him not having them?

16 **A.**   I don't remember him not having them.

17 **Q.**   You can't remember tens of thousands of nasal turbinates,

18 can you?

19 **A.**   No.

20 **Q.**   There was some confusion about Chris' eczema.  Chris'

21 eczema was actually on his arms, not on the back of his knees;

22 correct?

23 **A.**   When he came into my office, he had it on his arm.  But

24 it's not uncommon to be behind your knees.

25 **Q.**   But that's not what you saw?

```
 1   A.   That's not what I saw.  And I didn't look.
 2   Q.   There was no eczema when you saw him in April of '08;
 3   correct?
 4   A.   No.  I had given him medicines.
 5   Q.   My statement's correct?
 6   A.   Yes.
 7   Q.   There was no eczema when you saw him in April of '09;
 8   correct?
 9   A.   Not on his arm.
10   Q.   My statement's correct?
11   A.   Not on his arm, I didn't.  You can have eczema different
12   places.  I didn't see it on his arm.
13   Q.   And, actually, allergies, eczema, sinusitis and
14   conjunctivitis can all be triggered by allergy; correct?
15   A.   Yes, and irritants and viruses and infections.
16   Q.   But certainly by what you called sort of a gumbo called
17   atopy; correct?
18   A.   Atopy, A-T-O-P-Y.
19   Q.   And that's just kind of like an allergic gumbo?
20   A.   Yes.
21   Q.   Chris Cooper is allergic to pecans and dust mites?
22   A.   I think Dr. Pacheco said that when she tested him, she
23   found him allergic to the pecan trees and dust mites.
24   Q.   And Chris Cooper is an atopic or allergic young man;
25   correct?
```

1  **A.**    Sure.

2  **Q.**    Asthma attacks can be triggered by dust mites, stress, and

3  being overweight?

4  **A.**    Yes.  But also irritants and allergens.

5  **Q.**    Chris Cooper's father had asthma?

6  **A.**    Yes.

7  **Q.**    Why is that significant, Doctor?

8  **A.**    Genetic disposition.

9  **Q.**    And, in fact, when we talked earlier about the myth of

10  growing out of asthma, the ones that it seems more persistent

11  in are those who have that genetic predisposition?

12  **A.**    Yes.

13  **Q.**    Doctor, is it correct that on occasion you refer patients

14  for psychiatric treatment?

15  **A.**    On rare occasions.

16  **Q.**    You never saw a reason to refer Chris Cooper for

17  psychiatric treatment, did you?

18  **A.**    No.

19  **Q.**    Doctor, do you recommend an annual checkup for your

20  patients?

21  **A.**    Yes.

22  **Q.**    And the same would be true for Chris Cooper?

23  **A.**    Yes.

24          **MR. WEINSTOCK:**  Thank you, Doctor.

25          **THE COURT:**  Thank you, Mr. Weinstock.

1          Any questions from Fluor?

2          **MR. SHERBURNE:**  No questions, Your Honor.

3          **THE COURT:**  All right.  Thank you.

4          Redirect?

5                    **REDIRECT EXAMINATION**

6  BY MR. BUZBEE

7  **Q.**  Doctor, let me show you something that the Gulf Stream

8  lawyer put up on the screen during the opening statement.

9          And Mr. Weinstock asked you about whether this young

10 man's asthma attacks were triggered by weather.  Do you

11 remember him asking you that?

12 **A.**  Yes.

13 **Q.**  And he showed this jury this -- this diagram that makes it

14 appear like there was a dramatic drop in the weather -- the

15 temperature at the time this young man went to the hospital;

16 right?

17 **A.**  Yes.

18 **Q.**  Now, take a look at the actual weather pattern during this

19 time frame.  And I circled the actual weather pattern as it

20 varied throughout the year instead of showing just a few days,

21 but instead showing quite a few days.

22          Based on looking at that, as a doctor who treats

23 children, like Coop, here, do you think that the weather -- at

24 least based on the temperature -- did the weather have anything

25 to do with this young fellow having this asthma attack, in

```
 1   light of the fact that there's multiple changes in weather
 2   where he didn't have an attack at all?
 3   A.   I was trying to see --
 4   Q.   I'm sorry.  I didn't --
 5   A.   -- the dates.
 6   Q.   You have to really have to --
 7   A.   April '07 to --
 8   Q.   Right.  I've got it from October '07 all the way to
 9   December of '07.
10   A.   Okay.
11   Q.   Instead of a few days, I got literally two months.  And we
12   know there was no significant asthma attack in those two
13   months, don't we?
14   A.   From Chris Cooper?
15   Q.   Yes, ma'am.  In other words --
16   A.   Significant, you mean that he had to use his inhaler every
17   four hours, that type of significant?
18   Q.   Right.
19   A.   Because he could have a minor, where he needs a couple of
20   puffs once a day or something like that.
21   Q.   It's my fault.  Let me tell you why.
22        This previous chart -- and I think the point is made,
23   but just so you and I are together on this, if we can get
24   together.
25   A.   Uh-huh.
```

214

1   **Q.**   The previous chart makes it look like over about a -- one,

2   two, three, four, five, six -- seven-day period the weather

3   dramatically dropped, does it not?

4   **A.**   Yes.

5   **Q.**   But if you look at it over two months, would you agree

6   that the weather fluctuated quite often in that two-month

7   period?

8   **A.**   Right.  Could you push it over to the right?

9   **Q.**   Yes, ma'am.  That starts at October of '07 and goes to

10  December of '07.

11  **A.**   Uh-huh.

12  **Q.**   There are multiple variations in the weather, were there

13  not?

14  **A.**   Yes.

15  **Q.**   Okay.  And you don't know of any significant asthma attack

16  that he had, say, in the month of October '07, do you?

17  **A.**   No.

18  **Q.**   And he didn't have --

19  **A.**   Not to my office.

20  **Q.**   And he didn't have to go to the ER in October of '07?

21  **A.**   No.

22  **Q.**   Or November of '07?

23  **A.**   No.

24  **Q.**   Okay.  One other -- he -- Mr. Weinstock, the Gulf Stream

25  lawyer, made some very handy visuals that are helpful to all of

1   us, I believe.

2          Mr. Weinstock asked you about an ER visit in

3   February/March of '05.  Do you remember him asking you that?

4   A.   Yes.

5   Q.   Did he show a doctor record?

6   A.   No.

7   Q.   Did you -- have you seen any ER record, whatsoever, that

8   this child and this mother ever went to the ER in

9   February/March of '05?

10  A.   No.

11  Q.   And if I were to tell you that no such record exists

12  because that child never went to the ER in February/March of

13  '05, would that surprise you?

14  A.   It would surprise me that he even asked me that and there

15  was no record.

16  Q.   It would surprise you that he would ask you that knowing

17  full well that those records don't exist?

18  A.   That would surprise me.

19  Q.   Yes, ma'am.

20  A.   I put my hand on the -- I mean, I put my hand up the oath

21  that I would tell the truth, and I would assume that he would

22  have to.

23  Q.   Very well.

24          Now, we see here in this Gulf Stream diagram that

25  this young man, when he was living in the trailer, his mother

1   brought him in in October '07 to refill the meds; correct?

2   A.   Yes.

3   Q.   And you know from Alana Alexander, that during this time

4   that this young fellow was in the trailer, he had four

5   inhalers; correct?

6   A.   Yes.

7   Q.   And we know there's a record that says -- in fact, we see

8   it here when he went to the ER two months later -- that his

9   significant -- or the last wheeze event was one year ago; do

10  you see that?

11  A.   Yes.

12  Q.   Now that would be, I guess, December of '06.  It should be

13  right here; correct?

14  A.   Yes.

15  Q.   Now, have you talked to Alana to determine whether that

16  event that she described in the ER record, what that event was?

17  A.   What do you mean?  In December of '06?

18  Q.   Yes, ma'am.  Because here she says in December -- when she

19  goes into the hospital with her son, she says the last

20  wheeze -- and it's shorthand, obviously.  They're writing

21  quickly as the child is -- they're taking the history.  But it

22  says, "Last wheeze one year ago"; right?

23  A.   Yes.

24  Q.   And we know that that would be somewhere around December

25  of '06; correct?

1   A.    Yes.

2   Q.    Have you spoken to Alana about what happened in December

3   of '06?

4   A.    No.  Not other than she had said that he'd been having

5   wheezing and it had progressed to once or twice a week.

6   Q.    And --

7   A.    When she came for her refill in October, she told me that

8   he had been wheezing and that it was -- it progressively had

9   gotten worse and he had run out of medicines.

10  Q.    Okay.  Now, I think everybody here knows this.  But,

11  generally speaking, what was the state of medical care in the

12  New Orleans area right after the storm and for a six months or

13  so?  In other words, how hard was it to find a doctor?

14  A.    It was very hard.

15  Q.    How easy was it go to the ER and get your son treated for

16  asthma?

17  A.    They had difficulty finding physicians for the ER.  They

18  even asked me, and I was out of town.  But you waited when you

19  went to the ER.

20  Q.    And if you were -- if there was a line as long as from

21  here to the outside of this courtroom at the ER and you were a

22  mother trying to take care of your baby, as the treating

23  doctor, would it be okay with you if she set this child in the

24  bathtub and steamed him and tried to get the albuterol to try

25  to relieve his wheezing attack?

218

```
1    A.   If that's your only option, yes.
2    Q.   I think we all can agree that irritants -- I think you
3    said this multiple times -- irritants make asthma worse?
4    A.   Yes.
5    Q.   Irritants trigger asthma?
6    A.   Yes.
7    Q.   Formaldehyde is an irritant?
8    A.   Yes.
9    Q.   Now, one thing I found over the years is that mothers --
10   and tell me if this is your experience -- mothers generally
11   know more about how to take care of the child than does, say,
12   the father?
13   A.   Yes.
14   Q.   Which might explain why, dumbly, I stood up here and said,
15   "Kids grow out of asthma."
16   A.   Yes.
17   Q.   That probably explains that, doesn't it?
18   A.   Yes.
19   Q.   Now -- but isn't it true that the symptoms related to
20   asthma, as the child gets older, generally decrease?
21           MR. WEINSTOCK:  Objection, Your Honor.  This was
22   covered on direct, I think.
23           MR. BUZBEE:  This is redirect.  He asked that
24   question.
25           MR. WEINSTOCK:  I didn't ask it.
```

1          **THE COURT:**  I don't recall him covering that on

2    cross.

3          **MR. BUZBEE:**  He talked about the myth, remember, Your

4    Honor?  He talked about the myth of growing out of asthma, and

5    he was glad I mentioned it, and he went into that?  I'm going

6    to go through it very quickly, like one minute, unless he keeps

7    objecting.

8          **THE COURT:**  Yeah.  I think he did start his cross out

9    with that, and so I will let you go ahead.

10          **MR. BUZBEE:**  Thank you, sir.

11   **BY MR. BUZBEE**

12   **Q.**   This myth that Mr. Weinstock mentioned, as a general

13   rule -- having treated thousands of little children, as a

14   general rule, as a child grows older, the asthma symptoms

15   decrease?

16   **A.**   Yes.

17   **Q.**   In this case, with this child, did his asthma symptoms

18   decrease?

19   **A.**   Yes.

20   **Q.**   Did they decrease when he got into the trailer, though?

21   **A.**   Not according to what the mother told me.

22   **Q.**   Okay.  Now, Mr. Weinstock showed you some Walgreens

23   records.  Were you aware that Mrs. Alexander was not only

24   getting inhalers from Walgreens, but from another program?

25   **A.**   No.

1   **Q.**   So we would have to ask her how many inhalers she was

2   getting and where she was getting them from?

3   **A.**   Yes.

4   **Q.**   Okay.  Now, I want to talk to you about the nebulizer.

5   First off, do you know whether or not Chris' father today has

6   any symptoms of asthma whatsoever?

7   **A.**   I don't know.

8   **Q.**   Now, I was looking -- let's just fast-forward to after the

9   storm to Florida.  And we -- we saw the record.  Mr. Weinstock

10  showed us.  It's Exhibit 12.

11          Now, he didn't go to the doctor because he was having

12  an asthma attack, did he, in Florida?

13  **A.**   No.

14  **Q.**   I mean, he just showed you the record.  And it's clear the

15  reason this -- the reason Alana took this child is just in for

16  a checkup; isn't that right?

17  **A.**   Yes.

18  **Q.**   Okay.  What I was looking -- and I was trying to figure

19  out where in this record it instructs how often the Advair is

20  supposed to be used.  Where is that?

21  **A.**   I didn't -- I mean, I don't see the "physical," and I

22  don't see the "assessment," I don't see "the plan".

23  **Q.**   What about this?  Does this help us any?  It looks like he

24  got -- he was given two inhalers, and he was also given this

25  Advair Diskus.  How is she supposed to know how often to use

221

1  this or whether she has to use it?  The doctor tells her?
2  A.   Can I just read it?
3  Q.   Yes, ma'am.
4  A.   I could read it out loud.  Plans:  Albuterol Sulfate HFA
5  which is the inhaler, two puffs inhalation every six hours,
6  PRN.
7  Q.   PRN is as needed; correct?
8  A.   As needed.  Refill:  Four refills.
9          I don't understand -- the number "20" inhaler --
10  okay.  30 days starting December 19th, 2005, ordered.
11  Dispensed two inhalers, one for home and one for school with
12  spacer.  And then he has:  Advair Diskus, one inhalation twice
13  a day, one diskus with six refills, 30 days starting
14  12/19/2005 ordered.  Follow-up in six months or as needed.
15  Q.   What does that mean?
16  A.   Which one?  Which part?
17  Q.   I -- I think you picked it up, Dr. Barnes.  But they're
18  accusing Alana of not giving the proper medical treatment to
19  her son.  So I'm -- what I'm trying to figure out is what the
20  instruction was as far as the --
21  A.   The instruction says to follow-up in six months or as
22  needed.
23  Q.   Does that mean you must give the child Advair once daily?
24  A.   It is recommending that he give the -- that she give the
25  Advair once a day -- once, twice a day.

 1  Q.    Once --

 2  A.    One inhalation twice a day.

 3  Q.    One inhalation of the Advair?

 4  A.    Twice a day.

 5  Q.    Now, you, of course, know that when she had issues with

 6  that, reading that warning and the side effects that Chris had

 7  from that, she went back to that doctor?

 8           MR. WEINSTOCK:  Objection, Your Honor, leading.

 9           THE COURT:  Yes, it is leading.  Sustained.

10           MR. BUZBEE:  Yes, sir.

11  BY MR. BUZBEE

12  Q.    What information, if any, do you have about her attempt to

13  use this Advair?

14  A.    She stopped the Advair because of the black box warning.

15  And Alana talked about the black box warning.

16  Q.    Do you know whether this doctor provided her any further

17  instructions or other medications to substitute or to replace

18  the Advair?

19  A.    No.  I don't -- I don't see that.

20  Q.    Now let's look for a minute, because this is -- I'm

21  curious about this.  It was your belief that Ms. Alexander was

22  provided steroids and a nebulizer pre-storm?

23  A.    Yes.  That's standard for me.

24  Q.    I'm looking, for instance, at University Hospital,

25  December of 2001.  These are medical records for Coop when he

```
 1   was four.  And it says, current medications, he's on Claritin
 2   and albuterol; right?
 3   A.   Where are you?  Oh, okay.
 4   Q.   Yes, ma'am.
 5   A.   Yes.
 6   Q.   Shouldn't there be there -- some sort of steroid
 7   medication listed if he was on it?
 8   A.   Yes.
 9   Q.   But there's nothing listed there at all, is there?
10   A.   No.
11   Q.   So if this defendant, this Gulf Stream, is accusing this
12   lady of not giving her son the right medication, would you
13   agree, at least in 2001, the medication he was being given was
14   not any steroid?  There's no steroid mentioned there?
15   A.   That doesn't mean she wasn't giving it.  And it doesn't
16   mean because -- when you showed me what she filled out for the
17   school when she enrolled him here, she didn't mention the fact
18   either that he was on med- -- what medications he was on.  Yet,
19   he was on medications.
20          So that could be just -- just, I guess, a neglect on
21   telling all the medications.
22   Q.   Okay.  Based on --
23   A.   And -- and she may have assumed that they meant oral as
24   opposed to at home on a nebulizer, but what do you, you know,
25   take by mouth.
```

1   **Q.**   Dr. Barnes, based on everything the Gulf Stream lawyer

2   said -- he showed you a lot of documents -- based on what you

3   know from this lady, the mother of this child, and the

4   questions I've asked you, do you believe that she or any doctor

5   that was providing treatment provided suboptimal treatment to

6   Chris Cooper?

7   **A.**   No, I don't.

8           MR. BUZBEE:  Pass the witness, Your Honor.

9           THE COURT:  All right.

10          MR. BUZBEE:  And, Your Honor, we'd also offer 321.

11          THE COURT:  321, any objection?

12          MR. BUZBEE:  That's the résumé of Dr. Barnes.

13          MR. WEINSTOCK:  No objection.

14          THE COURT:  All right.  321 is in.

15              Thank you, Dr. Barnes, you may step down.

16          THE COURT:  All right.

17              Mr. Watts?

18          MR. WATTS:  Dr. Thomas Mayor.

19          THE COURT:  Dr. Thomas Mayor.

20          MR. WEINSTOCK:  Your Honor, may we approach?

21          THE COURT:  Yes.

22          (WHEREUPON, the following proceedings were held at

23  the bench.)

24          MR. WEINSTOCK:  We have certainly worked up a

25  calculation issue.  The issue I have is to foundation.  No one

225

1   has said that he's worse now than he was pre-storm says he

2   needs any of this.  It's just Dr. Kornberg's very brief

3   discussion about his cancer risks.  This is $222,000 of asthma

4   medication, that nobody says is a result of his being in the

5   trailer.  He was on it before, he's on it now.

6          MR. WATTS:  Well, number one, Pacheco does say it.

7   I'll show you the page and line.

8               Number two, with respect to what we've done here

9   is we took the exhibit -- now, you remember, I went up to

10  Dr. Kornberg -- this is the elements that were allowed into

11  evidence, got the costs from Dr. Kornberg in evidence, and

12  that's the basis for it.  He's simply reducing it to present

13  value.

14         THE COURT:  What about Dr. Pacheco's testimony?

15         MR. WEINSTOCK:  She said he was worse in the trailer

16  but not since getting out of the trailer.  I'll get to that.

17  I've got a blowup he objected to at opening.

18         MR. WATTS:  I don't know what blowup you're talking

19  about, but we have the admissions.  She's tied it in.  He tied

20  it in.

21         THE COURT:  Show me where she says --

22         MR. WATTS:  Let me go get it.

23               It's 123, Line 10.

24         THE COURT:  Okay.

25         MR. WATTS:  I also have these other ones if you want

 1   to see them.  And there --

 2              THE COURT:  Hang on to that.

 3              MR. WATTS:  Yeah.  Okay.

 4              THE COURT:  Come on, let's go.

 5              MR. WATTS:  Sorry, wrong one.

 6              THE COURT:  But doesn't that assume that the jury's

 7   going to buy her testimony?  I mean, what I'm looking at here

 8   is that it got worse while he was in the trailer.  The jury has

 9   to find credible her testimony that it got better; right?  I

10   remember that.  She says that she hasn't found that it's gotten

11   any worse.

12              MR. WEINSTOCK:  So did Kornberg.  So why are we

13   talking about it.  You're making an assumption that it's worse

14   and he needs medication as a result of that.

15              THE COURT:  So you want to *Daubert* this witness and

16   exclude the witness in his entirety?

17              MR. WEINSTOCK:  I think at this point, yes.  With the

18   testimony we have, there's no foundation for this testimony.

19              THE COURT:  We'll send the jury out and put them on

20   ice, you know --

21              MR. WATTS:  Judge --

22              THE COURT:  Hold on a second.  I don't recall getting

23   a *Daubert* motion on this witness.

24              MR. WEINSTOCK:  Your Honor, more than one was asked

25   for.  I did not know how the testimony would play out.  Until

1    Dr. Kornberg retracted his future damage opinions, this wasn't
2    much of a motion.  But when he changed his opinions on the
3    stand, it became very valid.
4              **MR. WATTS:**  He didn't retract his opinions with
5    respect to the portion of the medical monitoring program that
6    this child --
7              **THE COURT:**  But he testified as to once a year.
8              **MR. WATTS:**  Yeah, he did.
9              **MR. WEINSTOCK:**  Absolutely.
10             **THE COURT:**  You see, I don't have the benefit of
11   knowing what this gentleman is going to say.
12             **MR. WATTS:**  All he's done is -- you remember the
13   exhibit that you told me not to put up, and I took it over to
14   Dr. Kornberg and had him highlight the portions --
15             **THE COURT:**  Yeah.
16             **MR. WATTS:**  That's what we've -- this gentleman,
17   instead of using the big number that we're used to, he ran the
18   present calculations for those elements.  That's all he's done.
19             **THE COURT:**  And it's only based on the medical costs,
20   medically; is that --
21             **MR. WATTS:**  All he's done is reduced it back to
22   present value.  In other words, he's taken the medical rate of
23   inflation over the normal rate of inflation and reduced it
24   back, just like an economist does.  He doesn't have anything to
25   do with causation or anything like that.  He's just -- you

1  know, I've got to reduce it back, and he's an economist.

2          **THE COURT:**  All right.

3          **MR. WATTS:**  And it will take three minutes.

4          **MR. WEINSTOCK:**  I just -- I don't see how there's a

5  foundation laid for any of this.  I understand that the kid

6  needs medication.  But if it's no different, then why are

7  discussing this?

8          **THE COURT:**  Well, Dr. Kornberg did testify as to

9  future medicals and the costs.

10         **MR. WEINSTOCK:**  He surely did talk about the costs.

11 But as far as the need for it being a result of being exposed

12 to formaldehyde in the trailer, he retracted that opinion.  So

13 then this is just smoke and mirrors for future meds.

14         **MR. WATTS:**  He did not retract his opinion as to

15 these elements, number one.  And we have Pacheco's admission

16 initially --

17         **MR. MEUNIER:**  And, also, Dr. Schwery said that he

18 thought Chris was being truthful saying that his asthma was

19 worse in the trailer.

20         **MR. WEINSTOCK:**  It's got to be worse now.  It's got

21 to be worse --

22         **MR. MEUNIER:**  Judge, this is a fact issue --

23         **THE COURT:**  I've heard his cross-examination.  I

24 think there's a basis for him, if it's just medicals.  Okay.

25         (WHEREUPON, the following proceedings were held in

```
 1   open court.)
 2            MR. WATTS:  Your Honor, again, we call Dr. Thomas
 3   Mayor.
 4            THE COURT:  All right.
 5            (WHEREUPON, Thomas H. Mayor, having been duly sworn,
 6   testified as follows.)
 7            THE DEPUTY CLERK:  You may be seated.
 8                 Please state and spell your full name for the
 9   record.
10            THE WITNESS:  Thomas H. Mayor.
11            MR. WATTS:  May I proceed, Your Honor?
12            THE COURT:  Yes, please.
13                         DIRECT EXAMINATION
14   BY MR. WATTS
15   Q.   Dr. Mayor, are you a professor of economics at the
16   University of Houston?
17   A.   Yes, I am.
18   Q.   Okay.
19            MR. WATTS:  Your Honor, this witness is being offered
20   in the field of economics.
21            MR. WEINSTOCK:  No objection, Your Honor.
22            MR. SHERBURNE:  No objection, Your Honor.
23            THE COURT:  All right.  This witness will be accepted
24   as an expert in the field of economics.
25
```

1  BY MR. WATTS

2  Q.   Now, Dr. Mayor, I'm going to put on the screen Exhibit

3  315.1, which is your CV.

4           Bottom line, did you get a bachelor of arts in

5  economics from Rice University in 1961 magna cum laude?

6  A.   Yes.

7  Q.   And then did you get a Ph.D in economics from the

8  University of Maryland in 1965?

9  A.   Yes.

10 Q.   Do you understand that in a court of law, when you're

11 dealing with future damages, that the Fifth Circuit and other

12 areas around the country require that those damages be put

13 through a grill, if you will, to see what the present value of

14 them are?

15 A.   Yes.

16 Q.   Can you tell the members of the jury how you take future

17 damages and reduce them back to present value, and what that

18 means?

19 A.   All right.  It's a very standard calculation in economics

20 called a present value calculation.  And the object is to find

21 out how much money needs to be paid today and put into a safe

22 investment, like insured CDs or something like that, what we

23 call treasury bills, short-term U.S. treasury securities.

24 These are safe -- very safe securities.

25           And the idea is to put the money in there and then,

1    over time as these medical costs are incurred, money would be

2    withdrawn.  And at the end of the child's life expectancy, the

3    original fund would be exactly exhausted.  It wouldn't be in

4    surplus or in deficit.  The hope is that we get exactly the

5    right amount of money required to fund those future medical

6    care expenses.

7    Q.    Okay.  And let me put on the screen Exhibit 315.2.  This

8    is a subset of Dr. Kornberg's Exhibit A, dealing with the

9    portions of his medical monitoring plan that he testified about

10   here today.

11          Let me just use one example of this primary care MD,

12   estimated annual costs of $100.  Let's use that as the example.

13   A.    Yes.

14   Q.    If 30 years from now he needs to go see an MD that costs

15   $100 in 2009, knowing what we know about medical inflation,

16   will it cost more than $100 in 2029 dollars?

17   A.    Yes.

18   Q.    And what is the basis for knowing that?

19   A.    Well, the government puts out statistics called price

20   indexes.  And there's a price index for medical care, and we

21   can go back in time and see how it's performed.

22          And since 1960, that index has grown about one and

23   three-quarter percent a year above the general price level.

24   Q.    Okay.

25   A.    So in my calculations, I'm assuming that that trend would

1   continue in the future.  And so medical care expenses would
2   rise at one and three-quarter percent above the rate of
3   inflation.
4   Q.   All right.  Now, because of that, will it be more
5   expensive to get this primary care MD in 2029 than it is right
6   now?
7   A.   Yes, indeed.
8   Q.   All right.  But on the flip side, if I put $100 in the
9   bank and earn what used to be five or six percent interest, now
10  it seems like about one, but there's interest that you can earn
11  on that; is that correct?
12  A.   That's correct.
13  Q.   Did you calculate what one could earn with dollars put
14  into secure short-term treasuries?
15  A.   Yes.  And my calculation assumes that the rate of return
16  out into the future will be equal to the rate of return on
17  treasury bills that we have actually experienced since 1960.
18  And that rate is one and a half percent above the rate of
19  inflation.
20          So if the inflation rate is, say, four percent a
21  year, you would expect, on average, to get five and a half
22  percent a year safely.
23  Q.   Okay.  So in terms of present value calculations for
24  Dr. Kornberg's medical monitoring plan for primary care MDs
25  annually, once a year; and specialist MDs -- I think it was

1    ENTs -- annually, once a year; pulmonary function tests once a

2    year; respiratory therapy once a year; and medications once a

3    year, have you calculated the grand total of the present value

4    of what it will cost to provide those services to Christopher

5    Cooper over of the rest his life?

6    A.   Yes, I have.

7    Q.   And what is the money, in present value, that it will take

8    to put into a bank account in order to fund the medical

9    monitoring plan or the portions of it that I've read into the

10   record here?

11   A.   All right.  The only ingredient we haven't mentioned in

12   the calculation is the number of years over which it will run.

13   And I'm using a 58.8-year time period, which is the average

14   life expectancy for a 12-year-old.

15   Q.   Okay.  Assuming that average life expectancy, do you have

16   an opinion to a reasonable degree of economic probability of

17   the amount of money in present dollars that will be necessary

18   to be invested in order to fund the portions of the life care

19   plan that are reflected on 315.2?

20   A.   Yes.  I think it would require $280,904, approximately,

21   to -- to fund that life care plan.

22   Q.   Now, to be fair, you're not here to say that the life care

23   plan is necessary or it's too low or too high?

24   A.   No, I have no medical opinions.  I'm an economist, so I

25   have a much easier job.

1    **Q.**   And what you have done is taken the costs and the

2    necessity of the medical monitoring plan that's in

3    Exhibit 315.2 and reduced that cost back to present value?

4    **A.**   That's right.

5              **MR. WATTS:**  We would offer Exhibit 315.1 and 315.2.

6              **THE COURT:**  Any objection?

7              **MR. WEINSTOCK:**  No objection.

8              **THE COURT:**  All right.  So ordered.

9              **MR. WATTS:**  Dr. Mayor, those are all my questions.

10   Thank you, sir.

11             **THE WITNESS:**  Thank you.

12                          **CROSS-EXAMINATION**

13   BY MR. WEINSTOCK

14   **Q.**   Dr. Mayor, Andy Weinstock.  We've never met before.  I

15   have a few questions for you.

16   **A.**   Okay.  Thank you.

17   **Q.**   This should be brief.

18             Primary care MD.  You heard Dr. Barnes say she

19   recommends -- you were sitting here; right?  You heard

20   Dr. Barnes say she recommends annual checkups for her patients

21   no matter what?

22   **A.**   Yes.

23   **Q.**   So this -- this first line, 6,312, an annual checkup,

24   would be no different if this case didn't exist; correct?  If

25   what Dr. Barnes said is accurate; right?

1    **A.**   I don't know the answer to that, whether this would be

2    equivalent to a standard checkup or if this is something in

3    addition to a standard checkup.

4    **Q.**   Dr. Barnes, to your knowledge, has never referred Chris

5    Cooper to a specialist, has she?

6    **A.**   Would you repeat that?

7    **Q.**   Dr. Barnes has never referred Chris Cooper to a

8    specialist, has she?

9    **A.**   I do not know.

10   **Q.**   If she's never referred Chris Cooper to a specialist, then

11   this figure is nameless, isn't it?  If it's not incurred, it

12   doesn't matter; right?

13   **A.**   I -- I feel very uncomfortable getting into the medical

14   side of this case.

15   **Q.**   Here's my favorite, medications.  That's almost

16   three-quarters of this total, huh?

17   **A.**   Yes.

18   **Q.**   Where did you get this figure from?

19   **A.**   Where did I get the --

20   **Q.**   The figure for the medications.

21   **A.**   The figure for the medications?  I originally had that

22   from a report by Dr. Kornberg.

23   **Q.**   You didn't test the accuracy of that report, did you?

24   **A.**   No.  I would have no opinions about that.

25   **Q.**   You didn't test the difference in costs between here and

1  Colorado, did you?

2  **A.**   No.

3  **Q.**   We have all the Walgreens records for the medications that

4  Chris Cooper's been using.  You didn't choose to review any of

5  that, did you?

6  **A.**   No, that's not my job.

7  **Q.**   Why not?

8  **A.**   Because my job is to estimate the costs based on

9  Dr. Kornberg's report.  And if it -- if -- if those numbers

10  need to be changed, he's the one who needs to change them.  I

11  wouldn't venture and do that as an economist.

12  **Q.**   So as an economist, the actual cost is irrelevant to you.

13  You only go by what Dr. Kornberg tells you?

14  **A.**   Yes.  Because the cost is inextricably intertwined with

15  the service, and that's clearly a medical prerogative.

16  **Q.**   But, I mean, we have the prescription records that tell us

17  the exact costs.  We don't have to estimate it.  Why don't you

18  do that?

19  **A.**   No, because I -- I wouldn't know if that's what

20  Dr. Kornberg was prescribing in this life care plan.  That

21  would require a medical opinion.  That wouldn't be appropriate

22  for an economist to do.

23  **Q.**   Dr. Kornberg doesn't prescribe anything, he defers to

24  Dr. Barnes; correct?

25  **A.**   Well, I -- I don't know.  I -- I would assume so.  But,

1  again, I'm not a medical expert.

2  **Q.**   Did you ask Dr. Barnes to confirm any of these figures?

3  **A.**   No.

4  **Q.**   You -- you sat here.  You understand she is the treating

5  doctor.  Dr. Kornberg is just somebody in Colorado the

6  plaintiffs flew this young man out to meet on one occasion;

7  correct?  You've worked with Dr. Kornberg before, haven't you?

8  **A.**   Many years ago on one occasion I met him.

9  **Q.**   And he is certainly not the treating physician; correct?

10  **A.**   That's my assumption.

11  **Q.**   So you never thought to ask the treating physician to

12  confirm any of these figures?

13  **A.**   No, that's not my job.

14  **Q.**   And more importantly, you're not in a position to say that

15  he needs one more prescription filled -- even if everything the

16  plaintiffs say is true, you're not in a position to say that he

17  needs one more prescription filled than he would have had he

18  never stepped foot in the trailer; correct?

19  **A.**   Right.  That's not my job.  I wouldn't have an opinion

20  about that under any circumstance.

21  **Q.**   And is it your understanding that he's never undergone

22  respiratory therapy in his life?

23  **A.**   I don't know the answer to that.

24  **Q.**   And the only pulmonary function test he's ever undergone

25  were those ordered about the plaintiff lawyers in Colorado;

1  correct?

2  **A.**   I do not know the answer to that.

3             **MR. WEINSTOCK:**  Doctor, thank you very much.

4             **THE COURT:**  Thank you.

5             **MR. SHERBURNE:**  No questions, Your Honor.

6             **THE COURT:**  Redirect?

7                    **REDIRECT EXAMINATION**

8  BY MR. WATTS

9  **Q.**   If a lawyer had a beef about the costs of medications, do

10 you think he might have asked one of the two medical doctors

11 that preceded you instead of asking an economist?

12 **A.**   Yes, that's generally what happens.

13 **Q.**   If a lawyer wanted to question the necessity of

14 respiratory therapy, or pulmonary function tests, or specialist

15 MDs, do you think a medical doctor who was on the stand before

16 you might have been the one to answer that question?

17 **A.**   That's certainly the way I think it ordinarily works.

18 **Q.**   And just so that we're clear, he asked you about this

19 primary care MD.

20            Let's just assume for a second that that's something

21 that the good doctor wants done anyway.  If you're going to

22 take that out, you would subtract 6,312 from the $280,914; is

23 that right?

24 **A.**   Yes, you can do that.  We've got it broken down, so that's

25 possible.

1   **Q.**   So even if you buy his argument that that's something that

2   ought to already be done, you would still have $274,592 as the

3   present value of the additional items in the Kornberg medical

4   monitoring plan; is that correct?

5   **A.**   Correct.

6          **MR. WATTS:**  All right.  Those are all my questions.

7          **THE COURT:**  Thank you.  You can step down, sir.

8   Who's next?

9          **MR. BUZBEE:**  Alana Alexander, Your Honor.

10          **THE COURT:**  All right.  Alana Alexander.

11             Ms. Alexander, if you would come forward,

12   please.

13       **(WHEREUPON, ALANA M. ALEXANDER, having been duly sworn,**

14                **testified as follows.)**

15          **THE DEPUTY CLERK:**  State and spell your full name for

16   the record.

17          **THE WITNESS:**  Alana M. Alexander, A-L-A-N-A, M.,

18   A-L-E-X-A-N-D-E-R.

19          **MR. BUZBEE:**  May I proceed, Your Honor?

20          **THE COURT:**  Yes, please.

21                      **DIRECT EXAMINATION**

22   BY MR. BUZBEE

23   **Q.**   You've already introduced yourself.

24             Would you tell us how old you are?

25   **A.**   43.

1    Q.    Where were you born, Alana?

2    A.    Here in New Orleans.

3    Q.    We met your mother.

4          Could you tell us briefly about your family?

5    A.    I'm the youngest of eight children.  I have five brothers,

6    two sisters.  One brother who's passed.

7    Q.    What's your dad do?

8    A.    My daddy's a plasterer -- retired plasterer and barber.

9    Q.    And your mom, does she work?

10   A.    She used to work up until I started school, and went --

11   wait.  I take that back.  She worked -- started working when I

12   started school; and when I graduated from high school, she

13   retired.

14   Q.    Now, are you a close family?

15   A.    Yes.

16   Q.    We saw -- we've seen some records.  One of your sisters

17   lived up in New York.  Which one is that?

18   A.    Maria.

19   Q.    And one of your sisters lived next door.  Which one is

20   that?

21   A.    Debra.

22   Q.    And tell me where they are.  You're the baby of the

23   family.  But where are they in relation to you?

24   A.    Debra's is the oldest, and Maria is the sixth child.

25   Q.    What does Maria do?

1    **A.**    Maria works for the AFL-CIO.

2    **Q.**    And Debra?

3    **A.**    Debra's a social worker, a master's social worker in the

4    school system.

5    **Q.**    Now, you work for whom right now?

6    **A.**    KIPP New Orleans.

7    **Q.**    What is that?

8    **A.**    That's one of the charter schools here in New Orleans.

9    **Q.**    Okay.  Let me show you a portion of Exhibit 21, which is

10   in the record.  This is a copy of your résumé, is it not?

11   **A.**    Yes, it is.

12            **MR. BUZBEE:**  Would you bring that down, Carl?

13   **BY MR. BUZBEE**

14   **Q.**    All right.  Your objective in working at the school system

15   is to assist in the education and development of the students

16   and to inspire the enjoyment of learning?

17   **A.**    Yes.

18   **Q.**    What is it that you do at the school?

19   **A.**    I'm the school disciplinarian.

20   **Q.**    What does that mean?  You carry around a board or

21   something?

22   **A.**    No.

23   **Q.**    A stick like I've got there?

24   **A.**    No.  When the children misbehave or get angry and act out

25   in the class, they will come to me, and I will talk to them

```
 1   until they calm down.  Or if any punishment would need to be
 2   delivered, then they would come to me and I would deliver the
 3   punishment, like detentions or extracurricular work to do.
 4   Q.    You're a paraprofessional?
 5   A.    Yes, I am.
 6   Q.    Take me through, briefly, your -- first off, how long have
 7   you worked at that school?
 8   A.    I've been at the school four years.  And I was there one
 9   year prior to the storm.
10   Q.    Okay.  And kind of -- that's kind of -- in New Orleans,
11   for sure, just like in Galveston with Ike, that's kind of how
12   you look at things, pre-storm and post-storm?
13   A.    Yes, correct.
14   Q.    So pre-storm, you worked at this school for a year?
15   A.    Yes.
16   Q.    And you've been -- since you've got back from Florida,
17   you've been working there?
18   A.    Yes.
19   Q.    What other jobs have you had in your life?
20   A.    Well, this job here is a little different than what I did
21   prior to the storm.  Even though I worked at the same school, I
22   was a paraprofessional with severe profound students, which are
23   the children that have trachs and tube feedings and stuff like
24   that.  And I worked with them prior to there at the one year
25   before storm and when I was at Dunbar.
```

```
 1              And prior to that, I was a cook at Carlone's
 2    Restaurant.  And before that I was an EMT.
 3    Q.   What kind of training did you get to be an EMT?
 4    A.   At the time, I went Nunez Community College out in
 5    Chalmette, and I was certified as an EMT.
 6    Q.   And being an EMT, does that help you -- at least kind of
 7    that general background training help you with your son Coop?
 8    A.   Yes.
 9    Q.   It looks like you -- what is Dillard University?
10    A.   That's a university here in New Orleans.
11    Q.   Okay.  And then you went to cooking school?
12    A.   Yes.
13    Q.   And you mentioned community college, Nunez.  And then you
14    graduated from St. Mary's Academy High School?
15    A.   Yes.
16    Q.   In 1984?
17    A.   Yes.
18    Q.   Is it fair to say most of your adult life you've been
19    working?
20    A.   Yes.
21    Q.   You're a taxpayer?
22    A.   For sure.
23    Q.   You believe it's important -- or do you believe it's
24    important to teach your children the importance of hard work?
25    A.   Yes.
```

```
 1   Q.   Why is that?
 2   A.   Because, really, you don't get anything out of life unless
 3   you work for it.  Nobody's going to give you anything.  And I
 4   don't expect you, meaning my children, I don't expect them to
 5   want handouts.  You will appreciate things more if you work for
 6   them.
 7   Q.   We met Chris on the day of the opening statements, and we
 8   got a chance to meet Erika.
 9   A.   Yes.
10   Q.   Let's start with Erika.  How old is she?
11   A.   She's 15 now.
12   Q.   When you-all were in the trailer, how old was she?
13   A.   She was 11.
14   Q.   And then Coop is how old?
15   A.   He's 12.
16   Q.   And I call him "Coop" because a lot of his friends call
17   him that; right?
18   A.   Right.
19   Q.   But when he was in the trailer, he was what?
20   A.   Nine.
21   Q.   All right.  We're going to meet Coop.  He's going to be
22   our last witness in this case.  I know he's going to be a
23   little shy.
24           Could you tell the ladies and gentlemen of the jury
25   what kind of child he is?
```

1  A.   Christopher is a good kid.  And I know a lot of people

2  say, "Well, that's your child.  You're going to say he's a good

3  kid."

4          Christopher is a good kid.  He doesn't get into any

5  trouble at school.  I guess that's partially because I'm there

6  all the time.  But he enjoys football.  He plays the center for

7  the football team at our school.  He really moves his music,

8  and he plays the baritone saxophone.

9          And, actually, he doesn't give me any trouble.  He

10  just -- he plays video games.  And I guess you could say he's

11  just basically an all around good kid.

12  Q.   And you're very proud of him?

13  A.   Oh, yes.

14  Q.   And he, with that music, the bass saxophone, that's the

15  big daddy, is it not?

16  A.   Yes, it is.

17  Q.   He travels around and does concerts and stuff?

18  A.   Yes.  He's in a group here in New Orleans called Tipitina

19  Interns.  And what it is, is it's a program that sets up and it

20  teaches children how to read music, and how to learn music from

21  ear, and how to incorporate it all in a small ensemble.

22  Q.   Is Chris a complainer?

23  A.   No, not really.

24  Q.   Is he a whiner?

25  A.   No.

 1   Q.   We're not going to get a chance to meet Chris' father, but
 2   we've heard that he had asthma.
 3            When you knew Chris' father, did he have any issues
 4   with asthma?
 5   A.   No.
 6   Q.   Does Chris' father have any involvement in his life?
 7   A.   No.
 8   Q.   Does he even pay child support?
 9   A.   No.
10   Q.   He doesn't help you in any way, does he?
11   A.   No, he doesn't.
12   Q.   So you are a single mother raising two children who --
13   they've got a lot of activities going on?
14   A.   Oh, yes.
15   Q.   But you make it work?
16   A.   Yes.
17   Q.   Does your family help you with that?
18   A.   Yes.
19   Q.   Chris right now is in what grade?
20   A.   Seventh.
21   Q.   Has any doctor or any person ever told you, "Look, because
22   this young fellow has asthma, he should not be playing the
23   saxophone"?
24   A.   No.
25   Q.   Have you spoken to any doctors about that issue?

1   A.   No, not really.

2   Q.   Okay.  What about football, for instance?  It's not tackle

3   football, as I understand it?

4   A.   No, it's not tackle.

5   Q.   It's flag?

6   A.   Flag football, yes.

7   Q.   What information have you been provided about whether he

8   should do activities such as band or sports in light of the

9   fact he has asthma?

10  A.   Well, I was told that even though he has asthma, that if

11  he did become somewhat physical, that it would actually help

12  improve his lung capacity for him to pass air through his

13  lungs.

14  Q.   So although it might be harder for him, in the long run it

15  might be better for him?

16  A.   Yes, that's what I was told.

17  Q.   When was Coop's first diagnosis of asthma, if you can

18  remember?

19  A.   I would say it was around two or three.

20  Q.   2003?

21  A.   No, two or three years old.

22  Q.   Okay.  Do you remember who made that diagnosis?

23  A.   Dr.  Richard LeBoeuf.

24  Q.   What sort of treatment -- let's take him from age two or

25  three -- has he had to have for his asthma as he has grown?

1   A.   Well, he's had albuterol.  He's had Pulmicort steroid.

2   Q.   Can I stop you there, Alana?

3   A.   Sure.

4   Q.   Now, we've heard a lot about this Pulmicort -- or I'm

5   probably mispronouncing it, but I think we all know what I'm

6   talking about.  That's a steroid?

7   A.   Yes.

8   Q.   That's a steroid that you use with a nebulizer?

9   A.   Yes.

10  Q.   Tell us -- and I think we know -- but what is a nebulizer?

11  A.   A nebulizer is a machine, and it, like -- it puts the

12  medicine in a mist form so when the child inhales, he's able to

13  inhale the medicine deeper down into the lungs.

14  Q.   Now, do you also use the nebulizer for the albuterol too?

15  A.   Yes, when he was younger.

16  Q.   Okay.  Were you also provided during the treatment, as he

17  got older, with steroids that weren't used with a nebulizer?

18  A.   Yes.  When he got older, it came, like -- it came, like,

19  in the form of a cough syrup.  It was in a syrup form.

20  Q.   Some when he was younger, it was nebulizer for the

21  steroid; but as he got older, there was some sort of oral

22  medication?

23  A.   Yes.  That was Prednisone.

24  Q.   Have you always been interested in this young fellow's

25  care?

1  **A.**   Of course.

2  **Q.**   I mean, do you feel like raising a child with asthma, that

3  you know what you're doing?

4  **A.**   Yes, I do.

5  **Q.**   If you don't know what you're doing, what do you do?

6  **A.**   I bring him to the emergency room.

7  **Q.**   You also have discussions with your doctors?

8  **A.**   Yes.

9  **Q.**   Let's just get it out there:  Have you always done, at

10  least in light of the circumstances, the best you could to

11  follow the doctors' recommendations with regard to the

12  treatment of Chris?

13  **A.**   Yes, I did.

14  **Q.**   Now, have you ever gone through a formal asthma education

15  program?

16  **A.**   Not a formal one.  I've had the doctors sit and explain to

17  me how to treat his asthma and how to keep it under control.

18  **Q.**   Okay.  When you were asked in your deposition about

19  whether you had -- you had gone through an asthma education

20  program, is that what you're talking about?

21          **MR. WEINSTOCK:**  Objection, Your Honor.  It's leading

22  and referring her back to her own deposition to lead.

23          **THE COURT:**  Yes.  It's an improper question for both

24  of those reasons.  Let's rephrase.

25

1  **BY MR. BUZBEE**

2  **Q.**   Do you consider what you just described an asthma

3  education program?

4  **A.**   Yes, I would.

5  **Q.**   All right.  Let's go back in time to August 29th of 2005.

6  I'm sure you remember that day.

7  **A.**   I remember it well.

8  **Q.**   Tell the ladies and gentlemen where, at that time, you

9  were living?

10  **A.**   I was living in a house on Dale Street that my daddy had

11  built when he was 18.

12  **Q.**   How long had you been in that house?

13  **A.**   All my life.

14  **Q.**   And you were living there with Coop and Erika?

15  **A.**   And my sister and her two children.

16  **Q.**   Okay.  And that's --

17  **A.**   Debra.

18  **Q.**   -- Debra.  Okay.

19        Did you evacuate?

20  **A.**   No.

21  **Q.**   Should have?

22  **A.**   Yeah.  Hindsight, yes.

23  **Q.**   Right.

24        But you ended up -- and the judge -- because of time,

25  we don't want to go through your journey.  But because of time

1   purposes, let's just fast-forward to you're in Florida with
2   your family.
3   **A.**   Okay.
4   **Q.**   Where did you live in Florida?
5   **A.**   When we first got to Florida, there was a program that
6   they had set up for Katrina evacuees, that if you went into
7   this apartment complex, you had the first month for free.
8           And my other brother -- because I had three brothers
9   living in Florida.  So one of my brothers in Florida, Darryl,
10  he had gotten the information from it -- about it, I should
11  say.  And I went into one of those apartments when we first got
12  there.
13  **Q.**   And how long did you stay in that apartment?
14  **A.**   I would say probably, I think it was like maybe three
15  months, I want to say.
16  **Q.**   And did you stay there and come back, or did you go
17  somewhere else?
18  **A.**   Well, actually, I then moved to my other brother's,
19  Wayne's, house that was in Florida.
20  **Q.**   And all total, how long did you-all stay in Florida?
21  **A.**   I think it was nine months.
22  **Q.**   Now, when you evacuated to Florida, were you able to take
23  Coop's medication with you?
24  **A.**   Not all of it.  I had grabbed the bag that I always would
25  carry with me to work.  And in that bag I had an inhaler that I

1    would keep with me while we were at school together.

2    **Q.**    How about any other medication other than that one

3    inhaler?

4    **A.**    No.  And it wasn't a full inhaler.

5    **Q.**    And you-all were in Jacksonville?

6    **A.**    Yes.

7    **Q.**    Now, Chris actually entered school in Florida?

8    **A.**    Yes.

9    **Q.**    When you enrolled Chris into school in Florida, Exhibit

10   19, which is already in the record, there was a questionnaire

11   about his eyes, and itching and burning and feeling scratchy.

12            Do you remember filling this out?

13   **A.**    Yes.

14   **Q.**    Okay.  You didn't mark any of those, did you?

15   **A.**    No.  Because at that time he wasn't having all that.

16   **Q.**    So he wasn't having any problems in Florida with anything

17   regarding his eyes?

18   **A.**    Correct.

19   **Q.**    Okay.  Now, in a minute I'm going to talk to you about why

20   you-all left Florida.

21            But could you compare his grades -- Coop's grades in

22   Florida versus the grades he was making in New Orleans?

23   **A.**    When we got to Florida, Christopher went down

24   considerably.  When he was here in New Orleans, he was in

25   second grade, starting third, so he was doing, I guess what you

 1   could say was equal and very good for those grades.

 2            But when we got to Florida, he went down drastically.

 3   **Q.**   Let's take a look at this Exhibit 19.  Of course, it says

 4   he's a good citizen.  And that's a true statement, isn't it?

 5   **A.**   Yes, it is.

 6   **Q.**   But his grades are horrid, aren't they?

 7   **A.**   Yes, they're terrible.

 8            **THE COURT:**  Mr. Buzbee, would you-all approach,

 9   please?

10            **MR. BUZBEE:**  Yes, sir.

11            (WHEREUPON, the following proceedings were held at

12   the bench.)

13            **THE COURT:**  Why is this relevant?

14            **MR. BUZBEE:**  As to why she left Florida and came

15   back.

16            **THE COURT:**  Can't we get to the part where they came

17   back?  I'm not -- I'm not understanding why we're reviewing his

18   report card for the jury.

19            **MR. BUZBEE:**  Well, Your Honor, because there's an

20   issue about whether she could have lived other places.  And

21   you're going to see it in the cross-examination.  I already

22   know what's coming.  I've seen the deposition.  So you'll see

23   why this is relevant when they start cross-examination.

24            **THE COURT:**  Is that correct, there's going to be a

25   lot of questioning that goes to her motivation for returning

1  here?

2          **MR. WEINSTOCK:**  Not a single question on that, Your

3  Honor.

4          **MR. BUZBEE:**  She could have lived elsewhere.  She

5  could have done this, she could have done that.

6          **MR. WEINSTOCK:**  We asked those questions in the

7  deposition, but it's not coming in.  I'm not asking her that.

8          **THE COURT:**  Respectfully, I think you should save it

9  for redirect.  Because I think we're getting -- the perception

10  I'm feeling from the jury, and myself, is that you're examining

11  his grades, and that appears to have no relevance at this

12  point.  So let's fast-forward.

13          **MR. BUZBEE:**  Okay.

14          (WHEREUPON, the following proceedings were held in

15  open court.)

16  **BY MR. BUZBEE**

17  **Q.**    Alana, at some point you were in contact with FEMA, as I

18  understand it, when you were Florida; is that right?

19  **A.**    Yes.

20  **Q.**    Tell us why -- what you learned from FEMA, and why you

21  came back.

22  **A.**    Well, I was contacting FEMA because when -- initially,

23  when we left for the storm, you had to fill out a whole bunch

24  of information for FEMA.  And I had mistakenly put something

25  wrong on the application.  And so I was in contact with FEMA to

1   try to fix that.  But I was never able to fix that.

2          So I came back -- and then you asked me about when I

3   came back home; right?

4   Q.   Yes.  Let's just get -- we've got to try to move it along.

5   A.   When I came back -- I came back home because, first of

6   all, it's home.  New Orleans is home.  And I never really felt

7   comfortable in Florida.  So I needed to come back where I could

8   be with my mom and my dad and all of my support.  And I needed

9   to come back and find my job -- get my job back.  I needed to

10  come back to give stability to my children.  Because it -- I

11  saw too much of a change in them in Florida.

12  Q.   Okay.  Now, let's talk about when you came back.

13          When did you first see that trailer?

14  A.   First day we pulled up.

15  Q.   Okay.

16  A.   It was in the yard.

17  Q.   And where was it sitting?

18  A.   It was on the driveway at 4415 Dale Street.

19  Q.   We've seen pictures.  It was sitting essentially right

20  there in the driveway?

21  A.   Yes.

22  Q.   Tell us about your experience when you first went inside

23  that trailer.

24  A.   Well, first of all, we were happy because we were home and

25  we had somewhere to stay.  And I walked into the trailer.  And

1   as soon as we walked in the trailer, we noticed that it had a

2   real strong smell.  And it kind of greeted you, you know, when

3   you walked in the door.

4           And so we walked around a while.  And while we was

5   walking around in there, we noticed that our eyes started

6   running and burning, and we had like a tickling, burning

7   sensation in our nose and in the back of our throat.

8           And we walked around the trailer.  And when I -- you

9   know, we was just looking over everything in the trailer.  And

10  when I went into what they call the master bedroom, I first

11  noticed that it had a really nice big bed in there.  And there

12  was like a crack in the wall where the wall had separated.

13  Q.   From what you saw in the trailer when you first went into

14  it, did it appear to you that it had been lived in before?

15  A.   No.  I thought it was brand new because it had all of

16  those -- you know when you get new appliances and it has that

17  bluish tint plastic across the appliances?  And they had that

18  on the microwave, the stove.  And the refrigerator was taped

19  shut.

20  Q.   When you smelled that smell, did you know what that was?

21  A.   No.

22  Q.   How did you deal with it?

23  A.   About a day or two later, the lady came in -- I'm not sure

24  from where -- or for whom, I should say -- and she walked us

25  around the trailer told me about the propane and everything,

 1   and I mentioned it to her.  And she said, "Well, that's because

 2   it's new.  Just open up the windows and leave the door open and

 3   turn the air conditioner on and it will blow it out."

 4   Q.   She instructed you to open all the windows and turn the

 5   air on?

 6   A.   Yes.

 7   Q.   Now, the windows don't open all the way, do they?

 8   A.   No.  If this is closed -- if this is closed, when you open

 9   the window, it goes like that.  It doesn't go up like a regular

10   window.

11   Q.   Let's take a look.  This is one of Gulf Stream's

12   documents.

13        When they say open these windows, what they're

14   basically -- how far open would those windows open?

15   A.   I would say maybe two, three inches.

16   Q.   And as far as fans in that trailer, other than -- lay

17   aside the air conditioning unit.  How many fans are in that

18   trailer?

19   A.   Just the one -- you don't see it on this picture, but

20   there's one in the bathroom.  You would have to crank the

21   little vent open and then turn the fan on.

22   Q.   I'm showing the jury what's going to be 323-D.  Is that

23   the fan you're talking about?

24   A.   Yes.

25   Q.   Is that the only fan in that trailer?

1  A.    The only fan like that.  Now, there's the exhaust fan over

2  the stove.

3  Q.    For cooking?

4  A.    Yes.

5  Q.    Okay.  Are there even any vents in the ceiling?

6  A.    No.

7  Q.    And did you -- when you lived in that trailer, did you

8  leave the bathroom door open?

9  A.    No, I don't like to leave the bathroom doors open.

10  Q.    Now, when you got to the trailer, were you provided an

11  owner's manual?

12  A.    Yes.

13  Q.    Did you read it?

14  A.    Yes.

15  Q.    Was there anything whatsoever in that owner's manual that

16  said anything whatsoever about formaldehyde?

17  A.    No.

18  Q.    Now, you talked about this smell that made your eyes burn.

19  We already know you lived in that trailer for 19 months.

20  A.    Correct.

21  Q.    How often did you smell that smell?

22  A.    I smelled it every day we were there.  As time went on, it

23  got lighter and lighter and lighter.  But it never totally went

24  away.  It just got real faint towards the end.

25  Q.    You mean right before you moved out?

1   A.   Yes.

2   Q.   And when you would come -- you would work a full day; is

3   that right?

4   A.   Yes.

5   Q.   And the children would go to school all the way until

6   5:00?

7   A.   Yes.

8   Q.   What was your standard practice or procedure when you

9   would come back to the trailer?

10  A.   We'd come home in the evening and I would open everything

11  up, turn the air conditioning on for a little while.  Usually

12  started cooking shortly thereafter.  But after the smells would

13  dissipate a bit in the trailer, I would turn it off and

14  continue to cook every day.

15  Q.   And did you leave the windows open 24 hours?

16  A.   Oh, no.

17  Q.   Did you leave the door open 24 hours?

18  A.   No.

19  Q.   Why not?

20  A.   The neighborhood I live in, you wouldn't do that.  And I

21  mean -- when we first came back, so many things were happening.

22  They had strange people walking through the neighborhoods and

23  everything.  So for safety reasons, I didn't know if these

24  people -- who they were, or if they were going to take my

25  children, or what.  So, no, at night we would close the doors

1  and windows.

2  **Q.**   So at night when you-all would sleep, would you run the

3  air?

4  **A.**   Yes.

5  **Q.**   But you would have all the windows shut down?

6  **A.**   Yes.

7  **Q.**   Did this person who you first met who told you the smell

8  was no big deal, did they tell you that you should leave the

9  windows open 24 hours?

10         **MR. WEINSTOCK:**  Object to the form, Your Honor.  It's

11  leading.  Most of it's been leading.

12         **THE COURT:**  I'm going to sustain the objection.

13  Please don't lead this witness, who is your client.  Please

14  don't lead the witness.

15         **MR. BUZBEE:**  Yes, sir.

16  **BY MR. BUZBEE**

17  **Q.**   What, if any, instructions did this individual give you

18  about how long you're supposed to leave the windows open?

19  **A.**   All she said was to air it out.  She never really said

20  how.

21  **Q.**   Now, did you observe anything unusual about Erika during

22  the time you-all were living in that trailer?

23  **A.**   Yes.  Erika developed nosebleeds.  And she had the runny

24  eyes and the -- the itching nose, and the burning sensation in

25  her nose and everything like that.

1  **Q.**    Okay.  Here's my problem with that:  One of your babies

2  who's living in this trailer with you has nosebleeds?

3  **A.**    Yes.

4  **Q.**    Why didn't you get out?

5  **A.**    Because Erika had sinus issues prior to the storm, so I

6  just assumed it was her sinuses and the drying out of the

7  sinuses and the nose would start bleeding.

8  **Q.**    Did you have any idea at the time that any issue Erika was

9  having was related to that smell in the trailer?

10          **MR. WEINSTOCK:**  Object to the form, Your Honor.  It

11  calls for a medical opinion.

12          **THE COURT:**  Well, it's asking her -- I'll overrule.

13  If she knows.  He's asking her on what -- her suspicion as a

14  parent.  So I'll allow her to answer.

15          **THE WITNESS:**  Could you say it again, please?

16  **BY MR. BUZBEE**

17  **Q.**    Yes.  And I'll use that word.

18          Did you have any suspicion, inkling, any idea

19  whatsoever that any issue Erika was having was related to

20  living in that trailer?

21  **A.**    No, I did not.

22  **Q.**    If you would have known that, what, if anything, would you

23  have done?

24  **A.**    We would have moved out.

25  **Q.**    What about your observations with regard to Chris?  Did

1  you notice anything -- what, if anything, did you notice about
2  him?
3  A.   Well, Christopher was a little different.  Christopher's
4  eyes constantly ran.  They were constantly running.  His nose
5  was constantly running.  I noticed that we started using the
6  inhaler more often.  He would -- he would -- he wasn't as
7  energetic as he was before.  He laid down a lot.  And he didn't
8  do as much as he used to do prior to it, being in the trailer.
9  Q.   Now, at the time -- at the time you were in that trailer,
10 did you relate any of those issues to the trailer?
11 A.   No.
12 Q.   If you had thought at the time you were in that trailer
13 that this smell had anything to do with any issue with Chris,
14 what, if anything, would you have done?
15 A.   Probably we all would have moved out.
16 Q.   Now, there's been some talk in this case about -- you had
17 a number for FEMA?
18 A.   Yes, I did.
19 Q.   Why didn't you -- did you call up and complain?
20 A.   No.  Like my child, I'm not a complainer.  And since the
21 lady told us to air it out and everything would be okay, that's
22 what I constantly did.  I constantly aired it out.
23 Q.   You happy to be in that trailer?
24 A.   Yes, I was, because I was happy to come back home.
25 Q.   Did you believe that living in that trailer caused any

1    danger or future problems for your son or daughter?

2    **A.**    You're asking me, do I believe that right now?

3    **Q.**    No.  I'm talking about when you were in the trailer.

4    **A.**    Oh, no, I didn't believe that then.

5    **Q.**    Now, before you moved into the trailer, you guys lived in

6    that same area, obviously?

7    **A.**    All my life.

8    **Q.**    Did Chris or Erika have any of those types of problems

9    living in that same area before the storm?

10   **A.**    They had some allergy problems, but not like that constant

11   runny eyes, nose burning, none of that stuff like that.

12   **Q.**    Could you have just opened the windows and left the door

13   open and run the air conditioner 24 hours?

14   **A.**    No.  For reasons like I said, safety reasons.  And I

15   couldn't afford to run the air conditioning constantly with the

16   windows wide opened, no.

17   **Q.**    If you would have known that -- if you would have believed

18   at the time that that smell or that lingering smell would have

19   caused your son problems, would you have done that?

20   **A.**    To be honest, probably not.  I would have moved.

21   **Q.**    What color were the walls of that trailer?

22   **A.**    They were a beigey-looking color.

23   **Q.**    You sat in here when we talked to that purchasing agent

24   for Gulf Stream.  Do you remember we talked to him about this

25   color Beck Sand, and he said it was taupe?

1  A.    Yes, I remember that.

2  Q.    And then he told us that means beige?

3  A.    Yes, he did.

4  Q.    And are you telling us now that the color of your paneling

5  were taupe or beige?

6  A.    Yes, it was.

7  Q.    Now, Mr. Mallet was here last week.  It seems like a long,

8  long time ago.  And he showed us a ton of pictures about the

9  condition of this trailer.

10          Could you tell us whether the condition that he

11  showed us were there while you were living in the trailer?

12  A.    Yes, it was there when I was living in the trailer.

13  Q.    All right.  We know that the wall was popped in the

14  bedroom when you moved in.  But what about the other wall that

15  he described; when did that happen?

16  A.    I'm not sure which wall you're talking about.

17  Q.    I think there was a wall in the bathroom, if I'm not

18  mistaken.

19  A.    Oh, yes.  The wall in the bathroom came about maybe four

20  months while we were in there.

21  Q.    What about -- we saw a lot of tape?

22  A.    Yeah.

23  Q.    Is that your fix?

24  A.    Yes.  Because when I initially showed the lady the first

25  crack in the wall when we first was there, she told me to go

1    ahead and put duct tape on it.  So then I was like, okay,

2    another panel come loose, so I'll just use the same remedy she

3    told me the first time.

4    **Q.**   Did you ever experience any leaks in the ceiling?

5    **A.**   Unfortunately, yes, it was right over the bed.

6    **Q.**   How often did that occur?

7    **A.**   Every time it rained.

8    **Q.**   Did it ever get fixed?

9    **A.**   They came out and they fixed it one time.  And the man

10   told me -- he said, "I don't -- well, he didn't tell me.  I

11   should take that back.

12           He told my mama, because my mama was there at the

13   time.  He told my mama that they didn't think that they had

14   gotten the leak --

15           **MR. WEINSTOCK:**  Objection, Your Honor.

16           **THE COURT:**  Yes.

17           **MR. BUZBEE:**  Let's move on to --

18           **THE COURT:**  Yeah.

19           **MR. BUZBEE:**  I'm sorry.  I figured we'd get past it

20   and go on.

21           **THE COURT:**  Let me guess which one it is.

22   **BY MR. BUZBEE**

23   **Q.**   Let's move past that.  Suffice it to say, the leak was

24   never fixed?

25   **A.**   Correct.

1  Q.    And suffice it to say, you don't know where it was coming
2  from?
3  A.    No, I didn't.  All I know is it was dropping on my head
4  over the light fixture.
5  Q.    Okay.  We heard some testimony about the -- there was some
6  hole in the bottom of the trailer.  Tell us about that.
7  A.    We had mice in the trailer.  And under the trailer, you
8  know, the pipes come in the walls like this.
9  Q.    Right.
10 A.    And the hole around the pipes was actually bigger than the
11 pipes itself.  And so the mice would get in between the pipes
12 and actually come up through the bathroom or behind the
13 cabinet -- or behind the toilet, I should say.  And sometimes
14 they would come in through the air vents that were down on the
15 bottom part.
16         And so what I did was I crawled up under the trailer.
17 And I've always been told that mice can't eat through steel
18 wool.  So I put the steel wool all around in those holes that I
19 found under there.  And then I took that expanding insulation
20 stuff and sprayed it in there, and it swolled up and it
21 actually pushed the steel wool further up.  And then I put my
22 usual gray tape around that area and kept everything up.
23 Q.    What kind of housekeeper are you?
24 A.    I would say a pretty good housekeeper.
25 Q.    Is a clean house important to you?

1  A.    Yes.

2  Q.    Did you have mice in your house before the storm?

3  A.    Yes, but not like they were in that trailer.

4  Q.    We also saw some pictures of the trim popping off.

5  When -- what time period did that occur?

6  A.    That happened even -- that happened after the one in the

7  bathroom, actually.  And -- because when it rained, the water

8  would come in around the doors, and that started popping off.

9  Q.    Is that because you had the door opened when it rained?

10  A.    No, I would close the door when it rained.

11  Q.    It just leaked around the door?

12  A.    Yes.

13  Q.    What about that -- we already saw the tape around the

14  molding of the door.

15         What about that space as you walk in that's kind of

16  soft, when did that occur?

17  A.    That happened even after that.  Because it was almost like

18  a progression thing.

19  Q.    Well, it looks like, when I look at the pictures, you guys

20  abused the devil out of this trailer?

21  A.    No, we didn't.  I mean, average, everyday living with two

22  children in a trailer.  And you-all seen how small the trailer

23  is.  So you have three people in there every day, so there was

24  going to be some good use put to the trailer.

25  Q.    By you weren't in there jumping up and down and trying to

1  ruin it or anything?

2  **A.**   No.   It was a trailer.   No.

3  **Q.**   We saw some pictures about the condensation on the ceiling

4  and around the air conditioning unit?

5  **A.**   Yes.

6  **Q.**   Did you ever see that when you were using the trailer?

7          **MR. WEINSTOCK:**  Objection, Your Honor.   Leading.

8  He's continuing to lead.

9          **MR. BUZBEE:**  I don't think so.

10          **THE COURT:**  We've already seen the pictures.   The

11  question was:   Did she ever see that while she was living

12  there?   I'll overrule.

13          **THE WITNESS:**  Yes, I saw that.   We used to wipe it

14  off with a towel.

15  **BY MR. BUZBEE**

16  **Q.**   At any point, did you ever have any mold issues in the

17  trailer?

18  **A.**   Yes.

19  **Q.**   Tell me about that.

20  **A.**   The closet that was in the master bedroom area, along --

21  because it was strange how it was, because it was made on a --

22  it was flat on the top, and then it angled down like this.   And

23  in the corners and on the floor part of it, it was mold in

24  there.   And that little nightstand that they had next to the

25  bed on this side, they had mold forming on the bottom parts

1  over there.

2         And then there was mold around the windows, the way

3  the windows were, that rubber caulking -- I don't know what it

4  is -- but the rubber around it.  And then it was like a little

5  well.  When you would close the window, the window would fit in

6  that well, and there was mold building up in that area also.

7  **Q.**   What, if anything, did you do about that?

8  **A.**   Well, being in New Orleans, and after Katrina, every day

9  you've been told to use a little bleach water solution to wash

10 the mold off.  And that's what I did on the windows and the

11 closet area.

12 **Q.**   So instead of calling and complaining, you just dealt with

13 it?

14 **A.**   Yeah.

15 **Q.**   Now, do you recall when you moved out of the trailer?

16 **A.**   I moved out in December of '07.

17 **Q.**   Can you tell the ladies and gentlemen of the jury why you

18 moved out of that trailer?

19 **A.**   I moved out of the trailer because I started hearing more

20 and more about the problem that was going on with the

21 formaldehyde.  And I was trying to find out more about

22 formaldehyde.

23        And when I realized that the smell that we smelled

24 when we first got in there was formaldehyde, and then I started

25 putting two and two together with all of the problems that my

1  children were having and everything, I was like, it's time for
2  us to go.
3  Q.   Okay.  Now, do you recall ever receiving any notices from
4  FEMA?
5  A.   Yes.
6  Q.   When did you receive a notice from FEMA?
7  A.   It was around the time that I made the decision to move,
8  which would have been in, like, late November, early December
9  time.
10  Q.   Okay.  At around the time you received the notice from
11  FEMA, were you -- what information, if any, were you getting
12  from other sources?
13  A.   Well, on the news it was saying that the formaldehyde --
14  the smell that we were smelling would agitate people who were
15  asthmatic, older people who were -- you know, had any kind of
16  other problems, and the possibility that there could be cancer.
17  Q.   Now, I understand that there was some sort of church
18  meeting?
19  A.   Yes.
20  Q.   Tell me about that.
21  A.   There was a meeting called at our church.  My mom told me
22  about it, and I went to the meeting.  I went late because it
23  was after work one day.  And they were talking about people who
24  had been living in the trailer, and things that was going on in
25  the trailer.

1  **Q.**   Okay.  This notice, church meeting, TV program, all

2  happened about the same time?

3  **A.**   All roughly in the same time frame, yes.

4  **Q.**   Let me ask you something:  If you had known when you were

5  in Florida, if you had been told in Florida, "Listen, we've got

6  this trailer for you.  It's got formaldehyde in it.  It might

7  make asthmatics worse.  It might have long-term issues with

8  regard to cancer or other problems," would you have moved from

9  Florida and moved into that trailer?

10          **MR. WEINSTOCK:**  Object to the form, Your Honor.  It's

11  leading and in the form of summation of closing argument.

12          **THE COURT:**  Yes, it is.  I agree.

13          **MR. BUZBEE:**  May we approach, Your Honor, on that

14  issue?

15          **THE COURT:**  Let's go ahead and move on.

16          **MR. BUZBEE:**  Okay.

17  **BY MR. BUZBEE**

18  **Q.**   Suffice it to say, you wish you would have known that

19  information before you moved in?

20  **A.**   Yeah.  I would have made an informed decision.

21  **Q.**   Now, let me show you what has been marked as 163.

22          **MR. BUZBEE:**  Carl, can you help me out here, please?

23  Carl, if you don't mind --

24  **BY MR. BUZBEE**

25  **Q.**   Is this one of the notices or the notice from FEMA you

1   think you saw?

2   **A.**   I think that could be it.

3           **MR. BUZBEE:**  Carl, will you bring it up so we can

4   look at the highlighted portion?

5           All right.

6   **BY MR. BUZBEE**

7   **Q.**   Prior to getting what you think was this notice, had you

8   ever been provided the information we see in the highlighting

9   before?

10  **A.**   No.

11  **Q.**   Has anyone ever told you that there might be some risk of

12  cancer from living in the trailer.

13  **A.**   Not prior to me receiving me this in here in the evidence,

14  no.

15  **Q.**   When you got this notice, did some of the issues Chris was

16  having make sense to you?

17  **A.**   Yes.  And Erika.

18  **Q.**   Now, we're going to hear a deposition from a fellow by the

19  name of Michael Harder from FEMA who says he delivered this

20  notice that we just saw in July.  July 21st of '07.

21          Did you receive this notice on July 21st of 2007?

22  **A.**   No, I did not.

23  **Q.**   How do you know?

24  **A.**   Because if I would have received this, knowing what I --

25  you know, saying about the children and their symptoms that

1   they were having, I would have moved out immediately.

2   Q.   Where would you have went?

3   A.   By that time I was working, so I would have been able to

4   afford more the rents that were being asked for.  I could have

5   went by my -- my mom and them had moved into a new -- not new,

6   but one of the houses that my daddy had, and they had room for

7   us there.  Or I could have went next door in the barbershop

8   with my sister.

9   Q.   It might not have been comfortable, but you would have

10  gotten out?

11  A.   Oh, yes.

12  Q.   Now, Mr. Harder says on July 21st of 2007, he dropped this

13  notice off at an unoccupied trailer.

14          Was your trailer occupied on July 21st of 2007?

15  A.   Yes.

16  Q.   What -- other than the trailer sitting up there on blocks,

17  what other things did you have there at the trailer that

18  anybody with any horse sense would know that the trailer was

19  occupied?

20  A.   Garbage cans sitting next to -- right next to the steps,

21  because Christopher didn't like to go put the trash out at

22  night, so I kept it close.  I had a basketball goal because

23  Erika was trying to get herself into basketball at school.  I

24  had a pink flamingo, and a barbecue grill, and I had lawn

25  chairs out.

1   **Q.**   Okay.  Now, on July 21st of '07, right next to where you

2   lived, was there an unoccupied trailer?

3   **A.**   Yes.

4   **Q.**   How far away from your trailer?

5   **A.**   Three doors down.

6   **Q.**   And you're absolutely sure, in July, despite what

7   Mr. Harder might say, where he says he taped this to an

8   unoccupied trailer that was yours, no doubt about, it you were

9   not only living in that trailer, you didn't get the notice?

10  **A.**   Correct.

11  **Q.**   Now, do you remember how you got this notice that we've

12  marked as 163?

13  **A.**   If I'm not mistaken, it was taped to the door.

14  **Q.**   But just several months later?

15  **A.**   Yeah.

16  **Q.**   Now, you saw me earlier show defendant's, the Gulf

17  Stream's time line.  And I've marked out -- there was a

18  document -- and I'm sure Mr. Weinstock will show it to you --

19  that states that Chris went to the ER February/March of '05.

20          Do you remember him showing us that document?

21  **A.**   Yes.

22  **Q.**   Did Chris go to the ER in February/March of '05, that you

23  know about?

24  **A.**   No, he didn't.  That was actually a mistake on my part

25  when I filled out that paper.  It was actually like the

1    beginning of '04.

2    **Q.**   So it would be -- actually, what you're referring to is

3    the January '04?

4    **A.**   Yes.

5    **Q.**   Okay.  So leading up to Hurricane Katrina, the last time

6    that Christopher had been to the ER would have been January of

7    '04?

8    **A.**   Yes.

9    **Q.**   18 months prior?

10   **A.**   Yes.

11   **Q.**   Now, let's talk about how often before the storm Chris

12   would use the nebulizer.

13          Okay.  Now, he would use the nebulizer -- I'm talking

14   about right before the storm -- for the albuterol, not for

15   the -- for the steroid; is that right?

16   **A.**   No.  That was -- the nebulizer was mostly used for the

17   steroid.

18   **Q.**   Okay.

19   **A.**   When he was younger.

20   **Q.**   Okay.  Let's talk about, though -- when you say he was

21   younger, are you talking about right before the storm?

22   **A.**   No.  I'm talking about even prior, before that.

23   **Q.**   Let's fast-forward, so we can get to the end, sometime in

24   the year 2005.

25   **A.**   Okay.

1   **Q.**   Was he using a nebulizer at that point?

2   **A.**   No.

3   **Q.**   Was there ever a time during that point that you can

4   recall him using a nebulizer?

5   **A.**   No.

6   **Q.**   Was he taking -- was he getting the steroid then?

7   **A.**   Yes, he was.

8   **Q.**   How often?

9   **A.**   Once a day.  But when they prescribed the steroid to

10  him -- yeah, prescribed to him, I was given the instruction

11  that it was like a four-day regimen.  And then after the four

12  days, then you would stop the steroid.

13  **Q.**   And how often would you do this regimen?

14  **A.**   It was only after, say, one of those instances when he

15  went to the hospital, they would give additional steroids over

16  those four days, and then I would stop because that's when he

17  told me to stop the steroid.

18  **Q.**   He wasn't instructed to do a nebulizer every day before

19  the storm?

20  **A.**   Not when he got a little -- not when we got closer to -- I

21  guess you could say to the storm, no, he wasn't.

22  **Q.**   And based on your observation of him, how was his asthma

23  right before the storm?

24  **A.**   Actually, it was getting better.

25  **Q.**   Is that the reason you didn't have to use the nebulizer

1   anymore?

2   **A.**   Yes.

3   **Q.**   All right.  Now, when you evacuated, you've already told

4   us you had a little bit of one inhaler?

5   **A.**   Yes.

6   **Q.**   When you got to Florida -- we've already seen the

7   record -- did you go and obtain any inhalers or any other

8   medication?

9   **A.**   Yes.  Because I had -- since I didn't have the

10  prescription with me, I was able to call Walgreens.  And I had

11  one left that Dr. Barnes had prescribed before the storm, and

12  they refilled that.  And since I had to give one to the school,

13  it was given to the school.

14          So I'm always a person, I like to keep enough of his

15  medicine so it really doesn't ever really run out.  So when he

16  started getting short on something, I would either get another

17  refill to be prepared.  Or if I had to go to a doctor, I would

18  make an appointment to -- so that I could get more scrips and

19  more refills done.

20          So while we were out there, I had to give the one

21  full one that I had to the school.  I made an appointment with

22  the doctor out there in Florida so I could get more scrips --

23  more prescriptions, I should say.

24  **Q.**   And how many inhalers did the doctor out there give you?

25  **A.**   He initially -- he gave me two.  And I -- we lost one.  So

```
 1   I got another one refilled.  And then when we were about to
 2   leave, I got the one back from the school.  So when we actually
 3   left Florida, I had a total of four inhalers.
 4   Q.   How often did Chris, in your observation, use the inhaler
 5   when he was out in Florida?
 6   A.   Not often.  Maybe once a month.
 7   Q.   And when you -- when you left Florida, how many inhalers
 8   did you have in hand?
 9   A.   Four.
10   Q.   Now, when you're in Florida, you were prescribed -- or
11   Chris was prescribed some other kind of medication?
12   A.   Yes.
13   Q.   What was it?
14   A.   Advair.
15   Q.   What did you understand that to be, at least from what the
16   doctor told you?
17   A.   I understood it to be a steroid.
18   Q.   Did you give that, or did he use that?
19   A.   Yes, he did.
20   Q.   And tell me what happened.
21   A.   When he was using it, Christopher came to me one day and
22   he said, "Mama, I don't like this new medicine.  It makes me
23   not feel like me."
24        And at first, I told him, I said, "Well, let's give
25   it a little time.  Let's see if things change."  You know,
```

1   because sometimes you just got to get used to the new medicine.

2   And over time, he still kept saying, "Mama, I don't feel like

3   me."

4          And then when I read everything further -- when they

5   give you the paper with all of the side effects on it, and when

6   I read that it did have some kind of emotional changes, and all

7   these other kind of problems that went along with it, I took

8   him off of it.  Because it to me felt like it was too high of a

9   risk.

10  Q.   You've heard this term "black box warning."

11         Did you read the warning?

12  A.   Yes.

13  Q.   And was the warning part of your equation, in your mind,

14  to take him off?

15  A.   Yes.

16  Q.   Did Chris have any -- let's talk about what Chris' asthma

17  attacks -- we've heard this term "wheezing" and "asthma

18  attack."  But from your perspective, tell me how you categorize

19  his either attacks, or wheezing, or episodes, that sort of

20  thing.

21  A.   Well, in Christopher's case, even when he was little, he

22  would always say his chest itched.  That's how -- when he would

23  come to me and say, "Mama, my chest itches," I knew his asthma

24  was coming on.  And if he told me that, then I would say,

25  "Okay.  It's time for your albuterol.  Go take you two puffs."

1         He would take his two puffs, and usually the two

2    puffs would alleviate everything with that.  But I would keep

3    an eye on him anyway; and if it didn't progress, or if the two

4    puffs didn't alleviate the problem, then -- the prescription

5    says two puffs every four hours.

6         So if after four hours he still had this problem,

7    then we would do two more puffs after the four hours.  And if

8    it went even further after the four hours, I was usually

9    heading to the hospital by then.  Because then he had this --

10   they call it pulling, where he would take a deep breath, and

11   this part of his throat, like that, would sink in.  And if he

12   got to that point, we would go to the hospital.

13   Q.   So if the inhaler won't work, and you're in a full-blown

14   asthma attack --

15   A.   Straight to the hospital.

16   Q.   But you may have wheezing, but never go to the hospital?

17   A.   Yes.  Because the albuterol, with the two initial puffs,

18   would usually subside it.

19   Q.   And as I understand what you're telling me, hopefully,

20   just with the itching, a couple of puffs ends that before it

21   ever gets started?

22   A.   Yes.

23   Q.   Back to this Advair.  When you read that black box

24   warning, did you read that the Advair itself could cause asthma

25   to be worse?

1  **A.**   I did.  And I thought that was kind of strange that a

2  medicine that was supposed to stop it would cause it.

3  **Q.**   Did you do everything you knew to do to take care of your

4  son's asthma?

5  **A.**   Yes, I did.

6  **Q.**   Now, we've already heard some evidence of this.  But when

7  you came back into the trailer, was there some episode that

8  occurred -- or what, if anything, occurred in December of '06?

9  **A.**   Well, he had a wheezing episode.  And what I did was --

10  like I just said, did the albuterol every two -- excuse me,

11  every four hours, the two puffs.

12          At this point I had -- when this was happening, I

13  would tell him, you know, "Sit down, relax."  I wouldn't let

14  him outside.  He had to totally, like, chill.

15          And when he was younger, the doctors also told me

16  that to help alleviate some of the tightness in the chest, you

17  could steam them where you would bring them in the bathroom and

18  turn the hot water on and you would stay there, and it would

19  alleviate the problem a lot.

20          And I did that, and it did.  So in that case, we did

21  not have to go to the hospital for that case.  Because after

22  everything that I have been doing and knowing to do, it stopped

23  it.

24  **Q.**   So if we look on this time line, when you told the doctor,

25  in December of '07, about the last episode of wheezing, you're

1    referring to the wheezing episode in the bathtub?

2    **A.**    Yes.

3    **Q.**    Were you also telling the doctor there that he hadn't had

4    any problems with asthma for a year?

5    **A.**    Nothing major where I would go to the hospital.

6    **Q.**    Okay.  You just meant no hospital visits?

7    **A.**    Right.

8    **Q.**    Okay.  During the time that -- when you told us you had

9    four inhalers in that 17-month period --

10   **A.**    Yes.

11   **Q.**    -- how often would Chris use those inhalers?

12   **A.**    Well, when we first got back, it was pretty much normal,

13   and he would use it once a few months.  But as time progressed

14   and we were in the trailer, he had gotten up to using it

15   anywhere from two to three days a week while we was in the

16   trailer.

17   **Q.**    Did you know why?

18   **A.**    No.  I just thought it was just the fact that we were back

19   and -- but I didn't really know why.  And it was being

20   maintained, so...

21              **THE COURT:**  Mr. Buzbee, how much longer have you got?

22   We'll take our mid-afternoon break.

23              **MR. BUZBEE:**  Yes, Your Honor.  I've got about ten

24   minutes.

25              **THE COURT:**  Let's go ahead and cover that.  Let's

1  conclude.

2  BY MR. BUZBEE

3  Q.  Now, after -- did FEMA kick you out of that trailer?

4  A.  No, they did not.

5  Q.  Why did you leave the trailer?

6  A.  I left the trailer because, like I said, all of this stuff

7  that I started hearing about the possible effects, the

8  long-term effects on Christopher and his asthma, and Erika

9  being a female, and --

10         MR. WEINSTOCK:  Objection, Your Honor.  This part's

11  not relevant.

12         MR. BUZBEE:  It's relevant to what she had in her

13  mind.

14         MR. WEINSTOCK:  If we can approach first, I'll

15  explain more.

16         MR. BUZBEE:  Can I just withdraw the question so we

17  can finish?

18         THE COURT:  I'm going to overrule that.

19         MR. BUZBEE:  Okay.

20         THE COURT:  I think her reasons for leaving the

21  trailer are relevant.  So I'll overrule it.

22         MR. BUZBEE:  Thank you, Your Honor.

23  BY MR. BUZBEE

24  Q.  Go ahead and please finish.

25  A.  Well, and Erika's reproduction system as a girl, I was

284

1   just like, you know what, this is a little bit too much of a

2   risk right now.  We need to go.

3   Q.   And you moved to where?

4   A.   I moved to my sister Maria's house.

5   Q.   Now, when you were at Maria's house, did you have any

6   arrangement with her with regard to rent?

7   A.   Yes.

8   Q.   Tell us about it.

9   A.   I paid her $500 a month for rent, and I incurred all of

10  the food costs.

11  Q.   Now, is that what she wanted you to pay?

12  A.   No, not initially.

13  Q.   Tell me what she wanted.

14  A.   She initially wanted 1,100, because that was the going

15  rate for apartments in New Orleans at that time.

16  Q.   When you were with your sister Maria at her place, did you

17  apply for any assistance from FEMA?

18  A.   Yes, I did.

19  Q.   What did you apply for?

20  A.   I applied for renter's assistance.

21  Q.   How much?

22  A.   $1,100.

23  Q.   Did you receive it?

24  A.   No.

25  Q.   Okay.  So you applied for 1,100 because that's what she

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
 1    wanted, but you ended up only paying 500?
 2  A.   Yes.
 3  Q.   Now, you have recently moved?
 4  A.   Yes.
 5  Q.   Tell us about that real quickly.
 6  A.   I moved in -- I finally got my own house.  So I moved in
 7    Labor Day weekend and am in my own now.
 8  Q.   As the mother of Chris Cooper, do you believe that his
 9    asthma was made worse while he was in the trailer?
10  A.   I do believe that.
11  Q.   Are you bringing any claim for your own injuries -- your
12    own physical injuries?
13  A.   No.
14  Q.   I mean, you told us that the trailer caused your eyes to
15    burn, your nose.  But you're not asking the jury for money for
16    that, are you?
17  A.   No.
18  Q.   You've heard the testimony about cancer?
19  A.   Yes.
20  Q.   You don't talk to Chris about that, do you?
21  A.   No.  I -- I don't want to say downplay it, but I don't
22    stress it so he doesn't have, you know, that constantly
23    reminder that, I might get cancer.  So, no, I don't talk about
24    it.
25  Q.   What about you?  Do you think about that?
```

1   A.   Yes, I think about it.

2   Q.   Tell me what your thoughts are about it.

3   A.   Well, I'm like -- I feel guilty.  Because, as a mother,

4   I'm not supposed to -- I'm not supposed to put my children in

5   harm's way; and had I known everything about it, I wouldn't

6   have.  So if in some way this affects his music, and Erika with

7   having children, then I would have to say it's my fault.

8            But, in a way, you could say it's not because I

9   wasn't told everything in the beginning.

10           **MR. BUZBEE:**  I pass the witness.

11           **THE COURT:**  All right.  Why don't we go ahead and

12   take a ten-minute break.  We'll start up again around 3:35.

13           And, Ms. Alexander, if you could be on the stand

14   when we resume from the break, that would be appreciated.

15           **THE DEPUTY CLERK:**  All rise.

16           (WHEREUPON, the jury exited the courtroom.)

17           (WHEREUPON, the Court took a recess.)

18           **THE DEPUTY CLERK:**  All rise.

19           Bring the jury in now.

20           (WHEREUPON, the jury entered the courtroom.)

21           **THE COURT:**  All right.  You may be seated.

22           All right.  Now, Ms. Alexander, of course,

23   you're still under oath since prior to the break, and

24   Mr. Weinstock is going to ask you some questions.

25           You may proceed.

1                        CROSS-EXAMINATION

2   BY MR. WEINSTOCK

3   Q.   Ms. Alexander, Andy Weinstock.

4            We've never actually met?

5   A.   We haven't.

6   Q.   Good afternoon.

7            Some preliminary matters.  You generally kept the

8   trailer at 75 degrees; is that correct?

9   A.   Yes.

10  Q.   You heard your daughter say she pushed it down to 70 when

11  you weren't looking; is that correct?

12  A.   Yes.

13  Q.   Prior to the storm -- I think we've covered some of

14  this -- Chris had asthma that was treated with albuterol and

15  Pulmicort with a nebulizer; right?

16  A.   Yes.

17  Q.   You heard Dr. Barnes say she thought you were using the

18  Pulmicort daily; correct?

19  A.   Yes.

20  Q.   But you were actually only using it once a year; correct?

21  A.   The Pulmicort -- the Pulmicort was used when he was

22  younger.  When he got older, he was given Prednisone, and that

23  came in like a cough syrup.

24  Q.   Prior to the hurricane, you used the Pulmicort in the

25  nebulizer about once a year; correct?

1   **A.**   When he was younger.

2   **Q.**   Just -- just before the hurricane, you used the Pulmicort

3   in the nebulizer about once a year; is that correct?

4   **A.**   I can't say that's correct because we used the nebulizer

5   when he was younger.  And when he got older, he was on the

6   Prednisone, which is also a steroid, but it came in syrup form

7   and you didn't need the nebulizer with the Prednisone.

8              **MR. WEINSTOCK:**  May I approach, Your Honor?

9              **THE COURT:**  Yes.

10  **BY MR. WEINSTOCK**

11  **Q.**   All right.  Prior to the storm, you were using the

12  nebulizer and Pulmicort about once a year; correct?

13  **A.**   Yes, when he was younger.

14  **Q.**   Just before the storm?

15  **A.**   Then it would be no.

16  **Q.**   If I can read:  "How often would you use the nebulizer

17  machine?

18              "I would say maybe twice a year, maybe.

19              "Again, I'm speaking about just before the hurricane.

20              "Oh, if we're going just before the hurricane, maybe

21  once a year."

22              Was that your testimony, ma'am?

23  **A.**   Yes.

24  **Q.**   And your testimony is different today; is that right?

25  **A.**   No, I didn't say it was different.  I'm just saying, when

1    that question was asked of me, I was under the impression they

2    were meaning when he was younger.  When he was younger, he did

3    use the nebulizer.  I agree with you there.  But as he got

4    older, the nebulizer -- they gave him his steroid form in

5    liquid form, which was given by mouth like a cough syrup.

6    Q.   I can see where this is going.

7            You filled your prescriptions at Walgreens; right,

8    ma'am?

9    A.   Yes.

10   Q.   That's the only place you filled your prescriptions;

11   right?

12   A.   Yes.

13   Q.   You've reviewed the Walgreens records, or no?

14   A.   Not really.

15   Q.   Are you telling me that there's a prescription for

16   steroids in the Walgreens records other than the ones I went

17   through with Dr. Barnes?

18   A.   Not in the Walgreens record.  At one point -- I'm not sure

19   which doctor at the University Hospital had set me up where

20   you -- you know how you see on the TV where they have those

21   prescriptions and medicines delivered to your home?  I had --

22   that was going on for a while too.

23   Q.   And did you fill out a fact sheet in this litigation?

24   A.   Yes.

25   Q.   Not only did you fill out that fact sheet at your

1   deposition, you went through that fact sheet page by page; is

2   that correct?

3   **A.**   Yes.

4           **MR. WEINSTOCK:**  May I approach, Your Honor?  Page 17.

5           **THE COURT:**  Yes.

6   **BY MR. WEINSTOCK**

7   **Q.**   Okay.

8   **A.**   Okay.

9   **Q.**   Each pharmacy that has dispensed medication during the

10  last seven years, you answered Walgreens; correct?

11  **A.**   Yes.  But I didn't -- this company, I don't know if it was

12  a pharmacy or not.  It was somebody that the hospital set up to

13  deliver medicines to the house directly.

14  **Q.**   Without prescriptions, huh?

15  **A.**   I didn't have to go -- physically go to the drug store to

16  fill the prescription.

17  **Q.**   Hospitals do that all the time.

18          Now, you did state:  "I declare --

19  **A.**   Well --

20          **MR. BUZBEE:**  Your Honor, I'm going to object to that

21  kind of side bar and disrespect.

22          **THE COURT:**  Let's just ask her a question --

23          **MR. WEINSTOCK:**  Fair enough.

24          **THE COURT:**  -- and go on to the next question.  Get

25  an answer.  And if you want to direct her attention to

1    something, you can do that, then let's get an answer, and then

2    another question.

3    **BY MR. WEINSTOCK**

4    Q.   When I asked you in this fact sheet where you got

5    prescriptions from, you said:  "I declare under penalty of

6    perjury, subject to 28 U.S.C. 1746, that all of the information

7    provided in this plaintiff fact sheet is true and correct to

8    the best of my knowledge.

9            "And that I have supplied all documents requested in

10   Part 7 of this plaintiff fact sheet to the extent that such

11   documents are in the possession, custody or control -- or in

12   the custody, possession or control of my lawyers, and I have

13   signed the authorizations attached to this declaration."

14           Is that correct?

15   A.   Yes.  But it says "to the best of my knowledge".  And at

16   that point when I filled that out, Walgreens was the best of my

17   knowledge.

18   Q.   Walgreens was the best of your knowledge when you filled

19   this out; right?

20   A.   Yes.

21   Q.   And then at your deposition you went through this sheet

22   line by line and did not change that; is that correct?

23   A.   That is correct.

24   Q.   At your deposition on June 28th of this year; is that

25   correct?

1  **A.**   That is correct.

2  **Q.**   But sometime between June 28th of this year and today, you

3  learned that you actually had medications delivered to you?

4  **A.**   No, I didn't learn.  I remembered.

5  **Q.**   Did you correct this?  Did you send me -- did you let me

6  know this?  Do you have any physical evidence of this?

7  **A.**   No, I don't.

8  **Q.**   You don't have any of the containers?

9  **A.**   They would have been destroyed in the storm.

10 **Q.**   So after the storm, you never got any of these

11 medications?

12 **A.**   No, I didn't.

13 **Q.**   Okay.  You went to Dr. Barnes in March of 2005 and got

14 Pulmicort.

15         Why would you go to Dr. Barnes and get Pulmicort if

16 University Hospital was dropping it off at your house without a

17 prescription?

18 **A.**   I don't think they were dropping it off at that time.

19 **Q.**   I apologize.  I'm confused, ma'am.

20         When were you getting this medication dropped off

21 from University Hospital?

22 **A.**   When he was a lot younger.

23 **Q.**   Oh.  So before the storm you were using the nebulizer once

24 a year with the Pulmicort that you got from Dr. Barnes;

25 correct?

1   **A.**   Closer to -- yes, that I got from Dr. Barnes, not from
2   this other place.
3   **Q.**   So this other place has nothing to do with right before
4   the storm?
5   **A.**   When you said "right before the storm," I'm also thinking
6   prior to when he was younger, too.  So, now, if you want to say
7   right before the storm, you're talking about like in the
8   beginning of '05?
9   **Q.**   Sure.
10  **A.**   Okay.  Well, then I would say, no, this medicine I wasn't
11  getting then.
12  **Q.**   Weather triggered asthma attacks for Chris?
13  **A.**   Yes, it did.
14  **Q.**   His chest would start to itch?
15  **A.**   Yes.
16  **Q.**   You would tell him to calm down and take his albuterol?
17  **A.**   Yes.
18  **Q.**   If he had an attack, you would take him to the emergency
19  room if you couldn't get him to calm down?
20  **A.**   Yes.
21  **Q.**   Now, we had -- there's been some dispute.  Prior to the
22  storm, didn't he go to the emergency room in January or
23  February of 2005?
24  **A.**   Not '5.  It would have been '4.  I mistakenly wrote that
25  on that paper.

1   Q.    You did.  Now, if we can --

2           MR. WEINSTOCK:  If I can approach, Page 61.

3           THE COURT:  Yes.

4   BY MR. WEINSTOCK

5   Q.    Does that refresh your recollection about your testimony

6   about Chris having an asthma attack in early January/February

7   of '05?

8   A.    Yes, but I was mistaken.

9   Q.    And you were mistaken again when you filled out a form at

10  Sabal Palm Elementary School saying that his last attack that

11  he needed to go to the emergency room was February of '05;

12  correct?

13  A.    Yes.  That was when we first got to Florida.

14  Q.    And you were still mistaken when you gave your deposition;

15  correct?

16  A.    Yes.

17  Q.    You had an opportunity to read and sign your deposition;

18  is that right?

19  A.    Yes.

20  Q.    And change anything that was incorrect?

21  A.    That deposition was like 500 pages.  If I missed

22  something, I'm sorry.

23  Q.    But did you have a chance to do that?

24  A.    Yes.

25  Q.    Did you make any changes?

1  **A.**  I think I did make a few.

2  **Q.**  But you didn't fix that?

3  **A.**  Like I said, I might have missed it.  And for that, I

4  apologize.

5  **Q.**  No problem.  Then you -- you did go to see Dr. Barnes in

6  March, and you got the full slate of medications for his

7  asthma, Pulmicort, albuterol and Claritin; is that right?

8  **A.**  Yes.  Prior to the storm.

9  **Q.**  And right before the storm in June of '05, you went to --

10  back to Dr. Barnes to get a prescription for Clarinex; correct?

11  **A.**  In June of '05?

12  **Q.**  Yes.

13  **A.**  I don't remember that one.  I'd have to see something.

14  **Q.**  I promise I'll get back to that.  But it's in the allergy

15  section.

16  Let's go back to asthma.  Prior to the storm, your

17  method of dealing with Chris' asthma, if his chest started to

18  itch, was to tell him to relax, take a puff on the albuterol --

19  two puffs.  If that didn't work, you would try Pulmicort in the

20  nebulizer.  And if that didn't work, you'd go to the ER;

21  correct?

22  **A.**  I don't want to say the Pulmicort, because it was

23  Prednisone.

24  **Q.**  Who wrote you the prescription for Prednisone?

25  **A.**  I think I got it -- I'm not exactly sure who wrote that

 1  one.

 2  Q.   Well, we've got the emergency rooms you go to and we've

 3  got Dr. Barnes.

 4          Who else you got?

 5  A.   That would have been it.

 6  Q.   So if I have all of those records, I've got them all?

 7  A.   To my knowledge.  Unless something was destroyed in the

 8  storm.  I don't know.

 9  Q.   There's not any more additional records that you're just

10  remembering about now, are there?

11  A.   No.

12  Q.   Now, after Chris took the Prednisone in the nebulizer --

13  A.   No.  Prednisone was not delivered in a nebulizer; it was

14  delivered by mouth.

15  Q.   In 2005, you had a prescription for Prednisone?

16  A.   If I'm not mistaken, yes.

17  Q.   After he used -- so if he was using the nebulizer -- well,

18  I'm sorry.  We've got to back up.

19          Your procedure, if he said, "My chest was itching,"

20  was to tell him to relax and take two puffs on the albuterol?

21  A.   Yes.

22  Q.   If that didn't work, you would then turn to the nebulizer;

23  correct?

24  A.   No.

25  Q.   How long would the nebulizer treatments last?

1  A.   I think it was something like -- maybe like a ten-minute

2  treatment.

3           MR. WEINSTOCK:  May I approach, Your Honor?

4           THE COURT:  Yes.

5  BY MR. WEINSTOCK

6  Q.   If relaxing him didn't make the albuterol work, you would

7  use the nebulizer; correct?

8  A.   When he was younger.

9  Q.   After he would take the nebulizer, he would then take a

10 nap; right?

11 A.   Yes.

12 Q.   Regardless of the time of day?

13 A.   Well, it -- yeah.  But if he was -- yeah.  Yeah.

14 Q.   Isn't it correct that only once they got to the emergency

15 room would they administer the Prednisone?

16 A.   They would give him Prednisone.  But I did have some at

17 home.

18 Q.   You learned -- you went to an asthma education program

19 when Chris was first diagnosed with asthma at age three;

20 correct?

21 A.   That was the program I understood to be when the doctor

22 was explaining to me how to treat his -- deal with his asthma.

23 Q.   And that's what you learned at that program, to use the

24 albuterol as needed and the nebulizer as needed; correct?

25 A.   When he first was diagnosed with asthma, we did not have a

1   nebulizer immediately.

2   **Q.**   But, thereafter, you learned that's how you use it, you

3   just use it as-needed?

4   **A.**   Yes.  Oh, and with the course of the medicine.  If that

5   course of medicine ended, then we wouldn't need to use the

6   nebulizer.

7   **Q.**   And at school you'd get pamphlets on asthma treatment?

8   **A.**   I can't say at every school I've gotten that.

9   **Q.**   At some schools Chris went to, you got pamphlets on the

10  asthma treatment?

11  **A.**   I guess you could say yes.

12  **Q.**   Well, I didn't go to school -- I didn't get them.

13          Did you get them or not?

14  **A.**   I would say no, then.

15          **MR. WEINSTOCK:**  If I may approach, Your Honor?

16  Page 64.

17          **THE COURT:**  Yes.

18  **BY MR. WEINSTOCK:**

19  **Q.**   At school, would you get pamphlets about asthma treatment?

20  **A.**   I would get papers.  But I already basically knew what

21  they would be saying because I had been dealing with his asthma

22  for a long time.

23  **Q.**   Exactly.

24          You got pamphlets, but you didn't read them very

25  carefully because you already knew what you were doing; right?

1  A.   Yes.

2  Q.   Pre-storm, Chris had a nebulizer at home and one at

3  school; correct?

4  A.   Not a nebulizer, an inhaler.

5  Q.   You're right.  An albuterol puffer?

6  A.   Yes.

7  Q.   One at home and one at school?

8  A.   Yes.

9  Q.   Obviously, you didn't recover the one from school;

10  correct?

11  A.   Correct.

12  Q.   And you lost his nebulizer in the storm; correct?

13  A.   Wait one second.  Let's go back for a minute.

14       You said the one at home.  At that time, before the

15  storm, I was working at the same school that he was going to,

16  so he had one that I had in a bag.

17  Q.   It was just the same inhaler?

18  A.   Yes.  Yes.

19  Q.   You lost his nebulizer in the storm?

20  A.   Yes.

21  Q.   The albuterol you took with you was the one you had gotten

22  from Dr. Barnes in March of '05?

23  A.   Yes, it was.

24  Q.   And how full was that?

25  A.   It wasn't full.  It was, I would venture to say, less than

1  full, actually -- less than half.

2  Q.   And then you had a prescription still with Walgreens from

3  Dr. Barnes, a refill, which you filled in October of 2005;

4  correct?

5  A.   Yes.

6  Q.   In Florida?

7  A.   Yes.

8  Q.   And through the magic of computers, when I asked Walgreens

9  for all your records, they gave me the Florida ones too.

10         That's the one; right?

11 A.   Yes.

12 Q.   Jacksonville, Florida, that's where you were staying?

13 A.   Yes.

14 Q.   Now, two months later you went to see the doctor because

15 you needed more albuterol; is that right?

16 A.   Correct.

17 Q.   And I know you explained it to Mr. Buzbee and the jury,

18 but if you could explain it to me.

19         Did you lose that inhaler?  Why were you in need of

20 one right away?

21 A.   Because I had to give the one that I had to the school.

22 Because the Florida school, I had to have one immediately to

23 give to them.  And when we got there in September, I got -- I

24 got the other one filled in October, so I gave that to them.

25         And since I didn't have my usual extra that I like to

```
 1   keep, I went to the doctor in Florida and he gave me a
 2   prescription for them and I had them then.
 3   Q.   So you gave the one you got in October to the school?
 4   A.   Yes.
 5   Q.   And the one you brought from New Orleans ran out?
 6   A.   Pretty much, yes.
 7   Q.   I mean, that's why -- otherwise, you don't need a new one?
 8   A.   No.  Like I said, I always like to keep extra.  So I still
 9   had the little bit that was left in the original one from New
10   Orleans, but that's all I had.  So I went -- because, like I
11   said, I like to have extra.  So I went and went to that doctor
12   in Florida.
13   Q.   So the one you had from New Orleans was close enough to
14   running out that you thought you needed to refill --
15   A.   Yes.
16   Q.   -- another prescription?
17   A.   Yes.
18   Q.   And that's a little bigger this way.
19             That's exactly what you did:  You told the doctor
20   that you just needed medication -- you needed albuterol, and
21   you described his asthma, and they put it down as moderate;
22   correct?
23   A.   Yes.
24   Q.   Dr. Joyner also prescribed Advair?
25   A.   Yes, he did.
```

1   **Q.**   This is the black box warning that you ultimately took
2   Christopher off of this?
3   **A.**   Yes, yes.
4   **Q.**   And then the next prescription for albuterol you filled
5   was October of 2007, about 22 months later; correct?
6   **A.**   Yes.
7   **Q.**   When you got back to New Orleans, you had to give a pump
8   to the school?
9   **A.**   I was working there, so I kept it with me.
10  **Q.**   So you had the one from New Orleans, 2005, that was about
11  to run out; the one you got from the doctor -- the one you gave
12  to the school --
13  **A.**   In Florida.
14  **Q.**   -- in Florida that you got from Dr. Joyner -- no, that you
15  got from Dr. Barnes through Walgreens in October of 2007 --
16  2005 -- let's start again.
17          You had the one with a little bit left over at some
18  point from March of '05 when you left New Orleans; you had the
19  one that you got from Walgreens in October of '05 that you gave
20  to the school; and then you refilled the prescription in
21  December of '05, from Dr. Joyner?  Yes?
22  **A.**   Yes.
23  **Q.**   And that's what you had until October 2007?
24  **A.**   I refilled it because we lost one.  And then we found that
25  one after -- afterwards.  So that's how I got the four.

 1           Now, the little bit of one that we got from New

 2    Orleans had -- didn't come back to New Orleans.

 3    **Q.**   Where did you refill it?

 4    **A.**   Rite Aid in Florida, I think it was.

 5    **Q.**   Where did you get the prescription?

 6    **A.**   That was the one that I had gotten from Joyner.

 7    **Q.**   Why didn't you put that down on the fact sheet?

 8    **A.**   Because I didn't think about it.  All I remembered, that

 9    the majority of his medicines I got from Walgreens.

10    **Q.**   Didn't you tell me in deposition you filled that

11    prescription at Walgreens, or my partner that you filled that

12    prescription at Walgreens?

13    **A.**   I don't know.  I might have, but I would be mistaken.

14    **Q.**   You would have filled that in December of 2005; correct?

15    **A.**   Yes, it would have been right about then.  Yes.

16    **Q.**   Well, now I'm really confused.  Because this -- this is

17    the October one.

18           So the question is:  Where's the December one?

19    Where's the December one?  I'll get back to it, but we'll get

20    to the bottom of the albuterol.

21           Okay.  Apparently, you did not fill it at Rite Aid.

22    You did fill it at Walgreens.  Is that correct, ma'am?

23    December 19th, 2005?

24    **A.**   Okay.

25    **Q.**   So you've got the one you've given to the school, the one

304

1    you're about to run out, and the one from Dr. Joyner; correct?

2    A.   Yes.  He also gave me one when we was at the place itself,

3    the office.

4    Q.   He gave you a sample of 20 puffs?

5    A.   I don't think it was -- I'm not sure.  I won't say it was

6    a 20-puff one.

7    Q.   He didn't give you a sample of a full prescription, did

8    he?

9    A.   I would have to say he did.

10   Q.   He gave you a sample of a full prescription, and then you

11   filled another full prescription?

12   A.   After we lost the other one.  You see what I'm saying?

13   Q.   I see exactly what you're saying.

14        You went to see Dr. Barnes in October of 2007 for

15   sinusitis and atopic dermatitis; correct?

16   A.   Correct.

17   Q.   She prescribed albuterol and Flovent?

18   A.   Yes.

19   Q.   You did not complain about Chris' asthma at that time, did

20   you?

21   A.   No, I didn't.

22   Q.   You just needed more medication; is that correct?

23   A.   Yes.

24   Q.   At that point you had been in the trailer about 17 months?

25   A.   Yes.

1   Q.   Previously you told us that on occasion cold air coming in
2   would trigger Chris' asthma; is that right?
3   A.   Correct.
4   Q.   And on December 4 -- 3 and 4, really, 2007, with the
5   temperature dropping, Chris' chest started to itch, and he
6   started using albuterol, and he kept using it until it brought
7   on a full-blown attack; correct?
8   A.   I don't know if the albuterol made it worse.  But we did
9   go to the ER.
10  Q.   You kept using the albuterol first, and then you went to
11  the ER; correct?
12  A.   Yeah.  But I didn't -- usually, I don't give -- maybe in
13  the whole course of a day before we would go, maybe six puffs,
14  total.
15  Q.   And at the hospital, they gave you Prednisone; right?
16  A.   I don't remember at that -- when we went to the ER that
17  day, which steroid they gave him.  I'm not sure.
18       Okay.  Yeah.  I see they gave me the Prednisone.
19  Q.   Now, if I understand correctly, today -- or strike that.
20       On June 28th, 2009, when you gave your deposition,
21  his albuterol use was way down, and he only takes it before
22  things like a band concert, as a preventative measure; is that
23  correct?
24  A.   And every morning.
25  Q.   He takes albuterol every morning?

1    A.    That's what I was told to start giving him.

2    Q.    Are you sure it wasn't Singulair he was told to take every

3    morning?

4    A.    No, he takes a Singulair.

5    Q.    Right.  He only takes the albuterol about -- on a rare

6    occasion, if he's going to do a band concert or something like

7    that?

8    A.    Or play football, yes.

9    Q.    Or play football.

10            You went to the emergency room in June or July of

11   2008?

12   A.    I think so, yeah.  I'd have to see the record to make

13   sure.

14   Q.    And they gave him some Prednisone?

15   A.    I said I'd have to see the record.  I'm not sure.

16   Q.    You did not give him any kind of steroid between June of

17   '08 and when he got to Colorado in May of '09; correct?

18   A.    No, not that I -- not that I remember, no.  I don't think

19   so.

20   Q.    So he had been off steroids from March of '05 until

21   October of '07, and then off again from June of '08 until May

22   of '09; correct?

23   A.    Yes.  He was off the steroids because he was only given

24   the steroids as a treatment for that time.  I was never told

25   that it was something that he had to constantly be on.  It was

 1 │ just used at that moment that he was having that problem.
 2 │ **Q.**   You met with Dr. Pacheco?
 3 │ **A.**   Yes.
 4 │ **Q.**   She told you that his -- his asthma was likely the result
 5 │ of a long history of being suboptimally treated?
 6 │ **A.**   She didn't tell me that.
 7 │ **Q.**   You've read that, though?
 8 │ **A.**   No.  I've not read it, I've heard it.
 9 │ **Q.**   You've heard it from me, haven't you?
10 │ **A.**   Often.
11 │ **Q.**   But she did explain to you that he needed an asthma
12 │ treatment program; correct?
13 │ **A.**   Yes, she did.
14 │ **Q.**   And she did explain to you that he needed daily
15 │ medication; isn't that correct?
16 │ **A.**   Yes, she did.
17 │ **Q.**   And since you've met with her, you've had him on that
18 │ daily medication?
19 │ **A.**   Yes.
20 │ **Q.**   And he's doing much better, isn't he?
21 │ **A.**   Yes.
22 │ **Q.**   And that's why he -- he never really needs his albuterol
23 │ except preventively, like if he's going to play a band concert?
24 │ **A.**   Yes.
25 │ **Q.**   Now, Chris' allergies, Chris has been on Claritin D since

```
 1    he was a very young child; correct?
 2    A.   Yes.
 3    Q.   And Claritin Reditabs, as well?
 4    A.   Yes.  From my understanding, it's all the same medicine,
 5    it just comes in different forms, and they change up as the
 6    child gets older.
 7    Q.   The Reditabs are pretty much for kids who can't swallow a
 8    pill?
 9    A.   Yes.
10    Q.   Kind of melts in your mouth like M&Ms?
11    A.   Yes.
12    Q.   I think I told you we'd get back to this:  But just before
13    the storm in June of '05, you filled a prescription for -- I'm
14    sorry, wrong document.
15              Here we go.  Page 2.  Before the storm he -- you
16    filled a prescription for Clarinex syrup, again because the
17    pills aren't made for everybody; right?
18    A.   I'm sorry, say that again.
19    Q.   Just before the storm June of '05, you filled a
20    prescription for Clarinex syrup; correct?
21    A.   Correct.
22    Q.   You've now learned that Chris is allergic to dust and
23    pollen?
24    A.   Yes.
25    Q.   You kind of already knew that, though, didn't you?
```

```
 1  A.   Yeah, I already knew.
 2  Q.   For a time you had a little mice infestation problem in
 3  your trailer?
 4  A.   Yes.
 5  Q.   Prior to the storm, you would agree that pollen and dust
 6  triggered his asthma, as well as the weather?
 7  A.   No, I wouldn't say the pollen and dust would.  I would say
 8  the weather.  I've always stated the weather.
 9  Q.   I'm sorry?
10  A.   I've stated --
11  Q.   Not prior to the storm.  In June of 2006, you would say
12  that -- about two weeks after you moved into the trailer, that
13  weather, dust and pollen triggered his asthma; correct?
14  A.   I've never said dust and pollen triggered his asthma.
15  I've always stated, for as long as he's had the asthma, that it
16  was always weather-related.
17          MR. WEINSTOCK:  May I approach, Your Honor?
18          THE COURT:  Yes.
19          MR. WEINSTOCK:  Page 184.
20  BY MR. WEINSTOCK
21  Q.   All right?
22  A.   Uh-huh.
23  Q.   Does that refresh your recollection if you said that
24  weather, dust and pollen triggered his asthma?
25  A.   I'm still saying it's not the dust.  Because that says
```

310

1   allergies or asthma, when the allergies was the dust and the

2   pollen.  But when it comes down to the asthma part of it, it's

3   the weather.

4   Q.   "What types of circumstances created problems with the

5   asthma that you described to McDonogh 15 when he first went

6   there?

7        "The weather changes.  And like I say, weather and

8   increasing pollen and dust that New Orleans had right after the

9   storm."

10  A.   Yeah.  But the question right before that said asthma or

11  allergies.  So I gave you the answer for asthma and allergies.

12  Okay?

13  Q.   December of 2007, one of the plaintiff's attorneys came to

14  your church and spoke; correct?

15  A.   I'm not sure of the exact date, but it's in the same

16  general time.

17  Q.   That good-looking guy over there, Mr. Woods?

18  A.   Yeah.

19  Q.   He handed you some paperwork to see if people wanted to

20  sign up for a lawsuit?

21  A.   I wouldn't say he handed me, but I was handed some

22  paperwork from somebody.

23  Q.   Was that somebody from Acorn?

24  A.   I'm not exactly sure.  Because I -- I went to that meeting

25  late, so all of the introductions I didn't see or know who was

1  who.

2  Q.   And you ultimately retained Mr. Woods initially, correct,

3  in January of 2008?

4  A.   Yes.

5  Q.   And you made a claim against FEMA in February of 2008?

6  A.   A claim for what?  I'm not sure -- which claim are you

7  talking about?  I'm not sure.

8  Q.   That's true.  You made more than one claim against the

9  government, didn't you?

10  A.   When I say "claim," I mean like are you talking about when

11  I --

12       MR. BUZBEE:  I object, Your Honor.  He's totally

13  opening the door to a lot of things here and I don't think he

14  wants to do that.

15       THE COURT:  Come on up.

16       (WHEREUPON, the following proceedings were held at

17  the bench.)

18       MR. BUZBEE:  I let pass the Acorn reference, which is

19  totally improper.  I mean, that's clearly calculated, and

20  that's just ridiculous.

21       THE COURT:  Well, I let that one -- wait.  Hold on a

22  second.  I let that one go because I didn't know whether

23  factually that was accurate or not.  She said she didn't know.

24       As to the claims against the government, didn't

25  we have a pretrial motion -- I forget who filed it -- but about

 1  excluding references to pleadings and amended pleadings?

 2          **MR. BUZBEE:**  Yes, we did.

 3          **MR. WEINSTOCK:**  This was an FTCA claim form.  I'll

 4  withdraw the question.

 5          **THE COURT:**  Wait a second.  Let me tell you this:

 6  Unless you have some particular information that she gave the

 7  government, the fact that she had a claim against the

 8  government, we're not here to litigate that.

 9          **MR. WEINSTOCK:**  I know that.  But on the back of the

10  form it says:  "Claims arising from formaldehyde."  And I

11  think -- here's the point:  Because then she goes to Dr. Barnes

12  two months later and she never mentions it.

13              I'll just get past the form and I'll just ask

14  her --

15          **THE COURT:**  Why don't you just ask her if she had a

16  claim?  Although, FEMA's fault is going to be on the jury

17  verdict form, the fact that she filed the claim, and what

18  happened to that claim, the fact that it was voluntarily

19  dismissed or Christopher Cooper's claim was dismissed as time

20  barred, the jury doesn't need to hear any of that.

21          **MR. BUZBEE:**  So what do I do now that he's put all

22  that out there?

23          **THE COURT:**  He asked a question about whether she

24  filed a claim with the government.

25          **MR. BUZBEE:**  Against FEMA.

1            **THE COURT:**  What is it that you intend to do?

2            **MR. BUZBEE:**  Or you have to say that she dropped her

3   claim against FEMA.  Because that's totally improper.

4            **MR. MEUNIER:**  Judge, you've instructed the jury

5   before to disregard the question.

6            **THE COURT:**  I'll go ahead and disregard it.  But once

7   I disregard, we're not going back into it.  I'll tell the jury

8   to disregard the last question and answer.

9            (WHEREUPON, the following proceedings were held in

10  open court.)

11           **THE COURT:**  All right.  As I did earlier today, I'm

12  going to instruct you to disregard the last question and

13  answer.  The Court is going to strike that from the record.

14  And as I did say that earlier today, to go ahead and strike

15  that from the record means that you are to disregard the last

16  question and answer.

17               All right.  Mr. Weinstock, let's go forward.

18  **BY MR. WEINSTOCK**

19  **Q.**   All right.  February of '08, you had retained Mr. Woods to

20  represent you and your son in his claim for asthma?

21  **A.**   Yes, I think that was in February.

22  **Q.**   And then when you went to see Dr. Barnes in April of '08,

23  you made no mention of asthma or your son's -- or any exposure

24  to formaldehyde; correct?

25  **A.**   No, I didn't.

1   **Q.**   My statement's correct?

2   **A.**   Yes.

3   **Q.**   There was testimony by your daughter and your mother.

4          You generally left that back vent open at all times;

5   correct?

6   **A.**   Most of the time, unless it was raining.

7   **Q.**   Unless it was raining, that back vent was open; right?

8   **A.**   Most of the time, yes.  Or if it was too cold outside,

9   yes.

10  **Q.**   And you remember that guy with the big walrus mustache

11  from the University of Lafayette, Louisiana?

12  **A.**   The guy right here?

13  **Q.**   No, not the bald guy with the beard.

14         The guy with the long mustache, Mr. Ritter, who told

15  us if the bath vent was open, there is no negative pressure?

16  Do you remember that?

17  **A.**   Yeah.  But I also said I mostly kept the bathroom door

18  closed.

19  **Q.**   It's air.  There's a gap under the door; yes?

20         And also --

21         **THE COURT:**  Wait.  We need to get an answer.

22  **BY MR. WEINSTOCK**

23  **Q.**   Oh, I'm sorry.  Yes.

24         There was a gap under the door; yes?

25  **A.**   Yes, a little gap like that.

```
1   Q.    That's all it takes.

2            MR. BUZBEE:  I'm going to object to that unless he

3   wants to be put on the stand.

4            THE COURT:  Just ask the next question.  We don't

5   need a follow-up comment.  Just ask the next question.

6   BY MR. WEINSTOCK

7   Q.    And you heard the guy come after him, that he said when

8   negative pressure -- without the negative pressure, the

9   formaldehyde migrates out --

10           MR. BUZBEE:  I'm going to object to this, too,

11  because she's not an expert in this.  It's an improper

12  question.

13           THE COURT:  Look, ask her something that she would

14  know.  We all sat here through other testimony.  If you would

15  like her to confirm a fact maybe, or give fact testimony,

16  that's fine.  But we could go through every witness for the

17  last week and ask her if she heard that and if she remembered

18  that.

19              But we're not going to do that.  Because I don't

20  have another week to spare on this trial.  So we're going to

21  find out what she knows about all this, and ask her questions,

22  and get factual information out of her, and then we're going to

23  take another witness.

24  BY MR. WEINSTOCK

25  Q.    You had a stand-up fan in your trailer; correct?
```

1    **A.**    Yes, I did.

2    **Q.**    That you used; correct?

3    **A.**    Yes, I did.

4    **Q.**    And you were using the AC when you needed to?  You were

5    not conserving money on the AC; correct?

6    **A.**    Usually, I used the AC at night.

7    **Q.**    You did call maintenance about the roof leak; correct?

8    **A.**    Yes, I did.

9    **Q.**    And the -- when it rained, the water would drip on your

10   head; is that right?

11   **A.**    Yes.

12   **Q.**    And this started sometime March, April or May of '07?

13   **A.**    Yeah, somewhere around that time.

14   **Q.**    In fact, if I remember the testimony earlier, you slept

15   around a pot when it rained?

16   **A.**    Yeah.

17   **Q.**    And FEMA came out and added caulking, which helped for a

18   little while?

19   **A.**    I'm assuming it did.  I wasn't there when it happened --

20   when they did it.

21   **Q.**    You said you moved out because of the formaldehyde?

22   **A.**    Yes.

23   **Q.**    But after -- isn't it accurate that they told you you had

24   to move out?

25   **A.**    No.  They didn't tell me I had to move out, no.  I was

1    never told that.

2    **Q.**   And that's why you were eligible for rental assistance?

3    **A.**   Because I lived in a trailer, not because they were

4    putting me out.

5    **Q.**   When they took away your trailer and they told you they

6    were taking away your trailer, that's when you became eligible

7    for rental assistance; correct?

8    **A.**   Yes.  After I called them to come get the trailer, yes.

9    **Q.**   Because they were taking it, not because you wanted to

10   leave it?  Correct?

11   **A.**   No.  I was leaving it -- no.  How can I explain it?

12          Nobody came to me and said, "You have to get out of

13   your trailer."  I chose to leave the trailer.

14   **Q.**   And I think Mr. Buzbee covered this to some extent, but

15   your sister was charging $500 a month; correct?

16   **A.**   Yes.

17   **Q.**   You applied to FEMA for $1,100 a month; correct?

18   **A.**   Because that's what she initially wanted.

19   **Q.**   But when I asked you about it -- or my partner did, you

20   told us you only asked them for $700 a month; correct?

21   **A.**   Probably so.

22   **Q.**   Now, you understood in your agreement to lease the unit

23   from FEMA that if alternative or suitable housing became

24   available, that you would have to take that housing; correct?

25   **A.**   I'm not sure what you mean when you say "lease."  Because

1    when I equate lease, that means you paying something.

2    Q.   Well, FEMA had you sign a document before you moved into

3    the trailer; correct?

4    A.   Correct.

5    Q.   And in that document it said when alternative or other

6    suitable housing became available, you would avail yourself of

7    it; correct?

8    A.   Correct.

9    Q.   So you're telling us today that you had other options in

10   July of '07, but you did not take those other options; right?

11   A.   I'm not sure.  Because I'm not exactly sure when other

12   housing would have been available.  Because there wasn't a lot

13   of housing when I first came back in that general time frame.

14   Q.   But by July of '07, there was available housing to you?

15   A.   I don't know.

16   Q.   You certainly could have moved into the barbershop after

17   your parents had moved out?

18   A.   Yes, I could have.  But my sister was there with her

19   children too.

20   Q.   And you also said on Mr. Buzbee's questioning that had you

21   known then what you know now, had you known that in July of

22   '07, you would have moved out?

23   A.   Yes.

24   Q.   So there must have been someplace for you to move to?

25   A.   Like I said, by then I was working.  I would have been

1   able to afford something, had I known all of the dangers.

2   Q.   So you had other suitable alternative housing available to

3   you; yes?

4   A.   Yes, I guess so.

5   Q.   Your trailer was tested by one of the experts in January

6   of 2008?

7   A.   Yes.

8   Q.   You moved out in December of 2008 [sic]?

9   A.   Yes.

10  Q.   The day after you moved out, you went back and cleaned up?

11  A.   I don't know if it was the day after I moved out, but I

12  think it was in the whole moving-out process.  And it could

13  have been the day after.

14  Q.   Did you clean the trailer on the day after you moved out?

15  A.   Yes.

16  Q.   And then it remained closed, windows, doors, everything,

17  for a month until Mr. Scott tested it; correct?

18  A.   Yes.

19  Q.   You opened it up for them to test it.  It took them

20  approximately 15 minutes.  And then you closed it back up and

21  locked it up; correct?

22  A.   Actually, I wasn't there.  I gave my mom the key and she

23  opened it.

24  Q.   Is it correct that you do not associate the future cost of

25  Chris' asthma with his time in the trailer?

1    **A.**    Ask me that again.

2    **Q.**    Is it correct that you do not associate the future cost of

3    Chris' asthma with his time in the trailer?

4    **A.**    I'm not really understanding the question because you

5    asking me about a future cost and -- are you asking me if I

6    felt the trailer did something?

7              I'm not sure how to answer anything when it comes

8    down to costs.  I'm really not.

9    **Q.**    I'll ask it one more time:  Are you associating the cost

10   of his asthma treatments with his time in the trailer?

11   **A.**    I don't know how to answer that.  I don't know.  I don't

12   know how to answer that because I can't equate costs with that.

13   I don't know.

14             **MR. WEINSTOCK:**  May I approach, Your Honor?

15             **THE COURT:**  Yes.

16             **MR. BUZBEE:**  Can we get a page, please?

17             **MR. WEINSTOCK:**  Sorry.  406, Line 25, through 407,

18   Line 3.

19             **MR. BUZBEE:**  Your Honor, I'm going to object.  He's

20   asking this witness, a fact witness, a question about an expert

21   area, that is costs of treatment in the future.

22             **THE COURT:**  This is out of her deposition, though,

23   isn't it?

24             **MR. BUZBEE:**  Right.  It was improper there, and

25   that's why it was objected to.  It's improper here.

1          **THE COURT:**  I'm going to overrule it.  I think if she

2    understands the question, she can answer it.  It has to do with

3    costs that she might expect to incur, I don't see any reason

4    why she can't answer it.

5          **MR. BUZBEE:**  Yes, sir.

6    BY MR. WEINSTOCK

7    **Q.**  Do you associate the costs of Chris' asthma treatments

8    with his time in the trailer?

9    **A.**  Yes, the inhalers and the Claritin.

10   **Q.**  But not anything else; correct?

11   **A.**  I can't answer anything else.  All I can speak on is the

12   Claritin.

13   **Q.**  Is it correct that you never saw a reason for Chris to see

14   a psychiatrist before he was sent by these attorneys?

15   **A.**  Correct.

16   **Q.**  And I -- I thought I understood Dr. Shwery, but if I can

17   hear it from you, he has not been back since that one

18   evaluation; correct?

19   **A.**  That is correct.

20         **MR. WEINSTOCK:**  Your Honor, if I could just confer.

21   I'm just about done.

22         **THE COURT:**  All right.

23         **MR. WEINSTOCK:**  While they're getting that, if I

24   could finish up one final point.

25         **THE COURT:**  Sure.

```
 1   BY MR. WEINSTOCK
 2   Q.   Have you ever seen any of these documents before?  These
 3   are three information/warnings that FEMA sent out.  If you
 4   would take a look at them.
 5   A.   I would say this one is the most familiar.
 6   Q.   Is this the one Mr. Buzbee showed you?  You don't
 7   remember?
 8   A.   Earlier, yeah.
 9   Q.   Yes.
10        Have you ever seen either of these two before?
11   A.   No, not really.  No, not really.
12   Q.   You don't recognize either of these two?
13   A.   No.
14        MR. WEINSTOCK:  I believe these are already in
15   evidence; is that right?
16        MR. BUZBEE:  Yes.
17   BY MR. WEINSTOCK
18   Q.   You did receive approximately 19 or 20 flyers or things
19   from FEMA that they had been out monthly while you were living
20   in the trailer; correct?
21   A.   I don't know about 19 or 20 flyers.  I can --
22   Q.   We'll get back to the flyers.
23        MR. WEINSTOCK:  I'm sorry.  I'm jumping back and
24   forth trying to finish up, Your Honor.  If we could pull up
25   this exhibit.
```

**BY MR. WEINSTOCK**

Q.   In April of 2008, did you tell FEMA that your sister was charging you $1,100 a month rent three or four months after you had moved in?

A.   I said she was going to be charging me that.  That's what she wanted.

Q.   But you were already in there for three or four months?

A.   Yes.

Q.   Did she charge you that or not?

A.   No.  She charged me the $500, with the stipulation that if it was approved, that it would be the $1,100.

Q.   If FEMA would pay it, you'd take $1,100; correct?

A.   Yes.

Q.   Do you have the page on the--

            MR. WEINSTOCK:  Your Honor, in the interest of speeding this along, since I can't find the exact page on the 19 or 20 flyers, I'll conclude at this point.

            THE COURT:  All right.

            MR. PENOT:  Your Honor, I'll try to be very brief.

            THE COURT:  Yes.

                        **CROSS-EXAMINATION**

**BY MR. PENOT**

Q.   Good afternoon, Ms. Alexander.

A.   Good afternoon.

Q.   In February of 2006, you were living in Jacksonville,

1  Florida, with your brother; correct?

2  **A.**    Correct.

3  **Q.**    So if it's been stipulated that, that is, we've agreed

4  that it's a fact, it's a given fact, that the trailer was put

5  on Dale Street in February of 2006, it remained vacant from

6  that date until you and Erika and Christopher moved back in May

7  of 2006; is that correct, ma'am?

8  **A.**    That's correct.

9  **Q.**    And when you -- when you arrived there, you walked through

10 and you noticed this separation of the wall panel in that front

11 bedroom, what's called the master bedroom; right, ma'am?

12 **A.**    Yes.

13 **Q.**    And within a couple of days, a lady came out and, did I

14 understand you to say, you do not know for whom she worked?

15 You don't know who she was with?

16 **A.**    No, I'm not sure.

17 **Q.**    And she walked you through and showed you how to work the

18 stove and the gas system and that kind of stuff; correct?

19 **A.**    Yes.

20 **Q.**    And Erika was with you?

21 **A.**    For some of it, yes.

22 **Q.**    And you were here for Erika's testimony.  She mentioned

23 that she heard you point out to the lady this separation of the

24 wall panel in the bedroom; correct, ma'am?

25 **A.**    Yes.  Yes.

1  **Q.**   And the lady said to you a couple of things, did she not?

2  She said, "Well, it's held together with tape.  And in this

3  humid weather down here, the tape must have come off," or words

4  to that effect; correct?

5  **A.**   Yes.

6  **Q.**   And she suggested that you tape it?

7  **A.**   Yes.

8  **Q.**   And she suggested that you call the maintenance line;

9  correct?

10  **A.**   I don't remember the maintenance line thing, but...

11  **Q.**   Do you remember Erika saying that she --

12  **A.**   I remember Erika saying it, but I don't remember the lady

13  telling me that.

14  **Q.**   And within just a couple of days there, you did have an

15  occasion to call that maintenance line, didn't you, ma'am, for

16  the air conditioner?  You had some problems with the air

17  conditioner in the unit?

18  **A.**   I don't know if it was a couple of days.

19  **Q.**   I can --

20  **A.**   But I do remember calling them about the air conditioner

21  at one time.  But I don't know if it was a couple of days.

22  **Q.**   And it was right there when you moved in; right?

23        I understand it's been a long time.  If I show you a

24  document and it said May 31st that you called about the air

25  conditioning, you couldn't quibble with that, could you?

```
 1   A.   Not if you showed me a real document, no.
 2            MR. PENOT:  Why don't we pull up 412, please.  And
 3   the page would be 4628.
 4                 And I'm going to apologize for the poor quality
 5   of this, but I'm hoping we can both read it together.  Wow,
 6   that's really poor.  Let's see if we blow it up at all if we
 7   can see it at all.
 8                 Well, I'll tell you what -- may I approach the
 9   witness, Your Honor?
10            THE COURT:  Yes.
11   BY MR. PENOT
12   Q.   Does this refresh your recollection -- I know it's really
13   hard to read, and if it doesn't, it doesn't -- that on
14   May 31st --
15   A.   It changed.  This is even worse.  It was better here.  I
16   could see it better here.
17   Q.   Okay.
18            MR. PENOT:  Could you go back to what you had up
19   there, please, and change the page.
20            THE WITNESS:  Blow it back up, please.
21            MR. PENOT:  Can you blow it back up, please?
22   BY MR. PENOT
23   Q.   And I don't want to waste a lot of time on this, ma'am.
24   But if Fluor's records showed that on May 31st, you called and
25   you couldn't get your air conditioner to work, and they sent
```

1    somebody out and fixed the breaker, you wouldn't have any basis
2    to quibble with that, would you?  That it was May 31st of '06?
3    A.   No, I wouldn't have anything to quibble about.
4    Q.   Okay.  Can I see the date on there?  I don't think that's
5    the date.
6    A.   Because that says 4/14/07.  I wasn't there, not in --
7    Q.   Go beneath it.
8    A.   Oh, no, I'm sorry.
9    Q.   5/31/06, do you see right there in the second line beneath
10   that?
11           MR. PENOT:  Could you please move that marking,
12   ma'am?  Jane, the green marking, could you remove it?
13           THE WITNESS:  Is this what you're talking about right
14   here?
15   BY MR. PENOT
16   Q.   5/31/06?
17   A.   Uh-huh.
18   Q.   Does that sound about right?
19   A.   I guess so.  Like I say, I don't really remember this.
20   Q.   And you didn't complain to the maintenance folks when you
21   called about the air conditioner, you didn't make any --
22   register any complaint with them about the wall in the bedroom,
23   did you, ma'am?
24   A.   No.  Because I had spoken to that lady initially, and she
25   told me what to do.  So why complain about it twice?

1   Q.   And at the time that you moved in and this lady showed you

2   around, you didn't have any problems with the -- other than

3   this wall that you explained to the jury, you didn't have any

4   problems with the doors fitting right or the windows fitting

5   right?  They all seemed to fit and work properly; right?

6   A.   Yes.

7   Q.   And it was not until about the next rainy season in New

8   Orleans, the April/May -- March/April/May period that you said

9   you first experienced this leak in the bedroom; correct?

10  A.   Yes.

11  Q.   So it was nine, ten, or ten, eleven months after you moved

12  in?

13  A.   No, I wouldn't want to say that long.  It shouldn't have

14  been that long.

15  Q.   Do you recall telling us that it would have been

16  March/April/May --

17  A.   Yeah, I do remember.

18  Q.   March/April/May of 2007; correct, ma'am?

19  A.   Yes.

20  Q.   Okay.  And that -- that wall in the bathroom that

21  eventually came loose, that was right next to the surround in

22  the bath -- in the shower; correct?

23  A.   Yes.

24  Q.   Right where the wall meets that material that surrounds

25  your shower area; correct?

1   A.    Yes.

2   Q.    And that was -- that didn't occur until maybe about

3   mid-way through your stay there; is that about right?

4   A.    Yeah, I guess around that time.

5   Q.    And you never called and reported that to the maintenance

6   folks; is that correct, ma'am?

7   A.    No.  Because I just did the same thing that the lady, when

8   I mentioned the first one.

9   Q.    Now, in July of '07, the trailer had to be moved because

10  your family was going to tear down that family home that your

11  father had built; correct?  At Dale Street?

12  A.    Yes.

13  Q.    And you don't know who moved the trailer then?

14  A.    No, I don't.

15  Q.    But they moved it off of the blocks, and moved in down the

16  street a couple of houses so it would be out of the way for the

17  demolition; correct?

18  A.    Correct.

19  Q.    And then they came, whoever this was, and put it back on

20  blocks; correct?

21  A.    Correct.

22  Q.    And at that point you noticed that it felt a little

23  different in that trailer, didn't you?  It had some leaning or

24  tilt to it that wasn't there before?

25  A.    Not really.  I don't recall that there was any significant

1   difference.

2   **Q.**   Do you recall the day that you had your deposition taken

3   by my colleague, Ms. Petrovich, right there?

4   **A.**   Yes, I remember.

5   **Q.**   Do you remember telling her that when you spilled water

6   after it had been replaced, that the water would run to the

7   back of the trailer, whereas before it didn't do that?  Do you

8   recall that?

9   **A.**   Yeah.  But I don't recall saying that it didn't happen

10  before.

11  **Q.**   When you moved out of that trailer, the only physical

12  problems that you recall were some mold in the closet --

13  **A.**   And the windows.

14  **Q.**   -- and the windows that buckled or -- or separated walls,

15  now in two places, in the bedroom and in the bathroom; correct?

16  **A.**   Actually, there was also a third place around the door.

17  **Q.**   You're saying there's now -- there was a third place

18  around the door?

19  **A.**   Yes.

20  **Q.**   But in your deposition you didn't tell us that, did you?

21  **A.**   I didn't remember.  I remembered when I saw those -- some

22  pictures.  And I remembered that -- that around the doors also,

23  because it had gray tape on it too.

24  **Q.**   And the heater in the bathroom.  Those are the -- the only

25  things you told us about in your deposition were the mold the

1   two places and the heater; correct?

2   A.   Yes.

3            **MR. PENOT:**  Thank you, ma'am.

4            **THE WITNESS:**  You're welcome.

5            **THE COURT:**  Go ahead and redirect, and then we'll

6   break for the day.

7                    **REDIRECT EXAMINATION**

8   **BY MR. BUZBEE**

9   Q.   Alana, you've never been on public assistance before, have

10  you?

11  A.   No, only once.

12  Q.   When was that?

13  A.   Right after I had Erika.  Because when you're single and

14  you become pregnant, they automatically put you on assistance.

15  Q.   Were you unemployed then?

16  A.   No.

17  Q.   So you've never been -- and no offense to these kind of

18  people -- but somebody who's looking to the government to help

19  you out?

20  A.   No, not really.  No.

21  Q.   You help yourself out?

22  A.   Yeah.

23  Q.   This -- your sister told you she wanted how much for rent?

24  A.   $1,100.

25  Q.   And did you check around to see if that was fair?

1   A.   It was fair.  Yeah, I did.

2   Q.   And you applied for assistance for that?

3   A.   Yes, I did.

4   Q.   And the FEMA said what?

5   A.   No.

6   Q.   Okay.

7   A.   Because they don't give family -- if you're renting from

8   family, they don't give it to family-to-family.

9   Q.   And all you could afford was what?

10  A.   500.

11  Q.   And she kicked you out?

12  A.   No, she didn't.

13  Q.   You still owe her a lot of money?

14  A.   No.  I fed her.

15  Q.   Oh, you fed her.  So you paid her that way?

16  A.   Yeah.

17  Q.   I take it from the records, though, that there were

18  several times the air conditioner just simply didn't work, or

19  the electricity, you would lose electricity, and that sort of

20  thing?

21  A.   Oh, yes.  Yes, yes.

22  Q.   Now, just so we're clear:  Prior to going to see

23  Dr. Pacheco, you had never been instructed or even prescribed a

24  daily steroid medication, had you?

25  A.   That is correct.

1  Q.   It's only when you saw Dr. Pacheco in Colorado, that's the

2  first time that you had ever been told, "Give it to him every

3  single day"?

4  A.   That is correct.

5  Q.   And prior to that, had you always done exactly what the

6  doctors told you?

7  A.   Yes.

8  Q.   Now, you remember Mr. Weinstock mentioning Acorn.  And I

9  don't know why -- I think I know why he mentioned Acorn.

10        But did Acorn have anything whatsoever to do with

11  that church meeting?

12  A.   No.  Not to my knowledge, no.

13  Q.   You don't have anything to do with Acorn, do you?

14  A.   No.

15  Q.   Now, as I understand that meeting, it was a -- somebody

16  requested Mr. Woods to come in there; is that right?

17  A.   To my knowledge, yes.

18  Q.   Do you know whether Mr. Woods attends that church?

19        Now, don't get him in trouble.  But at least he's a

20  member of that church?

21        THE COURT:  Now, wait.  Wait a second.  Wait a

22  second.  Are we testifying now, or are we asking leading

23  questions, or are we going to ask a proper question?

24        MR. BUZBEE:  We're going to ask a proper question.

25        THE COURT:  Well, let's do that then, because you're

```
 1   not doing it right now.
 2              MR. BUZBEE:  Yes, sir.
 3   BY MR. BUZBEE
 4   Q.    Is his mother a member of that church?
 5   A.    Yes, she is.
 6   Q.    And did you learn that he was requested to come in there?
 7   A.    Yes, I did.
 8              THE COURT:  Now we're leading again.
 9              MR. BUZBEE:  Yes, sir.  I understand.
10   BY MR. BUZBEE
11   Q.    You know, we've seen this --
12              MR. BUZBEE:  Carl, could you make that a little
13   smaller?
14   BY MR. BUZBEE
15   Q.    All right.  Now, prior to the storm -- or prior to living
16   in the trailer, how often would Coop have to use his inhaler?
17   A.    Maybe once a month.  Once or twice a month, maybe.
18   Q.    And how long would one of those inhalers last?
19   A.    A good eight to nine months.
20   Q.    Okay.  Now, when you were in the trailer, how many
21   inhalers did you use?
22   A.    Four.
23   Q.    Would you agree that that's -- you were using one every
24   four and a half months?
25   A.    Yes.
```

1   **Q.**   Now, based on your view of your son, did you notice that

2   he was having more itching or episodes with asthma in the

3   trailer than before the trailer?

4   **A.**   Yes.

5   **Q.**   Now, you remember Mr. Weinstock was asking you about

6   whether somebody kicked you out of that trailer?

7   **A.**   Yes.

8   **Q.**   Implying that you were staying there until they pried your

9   hands off the trailer.

10           Now, we have this document, and he showed you some of

11  it, Exhibit 27.

12           And isn't it true that, as it says here, that you

13  asked them to come out and move that trailer?

14  **A.**   Yes, I did.

15  **Q.**   You decided to get out of that trailer?

16  **A.**   Yes, I did.

17  **Q.**   And, finally, when you were in Florida, you heard

18  Mr. Weinstock say -- and you read the record -- Chris was

19  diagnosed with moderate asthma; is that right?

20  **A.**   Yes, he was.

21  **Q.**   Do you recall Dr. Pacheco, after he was in the trailer,

22  diagnosing him with moderate to severe asthma?

23  **A.**   Yes, I do.

24           **MR. BUZBEE:**  Pass the witness, Your Honor.

25           **THE COURT:**  All right.  Ma'am, you can step down.

1    Thank you.

2                   All right.  It's about 10 minutes to 5:00, and I

3    don't know what we're going to be able to cover.

4          **MR. BUZBEE:**  Your Honor, I would for -- not only for

5    the sake of the jury, but for the sake of Chris Cooper, my

6    questions of him literally will be five minutes.  If you're

7    willing to indulge us --

8          **THE COURT:**  Is that a real five minutes or a lawyer

9    five minutes?

10         **MR. BUZBEE:**  Not a lawyer five minutes, but a Marine

11   five minutes.  I'm going to ask him three questions and, you

12   know, they can do what they want with him.  But...

13         **THE COURT:**  All right.

14                  Counsel?

15         **MR. WEINSTOCK:**  You know, I think we can -- my

16   questions could be definitely less than ten minutes, if it's

17   truly three or four questions.

18         **THE COURT:**  All right.  We may go a couple minutes

19   past 5:00, but we're not going to go well past 5:00, because

20   that was the commitment that we made, and that's what I told

21   the jury.

22                  So let's go ahead and bring him in.  And,

23   Counsel, you're going to have to be very, very efficient if

24   we're going to do this in time.

25         **MR. BUZBEE:**  All right.  Plaintiffs call Christopher

 1  Cooper.

 2          **THE COURT:**  All right.  Mr. Cooper, if you'd come up

 3  here, please.  Come sit up in this chair right here by me.  And

 4  when you get to this chair, go ahead and remain standing, and

 5  the courtroom deputy is going to make you take an oath, and

 6  then you can have a seat and answer some questions.

 7          (WHEREUPON, **Christopher Cooper**, having been duly

 8  sworn, testified as follows.)

 9          **THE DEPUTY CLERK:**  Thank you.  You may be seated.

10          **THE COURT:**  You might want to pull that microphone --

11  go ahead and sit down and pull that microphone right there

12  closer to your mouth.

13          **THE DEPUTY CLERK:**  Please state your name for the

14  record.

15          **THE WITNESS:**  Christopher Cooper.

16          **MR. BUZBEE:**  Scoot up a little bit, Coop.

17                      **DIRECT EXAMINATION**

18  BY MR. BUZBEE

19  **Q.**   Coop, would you introduce yourself to the ladies and

20  gentlemen of the jury, please?

21  **A.**   I am Christopher Cooper.  I'm 12 years old.  I'm in the

22  seventh grade.  I go to McDonogh 15.

23  **Q.**   Coop, what kind of things do you like to do?

24  **A.**   I like to play football, basketball.  I play video games

25  and hang out with friends and family.

338

1    **Q.**    Does your asthma make it more difficult for you to do
2    those things?
3    **A.**    Yes, sir.
4    **Q.**    But you still do them anyway, don't you?
5    **A.**    Yes, sir.
6    **Q.**    Now, Coop, do you remember how many times you used your
7    inhaler or how many times you smelled the smell in the trailer?
8    **A.**    I do not.
9    **Q.**    Okay.  Do you remember in your deposition you -- you gave
10   some estimates.  But back when you were nine years old, do you
11   really remember every single time you smelled the smell?
12   **A.**    No, sir.
13   **Q.**    Okay.  But do you remember, when you were in that trailer,
14   smelling a smell?
15   **A.**    Yes, sir.
16   **Q.**    And could you tell the jury what kind of smell that was,
17   Coop?
18   **A.**    It smelled like a dead animal.
19   **Q.**    And you don't know how many times you smelled it?
20   **A.**    No, sir.
21   **Q.**    Okay.  All right.  Coop, I know you were only nine when
22   you moved in there.  But since it's your body, do you believe
23   your asthma was made worse by living in that trailer?
24   **A.**    Yes, sir.
25          **MR. BUZBEE:**  I pass the witness.

1        **THE COURT:**  All right.

2                Mr. Weinstock?

3                        **CROSS-EXAMINATION**

4    BY MR. WEINSTOCK:

5    **Q.**   Mr. Cooper, we're going to be quick, because we all want

6    to go home.

7                You play football; is that correct?

8    **A.**   Yes, sir.

9    **Q.**   You're pretty good at it; is that correct?

10   **A.**   Yes, sir.

11   **Q.**   Last year you made the cut from 24 down to 12?

12   **A.**   Yes, sir.

13   **Q.**   And you were one of five starters?

14   **A.**   Yes, sir.

15   **Q.**   And you never had to leave a game because of asthma or

16   running?

17   **A.**   No, sir.

18   **Q.**   My statement's correct?

19   **A.**   Yes, sir.

20   **Q.**   You play the baritone saxophone?

21   **A.**   Yes, sir.

22   **Q.**   And you play in a band; correct?

23   **A.**   Yes, sir.

24   **Q.**   And that's something you've picked up since you came back

25   to New Orleans after the storm; correct?

1   **A.**   Yes, sir.

2   **Q.**   When you first walked into the trailer, you didn't

3   recognize any smell; correct?

4   **A.**   No, sir.

5   **Q.**   It was only later on that you smelled that dead animal

6   smell?

7   **A.**   Yes, sir.

8   **Q.**   And you had a little bit of a mouse problem early on; is

9   that right?

10  **A.**   Yes, sir.

11  **Q.**   There was a fan you used in the trailer?

12  **A.**   Yes, sir.

13  **Q.**   Running around outside around the pecan tree makes your

14  nose run?

15  **A.**   Yes, sir.

16  **Q.**   It makes your eyes water?

17  **A.**   Yes, sir.

18  **Q.**   You took Claritin and Claritin D both before and after the

19  storm?

20  **A.**   I think so, sir.

21  **Q.**   You know the little Reditabs that melt in your mouth?

22  **A.**   Yes, sir.

23  **Q.**   You took those before the storm?

24  **A.**   No, sir.

25  **Q.**   You don't remember or...

341

```
 1              Do you remember not taking them or...
 2   A.   No, sir.
 3   Q.   Did you say you used your albuterol about once or twice
 4   more a month when you were in the trailer?
 5   A.   You would have to ask my mother, sir.
 6   Q.   You don't remember giving that answer?
 7   A.   No, sir.
 8   Q.   Is it correct that you never woke up in the trailer at
 9   night because you couldn't breathe?
10   A.   Yes, sir.
11   Q.   You never woke up coughing?
12   A.   Yes, sir.
13   Q.   You always got a good night's sleep?
14   A.   Yes, sir.
15          MR. WEINSTOCK:  I told you we'd be quick.
16          MR. PENOT:  No questions, Your Honor.
17          THE COURT:  No questions.  Redirect?
18                    REDIRECT EXAMINATION
19   BY MR. BUZBEE
20   Q.   What position do you play on the football team?
21   A.   Center.
22   Q.   And are you looking forward to going back to school
23   tomorrow?
24   A.   Yes, sir.
25          MR. BUZBEE:  Pass the witness, Your Honor.
```

1          **THE COURT:**  All right.  Thank you, sir.  You can step

2     down.

3              Okay.  We're going to go ahead -- and, actually,

4     we're five minutes early.  We're going to go ahead and break

5     for the day.

6              I will remind you again, and as I said, you know

7     what I'm going to say, ladies and gentlemen of the jury.

8     Please do not discuss the testimony, any of the evidence with

9     anyone, including amongst yourselves, because we have some more

10    witnesses that you're going to hear.  We will start tomorrow at

11    8:30 and follow the same schedule with the mid-afternoon --

12    mid-morning, mid-afternoon breaks and about an hour or so for

13    lunch.

14              So if you-all will be here at 8:30, we will be

15    committed to start promptly at 8:30, and we will cover a lot of

16    ground tomorrow, as well.

17              I think we're on course to finish the case along

18    the lines that we suggested at the outset.  We have not gotten

19    delayed, and it's possible that we may finish it a tad earlier,

20    but we won't know that yet until we get another day in.

21              So I appreciate your attention, and we'll see

22    you-all tomorrow morning.

23          **THE DEPUTY CLERK:**  All rise.

24          (WHEREUPON, the jury exited the courtroom.)

25          **THE COURT:**  Why don't you-all be seated?

1          The first thing, are we up to date on exhibits?

2          MR. WATTS:  That's what -- with the Court's

3    indulgence, what we'd like to do is spend the evening checking

4    to make sure that we are, and then we will rest formally in the

5    morning.

6          THE COURT:  Right.  That's what I would propose you

7    do, is don't leave, and double check -- and double check with

8    Pam --

9          MR. WATTS:  We will.

10         THE COURT:  -- to make certain that we have

11   everything that you need in evidence.  Once you rest, you're

12   not going to have that opportunity unless it's by way of

13   stipulation.

14         MR. WATTS:  Sure.

15         THE COURT:  So let's double check overnight, and

16   we'll wrap that up in the morning, and then plaintiffs will

17   rest.

18         Insofar as any motion practice is concerned, I

19   would suggest that you simply reserve your right at that point,

20   and then we'll take that up on our time as opposed to the

21   jury's time.

22         Okay.  And then we have a lineup for tomorrow,

23   Mr. Weinstock?

24         MR. WEINSTOCK:  Yes, Your Honor.

25         THE COURT:  Why don't you give us just a head's up

 1    here?

 2                    We have Mr. James?

 3            **MR. WEINSTOCK:**  Mr. James, we have Mr. Little,

 4    Mr. Serauskas, and probably --

 5            **THE COURT:**  Mr. James, Mr. Little, Mr. Serauskas.

 6            **MR. WEINSTOCK:**  Serauskas, probably another video.

 7    In fact, there may be one or two more.  The FEMA videos, I

 8    think, are pretty short.

 9            **THE COURT:**  Little is by video; is that right?

10            **MR. WEINSTOCK:**  Little is by video.

11                    With the exception of Mr. Little, his deposition

12    is probably more like an hour.

13            **MR. BUZBEE:**  No Graham Allen?  No Graham Allen

14    tomorrow?

15            **MR. WEINSTOCK:**  In the afternoon.

16            **THE COURT:**  Okay.  So we've got a full morning here

17    with these three: James, Serauskas, and Little.  And who else

18    would we cover in the morning?  Anybody else?

19            **MR. WEINSTOCK:**  Just -- just more FEMA videos.

20            **THE COURT:**  Okay.

21            **MR. WATTS:**  And then in the afternoon we've got --

22            **MR. BUZBEE:**  And then in the afternoon?

23            **MR. WEINSTOCK:**  In the afternoon would be Graham

24    Allen.  I've not made a decision if we're going to call Jessica

25    Herzstein.  I've got to digest Dr. Kornberg's testimony.

1        I mean, other than that, that's going to be my
2    last live witness.
3        **MR. WATTS:**  Can we have an agreement that you'll let
4    me know by, let's say, 6:00 or so?
5        **MR. WEINSTOCK:**  Sure.
6        **MR. WATTS:**  Yeah.  That would be great.
7        **THE COURT:**  If you would, follow the same procedure
8    that we used last week.
9        **MR. WATTS:**  Judge, if I could throw out one thing
10   about Mr. James and Mr. Serauskas.
11       These were witnesses that were originally
12   retained by the government.  And we have no objection to him
13   calling them.  However, I don't want a repeat of what we had in
14   open court here, "You originally filed a claim against FEMA."
15       What I would ask is that Mr. Weinstock not ask
16   witnesses James and Serauskas who originally retained them.
17   Because then I think you inject the same thing about FEMA that
18   led to the bench conference.
19       **THE COURT:**  Well, why don't we go ahead and -- let's
20   go off the record for a second.
21                      **(OFF THE RECORD)**
22
23
24
25

1                              *****

2                          <u>**CERTIFICATE**</u>

3           I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                              _S/ Jodi Simcox, RMR, FCRR_
                                Jodi Simcox, RMR, FCRR
12                              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25