1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  FEMA TRAILER          *   Docket MDL 1873 "N"
    FORMALDEHYDE PRODUCTS          *
6   LIABILITY LITIGATION           *   New Orleans, Louisiana
                                   *
7   THIS DOCUMENT IS RELATED TO:   *   September 22, 2009
                                   *
8   CHARLIE AGE, ET AL V           *   1:30 P.M.
    GULF STREAM COACH, INC.,       *
9   ET AL, DOCKET NO. 09-2892;     *
    ALANA ALEXANDER, INDIVIDUALLY  *
10  AND ON BEHALF OF               *
    CHRISTOPHER COOPER             *
11  * * * * * * * * * * * * * * *

12                    DAY 7
                  AFTERNOON SESSION
13        JURY TRIAL PROCEEDINGS BEFORE THE
              HONORABLE KURT D. ENGELHARDT
14            UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16

17  For the Plaintiffs:        Gainsburgh, Benjamin, David,
                                 Meunier & Warshauer
18                             BY:  GERALD E. MEUNIER, ESQ.
                               1100 Poydras Street
19                             Suite 2800
                               New Orleans, Louisiana 70163
20

21                             The Buzbee Law Firm
                               BY:  ANTHONY G. BUZBEE, ESQ.
22                             JP Morgan Chase Tower
                               600 Travis, Suite 7300
23                             Houston, Texas  77002

24

25

1    <u>APPEARANCES</u>:

2    For the Plaintiffs:          Watts Guerra Craft
                                  BY:  MIKAL C. WATTS, ESQ.
3                                 Four Dominion Drive
                                  Building Three, Suite 100
4                                 San Antonio, Texas  78257

5
                                  Hilliard Munoz Guerra
6                                 BY:  ROBERT C. HILLIARD, ESQ.
                                  710 S. Shoreline Boulevard #500
7                                 Corpus Christi, Texas  78401

8
                                  CHRIS PINEDO, ESQ.
9                                 Attorney at Law
                                  802 North Carancahua
10                                Suite 2250
                                  Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                    & Morton
13                                BY:  ANDREW D. WEINSTOCK, ESQ.
                                  BY:  JOSEPH G. GLASS, ESQ.
14                                3838 N. Causeway Blvd.
                                  Suite 2900
15                                Metairie, Louisiana 70002

16
                                  Scandurro & Layrisson
17                                BY:  TIMOTHY SCANDURRO, ESQ.
                                  607 St. Charles Avenue
18                                New Orleans, Louisiana  70130

19
     For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                                BY:  CHARLES R. PENOT, JR., ESQ.
                                  BY:  RICHARD A. SHERBURNE, ESQ.
21                                BY:  SONIA MALLETT, ESQ.
                                  717 North Harwood
22                                Dallas, Texas  75201

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES</u>:

2

3    Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
                                   Room HB-406

4                                  New Orleans, Louisiana 70130
                                   (504) 589-7780

5

6

7

8    Proceedings recorded by mechanical stenography, transcript

9    produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **I N D E X**

2                                                        Page

3

KEVIN SOUZA
4          Videotaped Deposition                        177

5     MARTIN EDWARD MCNEESE
           Videotaped Deposition                        196
6
      DAVID GARRATT
7          Videotaped Deposition                        214

8     GUY NICHOLAS BONOMO
           Videotaped Deposition                        254
9
      STANLEY EDWARD LARSON
10         Videotaped Deposition                         264

11    MICHAEL HARDER
           Videotaped Deposition                        272
12
      STEPHEN CARL MILLER
13         Videotaped Deposition                        287

14

15

16

17

18

19

20

21

22

23

24

25

1                    **AFTERNOON SESSION**

2                   **(September 22, 2009)**

3                        * * * * *

4        **THE DEPUTY CLERK:**  All rise.

5        (WHEREUPON, the jury entered the courtroom.)

6        **THE COURT:**  All right.  You may be seated.

7             Thank you-all for being on time after lunch.

8   Hopefully, you didn't get caught in the rain too badly.

9             Let's go ahead and pick up with our next

10  witness.  Mr. Weinstock, you intend to call who?

11       **MR. WEINSTOCK:**  Kevin Souza by videotape.

12       **THE COURT:**  All right.  Kevin Souza.

13            Now, I understand that the next few witnesses

14  are going to be by way of videotape.  So what I think we should

15  do, especially since we're after the lunch hour is, after each

16  of the videotapes have played, if you-all want to stand and

17  stretch or kind of move around a little bit, it might make the

18  afternoon go a little quicker and it might help us keep our

19  energy level up a little bit.

20       **MR. HILLIARD:**  It might help if we keep the lights

21  on, too, Judge.

22       **THE COURT:**  All right.  Well, we can do that too.

23            Let's go ahead and play Mr. Souza's testimony.

24  He's been sworn in and counsel are present.

25                     **(PAUSE)**

1       **MR. SCANDURRO:**  That ain't Mr. Souza, Your Honor.

2       **THE COURT:**  Let's find Mr. Souza in there in that

3  little machine and get him up here.

4       (WHEREUPON, the videotaped deposition of **Kevin Souza**

5  was played.)

6                          **EXAMINATION**

7  **Q.**  I'm Justin Woods.  Could you state your full name and

8  address for the record, please?

9  **A.**  It's Kevin Souza.  And the address is 430 Market Street,

10  Winchester, Virginia.  I don't know the ZIP.

11  **Q.**  Okay.  Let's -- I know you've had multiple positions.

12       How long have you been employed by FEMA?

13  **A.**  16 years.

14  **Q.**  FEMA relied upon the vendors and manufacturers to use

15  their expertise to provide FEMA with safe and habitable housing

16  units, housing units that complied with industry standards and

17  all applicable regulatory requirements.

18       When you say that FEMA relied upon the vendors and

19  manufacturers to use their expertise to provide FEMA with safe

20  and habitable housing units, is there a document that you can

21  point us to, or was there a request for proposals when FEMA

22  approached vendors or manufacturers to provide EHUs?

23  **A.**  There was a contract for the units that we purchased.

24  **Q.**  Okay.  When you say that FEMA relied upon the vendors and

25  manufacturers to use their expertise, what particular expertise

1  was FEMA relying upon the vendors and manufacturers?

2  **A.**   Their expertise in manufacturing the units that we were

3  purchasing.

4  **Q.**   Were you relying upon -- on the vendors' and

5  manufacturers' expertise in the appropriateness and use of

6  travel trailers or mobile homes for emergency housing units?

7  **A.**   No.

8  **Q.**   You were relying upon the vendors and manufacturers just

9  to provide units that were safe and habitable?

10  **A.**   Yes.

11  **Q.**   And to use their expertise in determining what was a safe

12  and habitable housing?

13  **A.**   My recollection is that the contracts we used said that

14  the units were supposed to be built to industry standards, and

15  that we were relying on them to build the units to industry

16  standards.

17  **Q.**   You had -- you don't know -- you didn't know at the time,

18  in August 2005, what the industry standards were; correct?

19  **A.**   Correct.

20  **Q.**   Do you now know what the industry standards are for either

21  that time period or the current -- or currently?

22  **A.**   Generally, I understand that the industry standards in

23  regard to formaldehyde was that there were no standards for

24  recreational vehicles.

25  **Q.**   You go on to state, the last sentence in your declaration

1 says that FEMA purchased these EHUs believing that they would
2 provide safe and habitable temporary emergency housing.
3          And you feel comfortable today testifying that you
4 knew, or you are certain that FEMA purchased these EHUs
5 believing that they would provide safe and habitable housing?
6 **A.**   Yes.  And I'm going to elaborate and say that we had used
7 the EHUs previously.  EHUs being, in this case, travel
8 trailers.  We used them as early -- or as recently, I should
9 say, as 2004.  And in our previous use of the units, we had no
10 real reasons to believe that units purchased off the lot would
11 not be safe and habitable as long as they met the industry
12 standards that we had purchased off the lot previously.
13          And so although I don't have any specific knowledge
14 of the standards as they existed back then, when I was told
15 that we were purchasing the units off the lot met -- to meet
16 industry standards, I had no reason to believe that they would
17 not be safe and habitable units as the units we had used
18 previously in our disaster operations.
19 **Q.**   Do you know the requirements involved in contractors
20 installing and maintaining EHUs?
21 **A.**   Generally, I know that we hired contractors to haul and
22 install the units.  And, generally, I know that they have to
23 pick up units at staging areas, transport them, install them on
24 private property, hook up basic utilities, and in some cases
25 block and strap the units.

1  **Q.**   What do you understand about blocking of units?

2  **A.**   Generally, I understand that we blocked the units to make

3  them more stable.

4  **Q.**   Describe to me what blocking is.

5  **A.**   Putting cement blocks or wood or other stable -- stable

6  structures under the unit to support it.

7  **Q.**   What do you understand to be the contractor's

8  responsibility in maintaining EHUs?

9  **A.**   Generally, the contractors were to receive calls regarding

10  maintenance issues, anything from parts of the unit that were

11  not working properly to plugged toilets or other maintenance

12  issues, and they were to respond to those maintenance requests.

13  **Q.**   Were they to respond to concerns from residents regarding

14  odors in the unit?

15  **A.**   I know that they did, yes.

16  **Q.**   Do you know if they were responsible in responding to

17  residents concerning formaldehyde concerns in the unit?

18  **A.**   Can you repeat that again, please?

19          (WHEREUPON, the requested portion of the record was

20  read by the court reporter.)

21          **THE WITNESS:**  Yes, if they were characterized as

22  formaldehyde concerns.

23  **Q.**   Mr. Souza, in your position in September 2005 as the

24  supervisory program manager, were you aware that OSHA conducted

25  testing EHUs in October of 2005?

1  **A.**    In 2005 I was not aware of that.

2  **Q.**    When did you become aware of that?

3  **A.**    Approximately 2008, maybe.  Maybe earlier.  I don't

4  recall.

5  **Q.**    How did you come to the decision to make that

6  recommendation to con- -- for FEMA to conduct its own testing?

7  **A.**    I believe it's in the e-mail.  But essentially, I just

8  wanted to either put the issue to rest or remove people from

9  harm.

10 **Q.**    What specifically about that request for information made

11 it apparent to you that FEMA needed to conduct its own testing?

12 **A.**    There may have been -- I don't recall specifically.  There

13 may have been reference in there, in that e-mail or in a

14 previous recent e-mail, to the Sierra Club testing.  And I did

15 not want to rely upon non-federal testing to make decisions

16 about how to move forward.

17 **Q.**    Why would you not want to rely upon the Sierra Club

18 testing?

19 **A.**    To be honest, because I wasn't sure how their testing was

20 performed, or potentially how biased the testing may have been.

21 And I wanted to reach out to the federal scientific community

22 to conduct our own testing.

23 **Q.**    So it was better, in your mind, that the federal

24 government conduct the testing than any other agency with the

25 capabilities?

1  **A.**   I don't know if it was better, but I believe it was an

2  appropriate course of action.

3  **Q.**   But it still took -- once the decision was made, it still

4  took three months for anything to -- any testing to take place

5  based -- basically -- based upon the funding issues, the

6  logistics, the powering of units?

7  **A.**   And the scientific concerns was probably the larger of all

8  those you just mentioned.  We were instructed by EPA that in

9  order to get valid results, they needed to develop a testing

10  methodology that would be scientifically sound, and they needed

11  to have that methodology reviewed by other scientific peers

12  before they could actually begin the testing.

13  **Q.**   Can you tell me what went into the consideration of

14  installation of vent fans as a possible response action?

15  **A.**   What I mean here was that I recalled conversations about

16  whether or not -- if there was formaldehyde in the units,

17  whether or not there were any structural changes we could make

18  to a unit to help ventilate them in terms of installation of

19  vent fans.

20  **Q.**   Okay.  And was that a discussion that was had with the

21  manufacturers of the units regarding the possibility of

22  installation of vent fans?

23  **A.**   I believe there was.  I don't recall when and I don't

24  recall who.

25  **Q.**   But, obviously, installation of vent fans wasn't chosen as

1    a response action; correct?

2    **A.**    That's correct.

3    **Q.**    And why is that?

4    **A.**    My general recollection was that -- and, again, without

5    the context of when -- at this point, we weren't even sure we

6    had a problem.  But at some point I believe we decided that the

7    vent fan that would need to be installed would require major

8    structural changes to the unit in terms of cutting holes in the

9    units, and external, I think they characterized them as

10   blowers, and there were going to be major structural changes to

11   the unit.

12           And so we were -- while we investigated whether or

13   not we had an issue, we tried to find other potential solutions

14   like filters or something else that may work.

15   **Q.**    But -- you talked about the alteration of the units.  But

16   it was a possibility to install the vent fans?

17   **A.**    Again, it was a possibility to install the vent fans.

18   **Q.**    But for some reason, there was a decision not to do such?

19   **A.**    Correct.

20   **Q.**    And, again, you believe that OGC, Mr. Preston in

21   particular, was involved because of litigation concerns?

22   **A.**    Yes.

23   **Q.**    Was there any plans of action suggested by anyone from

24   OGC?

25   **A.**    There was an e-mail from Rick Preston where he agreed that

1   testing should be done, but he wanted to make sure we had a --

2   that the program side of the house had a course of action laid

3   out before we started.

4   Q.   What was -- why -- what did you understand to be his

5   concern for the program side having a course of action set up?

6   A.   His concern, quite frankly, was already one of the program

7   concerns, which is, if we started testing with EPA, and the

8   results came back requiring us to take action, what would that

9   action be?

10          His concern was pretty much that we have a plan of

11  action before we begin the concern.  At least that's how I

12  understood his concern.

13  Q.   So you understood his concern to wait, not perform testing

14  until there is an appropriate plan of action?

15  A.   I believe that was his concern, yes.

16  Q.   You don't know of any complaints or concerns that were

17  being voiced by occupants during this time?

18  A.   Yeah.  I don't know when the complaints came into the

19  maintenance line.

20  Q.   But you knew that concerns had been raised, according to

21  your declaration, in, I believe, April or May of 2006; correct?

22  A.   Yes.

23  Q.   And those concerns went unanswered and unaddressed until

24  an appropriate plan of action was developed between OGC and

25  FEMA?

1   **A.**   No.  I don't believe that that's the case.  I think they

2   were addressed at the field level.

3   **Q.**   How so?

4   **A.**   My understanding is that they advised applicants to

5   ventilate the units.  And there may have actually been some

6   site visits conducted by housing specialists.

7   **Q.**   If you would, sir, if you'd turn to Page 7 of your

8   declaration, Section 18.  The second sentence, you say:

9   "Around July 2006, FEMA prepared and distributed a formaldehyde

10   brochure to all EHU occupants about:  Formaldehyde, potential

11   health concerns often assoc- -- often associated with

12   formaldehyde, actions occupants could take to reduce the levels

13   of formaldehyde in their EHU, and the need for occupants to

14   consult a medical provider if they start to have health

15   concerns related to formaldehyde."

16          Can you -- and that's a description of that brochure,

17   but I'm trying to -- and I've seen several brochures, and I'm

18   trying to determine which particular one this is.

19          Is it a two-page brochure?

20   **A.**   I think this one is the tri-fold brochure with the trailer

21   on the front.

22   **Q.**   So based upon this baseline level of formaldehyde in EHUs

23   of .3 parts per million as being the threshold level of concern

24   for sensitive individuals, FEMA then concluded that EHUs

25   remained a viable housing option; correct?

1   A.   When combined with ventilation, yes.

2   Q.   But FEMA took no steps to install the vent fans, as we

3   discussed earlier; correct?

4   A.   That's correct.

5   Q.   So it was just normal ventilation, meaning, i.e., opening

6   up windows?

7   A.   Right.  Because the -- at least to the best of my

8   recollection, the EPA testing methodology didn't have vent

9   fans.  They just used ventilation in terms of opening windows

10  and doors and those sorts of things, the things that we

11  recommended that applicants do.  And it was enough to lower it

12  below these levels of concern.

13  Q.   So through ventilation, you were somewhat satisfied that

14  that issue had been addressed?

15  A.   That's correct.

16  Q.   Mr. Souza, my name is Lezly Petrovich.  I only have a few

17  questions for you.

18          When you said that FEMA relied on the contractors to

19  install and maintain the trailer, that was based on the

20  contractor's contract with FEMA; correct?

21  A.   Correct.

22  Q.   And those contracts defined the contractor's obligation

23  and duties; correct?

24  A.   Correct.  Yes.  Yes.

25  Q.   Did you, in fact, go to Louisiana right around the time

1   Hurricane Katrina hit the Gulf Coast?

2   **A.**   Yes.  I was deployed to Katrina a day before, or maybe two

3   days before the storm made landfall, and was there until

4   Christmas of that year.

5   **Q.**   So when everybody was leaving right before, you were

6   coming into the storm zone; is that right?

7   **A.**   That's correct.

8   **Q.**   And you said you stayed until about Christmas of 2005?

9   **A.**   Yes.

10  **Q.**   During your approximate four months' stay at the end of

11  2005 in Louisiana, what were your job duties while you were

12  there?

13  **A.**   I had a couple.  I was the deputy housing area commander

14  for a brief period in the beginning of the response phase.  And

15  then eventually ended up as a housing manager in the Louisiana

16  joint field office.

17  **Q.**   Okay.  And during your tenure in those positions at the

18  end of 2005, am I correct that FEMA's contractors would have

19  set up thousands of travel trailers for residents?

20  **A.**   I can't recall how many were set up in the time that I was

21  there.  But it was many.

22  **Q.**   Would you say it was thousands, or would you say it was

23  hundreds?

24  **A.**   If I had to guess, I'd say it was thousands.

25  **Q.**   Okay.  And that would have included all manner of

1   different travel trailers, including new travel trailers?

2   **A.**   New travel trailers were purchased off the lot probably.

3   **Q.**   In any event, you oversaw probably thousands of travel

4   trailers being installed at the end of 2005?

5   **A.**   Yes.

6   **Q.**   And am I correct that during that period, when those

7   travel trailers were presumably at their newest, no

8   formaldehyde complaints came to your desk as the FEMA

9   representative down in New Orleans?

10   **A.**   Not that I'm aware of, no.

11   **Q.**   When you became one of the FEMA point people in mid '06 on

12   the formaldehyde issue, did you learn then that there were no

13   governmental regulations on formaldehyde in residential indoor

14   air?

15   **A.**   Eventually, at some point in 2006, yes, I learned that.

16   **Q.**   And did you also learn at around the same time that there

17   were no government regulations on formaldehyde in travel

18   trailers specifically?

19   **A.**   Yes.

20   **Q.**   Was one of the things you were trying to do in your

21   representation of FEMA in 2006, to get somebody to tell you

22   what the levels ought to be so that you would have a benchmark

23   to look at as to what was a safe or unsafe level in these

24   travel trailers?

25   **A.**   Yes.

1  **Q.**   You understood, as a result of your review of the ATSDR

2  consultation -- health consultation, that .3 parts per million

3  of formaldehyde was a level of concern for sensitive

4  individuals; is that correct?

5  **A.**   Yes.

6  **Q.**   Did they ever tell you how many people are considered

7  sensitive individuals, by percentages or otherwise?

8  **A.**   I don't recall them ever telling me.

9  **Q.**   Did you assume, from reading the ATSDR report, that even

10 at levels above .3 parts per million, which was the sensitive

11 individual level, there were levels above that that lots of

12 people would have no problem with?

13 **A.**   I wouldn't characterize it that way.  I would say that

14 based on the results I got, that I assumed that if .3 was for

15 sensitive individuals, that above .3 was something that would

16 not impact non-sensitive individuals.

17 **Q.**   Okay.

18 **A.**   Does that make sense?

19 **Q.**   It does.

20 **A.**   Okay.

21 **Q.**   Did you also learn, as a part of your background research

22 into -- into formaldehyde, that it affects all people

23 individually and differently?

24 **A.**   Generally, yes.

25 **Q.**   I wanted to ask you a question or two about your

1   declaration that was marked as Souza Exhibit No. 2, and

2   particularly Paragraph 6.  Do you see that?

3   A.   Yes.

4   Q.   I wanted to understand a little bit about the sequence of

5   FEMA's mission.

6           Am I correct that FEMA's approach to the housing

7   issues was a three-part approach?  That initially you would

8   look to solve immediate needs by putting people in emergency

9   shelters, hotels, motels, even tents, that sort of thing?

10          Was that the initial response of FEMA?

11  A.   Yes.

12  Q.   And that after that, after the initial response, that's

13  when the travel trailers and the emergency housing units would

14  come into play, and you would look to transition people out of,

15  for example, tents and emergency shelters into travel trailers?

16  A.   Yes.

17  Q.   And that after that, you would be looking to transition

18  people out of travel trailers and into more permanent housing;

19  is that correct?

20  A.   Yes, that's correct.

21  Q.   And was that FEMA's plan of action from the beginning as

22  soon as Katrina made landfall?

23  A.   Yes.

24  Q.   And so you -- FEMA always envisioned travel trailers as a

25  temporary house -- emergency housing option to bridge the gap

1    between living in a tent and moving into more permanent

2    housing?

3    A.    Yes.

4    Q.    Mr. Souza, my name is Henry Miller and I represent the

5    United States, which is a defendant in this litigation.

6              You were just asked some questions about FEMA's plan

7    at the time of the response and how this included sort of a

8    three-prong approach.

9              Were travel trailers FEMA's initial choice for the

10   temporary emergency housing, or were there alternative housing

11   methods that were considered?

12   A.    We had talked about using manufactured homes or mobile

13   homes as -- as the initial going-in position.

14   Q.    Was a decision made -- well, what was decided?

15   A.    The decision was made to use travel trailers as opposed to

16   mobile homes.

17   Q.    Were you involved with that decision-making process?

18   Actually, let me rephrase it.

19             Do you have -- did you -- do you have knowledge of

20   that decision-making process?

21   A.    Yes.

22   Q.    And how do you have that knowledge?

23   A.    As part of the housing area command, there were

24   discussions about what types of units we could use and where we

25   could place them.

1  Q.   And what is your understanding why the decision was made

2  to use travel trailers as opposed to manufactured housing or

3  mobile homes as the primary temporary emergency housing

4  response for Hurricane Katrina victims and Hurricane Rita

5  disaster victims?

6  A.   My recollection was that we were going to use mobile

7  homes.  But because of the size of the mobile homes and the

8  quantity in which we needed them, the areas available to us to

9  put those mobile homes were outside of the impacted areas.

10          In other words, they were outside of the areas of New

11  Orleans, and really not even a practical solution in the

12  immediate vicinity of Baton Rouge.  They would have to be

13  probably even further north than that.

14          And when we made this proposal to the State, concerns

15  were raised that people wanted to live closer to their impacted

16  homes, if they were homeowners, so that they could begin making

17  immediate repairs.  There were concerns that rebuilding the

18  community in terms of businesses and economic stability and

19  reinvigorating the economy, that putting people that far away

20  from those impacted areas would not be a preferrable solution.

21  Q.   Were there discussions about the effects that this may

22  have on the future demographics of New Orleans?  Population

23  makeup of New Orleans?

24  A.   There were discussions about demographics, but I don't

25  specifically recall whether or not they were in regards to the

```
 1  mobile home or travel trailer discussion versus people moving
 2  out of the state discussion.
 3  Q.   Was there a concern that if you used mobile homes as
 4  opposed to travel trailers, that many of the people, because
 5  they'd have to be placed farther away from New Orleans or Baton
 6  Rouge, that they may not eventually move back to New Orleans?
 7  A.   Yes, there were those concerns.
 8            THE COURT:  Is that it, Counsel?
 9            MR. MEUNIER:  Your Honor, may we approach the bench?
10            THE COURT:  Yes, please.
11            (WHEREUPON, the following proceedings were held at
12  the bench.)
13            MR. WEINSTOCK:  About the Henry Miller introduction
14  would you just make an announcement that this deposition was
15  taken in another case.
16            THE COURT:  We have two problems.  The first one was
17  maintenance, which the second one was the Henry Miller thing.
18  And you-all were picking these segments.
19            MR. MEUNIER:  I know.  And I don't think it was done
20  intentionally, Your Honor.
21                 What I would suggest is that Henry says, "A
22  defendant in the litigation."  Could you instruct the jury that
23  while the United States may be a defendant in other litigation
24  involving FEMA trailers, that it is not a defendant in this
25  case.
```

194

 1          **THE COURT:**  I will be happy to do that.

 2          **MR. WEINSTOCK:**  I would suggest --

 3          **MR. MEUNIER:**  -- and that will clarify it, I think.

 4          **MR. PENOT:**  And can we get an instruction that there

 5   is no maintenance claim against Fluor?

 6          **THE COURT:**  Well, I've thought about that.  But part

 7   of the instructions -- I don't know if you've looked at the

 8   jury instructions --

 9          **MR. PENOT:**  I'll look through it.

10          **THE COURT:**  -- but there is a segment in there that

11   makes clear, I think, as to the maintenance claim.

12          **MR. PENOT:**  I have some additional language that I

13   was going to ask to make that clear.

14          **THE COURT:**  My point, though, is can that not be

15   cleared up with regard to a jury instruction, or would you

16   prefer that I make that announcement here as well?  I

17   honestly --

18          **MR. MEUNIER:**  Yeah.  I don't think that -- I don't

19   think that part is --

20          **MR. HILLIARD:**  I think it highlights it if you do

21   that.

22          **MR. PENOT:**  Okay.  Then I'll leave it in the jury

23   instruction.

24          **THE COURT:**  What do you want me to say about the

25   defendant?

1          **MR. MEUNIER:**  That they're a defendant in certain

2     litigation, but not in this case.

3          **THE COURT:**  Okay.

4          (WHEREUPON, the following proceedings were held in

5     open court.)

6          **THE COURT:**  While we're getting the next witness'

7     video teed up here, let me point out that on the video and on

8     the transcript of the witness' testimony that you've just

9     heard, Mr. Henry Miller had introduced himself as representing

10    the United States as a defendant.

11              The United States is a defendant in other

12    related litigation, but not in the case that we are here

13    trying.  So to be clear, his introduction should not suggest to

14    you that the United States is a defendant.

15              We will have some -- as part of the jury

16    instructions, you will get some additional information in that

17    regard.  But neither the United States, nor its agency, FEMA,

18    is a defendant in this case, just to be clear.

19              Okay.  Anybody need to stand and stretch at this

20    point or are you ready for another video deposition?

21          **MR. WEINSTOCK:**  To continue the afternoon matinee,

22    it's Mr. Martin McNeese.

23          **THE COURT:**  Okay.  Mr. Martin McNeese is the next

24    witness who has been sworn in and all counsel are present.

25              (WHEREUPON, the videotaped deposition of **Martin**

1   **Edward McNeese** was played.)

2                            **EXAMINATION**

3   **Q.**   Mr. McNeese, could you state your full name for the

4   record?

5   **A.**   It's Martin Edward McNeese.

6   **Q.**   And can you give us a little background on your education.

7   Did you attend college?

8   **A.**   I did attend college.  I graduated with an associate in

9   science electrical technology from the University of Texas in

10  Arlington, Texas.

11  **Q.**   In ever in your time with FEMA, have you ever been

12  required to take a special certification course of any type?

13  **A.**   Actually, I am not currently certified, but I was a

14  certified contracting officer technical representative.

15  **Q.**   And when you say you were certified, did you have to go

16  through a certain course or a certain training program to

17  become certified?

18  **A.**   Yeah.  There's a -- the Department of Homeland Security

19  specifies a curriculum that you can pick from for 40 hours to

20  take that, yes.

21  **Q.**   And, Mr. McNeese, who is your current employer?

22  **A.**   It is Department of Home -- Homeland Security, Federal

23  Emergency Management Agency.

24  **Q.**   And in what capacity?  What's your current position?

25  **A.**   I am currently a program officer.

1   **Q.**    And what are the duties of a program officer?

2   **A.**    The -- my responsibilities are to be the -- basically the

3   expert for FEMA, Region 8, in individual assistance programs.

4              Well, it actually means that I am -- my job is

5   actually to interpret the regulations and the laws for our

6   region for individual assistance programs.

7   **Q.**    What was your previous position before your current one?

8   **A.**    I was an emergency management program specialist.

9   **Q.**    Roughly from what dates were you holding that position?

10  **A.**    From 2002 until September of last year.

11  **Q.**    And what were your duties or responsibilities as an

12  emergency program specialist?

13  **A.**    My responsibilities were to support the state and the

14  region and the citizens of the United States in delivering

15  programs for individual assistance under the Stafford Act.

16  **Q.**    And so were you in this position as an emergency

17  management program specialist when Hurricanes Katrina and Rita

18  first struck?

19  **A.**    I was.

20  **Q.**    Could you -- did -- could you specify a little bit more

21  for me what -- what -- for exam- -- examples of what you did to

22  support the states in the individual assistance programs?

23  **A.**    Basically, under the Stafford Act, the programs that FEMA

24  delivers are in support of the state and supplemental to state

25  programs.  And so when we deliver disaster assistance, we're

1   basically delivering federal assistance to supplement and
2   support state assistance.  And so in multiple disasters, that
3   was my responsibility.
4           Individual assistance consists of -- and it varies,
5   depending upon the years that we were in because of law
6   changes -- but it's temporary housing, personal property
7   assistance, crisis counseling, disaster unemployment
8   assistance, disaster legal assistance, and any other
9   authorities that are provided under the law, under the Stafford
10  Act.
11  Q.   Mr. McNeese, did you draft this document?
12  A.   I did draft it by quoting a lot of the statements, and
13  then modifying it and correcting it and setting it correct.
14  Q.   It states:  "Based upon my review of that report, I
15  informed Mr. Souza on or about March --slash -- February/March
16  of 2007 that travel trailers in combination with ventilation
17  remained a viable temporary emergency housing unit -- I'm
18  sorry -- housing option."
19          So what was your basis for informing Mr. Souza that
20  the travel trailers in combination with ventilation remained a
21  viable temporary -- temporary emergency housing option?
22  A.   The report actually stated, you know -- graphically
23  depicted and stated that the units could be brought down below
24  what they'd identified as a level of concern for sensitive
25  people.  And so if the trailers could be brought there, I felt

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1  that left them as a available option.

2  Q.  What did you mean by the term "viable"?

3  A.  Meant that they could still be used.

4       Okay.  What I'm saying is that in considering that

5  the ventilation -- the ventilation levels and what the ATSDR

6  determined as a level of concern was not strictly a safety.  It

7  was a -- that this was okay, that the units could be brought

8  down, that we were looking at indoor air quality.

9       I'm not saying that I was not concerned about the

10  safety of the units.  Because I will tell you right now on

11  record, the number one thing we concern with -- ourselves with

12  in the housing is safety of the applicants.

13       But in the indoor air quality, I'm predominantly

14  looking at that report.  And that report was not a, quote,

15  unquote, safety report.  It was an indoor air quality report.

16  Q.  You are aware, though, that the report from ATSDR was

17  also -- was actually entitled a health consultation; correct?

18  A.  I don't remember that.  I don't know.

19  Q.  Mr. McNeese, to go back to this same statement, you

20  previously testified that upon the review of the report, you

21  came to the conclusion that the travel trailers in combination

22  with the ventilation remained a viable option; correct?

23  A.  A viable temporary housing -- emergency housing option.

24  Q.  And that you based that conclusion upon that -- the study

25  itself?

1   A.    That's correct.

2   Q.    So did you believe the task of EPA and ATSDR in terms of

3   determining whether venting was an effective response was to

4   determine whether or not it lowered the levels of formaldehyde?

5   A.    No, I didn't believe that.

6         If the test -- the task that was given to EPA was to,

7   number one, establish a baseline, or establish a level of

8   volatile inorganic compounds, and specifically formaldehyde;

9   and, number two, to -- because we weren't denying that there

10  was formaldehyde in the units -- we knew there was -- to see

11  if -- what the impact of venting was on the formaldehyde

12  levels.

13  Q.    In Paragraph 5:  "FEMA was responsible for setting up the

14  test area and providing new EHUs for testing.  A portion of the

15  FEMA Baton Rouge staging facility was set aside as a test area,

16  and 96 new travel trailers built by eight different trailer

17  manufacturers, 12 from each manufacturer, were obtained from

18  FEMA staging and storage facilities.

19        "Commencement of testing was delayed because of

20  problems associated with extending electricity to the testing

21  area.  As previously noted, EPA commenced the testing of the

22  units in mid-September, and testing was completed by

23  mid-October."

24        Who from FEMA was responsible for setting up the

25  testing area?

1    A.    By name, I don't remember that.  It was our -- we had a

2    Baton Rouge staging area, and the logistics area that was over

3    there were responsible for setting aside the area and getting

4    it prepared.

5    Q.    In Paragraph 6 or Section 6 it states:  "EPA completed its

6    processing of the test data in November, and the data was

7    provided to FEMA's counsel, Rick Preston, who sent it on to the

8    ATSDR for analysis."

9          Why did EPA's test results go through Rick Preston?

10   A.    It was agreed upon that they would be for -- for the

11   record, that Rick would be the custodian of the data.

12   Q.    And why was he chosen for that task?

13   A.    You know, I don't remember, at the time why we chose that.

14   We wanted to control it, but I don't remember why we chose

15   Rick.

16   Q.    When you say, "We wanted to control it," who is "we"?

17   A.    It would be EPA, FEMA and ATSDR.  We wanted the results --

18   you know, the tests -- that was raw data that we're talking

19   about right now, that it be channeled to where it wasn't pulled

20   out of context until it had been analyzed by ATSDR.

21   Q.    So when you say "control," you mean not letting anyone

22   else see it until it had been interpreted by ATSDR?

23   A.    That's -- that is part of control, yes.

24   Q.    What else is involved in control?

25   A.    Just not to have the data released, and to have -- the

 1   intent was to have ATSDR analyze the data before anyone else

 2   analyzed the data.  And that was our protocol, and that was the

 3   procedure we were following.

 4   **Q.**   So for lack of a better word, you wanted to make sure that

 5   the raw data stayed confidential?

 6   **A.**   That's one way to put it.  We wanted to make sure it

 7   stayed in our control.

 8   **Q.**   Do you have any direct knowledge that they were given

 9   out -- and I have to ask this five separate times, so bear with

10   me.

11          Do you know whether or not the flyer was given out

12   specifically to Alana Alexander?

13   **A.**   I don't know that.

14   **Q.**   What was the purpose of the flyer being distributed in

15   July of 2006?

16   **A.**   It was to inform the residents of the travel trailers that

17   there was formaldehyde in the units to make sure that they had

18   that positive knowledge of that, and to recommend ways to

19   reduce the formaldehyde level.

20   **Q.**   This flyer, though, was distributed prior to the test

21   results from EPA and ATSDR being --

22   **A.**   That's right.

23   **Q.**   When you say, though, that you were not trying to generate

24   a lot of calls, what did you mean?

25   **A.**   What we meant -- what I meant was that we were actually

1  trying to get the information out to the applicants.  We

2  weren't trying to raise an alarm.  We were trying to pass

3  information to them.

4          And as a result, the applicants already have numbers

5  that they can contact us.  We weren't trying to start a new

6  series of issues.

7  Q.   When you say you weren't trying to start a new series of

8  issues, what were the old issues that had been going on?

9  A.   Well, the standard day-to-day business of someone living

10  in a travel trailer, they have maintenance issues, they call

11  our maintenance department.  If they have concerns with the

12  applicant, they have an 800 number they can call.

13          There's a whole series of responsibilities we have to

14  take care of people that are living in mobile homes and travel

15  trailers.

16  Q.   And so with this flyer, you wanted to give the occupants,

17  applicants positive knowledge that their trailers had

18  formaldehyde, but you did not want to generate a new series of

19  issues?

20  A.   We wanted to provide the information that the travel

21  trailers had formaldehyde in them, that's correct.

22  Q.   The e-mail states:  "As a follow-up to our formaldehyde

23  call on 2/28, here is my draft of where we need to go based on

24  the results of the test.  As I said before, I think the test

25  confirmed that we do not have a major issue with the

1   formaldehyde, but we are probably too casual in our
2   communications with our applicants regarding proper
3   ventilation."
4          How did the test confirm that you did not have a
5   major issue with the formaldehyde?
6   A.   Well, based upon my interpretation at the time, you know,
7   they had a level of concern in the ATSDR report that the
8   ventilation methods were able to reduce to significantly below
9   that level of concern.  So that was my interpretation of the
10  report.
11  Q.   When you say that's your interpretation of the report,
12  you, however, have no independent personal knowledge or
13  experience to serve as a basis for that interpretation, do you?
14  A.   That's correct.
15  Q.   And so you believed that this report issued by ATSDR using
16  the .3 ppm level of concern confirmed that there was no major
17  issue with formaldehyde?
18  A.   That was my con- -- my belief at the time, yes.
19  Q.   At the end of that paragraph you also state that:  "We are
20  probably too casual in our communications with our applicants
21  regarding proper ventilation."
22          What did you mean by "too casual in your
23  communications"?
24  A.   Well, it was my opinion and my recommendation that we be
25  more aggressive in addressing ventilation of the travel

1    trailers.

2            Right now we had put it in the flyer, but we weren't

3    using our recertified patient people that were meeting with

4    them, our maintenance people, or any of our people to actually

5    discuss ventilation of the trailer.  And that was just my -- my

6    opinion that we should be more aggressive in discussing that.

7    Q.    Did you ever voice that opinion to others in FEMA?

8    A.    This e-mail is -- went to quite a few people in FEMA.

9    Q.    Once the CDC analysis of EPA testing had concluded, what

10   was your understanding as to what was to be done with that

11   information?

12   A.    Actually -- I didn't actually have an understanding.  That

13   was one of the reasons I made recommendations before, because I

14   had no authority or jurisdictions once -- I was only in charge

15   of the test, not what would happen after that.

16   Q.    Uh-huh.

17   A.    And so I made recommendations and passed them to IA

18   program management to Kevin Souza in headquarters in the hopes

19   that they would implement training and additional information

20   out to the field to -- to let people know what needed to be

21   done with the results of it.

22   Q.    When you say "implement training," you mean just training

23   of the individuals in staging areas as to how to properly enter

24   the units or to properly vent the units?

25   A.    Actually, in -- in the staging areas, plus in the -- for

1    our own people that were doing the lease-ins and stuff.

2    Because, you know, there were some -- the obvious thing we saw

3    was the initial high level of formaldehyde that dropped with

4    ventilation, is that if everyone knew that, then we would be

5    ventilating the units before we allowed anyone to be placed in

6    them.

7    Q.    And you were asked about your -- the conclusions that you

8    drew as a result of those EPA tests.  Do you recall that?

9    A.    Yes, I do.

10   Q.    And you recall that your conclusion was that based on

11   those tests, you felt like travel trailers in combination with

12   ventilation were a viable option for emergency housing;

13   correct?

14   A.    That's correct.

15   Q.    Okay.  And you were asked a follow-up question as to

16   whether you were basing that solely on the ATSDR test or

17   whether you had any personal training or experience or

18   knowledge.  Do you recall those questions?

19   A.    I do.

20   Q.    Am I correct that you did, in fact, have some personal

21   experience while you were with FEMA with the use of travel

22   trailers in other disasters prior to Hurricane Katrina?

23   A.    That's correct.  I have actually been working in housing

24   programs over the past -- over the years before Katrina.

25   Q.    And am I also correct that part of your experience would

1   have been working with travel trailers in hurricane disaster

2   areas, including the Gulf Coast and Florida?

3   A.   That's correct.

4   Q.   Is -- am I also correct that to the best of your knowledge

5   and experience working with travel trailers prior to Hurricane

6   Katrina, you weren't aware of any health concerns associated

7   with formaldehyde in the travel trailers; is that right?

8   A.   That's correct.  I was not.

9   Q.   And you dealt directly with occupants, didn't you, in

10  those other hurricane disaster areas from time to time?

11  A.   I did.

12  Q.   And, again, prior to Hurricane Katrina, you weren't aware

13  of any complaints by occupants related to formaldehyde or

14  health effects of living in these trailers?

15  A.   Yeah.  I actually was not aware of any.

16  Q.   Do you recall in your discussions with EPA and ATSDR in

17  2006 about the testing protocol, concerns being raised about

18  testing occupied units because of the formaldehyde that could

19  be introduced by the occupants?

20  A.   I do recall the discussions of testing occupied units.

21  And it wasn't only for formaldehyde, but because of -- it would

22  have taken an extensive study or -- study or effort to develop

23  a protocol for testing occupied units, because there are

24  volatile inorganic compounds introduced, including

25  formaldehyde, from the occupants, or could be.  So I do

1  remember those discussions, yes.

2  **Q.**   And that would include items they brought into the travel

3  trailer, such as bedding, furnishings, clothing, that sort of

4  thing?

5  **A.**   Well, that -- that was the discussion from EPA and CDC and

6  the experts was that there are items that contained

7  formaldehyde that could be brought in.  I don't remember the

8  specific items, though.

9  **Q.**   Do you also recall a discussion that activities could

10 increase formaldehyde inside an occupied unit, such as cooking

11 and cleaning and that sort of thing?

12 **A.**   I do remember discussions along that line.

13 **Q.**   When we looked at McNeese No. 7 -- I don't know if you

14 have that in front of you.

15 **A.**   Okay.

16 **Q.**   I wanted to ask you a question about Item 3, "status of

17 EPA testing efforts."

18         Is this text in McNeese No. 7 yours?  Did you type

19 all of this?

20 **A.**   Actually, all of the typing is not mine, because the

21 headings appear to be from questions that someone else was

22 asking.

23 **Q.**   Do you recall where that information came from on the

24 first page of McNeese No. 7?

25 **A.**   The information that -- in the body?

1   **Q.**   Below the first three lines, yes, sir.

2   **A.**   Well, I would have generated the responses to the

3   questions.  But I don't -- I don't know if I actually typed --

4   had questions on them.

5   **Q.**   Okay.  So when you referenced, for example, under No. 1

6   that there were as of October 2006, approximately 50 complaints

7   in Mississippi and approximately 20 in Louisiana --

8   **A.**   That's correct.

9   **Q.**   -- was that information that you had obtained from some

10  source?

11  **A.**   Yes, it is.

12  **Q.**   Would you -- and are you aware of the total number of

13  travel trailers that were deployed after Hurricane Katrina and

14  Hurricane Rita in the Gulf Coast area?

15  **A.**   Actually, the count that I had was about 118,000 travel

16  trailers.

17  **Q.**   So this information indicates that a year after the storm,

18  for every one complaint that you had about formaldehyde, there

19  were thousands, literally, of people who had not complained; is

20  that right?

21  **A.**   That could be interpreted that way, yes.

22  **Q.**   Is that also support for your conclusion that the

23  formaldehyde in the travel trailers was a relatively small

24  problem that could be managed; and that for the vast majority

25  of people, travel trailers were, in fact, a good, viable option

1    for temporary emergency housing?

2    **A.**    Actually, in my conclusion that it was viable emergency

3    housing units, I was predominantly not looking at the vast

4    universe or the large universe of the travel trailers.  Because

5    if there was a problem in any of them, then there was a problem

6    in all of them.

7             What I was looking at was the level of sensitivity

8    ATSDR gave us and the fact that we could come considerably

9    below that with ventilation, and that was what it was based on.

10   **Q.**    Let me ask you also about McNeese No. 7.  There's a

11   reference in the second paragraph here to the -- what's been

12   described to us in other depositions as the swapout program or

13   the swapping out of newer units for older units.

14            Do you see that discussion there on McNeese 7 under

15   No. 2?

16   **A.**    Yes.

17   **Q.**    Was it your conclusion that the program at this time of

18   swapping out a newer trailer for an older trailer with people

19   who had complained an adequate response that was, in fact,

20   effective in addressing the complaints of those individuals?

21   **A.**    It was my feeling that that was, in fact, a valid program

22   and a valid process, realizing that if people did not want to

23   do that, we would put them in a hotel or somewhere else.

24            I mean, that was always the other option that went

25   with it.  But the ones that we swapped out with older units, we

1   never, to my knowledge, got a complaint back from them again.

2   Q.   And the older units would be, for example, units from the

3   2004 hurricanes in Florida?

4   A.   Or from any other disasters.  But prior to Katrina-type

5   units, yes.

6   Q.   So some of the swapout units were, in fact, from the 2004

7   hurricanes in Florida; is that right?

8   A.   That's probably true, yes.

9   Q.   And you're not aware of any follow-up problems in those

10  2004 units once they were swapped out, from a formaldehyde

11  standpoint?

12  A.   I'm not aware of any, that's correct.

13  Q.   Also in McNeese 7 you refer under No. 3 to the fact that:

14  "It is a given that the materials used in the construction of

15  mobile homes and travel trailers, in addition to other

16  residential structures, contain formaldehyde."

17       Do you see that?

18  A.   I do.

19  Q.   It was no surprise to you that there was some formaldehyde

20  in these travel trailers, was it?

21  A.   No, it was not.

22  Q.   And, in fact, you're generally aware that there is also

23  formaldehyde not only in travel trailers, but in mobile homes

24  and in stick-built residential structures; is that right?

25  A.   That's correct.

1  Q.    In some of the documents that we looked at this morning, I

2  noted that you made references to the fact that there were no

3  standards -- residential indoor air standards that FEMA could

4  look to for guidance.

5         Do you recall having that concern at the time?

6  A.    I do --

7  Q.    Could you --

8  A.    -- recall that.

9  Q.    -- elaborate on what -- what your reaction was to learning

10 that there were, in fact, no standards that FEMA could look to

11 regarding residential indoor air quality and formaldehyde?

12 A.    Well, it was quite a while ago.  But the main challenge --

13 that's your word -- the main challenge we had was that it

14 didn't give us a baseline for determining what was good and

15 what was bad.  So that was one of the reasons we had to do the

16 EPA testing, was so that we could at least establish what is a

17 baseline of what is in the units, you know.

18        But it's not really FEMA's job to set an indoor air

19 quality standard for anyone or an external air quality standard

20 since we're not a standard-making company.

21 Q.    Was that something that you wished you had had when this

22 whole business started, was a standard that you could look to

23 and evaluate these trailers against?

24 A.    Well, it would at least have given us a gauge of whether

25 the units were in compliance with something or not.  Whereas,

1   today they're totally in compliance with voluntary standards at
2   this point in time.
3   **Q.**   Were you generally aware then that the specifications to
4   which these travel trailers were built didn't say anything
5   about formaldehyde or formaldehyde levels or formaldehyde
6   testing?
7   **A.**   In general that's correct, yes.
8   **Q.**   And the reason I'm asking these questions is, I think what
9   I heard you to say -- and I may be wrong about this -- but you
10  indicated that if there was a problem in one unit, you thought
11  it was a problem possibly in all units.
12         And at this point in time, was it your understanding
13  or belief that you had a formaldehyde problem in all of these
14  118,000 units that were out there?
15  **A.**   No, that's not true.
16  **Q.**   Did they ask to -- did the representatives of Gulf Stream
17  Coach ask to participate in this testing?
18  **A.**   Yes, they did.
19  **Q.**   And are you aware that that happened?
20  **A.**   I am aware, yes.
21  **Q.**   Were they allowed to participate in the testing?
22  **A.**   No.
23  **Q.**   Do you have any idea following Hurricanes Katrina and Rita
24  how many individuals were transitioned through the federal
25  government through evacuation processes to other cities or

 1  states?

 2  **A.**   Roughly 700,000 at one point.

 3  **Q.**   Now, you also testified that in 2006, when you became

 4  involved in the EPA testing, you knew that there was a concern

 5  about formaldehyde; correct?

 6  **A.**   I knew that there was a concern when I became involved,

 7  yes.

 8  **Q.**   But you also testified that you were still actively

 9  engaged in placing people -- occupants in units; correct?

10  **A.**   That's correct.

11  **Q.**   During that concern?

12  **A.**   That's correct.

13          **THE COURT:**  All right.  Is that it, Counsel?

14          **MR. WEINSTOCK:**  Yes.

15          **THE COURT:**  Okay.  Again, if you'd like to stand and

16  stretch, we'll go ahead and take the next witness, who is?

17          **MR. WEINSTOCK:**  David Garratt.

18          **THE COURT:**  David Garratt.  Okay.  Let's go ahead and

19  play Mr. Garratt's testimony.  He has also been sworn in and

20  counsel are present.

21          (WHEREUPON, the videotaped deposition of **David**

22  **Garratt** was played.)

23                      **EXAMINATION**

24  **Q.**   Mr. Garratt, could you tell us what position you hold

25  currently?

1    A.    Acting deputy administrator of the Federal Emergency
2    Management Agency.
3    Q.    Could you give us a brief description of what your duties
4    are as acting deputy?
5    A.    Basically, to manage the Federal Emergency Management
6    Agency and support the administrator in the management of the
7    agency.
8    Q.    Okay.  And how long have you held your position as acting
9    deputy director?
10   A.    Since January 21st.
11   Q.    Of?
12   A.    2009.
13   Q.    And prior to January 21st, 2009, what was your job title?
14   A.    Deputy assistant administrator of disaster assistance.
15   Q.    How long have you been with FEMA?
16   A.    14 years.
17   Q.    Prior to your 14 years with FEMA, what was your
18   professional employment?
19   A.    20 years with the United States Air Force.
20   Q.    And what was your rank?
21   A.    Master sergeant, E-7.
22   Q.    You go on to state after that:  "Disaster victims have not
23   been charged for their use of the EHUs, nor have they been
24   required to pay any costs associated with the installation,
25   maintenance, or removal of the units."

1          What is the significance of that statement in this

2   declaration?

3   A.    Other than, again, painting the picture of -- of how we

4   provide these units and the conditions under which they're

5   provided to disaster victims.

6   Q.    So, in your mind, is it important to note that the victims

7   have received something at cost -- at no cost to them, and

8   they've not been required to pay any costs associated with the

9   installation, maintenance, or removal of the units?

10          Does that mean that they should have no right to

11   complain about what they received?

12   A.    No.   What it means is these units are our responsibility.

13   Q.    So this statement, basically, means -- what you're trying

14   to convey -- is that this is FEMA's responsibility.   It has no

15   other -- no other meaning besides that?

16   A.    That's correct.

17   Q.    I'm trying to get to -- this -- this particular statement,

18   and you've just testified -- is this to say that FEMA has the

19   authority due to the Stafford Act, to provide and to -- to

20   respond to disasters, in this particular instance, to provide

21   temporary emergency housing assistance to victims?

22   A.    Yes.

23   Q.    What was your understanding in June of 2006 of how the

24   Gulf Coast recovery office was responding to air quality

25   complaints?

1   **A.**   I'm not sure what you mean when you say my understanding
2   of how they were responding to complaints.
3           You mean the -- the mechanism by which they respond
4   to complaints, how they're set up to respond to complaints?
5   **Q.**   How they are set up to respond to complaints, and how did
6   they actually respond to complaints, if you know?
7   **A.**   In terms of the former, the transitional recovery offices,
8   which are really extended versions of our joint field offices
9   that we set up in every disaster operation, but these are there
10  long term, and we typically staff them with longer-term
11  employees, have maintenance and deactivation contracts, and
12  those maintenance and deactivation contractors -- and they had
13  numerous maintenance and deactivation contractors -- supporting
14  each of the transitional recovery offices, depending on which
15  state that you're in, are assigned a certain sector of area.
16          And occupants of the emergency housing units in those
17  areas would call this particular maintenance and deactivation
18  contractor if they had an issue or a problem with the unit.
19  And it was that contractor's responsibility to respond and
20  address and deal with the issue.
21  **Q.**   And what is your understanding today of how they were
22  responding?
23  **A.**   My understanding today of how they were responding in June
24  of 2006?
25  **Q.**   Yes.

1  **A.**   My under- -- my understanding is that the maintenance and

2  deactivation contractors were, in general, doing a pretty good

3  job of responding to the slew of complaints or concerns that

4  occupants were calling in, this being one among many.

5        And I have, at least to this date, no reason to

6  believe that they were not executing the provisions of the

7  contract in meeting their performance requirements.

8  **Q.**   This statement says that:  "As a result, FEMA has been

9  committed to providing applicants and consumers with

10 information on health and safety issues regarding manufactured

11 housing units, including formaldehyde levels in these units.

12       Do you know specifically what was the communication

13 given to Alana Alexander and the unit that she occupied?

14 **A.**   I don't -- I don't know who Alana Alexander is.

15 **Q.**   So that through this change in strategy, again, informed

16 by the experience of Katrina, FEMA does not plan to rely on

17 travel trailers, for example, as a primary means of providing

18 emergency assistance for housing?

19 **A.**   That's accurate.  We do not plan to rely on travel

20 trailers as the primary means.  We will still use travel

21 trailers under a unique set of circumstances.

22 **Q.**   Right.

23       Much more limited than those which -- under which the

24 travel trailers were used after Katrina, obviously?

25 **A.**   That is correct.  Prior to Katrina, we used all

1    manufactured housing under essentially the same conditions.

2           Since Katrina, we will only allow travel trailers to

3    be used, number one, if they meet our formaldehyde requirements

4    and are built to our unique specifications.

5           Two, if they are placed on somebody's private

6    property and that individual or that household can rebuild

7    their home within six months.

8           Those are the only conditions under which we'll allow

9    travel trailers to be used.

10   Q.   So it sounds like even to the extent travel trailers are

11   used again after hurricanes in FEMA's provision of emergency

12   housing, there will be a programmatic limit to a six-month

13   residency or occupancy in travel trailers?

14   A.   Provisional, correct.

15   Q.   And is it fair to say that's because of the concern about

16   formaldehyde in travel trailers?

17   A.   No.

18          It's because a travel trailer is, in our estimation,

19   not an adequate -- because of the size of the unit, not

20   adequate to be a long-term temporary housing solution.  They're

21   very small.

22          And we would not, for example, put travel trailers in

23   a group site environment that houses what were principally

24   pre-disaster renters who are going to have to wait for

25   post-disaster rental resources to be made available and might

220

 1   need that -- those sorts of accommodations for many, many
 2   months, if not many years.
 3           What they need is a unit that is, in fact, built for,
 4   designed for, long-term habitation, like a mobile home.
 5   Obviously, millions of people live in those in this country as
 6   a permanent home.  So that's an adequate longer-term living
 7   environment.
 8           A travel trailer is designed for recreational use on
 9   weekends.  It's not designed for that sort of long term.  So we
10   will only provide those in the very short term, for someone who
11   we think can get back on their feet in a relatively short
12   period of time.
13           We -- we have solved, at least from our perspective
14   of the formaldehyde issue, because we are only producing now
15   units that meet our own specifications.
16   Q.   Now, in this case, though, FEMA contracted to have certain
17   private companies handle the installation and maintenance of
18   the units; correct?
19   A.   We did.
20   Q.   Which companies were contracted with to do that?
21   A.   For Katrina?
22   Q.   Yes.
23   A.   Shaw, Fluor, CH2M Hill.  I think there was one other one,
24   but...
25   Q.   Bechtel?

1  A.    Bechtel, yes, sir.

2  Q.    Did FEMA -- did you have participation in -- in the

3  selection of those contractors?

4  A.    I did not.

5  Q.    Who at FEMA did?

6  A.    I believe it was Mr. Craig, but I'm not a hundred percent

7  sure if -- no, I am a hundred percent sure.  That was before he

8  recused himself.  So Mr. Craig was responsible for that.

9  Q.    Before he recused himself?

10 A.    Yes.

11 Q.    Why -- why did Mr. Craig recuse himself?

12 A.    He left the agency.

13 Q.    Oh.

14 A.    He made a decision to leave the agency.  And at the point

15 that he made a decision to leave the agency, he recused

16 himself.

17 Q.    Well, so before leaving the agency, Mr. Craig is the one

18 who -- who selected those four contractors?

19 A.    Well, I believe he was -- he was the head of the

20 disaster -- excuse me -- the recovery division at the time.

21        Now, I don't know if it was technically him or if it

22 was technically the chief acquisitions officer, senior

23 procurement official, who was the one who technically did that.

24        But from a program perspective, it would have been

25 under his area of responsibility.

1    Q.   And what do the records reflect was being said to people

2    who complained about air quality or formaldehyde?  What -- what

3    kind of response was being given to those types of complaints?

4    A.   I would -- as I recall, different types of responses were

5    being provided to individuals, but those responses were

6    generally related to what it was that was being reported.

7              For example, air quality issues:  My unit has an odor

8    to it, or my eyes are watering -- and I'm not saying that these

9    are specific things that they reported at the time.

10             I don't recall for most of the complaints that I saw

11   prior to -- and my memory is vague here -- that formaldehyde

12   was mentioned.  It was typically air -- general air quality

13   issues that were mentioned.  It was characterized that way.

14             It wasn't really formaldehyde being reported as the

15   problem until after this became a public issue.

16   Q.   Yes, sir.

17             But my question was if you can tell me what types of

18   responses were being given to those who called about things

19   like air quality, smell, watery eyes, et cetera, according to

20   the records that you reviewed.

21   A.   I recall, imperfectly, different responses.

22             In some cases, individuals were told to try and

23   ventilate their units or air it out and then call back.

24             In some cases, people went out to the unit to check

25   on them themselves.

1          In some cases, a determination was made they needed
2   to swap out a unit.
3          It depends, but different responses.
4   **Q.**   You had the authority then in June of '06 to authorize
5   both the issuance of safety notices and the commencement of
6   testing?
7   **A.**   Well, I certainly assumed I had the authority.
8   **Q.**   But in any event, you were asked to authorize it, and did
9   so?
10  **A.**   Correct.
11  **Q.**   And, on your authorization, it happened?
12  **A.**   Correct.
13  **Q.**   All right.  Let's just talk about the headquarters
14  directive.  Who had input into the language of the safety
15  notice?
16  **A.**   Our directorate, office of chief counsel, I think our
17  safety office was involved, the office of health affairs was
18  involved.  We consulted CDC and the Department of Health and
19  Human Services.
20         And I think either Admiral Johnson and/or
21  Chief Paulison were likely involved in that.  And it's possible
22  that higher headquarters at the department level was involved
23  as well, but I don't have any specific memory of that.
24  **Q.**   Did you mention legal counsel?
25  **A.**   I did.

1   **Q.**   Well, did any of the individuals having input into the

2   language of the safety notice, as far as you know, have

3   information to share about the long-term effects of

4   formaldehyde?

5   **A.**   There was certainly discussion -- a lot of discussion

6   about formaldehyde throughout that period of time.  And we were

7   reaching out to and consulting any number of people to try to

8   get a handle on exactly what we were dealing with at this

9   particular time.

10         Central to those discussions were obviously the

11   department's office of health affairs and CDC, at least in

12   2007, when we actively engaged them.

13         In 2006, when this issue first arose, I think at the

14   time that we were starting this process, we did not yet know

15   what the extent of this potential problem was.  What we

16   recognized was that the Sierra Club was asserting that, in

17   fact, there was a systemic issue which, prior to that, we did

18   not recognize.  So they had asserted there was a systemic

19   issue, and what we wanted was validation.  And that's really

20   the point that we were at, at that point in time.

21         And what we were interested in doing was reducing the

22   formaldehyde levels in these units.  And so the safety notices

23   were designed to help those occupants who really didn't have

24   any other place to go take actions to reduce formaldehyde in

25   their units.

1    **Q.**    Meaning ventilate the units?

2    **A.**    Ventilate the units was the principal mechanism for

3    reducing formaldehyde.

4    **Q.**    Mr. Garratt, you've indicated you really don't recall

5    today exactly how many safety notices were put out.  And I

6    think you've also indicated that, you know, if we named any one

7    occupant, no matter what the name of that occupant, you could

8    not, as you sit here, tell us one way or the other if that

9    occupant received a notice; true?

10   **A.**    I did not see occupants receiving notices.

11   **Q.**    Now, you -- you could, though, I hope, tell us exactly how

12   the notices -- the safety notices that you know about were

13   meant to be delivered to or received by occupants.

14   **A.**    Hand-delivered.  At least some number of notices were

15   hand-delivered.  It's entirely possible that some notices were

16   also mailed to occupants.  I honestly don't recall, but that is

17   possible.

18           But at least this initial notice was to be

19   hand-delivered.  And we had asked the TROs to report back to us

20   when they had completed those hand-deliveries.

21   **Q.**    And the TRO, just so the jury understands --

22   **A.**    The transitional recovery office.

23   **Q.**    -- is the transitional recovery office.  All right.

24           All right.  So this initial notice of late June '06,

25   which is the one mentioned in your declaration, that was not

1    mailed, but hand-delivered to some occupants; correct?

2    A.    I believe it was hand-delivered to all occupants.

3    Q.    All right.

4    A.    Or at least to all units.

5    Q.    To all units.  All right.

6          Now, how many units were out in place in the field as

7    of late June of '06?

8    A.    I do not recall.

9    Q.    And the intent -- the mission, if you will, of this safety

10   notice effort was to get a written safety notice hand-delivered

11   to each and every unit; correct?

12   A.    Correct.

13   Q.    Given the importance of the safety notice and what was at

14   stake, I assume that the intent is to have a hundred percent

15   delivery of the notice, that is, every occupant in every --

16   every unit was to physically receive a notice.  That was the

17   intent?

18   A.    Correct.

19   Q.    Did you achieve that?

20   A.    To the best of my recollection, yes.

21   Q.    Now, the office of chief counsel expressed concerns about

22   proceeding with testing; true?

23   A.    Yes.

24   Q.    They wanted to delay testing; true?

25   A.    According to the e-mail records, yes.

1  **Q.**   And they wanted to delay testing because of concerns about

2  pending litigation; true?

3  **A.**   I do not know that that's true.

4  **Q.**   Do you deny that that's true?

5  **A.**   I do not deny that that's true.

6  **Q.**   You're not in a position to deny that?

7  **A.**   I'm not.

8  **Q.**   In fact, have you seen e-mails from attorneys with FEMA

9  talking about once you get the results, you have a duty to

10  respond, and let's be careful, because this implies FEMA's

11  ownership in the issue?

12  **A.**   I have.

13  **Q.**   Well, was it your understanding at that time, that if

14  people ventilated their units, they could get the level of

15  formaldehyde below that which would be a health risk for them?

16  **A.**   I don't know that it would be accurate to say that they

17  could get them below a level that would be a health risk to

18  them.  I'm not in -- was never in a position to -- to state

19  that.

20            What I was in a position to do was take the results

21  of the qualified agency that we had asked to make

22  recommendations to us, who said, if you ventilate them to this

23  level, then they are safe for these folks to live in, and they

24  can get them to acceptable levels.

25            Now, the health risk...

1  **Q.**   Well, but -- but -- so your -- your conclusion going

2  forward was, if you ventilate the units, they're safe to

3  occupy; true?

4  **A.**   Or can be made safe to occupy if they're ventilated, yes.

5  **Q.**   And that's, in fact, what you communicated going forward

6  from that point in time to people, that if they ventilated the

7  units, they would be safe to occupy?

8  **A.**   Safe in comparison to the average living environment that

9  the average -- that we live in, correct, as opposed to

10  absolutely safe.

11  **Q.**   And his advice to FEMA in this e-mail of May 18th, '07,

12  was to put a hold on citing to formaldehyde standards or levels

13  at that time; right?

14  **A.**   His advice to FEMA was much more than this e-mail.  His

15  advice to FEMA, when we initially reached out to Dr. Runge, was

16  that we get CDC and HHS engaged right away, and he volunteered

17  to lead that effort and to devote his own resources to helping

18  coordinate and to manage that effort.

19          So his advice was much more comprehensive than just

20  this e-mail.

21  **Q.**   Oh, and I'm not suggesting otherwise.  My -- my focus is

22  this:  There's been talk here about all these different

23  standards .0 this and .0 that.  And I think a witness yesterday

24  called it a tyranny of numbers.  And we've got all these

25  various levels and standards for formaldehyde issues.

1          Did you understand this chief medical officer,

2    Dr. Runge, to be saying in May of '07, among other things, hold

3    off on citing to specific standards and levels because, among

4    other things, as he puts in the e-mail, none of these are

5    germane to 24-hour, 7-day-a-week exposure in a mobile home or

6    trailers that a child or stay-at-home parent may receive?

7    **A.**   First off, as I indicated before, I do not recall seeing

8    this e-mail or series of e-mails.

9    **Q.**   Well, you were copied?

10   **A.**   I was copied.  I don't recall seeing this, however.

11   **Q.**   All right.

12   **A.**   However, this was common -- in terms of our dealing with

13   the office of health affairs, Dr. Lake, Dr. Lang, and the

14   others who were the -- leading this effort for Dr. Runge, that

15   was understood by us, is that this community was -- this

16   reflects their concern that there are a number of different

17   standards that exist out there published by different agencies,

18   different organizations, and that their concern was there is no

19   single standard to operate by.

20          But this -- this is reflective -- if what it's

21   reflecting is his concern that there are -- there are no

22   standards and that we need to be careful about that, that was a

23   common, prevailing concern among the medical community, the

24   health community that we were dealing with at that time.

25          We were anxious to have standards.  We wanted

1   standards.  And they simply were either not available or there

2   were a number of different standards, and no one was able to

3   point at one and say, that is the standard that you need to

4   use.

5   **Q.**   Right.

6          Prior to that change, did -- was it the prevailing

7   view, at least in your view, that the con- -- that the

8   manufacturers were, in fact, providing units that complied with

9   the required safety standards for formaldehyde?

10  **A.**   It was our understanding that the manufacturers were, if

11  they were producing mobile homes or manufactured housing,

12  producing units that complied with HUD standards.

13  **Q.**   Uh-huh.

14  **A.**   For those who were not producing manufactured housing,

15  they were producing park models or travel trailers, which are

16  recreational vehicles, that met or exceeded industry standards,

17  since there were no federal standards that applied to -- there

18  were no HUD standards that applied to that construction at the

19  time that those units were purchased for Hurricane Katrina.

20  **Q.**   But do you agree with the suggestion that the industry

21  sources for these products should also be looked to as -- as

22  sharing in the responsibility for the formaldehyde issues?

23  **A.**   Well, I would say anyone involved in -- in this should

24  share responsibility.  But let's keep in mind, if what they

25  were producing were units that were built to meet or exceed

1   industry standards, and that that's what your contracts

2   required, and they did, then they were meeting their contract

3   obligations.

4            So in terms of responsibility, yes, we all share some

5   responsibility.  With regard to these particular units,

6   manufacturers share the responsibility for the construction of

7   the units and whatever guidance they provide regarding its use.

8            But it's our responsibility, as the purchasers and

9   subsequent providers of those units to the disaster population,

10  to be -- to own up to and be responsible for those units from

11  that point on, at least in terms of dealing with the needs and

12  the concerns of the occupants of the units that we own and have

13  provided to them.  So I'd say it's a shared responsibility.

14  Q.   And you certainly wanted to -- you wanted to -- you would

15  rely on the manufacturer of a travel trailer, for example, to

16  furnish a product that would be safe for long-term residence

17  knowing that these travel trailers, which as you say are

18  recreational vehicles, were going to be used for long-term

19  residence.

20  A.   I would suggest that the responsibility of the

21  manufacturers would be to meet the terms of whatever

22  performance specifications that we ask them to meet with the

23  contracts that we awarded to them.

24  Q.   Did you specify anything in those contracts that was

25  directed to long-term residence or occupancy of a unit

1   containing formaldehyde-emitting products?

2   **A.**   Don't know.

3   **Q.**   Would it be in the contract if it was there?

4   **A.**   Well, yes.

5   **Q.**   Okay.  I mean, it wouldn't have been done verbally.  If

6   you specified it, it would be written in the contract?

7   **A.**   I can't imagine a verbal --

8   **Q.**   Right.

9   **A.**   -- of that nature that would -- would not have to be a

10  contract --

11  **Q.**   Right.

12  **A.**   -- in written form, as an amendment or otherwise.

13  **Q.**   Let me next refer you to an exchange of e-mails in August

14  of '07 between you and Gil Jamieson.  And I want to direct your

15  attention in particular to yours to Jamieson of August 18, '07,

16  in which the subject is "TT replacement housing".  TT being

17  travel trailers; true?

18  **A.**   Correct.

19  **Q.**   And you say:  "The allowance for MHs" -- that's mobile

20  housing?

21  **A.**   Mobile housing or manufactured housing.

22  **Q.**   "The allowance for MHs is not based on an independent

23  determination by FEMA that the units are, quote, safe, close

24  quote, in terms of formaldehyde exposure levels.  FEMA does not

25  have the expertise/capability to render such an authoritative

1    determination."  Correct?

2    A.    Correct.

3    Q.    Are you suggesting there that the entities which have the

4    expertise and capability to render authoritative determinations

5    of the safety of those units would be the manufacturers?

6    A.    No.

7    Q.    Who -- who would it be, if not them and if not FEMA?

8    A.    Well, I would -- we believed -- or I believed that this --

9    establishing federal standards is a federal responsibility, and

10   it belongs within the bailiwick of whatever agency was most

11   appropriate.

12         I would have voted for EPA and/or CDC to be

13   establishing what are appropriate standards for -- for what is

14   safe in the terms of formaldehyde exposure levels.

15         I do not think that it's the industry's

16   responsibility to develop federal standards.  I think that's a

17   federal responsibility.

18   Q.    As of September the 1st, 2005, when you walked into the

19   Katrina situation, did you have any reason to believe that

20   travel trailers were going to be a problem?

21   A.    From a formaldehyde --

22   Q.    From a formaldehyde standpoint.

23   A.    None whatsoever.

24   Q.    Can you talk a little bit about why FEMA used travel

25   trailers by the thousands, both prior to Hurricane Katrina and

1  during the Hurricane Katrina response?

2  **A.**    They were the preferred direct temporary housing product

3  because of their -- because of their size, because we could

4  move them in and set them up quickly.

5         I think 80 percent of the units that we provided in

6  response to Hurricanes Katrina and Rita were on individuals'

7  private property.  Typically, we put travel trailers on private

8  property, or often, because we can't fit anything else on that

9  private property.  We simply can't accommodate a mobile home on

10  the driveway.

11         So they were used because, number one, they filled a

12  need that could not be met any other way.

13         Two, they were inexpensive compared to a mobile home.

14         Three, they allowed people to stay at their property

15  and rebuild their home, as opposed to relocating them to a

16  community site that might be miles away and might be far more

17  expensive to build.

18         So a number of reasons, I think, contributed to the

19  use of travel trailers and their popularity, at least within a

20  certain segment of the disaster population on those small

21  properties and wanted to stay on their property and rebuild

22  their home.

23  **Q.**    Am I also correct that during the prior natural disaster

24  events that we talked about prior to Hurricane Katrina, can we

25  assume that there were young children and elderly people and

1  stay-at-home moms living in those travel trailers as well?

2  A.   I think that's safe to assume.

3  Q.   And, again, you're not aware of any formaldehyde claims by

4  any of those people in those prior disasters?

5  A.   I'm not personally aware of any.

6  Q.   This is a document Bates stamped FEMA 17-000023, and also

7  marked FEMA-Waxman 23.

8           It looks to be a memorandum from Secretary Chertoff

9  to -- to Secretary Chertoff from David Paulison.  Let me show

10 you that document and ask you, first, if you've seen it before.

11 A.   I think I have seen this before, and I think that I

12 probably participated in the review and editing of this

13 document, I think.

14 Q.   What does that document say about the number of complaints

15 FEMA had recorded in Louisiana on formaldehyde as of July 2006,

16 compared to the total number of trailers on the ground in

17 Louisiana?

18 A.   Do you want to give me a clue as to where in --

19 Q.   Yes.  On the first page in about the middle.

20 A.   Okay.  "While the number of complaints recorded by FEMA

21 thus far has been minimal, 20-plus complaints out of 79,000

22 trailers deployed in Louisiana."

23           Is that the reference?

24 Q.   Yes, sir.

25 A.   Okay.

236

1   **Q.**   So it was 20-plus complaints out of 79,000 trailers that

2   were in use in Louisiana.  And that's about, what, 10 months

3   after Hurricane Katrina, 11 months?

4   **A.**   Let's see.  "While the number of complaints recorded by

5   FEMA thus far has been minimal" -- and this is as of July.  So

6   a little less than a year since Katrina.

7   **Q.**   And was the swapout procedure intended to give the

8   occupant an older trailer than the one the occupant was then

9   in?

10  **A.**   No.  That was only a policy, as far as I know, that was

11  utilized for this particular issue.  Because the belief at the

12  time was that older trailers were less likely to have the same

13  potentially elevated levels of formaldehyde, because they would

14  have off-gassed more over some period of time.

15  **Q.**   So anybody who complained, any occupant who complained

16  about formaldehyde and you couldn't resolve the concern, that

17  person would be given the opportunity to move into a different

18  housing unit?

19  **A.**   I can't say that everybody was given that opportunity.  I

20  can say that that was an opportunity that was presented to some

21  number of -- of occupants.

22  **Q.**   Are you aware of anyone who was denied that opportunity?

23  **A.**   No.  I'm not aware that anyone was denied that

24  opportunity, at least until we made the determination that we

25  were going to stop swapping units and, instead, move people out

 1  of them and into hotels and motels instead.  It doesn't mean

 2  that it did not happen, but I'm not aware of it.

 3  Q.   Okay.  And did FEMA, at some point, establish a call

 4  center where an occupant who had any concern at all about

 5  formaldehyde could make a phone call to FEMA and talk about it?

 6  A.   Yes.

 7         We actually did several call centers.  The main one

 8  was at one of our national processing service centers, and they

 9  were linked in to CDC, which also maintained a hotline.  And so

10  they were collaborating on that in terms of referring phone

11  calls back and forth.

12         But also our TROs established their own separate call

13  centers in Mississippi and Louisiana to handle calls regarding

14  the same thing.  They were also linked into this principal call

15  center.

16         The short answer is yes.

17  Q.   Okay.  And I'm not trying to dictate a date on that --

18  whatever it turns out to be -- but at some point in time around

19  the time of the Sierra Club result, I understand that the

20  problem seemed to be one that needed greater attention than

21  perhaps it was getting; is that true?

22  A.   Yes.

23  Q.   And as I understand your testimony, FEMA assumed the

24  responsibility for coordinating the response to this issue at

25  that time, whenever it was; isn't that fair?

1  **A.**    That is fair.

2  **Q.**    And FEMA debated what an appropriate response might be,

3  whether it be testing, warnings, or taking people out of the

4  trailers; is that true?

5  **A.**    True.

6  **Q.**    And you would agree with me that the responsibility for

7  determining an appropriate programmatic response to this issue

8  lay within the FEMA organization?

9  **A.**    Let me caveat my response to that.  And that -- or let me

10  characterize this carefully.

11         FEMA is delegated responsibility for the disaster

12  environment and coordinating the engagement and application of

13  all federal resources and assets to support that state.

14         So at the top of that multi-organizational activity

15  is FEMA, who is solely or responsible for what goes on by all

16  of those agencies.  So, yes, we are ultimately responsible.

17         But in terms of expertise and agency responsible --

18  agency responsibility, this was something we believed that we

19  shared.

20  **Q.**    Okay.  With other agencies?

21  **A.**    Yes.

22  **Q.**    Sir, my name is Henry Miller.  I'm an attorney with the

23  Department of Justice and represent the United States, which is

24  a defendant in this case.

25         I have a couple follow-up questions.  And the first

239

1    is:  I'd ask you to refer to what has been marked as Garratt

2    Exhibit No. 7, which is assigned identification numbers FEMA

3    17-009030 through 33.

4              And it's talking about new specifications do require

5    formaldehyde testing, and 100 percent inspection before

6    government acceptance of any unit.

7              The formaldehyde specifications that are

8    referencing -- referenced here, were these in place prior to

9    Hurricanes Katrina and Rita?

10   A.    Not for travel trailers and park models.

11   Q.    In any of the prior disasters that you're aware of where

12   FEMA provided emergency housing, what do you think was the

13   maximum length of time that any displaced citizen was required

14   to live in a temporary housing unit?

15   A.    First off, no one is required to live in a temporary

16   housing unit.  Individuals choose to live in a temporary

17   housing unit.

18   Q.    Normally, because they don't have any other place to go?

19   A.    Or because they don't want to go to any other place.

20   Q.    Okay.  But we --

21   A.    There's always someplace else to go.  It just may not be

22   as close as they would like, and so they prefer living in a

23   small travel trailer here than in an apartment over there.

24   Q.    So what's the longest period of time, prior to the Katrina

25   disaster, that you knew displaced citizens to be actually

1   occupying a FEMA-provided emergency housing unit?

2   **A.**   Probably in the neighborhood of 36 months.

3   **Q.**   And which disaster was that?

4   **A.**   Several different disasters.  For example, in West

5   Virginia, we've had individuals who were living in manufactured

6   housing.  These are very small disasters, but -- very small

7   communities, but in which, purportedly, there was no rental

8   housing available.  And so they were extended in those -- those

9   units for an extensive period of time.

10          In Florida, following the 2004 hurricanes, we had

11  individuals living in units down there for at least 24 months,

12  perhaps longer.

13  **Q.**   Travel trailers?

14  **A.**   Some travel trailers, yes.

15  **Q.**   Would you agree that after Katrina, there were more people

16  living for longer periods of time in travel trailers than in

17  any prior disaster ever in the history of this country?

18  **A.**   To my knowledge --

19  **Q.**   The answer is yes?

20  **A.**   -- yes.

21          (NODS HEAD.)

22  **Q.**   In giving that direction to contractors to put travel

23  trailers on blocks, FEMA certainly did not expect or understand

24  that this action might increase levels of formaldehyde

25  off-gassing in the units, did it?

1    **A.**    I'm not aware that it would.  So the answer is no.

2    **Q.**    Did the contractors ever communicate their concerns about

3    the risk of increasing formaldehyde off-gassing through the

4    jacking up of travel trailers onto blocks?  Did they ever

5    communicate that concern?

6    **A.**    Not to my knowledge.

7    **Q.**    Did they ever communicate that as a risk or a possible

8    risk?

9    **A.**    Not to me.

10             **THE COURT:**  Okay.

11             **MR. MEUNIER:**  May we approach the bench, Your Honor?

12             **THE COURT:**  Yes.

13             (WHEREUPON, the following proceedings were held at

14    the bench.)

15             **MR. MEUNIER:**  Two issues.  One is to renew to Henry

16    Miller again saying --

17             **THE COURT:**  I've already instructed them on that.

18             **MR. MEUNIER:**  Tim's got the guy saying, "20-plus out

19    of -- complaints out of 79,000 units."  I thought we were going

20    to stay away from this issue about what complaints were --

21             **THE COURT:**  Look, you-all came together and agreed on

22    these edits.

23             **MR. MEUNIER:**  Well, some things like these references

24    to Henry just got through, Judge.

25             **THE COURT:**  Well, I know that.

1          **MR. MEUNIER:**  It just takes a simple limiting

2    instruction to say that you heard -- he wasn't talking about

3    legal complaints or legal claims --

4          **THE COURT:**  So you're indicating that I tell the jury

5    that the reference to the numbers is not relative to lawsuits

6    or claims?  Is that...

7          **MR. MEUNIER:**  Yes, yes.  There was one that lawsuit

8    at that time, Your Honor.

9          **MR. SCANDURRO:**  Those are complaints to FEMA, not us.

10         **MR. MEUNIER:**  No, no.  I don't even think that's

11   true, 20-plus complaints.

12         **MR. SCANDURRO:**  It was in the documents.

13         **MR. WEINSTOCK:**  It's not my testimony.

14         **MR. SCANDURRO:**  He participated in creating the

15   document, and that was his knowledge.  The other guy said 50

16   to --

17         **MR. MEUNIER:**  I thought we had spoken earlier about

18   the need to not confuse the jury about this.

19         **THE COURT:**  We did.

20         **MR. MEUNIER:**  All I'm asking for another

21   clarification that when they heard reference to the number of

22   complaints, they should not consider that to be -- to be that

23   those are legal -- legal complaints, legal filings.

24         **THE COURT:**  So you want me to tell them the reference

25   to the number is not to the number of lawsuits filed?

1          **MR. MEUNIER:**  Not necessarily to the number of suits

2    being filed, Judge.  I think the jury's going to be wondering

3    why 20 people filed lawsuits out of 79,000, and that's the

4    obvious --

5          **THE COURT:**  What date was this testimony taken?

6          **MR. MEUNIER:**  Ten months after.

7          **MR. SCANDURRO:**  When was it taken?

8          **THE COURT:**  What point in time is he referring to?

9          **MR. MEUNIER:**  No, no, ten months after.

10         **MR. SCANDURRO:**  He's referring to July of '06.

11         **MR. WEINSTOCK:**  And he said that in the deposition.

12         **THE COURT:**  Okay.

13         **MR. WEINSTOCK:**  Received complaints by July of --

14         **MR. MEUNIER:**  Are there lawsuits filed --

15         **MR. WEINSTOCK:**  There was none by then.

16         **MR. BUZBEE:**  This is --

17         **MR. WEINSTOCK:**  Just FEMA.

18         **MR. BUZBEE:**  -- and he did it again.  I mean, we've

19    already had this discussion.

20         **THE COURT:**  He didn't agree with that.  I'm not the

21    one doing the editing and I'm not the one reading the

22    transcripts, other than the objections that you-all bring to

23    me.

24         **MR. MEUNIER:**  I know, but -- and I'm responsible for

25    the mistake, Judge.  But you're in a position to help correct

 1   it, and that's all we're asking for is a clarifying

 2   instruction.

 3           THE COURT:  And let me know -- what is the clarifying

 4   instruction that you want?  What I'm getting is objection from

 5   the other side, and I don't want to say something that's

 6   equally objectionable.

 7           MR. SCANDURRO:  It doesn't go to our knowledge,

 8   obviously, it goes to FEMA's knowledge.  FEMA's response in the

 9   middle of '06, which we're being blamed for, is relevant to the

10   reasons why they did or didn't do what they did.  It went to

11   the safety notice.

12           MR. MEUNIER:  I'm not saying it's irrelevant, Tim.

13   What I'm saying is when you just ask the question about numbers

14   and leave it at that, and this jury doesn't know better,

15   they'll end up wondering why -- how can it be that out of

16   70,000 residents only 20 people are fussing about formaldehyde,

17   and that just ain't true.

18           MR. WEINSTOCK:  That's accurate in July of '06.

19           MR. MEUNIER:  It's not accurate.  It is not accurate.

20           MR. WEINSTOCK:  In the time of the questioning --

21   well, that's what his testimony was.  You should have crossed

22   him.

23           THE COURT:  That's what his testimony is.  I can't

24   sit there and say the witness is wrong.

25           MR. WEINSTOCK:  That's what you want us to do is --

1          THE COURT:  That's what his testimony is in the

2    record.

3          MR. WEINSTOCK:  -- one lawsuit.

4          MR. MEUNIER:  No.  Well, then we will be allowed in

5    rebuttal to bring out how many complaints were filed and how

6    many FTCA forms were filed in rebuttal long after that?

7          THE COURT:  Are you going to put a witness on?

8          MR. MEUNIER:  Put Henry Miller on stand.

9          MR. SCANDURRO:  Your Honor, we had two lawsuits until

10   the CBS Evening News in May of 2007.  And then all the lawyers

11   advertised and signed up all these clients.  And they want to

12   put on evidence that this is a big --

13         THE COURT:  Look.  Look.  I think we ought to just

14   leave it where it is.  You-all edited these videotapes.  If

15   there was an error in something that slipped through, I'm

16   sorry.

17              I don't think there's an appropriate instruction

18   I can give that tells the jury that a witness testified

19   erroneously, absent the testimony of another witness that's

20   going to offer contrary testimony.

21              Far be it from me to declare to say that the

22   gentleman was wrong.  He may be wrong.

23         MR. MEUNIER:  I don't think he may be wrong, but he

24   wasn't referring to legal complaints.

25         MR. SCANDURRO:  He was referring to complaints --

1          **MR. MEUNIER:**  These are like consumer calls, Judge.
2   That's what I'm saying.  It's not a legal matter.  It's someone
3   picking up the phone and saying, "My trailer smells bad."  He's
4   not talking about legal complaints.
5          **THE COURT:**  Wasn't that clear from his testimony?
6          **MR. MEUNIER:**  No, it wasn't.
7          **THE COURT:**  It wasn't --
8          **MR. WEINSTOCK:**  He said "complaints."
9          **MR. MEUNIER:**  He said --
10          **THE COURT:**  I understood a laymen's version of his
11   testimony would mean that they had gotten a complaint.
12   Somebody called and said, "My trailer --
13          **MR. MEUNIER:**  So you don't think that this jury would
14   be possibly confused about the word "complaint," that it might
15   be referring to legal actions or legal claims?
16          **THE COURT:**  I don't think that they will understand
17   the word "complaint," with a capital "C", to mean the complaint
18   as in the one that's in this book, this.
19          **MR. MEUNIER:**  All I'm asking is that you tell them
20   that.
21          **THE COURT:**  I think they need to understand that a
22   complaint, meaning that somebody called up and complained, as
23   you would at the complaint desk of a department store.
24          **MR. SCANDURRO:**  Your Honor, may I suggest this, if we
25   can -- if I play Miller -- let's check that Miller had it,

1   because I want to make sure because I asked a lot questions, I
2   want them taken out if it's in Miller.
3          THE COURT:  So what are we going to do?  Are we going
4   to take a break here?
5          MR. WEINSTOCK:  Let's take a break.  We've got three
6   short witnesses --
7          MR. BUZBEE:  Your Honor, one other thing.  As you
8   recall when I was questioning their corporate people --
9          THE COURT:  Hold that thought.  Why don't we just go
10  ahead take a break here?  Okay.  Stay up here.
11         MR. BUZBEE:  Yes, sir.
12             (WHEREUPON, the following proceedings were held in
13  open court.)
14         THE COURT:  All right.  We're going to go ahead and
15  take a short ten-minute break while I continue to discuss an
16  issue with the attorneys, rather than have you sit here.
17             Why don't we take ten minutes?  We've got a few
18  more things to cover with you.  There's a chance that we might
19  finish a little bit early today, which I know you would not
20  oppose that.
21             So why don't we start at 3:00?  It's 3:20 right
22  now.  We'll resume at 3:30.
23         THE DEPUTY CLERK:  All rise.
24             (WHEREUPON, the jury exited the courtroom.)
25         MR. BUZBEE:  Your Honor, just so you recall, it was

1   their motion in limine to keep out complaints.  It wasn't ours.

2   We were full -- happy to put in everything.

3           **THE COURT:**  I understand.

4           **MR. BUZBEE:**  When I questioned the only live

5   witnesses they brought, I was severely hampered.  Not only

6   could I not talk about the nature of the complaints.  I had to

7   talk generally about just number, and it had to be before the

8   lady moved into the trailer.

9           **THE COURT:**  I understand.

10          **MR. BUZBEE:**  Even though I argued there was a

11  post-duty to warn that would apply while she was in the trailer

12  as well.

13              The ruling was, if it's not a complaint before

14  May when she moved in, I don't want to hear it.

15              And, number two, I don't want to hear the nature

16  of the complaint, just the numbers and the general, and I

17  couldn't even put it in.

18          **THE COURT:**  I remember that.  And you're right.  Your

19  recollection is correct.

20          **MR. BUZBEE:**  There have been two separate occasions.

21  We had this conversation once where I argued, and probably

22  acted like a knucklehead, but I tried to convince you that they

23  cannot open that door and then jump back like that and not let

24  us complete the record.  They've done it now twice.

25              And I think that this jury is sitting over there

1    thinking -- and you noticed the preface of the question is

2    July, after the lady's in.  It wasn't May.  The preface of the

3    question was July, which means she was already in the trailer.

4                      Here's what they've thrown out there, it's very

5    clear and it's smooth the way the way they're doing it,

6    "There's 79,000 trailers deployed, and you've only got 20

7    complaints."  That is incredibly misleading.  When we all know

8    by that point, people were lawyering up, and there wasn't going

9    to be no "complaint".  People were filing lawsuits by that

10   point.

11                      That is an improper and that's not an

12   accurate -- now, how do we remedy that?

13                      One way, I believe, is in our rebuttal to this

14   is we put in the complaints that have been filed by the time

15   that he referenced.  This is the complete picture.  There's

16   been a class action filed that seeks -- purports to represent

17   thousands of people.

18            **THE COURT:**  That was May 18th.  I have it right here.

19            **MR. BUZBEE:**  Yeah.  So -- and, remember, they

20   prefaced the question with July.  And they obviously intended

21   to do it again until now they're going to edit their disk.  So

22   I just think as a matter of simple fairness, it was their

23   motion in limine, not ours.

24                      I was fully -- fully satisfied with putting it

25   all out there and letting the jury sort it out.  They argued

 1    vehemently for that.  And now that our case is closed, they're

 2    doing this.  It's totally improper.

 3            MR. WEINSTOCK:  Your Honor.  These cuts were made

 4    before we even started trial.

 5            THE COURT:  Well, the problem is that --

 6            MR. WEINSTOCK:  And that has been a problem all

 7    along, no doubt.

 8            THE COURT:  The problem is that the cut that was

 9    supposed to have been made wasn't.  I think we can all agree on

10    that.  That that was not supposed to be part of the

11    presentation.

12                The question is what to do about it.  A, do

13    nothing and assume the jury understood it as I understood it,

14    meaning complaint, as in small "C" complaint; or, B, give a

15    limiting instruction; or, C, do something more expansive, such

16    as what Mr. Buzbee suggested.

17            MR. SCANDURRO:  Your Honor, Jerry wants to -- is

18    concerned about this mention to the complaint and a legal

19    claim.  Clearly, he was talking about complaints and not legal

20    claims.  If you want to give that --

21            THE COURT:  Let me suggest this to you:  Why don't

22    you-all scribble out a simple sentence that I can read to the

23    jury, that in the last video deposition reference was made to

24    complaints as of July of '06.  To be clear, that testimony

25    relates to, and then finish the sentence.

1              **MR. MEUNIER:**  Does not relate to legal claims.

2              **THE COURT:**  Does not relate to the filing of legal

3    claims against --

4              **SPEAKERH:**  That's all I'm asking for.

5              **THE COURT:**  -- against any party.  Why don't you just

6    write that sentence out and show it to them and I'll read it to

7    the jury.  And let's check and make sure --

8              **MR. MEUNIER:**  Can we steer clear of this

9    grandstanding?

10             **MR. WEINSTOCK:**  Here's what we have left.  Let's talk

11   about this.  We've got the three guys that said they delivered

12   the notices.

13             **THE COURT:**  Right.

14             **MR. MEUNIER:**  They're not going to talk about that.

15             **MR. WEINSTOCK:**  Right.  Then we got Miller.  And he

16   says there's all kinds of that stuff in there.  So what I would

17   propose is:  Let's pull Miller and see if we can just cut it,

18   or if we cut it to make sure all of that's out of there and

19   play it tomorrow.

20             **THE COURT:**  Can somebody be doing Miller while we're

21   doing this?

22             **MR. WEINSTOCK:**  Yes.

23             **THE COURT:**  You've got three more.

24             **MR. WEINSTOCK:**  They're all less than ten minutes.

25             **THE COURT:**  How long is Miller?

 1           MR. WEINSTOCK:  Miller's like 20 minutes.  He'll look
 2   at Miller.  If we can get it done, we can get it done.
 3   Otherwise, if it's 20 minutes, it's 20 minutes tomorrow with
 4   the two live witnesses.
 5           THE COURT:  Look at the 20 minutes that we have --
 6           MR. WEINSTOCK:  Right.  I'd rather spare that than
 7   try to fix it later.
 8           MR. MEUNIER:  Who do you want me to wordsmith this
 9   with, Tim or you, to give to the Judge?
10           MR. WEINSTOCK:  I'm not the wordsmith.
11           MR. MEUNIER:  I'll do Tim.
12           (WHEREUPON, the proceedings were concluded.)
13           THE DEPUTY CLERK:  All rise.
14           (WHEREUPON, the jury entered the courtroom.)
15           THE COURT:  All right.  You may be seated.
16               We're going to go ahead and finish up for the
17   day here with a couple more -- or just a few more, I should
18   say, videotaped witnesses.
19               Mr. Weinstock, are we prepared with the next
20   one?  Who will the next one be?
21           MR. WEINSTOCK:  Michael Harder.  And the next three
22   are all extremely short.
23           THE COURT:  All right.
24           MR. MEUNIER:  May we approach before we --
25           THE COURT:  Yes.  Let's go ahead and cover the --

 1                           **(OFF THE RECORD)**

 2              **MR. WEINSTOCK:**  Judge, it's going to be Mr. Bonomo

 3    first.  I apologize.

 4              **THE COURT:**  Okay.  Let's go ahead and tee him up.

 5                   In the meantime, let me read to you a

 6    clarification with regard to the testimony that you just heard.

 7    The attorneys have agreed that the following clarification is

 8    necessary:  There was a reference in the last video deposition

 9    of David Garratt to the number of "complaints" this witness

10    knew about as of July of 2006.

11                   You are instructed that this testimony does not

12    refer to the number of legal claims or complaints at that time.

13              **MR. MEUNIER:**  Thank you, Judge.

14              **MR. WEINSTOCK:**  Now, with the slight change, it's Guy

15    Bonomo.

16              **THE COURT:**  Okay.  Guy Bonomo is his name?  I've been

17    pronouncing it Bonomo.  Am I right?  He'll correct me --

18              **MR. WEINSTOCK:**  We'll find out.

19              **THE COURT:**  -- when he gets on the screen, so...

20                   The name is spelled B-O-N-O-M-O?

21              **MR. WEINSTOCK:**  I believe that's correct, Your Honor.

22              **THE COURT:**  All right.

23              (WHEREUPON, the videotaped deposition of **Guy Bonomo**

24    was played.)

25

1                              **EXAMINATION**

2    **Q.**   And when you say that we had to "mitigate" matters, what

3    do you mean by that?

4    **A.**   Well, I mean to, you know, get some public awareness out

5    there to people that were in the emergency housing units.  You

6    know, we were as surprised as the applicants, you know.  We had

7    no idea.  I didn't personally.

8    **Q.**   You had no idea about what?

9    **A.**   That there was a formaldehyde issue.  So we wanted to get

10   the word out there.  I mean, it was very serious, and we took

11   it very serious.

12   **Q.**   And today you can't sit here and tell me exactly when and

13   if Ms. Alexander as a resident of a travel trailer received

14   this particular flyer; correct?

15   **A.**   No.  I cannot tell you definitively, no.

16   **Q.**   Sir, can you please state your full name and spell your

17   last name?

18   **A.**   Guy Nicholas Bonomo, B-O-N-O-M-O.

19   **Q.**   Sir, I want to direct you to the summer of 2006.

20            Were you employed by the Federal Emergency Management

21   Agency in the summer of 2006?

22   **A.**   Yes, sir, I was.

23   **Q.**   And where were you based at that time?

24   **A.**   Out of the New Orleans TRO, which is located in Algiers.

25   **Q.**   And what was your position?

1   A.   I was the individual deputy section chief.

2   Q.   And as the individual deputy section chief, what were your

3   duties and responsibilities?

4   A.   To oversee all temporary housing.

5   Q.   And by "temporary housing," what are you referring to?

6   A.   Travel trailers and mobile homes and park models.

7   Q.   Is this the emergency housing that FEMA gave to disaster

8   victims?

9   A.   Yes, sir.

10  Q.   And that included travel trailers?

11  A.   Yes, sir.

12  Q.   Would it be fair to say that any travel trailer that was

13  within Orleans Parish or New Orleans fell under your -- fell

14  within the scope of your responsibility?

15  A.   Yes, it would.

16  Q.   Do you know what the phrase "recertification advisor"

17  refers to?

18  A.   Yes, sir, I do.

19  Q.   Is recertification advisor, do they fall under your

20  supervision?

21  A.   Yes.

22  Q.   What is a recertification advisor?

23  A.   It's our boots-on-the-ground folks that go out and visit

24  the travel trailers where the occupants are living to try to

25  establish and help them establish a permanent housing solution.

1  **Q.**   How many recertification advisors fell under your command
2  in the summer of 2006?
3  **A.**   Too many to count, sir.  Hundreds.
4  **Q.**   Did you directly supervise these persons, or were there
5  intermediaries who supervised them?
6  **A.**   Intermediaries.
7  **Q.**   And how many intermediary supervisors were there?
8  **A.**   Half a dozen to a dozen.
9  **Q.**   The recertification advisors, did they report directly to
10 you or to your supervisors?
11 **A.**   To my supervisors.
12 **Q.**   And the supervisors then reported to you?
13 **A.**   Correct.
14 **Q.**   I want to refer you to the document which has been marked
15 as Exhibit No. 4, Bonomo No. 4, and assigned Bates Number FEMA
16 0800013 through 14, and ask you:  Do you recognize that
17 document?
18 **A.**   Yes, I do.
19 **Q.**   What is that document, sir?
20 **A.**   It's the formaldehyde flyer that we had sent out and
21 posted on all the temporary housing unit doors.
22 **Q.**   Is that a true and accurate copy of the formaldehyde flyer
23 that was distributed to travel trailer occupants?
24 **A.**   Yes, it is.
25 **Q.**   Was this formaldehyde brochure, "Important Information for

1   Travel Trailer Occupants," distributed to all occupied travel

2   trailers in your footprint?

3   A.   Yes, sir, to the best of my knowledge.

4   Q.   When I say "your footprint," what is that area?

5   A.   Orleans, St. Bernard, Plaquemines, Jefferson and

6   St. Tammany.

7   Q.   Were you provided with copies of Exhibit 4, the "Important

8   Information for Travel Trailer Occupants," to distribute to the

9   travel trailer occupants?

10   A.   Yes, sir, I was.

11   Q.   Who provided those to you?

12   A.   I don't remember.

13   Q.   At that time -- if you'll look at Exhibit No. 5.

14   A.   Uh-huh.

15        George Smith?

16   Q.   It indicates on the second page, George Smith, 50,000

17   copies.

18        Does that refresh your recollection?

19   A.   Yeah.  I guess they would have to come from my boss.

20   Q.   And these brochures, where were they initially stored?

21   A.   In my office.

22   Q.   And did that take up a substantial amount of space in your

23   office?

24   A.   They were touching the ceiling.

25   Q.   And what did you do with those 50,000 brochures?

1    **A.**   We had a meeting with my supervisors, and they distributed

2    them out to their recert advisors, and took them out of my

3    office.

4    **Q.**   The formaldehyde flyer, Exhibit No. 4, did you review that

5    document at the time?

6    **A.**   Yes, I did.

7    **Q.**   And were you aware that if you go to the second page of

8    that document, Exhibit No. 4, FEMA 0800014, the second column,

9    the last sentence of that says:  "People who suspect they are

10   sensitive to formaldehyde should closely work with a doctor to

11   see if formaldehyde is causing their symptoms"?

12   **A.**   Uh-huh.

13   **Q.**   Were you aware of that?

14   **A.**   Yes, I was.

15   **Q.**   And this is what the occupants were being told when this

16   was being distributed to them?

17   **A.**   That's correct, sir.

18   **Q.**   It also indicates in the third column, the "four things

19   that the occupants should do to reduce their exposure to

20   formaldehyde in the trailers."

21           Do you see that?

22   **A.**   Uh-huh.

23   **Q.**   "Increase ventilation, keep indoor temperature moderate,

24   lower the humidity, and do not smoke inside"; is that right?

25   **A.**   That's correct.

1    **Q.**   And this was what was distributed to the occupants

2    sometime in the summer of 2006; is that right?

3    **A.**   That is correct, sir.

4    **Q.**   Now, you indicate, I believe -- it's your understanding

5    that this -- the delivery of this formaldehyde flyer was

6    completed to all of the occupants by September of 2006; is that

7    right?

8    **A.**   Uh-huh.

9    **Q.**   I'm sorry.  You have to say yes or no.

10   **A.**   Yes.  Sorry.

11   **Q.**   Having looked at Exhibit No. 5, that document, it

12   indicates -- having read that, does that refresh your

13   recollection of the dates that the distribution of that flyer

14   would have commenced?

15   **A.**   Yes.  Yes.

16   **Q.**   And what is your recollection as to when the distribution

17   of the flyer would have commenced?

18   **A.**   Sometime -- it happened rather quickly.  So if the flyers

19   were received -- the brochures were received on August the

20   2nd or 3rd --

21   **Q.**   Exhibit No. 5 is an e-mail from Mr. Martin McNeese; is

22   that right?

23   **A.**   That's correct.

24   **Q.**   And in that e-mail, Mr. McNeese indicates that the

25   brochures were received on August 2nd or 3rd, "And we began

1    distribution immediately in Louisiana"?

2    **A.**    Correct.

3    **Q.**    If I was a recertification -- why don't you walk us

4    through what a recertification advisor would do to deliver

5    something such as a formaldehyde information flyer, Exhibit

6    No. 4?

7    **A.**    Well, and if, in fact, the applicant was home, they were

8    handed the flyer.  If they weren't, they were either taped to

9    the door, left on the doorstep, some way.

10   **Q.**    And were the flyers just -- were they left -- paper copy

11   just taped to the door, or were they put in any --

12   **A.**    No, we put them in --

13   **Q.**    -- covering?

14   **A.**    -- we put them in plastic sleeves to keep them out of the

15   weather.

16   **Q.**    And in the summer in New Orleans it rains quite often;

17   isn't that fair?

18   **A.**    That's correct.

19   **Q.**    To the best of your recollection, did you have enough

20   plastic sleeves to deliver all these flyers to all the doors

21   and attach them without them getting wet?

22   **A.**    Yes, we did.

23   **Q.**    Were any steps taken by yourself or your supervisors to

24   check or determine whether the recertification advisors

25   actually delivered the flyers to the private occupier, the

1    resident?

2    **A.**    Yes.  We did spot-checks.

3    **Q.**    And how did you know that your supervisors did

4    spot-checks?

5    **A.**    Well, actually, I went out in the field a few times

6    myself.  We had checkers checking on the checkers.

7    **Q.**    Was it -- was that something you thought was necessary or

8    appropriate to do?

9    **A.**    Absolutely.  This is a very serious situation, yes.

10   **Q.**    And the recertification advisors, how often would the

11   recertification advisors meet with the travel trailer occupant?

12   **A.**    Once every 30 days.

13   **Q.**    And when they were delivering these flyers, do you know

14   whether they made a special visit to the travel trailer

15   occupants, or did they just deliver it in the normal, regular

16   visit to the occupied trailers?

17   **A.**    The group sites and commercial sites were done

18   immediately.  We didn't have enough personnel on the ground to

19   do all the private sites, so that was handled in their monthly

20   recertification visit.

21   **Q.**    Now, I gather from the discussion here that it was FEMA's

22   goal to deliver a copy of Exhibit No. 4 to all the occupied

23   travel trailers?

24   **A.**    Correct.

25   **Q.**    And as to any individual travel trailer, do you know

 1  whether or not they actually received that?

 2  **A.**   No, I do not.

 3  **Q.**   You're aware of the process that FEMA had in place to

 4  effect that delivery; is that right?

 5  **A.**   That's correct.

 6  **Q.**   And to the best of your knowledge, was that process

 7  followed?

 8  **A.**   Yes.

 9       I'd like to add one thing to that, something I just

10  remembered.  We also dropped off hundreds and hundreds of

11  flyers at all the DRCs that were still open in all the

12  footprints.

13  **Q.**   What's --what is a DRC?

14  **A.**   That's a disaster recovery center.

15       So when you walk into a disaster recovery center,

16  there's tons of paperwork that tells you about mitigation, what

17  to do, how to apply to SBA, and the flyers were on all those

18  tables.

19  **Q.**   Mr. Bonomo, I just have one follow-up question to what

20  Mr. Miller recently asked you.

21       When you said that it's a part of the distribution of

22  the flyers that you personally performed several spot-checks --

23  **A.**   Uh-huh.

24  **Q.**   -- to determine whether or not the recertification

25  advisors were actually distributing the flyers; is that

 1  correct?

 2  **A.**   Yes, sir.

 3  **Q.**   Do you have any recollection of performing a spot-check at

 4  the address of 4415 Dale Street in New Orleans?

 5  **A.**   No, sir, I do not.

 6       The spot-check I did perform -- the two or three that

 7  I did perform were in group parks.

 8  **Q.**   Just in group parks?

 9  **A.**   Yes, sir.  Not individual sites.

10       **THE COURT:**  Okay.

11       **MR. WEINSTOCK:**  Your Honor, at this time we'd like to

12  publish Exhibit 162 to the jury, which has been pre-admitted,

13  but that's the document that was being discussed.

14       **THE COURT:**  Okay.  Go ahead and do that.

15       (WHEREUPON, Exhibit 162 was published to jury.)

16       **THE COURT:**  This has already been admitted, you said?

17       **MR. WEINSTOCK:**  Yes, Your Honor.

18       **THE COURT:**  All right.  And this was the document

19  that was covered in the deposition; correct, sir?

20       **MR. WEINSTOCK:**  Yes, sir.

21       **THE COURT:**  What number is this again?

22       **MR. WEINSTOCK:**  Exhibit 162.

23       **THE COURT:**  Exhibit 162.  Okay.

24       **MR. WEINSTOCK:**  Now, we're going to play Stanley

25  Larson.

1          **THE COURT:**  Which one?

2          **MR. WEINSTOCK:**  Stanley Larson.

3          **THE COURT:**  Stanley Larson?  Okay.

4          **MR. WEINSTOCK:**  And he pronounces that Larson.

5          **THE COURT:**  All right.  I got that one.

6          (WHEREUPON, the videotaped deposition of **Stanley**

7   **Edward Larson** was played.)

8                        **EXAMINATION**

9   **Q.**  Okay.  I want to return now back to your declaration.

10         On Page 2 in Section 4 it states:  "To create the

11  database, I used information obtained from FEMA's FRRATS,

12  F-R-R-A-T-S, database to identify occupied THUs in the state of

13  Louisiana."

14         Why were you only concerned with identifying occupied

15  THUs?

16  **A.**  We wanted just the trailers that were still on the ground

17  and weren't being deactivated.  If they're being deactivated,

18  nobody's living in them.

19  **Q.**  So if a trailer was unoccupied, there was no need to

20  distribute a flyer to them?

21  **A.**  Right.

22  **Q.**  To that trailer?

23         How did you determine whether or not a THU was

24  occupied?

25  **A.**  Basically, in the system of FRRATS, if there was a

1   deactivation work order cut for that trailer, then we would

2   consider it not to be occupied, and we pulled everything but

3   those.

4   Q.   So you relied entirely on the FRRATS database to determine

5   whether a trailer was occupied or vacated?

6   A.   Yes.

7   Q.   Did you engage in any type of double-checking the FRRATS

8   database to make sure it was accurate?

9   A.   No.

10  Q.   It is possible that the FRRATS database had inaccuracies

11  in it?

12  A.   It could be possible, yes.

13  Q.   If a THU unit was determined to be vacated, you would not

14  have expected a flyer to be left or handed to that trailer?

15  A.   No, we would not have delivered a -- a flyer to that

16  trailer.

17  Q.   Do you know if these -- the distributors of the flyer

18  traveled in pairs or alone?

19  A.   They were to do this alone.

20  Q.   And were they responsible -- the distributors responsible

21  for reporting their distribution to you or to their own

22  supervisor?

23  A.   The -- the offices split up the list that I sent them to

24  each of the inspectors, and then the inspector would come back

25  to the person that issued their list to them and report back to

1   them.

2   **Q.**   And so once they reported back to them, I assume that

3   their supervisors then forwarded that information to you?

4   **A.**   Yes.

5   **Q.**   Is it possible that there were inaccuracies in the

6   reporting of what flyers were distributed and not distributed?

7   **A.**   Yes.

8   **Q.**   And you relied on the supervisors of the distributors to

9   give you correct and accurate information as to which flyers

10  were distributed and to where; correct?

11  **A.**   Yes.

12  **Q.**   Bad words in creating.  But you relied on them and on

13  their information that they're giving to you to complete your

14  database, to fill in the information?

15  **A.**   Yes.

16  **Q.**   That's what you entered into your database?

17  **A.**   That's what I updated just from their reports.

18  **Q.**   And you've already testified that you relied on the FRRATS

19  database also in creating and inputting information into your

20  database; correct?

21  **A.**   To create the list, yes.

22  **Q.**   Isn't it possible, then, that there are inaccuracies in

23  your database?

24  **A.**   There's always possibilities, yes.

25  **Q.**   First of all, can you please state your name and spell

1   your last name?

2   **A.**   My name is Stanley Edward Larson, L-A-R-S-O-N.

3   **Q.**   So from March 2006 to present, you've been employed by

4   FEMA as a DAE?

5   **A.**   Yes.

6   **Q.**   What is a DAE?

7   **A.**   Disaster assistance employee.

8   **Q.**   And, generally, can you explain to the jury what the

9   duties and responsibilities of a disaster assistance employee,

10  DAE, is?

11  **A.**   It can range from a lot of different things.  Every job

12  within the disaster recovery and response.  So from logistics

13  to housing to individual assistance, depending on what they

14  needed us to do.

15  **Q.**   And my understanding is during the time period from

16  March 2006 until you were deployed to Beaumont for Hurricane

17  Ike, you were employed by FEMA as a disaster assistance

18  employee?

19  **A.**   Yes.

20  **Q.**   I want to focus your attention to July 2007.  In

21  July 2007, where were you based?

22  **A.**   At the TRO in Algiers.

23  **Q.**   And when you say "TRO," what does that refer?

24  **A.**   Transitional recovery office.

25  **Q.**   In July 2007, did you have a specific job position or

 1  title such as that?

 2  **A.**   My official title was DHOPS management specialist.

 3  **Q.**   What does DHOPS refer to?

 4  **A.**   Direct housing operations.

 5  **Q.**   And as a direct housing operations management specialist

 6  in July of 2007, what were your general duties and

 7  responsibilities?

 8  **A.**   Field work within DHOPS.  Anything that dealt with the

 9  trailers, basically, was DHOPS's function.  I also worked in

10  the office building databases to track what the employees were

11  doing, the inspectors, and to make sure that we didn't miss any

12  of the trailers.

13  **Q.**   Are you familiar with something called project operation

14  impact?

15  **A.**   Yes.

16  **Q.**   Did you have any involvement in the project operation

17  impact?

18  **A.**   I performed the reporting features and distribution

19  features in the database to deliver the flyers.

20  **Q.**   What was operation impact?

21  **A.**   We were to deliver a formaldehyde flyer to all the trailer

22  units that were still on the ground in the state of Louisiana.

23  **Q.**   And this project, I understand, was completed between

24  July 21st and July 25th, 2007?

25  **A.**   That's about right.

1   Q.   Can you explain your duties and responsibilities relating

2   to the operation impact project?

3   A.   I was to generate a database of addresses to the units

4   that were still deployed in Louisiana.  I got that information

5   from FRRATS.  And design a reporting tool within the database

6   to -- to receive back the information that the flyers had been

7   delivered.  And also create a distribution system for the

8   inspectors to receive their work and send it back.

9   Q.   What is -- what does FRRATS refer to?

10  A.   It's a database that we used in Katrina to issue work

11  orders for installation of trailers, maintenance of trailers,

12  deactivation of trailers.  It was the tool that we used to get

13  the contractors to go where they needed to go to work on the

14  trailers.

15  Q.   Sir, I'm handing you a document which has been marked

16  Larson Exhibit 3, and it's assigned identification numbers FEMA

17  09-000388.  It's a one-page document.  And I'll ask you to look

18  at that.

19          Are you familiar with the document marked Exhibit No.

20  3?

21  A.   Yes.  It looks like the flyer that we were to deliver.

22  Q.   Is that a true and accurate copy of the July 2007 flyer?

23  A.   It looks like it is.

24  Q.   Do you recognize the document marked Exhibit No. 4?

25  A.   Yeah.  It looks like a copy of the table that I used in

1  the database to track the formaldehyde flyer.

2  **Q.**   And was it necessary for the information reported in this

3  document to be accurate?

4  **A.**   Yes.

5  **Q.**   Why?

6  **A.**   We didn't want to miss any of the trailers.  Our goal

7  given to us was to hit them all.  And also we didn't want to go

8  back to trailers over and over again, so we wanted to make sure

9  that we were marking down that we delivered them.

10  **Q.**   I'll provide you a document which is marked Exhibit No. 5.

11  And this is a page from the document which has been marked

12  Exhibit 4.  It's Bates stamped FEMA 162-000388.

13         Do you recognize this page?

14  **A.**   It looks like a -- again, a copy of the table that was in

15  the database.

16  **Q.**   And then the next number is referred to as a bar code.

17  What is that referring to?

18  **A.**   The bar code number on the trailer.

19  **Q.**   So for this column here, this is referring to a trailer

20  bar code 1041407?

21  **A.**   Yes.

22  **Q.**   And then there's a VIN number listed here,

23  1NLIGTR2551021783; is that right?

24  **A.**   Yes.

25  **Q.**   So at least from the document that you prepared, Exhibit

 1   No. 4, you requested that a formaldehyde flyer be delivered to

 2   the FEMA trailer, bar code 1041407, with the listed VIN number;

 3   is that correct?

 4   A.   Yes.

 5   Q.   The next column of information indicate an address; is

 6   that right?

 7   A.   Yes.

 8   Q.   And this address here is for 4415 Dale Street,

 9   New Orleans, Louisiana?

10   A.   Yes.

11   Q.   Now, the next column of information -- it has "flyer

12   posted," and then it has an "X" there.  What does that denote?

13   A.   The inspector would put an "X" in that column or in that

14   field when they delivered a flyer.

15   Q.   So what the chart indicates is that Mike Harder was the

16   person who delivered the flyer, the 2006 flyer, Exhibit No. 3,

17   to the address 4415 Dale Street, New Orleans, Louisiana?

18   A.   Yes.  That was the information given.

19   Q.   And what does the inspection date represent?

20   A.   That's going to be the date that he delivered the flyer.

21   Q.   And so here it indicates 7/21/2007?

22   A.   Yes.

23   Q.   And so what -- the information that was reported back to

24   you was that Mike Harder from the DHOPS field office in Harahan

25   delivered Exhibit No. 3, the formaldehyde flyer, to the

1   4415 Dale Street, New Orleans, address on July 21st, 2007; is

2   that right?

3   **A.**   Yes.

4   **Q.**   And so just to make clear, your records, which is now

5   Government Exhibit 5, Bates stamp FEMA 162-000388, that

6   indicates that a flyer, the July 2007 flyer, Exhibit No. 3, was

7   delivered to 4415 Dale Street, New Orleans, Louisiana, by Mike

8   Harder on July 21st, 2007; is that right?

9   **A.**   Yes.

10              **THE COURT:**  Okay.  Who's next?

11              **MR. WEINSTOCK:**  Michael Harder.

12              **THE COURT:**  All right.  Michael Harder.  Let's go

13   ahead and play that one.  And of course he's been sworn in, and

14   counsel are present.

15              (WHEREUPON, the videotaped deposition of **Michael**

16   **Harder** was played.)

17                          **EXAMINATION**

18   **Q.**   Mr. Harder, how many flyers were you responsible for

19   delivering?

20   **A.**   An actual amount, I'm not certain.  It averaged -- I

21   probably put out about 30 a day, 30 to 35, maybe 40 a day.

22   **Q.**   And how many days were you delivering the 2007

23   formaldehyde flyer?

24   **A.**   I'm uncertain.  I think it was probably about a week, week

25   and a half we actually delivered them.

1  **Q.**   Mr. Harder, did you deliver all of the flyers that were

2  given to you?

3  **A.**   No, ma'am.

4  **Q.**   What happened with the ones that you were unable to

5  deliver?

6  **A.**   Took them back to the office.

7  **Q.**   And under what circumstances did you not deliver a flyer?

8  **A.**   The end of the day.

9  **Q.**   Mr. Harder, after you would leave a property, was there

10  ever any mechanism, or did you ever check to confirm that an

11  occupant had received the flyer?

12  **A.**   No, ma'am.

13  **Q.**   Do you recognize this document?

14  **A.**   Yes, ma'am.

15  **Q.**   What is it?

16  **A.**   It's a spreadsheet listing trailer unit numbers,

17  verification of bar code, and vehicle identification number,

18  identifying whether it was an occupied unit or not, and the

19  type of unit it was, plus an address.

20  **Q.**   In the top row -- and it may be a little hard to read --

21  it says you -- one, two, three, four -- five cells over it says

22  "UXA status."

23       What does that mean?

24  **A.**   Five rows over.

25       That describes whether the unit is occupied or not.

274

```
 1   Q.   You don't know what UXA --
 2   A.   No, I don't.
 3   Q.   -- might stand for?
 4   A.   No, ma'am.
 5   Q.   Do you also know what "vacant, not ready" means?
 6   A.   Yes, ma'am.
 7   Q.   What does that mean?
 8   A.   It means that the unit is unoccupied and is not ready for
 9   occupancy.
10   Q.   So if an address and trailer next to it is indicated
11   "vacant, not ready," it would mean that it's unoccupied?
12   A.   Yes, ma'am.
13   Q.   To Exhibit 3.
14            Did you prepare this spreadsheet?
15   A.   No, ma'am.
16   Q.   So you cannot testify to its accuracy?
17   A.   No, ma'am.
18   Q.   Mr. Harder, do you remember delivering the July 2007 flyer
19   to the trailer at 4415 Dale Street, New Orleans?
20   A.   No to that particular trailer.
21   Q.   Can you please state your name and spell your last name?
22   A.   Michael Harder, H-A-R-D-E-R.
23   Q.   Are you currently employed?
24   A.   Yes, sir.
25   Q.   Who are you employed by?
```

1    **A.**    I'm employed by the Department of Homeland Security, FEMA.

2    **Q.**    And what is your current position with FEMA?

3    **A.**    My current position with them is in the sales department

4    as an individual assistance specialist.

5    **Q.**    Were you employed by FEMA in July of 2007?

6    **A.**    Yes, sir.

7    **Q.**    Where were you employed by FEMA in July 2007?

8    **A.**    New Orleans.

9    **Q.**    And what was your position with FEMA in July 2007?

10   **A.**    My position with them was an applicant services program

11   specialist.

12   **Q.**    What is an applicant program services specialist?

13   **A.**    Basically, what we are is we deal with the actual

14   applicant, the face-to-face meetings, serving them the best we

15   can in getting directed back into the permanent housing

16   program.

17   **Q.**    And in July of 2007, what was the approximate geographic

18   area that you had?

19   **A.**    The Ninth Ward.

20   **Q.**    In July 2007, were you instructed to deliver a FEMA

21   formaldehyde flyer to various occupants in the Ninth Ward?

22   **A.**    Yes, sir.

23   **Q.**    And what were you -- what were the instructions that you

24   received regarding the delivery of that formaldehyde flyer?

25   **A.**    Basically, to deliver every trailer that we were assigned

1    to.   And they gave us a spreadsheet.

2    Q.   Can you please explain to the jury what you would do to

3    deliver -- walk us through what you would do to deliver the

4    flyer to an individual trailer?

5    A.   Basically, what we'd do is we'd walk -- pull down to the

6    end of the street, take a handful of flyers and sleeves with us

7    and a roll of duct tape, walk down the street, knock on the

8    door, hand the flyer to the individual if they were home, and

9    explain to them that if they had any issues, to contact the

10   number on the sheet, and then we'd walk away.

11        If they were not home, we'd put the flyer in -- in

12   the plastic sleeve, and with duct tape, tape it over the

13   door -- between the door and the frame of the doorway so that

14   they had to take it off the doorway so they could get into the

15   house.

16   Q.   Now, you've also reviewed the document which has been

17   marked Exhibit No. 3, and this document has been referred to

18   earlier.

19        This indicates, I believe, that -- on that -- on the

20   last three columns, that a Mike Harder delivered a formaldehyde

21   flyer on July 21st, 2007, to an address on Dale Street.

22        Do you see that?

23   A.   Yes, sir.

24   Q.   To the best of your recollection, did you deliver flyers

25   to travel trailers on Dale Street?

1   A.   Yes, sir.

2   Q.   And if you had been provided with a list which identified

3   and set forth a trailer on Dale Street, would you have

4   delivered a flyer to that unit?

5   A.   Absolutely.

6   Q.   Is there any doubt in your mind, as you sit here today,

7   whether or not you delivered flyers to the units on Dale

8   Street?

9   A.   There is no doubt at all.

10  Q.   Is the document which is marked Exhibit No. 4 entitled

11  "Important Formaldehyde Information for FEMA Housing

12  Occupants," and Bates stamped FEMA 09-000388, a true and

13  accurate copy of the formaldehyde brochure you would have left

14  with the travel trailers or given to occupants of travel

15  trailers on Dale Street in New Orleans, Louisiana?

16  A.   To the best of my knowledge, yes.

17  Q.   And this is the same brochure that provides, in the last

18  paragraph, right above additional information:  "If you're

19  experiencing these symptoms or suspect you're sensitive to

20  formaldehyde, you should seek medical attention to see if

21  formaldehyde may be causing your symptoms."  Is that right?

22  A.   Yes, sir.

23            THE COURT:  Okay.

24            MR. WEINSTOCK:  Your Honor, we need one minute to get

25  Stephen Miller ready, and it's about 22 minutes.

 1          **MR. BUZBEE:**  Your Honor, we want to publish those two

 2   documents.

 3          **THE COURT:**  Go right ahead.

 4              All right.  Let's go ahead and get the documents

 5   pertinent to that deposition.

 6          **MR. MEUNIER:**  Your Honor --

 7          **MR. BUZBEE:**  We wanted to make a record.  I mean, we

 8   agreed that that's what we're going to do.

 9          **THE COURT:**  Have they been identified as exhibits

10   already?

11          **MR. GLASS:**  The exhibit with the warning is 163.

12          **THE COURT:**  Okay.

13          **MR. GLASS:**  And the other one has not been published.

14   This is -- hold on.

15          **THE COURT:**  Let's go ahead and show 163.  And the

16   other one has not been marked?

17          **MR. BUZBEE:**  I thought we agreed to do that.  I'm

18   going to offer it --

19          **THE COURT:**  I'm sorry.  The other one has not been

20   marked?

21          **MR. BUZBEE:**  Not as yet.  We're going to mark it,

22   Your Honor.

23              We're going to mark the -- Your Honor, this is

24   163.  It's already in evidence.

25          **THE COURT:**  All right.  This is the one that's on the

 1   screen now.

 2          **MR. BUZBEE:**  Yes, sir, that's the one that --

 3          **THE COURT:**  That's 163?

 4          **MR. BUZBEE:**  Yes.

 5          **THE COURT:**  All right.  Let's see the other one, and

 6   let's identify it.

 7          **MR. BUZBEE:**  And we're marking this one 513.

 8          **THE COURT:**  513.

 9              Any objection to including 513?

10          **MR. WEINSTOCK:**  No objection, Your Honor.

11          **THE COURT:**  All right.  No objection to 513.

12          **MR. BUZBEE:**  Could you bring that up, Carl, so we can

13   see this?

14          **THE COURT:**  All right.  And that's 513.

15          **MR. BUZBEE:**  Yes, sir.

16          **THE COURT:**  Okay.  Who's next?

17              All right.  Come on up.

18              (WHEREUPON, the following proceedings were held at

19   the bench.)

20          **MR. SCANDURRO:**  For the Miller deposition we talked

21   to.  Jerry.  There's no reference to that line of questions in

22   the middle of '06.  There is a Q and A on his experience in '04

23   in Florida where he says he's not aware of any complaints in

24   Florida.

25          **MR. MEUNIER:**  Yeah, that' --

 1          MR. SCANDURRO:  That's something -- you know, that's
 2   part of our case.  The other thing is, when -- I did the best I
 3   could to hit the predicate questions and say I'm going to show
 4   you the United States motion to dismiss, Exhibit X, I can't --
 5          MR. MEUNIER:  I can't have that motion to dismiss
 6   reference.
 7          MR. SCANDURRO:  I took it out everywhere I saw it.
 8          THE COURT:  Can we not show it altogether?
 9          MR. MEUNIER:  You can't splice that out.
10          MR. SCANDURRO:  Pardon me?  I'm speaking of the ones
11   I showed you that were your designations --
12          MR. MEUNIER:  Oh, you said it like there's some
13   others --
14          MR. SCANDURRO:  -- I think I have them all.  I think
15   I have them all.
16          MR. MEUNIER:  Reasonable doubt or preponderance of
17   the evidence, which would you --
18          THE COURT:  We're talking about a 20-minute video
19   depo?
20          MR. SCANDURRO:  Yeah.
21          THE COURT:  It's 20 minutes?
22          Can't we just do a quick spot-check or word
23   check on it?
24          MR. SCANDURRO:  I did that.
25          THE COURT:  Do you want to scan it?

 1          **MR. MEUNIER:**  Well, you just showed me one point that
 2   you left it in, and you've taken that out --
 3          **MR. SCANDURRO:**  We're taking it out.  Because it was
 4   your designation, and I didn't want you to think --
 5          **MR. MEUNIER:**  Well, we didn't ask your designations
 6   so...
 7          **THE COURT:**  Can you scan it real quickly?  I don't
 8   want -- I'd like to leave the jury in the box.
 9          **MR. MEUNIER:**  How many pages is it?
10          **THE COURT:**  While you-all are doing that, why don't
11   you-all go ahead and clear that up.  One second.  Don't go
12   anywhere.
13          (WHEREUPON, the following proceedings were held in
14   open court.)
15          **THE COURT:**  Ladies and gentlemen of the jury, let me
16   confer with counsel real quick.  I'm going to try to get an
17   idea of what tomorrow will look like time-wise, and I'll be
18   able to give you that information before you leave today.  I
19   think we have one other short videotape to play for you before
20   you leave today.  So you will be leaving a little bit early,
21   but let me get an idea of what's left for tomorrow.
22          (WHEREUPON, the following proceedings were held at
23   the bench.)
24          **MR. BUZBEE:**  You're on the spot.
25          **MR. PENOT:**  If I can get two little stipulations --

```
 1              THE COURT:  Let me finish up with --
 2              MR. WEINSTOCK:  I'm calling Cole and Wedner and
 3   that's it.
 4              THE COURT:  You're calling Wedner tomorrow --
 5              MR. WEINSTOCK:  Phil Cole and James Wedner, in that
 6   order.
 7              THE COURT:  Cole and Wedner tomorrow, two live
 8   witnesses?
 9              MR. WEINSTOCK:  Two live experts.
10              THE COURT:  Okay.  And this videotape, which
11   hopefully we're going to cover today?
12              MR. WEINSTOCK:  This videotape we're hopefully going
13   to finish right now.
14              THE COURT:  Yes?
15              MR. WEINSTOCK:  Yes, sir.
16              THE COURT:  Okay.
17              MR. HILLIARD:  The two stipulations he wants, I
18   probably can give them.  He just wants one on maintenance and
19   one on Daren Lemieux's document.
20              THE COURT:  Okay.  Get him up here.  Charlie?
21              MR. PENOT:  If I could get --
22              THE COURT:  And this is an e-mail for the sake of the
23   court reporter --
24              MR. PENOT:  -- that Fluor had no maintenance
25   responsibilities after June 2006, shortly after they moved in.
```

 1          **MR. BUZBEE:**  Is that when the contract ended?

 2          **MR. PENOT:**  Yes.

 3               And that it was not a maintenance and

 4  deactivation contractor.

 5          **MR. BUZBEE:**  I don't know what that means.

 6          **MR. PENOT:**  Those are the people that got all of the

 7  contracts as of June of 2006 when we went off of maintenance.

 8  But you don't have a maintenance claim against me anyways.  My

 9  point is, I'm just concerned -- I know you said you'll give me

10  that instruction.  It's just popped up twice, and I just kind

11  of want it clear that we didn't have anything to do with

12  maintenance.

13          **THE COURT:**  If we can't agree on that as a matter of

14  fact, can we not agree that there is no claim in this case for

15  maintenance against Fluor -- negligent maintenance against

16  Fluor?

17          **MR. BUZBEE:**  After June of '06.

18          **MR. PENOT:**  No, there's not --

19          **THE COURT:**  I've already handled the motion to

20  dismiss on that.

21          **MR. HILLIARD:**  I figured, Judge, would be, you've

22  already indicated that you're going to give him the

23  instruction.  So if you read that as a stipulation to the jury,

24  it would almost be paramount to them thinking they had no

25  responsibility.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

 1            **THE COURT:**  Well, that's what I was saying:  Can we
 2    not reword that such that I can advise the jury, which I think
 3    is what Charlie wants?
 4            **MR. PENOT:**  I just want it be clear because it's come
 5    up a couple of times.
 6            **THE COURT:**  It has come up in the depositions through
 7    the cuts that have been played.  I think I should advise the
 8    jury at some point that they're not here to defend a negligent
 9    maintenance claim.
10            **MR. HILLIARD:**  Right.
11                At the same time, I think it needs to be made
12    clear that the claims against Fluor involved with the setup or
13    the haul and install, not the maintenance, just so they'll know
14    that that this isn't --
15            **THE COURT:**  That's part of the instructions.  I don't
16    know if you-all have looked at the -- it's part of the jury
17    instructions.  I think we've explained that that is the conduct
18    that the jury is going to examine.
19            **MR. HILLIARD:**  And then the same instruction, haven't
20    we already decided that he's going to get a -- there's no
21    maintenance issue?
22            **THE COURT:**  Well, upon review of the instructions,
23    although I said that, I'm not sure that that's clear in the
24    instructions, and we can certainly add it to the instructions.
25                But he's talking about in his case-in-chief.  I

 1    don't know that they can stipulate that there's no contractural

 2    obligation to do it, rather the Court granted a motion to

 3    dismiss because there was no evidence that, in fact, they did

 4    not do it.

 5              **MR. PENOT:**  Okay.  I understand what your concern is.

 6              **MR WATTS:**  I think we can --

 7              **THE COURT:**  I think, because it's come up in the

 8    testimony, that at some point I'm going to have to tell the

 9    jury that the claim against Fluor is their negligence in

10    installing this and blocking.  I mean, that's what we've spend

11    all the time talking about.  Because I granted the summary

12    judgment because there was no evidence --

13              **MR. PENOT:**  Against the haul and install.

14              **THE COURT:**  -- that they negligently maintained the

15    unit after she moved in.

16              **MR. PENOT:**  All right.  I'm good with that.

17                    Will you also give me the stipulation that

18    Gator, that he got paid -- or somebody called Kado, probably.

19              **THE COURT:**  So we're going to stipulate into evidence

20    the 1099 -- Gator's 1099?

21              **UNIDENTIFIED SPEAKER:**  Submitted without objection,

22    Your Honor.

23              **THE COURT:**  So you're going to do this on your

24    case-in-chief?

25              **MR. PENOT:**  I guess so.

1     **THE COURT:**  You're going to make this presentation,

2  and I'm going to go ahead and say all right.

3     **MR. PENOT:**  I just want it in the record.  I'm trying

4  to --

5     **MR WATTS:**  So you're not going to call anybody?

6     **MR. PENOT:**  I'm not going to call anybody.

7     **THE COURT:**  Okay.  Good.  Well, that means that

8  tomorrow afternoon we'll probably do closing arguments right

9  after lunch.

10                    **(OFF THE RECORD)**

11     (WHEREUPON, the following proceedings were held in

12  open court.)

13     **THE COURT:**  We're going to go ahead and finish up for

14  the day with this last videotape, which I'm told is

15  approximately 20 minutes long, or thereabouts.

16          Tomorrow, I've confirmed with the attorneys, we

17  are going to finish the testimony tomorrow, all the testimony

18  from all of the remaining defendants, and rebuttal, if any,

19  that the plaintiffs will offer.  They have advised me of their

20  intentions in that regard, and we feel very comfortable with

21  the idea that we are going to finish the testimony and

22  evidentiary portion of this case tomorrow.

23          I don't know what time we will finish.  But in

24  all likelihood, we would come back on Thursday morning at 8:30

25  with closing arguments, my charge to you, and then you will

1    have the case to deliberate.  And then, of course, after that

2    it's up to you-all how long it takes to deliberate on the case.

3    There's no way to foresee how long that process will take.

4              But that's generally where we are on it.  And I

5    think we can say with some confidence that, as I said, we'll

6    finish up the evidentiary portion of the case tomorrow,

7    sometime probably in the afternoon.

8              But let's go ahead and play the tape, and then

9    we'll finish up for today.

10             This is?

11        **MR. WEINSTOCK:**  Steve Miller.

12        **THE COURT:**  Steve Miller.  Stephen Miller?

13        **MR. WEINSTOCK:**  Yes.

14             (WHEREUPON, the videotaped deposition of **Stephen Carl**

15   **Miller** was played.)

16                          **EXAMINATION**

17   **Q.**   Would you please state your name and address for the

18   record?

19   **A.**   Stephen, S-T-E-P-H-E-N, Carl, C-A-R-L, Miller.  5106

20   Contrell, C-O-N-T-R-E-L-L, Court, Stone Mountain, Georgia

21   30087.

22   **Q.**   Mr. Miller, could you just please tell me:  What is your

23   current position with FEMA?

24   **A.**   Currently, I am a disaster reservist in -- in the -- with

25   Region 2 with FEMA.

1   **Q.**   And prior to this position, what position did you hold?

2   **A.**   I was a CORE employee.

3   **Q.**   I'm sorry?

4   **A.**   A CORE, C-O-R-E, employee, cadre of reserve employees,

5   which is a temporary full-time employee, logistics management

6   specialist supervisor.

7   **Q.**   And how long did you hold that position?

8   **A.**   Approximately two and a half years.

9   **Q.**   Beginning when?

10  **A.**   January of '06.

11  **Q.**   And just give me a brief description of what your job

12  duties were for that position.

13  **A.**   During that -- with that position, I was a supervisor over

14  logistical operations through headquarters and in the Gulf

15  Coast recovery office in dealing with the emergency housing

16  unit, which is the unit that supplies temporary housing -- to

17  give temporary housing units to disaster victims.

18  **Q.**   If you'd turn, please, to Page 4, Section 11.  You say:

19  "In addition, a formaldehyde brochure was prepared, and in

20  July 2006 distributed to occupants of EHUs.  To ensure that all

21  occupants received a copy, FEMA issued the brochures to its

22  maintenance contractors with instructions to leave a copy of

23  the brochure at each EHU."

24          Can you just describe for me -- we -- we probably

25  have all seen it, but could you just describe for me what that

1  brochure looked like and what it was and what it contained?

2  **A.**   I was not -- I mean, I -- I recall the document.  We put

3  out many documents.  I can't specifically state what was in

4  that document, or I was not responsible as well for the

5  distribution of that -- of that document to the applicants or

6  to the units.

7  **Q.**   Are you certain that it was distributed in July of 2006?

8  **A.**   To my knowledge and discussions that I've had with other

9  people who were in charge of that, that is -- that is what

10 occurred.

11 **Q.**   So when you say it was prepared in July 2006 and

12 distributed to the occupants, that's not your personal

13 knowledge.  That's just what you have heard?

14 **A.**   I would say so.  I did not distribute.

15 **Q.**   So you have no confirmation that Alana Alexander received

16 this brochure that was distributed in July of 2006?

17 **A.**   That is correct.

18 **Q.**   And it's an e-mail from Michael Miller to Sydney Melton,

19 David Hart, and Stephen Miller, on -- sent on Friday June 2nd,

20 2006.  Do you see it?

21 **A.**   I do see that.

22 **Q.**   The next sentence begins:  "A brochure is provided in

23 every travel trailer that was issued and it's glued on the

24 wall.  In the owner's manual, which is provided in each unit,

25 there is a section on formaldehyde and ventilation of the

1   unit."

2            What I want to ask you, there's -- the first question

3   is:  What is your knowledge that there was a brochure in each

4   and every travel trailer that was issued?

5   A.   I -- I don't have personal knowledge that there was one in

6   each and every trailer.

7   Q.   Okay.  If you go further down, do you see where

8   "temporary" is in bold and underlined and in all caps?

9   A.   I do.

10  Q.   That sentence says:  "These units are for temporary

11  housing, not for long-term occupancy."

12           Do you agree with that statement from Michael Miller?

13  A.   For the use that we did, that we provided them, that's

14  FEMA's -- that is FEMA's policy, is that's how we provide them.

15  Q.   Okay.

16  A.   Not long-term.

17  Q.   Mr. Miller here says:  "Why is it that everybody whines

18  about everything nowadays??" with two question marks.

19           And I couple that with his earlier sentence, the one

20  we read first:  "We can't be sure that an applicant will

21  ventilate the unit, keep the air conditioner on, keep the fans

22  on, et cetera, et cetera.  We can't be sure that applicants

23  don't drink gas, sniff glue, shoot dope, nor can we keep then

24  from consuming too much alcohol, chain smoking or overeating.

25  All of that will definitely kill them."

1           And then he complains -- it seems as if he's

2    complaining that everybody is whining nowadays.

3           Do you agree with Mr. Miller's statement?

4    A.    I -- I do -- I don't necessarily agree with Mr. Miller's

5    statement, no.

6    Q.    Well, that was a qualification.  What do you agree with?

7    A.    I agree with many things.

8    Q.    He goes on to say that:  "Gulf Stream is working closely

9    with FEMA to resolve the formaldehyde problem in the smaller

10   travel trailer Cavalier units.  They have offered to install an

11   exhaust fan at their expense on a case-by-case basis should

12   this become necessary."

13          In your knowledge, did that ever become necessary?

14   A.    I do not recall that we ever installed the fans.

15   Q.    And if you turn to Page 2 of 2, it appears to be an e-mail

16   from Dan Shea to you, Stephen Miller; is that correct?

17   A.    Yes, sir.

18   Q.    And it's regarding Cavalier trailers; correct?

19   A.    Yes, sir.

20   Q.    Received on March 17th, 2006; correct?

21   A.    Yes, sir.

22   Q.    And it says:  "Stephen, I want to advise you of Gulf

23   Stream Coach's use of low formaldehyde-emitting materials in

24   our Cavalier travel trailers."

25          What was the -- again the impetus for this e-mail

1    being sent to you?

2    A.    Just a result of the -- just conversations.

3    Q.    So was there a phone conversation between you and

4    Mr. Shea?

5    A.    There were -- there were numerous phone conversations

6    between Mr. Shea and myself.

7    Q.    But in a phone conversation, you asked Dan Shea to forward

8    this information to you?

9    A.    To my recollection, when I was told this, I requested some

10   sort of verification.

11   Q.    How long have you known Dan Shea?

12   A.    Only -- I've known Dan Shea since the response to Katrina.

13   Q.    And when would that have been?

14   A.    August of '05.

15   Q.    Prior to Katrina actually making landfall?

16   A.    No, I mean -- right.  At the -- actually, probably

17   within -- within a couple of weeks after -- after Katrina

18   landfall, I was in contact with them.

19   Q.    And how did you make contact with them?

20   A.    They were -- they, as -- as being the supplier of 50,000

21   units, as well as with every -- every distributor and other

22   middleman dealer that we procured units from, I was sent a

23   sheet of information containing contact -- points of contacts

24   and their phone numbers in -- in the event that we just needed

25   to contact them regarding deliveries, shipments, or the units

1   themselves.

2   **Q.**   Did you make any other request to any manufacturer,

3   intermediary, or distributor to be provided with this same type

4   of information?

5   **A.**   Not that I recall.

6   **Q.**   Why was it important to get this information from Gulf

7   Stream?

8   **A.**   I don't necessarily think that it was important at that

9   point in time.  It was a conversation, and I thought that since

10  we had probably better than 50 percent, or somewhere around

11  50 percent of our units, to have any positive information

12  regarding a unit that was built with the -- the low

13  formaldehyde emissions would be a -- just some good information

14  to have.

15  **Q.**   This information contained in this e-mail, did you ever

16  verify such?

17  **A.**   No, I never did.

18  **Q.**   So you just strictly relied on Dan Shea's representations?

19  **A.**   I -- I believe that I asked in my e-mail that we discussed

20  previously for additional information.  And in the -- you know,

21  the question to put this to bed regarding the products and the

22  formaldehyde in the units, so I did ask for additional

23  information, I believe.

24  **Q.**   Mr. Miller, good afternoon.  My name is Tim Scandurro, and

25  I represent Gulf Stream Coach.

1          Let me show you a letter you may not have seen before
2    that we will mark as Miller Exhibit No. 20.  It's Bates stamped
3    Gulf 0004473 and 74.
4          Mr. Miller, this is a letter from Phillip Sarvari of
5    Gulf Stream Coach to a Diedre Lee with FEMA in Washington,
6    D.C., dated May 11th, 2006.
7    A.   Yes.
8    Q.   I want to make sure.  You're not -- you're not saying
9    under oath today that Gulf Stream refused to provide any
10   information to FEMA?
11   A.   I'm not stating that, no, sir.
12   Q.   Okay.  If you look at the -- the next sentence in the
13   letter, Mr. Sarvari says:  "And as mentioned during our
14   meeting, if FEMA wishes to conduct formal testing protocols on
15   any designated units, we are willing to participate in that
16   testing."
17          Do you see that?
18   A.   Yes, sir.
19   Q.   You mentioned earlier in your testimony that Gulf Stream
20   was proactive.  Was that the word you used?
21   A.   I've used that many times with Gulf Stream, yes, sir.
22   Q.   Okay.  You've dealt with a lot of vendors and contractors
23   with FEMA and in your prior life in business.
24          Based on your dealings with Gulf Stream, how would
25   you characterize their -- I guess their responsiveness to your

1   needs and your questions and information you needed?

2   **A.**   Very willing to work with -- with you -- with the

3   customer, provide assistance as necessary, in response to

4   requests for parts or repairs or information.  Very good.

5   **Q.**   You would describe them as a good, responsible contractor?

6   **A.**   Yes, sir.

7   **Q.**   In your experience?

8   **A.**   Yes, sir.

9   **Q.**   Coming back to the -- the question of testing, were you

10  aware of the fact at any time, up to including today, that

11  OSHA, on behalf of the federal government, was doing some

12  random testing as early as 2005 of formaldehyde levels in FEMA

13  trailers?

14  **A.**   I do not recall the -- the testing by OSHA in early 2005,

15  even hearing about it, until this.

16  **Q.**   And you weren't aware of it in March of 2006?

17  **A.**   I don't recall that, no, sir.

18  **Q.**   Are you aware of the fact that FEMA did some testing of

19  unoccupied FEMA travel trailers in Purvis, Mississippi, in

20  March of 2006?

21  **A.**   That, I am aware of.

22  **Q.**   This is a declaration by Clyde Payne, who was with OSHA at

23  the time.  And I want to just ask you a question about one of

24  Mr. Payne's conclusions.  If you would turn to Page 3 of 4,

25  sir.

1        In Paragraph 10, five lines from the bottom of

2   Paragraph 10, Mr. Payne makes the statement in his declaration:

3   "Further, I informed him -- and "him" is a Bronson Brown, with

4   the FEMA safety office -- further, I informed him that OSHA had

5   conducted follow-up testing to confirm that ventilation and

6   airing out the units was a sufficient response action.

7        "That testing confirmed that airing out and venting

8   units for a short time reduced formaldehyde levels below OSHA

9   PELs, and those results were shared at regular JFO meetings and

10  also posted on the OSHA website."

11       Do you see that?

12  A.   I do see that.

13  Q.   And in Paragraph 11, Mr. Payne says:  "In addition, I

14  further informed Mr. Brown that formaldehyde levels in units

15  should be relatively low once they were handed over to the

16  public.  This is because by the time the unit is issued to a

17  disaster victim, the unit will have had an opportunity to air

18  out and vent as a result of contractor making the unit ready

19  for occupancy."

20       Do you see that?

21  A.   Yes, sir.

22  Q.   I'm going to mark an e-mail as Miller No. 22 and ask you

23  to take a look at that.

24       This is a May 11, 2006, e-mail from Kurtis Melnick to

25  Marvin Dickerson.  And do you see you're cc'd on that e-mail?

1   **A.**   Yes, sir.

2   **Q.**   Who is Kurtis Melnick?

3   **A.**   Kurtis Melnick and I work together.  He is a log chief

4   down in New Orleans now.

5   **Q.**   Looking at the e-mail in the third paragraph, Mr. Melnick

6   is talking about the procedure for removing formaldehyde odor

7   from a temporary housing unit that's been sitting in the sun.

8   Do you see that?

9   **A.**   Yes, sir.

10   **Q.**   He says:  "The procedure for this is opening the windows

11   and possibly the door for a day or two, or until the odor is

12   completely gone.  In Louisiana, this has been the job of the

13   contractors, or it -- or it has occurred that someone from IA

14   enters a trailer and notices the odor, then they have also been

15   opening the windows.  This should, however, be the

16   responsibility of the contractors."

17          Do you see that?

18   **A.**   Yes, sir.

19   **Q.**   Was that your understanding of what the contractors and/or

20   the IA personnel were doing in the field when they set these

21   trailers up?

22   **A.**   That is pretty much my understanding.

23   **Q.**   And if you look down in the last paragraph, Mr. Melnick

24   says:  "Our current method of having the contractors who make

25   the units RFO -- is that "ready for occupancy"?

1   A.   Yes, sir.

2   Q.   -- seems to be satisfying any concerns from the applicants

3   we are housing."

4         Do you see that?

5   A.   Yes, sir.

6   Q.   Do you agree with that statement based on your experience

7   at that time?

8   A.   I think at -- at that time during early May of 2006, that

9   the number of complaints and the resolution by airing it out --

10  by the contractor making it -- was -- was satisfying the

11  applicants.

12  Q.   And, again, the contractors we're talking about here are

13  the contractors who are actually installing the units on-site?

14  A.   That is correct.

15  Q.   It would not be a manufacturer like Gulf Stream?

16  A.   No, sir.

17  Q.   When you worked the Florida hurricanes in 2004, did you

18  actually go to Florida at any -- for any of those four storms

19  you described earlier?

20  A.   I -- I was -- I was in Florida.

21  Q.   So you were in Florida at the end of 2004?

22  A.   Yes, sir.

23  Q.   Okay.  Were you made aware of any formaldehyde claims by

24  residents of the THUs in Florida?

25  A.   I do not recall any formaldehyde claims out of Florida --

1    Q.    Okay.

2    A.    -- that I'm aware of.

3    Q.    Are you aware of the fact that Gulf Stream sold

4    approximately 7,000 travel trailers to FEMA on the Florida

5    disaster?

6    A.    I -- I'm not sure of the number, but I do know that they

7    did sell -- we had quite a number of the spec models.

8    Q.    And as far as your experience in Florida was concerned,

9    there was no formaldehyde problem or issue with any of those

10   Gulf Stream travel trailers in 2004?

11   A.    That is correct.

12   Q.    Mr. Miller, we are going to mark the next exhibit as

13   Miller No. 24.

14          Mr. Miller, this is an e-mail that appears to be from

15   a Judith Reilly, to a David Chawaga.  If you look down at the

16   e-mail, it's dated April 14th of '06, from Judith Reilly to

17   Bronson Brown.

18          Again, Bronson Brown is with -- also with FEMA?

19   A.    Yes, sir.

20   Q.    Cc'd to David Chawaga, again, dated April 14th, '06.

21   There's a discussion of formaldehyde test results.

22          Do you see that?

23   A.    Yes, sir.

24   Q.    Do you have any idea what formaldehyde test results these

25   individuals are referring to in April of 2006?

300

1    A.    The only knowledge I have about testing that -- that this

2    might be involved with or regarding is the -- the testing that

3    was performed in the Purvis staging yard on the unoccupied

4    units.

5    Q.    We've seen a couple documents -- and I can find them if

6    you need me to -- but the documents that refer to Gulf Stream

7    offering ventilation fans on a case-by-case basis if FEMA

8    wanted those.

9          Do you recall seeing those documents?

10   A.    Yes, sir, I do.

11   Q.    And to your knowledge, did FEMA ever take Gulf Stream up

12   on that offer to use or test ventilation fans in units?

13   A.    To my knowledge, FEMA never did utilize that offer.

14   Q.    Turn to the e-mail that Mr. Woods spent some time talking

15   to you about.  It's on Page 7 of 12.

16         Do you have it?

17   A.    Yes, sir.

18   Q.    I want to ask you about a statement that Mr. Woods didn't

19   ask you about in that e-mail.  If you look towards the bottom,

20   the second to last sentence says:  "the materials used in these

21   FEMA travel trailers, mobile homes, office trailers, school

22   trailers, and other temp billings are built by the same folks

23   with the same materials that are used for all the other like

24   facilities and trailers that are built every day."

25         Do you see that?

```
 1   A.   Yes, sir, I do.
 2              THE COURT:  Okay.  Is that it?
 3              MR. WEINSTOCK:  I believe that's it, Your Honor,
 4   until tomorrow.
 5              THE COURT:  Okay.
 6              MR. WATTS:  Your Honor, we'd like to offer Exhibit 22
 7   to that deposition.  It's Miller 22, a May 11, 2006 e-mail from
 8   Kurtis Melnick.
 9              THE COURT:  Has that already been marked as an
10   exhibit?
11              MR. WATTS:  I don't know.
12              MR. GLASS:  It's already been admitted as 174, Your
13   Honor.
14              MR. WEINSTOCK:  Okay -- okay.  I stand corrected.
15              THE COURT:  174 is already in.  I have it down as in
16   if that's, in fact, the exhibit.  I don't recall specifically,
17   but 174 is in.
18              MR. WATTS:  We'll check all those this evening, and
19   if anything is missing, we'll do it first thing.
20              THE COURT:  Anything else, Counsel, on this?
21                  On this testimony, are there any other exhibits
22   that need to be put in?
23              MR. SCANDURRO:  Yes, Your Honor.
24              THE COURT:  All right.  Let's get them in.  Let's
25   mark them and get them in, and then we'll break for the day.
```

```
 1                    Somebody tell me what's going on.
 2              MR. HILLIARD:  The only exhibit we wanted, Judge, is
 3    already in.
 4              THE COURT:  Okay.  What else do we have, guys?  Come
 5    on, let's go.
 6              MR. SCANDURRO:  Exhibit 4 from the deposition, Your
 7    Honor, which is --
 8              THE COURT:  Exhibit --
 9              MR. SCANDURRO:  It's labeled FEMA 17-004817.
10              THE COURT:  And what -- has that been identified in
11    this case?
12              MR. SCANDURRO:  I think so, Your Honor.
13              THE COURT:  What is it?  What's our number?
14              MR. BUZBEE:  We're going it call it 514, Your Honor.
15              THE COURT:  514?
16              MR. BUZBEE:  Yes.  We're going to mark it and offer
17    it as 514.
18              THE COURT:  I take it there's no objection?
19              MR. BUZBEE:  No, sir.
20              MR. WATTS:  No.
21              THE COURT:  All right.  514 is admitted.
22                    Do we need to put that up right now?
23              MR. BUZBEE:  No, sir.
24              THE COURT:  All right.  What else?
25              MR. BUZBEE:  That should be it, huh?
```

1          MR. WEINSTOCK:  I hope so.

2          THE COURT:  Come on.  Let's go.  We should be ready

3     with these numbers.

4          MR. SCANDURRO:  That's it, Your Honor.

5          THE COURT:  All right.  That's it.  514.  All right.

6     All right.  So ordered.  Those will be added to the admitted

7     exhibits.

8                We're going to go ahead and break for the day.

9     Thank you-all for your attention.

10               Again, please do not discuss the case with

11    anyone over the evening hours.  We will reconvene tomorrow at

12    8:30.  If you can be ready we'll reconvene, and we'll finish up

13    with the testimony and evidence tomorrow.  So, again, we

14    appreciate your time and attention during the course of today.

15               Thank you-all.

16          THE DEPUTY CLERK:  All rise.

17    (WHEREUPON, the jury exited the courtroom.)

18          THE COURT:  Counsel, is there anything we need to

19    cover on the record while the record's still open?

20          MR. WATTS:  There's one issue that I'd like to bring

21    up.  I don't think it's a big issue, and Andy and I can

22    probably agree on it.

23               His witness, Cole, tomorrow is going to testify

24    about the epidemiology and cancer for -- among other things.  I

25    was expecting him to bring a gentleman by the name of Gary

1    Marsh, and I see why he's bringing Cole.

2                    But in the event that Cole plays stupid with

3    respect to what Marsh did in my deposition with him and like

4    that, I want to reserve the right to play a very short portion

5    of Marsh's deposition, if necessary.  I don't think it's even

6    going to come up, but...

7            MR. WEINSTOCK:  We'll cross that bridge when we come

8    to it.

9            MR. WATTS:  The bottom line is, he's going to --

10           THE COURT:  I'm confused as to how -- you want to

11   play somebody else's deposition while you're talking to that

12   witness?

13           MR. WATTS:  All right.  Here's the deal.  He's going

14   to talk about Marsh's study, I would assume.

15           MR. WEINSTOCK:  I would assume.

16           MR. WATTS:  And -- okay.  And if he's going to talk

17   about Marsh's study and he pleads ignorant to some things I

18   talked to Marsh about, then I want to reserve the right in

19   rebuttal to play just a short portion of Marsh's deposition to

20   address that, if I can't get it out --

21           THE COURT:  In your rebuttal case?

22           MR. WATTS:  Yes.  And it won't be long at all.  It

23   will be very short.  And I don't think it's even going to

24   become necessary, because I don't think that witness will do

25   that.

 1           THE COURT:  Well --

 2           MR. WATTS:  I don't think this witness plays stupid.

 3           THE COURT:  -- that -- that's fine, except get

 4    together and decide what is going to be played out of that

 5    videotape --

 6           MR. WATTS:  We will.

 7           THE COURT:  -- because we've been down this road

 8    already with several other witnesses.

 9           MR. WATTS:  It would probably be something I just

10    read into the record real quick.

11           THE COURT:  There has been some confusion as to what

12    is and is not going to be played for the jury.  So you're going

13    to have to get together.  Let's see what happens, but don't

14    wait until the last minute and tell me, "Well, I need to play a

15    tape, and I need to get the tape edited."

16           MR. WATTS:  We won't do a tape.  If I do anything,

17    I'll just read it in, a real brief question and answer.  And I

18    don't even think it's going to become necessary.  Okay?  That

19    way we won't --

20           MR. MEUNIER:  And on the same theme, we had a screwup

21    with the Little deposition.  We didn't get our

22    counter-designations in.  If you notice, Justin asked questions

23    and then Andy testified for a while, with this guy in uniform

24    saying yes.  There were some follow-up questions from Justin

25    that we're still trying to figure out why they were not in.

1          THE COURT:  Yeah.  I thought we had checked on that

2     and we had moved on.

3          MR. MEUNIER:  Well, we did.

4          THE COURT:  This came up earlier today and I

5     thought --

6          MR. MEUNIER:  And the reason I didn't bring it up

7     again and say we were going to do something about Little is

8     because there's no way to do it.  What I'm saying is we had a

9     literally ten-second, two-question -- or maybe it's one

10    question and answer from DeRosa that I'm going to offer in

11    rebuttal to the literature search done by this man, which would

12    have been in those counter-designations.

13          Your Honor, you know, we are doing our best on

14    these things.  And it's just -- some of these -- some of these

15    designations are just not getting in.  And I know that's not

16    the Court's fault, and it's certainly not Andy's fault.  But

17    I'm going to ask the Court, because you do have discretion --

18          THE COURT:  Well, if it's not rebuttal, then...

19          MR. MEUNIER:  Well, it is rebuttal.  No, it is

20    rebuttal.

21          THE COURT:  Well, it's got to rebut something that's

22    come out in the course of the defendant's case.

23          MR. MEUNIER:  Oh, it does.  No, that's not the point,

24    Judge.  It rebuts very -- I'll show Andy.  It's a clear

25    rebuttal to what Little said.  We didn't have it cued up

1  because we thought we had Little counter-designations.  It

2  didn't make it in, and I don't propose to play it.  I can put

3  one of us on the stand.  It's a question and answer.

4          **THE COURT:**  Why don't we find that question and

5  confer with counsel --

6          **MR. MEUNIER:**  I have it.

7          **THE COURT:**  -- and I'll hear any objections to it.

8  But it must be limited to rebuttal.

9          **MR. MEUNIER:**  It is rebuttal.  But his issue is we

10  should have reasonably anticipated it.

11          My issue is -- I think we agree it's rebuttal.

12  He says I should have reasonably anticipated.  I say if I -- if

13  our counter-designations on Little go in, there's no reason for

14  it now, unfortunately.

15          **MR. WEINSTOCK:**  Judge, I -- I will look at it and

16  I'll consider it.  But I will tell you this:  They told me the

17  designations did not go in.  I'm not the one that prepared the

18  designations.  The plaintiff's side did, and it's not on there.

19          I mean there's -- clearly, it's not something

20  that my tech person missed.

21          **THE COURT:**  I understand that.  I'm not interested in

22  who did what and where and why.  I'm interested in the

23  procedure that the jury's going to hear.  And if it's going to

24  be offered as rebuttal, it's going to have to be rebuttal.

25          **MR. WEINSTOCK:**  Which means it has to have been

1  reasonably anticipated that we -- that we would not put it on.

2  And we did our depo cuts on Little before this trial started.

3  I'm having a hard time understanding how they could not

4  anticipate what we're saying -- what we were going to say.

5  They certainly could.

6          What they want to do is trump them.  Because

7  Little was pretty good, they want to trump him after the fact.

8  They get to play DeRosa early and late.  They should have had

9  to play him all at once.

10         **THE COURT:**  I've asked you-all to put people on once

11  and only once, absent some compelling reason to do so.  In

12  fact, I think the only exception I made was the corporate rep

13  of Fluor, Mr. Whitaker.  And Mr. Penot reserved his right to

14  put Mr. Whitaker back on the stand because that was his client,

15  and they had not gotten to his case in chief yet.

16         But I've asked you-all to put these people on

17  once and only once.  I have a problem with reopening videotape

18  depositions and going back to explain something --

19         **MR. MEUNIER:**  It's not -- it's not a --

20         **THE COURT:**  Well, whether it's played or if it's read

21  from the witness stand, it all should have been done at one

22  time.  That was the pretrial instruction.  We sat in this very

23  room and I gave the pretrial instructions on how this was going

24  to be handled.  The fact that it wasn't handled properly, you

25  know, the sanction for that is that we are not going to go back

1   and revisit it.

2              So if somebody's already testified by way of a

3   videotape, you're going to have to show me a very compelling

4   reason why we should revisit testimony again that the jury has

5   already heard.

6         **MR. MEUNIER:**  Your Honor, it's not a -- I want to

7   make sure, and I'll show it to Andy --

8         **MR. WEINSTOCK:**  Well, I'm going to -- I'm going to

9   add something.

10        **THE COURT:**  Let him finish talking, please.  Let him

11  finish talking, please.

12        **MR. MEUNIER:**  It wasn't in the deposition of DeRosa

13  that the jury's heard.  This is something -- this is from

14  another part of his deposition that directly comments -- when

15  this guy says, "I looked at literature and got the .3 ppm."

16             In this Q and A DeRosa says:  "Yeah.  Here the's

17  .3 ppm.  Here's the literature he's talking about."

18             It literally takes ten seconds.  The reason we

19  didn't cut it in the early going is because I had a different

20  understanding about what the scope of Little's own deposition

21  was going to be.  We take responsibility.  We're doing our

22  best.  We didn't get in our depo cuts.

23        **THE COURT:**  But didn't you have -- didn't you

24  designate portions of Little's depo that was going to be played

25  for the jury?

 1              **MR. MEUNIER:**  Our counter-designations for Little

 2   didn't get in.  We -- we designated --

 3              **MR. WEINSTOCK:**  Some of them did.

 4              **THE COURT:**  Didn't you check for the

 5   counter-designations to be added?

 6              **MR. BUZBEE:**  Speaker:  Your Honor, you know that --

 7              **THE COURT:**  Didn't somebody check?  We've got a bunch

 8   of people sitting at this table over here.

 9              **MR. WATTS:**  Yeah.

10              **THE COURT:**  We've got a bunch of other people sitting

11   around here that know a lot about what's going on, and nobody

12   went and checked for any counter-designations.  The tape's been

13   played.

14              **MR. MEUNIER:**  I can't do anything about that.

15              **THE COURT:**  Well, I can't, either.

16              **MR. MEUNIER:**  And all I'm asking is if the Court, in

17   its discretion, will allow me to put in rebuttal, read from the

18   stand, the Q and A from DeRosa that the jury has not heard yet,

19   which I think without doubt is in rebuttal in the subject

20   matter to what Little said.  It's just that it was not

21   previously designated for the reasons I mentioned.

22              **MR. WEINSTOCK:**  Now --

23              **THE COURT:**  Go ahead.

24              **MR. WEINSTOCK:**  Now, if we're going to start

25   reoffering these, Karin Pacheco, you struck when I asked her

1   comment upon -- about Dr. Kornberg, that he said -- she said

2   she didn't want to talk to him because he was too tied into the

3   plaintiffs, and you struck that.

4                He said he spoke to her on the stand.  That

5   would open the door to that three lines of questions which I

6   would love to put in.

7                Second, in response to Mr. Buzbee's exhibit that

8   he put up that nobody was home at -- that that 1619 Miracle was

9   unoccupied, there was a designation that we missed.  We would

10  like to put in where he explains that.

11               So if we're going to start reopening these, I

12  want mine in too.

13          THE COURT:  Counsel, if you needed witnesses to

14  testify by way of rebuttal, you should have had them here live

15  so that they could testify after you heard the opponent's case.

16  So anybody that's testified by way of a videotaped deposition,

17  we are not going to revisit.

18               And that's the Court's ruling.  It's

19  discretionary.  I think we've done enough.  If you-all haven't

20  checked these designations to make sure the jury has heard all

21  of the testimony that's relevant from all of these witnesses --

22  we've had this testimony both in writing and by way of video

23  for a long time.

24               You've also had your opponents' designations on

25  what was going to be played for the jury.  And if you haven't

1  had a chance to check it and you missed something or something

2  was added that wasn't supposed to be, then we're going to live

3  with that.

4           But we're not going to start playing a snippet

5  of this one, and that one, and the other one, when all of the

6  testimony was taken pretrial.  And if you needed somebody for

7  rebuttal, they should have been here so that they could testify

8  live.  So unless you plan on getting somebody on a plane

9  overnight to come in here and testify, I am not going to go

10  back to any depositions that have already been played.

11           **MR. MEUNIER:**  I will make a rebuttal proffer, Your

12  Honor.

13           **THE COURT:**  You may make a proffer on it.

14           **MR. MEUNIER:**  When they -- when they rest.

15           **THE COURT:**  When they rest.

16           Thank you.

17           Now, those of you who are here on *Bell versus*

18  *Keystone*, if you've got a few minutes, let's go ahead and

19  confer in the back on the issue we discussed yesterday.

20           **MR. BUZBEE:**  8:30?

21           **THE COURT:**  8:30 tomorrow, yes.

22           Oh, by the way, those of you who have material

23  on the tables here, if you can push it to one side, I have a

24  criminal docket tomorrow at 8:00, which I hope to be finished

25  by 8:30.  If you would move your -- you can leave your stuff

1    against the wall and elsewhere.  But on these two tables here,

2    if you could clear out as much space as you can.

3              (WHEREUPON, the proceedings were concluded.)

4                              *****

5                          **CERTIFICATE**

6              I, Jodi Simcox, RMR, FCRR, Official Court Reporter

7    for the United States District Court, Eastern District of

8    Louisiana, do hereby certify that the foregoing is a true and

9    correct transcript, to the best of my ability and

10   understanding, from the record of the proceedings in the

11   above-entitled and numbered matter.

12

13

14                          _S/ Jodi Simcox, RMR, FCRR_
                             Jodi Simcox, RMR, FCRR
15                           Official Court Reporter

16

17

18

19

20

21

22

23

24

25