1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  FEMA TRAILER         *    Docket MDL 1873 "N"
     FORMALDEHYDE PRODUCTS        *
6    LIABILITY LITIGATION         *    New Orleans, Louisiana
                                  *
7    THIS DOCUMENT IS RELATED TO: *    September 24, 2009
                                  *
8    CHARLIE AGE, ET AL V         *    8:30 A.M.
     GULF STREAM COACH, INC.,     *
9    ET AL, DOCKET NO. 09-2892;   *
     ALANA ALEXANDER, INDIVIDUALLY *
10   AND ON BEHALF OF             *
     CHRISTOPHER COOPER           *
11   * * * * * * * * * * * * * * *

12                            DAY 9
             JURY TRIAL PROCEEDINGS BEFORE THE
13             HONORABLE KURT D. ENGELHARDT
                 UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16

17   For the Plaintiffs:          Gainsburgh, Benjamin, David,
                                    Meunier & Warshauer
18                                BY:  GERALD E. MEUNIER, ESQ.
                                  1100 Poydras Street
19                                Suite 2800
                                  New Orleans, Louisiana 70163

20

21                                The Buzbee Law Firm
                                  BY:  ANTHONY G. BUZBEE, ESQ.
22                                JP Morgan Chase Tower
                                  600 Travis, Suite 7300
23                                Houston, Texas  77002

24

25

             JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES</u>:

2    For the Plaintiffs:          Watts Guerra Craft
                                   BY:  MIKAL C. WATTS, ESQ.
3                                  Four Dominion Drive
                                   Building Three, Suite 100
4                                  San Antonio, Texas  78257

5
                                   Hilliard Munoz Guerra
6                                  BY:  ROBERT C. HILLIARD, ESQ.
                                   710 S. Shoreline Boulevard #500
7                                  Corpus Christi, Texas  78401

8
                                   CHRIS PINEDO, ESQ.
9                                  Attorney at Law
                                   802 North Carancahua
10                                 Suite 2250
                                   Corpus Christi, Texas  78470
11

12   For Gulf Stream Coach:       Duplass, Zwain, Bourgeois
                                     & Morton
13                                 BY:  ANDREW D. WEINSTOCK, ESQ.
                                   BY:  JOSEPH G. GLASS, ESQ.
14                                 3838 N. Causeway Blvd.
                                   Suite 2900
15                                 Metairie, Louisiana 70002

16
                                   Scandurro & Layrisson
17                                 BY:  TIMOTHY SCANDURRO, ESQ.
                                   607 St. Charles Avenue
18                                 New Orleans, Louisiana  70130

19
     For Fluor Enterprises:       Middleberg, Riddle & Gianna
20                                 BY:  CHARLES R. PENOT, JR., ESQ.
                                   BY:  RICHARD A. SHERBURNE, ESQ.
21                                 BY:  SONIA MALLETT, ESQ.
                                   717 North Harwood
22                                 Dallas, Texas  75201

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES</u>:

2

3    Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                     500 Poydras Street
                                     Room HB-406
4                                    New Orleans, Louisiana 70130
                                     (504) 589-7780
5

6

7

8    Proceedings recorded by mechanical stenography, transcript

9    produced by computer.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                    <u>Page</u>

3

   CLOSING ARGUMENTS
4        Mikal C. Watts, Esq.                          8
         Andrew D. Weinstock, Esq.                    39
5        Charles R. Penot, Esq.                       63
         Anthony G. Buzbee, Esq.                      72
6
   JURY INSTRUCTIONS                                  86
7
   JURY VERDICT                                      151
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **PROCEEDINGS**

2                      **(September 24, 2009)**

3                              * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          (WHEREUPON, the jury entered the courtroom.)

6          **THE COURT:**  All right.  You may be seated.

7                  All right.  Ladies and gentlemen of the jury,

8    thank you-all for being here on time.  As I indicated

9    yesterday, we're at the part of the trial where the attorneys

10   are going to make their closing arguments to you.

11                 Closing arguments, like opening statements, are

12   not evidence.  They are merely an explanation of how the

13   attorneys see the evidence; and, of course, afternoon

14   explanation of their respective client's positions with regard

15   to the evidence that's been presented here in court.

16                 The ground rules for the closing arguments are

17   going to be as follows:

18                 The plaintiffs have -- will have 60 minutes and

19   they will begin closing argument.  They are entitled to reserve

20   some rebuttal time, and the rebuttal time will be 15 minutes.

21   As I understand it, Mr. Watts is going to have closing argument

22   with you for 45 minutes, and I will give him a one minute

23   warning when he's about to hit the --

24                 In other words, at 44 minutes, I will so advise

25   him.  If he goes over, it will be subtracted from the remaining

1    15 minutes that Mr. Buzbee is going to use for rebuttal.

2    Mr. Weinstock is going to have, I believe, 45 minutes on behalf

3    of defendant Gulf Stream.

4             **MR. WEINSTOCK:**  Yes, Your Honor.

5             **THE COURT:**  At which time Mr. Penot will have the 15

6    minutes -- in other words, the defendants have a total time of

7    60.  Mr. Penot will have 15 minutes to address you on behalf of

8    his client, Fluor, and then we will hear rebuttal.

9             At that point we will take a very short break

10   and you will come back into the courtroom and I will instruct

11   you as to the law and as to how to deliberate on this case.

12   Then you will have the case for deliberations and you can

13   finally discuss it amongst yourselves.  And we will work

14   through as long as it takes for you to reach a verdict in this

15   case.

16            I also mentioned yesterday that when we begin

17   closing arguments, and I'll reiterate, I'll ask the CSO once we

18   begin to lock the door of the courtroom so that there is no

19   entry during the course of closing argument.

20            If anybody has a personal emergency that they

21   have to tend to, they will be allowed to leave the courtroom,

22   but we will not have anyone entering during the course of

23   closing arguments.  That will be the case up until we take the

24   break.

25            So let's go ahead and begin.  Mr. Watts, you're

1    prepared.

2              **MR WATTS:**  I am, sir.

3              **THE COURT:**  Okay.  I'll be the official timekeeper

4    here.  If you-all --

5              **MR. WEINSTOCK:**  Could we finalize the exhibits.

6    There was one piece -- Exhibit 172 needed to be admitted and

7    167 withdrawn.

8              **THE COURT:**  Wait.  Do we have a fact question here?

9    What are we doing now?  172...

10             **MR. WEINSTOCK:**  Is to be admitted and 167 withdrawn.

11   It's a redacted version of the same copy.

12             **THE COURT:**  That is correct, Counsel?

13             **MR. BUZBEE:**  Yes, sir.

14             **THE COURT:**  All right.

15             **MR. BUZBEE:**  And, Your Honor, just since we're doing

16   that, we're formally withdrawing 332, 333, 336, 341, 329, 143

17   and 363 and I think with that, we've got it all squared away.

18             **THE COURT:**  Those will be withdrawn?

19             **MR. BUZBEE:**  Yes, sir.

20             **THE COURT:**  All right.  What I want you-all to do is

21   get with Ms. Radosta at the conclusion of the Court's

22   instructions, because those exhibits will be sent into the jury

23   room and you-all will be signing a certificate indicating that

24   you have verified that all the exhibits that belong in the

25   court's record are in the court's record and those that should

 1   not be in the record have been withdrawn and that you-all have

 2   personally reviewed that with the court and that that is the

 3   case.

 4              **MR. BUZBEE:**  Yes, sir.

 5              **THE COURT:**  All right.  Mr. Watts --

 6              **MR WATTS:**  Thank you, Your Honor.

 7              **THE COURT:**  -- sorry about the delay.  Go ahead.

 8              **MR WATTS:**  May it please the Court, Counsel, my good

 9   friends, Alana and Coop.

10              Ladies and gentlemen, before I begin my remarks

11   to you, I do want to say one thing on behalf of everybody.

12   When eight people get pulled out of their homes with a notice

13   to appear for federal jury service, I know it's not the best

14   thing that ever happened to you.

15              We thank you for the last eight or nine days of

16   your jury service.  We hope that you found it interesting.  But

17   I think we would be remiss to proceed forward to the end of

18   this case without thanking you for your service.  So thank you

19   very much.

20              I would like to spend the next 45 minutes

21   discussing the evidence that has come forward in this trial in

22   great detail and to weave it into jury questions that the Court

23   is going to ask you and give you my thoughts about how those

24   ought to be answered under the evidence.

25              But before I do, I think that we have to start

 1    with a global thought, and that is:  Number one, the scientific

 2    community of this planet has gotten together and conclusively

 3    established that nasopharyngeal cancer causes -- or that

 4    formaldehyde causes nasopharyngeal cancer.  They have

 5    conclusively established that formaldehyde is carcinogenic in

 6    humans.

 7              And despite the fact that in litigation one

 8    might want to undo that, you have no evidence before you that

 9    this consensus in the global scientific community has any

10    problems with it whatsoever.

11              Secondly, if these trailers weren't defective,

12    Fluor's lawyer shows you a graveyard there are 30,000 trailers

13    no longer being used.  Why is that?  Well, I want to talk to

14    you about that with respect to the Court's charge.

15              The Court is going to ask you a total of 11 or

16    12 questions and he split it up very organized -- no surprise

17    there -- into A, Gulf Stream; B, Fluor; C, apportionment of

18    fault and damages, and that's the way the jury verdict form

19    will be presented to you.  So I want to go through that with

20    you.

21              And just, globally, we think that the evidence

22    is going to be that you need to answer the first nine questions

23    "yes" on liability.  Now, what's the evidence that supports

24    that?  Well, we think that when you get to Questions 10 and 11,

25    you're going to be asked, among the different parties, to

1    apporton of fault for the damages that were caused, and we're

2    going to recommend to you that you apportion 90 percent to Gulf

3    Stream, 10 percent to Fluor, and proceed forward to damages.

4              And there's six different kinds of damages that

5    you'll be asked to fill in dollar amounts for.  And, of course,

6    you've already heard from the economist with respect to the

7    expense of medical monitoring.  The rest of them are damages

8    that you, in your discretion, are going to have to come up with

9    a number for; but I can tell you that under this evidence, they

10   are severe damages.

11             Now, Question No. 1 that's going to be presented

12   to you is unreasonably dangerous construction or composition.

13   What does that mean?  Well, this is what the jury verdict form

14   is going to look like, and there you go:  "Do you find that the

15   Gulf Stream trailer occupied by Alana Alexander and Christopher

16   Cooper was unreasonably dangerous in its construction or

17   composition?" key words.  And the reason that's key words is,

18   of course, the basic principles of formaldehyde emissions from

19   wood products.

20             And the composition is factor number one.  It's

21   the key factor, together with ventilation.  But as we go

22   through the evidence, what you're going to see is that

23   construction or composition is not what it was intended to be.

24             The LFE policy under the evidence from Scott

25   Pullin is a safety policy, low formaldehyde emissions.  Now, I

1    will tell you that under this record, I think that you can

2    reach the conclusion very easily that no such policy ever

3    existed.

4              I have never seen -- and you can judge the

5    credibility of the witnesses -- a major manufacturing

6    corporation with a safety policy that is not written down.  It

7    may be convenient in litigation to claim the policy always

8    existed, it was so intense that we didn't have to write it

9    down.  But you can also reach the conclusion that it was never

10   written down because it ever existed before this litigation

11   began.

12             But Eddie Abbott, the Gulf Stream engineering

13   manager, agrees that wood that is not LFE would be contrary to

14   Gulf Stream specs.  That's important, because when you get to

15   the charge on this question, one of the elements is, is that

16   the product that was produced is different from the

17   specifications that were made.  That's one difference.

18             Jeff Zumbrun comes in here and tries to undo all

19   the other evidence.  But he did admit that if you receive LFE

20   wood, it should be on the purchase order.  He has been shown

21   numerous purchase orders with LFE not on it.  I'm going to show

22   you a couple, and Mr. Buzbee will show you a couple, that will

23   tell you and prove conclusively that the wood that was utilized

24   for Alana Alexander's trailer built on December the 13th of

25   2004, did not have LFE wood in it.

1          Alan Davis -- do you remember these workers that
2  responded to the ads that we put in? -- when working at Gulf
3  Stream's plant, he never saw "LFE" on the wood.  He was not
4  aware of any LFE-only policy at Gulf Stream.
5          Don Shaffer had never heard of an LFE-only
6  policy at Gulf Stream.  He never saw wood with an "LFE" stamp
7  on it.  Dan Shea, in his deposition, admits that he learned
8  that 15 percent of the wood was not LFE; and then later on they
9  learned that two-thirds of the wood from Samling and
10  Weyerhaeuser, the roof underlayment wood suppliers, was not
11  LFE.  And, oh, by the way, they never told the government this.
12          Scott Bailey, Mr. Buzbee went and took the
13  deposition of this gentlemen from Adorn.  Gulf Stream had no
14  policy on LFE according to him.  Quote, "They were happy to get
15  whatever they could get."
16          "If the LFE does not -- and there's a typo, I
17  apologize -- does not appear on the purchase order invoices,
18  then we assume that the product sent to Gulf Stream was reg."
19  And that's the testimony you got this from their suppliers.
20          The had a receiver at Gulf Stream who says if
21  the load, the product, came in without an LFE designation it
22  would be a mistake.  If Gulf Stream's billed for reg product,
23  it received reg product.  So I think the consensus of the
24  evidence is, unless it says "LFE" on both the purchase order
25  and on the wood, it's reg wood.

1          Well, let's talk about this.  This is hard to
2   see, but you'll see that on the left and on the right are two
3   different documents that are in evidence.  With respect to the
4   one on the left, you'll see the date of November 30th of 2004.
5   With respect to the one on the right, you'll see the same date
6   November 30th of 2004.  The numbers add up, it's the same
7   thing.
8          Now, what Mr. Weinstock's problem is, is he
9   wants to tell you, you know, it's hidden behind the dark
10  curtain.  In fact, it's not.  In fact it cannot be.  Because as
11  you look further at this document, you will see that there are
12  two parts of wood being ordered here.  One of them is over
13  here, 2.7 times four times eight-foot grand artic, and that's
14  LFE.
15         Now, when you look at that and you compare it
16  with what's below it, you're going to see the Beck product that
17  has been talked about that.  And it was 2.7 times 48 inches,
18  which is four, same size, times 78 inches, which is less wood
19  than the one above it.
20         And, yet, you'll note that the price is the same
21  for both, and that's because reg wood is cheaper than LFE wood.
22  So you can get a product that is the same price.
23         Now, when you take over here to the one behind
24  the curtain, that doesn't work out.  Because one of them is reg
25  wood and one of them is LFE wood.  The importance of the Beck's

 1    sand is Mr. Jeff Zumbrun was asked on cross-examination what

 2    the color of it is and he said it looks like a taupe, which is

 3    beige.

 4              Now, when you take and ask Alana Alexander,

 5    "What color were the side panels of the walls?" they were a

 6    beigey-looking color.  This non-LFE wood was used on the side

 7    panels of the walls.  And there are numerous other examples, if

 8    you'll take the time to go through the purchase orders, that

 9    demonstrate different kinds of woods in different parts are not

10    LFE.

11              Al Mallet, I thought he was an extremely

12    impressive individual.  He concluded that Gulf Stream failed to

13    meet FEMA's superior quality spec and that when he examined --

14    104-page report, and trust me, the guy was thorough -- when he

15    examined all this wood, he saw no "LFE" stamps on any wood.

16              Now, one of the defenses that Gulf Stream is

17    going to present is called the government contractor defense.

18    And they're going to say, you know, the government approved a

19    reasonably precise specification.  Number one, I think the

20    evidence is there was no specification that was reasonably

21    precise.  That's number one.

22              Number two, that Gulf Stream's product conformed

23    to those specifications.  All you had is industry standard.

24    Industry standard in this case is clearly LFE, and it does not

25    have it, so it does not conform.

1                   And three, Gulf Stream's products warns the

2    government, at the time of the first sale, of the product

3    dangers -- of product dangers that were known to Gulf Stream.

4                   Now, the only warning that goes with the product

5    is the owner's manual, and there is no warning respect to

6    formaldehyde in there.  So the government contractor defense

7    does not apply.

8                   This is confirmed by the deposition testimony of

9    Jim Shea.  They did not instruct the government to air out the

10   trailers.  Gulf Stream was familiar with formaldehyde.  Gulf

11   Stream included no language in its warnings about formaldehyde,

12   even though Gulf Stream knew it was there.  Gulf Stream, when

13   it did testing in March of 2006, did not share that testing.

14                  Burl Keel, I thought, was a very interesting

15   witness.  There was a complaint.  They went down to investigate

16   the complaint.  He went in.  He had the eyes burning.  He

17   smelled it.  And how did they fix the complaint?  They changed

18   out the woods on the beds and the dinettes and they took out

19   the lauan, with emitting formaldehyde, and put in the OSB that

20   doesn't emit formaldehyde that Stephen Smulski says you should

21   use.

22                  Gerald McGwin, I teased my own witness about

23   being stuck in the math lab.  It seemed like a funny joke until

24   somebody in the back told me they thought I said the "meth"

25   lab.  But the math lab.

1          This gentlemen looked at all the world studies
2   with respect to the prevalence of asthma in children.  And what
3   you can tell, and this exhibit is in evidence, is that the
4   odd's ratio is almost two and a half times greater if you're at
5   .50 parts per million than if you're at no formaldehyde.  It's
6   almost -- or it is 7.1 times greater than -- at no level than
7   if you're at .10.
8          So part of what I think that is important given
9   the graph that he put in is:  Was it down here at the ATSDR
10  level?  Was it down here at the NIOSH level?  Here's the level
11  it was tested at in January of 2008.  But I think that the
12  evidence in this case has been clear.  Several things:  Number
13  one, you get higher emissions closer to the build date; number
14  two, you get higher emissions when it's hot and humid in the
15  summer months than in the winter months.
16          So where is the level of exposure for
17  Christopher Cooper?  There's four or five different ways to
18  look at this under evidence and I want to talk to you about
19  those ways.
20          First, you could look at the January 2008 test
21  of .050, and you already, looking at Dr. McGwin's data, have
22  more than a doubling of the risk of asthma.  But the CDC
23  report, which is in evidence, and I humbly request that before
24  you begin your deliberations, you take a look through the CDC
25  report.

1          A lot of times lawyers in litigation get so
2 involved so deeply on behalf their clients they kind of
3 redefine the reality.  You don't have to do that.  You have
4 government reports from the CDC, the Centers for Disease
5 Control, the governmental agency that's designed to monitor
6 outbreaks of health problems, and this certainly was one.

7          You have government reports from the Berkeley
8 National Lab that you can read.  You have government reports
9 all of which scream out this is a huge public health disaster.
10 But the CDC report says look, the formaldehyde levels tend to
11 be higher in newly constructed trailers and during warm
12 weather.

13          So when you're looking at a .05 result that's in
14 January of '08 more than three years and a month after it was
15 built and taken in the middle of the winter, you're going to
16 have a different result.

17          So what's another way that you can look to see
18 what the exposure may have been?  Well, how about the
19 government tests that were gone on Gulf Stream Cavalier
20 trailers?  You recall the Lawrence Berkeley (CCK) lab tests.

21          The important things about this are two-fold.
22 Number one, the Gulf Stream Cavalier trailer that was tested
23 was tested 18 months after it was built.  Alana Alexander,
24 Christopher Cooper and Erika Alexander moved into their trailer
25 18 months after it was built.

1          And the results that you got are somewhere

2    between .31 and .78 parts per million, or 310 to 780 parts per

3    billion.  We don't know in that report which of the four was

4    Gulf Stream, but we can look at other reports and know that

5    when the CDC tested trailers, they got levels up to 590 parts

6    per billion.  And then we go on.

7          Dr. Hewett, the fellow that I was pushing --

8    talk about stuck in a math lab, right? -- the fellow that I was

9    pushing and said, "I want to talk about these charts."  He's

10   right.  These charts contain the data of what was.  Nobody has

11   to guess.  It was all tested.  There were 1,185 Gulf Stream

12   trailers that were tested.  There were 876 Gulf Stream

13   Cavaliers that were tested.

14         And he plotted it all out for you, and this is

15   in evidence.  And you can see that in the summer months, you

16   get higher readings.  It makes sense.  But, most importantly,

17   regardless of who did the testing, all of the different groups,

18   the mean, or the average, level was 448.9 parts per billion in

19   876 Gulf Stream Cavalier trailers tested.

20         So that gives you some idea, unless their

21   quality control is all over the map, you get some idea about

22   what the average Gulf Stream Cavalier trailer had in

23   formaldehyde when it got tested.  Not when it was new, when it

24   got tested.

25         But you don't have to stop there, you have other

1    evidence that came in yesterday.  The odor threshold for

2    formaldehyde.  You remember the first witness?  Erika Alexander

3    testified:  "It had that funky smell."  When her mother

4    testified:  "We noticed the trailer had a real strong smell."

5                Now, Andy's going to get up here and say, "But

6    Coop didn't smell it."  The problem is, is that Coop is not

7    average.  He had asthma and allergies already.  He's got a

8    clogged up nose.  He's not going to smell things as well as his

9    sister and his mother.

10               But when you talk about average people, which

11   Coop certainly is not, so I would suggest that the odor

12   threshold demonstrates that the threshold -- or the level was

13   higher.  But the average threshold, Marco Kaltofen told you, is

14   between .5 and 1.  But it's warmer there's more formaldehyde

15   released; when it's more humid, there's more formaldehyde

16   released.

17               You don't have to rely on the plaintiff's

18   expert.  Commander Joseph Little testified that the odor

19   threshold is from .5 parts per million to 1 part per million.

20               Robert James -- Dr. Robert James:  "If smelling

21   formaldehyde, then the level is at or above the threshold of

22   500 parts per billion."  So you know based on the fact that

23   people could smell it, that it's more than 500 parts per

24   billion when they were smelling it.

25               Dr. James Wedner, I asked him these same things

1    and he had to admit this on cross-examination.

2                    You could also look at the irritant threshold

3    for formaldehyde, and I've talked to Dr. Wedner about this.

4    Now, his defense is, is that nosebleeds are caused by people

5    picking their nose.

6                    But if formaldehyde caused nosebleeds, and I

7    think that the evidence here with my example of the young boy

8    Heath kind of makes the point, if we don't have an epidemic of

9    nose pickers in Louisiana, we do know that if formaldehyde is

10   causing nosebleeds, the level would have to be on the high end

11   of that irritant threshold range between 500 parts per billion

12   and 3,000 parts per billion.

13                   So that gives you some indicia of the level of

14   formaldehyde that Erika Alexander was exposed to when she first

15   moved into this trailer.  She had nosebleeds.  She testified

16   that she would wake up with dried blood on her nose and on her

17   pillowcase.  Heath Allen talked about, first, one and then two

18   nosebleeds when he first walked into these Gulf Stream Cavalier

19   trailers.

20                   Dr. Chris DeRosa:  "Kids were presenting with

21   clinical signs of formaldehyde toxicity and they were being

22   taken from the hospitals, returned back to their environment

23   which caused it."

24                   So I think that the answer to Question No. 1 is

25   a resounding "yes".  This was an unreasonably dangerous

1   condition cause by its construction or composition.

2                   No. 2, unreasonably dangerous in its design.

3   There is the question:  "Do you find that the Gulf Stream

4   trailer occupied by Alexander and Cooper was unreasonably

5   dangerous in its design?"

6                   The reason this is true is because of the two

7   factors that Dr. Smulski talked to you about that are circled.

8   These are the two factors that a designer of a product can

9   control, through material selection and through AC design, and

10  Gulf Stream controlled both of the factors that could be

11  controlled.

12                  Let's talk about this a little bit.  The five

13  basic principles, the number and age of formaldehyde-emitting

14  wood products, the volume of the air enclosed, the ventilation

15  rate, the temperature, the relative humidity.

16                  This gentleman also testified that in 2004 there

17  were alternative materials available that were both

18  economically and technologically feasible that would emit no

19  formaldehyde, or so little it wouldn't even show up on the

20  regulatory screenings.

21                  Now, what does that tell you?  What it tells me

22  is that Gulf Stream, in designing a travel trailer that it

23  knows the size of, that it knows is going to be used in

24  hurricane zones, hot, humid climates, has choices to make.  And

25  that is, are they going to choose to limit formaldehyde, or are

1    they going to choose to buy shoddy construction materials, slap

2    it together and tell people, air it out with your air

3    conditioner on.  And we know the choices they made.

4              All that particleboard is, according to Al

5    Mallet, is basically sawdust and glue.  The killer is the glue.

6    The glue.  The glue is formaldehyde.  Condensation comes

7    through the walls and gets insulation wet, raises the

8    temperature, raises the off-gassing, the trailer's under

9    negative pressure, you don't have a recirculating air

10   conditioner so it doesn't go anywhere.

11             I've talked to Damien Serauskas about this, it

12   is true that travel trailers are not subject ATSDR standards,

13   but a reasonable designer at a bare minimum should use them.

14   Gulf Stream did not.  He talked about mechanical ventilation is

15   not necessary, but every building that we were able to identify

16   has it.  And the truth of the matter is, there are reasons that

17   those of you who live in mobile homes and larger mobile

18   products are not having these problems, and I'll talk to you

19   about that.

20             But the fact of the matter is the recirculating

21   AC keeps the polluting air from escaping.  Unlike mobile homes

22   and houses, Gulf Stream travel trailers, they're a lot smaller,

23   they have less head space, and therefore less air volume.

24   They use particleboards over the entire body, and you saw that

25   with Exhibit B to Mr. Smulski, and a low-quality composite wood

1    products.  They used much more formaldehyde-emitting products

2    per square foot, and they used no real ventilation system.

3    They don't have vents up in the top of the ceiling, like mobile

4    homes.  They don't have recirculating HVAC systems like homes

5    do.

6                    That's why you have this problem, because of

7    design choices made by Gulf Stream with respect to travel

8    trailers.  We don't have a big epidemic of mobile home problems

9    in Louisiana, and there's reasons, design choices.  And there

10   is the result of those design choices, 30,000 travel trailers

11   left to rot.

12                   Is it unreasonably dangerous in its design?  I

13   would submit to you that under this record, the answer is

14   clearly "yes".

15                   No. 3, unreasonably dangerous in failing to

16   provide an adequate warning.  There's the question:  "Do you

17   find that the Gulf Stream trailer occupied by Alexander and

18   Cooper was unreasonably dangerous because an adequate warning

19   about the trailer was not provided?"

20                   You have the owner's manual.  If you want to be

21   thorough, you can look through it.  But I think that you can

22   also take everybody's word for it, the word "formaldehyde" is

23   not in there.  Not once.  Not even obliquely referenced.

24                   Mr. Buzbee told you in opening statement, "What

25   you don't know can hurt you," and that's true.  Scott Pullin

1   told you the owner's manual didn't even mention formaldehyde.

2   He told us, March 2006, eyes burning, and headaches, and

3   changing out the woods for the customers.  They went down and

4   did testing and showed .55, .72 parts per million, but did not

5   share the tests.

6            But they did send an e-mail to FEMA:  "Stephen,

7   I want to advise you of Gulf Stream's use of LFE materials in

8   our Cavalier travel trailers."

9            Sometimes the most important evidence in a case

10  is the evidence that does not come in.  Did you ever see a

11  picture of any piece of wood in this trailer with an "LFE"

12  stamp on it?  No.  We got one of the top wood guys in the

13  country to go upside down one side to the other and he found

14  one illegible stamp in that entire travel trailer.

15           They didn't warn about it.  Now, their defense

16  is -- and they can invoke all these defenses, and you get

17  instructed now that doesn't mean that the Court thinks there's

18  any evidence of anything.  They've invoked the defense, and

19  here's the defense.

20           If FEMA is some sort of a sophisticated

21  purchaser who, by experience and expertise, is aware of the

22  possible hazards associated with the use of the product and you

23  have an obligation to inform end users of such potential health

24  hazards, then they're considered a sophisticated purchaser who

25  didn't need to be warned.  Well, let's talk about that.

1          Number one, before Hurricane Katrina, travel

2  trailers had always been used principally for short-term

3  housing needs, and so FEMA didn't know the difference.  FEMA --

4  Kevin Souza testified that FEMA was relying on vendors and

5  manufacturers to provide units that were safe and habitable.

6          Ask yourself the question when you're

7  deliberating this issue of sophisticated purchaser, who knows

8  more about travel trailers more than the person who's making

9  them?  More importantly, Dan Shea told FEMA, "We're going to

10  send a person down to Baton Rouge to test units in your staging

11  area."  And the test results showed what's up on the screen.

12          Mr. Buzbee told you in opening statements that

13  you would see results up to 500 times the minimum safe levels,

14  that's precisely what they got.  You heard from nobody that

15  said, "We shared this testing with FEMA."

16          Most importantly, Alana Alexander says, "You

17  know, if we had been told about the formaldehyde issue, we

18  would have moved out."  These people are human beings.  They

19  are entitled to the information that affects their safety.

20  They were not given it by the manufacturer of this product.

21  They were not told one word.  That renders the product

22  unreasonably dangerous in failing to provide an adequate

23  warning.

24          Did this unreasonably dangerous condition exist

25  at the time the trailer left Gulf Stream's control?  Well, the

 1   composition was the same at the time that it left Gulf Stream.

 2   The design did not change from the time that it left Gulf

 3   Stream until it got to the Alexander's; and the warnings did

 4   not change because there were none.  So answer is "yes".

 5   There's the question, No. 4.

 6              Some of the evidence:  "They failed to meet

 7   FEMA's superior quality spec," and in 2004.  I thought this was

 8   one the more important witnesses in the case.  He is Gulf

 9   Stream's wood receiver.  Now, their defense to him is, "Oh, he

10   must not have known about the policy.  He didn't need to know."

11              If you hire somebody whose job it is to make

12   sure that the product that comes in is the product that should

13   have come in, but you never advise him of Gulf Stream policy

14   requiring LFE woods, you never train him to look for LFE-only,

15   how are we going to catch wood that comes in that's not LFE?

16              And then he also testified in 2004 Adorn sent in

17   most of the wood used for FEMA trailers.  Don Freiberger worked

18   there in 2004.  He never saw a stamp "LFE" on wood used on FEMA

19   trailers.  The answer to Question No. 4 should be "yes" under

20   this record.

21              Question No. 5:  "Did this condition cause

22   injury to Chris Cooper?"  The answer here is clear and it's

23   "yes" for a lot of different reasons.

24              First, Karen Freiberger said when she got it,

25   "The smell would just totally take your breath away, choke and

 1  gag you, eyes would water.  It was just horrible."  Now,

 2  compare that to Alana Alexander:  "Our eyes started running.

 3  We saw the smell -- or we smelled the smell.  We had a tickling

 4  sensation in the back of our throats.  Christopher's eyes

 5  constantly ran."  These classic signs of formaldehyde toxicity,

 6  and they injured this boy.

 7            Erika Alexander:  "When you smelled it, your

 8  nose would burn and it would burn your eyes too.  His nose and

 9  his eyes were runny."

10            The Court's going to instruct you that there's a

11  concept in the law known as aggravation of pre-existing

12  condition.  Just because Chris had asthma does not mean that

13  he's not entitled to recover for an aggravation of it.  And the

14  literature is clear:  Formaldehyde is an irritant.  That

15  irritant aggravated this boy's asthma.  He believes his asthma

16  was made worse by living in the trailer.

17            And the one thing that I have not heard out of

18  anybody is that either of these plaintiffs are anything other

19  than completely honest.  Every witness that talked to them said

20  they'd tell it like it was.

21            Karin Pacheco, she works at one of the finest

22  pulmonology centers in this country, world renowned National

23  Jewish.  In her opinion, his symptoms were due to formaldehyde.

24  His aggravation of respiratory symptoms was due to the

25  formaldehyde exposure that he experienced while he was in the

1   FEMA trailers.  The answer to Question No. 5 should be "yes".

2                    Question No. 6 with respect to Alana Alexander.

3   Now, let me stop and make something perfectly clear, I think we

4   did when she was on the stand.  We are not bringing, and Alana

5   Alexander is not bringing, a lawsuit for any personal injury

6   that she claims, okay?  But does she have a compensable injury?

7   The answer is "yes", and let me tell you why.

8                    There's the question with respect to Question 6

9   and here are the instructions:  "Our law permits certain

10  persons to recover damages for mental anguish or emotional

11  distress that they may have suffered as a result of witnessing

12  something that causes injury to another person or as a result

13  of coming on the scene of the event soon thereafter.  Such

14  recovery is possible in the case of a mother alleging mental

15  anguish and emotional distress due to an injury suffered by a

16  child."

17                   The Court instructs you later:  "Other than

18  medical monitoring costs and fear of cancer damages -- which

19  are compensable -- a plaintiff can't recover for damages that

20  you don't presently have," and that makes sense.  So with

21  respect to Alana Alexander, it's her mental anguish, it's her

22  fear of cancer for that's happening to her son, and potentially

23  her daughter and herself.

24                   A good woman.  A good family.  She loves those

25  kids.  And you can only imagine the effort that she's gone

1   through to steer them the right way.  And for the rest of her

2   life, her injury is, is that she knows that her kids and

3   herself were exposed in a way that the data shows has increased

4   their risk of cancer, that the data shows has exacerbated her

5   son's asthma, the data shows has caused a permanent epithelial

6   injury, that the data shows has caused vocal cord dysfunction.

7   Answer to Question No. 6 is "yes".

8                   Now, the Court then switches to Fluor's

9   liability with Question No. 7, and the common law negligence is

10  really the question.  Were they negligent?  And there's the

11  question.  And we've limited our allegations in this case to

12  concerning the hauling and installing, as my friend Charlie

13  Penot says.

14                  Well, there's really two different things that

15  they did wrong here.  Number one, you know, they did testing.

16  They didn't share it with FEMA, but that's not what we're

17  claiming.  I think their testing is very important from the

18  standpoint that it shows levels in these trailers that is

19  consistent with what we're talking about.

20                  Scissor jack warning, don't use it to jack up,

21  but they did.  But here's the two principal allegations against

22  Fluor.  Number one, you see the note back in January of 2006.

23  There's a notation about "wall in the bedroom," and you can

24  take that evidence to be mean one of two things.

25                  If you believe that that evidence means that the

1    wall panel in the bedroom was already apart, then you go one

2    way.  And that way is, is that they should have fixed it before

3    they ever started hauling and installing.  The handwriting says

4    "wall in bedroom".  Angela Baksh, the Fluor inspector, said,

5    "It's supposed to be fixed once the issue is identified and

6    documented."

7                  Al Whitaker, the second thing they did wrong is

8    they failed to train their installers how to jack the trailers.

9    Why is that important?

10                 Well, we brought you two or three other folks

11   that are installing.  They had no experience jacking the

12   trailers.  They had no training with respect to how to jack the

13   trailers.  Travis Allen, "Gator had no prior experience hauling

14   or installing trailers."  He and Heath had no experience.  No

15   safety training by Fluor.  No Fluor written protocols provided.

16   No supervision whatsoever.  It was a bunch of guys pulled off

17   the street that jacked trailers however they wanted.

18                 But the contractor under the contract, Fluor,

19   shall be responsible for providing training to its staff.  And

20   if they're going to use subcontractors, they've got to ensure

21   that those personnel are adequately trained.  That's their

22   obligation.  You heard not from one witness.  They didn't call

23   any witnesses.  But when he put his corporate representative

24   on, nobody told you about any training that was done by Fluor

25   to its subcontractors.

1           As a result, Fluor was responsible for the work

2    of subcontractors.  Because, as Richard Sober said, "Because

3    they had to flow down all the requirements from the primary

4    contractor."  Fluor is ultimately responsible for the proper

5    installation of the trailers.  You work from end to end, never

6    side to side.  That's the way I'd do it.  Well, there you go,

7    tool box training, No. 7, work from end to end, never side to

8    side.

9           Darryl Lemieux, instead of putting his picture

10   up here, I put up the model because that's the key with respect

11   to Fluor.  He did it side to side.  He was never told not to do

12   it side to side.  "And, by the way, that's not my son's

13   signature."

14          Shirley Alexander said it was done side to side.

15   She said on the corners, like an X.  The bottom line is either

16   way what that does is it puts stresses not merely on the frame,

17   but on everything attached to the frame.  That causes supply

18   duct leakage, that causes negative air pressure, that causes

19   condensation which adds moisture that increases formaldehyde

20   off-gassing which causes injury.

21          Dan Shea admitted to such:  "Distortion of the

22   frame causes doors to buckle, ducts to leak and water it

23   intrude."

24          David Moore, our expert, again:  "The steel beam

25   is going to droop on both sides.  Everything attached to it's

1    going to droop as well.  The skeleton warps which will cause
2    leaking.  It will cause the caulk to pull out and rubber seals
3    to pull apart enabling water to be able to intrude into this
4    trailer."  So when they talk about the seals had come apart, no
5    kidding.
6                    "Haul and install" really means "throw and go".
7    They pay these guys by the installed trailer.  They did not
8    provide any training.  They were negligent.  The answer to
9    Question No. 7 is "yes".
10                    That negligence, because of the reasons that I
11   just described, caused an injury to Chris Cooper.  In No. 8 it
12   should be "yes".
13                    No. 9, caused the same injury to Alana
14   Alexander.  No. 9 should be "yes".
15                    Now, why am I running through that so quickly?
16   Because the real issue you have to decide is:  Among those two
17   defendants, how do you apportion responsibility?  You can
18   apportion it between Gulf Stream, Fluor, FEMA, Alana Alexander,
19   maintenance contractors, and I want to talk to you about all of
20   these.
21                    Number one, Gulf Stream.  I would just ask the
22   question as we start off:  Whose formaldehyde is it?  Who put
23   the formaldehyde in the trailer?  The people that chose the
24   wood that emitted formaldehyde.  The people that stacked that
25   trailer full of formaldehyde without a proper ventilation

1   system, Gulf Stream.

2          They don't consider the OSHA standard terribly

3   relevant.  I agree with them.  Their document, Exhibit 361, an

4   e-mail to Dan Shea:  "HUD says their standard doesn't bear any

5   association to travel trailers."  That's true.  So you're down

6   to the NIOSH standard, which is an industrial standard; or at

7   ATSDR standard, which is meant for residential exposure.

8          When you're deciding what the percentage of

9   responsibility is, you should keep track of Paul Hewett's

10  testimony:  "98.9 percent of the Cavalier's tested exceeded the

11  ATSDR limit.  98.1 of the those tested exceeded the NIOSH

12  limit.  And they averaged almost 500 parts per billion."  I

13  think that the evidence there is 90 percent.

14         Defendant Fluor, he's told you in opening statement,

15  "I'm going to turn around and hire expert haulers and

16  installers.  I'm going to bring you the people that had their

17  boots in the dirt.  The guys who jacked it up."  We had to

18  bring that person to you.  We subpoenaed him.  We brought him

19  here.  He jacked and hauled it wrong, according to their own

20  policy.  Ten percent on Fluor.

21         FEMA, I thought the day that we played all the FEMA

22  depositions was very interesting.  It, frankly, caused me to

23  feel good about how FEMA responded to this in the following

24  way:  When they finally were told about the formaldehyde

25  problem that they had no knowledge of and, therefore, were not

1   sophisticated users about, they said, "We wanted to provide the

2   information that the travel trailers had formaldehyde in them."

3   That's what Mr. McNeese, the program specialist, said.

4           I put a LifeSaver there.  That was one of the funny

5   moments of the trial.  I mean, I saw everybody laughing.  The

6   bottom line is the guy testified truthfully.  He said, "Look,

7   the distribution of the flyers was very necessary."  This is a

8   very serious situation, yes.  And FEMA just didn't sit on its

9   hands.  It created documents.

10          Now, one of the documents in July of 2007 includes

11  the statement:  "More serious health problems may be caused by

12  extended exposure, including a small but increased risk of some

13  forms of cancer."

14          Stanley Larsen said, "Look, if a trailer was

15  unoccupied, there's no need to distribute a flyer to them.

16  We've got a database that determines whether it's occupied or

17  not.  Could it have inaccuracies in it?  Sure."

18          Michael Harder, "Look, I don't remember specifically

19  remember delivering to that address.  If it was occupied, I

20  would have."  But we showed him the document that says,

21  "vacant, not ready."  If you look at the exhibit, and it's in

22  evidence, with respect to this location on Dale Street, their

23  database says, "vacant, not ready."  You have no evidence that

24  FEMA actually got this delivered.

25          So to the extent that you want to hold them

1    responsible, that would be the reason why.  But, frankly, I

2    think they were trying to clean up somebody else's mess and

3    they should not be held responsible.

4              To their credit, they now say:  "Since Katrina, FEMA

5    will only trailers to be used if they meet our formaldehyde

6    requirements."  They didn't have any before, because they

7    weren't a sophisticated user at the time.  I don't think that

8    there should be any percentage on FEMA.

9              Alana Alexander, this stuff about suboptimal care and

10   mama did it is disgraceful.  But the evidence is he was put on

11   Advair by a doctor in Florida.  Mama reads a black box that

12   said African Americans die on Advair at a rate four times

13   higher than those not on it.

14             Come on, folks, that's not negligence.  That's a

15   loving mother.  She didn't just pull him off.  She went back to

16   the doctor and what the doctor said.

17             And that's why Dr. Janet Barnes, who was the treater

18   here in New Orleans, says, "Poppycock.  Chris Cooper was not

19   suboptimally treated."  His mother did nothing wrong and the

20   percentage should be zero.

21             And then you the choice among the maintenance

22   contractor and installer subcontractors.  Here's why I think

23   the answer I think the answer to that ought to be zero.  Al

24   Whitaker:  "The sins of MLU are the sins of Fluor.  If you can

25   hire a contractor like Fluor and have them do this when things

1    go wrong, contracts are never going to get followed."

2           Contractually, they had the obligation to train these

3    people, they didn't.  As a matter of reality, they should have

4    done it, and they didn't.  As a matter of the admission, they

5    admit that anything these guys did wrong is the responsibility

6    of Fluor.  And so the percentage should be zero, and that ought

7    to be incorporated into the 10 percent there to Fluor.

8           Lastly, allocation of fault and damages.  Damages.

9    Here's the question.  There's six elements of damages.  I want

10   to go just through a few of them.  Medical monitoring expenses,

11   including medical monitoring for Christopher Cooper.  The

12   Court's going to give you a long instruction about this.

13          It's got seven different factors, and they're going

14   to be familiar with you because I took Dr. Kornberg through

15   each and every of the seven factors.  His evidence is the only

16   evidence that you have with respect to whether it's necessary.

17          You also have the evidence from Patricia Williams:

18   "Formaldehyde can cause cancer.  Formaldehyde exposure

19   relationship to cancer is found in many studies."

20          Dr. Kornberg:  "Chris was exposed to 17 times the EPA

21   baseline lifetime dose for formaldehyde."  This gentleman, MIT,

22   Harvard -- I mean, it went on forever.  A really bright guy has

23   designed over 150 medical monitoring programs.  He says, "Chris

24   requires a medical monitoring program to achieve early

25   detection of potential nasopharyngeal cancer."

1          Contrast that with Phillip Cole who wants to tell you
2    in direct:  "Well, there's no proof it really causes it," even
3    though IARC has called it a known human carcinogen and a
4    chemical that causes nasopharyngeal cancer.  Even though in
5    Corpus Christi in 2005, he testified -- and in the Hauptmann
6    paper is supportive of a casual relationship between
7    formaldehyde and cancer.
8          Even though in 2005, he had to admit, "well, whether
9    formaldehyde causes nasopharyngeal cancer in humans may or may
10   not be true."  I don't think this was a credible witness when
11   you compare him with the avalanche of scientific literature
12   offered by IARC.
13         So the testimony that you have is a specific program
14   is necessary.  We had Dr. Thomas Mayor come in, as you're
15   required to do under the law, the economist, and reduce it back
16   down to present value.  The evidence that you have is the
17   present value of that medical monitoring cost is $280,904.  You
18   have that summary in the record that you can get that number
19   from.
20         Next, mental anguish and emotional distress of Chris
21   Cooper.  We brought you a local clinical psychologist who says
22   his asthma attacks are a continuing worrying concern that he
23   has in his mind.  He comes up with some significant impact
24   psychologically.  There are worries and concerns about asthma
25   attacks leading to the thoughts of death, and worries that he

1   will die.

2         So you've got to figure out what that mental anguish

3   is worth.  I would venture to say every time this kid has an

4   asthma attack, he's having those thoughts; every time his nose

5   started to run, every time he started to get all this

6   formaldehyde irritation, those thoughts.  He's doing better

7   now.  He's out of the trailer.  But at the time he had those

8   thoughts are compensable.

9         One last issue I want to talk to you about, and I'm

10  going to leave the other three to your consideration, the

11  mental anguish and emotional distress of Alana Alexander.

12        I thought one most poignant moments in the trial is

13  when one of the neatest women that I've ever met was asked what

14  she thought about when she heard about the cancer.  And it took

15  her a solid 30 seconds to answer, crying, and you could look

16  into her heart, and into her soul, and into a parent's heart,

17  and the utter terror a parent must have knowing that her child

18  has been exposed in a way that increases his risk of cancer.

19  Unbelievable, unbelievable fear of cancer.

20        You've also got loss of consortium.  You've got some

21  others items that I'll leave to your discretion.  The bottom

22  line is you've got to decide what this case is worth.  What I

23  can tell you is:  A lot of lawyers here, a lot of experts that

24  charged a lot of money.  But at the end of the day, my hope is,

25  is that you will return a verdict that is a true and just

1  verdict based upon the evidence that will provide this young

2  man with the compensation he so clearly deserves for what was

3  done to him through no fault of his own.

4          Thank you for your jury service, and we will await

5  your just verdict.  I appreciate your time.

6          **THE COURT:**  All right.  Thank you, Mr. Watts.

7          Mr. Weinstock?

8      **MR. WEINSTOCK:**  Good morning.

9          First, I share with Mr. Watts, I really do

10  appreciate, and I know we all appreciate, the effort and

11  attention we got from this jury over the last nine days.  I

12  also applaud Mr. Watts on giving a fantastic closing about

13  other trailers.  Mr. Watts and Mr. Buzbee have spent the last

14  nine days talking about every trailer except this one.

15          It's an odd thing -- it's never happened to me

16  before -- where what I told you in opening is exactly what

17  played out, and now I'm going to tell it to you with more

18  detail on closing.

19          They started with their theories.  I'm going to

20  start talking about them and we'll see if we can get them up on

21  the screen.  First theory, what did I tell you?  050, they

22  would never live it.  They would bring in three or four experts

23  to explain to you that it must be higher, because 050 doesn't

24  hurt anybody and they know it.

25          The unit was tested at 70 -- yes, dead of

1    winter -- but 72 degrees inside, and that's all that matter is

2    the interior temperature.  Their expert said it, Marco

3    Kaltofen.  What they did is they put up thousands of

4    comparisons with testing results from 2005/2006 trailers,

5    trailers made with different component wood products.

6                    Dr. James certainly did not testify that the

7    odor threshold was .5.  He clearly said it was .050.  Yesterday

8    Dr. Wedner said the average is .5, but many people can smell it

9    as low as .050.  Chris Cooper's mom could smell it.  Chris

10   Cooper could not.  Chris Cooper should have been able to smell

11   it at .5 if it existed.

12                   Heath Allen.  Health Allen had one nosebleed in

13   a trailer at 140 degrees.  He then told us that when he

14   ventilated it and the temperature dropped to 75 degrees, he

15   never had a problem.  No problem whatsoever.  Certainly no

16   nosebleeds.

17                   The next theory they gave us was -- this is very

18   clever -- a computer image of the trailer sucking in green or

19   red formaldehyde, sucking it in.  What was the reality?  From

20   day one, Mrs. Alexander said she heavily ventilated that

21   trailer from the first day.  ATSDR study through EPA study, 96

22   trailers, what did they learn from air conditioning, that it

23   dropped the levels by over 60 percent within just six days and

24   further from there.

25                   They're next theory -- and they spent a lot of

1  money on this one -- the trailer had negative pressure which

2  drew in formaldehyde.

3              Their experts:  Ervin Ritter:  "When the bath

4  vent is open, there is no negative pressure."  Al Mallet, the

5  which Mr. Watts was so impressed with:  "Without negative

6  pressure, formaldehyde would travel away from the trailer, not

7  into it."

8              But they had an ace in the hole, Alana

9  Alexander, who said the bath vent was open unless it was

10 raining, said:  "But I kept the bathroom door closed."  Damien

11 Serauskas said:  "It wouldn't matter.  The gap -- this is air.

12 The gap beneath it would give free air exchange and negative

13 pressure is eliminated."  He also said:  "Don't take the

14 negative pressure that they found too seriously.  If the wind

15 shifted, it wouldn't exist."

16             Next theory, the problem is Gulf Stream did not

17 warn.  The reality, they played both brother Sheas' tapes and

18 we showed you the letters.  At FEMA's request, they went to

19 Washington in April of 2006 and met with FEMA.  As a result of

20 that meeting, they sent a letter.  "During our meeting -- there

21 it is -- you requested that we provide some information that

22 FEMA could add to the tri-fold, which FEMA had already

23 developed -- this company -- this entity that knew nothing

24 about formaldehyde -- that you could provide the occupants of

25 trailers.  Accordingly, please see the enclosed ventilations."

1            What was Scott Pullin doing?  He was generating

2     information for ventilation.  "We would like to reiterate our

3     willingness to assist you in addressing any concerns about the

4     product.  Our informal testing -- and here it is -- we are

5     willing to share the results with you."

6            They keep saying we hid the results, we hid the

7     results.  They were offered.  FEMA had their own test results.

8     They did not need our results from a little Formaldemeter that

9     didn't seem to make much sense because it wasn't calibrated.

10           And here are the ventilation instructions.  This

11    is the Deidre Lee letter.  It is in evidence.  Then what did we

12    give them?  We gave them the HUD warning.  They're similar

13    products.  HUD does not apply -- I've never said HUD applies,

14    only by analogy.

15           But if the HUD warning on formaldehyde is good

16    enough for mobile homes, it ought to be good enough for travel

17    trailers, and that's what was provided to FEMA before

18    Mrs. Alexander moved into the trailer.

19           Somehow, someway -- we meet with FEMA

20    April 24th, the letter's sent May 11th, FEMA's pretty much

21    ahead of us anyway -- but somebody tells her on May 26th,

22    ventilate the trailer.  And you heard her testimony, her

23    mother's testimony, and her daughter's testimony, that trailer

24    was ventilated every day, the bath vent never closed, the

25    windows were opened, oftentimes windows stayed open.  Grandma

```
 1    said many times during the day when they were at school the
 2    windows were open.  It was never a concern.  The parents were
 3    right next door.  Nobody was going into that trailer.
 4                    More reality.  2004, forget about 2005, forget
 5    about 2006 for one moment.  This trailer was built for
 6    Hurricane Ivan.  6,000 of them got used in Florida in 2004 and
 7    2005.  Nobody ever heard a word at FEMA about a formaldehyde
 8    problem with the trailer made in front of it, the trailer made
 9    behind it, the one made the day before, the one made the day
10    after.
11                    The only problem seems to be when this trailer
12    got to Louisiana for some reason.  But the ones used in
13    Florida, I mean the brothers and sisters of that trailer, never
14    had a complaint, never had a problem.
15                    Jury instructions.  This is what the judge is
16    going to charge you:  "When a manufacturer sells a product to a
17    sophisticated purchaser, and the purchaser then supplies the
18    product for use, the manufacturer has no legal duty to provide
19    any warnings to the user concerning possible hazards associated
20    with the product's use."
21                    A similar comment.  And who did we sell this to?
22    We sold this to the most sophisticated purchaser in the world,
23    the United States Government.  The people that regulate FEMA --
24    formaldehyde in the workplace.  The people that regulate
25    formaldehyde in mobile homes.  The people who have used these
```

1 identical travel trailers since 1992 without a complaint until

2 2006.

3          You don't run out and warn people about

4 something they know about and that they've never had a problem

5 with.

6          The FEMA specs also are in evidence.  It's

7 Exhibit 165.  We do have a Fantastic Fan.  But FEMA said, "No,

8 no options.  This is what we want."

9          What did Dave Garratt have to say?  He said, the

10 trailers are FEMA's responsibility; that the government's job

11 is to make regulations; and that manufacturers simply had to

12 meet contract requirements, which was done.

13          What did Mr. McNeese have to say:  "Since it is

14 a given that the materials used in the construction of mobile

15 homes, travel trailers, in addition to other residential

16 structures contain formaldehyde, it was not a secret to FEMA

17 that there's formaldehyde in wood."

18          The next theory is that we actually hid the

19 presence of wood from FEMA.  The reality -- I don't want to

20 beat on it, but we've discussed it already -- they didn't have

21 any complaints for 12 years.  FEMA, through their contractor,

22 had OSHA test units in 2005, and they cleared these units for

23 use.

24          In March of '06, FEMA asked Fluor some questions

25 about formaldehyde and got answers right away.  Two months

1   before Mrs. Alexander moved in, FEMA was fully aware of

2   everything, at a minimum of those things they've known for

3   years.  But there it was in black and white from Fluor.

4                   .050 is too high because it exceeds ATSDR's MRL

5   and NIOSH's REL.  I told you they wouldn't live with .050, and

6   I think we all saw plenty of that.  But .050 exceeding the

7   ATSDR limit is meaningless.

8                   HUD does not apply.  Let me make that very, very

9   clear:  HUD does not apply to travel trailers.  But that does

10  not mean by way of analogy that somebody can live in a mobile

11  home and the air should be any different than somebody living

12  in a travel trailer.  The air's the air.

13                  If .05 is good enough -- if .4 is good enough

14  for people living in mobile homes, it should be good enough for

15  people living in travel trailers, and this one was eight times

16  less.  Dr. Smulski's own article:  "Indoor mobile homes, no

17  complaints at .09," almost twice the level of this trailer.

18                  Joe Little, ACGIH, American Congress of

19  Governmental Industrial Hygienists, and the no-action level he

20  selected, 300 parts per billion, after he did the actual

21  workup.  Six times lower is the Alexander unit than the level

22  of no concern that Joe Little put forward.

23                  We couldn't have made it clearer, I hope in the

24  evidence:  These are public safety standards.  They are

25  designed to overprotect.  They are good things to have.  That

 1    is a huge difference between what we have in a court of law.

 2    In a court of law, you have to show a level that hurts

 3    somebody, not that we want to make sure nobody gets hurt so

 4    we're going to overprotect.  That's not the standard.

 5            What does ATSDR say about their own MRL?

 6    "Exposure to a level above the MRL does not mean adverse health

 7    effects will occur."  I didn't put it in there.  They put it in

 8    there.  Don't misuse these standards to prove injury.

 9            Look at these standards for what they are.  If

10    you see levels like this, take a good look, make an

11    investigation, but don't presume an injury.  And that's what

12    Joe Little did and he came back and said:  "In these type of

13    units, 300 parts per billion works.  It's a no-action level.

14    It's consistent with the ACGIH."

15            More reality.  We told you earlier at the

16    beginning:  Dose makes the poison.  .050 does not poison or

17    injure anybody.  That's why they can't live with it.  .050 is

18    like two aspirin, it cures a headache.  Your body needs

19    formaldehyde.  Your body has formaldehyde.

20            If your body didn't have formaldehyde, it would

21    create formaldehyde.  You need it for the one-carbon pool.  I'm

22    sure you were rolling your eyes, "Why is Mr. Weinstock asking

23    yet another expert about the one carbon pool?"  Because that is

24    the building blocks of normal metabolism.  Carbon is life.

25    When we say "organic chemistry," those are the ones with a

1   carbon attached to it.  That's what the one-carbon pool is, and
2   that's what formaldehyde is part of.
3               Theory, the level in this trailer was unusually
4   high and unsafe.  Reality, we brought you the Lemus study, not
5   a study from Spokane, Washington or Canada.  This is 53
6   Louisiana homes, who on average tested six times higher than
7   this unit.  It's an amazing concept that you can be sued for
8   this.  My house is probably higher than this.  If I put up my
9   mother-in-law for a year, she can turn around and sue me.  It's
10  absurd.
11              Formaldehyde is everywhere.  I know we killed
12  that to death, but I do want to go over it one more time.  Four
13  times higher in office buildings without smoking, 12 times
14  higher in office buildings with smoking.  Busy streets are
15  higher.  Where he lives, in theory -- their theory, the
16  formaldehyde is higher outside than inside.
17              It is everywhere.  Anybody who's ever used these
18  products has exposed themselves to formaldehyde.  My personal
19  favorite is the amount in human breath.  That's because it's
20  part of normal metabolism, that's how we get some of it out.
21              And remember in the Lemus study that the indoor
22  concentrated -- they keep talking about humidity.  But those
23  indoor concentrations in Louisiana, because of our wonderful
24  weather we have here, humidity is pretty high in the winter
25  too.  And that's why Lemus found that in normal homes, winter

1   was the second highest month.

2                   So do not be confused that just because they

3   have some test results from unoccupied trailers sealed up at

4   140 degrees in the summer that that's an automatic that those

5   would necessarily be higher.

6                   The Adorn issue.  Gulf Stream purchased regular

7   wood, non-LFE, from Adorn for use in FEMA trailers.  The

8   reality.  Jeff Zumbrun looked through every single purchase

9   order, invoice and receipt and found no wood -- first, no wood

10  purchased from Adorn.

11                  And, keep in mind, they subpoenaed records from

12  Adorn.  The only thing they produced is a record from the

13  spring of '04, before the FEMA run starts, which, of course,

14  follows the hurricane season, for regular seconds.  And what

15  were those used for?  Packing crates.

16                  And he asked the same question in deposition

17  because they knew it, but they want to bait and switch.  And

18  we'll go a little further and I'll show you what I'm talking

19  about.  They kept asking all of the witnesses about non-LFE

20  that was used in 2005 and 2006, and every witness answered

21  truthfully.  There is no question some non-LFE was used in 2005

22  and 2006.  They rarely put a date on the question.

23                  And here it is.  Here's the big ticket item.

24  Mr. Watts said it, and I knew he would:  "The roof underlayment

25  was not LFE.  It was up supplied by Weyerhaeuser and Samling."

1   You heard him say it.  And then what did he show you?  He
2   showed you a Genesis invoice, alleged part of her unit -- or
3   alleged part of the Alexander unit.  Where is the Weyerhaeuser
4   and Samling roof underlayment that's taupe for 2004 that's
5   non-LFE.  It doesn't exist.
6            They take an admission from 2006, take the color
7   of the roof underlayment, and say "Oh, it's a match."  But they
8   left out the supplier.  Where is the testimony that Genesis
9   provided non-LFE in 2004 for the roof underlayment?  It only
10  existed from Weyerhaeuser and Samling in 2006 and he admitted
11  it as such on his argument.
12           He also showed you an invoice, before I go on,
13  suggesting that there are two different types of wood.  Then
14  why are they the same price?  The unit is defective in how it
15  was built.  What did Dave Garratt say? Dave Garratt said:
16  "There were no regulations.  LFE is not required.  Regardless,
17  LFE was used.  The HUD target is .4."
18           Ladies and gentlemen, the proof is in the
19  pudding.  If you used regular wood, you would not get an 050
20  reading.  In 2005/2006 -- I've said is over and over.  They've
21  beat on it over and over.  They've tried a great 2006 case.  In
22  2006, when there's some regular wood, the numbers are higher.
23           The explanation for 2004 is very simple.  That's
24  where the number comes from, LFE.  They did not pull back --
25  they pulled back one wall panel and found one mill stamp that

1   they couldn't read.  Al Mallet, for whatever amount he was

2   charging, missed even that one.

3               They did not take off all the wall panels and

4   look for it.  They pulled back the one with the duct tape.

5   That's the only wall panel they looked at.  We're batting a

6   thousand.  One wall panel, one mill stamp.

7               Exhibit 26 is the Best Buy inspection.  When we

8   sold it, through Best Buy, to FEMA, this unit was inspected and

9   cleared by FEMA that it was built to spec without damage.

10              If there was a moisture problem, it was the

11  result of a roof leak, not any mumbo jumbo that they were

12  talking about.  It dripped on her forehead when it rained; and

13  her daughter testified she slept around a pot when it rained.

14  That is not condensation, ladies and gentlemen.

15              And we need to be very clear about this:  The

16  standard is is it unreasonably dangerous, not did we build a

17  perfect product.  Did we build a product that they want -- a

18  system that was in the Ritz Carlton?  Did we build a product

19  that -- you know, you can buy $150,000 mobile home.  That's not

20  what they came to buy.  They came to buy a travel trailer

21  that's been built the same way for 30 or 40 years, and that's

22  what they got.  And it's a good product.  That's why there were

23  no complaints before 2006.

24              All travel trailers are defective.  All travel

25  trailers, not just Gulf Stream's.  That's what Dr. Smulski

1   said.  All are defective because they're made out of wood and

2   they don't have a mechanical air conditioning system.  I submit

3   that the Ritz Carlton did.  But 99 percent of houses are

4   similarly defective because they don't have a mechanical air

5   conditioning system.

6               This has been an industry standard design for

7   decades.  If it's such a bad trailer, why does it take 22

8   experts to figure it out?  If it's that bad, can't one guy walk

9   into it and say, "Why didn't you make it this way?"  22 experts

10  to prove one trailer's not good.  It's absurd.

11              They did have an expert who threw out some

12  suggestions that -- he's never tested, he's never designed a

13  travel trailer, he's never watched one built -- let's use

14  Masonite.  We've tried that, it warps.  Let's use isocyanates.

15  That's a great idea.  And that actually causes asthma,

16  Dr. Wedner told us.  And, by the way, they want to put the

17  vinyl -- the vinyl that reduces emissions by 30 times,

18  according to the Berkeley lab reports and Dr. Smulski -- they

19  want to put it on the outside.  This is the craziest thing I've

20  ever heard.  I asked him:  "Is that the stupidest idea you've

21  ever heard"?  Well, I mean, there's a vapor barrier.  I don't

22  know."

23              Formaldehyde causes cancer.  What's the reality?

24  You heard it yesterday very clearly:  IARC is the only agency

25  that's ever declared formaldehyde a known human carcinogen.

1   I'm really glad Mr. Watts went through that whole litany, "Well
2   why do they call it a probable here, and a maybe there, and a
3   suspected there?"  Those are based on animal test results, not
4   on human test results.  IARC's the only one and it's based on
5   those three cohorts; and those three cohorts, with the
6   exception of Hauptmann, show nothing.
7             So that's why I asked him to explain Hauptmann
8   to you, not only in what was wrong with it -- and, look, he
9   answered the questions honestly:  "The flaws in Hauptmann were
10  not known about 2005," the thousand deaths that they somehow
11  missed in the cohort.  But they were known by 2008.  Everybody
12  agrees it's only linked to nasopharyngeal cancer.
13            We're still looking for the epidemic, because
14  formaldehyde is everywhere.  But dose makes the poison, ladies
15  and gentlemen, and that -- cigarette smoking causes cancer, but
16  not one cigarette.  Even if you say, and I asked him three or
17  four times:  "Dr. Cole, if you're dead wrong, IARC's right, you
18  still need 4,000 parts per billion peak exposure," and that was
19  their expert, the guy from the math lab.
20            The Alexander unit tested 80 times lower.  And
21  I'll tell you what else he said.  Forget about 4,000 parts per
22  billion, forget about 050.  What he said was:  "Not in the
23  travel trailers based on the CDC test results."  So up to 590
24  parts per billion, he still would never make that association.
25  You have to get 4,000 parts per billion to make that

1   association, if you buy IARC's interpretation of Hauptmann.

2                    The judge is going to charge you on this, and

3   it's so important.  This case is not about cancer.  They've

4   tried everything they can to make this case about cancer.  But

5   it's not about cancer.  If God forbid this child gets cancer

6   someday, he comes back and he files a new lawsuit.

7                    Do not compensate him on the one in a trillion

8   chance that he might get nasopharyngeal cancer from some other

9   reason and then attribute it to formaldehyde.  If that happens,

10  he gets another bite at the apple.  So do not concept him for

11  that unknown.

12                   They had an old theory when they started that

13  Mrs. Alexander was injured from the formaldehyde in the

14  trailer.  While we were sitting here, apparently, she was not.

15  This is big one:  Chris Cooper's asthma was aggravated by

16  exposure to formaldehyde.

17                   The reality, their doctors and our doctors,

18  "Chris Cooper's asthma is exactly the same or better than

19  before Hurricane Katrina."  And this is important, ladies and

20  gentlemen, when he was seen by doctors in May and June and

21  started on steroids, his asthma was already as good as when we

22  got out of the trailer.  The testimony has been that it's much

23  better now because he's on steroids, and I'll explain that to

24  you in a minute.

25                   I'm sure when you walked in here a week ago

1   Monday, you ever thought you'd hear the word "suboptimally" so
2   many times in your life.  Chris Cooper's treatment of his
3   asthma was suboptimally treated.  I don't question a mother
4   reading a black box warning.  I do question why they want to
5   blame my client for it.  If you don't like the black box
6   warning, go get a steroid.
7               She testified she used Pulmicort once a year.
8   Dr. Barnes said you should use it once a day.  That is the
9   definition of suboptimal treatment.  And even that once a year,
10  he did not get for two and a half years.  All the experts agree
11  that would cause damage to the lungs.  Much, much, much of a
12  greater chance than formaldehyde getting in there.
13              It was confirmed.  Dr. Barnes called it the
14  "gold standard", daily steroid treatment.  And if you heard the
15  testimony carefully, what's going on now?  He's been on daily
16  steroids.  How often does he use his albuterol, the as-needed
17  medication?  He doesn't.  He doesn't.  It's as-needed, he
18  doesn't need it.  The only thing he uses it for now is to
19  pre-medicate before a football or a concert.  The as-needed
20  medication has become the not-needed medication.  His asthma is
21  better today than it was when he left that trailer and before
22  Hurricane Katrina as a result of what was learned in this
23  litigation.
24              I know you got tired of my drawings, but here it
25  is.  There's the gap, Pulmicort in '05, until he gets back on

1    it briefly in '07, and really doesn't get back on it until '08.

2    But after '08, he drops off it again.  He was off steroids for

3    nine months before he was seen by Dr. Pacheco.

4                    We brought you the volunteer studies which show

5    there is no difference between asthmatics and non-asthmatics.

6    They brought you prevalent studies that studies the chicken and

7    the egg.  Who knows what came first, the asthma or the

8    formaldehyde?  In this case we know.  There's no dispute.  He

9    had asthma.  Those studies don't matter.

10                   Dr. McGwin said, those studies, they're not

11   exacerbation studies.  They're, at best, trying to show

12   causation.  They don't address exacerbation.  These do.

13   There's no difference.  And I know what the response is going

14   to be, and we'll get to it in a minute.

15                   But these people were exposed at phenomenally

16   high levels compared to this trailer, 3 parts per -- I'm

17   sorry -- it must be million -- 3,000 parts per billion, and no

18   difference in response.

19                   What every expert testified to was the

20   epidemiological gold standard, the chamber studies where you

21   actually expose people to a known level, not a guess level.

22   They put it up.  There it is:  "Drs. Kornberg, Barnes and

23   Pacheco found that his asthma was aggravated while he was

24   living in the trailer."

25                   Unquestionably they did.  Why?  Based on the

 1    history that they were told.  You heard Dr. Barnes, "The
 2    history is never wrong."  It doesn't matter what she said,
 3    she's never wrong.  That's not reality.  That's a litigant's
 4    version of what you want your doctor to hear.  What did
 5    Drs. Pacheco and Kornberg base it on?  The history given to
 6    Dr. Barnes.
 7              Now, who's giving this history?  Michael said
 8    something on his closing that just simply isn't true.  We have
 9    stipulated Chris Cooper gets the good kid exception.  We did
10    not stipulate about Alana Alexander.  I about burned a path in
11    this carpet trying to get her to stick to what she had said in
12    her deposition.
13              And what did she tell FEMA?  She was paying $500
14    a month rent, she'd have liked $1,100 a month.  And what did
15    she say:  "If they had given it to me, I'd have taken it."
16    That's the credibility we're talking about.
17              Before I leave, one more issue that came up,
18    this vocal cord dysfunction.  Clearly a dispute.  Does he have
19    it?  Dr. Pacheco even admitted, the pulmonary function tests,
20    the flow loop was of a normal person, not vocal cord
21    dysfunction.  But ignore all that.  Not one expert cited a
22    single study that said vocal cord dysfunction is related to
23    formaldehyde exposure.
24              Formaldehyde is everywhere.  Wouldn't it be
25    breaking out all over?  All those cross-sectional studies they

1    showed you, the Rumchev study.  Wouldn't author say, "Gee, we

2    ought to report on this.  Half these kids have vocal cord

3    dysfunction as well."  They don't because it's not there.  Not

4    one epidemiological study to support that theory.

5                 But they did give you their favorite theory:

6    Kids are more susceptible.  So I brought you the guy.  He's the

7    guy.  He's been doing it for 35 years.  You can't forget him.

8    He's the one that talked about picking noses.  He's worked with

9    kids for 35 years.  He's done the inner city studies.  He's

10   read the epidemiology.  He's read the papers.  And he said

11   point blank, "Kids are different.  They're less susceptible,

12   the way kids' anatomy is set up."

13                 He said, "But don't worry about it, because it

14   doesn't get to the lungs anyway."  They tested rats at 14 parts

15   per billion with radioactive formaldehyde.  It never got to the

16   lungs.

17                 This case is about too much formaldehyde.  That

18   was their theory.  Same old story, this case is about money.

19   This is the reality of this case, ladies and gentlemen.  If you

20   noticed, I bite my nails.  When my daughter was younger, I

21   looked down and she starts biting her nails.  I said, "You

22   can't bite your nails."  But kids don't do what you say, they

23   do what you do.

24                 And what did these people do?  What actions did

25   they take?  Actions speak louder than words.  Before

1    litigation:  "Asthma triggered by weather," school report.

2    "Seasonal asthma," school report.  Goes to see Dr. Barnes, no

3    mention of problems regarding asthma in the trailer after 17

4    months of living in the trailer.  Goes to the hospital, last

5    episode of wheeze was a year ago.  They had been living in the

6    trailer for a year without an episode of wheeze.

7              I know you're tired of seeing my little blowup

8    on the weather.  But the weather dropped, asthma triggered by

9    weather, bang, bang, bang.  Mrs. Alexander hires a lawyer.

10   Well, that's when the game starts to -- should start to change,

11   but not yet.

12             Because she goes to see Dr. Barnes in April of

13   2008, and neglects to mention -- she's got a lawyer for a

14   formaldehyde claim for asthma for her son and neglects to

15   mention to her asthma doctor that she had a problem while

16   living in the trailer.  She doesn't say, "You know, boy, really

17   Chris is just not doing as well.  That trailer must have done

18   something to him."  Well, forget about the trailer.  "Chris is

19   not doing so well."  She never mentions asthma.

20   Conjunctivitis.

21             My personal favorite, March 30th, 2009, asthma

22   brought on by changes in the weather.  Seven days later they

23   get picked to be the first trial plaintiff in this case.  Three

24   weeks later, the song has changed.  It's all about

25   formaldehyde.  It's ABC.  It's not about formaldehyde.  It's

1    all about cash.  Now the first time ever the word
2    "formaldehyde" appears in his medical records.  The first time
3    ever he's having a problem that he relates to the trailer.
4              Here's one.  Theory, the plaintiff returned to
5    New Orleans with four albuterol inhalers.  The reality, you may
6    remember this little exchange, "No, I forgot about that.  That
7    one I got from Rite Aid.  That one was Rite Aid."
8              Sorry, that one disappears, because I found it.
9    They're missing an inhaler.  They had to make one up.  Because
10   it's the as-needed medication, so he had to need it.  But there
11   it is from Dr. Joyner in Florida.  There it is.  There is no --
12             You can't take a prescription and go to
13   Walgreens and then say, "can I get that back so I can go to
14   another pharmacy?"  It didn't work that way.  They take it, if
15   you got refills on it, you can come back and get a refill; but
16   you don't get to take the prescription and run around town
17   filling it.
18             What did Chris Cooper say about his albuterol
19   use?  I asked him point blank:  "Did you say you used you're
20   albuterol about once or twice more a month when you were in the
21   trailer?"  He wasn't on the stand very long.  We had a long,
22   long pause.  "You'll have to ask my mother."  That means one of
23   two things, ladies and gentlemen, either "I don't remember what
24   I was told to say," or more likely, "I've sworn under oath.  I
25   get the good kid exception.  I'm not going to lie, sir.  Take

1    it up with my mother."

2              Was this trailer defective in composition?

3    Absolutely not.  LFE is not required, but LFE is what they got.

4    What this trailer unreasonably dangerous in design?  No, and

5    neither are the other hundreds of thousands travel trailers

6    that have been made since the '60s the exact same way that are

7    driving around this country.

8              The standard is "unreasonably dangerous", not

9    "perfect".  It's a nice piece of equipment.  It is not the Taj

10   Mahal.

11             Was it unreasonably dangerous for an adequate

12   warning?  First, no warning was required when you're selling to

13   a sophisticated purchaser like the government.

14             Second, a warning was provided to our purchaser,

15   the United States Government, who created the tri-fold, who

16   told her to ventilate, which she did.  I mean, what better

17   contact can you have?  You want to ventilate, here's the

18   tri-fold.  She ventilated from day one.

19             You don't warn about something that has not been

20   a problem for 14 years that you've been selling it with nary a

21   word.  You don't warn about things that you don't think are a

22   problem, until somehow one of 7,000 trailers that we used in

23   Rita -- I'm sorry -- in Ivan were not a problem, but it gets to

24   Louisiana and now it's a problem.

25             No. 4:  "Do you find that it's unreasonably

1   dangerous at the time that it left Gulf Stream?"  The Best Buy
2   inspection, it passed.  It's Exhibit 26.  It met the specs.  It
3   passed FEMA's inspections.
4           No. 5 and 6 is:  "Did it cause injury?"  Well,
5   you've got to have injury to cause it.  You've got to have an
6   injury related to formaldehyde to cause it.  So if you get past
7   1, 2 and 3, we submit that 5 and 6 are clearly "no's".
8           Now we get to the amount of damages.  They put
9   it up and they took it down very quickly, $280,000 worth of
10  damages.  But what didn't they show you?  They didn't show you
11  the actual chart that Mr. Mayor filled out, because none of
12  that had anything to do with cancer.  It was all about asthma.
13  $280,000 for asthma medication that Mrs. Alexander says she's
14  not seeking.  And then respiratory therapy, pulmonary function
15  studies, and seeing a specialist.
16          Janet Barnes is his treating doctor.  She has
17  never sent him for respiratory therapy, pulmonary function
18  tests, or to a specialist.  The only person that's ever sent
19  him to a specialist are these gentlemen and myself; and as a
20  result those trips, he's doing great.  And I will tell you,
21  ladies and gentlemen, my client's been through a lot in this
22  case.  They've been mocked and belittled.  And they've put up
23  with it.  And they've stood here and they've stood tall and
24  they've stood proud.
25          But here's the thing:  Liz Gainere sat here and

 1   listened to her superiors and her colleagues get mocked on a

 2   daily basis.  But something good has come out of this case, I

 3   will tell you that.  Because in the grand scheme of things, I

 4   think there is something good here.  As a result of this case,

 5   Chris Cooper is finally on the proper medication that he should

 6   have been on for years.

 7              His mother now understands the importance of

 8   steroid medication and he no longer needs the as-needed

 9   albuterol.  So if my client had to go through that so that he

10   can get to where he is now, which is much healthier and much

11   happier than he was on August 29th, 2005, maybe, just maybe, it

12   was all worth it.

13              I thank you so much for your time.  You've been

14   the most attentive jury I've ever dealt with.

15        THE COURT:  All right.  Thank you, Mr. Weinstock.

16   You will actually finished a few minutes short.  Come on up,

17   Mr. Penot.  I told you-all had a total of 60.  So Mr. Penot, I

18   know you're prepared for 15 minutes.  If you go a minute or two

19   over, we'll let you use the balance of that time.

20              Before you start, one second, let me take care

21   of something here.

22                       (OFF THE RECORD)

23        THE COURT:  If you want to stand up at your seats,

24   I'll only be a second, but you can stand at your seats.

25                       (OFF THE RECORD)

```
 1            THE COURT:  All right.  Let's go ahead and pick up.
 2            If you-all would go ahead and settle in,
 3   Mr. Penot is going to argue on behalf of Fluor, and then we
 4   will have rebuttal, and that will be it for the closing
 5   arguments.
 6            Mr. Penot, you may begin.
 7            MR. PENOT:  Do you remember me?  Does it seem like at
 8   times -- you're laughing, and you laughed a couple times during
 9   the trial -- did it seem like at times we were an afterthought,
10   my client was an afterthought?  You know, my client turned to
11   me at one point in the trial and said, "Let's figure out what
12   your rate is per word, okay?"
13            You know, they said, "They didn't put on any
14   evidence."  You're right.  I put on very little evidence.  I
15   didn't take a lot of your time.  Because you know why?  The
16   people who do the suing, have to do the proving.  Okay?
17            The judge is going to charge you in a little
18   while, they have to prove by a preponderance of the evidence --
19   okay, by the greater weight of the evidence -- that my client
20   did something wrong.  What did they bring?  Do you remember
21   that question?  What did they bring?  They didn't bring much,
22   so we didn't say much.  And we're going to go through that.
23   We're going to go through that.
24            You heard a lot about numbers.  You heard a lot
25   about standards; right?  You heard about 2.0.  You heard about
```

1    .75.  You heard about .40.  You heard about .050.  You heard

2    about Mr. Buzbee's gold standard .008; right?

3                    Well, I'm here to tell you, we're going to talk

4    about another gold standard.  And I'm not talking about

5    formaldehyde levels, am I?  I'm talking about a gold standard,

6    it's called justice.  Mr. Watts put 10 percent up there.

7    Here's the gold standard for Fluor, zero.  Because what did

8    they prove?  They've proved zero about my client.

9                    Look out there.  It's a pretty full courtroom,

10   isn't it?  Mr. Buzbee told you this is the most important case

11   that will be tried in Louisiana this year.  You will, like it

12   or not, forever be the jury that decided the formaldehyde --

13   the FEMA trailer formaldehyde case.

14                   Words are cheap.  Anybody with $150 and a word

15   processor can go downstairs and file a lawsuit.  But verdicts

16   are important and strong and they send messages.  Don't

17   think -- don't think you're doing Fluor a favor if you say,

18   "Well, let's just spread a little bit around.  Let's just put

19   10 percent up there."  Not much.  That message goes out from

20   here.

21                   And what that message is, if you put 2, .75, .5,

22   a quarter of one percent, you're sending a message.  You're

23   sending a message to Al Whitaker, and to Fluor, and to the

24   world for who they do work, that they're negligent, that

25   they're not careful, that their negligence harmed a young man,

 1    and that's simply not true.

 2                    Now, what's the theory here?  What's the theory

 3    here?  Do you remember my model?  The theory is this thing with

 4    six-inch solid steel I-beams that's meant to be put behind your

 5    SUV and your pick-up truck and hauled to Yosemite and back, got

 6    bent and twisted.

 7                    It got bent and twisted in such a way as to

 8    break seams, and seals, and open -- make some openings in the

 9    roof so where humidity gets in and in the presence of humidity,

10    Mr. Smulski -- Dr. Smulski -- do you remember him? -- said

11    formaldehyde off-gassing increases.

12                    Six-inch solid I-beams.  Six-inch solid steel

13    I-beams.  Who did they bring?  Who did they bring?  Yeah,

14    you're right.  They're right, they brought you the fellow with

15    the boots in the dirt.  I didn't have to bring the fellow with

16    the boots in the dirt.  They did it for me.

17                    Did that guy have an axe to grind?  A believable

18    guy.  A guy who, what, said he'd been doing this since he was

19    14 years old, his daddy's business.

20                    Mr. Watts made a mistake.  I'm sure it was

21    unintentional, but he didn't said they used the scissors jacks.

22    You didn't hear anything about that.  He said no such thing.

23    He said he used the bottle jack.  And what did he say?  He

24    said, "I went right there by the axles -- right -- and I jacked

25    it up just enough -- I jacked it up just enough to relieve the

1   pressure off of the chassis.  Then I went around to the other
2   side and did it there."

3              He said that's fine; right?  He said nothing
4   about scissor jacks.  He said nothing about walking from corner
5   to corner to do it.

6              Now, do you believe that's what happened?  That
7   because he lifted it up -- I think Mr. Hilliard asked him,
8   what, two to four inches max, he twisted solid steel I-beams,
9   the I-beams that their expert, Mr. Moore -- do you remember
10  him -- said that you could put three to four tons in the
11  trailer, three to four tons in the trailer, and it wouldn't
12  bend the I-beams.  The I-beams were meant to deflect somewhat.

13             Did you see any permanent deformation, any
14  permanent damage to the I-beams, or the structure, or the
15  cross-beams?  No.  But he says -- he's not a guy lifting
16  trailers since he was 14 years old in his daddy's business.
17  But he says that could have damaged those I-beams.  Who did
18  they bring up the same day, a few hours later?  Al Mallet, do
19  you remember him?  The fellow that Mr. Watts thought was a very
20  impressive witness.  I did too.

21             Do you remember what I asked him?  I didn't ask
22  him much.  I said, "Do you have a trailer?"  He said, "Yeah, I
23  got a trailer.  I use it for my work."

24             "How do you change the tire?"

25             "Well, I don't do it, but I hire somebody who

1   knows what they're doing.  And he goes and takes a jack and

2   puts it right there by the axle and lifts it up so I can change

3   my tire."

4                    What did he just tell you when you change the

5   tire on your boat trailer?

6                    He said he did it just like Darryl Lemieux told

7   you he did it.  They've got to do the proving.  They've got to

8   do the proving.  Do you believe that?  Do you believe Darryl

9   Lemieux, who's done it for 30 years, or do you believe this

10  hired expert that they brought in here for you?

11                   Let's talk about wall panels.  Let's talk about

12  wall panels.  Did you hear anybody say that there was a leak in

13  that trailer when it was installed?  That there was a problem

14  with leaking when it was installed.  You didn't hear that.

15                   You saw a form.  It said "wall in bedroom".  Do

16  you remember that?  And when that young lady, who was very

17  nervous, I think, came in here to testify -- do you remember

18  her, Angela Baksh? -- I went through some other forms she had

19  had.  Do you remember that?  And I showed her four or five

20  where it said something about wall in bedroom, or wall loose,

21  or wall over kitchen loose.

22              I asked Scott Pullin.  Do you remember him?  The guy

23  from Gulf Stream.  I said:  "Does that happen sometimes that

24  you have these loose wall panels?"  He said, "Well, we sure

25  don't like it.  But, you know, when you're moving fast and

1    you're trying to build a lot of trailers, and you're going
2    through with that staple gun, sometimes the guys miss the stud.
3    It's a two by two stud."
4            When did the leak come?  The leak wasn't when it was
5    installed.  Ms. Alexander and her daughter, Erika, both said it
6    was months later.  She said it was March, April, May of 2007.
7    She moved in this May of 2006; right?  Nine months -- eight,
8    nine months later a leak shows up.
9            And Erika says, "You know, we would call maintenance,
10   but sometimes they wouldn't come."  Maintenance wasn't Fluor.
11   It was some other maintenance contractor.  That's why that
12   maintenance contractor's on that verdict form Mr. Watts talked
13   to you about.
14           Ms. Alexander said, "The maintenance contractor came
15   out and talked about the leaks, and said, 'You know, we tried
16   to fix it.  But we don't think we really did.  It's probably
17   going to come back.'"  She said it came back.  That's nine, ten
18   months later.
19           What's the only other thing they talked about with
20   Fluor?  "You're a big contractor.  You know about
21   formaldehyde."  Mr. Watts said he's not even complaining about
22   what Fluor did there, just pointing it out to show that we did
23   some testing and found some levels of formaldehyde.
24           But what did Fluor do?  Do you remember
25   Mr. Duckworth, the safety hero of the year, the safety manager

 1   that worked for Fluor?  He sat here and told you a few very

 2   important things.

 3              He said he sat in on safety meetings weekly that

 4   included OSHA, FEMA, U.S. Army Corps of Engineers, and the

 5   other contractors working in Louisiana.  Nary a word of

 6   formaldehyde until March 2006.  March 2006, when an e-mail

 7   comes into Fluor and it says:  "Louisiana contractors, what are

 8   you guys doing about airing out these trailers with respect to

 9   formaldehyde?"  Why?  Because a news article had broke just

10   about a week or so before in Mississippi concerning

11   formaldehyde.

12              Do you remember I ran through all those e-mails for

13   you?  What did Fluor do?  It hopped to.  Within 45 minutes,

14   about 10 or 12 or more people had gotten the e-mail and said,

15   now, let's get the information together and let's get it to

16   FEMA.  They got an industrial hygienist on their staff on the

17   project.  What did he do?  He goes and does research.  Within a

18   day, they got two memos.

19              Mr. Watts used one of them in examining one of the

20   expert witnesses.  All the research -- and here's the state of

21   the research.  Here's what people know about formaldehyde as of

22   March 21st, a day later, and Fluor gave it to its -- gave it to

23   the party that it contracted with, FEMA.

24              Now, it also went to FEMA -- and Mr. Hilliard asked

25   Mr. Whitaker about this, but he didn't show it to you -- Fluor

1    kept a log.  You know, in government contracting, you don't

2    just go do things; right?  You only do that what you're asked

3    to do, and that's what you get paid for.  And they kept careful

4    track of what they did, and what they were asked to do, and

5    what they were not asked to do.

6         See here, March 21st:  "Formaldehyde process for

7    airing out trailers request for NOAFO, New Orleans area field

8    office."  That was that March 20th e-mail that came in.

9         A guy named Jim Rammell, who you didn't hear about

10   here who works for Fluor:  "FYI and clarification, if any needs

11   to be provided, 3/22 COTR -- I believe Mr. Whitaker talked to

12   you about that.  Everything in government contracting is an

13   acronym.  It's contracting officers technical representative.

14   It's the guy that would walk talk to Fluor about it.

15        This is what the contract says.  This is what we

16   need.  This is how you're supposed to do it.  This is what you

17   want.  "COTR informs no further action needs to be taken."

18        But what did Fluor do?  It had the memo from the

19   industrial hygienist, including the research, that it gave to

20   its client.  What happened next?  Do you remember the other

21   e-mails that I read through with Mr. Duckworth?  Some faculty

22   members out at the Southern University of New Orleans trailer

23   park said, "oh, we see these warnings in the trailers and that

24   gives us a little concern.  What's up with that?"

25        The same fellow, industrial hygienist, hops to work,

1    exhibit 492, puts together -- you can look at it back in the

2    jury room if you want -- puts together a 16-page set of

3    materials for the people at the Southern University of New

4    Orleans.

5            In other words, people who lived in the trailers had

6    a question, asked FEMA about it, FEMA asked Fluor about it,

7    Fluor gave it to them.

8            But look at Exhibit 492 when you're back in the jury

9    room.  Look at the 16 pages of EPA and other materials that

10   were provided, and Web sites, here's where you go get more

11   information.

12           In fact, part of that exhibit is the lady from FEMA

13   writes back, Barbara Russel.  Do you remember I asked

14   Mr. Duckworth about Barbara Russel?  She writes back to the

15   industrial hygienist Patrick Logue:  "Excellent research.  I'm

16   sure those at the university will be impressed with your

17   attention to this matter as I am."

18           **THE COURT:**  One minute, Mr. Penot.

19           **MR. PENOT:**  Thank you so much.

20           One last point -- I only have one minute -- this

21   may happen when you go back to the jury room to deliberate.

22   One or two of your number may turn to you and say, "You know,

23   what's the big deal, one percent, two percent, 10 percent.  Its

24   it's a big company?"

25           You took an oath.  Your verdict follows you.

1   You have to look yourself in the mirror.  Say to that person,

2   "no.  That's not the oath I took."  If you believe me, if you

3   believe that they brought nothing, then justice says, and your

4   oath says, the answer on that verdict form is "zero," not

5   10 percent, not two percent, not one percent, not one-quarter

6   of one percent.  Because your verdict goes out.  It will be on

7   CNN tomorrow morning.

8               Thank you very much for your attention.

9          THE COURT:  All right.  Thank you, Mr. Penot.

10              Mr. Buzbee, if you'd like to go ahead and argue

11  on rebuttal.  Rebuttal, of course, is limited to the arguments

12  that were made in closing by the defendants.  Go ahead.

13  Mr. Buzbee.

14         MR. BUZBEE:  May it please the Court.

15              What you don't know can hurt you.  I used to be

16  skinny.  In 1993, I was in Somalia.  There were snipers on many

17  of the roofs in Somalia.  There were humanitarian workers there

18  trying to bring aid to a lot of people who were displaced and

19  had a lot of problems.  Our job was to keep those humanitarian

20  workers safe.

21              We had the knowledge that there were snipers,

22  and many people were killed there.  And it would have been

23  criminal -- absolutely criminal -- for us not to pass along

24  that information.  To know that there was a chance of injury or

25  death, but not to pass that information along.

1        What you don't know can hurt you.  These people,

2   with all their lawyers, and their excuses, and their

3   half-truths, and their tricks, they had the information.  They

4   had the information that any mother would have wanted.  She, if

5   nothing else, was entitled to have a choice.  A choice.

6        And they sit up here and they talk about how

7   great this trailer was, "Well, it's not perfect."  We know it's

8   not perfect.  We saw it.  We saw the trailer.  Of course, it's

9   not perfect.  It's far from perfect.  It's certainly not

10  superior quality.

11       If those trailers weren't dangerous, would there

12  be 30,000 of them sitting in a field?  Any taxpayer -- any

13  taxpayer -- should be appalled at that.  Absolutely appalled.

14  And they're still spending money.  Still spending money to --

15  remember this, when you point a finger at someone, you got

16  three fingers pointing back at you.

17       They want to blame this mother.  They want to

18  call her a liar in front of her son.  Her son is here and they

19  call her a liar in front of her son.  They play games.  I know

20  you caught it.  I know you caught it a couple of days ago when

21  they put on testimony that she got notice.  But then I stood up

22  and showed the actual document showing that absolutely she did

23  not get notice.

24       She was entitled to notice.  And it's not enough

25  to say, "Well, we're relying on FEMA to give notice."  You put

1    the product in the market.  You made a ton of money.  30,000
2    trailers wasted.
3                     I'm a taxpayer.  The judge is a taxpayer.  The
4    case manager is a taxpayer.  The court reporter is a taxpayer.
5    The clerk's a taxpayer.  Many people in this room are
6    taxpayers.  And I know you're all taxpayers.  You should be
7    appalled.  You should be absolutely appalled.  That is not
8    right.
9              **MR. WEINSTOCK:**  That's fairly inappropriate, Your
10   Honor.
11             **THE COURT:**  Well, it's closing argument.
12             **MR. BUZBEE:**  I think it's absolutely appropriate to
13   be appalled.
14                     Waste, absolute waste.  If those trailers were
15   safe, they wouldn't be sitting in a graveyard.  These people
16   were forced out of the trailers.  Not her.  She found out and
17   she got out.  They tried to pretend like she was forced out.
18   She got out.  Once she had the information, like any
19   responsible mother would do, she got out.
20                     And now, our taxpayer dollars are sitting in
21   some field in Lottie, Louisiana, because they didn't care
22   enough to do what was right, to be responsible.
23                     You know, when I first was asked to get involved
24   in this case the first thing thought, my first reaction was --
25   I'm be honest.  I'm a very conservative person.  I thought,

1   "Don't bite the hand that feeds you.  You got something free.

2   What are you complaining about?"

3                 And you've heard their little hints about it all

4   throughout this case.  You've heard it when they mentioned

5   Acorn.  They mentioned Acorn for a reason.  Come on.  It had

6   nothing to do with this case.  It's a hot button issue, Acorn.

7   It has nothing to do with this case.  That's the kind of tricks

8   they play.  That's the kind of games they play.

9                 You saw their CEO.  Did you see him in the

10  courtroom?  It was not important enough for him to even come

11  down here.  His brother?  Not important.  They laughed all the

12  way to the bank.  And guess who's left holding the bag?  The

13  federal government.

14                Who is the federal government anyway?  We're the

15  federal government.  We're the taxpayers.  We pay the taxes.

16  We bought those trailers.  We bought a bunch of junk is what we

17  bought.  They've created a public health emergency.  If it

18  wasn't a public health emergency, these people would not have

19  been forced out of the trailers.

20                There's many people scamming FEMA, of course.

21  It happens all the time.  Every time there's a disaster,

22  there's people that -- the storm chasers that try to make money

23  off disasters.  And then there's people that try to get a

24  handout and they don't deserve it.

25                But one thing I hope we all can agree on, that's

1   not this lady.  That's not her.  There may be people out there

2   trying to scam FEMA, who were homeless before.  You've heart

3   about them.  They were homeless before, and now they got a free

4   trailer, and now they're trying to hang in as long as they can

5   until they finally get forced out.  This is the prejudice that

6   they're trying to use.

7                    But we've met her, Alana.  We've met her son.

8   We've met her daughter.  A single mother trying to do what she

9   can to support her family, with no support from the father.

10  But she's not laying around and crying.

11                   They say, "Well, she didn't call FEMA and

12  complain of the smell."  She was happy to have a roof over her

13  head.  She was happy to have a place so her son, who's grades

14  were going in the tank, could come back and get some normalcy

15  in her life.  So she could come back and earn a living for her

16  family.  That's what she wanted.

17                   And when she found out that this smell --

18  remember, when she moved into the trailer, no one said to her,

19  that's formaldehyde.  They didn't say that.  Let's be very

20  clear what she was told.  They didn't say it was formaldehyde.

21  Because if they would have said it was formaldehyde, she would

22  have gotten on the Internet and she would have figured out what

23  it was.  She would have figured it out.

24                   They told her, "Oh, it's a new smell.  It will

25  go away."  But it didn't go away.  It kept coming back.  Now,

1    we spent a lot of time about the odor threshold.  Let's talk

2    about that.  Let's be clear on what we're talking about.  If

3    you smell formaldehyde you are being exposed at, at least .5

4    parts per million.  Any doctor, any study, any governmental

5    organization, it doesn't matter who, that is dangerous.

6               Do you remember the .3, the .3 parts per million

7    that Navy guy with the shoulder boards, the commander?  That

8    was an action level.  Meaning for 30 minutes of exposure, 30

9    minutes at .3.  We're talking about 570 days for a child.

10              Do you know why they used to send canaries down

11   to the mines?  Do you remember why they used to do that?  It's

12   something we were taught in school.  Everybody knows this.  You

13   send a canary down there because it's small.  If the canary,

14   dies you know the mine's not safe.

15              They bring a high -- a high dollar doctor in

16   here to tell you that kids are less susceptible to a toxin than

17   an human [sic].  Does that make sense to you?  One thing we

18   know, with their experts, they got what they paid for.  They

19   came in here:  Money in, opinion out.

20              But once you scratch a little further, what do

21   we find out?  They're all in cahoots with the formaldehyde

22   counsel.  They're all in cahoots with the company that makes

23   the chemical that poisoned this child.

24              Do you remember this lawyer here, very nasty

25   sometimes to various people?  But do you remember the thing he

1   said at the beginning:  "Shrimp, oh, shoot, man, that's my

2   favorite meal.  Shrimp 47 parts per million."  You don't inhale

3   shrimp.  I mean, sometimes you eat it very fast, but you

4   certainly don't inhale it.

5                   This is the kind of tricky stuff that they do.

6   They say, "Oh, well, out on the freeway you can get X parts per

7   million."  Would you take air from the freeway and put it into

8   a little box and let your child sleep in it for 570 days?  Of

9   course not.  That's ridiculous.

10                   Cigarette smoke, what is this?  Would you smoke

11  a pack of cigarettes into a little trailer and let your child

12  sleep in there for 570 days?  Ridiculous.  This is the kind of

13  games they play.  They said catfish -- another one of my

14  favorite meals -- oh, it's -- we're talking about the

15  difference between ingestion and inhalation.

16                   The difference is this:  You can take a bite of

17  an onion, and you can bite it, and you can eat it, and you can

18  swallow it, and it's fine.  You take that same onion, you cut

19  it in up in very fine pieces and throw it in your face, you

20  breathe it in, there's the difference.

21                   Formaldehyde is everywhere.  We're not talking

22  about the formaldehyde that's naturally occurring.  We're

23  talking about man-made formaldehyde that they put inside of a

24  trailer using woods from Asia that were cheaper so they could

25  make a buck.  That's what we're talking about.

1           We're talking about them placing expediency and
2    profit over the safety and long-term health of the people that
3    they were supposed to be serving.  That's what's going on here.
4    I mean, that's what the case is about.  And it's an age -- from
5    beginning of time, people will do things for money.  And that's
6    what's going on here.

7           So when they talk about the case is about money,
8    have you heard them say, "We're going to give all this money
9    back for these wasted trailers?"  No.  They're not going to do
10   that.  And so now the taxpayer, you and me, when cancer does
11   show up 20 years from now and they relate it back to all the
12   people that lived in the trailers, especially the children,
13   guess who's going to pay for that?  Do you think it's going to
14   be these people?  It's going to be us.  That's what's happening
15   here.

16          We are all on a journey in life.  My goal in
17   life:  Live my life; try to be as healthy as I can; raise my
18   children, watch them grow; hopefully, go to college; hopefully,
19   they'll have grandkids one day.  We, as a country, we place
20   children -- in all of our concerns, children are up here.
21   That's what we do.

22          I mean, I have four of them.  I would take a
23   bullet for my kids.  I mean, it wouldn't even be a discussion,
24   I would do it.  That's how it is.  That is in our collective
25   DNA as a country.  Children are they top.  That's how it is in

1    our country.  God bless us for that.

2                   These people put, not only this child, but a lot

3    of children, in a heck of a jeopardy.  You know, Mr. Watts

4    may -- and I don't know if I like this example or not, but it

5    really brought it home to me.  He talked to you about the game

6    this weekend, LSU going to Mississippi State.  And he talked

7    about how you drive 60 miles an hour, but Chris -- Coop -- is

8    getting there a lot quicker at a lot faster speed.  There are

9    17 more bullets in the gun at .050.

10                  If the level is what, I think, anybody with

11   common sense would believe, that it's really at .5, there's

12   5,000 more bullets in the gun.  I know you-all picked up on

13   that.  If the level in that trailer was .5, he has a 5,000 more

14   chance of getting cancer than he would have had, had he not

15   lived in that trailer.  That's a fact.

16                  She came in the trailer.  She smelled the smell.

17   She asked, "What is this?"  It's nothing, air it out.  It's at

18   .5.  She airs it out.  The formaldehyde level goes below the

19   smell, the threshold.  But it didn't go away, because her

20   child's eyes kept being bothered, and they kept having the

21   symptoms.  Her daughter kept having nosebleeds.

22                  So what we're talking about is, she's airing out

23   for the smell, not because she thought it was dangerous.

24   Because she's trying to get rid of the smell.  And only an

25   irresponsible person where she lived would leave doors and

1  windows open at night.

2            Remember, it wasn't a danger she was concerned

3  about with the smell, it was the smell.  That's a big

4  difference.  She airs it out enough to where she can no longer

5  smell it, and the levels are still high to where her son is

6  being exposed for 570 days.  570 days of exposure in his

7  formative years.

8            That's what the case is about.  And you know

9  what?  Tomorrow morning, there will be news all over the

10 country about what you do.

11           The great things about jury -- you know,

12 military service is way up there on service to country.  But

13 jury service, it's got to be up there.  Because a judge can't

14 decide this case.  I can't decide this case.  Look at all these

15 people?  Look at them.  It matters to somebody.  They can't

16 decide the case.  There's seven people -- or eight people that

17 can.  It's you.

18           The president can't do it.  Nobody but you.  And

19 you have the power to say, "You know what?  It ain't right.

20 I'm not going to allow you to pretend that an RV off the lot is

21 the same as the piece of junk --

22           **THE COURT:**  One minute, Mr. Buzbee.

23           **MR. BUZBEE:**  -- you sold the government.  Or that a

24 mobile home that a family lives in is the same as this piece of

25 junk these people sold the government."  It's not right.

1    There's no comparison between an RV that you may own and this

2    piece of junk that they sold.

3                When you return this verdict, you have an

4    opportunity here to make a difference.  To make a difference.

5    And I'm asking you to do that, and I know you will do that.

6    And I thank you in advance for that.

7            **THE COURT:**  All right.  Thank you, Counsel.

8                We are going to take a ten-minute break.  And

9    then when you come back in, I will go ahead and charge you,

10   which will take probably a little less than an hour.  So let's

11   go ahead and we will plan to start at 10:40.

12                All rise.

13           **THE DEPUTY CLERK:**  All rise.

14           (WHEREUPON, the jury exited the courtroom.)

15           **THE COURT:**  All right.  You can be seated.  Counsel,

16   anything we need to cover at this point?

17           **MR. WEINSTOCK:**  Yes.  We'd ask for a limiting

18   instruction.  I think the "taxpayer" reference violates the

19   gold standard that you're talking about the personal jurors.

20   It's personal to them.  It's like saying to them, "Your

21   insurance premium is going to go up."

22           **THE COURT:**  I think that the nature of the rebuttal

23   of the closing argument was dangerously close to the edge of

24   being improper.  And I suppose we're going to find out whether

25   it crossed the line of propriety by the way of post-trial

1    motions.

2              I instructed counsel yesterday -- which I

3    shouldn't even need to instruct counsel -- to argue the

4    evidence.  Argue the evidence.  And I think we departed from

5    that in rebuttal; and, yes, I am concerned about it.  But we'll

6    see what the jury does with this.  Your objection is so noted

7    and the issue will be briefed, I would think, appropriately,

8    after trial.

9         **MR. WEINSTOCK:**  It will be, Your Honor.  But we would

10   still ask for a limiting instruction at the close of the

11   charge.

12        **THE COURT:**  Well, I'm going to explain to them that

13   closing arguments are not evidence.  I've already told them

14   that probably half a dozen times already, and I will certainly

15   do that again before I begin to give them the formal

16   instructions.

17             But we'll go ahead and take it up and give them

18   the limiting instruction again, as I had always planned to do.

19             Thank you.

20        **MR. BUZBEE:**  Yes, sir.

21   (WHEREUPON, the Court took a recess.)

22        **THE DEPUTY CLERK:**  All rise.

23   (WHEREUPON, the jury entered the courtroom.)

24        **THE COURT:**  You may be seated.

25        **MR. WEINSTOCK:**  Your Honor, can we approach?

 1          THE COURT:  Yes.

 2          (WHEREUPON, the following proceedings were held at

 3  the bench.)

 4          MR. WEINSTOCK:  I was told by learned counsel if I

 5  want to preserve my rights, I have to move for a mistrial

 6  before we move into the next stage.  I have at least preserved

 7  the record --

 8          THE COURT:  Okay.

 9          MR. WEINSTOCK:  -- by moving it before.  I'm moving

10  on the basis that when you talked about taxpayers, you were

11  essentially talking about the jurors, and you cannot reference

12  a jury about their own personal -- how things apply to them

13  personally.

14          THE COURT:  Well, I've got some concerns about that,

15  which I've already expressed.  I think we should go ahead and

16  defer any ruling on that until it can be adequately briefed,

17  which I'm sure you-all will very capably do.

18          MR. BUZBEE:  Yes, sir, we will.

19          MR. WEINSTOCK:  I just want to make sure the record's

20  preserved.

21          THE COURT:  Okay.  So noted.

22          MR. BUZBEE:  And just for the record, Your Honor, I

23  mean, I looked -- I know that we were pretty careful.  I looked

24  at it pretty carefully and I state pretty -- firmly that I

25  didn't violate any rules of any sort.

1          **THE COURT:**  Okay.

2          **MR. BUZBEE:**  Yes, sir.

3          **MR. WEINSTOCK:**  Thank you, sir.

4          (WHEREUPON, the following proceedings were held in

5     open court.)

6          **THE COURT:**  All right.  As I told you earlier, we are

7     at the part of the trial where you will receive some

8     instructions on the law and on how to conduct your

9     deliberations, and I'm going to give those to you here.

10               Before I do that, I would remind you, again --

11    and I've already said it a few times -- that closing arguments,

12    like opening statements, are not evidence.  You are to decide

13    the case based on the evidence, the witnesses' testimony, and

14    the exhibits that have been introduced into evidence.  You will

15    be provided with those exhibits and, of course, you have your

16    recollection, as well as your notes about what the testimony

17    was during the trial.

18               So any closing argument, to the extent that it's

19    not based on the evidence, is merely argument and is not the

20    basis for a verdict in this case.  So accept the closing

21    arguments, of course, and appreciate them for what they are.

22    But be mindful of the fact that closing arguments, like opening

23    statements, are not evidence.

24               And I'm going to tell you a little bit more

25    about that when I give you the charge here.  I'm going to read

 1  to you the jury instructions as they've been prepared, and I
 2  want you to listen to them very carefully at this juncture.
 3              You will be provided a written copy.  In other
 4  words, the exact same thing that I'm reading off of, you will
 5  be given a copy of as part of your things that you can
 6  consider, of course, when you're in the jury room.  So you will
 7  be able to follow and look at this once you're back in the jury
 8  deliberations.  But, right now, I would prefer it if you would
 9  just try to listen very carefully.
10              Members of the jury, you have heard the evidence
11  in this case.  I will now instruct you on the law that you must
12  apply.  In any jury trial, there are, in effect, two judges.  I
13  am one of the judges and the other is you, the jury.
14              It is my duty to preside over the trial and to
15  determine what testimony and other evidence is admissible under
16  the law for your consideration.  It is also my duty at the end
17  of the trial to instruct you on the law applicable to the case.
18  It is your duty to follow the law as I shall state it to you.
19  You must apply that law to the facts as you find them from the
20  evidence in this case.  You are not to single out one
21  instruction alone as stating the law, but must consider the
22  instructions as a whole.
23              The parties have agreed or stipulated to the
24  following:
25              1.  FEMA has provided thousands of travel

1  trailers to displaced residents following natural disasters in
2  the United States since 1992, including displaced residents
3  from the Gulf Coast region.
4              2.   FEMA provided approximately 143,000
5  emergency housing units to families across the Gulf Coast in
6  response to Hurricanes Katrina and Rita.
7              3.   FEMA provided plaintiff, Alana Alexander and
8  her minor son, a travel trailer with Vehicle Identification
9  No. 1N61GTR2551021783.
10             4.   This travel trailer was manufactured by
11 defendant Gulf Stream Coach, Incorporated, on or about
12 December 14th of 2004.
13             5.   Gulf Stream Coach, Incorporated, sold the
14 travel trailer to Best Buy RV on or about December 13th, 2004.
15             6.   Gulf Stream travel trailers in 2004 were
16 made of composite wood products, such as plywood, particleboard
17 and fiberboard that contained formaldehyde.
18             7.   Fluor had a contract with the government to
19 install travel trailers after Hurricanes Katrina and Rita,
20 including the trailer occupied by Ms. Alexander and her family.
21             8.   In February 19- -- I'm sorry -- in February
22 of 2006, the Gulf Stream trailer was set up at 4415 Dale Street
23 by a subcontractor of one of Fluor's subcontractors.
24 Ms. Alexander and her family moved into the trailer on
25 May 26th, 2006.

1          9.   On January 28th or 29th, 2008, the Gulf

2    Stream travel trailer which had been occupied by Alana

3    Alexander and her family was tested for formaldehyde.  The

4    average temperature inside the travel trailer at this time was

5    71.8 degrees Fahrenheit, the average indoor humidity was

6    47 percent, and the level of formaldehyde was 0.050 ppm or

7    parts per million.

8          10.   Gulf Stream provided no written or oral

9    warnings directly to Alana Alexander or her family regarding

10   the subject of formaldehyde in the travel trailer which they

11   occupied.

12         11.   Chris Cooper was diagnosed with asthma at

13   age three in 1999.

14         12.   Alana Alexander has never seen a doctor for

15   formaldehyde-related injuries.

16         13.   Erika Alexander is a named plaintiff in

17   this litigation.  The Court has determined that Alana

18   Alexander's and Christopher Cooper's case shall be tried

19   separately from Erika's case.

20         14.   Paul Blanchard, known as "Gator", was

21   employed by Kedo Properties, LLC, in connection with installing

22   travel -- installing trailers following Hurricane Katrina.

23         This means that all parties agree that these

24   facts -- that these are facts.  You must, therefore, treat

25   these facts as having been proved.

1          If there's publicity or other discussion about
2     this trial outside of this courtroom, you must ignore it.  You
3     must decide this case only from the evidence presented in the
4     trial.
5          A demonstrative exhibit is an illustration.  It
6     is a party's summary, charge, picture, video, or video graphic,
7     or model used to describe something involved in this trial.  If
8     you recollection of the evidence differs from the demonstrative
9     exhibit, rely on your recollection.
10          During the course of the trial, you have heard
11     objections to evidence.  Sometimes these were argued out of the
12     hearing of the jury.  It is the duty of the attorney on each
13     side of a case to object when the other side offers testimony
14     or other evidence that the attorney believes is not properly
15     admissible.  You should not draw any inference against or show
16     any prejudice against a lawyer or his client because of the
17     making of an objection.
18          Upon allowing testimony or other evidence to be
19     introduced over the objection of an attorney, the Court does
20     not, unless expressly stated, indicate any opinion as to the
21     weight or effect of such evidence.  As stated before, you are
22     the sole judges of the credibility of all witnesses and the
23     weight and effect of all evidence.
24          When the Court has sustained an objection to a
25     question addressed to a witness, the jury must disregard the

1    question entirely and may draw no inference from the wording of
2    it or speculate as to what the witness would have said if
3    permitted to answer the question.
4            During the course of the trial, I may have
5    occasionally asked a question of a witness or admonished an
6    attorney or witness.  Do not assume that I hold any opinion of
7    the matters to which my question or questions or my comments
8    may have related.
9            If you could possibly construe any remarks that
10   I have made during the course of the trial as a comment on
11   evidence, then I instruct you to disregard any such comment,
12   for you, as jurors, are the sole judges of the facts in this
13   case.
14           Also, at times during the trial, I have directed
15   that certain testimony or other evidence be stricken from the
16   record and have instructed you to disregard that evidence.  You
17   will not consider testimony that has been stricken and as to
18   which you have been so instructed in reaching your decision.
19   Your verdict must be based solely on the legally admissible
20   evidence and testimony.
21           Any notes that you've taken during this trial
22   are only aids to your memory.  If you are memory differs from
23   your notes, you should rely on your memory and not on your
24   notes.  The notes are not evidence.  If you have not taken
25   notes, you should rely on your independent recollection of the

1   evidence and should not be unduly influenced by the notes of

2   other jurors.  Notes are not entitled to any greater weight

3   than the recollection or impression of each juror about the

4   testimony.

5              In determining the weight to give to the

6   testimony of a witness, you should ask yourself whether there

7   was evidence tending to prove that the witness falsely

8   testified about some important fact, or whether there was

9   evidence that at some other time the witness said or did

10  something or failed to say or do something that was different

11  from the testimony he gave at the trial.

12             When knowledge of technical subject matter may

13  be helpful to the jury, a person who has special training or

14  expertise in that technical field, and he is called an expert

15  witness, is permitted to state his or her opinion on those

16  technical matters.  However, you are not required to accept

17  that opinion.  As with any other witness, it is up to you to

18  decide whether to rely upon it.

19             Certain testimony has been presented to you

20  through a videotaped deposition or a deposition read to you

21  here in the courtroom.  A deposition is the sworn, recorded

22  answers to questions asked a witness in advance of the trial.

23  Under some circumstances, if a witness cannot be present to

24  testify from the witness stand, that witness' testimony may be

25  presented under oath in the form of a deposition.

1          Sometime before this trial, attorneys

2   representing the parties in this case questioned this witness

3   under oath.  A court reporter was present and recorded the

4   testimony.  The questions and answers have been played or read

5   to you at trial.  This deposition testimony is entitled to the

6   same consideration and is to be judged by you as to credibility

7   as if the witness had been present and had testified from the

8   witness stand in court.

9          The testimony of physicians who examine and

10  treat an injured person -- let's make it singular here.

11         The testimony of a physician who examined and

12  treated an injured person is entitled to greater weight than

13  that of physicians who only examined the injured person once.

14         You must consider only the evidence in this

15  case.  However, you may draw such reasonable inferences from

16  the testimony and exhibits as you feel are justified in the

17  light of common experience.  You may make deductions and reach

18  conclusions that reason and common sense lead you to make from

19  the testimony and evidence.

20         The testimony of a single witness may be

21  sufficient to prove any fact, even if a greater number of

22  witnesses may have testified to the contrary, if after

23  considering all the other evidence you believe that single

24  witness.

25         There are two types of evidence you may

1   consider.  One is direct evidence, such as testimony of an

2   eyewitness.  The other is indirect or circumstantial evidence,

3   the proof of circumstances that tend to prove or disprove the

4   existence or nonexistence of certain other facts.  The law

5   makes no distinction between direct and circumstantial

6   evidence, but simply requires that you find the facts from a

7   preponderance of all the evidence, both direct and

8   circumstantial.

9             Do not let bias, prejudice or sympathy play any

10  part in your deliberations.  A corporation, the United States

11  Government, its officers, and all other persons are equal

12  before the law and must be treated as equals in a court of

13  justice.

14            In this case the plaintiffs must prove every

15  essential part of their claims by a preponderance of the

16  evidence.  This is sometimes called the "burden of proof".

17            A "preponderance of the evidence" means the

18  greater weight and degree of credible evidence before you.  In

19  other words, a preponderance of the evidence just means the

20  amount of evidence that persuades you that a claim or defense

21  is more likely so than not so.

22            In determining whether any fact has been proven

23  by a preponderance of the evidence in the case, you may, unless

24  otherwise instructed, consider the testimony all witnesses,

25  regardless of who may have called them, and all exhibits

1    received in evidence, regardless of who may have produced them.

2                    If the proof fails to establish any essential

3    part of the plaintiff's claim by a preponderance of the

4    evidence, you should find for the defendant as to that claim.

5                    To be clear:  Plaintiffs need to prove their

6    claims only by a preponderance of the evidence.  The plaintiffs

7    need not produce every possible witness, and they need not

8    prove their case beyond a reasonable doubt, as is necessary in

9    a criminal prosecution.  But speculation or mere possibility

10   and even unsupported probability is not sufficient to support a

11   judgment in their favor.

12                   The mere fact that an incident happens or an

13   injury occurs does not raise a presumption that any party,

14   person, or entity was at fault.

15                   Plaintiffs Alana Alexander and Christopher

16   Cooper claim that Gulf Stream Coach, Inc., or "Gulf Stream", is

17   liable for their damages as the manufacturer of the emergency

18   housing unit, which was sometimes referred to as an "EHU", that

19   they occupied.  Plaintiffs claim these damages under the

20   Louisiana Product Liability Act, which I will refer to

21   sometimes as the "LPLA".

22                   Specifically plaintiffs are not suing Fluor

23   Enterprises, Inc., or "Fluor" under the LPLA.

24                   The LPLA provides the exclusive remedy against a

25   manufacturer for injuries or damages caused by an unreasonably

1   dangerous product.  There are three separate theories of

2   liability under the LPLA that are applicable to this case:

3               First, liability based on unreasonably dangerous

4   construction or composition;

5               Second, liability based on unreasonably

6   dangerous design;

7               And third, liability based on inadequate warning

8   rendering the product unreasonably dangerous.

9               Let's talk about liability based on unreasonably

10  dangerous construction or composition.

11              In this case the plaintiffs claim that the

12  product manufactured by Gulf Stream was unreasonably dangerous

13  in construction or composition; and, in order to be successful,

14  plaintiffs must prove by a preponderance of the evidence that:

15              First, the product in question deviated in a

16  material way from the manufacturer's specifications or

17  performance standards for the product, or from otherwise

18  identical products manufactured by Gulf Stream;

19              Second, the injury which each plaintiff suffered

20  was proximately caused by a characteristic of the product which

21  made it unreasonably dangerous and existed at the time the

22  product left Gulf Stream's control;

23              Third, the injury which the plaintiffs suffered

24  arose from a reasonably anticipated use of the product by

25  plaintiffs or some other person;

1          And four, there was actual damage to the person
2   of each plaintiff.
3          Secondly, let's talk about liability based on
4   unreasonably dangerous design.
5          In this case plaintiffs claim that the product
6   manufactured by Gulf Stream was unreasonably dangerous in its
7   design.  In order to be successful, plaintiffs must prove by a
8   preponderance of the evidence that:
9          First, there was an alternative design for the
10  product that was capable of preventing the injuries, and the
11  likelihood that the product's design would cause the injuries
12  and the seriousness of that injury outweighed the burden on the
13  defendant of using that alternative design and the adverse
14  effect of using that alternative design on the utility of the
15  product;
16         Second, the injury which each plaintiff suffered
17  was proximately caused by a characteristic of the product which
18  made it unreasonably dangerous and existed at the time the
19  product left the manufacturer's control or resulted from a
20  reasonably anticipated alteration of the product later;
21         Third, the injuries which plaintiff suffered
22  arose from a reasonably anticipated use of the product by the
23  plaintiffs or some other person;
24         And fourth, that there was actual damage to the
25  person of each plaintiff.

1    If you find that Gulf Stream has used reasonable
2  care to provide an adequate warning to the users of the
3  product, then you must consider the effect of that warning in
4  deciding the likelihood that the design of the product would
5  cause plaintiffs' injuries.
6    Third, let's talk about liability based on
7  inadequate warning.
8    In this case the plaintiffs claim that the
9  product manufactured by Gulf Stream was unreasonably dangerous
10 because of an inadequate warning about its potential risks.  In
11 order to be successful, plaintiffs must prove each of the four
12 elements by a preponderance of the evidence:
13    First, at the time the product left Gulf
14 Stream's control, the product had a characteristic that might
15 cause damage and Gulf Stream failed to use reasonable care to
16 provide an adequate warning of that characteristic and its
17 danger to the users of the product;
18    Second, the injury with which each plaintiff
19 suffered was proximately caused by a characteristic of the
20 product which made it unreasonably dangerous and existed at the
21 time the product left Gulf Stream's control or resulted from a
22 reasonably anticipated alteration of the product later;
23    Third, the injury which plaintiff suffered arose
24 from a reasonably anticipated use of the product by the
25 plaintiffs, or some other person;

1        And four, there was actual damage to the person

2   of each plaintiff.

3        Once a plaintiff proves that the lack of

4   adequate warning rendered the product unreasonably dangerous,

5   there is a presumption that had the manufacturer provided an

6   adequate warning, the user would have both read and heeded the

7   warning.  This presumption may be rebutted by competent

8   evidence.

9        The LPLA provides that specific definitions for

10  certain terms that are used in these instructions, which I will

11  explain to you now:

12       When I use the term "reasonably anticipated

13  use," I mean use of a product that the manufacturer should

14  reasonably expect of an ordinary person in similar

15  circumstances.

16       When I use the term "adequate warning," I mean a

17  warning or instruction that would lead an ordinary user of a

18  product to contemplate the danger in using the product, and

19  then either to decline to use it or, if possible, to use it in

20  such a manner as to avoid the injury for which the claim is

21  made.

22       When I use the term "reasonably anticipated

23  alteration" of the product at a later time, I mean a change in

24  the product that the manufacturer should reasonably expect to

25  be made by an ordinary person in similar circumstances, or a

99 of 166

1    change arising from ordinary wear and tear.

2                  I do not mean by that term:

3                  One, failure of a person other than the

4    manufacturer reasonably to pass on a warning about the product

5    provided by the manufacturer to that person rather than to the

6    actual user;

7                  Or two, changes to the product or its operation

8    because it does not receive reasonable care and maintenance.

9                  These are not reasonably anticipated actions for

10   which the defendant may be held responsible based on inadequate

11   warning.

12                 There are certain circumstances, however, under

13   which a manufacturer does not have to provide an adequate

14   warning as described above.  A manufacturer does not have to

15   provide such a warning when:

16                 One, the danger of the product is not beyond

17   that which would be contemplated by the ordinary user, with the

18   ordinary knowledge common to the community as to the product's

19   characteristics;

20                 Or two, the user already knows or reasonably

21   should be expected to know of the characteristic of the product

22   that may cause injury and the danger of that characteristic.

23                 A manufacturer is not liable for the

24   unreasonable danger of a product due to inadequate warning if

25   he proves that at the time the product left its control, it did

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1   not know, and in light of the reasonably available scientific

2   and technical knowledge then existing, could not have known of

3   the characteristic of the product or its danger that caused the

4   injury.

5           A manufacturer who learns of a characteristic of

6   a product and its danger after it has left its control that may

7   cause injury, or who would have learned about it had it acted

8   in a reasonably prudent fashion, is liable for injury caused by

9   its subsequent failure to use reasonable care to provide an

10  adequate warning of such characteristic and its danger of users

11  of the product.

12          A manufacturer cannot be expected to design

13  products with component parts which will never wear out,

14  regardless of the nature of use or maintenance of the product.

15  A manufacturer is entitled to anticipate that a consumer

16  purchasing its product will use reasonable care in maintaining

17  it.

18          A manufacturer is not liable for the

19  unreasonable danger of a product due to its design if it proves

20  that at the time the product left its control:

21          One, it did not know, and in light of the

22  reasonably available scientific and technical knowledge then

23  existing, could not have known of the design characteristics or

24  its danger that caused the injury or of the alternative design

25  identified by the plaintiffs;

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1          Or two, the alternative design identified by the

2    plaintiffs was not feasible, in light of the reasonably

3    available scientific and technical knowledge, or the economic

4    practicality, then existing.

5          In this case Gulf Stream has asserted the

6    sophisticated purchaser/user defense in relation to the LPLA

7    claims asserted against it by the plaintiffs.

8          When a manufacturer or distributor sells a

9    product to a sophisticated purchaser and that purchaser then

10   supplies the product for use, the manufacturer has no legal

11   duty to provide any warnings to the user concerning possible

12   hazards associated with the product's use.

13         A sophisticated purchaser is one who by

14   experience and expertise is aware of the possible hazards

15   associated with the use of the product and who has an

16   obligation to inform end users of such potential health

17   hazards.

18         Therefore, if you find that:

19         One, Gulf Stream is a manufacturer, which is

20   undisputed;

21         And two, the United States through FEMA is a

22   sophisticated purchaser of this Gulf Stream trailer, then you

23   must return your verdict in favor of the Gulf Stream on the

24   LPLA claims based on inadequate warnings.

25         Plaintiffs have asserted a negligence claim

1    against Fluor.  It should be noted that this negligence claim

2    does not relate or apply to Gulf Stream.  Specifically,

3    plaintiffs have alleged that Fluor negligently caused damage to

4    plaintiffs in failing to act reasonably in the installation of

5    their trailer.  Plaintiffs are not asserting a negligence claim

6    against Fluor with respect to the maintenance of the trailer,

7    aside from installation.

8                    For plaintiffs to recover damages from a party

9    on a claim of negligence, they must prove each of the following

10   four elements by a preponderance of the evidence.

11                   The first element that you must consider is

12   whether a party's conduct was negligent in that it fell below

13   the standard of care that the law requires.  In other words,

14   you must decide whether a party breached a duty it owed to the

15   plaintiffs to exercise the degree of care that we might

16   reasonably expect of an ordinarily prudent person, party, or

17   entity under the same or similar circumstances.

18                   A party's conduct was below the expected

19   standard of care if it created an unreasonable risk of harm.

20   In determining whether an unreasonable risk harm has been

21   created, you may weigh the likelihood that an accident might

22   have occurred, and the seriousness of that accident, against

23   the importance to society of what that party was doing, the

24   advisability of the manner in which it was done, under the

25   circumstances, and the burden of taking precautions sufficient

1   to avoid an accident.

2                   Reasonable and ordinary care can include prior

3   discovery of reasonably discoverable conditions that might be

4   unreasonably dangerous and in remedying and/or warning of such

5   dangers.

6                   The second element that you must consider is

7   whether a party's conduct, if negligent, was a cause in fact of

8   the loss, if any, suffered by either plaintiff.  In other

9   words, you must decide whether a party's conduct actually

10  caused a plaintiff's loss.

11                  Determining this element is usually a "but for"

12  inquiry that tests whether the plaintiff's loss probably would

13  not have occurred but for the conduct in question.

14                  This does not mean, however, that the law

15  recognizes only one cause of any injury, consisting of only one

16  factor or thing, or the conduct of only one person or party.

17                  On the contrary, many factors or things may

18  operate at the same time, either independently or together, to

19  cause injury or damage.  When there are concurrent causes of an

20  injury, which nevertheless would have occurred in the absence

21  of one of the causes, the proper inquiry is whether the

22  particular conduct in question was a substantial factor in

23  bringing about the injury.

24                  The third element that you must consider is

25  whether the defendant's conduct, if negligent, was a legal

1   cause of any loss by plaintiffs.  Conduct is a legal cause of a

2   loss if the loss was a direct result of the conduct in

3   question; or, at the time that conduct occurred, was a

4   reasonably foreseeable consequence of that conduct.

5           With this inquiry, you should consider whether

6   the loss in question is one which the duty owed was designed to

7   prevent.  There may be more than one legal cause of each

8   plaintiff's loss, if any.

9           The fourth element that you must consider is

10  whether there was actual damage or loss to each plaintiff.  In

11  other words, each plaintiff must show that each actually has

12  suffered a loss.

13          If a party against whom a negligence claim is

14  asserted contends others' actions were negligent, then that

15  party has the burden of proving the negligence of either or

16  both plaintiffs, one or all of the other defendants, or a

17  non-party.  If that negligence is proven, the amount of any

18  monetary relief for damages that each plaintiff has suffered

19  will be reduced by the extent of that negligence.

20          To establish the negligence of a plaintiff, any

21  other defendant, or a non-party, the party against whom the

22  negligence claim is asserted must establish that the same

23  elements that I've just explained in the context of the conduct

24  of plaintiffs, the other defendants, or a non-party.

25          Specifically, the party against whom the

1  negligence claim is asserted must establish that the conduct of

2  the plaintiffs, some or all of the other defendants, or a

3  non-party was negligent and that the conduct was a causing fact

4  and a legal cause of any damages or loss actually suffered by

5  each plaintiff.

6           In certain instances, a manufacturer or other

7  defendant is not liable for the entirety of the harm suffered

8  by a plaintiff if the harm is caused in part by the

9  contributing fault or negligence of another defendant, the

10 plaintiff herself, or a person or entity who is not a party to

11 this case.  In other words, a non-party.  This is an issue on

12 which the defendant has the burden of proof.  The defendant

13 must prove this defense by a preponderance of the evidence.

14          If you conclude that the conduct of the

15 defendants, the plaintiffs, or a non-party caused or

16 contributed to the plaintiffs' injuries, then you must assign

17 percentages of fault to each one.

18          Louisiana law requires that you divide the total

19 responsibility -- Louisiana law requires that you divide the

20 total responsibility for this incident among all those at

21 fault.  You should do this by assigning percentages of fault to

22 the various involved parties and non-parties which will total

23 100 percent.  You are free to assign whatever percentage you

24 feel appropriate.

25          If determine that a reduction in a plaintiff's

1  recovery in this case will provide consumers generally with an

2  incentive to use a product carefully, without requiring an

3  exceptional sacrifice of other interests, you may assign a

4  percentage of fault to the plaintiffs in the manner that I will

5  describe to you.

6            On the other hand, if you determine that a

7  reduction in plaintiffs' recovery will not realistically serve

8  to promote careful product use by the consumer, or would

9  drastically reduce the manufacturer's incentive to make a safer

10 product, you may decide not to assign a percentage of fault to

11 a plaintiff.

12           In determining those percentages, you may

13 consider both the nature of the fault or negligent conduct and

14 the extent of the causal relation between such fault or conduct

15 and each plaintiff's injuries.

16           When I say "the nature of the fault or negligent

17 conduct," I mean that you may consider:

18           First, whether the conduct resulted from

19 inadvertence or rather involved an awareness of the danger

20 involved;

21           Second, how great the risk created by the

22 conduct was;

23           Third, the importance of what was sought by the

24 conduct;

25           Fourth, the physical and mental capacities of

1    the person, either ordinary or perhaps superior or inferior;

2    And five, any extenuating circumstances which

3    might have required a party to act in haste, without proper

4    thought.

5    When I say "the extent of the causal relation"

6    between the conduct and the injuries, I mean that you may

7    consider the extent to which the conduct contributed to the

8    happening of the accident and plaintiffs' injuries.

9    Here, Fluor claims that it did not install

10   plaintiffs' EHU.  Instead, Fluor asserts that it hired MLU

11   Services, Inc., which in turn hired Dan's Mobile Home Service

12   to install plaintiffs' EHU.

13   If you find that Fluor contracted with the

14   tortfeasor or wrongdoer to do something for him, but did not

15   control how he did it or when he did it, then you must conclude

16   that the individual is an independent contractor responsible

17   for his own conduct and Fluor is not responsible for his

18   conduct.

19   This rule is subject to an exception if Fluor

20   reserved the right to supervise or control the work of the

21   independent contractor, or gave express or implied

22   authorization to an unsafe practice.

23   Gulf Stream asserts that it is a government

24   contractor that performed its work according to and in

25   compliance with specifications approved and mandated by FEMA.

 1   Gulf Stream has the burden of proving that it is a government
 2   contractor.
 3                 In this regard, I instruct you that Gulf Stream
 4   cannot be liable under the LPLA based on defective design
 5   where:
 6                 First, the federal government approves
 7   reasonably precise specifications;
 8                 Second, Gulf Stream's product conforms to those
 9   specifications;
10                 And third, Gulf Stream's product warns the
11   government at the time of the first sale of the product -- I'm
12   sorry -- at the time of the first sale of the product of
13   product dangers that were known to Gulf Stream but not known to
14   the government.
15                 The government need not prepare the
16   specifications to be considered to have them -- to have
17   approved them, as long as the government provides a substantive
18   review or evaluation of Gulf Stream's plans.  Evidence of
19   continuous back and forth between Gulf Stream and the
20   government, such as proof that Gulf Stream and the government
21   worked closely together in the development of a product from
22   its planning stages through its full production, generally is
23   sufficient.  The specifications need not address the specific
24   defect alleged.  The government need only evaluate the design
25   feature in question.

1           The government's issuance of a form or report

2   indicating acceptance of the product and/or conformity with all

3   required specifications is evidence that Gulf Stream's product

4   met the government's requirements.

5           This condition also may be satisfied by showing

6   that the government supervised and controlled Gulf Stream's

7   implementation of approved specifications or that the

8   government accepted as complete or used Gulf Stream's product.

9           Extensive government involvement in the design,

10  review, development and testing of Gulf Stream's product, as

11  well as extensive acceptance and use of Gulf Stream's product

12  following product, is evidence that the product generally

13  conformed with the government-approved specifications.

14          Gulf Stream satisfies the government contractor

15  defenses' third condition by proving that it knew of no reasons

16  not known to the government why the application of the approved

17  specifications were unsafe or unreasonable.  The government

18  contractor defense does not require Gulf Stream to warn the

19  government of defects about which it should have reasonably

20  known.  Rather, a government contractor is only responsible for

21  warning the government of dangers about which it has actual

22  knowledge.  This third condition tests only whether the

23  contractor knew of dangers not known to the government.

24          A contractor who performs work pursuant to plans

25  and specifications provided by another party cannot be held

1    liable to any person injured as a result of that work unless
2    the contractor had a justifiable reason to believe that
3    following the plans and specifications would create a hazardous
4    condition.

5              The law requires you to determine whether FEMA's
6    conduct was negligent.  I have already instructed you as to the
7    law regarding negligence in the negligence liability
8    instruction.

9              With regard to damages.

10             As to each Christopher Cooper and Alana
11   Alexander, if you find that each or either has proven his or
12   her claims against the defendants, you must then assess the
13   amount of damages, if any, established by a preponderance of
14   the evidence as full and just compensation for the injuries
15   suffered by Christopher Cooper and/or Alana Alexander which you
16   find to have been proximately caused by the acts of the
17   defendants, no more and no less.

18             You should not interpret fact that I have given
19   instructions about each plaintiff's damages as an indication in
20   any way that I believe that the plaintiffs should or should not
21   win this case.  It is your task first to decide whether the
22   defendants are liable.  I am instructing you on damages only so
23   that you will have guidance in the event you decide that either
24   defendant or both defendants are liable to either plaintiff and
25   that plaintiff is entitled to recover money from one or both of

1   the defendants.

2              If you find that either of the plaintiffs have

3   proven his or her claim against the defendants, you are not

4   forced to assess an amount of damages for each and every

5   element of damage that the plaintiff has claimed.  If you find

6   that a plaintiff is entitled to one element of damages, but not

7   another, then you are only required to assess damages for the

8   element to which you believe that plaintiff is entitled.

9              The law recognizes both general damages for the

10  pain and suffering which a plaintiff may have faced because of

11  this incident and specific damages, sometimes called "special

12  damages," which are intended to reimburse a plaintiff for the

13  actual or anticipated out-of-pocket expenses which have been

14  incurred to date or which will incur in the future.

15             If you decide to award either plaintiff special

16  damages, you should consider the evidence that has been offered

17  on these issues and you may award sums of money for past and

18  future medical expenses and loss of earning capacity.

19             I remind you that in the assessment of damages,

20  you have wide discretion in terms of both the decision about

21  any award at all and the level of the award.  The fact that I

22  have instructed you on damages should not indicate to you that

23  I believe either plaintiff should or should not recover any

24  damages in this case.  This is entirely for you to decide.

25             With regard to compensatory damages.  If you

1    find that defendants are liable to either of the plaintiffs,
2    then you must determine an amount that is fair compensation for
3    all of that plaintiff's general damages.  These damages are
4    also called "compensatory damages".
5                    The purpose of compensatory damages is to make
6    the plaintiff whole, that is to compensate the plaintiff for
7    the damage that plaintiff has suffered.  Compensatory damages
8    are not limited to expenses that the plaintiff may have
9    incurred because of her or his injuries.
10                   If Christopher Cooper wins, he is entitled to
11   compensatory damages for physical injury and pain and
12   suffering, including mental anguish and anxiety and distress
13   that he suffered because of the defendant's conduct and/or the
14   action or inactions.  If Alana Alexander wins, she is entitled
15   to compensatory damages for her past, present and/or future
16   mental anguish and emotional distress.
17                   You may award compensatory damages only for
18   injuries that each plaintiff proves were proximately caused by
19   the defendants allegedly wrongful conduct.  The damages that
20   you award must be fair compensation for all of that particular
21   plaintiff's damages, no more and no less.
22                   Compensatory damages are not allowed as a
23   punishment and cannot be imposed or increase to penalize either
24   defendant.  You should not award compensatory damages for
25   speculative injuries, but for only those injuries which that

1　particular plaintiff has actually suffered or that plaintiff is
2　reasonably likely to suffer in the future.

3　　　　　　If you decide to award compensatory damages, you
4　should be guided by dispassionate common sense.  Computing
5　damages may be difficult, but you must not let that difficulty
6　lead you to engage in arbitrary guesswork.  On the other hand,
7　the law does not require that the plaintiffs prove the amount
8　of their losses with mathematical precision, but only with as
9　the definiteness and accuracy as the circumstances permit.

10　　　　　You must use sound discretion in fixing an award
11　of damages, drawing reasonable inferences where you find them
12　appropriate from the facts and circumstances in evidence.

13　　　　　You should consider the following elements of
14　compensatory damages to the extent you find -- that you find
15　that they have been proved by a preponderance of the evidence
16　and proximately caused by the defendants acts.

17　　　　　This is with regard to calculation of past and
18　future damages.  If you find for both or either of the
19　plaintiffs, they are entitled to recover an amount that will
20　fairly compensate them for any damages they have suffered to
21　date.

22　　　　　If you find that either of the plaintiffs are
23　reasonably certain to suffer damages in the future from his or
24　her injuries, then you should award them the amount you believe
25　would fairly compensate him or her for future damages.

1        In calculating future damages, you should
2   consider the standard table of mortality as compiled by the
3   United States Bureau of the Census, or other recognized
4   mortality table.
5        An award of future damages necessarily requires
6   that payment be made now for a loss that plaintiffs will not
7   actually suffer until some future date.  If you should find
8   that the plaintiffs are entitled to future damages,
9   including -- I'm sorry -- future damages, then you must
10  determine the present worth in dollars of the such future
11  damages.
12       If you make an award for future medical
13  expenses, you must reduce it to present value by considering
14  the interest that the plaintiffs could earn on the amount of
15  the award if they made a relatively risk-free investment.
16       The reason why you must make this reduction is
17  because an award of an amount representing future medical
18  expenses is more valuable to the plaintiff if they received it
19  today than if they received it in the future when they would
20  have otherwise incurred it.
21       It is more valuable because the plaintiffs can
22  earn interest on it for the period of time between the date of
23  the award and the date they would have incurred the expense.
24  Thus, you should adjust the amount of any award for future
25  medical expenses by the amount of interest that that plaintiff

1    can earn on that amount in the future.

2                     However, you must not make any adjustment to

3    present value for any damages you may award for future pain and

4    suffering or future mental anguish.

5                     In determining any award that you might make for

6    past or future medical expenses, you should consider the

7    evidence and the opinions of expert witnesses to decide the

8    reasonable value or expense of medical and hospital care and

9    treatment which was or will be reasonable and necessary for a

10   plaintiff's condition.

11                    Here, Plaintiff Alana Alexander seeks to recover

12   such expenses for her minor son, Christopher Cooper.

13                    The reasonable value -- this is with regard to

14   Christopher Cooper.  The reasonable value and/or expense of

15   hospitalization and/or medical care and treatment that

16   Alexander reasonably -- or I should say that Cooper reasonably

17   obtained -- well, let me go back.

18                    The reasonable value and/or expense of

19   hospitalization and/or medical care and treatment that

20   Ms. Alexander reasonably obtained for Cooper in the past or

21   will obtain for Cooper in the future until Cooper reaches the

22   age of majority.

23                    The reasonable value and/or expense of

24   hospitalization and/or medical care and treatment that

25   Cooper -- I'm sorry.  We just covered that.  Let me go back and

1    read this again.

2                   With regard to Christopher Cooper, I just read

3    to you the instruction which relates to the age at which Cooper

4    reaches the age of majority.  You must also consider the

5    reasonable value and/or expense of hospitalization and/or

6    medical care and treatment that Cooper reasonably will require

7    after he reaches the age of majority.

8                   You may award damages for aggravation of an

9    existing disease or physical defect or activation of any such

10   latent condition resulting in physical injury to Christopher

11   Cooper.

12                  In your consideration of the items of damage,

13   you should bear in mind that under the law the one liable or

14   responsible for an accident must take the injured person as he

15   finds him, and is responsible for all the natural and probable

16   consequences of its wrong, even though they are more serious

17   and harmful by reason of a pre-existing condition, physical

18   defect or weakness of the injured person.

19                  If the accident results in aggravation of a

20   previous condition of disability or of pain of the injured

21   person, the one responsible is liable both for the aggravation

22   of the pre-existing condition and for any new injuries

23   resulting from the accident.

24                  However, Christopher Cooper must prove:

25                  First, the prior existing condition;

1        Secondly; the extent of the aggravation -- and

2    the extent of the aggravation.

3        If you find that he would have faced this

4    aggravation of his condition whether this incident happened or

5    not, then he is not entitled to damages on that portion of his

6    claim, since the defendants are not responsible for the normal

7    and natural results of his prior condition.

8        If you find that there was such an aggravation

9    of a prior existing condition, you should determine, if you

10   can, what portion of Christopher Cooper's condition resulted

11   from the aggravation and make allowance in your verdict only

12   for the aggravation.

13       You may award damages for any bodily injury that

14   Christopher Cooper sustained, and any pain and suffering,

15   mental anguish, and loss of capacity for enjoyment of life that

16   he experienced in the past or will experience in the future as

17   a result of the injury.  No evidence of the value of intangible

18   things, such as mental or physical pain and suffering, has been

19   or need be introduced.

20       You are not trying to determine value, but an

21   amount that will fairly compensate Christopher Cooper for the

22   damages he has suffered.  There is no exact standard for fixing

23   the compensation to be award for these elements of damage.  Any

24   award that you make should be fair in the light of the

25   evidence.

1          A claim has been made by Alana Alexander as the

2   mother of Christopher Cooper for damages she has experienced

3   because of her son's injuries due to the loss of consortium

4   previously enjoyed with her son.

5          "Loss of consortium" is the term which the law

6   uses to describe the loss of love, companionship and services

7   which a family member, in this case Christopher Cooper, might

8   have provided if had he not been injured.

9          You may award damages to Alana Alexander for her

10  loss of consortium because of Cooper's injuries by considering

11  Alexander's loss of love and affection, loss of Cooper's

12  companionship, and the impact of Cooper's decreased ability to

13  perform household services and to provide similar aid and

14  assistance in the family unit.

15         You are not required to make an award in this

16  case to Alexander for loss of consortium merely because you

17  determine that Cooper was injured.  You should award damages to

18  Alexander only if you determine that she has proven that there

19  has been a loss of consortium, as I have described it to you,

20  resulting from the injury.

21         The law recognizes that a plaintiff may suffer

22  memorandum distress and anguish as a result of an incident, as

23  well as physical pain and suffering.  You are permitted to

24  consider such consequences as a part of the general damages

25  which you may award.  By "mental distress and anguish," I mean

1    substantial worry or concern, grief and the like.

2                    Plaintiffs claim to be entitled to medical

3    monitoring costs.  A plaintiff who proves the following factors

4    has proven that he meets what the law calls "medical

5    monitoring":

6                    One, that he was exposed to a proven hazardous

7    substance;

8                    Two, that has a proximate result of that

9    exposure, he suffered a significantly increased risk of

10   contracting a serious latent disease;

11                   Three, that this risk is greater than:

12                       A, the risk of contracting that same

13   disease had he not been exposed;

14                       And B, the chances of members of the public

15   at large of developing that disease;

16                   And four, that there is a monitoring procedure

17   that makes early detection of the disease possible;

18                   Five, that the monitoring procedure has been

19   prescribed by a qualified physician and is reasonably necessary

20   according to contemporary scientific principles;

21                   Six, that the monitoring procedure is different

22   from a procedure that would normally be recommended if there

23   were no exposure;

24                   And seven, there is some demonstrated clinical

25   value in the early detection and diagnosis of the disease.

1            Our law permits certain persons to recover

2    damages for mental anguish or emotional distress that they may

3    have suffered as a result of witnessing something that causes

4    injury to another person or as a result of coming on the scene

5    of an event soon thereafter.  Such recovery is possible in the

6    case of a mother alleging mental anguish and emotional distress

7    due to an injury suffered by a child.

8            In order to recover, the injured person must

9    have suffered such harm that one could reasonably expect that

10   someone who witnessed the event or came upon it soon thereafter

11   would experience serious mental anguish or emotional distress,

12   and that anguish or distress must be severe and debilitating.

13           Recovery is not permitted if the claimant has

14   merely been informed of the injuries after the accident.

15           Other than medical monitoring costs and fear of

16   cancer damages, a plaintiff may not recover for damages that he

17   or she does to the presently have.  Other damages for a

18   particular disease are not recoverable unless and until a

19   disease is diagnosed.  This is true because if the plaintiff

20   develops cancer or another illness or disease at another time,

21   then he is entitled to bring another lawsuit regarding that

22   condition at a later date.

23           A person who claims damages resulting from the

24   wrongful act of another has a duty under the law to use

25   reasonable diligence to mitigate to avoid or minimize those

1   damages.

2                   If you find either or both the defendants are

3   liable and a plaintiff has suffered damages, that plaintiff may

4   not recover for any item of damage which he or she could have

5   avoided through a reasonable effort.  If you find by a

6   preponderance of the evidence that the plaintiff unreasonably

7   failed to take advantage of an opportunity to lessen the

8   damages, you should deny that plaintiff recovery for those

9   damages for which he or she could have avoided had he or she

10  taken advantage of the opportunity.

11                  You are the sole judge of whether each plaintiff

12  acted reasonably in avoiding or minimizing their damages.  An

13  injured plaintiff may not sit idly by when presented with an

14  opportunity to reduce the damages.  However, a plaintiff is not

15  required to exercise unreasonable efforts or incur unreasonable

16  expenses in mitigating the damages.  The defendants have the

17  burden of proving the damages which the plaintiff could have

18  mitigated.

19                  In deciding whether to reduce a plaintiff's

20  damages because of a failure to mitigate, you must weigh all

21  the evidence in light of the particular circumstances of the

22  case, using sound discretion in deciding whether the defendants

23  have satisfied their burden of proving that the plaintiff's

24  conduct was not reasonable.

25                  In deciding the damages to which a plaintiff may

1  be entitled if he or she have otherwise proven his or her claim

2  by a preponderance of the evidence, you may not consider or

3  award any attorney's fees which the plaintiff may be required

4  to pay as a result of this proceeding.

5            It is your sworn duty as jurors to discuss the

6  case with one another in an effort to reach agreement if you

7  can do so.  Each of you must decide the case for yourself, but

8  only after full consideration of the evidence with the other

9  members of the jury.  While you are discussing the case, do not

10  hesitate to re-examine your own opinion and change your mind if

11  you become convinced that you are wrong.  However, do not give

12  up your honest beliefs solely because the others think

13  differently or merely to finish this case.

14            Remember that in a very real way you are the

15  judges -- judges of the facts.  Your only interest is to seek

16  the truth from the evidence in the case.

17            When you retire to the jury room to deliberate,

18  you may take with you a copy of these instructions, as well as

19  the exhibits that the Court has admitted into evidence.  Select

20  your foreperson and conduct your deliberations.  If you recess

21  during your deliberations, follow all of the instructions that

22  I have given you concerning your conduct during the trial.

23            After you have reached your unanimous verdict,

24  your foreperson must fill in your answers to the written

25  questions and sign and date the verdict form.  Return this

1   charge, together with your written answers to the questions.

2   Unless I direct you otherwise, do not reveal your answers until

3   such time as you are discharged.  You must never disclose to

4   anyone, not even to me, your numerical division on any

5   particular question.

6                   I indicated that we had prepared a jury verdict

7   form.  I will now read the form to you.  You've seen portions

8   of it during closing arguments.  I'm going to read this to you.

9   At times when I read you the instructions, after each question,

10  it may sound confusing, but if you concentrate on answering

11  each question and moving to the next question pursuant to the

12  instructions, you will see that it makes sense.  But I'm going

13  to go ahead and read to you the jury verdict form.

14                  It says at the top the in re:  FEMA Trailer

15  Formaldehyde Product Liability Litigation, MDL-1873, Section

16  N-5.  This document is related to *Age, et. al. v. Gulf Stream*

17  *Coach, Inc., et al*, No. 09-2892.  That's the caption on the

18  case as it's been docketed here in the court.

19                  Jury verdict form.

20                  A.  Gulf Stream Coach, Inc., or Gulf Stream.

21                  1.  Do you find that the Gulf Stream trailer

22  occupied by Alana Alexander and Christopher Cooper was

23  unreasonably dangerous in its construction or composition?

24                  Yes or no.  Proceed to Question 2.

25                  2.  Do you find that the Gulf Stream trailer

1   occupied by Alexander and Cooper was unreasonably dangerous in
2   its design?
3                   Yes or no.  Proceed to Question 3.
4                   3.  Do you find that the Gulf Stream trailer
5   occupied by Alexander and Cooper was unreasonably dangerous
6   because of an adequate warning -- because an adequate warning
7   about the trailer was not provided?
8                   Yes or no.  If you answered any of the Question
9   Nos. 1, 2 or 3 "yes," proceed to Question 4.  If you answered
10  each and all of Question Nos. 1, 2 and 3 "no," proceed to Part
11  B, question 7.
12                  Question 4.  Do you find that any unreasonably
13  dangerous condition of the trailer existed at the time it left
14  Gulf Stream's control?
15                  Yes or no.  If you answered Question No. 4
16  "yes," proceed to Question 5.  If you answered Question No. 4
17  "no," proceed to Part B, Question 7.
18                  5.  Do you find that Christopher Cooper
19  sustained injury to which Gulf Stream substantially contributed
20  as a result of any unreasonably dangerous condition of the
21  trailer?
22                  Yes or no.  Proceed to Question 6.
23                  6.  Do you find that Alana Alexander sustained
24  injury to which Gulf Stream substantially contributed as a
25  result of any unreasonably dangerous condition of the trailer?

1              Yes or no.  Proceed to Question 7.

2              B.  Fluor Enterprises, Inc., or Fluor.

3              7.  Do you find that Fluor was negligent in

4     regard to its actions or inactions concerning the hauling

5     and/or installation of the trailer occupied by Alexander and

6     Cooper?

7              Yes or no.  If you answered Question No. 7

8     "yes," proceed to Question 8.  If you answered Question No. 7

9     "no," proceed to Part C, Question 10 without regard to the

10    parenthetical instructions between C and Question 10.

11             8.  Do you find that Christopher Cooper

12    sustained injury to which Fluor substantially contributed as a

13    result of the negligence of Fluor in its actions or inactions

14    concerning the hauling and/or installation of the trailer

15    occupied by Alexander and Cooper?

16             Yes or no.  Proceed to Question 9.

17             9.  Do you find that Alana Alexander sustained

18    injury as to which Fluor substantially contributed as a result

19    of the negligence of Fluor in its actions or inactions

20    concerning the hauling and/or installing of the trailer

21    occupied by Alexander and Cooper?

22             Yes or no.  Proceed to Part C, Question No. 10.

23             C.  Allocation of fault/damages, and there's an

24    instruction.

25             If you answered each and all of Question Nos. 5,

1  6, 8 and 9 "no," do not answer anymore questions.  Please sign

2  and date this jury verdict form and advise the court security

3  officer that you have reached a verdict.  Otherwise, proceed to

4  Question No. 10 if you answered Question Nos. 5 or 8 "yes," if

5  you answered both Question 5 and 8 "no," proceed to

6  Question 11.

7              10.  For Christopher Cooper, please allocate on

8  a percentage basis the degree of fault, if any, which you

9  attribute to each of the following parties and non-parties.

10  Please be careful to enter a "zero" or leave blank where you

11  have found no fault on the part of a party in your previous

12  answers.  All numerical percentages you enter in this question

13  should add up to a total of 100 percent.

14              Defendant Gulf Stream Coach, Inc., and there's a

15  blank with a percentage under it and there's an additional

16  instruction.

17              Defendant Fluor Enterprises, Inc., and there's a

18  blank which a percentage.

19              Plaintiff Alana Alexander, and there's a blank

20  with a percentage.

21              United States or FEMA, a blank with a

22  percentage.

23              And then person or entity other than defendants,

24  FEMA, or Alexander, which means maintenance contractor and/or

25  installer subcontractors only, and there's a blank with a

1    percentage.  And underneath that is the total of 100 percent.

2                    Proceed to Question No. 11 if you answered

3    Question No. 6 or 9 "yes".  If you answered both Questions 6

4    and 9 "no," proceed to Question 12 only if you answered

5    Question No. 10.  Otherwise, please sign and date this jury

6    verdict form and advise the court security officer that you've

7    reached a verdict.

8                    11.  For Alana Alexander, please allocate on a

9    percentage basis of degree of fault, if any, which you

10   attribute to each of the following parties and non-parties.

11   Please be careful to enter a "zero" or leave blank where you

12   have found no fault on the part of a party in your previous

13   answers.

14                    All numerical percentages you enter in this

15   question should add up to a total of 100 percent.  And then

16   there are the same identifications with blanks for the

17   percentage.

18                    Defendant Gulf Stream Coach, Inc., with a blank

19   and a percentage.

20                    Defendant Fluor Enterprises with a blank and a

21   percentage.

22                    Plaintiff Alana Alexander with a blank and a

23   percentage.

24                    The United States or FEMA, with a blank with a

25   percentage.

 1                    And a person or entity other than the

 2    defendants, FEMA, or Alexander, namely the maintenance

 3    contractor and/or installer subcontractors only, and there is a

 4    blank with a percentage and a 100 percent total.

 5                Proceed to Question 12.

 6                    12.  What amount of damages, if any, do you find

 7    should be awarded with respect to each of the following claims:

 8                    Past, present and future physical pain and

 9    suffering of Christopher Cooper and there's a blank with a

10    dollar sign.

11                    Past, present and future mental anguish and

12    emotional distress of Christopher Cooper, and there's a blank

13    with a dollar sign.

14                    Past, present and future medical expenses,

15    including medical monitoring, for Christopher Cooper, and

16    there's a blank with a dollar sign.

17                    Loss of impairment of life's pleasures for

18    Christopher Cooper, and a there's a blank with a dollar sign.

19                    Past, present and future mental and emotional

20    distress of Alana Alexander, and there's a blank with a dollar

21    sign.

22                    Loss of consortium for Alana Alexander, and

23    there's a blank with a dollar sign.

24                    There is a line for the date and a signature

25    line for the foreperson of the jury.

1            If you want to communicate with me at any time,

2    please give a written message to the -- well, it says "bailiff"

3    here, which is an old term.  It means CSO or the marshal, the

4    gentlemen who have been assisting you during the course of the

5    trial, who will then bring that note to me.  I will then

6    respond as promptly as possible, either in writing or by

7    meeting with you here in the courtroom.  I will always first

8    show the attorneys your question and my response before I

9    answer your question.

10           After you have reached a verdict, you are not

11   required to talk with anyone about the case unless I order you

12   to do so, and that would be under extraordinary circumstances

13   only.

14           I might also add that any notes that you have

15   taken during the course of this trial will be destroyed at the

16   conclusion of the trial and will not be made available to

17   anyone.

18           You may now retire to the jury room to conduct

19   you deliberations.

20           **THE DEPUTY CLERK:**  All rise.

21           (WHEREUPON, the jury exited the courtroom.)

22           **THE COURT:**  You maybe seated.

23           First thing's first.  Since we're going to be

24   sending into the jury room the instructions and the verdict

25   form, we want to make sure that we've got some corrections and

1    I have some things in that regard.

2                     Mr. Meunier, you're standing up.  Are you coming

3    to talk about that, or are you making other objections, or

4    errors that I made in the jury instructions?

5             **MR. MEUNIER:**  Judge, on that, I guess we'll be given

6    the chance on the record to state our objections.

7             **THE COURT:**  Sure.

8             **MR. MEUNIER:**  This has to do with something that,

9    frankly, we did not discuss, but which I believe may arise to

10   the level of something that requires correction, at least in

11   the written version that you send in.

12            **THE COURT:**  Okay.

13            **MR. MEUNIER:**  If I can refer the Court and counsel,

14   it's the language that is at Page 13, 14 and 15.  It's the

15   fourth and final element.  Every time you talk about the

16   requirements of the LPLA.

17            **THE COURT:**  Yes, sir.

18            **MR. MEUNIER:**  And remember, Judge, we're combining

19   Alana and Chris here.

20            **THE COURT:**  Right.

21            **MR. MEUNIER:**  The concern is two-fold.  Number one,

22   you make it a requirement that there be actual damage to the

23   person of each plaintiff.  The problem with the word "each,"

24   and I'm suggesting in the writing we can change this, that it

25   should be "the".  Because the problem is since they're

 1   combined, you're going to make, for example, Chris' recovery

 2   dependent on whether they find injury to his mom.

 3            **THE COURT:**  So what do you suggest on that?

 4            **MR. MEUNIER:**  I think the word "each" should be

 5   "the".  Since we're separately doing the percentage of fault

 6   allocation, I think it's necessary.

 7            **MR. WEINSTOCK:**  We agree, Your Honor.

 8            **MR. SHERBURNE:**  And I agree also.

 9            **MR. MEUNIER:**  Judge, the other concern I have is

10   this:  "Actual damage to the person" is not defined.  I'm going

11   to respectfully request that in subpart 4, every time you say

12   this, that we simply add this statement in each of the three

13   cases, because you do it for warning, design and composition.

14            And it would be:  Under the LPLA "actual damage

15   to the person," closed quote, of a plaintiff may include mental

16   as well as physical injury.

17            And the reason I say that, Your Honor, is

18   because, I think, Michael in closing even said something about,

19   Alana's not claiming injury to her person.

20            **THE COURT:**  Right.

21            **MR. MEUNIER:**  And that's a fair way for a lay person

22   to understand it.  But when they see this, they'll say, "Well,

23   wait a minute.  You know, Watts told us she's not even claiming

24   an injury to her person.

25            **THE COURT:**  Okay.  Counsel, is there any objection to

1    that change?

2         **MR. WEINSTOCK:**  No, Your Honor.

3         **THE COURT:**  I think that's accurate.  This did not

4    come up in the jury charge conference.  I appreciate you

5    bringing it to my attention now so we can get it right.

6         **MR. MEUNIER:**  Many eyes have been on it.

7         **THE COURT:**  Right.

8         **MR. MEUNIER:**  So it would be after subpart 4 which

9    occurs on Page 13, 14 and 15.  And in each case you'd follow

10   the sentence:  "There was actual damage to the person of the

11   plaintiff with:  "Under the LPLA, "actual damage to the person"

12   of a plaintiff may include mental as well as physical injury."

13        **MR. SCANDURRO:**  I think the only suggestion would be

14   that we don't need "under the LPLA."  I think that adds a gloss

15   to it that the statute is endorsing it.

16        **THE COURT:**  That's fine.

17        **MR. MEUNIER:**  That's fine.

18        **THE COURT:**  Make sure we get it to make that change.

19        **MR. MEUNIER:**  Thank you, Judge.

20        **THE COURT:**  Anything else before we get to objections

21   on what are substantive inclusions or exclusions, let me, first

22   of all, on the jury verdict form or Nos. 11 and 12 -- I'm

23   sorry -- 10 and 11.  I think we did discuss this last night,

24   but we should state on the fourth line there, party or

25   non-party.  No, no, I'm sorry.  We did discuss that last night.

1    I take that back.

2                    All right.  That's the only thing.  On the jury

3    verdict form, does anybody have anything else?

4                    All right.  In the jury instructions, and I'm

5    going to tell you about any possible thing I changed here, just

6    in case anybody's got a problem on it.  I ran into a few

7    things.  I think on the top of Page 9, we only had one

8    physician and yet it's plural here.

9                    It should be the testimony of the physician.  I

10   think I corrected it when I said it.

11            **MR WATTS:**  You did.

12            **THE COURT:**  Of a physician.

13            **MR. MEUNIER:**  You said "a physician".

14            **THE COURT:**  Right.  Who examines and treats.  We'll

15   make that correction.  That's on Page 9.  Page 15, under No. 2,

16   there's an extra "the" and there's an extra "to the" at the

17   bottom of Page 15.  We'll make that change.

18                    I think I said that part correctly.

19            **MR WATTS:**  You did.

20            **THE COURT:**  On Page 22, "and" should be "in" at the

21   end of the sentence on the bottom half of the page.  I think I

22   said that one correctly, although for purposes of sending it

23   in.  Page 23, bottom of the page, the third line up it should

24   be "has" to get the proper verb.

25                    Let's see what else we have here.  Page 28,

1    fourth line up it should be "product," which I also think I

2    caught there.  "Product from its planning stages".  Make that

3    change.

4                    Page 33, about a little more than half way down

5    there's a misspelling on "win".  There's an extra "N" there.

6                    Page 34, three lines up from the bottom, we need

7    to delete "you find them".  Well, let's see.  Well, actually,

8    delete "you find".  So it should read:  "Damages to the extent

9    you find that..."  We need to fix that.  I think I said it

10   correctly, but it's written -- there's something in here.

11   We've got a few extra words in here.

12                    To the extent that you find them to have been

13   proved by a preponderance of the evidence.  That's how it

14   should read.  "To the extent you find them to have been

15   proved."  It should say "proven," but...

16                    All right.  Page 35, I think we had discussed

17   reversing "his and her".  It's not a big deal, but a couple on

18   those.

19                    **MR. MEUNIER:**  Your Honor, while we're on Page 35 --

20                    **THE COURT:**  Yes.  I know what you're going to say.

21                    **MR. MEUNIER:**  In the calculation of future damages

22   you said:  "If you find that either of the plaintiffs are

23   reasonably certain."  Again, this is nothing we talked about,

24   but shouldn't that be "probable" or...

25                    **THE COURT:**  Say that again.

1          **MR. MEUNIER:**  "If you find that either of the

2   plaintiffs are reasonably certain to suffer damages in the

3   future."  I don't know if we covered this, but...

4          **MR WATTS:**  How about "reasonably likely".

5          **MR. MEUNIER:**  You used "reasonably likely" elsewhere

6   in here.

7          **THE COURT:**  Well, does anybody have any objection to

8   that change?  This was a pattern jury charge.

9          **MR. MEUNIER:**  I'm sorry.  We didn't talk about it in

10  chambers.

11         **THE COURT:**  No, that's okay.  It's not too late to

12  make the change on here.  I read the pattern charge and it was

13  all reviewed by counsel in advance of trial, and, actually,

14  again last night.

15         **MR. WEINSTOCK:**  Yes, Your Honor, without looking at

16  the pattern charges, I don't want to agree without seeing

17  what's behind it.

18         **THE COURT:**  Well, verify it.  If it's in the pattern

19  charge, I'd rather just stick with the pattern charge.  We can

20  pick on the people who prepared them later but...

21              Also, on there, there is on the bottom right

22  above Section C, table -- I scratched something out there.  Is

23  there an extra letter in there?  I'm sorry.  There's nothing on

24  the part that I just mentioned.

25              However, about five lines below "including

 1  future earnings" should be taken out, and I think I skipped
 2  that clause when I was reading it, so I caught that one.
 3            All right.  Page 43, we just have a couple of
 4  reversing "he and she's".  And that's all I have on the jury
 5  charges.
 6            Are there any other, whether they're typos or
 7  any other types of corrections on the jury charges in terms of
 8  sending them into the jury room, as read?
 9       **MR WATTS:**  Not by way of corrections, no.
10       **THE COURT:**  All right.
11                   **(OFF THE RECORD)**
12       **THE COURT:**  It is in the pattern charges, as we have
13  suspected of course, the issue about "certain," Mr. Meunier.
14  It's in the pattern charge, so we're good with that.  Thank
15  you.  All right.
16            I'm sorry, Mr. Sherburne, you wanted to...
17       **MR. SHERBURNE:**  Yes, Your Honor.  On the Page 14,
18  Line No. 4, there's an extra "to the" in that line also.  It
19  happened twice, not just once.
20       **THE COURT:**  Line No. 4 -- oh, item No. 4.  Yes,
21  you're correct.  I think I caught that one too.  Okay.
22  Anything else on the instructions as read?
23            All right.  Let's go ahead.  We'll make those
24  changes before we send them into the jury room, along with the
25  one modification on the jury verdict form, which is really a

1   spacing issue.

2               Let me at this time go ahead and invite any

3   objections to jury instructions by way of inclusion or

4   exclusion on the plaintiff's side.

5         **MR. MEUNIER:**  Your Honor, I believe -- just so I

6   understand, I believe under Rule 51, I'm supposed to request to

7   state the grounds for this to protect the record, but that

8   we're going to let the jury begin to deliberate because this

9   may take a while to state all of the objection.

10        **THE COURT:**  Yes, yes.  I have -- well, for the

11  record, let me --

12        **MR. MEUNIER:**  I need to request the opportunity to

13  state the grounds before they deliberate.

14        **THE COURT:**  Well, that's what I'm inviting at this

15  time.  We have discussed in the jury charge conference, which

16  was not on the record, the submitted jury instructions and the

17  Court has worked with counsel at a jury charge conference, both

18  prior to trial and again yesterday following the conclusion of

19  the evidence, as to the inclusion or exclusion of any

20  particular instructions.

21              So the Court at this time will allow those

22  counsel who have reserved the right to make such objections on

23  the record.  So, Mr. Meunier, you're correct, and now's the

24  time to do it.

25        **MR. MEUNIER:**  Your Honor, beginning with the verdict

 1   form, the plaintiffs respectfully object to the inclusion of a

 2   fault allocation percentage for FEMA in Questions 10 and 11.

 3   We don't believe there's any -- certainly not sufficient fault

 4   proven in this record on the part of FEMA.  It is the

 5   defendant's burden to present that evidence.  We don't think

 6   they've done it.

 7                We don't think they've demonstrated any causal

 8   relationship between any conceivable fault on the part of FEMA

 9   and FEMA and the harm of these plaintiffs.  So we object,

10   respectfully, to including a percentage fault allocation line

11   for FEMA on the verdict form.

12                We, likewise, object to the inclusion of a

13   percentage fault allocation line for maintenance contractors

14   and/or -- I think it's maintenance contractor, singular, or

15   installment subcontractors, plural, in Questions 10 and 11.

16                On this ground:  That the risk of harm that is

17   encompassed within Fluor's duty is the risk of improper

18   installation.  And so if we're now going to allow,

19   notwithstanding that duty, that risk of harm encompassed in

20   Fluor's duty to become the basis for a percentage allocation to

21   someone other than Fluor, then I think it's both duplicative

22   and legally inappropriate to reduce the plaintiffs' recovery by

23   allocated percentage fault to these other entities.

24                We also, just for the record, respectfully

25   object to there being two separate questions for the

1    comparative fault allocation among parties and non-parties for

2    each plaintiff.  Because we think the claims of Alana Alexander

3    and Chris Cooper are independent so as to make it both

4    illogical and inconsistent to have different percentage

5    allocations to the one and to the other.

6                    I think, unfortunately, it may invite, without

7    necessity, the possibility of an inconsistent verdict.  And for

8    that reason, for the record, we make an objection to that.

9                    As to the jury charges that the Court has given,

10   we respectfully object to the sophisticated purchaser/user

11   charge on three grounds.

12                   Number one, it was not pled with specificity as

13   an affirmative defense.  Number two, the case law cited in the

14   Court's instruction dealt with an employer/employee

15   relationship that existed between the sophisticated purchaser

16   and the user, and that's not the case here.  And we don't think

17   that charge has application to FEMA in this case.

18                   We respectfully object to the inclusion of all

19   charges dealing with government contractor defense.  We

20   respectfully submit to the Court that Gulf Stream has not

21   demonstrated in this case evidence to go to the jury on the

22   required evidence of government contractor defense.

23                   We're talking about formaldehyde.  There's no

24   government specificity as to that.  Therefore, there's no

25   conformance, so there's no specificity.  So the first two

1    elements are out.  And then on the third element, I don't think

2    there's any jury issue in this case as to the requirement they

3    would have to show that they had actual knowledge of a danger

4    which they then communicated to the government which didn't

5    know of the danger.

6               In fact, that's opposite to what -- most of what

7    they're saying about FEMA's knowledge.  So I just don't

8    think -- I think we've put government contractor defense in a

9    case where it doesn't below.

10              You rejected it as to Fluor.  I certainly think

11   if it's out as to Fluor, it needs to be out as to Gulf Stream.

12   And, therefore, that objection would extend to all of the

13   charges you gave related to the government contractor defense.

14              And then in the charge, of course, for the same

15   reason we mentioned, we object to the Court including a charge

16   for fault allocation to FEMA.

17              Beyond that, Judge, we would just, for the

18   record, object to the failure to give our requested charges 6,

19   dealing with there still being a defective product even when

20   the customer doesn't order an option.  There's evidence in this

21   case that FEMA may have failed to order an extra vent fan.

22   That charge should have been given, we think.

23              No. 8.  We object to the failure to give No. 8

24   because in the presence of a safe alternative design should be

25   given as an element of defective design, and that's simply

1   discussed as part of the state-of-the-art defense.

2                   We object to the failure to give plaintiffs'

3   requested charge No. 9 because there's evidence here that Gulf

4   Stream either may or may not have conformed to industry

5   standards.  And that's the charge that says:  "Conformance with

6   industry standards is not dispositive of an LPLA case."

7                   We object to the failure to give plaintiffs'

8   charge No. 13 because there's evidence here that Gulf Stream's

9   duty to warn specifically could and should have included a

10  warning as to proper use and ventilation of the trailer.

11                  We object to the Court's failure to give

12  plaintiffs' requested charge 14 because of the evidence in this

13  case that Gulf Stream knew of the extended use and environment

14  in which these trailers would be used, namely, in hot humid

15  weather for many months.  So that particular charge dealing

16  with case law on the anticipated environment and product's use

17  was, we think, appropriate for this case.

18                  We object to the failure to give plaintiffs'

19  charge No. 16, which is the charge and the case law that we

20  cited that the manufacturer's duty to warn is "continual".  And

21  we think it was important to have that word in dealing with the

22  duty to warn, because there is evidence in this case that it's

23  critically important that Gulf Stream learned of dangers

24  associated with this product after the product left its

25  control.

1          We object to the Court not giving plaintiffs'
2   charges 19 through 27.  Your Honor, you had ruled, I think on
3   motions before trial, that our seller claims against FEMA --
4   I'm sorry -- Gulf Stream were dismissed, that we could not say
5   that they were both manufacturer at fault and the seller of the
6   product.  We understand your ruling.  But, for the record, we
7   had submitted charges on Gulf Streams' fault as seller.  We
8   respectfully object to the exclusion of those charges.

9          Plaintiffs' charge No. 29 should have been
10  given.  We object to it not being given.  That simply makes it
11  clear to a jury that intentionality is not an element of
12  negligent fault.  We object to the Court not giving plaintiffs'
13  charge 32 -- strike that.  I withdraw that.

14         We object to the Court not giving plaintiffs'
15  charge No. 36, which is the Louisiana law that a defendant may
16  be held liable on a legal cause basis, even though it does not
17  foresee or predict the specific harm that was incurred.  And we
18  think that would have been appropriate in this case to give
19  that charge.

20         We respectfully object to the failure to give
21  charge No. 44, which we think a more appropriate statement of
22  the law regarding the aggravation of a pre-existing condition
23  than the one given by Court.

24         And then, Judge, you've heard us -- me -- object
25  to the failure to give charges 59 and 60, dealing with gross

 1   fault.  I will just say for the record, to me it's not a

 2   question of whether there is or isn't evidence of gross fault

 3   on the part of the FEMA.  We don't think there's evidence of

 4   gross fault.

 5                    The question is:  Is there evidence that FEMA

 6   made its property available to shelter storm victims?  That's

 7   the question.  That's the question.  And if there's evidence in

 8   this case that they did, then the jury has to be told about

 9   gross fault.  We don't think there's any evidence of gross

10   fault.  We don't think the answer is zero.

11                    But the question is not whether there's evidence

12   of gross fault.  The question is whether there's evidence that

13   they made the property available to shelter storm victims, and

14   there's evidence clearly of that.

15                    And so we, again, not for the first time,

16   respectfully object to not giving plaintiffs' charges 59 and

17   60, which was the gross fault statute as to FEMA and the

18   definition of gross fault.

19                    Thank you, Judge.

20              **THE COURT:**  Sure.

21              **MR. MEUNIER:**  Your Honor, I thought I had covered

22   sophisticated purchaser...

23              **MR WATTS:**  Andy's saying you did as well.  Maybe I

24   just didn't hear it.

25              **MR. MEUNIER:**  So we're covered on that.  There is one

1   final item, Judge, and that is we respectfully object to the

2   failure of the Court to give the jury appropriate instructions

3   about the fault of Fluor based on its negligent maintenance of

4   the trailer.

5           Thank you, sir.

6           **THE COURT:**  All right.  Thank you.

7           I don't think we need to have any argument on

8   these at this time because we hammered on this quite a bit, and

9   a lot of what Mr. Meunier put on the record to preserve was the

10  subject either of pretrial motion practice, ruling, or the

11  results of our discussions on the Rule 50 motions, or part of

12  the jury charge conferences that we have held in this case, and

13  the Court will overrule those objections, but they are so noted

14  for the record.

15          Mr. Weinstock?  Or Mr. Scandurro?  May I ask

16  you -- as handsome as Mr. Meunier's profile is, would you turn

17  that thing this way so I feel like I'm a party to this

18  conversation?

19          **MR WATTS:**  I felt like I was the judge there for a

20  minute.

21          **MR. MEUNIER:**  I needed to talk to that jury, Judge.

22          **MR. SCANDURRO:**  We'll be very brief, Your Honor.  We

23  have no comments on jury verdict form in its present form.  And

24  our only comment on the jury instructions that the Court has

25  given relates to the continuing duty to warn charge, and it's

1   not that it's an incorrect statement of the law, it's that in

2   the particular context of this case, it should not be given.

3               And the very brief ground for that is whatever

4   knowledge Gulf Stream acquired in the spring of 2006, which is

5   in evidence, clearly related solely and only to

6   post-Katrina-produced 2005 and 2006 travel trailers.

7               And it doesn't flow from that that there is a

8   duty to warn about a condition in a 2004 travel trailer,

9   especially when the evidence is undisputed that the 7,000 units

10  sold to FEMA for use in Florida did not produce any such

11  complaints.

12              In addition, and on the same subject matter, the

13  evidence is undisputed that Gulf Stream went to FEMA a month

14  before Ms. Alexander moved into her trailer, had a discussion

15  with FEMA about the formaldehyde issue, and then subsequently

16  in Exhibit 46, which is in evidence, gave to FEMA ventilation

17  instructions and a health notice for FEMA's inclusion in the

18  packets it was presenting to residents.

19              This was done before Ms. Alexander moved in, and

20  it was the only feasible means for Gulf Stream to get a warning

21  out based on the information that it received.  As Your Honor

22  is aware, under the Privacy Act, that we have a lot of

23  experience with with Mr. Miller, none of us really know, and

24  certainly Gulf Stream was unable to know, Ms. Alexander's

25  specific existence and how to reach her.

1        So that's our objection to that.

2        **THE COURT:**  All right.  Thank you.  I will overrule

3   that, again, for the reasons that have been cited at the jury

4   charge conferences and reasons that I've cited with regard to

5   the Rule 50 rulings on the record.

6            Mr. Sherburne?

7        **MR. SHERBURNE:**  Yes, Your Honor?

8        **THE COURT:**  Do you want to address the Court on

9   Fluor's behalf?

10       **MR. SHERBURNE:**  Your Honor, I regret I can't be quite

11  as concise as Mr. Scandurro was.

12            Your Honor, Fluor has seven charges which it

13  wishes to discuss with the Court.  The first being the fact

14  that the Court -- and we understand the Court's ruling on the

15  Rule 50 motion concerning Fluor's government contractor

16  defense.  We objected to at the time.  We know that the Court

17  did not give a government contractor defense charge to the jury

18  as to Fluor's conduct.  We object to that charge to make sure

19  that we preserve our rights to object to the Rule 50 ruling.

20            Secondly, Your Honor, in regard to the

21  independent contractor defense that the court read to the jury

22  which is on Pages 26 and 27 of the charge, that charge

23  developed over time from a request by Fluor, I believe, at the

24  original pretrial conference some weeks ago through yesterday

25  when we went into the jury charge conference, there was a

1    proposed charge from the Court.

2                    And at the jury charge conference, and I believe

3    it was Mr. Meunier, requested the addition of a sentence to the

4    end of the charge.  The charge as we went into the jury

5    conference was acceptable to Fluor.  The addition of that

6    sentence which reads:  "This rule is subject to an exception if

7    Fluor reserved the right to supervise or control the work of

8    the independent contractor or gave express or implied

9    authorization to unsafe practice."

10                   We object to and we believe it is not supported

11   by the law.  And I have a charge which I will proffer along

12   with several others to the Court that we believe would have

13   been a correct statement in that respect, Your Honor.

14                   Secondly, Your Honor, the Court in the jury

15   verdict form in Questions 10 and 11 require that the fault

16   proportion add up to 100 percent.  There's a clear instruction

17   in the document that requires all numerical percentages you

18   enter into this question should add up to a total of 100

19   percent.

20                   Your Honor, as we raised at the jury charge

21   conference yesterday, and I point out at this point, that

22   requirement in the verdict form is somewhat in tension with

23   Louisiana law, which recognizes that sometimes, as I think my

24   colleague yesterday said at some point, accidents do happen and

25   they're not anybody's fault.

1             And the Court in its charge in two different

2    places creates a tension.  On Page 11 the Court charged the

3    jury that:  "The mere fact that an incident happens or an

4    injury occurs does not raise a presumption that any party,

5    person, or entity was at fault."

6             And on Page 25, the Court charged the jury that:

7    "Louisiana law requires that you divide the total

8    responsibility for this incident among all those at fault."

9             Those two statements are clearly in some tension

10   and that tension is resolved in a verdict form in favor of

11   requiring 100 percent fault allocation, thus obviating the

12   instruction on page 11.

13             I know that yesterday in our jury charge

14   conference, the Court was not receptive to that.

15             **THE COURT:**  Well, it seems to me that they're going

16   to answer the questions with regards to liability or not.  And

17   we do have a series of instructions thereafter regarding which

18   questions to answer and which ones not to answer.  And if there

19   is no liability, then it can't be apportioned.

20             **MR. SHERBURNE:**  I understand.

21             **MR. WEINSTOCK:**  Can I step out one minute, Your

22   Honor?

23             **THE COURT:**  Yes.  Oh, wait.  I thought he said he

24   wanted to talk to Mr. Sherburne for a minute.

25             **MR. SHERBURNE:**  Your Honor, lastly on July 8th, Fluor

1    filed a number of charges, and I'm not here to suggest that

2    each and every one of them should have been given by the Court,

3    but there are five particular ones.  As Mr. Meunier urged some

4    additional charges, we, too, urge some additional charges.

5                    There was a proposed instruction on causation,

6    which was Page 17 of 23 of Record Document 2100.  I have copies

7    for the Court.  There was a proposed alternate instruction on

8    causation way was Page 19 of 23 of Record Document 2100.  I

9    regret we didn't number these.  I wish we had now in hindsight.

10                   There was a proposed instruction on the

11   prescription defense.  I would note that Fluor did assert

12   prescription.  The Court has ruled on it pretrial on a summary

13   judgment motion.  We believe that we need to make that

14   objection to preserve it.  That was Page 21 of 23 of Record

15   Document 2100.

16                   There was a proposed instruction on Fluor's

17   revised -- Louisiana Revised Statutes 9:2771 defense, that it

18   was a contractor defense, that was Page 16 of 23 of Record

19   Document 2100.

20                   And there were two proposed instructions on

21   negligence which were Page 13 and 14 of Record Document 2100.

22   I would tender all of those charges to the Court at this time

23   and note our objections to the charges given as a result.

24           THE COURT:  Okay.  We will make those part of the

25   record.  But let me ask you this to make sure that they get in

1   the record, when Ms. Radosta gets here, she's the official
2   record keeping lady in this trial, so you need to make certain
3   that she gets them.
4           For the reasons that the Court stated, again, in
5   both pretrial motion practice, as well as the Rule 50 practice,
6   and the jury charge conference, the motion is denied.  I should
7   say, the objections are excluded.
8           Let me also ask you-all to -- and you should
9   have already done this, because I know that she's been
10  pestering you, Ms. Radosta has got to have all of the exhibits,
11  inclusive of admitted exhibits and excluding any exhibits or
12  other extraneous material that is not going to be in the court
13  record in order that the jury may review only the exhibits that
14  have been admitted in this trial.
15          She also has a certification for you-all to sign
16  that, in fact, you have double-checked that and verified that
17  to be the case.  So if you would -- have you-all done that?
18          **MR. BUZBEE:**  We've done that.
19          **MR. WEINSTOCK:**  We've done that, Your Honor.
20          **THE COURT:**  She's quick.  All right.  Anything else
21  we need to put on the record at this time, Counsel?
22          **MR WATTS:**  Not at this time, Your Honor.
23          **THE COURT:**  All right.  Thank you-all.  Excellent
24  work.  If we hear anything, we'll let you know.  If you leave
25  this area outside of the courtroom here, please make sure that

1   we have contact information for you in case we get a note or,

2   obviously, a verdict, we need to have a way to get you.

3            **MR. MEUNIER:**  We should tell Amanda, we'll be down at

4   the attorney conference.  We should tell Amanda that.

5            **THE COURT:**  I'll know that.  I'll know that.

6            (WHEREUPON, the Court took a recess.)

7            **THE DEPUTY CLERK:**  All rise.

8            (WHEREUPON, the jury entered the courtroom.)

9            **THE COURT:**  You may be seated.

10           Ladies and gentlemen of the jury, I understand

11  that you have reached a verdict.  Mr. Smallwood, obviously, by

12  the way you're seated here, you're the foreperson of the jury?

13           **THE FOREPERSON:**  Yes, sir.

14           **THE COURT:**  Okay.  If you would hand that to the

15  courtroom deputy.

16                        **(COMPLIES.)**

17           **THE DEPUTY CLERK:**  Thank you.

18           **THE COURT:**  Thank you.

19           I'm going to go ahead and read through the jury

20  verdict form.

21           No. 1.  A.  Gulf Stream Coach, Inc.  Do you find

22  that the Gulf Stream trailer occupied by Alana Alexander and

23  Christopher Cooper was unreasonably dangerous in its

24  construction and composition?

25           Answer:  No.

1               No. 2.  Do you find that the Gulf Stream trailer
2     occupied by Alexander and Cooper was unreasonably dangerous in
3     its design?
4               Answer:  No.
5               3.  Do you find that the Gulf Stream trailer
6     occupied by Alexander and Cooper was unreasonably dangerous
7     because of an adequate warning -- because an adequate warning
8     about the trailer was not provided?
9               No.
10              Question 7.  Do you find that Fluor was
11    negligent in regard to its actions or inactions concerning the
12    hauling and/or installing of the trailer occupied by Alexander
13    and Cooper?
14              No.
15              And then the jury verdict form is signed by the
16    jury foreperson, Mr. Smallwood.  It's dated September 24th,
17    2009.
18              Would anyone like to poll the jury on this?
19          **MR. MEUNIER:**  Yes, Your Honor.
20          **MR. WEINSTOCK:**  I would waive.
21          **THE COURT:**  All right.  I'll the courtroom deputy to
22    poll the jury.
23          **THE DEPUTY CLERK:**  Ms. Aucoin, is this your verdict?
24          **THE JUROR:**  Yes.
25          **THE DEPUTY CLERK:**  Ms. Robichaux, is this your

1   verdict?

2           **THE JUROR:**  Yes.

3           **THE DEPUTY CLERK:**  Mr. Wetzel, is this your verdict?

4           **THE JUROR:**  Yes.

5           **THE DEPUTY CLERK:**  Mr. Naquin, is this your verdict?

6           **THE JUROR:**  Yes.

7           **THE DEPUTY CLERK:**  Ms. Bourg, is this your verdict?

8           **THE JUROR:**  Yes.

9           **THE DEPUTY CLERK:**  Mr. Pierce, is this your verdict?

10           **THE JUROR:**  Yes.

11           **MR. BUZBEE:**  Mr. Smallwood, is this your verdict?

12           **THE JUROR:**  Yes.

13           **THE DEPUTY CLERK:**  And, Mr. Bacchus, is this your

14   verdict?

15           **THE JUROR:**  Yes.

16           **THE DEPUTY CLERK:**  The jury's been polled and they've

17   all answered in the affirmative.

18           **THE COURT:**  All right.  We'll let the jury's verdict

19   be the judgment of the court.  I do have a few other things

20   that I want to cover with you-all before we let you go from

21   your jury service.

22               First of all, I want to comment on the trial of

23   the case.  I thought the lawyers in this case did an

24   outstanding job in terms of preparation, and I think that was

25   very evident in what you saw in court.  They did an outstanding

1    job in preparation, as well as in their presentation.

2                    I strongly urged them before trial to be very

3    efficient in how they presented the case to you and not have

4    downtime where we were wasting time.  We value your time very,

5    very much.  And I think they very much took that advice in the

6    course of their preparations and it showed in their

7    presentations.  They all did an excellent job.  And I would

8    like to state on the record, not only that, but also to thank

9    them for the hard work that they put into this.

10                   And it should be obvious to those of you -- I

11   know many of you have never been on a jury before -- but it

12   should be obvious to you, unlike television shows and movies

13   where they hear about a case and then 20 minutes later in the

14   program, they're suddenly in court trying the case.  It doesn't

15   work like that.  These lawyers, I gave them some very stringent

16   time limits to do things to prepare this case, and it was very

17   difficult for them and all of their associates and people

18   working on their respective teams to meet those deadlines.  So

19   I know they worked very, very hard in that regard.

20                   But you should realize now that this is no small

21   undertaking to present a case to a jury.  So we appreciate your

22   attention and your ability to sit and try to understand

23   everything that's been presented to you.

24                   The other people that I want to thank here,

25   first of all, are our CSOs, and we've had a few of them up

1   here, who did an excellent job, and they always do, to keep

2   track of you-all, and your needs, and try to make sure that

3   you-all are where you need to be, and everything that --

4   questions you may have, the time that you be spent with us that

5   you-all were treated right.

6              Of course, I'll thank the people down in the

7   jury room.  You-all came in and filled out questionnaires

8   several weeks ago, that you may not have known it at the time,

9   but were related to this trial.  So I know that they did a lot

10  of work downstairs to get you here, up to the point where you

11  had been selected to hear this case.

12             Of course, Cathy Pepper and Jodi Simcox, our

13  court reporters here with blazing fingers, who have been able

14  to keep track of everything that's been said in the courtroom.

15  And Amanda Ballay, my law clerk, who's put in a lot of time.

16  Pam Radosta and Tonya Lee, who have been courtroom deputies

17  during the course of this trial.

18             There's another gentleman who I would like to

19  mention who you did not see during the course of the trial, and

20  the reason you didn't see him is because he did his job so well

21  that we did not have to call him, and that's Steve Munster, who

22  works on the first floor.

23             All of this equipment that the attorneys used

24  very effectively over the last week and a half was recently

25  installed.  In fact, this is -- I hope it wasn't too obvious

1   for us -- but this was the first time that we have been able to

2   use the equipment here in the courtroom, and it was used

3   flawlessly by the attorneys.

4               That's really a testament to Steve Munster and

5   some of our people technical people here in the court who spent

6   a lot of time installing all of this equipment; and I'm happy

7   to say that it worked flawlessly and, hopefully, you've gotten

8   the benefit of that in terms of making the presentation of the

9   case to you.

10              I want to talk to you about jury service.  It's

11  something that I get kind of excited about this, so you'll have

12  to forgive me.  But it's really important that you serve on

13  juries.  And, look, you-all came up here Monday a week ago and

14  probably -- and you don't have to confess this -- but probably

15  all of you thought, "Gee, I hope I don't get picked."

16              And I understand that.  That's the natural

17  inclination.  You have things to do.  You have jobs.  You may

18  have families that need you, maybe if you have a sick child, or

19  maybe an elderly person that depends on you.  We understand

20  that there's never a good time to serve on a jury because you

21  have your life and this disrupts that routine in a very

22  significant way.

23              But jury service is so important, and the

24  attorneys mentioned this to you at the outset, and I think even

25  in closing arguments it came up.  It, aside from voting, is

1    probably is the most important civic responsibility that you

2    have as citizens.

3                And the reason for that is when there's a

4    dispute, or in a criminal case when there's an accusation made

5    against somebody, we in this country don't allow that to be

6    resolved by some bureaucrat somewhere, or somebody who the

7    public can't trust, or, worse yet, by resolving a dispute

8    through violent measures, or through other unseemly tactics.

9                What we do is what we did here.  We summon

10   regular citizens.  None of you-all knew each other before this

11   case.  None of you-all knew any of the people in this case, any

12   of the attorneys here, you didn't know me, and you came with

13   open minds to hear the evidence and to try to decide this case

14   based upon the evidence as I instructed you as to the law.

15               And people underestimate the beauty of that, and

16   the need for it, and what the country would be like if we

17   didn't have people sit on juries and on grand juries in state

18   and federal court.  I'm very passionate about it.  I think we

19   should have more juries.  We don't have enough jury trials in

20   this country.

21               And the beauty of it is that we let citizens

22   from every walk of life participate in a very, very meaningful,

23   serious way in how cases and disputes are decided and how

24   things are resolved, and that's very important.

25               So if you have neighbors, or friends, or your

1   spouse, or somebody in the near future is going to tell you, "I

2   got one of those doggone jury summonses," and, "Do I really

3   have to go?" and "Do you know anybody that can get me out of

4   this?"  I hope -- I hope -- that you will tell them how

5   important it is and that, based on your experience -- we'll

6   talk about this in a minute too -- that based on your

7   experience that it wasn't the most horrible thing you've ever

8   done.

9            That, in fact, jury service can be very much of

10   a learning experience, and perhaps even an enjoyable experience

11   to come in and listen to some well prepared lawyers talk about

12   a very important case.

13            And to me every case is important.  Maybe this

14   case, because there are others like it around, maybe this case

15   is important for that reason.  But, really, to the litigants,

16   to the parties, if this was just one case like this, it would

17   be just as important.

18            To the people involved, it's important.  And

19   it's critical that we have people like yourselves to show up

20   for jury service.  I myself got summoned to sit in state court

21   about a year ago, and gladly reported, and went through the

22   entire process, although I wasn't picked to sit -- it was a

23   criminal case in state court -- but I felt a great sense of

24   responsibility to be there.

25            And, like I said, it's one of the most critical,

1    important things you can do as a citizen is to respond to a
2    jury summons; and, if chosen, sit on the jury and take that
3    responsibility very seriously.
4                    Your conduct in the course of the trial has been
5    the subject of observation by me and by others, and I'm happy
6    to say that, at least in terms of my perception, you-all have
7    discharged that responsibility while you were here in the
8    courtroom in terms of paying attention, and trying to
9    understand what was going on in the courtroom, and what was
10   being told to you by the lawyers and the witnesses.
11                   We would like to know about your experience
12   here.  You will get a questionnaire from the folks downstairs.
13   You'll also get a certificate, of course, indicating that you
14   have served.
15                   But you'll get a questionnaire shortly and it
16   will ask you about your experiences here and allow you to make
17   comments about things we've done well here -- and when I say
18   "we," I mean everybody from the folks downstairs to those of us
19   who were here in court, including the attorneys, to the folks
20   who you dealt with, the CSOs.
21                   We want to know the good and the bad.  Because
22   those who come after you, maybe we can change things.  The
23   things you didn't like, we'll try to fix; and the things you
24   did like, we'll try to enhance.  But please be as candid as you
25   can possibly be about your jury experience.  We'd like to know

160

1    that.

2                    If it's something that you don't think you would

3    like to write down, please call me, or call Ms. Judice down in

4    the jury administrator's office.  If it's something about this

5    trial that I need to know, my number's in the book, and I

6    welcome all of your calls.  Or if you would like to meet with

7    me, personally, including today, about something, then I'm more

8    than happy to meet with you in chambers to discuss whatever, if

9    it's an issue or if it's a problem, whatever you have to say,

10   we are certainly interested in hearing.  And if at a later date

11   you think of something, again, call.

12                   There are some limitations on that:  Under no

13   circumstances -- I'm going to talk a little -- let me skip

14   ahead here and I'll come back to that.

15                   The attorneys in this case, and anyone else for

16   that matter, may have questions for you about what you thought

17   of the trial.  Sometimes attorneys like to get a critique about

18   what you thought of a certain witness, about what you thought

19   about a certain attorney, what you thought about certain parts

20   of their presentation, and sometimes they like to contact you

21   about that, which they're free to do.

22                   You, on the other hand, are free to tell them

23   that you do not wish to discuss the trial or anything else

24   about your jury service, and that's the end of it.  So if you

25   have a problem in that regard -- in other words, if somebody

1    contacts you after you have told them you do not wish to

2    discuss it, you need to let me know that and I will certainly

3    take care of it.

4               If you do choose to discuss your jury service

5    and the trial with anyone, you are not to discuss your

6    deliberations, what any juror said or didn't say, or what vote

7    you took, or however you did it in the jury room, you are not

8    no discuss that at all.  That's prohibited.  Even if you would

9    like to discuss it, the Court's order is that you do not

10   discuss what you covered in the jury room during the course of

11   your deliberations.

12              Even if the attorneys ask about it, you can

13   certainly cite me as being the meany that won't let you talk

14   about it.  So keep that in mind at all times, that no matter

15   who questions you about this case, you are not to discuss what

16   happens in the jury room.  And all that are here, I'm sure,

17   will not press you on that.  If, in fact, they were to contact

18   you at all, they won't press you on that.

19              I have a notice here, which I'll read to you

20   along those same lines.

21              It says:  "Notice to jurors.  This is a reminder

22   that you have absolutely no obligation to discuss anything

23   about this case with any member of the press or anyone else.

24              "If you do not want to talk to the press and you

25   are contacted by them, I recommend that you immediately and

1  clearly advise the caller that you do not want to discuss
2  anything about the case with anyone.

3                    "If after so advising a member of the press, or
4  anyone else, you are further bothered or harassed by anyone
5  seeking a statement, please report that fact immediately to the
6  presiding judge who will take appropriate action.

7                    "This notice is also to remind you that if you
8  choose to discuss anything about your jury duty with anyone,
9  including the press, you are under no circumstances to discuss,
10  or in any way disclose, anything about the deliberative process
11  or the vote of any of your fellow jurors."

12                    So I don't know if I can possibly be any clearer
13  as to what the guidelines are.  Again, I want to thank you very
14  much for your time.  It's a tedious process at times.
15  Hopefully, you found this interesting.  But I want to thank you
16  again for all of your attention and your hard work over the
17  last week and a half and we do appreciate you being here.

18                    Counsel, is there anything that you would like
19  to cover before we release the jury?

20              **MR. MEUNIER:**  No, Your Honor.

21              **MR. WEINSTOCK:**  Your Honor, I would like to say
22  again, as I said twice on closing, thank you so much for your
23  time, your patience and attention.  It was unbelievable.

24                    Thank you, Your Honor.

25              **THE COURT:**  Thank you.

 1                And with that, we will go ahead and discharge
 2   you from your jury responsibilities.
 3                **THE DEPUTY CLERK:**  All rise.
 4                (WHEREUPON, the jury exited the courtroom.)
 5                **THE COURT:**  All right.  You can be seated.
 6                With regard to the Rule 50 motion on behalf of
 7   Fluor, that's moot -- denied as moot.
 8                Mr. Weinstock, motion for mistrial?
 9                **MR. WEINSTOCK:**  It's withdrawn, Your Honor.
10                **THE COURT:**  Withdrawn.  I figured that.  All right.
11                **MR. MEUNIER:**  We oppose the withdrawal.
12                **THE COURT:**  At least I can mark one off on my little
13   list of things to do.
14                Counsel, is there anything at this point that we
15   need to cover on the record other than my continued thanks to
16   you-all?
17                **MR. MEUNIER:**  Just to give thanks back to the court
18   and its staff.  I know it was a difficult strain on everybody,
19   and on the system, and we appreciate the hard work that you-all
20   put into this.  We're grateful for that.
21                **THE COURT:**  Well, thank you-all.  That's what we're
22   here for, and we have enjoyed working with you-all.
23                I know that in the course of the MDL, this is
24   only the first step of what may be a long journey for those of
25   you who are here and have been here over the past week and a

 1    half.  This was the first of five scheduled bellwether trials
 2    and so it must be considered in that context.
 3                    So we are going to move on from here.  In fact,
 4    during the -- while the jury was deliberating, we were
 5    attempting to establish the date for the next status
 6    conference, both the meeting with the committees, as well as
 7    with all counsel.  We've tentatively tagged the date of Friday,
 8    October the 16th, and we will try to verify that that date is
 9    clear with as many people on the committees as possible, as
10    well as with liaison counsel.
11                    So at that time, I'm sure we will all do
12    post-mortems as to this case and consider what will be done
13    with regard to the December Bellwether No. 2.  And, as I said,
14    this case will be considered in the context of the other cases.
15                    So this experience, I think all counsel will
16    agree, counsel who tried this case, this experience has been a
17    good learning experience on how we will handle the subsequent
18    bellwethers.
19                    We've got one set in December, and I believe
20    another one in January, and then through, I think, May is the
21    last of the five that are set.  And, of course, once we get
22    closer to the end of the year, we will probably start
23    discussing whether there should be and, of course, we probably
24    will schedule a sixth and seventh.  At some time either during
25    the summer or early fall, we'll set a sixth and seventh

1  bellwether.

2             So we will go on from here.  I want to thank

3  you-all; and I said this in front of the jury, but I appreciate

4  all of the effort that was put in.  We had a lot of telephone

5  conferences, and we had a lot of stuff come up late, and I know

6  that you-all had three or four tracks of depositions going at a

7  time and that this was no easy undertaking.

8             And I do appreciate all of the work that you,

9  and your offices, your staff, have done over the past --

10  gee-whiz -- since we've started this journey.  It's been no

11  small undertaking.  It's been expensive.  It's been

12  time-consuming.  It's taken a lot of energy and emotion.

13            So I want to thank all of you-all for your

14  excellent work.  Mr. Watts and Mr. Buzbee, who are not here,

15  and Mr. Hilliard, but certainly I would extend that to them as

16  well.  And, Mr. Meunier, if you would do that, I would greatly

17  appreciate it.

18            Is there anything else, Counsel, that we need to

19  cover on the record at this time?

20         **MR. WEINSTOCK:**  No, Your Honor.

21         **THE COURT:**  All right.  Anything we need to cover off

22  the record at this time?

23                 **(OFF THE RECORD)**

24         **THE DEPUTY CLERK:**  All rise.

25         (WHEREUPON, the proceedings were concluded.)

1                              *****

2                          **CERTIFICATE**

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                              _S/ Jodi Simcox, RMR, FCRR_
                                Jodi Simcox, RMR, FCRR
12                              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25


                JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA