## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**In Re:  FEMA TRAILER**
**FORMALDEHYDE PRODUCTS**
**LIABILITY LITIGATION**


**ROZELLAR LEWIS**                                                    **PLAINTIFF**

**VS.**                           **CIVIL ACTION NO. 2:09-cv-08063-KDE-ALL**

**GULF STREAM COACH, INC.,**
**CH2M Hill CONSTRUCTORS, INC.,**
**BECHTEL NATIONAL, INC., and**
**THE UNITED STATES OF AMERICA**
**Through the FEDERAL EMERGENCY**
**MANAGEMENT AGENCY**                                    **DEFENDANT**


## SECOND AMENDED COMPLAINT AND SUPPLEMENTAL EXHIBIT
### JURY TRIAL REQUESTED

     **NOW INTO THE COURT** comes the Petitioner to amend his Complaint, and

file his Supplemental Exhibit "A" as ordered by the Court and to the following respects

would show, to wit:

1.    Plaintiff Rozellar Lewis is an adult citizen that resided in the state of Mississippi

during and after the destruction of Hurricane Katrina.  Plaintiff is part of the original

Complaint filed in the United States District Court, Southern District of Mississippi

Western Division and under Civil Action Number 09-6429, filed by Mark Brown, Sr., et

al v. Gulfstream Coach, Inc., et al.  The Plaintiff's information is provided in the

Supplemental Exhibit "A" attached.

2.    **Gulf Stream Coach, Inc.** is upon information and belief an Indiana corporate

entity which conducts business in the state of Mississippi and which manufactured and

supplied FEMA trailers or housing units as defined below pursuant to contracts with

FEMA for use in Mississippi.

3.      The Defendant **United States of America** is sued herein as acting through the **Federal Emergency management Agency (FEMA)**, and both are referred to interchangeably herein as the "Federal Government," "Government," and "FEMA."

4.      **CH2M Hill Constructors, Inc. ("CH2M"),** is a Delaware corporation with its principal place of business in Colorado, licensed to do business in the State of Mississippi an din good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

5.      **Bechtel National, Inc., ("Bechtel"),** is a Nevada corporation with its principal place of business in California, licensed to do business in the State of Mississippi an din good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita.

## JURISDICTION and VENUE

6.      This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C.§§1346 and 2671, *et seq*.

7.      Plaintiff alleges that he has suffered damages in an amount in excess of $75,000.00 exclusive of interest and court costs.

8.      Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendants with citizenship other than that of the

Plaintiff, because of diversity of citizenship and because of the amount in controversy exceeds, $75,000.00, exclusive of interest and costs.

9.      Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

10.     Defendants Gulf Stream Coach, CH2M and Bechtel are subject to the *in personam* jurisdiction of this Court because they do substantial business in the State of Mississippi and within this federal district, and were at all times relevant hereto engaged in commerce both in this federal district and in the State of Mississippi.  The remaining Manufacturing Defendants do substantial business in the State of Mississippi, and at all times relevant were hereto engaged in commerce within said State.

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391 as the emergency housing units were provided in the Southern District of Mississippi.  As well, the named Plaintiff's injuries occurred within the same.

## BACKGROUND

12.     On August 29, 2005 Hurricane Katrina stuck the Mississippi Gulf Coast, as a Category 4 hurricane.  Katrina's fury devastated many of the homes of Mississippi Citizens, including the home of the Plaintiff.

13.     After the hurricane, the Plaintiff resided in travel trailers (hereinafter referred to as "FEMA Trailers") that were provided by the Federal Emergency Management Agency ("FEMA") for "temporary" housing.  The specific FEMA Trailer in which the Plaintiff resided was manufactured by the Defendant named in paragraph 2, (hereinafter referred to as "Defendant Manufacturer").

3

14.     FEMA contracted to purchase approximately 120,000 of these FEMA Trailers from numerous private manufacturing companies who reportedly grossed over a billion dollars from the sale of these FEMA Trailers.  The named Defendant Manufacturer is one of these many manufactures and manufactured the specific trailer the in which the Plaintiff resided.

15.     Tragically, the rush by Defendant Manufacturer to pursue profit led to the Defendant Manufacturer producing and delivering unsafe and hazardous units.  Due to the fault of the Manufacturer Defendant, FEMA Trailers contain a high level of formaldehyde, a known carcinogen and toxic chemical.

16.     In order to manage the significant obligation of providing housing to the victims of Katrina, FEMA engaged CH2M and Bechtel to assist with many aspects of the project. Engaged through contracts, these two defendants (hereinafter referred to as "Contract Defendants" or "CH2M and Bechtel") were to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

17.     The Contract Defendants were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

18.     Under the terms of their contracts, the Contract Defendants were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same.  Further, under their contract with FEMA, the Contract Defendants were obligated to advise and instruct FEMA regarding

the implementation of those contracts.  The Contract Defendants failed to properly fulfill any and all tasks due to FEMA and the Plaintiff.

19.     The Plaintiff spent significant time in his FEMA Trailer, which was manufactured by the Defendant Manufacturer and supervised by the Contract Defendants and which exposed him to dangerously high concentrations of formaldehyde fumes.

20.     Although the Defendant Manufacturer knew or should have known of the health hazards inherent in the FEMA Trailers they were making, selling, distributing and delivering, the Defendant Manufacturer failed to inspect the trailers, failed to warn the Plaintiff of the deadly dangerous of formaldehyde, failed to design the trailers with any suitable or adequate ventilation and failed to construct the trailers with materials that would not emit hazardous levels of formaldehyde and/or failed to follow a proper manufacturing process that would serve to lower the amount of formaldehyde fumes in the FEMA Trailers.

21.     Defendant Manufacturer ignored and/or withheld vital information in order to sell their products and/or to avoid the costs necessary to ensure safety to their end user.  The FEMA Trailers provided have been and continue to be unsafe and present a clear and present danger to the health and well being of the Plaintiff, causing immediate and long term risk to their health.

22.     Formaldehyde is used in the manufacture of certain construction materials such as particle board and plywood, both of which are often used in the manufactured home industry.  There is no doubt that the Defendant Manufacturer had knowledge of the dangers that formaldehyde presented.  In fact, Defendant was required by federal law to display a "Health Notice" about exposure to formaldehyde which reads as follows:

IMPORTANT HEALTH NOTICE

  Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

  Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

  High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system. If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.
See 24 C.F.R. §3280.309.

23. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probably human carcinogen by the U.S. Environmental Protection Agency.

24. ASTDR, OSHA and NIOSH have all set limits on formaldehyde exposure for adults in the workplace, based on a forty hour work week. Specifically, OSHA reduced the acceptable amount of formaldehyde to which a worker can be exposed over an eight hour day from 3 parts per million (ppm) to 1ppm in 1987. By May of 1992, the limit was further reduced to only 0.75ppm.

25.     The Department of Housing and Urban Development ("HUD") regulates formaldehyde levels in certain construction materials, including the pressed wood products used in manufactured housing (such as those used by Defendant Manufacturer). Their regulation states that plywood "shall not emit formaldehyde in excess of 0.2 parts per million . . ."   Similarly, regulations require that particleboard materials shall not emit formaldehyde in excess of 0.3 ppm . . ." *See* 24 C.F.R. §3280.308.

26.     OSHA also requires medical monitoring for all employees exposed to a time-weighted average concentration of formaldehyde of 0.1 ppm or more.

27.     Knowing these facts, the Manufacturer Defendant provided trailers to the victims of Katrina (the Plaintiff included), each of which emit formaldehyde at a dangerously unhealthy rate in excess of any accepted level, and which have resulted and will continue to result in injury to the Plaintiff.

28.     FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act").   The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants:  financial assistance and direct services.  This aid is sometimes referred to as Section 408 Assistance.  This provision was enacted as Public Law 93-28, Title IV, §408 (1988).  Under the Stafford Act, at 42 U.S.A. §5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

29.     In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged CH2M and Bechtel with No-Bid contracts, eventually amounting to billions of dollars.  The Federal Government also relied on the expertise and knowledge of CH2M and Bechtel to provide information, advice and guidance on, among other things, the conversion of mobile trailers into adequate temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

30.     CH2M and Bechtel were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

31.     Under the terms of their No-Bid Contracts, CH2M and Bechtel were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufactures of the same.  Further, under their No-Bid Contracts with FEMA, they were obligated to advise, instruct and guide FEMA regarding the implementation of those contracts.  CH2M and Bechtel failed to properly fulfill any of these tasks.

32.     CH2M and Bechtel contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to the location that they were tasked with operating.  These new locations included staging areas to be managed and maintained as assigned to either CH2M or Bechtel or individual locations and addresses where CH2M and Bechtel assigned that temporary housing unit with obligations to manage, maintain and supervise it.

33.     To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, CH2M and Bechtel entered into numerous sub-contracts, but at all times they retained supervisory capacity and responsibility under their individual contracts with FEMA.

34.     CH2M and Bechtel were tasked under their FEMA contracts to identify and prepare the infrastructure for the various group site locations.  This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc.  CH2M and Bechtel knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

35.     Once the temporary housing unit was transported and delivered to its destination location, CH2M and Bechtel had the responsibility for installing that temporary housing unit.  CH2M and Bechtel installed the temporary housing unit by "blocking" the unit.  This meant raising the unit several feet into the air and off of its wheel base, and then setting it upon concrete blocks.

36.     By blocking the temporary housing unit, CH2M and Bechtel created stress and flexing on the frames of the unit as they were not designed to be lifted off of their wheel base.  In fact, the manufactures of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be "jacked" so that the vehicles weight was no longer supported by the wheels.

37.     This stress and flexing of the temporary housing unit's frame caused by CH2M and Bechtel's "blocking" of them with their weight off of the wheels created distortion in the travel trailer's shell, allowing increased moisture intrusion which, in turn, contributed to increased formaldehyde exposures.

38.     Once the CH2M and Bechtel had completed the transportation, delivery and installation of the FEMA Trailer, they were also tasked with inspecting the units to ensure they were safe and habitable, prior to occupancy by the victims of Hurricane Katrina.  The Contract Defendants failed to adequately inspect the FEMA Trailers to ensure that the units were safe and suitable for long-term occupancy by individuals and families displaced by Hurricane Katrina.  This failure to properly inspect the FEMA Trailers for unsafe and/or hazardous conditions directly contributed to the adverse health effects suffered by the hurricane victims.

39.     Contract Defendants were also responsible for the management, maintenance, repair and care of the FEMA Trailers.  The Contract Defendants failed to undertake appropriate action, maintenance or repair in response to the numerous complaints made by the Plaintiff about the condition of his FEMA Trailer and the various adverse health effects caused by exposure to elevated levels of formaldehyde.

40.     The Contract Defendants failed, at every stage of their involvement, to warn the Plaintiff of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde.

41.     The Federal Government has long been aware of the dangers of formaldehyde and had knowledge that this chemical is used in certain construction materials used in manufactured housing.  The Federal Government has regulated emissions standards for HUD-regulated mobile homes, has (since Katrina and Rita) adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over 30 years of the relationship between formaldehyde emissions in indoor environments and the severe health problems associated therewith.  *See* Statement of R. David Paulison,

Administrator, Federal Emergency Management Agency, Department of Homeland

Security, before the Committee on Oversight and Government Reform, U.S. House of

Representatives, July 19, 2007, *available at*

http://oversight.house.gov/documents/20070719131219.pdf.

42.     Although, as alleged above, FEMA had long been aware of the presence of

formaldehyde in certain manufactured housing construction materials, including the

housing units used for the hurricane refugees, and specifically was aware of the published

dangers associated with the gradual release into the atmosphere of formaldehyde, upon

information and belief, in March of 2006, a family in Mississippi reported the results of

independent testing and health complaints which they related to high levels of

formaldehyde exposure.

43.     In fact, the Federal Government was conducting initial formaldehyde air sampling

of subject housing units at FEMA staging facilities in Mississippi as early as October

2005 and as late as January of 2006.  The sampling results showed that the levels

detected in nearly every trailer exceeded the ATDSR minimum risk levels associated

with exposures up to and exceeding 14 days, that most levels exceeded the EPA

recognized level at which acute health effects can manifest, and that several exceeded the

OSHA workplace maximum levels.

44.     Nevertheless, even though the Federal Government was actively testing for and

aware of the dangerous conditions that formaldehyde presented in housing units

scheduled for delivery to Katrina and Rita refugees, the Federal Government continued to

supply the defective and dangerous housing units.

45.     Even after the Sierra Club publically announced the initiation of its own testing which resulted in demonstrating that the levels were above the threshold that the EPA warns can cause acute health effects in humans in over 83% of the trailers tested, the Federal Government continued to supply the defective and dangerous housing units.

46.     After their own tests revealed trailers with the presence of formaldehyde at twelve times the EPA's allowed value and even after they had been notified by numerous residents' concerns over formaldehyde emissions in their own housing units, the Federal Government continued to supply the defective and dangerous housing units.

47.     While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, *supra*, and Supplemental A (various emails *available at* http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails *available at* http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

48.     Even as Katrina refugees were being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of

formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

49.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, *supra*, and Exhibit R (various emails *available at* http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

50.     FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, *supra. See also* Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb. 1, 2007, *available at*

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_0507.pdf.

51.     This testing methodology did not simulate the living conditions, temperatures, humidity, standard ventilation practices, or timescales at which residents lived in the trailers. It also did not take into account that the trailer building materials continue to emit formaldehyde for four to five years. Union of Concerned Scientists, *supra*.

52.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation of the earlier testing of the housing units occupied by the Plaintiff supplied in the wake of the hurricanes in order to avoid legal liability for injuries to Named Plaintiff as a result of their exposure to formaldehyde. FEMA's activities, which included hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies, began immediately after FEMA began to receive complaints from trailer residents concerning formaldehyde fumes in 2006. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security, January 28, 2008.

53.     FEMA further manipulated the governmental testing by involving ATSDR to analyze the testing data, and explicitly sought to ensure that no long-term exposure considerations would be included in the health consultation by removing the consultation from the normal ATSDR review process so that scientists who had specifically recommended looking at long-term exposure effects were excluded from the review. FEMA did so in order to avoid negative publicity and legal liability in connection with the presence of formaldehyde in the housing units. *See* correspondence from U.S. House of Representatives, Committee on Science and Technology, to Michael Chertoff, January 28, 2008 and to Dr. Howard Frumkin,

Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

54.     FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern," a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. *See* THE SERIOUS PUBLIC HEALTH ISSUES RESULTING FROM FORMALDEHYDE EXPOSURES WITHIN FEMA TRAVEL TRAILERS ISSUED HURRICANE DISASTER VICTIMS, AND RECOMMENDED ACTION ITEMS, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, at 7, *available at* http://oversight.house.gov/documents/20070719102502.pdf.

55.     Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw… I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007 at 107-108 of the full hearing transcript, *available at* http://oversight.house.gov/documents/20071114164004.pdf.

56.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr.

Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February

Health Consultation was "possibly misleading and a threat to public health" for failure to

disclose the carcinogenic status of formaldehyde and that there are no safe exposure

levels.

57.     Despite this information, FEMA and the ATSDR did not revise the original

Health Consultation until October of 2007 to include the warning that the original

Health Consultation "did not sufficiently discuss the health implications of

formaldehyde exposure and included language that may have been unclear, leading to

potentially incorrect or inappropriate conclusions." *See* An Update and Revision of

ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA

TemporaryHousing Trailers; Baton Rouge, Louisiana, September-October, 2006,

*available at* http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

58.     The Federal Government, through FEMA, deliberately ignored and/or rejected

objective, scientific standards in the design and implementation of its testing procedures,

which resulted in the prolongation of the Plaintiff's exposure to dangerous levels of

formaldehyde in the housing units, and causing them serious injuries.

59.     It was not until December of 2007 that the Federal Government initiated testing of

occupied housing units. Apparently, FEMA requested the CDC to conduct testing of a

random sample of 519 housing units in Louisiana and Mississippi between December 21,

2007 and January 23, 2008, the stated purpose of which was to assess levels of

formaldehyde in indoor air occupied FEMA-supplied housing units. *See* Statement of

Howard Frumkin, M.D., DrPH, Director, National Center for Environmental

Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control

16

and Prevention, U. S. Department of Health and Human Services, CDC's RESPONSE TO HEALTH CONCERNS RELATED TO FEMA-PROVIDED TRAVEL TRAILERS AND MOBILE HOMES IN THE GULF COAST REGION, March 4, 2008, at 1, 3-4.

60.     The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under- represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments.  *Id.* at 4.

61.     The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA-provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

62.     As a result of this round of testing, the Federal Government implemented a

program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

63.     The Federal Government's actions with regard to this Plaintiff in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

64.     Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

### COUNT ONE:
### CAUSES OF ACTION AGAINST THE FEDERAL GOVERNMENT

65.     At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to the Named Plaintiff herein.

66.     The Federal Government was obligated to promptly warn the Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal

Government was aware.

67.     The Federal Government, after becoming aware of the potential for such harm, violated this duty to the Named Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

68.     As a direct and proximate result of the acts and omissions of the Federal Government, as well as its violations of state and federal laws, the Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

69.     Further, since the Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Plaintiff specifically plead the application of the doctrine of negligence *per se.*

70.     The Federal Government was negligent and at fault in the following non-exclusive particulars:

> a.  In failing to warn the Named Plaintiff of the unreasonably dangerous nature of the housing unit which that Plaintiff occupied
>
> b.  In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.
>
> c.  In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of the Named Plaintiff, on becoming aware of the formaldehyde danger associated with the unit.
>
> d.  Such other actions of negligence and fault as will be shown at the trial of this matter.

**COUNT TWO:**
**STRICT PRODUCT LIABILITY**
**MS CODE ANNOTATED §11-1-63**
**DEFECTIVE MANUFACTURING AND DESIGN**
**DEFENDANT MANUFACTURER**

71.     Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

72.     Manufacturing Defendant, at the time the subject FEMA Trailer left their control, knew or should have known that the products were defective because they deviated in a material way from manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

73.     The Manufacturing Defendants knew or should have known that the defective condition rendered the subject FEMA Trailers unreasonably dangerous to the user or consumer or others; and

74.     The defective and unreasonably dangerous condition of the product (the failure of the FEMA Trailers to be safely habitable without undue exposure to formaldehyde) proximately caused the damages and injuries sustained by Plaintiff.

75.     At the time the subject FEMA Trailers left control of the Defendant Manufacturer, the trailers did not contain properly selected prepared and installed components.

76.     At all relative times, Plaintiff lacked actual or constructive knowledge of the defective condition of the FEMA Trailers and that the said trailers were inconsistent with normal required safety standards.

77.     At all relative times, the Plaintiff did not appreciate the danger of the FEMA Trailers defective conditions.

78.     At all relative times, the Plaintiff did not deliberately nor voluntarily choose to expose themselves to this dangerous in such a manner to register assent to the continuance of the dangerous condition.

79.     The FEMA Trailers manufactured by the Manufacturer Defendant failed to function as expected as a result of their design characteristics.

80.     An alternative design existed (and was the industry standard) at the time the housing units left control of the Manufacturer Defendants which would not have impaired the products' usefulness or desirability.

81.     The alternative design would have to a reasonable probability prevented the toxic exposure of the Plaintiff.

**COUNT THREE:**
**MS CODE ANNOTATED §11-1-63**
**CONTRACT DEFENDANTS CH2M and BECHTEL**

82.     Plaintiff incorporate the above allegations as if fully repeated verbatim herein.

83.     The Contract Defendants, CH2M and Bechtel, at the time the FEMA Trailers left their control, knew or should have known the products were defective because they deviated in a material way from the manufacturers' warnings.

84.     The Contract Defendants, CH2M and Bechtel, by installing the temporary housing units on concrete blocks for extended occupancy, knowingly and intentionally modified the design and the actual use of the units.

85.     The Contract Defendants, CH2M and Bechtel, knew or should have known that the defective condition rendered the FEMA Trailer unreasonable dangerous to the Plaintiff and others.

86.     The defective and unreasonably dangerous conditions of the product, the failure of the FEMA Trailer to be safely habitable and free from hazardous levels of formaldehyde, proximately caused damages and injuries sustained by Plaintiff.

87.     At all relative times, the Plaintiff lacked actual or constructive knowledge of the defective condition of the products and that the defective products were inconsistent with their safety.

88.     At all relative times, the Plaintiff did not deliberately nor voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition

89.     An alternative installation procedure existed at the time the FEMA Trailers left control of the Contract Defendants which would not have impaired or negatively impacted the product's usefulness or desirability.  This design would have to a reasonable probability prevented increased toxic exposure to the Plaintiff.

**COUNT FOUR:**
**FAILURE TO WARN**
**DEFENDANT MANUFACTURER AND CONTRACT DEFENDANTS**

90.     Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

91.     The FEMA Trailers manufactured by the Defendant Manufacturer were defective in that they failed to provide or contain any adequate warnings or instructions.

92.     The Contract Defendants failed to warn the Plaintiff of the inherently dangerous properties of the foreseeable conditions of the FEMA Trailer when used for long term occupancy.

93.     The Contract Defendants failed to warn the Plaintiff of the presence of excessive levels of formaldehyde present in the FEMA Trailer they installed and supervised.

**COUNT FIVE:**
**BREACH OF EXPRESS WARRANTY**
**DEEFENDANT MANUFACTURER**

94.     Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

95.     The FEMA Trailers manufactured by the Defendant Manufacturer breached an express warranty and/or failed utterly to conform to other express factual representations upon which the claimant justifiably relied in electing to use these products.

**COUNT SIX:**
**BREACH OF IMPLIED WARRANTY**
**DEEFENDANT MANUFACTURER- CONTRACT DEFENDANT**

96.     Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

97.     The Defendant Manufacturer breached the implied warranty of habitability due to the Plaintiff.  These homes were manufactured with the expectation that the end user would be residing in the home for at least a period of eighteen months.  There is a clear implied warranty that such housing would be safe and free of any toxic dangers.

98.     The Contract Defendant breached the implied warranty of habitability due to the Plaintiff.  These homes were installed and maintained with an expectation of habitability and a clear implied warranty that such housing would be safe and free of any toxic dangers.

**COUNT SEVEN:**
**NEGLIGENCE**
**DEFENDANT MANUFACTURER**

99.     Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

100.    At all times relevant hereto, the Defendant Manufacturer was under a duty to use due care and caution for the safety of foreseeable users and occupants of the FEMA Trailer homes, including the Plaintiff:

(a)    In manufacturing, marketing, distributing, licensing, and selling the FEMA Trailer;

(b)    In observing and complying with the requirements of all applicable statutes, regulations, and ordinances;

(c)    In ensuring that the product met or exceeded industry standards and government standards; and

(d)    In alerting consumers and occupants of the defects in the mobile homes through a meaningful product recall or other notice of defects to the marketplace.

101.    In violation of said duties, the Defendant Manufacturers were negligent, reckless, and/or willful in the following:

(a)    The manufacturing, testing, marketing, distribution, licensing and sale of the FEMA Trailer which was defective and unreasonable dangerous for their foreseeable use because of excessive emissions of formaldehyde;

(b)    The failure to properly test the FEMA Trailers to properly evaluate their level of emissions of formaldehyde under foreseeable conditions for extended periods of time;

(c)    In manufacturing, advertising, marketing, distributing, and selling the FEMA Trailers to third-parties including, and without limit, government personnel and end users when the Manufacturer Defendant knew or should have known that the mobile homes were defective and unsuitable for use under the foreseeable conditions;

(d)    The failure to provide adequate and proper warnings to the occupants and end-users of the FEMA Trailers of the presence of excessive levels of emissions of formaldehyde and the hazards associated with the excessive levels of emissions of formaldehyde.

(e)    The failure to provide proper and adequate updates, information, and warnings to occupants and end-users, after the sale of the FEMA Trailers, of the hazards associated with the excessive levels of emissions of formaldehyde; and

(f)    The failure to properly hire, train and supervise individuals who, in turn, would inspect materials manufactured by vendors of wood products used in FEMA Trailers to ensure that such wood materials did not emit excessive levels of formaldehyde.

102.    As the direct and proximate result of the acts and/or omissions of the Defendant Manufacturer, the Plaintiff has suffered and will suffer injury and damages.

## COUNT EIGHT:
## NEGLIGENCE
## CONTRACT DEFENDANTS

103.    Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

104.    At all relevant times the Contract Defendants were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair of the FEMA Trailer, which caused the Plaintiff's injuries.

105.    The Contract Defendants owed a duty to the Plaintiff to provide, transport, install, inspect, maintain and repair safe FEMA Trailer units that did not emit hazardous levels of formaldehyde.

106.    The Contract Defendants breached their duty to the Plaintiff in failing to act reasonably in the provision, transportation, installation, maintenance and repair of the FEMA Trailer; specifically by:

>       (a)   Failing to sufficiently warn the Plaintiff of the inherently dangerous properties or the foreseeable conditions of the FEMA Trailers when used for long term occupancy;
>       (b)  Failing to adhere to the Defendant Manufacturer's warnings against jacking the FEMA Trailer off the wheel base by "blocking" the unit;

107.    The Contract Defendants' actions were the proximate cause of the increased exposure of formaldehyde to the Plaintiff.

## COMPENSATORY DAMAGES

108.    Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

109.    As a direct and proximate result of the Defendant Manufacturer and Contract Defendants' acts and omissions, Plaintiff have suffered and will continue to suffer damages in an amount in excess of the minimum jurisdictional limits of the court for past and future physical pain and mental suffering, past and future reasonable and necessary

medical expenses and monitoring, past and future physical impairments and disability, past and future loss of earning capacity, and past and future loss of enjoyment and quality of life and other damages and injuries set for above, including damages Plaintiff suffered from exposure to formaldehyde, a carcinogenic material.

110.    Plaintiff, as a direct and proximate result of the Defendant Manufacturer and Contract Defendants' negligence, malicious, fraudulent and intentional acts and omissions, and as a direct result of the other causes of action described above, have experienced and continue to experience severe mental pain, anguish and suffering directly attributable to the occurrence made the basis of this lawsuit and directly attributable to their injuries and the harm they have suffered.

111.    Plaintiff has suffered sizeable out-of-pocket expenses which include travel expenses, attorney's fees, costs of court, time from work and other expenses. Accordingly, Plaintiff seeks all general, special incidental and consequential damages as shall be proven at the time of trial, including exemplary, enhanced and trebled damages, pre-judgment interest, and post-judgment interest.

112.    As a result of the FEMA Trailers' component parts emitting excessive and dangerous levels of formaldehyde, the trailers are dangerous to any human health.

113.    The amount of total damages suffered by Plaintiff is significant and continuing in nature.  Plaintiff reserves the right to amend and state further with respect to his damages.

## PUNITIVE/EXEMPLARY DAMAGES

114.    Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

115.    Pursuant to Miss. Code Ann. §11-1-65, inasmuch as the conduct of the Defendant Manufacturer, Contract Defendants and the servant/employees of both entities constitutes

willful, wanton, egregious and reckless disregard for the rights, safety and welfare of the Plaintiff, an award of punitive damages in appropriate and necessary under the facts at hand.

116.   The Plaintiff respectfully demands a jury trial.

**WHEREFORE**, the Plaintiff prays that:

1.     The Plaintiff be awarded actual, consequential and punitive damages;

2.     The Defendant Manufacturer and Contract Defendants provide the Plaintiff with medical testing to determine the adverse effects of formaldehyde exposure and medical monitoring and surveillance;

3.     The Plaintiff be awarded his attorneys' fees, expenses and costs of this action;

4.     The Plaintiff be awarded prejudgment interest from the date of the filing of this Complaint, and any further relief, general or equitable, as the Court may deem appropriate;

THIS the 26th day of July, 2010.


   /s/ John Arthur Eaves, Jr.
JOHN ARTHUR EAVES, JR., ESQ.
ATTORNEY FOR PLAINTIFF

John Arthur Eaves, Jr., (MSB 8843)
Jon-Marc King (MSB 9736)
Shana D. Fondren (MSB 100762)
Anders Ferrington (MSB 102444)
**Eaves Law Offices**
101 North State Street
Jackson, MS 39201
Telephone:  (601)355-7961
Facsimile (601)355-0530