```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3      -----------------------------X

 4      IN RE: FEMA TRAILER           :   MDL NO. 1873

 5      FORMALDEHYDE PRODUCTS         :   SECTION "N"

 6      LIABILITY LITIGATION.         :   JUDGE ENGELHARDT

 7                                    :   MAGISTRATE CHASEZ

 8                                    :

 9      -----------------------------X

10                          Washington, D.C.

11                          Friday, October 16, 2009

12              Deposition of BELLANCE "FAYE" GREEN, a

13      witness herein, called for examination by counsel for

14      Plaintiffs in the above-entitled matter, pursuant to

15      notice, the witness being duly sworn by ANDREA P.

16      HUSTON, a Notary Public in and for the District of

17      Columbia, taken at the offices of Nelson Mullins

18      Riley & Scarborough LLP, 101 Constitution Avenue,

19      N.W., Washington, D.C., at 9:00 a.m., Friday, October

20      16, 2009, and the proceedings being taken down by

21      stenotype by ANDREA P. HUSTON, RPR, CRR, and

22      transcribed under her direction.
```

Page 70

1  are the main duties or responsibilities of the
2  applicant services for lack of a better term --
3  department?
4      A.  The primary function is they staff our
5  call center which means they answer calls for
6  registration or help line and they actually do the
7  case processing.
8      Q.  If an individual wanted to -- for example,
9  if I wanted to find out what my FEMA ID number is, I
10 had filed one during Hurricane Katrina but I can't
11 recall it and I made a call to the 1-800 number -- I
12 think it's 1-800-something, F-E-M-A, would that go
13 through the applicant services department, that
14 question?
15      MR. WALDRON:  Object to vagueness.  You
16 can answer.
17      THE WITNESS:  Staff and applicant services
18 section would be the ones to answer that particular
19 phone call and provide that assistance.
20 BY MR. WOODS:
21      Q.  And do you know at one point applicants
22 were able to call the 1-800 number to inquire about

Page 71

1  their FEMA ID number and then at some point that
2  ability was limited, mean that individuals who called
3  that number to inquire about their FEMA ID number and
4  then were told that such a request had to be made in
5  writing?
6          Do you have any information or are you
7  aware of that particular decision?
8      MR. WALDRON:  Objection.  Assumes facts
9  not in evidence.
10     THE WITNESS:  I'm not aware of that.
11 BY MR. WOODS:
12     Q.  So are you aware as you sit here today if
13 an individual called to inquire about their FEMA ID
14 number, is that information that they can still be
15 given over the telephone today?
16     A.  It can be, but in order to give that
17 information out, our agents are required to -- the
18 applicant has to have some information to provide to
19 the agent so that we can verify that we are giving
20 that information out to the proper person.
21         So, you can't just call up and say my name
22 is John Smith, what's my ID number?  So, there is a

Page 72

1  verification process to access the file and to give
2  that information out.
3      Q.  What verification information would you
4  need in order for that information to be given out?
5      A.  We would need either their Social, their
6  name, the damaged dwelling address, their current
7  mailing address, their damage telephone number, their
8  current telephone number.  So we would have to go
9  through and be able to verify all of that to access
10 the file and then provide that information.
11     Q.  All of this information would be required
12 before you would give someone that FEMA ID number?
13     A.  Yes.
14     Q.  Pretty funny.  I never had to do that to
15 get my own FEMA ID number.  I only had to give my
16 Social Security Number to get it.
17     MR. WALDRON:  Objection.  Assumes facts
18 not in evidence.
19 BY MR. WOODS:
20     Q.  So is that a recent change to the rules?
21     MR. WALDRON:  Same objection.
22     THE WITNESS:  It hasn't been a recent

Page 73

1  change and when we open up the file and you only gave
2  your Social, if they didn't verify your address and
3  your phone numbers then that would have been an error
4  on the part of the agent that you talked to, because
5  those have been our procedures for a number of years.
6  BY MR. WOODS:
7      Q.  Maybe I just got lucky that day.
8          If you would, on page 4 of your
9  declaration, paragraph 8.  This is discussing the
10 production and the creation and production of 4,791
11 IA files, the last sentence says:  "For this work to
12 be completed on such an expedited basis, a contractor
13 would need to be hired."
14         If you have 280 employees that are working
15 in applicant services, why would a contractor need to
16 be hired to produce this?
17     A.  We couldn't dedicate all 280 to this
18 function.  We have other responsibilities and
19 disaster can occur at any time and we would need to
20 dedicate all of our resources.  And from time to time
21 even the four or five people in the section are
22 dedicated to duties that have a higher priority, such

Page 74

1  as registration intake and answering help line calls.
2  So the whole 282, except for the four or five, they
3  still have specific duties separate from the records
4  management section.
5      Q.  And that's when and if a disaster were to
6  occur, those individuals tasked with --
7      A.  Do you mean the four or five?
8      Q.  No.
9      A.  The whole 282.  No, I mean those are the
10 duties they are currently performing now.  They are
11 staffing our call center and processing cases for
12 active disasters right now.
13     Q.  Okay.  I guess for completeness, I will
14 attach the declaration as Exhibit 2.
15         (Exhibit No. 2 was
16          marked for identification.)
17     MR. WOODS:  Ms. Green, I think I have
18 exhausted what I can possibly ask about this subject
19 at this time.  Thank you.
20     MR. WALDRON:  Do you mind if we take a
21 break?
22     (Recess 11:14 a.m.-11:21 a.m.)

Page 75

1      EXAMINATION BY COUNSEL FOR THE UNITED STATES
2  BY MR. WALDRON:
3      Q.  Before we begin the questioning for the
4  United States, I'm Jonathan Waldron, representing the
5  United States.  You stipulated that some of the
6  exhibits we are going to introduce here with
7  Ms. Green are going to be marked confidential,
8  because they contain Privacy Act information and we
9  will supply within a reasonable amount of time after
10 the deposition copies of those same exhibits with
11 Privacy Act information redacted, so that -- if
12 somebody else requests a copy that information isn't
13 released.
14         Good morning, Ms. Green?
15     A.  Good morning.
16     Q.  Could you please state your full name and
17 spell your last name for the record?
18     A.  Bell Lance R. Green G-R-E-E-N.
19     Q.  Do you go by another name?
20     A.  Yes, I'm also known as Faye Green.
21     Q.  Where do you reside?
22     A.  132 Farm Road, Aberdeen, Maryland, 20001.

Page 76

1      Q.  You understand that you are under oath
2  today and you are sworn to tell the full and complete
3  truth?
4      A.  Yes.
5      Q.  Ms. Green, are you familiar with how FEMA
6  produces documents referred as individual assistance
7  or IA files?
8      A.  Yes.
9      Q.  And do you understand that's why you are
10 testifying here today?
11     A.  Yes.
12     Q.  Let's discuss your employment a little
13 bit.  Who's your employer?
14         MR. WOODS:  I'm going to just object.
15 Because we have been through all of this on direct.
16 This is not for trial purposes.  I'm just going to
17 enter an objection, I don't see the reason for going
18 through the same questions over again.
19         MR. BAIN:  He has a right to go through
20 this like you did with your expert witnesses and in
21 case this witness can appear at trial.
22         MR. WOODS:  I don't see how Ms. Green

Page 77

1  would ever appear at trial but if you want to do it,
2  go for it.
3  BY MR. WALDRON:
4      Q.  Ms. Green, who is your employer?
5      A.  Federal Emergency Management Agency which
6  is part of the Department of Homeland Security.
7      Q.  Is there a subdivision where you work?
8      A.  Yes.  Maryland National Processing Service
9  Center.
10     Q.  Is there an acronym that shortens that?
11     A.  NPSC, NPSC.
12         MS. PETROVICH:  Jonathan, this is Lezly.
13 Can you have the witness speak up, please?
14         MR. WALDRON:  We will move the phone a
15 little closer and also if everyone else can mute
16 their lines, because we continue to receive feedback.
17 BY MR. WALDRON:
18     Q.  Ms. Green, what is the title of your
19 position?
20     A.  The title of my position is center
21 manager.
22     Q.  And are you responsible for supervising

Page 78

1  employees?
2      A.  Yes, I am.
3      Q.  About how many employees do you currently
4  supervise?
5      A.  Approximately 350.
6      Q.  And where is the NPSC located that you
7  work at?
8      A.  We are located in Hyattsville, Maryland.
9      Q.  And how many employees work at that
10 facility?
11     A.  350.
12     Q.  So you supervise every one of those
13 employees?
14     A.  Yes.
15     Q.  What are the primary functions that the
16 Hyattsville NPSC is responsible for?
17     A.  Our primary responsibilities are to take
18 registrations from disaster survivors, answer help
19 line calls, process cases for disaster assistance,
20 and we have a support section that includes our
21 administrative section.
22     Q.  How much of the time do the primary

Page 79

1  responsibilities take up of your staff?
2      A.  Well, of those that are assigned for
3  registration intake help line and processing,
4  100 percent of their time.
5      Q.  Are there any other NPSCs?
6      A.  There are two other NPSCs.
7      Q.  Where are they located?
8      A.  Winchester, Virginia, and Denton, Texas.
9      Q.  How are those facilities different from
10 the NPSC in Hyattsville?
11     A.  Each of the NPSCs have core functions of
12 registration intake, help line and case processing
13 and each NPSC has specific areas of expertise, so
14 they would also have their own areas of expertise
15 that aren't duplicated at the other NPSCs.
16     Q.  What area of expertise at the Hyattsville
17 facility does your center manager have?
18     A.  Records management, flood mapping and mail
19 operations.
20     Q.  Could you briefly describe what your
21 primary duties are as center manager?
22     A.  My primary duties are to supervise and

Page 80

1  manage the functions of our NPSC, supervise the
2  staff.
3      Q.  How does that repeat to individual
4  assistance files?
5      A.  I supervise the staff that actually
6  produces those files.
7      Q.  Now, where does the term individual
8  assistance file or IA file come from?
9      A.  It arises from the actual program which is
10 the individual assistance program, and the file would
11 include the information that comprises -- or related
12 to that particular program.  Related to the
13 applicant.
14     Q.  How are these files kept?
15     A.  They are all kept electronically within
16 our database.
17     Q.  What database would that be?
18     A.  It's called NEMIS, National Emergency
19 Management Information System.
20     Q.  How familiar are you with the NEMIS
21 system?
22     A.  I'm very familiar with it.

Page 81

1      Q.  How did you become familiar with it?
2      A.  Just from using it on a daily basis for
3  the last 11 years.
4      Q.  And so you have worked for FEMA for the
5  past 11 years?
6      A.  Yes.
7      Q.  Who uses NEMIS?
8      A.  A large group of folks use NEMIS but
9  within the individual assistance community would be
10 the staff at the NPSC, would be people in the field
11 at disaster recovery centers or disaster field
12 offices, is who would use NEMIS.
13     Q.  And what about non-FEMA employees, do they
14 have access to NEMIS?
15     A.  They don't.
16     Q.  And how specifically do FEMA employees
17 whether located in your facility or in the field use
18 NEMIS?
19     A.  On a daily basis.
20     Q.  What's the purpose of NEMIS?
21     A.  It's -- the purpose is to house
22 information related to the applicant's file, as well

Bellance "Faye" Green                                                October 16, 2009
Washington, DC

Page 82

1  as we use it to actual make the disaster assistance
2  eligibility determinations.  It stores information
3  about the file, how -- and any assistance that was
4  given to the applicant.  So it's used to store
5  information about the IA files.
6       Q.   Was NEMIS used in response to hurricanes
7  Katrina and Rita?
8       A.   Yes.
9       Q.   And was it used in the same way prior to
10 Katrina?
11      A.   Yes.
12      Q.   Do these, what are known as IA files, do
13 they exist in a paper form outside of the NEMIS
14 database?
15      A.   No, they don't.
16      Q.   What about in an electronic file folder
17 like most people have on their home computer, do they
18 exist in that type of format?
19      A.   No.
20      Q.   Why not?
21      A.   Well, I mean the system, you know, really
22 wasn't designed that way.  It was designed basically

Page 83

1  to track the processing of the file in terms of
2  eligibility determinations.  So the information
3  was -- is just only available electronically.
4       Q.   Can you simply open up a file in NEMIS and
5  print out all the information pretty quickly?
6       A.   No.
7       Q.   Why not?
8       A.   The way the information is contained in
9  NEMIS under various tabs, and so in order to extract
10 the information, it requires you to do screen prints
11 and use other software to actually generate all the
12 data that is contained about the file.
13      Q.   What are screen prints?
14      A.   Screen prints are just pulling up a tab or
15 pulling up information in NEMIS and hit the screen
16 print button, then opening up Microsoft Word and
17 pasting in a copy or -- like taking a picture of what
18 is in your screen and pasting it into Microsoft Word.
19      Q.   Are you saying that an IFL must manually
20 be assembled before it can be produced?
21      A.   Yes.
22      Q.   Is the reason that storing information

Page 84

1  within NEMIS the way it is stored would be more
2  advantageous than keeping it in a file folder, for
3  instance?
4       A.   It is more advantageous.
5       Q.   How so?
6       A.   Well, I will just compare it to pre-NEMIS
7  and we had actual hard copy files, and they are hard
8  to keep track of, you tend to lose pieces of the
9  file, pieces of paper, and basically it's only
10 available to the person who actually has the hard
11 copy file.  And an electronic file can be available
12 for people in various locations, the data's more
13 secure, and easily accessible.  So you are more
14 likely to have a complete file available at all
15 times.
16      Q.   So there is more consistency involved in
17 how data is organized in a database than simply in
18 file folders?
19      A.   Yes.
20      Q.   Ms. Green, I'm going to hand you what I am
21 marking as depo Exhibit 3.
22           (Green Exhibit No. 3 was

Page 85

1            marked for identification.)
2  BY MR. WALDRON:
3       Q.   Do you recognize the document I am handing
4  to you?
5       A.   Yes.
6       Q.   What type of document is that?
7       A.   It's an individual assistance file for an
8  applicant.
9       Q.   And how do you know which applicant that
10 is for?
11      A.   It's on the copy of the registration.
12      Q.   About how many pages is that particular IA
13 file?
14      A.   It looks like it's approximately 80 pages.
15      Q.   And --
16      A.   79 or 78 -- 77, looks like.
17      Q.   Can you tell me the name of the individual
18 whose IA file that is?
19      A.   Bobbie W-r-i-g-h-t.  Bobbie, B-o-b-b-i-e.
20      Q.   I'm looking at the first page.  Do you see
21 a stamp on that first page?
22      A.   Yes.

22 (Pages 82 to 85)

Page 130

1  stored in NEMIS.
2      Q.   So in order to print off -- somebody sends
3  in a letter that is say, 10 pages long and you wanted
4  to open up the incoming correspondence and print off
5  that document, you are telling me you have to pull up
6  each page separately and hit the print button ten
7  different times in order to get that information?
8      A.   Yes, it brings up all ten pages, but you
9  have to view Page 1, print, and view page 2, and
10 print it out.  So every page requires a different --
11 hitting the print button, for example.
12     Q.   So the size of a person's IA file really
13 does affect how long it will take to print out those
14 documents?
15     A.   Yes.
16     Q.   So after you physically print out these
17 documents, whether it be from the Word print screens
18 or from the comments report that is generated, what
19 happens then?
20     A.   Once we generate all the reports and the
21 screen prints, we, you know, print out, collate the
22 file, and if they have asked for it in some form

Page 131

1  other than hard copy and in this case -- for this
2  case we had to actually scan them into a PDF file and
3  save them to a CD.
4      Q.   So you assemble all the documents before
5  scanning them?
6      A.   Yeah, we verify that all of the pages
7  belong to the applicant, that we pull the file.  We
8  do a quick review of the file, assemble it in the
9  order that we put them in and then actually scan
10 them.
11     Q.   And how long does that whole process take?
12     A.   On average ten minutes.
13     Q.   So I think you said about ten minutes for
14 the contact, comments, inventory reports -- I'm
15 sorry, inspection reports; and 30 minutes on average
16 for the correspondence file and ten minutes on
17 average for the screen shots.  That adds up to
18 50 minutes, right?
19     A.   Yes.
20     Q.   And ten minutes or so to put it in a
21 produceable form?
22     A.   Yes.

Page 132

1      Q.   So that is where we get the hour that it
2  takes to produce each of these files?
3      A.   Yes.
4      Q.   And if a person had multiple IA files, say
5  one for Katrina and one for Rita, you would have to
6  undergo that process two times?
7      A.   Yes.
8      Q.   Has FEMA considered alternatives to this
9  process?  Let me step back for a minute.
10     Do FEMA employees generally need to print
11 out the documents within a person's IA file for their
12 own use?
13     A.   No.
14     Q.   Okay.  Has FEMA considered alternative
15 measures to be able to produce these files more
16 quickly?
17     A.   We have and we have been able to generate
18 some reports, for instance, the inspection report,
19 the contact comment report have been -- you know,
20 we've kind of generated reports that will give us
21 that information and prevent us from having to do the
22 screen prints, and we have looked at the others but

Page 133

1  we haven't really found a way, an efficient way to
2  print those out yet.  So --
3      Q.   What about would there be any problems if
4  third parties other than FEMA employees or a
5  contractor working with FEMA was given access to
6  these files to try to search for individual
7  applicants?
8      A.   Well, it's not an easy process to just
9  bring a contractor in to work on the process or the
10 project.
11     Q.   I'm saying a non-contractor, though.
12     A.   Other FEMA workers?
13     Q.   Non-FEMA employees.  If Plaintiff's
14 Counsel said let me bring my people in and we will
15 search for the files and do this process, would that
16 be a possibility?
17     A.   No.
18     Q.   Why not?
19     A.   Only people that have been -- I mean there
20 are requirements before we allow people to have
21 access obviously to the FEMA network or to any kind
22 of privacy information which would be our IA files.