**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

IN RE: FEMA TRAILER                        MDL NO. 07-1873
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION                       SECTION "N" (5)
                                           JUDGE ENGELHARDT
                                           MAG. JUDGE CHASEZ

THIS DOCUMENT RELATES TO:
ALL CASES ("Louisiana Plaintiffs")

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * ** * * * * *

**DEFENDANT UNITED STATES' STATEMENT OF FACTS IN SUPPORT OF ITS
MOTION TO DISMISS THE REMAINING FTCA CLAIMS OF ALL "LOUISIANA
PLAINTIFFS," OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendant, the United States of America, hereby submits the following statement of facts

in support of its motion.

<u>STATEMENT OF FACTS</u>

I.     **FEMA Chose to Provide Disaster Victims with EHUs Following Hurricanes Katrina
       and Rita.**

1.     Hurricane Katrina made landfall near the Mississippi-Louisiana border on August 29,

       2005.  Ex. 1, White House Rept. ("WHR") at 000013.  Hurricane Rita made landfall

       along the Texas-Louisiana border on September 24, 2005.  Ex. 2, Hurricane Rita Rept.

       ("HRR") at 000003, 11.

2.     In response to each disaster, the President of the United States, pursuant to the Stafford

       Act, authorized FEMA to respond and provide disaster assistance.  Ex. 3, Fed. Reg.

       Notices.  The Act provides that FEMA "may provide financial or other assistance . . . to

       respond to the disaster-related housing needs of individuals and households who are

       displaced from their predisaster primary residences or whose predisaster primary

residences are rendered uninhabitable . . . as a result of damage caused by a major

disaster." 42 U.S.C. § 5174(b)(1).  In addition, the Act provides that FEMA "may

provide temporary housing units, acquired by purchase or lease, directly to individuals or

households." 42 U.S.C. § 5174(c)(1)(B)(i).

3.      Hurricanes Katrina and Rita destroyed or made uninhabitable an estimated 323,000

homes, leaving hundreds of thousands of people homeless and without shelter.  Ex. 1,

WHR at 000015; Ex. 2, HRR at 000003.  This massive damage to housing stock created

an urgent and immediate need for an unprecedented amount of temporary housing.  Ex. 4,

May 14, 2008, Souza Decl. ¶ 5.

4.      FEMA chose to provide the hurricane victims with shelter.  Initially, FEMA intended to

rely primarily upon mobile homes wherein disaster victims could be re-located to mobile

home cities setup near the affected areas.  Ex. 4, Souza Decl. ¶ 6.  However, for a number

of reasons, state and local officials objected to this plan, asserting that disaster victims

should be placed in, or as close as possible, to their devastated communities to encourage

and promote rebuilding and recovery efforts.  *Id*.

5.      In an attempt to satisfy these objections, FEMA made the decision to rely upon travel

trailers and park models as the primary type of emergency housing unit ("EHU").  *Id*.

Unlike mobile homes, these units could be placed in, or in close proximity to, the

devastated communities.  *Id*.

6.      FEMA sought to provide safe housing to those affected by the disasters by purchasing

EHUs from a variety of private vendors and relying upon the vendors and manufacturers

"to construct and provide FEMA with new units, under warranty, that met and complied

2

with any and all applicable requirements, and that would provide disaster victims with a safe, habitable place to live . . . ."  Ex. 8, McCreary Decl. ¶¶ 5-6, 8, 10-12.

7.      Given past successful experiences using these types of EHUs, FEMA thought these units would accomplish the goal of providing safe shelter for disaster victims.[1]/  Ex. 4, Souza Decl. ¶ 8.

8.      FEMA spent more than $2.5 billion dollars to purchase over 140,000 EHUs.  Ex. 8, McCreary Decl. ¶ 3.

## II.     Background on Formaldehyde: There Is No Consensus or Bright Line Standard Regarding What Levels of Formaldehyde Are Acceptable in Residences or Emergency Housing.

9.      There are no regulations that address the concentrations of formaldehyde in the indoor air and there is a lack of consensus among various agencies and entities regarding the appropriate target levels of formaldehyde in residences.[2]/  Ex. 11, FEMA E-Mail at FEMA17-006702-03.

10.     To this day, there remains considerable disagreement as to what levels of formaldehyde

---

[1]/      According to Michael K. Lindell, Ph.D., comprehensive research shows that during the three decades or more prior to Katrina that FEMA provided emergency housing, air quality problems had never been among the many different concerns and complaints occupants had voiced about EHUs.  *See* Ex. 9, Lindell Decl. and Rept.  Dr. Lindell has over 35 years experience in the field of emergency management and is one of the foremost researchers in the country on how individuals and organizations respond to disasters and other hazards.  He has taught classes in emergency management, disaster response, and hazard mitigation at schools such as George Washington University and Texas A&M University, has given 170 presentations, and has authored 70 technical reports, 90 journal articles, and ten books (including a textbook on emergency management).  Dr. Lindell has offered opinions in this case regarding the concept of temporary housing, the delays associated with proper threat assessment, and the options that were available to emergency managers under the circumstances of this case.  *Id.*

[2]/      HUD has selected the level of 400 ppb as the target level of formaldehyde for manufactured housing (mobile homes).  Ex. 10, 49 FR 31998 at pp. 7-13.  That there is no consensus regarding formaldehyde levels indoors is reflected by the fact that when HUD initially came out with this target level, "there was considerable disagreement" regarding this standard.  *See New Mexico v. HUD*, 1987 WL 109007, at *4 (10th Cir. 1987).

are appropriate in residential environments and what levels will or will not cause irritant or health effects. This is further illustrated by the fact that in September 2007, after the CDC convened an expert scientific panel in a specific attempt to reach a consensus "action level" for formaldehyde in the indoor residential environment, no consensus level could be agreed upon, notwithstanding substantial deliberation. Ex. 12, Lapinski Decl. ¶ 10; Ex. 13, Johnson Decl. ¶ 4.

11.     The EPA and ATSDR, among other agencies, recommend that ventilation is an appropriate and effective way to lower formaldehyde levels indoors and reduce risks associated with exposure. Ex. 14, CDC/ATSDR, Toxicological Profile: Formaldehyde at 000025, 329; Ex. 15, EPA Fact Sheet at EPA-000003 (Rec. Doc. 1543-17); Ex. 16, Consumer Products Safety Commission ("CPSC"), "Update on Formaldehyde" at CPSC-000004-05, 000011. This recommendation is echoed by a number of private groups and entities, examples include: the Recreation Vehicle Industry Association ("RVIA"); trailer manufacturers such as Fleetwood Enterprises, Inc.; the Sierra Club; and the CPSC. *See* Ex. 17, July 22, 2009, FEMA E-Mail at FEMA17-005982, 05984; Ex. 18, Fleetwood 30(b)(6) Depo. 110:17-111:19, 141:16-142:5; Ex. 19, Fleetwood Occupancy Manual at 03-2; Ex. 20, Fleetwood Formaldehyde Warning at FLE 005672; Ex. 21, Sierra Club Formaldehyde Document at FEMA123-000006.

**III.    FEMA's Contractors Installed and Maintained EHUs.**

12.     FEMA contracted with various government contractors to install and maintain the EHUs provided for the purpose of disaster assistance. Ex. 22, Oliver Decl. ¶¶ 3-5. In mid-September 2005, the government contractors commenced moving disaster victims into EHUs. Ex. 23, DHS Rept. at 000155-56.

4

13.    On October 11, 2005, in response to a request from an installation contractor, OSHA tested some of the new, sealed, unoccupied trailers at the contractor's staging facility for the presence of formaldehyde. Ex. 24, Payne Decl. ¶¶ 4-5; Ex. 25, OSHA E-mail at OSH001-004338. OSHA determined that venting a new, sealed, unit that had not been made ready for occupancy for 15 to 20 minutes significantly decreased formaldehyde levels and would reduce any levels experienced by workers consistently working in these units below the occupational level of concern. Ex. 24, Payne Decl. ¶¶ 4-5; Ex. 25, OSHA E-Mail at OSH001-004338.

14.    In connection with the government's response to the hurricanes, OSHA tested a variety of facilities and areas for a number of different environmental constituents. Ex. 24, Payne Decl. ¶¶ 2, 9. As part of this testing, OSHA performed periodic formaldehyde tests on new, sealed EHUs that had not been made ready for occupancy. *Id*. ¶¶ 8-9. These tests took place between October 2005 and February 2006. *Id*. ¶ 9. The OSHA testing showed that airing out and venting sealed up, unoccupied EHUs for a short period of time reduced formaldehyde to permissible levels for workers who were working in new, sealed, and unoccupied EHUs on a daily basis. *Id*. ¶¶ 9, 11.

15.    This testing of new and sealed units did not raise concerns about the levels of formaldehyde in occupied units because these units had not been readied for occupancy (all windows and vents had been closed since manufacture or for an extended period of time, units had no electricity and thus no air conditioning or operable vent fans) and once the new and sealed units were vented and aired out (as would occur during occupancy), the levels of formaldehyde were shown to significantly decrease. Ex. 24, Payne Decl. ¶¶ 9, 11; Ex. 26, Brown Decl. ¶ 6; Ex. 27, March 22, 2005, FEMA E-Mail at FEMA09-

000362; Ex. 28, March 17, 2006, FEMA E-Mail at FEMA-Waxman 3623-24.

16.     FEMA did not hear of an occupant voicing concerns about formaldehyde odors or smells in EHUs until mid-March 2006.  Ex. 4, Souza Decl. ¶ 10; Ex. 29, Miller Decl. ¶ 3.

**IV.     FEMA First Learned of an Occupant Complaint or Concern About Formaldehyde in EHUs in Mid-March 2006.**

17.     FEMA received its first occupant complaint about formaldehyde in EHUs in mid-March 2006.  Ex. 4, Souza Decl. ¶ 10; Ex. 29, Miller Decl. ¶ 3.  The particular occupant's unit was swapped out with a different unit that same month.  Ex. 29, Miller Decl. ¶ 3.

18.     As of June18, 2006, FEMA had received six Louisiana occupant complaints about formaldehyde in EHUs.  Ex. 30, FEMA E-Mail at FEMA-Waxman-16.  These complaints were resolved by urging the occupants to vent the EHUs, and if that did not work, swapping out the complaint units with "good, clean units."  *Id.*

19.     Between March 2006 and July 2007, FEMA received a total of 207 occupant complaints about odors and smells, including formaldehyde, in EHUs.  Ex. 4, Souza Decl. ¶ 10; Ex. 31, 7/19/08 Paulison Statement at 00002-3; Ex. 32, June 20, 2007, FEMA Release No. FNF-07-028 at 000191.

**V.     FEMA Took Action in Response to Complaints and Concerns Surrounding Formaldehyde in EHUs.**

20.     FEMA initially responded to complaints and concerns voiced by occupants about formaldehyde in EHUs by advising the occupants to air out and vent their EHUs.  Ex. 29, Miller Decl. ¶¶ 3, 8.

21.     Commencing in mid-March 2006, FEMA, through the news media, encouraged all EHU occupants who had concerns about formaldehyde in their EHUs to air out and vent the EHUs.  Ex. 21, June 13, 2006, Sierra Club Letter at FEMA123-000012, FEMA123-

000014; Ex. 33, Bechtel Rule 30(b)(6) Depo. 139:5-140:14.

22.     In response to the initial occupant concerns, FEMA contacted its installation contractors
        on March 20, 2006, to determine what they were doing about the possibility of
        formaldehyde in EHUs.  Ex. 34, March 20, 2006, E-Mail at SHAW 013521-22; Ex. 35,
        Boyle Depo. 132:12-135:12.  FEMA learned that some contractors were airing out and
        ventilating EHUs prior to issuing them to occupants.  Ex. 34, March 20, 2006, E-Mail at
        SHAW 01352-22 (CH2M Hill airs out EHUs prior to issuing them to occupants and
        advises occupants during monthly inspections to ventilate the EHU); Ex. 36, March 21,
        2006, E-Mail SHAW 013539, 544 (Shaw vents EHUs prior to issuing them to
        occupants).  FEMA also learned that monthly maintenance contractors were instructing
        occupants to air out and vent EHUs as part of monthly preventive maintenance
        inspections.  Ex. 34, March 20, 2006, E-Mail at SHAW 01352-22.

23.     Also in March 2006, following the initial occupant concerns, FEMA was informed by
        their largest supplier of EHUs (50,000 units) that their trailers were only constructed with
        low formaldehyde emitting materials.  Ex. 29, Miller Decl. ¶¶ 3-5; Ex. 37, Gulf Stream
        Coach E-Mail, March 17, 2006.  FEMA also learned that some manufacturers provided
        formaldehyde warnings and notices in their units or in their owners' manuals.  Ex. 26,
        Brown Decl. ¶ 9; Ex. 38, Manufacturers' Notice at FEMA09-000363.  At least one
        manufacturer represented in their owners' manuals that their products were entirely
        formaldehyde free.[3]/  Ex. 39, Keystone RV Co., Owner's Manual at McGraw0000113.

---

[3]/     As an additional example of the conflicting information facing FEMA during this time period, an
attachment to a June 13, 2006, letter from the Sierra Club (referencing the supposed suggestions of Mary
C. DeVany – Plaintiffs' former expert witness in this litigation) advised FEMA that "airborne
formaldehyde [in trailers] will slowly decrease to 'safe levels' in approximately three to six months after
manufacture."  June 13, 2006, Letter at FEMA123-0000007 (Rec. Doc. 1545-24).

Another manufacturer told FEMA that its own testing for formaldehyde in EHUs showed that there was not an issue of concern.  Ex. 40, Gulf Stream Coach, Inc. Rule 30(b)(6) Depo. 19:7-20:13, 79:17-80:18.

24.    At the end of March 2006, officials in FEMA's occupational safety office did their own testing of sealed units that had not yet been made ready for occupancy to assess the levels of formaldehyde facing FEMA workers at staging areas who were working in and around sealed and unoccupied units on a daily basis.  Ex. 26, Brown Decl. ¶ 8; Ex. 42, May 31, 2006, FEMA Memo.; Ex. 43, April 14, 2006, FEMA E-Mail at FEMA17-024461.  The occupational safety office recommended that FEMA employees vent sealed, unoccupied, units for a short time before entering.  Ex. 26, Brown Decl. ¶ 8; Ex. 46, May 31, 2006, FEMA Memo.; Ex. 43, April 14, 2006, FEMA E-Mail.  They also recommended that residents be instructed to air out and vent units.  Ex. 42, May 31, 2006, Memorandum at 000164 (Rec. Doc. 1543-53); Ex. 43, April 14, 2006, FEMA E-Mail at FEMA17-024461 ("[b]ased upon the test results" . . .  "[r]esidents should follow the recommendations of the manufacturer and the EPA website").  After receiving the results of their testing, the occupational safety office determined that the concentrations of formaldehyde in sealed, unoccupied, units were comparable to levels posted on the EPA website for typical levels found in trailers and manufactured homes.  Ex. 26, Brown Decl. ¶ 8; Ex. 42, May 31, 2006, FEMA Memo.; Ex. 43, April 14, 2006, FEMA E-Mail at FEMA17-024461.

25.    Commencing on or before May 2006, FEMA officials were attempting to put in place a contract for formaldehyde testing a number of EHUs.  Ex. 44, May 23, 2006, FEMA E-mail at FEMA17-023196; Ex. 45, FEMA E-Mail at FEMA17-022665 (June 1, 2006, "[w]e are still in pursuit of a contract to do testing").

26.   In June 2006, FEMA issued a press release stressing to EHU occupants that "Trailer

safety is important for those living in travel trailers . . . Ventilate trailers regularly to

avoid buildup of possible odors from construction materials."  Ex. 46, June 2, 2006,

FEMA Press Release No. 1606-217.

27.   On or before June 2006, FEMA offered to swap out and replace EHUs if the suggested

steps of venting and airing out the EHU did not resolve an occupant's complaints or

concerns.  Ex. 5, Souza Decl. ¶ 9; Ex. 29, Miller Decl. ¶¶ 3, 8-10; Ex. 30, FEMA E-Mail.

FEMA would replace any complaint units with older, previously used, EHUs because it

reasoned that older units, on account of their age and past usage, would have lower

formaldehyde levels.  Ex. 4, Souza Decl. ¶¶ 13-14; Ex. 5, Souza Decl. ¶ 9; Ex. 29, Miller

Decl. ¶¶ 3, 8-10; Ex. 30, FEMA E-Mail.

28.   David Garratt and Kevin Souza were chiefly responsible for developing FEMA's

programmatic responses to the issue of formaldehyde in EHUs.  Ex. 7, Souza Depo.[4]/

59:18-64:16, 145:22-147:10; Ex. 47, Little E-Mail; Ex. 48, Little Decl.; Ex. 49, Little

Depo. 148:18-149:21, 150:5-25, 151:1-22; Ex. 50, McNeese Depo. 24:11-22, 25-29,

39:17-40:8, 66:12-67:12, 87:1-88:5, 89:1-16, 121:20-125:7, 116:14-121:19, 118:22-

119:16; Ex. 51, Garratt Decl. ¶¶ 4-6; Ex. 52, Garratt Depo. 95:21- 97:20; Ex. 53, June 27,

2006, FEMA E-Mail at FEMA17-007073-076.

29.   David Garratt received a letter dated June 13, 2006, from the Sierra Club – the entity that

had first publically raised the issue of formaldehyde in EHUs.  The letter suggested that

---

[4]/    Plaintiffs' Steering Committee has deposed Mr. Souza two times.  For the sake of completeness,
the United States has attached the complete transcripts of these two depositions.  *See* Ex. 6, Souza Depo.;
Ex. 7, Souza Depo.

9

FEMA provide "FEMA trailer occupants [with] better notification of the need to adequately vent the trailer[s] and control humidity levels."  Ex. 21, June 13, 2006, Sierra Club Letter at FEMA123-000002.

30.     In June 2006, David Garratt and Kevin Souza made the decision that FEMA should prepare its own formaldehyde brochure for the occupants of EHUs.  Ex. 5, Souza Decl. ¶¶ 12-14, 18; Ex. 51, Garratt Decl. ¶¶ 4-6;  Ex. 52, Garratt Depo. 95:21-97:20; Ex. 53, June 27, 2006, FEMA E-Mail at FEMA17-007074.

31.     Between July 2006 and September 2006, FEMA sought to distribute a formaldehyde brochure to all EHU occupants.  The brochure warned that EHUs may contain formaldehyde, described formaldehyde, advised occupants to air out and vent EHUs and to keep indoor temperatures low to reduce formaldehyde levels, and advised occupants to consult a doctor if they had any health concerns.  Ex. 4, Souza Decl. ¶ 14; Ex. 5, Souza Decl. ¶ 18; Ex. 52, Garratt Depo. 95:21-97:20; Ex. 53; June 27, 2006, FEMA E-Mail; Ex. 54, July 2006 Brochure; Ex. 29, Miller Decl. ¶ 11; Ex. 55, July 26, 2006, McNeese E-Mail at FEMA10-000183; Ex. 56., Bonomo Decl. ¶¶ 2-6.

32.     In June 2006, David Garratt and Kevin Souza made the decision that FEMA should engage the EPA and CDC/ATSDR (government agencies with scientific backgrounds) to independently test EHUs for formaldehyde and analyze the test results.[5]/  Ex. 57, February 1, 2007, ATSDR Report at 00004.  An initial conference call between FEMA,

---

[5]/     The United States' Supplemental Memorandum in Support of its "Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction" (Rec. Doc. 2505) sets forth the facts surrounding how FEMA moved past concerns that were expressed by FEMA lawyers (who were then involved in a pending litigation regarding formaldehyde in EHUs and had concerns about the confidentiality of pre-decisional data) to move forward with government testing of EHUs.  *See also* Order and Reasons, August 13, 2009, at 2 (Rec. Doc. 2621).

EPA, and CDC/ATSDR to discuss testing was held on June 19, 2006.  Ex. 47,  Little E-Mail.

33.     FEMA initially requested that the EPA and CDC/ATSDR test both occupied and unoccupied EHUs, but EPA and CDC/ATSDR advised that testing should be limited to unoccupied units to remove any confounding factors, establish a baseline for formaldehyde in new units, and to specifically test how various mitigation techniques performed in these EHUs and whether they would work to an acceptable degree.  Ex. 50, McNeese Depo. 123:10-125:7.

34.     FEMA discussed possible contingencies if no mitigation techniques were shown to be effective to a level of satisfaction in dealing with formaldehyde in EHUs.  Because there was no alternative housing available in areas in the Gulf South at this time, this included the possible relocation of over one hundred thousand families to remote out-of-state locations where rental units would be available.  Ex. 7, Souza Depo. 116:14-121:19; 118:22-119:16; *see generally* Ex. 7, Souza Depo. 145:22-147:10; Ex. 50, McNeese Depo. 116:14-121:19, 118:22-119:16.

35.     The EPA testing initially encountered logistical difficulties (including difficulties associated with locating certain models of EHUs and setting up the testing facility), but EPA began its testing of 96 EHUs in September 2006 and completed the testing in early October 2006.  Ex. 58, McNeese Decl. ¶¶ 3-6.

36.     In December 2006, the CDC/ATSDR, through the assigned ATSDR Emergency Response Team under the National Response Plan, reviewed the test data, and prepared a Consultation Report.  Ex. 48, Little Decl.  That report underwent the standard CDC/ATSDR review process before being finalized, and was sent to FEMA in February

2007.  Ex. 49, Little Depo. 85:4-17; 144:3-145:22; Ex. 59, January 8, 2007, E-Mail

Allred to Little; Ex. 60, February 2, 2007, E-Mail Nickles to ATSDR.

37.     The February 2007, CDC/ATSDR report stated that 0.3 ppm constituted an appropriate

"level of concern," for response purposes and concluded that the EPA test data showed

that airing out and venting EHUs would successfully reduce formaldehyde levels in the

EHUs below 0.3 ppm.  Ex. 49, Little Depo. 153:23-155:5; Ex. 60, February 2, 2007, E-

Mail Nickles to ATSDR; Ex. 61, April 6, 2007, E-Mail Frumpkin to ATSDR.

38.     In Spring 2007, FEMA learned that some children in Mississippi were potentially

presenting with illnesses that could be related to formaldehyde in EHUs.  Ex. 5, Souza

Decl. ¶ 20.

39.     In response to continuing concerns about formaldehyde in EHUs, in July 2007, FEMA set

up a dedicated call center to answer occupant questions or concerns about formaldehyde

in EHUs.  Ex. 5, Souza Decl. ¶ 20; Ex. 12, Lapinski Decl. ¶ 4.  The call center could

assist occupants who had concerns in finding alternate housing (this included offering

EHU occupants housing in a hotel or motel if no longer term housing was available).  *Id.*

40.     FEMA also engaged in another information campaign (Operation Impact) in July 2007.

Ex. 12, Lapinski Decl. ¶ 4.  FEMA sought to deliver new formaldehyde flyers to all EHU

occupants.  Ex. 12, Lapinski Decl. ¶ 12; Ex. 62, Larson Decl. ¶¶ 2-8; Ex. 63, Harder Decl.

¶¶ 2-5; Ex. 64, FEMA 2007 Flyer.  The flyer warned that EHUs contain formaldehyde,

provided instructions on how to reduce formaldehyde levels in EHUs, encouraged

occupants to seek medical advice if they had any health concerns, and provided a

telephone number for occupants to call if they had health concerns or wanted to vacate

their trailer and move into alternate housing.  Ex. 62, Larson Decl. ¶¶ 2-8; Ex. 64, FEMA

2007 Flyer.

41.    In July 2007, FEMA offered to relocate any resident who had complaints or concerns about formaldehyde in EHUs.  Ex. 5, Souza Decl. ¶ 20; Ex. 12, Lapinski Decl. ¶ 4-5. FEMA also adopted a policy to require formaldehyde specifications in all future contracts for EHUs.  Ex. 4, Souza Decl. ¶ 16.

42.    Also in July 2007, FEMA re-engaged CDC/ATSDR to test occupied EHUs, pending approval from the occupants of the selected EHUs.  Ex. 5, Souza Decl. ¶ 20; Ex. 12, Lapinski Decl. ¶ 3.  CDC commenced testing 519 units in December 2007 and reported initial results in February 2008.  Ex. 12, Lapinski Decl. ¶ 7.

43.    In response to the CDC's findings, FEMA continued its ongoing efforts to relocate EHU occupants to alternate housing – providing priority relocation assistance to groups (such as the elderly, households with young children, and persons with respiratory problems) who the CDC had identified as being especially susceptible to formaldehyde.  Ex. 12, Lapinski Decl. ¶ 7

44.    In February 2008, FEMA sought to distribute another formaldehyde flyer to all EHU occupants.  Ex. 12, Lapinski Decl. ¶ 7.  The flyer detailed the results and findings of CDC's December 2007 testing.  Ex. 65, February 2008, FEMA/CDC Formaldehyde Flyer 000011-12, 000017-18.

45.    In approximately February 2008, FEMA offered to have its contractor test any FEMA-issued EHU for formaldehyde upon an occupant's request.  Ex. 12, Lapinski Decl. ¶ 8.

46.    At all times, no specific instructions or regulations set forth what action FEMA was required to take in response to any complaints or concerns about formaldehyde in EHUs. Souza Decl. ¶¶ 13-19.

13

Dated:  October 4, 2010                                        Respectfully Submitted,

TONY WEST                                                       HENRY T. MILLER
Assistant Attorney General, Civil Division         ADAM BAIN
                                                                       Senior Trial Counsel
J. PATRICK GLYNN
Director, Civil Division, Torts Branch                 MICHELLE BOYLE
                                                                       JONATHAN WALDRON
DAVID S. FISHBACK                                          Trial Attorneys
Assistant Director

OF COUNSEL:                                                   *s/ Adam M. Dinnell*
                                                                       ADAM M. DINNELL (TX No. 24055405)
JORDAN FRIED                                                  Trial Attorney
Associate Chief Counsel                                    United States Department of Justice
FEMA/DHS                                                       Civil Division, Torts Branch
                                                                       P.O. Box 340, Ben Franklin Station
JANICE WILLIAMS-JONES                                Washington, DC 20004
Senior Trial Attorney                                         Telephone:  (202) 616-4211
FEMA/DHS                                                       E-mail:  Adam.Dinnell@usdoj.gov

                                                                       Attorneys for Defendant United States

## CERTIFICATE OF SERVICE

        I hereby certify that on October 4, 2010, the foregoing document was filed via the U.S.

District Court's CM/ECF electronic filing system and a copy thereof was served upon Liaison

Counsel.

                                                *s/ Adam M. Dinnell*
                                                ADAM M. DINNELL (TX No. 24055405)

14