1

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
 4
 5   IN RE:  FEMA TRAILER         *   Docket MDL 1873 "N"
     FORMALDEHYDE PRODUCTS        *
 6   LIABILITY LITIGATION         *   New Orleans, Louisiana
                                  *
 7   THIS DOCUMENT IS RELATED TO: *   September 24, 2009
                                  *
 8   CHARLIE AGE, ET AL V         *   8:30 A.M.
     GULF STREAM COACH, INC.,     *
 9   ET AL, DOCKET NO. 09-2892;   *
     ALANA ALEXANDER, INDIVIDUALLY*
10   AND ON BEHALF OF             *
     CHRISTOPHER COOPER           *
11   * * * * * * * * * * * * * * *

12                            DAY 9
               JURY TRIAL PROCEEDINGS BEFORE THE
13                HONORABLE KURT D. ENGELHARDT
                  UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16
     For the Plaintiffs:        Gainsburgh, Benjamin, David,
17                                 Meunier & Warshauer
                                BY:  GERALD E. MEUNIER, ESQ.
18                              1100 Poydras Street
                                Suite 2800
19                              New Orleans, Louisiana 70163

20
                                The Buzbee Law Firm
21                              BY:  ANTHONY G. BUZBEE, ESQ.
                                JP Morgan Chase Tower
22                              600 Travis, Suite 7300
                                Houston, Texas  77002
23
24                                              EXHIBIT
25                                                 D
```

EXHIBIT D

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1            Number one, before Hurricane Katrina, travel
2   trailers had always been used principally for short-term
3   housing needs, and so FEMA didn't know the difference.  FEMA --
4   Kevin Souza testified that FEMA was relying on vendors and
5   manufacturers to provide units that were safe and habitable.
6            Ask yourself the question when you're
7   deliberating this issue of sophisticated purchaser, who knows
8   more about travel trailers more than the person who's making
9   them?  More importantly, Dan Shea told FEMA, "We're going to
10  send a person down to Baton Rouge to test units in your staging
11  area."  And the test results showed what's up on the screen.
12           Mr. Buzbee told you in opening statements that
13  you would see results up to 500 times the minimum safe levels,
14  that's precisely what they got.  You heard from nobody that
15  said, "We shared this testing with FEMA."
16           Most importantly, Alana Alexander says, "You
17  know, if we had been told about the formaldehyde issue, we
18  would have moved out."  These people are human beings.  They
19  are entitled to the information that affects their safety.
20  They were not given it by the manufacturer of this product.
21  They were not told one word.  That renders the product
22  unreasonably dangerous in failing to provide an adequate
23  warning.
24           Did this unreasonably dangerous condition exist
25  at the time the trailer left Gulf Stream's control?  Well, the

```
 1   system, Gulf Stream.
 2              They don't consider the OSHA standard terribly
 3   relevant.  I agree with them.  Their document, Exhibit 361, an
 4   e-mail to Dan Shea:  "HUD says their standard doesn't bear any
 5   association to travel trailers."  That's true.  So you're down
 6   to the NIOSH standard, which is an industrial standard; or at
 7   ATSDR standard, which is meant for residential exposure.
 8              When you're deciding what the percentage of
 9   responsibility is, you should keep track of Paul Hewett's
10   testimony:  "98.9 percent of the Cavalier's tested exceeded the
11   ATSDR limit.  98.1 of the those tested exceeded the NIOSH
12   limit.  And they averaged almost 500 parts per billion."  I
13   think that the evidence there is 90 percent.
14              Defendant Fluor, he's told you in opening statement,
15   "I'm going to turn around and hire expert haulers and
16   installers.  I'm going to bring you the people that had their
17   boots in the dirt.  The guys who jacked it up."  We had to
18   bring that person to you.  We subpoenaed him.  We brought him
19   here.  He jacked and hauled it wrong, according to their own
20   policy.  Ten percent on Fluor.
21              FEMA, I thought the day that we played all the FEMA
22   depositions was very interesting.  It, frankly, caused me to
23   feel good about how FEMA responded to this in the following
24   way:  When they finally were told about the formaldehyde
25   problem that they had no knowledge of and, therefore, were not
```

1  sophisticated users about, they said, "We wanted to provide the
2  information that the travel trailers had formaldehyde in them."
3  That's what Mr. McNeese, the program specialist, said.
4       I put a LifeSaver there.  That was one of the funny
5  moments of the trial.  I mean, I saw everybody laughing.  The
6  bottom line is the guy testified truthfully.  He said, "Look,
7  the distribution of the flyers was very necessary."  This is a
8  very serious situation, yes.  And FEMA just didn't sit on its
9  hands.  It created documents.
10      Now, one of the documents in July of 2007 includes
11 the statement:  "More serious health problems may be caused by
12 extended exposure, including a small but increased risk of some
13 forms of cancer."
14      Stanley Larsen said, "Look, if a trailer was
15 unoccupied, there's no need to distribute a flyer to them.
16 We've got a database that determines whether it's occupied or
17 not.  Could it have inaccuracies in it?  Sure."
18      Michael Harder, "Look, I don't remember specifically
19 remember delivering to that address.  If it was occupied, I
20 would have."  But we showed him the document that says,
21 "vacant, not ready."  If you look at the exhibit, and it's in
22 evidence, with respect to this location on Dale Street, their
23 database says, "vacant, not ready."  You have no evidence that
24 FEMA actually got this delivered.
25      So to the extent that you want to hold them

1  responsible, that would be the reason why.  But, frankly, I
2  think they were trying to clean up somebody else's mess and
3  they should not be held responsible.
4          To their credit, they now say:  "Since Katrina, FEMA
5  will only trailers to be used if they meet our formaldehyde
6  requirements."  They didn't have any before, because they
7  weren't a sophisticated user at the time.  I don't think that
8  there should be any percentage on FEMA.
9          Alana Alexander, this stuff about suboptimal care and
10 mama did it is disgraceful.  But the evidence is he was put on
11 Advair by a doctor in Florida.  Mama reads a black box that
12 said African Americans die on Advair at a rate four times
13 higher than those not on it.
14         Come on, folks, that's not negligence.  That's a
15 loving mother.  She didn't just pull him off.  She went back to
16 the doctor and what the doctor said.
17         And that's why Dr. Janet Barnes, who was the treater
18 here in New Orleans, says, "Poppycock.  Chris Cooper was not
19 suboptimally treated."  His mother did nothing wrong and the
20 percentage should be zero.
21         And then you the choice among the maintenance
22 contractor and installer subcontractors.  Here's why I think
23 the answer I think the answer to that ought to be zero.  Al
24 Whitaker:  "The sins of MLU are the sins of Fluor.  If you can
25 hire a contractor like Fluor and have them do this when things

1  spacing issue.
2          Let me at this time go ahead and invite any
3  objections to jury instructions by way of inclusion or
4  exclusion on the plaintiff's side.
5          MR. MEUNIER: Your Honor, I believe -- just so I
6  understand, I believe under Rule 51, I'm supposed to request to
7  state the grounds for this to protect the record, but that
8  we're going to let the jury begin to deliberate because this
9  may take a while to state all of the objection.
10         THE COURT: Yes, yes. I have -- well, for the
11 record, let me --
12         MR. MEUNIER: I need to request the opportunity to
13 state the grounds before they deliberate.
14         THE COURT: Well, that's what I'm inviting at this
15 time. We have discussed in the jury charge conference, which
16 was not on the record, the submitted jury instructions and the
17 Court has worked with counsel at a jury charge conference, both
18 prior to trial and again yesterday following the conclusion of
19 the evidence, as to the inclusion or exclusion of any
20 particular instructions.
21         So the Court at this time will allow those
22 counsel who have reserved the right to make such objections on
23 the record. So, Mr. Meunier, you're correct, and now's the
24 time to do it.
25         MR. MEUNIER: Your Honor, beginning with the verdict

1  form, the plaintiffs respectfully object to the inclusion of a
2  fault allocation percentage for FEMA in Questions 10 and 11.
3  We don't believe there's any -- certainly not sufficient fault
4  proven in this record on the part of FEMA.  It is the
5  defendant's burden to present that evidence.  We don't think
6  they've done it.
7           We don't think they've demonstrated any causal
8  relationship between any conceivable fault on the part of FEMA
9  and FEMA and the harm of these plaintiffs.  So we object,
10 respectfully, to including a percentage fault allocation line
11 for FEMA on the verdict form.
12          We, likewise, object to the inclusion of a
13 percentage fault allocation line for maintenance contractors
14 and/or -- I think it's maintenance contractor, singular, or
15 installment subcontractors, plural, in Questions 10 and 11.
16          On this ground:  That the risk of harm that is
17 encompassed within Fluor's duty is the risk of improper
18 installation.  And so if we're now going to allow,
19 notwithstanding that duty, that risk of harm encompassed in
20 Fluor's duty to become the basis for a percentage allocation to
21 someone other than Fluor, then I think it's both duplicative
22 and legally inappropriate to reduce the plaintiffs' recovery by
23 allocated percentage fault to these other entities.
24          We also, just for the record, respectfully
25 object to there being two separate questions for the

1  fault.  I will just say for the record, to me it's not a
2  question of whether there is or isn't evidence of gross fault
3  on the part of the FEMA.  We don't think there's evidence of
4  gross fault.
5           The question is:  Is there evidence that FEMA
6  made its property available to shelter storm victims?  That's
7  the question.  That's the question.  And if there's evidence in
8  this case that they did, then the jury has to be told about
9  gross fault.  We don't think there's any evidence of gross
10 fault.  We don't think the answer is zero.
11          But the question is not whether there's evidence
12 of gross fault.  The question is whether there's evidence that
13 they made the property available to shelter storm victims, and
14 there's evidence clearly of that.
15          And so we, again, not for the first time,
16 respectfully object to not giving plaintiffs' charges 59 and
17 60, which was the gross fault statute as to FEMA and the
18 definition of gross fault.
19          Thank you, Judge.
20      **THE COURT:**  Sure.
21      **MR. MEUNIER:**  Your Honor, I thought I had covered
22 sophisticated purchaser...
23      **MR WATTS:**  Andy's saying you did as well.  Maybe I
24 just didn't hear it.
25      **MR. MEUNIER:**  So we're covered on that.  There is one