UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | MDL NO. 07-1873<br><br>SECTION "N" (5)<br><br>JUDGE ENGELHARDT<br>MAG. JUDGE CHASEZ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DECLARATION OF KEVIN SOUZA

I, Kevin Souza, state and declare as follows:

1. From late 2005 until April 2008, I was the Chief of the Individual Assistance Program Management (IAPM) Branch of the Individual Assistance Division of the Federal Emergency Management Agency (FEMA), a component agency of the Department of Homeland Security (DHS). As Branch Chief of IAPM, my direct supervisor was Berl Jones, Deputy Director of the Individual Assistance Division, FEMA.

2. As Branch Chief, my job was to manage and oversee Individual Assistance programs, as authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act. Through my duties and responsibilities at FEMA, I have personal knowledge regarding FEMA's decision to provide Emergency Housing Units (EHUs) to disaster victims following Hurricanes Katrina and Rita. I also have personal knowledge regarding FEMA's response to concerns and complaints about formaldehyde in EHUs.

1

EXHIBIT
5

3.  Hurricane Katrina made landfall on August 29, 2005. That same day, President Bush declared a Stafford Act disaster in the States of Louisiana, Mississippi, and Alabama. Katrina resulted in well over a million people being evacuated from impacted areas and rendered thousands of homes destroyed or uninhabitable, leaving hundreds of thousands of families homeless and without shelter.

4.  On September 24, 2005, Hurricane Rita made landfall along the Texas-Louisiana border, leading the President to declare a Stafford Act disaster in the States of Louisiana and Texas. Rita rendered thousands of additional homes destroyed or uninhabitable throughout Texas and Louisiana, and forced the evacuation of many Katrina victims who had initially sought refuge in the areas impacted by Rita.

5.  Consistent with the terms of the Stafford Act, FEMA has provided Individual Assistance to the victims of Hurricanes Katrina and Rita. FEMA administers four distinct Individual Assistance Programs: (1) Individual and Household Assistance; (2) Crisis Counseling; (3) Disaster Unemployment Assistance; and (4) Legal Services. The Individual and Household Program (IHP) provides both housing assistance and assistance with other needs. The IHP is the primary mechanism by which FEMA helps individuals and households recover from damages or losses sustained as the direct result of a disaster. IHP assistance may include financial aid to repair and replace lost or destroyed property, rental assistance to renters and homeowners whose homes are left uninhabitable, and - when housing resources are not available within an affected area - direct assistance such as mobile homes and travel trailers.

6.  Before Katrina made landfall, a Housing Area Command was activated and FEMA began planning to address potential shortfalls in shelter and housing. The

2

short-term plan was to put displaced disaster victims into emergency shelters, hotels, motels, cruise ships, tents, with friends and relatives, or to use any and all other available housing resources. After the initial disaster response, disaster victims would make use of IHP rental assistance or be transferred to EHUs as necessary. As rebuilding and recovery efforts progressed, disaster victims would later be transferred from EHUs into more permanent housing.

7. The massive damage to housing stock in the Gulf Coast region created an urgent and immediate need for an unprecedented number of EHUs, and a determination was made to rely primarily upon travel trailers, which could be placed in or closer to the devastated communities. FEMA had relied upon EHUs for temporary housing in previous disasters and spent more than $2.5 billion dollars and purchased more than 140,000 new EHUs. These EHUs were purchased both "off the lot" from existing inventories and directly from manufacturers. FEMA relied upon the vendors and manufacturers to use their expertise to provide FEMA with safe and habitable housing units - housing units that complied with industry standards and all applicable regulatory requirements. FEMA purchased these EHUs believing that they would provide safe and habitable temporary emergency housing.

8. FEMA relied upon contractors to install, maintain, and retrieve EHUs from disaster victims. FEMA's contractors started moving disaster victims from short-term shelters to EHUs as soon as EHUs became available. Without EHUs, many, if not most, disaster victims who returned to their devastated communities to rebuild would have had no place to live. As construction and rebuilding efforts have progressed, disaster victims have been moved into more permanent long-term housing.

3

9. On or about March 2006, FEMA received the first reported concerns from a Gulf Coast EHU occupant regarding formaldehyde fumes. These initial complaints were handled by the various recovery offices of the Gulf Coast Recovery Office (GCRO), and addressed on a case-by-case basis. Generally, the occupant would be instructed to vent the unit, and if that was not effective in resolving the issue, the unit would be switched out and replaced with a different unit.

10. In April/May 2006, FEMA learned from newspaper reports that the Sierra Club had tested trailers and detected formaldehyde in most of the tested units. Also, in May 2006, FEMA learned that a class action lawsuit had been filed against the Government and EHU Manufacturers asserting claims related to formaldehyde in the EHUs.

11. By mid-June 2006, FEMA determined that several trailer occupants in both Louisiana and Mississippi had complained about formaldehyde fumes in their EHUs. FEMA began to consider various response actions, including the testing of individual units and the installation of vent fans.

12. In June 2006, I was made aware of ongoing discussions between FEMA field program staff and FEMA's Office of General Counsel (OGC) regarding formaldehyde related applicant requests for EHU information. At that time, I recommended to field staff and FEMA OGC that the Agency conduct our own testing of EHUs (vs. reliance on non-federal testing). David Garratt, Acting Assistant Administrator of the Disaster Assistance Directorate, concurred with my recommendation to task the Environment Protection Agency (EPA) with a full assessment of the formaldehyde problem and to make recommendations. As part of

4

my duties, I served as the FEMA Headquarters Individual Assistance Program point of contact for formaldehyde related issues. I regularly briefed Mr. Garratt regarding such formaldehyde issues, consulted with him on how FEMA should respond, and involved him in the decision making process whenever a significant issue was presented.

13. To implement FEMA's decision, the United States Environmental Protection Agency (EPA) was mission assigned responsibility for preparing a testing protocol and conducting the actual testing of the units; the Centers for Disease Control, Agency for Toxic Substances and Disease Registry (CDC/ATSDR) was tasked with interpreting the test results. FEMA relied on these agencies for their scientific knowledge and background.

15. I assigned several Individual Assistance program specialists to serve as my representatives and program Point of Contact (POC) for formaldehyde testing including Tracy Haynes and Martin McNeese. In July 2006, Mr. Haynes was replaced by Martin McNeese, FEMA. As the POCs, Mr. Haynes and Mr. McNeese were responsible for meeting and conferring with EPA and CDC/ATSDR to (1) help identify what should be tested, (2) aid in the preparation of a testing protocol, and (3) assist in the actual testing process. Mr. Haynes and, later, Mr. McNeese reported to me on regular basis regarding the status of the testing project and, if they deemed it appropriate, would seek my direct involvement in conference calls and seek my assistance in resolving issues of concern.

16. Early on in the process, Mr. McNeese reported to me that, because there were no regulatory/statutory action levels for formaldehyde in the indoor air of residential structures, concerns were being raised about the advisability of moving

5

forward with testing. The consensus was that testing without a regulatory action level baseline would provide little or no benefit to the Agency in determining when and what, if any, response action should be undertaken. The EPA and CDC/ATSDR also expressed concern that the ATSDR Minimum Risk Levels (MRLs) for formaldehyde could be substantially lower than the formaldehyde levels in the EHUs, and if MRLs were found to be the applicable level for comparison - none of the EHUs might meet this criteria. Notwithstanding these concerns, I made the specific decision that FEMA needed to proceed with testing and, if ATSDR determined that the formaldehyde MRLs constituted an appropriate action level and test data showed that the units exceeded such levels, FEMA would prepare and implement an appropriate response action. FEMA had to test so it could decide whether there was, in fact, a systemic problem, and whether there was an engineering solution that would solve the problem.

17.  I was advised by Mr. McNeese that a consensus had been reached by EPA, CDC/EPA, and FEMA, that the scope of the testing should initially be restricted to new, never occupied, trailers. The intent of testing new, unoccupied units was to isolate the cause of any potential formaldehyde findings to the units themselves, versus other extraneous potential causes of occupancy. Given the total number of occupied EHUs and the many occupant-related environmental confounders and other sources of formaldehyde that could affect the total amount of formaldehyde in any given unit, it was decided that testing occupied units would not be the most effective testing methodology. An additional consideration was that the testing of unoccupied units would allow FEMA to assess and test potential means of remediation, including whether ventilation would be able to reduce the baseline levels of formaldehyde in units below

6

an appropriate action level. Given Mr. McNeese's recommendation and the advice provided by the EPA and CDC/ATSDR, I agreed with the decision to limit the initial testing to new, never occupied, units. It made practical sense to test unoccupied units first to establish a baseline rather than immediately testing occupied units without a baseline for comparison.

18. FEMA continued to respond to formaldehyde complaints on a case-by-case basis while testing was in process. Around July 2006, FEMA prepared and distributed a formaldehyde brochure to all EHU occupants about: formaldehyde, potential health concerns often associated with formaldehyde, actions occupants could take to reduce the levels of formaldehyde in their EHU, and the need for occupants to consult a medical provider if they start to have health concerns related to formaldehyde. In September 2006, EPA commenced its testing of new, never occupied, units at a staging facility in Baton Rouge, Louisiana.

19. In February 2007, ATSDR issued a report and advised FEMA that the tests showed that ventilation would reduce the baseline levels of formaldehyde in EHUs below 0.3 parts per million (ppm), a concentration level that ATSDR had determined would be a threshold level of concern for sensitive individuals. As a result of these ATSDR findings, FEMA concluded that EHUs remained a viable disaster housing option when combined with ventilation.

20. In Spring 2007, FEMA learned that a doctor in Mississippi had reported an increased rate of illness in children living in EHUs, and that it was his opinion that this was potentially a result of exposure to formaldehyde in EHUs. These new concerns prompted the Office of Health Affairs (OHA), Department of Homeland Security to

engage with FEMA in continuing research efforts of formaldehyde in EHUs. By July 2007, FEMA established a dedicated formaldehyde call center to answer occupant questions regarding formaldehyde and to assist occupants who were dissatisfied with their EHUs in finding alternate housing. Further, since July 2007, FEMA has offered to move any occupant who calls the formaldehyde hotline to alternate housing including hotels. In addition, FEMA prepared and distributed a Formaldehyde Fact Sheet to EHU occupants and also engaged ATSDR to conduct a study of occupied units and conduct a public health assessment based upon that data. In August, Harvey Johnson, FEMA Deputy Administrator appointed Michael Lapinski, FEMA, to coordinate the Agency's formaldehyde response.

21. ATSDR commenced testing occupied trailers in December 2007, and reported the initial findings of that testing in February 2008. After reviewing ATSDR's initial findings, FEMA increased efforts to provide priority relocation to those occupants who express health concerns and/or may be more susceptible to formaldehyde fumes - such as the elderly, households with young children, and those with respiratory problems. A flyer detailing CDC's initial findings was prepared and distributed to EHU occupants. FEMA also hired a contractor to continue testing occupied units, and offered, upon request, to test any occupant's unit for formaldehyde.

22. FEMA took a progressive action approach to formaldehyde in EHUs. A number of formaldehyde research and outreach efforts were undertaken to obtain an understanding necessary to making informed decisions regarding disaster temporary housing. As additional information became available, FEMA took increasingly greater steps to address the safety of EHU occupants in an appropriate and effective manner,

while still complying with the regulations that instruct FEMA that its provision of housing assistance should always be based upon a variety of competing considerations, including, but not limited to, cost-effectiveness, convenience to the individuals and households, and the suitability and availability of other types of assistance.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of 2007, May

_____
KEVIN SOUZA
DHS/FEMA