Capital Reporting Company
CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

------------------------X
IN RE:                   )   MDL NO. 1873

   FEMA TRAILER          )   SECTION "N" (4)

   FORMALDEHYDE PRODUCTS )   JUDGE ENGELHARDT

   LIABILITY LITIGATION. )   PAGES 1 - 87
------------------------X

Tuesday, September 23, 2008

Washington, D.C.


CONFIDENTIAL DISCOVERY MATERIAL

30(b)(6) Videotaped Deposition of:


   KEVIN SOUZA, called for oral examination by

counsel for the Plaintiffs, pursuant to notice, at 1821

Jefferson Place, Washington, D.C., before Leslie Todd,

of Capital Reporting Company, a Notary Public in and for

the Commonwealth of Virginia, beginning at 9:13 a.m.,

when were present on behalf of the respective parties:


EXHIBIT 6A

(866) 448.DEPO
www.CapitalReportingCompany.com                    ©2008

e2878f90-2c70-4ddc-bccd-0f65046623d8

Capital Reporting Company
CONFIDENTIAL

Page 2

```
 1         APPEARANCES
 2
 3  On Behalf of Plaintiffs' Steering Committee
 4  Law Offices of Ronnie G. Penton
 5      209 Hoppen Place
 6      Bogalusa, Louisiana 70427
        (504) 732-5651
 7      rgp@rgplaw.com
    BY:  Ronnie G. Penton, Esquire
 8
            -and-
 9
    Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
10      2800 Energy Centre, 1100 Poydras Street
        New Orleans, Louisiana 70163
11      (504) 522-2304
        jwoods@gainsben.com
12  BY:  Justin I. Woods, Esquire
13  On Behalf of Morgan Building and Spas, Inc.
    and Morgan Building Systems, Inc.
14
    McGlinchey Stafford, PLLC
15      Fourteenth Floor, One American Place
        301 Main Street
16      Baton Rouge, Louisiana 70825
        (225) 382-3619
17      dwest@mcglinchey.com
    BY:  Dan E. West, Esquire
18
    On Behalf of Gulf Stream Coach, Inc.
19
    Duplass Zwain Bourgeois Pfister & Weinstock
20      3838 N. Causeway Boulevard
        Three Lakeway Center, 29th Floor
21      Metairie, Louisiana 70002
        (504) 832-3700
22      andrewwduplass.com
    BY:  Andrew D. Weinstock, Esquire
```

Page 3

```
 1         APPEARANCES (continued)
 2  On Behalf of Fleetwood
 3  Nelson Mullins Riley & Scarborough LLP
        201 17th Street NW
 4      Suite 1700
        Atlanta, Georgia 30363
 5      (404) 322-6156
        taylor.daly@nelsonmullins.com
 6  BY:  Taylor Tapley Daly, Esquire
 7  On Behalf of United States of America
 8  United States Department of Justice, Civil Division
 9      1331 Pennsylvania Avenue, N.W.
10      Room 8006-S
11      Washington, D.C. 20004
        (202) 616-4223
12      henry.miller@usdoj.gov
    BY:  Henry T. Miller, Esquire
13      Michelle Boyle, Esquire
14  On Behalf of Federal Emergency Management Agency
    Office of the General Counsel
15      500 C Street, S.W., Suite 840
        Washington, D.C. 20472
16      (202) 646-4112
        Jordan.Fried@FEMA.gov
17  BY:  Jordan S. Fried, Esquire
        Jan Williams-Jones, Esquire
18  On Behalf of Forest River, Inc.
    Gieger, LaBorde & Laperouse, LLC
19      701 Poydras Street
        Forty-Eighth Floor
20      New Orleans, Louisiana 70139-4800
        (504) 654-1325
21      jbone@glllaw.com
22  BY:  Jason D. Bone, Esquire
```

Page 4

```
 1         APPEARANCES (continued)
 2  On Behalf of Destiny Industries, LLC, and River Birch
    Homes
 3  Deutsch, Kerrigan & Stiles
        755 Magazine Street
 4      New Orleans, Louisiana 70130
        (504) 593-0735
 5      jkeller@dkslaw.com
    BY:  Josh Keller, Esquire (telephonically)
 6
 7  On Behalf of Silver Creek
    Daigle, Jamison and Rayburn, LLC
 8      303 West Vermilion Street, Suite 210
        P.O. Box 3667
 9      Lafayette, Louisiana 70501
        (337) 234-7000
10      marjie@djrlawfirm.com
    BY:  Marjorie Breaux, Esquire (telephonically)
11
12  On Behalf of Recreation by Design, LLC, TL Industries,
    Inc. and Frontier RV, Inc.
13  Garrison, Yount, Lormand, Forte & Mulcahy, LLC
        909 Poydras Street, Suite 1800
14      Orleans, Louisiana 70112
        (504) 527-0680 X129
15      rmulcahy@garrisonyount.com
16  BY:  Randall C. Mulcahy, Esquire (telephonically)
17
18  On Behalf of Jayco and Starcraft
    Willingham, Fultz & Cougill
19      808 Travis, Suite 1608
20      Houston, Texas 77002
21      (713) 333-7600
22      tomc@willingham-law.com
```

Page 5

```
 1         APPEARANCES (continued)
 2
 3  On Behalf of CMH Mfg., Inc., Southern Energy Homes,
    Inc., Palm Harbor Homes, Inc., Giles Family Holdings,
 4  Inc., SunRay Investments, Inc.
 5  Maynard, Cooper & Gale, PC
        1901 Sixth Avenue North
 6      2400 Regions Harbert Plaza
        Birmingham, Alabama 35203
 7      (205) 254-1091
    BY:  Thomas W. Thagard, III, Esquire (telephonically)
 8
    On Behalf of Redman Homes, Inc., et al.
 9
    Voorhies & Labbe
10      P.O. Box 3527
        Lafayette, Louisiana 70502-3527
11      (337) 232-9700
        lpd@volalaw.com
12  BY:  Hoai T. Hoang, Esquire (telephonically)
13  On Behalf of Plaintiffs
14  Bencomo & Associates
        639 Loyola Avenue, Suite 2110
15      New Orleans, Louisiana 70113
        (504) 529-2929
16  BY:  Raul R. Bencomo, Esquire (telephonically)
17  On Behalf of ScotBilt Homes, Inc.
    Nielsen Law Firm, LLC
18      3838 North Causeway Boulevard
        Suite 2850
19      Metairie, Louisiana 70002
        (504) 837-2500
20      tpennebaker@nielsenlawfirm.com
21  BY:  Thomas C. "Chris" Pennebaker, Esquire
22
```

2 (Pages 2 to 5)

(866) 448.DEPO
www.CapitalReportingCompany.com                    ©2008

e2878f90-2c70-4ddc-bccd-0f65046623d8

Capital Reporting Company
CONFIDENTIAL

Page 6

1   APPEARANCES (continued)
2   On Behalf of American Homestar Corporation and Oak Creek Homes, LP
3
    Hailey McNamara Hall Larmann & Papale
4       10725 Perkins Road, 2nd Floor
        Baton Rouge, Louisiana 70810
5       (225) 766-5567
        DavidBach@HaileyMcNamara.com
6   BY:  David Bach, Esquire (telephonically)

7   On Behalf of Monaco Coach Corporation and R-Vision, Inc.

8       606 Nelson's Parkway, P. O. Box 465
        Wakarusa, Indiana 46573
9       (574) 862-7227
        Michael.hays@monacocoach.com
10  BY:  Michael Hays, Esquire (telephonically)

11  On Behalf of Plaintiffs
    Law Offices of Darryl Becnel
12      106 West 7th Street
        Reserve, Louisiana 70084
13      (985) 536-1186
        darrylbecnel@becnellaw.com
14  BY:  Darryl Becnel, Esquire (telephonically)
15
16  On Behalf of Plaintiffs
    Law Offices of Frank D'Amico
17      622 Baronne Street
        New Orleans, Louisiana 70113
18      (504) 525-7272
19      Aahlquist@damicolaw.net
20  BY:  Aaron Z. Ahlquist, Esquire (telephonically)
21  Also PRESENT:  DANIEL HOLMSTOCK (VIDEOGRAPHER)
22              BRIAN McCREARY (FEMA)

Page 7

1           I N D E X
2   EXAMINATION OF KEVIN SOUZA BY        PAGE
        Mr. Woods               10
3       Mr. Weinstock           73
        Mr. Miller              82
4   SOUZA DEPOSITION EXHIBITS:*          PAGE
5   1 - Notice of Deposition        10
6   2 - Letter to Meunier, et al., from Miller
        dated August 21, 2008       11
7
8   3 - Chain emails re FEMA trailer litigation   11
9
10  4 - Document entitled "Formaldehyde Timeline"  27
11
12  5 - Memorandum re "Formaldehyde - Helpline
        Calls, Referrals and Transfers"     56
13  6 - Document entitled "Formaldehyde Levels in
        FEMA-Supplied Trailers"             57
14
15  7 - Document entitled "Important Information
        For Travel Trailer Occupants"       58
16  8 - Document entitled "Operational Housing
17      Action Plan Script"                 60
18
19  9 - Document entitled "Important Formaldehyde
        Information for FEMA Housing Occupants"  62
20  10 - Document entitled "Script for Formaldehyde
        Concerns in Occupied Temporary Housing Unit"  65
21  11 - Document headed "Important Health Notice"  66
22      (*Exhibits attached to transcript.)

Page 8

1           THE VIDEOGRAPHER:  This is tape number 1 in
2   the 30(b)(6) deposition of Mr. Kevin Souza, taken in
3   the matter in re FEMA Trailer Formaldehyde Products
4   Liability Litigation, pending before the United
5   States District Court for the Eastern District of
6   Louisiana, MDL No. 1873, Section N(4).
7           This deposition is being held at the court
8   reporting offices of Capital Reporting Company,
9   located at 1821 Jefferson Place, Northwest, in
10  Washington, D.C., on September 23rd, 2008 at
11  approximately 9:13 a.m.
12          My name is Daniel Holmstock, from the firm
13  of Capital Reporting Company, and I'm the certified
14  legal video specialist.  The court reporter today is
15  Leslie A. Todd, in association with Capital Reporting
16  Company.
17          For the record, will counsel please
18  introduce themselves and whom they represent.
19          MR. WOODS:  Good morning.  My name is Justin
20  Woods, Mr. Souza, and I represent the plaintiffs in
21  this matter.
22          MR. PENTON:  Ronnie Penton, and I also

Page 9

1   represent the plaintiffs, Mr. Souza.
2           MR. BONE:  Jason Bone on behalf of Forest
3   River, Incorporated.
4           MS. DALY:  Taylor Daly for the Fleetwood
5   defendants.
6           MS. BOYLE:  Michelle Boyle, United States.
7           MR. WEST:  Dan West with McGlinchey
8   Stafford, representing Morgan Building and Spas, and
9   we are appearing here under reservations of rights
10  pursuant to our 12(b) motions that are currently
11  pending.
12          MR. WEINSTOCK:  Andy Weinstock representing
13  Gulf Stream Coach and defense liaison.
14          MS. WILLIAMS-JONES:  Jan Williams-Jones on
15  behalf of FEMA.
16          MR. FRIED:  Jordan Fried, FEMA.
17          MR. MILLER:  Henry Miller on behalf of the
18  defendant United States of America.
19          THE VIDEOGRAPHER:  Before we begin, Counsel,
20  if there are cell phones, they don't have to be
21  turned off, but they do have to be four feet away
22  from the microphone because it could cause

3 (Pages 6 to 9)

(866) 448.DEPO
www.CapitalReportingCompany.com                    ©2008

Capital Reporting Company
CONFIDENTIAL

Page 10

1  interference.
2      Would the court reporter please swear or
3  affirm the witness.
4
5          KEVIN SOUZA,
6      having first been duly sworn, was
7      examined and testified as follows:
8
9      EXAMINATION BY COUNSEL FOR PLAINTIFFS
10 BY MR. WOODS:
11     Q. Good morning, Mr. Souza.
12     Before we get started, we have some
13 administrative tasks that we need to take care of
14 first. The first is I wanted to attach to this
15 deposition, which is the 30(b)(6) deposition of the
16 governmental defendants, which actually is the United
17 States through the Federal Emergency Management
18 Agency, I want to attach the notice of that
19 deposition as Exhibit 1.
20     (Souza Exhibit 1 was marked for
21     identification.)
22     MR. WOODS: The second thing that I want to

Page 11

1  attach is a letter from Henry Miller as Exhibit 2
2  which details the government's objections to the
3  notice of deposition of FEMA as drafted.
4      (Souza Exhibit 2 was marked for
5      identification.)
6      MR. WOODS: And attached as Exhibit 3 is a
7  series of emails between the government attorneys and
8  liaison counsel for plaintiffs, with defendants being
9  copied as well, regarding the scope of this
10 deposition and the matters on which the government
11 has agreed to produce someone to testify on behalf of
12 the government.
13     (Souza Exhibit 3 was marked for
14     identification.)
15     MR. WOODS: Two other items to be attached
16 to this deposition are documents that have been
17 produced in CD format that are detailed in Exhibit 2,
18 which is the letter objections from the government.
19 These CDs contain FEMA's contracts with
20 vendors/manufacturers for the purchase of THUs. It
21 also contains FEMA's contracts with its individual
22 assistance, technical assistance contractors, and it

Page 12

1  contains FEMA documents showing total number of
2  households that occupy THUs, and it also includes
3  documents that were produced by FEMA to Congress and
4  that are not otherwise protected from discovery by
5  virtue of the attorney/client privilege, work-product
6  doctrine, deliberative process privilege, Privacy
7  Act, or any other applicable privilege or protection.
8  BY MR. WOODS:
9      Q. The first question, Mr. Souza, if you would
10 tell me, what is your title with FEMA?
11     A. My current position is I'm the section chief
12 of enterprise coordination and information
13 management.
14     Q. And how long have you held that position?
15     A. Since May of this year.
16     Q. May of 2008. And what position did you hold
17 prior to that?
18     A. Prior to that I was the acting deputy
19 division director of individual assistance at FEMA
20 headquarters.
21     Q. And how long did you hold that position?
22     A. From approximately September or October of

Page 13

1  2007 to May of 2008.
2      Q. And prior to September of 2007, did you have
3  a position with the federal government?
4      A. I did.
5      Q. And what was that position?
6      A. I was the individual assistance program
7  management branch chief for individual assistance at
8  FEMA headquarters.
9      Q. And how long did you hold that position?
10     A. From approximately September or October of
11 2005 until assuming the position of acting deputy
12 division director.
13     Q. Prior to September 2005, did you hold a
14 position with the federal government?
15     A. I did.
16     Q. And what was that?
17     A. I was the executive officer of the recovery
18 division at FEMA headquarters.
19     Q. And how long did you hold that position?
20     A. I believe it was February of 2004 until the
21 program management branch chief.
22     Q. Until September of 2005?

4 (Pages 10 to 13)

Capital Reporting Company
CONFIDENTIAL

Page 14

1  A. Yes, approximately, yes.
2  Q. Okay. Prior to February of 2004, did you
3  hold a position with the federal government?
4  A. Yes.
5  Q. And what was that position?
6  A. I was the administrative program management
7  branch chief at our Boston regional office for FEMA.
8  Q. And how long did you hold that position?
9  A. Approximately a year and a half.
10 Q. So that would be from approximately late
11 2003 to February of 2004?
12 A. I don't recall.
13 Q. Okay. Did you hold a position prior to that
14 with the federal government?
15 A. Yes.
16 Q. Can you tell me about that position?
17 A. Sure. I was an individual assistance
18 program management specialist for the Boston office
19 for FEMA.
20 Q. How long did you hold that position?
21 A. Approximately February of 1998 until the
22 admin services chief.

Page 15

1  Q. Prior to February of '98, did you hold a
2  position with the federal government?
3  A. I did.
4  Q. And what was that position?
5  A. I was an emergency management program
6  specialist with the operations and support division.
7  Q. And how long did you hold that position?
8  A. From approximately 1995 until 1998.
9  Q. Until February of '98?
10 A. Yes.
11 Q. And prior to that position, did you hold a
12 position with the federal government?
13 A. Yes, I did.
14 Q. And what was that position?
15 A. I was a disaster assistance reservist in
16 disaster assistance programs, and that was from
17 approximately July of 1993 until the program
18 management specialist.
19 Q. Prior to holding the position as disaster
20 assistant, did you hold a position with the federal
21 government prior to that?
22 A. I did not.

Page 16

1  Q. You did not. So you began your employment
2  with the federal government with the Federal
3  Emergency Management Agency in July of 1993?
4  A. That's correct.
5  Q. And you are still employed by the Federal
6  Emergency Management Agency?
7  A. Yes.
8  Q. In your current position can you please give
9  me a general description of your responsibilities?
10    MR. MILLER: Objection. Narrative.
11    Go ahead.
12    THE WITNESS: A general description is I'm
13 responsible for reports and information management
14 for the national processing service centers of FEMA.
15 BY MR. WOODS:
16 Q. So just -- does that mean that you are
17 responsible for generating reports or -- and I know
18 this is kind of unartful -- or putting reports
19 together?
20 A. Both. Both for generating reports and the
21 data analysis.
22 Q. Mr. Souza, we marked at the beginning as

Page 17

1  Exhibit No. 1 the Notice of Videotaped Federal Rule
2  30(b)(6) Deposition of Governmental Defendants.
3     Have you seen this document before?
4  A. No, I haven't.
5  Q. You have not?
6  A. No.
7  Q. What is your understanding -- what have you
8  been told is the reason for your appearing at a
9  deposition here today?
10 A. To represent the Agency in regards to
11 formaldehyde concerns and complaints on the lawsuit
12 against FEMA.
13 Q. Let me back up a second. Have you ever
14 given a deposition before?
15 A. Yes, I have.
16 Q. In your capacity as an employee of the
17 federal government?
18 A. Yes.
19 Q. How many times have you given a deposition?
20 A. One other time.
21 Q. And what was the circumstances surrounding
22 that deposition?

5 (Pages 14 to 17)

(866) 448.DEPO
www.CapitalReportingCompany.com                ©2008

Capital Reporting Company
CONFIDENTIAL

Page 18

1   A. I don't specifically recall, but it was a
2   lawsuit against the Agency regarding one of our
3   individual assistance programs.
4   Q. Do you remember a date when that deposition
5   possibly took place?
6   A. I don't.
7   Q. Do you remember what your job title was at
8   the time that that deposition occurred?
9   A. At that time I believe I was the IA program
10  management branch chief.
11  Q. So have you prior to today given any
12  deposition regarding formaldehyde emissions or health
13  concerns regarding such emissions?
14  A. No.
15  Q. Have you provided any congressional
16  testimony upon this subject matter?
17  A. I -- can you better define "provide"?
18  Q. Have you been called before Congress or any
19  committee or subcommittee to provide any testimony?
20  A. No.
21  Q. Were you in any way involved in the
22  preparation of any individual or higher-up in FEMA

Page 19

1   for their congressional testimony?
2   A. Yes.
3   Q. What were you -- who did you assist in such
4   preparation?
5   A. Both Administrator Paulison and Deputy
6   Administrator Harvey Johnson.
7   Q. And how did you provide such assistance?
8   A. General historic and program information
9   about the activities that took place in Katrina.
10  MR. PENTON: Someone does not have their
11  phone on mute.
12  MR. MILLER: And is typing.
13  MR. PENTON: Yes.
14  BY MR. WOODS:
15  Q. When did you meet with Secretary Paulison
16  and Mr. Johnson to prepare them for their
17  congressional testimony?
18  MR. MILLER: Objection. Assumes facts not
19  in evidence.
20  THE WITNESS: I don't specifically recall.
21
22  BY MR. WOODS:

Page 20

1   Q. We'll just explain a little bit about what
2   we're here to do today. There is this notice of
3   deposition. We have attached certain areas that we
4   are interested in developing and inquiring and trying
5   to discover as much information as possible for our
6   class certification purposes in this litigation.
7   It's our understanding that you are being offered to
8   address health issues and concerns as has been
9   detailed in our notice of deposition. And what that
10  means is basically I want to go through a certain
11  series of questions about the Federal Emergency
12  Management Agency's response to the particular crisis
13  that occurred following Hurricanes Katrina and Rita
14  and the relocation of residents to temporary housing
15  units following those hurricanes.
16  MR. MILLER: Counsel, just to make it clear,
17  although you are reading from the notice, my letter
18  and our discussions restricts the deposition to three
19  subject matters. Obviously, you can go beyond that.
20  But for 30(b)(6) purposes, it is restricted to those
21  three subject matters. This witness is presented to
22  discuss FEMA's response to formaldehyde complaints

Page 21

1   and/or concerns between August 2005 and July 2007.
2   MR. WOODS: Okay. And that brings up the --
3   I'm going to take that opportunity now to note for
4   the record our objection that our notice asks for a
5   representative to speak on FEMA's response from
6   August 29, 2005 to the present. The government has
7   told us that the witness that they are making
8   available will only give testimony or information to
9   the time period of July 2007.
10  MR. MILLER: Counsel, let's make it very
11  clear. There was an agreement between us that that
12  would be the scope of this deposition, and you agreed
13  to that, and that is what your emails indicate. If
14  you want to now object, you should have brought that
15  up to the court beforehand and we would have
16  addressed it at that time. You may ask this witness
17  any questions you want post July 2007. It will just
18  not constitute a Rule 30(b)(6) witness on those
19  issues.
20  And we can take up this objection later with
21  the court. You have limited time, so go forward is
22  what I would suggest.

6 (Pages 18 to 21)

(866) 448.DEPO
www.CapitalReportingCompany.com                    ©2008

Capital Reporting Company
CONFIDENTIAL

Page 22

1  BY MR. WOODS:
2      Q. Mr. Souza, do you know the circumstances
3  through and by which FEMA first became aware of any
4  health hazards associated with the exposure to
5  formaldehyde in temporary housing units provided to
6  residents following Hurricanes Katrina and Rita?
7      MR. MILLER: Objection. Vague. Compound.
8      THE WITNESS: Yes, I have a general
9  understanding of how FEMA became aware of
10 formaldehyde concerns.
11 BY MR. WOODS:
12     Q. What is your understanding?
13     A. My understanding is that in approximately
14 March of 2006 that one of our field offices became
15 aware of a formaldehyde issue through a media story,
16 and they began addressing that particular case at
17 that time.
18     Q. I'm sorry. Who became aware?
19     A. One of our field offices.
20     Q. And who would that be?
21     A. It was the Mississippi joint field office.
22     Q. Do you have an individual's name?

Page 23

1      A. Possibly Sid Melton, Sidney Melton.
2      Q. And Mr. Melton's title again is?
3      A. I believe he was the individual assistance
4  program officer at that field office.
5      Q. How did you become to have personal
6  knowledge of this issue?
7      A. I obtained personal knowledge of it after
8  returning to FEMA headquarters from the field in
9  approximately late May or early June.
10     Q. So this is after a field visit to the
11 Mississippi site where Mr. Melton works?
12     A. No.
13     Q. Where -- where were you returning from when
14 you discovered this information?
15     A. I was deployed to Hurricane Katrina in
16 Louisiana two days before the storm made landfall,
17 and I stayed there until approximately Christmas of
18 2005.
19     Q. Between August 29 -- well, I'm sorry --
20 August 27, 2005 and Christmas of 2005, what were your
21 responsibilities?
22     A. I was responsible for initially working

Page 24

1  housing issues across the gulf, and then within a
2  short period of time working housing issues for the
3  State of Louisiana.
4      Q. Could you please explain what you mean by
5  housing issues?
6      A. When a storm is approaching, we start to
7  discuss what a housing plan and strategy may be,
8  along with all of the logistical concerns that would
9  be involved in providing temporary housing units.
10     Q. So was it at this time -- during this time
11 period were you involved in discussions and decisions
12 regarding the use of travel trailers, park models or
13 mobile homes to be used for temporary housing for
14 victims of the hurricane?
15     A. I was involved in discussions.
16     Q. If you can recall, approximately how many
17 meetings occurred regarding the decision to use these
18 THUs for victims of the hurricanes?
19     MR. MILLER: Objection. Foundation.
20     THE WITNESS: I don't recall.
21
22 BY MR. WOODS:

Page 25

1      Q. Do you recall any discussions regarding the
2  possible dangers associated with using THUs for
3  victims of the hurricanes?
4      MR. MILLER: Objection. Vague.
5      THE WITNESS: I recall discussions about the
6  placement of travel trailers in areas that did not
7  have adequate infrastructure, such as water and
8  electricity, which we considered to be a safety issue
9  at that time.
10 BY MR. WOODS:
11     Q. Were you involved in any conversations
12 regarding the possibility of elevated levels of
13 formaldehyde emissions in THUs?
14     A. No.
15     Q. Can you describe for us, please, the
16 circumstances through and under which FEMA first
17 became aware of the existence of, quote/unquote,
18 elevated formaldehyde levels in THUs?
19     MR. MILLER: Objection. Vague.
20     THE WITNESS: Generally, we became aware of
21 the formaldehyde in our units through our field
22 offices, through individuals that were reporting

7 (Pages 22 to 25)

Capital Reporting Company
CONFIDENTIAL

Page 26

1  those concerns to our maintenance office, and then
2  eventually through the media and other avenues,
3  including the Sierra Club, until it became aware --
4  brought up to headquarter's attention, again, in
5  approximately May, I believe -- or at least that's
6  when I got involved was the end of May.
7  BY MR. WOODS:
8      Q. You earlier testified that FEMA officially
9  became aware in March of 2006. Are you now saying
10 that there were complaints that were filed with FEMA
11 prior to March of 2006 in your work in Louisiana?
12     A. Not that I -- no, not that I'm aware of.
13     Q. Are you aware of any complaints that existed
14 prior to March of 2006 anywhere along the gulf coast
15 region regarding formaldehyde emissions in THUs?
16     A. Not that I'm aware of.
17         MR. MILLER: Do you want to take this one
18 which is the unmarked exhibit and give this exhibit
19 to him?
20         MR. PENTON: Yes.
21
22 BY MR. WOODS:

Page 27

1       Q. Mr. Souza, what I'm looking at right now is
2  a document entitled "Formaldehyde Timeline." It
3  starts at March of 2006. And I want to mark this as
4  Exhibit 4.
5          (Souza Exhibit 4 was marked for
6          identification.)
7  BY MR. WOODS:
8       Q. Have you seen this document before?
9       A. Yes.
10      Q. Did you prepare this document?
11      A. No.
12      Q. Did you have any input into the preparation
13 of this document?
14      A. Yes.
15      Q. How so, sir?
16      A. Our FEMA office for legislative affairs was
17 putting this together, and they asked for my input,
18 and I believe I commented via email on their
19 timeline.
20      Q. Who did that request come from in FEMA for
21 you to make your comments?
22      A. It came from, I believe, Heather Smith.

Page 28

1       Q. And what is Ms. Smith's title?
2       A. I believe she's a program specialist.
3       Q. And so was Ms. Smith responsible for the
4  drafting of this document?
5          MR. MILLER: Objection. Foundation.
6          THE WITNESS: I don't know for certain.
7  BY MR. WOODS:
8       Q. Under the March 2006 headline, the third
9  paragraph down, it says that, "FEMA HQ became aware
10 that the Occupational Safety and Health
11 Administration, OSHA, had been conducting
12 formaldehyde testing in Mississippi."
13         Do you see that statement?
14      A. Yes.
15      Q. Were you aware -- at this time in
16 March 2006, were you personally aware that OSHA was
17 conducting formaldehyde testing in Mississippi?
18         MR. MILLER: Objection. Asked and answered.
19         THE WITNESS: No.
20 BY MR. WOODS:
21      Q. Mr. Souza, what studies and/or testing
22 concerns are you aware of that have occurred since

Page 29

1  August 29, 2005 regarding formaldehyde emissions in
2  THUs?
3          MR. MILLER: Objection. Vague, compound.
4          THE WITNESS: I'm aware of the OSHA testing
5  that occurred in approximately March of 2006; I'm
6  aware that FEMA's office of health and safety
7  conducted testing of their own later in 2006; I'm
8  aware of a test done by one of FEMA's contractors, I
9  believe it was Bonner, on an occupied unit; and I'm
10 aware of FEMA's test -- or FEMA's mission/assignment
11 to EPA to conduct testing in late 2006.
12 BY MR. WOODS:
13      Q. Let me go back to the OSHA testing for 2006.
14 What do you know about the OSHA testing of 2006?
15      A. My understanding is that OSHA was conducting
16 testing at one of our -- I believe it was a forward
17 staging area for the safety of some of the contract
18 employees that were working there.
19      Q. Do you know if this testing was requested by
20 FEMA, or is it testing that is just done in the
21 normal course and scope of business?
22      A. I believe in this case, it was not requested

Capital Reporting Company
CONFIDENTIAL

### Page 30

1  by FEMA, but I'm not certain of that.
2      Q. You said you were also aware of FEMA's
3  office of health and safety, that that office
4  conducted testing in 2006 as well. What sort of
5  testing was conducted?
6      A. Employee safety testing.
7      Q. What did that entail?
8      A. I don't know specifically.
9      Q. Do you know if it was to test for
10 formaldehyde emissions in units?
11     A. Yes. I believe it at least included that.
12     Q. And it was -- this testing was conducted to
13 ensure the safety of FEMA personnel?
14     A. Yes.
15     Q. Do you know the results of that testing?
16     A. Generally.
17     Q. What is your understanding of the results?
18     A. The results came back, and the safety office
19 determined that the levels of formaldehyde in the
20 units did not pose a health risk to our employees.
21     Q. Do you know -- do you know if that
22 determination was made based -- I'm sorry. Strike

### Page 31

1  that.
2          What criteria went into determining or
3  setting the guidelines for that testing?
4      A. I don't know specifically.
5      Q. You next said that you were aware of FEMA's
6  contractor testing, the Bonner testing. What is your
7  understanding of the Bonner testing?
8      A. My understanding is that one of our
9  contracting officer's technical representatives in
10 the field requested through one of our, what we call,
11 IA technical assistance contractors to conduct a
12 study on an occupied unit that had concerns about
13 formaldehyde.
14     Q. What were the results of that testing?
15     A. I don't recall.
16     Q. You don't recall. On the -- on the Bonner
17 testing, were you involved in any instructions given
18 to Bonner on the testing that they were conducting?
19     A. No. Excuse me. No.
20     Q. Who was at FEMA involved in the Bonner
21 testing on an administrative or task delivering
22 basis?

### Page 32

1      A. I believe it was the COTR, but I'm not
2  certain of that.
3      Q. I'm sorry?
4      A. I'm sorry. The contracting officer's
5  technical representative.
6      Q. And who is that?
7      A. I don't know who FEMA's COTR was that made
8  that request.
9      Q. Do you know if FEMA ever followed up on the
10 test results of the Bonner testing?
11        MR. MILLER: Objection. Vague.
12        THE WITNESS: I don't know.
13 BY MR. WOODS:
14     Q. The next thing you said you were aware of
15 was FEMA's EPA testing in late 2006. What were the
16 circumstances of that testing?
17        MR. MILLER: Objection. Vague, narrative.
18        THE WITNESS: In approximately early June,
19 we went to EPA, because FEMA is not a scientific
20 organization, and asked for their assistance in
21 conducting formaldehyde testing on behalf of FEMA.
22 BY MR. WOODS:

### Page 33

1      Q. Do you know the results of the EPA testing?
2      A. Generally, yes.
3      Q. And what is your understanding?
4      A. My understanding is that they provided us a
5  report that said that the levels that they found in
6  the units that they tested were below the level of
7  concern for sensitive individuals.
8      Q. Mr. Souza, were you aware that the CDC,
9  Centers for Disease Control, conducted testing in
10 late 2007?
11     A. Yes.
12     Q. On THUs?
13     A. Yes.
14     Q. What is your understanding of that testing?
15        MR. MILLER: Objection. Beyond the scope.
16        THE WITNESS: My understanding is that we
17 went to the CDC to ask for their assistance in doing
18 additional testing of the units, and that they found
19 what they characterized as elevated levels of
20 formaldehyde in some units that they tested.
21
22 BY MR. WOODS:

Capital Reporting Company
CONFIDENTIAL

Page 34

1   Q. And that brings us to the next series of
2   questions. What -- once the CDC informed FEMA of
3   these concerns regarding elevated levels in the THUs,
4   what was FEMA's response?
5       MR. MILLER: Objection. Beyond the scope.
6       THE WITNESS: I would like to refer to my
7   timeline if I can.
8   BY MR. WOODS:
9   Q. Sure. I'm sorry. Are you ready to respond?
10  A. Yes. Prior to the CDC testing in
11  approximately, I believe it was, July of 2007 -- I'm
12  sorry, July of 2007 -- yes, July of 2007, FEMA issued
13  interim direction regarding that anyone who had a
14  concern about formaldehyde -- let me refer to this
15  again.
16      We set up a formaldehyde call center line.
17  I believe that was in July of 2007.
18      I'm sorry. I was mistaken. Oh, maybe I'm
19  not.
20  Q. The CDC testing didn't occur until late '08.
21  The interim report was issued in February of '08, so
22  the call center would have been set up sometime after

Page 35

1   that?
2   A. No. I believe the call center was set up
3   prior to that. And I'm trying to find a specific
4   reference for you, but --
5       MR. MILLER: If you go to page 5, I think,
6   about two-thirds of the way down. It's July 21,
7   2007.
8       THE WITNESS: Yes. In July of 2007, FEMA
9   had already issued an interim direction and set up a
10  formaldehyde call center, and the instructions were
11  that anyone who called that formaldehyde hotline
12  would either be transferred over to CDC, if they had
13  health questions or concerns, or they would also be
14  offered safe, alternate housing anywhere else, to
15  include hotels, motels or apartments anywhere in the
16  Continental United States.
17      So following the CDC testing, we continued
18  to inform applicants that they could move out of
19  those units at any time. And in addition, we set up
20  a new contract to test any units where -- if people
21  called up and said, "My unit was not tested as part
22  of the study, but I have concerns about that." And

Page 36

1   then for the people who were tested, CDC and FEMA
2   went out with a health consultation and provided
3   those people an explanation and information about the
4   individual testing on their unit that was conducted.
5   BY MR. WOODS:
6   Q. Can you answer for me, why did it take to
7   that time period -- if complaints were received in
8   March of 2006 and the call center was set up in July
9   of 2007 -- that's approximately a year and three
10  months -- could you explain to me why it took FEMA so
11  long to set that call center up?
12      MR. MILLER: Objection. Narrative, vague.
13      THE WITNESS: There were a number of steps
14  that were taken prior to us setting up that specific
15  call center. Beginning in March of two thousand --
16  well, beginning in earnest in June, late May or June,
17  with the EPA testing, FEMA sent out brochures to
18  every occupant of our units in, I want to say about,
19  July of 2006 informing them of what formaldehyde was
20  and what they could do to mitigate against some of
21  the potential effects of it, and then we were
22  awaiting the results from the EPA studies, and then

Page 37

1   when the EPA studies were completed, we again did a
2   public and media campaign to inform the public of
3   those results and what they could do.
4       And so a number of steps were taken prior to
5   CDC's involvement in 2008.
6   BY MR. WOODS:
7   Q. Have you had an opportunity -- or, have you
8   seen either the interim findings on formaldehyde
9   levels in FEMA supplied travel trailers, park models
10  and mobile homes that was issued by CDC in February
11  of '08 or its final report that was issued in July of
12  '08?
13      MR. MILLER: Objection. Beyond the scope.
14      THE WITNESS: I may have seen it. I don't
15  specifically recall.
16  BY MR. WOODS:
17  Q. Okay. I'm going to just ask you
18  specifically in your capacity, in the report there
19  were certain recommendations that were made by CDC,
20  and I just want to get a response as to what was
21  FEMA's response to these recommendations.
22      The first was that there would be a

Capital Reporting Company
CONFIDENTIAL

Page 38

1  follow-up requiring multi-agency collaboration,
2  including FEMA, HUD and CDC, to achieve safe, healthy
3  housing for people displaced by Hurricanes Katrina
4  and Rita who continue to live in travel trailers,
5  park models and mobile homes.
6       What was FEMA's role in that multi-agency
7  collaboration, if any?
8       MR. MILLER: Objection. Hold on. Beyond
9  the scope.
10      Maybe we can just have a standing objection
11 on this because I don't want to interrupt your
12 questions.
13      MR. WOODS: Sure. No problem.
14      MR. MILLER: Okay. And, I mean, he is not
15 speaking for FEMA at this point. He hasn't been
16 prepped to speak for FEMA on these issues. So to the
17 extent you get his personal knowledge, I have no
18 objection to that.
19      MR. WOODS: Well, he's -- I'm sorry -- he's
20 being offered concerning the health issues, concerns
21 and response by FEMA.
22      MR. MILLER: Up to July of 2007. You are

Page 39

1  talking 2008 here now, Justin.
2       MR. WOODS: Okay.
3       MR. MILLER: To the extent he has knowledge,
4  you are welcome to explore it.
5       THE WITNESS: I'm sorry. Can you just
6  repeat the question?
7  BY MR. WOODS:
8    Q. Yes. There was a recommendation that there
9  would be a follow-up, a multi-agency collaboration
10 follow-up, including FEMA, HUD and CDC, including
11 state and local officials, to achieve safe, healthy
12 housing for people displaced by Hurricanes Katrina
13 and Rita who continue to live in travel trailers,
14 park models and mobile homes.
15      Do you know what role FEMA played in that
16 multi-agency follow-up, if any?
17   A. I don't know.
18   Q. Another recommendation -- and this is,
19 again, if you know, noting the ongoing objection --
20 was that federal, state and local officials should
21 consider how best to provide necessary assistance to
22 the Louisiana and Mississippi state health

Page 40

1  departments to ensure adequate follow-up, including
2  medical needs for residents with health and medical
3  concerns resulting from formaldehyde exposure while
4  residing in FEMA travel trailers, park models and
5  mobile homes.
6       Do you know what FEMA has done in such a
7  regard?
8       MR. MILLER: And I understand I have a
9  standing objection. Correct, Counsel?
10      MR. WOODS: Yes.
11      MR. MILLER: Thank you.
12      THE WITNESS: No, I don't.
13 BY MR. WOODS:
14   Q. And another recommendation was that the
15 federal, state and local officials should consider
16 supporting the establishment of a health registry of
17 children and others who resided in travel trailers,
18 park models and mobile homes in the Louisiana gulf
19 coast region.
20      Do you know, sir, if FEMA has in any way
21 participated in setting up such a health registry of
22 children?

Page 41

1    A. I don't know.
2    Q. Again, this is an issue that is beyond the
3  July '07 scope. It's the -- are you, sir, aware of a
4  Lawrence Berkeley national laboratory study?
5    A. No.
6    Q. It was a study that was conducted on
7  component parts -- or, a testing conducted on
8  component parts, I believe, at the request of FEMA.
9       Do you have any knowledge of that?
10   A. I have general information that FEMA was
11 interested in -- I think they asked CDC to take a
12 better look at the component parts of what was in the
13 units so that perhaps in the future we could make
14 FEMA-specific changes that may assist in reducing
15 formaldehyde.
16   Q. Do you know, sir, what changes have occurred
17 to make those specifications more in line with lower
18 formaldehyde emissions?
19      MR. MILLER: Objection. Vague, time.
20      THE WITNESS: I know that FEMA has made
21 changes to the specifications, not -- to the best of
22 my knowledge, not in specific regards to any study --

11 (Pages 38 to 41)