Capital Reporting Company
CONFIDENTIAL

Page 42

1  but we have worked with HUD and, I believe, members
2  of the industry to try and remove some of the more
3  known items that contain formaldehyde in our units.
4  BY MR. WOODS:
5      Q. In response to some discovery requests that
6  were sent to the federal government in this matter,
7  we were directed to a website, and it's entitled,
8  "FEMA's Ongoing Response to Formaldehyde," and it's
9  current up to February 12, 2008, and it can be found
10 at www.fema.gov/news/newsrelease.FEMA?id=42586.
11 That's for the record.
12     Are you aware of that website?
13     A. Only generally.
14     Q. What is your understanding of the purpose of
15 that website?
16     A. I believe you were referring to just the
17 general news and media site that FEMA has, and I was
18 aware that some formaldehyde information in terms of
19 what we were doing was being posted there.
20     Q. Do you supply any information or did you --
21 I'm sorry -- did you supply any information for
22 inclusion at that website?

Page 43

1      A. Not that I'm aware of.
2      MR. MILLER: Objection. Vague.
3  BY MR. WOODS:
4      Q. The other website that we were directed to
5  for -- in response to our discovery requests is a
6  website entitled, "FEMA Katrina/Rita Individual
7  Weekly Updates."
8      MR. MILLER: Justin, just to make it clear,
9  I actually also produced those documents to you after
10 our discussion and supplemented the production, so
11 you actually have those documents that are at those
12 websites. I emailed it to you.
13     MR. WOODS: I'm sure it's there somewhere.
14 BY MR. WOODS:
15     Q. For the record, it is www.fema.gov/
16 hazard/hurricane/2005Katrina/weekly_ia.shtm.
17     Do you have responsibility for that
18 particular -- the information that can be found at
19 that particular website?
20     A. I don't, no.
21     MR. MILLER: Just to make it clear, Justin,
22 I think that second site was where you were asking

Page 44

1  for the total number of people who received by state
2  and that was a document which summarized that
3  information.
4      MR. WOODS: And just for the record, it is
5  our understanding that -- we understand that those
6  websites exist and give information, and it is
7  current, I believe -- I checked it last night, and
8  it's current up to September 11, 2008. It's my
9  understanding that we would have a witness available
10 to discuss the information that's contained in that
11 website. It's part of the response --
12     MR. MILLER: It was not, but if you had
13 those documents present, this witness could probably
14 go through in detail and explain what is in those
15 documents, and you were produced and provided with
16 those documents.
17     MR. WOODS: Okay.
18     MR. MILLER: I believe it shows the
19 aggregate number of households that were assigned
20 units, temporary housing units, in each of the four
21 states, the total number, how many are currently in
22 those units at this time. And this witness could

Page 45

1  explain generally how those numbers are collected and
2  where they are collected, if that is what you want.
3  But it is beyond the scope, but I think this witness
4  can probably give you that if that's what you're
5  looking for.
6      MR. PENTON: It's part of the production of
7  documents.
8      MR. MILLER: Yeah. Yeah. And, just to be
9  clear, we are not contesting the accuracy of those
10 documents in terms of authentication or anything like
11 that.
12     MR. WOODS: I'm sorry. It's my
13 understanding that he was going to be offered and be
14 able to testify regarding the compilation of that
15 information and how it comes to be collected and
16 compiled.
17     MR. MILLER: I think that's beyond the scope
18 but you might want to ask him; he may have that
19 information available and be able to explain it to
20 you. I'm not positive about that.
21
22 BY MR. WOODS:

EXHIBIT 6B

(866) www.CapitalReporting.com    ©2008

12 (Pages 42 to 45)

Capital Reporting Company
CONFIDENTIAL

Page 46

1   Q. Mr. Souza, let me go back just for a second
2   to FEMA's contractor testing, the Bonner testing,
3   that was overseen by the contractor officer.
4       MR. MILLER: Objection. Assumes facts not
5   in evidence.
6       MR. WOODS: I believe he testified that that
7   was who was responsible for the oversight of the
8   Bonner testing.
9       MR. MILLER: The testimony speaks for
10  itself, but I think he testified that the contracting
11  officer's technical representative ordered or
12  requested that CH2M Hill conduct that testing or get
13  that testing done.
14      MR. PENTON: I don't think he remembered
15  that it was CH2, but --
16      MR. MILLER: Maybe it was you who mentioned
17  that. I apologize for that --
18      MR. PENTON: It was --
19      MR. WOODS: Yeah, that wasn't on the record.
20  Okay.
21      MR. MILLER: And I don't like speaking
22  objections, and I apologize for that.

Page 47

1   BY MR. WOODS:
2       Q. And, again, I'm sorry if I've asked this
3   question: Sidney Melton, what was his title again?
4       A. I believe he was the individual assistance
5   program officer in Mississippi.
6       Q. Would he have had any oversight authority on
7   CH2M Hill?
8       A. He may have. Let me clarify that a little
9   bit. Our contracting specialists have direct
10  oversight over the contractors. Sid's position would
11  have been on the program side, and so while he may
12  not have had direct oversight over CH2M Hill, he
13  would have had a close working relationship with
14  them.
15      Q. He would have had a close working
16  relationship?
17      A. Yes.
18      Q. He would have had certain authority to
19  instruct them to perform certain tasks?
20      MR. MILLER: Objection. Foundation.
21      THE WITNESS: He actually wouldn't have had
22  the authority to instruct the contractors to do

Page 48

1   anything, but he does have the authority to direct
2   FEMA's contracting office technical representatives
3   to put forward -- initiate the action rather than go
4   directly to the contractor.
5   BY MR. WOODS:
6       Q. Sir, what is your understanding -- or, what
7   do you consider to be -- and this is in your capacity
8   as a FEMA employee -- to be a safe level of
9   formaldehyde concentration in indoor air for
10  residents of THUs?
11      MR. MILLER: Objection. Foundation,
12  speculation, calls for expert testimony.
13      Go ahead.
14      THE WITNESS: My understanding is that there
15  is no specifically-defined safe level of
16  formaldehyde.
17  BY MR. WOODS:
18      Q. No specifically defined, meaning that there
19  are no safe levels?
20      A. I believe that several federal agencies and
21  departments have some levels that they use, but that
22  there's no specific residential indoor standard.

Page 49

1       Q. Do you know that to be the case today as you
2   currently sit here, that there's no specific level?
3       MR. MILLER: Objection. Vague.
4       THE WITNESS: For residential?
5   BY MR. WOODS:
6       Q. For residential.
7       A. That's my understanding, yes.
8       Q. What steps were taken by FEMA to coordinate
9   with any manufacturer or supplier of THUs to resolve
10  concerns about formaldehyde emissions?
11      MR. MILLER: Objection. Vague, time.
12      THE WITNESS: I believe initially there was
13  outreach from the program office for individual
14  assistance to some members of the manufacturing
15  community on kind of fact-gathering on what is
16  formaldehyde and why it would be present in the
17  specific units.
18  BY MR. WOODS:
19      Q. Were you present at any meeting or
20  conference, telephone conference, with any
21  manufacturer or supplier regarding formaldehyde
22  emission concerns?

13 (Pages 46 to 49)

Capital Reporting Company
CONFIDENTIAL

Page 50

1    A. No.
2    Q. You described FEMA's coordination activities
3 with manufacturers or suppliers as outreach, and that
4 is sort of a vague term. Can you be more specific
5 regarding outreach?
6        MR. MILLER: Objection. Vague.
7        THE WITNESS: I'm sorry. I don't remember
8 where I specifically used the word "outreach." Can
9 you --
10 BY MR. WOODS:
11   Q. That was in response to a question
12 concerning the steps that FEMA took to coordinate
13 with manufacturers or suppliers of THUs, you said
14 that there was outreach from program officers.
15   A. By outreach, I meant -- I believe one of our
16 program specialists contacted some members of the
17 industry to start fact gathering on formaldehyde in
18 general.
19   Q. And who was that program specialist?
20   A. I believe it was David Porter.
21   Q. And he was tasked with this specific
22 responsibility?

Page 51

1    A. He was tasked with -- his primary
2 responsibility is direct housing which includes the
3 temporary housing units. I don't recall that he was
4 specifically tasked to contact the industry, but I
5 believe that he did so.
6    Q. Also, sir, in this litigation, we were
7 provided with what is considered to be communications
8 from governmental entities to residents of THUs
9 regarding formaldehyde exposure and emission in
10 units.
11       Were you responsible or involved in the
12 drafting of such notices? And I know that's a broad
13 question. We have, I think, about 43 individual --
14 42 individual documents that were crafted or provided
15 to us in response to that request.
16       MR. MILLER: I'm going to object. Vague.
17 BY MR. WOODS:
18   Q. On behalf of FEMA, were you involved in
19 drafting language or -- that addresses health
20 concerns of formaldehyde emission?
21       MR. MILLER: Same objection.
22       THE WITNESS: I don't recall being

Page 52

1 specifically involved in the drafting of those
2 documents. I'd clarify that I was provided -- I
3 don't know what's -- what you have been provided, but
4 I was provided copies of some documents for comment.
5 BY MR. WOODS:
6    Q. Do you know what documents you were provided
7 for comment?
8    A. Only by general category. Sometimes it was
9 press releases; sometimes it was fact sheets for
10 frequently-asked questions. Things of that nature.
11   Q. What specific areas were you asked to
12 provide comment on?
13   A. I don't recall.
14   Q. Were you asked to provide comment on health
15 concerns, or were you asked to provide comment on
16 displacement and alternative housing issues?
17   A. I was not asked to provide comment or
18 technical expertise on health or formaldehyde
19 specific related issues. It was more in the context
20 of either actions that we had taken as a program, or
21 were taking, in terms of alternative housing options
22 to address potential issues.

Page 53

1        MR. PENTON: Could we get a time from the
2 videographer?
3        THE VIDEOGRAPHER: Sure. One hour and two
4 minutes.
5        (A discussion was held off the record.)
6 BY MR. WOODS:
7    Q. On the communications that were sent to
8 residents of THUs to address concerns of formaldehyde
9 emissions in units, what was the criteria that was
10 used to select or to determine who would receive
11 those communications?
12       MR. MILLER: Objection. Vague, compound.
13       I think you indicated, Counsel, that there
14 were 40 in the notebook that you are referring to.
15       THE WITNESS: In regards --
16 BY MR. WOODS:
17   Q. If you can answer it.
18   A. In regards to at least the flyers that were
19 sent, they were sent to everyone who was in a unit.
20   Q. I want to go back to earlier testimony. You
21 testified that between August 27, 2005 and Christmas
22 of 2005, you were on the ground in Louisiana, and you

14 (Pages 50 to 53)

Capital Reporting Company
CONFIDENTIAL

Page 54

1  were involved in the decision-making process
2  regarding the use -- or, housing issues following
3  Hurricanes Katrina and Rita, correct?
4      A. I was involved in discussions, yes.
5      Q. During those discussions, do you recall any
6  discussion or any topic concerning the warnings or
7  instructions and/or use recommendations of THUs for
8  residents?
9          MR. MILLER: Objection. Vague, compound.
10         THE WITNESS: No.
11         MR. MILLER: Narrative.
12         MR. WOODS: Henry, I thought that we had --
13 this is item No. 7 -- is this the same witness that
14 is supposed to testify regarding the FEMA's warnings,
15 instructions and manufacturing brochures and
16 warnings?
17         MR. MILLER: I think what I discussed with
18 you is that this witness would be able to opine on
19 what FEMA did to respond between August 2005 and July
20 2007. And I believe that most of the warnings that
21 you have there are probably things that were
22 generated after July 2007 once the call line --

Page 55

1  because a lot of those, if I'm correct -- and
2  Michelle probably knows better than me -- are like
3  decision trees or phone trees that were supposed to
4  be used. The warnings or discussions that FEMA
5  issued regarding formaldehyde, if that is what you
6  want to ask, I think you can ask this witness, but I
7  don't think anything other than the actual flyer that
8  was sent in July 2007 and July 2006 are the documents
9  that were sent out by July 2007, Counsel. There may
10 be something else in there, but that's my
11 recollection.
12         MS. BOYLE: And the index will tell you the
13 dates.
14         MR. MILLER: Yeah.
15         MR. WOODS: I'm sorry. I'm just recalling
16 from my conversation that this witness would also be
17 able to testify regarding any of the manufacturing
18 brochures or anything else that would have been in
19 the units during that time period.
20         MR. MILLER: In the units?
21         MR. WOODS: Yes, or available to FEMA.
22         MR. MILLER: I don't even -- I have no --

Page 56

1  and I apologize. I just may have misunderstood. But
2  if I recall correctly, what I told you is that the
3  documents that have been collected have been provided
4  to you pursuant to court order, and that those had
5  been collected at the request of FEMA counsel, and
6  that there wasn't any one witness or anyone who could
7  address any of those matters. This witness could
8  address what issues or what disclosures had been
9  issued by FEMA up to July 2007, but what the
10 manufacturers included with their units or came
11 within the units, that I have no idea and obviously
12 vary from manufacturer to manufacturer, and you'd
13 have to ask them what they included. And just a
14 note, that has been asked of all of the various
15 manufacturers who have been deposed.
16         (Souza Exhibit 5 was marked for
17         identification.)
18 BY MR. WOODS:
19     Q. Mr. Souza, what you've just been handed and
20 what we'll mark as Exhibit 5 is a document with an
21 identifying Bates range of FEMA 10-000386 through
22 FEMA 10-000390, and it is -- appears to be a

Page 57

1  memorandum from -- for the FEMA temporary housing
2  agency group from the national coordination team.
3         Have you seen this document before?
4      A. No.
5      Q. If -- after looking at this document, do you
6  have any recollection of having any input into the
7  crafting of this document?
8      A. No.
9          MR. WEINSTOCK: Date?
10         MR. WOODS: I'm sorry. The date is --
11         MR. MILLER: July 21st, 2007, 4:48 p.m.
12         (Souza Exhibit 6 was marked for
13         identification.)
14 BY MR. WOODS:
15     Q. Mr. Souza, what you've just been handed and
16 we are now marking as Exhibit 6 to this deposition is
17 a document with a Bates range of FEMA 09-000390
18 through FEMA 09-000391, and it's entitled,
19 "Formaldehyde levels in FEMA supplied trailers; early
20 findings from the Centers For Disease Control and
21 Prevention."
22     I don't have a date as being referenced on

15 (Pages 54 to 57)

(866) 448.DEPO
www.CapitalReportingCompany.com                    ©2008

Capital Reporting Company
CONFIDENTIAL

Page 58

1  this particular document.
2      MR. MILLER: You may want to check the
3  timeline, Counsel.
4      MR. WOODS: Yes.
5  BY MR. WOODS:
6      Q. But it purports to be a document that was
7  drafted and disseminated in approximately February of
8  2008. Have you ever seen this document, sir?
9      A. Yes, I believe I have.
10     Q. Did you have any involvement in the drafting
11 of this document?
12     A. No.
13     Q. Again, what department at FEMA or what
14 particular individual, if you know, would have had
15 the task of drafting this particular document?
16     A. At FEMA it's possible that Michael Lapinski
17 was involved.
18     Q. Michael Lapinski?
19     A. Yes.
20     (Souza Exhibit 7 was marked for
21     identification.)
22 BY MR. WOODS:

Page 59

1      Q. Sir, I'm handing you another document that
2  will be attached as Exhibit 7 to your deposition, and
3  it's Bates range FEMA 09-000386 through FEMA
4  09-000387. It's a document entitled, "Important
5  Information for Travel Trailer Occupants."
6      The purported date for this to be drafted
7  was approximately July of 2006. Have you seen this
8  document before?
9      A. Yes.
10     Q. Did you have any responsibility in the
11 drafting of this document?
12     A. Not in the specific drafting of it, but an
13 employee who worked for me.
14     Q. An employee who worked for you.
15     And what instructions were given to the
16 employee working for you in the drafting of this
17 document?
18     A. They were to work with EPA and the field
19 offices to craft a flyer that could be sent to all
20 travel occupants, travel trailer occupants.
21     Q. And this flyer was drafted in response to
22 the EPA testing results?

Page 60

1      A. No. I believe this was prior to the actual
2  results.
3      Q. If you know, sir, how -- what was the origin
4  or the need for this document to be created?
5      A. As I had mentioned earlier, FEMA, in
6  approximately March through May, became aware that
7  people were calling the maintenance line about
8  formaldehyde issues, and so FEMA wanted to provide
9  information to the occupants about what formaldehyde
10 was and what they could do to reduce it in their
11 units, and so we contacted EPA to assist us with
12 that.
13     Q. So EPA, sir, provided you with the
14 background information and suggested text for this
15 particular document?
16     MR. MILLER: Objection. Foundation.
17     THE WITNESS: I don't know that
18 specifically. I just know that they were involved in
19 assisting us in drafting this.
20     (Souza Exhibit 8 was marked for
21     identification.)
22 BY MR. WOODS:

Page 61

1      Q. The next document, sir, that I'm handing you
2  is going to be marked as Exhibit 8 and it's a
3  document with Bates range FEMA 09-000408 through FEMA
4  09-000424. It's entitled, "Operational Housing
5  Action Plan Script." It has at the bottom of it a
6  date of February 14, 2008; however, we have been told
7  that it was approximately drafted and used in
8  February of 2007.
9      Have you ever seen this document before?
10     A. I don't think so, no.
11     Q. In your duties -- and talking about the time
12 period of August 29 through July of 2007 -- would
13 this have been a particular type of document that you
14 would have been involved in the drafting of?
15     A. Can you repeat the question, please?
16     Q. Bad question.
17     I'm trying to determine whether or not --
18 and maybe counsel can answer this -- whether or not
19 this is indeed a February 2008 document or a February
20 2007 document as we've been told. So I'm trying to
21 determine whether or not during the time period for
22 which you are being offered --

16 (Pages 58 to 61)

(866) 448.DEPO
www.CapitalReportingCompany.com                      ©2008

Capital Reporting Company
CONFIDENTIAL

Page 62

1  MS. BOYLE: I apologize. That may be a typo
2  on the index. I would use the date on the document.
3  MR. WOODS: On the document. Okay.
4  MR. MILLER: And the reason why is that we
5  didn't have the telephone hotline established until
6  July of 2007, so you wouldn't think there would be a
7  script.
8  MR. WOODS: All right. I wanted to get that
9  clear.
10  MR. MILLER: Understood. If that becomes an
11  issue, just write us a letter and we will clarify it.
12  (Souza Exhibit 9 was marked for
13  identification.)
14  BY MR. WOODS:
15  Q. The next document, sir, that I'm handing to
16  you is to be marked as Exhibit 9 to this deposition.
17  It's with a Bates range of FEMA 09-000388 -- I'm
18  sorry.
19  MR. WOODS: I'm sorry, Henry. Does that
20  have two pages?
21  MR. MILLER: It does.
22  THE WITNESS: It does. The second page is

Page 63

1  blank.
2  BY MR. WOODS:
3  Q. For purposes of the record, it goes through
4  FEMA 09-000389, and it is entitled, "FEMA: Important
5  Formaldehyde Information for FEMA Housing Occupants."
6  It's a document that we have been told was
7  drafted and referred to and used in approximately
8  July of 2007. Have you ever seen this document
9  before, sir?
10  A. Yes.
11  Q. What involvement did you have, sir, in the
12  drafting of this document?
13  A. I think I recall reviewing this through
14  email.
15  Q. You reviewed it through email. Who asked
16  you to review this particular document?
17  A. I don't recall.
18  Q. Do you recall what you were asked to pay
19  any -- if -- to pay any particular attention to any
20  particular item on this document?
21  A. I don't recall.
22  Q. Did you provide any comment to this

Page 64

1  particular document?
2  A. I don't recall.
3  Q. Do you recall the purpose for this
4  particular document?
5  A. Yes. We had just set up the formaldehyde
6  hotline, and this was a way to disseminate that phone
7  number to all the travel trailer occupants.
8  Q. How was this flyer disseminated, if you
9  recall?
10  A. I think it was sent -- I don't know for
11  certain, but I think it was sent in multiple ways. I
12  think it was sent by mail for our group sites and
13  units we had access to. I think they were hand
14  delivered. And then there was also -- the number was
15  sent out through media outlets and other forms of
16  public communication.
17  Q. At the bottom of this particular form, it
18  says that "FEMA operators will immediately direct
19  your call to specialists, who will assist you with
20  questions about three items: Formaldehyde and
21  health-related issues, other available FEMA housing
22  assistance options, and recently purchased FEMA

Page 65

1  housing units."
2  The first item, formaldehyde and
3  health-related issues, what were the specialists --
4  strike that. What instructions were given to the
5  specialists responding to these calls concerning
6  formaldehyde and health-related issues?
7  A. My understanding is that the operators
8  answering this number were supposed to refer those
9  calls to the CDC hotline that had been set up.
10  Q. Okay. And was there a script developed to
11  be responsive to this particular flyer?
12  A. I believe there was.
13  (Souza Exhibit 10 was marked for
14  identification.)
15  BY MR. WOODS:
16  Q. I've just handed you a document that will be
17  Exhibit 10 to this deposition, and it has a Bates
18  range of FEMA 09-000402 through FEMA 09-000407. It's
19  entitled "Script for formaldehyde concerns in
20  occupied temporary housing units." At the bottom
21  there is a date of July 21, 2007.
22  Is this the script that was drafted to be

17 (Pages 62 to 65)

Capital Reporting Company
CONFIDENTIAL

Page 66

1  responsive to this particular flyer -- which has been
2  labeled as Exhibit 9, the flyer?
3       MR. MILLER: Objection. Foundation.
4       THE WITNESS: I don't know if this is the
5  actual script, but it appears to be.
6  BY MR. WOODS:
7       Q. Do you know, sir, that if someone were to --
8  a resident were to call with health-related issues,
9  formaldehyde and health-related issues, and they are
10 directed to, as you said earlier, to a CDC number,
11 what information is then disseminated or given to
12 them by CDC?
13      MR. MILLER: Objection. Foundation.
14      THE WITNESS: I don't know.
15 BY MR. WOODS:
16      Q. I'm handing you a document which I would
17 like to mark as Exhibit 11.
18      (Souza Exhibit 11 was marked for
19      identification.)
20 BY MR. WOODS:
21      Q. Exhibit 11 is entitled, "Important Health
22 Notice." At the bottom of this document, it says

Page 67

1  that, "This notice is required by the Department of
2  Housing and Urban Development and shall not be" --
3  and there's some other language that's missing from
4  this particular copy.
5       Have you ever seen this document before?
6       A. Not that I recall.
7       Q. Sir, if I told you that this document was
8  found in a recreational vehicle, not any unit that
9  was used in response to provide housing for residents
10 following Hurricanes Katrina and Rita, do you have
11 any reason to disbelieve that?
12      MR. MILLER: Objection. Speculation.
13      THE WITNESS: The only reason I might have
14 to disbelieve that is that -- I know that HUD
15 provides oversight to the manufactured housing and
16 not necessarily the recreational vehicle industry.
17      I'm sorry. To repeat, I know that HUD is
18 responsible for oversight of the manufactured housing
19 industry, but I don't know how much oversight they
20 have over the recreational vehicle industry.
21
22 BY MR. WOODS:

Page 68

1       Q. If you look down to paragraph 3 of this
2  particular document, it reads, "High indoor
3  temperatures and humidity raise formaldehyde levels.
4  When a home is to be located in areas subject to
5  extreme summer temperatures, an air conditioning
6  system can be used to control indoor temperature
7  levels. Check the comfort cooling certificate to
8  determine if this home has been equipped or designed
9  for the installation of an air conditioning system."
10      In your capacity and during the discussions
11 that you were involved in during August 27, 2005
12 through Christmas 2005, were there ever any concerns
13 raised concerning the use of THUs in the climate in
14 which -- the gulf south region climate in which the
15 THUs would be used?
16      A. No.
17      Q. If you look at the very first paragraph, it
18 says: "Some of the building materials used in this
19 home emit formaldehyde. Eye, nose and throat
20 irritation, headache, nausea and a variety of
21 asthma-like symptoms, including shortness of breath,
22 have been reported as a result of formaldehyde

Page 69

1  exposure. Elderly persons and young children, as
2  well as anyone with a history of asthma, allergies or
3  lung problems may be at a greater risk. Research is
4  continuing on the possible long-term effects of
5  exposure to formaldehyde."
6       Again, during your discussions in Louisiana
7  between August 27, 2005 and Christmas of 2005, were
8  there ever any concerns raised of these particular
9  types of symptoms that may occur from the use of THUs
10 by residents displaced by Hurricanes Rita or Katrina?
11      A. Not that I'm aware of.
12      Q. Sir, again, if you would go back to the
13 formaldehyde timeline, I just have a couple of quick
14 follow-up questions on that.
15      MR. MILLER: Exhibit 4?
16      MR. WOODS: I think it's Exhibit 4.
17 BY MR. WOODS:
18      Q. Do you have it in front of you?
19      If you go to page 2, on August 8, 2006, it
20 says that FEMA issued a press release on a plan to
21 test methods to reduce formaldehyde in travel
22 trailers.

18 (Pages 66 to 69)

Page 70

1  Sir, do you have any recollection as to what
2  that plan to test methods to reduce formaldehyde in
3  travel trailers was?
4      A. I know, in general, what the plan was, and
5  the plan was to test unoccupied units for
6  formaldehyde.
7      Q. And that plan would then lead to the -- a
8  method to reduce formaldehyde?
9      A. The plan was to test unoccupied units to see
10 if ventilation was an effective mitigation strategy.
11     Q. And the results of that testing, if you
12 know?
13     A. The general results were that units that
14 were properly ventilated had a formaldehyde level
15 below the level of concern for sensitive individuals.
16     Q. How long, sir, is proper?
17     A. I don't know.
18     Q. Okay. Sir, if you know -- you said that
19 following that testing to reduce, that -- it was
20 determined that ventilation would help to reduce the
21 level of formaldehyde in units, correct?
22     A. Correct.

Page 71

1      Q. Can you give us a period, a time period, as
2  to when -- as to how much ventilation time would be
3  required to reduce levels?
4      A. No.
5      Q. When -- were there ever any instructions
6  given to residents to ventilate their unit to reduce
7  formaldehyde levels?
8      A. I believe it was in the flyer that we sent
9  out.
10     Q. And that's the flyer of July 2007?
11     A. That's correct.
12     Q. So that's when -- again, a year and four
13 months following the first notification of FEMA of
14 issues and concerns regarding formaldehyde exposure?
15     A. I'm sorry. The first flyer that we sent
16 out, which was in June of 2006 -- there's actually a
17 couple of things. One is the initial instructions
18 that we provided to the field offices when the
19 formaldehyde complaints first started coming in in
20 and around, I think it was, mid-June was that if
21 applicants called the maintenance line with concerns
22 about formaldehyde that they were to be instructed to

Page 72

1  ventilate out the units and not smoke in the units
2  and so forth. We were sending housing specialists to
3  the units to provide them that instruction.
4      And then in and around that same time, I
5  think the first flyer that we sent out instructed
6  folks to ventilate their units.
7      Q. Do you have -- is that one of the flyers
8  that's been marked as an exhibit?
9      A. I believe it is. I'm looking at Exhibit 7.
10     Q. Exhibit 7. And again the date of that
11 particular exhibit?
12     A. There's no date on here, but I believe it
13 was distributed in July of 2006 -- in and around July
14 of 2006.
15     Q. And that was distributed to each and every
16 resident of a THU?
17     A. Yes.
18     Q. How so?
19     A. Either through the mail or through hand
20 delivered at our group sites.
21     MR. WOODS: What's the time right now?
22     THE VIDEOGRAPHER: One hour, 41 minutes.

Page 73

1      MR. WOODS: Mr. Souza, okay. Sir, I think
2  at this time we are finished with our questioning of
3  you. Thank you.
4      THE WITNESS: You are welcome.
5      MR. MILLER: Does defense want to --
6      MR. WEINSTOCK: Yeah. Can we take a short
7  break, and then -- I want to talk about logistics.
8      THE VIDEOGRAPHER: The time is 10:41 a.m.
9  We are going off the record.
10     (A discussion was held off the record.)
11     THE VIDEOGRAPHER: The time is 11:05 a.m.,
12 September 23, 2008. On the record with video number
13 two.
14
15     EXAMINATION BY COUNSEL FOR DEFENDANT
16         GULF STREAM, INCORPORATED
17
18 BY MR. WEINSTOCK:
19     Q. Andy Weinstock. I have a few questions for
20 you, sir.
21     One of the topics you're here to discuss is
22 formaldehyde complaints; is that correct?

19 (Pages 70 to 73)

Capital Reporting Company
CONFIDENTIAL

Page 74

1  A. Yes, I believe so.
2  Q. How does FEMA define a formaldehyde
3  complaint?
4  A. I believe that we were defining a FEMA
5  complaint as -- a formaldehyde complaint as someone
6  who contacted the maintenance line, in particular,
7  and possibly any other complaint that may have been
8  referred to a disaster recovery center, although I'm
9  not sure of that.
10  Q. Did the person making a complaint have to
11  use the term "formaldehyde" or could it have been
12  something complaining about the air in the THU?
13  A. I don't know specifically.
14  Q. Who within FEMA quantified the formaldehyde
15  complaints? For example, in Commissioner Paulison's
16  July 19th, 2007 testimony, there was information
17  about how many complaints were made by a specific
18  date.
19      Do you know who quantified those complaints?
20  A. I think that information was collected
21  through the Gulf Coast Recovery Office.
22  Q. And would the people in the Gulf Coast

Page 75

1  Recovery Office be the ones who set the criteria for
2  what they considered a formaldehyde complaint versus
3  another type of complaint?
4  A. They may have been.
5  Q. Does that mean you don't know?
6  A. I don't know.
7  Q. Did FEMA get other types of complaints about
8  the temporary housing units?
9  A. You mean besides formaldehyde?
10  Q. Besides formaldehyde.
11  A. Yes, we did.
12  Q. Did those complaints include equipment
13  problems?
14  A. Yes.
15  Q. Did those complaints on occasion include
16  mold issues?
17  A. I don't know.
18  Q. Did those complaints, to your knowledge,
19  include air quality?
20  A. I don't know.
21  Q. If you were me and you were trying to
22  determine who developed the criteria for what made a

Page 76

1  complaint, a formaldehyde complaint, who would you
2  ask?
3  A. I would ask Blair McDonald from the Gulf
4  Coast Recovery Office.
5  Q. Is it my understanding that at a certain
6  point in time, early on, with complaints about
7  formaldehyde, FEMA's -- one solution FEMA proposed
8  was to move people into a different temporary unit?
9  A. Is that the question?
10  Q. That's the question.
11      Was that one of the alternate --
12  A. Yes, it was.
13  Q. Sometimes it just appears like a statement,
14  but it is a question. Perhaps if I rose the
15  inflection on it.
16      And one of the -- if I understood your
17  testimony earlier, you helped prepare Commissioner
18  Paulison's testimony before Congress, the July 19th
19  testimony. Is that accurate?
20  A. I reviewed it, yes.
21  Q. In that testimony, he stated that at a point
22  of time in 2006, approximately 58 people had concerns

Page 77

1  about formaldehyde in their units and had been moved
2  to other units. Do you recall that?
3  A. I recall something along those lines, yes.
4  Q. Are you aware of anybody of those 58 who had
5  been moved into a unit who requested to be moved into
6  yet another unit?
7  A. I'm not aware of that.
8  Q. And you've testified today that you were
9  aware of various times that testing was ongoing in
10  the temporary housing units.
11  A. Yes.
12  Q. Correct? It's sort of like a question.
13      What is your understanding of the
14  consistency or inconsistency of those test result
15  numbers? Did they all come back the same?
16  A. From -- I'm sorry. A clarification.
17      From test to test or within the same test?
18  Q. Well, that's a very valid point. Let's go
19  from within the same test.
20      When OSHA did their testing, do you know how
21  many units were tested?
22  A. I don't.

20 (Pages 74 to 77)

Capital Reporting Company
CONFIDENTIAL

Page 78

1  Q. Do you know approximately, a ballpark?
2  A. I don't know.
3  Q. How about when EPA did their testing?
4  A. I don't know.
5  Q. Does the number 96 units sound right?
6  A. It may be. I don't know.
7  Q. Was it your understanding that all the units
8  EPA tested came back with the same number?
9  A. I don't know.
10 Q. Did you review the test results?
11 A. Only to summary level.
12 Q. Do you know if the levels were similar to
13 the levels found by OSHA?
14 A. I don't know.
15 Q. And I understand that you are not here to
16 testify on behalf of FEMA after July of 2007, but are
17 you familiar with the CDC test results from February
18 of 2008?
19 A. Only in summary form.
20 Q. Do you know if those numbers were similar or
21 dissimilar to the EPA testing?
22 A. I don't know.

Page 79

1  Q. Similar or dissimilar to the OSHA testing?
2  A. I don't know.
3  Q. Are you aware of a range of testing in the
4  CDC test results from .03 parts per million to .59
5  parts per million?
6  A. No, I'm not aware of that.
7  Q. The Bonner test, where does it get that
8  name? Was that the individual involved?
9  A. I don't think so. I refer to it as the
10 Bonner test, because the document I've seen at the
11 top said "Bonner Analytical" or something along those
12 lines. I believe it was the name of the testing
13 company.
14 Q. Do you know what state the unit was located
15 in that was testing?
16 A. I think it was Mississippi.
17 Q. When people made formaldehyde complaints,
18 did FEMA ever evaluate those complaints before
19 deciding on whether to move somebody to a new unit or
20 move them out completely?
21    MR. MILLER: Objection. Vague, time.
22    THE WITNESS: The only definition of

Page 80

1  evaluation that may apply is I believe the
2  instructions to the housing specialists who visited
3  the units were at the first time that they visited
4  the unit were to provide instructions on ventilation,
5  but I also think they were told that if when they
6  walked in the unit they immediately felt the presence
7  of something that was troubling them that they could
8  make the decision at that point to move them to a new
9  unit.
10 BY MR. WEINSTOCK:
11 Q. What if they did not and -- but the people
12 still wanted to be moved?
13 A. I believe the initial instructions were to
14 have them ventilate the unit.
15 Q. And then -- on the second visit?
16 A. I don't know if it was the second visit.
17 Q. What process was in place to move people to
18 a new unit, other than the one you've told me? How
19 did somebody come about getting into a new unit?
20 A. The only instructions that I have seen were
21 that if ventilation did not work, a decision could be
22 made to move the person to an alternate, different

Page 81

1  unit.
2  Q. Was it your understanding on occasion that
3  ventilation did work?
4  A. I don't know.
5  Q. Turning to the timeline, at the top of
6  page 4, March 2006 through May 2007, it states,
7  "Between March 2006 and May 2007, FEMA received 130
8  complaints regarding formaldehyde and 47 requests for
9  a swap-out of their unit. FEMA provided temporary
10 housing units to more than 130,000 families across
11 the gulf coast."
12    Who compiled this information?
13 A. I don't know who compiled it, but the Office
14 of Legislative Affairs developed this timeline.
15 Q. Do you know what happened or what the result
16 was with the 83 people who did not request a swap-out
17 of their units?
18 A. I don't know.
19 Q. On the FEMA website, there's -- at different
20 points in time there's information about complaints,
21 the number of formaldehyde complaints and the number
22 of people that moved out of the units.

21 (Pages 78 to 81)

(866) 448.DEPO
www.CapitalReportingCompany.com                ©2008

e2878f90-2c70-4ddc-bccd-0f65046623d8

Capital Reporting Company
CONFIDENTIAL

Page 82

1  Are you aware of that?
2  A. Generally, yes.
3  Q. Who compiles that information?
4  A. The Gulf Coast Recovery Office.
5  Q. And who in the Gulf Coast Recovery Office
6  would you ask if you were trying to ask where the
7  information comes from?
8  A. Blair McDonald.
9      MR. WEINSTOCK: That's all the questions I
10 have. Thank you.
11     MR. MILLER: Anybody else?
12
13     EXAMINATION BY COUNSEL FOR DEFENDANT
14          UNITED STATES OF AMERICA
15 BY MR. MILLER:
16 Q. I actually have one follow-up. Henry Miller
17 for the defendant United States of America.
18     Sir, you referred to the EPA testing that
19 was conducted, I think, in the fall of 2006. Do you
20 recall that?
21 A. Yes.
22 Q. And then you said that EPA provided a

Page 83

1  report. Did EPA provide that report or did another
2  agency at ATSTR issue a report based on that data?
3  A. EPA provided us the actual data, and then
4  FEMA sent the data over to ATSTR of CDC for analysis,
5  and it was ATSTR that provided us the analysis.
6      MR. MILLER: That's it.
7      MR. PENTON: Okay. That concludes this
8  witness. Could we get, off the record, a time
9  in/time out so we have a total time?
10     MR. MILLER: Sure. You have an hour and 19
11 minutes.
12     THE VIDEOGRAPHER: The time is 11:17 a.m.
13 Going off the record and concluding this session of
14 the 30(b)(6) deposition.
15     (Whereupon, the deposition was
16     concluded at 11:17 a.m.)
17
18
19
20
21
22

Page 84

1           CERTIFICATE
2
3      I, Leslie A. Todd, Certified Shorthand Reporter,
   Registered Professional Reporter, and Notary Public for
4  the Commonwealth of Virginia, duly commissioned and
   qualified, do hereby certify that the within named
5  witness was by me first duly sworn to testify the truth,
   the whole truth and nothing but the truth in the cause
6  aforesaid; that the testimony given by said witness was
   taken down in stenotype and subsequently transcribed
7  into English text, and that the foregoing is a true and
   accurate transcript of the testimony so given.
8
9      I do hereby certify that the deposition was taken
10 at the time and place as specified in the foregoing
11 caption.
12
13     I do hereby further certify that I am in no way
14 interested in the outcome of this action.
15     In witness whereof, I have hereunto signed my
16 name this _____ day of _____ 2008.
17
18
19     _____
20       Leslie A. Todd, CSR and RPR
21 My commission expires
   September 30, 2009
22 Notary No. 311305

Page 85

1  A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3      I, KEVIN SOUZA, do hereby acknowledge I have read and
4  have examined the foregoing pages of testimony, and the
5  same is a true, correct and complete transcription of
6  the testimony given by me, and any changes or
7  corrections, if any, appear in the attached errata sheet
8  signed by me.
9
10
11
12
13
14
15
16
17
18
19 _____  _____
20 Date                    KEVIN SOUZA
21
22

22 (Pages 82 to 85)

(866) 448.DEPO
www.CapitalReportingCompany.com    ©2008

Capital Reporting Company
CONFIDENTIAL

Page 86

1  Kevin Souza
2  c/o Henry T. Miller, Esquire
3  United States Department of Justice
4  Civil Division
5  1331 Pennsylvania Avenue, N.W.
6  Room 8006-S
7  Washington, D.C. 20004
8  IN RE:  FEMA Trailer Formaldehyde Products
          Litigation
9  Dear Mr. Souza:
10       The enclosed transcript of your deposition taken
   on September 23, 2008 in the above-captioned case is
11 submitted to you for your signature and any corrections
   or other changes you wish to make.  All corrections and
12 other changes will become part of your sworn testimony.
         After you have read the transcript, please sign
13 the Acknowledgement of Deponent.  In addition, an errata
   sheet is attached for you to list any change and the
14 reason why such change is being made.
         Please return the original signed Acknowledgement
15 of Deponent and the accompanying Errata Sheet to Capital
   Reporting Company, 1821 Jefferson Place, Northwest,
16 Third Floor, Washington, D.C. 20036 no later than 30
   days after the date stated above.  You can also fax a
17 copy prior to sending the originals to (202) 857-8577.
         If you fail to return the above-referenced pages
18 within the time allowed, the transcript may be used as
   if signed by you.
19 Sincerely yours,
20
21 Leslie A. Todd
   Reporter/Notary
22 cc:  Ronnie Penton, Esquire

Page 87

1   Capital Reporting Company
2   1821 Jefferson Place, NW
3   3rd Floor
4   Washington, DC 20036
5   (202) 857-3376
6        E R R A T A   S H E E T
7   Case Name:  FEMA Trailer Formaldehyde Products
8               Liability Litigation
9   Witness Name:  KEVIN SOUZA
10  Deposition Date:  Tuesday, September 23, 2008
11  Page No.   Line No.      Change/Reason for Change
12
13
14
15
16
17
18
19
20
21  _____  _____
22  DATE              SIGNATURE

23 (Pages 86 to 87)