## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
-------------------X
IN RE: FEMA TRAILER :
  FORMALDEHYDE PRODUCTS : MDL NO. 1873
  LIABILITY LITIGATION : Section "N" (5)
      : Judge Engelhardt
      : Magistrate Chasez
-------------------X

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
Winchester, Virginia
Wednesday, July 15, 2009
10:34 a.m.

Job No.: 1-159429
Pages: 1 - 156
Reported by: Michelle L. Lonas, RPR, CCR

---

1  Videotaped deposition of KEVIN SOUZA, held
2  at the:
3
4  Courtyard/Medical Center Marriott
5  300 Marriott Drive
6  Winchester, Virginia 22603
7
8
9  Pursuant to agreement, before Michelle L.
10 Lonas, Registered Professional Reporter, Certified
11 Court Reporter, and Notary Public of the Commonwealth
12 of Virginia.

---

1          A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3    JUSTIN I. WOODS, ESQUIRE
4    TARA GILBREATH, ESQUIRE
5    GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
6      WARSHAUER, L.L.C.
7    2800 Energy Centre
8    1100 Poydras Street
9    New Orleans, Louisiana 70163-2800
10   (504) 522-2304
11
12
13
14 ON BEHALF OF THE DEFENDANT, FLUOR
15 ENTERPRISES, INC.:
16   LEZLY L. PETROVICH, ESQUIRE
17   MIDDLEBERG, RIDDLE & GIANNA
18   31st Floor
19   201 St. Charles Avenue
20   New Orleans, Louisiana 70170-3100
21   (504) 525-7200
22

---

1          A P P E A R A N C E S  (C O N T' D.)
2  ON BEHALF OF THE DEFENDANT, GULF STREAM COACH:
3    TIMOTHY D. SCANDURRO, ESQUIRE
4    SCANDURRO & LAYRISSON, L.L.C.
5    607 St. Charles Avenue
6    New Orleans, Louisiana 70130
7    (504) 522-7100
8
9
10
11 ON BEHALF OF THE DEFENDANT, HEARTLAND
12 RECREATIONAL VEHICLES, L.L.C.:
13   BRENT M. MAGGIO, ESQUIRE
14   ALLEN & GOOCH
15   3900 N. Causeway Boulevard
16   Suite 1450
17   Metairie, Louisiana 70002
18   (504) 836-5200

EXHIBIT 7A

1 (Pages 1 to 4)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

Page 5:

```
 1    APPEARANCES (CONT'D.)
 2    ON BEHALF OF THE DEFENDANT, FEMA:
 3       JANICE WILLIAMS-JONES, ESQUIRE
 4       FEDERAL EMERGENCY MANAGEMENT AGENCY
 5       409 3rd Street, S.W.
 6       Room 206
 7       Washington, D.C. 20472
 8       (202) 646-4168
 9
10
11            - and -
12
13
14       JORDAN S. FRIED, ESQUIRE
15       CHIEF COUNSEL FOR LITIGATION
16       FEDERAL EMERGENCY MANAGEMENT AGENCY
17       Suite 840
18       500 C Street, S.W.
19       Washington, D.C. 20472
20       (202) 646-4112
21
22
```

Page 7:

```
 1    APPEARANCES VIA TELEPHONE
 2    ON BEHALF OF CMH MANUFACTURED HOMES; SOUTHERN
 3    ENERGY, INC.; SUNRAY INVESTMENTS, LLC; GILES
 4    FAMILY HOLDINGS, LLC:
 5       JAMES K. CARROLL, ESQUIRE
 6       FOWLER, RODRIGUEZ, VALDES-FAULI
 7       400 Poydras Street
 8       30th Floor
 9       New Orleans, Louisiana 70130
10       (504) 523-2600
11
12
13
14    ON BEHALF OF PROJECT RESOURCES, INC.:
15       A. KIRK GASPERECZ, ESQUIRE
16       ADAMS AND REESE, LLP
17       4500 One Shell Square
18       701 Poydras Street
19       New Orleans, Louisiana 70139
20       (504) 581-3234
21
22
```

Page 6:

```
 1    APPEARANCES (CONT'D.)
 2    ON BEHALF OF THE UNITED STATES GOVERNMENT:
 3       HENRY T. MILLER, ESQUIRE
 4       SENIOR TRIAL ATTORNEY
 5       U.S. DEPARTMENT OF JUSTICE
 6       1331 Pennsylvania Avenue, N.W.
 7       Room 8220-N
 8       Washington, D.C. 20004
 9       (202) 616-4223
10
11
12
13    ALSO PRESENT: Antonio Tropeano, Videographer
14
15
16
17
18
19
20
21
22
```

Page 8:

```
 1    APPEARANCES VIA TELEPHONE
 2              (CONT'D.)
 3    ON BEHALF OF KEYSTONE RV COMPANY; THOR
 4    CALIFORNIA; THOR INDUSTRIES; DUTCHMEN
 5    MANUFACTURING; DS CORP, D/B/A CROSSROADS RV;
 6    KZ RV, LP:
 7       RYAN E. JOHNSON, ESQUIRE
 8       JONES WALKER
 9       Four United Plaza
10       8555 United Plaza Boulevard
11       Baton Rouge, Louisiana 70809
12       (225) 248-2000
13
14
15
16    ON BEHALF OF BECHTEL NATIONAL, INC.:
17       A. J. KROUSE, ESQUIRE
18       FRILOT, L.L.C.
19       3700 Energy Centre
20       1100 Poydras Street
21       New Orleans, Louisiana 70163
22       (504) 599-8000
```

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

**Page 9**

APPEARANCES VIA TELEPHONE (CONT'D.)

ON BEHALF OF SHAW ENVIRONMENTAL, INC. AND CH2M HILL CONSTRUCTORS, INC.:
  DAVID KURTZ, ESQUIRE
  BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC:
  201 St. Charles Avenue
  Suite 3600
  New Orleans, Louisiana 70170
  (504) 566-5200

ON BEHALF OF RECREATION BY DESIGN, LLC; TL INDUSTRIES, INC.; FRONTIER RV, INC.; PLAY'MOR TRAILERS, INC.:
  RANDALL C. MULCAHY, ESQUIRE
  GARRISON, YOUNT, FORTE & MULCAHY, LLC
  909 Poydras Street
  Suite 1800
  New Orleans, Louisiana 70112
  (504) 527-0680

---

**Page 10**

CONTENTS

| WITNESS | PAGE |
|---|---|
| KEVIN SOUZA | |
| By Mr. Woods | 15, 149 |
| By Ms. Petrovich | 130 |
| By Mr. Scandurro | 132 |
| By Mr. Miller | 143 |

EXHIBITS
(Attached to the Transcript)

| SOUZA NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Amended Notice of Oral and Videotaped Deposition of Kevin Souza | 13 |
| 2 | Exhibit No. 28 to Defendant United States of America's Motion to Dismiss Plaintiffs' Remaining FTCA Claims for Lack of Subject Matter Jurisdiction | 21 |
| 3 | E-mail string (FEMA 17-015068) | 82 |
| 4 | E-mail string (FEMA 17-008999 - FEMA 17-009007) | 84 |

---

**Page 11**

EXHIBITS (CONT'D.)
(Attached to the Transcript)

| SOUZA NO. | DESCRIPTION | PAGE |
|---|---|---|
| 5 | E-mail string (FEMA 17-008762 - FEMA 17-008764) | 91 |
| 6 | E-mail string (FEMA 17-015050 - FEMA 17-015052) | 95 |
| 7 | E-mail string (FEMA 17-009102) | 98 |
| 8 | E-mail string (FEMA 17-008912 - FEMA 17-008915) | 103 |
| 9 | E-mail string (FEMA 17-009024 - FEMA 17-009026) | 105 |
| 10 | E-mail string (FEMA 17-009232 - FEMA 17-009236) | 108 |
| 11 | E-mail string (FEMA 17-009336 - FEMA 17-009337) | 110 |
| 12 | E-mail string (FEMA 17-009367 - FEMA 17-009371) | 113 |
| 13 | E-mail string (FEMA 17-009247) | 116 |
| 14 | E-mail string (FEMA 17-009330 - FEMA 17-009331) | 118 |

---

**Page 12**

EXHIBITS (CONT'D.)
(Attached to the Transcript)

| SOUZA NO. | DESCRIPTION | PAGE |
|---|---|---|
| 15 | E-mail string (FEMA 17-007251 - FEMA 17-007255) | 121 |
| 16 | E-mail string (FEMA 17-015220 - FEMA 17-015221) | 123 |
| 17 | E-mail string (FEMA 17-009688 - FEMA 17-009690) | 125 |

---

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | | |
|---|---|---|
| 1 | PROCEEDINGS | |
| 2 | (Mr. Fried is not present.) | 10:14:47 |
| 3 | (Exhibit Souza 1 was marked for | 10:14:47 |
| 4 | identification and attached to the transcript.) | 10:34:31 |
| 5 | THE VIDEOGRAPHER: Here begins tape number | 10:34:31 |
| 6 | one in the deposition of Kevin Souza, In Re: FEMA | 10:34:42 |
| 7 | Trailer Formaldehyde Products Liability Litigation, In | 10:34:51 |
| 8 | the United States District Court, Eastern District of | 10:34:54 |
| 9 | Louisiana, Case Number MDL 1873. Today's date is | 10:34:57 |
| 10 | July 15, 2009. The time on the video monitor is | 10:35:02 |
| 11 | 10:35 a.m. The video operator today is Antonio | 10:35:07 |
| 12 | Tropeano on behalf of Professional Shorthand | 10:35:11 |
| 13 | Reporters. This video is taking place -- this video | 10:35:13 |
| 14 | deposition is taking place at 300 Marriott Drive, | 10:35:16 |
| 15 | Winchester, Virginia, 22603. | 10:35:20 |
| 16 | Counsel, please voice identify yourselves | 10:35:23 |
| 17 | and state whom you represent. | 10:35:25 |
| 18 | MR. WOODS: Justin Woods for the | 10:35:28 |
| 19 | plaintiffs. | 10:35:29 |
| 20 | MS. GILBREATH: Tara Gilbreath for the | 10:35:30 |
| 21 | plaintiffs. | 10:35:32 |
| 22 | MR. MAGGIO: Brent Maggio for Heartland | 10:35:32 |
| | 13 | |

| | | |
|---|---|---|
| 1 | Recreational. | 10:35:35 |
| 2 | MR. SCANDURRO: Tim Scandurro for Gulf | 10:35:35 |
| 3 | Stream Coach. | 10:35:35 |
| 4 | MS. WILLIAMS-JONES: Jan -- | 10:35:35 |
| 5 | MS. PETROVICH: Lezly -- oh. Lezly | 10:35:35 |
| 6 | Petrovich for Fluor Enterprises, Inc. | 10:35:39 |
| 7 | MS. WILLIAMS-JONES: Janice Williams-Jones | 10:35:42 |
| 8 | for FEMA. | 10:35:42 |
| 9 | MR. MILLER: Henry Miller, Department of | 10:35:43 |
| 10 | Justice for the United States. | 10:35:46 |
| 11 | THE VIDEOGRAPHER: The court reporter today | 10:35:48 |
| 12 | is Michelle Lonas on behalf of Professional Shorthand | 10:35:49 |
| 13 | Reporters. Would the reporter please swear in the | 10:35:54 |
| 14 | witness? | 10:35:56 |
| 15 | THE REPORTER: Would you raise your right | 10:35:56 |
| 16 | hand, please? | 10:35:56 |
| 17 | (Witness sworn by the reporter.) | 10:36:01 |
| 18 | THE VIDEOGRAPHER: Please begin. | 10:36:03 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| | 14 | |

| | | |
|---|---|---|
| 1 | KEVIN SOUZA, | |
| 2 | having been duly sworn, was examined and testified as | |
| 3 | follows: | |
| 4 | EXAMINATION BY COUNSEL FOR THE PLAINTIFFS | |
| 5 | BY MR. WOODS: | |
| 6 | Q Good morning, Mr. Souza. | 10:36:05 |
| 7 | A Good morning. | 10:36:07 |
| 8 | Q I'm Justin Woods. We've met in the past, | 10:36:08 |
| 9 | but would you state your full name and address for the | 10:36:10 |
| 10 | record, please? | 10:36:15 |
| 11 | A Home address? | 10:36:15 |
| 12 | MR. MILLER: No, work address. | 10:36:16 |
| 13 | BY MR. WOODS: | 10:36:16 |
| 14 | Q Work address. | 10:36:17 |
| 15 | A It's Kevin Souza. And the address is 430 | 10:36:17 |
| 16 | Market Street, Winchester, Virginia. I don't know the | 10:36:21 |
| 17 | ZIP. | 10:36:24 |
| 18 | Q Thank you. Mr. Souza, what I'm going to | 10:36:24 |
| 19 | show you now is what we're going to attach as Exhibit | 10:36:29 |
| 20 | Souza 1 to this deposition. And it's really just a | 10:36:32 |
| 21 | Notice of Deposition. Have you seen that before? | 10:36:36 |
| 22 | A No. | 10:36:39 |
| | 15 | |

| | | |
|---|---|---|
| 1 | Q Okay. Well, it's just giving notice to the | 10:36:41 |
| 2 | parties in the litigation that your deposition is | 10:36:44 |
| 3 | taking place today, and it's being used -- this | 10:36:46 |
| 4 | deposition is to be used for all purposes, and it's | 10:36:50 |
| 5 | regarding information that we'll solicit from you in | 10:36:53 |
| 6 | this litigation. And we'll attach that as Exhibit | 10:36:57 |
| 7 | Souza 1. | 10:37:03 |
| 8 | And I know you've been through this, this | 10:37:09 |
| 9 | process before. We've been here -- well, not here, in | 10:37:11 |
| 10 | Washington, D.C., taking your deposition before. But | 10:37:15 |
| 11 | for this particular record, if you could give -- just | 10:37:18 |
| 12 | give me, what is your current job title? | 10:37:21 |
| 13 | A I am currently the Enterprise Coordination | 10:37:24 |
| 14 | and Information Management Section Chief. | 10:37:30 |
| 15 | Q And for whom are you employed? And by whom | 10:37:40 |
| 16 | are you employed? | 10:37:43 |
| 17 | A The FEMA Virginia NPSC, or National | 10:37:44 |
| 18 | Processing Service Center. | 10:37:50 |
| 19 | Q And how long have you held that position? | 10:37:54 |
| 20 | A Since May of 2008. | 10:37:57 |
| 21 | Q Briefly, what are -- what are your job | 10:37:59 |
| 22 | duties involved with this position? | 10:38:06 |
| | 16 | |

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009**

Page 17

```
1   A   Well, it's essentially an information               10:38:09
2   management position, responsible for coordinating       10:38:11
3   information management, data analysis, and database     10:38:15
4   systems across the multiple national processing         10:38:21
5   service centers.                                        10:38:24
6   Q   And that job is actually located here in            10:38:27
7   Winchester, Virginia?                                   10:38:32
8   A   It is.                                              10:38:35
9   Q   Prior to May of 2008, were you employed by          10:38:41
10  FEMA?                                                   10:38:46
11  A   Yes.                                                10:38:46
12  Q   What was your position?                             10:38:47
13  A   I had --                                            10:38:48
14      MR. MILLER: Hold on. Objection, vague.              10:38:52
15  A   -- multiple positions.                              10:38:54
16  BY MR. WOODS:                                           10:38:57
17  Q   Okay. Let's -- I know you've had multiple           10:38:57
18  positions. How long have you been employed by FEMA?     10:39:00
19  A   Sixteen years.                                      10:39:03
20  Q   Sixteen years. And from 16 years ago,               10:39:04
21  would you give me all of the job titles you've had?     10:39:06
22      MR. MILLER: Objection, vague, narrative.            10:39:11
```

Page 18

```
1   A   I was a Disaster Assistance employee. I've          10:39:13
2   been an Emergency Management Program Specialist. I've   10:39:17
3   been a Supervisory Program Specialist. I've been an     10:39:22
4   executive officer. And I've been an Acting Division     10:39:27
5   Director.                                               10:39:36
6   BY MR. WOODS:                                           10:39:36
7   Q   I'm sorry?                                          10:39:36
8   A   Acting Division Director.                           10:39:37
9   Q   Of what division?                                   10:39:40
10  A   Individual Assistance Division. Oh. Let             10:39:41
11  me restate that. I was the Acting Deputy Division       10:39:47
12  Director.                                               10:39:51
13  Q   And was that the last position that you             10:39:57
14  held prior to the current position of Enterprise        10:39:59
15  Coordinator --                                          10:40:04
16  A   Yes.                                                10:40:04
17  Q   -- coordination of info?                            10:40:05
18  A   Yes.                                                10:40:09
19  Q   Okay. Is that position, Acting Deputy               10:40:10
20  Division Director of Individual Assistance, was that    10:40:12
21  the position you held in August of 2005?                10:40:15
22  A   No.                                                 10:40:20
```

Page 19

```
1   Q   When did you begin with that -- in that             10:40:20
2   position?                                               10:40:24
3   A   Probably -- approximately November of 2007.         10:40:25
4   Q   So that was November 2007 through May of            10:40:34
5   2008?                                                   10:40:40
6   A   Approximately, yes.                                 10:40:40
7   Q   Before that, you said you were an executive         10:40:42
8   officer. Executive officer of what? What department?    10:40:48
9   A   Actually, immediately prior to that                 10:40:52
10  position, I was a Supervisory Program Manager for the   10:40:54
11  Individual Assistance Program Management Branch.        10:41:00
12  Q   And what were the start and end dates of            10:41:08
13  that position, Supervisory Program Manager?             10:41:13
14  A   Approximately September of 2005 to November         10:41:17
15  of 2007.                                                10:41:22
16  Q   And the position immediately before that            10:41:23
17  particular position?                                    10:41:33
18  A   That was the executive officer position.            10:41:34
19  Q   Executive officer of a particular                   10:41:36
20  department, or --                                       10:41:40
21  A   Of the Recovery Division at that point.             10:41:41
22  Q   And how long did you hold that position?            10:41:46
```

Page 20

```
1   A   From February of 2004 until approximately           10:41:49
2   August or September of 2005.                            10:41:55
3   Q   Okay. Did you attend college, Mr. Souza?            10:41:59
4   A   Yes.                                                10:42:13
5   Q   Did you graduate from college?                      10:42:13
6   A   Yes.                                                10:42:15
7   Q   What college did you attend or grad --              10:42:15
8   which college did you graduate from and what was your   10:42:18
9   degree in?                                              10:42:21
10  A   Castleton State College.                            10:42:23
11  Q   Okay.                                               10:42:27
12  A   And I was a double major in Psychology and          10:42:28
13  Criminal Justice.                                       10:42:32
14  Q   And when did you receive your degree?               10:42:33
15  A   1992.                                               10:42:38
16  Q   And where is Castleton State College?               10:42:39
17  A   It's in Vermont.                                    10:42:48
18  Q   Do you hold any advanced degrees?                   10:42:54
19  A   No.                                                 10:42:57
20  Q   Any special certifications?                         10:42:58
21      MR. MILLER: Objection, vague.                       10:43:04
22  A   No.                                                 10:43:06
```

5 (Pages 17 to 20)

**L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664**

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

Page 21

1  (Exhibit Souza 2 was marked for  10:43:06
2  identification and attached to the transcript.)  10:43:09
3  BY MR. WOODS:  10:43:09
4  Q  Mr. Souza, what I'm going to hand you next  10:43:33
5  is what I'm going to attach to this exhibit -- to this  10:43:35
6  deposition as Exhibit Souza 2.  10:43:38
7  MR. MILLER: Maybe the easiest way to  10:43:44
8  circulate them is to hand them all, and then Mr. Souza  10:43:47
9  can just pass the extras on.  10:43:52
10  MR. WOODS: Well --  10:43:52
11  MR. MILLER: I'm thinking we're --  10:43:52
12  MR. WOODS: We have one here.  10:43:52
13  MR. MILLER: Yeah. I'm just thinking we're  10:43:58
14  going to get on the film. That's why.  10:44:00
15  BY MR. WOODS:  10:44:03
16  Q  Souza Exhibit Number 2 is identified as  10:44:07
17  U.S. Exhibit Number 28 to Defendant United States of  10:44:12
18  America's Motion to Dismiss Plaintiffs' Remaining FTCA  10:44:16
19  Claims for Lack of Subject Matter Jurisdiction. And  10:44:22
20  it is a Declaration of Kevin Souza. Mr. Souza, you've  10:44:25
21  seen this document before, correct?  10:44:33
22  A  Yes.  10:44:34

---

Page 22

1  Q  If you would turn to page nine of the  10:44:35
2  document. Is that indeed your signature on that last  10:44:39
3  page?  10:44:44
4  A  Yes.  10:44:45
5  Q  All right. Mr. Souza, did you draft this  10:44:45
6  document?  10:44:52
7  A  I assisted in the drafting, yes.  10:44:53
8  Q  And who did you assist in the drafting of  10:44:58
9  it?  10:45:01
10  A  Our Chief Counsel's Office.  10:45:02
11  Q  Who particularly in Chief Counsel's Office?  10:45:04
12  A  I don't recall.  10:45:09
13  Q  And it wasn't -- it wasn't DOJ. It was  10:45:10
14  Chief Counsel for FEMA?  10:45:16
15  MR. MILLER: Objection, foundation.  10:45:21
16  A  I don't recall.  10:45:23
17  (Mr. Fried entered the room, 10:45 a.m.)  10:45:24
18  BY MR. WOODS:  10:45:24
19  Q  Were you told the reason why you needed to  10:46:07
20  complete this particular declaration?  10:46:10
21  A  Yeah.  10:46:13
22  MR. MILLER: Object. Well, never mind.  10:46:14

---

Page 23

1  Answer, but do not go into the explanation.  10:46:17
2  BY MR. WOODS:  10:46:25
3  Q  And was it your impression that this  10:46:32
4  declaration needed to be completed for litigation  10:46:34
5  purposes?  10:46:39
6  A  Yes.  10:46:49
7  Q  In paragraph two or section two of the  10:47:32
8  declaration, you say that you were Branch Chief, and  10:47:35
9  your job was to manage and oversee Individual  10:47:39
10  Assistance programs. Would you please explain for us  10:47:43
11  what that exactly means? What is the Individual  10:47:47
12  Assistance Program?  10:47:49
13  A  Individual Assistance is actually an  10:47:50
14  umbrella term for several programs that assist  10:47:54
15  individuals. Programs like the Individuals in  10:47:58
16  Households program, Disaster Unemployment, Crisis  10:48:03
17  Counseling, Disaster Legal Services.  10:48:08
18  Q  So as Branch Chief, you oversaw all of  10:48:11
19  those particular programs?  10:48:14
20  A  Yes.  10:48:17
21  Q  And if you look at paragraph five, is that  10:48:18
22  a better description of it? The second sentence  10:48:38

---

Page 24

1  begins, FEMA administrates four distinct Individual  10:48:43
2  Assistance programs: Individual and Household  10:48:48
3  Assistance, Crisis Counseling, Disaster Unemployment  10:48:49
4  Assistance, and Legal Services?  10:48:52
5  A  Yes.  10:48:54
6  Q  All right. Your declaration has to do a  10:48:56
7  lot with -- well, the opening paragraphs have a lot to  10:49:20
8  do with the selection of EHUs as -- in -- as temporary  10:49:25
9  housing for Hurricane Katrina and Rita victims. We  10:49:35
10  won't really go into that. We're more concerned with  10:49:45
11  talking to you about the response of FEMA once it  10:49:50
12  became apparent or aware of certain complaints  10:49:53
13  regarding formaldehyde concerns in the EHUs. If you  10:49:56
14  look at paragraph seven, which is on page four -- I'm  10:50:13
15  sorry, page three of your declaration, and if you go  10:50:16
16  down one, two, three, four, five, six -- to the sixth  10:50:23
17  line, there's a sentence that begins, These EHUs. Do  10:50:28
18  you see that?  10:50:32
19  A  Uh-huh. Yes.  10:50:32
20  Q  Okay. You say, These EHUs were purchased  10:50:33
21  both off the lot from existing inventories and  10:50:37
22  directly from manufacturers. FEMA relied upon the  10:50:40

---

6 (Pages 21 to 24)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

**Page 25**

1  vendors and manufacturers to use their expertise to   10:50:45
2  provide FEMA with safe and habitable housing units,   10:50:49
3  housing units that complied with industry standards   10:50:50
4  and all applicable regulatory requirements.   10:50:52
5      When you say that FEMA relied upon vendors   10:50:59
6  and manufacturers to use their expertise to provide   10:51:01
7  FEMA with safe and habitable housing units, is there a   10:51:04
8  document that you can point us to, or was there a   10:51:08
9  request for proposals when FEMA approached vendors or   10:51:10
10 manufacturers to provide EHUs?   10:51:16
11   A  There was a contract for the units that we   10:51:21
12 purchased.   10:51:24
13   Q  Was there a specific contract, or different   10:51:24
14 contracts between vendors versus manufacturers?   10:51:28
15     MR. MILLER:  Objection, foundation.   10:51:32
16   A  I don't know.   10:51:34
17 BY MR. WOODS:   10:51:35
18   Q  You don't know?   10:51:35
19   A  No.   10:51:36
20   Q  Okay.  When you say that FEMA relied upon   10:51:40
21 the vendors and manufacturers to use their expertise,   10:51:43
22 what particular expertise was FEMA relying upon the   10:51:46

**Page 26**

1  vendors and manufacturers?   10:51:51
2    A  Their expertise in manufacturing the units   10:51:52
3  that we were purchasing.   10:51:57
4    Q  Were you relying upon, on the vendors' and   10:52:02
5  manufacturers' expertise in the appropriateness and   10:52:06
6  use of travel trailers or mobile homes for emergency   10:52:12
7  housing units?   10:52:17
8    A  No.   10:52:19
9    Q  You were relying upon the vendors and   10:52:22
10 manufacturers just to provide units that were safe and   10:52:28
11 habitable?   10:52:32
12   A  Yes.   10:52:32
13   Q  And to use their expertise in determining   10:52:33
14 what was a safe and habitable housing?   10:52:36
15   A  My recollection is that the contracts we   10:52:39
16 used said that the units were supposed to be built to   10:52:44
17 industry standards, and that we were relying on them   10:52:48
18 to build the units to industry standards.   10:52:51
19   Q  What do you understand the industry   10:52:55
20 standards to be?   10:52:57
21     MR. MILLER:  Objection.  Foundation, vague,   10:52:59
22 time.   10:53:01

**Page 27**

1    A  Generally, I --   10:53:01
2  BY MR. WOODS:   10:53:02
3    Q  Okay.  Let me -- let me qualify it.  What   10:53:03
4  do you understand the industry standards to have been   10:53:06
5  in August or September of 2005 in supplying EHUs to   10:53:09
6  victims of Hurricane Katrina and Rita?   10:53:16
7      MR. MILLER:  And I'm going to object again,   10:53:19
8  vague as to time whether he knows -- what he knows now   10:53:21
9  or what he knew back then?   10:53:24
10     MR. WOODS:  I asked what he knew back then.   10:53:25
11     MR. MILLER:  Okay.  I just wanted to   10:53:27
12 clarify it.  Thank you.   10:53:29
13   A  Could you repeat the question, please?   10:53:30
14     MR. WOODS:  Let me see if I can get it read   10:53:33
15 back.   10:53:35
16     (Last question was read back by the   10:53:35
17 reporter.)   10:53:50
18     MR. MILLER:  And with the caveat what   10:53:50
19 information he knew back in August and September 2005.   10:53:52
20   A  Back then, I didn't know anything about the   10:53:55
21 actual industry standards.   10:54:01
22     MR. WOODS:  Okay.  And I probably should do   10:54:07

**Page 28**

1  this on the record.  I just want to be clear, we have   10:54:08
2  a -- and this is not a question for you, Mr. Souza,   10:54:12
3  but to Henry.  We have an outstanding request for a   10:54:15
4  30(b)(6) deposition.  Mr. Souza is not being offered?   10:54:18
5      MR. MILLER:  Not at this time.   10:54:27
6      MR. WOODS:  Okay.   10:54:33
7      I need your answer read back.   10:54:33
8      (Counsel reviewing the court reporter's   10:54:33
9  rough draft on the computer screen.)   10:54:38
10 BY MR. WOODS:   10:54:38
11   Q  You had -- you don't know -- you didn't   10:54:39
12 know at the time, in August 2005, what the industry   10:54:41
13 standards were, correct?   10:54:45
14   A  Correct.   10:54:46
15   Q  Do you now know what the industry standards   10:54:47
16 are for either that time period or the current -- or   10:54:51
17 currently?   10:54:54
18     MR. MILLER:  Objection, compound and vague.   10:54:55
19   A  Generally, I understand that the industry   10:54:57
20 standards in regard to formaldehyde was that there   10:55:01
21 were no standards for recreational vehicles.   10:55:04
22 BY MR. WOODS:   10:55:08

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

Page 29

1  Q  Were recreational vehicles used as --  10:55:08
2  A  Recreational vehicles, things like travel  10:55:14
3  trailers, as opposed to manufactured homes regulated  10:55:16
4  by HUD.  10:55:20
5  Q  Well, I'm trying to understand what you  10:55:21
6  meant by this statement, FEMA relied upon the vendors  10:55:34
7  and manufacturers to use their expertise to provide  10:55:39
8  FEMA with safe and habitable housing units, housing  10:55:41
9  units that complied with industry standards and all  10:55:45
10  applicable regulatory requirements. And you're saying  10:55:50
11  that you don't know, or you didn't know at that time,  10:55:53
12  what the industry standards were. And today, you  10:55:57
13  still don't know what the industry standards are for  10:56:05
14  travel trailers or recreational vehicles?  10:56:11
15  MR. MILLER: Objection, argumentative,  10:56:13
16  compound, and vague. And mischaracterizes the  10:56:15
17  witness' testimony.  10:56:23
18  A  I'm sorry. What was the question -- I  10:56:24
19  mean, what was the question there?  10:56:27
20  MR. MILLER: She can read it back. That's  10:56:29
21  probably the easiest way.  10:56:31
22  MR. SCANDURRO: Ma'am, before you read it  10:56:41

---

Page 30

1  back, I'd like to join in that objection as well.  10:56:43
2  (Last question was read back by the  10:56:43
3  reporter.)  10:57:17
4  BY MR. WOODS:  10:57:17
5  Q  Is that true?  10:57:17
6  A  That's correct.  10:57:18
7  Q  Do you feel comfortable sitting here today  10:57:20
8  testifying and telling us exactly -- and affirming  10:57:47
9  what you, the statements you've made in this  10:57:52
10  declaration as to what FEMA relied upon when  10:57:55
11  negotiating with vendors and manufacturers for  10:58:04
12  emergency housing units?  10:58:10
13  MR. MILLER: Objection, mischaracterizes  10:58:12
14  the declaration and the terms in the declaration.  10:58:14
15  A  Yes.  10:58:16
16  BY MR. WOODS:  10:58:22
17  Q  You go on to state, the last sentence in  10:58:22
18  your declaration says that, FEMA purchased these EHUs  10:58:25
19  believing that they would provide safe and habitable  10:58:29
20  temporary emergency housing. And you feel comfortable  10:58:34
21  today testifying that you knew, or you are certain  10:58:38
22  that FEMA purchased these EHUs believing that they  10:58:43

---

Page 31

1  would provide safe and habitable housing?  10:58:46
2  A  Yes. And I'm going to elaborate and say  10:58:50
3  that we had used the EHUs previously. EHUs being, in  10:58:55
4  this case, travel trailers. We used them as early, or  10:59:01
5  as recently I should say as 2004. And in our previous  10:59:05
6  use of the units, we had no real reasons to believe  10:59:10
7  that units purchased off the lot would not be safe and  10:59:13
8  habitable as long as they met the industry standards  10:59:19
9  that we had purchased off the lot previously. And so  10:59:24
10  although I don't have any specific knowledge of the  10:59:26
11  standards as they existed back then, when I was told  10:59:28
12  that we were purchasing the units off the lot met --  10:59:32
13  to meet industry standards, I had no reason to believe  10:59:37
14  that they would not be safe and habitable units as the  10:59:41
15  units we had used previously in our disaster  10:59:45
16  operations.  10:59:47
17  Q  But you don't know what the industry  10:59:48
18  standards were?  10:59:49
19  A  No.  10:59:50
20  Q  Okay. But you do know that FEMA relied  10:59:50
21  upon the vendors and manufacturers in their expertise  11:00:09
22  in -- to what industry standards would have been in  11:00:15

---

Page 32

1  August or September of 2005?  11:00:18
2  A  I believe that was written into the  11:00:20
3  contract, yes.  11:00:22
4  Q  All right. Go on to section eight of your  11:00:23
5  declaration. You say that, FEMA relied upon  11:00:27
6  contractors to install, maintain and retrieve EHUs  11:00:29
7  from disaster victims. Exactly what did FEMA rely  11:00:32
8  upon -- or strike that.  11:00:42
9  Do you know the requirements involved in  11:00:45
10  contractors installing and maintaining EHUs?  11:00:52
11  A  Generally.  11:00:56
12  Q  Generally what do you know?  11:01:01
13  A  Generally, I know that we hired contractors  11:01:03
14  to haul and install the units. And generally I know  11:01:08
15  that they have to pick up units at staging areas,  11:01:11
16  transport them, install them on private property, hook  11:01:15
17  up basic utilities, and in some cases block and strap  11:01:19
18  the units.  11:01:25
19  Q  Let's talk about blocking the units. What  11:01:26
20  do you understand --  11:01:30
21  MS. PETROVICH: Objection. The question --  11:01:31
22  finish your question, and then I'll object.  11:01:33

---

8 (Pages 29 to 32)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

Page 33

| | | |
|---|---|---|
| 1 | BY MR. WOODS: | 11:01:35 |
| 2 | Q What do you understand about blocking of | 11:01:35 |
| 3 | units? | 11:01:37 |
| 4 | MS. PETROVICH: Objection to the form of | 11:01:38 |
| 5 | the question, vague, and -- vague's good for now. | 11:01:39 |
| 6 | Objection. | 11:01:45 |
| 7 | A In general, I understand we blocked the | 11:01:48 |
| 8 | units to make them more stable. | 11:01:50 |
| 9 | BY MR. WOODS: | 11:01:53 |
| 10 | Q Describe to me what blocking is. | 11:01:54 |
| 11 | A Blocking is put -- | 11:01:56 |
| 12 | MR. MILLER: Hold on. I'm going to object | 11:02:02 |
| 13 | to foundation. Go ahead. | 11:02:05 |
| 14 | A Putting cement blocks or wood or other | 11:02:06 |
| 15 | stable, stable structures under the unit to support | 11:02:11 |
| 16 | it. | 11:02:18 |
| 17 | BY MR. WOODS: | 11:02:18 |
| 18 | Q Okay. And you're saying in your | 11:02:19 |
| 19 | declaration that FEMA relied upon the contractors just | 11:02:20 |
| 20 | for installing. Let's talk specifically about | 11:02:24 |
| 21 | blocking. FEMA relied upon the contractors to | 11:02:27 |
| 22 | properly block the units? | 11:02:31 |

Page 34

| | | |
|---|---|---|
| 1 | MS. PETROVICH: Objection to the form of | 11:02:33 |
| 2 | the question. That's mischaracterizing prior | 11:02:35 |
| 3 | testimony, and the document speaks for itself and | 11:02:38 |
| 4 | nowhere states anything about blocking in its | 11:02:41 |
| 5 | foundation. | 11:02:45 |
| 6 | MR. MILLER: Go ahead. | 11:02:48 |
| 7 | A I'm sorry. Repeat the question again, | 11:02:49 |
| 8 | please? | 11:02:51 |
| 9 | MR. WOODS: Okay. Read it back. | 11:02:52 |
| 10 | (Last question was read back by the | 11:02:52 |
| 11 | reporter.) | 11:03:11 |
| 12 | MR. MILLER: I'm going to join in the | 11:03:11 |
| 13 | objection for mischaracterization of the witness' | 11:03:13 |
| 14 | prior testimony. Go ahead. | 11:03:16 |
| 15 | A Yes, we relied on the contractors to | 11:03:17 |
| 16 | properly block the units. | 11:03:22 |
| 17 | BY MR. WOODS: | 11:03:24 |
| 18 | Q You relied on the contractors to properly | 11:03:24 |
| 19 | install the units, correct? | 11:03:27 |
| 20 | A Yes. | 11:03:28 |
| 21 | Q You relied upon the contractors to properly | 11:03:29 |
| 22 | maintain the units, correct? | 11:03:32 |

Page 35

| | | |
|---|---|---|
| 1 | A Yes. | 11:03:34 |
| 2 | Q Would you rely upon the contractors if | 11:03:34 |
| 3 | they, in their expertise, had information to share | 11:03:45 |
| 4 | with FEMA regarding the proper installation of units? | 11:03:51 |
| 5 | Would you rely upon them to provide that information | 11:03:55 |
| 6 | to FEMA? | 11:03:58 |
| 7 | MR. MILLER: Objection, foundation. | 11:03:59 |
| 8 | A Can I repeat the question to you to make | 11:04:01 |
| 9 | sure I understand it? | 11:04:09 |
| 10 | BY MR. WOODS: | 11:04:09 |
| 11 | Q Let me re -- let me rephrase it. You say | 11:04:11 |
| 12 | that FEMA relied upon the contractors to install and | 11:04:13 |
| 13 | maintain the units properly, correct? | 11:04:16 |
| 14 | A Yes. | 11:04:20 |
| 15 | Q In -- in properly installing the units, | 11:04:21 |
| 16 | FEMA relied upon the contractors in their expertise in | 11:04:30 |
| 17 | what would be a proper installation of the units, | 11:04:34 |
| 18 | correct? | 11:04:39 |
| 19 | A I -- | 11:04:41 |
| 20 | MR. MILLER: Can you -- hold on. Can you | 11:04:41 |
| 21 | re-read that back? I think there's a double negative | 11:04:42 |
| 22 | in there. Can you just read the question back to me? | 11:04:45 |

Page 36

| | | |
|---|---|---|
| 1 | (Last question was read back by the | 11:04:45 |
| 2 | reporter.) | 11:04:47 |
| 3 | MR. MILLER: In what would be improper or | 11:04:57 |
| 4 | proper? | 11:05:00 |
| 5 | MR. WOODS: Proper. | 11:05:01 |
| 6 | MR. MILLER: Proper, okay. Thank you. No | 11:05:01 |
| 7 | objection. Thank you. Sorry. | 11:05:02 |
| 8 | A I don't know. | 11:05:06 |
| 9 | BY MR. WOODS: | 11:05:08 |
| 10 | Q You don't know? | 11:05:08 |
| 11 | Do you know when the contractors began | 11:05:41 |
| 12 | installing EHUs for victims? | 11:05:48 |
| 13 | MR. MILLER: Objection, foundation, vague. | 11:05:51 |
| 14 | A Approximately September. | 11:05:54 |
| 15 | BY MR. WOODS: | 11:05:59 |
| 16 | Q Of 2005? | 11:05:59 |
| 17 | A Of 2005. | 11:06:01 |
| 18 | Q What do you understand to be the | 11:06:02 |
| 19 | contractor's responsibility in maintaining EHUs? | 11:06:13 |
| 20 | MR. MILLER: Objection, foundation, asked | 11:06:18 |
| 21 | and answered. | 11:06:21 |
| 22 | A Generally, the contractors were to receive | 11:06:22 |

9 (Pages 33 to 36)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009**

### Page 37

1 calls regarding maintenance issues, anything from 11:06:32
2 parts of the unit that were not working properly to 11:06:36
3 plugged toilets or other maintenance issues, and they 11:06:41
4 were to respond to those maintenance requests. 11:06:45
5 BY MR. WOODS: 11:06:48
6    Q   Were they to respond to concerns from 11:06:48
7 residents regarding odors in the unit? 11:06:51
8        MS. PETROVICH: Objection to the form of 11:06:55
9 the question, and its foundation. 11:06:57
10    A   I know that they did, yes. 11:06:59
11 BY MR. WOODS: 11:07:01
12    Q   Do you know if they were responsible in 11:07:02
13 responding to residents concerning formaldehyde 11:07:06
14 concerns in the unit? 11:07:10
15        MS. PETROVICH: Objection as to foundation. 11:07:13
16        MR. MILLER: I'm going to object, vague, 11:07:17
17 time. 11:07:19
18    A   Can you repeat that again, please? 11:07:19
19        (Last question was read back by the 11:07:22
20 reporter.) 11:07:23
21    A   Yes, if they were characterized as 11:07:34
22 formaldehyde concerns. 11:07:40

### Page 38

1        MR. MILLER: Justin, if there's one 11:07:46
2 objection by one of the defendants, can we have an 11:07:47
3 agreement that it's for all defendants? 11:07:50
4        MR. WOODS: That's fine. 11:07:52
5        MR. MILLER: That will prevent there being 11:07:52
6 multiple piling on. 11:07:55
7        MR. WOODS: That's up to them. I mean -- 11:07:58
8        MS. PETROVICH: That's fine. 11:07:58
9        MR. MAGGIO: Yeah. I mean, that's a 11:08:01
10 standard rule. 11:08:02
11        MR. MILLER: It's been a standard rule. I 11:08:04
12 just wanted to make sure, 'cause -- 11:08:06
13        MR. MAGGIO: Otherwise, we have 30 11:08:06
14 objections. 11:08:08
15        MR. MILLER: Yeah. No, no, no. I just 11:08:08
16 put -- it's better to have it on the record as an 11:08:09
17 agreement of the parties. 11:09:07
18 BY MR. WOODS: 11:09:07
19    Q   Mr. Souza, in your position in 11:09:08
20 September 2005 as Supervisory Program Manager, were 11:09:16
21 you aware that OSHA conducted testing EHUs in October 11:09:20
22 of 2005? 11:09:28

### Page 39

1    A   In 2005 I was not aware of that. 11:09:29
2    Q   When did you become aware of that? 11:09:32
3    A   Approximately 2008 maybe. Maybe earlier. 11:09:34
4 I don't recall. 11:09:44
5    Q   If you can recall, who would have been 11:09:46
6 aware of the OSHA testing in October of 2005? 11:09:48
7        MR. MILLER: Objection, foundation. 11:09:54
8    A   Probably our safety personnel. 11:09:55
9 BY MR. WOODS: 11:09:57
10    Q   Do you -- can you give me a specific 11:09:57
11 individual? 11:10:00
12    A   Perhaps Bronson Brown, I think his name is. 11:10:01
13    Q   And Mr. Brown would have had to have 11:10:07
14 approved that particular OSHA testing that took place 11:10:14
15 in October of 2005? 11:10:19
16        MR. MILLER: Objection, foundation, assumes 11:10:21
17 facts not in evidence. 11:10:22
18    A   I don't know. Sorry. I don't know. 11:10:23
19 BY MR. WOODS: 11:10:27
20    Q   You don't know? 11:10:27
21        Who is Mr. Brown's supervisor? 11:10:28
22    A   I don't know. 11:10:30

### Page 40

1    Q   And do you know where Mr. Brown is located? 11:10:31
2    A   I think he is at FEMA headquarters. 11:10:37
3    Q   In D.C.? 11:10:40
4    A   Yes. 11:10:41
5    Q   How did you become aware of the 11:10:42
6 OSHA testing that took place in October 2005? 11:10:53
7    A   I don't specifically recall. I think there 11:10:56
8 were E-mails that came out about testing that was, 11:11:11
9 that was done by OSHA previously, and people started 11:11:17
10 asking where the testing was and who conducted it. 11:11:24
11 It's possible I have the OSHA testing confused with 11:11:27
12 something else, but I think this was the testing where 11:11:30
13 there were some E-mails saying the testing had been 11:11:35
14 done previously. 11:11:38
15    Q   If we were to assume that the testing took 11:11:39
16 place at a staging facility -- well, let me ask you 11:11:41
17 this: Do you know where the testing took place? 11:11:44
18    A   I thought it was at a staging facility. 11:11:46
19    Q   Do you know which staging facility? 11:11:49
20    A   No. 11:11:51
21    Q   No. In your capacity, could you tell me 11:11:53
22 who would have to make the arrangements for such 11:12:02

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009**

Page 41

1  testing to take place?  11:12:05
2  MR. MILLER: Objection to foundation.  11:12:07
3  A  If it was at staging, Logistics.  11:12:09
4  BY MR. WOODS:  11:12:18
5  Q  And would safety personnel be a part of the  11:12:18
6  Logistics Department, if Logistics is a department?  11:12:24
7  A  They would not be a part of Logistics, but  11:12:28
8  they would probably be working with Logistics.  11:12:32
9  Q  So Logistics and safety personnel would  11:12:35
10  have to coordinate to facilitate such testing?  11:12:38
11  MR. MILLER: Objection, assumes facts not  11:12:43
12  in evidence, foundation.  11:12:44
13  A  I would suspect so.  11:12:45
14  BY MR. WOODS:  11:12:47
15  Q  Would Logistics be a department that would  11:12:47
16  be on site at the staging facility?  11:13:02
17  A  Yes.  11:13:05
18  Q  Do you know who was in charge of Logistics  11:13:07
19  at that time, in October of 2005?  11:13:13
20  MR. MILLER: Objection, vague.  11:13:17
21  A  It would depend on what state.  11:13:18
22   11:13:23

Page 42

1  BY MR. WOODS:  11:13:23
2  Q  Let's say Louisiana.  11:13:24
3  MR. MILLER: Objection, vague.  11:13:26
4  A  I think it was Steve Miller.  11:13:28
5  BY MR. WOODS:  11:13:36
6  Q  I believe -- is there a Steve Miller and a  11:13:39
7  Stephen Miller?  11:13:42
8  A  I'm talking about -- I -- I go -- I call  11:13:43
9  him by Steve Miller. I don't know if -- his name is  11:13:47
10  Stephen Miller, but I call him Steve. I don't know if  11:13:51
11  there's another one.  11:13:54
12  Q  We've just run across a couple of people.  11:13:55
13  One, I think, is referred to as Steve, and one is  11:13:58
14  referred to as Stephen. You don't know?  11:14:01
15  A  I don't know.  11:14:03
16  Q  When was the first that you ever heard of  11:14:06
17  any complaints or concerns? Let's say that. When was  11:14:41
18  the first that you ever heard of any concerns  11:14:44
19  regarding formaldehyde emissions in the EHUs?  11:14:47
20  A  I think it was about May of 2006.  11:14:51
21  Q  But in your declaration, you say that FEMA  11:14:57
22  received the first reported concerns in March of 2006;  11:15:11

Page 43

1  is that correct?  11:15:16
2  A  Yes.  11:15:16
3  Q  How did you become aware of the March 2006  11:15:16
4  concerns?  11:15:21
5  A  As the formaldehyde topic started to grow,  11:15:22
6  people started asking questions about -- people at  11:15:28
7  headquarters I should say, started saying to the field  11:15:33
8  offices in particular, trying to fact gather in terms  11:15:37
9  of what they knew and what they had collected to  11:15:41
10  point. And I think it was Mississippi indicated that  11:15:45
11  the first indication they had or were aware of a  11:15:50
12  problem was in March.  11:15:54
13  Q  If you'd turn to page four of your  11:15:55
14  declaration, and if I can draw your attention to  11:16:12
15  section 12. You state, In June 2006, I was made aware  11:16:21
16  of ongoing discussions between FEMA Field Program  11:16:24
17  staff and FEMA's Office of General Counsel regarding  11:16:27
18  formaldehyde-related applicant requests for EHU  11:16:31
19  information. What discussions -- what particular  11:16:35
20  discussions were you made, made aware of in June of  11:16:39
21  2006 between FEMA field program staff and FEMA  11:16:43
22  office -- FEMA's Office of General Counsel?  11:16:46

Page 44

1  MR. MILLER: Okay. I'm going to object,  11:16:48
2  and I'm going to instruct the witness not to answer to  11:16:51
3  the extent it would reveal the specific communications  11:16:54
4  between Office of General Counsel and the staff  11:16:58
5  personnel.  11:17:01
6  MR. WOODS: That wasn't the question.  11:17:02
7  MR. MILLER: I understand. But to the  11:17:03
8  extent, I'm instructing the witness not to provide  11:17:04
9  that information. Otherwise, answer the question  11:17:07
10  completely.  11:17:10
11  A  What I'm referring to in my declaration is  11:17:10
12  I would -- got added to an E-mail chain requesting EHU  11:17:14
13  information.  11:17:19
14  BY MR. WOODS:  11:17:20
15  Q  What particular EHU information was  11:17:20
16  requested?  11:17:24
17  A  I think it was specification sheets.  11:17:24
18  Q  Can you be more descriptive?  11:17:29
19  A  I think they were called specification  11:17:33
20  sheets for the travel trailers, and I don't know  11:17:37
21  exactly what was on them other than the general unit  11:17:41
22  specifications.  11:17:44

11 (Pages 41 to 44)

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 45**

| | | |
|---|---|---|
| 1 | Q Meaning size, or dimensions, or -- | 11:17:46 |
| 2 | A I don't know. | 11:17:51 |
| 3 | Q So based upon a request for -- from an | 11:17:52 |
| 4 | occupant for EHU information, which information you | 11:18:07 |
| 5 | can't remember, let's -- would be on that | 11:18:11 |
| 6 | specification sheet, you recommended to field staff | 11:18:18 |
| 7 | and FEMA OGC that the agency conduct its own testing; | 11:18:22 |
| 8 | is that correct? | 11:18:28 |
| 9 | A The request for the specification sheets | 11:18:28 |
| 10 | was a part of the E-mail discussing formaldehyde, and | 11:18:31 |
| 11 | yes, as part of that E-mail chain, I recommended that | 11:18:35 |
| 12 | we conduct our own testing. | 11:18:38 |
| 13 | Q How did you come to the decision to make | 11:18:40 |
| 14 | that recommendation to con -- for FEMA to conduct its | 11:18:45 |
| 15 | own testing? | 11:18:50 |
| 16 | A I believe it's in the E-mail, but | 11:18:50 |
| 17 | essentially, I just wanted to either put the issue to | 11:18:53 |
| 18 | rest or remove people from harm. | 11:18:56 |
| 19 | Q What specifically about that request for | 11:19:00 |
| 20 | information made it apparent to you that FEMA needed | 11:19:04 |
| 21 | to conduct its own testing? | 11:19:09 |
| 22 | MR. MILLER: Objection. Mischaracterizes | 11:19:11 |

**Page 46**

| | | |
|---|---|---|
| 1 | the witness' testimony. | 11:19:13 |
| 2 | A I'm sorry. Can you repeat that, please? | 11:19:15 |
| 3 | (Last question was read back by the | 11:19:19 |
| 4 | reporter.) | 11:19:31 |
| 5 | A There may have been -- I don't recall | 11:19:41 |
| 6 | specifically. There may have been reference in there, | 11:19:43 |
| 7 | in that E-mail or in a previous recent E-mail to the | 11:19:47 |
| 8 | Sierra Club testing. And I did not want to rely upon | 11:19:52 |
| 9 | non-federal testing to make decisions about how to | 11:19:57 |
| 10 | move forward. | 11:20:00 |
| 11 | BY MR. WOODS: | 11:20:03 |
| 12 | Q Why would you not want to rely upon the | 11:20:04 |
| 13 | Sierra Club testing? | 11:20:07 |
| 14 | A To be honest, because I wasn't sure how | 11:20:10 |
| 15 | their testing was performed or potentially how biased | 11:20:13 |
| 16 | the testing may have been, and I wanted to reach out | 11:20:18 |
| 17 | to the federal scientific community to conduct our own | 11:20:22 |
| 18 | testing. | 11:20:27 |
| 19 | Q So you believe the Sierra Club testing was | 11:20:27 |
| 20 | biased? | 11:20:31 |
| 21 | A I didn't -- | 11:20:31 |
| 22 | MR. MILLER: Objection. Hold on. | 11:20:31 |

**Page 47**

| | | |
|---|---|---|
| 1 | Mischaracterizes witness' testimony. Go ahead. | 11:20:34 |
| 2 | A I didn't say that. I said I just wasn't | 11:20:36 |
| 3 | sure. | 11:20:39 |
| 4 | BY MR. WOODS: | 11:20:47 |
| 5 | Q But you said that, To be honest, because I | 11:20:47 |
| 6 | wasn't sure how their testing was performed or | 11:20:50 |
| 7 | potentially how biased the testing may have been. So | 11:20:52 |
| 8 | you're not saying that, that you were concerned about | 11:20:58 |
| 9 | the bias of their testing? | 11:21:01 |
| 10 | MR. MILLER: Objection, mischaracterizes | 11:21:03 |
| 11 | the witness' testimony again. And I think if you're | 11:21:06 |
| 12 | reading back from the court reporter's draft that you | 11:21:08 |
| 13 | have right on the screen, the testimony speaks for | 11:21:12 |
| 14 | itself. Go ahead. | 11:21:14 |
| 15 | A I'm saying that it potentially could have | 11:21:16 |
| 16 | been biased, and I wanted to reach out to the | 11:21:19 |
| 17 | scientific community. | 11:21:22 |
| 18 | BY MR. WOODS: | 11:21:23 |
| 19 | Q So Sierra Club had no -- you had some | 11:21:23 |
| 20 | understanding that the Sierra Club was not a part of | 11:21:27 |
| 21 | the, quote, unquote, "scientific community"? | 11:21:30 |
| 22 | MR. MILLER: Objection, mischaracterizes | 11:21:33 |

**Page 48**

| | | |
|---|---|---|
| 1 | witness' testimony. | 11:21:35 |
| 2 | A I don't know whether or not they were part | 11:21:36 |
| 3 | of the scientific community. I just wanted to reach | 11:21:38 |
| 4 | out to the federal scientific community. | 11:21:42 |
| 5 | BY MR. WOODS: | 11:21:44 |
| 6 | Q So it was better, in your mind, that the | 11:21:44 |
| 7 | federal government conduct the testing than any other | 11:21:46 |
| 8 | agency with the capabilities? | 11:21:51 |
| 9 | MR. MILLER: Objection, mischaracterizes | 11:21:53 |
| 10 | witness' testimony. | 11:21:57 |
| 11 | A I don't know if it was better, but I | 11:21:58 |
| 12 | believe it was an appropriate course of action. | 11:22:00 |
| 13 | BY MR. WOODS: | 11:22:04 |
| 14 | Q Do you know when the Sierra Club testing | 11:22:04 |
| 15 | took place? | 11:22:08 |
| 16 | MR. MILLER: Objection, foundation. | 11:22:12 |
| 17 | A Approximately March of -- | 11:22:14 |
| 18 | BY MR. WOODS: | 11:22:22 |
| 19 | Q March of '06? | 11:22:22 |
| 20 | A Yes. | 11:22:24 |
| 21 | Q And when did you become aware of the Sierra | 11:22:25 |
| 22 | Club testing? | 11:22:28 |

12 (Pages 45 to 48)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

Page 49

1  A   I don't recall specifically. There were
2  news articles. What I do specifically recall was
3  being given a copy of a letter from the Sierra Club.
4  Q   Okay. So if you're aware that a -- or FEMA
5  was aware that the Sierra Club testing took place in
6  March of '06; is that correct?
7      MR. MILLER: Objection, mischaracterizes
8  witness' testimony, foundation.
9  A   I learned of it from the timeline, that
10 that's approximately when it took place.
11 BY MR. WOODS:
12 Q   You don't know when Sierra Club
13 communicated to FEMA that it had tested some units, do
14 you?
15 A   The letter I saw had a mid-June date on it
16 as I recall.
17 Q   Okay. The testing took place in March of
18 2006. When did -- excuse me, when did FEMA's testing
19 begin?
20 A   FEMA's --
21     MR. MILLER: Objection, vague.
22 A   EP -- EPA testing?

Page 50

1  BY MR. WOODS:
2  Q   Yes.
3  A   I think it was September of --
4  approximately September of 2006.
5  Q   So if the Sierra Club testing took place in
6  March of 2006 and FEMA did not begin its testing until
7  Sep -- with EPA -- through EPA in September of 2006,
8  can you explain why there would have been such a lapse
9  of time in between FEMA being aware of the Sierra Club
10 testing and FEMA actually conducting its own testing?
11     MR. MILLER: Objection, foundation.
12 A   There were a number of steps that took
13 place between my recommendation in mid-June, late
14 June, to have the EPA conduct the testing, and then
15 the actual beginning of the testing itself.
16 BY MR. WOODS:
17 Q   Okay. Well, let's back up. If the testing
18 of Sierra Club took place in March of 2006, and there
19 wasn't a recommendation or a discussion for FEMA to
20 conduct its testing until June of 2006, can -- do you
21 understand or can you explain to me why there was a
22 lapse of three months in between that decision being

Page 51

1  made and FEMA being aware of the Sierra Club testing?
2      MR. MILLER: Let me object. First of all,
3  it assumes facts not in evidence, specifically to
4  explain, you're assuming FEMA knew in March of '06
5  when this witness has testified there was a letter in
6  mid-June 2006 that it became aware of it. So it's an
7  improper hypothetical. Go ahead.
8  A   I understand that the -- from the timeline,
9  that the testing took place in approximately March. I
10 don't know when those test results became public, and
11 I -- I do know that there was some discussion previous
12 to my decision in June, in going through the E-mails
13 and timelines, that there were some discussions at the
14 field level on whether or not testing should be
15 conducted and how that testing may be conducted
16 previous to the June timeline. But my decision in
17 June was the catalyst to get the EPA on board to do
18 standard, across-the-board testing.
19 BY MR. WOODS:
20 Q   Can you explain why it would take from June
21 of '06 until September of '06 for the testing to
22 actually commence?

Page 52

1  A   As I mentioned, there were a number of
2  steps that took place there. We were meeting with
3  EPA on the testing protocol and methodology. There
4  were Logistics requirements in terms of identifying
5  units and setting up the units and powering the units.
6  And then the actual implementation. EPA -- I believe
7  EPA used a contractor to perform those tests on their
8  behalf, and then we had to put the funding mechanisms
9  in place through a mission assignment to have EPA do
10 those things on our behalf. So there were a number of
11 I guess I'd characterize them as administrative and
12 scientific steps that needed to be taken prior to the
13 actual begin of testing.
14 Q   Let's talk about the funding. You
15 mentioned funding. Let's talk about the funding
16 aspect. Was it -- can you explain that a bit to me?
17 What was required in getting the funding for this
18 testing and what steps were involved?
19 A   Generally.
20 Q   Generally.
21 A   Generally, we would use what we call a
22 mission assignment, and my request for a mission

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

**Page 53**

1  assignment in this case normally would have been  11:28:15
2  cleared through the Gulf Coast Recovery Office to  11:28:18
3  perhaps the comptroller at one of the field offices  11:28:24
4  for approval of the funds. It usually requires a  11:28:29
5  general statement of the request and what's to take  11:28:32
6  place, and then agreement from EPA to accept the  11:28:37
7  mission assignment and begin the work.  11:28:43
8     Q   So, that's, I guess, what we would all  11:28:44
9  refer to as bureaucratic red tape that needs to be  11:28:50
10  negotiated before anything is to take -- or any  11:28:55
11  actions take place?  11:28:57
12        MR. MILLER: Objection, argumentative,  11:28:58
13  mischaracterizes witness' testimony.  11:29:01
14     A   I wouldn't characterize it as bureaucratic  11:29:04
15  red tape. I'm not sure how long this particular  11:29:09
16  mission assignment took to get approved, but in  11:29:13
17  general, mission assignment authority is designed to  11:29:17
18  be relatively quick.  11:29:20
19  BY MR. WOODS:  11:29:21
20     Q   But it still took -- once the decision was  11:29:21
21  made, it still took three months for anything to --  11:29:25
22  any testing to take place based -- basically -- based  11:29:28

**Page 54**

1  upon the funding issues, the logistics, the powering  11:29:33
2  of units --  11:29:38
3     A   And the scientific concerns was probably  11:29:39
4  the larger of all of those you just mentioned. We  11:29:42
5  were instructed by EPA that in order to get valid  11:29:46
6  results, they needed to develop a testing methodology  11:29:49
7  that would be scientifically sound, and they needed to  11:29:54
8  have that methodology reviewed by other scientific  11:29:58
9  peers before they could actually begin the testing.  11:30:01
10     Q   Do you know what scientific methodology EPA  11:30:04
11  used to conduct its testing?  11:30:07
12     A   Generally, I guess. I'm not sure what  11:30:09
13  you're asking.  11:30:15
14     Q   What -- what was their testing mechanism?  11:30:16
15     A   In terms of --  11:30:20
16        MR. MILLER: Object, vague.  11:30:22
17     A   In terms of the instruments they used?  11:30:23
18  BY MR. WOODS:  11:30:26
19     Q   Yes.  11:30:26
20     A   I don't know.  11:30:26
21     Q   You don't know? You don't know if they did  11:30:27
22  passive or active testing of units?  11:30:28

**Page 55**

1     A   I don't know.  11:30:31
2     Q   In section 11 of your declaration, the last  11:30:32
3  sentence, you say that FEMA began to consider various  11:30:57
4  response actions, including the testing of individual  11:31:01
5  units and the installation of vent fans. Can you tell  11:31:03
6  me what went into the consideration of the  11:31:09
7  installation of vent fans as a possible response  11:31:11
8  action?  11:31:17
9     A   What I mean here was that I recalled  11:31:17
10  conversations about whether or not if there was  11:31:27
11  formaldehyde in the units, whether or not there were  11:31:32
12  any structural changes we could make to a unit to help  11:31:34
13  ventilate them in terms of installation of vent fans.  11:31:38
14     Q   Okay. And was that a discussion that was  11:31:43
15  had with the manufacturers of the units regarding the  11:31:47
16  possibility of installation of vent fans?  11:31:50
17     A   I believe there was. I don't recall when  11:31:54
18  and I don't recall who.  11:32:02
19     Q   But obviously, installation of vent fans  11:32:07
20  wasn't chosen as a response action, correct?  11:32:13
21     A   That's correct.  11:32:15
22     Q   And why is that?  11:32:16

**Page 56**

1     A   My general recollection was that -- and  11:32:18
2  again, without the context of when -- at this point,  11:32:33
3  we weren't even sure we had a problem, but at some  11:32:41
4  point I believe we decided that the vent fan that  11:32:45
5  would need to be installed would require major  11:32:50
6  structural changes to the unit in terms of cutting  11:32:55
7  holes in the units, and external, I think they  11:32:59
8  characterized them as blowers, and there were going to  11:33:04
9  be major structural changes to the unit. And so we  11:33:07
10  were -- while we investigated whether or not we had an  11:33:12
11  issue, we tried to find other potential solutions like  11:33:15
12  filters or something else that may work.  11:33:19
13     Q   Did you know or have an idea as to what  11:33:21
14  would be an estimated cost for the installation of the  11:33:24
15  vent fans?  11:33:27
16     A   No.  11:33:28
17     Q   No? Was it a cost factor -- was cost a  11:33:28
18  factor in determining or deciding not to install vent  11:33:33
19  fans?  11:33:39
20     A   I don't recall.  11:33:39
21     Q   But -- you talked about the alteration of  11:33:40
22  the units, but it was a possibility to install the  11:33:49

14 (Pages 53 to 56)

**L.A.D. REPORTING & DIGITAL VIDEOGRAPHY**
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

# VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 57**

1  vent fans? 11:33:53
2  MR. MILLER: Objection. 11:33:54
3  A  Again, it was a possibility to install the 11:33:56
4  vent fans. 11:34:00
5  BY MR. WOODS: 11:34:01
6  Q  But for some reason, there was a decision 11:34:01
7  not to do such? 11:34:04
8  A  Correct. 11:34:05
9  Q  In section 12 of your declaration, at the 11:34:06
10 bottom of page four, last sent -- well, the sentence 11:34:44
11 begins, As part of. Do you see that? 11:34:48
12 A  Uh-huh. Yes. 11:34:50
13 Q  Flip over. It says, As part of my duties, 11:34:51
14 I served as the FEMA headquarters Individual 11:34:56
15 Assistance Program point of contact for 11:34:59
16 formaldehyde-related issues. Exactly what were your 11:35:01
17 duties as point of contact for formaldehyde-related 11:35:05
18 issues? 11:35:08
19 A  I don't know exactly what they were. 11:35:10
20 Essentially, I was asked by Mr. Garratt, who was our 11:35:16
21 division -- Deputy Division Director at the time, or 11:35:20
22 may have been Acting Division Director, to take the 11:35:23

**Page 58**

1  lead in coordinating with the field and other elements 11:35:27
2  of the agency, our -- our formaldehyde actions, in 11:35:32
3  particular, this EPA initiative that I had asked to 11:35:37
4  take place. 11:35:43
5  Q  So were you, for lack of a better term, the 11:35:43
6  coordinator of all of these related issues, all 11:35:48
7  formaldehyde-related issues? 11:35:53
8  A  I'll say that my office was coordinating 11:35:55
9  this EPA testing on behalf of headquarters 11:35:58
10 IA division. 11:36:03
11 Q  And what was your understanding as to OGC's 11:36:03
12 role in the coordination of the related -- 11:36:08
13 formaldehyde-related issues? 11:36:13
14 A  They became one of multiple players in the 11:36:15
15 formaldehyde actions that we were taking. 11:36:23
16 Q  But what is your understanding as to 11:36:24
17 specifically why OGC was involved? 11:36:26
18 A  Oh. There was litigation or pending 11:36:29
19 litigation regarding formaldehyde, and so they wanted 11:36:32
20 to be kept in the loop. 11:36:38
21 Q  And whom from OGC asked to be kept in the 11:36:40
22 loop? 11:36:44

**Page 59**

1  A  Rick Preston. I believe I saw E-mails from 11:36:44
2  Jordan Fried and Jill Igert, who was a field attorney 11:36:51
3  at that time. 11:36:58
4  Q  We've had testimony from other individuals 11:37:03
5  that there were bi-weekly or twice-monthly telephone 11:37:27
6  conferences regarding the formaldehyde issues and 11:37:33
7  concerns. Were you a part of those telephone 11:37:38
8  conversations? 11:37:43
9  A  I think I sat in on a couple of them. 11:37:44
10 Q  Do you recall Mr. Preston participating in 11:38:03
11 those conferences? 11:38:07
12 A  The one that I -- the one or two that I sat 11:38:08
13 in on, yes, I think he was present. 11:38:11
14 Q  And again, you believe that OGC, 11:38:14
15 Mr. Preston in particular, was involved because of 11:38:21
16 litigation concerns? 11:38:26
17 A  Yes. 11:38:28
18 Q  Did Mr. Preston or anyone from OGC ever 11:38:30
19 suggest a plan of action in responding to occupant 11:38:52
20 concerns? 11:39:00
21 MR. MILLER: I'm going to object, and I'm 11:39:00
22 going to instruct the witness not to answer except to 11:39:03

**Page 60**

1  the extent it relates to communications during these 11:39:06
2  bi-monthly or bi-weekly telephone calls. 11:39:09
3  A  I don't recall the specific phone calls, 11:39:13
4  the topics of the phone calls. 11:39:29
5  BY MR. WOODS: 11:39:31
6  Q  Any specific E-mails? 11:39:31
7  A  In regards to -- 11:39:33
8  Q  Any plans of action suggested by anyone 11:39:39
9  from OGC. 11:39:43
10 A  I recall an E-mail from Rick Preston saying 11:39:44
11 that -- 11:39:52
12 MR. MILLER: Hold on one minute. 11:39:52
13 MR. WOODS: What's going on? 11:40:00
14 MR. MILLER: I just -- I need to consult 11:40:02
15 with the witness. I need to find out what he's going 11:40:03
16 to talk about before I determine whether I need to 11:40:05
17 object, counsel. 11:40:08
18 MR. WOODS: We're in the middle of a -- 11:40:09
19 MR. MILLER: It's in determination of 11:40:10
20 whether the question is privileged. I'm allowed to 11:40:14
21 consult with my client at that point, counsel. Do you 11:40:17
22 understand that? 11:40:19

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

Page 61

1  (Counsel conferred with the witness.) 11:40:30
2  MR. MILLER: Go ahead and answer the 11:40:33
3  question. 11:40:34
4  A  There was an E-mail from Rick Preston where 11:40:35
5  he agreed that testing should be done, but he wanted 11:40:42
6  to make sure we had a -- that the program side of the 11:40:46
7  house had a course of action laid out before we 11:40:50
8  started. 11:40:53
9  BY MR. WOODS: 11:40:55
10  Q  What was -- why -- what did you understand 11:40:56
11  to be his concern for the program side having a course 11:40:57
12  of action set up? 11:41:02
13  A  His concern, quite frankly, was already one 11:41:04
14  of the program concerns, which is, if we started 11:41:08
15  testing with EPA, and the results came back requiring 11:41:12
16  us to take action, what would that action be? His 11:41:17
17  concern was pretty much that we have a plan of action 11:41:21
18  before we begin the concern. At least that's how I 11:41:27
19  understood his concern. 11:41:31
20  Q  So you understood his concern to wait, not 11:41:32
21  perform testing until there is an appropriate plan of 11:41:36
22  action? 11:41:40

Page 62

1  A  I believe that was his concern, yes. 11:41:40
2  Q  Did it not concern you, sir, that 11:41:51
3  individuals were complaining about formaldehyde 11:41:53
4  emissions while FEMA and its lawyers took time to come 11:41:55
5  up with an appropriate plan of action in response to 11:42:01
6  if there were actual elevated levels? 11:42:05
7  MR. MILLER: Hold on a minute. Can you 11:42:08
8  re-read that question back? 11:42:10
9  (Last question was read back by the 11:42:11
10  reporter.) 11:42:13
11  MR. MILLER: Objection. Assumes facts not 11:42:27
12  in evidence, mischaracterizes the witness' testimony, 11:42:30
13  and is vague as to time. 11:42:34
14  A  As I mentioned, those were Rick's concerns, 11:42:36
15  or OCC's concerns. My position as the program officer 11:42:40
16  was that the testing would proceed forward, and that 11:42:45
17  we would develop the plan of action simultaneously 11:42:49
18  with getting the testing underway. 11:42:54
19  BY MR. WOODS: 11:42:56
20  Q  Okay. So, once Rick was -- Rick Preston 11:42:56
21  was okay with a plan of action in response to possible 11:43:00
22  elevated formaldehyde emission levels, then the 11:43:07

Page 63

1  testing would be allowed to commence, correct? 11:43:10
2  MR. MILLER: Objection. Mischaracterizes 11:43:12
3  witness' testimony, assumes facts not in evidence. 11:43:15
4  And I want to make it very clear the E-mail that the 11:43:18
5  witness is talking about is that June 15th, 2006, 11:43:21
6  E-mail that's been released by Congress. 11:43:26
7  A  No. And to be frank, I felt the decision 11:43:28
8  was mine to make in coordination with the program 11:43:32
9  leadership, Mr. Garratt. So, I was not overly 11:43:36
10  concerned with Rick's concerns. He made a good and -- 11:43:46
11  what I considered to be a good and valid point in 11:43:48
12  terms of a course of action, but we had already 11:43:51
13  considered it, and the decision was made that we were 11:43:54
14  moving forward, and we did. 11:43:56
15  BY MR. WOODS: 11:43:58
16  Q  But you did consider his concerns? 11:43:58
17  A  Like I said, we had already considered his 11:44:01
18  concerns. It was already one of our concerns. 11:44:04
19  Q  Litigation? 11:44:07
20  MR. MILLER: Objection, mischaracterizes 11:44:08
21  witness' testimony. 11:44:11
22  A  No. What I saw in his E-mail was that he 11:44:12

Page 64

1  was concerned that we have an appropriate course of 11:44:15
2  action before we begin testing. That's what I'm 11:44:18
3  referencing. 11:44:21
4  BY MR. WOODS: 11:44:27
5  Q  Between Mr. Preston's E-mail, I believe, of 11:44:27
6  June 15, 2006, when was an appropriate, or what FEMA 11:44:35
7  considered an appropriate plan of action developed and 11:44:40
8  formalized? 11:44:43
9  MR. MILLER: I'm going to object, vague. 11:44:48
10  Go ahead. 11:44:50
11  A  I don't -- I don't recall that we ever 11:44:51
12  developed an actual written plan, although there may 11:44:59
13  have been one. The discussions began immediately in 11:45:04
14  terms of possible options given the various results 11:45:08
15  that we may get back. 11:45:15
16  BY MR. WOODS: 11:45:18
17  Q  But meanwhile, while all of these 11:45:36
18  discussions are going on between Mr. Preston or any 11:45:38
19  other member of OGC and FEMA, there were complaints 11:45:44
20  that were still being received from occupants about -- 11:45:51
21  or concerns about formaldehyde emissions, correct? 11:45:56
22  MR. MILLER: Object. One, vague as to 11:45:59

16 (Pages 61 to 64)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

**Page 65**

1   time, two, mischaracterizes witness' testimony, and
2   three, assumes facts not in evidence.
3       A    I don't know.
4   BY MR. WOODS:
5       Q    You don't know of any complaints or
6   concerns that were being voiced by occupants during
7   this time?
8           MR. MILLER:  Objection, vague, time.
9       A    Yeah, I don't know when the complaints came
10  into the maintenance line.
11  BY MR. WOODS:
12      Q    But you knew that concerns had been raised,
13  according to your declaration in, I believe, April or
14  May of 2006, correct?
15          MR. MILLER:  I'm sorry.  What are you
16  referring to, counsel?  Ten?
17          MR. WOODS:  Yes.
18      A    Yes.
19  BY MR. WOODS:
20      Q    And those concerns went unanswered and
21  unaddressed until an appropriate plan of action was
22  developed between OGC and FEMA?

---

**Page 66**

1           MR. MILLER:  Objection, mischaracterizes
2   witness' testimony, assumes facts not in evidence.
3       A    No, I don't believe that that's the case.
4   I think they were addressed at the field level.
5       Q    How so?
6           (Mr. Maggio exited the room.)
7       A    My understanding is that they advised
8   applicants to ventilate the units, and there may have
9   actually been some site visits conducted by housing
10  specialists.
11  BY MR. WOODS:
12      Q    Was that a programatic response?
13      A    Yes.
14      Q    In paragraph 15, or section 15 of your
15  declaration, in your last sentence, you talk about
16  Mr. Haynes and Mr. McNeese.  You say, Mr. Haynes and,
17  later, Mr. McNeese reported to me on a regular basis
18  regarding the status of the testing project --
19  project, and if they deemed it appropriate, would seek
20  my direct involvement in conference calls and seek my
21  assistance in resolving issues of concern.
22          First of all, who's Mr. Haynes and who's

---

**Page 67**

1   Mr. McNeese?
2           MR. MILLER:  I'm going to object, compound.
3       A    Tracy Haynes and Martin McNeese were other
4   Individual Assistance Program Specialists.
5   BY MR. WOODS:
6       Q    And what were they tasked to do?
7       A    At first --
8           MR. MILLER:  Actually, hold on.  Vague and
9   narrative.
10      A    At first, Tracy Haynes was in the field,
11  still in Louisiana, and I had asked him to help me
12  coordinate some of the aspects from the field office.
13  And then I can't remember when, but I asked Martin
14  McNeese to come into FEMA headquarters, I think it was
15  FEMA headquarters, to help us get this testing off the
16  ground.
17  BY MR. WOODS:
18      Q    So, basically, if I read your last sentence
19  properly in section 15, you said that, Mr. Haynes and,
20  later, Mr. McNeese reported to me on a regular basis
21  regarding the status of the testing project, and if
22  they deemed it appropriate, would seek my direct

---

**Page 68**

1   involvement.  Does that mean, sir, that Mr. Haynes and
2   Mr. McNeese were tasked with the testing project and
3   only if some important issue were to -- were to result
4   or occur, then they would consult you?
5       A    Yes.  I delegated the responsibility to
6   them to get the testing underway.
7       Q    You said that, They would seek my direct
8   involvement in conference calls and seek my assistance
9   in resolving issues of concerned -- of concern.  I
10  know this was back in July of 2006, but do you recall
11  any conference calls with Mr. Haynes or Mr. McNeese
12  required to resolve issues of concern?
13      A    I -- generally, I think I recall Martin
14  sent me an E-mail about -- I think it was EPA concerns
15  about the discussions about the levels that we were
16  going to use or potentially could be used in the
17  units, and EPA's general concern that those unit --
18  that those -- that the units that they were going to
19  test were going to be above those unit levels, and
20  there was discussion on how we wanted to proceed in
21  terms of a particular level.
22      Q    When you say unit level, what are you

---

17 (Pages 65 to 68)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 69**

1 referring to? 11:52:18
2  A  That the travel trailer units -- my 11:52:18
3 recollection of -- general recollection from the 11:52:22
4 E-mail, was that there were discussions about what 11:52:25
5 should be used as a baseline level. And EPA had 11:52:27
6 expressed a general concern that the units that we 11:52:33
7 tested may be above some of the levels that were being 11:52:39
8 concerned -- considered. And so Martin asked me to 11:52:47
9 join the conference call to work through those issues. 11:52:54
10  Q  And how was that issue resolved? 11:52:57
11  A  My general position on the call was I'm not 11:53:00
12 overly concerned with the levels that are being 11:53:09
13 discussed in terms of what levels should be used. 11:53:13
14 That's why we went to EPA to begin with. And that if 11:53:16
15 the levels came back above whatever level was deemed 11:53:21
16 as a safe and appropriate level, then we would take 11:53:24
17 appropriate action; essentially, to press forward. 11:53:29
18  Q  Do you now know what the appropriate level 11:53:32
19 is or was at that time? 11:53:37
20  MR. MILLER: Objection, vague, time. 11:53:39
21  A  Can you read that back to me, please? 11:53:44
22  (Last question was read back by the 11:53:54

**Page 70**

1 reporter.) 11:53:55
2  MR. MILLER: And just to clarify, are 11:53:56
3 you -- and you might want to clarify it. 11:53:57
4 BY MR. WOODS: 11:54:02
5  Q  Yeah. Let me back up. That wasn't a good 11:54:03
6 question. When you're talking about levels, once 11:54:06
7 that -- and you have these conference calls regarding 11:54:14
8 what's an appropriate level, what was determined to be 11:54:17
9 an appropriate level as a result of these conference 11:54:22
10 calls? 11:54:25
11  MR. MILLER: I'm going to object. Vague, 11:54:26
12 time. 11:54:29
13  A  I don't know that we ever -- I don't know 11:54:30
14 that we ever came up with what the appropriate level 11:54:34
15 would be. That was, in the end, going to be, I think, 11:54:37
16 ATSDR and EPA deciding what a safe level would be, and 11:54:44
17 that's really what we were asking them for. And so 11:54:51
18 there -- those discussions were, in general, these are 11:54:54
19 the kinds of levels that could be considered, and 11:54:58
20 there was this general concern that, you know, what 11:55:01
21 level was going to be appropriate. And I think Martin 11:55:05
22 asked me to join the call to push through those 11:55:09

**Page 71**

1 concerns, and we did, and I just said whatever the 11:55:12
2 level turns out to be, it's not important right now. 11:55:15
3 Press forward with the testing. And when we get the 11:55:19
4 results back and they get analyzed, whatever they are 11:55:22
5 is what they are. 11:55:25
6 BY MR. WOODS: 11:55:26
7  Q  And if you go to section 16, is that more 11:55:26
8 of an explanation as to what those conference calls 11:55:52
9 were concerning regarding levels? 11:55:59
10  (Mr. Maggio entered the room.) 11:56:05
11  A  Yes. That's a much clearer way to put 11:56:07
12 that, yes. 11:56:10
13 BY MR. WOODS: 11:56:11
14  Q  Paragraph, or section 17 says that, I was 11:56:11
15 advised by Mr. McNeese that a consensus -- consensus 11:56:42
16 had been reached by EPA, CDC/EPA and FEMA that the 11:56:46
17 scope of the testing should initially be restricted to 11:56:53
18 new, never occupied trailers. What is your 11:56:57
19 understanding as to why the testing should be 11:57:02
20 restricted to new, never occupied trailers? 11:57:05
21  A  My understanding was that we were trying to 11:57:07
22 figure out whether we had a systemic problem with the 11:57:10

**Page 72**

1 units themselves, or whether or not this formaldehyde 11:57:13
2 issue could be related to something other than the 11:57:17
3 units. And so, I guess the scientists involved talked 11:57:20
4 about things like extraneous variables in terms of the 11:57:26
5 way people lived in the units, smoking, and chemicals 11:57:31
6 that may be stored there. And so in order to isolate 11:57:35
7 this potential issue to the units themselves, the 11:57:39
8 decision was made to test unoccupied units. 11:57:44
9  Q  Do you know who were the manufacturers of 11:57:48
10 the unoccupied units that were tested? 11:57:53
11  A  I don't know. I know that we were trying 11:57:56
12 to get a representative sample, I think. But I don't 11:57:58
13 know which ones ultimately were included. 11:58:01
14  Q  Was it your position that that 11:58:04
15 representative sample of testing could be applied to 11:58:12
16 the larger inventory of units? 11:58:15
17  A  Yes, I think so, yes. 11:58:19
18  Q  If you would, sir, if you'd turn to page 11:58:25
19 seven of your declaration, section 18. The second 11:58:57
20 sentence, you say, Around July 2006, FEMA prepared and 11:59:08
21 distributed a formaldehyde brochure to all EHU 11:59:12
22 occupants about: Formaldehyde, potential health 11:59:18

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

---

**Page 73**

1  concerns often assoc -- often associated with    11:59:21
2  formaldehyde, actions occupants could take to reduce    11:59:23
3  the levels of formaldehyde in their EHU, and the need    11:59:27
4  for occupants to consult a medical provider if they    11:59:30
5  start to have health concerns related to formaldehyde.    11:59:34
6  Can you -- and that's a description of that brochure,    11:59:37
7  but I'm trying to -- and I've seen several brochures.    11:59:40
8  I'm trying to determine which particular one this is.    11:59:44
9  Is it a two-page brochure?    11:59:47
10      A    I think this one is the tri-fold brochure    11:59:51
11  with the trailer on the front.    11:59:56
12      Q    In black and white? Tri-fold, and a    11:59:58
13  drawing of a trailer?    12:00:01
14      A    That sounds like it, yes.    12:00:02
15      Q    One of the last items mentioned here is the    12:00:04
16  need for occupants to consult a medical provider if    12:00:23
17  they start to have health concerns related to    12:00:27
18  formaldehyde. Can you -- sir, can you tell me how    12:00:29
19  that became, that particular item, became a part of    12:00:33
20  the brochure?    12:00:38
21      A    I don't know.    12:00:39
22      Q    Were there ever any conversations as to    12:00:41

**Page 74**

1  whether or not FEMA would assist individuals in    12:00:51
2  consulting a medical provider if they start to have    12:00:56
3  health concerns related to formaldehyde?    12:01:00
4          MR. MILLER: Objection, vague, time.    12:01:03
5      A    Not that I'm aware of.    12:01:05
6  BY MR. WOODS:    12:01:09
7      Q    Did the brochure have any recommendations    12:01:09
8  of where to consult or how to consult a medical    12:01:11
9  provider if they started to have health concerns    12:01:15
10  related to formaldehyde?    12:01:18
11      A    I don't recall. I don't think so.    12:01:19
12      Q    But you do think it was appropriate at this    12:01:24
13  time, in July of 2006, that if an individual had    12:01:35
14  health concerns related to formaldehyde, that they    12:01:39
15  should consult a medical provider?    12:01:41
16      A    Yes.    12:01:45
17      Q    But none was provided through FEMA?    12:01:48
18      A    That's correct.    12:01:53
19      Q    Section 19, you say, In February of 2007,    12:01:54
20  ATSDR issued a report and advised FEMA that the tests    12:02:19
21  show that ventilation would reduce the baseline levels    12:02:25
22  of formaldehyde in the EHUs below 0.3 parts per    12:02:28

**Page 75**

1  million, the concentration level that ATSDR had    12:02:33
2  determined would be a threshold level of concern for    12:02:36
3  sensitive individuals.    12:02:39
4          Do you recall any discussions with ATSDR    12:02:52
5  and RCC that .3 parts per million is a concentration    12:02:56
6  level that would be a threshold level of concern for    12:03:06
7  sensitive individuals?    12:03:08
8          MR. MILLER: I'm going to object, vague,    12:03:10
9  time.    12:03:12
10      A    You said conversations, correct? No.    12:03:13
11  BY MR. WOODS:    12:03:15
12      Q    Any E-mails regarding that issue?    12:03:15
13          MR. MILLER: I'm going to object, vague.    12:03:18
14      A    Not that I can recall.    12:03:21
15  BY MR. WOODS:    12:03:23
16      Q    Any communications at all?    12:03:23
17      A    Only the report that they issued.    12:03:25
18      Q    So based upon this baseline level of    12:03:28
19  formaldehyde in EHUs of .3 parts per million as being    12:03:46
20  the threshold level of concern for sensitive    12:03:51
21  individuals, FEMA then concluded that EHUs remained a    12:03:54
22  viable housing option, correct?    12:04:01

**Page 76**

1          MR. MILLER: Object. It mischaracterizes    12:04:02
2  witness' testimony and the declaration.    12:04:05
3      A    When combined with ventilation, yes.    12:04:07
4  BY MR. WOODS:    12:04:10
5      Q    But FEMA took no steps to install the vent    12:04:10
6  fans as we discussed earlier, correct?    12:04:19
7      A    That's correct.    12:04:21
8      Q    So, it was just normal ventilation, meaning    12:04:22
9  i.e., opening up windows?    12:04:30
10      A    Right. Because the -- at least as to the    12:04:33
11  best of my recollection, the EPA testing methodology    12:04:36
12  didn't have vent fans. They just used ventilation in    12:04:42
13  terms of opening windows and doors and those sorts of    12:04:45
14  things, the things that we recommended that applicants    12:04:49
15  do, and it was enough to lower it below these levels    12:04:52
16  of concern.    12:04:58
17          MR. MILLER: Mr. Woods, we've been going an    12:05:01
18  hour and a half, so when it comes to a point that --    12:05:04
19          MR. WOODS: Have we?    12:05:07
20          MR. MILLER: -- yes -- that you think a    12:05:07
21  reasonable break, we can take a break.    12:05:09
22          MR. WOODS: Okay. We can -- when do you    12:05:12

---

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

Page 77

1  have to change the tape? 12:05:15
2      THE VIDEOGRAPHER: Two hours. 12:05:17
3      MR. WOODS: You have a two-hour tape? 12:05:20
4      MR. SCANDURRO: You've got about 25 minutes 12:05:23
5  left? 12:05:25
6      THE VIDEOGRAPHER: Correct. 12:05:29
7  BY MR. WOODS: 12:05:54
8      Q   In section 21 of your declaration, it 12:05:55
9  begins on -- I'm sorry, section 20, begins on page 12:05:59
10 seven, but if you turn to page eight, the last 12:06:03
11 sentence says, In August, Harvey Johnson, FEMA Deputy 12:06:08
12 Administrator, appointed Michael Lapinski, FEMA, to 12:06:14
13 coordinate the agency's formaldehyde response. 12:06:18
14     Who's Michael Lapinski? What's his job 12:06:20
15 title? 12:06:24
16     A   He's a federal coordinating officer. 12:06:25
17     Q   What was your understanding as to how 12:06:28
18 Mr. Lapinski was to coordinate the agency's 12:06:33
19 formaldehyde response? 12:06:37
20     A   My understanding was that he was going to 12:06:38
21 be the lead on behalf of the administrator's office to 12:06:40
22 coordinate all the various elements and parts and 12:06:45

Page 78

1  offices that were involved in trying to respond to 12:06:48
2  these concerns. 12:06:50
3      Q   Why was Mr. -- what's your understanding as 12:06:52
4  to why Mr. Lapinski was brought in at that point in 12:06:55
5  August? 12:06:58
6      A   My understanding was that Mr. Johnson 12:06:59
7  wanted additional folks brought in who could focus 12:07:07
8  exclusively on this issue as opposed to the multitude 12:07:11
9  of other ongoing Katrina issues and ongoing other 12:07:15
10 disaster responses that we were working. 12:07:19
11     MR. MILLER: Mr. Woods, this is a good time 12:07:22
12 to take a break because it seems like you're changing 12:07:24
13 subject matters. We've been going a half -- an hour 12:07:27
14 and a half. I'd like to take a five-minute. 12:07:30
15     MR. WOODS: I just want to get through the, 12:07:30
16 want to get through the declaration. 12:07:31
17     MR. MILLER: Let's take a break. It's an 12:07:32
18 hour and a half, counsel. I'm taking a break. 12:07:34
19     Yeah. Five minutes. Let's go. 12:07:40
20     THE VIDEOGRAPHER: We're going off the 12:07:45
21 record. The time is 12:07 p.m. 12:07:46
22     (Recess taken, 12:07 p.m. to 12:20 p.m.) 12:18:14

Page 79

1      THE VIDEOGRAPHER: We're now back on the 12:20:26
2  record. The time is 12:20 p.m. 12:20:38
3  BY MR. WOODS: 12:20:38
4      Q   Mr. Souza, again, in section 20 of your 12:20:42
5  declaration it says, In August, Harvey Johnson, FEMA 12:20:46
6  Deputy Administrator, appointed Michael Lapinski. We 12:20:55
7  were just talking about Mr. Lapinski before the break. 12:20:57
8  Um, what do you understand to be Mr. Lapinski's 12:21:14
9  responsibilit -- responsibilities in the coordinating 12:21:24
10 the agency's formaldehyde response? 12:21:28
11     MR. MILLER: Objection, foundation. 12:21:31
12     A   As I said earlier, I thought his 12:21:32
13 responsibilities were to bring together the multiple 12:21:36
14 players who were involved from the various offices and 12:21:40
15 the various field offices and kind of coordinate their 12:21:46
16 actions and their input on behalf of the 12:21:53
17 administrator. 12:21:55
18 BY MR. WOODS: 12:21:56
19     Q   Okay. Did -- at the time that Mr. Lapinski 12:21:56
20 became involved in the formaldehyde response, were you 12:22:00
21 still involved at that time as well? 12:22:03
22     A   Less so, but yes. 12:22:04

Page 80

1      Q   What became your role, if you can identify 12:22:10
2  it? 12:22:13
3      A   It was really kind of a dual role. One was 12:22:15
4  the historical perspective on what we had done prior 12:22:18
5  to him getting there, and then from the program side 12:22:22
6  of the house, kind of a reference point, a subject 12:22:26
7  matter expert in terms of housing and housing options 12:22:31
8  and those sorts of things. 12:22:34
9      Q   In section 21, you say that, ATSDR 12:22:35
10 commenced testing occupied trailers in December 2007, 12:22:43
11 and then reported the initial findings of that testing 12:22:50
12 in February of 2008. What is your understanding as to 12:22:54
13 why ATSDR commenced its testing in December of 2007? 12:22:58
14     MR. MILLER: Objection, vague, narrative. 12:23:03
15 And foundation. 12:23:06
16     A   Generally, the initial -- the initial 12:23:07
17 testing was conducted following additional concerns 12:23:08
18 that were raised by a pediatrician in Mississippi, I 12:23:13
19 believe. 12:23:20
20 BY MR. WOODS: 12:23:24
21     Q   And it was based upon those concerns at the 12:23:24
22 pediatrician in Mississippi that ATSDR commenced its 12:23:27

**L.A.D. REPORTING & DIGITAL VIDEOGRAPHY**
**(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664**