# VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 81**

1  testing?                                                     12:23:32
2      A    Well, there was a series of events between          12:23:33
3  those two things.  The pediatrician's concerns kind of       12:23:37
4  put formaldehyde forefront again with FEMA and with          12:23:44
5  the Department of Homeland Security.  The Office of          12:23:48
6  Health Affairs got involved, and I believe they or           12:23:52
7  someone on their behalf discussed with the                   12:23:56
8  pediatrician his concerns, and somebody in either DHS        12:24:01
9  or FEMA leadership made the decision to conduct              12:24:07
10 additional testing.                                          12:24:12
11     Q    You just said that it put formaldehyde at           12:24:12
12 the forefront again.  Was there a drop off of concern        12:24:15
13 between what was done in the fall of '06 and this            12:24:29
14 testing in December of 2007?                                 12:24:31
15     MR. MILLER:  Objection.  Mischaracterizes                12:24:31
16 witness' testimony.                                          12:24:37
17     A    Well, the testing was -- as far as the              12:24:38
18 testing was done in 2007, but the, the renewed concern       12:24:39
19 was much earlier.  I don't know when the Mississippi         12:24:45
20 pediatrician -- may have been May.  In any event, I          12:24:49
21 wouldn't say there was an outright reduction in              12:24:55
22 concern, but I will say that when I received the             12:24:57

**Page 82**

1  EPA report, that the levels with proper ventilation          12:25:01
2  were below the level of concern, and once we had             12:25:05
3  communicated the instructions to ventilate units for        12:25:09
4  individuals who were having a sensitivity, again, I'm        12:25:13
5  speaking on behalf of myself now at the program level,       12:25:18
6  I was somewhat satisfied that the issue had been             12:25:22
7  addressed.                                                   12:25:27
8  BY MR. WOODS:                                                12:25:28
9      Q    So through ventilation, you were somewhat           12:25:28
10 satisfied that the issue had been addressed?                 12:25:34
11     A    That's correct.                                     12:25:36
12     Q    But yet, you were still receiving                   12:25:44
13 complaints, or FEMA was still receiving complaints?          12:25:48
14     A    I don't know that.                                  12:25:51
15     (Exhibit Souza 3 was marked for                          12:25:51
16 identification and attached to the transcript.)              12:25:51
17 BY MR. WOODS:                                                12:25:52
18     Q    Okay.  Next document I'm going to show you,         12:25:52
19 Mr. Souza, we're labeling as Exhibit Souza 3 to this         12:27:12
20 deposition.  And it is an E-mail from you, Kevin             12:27:24
21 Souza, to David Garratt, Donna Dannels, CCing Tod            12:27:34
22 Wells and Leslie Bailey.  And it's an E-mail string          12:27:41

**Page 83**

1  that begins with David Garratt on May 16th, 2007.  And       12:27:48
2  in your original response to David Garratt's E-mail of       12:27:57
3  May 16, 2007, and just -- see if you first agree with        12:28:04
4  me with the basic subject matter of Dave Garratt's          12:28:09
5  E-mail, and he was concerned or had just heard about a       12:28:18
6  CDC report about the physician who's identified what         12:28:21
7  he believes is an ailment trend among travel trailer         12:28:25
8  residents, which he attributes to formaldehyde.  And         12:28:30
9  he says that while the CDC and the EPA study with            12:28:37
10 FEMA -- while our study with CDC and EPA would seem to       12:28:43
11 dispute that, would like to have HHS have someone meet       12:28:50
12 with this individual and give his conclusions a fair         12:28:53
13 assessment if Gil agrees.  Think we have an obligation       12:28:57
14 to investigate rather than just dismiss his concerns.        12:29:01
15 Thoughts?  And he sends that to, I guess, Donna and          12:29:04
16 Berl.  Who's -- first of all, who's Donna Dannels?           12:29:09
17     A    Donna Dannels was the Division Director for         12:29:14
18 Individual Assistance.                                       12:29:18
19     Q    And Berl Jones?                                     12:29:20
20     A    Was the Deputy Division Director.                   12:29:22
21     Q    Okay.  In response, you say that, Agree             12:29:25
22 with your assessment, Dave.  Our test focused on             12:29:32

**Page 84**

1  reducing F-mald emissions.  Was that the only focus of       12:29:36
2  your test?                                                   12:29:43
3      MR. MILLER:  Objection, mischaracterizes                 12:29:44
4  the document and prior testimony.                            12:29:46
5      A    No.                                                 12:29:48
6  BY MR. WOODS:                                                12:29:52
7      Q    What were the other focuses?                        12:29:52
8      A    On trying to determine whether or not they          12:30:00
9  were the units themselves that were responsible for          12:30:05
10 the formaldehyde that we may have detected.                  12:30:09
11     Q    Okay.  Further up, you say this is an FYI           12:30:15
12 to David Garratt, Donna Dannels.  It says FYI, Senate        12:30:19
13 Homeland is currently investigating formaldehyde            12:30:25
14 issues.  My office has been working extensively with         12:30:28
15 OLA to respond to inquiries for documents and timeline       12:30:30
16 development.  What is OLA?                                    12:30:35
17     A    Office of Legislative Affairs.                      12:30:38
18     Q    Is that where the request came from for             12:30:40
19 documents and the timeline?                                  12:30:43
20     A    Yes.                                                12:30:46
21     (Exhibit Souza 4 was marked for                          12:30:46
22 identification and attached to the transcript.)              12:30:46

21 (Pages 81 to 84)

EXHIBIT
7B

# VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

---

**Page 85**

1 BY MR. WOODS:  12:30:48
2    Q   The next document I'm handing to you is  12:30:48
3 labeled Souza 4, Exhibit 4.  For identification  12:31:24
4 purposes, it has a FEMA Bates number of FEMA 17-008999  12:31:33
5 through FEMA 17-009007.  And it's also, apparently was  12:31:40
6 produced as part of the Waxman report.  And Mr. Souza,  12:31:52
7 if you would -- I understand it's a series of E-mails,  12:32:12
8 but I want to take -- concentrate on one particular  12:32:17
9 E-mail in the string.  Well, actually two.  If you  12:32:20
10 would turn to page two.  And at the bottom of page  12:32:27
11 two, it's an E-mail from Harvey E. Johnson to Jeff  12:32:35
12 Runge and CCing various other people.  You're one of  12:32:40
13 the CCed individuals on this document.  What did you  12:32:45
14 understand -- in receiving this E-mail from Harvey  12:32:51
15 Johnson, what did you understand his role to be in the  12:32:53
16 formaldehyde response, for lack of a better term,  12:32:59
17 program?  12:33:05
18       MR. MILLER:  Objection, vague, assumes  12:33:06
19 facts not in evidence.  12:33:08
20    A   The deputy administrator?  12:33:11
21 BY MR. WOODS:  12:33:13
22    Q   Yes.  12:33:13

**Page 86**

1    A   What did I perceive his role to be?  As the  12:33:15
2 deputy administrator, I suppose any ultimate decisions  12:33:18
3 on how to proceed may have been his as they elevated  12:33:25
4 up to his level as necessary.  12:33:30
5    Q   So he would be the ultimate decision-maker,  12:33:31
6 wouldn't he?  12:33:40
7    A   For any decision that was elevated to him  12:33:40
8 for consideration.  In other words, he was delegating  12:33:43
9 this to Dave Garratt and also to me.  So I think his  12:33:47
10 expectation was that we would handle this.  But  12:33:52
11 ultimately, if we had questions and brought them to  12:33:55
12 him, that he would be the ultimate decision-maker.  12:34:00
13    Q   But in, let's say in the organizational  12:34:04
14 chart, he would be the one that would have assumed the  12:34:07
15 ultimate responsibility for the formaldehyde response,  12:34:13
16 correct?  12:34:16
17       MR. MILLER:  Objection.  Mischaracterizes  12:34:17
18 the witness' testimony, assumes facts not in evidence.  12:34:20
19    A   I don't know that.  12:34:23
20 BY MR. WOODS:  12:34:24
21    Q   But in the organizational chart, he is a  12:34:24
22 position above you, correct?  He would have -- he  12:34:28

**Page 87**

1 is --  12:34:30
2    A   He -- he is above me certainly and he's  12:34:31
3 above Mr. Garratt.  But he answered to Administrator  12:34:36
4 Paulison who adminis -- who answered to the Deputy  12:34:42
5 Secretary, who answered to the Secretary.  So I don't  12:34:46
6 know that he would ultimately have absolute  12:34:49
7 decision-making authority in the formaldehyde, but --  12:34:53
8    Q   All right.  But you would answer to him?  12:34:56
9    A   Yes.  12:34:58
10    Q   And when you say that Admiral Johnson would  12:34:58
11 have that authority, did he ever exercise that  12:35:23
12 authority over you?  12:35:27
13    A   Yes.  12:35:28
14    Q   If you would, if you turn to that first  12:35:28
15 page of those E-mails, and there's one from you dated  12:35:35
16 Thursday, May 17, 2007, to David Garratt, John  12:35:41
17 Philbin, Adrian Sevier, and Dan Shulman, and CCing  12:35:49
18 other individuals.  And it's regarding the CBS evening  12:35:55
19 news on formaldehyde in FEMA trailers.  Do you see  12:36:00
20 that E-mail?  12:36:07
21    A   Yes.  12:36:07
22    Q   Okay.  It says, Dave, I am out of the  12:36:08

**Page 88**

1 office today and do not have ready access to these  12:36:09
2 materials.  You go on to say, Public Affairs, OCC and  12:36:12
3 OLA have all been extensively involved in this process  12:36:14
4 as a result of litigation, Congressional inquiries,  12:36:19
5 and other media reports.  You go on to say, Am  12:36:22
6 requesting by way of this E-mail that they provide you  12:36:36
7 with all related press releases, talking points,  12:36:41
8 Congressional responses (QFRs and letters) and  12:36:41
9 litigation findings.  What type of litigation findings  12:36:45
10 were you requesting?  12:36:49
11       MR. MILLER:  I'm going to instruct the  12:36:56
12 witness to answer the question, except not to disclose  12:36:57
13 the information contained inside those -- within those  12:37:00
14 documents on the grounds that it's privileged.  12:37:03
15 Go ahead.  12:37:11
16    A   In general, what I meant by this E-mail was  12:37:11
17 the status of any of the litigation findings  12:37:17
18 previously that may have occurred, or an update on the  12:37:20
19 status of where current pending litigation was, and  12:37:25
20 maybe any associated materials that we had collected  12:37:28
21 along the way in response to those, those litigations.  12:37:31
22 BY MR. WOODS:  12:37:41

22 (Pages 85 to 88)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

1    Q    And when you say that Public Affairs, OCC    12:37:41
2  and OLA have all been extensively involved in the    12:37:46
3  process, in this process, again, explain to me how    12:37:52
4  extensively involved OCC was in the process.    12:37:57
5        MR. MILLER:  Objection, vague.    12:38:01
6    A    All I meant by what I said here was that    12:38:02
7  people like Rick Preston and others had been parts of    12:38:08
8  conference calls, and they had looked at documents    12:38:13
9  that were created from a -- from the legal    12:38:16
10  perspective, and they had been one of the players who    12:38:19
11  had been involved from a very early stage.    12:38:23
12  BY MR. WOODS:    12:38:28
13    Q    And it was your understanding that they    12:38:28
14  were involved, again, because of the pending    12:38:30
15  litigation?    12:38:33
16    A    Right.    12:38:33
17    Q    Would you have expected OCC to be involved    12:38:34
18  if there weren't pending litigation?    12:38:40
19    A    Possibly.    12:38:43
20    Q    Why do you say that?    12:38:50
21    A    At the program level, it's not unusual if    12:38:51
22  I, for example, were to anticipate that it's possible    12:38:58
                                                                    89

1  that legal action may result as a pro -- as a result    12:39:02
2  of a program decision I was considering making, I may    12:39:09
3  seek their counsel on the risks associated with the    12:39:12
4  course of action I was considering taking.    12:39:16
5    Q    In this particular response, formaldehyde    12:39:19
6  response, was there any program action that you were    12:39:24
7  taking that would have, you thought, should have    12:39:27
8  received OCC review?    12:39:31
9    A    Can you drill down a little bit in the    12:39:34
10  question?    12:39:45
11    Q    Now, you say that as a result of a program    12:39:46
12  decision that you were considering making, you may    12:39:57
13  seek their counsel on the risks associated with the    12:40:02
14  course of action you were considering taking.  So in    12:40:07
15  this particular response effort, formaldehyde response    12:40:10
16  effort, was there any action that you were considering    12:40:14
17  taking that you thought would require OCC review?    12:40:16
18        MR. MILLER:  Object, vague as to time, and    12:40:21
19  also instruct the witness not to disclose any such --    12:40:25
20  the nature of any actual such discussions or    12:40:29
21  conversations with OCC.  Go ahead.    12:40:32
22    A    Given the pending litigation, again,    12:40:35
                                                                    90

1  general practice is if there's pending litigation,    12:40:39
2  that we keep them informed of just about everything    12:40:43
3  that we're actually doing so that they're informed of    12:40:46
4  it.    12:40:50
5  BY MR. WOODS:    12:40:50
6    Q    So because of the pending litigation,    12:40:50
7  any -- the actions that you considered, or action    12:40:53
8  plans that were developed required OCC review?    12:40:58
9        MR. MILLER:  Objection, mischaracterizes    12:41:02
10  the witness' testimony.    12:41:05
11    A    I don't know if they required review, but    12:41:06
12  they were included from an informational perspective    12:41:08
13  at least, yeah.    12:41:13
14  BY MR. WOODS:    12:41:14
15    Q    And they were given -- giving their input?    12:41:14
16    A    They were providing their, their legal    12:41:18
17  counsel, yes.    12:41:21
18        (Exhibit Souza 5 was marked for    12:41:21
19  identification and attached to the transcript.)    12:41:21
20  BY MR. WOODS:    12:41:21
21    Q    Next document I'm handing you is going to    12:41:41
22  be labeled Exhibit Souza 5.  And for identification    12:41:51
                                                                    91

1  purposes, it's produced in this litigation, it's Bates    12:41:55
2  label FEMA 17-008762 through FEMA 17-008764.  Again,    12:42:01
3  it's a series of E-mails, and I just want to pay    12:42:16
4  attention right now to the top E-mail on page one.    12:42:20
5  It's from Kevin Souza to Tod Wells and David Garratt,    12:42:26
6  CCing other individuals.  It's dated May 17, 2007,    12:42:33
7  regarding formaldehyde issues.  It's to Tod.  Tod,    12:42:37
8  check with the safety folks in Logistics, as I    12:42:41
9  recall something about staging area safety, K.    12:42:45
10      What do you recall about this staging    12:42:51
11  area safety with regard to formaldehyde?    12:42:53
12        MR. MILLER:  And I'm going to instruct the    12:42:56
13  witness, you can review the entire document if you    12:42:57
14  need to to make you comfortable with the part before    12:43:00
15  you answer that question, if you believe it's    12:43:03
16  necessary.    12:43:06
17    A    I think when I wrote this, I was    12:43:09
18  referencing -- I think at the time I recalled seeing    12:43:17
19  some E-mails about, I don't know if it was the Bonner    12:43:20
20  analytical testing or some other testing that was done    12:43:23
21  at a staging area.  I recalled seeing some E-mails or    12:43:35
22  something like that, and I knew that they were from    12:43:39
                                                                    92

**L.A.D. REPORTING & DIGITAL VIDEOGRAPHY**
**(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664**

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | | |
|---|---|---|
| 1 | Safety or Logistics or something like that. | 12:43:41 |
| 2 | BY MR. WOODS: | 12:43:43 |
| 3 | Q    What was the general subject matter of the | 12:43:43 |
| 4 | E-mails? | 12:43:46 |
| 5 | A    To be honest, I don't recall. | 12:43:46 |
| 6 | Q    Did it raise some sort of safety concern? | 12:43:52 |
| 7 | A    What I was referring to here was in regard | 12:43:55 |
| 8 | to, again, to the best of my ability, recalling this | 12:44:03 |
| 9 | specific E-mail, I think I was referring to, in my | 12:44:06 |
| 10 | head, some testing or something that was done in a | 12:44:12 |
| 11 | staging area, and relating to safety of some kind. | 12:44:15 |
| 12 | So -- | 12:44:19 |
| 13 | Q    And you mentioned the Bonner analytical | 12:44:20 |
| 14 | testing, correct? | 12:44:23 |
| 15 | A    Yes.  I became aware of that long after | 12:44:24 |
| 16 | that was done, but yeah. | 12:44:27 |
| 17 | Q    Do you know when it was done? | 12:44:28 |
| 18 | MR. MILLER:  Objection, foundation. | 12:44:32 |
| 19 | A    I don't recall. | 12:44:33 |
| 20 | BY MR. WOODS: | 12:44:36 |
| 21 | Q    You don't recall.  Do you know the purpose | 12:44:36 |
| 22 | of the Bonner analytical testing that was performed? | 12:44:39 |

93

| | | |
|---|---|---|
| 1 | Q    It says, The CBS report refers to an, | 12:48:10 |
| 2 | quote, "internal FEMA document" on guidance for | 12:48:15 |
| 3 | inspectors, which appears to be separate from the EPA | 12:48:19 |
| 4 | study.  Will check with the housing folks.  This | 12:48:23 |
| 5 | "internal FEMA document," do you know what document | 12:48:26 |
| 6 | Tod Wells is referring to there? | 12:48:29 |
| 7 | A    In retrospect, I think they're referring to | 12:48:31 |
| 8 | possibly the study that was done by our Safety office. | 12:48:39 |
| 9 | Q    And what study was done by your Safety | 12:48:44 |
| 10 | office? | 12:48:47 |
| 11 | A    I don't recall specifically.  It was -- I | 12:48:47 |
| 12 | think it was testing to comply with OSHA requirements | 12:48:53 |
| 13 | or something like that. | 12:48:58 |
| 14 | Q    Do you know when that testing took place? | 12:49:00 |
| 15 | A    No. | 12:49:01 |
| 16 | Q    No.  And have you seen this document, this | 12:49:03 |
| 17 | internal FEMA document that he's referencing? | 12:49:13 |
| 18 | MR. MILLER:  Objection.  Objection, | 12:49:18 |
| 19 | foundation. | 12:49:20 |
| 20 | A    I don't think so. | 12:49:21 |
| 21 | (Exhibit Souza 6 was marked for | 12:49:21 |
| 22 | identification and attached to the transcript.) | 12:49:24 |

95

| | | |
|---|---|---|
| 1 | MR. MILLER:  Objection, foundation. | 12:44:44 |
| 2 | A    To the best of my recollection, one of | 12:44:46 |
| 3 | the -- I think it was one of our contractors may have | 12:44:50 |
| 4 | asked for the test to be done.  I don't recall. | 12:44:57 |
| 5 | MR. WOODS:  He needs to change the tape | 12:45:05 |
| 6 | here, so we're going to take a brief -- we're going to | 12:45:08 |
| 7 | take a brief recess so that he, the videographer, can | 12:45:13 |
| 8 | change the tape. | 12:45:13 |
| 9 | THE VIDEOGRAPHER:  This marks the end of | 12:45:17 |
| 10 | tape number one in the deposition of Kevin Souza. | 12:45:18 |
| 11 | We're going off the record.  The time is 12:45 p.m. | 12:45:21 |
| 12 | (Recess, 12:45 p.m. to 12:47 p.m.) | 12:47:28 |
| 13 | THE VIDEOGRAPHER:  This marks the beginning | 12:47:28 |
| 14 | of tape number two in the deposition of Kevin Souza. | 12:47:41 |
| 15 | We're back on the record.  The time is 12:47 p.m. | 12:47:44 |
| 16 | BY MR. WOODS: | 12:47:49 |
| 17 | Q    Okay.  Mr. Souza, if you would look further | 12:47:49 |
| 18 | down in that E-mail chain under the E-mail to Tod | 12:47:51 |
| 19 | Wells.  Tod Wells sent an E-mail May 17th at 12:59. | 12:47:57 |
| 20 | Do you see that?  To David Garratt, Dan Shulman, John | 12:48:02 |
| 21 | Philbin.  That one? | 12:48:07 |
| 22 | A    Yes. | 12:48:10 |

94

| | | |
|---|---|---|
| 1 | BY MR. WOODS: | 12:49:24 |
| 2 | Q    The next document I'm going to show you, | 12:49:52 |
| 3 | Mr. Souza, I'm going to label as Exhibit Souza 6.  And | 12:49:54 |
| 4 | for identification purposes, it is Bates labeled FEMA | 12:50:02 |
| 5 | 17-015050 through FEMA 17-015052.  Again, it's a | 12:50:08 |
| 6 | series of E-mails.  And if I can turn your attention | 12:50:20 |
| 7 | to -- you're not actually copied or a recipient of | 12:50:35 |
| 8 | this particular E-mail, but I want to see if you have | 12:50:43 |
| 9 | any information regarding it.  It's the second one -- | 12:50:45 |
| 10 | I'm sorry, the third one down.  It's from Dr. William | 12:50:48 |
| 11 | Lang to David Garratt, dated May 29, 2007.  Do you see | 12:50:52 |
| 12 | that one? | 12:50:56 |
| 13 | A    Yes. | 12:50:56 |
| 14 | Q    Okay.  Dr. Lang says, Dave, here's the | 12:50:57 |
| 15 | latest from CDC.  I talked with them at length on the | 12:51:03 |
| 16 | phone today, and they would like to get together for a | 12:51:07 |
| 17 | face-to-face discussion on Thursday down in Atlanta. | 12:51:10 |
| 18 | Did you attend that face-to-face discussion in Atlanta | 12:51:15 |
| 19 | with the CDC that's being referenced here? | 12:51:21 |
| 20 | A    No.  Not -- this is the -- if this is the | 12:51:24 |
| 21 | call I'm thinking of, I didn't attend the actual | 12:51:29 |
| 22 | meeting in Atlanta, but I did dial in by phone.  If | 12:51:32 |

96

24 (Pages 93 to 96)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | |
|---|---|
| 1 this is the one I'm thinking of. 12:51:36 | |
| 2     Q     So you participated by phone, -- 12:51:37 | |
| 3     A     Yes. 12:51:41 | |
| 4     Q     -- if it's the one you're thinking of. 12:51:41 | |
| 5          Okay.  If you look further down, one, two, 12:51:44 | |
| 6 three -- the fourth line in this E-mail, the sentence 12:51:54 | |
| 7 begins, They read me.  Do you see that? 12:52:00 | |
| 8     A     Do what? 12:52:02 | |
| 9     Q     They read me. 12:52:03 | |
| 10    A     Oh, yes. 12:52:04 | |
| 11    Q     They read me the not-yet-cleared approach 12:52:06 | |
| 12 that they are going to recommend, and it sounds fairly 12:52:08 | |
| 13 complete.  They are going to be fairly resistant to 12:52:12 | |
| 14 recommending an interim target, but I think that we 12:52:17 | |
| 15 need that in order to make a positive step now while 12:52:21 | |
| 16 the science is cooking.  Do you know what an interim 12:52:24 | |
| 17 target is? 12:52:29 | |
| 18          MR. MILLER:  Objection, foundation. 12:52:33 | |
| 19    A     No. 12:52:34 | |
| 20 BY MR. WOODS: 12:52:38 | |
| 21    Q     Do you know what Dr. Lang meant by the 12:52:43 | |
| 22 term, quote, unquote, "cooking," -- 12:52:46 | |
| 97 | |

| | |
|---|---|
| 1          MR. MILLER:  Objection. 12:52:49 | |
| 2 BY MR. WOODS: 12:52:49 | |
| 3     Q     -- science is cooking? 12:52:50 | |
| 4          MR. MILLER:  Objection, foundation. 12:52:51 | |
| 5     A     No. 12:52:53 | |
| 6 BY MR. WOODS: 12:53:03 | |
| 7     Q     Did you discuss the interim target at that 12:53:05 | |
| 8 meeting, the one that you participated via telephone? 12:53:09 | |
| 9     A     I don't recall. 12:53:17 | |
| 10          (Exhibit Souza 7 was marked for 12:53:17 | |
| 11 identification and attached to the transcript.) 12:53:17 | |
| 12 BY MR. WOODS: 12:53:18 | |
| 13    Q     The next document I'm marking as Souza -- 12:53:18 | |
| 14 Exhibit Souza 7.  And it's a one-page document.  It's 12:53:49 | |
| 15 Bates labeled FEMA 17-009102.  And it is -- appears to 12:53:55 | |
| 16 be three E-mails, the first one beginning from 12:54:05 | |
| 17 Michelle McQueeney to David Garratt, CCing Tod Wells, 12:54:10 | |
| 18 you, Mr. Souza, and Gil Jamieson.  Who is Michelle 12:54:17 | |
| 19 McQueeney? 12:54:21 | |
| 20    A     Michelle McQueeney was a FEMA employee, and 12:54:23 | |
| 21 at this time I don't know if she was Gil's special 12:54:26 | |
| 22 assistant or executive officer equivalent, something 12:54:32 | |
| 98 | |

| | |
|---|---|
| 1 along those lines. 12:54:36 | |
| 2     Q     She's sending an E-mail to David Garratt 12:54:37 | |
| 3 saying, Dave, Gil and I will both be flying to NOLA at 12:54:42 | |
| 4 this time, but I will link up with Kevin or Tod 12:54:47 | |
| 5 afterwards for a backbrief.  Thanks, Michelle. 12:54:50 | |
| 6          And in response to that E-mail, you sent, 12:54:54 | |
| 7 on May 21, 2007, an E-mail to David Garratt saying, 12:55:00 | |
| 8 Suggest a reschedule given the conflict with Gil and 12:55:01 | |
| 9 Michelle.  It goes on to state that, GCRO should and 12:55:05 | |
| 10 actually already previously agreed to acceptable 12:55:10 | |
| 11 responsibility for formaldehyde issues in the Gulf. 12:55:13 | |
| 12 What did you mean by that statement? 12:55:18 | |
| 13    A     Well, first of all, that should read GCRO 12:55:20 | |
| 14 should and actually previously agreed to accept 12:55:31 | |
| 15 responsibility, I think is what I meant to type.  And 12:55:37 | |
| 16 what I meant by that is I'd had a conversation with I 12:55:37 | |
| 17 think it was -- not a conversation, E-mail exchange 12:55:44 | |
| 18 with Michelle McQueeney earlier on, and asked her 12:55:48 | |
| 19 whether or not the Gulf Coast Recovery Office was 12:55:52 | |
| 20 going to take a leadership role in the formaldehyde 12:55:56 | |
| 21 issue, and she said that they would.  This E-mail to 12:55:59 | |
| 22 Dave is me saying Gil and Michelle, since they 12:56:03 | |
| 99 | |

| | |
|---|---|
| 1 couldn't meet this meeting with Drs. Lang and Merritt, 12:56:07 | |
| 2 that we should reschedule the meeting so that they 12:56:15 | |
| 3 could attend. 12:56:19 | |
| 4          (Mr. Maggio exited the room.) 12:56:37 | |
| 5 BY MR. WOODS: 12:56:42 | |
| 6     Q     What did you understand GCRO's taking 12:56:42 | |
| 7 responsibility of the formaldehyde issue in the Gulf 12:56:46 | |
| 8 to mean? 12:56:51 | |
| 9     A     I'm trying to get the timing situated in my 12:56:52 | |
| 10 head.  Um, generally speaking, GCRO had a 12:57:11 | |
| 11 responsibility for field coordination across the 12:57:19 | |
| 12 multiple field offices.  So when we were taking 12:57:21 | |
| 13 actions at FEMA headquarters, we would go through the 12:57:25 | |
| 14 Gulf Coast Recovery Office, and then they would be 12:57:29 | |
| 15 responsible for coordinating with us on the potential 12:57:33 | |
| 16 action, and then essentially communicating that 12:57:37 | |
| 17 direction to the various field offices.  So that was 12:57:40 | |
| 18 one part of their responsibility was to participate in 12:57:43 | |
| 19 the decision-making, and then ultimately to 12:57:46 | |
| 20 communicate that to the various field offices. 12:57:49 | |
| 21          The second part was, and this is where the 12:57:52 | |
| 22 timing I can't quite remember, is when the 12:57:54 | |
| 100 | |

25 (Pages 97 to 100)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 101**

1  formaldehyde issue started up again, it wasn't -- 12:58:00
2  well, I don't want to say again.  When the 12:58:05
3  formaldehyde issue started to grow a little bit, I was 12:58:08
4  confused about responsibility between my office and 12:58:11
5  the Gulf Coast Recovery Office in terms of who would 12:58:15
6  be taking the lead for some of the coordination and 12:58:18
7  communication.  And that's the E-mail I'm referring to 12:58:22
8  with Michelle. 12:58:25
9       MR. WOODS:  If -- if you're ready to take a 12:58:33
10  break, it's almost one o'clock.  We can take a break 12:58:35
11  here -- 12:58:39
12       MR. MILLER:  Is that good for you? 12:58:39
13       MR. WOODS:  -- for lunch.  Yeah, that's 12:58:42
14  fine. 12:58:43
15       THE VIDEOGRAPHER:  We're going off the 12:58:45
16  record.  The time is 12:58 p.m. 12:58:46
17       MR. MILLER:  Let's try to do this in a half 12:58:49
18  hour. 12:58:51
19       MR. WOODS:  Uh-huh. 12:58:51
20       (Lunch recess taken, 12:58 p.m. to 01:46:53
21  1:47 p.m.) 01:46:54
22       (Mr. Maggio is not present in the room.) 01:47:08

**Page 102**

1       THE VIDEOGRAPHER:  We're back on the 01:47:08
2  record.  The time is 1:47 p.m. 01:47:10
3       MR. CARROLL (VIA TELEPHONE):  Um, I'm 01:47:10
4  having a hard time hearing Justin a lot of times.  I 01:47:10
5  can hear you fine, the witness fine. 01:47:10
6       MR. MILLER:  Okay.  I'm going to move the 01:47:13
7  phone closer towards Justin and away from me.  So you 01:47:17
8  probably won't hear my objections so clearly, I know 01:47:18
9  that's what you really wanted to listen to, but 01:47:22
10  you'll -- that may improve it a little bit. 01:47:22
11       MR. CARROLL:  Do that.  And ask Justin not 01:47:26
12  to shuffle papers while he's talking. 01:47:26
13       MR. MILLER:  Well, Justin's hearing you. 01:47:31
14       MR. WOODS:  Well, I'm here right now, and I 01:47:33
15  can't necessarily control that.  I will try my best. 01:47:33
16       MR. CARROLL:  Do the best you can, because 01:47:39
17  when you shuffle, it disrupts the flow.  Thanks. 01:47:39
18       THE REPORTER:  Who was speaking? 01:47:47
19       MR. MILLER:  Were we on the record? 01:47:47
20       MR. WOODS:  Everybody's got an opinion. 01:47:47
21       MR. MILLER:  Who was that?  Who was that 01:47:47
22  speaking? 01:47:48

**Page 103**

1       MR. WOODS:  Jim Carroll. 01:47:50
2       MR. MILLER:  Jim Carroll.  Thanks, guys. 01:47:51
3       MR. WOODS:  Oh, we're on?  Oh, okay. 01:47:57
4       (Cell phone interruption.) 01:47:57
5       MS. PETROVICH:  Oh gees.  I'm sorry.  I'll 01:48:03
6  turn that off.  Okay. 01:48:05
7       (Exhibit Souza 8 was marked for 01:48:05
8  identification and attached to the transcript.) 01:48:15
9  BY MR. WOODS: 01:48:15
10       Q    All right.  Mr. Souza, I'm going to show 01:48:23
11  you a document which we're labeling as Souza 01:48:27
12  Exhibit 8.  For identification purposes, it is Bates 01:48:31
13  labeled FEMA 17-008912 through FEMA 17-008915.  And 01:48:38
14  it's a string of E-mails.  And if you could, sir, turn 01:48:51
15  to page two.  And I want to pay attention to, or draw 01:49:06
16  your attention to the first E-mail at the top of that 01:49:13
17  page.  And it's from Michael Jackson to Jeff Runge, 01:49:16
18  Robert David Paulison, and Harvey E. Johnson.  Is this 01:49:25
19  the Michael Jackson of Thriller? 01:49:31
20       A    No. 01:49:33
21       Q    No?  Okay.  Who is Michael Jackson? 01:49:33
22       A    At this time, he was the Deputy Secretary 01:49:36

**Page 104**

1  of the Department of Homeland Security. 01:49:39
2       Q    Okay.  In his E-mail to Jeff Runge, he 01:49:43
3  says, Jeff, can you work with FEMA to do a quick 01:49:52
4  assessment of the facts associated with this story and 01:49:55
5  let me know what you think?  Is this a real medical 01:49:58
6  concern?  If so, how serious, question mark, and 01:50:01
7  remedy, question mark? 01:50:05
8       Were you tasked with responding to Michael 01:50:07
9  Jackson's inquiry as the subject matter of this 01:50:10
10  E-mail? 01:50:16
11       And if you read up further on that first 01:50:40
12  page in the series of E-mails, from Harvey Johnson to 01:50:42
13  David Garratt, Mr. Johnson said, I was thinking of the 01:50:49
14  person most familiar with the CDC study and could 01:50:52
15  describe all that we have done to investigate the 01:50:56
16  issue.  Thought we could connect that person to 01:50:58
17  Runge's staff.  Do you want to be that person?  And 01:51:03
18  David Garratt responded and said, That would be Kevin 01:51:05
19  Souza unless he identifies someone even more familiar, 01:51:09
20  and there's a question mark, Kevin? 01:51:13
21       And so, going back to that first E-mail, 01:51:16
22  were you the person to respond to Michael Jackson's 01:51:20

26 (Pages 101 to 104)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | | |
|---|---|---|

**Page 105**

1　request?　01:51:24
2　　A　A couple of things that -- Michael　01:51:26
3　Jackson's request was to Mr. Runge, but in terms of a 01:51:33
4　point of contact, I don't know what comes next after　01:51:40
5　this E-mail. I don't know what my response was, but　01:51:43
6　I -- yes, I ended up working with DHS, the Office of　01:51:48
7　Health Affairs, and I think this is what this is in　01:51:57
8　reference to, the DHS Office of Health Affairs in　01:52:00
9　terms of getting them up to speed from a historical　01:52:00
10　perspective on what we had done previously.　01:52:06
11　　Q　Okay. So would you have done it in a memo 01:52:08
12　form to Mr. Jackson, or --　01:52:12
13　　A　I would not have responded directly to　01:52:13
14　Mr. Jackson.　01:52:16
15　　Q　You would not have?　01:52:17
16　　A　No.　01:52:18
17　　Q　You would have responded to whom?　01:52:18
18　　A　I would have responded to David Garratt.　01:52:20
19　　Q　Do you remember that response?　01:52:22
20　　A　No.　01:52:28
21　　　(Exhibit Souza 9 was marked for　01:52:28
22　identification and attached to the transcript.)　01:52:28

**Page 106**

1　BY MR. WOODS:　01:52:31
2　　Q　Okay. The next document I'm labeling as　01:52:31
3　Exhibit Souza 9. And for identification purposes,　01:52:56
4　it's Bates labeled FEMA 17-009024 through FEMA　01:53:08
5　17-009026. It's a series of E-mails beginning from　01:53:19
6　David Garratt to Jeff Runge dated May 17, 2007. And　01:53:31
7　again, I want to draw your attention, Mr. Souza, to　01:53:42
8　the -- on the first page there is an E-mail from Tod　01:53:45
9　Wells to David Garratt, Dan Shulman, John Philbin, and 01:53:49
10　CCing Aaron Walker, yourself, and Leslie Bailey. And 01:53:53
11　again, it refers to this internal FEMA document that　01:54:00
12　we discussed earlier. It says, The "internal FEMA　01:54:03
13　document" in the CBS News report referencing potential 01:54:11
14　cancer risk slash injury is a job aide for inspectors 01:54:15
15　examining new TT units. It does not mention FM-hyde　01:54:20
16　exposure risks along with exposure limits. It's　01:54:27
17　posted on the CBS News website.　01:54:29
18　　　David Garratt responds and asks, is it a　01:54:32
19　FEMA doc or a manufacturer's doc? Tod Wells responds 01:54:35
20　and says, FEMA. This is a part of a job hazard aid　01:54:41
21　from the safety office.　01:54:45
22　　　Do you know which particular document Tod　01:54:49

**Page 107**

1　Wells was referring to when he says a job hazard aid　01:54:52
2　from the safety office?　01:54:56
3　　　MR. MILLER: I'm going to object,　01:54:57
4　argumentative. Also assumes facts not in evidence　01:54:59
5　that apparently you believe that this refers to some　01:55:02
6　earlier document or exhibit that you used, and I don't 01:55:05
7　think that's been established. Go ahead.　01:55:08
8　　A　No, I don't recall the specific job aid　01:55:10
9　that they're talking about.　01:55:15
10　BY MR. WOODS:　01:55:15
11　　Q　Okay. Do you know what the term, or are　01:55:17
12　you familiar with the document "job hazard analysis"? 01:55:20
13　　A　No.　01:55:24
14　　Q　Well, Tod Wells says, This is part of a job 01:55:25
15　hazard aid from the safety office for training and　01:55:41
16　advisory to employees, contractors -- slash　01:55:43
17　contractors based on OSHA guidance and standards for 01:55:47
18　specific job activities. Does that help to refresh　01:55:53
19　your memory as to what this particular document might 01:55:57
20　be?　01:56:01
21　　A　No. Only that, as I mentioned previously,　01:56:02
22　I thought that the safety office had conducted some　01:56:08

**Page 108**

1　sort of study and -- as it related to OSHA. And it　01:56:11
2　sounds like this, quote, "internal FEMA document" may 01:56:17
3　be that study.　01:56:21
4　　Q　What was that last document?　01:56:28
5　　A　This was nine.　01:56:47
6　　　(Exhibit Souza 10 was marked for　01:56:47
7　identification and attached to the transcript.)　01:56:47
8　BY MR. WOODS:　01:57:30
9　　Q　Mr. Souza, the next document, which I've　01:57:30
10　labeled Souza 10 to the -- attached to this　01:57:35
11　deposition --　01:57:38
12　　　MR. MILLER: Counsel? Thank you.　01:57:39
13　BY MR. WOODS:　01:57:48
14　　Q　-- is -- is for further identification　01:57:50
15　purposes, is Bates labeled FEMA 17-009232 through FEMA 01:57:51
16　17-009236. If you would, sir, if you'd just pay　01:58:00
17　attention -- this is a series of E-mails dating from　01:58:24
18　Tuesday, May 29, 2007, beginning with an E-mail from　01:58:36
19　Dr. William L. Lang. But I want to draw attention,　01:58:43
20　your attention to the first page. There is an　01:58:48
21　E-mail -- excuse me --　01:58:50
22　　　(Mr. Maggio entered the room.)　01:58:52

27 (Pages 105 to 108)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | |
|---|---|
| 1  BY MR. WOODS:                                      01:58:52 | 1   see that?                                              02:02:55 |
| 2      Q   -- from David Garratt to Donna Dannels,    01:58:54 | 2       A   Yes.                                           02:02:57 |
| 3  Kevin Souza, Mark Misczak, Gil Jamieson, Michelle  01:58:57 | 3       Q   It says, Dave, as we discussed, I agree        02:02:57 |
| 4  McQueeney, Tod Wells and Leslie Bailey.  And it    01:59:04 | 4   with the direction of your proposal, but recommend you 02:03:04 |
| 5  says -- it's FYI, the call-in number for meeting with 01:59:06 | 5   slow roll any sales and/or provisions as opposed to a  02:03:07 |
| 6  CDC tomorrow in Atlanta.  And I'm assuming it's    01:59:10 | 6   notice to suspend.  Further, we need to have a         02:03:13 |
| 7  forwarding that call-in information.  Did you       01:59:15 | 7   discussion with the Chief, Public Affairs, Leg         02:03:19 |
| 8  participate in this particular call, if you can     01:59:17 | 8   Affairs, which I'm assuming is Legislative Affairs,     02:03:23 |
| 9  recall?                                             01:59:19 | 9   and Legal to consider our public position.             02:03:26 |
| 10     A   I believe I did, if this is the call I was  01:59:20 | 10      You go to the second paragraph, it says,           02:03:41 |
| 11  referencing earlier with Office of Health Affairs and 01:59:23 | 11  Further with the larger issues, appreciate your         02:03:43 |
| 12  CDC where they traveled to Atlanta and I called in. 01:59:29 | 12  willingness to frame the four major issue of interest,   02:03:47 |
| 13     Q   Okay.  Did anyone from OGC participate in   01:59:33 | 13  and then to set up a meeting with the OHA folks.         02:03:52 |
| 14  this meeting or call?                               01:59:37 | 14  This, of course -- this course will permit me and the    02:03:57 |
| 15     A   I don't think so, but I don't recall        01:59:39 | 15  Chief a chance to come up to speed on the issues.        02:04:00 |
| 16  specifically.                                       01:59:45 | 16      What did you understand to be the purpose            02:04:03 |
| 17     Q   Another E-mail that you sent, the one       01:59:46 | 17  of the meeting that the Admiral Johnson was requesting    02:04:05 |
| 18  before this, as you sent to David Garratt on        01:59:57 | 18  at this time?                                             02:04:09 |
| 19  Wednesday, May 30th, at 6:39 p.m., and you say, Are 02:00:03 | 19      MR. MILLER:  I'm going to object,                    02:04:09 |
| 20  you in tomorrow at all?  You go on to say, I should  02:00:08 | 20  completeness, Counsel.  You omitted one of the           02:04:12 |
| 21  probably talk to you before I jump on this call.  What 02:00:12 | 21  sentences in the two paragraphs.  Go ahead.              02:04:15 |
| 22  did you need to talk to Mr. Garratt about prior to  02:00:15 | 22      A   What it says here in the Admiral's E-mail,      02:04:17 |
| 109 | 111 |

| | |
|---|---|
| 1  participating in this call?                         02:00:19 | 1   which was -- I thought the purpose of that meeting was   02:04:23 |
| 2      A   If you can give me a moment to review the    02:00:20 | 2   to get the Office of Health Affairs to brief the Chief    02:04:25 |
| 3  context of the E-mail.                               02:00:23 | 3   and the Admiral on their scientific understanding of     02:04:32 |
| 4      Q   Sure.                                        02:00:25 | 4   formaldehyde, the medical practitioner, and answer any   02:04:38 |
| 5      A   Okay.  I think what I meant here was that    02:00:25 | 5   questions he may have about formaldehyde and things      02:04:44 |
| 6  Dave had E-mailed earlier some additional questions  02:01:23 | 6   like that.                                               02:04:46 |
| 7  that he wanted addressed, and Dr. Lang had kind of   02:01:27 | 7   BY MR. WOODS:                                            02:04:49 |
| 8  characterized, looks like about three, three broad   02:01:31 | 8       Q   What is your understanding for the basis of     02:04:49 |
| 9  topics that needed to be discussed.  And I was just  02:01:35 | 9   reasoning behind the Admiral requesting the meeting?      02:04:51 |
| 10  trying to make sure that me and my boss were on the  02:01:38 | 10      MR. MILLER:  Objection, foundation.                  02:04:54 |
| 11  same page before attending the call, make sure I     02:01:41 | 11      A   I don't know, other than this was getting a      02:04:56 |
| 12  covered the topics he wanted covered.                02:01:44 | 12  lot of visibility, and it sounds like he and the Chief    02:05:03 |
| 13      (Exhibit Souza 11 was marked for                02:01:44 | 13  wanted to be brought up to speed on what was taking       02:05:12 |
| 14  identification and attached to the transcript.)      02:01:44 | 14  place in the agency.                                      02:05:14 |
| 15  BY MR. WOODS:                                        02:01:46 | 15  BY MR. WOODS:                                            02:05:15 |
| 16      Q   Okay.  The next document, Mr. Souza, we've  02:01:46 | 16      Q   Do you think that's something that's best       02:05:15 |
| 17  attached as Souza 11.  And for identification         02:02:16 | 17  asked of the Admiral as to why he requested this          02:05:17 |
| 18  purposes, it's Bates labeled FEMA 17-009336 through   02:02:21 | 18  meeting?                                                  02:05:20 |
| 19  FEMA 17-009337.  And it begins an E-mail conversation 02:02:28 | 19      A   Certainly.                                       02:05:21 |
| 20  begun by Harvey Johnson on June 1st, 2007, and it's to 02:02:40 | 20      Q   Did you attend the meeting with the             02:05:21 |
| 21  David Garratt, John Philbin, and David Trissell, and  02:02:48 | 21  Admiral?                                                  02:05:25 |
| 22  you're one of the CCs on that original E-mail.  Do you 02:02:52 | 22      A   Yes, I was there.                                02:05:26 |
| 110 | 112 |

28 (Pages 109 to 112)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | |
|---|---|
| 1  Q   And what was discussed at that meeting?   02:05:27 | 1  Q   You're referring to -- what's the --   02:08:59 |
| 2  A   Um, Dr. Lang and I believe Dr. Lake were   02:05:30 | 2  A   Oh, sorry.  Exhibit 10.   02:09:03 |
| 3  both present, and they made a presentation to the   02:05:37 | 3  Q   Okay.   02:09:05 |
| 4  Admiral.  I can't remember if the Chief was there or   02:05:43 | 4  A   But again, I don't specifically recall, but   02:09:26 |
| 5  not.  But they made a presentation about formaldehyde,   02:05:46 | 5  I think these were at least three out of the four, and   02:09:29 |
| 6  and some of the history of formaldehyde, and some of   02:05:50 | 6  I don't remember what the fourth one was.   02:09:32 |
| 7  the various federal standards that existed for   02:05:53 | 7  Q   Okay.  In the second paragraph of that   02:09:34 |
| 8  formaldehyde.   02:05:57 | 8  E-mail of June 7, 2007, you say, I think you mentioned   02:09:50 |
| 9  Q   And I'm sorry.  Who was all in attendance   02:05:58 | 9  previously that you would request Ops and OCC to draft   02:09:54 |
| 10  at this meeting?   02:06:04 | 10  the actual document.  First of all, who's Ops?   02:09:59 |
| 11  A   I don't recall.  I was there.  Dr. Lang was   02:06:04 | 11  A   Operations.   02:10:07 |
| 12  there I think.  Merritt Lake was there.  The Admiral   02:06:11 | 12  Q   Just --   02:10:08 |
| 13  was there.  And I don't remember him being there, but   02:06:16 | 13  A   They're -- in a -- I mentioned earlier that   02:10:09 |
| 14  I -- I suspect that Dave Garratt was there as well.   02:06:20 | 14  sometimes we'll have people in the field create some   02:10:14 |
| 15  Q   Anyone from OGC?   02:06:25 | 15  of the documents on our behalf.  I think that's   02:10:21 |
| 16  A   I don't remember.   02:06:28 | 16  what -- the operations I was referring to.  There's   02:10:24 |
| 17  Q   Okay.   02:06:31 | 17  several different operations, but I think here I was   02:10:26 |
| 18     (Exhibit Souza 12 was marked for   02:06:50 | 18  referring to the people in the field who could get the   02:10:31 |
| 19  identification and attached to the transcript.)   02:06:52 | 19  funding for us.   02:10:31 |
| 20  BY MR. WOODS:   02:06:53 | 20  Q   Okay.  Would OCC normally be involved in   02:10:32 |
| 21  Q   Next document is labeled Souza 12.  For   02:06:53 | 21  the drafting of the funding docs?   02:10:37 |
| 22  identification purposes, it's FEMA 17-009367 through   02:07:00 | 22  A   No.  Ops would be the funding piece.  The   02:10:40 |
| **113** | **115** |

| | |
|---|---|
| 1  FEMA 17-09371.  And it's a series of E-mails   02:07:09 | 1  Chief Counsel's Office does assist the program   02:10:43 |
| 2  beginning -- again, this is -- it seems to be almost a   02:07:31 | 2  regularly in the drafting of things like interagency   02:10:46 |
| 3  continuation or exchange of E-mail chain that was   02:07:36 | 3  agreements, memorandum of understandings, memorandum   02:10:49 |
| 4  Souza 11.  It's the E-mail that begins from Harvey   02:07:41 | 4  of agreements, those sorts of things.   02:10:53 |
| 5  Johnson on Friday June 1st, 2007.  But I want to   02:07:46 | 5  Q   Just one question, if you'd turn to page   02:10:55 |
| 6  concentrate or send you -- or focus on an E-mail from   02:07:52 | 6  one, at the bottom, it's an E-mail, the very last   02:11:15 |
| 7  you on page two of the document, but you can look   02:07:56 | 7  E-mail on that page from David Garratt to you.  It   02:11:20 |
| 8  at and verify that this is just pretty much a   02:08:01 | 8  says, Did you have the meeting with F2/Lang?  Who is   02:11:24 |
| 9  continuation of the previous E-mail string.   02:08:03 | 9  F2?   02:11:29 |
| 10  A   Yes.   02:08:07 | 10  A   That's Admiral Johnson.   02:11:30 |
| 11  Q   It is?   02:08:07 | 11  Q   Okay.  Who's -- there's also an S1.   02:11:32 |
| 12     On page two, there's an E-mail from you,   02:08:08 | 12  Who's --   02:11:38 |
| 13  Mr. Souza, to David Garratt, dated June 7th, 2007.   02:08:11 | 13  A   That would be the secretary.   02:11:38 |
| 14  And it says, Dave, now that the executive summary with   02:08:20 | 14  Q   Well, who would F1 be?   02:11:41 |
| 15  the four CD -- quote, "4 CDC Tasks" is complete, can   02:08:24 | 15  A   Chief Paulison.   02:11:43 |
| 16  we please more forward with having somebody start   02:08:29 | 16     (Exhibit Souza 13 was marked for   02:11:43 |
| 17  drafting the appropriate FEMA task documents to CDC?   02:08:32 | 17  identification and attached to the transcript.)   02:11:43 |
| 18  Could you tell me, what are the "4 CDC Tasks"?   02:08:37 | 18  BY MR. WOODS:   02:11:45 |
| 19  A   I don't specifically recall.  I think some   02:08:41 | 19  Q   Mr. Souza, what I'm handing you is now   02:11:45 |
| 20  of them were the ones -- three of them were the ones   02:08:45 | 20  Souza Exhibit Number 13.  For identification purposes,   02:12:49 |
| 21  listed by Dr. Lang in that other E-mail.  Yeah,   02:08:50 | 21  it's Bates labeled FEMA 17-009247.  It's a series --   02:12:56 |
| 22  numbers one, two, and three.   02:08:56 | 22  well, it's three E-mails beginning with Dave -- David   02:13:05 |
| **114** | **116** |

29 (Pages 113 to 116)

VIDEOTAPED DEPOSITION OF KEVIN SOUZA
CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | | |
|---|---|---|
| 1 | Garratt sent on June 1, 2007, to Robert David | 02:13:08 |
| 2 | Paulison, Harvey E. Johnson and Marko Bourne. And | 02:13:15 |
| 3 | CCing Kevin Souza and Tod Wells. I recognize a number | 02:13:20 |
| 4 | of these names, but Marko Bourne, who is Marko Bourne? | 02:13:24 |
| 5 | A    Marko Bourne led -- he led the policy | 02:13:29 |
| 6 | office, the Administrative Policy Office. | 02:13:33 |
| 7 | Q    Is he still with FEMA, do you know? | 02:13:35 |
| 8 | A    No, he's not. | 02:13:47 |
| 9 | Q    Go up to Harvey E. Johnson's E-mail sent on | 02:13:48 |
| 10 | Friday, June 1, 2007, at 9:18 p.m., to David Garratt, | 02:13:59 |
| 11 | John Philbin and David Trissell, CCing you, Kevin | 02:14:07 |
| 12 | Souza, Tod Wells, Marko Bourne, Robert David Paulison | 02:14:10 |
| 13 | and Eric B. Heighberger. It says, Dave, as we | 02:14:15 |
| 14 | discussed, I agree with the direction of your | 02:14:22 |
| 15 | proposal, but recommend you slow roll any sales and/or | 02:14:25 |
| 16 | provisions as opposed to a notice to suspend. | 02:14:30 |
| 17 | Further, we need to have a discussion with the Chief, | 02:14:33 |
| 18 | Public Affairs, Legislative Affairs and Legal to | 02:14:36 |
| 19 | consider our public position. | 02:14:41 |
| 20 | Why do you think that -- or what is your | 02:14:47 |
| 21 | belief, why would Admiral Johnson want Legal to | 02:14:49 |
| 22 | participate in a discussion concerning the public | 02:14:55 |

117

| | | |
|---|---|---|
| 1 | position? | 02:14:59 |
| 2 | MR. MILLER:  Objection, foundation. | 02:15:00 |
| 3 | A    Um, you asked me, I think, what my belief | 02:15:02 |
| 4 | was.  My general belief is when issues this big came | 02:15:08 |
| 5 | up at the agency, that it wasn't uncommon for senior | 02:15:15 |
| 6 | leadership to call senior leadership meetings, all of | 02:15:18 |
| 7 | the senior executives in the administrator's office, | 02:15:23 |
| 8 | counsel being one of them, to discuss kind of courses | 02:15:27 |
| 9 | of action, public positions, and things like that. | 02:15:30 |
| 10 | BY MR. WOODS: | 02:15:33 |
| 11 | Q    Did Admiral Johnson tell you what his | 02:15:33 |
| 12 | reasoning was behind having all of these individuals | 02:15:37 |
| 13 | put -- have their input into the public position? | 02:15:40 |
| 14 | A    No. | 02:15:42 |
| 15 | (Exhibit Souza 14 was marked for | 02:16:24 |
| 16 | identification and attached to the transcript.) | 02:16:29 |
| 17 | BY MR. WOODS: | 02:16:30 |
| 18 | Q    Mr. Souza I'm now handing you what we've | 02:16:30 |
| 19 | labeled as Souza Exhibit 14 as an attachment to this | 02:16:34 |
| 20 | deposition transcript.  For identification purposes, | 02:16:37 |
| 21 | it's FEMA 17-009560, through 0 -- FEMA 17-09 -- | 02:16:39 |
| 22 | 009561.  And it also includes FEMA 17-009330 through | 02:16:52 |

118

| | | |
|---|---|---|
| 1 | FEMA 17-009331. | 02:16:59 |
| 2 | MR. MILLER:  Is there -- one document, two | 02:17:05 |
| 3 | pages? | 02:17:09 |
| 4 | MS. PETROVICH:  I think we're miss -- I | 02:17:11 |
| 5 | think this is -- the numbers you read, Justin, are not | 02:17:13 |
| 6 | the same document we're talking about.  Maybe I'm | 02:17:18 |
| 7 | incorrect. | 02:17:23 |
| 8 | MR. WOODS:  These may have been put | 02:17:23 |
| 9 | together -- you know what? | 02:17:23 |
| 10 | MR. MILLER:  Justin, I have two pages here: | 02:17:23 |
| 11 | One is 9330, and page two is 9331.  Is that what you | 02:17:26 |
| 12 | have? | 02:17:26 |
| 13 | MR. WOODS:  Yeah. | 02:17:31 |
| 14 | MR. MILLER:  Okay. | 02:17:33 |
| 15 | MR. SCANDURRO:  What's the exhibit number? | 02:17:33 |
| 16 | A    Fourteen. | 02:17:35 |
| 17 | MR. WOODS:  Fourteen. | 02:17:37 |
| 18 | MR. MILLER:  We're good. | 02:17:37 |
| 19 | BY MR. WOODS: | 02:17:44 |
| 20 | Q    I want to draw your attention to your | 02:17:45 |
| 21 | E-mail.  It's the second one on the first page of -- | 02:17:49 |
| 22 | well, it's on FEMA 17-009330.  Do you see that? | 02:17:54 |

119

| | | |
|---|---|---|
| 1 | A    Yes, the one at 1:28? | 02:18:02 |
| 2 | Q    On June 5th, 2007, 1:28. | 02:18:05 |
| 3 | A    Yes. | 02:18:08 |
| 4 | Q    And it's to Martin McNeese, and it's, | 02:18:09 |
| 5 | Forward, Letter from Department of Health and Human | 02:18:11 |
| 6 | Services. It says, Hi Martin!  Thank you and welcome | 02:18:14 |
| 7 | to Formaldehyde-Round Two.  I will try to keep you | 02:18:18 |
| 8 | involved without overwhelming you.  Let's talk soon. | 02:18:22 |
| 9 | What did you mean by Formaldehyde-Round Two? | 02:18:26 |
| 10 | A    It was a bit of an attempt at humor. | 02:18:30 |
| 11 | Martin was involved in round one, which I | 02:18:34 |
| 12 | characterized as the EPA study, and then when we | 02:18:36 |
| 13 | needed some additional help for the CDC study, I was | 02:18:40 |
| 14 | characterizing the CDC study as round two. | 02:18:45 |
| 15 | Q    So the fight wasn't over in round one.  You | 02:18:49 |
| 16 | couldn't declare victory in round one? | 02:18:52 |
| 17 | MR. MILLER:  Objection, argumentative, | 02:18:55 |
| 18 | speculation. | 02:19:00 |
| 19 | A    Well, I didn't mean that. | 02:19:01 |
| 20 | BY MR. WOODS: | 02:19:09 |
| 21 | Q    But you did see it as sort of another | 02:19:09 |
| 22 | additional go-round to the formaldehyde issue? | 02:19:12 |

120

30 (Pages 117 to 120)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

--- Page 121 ---

1    A    Sure.  It was another study to be          02:19:16
2  conducted, yes.                                    02:19:19
3    Q    It wasn't even a TKO in round one?          02:19:24
4       MR. MILLER:  Objection, argumentative.        02:19:29
5    A    Again, I --                                 02:19:29
6       MR. MILLER:  Hold on.  Mischaracterizes       02:19:30
7  witness' testimony, assumes facts not in evidence.  02:19:32
8    A    Again, I wasn't thinking of it in terms     02:19:34
9  like that.                                         02:19:37
10     (Exhibit Souza 15 was marked for               02:20:10
11  identification and attached to the transcript.)   02:20:12
12  BY MR. WOODS:                                      02:20:14
13    Q    The next document I'm handing you is        02:20:14
14  labeled Souza 15.  For identification purposes, it's  02:20:17
15  FEMA 17-007251 through FEMA 17-007255.  And I just  02:20:23
16  have one basic question.  Well, two actually.  If you  02:20:33
17  look at Dr. Lang's E-mail to you dated June 6, 2007,  02:20:47
18  and if you go to page two, it has final questions one  02:20:57
19  through four.  I want you to take a look at these and  02:21:03
20  see if that could possibly be the four CDC tasks that  02:21:09
21  we -- that I asked you about earlier that you       02:21:14
22  mentioned in an earlier E-mail.                     02:21:16

--- Page 122 ---

1    A    Yes, they appear to be.                     02:21:30
2    Q    Okay.  Then I want you to look at your      02:21:32
3  E-mail above that dated Wednesday, June 6, 2007, Re:  02:21:35
4  The 4 questions and next steps.  And it's to Bill   02:21:44
5  Lang, and it looks like you -- well, for whatever   02:21:49
6  reason I guess you sent one, it's a copy to yourself  02:21:53
7  and CCed some other individuals.  It says, Thanks   02:21:56
8  Bill.  Will incorporate the final questions into the  02:21:58
9  Exec Summary.  Will make attempts today to arrange a  02:22:01
10  briefing on Thursday (tomorrow) for the Chief and    02:22:05
11  Admiral (slides will come in handy).  Were slides ever  02:22:07
12  developed or created for that executive summary?     02:22:11
13    A    Yes.  There was the presentation that I     02:22:15
14  referenced earlier.                                  02:22:24
15    Q    And when would those -- do you know how     02:22:24
16  many slides and who created those slides?           02:22:27
17    A    The Office of Health Affairs created them,  02:22:29
18  and there may have been approximately ten.          02:22:37
19       MR. WOODS:  Counsel, I don't -- I'm not       02:22:45
20  certain, but I don't believe that we have those ten  02:22:47
21  slides.  Those -- I don't believe they've been      02:22:50
22  produced, but I'll do a formal request for them.    02:22:54

--- Page 123 ---

1       I think we're almost there.                   02:23:17
2       (Exhibit Souza 16 was marked for              02:23:17
3  identification and attached to the transcript.)     02:23:17
4  BY MR. WOODS:                                        02:23:39
5    Q    Mr. Souza I'm handing you a document which   02:23:39
6  is being attached as an exhibit.  It will be Souza 16.  02:23:43
7  For identification purposes, it's Bates labeled FEMA  02:23:47
8  17-015220 through FEMA 17 -- no, this can't be right.  02:23:51
9  Okay.  Through FEMA 17-015221.  And it's a series of  02:24:04
10  E-mails beginning on -- from Harvey E. Johnson dated  02:24:23
11  July 22nd, 2007, to Rob Paulison, Bob Shea, Marko    02:24:28
12  Bourne, Carlos Castillo, David Garratt, Gil Jamieson,  02:24:34
13  John Philbin, David Trissell, William Lang, Merritt  02:24:40
14  Lake, Jeff Runge, Michael Jackson, CCing Kevin Souza  02:24:44
15  and others.  And the first question, but I believe   02:24:44
16  you've answered this now, the second paragraph says,  02:24:54
17  The intent at this point is to flesh out this outline  02:24:57
18  in anticipation of an alignment session with S2 and   02:25:00
19  senior DHS/FEMA/OHA tomorrow afternoon.  And I believe  02:25:03
20  you told us that S2 was -- I'm sorry, tell me again?  02:25:10
21    A    Deputy Secretary Michael Jackson.          02:25:13
22    Q    Michael Jackson.  Okay.                     02:25:15

--- Page 124 ---

1       The last paragraph says, Please remember      02:25:18
2  that all of our discussion and pre-decisional and the  02:25:21
3  information contained herein must remain within our  02:25:27
4  decision group until specifically authorized        02:25:30
5  otherwise.                                           02:25:36
6       Do you have an understanding as to why        02:25:37
7  Admiral Johnson would have wanted this information to  02:25:39
8  remain contained?                                    02:25:49
9       MR. MILLER:  Objection, foundation.           02:25:51
10    A    I don't know specifically.  I suspect it    02:25:55
11  was because some of the decisions that we were talking  02:25:59
12  about making sounds like would have some fairly large  02:26:02
13  implications for a bunch of folks, and he just wanted  02:26:07
14  to make sure that there wasn't any misinformation that  02:26:12
15  got out there before -- that was pre-decisional before  02:26:15
16  an actual decision had been made.                   02:26:18
17  BY MR. WOODS:                                        02:26:27
18    Q    Do you know if Admiral Johnson was advised  02:26:27
19  as such to keep the information within the decision  02:26:30
20  group by OGC?                                        02:26:34
21    A    I don't -- I don't know.                    02:26:37
22                                                      02:26:37

31 (Pages 121 to 124)

### VIDEOTAPED DEPOSITION OF KEVIN SOUZA
### CONDUCTED ON WEDNESDAY, JULY 15, 2009

| | |
|---|---|
| 1     (Exhibit Souza 17 was marked for | 02:27:40 |
| 2  identification and attached to the transcript.) | 02:27:41 |
| 3  BY MR. WOODS: | 02:27:55 |
| 4     Q   The next document, Mr. Souza, I'm showing | 02:27:55 |
| 5  you is going to be labeled as Souza 17.  For | 02:27:57 |
| 6  identification purposes, it's FEMA 17-009689 through | 02:28:04 |
| 7  FEMA 17-009690.  A series of E-mails beginning with | 02:28:10 |
| 8  one from Jon Krohmer to Harvey E. Johnson, and the | 02:28:18 |
| 9  subject matter is FEMA CD -- dash CDC study.  It's | 02:28:22 |
| 10  dated July 11, 2007.  And if you would go up, sir, to | 02:28:29 |
| 11  your E-mail, it's dated July 12, 2007.  It's on the | 02:28:41 |
| 12  first page.  It's from you to David Garratt, Harvey | 02:28:48 |
| 13  Johnson, CCing Carlos Castillo, Leslie Bailey and | 02:28:51 |
| 14  Donna Dannels.  And you say, As of yesterday | 02:28:57 |
| 15  afternoon, the CDC letters were with ODC for review | 02:28:59 |
| 16  and concur -- slash concurrence.  What CDC letter are | 02:29:05 |
| 17  you referring to here? | 02:29:09 |
| 18     A   If I can have a moment and just look at the | 02:29:10 |
| 19  context.  (Pause) | 02:29:16 |
| 20      Looks like this was the letter that was | 02:29:36 |
| 21  going to go from FEMA to CDC asking for their | 02:29:39 |
| 22  assistance with additional testing formally. | 02:29:43 |

125

| | |
|---|---|
| 1     Q   What was the need for OCC to review or | 02:29:47 |
| 2  concur in the letter that was being sent? | 02:29:52 |
| 3      MR. MILLER:  Objection, foundation. | 02:29:53 |
| 4     A   I don't know specifically.  I know that for | 02:29:55 |
| 5  things like this, where there's an IAA involved, and | 02:30:03 |
| 6  they were part of the senior executive group at the | 02:30:08 |
| 7  agency, it wouldn't be uncommon for them to be part of | 02:30:13 |
| 8  a concurrent list where there may have been five, six, | 02:30:16 |
| 9  seven, eight or more offices on the list, and it looks | 02:30:22 |
| 10  like maybe I've tried to track down where it was and | 02:30:27 |
| 11  said that OCC had it at this time. | 02:30:30 |
| 12  BY MR. WOODS: | 02:30:34 |
| 13     Q   Do you have any idea as to how long OCC had | 02:30:34 |
| 14  this particular CDC letter under review? | 02:30:40 |
| 15     A   No. | 02:30:44 |
| 16     Q   But it was sometime that you needed to | 02:30:45 |
| 17  track it down, correct? | 02:30:47 |
| 18      MR. MILLER:  Objection, vague, assumes | 02:30:49 |
| 19  facts not in evidence. | 02:30:52 |
| 20     A   Again, the -- not just for the OCC.  Harvey | 02:30:53 |
| 21  Johnson's asking, Where is it?  So, in that | 02:31:02 |
| 22  concurrence chain that I was talking to you about, I | 02:31:07 |

126

| | |
|---|---|
| 1  may have had to track it down.  OCC could have only | 02:31:10 |
| 2  had it five minutes.  I don't know. | 02:31:13 |
| 3  BY MR. WOODS: | 02:31:16 |
| 4     Q   Was this one of the issues that -- we | 02:31:16 |
| 5  talked about whether or not Harvey Johnson would | 02:31:27 |
| 6  become involved in issues if they were of concern to | 02:31:32 |
| 7  him, correct? | 02:31:36 |
| 8     A   Yes. | 02:31:37 |
| 9     Q   This particular issue was of concern to | 02:31:38 |
| 10  Admiral Johnson? | 02:31:45 |
| 11     A   The formaldehyde issue?  Yes, the | 02:31:47 |
| 12  formaldehyde issue was of concern to him. | 02:31:50 |
| 13     Q   Okay.  But you testified that as you had | 02:31:52 |
| 14  control over the point of contact for this particular | 02:32:06 |
| 15  formaldehyde issue, that Admiral Johnson wasn't always | 02:32:11 |
| 16  consulted or was not always involved in -- and I'm | 02:32:15 |
| 17  paraphrasing, and please correct me if I'm wrong and | 02:32:19 |
| 18  misinterpreting what you said -- but he would not have | 02:32:24 |
| 19  been involved in the day-to-day operations of this | 02:32:27 |
| 20  particular project? | 02:32:30 |
| 21     A   He would not have been involved in every | 02:32:31 |
| 22  aspect of the formaldehyde issue, but things like this | 02:32:34 |

127

| | |
|---|---|
| 1  CDC letter where I don't recall who signed the letter, | 02:32:39 |
| 2  but a request like this from one department or agency | 02:32:43 |
| 3  to another department of an agency that may go out | 02:32:47 |
| 4  under his signature or the chief's signature, that's | 02:32:50 |
| 5  something typical for him to want to take a look at. | 02:32:54 |
| 6     Q   Who would have drafted that letter? | 02:32:58 |
| 7     A   I don't know. | 02:33:00 |
| 8     Q   But it would have -- it's quite possible | 02:33:08 |
| 9  that it went out under his signature? | 02:33:11 |
| 10      MR. MILLER:  Objection, foundation. | 02:33:13 |
| 11     A   It's possible. | 02:33:15 |
| 12  BY MR. WOODS: | 02:33:17 |
| 13     Q   In that E-mail, you also say, Dad, D-A-D, | 02:33:18 |
| 14  continues to work with Procurement to finalize the | 02:33:23 |
| 15  IAA.  What does D-A-D, Dad, stand for? | 02:33:28 |
| 16     A   That's the Disaster Assistance Directorate. | 02:33:30 |
| 17  We went through a bit of a reorganization.  That was | 02:33:35 |
| 18  previously known as the Recovery Division. | 02:33:38 |
| 19     Q   Okay.  You go on to say, A final IAA should | 02:33:42 |
| 20  be completed early next week.  GCRO is processing the | 02:33:46 |
| 21  40-1 for the IAA now.  What's the 40-1? | 02:33:50 |
| 22     A   That's the actual funding request document. | 02:33:58 |

128

32 (Pages 125 to 128)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 129**

1  Q   Who would have to sign off on the 40-1, or  02:34:01
2  who did sign off on the 40-1, if you can remember?  02:34:12
3  A   It would typically be multiple people.  02:34:16
4  There would have to be somebody from the program sign  02:34:19
5  off on it. Somebody from the finance office would  02:34:22
6  have to sign off on it. Maybe somebody from  02:34:26
7  Procurement, if there was procurement involved.  02:34:32
8        MR. WOODS: How much time do we have left?  02:34:47
9        THE VIDEOGRAPHER: One hour on the tape.  02:34:51
10       MR. WOODS: So I've done a total of --  02:34:54
11       THE VIDEOGRAPHER: Three hours.  02:34:56
12       MR. WOODS: Three hours.  02:35:05
13       All right. I'm going to reserve the rest  02:35:06
14 of our time for redirect, so we'll pass the witness.  02:35:07
15       MR. MILLER: Are you going to have to  02:35:18
16 change the -- oh, we don't need to.  02:35:20
17       You want to take a quick five-minute break  02:35:23
18 to change positions? Go off record.  02:35:25
19       THE VIDEOGRAPHER: Going off the record,  02:35:28
20 the time is 2:35 p.m.  02:35:28
21       (Recess taken, 2:35 p.m. to 2:47 p.m.)  02:47:01
22       THE VIDEOGRAPHER: We're now back on the  02:47:04

**Page 130**

1  record. The time is 2:47 p.m.  02:47:16
2        EXAMINATION BY COUNSEL FOR THE DEFENDANT, FLUOR  02:47:16
3        ENTERPRISES, INC.  02:47:16
4  BY MS. PETROVICH:  02:47:16
5  Q   Mr. Souza, my name is Lezly Petrovich, and  02:47:21
6  I only have a few questions for you. When you said  02:47:23
7  that FEMA relied on the contractors to install and  02:47:26
8  maintain the trailers, that was based on the  02:47:30
9  contractor's contract with FEMA, correct?  02:47:34
10 A   Correct.  02:47:37
11 Q   And those contracts defined the  02:47:38
12 contractor's obligations and duties, correct?  02:47:46
13 A   Correct, yes.  02:47:49
14       MR. WOODS: Objection, lack of foundation.  02:47:49
15 BY MS. PETROVICH:  02:47:54
16 Q   And would you expect that the contractors  02:47:54
17 follow those contracts and any applicable statutes and  02:47:58
18 regulations governing government contracting?  02:48:02
19       MR. MILLER: Objection, compound,  02:48:06
20 foundation.  02:48:08
21       MR. WOODS: Same.  02:48:08
22       MR. MILLER: Go ahead.  02:48:09

**Page 131**

1  A   Yes.  02:48:11
2  BY MS. PETROVICH:  02:48:11
3  Q   And you were also asked if FEMA relied on  02:48:16
4  the contractors to properly block the trailers as  02:48:21
5  well. Correct?  02:48:25
6  A   Yes.  02:48:26
7  Q   And that would be pursuant to the contract  02:48:26
8  between FEMA and the contractors, correct?  02:48:31
9  A   Yes.  02:48:35
10       MS. PETROVICH: No further questions.  02:48:36
11       MR. MILLER: I like that, short and sweet.  02:48:47
12       MR. SCANDURRO: Is short and sour okay?  02:48:47
13       MR. MILLER: Then I have to object more.  02:48:47
14       MR. WOODS: I think I'm pretty tired,  02:48:47
15 because I want to start singing in the mic.  02:48:50
16       MR. SCANDURRO: Can you wait until I get to  02:48:50
17 the other side of the table?  02:49:05
18       MS. PETROVICH: You want to start singing?  02:49:05
19       MR. WOODS: No, I might be a better --  02:49:08
20       MR. SCANDURRO: You probably -- you know, I  02:49:09
21 don't want to -- I'm tone deaf. I would not know the  02:49:11
22 difference.  02:49:13

**Page 132**

1        MR. MILLER: Either the secretary or the  02:49:14
2  deputy secretary or --  02:49:15
3  EXAMINATION BY COUNSEL FOR THE DEFENDANT, GULF STREAM  02:49:15
4        COACH  02:49:25
5  BY MR. SCANDURRO:  02:49:25
6  Q   Mr. Souza, my name is Tim Scandurro, and I  02:49:25
7  represent Gulf Stream, and I just have a very few  02:49:28
8  questions for you here today. If I understand your  02:49:31
9  testimony earlier correctly, you became personally  02:49:33
10 aware of the formaldehyde issue in about June of 2006?  02:49:36
11 Is that correct?  02:49:43
12 A   May, June time frame, yes.  02:49:44
13 Q   2006?  02:49:48
14 A   Yes, 2006.  02:49:50
15 Q   Were you up in Washington when you  02:49:51
16 developed that awareness of the issue?  02:49:52
17 A   Yes.  02:49:54
18 Q   Did you, in fact, go to Louisiana right  02:49:55
19 around the time Hurricane Katrina hit the Gulf Coast?  02:49:59
20 A   Yes. I was deployed to Katrina a day  02:50:04
21 before, or maybe two days before the storm made  02:50:09
22 landfall, and was there until Christmas of that year.  02:50:12

33 (Pages 129 to 132)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

1  Q    So when everybody was leaving right before,    02:50:15
2  you were coming into the storm zone; is that right?    02:50:19
3  A    That's correct.    02:50:23
4  Q    And you said you stayed until about    02:50:23
5  Christmas of 2005?    02:50:26
6  A    No.    02:50:27
7  Q    After Christmas of 2005 and before May/June    02:50:28
8  '06, did you return to Louisiana at any time in that    02:50:32
9  time frame?    02:50:36
10  A    No.    02:50:37
11  Q    Okay.  During your approximate four months'    02:50:40
12  stay at the end of 2005 in Louisiana, what were your    02:50:46
13  job duties while you were there?    02:50:49
14  A    Uh, I had a couple.  I was the Deputy    02:50:52
15  Housing Area Commander for a brief period, in the    02:50:55
16  beginning of the response phase, and then eventually    02:51:02
17  ended up as a Housing Manager in Louisiana Joint Field    02:51:07
18  Office.    02:51:11
19  Q    Okay.  And during your tenure in those    02:51:11
20  positions at the end of 2005, am I correct that FEMA's    02:51:15
21  contractors would have set up thousands of travel    02:51:21
22  trailers for residents?    02:51:25
                                                    133

1          MR. MILLER:  Objection, foundation,    02:51:27
2  mischaracterizes facts.    02:51:29
3  A    I can't recall how many were set up in the    02:51:32
4  time that I was there.  But it was many.    02:51:34
5  BY MR. SCANDURRO:    02:51:39
6  Q    Would you say it was thousands, or would    02:51:39
7  you say it was hundreds?    02:51:43
8  A    If I had to guess, I'd say it was    02:51:44
9  thousands.    02:51:47
10  Q    Okay.  And that would have included all    02:51:47
11  manner of different travel trailers, including new    02:51:51
12  travel trailers?    02:51:54
13  A    New travel trailers purchased off the lot    02:51:56
14  probably.    02:52:02
15  Q    Any -- okay.  I'm sorry.    02:52:03
16  A    I was just going to -- I can't recall.  I    02:52:06
17  know we had purchased some units directly from    02:52:08
18  manufacturers, but I can't -- I didn't know when we    02:52:11
19  were getting the units from staging whether or not    02:52:16
20  they had been purchased off the lot or direct from    02:52:19
21  manufacturers.    02:52:22
22  Q    In any event, you oversaw probably    02:52:22
                                                    134

1  thousands of travel trailers being installed at the    02:52:25
2  end of 2005?    02:52:28
3  A    Yes.    02:52:29
4  Q    And am I correct that during that period,    02:52:29
5  when those travel trailers were presumably at their    02:52:32
6  newest, no formaldehyde complaints came to your desk    02:52:37
7  as the FEMA representative down in New Orleans?    02:52:42
8  A    Not that I'm aware of, no.    02:52:46
9  Q    When you became one of the FEMA point    02:52:48
10  people in mid '06 on the formaldehyde issue, did you    02:52:54
11  learn then that there were no governmental regulations    02:52:58
12  on formaldehyde in residential indoor air?    02:53:02
13  A    Eventually, at some point in 2006, yes, I    02:53:06
14  learned that.    02:53:11
15  Q    And did you also learn at around the same    02:53:11
16  time that there were no government regulations on    02:53:14
17  formaldehyde in travel trailers specifically?    02:53:17
18  A    Yes.    02:53:19
19  Q    And did you also learn, as a part of your    02:53:19
20  investigation of the issue, that outside the area of    02:53:26
21  government regulation, there was really no medical or    02:53:30
22  scientific consensus on what an appropriate    02:53:35
                                                    135

1  formaldehyde ambient air level ought to be in a    02:53:38
2  residential structure?    02:53:41
3          MR. WOODS:  Objection, lack of foundation.    02:53:44
4  A    I was told that by several experts.    02:53:46
5  BY MR. SCANDURRO:    02:53:54
6  Q    Okay.  Did you also learn, as a part of    02:53:54
7  your investigation -- and I'm including in the    02:53:59
8  question what you learned from others, just part of    02:54:02
9  your general background investigation of the issue --    02:54:04
10  that formaldehyde is present literally almost    02:54:07
11  everywhere in our environment inside and outside?    02:54:12
12  A    Yes.    02:54:15
13  Q    And did you also learn that a lot of human    02:54:15
14  activities such as smoking, cooking, cleaning, the    02:54:19
15  type of clothes you wear, that there are a variety of    02:54:24
16  human factors that can increase the level of ambient    02:54:28
17  formaldehyde?    02:54:32
18          MR. WOODS:  Objection, lack of foundation.    02:54:33
19  A    Yes.    02:54:35
20          MR. MILLER:  I'm sorry.  What was the    02:54:36
21  answer to that?    02:54:37
22  A    Yes.    02:54:38
                                                    136

34 (Pages 133 to 136)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

| | | |
|---|---|---|
| 1 | MR. MILLER: Okay. | 02:54:38 |
| 2 | BY MR. SCANDURRO: | 02:54:43 |
| 3 | Q    Was one of the things you were trying to do | 02:54:43 |
| 4 | in your representation of FEMA in 2006 to get somebody | 02:54:45 |
| 5 | to tell you what the levels ought to be so that you | 02:54:51 |
| 6 | would have a benchmark to look at as to what was a | 02:54:55 |
| 7 | safe or unsafe level in these travel trailers? | 02:54:59 |
| 8 | A    Yes. | 02:55:02 |
| 9 | Q    And you never got that during the course of | 02:55:03 |
| 10 | 2006, did you? | 02:55:05 |
| 11 | A    No. | 02:55:09 |
| 12 | Q    Did you eventually, early in 2007, review | 02:55:10 |
| 13 | the ATSDR report as a result of the testing that was | 02:55:16 |
| 14 | done in late '06? | 02:55:21 |
| 15 | A    Yes. | 02:55:22 |
| 16 | Q    And you recall that the level of concern | 02:55:23 |
| 17 | that ATSDR/CDC set was .3 parts per million of | 02:55:25 |
| 18 | formaldehyde? | 02:55:34 |
| 19 | A    For -- for sensitive individuals, yes. | 02:55:34 |
| 20 | Q    Okay. Did you understand, as a part of | 02:55:36 |
| 21 | your investigation of the issue, that a level at which | 02:55:39 |
| 22 | a sensitive individual might have a problem was a | 02:55:42 |
| | | 137 |

| | | |
|---|---|---|
| 1 | level that the vast majority of people who weren't | 02:55:46 |
| 2 | sensitive would not have a problem with? | 02:55:50 |
| 3 | A    Repeat that question, please? | 02:55:51 |
| 4 | Q    You understood, as a result of your review | 02:55:55 |
| 5 | of the ATSDR consultation, health consultation, that | 02:55:59 |
| 6 | .3 parts per million of formaldehyde was a level of | 02:56:05 |
| 7 | concern for sensitive individuals; is that correct? | 02:56:08 |
| 8 | A    Yes. | 02:56:11 |
| 9 | Q    Did they ever tell you how many people are | 02:56:11 |
| 10 | considered sensitive individuals by percentages or | 02:56:17 |
| 11 | otherwise? | 02:56:19 |
| 12 | A    I don't recall them ever telling me. | 02:56:20 |
| 13 | Q    Do you recall that it was a very small | 02:56:24 |
| 14 | percentage of the population who had a sensitivity to | 02:56:28 |
| 15 | formaldehyde? | 02:56:31 |
| 16 | MR. WOODS: Object to the form of the | 02:56:32 |
| 17 | question. | 02:56:33 |
| 18 | A    I don't recall. | 02:56:33 |
| 19 | BY MR. SCANDURRO: | 02:56:34 |
| 20 | Q    Did -- did you assume from reading the | 02:56:36 |
| 21 | ATSDR report that even at levels above .3 parts per | 02:56:41 |
| 22 | million, which was the sensitive individual level, | 02:56:46 |
| | | 138 |

| | | |
|---|---|---|
| 1 | there were levels above that that lots of people would | 02:56:50 |
| 2 | have no problem with? | 02:56:52 |
| 3 | MR. WOODS: Objection, lack of foundation. | 02:56:54 |
| 4 | A    I wouldn't characterize it that way. I | 02:56:59 |
| 5 | would say that based on the results I got, that I | 02:57:01 |
| 6 | assumed that if .3 was for sensitive individuals, that | 02:57:06 |
| 7 | above .3 was something that would not impact | 02:57:11 |
| 8 | non-sensitive individuals. | 02:57:19 |
| 9 | BY MR. SCANDURRO: | 02:57:22 |
| 10 | Q    Okay. | 02:57:22 |
| 11 | A    Does that make sense? | 02:57:23 |
| 12 | Q    It does. | 02:57:25 |
| 13 | A    Okay. | 02:57:25 |
| 14 | Q    Did you also learn, as a part of your | 02:57:26 |
| 15 | background research into, into formaldehyde, that it | 02:57:29 |
| 16 | affects all people individually and differently? | 02:57:33 |
| 17 | A    Generally, yes. | 02:57:37 |
| 18 | Q    I wanted to ask you a question or two about | 02:57:40 |
| 19 | your declaration that was marked as Souza Exhibit | 02:57:45 |
| 20 | Number 2. And particularly, paragraph six. Do you | 02:57:49 |
| 21 | see that? | 02:58:14 |
| 22 | A    Yes. | 02:58:14 |
| | | 139 |

| | | |
|---|---|---|
| 1 | Q    I wanted to understand a little bit about | 02:58:15 |
| 2 | the sequence of FEMA's mission. Am I correct that | 02:58:17 |
| 3 | FEMA's approach to the housing issues was a three-part | 02:58:25 |
| 4 | approach? That initially, you would look to solve | 02:58:28 |
| 5 | immediate needs by putting people in emergency | 02:58:34 |
| 6 | shelters, hotels, motels, even tents, that sort of | 02:58:36 |
| 7 | thing? Was that the initial response of FEMA? | 02:58:42 |
| 8 | A    Yes. | 02:58:45 |
| 9 | Q    And that after that, after the initial | 02:58:46 |
| 10 | response, that's when the travel trailers and the | 02:58:49 |
| 11 | emergency housing units would come into play, and you | 02:58:54 |
| 12 | would look to transition people out of, for example, | 02:58:57 |
| 13 | tents and emergency shelters into travel trailers? | 02:59:01 |
| 14 | A    Yes. | 02:59:06 |
| 15 | Q    And that after that, you would be looking | 02:59:07 |
| 16 | to transition people out of travel trailers and into | 02:59:12 |
| 17 | more permanent housing; is that correct? | 02:59:17 |
| 18 | A    Yes, that's correct. | 02:59:19 |
| 19 | Q    And was that FEMA's plan of action from the | 02:59:20 |
| 20 | beginning as soon as Katrina made landfall? | 02:59:24 |
| 21 | A    Yes. | 02:59:27 |
| 22 | Q    And so you, FEMA always envisioned travel | 02:59:29 |
| | | 140 |

35 (Pages 137 to 140)

**VIDEOTAPED DEPOSITION OF KEVIN SOUZA**
**CONDUCTED ON WEDNESDAY, JULY 15, 2009**

| | |
|---|---|
| 1 | trailers as a temporary house -- emergency housing 02:59:33 |
| 2 | option to bridge the gap between living in a tent and 02:59:37 |
| 3 | moving into more permanent housing? 02:59:40 |
| 4 | A   Yes. 02:59:43 |
| 5 | MR. WOODS:  Object to the form of the 02:59:44 |
| 6 | question. 02:59:45 |
| 7 | BY MR. SCANDURRO: 02:59:46 |
| 8 | Q   What was your answer, sir? 02:59:46 |
| 9 | A   Yes. 02:59:48 |
| 10 | Q   And am I correct that what you referred to 02:59:50 |
| 11 | as formaldehyde round two in 2007 was triggered by a 03:00:01 |
| 12 | physician somewhere on the Gulf Coast who raised a 03:00:06 |
| 13 | question as to whether or not there might be some 03:00:09 |
| 14 | association between travel trailers and illnesses? 03:00:12 |
| 15 | A   Yes. 03:00:16 |
| 16 | Q   Was there a particular concern about 03:00:17 |
| 17 | children illnesses? 03:00:19 |
| 18 | A   Yes.  I think he was a pediatrician and it 03:00:22 |
| 19 | was related to children. 03:00:26 |
| 20 | Q   And I noted that Mr. Garratt, your 03:00:28 |
| 21 | superior, said he felt like you guys ought to 03:00:32 |
| 22 | investigate the doctor's claims; is that right? 03:00:35 |

141

| | |
|---|---|
| 1 | A   Yes. 03:00:37 |
| 2 | Q   But did you also feel as he did, that the 03:00:38 |
| 3 | doctor's claims seemed to be inconsistent with or 03:00:41 |
| 4 | possibly refuted by the ATSDR report from earlier that 03:00:45 |
| 5 | year? 03:00:50 |
| 6 | MR. WOODS:  Objection, lack of foundation, 03:00:50 |
| 7 | assumes facts not in evidence. 03:00:53 |
| 8 | MR. MILLER:  Join. 03:00:54 |
| 9 | A   I wouldn't say that they contradicted or 03:00:56 |
| 10 | refuted, but that they warranted additional 03:00:59 |
| 11 | investigation. 03:01:02 |
| 12 | BY MR. SCANDURRO: 03:01:04 |
| 13 | Q   Okay.  Did -- are you aware of the fact 03:01:04 |
| 14 | that the CDC, in fact, did do an initial study of 03:01:06 |
| 15 | children's medical visits in Hancock County, 03:01:11 |
| 16 | Mississippi? 03:01:15 |
| 17 | A   I wasn't aware of that. 03:01:17 |
| 18 | Q   Okay. 03:01:18 |
| 19 | MR. SCANDURRO:  I have no further 03:01:20 |
| 20 | questions.  Thanks. 03:01:21 |
| 21 | MR. MILLER:  I have some questions to 03:01:24 |
| 22 | follow up here on. 03:01:27 |

142

| | |
|---|---|
| 1 | EXAMINATION BY COUNSEL FOR THE UNITED STATES 03:01:27 |
| 2 | GOVERNMENT 03:01:27 |
| 3 | BY MR. MILLER: 03:01:27 |
| 4 | Q   Mr. Souza, my name is Henry Miller, and I 03:01:29 |
| 5 | represent the United States which is a defendant in 03:01:33 |
| 6 | this litigation.  You were just asked some questions 03:01:37 |
| 7 | about FEMA's plan at the time of the response, and how 03:01:41 |
| 8 | this included sort of a three-prong approach.  Were 03:01:46 |
| 9 | travel trailers FEMA's initial choice for the 03:01:50 |
| 10 | temporary emergency housing, or were there alternative 03:01:54 |
| 11 | housing methods that were considered? 03:01:58 |
| 12 | A   We had talked about using manufactured 03:02:01 |
| 13 | homes or mobile homes as, as the initial going-in 03:02:07 |
| 14 | position. 03:02:12 |
| 15 | Q   Was a decision made -- well, what was 03:02:13 |
| 16 | decided? 03:02:18 |
| 17 | A   The decision was made to use travel 03:02:19 |
| 18 | trailers as opposed to mobile homes. 03:02:25 |
| 19 | Q   Were you involved with that decision-making 03:02:29 |
| 20 | process?  Actually, let me rephrase it.  Do you 03:02:32 |
| 21 | have -- did you -- do you have knowledge of that 03:02:37 |
| 22 | decision-making process? 03:02:37 |

143

| | |
|---|---|
| 1 | A   Yes. 03:02:38 |
| 2 | Q   And how do you have that knowledge? 03:02:39 |
| 3 | A   As part of the housing area command, there 03:02:41 |
| 4 | were discussions about what types of units we could 03:02:48 |
| 5 | use and where we could place them. 03:02:51 |
| 6 | Q   And what is your understanding why the 03:02:55 |
| 7 | decision was made to use travel trailers as opposed to 03:02:57 |
| 8 | manufactured housing or mobile homes as the primary 03:03:02 |
| 9 | temporary emergency housing response for Hurricane 03:03:08 |
| 10 | Katrina victims and Hurricane Rita disaster victims? 03:03:12 |
| 11 | A   My recollection was that we were going to 03:03:16 |
| 12 | use mobile homes, but because of the size of mobile 03:03:18 |
| 13 | homes and the quantity in which we needed them, the 03:03:22 |
| 14 | areas available to us to put those mobile homes were 03:03:26 |
| 15 | outside of the impacted areas.  In other words, they 03:03:30 |
| 16 | were outside of the areas of New Orleans, and really 03:03:32 |
| 17 | not even a practical solution in the immediate 03:03:37 |
| 18 | vicinity of Baton Rouge.  They would have to be 03:03:40 |
| 19 | probably even further north than that.  And when we 03:03:43 |
| 20 | made this proposal to the state, concerns were raised 03:03:46 |
| 21 | that people wanted to live closer to their impacted 03:03:52 |
| 22 | homes, if they were homeowners, so that they could 03:03:56 |

144

36 (Pages 141 to 144)

## VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

1 begin making immediate repairs. There were concerns 03:03:59
2 that rebuilding the community in terms of businesses 03:04:03
3 and economic stability and re-invigorating the 03:04:07
4 economy, that putting people that far away from those 03:04:13
5 impacted areas would not be a preferable solution. 03:04:16
6 Q Were there discussions about the effects 03:04:20
7 that this may have on the future demographics of New 03:04:23
8 Orleans? Population makeup of New Orleans? 03:04:30
9 A There were discussions about demographics, 03:04:35
10 but I don't specifically recall whether or not they 03:04:39
11 were in regards to the mobile home or travel trailer 03:04:42
12 discussion versus people moving out of the state 03:04:46
13 discussion. 03:04:48
14 Q Was there a concern that if you used mobile 03:04:49
15 homes as opposed to travel trailers, that many of the 03:04:53
16 people, because they'd have to be placed farther away 03:04:56
17 from New Orleans or Baton Rouge, that they may not 03:04:58
18 eventually move back to New Orleans? 03:05:02
19 MR. WOODS: Objection, lack of foundation. 03:05:06
20 A Yes, there were those concerns. 03:05:10
21 BY MR. MILLER: 03:05:10
22 Q Mr. Woods, plaintiffs' counsel, asked you 03:05:26
145

1 some questions relating to what response actions FEMA 03:05:29
2 would have taken -- well, let me step back and 03:05:42
3 rephrase this. 03:05:46
4 There were some questions that related to 03:05:47
5 the testing that was done by the EPA, and what 03:05:49
6 response actions would come back if that testing came 03:05:52
7 back and the results suggested that the levels of 03:05:55
8 concern was much lower than .3 PPM, and venting was 03:05:59
9 not an effective solution. Do you recall that? 03:06:05
10 A Yes. 03:06:08
11 Q Did -- did FEMA work up or consider or 03:06:08
12 discuss what were the possible contingency plans of 03:06:15
13 what action it would take if such results came back 03:06:20
14 negatively or adversely or -- actually, let me step 03:06:25
15 back. What were those discussions between July -- or 03:06:29
16 June of 2006 and December of 2006? Were there 03:06:35
17 discussions regarding that matter? 03:06:41
18 A At the program level, we were discussing if 03:06:43
19 the results came back from EP -- EPA and CDC and they 03:06:45
20 came back and told us that the results that they had 03:06:52
21 were of concern, and that we needed to take action as 03:06:57
22 a result of the, of the findings, obviously, we had 03:07:01
146

1 over a hundred thousand families in these units. The 03:07:06
2 reason that they were in the units was because there 03:07:10
3 were no immediate or surrounding other adequate 03:07:13
4 alternate housing solutions. And so if we couldn't 03:07:20
5 use those units and we had to get people out quickly, 03:07:23
6 there was general mutual agreement that the only real 03:07:27
7 viable solution available to us was to move people out 03:07:32
8 of the immediate impacted area and most likely out of 03:07:37
9 the state altogether to available rental units that 03:07:41
10 were already available elsewhere in the country. 03:07:44
11 Q I want to ask you to refer to Exhibit 03:08:35
12 Number 3 that I'm providing you here marked by 03:08:37
13 plaintiffs' counsel, and it's a document which is 03:08:42
14 Bates stamped FEMA 17-015068. And Mr. Woods, the 03:08:45
15 plaintiffs' counsel, asked you some questions about 03:08:53
16 the second E-mail on that page, which was an E-mail 03:08:55
17 from yourself to Mr. Garratt and several other people 03:08:59
18 dated May 16th, 2007. And it said, Our test focused 03:09:03
19 on reducing F-mald emissions. I think by F-mald, you 03:09:09
20 were talking formaldehyde? 03:09:14
21 A Yes. 03:09:15
22 Q And what I wanted to focus on this 03:09:16
147

1 question, the use of the word focus. Not only was it 03:09:22
2 on reducing formaldehyde emissions, but you also were 03:09:26
3 trying to determine what was the baseline level of 03:09:29
4 concern; isn't that correct? 03:09:31
5 MR. WOODS: Object to the form of the 03:09:33
6 question. 03:09:34
7 BY MR. MILLER: 03:09:34
8 Q Well, what were all of the issues that you 03:09:35
9 were relying upon that study to supply you information 03:09:37
10 on? 03:09:40
11 MR. WOODS: Objection, asked and answered. 03:09:40
12 A Yeah, I -- 03:09:42
13 MR. MILLER: Wait, hold on. Let me respond 03:09:42
14 to that. I have not asked that question before, and 03:09:45
15 therefore I get to ask the question. Go ahead. 03:09:48
16 MR. WOODS: Same objection. 03:09:50
17 A We were trying to reduce the formaldehyde 03:09:53
18 emissions. But as part of that reduction, we were 03:09:55
19 asking for, reduce them to what level? What level 03:09:58
20 would be safe for occupants to stay in the units 03:10:02
21 essentially? 03:10:10
03:10:10
148

37 (Pages 145 to 148)

# VIDEOTAPED DEPOSITION OF KEVIN SOUZA
## CONDUCTED ON WEDNESDAY, JULY 15, 2009

**Page 149**

1  BY MR. MILLER:                                          03:10:10
2      Q.   And when you used this phrase in this          03:10:11
3  E-mail, Our test focused on reducing F-mald emissions,  03:10:13
4  that referred to that whole bailiwick that you just     03:10:17
5  mentioned there?                                         03:10:19
6      A.   Yes.                                            03:10:20
7      Q.   It was just not on the engineering             03:10:20
8  mechanism that might reduce formaldehyde somewhat.       03:10:22
9      A.   No.  I mean, the purpose of the study,         03:10:25
10 obviously, was we had people in units, and reducing      03:10:27
11 the formaldehyde was, I'll say, was the vehicle to get   03:10:31
12 us to where we wanted to go, and that was a safe unit.   03:10:35
13     MR. MILLER:  I have no further questions.            03:10:41
14 The Government reserves the right for the witness to     03:10:42
15 read and sign the deposition.  We'll read and sign.      03:10:46
16     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS            03:11:06
17 BY MR. WOODS:                                            03:11:06
18     Q.   Mr. Souza, you just testified in response       03:11:08
19 to a question by Mr. Miller that -- and again,           03:11:11
20 referring to Exhibit 3, FEMA 17-015068, that a part of   03:11:25
21 the focus of the test was to establish levels.  Is       03:11:25
22 that correct?  Is that accurate?                         03:11:34

**Page 150**

1      A.   A safe level.                                  03:11:35
2      Q.   A safe level?                                  03:11:37
3      A.   Yes.                                           03:11:40
4      Q.   Do you have personal knowledge that that      03:11:40
5  was the focus of the ATSDR, EPA testing?                03:11:43
6      A.   Yes.                                           03:11:51
7      Q.   Have you ever referred or reviewed the        03:11:53
8  health consultation study that was the result of the    03:11:57
9  EPA testing?                                             03:12:03
10     A.   Yes.                                            03:12:06
11     Q.   Are you familiar with the conclusions         03:12:07
12 reached by -- or reached as part of that study as        03:12:12
13 drafted by one of, one of the drafters being Joseph      03:12:18
14 Little?                                                  03:12:23
15     A.   I'm sorry.  I may have gotten my studies       03:12:30
16 mixed up.  Are you talking about the results that came   03:12:33
17 in February of 2007?                                     03:12:35
18     Q.   The results or the conclusions or findings    03:12:39
19 of the health consultation study.  Do you know what      03:12:41
20 the conclusions were?                                     03:12:46
21     A.   Again, the EPA study from 2007?  That one?     03:12:48
22     Q.   Yes.                                            03:12:52

**Page 151**

1      A.   I'm asking, because I don't know the name     03:12:52
2  of any of -- generally, yes.                             03:12:54
3      Q.   And what were they?                            03:12:57
4      A.   That was that .3 parts per million for        03:12:59
5  sensitive individuals.                                   03:13:05
6      Q.   Okay.  Do you have any information or         03:13:05
7  reason to believe that the study of the health -- the   03:13:08
8  health consultation study had anything to do with the   03:13:11
9  evaluation of ventilation methods?                       03:13:15
10     A.   Only in the context that they were -- I       03:13:18
11 think part of the study was to study ventilated from     03:13:33
12 non-ventilated units.  So I don't recall specifically,   03:13:36
13 but I suspect at somewhere in the study they talked      03:13:39
14 about what they did to ventilate the units.              03:13:43
15     MR. WOODS:  Okay.  I think that's it.               03:13:46
16 Thank you very much.                                     03:13:51
17     MR. SCANDURRO:  Thank you.                          03:13:53
18     MR. MILLER:  Anybody else have any further         03:13:54
19 questions?                                               03:13:56
20     MS. PETROVICH:  No.                                 03:13:56
21     MR. MILLER:  Lezly?                                 03:14:00
22     MS. PETROVICH:  No.                                 03:14:02

**Page 152**

1      MR. MILLER:  We're all done.  Counsel,             03:14:04
2  thank you very much.                                     03:14:04
3      People on the phone, we're all done.  Thank        03:14:05
4  you.                                                     03:14:05
5      THE VIDEOGRAPHER:  This marks the end of           03:14:08
6  tape number two in the deposition of Kevin Souza.        03:14:09
7  Going off the record, the time is 3:14 p.m.              03:14:12
8      (Signature having not been waived, the
9  deposition of Kevin Souza was concluded at 3:14 p.m.)

38 (Pages 149 to 152)