**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**NEW ORLEANS DIVISION**

IN RE: FEMA TRAILER
FORMALDEHYDE PRODUCTS
LIABILITY LITIGATION

MDL NO. 07-1873

SECTION "N" (5)
JUDGE ENGELHARDT
MAG. JUDGE CHASEZ

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DECLARATION OF MICHAEL K. LINDELL, Ph.D.**

I, Michael K. Lindell, Ph.D., state and declare as follows:

1.   I have been retained by the United States as an expert witness in this case.

2.   If called to testify, I would testify to the opinions and matters contained in the attached reports.

3.   The attached reports, dated June 19, 2009 (LINDELL-004072-004120), August 1, 2009 (LINDELL-003952-003957), and April 27, 2010, are true and accurate copies of reports that I prepared.

4.   The initial report (June 19, 2009) and the two supplemental reports (August 1, 2009, and April 27, 2010) together contain a complete statement of all opinions, including the basis and reasons for those opinions, I would express if called to testify.

5.   Lists of references used, information considered, and materials received are included at LINDELL-004121-004134, LINDELL-003957, and on the lone page of the April 27, 2010, supplement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of September, 2010.

Michael K. Lindell, Ph.D.

**EXHIBIT**

**9**

**Report on Formaldehyde in FEMA Temporary Housing Units**

**Provided after the 2005 Hurricanes**

**Michael K. Lindell**

**Bryan TX 77802**

**19 June 2009**

LINDELL-004072

## Professional Qualifications in Emergency Management

Dr. Michael K. Lindell has a graduate degree in Social Psychology from the University of Colorado (1975) with a specialty in disaster research and has completed hazardous materials emergency responder training through the Hazardous Materials Specialist level. Dr. Lindell has over 35 years of experience in the field of emergency management, during which time he has conducted a program of research on the processes by which individuals and organizations respond to natural (flood, volcanic eruptions, earthquakes, hurricanes, tsunamis, and landslides) and technological (radiological and toxic chemicals at fixed-site facilities and in transportation) hazards. In addition, he has had extensive experience in providing technical assistance to government agencies, industry groups, and private corporations in performing hazard/vulnerability analyses and developing emergency plans and procedures.

Much of his research, especially that supported by the National Science Foundation (NSF), has examined the processes by which affected populations respond to warnings of the imminent threat of a natural or technological hazard. This research has been conducted in communities affected by hazards as diverse as hurricanes, floods, volcanic eruption, and the release of hazardous materials. He was involved in four studies around Mt. St. Helens, examining perceptions of risk immediately prior to the May 18, 1980 eruption, evacuation during the major eruption, and adjustment to the long term threat. In addition, he directed two nationwide surveys for the Department of Energy that examined public perceptions of risk associated with technological hazards. Later, he completed a five year longitudinal study investigating factors that affect households' adoption of earthquake hazard adjustments. More recent NSF-supported research is developing an evacuation management decision support system (EMDSS) that combines a capability for real-time evacuation modeling with a hurricane tracking system. EMDSS is currently undergoing usability testing and will then be used for research and training on hurricane evacuation decision making. His current NSF project will use process tracing techniques to assess the ways in which people search for and interpret information about approaching hurricanes. In collaboration with computer scientists at Clemson University, he is developing software for Web-based experiments that will provide more control over information displays than is possible with mailed surveys, yet have participants with greater demographic diversity than is possible in most laboratory experiments.

His organizational research, also supported by NSF, has looked at the effects of disaster experience and the community planning process upon the development of adaptive strategies for promoting emergency preparedness. One series of studies examined factors contributing to the success of Local Emergency Planning Committees (LEPCs) in developing plans for hazardous materials releases. These studies have examined the effects of external/contextual and internal structural factors on the climate within LEPCs, member outcomes (e.g., attendance, effort and turnover intentions), and organizational effectiveness. Other research studied hazardous materials handlers' experience with hazardous materials releases during the Northridge earthquake as well as their subsequent adoption of hazard assessment, hazard mitigation and emergency preparedness actions for future earthquakes. His most recent organizational research examined the use of the Incident Command System in county Emergency Operations Centers during Hurricane Rita.

Professor Lindell also has had extensive experience in providing technical assistance to government agencies, industry groups and private corporations in developing emergency plans and procedures. During seven years as a contractor to the Nuclear Regulatory Commission, he reviewed numerous emergency response plans and evaluated organizational performance in more than forty full-scale emergency exercises at nuclear facilities. In the course of these emergency exercises, he has observed organizational

i

LINDELL-004073

response in all major onsite (Control Room, Technical Support Center, Operations Center), near-site (Emergency Operations Facility and Emergency News Center) and offsite (county and state EOC) facilities. He has participated in the development of designs for emergency operations centers by providing human factors assistance to the NRC and DOE, developing or reviewing the design of seven emergency operations centers for these agencies and directing the design of the NRC Headquarters Emergency Operations Center. He also served on American National Standards Institute/American Nuclear Society and International Atomic Energy Agency committees that developed criteria for the design of emergency response facilities at nuclear power plants. More recently, he provided technical assistance to the Texas Governor's Division of Emergency Management, directing the inspection of hurricane evacuation shelters, conducting a needs assessment for hazard analysis materials, performing a survey of coastal residents' hurricane evacuation expectations, assessing local communities' vulnerability to hurricane impacts, and providing evacuation time estimates for coastal counties.

Dr. Lindell wrote a planning guide for protective action decision making in a nuclear power plant emergency for the Atomic Industrial Forum and developed an emergency response plan for Smith/Klein Chemical Company. He also evaluated the emergency plans and exercise performance of the Long Island Lighting Company's Local Emergency Response Organization, and presented his findings as an expert witness before an Atomic Safety and Licensing Board. Later, he evaluated local emergency preparedness for accidents involving the transportation of hazardous wastes to a facility proposed by GAF Chemical and fixed site facilities in Porter County Indiana. He also conducted emergency preparedness training sessions for communities around the Indian Point nuclear power plant. In addition, he has been a consultant to five of the Department of Energy National Laboratories on a variety of topics in the area of emergency preparedness and response. Most recently, he served as an expert witness for Ventura County in a lawsuit about landslides at La Conchita California.

Dr. Lindell has served on the faculty of the University of Washington, Georgia Institute of Technology, Michigan State University, George Washington University, and Texas A&M University. Those appointments involved teaching research methods and statistical analysis, social psychology, industrial/organizational psychology, project management, strategic management, and emergency management. Courses in the latter area include one at the undergraduate level (Introduction to Emergency Management) and three at the graduate level (Community and Organizational Response to Disasters, Disaster Recovery and Hazard Mitigation, and Disaster Response Planning). He has also served as an adjunct faculty for the Federal Emergency Management Agency's National Emergency Training Center, lecturing on disaster psychology and public response to warning. He also has been an instructor in federal agency sponsored workshops for state and local emergency planners throughout the country.

Professor Lindell has made over 170 presentations before scientific societies and short courses for emergency planners in this country and abroad. He organized and chaired an American Society of Civil Engineers (ASCE) Specialty Conference on Hazardous Facilities, served on the ASCE Task Committee on Natural Disaster Reduction, and served twice as Secretary of the Executive Committee of the ASCE Council on Natural Disaster Reduction. He co-chaired the organizing committee for a conference on protective action decision making in nuclear power plant accidents and was a member of the steering committee for a similar conference on protective action decision making in chemical emergencies. He participated in the NSF's Second Assessment of Research and Applications on Natural Hazards, serving as a member of the committee on Preparedness and Response, and chairing the committee on Adoption, Implementation, and Evaluation of Hazard Adjustments. He has served seven times as a consultant to the International Atomic Energy Agency in developing planning guidance for response to nuclear and

ii

LINDELL-004074

radiological incidents, has made three presentations to National Academy of Sciences panels, and was a member of two National Academy of Sciences panels—*Disasters Research in Social Sciences* and *Assessing Vulnerabilities Related to the Nation's Chemical Infrastructure*. He recently served as an external reviewer for the National Oceanographic and Atmospheric Administration's *National Tsunami Hazard Mitigation Program* and the U.S. Department of Homeland Security's Center for *Studies of Terrorism and Responses to Terrorism,* and currently is a member of the National Earthquake Hazard Reduction Program's *Advisory Committee on Earthquake Hazard Reduction*. He has conducted research or provided technical services to 40 different organizations in the public and private sectors. In addition, Professor Lindell has reviewed research proposals for 20 different foreign, federal, and state agencies as well as performing manuscript reviews for over 40 different journals in the social and environmental sciences and engineering. He has written extensively on emergency management and is the author of 70 technical reports, 90 journal articles and book chapters, and ten books. He recently published a book on risk communication in multiethnic communities (Sage, 2004) and a textbook on community emergency planning (Wiley, 2006). He recently completed an introductory textbook on emergency management under contract to the Federal Emergency Management Agency, a condensed version of which has been published by Wiley (2006). Professor Lindell is the current editor of the *International Journal of Mass Emergencies and Disasters*.

LINDELL-004075

**Executive Summary**

Disasters frequently damage and destroy so many housing units (single family and multi-family structures and mobile homes) that a substantial number of households must find alternative places to live. In many cases, households must remain in temporary housing for an extended period of time before moving on to permanent housing. When there is a substantial amount of available housing within commuting distance of a displaced household's pre-disaster location, FEMA only needs to provide financial assistance for rental housing. However, when the local supply of housing is inadequate, FEMA is authorized to provide temporary housing units (THUs) in the form of mobile homes and travel trailers to meet the demand.

The devastation resulting from Hurricane Katrina displaced an estimated 600,000 households and ultimately led FEMA to provide approximately 144,000 THUs. Approximately 90 per cent of these THUs were located at displaced households' pre-disaster addresses (Garrratt and Stark 2009), a locational policy that was consistent with FEMA's practice and the preferences of displaced households in previous disasters. Specifically, relocation to people's pre-disaster homesites facilitates their resumption of normal patterns of work, schooling, and interaction with family and friends, as well as the recovery of local businesses (who need people to return both as workers and consumers). Household and business recovery, in turn, supports the resumption of government services and maintains local government revenues.

Hurricane Katrina created a secondary crisis for FEMA emergency managers who were, quite reasonably, unprepared for temporary housing demand of this magnitude. Even in the nation's most severe urban disasters of the past 50 years (Hurricane Hugo, the Loma Prieta earthquake, Hurricane Andrew, and the Northridge earthquake), there has only been a need for a few thousand THUs. In most cases, urban areas have sufficient rental vacancies to absorb the displaced households. The available evidence indicates that the greatest previous demand for THUs had occurred after the four 2004 Florida hurricanes and even those disasters required only about 16,000 units. Moreover, many of those THUs were still in service in Florida, so there was a shortfall of nearly 140,000 units. This was filled by purchasing existing units from dealers across the country and by contracting with manufacturers to build additional units.

The allegations of formaldehyde in the THUs created a tertiary crisis for FEMA emergency managers. Here also, they were quite reasonably surprised by this turn of events because there was no evidence of any air quality problems in THUs during the three decades or more that FEMA had been providing temporary housing. Given this long history of safe operation, FEMA emergency managers were understandably cautious in deciding what course of action to take in responding to the initial reports of formaldehyde. An effective emergency manager should assess a threat once it has been detected and should choose appropriate population protection and hazard mitigation actions after considering the efficacy and resource requirements of each action. In addition, an effective emergency manager should coordinate with technical experts in relevant disciplines and communicate any recommended protective actions to relevant population segments by following recommended principles for risk communication.

The available evidence indicates that FEMA emergency managers took reasonable steps to respond, given that there was substantial variation among THUs in exposure levels, substantial variation among individuals in susceptibility to formaldehyde, and no relevant standard on formaldehyde exposure limits in residential housing. FEMA emergency managers collaborated with other federal agencies that had

iv

LINDELL-004076

more expertise in assessing chemical exposure levels (Lawrence Berkeley National Laboratory) and their health effects (Environmental Protection Agency and Centers for Disease Control and Prevention/Agency for Toxic Substances and Disease Registry). Even while awaiting advice from these agencies, FEMA emergency managers pursued a strategy of population protective action and hazard mitigation. This included recommending that all THU occupants ventilate and cool their units, along with advice for them to consult their physicians if they suspected formaldehyde health effects, especially if they had members of vulnerable population segments within their households.

In reviewing the actions of FEMA emergency managers, it is important to recognize the effect of uncertainty on emergency management decisions. They needed to define their decision alternatives and identify the criteria for choosing among the alternatives (i.e., the outcomes of each option). They also needed to assess the likelihood of each outcome and consider whether the costs of decision errors were acceptable. Reviewing a decision that was made years ago raises the issue of *hindsight bias*, which is a tendency for people to judge a decision's outcome as more inevitable or foreseeable after they know what the outcomes is than if they did not know the decision's outcome. Thus, it is important to examine the reasonableness of FEMA emergency managers' response to formaldehyde concerns on the basis of the information that was available *when that decision was made,* not on the basis of what we now know to be true. Second, it important to understand the costs of decision errors, that is, the consequences that could have occurred if FEMA emergency managers acted on the assumption that one event would occur and, later, a different event occurred. Third, it is important to recognize that even the "best" policy option was unlikely to produce completely satisfactory outcomes for all THU residents. After carefully examining the likely options and objectives considered, together with likely frequency of households with formaldehyde sensitive individuals and high emission THUs, it appears that FEMA emergency managers chose a policy that was certainly reasonable and could be argued to be the best one available. Specifically, their practice of ventilation, cooling and dehumidification, together with exchange of units at some occupants' requests, could provide protection to those households with sensitive individuals without unnecessarily disrupting those households that did not have members with formaldehyde sensitivity.

Unfortunately, no policy is likely to achieve its desired effects as rapidly or completely as policy makers want because the policy must be implemented by subordinates who need to be selected, trained, and guided by standard operating procedures. Personnel issues are problematic even in very stable and predictable environments, but they are especially difficult in disasters when there is a major increase in the need for qualified personnel. Even though faster and more complete implementation would have been desirable, FEMA emergency managers appear to have implemented their policy in a reasonably timely and effective manner, given the circumstances within which they were operating.

One important part of the policy FEMA emergency managers selected was to work with its partner agencies in the federal government to disseminate information about formaldehyde and recommended protective actions. These advisories generally met the criteria for an acceptable warning message. They used multiple channels to disseminate messages that identified the warning source, nature of threat, expected location, timing and magnitude of impact; potential consequences of exposure, high-risk groups that require special actions, environmental cues (in this context, the functional equivalent is personal health symptoms), and recommended protective actions. In some cases, they provided contacts for further information and disseminated the information in languages other than English.

Finally, FEMA emergency managers did a reasonable job of controlling the duration of displaced households' formaldehyde exposure. They moved displaced households from temporary shelter to

LINDELL-004077

temporary housing and then from temporary housing to permanent housing in a timely and effective manner, given their limited control over the conditions in which they operated. Obstacles occurred because the affected communities appear to have lacked disaster recovery plans and the magnitude of destruction required considerable time for debris clearance and infrastructure restoration. In addition, households seeking to recover from disasters typically encounter delays in obtaining building permits and building inspections; securing financing for reconstruction and agreements with building contractors. Major disasters frequently see delays in actual construction—especially when the demand for personnel, equipment, and materials exceeds the supply.

These considerations lead to the following ten professional opinions regarding formaldehyde in FEMA THUs provided after the 2005 hurricanes:

1. FEMA has an important role in providing post-disaster housing, but its mission is more limited than is often assumed.

2. Hurricane Katrina imposed unique demands for displaced households and those trying to provide housing assistance for those displaced households.

3. FEMA emergency managers could not reasonably have been expected to prepare in advance of Hurricane Katrina for the level of temporary housing required after impact.

4. FEMA emergency managers had no forewarning about formaldehyde in THUs from its experience in providing temporary housing after previous disasters.

5. FEMA emergency managers achieved timely detection and accurate classification of the potential formaldehyde threat after Hurricane Katrina.

6. FEMA emergency managers had limited options and conflicting criteria for making decisions about how to manage the potential threat of formaldehyde in THUs.

7. FEMA emergency managers made reasonable decisions about how to respond to the potential threat of formaldehyde in THUs.

8. FEMA emergency managers developed and implemented a comprehensive program for responding to the potential threat of formaldehyde.

9. FEMA's formaldehyde communication program met prevailing standards of effectiveness and timeliness.

10. FEMA emergency managers made reasonable progress in assisting displaced households to move from temporary shelter to temporary housing and from temporary housing to permanent housing.

LINDELL-004078

**Table of Contents**

Introduction ........................................................................................................................... 1

Temporary Housing In Major US Disasters ......................................................................... 1

Professional Opinions On Formaldehyde In FEMA THUs .................................................. 3

Opinion   1.   FEMA has an important role in providing post-disaster housing, but its mission is more limited than is often assumed ................................................................................... 3

Opinion   2.   Hurricane Katrina imposed unique demands for displaced households and those trying to provide housing assistance for those displaced households ................................... 5

Opinion   3.   FEMA emergency managers could not reasonably have been expected to prepare in advance of Hurricane Katrina for the level of temporary housing required after impact. .. 5

Opinion   4.   FEMA emergency managers had no forewarning about formaldehyde in THUs from its experience in providing temporary housing after previous disasters. ................................ 6

Opinion   5.   FEMA emergency managers achieved timely detection and accurate classification of the potential formaldehyde threat after Hurricane Katrina. ...................................... 9

Opinion   6.   FEMA emergency managers had limited options and conflicting criteria for making decisions about how to manage the potential threat of formaldehyde in THUs. .............. 11

Opinion   7.   FEMA emergency managers made reasonable decisions about how to respond to the potential threat of formaldehyde in THUs. ...................................................... 16

Opinion   8.   FEMA emergency managers developed and implemented a comprehensive program for responding to the potential threat of formaldehyde. .......................................... 23

Opinion   9.   FEMA's formaldehyde communication program met prevailing standards of effectiveness and timeliness ....................................................................................... 25

Opinion 10.   FEMA emergency managers made reasonable progress in assisting displaced households to move from temporary shelter to temporary housing and from temporary housing to permanent housing. ......................................................................................... 38

References .......................................................................................................................... 41

LINDELL-004079

## Introduction

This report was prepared for the case of Charlie Age, et al. (Alana Alexander and Christopher Cooper) v. Gulf Stream Coach, Inc., et al, No. 09-2892. It addresses the context in which FEMA emergency managers detected a potential formaldehyde hazard in temporary housing units assigned to displaced households following the 2005 hurricanes, especially Hurricane Katrina. This report describes disaster research on post-disaster housing and provides ten professional opinions about the performance of emergency managers at the Federal Emergency Management Agency in providing temporary housing. All materials that are specifically relevant to these opinions are cited in the Reference section. Other materials that I reviewed but decided were not relevant to these opinions are listed in the Bibliography in Appendix 1. Materials supplied by the U.S. Department of Justice are listed in Appendix 2. The terms of my contract with the U.S. Department of Justice are listed in Appendix 3. A current copy of my Curriculum Vitae is listed in Appendix 4. Major presentation materials are presented in the Attachment. I have only worked on one other legal case during the past four years. I was hired as a defense witness for Ventura County California in a lawsuit about the landslide at La Conchita. I was deposed but did not need to testify in court.

## Temporary Housing In Major US Disasters

In the aftermath of a disaster, displaced households typically move through four stages—emergency shelter, temporary shelter, temporary housing, and permanent housing (Quarantelli 1982). The first type of post-disaster housing, *emergency shelter*, consists of unplanned and spontaneously sought locations that are intended only to provide protection from the elements. In some cases, such as hurricanes, people have continued to live in structures that had moderate or major damage and have lost all infrastructure (electric power, fuel, water, and sewer) in order to remain in their property (Yelvington 1997). In other cases, such as earthquakes, people have moved to tents in their yards or into their cars because of the threat of aftershocks (Tierney, Lindell and Perry 2001). However, residence in such structures can rarely be sustained for more than a few days or weeks because of the lack of infrastructure.

The second type of post-disaster housing is *temporary shelter*, which includes facilities for food preparation, sleeping, and personal hygiene (toilets and showers). Temporary shelter is usually sought in the homes of friends and relatives, or commercial establishments such as hotels and motels, although Red Cross mass care facilities in school gymnasiums or church auditoriums are used as a last resort. Lindell, Lu and Prater (2005) reported that during Hurricane Lili only 3% of evacuees stayed in Red Cross shelters, whereas 30% stayed in hotels and motels and 53% stayed with friends and relatives. The percentage of displaced households staying in shelters averages 15% but ranges from less than 1% to over 43% (Mileti, Sorensen and O'Brien 1992). The location where a household seeks temporary shelter is relatively predictable. Severity of damage and the availability of relatives nearby predict which evacuating households stay with relatives (Morrow 1997). Moreover, kin networks are likely to seek temporary shelter together, especially if all relatives became displaced because they lived so close together (Yelvington 1997). Households with higher incomes who lack nearby friends and relatives with undamaged homes seek commercial facilities, whereas lower income households in such conditions are forced to accept mass care facilities. As is the case with emergency shelter, residence in temporary shelter can rarely be sustained for more than a few days or weeks. This is because the schools and churches that

1

provide the gymnasiums and auditoriums cannot give up the food preparation, toilet, shower, and sleeping facilities indefinitely.

The third type of post-disaster housing is *temporary housing*, which allows displaced households to reestablish household routines in nonpreferred locations or structures. That is, temporary housing allows households to begin to function again as independent households but not in the locations where they want to be. In this connection, it is useful to note that, according to the US Bureau of the Census <www.census.gov/population/www/cps/cpsdef.html>, "[a] household consists of all the people who occupy a housing unit. A house, an apartment or other group of rooms, or a single room, is regarded as a housing unit when it is occupied or intended for occupancy as separate living quarters; that is, when the occupants do not live and eat with any other persons in the structure and there is direct access from the outside or through a common hall." Thus, temporary housing comprises structures with facilities for food preparation, sleeping, and personal hygiene (toilets and showers). A household is not necessarily the same as a family which, again according to the US Bureau of the Census, is "a group of two people or more (one of whom is the householder) related by birth, marriage, or adoption and residing together." The significant difference between a family and a household is the latter might include not only members of an extended family but, in the case of immigrants, people from the same region of another country.

Consequently, sites for temporary housing include homes of friends and relatives ("doubling up"—Morrow 1997), commercial facilities such as rental houses and apartments, and mass facilities such as trailer parks. Some of these sites are in or near the stricken community, but others are hundreds or even thousands of miles away. Lack of alternative housing within an acceptable distance of jobs or peers led some households to leave the Miami area after Hurricane Andrew. The population loss was 18% in South Dade County, 33% in Florida City, and 31% in Homestead (Dash, Peacock and Morrow 1997). The occupancy of temporary housing can be as short as a few weeks, but usually lasts for months and even years. Indeed, in some cases, displaced households are forced to accept that what they planned to be a temporary move has become a permanent relocation.

The last type of post-disaster housing is *permanent housing*, which reestablishes household routines in preferred locations and structures. The significance of the qualifier "preferred location" is that the widespread destruction of housing in a displaced households' pre-disaster neighborhoods often forces them to seek temporary shelter or temporary housing in areas that are far away from their pre-disaster homesites and, thus, their places of employment, shopping, worship, and education, as well as their social networks of friends, relatives, neighbors, and coworkers. These neighborhood ties prompt most displaced households to return so home owners can rebuild on the same lot and renters can find housing in the area where they previously lived.

Although these four categories of housing might seem to imply that displaced households rapidly follow a uniform progression from emergency shelter to permanent housing, this is not the case (Nigg, Barnshaw and Torres 2006). In fact, households vary in the amount of time it takes to move from one stage to another and some households bypass stages or regress from more advanced stages (e.g., permanent housing) to more basic stages (e.g., temporary shelter). Consequently, it is difficult for government authorities to determine what will be the numbers of displaced households in any given status, at any given location, at any given time. For example, Bolin (1993) found that it took nine days for shelter occupancy to peak after the Whittier Narrows earthquake. Similarly, Yelvington (1997) reported that temporary shelters after Hurricane Andrew experienced increased demand as buildings were condemned by authorities or landlords begin reconstruction on damaged structures. On 4 September, 10 days after Hurricane Andrew, there were 41 people at Harris Field and 58 people at Florida City. Three

LINDELL-004081

days later the figures were 1,125 and 467, respectively. By the end of September, there were more than 4,000 people occupying temporary shelter in four tent cities.

Forecasting the number of displaced households seeking housing in any given area is also complicated by the availability of alternative housing within commuting distance of the disaster impact area. The loss of housing in a disaster can be extremely problematic in a tight housing market but not when there are many available rental units. Vacancies in the Miami/Dade area were 5.5% before Hurricane Andrew, which provided immediate temporary or even permanent housing for many displaced households. The decreased availability of housing (vacancies dropped to 1.6%) after the hurricane was further complicated by the fact that the resulting housing shortage increased rents by 15-20%, which priced low income victims out of the market (Yelvington 1997). Even when affordable temporary housing can be found, the return to permanent housing can be long. In one working class neighborhood, the average length of displacement was 95 days and the percentage of returnees was still only 62% nearly a year after the disaster (Morrow 1997). However, other areas recovered more rapidly, with 64% of North Dade households returning within two weeks (almost half of them left because of lack of utilities) whereas only 14% of South Dade households returned that rapidly. Nonetheless, 95% of North Dade households had returned within one year and 87% of South Dade households had returned by that time.

In summary, the need for temporary sheltering and housing of displaced households after disasters is very difficult to predict. This inability to predict is compounded by the fact that the post-disaster housing supply is generated by a combination of free market, governmental, and non-governmental organizations (e.g., religious-affiliated organizations such as the United Methodist Committee on Relief and secular organizations such as Habitat for Humanity). Uncertainty about the demand and the multiplicity of housing supply sources makes it very difficult to manage the post-disaster housing process. Inevitably, however, the federal government plays a major role in ensuring that displaced households have adequate temporary housing until they can obtain permanent housing.

### Opinions on Formaldehyde in FEMA THUs

The following sections explain the basis for each of my ten opinions on formaldehyde in the THUs FEMA emergency managers provided after the 2005 hurricanes.

**1. FEMA has an important role in providing post-disaster housing, but its mission is more limited than is often assumed.**

The primary role for providing post-disaster temporary and permanent housing lies with the private sector housing market because most of the housing units in the US are owned by private parties. Under ordinary circumstances, households evacuating from a disaster stay with friends or relatives, or in commercial facilities such as hotels and motels. Only a small percentage seek temporary shelter in public facilities (mass care centers that are often called "evacuation shelters"). Moreover, households that have enough savings or large enough lines of credit can rent houses or apartments as temporary housing until they find permanent housing. This is especially common if vacancy rates are high enough within commuting distance of the households' pre-disaster homesites. Government assistance is needed when vacancy rates are too low to provide enough temporary housing for the households that have been displaced or when displaced households lack the funds to pay for temporary housing.

At the time Hurricane Katrina struck, the federal government's role in post-disaster housing was described in the National Response Plan (NRP), which set forth 15 emergency support functions (ESFs)

LINDELL-004082

that span the types of activities federal agencies perform in response to an event that overwhelms the resources of local and state government <www1.va.gov/emshg/docs/national_response_plan/start.htm>. Two of these ESFs are relevant to post-disaster sheltering and housing—ESF #6 (Mass Care, Housing and Human Services) and ESF #14 (Long-Term Community Recovery and Mitigation). The NRP also established three types of agency roles for each ESF, the first of which is that of coordinator, the agency that is responsible for planning and coordinating the federal response in that ESF. The second role is a primary agency, which is responsible for staffing the emergency response (there can be multiple primary agencies). The third role is a support agency, which is responsible for providing personnel technical assistance as requested by the primary agencies.

The NRP gave FEMA the role of coordinator for ESF #6 (Mass Care, Housing and Human Services) with the objective of providing shelter and feeding of victims, short- and long-term housing, and support for victim counseling and benefits claims. FEMA shared the role of primary agency for ESF #6 with the American Red Cross. The NRP also gave FEMA the role of coordinator for ESF #14 (Long-Term Community Recovery and Mitigation). FEMA shared the role of primary agency for ESF #14 with the Department of Housing and Urban Development. Thus, FEMA's first objective is to work with the American Red Cross (and other non-governmental organizations such as the Salvation Army), who directly provider temporary shelter in auditoriums, gymnasiums, and—in some cases—motel or hotel rooms. In addition, FEMA is charged with providing temporary housing but  is not authorized to act as a social service agency that provides housing to those who were homeless before the disaster struck or to improve the quality of housing beyond its condition before the disaster struck (unless these improvements will reduce future hazard vulnerability). Like emergency management agencies in other countries, FEMA must take some actions to limit the attractiveness and the availability of its temporary housing to ensure that it does not inadvertently become a provider of subsidized permanent housing.

To facilitate the transition from emergency shelter to permanent housing, the Stafford Act (Public Law 93-288) authorizes FEMA to provide housing assistance to those who have been displaced from their homes. This assistance can take the form of financial aid so displaced households can rent housing on the open market. When there is an inadequate supply of housing in the disaster impact area, FEMA is authorized to provide direct assistance in the form of temporary housing units (THUs) such as mobile homes and travel trailers. By law, FEMA can provide financial assistance or direct assistance to displaced households. Financial assistance is a check for $2358 for three months of housing from a private sector source (Fischer and Sard 2005). This is FEMA's preferred method for providing temporary housing because it requires a minimum amount of bureaucratic oversight. However, financial assistance only works when there is an adequate amount of affordable vacant housing near the disaster impact area.

Direct assistance, in the form of mobile homes or travel trailers, is provided when there is insufficient housing near the disaster impact area. Displaced homeowners often prefer to move into temporary housing units (THUs—mobile homes or travel trailers) located on their own lots so they remain close to their preimpact places of work; their children's schools; and their friends, relatives, and neighbors. In addition, they are better able to supervise—and even participate in—the reconstruction of their homes. Although THUs are themselves not a highly regarded type of housing, the ability to locate these units on or near the displaced households' preimpact housing locations makes them more attractive than they would be otherwise.

LINDELL-004083

**2. Hurricane Katrina imposed unique demands for displaced households and those trying to provide temporary housing for those displaced households.**

The widespread devastation caused by Hurricane Katrina differed from recent major US disasters (Hurricanes Hugo, 1989, and Andrew, 1992; the Loma Prieta, 1989, and Northridge, 1994, earthquakes, see Comerio 1998a) in two very important ways. First, Hurricane Katrina took place during a year in which there were 28 named storms—so many that the National Hurricane Center was forced to depart from the convention of assigning Atlantic storms names that began with letters of the English alphabet. Fifteen of these storms were hurricanes and five of these made landfall in the US. The consequence of this extreme level of hurricane activity was that FEMA needed to provide temporary housing to displaced households from other hurricanes, which also included Arlene, Cindy, Dennis, Rita, Tammy, and Wilma (Weiss 2006). Moreover, FEMA was still in the process of housing over 8,000 of the 16,000 displaced households for which it provided trailers after Florida's four 2004 hurricanes—Charley, Frances, Ivan, and Jeanne.

Second, the sheer size of Hurricane Katrina's impact area—approximately 90,000 square miles—and the population density of the area it struck produced an estimated 600,000 displaced households. The large number of displaced households in comparison to the small number of undamaged residential units in the impact area (especially in Louisiana and Mississippi) made it immediately clear that it would not be feasible to use financial assistance alone to provide temporary housing in or near the impact area.

**3. FEMA emergency managers could not reasonably have been expected to prepare in advance of Hurricane Katrina for the level of temporary housing required after impact.**

Over the years, FEMA and its predecessor agencies have provided temporary housing to displaced households after many disasters. However, the 600,000 households displaced by Hurricane Katrina significantly exceeded the number displaced in the two greatest US disasters prior to Hurricane Katrina—the Northridge earthquake in 1994 and Hurricane Andrew in 1992. Using Comerio's (1997) figures for comparison (see Table 1), Hurricane Katrina produced ten times as many displaced households as the Northridge earthquake (60,000) and nearly eight times as many displaced households as Hurricane Andrew (80,000). Neither of those disasters required FEMA to use many THUs because these urban areas had many surviving housing units into which the displaced households could move. After Hurricane Andrew, for example, the hardest hit area only accounted for about 17% of Dade County's housing stock so about 86% of the households were able to relocate elsewhere within Dade County or in adjacent Broward County (Smith and McCarty 2006). Thus, only about 3,800 displaced households needed THUs after Hurricane Andrew (Morrow 1997).

In fact, it appears that the largest number of THUs FEMA had provided previous to Hurricane Katrina was the 16,000 units the agency provided after the four hurricanes that struck Florida in 2004 (FEMA 2005a, 2005b). By contrast, FEMA ultimately provided approximately 144, 000 THUs to the Gulf Coast after Hurricane Katrina (FEMA 2008a)—approximately nine times as many as its previous largest allocation. FEMA did not have enough THUs immediately available for the demand and, indeed, it would have been extraordinarily expensive to purchase and maintain the number of THUs needed to house a displaced population of this size. Moreover, even if FEMA emergency managers had projected a THU demand of this size, it would have been extremely wasteful of taxpayer funds to acquire this many units because the probability of a major hurricane striking New Orleans in any given year is less than one

LINDELL-004084

percent per year, according to the Colorado State University hurricane forecasting group (see <landfalldisplay.geolabvirtualmaps.com>). In summary, it was far more cost effective for FEMA emergency managers to adapt their temporary housing program to the circumstances that arose after a major disaster than to maintain a reserve inventory that would have been large enough to meet the projected demand from a major hurricane striking New Orleans.

Ultimately, the substantially greater demand for temporary housing caused by Hurricane Katrina (approximately eight times as much as the next greatest disaster) created a secondary crisis for FEMA. This situation was a crisis because 1) there was initial uncertainty about how FEMA should meet the housing demand created by 600,000 displaced households and 2) the required number of THUs that were needed as soon as possible greatly exceeded FEMA's capacity to respond—at least with the speed that displaced households and their political representatives wanted.

**Table 1**: Residential Losses in Major Urban Disasters Preceding Hurricane Katrina (US$)

|  | Hurricane Hugo September 1989 | Loma Prieta October 1989 | Hurricane Andrew August 1992 | Northridge January 1994 |
|---|---|---|---|---|
| Estimated Property Damage | $6.4 Billion | $7.5 Billion | $22.6 Billion | $25 Billion |
| Estimated value of residential losses | $3 Billion | $2 Billion | $10.5 Billion | $13 Billion |
| Housing damage as share of total per cent | 46 | 26 | 46 | 52 |
| Damaged housing units | 112,000 | 43,000 | 135,000 | 500,000 |
| Destroyed and severely damaged housing units | 36,000 | 11,500 | 80,000 | 60,000 |
| Per cent | | | | |
| destroyed or severely damaged | 32 | 27 | 59 | 20 |
| single-family units | 71 | 40 | 63 | 11 |
| multi-family units | 11 | 60 | 29 | 88 |
| mobile homes | 18 | 0 | 8 | 1 |
| Number of insurance claims | 278,000 | 45,000 | 300,000 | 280,000 |
| Residential insurance payouts | $1.5 Billion | $ .6 Billion | $1.2 Billion | $10 Billion |
| Residential vacancy rate (per cent) | 8 | 1 | 10 | 9 |

Source: Adapted from Comerio (1997)

## 4. FEMA emergency managers had no forewarning about formaldehyde in THUs from its experience in providing temporary housing after previous disasters.

FEMA emergency managers had a long history of providing THUs to displaced households but there is no indication they had ever received any complaints about air quality in general or formaldehyde in particular. It is not clear from the research literature what was the first time the federal government provided travel trailers or mobile homes to households that were displaced by disasters. However, there is an account of the federal government providing THUs after Tropical Storm Agnes flooded central Pennsylvania in 1972 (SEDA Council of Governments 1975). After the flood, Northumberland County placed 94 households into public and private rental units and 291 into federally supplied mobile homes. The report noted the advantages of placing mobile homes near residences. "Placing mobile homes or other temporary quarters near the residences of flood victims provides families with the opportunity to repair and protect their property. These sites use existing

LINDELL-004085

utilities from the pre-flood residences and can be set up with little delay. Use of these sites allows families to continue to live in a relatively familiar lifestyle." (p. 23). However, the report also noted three types of problems with the THUs after the Tropical Storm Agnes flooding. First, some large families were assigned two mobile homes that lacked a connecting walkway, which would be an especially significant problem in the winter months. Second, the THUs had inadequate insulation for a northern climate. Third, THUs had insufficient storage space for items salvaged from the flood. However, there was no mention anywhere in the report of problems with air quality, let alone formaldehyde.

In addition, there are at least ten scholarly studies that have addressed FEMA's provision of temporary housing after disasters. Bolin (1982) discussed the provision of THUs after two Texas tornadoes, one in Vernon and the other in Wichita Falls. Because of local housing shortages, almost all the displaced households who used temporary housing moved into FEMA mobile homes. There were differences between the two communities in the average length of stay in the THUs; "[t]he longer length of occupancy in Wichita Falls reflects the housing shortage there and home rebuilding delays because of contractor and material scarcity." (p. 161). Moreover, higher income households tended to have shorter stays, presumably because they were more likely to be home owners and better able to afford to pay for the reconstruction of their homes. Ninety six percent of the respondents rated FEMA THUs as important to their families' recovery and provided positive comments about the advantages of siting the units at their pre-disaster homesites. However, THU occupants did have some negative reactions to their accommodations. Specifically, 35% thought the amount of space was a problem, 36% thought the lack of privacy (both inside and outside the THU) was a problem, 62% reported problems with utilities, maintenance, or the THU structure (e.g., inadequate wiring, inadequate heating); 21% complained of unexpected expenses (such as paying for repairs rather than waiting for FEMA contractors), and 48% complained about constant monitoring by FEMA personnel (many times caused by miscommunication and misunderstanding of federal regulations on temporary housing). However, there was no mention of any problems with air quality, let alone formaldehyde.

Bolin and Bolton (1986) interviewed 431 households that were affected by the 1982 Paris Texas tornado. A total of 391 households were eligible for temporary housing assistance and 387 received it. The majority (299—77%) moved into houses or apartments, 84 (22%) moved into mobile homes, and four (1%) moved into travel trailers.

> The majority of respondents in both racial groups living in FEMA mobile home courts (60% of whites and 85% of blacks) felt that the courts were less pleasant than their old neighborhoods. For both racial groups, most respondents felt that the trailer application form was not difficult to fill out, that the wait to actually get the trailer was reasonable, and that no extra or unanticipated expenses were incurred. When asked to assess the disruption to family life caused by being temporarily housed in FEMA trailers, 75% of both groups reported that it was very disruptive. (Bolin and Bolton 1986, p. 48).

Although the authors used a questionnaire that was quite similar to that used by Bolin (1982), they did not report any problems with air quality or, specifically, with formaldehyde.

Comerio's (1998b) study of temporary housing after Hurricane Hugo reported that half the total damage was concentrated in four coastal counties, where 25 percent of the existing housing stock was affected. Temporary housing was not a problem despite the concentrated damage because there were high vacancy rates and the most severely damaged, and therefore uninhabitable, housing consisted of coastal

7

vacation units. Her report on this disaster does not mention any problems with air quality or, specifically, formaldehyde.

Phillips (1993, 1998) examined post-disaster shelter and housing following the Loma Prieta earthquake by conducting 117 face-to-face interviews and contacting eight key informants for a total of 72 separate persons from 58 different organizations in Santa Cruz County California. The major issues her respondents reported were an insufficient number of Spanish-language brochures and bilingual workers, and frustration with FEMA administrative procedures. Although there were 122 trailers allocated to displaced households in this area, there is no mention of problems with air quality in general, or formaldehyde in particular.

Comerio's (1998a, 1998b) study of temporary housing after the Loma Prieta earthquake reported that, in proportion to the area's housing stock, the losses appeared to be minimal. Despite the large number of structures severely damaged or destroyed, this represented less than one percent of the total housing in San Francisco and Oakland and about ten percent in Watsonville and Santa Cruz. However, the damage was concentrated in specific types of structures. Most (60 %) of the severe damage was in old single-room-occupancy hotels and apartments that served elderly, transients, and low-income households. Thus, there was a general short-term shortage of temporary housing because vacancy rates were low and housing was severely limited at the lowest rental rates (p. 172). Comerio's (1998a) comparison of housing recovery in San Francisco (population 720,000) and Watsonville (population 30,000) noted that San Francisco had 1,482 red tagged (uninhabitable) housing units, whereas Watsonville lost 642 of its 8,100 housing units. An undetermined number of mobile homes was brought into Watsonville but there is no mention of mobile homes within San Francisco—presumably because of the larger number of vacant housing units available for displaced households in the larger city. Neither of Comerio's reports on the Loma Prieta earthquake mentions air quality issues or, more specifically, formaldehyde.

Peacock, Morrow and Gladwin (1997) reported the results of nine studies conducted in the aftermath of Hurricane Andrew. Although the hurricane destroyed or severely damaged 144,000 housing units and displaced approximately 137,000 households, FEMA only needed to move about 3,800 households into THUs (Morrow, 1997). A year after the hurricane, there were still 2,261 FEMA trailers occupied in the Miami area (Yelvington 1997), which was 60 per cent of the original allocation. Three chapters in the Peacock et al. (1997) book specifically address post-disaster housing in THUs and one of these includes an extensive interview with a THU resident. The book documents a large number of negative comments about THUs, the first of which concerns delays in moving households to THUs from damaged structures or tent cities and the second of which is the inadequate number of THUs. However, neither formaldehyde specifically, nor air quality more generally, are mentioned in any of the chapters.

Comerio's (1998b) study of temporary housing after Hurricane Andrew reported FEMA sited about 3,600 THUs and HUD provided 8,000 Section 8 rental vouchers for disaster victims. Approximately half of these rental vouchers were still in force four years after the storm. However, this study did not report any complaints about air quality or formaldehyde.

Comerio's (1997, p. 167) report on the Northridge earthquake indicated that displaced households were rapidly resettled through a combination of FEMA short-term rental assistance and HUD Section 8 rent vouchers to 130,000 middle- and low-income families. The majority of the households found alternate housing less than two months after the earthquake, mostly because of high vacancy rates (over 8 per cent) in the local housing market. Almost all households found alternative housing that was equivalent to what they had before the earthquake. Her further work on this earthquake concluded "the recession had created high vacancies in multifamily apartments, so temporary housing was not a significant issue."

LINDELL-004087

(Comerio 1998b, p. 109). This was because the uninhabitable units were only three percent of the local housing but the recession had resulted in a nine percent vacancy rate—54,000 vacant units—in the San Fernando Valley. This study did not report any complaints about air quality or formaldehyde.

Enarson (1999) conducted interviews in Miami during the two years after the 1992 landfall of Hurricane Andrew. The sample comprised 25 service providers and five focus groups totaling 25 women. She also conducted interviews with 95 women, service providers, and disaster responders after the 1997 Grand Forks flood. Respondents reported respiratory problems from mildew and mold while living in apartments that were still being repaired, but complaints about trailers focused on "physical limitations of temporary accommodations, e.g., lack of privacy, few play spaces for children or activities for teens, insufficient laundry facilities, and social isolation." (p. 48). Even though mildew and mold are mentioned specifically, there is no report of complaints about formaldehyde.

Tobin, Bell, Whiteford and Montz (2006) conducted a study of THU residents who were displaced by Hurricane Charley. The researchers obtained the data from a FEMA survey of 159 households in a single trailer park and supplemented it with 61 face-to-face interviews (approximately 20 minutes apiece) and 18 in-depth interviews (approximately 45 minutes apiece). Open ended question on "the ways in which their lives were impacted by Hurricane Charley" elicited the loss of housing (100% of respondents), loss of transportation (46%), loss of job (39%), loss of everything (20%), and stress (18%). After two and a half months, the three most common current concerns were housing (74%), money and job (30%), and future prospects ("Now where, now what?", 21%). When asked for improvements to the relocation facility, most suggestions addressed children's issues (25%). "Trailer improvements tended to focus on size and special needs issues. Multiple interviewees commented on the small size of appliances, especially refrigerators, which necessitated more frequent shopping trips and limited meal diversity." (p. 95). This study reported no complaints about air quality in general, let alone formaldehyde in particular.

In summary, none of the scholarly studies that have collected data on the use of FEMA THUs after disasters has reported any complaints about air quality in general, let alone formaldehyde in particular. In some cases, the questionnaires were highly structured so there was less opportunity for respondents to provide information that was not specifically requested. However, even the reports of open-ended interviews and focus groups failed to generate comments about formaldehyde, even when other environmental contaminants were mentioned (i.e., mold and mildew). As a consequence, FEMA emergency managers appear to have received no forewarning about formaldehyde in trailers during their experience in providing temporary housing after previous disasters.

## 5. FEMA emergency managers achieved timely detection and accurate classification of the potential formaldehyde threat after Hurricane Katrina.

Detection and classification of the potential formaldehyde threat in THUs was much more difficult than the detection and classification of the hurricane threat that created the need for the extraordinary numbers of THUs. First, the weather patterns that generate hurricanes are routinely monitored by satellites, radar, aircraft, as well as ships at sea and land-based weather stations as part of a continuous world-wide meteorological monitoring system. By contrast, an excessive level of formaldehyde would have to be detected as part of an air quality monitoring program in the approximately 144,000 THUs FEMA provided after Hurricane Katrina. As noted earlier, there is no clear indication that FEMA had received complaints about THU air quality, particularly formaldehyde, in the years before Hurricane Katrina. Thus, there would have been no reason to establish the air quality monitoring system that would be needed to measure formaldehyde concentrations in these THUs.

9

LINDELL-004088

The fact that the first indications of a formaldehyde issue emerged in the occupational safety and health (OSH) monitoring system follows logically from the fact that the FEMA contractors were the first ones to open the THUs after they had been shipped to the staging areas where they would be held pending assignment to qualifying households. When the potential formaldehyde threat was detected in occupied units, FEMA emergency managers lacked a federal standard to judge the acceptability of long-term residential formaldehyde exposure in travel trailers. There were multiple action levels for ambient formaldehyde concentrations (see Table 2) but these differences in these action levels were themselves an impediment to prompt action. Indeed, even when CDC convened an expert panel to establish a single standard for formaldehyde in THUs, it adjourned without reaching consensus (FEMA 2008b). In the absence of a single standard, FEMA emergency managers were forced to *improvise* a response to the situation rather than implement a *pre-planned* procedure.

Although it might seem in retrospect that FEMA emergency managers were exceptionally slow in responding to the potential formaldehyde threat, this impression is not correct. An organization that is responsible for confronting a crisis (referred to below as a "focal organization") typically goes through five critical activities in crisis response—sense making, decision making, meaning making, terminating, and learning (Boin and 't Hart 2006). *Sense making* requires the focal organization's policy makers to "recognize from vague, ambivalent, and contradictory signals that something out of the ordinary is developing…In fact, research shows that organizations are unable to detect even the most simple incubation processes with few factors, interacting according to standard patterns and taking a long lead time" (Boin and 't Hart 2006, p. 49).

**Table 2**. Guidance for Ambient Formaldehyde Concentrations

| Department of Housing and Urban Development (1984) | • Regulates product emissions instead ambient concentrations (p.4)<br>• Recognized but avoided issues of temps > 77F and RH > 50% in the South, and ventilation < 0.5 ACH in mobile homes when HVAC is not operating (p.8)<br>• Concluded there is insufficient evidence to reduce below 0.4 parts per million (ppm, see p.10)<br>• Regulated mobile homes but not travel trailers (p. 30) |
|---|---|
| Consumer Product Safety Commission (1997) | • "For most people, a low-level exposure to formaldehyde (up to 0.1 ppm) does not produce symptoms." |
| OSHA (1992) | • .75 ppm as an 8-hour time-weighted average |
| GEORGIA-PACIFIC MSDS (1998) | • "An expert panel has observed exposure up to concentrations of 0.3 ppm failed to produce irritation. [T]he threshold for long-term chronic pulmonary effects is between 0.4 and 3 ppm and for chronic obstructive pulmonary disease is 2 ppm. Pre-existing respiratory disorders may be aggravated by exposure." |
| BLUELINX MSDS (2004) | • Same as GEORGIA-PACIFIC (1998) |
| ATSDR (2007a) | • 1980s complaint mobile homes 0.0-4.2 ppm<br>• 1993 complaint homes (including mobile homes ) 0.02-4.0 ppm<br>• Medical Management Guidelines = 0.3 ppm<br>• Chronic Minimal Risk Level (> 365 days) = .008 ppm |

Moreover, *decision making* does not usually involve a single decision maker or even a small group of senior policy makers but typically involves a network of personnel throughout the focal organization who identify alternative course of action, evaluate their consequences, and select the most appropriate ones. In

10

LINDELL-004089

the best of circumstances, these decisions are coordinated—with field personnel contributing the information that is needed for a full assessment of the problem and response options; senior policy makers evaluating this information thoroughly and communicating their policy choices to all relevant parties; and, finally, field personnel implementing the policy and providing a steady stream of feedback about the progress of its implementation. Consistently, "[t]here are simply too many hurdles that separate a leadership decision from its timely execution in the field." (Boin and 't Hart 2006, p. 51). Consequently, decision making is often loosely coordinated because of differences in situation assessment, different points of view regarding the implications of that situation assessment, and variations among subunits in the timing and effectiveness of policy implementation. *Meaning making* involves explaining the nature of the incident and the organization's response in a way that stakeholders (that is, anyone who has or thinks they have a stake in the issue) understand and accept the organization's view of the event. The attempt to provide meaning to the situation further complicates the crisis response because policy makers must reorganize the available information and often seek additional information so they can provide understandable explanations to a wide variety of stakeholders that differ in their ability to comprehend the often complex technical issues involved. Moreover, the organization's policy makers must address the public statements of other stakeholders who are publicizing their own interpretations and advocating their own preferred courses of action in the news media. *Crisis termination* involves reallocating the focal organization's resources from the crisis response to other activities and negotiating agreement with other stakeholders that the crisis is, in fact, terminated. Finally, *learning* involves identifying and implementing the changes that must be made to the focal organization's plans and procedures, personnel selection and training, facilities, and equipment so it can respond more rapidly and effectively if this type of crisis occurs again.

In summary, from the perspective of research on organizational crisis response, the available accounts of FEMA emergency managers' response to the potential threat of formaldehyde in THUs indicate that this incident was typical of many organizational crises in public and private sector organizations throughout the world. In such situations, a focal organization must rapidly confront an unfamiliar threat that provides ambiguous cues regarding its magnitude (in the aftermath of Hurricane Katrina, there was uncertainty about the potential severity of health consequences that formaldehyde might cause) and scope of impact (similarly, there was uncertainty about the number of high emission THUs and displaced households that were sensitive to formaldehyde). Moreover, FEMA emergency managers needed to minimize the likelihood of making either one of two types of decision errors. The first type of decision error would be to move *too few* people from THUs, which had the potential to cause adverse health effects if the formaldehyde threat were underestimated. However, the second type of decision error would be to move *too many* people from THUs, which had the potential to cause a massive degree of disruption to the recovery effort if the formaldehyde threat were overestimated. Given these extremely difficult circumstances, the FEMA emergency managers acted with a reasonable balance of speed and caution in their response.

## 6. FEMA emergency managers had limited options and conflicting criteria for making decisions about how to manage the potential threat of formaldehyde in THUs.

In judging the reasonableness of FEMA emergency managers' response actions, it is important to avoid the problem of hindsight bias. Hindsight bias, known commonly as "Monday morning quarterbacking" or "20-20 hindsight" is the tendency to view events as more foreseeable or more inevitable *after the fact* than they actually would have appeared at the time actions needed to be taken

LINDELL-004090

(Blank, Musch and Pohl 2007; Fischhoff 1975; Louie, Rajan and Sibley 2007). In particular, anyone who is judging FEMA emergency managers' decisions today has information that was not available to those emergency managers at the time they made their decisions. Although most people recognize it would be unfair to use later information to second guess earlier decisions, research on hindsight bias has shown that cognitive biases can limit our ability to ignore the additional information that we have.

One way to *fairly* review the FEMA emergency managers' decisions about managing formaldehyde exposure in THUs is to frame these decisions as they might have done at the time. This involves using decision analysis techniques (e.g., Clemen 1996; Raiffa 1968) to identify both the options the FEMA emergency managers might have considered and also the objectives (sometimes called criteria) they might have used to distinguish among the options. Although some decision analysis techniques are extremely sophisticated and require advanced mathematics to explain, other decision analysis techniques are extremely simple. Indeed, the method described below is quite similar to the product evaluation tables routinely reported in *Consumer Reports* product reviews.

Agency reports (ATSDR 2007a, 2007b; CDC 2008a, 2008b; Maddalena, Russell, Sullivan and Apte 2008) and formaldehyde advisories (CDC/FEMA, no date; FEMA, no date, 2008) seem to indicate that FEMA emergency managers had five basic options available for responding to the possible threat of formaldehyde. Option A was to vent/cool/dehumidify (VCD) only, Option B was to exchange individual units rejected by their occupants plus advise all households to implement VCD in their units, Option C was accelerated phase-out of all travel trailers plus VCD, Option D was accelerated phase-out of all THUs plus VCD. Finally, Option E was to immediately phase out all THUs (in which case VCD would no longer be necessary). Of course, in theory, there was also the option to do nothing at all about the potential formaldehyde threat. Even though it is unlikely that FEMA emergency managers would have seriously considered this option, it is included in the analysis below. These six options can be described in terms of four primary objectives: 1) maximize formaldehyde safety, 2) maximize support for community recovery, 3) minimize financial cost to THU occupants and 4) minimize financial cost to FEMA. These are not the only possible options and objectives that FEMA emergency managers might have considered; they might have considered others as well (see Souza 2008 Paragraph 13 for discussion of some of the criteria he recalled considering). However, these seem very likely to be the primary options and objectives they would have been considered.

*Decision Objectives (Criteria for Choosing Among the Options)*

*Formaldehyde safety* is the degree to which an option reduces the level of formaldehyde exposure and, thus, the likelihood that THU occupants will experience adverse health effects. The degree of formaldehyde safety associated with each option is rather difficult to estimate because, as research by a variety of federal agencies later confirmed, the THUs varied in their ambient levels of formaldehyde, people vary in their susceptibility to formaldehyde, and there was (and still is) no scientific consensus on an action level for formaldehyde exposure in travel trailers.

*Support for community recovery* is the contribution an option makes to THU occupants' opportunities for household recovery by helping them re-establish their pre-disaster patterns of work, school, and social interaction at their pre-disaster homesites. In turn, household recovery facilitates community recovery because returning households are available to work in local businesses and purchase goods and services from these businesses. By contrast, mobile home parks are generally located far from the THU occupants' homesites, so they prevent households from re-establishing pre-disaster patterns of work, school, and

12

social interaction or contributing significantly to the community's disaster recovery. Thus, THUs located in trailer parks would provide low support for community recovery.

*Financial cost to THU occupants* is the amount of money that each option would cost each displaced household—over and above the normal cost of THU occupancy (i.e., electricity for routine heating, cooling, and lighting). The need for ventilation, cooling and dehumidification would be relatively high in Gulf coast counties during the summer and would be least affordable to low-income households. This cost, like other utility bills, is not reimbursed by FEMA. Although low income households can frequently receive support from local Unmet Needs Committees for utility costs, the discussion below assumes that THU residents' utility costs will *not* be supported by others.

*Financial cost to FEMA* is the amount of money each option would cost FEMA—over and above the original purchase price of the THUs, their initial installation, and their final removal. All THUs had been purchased by the time formaldehyde was first detected, so the purchase price of the THUs was a "sunk cost" that should be ignored. Moreover, all five options would have these same sunk costs, so these sunk costs definitely should not be considered when choosing among the options. Thus, the financial cost to FEMA considered below is the incremental amount the agency would have to pay for alternative housing between the time a household vacates its THU and the time it finally moves into permanent housing. In most cases, the incremental cost for each household would be the cost of one additional move plus the cost of renting the house or apartment where it would reside until moving to permanent housing—at which time the household would no longer be an expense to FEMA.

Table 3 shows how the six options could be scored on the four objectives in a way that is consistent with the research literature that was available at the time of the Hurricane Katrina temporary housing decisions made during 2005-2007. Thus, FEMA emergency managers would need to be aware that travel trailers are likely to have higher concentrations of formaldehyde than mobile homes because of their smaller size and also would need to estimate approximately what proportion of the THU occupant population would be affected by the formaldehyde. They would need to recognize that travel trailers are usually sited on homesites (because of their small size), where they contribute more to household and community recovery than do mobile homes (which are usually sited in parks). They would need to recognize that ventilating exhausts warm air from the THU in the winter and cool air in the summer, so the cost of VCD would be somewhat greater than the cost of normal heating and cooling. Finally, they would need to recognize that the financial cost to FEMA increases with the number of households that must be moved to houses or apartments. None of the options gets a perfect score on formaldehyde safety because this chemical is pervasive throughout all types of housing.

*Decision Options (Alternative Courses of Action)*

Option A (Do nothing) has moderately high formaldehyde safety because FEMA emergency managers' experience in previous disasters would have suggested that almost no households had problems with formaldehyde in THUs. The support for community recovery is very high because travel trailer occupants can live at their pre-disaster residential homesites. It has no *incremental* cost to the THU occupants because they only need electric power for normal heating, cooling and dehumidification and no *incremental* cost to FEMA because it has already paid for the THUs (as noted earlier, this is a "sunk cost"). However, FEMA emergency managers would certainly have considered this option to be inadequate for the most sensitive THU occupants.

LINDELL-004092

Table 3. Alternatives for FEMA Emergency Managers' Response to Formaldehyde.

| Option | Formaldehyde safety | Support for community recovery | Financial cost to THU households | Financial cost to FEMA |
|---|---|---|---|---|
| A.  Do nothing | Moderately high | Very high | None | None |
| A.  VCD* only | High | Very high | Modest | None |
| B.  Exchange individual units + VCD | Very high | High/medium | Modest | Minimal |
| C.  Accelerated phase-out of all TTs + VCD | Very high[+] | Medium/low | Modest | Moderate |
| D.  Accelerated phase-out of all THUs + VCD | Very high[++] | Very low | Modest | Moderate |
| E.  Immediate phase-out of all THUs | Extremely high | Extremely low | None | Substantial |

* VCD = Ventilation, cooling, and dehumidification

Option B (VCD only) has high formaldehyde safety because the available evidence from 2006 onward indicated that VCD could significantly reduce formaldehyde concentrations in THUs. The support for community recovery is very high because travel trailer occupants can live at their pre-disaster residential locations. It has a modest incremental cost to the THU occupants for the additional electric power needed to run the air conditioners for ventilating, cooling, and dehumidifying more thoroughly than normal. It has no incremental cost to FEMA because the agency has already paid for the THUs. However, FEMA emergency managers would probably have considered this option to be inadequate for the most sensitive THU occupants.

Option C (Exchange individual units + VCD) was feasible because there were older reserve units from 2004 that had presumably released a larger fraction of their formaldehyde and, therefore, would be more suitable for the households with sensitive occupants. This option's formaldehyde safety is very high if occupants (or their physicians) are able to promptly recognize and report possible symptoms of formaldehyde exposure and FEMA promptly exchanges the rejected units. In turn, successful occupant/physician recognition of possible formaldehyde symptoms depends on the effectiveness and timeliness of FEMA's risk communication efforts. The support for community recovery is very high if the rejected units are exchanged with like units (travel trailers exchanged with travel trailers and mobile homes exchanged with mobile homes). However, if rejected travel trailers are exchanged with mobile homes, then occupants must be moved from homesites to parks, so support for community recovery would decrease to high. The financial cost to each THU occupant is modest. This option would have minimal incremental cost to FEMA as long as the number of households to be moved was smaller than the number of older low emission THUs that were still available. However, FEMA would have to pay for an extra move from the newer THU to the older THU.

Option D (Accelerated phase-out of all travel trailers + VCD) has slightly higher formaldehyde safety than Option C because there would be fewer people remaining in the high emission travel trailers at any given point in time. This option's support for community recovery would be medium/low because travel

LINDELL-004093

trailer occupants would be moved away from their pre-impact homesites and the financial cost of this option to THU occupants would be modest. This option would have moderate incremental cost to FEMA as long as the rate of replacing rejected travel trailer s did *not* exceed the total of the number of reserve mobile homes plus the number of newly available mobile homes (from other households transitioning to permanent housing). If the number of exchanged travel trailer s *did* exceed the total number of available mobile homes, there would be somewhat greater cost because formaldehyde-sensitive travel trailer occupants would have to be relocated to other temporary housing in single family, multi-family, or commercial (hotel or motel) structures and relocated again when their permanent housing became available. Thus, the financial cost to FEMA of this option would depend on the number of households moving to other temporary housing (rather than permanent housing), the average cost of the substitute housing, and the duration of their stays.

Option E (Accelerated phase-out of all THUs + VCD) would have slightly higher formaldehyde safety than Option D because there would be even fewer people remaining in either travel trailers or mobile homes at any given point in time. This option's support for community recovery would be very low because all travel trailer occupants would be moved away from their pre-impact homesites and mobile home occupants would be moved even farther away than their parks. In both cases, housing in single houses or apartments is likely to be well beyond commuting distance from THU households' pre-disaster residences. The financial cost of this option to THU occupants would be the same as for all previous options but there would be moderate incremental cost to FEMA if, as is the case with Option D, the rate of replacing rejected THUs did *not* exceed the total of the number of reserve units plus the number of newly available THUs (from other households transitioning to permanent housing). Similarly, the financial cost of this option to FEMA would depend on the number of households moving to other temporary housing (rather than permanent housing), the average cost of the substitute housing, and the duration of their stays.

Option F (Immediately phase out all THUs) would have extremely high formaldehyde safety because it would reduce the level of formaldehyde exposure to that of normal "permanent" structures. This option's support for community recovery would be extremely low because all THU occupants would be moved far away from their pre-impact residences. The incremental cost of this option to each occupant would be zero if one assumes that the occupants could avoid the additional use of electric power that was required for formaldehyde-related ventilation, cooling, and dehumidification and all other utility costs remained the same. However, a constant level of utility costs would not be true for houses and apartments, which have larger spaces to heat and cool. Although the utility costs for the larger spaces could quite possibly offset the savings from eliminating formaldehyde-related ventilation, cooling, and dehumidification, the analysis below assumes that there will, in fact, be a cost saving to the THU occupants. This option would have substantial incremental cost to FEMA because all THU occupants would have to be relocated to other temporary housing and relocated again when their permanent housing became available. As is the case with Options C-E, the cost of this option would depend on the number of households relocating to other temporary housing (rather than permanent housing), the average cost of the substitute housing, and the duration of their stays.'

*Interdependencies Among the Decision Objectives*

The choice of a course of action for managing the potential threat of formaldehyde in THUs is complicated by the fact that there are negative relationships among some of the decision objectives. As Table 4 indicates, there is a negative relationship between formaldehyde safety, on the one hand, and

LINDELL-004094

support for community recovery, financial cost to THU occupants, and financial cost to FEMA, on the other hand. That is, options having higher formaldehyde safety (a desirable consequence) tend to have lower support for community recovery, higher financial cost to THU occupants (except at the highest level of formaldehyde safety), and higher financial cost to FEMA—all of which are undesirable consequences. Increasing formaldehyde safety tends to decrease support for community recovery because, as noted above, the THUs with the highest formaldehyde exposure levels (travel trailers) are the ones that provide the greatest support for community recovery—they are the ones that can be located on the displaced households' pre-disaster homesites. Similarly, increasing formaldehyde safety tends to increase financial cost to THU occupants because they must pay for the electricity needed to run the air conditioners used to ventilate, cool and dehumidify their units. Finally, increasing formaldehyde safety tends to increase financial cost to FEMA because moving households from THUs into alternative temporary housing (i.e., lower emission travel trailers, mobile homes, or houses or apartments) that require additional funding. In other words, increasing formaldehyde safety has inherent costs to the stricken communities (reducing support for community recovery), the displaced households (increasing financial cost to THU occupants), or federal taxpayers in general (increasing financial cost to FEMA). This is another unfortunate example of the well-known principle that "there is no free lunch". FEMA emergency managers were responsible for considering and weighing all four of the primary objectives, not just formaldehyde safety, in developing and implementing a temporary housing plan. Thus, the negative relationships of formaldehyde safety with the other objectives made it inevitable that there would be some unavoidable residual level of formaldehyde exposure that might result in adverse health consequences.

**Table 4**. Interdependencies among Decision Objectives

| Objective | Formaldehyde safety | Support for community recovery | Financial cost to THU occupants | Financial cost to FEMA |
|---|---|---|---|---|
| Formaldehyde safety | -- | Lower support | Higher cost | Higher cost |
| Support for community recovery | | -- | Higher cost | Lower cost |
| Financial cost to THU occupants | | | -- | Lower cost |
| Financial cost to FEMA | | | | -- |

7. **FEMA emergency managers made reasonable decisions about how to respond to the potential threat of formaldehyde in THUs.**

Deciding whether FEMA emergency managers made reasonable decisions about how to respond to the potential threat of formaldehyde in THUs can be examined from two related perspectives. The first involves a systematic comparison of the decision options in terms of their scores on the objectives. The second involves an examination of the costs of a decision error. The next two sections discuss these two perspectives in sequence.

*Choosing Among the Decision Options*

As Table 3 indicates, the five options tend to increase in desirability from Option A to Option F on formaldehyde safety and (to a lesser extent) financial cost to occupants, but decrease in desirability from

16

Option A to Option F on support for community recovery and financial cost to FEMA. Thus, it is impossible to find a single dominant option—one that is the best option on all four criteria. However, careful examination of the options indicates that it is not necessary for one of the options to be clearly better than all the others. Specifically, it is noteworthy that Options D, E, and F all seem to have small increases in formaldehyde safety, but only at the cost of large decreases in support for community recovery and large increases in costs to FEMA. In particular, if only a few people are sensitive to formaldehyde, then very many non-sensitive households must be disrupted to protect the health of the few. The number of non-sensitive households disrupted increases from Option D to E and again from E to F. Thus, an option would be preferred if it required relocating only formaldehyde-sensitive occupants rather than relocating all travel trailer occupants or all THU occupants. Ultimately, FEMA chose to implement Option C (Exchange of individual units + VCD), quite possibly for this reason. The preference for Option C over Option A (Do nothing) can be explained as a willingness to incur a minimal cost to FEMA in exchange for an increase in formaldehyde safety from moderately high to very high. Similarly, the preference for Option C over Option B (VCD only) can be explained by FEMA emergency managers' willingness to incur a minimal cost to FEMA in exchange for an increase in formaldehyde safety from high to very high. Neither financial cost to THU households nor support for community recovery have a major impact on the preference for Option C over Options A and B because both options have only small changes on these two criteria.

It would be reasonable to prefer Option C to Option D (Accelerated phase-out of all travel trailers + VCD) because the latter would produce a lower contribution to community recovery and cost FEMA more without providing significantly higher formaldehyde safety or lower financial cost to THU households. In addition, it would also be reasonable to prefer Option C to Option E because the latter would have produced a very low contribution to community recovery and cost FEMA much more without providing significantly higher formaldehyde safety or lower financial cost to THU households. Finally, it would be reasonable to prefer Option C to Option F because the latter would have produced an extremely low contribution to community recovery and cost FEMA a very substantial amount but only provided a slightly higher level of formaldehyde safety and somewhat lower financial cost to THU households.

Of course, it is possible to prefer one of the other policy options if one ignores the support for community recovery and focused exclusively on formaldehyde safety. However, Souza (2008) indicates that local officials "wanted a plan for temporary housing "that placed disaster victims in, or as close as possible, to their devastated communities to ensure political and social stability and promote rebuilding and recovery efforts" (p. 3). As noted earlier, it is not possible to determine conclusively from the available documentation what was the relative importance that FEMA emergency managers placed on each of the objectives addressed in this analysis. Thus, the purpose of this policy analysis is not to claim that the preceding paragraphs describe the exact way in which FEMA emergency managers decided how to respond to the potential formaldehyde threat—or even that they explicitly considered exactly these options and objectives. Instead, FEMA emergency managers might have reasoned that excahnging individual units (Option C) respects household autonomy by allowing each household to make its own decision about whether its members are willing to control their formaldehyde exposure by VCD actions alone in order make greater progress on household and community recovery. Alternatively, FEMA emergency managers might have reasoned that the best decision for displaced households as a whole (i.e., the utilitarian principle of choosing the policy that provides the greatest good for the greatest number of citizens) will not necessarily produce the best outcomes for every single individual household.

LINDELL-004096

In summary, this decision analysis describes the types of options and objectives that a professional emergency manager would be likely to consider and shows that FEMA's chosen course of action is consistent with those considerations. Whether or not everyone would agree after the fact that FEMA's emergency managers chose the best option (although I do believe they did), it is possible to conclude that FEMA emergency managers made a reasonable decision, given the information that was available at the time.

*Examining the Costs of Decision Errors*

One of the most important concepts in decision analysis is the cost of a decision error. In most cases, a course of action has both positive and negative consequences. Thus, in choosing between two courses of action, a policy maker must balance the positive and negative consequences of one action against the positive and negative consequences of the other action. This balancing process can be illustrated by the decision whether to take an umbrella when there is the possibility of rain. As Table 5 indicates, the two courses of action—take the umbrella or leave the umbrella—are the two rows. The two events—there is rain or no rain—are the two columns. Taking an umbrella (Row 1) means that I need to carry some extra weight in my brief case (a negative consequence) but I am protected from getting wet if it rains (the positive consequence). If I carry the umbrella and there is no rain, I incur the negative consequence without receiving a positive consequence.

**Table 5**. Consequence matrix for carrying an umbrella (adapted from Raiffa 1968).

| Alternative | Event | |
|---|---|---|
| | Rain | No rain |
| Take umbrella | Additional weight (-Y) <br> No wet clothes (0) | Additional weight (-Y) <br> No wet clothes (0) |
| Leave umbrella | No additional weight (0) <br> Wet clothes (-X) | No additional weight (0) <br> No wet clothes (0) |

The second row of Table 5 displays the consequences of leaving the umbrella at home. Leaving the umbrella avoids the additional weight (a positive consequence) but I will get wet clothes if there is rain because I am not protected from getting wet (the negative consequence). If I leave the umbrella and there is no rain, I incur the positive consequence without the negative consequence. By organizing my thoughts about the decision to carry an umbrella this way, it becomes clear that the choice between the two courses of action depends on the relative importance of the additional weight of the umbrella (-Y) versus the chance of wet clothes (-X). If I am wearing a suit on the way to an important meeting, I would almost certainly take the umbrella because avoiding wet clothes is much more important than avoiding additional weight. On the other hand, if I am going running in shorts and a T-shirt, getting wet is not a problem and, moreover, carrying an umbrella when running is even more effort than when walking.

The decision to take an umbrella when leaving home should also depend on the probability that it will rain. If the morning news says the probability of rain is near zero, this suggests that I leave the umbrella at home. On the other hand, if it is already raining, I should definitely take the umbrella. If the probability of rain is between zero and one, I will need to consider both the probabilities and consequences in order to make the best decision. It is important to recognize that this consequence matrix does not dictate my decision whether to take an umbrella—I must decide how important it is to carry the umbrella

18

unnecessarily versus get wet. The consequence matrix simply organizes the relevant variables and helps me to think about them. Of course, people don't need to use a consequence matrix to help themselves decide whether to take an umbrella when leaving home. However, this device can be very useful when making decisions about more complex decisions.

Table 6 shows how, in deciding how to respond to the potential formaldehyde threat in THUs, FEMA emergency managers might have used a similar logic to consider whether to immediately relocate all households from THUs to houses or apartments (Row 1) or leave all households in THUs (Row 2). Even though FEMA emergency managers had more options than just these two, Table 6 provides a simple extension of Table 5 that illustrates the way in which they might have established a population protective action policy. In this case, there are four events that are relevant. The first event (Column 1) is that there are very few households with members who are sensitive to formaldehyde (1% sensitive cases) and very few THUs that have high levels of formaldehyde emissions (1%). The second event (Column 2) is that there are very few sensitive cases (1%) and an appreciable number of THUs that have high levels of formaldehyde emissions (10%). The third event (Column 3) is that there is an appreciable number of households with members who are sensitive to formaldehyde (10%) and very few THUs (1%) that have high levels of formaldehyde emissions. The fourth event (Column 4) is that there is an appreciable number of households with members who are sensitive to formaldehyde (10%) and an appreciable number of THUs that have high levels of formaldehyde emissions (10%). Of course, there is no way of knowing if FEMA emergency managers considered these specific percentages, but it seems likely that this would be the approximate range of percentages that would have occurred to them—especially because they had not had problems with formaldehyde in THUs during the previous thirty years.

If FEMA emergency managers immediately relocated all households (Row 1), there would be no near-term or long-term health effects and no costs to THU households. However, disaster recovery might be delayed 3-6 months for each household (an approximate estimate that seems consistent with the disaster research literature) and there would be substantial costs to FEMA (and, thus, taxpayers in general). This would be true regardless of what was the frequency of households with sensitive individuals and THUs with high emissions (which is why all cells in Row 1 have exactly the same entries). As noted earlier, this is because travel trailers (which have the highest emissions) were located on homesites and no alternative housing was available in the vicinity. Consequently, relocated households would necessarily go to communities that did have vacant houses and apartments, which were beyond commuting distance.

If FEMA emergency managers decided not to relocate all households (Row 2), consequences would depend on the events that occurred—the percentage of sensitive households and the percentage of high emission THUs. Specifically, there would be no community recovery delays or additional costs to FEMA but there would be electric power costs to THU households for ventilation, cooling, and dehumidification (VCD). There would also be some adverse health effects whose frequency of occurrence would vary depending on the frequency of households with sensitive individuals and THUs with high emissions. Specifically, in Column 1 (1% sensitive cases and 1% THUs with high emissions), there would be noticeable respiratory effects in .01% (1 in 10,000) of the THU households. This result follows from the mathematical principle that if households are randomly assigned to THUs, the probability of a sensitive case ($S$) in a high emission THU ($HE$) equals the product of the probabilities of the two independent events. That is, $p(HE \text{ and } S) = p(HE) \times p(S)$. Using the same logic, Column 2 (1% sensitive cases and 10% THUs with high emissions) indicates there would be noticeable respiratory effects in .1% (1 in 1,000) of the THU households; Column 3 (10% sensitive cases and 1% THUs with high emissions) would

19

LINDELL-004099

**Table 6**. Consequence Matrix for Immediate Relocation and VCD Only.

| | Event | | | |
|---|---|---|---|---|
| | 1% Sensitive Cases | | 10% Sensitive Cases | |
| Alternative | 1% High Formaldehyde Emission THUs | 10% High Formaldehyde Emission THUs | 1% High Formaldehyde Emission THUs | 10% High Formaldehyde Emission THUs |
| Immediately relocate all | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA |
| VCD only (relocate none) | • Noticeable respiratory effects in .01% (1 in 10,000) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA | • Noticeable respiratory effects in .1% (1 in 1,000) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA | • Noticeable respiratory effects in .1% (1 in 1,000) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA | • Noticeable respiratory effects in 1% (1 in 100) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA |

LINDELL-004100

have noticeable respiratory effects in .1% (1 in 1,000) of the THU households; and Column 4 (10% sensitive cases and 10% THUs with high emissions) indicates there would be noticeable respiratory effects in 1% (1 in 100) of the THU households.

If FEMA emergency managers were limited to just these two options (*either* relocate all households *or* relocate none of the households and implement ventilation, cooling, and dehumidification instead), they should choose on the basis of their assessment of the likelihood of each of the events (households with sensitive individuals and THUs with high emission levels). It would be reasonable for a FEMA emergency manager to conclude that the most likely event was that there were 1% sensitive cases and 1% THUs with high emissions since, as noted earlier, there appear to have been no previous reports of formaldehyde problems in THUs during the previous 30 years. Moreover, from March 2006 to March 2007, they only received 130 complaints and 47 requests to exchange units out of 144,000 THUs (a rate of .1% for complaints and .03% for exchanges)—a result that seems to support the conclusion that sensitive households are relatively rare. Thus, to avoid noticeable respiratory effects in .01% (1 in 10,000) of the households (1% households with sensitive members times 1% THUs with high emission levels) and modest electric power costs for ventilation, cooling, and dehumidification, FEMA emergency managers would have to force all households to experience 3-6 months of recovery delays and incur substantial costs to the rest of the taxpayers. Even if they thought the frequency of sensitive cases or THUs with high emissions might have been higher, this would have only avoided a slightly higher incidence of noticeable respiratory effects (.1%, or 1 in 1,000) of the THU households at the cost of forcing all households to experience 3-6 months of recovery delays and a substantial amount of additional expense to FEMA. In any of these three cases (i.e., the first three columns of Row 2), a responsible emergency manager could have reasonably decided that a probable 3-6 month recovery delay was more important to the entire population of dislocated households than was the small number of additional cases of respiratory effects. This decision would be particularly likely if the FEMA emergency managers believed that households' physicians could diagnose and treat the respiratory effects before they progressed to severe conditions.

In fact, the FEMA emergency managers were not limited themselves to just the two options, either relocate all households or relocate none of the households. In fact, they had the option to *systematically re-assign* sensitive households to low emission THUs (Option C: Exchange individual units + VCD). If they did successfully implement Option C, the probability of a sensitive case in a high emission THU would become zero. That is, if FEMA emergency managers, in conjunction with family physicians, could detect which households had members were sensitive to high emission THUs, it would be possible to avoid further noticeable respiratory effects by relocating just the households that had sensitive members. All households with non-sensitive members could remain at their homesites or, in the case of the 10% of households in trailer parks, could remain closer to their homes than would be possible if they were relocated.

It is possible that this systematic re-assignment policy could fail if the sensitive households were not reassigned to low emission THUs. The most likely reason for this would be that the occupants or their physicians failed to recognize that respiratory effects were occurring, were caused by formaldehyde, and should be reported to FEMA so the household could be relocated. In this case, the probability of a sensitive household remaining in a high emission THU is equal to the probability of a sensitive household being initially assigned to a high emission THU times the probability of the failure to recognize the formaldehyde reaction.

LINDELL-004101

If the probability of successful detection is a certainty (i.e., $p = 1.0$), because all sensitive households (or their physicians) recognize a formaldehyde reaction and seek reassignment to a low emission THU, the policy would be completely successful and the probability of further noticeable respiratory effects would become zero. If the probability of successful detection is zero (i.e., $p = 0.0$), because no households (or their physicians) recognize the formaldehyde reaction and, thus, fail to be reassigned to a low emission THU, the policy would fail completely. In this case, the probability of noticeable respiratory effects would remain at its probability on initial assignment. In the case of 1% sensitive households and 1% high emission THUs, even a completely failed policy of replacing individual THUs (Option C) would still result in noticeable respiratory effects in a very small percentage of the households. This would still be just .01% (1 in 10,000) if the probability of a sensitive household and a high emission THU were both .01%. In point of fact, a formaldehyde notification program would be likely to be 75-95% effective in moving households to low emission THUs. If this were the case, the likelihood of a household with sensitive members remaining in a high emission THU would be somewhere between .001% and .0001% (i.e., between 1 in 100,000 and 1 in 1,000,000).

In summary, decision analysis reveals that FEMA emergency managers had a very difficult decision because conflicting objectives left them with no completely satisfactory options. On the one hand, FEMA emergency managers needed to rapidly provide housing so displaced households could move out of temporary shelter (auditoriums/gymnasiums/hotels or friends'/relatives' homes) and to provide this housing as close as possible to these households' pre-disaster homesites. On the other hand, FEMA emergency managers needed to provide housing that was safe from formaldehyde and other hazards. (They addressed THU safety issues by issuing advisories to THU occupants on 12/15/05 about propane heaters; on 2/11/06 about kerosene heaters and related hazards; on 2/21/06, about carbon monoxide; on 3/9/06, about propane heaters; and on 4/12/06, about electrical meters and other equipment; see <www.fema.gov/news/eventnews.fema?id=4808 >). These are just the safety advisories for the first year after Hurricane Katrina made landfall; there is also more general trailer safety information at <www.fema.gov/assistance/trailer.shtm>.)

Even after FEMA emergency managers received their first complaints about formaldehyde emissions in March 2006, there was no clear standard to indicate what was the action level that should be used to avoid an excessive level of risk. Available Material Safety Data Sheets (MSDSs) differ in their implied standards (e.g., Bluelinx 2004; Georgia Pacific 1998). In addition, federal agencies differed in their standards—all of which applied to other exposure situations (HUD 1984; ATSDR 2007; OSHA 1992)—or provided no standards at all (CPSC 1997; EPA 2007, 2008; OSHA 1992). Given that there was a severe housing shortage in the hurricane impact area, it would not necessarily have been appropriate to choose the standard involving the lowest level of formaldehyde exposure. Indeed, federal guidance regarding exposure to ionizing radiation is relevant here. EPA Protective Action Guides (PAGs) recognize that a permissible dose is not absolute; it depends on the benefits resulting from exposure. PAGs are higher for life saving actions than for other situations (EPA 1992; FEMA 1998). Thus, it was appropriate for FEMA emergency mangers to consider multiple objectives in choosing a course of action for supplying temporary housing for displaced households.

As noted earlier, it is not necessary to assume that FEMA emergency managers actually drew up a consequence matrix and estimated the error costs and probabilities for their decision about how to manage the potential threat of formaldehyde in THUs. Indeed, the discussion on the previous pages is simply a very detailed implementation of three simple heuristics ("mental rules of thumb") for making a decision. The first heuristic is "A very large population will always have a few extreme cases ('outliers')." Applied

LINDELL-004102

to households, this heuristic suggests there would be very few households with members who are sensitive to formaldehyde. Indeed, this heuristic is consistent with the fact that FEMA emergency managers had over 30 years experience in providing THUs with no complaints of formaldehyde. This "few outliers" heuristic also suggests there would be very few high emission THUs. Indeed, the scientific data on formaldehyde emissions in the THUs is also consistent with this heuristic (ATSDR 2007a, Table 1). The second heuristic is "The conjunction of two independent rare events will be extremely rare." Indeed, this common sense reasoning is consistent with statistical decision theory which, as noted earlier, indicates that the likelihood of sensitive households in high emission THUs would be quite unlikely. Finally, the third heuristic is "Individualized decisions are better than blanket policies." That is, it is better to make decisions on a "case-by-case basis" than to impose a "one-size-fits-all" solution on THU households. The common use of these terms in everyday life supports the likelihood that FEMA emergency managers would have used this heuristic when deciding how to respond to the potential formaldehyde threat in THUs.

## 8. FEMA emergency managers developed and implemented a comprehensive program for responding to the potential threat of formaldehyde.

Available documentation (e.g., FEMA 2008b) indicates that FEMA emergency managers developed a timely and effective program for responding to the potential threat of formaldehyde (FEMA 2008). Their actions span the four basic emergency response functions that emergency organizations must perform during incident response—emergency assessment, hazard operations, and population protection, and incident management (Lindell and Perry 1992; Lindell, Prater and Perry 2006). *Emergency assessment* consists of those diagnoses of past and present conditions and prognoses of future conditions that guide an emergency response. *Hazard operations* refers to expedient hazard mitigation actions that emergency personnel take to limit the magnitude or duration of disaster impact (e.g., sandbagging a flooding river or patching a leaking railroad tank car). *Population protection* refers to actions—such as sheltering in-place, evacuation, and mass immunization—that protect people from hazard agents. *Incident management* consists of the activities by which the human and physical resources used to respond to the emergency are mobilized and directed to accomplish the goals of the emergency response organization.

As FEMA (2008b) indicates, FEMA emergency managers engaged experts from other federal agencies having relevant scientific expertise regarding formaldehyde (June-August 2006). These included the Department of Energy's Lawrence Berkeley National Laboratory regarding the effectiveness of ventilation, cooling and dehumidification, the Environmental Protection Agency (EPA) regarding environmental sampling, and the Centers for Disease Control and Prevention's Agency for Toxic Substances and Disease Registry (CDC/ATSDR) regarding the health effects of formaldehyde. Other contacts included the National Center for Environmental Health and the National Institute for Occupational Safety and Health (May 2007). These contacts represent the incident management function of external coordination.

Second, FEMA emergency managers initiated a systematic assessment of ambient formaldehyde levels in different THUs under different conditions. This research represents the emergency assessment function of threat detection and classification.

- Conducted air sampling in THUs at staging areas to assess peak concentrations in stored units. (March-May 2006).
- Supported EPA tests on unoccupied THUs to assess the effectiveness of ventilation, cooling, and dehumidification in THUs at staging areas (September 2006).

LINDELL-004103

Third, FEMA emergency managers initiated collaboration with EPA and ATSDR to assess the effectiveness of ventilation, cooling, and dehumidification in reducing formaldehyde levels (June-August 2006). This represents the population protection function of protective action assessment and selection.

Fourth, FEMA emergency managers disseminated formaldehyde hazard information to the THU residents via multiple channels. These actions represent the population protection function of population warning.

- Used an established channel (the FEMA trailer maintenance line) to receive questions and complaints about formaldehyde in THUs (March 2006).
- Delivered brochures about formaldehyde health issues, mitigation strategies, and housing options to all trailer occupants (July-August 2006; July 2007).
- Issued press releases about formaldehyde exposure and the effectiveness of ventilating, cooling, and dehumidifying THUs (March 2007; May 2007).
- Established a toll-free number for formaldehyde information (July 2007).
- Established web pages on the FEMA and CDC web sites to provide information about formaldehyde health issues, as well as mitigation and population protection strategies (there are no creation dates listed on the web sites).

Fifth, FEMA emergency managers first offered THU exchange to occupants in March 2006, but this was done as a local initiative rather than an agency policy. Case-by-case THU exchange for those who complained about formaldehyde and were unsuccessful with venting was instituted during the summer of 2006 (Souza, 2008) and relocation was publicized as an agency policy in July 2007 (Souza, 2009). This action represents the population protection function of protective action implementation support.

Sixth, FEMA emergency managers acted to reduce the exposure of future THU residents. These actions represent the hazard operations function of hazard source control.

- Established new THU procurement policies that would result in lower formaldehyde exposures to households displaced in future disasters (November 2006).
- Suspended the new use of THUs with the highest formaldehyde levels—travel trailers and park model RVs (July 2007).
- Offered to refund the purchase price of travel trailers and park RVs that had been purchased (January 2008).
- Established a protocol for testing mobile homes assigned to households displaced in future disasters (March 2008).

Even when decision makers choose the best policy, that policy might not achieve its desired effects as rapidly or completely as the decision makers want because the policy must be implemented by subordinates who need to be selected, trained, and guided by standard operating procedures. In most cases, conditions in the field generate exceptions that have not been anticipated by policy makers so field units need to seek clarification and elaboration of the policy guidance that was previously issued. In the case of Hurricane Katrina THUs, the policy FEMA emergency managers chose was implemented by contractor personnel who may have had little or no previous experience in preparing and managing THUs as part of their job descriptions. This is because FEMA could only handle the sudden increase in workload following a disaster by hiring external contractors to supplement its permanent personnel. Because the provision of THUs was a temporary duty, it would have been much more difficult to ensure that service was provided at a level of quality that one would expect from the full-time permanent employees of a conventional landlord. As a consequence, installation, maintenance, removal of THUs could be expected to take time to reach the agency's desired level of effectiveness. The formulation of

LINDELL-004104

policy on formaldehyde assessment, mitigation, and population protection further complicated this process. Even though faster and more complete implementation would have been desirable, FEMA emergency managers appear to have implemented their policy in a reasonably timely and effective manner, given the circumstances within which they were operating.

**9. FEMA's formaldehyde communication program met prevailing standards of effectiveness and timeliness.**

There is general consensus on the basic elements of an effective program for communicating the risks of imminent and long-term threats to public health and safety (for discussions, see Lindell and Perry 2004; Lindell, Prater and Peacock 2007; Tierney et al. 2001). Lindell and Perry (2004) summarize the research literature as indicating that disaster warning systems have seven stages. First, authorities detect the environmental threat. Second, they monitor the threat to assess its significance for their communities. Third, authorities assess the threat in terms of its impact location, severity, certainty, immediacy, and duration. Fourth, they project the likely consequences for people and property in their communities. Based on this information, authorities decide if it is appropriate to issue warnings. If not, they resume monitoring the threat. If warnings are appropriate, they proceed to the fifth step, formulating one or more protective action recommendations. Sixth, authorities select message content, delivery channels, timing of issuance, and frequency of delivery. Last, they initiate warning dissemination.

*Threat detection*. In many cases, a threat is detected by specialized agencies such as the National Weather Service or US Geological Survey, but there are cases in which the threat is first detected by local authorities or even local residents. Emergency managers establish procedures to use appropriate scientific instrumentation (e.g., radar, rain/stream gauges, accelerometers) to detect all known hazards to which their communities are vulnerable and ensure that any threat that is detected will be transmitted to them.

*Monitoring and threat assessment*. Emergency managers observe threat indicators provided by scientific instrumentation and use this information together with exposure models to assess the significance of the threat to people and property within their jurisdictions.

*Consequence projection*. Emergency managers forecast the likely effects of hazard impact on people and property at future points in time. They use this information along with action thresholds to determine when protective action should be initiated.

*Protective action recommendations*. Emergency managers identify specific actions that households, businesses, and government agencies can take to reduce the threat to persons and property. Emergency managers also evaluate the suitability of these protective action actions in terms of their efficacy in protecting persons and property and also the resources required to implement these protective actions.

*Selection of message content, delivery channels, timing of issuance and frequency of delivery*. Emergency managers formulate warning messages that identify the source of the warning, the nature of threat, the expected location, timing and magnitude of impact, the potential personal consequences of exposure, high-risk groups requiring special actions, and appropriate protective action(s) that should be taken. The warning sources should be high in perceived credibility (expertise and trustworthiness) based on their scientific credentials, acceptance by other sources of established credibility, and past history of reliable performance. In particular, federal government agencies are the most credible sources for information about unfamiliar hazards such as radiological materials and toxic chemicals (Lindell and Perry 1992).

The warning message should also discourage any actions that might seem reasonable but are actually dangerous (e.g., evacuating through running water during floods), and provide contacts for further

26

LINDELL-004105

information. The warning messages should be clear, specific, and internally consistent to maximize the number of people at risk who will receive the message, pay attention to it, understand its meaning and recall relevant information when required. The message should be transmitted in languages other than English if there are significant non-English speaking population segments in the risk area.

Emergency managers should select the channels through which these warnings should be disseminated (Lindell and Perry 2004). Warning channels for very rapid onset (minutes to hours) emergencies include face-to-face, telephone, siren (mechanical and electronic), mobile loudspeaker (route alerting), radio (normal and tone alert), and television (broadcast and cable). Warning channels for slower onset (days or more) include the Internet, community meetings, and newspaper/magazine articles. In the much longer term (weeks to months), specialized brochures are also feasible. These channels can be evaluated in terms of their precision of dissemination (ability to warn all of those at risk and only those at risk), penetration of normal activities, message specificity, susceptibility to message distortion, rate of dissemination over time, sender capital and personnel training resources, receiver capital and training requirements, and ability to obtain feedback about warning reception and compliance.

*Initiate warning dissemination*. Emergency managers select an appropriate time at which the advisories should be issued. The time of issuance must balance the need for scientific certainty about the threat (which usually delays issuance) against the need for prompt action (which usually accelerates issuance). Emergency managers recognize that official warning systems (messages directly from authorities to those at risk) are unlikely to achieve 100% reception by those at risk. Consequently, they disseminate warning messages through multiple channels to maximize the number of people at risk who will receive the message. Specifically, they ensure that official warning information is transmitted indirectly through the mass media. However, they recognize that official warning information is also transmitted by informal warning networks consisting of peer contacts (among friends, relatives, neighbors, and coworkers). Emergency managers expect varying degrees of message distortion as information is transmitted through successive intermediate links in these informal networks. Thus, they provide mechanisms for managing warning recipients' information seeking by providing hotlines staffed by personnel who are trained to answer routine questions and to seek assistance from specialists for questions that they have not been trained to answer. The staff of these telephone hotlines a) confirm correct information, b) correct misinformation, and c) provide supplementary information to ensure that callers have an accurate assessment of the potential hazard and appropriate protective actions.

*Dissemination of Formaldehyde Information by Federal Agencies*

FEMA emergency managers distributed a brochure to all displaced households in travel trailers (FEMA, no date). In addition, FEMA and CDC both established formaldehyde web sites, <www.cdc.gov/nceh/ehhe/trailerstudy/formaldehyde.htm>   and   <www.fema.gov/hazard/hurricane/ 2005katrina/formaldehyde.shtm>, indicating that these agencies disseminated formaldehyde information through brochures and community meetings for THU residents and general press releases for the electronic (television and radio) and print (newspapers and magazines) news media. Finally, these agencies posted formaldehyde information on their web sites where it could be accessed from the internet. Each of the three major archival sources of formaldehyde information for THU residents—the FEMA *Travel Trailer* brochure, the FEMA formaldehyde web site, and the CDC formaldehyde web site—is presented and evaluated below.

*Formaldehyde Information in the FEMA Travel Trailer Brochure*

LINDELL-004106

The content of the FEMA *Travel Trailer* brochure (FEMA08-000013-000014) is reproduced in Table 7 (numbers identifying each section have been added to clarify the evaluation of this brochure that is presented in Table 8). An email from Martin McNeese to Edward Laundry, Sidney Melton, and Jon Arno (26 July 2006, 9:44AM FEMA17-001838) indicates that this brochure was distributed to all new leases, to existing leases during monthly maintenance visits, and to all THU occupants being recertified for continued occupancy.

**Table 7**. FEMA brochure, *Important Information for Travel Trailer Occupants*

| **1. If you notice an odor in your trailer—it could be formaldehyde.** |
| --- |
| **2. What is formaldehyde?**<br><br>Formaldehyde is a common indoor air pollutant that can be found in nearly all homes and buildings. It is a colorless gas that is released into the home from a variety of indoor sources. Formaldehyde can be found in a variety of every day products in your home such as:<br><br>**Household Products**: cleaning solutions, dishwashing liquids, fabric softeners, shoe-care agents, carpet cleaning solutions, adhesives<br>**Personal Care Products**: nail polish, cosmetics, shampoos, antiperspirants<br>**Fabrics**: clothing, linens, draperies, couch cushions, automobile interiors<br>**Appliances**: wood stoves, gas appliances, kerosene stoves<br>**Tobacco products**: cigarettes, cigars<br>**Building materials**: particleboard, plywood, cabinets, and wall and floor materials, wallpaper, and some other paper goods, paint coatings<br><br>As a result, travel trailers, mobile homes, manufactured homes, new homes, and recently remodeled homes are more likely to contain higher levels of formaldehyde. Over time, formaldehyde goes away and the odors and the effects decrease or disappear. |
| **3. How might formaldehyde affect me?**<br><br>Formaldehyde is just one of several gases present indoors that may cause discomfort. It may cause symptoms similar to that of the common cold or flu. Formaldehyde can affect people differently—some people are very sensitive to formaldehyde while others may not have any noticeable reaction to the same level. People with eye, skin, respiratory, or allergic conditions, and those with asthma are potentially more susceptible to the effects of formaldehyde. Children and the elderly may be more sensitive as well. People who suspect they are sensitive to formaldehyde should work closely with a doctor to see if formaldehyde is causing their symptoms. |
| **4. What can I do to reduce my exposure to formaldehyde in my travel trailer?**<br><br>• **Increase ventilation.** You can reduce your exposure to formaldehyde by bringing more outdoor air into your home. Open windows and doors whenever possible.<br><br>• **Keep indoor temperatures moderate.** As the temperature rises, the effects of formaldehyde may be more noticeable. You can use the air conditioner to keep temperatures relatively low, which will help lower the formaldehyde effects and odors<br><br>• **Lower the humidity**. You can decrease the rate at which formaldehyde is released from pressed wood and other products by lowering the humidity in your travel trailer. Humidity should be maintained at about 40% to 50% relative humidity in the home<br><br>• **Do not smoke inside.** Tobacco smoking produces formaldehyde and other toxic chemicals. |

The content of the FEMA *Travel Trailer* brochure can be evaluated according to the criteria for warning message evaluation presented in the previous section—warning source, nature of threat, expected

LINDELL-004107

location, timing and magnitude of impact; potential consequences of exposure, high-risk groups that require special actions, environmental cues (in this context, the functional equivalent would be personal health symptoms), recommended protective actions, contacts for further information, and dissemination in languages other than English. This evaluation is presented in Table 8.

**Table 8**. Evaluation of FEMA *Travel Trailer* Brochure.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This brochure is clearly labeled as coming from FEMA, the agency operating the THU program. |
| Nature of threat | Section 1 describes formaldehyde, whose name is probably known to many people but whose health threats are almost certainly unknown to most people other than toxicologists and industrial hygienists. |
| Expected location, timing and magnitude of impact | The location of impact is indicated by the title of the brochure and the last section of Section 1. The timing of impact is not explicitly addressed, although the brochure implies people have already been exposed. The magnitude of impact is not addressed in this brochure. |
| Potential personal consequences of exposure | Section 2 identifies the immediate consequences of formaldehyde exposure but does not discuss the potential long-term cancer risk. |
| Identity of high-risk groups that require special actions | The middle of Section 2 identifies people with eye, skin, respiratory, or allergic conditions, and those with asthma as high risk groups. |
| Environmental cues (health symptoms) | The last paragraph of Section 1 and the first paragraph of Section 2 identify the personal symptoms of formaldehyde exposure. Section 2 explains how formaldehyde symptoms are likely to be similar to those of more common conditions such as colds, influenza, and seasonal allergies. |
| Recommended protective action(s) | Section 2 recommends seeking medical assistance to determine if any adverse health symptoms are caused by formaldehyde. Section 4 describes four additional recommended protective actions: ventilation, cooling, dehumidification; and smoking cessation/limitation. |
| Contacts for further information | Section 4 identifies the FEMA hotline and the warning recipient's personal physician as sources for further information. |
| Dissemination in languages other than English | The available documentation does not indicate if this brochure is available in languages other than English. |

As Table 8 indicates, the FEMA *Travel Trailer* brochure generally meets the criteria for an acceptable warning message. FEMA is identified as the warning source but it would have been better to have the brochure co-sponsored by one or more credible scientific agencies such as the EPA or CDC. The nature of the threat is adequately identified, but the expected location, timing and magnitude of impact are somewhat ambiguous, and, therefore, not completely satisfactory. This aspect of the brochure would have been better if each copy had contained information about formaldehyde levels in the recipient's trailer. However, such an assessment would have required FEMA emergency managers to delay distribution of these brochures until each trailer had been assessed. Thus, the ambiguity about the actual magnitude of the potential threat in each travel trailer is an unavoidable consequence of the need to provide the best available information about recommended protective actions as soon as possible. The personal consequences of exposure are clearly described, as is the identity of high-risk groups that require special action. The environmental cues (personal health symptoms) of exposure are also clearly identified and five protective actions are recommended. There are no contacts listed for further information but an email from Martin McNeese to Sidney Melton (26 July 2006, 9:44AM FEMA17-001837) indicates that the

LINDELL-004108

omission of a contact phone number was deliberate rather than unintentional and the reason for the omission was that they were "trying to not generate a lot of calls". Given the thousands of households to which the brochures were to be distributed, it is not surprising that FEMA emergency managers would be concerned about being inundated by large numbers of "worried well"—people who would phone the call center even though they were at very low risk. Finally, the available documentation does not indicate if this brochure is available in languages other than English. Distribution of the brochure to all new leases, to existing leases during monthly maintenance visits, and to all THU occupants being recertified should have achieved 100% coverage of all displaced households in THUs.

*Formaldehyde Information in the FEMA Housing Occupants Brochure*

The content of the FEMA *Housing Occupants* brochure (FEMA08-000015) is reproduced in Table 9 (numbers identifying each section have been added to clarify the evaluation of this brochure that is presented in Table 10). A declaration by Mr. Kevin Souza (11 May 2009) indicates that this brochure was distributed to all THU occupants in July 2007.

**Table 9**. FEMA brochure, *Important Formaldehyde Information for FEMA Housing Occupants*

| **1. Why are you receiving this information?** |
|---|
| FEMA is providing this information to help you and your family better understand what formaldehyde is and how it could affect living and health conditions in your FEMA-provided housing unit. We are also providing you with a phone number where you can receive additional information about formaldehyde and discuss your disaster housing situation with a FEMA specialist. |
| **2. What is formaldehyde?** |
| Formaldehyde is a common indoor air pollutant that can be found in nearly all homes and buildings. It is a colorless gas that is released into the home from a variety of indoor sources. Formaldehyde can be found in a variety of materials used in home construction and products for everyday living. |
| **3. How might formaldehyde affect me and my family?** |
| There are several formaldehyde-related symptoms, such as watery eyes, runny nose, burning sensation in the eyes, nose, and throat, headaches and fatigue. These symptoms are similar to those associated with the common cold, the flu or other pollutants.<br><br>Formaldehyde can affect people differently. Some people may not have any noticeable reaction to formaldehyde; others are very sensitive to it. People with eye, skin, respiratory, or allergic conditions, and those with asthma are more likely to feel the effects of formaldehyde. Children and the elderly may be more sensitive as well.<br><br>The most common route of exposure is by breathing it, which may cause nose and eye irritation even in low levels. More serious health problems may be caused by extended exposure, including a small but increased risk of some forms of cancer.<br><br>If these symptoms lessen when you are away from your home but reappear when you return, your symptoms could be from indoor pollutants that may include formaldehyde or other indoor pollutants, such as dust, mold, or smoke.<br><br>If you are experiencing these symptoms, or suspect you are sensitive to formaldehyde, you should seek medical attention to see if formaldehyde may be causing your symptoms. |

LINDELL-004109

**Table 9**. *Important Formaldehyde Information for FEMA Housing Occupants* (Continued)

| |
|---|
| **4. Additional Information**<br>**If you have additional questions or concerns regarding formaldehyde in your**<br>**FEMA provided housing unit, please call:**<br><br>**1-866-562-2381**<br>**(TTY 1-800-462-7585)**<br><br>FEMA operators will immediately direct your call to specialists who will assist you with questions about:<br>• Formaldehyde and health related issues<br>• Other available FEMA housing assistance options; and<br>• Recently purchased FEMA housing units |

The content of the FEMA *Housing Occupants* brochure can be evaluated according to the criteria for warning message evaluation presented in the previous section—warning source, nature of threat, expected location, timing and magnitude of impact; potential consequences of exposure, high-risk groups that require special actions, environmental cues (in this context, the functional equivalent would be personal health symptoms), recommended protective actions, contacts for further information, and dissemination in languages other than English. This evaluation is presented in Table 10.

**Table 10**. Evaluation of FEMA *Housing Occupants* Brochure.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This brochure is clearly labeled as coming from FEMA, the agency operating the THU program. |
| Nature of threat | Section 1 describes formaldehyde, whose name is probably known to many people but whose health threats are almost certainly unknown to most people other than toxicologists and industrial hygienists. |
| Expected location, timing and magnitude of impact | The location of impact is indicated by the title of the brochure and the first sentence of Section 1 "how it could affect living and health conditions in your FEMA-provided housing unit." The timing of impact is not explicitly addressed, although the brochure implies people have already been exposed. The magnitude of impact is not addressed in this brochure. |
| Potential personal consequences of exposure | Section 3 identifies the immediate consequences of formaldehyde exposure in Paragraph 1, including the potential long-term cancer risk (in Paragraph 3). |
| Identity of high-risk groups that require special actions | The second paragraph of Section 2 identifies people with eye, skin, respiratory, or allergic conditions, and those with asthma or who are children or the elderly as high risk groups. |
| Environmental cues (health symptoms) | The first paragraph of Section 3 identifies the personal symptoms of formaldehyde exposure and how formaldehyde symptoms are likely to be similar to those of more common conditions such as colds, influenza, and other pollutants. |
| Recommended protective action(s) | The last paragraph of Section 3 recommends one protective action: seeking medical attention. |
| Contacts for further information | Section 4 identifies the FEMA hotline as a source for further information. |
| Dissemination in languages other than English | The available documentation does not indicate if this brochure is available in languages other than English. However, the TTY number indicates an ability to communicate with the hearing impaired. |

LINDELL-004110

As Table 10 indicates, the FEMA *Housing Occupants* brochure generally meets the criteria for an acceptable warning message. FEMA is identified as the warning source but it would have been better to have the brochure co-sponsored by one or more credible scientific agencies such as the EPA or CDC. The nature of the threat is adequately identified, but the expected location, timing and magnitude of impact are somewhat ambiguous, and, therefore, not completely satisfactory. As with the *Travel Trailer* brochure, information about formaldehyde levels in the recipient's trailer would have been desirable but would have delayed dissemination of the other information. The personal consequences of exposure are clearly described, as is the identity of high-risk groups that require special action. The environmental cues (personal health symptoms) of exposure are also clearly identified and one protective action is recommended. There are contact numbers listed for further information. Finally, the available documentation does not indicate if this brochure is available in languages other than English. Distribution of the brochure to all THU occupants should have achieved nearly 100% coverage.

*Formaldehyde Information on the FEMA Web Site*

The joint *FEMA/CDC/EPA* formaldehyde brochure titled *What You Should Know about Formaldehyde in Mobile Homes*, which is available at <www.fema.gov/pdf/media/2008/ know_form.pdf> (downloaded on 14 June 2009) is presented in Table 11. To facilitate identification of the sections of the brochure, identifying labels ("A", "B", "C", and "D") were inserted into the brochure that were not present in the original copy of the brochure. Although this brochure was downloaded from a web site, Page 1 Section D clearly indicates it was designed for distribution to displaced households occupying THUs.

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure.

| **Page 1** | |
|---|---|
| A. Purpose | This flyer tells you about testing of indoor air in mobile homes supplied by the Federal Emergency Management Agency (FEMA). Because FEMA has offered you a mobile home to use as temporary housing, you may want to know about these tests. This flyer also tells you how to keep the air inside your home healthy so you can stay well while living in a mobile home. |
| B. Background | In December 2007 and January 2008, the Centers for Disease Control and Prevention (CDC) tested FEMA-supplied trailers and mobile homes in Louisiana and Mississippi. CDC found some useful facts about trailers and mobile homes for residents living in these two states. Based on the study findings, FEMA is now testing every mobile home for formaldehyde before using them as temporary housing. **What CDC found out applies only to Louisiana and Mississippi, where they tested FEMA-supplied trailers and mobile homes.** The mobile home you are offered has been tested for formaldehyde levels, and an expert has made sure the results are correct. |
| C. What is formaldehyde? | Formaldehyde is a colorless, strong-smelling gas. It is used to make building materials and household products. Formaldehyde is used to make walls, cabinets, and furniture in trailers and mobile homes. |
| D. ***What was the level of formaldehyde measured in the mobile home FEMA has offered you?*** The level measured in your mobile home on _____ was _____ ppb. | |

LINDELL-004111

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure (Continued).

| Page 2 | |
|---|---|
| A. What happens when someone breathes too much formaldehyde? | Formaldehyde can make you feel sick if you breathe a lot of it. People can have symptoms such as:<br>• sore throat<br>• cough<br>• scratchy eyes<br>• nosebleeds<br>Scientists use the words "exposed" or "exposure" to talk about how people come in contact with a substance, such as formaldehyde. Some people are more sensitive than others, so an exposure that causes no problems for some people can make other people sick or uncomfortable. Some of these symptoms also happen with other upper respiratory illnesses, such as colds/flu and seasonal allergies, so if you have these symptoms we recommend that you see a doctor or another medical professional.<br>In general −<br>• If you are more sensitive to formaldehyde and are exposed to more of it for a longer time, you are more likely to have symptoms.<br>• If you are exposed to less formaldehyde for a shorter time, you are less likely to have symptoms, especially if you are not sensitive to formaldehyde.<br>Formaldehyde is known to cause cancer. The cancer of greatest concern is cancer of the nose and throat. Scientific research has not shown that a certain level of formaldehyde exposure causes cancer. However, the higher the level and the longer the exposure, the greater the chance of getting cancer. Exposure to formaldehyde might increase the chance of getting cancer even at levels too low to cause symptoms. |
| B. What was the level measured in the mobile home FEMA has offered me? | The level measured in your mobile home tells us the amount of formaldehyde that was there when FEMA did the test. It can also help you decide what kind of short-term housing will be best for your family. This level does not tell us how much formaldehyde you might breathe in while you live in your mobile home. When the mobile home was new, or during hot weather, the level might have been higher. Because there are no laws or regulations for formaldehyde, there is not a single number that will tell us if your mobile home's level is high or low. Please look at the chart below to help you understand your mobile home's level. |

33

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure (Continued).

| Page 3 | |
|---|---|
| A. 1000-100 | If your reading falls into the **higher range**, you need to place a high priority on lowering your exposure to formaldehyde. This is especially important if family members are elderly, young children, or have health conditions such as asthma. |
| 100-10 | If your reading falls into the **intermediate range**, your risk of irritation from formaldehyde exposure is lower, but it is still important to take steps to reduce your formaldehyde exposure. This is especially important if family members are elderly, young children, or have health conditions such as asthma. |
| 10-1 | If your reading falls into the **intermediate range**, your risk of irritation from formaldehyde exposure is lower, but it is still important to take steps to reduce your formaldehyde exposure. This is especially important if family members are elderly, young children, or have health conditions such as asthma. |
| | Note: Levels are expressed at parts per billion (ppb). To convert to parts per million (ppm), divide by 1000. |
| B. | In addition to the formaldehyde level, you should think about other factors.<br>• **Age.** Formaldehyde exposure is a special concern for children and the elderly. Children may become sensitive to formaldehyde more easily, which may make it more likely they will become sick. Elderly people may be less able to tolerate high formaldehyde exposures. If children or elderly people are in your mobile home, it is important to reduce their exposure to formaldehyde.<br>• **Health conditions.** Formaldehyde irritates the airways. People with asthma, bronchitis, or other breathing conditions are especially sensitive to formaldehyde. People with other chronic diseases also may be less able to tolerate formaldehyde exposure. Pregnant women and their unborn children may not be at higher risk, but they should be careful about exposure. If anyone in your mobile home has any of these conditions, it is important to reduce their exposure to formaldehyde.<br>• **How the mobile home is used.** Some people are in their mobile home for many hours of the day. Other people are in their home only for short stays. The more time you spend in your home, the more important it is to lower your formaldehyde exposure. |
| C. What does this mean for my family? | FEMA-supplied mobile homes are meant for temporary, emergency housing. Mobile home residents should try to move to permanent housing. Families living in mobile homes with children, elderly persons or persons who already have an illness like asthma should try to find permanent housing as soon as possible. |
| D. How can I improve the air quality in my mobile home? | ***To protect yourself from formaldehyde exposure:***<br>• Open windows as much as possible to let in fresh air.<br>• Try to keep the temperature inside mobile homes at the lowest comfortable setting.<br>• Run the air conditioner or dehumidifier to control mold.<br>• Also, spend as much time outdoors in fresh air as possible. This is especially important for families with children, elderly people or those with chronic diseases such as asthma. |

34

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure (Continued).

| Page 4 | |
|---|---|
| A. | ***To control mold:*** <br> • Fix water leaks to help keep mold away. <br> • Clean away any mold you see or smell detergent and water. <br> ***In addition:*** <br> • Be sure to bring in fresh air when you use cleaning products and insecticides. To do this, open windows or run the air conditioner. Be sure the air conditioner is bringing in air from outside. <br> • Do not smoke, and especially do not smoke indoors. <br>    If you smell gas, do not light any flames or sparks and leave the trailer right away. <br>    If you have health concerns, see a doctor or another medical professional. |
| B. You will need to make a choice about the mobile home offered to you. | There is no federal standard for formaldehyde in indoor air. Houses in the United States generally have a level of about 10 to 50 ppb <br> ***For mobile homes with higher levels (50-80 ppb):*** <br> The formaldehyde level in this mobile home is above that usually seen in houses but is below the levels that usually cause acute health effects in sensitive people. There are benefits to reducing the level. While you are in the mobile home, please follow the steps listed in this flyer to improve the air quality. <br> ***For mobile homes with medium levels (10-50 ppb):*** <br> The formaldehyde level in your mobile home was not in the highest range but there are still benefits to reducing the level. While you are in the mobile home, please follow the steps listed in this flyer to improve the air quality. <br> ***For mobile homes with low levels (below 10 ppb):*** <br> Even though the formaldehyde level in your mobile home was low, you can still improve the air quality by following the steps listed in this flyer. |
| C. Where can I find help? | CDC's study of formaldehyde in trailers and mobile homes, please call CDC toll-free at **1-800-CDC-INFO**. <br> ***If you have questions about your mobile home, please call FEMA at 1-866-562-2381 (TTY 1-800-462-7585).*** |

As was the case with the previous brochures, the *CDC/FEMA/EPA* brochure can be evaluated according to the criteria for warning message evaluation presented previously—warning source, nature of threat, expected location, timing and magnitude of impact; potential consequences of exposure, identity of high-risk groups that require special actions, environmental cues (personal health symptoms), recommended protective actions, contacts for further information, and dissemination in languages other than English. This evaluation is presented in Table 12.

35

LINDELL-004114

**Table 12**. Evaluation of *CDC/FEMA/EPA* Brochure.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This brochure is located on the FEMA web site, but the flyer itself is cosponsored by CDC and EPA. |
| Nature of threat | Page 1, Section C of the brochure describes formaldehyde and its common sources. |
| Expected location, timing and magnitude of impact | The location of impact is clearly indicated in Page 1 Section D, which refers to "the level of formaldehyde measured in the mobile home FEMA has offered you". The timing of impact is clearly indicated by the date of the formaldehyde measurements and the magnitude of impact is clearly indicated by the airborne concentration of formaldehyde in parts per billion (ppb). |
| Potential personal consequences of exposure | Page 2 Section A identifies the immediate consequences of formaldehyde exposure and the last paragraph of this section describes the long-term cancer risk. |
| Identity of high-risk groups that require special actions | Page 3 Section B identifies seniors and children as well as those with asthma, bronchitis, and lung and other chronic conditions as high risk groups. |
| Environmental cues (health symptoms) | On Page 2 Section A, the first paragraph identifies personal symptoms of formaldehyde exposure and the second paragraph explains how formaldehyde symptoms are similar to those of more common conditions (e.g., colds, influenza, and seasonal allergies). |
| Recommended protective action(s) | Page 2, Section A recommends seeing a doctor or another medical professional if symptoms of a formaldehyde reaction are present. Page 3 Section D describes five more recommended protective actions: ventilation, cooling, dehumidification, mold abatement, and spending time outside. Page 4 Section A provides further information about mold abatement, as well as smoking cessation and medical assistance. Page 4 Section B provides ranges of formaldehyde but these do not constitute action levels because all categories make the same protective action recommendations. |
| Contacts for further information | Page 4 Section C identifies the CDC hotline for further information about indoor air quality, formaldehyde health effects, the CDC's study of formaldehyde in THUs, and the FEMA hotline as a source for information about the recipient's THU. |
| Dissemination in languages other than English | This web page is available in English and 12 other languages (Spanish, Chinese, Croatian, French, Haitian-Creole, Italian, Japanese, Korean, Russian, Tagalong, Urdu, and Vietnamese). |

As Table 12 indicates, the *CDC/FEMA/EPA* formaldehyde brochure clearly meets the criteria for an acceptable warning message. The information sources are clearly identified as FEMA and two of its partners (CDC and EPA); both of the latter are credible scientific agencies. CDC is a public health agency specializing in biomedical science whereas EPA is an agency that specializes in environmental health. The nature of the threat is adequately identified, as are the expected location, timing, and magnitude of impact. The personal consequences of exposure are clearly described, as is the list of high-risk groups that require special actions. The environmental cues (personal health symptoms) of exposure are also clearly identified and six protective actions are recommended. There are contacts for further information and the brochure is available in 12 languages other than English. This brochure was sent out later than the *Travel Trailer* and *Housing Occupants* brochures so it includes more information than was available at an earlier stage of the crisis.

*Formaldehyde Information on the FEMA Web Site*

LINDELL-004115

The information in the CDC web page formaldehyde advisory, titled *FEMA-Provided Travel Trailer Study* at <www.cdc.gov/nceh/ehhe/trailerstudy/ formaldehyde.htm> (copied and pasted directly from the web page on 14 June 2009) is presented in Table 13. To facilitate identification of the sections of the brochure, section numbers were inserted that were not present on the web site.

**Table 13**. CDC Web Page Formaldehyde Advisory.

| **FEMA-Provided Travel Trailer Study** |
|---|
| **Section 1. What is Formaldehyde?** |
| Formaldehyde is a common chemical in our environment. Sources of formaldehyde in the environment may include: |
| o        Household sources, such as fiberglass, carpets, permanent press fabrics, paper products, and some household cleaners, |
| o        Manufactured wood products used in new mobile homes, |
| o        Cigarettes and other tobacco products, gas cookers, and open fireplaces, |
| o        Smog |
| Exposure to low levels of formaldehyde may cause irritation of the eyes, nose, throat, and skin. It is possible that people with asthma may be more sensitive to the effects of inhaled formaldehyde. |
| **Section 2. What happens when someone breathes too much formaldehyde?** |
| Formaldehyde can make you feel sick if you breathe a lot of it. People can have symptoms such as: |
| o        sore throat |
| o        cough |
| o        scratchy eyes |
| o        nosebleeds |
| Scientists use the words "exposed" or "exposure" to talk about how people come in contact with a substance, such as formaldehyde. Some people are more sensitive than others, so an exposure that causes no problems for some people can make other people sick or uncomfortable. Some of these symptoms also happen with other upper respiratory illnesses, such as colds/flu and seasonal allergies, so if you have these symptoms we recommend that you see a doctor or another medical professional. |
| In general – |
| o        If you are more sensitive to formaldehyde and are exposed to more of it for a longer time, you are more likely to have symptoms. |
| o        If you are exposed to less formaldehyde for a shorter time, you are less likely to have symptoms, especially if you are not sensitive to formaldehyde. |
|        Formaldehyde is known to cause cancer. The cancer of greatest concern is cancer of the nose and throat. However, the higher the level and the longer the exposure, the greater the chance of getting cancer. Exposure to formaldehyde might increase the chance of getting cancer even at levels too low to cause symptoms. |
| **Section 3. How can I improve the air quality in my mobile home?** |
| To protect yourself from formaldehyde exposure: |
| o        Open windows as much as possible to let in fresh air. |
| o        Try to keep the temperature inside mobile homes at the lowest comfortable setting. |
| o        Run the air conditioner or dehumidifier to control mold. |
| o        Also, spend as much time outdoors in fresh air as possible. This is especially important for families with children, elderly people or those with chronic diseases such as asthma. |
| To control mold: |
| o        Fix water leaks to help keep mold away. |
| o        Clean away any mold you see or smell detergent and water. |
| In addition: |
| o        Be sure to bring in fresh air when you use cleaning products and insecticides. To do this, open windows or run the air conditioner. Be sure the air conditioner is bringing in air from outside. |
| o        Do not smoke, and especially do not smoke indoors. |
| o        If you smell gas, do not light any flames or sparks and leave the trailer right away. |
| o        If you have health concerns, see a doctor or another medical professional. |
| **Section 4. Where can I find help?** |
| People living in FEMA-Provided Travel Trailers who are concerned about the level of formaldehyde in their trailers and the possible health risks of contact with formaldehyde should seek appropriate assistance. |
| o        For concerns about conditions in your trailer, contact FEMA at 1-866-562-2381 (TTY 1-800-462-7585). |

LINDELL-004116

o          For concerns about medical problems that you think may be related to the trailer, talk to a doctor or other medical professional.

The CDC web page advisory can also be evaluated according to the criteria used previously. As Table 14 indicates, the CDC web page formaldehyde advisory generally met the criteria for an acceptable warning message. The warning source, which is a credible scientific agency (in this case, a public health agency specializing in biomedical science), is adequately identified and the nature of the threat is adequately identified. The expected location, timing and magnitude of impact are somewhat ambiguous, and, therefore, not completely satisfactory. The personal consequences of exposure are clearly described, as are the high-risk groups that require special actions. The environmental cues (personal health symptoms) of exposure are also clearly identified and five protective actions are recommended. There are contacts for further information but the web page is only available in English.

**Table 14**. Evaluation of CDC Web Page Formaldehyde Advisory.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This advisory is located on the web site of the Centers for Disease Control and Prevention, a federal agency that has relevant credentials for health and safety threats, and which is administratively independent of the FEMA emergency managers who are operating the THU program. |
| Nature of threat | Section 1 of the advisory describes formaldehyde, shoes name is probably known to many people but whose health threats are almost certainly unknown to most people other than toxicologists and industrial hygienists. |
| Expected location, timing and magnitude of impact | The location of impact is indicated indirectly by the title of the web page, *FEMA-Provided Travel Trailer Study*. The timing of impact is not explicitly addressed, although web site visitors would presumably only be visiting if they believed they had already been exposed. The magnitude of impact is not addressed on this web page. |
| Potential personal consequences of exposure | The first paragraph of Section 2 identifies the immediate consequences of formaldehyde exposure and the last paragraph of this section describes the long-term cancer risk. |
| Identity of high-risk groups that require special actions | The last paragraph of Section 1 identifies asthma patients as a high risk group. |
| Environmental cues (health symptoms) | The last paragraph of Section 1 and the first paragraph of Section 2 identify the personal symptoms of formaldehyde exposure. Section 2 explains how formaldehyde symptoms are likely to be similar to those of more common conditions such as colds, influenza, and seasonal allergies. |
| Recommended protective action(s) | Section 3 describes five recommended protective actions: ventilation/cooling/dehumidification; spending time outside; mold abatement; smoking cessation/limitation; medical assistance. |
| Contacts for further information | Section 4 identifies the FEMA hotline and the warning recipient's personal physician as sources for further information. |
| Dissemination in languages other than English | This web page is only available in English. |

38

LINDELL-004117

10. **FEMA emergency managers made reasonable progress in assisting displaced households to move from temporary shelter to temporary housing and from temporary housing to permanent housing.**

FEMA emergency managers did a reasonable job of managing the duration of displaced households' formaldehyde exposure. They moved displaced households from temporary shelter to temporary housing and from temporary housing to permanent housing in a timely and effective manner, given their limited control over the conditions in which they operated. FEMA emergency managers' first set of problems with respect to the timing of post-disaster housing arose from the fact that they had limited control over the rate at which displaced households moved from temporary shelter to temporary housing. Storm damage determined the number of households requiring assistance, whereas the THU manufacturers' production capacity determined the rate at which THUs became available, and state and local land use policies determined the rate at which the THUs could be sited. With regard to the latter factor, some studies indicate local jurisdictions passed ordinances preventing the siting of THUs in their communities immediately after Hurricane Katrina (Aldrich and Crook 2008; Davis and Bali 2006). Thus, FEMA emergency managers had limited control over the rate at which displaced households could be moved from temporary shelter to temporary housing.

FEMA emergency managers' second set of problems with respect to the timing of post-disaster housing arose from the fact that they had limited control over the rate at which displaced households moved from temporary housing to permanent housing. The first obstacle to the transition to permanent housing was that the affected communities appear to have lacked disaster recovery plans (Lindell et al. 2006; Schwab, Topping, Eadie, Deyle and Smith 1998). The lack of a recovery plan typically arises from three misconceptions, the first of which is that a disaster recovery effort can be improvised after the emergency response is complete. In fact, a timely and effective disaster recovery requires a significant amount of data collection that will delay the recovery if postponed until after the emergency response is over. The second misconception is that there will be ample time to plan the recovery during the emergency response. However, the recovery process should be designed before the disaster strikes so planners can conduct a rapid assessment of "lessons learned" from the disaster impact. Finally, the third misconception is that the objective of disaster recovery should be to restore the community to the conditions that existed before the disaster. This will simply reproduce the community's existing disaster vulnerability, so it is necessary to build support for hazard mitigation before disaster strikes so it can be incorporated into the disaster recovery. Thus, it appears that communities failed to establish Recovery/Mitigation Committees before Hurricane Katrina struck that could formulate a vision of community disaster recovery and articulate the basic strategies that would be implemented before and after disaster impact (Evans-Cowley and Gough 2007). Communities that waited until after the disaster to accomplish these tasks were sure to experience delays in their recovery until these tasks were accomplished.

The second obstacle to displaced households' movement from temporary housing to permanent housing was that construction cannot begin until debris has been cleared and local infrastructure has been restored (Phillips 2009). Electric power, water and sewer services, and roadways are not only essential for reoccupancy, they are also necessary during the reconstruction process itself. Moreover, people are often unwilling to move back to their former neighborhoods until they are sure that public facilities such schools, hospitals, police and fire stations, and libraries will be rebuilt. The greater the scope and intensity

LINDELL-004118

of the damage, the longer it takes to restore this community infrastructure. Moreover, the rate at which this infrastructure is rebuilt depends on the financial viability of the local jurisdictions, but this has been problematic in the case of New Orleans. Previous research on disaster recovery has concluded that disasters accentuate existing demographic and economic trends (Rubin, Saperstein and Barbee 1985), so New Orleans' continuous demographic and economic decline over the past four decades compounded this obstacle to recovery (Weiss 2006).

The third obstacle in the transition to permanent housing is that displaced households often take a long time to secure financing for reconstruction. When a disaster has severely damaged a large number of structures, the time to secure financing increases dramatically because of the insufficient number of local insurance adjusters. Even when major insurance companies bring in insurance adjustors from outside the area, insurance settlements are often delayed if there is dispute over the amount of the reimbursement. In some major disasters, local or regional insurance companies have provided inadequate payments, causing protracted lawsuits, or even gone bankrupt because their obligations exceeded their financial reserves (Peacock and Girard 1997). Delays can also be caused by disputes over whether the damage was caused by wind (covered by homeowner's policies) or water (covered only by separate flood insurance). This was especially relevant after Hurricane Katrina because much of the damage was caused by storm surge. If there is ambiguity about whether the damage to a structure was caused by wind or flood, there is likely to be an extended time period in which a homeowner negotiates with the insurance company about which was the cause of the damage. If homeowners do not have insurance, or have inadequate insurance, they must qualify for FEMA grants, SBA loans, or other sources of funding such as grants or loans from state or local government or non-governmental organizations. These delays can significantly extend the length of time that the homeowner must remain in temporary housing.

The fourth obstacle in the transition to permanent housing is that securing a building contractor with an agreement on project scope, cost, and schedule also can take a long time. The availability of reliable contractors is limited after major disasters because of the dramatic increase in demand. The disparity between the increased demand and limited local supply is met by the in-migration of construction companies, skilled tradespersons (e.g., electricians and plumbers), and semi-skilled and unskilled laborers from outside the impact area. However, the scarcity of local housing and substantial increases in rents can limit the number of construction workers that can move into the area. Even when adequate number of workers can be put to work, limits can arise on the number of hours they can work each day if they must commute long distances from the nearest available housing.

The fifth obstacle in the transition to permanent housing is the lengthy time it takes to obtain building permits and building inspections. Here also, there are shortages of trained personnel after major disasters. The number of local permit processers that is adequate for normal rates of construction is inadequate after a major disaster. For example, there was a more than 20-fold increase in the number of building permits per month in the months after the Northridge earthquake (Wu and Lindell 2004). The processes of permitting and inspection can be further delayed when the destruction of housing value reduces local governments' income from property taxes. This, in turn, can lead local jurisdictions to lay off permit and inspection personnel at the same time the demand for their services is increasing. A related problem is that many homes affected by Hurricane Katrina had more than 50% damage—more than 287,000 were severely damaged or destroyed (NLIHC 2005). This is important because homes that exceed this level must usually be upgraded to meet current building codes. In turn, this increases the cost and time required to process the permit as well as the time and cost to rebuild. As is the case with insurance disputes, the

LINDELL-004119

delay caused by code requirements would also extend the length of time that displaced households must remain in temporary housing.

The final obstacle in the transition to permanent housing is the length of time required to accomplish the actual construction. Most directly, the time to rebuild the household's original home depends on the size and complexity of the structure, as well as the severity of the damage to that structure (Al-Nammari and Lindell, in press). However, a dramatic increase in the number of construction projects, compared to the time before the disaster, creates severe shortages in equipment and materials that further delay the reconstruction process. In the case of Hurricane Katrina, there was an extraordinary amount of competition for these resources after Katrina that was caused by the landfall of the six other hurricanes that struck that same year (Weiss 2006).

For any given household, these obstacles can compound each other, so delays early in the reconstruction process cause even greater delays later in the process as applicants "go to the end of the line" in the recovery process. That is, households that take a long time to secure funding are likely to take even longer to obtain building permits, find building contractors, and complete construction. In summary, the length of time households must spend in temporary housing is determined by factors that are beyond the control of the household or any single government agency or private sector organization—including FEMA. Frequently, the reconstruction of rental housing, such as apartment buildings, lags behind the reconstruction of owner-occupied housing because only the latter are eligible for federal assistance. Thus, it takes even longer for those who normally rent—which means a disproportionate percentage of displaced households from low income groups—to find housing in their pre-disaster communities. This is precisely the demographic segment that is most likely to have moved into THUs to begin with, so they are the households that are likely to take the longest time to move out of them.

41

LINDELL-004120

# References

Aldrich, D.P. and Crook, K. (2008). "Strong Civil Society as a Double-Edged Sword: Siting Trailers in Post-Katrina New Orleans." *Political Research Quarterly*, 61, 379-389.

Al-Nammari, F.M. and Lindell, M.K. (in press). "Earthquake Recovery of Historic Buildings: Exploring Cost and Time Needs." *Disasters*.

ATSDR—Agency for Toxic Substances and Disease Registry. (2007a). *Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Baton Rouge, Louisiana*. Atlanta GA: Author.

ATSDR—Agency for Toxic Substances and Disease Registry. (2007b). *An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling at FEMA Temporary-Housing Trailers, Baton Rouge, Louisiana, September-October, 2006*. Atlanta GA: Author.

Blank, H., Musch, J. and Pohl, R.F. (2007). "Hindsight Bias: On Being Wise After The Event." *Social Cognition*, 25(1), 1-9.

Bluelinx. (2004). *Material Safety Data Sheet: Urea-Formaldehyde Bonded Wood Products*. Atlanta GA: Author.

Boin, A. and 't Hart, P. (2006). "The Crisis Approach." Pp. 42-54 in *Handbook of Disaster Research*, edited by H. Rodriguez, E.L. Quarantelli and R.R. Dynes. New York: Springer.

Bolin, R.C. (1982). *Long Term Family Recovery from Disaster.* Boulder CO: University of Colorado Institute of Behavioral Science.

Bolin, R.C. (1993). *Household and Community Recovery after Earthquakes.* Boulder CO: University of Colorado Institute of Behavioral Science.

CDC—Centers for Disease Control and Prevention. (2008a). *Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Atlanta GA: Author.

CDC—Centers for Disease Control and Prevention. (2008b). *Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Atlanta GA: Author.

CDC/FEMA—Centers for Disease Control and Prevention/Federal Emergency Management Agency. (no date). *Formaldehyde Levels in FEMA-Supplied Trailers: Early Findings from the Centers for Disease Control and Prevention.* Atlanta GA and Washington DC: Authors.

Clemen, R. (1996). *Making Hard Decisions*. Pacific Grove CA: Duxbury.

Comerio, M. (1997). "Housing Issues after Disasters." *Journal of Contingencies and Crisis Management*, 5, 166-178.

Comerio, M. (1998a). *Disaster Hits Home: New Policy for Urban Housing Recovery*. Berkeley: University of California Press.

Comerio, M. (1998b). "Hazards Mitigation and Housing Recovery—Watsonville and San Francisco One Year Later." Pp. 29-34 in *The Loma Prieta, California, Earthquake of October 17, 1989—Recovery, Mitigation and Reconstruction*, edited by J.M. Nigg. Washington DC: U.S. Geological Survey.

CPSC—Consumer Products Safety Commission. (1997). *An Update on Formaldehyde, 1997 Revision*. Washington DC: Author.

42

Dash, N., Peacock, W.G. and Morrow, B.H. (1997). "And the Poor Get Poorer: A Neglected Black Community." Pp. 206-225 in *Hurricane Andrew: Ethnicity, Gender and the Sociology of Disaster*, edited by W.G. Peacock, B. H. Morrow and H. Gladwin. London: Routledge.

Davis, B.C. and Bali, V. (2006). "Not in My District: The Placement of FEMA Trailer Parks." Paper presented at the *Sixth Annual State Politics and Policy Conference*. Texas Tech University-Lubbock

Enarson, E. (1999). "Women and Housing Issues in Two U.S. Disasters: Case Studies from Hurricane Andrew and the Red River Valley Flood." *International Journal of Mass Emergencies and Disasters*, 17(1), 39-63.

EPA—Environmental Protection Agency. (1992). *Manual of Protective Action Guides and Protective Actions for Nuclear Incidents,* EPA 400-R-92-001. Available at < www.epa.gov/rpdweb00/rert/ pags.html#status>

EPA—Environmental Protection Agency. (2007). *Basic Information; Formaldehyde*. Available at <www.epa.gov.iaq/formalde.html>

EPA—Environmental Protection Agency. (2008). *An Introduction to Indoor Air Quality*. Available at <www.epa.gov.iaq/formalde.html>

Evans-Cowley, J.S. and Gough, M.Z. (2007). "Is Hazard Mitigation Being Incorporated into Post-Katrina Plans in Mississippi?" *International Journal of Mass Emergencies and Disasters*, 25(3), 177-217.

FEMA—Federal Emergency Management Agency. (no date). *Important Information for Travel Trailer Occupants*. Washington DC: Author.

FEMA—Federal Emergency Management Agency. (1998). *Radiological Emergency Response Independent Study*, IS-301. Washington DC; Author

FEMA—Federal Emergency Management Agency. (2005a). *Florida Hurricane Recovery Progress*. http://www.fema.gov/news/newsrelease.fema?id=17419.

FEMA—Federal Emergency Management Agency. (2005b). *Recovery: FEMA Housing Units Drop Below 10,000*. http://www.fema.gov/news/newsrelease.fema?id=17812.

FEMA—Federal Emergency Management Agency. (2008a). *FEMA's Ongoing Response to Formaldehyde*. Washington DC: Author.

FEMA—Federal Emergency Management Agency. (2008b). *Formaldehyde Timeline*. Washington DC: Author.

Fischer, W. and Sard, B. (2005). *Bringing Katrina's Poorest Victims Home: Targeted Federal Assistance Will Be Needed to Give Neediest Evacuees Option to Return to Their Hometowns*. Washington DC: Center on Budget and Policy Priorities.

Fischhoff, B. (1975). "Hindsight ≠ Foresight: The Effect of Outcome Knowledge on Judgment Under Uncertainty." *Journal of Experimental Psychology: Human Perception and Performance*, 1(3), 288-299.

Garratt, D. and Stark, J.W. (2009). *Post Katrina Disaster Response and Recovery: Evaluating FEMA's Continuing Efforts in the Gulf Coast and Response to Recent Disasters: Statement before the House Transportation and Infrastructure Committee Subcommittee on Economic Development, Public Buildings, and Emergency Management*.

Georgia Pacific. (1998). *Material Safety Data Sheet: Urea-Formaldehyde Bonded Wood Products*. Atlanta GA: Author.

LINDELL-004122

HUD—Department of Housing and Urban Development. (1984). *Manufactured Home Construction and Safety Standards*. 24 CFR Part 3280.

Lindell, M.K., Lu, J.C., and Prater, C.S. (2005). "Household Evacuation Decision Making in Response to Hurricane Lili." *Natural Hazards Review*, 6, 171-179.

Lindell, M.K. and Perry, R.W. (1992). *Behavioral Foundations of Community Emergency Planning*. Washington DC: Hemisphere Press.

Lindell, M.K. and Perry, R.W. (2004). *Communicating Environmental Risk in Multiethnic Communities*. Thousand Oaks CA: Sage.

Lindell, M.K., Prater, C.S. and Peacock, W.G. (2007). "Organizational Communication and Decision Making in Hurricane Emergencies." *Natural Hazards Review*, 8, 50-60.

Lindell, M.K., Prater, C.S. and Perry, R.W. (2006). *Fundamentals of Emergency Management*. Emmitsburg MD: Federal Emergency Management Agency Emergency Management Institute. Available at <www.training.fema.gov/EMIWeb/edu/fem.asp>.

Louie, T.A., Rajan, M.N. and Sibley, R.E. (2007). "Tackling the Monday-Morning Quarterback: Applications of Hindsight Bias in Decision-Making Settings." *Social Cognition*, 25(1), 32-47.

Maddalena, R.L., Russell, M., Sullivan, D.P. and Apte, M.G. (2008). *Interim Report: VOC and Aldehyde Emissions in Four FEMA Temporary Housing Units*. Berkeley CA: Lawrence Berkeley National Laboratory.

Mileti, D.S., Sorensen, J.H. and O'Brien, P.W. (1992). "Toward an Explanation of Mass Care Shelter Use in Evacuations." *International Journal of Mass Emergencies and Disasters, 10*, 25-42.

Morrow, B.H. (1997). "Stretching the Bonds: The Families of Andrew." Pp. 141-170 in *Hurricane Andrew: Ethnicity, Gender and the Sociology of Disaster*, edited by W.G. Peacock, B.H. Morrow and H. Gladwin. London: Routledge.

National Low-Income Housing Coalition. (2005). *Hurricane Katrina's Impact on Low Income Housing Units*, Research Note #05-02. As cited in Sard, B. and Rice, D. (2005). *Changes Needed in Katrina Transitional Housing Plan to Meet Families' Needs*. Washington DC: Center on Budget and Policy Priorities.

Nigg, J.M., Barnshaw, J. and Torres, M.R. (2006). "Hurricane Katrina and the Flooding of New Orleans: Emergent Issues in Sheltering and Temporary Housing." *The Annals of the American Academy of Political and Social Science*, 604,113-128

OSHA—Occupational Health and Safety Administration. (1992). *Occupational Exposure to Formaldehyde*, 29 CFR Part 1910.

Peacock, W.G. and Girard, C. (1997). "Ethnic and Racial Inequalities in Hurricane Damage and Insurance Settlements." Pp. 171-190 in *Hurricane Andrew: Ethnicity, Gender and the Sociology of Disaster*, edited by W.G. Peacock, B. H. Morrow and H. Gladwin. London: Routledge.

Peacock, W.G., Morrow, B. and Gladwin, H. (1997). *Hurricane Andrew: Gender, Ethnicity and the Sociology of Disasters*. London: Routledge.

Phillips, B.D. (1993). "Cultural Diversity in Disasters: Sheltering, Housing, and Long-Term Recovery." *International Journal of Mass Emergencies and Disasters*, 11(1), 99-110.

Phillips, B.D. (1998). "Sheltering and Housing of Low-Income and Minority Groups in Santa Cruz County after the Loma Prieta Earthquake." Pp. 17-28 in *The Loma Prieta, California, Earthquake of*

LINDELL-004123

*October 17, 1989—Recovery, Mitigation and Reconstruction*, edited by J.M. Nigg. Washington DC: U.S. Geological Survey.

Phillips, B.D. (2009). *Disaster Recovery*. Boca Raton FL: CRC Press.

Quarantelli, E.L. (1982). *Sheltering and Housing after Major Community Disasters*. Columbus OH: Ohio State University Disaster Research Center.

Raiffa, H. (1968). *Decision Analysis*. Reading MA: Addison-Wesley

Rubin, C.B., Saperstein, M.D. and Barbee, D.G. (1985). *Community Recovery from a Major Natural Disaster*. Monograph # 41. Boulder: University of Colorado, Institute of Behavioral Science

Schwab, J., Topping, K.C., Eadie, C.C., Deyle, R.E. and Smith, R.A. (1998). *Planning for Post-Disaster Recovery and Reconstruction,* PAS Report 483/484. Chicago IL: American Planning Association.

SEDA Council of Governments (1975). *Northumberland County Disaster Housing Plan*. Lewisburg PA: Author (NTIS PB-250 646).

Smith, S.K. and McCarty, C. (2006). "Demographic Effects of Natural Disasters: A Case Study of Hurricane Andrew". *Demography*, 33, 265-275.

Souza, K. (2008). Declaration of Kevin Souza, 14 May 2008. *In Re: FEMA Trailer Formaldehyde Products Liability Litigation*. U.S. District Court, Eastern District of Louisiana.

Souza, K. (2009). Declaration of Kevin Souza, 11 May 2009. *In Re: FEMA Trailer Formaldehyde Products Liability Litigation*. U.S. District Court, Eastern District of Louisiana.

Tierney, K.J., Lindell, M.K. and Perry, R.W. (2001). *Facing the Unexpected: Disaster Preparedness and Response in the United States*. Washington DC: Joseph Henry Press.

Tobin, G.A., Bell, H.M., Whiteford, L.M. and Montz, B.E. (2006). "Vulnerability of Displaced Persons: Relocation Park Residents in the Wake of Hurricane Charley." *International Journal of Mass Emergencies and Disasters*, 24(1), 77–109.

Weiss, N.E. (2006). *Rebuilding Housing after Hurricane Katrina: Lessons Learned and Unresolved Issues*. Washington DC: Congressional Research Service.

Wu, J.Y. and Lindell, M.K. (2004). "Housing Reconstruction after Two Major Earthquakes: The 1994 Northridge Earthquake in the United States and the 1999 Chi-Chi Earthquake in Taiwan." *Disasters*, 28, 63-81.

Yelvington, K.A. (1997). "Coping in a Temporary Way: The Tent Cities." Pp. 92-115 in *Hurricane Andrew: Ethnicity, Gender and the Sociology of Disaster,* edited by W.G. Peacock, B.H. Morrow and H. Gladwin. London: Routledge.

LINDELL-004124

# Appendix 1: Complete Bibliography

Abramson, D., Stehling-Ariza, T., Garfield, R. and Redlener, I. (2008). Prevalence and Predictors of Mental Health Distress Post-Katrina: Findings from the Gulf Coast Child and Family Health Study. *Disaster Medicine and Public Health Preparedness*, 2, 77-86.

Aldrich, D.P. and Crook, K. (2008). Strong Civil Society as a Double-Edged Sword: Siting Trailers in Post-Katrina New Orleans. *Political Research Quarterly*, 61, 379-389.

Al-Nammari, F.M. and Lindell, M.K. (in press). Earthquake Recovery of Historic Buildings: Exploring Cost and Time Needs. *Disasters*.

ATSDR—Agency for Toxic Substances and Disease Registry. (2007a). *Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Baton Rouge, Louisiana*. Atlanta GA: Author.

ATSDR—Agency for Toxic Substances and Disease Registry. (2007b). *An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling at FEMA Temporary-Housing Trailers, Baton Rouge, Louisiana, September-October, 2006*. Atlanta GA: Author.

Berke, P.R., Kartez, J. and Wenger, D.E. (1993). Recovery after Disaster: Achieving Sustainable Development, Mitigation and Equity. *Disasters*, 17, 93-109.

Blank, H., Musch, J. and Pohl, R.F. (2007). Hindsight Bias: On Being Wise after the Event. *Social Cognition*, 25(1), 1-9.

Bluelinx. (2004). *Material Safety Data Sheet: Urea-Formaldehyde Bonded Wood Products*. Atlanta GA: Author.

Boettke, P., Chamlee-Wright, E., Gordon, P., Ikeda, S., Leeson, P.T., Sobel, R. (2007). The Political, Economic, and Social Aspects of Katrina. *Southern Economic Journal*, 74(2), 363-76.

Boin, A. and 't Hart, P. (2006). The Crisis Approach. In H. Rodriguez, E.L. Quarantelli and R.R. Dynes (eds.) *Handbook of Disaster Research* (pp. 42-54). New York: Springer.

Bolin, R.C. (1982). *Long Term Family Recovery from Disaster.* Boulder CO: University of Colorado Institute of Behavioral Science.

Bolin, R.C. (1993). *Household and Community Recovery after Earthquakes.* Boulder CO: University of Colorado Institute of Behavioral Science.

Bolin, R.C. (1986). Post-Disaster Sheltering and Housing: Social Processes in Response and Recovery. R.R. Dynes and K.J. Tierney (eds.) *Disasters, Collective Behavior and Social Organization* (pp. 115-127). Newark DE: University of Delaware Press.

Bolin, R.C. and Bolton, P.A. (1993). *Race, Religion, and Ethnicity in Disaster Recovery.* Boulder CO: University of Colorado Institute of Behavioral Science.

Bolin, R.C. and Stanford, L. (1990). Sheltering and Housing Issues in Santa Cruz County. In R. Bolin (ed.) *The Loma Prieta Earthquake: Studies of Short-Term Impacts* (pp. XXX-XXX). Boulder CO: University of Colorado Institute of Behavioral Science. (Request ILL)

Bolin, R.C. and Stanford, L. (1991). Shelters, Housing and Recovery: A Comparison of U.S. Disasters. *Disasters*, 45, 25-34. (Search stacks)

Bolin, R. C. and Stanford, L. (1998). Community-Based Approaches to Unmet Recovery Needs. *Disasters*, *22*, 21-38.

46

Bolin, R. C. and Stanford, L. (1998). *The Northridge Earthquake: Vulnerability and Disaster*. London: Routledge.

Brettschneider, B. (2008). Climatological Hurricane Landfall Probability for the United States. *Journal of Applied Meteorology and Climatology*, 47(2), 704–716.

Brodie, M., Weltzien, E., Altman, D., Blendon, R.J. and Benson, J.M. (2006). Experiences of Hurricane Katrina Evacuees in Houston Shelters: Implications for Future Planning. *American Journal of Public Health*, 96, 1402-1408.

Brookings Institution and GNOCDC (2008). *Anniversary Edition: Three years after Katrina*. New Orleans: Greater New Orleans Community Data Center. Available at www.gnocdc.org

CDC—Centers for Disease Control and Prevention. (2008a). *Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Atlanta GA: Author.

CDC —Centers for Disease Control and Prevention. (2008b). *Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Atlanta GA: Author.

CDC/FEMA—Centers for Disease Control and Prevention/Federal Emergency Management Agency. (no date). *Formaldehyde Levels in FEMA-Supplied Trailers: Early Findings from the Centers for Disease Control and Prevention.* Atlanta GA and Washington DC: Authors.

Chappell, W.F., Forgette, R.G., Swanson, D.A. and van Boening, M.V. (2007). Determinants of Government Aid to Katrina Survivors: Evidence from Survey Data, *Southern Economic Journal*, 74(2), 344-362.

Clarkson, P. M., Emby, C, and Watt, V. W. S. (2002). Debiasing the Outcome Effect: The Role Of Instructions In An Audit Litigation Setting. *Auditing: A Journal of Practice and Theory, 21(2), 7-20.*

Clemen, R. (1996). *Making Hard Decisions*. Pacific Grove CA: Duxbury. (Search stacks)

Comerio, M. (1997). Housing Issues after Disasters. *Journal of Contingencies and Crisis Management*, 5, 166-178.

Comerio, M. (1998a). *Disaster Hits Home: New Policy for Urban Housing Recovery*. Berkeley: University of California Press.

Comerio, M. (1998b). Hazards Mitigation and Housing Recovery—Watsonville and San Francisco One Year Later. In J.M. Nigg (ed.) *The Loma Prieta, California, Earthquake of October 17, 1989—Recovery, Mitigation and Reconstruction* (pp. 29-34). Washington DC: U.S. Geological Survey.

Cossman, R. (2007). Hurricane Katrina as a Natural Experiment of "Creative Destruction". *Journal of the Mississippi Academy of Sciences*, 52(4), 281-288.

CPSC—Consumer Products Safety Commission. (1997). *An Update on Formaldehyde, 1997 Revision*. Washington DC: Author.

Cossman, R. (2007). Hurricane Katrina as a Natural Experiment of "Creative Destruction". *Journal of the Mississippi Academy of Sciences*, 52(4), 281-288.

Cutter, S.L., Emrich, C.T., Mitchell, J.T., Boruff, B.J., Gall, M., Schmidtlein, M.C., Burton, C.G. and Melton, G. (2006). The Long Road Home: Race, Class, and Recovery from Hurricane Katrina. *Environment*, 48(2), 8-20.

Dash, N., Peacock, W.G. and Morrow, B.H. (1997). And the Poor Get Poorer: A Neglected Black Community. In W.G. Peacock, B. H. Morrow and H. Gladwin, *Hurricane Andrew: Ethnicity, gender and the sociology of disaster* (pp. 206-225). London: Routledge.

Davis, B.C. and Bali, V. (2006). Not in My District: The Placement of FEMA Trailer Parks. Paper presented at the *Sixth Annual State Politics and Policy Conference*. Texas Tech University-Lubbock

Eckel, C., Grossman, P.J. and Milano, A. (2007). Is More Information Always Better? An Experimental

LINDELL-004126

Study of Charitable Giving and Hurricane Katrina. *Southern Economic Journal*, 74(2), 388-411.

Elsner, J.B. and Kara, A.B. (1999). *Hurricanes of the North Atlantic: Climate and Society*. New York: Oxford University Press. (Search stacks)

Enarson, E. (1999). Women and Housing Issues in Two U.S. Disasters: Case Studies from Hurricane Andrew and the Red River Valley Flood. *International Journal of Mass Emergencies and Disasters*, 17(1), 39-63.

Enarson, E. and Morrow, B.H. (1997). A Gendered Perspective: The Voices of Women. In W.G. Peacock, B. H. Morrow and H. Gladwin, *Hurricane Andrew: Ethnicity, gender and the sociology of disaster* (pp. 116-140). London: Routledge.

EPA—Environmental Protection Agency. (1992). *Manual of Protective Action Guides and Protective Actions for Nuclear Incidents,* EPA 400-R-92-001. Available at < www.epa.gov/rpdweb00/rert/pags.html#status>

EPA—Environmental Protection Agency. (2007). *Basic Information; Formaldehyde*. Available at <www.epa.gov.iaq/formalde.html>

EPA—Environmental Protection Agency. (2008). *An Introduction to Indoor Air Quality*. Available at <www.epa.gov.iaq/formalde.html>

Evans-Cowley, J.S. and Gough, M.Z. (2007). Is Hazard Mitigation Being Incorporated into Post-Katrina Plans in Mississippi? *International Journal of Mass Emergencies and Disasters*, 25(3), 177-217.

Ewing, B.T., Kruse, J.B., and Sutter, D. (2007), Hurricanes and Economic Research: An Introduction to the Hurricane Katrina Symposium. *Southern Economic Journal*, 74(2), 315-25.

FEMA—Federal Emergency Management Agency. (no date, a). *Important Information for Travel Trailer Occupants*. Washington DC: Author.

FEMA—Federal Emergency Management Agency. (no date, b). *FEMA Travel Trailers*. Available at www.fema.gov/assistance/trailer.shtm.

FEMA—Federal Emergency Management Agency. (no date, c). *FEMA Travel Trailer FAQs*. Available at www.fema.gov/assistance/dafaq.shtm#travel.

FEMA—Federal Emergency Management Agency. (1998). *Radiological Emergency Response Independent Study*, IS-301. Washington DC; Author

FEMA—Federal Emergency Management Agency. (2005a). *Florida Hurricane Recovery Progress.* http://www.fema.gov/news/newsrelease.fema?id=17419.

FEMA—Federal Emergency Management Agency. (2005b). *Recovery: FEMA Housing Units Drop Below 10,000*. http://www.fema.gov/news/newsrelease.fema?id=17812.

FEMA—Federal Emergency Management Agency. (2008a). *FEMA's Ongoing Response to Formaldehyde*. Washington DC: Author.

FEMA—Federal Emergency Management Agency. (2008b). *Formaldehyde Timeline*. Washington DC: Author.

Fischer, W. and Sard, B. (November 2005). *Bringing Katrina's Poorest Victims Home: Targeted Federal Assistance Will Be Needed to Give Neediest Evacuees Option to Return to Their Hometowns*. Washington DC: Center on Budget and Policy Priorities.

Fischhoff, B. (1975). Hindsight ≠ Foresight: The Effect of Outcome Knowledge on Judgment under Uncertainty. *Journal of Experimental Psychology: Human Perception and Performance,* 1(3), 288-299.

Fothergill, A. (2004). *Heads above Water: Gender, Class and Family in the Grand Forks Flood.* Albany: State University of New York Press. (Search stacks)

LINDELL-004127

Garratt, D. and Stark, J.W. (2009). *Post Katrina Disaster Response and Recovery: Evaluating FEMA's Continuing Efforts in the Gulf Coast and Response to Recent Disasters: Statement before the House Transportation and Infrastructure Committee Subcommittee on Economic Development, Public Buildings, and Emergency Management.*

Georgia Pacific. (1998). *Material Safety Data Sheet: Urea-Formaldehyde Bonded Wood Products*. Atlanta GA: Author.

Gill, D., Ladd, A.E. and Marszlek, J. (2007). College Students' Experiences with Hurricane Katrina: A Comparison Between Students from Mississippi State University and Three New Orleans Universities, *Journal of the Mississippi Academy of Sciences*, 52(4), 262-280.

Gill, D.A. (2007). Secondary Trauma or Secondary Disaster? Insights from Hurricane Katrina. *Sociological Spectrum*, 27, 613-632

Girard, C. and Peacock, W.G. (1997). Ethnicity and Segregation: Post-Hurricane Relocation. In Peacock, W.G., Morrow, B.H., and Gladwin, H. (Eds). *Hurricane Andrew: Ethnicity, Gender and the Sociology of Disasters* (pp. 191-205). New York: Routledge.

Harley, E.M. (2007). Hindsight Bias in Legal Decision Making. *Social Cognition*, 25(1), 48-63.

HUD—Department of Housing and Urban Development. (1984). *Manufactured Home Construction and Safety Standards*. 24 CFR Part 3280.

Ink, D. (2006). An Analysis of the House Select Committee and White House Reports on Hurricane Katrina. *Public Administration Review*, 66(6), 800-807.

Kamin, K.A. and Rachlinski, J.J. (1995). Ex Post Not = Ex Ante: Determining Liability in Hindsight. *Law and Human Behavior,* 19, 89-104.

Kinnell, A.M. and Dellinger, K. (2007). Challenges of Collecting Survey Data on the Mississippi Gulf Coast after Hurricane Katrina: An In-Depth Interview Study of Survey Team Members, *Journal of the Mississippi Academy of Sciences*, 52(4), 223-227.

Landry, C.E., Bin, O., Hindsley, P., Whitehead, J.C. and Wilson, K. (2007). Going Home: Evacuation-Migration Decisions of Hurricane Katrina Survivors. *Southern Economic Journal*, 74(2), 326-343.

Larrance, R., Anastario, M. and Lawry, L. (2007). Health Status among Internally Displaced Persons in Louisiana and Mississippi Travel Trailer Parks. *Annals of Emergency Medicine*, 49, 590-601.

Lee, M.R., Weil, F.D. and Shihadeh, E.S. (2007). The FEMA Trailer Parks: Negative Perceptions and the Social Structure of Avoidance. *Sociological Spectrum*, 27, 741-766.

Lindell, M.K., Lu, J.C., and Prater, C.S. (2005). Household Evacuation Decision Making in Response to Hurricane Lili. *Natural Hazards Review, 6*, 171-179.

Lindell, M.K. and Perry, R.W. (1992). *Behavioral Foundations of Community Emergency Planning.* Washington DC: Hemisphere Press.

Lindell, M.K. and Perry, R.W. (2004). *Communicating Environmental Risk in Multiethnic Communities.* Thousand Oaks CA: Sage.

Lindell, M.K., Prater, C.S. and Peacock, W.G. (2007). Organizational communication and decision making in hurricane emergencies. *Natural Hazards Review*, 8, 50-60.

Liu, A., Fellowes, M. and Mabanta, M. (2006). *Special Edition of the Katrina Index: A One-Year review of Key Indicators of Recovery in Post-Storm New Orleans*. Washington DC: Brookings Institution/Metropolitan Policy Program.

Lindell, M.K., Prater, C.S. and Perry, R.W. (2006). *Fundamentals of Emergency Management.* Emmitsburg MD: Federal Emergency Management Agency Emergency Management Institute. Available at www.training.fema.gov/EMIWeb/edu/fem.asp.

LINDELL-004128

Louie, T.A., Rajan, M.N. and Sibley, R.E. (2007). Tackling the Monday-Morning Quarterback: Applications of Hindsight Bias in Decision-Making Settings. *Social Cognition*, 25(1), 32-47.

Maddalena, R.L., Russell, M., Sullivan, D.P. and Apte, M.G. (2008). *Interim Report: VOC and Aldehyde Emissions in Four FEMA Temporary Housing Units*. Berkeley CA: Lawrence Berkeley National Laboratory.

Menzel, D.C. (2006). The Katrina Aftermath: A Failure of Federalism or Leadership. *Public Administration Review*, 66(6), 808-812.

Mileti, D.S., Sorensen, J.H. and O'Brien, P.W. (1992). Toward an Explanation of Mass Care Shelter Use In Evacuations. *International Journal of Mass Emergencies and Disasters, 10*, 25-42.

Morrow, B.H. (1997). Stretching the bonds: The families of Andrew. In W.G. Peacock, B. H. Morrow and H. Gladwin, *Hurricane Andrew: Ethnicity, gender and the sociology of disaster* (pp. 141-170). London: Routledge.

Morrow-Jones, H.A. and Morrow-Jones, C.R. (1991). Mobility Due to Natural Disaster: theoretical Considerations and Preliminary Analyses. *Disasters*, 15(2), 126-132.

Murnane, R. J., Barton, C., Collins, E., Donnelly, J., Elsner, J., Emanuel, K., Ginis, I., Howard, S., Landsea, C., Liu, K-b., Malmquist, D., McKay, M., Michaels, A., Nelson, N., O'Brien, J., Scott, D., Webb III T. 2000. Model estimates hurricane wind speed probabilities, *EOS, Transactions of the American Geophysical Union,* 81(38), 433- 438.

National Low-Income Housing Coalition. (2005). *Hurricane Katrina's Impact on Low Income Housing Units*, Research Note #05-02. As cited in Sard, B. and Rice, D. (2005). *Changes Needed in Katrina Transitional Housing Plan to Meet Families' Needs*. Washington DC: Center on Budget and Policy Priorities.

Neal, D.M. and Phillips, B.D. (1995). Effective Emergency Management Organizations: Reconsidering the Bureaucratic Approach. *Disasters*, 19, 327-337.

Nigg, J.M., Barnshaw, J. and Torres, M.R. (2006). Hurricane Katrina and the Flooding of New Orleans: Emergent Issues in Sheltering and Temporary Housing. *The Annals of the American Academy of Political and Social Science*, 604,113-128

OSHA—Occupational Health and Safety Administration. (1992). *Occupational Exposure to Formaldehyde*, 29 CFR Part 1910.

Peacock, W.G. and Girard, C. (1997). Ethnic and Racial Inequalities in Hurricane Damage and Insurance Settlements. Pp. 171-190 in W.G. Peacock, B. H. Morrow and H. Gladwin (Eds.), *Hurricane Andrew: Ethnicity, Gender and the Sociology of Disaster.* London: Routledge.

Peacock, W.G., Morrow, B. and Gladwin, H. (1997). *Hurricane Andrew: Gender, Ethnicity and the Sociology of Disasters*. London: Routledge.

Phillips, B.D. (1993). Cultural diversity in disasters: sheltering, housing, and long-term recovery. *International Journal of Mass Emergencies and Disasters*, 11(1), 99-110.

Phillips, B.D. (1998). Sheltering and housing of low-income and minority groups in Santa Cruz County after the Loma Prieta earthquake. In J.M. Nigg (Ed.) *The Loma Prieta, California, Earthquake of October 17, 1989—Recovery, Mitigation and Reconstruction* (pp. 17-28). Washington DC: U.S. Geological Survey.

Phillips, B.D. (2009). *Disaster Recovery*. Boca Raton FL: CRC Press.

Pierre, J.K. and Stephenson, G.S. (2007). After Katrina: A Critical Look at FEMA's Failure to Provide Housing for Victims of Natural Disasters. Louisiana Law Review, 68, 1-46.

LINDELL-004129

Quarantelli, E.L. (1982a). *Sheltering and Housing after Major Community Disasters*. Columbus OH: Ohio State University Disaster Research Center.

Quarantelli, E.L. (1982b) *Sheltering and Housing after Major Community Disasters: Case Studies and General Observations*. Newark DE: Disaster Research Center.

Quarantelli, E.L. (1982c). General and Particular Observations on Sheltering and Housing after American Disasters. *Disasters*, 6, 277-281.

Raiffa, H. (1968). *Decision Analysis*. Reading MA: Addison-Wesley

Regnier, E. (2008). Doing Something about the Weather. *Omega*, 36(1), 22-32.

Regnier, E. (2008). Public Evacuation Decisions and Hurricane Track Uncertainty, *Management Science*, 54(1), 16-28.

Regnier, E. and Harr, P.A. (2006). A Dynamic Decision Model Applied to Hurricane Landfall. *Weather and Forecasting*, 21(5), 764–780.

Rubin, C.B., Saperstein, M.D. and Barbee, D.G. (1985). *Community Recovery from a Major Natural Disaster.* Monograph # 41. Boulder: University of Colorado, Institute of Behavioral Science

Sard, B. and Rice, D. (October 2005) *Changes Needed in Katrina Transitional Housing Plan to Meet Families' Needs.* Washington DC: Center on Budget and Policy Priorities.

Schwab, J., Topping, K.C., Eadie, C.C., Deyle, R.E. and Smith, R.A. (1998). *Planning for Post-Disaster Recovery and Reconstruction,* PAS Report 483/484. Chicago IL: American Planning Association.

SEDA Council of Governments (1975). *Northumberland County Disaster Housing Plan*. Lewisburg PA: Author (NTIS PB-250 646).

Sittig, M. (1985). Formaldehyde. *Handbook of Toxic and Hazardous Chemicals*, 2nd. Ed. (pp. 462-464). Park Ridge NJ: Noyes Publications.

Smith, S.K. (1996). Demography of Disaster: Population Estimates after Hurricane Andrew. *Population Research and Policy Review*, 15 (5-6), XXX-XXX. (Search stacks)

Smith, A.C. and Greene, E. (2005). Conduct and Its Consequences: Attempts at Debiasing Jury Judgments. *Law and Human Behavior,* 29(5), 505-526.

Smith, S.K. and McCarty, C. (2006). Demographic Effects of Natural Disasters: A Case Study of Hurricane Andrew, *Demography*, 33, 265-275.

Solura, B. and Cosby, A. (2007). The Role of Information and Communication Technology (ICT) in the Resilianece of Educational Institutions in the Wake of Hurricane Katrina, *Journal of the Mississippi Academy of Sciences*, 52(4), 243-261.

Souza, K. (2008). Declaration of Kevin Souza, 14 May 2008. *In Re: FEMA Trailer Formaldehyde Products Liability Litigation.* U.S. District Court, Eastern District of Louisiana.

Souza, K. (2009). Declaration of Kevin Souza, 11 May 2009. *In Re: FEMA Trailer Formaldehyde Products Liability Litigation.* U.S. District Court, Eastern District of Louisiana.

Spence, P.R., Lachlan, K.A. and Burke, J.M. (2007). Adjusting to Uncertainty: Coping Strategies among the Displaced after Hurricane Katrina, *Sociological Spectrum*, 27, 653-678.

Stallard, M. J., and Worthington, D. L. (1998). Reducing the Hindsight Bias Utilizing Attorney Closing Arguments. *Law and Human Behavior, 22,* 671-683.

Stringham*, E.P. and Snow, N.A. (2008).* The Broken Trailer Fallacy: Seeing the Unseen Effects of Government Policies in Post-Katrina New Orleans. *International Journal of Social Economics*, 35, 480-489.

LINDELL-004130

Swanson, D., Forgette, R., Van Boening, M., Holley, C. and Kinnell, A.M. (2007). Assessing Katrina's Demographic and Social Impacts on the Mississippi Gulf Coast- *The Journal of the Mississippi Academy of Sciences,* 52, 228-242.

Thomas, S.A. (2007). Lies, Damn Lies, and Rumors: An Analysis of Collective Efficacy, Rumors, and Fear in the Wake of Katrina. *Sociological Spectrum*, 27, 679-703.

Tierney, K.J. (1988). Social aspects of the Whittier Narrows earthquake. *Earthquake Spectra*, 4, 11-23. (Request ILL)

Tierney, K.J., Lindell, M.K. and Perry, R.W. (2001). *Facing the Unexpected: Disaster Preparedness and Response in the United States.* Washington DC: Joseph Henry Press.

Tobin, G.A., Bell, H.M., Whiteford, L.M. and Montz, B.E. (2006). Vulnerability of Displaced Persons: Relocation Park Residents in the Wake of Hurricane Charley. *International Journal of Mass Emergencies and Disasters*, 24(1), 77–109.

Verderber, S. (2008). Emergency housing in the Aftermath of Hurricane Katrina: An Assessment of the FEMA Travel Trailer Program. *Journal of Housing and the Built Environment*, 23, 367–381.

Weiss, N.E. (2006). *Rebuilding Housing after Hurricane Katrina: Lessons Learned and Unresolved Issues*. Washington DC: Congressional Research Service.

Whitt, S. and Wilson, R.K. (2007). Public Goods in the Field: Katrina Evacuees in Houston. *Southern Economic Journal*, 74, 377-387.

Woods, J.M. and Lewis, H. (2005). Statement. *Hearings of the United Nations Special Rapporteur on Extreme Poverty, Dr. Arjun Sengupta, on the Aftermath of Hurricane Katrina*. Available at ssrn.com/abstract=1330582.

Wu, J.Y. and Lindell, M.K. (2004). Housing Reconstruction after Two Major Earthquakes: The 1994 Northridge Earthquake in the United States and the 1999 Chi-Chi Earthquake in Taiwan. *Disasters*, *28*, 63-81.

Yelvington, K.A. (1997). Coping in a Temporary Way: The Tent Cities. In W.G. Peacock, B. H. Morrow and H. Gladwin, *Hurricane Andrew: Ethnicity, gender and the sociology of disaster* (pp. 92-115). London: Routledge.

Zeigler, Brunn and Johnson (1996). Focusing on Hurricane Andrew Through the Eyes Of the Victims. *Area*, 28(2), 124-129. (search stacks)

LINDELL-004131

## Appendix 2: Materials Provided by the U.S. Department of Justice

**Background Materials**:
Federal Rule of Civil Procedure 26(2)
FEMA Bellwether Trials - Master Schedule
Pretrial Order No. 34
Bellwether Trial Plaintiffs PFS Symptoms
   Summary
Complaint, Age v. Gulf Stream, 09-2892
   (Alexander Complaint)
Trial I Scheduling Order
Alana M. Alexander PFS
Christopher J. Cooper PFS
Alexander SF-95
Alexander Denial Letter
Cooper SF-95
Cooper Denial Letter
Complaint, Crawford v. Fleetwood, 09-2893
   (Jenkins Complaint)
Trial II Scheduling Order
Shalahn Jenkins PFS
Craig Jenkins Jr. PFS
Shalahn Jenkins SF-95
Shalahn Jenkins Denial Letter
Complaint, Wright v. Forest River, 09-2977
Trial III Scheduling Order
Lyndon T. Wright PFS
Complaint, Bell v. Keystone, 09-2967
Trial IV Scheduling Order
Diana Bell PFS
Diana Bell SF-95
Diana Bell Denial Letter

**Case Background Documents:**
Summary of LBNL Interim VOC Report
PSC 002113 - 2166
Formaldehyde Levels in Occupied THUs
PSC 002167 - 2181
CDC Interim Findings on Formaldehyde Levels
PSC 002182 - 2202
CDC Final Report on Formaldehyde Levels
CDC 000208 - 268
ATSDR Health Consultation 2/1/07
PSC 002264 - 2277

ATSDR Updated and Revised Health
   Consultation 10/07
PSC 002278 - 2318
MSDS Sheets
PSC 003068 - 3091
EPA Basic Information for Formaldehyde
PSC 003214 - 3217
EPA Introduction to Indoor Air Quality
EPA 000001 - 4
HUD Rules and Regulations re: Formaldehyde
HUD 000001 - 48
CDC/FEMA Formaldehyde Exposure in Homes
CDC 000269 - 274
Consumer Products Safety Commission Update
   on Formaldehyde
CPSC 000001 - 000012
Important Information for TT Occupants
FEMA08 0000013 - 15
FEMA's Ongoing Response to Formaldehyde
FEMA10 000209 - 211
Formaldehyde Levels, Early Findings
FEMA 08-000011 - 12

**FEMA IA Files:**
Alexander Disaster File
FEMA 137-000001 - 86
Jenkins Disaster File
FEMA 133-000001 - 209
Wright Disaster File
FEMA 124-000001 - 78
Bell Disaster File
FEMA 138-000001 - 137

**Deposition Transcripts:**
FEMA 30(b)(6) (9/23/08)

**Formaldehyde Timeline:**
FEMA Timeline
FEMA10-000325 - 337

**U.S. Filings:**
Document 196

LINDELL-004132

Document 1545
WH-00003-17
LARR-00001-16
FEMA09-000344-352
Fact Sheet on Providing Continued Assistance
   from FEMA
FEMA09-00110-272
FEMA09-000353-358
FEMA09-000331-332
Declaration of Kevin Souza
HUD-00001-14
Declaration of Brian McCreary
FEMA07-00001-19
FEMA10-000213-250
FEMA10-000310-324
FEMA10-000280-309
FEMA10-000272-279
FEMA10-000251-271
Declaration of Stephen Miller
FEMA09-00073-74
Declaration of Clifford Oliver
FEMA10-000209-211
FEMA09-000326-330
ATSDR_FEMA-00001-14
ATSDR-00001-352
FEMA09-000081-85
FEMA09-00001-9
FEMA09-00086-363
FEMA10-000163-164
June 18, 2006 email
FEMA08-00013-14
RATSDR_FEMA00001-23
FEMA10-000190-000192
FEMA10000193-194
FEMA08-000015
FEMA10-000198-208
FEMA10-000195-197
ATSDR-000470-472
FEMA08-000011-12, FEMA08-000017-18
FEMA-00022-55
FEMA-000438-514
FEMA-000196-237
EPA Document Entitled, "Indoor Air Quality"
ATSDR_MRL-00001-10

FEMA09-000333-343
FEMA10-000340-341
FEMA10-000325-337
Excerpted pages from the transcript of the
   Motion to Certify Class
Excerpted pages of the deposition transcript of
   Patricia M. Williams
Declaration of Michael Lapinski (May 6, 2009)
Declaration of Clyde Payne (May 15, 2009)
FEMA17-006702-6704
Declaration of Bronson Brown (May 14, 2009)
FEMA09-000363
Excerpted pages from the deposition transcript
   of Fleetwood Enterprises, Inc.
Fleetwood deposition Exhibit 10, 2006 Owner's
   Manual.
FLE-00005672
ATSDR-00001; ATSDR-000025; ATSDR-
   0000329
EPA-000001-4
CPSC-000001-12
FEMA17-005982-84
FEMA123-000001-15
OSH001-004338
FEMA09-000364-380
FEMA09-000362
March 21, 2006 email
FEMA17-0003670-71
Declaration of Stephen C. Miller
FEMA09-000360-361
Excerpted pages from the deposition transcript
   of Jack Hume
FEMA09-000088-89
Declaration of David Garratt (May 12, 2009)
Declaration of Keven Souza (May 11, 2009)
FEMA17-007073-7076
FEMA10-000183-184
FEMA000013-14
"Trailer Manufacturers and Elevated
   Formaldehyde Levels Manual"
Excerpted pages from the deposition transcript
   of Gulf Stream Coach, Inc.
Excerpted pages from the deposition transcript
   of Kenneth Melchiorre

54

CH2M-FEMA(Sub2)-006379-006381
Excerpted pages from the deposition transcript
  of Michael Bonner
FEMA17-023196
FEMA17-000520-521
CDC104-001024-1026
Declaration of Joseph Little (May 12, 2009)
Declaration of Martin McNeese (May 8, 2009)
FEMA17-002458-2459
FEMA17-022333
FEMA17-02236-2267
FEMA17-004817-4818
FEMA10-000163-164
FEMA17-024461
FEMA17-000111-112
FEMA17-001838

**FEMA/CDC Formaldehyde Contact**
  **Documents:**
FEMA09 386-387
FEMA09 408-424
FEMA09 402-407
FEMA10 378
FEMA09 388-389
FEMA10 386-390
FEMA10 384-385
CDC 26-78
CDC 157
CDC152-153
CDC 84
CDC 154

CDC 180-181
CDC 165-166
CDC 177-179
CDC 164
CDC 158-160
CDC 171
CDC 167-169
CDC 170
CDC 82
CDC 83
FEMA09 390-391
CDC 146-149
CDC 161-163
CDC 79-80
CDC 80-81
CDC 7-25
CDC 112-120
CDC 121-132
CDC 133-145
CDC 150-151
FEMA09 385
FEMA09 381-383
FEMA09 384
CDC 85-96
CDC 97-111
FEMA09 425-443
FEMA10 355-362
FEMA10 363-365
FEMA10 369-375
FEMA10 376-377
FEMA162 000001-000002

55

**Appendix 3: Contract Proposal**

# Michael K. Lindell, Ph.D.
## 3122 Camelot Drive #52
## Bryan Texas 77802

4 March, 2009

Adam Dinnell
Environmental Torts
U.S. Department of Justice
Washington DC

Dear Adam:

In response to your request, I am providing the following estimates of the maximum amount of time and other direct expenses for preparing and delivering testimony in connection with the lawsuit regarding toxic exposures to occupants of FEMA trailers after Hurricane Katrina.

I estimate that the maximum time commitment for preparing written testimony will be 240 hours. This will be the six weeks between 1 May (the time I can begin work after the end of the spring semester) and June 19 (the date on which my written testimony must be filed). I assume there will be no other direct costs (e.g., travel) for testimony preparation.

I estimate that the maximum time commitment for deposition preparation and testimony will be 40 hours. I assume that the deposition will take place in Seattle, where I reside from mid-May through mid-August. Consequently, there will be no other direct costs for deposition preparation and testimony.

I estimate that the maximum time commitment for trial preparation and testimony will be 60 hours for each trial, for a total of 240 hours if all four trials go to court. I estimate that the maximum direct expenses for round trip travel to New Orleans will be $975 (Airfare $350; Hotel 2 nights @ $225 = $450; Meals 3 days @ $50 = 150; Ground transportation $25), for a total of $3900 if all four trials go to court.

The maximum estimate of time required is 520 hours which, at my $250/hour rate for litigation consulting, would produce a total labor cost of $130,000. Adding the $3,900 in direct costs yields a maximum total cost of $133,900. If you have any questions, please email me at mlindell@tamu.edu or call me at (979) 599-4564.

Sincerely,

56

LINDELL-004135

Michael K. Lindell

LINDELL-004136

**Appendix 4: Michael K. Lindell Current CV**

*EDUCATION*
Ph. D.      Social/Quantitative Psychology, University of Colorado, 1975
B.A.        Psychology, University of Colorado, 1969


*PROFESSIONAL POSITIONS*
1997 to     Professor of Landscape Architecture and Urban Planning,
present     Texas A&M University
1997 to     Professor of Construction Science,
2001        Texas A&M University
1996 to     Associate Professor of Administrative Sciences
1997        George Washington University
1995 to     Visiting Associate Professor of Psychology
1996        George Washington University
1995 to     Research Associate Professor of Psychology
1996        Michigan State University
1987 to     Associate Professor of Psychology
1995        Michigan State University
1986 to     Visiting Associate Professor of Psychology
1987        Georgia Institute of Technology
1974 to     Research Scientist
1989        Battelle Human Affairs Research Centers
1974        Research Psychologist
            K.R. Hammond Associates
1972 to     Computer Programmer/Data Analyst
1974        Assessment of Research on Natural Hazards, University of Colorado
1971 to     Teaching Assistant
1972        Department of Psychology, University of Colorado
1970 to     Research Assistant
1971        Institute of Behavioral Science, University of Colorado

*ADJUNCT AND ADMINISTRATIVE POSITIONS*
2003        Visiting Professor
            Istanbul Technical University
2002 to     Adjunct Professor of Psychology
present     Texas A&M University
1997 to     Director, Hazard Reduction and Recovery Center
2003        Texas A&M University
1995 to     Associate Director, Institute for Crisis and Disaster Management
1997        George Washington University
1993,       ASEE Senior Research Fellow, Medical Information Systems and
1994        Operations Research Department, Naval Health Research Center, San Diego, CA
1993        Visiting Scholar, Center for Risk Management
            Resources for the Future, Washington, D.C.
1987 to     Adjunct Faculty, Federal Emergency Management Agency
1988        National Emergency Training Center
1981 to     Adjunct Assistant Professor of Psychology
1987        University of Washington
1981        Visiting Lecturer in Educational Psychology
            School of Education, University of Washington

58

LINDELL-004137

*PROFESSIONAL ASSOCIATIONS*

Association for Psychological Science; Society for Industrial and Organizational Psychology; Society for Risk Analysis; Research Committee on Disasters; International Sociological Association

*PRINCIPAL INVESTIGATOR/PROJECT DIRECTOR*

1.  Lindell, M.K. & Perry, R.W. National Institute of Mental Health. *Consequences of natural hazards for mental health*, 5/77-2/78, $10,000.
2.  Lawler, E.E. III (Principal Investigator) Lindell, M.K. (Project Director) Office of Naval Research. *Effects of social structure, technology and job design on job satisfaction*, 3/77-8/80, $77,000.
3.  Lindell, M.K. Energy Research and Development Administration. *Public perception and evaluation of risk associated with nuclear waste*, 10/77-9/78, $50,000.
4.  Lindell, M.K. General Telephone of the Northwest. *Analysis of the Position Evaluation System*, 5/79-12/79, $15,000.
5.  Lindell, M.K. Department of Energy. *Consumer response to gasoline shortage*, 7/79-1/80, $30,000.
6.  Lindell, M.K. Nuclear Regulatory Commission. *Technical assistance in implementing emergency preparedness requirements*, 9/79-9/82, $355,000.
7.  Lindell, M.K. Nuclear Regulatory Commission. *Evaluation of licensee emergency response facility designs*, 6/81-10/81, $56,000.
8.  Lindell, M.K. Nuclear Regulatory Commission. *Design assistance for NRC headquarters and regional operations centers*, 9/81-3/84, $105,000.
9.  Lindell, M.K. Nuclear Regulatory Commission. *Evaluation of emergency exercises at nuclear power plants*, 10/81-9/82, $114,000.
10. Lindell, M.K. Nuclear Regulatory Commission. *Analysis of emergency staffing*, 10/82-3/84, $59,000.
11. Lindell, M.K. Atomic Industrial Forum. Planning concepts and decision criteria for sheltering and evacuation, 8/83-5/84, $110,000.
12. Lindell, M.K. National Science Foundation. *Contingent conditions for research-based local emergency planning*, 6/83-5/85, $21,000.
13. Lindell, M.K. National Science Foundation. *Behavioral response to technological hazards*, 8/84-11/85, $60,000.
14. Lindell, M.K. Westinghouse Corporation. *Human factors assistance for the Hanford Emergency Control Center*, 1/85-9/85, $26,000.
15. Lindell, M.K. SmithKline. *Development of toxic chemical emergency response plan*, 1/86-7/86, $44,000.
16. Lindell, M.K. Department of Energy. *Human factors assistance for the DOE headquarters emergency operations center*, 2/86-11/86, $66,000.
17. Lindell, M.K. Nuclear Regulatory Commission. *Evaluation of licensee emergency response facilities*, 5/86-9/86, $19,000.
18. Lindell, M.K. Long Island Lighting Company. *Evaluation of offsite preparedness for an emergency at the Shoreham Nuclear Power Station*, 1/87-2/89, $80,000.
19. Lindell, M.K. Federal Emergency Management Agency. *Provide technical support for National Emergency Training Center courses on "Evacuation planning and response" and "Multihazard planning,"* 8/87-5/88, $3,000.
20. Lindell, M.K. Michigan State University. *Effectiveness of community planning for toxic chemical emergencies*, 7/89-10/90, $6,000.
21. Lindell, M.K. GAF Chemical. *Evaluation of local emergency preparedness for transportation of hazardous waste*, 9/92-2/93, $48,000.
22. Lindell, M.K. National Institute for Occupational Safety and Health. *Promoting adaptive response to hazardous situations*, 2/93-6/93, $7,000.

LINDELL-004138

*PRINCIPAL INVESTIGATOR/PROJECT DIRECTOR (continued)*

23. Lindell, M.K. National Science Foundation. *Assessing the effectiveness of Local Emergency Planning Committees*, 9/93-8/96, $207,000.

24. Lindell, M.K. National Science Foundation. *Hazardous materials in the Northridge earthquake: Hazard analysis, mitigation & preparedness*, 8/94-6/96, $99,638.

25. Lindell, M.K. National Science Foundation. *Adoption of earthquake hazard adjustments by households and complex organizations*, 9/96-12/01, $399,775.

26. Lindell, M.K. & Graham, C.W. Texas Division of Emergency Management. *Texas hurricane evacuation shelter survey*, 8/98-9/99, $228,542.

27. Lindell, M.K. Texas Division of Emergency Management. *Texas hazard analysis information web site*, 7/99-09/00, $77,039.

28. Prater, C.S., Lindell, M.K. & Wenger, D.E. National Science Foundation. *Analysis of institutional response to the Taiwan 9/21 earthquake*, 9/00-8/01, $74,999.

29. Lindell, M.K. Alaska Division of Emergency Services. *ADES intern/operations and planning support,* 06/01-08/02, $121,874.

30. Lindell, M.K. Texas Engineering Experiment Station, *Hurricane planning support for the Texas Gulf coast*, 6/01-12/01, $80,400.

31. Lindell, M.K. Texas Division of Emergency Management. *Hurricane evacuation study materials*, 12/01-06/02, $125,622.

32. Lindell, M.K. Taiwanese Institute of Environment and Disaster Policy. *Teach courses in disaster response planning*, 08/02-09/02, $19,540.

33. Lindell, M.K. National Science Foundation. *Develop an evacuation management decision support system*, 9/02-8/05, $409,210.

34. Lindell, M.K. & Prater, C.S. Federal Emergency Management Agency. *Development of an electronic textbook: "An introduction to emergency management"*, 09/02-09/04, $98,537.

35. Lindell, M.K. & Prater, C.S. Istanbul Technical University. *Teach courses in disaster response planning and hazard mitigation planning*, 02/03-03/03, $15,000.

36. Lindell, M.K. & Prater, C.S. Mid America Earthquake Center/National Science Foundation. *Damage synthesis: Socio-economic impact assessment* 1/03-10/04, $80,000 (plus $80,000 match).

37. Lindell, M.K. & Prater, C.S. Mid America Earthquake Center/National Science Foundation. *Political and organizational structure influence on earthquake decision making* 11/04-10/05, $21,700 (plus $26,100 match).

38. Lindell, M.K. & Prater, C.S. Mid America Earthquake Center/National Science Foundation. *Socio-economic impact assessment* 11/04-10/05, $40,000 (plus $40,000 match).

39. Peacock, W.G., Lindell, M.K. & Prater, C.S. Mid America Earthquake Center/National Science Foundation. *Quantitative models of social and economic consequences* 11/04-10/05, $13,300 (plus $16,100 match).

40. Lindell, M.K. & Prater, C.S. Army Corps of Engineers, Baltimore. *The Capitol Hill project*. 01/05-06/05, $44,970.

41. Prater, C.S., Lindell, M.K. & Peacock, W.G. National Science Foundation. *Social vulnerability mapping and GIS in tsunami impact analysis*. 03/05-02/06, $95,256.

42. Lindell, M.K., Prater, C.S., Yeh, H. & Pancake, C. National Science Foundation SBE 0527699. *Community risk management of hurricane and tsunami surge hazards*. 02/06-01/09, $750,000 ($417,581 Texas A&M University; $332,419 Oregon State University).

43. Peacock, W.G., Lindell, M.K. & Prater, C.S. Texas Department of Transportation. *Hurricane Rita behavioral survey*. 03/06-01/07. $67,000.

44. Peacock, W.G., Brody, S., Prater, C.S., Lindell, M.K., Ndubisi, F., Martin, J. & Wunneburger, D. Texas General Land Office. *Status and trends of coastal vulnerability to natural hazards*. 08/06-07/11. $750,000. (Year 1, $131,000).

45. Lindell, M.K., House, D.H. & Prater, C.S. National Science Foundation SBE0838654. *Communicating hurricane information to local officials for protective action decision making*. 01/09-12/11, $399,975 ($234,580 Texas A&M University; $165,395 Clemson University).

LINDELL-004139

*OTHER RESEARCH SPONSORS*

Argonne National Laboratory, ARCO, Brookhaven National Laboratory, CIBA-GEIGY Pharmaceutical, Centers for Disease Control and Prevention/Agency for Toxic Substances and Disease Registry, ConEdison Indian Point Station, Defense Civil Preparedness Agency, Federal Aviation Administration, General Electric, International Atomic Energy Agency, Japan Power Engineering and Inspection Corporation, Muskegon County Michigan, Naval Health Research Center, Ohio EPA, Porter County Indiana, Prince William Sound Risk Assessment Steering Committee, Sandia National Laboratory, Simpson Timber, United Autoworkers–General Motors Human Resource Center, Ventura County California, Weyerhaeuser

*BOOKS and MONOGRAPHS*

1. Perry, R.W., Lindell, M.K. & Greene, M.R. (1981). *Evacuation Planning in Emergency Management.* Lexington, MA: Heath Lexington Books.
2. Perry, R.W. & Lindell, M.K. (1990). *Living with Mt. St. Helens: Human Adjustment to Volcano Hazards.* Pullman, WA: Washington State University Press.
3. Lindell, M.K. & Perry, R.W. (1992). *Behavioral Foundations of Community Emergency Planning.* Washington DC: Hemisphere Press.
4. Lindell, M.K., with Alesch, D., Bolton, P.A., Greene, M.R., Larson, L.A., Lopes, R., May, P.J., Mulilis, J-P., Nathe, S., Nigg, J.M., Palm, R., Pate, P., Perry, R.W., Pine, J., Tubbesing, S.K. & Whitney, D.J. (1997). Adoption and implementation of hazard adjustments. *International Journal of Mass Emergencies and Disasters Special Issue, 15,* 327-453.
5. Tierney, K.J., Lindell, M.K. & Perry, R.W. (2001). *Facing the Unexpected: Disaster Preparedness and Response in the United States.* Washington DC: Joseph Henry Press.
6. Lindell, M.K. & Perry, R.W. (2004). *Communicating Environmental Risk in Multiethnic Communities.* Thousand Oaks CA: Sage.
7. Lindell, M.K., Prater, C.S. & Perry, R.W. (2006). *Fundamentals of Emergency Management.* Emmitsburg MD: Federal Emergency Management Agency Emergency Management Institute. Available at www.training.fema.gov/EMIWeb/edu/fem.asp.
8. Committee on Disaster Research in the Social Sciences. (2006). *Facing Hazards and Disasters: Understanding Human Dimensions.* Washington DC: National Academy of Sciences.
9. Committee on Assessing Vulnerabilities Related to the Nation's Chemical Infrastructure. (2006). *Terrorism and the Chemical Infrastructure: Protecting People and Reducing Vulnerabilities.* Washington DC: National Academy of Sciences.
10. Lindell, M.K., Prater, C.S. & Perry, R.W. (2007). *Introduction to Emergency Management.* Hoboken NJ: John Wiley.
11. Perry, R.W. & Lindell, M.K. (2007). *Emergency Planning.* Hoboken NJ: John Wiley.

*BOOK and ENCYCLOPEDIA CHAPTERS*

1. Stewart, T.R., Joyce, C.R.B. & Lindell, M.K. (1975). New analyses: application of judgment theory to physicians' judgments of drug effects. In K.R. Hammond and C.R.B. Joyce (Eds.) *Psychoactive Drugs and Social Judgment: Theory and Research* (pp. 249-262). New York: Wiley Interscience.
2. Perry, R.W. and Lindell, M.K. (1979). Predisaster planning to promote compliance with evacuation warnings. In E.J. Baker (Ed.) *Hurricanes and Coastal Storms: Awareness, Education and Mitigation* (pp. 44-49). Tallahassee, FL: Florida State University.
3. Earle, T.C. & Lindell, M.K. (1984). Public perception of industrial risks: A free response approach. In R.A. Waller and V. T. Covello (Eds.) *Low Probability-High Consequence Risk Analysis: Issues, Methods and Case Studies* (pp. 531-550). New York: Plenum Press.
4. Perry, R.W. & Lindell, M.K. (1989). Communicating threat information for volcano hazards. In L. Walters, L. Wilkins and T. Walters (Eds.) *Bad Tidings: Communication and Catastrophe* (pp. 47-62). Hillsdale, NJ: Lawrence Erlbaum.
5. Feldman, J. & Lindell, M.K. (1990). On rationality. In I. Horowitz (Ed.) *Recent Economic Thought: Organization and Decision Theory* (pp. 83-170). Boston: Kluwer Publishers.

LINDELL-004140

*BOOK and ENCYCLOPEDIA CHAPTERS (continued)*

6. Kartez, J.D. & Lindell, M.K. (1990). Adaptive planning for community disaster response. In R.T. Silves and W.L. Waugh, Jr. (Eds.) *Cities and Disaster: North American Studies in Emergency Management* (pp. 5-31). Springfield, IL: Charles C. Thomas Publishers.

7. Lindell, M.K. & Perry, R.W. (1993). Risk area residents' changing perceptions of volcano hazard at Mt. St. Helens. In F. Siccardi, J. Nigg and J. Nemec (Eds.) *Prediction and Perception of Natural Hazards* (pp. 159-166). Amsterdam: Kluwer Academic Publishers.

8. Lindell, M.K. (1994). Motivational and organizational factors affecting implementation of worker safety training. In M.J. Colligan (Ed.) *Occupational Medicine State of the Art Reviews: Occupational Safety and Health Training* (pp. 211-240). Philadelphia: Hanley & Belfus.

9. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1996). The Local Emergency Planning Committee: A better way to coordinate disaster planning. In R.T. Silves and W.L. Waugh, Jr. (Eds.) *Disaster Management in the U.S. and Canada: The Politics, Policymaking, Administration and Analysis of Emergency Management* (pp. 234-249). Springfield, IL: Charles C. Thomas Publishers.

10. Lindell, M.K. (2006). Hazardous materials. In American Planning Association (Ed.) *Planning and Urban Design Standards* (pp. 168-170). New York: John Wiley and Sons.

11. Lindell, M.K. (2006). Regulation of hazardous chemicals and chemical wastes. In S. Lee. (Ed.) *Encyclopedia of Chemical Processing* (pp. 1-10). New York: Marcel Dekker.

12. Lindell, M.K. & Perry, R.W. (2006). Onsite and offsite emergency preparedness. In S. Lee. (Ed.) *Encyclopedia of Chemical Processing* (pp. 1959-1971). New York: Marcel Dekker.

*13.* Lindell, M.K. & Perry, R.W. (2007). Planning and preparedness. In K.J. Tierney and W.F. Waugh, Jr. (Eds.) *Emergency Management: Principles and Practice for Local Government, 2nd ed.* (pp. 113-141). Washington DC: International City/County Management Association.

14. Perry, R.W. & Lindell, M.K. (2007). Responding to disaster. In K.J. Tierney and W.F. Waugh, Jr. (Eds.) *Emergency Management: Principles and Practice for Local Government, 2nd ed.* (pp. 159-181). Washington DC: International City/County Management Association.

15. Lindell, M.K. (2008). Cross-sectional research. In N. Salkind (Ed.). *Encyclopedia of Educational Psychology* (pp. 206-213). Thousand Oaks CA: Sage.

*JOURNAL ARTICLES*

1. Lindell, M.K. & Stewart, T.R. (1974). The effects of redundancy in multiple cue probability learning. *American Journal of Psychology, 87,* 393-398.

2. Lindell, M.K. (1976). Cognitive and outcome feedback in multiple cue probability learning tasks. *Journal of Experimental Psychology: Human Learning and Memory, 2,* 739-745.

3. Lindell, M.K. (1978). Interpretation of the $R^2$ index in regression models of judgment. *Educational and Psychological Measurement, 38,* 69-74.

4. Perry, R.W. & Lindell, M.K. (1978). Psychological consequences of natural disaster. *Mass Emergencies, 3,* 105-115.

5. Lindell, M.K. & Drexler, J.A. Jr. (1979). Issues in using survey methods for measuring organizational change. *Academy of Management Review, 4,* 13-19.

6. Lindell, M.K. & Drexler, J.A. Jr. (1980). Equivocality of factor incongruence as an indicator of type of change in OD interventions. *Academy of Management Review, 5,* 105-107.

7. Lindell, M.K. & Perry, R.W. (1980). Evaluation criteria for emergency response plans in radiological transportation. *Journal of Hazardous Materials, 3,* 335-348.

8. Lindell, M.K. & St. Clair, J.B. (1980). TUKKNIFE: A jackknife supplement to canned statistical packages. *Educational and Psychological Measurement, 40,* 71-74.

9. Perry, R.W., Greene, M.R. & Lindell, M.K. (1980). Enhancing evacuation warning compliance: Suggestions for emergency planning. *Disasters, 4,* 433-449.

10. Greene, M.R., Perry, R.W. & Lindell, M.K. (1981). The March 1980 eruptions of Mt. St. Helens: Citizen information and threat perception. *Disasters, 5,* 49-66.

LINDELL-004141

*JOURNAL ARTICLES (continued)*

11. Drexler, J.A. Jr. & Lindell, M.K. (1981). Training/job fit and worker satisfaction. *Human Relations, 34,* 907-915.

12. Southwick, L., Steele, C., Marlatt, A. & Lindell, M.K. (1981). Alcohol-related expectancies: Defined by phase of intoxication and drinking experience. *Journal of Consulting and Clinical Psychology, 49,* 713-721.

13. Perry, R.W., Lindell, M.K. & Greene, M.R. (1982). Threat perception and public response to volcano hazard. *Journal of Social Psychology, 116,* 199-204.

14. Perry, R.W., Lindell, M.K. & Greene, M.R. (1982). Crisis communications: Ethnic differentials in interpreting and responding to disaster warnings. *Social Behavior and Personality, 10,* 97-104.

15. Lindell, M.K., Perry, R.W. & Greene, M.R. (1983). Individual response to emergency preparedness planning near Mt. St. Helens. *Disaster Management, 3,* 5-11.

16. Lindell, M.K. & Earle, T.C. (1983). How close is close enough: Public perceptions of the risks of industrial facilities. *Risk Analysis, 3,* 245-253. Reprinted in S. Gerard, R. K. Turner & I. J. Bateman (eds.) *Managing the Environment for Sustainable Development Vol. 4, Environmental Risk Planning and Management*, Northampton, MA: Elgar (2001), pp. 449-457.

17. Houts, P.S., Lindell, M.K., Hu, T.W., Cleary, P.D., Tokuhata, G. & Flynn, C.B. (1984). The protective action decision model applied to evacuation during the Three Mile Island crisis. *International Journal of Mass Emergencies and Disasters, 2,* 27-39.

18. Lindell, M.K. & Barnes, V.E. (1986). Protective response to technological emergency: Risk perception and behavioral intention. *Nuclear Safety, 27,* 457-467.

19. Southwick, L., Steele, C. & Lindell, M. (1986). The roles of historical experience and construct accessibility in judgments about alcoholism. *Cognitive Therapy and Research, 10,* 167-186.

20. Kartez, J.D. & Lindell, M.K. (1987). Planning for uncertainty: The case of local disaster planning. *Journal of the American Planning Association, 53,* 487-498.

21. Lindell, M.K. & Perry, R.W. (1987). Warning mechanisms in emergency response systems. *International Journal of Mass Emergencies and Disasters, 5,* 137-153.

22. Perry, R.W. & Lindell, M.K. (1990). Predicting long term adjustment to volcano hazard. *International Journal of Mass Emergencies and Disasters, 8,* 117-136.

23. Lindell, M.K. & Perry, R.W. (1990). Effects of the Chernobyl accident on public perceptions of nuclear plant accident risks. *Risk Analysis, 10,* 393-399.

24. Perry, R.W. & Lindell, M.K. (1990). Citizen knowledge of volcano threats at Mt. St. Helens. *The Environmental Professional, 12,* 45-51.

25. Perry, R.W. & Lindell, M.K. (1991). The effects of ethnicity on evacuation decision-making. *International Journal of Mass Emergencies and Disasters, 9,* 47-68.

26. Lindell, M.K. & Meier, M.J. (1994). Effectiveness of community planning for toxic chemical emergencies. *Journal of the American Planning Association, 60,* 222-234.

27. Lindell, M.K. (1994). Are Local Emergency Planning Committees effective in developing community disaster preparedness? *International Journal of Mass Emergencies and Disasters, 12,* 159-182.

28. Lindell, M. K. (1994). Perceived characteristics of environmental hazards. *International Journal of Mass Emergencies and Disasters, 12,* 303-326.

29. Lindell, M. K. (1995). Assessing emergency preparedness in support of hazardous facility risk analyses: An application at a U.S. hazardous waste incinerator. *Journal of Hazardous Materials, 40,* 297-319.

30. Lindell, M.K. & Whitney, D.J. (1995). Effects of organizational environment, internal structure and team climate on the effectiveness of Local Emergency Planning Committees. *Risk Analysis, 15,* 439-447.

31. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1996). Multi-method assessment of organizational effectiveness in a Local Emergency Planning Committee *International Journal of Mass Emergencies and Disasters 14,* 195-220.

32. Lindell, M.K. & Perry, R.W. (1996). Addressing gaps in environmental emergency planning: Hazardous materials releases during earthquakes. *Journal of Environmental Planning and Management, 39,* 531-545.

LINDELL-004142

*JOURNAL ARTICLES (continued)*

33. Lindell, M.K. & Perry, R.W. (1996). Identifying and managing conjoint threats: Earthquake-induced hazardous materials releases in the U.S. *Journal of Hazardous Materials, 50,* 31-46.

34. Perry, R.W. & Lindell, M.K. (1997). Earthquake planning for governmental continuity. *Environmental Management, 21,* 89-96.

35. Perry, R.W. & Lindell, M.K. (1997). Principles for managing community relocation as a hazard mitigation measure. *Journal of Contingencies and Crisis Management, 5,* 49-59.

36. Lindell, M.K. & Perry, R.W. (1997). Hazardous materials releases in the Northridge earthquake: Implications for seismic risk assessment. *Risk Analysis, 17,* 147-156.

37. Perry, R.W. & Lindell, M.K. (1997). Aged citizens in the warning phase of disasters: Re-examining the evidence. *International Journal of Aging and Human Development, 44,* 257-267.

38. Lindell, M.K. & Brandt, C.J. (1997). Measuring interrater agreement for ratings of a single target. *Applied Psychological Measurement, 21,* 271-278.

39. Lindell, M. K. (1997). Occupational safety and health inspection scores predict rates of workers' lost-time injuries. *Accident Analysis and Prevention, 29,* 563-571.

40. Lindell, M.K. & Perry, R.W. (1998). Earthquake impacts and hazard adjustment by acutely hazardous materials facilities following the Northridge earthquake. *Earthquake Spectra, 14,* 285-299.

41. Lindell, M.K., Clause, C.S., Brandt, C.J. & Landis, R.S. (1998). The relationship between organizational context and job analysis task ratings. *Journal of Applied Psychology, 83,* 769-776.

42. Lindell, M.K., Brandt, C.J. & Whitney, D.J. (1999). A revised index of agreement for multi-item ratings of a single target. *Applied Psychological Measurement, 23, 127-135.*

43. Lindell, M.K. & Brandt, C.J. (1999). Assessing interrater agreement on the job relevance of a test: A comparison of the CVI, T, $r_{WG(j)}$ and $r_{WG}^{*}$ indexes. *Journal of Applied Psychology, 84,* 640-647.

44. Lindell, M.K. & Whitney, D.J. (2000). Correlates of seismic hazard adjustment adoption. *Risk Analysis, 20,* 13-25.

45. Prater, C.S. & Lindell, M.K. (2000). Politics of hazard mitigation. *Natural Hazards Review, 1,* 73-82.

46. Lindell, M.K. & Perry, R.W. (2000). Household adjustment to earthquake hazard: A review of research. *Environment & Behavior, 32,* 590-630.

47. Lindell, M.K. (2000). An overview of protective action decision making for a nuclear power plant emergency. *Journal of Hazardous Materials, 75,* 113-129.

48. Lindell, M.K. & Brandt, C.J. (2000). Climate quality and climate consensus as mediators of the relationship between organizational antecedents and outcomes. *Journal of Applied Psychology, 85,* 331-348.

49. Lindell, M.K. & Prater, C.S. (2000). Household adoption of seismic hazard adjustments: A comparison of residents in two states. *International Journal of Mass Emergencies and Disasters, 18,* 317-338.

50. Whitney, D.J. & Lindell, M.K. (2000). Member commitment and participation in Local Emergency Planning Committees. *Policy Studies Journal, 28,* 467-484.

51. Lindell, M.K. (2001). Assessing and testing interrater agreement on a single target using multi-item rating scales. *Applied Psychological Measurement, 25,* 89-99.

52. Whitney, D.J., Dickerson, A. & Lindell, M.K. (2001). Non-structural seismic preparedness of Southern California hospitals. *Earthquake Spectra, 17,* 153-171.

53. Lindell, M.K. & Whitney, D.J. (2001). Accounting for common method variance in cross-sectional research designs. *Journal of Applied Psychology, 86,* 114-121.

54. Hwang, S.N., Sanderson, W.G. & Lindell, M.K. (2001). Analysis of state emergency management agencies' hazard analysis information on the Internet. *International Journal of Mass Emergencies and Disasters, 19,* 85-106.

55. Lindell, M.K. & Perry, R.W. (2001). Community innovation in hazardous materials management: Progress in implementing SARA Title III in the United States. *Journal of Hazardous Materials, 88,* 169-194.

56. Lindell, M.K., Sanderson, W.G. & Hwang, S.N. (2002). Local government agencies' use of hazard analysis information. *International Journal of Mass Emergencies and Disasters, 20,* 29-39.

LINDELL-004143

*JOURNAL ARTICLES (continued)*

57. Lindell, M.K. & Prater, C.S. (2002). Risk area residents' perceptions and adoption of seismic hazard adjustments. *Journal of Applied Social Psychology, 32,* 2377-2392.

58. Perry, R.W. & Lindell, M.K. (2003). Understanding citizen response to disasters with implications for terrorism. *Journal of Contingencies and Crisis Management, 11,* 49-60.

59. Lindell, M.K. & Prater, C.S. (2003). Assessing community impacts of natural disasters. *Natural Hazards Review, 4,* 176-185.

60. Perry, R.W. & Lindell, M.K. (2003). Preparedness for emergency response: Guidelines for the emergency planning process. *Disasters,* 27, 336-350. Reprinted in A. Boin (ed.) *Crisis Management* Volume 2. London: Sage (342-357).

61. Wu, J.Y. & Lindell, M.K. (2004). Housing reconstruction after two major earthquakes: The 1994 Northridge earthquake in the United States and the 1999 Chi-Chi earthquake in Taiwan. *Disasters,* 28, 63-81.

62. Whitney, D.J., Lindell, M.K. & Nguyen, D.H. (2004). Earthquake beliefs and adoption of seismic hazard adjustments. *Risk Analysis,* 24, 87-102.

63. Zhang, Y., Prater, C.S., & Lindell, M.K. (2004). Risk area accuracy and evacuation from Hurricane Bret. *Natural Hazards Review, 5,* 115-120.

64. LeBreton, J.M., James, L.R. & Lindell, M.K. (2005). Recent issues regarding $r_{WG}$, $r*_{WG}$, $r_{WG(J)}$, and $r*_{WG(J)}$. *Organizational Research Methods, 8,* 128-138.

65. Lindell, M.K., Lu, J.C., & Prater, C.S. (2005). Household decision making and evacuation in response to Hurricane Lili. *Natural Hazards Review,* 6, 171-179.

66. Perry, R.W. & Lindell, M.K. (2006). Hospital planning for weapons of mass destruction incidents *Journal of Postgraduate Medicine*, 52, 115-119

67. Arlikatti, S., Lindell, M.K., Prater, C.S. & Zhang, Y. (2006). Risk area accuracy and hurricane evacuation expectations of coastal residents. *Environment & Behavior,* 38, 226-247.

68. Lindell, M.K. & Prater, C.S. (2007). Critical behavioral assumptions in evacuation analysis for private vehicles: Examples from hurricane research and planning. *Journal of Urban Planning and Development, 133,* 18-29.

69. Lindell, M.K. & Prater, C.S. (2007). A hurricane evacuation management decision support system (EMDSS). *Natural Hazards, 40,* 627-634.

70. Kang, J.E., Lindell, M.K. & Prater, C.S. (2007). Hurricane evacuation expectations and actual behavior in Hurricane Lili. *Journal of Applied Social Psychology, 37,* 881-897.

71. Lindell, M.K., Prater, C.S. & Peacock, W.G. (2007). Organizational communication and decision making in hurricane emergencies. *Natural Hazards Review, 8,* 50-60.

72. Arlikatti, S., Lindell, M.K., & Prater, C.S. (2007). Perceived stakeholder role relationships and adoption of seismic hazard adjustments. *International Journal of Mass Emergencies and Disasters, 25,* 218-256.

73. Lindell, M.K. (2008). EMBLEM2: An empirically based large-scale evacuation time estimate model. *Transportation Research A 42*, 140-154.

74. Tang, Z., Lindell, M.K., Prater, C.S. & Brody, S.D. (2008). Measuring tsunami planning capacity on the U.S. Pacific coast. *Natural Hazards Review, 9,* 91-100.

75. Lindell, M.K. & Hwang, S.N. (2008). Households' perceived personal risk and responses in a multi-hazard environment. *Risk Analysis, 28,* 539-556.

76. Lutz, L.D. & Lindell, M.K. (2008). The Incident Command System as a response model within emergency operation centers during Hurricane Rita. *Journal of Contingencies and Crisis Management, 16,* 122-134.

77. Perry, R.W. & Lindell, M.K. (2008). Volcanic risk perception and adjustment in a multi-hazard environment. *Journal of Volcanology and Geothermal Research, 172,* 170-178.

78. Zhang, Y., Lindell, M.K. & Prater, C.S. (2009). Vulnerability of community businesses to environmental disasters. *Disasters, 33,* 38-57.

79. Al-Nammari, F.M. & Lindell, M.K. (in press). Earthquake recovery of historic buildings: Exploring cost and time needs. *Disasters.*

65

*JOURNAL ARTICLES (continued)*

80. Zhang, Y., Hwang, S.N. & Lindell, M.K. (in press). Hazard proximity or risk perception? Evaluating environmental hazards' effects on housing value. *Environment & Behavior*.

81. Zahran, S., Weiler, S., Brody, S.D., Lindell, M.K. & Highfield, W.E. (in press). Modeling National Flood Insurance Policy Holding at the County Scale in Florida, 1999-2005. *Ecological Economics*.

82. Terpstra, T., Lindell, M.K. & Gutteling, J.M. (in press). Does communicating (flood) risk affect (flood) risk perceptions? Results of a quasi-experimental study. *Risk Analysis*.

83. Lindell, M.K., Arlikatti, S. & Prater, C.S. (in press). Why people do what they do to protect against earthquake risk: Perceptions of hazard adjustment attributes. *Risk Analysis*.


*OTHER ARTICLES AND CONFERENCE PROCEEDINGS*

1. Lindell, M.K., Perry, R.W. & Greene, M.R. (1980). Mt. St. Helens: Washingtonians view their volcano. *Hazard Monthly,* 1 (2), 1-3.

2. Perry, R.W., Lindell, M.K. & Greene, M.R. (1981). Flood warning: How people react after the warning. *Hazard Monthly,* 1 (11), 1-6.

3. Lindell, M.K. & Perry, R.W. (1983). Nuclear power plant emergency warning: How would the public respond? *Nuclear News,* 26, 49-53.

4. Lindell, M.K. (1985). Review of *Warning and response to the Mt. St. Helens eruption* by Saarinen and Sell. *Disasters,* 9, 230-232.

5. Perry, R.W. & Lindell, M.K. (1986). Source credibility in volcanic hazard information. *Volcano News,* 22 (12), 7-10.

6. Lindell, M.K. & Perry, R.W. (1991). Understanding evacuation research. *International Journal of Mass Emergencies and Disasters, 9,* 133-136.

7. Lindell, M.K. (1995). Managing environmental threats to sustainable economic development. In R.L. Bras (ed.) *Proceedings of the Workshop on Sustainable Development in Urban Areas of the Americas,* pp 192-199. Cambridge MA: Massachusetts Institute of Technology.

8. Lindell, M.K., Prater, C.S., Perry R.W. & Wu, J.Y. (2002). Recent developments in hurricane evacuation time estimation. *Proceedings of the 2002 US/Taiwan Workshop on Hazard Mitigation,* pp. 12-1—12-8.

9. Lindell, M.K. & Prater, C.S. (2002). Development of a decision support system for hurricane evacuation management. *Proceedings of the 2002 US/Japan Workshop on Wind Engineering,* pp 283-294.

10. Lindell, M.K. & Prater, C.S. (2002). Development of a decision support system for evacuation management. *Proceedings of the First International Conference on Debris-Flow Disaster Mitigation Strategy,* pp. 47-71.

*SCIENTIFIC JOURNAL AD HOC REVIEWS*

Academy of Management Review, Accident Analysis & Prevention, Applied Psychological Measurement, Area, Basic and Applied Social Psychology, Biosecurity and Bioterrorism, Demography, Disasters, Earthquake Spectra, Educational & Psychological Measurement, Environment and Planning B, Environmental Hazards, Environmental Health Insights, Environmental Management, European Journal of Operational Research, IEEE Systems Journal, International Journal of Mass Emergencies and Disasters, International Journal of Contingencies and Crisis Management, International Journal of Sustainable Transportation, Journal of Applied Psychology, Journal of Applied Social Psychology, Journal of the Chinese Institute of Engineers, Journal of Environmental Psychology, Journal of Flood Engineering, Journal of Information Science, Journal of Occupational and Organizational Psychology, Journal of Planning Literature, Journal of Public Management and Social Policy, Multivariate Behavioral Research, Natural Hazards Review, Nuclear Safety, Organizational Behavior and Human Decision Processes, Organizational Research Methods, Personnel Psychology, Policy Studies Journal, Professional Psychology, Psychological Methods, Public Administration Review, Public Health Reports, Public Performance & Management Review, Risk Analysis, Social Science Quarterly, Sociological Perspectives, State and Local Government Review, The Environmental Professional, The Science of the Total Environment.

LINDELL-004145

*SCIENTIFIC PEER REVIEWS*

Foreign Scientific Agencies

French Embassy Office for Science and Technology Chateaubriand Fellowship Program, New Zealand Earthquake Commission Research Foundation, New Zealand Institute of Geological and Nuclear Sciences, New Zealand Foundation for Research, Science, and Technology, Social Science and Humanities Research Council of Canada, Research Grants Council of Hong Kong

U.S. Federal Agencies

- National Science Foundation: Community Water Management Program, Applied Science/Research Applications Directorate, Earthquake Hazards Mitigation Program, Decision/Risk/Management Science Program, Biological and Critical Systems Program, Information Technology Research Program, Geography and Regional Science Program, Civil and Mechanical Systems Division (Infrastructure Management and Hazard Response), Time-sharing Experiments for the Social Sciences

- National Laboratories: Brookhaven National Laboratory (Department of Nuclear Energy), Argonne National Laboratory (Energy and Environmental Systems Division), Oak Ridge National Laboratory, (Energy Division; Director's Research and Development Fund), Lawrence Livermore Laboratory

- Environmental Protection Agency, Office of Research and Development

- US Department of Agriculture, Forest Service

- US Department of Homeland Security, Science and Technology Directorate

- US Department of Health and Human Services, Centers for Disease Control and Prevention

- United States Civilian R&D Foundation for the Independent States of the Former Soviet Union

State Agencies

Michigan State Police, Emergency Management Division; South Carolina Space Grant Consortium, Louisiana Sea Grant

Universities

University of Washington (Department of Family Medicine), Pennsylvania State University College of Medicine (Department of Behavioral Science), University of Pittsburgh (University Center for Social and Urban Research), University of Southern California (Institute of Safety and Systems Management), Clark University (Center for Technology, Environment and Development)

Publishers: Lawrence Erlbaum Associates, Routledge Press, Taylor & Francis

*NATIONAL ACADEMY OF SCIENCES PRESENTATIONS*

1. Lindell, M.K. (2002). Community emergency preparedness for terrorist threats. *Disasters Roundtable Forum on Countering Terrorism: Lessons Learned from Natural and Technological Disasters.*

2. Lindell, M.K. (2003). Research needed to support the emergency manager of the future. *Disasters Roundtable Forum on The Emergency Manager of the Future* (presented again at the *Workshop on Designing Educational Opportunities for the Hazard Manager of the 21st Century*, sponsored by the National Science Foundation and Federal Emergency Management Agency).

3. Lindell, M.K. (2004). Risk perception/communication about high level radioactive waste transportation. *Committee on Transportation of Radioactive Wastes.*

4. Lindell, M.K. and Prater, C.S. (2007). Multi-hazard evacuation modeling in disasters. *Disasters Roundtable Forum on Creating and Using Multi-Hazards Knowledge and Strategies.*

5. Lindell, M.K. and Prater, C.S. (2008). Tsunami warning and protective response. *Committee on Review of the Tsunami Warning and Forecast System and Overview of the Nation's Tsunami Preparedness.*

*EXPERT PANELS AND WORKSHOPS*

1. Lindell, M.K. (1984). Public Forum on the Operation of the Shoreham Nuclear Power Plant, sponsored by Scientists and Engineers for Secure Energy.

2. Lindell, M.K. (1986). Public Hearing on the Operation of the Pilgrim Nuclear Power Plant, sponsored by the Plymouth Board of Selectmen and Boston Edison Company.

3. Lindell, M.K. (1986-1989). Litigation of Long Island Lighting Company Application for Operating License for Shoreham Nuclear Power Station, conducted by the U.S. Nuclear Regulatory Commission Atomic Safety and Licensing Board. Dockets 50-322-OL-3 (Emergency Planning) and -OL-5 (Emergency Exercise Performance).

LINDELL-004146

*EXPERT PANELS AND WORKSHOPS (Continued)*

4. Lindell, M.K. (1989). Videoconference on *Protective Actions for Hazardous Materials*, broadcast over the Emergency Education Network by the Department of Transportation, Federal Emergency Management Agency and Environmental Protection Agency.
5. Lindell, M.K. (1992). National Workshop on *Assessment of Research on Natural Hazards*, sponsored by the National Science Foundation.
6. Lindell, M.K. (1992-1993). Litigation of GAF Chemical Corporation's Application for the Siting of a Hazardous Waste Facility in Linden, New Jersey conducted by the State of New Jersey Office of Administrative Law. OAL Docket EHS 01122-91S; Agency Docket HWFSC-1.
7. Lindell, M.K. (1993). National Workshop on *The Future of Local Emergency Planning Committees*, sponsored by the Environmental Protection Agency.
8. Lindell, M.K. (1993). National Workshop on *Communicating with the Public Before, During, and After Chemical Emergencies*, sponsored by the Environmental Protection Agency.
9. Lindell, M.K. (2002). National Workshop on *Safety of Hazardous Materials Transported by Rail*, sponsored by the General Accounting Office.
10. Lindell, M.K. (2002). National Workshop on *Effective Hazard Warnings*, sponsored by the Federal Emergency Management Agency/ National Science Foundation/National Weather Service/US Geological Survey.
11. Lindell, M.K. (2003). National Workshop on *The Legacy of Earthquake Engineering*, sponsored by the Earthquake Engineering Research Institute.
12. Lindell, M.K. (2005). National Workshop on *Communicating with the Public using ATIS during Disasters*, sponsored by the Department of Transportation/Federal highway Administration.
13. Lindell, M.K. (2006). National Workshop to *Develop a Strategic Plan for Tsunami Research*, sponsored by the National Science Foundation and the National Oceanic and Atmospheric Administration.
14. Lindell, M.K. (2006). Workshop on *Assessing Disaster Preparedness*, sponsored by the Fritz Institute.
15. Lindell, M.K. (2006). Workshop to *Review the Tsunami Preparedness Guidebook*, sponsored by GeoHazards International.
16. Lindell, M.K. (2006). Workshop on *Building NOAA's Weather and Water Social Science Program*, sponsored by the National Oceanographic and Atmospheric Administration.
17. Lindell, M.K. (2007). Workshop on *Rethinking Egress*, sponsored by the National Institute for Standards and Technology.

*INTERNATIONAL WORKSHOPS*

1. Lindell, M.K. (1985). Workshop on *Risk Analysis in Developing Countries*, sponsored by the Administrative Staff College of India, held in Hyderabad India.
2. Lindell, M.K. (1989). Workshop on *Communication about Energy and Environment*, organized by the Institut de Recherches Internationales, Universite de Paris-Dauphine, held in Paris, France.
3. Lindell, M.K. & Perry, R.W. (1990). Workshop on *Prediction and Perception of Natural Hazards*, sponsored by the U.S. National Science Foundation and the National Research Council of Italy in Perugia Italy.
4. Lindell, M.K. (1989). Workshop on *Sustainable Development in Urban Areas of the Americas*, held at the Universidad de Chile, held in Santiago Chile, 1994.
5. Lindell, M.K. (1999). Workshop on *Next Generation Internet Applications*, sponsored by the U.S. National Science Foundation and the Taiwanese National Science Council at the National Center for High-Performance Computing, held in Hsinchi Taiwan.
6. Lindell, M.K. & Prater, C.S. (1999). Workshop on *Community Hazards Awareness and Hazards Mitigation Learning*, sponsored by the Taiwanese National Science and Technology Program for Hazards Mitigation at National Taiwan University, held in Taipei Taiwan.
7. Lindell, M.K. (2000). Workshop on *To Revise. Update, and Extend TECDOC-953 on Nuclear and Radiological Emergency Preparedness*, sponsored by the International Atomic Energy Agency, held in Vienna Austria,.
8. Lindell, M.K. (2000). Workshop on *To Develop the Structure for a Safety Guide on Nuclear and Radiological Emergency Preparedness*, sponsored by the International Atomic Energy Agency, held in Vienna Austria.
9. Lindell, M.K. & Prater, C.S. (2001). Conference on *Cities on Volcanoes II*, held in Auckland New Zealand.
10. Lindell, M.K. & Prater, C.S. (2002). Workshop on *Debris-Flow Disaster Mitigation Strategies,* held in Taipei Taiwan.

LINDELL-004147

*INTERNATIONAL WORKSHOPS (Continued)*

11. Lindell, M.K., Prater, C.S., Perry, R.W. & Wu, J.Y. (2002). Recent developments in hurricane evacuation time estimation. *U.S.–Taiwan Conference on Natural Disaster Mitigation,* held in Washington DC.

12. Lindell, M.K. & Prater, C.S. (2002). Development of a decision support system for hurricane evacuation management. *U.S.–Japan Workshop on Wind Engineering,* held in Seattle Washington.

13. Lindell, M.K. & Prater, C.S. (2003). *Seminàrio Internacional de Catàstrofes,* held in São Carlos Brasil.

14. Lindell, M.K., Perry, R.W. & Prater, C.S. (2005). Organizing response to disasters with the Incident Command System/Incident Management System (ICS/IMS). *International Workshop on Emergency Response and Rescue,* held in Taipei Taiwan.

15. Lindell, M.K. (2006). Workshop on *To Develop a Guide on Radiation Emergency Preparedness,* sponsored by the International Atomic Energy Agency, held in Salt Lake City.

16. Lindell, M.K. & Prater, C.S. (2006). Hurricanes Katrina and Rita: Scientific surprises and policy failures. Workshop on *Le Cyclone Katrina: Quelles Leçons pour L'Europe*, sponsored by the Association Française pour la Prevention des Catastrophes Naturalles in Paris France.

17. Lindell, M.K. (2007). *Natech Workshop,* sponsored by the European Commission Joint Research Centre, held in Stresa Italy.

18. Lindell, M.K. & Prater, C.S. (2007). Critical Behavioral Assumptions in Evacuation Time Estimate Analysis for Private Vehicles: Examples from Recent U.S. Research, *Second International Conference on Urban Disaster Reduction*, held in Taipei, Taiwan.

19. Lindell, M.K. (2007). EMBLEM2: An Empirically Based Large-Scale Evacuation Time Estimate Model for Hurricane Evacuation Analysis, *Second International Conference on Urban Disaster Reduction*, held in Taipei, Taiwan.

20. Lindell, M.K. (2007). EMBLEM2: An Empirically Based Large-Scale Evacuation Time Estimate Model for Hurricane Evacuation Analysis, *Second International Conference on Urban Disaster Reduction*, held in Taipei, Taiwan.

21. Lindell, M.K. & Prater, C.S. (2008). Disaster Response and Recovery: The Cases of Hurricanes Katrina and Rita. *Study Course on Disaster Emergency Response and Recovery*. Sponsored by Asia-Pacific Economic Cooperation, held in Beijing, China.

22. Lindell, M.K. (2007). *Society's Resilience in Withstanding Disaster*. Sponsored by the Ditchley Foundation, held in Oxford, UK.

*PRESENTATIONS*

1. Lindell, M.K. (1976). *Assessment of social values in nuclear waste disposal.* Western Psychological Association.

2. Lindell, M.K. & Maynard, W.S. (1976). *Interchange of technical information and public beliefs in energy decisionmaking.* Western Psychological Association.

3. Drexler, J.A., Jr. and Lindell, M.K. (1976). *Training/job fit and worker satisfaction.* Western Psychological Association.

4. Lindell, M.K. (1978). *Jackknife, ridge and ordinary least squares estimators of regression parameters: A Monte Carlo comparison.* Psychometric Society.

5. Lindell, M.K. and Drexler, J.A., Jr. (1978). *Issues in using survey methods for measuring organizational change.* Western Psychological Association.

6. Lindell, M.K. (1979). *Equal vs. differential predictor weights: testing hypotheses and estimates with restricted regression models.* Psychometric Society.

7. Lindell, M.K., Earle, T.C., and Perry, R.W. (1979). *Radioactive wastes: public attitudes toward disposal facilities.* American Nuclear Society.

8. Lindell, M.K. (1980). *Ridge and ordinary least squares estimators of relative weights in regression analysis.* Psychometric Society.

9. Lindell, M.K., Perry, R.W. and Greene, M.R. (1980). *Race and disaster warning response.* Pacific Sociological Association.

10. Lindell, M.K., Perry, R.W. and Greene, M.R. (1980). *Consistency of attitudes and behavior related to nuclear power.* Western Psychological Association.

69

PRESENTATIONS (continued)

11. Greene, M.R., Perry, R.W. and Lindell, M.K. (1981). *Citizen perception of public action.* Western Political Science Association.

12. Lindell, M.K., Perry, R.W. and Greene, M.R. (1981). *Individual response to emergency preparedness planning.* Western Social Science Association.

13. Lindell, M.K., Perry, R.W. and Greene, M.R. (1981). *Social and psychological factors affecting evacuation decisionmaking.* American Psychological Association.

14. McGuire, M.V., Lindell, M.K. and Walsh, M.E. (1981). *Law enforcement response to an investigative innovation.* American Psychology Law Society.

15. Perry, R.W., Greene, M.R. and Lindell, M.K. (1981). *Evacuation behavior during the May 18th eruption of Mt. St. Helens.* Pacific Sociological Association.

16. Bolton, P.A., Perry, R.W., Lindell, M.K. and Greene, M.R. (1981). *Hazard experience and warning response of older persons.* Gerontological Society of America.

17. Lindell, M.K. (1982). *Judgments, values and the management of conflict over nuclear waste.* International Conference on Social Impact Assessment.

18. Earle, T.C. and Lindell, M.K. (1982). *Public perceptions of industrial risks.* Society for Risk Analysis.

19. Lindell, M.K. and Earle, T.C. (1982). *How close is close enough: public perceptions of the risks of industrial facilities.* Society for Risk Analysis.

20. Perry, R.W., Lindell, M.K. and Huffnagel, R. (1982). *Implications of collective behavior theory for civil defense programs.* Pacific Sociological Association.

21. Lindell, M.K. and Perry, R.W. (1982). *Protective action recommendations: how would the public respond?* American Nuclear Society.

22. Lindell, M.K. and Southwick, L.L. (1982). *An analysis of information integration using free response data.* American Psychological Association.

23. Southwick, L.L., Lindell, M.K. and Earle, T.C. (1982). *Attitude polarization in public issues: the roles of cognitive complexity, evaluative consistency and issue importance.* Washington State Psychological Association.

24. Lindell, M.K. (1982). *Development of a design for the Nuclear Regulatory Commission's emergency operations center.* Human Factors Society.

25. Hansvick, C. Archea, J., Hanson, H., Keating, J., Lindell, M.K. and Wise, J.A. (1983). *Designing for personal control in hazards and disasters.* Environmental Design Research Association.

26. Lindell, M.K. (1983). *Analysis of emergency staffing for nuclear power plants.* Human Factors Society.

27. Lindell, M.K., Moeller, P.A. and Renner, M.S. (1984). *Offsite response considerations for appropriate protective actions.* American Nuclear Society.

28. Lindell, M.K. and Perry, R.W. (1984). *Social psychological processes and personal risk assessment.* Society for Risk Analysis.

29. Lindell, M.K. (1985). *Tukey's "jackknife" in theory and in practice.* American Psychological Association.

30. Lindell, M.K. (1985). *Decision criteria for sheltering or evacuating medical facilities in radiological and hazardous materials incidents.* Association for the Advancement of Medical Instrumentation.

31. Lindell, M.K. (1989). *Disasters in the application of I/O Psychology: Designing and staffing emergency response organizations.* Society for Industrial and Organizational Psychology Doctoral Consortium.

32. Lindell, M.K. (1990). *Social systems issues in high level radioactive waste management.* International Conference on High Level Radioactive Waste Management.

33. Lindell, M.K., Landis, R.S. & Quiñones, M.A. (1991). *Employee response to job loss: An emergency decision making approach.* Society for Industrial and Organizational Psychology.

34. Lindell, M.K. (1991). *Risk communication and emergency response.* Society for Risk Analysis (Michigan Chapter).

35. Lindell, M.K. & Whitney, D.J. (1992). *Team climate and the effectiveness of Local Emergency Planning Committees.* Hazards Research and Applications Workshop.

LINDELL-004149

PRESENTATIONS (continued)

36. Lindell, M.K. (1993). *Assessing emergency preparedness in support of hazardous facility risk analyses.* Society for Risk Analysis.

37. Futch, C.J., Lindell, M.K. & Clause, C.S. (1994). *Attitudinal and behavioral effects on household chemical disposal practices.* American Psychological Society.

38. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1994). *An assessment of community emergency planning organizations in three states.* Hazards Research and Applications Workshop.

39. Lindell, M.K. (1994). *State of the art in psychological research on disasters.* Hazards Research and Applications Workshop.

40. Lindell, M.K. & Perry, R.W. (1994). *The protective action decision model.* International Sociological Association.

41. Lindell, M.K. (1994). *Are Local Emergency Planning Committees effective in developing community disaster preparedness?* American Society for Public Administration.

42. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1995). *Organizational correlates of effective LEPCs.* Hazards Research and Applications Workshop.

43. Lindell, M.K. & Perry, R.W. (1995). *Earthquake-initiated hazmat releases: A preliminary assessment.* Hazards Research and Applications Workshop.

44. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1995). *Organizational assessment of the Muskegon LEPC.* American Sociological Association.

45. Lindell, M.K. & Perry, R.W. (1996). *Earthquake damage and hazard adjustment by hazardous materials facilities following the Northridge earthquake.* Earthquake Engineering Research Institute.

46. Perry, R.W. & Lindell, M.K. (1996). *Emergency response challenges in the Northridge earthquake: The impacts of earthquake-induced hazmat releases.* National Disaster Medical System Conference.

47. Lindell, M.K. & Perry, R.W. (1996). *Emergency planning by municipal and county government organizations.* National Disaster Medical System Conference.

48. Lindell, M.K. & Perry, R.W. (1996). *Integrating hazardous materials emergency response planning into the earthquake management environment.* National Disaster Medical System Conference.

49. Lindell, M.K. & Brandt, C.J. (1996). *Measuring inter-rater agreement using $r_{wg(j)}$.* Society for Industrial and Organizational Psychology.

50. Lindell, M.K. (1996). *Disaster planning organizations and I/O Psychology: An overview.* Society for Industrial and Organizational Psychology.

51. Lindell, M.K. (1996). *Multi-method assessment of organizational effectiveness in a Local Emergency Planning Committee.* Society for Industrial and Organizational Psychology.

52. Lindell, M.K. (1996). *Real world constraints to implementing hazard adjustments.* Hazards Research and Applications Workshop.

53. Lindell, M.K. (1996). *Emergency preparedness and response: Major advances in the past twenty years.* Hazards Research and Applications Workshop.

54. Brandt, C.J. & Lindell, M.K. (1996). *Climate consensus as a mediator of the relationship between organizational structure and effectiveness.* Academy of Management.

55. Lindell, M.K. & Perry, R.W. (1996). *Earthquake initiated hazmat releases: An assessment.* International Conference and Exposition on Natural Disaster Reduction.

56. Lindell, M.K. (1997). *Local Emergency Planning Committees: Community based organizations for toxic chemical hazard management.* Hazards Research and Applications Workshop.

57. Lindell, M.K. (1997). *Household adoption of seismic adjustments: A research design.* Hazards Research and Applications Workshop.

58. Lindell, M.K., Brandt, C.J. & Whitney, D.J. (1998). *A revised index of agreement for multi-item ratings of a single target.* Society for Industrial and Organizational Psychology.

59. Lindell, M.K. & Whitney, D.J. (1998). *Correlates of seismic hazard adjustment adoption.* Hazards Research and Applications Workshop.

LINDELL-004150

*PRESENTATIONS (continued)*

60. Lindell, M.K., (1999). *Assessing and testing interrater agreement in multi-item rating scales.* Society for Industrial and Organizational Psychology.

61. Lindell, M.K. and Prater, C.S. (1999). *Household adoption of seismic hazard adjustments: A comparison of residents in two states.* Hazards Research and Applications Workshop.

62. Lindell, M.K. and Prater, C.S. (2000). *Risk area residents' perceptions of seismic hazard adjustments.* Hazards Research and Applications Workshop.

63. Lindell, M.K. (2000). *Getting the disciplines to work together.* Hazards Research and Applications Workshop.

64. Lindell, M.K. & Prater, C.S. (2000). *Community management of environmental hazards: Household response to earthquakes.* Association of Collegiate Schools of Planning.

65. Lindell, M.K., (2001). *Assessing climate consensus effects using Multiple Moment Analysis (MMA) and Within and Between Analysis (WABA).* Society for Industrial and Organizational Psychology.

66. Lindell, M.K. (2002). *Analyzing interrater agreement with and without disattenuation.* Society for Industrial and Organizational Psychology.

67. Lindell, M.K., Prater, C.S., Perry R.W., & Wu, J.Y. (2002). *EMBLEM: An empirically based large-scale evacuation time estimate model.* Hazards Research and Applications Workshop.

68. Hwang, S.N., Lee, S.W. & Lindell, M.K., (2002). *Does environmental risk affect in-migration and duration of stay?* Hazards Research and Applications Workshop.

69. Lindell, M.K., (2003). *Achievements and challenges in research on climate and culture strength.* Society for Industrial and Organizational Psychology.

70. Lindell, M.K., (2003). *Interrater agreement.* Society for Industrial and Organizational Psychology.

71. Peacock, W.G., Lindell, M.K. & Prater, C.S. (2003). *Effects of uncertainty on evacuation decisions by households and local officials.* Hazards Research and Applications Workshop.

72. Lindell, M.K., Prater, C.S. & Lu, J.C. (2004). *Household evacuation decision making in Hurricane Lili.* Hazards Research and Applications Workshop.

73. Prater, C.S., Peacock, W.G., Lindell, M.K., Lu, J.C. & Zhang, Y & (2004). *GIS based analysis of socioeconomic vulnerability to disasters.* Hazards Research and Applications Workshop.

74. Zhang, Y., Lindell, M.K. & Prater, C.S. (2004). *Modeling and managing the vulnerability of community businesses to environmental disasters.* Association of Collegiate Schools of Planning.

75. Lindell, M.K., Prater, C.S., Perry, R.W. & Peacock, W.G. (2004). *Managing evacuations from tropical cyclones.* Hazards 2004.

76. Arlikatti, S. & Lindell, M.K. (2004). *Perceived stakeholder characteristics and adoption of seismic hazard adjustments: A survey of California and Washington residents.* Hazards Research and Applications Workshop.

77. Arlikatti, S. & Lindell, M.K. (2004). *Hurricane risk management in the Rio Grande Valley Study Area. Sustainable development in the Rio Bravo/ Rio Grande borderlands.* Texas A & M University, Kingsville, TX.

78. Arlikatti, S. & Lindell, M.K. (2004). *Risk area population's risk area accuracy – Texas Gulf Coast.* South Western Social Science Association.

79. Arlikatti, S. & Lindell, M.K. (2006). *The role of knowledge, trust, responsibility, and stakeholder interactions in garnering partnerships for seismic safety.* Association of Collegiate Schools of Planning.

80. Arlikatti, S., Lindell, M.K. & Prater, C.S. (2006). *Building trust among community stakeholders, understanding and responding to terrorism: A multidimensional approach.* Advanced Research Workshop hosted by NATO and Turkish Institute of Police Studies

81. Lindell, M.K. & Perry, R.W. (2007). *Local Emergency Planning Committees: Community organizations for managing the risks of natural and technological hazards.* International Institute for Applied Systems Analysis/Disaster Prevention Research Institute Forum.

82. Lindell, M.K. & Hwang, S.N. (2007). *Households' perceived personal risk and responses in a multi-hazard environment.* Society for Risk Analysis.

LINDELL-004151

*INVITED PRESENTATIONS*

1. Lindell, M.K. (1983). *Perception of risk at nuclear waste disposal sites and power plants.* Pacific Lutheran University Center for the Study of Public Policy.
2. Lindell, M.K. (1983). *Emergency preparedness at nuclear power plants.* University of Washington Department of Environmental Health and Nuclear Engineering.
3. Lindell, M.K. (1983). *Design of emergency response facilities.* Pacific Northwest Laboratory Short Course in Emergency Planning.
4. Lindell, M.K. (1983). *Emergency public information.* Pacific Northwest Laboratory Short Course in Emergency Planning.
5. Lindell, M.K. (1984). *Emergency staffing.* Pacific Northwest Laboratory Short Course in Emergency Planning.
6. Lindell, M.K. (1984). *Emergency public information.* Pacific Northwest Laboratory Short Course in Emergency Planning.
7. Lindell, M.K. (1984). *Communicating risk information to the public: A review of research on natural hazards.* NSF/EPA Workshop on Risk Communication.
8. Lindell, M.K. (1985). Two lectures on *Protective action decision making. and Emergency public information.* Pacific Northwest Laboratory Short Course in Emergency Planning.
9. Lindell, M.K. (1985). *Social and political aspects of nuclear power plant emergency planning.* Health Physics Society Short Course on Emergency Planning.
10. Lindell, M.K. (1985). *Social response to the Mt. St. Helens eruptions.* University of Washington Extension Course on Mt. St. Helens.
11. Lindell, M.K. (1986). *Concerns about offsite response in a nuclear power plant emergency.* GPU Nuclear Annual Training Workshop for TMI Area Emergency Response Agencies.
12. Lindell, M.K. (1987). *Public response considerations and public information.* Federal Emergency Management Agency National Emergency Training Center Short Course on Evacuation Planning and Response Simulation (also taught in 1988).
13. Lindell, M.K. (1988). *Disaster psychology.* Federal Emergency Management Agency National Emergency Training Center Short Course on Multi-Hazard Planning (taught twice).
14. Lindell, M.K. (1988). *Risk communication: What to tell the public about emergency planning.* Michigan State University Center for Environmental Toxicology Seminar on Risk Communication.
15. Lindell, M.K. (1988). *Emergency planning for hazardous facilities.* American Society of Civil Engineers Specialty Conference on Hazardous Facilities: Siting, Permitting and Development.
16. Lindell, M.K. (1988). *Public perceptions of emergency response actions.* Environmental Protection Agency/Federal Emergency Management Agency Conference on Sheltering In-Place During Chemical Emergencies.
17. Lindell, M.K. & Palmer, D. (1989). *Evacuation versus in-place shelter during hazardous materials emergencies.* Annual Conference of the Virginia Association of Hazardous Materials Response Specialists and Virginia Department of Emergency Services.
18. Kamrin, M.A. & Lindell, M.K. (1990). *Risk communication.* Ingham County Local Emergency Planning Committee Risk Communication Workshop.
19. Lindell, M.K. (1990). *Public response to incidents.* Federal Emergency Management Agency Technical Orientation Workshop on Emergency Preparedness for Incidents at Army Chemical Weapons Depots.
20. Lindell, M.K. (1990). *Organizational response to incidents.* Federal Emergency Management Agency Technical Orientation Workshop on Emergency Preparedness for Incidents at Army Chemical Weapons Depots.
21. Lindell, M.K. (1993). *How people respond in emergencies: What influences them?* Federal Emergency Management Agency/Department of the Army Chemical Stockpile Emergency Preparedness Program (CSEPP) Emergency Broadcast System (EBS) Symposium.
22. Lindell, M.K. (1993). *How to motivate members and mobilize communities for LEPCs.* Michigan Emergency Management Workshop.

LINDELL-004152

*INVITED PRESENTATIONS (continued)*

23. Lindell, M.K. & Whitney, D.J. (1993). *Assessing emergency preparedness for hazardous waste transportation and disposal.* Michigan Waste Management Conference.

24. Futch, C., Clatterbaugh, C.M. & Lindell, M.K. (1993). *Attitudes and perceptions associated with household hazardous waste.* Michigan Waste Management Conference.

25. Lindell, M.K. (1993). *Enhancing community emergency preparedness using organization development techniques.* Disaster Research Center, University of Delaware.

26. Lindell, M.K. (1993). *Enhancing the effectiveness of Local Emergency Planning Committees: Perspectives from Industrial/Organizational Psychology.* University of Maryland Department of Psychology.

27. Lindell, M.K. (1993). *Improving the effectiveness of Local Emergency Planning Committees: A psychological perspective.* George Washington University Department of Psychology.

28. Lindell, M.K. (1993). *Protective response by the public in natural and technological disasters.* Southern California Edison Annual Medical Seminar for San Onofre Area Hospitals.

29. Lindell, M.K. (1994). *Indiana LEPC survey results.* Indiana LEPC Conference.

30. Lindell, M.K. (1994). *Hazardous materials in the Northridge earthquake.* Northridge Earthquake Research Coordination Conference.

31. Lindell, M.K. (1995). *Overview of protective action decision making.* Risk Analysis Symposium: Integrating Onsite Risk Assessment and Offsite Implementation in Protective Action Decision Making.

32. Lindell, M.K. (1995). *Team climate and LEPC effectiveness.* Indiana LEPC Conference.

33. Lindell, M.K. (1995). *Protective action implementation by the public during chemical emergencies.* Protecting the Public: A conference on protective actions during chemical emergencies.

34. Perry, R.W. & Lindell, M.K. (1995). *Hazardous materials problems and solutions in earthquakes.* Western States Seismic Policy Council.

35. Lindell, M.K. (1995). *Characteristics of effective LEPCs.* National Governors' Association State Emergency Response Commission Conference.

36. Lindell, M.K. (1995). *How to improve LEPC effectiveness.* EPA Region III Chemical Emergency Preparedness and Prevention Conference.

37. Lindell, M.K. (1996). *Risk perception and risk communication.* Prince William Sound Risk Assessment Steering Committee Workshop on Risk Assessment, Risk Perception and Risk Communication.

38. Lindell, M.K. (1996). *Evaluating the effectiveness of Local Emergency Planning Committees.* George Washington University Administrative Sciences Program.

39. Lindell, M.K. (1997). *Enhancing the effectiveness of Local Emergency Planning Committees.* Texas A&M University College of Architecture.

40. Lindell, M.K. (1997). *Enhancing the effectiveness of Local Emergency Planning Committees.* Worcester Polytechnic Institute Department of Social Science and Policy Analysis.

41. Lindell, M.K. & Perry, R.W. (1997). *Hazardous materials releases and risk reduction following the Northridge earthquake.* Northridge Earthquake Research Conference.

42. Lindell, M.K. (1997). *Have Local Emergency Planning Committees been effective?* Toxics Release Inventory and Right-to-Know Conference.

43. Lindell, M.K. (1998). *Climate quality and climate consensus as mediators of the relationship between organizational antecedents and outcomes.* Tulane University Department of Psychology.

44. Lindell, M.K. (1998). *Improving the effectiveness of Local Emergency Planning Committees.* University of North Texas Institute of Emergency Administration & Planning.

45. Lindell, M.K. (1999). *Hazard reduction and recovery: Foundation for reconstruction and transformation.* Conference on Reconstruction and Transformation of Central America. Texas A&M University.

46. Lindell, M.K. (1999). *Recent developments in assessing interrater agreement.* Center for the Advancement of Research Methods and Analysis Mini-Conference on Research Methods for Organizational and Social Psychology. Virginia Commonwealth University.

LINDELL-004153

*INVITED PRESENTATIONS (continued)*

47. Lindell, M.K. (1999). *A rapid approximate protective action decision (RAPAD) table for nuclear power plant accident response.* Federal Emergency Management Agency Technology Partnership for Emergency Management Workshop and Exhibition.

48. Lindell, M.K. (1999). *Prevention pays: But how do we get people to invest?* University of North Texas World Disaster Reduction Day.

49. Lindell, M.K. (2000). *Tsunami warning preparedness.* Oregon Department of Geology and Mineral Industries Coastal Workshop on Tsunami Preparedness.

50. Lindell, M.K. (2001). *Assessing community impacts of environmental disasters.* Cities on Volcanoes 2. Auckland, New Zealand.

51. Lindell, M.K. (2001). *Community response to a nuclear power plant accident.* Indian Point Nuclear Power Plant Offsite Emergency Preparedness Workshop.

52. Lindell, M.K. (2002). *Recent advances in emergency management information technology.* Federal Emergency Management Higher Education Workshop.

53. Lindell, M.K. (2003). *Assessing community impacts of environmental disasters.* Consequence-Based Engineering Institute.

54. Lindell, M.K. (2003). *The second assessment books.* FEMA Higher Education Workshop.

55. Lindell, M.K. (2003). *"Introduction to emergency management" electronic textbook.* FEMA Higher Education Workshop.

56. Lindell, M.K., Prater, C.S., & Peacock, W.G. (2004). *Models and methods of disaster impact assessment.* Mid-America Earthquake Center Annual Meeting.

57. Lindell, M.K. (2004). *The Protective Action Decision Model: Theoretical foundations, empirical support, and practical applications.* University of Texas at San Antonio Department of Psychology.

58. Lindell, M.K. & Prater, C.S. (2004). *Development of a hurricane evacuation management decision support system (EMDSS).* Virginia Commonwealth University School of Government and Public Administration.

59. Lindell, M.K. & Prater, C.S. (2004). *Evacuation behavior in Hurricane Lili.* National Weather Service Lake Charles Regional Hurricane Conference.

60. Lindell, M.K. & Prater, C.S. (2004). *Estimating evacuation time components: Lessons from nuclear power plants, hurricanes, and the first World Trade Center bombing.* National Institute for Standards and Technology Workshop on Building Occupant Movement During Fire Emergencies.

61. Lindell, M.K. & Prater, C.S. (2004). *Organizational decision making and household response to tsunami evacuation warnings.* Tsunami Scenario Simulation Workshop.

62. Lindell, M.K. (2005). *Assessing community impacts of environmental disasters.* Consequence-Based Engineering Institute.

63. Lindell, M.K., Prater, C.S. & Peacock, W.G. (2005). *Organizational communication and decision making in hurricane emergencies.* National Weather Service Hurricane Forecast Socioeconomic Workshop.

64. Lindell, M.K. & Prater, C.S. (2005). *EMDSS: An Evacuation Management Decision Support System.* National Science Foundation.

65. Lindell, M.K. & Prater, C.S. (2005). *EMDSS: An Evacuation Management Decision Support System.* Hazards and Disasters Researchers Meeting.

66. Lindell, M.K., & Prater, C.S. (2005). *Emergency management for the facilities manager.* Facilities Management Industry Advisory Council.

67. Lindell, M.K., Prater, C.S. & Peacock, W.G. (2006). *Organizational communication and decision making in hurricane emergencies.* American Meteorological Society.

68. Lindell, M.K. (2006). *Hurricane science and engineering: Research needs in emergency preparedness and response.* National Science Board Committee on Hurricane Science and Engineering.

69. Lindell, M.K., & Prater, C.S. (2006). *Evacuation from Hurricane Katrina: Jefferson and St. Charles parishes.* National Hurricane Conference.

LINDELL-004154

*INVITED PRESENTATIONS (continued)*

70. Lindell, M.K., & Al-Nammari, F. (2006). *Before disaster strikes: Plan for recovery*. Texas Historical Commission Annual Historic Preservation Conference. Also presented at International Symposium on the Development Experience and Management (Nantou Taiwan)

71. Lindell, M.K., & Prater, C.S. (2006). *Understanding evacuation demand*. Intelligent Transportation Systems America.

72. Lindell, M.K. (2006). *Hazard adjustment adoption: Theoretical, methodological, and practical issues*. American Marketing Association: Marketing and Public Policy Conference.

73. Lindell, M.K. & Prater, C.S. (2006). *Hurricane evacuation after Katrina/Rita: How much worse could it be?* American Meteorological Society 2nd Annual Community Meeting.

74. Arlikatti, S., Lindell, M. & Prater, S. (2006). *Building trust among community stakeholders*. NATO and TIPS Advanced Research Workshop on Understanding and Responding to Terrorism: A Multidimensional Approach.

75. Lindell, M.K. (2007). *Personal styles of incident management in emergencies, disasters, and catastrophes*. Wiley Faculty Network Guest Lecture Series.

76. Lindell, M.K., & Prater, C.S. (2007). *What caused the traffic jams in the Hurricane Rita evacuation?* National Hurricane Conference.

77. Lindell, M.K. (2007). *Organizational preparedness for public warnings*. Department of Homeland Security Workshop on Risk Communication and Warnings in Support of Protective Actions in Terrorist Events.

78. Lindell, M.K. (2007). *Pre-event public education for event-specific warnings*. Department of Homeland Security Workshop on Risk Communication and Warnings in Support of Protective Actions in Terrorist Events.

79. Lindell, M.K., & Sorensen, J.H. (2007). *Technologies available to deliver public warnings*. Department of Homeland Security Workshop on Risk Communication and Warnings in Support of Protective Actions in Terrorist Events.

80. Lindell, M.K. (2007). *Community impacts of environmental disasters*. University of Sao Paulo-Sao Carlos (Brazil) Department of Hydraulic and Sanitary Engineering.

81. Lindell, M.K. (2007). *Submitting manuscripts to journals: An editor's perspective*. Ming-Chuan (Taiwan) University Dept. of Urban Planning and Disaster Management.

82. Lindell, M.K., Prater, C.S., Siebeneck, L. & Cova. T. (2009). *Hurricane Ike reentry*. National Hurricane Conference.

*TECHNICAL REPORTS*

1. Lindell, M.K. (1974). *Factors Affecting Measures of Linear Achievement: Some Methodological Considerations*. Program on Judgment and Social Interaction, Report No. 167, Institute of Behavioral Science, University of Colorado.

2. Nealey, S.M., Thornton, G.C., Maynard, W.S. & Lindell, M.K. (1975). *Defining Research Needs to Insure Continued Job Motivation of Air Traffic Controllers in Future Air Traffic Control Systems*. Battelle Human Affairs Research Centers.

3. Hébert, J.A., Lindell, M.K., Maynard, W.S., Nealey, S.M. & Burnham, J.B. (1975). *Socially Weighted Linear Composites in Environmental Decision Making*. BNWL-B-467 UC-11, Battelle Pacific Northwest Laboratories.

4. Maynard, W.S., Nealey, S.M., Hebert, J.A. & Lindell, M.K. (1976). *Public Values Associated with Nuclear Waste Disposal*. BNWL-1997 UC-11, Battelle Pacific Northwest Laboratories.

5. Curry, M.G., Greene, M.R. & Lindell, M.K. (1977). *Energy Policy and Public Acceptance: Current and Future Directions*. BNWL-2084 RAP-15, Battelle Pacific Northwest Laboratories.

6. Lindell, M.K., Earle, T.C., Hébert, J.A. & Perry, R.W. (1978). *Radioactive Wastes: Public Attitudes Toward Disposal Facilities*. B-HARC-411-044.

7. Lindell, M.K. (1978). *Equal vs. Differential Predictor Weights: Testing Hypotheses and Estimates With Restricted Regression Models*. B-HARC-422-032.

LINDELL-004155

TECHNICAL REPORTS (continued)

8. Lindell, M.K. (1979). *Jackknife, Ridge and Ordinary Least Squares Estimators of Regression Parameters: A Monte Carlo Comparison.* B-HARC-422-031.

9. Lindell, M.K. & Earle, T.C. (1979). *Public Attitudes Toward Risk Tradeoffs in Energy Policy Choices.* B-HARC-411-025.

10. Greene, M.R., Lindell, M.K., Nealey, S.M. & Drexler, J.A., Jr. (1979). *Nuclear Waste Management and Environmental Mediation: An Exploratory Analysis.* B-HARC-411-029.

11. Lindell, M.K., Perry, R.W. & Greene, M.R. (1979). *Attitude-Action Consistency and Social Policy Related to Nuclear Power.* B-HARC-411-030.

12. Lindell, M.K., Earle, T.C. & Perry, R.W. (1979). *Social Issues and Energy Alternatives: The Context of Conflict over Nuclear Waste.* B-HARC-411-033.

13. Perry, R.W., Schuller, C.R., Lindell, M.K., Greene, M.R., Earle, T.C. & Walsh, J.T. (1979). *Community Stress and Social and Technological Change: A Framework for Interpreting the Behavior of Social Movements and Community Action Groups.* B-HARC-411-034.

14. Perry, R.W., Lindell, M.K. & Greene, M.R. (1979). *The Implications of Natural Hazard Evacuation Warning Studies for Crisis Relocation Planning.* B-HARC-411-035.

15. Schilling, A., Harris, A., Lindell, M., Marcus, A., Perry, R. & Selvin, M. (1979). *Emergency Response in Transportation of Radioactive Materials: An Evaluation Methodology.* BHARC-311-004.

16. Lindell, M.K. & Jayne, S. (1979). *Evaluation of the Management Job Analysis Questionnaire.* BHARC/422-79-050.

17. Earle, T.C. & Lindell, M.K. (1980). *The Role of the News Media in the Gasoline Crisis.* BHARC/411-80-002.

18. Lindell, M.K., Walsh, J.T., Drexler, J.A, Jr. & Lawler, E.E., III. (1980). *Effects of Technology on Experienced Job Characteristics and Job Satisfaction.* BHARC-422/80/019.

19. Urbanik, T., Desrosiers, A., Lindell, M.K. & Schuller, C.R. (1980). *Analysis of Techniques for Estimating Evacuation Times for Emergency Planning Zones.* BHARC-401/80-017. NUREG/CR-1745.

20. Perry, R.W., Lindell, M.K. & Bennett, C.W. (1981). *Security Clearance Criteria and Insider Motivation.* BHARC-400/81/025.

21. Bolton, P.A., Greene, M.R. & Lindell, M.K. (1981). *Public Information Programs Accompanying Emergency Plans at Nuclear Power Plants: Issues for Consideration.* BHARC-400/81/025.

22. Lindell, M.K. & Earle, T.C. (1981). *Comparative Analysis of Risk Characteristics of Nuclear Waste Repositories and Other Disposal Facilities.* BHARC-411/81/005.

23. Earle, T.C., Lindell, M.K. & Rankin, W.L. (1981). *Risk Perception, Risk Evaluation and Human Values: Cognitive Bases of the Acceptability of a Radioactive Waste Repository.* BHARC-411/81/007.

24. Lindell, M.K., Perry, R.W. & Greene, M.R. (1981). *Public Response to Evacuation Warnings: Implications of Natural Hazards Evacuations for Nuclear Emergencies.* BHARC-411/81/032.

25. Earle, T.C., Southwick, L.L. & Lindell, M.K. (1981). *Newspaper Coverage of Mt. St. Helens: Patterns of Content and Information Sources.* BHARC-411/81/035.

26. Desrosiers, A.E., Hickey, E.E., Lewis, J.R. & Lindell, M.K. (1981). *Criteria for Evaluation of Emergency Response Facilities.* (published as NUREG-0814).

27. Lindell, M.K., Wise, J.A., Desrosiers, A.E., Griffin, B.N. & Meitzler, W.D. (1982). *Design Basis for the NRC Operations Center.* BHARC-400/82/005.

28. Lindell, M.K. & Southwick, L.L. (1982). *An Analysis of Information Integration Using Free Response Data.*

29. Southwick, L.L., Lindell, M.K. & Earle, T.C. (1982). *Attitude Polarization in Public Issues: The Roles of Cognitive Complexity, Evaluative Consistency and Issue Importance.* BHARC-400/82/006.

30. Lindell, M.K. (1983). *Design Recommendations for the Region V Incident Response Center.* BHARC-400/83/031.

31. Lindell, M. K. (1983). *Analysis of Emergency Staffing for Nuclear Power Plants.* BHARC-400/83/032.

32. Lindell, M. K. (1984). *Communicating Risk Information to the Public: A Review of Research on Natural Hazards.* BHARC-400/84/026.

LINDELL-004156

*TECHNICAL REPORTS (continued)*

33. Lindell, M. K., Bolton, P. A., Perry, R. W., Stoetzel, G. A., Martin, J. B. & Flynn, C. B. (1985). *Planning Concepts and Decision Criteria for Sheltering and Evacuation in a Nuclear Power Plant Emergency.* Atomic Industrial Forum/National Environmental Studies Project. AIF/NESP-031.

34. Lindell, M.K., Martin, J.B. & Stoetzel, G.A. (1985). *A Protective Action Decision Procedure Using Radiological Release Data and Offsite Response Times.* BHARC-400/85/007.

35. Lindell, M.K. (1985). *Functional Analysis for the Hanford ECC.* BHARC-400/85/009.

36. Lindell, M.K. (1985). *Social and Political Aspects of Nuclear Power Plant Emergency Planning.* BHARC-400/85/012.

37. Lindell, M.K. (1985). *Analysis of Information Flow Within the Hanford Emergency Control Center.* BHARC-400/85/018.

38. Kartez, J.D., Lindell, M.K. & Kelley, W.J. (1986). *Managerial Acceptance of Research-Based Community Crisis Planning.* BHARC-400/86/002.

39. Morgenstern, M.H., Bolton, P.A., Geisendorfer, C.L., Lindell, M.K., Melber, B.D., Olson, J., Saari, L.M., Sanquist, T.F. & Wheeler, W.A. (1987). *Human Factors in the Design, Operation and Maintenance of Nuclear Power Plants.* BHARC-700/87/001.

40. Lindell, M.K., Landis, R.S. & Quiñones. (1991). *Framing Alternative Responses to Threatened Job Loss: A Laboratory Approach.* East Lansing, MI: Michigan State University Department of Psychology.

41. Ilgen, D.R., Lindell, M.K. & Schneider, J. (1991). *Changes in Attitudes, Beliefs, and Individual Responses Over Time in Closing/Idling Plants.* East Lansing, MI: Michigan State University Department of Psychology.

42. Lindell, M.K. (1992). *Hazard Awareness and Education: A Summary Paper Prepared for the Second Assessment of Research on Natural Hazards.* East Lansing, MI: Michigan State University Department of Psychology.

43. Lindell, M.K. & Lindell, D.M. (1992). *Introduction to HYPERSTAT.* East Lansing, MI: Michigan State University Department of Psychology.

44. Lindell, M.K. & Ogren, D.L. (1992). *Analysis of Emergency Preparedness for Transportation Accidents Involving Hazardous Wastes in Linden.* Haslett, MI: Emergency Response Planning and Research.

45. Lindell, M.K. & Ogren, D.L. (1992). *Analysis of Emergency Preparedness for Transportation Accidents Involving Hazardous Wastes in Linden: Supplementary Report.* Haslett, MI: Emergency Response Planning and Research.

46. Lindell, M.K. & Ogren, D.L. (1992). *Analysis of Emergency Preparedness for Transportation Accidents Involving Hazardous Wastes in Linden: Supplementary Report on the City of Rahway and Union County Emergency Operations Plans.* Haslett, MI: Emergency Response Planning and Research.

47. Lindell, M.K. & Ogren, D.L. (1993). *Analysis of Emergency Preparedness for Accidents Involving Transportation of Hazardous Wastes by Turnpike or Rail to the Proposed GAF Facility.* Haslett, MI: Emergency Response Planning and Research.

48. Lindell, M.K., Whitney, D.J., Futch, C.J., Clause, C.S. & Rogers, W.M. (1994). *First Year Feedback Report for the Michigan SERC.* East Lansing, MI: Michigan State University Department of Psychology.

49. Lindell, M.K., Whitney, D.J., Futch, C.J., Clause, C.S. & Rogers, W.M. (1994). *First Year Feedback Report for the Indiana SERC.* East Lansing, MI: Michigan State University Department of Psychology.

50. Lindell, M.K., Whitney, D.J., Futch, C.J., Clause, C.S. & Rogers, W.M. (1995). *First Year Feedback Report for the Illinois SERC.* East Lansing, MI: Michigan State University Department of Psychology.

51. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1995). *Feedback Report: Organizational Characteristics of Effective LEPCs.* East Lansing, MI: Michigan State University Department of Psychology.

52. Lindell, M.K. & Perry, R.W. (1995). *Earthquake-Initiated Hazardous Materials Releases: Lessons From the Northridge Earthquake.* Washington DC: George Washington University Institute for Crisis and Disaster Management.

53. Lindell, M.K. (1995). *Assessment of Emergency Preparedness for Hazardous Materials Incidents in Porter County Indiana.* Washington DC: George Washington University Institute for Crisis and Disaster Management.

LINDELL-004157

*TECHNICAL REPORTS (continued)*

54. Lindell, M.K. and Perry, R.W. (1996). *Major Advances in Emergency Preparedness and Response Since the First Assessment of Research on Natural Hazards.* Washington DC: George Washington University Institute for Crisis and Disaster Management.

55. Lindell, M.K. & Perry, R.W. (1996). *Adoption of Pre-Impact Earthquake Hazard Adjustments by Households, Businesses and Government Agencies.* Washington DC: George Washington University Institute for Crisis and Disaster Management.

56. Lindell, M.K., Whitney, D.J., Futch, C.J. & Clause, C.S. (1996). *Feedback Report: Team Climate Within Effective LEPCs.* Washington DC: George Washington University Institute for Crisis and Disaster Management.

57. Lindell, M.K. & Perry, R.W. (1997). *Hazardous Materials Releases and Risk Reduction Following the Northridge Earthquake.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

58. Lindell, M.K. (1998). *Target and Rater Post-Analyses of Interrater Agreement.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

59. Lindell, M.K. Graham, C.W. & Sanderson, W.G. (1999). *Hurricane Evacuation Shelter Project: Final Report.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

60. Lindell, M.K. (2000). *Design guidelines for emergency operations centres.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center (published as Appendix 10 in International Atomic Energy Agency, *Method for the Development of Emergency Response Preparedness for Nuclear or Radiological Accidents,* TECDOC-953).

61. Lindell, M.K., Sanderson, W.G., Hwang, S.N., Wu. J.Y., Lee, H.M., Jung, J.C. & Jeong, C.H. (2000). *Local Emergency Management Agencies' Use of Hazard Analysis Information.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

62. Lindell, M.K. (2001). *Assessing Climate Consensus Effects Using Multiple Moment Analysis (MMA) and Within and Between Analysis (WABA).* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

63. Lindell, M.K. (2001). *Analyzing Interrater Agreement With and Without Disattenuation.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

64. Lindell, M.K., Prater, C.S., Sanderson, W.G., Jr., Lee, H.M., Zhang, Y., Mohite A. & Hwang, S.N. (2001). *Texas Gulf Coast Residents' Expectations and Intentions Regarding Hurricane Evacuation.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center. [Available at www.txdps.state.tx.us/dem/documents.htm]

65. Lindell, M.K., Prater, C.S. Darapureddy, K., Hwang, S.N., Lee, H.M., Wu, J.Y. & Zhang, Y. (2001). *Coastal Bend Study Area Hurricane Storm Atlas.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

66. Lindell, M.K., Prater, C.S. Darapureddy, K., Hwang, S.N., Lee, H.M., Wu, J.Y. & Zhang, Y. (2001). *Hurricane Contingency Planning Guide: Valley Study Area.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

67. Lindell, M.K., Prater, C.S. & Zhang, Y. (2001). *Estimating Inland Wind Speeds for Hurricanes Striking the Texas Gulf Coast.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

68. Lindell, M.K., Prater, C.S., Perry, R.W. & Wu, J.Y. (2002). EMBLEM: *An Empirically-Based Large Scale Evacuation Time Estimate Model.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center. [Available at www.txdps.state.tx.us/dem/documents.htm]

69. Lindell, M.K., Prater, C.S. & Wu, J.Y. (2002). *Hurricane Evacuation Time Estimates for the Texas Gulf Coast.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center. [Available at www.txdps.state.tx.us/dem/documents.htm]

70. Lindell, M.K., Prater, C.S. Hwang, S.N. Wu, J.Y. & Zhang, Y. (2002). *Local Population and Estimated Evacuation in Risk Areas of the Texas Gulf Coast.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center. [Available at www.txdps.state.tx.us/dem/documents.htm]

71. Lindell, M.K., Prater, C.S., Lu, J.C., Arlikati, S. Zhang, Y. & Kang, J.E. (2004). *Hurricane Lili Evacuation.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

LINDELL-004158

*TECHNICAL REPORTS (continued)*

72. Lindell, M.K., Veluswami, S., Naik, S. & Agrawal, C. (2005). *Evacuation Management Decision Support System (EMDSS) For Hurricane Emergencies: User Manual*. College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

73. Lindell, M.K., Rogers, G.O., Prater, C.S., Peacock, W.G., Bilbo, D. & Wenger, D.E. (2005). *Protective Response to Air Attack on the Capitol Hill Complex*. College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

74. Lindell, M.K. & Prater, C.S. (2006). *Tsunami Hazard Management on the Oregon and Washington Coast: Recommendations for Research and Policy*. College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

75. Peacock, W.G., Maghelal, P., Lindell, M.K. & Prater, C.S. (2006). *Report on the Hurricane Rita Behavioral Survey*. College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

76. Lindell, M.K. & Prater, C.S. (2008). *Behavioral Analysis: Texas Hurricane Evacuation Study.* College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

77. Tang, Z., Lindell, M.K., Prater, C.S. & Hussey, C.M. (2008). *Measuring Local Coastal Zone Land Use Planning Capacity In Pacific Coastal Counties*. College Station TX: Texas A&M University Hazard Reduction & Recovery Center.

*PROFESSIONAL ACTIVITIES*

Member—American National Standards Institute/American Nuclear Society Committee on *Criteria for Emergency Response Facilities*, 1981–1982.

Conference Organizer and Chair—American Society of Civil Engineers Specialty Conference on *Community Planning for Hazardous Facilities*, 1987–1988.

Member—Academy of Management Personnel & Human Resources Division Annual Program Committee, 1988.

Secretary—American Society of Civil Engineers Task Committee on *Natural Hazards Mitigation*, 1988–1989.

Member—American Society of Civil Engineers Task Committee on *Natural Hazards Mitigation*, 1990.

Program Committee Member and Lead Organizer for Social Systems Sessions—American Nuclear Society/American Society of Civil Engineers International Conference on *High Level Radioactive Waste Management*, 1988–1990.

Business Manager—Society for Industrial and Organizational Psychology *The Industrial-Organizational Psychologist,* 1990–1992.

Co-Editor—*International Journal of Mass Emergencies and Disasters* Special Issue on Evacuation Research, 1991.

Member—American Society of Civil Engineers Task Committee on *Natural Disaster Reduction*, 1991–1994.

Member—Ingham County Local Emergency Planning Committee, 1992–1995.

Conference Organizing Committee Co-Chair—Michigan State University, Michigan State Police, Consumers Power, Detroit Edison, and Indiana Michigan Power Conference on *Protective Action Decision Making in Nuclear Power Plant Emergencies*, 1994.

Advisory Committee Member—National Institute of Chemical Studies Conference on *Protective Action for the Public During Chemical Emergencies*, 1994.

Member—National Science Foundation Assessment of Research and Applications on Natural Hazards Committee on *Emergency Planning and Response,* 1994–1995.

Chair—National Science Foundation Assessment of Research and Applications on Natural Hazards Committee on *Mitigation Adoption, Implementation and Evaluation*, 1994–1996.

Editor—*International Journal of Mass Emergencies and Disasters* Special Issue on Adoption, Implementation, and Evaluation of Natural Hazard Adjustments, 1996.

Editor—*Journal of Hazardous Materials* Special Issue on Protective Action Decision Making in Nuclear Power Plant Emergencies, 1997-1999.

Advisory Committee Member—International City/County Management Association *Disaster Resistant Communities Project,* 1996-1997.

LINDELL-004159

*PROFESSIONAL ACTIVITIES (Continued)*

Senior Research Mentor—National Science Foundation Project: *Enabling the Next Generation of Hazards Researchers*, 1996-1997.

Session Leader— Conference on *Toxics Release Inventory and Right-to-Know*, 1997.

Member—Society for Industrial and Organizational Psychology Annual Program Committee, 1998.

Co-Chair—Natural Hazards Researchers' Conference, 1998-2001.

Member—Scientific Programme Committee, *Cities on Volcanoes 2*, 1999-2001.

Member—American Society of Civil Engineers Council Committee on *Natural Disaster Reduction Policy*, 1999-2001.

Secretary—American Society of Civil Engineers Council on Natural Disaster Reduction Executive Committee, 1999-2001.

Fellow—Virginia Commonwealth University School of Business Center for the Advancement of Research Methods and Analysis, 2000-present.

Member—Steering Committee for the Research Grants Program of the Center for Disaster Management and Humanitarian Assistance, 2000-2001.

Visiting Scientist—Defense Threat Reduction Agency Program on *National Emergency Response Architecture*, 2001.

Research Mentor—National Science Foundation Project on *Enabling the Next Generation of Hazards Researchers*, 2002-2004.

Member—National Academy of Sciences Committee on *Disaster Research in the Social Sciences*, 2004-2005.

Member—National Academy of Sciences Committee on *Assessing Vulnerabilities Related to the Nation's Chemical Infrastructure*, 2004-2005.

Editor—*International Journal of Mass Emergencies and Disasters*, 2006-present.

Review Committee Member—*National Tsunami Hazard Mitigation Program*, 2007.

Review Committee Member—U.S. Department of Homeland Security *National Consortium for the Study of Terrorism and Responses to Terrorism*, 2007.

Committee of Visitors Member—National Science Foundation. *Human and Social Dynamics Program Review*, 2008.

Member—National Earthquake Hazard Reduction Program's Advisory Committee on Earthquake Hazard Reduction, 2008-2010.

Editorial Board—*Risk, Hazards & Crisis in Public Policy*, 2009-present.


*UNIVERSITY SERVICE*

Member—Department of Psychology Graduate Admissions Committee, 1989–1990.

Member—College of Social Science Graduate Committee, 1991–1993.

Chair—Department of Psychology Faculty Search Committee, 1993.

Member—University Grievance Committee, 1991–1997.

Graduate Advisor—Administrative Sciences Program, 1996–1997

Member—Department of Construction Science Tenure and Promotion Committee, 1997–2001

Member—College Research Council, 1997–2003

Member—University Research Council, 1997–2001

Member—Department of Construction Science Research Committee, 1998–2001

Member—Department of Construction Science Graduate Committee, 1999–2001

Member—Department of Construction Science Faculty Search Committee, 2000.
   Chair—Environmental Hazard Management Certificate Committee, 2000-2005.

Member—Department of Landscape Architecture & Urban Planning Faculty Search Committee, 2000.
   Chair—Department of Landscape Architecture & Urban Planning Faculty Search Committee, 2001-2002.
   Member—Department of Landscape Architecture & Urban Planning Department Head Search Committee, 2003-2004.

Member—College of Architecture Sustainability Search Committee, 2003-2004.

Chair—Department of Landscape Architecture & Urban Planning Tenure and Promotion Committee, 2004–present

LINDELL-004160

*UNIVERSITY SERVICE (Continued)*

Member—Department of Landscape Architecture & Urban Planning Master's of Urban Planning Committee, 2003-present.

Member—Department of Landscape Architecture & Urban Planning Department Faculty Search Committee, 2007-2008.

Member—Department of Landscape Architecture & Urban Planning Department Urban and Regional Science Doctoral Committee, 2008-present.

Member—College Research and Interdisciplinary Council, 2008-present.

Member—Texas A&M University Council of Principal Investigators, 2008-present.

Member—Vice-President for Research Faculty Advisory Committee, 2009-present.

*TEACHING EXPERIENCE*

    *UNDERGRADUATE*

        Psychological Statistics (Psychology Department)
        Psychological Testing (Psychology Department)
        Industrial/Organizational Psychology (Psychology Department)
        Social Psychology (Psychology Department)
        Personnel Research Techniques (Psychology Department)
        Introduction to Emergency Management (Planning Department)**
        Urban Analytical Methods (Planning Department)**

    *GRADUATE*

        Introduction to Research (Educational Psychology Department)
        Multivariate Analysis of Survey Data (Psychology Department)**
        Social Psychology (Psychology Department)
        Individual and Organizational Decision Processes (Psychology Department)**
        Organizational Psychology (Psychology Department)
        Research Methods in Applied Psychology (Psychology Department)**
        Social Influence (Psychology Department)
        Project Management Systems (Administrative Science Department)
        Strategic Management (Administrative Science Department)*
        Decision Analysis (Construction Science Department)*
        Supervision of the Workforce (Construction Science Department)*
        Disaster Response Planning (Planning Department)*
        Disaster Recovery and Hazard Mitigation (Planning Department)**
        Hazard Analysis and Management (Planning Department)
        Planning Methods I (Planning Department)**
        Community and Organizational Response to Disasters (Planning Department)

 * Substantially revised course format and content from previous instructors

 ** Developed new course not previously taught in this department

LINDELL-004161

**Attachment A**

**Exhibit 1**. Professional Opinions
1. FEMA has an important role in providing post-disaster housing, but its mission is more limited than is often assumed.
2. Hurricane Katrina imposed unique demands for displaced households and those trying to provide housing assistance for those displaced households.
3. FEMA emergency managers could not reasonably have been expected to prepare in advance of Hurricane Katrina for the level of temporary housing required after impact.
4. FEMA emergency managers had no forewarning about formaldehyde in THUs from its experience in providing temporary housing after previous disasters.
5. FEMA emergency managers achieved timely detection and accurate classification of the potential formaldehyde threat after Hurricane Katrina.
6. FEMA emergency managers had limited options and conflicting criteria for making decisions about how to manage the potential threat of formaldehyde in THUs.
7. FEMA emergency managers made reasonable decisions about how to respond to the potential threat of formaldehyde in THUs.
8. FEMA emergency managers developed and implemented a comprehensive program for responding to the potential threat of formaldehyde.
9. FEMA's formaldehyde communication program met prevailing standards of effectiveness and timeliness.
10. FEMA emergency managers made reasonable progress in assisting displaced households to move from temporary shelter to temporary housing and from temporary housing to permanent housing.

**Table 1**: Residential Losses in Major Urban Disasters Preceding Hurricane Katrina (US$)

|  | Hurricane Hugo September 1989 | Loma Prieta October 1989 | Hurricane Andrew August 1992 | Northridge January 1994 |
|---|---|---|---|---|
| Estimated Property Damage | $6.4 Billion | $7.5 Billion | $22.6 Billion | $25 Billion |
| Estimated value of residential losses | $3 Billion | $2 Billion | $10.5 Billion | $13 Billion |
| Housing damage as share of total per cent | 46 | 26 | 46 | 52 |
| Damaged housing units | 112,000 | 43,000 | 135,000 | 500,000 |
| Destroyed and severely damaged housing units | 36,000 | 11,500 | 80,000 | 60,000 |
| Per cent | | | | |
| destroyed or severely damaged | 32 | 27 | 59 | 20 |
| single-family units | 71 | 40 | 63 | 11 |
| multi-family units | 11 | 60 | 29 | 88 |
| mobile homes | 18 | 0 | 8 | 1 |
| Number of insurance claims | 278,000 | 45,000 | 300,000 | 280,000 |
| Residential insurance payouts | $1.5 Billion | $ .6 Billion | $1.2 Billion | $10 Billion |
| Residential vacancy rate (per cent) | 8 | 1 | 10 | 9 |

Source: Adapted from Comerio (1997)

LINDELL-004162

**Exhibit 2**. Reports, Articles or Books on Mobile Homes and Trailers after Disasters

| Study | Disaster |
|---|---|
| 1. SEDA Council of Governments 1975) | Tropical Storm Agnes floods (1972) |
| 2. Bolin (1982) | Vernon and Wichita Falls tornadoes (1979) |
| 3. Bolin and Bolton (1986) | Paris Texas tornado (1982) |
| 4. Comerio (1998b) | Hurricane Hugo (1989) |
| 5. Phillips (1993, 1998) | Loma Prieta earthquake (1989) |
| 6. Comerio (1998b) | Loma Prieta earthquake (1989) |
| 7. Peacock, Morrow and Gladwin (1997) | Hurricane Andrew (1992) |
| 8. Comerio (1998b) | Hurricane Andrew (1992) |
| 9. Comerio (1997) | Northridge earthquake (1994) |
| 10. Enarson (1999) | Hurricane Andrew (1992) Grand Forks flood (1997) |
| 11. Tobin, Bell, Whiteford and Montz (2006) | Hurricane Charley (2004) |

**Table 2**. Guidance for Ambient Formaldehyde Concentrations

| Department of Housing and Urban Development (1984) | • Regulates product emissions instead ambient concentrations (p.4) • Recognized but avoided issues of temps > 77F and RH > 50% in the South, and ventilation < 0.5 ACH in mobile homes when HVAC is not operating (p.8) • Concluded there is insufficient evidence to reduce below 0.5 parts per million (ppm, see p.10) • Regulated mobile homes but not travel trailers (p. 30) |
|---|---|
| Consumer Product Safety Commission (1997) | • "For most people, a low-level exposure to formaldehyde (up to 0.1 ppm) does not produce symptoms." |
| OSHA (1992) | • .75 ppm as an 8-hour time-weighted average |
| GEORGIA-PACIFIC MSDS (1998) | • "An expert panel has observed exposure up to concentrations of 0.3 ppm failed to produce irritation. [T]he threshold for long-term chronic pulmonary effects is between 0.4 and 3 ppm and for chronic obstructive pulmonary disease is 2 ppm. Pre-existing respiratory disorders may be aggravated by exposure." |
| BLUELINX MSDS (2004) | • Same as GEORGIA-PACIFIC (1998) |
| ATSDR (2007a) | • 1980s complaint mobile homes 0.0-4.2 ppm • 1993 complaint homes (including mobile homes ) 0.02-4.0 ppm • Medical Management Guidelines = 0.3 ppm • Chronic Minimal Risk Level (> 365 days) = .008 ppm |

84

**Exhibit 3**. Stages of Crisis Response

| Stage | Definition |
|---|---|
| Sense making | Recognizing from vague, ambivalent, and contradictory signals that something out of the ordinary is developing. |
| Decision making | Identifying alternative course of action, evaluating their consequences, and selecting the most appropriate ones. |
| Meaning making | Explaining the nature of the incident and the organization's response in a way that stakeholders understand and accept the organization's view of the event. |
| Crisis termination | Reallocating the focal organization's resources from the crisis response to other activities and negotiating agreement with other stakeholders that the crisis is, in fact, terminated. |
| Learning | Identifying and implementing the changes that must be made to the focal organization's plans and procedures, personnel selection and training, facilities, and equipment so it can respond more rapidly and effectively if this type of crisis occurs again. |

**Exhibit 4**. Formaldehyde Management Decision Objectives

| Objective | Definition |
|---|---|
| Formaldehyde safety | The degree to which an option reduces the level of formaldehyde exposure and, thus, the likelihood that THU occupants will experience adverse health effects. |
| Support for community recovery | The contribution an option makes to THU occupants' opportunities for household recovery by helping them re-establish their pre-disaster patterns of work, school, and social interaction at their pre-disaster homesites. |
| Financial cost to THU occupants | The amount of money that each option would cost each displaced household—over and above the normal cost of THU occupancy. |
| Financial cost to FEMA | The amount of money each option would cost FEMA—over and above the original purchase price of the THUs, their initial installation, and their final removal. |

**Table 3**. Alternatives for FEMA Emergency Managers' Response to Formaldehyde.

| Option | Formaldehyde safety | Support for community recovery | Financial cost to THU households | Financial cost to FEMA |
|---|---|---|---|---|
| A.  Do nothing | Moderately high | Very high | None | None |
| A.  VCD* only | High | Very high | Modest | None |
| B.  Replacement of individual units + VCD | Very high | High/medium | Modest | Minimal |
| C.  Accelerated phase-out of all TTs + VCD | Very high[+] | Medium/low | Modest | Moderate |
| D.  Accelerated phase-out of all THUs + VCD | Very high[++] | Very low | Modest | Moderate |
| E.  Immediate phase-out of all THUs | Extremely high | Extremely low | None | Substantial |

* VCD = Ventilation, cooling, and dehumidification

85

**Table 4**. Interdependencies among Decision Objectives

| Objective | Formaldehyde safety | Support for community recovery | Financial cost to THU occupants | Financial cost to FEMA |
|---|---|---|---|---|
| Formaldehyde safety | -- | Lower support | Higher cost | Higher cost |
| Support for community recovery | | -- | Higher cost | Lower cost |
| Financial cost to THU occupants | | | -- | Lower cost |
| Financial cost to FEMA | | | | -- |

**Table 5**. Consequence matrix for carrying an umbrella (adapted from Raiffa 1968).

| | Event | |
|---|---|---|
| Alternative | Rain | No rain |
| Take umbrella | Additional weight (-Y) <br> No wet clothes (0) | Additional weight (-Y) <br> No wet clothes (0) |
| Leave umbrella | No additional weight (0) <br> Wet clothes (-X) | No additional weight (0) <br> No wet clothes (0) |

LINDELL-004165

**Table 6**. Consequence Matrix for Immediate Relocation and VCD Only.

| | Event | | | |
|---|---|---|---|---|
| | 1% Sensitive Cases | | 10% Sensitive Cases | |
| Alternative | 1% High Formaldehyde Emission THUs | 10% High Formaldehyde Emission THUs | 1% High Formaldehyde Emission THUs | 10% High Formaldehyde Emission THUs |
| Immediately relocate all | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA | • No near-term or long-term health effects;<br>• Recovery delayed 3-6 months for all households<br>• No cost to THU households<br>• Substantial cost to FEMA |
| VCD only (relocate none) | • Noticeable respiratory effects in .01% (1 in 10,000) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA | • Noticeable respiratory effects in .1% (1 in 1,000) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA | • Noticeable respiratory effects in .1% (1 in 1,000) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA | • Noticeable respiratory effects in 1% (1 in 100) households;<br>• No recovery delays<br>• Modest cost to THU households<br>• No cost to FEMA |

87

LINDELL-004166

**Exhibit 5**. Stages in the Disaster Warning System (Adapted from 33333Lindell & Perry, 2004)



LINDELL-004167

**Table 7**. FEMA brochure, *Important Information for Travel Trailer Occupants*

| |
|---|
| **1. If you notice an odor in your trailer—it could be formaldehyde.** |

**2. What is formaldehyde?**

Formaldehyde is a common indoor air pollutant that can be found in nearly all homes and buildings. It is a colorless gas that is released into the home from a variety of indoor sources. Formaldehyde can be found in a variety of every day products in your home such as:

**Household Products**: cleaning solutions, dishwashing liquids, fabric softeners, shoe-care agents, carpet cleaning solutions, adhesives
**Personal Care Products**: nail polish, cosmetics, shampoos, antiperspirants
**Fabrics**: clothing, linens, draperies, couch cushions, automobile interiors
**Appliances**: wood stoves, gas appliances, kerosene stoves
**Tobacco products**: cigarettes, cigars
**Building materials**: particleboard, plywood, cabinets, and wall and floor materials, wallpaper, and some other paper goods, paint coatings

As a result, travel trailers, mobile homes, manufactured homes, new homes, and recently remodeled homes are more likely to contain higher levels of formaldehyde. Over time, formaldehyde goes away and the odors and the effects decrease or disappear.

**3. How might formaldehyde affect me?**

Formaldehyde is just one of several gases present indoors that may cause discomfort. It may cause symptoms similar to that of the common cold or flu. Formaldehyde can affect people differently—some people are very sensitive to formaldehyde while others may not have any noticeable reaction to the same level. People with eye, skin, respiratory, or allergic conditions, and those with asthma are potentially more susceptible to the effects of formaldehyde. Children and the elderly may be more sensitive as well. People who suspect they are sensitive to formaldehyde should work closely with a doctor to see if formaldehyde is causing their symptoms.

**4. What can I do to reduce my exposure to formaldehyde in my travel trailer?**

- **Increase ventilation.** You can reduce your exposure to formaldehyde by bringing more outdoor air into your home. Open windows and doors whenever possible.

- **Keep indoor temperatures moderate**. As the temperature rises, the effects of formaldehyde may be more noticeable. You can use the air conditioner to keep temperatures relatively low, which will help lower the formaldehyde effects and odors

- **Lower the humidity**. You can decrease the rate at which formaldehyde is released from pressed wood and other products by lowering the humidity in your travel trailer. Humidity should be maintained at about 40% to 50% relative humidity in the home

- **Do not smoke inside.** Tobacco smoking produces formaldehyde and other toxic chemicals.

LINDELL-004168

**Table 8**. Evaluation of FEMA *Travel Trailer* Brochure.

| ELEMENT | ASSESSMENT |
|---------|------------|
| Warning source | This brochure is clearly labeled as coming from FEMA, the agency operating the THU program. |
| Nature of threat | Section 1 describes formaldehyde, whose name is probably known to many people but whose health threats are almost certainly unknown to most people other than toxicologists and industrial hygienists. |
| Expected location, timing and magnitude of impact | The location of impact is indicated by the title of the brochure and the last section of Section 1. The timing of impact is not explicitly addressed, although the brochure implies people have already been exposed. The magnitude of impact is not addressed in this brochure. |
| Potential personal consequences of exposure | Section 2 identifies the immediate consequences of formaldehyde exposure but does not discuss the potential long-term cancer risk. |
| Identity of high-risk groups that require special actions | The middle of Section 2 identifies people with eye, skin, respiratory, or allergic conditions, and those with asthma as high risk groups. |
| Environmental cues (health symptoms) | The last paragraph of Section 1 and the first paragraph of Section 2 identify the personal symptoms of formaldehyde exposure. Section 2 explains how formaldehyde symptoms are likely to be similar to those of more common conditions such as colds, influenza, and seasonal allergies. |
| Recommended protective action(s) | Section 2 recommends seeking medical assistance to determine if any adverse health symptoms are caused by formaldehyde. Section 4 describes four additional recommended protective actions: ventilation, cooling, dehumidification; and smoking cessation/limitation. |
| Contacts for further information | Section 4 identifies the FEMA hotline and the warning recipient's personal physician as sources for further information. |
| Dissemination in languages other than English | The available documentation does not indicate if this brochure is available in languages other than English. |

90

**Table 9**. FEMA brochure, *Important Formaldehyde Information for FEMA Housing Occupants*

| **1. Why are you receiving this information?** |
|---|
| FEMA is providing this information to help you and your family better understand what formaldehyde is and how it could affect living and health conditions in your FEMA-provided housing unit. We are also providing you with a phone number where you can receive additional information about formaldehyde and discuss your disaster housing situation with a FEMA specialist. |
| **2. What is formaldehyde?** |
| Formaldehyde is a common indoor air pollutant that can be found in nearly all homes and buildings. It is a colorless gas that is released into the home from a variety of indoor sources. Formaldehyde can be found in a variety of materials used in home construction and products for everyday living. |
| **3. How might formaldehyde affect me and my family?** |
| There are several formaldehyde-related symptoms, such as watery eyes, runny nose, burning sensation in the eyes, nose, and throat, headaches and fatigue. These symptoms are similar to those associated with the common cold, the flu or other pollutants. |
| Formaldehyde can affect people differently. Some people may not have any noticeable reaction to formaldehyde; others are very sensitive to it. People with eye, skin, respiratory, or allergic conditions, and those with asthma are more likely to feel the effects of formaldehyde. Children and the elderly may be more sensitive as well. |
| The most common route of exposure is by breathing it, which may cause nose and eye irritation even in low levels. More serious health problems may be caused by extended exposure, including a small but increased risk of some forms of cancer. |
| If these symptoms lessen when you are away from your home but reappear when you return, your symptoms could be from indoor pollutants that may include formaldehyde or other indoor pollutants, such as dust, mold, or smoke. |
| If you are experiencing these symptoms, or suspect you are sensitive to formaldehyde, you should seek medical attention to see if formaldehyde may be causing your symptoms. |
| **4. Additional Information** |
| **If you have additional questions or concerns regarding formaldehyde in your FEMA provided housing unit, please call:** <br><br> **1-866-562-2381** <br> **(TTY 1-800-462-7585)** <br><br> FEMA operators will immediately direct your call to specialists who will assist you with questions about: <br> • Formaldehyde and health related issues <br> • Other available FEMA housing assistance options; and <br> • Recently purchased FEMA housing units |

91

LINDELL-004170

**Table 10**. Evaluation of FEMA *Housing Occupants* Brochure.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This brochure is clearly labeled as coming from FEMA, the agency operating the THU program. |
| Nature of threat | Section 1 describes formaldehyde, whose name is probably known to many people but whose health threats are almost certainly unknown to most people other than toxicologists and industrial hygienists. |
| Expected location, timing and magnitude of impact | The location of impact is indicated by the title of the brochure and the first sentence of Section 1 "how it could affect living and health conditions in your FEMA-provided housing unit." The timing of impact is not explicitly addressed, although the brochure implies people have already been exposed. The magnitude of impact is not addressed in this brochure. |
| Potential personal consequences of exposure | Section 3 identifies the immediate consequences of formaldehyde exposure in Paragraph 1, including the potential long-term cancer risk (in Paragraph 3). |
| Identity of high-risk groups that require special actions | The second paragraph of Section 2 identifies people with eye, skin, respiratory, or allergic conditions, and those with asthma or who are children or the elderly as high risk groups. |
| Environmental cues (health symptoms) | The first paragraph of Section 3 identifies the personal symptoms of formaldehyde exposure and how formaldehyde symptoms are likely to be similar to those of more common conditions such as colds, influenza, and other pollutants. |
| Recommended protective action(s) | The last paragraph of Section 3 recommends one protective action: seeking medical attention. |
| Contacts for further information | Section 4 identifies the FEMA hotline as a source for further information. |
| Dissemination in languages other than English | The available documentation does not indicate if this brochure is available in languages other than English. However, the TTY number indicates an ability to communicate with the hearing impaired. |

LINDELL-004171

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure.

| Page 1 | |
|---|---|
| **A. Purpose** | This flyer tells you about testing of indoor air in mobile homes supplied by the Federal Emergency Management Agency (FEMA). Because FEMA has offered you a mobile home to use as temporary housing, you may want to know about these tests. This flyer also tells you how to keep the air inside your home healthy so you can stay well while living in a mobile home. |
| **B. Background** | In December 2007 and January 2008, the Centers for Disease Control and Prevention (CDC) tested FEMA-supplied trailers and mobile homes in Louisiana and Mississippi. CDC found some useful facts about trailers and mobile homes for residents living in these two states. Based on the study findings, FEMA is now testing every mobile home for formaldehyde before using them as temporary housing. **What CDC found out applies only to Louisiana and Mississippi, where they tested FEMA-supplied trailers and mobile homes.**<br>The mobile home you are offered has been tested for formaldehyde levels, and an expert has made sure the results are correct. |
| **C. What is formaldehyde?** | Formaldehyde is a colorless, strong-smelling gas. It is used to make building materials and household products. Formaldehyde is used to make walls, cabinets, and furniture in trailers and mobile homes. |
| D. ***What was the level of formaldehyde measured in the mobile home FEMA has offered you?***<br>The level measured in your mobile home on _____ was _____ ppb. | |

LINDELL-004172

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure (Continued).

| Page 2 | |
|---|---|
| **A. What happens when someone breathes too much formaldehyde?** | Formaldehyde can make you feel sick if you breathe a lot of it. People can have symptoms such as:<br>• sore throat<br>• cough<br>• scratchy eyes<br>• nosebleeds<br>Scientists use the words "exposed" or "exposure" to talk about how people come in contact with a substance, such as formaldehyde. Some people are more sensitive than others, so an exposure that causes no problems for some people can make other people sick or uncomfortable. Some of these symptoms also happen with other upper respiratory illnesses, such as colds/flu and seasonal allergies, so if you have these symptoms we recommend that you see a doctor or another medical professional.<br>In general –<br>• If you are more sensitive to formaldehyde and are exposed to more of it for a longer time, you are more likely to have symptoms.<br>• If you are exposed to less formaldehyde for a shorter time, you are less likely to have symptoms, especially if you are not sensitive to formaldehyde.<br>Formaldehyde is known to cause cancer. The cancer of greatest concern is cancer of the nose and throat. Scientific research has not shown that a certain level of formaldehyde exposure causes cancer. However, the higher the level and the longer the exposure, the greater the chance of getting cancer. Exposure to formaldehyde might increase the chance of getting cancer even at levels too low to cause symptoms. |
| **B. What was the level measured in the mobile home FEMA has offered me?** | The level measured in your mobile home tells us the amount of formaldehyde that was there when FEMA did the test. It can also help you decide what kind of short-term housing will be best for your family. This level does not tell us how much formaldehyde you might breathe in while you live in your mobile home. When the mobile home was new, or during hot weather, the level might have been higher. Because there are no laws or regulations for formaldehyde, there is not a single number that will tell us if your mobile home's level is high or low. Please look at the chart below to help you understand your mobile home's level. |

94

LINDELL-004173

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure (Continued).

| Page 3 | |
|---|---|
| A. 1000-100 | If your reading falls into the **higher range**, you need to place a high priority on lowering your exposure to formaldehyde. This is especially important if family members are elderly, young children, or have health conditions such as asthma. |
| 100-10 | If your reading falls into the **intermediate range**, your risk of irritation from formaldehyde exposure is lower, but it is still important to take steps to reduce your formaldehyde exposure. This is especially important if family members are elderly, young children, or have health conditions such as asthma. |
| 10-1 | If your reading falls into the **intermediate range**, your risk of irritation from formaldehyde exposure is lower, but it is still important to take steps to reduce your formaldehyde exposure. This is especially important if family members are elderly, young children, or have health conditions such as asthma. |
| | Note: Levels are expressed at parts per billion (ppb). To convert to parts per million (ppm), divide by 1000. |
| B. | In addition to the formaldehyde level, you should think about other factors.<br>• **Age.** Formaldehyde exposure is a special concern for children and the elderly. Children may become sensitive to formaldehyde more easily, which may make it more likely they will become sick. Elderly people may be less able to tolerate high formaldehyde exposures. If children or elderly people are in your mobile home, it is important to reduce their exposure to formaldehyde.<br>• **Health conditions.** Formaldehyde irritates the airways. People with asthma, bronchitis, or other breathing conditions are especially sensitive to formaldehyde. People with other chronic diseases also may be less able to tolerate formaldehyde exposure. Pregnant women and their unborn children may not be at higher risk, but they should be careful about exposure. If anyone in your mobile home has any of these conditions, it is important to reduce their exposure to formaldehyde.<br>• **How the mobile home is used.** Some people are in their mobile home for many hours of the day. Other people are in their home only for short stays. The more time you spend in your home, the more important it is to lower your formaldehyde exposure. |
| C. What does this mean for my family? | FEMA-supplied mobile homes are meant for temporary, emergency housing. Mobile home residents should try to move to permanent housing. Families living in mobile homes with children, elderly persons or persons who already have an illness like asthma should try to find permanent housing as soon as possible. |
| D. How can I improve the air quality in my mobile home? | ***To protect yourself from formaldehyde exposure:***<br>• Open windows as much as possible to let in fresh air.<br>• Try to keep the temperature inside mobile homes at the lowest comfortable setting.<br>• Run the air conditioner or dehumidifier to control mold.<br>• Also, spend as much time outdoors in fresh air as possible. This is especially important for families with children, elderly people or those with chronic diseases such as asthma. |

LINDELL-004174

**Table 11**. Content of the *CDC/FEMA/EPA* Brochure (Continued).

| Page 4 | |
|---|---|
| A. | **To control mold:**<br>• Fix water leaks to help keep mold away.<br>• Clean away any mold you see or smell detergent and water.<br>**In addition:**<br>• Be sure to bring in fresh air when you use cleaning products and insecticides. To do this, open windows or run the air conditioner. Be sure the air conditioner is bringing in air from outside.<br>• Do not smoke, and especially do not smoke indoors.<br>  If you smell gas, do not light any flames or sparks and leave the trailer right away.<br>  If you have health concerns, see a doctor or another medical professional. |
| **B. You will need to make a choice about the mobile home offered to you.** | There is no federal standard for formaldehyde in indoor air. Houses in the United States generally have a level of about 10 to 50 ppb<br>**For mobile homes with higher levels (50-80 ppb):**<br>The formaldehyde level in this mobile home is above that usually seen in houses but is below the levels that usually cause acute health effects in sensitive people. There are benefits to reducing the level. While you are in the mobile home, please follow the steps listed in this flyer to improve the air quality.<br>**For mobile homes with medium levels (10-50 ppb):**<br>The formaldehyde level in your mobile home was not in the highest range but there are still benefits to reducing the level. While you are in the mobile home, please follow the steps listed in this flyer to improve the air quality.<br>**For mobile homes with low levels (below 10 ppb):**<br>Even though the formaldehyde level in your mobile home was low, you can still improve the air quality by following the steps listed in this flyer. |
| **C. Where can I find help?** | CDC's study of formaldehyde in trailers and mobile homes, please call CDC toll-free at **1-800-CDC-INFO**.<br>**If you have questions about your mobile home, please call FEMA at 1-866-562-2381 (TTY 1-800-462-7585).** |

LINDELL-004175

**Table 12**. Evaluation of *CDC/FEMA/EPA* Brochure.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This brochure is located on the FEMA web site, but the flyer itself is cosponsored by CDC and EPA. |
| Nature of threat | Page 1, Section C of the brochure describes formaldehyde and its common sources. |
| Expected location, timing and magnitude of impact | The location of impact is clearly indicated in Page 1 Section D, which refers to "the level of formaldehyde measured in the mobile home FEMA has offered you". The timing of impact is clearly indicated by the date of the formaldehyde measurements and the magnitude of impact is clearly indicated by the airborne concentration of formaldehyde in parts per billion (ppb). |
| Potential personal consequences of exposure | Page 2 Section A identifies the immediate consequences of formaldehyde exposure and the last paragraph of this section describes the long-term cancer risk. |
| Identity of high-risk groups that require special actions | Page 3 Section B identifies seniors and children as well as those with asthma, bronchitis, and lung and other chronic conditions as high risk groups. |
| Environmental cues (health symptoms) | On Page 2 Section A, the first paragraph identifies personal symptoms of formaldehyde exposure and the second paragraph explains how formaldehyde symptoms are similar to those of more common conditions (e.g., colds, influenza, and seasonal allergies). |
| Recommended protective action(s) | Page 2, Section A recommends seeing a doctor or another medical professional if symptoms of a formaldehyde reaction are present. Page 3 Section D describes five more recommended protective actions: ventilation, cooling, dehumidification, mold abatement, and spending time outside. Page 4 Section A provides further information about mold abatement, as well as smoking cessation and medical assistance. Page 4 Section B provides ranges of formaldehyde but these do not constitute action levels because all categories make the same protective action recommendations. |
| Contacts for further information | Page 4 Section C identifies the CDC hotline for further information about indoor air quality, formaldehyde health effects, the CDC's study of formaldehyde in THUs, and the FEMA hotline as a source for information about the recipient's THU. |
| Dissemination in languages other than English | This web page is available in English and 12 other languages (Spanish, Chinese, Croatian, French, Haitian-Creole, Italian, Japanese, Korean, Russian, Tagalong, Urdu, and Vietnamese). |

97

**Table 13**. CDC Web Page Formaldehyde Advisory.

| FEMA-Provided Travel Trailer Study |
|---|
| **Section 1. What is Formaldehyde?**<br>Formaldehyde is a common chemical in our environment. Sources of formaldehyde in the environment may include:<br>o　　　　　Household sources, such as fiberglass, carpets, permanent press fabrics, paper products, and some household cleaners,<br>o　　　　　Manufactured wood products used in new mobile homes,<br>o　　　　　Cigarettes and other tobacco products, gas cookers, and open fireplaces,<br>o　　　　　Smog<br>Exposure to low levels of formaldehyde may cause irritation of the eyes, nose, throat, and skin. It is possible that people with asthma may be more sensitive to the effects of inhaled formaldehyde. |
| **Section 2. What happens when someone breathes too much formaldehyde?**<br>Formaldehyde can make you feel sick if you breathe a lot of it. People can have symptoms such as:<br>o　　　　　sore throat<br>o　　　　　cough<br>o　　　　　scratchy eyes<br>o　　　　　nosebleeds<br>Scientists use the words "exposed" or "exposure" to talk about how people come in contact with a substance, such as formaldehyde. Some people are more sensitive than others, so an exposure that causes no problems for some people can make other people sick or uncomfortable. Some of these symptoms also happen with other upper respiratory illnesses, such as colds/flu and seasonal allergies, so if you have these symptoms we recommend that you see a doctor or another medical professional.<br>In general −<br>o　　　　　If you are more sensitive to formaldehyde and are exposed to more of it for a longer time, you are more likely to have symptoms.<br>o　　　　　If you are exposed to less formaldehyde for a shorter time, you are less likely to have symptoms, especially if you are not sensitive to formaldehyde.<br>　　　　　Formaldehyde is known to cause cancer. The cancer of greatest concern is cancer of the nose and throat. Scientific research has not yet shown that a certain level of formaldehyde exposure causes cancer. However, the higher the level and the longer the exposure, the greater the chance of getting cancer. Exposure to formaldehyde might increase the chance of getting cancer even at levels too low to cause symptoms. |
| **Section 3. How can I improve the air quality in my mobile home?**<br>To protect yourself from formaldehyde exposure:<br>o　　　　　Open windows as much as possible to let in fresh air.<br>o　　　　　Try to keep the temperature inside mobile homes at the lowest comfortable setting.<br>o　　　　　Run the air conditioner or dehumidifier to control mold.<br>o　　　　　Also, spend as much time outdoors in fresh air as possible. This is especially important for families with children, elderly people or those with chronic diseases such as asthma.<br>To control mold:<br>o　　　　　Fix water leaks to help keep mold away.<br>o　　　　　Clean away any mold you see or smell detergent and water.<br>In addition:<br>o　　　　　Be sure to bring in fresh air when you use cleaning products and insecticides. To do this, open windows or run the air conditioner. Be sure the air conditioner is bringing in air from outside.<br>o　　　　　Do not smoke, and especially do not smoke indoors.<br>o　　　　　If you smell gas, do not light any flames or sparks and leave the trailer right away.<br>o　　　　　If you have health concerns, see a doctor or another medical professional. |
| **Section 4. Where can I find help?**<br>People living in FEMA-Provided Travel Trailers who are concerned about the level of formaldehyde in their trailers and the possible health risks of contact with formaldehyde should seek appropriate assistance.<br>o　　　　　For concerns about conditions in your trailer, contact FEMA at 1-866-562-2381 (TTY 1-800-462-7585).<br>o　　　　　For concerns about medical problems that you think may be related to the trailer, talk to a doctor or other medical professional. |

LINDELL-004177

Table 14. Evaluation of CDC Web Page Formaldehyde Advisory.

| ELEMENT | ASSESSMENT |
|---|---|
| Warning source | This advisory is located on the web site of the Centers for Disease Control and Prevention, a federal agency that has relevant credentials for health and safety threats, and which is administratively independent of the FEMA emergency managers who are operating the THU program. |
| Nature of threat | Section 1 of the advisory describes formaldehyde, shoes name is probably known to many people but whose health threats are almost certainly unknown to most people other than toxicologists and industrial hygienists. |
| Expected location, timing and magnitude of impact | The location of impact is indicated indirectly by the title of the web page, *FEMA-Provided Travel Trailer Study.* The timing of impact is not explicitly addressed, although web site visitors would presumably only be visiting if they believed they had already been exposed. The magnitude of impact is not addressed on this web page. |
| Potential personal consequences of exposure | The first paragraph of Section 2 identifies the immediate consequences of formaldehyde exposure and the last paragraph of this section describes the long-term cancer risk. |
| Identity of high-risk groups that require special actions | The last paragraph of Section 1 identifies asthma patients as a high risk group. |
| Environmental cues (health symptoms) | The last paragraph of Section 1 and the first paragraph of Section 2 identify the personal symptoms of formaldehyde exposure. Section 2 explains how formaldehyde symptoms are likely to be similar to those of more common conditions such as colds, influenza, and seasonal allergies. |
| Recommended protective action(s) | Section 3 describes five recommended protective actions: ventilation/cooling/dehumidification; spending time outside; mold abatement; smoking cessation/limitation; medical assistance. |
| Contacts for further information | Section 4 identifies the FEMA hotline and the warning recipient's personal physician as sources for further information. |
| Dissemination in languages other than English | This web page is only available in English. |

Exhibit 6. Obstacles to transition from temporary housing to permanent housing
- Clear debris
- Restore infrastructure
- Develop recovery plan
- Secure construction funding
- Hire building contractor
- Construct building

LINDELL-004178

Michael K. Lindell, Ph.D.
10501 Eighth Avenue NE #119
Seattle WA 98125

1 August, 2009

Adam Dinnell
Environmental Torts
U.S. Department of Justice
Washington DC

Dear Mr. Dinnell:

At your request, I have read the Department of Homeland Security Inspector General's report *FEMA Response to Formaldehyde in Trailers (Redacted)*, OIG-09-83 (FEMA164-000001— 000085), which I did not address in my report dated 19 June, 2009 because the OIG report was not released until July, 2009. I examined the information the OIG report presents and evaluated its conclusions and recommendations. First, I have no disagreements with any of the report's recommendations. In many cases, implementation of these recommendations would support a faster and more effective response to any future conditions involving the health and safety of households displaced by disaster. Second, however, I do disagree with some of the DHS OIG report's conclusions. The relationship between the OIG report's conclusions and my professional opinions can be summarized as follows.

The OIG report does not appear to address five of my professional opinions.
  1. FEMA has an important role in providing post-disaster housing, but its mission is more limited than is often assumed.
  3. FEMA emergency managers could not reasonably have been expected to prepare in advance of Hurricane Katrina for the level of temporary housing required after impact.
  4. FEMA emergency managers had no forewarning about formaldehyde in THUs from its experience in providing temporary housing after previous disasters.
  9. FEMA's formaldehyde communication program met prevailing standards of effectiveness and timeliness.
 10. FEMA emergency managers made reasonable progress in assisting displaced households to move from temporary shelter to temporary housing and from temporary housing to permanent housing.

The OIG report appears to be consistent with one of my professional opinions.
  2. Hurricane Katrina imposed unique demands for displaced households and those trying to provide housing assistance for those displaced households.

The OIG report appears to disagree with four of my professional opinions.
  5. FEMA emergency managers achieved timely detection and accurate classification of the potential formaldehyde threat after Hurricane Katrina.

6. FEMA emergency managers had limited options and conflicting criteria for making decisions about how to manage the potential threat of formaldehyde in THUs.
7. FEMA emergency managers made reasonable decisions about how to respond to the potential threat of formaldehyde in THUs.
8. FEMA emergency managers developed and implemented a comprehensive program for responding to the potential threat of formaldehyde.

The following sections of this letter report address the specific areas of disagreement and identify the deficiencies in the OIG report. In addressing these deficiencies, I should point out that—although the OIG report fails to document the sources for many of the facts it cites and lacks a conventional reference section—it clearly repeats information presented in many of the reports I cited in my own report. Thus, the two reports appear to rely on substantially the same fact basis. Specifically, our reports agree on the sequence of events, as well as the dates of important actions by FEMA emergency managers and others, and the findings and conclusions of reports such as those by the Agency for Toxic Substances and Disease Registry (ATSDR) and Centers for Disease Control and Prevention (CDC). However, the OIG report substantially ignores the context in which FEMA emergency managers were making their decisions. It appears that a major flaw in the OIG report is its failure to recognize the potential impact of hindsight bias on its conclusions. It is somewhat ironic that the OIG report fails to recognize that hindsight is a cognitive bias when it states "[i]n hindsight, however, it is *now clear* that they should have reacted in a more timely manner to determine the extent and cause of the formaldehyde problem and taken a more aggressive approach to correcting the problem." (p. 15, my emphasis). More broadly, the OIG report reveals four major misconceptions. These are a) the assumed need for individual testing of occupied THUs, b) the assumed need for universal relocation of THU occupants, c) the neglect of community recovery as a decision criterion, and d) the myopic focus on formaldehyde safety as a decision criterion.

*Assumed need for individual testing of occupied THUs*
The OIG report's first misconception is that individual testing of occupied THUs was a *necessary* and *sufficient* condition for taking action to protect THU occupants from a potential formaldehyde threat. In fact, as FEMA's actions demonstrated, testing ambient concentrations of formaldehyde in all occupied THUs was not *necessary* because it was possible to use environmental cues (strong odors and minor adverse health effects) coupled with warning messages and individual physician diagnosis as a basis for deciding whether to relocate sensitive occupants from highly emissive THUs. Moreover, testing ambient concentrations of formaldehyde in all occupied THUs was not *sufficient* because, in the absence of a single standard for formaldehyde exposure, FEMA emergency managers had no clear basis for deciding what was the concentration at which they should relocate THU occupants.

The OIG report criticized FEMA's Deputy Administrator for stopping testing until a "safe" level of formaldehyde in trailers was established and a plan of action was formulated (p. 57). The OIG report dismissed this concern as an unnecessary delay that should have been addressed while the survey of occupied THUs was in progress (p. 2). However, FEMA itself had neither the legal authority nor the technical capability to establish a "safe" level of formaldehyde in trailers and none of the other federal

LINDELL-003953

agencies with which it was collaborating had provided one in the16 month interval between FEMA's first consultation with them (June 2006) and the date of the stop work order (October 2007). Thus, there was little prospect that a formaldehyde standard would materialize during the six week course of the trailer survey. Indeed, as the OIG report notes that, even by its publication date (June 2009), "there never was and still has not been, a determination of what constitutes a 'safe' level of formaldehyde in travel trailers" (p. 57)—a statement similar to those made in CDC (2008a, p. 15) and CDC (2008b, p. 5). Instead, it appears that the entire issue of a "safe" standard for formaldehyde was finessed by the CDC (2008a) interim report that presented data on formaldehyde exposure levels (pp. 8-13), acknowledged that there was no standard on formaldehyde (p. 15), yet—nonetheless—made a recommendation to relocate all THU occupants within the next 2-3 months (p. 18).

The OIG report also implies that testing of individual THUs was necessary because it would have encouraged occupants to move out of their THUs (which, of course, *assumes* that moving out of the THUs was the correct action). Specifically, page 25 asserts that, unless each THU was tested, many sensitive individuals (those with preexisting health conditions such as asthma) "might not have been aware that the formaldehyde in their trailers was a reason their health conditions were deteriorating." However, this statement completely ignores FEMA and its partners' multiple warnings that identified groups at greater risk from formaldehyde exposure, recommended that members of these groups consult their physicians if they experienced any of the listed adverse health effects, and recommended that all groups ventilate, cool, and dehumidify their units to reduce ambient formaldehyde levels. Most of these warnings were disseminated before the individualized testing was conducted.

### Assumed need for universal relocation of THU occupants
The second major misconception is that universal relocation of THU occupants was necessary. In fact, as the analyses in my report indicate, it is not obvious *even in hindsight* that this was an appropriate strategy. In any event, the OIG report implicitly assumes that the only options were a) FEMA's policy of ventilating, cooling, and dehumidifying all THUs and exchanging individual units whose ambient concentrations could not be controlled in this way, or b) CDC's recommended policy of immediate phase-out of all THUs. Thus, the OIG report fails to recognize that there were at least two additional options that could have been considered. However, given the misconceptions discussed below, it is not surprising that these other options were ignored.

### Neglect of community recovery as a decision criterion
The third major misconception in the OIG report is the failure to recognize that the THUs providing the greatest formaldehyde exposure (travel trailers) were the very ones that made the greatest contribution to community recovery. Contrary to the OIG report's reference to "the crowded, often barren, multiple-trailer group sites where many families were placed" (p. 12), this was true of only a minority of the THUs overall. Moreover, the small proportion of THUs at group sites were mobile homes rather than travel trailers. Instead, travel trailers were typically placed on households' preimpact homesites where local officials had strongly encouraged FEMA emergency managers during 2005 to locate them

3

so they would be most effective in promoting community recovery. The OIG report briefly mentions the impact of relocation on household recovery (p. 59), but fails to recognize that this is a critical criterion for selecting a response to the potential formaldehyde threat.

*Myopic focus on formaldehyde safety as a decision criterion*

Finally, the failure to recognize the relevance of an option's support for community recovery leads to the fourth major misconception, that formaldehyde safety was the only criterion relevant to choosing between the two alternative courses of action that were addressed. As a result of this myopic focus on formaldehyde safety, the data in the table on p. 52 emerge as the OIG report's basis for determining the "correct" option for responding to formaldehyde and, therefore, the timeliness and effectiveness of FEMA actions. Given the centrality of this table to the OIG report's conclusions, it warrants careful examination. In fact, this table shows that recommending relocation of *all* THU occupants based on the finding that 5% of the THUs exceeded 300 ppb is a substantial over-response to the potential formaldehyde threat. Specifically, even if one concludes that 5% of the THUs were "highly emissive" (by applying the standard of 300 ppb that was selected without any apparent external review), this means that there was an unnecessary relocation from the vast majority of THUs. That is, dislocated households were unnecessarily relocated from 100% of the park models, 98.8% of the mobile homes, and 94.2% of the travel trailers. This unnecessary relocation achieved an unknown gain in health outcomes at the expense of significant delays to household and community recovery and significant financial cost to the federal government.

It should, of course, be no great surprise that CDC—a federal agency whose mission is public health—would assume that individual testing of THUs was necessary, be unaware of alternatives to mass relocation, ignore criteria such as support for community recovery, and focus myopically on formaldehyde safety. Moreover, given the lack of progress over a 16 month period in establishing a standard for formaldehyde safety, and thus resolving the question of which households should be relocated, it should be no great surprise that FEMA adopted CDC's protective action recommendation without expressing any public reservations. What is surprising, however, is that the OIG report would treat FEMA's acceptance of this resolution as an implicit admission of incompetently managing the situation during the previous two years.

Based on these considerations, I can state that the OIG report provided some potentially useful recommendations, but no new information and some questionable conclusions. Thus, none of the material in the DHS OIG report changes any of the opinions I expressed in my own report.

Moreover, since completing my 19 June, 2009 report, I have also received and reviewed the *United States Supplemental Memorandum in Support of its Motion to Dismiss* and all attached exhibits. None of the material cited in the Supplemental Memorandum or in the attached exhibits changes any of the opinions I expressed in my own report.

4

Thank you for providing me with these additional case materials and giving me the opportunity to determine if they affected my professional opinions in any way. If you have any questions, please email me at mlindell@tamu.edu or call me at (979) 599-4564.

Sincerely,

Michael K. Lindell

LINDELL-003956

*References*

CDC—Centers for Disease Control and Prevention. (2008a). *Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Atlanta GA: Author.

CDC —Centers for Disease Control and Prevention. (2008b). *Final Report on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes*. Atlanta GA: Author.

Lindell, M.K. (2009). *Report on Formaldehyde in FEMA Temporary Housing Units Provided after the 2005 Hurricanes*. Seattle WA: Author.

6

Michael K. Lindell, Ph.D.
3122 Camelot Drive #52
Bryan Texas 77802

27 April, 2010

Adam Dinnell
Environmental Torts
U.S. Department of Justice
Washington DC

Dear Adam:

In response to your request, I have reviewed the documents listed below. They do contain some additional information that was not available when I wrote my report dated 19 June, 2009. However, none of this additional information changes any of the conclusions I drew in that report. If you have any questions, please email me at mlindell@tamu.edu or call me at (979) 599-4564.


Sincerely,

Michael K. Lindell

**Documents Reviewed**

| | |
|---|---|
| Lindell01-000173 David Garratt | FEMA214-000001 McGraw DAA |
| Lindell01-001617 Kevin Souza | |
| Lindell01-001737 Christopher DeRosa | McGraw000001 Keystone Owner Manual |
| Lindell01-000934 Stanley Larson | McGraw001443 Schwery |
| Lindell01-001040 Martin McNeese | McGraw001450 Laughery |
| Lindell01-002077 Joseph Little | McGraw011064 Lawrence Miller report |
| Lindell01-000042 Bryan Boyle | McGraw001555 Ervin Ritter report |
| Lindell01-000006 Guy Bonomo | McGraw001539 Harvey Fields report |
| Lindell01-000699 Michael Lapinski | McGraw001665 Hewett (Exposure |
| Lindell01-000659 Michael Harder | Assessment Solutions) report |
| Lindell01-000328 Bellance Green | McGraw001524 Lagrange report |
| Lindell01-001291 Clifford Oliver | McGraw009726 Mallet (First General |
| Lindell01-001432 Rene Rodriquez | Services) report |
| Lindell01-001315 David Porter | McGraw001541 McGwin report |
| Lindell01-001094 Stephen Miller | McGraw001511 Moore report |
| Lindell01-000999 Brian McCreary | McGraw001479 Stephen Smulski report |
| Lindell01-001259 Travis Morris | McGraw001753 Patricia Williams report |