HUD-000001

Westlaw.

49 FR 31996-01                                                                    Page 1
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

RULES and REGULATIONS
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
Office of the Assistant Secretary for Housing--Federal Housing Commissioner
24 CFR Part 3280
[Docket No. R-84-1068; FR 1637]
Manufactured Home Construction and Safety Standards
Thursday, August 9, 1984
*31996 AGENCY: Office of the Assistant Secretary for Housing--Federal Housing Com-
missioner, HUD.

ACTION: Final rule.

SUMMARY: HUD is revising its Manufactured Home Construction and Safety Standards
to improve the safety and quality of manufactured homes.    Standards limiting per-
missible amounts of formaldehyde emissions from plywood and particleboard are be-
ing added.    Standards relating to fire safety are being revised.

EFFECTIVE DATE: October 29, 1984.

FOR FURTHER INFORMATION CONTACT: Richard A. Mendlen, Manufactured Housing Stand-
ards Division, Office of Manufactured Housing and Regulatory Functions, Room 9154,
Department of Housing and Urban Development, 451 Seventh Street, S.W., Washington,
D.C. 20410.    Telephone (202) 755-5798. (This is not a toll-free number.)

SUPPLEMENTARY INFORMATION:

I. Background

A. General

The National Manufactured Housing Construction and Safety Standards Act of 1974,
42 U.S.C. 5401-5427 (Act), authorizes the Secretary of Housing and Urban Develop-
ment (Secretary) to establish and amend the Manufactured Home Construction and
Safety Standards, 24 CFR Part 3280 (Standards).    The stated purposes of the Act
are "to reduce the number of personal injuries and deaths and the amount of insur-
ance costs and property damage resulting from manufactured home accidents and to
improve the quality and durability of manufactured homes." Changes to the fire
safety standards and the addition of standards on formaldehyde emissions from

EXHIBIT

10

HUD-000002

49 FR 31996-01                                                                                    Page 2
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

particleboard and plywood are being adopted in accordance with these purposes.
In accordance with the Act, these rules will take effect 180 days from the date of
this publication. 42 U.S.C. 5403(c).

*B. Advance Notices of Proposed Rulemaking*

The Department published an Advance Notice of Proposed Rulemaking (ANPR) on June
7, 1979, soliciting comment concerning revision of the Standards (44 FR 32711).
Generally, the industry responded that cost effectiveness and clarity of object-
ives should be the Department's primary concerns in evaluating the need for change
in the safety and durability areas cited in the ANPR. Consumers and associated
groups expressed the view that manufactured homes lacked the qualities necessary
to make the homes as durable and safe as they desire.

Another ANPR, directed solely at the issue of formaldehyde emissions in manufac-
tured homes, was published on August 28, 1981.   That ANPR solicited comment on 21
different aspects of formaldehyde outgassing, including adverse health effects,
test methods, and the economic impact of regulation.    Comments were submitted by
individual consumers and consumer organizations, manufactured home builders, wood
product producers, trade associations, government agencies, universities, and the
chemical industry.   The major issues raised in the comments included the need for
a formaldehyde standard and whether a standard should regulate the amount of form-
aldehyde in the total home environment or the amount emitted from the major
sources of formaldehyde in the home.   Other issues addressed in the comments in-
cluded the adverse health effects associated with exposure to formaldehyde, sens-
itization, test methods, regulatory alternatives, and warning notices.

*C. Proposed Rule*

On August 16, 1983, the Department published a proposed rule revising all Sub-
parts of the Standards (48 FR 37136).    The comment period was held open until 30
days after a Cost Impact Analysis was made available for public inspection.    On
March 9, 1984, a Notice of the availability of the Coast Impact Analysis was pub-
lished (49 FR 8946).   Accordingly, the comment period closed on April 9, 1984.
The Department received 253 comments, many of them quite extensive.    To expedite
the implementation of those standards which would have the greatest effect on pub-
lic health and safety, the Department determined that the regulations concerning
fire safety and formaldehyde should be separated from the other proposed revisions
and published for effect as soon as possible.    The comments on the fire safety
and formaldehyde standards are discussed below.   The Department is continuing its
review of the remaining comments and will take appropriate action on the other
proposed standards when the analysis of the comments is complete.

*D. The National Manufactured Home Advisory Council*

The Act provides for a National Manufactured Home Advisory Council comprised of
24 members divided equally among the industry, government agencies, and consumer

HUD-000003

49 FR 31996-01                                                          Page 3
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

groups.   The Act directs the Secretary to consult with the Advisory Council, to
the extent feasible, before establishing, amending, or revoking any Standard (42
U.S.C. 5404).

In September 1983, the Council was convened to review the proposed revisions
which had been published in August.   Subcommittees of the Council met in workshop
sessions for three days and then presented reports which were voted upon by the
full Council.   Several changes were made to the rule based upon the Council's re-
commendations.   Copies of the Advisory Council Subcommittee reports are part of
the Department's rulemaking record and are available for public inspection.

II. Formaldehyde Regulation

A. General

The Department has concluded that a Federal Standard designed to limit formalde-
hyde emissions in manufactured homes should be adopted.   The formaldehyde rule is
a product standard which limits the level of formaldehyde emitted from particle-
board floor decking and cabinetry and from interior plywood installed in manufac-
tured homes.   The rule requires that formaldehyde emissions not exceed 0.2 parts
per million (ppm) from plywood and 0.3 ppm from particleboard as measured by a
specified air chamber test.   Generally, manufactured home manufacturers must use
only particleboard and plywood that comply with these emission standards and are
certified as meeting the standards.

B. Regulatory Alternatives

There were a substantial number of comments concerning whether the HUD formalde-
hyde standard should limit formaldehyde emissions from specific products installed
in the home (product standard) or the overall amount of formaldehyde in the home
environment (ambient standard).   In choosing a product standard, the Department
considered effectiveness, quality control, and ease of enforcement.

*31997 1. Ambient Standard

Many commenters, especially State agencies, endorsed the use of an ambient stand-
ard that would limit the level of formaldehyde in the home despite variations in
temperature, humidity, ventilation, and living habits.   These sources stated that
an ambient standard would ensure the maintenance of a safe level of formaldehyde
in the home by limiting outgassing from all sources of formaldehyde used in the
home's construction.   Some of the commenters expressed concern that a product
standard would protect home manufacturers from claims regarding homes that have
high levels of formaldehyde but that are built with products certified as meeting
a product standard.   Other commenters indicated that a product standard would un-
fairly single out the wood products industry, which is not responsible for the ul-
timate construction of the home.

HUD-000004

According to some of these commenters, an ambient standard would not be difficult
to enforce.   They stated that there are ambient test methods available which are
accurate and inexpensive.   One such method cited was a formaldehyde dosimeter
used by several States and Canada.    Proper ambient test procedures, stated these
sources, can eliminate homeowner contribution and compensate for differences in
temperature and humidity.    Some suggested that, to enforce the standard, ambient
testing could be done on prototype or randomly selected homes.

Of those commenters urging the adoption of an ambient standard, levels from 0.1
ppm to 0.4 ppm were suggested.   Many commenters indicated that a 0.4 ppm standard
could be met using currently available technology.   Some sources recommended that
a 0.4 ppm standard be adopted now and that lower levels be designated to take ef-
fect over the next few years, thus gradually phasing in a 0.1 ppm standard.   Oth-
ers argued that, to protect the health of manufactured home occupants, no greater
than a 0.1 ppm standard should be adopted. (Health effects associated with formal-
dehyde exposure are discussed below.)

Finally, several commenters suggested that an ambient standard could be used in
conjunction with a product standard.   These commenters stated that an end result
specification is necessary as a cross-check to any product standard.

2. Product Standard

Many commenters, especially those from the manufactured home industry, endorsed
the use of a product standard.   These commenters cited the unreliability of ambi-
ent measurements because of differences in temperature, humidity, ventilation, and
lifestyle of the home occupants.   Consumers, they said, could bring other formal-
dehyde contributors into the home over which the manufacturer has no control.
Several of these sources also cited the Department's research study conducted by
Clayton Environmental Consultants, the National Particleboard Association, and the
Hardwood Plywood Manufacturers Association ("Evaluation of the Relationship
Between Formaldehyde Emissions From Particleboard Mobile Home Decking and Hardwood
Plywood Wall Paneling in Experimental Mobile Homes" (March 1982)).   This study
determined that a wood product standard can effectively reduce the amount of form-
aldehyde in the home environment.   Finally, these commenters also stated that am-
bient test methods are more costly and less reliable than test methods.

3. Selection of a Product Standard

The Department has decided to adopt product standards.   The Clayton study cited
above establishes that a product standard can be effective and that product test
values reasonably correlate to formaldehyde levels in homes.  Products can be
tested easily under standardized conditions, which will avoid the problem of com-
pensating for variations in home temperature and humidity levels.   Also, a
product standard has the advantage of allowing for early detection of a potential
formaldehyde problem.   Unlike the violation of an ambient standard, which can be

HUD-000005

established only after a manufactured home has been completely assembled, viola-
tion of a wood product standard can be discovered before the wood is shipped by
its supplier or installed in a home. Therefore, based on its effectiveness, the
availability of reliable test methods, and the potential to prevent formaldehyde
problems before the homes are sold, the Department has concluded that a product
standard is appropriate.

The standards will cover particleboard and plywood, two of the major emitters of
formaldehyde in manufactured homes.   HUD's objective in implementing these stand-
ards is to reduce the level of formaldehyde within the home environment. It is
HUD's intention that these standards preempt State and local formaldehyde stand-
ards in accordance with the Act (42 U.S.C. 5403(d)).

*C. The Adopted Product Standards (§ 3280.309(a))*

The formaldehyde standards will limit emissions from plywood and particleboard
produced with resins or surface finishes containing formaldehyde.   The standards
do not apply to wood products that cannot be characterized as plywood or particle-
board, most notably medium density fiberboard (MDF).   Rulemaking is being initi-
ated to determine the extent to which MDF and similar products contribute to form-
aldehyde levels in manufactured homes and how these products should be regulated,
if at all.

1. Plywood Standard

The proposed rule would have prohibited the use of plywood that emits more than
0.2 ppm formaldehyde when tested in a large air chamber in manufactured homes.   A
significant number of commenters from the wood products industry urged that the
permissible limit be raised from 0.2 to 0.25 ppm.   These commenters said that
0.25 ppm reflects current technology and provides a sufficiently wide margin to
meet the Department's anticipated ambient result. (See Targeted Ambient Level, be-
low.)   Further, they said that a 0.2 ppm standard is too restrictive because it
would require too much costly retesting under the testing protocol proposed.
Several of these commenters stated that an appropriate means of changing the pro-
posed plywood standard to 0.25 ppm and of regulating formaldehyde in general would
be to incorporate by reference the Hardwood Plywood Manufacturers Association's
voluntary standard.

Other representatives from both the wood products and manufactured home indus-
tries supported the 0.2 ppm level and said that it is being met at this time.   A
major manufacturer of manufactured homes stated that it was certain, based on in-
formation obtained from its wood product suppliers, that the proposed level was
being achieved.   One commenter stated that plywood that emits at only 0.15 ppm
formaldehyde is being produced.

A number of consumers and academic sources stated that it was imperative that the
plywood standard be lowered.   These commenters expressed the opinion that the in-

HUD-000006

49 FR 31996-01                                                                           Page 6
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

dustry could produce plywood that would emit at levels below 0.2 ppm and stated
that a lower standard is necessary to protect the health of manufactured home oc-
cupants.

The Department has decided to adopt a 0.2 ppm plywood standard.   The 0.2 ppm
standard is reasonable, can be met *31998 consistently in production, and gives a
margin for error in achieving the 0.4 ppm targeted ambient level in the home.
The Department does not have adequate information or data upon which to base a de-
cision to lower the plywood standard below 0.2 ppm.  · The proposed testing proced-
ures have been revised to avoid the high cost of retesting that may be necessary
to meet the 0.2 ppm standard. (See Testing Requirements, below.)

2. Particleboard Standard

The proposed rule would have prohibited the use of particleboard in manufactured .
homes that emits more than 0.3 ppm formaldehyde when tested in a large air cham-
ber.   Virtually all of the industry representatives who commented on the
particleboard standard approved the 0.3 ppm level.  Generally, these commenters
stated that the technology to consistently produce particleboard that meets this
standard is currently available.   Recently, the National Particleboard Associ-
ation (NPA) adopted a voluntary standard of 0.3 ppm.  According to the NPA, major
producers of particleboard already comply with the 0.3 ppm standard.

The response from consumers and several other sources on the particleboard stand-
ard was much like the response to the plywood standard.  Basically, these com-
menters objected to the 0.3 ppm level as being too high.   Some consumers and rep-
resentatives from the wood products industry stated that the industry could pro-
duce lower-emitting particleboard at this time.   A few consumers felt that urea-
formaldehyde-based particleboard was so significant an emitter that it should be
banned from use in manufactured homes.

The Department has decided to adopt a 0.3 ppm particleboard standard.  · This
level was endorsed by the Advisory Council when it met in September 1983. Further,
this standard can consistently be met in the production of particleboard.   Fi-
nally, the Department does not have sufficient verifiable information or data to
justify lowering the particleboard standard below this level.

3. Phenol-Formaldehyde Resin Exemption

The proposed formaldehyde standard would have covered all particleboard and ply-
wood which contain formaldehyde.

Most of the plywood and particleboard used in manufactured homes is produced with
urea-formaldehyde resins.   Manufacturers of phenol-formaldehyde-based wood
products, which are used in some manufactured homes, objected to the application
of the standard to their materials.   They submitted information demonstrating
that phenol-formaldehyde resin is much more stable than the urea-based resins and

49 FR 31996-01                                                                    Page 7
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

that products made with phenol-based resins emit formaldehyde at a much lower
rate.   The phenol-based products emit such small quantities of formaldehyde that
the standards for both plywood and particleboard are met easily.   Thus, requiring
that these products be tested and certified is not necessary.

Therefore, the Department has decided to exempt products that are formulated ex-
clusively with phenol-formaldehyde resins and surface finishes from the testing
and certification provision of the rule.

4. Medium Density Fiberboard (MDF)

The proposed rule did not specifically mention medium density fiberboard or any
other formaldehyde-based wood product except plywood and particleboard.

There was some confusion expressed in the comments as to precisely which wood
products were to be covered by the proposed rule.   One manufacturer of wood
products stated that the terms "plywood" and "particleboard" are generic and in-
clude medium density fiberboard and other wood products.   Other industry sources
simply questioned the coverage of the rule and requested clarification.   Still
other commenters assumed that MDF was not covered and recommended that HUD initi-
ate rulemaking on this product.

The proposed rule would have covered all forms of plywood and particleboard in-
cluding waferboard, flakeboard, and chipboard.   MDF is a product which is not
generally accepted by the industry as either plywood or particleboard. Since the
publication of the proposed rule, the Department has learned that MDF is used in
manufactured homes, particularly in cabinetry, and that it is a high emitter of
formaldehyde unless properly sealed.   When used unsealed in a manufactured home,
MDF could be a major contributor to the home's overall formaldehyde level.
Therefore, the Department is preparing an Advance Notice of Proposed Rulemaking
(ANPR) on MDF and any other formaldehyde-emitting wood products which are used in
manufactured homes and which were not covered by the proposed rule.   The ANPR
will solicit comment on the identity of such products, the extent to which they
emit formaldehyde, and how they could be regulated.

D. Targeted Ambient Level

The Department has concluded that an indoor ambient formaldehyde level of 0.4 ppm
provides reasonable protection to manufactured home occupants.   The Department
has determined that the plywood and particleboard standards will result in indoor
ambient formaldehyde levels of not greater than 0.4 ppm when:   (1) The indoor tem-
perature does not exceed 77  F;   (2) the indoor relative humidity level does not
exceed 50%;   (3) the home's ventilation rate is at least 0.5 air change per hour
(ACH);   and (4) there are no other major emitters of formaldehyde, such as MDF,
installed in the home.

1. Home Conditions

HUD-000008

There was a considerable amount of disagreement in the comments concerning how often the 0.4 ppm level would be exceeded in the home.   Many commenters stated that, given the conditions which must exist to achieve a 0.4 ppm ambient level, it is likely that homes constructed with plywood and particleboard that meet the standard will, at times, exceed 0.4 ppm.   Some of these commenters said that the 0.4 ppm target would be exceeded quite often, especially in the summer months. One source expressed the opinion that, even if the stated environmental conditions are met, the ambient level in the home will be 0.5 ppm.   Still other commenters said that the proposed product standards leave an adequate margin to achieve 0.4 ppm in the home, even if there are other sources of formaldehyde present or if the air exchange rate is less than 0.5 ACH.

(a) Temperature and humidity conditions. There was general agreement in the comments that increases in temperature and humidity increase formaldehyde emission rates.   This was of particular concern to commenters from the southern States. They stated that 77 F and 50% relative humidity are exceeded often in their States.   A major consumer organization reported that these temperature and humidity conditions would be exceeded most often in States with the highest manufactured home populations, citing Florida, Texas, and California specifically.   One State claimed that the Department was ignoring its statutory mandate by not considering the geographical location of the regulated homes in developing the formaldehyde rule. (See 42 U.S.C. 5403(f)(3).)

The Department realizes that the selected temperature and humidity conditions will not be met in all homes at all times.   These conditions are *31999 reasonable, however, and do reflect typical living conditions.   The Department does not have sufficient data at this time to substantiate that there is a particular problem in the southern part of the country.   Once the formaldehyde rule takes effect, the Department will monitor homes and evaluate complaints to determine whether there is a greater problem in the South and to assess the effectiveness of the standards generally.   Further, the health notice which must be posted in all manufactured homes specifically warns purchasers about the effects of heat and humidity on formaldehyde emissions. (See Air Quality Notice, below.)

(b) Ventilation. Other commenters concentrated more on the 0.5 ACH condition.   The comments demonstrated that, while not as significant as temperature and humidity, reduced air changes also raise the level of formaldehyde in the home. According to some sources, the 0.4 ppm level will not be achieved unless ventilation also is controlled.   These commenters stated that the average air exchange rate in manufactured homes is 0.3 ACH with the heating/cooling system operating. One source said that in the spring and fall, when no such system is used, air changes can fall to 0.1 and 0.2 ACH.

The Department does not have adequate information about the effect of ventilation on air quality to require mandatory air change requirements. However, HUD does recognize that, generally, better ventilation results in reduced formaldehyde

HUD-000009

49 FR 31996-01
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)                                                       Page 9

levels.   Therefore, the Department has decided to require that a ventilation im-
provement option be offered with each manufactured home. (See Ventilation and Oth-
er Options, below.)

(c) Other sources of formaldehyde. There was some concern expressed in the com-
ments about the introduction of sources of formaldehyde other than plywood and
particleboard into the home by either the manufacturer or purchaser.   One com-
menter said that other formaldehyde contributors typically raise the indoor level
to over 0.7 ppm.   Another commenter stated that the formaldehyde-emitting
products brought into the home by the occupants are not a significant prob-
lem.  This source relied on a widely recognized theory that the highest emitter
present in the home is the most significant determinant of the home's overall
formaldehyde level and concluded that it is usually the manufacturer who installs
the highest formaldehyde emitters in the home.

A related concern expressed in the comments is that the installation of unusually
large amounts of plywood and particleboard in the home could cause the ambient re-
sponse to be higher than 0.4 ppm.   According to these sources, by increasing the
loading rates of these products in the home, a manufacturer can push the home's
formaldehyde level beyond 0.4 ppm but still be in compliance with the HUD stand-
ard.   One commenter suggested that, to address this problem, the Department regu-
late the loading rate of plywood and particleboard in manufactured homes.

The Department believes that the product standards of 0.2 ppm and 0.3 ppm for
plywood and particleboard, respectively, will themselves, under test conditions,
result in emissions of sufficiently less than 0.4 ppm to allow for a certain
amount of formaldehyde contribution from other sources.   Therefore, even if car-
pets, drapes, or furniture which contain formaldehyde are installed in the home,
the Department believes that the 0.4 ppm target will not be exceeded if the re-
quisite temperature, humidity, and ventilation conditions exist.   However, the
Department realizes that levels higher than 0.4 ppm will result when other major
emitters of formaldehyde that are not covered by the rule, such as MDF, are used
in the home.   For this reason, HUD is initiating rulemaking to identify these
products and to determine how they should be regulated. (See Medium Density Fiber-
board, above.)   Further, the Department believes that the loading rates of
particleboard and plywood do not typically vary enough to affect formaldehyde
levels significantly.   Again, the margin for error allowed by the product stand-
ards is sufficient to permit loading rates greater than usual.

2. Health Effects

There was considerable disagreement in the comments regarding the adequacy of 0.4
ppm to protect manufactured home occupants from discomfort and from acute and
chronic health effects.   Some commenters stated generally that this level is too
high to protect home occupants' health.   Others said that there is ample medical
and scientific evidence to support the 0.4 ppm level.   Several commented that the

HUD-000010

target 0.4 ppm level is obsolete, pointing out that the Department's product standards do not reduce levels below those voluntarily achieved by the industry.

HUD believes that the product standards will result in a 0.4 ppm indoor level under the specified conditions and that this level, given economic considerations, is reasonable.   The Department realizes that this targeted level will not be achieved at all times.   However, the currently available medical and scientific evidence does not adequately establish the effect on health benefits of a level below 0.4 ppm.   In any event, it is not possible to implement a formaldehyde standard that will protect the entire population.

(a) Acute health effects and threshold levels. The extent, intensity, and duration of symptoms caused by exposure to formaldehyde vary, depending on the individual and the level of formaldehyde in the home.   Common complaints include eye, nose, and throat irritation, persistent cough, skin irritation, nausea, headache, dizziness, and respiratory distress.   The symptoms usually diminish or disappear when the individual leaves the home.

Several commenters stated that the 0.4 ppm target ambient level is too high to protect the majority of manufactured home occupants from odor and irritation. Consumers wrote letters relating their personal experiences with formaldehyde, in some cases attaching letters from physicians and results of tests measuring the levels of formaldehyde in their homes.   These letters chronicled the occurrence of acute symptoms at levels as low as 0.15 ppm.   A comment from one State agency reported that the agency receives many complaints from people in homes where formaldehyde levels were measured between 0.1 ppm and 0.4 ppm.   Another State agency submitted the results of a study it funded that preliminarily analyzed acute symptomatology and found no association with formaldehyde concentrations in indoor air.

Other commenters submitted evidence showing varying degrees of functional disturbance and response to low levels of formaldehyde.   Several commenters stated that 20% of the population will experience slight irritation at levels from 0.05 ppm to 0.5 ppm.   A major industry trade association said that the irritation threshold is between 0.8 ppm to 1.2 ppm and that the general population will not experience adverse effects from exposure to 0.5 ppm formaldehyde.

The Department has concluded that there is insufficient medical and scientific evidence to substantiate more than minimal health benefits when formaldehyde levels are reduced below 0.4 ppm.   Studies of human exposure to formaldehyde still do not conclusively establish whether there is a level of formaldehyde that will not cause acute symptoms.   Therefore, HUD continues to rely on the Committee on Toxicology's conclusion that there is no population threshold for the irritant effect of formaldehyde in humans (Report, Committee on Toxicology, National Academy of Sciences, Formaldehyde--*32000 An Assessment of Its Health Effects, NTIS Doc. No. ADA-08785g, April 1980).

HUD-000011

49 FR 31996-01                                                        Page 11
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

(b) Sensitization and Susceptible Groups. Exposure to formaldehyde gas causes
sensitization in certain individuals.    Sensitized persons exhibit allergic reac-
tions when exposed to formaldehyde.   Also, certain groups are more susceptible to
the acute irritant effects of formaldehyde than the general population.    These
include persons with a history of allergies or respiratory diseases, elderly per-
sons, and children, especially infants.

Commenters disagreed strongly as to whether formaldehyde gas is a sensitizer and,
if so, how many people were likely to become sensitized.    One commenter stated
that sensitization can occur in 1-5% of the population; another maintained that
there is little evidence that exposure to formaldehyde produces any pulmonary
sensitization reaction.    A few consumers submitted histories of their own or
their families' sensitization, including confirmation from their doctors.

Virtually all commenters agreed, however, that certain populations seem to be
particularly susceptible to formaldehyde's irritant effects.    Several commenters
emphasized that the groups that are most sensitive to formaldehyde are those who
are most likely to stay in the home for extended periods of time, such as the eld-
erly, the infirm, and infants.   One source said that a 0.4 ppm ambient air level
will expose these persons to a cumulative formaldehyde exposure in excess of the
National Institute for Occupational Safety and Health's recommended occupational
exposure of 1.0 ppm per 40-week.    Another commenter said that a State has estim-
ated that nearly two million high-risk, particularly susceptible persons now live
in manufactured homes.

The Department realizes that there are people who will react adversely to ex-
tremely low levels of formaldehyde and who are unusually sensitive to formalde-
hyde's irritant effects.   The Committee on Aldehydes of the National Academy of
Sciences stated that 10-12% of the population may have some degree of airway hy-
peractivity which will result in a more severe response to the effects of formal-
dehyde exposure. (Formaldehyde and Other Aldehydes, Committee on Aldehydes, Board
on Toxicology and Environmental Health Hazards, Assembly of Life Sciences, Nation-
al Research Council, 1981.)    To alert those people who may be sensitive to form-
aldehyde, the Department is requiring that a health notice be posted in every man-
factured home and placed in each home's consumer manual. (See Air Quality Notice,
below.)

(c) Chronic health effects and carcinogenicity. Respiratory illnesses reported to
be caused by chronic formaldehyde exposure include difficulty in breathing and
other asthma-like symptoms, persistent cough, and chest congestion. Further, stat-
istically significant incidences of nasal cancer (squamous cell carcinoma) occured
in rats exposed to 15.0 ppm formaldehyde gas (Final Report: A Chronic Inhalation
of Toxicology Study on Rats and Mice Exposed to Formaldehyde, CIIT/Batelle Labor-
atories, 1981).

In terms of chronic health effects, the comments primarily focused on the carci-

49 FR 31996-01
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

nogenic risk posed by exposure to formaldehyde.   Generally, the Commenters were
divided into those who believe that formaldehyde should be presumed to be a human
carcinogen and those who maintain that there are sufficient human epidemiological
and animal studies to conclude that formaldehyde presents a cancer risk to hu-
mans.   A State Attorney General criticized the Department for failing to take a
position on this issue, citing a report from the Congressional Office of Techno-
logy Assessment which concluded that, in the absence of epidemiological data con-
cerning a substance's effect on humans, bioassays on carcinogenicity in animals
should be used to identify potential human carcinogens.

Among those commenters who presumed that formaldehyde is a human carcinogen,
there was disagreement regarding the extent of the risk presented by exposure to a
level of 0.4 ppm.   Some commenters said that, using the highest level of exposure
in the CIIT study, 15.0 ppm, and applying a safety factor of 100, there is a sig-
nificant level of risk at 0.15 ppm.   These commenters asserted that this method
of calculation is conservative because, when no threshold is known, a 1000-fold or
greater safety factor often is used.   This conclusion was used as a basis for re-
commending that the appropriate ambient formaldehyde level is no more than 0.1
ppm.   Other commenters said that the animal and human studies performed to date
establish that the cancer risk at 0.4 ppm formaldehyde is virtually nonexistent.
A large compilation of studies and reports was submitted by the Formaldehyde In-
stitute showing that there is no basis, at this time, for treating formaldehyde as
a human carcinogen.

On May 23, 1984, the Environmental Protection Agency designated formaldehyde for
expedited regulatory action under section 4(f) of the Toxic Substances Control Act
(TSCA) (49 FR 21870).   In the publication, EPA stated that there may be a reason-
able basis to conclude that formaldehyde presents a significant risk of widespread
harm to humans from cancer.   The EPA determined that there are animal data on
formaldehyde that can be used to assess the human cancer risk.   One of the expos-
ure categories to which the section 4(f) decision applies is the exposure associ-
ated with residence in manufactured homes.

In addition, the Executive Office of the President, Office of Science and Techno-
logy Policy, issued a draft document containing guidelines to be used by regulat-
ory agencies in assessing cancer risks from chemicals (49 FR 21594) (May 22,
1984).   The Department has reviewed these guidelines and will evaluate them fur-
ther when the final report is issued.

The Department will monitor the EPA's regulatory progress closely.   In its May
23rd publication, the EPA clearly stated that its decision does not mean that the
agency believes that formaldehyde presents short-term emergency risks.   Further,
the EPA stated that "information available to the Agency does not indicate that
people should substantially change their habits if they are being exposed to some
level of formaldehyde." Therefore, the Department does not believe it would be ap-
propriate to change the formaldehyde product standards in response to the section

HUD-000013

49 FR 31996-01                                                                                    Page 13
49 FR 31996-01, 1984 WL 106759 (F.R.)
**(Cite as: 49 FR 31996)**

4(f) designation.   The Department will reevaluate the formaldehyde standards when
the EPA reaches a final regulatory decision and may change the standards if the
basis for EPA's findings show that these standards are not adequate to protect the
health of manufactured home occupants.

Because the scientific community has not resolved the human carcinogenic issue,
HUD has not taken a position as to whether formaldehyde causes cancer in humans.
(See the discussion of this issue in the proposed rule (48 FR 37136, 37138).)

*E. Ventilation and Other Options (§ 3280.710(g))*

The Department received many comments which suggested methods by which formalde-
hyde levels could be reduced.   Some suggested methods of reducing the amount of
formaldehyde emitted from the wood products so that the product standards could be
met or bettered.   These methods included using sealants, such as varnishes,
paints, sealers, and liquid fire-retarding saturants; coating systems, including
water-based finishing coats;   scavengers, *32001 such as wax, ammonia, and other
chemicals;   low mole resin (low formaldehyde-to-urea ratio);   pretreatment of
particles;   and covers or veneers.

Other commenters suggested ways to reduce the overall formaldehyde level in the
home.   These methods included substituting other products for urea-form-
aldehyde-based particleboard and plywood, venting wall and floor cavities, spe-
cifying a maximum loading ratio for particleboard and plywood, and installing va-
por barriers.

The Department has limited information on most of the methods of reducing formal-
dehyde levels suggested in the comments.   The commenters did not provide and the
Department does not have sufficient data on the cost or effectiveness of any meth-
ods to mandate the use of any one in particular.   The Department will seek fur-
ther comment on methods of reducing formaldehyde levels in the home in the ANPR
which is being prepared. (See Medium Density Fiberboard, above.)   A significant
number of comments recommended ventilation as an effective means of reducing in-
door formaldehyde levels.   Many of these were comments which generally stated
that better ventilation will lead to improved air quality.   Other commenters ex-
pressed opinions on specific methods of ventilating the home.   One source stated
that the addition of outside air will provide a modest reduction in short-term
formaldehyde levels but that there is a more significant impact on long-term
levels.

The Department agrees that, generally, improved ventilation reduces the amount of
formaldehyde in the home.   Therefore, the Department is requiring that manufac-
turers offer a ventilation improvement option with each home.   The fresh air in-
let which was proposed to be installed in the heating system will be one of the
acceptable options which a manufacturer may offer.   As alternatives to the fresh
air inlet, a manufacturer may offer a passive, mechanical, or a combination of

HUD-000014

49 FR 31996-01                                                                Page 14
49 FR 31996-01, 1984 WL 106759 (F.R.)
(Cite as: 49 FR 31996)

mechanical and passive ventilation system.  The ventilation system offered must
improve the ventilation in the manufacturered home's occupied living space.  A
device which is designed to vent the ceiling cavity alone, for example, is not ac-
ceptable.

A ventilation improvement sheet must be given to every purchaser before a sales
agreement is signed.  The information sheet will contain a description of the
available ventilation option(s) and, for mechanical systems, the ventilation capa-
city expressed in air changes per hour or cubic feet per minute.

*F. Testing Requirements (§§ 3280.308(b) and 3280.406)*

The testing requirements contained in the proposed rule generated a lot of com-
ment, particularly from industry sources.  The proposed rule set forth a detailed
scheme for certifying wood products and for production testing using a specified
desiccator test and frequent air chamber retesting to maintain the certification.

1. Test Method

There was general support in the comments for the use of the large air chamber
test.  Commenters agreed that the air chamber test can provide an excellent pre-
diction of actual formaldehyde levels in manufactured homes.  Several commenters
did say, however, that testing wood under controlled conditions has little prac-
tical application to emissions in homes.

2. Certification Testing

Most commenters agreed that certification is appropriate and that the large air
chamber test is a reasonable test method upon which to rely.  Certification will
take place on a plant-by-plant basis.  Since the rule no longer specifies that
exceeding a desiccator test value will trigger an air chamber test, the certifica-
tion process does not mandate the performance of a desiccator test. Production
testing methods are to be determined by the certifying agency. (See Production
Testing, below.)  However, air chamber testing must be conducted on a quarterly
basis, rather than semiannually as proposed.

Some commenters recommended that HUD incorporate by reference the air chamber
test developed by the Hardwood Plywood Manufacturers Association and the National
Particleboard Association, FTM-2-1983.  These commenters stated that the industry
test includes provisions for prehandling of boards, background formaldehyde
levels, and sample spacing, and therefore is more complete than the proposed
test.  They also preferred the industry's selection of a seven-day precondition-
ing period, in lieu of the two-day period proposed, and the 75  F plus or minus
2  chamber temperature as opposed to the 77  F plus or minus 2  proposed by HUD.

Other commenters addressed the conditions in the chamber selected by the Depart-
ment.  Ventilation rate, temperature, and humidity were all criticized in the