UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

IN RE: FEMA TRAILER                           MDL NO. 1873
FORMALDEHYDE
PRODUCT LIABILITY LITIGATION                  SECTION N-5
                                              JUDGE ENGELHARDT
                                              MAG. JUDGE CHASEZ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### DECLARATION OF ADMIRAL HARVEY E. JOHNSON, JR.

I, Harvey E. Johnson, Jr., Vice Admiral, United States Coast Guard (Ret.), state and

declare as follows:

1.      On August 21, 2009, the Court in this litigation issued an Order [Rec. No. 2774],

granting in part and denying in part the Defendant United States of America's Motion for a

Protective Order to Prevent Plaintiff's Deposition of Harvey E. Johnson, Jr., Former FEMA

Deputy Administrator and Chief Operating Officer [Rec No. 1756].  This Order was sent to me

by counsel for the government.  In the Order, the Court stated:

> Within 15 days of the entry of this Order and Reasons, Admiral Johnson shall
>
> provide his response to the following question in writing, under oath: "What were
>
> Admiral Johnson's concerns and his reasoning behind delaying the testing from
>
> October 2007 until December 2007."

The following paragraphs are my answer to this question.

2.      I am Harvey E. Johnson, Jr., VADM, USCG (retired), and served our Nation as

the Deputy Administrator and Chief Operating Officer for the Federal Emergency Management

Agency (FEMA) from May 2006 to January 2009.  With regard to the question posed by the

1



EXHIBIT

13

court, I affirm that, after hours of extensive briefings and consultations within FEMA and across the inter-agencies, I personally made the decision to delay from October 2007 to December 2007, the testing of up to 500 occupied temporary housing units by the Center for Disease Control (CDC) for the presence of formaldehyde.

3.      In context of that decision, my overriding purpose – and that of the Administration, FEMA and supporting Federal departments and agencies – since becoming aware that formaldehyde was present in the construction materials of housing units purchased by FEMA, and the potential for health effects, was to take affirmative action that would protect the health and safety of all of the housing occupants, past and present. Meeting that simply stated purpose required the smooth functioning of a series of complex interdependencies, principally among FEMA, DHS, HHS and CDC, supported by contractors and approved through the inter-agency process of the Administration.

4.      In late October, it became starkly apparent that the multitudes of interdependent actions needing to be in place prior to the initiation of testing were not aligning as expected. For example, CDC put a contract in place that would have supported the initiation of testing in October 2007. The testing would have been consistently conducted by a certified independent party, using nationally accredited procedures, and would have resulted in a numerical reading of the level of formaldehyde in each housing unit. However, due to the unexpected inability of a CDC established scientific advisory panel to develop any empirical guidance for evaluating the numerical reading, there was no yardstick for a family to determine whether their unit was safe or unsafe based on the reading. Based upon my interaction with FEMA and DHS staff, State officials, advocacy groups and occupant families, I believed that it would have been very disconcerting for a concerned family to receive a government form letter advising them that their

2

formaldehyde level was XX parts per million (ppm), with absolutely no indication as to whether XX ppm indicated a safe or unsafe condition. It was my thought that simply providing a formaldehyde level absent any meaningful reference point would have frustrated disaster families – and the Nation.

5.       Additionally, I believed that families who resided in disaster housing and were understandably concerned about the potential effects of formaldehyde needed more than a numerical reading and a CDC web site as sources of information: they needed a personal, common sense explanation of the reading, a one-on-one discussion with medical experts of its implications and an awareness of the available housing options. In late October, there was not yet any agreement among the responsible agencies regarding the method by which the reading would be provided to families or how the reading would be described both for the significance of the reading and the health and safety implications. Based upon all of the information, including consultation with agency staff, medical experts and senior FEMA and DHS leadership, I concluded that to proceed with testing absent a coordinated plan for management of the providing of the results of testing would have frustrated disaster families and all others concerned for their welfare.

6.       Additionally, while the CDC plan, and contract, would have provided a reading of the level of formaldehyde for up to 500 (or perhaps less) families, there were 52,000 other families residing in disaster housing at that time and many times that number of families who previously occupied disaster housing. We expected that some of these families might have also requested testing and/or access to additional information. The Federal government needed to be ready to quickly respond to all requests for testing of disaster housing. The CDC contract would not have permitted additional testing on the scale anticipated. In my view, having to delay or

defer testing for additional families would have appeared uncaring and been highly frustrating to all of those families.

7.      Additionally, the inordinate energy narrowly focused on formalizing procedures for testing a statistically significant number of disaster housing units left many other essential actions inadequately addressed: there was no overarching operations plan that tied all of the interdependent actions into an organized effort; there was no systematic approach to public health advisories that was mutually agreed upon by FEMA and CDC; and, the existing communications plan would not have ensured that disaster families, state and local officials, advocacy groups, Federal officials, congressional committees and the public at large were sufficiently informed of the impending testing and able to plan to address the results of the testing.  I believed that this lack of coordination would have been immediately evident and detrimental to disaster families and to all of those concerned for their welfare.

8.      In view of the overarching situation and status of interdependencies essential to protecting the health and safety of all of the housing occupants, acquiescing to the initiation of testing in October 2007 would have been a serious abrogation of my responsibilities.  I believed that had testing gone forward, frustration and chaos would most certainly have erupted 35 days hence when results would have been available absent meaningful interpretative guidance; without personal and professional explanation to each family and no ability to provide testing to other families not included in the CDC study.  My concern was that this would have evidenced a lack of readiness to address the significant issues of the larger community of disaster survivors and insufficient coordination of a Federal plan with State and other officials.  In my view, difficult as it was to delay testing, it was the only proper course of action.

9.      During the weeks that followed the late October decision to delay testing, and up to and including a White House meeting of the interagency group in mid-November 2007, FEMA led or facilitated an intense level of inter-agency engagement, planning, and senior level decision making.  This process was complicated, involved detailed medical and scientific discussion, and required all of the time between October and December.  It could not have been accomplished, as some have suggested, in parallel with the 35-day test-to-results timeframe. More importantly, the process was successful in that it resulted in the following:

- A comprehensive testing operations plan:  In preparation for testing in December, FEMA and the supporting departments and agencies were prepared to follow a comprehensive operations plan.  CDC developed public health guidance and all departments and agencies were prepared to follow a joint communications plan.  By the time the testing began in December, all affected parties, including government agencies, advocacy groups, disaster families, and the general public were fully aware of each key element of a plan that would play out over the course of weeks and months.

- Meaningful guidance: After much intensive discussion, it became apparent that the science and health community could not – for good reason – identify an empirical delineation between a formaldehyde level that was either safe or unsafe.  Rather, a number of environmental, demographic and personal health factors were identified that would contribute to determining an individual family's levels of risk.  In addition, while the formaldehyde reading and risk factors made sense to  scientists and medical experts, it was more important that it be explained in plain English such that the head of

household could understand the testing protocol, the testing result, and have a frame of reference to make a personal/family decision.

- Informed decision making: In view of the above, the FEMA and CDC developed and implemented a plan such that each home tested would have the test results delivered and discussed by a public health official and a FEMA representative. This plan ensured a personal as opposed to a bureaucratic process whereby each family would be assured an opportunity to understand the test results and elements of risk, ask medical as well has housing questions, and be positioned to make an informed decision that would protect the health and safety of the family.

10.     To the best of my recollection, this plan was implemented in large part as it was designed. Throughout a several month process, all levels of government, the general public, and, most importantly, disaster families anticipated the testing processes, patiently waited for the results, understood the results, and made informed decisions. Within this aspect of the much larger issue enveloping the presence of formaldehyde in disaster housing units, disaster families were well served. Again, in my view, the decision to delay testing was indeed the proper decision. And, in context of a comparison between the likely potential for chaos and the proven certainty of a smoothly implemented testing period, I believe that the decision served the disaster families well.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4<u>th</u> day of September, 2009.

Harvey E. Johnson Jr.
Vice Admiral, USCG  (Ret.)