Case 2:07-md-01873-KDE-MBN    Document 16598-36    Filed 10/05/10    Page 1 of 9
Case 2:07-md-01873-KDE-KWR    Document 196-9    Filed 05/18/2008    Page 2 of 36
FEMA09-000110

*Office of Inspector General*

U.S. Department of Homeland Security



March 31, 2006

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978. This is one of a series of audit, inspection, and special reports prepared by our office as part of our oversight responsibilities to promote economy, effectiveness, and efficiency within the department.

This report assesses the Federal Emergency Management Agency's (FEMA) performance as it conducted its disaster management responsibilities in response to Hurricane Katrina. We examined whether the laws, regulations, policies, procedures, plans, guidelines, and resources were adequate and operational, and whether FEMA's organizational structure enhanced or hindered its emergency management capabilities.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all who contributed to the preparation of this report.

Richard L. Skinner
Inspector General

EXHIBIT
23

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 2 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 3 of 36
FEMA09-000112

# Table of Contents

Executive Summary ........................................................................................................ 1

Background .................................................................................................................... 4
    Hurricane Katrina's Devastation ................................................................................ 4
    Preparing for the Storm ............................................................................................. 5
    Initial Response ......................................................................................................... 6
    Initial Recovery ....................................................................................................... 13
    Framework for Federal Disaster Response ............................................................. 13

Results of Review ........................................................................................................ 18

Difficulty Adapting to New Response Plans ............................................................ 18

    States Had Varied Success Implementing Incident Command System Structures and
    Establishing Unified Command ............................................................................. 19
    FEMA and DHS Were Adjusting to the National Response Plan .......................... 23
    Need to Solidify Role of ESF-5, Emergency Management .................................... 31
    ESF-6, FEMA's Coordination Efforts with Other Governmental and
    Nongovernmental Partners ...................................................................................... 34
    New Capabilities and Improved Coordination Necessary for ESF-9 ..................... 52
    ESF-15 Structure and State Coordination Need Improvement .............................. 56
    National Guard and Active Duty Troops Provide Valuable Support but
    Improved Coordination with FEMA Is Needed ..................................................... 62

FEMA Provided Record Levels of Support but Delivery Structure
Needs Improvement .................................................................................................... 65

    Visibility and Improvements to Resource Ordering and Delivery Process Required ... 66
    Unreliable Disaster Communications During the Initial Response ........................ 77
    FEMA Does Not Have Staff or Plans Adequate to Meet Its Human Capital Needs during
    Catastrophic Disasters ............................................................................................ 81
    Individual Assistance .............................................................................................. 87
    FEMA's Efforts to Augment Staff and Call Center Capacity ................................ 87
    Housing Area Command Concept .......................................................................... 94
    Delivery of FEMA's Individuals and Households Program ................................... 97
    Delivery of FEMA's Public Assistance Program ................................................. 106

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 3 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 4 of 36
FEMA09-000113

# Table of Contents

**FEMA Needs to Improve Readiness** ............................................................................................109

    FEMA's Organization and Capacity to Respond to Disasters..............................................110
    Grant Program Changes Contributed to Weakened Relationship with States.....................112
    Organizational Staffing Requires Better Management........................................................118
    Despite Expanded Training Delivery, Some FEMA Training Needs Are Unmet................120
    FEMA Planning Efforts Were Incomplete and Insufficient..................................................123
    Long-term Deterioration in FEMA's Exercise Program.......................................................128
    FEMA Should Strengthen Remediation Measures for "Lessons Learned"..........................132

**Future Considerations**..................................................................................................................134

    Working Toward All-Hazards Preparedness........................................................................135
    Developing DHS Culture in Carrying Out Emergency Management Responsibilities.......140
    Stafford Act Authorities Are Sufficient, Long-term Recovery Issues Need to be Addressed....143

**Management Comments and OIG Analysis**................................................................................145

## Appendices

    Appendix A:    Hurricane Katrina Timeline........................................................................146
    Appendix B:    FEMA's Individual Assistance Programs..................................................149
    Appendix C:    FEMA's Public Assistance Program and Eligible Work............................156
    Appendix D:    The National Incident Management System..............................................159
    Appendix E:    The National Response Plan.......................................................................163
    Appendix F:    Comparison of PFO and FCO Duties Under the National Response Plan........165
    Appendix G:    National Voluntary Organizations Active in Disaster................................166
    Appendix H:    FEMA Consolidated Shelter Report............................................................168
    Appendix I:    Disaster Recovery Centers: Location Map.................................................170
    Appendix J:    Disaster Recovery Centers: Hours of Operation........................................171
    Appendix K:    Agencies Receiving Mission Assignments................................................173
    Appendix L:    Mission Assignment Descriptions..............................................................174
    Appendix M:    Call Center Staff Compared to Number of Calls.......................................178
    Appendix N:    Average Length of Disaster Victim Calls...................................................179
    Appendix O:    FEMA Referrals to Other Assistance Providers........................................180
    Appendix P:    DHS Organizational Charts........................................................................181
    Appendix Q:    FEMA Ten-Year Timeline..........................................................................183
    Appendix R:    Purpose, Scope, and Methodology.............................................................185
    Appendix S:    Recommendations......................................................................................187
    Appendix T:    Management Response to Draft Report.....................................................193

# Table of Contents

Appendix U:   Major Contributors to This Report...................................................................209
Appendix V:   Report Distribution...........................................................................................210

# Abbreviations

| | |
|---|---|
| ADD | Automated Deployment Database |
| CORE | Cadre of On-Call Response Employees |
| DAE | Disaster Assistance Employee |
| DHS | Department of Homeland Security |
| EMAC | Emergency Management Assistance Compact |
| EMPG | Emergency Management Performance Grants |
| EOC | Emergency Operations Center |
| EP&R | Emergency Preparedness and Response |
| ESF | Emergency Support Function |
| FCO | Federal Coordinating Officer |
| FEMA | Federal Emergency Management Agency |
| FY | Fiscal Year |
| HSOC | Homeland Security Operations Center |
| HUD | Department of Housing and Urban Development |
| ICS | Incident Command System |
| IHP | Individuals and Households Program |
| IIMG | Interagency Incident Management Group |
| JFO | Joint Field Office |
| MERS | Mobile Emergency Response Support |
| MRE | Meal Ready-to-Eat |
| NDMS | National Disaster Medical System |
| NEMB-CAP | National Emergency Management Baseline Capabilities Assurance Program |
| NPSC | National Processing Service Center |
| NRCC | National Response Coordination Center |
| NIMS | National Incident Management System |
| NRP | National Response Plan |
| ODP | Office of Domestic Preparedness |
| OIG | Office of Inspector General |
| PFO | Principal Federal Official |
| RAMP | Remedial Action Management Program |
| RRCC | Regional Response Coordination Center |
| SBA | Small Business Administration |
| US&R | Urban Search and Rescue |
| VOAD | Voluntary Organizations Active in Disaster |

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 5 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 20 of 36
FEMA09-000154

Disaster Welfare Information

The intent of the Disaster Welfare Information concept of operations for ESF-6 is to collect and provide information on individuals who live in an affected disaster area to family members and friends outside of the disaster area. The Red Cross, in collaboration with Microsoft Corporation, established the Family Links Website to provide this service. It includes records from the previous Red Cross Family Links website and many other websites. Family Links attempts to provide the most current and accurate information available. However, due to the relocation and movement of Hurricane Katrina evacuees, location information on the website was not always complete, current, or correct. Evacuees were able to provide information on their location, and concerned family members and friends could search the list of those already registered. This website was available online for evacuee searches through February 28, 2006. As of September 25, 2005, 276,439 evacuees had reported their status and 28,237 concerned family members and friends had registered on line. In addition, calls were made to the Red Cross' 1-877-LOVED1s number concerning the status of 167,682 names.

### FEMA's Efforts to Identify and Establish Housing Resources

FEMA's overall housing strategy for Hurricane Katrina was to use shelters, hotels, motels, cruise ships, tents, applicants staying with friends and relatives, tarping of roofs so applicants could remain in place where possible, and other available housing resources to address immediate housing needs of disaster victims. It would then transition victims to travel trailers and mobile homes, and finally to apartments to address longer-term housing needs. Some components of FEMA's housing strategy were not well planned or coordinated, while other components to address and support the housing needs of displaced disaster victims were not as effective or efficient as FEMA had anticipated.

Because of Hurricane Katrina's devastation, FEMA made immediate housing decisions. For example, on August 31, 2005, it procured 20,000 manufactured housing units, for approximately $1 billion, to address anticipated housing needs and planned to purchase over 100,000 units. It also purchased 30 mobile Disaster Recovery Centers to compliment its existing inventory and 30 office trailers for use in implementing Individual Assistance field operations. By September 4, 2005, FEMA continued to assess available housing resources such as hotels, properties owned by federal agencies, and vacant lots at mobile home parks as well as the potential use of recently closed nursing homes and

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 6 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 21 of 36
FEMA09-000155

commercial cruise ships as options for temporary housing resources. The Individual Assistance Technical Assistance Contactors were en route to Mississippi and two cruise ships, with a capacity to hold 5,200 passengers, were to arrive the following day in Galveston, Texas for use as interim housing for the elderly, persons with special needs, and families with small children who were in shelters.

By September 5, 2005, FEMA's Individual Assistance management cell had developed a strategy to address the immediate needs of disaster victims that included: deploying teams to register evacuees, activating expedited assistance, facilitating relocation of evacuees, using alternative means to verify program eligibility, and establishing a gradual transition to its standard operating procedures and program implementation once immediate needs had been addressed. By September 7, 2005, the U.S. Department of Agriculture was working with the private sector to identify privately owned rental resources nationwide that could be used to house displaced victims. In addition, the department made 3,000 vacant housing units in the affected region available and 30,000 housing units available nationwide. FEMA and the department also coordinated with faith-based organizations to match displaced residents with those housing resources. FEMA officials expressed to us the integral role the Department of Agriculture played in identifying and providing housing resources to displaced victims.

The Corporation for National and Community Service and FEMA worked to develop a plan for the most effective use of national service resources in assisting disaster victims. Also, FEMA made requests of the Corporation for National and Community Service to help augment its Disaster Recovery Centers staff by providing casework, outreach, and other administrative services throughout the impacted area.

### Travel Trailers and Mobile Homes

By September 6, 2005, FEMA's primary ESF-6 issues in Louisiana were to stabilize shelter operations and food distribution; in Mississippi it was supporting shelters and the relocation of evacuees as well as identifying emergency group sites for travel trailers; and in Alabama it was coordinating the installation of travel trailers on individual private sites and developing group sites. FEMA's Housing Area Command stated it had identified sufficient sites to address the housing needs of displaced Alabama residents and would redirect resources to address the more affected states of Mississippi and Louisiana. In all states, 3,500 manufactured homes and 5,200 travel

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 7 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 22 of 36
FEMA09-000156

trailers, in various stages of production, were purchased from dealer lots. FEMA also began moving approximately 5,000 units from its inventory to staging areas, had 60,000 travel trailers being produced at the rate of approximately 120 per day, and awarded a contract for 1,500 modular structures.

By September 10, 2005, staff at FEMA registration call centers began recording information for mobile and travel trailer pre-placement interviews. The first family to be placed in a travel trailer occurred 12 days after the disaster was declared. By September 12, 2005, construction started on a 500-unit travel trailer site in Louisiana with an accelerated occupancy schedule of one week. Within the three affected states, there were 903 travel trailers occupied by September 15, 2005; an additional 1,306 (both travel trailers and mobile homes) were ready for occupancy; and 4,798 were positioned in various staging areas. The following day, only 910 units were occupied: 491 in Louisiana; 107 in Mississippi; and 312 in Alabama.

In Louisiana, the Housing Area Command was working to have 2,405 housing units ready for occupancy by the week of September 17, 2005, and an additional 3,408 units ready the following week. Construction began on a site in Baton Rouge on September 19, 2005, to place 580 travel trailers. The anticipated completion date for this project was September 29, 2005. As of October 1, 2005, only 4,128 units were occupied: 667 in Louisiana, 2,929 in Mississippi, and 532 in Alabama; and, an additional 5,446 units were ready for occupancy. FEMA, in working with its contractors, experienced difficulty in identifying acceptable sites to place units and was slow in identifying applicants to occupy units.[33] For example, several sites initially identified by FEMA in Louisiana to place multiple units were not well coordinated with local officials, and local officials determined placement was not acceptable. Also, in several states there were issues with leasing existing parks. FEMA can pay only for minimum improvements and some parks required major renovations before being considered suitable for unit placement.

Cruise Ships

In Alabama, FEMA's use of a cruise ship was primarily focused on housing evacuees from Mississippi who were 65 years and older and in good health, single parents with children, and homeless individuals living in adverse

---

[33] The DHS OIG Office of Gulf Coast Hurricane Oversight is conducting ongoing work regarding housing issues.

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 8 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 23 of 36
FEMA09-000157

conditions.[34] By September 5, 2005, the ship had a lower than anticipated occupancy rate. The lower rate may have been caused by the availability of shelters and tents in the area. Evacuees could commute more easily to work and were closer to their damaged homes by residing in these facilities rather than on the ship, as living on the ship meant a 45-minute commute for some. By September 19, 2005, FEMA was working to move more displaced persons on to the ship. In addition, it had been trying to move the ship from Mobile, Alabama to Pascagoula, Mississippi, as this would place the evacuees closer to home and work, but FEMA received resistance from Mobile's port director because a docking fee would be lost should the ship move. As of September 30, 2005, the number of Mississippi residents aboard the cruise ship was 1,111, although the ship was capable of accommodating 1,848 passengers. The ship moved to Pascagoula, Mississippi on October 29, 2005.

On September 10, 2005, two cruise ships arrived in New Orleans, Louisiana, to provide housing to disaster victims, with a primary focus to house disaster victims and first responders or personnel essential to the recovery effort. On September 12, 2005, FEMA met with New Orleans and parish officials regarding the use of the ships for evacuees but the most critical need expressed to FEMA was to house essential city personnel, such as police and firefighters. Boarding began that day. The two ships provided immediate housing for essential emergency workers, created a base camp from which to operate, and also housed disaster victims. An additional 262 boarded on September 15, 2005, and pre-registration for an additional 866 began, bringing the total cruise ship occupants registered to approximately 3,366, with 1,430 on board. By September 18, 2005, a third cruise ship was in the New Orleans area and the total boarded population was 2,105. By October 1, 2005, 4,658 passengers were on all four ships in New Orleans and Chalmette, Louisiana, and Mobile, Alabama.

During the first 30 days after the disaster, all four ships were only about 35 percent occupied. At that occupancy rate, the cost to FEMA was approximately $3,363 per week, per evacuee, which was about three times higher than the existing per diem rate for federal government workers for the area. As of October 31, 2005, however, the occupancy increased significantly. In New Orleans, one ship with a capacity of 2,634 passengers had 2,118 on board (80 percent occupied); another ship with the same

---

[34] DHS OIG Office of Audits conducted an initial review of the decision to use cruise ships to provide housing for victims and first responders. DHS OIG, Memorandum to AIG for Hurricane Katrina Oversight, *Hurricane Katrina Cruise Ships*, November 4, 2005.

Case 2:07-md-01873-KDE-MBN   Document 16598-36   Filed 10/05/10   Page 9 of 9
Case 2:07-md-01873-KDE-KWR   Document 196-9   Filed 05/18/2008   Page 24 of 36
FEMA09-000158

capacity had 2,374 passengers (90 percent occupied); and the additional ship with a capacity of 1,020 had 862 passengers (85 percent occupied). The last of the four ships, with a capacity of 1,848 had 1,367 passengers (74 percent occupied).

The use of high occupancy ships as an alternative resource to provide housing for disaster victims and personnel essential to the response and recovery effort was effective, but not necessarily efficient. For example, in Alabama, because other immediate housing resources were available in the affected area and provided evacuees with better accessibility to their work and damaged residences, the initial efficiency of the ships as an alternative housing resource was diminished. Future planning for the use of this resource should be focused more on accommodating the needs of disaster victims and should take into account other available housing resources to avoid potential duplication.

**Recommendation #5:** We recommend that the Director of the Federal Emergency Management Agency develop alternative housing resource plans that include a review of all identified resources within an affected area, determine whether potential duplication exists, and efficiently deliver services that are accommodating to the disaster victim.

**Coordination with Voluntary Organizations**

Voluntary organizations are FEMA's partners in the provision of many mass care services for ESF-6, such as feeding and the bulk distribution of items to victims of disaster, and offer assistance that FEMA is unable to provide. For example, by September 23, 2005, both the Red Cross and the Salvation Army had provided over 16 million meals, 12 million snacks, established over 780 fixed feeding sites, and used over 520 mobile feeding units in response to Hurricane Katrina.[35] In addition, over 158,000 clean up kits and 287,000 comforts kits had been distributed.[36]

FEMA worked with the Department of Agriculture and ESF-6 to keep sufficient food supplied to shelters. In Louisiana, a mass feeding coordination group was established that included: ESF-11, FEMA, VOAD, the Red Cross, the Salvation Army, the Southern Baptist Convention, and the state. The group reviewed and updated resources, parish feeding needs, and meal capacity for hurricane victims and evacuees. By September 30, 2005, six

---

[35] ESF-6, data as of September 23, 2005.
[36] ESF-6, data as of September 26, 2005.