Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2
 3
    IN RE: FEMA TRAILER      *    MDL NO. 1873
 4       FORMALDEHYDE PRODUCTS  *
         LIABILITY LITIGATION   *    SECTION "N"(4)
 5                           *
                             *    JUDGE ENGELHARDT
 6
    * * * * * * * * * * * * * *
 7
 8
 9          The 30(b)(6) videotaped deposition upon oral
10   examination of GULF STREAM COACH, INC., by
11   JAMES SHEA, a witness produced and sworn before me,
12   Patrice E. Morrison, RMR, CRR, Notary Public in and
13   for the County of Marion, State of Indiana, taken on
14   behalf of the Plaintiffs at The Marriott, 123 North
15   Saint Joseph Street, South Bend, Indiana, on July 24,
16   2008, at 10:27 a.m., pursuant to the Federal Rules of
17   Civil Procedure.
18
19
20
21
22          STEWART RICHARDSON & ASSOCIATES
              Registered Professional Reporters
23                 One Indiana Square
                       Suite 2425
24              Indianapolis, IN  46204
                     (317)237-3773
25
```

Page 2

```
 1                    APPEARANCES
 2
 3   FOR THE PLAINTIFFS:
 4       Anthony G. Buzbee, Esq.
         Peter K. Taaffe, Esq.
 5       BUZBEE LAW FIRM
         104 21st Street
 6       Galveston, TX  77550
 7       Ronnie G. Penton, Esq.
         LAW OFFICES OF RONNIE G. PENTON
 8       209 Hoppen Place
         Bogalusa, LA  70427
 9
         Hugh Palmer Lambert, Esq.
10       Linda J. Nelson, Esq. (By telephone)
         LAMBERT & NELSON
11       A Professional Law Corporation
         701 Magazine Street
12       New Orleans, LA  70130
13       Sean Trundy, Esq.
         174 East Bay Street, Suite 201
14       Charleston, SC  29401
15       Raul R. Bencomo (By telephone)
         BENCOMO & ASSOCIATES
16       639 Loyola Avenue, Suite 2110
         New Orleans, LA  70113
17
         Frank D'Amico, Jr., Esq. (By telephone)
18       Aaron Ahlquist, Esq. (By telephone)
         LAW OFFICES OF FRANK D'AMICO, JR.
19       622 Baronne Street
         New Orleans, LA  70113
20
21   FOR THE DEFENDANTS GULF STREAM COACH, INC., and
     FAIRMONT HOMES:
22
         Andrew D. Weinstock, Esq.
23       DUPLASS ZWAIN BOURGEOIS MORTON PFISTER &
           WEINSTOCK
24       29th Floor, Three Lakeway Center
         3838 N. Causeway Boulevard
25       Metairie, LA  70002
```

Page 3

```
 1              APPEARANCES (cont'd)
 2
     FOR THE DEFENDANTS GULF STREAM COACH, INC., and
 3   FAIRMONT HOMES:
 4       Timothy D. Scandurro, Esq.
         SCANDURRO & LAYRISSON, L.L.C.
 5       607 St. Charles Avenue
         New Orleans, LA  70130
 6
 7   FOR THE DEFENDANTS RECREATION BY DESIGN, LLC,
     TL INDUSTRIES, INC., and FRONTIER RV, INC.:
 8
         Randall C. Mulcahy, Esq. (By telephone)
 9       GARRISON YOUNT LORMAND FORTE & MULCAHY, LLC
         909 Poydras Street, Suite 1800
10       New Orleans, LA  70112
11   FOR THE DEFENDANT FOREST RIVER:
12
         Jason D. Bone, Esq.
13       GIEGER LABORDE & LAPEROUSE, L.L.C.
         One Shell Square, 48th Floor
14       701 Poydras Street
         New Orleans, LA  70139-4800
15
16   FOR THE DEFENDANTS AMERICAN HOMESTAR CORP. and OAK
     CREEK HOMES:
17
         David C. Bach, Esq. (By telephone)
18       HAILEY McNAMARA HALL LARMANN & PAPALE
         10725 Perkins Road, Suite 200
19       Baton Rouge, LA  70810
20
     FOR THE DEFENDANTS PILGRIM, KEYSTONE, MONACO,
21   R-VISION, THOR CALIFORNIA, KZ RV, DS CORP. and
     DUTCHMEN:
22
         James C. Percy, Esq.
23       JONES WALKER WAECHTER POITEVENT CARRERE &
           DENEGRE, L.L.P.
24       8555 United Plaza Boulevard
         Baton Rouge, LA  70809-7000
25
```

Page 4

```
 1              APPEARANCES (cont'd)
 2
     FOR THE DEFENDANT FLEETWOOD ENTERPRISES:
 3
         Jeffrey M. Burg, Esq. (By telephone)
 4       LEAKE & ANDERSSON, L.L.P.
         1100 Poydras Street, Suite 1700
 5       New Orleans, LA  70163-1701
 6
     FOR THE DEFENDANTS CMH MANUFACTURING, SOUTHERN ENERGY
 7   and PALM HARBOR:
 8       Thomas W. Thagard III, Esq.
         MAYNARD COOPER & GALE PC
 9       1901 Sixth Avenue North
         2400 AmSouth/Harbert Plaza
10       Birmingham, AL  35203-2618
11
     FOR THE DEFENDANTS MORGAN BUILDING & SPAS and MORGAN
12   BUILDING SYSTEMS:
13       Christine Lipsey, Esq. (By telephone)
         McGLINCHEY STAFFORD PLLC
14       301 Main Street
         One American Place, 14th Floor
15       Baton Rouge, LA  70825
16
     FOR THE DEFENDANTS FLEETWOOD:
17
         Richard K. Hines V, Esq.
18       NELSON MULLINS RILEY & SCARBOROUGH LLP
         Atlantic Station
19       201 17th Street NW/Suite 1700
         Atlanta, GA  30363
20
21   FOR THE DEFENDANT COACHMEN INDUSTRIES:
22       John Stewart Tharp, Esq. (By telephone)
         TAYLOR PORTER BROOKS & PHILLIPS
23       8th Floor - Chase Tower South
         451 Florida Street
24       Baton Rouge, LA  70801
25
```

Min-U-Script®



EXHIBIT

40

(1) Page 1 - Page 4

Page 5

```
 1                    APPEARANCES (cont'd)
 2
   FOR THE DEFENDANT UNITED STATES OF AMERICA:
 3
        Henry T. Miller, Esq.
 4      U.S. DEPARTMENT OF JUSTICE
        Civil Division
 5      1331 Pennsylvania Ave., N.W.
        Room 8006-S
 6      Washington, DC 20004
 7
   FOR THE DEFENDANTS JAYCO and STARCRAFT:
 8
        Thomas L. Cougill, Esq. (By telephone)
 9      WILLINGHAM FULTZ & COUGILL LLP
        Niels Esperson Building
10      808 Travis, Suite 1608
        Houston, TX  77002
11
12 ALSO PRESENT:
13      Elizabeth A. Ganiere, Esq.
        GULF STREAM COACH, INC.
14
        Michael J. Hays, Esq.
15      MONACO COACH CORPORATION
16      David Thomas, Esq.
        KEYSTONE RV
17
        Philip Sarvari
18      GULF STREAM COACH, INC.
19      Lorijean Oei (By telephone)
        COACHMEN INDUSTRIES
20
        Doug Gaeddert
21      FOREST RIVER
22      Edward E. Weiss, Videographer
        LAW GRAPHICS
23      50811 Galaxy Drive
        Granger, IN  46530
24
25
```

Page 6

```
 1                 INDEX OF EXAMINATION
 2                                              PAGE
 3 DIRECT EXAMINATION
        Questions By Mr. Buzbee:                  8
 4
   CROSS-EXAMINATION
 5      Questions By Mr. Miller:                 90
 6                 INDEX OF EXHIBITS
 7 NUM.           DESCRIPTION             PAGE
 8 Gulf Stream 9   Testimony before the House    11
                   Committee on Oversight and
 9                 Government Reform; Statement
                   of Jim Shea, Chairman, Gulf
10                 Stream Coach, Inc., July 9,
                   2008
11
   Gulf Stream 10  Adorn, LLC purchase order     37
12                 dated 9/1/05 (GULF000581).
13 Gulf Stream 11  Plant #57 Operations Meeting  60
                   dated 9/12/05 (GULF0000970)
14
15 Gulf Stream 12  E-mail string dated 2/23/06   67
                   (GULF0000966)
16 Gulf Stream 13  E-mail dated 3/17/06 Dan Shea 69
                   to Stephen Miller re:
17                 Cavalier trailers
                   (GULF0002831)
18
   Gulf Stream 14  E-mail string re: DR-1604-MS  71
19                 Morning Report 03-17-06
                   (GULF0002838-2841)
20
   Gulf Stream 15  E-mail dated 3/21/06 Pullin   74
21                 to Dan Shea re: Ask Mr.
                   Worthmore Query
22                 (GS (COGR) 02211)
23 Gulf Stream 16  E-mail string re: Cavalier    78
                   trailers (GULF0002832)
24
25
```

Page 7

```
 1      THE VIDEOGRAPHER: We're going to continue
 2 some questioning. The new witness is James
 3 Shea, Jr., and the time is 10:27. You may continue
 4 questioning, please.
 5      THE REPORTER: Sir, could you raise your right
 6 hand, please?
 7      THE WITNESS: Could I make a correction for
 8 the record?
 9      THE VIDEOGRAPHER: Yes.
10      THE WITNESS: I'm really not a junior.
11      MR. BUZBEE: I'm sorry, that was my fault.
12      THE WITNESS: Yeah, different middle name. My
13 mom's intent was that I wouldn't be called Junior,
14 but it didn't really work, did it?
15      MR. BUZBEE: Well, they call you Jim. At
16 least they don't call you Junior.
17      THE WITNESS: Just the Amish guys. That's an
18 Amish tradition. But, anyway, that's just for the
19 record.
20      MR. BUZBEE: Okay, thanks.
21      MR. WEINSTOCK: She still needs to swear you
22 in.
23      THE WITNESS: Oh, I'm sorry.
24      JAMES SHEA
25 having been first duly sworn to tell the truth, the
```

Page 8

```
 1 whole truth, and nothing but the truth took the stand
 2 and testified as follows:
 3 DIRECT EXAMINATION
 4      BY MR. BUZBEE:
 5 Q   Your name is Jim Shea; right?
 6 A   Correct.
 7 Q   And you're the chairman of Gulf Stream Coach?
 8 A   That's correct.
 9 Q   Tell me the difference between a screening and a
10 test.
11 A   A test would be -- would follow a prescribed
12 protocol, proper prescribed protocol. It would use
13 certified personnel, certified equipment. It would
14 be something that ostensibly could be used by OSHA
15 or would be something could be used evidentiarily
16 for other purposes.
17      Screening is an indicator, and it could be
18 used as an indicator of indoor air quality, could
19 be used as whether -- an indicator of whether
20 potentially -- to testing might be employed in a
21 given situation.
22 Q   Screening would give you an indication -- and of
23 course we're talking about this testing or what you
24 call screening that was done in March and April of
25 '06. You realize that; right? You testified to
```

Page 17

1 would say you would get paid 30 days thereafter.
2 A  Correct.
3 Q  Okay.  Now, who did you send down to do this
4 screening in anticipation of litigation?
5 A  The person that we sent down to canvass several
6 occupants was Scott Pullin.
7 Q  Who is that guy?
8 A  Scott Pullin was a long-term technical specialist
9 and vice president of Gulf Stream.
10 Q  What's a technical specialist?
11 A  He's familiar with the construction of units, the
12 various systems, the elements that would relate to
13 the RVIA standard.  Just a person that is well
14 rounded in understanding the technical aspects of a
15 recreational vehicle.
16 Q  Does he have a degree of some sort?
17 A  I don't know what his degree standing is.  He's
18 been with the company for a long time so I don't
19 really recall that.
20 Q  Okay.  Why did you choose him to go do this
21 screening?
22 A  He had -- has experience in the field and had spent
23 time in the hurricane zone related to, you know,
24 the deployment of units and so forth.
25 Q  Okay.  Did you feel that he was a competent

Page 18

1 individual?
2 A  He's a competent individual relative to
3 understanding RV construction and standards.
4 Q  And you chose him because you wanted to get some
5 useful information; right?
6 A  Correct.
7 Q  You told the Congress that he wasn't a scientist
8 and had no training or prior experience on the use
9 of the screening device.
10 A  Correct.
11 Q  Did you know that before you sent him down there?
12 A  Yes.
13 Q  Could you have sent someone down that had training?
14 A  No.
15 Q  You couldn't do that.
16 A  No.
17 Q  Why not?
18 A  We didn't have anybody in the employment of the
19 company that did that.
20 Q  And you told the Congress that he determined that
21 he had failed to follow the operating instructions.
22 What do you mean by that?
23 A  There is some aspects of that piece of equipment
24 that -- that he didn't follow.
25 Q  Like what?

Page 19

1 A  He didn't, as I understand, he didn't necessarily
2 recalibrate the unit with the frequency that would
3 have been required.  He didn't observe, as I
4 understand it, necessarily the amount of time
5 between uses in certain cases.  And there's some
6 other things that you can do that he didn't do.
7 Q  So you felt that his screening was useless?
8 A  We felt that the screening from given indication of
9 the changes in indoor air had some value in terms
10 of us being able to communicate with FEMA relative
11 to ventilation aspects of the unit, so we thought
12 that it had some value there.  And so for that
13 purpose, you know, it was better than, quote, a
14 sniff analysis, as somebody might do in a unit to
15 try to determine indoor air quality.
16 Q  When you got the results of the screening, did you
17 believe that there may be a problem with
18 formaldehyde in the trailers that you were selling
19 the Government?
20 A  Well, there was two types of screening that we did:
21 One was occupied units and one type was unoccupied
22 units.
23 Q  Okay.
24 A  And relative to the occupied units, the screenings
25 fell below or proximate to the only two -- the only

Page 20

1 two federal regulatory rules that I was -- that we
2 were familiar with that might give guidance.  Even
3 though, as you probably know, there's no such U.S.
4 Government regulatory rules on formaldehyde for
5 travel trailers.
6 Q  So did you or did you not believe, once this
7 employee had done this screening, that you had
8 potential problem with formaldehyde in the trailers
9 you had sold the Government?
10 A  Well, the indication to us was that no.  Because
11 the people that he had spoken to, you know, the
12 approximate dozen people, didn't have health issues
13 or complaints.
14 Q  None of the people he talked to had a complaint?
15 A  Right.  Correct.
16 Q  You're sure of that?  Because that's what you
17 told --
18 A  That's what the reportings were to us from
19 Mr. Pullin, and they weren't people that had
20 registered complaints to our company in any way
21 that we could find, and so those were the -- that
22 experience that he had and that he relayed to us.
23    And I also believe to my knowledge in speaking
24 to him he did some follow-ups with those people
25 just to see what their course over a several-week

Page 21

1 period of time was, and that was -- their initial
2 response to him was that -- you know, remained the
3 same.
4 Q   So as far as you know, no resident of any of the
5 occupied trailers that you screened were
6 complaining or had any complaints.
7 A   Correct.
8 Q   And if some of the documents show that they did, in
9 fact, have complaints, you just don't know about
10 it.
11 A   I don't see any -- I haven't seen any documents
12 that would say that they had complaints.
13 Q   Okay.  And you didn't think that the screening that
14 was done was scientific or reliable.
15 A   No.
16 Q   However, you just told us that the readings, only
17 two were -- you know, there's no standard, but from
18 what you could tell with the readings, you weren't
19 concerned about them.  Right?
20 A   Well, I think, you know, you're asking me to make
21 my judgment.  Your earlier question asked me to
22 make a judgment, and I gave you some basis for that
23 judgment.  The most important basis was the people
24 weren't complaining.
25 Q   Okay.  Let's go back.  In this statement you gave,

Page 22

1 isn't it true, on page 3 -- and just so we all
2 understand, because we heard from your vice
3 president, but a deal was cut with FEMA prior to
4 even signing a contract.  Is that right?
5 A   As I recall in my review of the documents, there
6 was the term that was used by the individual that
7 contacted our vice president, executive vice
8 president, that he could take his word as a
9 purchase order, but I don't consider that we had a
10 contract until we received the executed contract.
11 Q   You were already hard at work doing your part
12 manufacturing the trailers, even before you ever
13 signed any written document.
14 A   My recollection, yes, is we had some trailers in
15 production relatively quickly, but there is a
16 certain element of risk that you take in business
17 whenever you prepare to do anything before you have
18 a bona fide contract.
19 Q   How many trailers did Gulf Stream manufacture in
20 2000?
21 A   In 2000?  I couldn't tell you that.  Don't have the
22 number.
23 Q   How about 2004?  The year before --
24 A   My recollection is about 13,000 travel trailers.
25 Q   13,000?

Page 23

1 A   That's my recollection.
2 Q   Is that the most that you had ever manufactured,
3 13,000, in 2004?
4 A   You know, I couldn't -- oh, I'm sorry, now, 2004.
5 I'm sorry, I was giving you 2003.
6 Q   Okay.
7 A   2004, we had a contract with FEMA for about 7000
8 units.  And then -- is that what you asked me, is
9 how many we --
10 Q   No, I was really asking you just in general.
11 A   For a total --
12 Q   Yes, sir.
13 A   -- for that year?  I can't really remember the
14 total for 2004, be honest with you.
15 Q   Had you ever manufactured in any year 50,000
16 trailers?
17 A   No, we had not.
18 Q   It's the most trailers you had ever manufactured.
19 A   We manufactured --
20 Q   In one year.
21 A   Yeah.  We manufactured 25,000, but -- approximately
22 25,000 FEMA trailers in 2005; 25,000 in 2006.
23 Q   Are you familiar with the component part
24 manufacturers that you dealt with?
25 A   You know, I have a pretty long term in the industry

Page 24

1 and I'm pretty well versed with the suppliers, so
2 yeah, I'm pretty well versed, but there may be some
3 that I don't remember or don't recall.
4 Q   In the manufacturing process with the FEMA trailers
5 in 2005, did you use different component part -- or
6 sources to get your particleboard and the other
7 items that you used to make the trailers, or did
8 you use the same old vendors you had always used?
9 A   We used vendors that we had used in the past or who
10 had been suppliers to the manufactured housing/RV
11 industry in the past.
12 Q   No new vendors?
13 A   I don't recall -- now, no new vendors relative to
14 wood products?
15 Q   Right.
16 A   No, I think they would all fall in that category.
17 Q   So with regard to wood products -- and when you say
18 wood products, what portions of the trailer are you
19 referring to?
20 A   Well, you said wood products, didn't you, first?
21 Q   No, but I like the way you said that.  So tell me
22 what wood products in the trailer are.
23 A   Well, you certainly have the lumber components:
24 Floor lumber, you know -- just start going upward?
25 Q   Please.

Page 37

1 does emit a certain amount of formaldehyde, but
2 it's not something that is normally considered to
3 be a large emitter or big contributor, so, you
4 know, certainly lumber, but those kinds of products
5 we did -- we did specify.
6 Q  This roof underlayment, is that plywood or
7 particleboard or --
8 A  Plywood.
9 Q  Plywood? Okay. So it could be that 100 percent of
10 your roof underlayment was not LFE.
11 A  I don't -- no, I don't think it was 100 percent,
12 from those two vendors, but...
13    MR. BUZBEE: Can we take a break, please? Do
14 you all mind? I'm sorry.
15    THE VIDEOGRAPHER: We'll go off the record.
16 The time is 11:06.
17    (A brief recess was taken.)
18    (Gulf Stream Exhibit 10 was marked for
19 identification.)
20    THE VIDEOGRAPHER: We're back on the record
21 after a short break. The witness is --
22    MR. BUZBEE: Jim Shea.
23    THE VIDEOGRAPHER: -- Jim Shea. Thank you.
24 And the time is 11:15.
25 Q  Okay, Mr. Shea, I'm going to have to hustle here.

Page 38

1    I've shown you Exhibit 10, which is Bates
2 stamp 581. This is an invoice from Adorn, LLC. Is
3 this the company you're referring to that sold Gulf
4 Stream Coach some non-LFE products?
5 A  Yeah, they sold us the reg -- some regular product,
6 yes. What they called regular product.
7 Q  And how did you determine that it was 5 percent
8 that was actually -- 5 percent of these products
9 were put into your trailers? How did you figure
10 that out?
11 A  It was a determination that was made in going back
12 through parts -- or purchase orders and so forth.
13 But I can't say that that's an exact number. That
14 was what we understood at the time.
15 Q  How did you figure that out?
16 A  He took the various purchase orders and so forth
17 and made a comparison.
18 Q  Who is he?
19 A  The individual I talked about earlier, Jeff
20 Zumbrum, you asked me about.
21 Q. Now, didn't the invoices, each one of them, at
22 least every one I've seen, had the language that we
23 see highlighted in Exhibit 10 to your deposition,
24 didn't it? Everyone of the invoices had that
25 language. True?

Page 39

1 A  The invoices?
2 Q  Uh-huh. That's an invoice in front of you, is it
3 not?
4 A  No. This is a purchase order.
5 Q  A purchase order. Every purchase order that I've
6 seen has the language highlighted. Can you read
7 the language to us?
8 A  "All products must be approved and comply to the
9 HUD requirements for manufactured housing."
10 Q  Every single purchase order with Adorn has that
11 language on it; is that true or false?
12 A  I think I've seen purchase orders that don't have
13 that same exact language.
14 Q  I'm talking about with Adorn. Or do you know?
15 A  I think I've seen Adorn purchase orders without
16 that exact language on them.
17 Q  What I'm trying to figure out --
18 A  I'm trying to be honest with you. That's what I
19 believe I've seen.
20 Q  No, I appreciate you doing that. What I'm trying
21 to figure out is, how would you determine that they
22 provided you reg rather than LFE product?
23 A  Well, if you recall, the product bundle, or
24 bundles, in that plant we observed, or our staff
25 observed in March 2006, they were marked reg --

Page 40

1 Q  Right. Okay.
2 A  -- versus LFE or LE or some of the other
3 designators that the various vendors used on their
4 bunks.
5 Q  Right. Well, how do you know that two or three
6 months prior that the stuff being used was not reg
7 as well?
8 A  Was not reg?
9 Q  That it was reg. Let me try it again. I know you
10 saw -- you had somebody saw --
11 A  Like I told you earlier, we rely on our vendors to
12 meet what we -- our policy is, so there's no
13 absolute way; you know, we don't -- we don't --
14 Q  No one within the factory makes sure that the
15 policy is followed; is that true?
16 A  We have purchasing agents in each factory and, you
17 know, part of their job is to communicate with the
18 vendor. But the vendors -- you know, we
19 communicate with POs. And if someone would see
20 something that wasn't properly labeled, then it
21 would be their responsibility to have it removed.
22 Q  Just so -- I mean the only -- it was your brother
23 who just so happened to see this in the factory;
24 right?
25 A  Correct.

Page 41

1 Q  Okay. Well --
2 A  He was with some other people, but, yeah, he spends
3 time in the factory -- factories.
4 Q  Well, the question is, obviously no one else said
5 anything about it; just your brother just so
6 happened to be walking through and saw it. How do
7 you know that every single Adorn product that you
8 used was not reg?
9 A  We, as I think I've made clear, we rely on our
10 vendors.
11 Q  So you don't check.
12 A  The only way that you could know is to test every
13 product, every piece. That's the only way you
14 could know.
15 Q  Well, your brother knew by simply looking at the
16 bundle; right?
17 A  He knew that it was marked reg. Doesn't know --
18 mean that he knows how that product would perform
19 in a test. In fact, you know -- well, yeah, in
20 fact, unless you test a product, you don't know how
21 it's going to perform relative to that HUD
22 standard.
23 Q  I understand, but what I'm asking you, again, is,
24 is there anyone in each of the -- how many -- you
25 have eight factories going at one point; is that

Page 42

1 right?
2 A  Correct.
3 Q  Did you have anyone within each factory making sure
4 that what was actually delivered and what was
5 actually used was LFE versus, quote, reg?
6 A  We didn't have an LFE inspector, no.
7 Q  Okay. I mean, from what I gather, and I don't know
8 anything about this, but your brother was able to
9 figure this out just by simply walking by; right?
10 A  He looked at the labeling on the bunk. And of
11 course anybody could have.
12 Q  But they didn't. Just your brother. Right?
13 A  In this particular case.
14 Q  Okay. So what I'm getting at is that, it could be
15 the case that all of your decorative wood -- what
16 did you call it? -- decorative wood products could
17 have been non-LFE, because you don't know, do you?
18 A  We rely on our vendors.
19 Q  I hear you. You said that many times. My question
20 is, you just don't know, do you?
21 A  The only way you can know absolutely is to test
22 every piece.
23 Q  No one within each of these factories was tasked
24 with looking at each bundle to make sure it was
25 marked LFE versus something else.

Page 43

1 A  We have a purchasing manager with each plant; we
2 have management with each plant that are familiar
3 with the labeling, but we don't have an LFE
4 inspector in each plant.
5 Q  Well, if that's the case, then why is it then that
6 you told Congress, under oath, that you used LFE
7 products in your trailers that were provided to the
8 Government?
9 A  I said we specify. Which isn't required, of
10 course, by our contract or by the RVIA code or by
11 any other U.S. Government standard. It's just
12 something that we did as a policy, and that's what
13 we did. That's what we specified.
14 Q  Okay. Fair to say that the products provided to
15 the Government were one of two different -- do you
16 call them models? Two different floor plans? Is
17 that how you would say it?
18 A  Correct.
19 Q  Other than maybe they had different sourcing for
20 the component parts, they were essentially the
21 same, trailer by trailer, depending on the floor
22 plan.
23 A  I don't want to make absolutes, but substantially
24 the same.
25 Q  And they were all made pursuant to this 2004

Page 44

1 Government specification that we discussed
2 previously?
3 A  Yes. The units that we sold to FEMA under our
4 contracts.
5 Q  Okay. There was nothing in the specs that dealt
6 with the ambient air quality within the trailer?
7 A  No.
8 Q  The Government relied upon you on that issue?
9 A  Government relied on us to fulfill the standards
10 and specs in their contract.
11 Q  As the chairman of this company, would you agree
12 that the Government -- at least your understanding
13 was the Government expected you to provide a safe
14 product?
15 A  Yes. We were concerned with safety and took
16 measures to provide a safe product, and those
17 included additional testing and so forth.
18 Q  So even though it doesn't say in the contract
19 provide a product that doesn't make people sick,
20 you, as the chairman, understand that that's
21 implicit in the contract.
22 A  We --
23    MR. WEINSTOCK: Object to the form. Calls for
24 a legal conclusion.
25    But you can answer his question, if you can.

---

**Page 77**

1 Q Sure. But I'm just trying to get — your
2 impression was at the time that this guy is just
3 sensitive to formaldehyde. Right?
4 A Yes.
5 Q So you knew as of March 21, '06, that at least one
6 resident — may be hypersensitive; may be just more
7 sensitive than others —
8 A Uh-huh.
9 Q Was having an issue —
10 A Potentially.
11 Q — with formaldehyde in his trailer; right?
12 A Potentially, yeah.
13 Q And you really don't know what the resolution of
14 Mr. Breaux's issue was, do you? You don't know
15 whether he actually moved out, got another trailer.
16 You have no idea.
17 A I don't know how long he was a resident or how long
18 he used the units. We addressed the situation to
19 his satisfaction and he wasn't having symptoms and
20 that's what I know.
21    MR. WEINSTOCK: Can we go off the record for a
22 minute?
23    MR. BUZBEE: Yes.
24    THE VIDEOGRAPHER: All right. We'll go off
25 the record. The time is 12:02.

---

**Page 78**

1    (A brief recess was taken.)
2    THE VIDEOGRAPHER: We've taken a short break.
3 We're beginning the deposition again and the time
4 is 12:06. You may question.
5    (Gulf Stream Exhibit 16 was marked for
6 identification.)
7 Q Okay, we're looking now at Exhibit 16, which is
8 Bates stamped 2832.
9 A Uh-huh.
10 Q Your brother told Stephen Miller that he would send
11 a person down to Baton Rouge on Friday to test
12 units in your staging area. That's what your
13 brother told the Government.
14 A Correct.
15 Q He didn't say screen units, did he?
16 A No, he didn't.
17 Q He said test units; right?
18 A Yes, he did.
19 Q I mean, I've never heard this distinction, but did
20 your brother just tell the Government that we're
21 going to use a test that's unreliable, a guy who is
22 untrained, and it's going to be useless when we're
23 done?
24 A You know, we'd always tried to be proactive with
25 FEMA and to react when they had a need or an issue,

---

**Page 79**

1 and so we made an affirmative statement that we
2 would — that we would do this. We certainly
3 recognized relatively soon after this that, you
4 know, we weren't equipped to do testing and there
5 wasn't any quick, easy way to do testing.
6 Q Did you inform the Government of that fact, or at
7 least of what you believed?
8 A Well, we informed them that we couldn't — we
9 informed them that we had made an attempt to get
10 this unit, and we were unsuccessful in getting a
11 unit, a functioning unit, but there was no
12 discourse subject to that relative to doing testing
13 or further doing testing or whatever, you know,
14 with Steve Miller.
15 Q Okay. So —
16 A You know, during that time frame.
17 Q So you intended to test but you couldn't find
18 someone to do what you considered a test? Or help
19 me —
20 A Yeah, we were —
21 Q None of that made any sense to me, what you just
22 said.
23 A Well, we wanted to be responsive; we hadn't made a
24 true assessment of what it would take to do such
25 testing. We obtained — made efforts to obtain

---

**Page 80**

1 this device.
2 Q Formaldehyde 400?
3 A Yeah. We found —
4 Q Or Formaldemeter 400?
5 A We found the device was a screening device. We
6 understood subsequent to this what it was possible
7 to do with it. We recognized that it was not
8 something that you could be considered testing, it
9 wouldn't be acceptable in a — as an absolute type
10 of testing.
11    And so we really — the issue just became nil,
12 you know. I didn't — we didn't pursue it further
13 on the basis of doing testing of units for the
14 Government.
15 Q But you told the Government you were going to do
16 some testing.
17 A We told them at this time that we would endeavor to
18 test units in the staging area.
19 Q By the time your brother wrote that e-mail, he had
20 already chosen the guy to do it and had a
21 Formaldemeter 400 to use, didn't he?
22 A Not to my knowledge, no.
23 Q And you know that I've spoken —
24 A No, I don't.
25 Q — to the CEO of the company that makes the

---