IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUL 19 2010

J.T. NOBLIN, CLERK
BY_____DEPUTY

DAVID ALLEN
together with all individuals and entities
whose names appear on the attached
"Exhibit A"

Civil Action No. _1: 10 CV 325 HSO-JMR_

versus

GULF STREAM COACH, INC., BECHTEL
NATIONAL, INC., CH2M HILL CONSTRUCTORS, INC.,
ABC CORPORATION, DEF CORPORATION,
and THE UNITED STATES OF AMERICA through the
Federal Emergency Management Agency

JURY TRIAL REQUESTED

COMPLAINT FOR DAMAGES

This Complaint of certain persons of the full age of majority, on behalf of themselves
and, in some instances, on behalf of individuals who lack the capacity to sue individually
(hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named
Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that:

I.   PARTIES

1.   Each Named Plaintiff is, for purposes of 28 U.S.C. §1332, a citizen of a state other than
     the state(s) in which Defendants are citizens.

2.   Named Plaintiffs are those individuals and entities listed on the attached Exhibit A, which
     is incorporated herein by reference.  References to Named Plaintiffs include Minors and
     other incapacitated individuals, whose representatives have filed suit on their behalf.

3.   Defendant Gulf Stream Coach, Inc. is, upon information and belief, an entity
     incorporated in the state of Indiana, which conducts business in the State of Mississippi,



but is not registered with the Mississippi Secretary of State, and which manufactured and supplied FEMA trailers or housing units as defined below pursuant to contracts with FEMA for use in the State of Mississippi. It may be served with process upon its registered agent for Service of Process, Kenneth C. Brinker, 503 South Oakland, Nappanee, IN 46550.

4.     Defendant United States of America is sued herein as acting through the Federal Emergency Management Agency (FEMA), and both are referred to interchangeably herein as the "Federal Government," "Government" and/or "FEMA". It may be served with process upon The United States of America, through the Federal Emergency Management Agency, Office of the Director, Office of the General Counsel, 500 C Street, SW, Washington, DC 20472, The United States of America, through the Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, and The United States of America through the U.S. Attorney's Office, Southern District of Mississippi, 188 East Capitol Street, Suite 500, Jackson, MS 39201.

5.     Defendant Bechtel National, Inc., a Nevada corporation with its principal place of business in California, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from FEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance, and repair, de-installation and refurbishment, of the temporary housing units provided by FEMA to the victims of hurricane Katrina. It may be served with process upon its registered agent, CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

6.   Defendant CH2M Hill Constructors, Inc., is a Delaware corporation with its principal place of business in Colorado, licensed to do business in the State of Mississippi and in good standing, received a No-Bid contract from GEMA and was tasked with, amongst other things, performing significant functions in the transportation, delivery, instillation, maintenance and repair, de-instillation and refurbishment of the temporary housing units provided by FEMA to the victims of Hurricane Katrina.  It may be served with process upon its registered agent, CT Corporation System, 645 Lakeland Drive, Suite 101, Flowood, MS 39232.

7.   Defendant ABC Corporation is a subsidiary of Gulf Stream Coach, Inc. that manufactured the housing units at issue in this suit.

8.   Defendant DEF Corporation is an unknown No-Bid contractor or subcontractor of No-Bid Contractor responsible for the transport, installation and set up for the housing units in question.

## II.   **JOINDER OF PARTIES**

9.   Named Plaintiffs are joined pursuant to Rule 20(a) of the Federal Rules of Civil Procedure.   The Named Plaintiffs possess a right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences, and there will be common questions of law and fact which will arise in the action.  Named Plaintiffs suing Bechtel National, Inc. are designated on Exhibit A.  Named Plaintiffs suing CH2M Hill Constructors, Inc. are designated on Exhibit A. Named Plaintiffs who do not know which No-Bid contractor installed their trailer are suing both at this time.

10.  Specifically, the following non-exclusive list illustrates the propriety of joinder in this matter:

a.  All Named Plaintiffs resided in temporary housing units located within the Southern District of Mississippi (hereinafter the Southern District).

b.  All Named Plaintiffs were exposed to the formaldehyde while residing within the temporary housing units.

c.  All named Plaintiffs were exposed to the formaldehyde while residing within the temporary housing units.

d.  Every Named Plaintiff's exposure to formaldehyde occurred within the same window of time-between the Fall of 2005 and the Fall of 2009.

e.  The Named Plaintiffs, all occupants of the temporary housing units in the Southern District and exposed to formaldehyde sometime between the Fall of 2005 and the Fall of 2009, experienced the exposure to formaldehyde in similar weather conditions.

f.  The temporary housing units in which the Named Plaintiffs resided were all manufactured by Defendant Gulf Stream Coach, Inc.

g.  The temporary housing units in which the Named Plaintiffs resided were all installed, maintained, repaired, etc. by the No-Bid contractor:  Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc.

h.  All Named Plaintiffs have experienced adverse health effects which are caused and/or made worse by exposure to formaldehyde.

i.  The Defendant committed the same or similar wrongful acts, described hereinafter, as to each Named Plaintiff.

j.  Defendant's wrongful acts occurred close in time in the aftermath of Hurricane Katrina, and close in space, within the Southern District.

## III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over the United States of America and FEMA pursuant to 28 U.S.C. §§1346 and 2671, et seq.

12.    Each Named Plaintiff herein has exhausted administrative remedies against the United States of America and FEMA and brings their claims timely by filing this complaint.

13.    Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.    Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

15.    Gulf Stream Coach, Inc. is subject to the in personam jurisdiction of this Court because it does sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

16.    Bechtel National, Inc. and CH2M Hill Constructors, Inc. are subject to the in personam jurisdiction of this Court because they do sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

17.     Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Named Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

## IV.     FACTS AND GENERAL ALLEGATIONS

18.     The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Mississippi were provided these housing units by FEMA after the landfall of Hurricane Katrina in August of 2005.

19.     Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). See Center for Disease Control and Prevention, Interim Findings on Formaldehyde Levels in FEMA-Supplied Travel Trailers, Park Models, and Mobile Homes, Feb. 29, 2008, at 4, available at http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

20.     Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

21.     Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

6

22.   The residence of each Named Plaintiff was rendered uninhabitable following Hurricane Katrina, leaving each plaintiff homeless and in need of housing assistance.

23.   FEMA contracted with Gulf Stream Coach, Inc. to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

24.   On information and belief, Gulf Stream Coach, Inc. expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

25.   On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to Hurricane Katrina and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

26.   Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to Hurricane Katrina and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

27.   Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior Hurricane Katrina and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Gulf Stream Coach, Inc.'s use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the

housing units as temporary residences for at least 18 months, but that Gulf Stream Coach, Inc. failed to warn the Federal Government about these dangers, which initially were not known to the Federal Government.

28.   Named Plaintiffs submit that Gulf Stream Coach, Inc. ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to Gulf Stream Coach, Inc.'s use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell Gulf Stream Coach, Inc.'s products, and/or avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

29.   Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Gulf Stream Coach, Inc. and provided to Plaintiffs by the Federal Government.  As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

30.   Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the Defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

IMPORTANT HEALTH NOTICE

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at

greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

31. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

32. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels

established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

33.    HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". See 24 C.F.R. §3280.308.

34.    Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. See 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
|  | 0.03 ppm – exposure durations between 15 and 364 days |
|  | 0.008 ppm – exposures of 365 days or greater |

See Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, FEMA Exposes Gulf Coast Residents to Formaldehyde, Updated on Dec 19, 2007, available at http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

35.  Gulf Stream Coach, Inc. knew, or should have known, of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

36.  FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

37.  In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged Bechtel National, Inc. and CH2M Hill Constructors, Inc. with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of Bechtel National, Inc. and CH2M Hill Constructors, Inc. to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

38. Bechtel National, Inc. and CH2M Hill Constructors, Inc. were tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

39. Under the terms of their contract, Bechtel National, Inc. and CH2M Hill Constructors, Inc. were obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the manufacturers of same. Further, under their No-Bid contract with FEMA, Bechtel National, Inc. and CH2M Hill Constructors, Inc. were obligated to advise and instruct FEMA regarding the implementation of those contracts. Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to properly fulfill either of these tasks.

40. Bechtel National, Inc. and CH2M Hill Constructors, Inc. contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Bechtel National, Inc. and CH2M Hill, Constructors, Inc. were tasked with operating. These new areas included staging areas to be managed and maintained as assigned to Bechtel National, Inc. and CH2M Hill Constructors, Inc. or individual locations and addresses where Bechtel National, Inc. and CH2M Hill Constructors, Inc. assigned that temporary housing unit would have obligations to manage and maintain it.

41. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Bechtel National, Inc. and CH2M Hill Constructors, Inc. entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

12

42.    Bechtel National, Inc. and CH2M Hill Constructors, Inc. were tasked under their contract with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc.  Bechtel National, Inc. and CH2M Hill Constructors, Inc. knew, or should have known, that these preparations were for long-term occupancy of the temporary housing units.

43.    Once the temporary housing unit(s) occupied by the Named Plaintiffs were transported and delivered to a particular location, Bechtel National, Inc. and CH2M Hill Constrictors, Inc. had the responsibility of installing each temporary housing unit.  Bechtel National, Inc. and CH2M Hill Constructors, Inc. installed the temporary housing units by "blocking" the units.  This meant raising the Named Plaintiffs' unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

44.    By blocking the temporary housing units of each Named Plaintiff, Bechtel National, Inc. and CH2M Hill Constructors, Inc. created stress and flexing on the frames of the unit as they were not designed to be lifted off of the wheel base.  In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

45.    The stress and flexing of temporary housing units' frames caused by Bechtel National, Inc. and CH2M Hill Constructors, Inc. "blocking" them with weight off of the wheels created distortion in the travel trailers' shells allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

46.    The temporary housing unit(s) occupied by the Named Plaintiffs, which were provided by FEMA, were for the most part travel trailers. The travel trailers are, by definition,

mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, Bechtel National, Inc. and CH2M Hill Constructors, Inc. knowingly and intentionally modified the design and the actual use of these units occupied by the Named Plaintiffs by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

47.    Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to consult with the manufacturers of the temporary housing units, including Gulf Stream Coach, Inc., with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation. Bechtel National, Inc. and CH2M Hill Constructors, Inc. took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

48.    Once Bechtel National, Inc. and CH2M Hill Constructors, Inc. had completed the transportation, delivery and installation of the temporary housing unit(s) occupied by the Named Plaintiffs, Bechtel National, Inc. and CH2M Hill Constructors, Inc. were tasked with inspecting each unit to ensure that it was safe and habitable, prior to occupancy by the Named Plaintiffs. Upon information and belief, Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to adequately inspect the temporary housing units occupied by the Named Plaintiffs to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by Hurricane Katrina. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

49.     In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the Named Plaintiffs provided in response to Hurricane Katrina were also managed, maintained and repaired by either Bechtel National, Inc., and CH2M Hill Constructors, Inc. or their various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the Named Plaintiffs.

50.     Parallel to their duty to manage, maintain and repair each temporary housing unit, and Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the Named Plaintiffs occupying the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

51.     Following the Named Plaintiffs' occupancy of each temporary housing unit, Bechtel National, Inc. and CH2M Hill Constructors, Inc. were tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to identify the unsuitability of the temporary housing units for long-term occupancy.

52.     In addition to de-installation of the temporary housing units, Bechtel National, Inc. and CH2M Hill Constructors, Inc. were tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to Hurricane Katrina and/or for use in the future. By restoring and refurbishing these temporary housing units, Bechtel National, Inc. and CH2M Hill Constructors, Inc. warranted that the units were fit for their

intended use, long term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Bechtel National, Inc. and CH2M Hill Constructors, Inc. created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by Hurricane Katrina and who were then directly exposed to hazardous levels of formaldehyde.

53.     Bechtel National, Inc. and CH2M Hill Constructors, Inc. at every stage of their involvement, failed to warn the Named Plaintiffs occupying each temporary housing unit of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde, a known human carcinogen, which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the Named Plaintiffs.

54.     Through their actions and omissions, Bechtel National, Inc. and CH2M Hill Constructors created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Bechtel National, Inc. and CH2M Hill Constructors, Inc. negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

55.    Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to warn the occupants of temporary housing unit(s) of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

56.    By restoring and refurbishing the trailers for future habitation, Bechtel National, Inc. and CH2M Hill Constructors, Inc. improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

57.    Finally, despite these failures, Bechtel National, Inc. and CH2M Hill Constructors, Inc. received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the Named Plaintiffs occupying the temporary housing units who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

58.    The Federal Government has been aware for years that formaldehyde is used in certain construction materials used in manufactured housing, has regulated emissions standards for HUD-regulated mobile homes, has, since the hurricane, adopted the HUD emissions regulations for travel trailer purchase specifications, and has known for over thirty years of the relationship between formaldehyde emissions in indoor environments and health problems associated therewith.  See Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, Department of Homeland Security, before the Committee on Oversight and Government Reform, U.S. House of Representatives, July 19, 2007, available at http://oversight.house.gov/documents/20070719131219.pdf.

59.    Although, as alleged above, FEMA has long been aware of the presence of formaldehyde in certain construction materials used in manufactured housing, including these housing units, and specifically was aware of the published dangers associated with the "out" or

"off -gassing" or the gradual release into the atmosphere of formaldehyde, upon information and belief, in March of 2006, a family in Mississippi reported the results of independent testing and health complaints which they related to high levels of formaldehyde.

60.     In fact, the Federal Government was conducting initial formaldehyde air sampling of the subject housing units at FEMA staging facilities in Mississippi as early as October 11, 2005 and as late as Jan. 17, 2006.  The sampling results showed that the levels detected in nearly every trailer exceeded the ATDSR minimum risk levels associated with exposures up to and exceeding 14 days that most levels exceeded the EPA recognized level at which acute health effects can manifest, and that several exceeded the OSHA workplace maximum levels.  See Response of the U.S. Department of Labor, Occupational Safety and Health Administration to Freedom of Information Act Request submitted by a plaintiff herein, November 16, 2007.

61.     Nonetheless, even though the Government was actively testing for and aware of the dangerous levels of formaldehyde present in housing units scheduled for delivery to the Plaintiffs, the Inspector General of the Department of Homeland Security, testifying before the Committee on Homeland Security and Governmental Affairs of the United States Senate, approximated that as of February 13, 2006, a little under six months post-Katrina, 75,000 travel trailers had been delivered to Plaintiffs.  See Statement of Richard L. Skinner, Inspector General, U.S. Department of Homeland Security Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate, February 13, 2006, available at http://www.dhs.gov/xlibrary/assets/Skinner-021306.pdf.

62.     The Federal Government also continued to supply the defective and dangerous housing units to the Named Plaintiffs after March of 2006.

18

63. The Federal Government continued to supply the defective and dangerous housing units to the Named Plaintiffs even though the Sierra Club publicly announced the initiation of its own testing of occupied housing units and, in April of 2006, reported the results which reflected formaldehyde levels above the threshold that the EPA warns can cause acute health effects in humans in 83% of the trailers tested. Union of Concerned Scientists, supra.

64. The Federal Government continued to supply the defective and dangerous housing units to the Named Plaintiffs even though the Federal Government, through FEMA, in March of 2006, conducted formaldehyde testing of unoccupied housing units at the Purvis, Mississippi staging area, and tested and obtained the results of an occupied Mississippi trailer on April 6, 2006, which reflected the presence of formaldehyde at twelve times the EPA's value. Union of Concerned Scientists, supra, and Exhibits B (available at http://oversight.house.gov/documents/20070719113015.pdf) and D (available at http://oversight.house.gov/documents/20070719113219.pdf) attached thereto.

65. The Federal Government continued to supply the defective and dangerous housing units to the Named Plaintiffs even though the Federal Government had been notified on a number of occasions in May and June 2006 regarding residents' concerns over formaldehyde emissions in their housing units. Union of Concerned Scientists, supra, and Exhibits E (available at http://oversight.house.gov/documents/20070719113322.pdf), I (available at http://oversight.house.gov/documents/20070719113515.pdf) and M (available at http://oversight.house.gov/documents/20070719113728.pdf) attached thereto.

66. While complaints of formaldehyde exposure continued to be reported to the Federal Government and evidence supporting the existence of dangerous levels of formaldehyde

present in the housing units was uncovered, the Federal Government intentionally avoided undertaking any comprehensive testing of their own because it wanted to avoid liability for the problem, as stated in emails from the FEMA Office of General Counsel (OGC) in June of 2006, "Do not initiate any testing until we give the OK. While I agree that we should conduct testing, we should not do so until we are fully prepared to respond to the results. Once you get results and should they indicate some problem, the clock is ticking on our duty to respond to them." Another email repeats these concerns, reading "OGC has advised that we do not do testing, which would imply FEMA's ownership of the issue." Union of Concerned Scientists, supra, and Supplemental A (various emails available at http://oversight.house.gov/documents/20070809120917.pdf) and Supplemental B (various emails available at http://oversight.house.gov/documents/20070809120940.pdf) attached thereto.

67.    Named Plaintiffs aver that, even as each Named Plaintiff was being placed at risk in unsafe temporary housing, the Federal Government had reviewed the results of all earlier testing and complaints of formaldehyde associated with the housing units and were actively conferring with one or more of the manufacturers concerning formaldehyde exposure in the housing units and how best to deal with the publicity fall-out as the media reports of same increased.

68.    Evidence of communications between the defendants exists by way of emails emanating from the FEMA Office of General Counsel (OGC). For example, in June 16, 2006 the same email which states "OGC has advised that we do not do testing," states that "Gulfstream is working closely with FEMA to resolve the formaldehyde problem in smaller travel trailer (Cavalier) units." A later email reflects relief of the FEMA OGC at the "good news" that "one of the major manufacturers of national housing units

(Gulfstream I think)...wanted to get with External Affairs so they could get on the same page...we may get the benefit of the manufacturer's 'science' and 'public relations' approaches." See U.S. House of Representatives, Committee on Oversight and Government Reform, FEMA's Travel Trailers: Litigation Considerations v. Health and Safety Considerations, And the Winner Is?, July 19, 2007, available at http://republicans.oversight.house.gov/Media/PDFs/20070719FEMAEmails.pdf.

69.     FEMA participated in an inter-agency meeting with the EPA and the Centers for Disease Control and Prevention (CDC) in July of 2006, during which senior EPA officials advised FEMA that the "health base level" for formaldehyde might be much lower than previously expected, with anticipated levels being more than 100 times higher. The discussions during this conference were more "strategic" in nature, with the EPA warning against the "the advisability of testing at all" concerned that the data would have to be released to the public and that the media would characterize the findings in the worst possible light. Union of Concerned Scientists, supra, and Exhibit R (various emails available at http://oversight.house.gov/documents/20070719114058.pdf) attached thereto.

70.     FEMA and EPA senior leadership instead agreed to test ventilation methods on unoccupied trailers. This testing methodology completely failed to simulate the living conditions of a trailer resident, so results, which would not be released for another seven to eight months, were useless for determining a policy to protect trailer residents. This testing was conducted by FEMA and EPA in September and October of 2006 at a trailer staging area located in Baton Rouge, Louisiana. Union of Concerned Scientists, and Exhibit R attached thereto, supra. See also Original Health Consultation: Formaldehyde Sampling at FEMA Temporary Housing Units, Agency for Toxic Substances and Disease Registry, Feb 1, 2007, available at

21

http://www.atsdr.cdc.gov/HAC/pha/fema_housing_formaldehyde/formaldehyde_report_0
507.pdf.

71.     This testing methodology did not simulate the living conditions, temperatures,
        humidities, standard ventilation practices, or timescales at which residents lived in the
        trailers. It also did not take into account that the trailer building materials continue to emit
        formaldehyde for four to five years. Union of Concerned Scientists, supra.

72.     FEMA and FEMA's lawyers purposefully interfered with the design and implementation
        of the earlier testing of the housing units occupied by the Named Plaintiffs supplied in the
        wake of the hurricane in order to avoid legal liability for injuries to Named Plaintiffs
        herein as a result of their exposure to formaldehyde. FEMA's activities, which included
        hiding, manipulating and ignoring the extant science and scientific work and concerns of
        federal scientists in other agencies, began immediately after FEMA began to receive
        complaints from trailer residents concerning formaldehyde fumes in 2006.          See
        correspondence from U.S. House of Representatives, Committee on Science and
        Technology, to Michael Chertoff, Secretary, U.S. Department of Homeland Security,
        January 28, 2008.

73.     FEMA further manipulated the governmental testing by involving a little-known office of
        the CDC, the ATSDR, to analyze the testing data, and explicitly sought to ensure that no
        long-term exposure considerations would be included in the health consultation by
        removing the consultation from the normal ATSDR review process so that scientists who
        had specifically recommended looking at long-term exposure effects were excluded from
        the review. FEMA did so in order to avoid negative publicity and legal liability in
        connection with the presence of formaldehyde in the housing units. See correspondence
        from U.S. House of Representatives, Committee on Science and Technology, to Michael

Chertoff, January 28, 2008 and to Dr. Howard Frumkin, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, January 28, 2008.

74.    FEMA's manipulation of the data was evidenced in the testing designed and implemented by FEMA through the ATSDR in July of 2006. The testing results of the study showed high levels of formaldehyde in nearly all of the trailers, yet the ATSDR, at FEMA's urging, did not use as its "level of concern" its own exposure limit of 0.008 ppm for 365 days or more, but arbitrarily chose a limit of 0.3 ppm as its "level of concern," a level nearly 400 times the ATSDR's annualized exposure limit. Yet even applying this "level of concern," the average sampling results still were higher. See The Serious Public Health Issues Resulting from Formaldehyde Exposures Within FEMA Travel Trailers Issued Hurricane Disaster Victims, and Recommended Action Items, Testimony of Mary C. DeVany before the Committee on Oversight and Government Reform, U.S. House of Representatives,      July      19,      2007,      at      7,      available      at http://oversight.house.gov/documents/20070719102502.pdf.

75.    Indeed, in testimony before Congress, independent industrial hygienist Mary DeVany described the FEMA testing and analysis process by stating "All I can say, in my professional opinion, is that they did this in order to minimize the actual extent of the problems in these trailers. I have no other conclusion I can draw... I think it was a complete violation of our professional code of ethics." Oral testimony of Mary C. DeVany before the House Committee on Oversight and Governmental Reform. July 19, 2007      at      107-108      of      the      full      hearing      transcript,      available      at http://oversight.house.gov/documents/20071114164004.pdf.

76.     On March 17, 2007, Dr. Mark Klein, of the ATSDR, at the direction of Dr. Frumkin, sent a letter to FEMA's counsel advising, as had Dr. DeRosa, that the February Health Consultation was "possibly misleading and a threat to public health" for failure to disclose the carcinogenic status of formaldehyde and that there are no safe exposure levels.

77.     Despite this information, FEMA and the ATSDR did not revise the original Health Consultation until October of 2007 to include the warning that the original Health Consultation "did not sufficiently discuss the health implications of formaldehyde exposure and included language that may have been unclear, leading to potentially incorrect or inappropriate conclusions."  See An Update and Revision of ATSDR's February 2007 Health Consultation: Formaldehyde Sampling of FEMA Temporary-Housing Trailers; Baton Rouge, Louisiana, September-October, 2006, available at http://www.atsdr.cdc.gov/substances/formaldehyde/public_assessment.html.

78.     The Federal Government, through FEMA, deliberately ignored and/or rejected objective, scientific standards in the design and implementation of its testing procedures, which resulted in the prolongation of the Named Plaintiffs' exposure to dangerous levels of formaldehyde in the housing units, and causing them serious injuries.

79.     It was not until December of 2007 that the Federal Government initiated testing of occupied housing units.  Apparently, FEMA requested the CDC to conduct testing of a random sample of 519 housing units in Mississippi and Louisiana between December 21, 2007 and January 23, 2008, the stated purpose of which was to assess levels of formaldehyde in indoor air occupied FEMA-supplied housing units.  See Statement of Howard Frumkin, M.D., DrPH, Director, National Center for Environmental Health/Agency for Toxic Substances and Disease Registry, Centers for Disease Control

and Prevention, U. S. Department of Health and Human Services, CDC's Response to Health Concerns Related to FEMA-Provided Travel Trailers and Mobile Homes in the Gulf Coast Region, March 4, 2008, at 1, 3-4.

80.    The CDC testing revealed the following important findings: (1) the formaldehyde levels were higher than typical levels of U.S. indoor exposure in single-family homes and apartments; (2) levels ranged from 3 parts per billion (ppb) to 590 ppb, with the average levels in all units measuring 77 ppb, the latter being higher than U. S. background levels in single-family homes and apartments; (3) the levels recorded in many of the units could affect the occupants' health; (4) the contemporary measured levels are likely to under-represent long-term exposures because formaldehyde levels tend to be higher in newer housing units and during warmer weather; (5) higher indoor temperatures were associated with higher formaldehyde levels, independent of unit make or model; and, (6) formaldehyde levels varied by type of housing unit (mobile home, park model, and travel trailer), but all types tested had elevated levels compared to the data on single-family homes and apartments. *Id.* at 4.

81.    The CDC's recommendations as a result of this testing included the following: (1) move quickly to relocate residents before the weather in the region warms up; (2) FEMA and the CDC to consider establishment of a registry to conduct long-term health monitoring of children and others who resided in FEMA- provided housing units in the Gulf Coast Region; (3) families still living in FEMA-provided housing units should spend as much time outdoors as possible and maintain the temperature inside the units at the lowest comfortable level as well as ventilate the unit; and, (4) establish available construction practices which could assure safe and healthy conditions. *Id.* at 5-6, 11.

82.    As a result of this round of testing, the Federal Government implemented a program which essentially entails removing the remaining residents from the subject housing units and placing them into other, safe, forms of housing. The Federal Government's action in this regard was the result of pressure imposed on it to act through various Congressional investigations into the Government's implementation of the "direct assistance" program under the Stafford Act, this litigation, and media coverage.

83.    The Federal Government's actions with regard to these plaintiffs in response to the early reports of formaldehyde emissions, hiding, manipulating and ignoring the extant science and scientific work and concerns of federal scientists in other agencies regarding its testing protocols and its public obfuscation of testing results, are not the kind of actions which involve decisions grounded in social, economic, or political policy. Rather, the Federal Government's actions and decisions were all made with a view toward avoiding negative publicity and legal liability.

84.    Additionally and/or in the alternative the Federal Government ignored, avoided and simply failed to adhere to and apply accepted professional and scientific standards in addressing and/or removing the health hazards posed by formaldehyde emissions in the housing units it provided.

85.    The provision of temporary housing to Named Plaintiffs created a duty on the part of the Federal Government to insure that such housing was habitable in a safe and sanitary condition. However, the housing provided is and was, at all times pertinent hereto, unsafe and presented a clear and present danger to the health and well-being of the Named Plaintiffs and their families by exposing them to elevated and hazardous levels of formaldehyde.

## COUNT I
## <u>CAUSE OF ACTION AGAINST THE FEDERAL GOVERNMENT</u>

86.  All preceding paragraphs are incorporated herein by reference.

87.  At all times herein, the Federal Government was under a duty to use due care and caution for the safety of the foreseeable users and occupants of the subject housing units, which duty extended to each and all of the Named Plaintiffs herein.

88.  The Federal Government was obligated to promptly warn each Named Plaintiff of any defects in the housing units which could cause harm and of which the Federal Government was aware.

89.  The Federal Government, after becoming aware of the potential for such harm, violated this duty to each Named Plaintiff, rendering the Federal Government negligent, grossly negligent, reckless, willful and/or wanton.

90.  As a direct and proximate result of the acts and/or omissions of the Federal Government, as well as its violation(s) of state and federal laws, each Named Plaintiff has suffered, and will continue to suffer harm and injuries, and is entitled to recover damages from the Federal Government.

91.  Further, since each Named Plaintiff is within the class and category of individuals meant to be protected by the state and federal statutory and regulatory laws which the Federal Government violated, Named Plaintiffs specifically plead the application of the doctrine of negligence per se.

92.  The Federal Government was negligent and at fault in the following non-exclusive particulars:

    a.  In failing to warn each of the Named Plaintiffs of the unreasonably dangerous nature of the housing units which Named Plaintiffs occupied.

b.     In failing to promptly remedy the dangerous nature of each such housing unit, on becoming aware of the formaldehyde dangers associated with the unit.

c.     In failing to timely implement adequate safety measures and procedures to address the defects in the housing unit of each Named Plaintiff, on becoming aware of the formaldehyde danger associated with the unit.

d.     Such other actions of negligence and fault as will be shown at the trial of this matter.

93.     As a direct and proximate result each Named Plaintiff has suffered and will continue to suffer injuries and damages, as is more fully set forth hereinafter.

**COUNT II**
**STRICT LIABILITY AND NEGLIGENCE OF**
**GULF STREAM COACH, INC.**

94.     All preceding paragraphs are incorporated herein by reference.

95.     Defendant Gulf Stream Coach, Inc. knew, or should have known, that the subject housing units were defective and unreasonably dangerous to the user or consumer or others because of the excessive formaldehyde present in the housing units, which condition was foreseeable. Notwithstanding, Gulf Stream Coach, Inc. allowed the defective and dangerous housing units to be placed into the stream of commerce and to reach Named Plaintiffs without substantial change.

96.     Defendant Gulf Stream Coach, Inc. failed to warn Named Plaintiffs of the excessive levels/emissions of formaldehyde and the hazards associated therewith. Defendant Gulf Stream Coach, Inc. owed Named Plaintiffs a non-delegable duty to warn of any dangerous and defective conditions under theories of negligence and strict liability.

97.     Defendant Gulf Stream Coach, Inc. was negligent in one or more of the following respects which proximately contributed to Named Plaintiffs' injuries:

a.   In manufacturing and distributing the subject housing units to Named Plaintiffs for use as temporary housing, which housing was defective and unreasonably dangerous for use due to the presence of excessive formaldehyde levels/emissions;

b.   In failing to properly test/inspect the subject housing units to properly evaluate the presence and/or levels of formaldehyde under foreseeable conditions for extended periods of time;

c.   In manufacturing, advertising, marketing, distributing, and selling the subject housing units to third party users when they knew or should have known that the housing units were defective and not suitable for use under foreseeable conditions;

d.   In failing to provide proper and adequate warnings, after the sales of the subject housing units, of the hazards associated with excessive levels/emissions of formaldehyde; and

e.   In failing to properly hire, train, and supervise individuals to inspect materials used in the manufacture of the subject housing units to ensure that such materials/component parts did not emit excessive levels of formaldehyde.

98.   As a result thereof, each Named Plaintiff has suffered injury and damages as is fully set forth hereinafter.

**COUNT III**
**STRICT PRODUCTS LIABILITY**
**MS CODE ANNOTATED § 11-1-63**

**PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN**

99.   All preceding paragraphs are incorporated herein by reference.

100. Gulf Stream Coach, Inc. at the time that each subject housing unit left its control, knew, or should have known, that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

101. Gulf Stream Coach, Inc. knew, or should have known, that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others; and

102. The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by each Named Plaintiff.

103. At the time the subject housing units left the control of Gulf Stream Coach, Inc. each subject housing unit did not contain properly selected prepared and installed components.

104. At all relative times, each Named Plaintiff lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

105. At all relevant times, each Named Plaintiff did not appreciate the danger of their housing unit's defective condition.

106. At all relevant times, each Named Plaintiff did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

107. Each subject housing unit in question failed to function as expected as a result of their design characteristics.

108.   An alternative design existed at the time that each housing unit left the control of Gulf Stream Coach, Inc. which would have not impaired the product's usefulness or desirability.

109.   The alternative design would have to a reasonable probability prevented the toxic exposure of each Named Plaintiff.

**PRODUCTS LIABILITY: FAILURE TO WARN**

110.   Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

**PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY**

111.   Each product (housing unit) breached an express warranty and/or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use this product.

112.   As a proximate result, each Named Plaintiff has suffered injuries and damages as is more fully set forth hereinafter.

**COUNT IV**
**NEGLIGENCE OF NO-BID CONTRACTOR DEFENDANTS**
**UNDER MISSISSIPPI LAW**

113.   All preceding paragraphs are incorporated herein by reference.

114.   At all relevant times, Bechtel National, Inc. and CH2M Hill constructors, Inc. were tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Named Plaintiffs' injuries.

115.   Bechtel National, Inc. and CH2M Hill Constructors, Inc. owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

116.  Bechtel National, Inc. and CH2M Hill Constructors, Inc. knew, or should have known, when they provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each Named Plaintiff, and that the temporary housing units would be used in the manner that each Named Plaintiff herein used the temporary housing units.

117.  Bechtel National, Inc. and CH2M Hill Constructors, Inc. breached their duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

   a.  Failing to sufficiently warn the Named Plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy; and

   b.  Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units.

118.  The actions of Bechtel National, Inc. and CH2M Hill Constructors, Inc. were the proximate cause of the increased exposure of formaldehyde to each Named Plaintiff.

119.  Bechtel National, Inc. and CH2M Hill Constructors, Inc. contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

120.  As a result thereof, each Named Plaintiff has been injured as is more fully set forth hereinafter.

## COUNT V
## STRICT PRODUCTS LIABILITY OF DEFENDANT NO-BID CONTRACTORS
## MS CODE ANNOTATED §11-1-63

121.    All preceding paragraphs are incorporated herein by reference.

122.    Defendant Bechtel National, Inc., and CH2M Hill Constructors, Inc. at the time that each
subject housing unit left its control, knew, or should have known, that each product was
defective because it deviated in a material way from the manufacturers' specifications or
from otherwise identical units manufactured to the same manufacturing specifications
and/or manufacturers' warnings.

123.    Defendant Bechtel National, Inc., and CH2M Hill Constructors, Inc. by installing the
housing units on concrete blocks for extended occupancy, knowingly and intentionally
modified the design and the actual use of the housing units.

124.    Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc. knew, or should have
known, that the defective condition rendered each subject housing unit unreasonably
dangerous to the user or consumer or others.  The defective and unreasonably dangerous
condition of each product (the failure of the subject housing units to be safely habitable
without exposure to formaldehyde) proximately caused the damages and injuries
sustained by Named Plaintiffs.

125.    At all relative times, each Named Plaintiff lacked actual or constructive knowledge of the
defective condition of their respective housing unit and that each defective product was
inconsistent with its safety.

126.    At all relevant times, each Named Plaintiff did not appreciate the danger of the housing
units' defective conditions.

33

127.   At all relevant times, each Named Plaintiff did not deliberately and voluntarily choose to expose himself or herself to this danger in such a manner to register assent to the continuance of the dangerous condition.

128.   Each subject housing unit in question failed to function as expected as a result of its design characteristics.

129.   An alternative design existed at the time that each housing unit left the control of the manufacturer which would have not impaired the product's usefulness or desirability.

130.   The alternative design would have, to a reasonable probability, prevented the toxic exposure of Named Plaintiffs.

131.   Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

132.   Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to warn the Named Plaintiffs of the inherently dangerous properties for the foreseeable conditions of the subject housing units when used for long term occupancy.

133.   Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc. failed to warn the Named Plaintiffs of the presence of excessive levels of formaldehyde present in the housing units they installed, maintained and supervised.

134.   Furthermore, Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc. breached the implied warranty of habitability due to Named Plaintiffs.  The subject housing units were installed and maintained with an expectation of habitability and a clear implied warranty that such housing would be safe and free of any toxic dangers.

135.   As a proximate result thereof, Named Plaintiffs have suffered injuries and damages as is more fully set forth hereinafter.

## COUNT VI
## BREACH OF CONTRACT BY DEFENDANT NO-BID CONTRACTORS

136. All preceding paragraphs are incorporated by reference.

137. Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc. entered into contracts with FEMA, contracting to provide the following service, among others: "The contractor will do maintenance necessary to maintain the temporary housing units in a safe, working, and liveable, condition." See Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc.'s contract with FEMA attached as Exhibit "B" at page 7.

138. Each Named Plaintiff constitutes a third party beneficiary to the subject contracts. The contracts were entered into for the Named Plaintiffs' benefit as a resident of the temporary housing units, or alternatively, the benefit to Named Plaintiffs as residents of the temporary housing units was the direct result of the performance within the contemplation of the parties to the contract as demonstrated by the terms of the contracts.

139. Defendant Bechtel National, Inc. and CH2M Hill Constructors, Inc. breached said contract by failing to maintain the Named Plaintiffs' temporary housing units in a safe, working, and liveable condition. Defendants' acts and omissions, which constitutes their failure to honor their contractual obligation, has caused damage to Named Plaintiffs for which Named Plaintiffs are entitled to recover money damages, as is more fully set forth hereinafter.

## COMPENSATORY DAMAGES

140. In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the Defendants, the United States of America through FEMA, Gulf Stream Coach, Inc., as well as, Bechtel National, Inc., and CH2M Hill Constructors, Inc. individually, and/or jointly, are responsible for all damages which each

Named Plaintiff herein has suffered and continues to suffer as a consequence of Defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

141. The minimum amounts claimed by each Named Plaintiff are designated on Exhibit "A". This amount does not include punitive damages, which are addressed hereinafter.

142. The damages sought herein by Sardie Cannan, as personal representative of the wrongful death beneficiary of her mother, Ella Johnson., deceased, were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available in wrongful death and survival actions, including loss of society and companionship, loss of support, survivor's grief, and pain and suffering endured by Decedent before her death, compensatory damages such as medical expenses, funeral and burial expenses.

## PUNITIVE/EXEMPLARY DAMAGES

143. Pursuant to Miss. Code Ann. § 11-1-65, inasmuch as the conduct of Gulf Stream Coach, Inc. and/or Bechtel National, Inc. and CH2M Hill Constructors, Inc. and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the Named Plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

144.   Punitive damages in an amount to be determined by the jury at a trial of this cause, but in no event less than Five Million Dollars (5,000.000.00).

## REQUEST FOR JURY TRIAL

145.   Each Named Plaintiff is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that Gulf Stream Coach, Inc., Bechtel National, Inc., CH2M Hill Constructors, Inc. and the Federal Government be served with a copy of this Complaint, and that, after due proceedings:

1.   There be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages and punitive damages together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the Defendants are liable for all applicable damages and thereafter;

2.   There be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a.   past and future physical injuries;

   b.   past and future mental and physical pain and suffering;

   c.   past and future physical impairments and disability;

   d.   past and future reasonable and necessary medical expenses;

   e.   past and future loss of earning capacity;

   f.   past and future loss of enjoyment and quality of life;

   g.   loss of consortium and/or society;

   h.   compensable out-of-pocket expenses related to Defendants' wrongdoing;

   i.   costs of court;

   j.   attorneys' fees;

   k.   prejudgment interest;

   l.   past and future mental anguish and emotional distress; and

     m.    punitive damages.

3.    All other general, equitable, and further relief as the Court may deem just and proper.

This the ___ day of July, 2010.

                                     Catherine Jacobs
                                     MSB# 2979

Catherine Jacobs
Attorney at Law
FEMA Trailer Litigation Annex
1161 Robinson Street
Ocean Springs, MS 39564
228-872-4642(office)
228-872-4698 (fax)
cathyftla@gmail.com

## Gulf Stream Coach, Inc. Exhibit "A"

### Installed by Bechtel National, Inc:

David Allen
4603 Seminole Avenue
Pascagoula, MS 39581
Total Compensatory Damages Claimed in the amount of $306,800.00

William Beddingfield
216 Oak Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $170,000.00

Darla Bell
2110 Canty Street
Pascagoula, MS 39563
Total Compensatory Damages Claimed in the amount of $306,800.00

Thomas Bradfield
258 Magnolia Street
Biloxi, MS  39530
Total Compensatory Damages Claimed in the amount of $290,000.00

George Britton
719 15th St. Bldg. 14401
Fort Gordon, GA 30905
Total Compensatory Damages Claimed in the amount of $2,053,500.00

Monica Brown
2010 South Street
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $255,000.00

Lucy Chambers
3819 Garges Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $306,800.00

Evera Cooks
622 Esters Boulevard
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

Genevieve Dennis
P.O. Box 2336
Bay St. Louis, MS  39531
Total Compensatory Damages Claimed in the amount of $290,000.00

Shirley A. Ducksworth
706 Georgia Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $170,000.00

Eyvonne Ellis
P.O. Box 15
Biloxi, MS  39533
Total Compensatory Damages Claimed in the amount of $435,200.00

Melvin Fairley
811 12th Street
Port Arthur, TX  77642
Total Compensatory Damages Claimed in the amount of $255,200.00

Rosa Fairley
811 12th Street
Port Arthur, TX  77642
Total Compensatory Damages Claimed in the amount of $230,000.00

Sarafina Fairley, a minor, Melvin Fairley as Representative and Father
811 12th Street
Port Arthur, TX  77642
Total Compensatory Damages Claimed in the amount of $230,000.00

Tegeron Fairley, a minor, Melvin Fairly as Representative and Father
811 12th Street
Port Arthur, TX  77642
Total Compensatory Damages Claimed in the amount of $230,000.00

Craig Farmer
504 Mimosa Lane
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $152,600.00

Lindsey Freeman
Post Office Box 2652
Bay St. Louis, MS 39521
Total Compensatory Damages Claimed in the amount of $240,000.00

Patience Harris
192 Bellman Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $210,500.00

Christopher Hawthorne
1335 19th Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $169,700.00

Jennifer Humphries
1903 34th Avenue
Gulfport, MS 39501
Total Compensatory damages Claimed in the amount of $230,000.00

Ella Johnson, deceased, Sardie Canaan, as Representative and Daughter
248 Stennis Drive, Apt. 151
Biloxi, MS 39531
Total Compensatory Damages Claimed in the amount of $1,192,600.00

Brenda Lewis
829 26 ½ Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $114,200.00

Middie Liddell
4306 Donnovan Street
Moss Point, MS 39563
Total Compensatory Damages Claimed in the amount of $290,000.00

William Major
640 Peyton Drive
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

Daniel McGlothin
258 Magnolia Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

James McGlothin
258 Magnolia Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

Linda McGlothin
258 Magnolia Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $306,800.00

Cynthia Mullins
2304 33rd Avenue, Apt. C.
Gulfport, MS  39501
Total Compensatory Damages Claimed in the amount of $290,000.00

Willie M. Potts
8185 Georgia Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $290,000.00

Robert E. Roberts
3437 Lawrence Street
Moss Point, MS 39563
Total Compensatory Damages Claimed in the amount of $242,600.00

Lolisa Ruffin
706 Georgia Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $170,000.00

Don Sebastian
400 Graveline Road
Gautier, MS 39553
Total Compensatory Damages Claimed in the amount of $370,000.00

Lucita Selman
2010 South Street
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $215,000.00

Cynthia Smith
11257 Helen Drive
Gulfport, MS 39503
Total Compensatory Damages Claimed in the amount of $290,000.00

Jo Ann Smith
26 Pass Road, #15F
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $242,600.00

Mae C. Smith
1903 34th Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $260,000.00

Estella Stringer
84725 Florida Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $290,000.00

Schquanna Tait
4200 Wisteria Drive
Moss Point, MS 39563
Total Compensatory Damages Claimed in the amount of $170,000.00

Little S. Thompson
8080 Florida Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $120,000.00

Markus Thompson
508 Ramsey Avenue
Gulfport, MS  39503
Total Compensatory Damages Claimed in the amount of $150,000.00

Verlean Tinzy
3600 19th Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $270,000.00

## Installed by CH2M Hill Constructors, Inc.

Luther Bass
7126 Turner Road
Long Beach, MS 39560
Total Compensatory Damages Claimed in the amount of $255,200.00

Bernadette Owens
250 Fayard Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $152,600.00

## Redacted Gulf Stream Coach, Inc. Exhibit "A"

### Installed by Bechtel National, Inc:

David Allen
4603 Seminole Avenue
Pascagoula, MS 39581
Total Compensatory Damages Claimed in the amount of $306,800.00

William Beddingfield
216 Oak Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $170,000.00

Darla Bell
2110 Canty Street
Pascagoula, MS 39563
Total Compensatory Damages Claimed in the amount of $306,800.00

Thomas Bradfield
258 Magnolia Street
Biloxi, MS  39530
Total Compensatory Damages Claimed in the amount of $290,000.00

George Britton
719 15th St. Bldg. 14401
Fort Gordon, GA 30905
Total Compensatory Damages Claimed in the amount of $2,053,500.00

Monica Brown
2010 South Street
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $255,000.00

Lucy Chambers
3819 Garges Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $306,800.00

Evera Cooks
622 Esters Boulevard
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

Genevieve Dennis
P.O. Box 2336
Bay St. Louis, MS 39531
Total Compensatory Damages Claimed in the amount of $290,000.00

Shirley A. Ducksworth
706 Georgia Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $170,000.00

Eyvonne Ellis
P.O. Box 15
Biloxi, MS 39533
Total Compensatory Damages Claimed in the amount of $435,200.00

Melvin Fairley
811 12th Street
Port Arthur, TX 77642
Total Compensatory Damages Claimed in the amount of $255,200.00

Rosa Fairley
811 12th Street
Port Arthur, TX 77642
Total Compensatory Damages Claimed in the amount of $230,000.00

S. Fairley, a minor, Melvin Fairley, as Representative and Father
811 12th Street
Port Arthur, TX 77642
Total Compensatory Damages Claimed in the amount of $230,000.00

T. Fairley, a minor, Melvin Fairley, as Representative and Father
811 12th Street
Port Arthur, TX 77642
Total Compensatory Damages Claimed in the amount of $230,000.00

Craig Farmer
504 Mimosa Lane
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $152,600.00

Lindsey Freeman
Post Office Box 2652
Bay St. Louis, MS 39521
Total Compensatory Damages Claimed in the amount of $240,000.00

Patience Harris
192 Bellman Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $210,500.00

Christopher Hawthorne
1335 19th Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $169,700.00

Jennifer Humphries
1903 34th Avenue
Gulfport, MS 39501
Total Compensatory damages Claimed in the amount of $230,000.00

Ella Johnson, deceased, Sardie Canaan, as Representative and Daughter
248 Stennis Drive, Apt. 151
Biloxi, MS 39531
Total Compensatory Damages Claimed in the amount of $1,192,600.00

Brenda Lewis
829 26 ½ Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $114,200.00

Middie Liddell
4306 Donnovan Street
Moss Point, MS 39563
Total Compensatory Damages Claimed in the amount of $290,000.00

William Major
640 Peyton Drive
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

Daniel McGlothin
258 Magnolia Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

James McGlothin
258 Magnolia Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $290,000.00

Linda McGlothin
258 Magnolia Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $306,800.00

Cynthia Mullins
2304 33rd Avenue, Apt. C.
Gulfport, MS  39501
Total Compensatory Damages Claimed in the amount of $290,000.00

Willie M. Potts
8185 Georgia Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $290,000.00

Robert E. Roberts
3437 Lawrence Street
Moss Point, MS 39563
Total Compensatory Damages Claimed in the amount of $242,600.00

Lolisa Ruffin
706 Georgia Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $170,000.00

Don Sebastian
400 Graveline Road
Gautier, MS 39553
Total Compensatory Damages Claimed in the amount of $370,000.00

Lucita Selman
2010 South Street
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $215,000.00

Cynthia Smith
11257 Helen Drive
Gulfport, MS 39503
Total Compensatory Damages Claimed in the amount of $290,000.00

Jo Ann Smith
26 Pass Road, #15F
Gulfport, MS 39507
Total Compensatory Damages Claimed in the amount of $242,600.00

Mae C. Smith
1903 34th Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $260,000.00

Estella Stringer
84725 Florida Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $290,000.00

Schquanna Tait
4200 Wisteria Drive
Moss Point, MS 39563
Total Compensatory Damages Claimed in the amount of $170,000.00

Little S. Thompson
8080 Florida Avenue
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $120,000.00

Markus Thompson
508 Ramsey Avenue
Gulfport, MS  39503
Total Compensatory Damages Claimed in the amount of $150,000.00

Verlean Tinzy
3600 19th Street
Gulfport, MS 39501
Total Compensatory Damages Claimed in the amount of $270,000.00

**Installed by CH2M Hill Constructors, Inc.**

Luther Bass
7126 Turner Road
Long Beach, MS 39560
Total Compensatory Damages Claimed in the amount of $255,200.00

Bernadette Owens
250 Fayard Street
Biloxi, MS 39530
Total Compensatory Damages Claimed in the amount of $152,600.00

48